## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. _____ |
| v. | ) ) | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., DAYBREAK FOODS, INC., HILLANDALE FARMS OF PA, INC., MICHAEL FOODS INC., MIDWEST POULTRY SERVICES, L.P., NATIONAL FOOD CORPORATION, NUCAL FOODS, INC., OHIO FRESH EGGS, LLC, ROSE ACRE FARMS, INC., R.W. SAUDER, INC., and SPARBOE FARMS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**Contents**

I.   Overview of Defendants' *Per Se* Unlawful Conspiracy to Control Supply and Artificially Maintain and Increase the Price of Eggs ...........................................................1

    A.   Defendants undertook a series of collective actions in furtherance of their conspiracy to control supply and artificially maintain and increase the price of eggs. ...........................................................................................................2

    B.   Defendants privately recognized that their conspiracy successfully increased prices. ....................................................................................................6

II.   Jurisdiction and Venue ........................................................................................................7

III.   Parties ...................................................................................................................................8

    A.   Plaintiffs .................................................................................................................8

        1.   Kraft Foods Global, Inc. ............................................................................8

        2.   The Kellogg Company .................................................................................9

        3.   General Mills, Inc. ......................................................................................9

        4.   Nestlé USA, Inc. .......................................................................................10

|   |   |   |   |
|---|---|---|---|
| | B. | Defendants and Co-Conspirators | 10 |
| | | 1. Defendant Egg Producers | 10 |
| | | 2. Defendant and Co-Conspirator Industry Trade Associations | 32 |
| | | 3. Producer and Other Co-Conspirators | 34 |
| IV. | Trade and Commerce | | 40 |
| | A. | Overview of Egg Production Cycle | 40 |
| | B. | The Sale and Consumption of Eggs | 42 |
| | C. | Shell Eggs and Egg Products Prices Are Correlated | 43 |
| | D. | Eggs Are a Commodity with No Substitutes and Inelastic Demand | 44 |
| | E. | Vertical Integration and Concentration Among Egg Producers | 45 |
| | F. | Interstate Commerce | 47 |
| V. | Implementing the Conspiracy | | 48 |
| | A. | In the 1990s, UEP economist Donald Bell advised that egg industry leaders needed to control supply to achieve profitable prices. | 48 |
| | B. | Beginning in at least 1999 and continuing through at least 2008, Defendants implemented their conspiracy to control supply and artificially maintain and increase the price of eggs. | 49 |
| | | 1. Defendants agreed to and did use UEP Certified Guidelines as a pretext to reduce and control the size of laying hen flocks and egg supply. | 49 |
| | | 2. Defendants agreed to and did engage in coordinated, large-scale exports to control supply and artificially maintain and increase the domestic price of eggs. | 56 |
| | | 3. Defendants agreed to and did adopt a series of short-term measures with the purpose and effect of reducing supply. | 58 |
| | C. | Defendants, through their actions in furtherance of the conspiracy, successfully increased prices. | 63 |
| | D. | UEP does not qualify as a Capper-Volstead protected cooperative and UEP's conduct falls outside the scope of the Capper-Volstead Act. | 65 |
| | | 1. UEP is not a Capper-Volstead protected cooperative because it has non-farmer members. | 65 |
| | | 2. UEP's pre-production supply control program falls outside the scope of the Capper-Volstead Act's protections. | 67 |
| | | 3. Because UEP engaged in exclusionary and discriminatory conduct, no Capper-Volstead protection applies. | 69 |
| | | 4. Capper-Volstead does not apply because UEP conspired with non-members. | 70 |

       5.       UEP is not a Capper-Volstead exempt cooperative because it does not collectively process, market, handle, ship, sell, bargain, or compete for the sale of any agricultural products. .................................... 71

VI.     Offenses Charged ................................................................................................. 71

VII.    Effects of Defendants' *Per Se* Unlawful Conduct ........................................... 73

VIII.   Fraudulent Concealment ..................................................................................... 73

IX.     Injury to Plaintiffs .............................................................................................. 78

X.      Injunctive Relief ................................................................................................. 78

XI.    Prayer for Relief ................................................................................................. 78

Plaintiffs Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA, Inc., by their undersigned attorneys, bring this action against Defendants for injunctive relief and treble damages arising out of Defendants' *per se* unlawful violations of the antitrust laws of the United States. Plaintiffs demand a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure, and allege the following.

**I.  Overview of Defendants' *Per Se* Unlawful Conspiracy to Control Supply and Artificially Maintain and Increase the Price of Eggs**

1.  "Shell eggs" are eggs sold in their hard shell, typically in cartons. "Egg products" are shell eggs that are broken and sold in liquid, frozen, or dried form. Unless otherwise noted, "eggs" refers to both "shell eggs" and "egg products."

2.  Defendants and their co-conspirators include producers of shell eggs and egg products and three interrelated trade groups—United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc. ("USEM"), and United Egg Association ("UEA").

3.  Starting in at least 1999 and continuing through at least 2008, Defendants unlawfully agreed to and did engage in a conspiracy to control supply and artificially maintain and increase the price of eggs. As direct purchasers of eggs, Plaintiffs were injured by Defendants' *per se* unlawful agreements to control supply and artificially maintain and increase the price of eggs.

4.  Historically, the eggs market has functioned in a volatile boom and bust cycle. As Defendant Cal-Maine Foods, Inc. ("Cal-Maine") stated in its August 4, 2011 Form 10-K (p. 9), "[t]he shell egg industry has traditionally been subject to periods of high profitability followed by periods of significant loss."

5.  In their non-public internal communications in furtherance of the conspiracy, Defendants recognized that, other things being equal, egg producers could profit from "boom" prices and avoid "bust" prices by controlling supply because the demand for eggs is inelastic.

1

This means that a change in the price of eggs does not materially affect the quantity of eggs that purchasers demand. As Defendant Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "[t]he non-specialty shell egg market is characterized by an inelasticity of demand." At the same time, Defendants recognized, as Defendant Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "small increases in production or decreases in demand can have a large adverse effect on prices and vice versa." Defendant Michael Foods, Inc. ("Michael Foods"), in an August 8, 2011 prospectus filed with the SEC, similarly stated that, "[i]n general, the pricing of eggs is affected by an inelasticity of supply and demand, often resulting in small changes in production or demand having a large effect on prices." Stated more concretely by Cal-Maine's Chairman Fred Adams in a July 2007 *Investor's Business Daily* article, Defendants recognized that "[o]ne or two percent on the supply side affects prices by 20% or 30%."

6. The relevant conspiracy period, starting in at least 1999 and continuing through at least 2008, coincided with egg industry consolidation and rationalization. This reduced the number of producers and concentrated the production of eggs among a handful of large producers. By way of example, in 1987 the number of companies with flocks of 75,000 hens or more was around 2,500. In 2010, however, the number of companies with 75,000 hens or more (accounting for the ownership of 95% of layer hens) had shrunk to about 205.

      **A.    Defendants undertook a series of collective actions in furtherance of their conspiracy to control supply and artificially maintain and increase the price of eggs.**

7. During the relevant conspiracy period, Defendants unlawfully agreed to and did implement their conspiracy to control supply and artificially maintain and increase the price of eggs through a series of collective actions, including short-term measures, the UEP Certified Guidelines, and coordinated, large-scale exports. These collective actions include at least the following.

2

A. In 1999 and 2000, as a short-term measure to control supply, Defendants established a supply adjustment program under which Defendants agreed to engage in an immediate 5% flock molt, a 5% reduction of flock inventory in the next 6 to 12 months, and the development of a hatch reduction program. Around the same time, USEM members voted to pursue development of a chick hatch reduction program.

B. In 2001, as a short-term measure to control supply, Defendants agreed to a 5% emergency flock reduction.

C. In 2002, as a short-term measure to control supply, Defendants agreed to an early molt and hen disposal plan.

D. By at least 2002, Defendants, using "animal welfare" as a pretext, and after having succeeded to a certain extent in controlling supply through short-term measures, adopted a program of guidelines to control the supply of eggs, the "UEP Certified Guidelines." Defendants realized that the UEP Certified Guidelines were a more reliable, long-term way to control supply and artificially maintain and increase the prices of eggs. The UEP Certified Guidelines required Defendants to increase the cage space for each laying hen (*e.g.*, from 53 square inches to 67 square inches per hen). Defendants agreed that this minimum floor space allowance would be achieved in part through a chick hatch reduction, which had the effect of limiting a producer's supply. Further, Defendants adopted this minimum floor space allowance with the understanding that hens displaced by lower density cages would not be replaced by building new facilities. The UEP Certified Guidelines had a direct and substantial impact on egg prices. Noting that 2003 had been "the best year on record for egg

3

producers," an internal March 4, 2004 UEP newsletter explained that "[t]he supply side was held in check with the implementation of the animal welfare guidelines."

E.      Throughout the conspiracy, as part of the UEP Certified Guidelines to control the supply of eggs, Defendants imposed a series of monthly and other reporting requirements as well as annual or other periodic audits to enforce the conspiratorial agreements and to provide a means to monitor for and detect cheating. As part of the UEP Certified reporting requirements, members had to submit periodic reports of all "shells eggs and or egg products [that] were sold as UEP Certified eggs" as well as shell eggs and egg products purchased from other UEP Certified companies.

F.      On October 11–12, 2002 at UEP's Annual Board Meeting (which, like virtually all UEP board and committee meetings, was open only to UEP members and invited guests), as part of the UEP Certified Guidelines to control the supply of eggs, Defendants adopted a rule that required each participant to produce all of its eggs in compliance with the Guidelines, including eggs that Defendants purchased for resale. This was referred to as the "100% Rule."  Defendants used this 100% Rule to extend the supply control requirements of the UEP Certified Guidelines to non-member producers.  At this meeting, two producers moved "[t]o reconfirm . . . that a company must commit to implementing the welfare guidelines on 100% of all production facilities regardless of how or where eggs may be marketed.  The 100% commitment is intended to be inclusive of all company entities, affiliates, etc."  The motion carried by a vote of 19 yes and 1 no.

G.      In mid-2004, as a short-term measure to control supply, Defendants agreed to an early molt and flock disposal plan.

H.      In or about October 2004, as a short-term measure to control supply, Defendants privately agreed to "establish a plan calling for hens currently scheduled for disposal between December 1, 2004 and July 1, 2005 be disposed of 4 weeks early or reduce your flock size by 5%."

I.      As part of a November 2004 Egg Industry Economic Summit, as a short-term measure to control supply, Defendants agreed to an "intentions program." Under the "intentions program," Defendants agreed to either "[1] To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled[; or 2] To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

J.      In December 2004, as part of the UEP Certified Guidelines to control the supply of eggs, Defendants privately adopted a rule that prohibited "backfilling," *i.e.*, the practice of replacing older hens that died to maintain overall flock size. Defendants adopted this backfilling ban after UEP's economics consultant concluded that backfilling "could have disastrous effects" on egg prices and, as reported in an August 12, 2004 UEP internal newsletter, the backfilling practices had caused "poor egg prices."

K.      During a January 25, 2005 UEP Board of Directors meeting in Atlanta, Georgia, as a short-term measure to control supply, the Defendants expanded the "intentions programs" and agreed that "flocks [were] to be disposed of 4 weeks

5

earlier than previously scheduled and/or flock size reduction by 5% be extended through Labor Day."

      L.      Beginning at least as early as August 2002 and continuing through at least March 2008, Defendants engaged in coordinated, large-scale exports to control the supply of eggs. In a private document, UEP acknowledged that "exports [we]re only taken in large volume shipments over a very short delivery period for the purpose of having the greatest impact upon surplus supply reduction." Defendants often exported eggs at a loss, and agreed to reimburse each other for related losses. These coordinated exports had a direct and substantial impact on domestic egg prices.

As discussed in Section VIII below, Plaintiffs only became aware of Defendants' conspiracy and agreements to control supply and artificially maintain and increase the price of eggs as a result of the September 2008 public disclosures of government antitrust investigations and Plaintiffs' December 2010 settlement with the Moark co-conspirators which, as part of the settling producers' ongoing cooperation, included access to Defendants' internal documents that disclosed their unlawful agreements and related communications which Defendants had concealed and misrepresented at all relevant times during the conspiracy.

      **B.**      **Defendants privately recognized that their conspiracy successfully increased prices.**

      8.      Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs was successful. Privately, Defendants acknowledged that egg prices had increased and attributed those increases to their collective actions taken in furtherance of the conspiracy. For example, in a June 4, 2003 internal newsletter, after noting that egg prices in May 2003 had been the "[b]est in [m]any [y]ears," UEP concluded that "[t]hese market improvements c[ould] be attributed to: 1. Reduced pullet hatch finally making an impact upon supplies. 2. USEM

exports reducing supplies at critical times.  3.  [UEP Certified] program beginning to work like many had projected."  Around two months later, in a private August 27, 2003 newsletter, UEP again acknowledged that "egg prices ha[d] risen to levels well above a year ago."  UEP then noted that one "major reason[]" for the increase was "[i]mplementing the space allowance to meet the industry's [UEP Certified] Guidelines."  In a September 11, 2003 internal newsletter that commented on 2003's high egg prices, UEP admonished producers  "Don't screw up a good thing!!"

9.    Commenting on 2003 egg prices in a November 12, 2003 internal newsletter, UEP wrote that "[c]onsumers [we]re still buying eggs and we have seen no resistance to price." Stated more concretely, a March 1, 2004 internal UEP newsletter estimated that the 2003 egg prices had been "a huge improvement in industry revenue of ONE BILLION DOLLARS (or more) !!"

10.    Likewise, in a January 3, 2008 internal newsletter, UEP included the following as part of a "partial list of the reasons for extremely good egg prices" in 2007:  "UEP's animal welfare guidelines continued to reduce the number of hens per house"; "Producers reduced their egg supply during the week between Easter and Labor Day"; "Timely exports of shell eggs by the United States Egg Marketers"; "Very limited construction of new houses or remodeled houses during 2006 and 2007"; and "Producers did far better job of managing their business to meet supply/demand.'"

## II.    Jurisdiction and Venue

11.    This Complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for injunctive relief and to recover damages that Plaintiffs have sustained because of Defendants' *per se* unlawful violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) and 28 U.S.C. § 1391(b) and (c).  A substantial part of the events or omissions giving rise to this claim occurred in this District; each Defendant is subject to personal jurisdiction in this District; Defendants transact business or are found in this District; and/or there is no district in which this action may otherwise be brought and a Defendant may be found in this District.  The interstate commerce described in this Complaint was carried out, in part, within this District.

13.     This Court has personal jurisdiction over Defendants because, among other reasons, Defendants:  (a) have transacted business throughout the United States, including this District; (b) have substantial contacts within the United States, including in this District; and/or (c) have engaged in an illegal antitrust conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Personal jurisdiction exists over all Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), the Illinois long-arm statute (735 ILCS § 5/2-209), and/or Rule 4(k)(2) of the Federal Rules of Civil Procedure.

## III.     Parties

### A.     Plaintiffs

#### 1.     Kraft Foods Global, Inc.

14.     Kraft Foods Global, Inc. is a Delaware corporation with its principal executive office at Three Lakes Drive, Northfield, Illinois.  Kraft Foods Global, Inc., including its predecessors and its separately incorporated parents, subsidiaries, and controlled affiliates (including Cadbury plc and related acquired entities), all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with Kraft Foods Global, Inc., as "Kraft Foods."  Kraft Foods is the world's second largest food company and manufactures and markets a wide variety of

branded food products, including snacks, beverages, cheese, convenient meals, and confectioneries. During the relevant period, Kraft Foods purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein. Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, the Kraft Foods parents, subsidiaries, or controlled affiliates that purchased eggs have ratified the commencement of this action by Kraft Foods on their behalf.

### 2. The Kellogg Company

15. The Kellogg Company is a Delaware corporation with its principal executive office at One Kellogg Square, Battle Creek, Michigan. The Kellogg Company, including its predecessors and divisions and its separately incorporated parents, subsidiaries, and controlled affiliates, all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with The Kellogg Company, as "Kellogg." Kellogg is the world's leading producer of cereal, as well as a leading producer of convenience foods, including cookies, crackers, toaster pastries, cereal bars, frozen waffles, and vegetarian foods. Kellogg markets more than 1,500 products in over 180 countries. Kellogg brands include *Kellogg's*, *Keebler*, *Eggo*, *Morningstar Farms*, *Townhouse*, *Kashi*, and others. During the relevant period, Kellogg purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein. Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, the Kellogg parents, subsidiaries, divisions, or controlled affiliates that purchased eggs have ratified the commencement of this action by Kellogg on their behalf.

### 3. General Mills, Inc.

16. General Mills, Inc. is a Delaware corporation with its principal executive office at Number One General Mills Boulevard, Minneapolis, Minnesota. General Mills, Inc., including its predecessors and divisions and its separately incorporated parents, subsidiaries, and controlled

affiliates, all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with General Mills, Inc., as "General Mills." General Mills is one of the largest food companies in the world, with products that range from Pillsbury refrigerated dough to Green Giant frozen vegetables, and from Cheerios cereal to Betty Crocker dessert mixes. During the relevant period, General Mills purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein. Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, the General Mills parents, subsidiaries, divisions, or controlled affiliates that purchased eggs have ratified the commencement of this action by General Mills on their behalf.

### 4. Nestlé USA, Inc.

17. Nestlé USA, Inc. is a Delaware corporation with its principal place of business in Glendale, California. Nestlé USA, Inc., including its predecessors and divisions and its separately incorporated subsidiaries and affiliates, including but not limited to Nestlé Prepared Foods Company and Nestlé Dreyer's Ice Cream Company, all of which are Plaintiffs in this action, are hereafter collectively referred to as "Nestlé USA." During the relevant period, Nestlé USA purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein. Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, the Nestlé USA subsidiaries, divisions, or affiliates that purchased eggs have ratified the commencement of this action by Nestlé USA on their behalf.

### B. Defendants and Co-Conspirators

#### 1. Defendant Egg Producers

##### a. Cal-Maine Foods, Inc.

18. Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation with its principal place of business in Jackson, Mississippi.

10

19.    Cal-Maine is the largest egg producer in the United States, with 26.8 million laying hens and 6.7 million pullets and breeders, which is more than 8% of the United States flock.  The company has completed 16 acquisitions since 1989, ranging in size from 600,000 to 7.5 million layers.  In fiscal year 2011, Cal-Maine sold approximately 821 million dozen shell eggs, approximately 18% of domestic shell egg consumption.  Its sales for fiscal year 2011 were over $941 million.  Cal-Maine markets eggs in 29 states in the Midwestern, Mid-Atlantic, Southeastern, and Southwestern United States.  Cal-Maine produces approximately 80% of the eggs it sells, and purchases the rest on the spot market or from farmers under contract.

20.    Cal-Maine is a member of UEP and USEM and was a UEP Certified producer under the UEP Certified Guidelines (certificate no. 103).  Fred Adams, Jr., the founder and former CEO of Cal-Maine, was a founding member of UEP.  Fred Adams also served as a director and past chairman of USEM.  In October 2010, Cal-Maine named Adolphus ("Dolph") Baker, Mr. Adams' son-in-law, to succeed Mr. Adams as CEO.  Dolph Baker is a past chair and, as of October 18, 2010, was a director of UEP.

21.    Cal-Maine had a 44% membership interest before and a majority membership interest after 1998 in American Egg Products ("AEP").  AEP processes shell eggs into liquid and frozen egg products for food manufacturers and the food service industry.  It offers refrigerated products and frozen products, such as egg whites and yolks, whole eggs, cook-in-bag scrambled eggs, egg whites and yolks, salted egg yolks and whole eggs, scrambled egg mixes, sugared egg yolks, whole eggs and yolks with corn syrup, whole eggs with citric acid, and whole eggs with yolk added.  AEP uses contract shell egg production for approximately 50% of its shell egg requirements and purchases the balance from regional egg markets.  Ken Looper, vice chairman of Cal-Maine, has served as CEO of AEP.

22.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Cal-Maine (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes.  Cal-Maine participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

    A.      In 1999, Dolph Baker and Ken Looper presented the argument for adopting a coordinated supply management scheme to members of UEP and USEM. At this meeting, members agreed to:  (1) an immediate molt of 5% of the flock; (2) cut back 5% on flock inventory over the next 6–12 months; and (3) develop a hatch reduction program.

    B.      Ken Looper attended a November 2001 UEP meeting where Defendants and co-conspirators agreed to a 5% emergency flock reduction.  Mr. Looper presented detailed statistics on bird numbers and pricing and asserted that the egg industry needed to reduce flock size to prevent continued low prices.

    C.      Fred Adams, Dolph Baker, Ken Looper, and Steve Storm, also from Cal-Maine, attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

    D.      Cal-Maine agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

    E.      Cal-Maine explicitly agreed to the mid-2004 early molt and flock disposal plan.

12

F.    At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Dolph Baker was elected to serve on the Executive/Export Committee for 2004.

G.    At UEP's 2004 Annual Membership Meeting, Dolph Baker and Ken Looper were elected to UEP's Board, with Mr. Baker serving as 1st Vice Chairman. In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans. Dolph Baker (UEP Marketing Committee Chair) also scheduled an "Economic Summit" in Atlanta, Georgia to further evaluate supply and demand.

H.    In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Cal-Maine signed a written commitment as part of UEP's "intentions program."

I.    Ken Looper and Fred Adams were on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions programs" was expanded.

J.    Steve Storm attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

K.    Cal-Maine was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

L.      Dolph Baker and Fred Adams attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities.  Dolph Baker also was elected to serve on the Export/Executive Committee for 2008.

M.      During the conspiracy period Cal-Maine employees have served in key executive positions and/or on committees of UEP on its behalf, including as chairman of UEP.  In 2008, Cal-Maine employees served on UEP's Executive Committee, Area #5, Finance Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, Long Range Planning Committee, and the USEM Committee.

### b.      Daybreak Foods, Inc.

23.     Defendant Daybreak Foods, Inc. ("Daybreak") is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin.

24.     Daybreak is the eighth largest egg producer in the United States, with 9.2 million laying hens, about 2.7% of the United States flock.

25.     William Rehm is the owner and president of Daybreak.  Daybreak is a member of UEP.

26.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Daybreak (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes.  Daybreak participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

14

A.    William Rehm  regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived.  In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

B.    Mr. Rehm attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

C.    At UEP's 2004 Annual Membership Meeting, Mr. Rehm was elected to UEP's Board.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

D.    In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, producers signed written commitments as part of UEP's "intentions program."

E.    William Rehm was on UEP's Board of Directors during a January 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded. Tony Rehm and Patricia Stronger, also from Daybreak, attended.

F.    Mr. Rehm served on UEP's Board of Directors from at least 2006–2009.

### c.    Hillandale Farms of Pa, Inc.

27.    Defendant Hillandale Farms of Pa., Inc. ("Hillandale PA") is a Pennsylvania corporation with its principal place of business in North Versailles, Pennsylvania.

28.    Hillandale PA was established in 1962 and is the third largest egg producer in the United States, with 14 million laying hens, more than 4% of the United States flock.  Orland Bethel owns the company and serves as President.  Gary Bethel is Secretary.

29.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Hillandale PA (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction programs.  Hillandale PA participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

      A.     Hillandale PA agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

      B.     In 2003 Gary Bethel recognized that Hillandale PA had reduced supply through the UEP Certified Guidelines.

      C.     In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Hillandale PA signed a written commitment as part of UEP's "intentions program."

      D.     During a January 25, 2005 Board of Directors meeting in Atlanta, Georgia, this "intentions program" was expanded.

      E.     As of September 30, 2008, UEP listed Hillandale PA as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 182).

### d.     Michael Foods, Inc.

30.     Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.  At all times before and during the relevant conspiracy period, the entity was named Michael Foods, Inc.  In a 2011 SEC filing, Michael Foods reported that on June 29, 2010, M-Foods Holdings, Inc., together with its subsidiaries (including Michael Foods, Inc.), merged with and into MFI Acquisition Corporation.

The shareholders of MFI Holding corporation are (a) a Goldman Sachs affiliate, GS Capital Partners VI Fund, LP and its affiliates ("GSCP") which owns approximately 75% of the corporation; (b) affiliates and co-investors of Thomas H. Lee Partners, LP ("THL") which owns approximately 21%; and (c) certain current and former members of management who own approximately 5%.

31.     Michael Foods produces and distributes egg products, cheese, other dairy case products, and potato products.  The Egg Products Division accounts for 68% of net sales, which were $1.54 billion in 2009.

32.     The Egg Products Division, composed of wholly owned subsidiaries M.G. Waldbaum Company ("Waldbaum"), Papetti's Hygrade Egg Products, Inc. ("Papetti's"), Abbotsford Farms, Inc., and MFI Food Canada Ltd., produces, processes, and distributes numerous egg products and shell eggs.  Michael Foods is the largest processed egg products producer and one of the largest egg producers in North America, with 11.2 million laying hens, more than 3% of the United States flock.

33.     Michael Foods' brands include Abbotsford Farms, All Day Café, All Whites, Better 'n Eggs, Crystal Farms, Inovatech Egg Products, M.G. Waldbaum, Papetti's, and Trilogy Egg Products.

34.     The Egg Products Division of Michael Foods distributes egg products to food processors, foodservice, and retail customers primarily in North America.  Most shell egg sales are made through the Crystal Farms Division, which markets Michael Foods' grocery products to U.S. retail grocery outlets.

35.     Michael Foods is also affiliated with Sunbest-Papetti Farms, which was a UEP member and participated in the UEP Certified Guidelines.  Michael Foods' Egg Products Division purchases eggs under a supplier agreement with Sunbest-Papetti Farms.

36.     Sunbest-Papetti Farms applied for certification and committed to the UEP Certified Guidelines in 2002 (certification no. 245).

37.     Jim Dwyer has been President and CEO of Michael Foods since October 2009.  He succeeded Gregg Ostrander, who became Executive Chairman of the company's Board of Directors.  Mr. Ostrander announced his retirement from that position in June 2010 but is now a member of the MFI Holding Corporation's board of directors following the completion of the merger.

38.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Michael Foods (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction schemes.  Michael Foods participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     Tim Bebee of Michael Foods regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived.  In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

B.     Mr. Bebee attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

C.     Toby Catherman of Michael Foods was elected chairman of UEA in 2004.  Mr. Catherman also served as chairman of the UEA-Further Processors in 2004.

18

D.      At UEP's 2004 Annual Membership Meeting, Terry Baker, Vice President of Procurement for Michael Foods, was elected to UEP's Board.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

E.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, producers signed written commitments as part of UEP's "intentions program."

F.      Terry Baker was on UEP's Board of Directors during a January 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded. Tim Bebee and Toby Catherman also attended.

G.      Tim Bebee attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

H.      Terry Baker served on UEP's Board of Directors from at least 2006–2008.

I.      Terry Baker attended an August 7, 2007 UEP Long Range Planning Committee meeting in Salt Lake City, Utah.

J.      As of September 30, 2008, UEP listed Michael Foods as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 345 and license agreement 509).

K.      At all relevant times, Michael Foods was active in UEP.  Employees of Michael Foods have served in key executive positions and on committees of UEP and UEA on behalf of Michael Foods.  In 2008, Michael Foods employees served on UEP's Area #3, Government Relations Committee, Environmental Committee,

Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, and the Long Range Planning Committee. Michael Foods employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

### e.    Midwest Poultry Services, L.P.

39.    Defendant Midwest Poultry Services, L.P. ("Midwest") is an Indiana corporation with its principal place of business in Mentone, Indiana. Midwest is the twelfth largest egg producer in the United States, with 6 million laying hens, 1.76% of the United States flock. Midwest is a member of UEP.

40.    In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Midwest (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs. Midwest participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.    Robert Krouse of Midwest regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived. In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

B.    Midwest has been a member of USEM since 2000.

C.    Robert Krouse attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

D.    Midwest agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

20

E.      At UEP's 2004 Annual Membership Meeting, Mr. Krouse was elected to UEP's Board and to serve as Treasurer.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

F.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Midwest signed a written commitment as part of UEP's "intentions program."

G.      Robert Krouse was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded.

H.      Robert Krouse attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

I.      Midwest was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

J.      As of September 30, 2008, UEP listed Midwest as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 102).

K.      Midwest representatives have served on various UEP committees, including, in 2008, UEP's Executive Committee (as first vice chairman), Finance

Committee, Shell Egg Price Discovery Committee, Environmental Committee, and the Producer Committee for Animal Welfare.

### f. National Food Corporation

41. Defendant National Food Corporation ("National Food") is a Washington corporation headquartered in Everest, Washington. National Food is the twenty-fourth largest egg producer in the United States, with 3.4 million laying hens. National Food owns and operates some of its own feed mills, pullet farms, layer farms, processing plants, and distribution centers. National Food sells table eggs and liquid and frozen egg products.

42. National Food is a member of UEP and USEM.

43. In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, National Food (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs. National Food participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A. Roger Deffner from National Food attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B. At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000. At that same meeting, Roger Deffner was elected to serve on the Executive/Export Committee for the next year.

22

C.    National Food agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

D.    At UEP's 2004 Annual Membership Meeting, Roger Deffner was elected to UEP's Board and to serve as Chairman.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.  UEP Chairman Roger Deffner also scheduled an "Economic Summit" in Atlanta, Georgia to further evaluate supply and demand.

E.    In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, National Food signed a written commitment as part of UEP's "intentions program."

F.    Roger Deffner was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded.

G.    National Food was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

H.    As of September 30, 2008, UEP listed National Food as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 184).

I.      National Food employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Roger Deffner has been an officer, board member, and chairman of the board of UEP, and has served as a member of various committees at UEP and USEM, including, in 2008, the Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (as chair), Public Relations Committee, Long Range Planning Committee, and USEM Export Committee (as secretary). Roger Deffner was elected as the Secretary of USEM and to serve on the Export/Executive Committee for 2008.  In these positions, Deffner actively participated in and promoted Defendants' conspiracy.

J.      In 2008, National Food employees served on UEP's Area #2, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (chair), Public Relations Committee, Long Range Planning Committee, United States Egg Marketers Export Committee (secretary).

### g.      NuCal Foods, Inc.

44.      Defendant NuCal Foods, Inc. ("NuCal") is a California corporation with its principal place of business in Ripon, California.  NuCal is a federated agricultural cooperative composed of two agricultural cooperatives:  Cal Eggs and Nulaid Foods, Inc., ("Nulaid").  Cal Eggs is composed of two shell egg producers, J.S. West Milling Co., Inc. and Sunrise Farms, LLC. Nulaid is composed of two shell egg producers, Gemperle Enterprises, Inc. and Valley Fresh Foods, Inc.  Combined, those four producers account for more than 10.5 million laying hens, or more than 3% of the United States flock.  NuCal is one of the largest distributors of shell eggs in the Western United States.  NuCal is a member of UEP and USEM.

45.      In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, NuCal (1) agreed to adopt the UEP Certified Guidelines, as has

24

each co-operative member; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs. NuCal participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

      A.      Chuck Elste, Ernie Gemperle, Mark Oldenkamp, and Gary West of NuCal attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

      B.      NuCal agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

      C.      At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000. At that same meeting, Chuck Elste was elected to serve on the Executive/Export Committee for the next year.

      D.      At UEP's 2004 Annual Membership Meeting, Steven Gemperle and Mark Oldenkamp were elected to UEP's Board. In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

      E.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, NuCal signed a written commitment as part of UEP's "intentions program."

      F.      Steve Gemperle and Mark Oldenkamp were on UEP's Board of Directors during a January 2005 Board meeting in Atlanta, Georgia when this "intentions

program" was expanded. Chuck Elste, Tom Silva, Jill Benson, and Wayne Winslow

from NuCal were present.

G.      Mark Oldenkamp attended an April 19, 2005 UEP Producer Committee

for Animal Welfare meeting in Chicago where the group discussed the marketing of

UEP Certified eggs by non-certified producers. Mark Oldenkamp sponsored two

motions which passed. One motion stated, "In order to protect the integrity of the

[UEP Certified] program and logo and in view of the difficulty in preventing the

commingling of certified eggs with non-certified eggs and to treat all egg producers

equally it is hereby moved that no new licenses to market [UEP] Certified eggs will

be issued or renewed to producers who are not ACC certified." The motion carried

with vote of 19 yes and 8 no. The second motion sponsored by Oldenkamp stated

that "a license to market [UEP Certified] eggs may be issued to shell egg processors

and further egg processors who do not own or operate egg production facilities." The

motion carried with a vote of 26 yes and 2 no.

H.      NuCal, Gemperle Enterprises, and J.S. West Milling were USEM

members when, on October 20, 2006, USEM members voted to approve an export of

20 container loads of eggs at what a November 17, 2006 UEP internal newsletter

referred to as a "heavy cost" to members.

I.      Chuck Elste and Gary West attended an October 18, 2007 USEM meeting

in Chicago where the group discussed offers for 2008 and other export opportunities.

Elste was also elected as the Vice Chairman of USEM and to serve on the

Export/Executive Committee for 2008.

J.      As of September 30, 2008, UEP listed NuCal as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 504).

K.      In 2008, NuCal representatives served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, and Quality Assurance Food Safety Committee, and on USEM's Export Committee.

### h.      Ohio Fresh Eggs, LLC

46.     Defendant Ohio Fresh Eggs, LLC, ("Ohio Fresh") is incorporated under the laws of Ohio with its principal place of business in Croton, Ohio.  It is the tenth largest egg producer in the United States, with 7.6 million laying hens, more than 2% of the United States flock. Hillandale PA purchases Ohio Fresh's entire output of shell eggs.  Hillandale Farms, LLC, holds a 70% membership interest in Ohio Fresh, and Orland Bethel is the sole member of Hillandale Farms, LLC.

47.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Ohio Fresh (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction programs.  Ohio Fresh committed acts in furtherance of the conspiracy including, but not limited to, the following.

A.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Ohio Fresh signed a written commitment as part of UEP's "intentions program."

B.      UEP's Board of Directors, during a January 25, 2005 Board meeting in Atlanta, Georgia, expanded this "intentions program."

27

C.      As of September 30, 2008, UEP listed Ohio Fresh as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 328).

### i.      Rose Acre Farms, Inc.

48.    Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation with its principal place of business in Seymour, Indiana.  Rose Acre is the second largest egg producer in the United States, with 20 million laying hens, nearly 6% of the United States flock.  The company produces shell eggs as well as liquid, frozen, and dried egg products.

49.    The Rust family founded the company in the 1930s as Rose Acre Brand Eggs, and the company is still privately held by the Rusts.  Lois M. Rust is the President of the company.  In 2009, Rose Acre acquired Crystal Farms, a shell egg producer based in Georgia with approximately 2.5 million laying hens.

50.    Rose Acre is fully vertically integrated:  the company breeds its own stock, runs its own hatchery and feed mills, operates its own egg-breaking and egg-drying facilities for liquid and powdered egg products, and does its own packing.

51.    Throughout the relevant period, Rose Acre was a UEP member.

52.    In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Rose Acre (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs.  Rose Acre participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.      Rose Acre agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

B.      At UEP's 2004 Annual Membership Meeting, Marcus Rust, an Executive Vice President from Rose Acre, was elected to UEP's Board.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

C.      Greg Hinton of Rose Acre was elected Vice-Chairman of UEA in 2005.

D.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, producers signed written commitments as part of UEP's "intentions program."

E.      Marcus Rust was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded. Greg Hinton and K.Y. Hendrix from Rose Acre also attended.

F.      Ky Hendrix attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

G.      On October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.  Rose Acre then became a USEM member for a January 2007 export of 300 container loads of eggs.

H.      Marcus Rust attended an October 18, 2007 USEM meeting in Chicago where the group announced officers for 2008 and discussed export opportunities.

I. As of September 30, 2008, UEP listed Rose Acre as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 198).

J. Rose Acre officers served on UEP's Board of Directors from at least 2006–2008 and 2010. Marcus Rust served on the USEM Executive Committee from at least 2008–2009.

K. In 2008, Rose Acre employees served on UEP's Area #3, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee. Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

### j. R.W. Sauder, Inc.

53. Defendant R.W. Sauder, Inc., ("R.W. Sauder") is a Pennsylvania corporation with its principal place of business in Lititz, Pennsylvania. R.W. Sauder is the twenty-ninth largest egg producer in the United States, with 2.3 million laying hens. R.W. Sauder sells table eggs and flavored egg products for retail and wholesale. R.W. Sauder has its own processing and marketing operations. R.W. Sauder is a UEP member.

54. In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase egg prices, R.W. Sauder (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes. R.W. Sauder participated in many meetings and communications and

30

committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.      Paul Sauder of R.W. Sauder attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B.      R.W. Sauder agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

C.      Paul Sauder attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

D.      On October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members. R.W. Sauder then became a USEM member for a January 2007 export of 300 container loads of eggs.

E.      R.W. Sauder employees have served on UEP's Shell Egg Price Discovery Committee, Producer Committee for Animal Welfare, and Public Relations Committee. As of September 30, 2008, UEP listed R.W. Sauder as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 121).

### k.      Sparboe Farms, Inc.

55.      Defendant Sparboe Farms, Inc. ("Sparboe Farms") is a Minnesota corporation with its principal place of business in Litchfield, Minnesota. Sparboe Farms is the fifth largest shell egg producer and marketer in the United States with 12 million laying hens.

56.      During the relevant period, Sparboe Farms was a UEP member.

57.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Sparboe Farms (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export; (3) participated in short-term supply reduction programs.  Sparboe participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

    A.      Garth Sparboe from Sparboe Farms regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived.  In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

    B.      Bob Sparboe was listed as a USEM member on the minutes for USEM's Annual Meeting on October 22, 2004 in New Orleans.

    C.      Sparboe Farms' employees have served in executive positions and/or on committees on behalf of UEP.

    **2.      Defendant and Co-Conspirator Industry Trade Associations**

    **a.      United Egg Producers, Inc.**

58.     Defendant United Egg Producers, Inc. ("UEP") is organized as a nonprofit corporation under the laws of the state of Georgia.  UEP was formed in 1968 when five regional cooperatives combined.

59.     As of August 2008, UEP had 205 members, representing approximately 270 million hens, or 97% of the United States flock.  Gene Gregory is the President and CEO of UEP.  Al Pope was the President of UEP before his retirement in 2007.  The organization's headquarters are in Alpharetta, Georgia.

60.     UEP administers the UEP Certified Guidelines, which are described more fully throughout this Complaint.

### b.  United States Egg Marketers, Inc.

61.     Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized under the laws of the state of Georgia.  During all or most of the relevant period, UEP managed USEM.  USEM shares a mailing address in Alpharetta, Georgia, and a web site with UEP.  Gene Gregory, the President and CEO of UEP, has used the title "President of USEM."

62.     USEM represents that it is a producer cooperative established specifically for the purpose of exporting large quantities of United States shell eggs.  In 2004, USEM's website stated that it "[was]s primarily in the business to respond to export inquiries which are too large for individual egg producers," and "d[id] not actively export or look for export but attempts to put together large volumes when the opportunity is available."  At the time, USEM members represented approximately 40% of the nation's egg production.  As of October 8, 2003, USEM included 68 companies with ownership of 109 million layers as members.

63.     USEM organized and negotiated large-scale, coordinated exports that impacted domestic supply and that maintained, stabilized, and increased egg prices.  These exports are described more fully throughout the Complaint.

### c.  United Egg Association

64.     Co-conspirator United Egg Association ("UEA") is a nonprofit corporation organized under the laws of the District of Columbia.  UEP manages UEA.  UEA shares a mailing address in Alpharetta, Georgia, and a website with UEP, and the two organizations have held their annual membership meetings jointly.  Gene Gregory, the President and CEO of UEP, has used the title "President of UEA."  Chad Gregory, Gene Gregory's son and the Senior Vice President of UEP, has used the title "Vice President of UEA."  UEA and UEP often coordinate activities.  For example, in 2004, UEP informed its members that UEA scheduled a meeting for UEA members during the UEP Annual Board Meeting and Executive Conference in New Orleans.

33

65.     UEA has three divisions:  UEA Further Processors, UEA Allied, and UEA Producers and Packers.  UEA Further Processors was established in 1983 to represent companies engaged in breaking and further egg processing.  The division has approximately 20 members, who break and process about 80% of all United States eggs broken, and customers include bakeries, food service establishments and food manufacturers.  UEA Allied was organized in January 1995 as a trade association representing companies or individuals who are engaged in providing products, services, consulting, and/or information services to the egg industry, but who do not produce eggs or engage in the processing of eggs into egg products.  UEA Producers and Packers was organized in September 1995 as a trade association to represent companies or individuals who pack (and/or produce) eggs.

### 3.     Producer and Other Co-Conspirators

#### a.     Moark LLC and Norco Ranch, Inc.

66.     Co-conspirator Moark LLC ("Moark") is a Missouri limited liability company, with its offices and principal place of business located in Norco, California.

67.     Co-conspirator Norco Ranch, Inc. ("Norco") is a California corporation with its principal place of business in Norco, California.  It is a subsidiary of Moark.  During all relevant times, Norco was an active participant in the conspiracy as alleged herein.

68.     Moark Productions began in 1957.  In 2000, Moark Productions and Land O'Lakes formed a joint venture, Moark—a national, consolidated egg company.  The companies jointly operated this joint venture from 2000 until Land O'Lakes acquired 100% of the ownership of Moark in 2006.  During the time period of this joint venture, Moark was an active participant in the conspiracy as alleged herein.

34

69.     Co-conspirator Moark participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

      A.     Joe Fortin and Paul Osborne of Moark attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

      B.     Moark agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

      C.     At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Joe Fortin was elected to serve on the Executive/Export Committee for the next year.

      D.     Moark explicitly agreed to the mid-2004 early molt and flock disposal plan.

      E.     At UEP's 2004 Annual Membership Meeting, Joe Fortin was electedto UEP's Board and to serve as its Secretary.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

      F.     Dan Meagher of Moark was elected vice chairman of UEA in 2004 and 2005.

G.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Moark signed a written commitment as part of UEP's "intentions program."

H.      Joe Fortin, Dave Cisneros, Jerry Kil, Dan Knutson, Dan Meagher, and Paul Osborne from Moark attended a January 25, 2005 Board of Directors meeting in Atlanta, Georgia when this "intentions programs" was expanded.

I.      Joe Fortin attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

J.      Moark was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

K.      Jerry Kil attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities. Mr. Kil was also elected to serve on the Export/Executive Committee for 2008.

L.      As of September 30, 2008, UEP listed Moark as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 116).

M.      Moark was a member of UEP and UEA and its employees served in key executive positions and/or on committees of these organizations on behalf of Moark. In 2008, Moark employees served on UEP's Executive Committee (secretary), Area #1, Area #4, Finance Committee, Government Relations Committee, Shell Egg Price

Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, and Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, and the United States Egg Marketers Export Committee. Moark employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Moark has participated in and benefitted from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

N.      Moark was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

70.     Co-conspirator Norco participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.      Norco agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

B.      Norco explicitly agreed to the mid-2004 early molt and flock disposal plan.

C.      Norco was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

37

D.      As of September 30, 2008, UEP listed Norco as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 133).

E.      Norco was a member of UEP and its employees served in key executive positions and/or on committees of the organization on behalf of Norco.  In 2008, Norco employees served on UEP's Government Relations Committee.  Norco employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

F.      Norco was a member of USEM and/or participated in USEM-sponsored, coordinated egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### b.      Hillandale Farms, Inc; Hillandale-Gettysburg; Hillandale Farms East

71.      Co-conspirator Hillandale Farms, Inc., is incorporated in Ohio with its principal place of business in Corry, Pennsylvania.  It was established in 1961.  Orland Bethel owns Hillandale Farms.  Gary Bethel is both President and Secretary.

72.       Co-conspirator Hillandale-Gettysburg, L.P., is organized under the laws of the state of Pennsylvania and headquartered in Gettysburg, Pennsylvania.  It was established in 1998.  Orland Bethel owns part of Hillandale-Gettysburg, L.P.  Donald Hershey is a limited partner.

73.      Co-conspirator Hillandale Farms East, Inc. ("Hillandale East") is incorporated in Pennsylvania with its principal place of business in Spring Grove, Pennsylvania.  It was established in 1977.  It is owned in part by Gary Bethel and in part by Donald Hershey.  Gary Bethel is president of the corporation and Orland Bethel is secretary and treasurer.

74.     Co-conspirators Hillandale Farms, Inc., Hillandale-Gettysburg LP, and Hillandale Farms East, Inc. are collectively referred to as "Hillandale Farms."

75.     One or more of the Hillandale Farms entities was a member UEP during the relevant time period.  In 2008, Ron Ballew and James Minkin, acting on Hillandale-Gettysburg's behalf, served on UEP's Shell Egg Marketing Committee and Environmental Committee.

76.     Up until 2008, Hillandale, LLC had a 27.5% membership interest in AEP.  AEP processes shell eggs into liquid and frozen egg products for food manufacturers and the food service industry.  It offers refrigerated products and frozen products, such as egg whites and yolks, whole eggs, cook-in-bag scrambled eggs, egg whites and yolks, salted egg yolks and whole eggs, scrambled egg mixes, sugared egg yolks, whole eggs and yolks with corn syrup, whole eggs with citric acid, and whole eggs with yolk added.  AEP uses contract shell egg production for approximately 50% of its shell egg requirements and purchases the balance from regional egg markets.

77.     As of September 30, 2008, UEP listed one or more of the Hillandale Farms entities as a Certified Company and Licensed Marketer that had signed on to the UEP Certified scheme (certification no. 200).

### c.     Wabash Valley Produce Inc.

78.     Co-conspirator Wabash Valley Produce Inc. ("Wabash Valley") is an Indiana corporation with its principal place of business in Dubois, Indiana.  As of April 1, 2010, Bradley Seger was the President of Wabash Valley.

79.     Wabash Valley participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

        A.     At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since

UEP took over management of USEM in late 2000. At that same meeting, Larry Seger of Wabash Valley, was elected to serve on the Executive/Export Committee for the next year.

B.      At the October 13, 2006 USEM meeting in San Antonio, Larry Seger of was elected as Chairman of USEM and also to serve on the USEM Executive/Export Committee.

C.      Scott Seger of Wabash Valley attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities. Larry Seger was also elected as the Chairman of USEM and to serve on the Export/Executive Committee for 2008.

### d.      Other Co-Conspirators

80.     Various other persons, entities, companies and corporations not named as Defendants in this Complaint, including some whose identities are presently unknown, participated with Defendants in the antitrust conspiracy alleged herein, and made statements and performed acts in furtherance of the overall conspiracy to control and manipulate supply and fix prices for eggs and egg products. These co-conspirators include, without limitation, Gene Gregory, Al Pope, Dolph Baker, Gary West, Ken Looper and others.

## IV.    Trade and Commerce

### A.      Overview of Egg Production Cycle

81.     At the beginning of the egg production cycle, once chicks are hatched (either by vertically integrated egg producers or by specialty hatcheries) and vaccinated, they are placed in layer pens or in pullet houses. Producers control the total hours of light and darkness that pullets receive to allow for skeletal growth before egg production begins.

82.     A flock begins producing eggs at 18 to 22 weeks of age.  At this stage, approximately 10% to 20% of the hens are producing eggs.  A flock's production then increases up to its peak—about 90% production—at 30 to 32 weeks of age.  Production then generally decreases, and by the time the hens reach 60 to 70 weeks of age, the flock's production will drop to around 50%.

83.     When a flock's production has declined to around 50%, the producer may decide to molt the flock.  Molting is a natural process for hens that usually occurs when the days become shorter during the fall.  Hens will substantially reduce their feed intake, stop laying eggs, and replace their feathers.

84.     A producer can artificially induce the molting process by withdrawing or limiting food and controlling light exposure.  Molting is a way for a producer to control the supply of eggs.   All else being equal, a producer is less likely to induce molting when egg prices are high and more likely to induce molting when egg prices are low.

85.     To achieve optimal results from a molt, hens must completely stop laying eggs for 14 to 17 days.  Approximately 10 weeks after a producer has induced molting, the flock will increase back up to 50% production.  Production following a molt will then peak at around 80%.  This peak is short-lived, and the flock generally returns to 50% production at 100 to 110 weeks of age.

86.     Once the flock has declined to around 50% production after a molting, the producer will decide whether to molt the hens again or to send them to a spent-hen processing facility.  Whether a producer will induce a second molting commonly depends on current egg prices and the availability of replacement pullets.  A producer ends production for a majority of hens between 100 and 130 weeks.

**B.      The Sale and Consumption of Eggs**

87.      According to the United States Department of Agriculture, as of April 2009, egg producers in the United States produced more than 90 billion eggs annually.  A large majority of these 90 billion eggs are consumed domestically, with over three quarters used for human consumption.

88.      The shell eggs sector includes:  table eggs, sold for immediate consumption in the home or in restaurants, or as ingredients in baked goods and other food items; breaking eggs, sold for use in processed egg products; and hatching eggs, used to produce breeder stock or growing stock, for eggs or meat.

89.      Shell eggs, often referred to as breaking eggs, also are processed further into egg products.  Automated systems crack the shells and separate yolks from whites.  Egg products can be sold in liquid, frozen, or dried form.  Egg products sold in liquid form are pasteurized and packed.  Egg products sold in frozen form are pasteurized and then typically frozen in large containers.  Egg products sold in dried form are usually produced by spray drying.

90.      Approximately 30% of eggs produced in the United States are breaking eggs that are used for egg products.  Egg products are used as ingredients in processed food items, such as baked goods, confectionery, mayonnaise, pasta, and salad dressings.

91.      In 2009, 1.2 billion pounds of egg products (43%) were sold to food processors, 1.4 billion pounds (51%) to foodservice customers and 0.2 billion pounds (6%) to retailers.  The American Egg Board reports that the primary applications for egg products (based on 2009 volume) include bakery (400 million pounds), mayonnaise (275 million pounds), dairy (200 million pounds) and pasta (125 million pounds).

92.      Within the segment of eggs used for human consumption, the shell egg and egg products sectors are both very substantial.  According to a 2004 forecast prepared by co-

conspirator Moark, egg industry revenue was projected to exceed $6 billion, with roughly $2 billion derived from processed egg products. For 2008, the United States Department of Agriculture estimated the farm value of domestic egg production for human consumption at $6.2 billion.

93.     Shell eggs include both generic and specialty eggs, with specialty eggs including organic, all-natural, cage-free, vegetarian, and omega-3 varieties.

94.     It is estimated that 90% of all shell eggs sold in the United States in the retail and foodservice channels are sold at prices related to the Urner Barry wholesale quotations for eggs, which are based largely on information provided by Defendants. The trend among some large buyers of shell eggs and egg products in recent years is to purchase based on a cost-based formula tied to poultry feed (primarily corn and soybean meal) costs.

### C.     Shell Eggs and Egg Products Prices Are Correlated

95.     Supply and demand factors affect shell eggs and egg products in very similar ways. Shell eggs are the key input for egg products, and feed costs are a primary cost component for both. Both shell eggs and breaking eggs originate from laying hens.

96.     Prices for shell eggs and egg products are correlated. Most leading producers produce and sell both shell eggs and egg products. Reduction or control of eggs supply artificially increased prices for both shell eggs and egg products. Defendants and their co-conspirators were aware of this relationship and agreed to control egg supply to artificially maintain and increase prices for shell eggs and for egg products. By way of example, Defendants agreed to apply the UEP Certified Guidelines' 100% Rule to both shell eggs and egg products. Indeed, in early 2003 Defendants considered but rejected a proposal to limit the application of the 100% Rule to shell eggs.

43

### D.      Eggs Are a Commodity with No Substitutes and Inelastic Demand

97.      Shell eggs and processed eggs are commodity products.  In most instances, eggs are homogenous and fungible products that are readily substitutable, with no qualitative or other factors that differentiate one producer's eggs from those of any other producer.  There also is little if any advertising or promotion to create any brand or other product identity.

98.      Historically, according to Defendant Cal-Maine's August 4, 2011 Form 10-K (p. 4)

> demand for shell eggs increases in line with overall population
> growth, averaging an increase of about 1% per year.  According to
> U.S. Department of Agriculture . . . reports, since 2000, annual per
> capita consumption in the United States has varied between 247
> and 258 eggs.  In calendar year 2010, per capita consumption in
> the United States was estimated to be 247 eggs, or approximately
> five eggs per person per week.

99.      There are no effective substitutes for eggs.  According to research conducted by the American Egg Board, "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single egg alternative."

100.      Demand for eggs generally is inelastic—*i.e.*, demand generally remains stable (or increases) when prices increase.  The inelasticity of demand for eggs is widely acknowledged by industry insiders.  UEP president Gene Gregory told *Egg Industry* magazine in February 2007, "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same."

101.      Defendants consistently acknowledged that a very small change in actual (or perceived) supply of eggs can cause a disproportionately large change in egg prices.  For example, an April 14, 2005 internal UEP newsletter, stated that "a small percentage change in supply can have . . . a major impact upon price."  As reported in a September 23, 2008 *Wall Street Journal* article, UEP's executive director Gene Gregory said that "it [wa]s amazing how one or two percent c[ould] have an effect on the rest of your domestic price."  An executive of Defendant Cal-Maine stated in a July 11, 2007 *Investor's Business Daily* article that "[o]ne or

two percent on the supply side affects prices by 20% or 30%."  In its August 4, 2011 Form 10-K

(p. 6), Defendant Cal-Maine acknowledged that "small increases in production or decreases in

demand can have a large adverse effect on prices and vice-versa."

102.     Prior to the conspiracy, as stated in a March 23, 2008 *Chicago Tribune* article,

historically the market for eggs had been volatile—when prices were high, "the egg industry's

normal response . . . [wa]s to feverishly add capacity until prices drop[ped] like a rock."

Defendant Cal-Maine acknowledged this volatility, noting in its August 4, 2011 Form 10-K (p.

9) that "[t]he shell egg industry has traditionally been subject to periods of high profitability

followed by periods of significant loss."  As further described by Cal-Maine, producers typically

have varied supply based on prices:  "In the past, during periods of high profitability, shell egg

producers have tended to increase the number of layers in production with a resulting increase in

the supply of shell eggs, which generally has caused a drop in shell egg prices until supply and

demand return to balance."

### E.     Vertical Integration and Concentration Among Egg Producers

103.     All major egg producers in the United States are vertically integrated, either through

contracts or ownership.  This includes both backward integration in the feed, chick hatching, and

pullet growing sectors, and forward integration in the egg processing and marketing stages.

Most large egg processors in the United States either own egg production facilities or have

production contracts with local egg producers.  Generally, integrated producers hatch all or most

of their layer stock.

104.     The adoption of the UEP Certified Guidelines and other measures to control supply

coincided with egg industry consolidation and rationalization, which reduced the number of

producers and concentrated the production of eggs among a handful of large producers.

105.     The American Egg Board estimated in 2010 that there were about 205 companies (accounting for 95% of the layer hens in the united States) with flocks of 75,000 hens or more. That number, which is down from 2,500 in 1987, reflects a clear and accelerating trend of horizontal consolidation (and vertical integration) in the industry.  This consolidation is further demonstrated by the increasing percentage of total layers that large producers own.  In 1985, 61 producers with one million or more layers owned 56% of the 248 million total United States layers.  In 1990, 56 producers with one million or more layers owned 64% of the 232 million total United States layers.  In 2009, 56 producers with one million or more layers owned 90% of the 253 million total United States layers.

106.     As of 2010, the ten largest producers owned approximately 49% of the total industry layers.  The top 20 egg producers owned approximately 55% of laying hens:

| TOP 20 PRODUCERS | LAYERS IN PRODUCTION | PERCENT OF LAYERS IN US |
|---|---:|---:|
| Cal-Maine | 28,000,000 | 8.24% |
| Rose Acre | 20,000,000 | 5.88% |
| Hillandale PA | 14,000,000 | 4.12% |
| Rembrandt Enterprises | 14,000,000 | 4.12% |
| Sparboe Summit Farms | 12,000,000 | 3.53% |
| Moark | 11,300,000 | 3.32% |
| Michael Foods | 11,200,000 | 3.29% |
| Daybreak Foods | 9,200,000 | 2.71% |
| DeCoster Egg Farms | 9,000,000 | 2.65% |
| Ohio Fresh | 7,600,000 | 2.24% |
| Weaver Brothers | 6,800,000 | 2.00% |
| Midwest | 6,000,000 | 1.76% |
| Center Fresh Egg Group | 5,700,000 | 1.68% |
| Fremont Farms of IA | 5,400,000 | 1.59% |
| Herbruck's Poultry Ranch | 5,320,000 | 1.56% |
| Fort Recovery Equity | 5,000,000 | 1.47% |
| Hickman's Egg Ranch | 4,300,000 | 1.26% |
| ISE America | 4,300,000 | 1.26% |
| Sunrise Farms Inc IA | 4,000,000 | 1.18% |
| Kreider Poultry Farms | 4,000,000 | 1.18% |
| **Total** | **187,120,000** | **55.04%** |

107.    As early as 1998, the top four producers of breaking eggs accounted for 76% of production.  Although historically the shell egg sector could sell surplus production into the egg products sector, around 2004, the egg-breaking sector became less dependent on the shell egg sector and it became more difficult for the shell egg sector to shift its excess supply to the egg-breaking sector.  The egg-breaking sector also increasingly moved to in-line production, following the shell egg model.  For example, in 2000, 25% of total breaking eggs were broken at in-line breaking facilities.  By 2004, the percentage of eggs broken at in-line facilities increased to 39%.

108.    For 2005, the USDA reported that 67.7 million cases (at 30 dozen eggs per case) were broken.  Vertically integrated in-line production/breaking farm facilities accounted for 41.4% of the total.  The number of eggs broken at in-line facilities increased by 2,866,020 cases, while the number of eggs broken at off-line facilities only increased by 482,549 cases.

**F.    Interstate Commerce**

109.    Defendants' conspiracy directly affected supply and prices of eggs in the United States.  The anticompetitive purpose and effect of Defendants' unlawful combination and conspiracy were to control supply and artificially maintain and increase the prices that Plaintiffs and others paid for eggs.

110.    Defendants' illegal conduct was intended to have, and did have, a direct, substantial, and reasonably foreseeable effect upon interstate commerce in the United States.  In particular, as the result of their unlawful combination and conspiracy, Defendants reduced supply and artificially inflated prices that Plaintiffs and others paid for eggs that were produced and sold in interstate commerce.

111.    Defendants and their co-conspirators sold and shipped eggs to states other than the states where the eggs were produced.

112.    Defendants and their co-conspirators have purchased and used substantial quantities of raw materials, equipment, and supplies in connection with the production and sale of egg products, and those materials were transported and moved in a continuous and uninterrupted flow of interstate commerce from the points of origin to the points where they were used or consumed.

113.    Defendants and their co-conspirators exchanged information, correspondence, and financial material between states.

114.    Plaintiffs and other customers have paid Defendants for eggs with checks, wire transfers, and/or other financial instruments that were negotiated, communicated, and/or transported in interstate commerce.

115.    Defendants' conspiracy had a direct and substantial effect on interstate commerce.

## V.    Implementing the Conspiracy

### A.    In the 1990s, UEP economist Donald Bell advised that egg industry leaders needed to control supply to achieve profitable prices.

116.    In the mid-to-late 1990s, the egg industry suffered from low prices and low profits. UEP members, in response, sought to find ways to increase egg prices.

117.    In his April 15, 1994 Egg Economics Update ("When More Means Less"), UEP economist Donald Bell advised that "[t]he U.S. has no way to control its flock size other than through the persuasive influence of trade associations such as UEP" and that "[r]emember—in the egg industry, 'more means less'—it always has and it will always be so." More succinctly, Bell advised: "More hens, less income!"

118.    In July 1999, Bell further advised that egg producers needed to "cut back to a more reasonable flock size if [unprofitable] prices [we]re going to be avoided." Bell recommended that producers should achieve a more reasonable flock size by: (1) "[a]dherence to a sensible industry-wide growth policy"; (2) "[e]arly removal of flocks before their normal sale with resulting empty cages in the interim"; (3) "[a] 2–3% reduction in chick hatch—but this would

result in a very slow correction"; and (4) "[a]n industry-wide policy of a minimum floor space

allowance would result in a more ideal national flock size[, through which] millions of extra

birds would be eliminated."  As part of this overall profit improvement plan, Bell also expressly

advised producers that "[m]utual restraint [wa]s necessary to accomplish the target numbers

associated with reasonable egg prices."

119.    In late 1999, Defendants and their co-conspirators met to consider Bell's proposals

and how they could control egg supply.  At about this same time, UEP's Marketing Committee

recognized that low prices were causing a crisis in the egg industry.

        **B.**      **Beginning in at least 1999 and continuing through at least 2008, Defendants implemented their conspiracy to control supply and artificially maintain and increase the price of eggs.**

120.    Beginning in at least 1999 and continuing at least through 2008, Defendants agreed to

control supply and artificially maintain and increase the price of eggs, and in furtherance of this

conspiracy, agreed to and did (1) use UEP Certified Guidelines as a pretext to reduce and control

chick hatch and the size of laying hen flocks and egg supply; (2) engage in coordinated, large-

scale exports to reduce supply and maintain and increase prices; (3) adopt a series of short-term

measures with the purpose and effect to reduce supply.

        **1.**      **Defendants agreed to and did use UEP Certified Guidelines as a pretext to reduce and control the size of laying hen flocks and egg supply.**

121.    In 2000, UEP first issued its UEP Certified Guidelines to control the egg production

process.  As a concerted and successful effort to control supply and artificially maintain and

increase the price of eggs, the UEP Certified Guidelines were a significant departure from the

historical boom or bust cycle in the egg industry.

122.    UEP publicly represented that it developed a program for the production of eggs

based on recommendations from a Scientific Advisory Committee on animal welfare that it had

convened.  In fact, however, at or about the same time that the Guidelines were first adopted, participants at UEP meetings privately discussed that the actual purpose of the UEP Certified Guidelines was to control supply.  Defendant Sparboe Farms correctly noted that the UEP was "playing games" when it failed to "call[] the program what it [wa]s—a voluntary cutback of animal numbers."

123.    In a July 16, 2004 internal UEP newsletter, Gene Gregory wrote that, following the adoption of the UEP Certified Guidelines, "we didn't think we would have to worry about unprofitable times for a few years" and that egg producers that adopted the Guidelines had "flock reduction expectations."  In the same internal newsletter, UEP provided the following illustration:  "If [UEP Certified] companies owned 227 million hens when the program began and they increased the cage space per hen from 53.3 square inches to 56 square inches we would have a reduction of 11 million hens."  UEP leadership saw the UEP Certified Guidelines as a seemingly legitimate pretext to control supply.

124.    In the earliest iteration of the UEP Certified Guidelines, a minimum floor space allowance was a prominent feature, the very same strategy that Donald Bell previously advised UEP members to adopt to control supply and achieve higher profits.  In connection with adopting the minimum floor space allowance, UEP warned Defendants not to add additional cages to make up for the lost production.  A violation of the minimum floor space allowance resulted in an automatic audit failure.

125.    When first developed, the UEP Certified Guidelines called for Defendants to increase the hens' floor space (*e.g.*, from 53 square inches to 67 square inches per hen) over a period of 12 years.  In 2001, however, Defendants agreed to cut the implementation time in half to six years, hastening the supply control effects of the Guidelines.

126.     After reducing by half the implementation time for the minimum floor space

allowance, in 2002, Defendants further adopted a rule requiring that each egg producer produce

all of its eggs in compliance with the Guidelines, including eggs that Defendants purchased for

resale.  This was referred to as the "100% Rule" and was adopted at UEP's Annual Board

Meeting on October 10–11, 2002 in Savannah, Georgia.  Relevant to the 100% Rule, the

following motions were made on October 10, 2002:

> To reconfirm the status that a company must commit to
> implementing the welfare guidelines on 100% of all production
> facilities regardless of how or when eggs may be marketed.  The
> 100% commitment is intended to be inclusive of all company
> entities, affiliates, etc.  The intent of the motion was that whoever
> manages or controls the entity must be responsible for meeting the
> 100% commitment.
>
> That egg products or shell egg processing plans with or without
> production can supply customers with certified animal welfare egg
> products or animal welfare shell eggs by purchasing eggs from a
> certified producer.  The egg products plant or shell egg processing
> plant would have an audit no less than annually for the purpose of
> confirming that the sale of certified product or eggs did not exceed
> the purchase of certified eggs.  The egg products plant or shell egg
> processing plant would use the certification number and seal of the
> producer or producers who produced the certified eggs.
>
> That a certified company or any marketer may not co-mingle and
> sell as certified eggs any eggs purchased from a non-certified
> producer regardless of how or where the eggs may be marketed.

Defendants used this 100% Rule to extend the UEP Certified Guidelines to non-member

producers.

127.     Customer demand was not the driving force behind the 100% Rule.  As UEP

explained in an internal January 30, 2003 memorandum summarizing the 100% Rule, "[m]any

producers said they would only commit to the program if 100% of facilities were required."

Describing what would happen if the 100% Rule were revoked, UEP concluded that "[t]he

program would then become a customer driven program and the guidelines would only be implemented for customers requiring it."

128.    At least one UEP member, Defendant Sparboe Farms, privately expressed concern to UEP and others about the justification for adopting the 100% Rule as part of the UEP Certified Guidelines.  Sparboe Farms drafted a letter to UEP stating that the program had "evolved into a production supply program, which requires producers to commit 100 percent of their flock."  Sparboe Farms continued that it was "concerned that the 100% [R]ule may be seen as an intentional effort to reduce supply and increase prices."  Sparboe Farms' in-house counsel expressed concerns that the 100% Rule was a "sham" that could be viewed as an unlawful attempt to manipulate supply.  Sparboe Farms was the only member of the Animal Welfare Committee that voted against the 100% Rule.

129.    As co-conspirator Moark recognized in June 2004 in internal emails, the UEP Certified Guidelines to reduce chick hatch "[we]re having a tremendous effect on production levels."  Moark noted that the number of layer hens was reduced by more than 20% based on "the reduction in layers necessary to increase the cage space density to the level required by implementation of the UEP guidelines."  Likewise, UEP reported in a July 2, 2003 internal newsletter that "the hatch ha[d] been down 15 of [the past] 17 months."

130.    In a December 16, 2004 UEP Board of Directors conference call, Defendants also agreed to ban backfilling (the practice of replacing older hens that died to maintain overall flock size) as part of the UEP Certified Guidelines, except in cases of catastrophic flock mortality.  Initially, the UEP Certified Guidelines allowed backfilling on a small scale to accommodate unexpected, productive pullets.  In 2003, however, Defendants agreed to "allow backfilling at any time with any age bird so long as the 'house average' space allowance requirement was not

exceeded." Defendants quickly reversed course when backfilling started causing "poor egg prices." Indeed, UEP economist Donald Bell had explained how backfilling "could have disastrous effects" on egg prices. The ban on backfilling was to be effective "immediate[ly]," meaning February 1, 2005 and Defendants agreed that, like the cage space requirements, "unauthorized backfilling . . . w[ould] result in a failed audit."

131. At about the same time that Defendants instituted the backfilling ban, during an April 19, 2005 UEP Animal Welfare Committee meeting, Defendants privately discussed that the UEP Certified Guidelines were being used to "manag[e] the marketing and economic restriction of movement of product." Prior to the ban on backfilling, the Guidelines required a producer to maintain records to demonstrate that the additional layers were added to replace mortality losses. Following the ban on backfilling, Defendants required that "[c]ompany records must document when the layer house was supplied with pullets and when additional pullets were moved in."

132. UEP enforced the UEP Certified Guidelines through mandatory, non-public compliance audits. UEP controlled the auditing program. These mandatory audits—the results of which Defendants kept from the general public—allowed UEP to ensure that all Defendants were following the agreed-upon supply controls. These audits were extensive. By way of example, according to a January 5, 2005 internal UEP newsletter, the 2004 audits included 474 facilities and included 2,388 separate layer houses.

133. Additionally, as part of the UEP Certified program, beginning at least as early as 2004, UEP required producers to submit monthly compliance reports detailing the number of layers housed in that month. Non-certified marketers were also required to report to UEP shell eggs and/or egg products that were sold as UEP Certified regardless of whether the package contained the UEP Certified logo and the number of eggs purchased from UEP Certified

companies. UEP used these reports to monitor for and detect cheating on the supply control agreements.

134. Defendants also were aware of each other's operations, including the size and location of their facilities, the size of their flocks, and their production. It was very difficult for any producer to keep its operations secret from other producers. As Gene Gregory explained in a September 18, 2008 internal UEP newsletter, "[t]he U.S. egg industry is much like a small community or a family. There are fewer than 250 commercial size egg farmers remaining in the industry. We all know one another. We see one another at meetings. We compete but remain friends."

135. UEP required strict compliance with the supply control Guidelines. For example, at a UEP meeting in October 2002, UEP's Board emphasized that violations of the minimum floor space allowance would not be tolerated.

136. In practice, Defendants did not enforce all of the Guidelines equally. Rather, the UEP Certified audits focused on the Guidelines closely related to supply controls. Under these Guidelines, a producer "automatic[ally] fail[ed]" an audit if it violated one of several provisions closely linked to the supply of eggs. For example, the UEP Certified Guidelines required that Defendants provide more cage space for laying hens (*e.g.*, from 53 square inches to 67 square inches per hen). Defendants adopted this minimum floor space allowance with the understanding that the displaced hens would not be replaced. Violating this Guideline resulted in automatic failure of the compulsory audit. As another example, the Guidelines also prohibited "backfilling," which is the practice of replacing older hens that died to maintain overall flock size. Violating this Guideline also resulted in automatic failure.

137.    But an egg producer that violated other Guidelines not related to supply, including true animal welfare concerns such as Guidelines on toxic ammonia concentrations, cruel killing methods, or failure to remove dead birds from cages daily, could still pass the UEP audit. Further, some cruel practices were completely unpunished, at least for a time, under the UEP Certified Guidelines. For example, Defendants allowed a producer to induce molting by withholding food—without penalty—until January 2006.

138.    When an egg producer complied with the UEP Certified Guidelines, the producer was permitted to use a UEP label on its eggs.

139.    When an egg producer attempted to withdraw from participation in the UEP Certified Guidelines, Defendants retaliated against that producer. For example, Defendant Sparboe Farms withdrew from the program because of its concerns that the program was a sham and a pretext for a supply control program that violated the antitrust laws. UEP representatives or staff, including Gene Gregory, contacted Sparboe Farms customers in an attempt to discourage customers from buying Sparboe Farms' eggs. In one instance, Gregory contacted the Canada Egg Marketing Agency ("CEMA"), a Sparboe Farms' customer, to convince the CEMA to stop buying Sparboe Farms' eggs. UEP made similar contacts with at least the Albertson's grocery chain and Wal-Mart. When another company, Kreider Farm Eggs, withdrew from participation in the UEP Certified Guidelines, UEP similarly retaliated. UEP contacted these customers despite purporting to have a policy against making direct contact with customers of UEP members. However, Sparboe Farms never brought its co-conspirators' unlawful conduct to the attention of law enforcement authorities, nor did Sparboe Farms ever take any action to effectively withdraw from the conspiracy.

140.     According to UEP, as of 2010, more than 80% of all eggs produced in the United States were produced under the UEP Certified Guidelines.

>    **2.     Defendants agreed to and did engage in coordinated, large-scale exports to control supply and artificially maintain and increase the domestic price of eggs.**

141.     Historically, a variety of factors, including the large domestic market and the perishability of shell eggs, discouraged United States egg producers from exporting eggs.  Egg exports to places outside of North America, such as Europe, were limited.  However, UEP, USEM, and others—recognizing that egg prices are very sensitive to supply and even small changes in supply (actual or perceived) had a very large impact on domestic egg prices—agreed to increase egg exports, especially to Europe.  Indeed, USEM's export program was a significant departure from historical practice.

142.     Defendants agreed to use a series of coordinated exports to control domestic supply. To fulfill these exports, Defendants had the choice of either shipping their own eggs or buying eggs for the export or having a UEP egg trader purchase the eggs for them.  USEM members were required to participate in exports as a condition of membership.  Defendants controlled the timing and scale of exports to support their overall scheme to control supply and artificially maintain and increase the price of eggs.  These exports were timed to occur when they would benefit Defendants by raising egg prices in the United States.  At least once, Defendants rejected a proposed export because it was "very small and likely would not have [a] positive impact on domestic prices."

143.     As part of this export scheme, Defendants often exported eggs to markets with prices lower than the then-current prices in the United States.  An integral part of Defendants' export scheme was the agreement to share resulting losses so that producers that physically exported their production were reimbursed for the difference between prevailing United States prices and

56

the lower prices in export markets.  As stated in a March 20, 2003 internal memorandum to all

USEM members, "Good news!!!  During the latest export we gained a sizeable new member.

This member agreed to share in the loss."

144.    By way of example, this agreement to share export related losses is reflected in an

April 17, 2007 email from UEP's Vice President Linda Reickard to co-conspirator Moark

requesting payment for Moark's share of the export loss:  "Would you also please check on our

past due invoice #2742 which covered your portion of the loss on the last export & let me know

the status?  I'm trying to get the last one finished up before the next one starts."  The export

losses were significant.  In one example, co-conspirator Norco's share of the export loss was

calculated as over $35,000.

145.    Defendants agreed to undertake at least the following coordinated exports in

furtherance of the conspiracy.

      A.    In August 2002, USEM organized large-scale exports to egg breakers and

further processors in Europe.  Through this export, Defendants removed three million

dozen shell eggs from the domestic market over a three-week period.

      B.    In November 2002, USEM followed up with another large-scale export for

200,000 cases of eggs.  This export order was significantly larger than the export

orders the United States egg industry had made in the past.

      C.    In February 2003, USEM organized yet another export of eggs to Europe

for 240,000 cases of eggs that, at the time, was the largest-ever United States egg

export.  It was expected that this export order would be extremely beneficial to egg

producers through increased prices.

D.      At the end of 2006 and in early 2007, Defendants organized another series of large-scale exports to Europe and the Middle East for 24 million dozen eggs.  In this series, Defendants exported eggs to markets with prices lower than prevailing prices in the Unites States.  UEP's executive director Gene Gregory, commenting on the success of these exports, noted that even though the exports involved less than 2% of industry supply, "it [wa]s amazing how one or two percent c[ould] have an effect on the rest of your domestic price."  Describing an export that USEM members voted to undertake on October 20, 2006, UEP reported in a November 17, 2006 internal newsletter that "[f]or the benefit of everyone, these USEM members have paid a heavy cost."

E.      In March 2008, Defendants organized an export order to Japan and Iraq for 100 container loads.  Again these eggs were exported to and sold in markets with lower prices than prevailing prices in the United States.

146.    Defendants recognized that these exports had the effect of raising the price of eggs. As stated in a March 4, 2004 internal UEP newsletter, following a USEM export, "the market immediately moved upward[ and] . . . set in motion what turned out to be the best year on record for egg producers."  Later, in a November 17, 2007 internal newsletter commenting on an export that USEM members agreed to on October 20, 2006, UEP noted that the "one-day value on November 15th for a producer with 1 million hens was more than $18,000.00 over the one-day value on October 20th."

### 3.      Defendants agreed to and did adopt a series of short-term measures with the purpose and effect of reducing supply.

147.    Starting in 1999, Defendants agreed to use short-term measures to control supply and artificially maintain and increase the price of eggs.  As stated in a February 2, 2007 internal UEP

newsletter, Defendants recognized that the largest egg producers "have the potential to have the greatest impact upon supply/demand conditions and can cause the most rapid changes for assured profits." As reported in minutes for an August 7, 2007 UEP Long Range Planning Committee meeting, UEP's outside counsel admonished that under the antitrust laws, "supply management recommendations written up in UEP newsletters [were] questionable."

148. During 1999, UEP's Marketing Committee decided it needed to take action to deal with low prices. The Marketing Committee passed a motion providing that, among other things, producers immediately molt 5% of flocks and cut back on 5% of flock inventory over the course of 6 to 12 months. The Committee also discussed using various means, including the media, to spread the word to the rest of the industry that had not attended the meeting.

149. In October 1999, UEP and USEM members voted in favor of a plan to reduce the national flock by seven million hens in an effort to increase prices. When this strategy was considered, it was noted that this program would need to be industry-wide to be effective. In response, UEP's board adopted a resolution instructing UEP staff to spread the message of responsible growth to egg producers.

150. In August 2001, Defendants distributed a document to UEP members that discussed how supply reduction would increase prices and stated that "[t]here should be a core segment of the industry that is willing to reduce egg supply in order to achieve profitable egg prices." The document also noted "several tools" available to the industry to reduce supply including: "Reduce chick hatch," "Dispose of old flocks early," and "Molt early." Finally, the document asked recipients, "**Would you be willing to meet with this core group of egg producers to discuss an action plan to achieve profitable egg prices?**" In a related internal document, "Supply Demand Recommendations," UEP's Marketing Committee outlined a series of supply

control measures including (1) disposing of old flocks four week early; (2) molting hens at 62 weeks of age; and (3) reduce day old pullet chick replacement by 5% over the next six months.

151.     In or about November 2001, UEP urged members to adopt an emergency flock reduction of 5%.   It was estimated that this flock reduction would increase producer profits.

152.     In or about June 2004, UEP's Marketing Committee "recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004."

153.     A September 15, 2004 internal UEP newsletter recommended the following supply control measures:  "remove the older hens[;] sell hens at younger ages[;] do not backfill cages[;] do not continue to use old depreciated houses[;] or to molt at younger ages."

154.     As reflected in the minutes of UEP's October 2004 Annual Board Meeting & Executive Conference, UEP's Marketing Committee passed a motion "to establish a plan calling for hens currently scheduled for disposal between December 1, 2004 and July 1, 2005 be disposed of 4 weeks early or reduce [] flock size by 5%."  Marketing Committee Chairman Dolph Baker "announced that staff would be working on an Economic Summit for the very near future with all members being invited."

155.     As part of a November 2004 "Economic Summit," as explained in a November 23, 2004 internal UEP newsletter, Defendants identified "a bleak picture of the supply side of the business."  "Recognizing that it serves no purpose to place blame, many attendees elected to be part of the solution," and agreed either:  "[1] To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled[; or 2] To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."  The number of egg producers agreeing to this supply control measure later

expanded to include 45 companies owning 125 million hens, or around 42% of domestic

production.  This was referred to as the current "intentions program"

156.    At a January 24, 2005 meeting, Shell Egg Marketing Committee Chairman Wayne

Mooney stated that this short-term measure "may have already been helpful to the market but

everyone needed to stay committed to the program."  During the January 25, 2005 UEP Board of

Directors meeting, UEP Chairman Roger Deffner summarized:  "We don't have to accept low

prices and we can have a good 2005 if we just make a few changes and work together."  Also

during this January 25, 2005 UEP Board of Directors meeting, Wayne Mooney made a motion,

which passed, "to recommend that the current 'intentions program' for flocks to be disposed of 4

weeks earlier than previously scheduled and/or flock size reduction by 5% be extended through

Labor Day."

157.    Of the Defendants and co-conspirators, at least Cal-Maine, National Food, Hillandale

PA, Midwest, Ohio Fresh, and Moark agreed to this "intentions program" commitment.  UEP

also sent letters to members not in attendance to announce this plan and to ask those members to

participate.  Egg producers signed their intentions to follow this short-term measure to control

supply.

158.    In a February 3, 2005 internal UEP newsletter following the January 5, 2005 UEP

Board of Directors meeting, UEP advised that Mooney's motion "d[id] not apply to only the

companies having signed the 'intention form' but [applied] to all UEP members."

159.    As early as 2005, UEP created a Production Planning Calendar "in hopes that

producers w[ould] manage their flock size or egg production."  In describing this Production

Planning Calendar in a February 17, 2005 internal newsletter, UEP noted that "[a]ll members can

maximize their profit potential or minimize their losses by paying closer attention to the high and low demand periods."

160.     In a February 15, 2006 internal newsletter, UEP advocated for a "2% Solution": "Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006."

161.     On March 31, 2006, UEP's Marketing Committee passed a motion "to recommend to the members a program calling for flocks to be molted six (6) weeks earlier than previously scheduled and to dispose of spent hens six (6) weeks earlier than previously scheduled."

162.     On April 13, 2006, UEP issued an internal "Supply/Demand" Alert in which the Marketing Committee recommended that UEP members:  "[1] Dispose of flocks six (6) weeks earlier than previously scheduled[; and 2] Molt flocks six (6) weeks earlier than previously scheduled."

163.     In an August 3, 2006 internal newsletter, UEP reminded members of a recommendation "to molt and dispose of flocks six weeks earlier than previously scheduled," and then urged members to "stay the course."

164.     In a February 2, 2007 internal newsletter, UEP advised that "[t]he best immediate answer to assure profitable prices [wa]s for the industry to show some restraint."

165.     In a March 15, 2007 internal newsletter, UEP explained that producers historically produced "surplus eggs [from] the week after Easter . . . until Labor Day."  UEP then urged that "[t]he only way to avert this history" was to "begin making plans **<u>NOW</u>** to molt or dispose of flocks" and to **"[m]ake the necessary adjustments**."

166.     In an April 12, 2007 internal newsletter, UEP again emphasized the importance of controlling supply, stating that "[t]he objective of supply management . . . is to prevent the over

supply of eggs which can reduce egg prices" and that billions would be lost without better supply management. The newsletter continued that "UEP recognizes this and has promoted reducing hen numbers and molting to help control supply."

167.    In its August 1, 2007 internal newsletter, UEP urged "egg producers to take care of their business by disposing of or molting hens 2–3 weeks earlier than previously scheduled."

### C.    Defendants, through their actions in furtherance of the conspiracy, successfully increased prices.

168.    Defendants and their co-conspirators' agreement to control supply and artificially maintain and increase the price of eggs was successful.

169.    Defendants privately recognized their agreement to control supply and artificially maintain and increase the price of eggs worked. For example, in an August 27, 2003 internal newsletter, UEP recognized that prices were around 60% higher than the same period during 2001and explained that one "major reason[]" for the high prices was "[i]mplementing space allowance to meet the industry's Animal Welfare Guidelines." UEP's Gene Gregory noted that implementation of the minimum floor space allowance had "the greatest impact" on lowering supply and increasing price as the previous supply management schemes had "never been endorsed by the majority of the industry and ultimately were discarded when prices improved for short period." Gregory further stated:

> The fact that approximately 200 companies have begun implementing the [UEPs Animal Husbandry Guidelines] . . . , has caused flock reduction and will continue to do so for some time. These 200 companies own approximately 226 million hens or more than 82% of the total hens in the country. The hatch reduction to meet the animal husbandry guidelines began with chicks hatched after April 2002. Since this beginning date the hatch has been reduced by 14.7 million pullets in comparison to the same period year earlier.

170.    UEP's June 4, 2003 internal newsletter noted that "[t]he hatch reduction, to meet the space allowance guidelines of the [UEP Certified Guidelines] are beginning to show egg market value improvements.  This trend should continue.'"  The private newsletter further stated that "market improvements c[ould] be attributed to:  [1] Reduced pullet hatch finally making an impact upon supplies[; 2] USEM exports reducing supplies at critical times[; and 3 UEP Certified Guidelines] beginning to work like many had projected."

171.    As reported in an October 31, 2003 internal UEP newsletter, during an annual meeting in or about October 2003, former UEP Chairman Mike Bynum explained that, in 2002, the egg industry had experienced "some real 'on-the-ropes' quarters" but that the industry was "anticipating a significant export opportunity to jump-start the fall egg market [and t]he industry had committed to the UEP Animal Welfare Guidelines."  Following these actions, Bynum explained, in 2003, "the egg supply began to moderate relative to strong demand through a consistent reduction in chick hatch and [in 2003 the egg industry was] enjoying market prices that [we]re 60% higher than [in 2002]."

172.    UEP's December 30, 2003 internal newsletter included commentary discussing the "fantastic market" for eggs, stating that "the biggest challenge will be maintaining the UEP Animal Welfare Guidelines of increased space per bird" and cautioning that "[t]here will be a huge temptation to get greedy."  Providing a concrete illustration of Defendants' illegal gains, UEP's newsletter explained, "[u]sing the [Urner Barry] Large quote, only as a comparison, we would estimate that a producer with 100,000 layers would have realized a cash flow improvement of more than $400,000.00 over the course of one year's production."

173.    In internal newsletters dated November 1, 2006 and November 17, 2006, UEP explained how USEM-orchestrated exports had a direct and substantial impact on domestic egg

prices. For example, after USEM voted on October 20, 2006 to export 90 container loads of shell eggs, "[t]he market began to react to the export" and "domestic prices began to rise rapidly" and prices increased by around 30%. UEP illustrated the impact of this export for a producer with one million hens following the announcement of the export: "During the 26-production day period for a producer with a million hens would have recognized improved revenues of more than $220,000.00." Further, "[m]ultiplied by the approximate 200 million hens needed to fill the shell egg markets, this would have returned shell egg producers $44 million."

174. In its January 3, 2008 internal newsletter, UEP included the following as part of a "partial list of the reasons for extremely good egg prices" in 2007: "UEP's animal welfare guidelines continued to reduce the number of hens per house"; "Producers reduced their egg supply during the week between Easter and Labor Day"; "Timely exports of shell eggs by the United States Egg Marketers"; "Very limited construction of new houses or remodeled houses during 2006 and 2007"; and "Producers did far better job of managing their business to meet supply/demand.'"

175. The reduced supply and higher egg prices were not attributable to forces outside of the conspiracy, such as feed costs. In May 1, 2008 testimony before Congress, Joseph Glauber, the United States Department of Agriculture's Chief Economist, noted that higher egg prices reflected "lower production and strong domestic demand," and that "[t]he decision to reduce production likely took place prior to the recent run-up in feed costs."

> **D.** **UEP does not qualify as a Capper-Volstead protected cooperative and UEP's conduct falls outside the scope of the Capper-Volstead Act.**
>
> > **1.** **UEP is not a Capper-Volstead protected cooperative because it has non-farmer members.**

176. UEP is not an agricultural cooperative protected by the Capper-Volstead Act, 7 U.S.C. § 291, *et seq.* Capper-Volstead protection is available only to farmers, planters,

ranchmen, dairymen, nut, or fruit growers (collectively "farmers"). The participation of one non-farmer member defeats Capper-Volstead immunity for the entire cooperative.

177.    During the applicable period, UEP included members that produced no eggs. These entities are not "farmers" under the Capper-Volstead Act, and their membership in UEP forecloses any antitrust immunity under the Capper-Volstead Act for UEP or its members individually.

178.    During the applicable period, UEP also included members that were vertically integrated agricultural businesses. Vertically integrated agricultural businesses also are not farmers under the Act. The two principal purposes of the Act are to: (1) provide farmers with countervailing power to bargain effectively with processors and middlemen, and (2) enable farmers to eliminate middlemen all together. Vertically integrated agricultural businesses act as processors and middlemen. The Act was designed to protect farmers from these types of organizations, not shield them from antitrust liability.

179.    Cal-Maine Foods, Moark, Michael Foods, NuCal, and other UEP members were non-farmers for Capper-Volstead purposes because they were vertically integrated agricultural businesses. These entities acted as middlemen, not as "farmers," because they purchased for resale significant quantities of eggs. For example, in 2002, Moark purchased for resale from the spot market or from third-party producers 59% of the eggs it marketed. In 2005, Moark purchased for resale from the spot market or from third-party producers 55% of the eggs it marketed. In 2008, Michael Foods purchased for resale from the spot market or from third-party producers 74% of the eggs it marketed. In 2008, Cal-Maine purchased for resale from the spot market or from third-party producers 23% of the eggs it marketed. This remained true for Cal-Maine's 2011 fiscal year when it also purchased from outside producers for resale approximately

23% of the total number of eggs it sold. For its fiscal year ending May 28, 2011, of the 821 million dozen eggs that Cal-Maine sold, it produced only 634 million dozen eggs, which means that it sold 187 million dozen more eggs than it produced. The membership and participation in UEP by these vertically integrated non-farmer middlemen destroys any limited Capper-Volstead protection for UEP and all of its members.

> **2.** **UEP's pre-production supply control program falls outside the scope of the Capper-Volstead Act's protections.**

180. Pre-production supply control programs are not protected by the Capper-Volstead Act as reflected by the plain language of the statute, its legislative history, as well as by statements and actions of the United States Department of Justice's Antitrust Division, the Federal Trade Commission, and the United States Department of Agriculture.

181. The plain text of the Capper-Volstead Act permits farmers to "collectively process[], prepar[e] for market, handl[e], and market[]" the agricultural products that they grow. All of these activities are post-production activities and only post-production activities are protected by the Act.

182. As noted above, the legislative history of the Act indicates that its two principal purposes are to: (1) provide farmers with countervailing power to bargain effectively with processors and middlemen, and (2) enable farmers to eliminate middlemen all together. Pre-production restraints, such as Defendants' joint supply control program, are unrelated to the furtherance of these goals and are, therefore, outside the scope of the exemption.

183. Federal agencies also have concluded that the Capper-Volstead Act does not protect pre-production supply control programs. For example, in 1968, the Antitrust Division of the Department of Justice issued a business review letter that refused to approve a wheat-growers association's proposal to limit its members' production of wheat. The letter stated, "the Capper-

Volstead antitrust exemption applies only to marketing and not production agreements." Letter from Edwin Zimmerman, Assistant Att'y Gen., Antitrust Div., to Ray Obrechet, Master, Colo. Grange (Oct. 2, 1968). The Antitrust Division later issued a report concluding that, "it would not be the act of a rational legislature to give the cooperatives the power to deal with overproduction, a factor which had been demonstrated was not a cause of the crisis it was addressing." U.S. Dep't of Justice, *Milk Marketing: A Report of the U.S. Dep't of Justice to the Task Group on Antitrust Immunities* 68–69 (1977).

184. Likewise, in *In re Central California Lettuce Producers Cooperative*, 90 F.T.C. 18, 102 n.20 (1977), the FTC stated, "Congress' attitude toward production controls provides an additional indication that it did not regard the corporation as the model around which the Capper-Volstead exemption would be built. Beyond doubt, a single corporation can restrict its output, if it chooses, without incurring antitrust liability. Nevertheless, there are strong indications that Congress did not intend to allow farmers to use cooperatives as a vehicle by which they could effectively agree to limit production."

185. The Department of Agriculture ("USDA") has taken similar positions in its Cooperative Information Reports stating, "it is not legal for cooperatives to control members' production. The basic role of cooperatives is to market the available supply in the most effective manner possible, not to limit production." U.S. Dep't of Agric. Rural Bus.-Coop. Serv., Cooperative Information Report 1, Section 3, *Cooperative Benefits and Limitations* 17 (1980 reprinted 1990). In another Report the USDA warned, "The conventional belief among cooperative scholars is that [using cooperatives to limit the quantity of a commodity they will produce] goes beyond the extent of the protection available under the Capper-Volstead Act." U.S. Dep't of Agric., Rural Bus.-Coop. Serv., Cooperative Information Report 38, *Managing*

*Cooperative Antitrust Risk* 23–24 (1989).  Commenting on the Department of Justice's Report on Milk Marketing, the Department of Agriculture concluded "a cooperative cannot . . . [r]estrict the amount of production of producers."  U.S. Dep't of Agric., *Comments on the Department of Justice Report on Milk Marketing* 16 (1977).

186.    Furthermore, there was no legitimate business justification for the collective supply control scheme and conspiracy among Defendants.  Indeed, UEP's counsel opined that, under Capper-Volstead compliance rules, some of UEP's practices were "questionable."  Moreover, the UEP Certified Guidelines did not, nor were they intended to, serve any legitimate or lawful purpose under the Capper-Volstead Act, such as marketing Defendants' eggs.  Defendants' conspiracy enabled Defendants to artificially maintain and increase prices for shell eggs and egg products at artificially high levels.

### 3.    Because UEP engaged in exclusionary and discriminatory conduct, no Capper-Volstead protection applies.

187.    Under the Capper-Volstead Act, farmer cooperatives are not immune from antitrust liability where, as here, they engage in exclusionary practices, monopolize trade, suppress competition with non-members, coerce individuals to participate in cooperative programs, engage in predatory harassment, or organize illegal boycotts.

188.    By using collective efforts to penalize UEP members that refused to participate in the Guidelines and other collusive practices, Defendants suppressed competition from growers that were not part of the supply control scheme.  Such conduct is outside the scope of the Capper-Volstead limited immunity.  For example, as early as November 2003, Sparboe Farms questioned whether the UEP Certified Program was a sham and a pretext for a supply control program that violated antitrust laws.  Sparboe Farms left the UEP Certified program.  Shortly after Sparboe Farms left the UEP Certified program because of its concerns, UEP President Gene

Gregory and other UEP staff members contacted several of Sparboe Farms' customers and pressured them not to purchase eggs from Sparboe Farms.

189.    Gregory also contacted the Canada Egg Marketing Agency ("CEMA"), a Sparboe Farms customer, asserting that CEMA should stop purchasing Sparboe Farms eggs because Sparboe Farms was no longer complying with UEP's UEP Certified Guidelines.  UEP made similar contacts with others, including the Albertson's grocery chain and Wal-Mart.  UEP took similar actions against Kreider Farm Eggs, another company that withdrew from the UEP Certified Guidelines.  On September 6, 2005, Sparboe Farms sent UEP a letter threatening legal action if UEP staff members continued to interfere with Sparboe Farms' relationships with its customers.  UEP contacted these accounts despite having a policy against making direct contact with customers of UEP members.

### 4.    Capper-Volstead does not apply because UEP conspired with non-members.

190.    Capper-Volstead does not immunize conduct resulting from collusion with non-members.

191.     UEP has conspired with UEA, USEM, and their non-farmer members to implement the supply control campaign.  Some of UEA's non-farmer members include:  Ovotherm, a producer of egg packaging products; Lubing Systems, LP, a manufacturer of bird watering and egg conveyor belt systems; Farm Credit Services of America, a company providing credit and financial services to farm and ranch operators; and Henning Construction Company, a general contractor that builds agricultural facilities.

70

### 5. UEP is not a Capper-Volstead exempt cooperative because it does not collectively process, market, handle, ship, sell, bargain, or compete for the sale of any agricultural products.

192.    The Capper-Volstead Act protects only cooperatives that collectively process, market, handle, ship, sell, bargain, or compete for the sale of agricultural products.  UEP does not engage in any of these activities.

193.    UEP members do not associate to collectively process, handle, or market their products, and UEP does not provide those services.  By way of example, UEP does not wash, break, pasteurize, store, distribute, or negotiate the sale of its members' eggs. On the contrary, UEP was founded to provide services to the industry, and not to market the products of its members.

## VI.    Offenses Charged

194.    As set forth in detail above, which allegations are incorporated by reference and repeated here, beginning at least as early as 1999 and continuing through at least 2008, Defendants and their co-conspirators engaged in a continuing combination, conspiracy, and agreement to control and manipulate supply and fix and raise prices for eggs and egg products. Defendants and their co-conspirators' horizontal combination and conspiracy was a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

195.    Defendants and their co-conspirators' combination and conspiracy consisted of a continuing understanding, agreement, and concerted action by and among each Defendant and co-conspirator, the material terms of which included:

    A.    To control and manipulate supply and/or capacity for production of eggs and egg products;

    B.    To artificially maintain and increase prices for eggs and egg products; and

C.      To affirmatively conceal the existence of their illegal understanding and

agreement.

196.    As set forth above, Defendants and their co-conspirators engaged in a variety of acts

to facilitate the formation, implementation, operation, enforcement and concealment of their

combination and conspiracy.  Defendants and their co-conspirators controlled and manipulated

capacity for production of eggs and egg products, including, without limitation, in the following

ways.

A.      Agreeing to adopt UEP Certified Guidelines that controlled the size of

egg-producing flocks of layer hens and egg production over the long-term and

thereby raising and/or stabilizing prices;

B.      Agreeing not to replace hens lost through the UEP Certified Guidelines'

minimum floor space allowance thereby raising and/or stabilizing prices;

C.      Agreeing to limit backfilling (*i.e.*, the practice of replacing older hens that

died to maintain overall flock size) through the UEP Certified Guidelines and thereby

raising and/or stabilizing prices;

D.      Agreeing to adopt the 100% Rule, requiring that each egg producer raise

all of its eggs in compliance with the Guidelines, including all eggs purchased for

resale;

E.      Agreeing to adopt, to enforce the UEP Certified Guidelines, a mandatory

audit program that focused on the Guidelines related to supply control;

F.      Agreeing to organize and participate in coordinated, large-scale exports of

eggs in order to control the supply of eggs available for sale to entities in the United

States and thereby raising and/or stabilizing prices;

      G.      Agreeing to cull or destroy existing layer hens in order to control egg production and thereby raising and/or stabilizing prices;

      H.      Agreeing not to increase existing flocks in order to stabilize egg production and thereby raising and/or stabilizing prices;

      I.      Agreeing to induce molting in order to control egg production by existing flocks and thereby raising and/or stabilizing prices; and

      J.      Agreeing overall to control supply and production of eggs in the United States and thereby raising and/or stabilizing prices.

## VII.    Effects of Defendants' *Per Se* Unlawful Conduct

197.    The purpose and effect of Defendants and their co-conspirators' *per se* unlawful combination and conspiracy were to maintain, stabilize, and increase the prices that Plaintiffs and others paid for eggs and egg products by controlling and manipulating supply and fixing and raising prices for eggs and egg products, to deprive Plaintiffs and others the benefit of free and open competition in their purchases of eggs, and to restrain, suppress and eliminate competition for eggs.

## VIII.    Fraudulent Concealment

198.    At all relevant times, Defendants and their co-conspirators engaged in an affirmative course of conduct to create the illusion of competition and to conceal their unlawful agreement to control supply and artificially maintain and increase the price of eggs. Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of the conspiracy because the nature of Defendants and their co-conspirators' conspiracy was self-concealing and because Defendants and their co-conspirators engaged in affirmative and deceptive acts to conceal the conspiracy.

73

199.    Defendants and their co-conspirators' agreement to control supply and artificially maintain and increase the price of eggs and their related meetings and communications were by their very nature self-concealing and not discoverable by Plaintiffs through the exercise of reasonable diligence.

200.    Defendants and their co-conspirators' conspiracy could not have survived absent secrecy.  If the conspiracy were not secret, it would have collapsed.   Plaintiffs sought competitive and independently determined prices for the eggs they purchased.

201.    At all relevant times, Defendants and their co-conspirators fraudulently concealed their conspiracy through affirmative and deceptive acts, including, but not limited to, the following.

       A.    Defendants and their co-conspirators concealed the fact that UEP members, including Sparboe Farms, raised concerns that the UEP Certified Guidelines were a sham and that the Guidelines, in fact, were an industry supply control program.

       B.    Defendants and their co-conspirators limited disclosure of the true purpose of the UEP Certified Guidelines to private meetings or communications.  At or about the same time that the Guidelines were first adopted, participants at UEP meetings privately discussed that the express purpose of the UEP Certified Guidelines was to control supply.  Additionally, UEP leadership saw the UEP Certified Guidelines as a seemingly legitimate pretext to control supply.

       C.    Defendants and their co-conspirators denied public access to meetings relating to the conspiracy and frequently discussed the true supply control purpose of

the Guidelines and other measurers at closed meetings that only UEP members were allowed to attend.

     D.     Defendants and their co-conspirators restricted knowledge of and communications in furtherance of their conspiracy to a limited number of high ranking and/or key individuals of each Defendant.

     E.     Defendants and their co-conspirators concealed, and agreed not to disclose publicly, various internal documents, including, but not limited to, UEP newsletters and minutes from Defendants' committee, board, and other internal meetings, that disclosed that the actual purpose of their egg production program was to control supply and artificially increase and maintain egg prices.

     F.     Defendants and their co-conspirators—through Defendant UEP— restricted public access to the UEP Certified Guidelines' audit results.

     G.     Defendants and their co-conspirators made secret payments to each other to share losses associated with their coordinated exports.

     H.     Defendants and their co-conspirators—through, for example, private communications by Defendant UEP's president Gene Gregory in June 2005—used covert means to punish egg producers that did not comply with the supply controls or who raised concerns that the UEP Certified Guidelines were a sham and a pretext to control supply.

202.     At all relevant times, animal welfare was a societal concern of importance to Plaintiffs. This concern was reflected in Plaintiffs' internal policies. One or more Plaintiffs required their facilities and the facilities of their direct suppliers that managed live animals to

meet or exceed industry standards and government regulations for animal welfare, including standards for handling, housing, transportation, and slaughter.

203.    Plaintiffs were aware that Defendants adopted a program for the production of eggs. However, Plaintiffs were unaware that Defendants' representations that they adopted this program based on animal welfare concerns were false and pretextual. Defendants' false and pretextual representations were plausible and credible to Plaintiffs, in part, because of Plaintiffs' own concern for animal welfare.

204.    Defendants recognized that their representations would cause Plaintiffs to believe that Defendants' program for the production of eggs was a legitimate response to genuine animal welfare concerns.

205.    Based on Defendants' false and pretextual representations and because of Plaintiffs' concern for animal welfare, at all relevant times, Plaintiffs believed (and had no reason to believe otherwise) that Defendants' program for the production of eggs was a credible attempt to address legitimate animal welfare issues. Plaintiffs were misled by Defendants and their co-conspirators' facially plausible and credible explanation based on the publicly stated animal husbandry purposes. As a result, Plaintiffs' inquiry obligations were substantially relaxed and were met by Plaintiffs' reliance on the fact that Defendants' and Plaintiffs' concerns for animal welfare were apparently coextensive.

206.    At all relevant times, Defendants and their co-conspirators' affirmative acts of concealment were intended to conceal the existence of their unlawful actions from Plaintiffs and others. At all relevant times, Plaintiffs were unaware, and had no reason to be aware, of Defendants and their co-conspirators' acts of concealment.

207.    Because of these acts of concealment, Plaintiffs did not have knowledge of Defendants' antitrust violations, or any facts that might have led Plaintiffs (or a reasonable purchaser in Plaintiffs' position) to discover Defendants' antitrust violations prior to the public disclosures concerning the government investigations of various egg producers in or about September 2008.  Prior to that time, Plaintiffs were not aware of the facts as alleged herein (nor were Plaintiffs aware of any other facts or circumstances) that should have alerted Plaintiffs (or would have alerted a reasonably diligent purchaser in Plaintiffs' position) of the need to investigate whether a conspiracy existed.

208.    As a direct result of Defendants' pervasive and successful efforts to conceal the existence of their combination and conspiracy, Plaintiffs first became aware of key facts alleged in this Complaint regarding the formation, existence, nature, and operation of the conspiracy in connection with their December 2010 settlement with the Moark co-conspirators, which provided access to Defendants' non-public, internal records such as UEP newsletters and minutes for internal meetings.

209.    Plaintiffs had no knowledge of Defendants' combination and conspiracy, or of any facts that would have led to the discovery thereof, until after the September 2008 disclosure of the government investigations and the subsequent access to Defendants' non-public internal records as part of the Moark settlement.  As a result, Plaintiffs did not discover, and through the exercise of due diligence (which they exercised) could not have discovered, the existence of Defendants' unlawful conspiracy at an earlier date.

210.    Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for Plaintiffs' claims.

## IX.     Injury to Plaintiffs

211.    During the relevant period, Plaintiffs purchased substantial amounts of eggs directly from one or more of the Defendants.  As a result of Defendants' *per se* unlawful combination and conspiracy, Plaintiffs paid prices for eggs that were substantially greater than what Plaintiffs would have paid but for Defendants' illegal conduct.  The full amount of Plaintiffs' damages will be calculated after discovery and upon proof at trial.

## X.     Injunctive Relief

212.    Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

## XI.     Prayer for Relief

WHEREFORE, Plaintiffs request the Court to:

A.     Enter a judgment declaring that the foregoing combination and conspiracy, and the acts in furtherance thereof, were an unlawful restraint of interstate commerce in violation of Section 1 of the Sherman Act;

B.     Enter a judgment in favor of Plaintiffs and jointly and severally against all Defendants for treble the amount of the jury verdict and for attorneys' fees and costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

C.     Enjoin each Defendant from continuing the unlawful conduct alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or efforts; and

D.     Enter, and retain jurisdiction to enter, such further orders as may be necessary or appropriate to remedy the injury to Plaintiffs or as the Court deems appropriate.

Dated:  December 12, 2011,

                                            Respectfully submitted,


By:  /s/ John F. Kinney
       John F. Kinney
       Richard P. Campbell
       Stephen R. Brown
       Jason M. Bradford
       Julia Zhang
       JENNER & BLOCK, LLP
       353 North Clark Street
       Chicago, IL 60654-3456
       (312) 222-9350
       (312) 527-0484 Fax
       ***Counsel for Plaintiffs***