# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | Civil Action No. 2:12-cv-00088 |
| ANTITRUST LITIGATION | : | |
| | : | MDL No. 2002 |
| | : | 08-md-02002 |
| ─────────────────────────── | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| Kraft Foods Global, Inc. et al v. United Egg | : | |
| Producers, Inc. et al | : | |
| No. 1:11-cv-08808 | : | |

## ANSWER TO FIRST AMENDED COMPLAINT

Defendant Midwest Poultry Services, L.P. ("Midwest"), for its Answer to

Plaintiffs Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA,

Inc.'s Amended Complaint, states as follows:

### Preliminary Statement

The First Amended Complaint ("FAC") does not comply with Fed. R. Civ. P.

8(a)(2). The FAC is not a "short and plain statement of the [plaintiffs'] claim[s]." The FAC

contains 212 separately numbered paragraphs, many with subparts, and is prolix, self-

contradictory and replete with improper evidentiary material. Midwest recognizes, however, that

courts generally disfavor Fed. R. Civ. P. 8 motions to dismiss and therefore has decided not to

delay this litigation and burden the Court with such a motion. Midwest has made a diligent and

good faith attempt to respond thoughtfully and accurately to the allegations in the FAC, but that

effort was unreasonably time consuming, costly and burdensome due to the nature and content of

the FAC.

<u>FIRST DEFENSE</u>

1.     "Shell eggs" are eggs sold in their hard shell, typically in cartons. "Egg products" are shell eggs that are broken and sold in liquid, frozen, or dried form. Unless otherwise noted, "eggs" refers to both "shell eggs" and "egg products."

**ANSWER:**     Midwest admits that Plaintiffs purport to define the terms "shell eggs," "egg products," and "eggs" as set forth in paragraph 1. Midwest admits that shell eggs may be sold in cartons. Midwest denies the remaining allegations in paragraph 1.

2.     Defendants and their co-conspirators include producers of shell eggs and egg products and three interrelated trade groups—United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc. ("USEM"), and United Egg Association ("UEA").

**ANSWER:**     Midwest admits that it produces shell eggs and that it produced egg products for a period of time until July 1, 2003. Midwest further admits that other defendants produce shell eggs and/or egg products. Midwest admits that UEP and USEM are Capper-Volstead Agricultural Cooperative corporations and that UEP manages USEM and UEA pursuant to separate management agreements. Midwest denies the remaining allegations in paragraph 2.

3.     Starting in at least 1999 and continuing through at least 2008, Defendants unlawfully agreed to and did engage in a conspiracy to control supply and artificially maintain and increase the price of eggs. As direct purchasers of eggs, Plaintiffs were injured by Defendants' *per se* unlawful agreements to control supply and artificially maintain and increase the price of eggs.

**ANSWER:**    Midwest denies the allegations in paragraph 3.

4.    Historically, the eggs market has functioned in a volatile boom and bust cycle.  As Defendant Cal-Maine Foods, Inc. ("Cal-Maine") stated in its August 4, 2011 Form 10-K (p. 9), "[t]he shell egg industry has traditionally been subject to periods of high profitability followed by periods of significant loss."

**ANSWER:**    Midwest admits that egg production and prices have fluctuated. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 and, to the extent that the allegations in paragraph 4 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

5.    In their non-public internal communications in furtherance of the conspiracy, Defendants recognized that, other things being equal, egg producers could profit from "boom" prices and avoid "bust" prices by controlling supply because the demand for eggs is inelastic.  This means that a change in the price of eggs does not materially affect the quantity of eggs that purchasers demand.  As Defendant Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "[t]he non-specialty shell egg market is characterized by an inelasticity of demand." At the same time, Defendants recognized, as Defendant Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "small increases in production or decreases in demand can have a large adverse effect on prices and vice versa."  Defendant Michael Foods, Inc. ("Michael Foods"), in an August 8, 2011 prospectus filed with the SEC, similarly stated that, "[i]n general, the pricing of eggs is affected by an inelasticity of supply and demand, often resulting in small changes in

production or demand having a large effect on prices." Stated more concretely by Cal-Maine's Chairman Fred Adams in a July 2007 *Investor's Business Daily* article, Defendants recognized that "[o]ne or two percent on the supply side affects prices by 20% or 30%."

  **<u>ANSWER:</u>**   Midwest admits that, among other factors, supply may impact the price of eggs. Midwest denies the remaining allegations in the first and second sentences of paragraph 5. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 and, to the extent that the remaining allegations in paragraph 5 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

  6.   The relevant conspiracy period, starting in at least 1999 and continuing through at least 2008, coincided with egg industry consolidation and rationalization. This reduced the number of producers and concentrated the production of eggs among a handful of large producers. By way of example, in 1987 the number of companies with flocks of 75,000 hens or more was around 2,500. In 2010, however, the number of companies with 75,000 hens or more (accounting for the ownership of 95% of layer hens) had shrunk to about 205.

  **<u>ANSWER:</u>**   Midwest denies the allegations in the first and second sentences of paragraph 6. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 6.

  7.   During the relevant conspiracy period, Defendants unlawfully agreed to and did implement their conspiracy to control supply and artificially maintain and increase the

price of eggs through a series of collective actions, including short-term measures, the UEP Certified Guidelines, and coordinated, large-scale exports. These collective actions include at least the following.

A. In 1999 and 2000, as a short-term measure to control supply, Defendants established a supply adjustment program under which Defendants agreed to engage in an immediate 5% flock molt, a 5% reduction of flock inventory in the next 6 to 12 months, and the development of a hatch reduction program. Around the same time, USEM members voted to pursue development of a chick hatch reduction program.

B. In 2001, as a short-term measure to control supply, Defendants agreed to a 5% emergency flock reduction.

C. In 2002, as a short-term measure to control supply, Defendants agreed to an early molt and hen disposal plan.

D. By at least 2002, Defendants, using "animal welfare" as a pretext, and after having succeeded to a certain extent in controlling supply through short-term measures, adopted a program of guidelines to control the supply of eggs, the "UEP Certified Guidelines." Defendants realized that the UEP Certified Guidelines were a more reliable, long-term way to control supply and artificially maintain and increase the prices of eggs. The UEP Certified Guidelines required Defendants to increase the cage space for each laying hen (*e.g.*, from 53 square inches to 67 square inches per hen). Defendants agreed that this minimum floor space allowance would be achieved in part through a chick hatch reduction, which

had the effect of limiting a producer's supply. Further, Defendants adopted this minimum floor space allowance with the understanding that hens displaced by lower density cages would not be replaced by building new facilities. The UEP Certified Guidelines had a direct and substantial impact on egg prices. Noting that 2003 had been "the best year on record for egg producers," an internal March 4, 2004 UEP newsletter explained that "[t]he supply side was held in check with the implementation of the animal welfare guidelines."

E.      Throughout the conspiracy, as part of the UEP Certified Guidelines to control the supply of eggs, Defendants imposed a series of monthly and other reporting requirements as well as annual or other periodic audits to enforce the conspiratorial agreements and to provide a means to monitor for and detect cheating. As part of the UEP Certified reporting requirements, members had to submit periodic reports of all "shells eggs and or egg products [that] were sold as UEP Certified eggs" as well as shell eggs and egg products purchased from other UEP Certified companies.

F.      On October 11–12, 2002 at UEP's Annual Board Meeting (which, like virtually all UEP board and committee meetings, was open only to UEP members and invited guests), as part of the UEP Certified Guidelines to control the supply of eggs, Defendants adopted a rule that required each participant to produce all of its eggs in compliance with the Guidelines, including eggs that Defendants purchased for resale. This was referred to as the "100% Rule." Defendants used this 100% Rule to extend the supply control requirements of the UEP Certified Guidelines to non-member producers. At this meeting, two producers moved

"[t]o reconfirm . . . that a company must commit to implementing the welfare guidelines on 100% of all production facilities regardless of how or where eggs may be marketed. The 100% commitment is intended to be inclusive of all company entities, affiliates, etc." The motion carried by a vote of 19 yes and 1 no.

G.      In mid-2004, as a short-term measure to control supply, Defendants agreed to an early molt and flock disposal plan.

H.      In or about October 2004, as a short-term measure to control supply, Defendants privately agreed to "establish a plan calling for hens currently scheduled for disposal between December 1, 2004 and July 1, 2005 be disposed of 4 weeks early or reduce your flock size by 5%."

I.      As part of a November 2004 Egg Industry Economic Summit, as a short-term measure to control supply, Defendants agreed to an "intentions program." Under the "intentions program," Defendants agreed to either "[1] To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled[; or 2] To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

J.      In December 2004, as part of the UEP Certified Guidelines to control the supply of eggs, Defendants privately adopted a rule that prohibited "backfilling," *i.e.*, the practice of replacing older hens that died to maintain overall flock size. Defendants adopted this backfilling ban after UEP's economics consultant

concluded that backfilling "could have disastrous effects" on egg prices and, as reported in an August 12, 2004 UEP internal newsletter, the backfilling practices had caused "poor egg prices."

K.      During a January 25, 2005 UEP Board of Directors meeting in Atlanta, Georgia, as a short-term measure to control supply, the Defendants expanded the "intentions programs" and agreed that "flocks [were] to be disposed of 4 weeks earlier than previously scheduled and/or flock size reduction by 5% be extended through Labor Day."

L.      Beginning at least as early as August 2002 and continuing through at least March 2008, Defendants engaged in coordinated, large-scale exports to control the supply of eggs.  In a private document, UEP acknowledged that "exports [we]re only taken in large volume shipments over a very short delivery period for the purpose of having the greatest impact upon surplus supply reduction." Defendants often exported eggs at a loss, and agreed to reimburse each other for related losses.  These coordinated exports had a direct and substantial impact on domestic egg prices.

As discussed in Section VIII below, Plaintiffs only became aware of Defendants' conspiracy and agreements to control supply and artificially maintain and increase the price of eggs as a result of the September 2008 public disclosures of government antitrust investigations and Plaintiffs' December 2010 settlement with the Moark co-conspirators which, as part of the settling producers' ongoing cooperation, included access to Defendants' internal documents that

disclosed their unlawful agreements and related communications which Defendants had concealed and misrepresented at all relevant times during the conspiracy.

**ANSWER:**     Midwest admits that UEP adopted voluntary animal husbandry guidelines and that the 2000 version of those guidelines called for cage space allowance in the range of 67-86 square inches per hen to optimize bird welfare; that members submit periodic reports as part of the UEP's animal welfare guidelines' auditing process; that UEP's Annual Board Meeting was held on October 11-12, 2002 in Savannah, Georgia, and that animal welfare issues were discussed at that meeting; that UEP held an "Economic Summit" meeting on November 16, 2004; that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities; and that certain Defendants, including Midwest, participated in certain USEM exports.  Midwest denies the remaining allegations in paragraph 7, including subparagraphs (A) through (L), inclusive, in paragraph 7 and, to the extent that the allegations in paragraph 7 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

8.     Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs was successful.  Privately, Defendants acknowledged that egg prices had increased and attributed those increases to their collective actions taken in furtherance of the conspiracy.  For example, in a June 4, 2003 internal newsletter, after noting that egg prices in May 2003 had been the "[b]est in [m]any [y]ears," UEP concluded that "[t]hese market improvements c[ould] be attributed to:  1.  Reduced pullet hatch finally making an impact upon

supplies.  2.  USEM exports reducing supplies at critical times.  3.  [UEP Certified] program beginning to work like many had projected."  Around two months later, in a private August 27, 2003 newsletter, UEP again acknowledged that "egg prices ha[d] risen to levels well above a year ago."  UEP then noted that one "major reason[]" for the increase was "[i]mplementing the space allowance to meet the industry's [UEP Certified] Guidelines."  In a September 11, 2003 internal newsletter that commented on 2003's high egg prices, UEP admonished producers "Don't screw up a good thing!!"

      **ANSWER:**    Midwest denies the allegations in the first two sentences of paragraph 8.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 and, to the extent that the remaining allegations in paragraph 8 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

      9.    Commenting on 2003 egg prices in a November 12, 2003 internal newsletter, UEP wrote that "[c]onsumers [we]re still buying eggs and we have seen no resistance to price."  Stated more concretely, a March 1, 2004 internal UEP newsletter estimated that the 2003 egg prices had been "a huge improvement in industry revenue of ONE BILLION DOLLARS (or more) !!"

      **ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 and, to the extent that the allegations in paragraph 9 purport to characterize written documents, Midwest denies that Plaintiffs accurately

or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

10.     Likewise, in a January 3, 2008 internal newsletter, UEP included the following as part of a "partial list of the reasons for extremely good egg prices" in 2007:  "UEP's animal welfare guidelines continued to reduce the number of hens per house"; "Producers reduced their egg supply during the week between Easter and Labor Day"; "Timely exports of shell eggs by the United States Egg Marketers"; "Very limited construction of new houses or remodeled houses during 2006 and 2007"; and "Producers did far better job of managing their business to meet supply/demand.'"

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 and, to the extent that the allegations in paragraph 10 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

11.     This Complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for injunctive relief and to recover damages that Plaintiffs have sustained because of Defendants' *per se* unlawful violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

**ANSWER:**     Midwest admits that Plaintiffs purport to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 1 of the Sherman Act, 15 U.S.C. § 1.  To the extent a response is required, Midwest denies the remaining allegations in

the first sentence of paragraph 11. Midwest admits the allegations in the second sentence of paragraph 11.

12.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) and 28 U.S.C. § 1391(b) and (c). A substantial part of the events or omissions giving rise to this claim occurred in this District; each Defendant is subject to personal jurisdiction in this District; Defendants transact business or are found in this District; and/or there is no district in which this action may otherwise be brought and a Defendant may be found in this District. The interstate commerce described in this Complaint was carried out, in part, within this District.

**ANSWER:**     Midwest admits that it transacted a very small amount of business in Pennsylvania between 2000 and 2008. Midwest does not contest that venue or personal jurisdiction are appropriate as to Midwest. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 to the extent they relate to other Defendants. Midwest denies any remaining allegations in paragraph 12.

13.     This Court has personal jurisdiction over Defendants because, among other reasons, Defendants: (a) have transacted business throughout the United States, including this District; (b) have substantial contacts within the United States, including in this District; and/or (c) have engaged in an illegal antitrust conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Personal jurisdiction exists over all Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), the Illinois long-arm statute (735 ILCS § 5/2-209), and/or Rule 4(k)(2) of the Federal Rules of Civil Procedure.

**ANSWER:** Midwest denies the allegations in paragraph 13 as they relate to Midwest, except that Midwest does not contest that this Court has jurisdiction over Midwest. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 as they relate to other defendants. Midwest denies any remaining allegations in paragraph 13.

14. Kraft Foods Global, Inc. is a Delaware corporation with its principal executive office at Three Lakes Drive, Northfield, Illinois. Kraft Foods Global, Inc., including its predecessors and its separately incorporated parents, subsidiaries, and controlled affiliates (including Cadbury plc and related acquired entities, Kraft Foods, Inc., and Kraft Foods North America, Inc.), all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with Kraft Foods Global, Inc., as "Kraft Foods." Kraft Foods is the world's second largest food company and manufactures and markets a wide variety of branded food products, including snacks, beverages, cheese, convenient meals, and confectioneries. During the relevant period, Kraft Foods purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein.

**ANSWER:** Midwest denies that it violated the antitrust laws or sold any products directly to Kraft Foods. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14.

15. The Kellogg Company is a Delaware corporation with its principal executive office at One Kellogg Square, Battle Creek, Michigan. The Kellogg Company, including its predecessors and divisions and its separately incorporated parents, subsidiaries, and controlled affiliates (including The Eggo Company, Keebler Company, Kellogg USA, Kellogg

North America Company, and Worthington Foods, Inc.), all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with The Kellogg Company, as "Kellogg." Kellogg is the world's leading producer of cereal, as well as a leading producer of convenience foods, including cookies, crackers, toaster pastries, cereal bars, frozen waffles, and vegetarian foods. Kellogg markets more than 1,500 products in over 180 countries. Kellogg brands include *Kellogg's*, *Keebler*, *Eggo*, *Morningstar Farms*, *Townhouse*, *Kashi*, and others. During the relevant period, Kellogg purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein.

        **ANSWER:**    Midwest denies that it violated the antitrust laws or sold any products directly to Kellogg. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15.

        16.    General Mills, Inc. is a Delaware corporation with its principal executive office at Number One General Mills Boulevard, Minneapolis, Minnesota. General Mills, Inc., including its predecessors and divisions and its separately incorporated parents, subsidiaries, and controlled affiliates (including General Mills Operations, LLC, and General Mills Operations, Inc.), all of which are Plaintiffs in this action, are hereinafter collectively referred to, along with General Mills, Inc., as "General Mills." General Mills is one of the largest food companies in the world, with products that range from Pillsbury refrigerated dough to Green Giant frozen vegetables, and from Cheerios cereal to Betty Crocker dessert mixes. During the relevant period, General Mills purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein.

**ANSWER:**    Midwest denies that it violated the antitrust laws or sold any products directly to General Mills.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16.

17.    Nestlé USA, Inc. is a Delaware corporation with its principal place of business in Glendale, California.  Nestlé USA, Inc., including its predecessors and divisions and its separately incorporated subsidiaries and affiliates (including Nestlé Prepared Foods Company and Nestlé Dreyer's Ice Cream Company), all of which are Plaintiffs in this action, are hereafter collectively referred to as "Nestlé USA."  During the relevant period, Nestlé USA purchased eggs directly from one or more Defendants or co-conspirators, and was injured by Defendants' antitrust violations alleged herein.

**ANSWER:**    Midwest denies that it violated the antitrust laws or sold any products directly to Nestle USA.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 17.

18.    Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation with its principal place of business in Jackson, Mississippi.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18.

19.    Cal-Maine is the largest egg producer in the United States, with 26.8 million laying hens and 6.7 million pullets and breeders, which is more than 8% of the United States flock.  The company has completed 16 acquisitions since 1989, ranging in size from 600,000 to 7.5 million layers.  In fiscal year 2011, Cal-Maine sold approximately 821 million

dozen shell eggs, approximately 18% of domestic shell egg consumption. Its sales for fiscal year 2011 were over $941 million. Cal-Maine markets eggs in 29 states in the Midwestern, Mid-Atlantic, Southeastern, and Southwestern United States. Cal-Maine produces approximately 80% of the eggs it sells, and purchases the rest on the spot market or from farmers under contract.

**ANSWER:** Midwest admits that it believed at all relevant times that Cal-Maine produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19.

20. Cal-Maine is a member of UEP and USEM and was a UEP Certified producer under the UEP Certified Guidelines (certificate no. 103). Fred Adams, Jr., the founder and former CEO of Cal-Maine, was a founding member of UEP. Fred Adams also served as a director and past chairman of USEM. In October 2010, Cal-Maine named Adolphus ("Dolph") Baker, Mr. Adams' son-in-law, to succeed Mr. Adams as CEO. Dolph Baker is a past chair and, as of October 18, 2010, was a director of UEP.

**ANSWER:** Midwest admits that Cal-Maine has been a member of UEP for at least some years between 2000 and 2008 and that Cal-Maine's representatives have served on various UEP committees. Midwest admits that Dolph Baker is a past Chairman of the UEP Board of Directors and has also served as a member of the UEP Board of Directors. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20.

21. Cal-Maine had a 44% membership interest before and a majority membership interest after 1998 in American Egg Products ("AEP"). AEP processes shell eggs

into liquid and frozen egg products for food manufacturers and the food service industry. It offers refrigerated products and frozen products, such as egg whites and yolks, whole eggs, cook-in-bag scrambled eggs, egg whites and yolks, salted egg yolks and whole eggs, scrambled egg mixes, sugared egg yolks, whole eggs and yolks with corn syrup, whole eggs with citric acid, and whole eggs with yolk added. AEP uses contract shell egg production for approximately 50% of its shell egg requirements and purchases the balance from regional egg markets. Ken Looper, vice chairman of Cal-Maine, has served as CEO of AEP.

**ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22. In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Cal-Maine (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes. Cal-Maine participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A. In 1999, Dolph Baker and Ken Looper presented the argument for adopting a coordinated supply management scheme to members of UEP and USEM. At this meeting, members agreed to: (1) an immediate molt of 5% of the flock; (2) cut back 5% on flock inventory over the next 6–12 months; and (3) develop a hatch reduction program.

B. Ken Looper attended a November 2001 UEP meeting where Defendants and co-conspirators agreed to a 5% emergency flock reduction. Mr. Looper

presented detailed statistics on bird numbers and pricing and asserted that the egg industry needed to reduce flock size to prevent continued low prices.

C.      Fred Adams, Dolph Baker, Ken Looper, and Steve Storm, also from Cal-Maine, attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

D.      Cal-Maine agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

E.      Cal-Maine explicitly agreed to the mid-2004 early molt and flock disposal plan.

F.      At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Dolph Baker was elected to serve on the Executive/Export Committee for 2004.

G.      At UEP's 2003 Annual Membership Meeting, Dolph Baker was elected to UEP's Board to serve as 1st Vice Chairman.  At UEP's 2004 Annual Membership Meeting, Dolph Baker and Ken Looper were elected to UEP's Board, with Mr. Baker serving as 1st Vice Chairman.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.  Dolph Baker (UEP Marketing

Committee Chair) also scheduled an "Economic Summit" in Atlanta, Georgia to further evaluate supply and demand.

H.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Cal-Maine signed a written commitment as part of UEP's "intentions program."

I.      Ken Looper and Fred Adams were on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions programs" was expanded.

J.      Steve Storm attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

K.      Cal-Maine was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

L.      Dolph Baker and Fred Adams attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities.  Dolph Baker also was elected to serve on the Export/Executive Committee for 2008.

M.      During the conspiracy period Cal-Maine employees have served in key executive positions and/or on committees of UEP on its behalf, including as

chairman of UEP.  In 2008, Cal-Maine employees served on UEP's Executive

Committee, Area #5, Finance Committee, Shell Egg Price Discovery Committee,

Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee,

Producer Committee for Animal Welfare, Long Range Planning Committee, and

the USEM Committee.

**ANSWER:**    Midwest denies that it participated in any unlawful conduct.

Midwest admits that Cal-Maine has been a member of UEP for at least some years between 2000

and 2008 and that Cal-Maine's representatives have served on various UEP committees.

Midwest further admits that Dolph Baker has served as Chairman of the UEP Board of Directors

and that Dolph Baker, Ken Looper and Fred Adams have served as members of the UEP Board

of Directors.  Midwest further admits that there was a UEP Board of Directors meeting on

October 10-11, 2002 in Savannah, Georgia and that animal welfare issues were discussed at that

meeting; that an Egg Industry Economic Summit was held on November 16, 2004 in Atlanta,

Georgia; that UEP's animal husbandry guidelines were modified to require producers who

voluntarily chose to participate in the UEP animal welfare program to comply with UEP's

animal husbandry guidelines at all of the producer's production facilities; and that a UEP Board

of Directors meeting was held on January 25, 2005 in Atlanta, Georgia.  Midwest is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph 22 , including subparagraphs (A) through (M), inclusive, in paragraph 22 and, to the

extent that the allegations in paragraph 22 purport to characterize a written document, Midwest

denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance

or context of the written document and further states that an authenticated document is the best

evidence of its content.

23.     Defendant Daybreak Foods, Inc. ("Daybreak") is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23.

24.     Daybreak is the eighth largest egg producer in the United States, with 9.2 million laying hens, about 2.7% of the United States flock.

**ANSWER:**    Midwest admits that it believed at all relevant times that Daybreak produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24.

25.     William Rehm is the owner and president of Daybreak.  Daybreak is a member of UEP.

**ANSWER:**    Midwest admits that Daybreak has been a member of UEP for at least some years between 2000 and 2008.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25.

26.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Daybreak (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes.  Daybreak participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     William Rehm  regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived.  In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

B.     Mr. Rehm attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

C.     At UEP's 2003 Annual Membership Meeting, Mr. Rehm was elected to UEP's Board.  At UEP's 2004 Annual Membership Meeting, Mr. Rehm again was elected to UEP's Board.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

D.     In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, producers signed written commitments as part of UEP's "intentions program."

E.     William Rehm was on UEP's Board of Directors during a January 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded.  Tony Rehm and Patricia Stronger, also from Daybreak, attended.

F.     Mr. Rehm served on UEP's Board of Directors from at least 2006–2009.

**ANSWER:**     Midwest denies that it participated in any unlawful conduct.  Midwest admits that Daybreak has been a member of UEP for at least some years between 2000 and 2008 and that Daybreak's representatives have served on various UEP committees.  Midwest

further admits that William Rehm was a member of the UEP Board of Directors for at least some years between 2000 and 2008. Midwest further admits that there was a UEP Board of Directors meeting on October 10-11, 2002 in Savannah, Georgia and that animal welfare issues were discussed at that meeting; that an Egg Industry Economic Summit was held on November 16, 2004 in Atlanta, Georgia; that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities; and that a UEP Board of Directors meeting was held in January 2005 in Atlanta, Georgia. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26, including subparagraphs (A) through (F), inclusive, in paragraph 26 and, to the extent that the allegations in paragraph 26 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

27.     Defendant Hillandale Farms of Pa., Inc. ("Hillandale PA") is a Pennsylvania corporation with its principal place of business in North Versailles, Pennsylvania.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.     Hillandale PA was established in 1962 and is the third largest egg producer in the United States, with 14 million laying hens, more than 4% of the United States flock. Orland Bethel owns the company and serves as President. Gary Bethel is Secretary. The

owners and/or managers of Hillandale PA owned, controlled, and/or managed co-conspirators Hillandale Farms, Inc., Hillandale-Gettysburg, L.P., and Hillandale Farms East, Inc.

**ANSWER:**    Midwest admits that it believed at all relevant times that one or more "Hillandale" entities produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 28.

29.    In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Hillandale PA (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction programs.  Hillandale PA participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.    Hillandale PA agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

B.    In 2003 Gary Bethel recognized that Hillandale PA had reduced supply through the UEP Certified Guidelines.

C.    In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Hillandale PA signed a written commitment as part of UEP's "intentions program."

D.    During a January 25, 2005 Board of Directors meeting in Atlanta, Georgia, this "intentions program" was expanded.

E.      As of January 11, 2008, UEP listed Hillandale PA among Certified

Companies and Licensed Marketers that had signed on to the UEP Certified

scheme (certification no. 182).

**ANSWER:**      Midwest denies that it participated in any unlawful conduct.

Midwest admits that "Hillandale" has been a member of UEP for at least some years between

2000 and 2008.  Midwest further admits that an Egg Industry Economic Summit was held on

November 16, 2004 in Atlanta, Georgia and that a UEP Board of Directors meeting was held on

January 25, 2005 in Atlanta, Georgia.  Midwest is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 29, including

subparagraphs (A) through (E), inclusive, in paragraph 29 and, to the extent that the allegations

in paragraph 29 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the

written document and further states that an authenticated document is the best evidence of its

content.

30.      Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware

corporation with its principal place of business in Minnetonka, Minnesota.  At all times before

and during the relevant conspiracy period, the entity was named Michael Foods, Inc.  In a 2011

SEC filing, Michael Foods reported that on June 29, 2010, M-Foods Holdings, Inc., together

with its subsidiaries (including Michael Foods, Inc.), merged with and into MFI Acquisition

Corporation.  The shareholders of MFI Holding corporation are (a) a Goldman Sachs affiliate,

GS Capital Partners VI Fund, LP and its affiliates ("GSCP") which owns approximately 75% of

the corporation; (b) affiliates and co-investors of Thomas H. Lee Partners, LP ("THL") which

owns approximately 21%; and (c) certain current and former members of management who own approximately 5%.

**ANSWER:**    Midwest denies that it engaged in any unlawful conduct.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30.

31.    Michael Foods produces and distributes egg products, cheese, other dairy case products, and potato products.  The Egg Products Division accounts for 68% of net sales, which were $1.54 billion in 2009.

**ANSWER:**    Midwest admits that it believed at all relevant times that Michael Foods produced eggs.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31.

32.    The Egg Products Division, composed of wholly owned subsidiaries M.G. Waldbaum Company ("Waldbaum"), Papetti's Hygrade Egg Products, Inc. ("Papetti's"), Abbotsford Farms, Inc., and MFI Food Canada Ltd., produces, processes, and distributes numerous egg products and shell eggs.  Michael Foods is the largest processed egg products producer and one of the largest egg producers in North America, with 11.2 million laying hens, more than 3% of the United States flock.

**ANSWER:**    Midwest admits that it believed at all relevant times that Michael Foods produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32.

33.     Michael Foods' brands include Abbotsford Farms, All Day Café, All Whites, Better 'n Eggs, Crystal Farms, Inovatech Egg Products, M.G. Waldbaum, Papetti's, and Trilogy Egg Products.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33.

34.     The Egg Products Division of Michael Foods distributes egg products to food processors, foodservice, and retail customers primarily in North America.  Most shell egg sales are made through the Crystal Farms Division, which markets Michael Foods' grocery products to U.S. retail grocery outlets.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34.

35.     Michael Foods is also affiliated with Sunbest-Papetti Farms, which was a UEP member and participated in the UEP Certified Guidelines.  Michael Foods' Egg Products Division purchases eggs under a supplier agreement with Sunbest-Papetti Farms.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

36.     Sunbest-Papetti Farms applied for certification and committed to the UEP Certified Guidelines in 2002 (certification no. 245).

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36.

37.     Jim Dwyer has been President and CEO of Michael Foods since October 2009.  He succeeded Gregg Ostrander, who became Executive Chairman of the company's Board of Directors.  Mr. Ostrander announced his retirement from that position in June 2010 but is now a member of the MFI Holding Corporation's board of directors following the completion of the merger.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37.

38.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Michael Foods (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction schemes.  Michael Foods participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     Tim Bebee of Michael Foods regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived.  In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

B.     Mr. Bebee attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

C.     Toby Catherman of Michael Foods was elected chairman of UEA in 2004. Mr. Catherman also served as chairman of the UEA-Further Processors in 2004.

D.      At UEP's 2003 Annual Membership Meeting, Terry Baker, Vice President

of Procurement for Michael Foods, was elected to UEP's Board.  At UEP's 2004

Annual Membership Meeting, Mr. Baker again was elected to UEP's Board.  In

October 2004, Defendants on the UEP Board approved a coordinated supply

management proposal at the UEP-UEA joint Annual Board Meeting in New

Orleans.

E.      In connection with the UEP Egg Industry Economic Summit on November

18, 2004, in Atlanta, Georgia, producers signed written commitments as part of

UEP's "intentions program."

F.      Terry Baker was on UEP's Board of Directors during a January 2005

Board meeting in Atlanta, Georgia when this "intentions program" was expanded.

Tim Bebee and Toby Catherman also attended.

G.      Tim Bebee attended an April 19, 2005 UEP Producer Committee for

Animal Welfare meeting in Chicago where the group discussed the marketing of

UEP Certified eggs by non-certified producers.

H.      Terry Baker served on UEP's Board of Directors from at least 2006–2008.

I.      Terry Baker attended an August 7, 2007 UEP Long Range Planning

Committee meeting in Salt Lake City, Utah.

J.      As of January 11, 2008, UEP listed Michael Foods among Certified

Companies and Licensed Marketers that had signed on to the UEP Certified

scheme (certification no. 345 and license agreement 509).

K.     At all relevant times, Michael Foods was active in UEP.  Employees of

Michael Foods have served in key executive positions and on committees of UEP

and UEA on behalf of Michael Foods.  In 2008, Michael Foods employees served

on UEP's Area #3, Government Relations Committee, Environmental Committee,

Quality Assurance/Food Safety Committee, Producer Committee for Animal

Welfare, and the Long Range Planning Committee.  Michael Foods employees

have attended UEP meetings and promoted efforts to reduce supply and fix prices.

**ANSWER:**     Midwest denies that it participated in any unlawful conduct and

denies that it signed a written commitment as part of a UEP intentions program.  Midwest admits

that Michael Foods has been a member of UEP for at least some years between 2000 and 2008

and that Michael Foods' representatives have served on various UEP committees.  Midwest

further admits that Terry Baker was a member of the UEP Board of Directors for at least some

years between 2000 and 2008.  Midwest further admits that a UEP Board of Directors meeting

was held in Savannah, Georgia on October 10-11, 2002 and that animal welfare issues were

discussed at that meeting; that an Egg Industry Economic Summit was held on November 18,

2004 in Atlanta, Georgia; that UEP's animal husbandry guidelines were modified to require

producers who voluntarily chose to participate in the UEP animal welfare program to comply

with UEP's animal husbandry guidelines at all of the producer's production facilities; and that a

UEP Board of Directors meeting was held in January 2005 in Atlanta, Georgia.  Midwest admits

that Tim Bebee attended meetings of the Producer Committee for Animal Welfare.  Midwest is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 38, including subparagraphs (A) through (K), inclusive, in paragraph 38

and, to the extent that the allegations in paragraph 38 purport to characterize a written document,

Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

39. Defendant Midwest Poultry Services, L.P. ("Midwest") is an Indiana corporation with its principal place of business in Mentone, Indiana. Midwest is the twelfth largest egg producer in the United States, with 6 million laying hens, 1.76% of the United States flock. Midwest is a member of UEP.

**ANSWER:** Midwest admits that it is an Indiana limited partnership with its principal place of business in Mentone, Indiana and is a member of UEP. Midwest further admits that it produces shell eggs. Midwest denies the remaining allegations in paragraph 39.

40. In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Midwest (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs. Midwest participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

    A. Robert Krouse of Midwest regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived. In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

    B. Midwest has been a member of USEM since 2000.

C.    Robert Krouse attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

D.    Midwest agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

E.    At UEP's 2003 Annual Membership Meeting, Mr. Krouse was elected to UEP's Board and to serve as Treasurer.  At UEP's 2004 Annual Membership Meeting, Mr. Krouse again was elected to UEP's Board and to serve as Treasurer. In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

F.    In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Midwest signed a written commitment as part of UEP's "intentions program."

G.    Robert Krouse was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded.

H.    Robert Krouse attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

I.      Midwest was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

J.      As of January 11, 2008, UEP listed Midwest among Certified Companies and Licensed Marketers that had signed on to the UEP Certified scheme (certification no. 102).

K.      Midwest representatives have served on various UEP committees, including, in 2008, UEP's Executive Committee (as first vice chairman), Finance Committee, Shell Egg Price Discovery Committee, Environmental Committee, and the Producer Committee for Animal Welfare.

**ANSWER:**      Midwest denies the allegations in the first and second sentences of paragraph 40.  With respect to subpart A of paragraph 40, Midwest admits that Bob Krouse attended some Producer Committee for Animal Welfare meetings where the UEP Certified guidelines were first discussed, but denies any remaining allegations.  Midwest admits the allegations in subpart B of paragraph 40. With respect to subpart C of paragraph 40, Midwest admits that Bob Krouse attended the UEP Annual Board Meeting held on October 10-11 in Savannah, Georgia, that animal welfare issues were discussed at that meeting, and that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities.  Midwest denies any remaining allegations in subpart C.  With respect to subpart D of paragraph 40, Midwest admits that it

participated in the UEP Certified Program. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart D of paragraph 40. With respect to subpart E of paragraph 40, Midwest admits that Bob Krouse was elected to UEP's Board and to serve as Treasurer in 2003 and 2004. Midwest denies the remaining allegations in subpart E of paragraph 40. Midwest denies the allegations in subpart F of paragraph 40. With respect to subpart G of paragraph 40, Midwest admits Bob Krouse was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia. Midwest denies the remaining allegations in subpart G of paragraph 40. With respect to subpart H of paragraph 40, Midwest admits that Bob Krouse attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart H of paragraph 40. With respect to subpart I of paragraph 40, Midwest admits that it was a member of USEM in October of 2006 and that it participated in the referenced export. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart I of paragraph 40. With respect to subpart J of paragraph 40, Midwest admits that it participated in the UEP Certified Program and that it was assigned certification number 102. Midwest denies the remaining allegations in subpart J of paragraph 40. With respect to subpart K of paragraph 40, Midwest admits that employees of Midwest have served on various UEP committees and that in 2008 Bob Krouse served on UEP's Executive Committee, Finance Committee, Shell Egg Price Discovery Committee, and the Producer Committee for Animal Welfare. Midwest further admits that in 2008 Mark Casper served on the UEP Environmental Committee. Midwest denies any remaining allegations in paragraph 40, and, to the extent that the allegations in paragraph 40, including subparagraphs (A) through (K),

inclusive, purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

41.     Defendant National Food Corporation ("National Food") is a Washington corporation headquartered in Everest, Washington.  National Food is the twenty-fourth largest egg producer in the United States, with 3.4 million laying hens.  National Food owns and operates some of its own feed mills, pullet farms, layer farms, processing plants, and distribution centers.  National Food sells table eggs and liquid and frozen egg products.

**ANSWER:**     Midwest admits that it believed at all relevant times that National Foods produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41.

42.     National Food is a member of UEP and USEM.

**ANSWER:**     Midwest admits that National Food has been a member of UEP for at least some years between 2000 and 2008.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42.

43.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, National Food (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs.  National Food participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.      Roger Deffner from National Food attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B.      At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Roger Deffner was elected to serve on the Executive/Export Committee for the next year.

C.      National Food agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

D.      At UEP 2003 Annual Membership Meeting, Roger Deffner was elected to UEP's Board and to serve as Chairman.  At UEP's 2004 Annual Membership Meeting, Mr. Deffner again was elected to UEP's Board and to serve as Chairman.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.  UEP Chairman Roger Deffner also scheduled an "Economic Summit" in Atlanta, Georgia to further evaluate supply and demand.

E.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, National Food signed a written commitment as part of UEP's "intentions program."

F.      Roger Deffner was on UEP's Board of Directors during a January 25,

2005 Board meeting in Atlanta, Georgia when this "intentions program" was

expanded.

G.      National Food was a USEM member when, on October 20, 2006, USEM

members voted to approve an export of 20 container loads of eggs at what a

November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to

members.

H.      As of January 11, 2008, UEP listed National Food among Certified

Companies and Licensed Marketers that had signed on to the UEP Certified

scheme (certification no. 184).

I.      National Food employees have attended UEP meetings and promoted

efforts to reduce supply and fix prices.  Roger Deffner has been an officer, board

member, and chairman of the board of UEP, and has served as a member of

various committees at UEP and USEM, including, in 2008, the Shell Egg Price

Discovery Committee, Shell Egg Marketing Committee (as chair), Public

Relations Committee, Long Range Planning Committee, and USEM Export

Committee (as secretary).  Roger Deffner was elected as the Secretary of USEM

and to serve on the Export/Executive Committee for 2008.  In these positions,

Deffner actively participated in and promoted Defendants' conspiracy.

J.      In 2008, National Food employees served on UEP's Area #2, Shell Egg

Price Discovery Committee, Shell Egg Marketing Committee (chair), Public

Relations Committee, Long Range Planning Committee, United States Egg
Marketers Export Committee (secretary).

**ANSWER:**     Midwest denies that it participated in any unlawful conduct.

Midwest admits that National Food has been a member of UEP for at least some years between
2000 and 2008 and that National Food's representatives have served as Chairman of UEP, on the
UEP Board of Directors, and on various UEP committees.  Midwest further admits that a UEP
Board of Directors meeting was held in Savannah, Georgia on October 10-11, 2002 and that
animal welfare issues were discussed at that meeting; that an Egg Industry Economic Summit
was held on November 18, 2004 in Atlanta, Georgia; and that a UEP Board of Directors meeting
was held on January 25, 2005 in Atlanta, Georgia.  Midwest is without knowledge or information
sufficient to form a belief as to the truth of the remaining allegations in paragraph 43, including
subparagraphs (A) through (J), inclusive, in paragraph 43 and, to the extent that the allegations in
paragraph 43 purport to characterize a written document, Midwest denies that Plaintiffs
accurately or completely interpreted, characterized or stated the substance or context of the
written document and further states that an authenticated document is the best evidence of its
content.

44.     Defendant NuCal Foods, Inc. ("NuCal") is a California corporation with
its principal place of business in Ripon, California.  NuCal is a federated agricultural cooperative
composed of two agricultural cooperatives:  Cal Eggs and Nulaid Foods, Inc., ("Nulaid").  Cal
Eggs is composed of two shell egg producers, J.S. West Milling Co., Inc. and Sunrise Farms,
LLC.  Nulaid is composed of two shell egg producers, Gemperle Enterprises, Inc. and Valley
Fresh Foods, Inc.  Combined, those four producers account for more than 10.5 million laying

hens, or more than 3% of the United States flock. NuCal is one of the largest distributors of shell eggs in the Western United States. NuCal is a member of UEP and USEM.

**ANSWER:**  Midwest admits that it believed at all relevant times that NuCal produced eggs. Midwest admits that NuCal has been a member of UEP for at least some years between 2000 and 2008. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 44.

45.  In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, NuCal (1) agreed to adopt the UEP Certified Guidelines, as has each co-operative member; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs. NuCal participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.  Chuck Elste, Ernie Gemperle, Mark Oldenkamp, and Gary West of NuCal attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B.  NuCal agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

C.  At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000. At that same meeting,

Chuck Elste was elected to serve on the Executive/Export Committee for the next
year.

D.      At UEP's 2003 Annual Membership Meeting, Steven Gemperle and mark
Oldenkamp were elected to UEP's Board.  At UEP's 2004 Annual Membership
Meeting, Mr. Gemperle and Mr. Oldenkamp again were elected to UEP's Board.
In October 2004, Defendants on the UEP Board approved a coordinated supply
management proposal at the UEP-UEA joint Annual Board Meeting in New
Orleans.

E.      In connection with the UEP Egg Industry Economic Summit on November
18, 2004, in Atlanta, Georgia, NuCal signed a written commitment as part of
UEP's "intentions program."

F.      Steve Gemperle and Mark Oldenkamp were on UEP's Board of Directors
during a January 2005 Board meeting in Atlanta, Georgia when this "intentions
program" was expanded.  Chuck Elste, Tom Silva, Jill Benson, and Wayne
Winslow from NuCal were present.

G.      Mark Oldenkamp attended an April 19, 2005 UEP Producer Committee
for Animal Welfare meeting in Chicago where the group discussed the marketing
of UEP Certified eggs by non-certified producers.  Mark Oldenkamp sponsored
two motions which passed.  One motion stated, "In order to protect the integrity
of the [UEP Certified] program and logo and in view of the difficulty in
preventing the commingling of certified eggs with non-certified eggs and to treat
all egg producers equally it is hereby moved that no new licenses to market [UEP]

Certified eggs will be issued or renewed to producers who are not ACC certified."
The motion carried with vote of 19 yes and 8 no. The second motion sponsored
by Oldenkamp stated that "a license to market [UEP Certified] eggs may be
issued to shell egg processors and further egg processors who do not own or
operate egg production facilities." The motion carried with a vote of 26 yes and 2
no.

H.      NuCal, Gemperle Enterprises, and J.S. West Milling were USEM
members when, on October 20, 2006, USEM members voted to approve an export
of 20 container loads of eggs at what a November 17, 2006 UEP internal
newsletter referred to as a "heavy cost" to members.

I.      Chuck Elste and Gary West attended an October 18, 2007 USEM meeting
in Chicago where the group discussed offers for 2008 and other export
opportunities. Elste was also elected as the Vice Chairman of USEM and to serve
on the Export/Executive Committee for 2008.

J.      As of January 11, 2008, UEP listed NuCal among Certified Companies
and Licensed Marketers that had signed on to the UEP Certified scheme (license
agreement 504). UEP also listed Gemperle Enterprises (certification no. 148),
J.S. West Milling (certification no. 131), Sunrise Farms (certification no. 135),
and Valley Fresh Foods (certification no. 136).

K.      In 2008, NuCal representatives served on UEP's Shell Egg Price
Discovery Committee, Shell Egg Marketing Committee, and Quality Assurance
Food Safety Committee, and on USEM's Export Committee.

    **ANSWER:**    Midwest denies that it participated in any unlawful conduct. Midwest admits that NuCal has been a member of UEP for at least some years between 2000 and 2008 and that NuCal's representatives have served on various UEP committees and on the UEP Board of Directors. Midwest further admits that a UEP Board of Directors meeting was held in Savannah, Georgia on October 10-11, 2002 and that animal welfare issues were discussed at that meeting; that an Egg Industry Economic Summit was held on November 18, 2004 in Atlanta, Georgia; that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities; and that a UEP Board of Directors meeting was held in January 2005 in Atlanta, Georgia. Midwest admits that certain entities were allowed to market eggs produced under the UEP animal welfare program if they obtained a marketing license, paid animal licensing fees, and agreed to submit periodic compliance reports, among other things. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 45, including subparagraphs (A) through (K), inclusive, in paragraph 45 and, to the extent that the allegations in paragraph 45 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

    46.    Defendant Ohio Fresh Eggs, LLC, ("Ohio Fresh") is incorporated under the laws of Ohio with its principal place of business in Croton, Ohio. It is the tenth largest egg producer in the United States, with 7.6 million laying hens, more than 2% of the United States flock. Hillandale PA purchases Ohio Fresh's entire output of shell eggs. Hillandale Farms,

LLC, holds a 70% membership interest in Ohio Fresh, and Orland Bethel is the sole member of Hillandale Farms, LLC.

**ANSWER:** Midwest admits that it believed at all relevant times that Ohio Fresh produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46.

47. In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Ohio Fresh (1) agreed to adopt the UEP Certified Guidelines and (2) participated in short-term supply reduction programs. Ohio Fresh committed acts in furtherance of the conspiracy including, but not limited to, the following.

A. In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Ohio Fresh signed a written commitment as part of UEP's "intentions program."

B. UEP's Board of Directors, during a January 25, 2005 Board meeting in Atlanta, Georgia, expanded this "intentions program."

C. As of January 11, 2008, UEP listed Ohio Fresh among Certified Companies and Licensed Marketers that had signed on to the UEP Certified scheme (certification no. 328).

**ANSWER:** Midwest denies that it participated in any unlawful conduct. Midwest admits that Ohio Fresh was a member of UEP for at least some years between 2000 and 2008; that an Egg Industry Economic Summit was held in Atlanta, Georgia on November 18, 2004; and that a UEP Board of Directors meeting was held on January 25, 2005 in Atlanta,

Georgia.  Midwest is without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in paragraph 47, including subparagraphs (A) through (C), inclusive,

in paragraph 47 and, to the extent that the allegations in paragraph 47 purport to characterize a

written document, Midwest denies that Plaintiffs accurately or completely interpreted,

characterized or stated the substance or context of the written document and further states that an

authenticated document is the best evidence of its content.

48.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation

with its principal place of business in Seymour, Indiana.  Rose Acre is the second largest egg

producer in the United States, with 20 million laying hens, nearly 6% of the United States flock.

The company produces shell eggs as well as liquid, frozen, and dried egg products.

**ANSWER:**     Midwest admits that it believed at all relevant times that Rose Acre

produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in paragraph 48.

49.     The Rust family founded the company in the 1930s as Rose Acre Brand

Eggs, and the company is still privately held by the Rusts.  Lois M. Rust is the President of the

company.  In 2009, Rose Acre acquired Crystal Farms, a shell egg producer based in Georgia

with approximately 2.5 million laying hens.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 49.

50.     Rose Acre is fully vertically integrated:  the company breeds its own stock, runs its own hatchery and feed mills, operates its own egg-breaking and egg-drying facilities for liquid and powdered egg products, and does its own packing.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50.

51.     Throughout the relevant period, Rose Acre was a UEP member.

**ANSWER:**    Midwest admits that Rose Acre has been a member of UEP for at least some years between 2000 and 2008.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51.

52.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Rose Acre (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction programs.  Rose Acre participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     Rose Acre agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

B.     At UEP's 2003 Annual Membership Meeting, Marcus Rust, a Rose Acre Executive Vice President, was elected to UEP's Board.  At UEP's 2004 Annual Membership Meeting, Marcus Rust again was elected to UEP's Board.  In

October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

C.      Greg Hinton of Rose Acre was elected Vice-Chairman of UEA in 2005.

D.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, producers signed written commitments as part of UEP's "intentions program."

E.      Marcus Rust was on UEP's Board of Directors during a January 25, 2005 Board meeting in Atlanta, Georgia when this "intentions program" was expanded. Greg Hinton and K.Y. Hendrix from Rose Acre also attended.

F.      Ky Hendrix attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

G.      On October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members. Rose Acre then became a USEM member for a January 2007 export of 300 container loads of eggs.

H.      Marcus Rust attended an October 18, 2007 USEM meeting in Chicago where the group announced officers for 2008 and discussed export opportunities.

I.     As of January 11, 2008, UEP listed Rose Acre among Certified
Companies and Licensed Marketers that had signed on to the UEP Certified
scheme (certification no. 198).

J.     Rose Acre officers served on UEP's Board of Directors from at least
2006–2008 and 2010.  Marcus Rust served on the USEM Executive Committee
from at least 2008–2009.

K.     In 2008, Rose Acre employees served on UEP's Area #3, Government
Relations Committee, Shell Egg Price Discovery Committee, Shell Egg
Marketing Committee, Environmental Committee, Producer Committee for
Animal Welfare, Public Relations Committee, Long Range Planning Committee,
Environmental Scientific Panel, and the United States Egg Marketers Export
Committee.  Rose Acre employees have attended UEP meetings and promoted
efforts to reduce supply and fix prices.

**ANSWER:**     Midwest denies that it signed a written commitment as part of a
UEP intentions program and denies that it participated in any unlawful conduct.  Midwest admits
that Rose Acre has been a member of UEP for at least some years between 2000 and 2008 and
that Rose Acre's representatives have served on various UEP committees and on the UEP Board
of Directors.  Midwest further admits that an Egg Industry Economic Summit was held on
November 16, 2004 in Atlanta, Georgia and that a UEP Board of Directors meeting was held on
January 25, 2005 in Atlanta, Georgia.  Midwest is without knowledge or information sufficient
to form a belief as to the truth of the remaining allegations in paragraph 52, including
subparagraphs (A) through (K), inclusive, in paragraph 52 and, to the extent that the allegations

in paragraph 52 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

53.     Defendant R.W. Sauder, Inc., ("R.W. Sauder") is a Pennsylvania corporation with its principal place of business in Litiz, Pennsylvania.  R.W. Sauder is the twenty-ninth largest egg producer in the United States, with 2.3 million laying hens.  R.W. Sauder sells table eggs and flavored egg products for retail and wholesale.  R.W. Sauder has its own processing and marketing operations.  R.W. Sauder is a UEP member.

**ANSWER:**     Midwest admits that it believed at all relevant times that R.W. Sauder produced eggs.  Midwest admits that R.W. Sauder has been a member of UEP for at least some years between 2000 and 2008.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53.

54.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and  increase egg prices, R.W. Sauder (1) agreed to adopt the UEP Certified Guidelines; (2) participated in Defendants' scheme to export eggs; and (3) participated in short-term supply reduction schemes.  R.W. Sauder participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     Paul Sauder of R.W. Sauder attended the UEP's Annual Board Meeting on

October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B.      R.W. Sauder agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

C.      Paul Sauder attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

D.      On October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.  R.W. Sauder then became a USEM member for a January 2007 export of 300 container loads of eggs.

E.      R.W. Sauder employees have served on UEP's Shell Egg Price Discovery Committee, Producer Committee for Animal Welfare, and Public Relations Committee.

F.      As of January 11, 2008, UEP listed R.W. Sauder among Certified Companies and Licensed Marketers that had signed on to the UEP Certified scheme (certification no. 121).

**ANSWER:**      Midwest denies that it participated in any unlawful conduct. Midwest admits that R.W. Sauder has been a member of UEP for at least some years between 2000 and 2008 and that R.W. Sauder's representatives have served on various UEP committees. Midwest further admits that a UEP Board of Directors meeting was held on October 10-11, 2002 in Savannah, Georgia and that animal welfare issues were discussed at that meeting.  Midwest

further admits that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 54, including subparagraphs (A) through (F), inclusive, in paragraph 54 and, to the extent that the allegations in paragraph 54 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

55.     Defendant Sparboe Farms, Inc. ("Sparboe Farms") is a Minnesota corporation with its principal place of business in Litchfield, Minnesota. Sparboe Farms is the fifth largest shell egg producer and marketer in the United States with 12 million laying hens.

**ANSWER:**    Midwest admits that it believed at all relevant times that Sparboe produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55.

56.     During the relevant period, Sparboe Farms was a UEP member.

**ANSWER:**    Midwest admits that Sparboe has been a member of UEP for at least some years between 2000 and 2008. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56.

57.     In furtherance of Defendants' conspiracy to control supply and artificially maintain and increase the price of eggs, Sparboe Farms (1) agreed to adopt the UEP Certified

Guidelines; (2) participated in Defendants' scheme to export; (3) participated in short-term supply reduction programs. Sparboe participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

> A.     Garth Sparboe from Sparboe Farms regularly attended UEP Animal Welfare Committee meetings starting in 1999 when the UEP Certified Guidelines were first conceived. In those meetings, the participants privately discussed the fact that the program's express purpose was to reduce supply.

> B.     Bob Sparboe was listed as a USEM member on the minutes for USEM's Annual Meeting on October 22, 2004 in New Orleans.

> C.     Sparboe Farms' employees have served in executive positions and/or on committees on behalf of UEP.

**ANSWER:**     Midwest denies the second sentence in subparagraph (A) and denies that it participated in any unlawful conduct. Midwest admits that Sparboe has been a member of UEP for at least some years between 2000 and 2008 and that Sparboe's representatives have served on various UEP committees. Midwest further admits that Garth Sparboe attended meetings of the Producer Committee for Animal Welfare. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57, including subparagraphs (A) through (C), inclusive, in paragraph 57 and, to the extent that the allegations in paragraph 57 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance

or context of the written document and further states that an authenticated document is the best evidence of its content.

58.　Defendant United Egg Producers, Inc. ("UEP") is organized as a nonprofit corporation under the laws of the state of Georgia.　UEP was formed in 1968 when five regional cooperatives combined.

**ANSWER:**　Midwest admits that UEP is a Capper-Volstead Agricultural Cooperative corporation organized and existing under the laws of the State of Georgia.　Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58.

59.　As of August 2008, UEP had 205 members, representing approximately 270 million hens, or 97% of the United States flock.　Gene Gregory is the President and CEO of UEP.　Al Pope was the President of UEP before his retirement in 2007.　The organization's headquarters are in Alpharetta, Georgia.

**ANSWER:**　Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 59.　Midwest admits the allegations in the last three sentences of paragraph 59.

60.　UEP administers the UEP Certified Guidelines, which are described more fully throughout this Complaint.

**ANSWER:**　Midwest admits that UEP administers the UEP animal welfare program and that Plaintiffs purport to characterize the Animal Husbandry Guidelines for U.S. Egg Laying Flocks in their Complaint.　Midwest denies Plaintiffs' characterization of the

Guidelines, and denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the Guidelines and further states that an authenticated document is the best evidence of its content. Midwest denies the remaining allegations in paragraph 60.

61. Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized under the laws of the state of Georgia. During all or most of the relevant period, UEP managed USEM. USEM shares a mailing address in Alpharetta, Georgia, and a web site with UEP. Gene Gregory, the President and CEO of UEP, has used the title "President of USEM."

**ANSWER:** Midwest admits that USEM is a Capper-Volstead Agricultural Cooperative organized and existing under the laws of the state of Georgia. Midwest further admits that UEP and USEM have the same mailing address in Alpharetta, Georgia, and that USEM is managed by UEP pursuant to a management agreement. UEP further admits that Gene Gregory is the President of UEP and has used the title President of USEM. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 61.

62. USEM represents that it is a producer cooperative established specifically for the purpose of exporting large quantities of United States shell eggs. In 2004, USEM's website stated that it "[was]s primarily in the business to respond to export inquiries which are too large for individual egg producers," and "d[id] not actively export or look for export but attempts to put together large volumes when the opportunity is available." At the time, USEM members represented approximately 40% of the nation's egg production. As of October 8, 2003, USEM included 68 companies with ownership of 109 million layers as members.

**ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 and, to the extent that the allegations in paragraph 62 purport to characterize a website, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the website and further states that an authenticated document is the best evidence of its content.

63. USEM organized and negotiated large-scale, coordinated exports that impacted domestic supply and that maintained, stabilized, and increased egg prices. These exports are described more fully throughout the Complaint.

**ANSWER:** Midwest admits that USEM negotiated shell egg export sales. Midwest denies the remaining allegations in paragraph 63.

64. Co-conspirator United Egg Association ("UEA") is a nonprofit corporation organized under the laws of the District of Columbia. UEP manages UEA. UEA shares a mailing address in Alpharetta, Georgia, and a website with UEP, and the two organizations have held their annual membership meetings jointly. Gene Gregory, the President and CEO of UEP, has used the title "President of UEA." Chad Gregory, Gene Gregory's son and the Senior Vice President of UEP, has used the title "Vice President of UEA." UEA and UEP often coordinate activities. For example, in 2004, UEP informed its members that UEA scheduled a meeting for UEA members during the UEP Annual Board Meeting and Executive Conference in New Orleans.

**ANSWER:** Midwest denies that it participated then in any unlawful conspiracy. Midwest admits that UEA is a non-profit corporation organized and existing under the laws of the District of Columbia. Midwest further admits that UEP and UEA have the same

mailing address in Alpharetta, Georgia and that certain UEP meetings have been held at the same

location and around the same time as certain UEA meetings. Midwest further admits that Gene

Gregory is the President of UEP. Midwest further admits that Chad Gregory is Gene Gregory's

son and that Chad Gregory is the Senior Vice President of UEP. Midwest is without knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

64.

65.     UEA has three divisions:  UEA Further Processors, UEA Allied, and UEA

Producers and Packers. UEA Further Processors was established in 1983 to represent companies

engaged in breaking and further egg processing. The division has approximately 20 members,

who break and process about 80% of all United States eggs broken, and customers include

bakeries, food service establishments and food manufacturers. UEA Allied was organized in

January 1995 as a trade association representing companies or individuals who are engaged in

providing products, services, consulting, and/or information services to the egg industry, but who

do not produce eggs or engage in the processing of eggs into egg products. UEA Producers and

Packers was organized in September 1995 as a trade association to represent companies or

individuals who pack (and/or produce) eggs.

**ANSWER:**     Midwest admits that UEA is comprised of three divisions: UEA

Further Processor Division, UEA Allied Industry Division, and UEA Producer/Packer Division.

Midwest is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 65, and, to the extent that the allegations in paragraph 65

purport to characterize a website, Midwest denies that Plaintiffs accurately or completely

interpreted, characterized or stated the substance or context of the website and further states that

an authenticated document is the best evidence of its content.

66.     Co-conspirator Moark LLC ("Moark") is a Missouri limited liability company, with its offices and principal place of business located in Norco, California.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 66.

67.     Co-conspirator Norco Ranch, Inc. ("Norco") is a California corporation with its principal place of business in Norco, California.  It is a subsidiary of Moark.  During all relevant times, Norco was an active participant in the conspiracy as alleged herein.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67.

68.     Moark Productions began in 1957.  In 2000, Moark Productions and Land O'Lakes formed a joint venture, Moark—a national, consolidated egg company.  The companies jointly operated this joint venture from 2000 until Land O'Lakes acquired 100% of the ownership of Moark in 2006.  During the time period of this joint venture, Moark was an active participant in the conspiracy as alleged herein.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 68.

69.     Co-conspirator Moark participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

A.     Joe Fortin and Paul Osborne of Moark attended the UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.

B.     Moark agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.

C.     At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Joe Fortin was elected to serve on the Executive/Export Committee for the next year.

D.     Moark explicitly agreed to the mid-2004 early molt and flock disposal plan.

E.     At UEP's 2003 Annual Membership Meeting, Joe Fortin was elected to UEP's Board and to serve as its Secretary.  At UEP's 2004 Annual Membership Meeting, Mr. Fortin again was elected to UEP's Board and to serve as its Secretary.  In October 2004, Defendants on the UEP Board approved a

coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

F.      Dan Meagher of Moark was elected vice chairman of UEA in 2004 and 2005.

G.      In connection with the UEP Egg Industry Economic Summit on November 18, 2004, in Atlanta, Georgia, Moark signed a written commitment as part of UEP's "intentions program."

H.      Joe Fortin, Dave Cisneros, Jerry Kil, Dan Knutson, Dan Meagher, and Paul Osborne from Moark attended a January 25, 2005 Board of Directors meeting in Atlanta, Georgia when this "intentions programs" was expanded.

I.      Joe Fortin attended an April 19, 2005 UEP Producer Committee for Animal Welfare meeting in Chicago where the group discussed the marketing of UEP Certified eggs by non-certified producers.

J.      Moark was a USEM member when, on October 20, 2006, USEM members voted to approve an export of 20 container loads of eggs at what a November 17, 2006 UEP internal newsletter referred to as a "heavy cost" to members.

K.      Jerry Kil attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities.  Mr. Kil was also elected to serve on the Export/Executive Committee for 2008.

L.       As of January 11, 2008, UEP listed Moark Productions among Certified
Companies and Licensed Marketers that had signed on to the UEP Certified
scheme (certification no. 147).

M.       Moark was a member of UEP and UEA and its employees served in key
executive positions and/or on committees of these organizations on behalf of
Moark.  In 2008, Moark employees served on UEP's Executive Committee
(secretary), Area #1, Area #4, Finance Committee, Government Relations
Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing
Committee, Quality Assurance/Food Safety Committee, and Producer Committee
for Animal Welfare, Public Relations Committee, Long Range Planning
Committee, and the United States Egg Marketers Export Committee.  Moark
employees have attended UEP meetings and promoted efforts to reduce supply
and fix prices.  Moark has participated in and benefitted from UEP's and its co-
conspirators' efforts to reduce supply and fix prices, as outlined herein.

N.       Moark was a member of USEM and/or participated in egg exports, sharing
any associated financial losses with other members, in order to reduce domestic
egg supplies and fix, maintain, and raise prices.

**ANSWER:**     Midwest denies that it participated in any unlawful conduct.
Midwest admits that Moark has been a member of UEP for at least some years between 2000 and
2008 and that Moark's representatives have served on various UEP committees and on UEP's
Board of Directors.  Midwest further admits that a UEP Board of Directors meeting was held in
Savannah, Georgia on October 10-11, 2002 and that animal welfare issues were discussed at that

meeting; that an Egg Industry Economic Summit was held on November 18, 2004 in Atlanta,

Georgia; that UEP's animal husbandry guidelines were modified to require producers who

voluntarily chose to participate in the UEP animal welfare program to comply with UEP's

animal husbandry guidelines at all of the producer's production facilities; and that a UEP Board

of Directors meeting was held on January 25, 2005 in Atlanta, Georgia.  Midwest admits that

USEM negotiated an export of shell eggs in October 2006.  Midwest is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph

69, including subparagraphs (A) through (N), inclusive, in paragraph 69 and, to the extent that

the allegations in paragraph 69 purport to characterize a written document, Midwest denies that

Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of

the written document and further states that an authenticated document is the best evidence of its

content.

      70.    Co-conspirator Norco participated in many meetings and communications

and committed numerous acts in furtherance of the conspiracy including, but not limited to, the

following.

      A.    Norco agreed to the UEP Certified Guidelines by 2003, when at least 202

companies with ownership of 226.2 million layers (or approximately 82% of the

nation's laying flock) also had agreed to the UEP Certified Guidelines.

      B.    Norco explicitly agreed to the mid-2004 early molt and flock disposal

plan.

C.      Norco was a USEM member when, on October 20, 2006, USEM members

voted to approve an export of 20 container loads of eggs at what a November 17,

2006 UEP internal newsletter referred to as a "heavy cost" to members.

D.      As of January 11, 2008, UEP listed Norco among Certified Companies

and Licensed Marketers that had signed on to the UEP Certified scheme

(certification no. 133).

E.      Norco was a member of UEP and its employees served in key executive

positions and/or on committees of the organization on behalf of Norco.  In 2008,

Norco employees served on UEP's Government Relations Committee.  Norco

employees have attended UEP meetings and promoted efforts to reduce supply

and fix prices.

F.      Norco was a member of USEM and/or participated in USEM-sponsored,

coordinated egg exports, sharing any associated financial losses with other

members, in order to reduce domestic egg supplies and fix, maintain, and raise

prices.

**ANSWER:**      Midwest denies that it participated in any unlawful conduct.

Midwest admits that Norco has been a member of UEP for at least some years between 2000 and

2008 and that Norco's representatives have served on various UEP committees.  Midwest further

admits that a UEP Board of Directors meeting was held in Savannah, Georgia on October 10-11,

2002 and that animal welfare issues were discussed at that meeting; that an Egg Industry

Economic Summit was held on November 18, 2004 in Atlanta, Georgia; and that a UEP Board of

Directors meeting was held on January 25, 2005 in Atlanta, Georgia.  Midwest admits that

USEM negotiated an export of shell eggs in October 2006. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70, including subparagraphs (A) through (F), inclusive, in paragraph 70 and, to the extent that the allegations in paragraph 70 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

71. Co-conspirator Hillandale Farms, Inc., is incorporated in Ohio with its principal place of business in Corry, Pennsylvania. It was established in 1961. Orland Bethel owns Hillandale Farms, Inc. Gary Bethel is both President and Secretary.

**ANSWER:** Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71.

72. Co-conspirator Hillandale-Gettysburg, L.P., is organized under the laws of the state of Pennsylvania and headquartered in Gettysburg, Pennsylvania. It was established in 1998. Orland Bethel owns part of Hillandale-Gettysburg, L.P. Donald Hershey is a limited partner.

**ANSWER:** Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 72.

73.     Co-conspirator Hillandale Farms East, Inc. is incorporated in Pennsylvania with its principal place of business in Spring Grove, Pennsylvania.  It was established in 1977. Hillandale PA has a 57% ownership interest in Hillandale Farms East, Inc.  Hillandale Farms East, Inc.  also is owned in part by Gary Bethel.  Gary Bethel is president of the corporation and Orland Bethel is secretary and treasurer.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 73.

74.     Co-conspirators Hillandale Farms, Inc., Hillandale-Gettysburg, L.P., and Hillandale Farms East, Inc. are collectively referred to as "Hillandale Farms."  The owners and/or managers of Hillandale PA owned, controlled, and/or managed the Hillandale Farms entities.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 74.

75.     One or more of the Hillandale Farms entities was a member UEP during the relevant time period.  In 2008, Ron Ballew and James Minkin, acting on Hillandale-Gettysburg, L.P.'s behalf, served on UEP's Shell Egg Marketing Committee and Environmental Committee.

**ANSWER:**     Midwest admits that one or more of the "Hillandale" entities was a member UEP for at least some years between 2000 and 2008. Midwest is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 75.

      76.    Up until 2008, Hillandale, LLC had a 27.5% membership interest in AEP. AEP processes shell eggs into liquid and frozen egg products for food manufacturers and the food service industry. It offers refrigerated products and frozen products, such as egg whites and yolks, whole eggs, cook-in-bag scrambled eggs, egg whites and yolks, salted egg yolks and whole eggs, scrambled egg mixes, sugared egg yolks, whole eggs and yolks with corn syrup, whole eggs with citric acid, and whole eggs with yolk added. AEP uses contract shell egg production for approximately 50% of its shell egg requirements and purchases the balance from regional egg markets.

      **ANSWER:**   Midwest admits that it believed at all relevant times that a "Hillandale" entity produced eggs. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76.

      77.    Co-conspirator Wabash Valley Produce Inc. ("Wabash Valley") is an Indiana corporation with its principal place of business in Dubois, Indiana. As of April 1, 2010, Bradley Seger was the President of Wabash Valley.

      **ANSWER:**   Midwest denies that it participated in any unlawful conspiracy. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 77.

78.     Wabash Valley participated in many meetings and communications and committed numerous acts in furtherance of the conspiracy including, but not limited to, the following.

      A.     At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000. At that same meeting, Larry Seger of Wabash Valley, was elected to serve on the Executive/Export Committee for the next year.

      B.     At the October 13, 2006 USEM meeting in San Antonio, Larry Seger of was elected as Chairman of USEM and also to serve on the USEM Executive/Export Committee.

      C.     Scott Seger of Wabash Valley attended an October 18, 2007 USEM meeting in Chicago where the group discussed offers for 2008 and other export opportunities. Larry Seger was also elected as the Chairman of USEM and to serve on the Export/Executive Committee for 2008.

**ANSWER:**     Midwest denies that it participated in any unlawful conduct. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 78, including subparagraphs (A) through (C), inclusive, in paragraph 78 and, to the extent that the allegations in paragraph 78 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

79.     Various other persons, entities, companies and corporations not named as Defendants in this Complaint, including some whose identities are presently unknown, participated with Defendants in the antitrust conspiracy alleged herein, and made statements and performed acts in furtherance of the overall conspiracy to control and manipulate supply and fix prices for eggs and egg products.  These co-conspirators include, without limitation, Gene Gregory, Al Pope, Dolph Baker, Gary West, Ken Looper and others.

**ANSWER:**     Midwest denies the allegations in paragraph 79.

80.     At the beginning of the egg production cycle, once chicks are hatched (either by vertically integrated egg producers or by specialty hatcheries) and vaccinated, they are placed in layer pens or in pullet houses.  Producers control the total hours of light and darkness that pullets receive to allow for skeletal growth before egg production begins.

**ANSWER:**     Midwest admits that chicks may be placed in a pullet house and that egg producers may regulate egg laying hens' exposure to light.  Midwest denies the remaining allegations in paragraph 80.

81.     A flock begins producing eggs at 18 to 22 weeks of age.  At this stage, approximately 10% to 20% of the hens are producing eggs.  A flock's production then increases up to its peak—about 90% production—at 30 to 32 weeks of age.  Production then generally decreases, and by the time the hens reach 60 to 70 weeks of age, the flock's production will drop to around 50%.

**ANSWER:**     Midwest denies the allegations in paragraph 81.

82.     When a flock's production has declined to around 50%, the producer may decide to molt the flock.  Molting is a natural process for hens that usually occurs when the days become shorter during the fall.  Hens will substantially reduce their feed intake, stop laying eggs, and replace their feathers.

**ANSWER:**     Midwest admits that the allegations in paragraph 82 set forth some possible explanations for and descriptions of the molting process.  Midwest denies the remaining allegations in paragraph 82.

83.     A producer can artificially induce the molting process by withdrawing or limiting food and controlling light exposure.  Molting is a way for a producer to control the supply of eggs.   All else being equal, a producer is less likely to induce molting when egg prices are high and more likely to induce molting when egg prices are low.

**ANSWER:**     Midwest admits that molting is a natural process of chickens and other feathered species in which birds shed and renew old, worn plummage and temporarily cease egg production.  Midwest denies the remaining allegations in paragraph 83.

84.     To achieve optimal results from a molt, hens must completely stop laying eggs for 14 to 17 days.  Approximately 10 weeks after a producer has induced molting, the flock will increase back up to 50% production.  Production following a molt will then peak at around 80%.  This peak is short-lived, and the flock generally returns to 50% production at 100 to 110 weeks of age.

**ANSWER:**     Midwest admits that farmers are able to induce molting. Midwest denies the remaining allegations in paragraph 84.

85.     Once the flock has declined to around 50% production after a molting, the producer will decide whether to molt the hens again or to send them to a spent-hen processing facility.  Whether a producer will induce a second molting commonly depends on current egg prices and the availability of replacement pullets.  A producer ends production for a majority of hens between 100 and 130 weeks.

**ANSWER:**     Midwest admits that egg farmers may elect to molt or dispose of egg-laying hens.  Midwest denies the remaining allegations in paragraph 85.

86.     According to the United States Department of Agriculture, as of April 2009, egg producers in the United States produced more than 90 billion eggs annually.  A large majority of these 90 billion eggs are consumed domestically, with over three quarters used for human consumption.

**ANSWER:**     Midwest admits that a majority of U.S. egg production is consumed domestically.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 86.

87.     The shell eggs sector includes:  table eggs, sold for immediate consumption in the home or in restaurants, or as ingredients in baked goods and other food items; breaking eggs, sold for use in processed egg products; and hatching eggs, used to produce breeder stock or growing stock, for eggs or meat.

**ANSWER:**     Midwest admits that shell eggs may include table eggs that are sold for consumption and breaking eggs that are used in egg products.  Midwest further admits that restaurants are among the potential purchasers of shell eggs and that shell eggs may be used as

an ingredient in baked goods and other food products. Midwest denies the remaining allegations in paragraph 87.

88. Shell eggs, often referred to as breaking eggs, also are processed further into egg products. Automated systems crack the shells and separate yolks from whites. Egg products can be sold in liquid, frozen, or dried form. Egg products sold in liquid form are pasteurized and packed. Egg products sold in frozen form are pasteurized and then typically frozen in large containers. Egg products sold in dried form are usually produced by spray drying.

**ANSWER:** Midwest admits that shell eggs may be processed into egg products, that automated systems may be utilized in the production of egg products, and that egg products may be sold in liquid, frozen, or dried form. Midwest further admits that egg products production may involve, among other things, breaking, pasteurizing, and/or freezing. Midwest further admits that dried egg production may involve spray drying. Midwest denies the remaining allegations in paragraph 88.

89. Approximately 30% of eggs produced in the United States are breaking eggs that are used for egg products. Egg products are used as ingredients in processed food items, such as baked goods, confectionery, mayonnaise, pasta, and salad dressings.

**ANSWER:** Midwest admits that egg products may be used as an ingredient in commercial baked goods and food items like mayonnaise, pasta and salad dressing. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 89.

90.     In 2009, 1.2 billion pounds of egg products (43%) were sold to food processors, 1.4 billion pounds (51%) to foodservice customers and 0.2 billion pounds (6%) to retailers.  The American Egg Board reports that the primary applications for egg products (based on 2009 volume) include bakery (400 million pounds), mayonnaise (275 million pounds), dairy (200 million pounds) and pasta (125 million pounds).

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and, to the extent that the allegations in paragraph 90 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

91.     Within the segment of eggs used for human consumption, the shell egg and egg products sectors are both very substantial.  According to a 2004 forecast prepared by co-conspirator Moark, egg industry revenue was projected to exceed $6 billion, with roughly $2 billion derived from processed egg products.  For 2008, the United States Department of Agriculture estimated the farm value of domestic egg production for human consumption at $6.2 billion.

**ANSWER:**     Midwest denies it participated in a conspiracy.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 91 and, to the extent that the allegations in paragraph 91 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted,

characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

92.     Shell eggs include both generic and specialty eggs, with specialty eggs including organic, all-natural, cage-free, vegetarian, and omega-3 varieties.

**ANSWER:**     Midwest admits that specialty eggs are sometimes referred to as organic, all-natural, cage-free, vegetarian, and omega-3.  Midwest denies the remaining allegations in paragraph 92.

93.     It is estimated that 90% of all shell eggs sold in the United States in the retail and foodservice channels are sold at prices related to the Urner Barry wholesale quotations for eggs, which are based largely on information provided by Defendants.  The trend among some large buyers of shell eggs and egg products in recent years is to purchase based on a cost-based formula tied to poultry feed (primarily corn and soybean meal) costs.

**ANSWER:**     Midwest admits that some egg buyers have purchased eggs based on a formula or contract that includes cost as a component.  Midwest admits that Urner Barry publishes newsletters that include egg price quotations that are relied on in certain egg sales contexts.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 93.

94.     Supply and demand factors affect shell eggs and egg products in very similar ways.  Shell eggs are the key input for egg products, and feed costs are a primary cost component for both.  Both shell eggs and breaking eggs originate from laying hens.

**ANSWER:**     Midwest admits that the prices of eggs and egg products may be influenced by supply and demand.  Midwest further admits that shell eggs are used in the production of egg products, that feed costs, among other factors, may affect the prices of shell eggs, and that shell eggs and breaking eggs originate from laying hens.  Midwest denies the remaining allegations of paragraph 94.

95.     Prices for shell eggs and egg products are correlated.  Most leading producers produce and sell both shell eggs and egg products.  Reduction or control of eggs supply artificially increased prices for both shell eggs and egg products.  Defendants and their co-conspirators were aware of this relationship and agreed to control egg supply to artificially maintain and increase prices for shell eggs and for egg products.  By way of example, Defendants agreed to apply the UEP Certified Guidelines' 100% Rule to both shell eggs and egg products.  Indeed, in early 2003 Defendants considered but rejected a proposal to limit the application of the 100% Rule to shell eggs.

**ANSWER:**     Midwest denies the allegations in the first, third, and fourth sentences of paragraph 95.  Midwest admits that some egg producers produce and sell both shell eggs and egg products and that the UEP Certified Program was amended to cover all eggs produced by egg farmers who voluntarily agreed to participate in the program.  Midwest further admits that some producers, including Midwest, were opposed to the 100% Rule.  Midwest denies the remaining allegations in paragraph 95.

96.     Shell eggs and processed eggs are commodity products.  In most instances, eggs are homogenous and fungible products that are readily substitutable, with no qualitative or other factors that differentiate one producer's eggs from those of any other

producer. There also is little if any advertising or promotion to create any brand or other product identity.

     **ANSWER:**   Midwest denies the allegations in paragraph 96.

     97.    Historically, according to Defendant Cal-Maine's August 4, 2011 Form 10-K (p. 4)

> demand for shell eggs increases in line with overall population growth, averaging an increase of about 1% per year. According to U.S. Department of Agriculture . . . reports, since 2000, annual per capita consumption in the United States has varied between 247 and 258 eggs. In calendar year 2010, per capita consumption in the United States was estimated to be 247 eggs, or approximately five eggs per person per week.

     **ANSWER:**   Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and, to the extent that the allegations in paragraph 97 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

     98.    There are no effective substitutes for eggs. According to research conducted by the American Egg Board, "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single egg alternative."

     **ANSWER:**   Midwest denies the allegations in the first sentence of paragraph 98. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 98 and, to the extent that the allegations in the

second sentence of paragraph 98 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

99.  Demand for eggs generally is inelastic—*i.e.*, demand generally remains stable (or increases) when prices increase.  The inelasticity of demand for eggs is widely acknowledged by industry insiders.  UEP president Gene Gregory told *Egg Industry* magazine in February 2007, "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same."

**ANSWER:**    Midwest admits that its representatives have expressed views about the elasticity of egg demand and otherwise denies of the allegations in the first sentence of paragraph 99.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 99 and, to the extent that the remaining allegations in paragraph 99 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

100.  Defendants consistently acknowledged that a very small change in actual (or perceived) supply of eggs can cause a disproportionately large change in egg prices.  For example, an April 14, 2005 internal UEP newsletter, stated that "a small percentage change in supply can have . . . a major impact upon price."  As reported in a September 23, 2008 *Wall Street Journal* article, UEP's executive director Gene Gregory said that "it [wa]s amazing how

one or two percent c[ould] have an effect on the rest of your domestic price." An executive of Defendant Cal-Maine stated in a July 11, 2007 *Investor's Business Daily* article that "[o]ne or two percent on the supply side affects prices by 20% or 30%." In its August 4, 2011 Form 10-K (p. 6), Defendant Cal-Maine acknowledged that "small increases in production or decreases in demand can have a large adverse effect on prices and vice-versa."

      **ANSWER:** Midwest denies of the allegations in the first sentence of paragraph 100. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 100 and, to the extent that the allegations in paragraph 100 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

      101. Prior to the conspiracy, as stated in a March 23, 2008 *Chicago Tribune* article, historically the market for eggs had been volatile—when prices were high, "the egg industry's normal response . . . [wa]s to feverishly add capacity until prices drop[ped] like a rock." Defendant Cal-Maine acknowledged this volatility, noting in its August 4, 2011 Form 10-K (p. 9) that "[t]he shell egg industry has traditionally been subject to periods of high profitability followed by periods of significant loss." As further described by Cal-Maine, producers typically have varied supply based on prices: "In the past, during periods of high profitability, shell egg producers have tended to increase the number of layers in production with a resulting increase in the supply of shell eggs, which generally has caused a drop in shell egg prices until supply and demand return to balance."

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest admits that egg prices have fluctuated.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 101 and, to the extent that the allegations in paragraph 101 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

102.     All major egg producers in the United States are vertically integrated, either through contracts or ownership.  This includes both backward integration in the feed, chick hatching, and pullet growing sectors, and forward integration in the egg processing and marketing stages.  Most large egg processors in the United States either own egg production facilities or have production contracts with local egg producers.  Generally, integrated producers hatch all or most of their layer stock.

**ANSWER:**     Midwest admits that it performs more than one step in the process of bringing a shell egg to market, and that, on information and belief, other egg farmers also perform more than one step in the process of bringing a shell egg to market.  Midwest denies that it hatches any of its layer stock.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 102.

103.     The adoption of the UEP Certified Guidelines and other measures to control supply coincided with egg industry consolidation and rationalization, which reduced the number of producers and concentrated the production of eggs among a handful of large producers.

**ANSWER:**     Midwest denies the allegations in paragraph 103.

104.     The American Egg Board estimated in 2010 that there were about 205
companies (accounting for 95% of the layer hens in the united States) with flocks of 75,000 hens
or more.  That number, which is down from 2,500 in 1987, reflects a clear and accelerating trend
of horizontal consolidation (and vertical integration) in the industry.  This consolidation is
further demonstrated by the increasing percentage of total layers that large producers own.  In
1985, 61 producers with one million or more layers owned 56% of the 248 million total United
States layers.  In 1990, 56 producers with one million or more layers owned 64% of the 232
million total United States layers.  In 2009, 56 producers with one million or more layers owned
90% of the 253 million total United States layers.

**ANSWER:**     Midwest is without knowledge or information sufficient to form a
belief as to the truth of the allegations in paragraph 104 and, to the extent that the allegations in
paragraph 104 purport to characterize a written document, Midwest denies that Plaintiffs
accurately or completely interpreted, characterized or stated the substance or context of the
written document and further states that an authenticated document is the best evidence of its
content.

105.     As of 2010, the ten largest producers owned approximately 49% of the
total industry layers.  The top 20 egg producers owned approximately 55% of laying hens:

| TOP 20 PRODUCERS | LAYERS IN PRODUCTION | PERCENT OF LAYERS IN US |
|---|---|---|
| Cal-Maine | 28,000,000 | 8.24% |
| Rose Acre | 20,000,000 | 5.88% |
| Hillandale PA | 14,000,000 | 4.12% |
| Rembrandt Enterprises | 14,000,000 | 4.12% |
| Sparboe Summit Farms | 12,000,000 | 3.53% |

| Moark | 11,300,000 | 3.32% |
|---|---|---|
| Michael Foods | 11,200,000 | 3.29% |
| Daybreak Foods | 9,200,000 | 2.71% |
| DeCoster Egg Farms | 9,000,000 | 2.65% |
| Ohio Fresh | 7,600,000 | 2.24% |
| Weaver Brothers | 6,800,000 | 2.00% |
| Midwest | 6,000,000 | 1.76% |
| Center Fresh Egg Group | 5,700,000 | 1.68% |
| Fremont Farms of IA | 5,400,000 | 1.59% |
| Herbruck's Poultry Ranch | 5,320,000 | 1.56% |
| Fort Recovery Equity | 5,000,000 | 1.47% |
| Hickman's Egg Ranch | 4,300,000 | 1.26% |
| ISE America | 4,300,000 | 1.26% |
| Sunrise Farms Inc IA | 4,000,000 | 1.18% |
| Kreider Poultry Farms | 4,000,000 | 1.18% |
| **Total** | **187,120,000** | **55.04%** |

**ANSWER:** Midwest admits that it had approximately six million layers in 2010. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 105 and, to the extent that the allegations in paragraph 105 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

106. As early as 1998, the top four producers of breaking eggs accounted for 76% of production. Although historically the shell egg sector could sell surplus production into the egg products sector, around 2004, the egg-breaking sector became less dependent on the shell egg sector and it became more difficult for the shell egg sector to shift its excess supply to the egg-breaking sector. The egg-breaking sector also increasingly moved to in-line production, following the shell egg model. For example, in 2000, 25% of total breaking eggs were broken at

in-line breaking facilities.  By 2004, the percentage of eggs broken at in-line facilities increased

to 39%.

      **ANSWER:**    Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 106.

      107.    For 2005, the USDA reported that 67.7 million cases (at 30 dozen eggs per

case) were broken.  Vertically integrated in-line production/breaking farm facilities accounted

for 41.4% of the total.  The number of eggs broken at in-line facilities increased by 2,866,020

cases, while the number of eggs broken at off-line facilities only increased by 482,549 cases.

      **ANSWER:**    Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 107 and, to the extent that the allegations in

paragraph 107 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the

written document and further states that an authenticated document is the best evidence of its

content.

      108.    Defendants' conspiracy directly affected supply and prices of eggs in the

United States.  The anticompetitive purpose and effect of Defendants' unlawful combination and

conspiracy were to control supply and artificially maintain and increase the prices that Plaintiffs

and others paid for eggs.

      **ANSWER:**    Midwest denies the allegations in paragraph 108.

      109.    Defendants' illegal conduct was intended to have, and did have, a direct,

substantial, and reasonably foreseeable effect upon interstate commerce in the United States.  In

particular, as the result of their unlawful combination and conspiracy, Defendants reduced supply and artificially inflated prices that Plaintiffs and others paid for eggs that were produced and sold in interstate commerce.

**ANSWER:** Midwest denies the allegations in paragraph 109.

110. Defendants and their co-conspirators sold and shipped eggs to states other than the states where the eggs were produced.

**ANSWER:** Midwest denies that it participated in any unlawful conspiracy. Midwest admits that it has sold and shipped eggs to states other than where the eggs were produced, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 as to the other Defendants. Midwest denies the remaining allegations in paragraph 110.

111. Defendants and their co-conspirators have purchased and used substantial quantities of raw materials, equipment, and supplies in connection with the production and sale of egg products, and those materials were transported and moved in a continuous and uninterrupted flow of interstate commerce from the points of origin to the points where they were used or consumed.

**ANSWER:** Midwest denies that it participated in any unlawful conspiracy. Midwest admits that it has purchased raw materials, equipment, and supplies from states other than where its eggs are produced, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 as to the other Defendants. Midwest denies the remaining allegations in paragraph 111.

112.     Defendants and their co-conspirators exchanged information, correspondence, and financial material between states.

**ANSWER:**     Midwest denies that it participated in any unlawful conspiracy. Midwest admits that it has communicated with and sold eggs to or purchased eggs from other defendants in other states.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112 as to the other Defendants.  Midwest denies the remaining allegations in paragraph 112.

113.     Plaintiffs and other customers have paid Defendants for eggs with checks, wire transfers, and/or other financial instruments that were negotiated, communicated, and/or transported in interstate commerce.

**ANSWER:**     Midwest denies that it ever sold eggs to Plaintiffs or received any payments from Plaintiffs for eggs, but admits that it has received payments from its customers in interstate commerce.  Midwest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113 as to the other Defendants.

114.     Defendants' conspiracy had a direct and substantial effect on interstate commerce.

**ANSWER:**     Midwest denies the allegations in paragraph 114.

115.     In the mid-to-late 1990s, the egg industry suffered from low prices and low profits.  UEP members, in response, sought to find ways to increase egg prices.

**ANSWER:**    The allegations in the first sentence of paragraph 115 are so vague
and general that Midwest is without knowledge or information sufficient to form a belief as to
their truth.  Midwest denies the remaining allegations in paragraph 115.

116.    In his April 15, 1994 Egg Economics Update ("When More Means Less"),
UEP economist Donald Bell advised that "[t]he U.S. has no way to control its flock size other
than through the persuasive influence of trade associations such as UEP" and that
"[r]emember—in the egg industry, 'more means less'—it always has and it will always be so."
More succinctly, Bell advised:  "More hens, less income!"

**ANSWER:**    Midwest denies that Don Bell is an economist.  Midwest is without
knowledge or information sufficient to form a belief as to the truth of the remaining allegations
in paragraph 116 and, to the extent that the allegations in paragraph 116 purport to characterize a
written document, Midwest denies that Plaintiffs accurately or completely interpreted,
characterized or stated the substance or context of the written document and further states that an
authenticated document is the best evidence of its content.

117.    In July 1999, Bell further advised that egg producers needed to "cut back
to a more reasonable flock size if [unprofitable] prices [we]re going to be avoided."  Bell
recommended that producers should achieve a more reasonable flock size by:  (1) "[a]dherence
to a sensible industry-wide growth policy"; (2) "[e]arly removal of flocks before their normal
sale with resulting empty cages in the interim"; (3) "[a] 2–3% reduction in chick hatch—but this
would result in a very slow correction"; and (4) "[a]n industry-wide policy of a minimum floor
space allowance would result in a more ideal national flock size[, through which] millions of
extra birds would be eliminated."  As part of this overall profit improvement plan, Bell also

expressly advised producers that "[m]utual restraint [wa]s necessary to accomplish the target numbers associated with reasonable egg prices."

       **ANSWER:**   Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117 and, to the extent that the allegations in paragraph 117 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

       118.   In late 1999, Defendants and their co-conspirators met to consider Bell's proposals and how they could control egg supply.  At about this same time, UEP's Marketing Committee recognized that low prices were causing a crisis in the egg industry.

       **ANSWER:**   Midwest denies the allegations in the first sentence of paragraph 118.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 118.

       119.   Beginning in at least 1999 and continuing at least through 2008, Defendants agreed to control supply and artificially maintain and increase the price of eggs, and in furtherance of this conspiracy, agreed to and did (1) use UEP Certified Guidelines as a pretext to reduce and control chick hatch and the size of laying hen flocks and egg supply; (2) engage in coordinated, large-scale exports to reduce supply and maintain and increase prices; (3) adopt a series of short-term measures with the purpose and effect to reduce supply.

       **ANSWER:**   Midwest denies the allegations in paragraph 119.

120.    In 2000, UEP first issued its UEP Certified Guidelines to control the egg

production process.  As a concerted and successful effort to control supply and artificially

maintain and increase the price of eggs, the UEP Certified Guidelines were a significant

departure from the historical boom or bust cycle in the egg industry.

**ANSWER:**    Midwest admits that the first version of UEP's voluntary animal

husbandry guidelines was published in 2000.  Midwest denies the remaining allegations in

paragraph 120.

121.    UEP publicly represented that it developed a program for the production

of eggs based on recommendations from a Scientific Advisory Committee on animal welfare that

it had convened.  In fact, however, at or about the same time that the Guidelines were first

adopted, participants at UEP meetings privately discussed that the actual purpose of the UEP

Certified Guidelines was to control supply.  Defendant Sparboe Farms correctly noted that the

UEP was "playing games" when it failed to "call[] the program what it [wa]s—a voluntary

cutback of animal numbers."

**ANSWER:**    Midwest admits that UEP commissioned an independent Scientific

Advisory Committee for Animal Welfare to review scientific literature relevant to the well-being

of egg-laying hens, and to develop animal welfare recommendations based upon existing science

and that UEP accepted most of the recommendations of the Scientific Advisory Committee for

Animal Welfare.  Midwest denies the remaining allegations in the first and second sentences of

paragraph 121.  Midwest is without knowledge or information sufficient to form a belief as to the

truth of the allegations in the third sentence of paragraph 121 and, to the extent that the

allegations in the third sentence of paragraph 121 purport to characterize a written document,

Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

122.    In a July 16, 2004 internal UEP newsletter, Gene Gregory wrote that, following the adoption of the UEP Certified Guidelines, "we didn't think we would have to worry about unprofitable times for a few years" and that egg producers that adopted the Guidelines had "flock reduction expectations." In the same internal newsletter, UEP provided the following illustration: "If [UEP Certified] companies owned 227 million hens when the program began and they increased the cage space per hen from 53.3 square inches to 56 square inches we would have a reduction of 11 million hens." UEP leadership saw the UEP Certified Guidelines as a seemingly legitimate pretext to control supply.

**ANSWER:**    Midwest denies the allegations in the last sentence of paragraph 122. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 122 and, to the extent that the allegations in paragraph 122 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

123.    In the earliest iteration of the UEP Certified Guidelines, a minimum floor space allowance was a prominent feature, the very same strategy that Donald Bell previously advised UEP members to adopt to control supply and achieve higher profits. In connection with adopting the minimum floor space allowance, UEP warned Defendants not to add additional

cages to make up for the lost production. A violation of the minimum floor space allowance resulted in an automatic audit failure.

       **ANSWER:** Midwest admits that the first version of UEP's voluntary animal husbandry guidelines addressed the minimum cage space per chicken. Midwest denies the allegations in paragraph 123 and, to the extent that the remaining allegations in paragraph 123 purport to characterize the guidelines, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the guidelines and further states that an authenticated document is the best evidence of its content.

       124. When first developed, the UEP Certified Guidelines called for Defendants to increase the hens' floor space (*e.g.*, from 53 square inches to 67 square inches per hen) over a period of 12 years. In 2001, however, Defendants agreed to cut the implementation time in half to six years, hastening the supply control effects of the Guidelines.

       **ANSWER:** Midwest admits that in or around 2001, at the request of organizations that represent food retailers, wholesalers, and restaurants, UEP modified the cage density phase-in period such that each hen would receive 67-76 square inches by 2008. To the extent that the allegations of paragraph 124 purport to characterize UEP's animal welfare guidelines, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the guidelines and further states that an authenticated document is the best evidence of its content. Midwest denies the remaining allegations in paragraph 124.

       125. After reducing by half the implementation time for the minimum floor space allowance, in 2002, Defendants further adopted a rule requiring that each egg producer produce all of its eggs in compliance with the Guidelines, including eggs that Defendants

purchased for resale. This was referred to as the "100% Rule" and was adopted at UEP's Annual Board Meeting on October 10–11, 2002 in Savannah, Georgia. Relevant to the 100% Rule, the following motions were made on October 10, 2002:

> To reconfirm the status that a company must commit to implementing the welfare guidelines on 100% of all production facilities regardless of how or when eggs may be marketed. The 100% commitment is intended to be inclusive of all company entities, affiliates, etc. The intent of the motion was that whoever manages or controls the entity must be responsible for meeting the 100% commitment.

> That egg products or shell egg processing plans with or without production can supply customers with certified animal welfare egg products or animal welfare shell eggs by purchasing eggs from a certified producer. The egg products plant or shell egg processing plant would have an audit no less than annually for the purpose of confirming that the sale of certified product or eggs did not exceed the purchase of certified eggs. The egg products plant or shell egg processing plant would use the certification number and seal of the producer or producers who produced the certified eggs.

> That a certified company or any marketer may not co-mingle and sell as certified eggs any eggs purchased from a non-certified producer regardless of how or where the eggs may be marketed.

Defendants used this 100% Rule to extend the UEP Certified Guidelines to non-member producers.

**ANSWER:** Midwest admits that UEP's Annual Board Meeting was held on October 11-12, 2002 in Savannah, Georgia and that animal welfare issues were discussed at that meeting. Midwest further admits that UEP's animal husbandry guidelines were modified to require producers who voluntarily chose to participate in the UEP animal welfare program to comply with UEP's animal husbandry guidelines at all of the producer's production facilities. Midwest denies the remaining allegations in the first, second, and fourth sentences of paragraph 125. Midwest is without knowledge or information sufficient to form a belief as to the truth of

the allegations in the third sentence of paragraph 125 and, to the extent the allegations in the

third sentence of paragraph 125 purport to characterize a written document, Midwest denies that

Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of

the written document and further states that an authenticated document is the best evidence of its

content.

126.    Customer demand was not the driving force behind the 100% Rule.  As

UEP explained in an internal January 30, 2003 memorandum summarizing the 100% Rule,

"[m]any producers said they would only commit to the program if 100% of facilities were

required."  Describing what would happen if the 100% Rule were revoked, UEP concluded that

"[t]he program would then become a customer driven program and the guidelines would only be

implemented for customers requiring it."

**ANSWER:**    Midwest denies the allegations in the first sentence of paragraph

126.  Midwest is without knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 126 and, to the extent that the remaining allegations in

paragraph 126 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the

written document and further states that an authenticated document is the best evidence of its

content.

127.    At least one UEP member, Defendant Sparboe Farms, privately expressed

concern to UEP and others about the justification for adopting the 100% Rule as part of the UEP

Certified Guidelines.  Sparboe Farms drafted a letter to UEP stating that the program had

"evolved into a production supply program, which requires producers to commit 100 percent of

their flock." Sparboe Farms continued that it was "concerned that the 100% [R]ule may be seen

as an intentional effort to reduce supply and increase prices." Sparboe Farms' in-house counsel

expressed concerns that the 100% Rule was a "sham" that could be viewed as an unlawful

attempt to manipulate supply. Sparboe Farms was the only member of the Animal Welfare

Committee that voted against the 100% Rule.

**ANSWER:**     Midwest admits that Sparboe Farms expressed opposition to the

100% Rule. Midwest denies the allegations in the last sentence of paragraph 127 and denies that

it participated in any unlawful conduct. Midwest is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 127 and, to the extent

that the allegations in paragraph 127 purport to characterize a written document, Midwest denies

that Plaintiffs accurately or completely interpreted, characterized or stated the substance or

context of the written document and further states that an authenticated document is the best

evidence of its content.

128.     As co-conspirator Moark recognized in June 2004 in internal emails, the

UEP Certified Guidelines to reduce chick hatch "[we]re having a tremendous effect on

production levels." Moark noted that the number of layer hens was reduced by more than 20%

based on "the reduction in layers necessary to increase the cage space density to the level

required by implementation of the UEP guidelines." Likewise, UEP reported in a July 2, 2003

internal newsletter that "the hatch ha[d] been down 15 of [the past] 17 months."

**ANSWER:**     Midwest denies that it participated in any unlawful conduct.

Midwest is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 128 and, to the extent that the allegations in paragraph 128

purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

129.   In a December 16, 2004 UEP Board of Directors conference call, Defendants also agreed to ban backfilling (the practice of replacing older hens that died to maintain overall flock size) as part of the UEP Certified Guidelines, except in cases of catastrophic flock mortality.  Initially, the UEP Certified Guidelines allowed backfilling on a small scale to accommodate unexpected, productive pullets.  In 2003, however, Defendants agreed to "allow backfilling at any time with any age bird so long as the 'house average' space allowance requirement was not exceeded."  Defendants quickly reversed course when backfilling started causing "poor egg prices."  Indeed, UEP economist Donald Bell had explained how backfilling "could have disastrous effects" on egg prices.  The ban on backfilling was to be effective "immediate[ly]," meaning February 1, 2005 and Defendants agreed that, like the cage space requirements, "unauthorized backfilling . . . w[ould] result in a failed audit."

**ANSWER:**   Midwest admits that the UEP animal husbandry guidelines were modified to prohibit backfilling except in certain limited circumstances.  Midwest denies the remaining allegations in paragraph 129 and, to the extent that the remaining allegations in paragraph 129 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

130.    At about the same time that Defendants instituted the backfilling ban, during an April 19, 2005 UEP Animal Welfare Committee meeting, Defendants privately discussed that the UEP Certified Guidelines were being used to "[l]imit[] free trade of eggs" and "manag[e] the marketing and economic restriction of movement of product."  Prior to the ban on backfilling, the Guidelines required a producer to maintain records to demonstrate that the additional layers were added to replace mortality losses.  Following the ban on backfilling, Defendants required that "[c]ompany records must document when the layer house was supplied with pullets and when additional pullets were moved in."

**ANSWER:**    Midwest denies the allegations in paragraph 130 and, to the extent that the allegations in paragraph 130 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

131.    UEP enforced the UEP Certified Guidelines through mandatory, non-public compliance audits.  UEP controlled the auditing program.  These mandatory audits—the results of which Defendants kept from the general public—allowed UEP to ensure that all Defendants were following the agreed-upon supply controls.  These audits were extensive.  By way of example, according to a January 5, 2005 internal UEP newsletter, the 2004 audits included 474 facilities and included 2,388 separate layer houses.

**ANSWER:**    Midwest admits that participants in the UEP Certified program were audited to determine if they were in compliance with the program and that the audits were conducted by independent third parties.  Midwest is without knowledge or information sufficient

Case 2:12-cv-00088-GERP Document 12 Filed 04/26/12 Page 92 of 143

to form a belief as to the truth of the allegations in the last sentence of paragraph 131. Midwest denies the remaining allegations in paragraph 131 and, to the extent that the allegations in paragraph 131 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content

132. Additionally, as part of the UEP Certified program, beginning at least as early as 2004, UEP required producers to submit monthly compliance reports detailing the number of layers housed in that month. Non-certified marketers were also required to report to UEP shell eggs and/or egg products that were sold as UEP Certified regardless of whether the package contained the UEP Certified logo and the number of eggs purchased from UEP Certified companies. UEP used these reports to monitor for and detect cheating on the supply control agreements.

**ANSWER:** Midwest admits that, in order to participate in the UEP animal welfare program, producers that joined the animal welfare program were required to submit periodic compliance reports, among other things. Midwest denies the remaining allegations in the first and third sentences of paragraph 132. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 132 and, to the extent that the allegations in the second sentence of paragraph 132 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content

133.     Defendants also were aware of each other's operations, including the size and location of their facilities, the size of their flocks, and their production.  It was very difficult for any producer to keep its operations secret from other producers.  As Gene Gregory explained in a September 18, 2008 internal UEP newsletter, "[t]he U.S. egg industry is much like a small community or a family.  There are fewer than 250 commercial size egg farmers remaining in the industry.  We all know one another.  We see one another at meetings.  We compete but remain friends."

**ANSWER:**     Midwest denies the allegations in the first two sentences of paragraph 133.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 133 and, to the extent that the allegations in the third sentence of paragraph 133 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

134.     UEP required strict compliance with the supply control Guidelines.  For example, at a UEP meeting in October 2002, UEP's Board emphasized that violations of the minimum floor space allowance would not be tolerated.

**ANSWER:**     Midwest admits that a component of UEP's voluntary animal husbandry guidelines is a cage space allowance.  Midwest denies the remaining allegations in the first sentence of paragraph 134.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 134 and, to the extent that the allegations in the second sentence of paragraph 134 purport to characterize a

written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

135.    In practice, Defendants did not enforce all of the Guidelines equally. Rather, the UEP Certified audits focused on the Guidelines closely related to supply controls. Under these Guidelines, a producer "automatic[ally] fail[ed]" an audit if it violated one of several provisions closely linked to the supply of eggs.  For example, the UEP Certified Guidelines required that Defendants provide more cage space for laying hens (*e.g.*, from 53 square inches to 67 square inches per hen).  Defendants adopted this minimum floor space allowance with the understanding that the displaced hens would not be replaced.  Violating this Guideline resulted in automatic failure of the compulsory audit.  As another example, the Guidelines also prohibited "backfilling," which is the practice of replacing older hens that died to maintain overall flock size.  Violating this Guideline also resulted in automatic failure.

**ANSWER:**    Midwest admits the allegations in the fourth sentence of paragraph 135.  Midwest further admits that the UEP animal husbandry guidelines were modified to prohibit backfilling except in certain limited circumstances.  Midwest denies the allegations in the first, second, fifth and sixth sentences of paragraph 135.  To the extent that the remaining allegations in paragraph 135 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.  Midwest denies any remaining allegations in paragraph 135.

136.   But an egg producer that violated other Guidelines not related to supply, including true animal welfare concerns such as Guidelines on toxic ammonia concentrations, cruel killing methods, or failure to remove dead birds from cages daily, could still pass the UEP audit.  Further, some cruel practices were completely unpunished, at least for a time, under the UEP Certified Guidelines.  For example, Defendants allowed a producer to induce molting by withholding food—without penalty—until January 2006.

   **ANSWER:**   Midwest denies the allegations in paragraph 136 and, to the extent that the allegations in paragraph 136 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

137.   When an egg producer complied with the UEP Certified Guidelines, the producer was permitted to use a UEP label on its eggs.

   **ANSWER:**   Midwest admits that producers which produced eggs pursuant to UEP's animal welfare program were permitted to market and sell eggs as produced under the program.  Midwest denies the remaining allegations in paragraph 137.

138.   When an egg producer attempted to withdraw from participation in the UEP Certified Guidelines, Defendants retaliated against that producer.  For example, Defendant Sparboe Farms withdrew from the program because of its concerns that the program was a sham and a pretext for a supply control program that violated the antitrust laws.  UEP representatives or staff, including Gene Gregory, contacted Sparboe Farms customers in an attempt to discourage customers from buying Sparboe Farms' eggs.  In one instance, Gregory contacted the

Canada Egg Marketing Agency ("CEMA"), a Sparboe Farms' customer, to convince the CEMA

to stop buying Sparboe Farms' eggs. UEP made similar contacts with at least the Albertson's

grocery chain and Wal-Mart. When another company, Kreider Farm Eggs, withdrew from

participation in the UEP Certified Guidelines, UEP similarly retaliated. UEP contacted these

customers despite purporting to have a policy against making direct contact with customers of

UEP members. However, Sparboe Farms never brought its co-conspirators' unlawful conduct to

the attention of law enforcement authorities, nor did Sparboe Farms ever take any action to

effectively withdraw from the conspiracy.

**ANSWER:** Midwest denies the allegations in the first sentence of paragraph

138 and denies that it engaged in any unlawful conduct. Midwest is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph

138 and, to the extent that the remaining allegations in paragraph 138 purport to characterize a

written document, Midwest denies that Plaintiffs accurately or completely interpreted,

characterized or stated the substance or context of the written document and further states that an

authenticated document is the best evidence of its content.

139. According to UEP, as of 2010, more than 80% of all eggs produced in the

United States were produced under the UEP Certified Guidelines.

**ANSWER:** Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 139.

140. Historically, a variety of factors, including the large domestic market and

the perishability of shell eggs, discouraged United States egg producers from exporting eggs.

Egg exports to places outside of North America, such as Europe, were limited. However, UEP,

USEM, and others—recognizing that egg prices are very sensitive to supply and even small changes in supply (actual or perceived) had a very large impact on domestic egg prices—agreed to increase egg exports, especially to Europe. Indeed, USEM's export program was a significant departure from historical practice.

        **ANSWER:**   Midwest denies the allegations in paragraph 140.

       141.    Defendants agreed to use a series of coordinated exports to control domestic supply. To fulfill these exports, Defendants had the choice of either shipping their own eggs or buying eggs for the export or having a UEP egg trader purchase the eggs for them. USEM members were required to participate in exports as a condition of membership. Defendants controlled the timing and scale of exports to support their overall scheme to control supply and artificially maintain and increase the price of eggs. These exports were timed to occur when they would benefit Defendants by raising egg prices in the United States. At least once, Defendants rejected a proposed export because it was "very small and likely would not have [a] positive impact on domestic prices."

        **ANSWER:**   Midwest denies the allegations in the first, fourth, and fifth sentences of paragraph 141. Midwest admits the allegations in the second and third sentences of paragraph 141. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of paragraph 141 and, to the extent that the allegations in the sixth sentence of paragraph 141 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

142.     As part of this export scheme, Defendants often exported eggs to markets with prices lower than the then-current prices in the United States.  An integral part of Defendants' export scheme was the agreement to share resulting losses so that producers that physically exported their production were reimbursed for the difference between prevailing United States prices and the lower prices in export markets.  As stated in a March 20, 2003 internal memorandum to all USEM members, "Good news!!!  During the latest export we gained a sizeable new member.  This member agreed to share in the loss."

**ANSWER:**     Midwest denies the allegations in the first and second sentences of paragraph 142.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 142 and, to the extent that the allegations in the third sentence of paragraph 142 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

143.     By way of example, this agreement to share export related losses is reflected in an April 17, 2007 email from UEP's Vice President Linda Reickard to co-conspirator Moark requesting payment for Moark's share of the export loss:  "Would you also please check on our past due invoice #2742 which covered your portion of the loss on the last export & let me know the status?  I'm trying to get the last one finished up before the next one starts."  The export losses were significant.  In one example, co-conspirator Norco's share of the export loss was calculated as over $35,000.

**ANSWER:** Midwest denies that it participated in any unlawful conduct. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 143 and, to the extent that the allegations in paragraph 143 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

144. Defendants agreed to undertake at least the following coordinated exports in furtherance of the conspiracy.

A. In August 2002, USEM organized large-scale exports to egg breakers and further processors in Europe. Through this export, Defendants removed three million dozen shell eggs from the domestic market over a three-week period.

B. In November 2002, USEM followed up with another large-scale export for 200,000 cases of eggs. This export order was significantly larger than the export orders the United States egg industry had made in the past.

C. In February 2003, USEM organized yet another export of eggs to Europe for 240,000 cases of eggs that, at the time, was the largest-ever United States egg export. It was expected that this export order would be extremely beneficial to egg producers through increased prices.

D. At the end of 2006 and in early 2007, Defendants organized another series of large-scale exports to Europe and the Middle East for 24 million dozen eggs. In this series, Defendants exported eggs to markets with prices lower than

prevailing prices in the Unites States.  UEP's executive director Gene Gregory,
commenting on the success of these exports, noted that even though the exports
involved less than 2% of industry supply, "it [wa]s amazing how one or two
percent c[ould] have an effect on the rest of your domestic price."  Describing an
export that USEM members voted to undertake on October 20, 2006, UEP
reported in a November 17, 2006 internal newsletter that "[f]or the benefit of
everyone, these USEM members have paid a heavy cost."

E.      In March 2008, Defendants organized an export order to Japan and Iraq
for 100 container loads.  Again these eggs were exported to and sold in markets
with lower prices than prevailing prices in the United States.

**ANSWER:**      Midwest denies that it participated in any unlawful conspiracy.
Midwest admits USEM accepted export orders in 2006 and 2007 and that Midwest participated
in an export of shell eggs in November 2006.  Midwest admits that one potential consequence of
an export of shell eggs is a reduction in domestic supply.  Except as expressly admitted, Midwest
is without knowledge or information sufficient to form a belief as to the truth of the allegations
regarding the size and timing of the exports referenced in paragraph 144.  Midwest denies the
remaining allegations in paragraph 144 and, to the extent that the allegations in paragraph 144
purport to characterize a written document, Midwest denies that Plaintiffs accurately or
completely interpreted, characterized or stated the substance or context of the written document
and further states that an authenticated document is the best evidence of its content.

145.    Defendants recognized that these exports had the effect of raising the price
of eggs.  As stated in a March 4, 2004 internal UEP newsletter, following a USEM export, "the

market immediately moved upward[ and] . . . set in motion what turned out to be the best year on record for egg producers." Later, in a November 17, 2007 internal newsletter commenting on an export that USEM members agreed to on October 20, 2006, UEP noted that the "one-day value on November 15th for a producer with 1 million hens was more than $18,000.00 over the one-day value on October 20th."

**ANSWER:**  Midwest admits that one potential consequence of an export of shell eggs is a reduction in domestic supply.  Midwest denies the remaining allegations in the first sentence of paragraph 145.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 145 and, to the extent that the allegations in paragraph 145 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

146.    Starting in 1999, Defendants agreed to use short-term measures to control supply and artificially maintain and increase the price of eggs.  As stated in a February 2, 2007 internal UEP newsletter, Defendants recognized that the largest egg producers "have the potential to have the greatest impact upon supply/demand conditions and can cause the most rapid changes for assured profits."  As reported in minutes for an August 7, 2007 UEP Long Range Planning Committee meeting, UEP's outside counsel admonished that under the antitrust laws, "supply management recommendations written up in UEP newsletters [were] questionable."

**ANSWER:**     Midwest denies the allegations in the first sentence of paragraph

146. Midwest is without knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 146 and, to the extent that the allegations in paragraph

146 purport to characterize written documents, Midwest denies that Plaintiffs accurately or

completely interpreted, characterized or stated the substance or context of the written documents

and further states that an authenticated document is the best evidence of its content.

147.    During 1999, UEP's Marketing Committee decided it needed to take

action to deal with low prices. The Marketing Committee passed a motion providing that,

among other things, producers immediately molt 5% of flocks and cut back on 5% of flock

inventory over the course of 6 to 12 months. The Committee also discussed using various

means, including the media, to spread the word to the rest of the industry that had not attended

the meeting.

**ANSWER:**     Midwest denies the allegations in the first sentence of paragraph

147. Midwest is without knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 147 and, to the extent that the remaining allegations in

paragraph 147 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the

written document and further states that an authenticated document is the best evidence of its

content.

148.    In October 1999, UEP and USEM members voted in favor of a plan to

reduce the national flock by seven million hens in an effort to increase prices. When this

strategy was considered, it was noted that this program would need to be industry-wide to be

effective.  In response, UEP's board adopted a resolution instructing UEP staff to spread the

message of responsible growth to egg producers.

      **ANSWER:**    Midwest denies the allegations in paragraph 148 and, to the extent

that the allegations in paragraph 148 purport to characterize a written document, Midwest denies

that Plaintiffs accurately or completely interpreted, characterized or stated the substance or

context of the written document and further states that an authenticated document is the best

evidence of its content.

      149.    In August 2001, Defendants distributed a document to UEP members that

discussed how supply reduction would increase prices and stated that "[t]here should be a core

segment of the industry that is willing to reduce egg supply in order to achieve profitable egg

prices."  The document also noted "several tools" available to the industry to reduce supply

including:  "Reduce chick hatch," "Dispose of old flocks early," and "Molt early."  Finally, the

document asked recipients, "**Would you be willing to meet with this core group of egg**

**producers to discuss an action plan to achieve profitable egg prices?**"  In a related internal

document, "Supply Demand Recommendations," UEP's Marketing Committee outlined a series

of supply control measures including (1) disposing of old flocks four week early; (2) molting

hens at 62 weeks of age; and (3) reduce day old pullet chick replacement by 5% over the next six

months.

      **ANSWER:**    Midwest denies that it distributed a document to UEP members in

August 2001 that discussed how supply reduction would increase prices.  Midwest is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph 149 and, to the extent that the allegations in paragraph 149 purport to characterize a

written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content

150.    In or about November 2001, UEP urged members to adopt an emergency flock reduction of 5%.   It was estimated that this flock reduction would increase producer profits.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150.

151.    In or about June 2004, UEP's Marketing Committee "recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004."

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 and, to the extent that the allegations in paragraph 151 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content

152.    A September 15, 2004 internal UEP newsletter recommended the following supply control measures:  "remove the older hens[;] sell hens at younger ages[;] do not backfill cages[;] do not continue to use old depreciated houses[;] or to molt at younger ages."

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 and, to the extent that the allegations in paragraph 152 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

153.     As reflected in the minutes of UEP's October 2004 Annual Board Meeting & Executive Conference, UEP's Marketing Committee passed a motion "to establish a plan calling for hens currently scheduled for disposal between December 1, 2004 and July 1, 2005 be disposed of 4 weeks early or reduce [] flock size by 5%."  Marketing Committee Chairman Dolph Baker "announced that staff would be working on an Economic Summit for the very near future with all members being invited."

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 and, to the extent that the allegations in paragraph 153 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

154.     As part of a November 2004 "Economic Summit," as explained in a November 23, 2004 internal UEP newsletter, Defendants identified "a bleak picture of the supply side of the business."  "Recognizing that it serves no purpose to place blame, many attendees elected to be part of the solution," and agreed either:  "[1] To dispose of hens that are currently

scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled[; or 2] To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."  The number of egg producers agreeing to this supply control measure later expanded to include 45 companies owning 125 million hens, or around 42% of domestic production.  This was referred to as the current "intentions program" [sic]

      **ANSWER:**    Midwest admits that Bob Krouse attended the Economic Summit referenced in paragraph 154.  Midwest denies the remaining allegations in paragraph 154 as they relate to Midwest.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 as they relate to other defendants and, to the extent that the remaining allegations in paragraph 154 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

      155.    At a January 24, 2005 meeting, Shell Egg Marketing Committee Chairman Wayne Mooney stated that this short-term measure "may have already been helpful to the market but everyone needed to stay committed to the program."  During the January 25, 2005 UEP Board of Directors meeting, UEP Chairman Roger Deffner summarized:  "We don't have to accept low prices and we can have a good 2005 if we just make a few changes and work together."  Also during this January 25, 2005 UEP Board of Directors meeting, Wayne Mooney made a motion, which passed, "to recommend that the current 'intentions program' for flocks to be disposed of 4 weeks earlier than previously scheduled and/or flock size reduction by 5% be extended through Labor Day."

**ANSWER:**     Midwest denies that it participated in any unlawful conduct. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 155 and, to the extent that the remaining allegations in paragraph 155 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

156.     Of the Defendants and co-conspirators, at least Cal-Maine, National Food, Hillandale PA, Midwest, Ohio Fresh, and Moark agreed to this "intentions program" commitment.  UEP also sent letters to members not in attendance to announce this plan and to ask those members to participate.  Egg producers signed their intentions to follow this short-term measure to control supply.

**ANSWER:**     Midwest denies that it participated in any unlawful conduct or agreed to an "intentions program" and denies the remaining allegations in paragraph 156 as they relate to Midwest.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 156 as they relate to other defendants and, to the extent that the remaining allegations in paragraph 156 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

157.    In a February 3, 2005 internal UEP newsletter following the January 5, 2005 UEP Board of Directors meeting, UEP advised that Mooney's motion "d[id] not apply to only the companies having signed the 'intention form' but [applied] to all UEP members."

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 and, to the extent that the remaining allegations in paragraph 157 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

158.    As early as 2005, UEP created a Production Planning Calendar "in hopes that producers w[ould] manage their flock size or egg production."  In describing this Production Planning Calendar in a February 17, 2005 internal newsletter, UEP noted that "[a]ll members can maximize their profit potential or minimize their losses by paying closer attention to the high and low demand periods."

**ANSWER:**    Midwest admits that UEP produced a Production Planning Calendar.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 158 and, to the extent that the remaining allegations in paragraph 158 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

159.     In a February 15, 2006 internal newsletter, UEP advocated for a "2% Solution":  "Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006."

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 and, to the extent that the remaining allegations in paragraph 159 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

160.     On March 31, 2006, UEP's Marketing Committee passed a motion "to recommend to the members a program calling for flocks to be molted six (6) weeks earlier than previously scheduled and to dispose of spent hens six (6) weeks earlier than previously scheduled."

**ANSWER:**     Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 and, to the extent that the remaining allegations in paragraph 160 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

161.     On April 13, 2006, UEP issued an internal "Supply/Demand" Alert in which the Marketing Committee recommended that UEP members:  "[1] Dispose of flocks six

(6) weeks earlier than previously scheduled[; and 2] Molt flocks six (6) weeks earlier than previously scheduled."

> **ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 and, to the extent that the remaining allegations in paragraph 161 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

162.    In an August 3, 2006 internal newsletter, UEP reminded members of a recommendation "to molt and dispose of flocks six weeks earlier than previously scheduled," and then urged members to "stay the course."

> **ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 and, to the extent that the remaining allegations in paragraph 162 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

163.    In a February 2, 2007 internal newsletter, UEP advised that "[t]he best immediate answer to assure profitable prices [wa]s for the industry to show some restraint."

> **ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163 and, to the extent that the remaining

allegations in paragraph 163 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

164.    In a March 15, 2007 internal newsletter, UEP explained that producers historically produced "surplus eggs [from] the week after Easter . . . until Labor Day."  UEP then urged that "[t]he only way to avert this history" was to "begin making plans **NOW** to molt or dispose of flocks" and to **"[m]ake the necessary adjustments**."

ANSWER:    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 and, to the extent that the remaining allegations in paragraph 164 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

165.    In an April 12, 2007 internal newsletter, UEP again emphasized the importance of controlling supply, stating that "[t]he objective of supply management . . . is to prevent the over supply of eggs which can reduce egg prices" and that billions would be lost without better supply management.  The newsletter continued that "UEP recognizes this and has promoted reducing hen numbers and molting to help control supply."

ANSWER:    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 and, to the extent that the allegations in paragraph 165 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

166.    In its August 1, 2007 internal newsletter, UEP urged "egg producers to take care of their business by disposing of or molting hens 2–3 weeks earlier than previously scheduled."

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 166 and, to the extent that the remaining allegations in paragraph 166 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

167.    Defendants and their co-conspirators' agreement to control supply and artificially maintain and increase the price of eggs was successful.

**ANSWER:**    Midwest denies the allegations in paragraph 167.

168.    Defendants privately recognized their agreement to control supply and artificially maintain and increase the price of eggs worked.  For example, in an August 27, 2003 internal newsletter, UEP recognized that prices were around 60% higher than the same period during 2001and explained that one "major reason[]" for the high prices was "[i]mplementing space allowance to meet the industry's Animal Welfare Guidelines."  UEP's Gene Gregory noted that implementation of the minimum floor space allowance had "the greatest impact" on

lowering supply and increasing price as the previous supply management schemes had "never

been endorsed by the majority of the industry and ultimately were discarded when prices

improved for short period." Gregory further stated:

> The fact that approximately 200 companies have begun implementing the
> [UEPs Animal Husbandry Guidelines] . . . , has caused flock reduction and
> will continue to do so for some time. These 200 companies own
> approximately 226 million hens or more than 82% of the total hens in the
> country. The hatch reduction to meet the animal husbandry guidelines
> began with chicks hatched after April 2002. Since this beginning date the
> hatch has been reduced by 14.7 million pullets in comparison to the same
> period year earlier.

**ANSWER:**   Midwest denies the allegations in the first sentence of paragraph

168. Midwest is without knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 168 and, to the extent that the remaining allegations in

paragraph 168 purport to characterize a written document, Midwest denies that Plaintiffs

accurately or completely interpreted, characterized or stated the substance or context of the

written document and further states that an authenticated document is the best evidence of its

content..

169.    UEP's June 4, 2003 internal newsletter noted that "[t]he hatch reduction,

to meet the space allowance guidelines of the [UEP Certified Guidelines] are beginning to show

egg market value improvements. This trend should continue.'" The private newsletter further

stated that "market improvements c[ould] be attributed to: [1] Reduced pullet hatch finally

making an impact upon supplies[; 2] USEM exports reducing supplies at critical times[; and 3

UEP Certified Guidelines] beginning to work like many had projected."

**ANSWER:**   Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 169 and, to the extent that the remaining

allegations in paragraph 169 purport to characterize a written document, Midwest denies that

Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of

the written document and further states that an authenticated document is the best evidence of its

content.

170.    As reported in an October 31, 2003 internal UEP newsletter, during an

annual meeting in or about October 2003, former UEP Chairman Mike Bynum explained that, in

2002, the egg industry had experienced "some real 'on-the-ropes' quarters" but that the industry

was "anticipating a significant export opportunity to jump-start the fall egg market [and t]he

industry had committed to the UEP Animal Welfare Guidelines."  Following these actions,

Bynum explained, in 2003, "the egg supply began to moderate relative to strong demand through

a consistent reduction in chick hatch and [in 2003 the egg industry was] enjoying market prices

that [we]re 60% higher than [in 2002]."

**ANSWER:**    Midwest is without knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 170 and, to the extent that the remaining

allegations in paragraph 170 purport to characterize a written document, Midwest denies that

Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of

the written document and further states that an authenticated document is the best evidence of its

content.

171.    UEP's December 30, 2003 internal newsletter included commentary

discussing the "fantastic market" for eggs, stating that "the biggest challenge will be maintaining

the UEP Animal Welfare Guidelines of increased space per bird" and cautioning that "[t]here

will be a huge temptation to get greedy."  Providing a concrete illustration of Defendants' illegal

gains, UEP's newsletter explained, "[u]sing the [Urner Barry] Large quote, only as a comparison, we would estimate that a producer with 100,000 layers would have realized a cash flow improvement of more than $400,000.00 over the course of one year's production."

   **ANSWER:**   Midwest denies that it has realized illegal gains.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 171 and, to the extent that the remaining allegations in paragraph 171 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

   172.   In internal newsletters dated November 1, 2006 and November 17, 2006, UEP explained how USEM-orchestrated exports had a direct and substantial impact on domestic egg prices.  For example, after USEM voted on October 20, 2006 to export 90 container loads of shell eggs, "[t]he market began to react to the export" and "domestic prices began to rise rapidly" and prices increased by around 30%.  UEP illustrated the impact of this export for a producer with one million hens following the announcement of the export:  "During the 26-production day period for a producer with a million hens would have recognized improved revenues of more than $220,000.00."  Further, "[m]ultiplied by the approximate 200 million hens needed to fill the shell egg markets, this would have returned shell egg producers $44 million."

   **ANSWER:**   Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 and, to the extent that the remaining allegations in paragraph 172 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of

the written document and further states that an authenticated document is the best evidence of its content.

173.    In March 2008, Gene Gregory gave a presentation titled "Egg Economics Report" at the Pacific Egg and Poultry Association Annual Convention.  Gregory listed factors that contributed to 2007 egg prices, including the following:  "Flock Reduction (Better supply management)"; "UEP Certified Cage Space Requirements"; "Prohibited backfilling of cages"; "Exports"; and "Reduced egg supply during weeks between Easter and Labor Day."  In a separate slide, titled "UEP Certified Program—Reduces Flock Size," Gregory estimated that, from 2002 to 2007, the Guidelines reduced the hens per house by 16.7%.   During this same presentation, Gregory noted that "the UEP Certified program . . . develop[ed] a policy to prohibit backfilling cages[ and t]he market [then] reflect[ed] the benefits of that policy."

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 and, to the extent that the remaining allegations in paragraph 173 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

174.    In its January 3, 2008 internal newsletter, UEP included the following as part of a "partial list of the reasons for extremely good egg prices" in 2007:  "UEP's animal welfare guidelines continued to reduce the number of hens per house"; "Producers reduced their egg supply during the week between Easter and Labor Day"; "Timely exports of shell eggs by the United States Egg Marketers"; "Very limited construction of new houses or remodeled

houses during 2006 and 2007"; and "Producers did far better job of managing their business to meet supply/demand.'"

      **ANSWER:**   Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174 and, to the extent that the remaining allegations in paragraph 174 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

      175.   The reduced supply and higher egg prices were not attributable to forces outside of the conspiracy, such as feed costs. In May 1, 2008 testimony before Congress, Joseph Glauber, the United States Department of Agriculture's Chief Economist, noted that higher egg prices reflected "lower production and strong domestic demand," and that "[t]he decision to reduce production likely took place prior to the recent run-up in feed costs."

      **ANSWER:**   Midwest denies the allegations in the first sentence of paragraph 175. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 175 and, to the extent that the remaining allegations in paragraph 175 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

      176.   UEP is not an agricultural cooperative protected by the Capper-Volstead Act, 7 U.S.C. § 291, *et seq*. Capper-Volstead protection is available only to farmers, planters,

ranchmen, dairymen, nut, or fruit growers (collectively "farmers"). The participation of one non-farmer member defeats Capper-Volstead immunity for the entire cooperative.

**ANSWER:** Paragraph 176 states legal conclusions to which no response is required. To the extent a response is required, Midwest denies the allegations in paragraph 176.

177. During the applicable period, UEP included members that produced no eggs. These entities are not "farmers" under the Capper-Volstead Act, and their membership in UEP forecloses any antitrust immunity under the Capper-Volstead Act for UEP or its members individually.

**ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 177. The second sentence of paragraph 177 states legal conclusions to which no response is required. To the extent a response is required, Midwest denies the allegations in the second sentence of paragraph 177.

178. During the applicable period, UEP also included members that were vertically integrated agricultural businesses. Vertically integrated agricultural businesses also are not farmers under the Act. The two principal purposes of the Act are to: (1) provide farmers with countervailing power to bargain effectively with processors and middlemen, and (2) enable farmers to eliminate middlemen all together. Vertically integrated agricultural businesses act as processors and middlemen. The Act was designed to protect farmers from these types of organizations, not shield them from antitrust liability.

**ANSWER:** Midwest admits that it performs more than one step in the process of bringing a shell egg to market, and that, on information and belief, other egg farmers also

perform more than one step in the process of bringing a shell egg to market. The remaining allegations in paragraph 178 state legal conclusions to which no response is required. To the extent a response is required, Midwest denies the remaining allegations in paragraph 178.

179. Cal-Maine Foods, Moark, Michael Foods, NuCal, and other UEP members were non-farmers for Capper-Volstead purposes because they were vertically integrated agricultural businesses. These entities acted as middlemen, not as "farmers," because they purchased for resale significant quantities of eggs. For example, in 2002, Moark purchased for resale from the spot market or from third-party producers 59% of the eggs it marketed. In 2005, Moark purchased for resale from the spot market or from third-party producers 55% of the eggs it marketed. In 2008, Michael Foods purchased for resale from the spot market or from third-party producers 74% of the eggs it marketed. In 2008, Cal-Maine purchased for resale from the spot market or from third-party producers 23% of the eggs it marketed. This remained true for Cal-Maine's 2011 fiscal year when it also purchased from outside producers for resale approximately 23% of the total number of eggs it sold. For its fiscal year ending May 28, 2011, of the 821 million dozen eggs that Cal-Maine sold, it produced only 634 million dozen eggs, which means that it sold 187 million dozen more eggs than it produced. The membership and participation in UEP by these vertically integrated non-farmer middlemen destroys any limited Capper-Volstead protection for UEP and all of its members.

**ANSWER:** The allegations in the first, second, and ninth sentences of paragraph 179 contain legal conclusions to which no response is required. To the extent a response is required, Midwest denies the allegations in the first, second, and ninth sentence of paragraph 179. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third through eighth sentences of paragraph 179.

180.    Pre-production supply control programs are not protected by the Capper-Volstead Act as reflected by the plain language of the statute, its legislative history, as well as by statements and actions of the United States Department of Justice's Antitrust Division, the Federal Trade Commission, and the United States Department of Agriculture.

**ANSWER:**    Midwest denies that it participated in any unlawful conduct.  The remaining allegations in paragraph 180 state legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the remaining allegations in paragraph 180.

181.    The plain text of the Capper-Volstead Act permits farmers to "collectively process[], prepar[e] for market, handl[e], and market[]" the agricultural products that they grow.  All of these activities are post-production activities and only post-production activities are protected by the Act.

**ANSWER:**    Paragraph 181 states legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the allegations in paragraph 181.

182.    As noted above, the legislative history of the Act indicates that its two principal purposes are to:  (1) provide farmers with countervailing power to bargain effectively with processors and middlemen, and (2) enable farmers to eliminate middlemen all together.  Pre-production restraints, such as Defendants' joint supply control program, are unrelated to the furtherance of these goals and are, therefore, outside the scope of the exemption.

**ANSWER:**    Paragraph 182 states legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the allegations in paragraph 182.

183.     Federal agencies also have concluded that the Capper-Volstead Act does not protect pre-production supply control programs.  For example, in 1968, the Antitrust Division of the Department of Justice issued a business review letter that refused to approve a wheat-growers association's proposal to limit its members' production of wheat.  The letter stated, "the Capper-Volstead antitrust exemption applies only to marketing and not production agreements."  Letter from Edwin Zimmerman, Assistant Att'y Gen., Antitrust Div., to Ray Obrechet, Master, Colo. Grange (Oct. 2, 1968).  The Antitrust Division later issued a report concluding that, "it would not be the act of a rational legislature to give the cooperatives the power to deal with overproduction, a factor which had been demonstrated was not a cause of the crisis it was addressing."  U.S. Dep't of Justice, *Milk Marketing:  A Report of the U.S. Dep't of Justice to the Task Group on Antitrust Immunities* 68–69 (1977).

**ANSWER:**     Paragraph 183 states legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the allegations in paragraph 183 and, to the extent that the remaining allegations in paragraph 183 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

184.     Likewise, in *In re Central California Lettuce Producers Cooperative*, 90 F.T.C. 18, 102 n.20 (1977), the FTC stated, "Congress' attitude toward production controls provides an additional indication that it did not regard the corporation as the model around which the Capper-Volstead exemption would be built.  Beyond doubt, a single corporation can restrict its output, if it chooses, without incurring antitrust liability.  Nevertheless, there are strong

indications that Congress did not intend to allow farmers to use cooperatives as a vehicle by which they could effectively agree to limit production."

**ANSWER:**   Paragraph 184 states legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the allegations in paragraph 184 and, to the extent that the remaining allegations in paragraph 184 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

185.   The Department of Agriculture ("USDA") has taken similar positions in its Cooperative Information Reports stating, "it is not legal for cooperatives to control members' production.  The basic role of cooperatives is to market the available supply in the most effective manner possible, not to limit production."  U.S. Dep't of Agric. Rural Bus.-Coop. Serv., Cooperative Information Report 1, Section 3, *Cooperative Benefits and Limitations* 17 (1980 reprinted 1990).  In another Report the USDA warned, "The conventional belief among cooperative scholars is that [using cooperatives to limit the quantity of a commodity they will produce] goes beyond the extent of the protection available under the Capper-Volstead Act."  U.S. Dep't of Agric., Rural Bus.-Coop. Serv., Cooperative Information Report 38, *Managing Cooperative Antitrust Risk* 23–24 (1989).  Commenting on the Department of Justice's Report on Milk Marketing, the Department of Agriculture concluded "a cooperative cannot . . . [r]estrict the amount of production of producers."  U.S. Dep't of Agric., *Comments on the Department of Justice Report on Milk Marketing* 16 (1977).

**ANSWER:**    Paragraph 185 states legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the allegations in paragraph 185 and, to the extent that the remaining allegations in paragraph 185 purport to characterize written documents, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written documents and further states that an authenticated document is the best evidence of its content.

186.    Furthermore, there was no legitimate business justification for the collective supply control scheme and conspiracy among Defendants.  Indeed, UEP's counsel opined that, under Capper-Volstead compliance rules, some of UEP's practices were "questionable."  Moreover, the UEP Certified Guidelines did not, nor were they intended to, serve any legitimate or lawful purpose under the Capper-Volstead Act, such as marketing Defendants' eggs.  Defendants' conspiracy enabled Defendants to artificially maintain and increase prices for shell eggs and egg products at artificially high levels.

**ANSWER:**    Midwest denies that it engaged in any unlawful conduct.  Midwest denies the remaining allegations in the first, third, and fourth sentences of paragraph 186. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 186 and, to the extent that the allegations in the second sentence of paragraph 186 purport to characterize a written document, Midwest denies that Plaintiffs accurately or completely interpreted, characterized or stated the substance or context of the written document and further states that an authenticated document is the best evidence of its content.

187.     Under the Capper-Volstead Act, farmer cooperatives are not immune from antitrust liability where, as here, they engage in exclusionary practices, monopolize trade, suppress competition with non-members, coerce individuals to participate in cooperative programs, engage in predatory harassment, or organize illegal boycotts.

**ANSWER:**     Midwest denies that it engaged in any unlawful conduct.  The remaining allegations in paragraph 187 state legal conclusions to which no response is required.  To the extent a response is required, Midwest denies the remaining allegations in paragraph 187.

188.     By using collective efforts to penalize UEP members that refused to participate in the Guidelines and other collusive practices, Defendants suppressed competition from growers that were not part of the supply control scheme.  Such conduct is outside the scope of the Capper-Volstead limited immunity.  For example, as early as November 2003, Sparboe Farms questioned whether the UEP Certified Program was a sham and a pretext for a supply control program that violated antitrust laws.  Sparboe Farms left the UEP Certified program.  Shortly after Sparboe Farms left the UEP Certified program because of its concerns, UEP President Gene Gregory and other UEP staff members contacted several of Sparboe Farms' customers and pressured them not to purchase eggs from Sparboe Farms.

**ANSWER:**     Midwest denies the allegations in the first and second sentences of paragraph 188.  Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third, fourth, and fifth sentences of paragraph 188.

189.     Gregory also contacted the Canada Egg Marketing Agency ("CEMA"), a Sparboe Farms customer, asserting that CEMA should stop purchasing Sparboe Farms eggs because Sparboe Farms was no longer complying with UEP's UEP Certified Guidelines.  UEP

made similar contacts with others, including the Albertson's grocery chain and Wal-Mart. UEP took similar actions against Kreider Farm Eggs, another company that withdrew from the UEP Certified Guidelines. On September 6, 2005, Sparboe Farms sent UEP a letter threatening legal action if UEP staff members continued to interfere with Sparboe Farms' relationships with its customers. UEP contacted these accounts despite having a policy against making direct contact with customers of UEP members.

> **ANSWER:** Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 189.

> 190. Capper-Volstead does not immunize conduct resulting from collusion with non-members.

> **ANSWER:** Paragraph 190 states legal conclusions to which no response is required. To the extent a response is required, Midwest denies the allegations in paragraph 190.

> 191. UEP has conspired with UEA, USEM, and their non-farmer members to implement the supply control campaign. Some of UEA's non-farmer members include: Ovotherm, a producer of egg packaging products; Lubing Systems, LP, a manufacturer of bird watering and egg conveyor belt systems; Farm Credit Services of America, a company providing credit and financial services to farm and ranch operators; and Henning Construction Company, a general contractor that builds agricultural facilities.

> **ANSWER:** Midwest denies the allegations in the first sentence of paragraph 191. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 191.

192.     The Capper-Volstead Act protects only cooperatives that collectively process, market, handle, ship, sell, bargain, or compete for the sale of agricultural products.  UEP does not engage in any of these activities.

**ANSWER:**     The first sentence of paragraph 192 states a legal conclusion to which no response is required.  To the extent a response is required, Midwest denies the allegations in the first sentence of paragraph 192.  Midwest denies the allegations in the second sentence of paragraph 192.

193.     UEP members do not associate to collectively process, handle, or market their products, and UEP does not provide those services.  By way of example, UEP does not wash, break, pasteurize, store, distribute, or negotiate the sale of its members' eggs. On the contrary, UEP was founded to provide services to the industry, and not to market the products of its members.

**ANSWER:**     Midwest denies the allegations in the first and third sentence of paragraph 193.  Midwest admits that UEP currently does not wash, break, pasteurize, package, store or distribute its members' eggs but denies the remaining allegations in the second sentence of paragraph 193.

194.     As set forth in detail above, which allegations are incorporated by reference and repeated here, beginning at least as early as 1999 and continuing through at least 2008, Defendants and their co-conspirators engaged in a continuing combination, conspiracy, and agreement to control and manipulate supply and fix and raise prices for eggs and egg products.  Defendants and their co-conspirators' horizontal combination and conspiracy was a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** Midwest denies the allegations in paragraph 194.

195.     Defendants and their co-conspirators' combination and conspiracy consisted of a continuing understanding, agreement, and concerted action by and among each Defendant and co-conspirator, the material terms of which included:

A.     To control and manipulate supply and/or capacity for production of eggs and egg products;

B.     To artificially maintain and increase prices for eggs and egg products; and

C.     To affirmatively conceal the existence of their illegal understanding and agreement.

**ANSWER:** Midwest denies the allegations in paragraph 195, including subparagraphs (A) through (C), inclusive, in paragraph 195.

196.     As set forth above, Defendants and their co-conspirators engaged in a variety of acts to facilitate the formation, implementation, operation, enforcement and concealment of their combination and conspiracy. Defendants and their co-conspirators controlled and manipulated capacity for production of eggs and egg products, including, without limitation, in the following ways.

A.     Agreeing to adopt UEP Certified Guidelines that controlled the size of egg-producing flocks of layer hens and egg production over the long-term and thereby raising and/or stabilizing prices;

B.       Agreeing not to replace hens lost through the UEP Certified Guidelines'

minimum floor space allowance thereby raising and/or stabilizing prices;

C.       Agreeing to limit backfilling (*i.e.*, the practice of replacing older hens that

died to maintain overall flock size) through the UEP Certified Guidelines and

thereby raising and/or stabilizing prices;

D.       Agreeing to adopt the 100% Rule, requiring that each egg producer raise

all of its eggs in compliance with the Guidelines, including all eggs purchased for

resale;

E.       Agreeing to adopt, to enforce the UEP Certified Guidelines, a mandatory

audit program that focused on the Guidelines related to supply control;

F.       Agreeing to organize and participate in coordinated, large-scale exports of

eggs in order to control the supply of eggs available for sale to entities in the

United States and thereby raising and/or stabilizing prices;

G.       Agreeing to cull or destroy existing layer hens in order to control egg

production and thereby raising and/or stabilizing prices;

H.       Agreeing not to increase existing flocks in order to stabilize egg

production and thereby raising and/or stabilizing prices;

I.        Agreeing to induce molting in order to control egg production by existing

flocks and thereby raising and/or stabilizing prices; and

J.      Agreeing overall to control supply and production of eggs in the United

States and thereby raising and/or stabilizing prices.

**ANSWER:**     Midwest denies the allegations in paragraph 196, including

subparagraphs (A) through (J), inclusive, in paragraph 196.

197.    The purpose and effect of Defendants and their co-conspirators' *per se*

unlawful combination and conspiracy were to maintain, stabilize, and increase the prices that

Plaintiffs and others paid for eggs and egg products by controlling and manipulating supply and

fixing and raising prices for eggs and egg products, to deprive Plaintiffs and others the benefit of

free and open competition in their purchases of eggs, and to restrain, suppress and eliminate

competition for eggs.

**ANSWER:**     Midwest denies the allegations in paragraph 197.

198.    At all relevant times, Defendants and their co-conspirators engaged in an

affirmative course of conduct to create the illusion of competition and to conceal their unlawful

agreement to control supply and artificially maintain and increase the price of eggs.  Plaintiffs

did not know, and through the exercise of due diligence (which they exercised) could not have

known, about the existence of the conspiracy because the nature of Defendants and their co-

conspirators' conspiracy was self-concealing and because Defendants and their co-conspirators

engaged in affirmative and deceptive acts to conceal the conspiracy.

**ANSWER:**     Midwest denies the allegations in paragraph 198.

199.    Defendants and their co-conspirators' agreement to control supply and

artificially maintain and increase the price of eggs and their related meetings and

communications were by their very nature self-concealing and not discoverable by Plaintiffs through the exercise of reasonable diligence.

      **ANSWER:**    Midwest denies the allegations in paragraph 199.

      200.    Defendants and their co-conspirators' conspiracy could not have survived absent secrecy. If the conspiracy were not secret, it would have collapsed. Plaintiffs sought competitive and independently determined prices for the eggs they purchased.

      **ANSWER:**    Midwest denies the allegations in the first and second sentence of paragraph 200. Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 200.

      201.    At all relevant times, Defendants and their co-conspirators fraudulently concealed their conspiracy through affirmative and deceptive acts, including, but not limited to, the following.

      A.    Defendants and their co-conspirators concealed the fact that UEP members, including Sparboe Farms, raised concerns that the UEP Certified Guidelines were a sham and that the Guidelines, in fact, were an industry supply control program.

      B.    Defendants and their co-conspirators limited disclosure of the true purpose of the UEP Certified Guidelines to private meetings or communications. At or about the same time that the Guidelines were first adopted, participants at UEP meetings privately discussed that the express purpose of the UEP Certified

Guidelines was to control supply.  Additionally, UEP leadership saw the UEP
Certified Guidelines as a seemingly legitimate pretext to control supply.

C.      Defendants and their co-conspirators denied public access to meetings
relating to the conspiracy and frequently discussed the true supply control purpose
of the Guidelines and other measurers at closed meetings that only UEP members
were allowed to attend.

D.      Defendants and their co-conspirators restricted knowledge of and
communications in furtherance of their conspiracy to a limited number of high
ranking and/or key individuals of each Defendant.

E.      Defendants and their co-conspirators concealed, and agreed not to disclose
publicly, various internal documents, including, but not limited to, UEP
newsletters and minutes from Defendants' committee, board, and other internal
meetings, that disclosed that the actual purpose of their egg production program
was to control supply and artificially increase and maintain egg prices.

F.      Defendants and their co-conspirators—through Defendant UEP—
restricted public access to the UEP Certified Guidelines' audit results.

G.      Defendants and their co-conspirators made secret payments to each other
to share losses associated with their coordinated exports.

H.      Defendants and their co-conspirators—through, for example, private
communications by Defendant UEP's president Gene Gregory in June 2005—
used covert means to punish egg producers that did not comply with the supply

controls or who raised concerns that the UEP Certified Guidelines were a sham and a pretext to control supply.

**ANSWER:**    Midwest denies the allegations in paragraph 201, including subparagraphs (A) through (H), inclusive, in paragraph 201.

202.    At all relevant times, animal welfare was a societal concern of importance to Plaintiffs. This concern was reflected in Plaintiffs' internal policies. One or more Plaintiffs required their facilities and the facilities of their direct suppliers that managed live animals to meet or exceed industry standards and government regulations for animal welfare, including standards for handling, housing, transportation, and slaughter.

**ANSWER:**    Midwest admits that animal welfare was a concern of many egg buyers. Midwest is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 202.

203.    Plaintiffs were aware that Defendants adopted a program for the production of eggs. However, Plaintiffs were unaware that Defendants' representations that they adopted this program based on animal welfare concerns were false and pretextual. Defendants' false and pretextual representations were plausible and credible to Plaintiffs, in part, because of Plaintiffs' own concern for animal welfare.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 203. Midwest denies the remaining allegations in paragraph 203.

204.    Defendants recognized that their representations would cause Plaintiffs to believe that Defendants' program for the production of eggs was a legitimate response to genuine animal welfare concerns.

**ANSWER:**    Midwest denies the allegations in paragraph 204.

205.    Based on Defendants' false and pretextual representations and because of Plaintiffs' concern for animal welfare, at all relevant times, Plaintiffs believed (and had no reason to believe otherwise) that Defendants' program for the production of eggs was a credible attempt to address legitimate animal welfare issues.  Plaintiffs were misled by Defendants and their co-conspirators' facially plausible and credible explanation based on the publicly stated animal husbandry purposes.  As a result, Plaintiffs' inquiry obligations were substantially relaxed and were met by Plaintiffs' reliance on the fact that Defendants' and Plaintiffs' concerns for animal welfare were apparently coextensive.

**ANSWER:**    Midwest denies the allegations in paragraph 205.

206.    At all relevant times, Defendants and their co-conspirators' affirmative acts of concealment were intended to conceal the existence of their unlawful actions from Plaintiffs and others.  At all relevant times, Plaintiffs were unaware, and had no reason to be aware, of Defendants and their co-conspirators' acts of concealment.

**ANSWER:**    Midwest denies the allegations in paragraph 206.

207.    Because of these acts of concealment, Plaintiffs did not have knowledge of Defendants' antitrust violations, or any facts that might have led Plaintiffs (or a reasonable purchaser in Plaintiffs' position) to discover Defendants' antitrust violations prior to the public

disclosures concerning the government investigations of various egg producers in or about September 2008. Prior to that time, Plaintiffs were not aware of the facts as alleged herein (nor were Plaintiffs aware of any other facts or circumstances) that should have alerted Plaintiffs (or would have alerted a reasonably diligent purchaser in Plaintiffs' position) of the need to investigate whether a conspiracy existed.

**ANSWER:** Midwest denies the allegations in paragraph 207.

208. As a direct result of Defendants' pervasive and successful efforts to conceal the existence of their combination and conspiracy, Plaintiffs first became aware of key facts alleged in this Complaint regarding the formation, existence, nature, and operation of the conspiracy in connection with their December 2010 settlement with the Moark co-conspirators, which provided access to Defendants' non-public, internal records such as UEP newsletters and minutes for internal meetings.

**ANSWER:** Midwest denies the allegations in paragraph 208.

209. Plaintiffs had no knowledge of Defendants' combination and conspiracy, or of any facts that would have led to the discovery thereof, until after the September 2008 disclosure of the government investigations in a *Wall Street Journal* article and the subsequent access to Defendants' non-public internal records as part of the Moark settlement. The September 2008 *Wall Street Journal* article noted that these government investigations "ha[d] not been previously reported" and that "collusion" may have been a "hidden factor" driving higher prices. As a result, Plaintiffs did not discover, and through the exercise of due diligence (which they exercised) could not have discovered, the existence of Defendants' unlawful conspiracy at an earlier date.

**ANSWER:**    Midwest denies that it participated in any unlawful conduct.
Midwest denies the remaining allegations in the first and third sentences of paragraph 209.
Midwest is without knowledge or information sufficient to form a belief as to the truth of the
allegations in the second sentence of paragraph 209 and, to the extent that the allegations in
paragraph 209 purport to characterize a written document, Midwest denies that Plaintiffs
accurately or completely interpreted, characterized or stated the substance or context of the
written document and further states that an authenticated document is the best evidence of its
content.

210.    Defendants and their co-conspirators' fraudulent concealment of their
unlawful conduct tolled the statute of limitations for Plaintiffs' claims.

**ANSWER:**    Midwest denies the allegations in paragraph 210.

211.    During the relevant period, Plaintiffs purchased substantial amounts of
eggs directly from one or more of the Defendants.  As a result of Defendants' *per se* unlawful
combination and conspiracy, Plaintiffs paid prices for eggs that were substantially greater than
what Plaintiffs would have paid but for Defendants' illegal conduct.  The full amount of
Plaintiffs' damages will be calculated after discovery and upon proof at trial.

**ANSWER:**    Midwest is without knowledge or information sufficient to form a
belief as to the allegations of the first sentence of paragraph 211.  Midwest denies the remaining
allegations in paragraph 211.

212.     Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

**ANSWER:**     Midwest denies the allegations in paragraph 212.

Midwest denies any and all allegations contained in Plaintiffs' prayer for relief and demand for jury trial, denies that Plaintiffs are entitled to any relief, and requests that Plaintiffs take nothing in this suit and that this matter be dismissed with prejudice, with costs and fees awarded to Midwest.

<div align="center">SECOND DEFENSE</div>

The Amended Complaint fails to state a claim upon which relief can be granted.

<div align="center">THIRD DEFENSE</div>

Plaintiffs' claims are barred in whole or in part by the statute of limitations.

<div align="center">FOURTH DEFENSE</div>

The alleged acts and omissions of Defendants were within the scope of the antitrust immunity provided by the Capper-Volstead Act, 7 U.S.C. § 291, in whole or in part.

<div align="center">FIFTH DEFENSE</div>

The alleged acts and omissions of Defendants were within the scope of the antitrust immunity provided by § 5 of the Cooperative Marketing Association Act, 7 U.S.C. § 455, in whole or in part.

<div align="center">SIXTH DEFENSE</div>

The alleged acts and omissions of Defendants were within the scope of the antitrust immunity provided by § 6 of the Clayton Act, 15 U.S.C. § 17, in whole or in part.

## SEVENTH DEFENSE

If, for any reason, any or all of the alleged acts and omissions of Defendants were not within the scope of the foregoing immunities, such a situation was not reasonably foreseeable by Midwest. At all relevant times, Midwest acted in good faith and with intent to comply with the law.

## EIGHTH DEFENSE

If, for any reason, any or all of the alleged acts and omissions of Defendants were not within the scope of the foregoing immunities, any resulting damages should be equitably mitigated.

## NINTH DEFENSE

If, for any reason, any or all of the alleged acts and omissions of Defendants were not within the scope of the foregoing immunities due to a technical defect or deficiency, any such technical defect or deficiencies should be regarded as de minimis.

## TENTH DEFENSE

Plaintiffs' claims are barred to the extent the injuries complained of are not the type of injury the antitrust laws were designed to prevent.

## ELEVENTH DEFENSE

Plaintiffs have failed to allege fraudulent concealment with sufficient particularity.

## TWELFTH DEFENSE

Defendants' alleged conduct and practices are not actionable because the conduct complained of by Plaintiffs was specifically authorized by statute.

## THIRTEENTH DEFENSE

Defendants' alleged conduct and practices are not actionable because Defendants did not act in concert or conspire with others so as to unreasonably affect or restrain trade.

<div align="center">FOURTEENTH DEFENSE</div>

Defendants' alleged conduct and practices are not actionable because they had no adverse impact on competition.

<div align="center">FIFTEENTH DEFENSE</div>

Defendants' alleged conduct and practices are not actionable because they were performed without anticompetitive intent or purpose.

<div align="center">SIXTEENTH DEFENSE</div>

Plaintiffs' alleged damages, if any, were not proximately caused by any acts or omissions by Midwest, but rather were proximately caused by intervening and superseding acts and omissions of others and by economic conditions for which Midwest is not responsible.

<div align="center">SEVENTEENTH DEFENSE</div>

Plaintiffs' claims are barred because Plaintiffs have suffered no damages or the damages they suffered are too speculative and uncertain.

<div align="center">EIGHTEENTH DEFENSE</div>

Plaintiffs' claims are barred to the extent that Plaintiffs lack antitrust standing to maintain this action.

<div align="center">NINETEENTH DEFENSE</div>

If, for any reason, any of the alleged acts and omissions of Defendants were unlawful under the antitrust laws and were outside the scope of any immunity, any resulting damages are limited to compensation for injuries that Plaintiffa can show to have resulted from

that which made Defendants' conduct unlawful and to be separate from the effects of lawful concerted activity.

## TWENTIETH DEFENSE

Midwest alleges that some or all of the damages sought by Plaintiffs in this case are duplicative of damages sought on behalf of alleged classes or subclasses of indirect purchasers, under a theory of "passing on" or otherwise. Double recovery of the same damages should not be permitted because such a grossly excessive and inequitable recovery would violate the Due Process Clause of the Fifth Amendment of the United States Constitution.

## TWENTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the Noerr-Pennington doctrine, the state action doctrine, and/or the doctrine of implied immunity.

## TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by waiver, laches and/or estoppel. In particular, Plaintiffs' claims are barred to the extent they are based on animal welfare guidelines that Plaintiffs requested or approved.

## TWENTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, because legitimate standard setting through cooperatives cannot give rise to antitrust liability.

## TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the claims are governed by the rule of reason, and Plaintiffs have not alleged and cannot prove the elements of a rule of reason claim.

## TWENTY-FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the pro-competitive benefits of the conduct alleged by Plaintiffs outweighs any alleged anti-competitive effects.

## TWENTY-SIXTH DEFENSE

Plaintiffs' damages claims are barred, in whole or in part, because the damages they seek are speculative and uncertain.

## TWENTY-SEVENTH DEFENSE

Midwest adopts by reference any applicable defense pleaded by any other Defendant in this action not expressly set forth herein.

## TWENTY-EIGHTH DEFENSE

Midwest reserves the right to assert additional defenses at any time prior to the conclusion of trial to the extent that such defenses become known to Midwest as a result of discovery or pretrial preparation.

## TWENTY-NINTH DEFENSE

Midwest did not knowingly or consciously participate in a scheme designed to achieve an unlawful objective.  Midwest itself is a "farmer" and a "producer" within the scope of the statutory immunities in the Capper-Volstead Act, 7 U.S.C. § 291, § 5 of the Cooperative Marketing Association Act, 7 U.S.C. § 455, and/or § 6 of the Clayton Act, 15 U.S.C. § 17.  At all relevant times Midwest believed that the other members of UEP and USEM were likewise "farmers" and "producers," and that UEP and USEM themselves qualified as cooperative organizations whose legitimate activities, including all those that are the subject of the Plaintiffs' claims, are within the scope of these immunities.  If, for some technical reason, Midwest was mistaken in any or all of such beliefs, it is not liable by reason of such mistake(s).

## THIRTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of *in pari delicto*, involvement, participation, equal involvement, complete involvement, and unclean hands.

## THIRTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs were co-initiators, co-conspirators, or involved in creating, maintaining, supporting, relying on, implementing, or otherwise utilizing the conduct and programs challenged in this action.

WHEREFORE, Defendant Midwest Poultry Services, L.P. prays that Plaintiffs take nothing by way of their First Amended Complaint, and for all other just and proper relief in the premises.

Dated:  April 26, 2012                    Respectfully submitted,

                                          FAEGRE BAKER DANIELS LLP


                                          By:____/s/ Ryan M. Hurley_____
                                              Robert K. Stanley
                                              Kathy L. Osborn
                                              Ryan M. Hurley
                                              FAEGRE BAKER DANIELS LLP
                                              300 North Meridian Street, Suite 2700
                                              Indianapolis, Indiana  46204
                                              Telephone: (317) 237-3000
                                              Facsimile:  (317) 237-1000
                                              Email:  Robert.Stanley@faegrebd.com
                                                      Kathy.Osborn@faegrebd.com
                                                      Ryan.Hurley@faegrebd.com


                                          *Attorneys for Midwest Poultry Services, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2012 the foregoing Answer to First Amended Complaint was filed electronically. Notice of this filing will be sent to the counsel of record by operation of the Court's electronic filing system and is available for viewing and downloading from the ECF system.


 /s/ Ryan M. Hurley
_____

FAEGRE BAKER DANIELS LLP