UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. <br><br>  Defendants. | No. 1:11-cv-08808 <br><br> Judge Charles R. Norgle |

### DEFENDANTS' MOTION FOR BIFURCATION OF TRIAL

Defendants United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc. ("USEM"), Cal-Maine Foods, Inc. ("CMF"), Michael Foods Inc. ("MFI"), and Rose Acre Farms, Inc. ("Rose Acre"), pursuant to Fed. R. Civ. P. 42(b), respectfully request bifurcation at trial of liability from damages.

### Introduction

Federal Rule of Civil Procedure 42(b) allows bifurcation of trial "[f]or convenience, to avoid prejudice, or to expedite and economize." The history of this multi-district antitrust litigation strongly supports bifurcation. Two other plaintiff groups, in two previous trials, tried the same claim based on the same theory of liability against some of the Defendants. Both jury trials were bifurcated as to

liability and damages. *See* ECF No. 1560.[1] The efficiencies from bifurcation materialized. Both trials resulted in a verdict of no liability for defendants, making adjudication of damages unnecessary and sparing the jury, Court, and litigants unnecessary work.

Nothing has changed to treat this trial differently. Plaintiffs have no additional evidence to support their theory of liability. To a significant degree, the witnesses, exhibits, and deposition designations Plaintiffs identified in their initial exchanges duplicate the evidence the two other plaintiff groups relied on in the two earlier trials. Likewise, the legal issues are nearly identical. The likelihood that Plaintiffs will fail to establish liability strongly supports bifurcation.

Bifurcation is also warranted to prevent unfair prejudice to Defendants. Plaintiffs want a jury to hear evidence of Plaintiffs' damages—which allegedly exceed $100 million—before the jury makes any finding of liability. Poisoning the well with this astronomical figure is not a proper trial tactic. Before either the jury or the Court is burdened with disputes over alleged damages, or related evidentiary issues, Plaintiffs should be required to prove liability for their alleged conspiracy—an endeavor that two sets of previous plaintiffs failed to accomplish.

## Factual Background

***Overview of the Litigation.*** Beginning in 2008, direct and indirect purchasers of shell eggs and certain processed egg products filed a series of lawsuits alleging that

---

[1] Unless otherwise noted, ECF docket entries cited herein ("ECF No.") refer to the consolidated district court docket in Case No. 2:08-md-2002-GEKP (E.D. Pa.), assigned to Judge Gene E.K. Pratter.

the Defendants and other egg producers conspired to raise prices by reducing the supply of eggs in violation of Section 1 of the Sherman Act. *See* ECF No. 1 (MDL Transfer Order). The complaints are virtually identical. All allege a single, overarching conspiracy to reduce the nation's supply of eggs to increase the price of shell eggs and egg products. Further, the complaints each allege this conspiracy had three components: (1) engaging in coordinated short-term supply reducing measures; (2) agreeing to participate in an animal welfare program known as the "UEP Certified Program"; and (3) coordinating exports.

The cases were consolidated for pretrial proceedings in the U.S. District Court for the Eastern District of Pennsylvania. ECF No. 3 (Case Management Order No. 1). In 2011, the Plaintiffs here—Kraft, Kellogg, General Mills, and Nestlé—filed their individual action in the Northern District of Illinois. The Judicial Panel on Multidistrict Litigation transferred Plaintiffs' complaint for consolidation with proceedings in the Eastern District of Pennsylvania. *See* Case No. 2:12 cv-00088-GEKP, ECF No. 1 (MDL Conditional Transfer Order).

For purposes of pretrial proceedings, the MDL Court coalesced plaintiffs into three groups: (1) a class of wholesale egg and egg product purchasers—the "Direct Purchaser Plaintiffs" or "DPPs"; (2) direct purchaser opt outs—"Direct Action Plaintiffs" or "DAPs";[2] and (3) a consumer class—"Indirect Purchaser Plaintiffs" or

---

[2] Those Direct Action Plaintiffs included the country's largest supermarket chains, including Kroger, Safeway, and Albertson's.

"IPPs." *See, e.g.,* MDL Case Management Order No. 20, ECF No. 822.[3] The MDL Court grouped Plaintiffs with the DAPs. After dispositive motions were concluded, this action was transferred back to this District for trial.

Both the DPPs and the subset of DAPs that had filed their action in the Eastern District of Pennsylvania went to trial, in 2018 and 2019, respectively. Both trials were bifurcated. Neither trial proceeded to the damages stage because both juries rendered a defense verdict on liability.

This case raises the same Sherman Act claim based on the same alleged conspiracy that DPPs and DAPs lost in these earlier two trials. After more than a decade of litigation, this case represents the last remaining vestige of the MDL.

***Plaintiffs' Claims in this Case.*** Plaintiffs allege that, from approximately 1999, Defendants conspired to reduce the domestic supply of eggs to raise the price of egg products. Plaintiffs contend that Defendants accomplished this through the above-described conspiracy. Plaintiffs' theories of liability are identical to the theories advanced in the two earlier trials.[4] Indeed, Plaintiffs' economic expert testified for the DAPs in the previous trial.

---

[3] The IPPs dismissed their case in June 2018, shortly after the DPP trial resulted in a defense verdict.

[4] Plaintiffs' alleged conspiracy is identical with only one difference. The other plaintiff groups sought damages for alleged price increases in both shell eggs and egg products. These Plaintiffs seek damages for egg products only. Shell eggs are eggs that remain in their shell and are typically sold in cartons for human consumption. Egg products are eggs that have been removed from their shells for processing into liquid, dried, or frozen products. Processing includes pasteurizing the egg and often adding other ingredients such as salt or sugar. These Plaintiffs use egg products as ingredients to manufacture foods like mayonnaise and ice cream. The market for egg products is demonstrably different from the market for shell eggs.

4

***The First of the Two Earlier Trials.*** In 2018, the DPPs took their Sherman Act claim to a jury against three producers—Rose Acre, R.W. Sauder, Inc. and Ohio Fresh Eggs, Inc. After a five-week trial on liability, the jury returned a defense verdict. The jury found that a conspiracy to reduce egg supplies existed, but the jury ruled that two defendants (Sauder and Ohio Fresh) did not participate in the conspiracy. Importantly, the jury found that, under the rule of reason, the conspiracy did not impose an unreasonable restraint on supply, consistent with the evidence that egg producers had independent business reasons for their conduct.

The Third Circuit affirmed the jury's verdict. *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020) (attached as Ex. A). Upholding application of the rule of reason, the Third Circuit concluded that the UEP Certified Program "was not a horizontal agreement to reduce supply and fix prices." *Id.* at 729. Rejecting the restrictive "*per se*" rule, the Third Circuit noted: "The [trial court] was confronted with practices having far less certain motives and far more complicated economic consequences, and that quite rightly led to application of the rule of reason. That choice was correct." *Id.*

***The Second of the Two Earlier Trials.*** Despite the DPPs' loss, the DAPs that originally filed their action in the Eastern District of Pennsylvania—12 of the country's largest supermarket chains—tried their Sherman Act claims to a jury. The defendants at that second trial were Rose Acre, UEP, and USEM. The liability phase of trial lasted approximately six weeks. During this second trial, the plaintiffs again failed to prove up their case. After only one day of deliberation, the jury rendered a

5

defense verdict after answering "no" to the first question on the verdict form—whether a conspiracy to reduce the supply of eggs existed.

On appeal, the Third Circuit upheld the verdict. The Third Circuit concluded that the MDL Court properly instructed the jury that the three components of the alleged conspiracy "must all be part of a single conspiracy, as opposed to, for example, three different conspiracies that were independent of each other." *Kroger v. Rose Acre Farms (In re Processed Egg Prods. Antitrust Litig.)*, 850 F. App'x. 142, 145 (3d Cir. 2021) (attached as Ex. B).[5] The Third Circuit observed that the jury instructions conformed to "the case the Direct Action Plaintiffs chose to make." *Id.* at 146. The Third Circuit explained that the trial court correctly distinguished between the alleged conspiracy—which had three parts—and the overt acts by which defendants may have carried it out. "The instructions repeatedly emphasized that the *agreement* was the important component, not the acts used to carry out that agreement." *Id.* (cleaned up).

***The Upcoming Trial.*** This third trial is scheduled to last approximately five weeks, beginning October 24. In their pretrial disclosures, Plaintiffs have identified 36 live witnesses, 1,224 exhibits, and designations of prior deposition or trial testimony of 30 witnesses. Defendants have identified 20 live witnesses, 1,449 exhibits, and designations of prior deposition testimony of 43 witnesses.

To promote efficiency and expediency—at a time when the Covid-19 pandemic lingers and creates complications with ensuring a jury remains seated throughout

---

[5] This same instruction was given in the DPP trial as well.

trial—Defendants seek to bifurcate the liability and damages phases of the trial, as the court did in the two earlier trials. *See* ECF No. 1560 (Case Management Order No. 24) (directing that the cases will be "tried separately as to both liability and any damages").

Plaintiffs here have refused to agree to bifurcation, necessitating this motion.

### Legal Standard

Rule 42(b) permits bifurcation of any issue "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1166 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983). Only one of these criteria need be met to justify bifurcation. *Id.* "The ultimate decision to order a separate trial under Rule 42(b) is at the court's discretion and will be overturned only upon a clear showing of abuse." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008).

Bifurcation of liability and damages is often granted in antitrust cases. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 666 (7th Cir. 2002) ("No doubt in view of the complexity of [this antitrust] case the judge will also want to bifurcate the trial. . . . ); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 93 C 4788, 1994 WL 362186, at *3 (N.D. Ill. July 11, 1994) (bifurcating a trial involving antitrust and patent claims into four parts, including one part for antitrust liability and one part for antitrust damages); *Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 79 C 2741, 1985 WL 1737, at *3 (N.D. Ill. June 7, 1985) (bifurcating an antitrust trial into separate phases for damages and liability).

Argument

Bifurcation promotes judicial economy, ensures that the issues are litigated efficiently, and avoids unfairly prejudicing Defendants by having the jury hear evidence of massive speculative damages before any finding of liability is made.

A.  **Bifurcating Liability and Damages Promotes Efficiency.**

Courts employ a two-part test to determine when efficiency "sufficiently tips the balance in favor of bifurcation." *Fetzer v. Wal-Mart Stores, Inc.*, 13-CV-9312, 2016 WL 6833912, at *3 (N.D. Ill. Nov. 21, 2016) (cleaned up). "First, the Court examines the likelihood that a finding of no liability will actually occur. . . . Second, where substantial time and effort will be saved by a finding of no liability, the Court is more likely to grant bifurcation." *Id.* (cleaned up).

Both prongs of this test support bifurcation here. Two juries have found no antitrust liability based on the same allegations and based on the same evidence identified by Plaintiffs in pretrial exchanges. Bifurcation, therefore, would streamline the presentation of evidence and obviate the need for expert testimony on damages.

1.  **Two Trial Losses Involving the Same Claim Establish that Plaintiffs Face a Significant Likelihood of Loss in this Case.**

The outcome of the two earlier trials is more than enough to establish that Plaintiffs face a significant likelihood that a jury will find no liability in this case. Plaintiffs have chosen to "base[] [their] claims on the same allegations" with much of the same evidence presented in the earlier two trials, creating at least "a reasonable likelihood that Plaintiff[s] may not succeed in proving liability." *CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Associates,* 389 B.R. 76, 84 (N.D. Ill. 2008)

8

(cleaned up) (finding bifurcation was in the interest of judicial economy where conspiracy claims based on the same allegations were dismissed in a different case).

Two prior juries weighed the same theories of antitrust liability advanced by these Plaintiffs. Both juries found no Sherman Act violation. Those verdicts are final. Both judgments were affirmed by the Third Circuit Court of Appeals. *See In re Processed Egg Products Antitrust Litigation*, 850 F. App'x 142, 147 (3d Cir. 2021) (attached as Ex. B); *In re Processed Egg Products Antitrust Litigation*, 962 F.3d 719, 722 (3d Cir. 2020) (attached as Ex. A).

At summary judgment, the MDL Court foreshadowed issues with Plaintiffs' case when assessing the evidence. "The plaintiffs argue that the UEP Certified Program functioned solely to impose restraints on supply . . . The record, however, demonstrates that the purpose and operation of the UEP Certified Program is not as clear as the plaintiffs assert . . . While the plaintiffs have characterized the Certified Program as a simple output-limitation agreement, they are unable to point to any evidence that, on its face, the agreement to enter into the UEP Certified Program constituted an express agreement among competitors to restrict egg supply. Moreover, the record suggests the specific challenged components of the UEP program do plausibly have procompetitive benefits . . . Similarly, while the plaintiffs argue that the supply reducing effects of the conspiracy are essentially undisputable, the record includes evidence that egg supply actually *increased* during the conspiracy period." *In re Processed Egg Products Antitrust Litigation*, 206 F. Supp. 3d 1033, 1045-47 (E.D. Pa., 2016) (attached as Ex. C).

Additionally, the MDL Court raised serious questions concerning the claims involving egg products and the related analysis conducted by Plaintiffs' economist, Dr. Michael Baye. *Id.* at 509. Specifically, the MDL Court observed that Dr. Baye did not analyze egg products "with the same depth that he considered shell eggs." *Id.* Acknowledging that "[t]here are undoubtedly different realities when it comes to making egg products than there are when it comes to producing shell eggs," the MDL Court was "troubled" by "the relative lack of attention the [Plaintiffs] have paid to the differences between shell eggs and egg products." *Id.* (cleaned up).

Because of these and other deficiencies in Plaintiffs' case, there is a substantial likelihood that this jury—like the two prior juries—will find no liability and thus eliminate any need to consider damages. As the MDL Court observed, and the two prior jury verdicts demonstrate, Plaintiffs have significant hurdles to overcome in establishing liability. Considering these deficiencies and the outcomes of the prior trials, it is likely that a finding of no liability will occur here.

### 2. **Bifurcation Will Streamline the Presentation of Evidence.**

Bifurcation will allow the parties to defer introducing damages evidence, which would "simplify[] factual presentation, reduce[] costs, and save[] time." *MCI Communications*, 708 F.2d at 1167 (cleaned up). Judicial economy supports bifurcation when the damages inquiry will require additional expert testimony. *See Adams v. City of Chicago*, 06 CV 4856, 2012 WL 13060050, at *2-3 (N.D. Ill. Nov. 2, 2012) (Norgle, J.) (bifurcation of *Monell* claim supported the interests of judicial economy by potentially avoiding expert testimony and extra days at trial); *Brom v. Bozell, et al*, 867 F. Supp. 686, 690 (N.D. Ill. 1994) (granting motion for bifurcation of

10

ADEA trial based on efficiency where both sides had retained damages experts). Here, separating liability from damages would obviate the need for the parties' economic experts to testify on damages if liability is not proven.[6]

Even if Plaintiffs prevail on liability, bifurcation serves the interest of judicial efficiency by streamlining the jury's consideration of evidence. Regardless of whether Plaintiffs succeed in establishing liability, "bifurcation will result in savings insofar as the deliberations regarding liability will not be sidetracked by extraneous and potentially confusing evidence relating to [Plaintiffs'] damages." *Brom,* 867 F. Supp. at 690. Moreover, a bifurcated damages phase avoids complications resulting from settlements between certain Defendants and certain (but not all) Plaintiffs.

Moreover, as a practical matter, Defendants do not believe that the five weeks allocated for trial is a feasible time frame in which to address both liability and damages, given the number of witnesses and exhibits involved in this highly complex case. *See In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d at 666 ("No doubt in view of the complexity of the case the judge will also want to bifurcate the trial . . . [I]f these suggestions are followed, we think the case can be tried in a reasonable amount of time and be made comprehensible to a jury."). This consideration also weighs in favor of bifurcation. There is a significant risk that an un-bifurcated jury trial will go past the Thanksgiving holiday into December 2022.

---

[6] To be clear, the parties' economics experts will still be testifying on issues related to liability if trial is bifurcated.

11

### B. Bifurcation Would Avoid Prejudicing Defendants, While Not Prejudicing Plaintiffs.

Although bifurcation is justified for reasons of judicial efficiency alone, a separate reason supports bifurcation: avoiding undue and unfair prejudice to Defendants. Plaintiffs allege compensatory damages well exceeding $100 million. Plaintiffs should be required to prove that Defendants are actually liable for antitrust violations before presenting evidence to the jury of their alleged damages. *Pittway Corp. v. Maple Chase Co.*, 91 C 3582, 1992 WL 392584, at *5 (N.D. Ill. Dec. 16, 1992) (granting motion to bifurcate liability from willfulness in a patent case to "eliminate[] the danger that evidence of willfulness might prejudice the jury against defendants during the liability phase of the case"); *Amstead Industries Inc. v. National Castings, Inc.*, 88 C 924, 1990 WL 106548, at *2 (N.D. Ill. July 11, 1990) (granting motion to bifurcate liability from damages and willfulness in a patent trial based on efficiency and avoidance of prejudice). Defendants will be unfairly prejudiced if Plaintiffs divert the jury's attention with allegations of massive damages before Plaintiffs carry their burden of proving liability.

In contrast, Plaintiffs cannot credibly claim prejudice. The issues and evidence pertaining to liability are clearly separable from those pertaining to damages, so deferring the latter will not prejudice Plaintiffs' presentation of the former. And because the two earlier trials were both bifurcated, this Court and the parties have a clear roadmap to follow for ensuring efficient bifurcation. *See MCI Communications*, 708 F.2d at 1168 ("In order to be effective, separate trials of liability and damages in antitrust cases must be grounded upon a clear understanding between the court and

12

the parties of the issues and proof involved in each phase of the trial."). For this additional reason, bifurcation is both warranted and demonstrably workable.

## Conclusion

This Court should adopt the approach taken by the MDL Court in the prior trials and should bifurcate liability from damages. Bifurcation is warranted in the interest of judicial efficiency and to avoid unfair prejudice to Defendants. Plaintiffs have no reason to avoid bifurcation, save a desire to prejudice Defendants in the eyes of a jury by laying out a nine-figure damages claim before any finding of liability is made.

Therefore, Defendants respectfully move the Court to bifurcate the trial of liability from damages pursuant to Fed. R. Civ. P. 42(b) and to grant them such other and further relief as is appropriate.

Dated: August 24, 2022　　　　　Respectfully submitted,

*/s/ Patrick M. Otlewski*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick Otlewski (potlewski@kslaw.com)
Abigail Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
Andrew Chinsky (achinsky@kslaw.com)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

*Counsel for Defendant Cal-Maine Foods, Inc.*

*/s/ Carrie C. Mahan*
Carrie C. Mahan (carrie.mahan@weil.com)
S. Nicole Booth (nicole.booth@weil.com)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 682-7000

Brian G. Liegel (brian.liegel@weil.com)
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Tel: (305) 577-3180

Stephen J. Siegel (ssiegel@novackmacey.com)
Elizabeth C. Wolicki (ewolicki@novackmacey.com)
NOVACK AND MACEY LLP
100 N Riverside Plaza
Chicago, IL 60606
Tel: (312) 419-6900

*Counsel for Defendant Michael Foods, Inc.*

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

14

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Robert E. Browne, Jr.
(robert.browne@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

*Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.*

*/s/ Donald M. Barnes*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

*Counsel for Defendant Rose Acre Farms, Inc.*

15

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants registered to receive service in this action.

*/s/ Patrick M. Otlewski*
Patrick M. Otlewski
