# Exhibit C

1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
    ANTITRUST LITIGATION                   08-MDL-02002
5

6
                             - - - - -
7
                        PHILADELPHIA, PA
8
                             - - - - -
9
                        NOVEMBER 12, 2019
10
                             - - - - -
11

12
    BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14                           - - - - -

15              TRANSCRIPT OF TRIAL PROCEEDINGS

16                          DAY 7

17                           - - - - -

18

19

20

21              KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                Official Court Reporter
22              Room 1234 - U.S. Courthouse
                601 Market Street
23              Philadelphia, PA  19106
                (215) 779-5578
24

25
         (Transcript produced by mechanical shorthand via C.A.T.)

1    pure statement that the numbers in later years are larger than

2    numbers in the earlier years, correct?

3    A.    According to USDA statistics.

4    Q.    And you have no opinion on what those numbers would have

5    been, absent the UEP Certified Program, correct?

6    A.    I don't have any way of knowing what that would be.

7              (End of videotape.)

8              THE COURT:  Okay, that is the conclusion of the

9    Gregory deposition and testimony, and we will now take a lunch

10   break, folks.  It's just a couple of minutes before 1 o'clock.

11   I'd like to get -- maybe get everybody back here by two and

12   get started.  Does that give you all enough time to get, you

13   know, have your lunches with reasonable convenience?  Great.

14   So let's aim for 2 o'clock and as soon as everybody is back,

15   we will resume.  Meanwhile, just enjoy lunch.  Don't chat

16   about the case.  And we will see you in about an hour.

17             THE DEPUTY CLERK:  All rise.

18             (Jury out.)

19             THE COURT:  Of course, I hope the hour is enough for

20   you all, too.  See you at two.

21             MR. PATTON:  Your Honor?

22             THE COURT:  Oh, yes.

23             MR. PATTON:  Good afternoon.  Douglas Patton.  The

24   next witness we intend to call is James Carlson, the gentleman

25   who's going to authenticate the Rose Acre's videos and photos.

1   Last night his deposition was taken and it --

2   everything's good, but I intend to play this video and five

3   photos, and I'd like to know if I'm going to get an objection

4   and when I start playing that video because it's not a

5   manageable thing to do, so I'd like to know now while we have

6   an hour.

7           THE COURT:  And you're asking me?

8           MR. PATTON:  No, I'm asking the other side -- well,

9   I'm asking you if I can ask the other side.

10          THE COURT:  Right there.  There they are.

11          MR. LEVINE:  Yes, we do have some -- we have

12  objections to several of the scenes in the Rose Acre video.

13          MR. PATTON:  So I would like to be able to work that

14  out now within the Court's presence because we think there

15  aren't problems with the video -- scenes in the video and I

16  will not be able to change the video.

17          THE COURT:  Well, do you know already what their

18  objections are?

19          MR. PATTON:  No.

20          THE COURT:  I'll tell you what.  How about if you

21  all at least try and find out what your respective positions

22  are, and I'll come back here in about 30 minutes.

23          MR. PATTON:  Excellent.  Thank you, Your Honor.

24          THE COURT:  And those of you who have that issue to

25  deal with can be here and the rest of you who are not

1    essential to that can enjoy the whole hour for lunch.  I'll be

2    back in a half hour.

3              MR. PATTON:  If we resolve it, then we'll let you

4    know.

5              THE COURT:  Yes, don't let me be the last to know.

6    Whatever, I'll be back in 30 minutes.

7              MR. BLECHMAN:  Thank you.

8              THE COURT:  Unless you don't need me.  Go.

9              (Luncheon recess taken.)

10             (After luncheon recess at 1:30:)

11             THE COURT:  Folks, don't worry.  What can I do to

12   help you?

13             MR. PATTON:  Thank you, Your Honor.

14             THE COURT:  No problem.

15             MR. PATTON:  So I think we're down to a couple of

16   general issues.  The first one has to deal -- deals with video

17   footage of the Rose Acre footage of pullet houses.  So the

18   concern there is, without going through the timeline of this,

19   we have -- the Defendants have had this video with the pullet

20   houses for three to four weeks.  At the pretrial conference,

21   there was a request that the captions be taken off the video,

22   and what Mr. King said was, Okay, we're set.  I think it's a

23   waiver argument in the first instance because for the first

24   time, and we would like to have heard something at least this

25   morning or later, we haven't heard this pullet house

1    objection.

2              Pullet house is the house where the hens stay before

3    they move into the layer house.  During Mr. King's opening,

4    behind the UEP chart, he presented a demonstrative that says,

5    Stages of egg production.

6              THE COURT:  Right.

7              MR. PATTON:  I think he talked about pullets.  And

8    more importantly, and I'm happy to show Your Honor the 2010

9    edition of the UEP Guidelines, if you would like to look at

10   them, but the videos that we have of the -- that the witness

11   took in the pullet house is of pullets.  Pullets being put in

12   transfer carts.  Pullets being transferred to a layer

13   facility.  And the guidelines, as they apply, deal directly

14   with pullets.  And I'm happy to hand it to you, if you'd like.

15             THE COURT:  I'm still waiting to find out what the

16   problem is.

17             MR. PATTON:  I -- we think they should be played,

18   but the Defendants have objected to all footage of the pullet

19   house.  And there's not many videos of it, but handling and

20   transportation.  Pullets.  Containers should be used for

21   pullets.  Pullets and hens must be -- catching of pullets and

22   hens must be done in a manner that avoids crowding or piling

23   in corners.  Moving pullets and hens -- and I'm

24   paraphrasing -- must be handled in methods that include, A,

25   removing birds from cage one or two at a time.  So pullets --

1   pullets under cage space, at the top:  Numerous studies have

2   shown decreasing space allowance.

3        Doesn't specify whether or not there's a difference

4   between layer houses or pullets.  There's no distinguishing

5   between them in the guidelines and the guidelines are Animal

6   Husbandry Guidelines.

7        THE COURT:  Do you have still shots of what the

8   video shows?

9        MR. PATTON:  We do not have still shots but we can

10  show you the videos.

11        THE COURT:  Well, how about -- I'm still -- I'm

12  still trying to figure out what the actual dispute is.  Okay.

13  Hold that thought.  Don't go away.

14        MR. LEVINE:  There's two categories, Your Honor.

15  The first category is where the witness could not properly

16  authenticate it as a film from a Rose Acre facility.

17        THE COURT:  I thought the premise there is that

18  these are films that this fellow took.

19        MR. PATTON:  They are.

20        MR. LEVINE:  They are.

21        THE COURT:  He can't remember where he was.

22        MR. LEVINE:  Yes, he went from Rose Acre to

23  Rembrandt Enterprises, and when we deposed him last night and

24  we went scene by scene in the proposed compilation, there were

25  several of the scenes he could not confirm it was, in fact, a

1   Rose Acre facility.  So we do not think those things have been

2   properly authenticated and should be played to the jury.

3          With respect to the pullet issue that Mr. Patton

4   raised, there are really two different issues.  There are

5   certain scenes that depict the transportation of the pullets

6   to the layer facilities.  We are not objecting to that because

7   as Mr. Patton appropriately pointed out, the Certified Program

8   does deal with the transportation and handling of pullets.

9          However, there are scenes of footage of just the

10  general conditions of a pullet house, and the Certified

11  Program does not deal with the general conditions of a pullet

12  house.  They deal with the general conditions of the layer

13  facilities.  So we believe it is both irrelevant and a 403 to

14  show footage of, generally, the conditions in a pullet house

15  that has no relevance to the argument that the certified

16  guidelines was a pretext.

17         THE COURT:  Let's deal with the -- what I think is

18  the easier one, which is whether the witness authenticates the

19  footage.

20         MR. PATTON:  So, Your Honor, 901, simple standard is

21  what it purports to be.

22         THE COURT:  What I'm hearing is he doesn't know what

23  it purports to be.

24         MR. PATTON:  Not true.

25         THE COURT:  It's a chicken farm.

1          MR. PATTON:  So -- so --

2          THE COURT:  And that's a little -- that's a little

3   general, don't you think?

4          MR. PATTON:  Well, first of all, 901 is a low

5   standard.  We have an affidavit that was provided from HSUS

6   that says these are the videos that were taken at Rose Acre.

7   They got that.  Then they subpoenaed.

8          THE COURT:  Okay, what is the witness's relationship

9   to HSUS?

10          MR. PATTON:  He was the investigator hired by HSUS.

11          THE COURT:  Okay.

12          MR. PATTON:  And he was retained by HSUS.  The

13   witness then went to a Rose Acre farm where they had three

14   facilities.  He testified in his deposition -- in his

15   deposition last night, he took these videos and he took these

16   photos.  And it's surprising, but that he -- he remembered

17   details such as scenes, cages, walls of henhouses, coworkers

18   and names.  What he was not able to do at times was, do you

19   know what layer house you were in?  And he said, I can't

20   remember and I don't know.

21          Do you know what pullet house?  Do you know if you

22   were in a pullet or a layer house?  He said at this point, I

23   can't remember.

24          But we're here to authenticate a deposition --

25   authenticate a video.  We're here to authenticate photos and

1    he says he took them and he knows he took them.  The issue of

2    whether it was --

3              THE COURT:  Well, leaving aside for a moment whether

4    he knew he was -- whether he now recalls whether it was house

5    A or house B, is he saying that it was a house at Rose Acre?

6              MR. PATTON:  Yes.  In most instances -- a couple of

7    times.  And I actually -- I won't say these were kind of

8    tricky questions because he was being asked about Rose

9    Acre-only videos, and in those instances where he got to say,

10   well, as I sit here today, I -- he -- it could have been

11   possible it was Rembrandt farm.  I've taken those out because

12   he was confused.

13             They played these scenes broken up not in

14   continuation, and he got confused and I'll live with that.

15   And I'm prepared to show the testimony.  Yeah, I believe this

16   was taken at Rose Acre Farms.  I'm fairly confident that it's

17   footage of my arms inspecting an injured bird and that would

18   be Rose Acre.  I mean --

19             THE COURT:  And these videos were taken when?

20             MR. PATTON:  In 2010.

21             THE COURT:  Is that a question or -- you had that

22   little range.

23             MR. PATTON:  That's fine, that's fine.

24             THE COURT:  Valley girl --

25             MR. PATTON:  They were taken in 2010, Your Honor.

1          THE COURT:  Okay.  And is that when the guidelines

2     are that you want to use?

3          MR. PATTON:  I won't use the guidelines.  I'm just

4     pointing out that the guidelines are applicable at that time

5     directly dealt with pullet house.  My point, Your Honor, at

6     this point, is this gentleman will testify and he's testified

7     last night, he wore the camera, he was in Rose Acre.  We have

8     videos from February 5th to the 22nd when he was there.

9     They've been produced by HSUS.  And if they have questions

10    about whether this was a layer house or a pullet house, which

11    are several of their objections, that should go to weight.

12    It's a simple standard.  Is this a photo that you took?  Is

13    this a video that you took?

14         THE COURT:  Okay, may I ask why is there a

15    significance between pullet houses and other houses?

16         MR. LEVINE:  Well, there are, but if I may --

17         THE COURT:  Okay.

18         MR. LEVINE:  It's almost easier to do this with a

19    little bit of devils in the details.  There are four scenes

20    where he says he could not state with confidence, he wasn't

21    sure that it was Rose Acre or Rembrandt.  So this isn't a

22    pullet versus a layer facility.  This is whether it's Rose

23    Acre and we believe --

24         THE COURT:  That was the question I thought I was

25    asking you.

1        MR. LEVINE:  No, no, no, I understand, but

2   Mr. Patton seemed to suggest that he could identify for all

3   the scenes that they haven't taken out, and I don't believe

4   that's correct.  In terms of the pullet versus the layer, the

5   issue really is they're trying to say that the Certified

6   Program is a pretext for a supply reduction facility.  The

7   Certified Program, then, you should be able to show video of

8   what the Certified Program applied to.  It did not apply to

9   the general conditions of a pullet house.  It applied to the

10  conditions in a layer facility.

11       The problem they have with this witness is he just

12  spent more time in facilities that were not governed by the

13  Certified -- the Certified Program.  The Certified Program did

14  govern the transportation and the video footage of the

15  transportation we're not objecting to.  It's just they have

16  general, you know, footage of a layer house that is irrelevant

17  to their argument.

18       THE COURT:  What's the amount of time on this, this

19  footage that's in dispute?

20       MR. PATTON:  The entire footage, I think with some

21  of our cuts that we've agreed to do and I've compromised, I

22  think we're down to maybe five minutes, five and a half

23  minutes.

24       THE COURT:  Does that sound about right?

25       MR. LEVINE:  Probably.

```
 1                THE COURT:  Okay.  And he's going to be here, right?

 2                MR. PATTON:  And he will be here.

 3                THE COURT:  Okay.  How much of the five minutes is

 4      devoted to pullets as opposed to layers?

 5                MR. PATTON:  Well, so --

 6                MR. LEVINE:  A lot.

 7                MR. PATTON:  It was complicated in the sense of the

 8      house.

 9                THE COURT:  It's only five minutes.  How complicated

10      can it be?

11                MR. PATTON:  Well, the unloading of pullets and

12      putting them in carts, which is clearly handling.  I mean,

13      look, the Animal Welfare Program, our view is this is -- this

14      is -- the Animal Welfare Program was used as an overall

15      justification, and it was promoted as the best thing since

16      sliced bread.  I get that part.  They're not here.  They're

17      not here right now.

18                MR. PATTON:  So I think we're cutting a little too

19      finely because this is the life of a hen under their program.

20      So the -- to answer that question, I'm trying to, because I

21      don't actually know.

22                THE COURT:  I'm hearing more and more like this is

23      an inflammatory move as opposed to evidentiary.

24                MR. PATTON:  No, it's not, Your Honor.  There's

25      several scenes of transport carts.  I don't know how long they
```

1  take.  So we have -- we have -- well, first, you've said

2  you've withdrawn the --

3          MR. LEVINE:  I've withdrawn -- we've withdrawn all

4  the objections with respect to the transportation, so anything

5  that deals with the car, we have it.  I can give Your Honor

6  the scene numbers we're objecting to, if that would help.

7          MR. PATTON:  Well, you had told me before the break

8  you had all these objections witnesses transporting the

9  pullet.

10         MR. LEVINE:  With respect to the transportation.

11         THE COURT:  One at a time.  Poor Ms. Feldman.  She

12  can't do this.

13         MR. LEVINE:  All right.  Would it be easier if I

14  just went through --

15         THE COURT:  Yes.  It would.  It actually would be

16  easier if I actually saw what you guys were talking about.

17         MR. PATTON:  We can play it.

18         THE COURT:  Sure.

19         MR. PATTON:  With the sound down.

20         (Video clip played.)

21         THE COURT:  Now, what I'm seeing is what now is,

22  after you've cut and --

23         MR. PATTON:  No.  We have to try to cut this before

24  the witness comes on.

25         THE COURT:  None of what you've discussed has been

1    removed, right?

2              MR. PATTON:  Correct.

3              THE COURT:  Okay.

4              MR. PATTON:  But it is what we edited down per

5    Your Honor's -- after Your Honor saw the first thing.

6              THE COURT:  Okay.

7              (Video clip played.)

8              MR. PATTON:  Those are pullets.  Those are pullets.

9    These are pullets being put in transport cages.

10             THE COURT:  This part is not even visible.  Whatever

11   this is.

12             MR. PATTON:  I don't think you have an objection to

13   that.

14             MR. LEVINE:  I could.

15             THE COURT:  Well, no, I mean, I just said it wasn't

16   visible.  Maybe it was just my screen.

17             MR. PATTON:  Your Honor, those are pullets being put

18   in the layer houses.  That's the layer house.  Now they're

19   being depopulated.  And this basically ends, Your Honor, with

20   the manure pits, and that's it.

21             THE COURT:  It ends with what did you say?

22             MR. PATTON:  Then there's just film of the manure

23   pits, and that's the end of it.

24             (Video clip ends.)

25             MR. LEVINE:  Your Honor --

1          THE COURT:  Well, let me get a couple of facts here.

2    Which of the Rose Acre facilities were these photos taken?

3          MR. PATTON:  So they were at three facilities.

4          THE COURT:  Which three?

5          MR. PATTON:  There was a facility at Guthrie,

6    Stewart and Winterset where he worked.

7          THE COURT:  Okay, and they're all in 2010?

8          MR. PATTON:  All in 2010.

9          THE COURT:  Okay, and as I recall and what I've

10   learned, pullets do not lay eggs --

11         MR. PATTON:  Not until they --

12         THE COURT:  -- while they are pullets?

13         MR. PATTON:  That's correct.

14         THE COURT:  Okay.  Go ahead.

15         MR. LEVINE:  So, I was just going to say, Plaintiffs

16   have already agreed to delete scenes 12 and 30, but in

17   addition to those, we believe scenes 32, 34, 35 and 39 could

18   not be authenticated as being definitively from Rose Acre.

19         With respect to scenes 2, 3, 4, 15, 29, and the

20   manure pit that's the back half of scene 49, they are --

21   either didn't know whether that was a layer facility or pullet

22   facility or definitively a pullet facility.  The scenes that

23   depicted the transportation, we've withdrawn our objections

24   to.

25         THE COURT:  Okay, run through the numbers of the

1    scenes for me, please.  I wasn't writing it down as I was

2    watching.  The order that the video --

3              MR. LEVINE:  If you want I have it.  Scene 2.

4              THE COURT:  Okay, go ahead.

5              MR. LEVINE:  Scene 3.

6              THE COURT:  Yes.

7              MR. LEVINE:  Scene 4.

8              THE COURT:  Yep.

9              MR. LEVINE:  Again, scene 12, I believe they agreed

10   to delete.  Scene 15, scene 21, scene 22, scene 23, scene 27,

11   scene 28, scene 29, scene 30, but again, I believe they agreed

12   to delete that.

13             MR. PATTON:  That's correct.

14             MR. LEVINE:  Scene 31, scene 32, scene 33, scene 34,

15   scene 35, scene 39.  Scene 40, scene 41, and scene 42, and

16   scene 49 had what looked like two parts, but it's not

17   delineated in the video as such, but you'll notice it moves

18   from a facility to the manure pit and our objection is from

19   the manure pit part of it.

20             MR. PATTON:  I think you maybe skipped 45.

21             MR. LEVINE:  I'm sorry, did I?

22             MR. KING:  45.

23             MR. PATTON:  41 and 41A and 45.

24             MR. LEVINE:  I don't have it on my list.

25             THE COURT:  And to which do you have objections now?

```
 1            MR. LEVINE:  So with respect to the fact that he

 2    cannot tell definitively that it's Rose Acre, our objections

 3    are to scenes 32, 34, 35, and 39.

 4            THE COURT:  32, 34, and 35, did you say?

 5            MR. LEVINE:  Yes.

 6            THE COURT:  And --

 7            MR. LEVINE:  And 39.  With respect to the fact --

 8            THE COURT:  And you say that the witness has said

 9    he's not sure whether it's Rose Acre or Rembrandt?

10            MR. LEVINE:  He couldn't say for sure.

11            THE COURT:  As opposed to which is Rose Acre's?

12            MR. LEVINE:  Exactly.

13            THE COURT:  Okay, that ought to be -- I mean, can we

14    not just sort of agree on what he doesn't know?

15            MR. PATTON:  So the witness's examination went as he

16    said, I'm -- I took this video.  I recognized it.  I'm highly

17    confident this is at a Rose Acre facility.  Is it possible --

18            THE COURT:  Does he actually say, I'm highly

19    confident?

20            MR. PATTON:  In most instances, Your Honor.  I don't

21    want to be held to every time, but he would say that and then

22    the question would be, Well, is it possible it would be a

23    Rembrandt?  And because it went so quick, in my opinion -- but

24    all of these -- all of these videos are Rose Acre videos, so I

25    really think it's not fair for this witness to be --
```

1          THE COURT:  Okay, and you're saying that they're all

2    Rose Acre because of the affidavit that you have?

3          MR. PATTON:  And that they were subpoenaed and

4    produced.  The same video was produced.  So after the

5    affidavit and after these videos were produced, then

6    Defendants served a subpoena on the Humane Society four weeks

7    ago and asked for all of the raw footage, and they got back

8    this same video that was part of the -- so now they've --

9    they're authentic in that they were produced.  And my point

10   only on the witness is nine years later he's going like this.

11   But we know he videoed it and he said --

12         THE COURT:  Okay, I'm trying to get a sense of this.

13   All right, so 32, 34, 35, and 39, the objection has to do with

14   the argument that the witness is not, last night, rock solid

15   as to whether it was Rose Acre or Rembrandt?

16         MR. LEVINE:  Or in at least one instance whether he,

17   in fact, took that video.  If Your Honor wants, I can hand up

18   the deposition and give you the page cites.

19         THE COURT:  Let me just get an order of magnitude

20   here.

21         MR. LEVINE:  Sure.

22         THE COURT:  Okay.  What are your other objections as

23   to other scenes?

24         MR. LEVINE:  Okay, so -- so on scene 2, he's not

25   certain it's a layer facility.  Scene 3 is definitively a

1   pullet facility.

2              THE COURT:  Three?

3              MR. LEVINE:  And scene 4 is definitively a pullet

4   facility.

5              THE COURT:  Yes.

6              MR. LEVINE:  Scene 15 he wasn't sure.

7              THE COURT:  Not sure as to whether it was a layer --

8              MR. LEVINE:  Whether it was a layer or a pullet.

9              Scene 29, he said it's maybe a layer but he couldn't

10  say for sure.  And, again, the manure pit that is the

11  conclusion of this video, he says he couldn't say whether that

12  was from a pullet facility or a layer facility.

13             THE COURT:  Is there a difference?

14             MR. LEVINE:  Again, it's certainly a difference in

15  terms of the --

16             THE COURT:  No, no, I mean --

17             MR. LEVINE:  Oh, yes.  How do I put it?  Layer

18  facilities are older -- are older hens that produce a

19  different volume of manure than does a pullet.  And so they

20  are different, but, more importantly, the Certified Program

21  does not --

22             THE COURT:  No, I understand that point.  There's

23  no -- in other words, there's no way by just looking at this?

24             MR. LEVINE:  There may be.  There may be, but I

25  couldn't represent to the Court right now whether there is or

1   there is not.

2              THE COURT:  You're not an expert?

3              MR. LEVINE:  Not yet.  I'm getting there.

4              THE COURT:  Okay.  Are there -- do you have any

5   other objections?

6              MR. LEVINE:  No, I think that covers --

7              THE COURT:  Okay.

8              MR. PATTON:  Last point I'll make on the pullets,

9   Your Honor, is, in fact, Gene Gregory said it today, the 100%

10  rule says that they treat all hens the same.

11             MR. LEVINE:  All egg-laying hens, all the layers,

12  not the pullets.

13             MR. BLECHMAN:  Your Honor, may I -- may I add

14  something?

15             THE COURT:  Sure.

16             MR. BLECHMAN:  Just further to what Mr. Patton just

17  said, there's been testimony in this trial, the Defendants'

18  contention is that as a result of the 100% rule, there cannot

19  be commingling between hens that are raising -- that have

20  more -- cages with more hens in them so they're not under the

21  Certified Program, and those that are not.  So the difference

22  between certified and uncertified eggs, the Court has heard

23  criticism by virtue of questions on cross-examination with the

24  Sparboe witnesses about that.  It is the Plaintiffs' position

25  that in addition to what Mr. Patton has said, that a measure

1    of the credibility, which the jury should be allowed to weigh,

2    as to the legitimacy of the contention about the no

3    commingling with regard to uncertified and certified hens that

4    are being raised is whether these same -- a measure of the

5    credibility of that contention as to whether it's really about

6    animal welfare or is it about supply management is the fact

7    that with regard to pullets, whether the Defendants treat

8    pullets humanely as well.  And assuming everything else --

9    putting aside everything else that the Court has heard, if the

10   Defendants are mistreating pullets, we suggest, it is our

11   position that it is a measure of the weight of the evidence

12   the jury's allowed to consider in deciding the legitimacy of

13   the Defense contention whether they're actually truly

14   interested in treating hens well because they have this

15   uncertified and certified distinction or whether that's supply

16   management.  And what belies that contention we contend, in

17   part, is, what's shown in the video of the mistreatment of

18   pullets.

19              THE COURT:  May I see the witness's comments about

20   scene 32, 34, 35, and 39?

21              MR. LEVINE:  May I approach?

22              THE COURT:  Yes.

23              MR. LEVINE:  With respect to scene 32, I believe

24   Your Honor will find the deposition at page 77, lines 19

25   through 21.  It doesn't recognize that he took the video.

```
1              THE COURT:  No, no, okay, just -- scene 32.  Okay,
2    what page is 34 on?
3              MR. LEVINE:  34 is on page 79, going over, I
4    believe, on to 80.
5              THE COURT:  And 35 follows right along on 80?
6              MR. LEVINE:  Yes.
7              THE COURT:  And then 39?
8              MR. LEVINE:  Is on page 81 on to page 82.
9              THE COURT:  Okay, on that particular issue, looking
10   at scene 32, 34, 35, and 39.  32 is out, 34 is out.  35 and 39
11   are in.  Based on at least what I read here.  Now, if the
12   witness changes what he's going to say here on the stand, so
13   be it.
14             Now, with respect to layers or pullets, the case
15   involves whether or not there is supply management or
16   mismanagement to affect prices.  Supply of eggs, pullets don't
17   lay eggs.  So 2 can stay in.  3 is out, 4 is out.  15 can stay
18   in, as can 29.
19             And it seems to me that there's enough repetition in
20   what is shown in the remaining scenes that to the extent this
21   also figures into the Court's ruling, I think there's some
22   gratuitousness of just some of the repeat, the repeat frames,
23   but you're left with quite a few.
24             MR. PATTON:  Okay.  We're going to --
25             THE COURT:  Unless somebody can tell me that just by
```

1  looking at the birds you can tell that one looks like a pullet

2  and one looks like a layer.

3          MR. LEVINE:  Yes.  Yes.  Sometimes that is true and

4  that has already been calculated.

5          THE COURT:  It's not a --

6          MR. LEVINE:  That testimony has already been

7  calculated into what we objected to and what we didn't.

8          THE COURT:  Okay, you've got my ruling.  Your egg

9  class has concluded.  Okay, thank you for working out as much

10  of this as you did.

11          MR. LEVINE:  Just for clarity, the back half of 49.

12          THE COURT:  Oh, leave that.  Let it stay as it is.

13          MR. LEVINE:  Thank you.

14          MR. PATTON:  Is that 49 and 42A?

15          MR. LEVINE:  Yes.

16          MR. PATTON:  Did someone on your staff take very

17  good notes?

18          MR. LEVINE:  I think I did.

19          MR. PATTON:  Okay.  Your Honor, if we could have ten

20  minutes, maybe 15 minutes to make sure we get the video.

21          THE COURT:  Pick one.

22          MR. PATTON:  15.  It will take a little longer to

23  get it right.

24          THE COURT:  As long as Mr. Coyle will tell our jury

25  that I've been working on making their next time in the

1   courtroom more productive.

2               THE DEPUTY CLERK:  Yes.

3               THE COURT:  I'll be back.

4               MR. PATTON:  Thank you, Your Honor.

5               (After recess:)

6               THE DEPUTY CLERK:  All rise.

7               THE COURT:  All right, we can bring the jury back.

8               THE DEPUTY CLERK:  All rise.

9               (Jury in.)

10              THE COURT:  Okay, you all may take your seats.

11  Ladies and gentlemen, as I told you, it's very difficult for

12  me to guarantee some timing things, but we were working on

13  making sure that this next segment of the trial is done in an

14  efficient and smooth way, so that was why I intruded upon the

15  time that I gave you and here we are.

16              So, Plaintiffs, you may proceed.

17              MR. PATTON:  Your Honor, at this time, we call

18  Mr. James Carlson to the stand.

19              THE COURT:  Yes.

20              THE DEPUTY CLERK:  Please remain standing and raise

21  your right hand.

22                          JAMES CARLSON,

23  Called as a witness herein by the Plaintiffs, having been

24  first duly sworn, was examined and testified as follows:

25              THE DEPUTY CLERK:  Would you please have a seat.