UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., )<br>)<br>)<br>) | |
| Plaintiffs, ) | No. 1:11-cv-08808 |
| ) | |
| v. ) | Judge Charles R. Norgle |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS, INC., and ROSE ACRE FARMS, INC. )<br>)<br>)<br>)<br>) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION *IN LIMINE* NUMBER 2 TO
PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE OF
POST-2008 STATE LAWS WHEN OFFERED TO CONTEST LIABILITY**

**I.    Introduction**

Plaintiffs' Motion *in Limine* No. 2 asks the Court to hold that the passage of laws in multiple states after 2008, imposing various cage-space and other animal welfare requirements for egg-laying hens either identical to or similar to those found in UEP's Certified Program, is irrelevant to Defendants' liability under the Sherman Act—or, if it is relevant, that such information is so prejudicial that it must be kept from the jury.  The DAPs brought an identical motion in the last trial, which the MDL Court properly denied.[1]  The fact that numerous states adopted cage-space requirements for egg-laying hens is probative evidence for each of the three elements Plaintiffs are required to prove to establish Defendants' liability.

---

[1] *In re Processed Egg Prods. Antitrust Litg.*, No. 08-md-2002, ECF No. 1981, at n.1 (E.D. Pa. Sept. 24, 2019).  A copy of Judge Pratter's Order is attached for the Court's convenience as Exhibit A.

First, these state animal welfare laws at issue, though enacted after 2008, represent a culmination of social and political change towards the humane treatment of livestock, particularly egg-laying hens, that began in the early 2000s, and which gathered steam during the period for which the Plaintiffs claim that Defendants' conduct caused a reduction in egg supply (August 2005 through December 2012). That evidence is relevant to whether the implementation and continued development of the Certified Program, and the decisions of various egg producers to join that Program over time, reflected an agreement among the Defendants to reduce egg production or, instead, represented independent responses to activist pressure and the demands of Defendants' customers. Though enacted after 2008, legislative discussions and public awareness of the laws started much earlier.

Second, the existence of these animal welfare laws is directly relevant, under a Rule of Reason analysis, to whether the UEP Certified Program imposed an *unreasonable* restraint on trade. Third, evidence of these state animal welfare laws is relevant to whether Plaintiffs' expert witness, Dr. Baye, can credibly demonstrate that the Certified Program actually caused a decrease in egg production (as compared to a world in which the alleged conspiracy never occurred), resulting in competitive harm and injuring Plaintiffs.[2]

Finally, Plaintiffs' proposal that the Court "voir dire" Dr. Baye, and then bar the Defendants from cross-examining Dr. Baye if the Court concludes he adequately addressed the impact of state laws, is inappropriate. The Court may determine Dr. Baye's qualifications, the

---

[2] In the DAP trial, Dr. Baye appeared during the liability phase, but Plaintiffs here indicate his testimony relates only to damages. If Plaintiffs are treating Dr. Baye solely as a damages expert, and the Court grants the Defendants' motion for bifurcation of trial, Dr. Baye's testimony should be reserved for the damages phase. That, however, would not affect the relevance or admissibility of these state laws.

helpfulness and relevance of his testimony, and the reliability of his methods. But determinations regarding his credibility, or the correctness of his conclusions, are left to the jury.

For all of these reasons, Plaintiffs' Motion *in Limine* No. 2 should be denied.

## II. The State Animal Welfare Laws Are Centrally Relevant to Liability.

Plaintiffs' motion is based on the mistaken belief that Defendants will introduce state animal welfare law evidence to prove the UEP Certified Program is *per se* lawful.[3] But that is not why Defendants intend to introduce such evidence. Accordingly, the cases that Plaintiffs cite[4] are readily distinguishable. In both *Aetna* and *Ricks*, the plaintiffs sought to establish liability by relying upon laws enacted after Defendants' conduct took place, arguing that such laws demonstrate the unlawful nature of the conduct at issue. *See Aetna, Inc. v. Blue Cross Blue Shield of Mich.*, No. 11-15346, 2015 LEXIS 48534, at *13–16 (E.D. Mich. Apr. 14, 2015); *Ricks v. Matayoshi*, Civ. No. 16-00044, 2017 U.S. Dist. LEXIS 56248, at *5-6 (D. Haw. Apr. 12, 2017). In comparison, Defendants do not introduce evidence relating to the state animal laws to show that their conduct was lawful under state law (which would be analogous to the two cases referenced above). Rather, evidence regarding state laws enacted after 2008 that dictate animal welfare guidelines demonstrate the type of pressure faced by supermarkets and producers that led to the creation of, and participation in, the Certified Program. Such evidence is also relevant to showing that the Certified Program is reasonable under a Rule of Reason analysis.

"To prevail under [Sherman Act] § 1 under any theory, plaintiffs generally must prove three things: (1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they

---

[3] Plaintiffs' Motion *in Limine* No. 2, ECF No. 173, at 3, 7.

[4] *See id.* at 4.

3

were injured." *Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). The state law evidence that Plaintiffs seek to exclude is relevant to each of these three factors.

> **A. Evidence of the state animal welfare laws is probative evidence that Defendants did not agree to reduce the supply of eggs.**

As has been briefed and argued in other filings, starting in the late 1990s, animal rights activists took aim at the farming industry.[5] Their goal, at least in part, was to improve the lives of animals that are part of the commercial food chain, including egg-laying hens. And their approach was multifaceted, targeting retailers, chain restaurants, producers, and state legislatures. In 1999, the European Union passed legislation phasing out the use of conventional caged production systems for hens. And as early as January 2001, bills were being introduced at the state level that would require a minimum amount of cage-space per egg-laying hen. *See* H.B. 1726, 57th Leg., Reg. Sess. (Wash. 2001).

Around this time, egg producers became concerned that animal welfare issues could lead to overly restrictive regulations or inconsistent contractual requirements that would have deleterious effects on the industry, including disruptions in supply. It was against this backdrop that UEP formed an independent Scientific Advisory Committee ("SAC") in 1999 to develop science-based recommendations for the wellbeing of egg-laying hens. The UEP Producer Committee on Animal Welfare then used the SAC's recommendations to develop the UEP

---

[5] Defendants summarize animal welfare activism and development of the Certified Program in this brief. For a fuller background and evidentiary support related to these issues, *see generally*, Defendants' Opposition to Plaintiffs' Motion *in Limine* No. 5 to Exclude or Limit Evidence Regarding Grocers and Certain 30(b)(6) Witness Testimony (filed contemporaneously) and Defendants' Opposition to Plaintiffs' *Santiago* Proffer (filed contemporaneously).

Animal Welfare Guidelines for Egg-Laying Hens ("Guidelines"), and created the UEP Certified Program in 2002.

The animal rights activists' efforts continued, and after only a few years, the activists succeeded in convincing numerous state legislatures to regulate the husbandry of egg-laying hens. *See, e.g.*, Cal. Proposition 2 (enacted Nov. 4, 2008; effective Jan. 1, 2015); Ariz. Admin. Code § R3-2-907 (noticed Nov. 14, 2008; effective Oct. 1, 2009); Mich. Comp. Laws § 287.746(2) (enacted Oct. 12, 2009; effective Oct. 12, 2019); Ohio Admin. Code 901:12-9-03(F)(6) (enacted Mar. 31, 2010; effective Sept. 29, 2011); Wash. Rev. Code § 69.25.065(1)(a) (enacted May 10, 2011; effective Aug. 1, 2012); Or. Rev. Stat. § 632.840(1)(c) (enacted June 17, 2011; effective Jan. 1, 2012). For example, in 2008, California passed Proposition 2. This law and the Companion Bill AB 1437, which extended Proposition 2's mandates to out-of-state producers, effectively required that all eggs sold in California be "cage-free" as of January 1, 2015. Other states, including Arizona, Oregon, and Washington, passed laws expressly requiring that egg-laying hens be raised according to the UEP Guidelines. *See* Ariz. Admin. Code § R3-2-907 ("All egg-laying hens . . . shall be raised according to the United Egg Producers Animal Husbandry Guidelines. . . . All eggs sold in this state . . . shall be from hens raised according to the [UEP guidelines], [and] shall display the United Egg Producers Certified logo on their cases . . . ."); Wash. Rev. Code § 69.25.065(1)(a) (requiring producers to comply with "the 2010 version of the united egg producers animal husbandry guidelines for United States egg laying flocks for conventional cage systems or cage-free housing systems."); Or. Rev. Stat. § 632.840(1)(c) (2011) (requiring producers to "meet standards equivalent to the requirements for certification established in the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg Laying Flocks").

5

The predicate element to a Section 1 violation is proof of an "agreement." *See, e.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010). Plaintiffs here claim that Defendants agreed to reduce the supply of eggs, principally through the Certified Program, which they claim is a sham and cover to accomplish that objective. The enactment of state laws requiring egg producers to comply with the UEP Guidelines or provide greater space per hen undermines Plaintiffs' allegations that Defendants entered into such a conspiracy.[6] The egg producer Defendants have consistently maintained that their choice to raise hens in accordance with the UEP Certified Program was the result of customer and consumer demand, not an illicit agreement with other egg producers to reduce supply. That state laws were introduced, discussed, and ultimately enacted that require egg producers to raise hens in a more humane fashion is probative evidence of that demand. Moreover, the fact that these laws mandate that egg producers provide hens with the amount of space prescribed by the Certified Program, and often more, has a strong tendency to support Defendants' position. This is particularly so because these laws, although they went into effect after 2008, were being introduced, discussed, debated, and lobbied a few years before their enactment.

Plaintiffs argue that states' adoption of animal welfare regulations is not probative of the pressures Defendants or lawmakers faced from animal welfare activists, and instead is only probative of the pressures lawmakers faced from Defendants' lobbying efforts.[7] Plaintiffs are free to try to persuade the jury of their position on the inferences to be drawn from the evidence. But the fact that the parties have differing interpretations of relevant evidence does not require the Court to exclude that evidence. Indeed, that is the very purpose of a trial. The extent to

---

[6] *See, e.g.*, DAP trial, Defendants' Ex. 184, p. 21 (attached as Exhibit B).

[7] Plaintiffs' Motion *in Limine* No. 2, ECF No. 173, at 5–7.

which the legislation reflects public demand is a question for the jury, and the jury is entitled to hear all relevant evidence. As such, the jury certainly could find that the animal welfare legislation introduced and passed by state legislatures is a reflection of demand for such laws, not an agreement among the Defendants to restrain egg production. As the MDL Court held when it denied an identical motion *in limine* in the previous DAP trial, "as factfinder, the jury should make the decision as to which side to believe and how much they believe." (*See* Exhibit A, *In re Processed Egg Prods. Antitrust Litg.*, No. 08-md-2002, ECF No. 1981, at n.1 (E.D. Pa. Sept. 24, 2019).)

And the very case that Plaintiffs cite to support their contention that "[t]he driving force behind the passage of any particular law cannot be discerned"[8] did exactly that, confirming that the New Jersey Department of Agriculture expressly "took into account the view of animal rights activists and animal welfare organizations" when it crafted its animal welfare standards for livestock and ultimately adopted rules that "carried out the legislative goal of ensuring that farm animals are treated humanely" *N.J. Soc'y for the Prevention of Cruelty to Animals v. New Jersey Dep't of Agric.*, 955 A.2d 886, 900–901 (N.J. 2008).

Plaintiffs also claim that the alleged conspiracy was fully formed in 2006, thus negating any relevance of state laws passed after that time. At the same time, though, Plaintiffs claim that the alleged conspiracy continues to the present, inasmuch as they are seeking an injunction, and their evidence of competitive harm, injury, and damages continues through 2012. Thus, given that the Certified Program is an ongoing voluntary program whereby, each year, an egg producer agrees to maintain its egg-laying hens in accordance with the animal husbandry rules of the Certified Program in return for a license to use the Certified mark, the yearly decision by egg

---

[8] *Id.* at 5.

producers to join the Certified Program must, according to the Plaintiffs, be a continuation of the alleged conspiracy. Accordingly, these state laws are directly relevant, both with respect to the decisions of egg producers who joined the Certified Program from 2008 to the present, as well as the impact of their joining the Certified Program (*see infra* Section C).[9]

### B. States' adoption of cage-space requirements generally, or of laws requiring compliance with the UEP Certified Program specifically, are relevant to whether the Certified Program is an unreasonable restraint on competition.

Additionally, evidence that states enacted legislation adopting the Certified Program, or required even more space be given to egg-laying hens, is directly relevant to the reasonableness of the Certified Program. Under the Rule of Reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Ohio v. Am. Express Co.*, 585 U.S. __, 138 S. Ct. 2274, 2284 (2018). Ultimately, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 881 (2007) (cleaned up). "Appropriate factors to take into account include 'specific information about the relevant business' and 'the restraint's history, nature, and effect.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

Here, the "nature" of the Certified Program is that it includes a set of animal welfare standards. Its "history" includes the fact that several states adopted cage-space requirements similar to, or more stringent than, the Certified Program's standards during (and after) the period

---

[9] As noted in other oppositions to Plaintiffs' Motions *in Limine*, Plaintiffs have yet to explain how Defendants are responsible for the effects of almost 200 other, non-conspirator egg producers joining the Certified Program.

8

for which Plaintiffs are seeking damages (August 2005–December 2012). And its "effect" is impacted by the state adoption of requirements that are identical to, or more stringent than, the very practices Plaintiffs claim caused a reduction in the supply of eggs.

For example, in June 2010, the State of Maine amended its Best Management Practices for Poultry Facilities of More than 10,000 Birds to require that egg-laying hens receive at least 67 square inches of space[10]—at the same time the Certified Program required egg-laying hens receive at least 67 square inches of space.[11] Ohio required the same amount of cage-space as of 2011.[12] And the State of Washington generally required compliance with UEP's animal husbandry guidelines (or equivalent or more stringent standards) beginning in August 2012.[13] Thus, the Certified Program's cage-space requirements had the same "effect" as several states' own animal welfare standards for hens. Under *Leegin*, all of this is relevant to determining whether the Certified Program imposed an unreasonable restraint on trade. Moreover, the very fact that states adopted similar requirements to the Certified Program is probative evidence that such requirements are reasonable.

## C. The state animal welfare laws are relevant to whether Plaintiffs can demonstrate competitive harm and injury.

As noted above, Plaintiffs must demonstrate that the allegedly unlawful conduct caused substantial competitive harm in the relevant market. Further, as in all antitrust cases, Plaintiffs

---

[10] Maine Department of Agriculture, Conservation & Forestry, Division of Animal and Plant Health, Best Management Practices for Poultry Facilities of More than 10,000 Birds at 4 (rev'd June 22, 2010) (attached as Exhibit C).

[11] *See, e.g.*, Exhibit B, DAP trial, Defendants' Ex. 184, p. 21.

[12] *See* Ohio Adm. Code 901:12-9-03 (2011) (attached to Plaintiffs' Motion i*n Limine* No. 2, ECF No. 173, as Exhibit 6).

[13] *See* Wash. Rev. Code § 69.25.065 (2011) (attached to Plaintiffs' Motion *in Limine* No. 2, ECF No. 173, as Exhibit 9).

must also prove that the Defendants' conduct caused an injury to them. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 477–478 (1982). Thus, Plaintiffs must directly tie their alleged injury to illegal conduct, as opposed to injury stemming from producers' lawful flock management practices, state-mandated cage-space requirements, or other factors unrelated to the alleged conspiracy.

As in the previous DAP case, Plaintiffs attempt to demonstrate competitive harm and injury through the testimony of their economic expert, Dr. Michael Baye. Dr. Baye's conclusions rest on a multi-step analysis he conducted to estimate the purported effect of the alleged conspiracy on egg production. He then purports to convert that alleged effect into monetary damages. *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 504 (E.D. Pa. 2019) (summarizing Dr. Baye's methods and conclusions). As the MDL court concluded, Dr. Baye's testimony constitutes "evidence that allows [the DAPs] to argue that an overall reduction in the supply of eggs could have affected egg products prices." *Id.* at 507. Thus, Dr. Baye's opinions appear to be relevant to competitive harm, injury, causation, *and* damages. Nevertheless, if Plaintiffs are asserting that Dr. Baye's testimony is limited to damages, his testimony should be reserved for the damages phase, if one is needed. Either way, the state animal welfare laws are still relevant to determining agreement and the reasonableness of the conduct, as Defendants explained above.

With respect to Dr. Baye's analysis itself, he concludes that egg supply was reduced by comparing national egg production from 1990–July 2002 (pre-Certified Program) against national egg production from August 2002–December 2012 (when the Certified Program was in place). Though egg production increased during that time, Dr. Baye concludes that egg production would have increased even more absent the Certified Program. But the state laws

10

that were passed after 2008, some of which became effective before the end of 2012, would affect producer behavior and egg production in the same way as the Certified Program, precluding Dr. Baye's ability to isolate the allegedly supply-reducing effects of the Certified Program. Although Plaintiffs assert that Dr. Baye adequately controlled for the impact of all of the state laws that were passed, Defendants are entitled to both test and refute this claim. Defendants will contend, for example, that Dr. Baye's model fails to disentangle the alleged conspiracy's production effects from the effects of state animal welfare laws. Defendants also intend to argue that it is arbitrary for Dr. Baye to assume that industry uncertainty would only manifest itself in 2013, or that it would only be instigated by California's cage-space laws. Thus, testimony relating to Dr. Baye's analysis of the impact of state laws (or lack thereof) is highly probative of the accuracy and reliability of Dr. Baye's model, which directly relates to the questions of competitive harm (did Defendants' conduct result in a decrease of supply), causation and injury (did that alleged reduction result in higher egg product prices), not just the extent of any damages. In the DAP case, the MDL Court denied an identical motion, holding that "the defendants may want to discuss whether Dr. Baye . . . disentangled the production effects of the alleged conspiracy from these laws in several states, and/or appropriately selected the cut-off date for his damages period." (*See* Exhibit A, *In re Processed Egg Prods. Antitrust Litg.*, No. 08-md-2002, ECF No. 1981, at n.1 (E.D. Pa. Sept. 24, 2019).) This Court should reach the same conclusion.

## III. Evidence of the Animal Welfare Laws Is Not More Prejudicial Than Probative.

Finally, Plaintiffs suggest that the Court should exclude or restrict the introduction of evidence of the state animal welfare laws to avoid unfair prejudice. Under the rules of evidence, courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues [or] misleading the jury." Fed. R. Evid. 403.

However, "[t]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote." *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) (quoting *United States v. Menzer*, 29 F.3d 1223, 1234 (7th Cir. 1994)). Here, evidence of the state animal welfare laws is probative of at least three issues to be presented to the jury, as discussed above.

Plaintiffs suggest that the jurors will believe the state animal welfare laws at issue retroactively immunize the Defendants' actions from liability under the Sherman Act.[14] Jurors are capable of considering the impact of state legislation on Defendants' production planning without making such an unlikely leap. And Defendants have no intention of arguing that state animal welfare laws operated retroactively, or that they could immunize Defendants from Sherman Act liability for actions that would otherwise be unlawful. Nonetheless, if the Court concludes this is a credible concern, the Court can easily offer a limiting instruction explaining the purposes for which this evidence is being introduced.

But again, the limiting instruction that Plaintiffs propose — one that instructs the jury that the state animal welfare laws are relevant only "for purposes of assessing Plaintiffs' damages"[15] — would misstate the law. As noted above, the passage of state cage-space requirements for egg-laying hens is part of a long-term animal welfare trend that tends to disprove the existence of a conspiracy to reduce egg production; state adoption of cage-space laws (and, in some instances, of laws requiring compliance with the UEP Certified Program itself) tends to prove that the Certified Program was not an unreasonable restraint of trade; and the passage of such laws makes it impossible for Dr. Baye to demonstrate that the Certified

---

[14] *See* Plaintiffs' Motion *in Limine* No. 2, ECF No. 173 at 7–8.
[15] *Id.* at 10.

Program's cage-space requirements, rather than state law cage-space requirements, caused any reduction in egg production found by Plaintiffs' expert witness.

Plaintiffs' alternative suggestion — that the Court allow evidence of state animal welfare laws only during cross-examination of Plaintiffs' witness Dr. Baye, and even then only if (a) "Defendants . . . first identify the laws that they assert were effective during Dr. Baye's damages period" and (b) the Court concludes that "Dr. Baye did not address the impact of the State laws" in his analysis[16] — misrepresents Dr. Baye's opinions and the law. Even Dr. Baye does not assert that state cage-space requirements began affecting egg production only after the requirements went into effect; in fact, he "ended his analysis in 2012 to account for the phase-in of changes in cage space requirements that became effective in *2015* . . . ."[17] Moreover, the evidentiary record demonstrates that producers' behavior was affected immediately after passage of California's Prop. 2 in 2008, though the laws were not to be effective for another 7 years. (*See* DAP Trial Transcript 12/5/19, pp. 73:25-75:6 (excerpt attached as Exhibit D.) Regardless, Plaintiffs themselves identify several state cage-space laws that went into effect during the August 2005 to December 2012 period when Dr. Baye claims the Certified Program reduced egg supply, including laws passed in Ohio and Arizona.[18]

Although Plaintiffs are free to argue to the jury that "Dr. Baye properly controlled for any later-enacted laws,"[19] it is not the role of this Court to decide that issue for the jury. As the Seventh Circuit has held:

> Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions

---

[16] *Id.* at 9-10.

[17] *Id.* at 9 (emphasis added).

[18] *See id.* at 2 (specifically, Arizona, Michigan, Ohio, Oregon, and Washington).

[19] *Id.* at 9.

13

> those methods produce — that is, whether the conclusions are unimpeachable. An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt.

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–766 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993)). In short, "[a]t this gatekeeping stage of the case, it would be inappropriate for the Court to 'evaluate the quality of an expert's data, inputs, or conclusions.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2022 U.S. Dist. LEXIS 11261, at *52 (N.D. Ill. Jan. 21, 2022) (quoting *Batty v. Zimmer, Inc. (In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.)*, MDL No. 2272, 2015 U.S. Dist. LEXIS 77475, 2015 WL 3669933, at *25 (N.D. Ill. June 12, 2015)). And as the MDL Court ruled in the DAP case, "The probative value in evaluating . . . the legitimacy of Dr. Baye's analysis is not outweighed by any danger of unfair prejudice, confusing the issues, or misleading the jury." (*See* Exhibit A, *In re Processed Egg Prods. Antitrust Litg.*, No. 08-md-2002, ECF No. 1981, at n.1 (E.D. Pa. Sept. 24, 2019).) For all of these reasons, the Court should also deny the Plaintiffs' invitation to prejudge the legitimacy of Dr. Baye's analysis or to otherwise strike evidence of state animal welfare laws on the grounds of unfair prejudice.

**IV.     Conclusion**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion *in Limine* No. 2.

Dated:  September 16, 2022            Respectfully submitted,

                                              */s/ Jay L. Levine*
                                              Jay L. Levine (jlevine@porterwright.com)
                                              Donald M. Barnes (dbarnes@porterwright.com)
                                              PORTER, WRIGHT, MORRIS & ARTHUR LLP
                                              2020 K. Street, N.W., Suite 600
                                              Washington, D.C. 20006-1110

Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding (whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Robert E. Browne, Jr. (robert.browne@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***

*/s/ Patrick M. Otlewski*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick Otlewski (potlewski@kslaw.com)
Abigail Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)

15

(pro hac vice)
Andrew Chinsky (achinsky@kslaw.com)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants registered to receive service in this action.

*/s/ Jay L. Levine*
Jay L. Levine

21278005v1