## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) | Judge Charles R. Norgle |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 5 TO EXCLUDE OR LIMIT EVIDENCE REGARDING GROCERS AND CERTAIN 30(b)(6) WITNESS TESTIMONY**

Plaintiffs' Motion *in Limine* No. 5 seeks to prevent the jury from receiving highly relevant and probative documentary evidence and Rule 30(b)(6) testimony regarding the origin and purpose of the UEP Certified Program. Such exclusion would undermine Defendants' ability to prove that joining the UEP Certified Program — the centerpiece of Plaintiffs' overarching conspiracy theory — was precipitated by demand from the nation's largest supermarkets — who are also Defendants' largest customers — not an intent to reduce egg supply. Though Plaintiffs attempt to dismiss the supermarket chains as "non-parties," not only were they either class members or plaintiffs in the first two trials, but they are the primary reason the Certified Program was developed and implemented. Indeed, the evidence at trial will show that Defendants Cal-Maine and Rose Acre only implemented the UEP Certified Program after some of their largest customers (supermarkets) began to demand that the eggs they purchase be Certified.

1

Barring this evidence would eliminate Defendants' primary defense to these serious allegations and run contrary to the MDL Court's previous rulings on this subject. This is particularly true for Cal-Maine, who never sold to Plaintiffs any egg products and whose top ten customers, some of the largest supermarket chains in the country, all purchased shell eggs. If Cal-Maine is barred from offering any of this evidence, then it will be prevented from offering any meaningful defense to these claims, hamstringing it in a way that is uncalled for and beyond unfair. And while Rose Acre sold egg products, approximately 70% of its revenue came from selling shell eggs to customers like Wal-Mart, Kroger, and Publix.

Plaintiffs attempt to downplay the relevance of supermarket evidence because supermarkets purchase shell eggs, while Plaintiffs only purchase egg products. But, that is no basis to grant their Motion. Plaintiffs *themselves* alleged that supply and demand factors "affect shell eggs and egg products in very similar ways" and the alleged "[r]eduction or control of eggs supply artificially increased prices for both shell eggs and egg products." (2d Am. Compl., ECF No. 73, ¶¶ 95–96.0 Plaintiffs cannot have it both ways; they cannot link shell eggs and egg products together when it benefits them, only to distinguish between the two when it suits them.

As Defendants explain below, and as they should be permitted to show to the jury at trial, concern over animal welfare issues from Defendants' key supermarket customers, including Wal-Mart, Kroger, Safeway, Albertson's, Publix, and others, led directly to the creation of the UEP Certified Program, which these supermarkets approved and required their egg suppliers to adopt. In fact, many of these supermarket chains still require UEP Certified eggs to this day. Evidence of supermarket customer demand for eggs produced under the UEP Certified Program demonstrates that egg producers who chose to be Certified were not conspiring to reduce supply. The evidence is also relevant to showing the Certified Program's procompetitive benefits under

the Rule of Reason, including satisfying customer demands and creating a new product — a Certified egg. Just as the MDL Court denied analogous motions from the DPPs and DAPs, the Court should deny Plaintiffs' Motion *in Limine* No. 5. (ECF No. 180.)

## BACKGROUND

In the years leading up to the adoption of the UEP Certified Program, animal activist groups such as the People for the Ethical Treatment of Animals ("PETA") and, later, the Humane Society of the United States ("HSUS"), organized a coordinated and well-publicized effort to push for better treatment of animals used to produce food for human consumption. (*See e.g.*, Ex. A, *In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, E.D. Pa. No. 08-MD-2022 ("*Eggs MDL*"), DPP Trial ("DPP Trial") Defs.' Ex. 165; *Egg MDL*, DAP Trial ("DAP Trial") Defs.' Ex. 234.[1]) As Plaintiffs' expert Dr. Jayson Lusk admitted, as a result of these aggressive tactics, food retailers experienced rising demand for food produced with humane farming and animal husbandry. (Ex. B, Lusk Dep. 125:3-14)

In 1999, the European Union passed legislation phasing out conventional caged production systems for egg-laying hens. (Ex. B, Lusk Dep. 62:14–63:1.) That same year, in the United States, PETA launched a campaign against McDonald's and Burger King demanding that each require its suppliers to follow husbandry guidelines that provided more cage space for hens. (Ex. C, DAP Trial Defs.' Ex. 448.) In response, in August 2000, McDonald's adopted animal welfare standards that required egg suppliers like Defendants to provide a minimum 72 square inches per bird in their cages, and submit to an annual audit to prove compliance. (Ex. D, DPP

---

[1] References to "DPP Trial" or "DAP Trial" exhibits refer to trial exhibits admitted into evidence during the class and DAP trials, held in 2018 and 2019, respectively. Where an exhibit was admitted in both trials, Defendants have included only one of marked trial exhibit as an exhibit to this opposition.

3

Trial Defs.' Ex. 108.) Burger King soon followed with its own even more stringent cage-space requirements. (Ex. B, Lusk Dep. at 123:4-22.)

Animal rights groups next turned their attention to national supermarket chains. Beginning in late 2000, PETA wrote to the nation's five largest supermarkets — Wal-Mart, Kroger, Safeway, Ahold, and Albertsons (which collectively accounted for approximately 40% of industry sales) — and demanded that they adopt *at least* the "significant improvements" reflected in McDonald's standards. (Ex. E & F, DPP Trial Defs.' Exs. 152 & 153.)  Again, PETA specifically identified cage space for egg-laying hens as an area of concern. (*See, e.g.*, Ex. G, DAP Trial Defs.' Ex. 239.) PETA quickly targeted other large national supermarket chains including Publix, Supervalu, and Winn-Dixie, eventually launching a well-publicized boycott and public demonstrations against Safeway, which PETA nicknamed "Shameway." (Ex. H, DAP Trial Defs.' Ex. 254.)

Concerned that PETA's public-relations campaign would impact their customers and their public image, by late 2000 the largest supermarkets asked their national trade association — the Food Marketing Institute ("FMI") — to act "on behalf of its members" to "get ahead of the issue." (Ex. I, Brown Dep. 25-28, 32-5-33:6, 51-52, 55-57, 73,74, 306:7-307:3; Ex. I, DPP Trial Defs.' Ex. 165.) At that time, FMI represented all of the country's major supermarket chains and the vast majority of the country's food retailers, as well food manufacturers, and Plaintiffs became members of FMI over the next few years.

In January 2001, the FMI Board of Directors approved an animal welfare policy to "[d]evelop a set of retailer expectations for growers, producers and processors that are modeled on 'best practices' for animal husbandry and humane processing."  (Ex. K, DAP Trial Defs.' Ex. 343 (DPP Trial Defs.' Ex. 188).) FMI also formed an Animal Welfare Group to "identify

universally what were the . . . scientific best practices" to ensure adequate animal welfare. (Ex. L, Hollingsworth/FMI 30(b)(6) Dep. 332:25–333:16.)

FMI members wanted to avoid supermarket chains adopting independent, and competing, animal welfare standards. They sought "uniform" standards or a "single industry approach to animal welfare" to avoid the need to monitor compliance with many different specifications. (Ex. B, Brown Dep. 30:7–31:20.) Likewise, uniform and science-based guidelines would let the supermarket chains assuage their customers' concerns while preventing any single company from being "singled out specifically by activist groups" and pitted against its competitors. (Ex. B, Brown Dep. 73:8-15, 78:21–80:5.) Individual supermarket chains began adopting FMI's approach to animal welfare reforms. For example, in July 2001, Kroger issued a press release "endors[ing] the Food Marketing Institute's new program addressing animal welfare." (Ex. M, DAP Trial Defs.' Ex. 346 (DPP Trial Defs.' Ex. 196).)

Similarly, egg producers recognized the need to address the animal welfare challenge. In 1999, UEP, an association of egg producers, formed an independent Scientific Advisory Committee ("SAC") comprising animal science experts to review the scientific literature on poultry management in order to develop an animal welfare program for UEP. (Exs. N & O, DPP Trial Defs.' Trial Ex. 329 and 365.) UEP recognized that it was important to work with FMI and retailers in the development of the animal welfare program to ensure its success. (Ex. P, Gene Gregory Dep. Tr. 852:6-11, 857:22.)

In September 2000, the SAC issued its formal recommendation for animal welfare guidelines, which suggested providing 67-86 square inches of cage space for each egg-laying hen, among other things. (Ex. Q, DAP Trial Pltfs.' Ex. 52 (DPP Trial Defs.' Ex. 117).) Based on the SAC's recommendations, UEP developed the 2000 working draft of the UEP Animal

Welfare Guidelines for Egg-Laying Hens ("Guidelines"). (Ex. R, DAP Trial Pltfs.' Ex. 57 (DPP

Trial Defs.' Ex. 159).) After FMI reviewed the Guidelines, UEP met with FMI to respond to

FMI's concerns and ensure that the Guidelines were acceptable to FMI's experts and members.

(Ex. B, Brown Dep. 87:2–92:22, 95:21–97:20.)

UEP issued final Guidelines in April 2002 that incorporated the compromises reached

with FMI. (Ex. B, Brown Dep. 316:15-24.) In response to the supermarket chains' need for proof

of compliance with animal welfare standards, UEP created the Certified Program, which

incorporated the 2002 Guidelines and allowed egg producers who complied with the Guidelines

to label their eggs with a "UEP Certified" trademark. (Ex. S, DAP Trial Defs.' Ex. 174.)

Importantly, the Certified Program was entirely voluntary.[2] (Ex. T, *Eggs MDL*, Nov. 6, 2019,

DAP Trial Tr. 57:6-14.)

FMI then recommended, in April 2002, that its members require their egg suppliers to

comply with the Certified Program.[3] (Ex. U, DPP Trial Defs.' Ex. 260; Ex. B Brown Dep.

189:16–192:16.) Many of Defendants' largest supermarket customers quickly incorporated the

Guidelines into their supplier requirements. For example, on July 11, 2002, Publix sent its egg

suppliers a memorandum asking that they "agree to follow [UEP Certified Program] guidelines"

and to confirm "in writing your Company's commitment to adhere to these guidelines." (Ex. V,

DPP Trial Defs.' Ex. 17.) Similarly, by at least October 2002, Kroger required the UEP Certified

---

[2] Fundamental to the legal analysis required here, the "Certified Program" is not an agreement *among producers*, but is simply a vertical agreement between the egg producer and UEP to adhere to the Guidelines in return for UEP granting a license to the Certified mark. No agreement between producers is involved. That numerous producers decided to become certified because their customers demanded it does not equate to an agreement *among producers. See* ABA Model Instructions at 17 (Section 1 of the Sherman Act, Instruction 2: Parallel Conduct).

[3] In fiscal year 2002, the overwhelming majority of Cal-Maine's sales were shell eggs, with over $93 million in sales to Wal-Mart, Albertson's, and Kroger alone, equal to 28.6% of Cal-Maine's total sales. Ex. W, CM00090460 at CM00090467. Similarly, in 2002, almost 40% of Rose Acre's sales were to Wal-Mart, Krogers and Sav-a-Lot, another supermarket chain that demanded certified eggs.

logo on all egg cartons sold in its stores across the United States. (Ex. X, DAP Trial Defs.' Ex. 348 (DPP Trial Defs.' Ex. 276).) Wal-Mart, the nation's largest retailer, moved promptly to mandate compliance in 2002. (Ex. Y, DPP Trial Tr., May 7, 2018, 116:3-21.)

By January 2003, Wal-Mart, Safeway, A&P, Giant Eagle, Albertson's, Publix, H-E-B, and Kroger, as well as other national supermarkets, required that their egg suppliers meet the UEP Guidelines. (Ex. Z, DAP Trial Defs.' Ex. 12; Ex. AA, DAP Trial Defs.' Ex. 24; Ex. BB, DAP Trial Defs.' Ex. 844 .) Some retailers, such as Publix, Wal-Mart, Food Lion, Fiesta, Associated Grocers, and Winn-Dixie, even provided producers a financial incentive to adopt the UEP Guidelines by agreeing to share in the increased costs of production for Certified eggs. (Ex. CC, DPP Trial Ex. Defs.' 296; Ex. DD, Hardin Dep. 269:21–271:3.) Notably, the supermarkets' commitment to the UEP Certified Program has continued even after many of them filed suits like this one. (Ex. EE, DAP Trial Defs.' Ex. DCX-15 (HEB); Ex. FF, DAP Trial Defs.' Ex. DCX-30 (Giant Eagle); Ex. GG, DAP Trial Defs.' Ex. DCX-81 (Kroger); Ex. HH, DAP Trial Defs.' DCX-83 (Publix) .) No supermarket chain has withdrawn support for the Certified Program or demanded from Defendants non-Certified eggs. (Ex. DD, Hardin Dep. 236:4–260:2.) Indeed, FMI reaffirmed its endorsement of the Guidelines in 2012 and 2013.  (Ex. II, FMI-000038; Ex. JJ, FMI-00472.)

Plaintiffs wrongly describe the supermarket evidence as concerning "irrelevant, collateral issues." This evidence goes to the heart of how and why the Defendants chose to implement the Certified Program in the first place, and why the Certified Program is not an unlawful conspiracy to reduce supply. Though styled differently, the DPPs brought a nearly identical motion to "preclude Defendants from presenting argument, evidence or testimony that . . . : (2) Defendants' intent in joining the UEP Certified Program (the "Certified Program") was to respond to pressure

from buyers or animal rights activists; and/or (3) that such outside pressures offer a pro-competitive justification for the Certified Program." *Eggs MDL*, ECF No. 1594 at 1. Similarly, DAPs sought to exclude evidence supporting Defendants' "claim that the [Certified Program] rules in question serve to satisfy customer demand." *Eggs MDL*, ECF No. 1887 at 1, 12–13. Judge Pratter summarily denied both. *Eggs MDL*, ECF Nos. 1658 and 1982. The Court should do likewise.

## LEGAL STANDARD

Defendants agree with Plaintiffs that their Motion is subject to Rules 401, 402, and 403 of the Federal Rules of Evidence. Defendants do *not* agree that *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006) — the only case cited in the Legal Standard section of Plaintiffs' Memorandum — is analogous. Unlike the evidence excluded in *Thompson* — a Section 1983 case arising from a fatal "choke hold" applied by Chicago police officers — the supermarket evidence that Plaintiffs seek to conceal from the jury is highly relevant, non-prejudicial, and admissible.

## ARGUMENT

### I.    Supermarket Evidence is Relevant to Core Trial Issues.

Plaintiffs' principal argument is that evidence related to the supermarkets' demand that their suppliers comply with the UEP Certified Program is "irrelevant." (Mem. 7–9.) According to Plaintiffs, since they themselves are not supermarkets that purchased shell eggs, evidence of what the supermarkets demanded (and evidence related to shell eggs) has no bearing on any issue to be decided in this case. (*Id.* at 2, 4 & 7) This overly simplistic argument ignores the basic facts associated with the Certified Program and what motivated Defendants' business decisions.

Hypocritically, while arguing that evidence related to supermarket chains is irrelevant, Plaintiffs have indicated that they intend to call a former Wal-Mart executive to testify about

8

Wal-Mart's demand for Certified, shell eggs. Moreover, the relevance of evidence related to shell eggs and the demand that they be Certified is highlighted by Plaintiffs themselves. Plaintiffs claim that (i) "Supply and demand factors affect *shell eggs* and egg products in very similar ways." (2d Am. Compl. ¶ 94) (emphasis added); and (ii) the conspiracy was "to artificially maintain and increase prices for shell eggs and egg products at artificially high levels." (*Id*. at ¶ 186) (emphasis added). In "heads I win, tails you lose" fashion, Plaintiffs intend to introduce "favorable" supermarket evidence, but seek to preclude Defendants from rebutting that evidence and telling the full story behind the Certified Program.

The supermarkets' involvement in creating, and their consistent demand for shell eggs produced in compliance with, the Certified Program underscores why companies like Rose Acre and Cal-Maine agreed to become Certified producers in the first place. This evidence is directly relevant to the two most critical issues that the jury will decide at trial: (1) whether a conspiracy existed and (2) whether the alleged anticompetitive effects of the Certified Program substantially outweigh the Certified Program's procompetitive benefits.

**A.     Supermarket evidence is directly relevant to whether a conspiracy existed.**

The centerpiece of Plaintiffs' three-prong conspiracy is the Certified Program. Evidence regarding supermarkets' demands for animal welfare standards generally (and the UEP Certified Program specifically) is directly relevant to whether the Certified Program is part of an unlawful conspiracy to reduce supply. Judge Pratter said so explicitly in denying a similar motion brought by the DAPs. *See Eggs MDL*, ECF 1982 ("The demand for, motivation behind, and actual effects of the UEP Certified Program are therefore entirely probative as to whether the Program was a pretext for an agreement to reduce supply.")

9

The jury will be instructed that Plaintiffs must show, as to each individual Defendant, that they knowingly joined in an unlawful plan with the intent to further the purpose of the conspiracy.[4] Defendants intend to show they developed and joined the Certified Program to satisfy the requirements of their largest retail supermarket customers and their national trade association, FMI, *not* to reduce egg supply. Indeed, at the last DAP trial, the jury concluded that no conspiracy to reduce supply existed. By any measure, such evidence is directly relevant to whether any conspiracy existed, and whether the Defendants knowingly intended to join it for an unlawful purpose to reduce the supply of eggs.[5]

### B. Supermarket evidence is directly relevant to the Rule of Reason.

Supermarkets' demand for the UEP Certified Program is also directly relevant to the Rule of Reason inquiry. Under the Sherman Act, a restraint of trade is unlawful only if it is found to be unreasonable. *If* the Plaintiffs prove that the alleged conspiracy resulted in substantial harm to competition in a relevant market, the jury must then consider whether Defendants' conduct, particularly the Certified Program, produced countervailing competitive benefits.[6] Such countervailing benefits include satisfying customer demand and facilitating the introduction of new products — *e.g.,* Certified eggs and egg products. The evidence that Plaintiffs wish to exclude bears directly on these issues under the Rule of Reason.

Plaintiffs' argument that that the evidence of supermarket demand for Certified eggs cannot qualify as a procompetitive benefit because the 100 percent rule prevented competition illustrates their fundamental misunderstanding of how the Certified Program operates and the

---

[4] *See* ABA Model Instructions at 21 (Instruction 4: Participation and Intent).
[5] *Eggs MDL*, ECF No. 1982 (E.D. Pa. Sept. 9, 2019) ("The demand for, motivation behind, and actual effects of the UEP Certified Program are therefore entirely probative as to whether the Program was a pretext for an agreement to reduce supply.")
[6] *See* ABA Model Instructions at 3 (General Instruction 3A: Rule of Reason—Overview); *see also id.* at 8 (General Instruction 3C: Rule of Reason—Evidence of Competitive Benefits).

reason the 100 percent rule was adopted. As a voluntary program, the Certified Program simply offers the marketplace a new product, but producers can choose not to join, and many did, providing customers with a non-Certified option. And the 100 percent rule was adopted to ensure the legitimacy of the Certified Program and thus its value to supermarkets. FMI supported the 100 percent rule precisely because it felt that no bona fide animal welfare program should allow a producer to maintain some of its egg-laying hens in sub-standard conditions.

Indeed, this exact issue was already decided adversely to these very Plaintiffs at summary judgment. In denying the individual Defendants' summary judgment motion, Judge Pratter explicitly ruled that evidence of customer demand is relevant to the Rule of Reason, stating:

> Of course, while such an argument does not carry the day, as a matter of law, in proving that the Defendants did not agree to restrain trade, [evidence of customer demand] will be available to the Defendants to argue to the jury under the rule of reason standard when the jury is to balance procompetitive and anticompetitive effects of the alleged conspiracy.

See *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2016 U.S. Dist. LEXIS 133110, at *40 (E.D. Pa. Sept. 28, 2016). Similarly, in granting a defense motion against Plaintiffs to judge the Certified Program under the Rule of Reason, Judge Pratter listed among the Certified Program's procompetitive benefits that it "was a response to consumer demand for humanely produced egg." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1046 (E.D. Pa. 2016). Plaintiffs provide no sound basis for this Court to depart from Judge Pratter's reasoning.

### C. Plaintiffs cite inapposite cases in the relevance section of their Memorandum.

None of the cases cited by Plaintiffs support the wholesale exclusion of evidence. The Ninth Circuit decision that Plaintiffs rely on concerned a motion to dismiss — not a motion *in limine* — examining whether the plaintiffs had adequately alleged antitrust injury, and whether

the challenged practice was subject to *per se* or Rule of Reason scrutiny. *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022). The opinion said nothing about the exclusion of relevant evidence.

Plaintiffs' next case, *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), actually supports Defendants' position. There, the Supreme Court held that "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition," which requires the factfinder to evaluate "the facts peculiar to the business, *the history of the restraint, and the reasons why it was imposed*." *Id.* at 692 (emphasis added). The supermarkets' demands for animal welfare standards are a critical part of the history and genesis of the UEP Certified Program.

The other Supreme Court decisions cited by Plaintiffs do not support the categorical exclusion of relevant, historical evidence that Plaintiffs seek. In *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85 (1984), the Supreme Court devoted an entire section of its opinion to discuss the "History of the NCAA Television Plan" that was challenged under the Sherman Act, and that history included the NCAA's reaction to television's adverse effect on college football attendance. *Id.* at 89–91. The corresponding history of the UEP Certified Program, which includes Defendants' reactions to the animal welfare concerns of its largest customers, simply cannot be told fully or fairly to the jury with the categorical exclusion of the evidence that Plaintiffs seek. And in *FTC v. Independent Federation of Dentists*, 476 U.S. 447 (1986), the Supreme Court also expressly considered documentary evidence that was "revealing as to the motives of" the defendant union of dentists in developing the work rule being challenged as a Sherman Act violation. *Id.* at 451 n.1 (addressing a presentation made by one of the founding members of the defendant union).

12

Finally, Plaintiffs cite *Perma Life Mufflers*, *Inc. v. International Parts Corp.*, 392 U.S. 134 (1968), and *General Leaseways*, *Inc. v. National Truck Leasing Association*, 830 F.2d 716 (7th Cir. 1987), as support for their contention that Defendants cannot pursue an *in pari delicto* defense. Even if that were true, as explained above, the relevance of the challenged supermarket evidence does not depend upon the viability of any *in pari delicto* defense.

## II.    The Supermarket Evidence is Not Unfairly Prejudicial.

Plaintiffs predict a parade of horribles to follow from the introduction of relevant supermarket evidence, such as "numerous lengthy mini-trials" and "extensive evidence and argument" about whether Defendants "drummed up" supermarkets' demand for Certified eggs. (Mem. at 11–12.) Putting aside that the evidence is highly relevant, Plaintiffs have grossly exaggerated the risks of its introduction at trial. If Plaintiffs want to introduce evidence undermining Defendants' supermarket evidence, they are free to do so as long as it is admissible. Jurors will be capable of assigning appropriate weight to the evidence introduced by both sides without undue confusion. The DPP and DAP trials before Judge Pratter were in no way "derailed" (to use Plaintiffs' term) by the introduction of the supermarket evidence. Plaintiffs complain about the prospect of adding "days or weeks to a trial that is already expected to take at least a month or longer," but the DAP trial concluded after 26 trial days and the DPP trial concluded after 27, without any categorical bar of this evidence.[7]

## III.    The Supermarkets' Rule 30(b)(6) Testimony Is Admissible.

Probative Rule 30(b)(6) testimony from corporate representatives is admissible at trial under Rule 32. Rule 32(a)(1)'s requirements for the use of depositions at trial against a party are

---

[7] Nevertheless, in reviewing and streamlining their Trial Exhibit List, Defendants are removing evidence related to Walgreens, A&P, Giant Eagle, Winn-Dixie and Roundy's.  What remains is evidence related to eight national supermarket chains who are among Defendants' largest customers.

not onerous and are met here. The Rule merely requires that: (1) the party was present or represented at the taking of the deposition or had reasonable notice of it (Rule 32(a)(1)(A)); (2) the testimony is otherwise admissible (Rule 32(a)(1)(B)); and (3) the testimony falls within at least one of the seven categories set forth in Rule 32(a)(2)–(8). Fed. R. Civ. P. 32(a)(1)(C). Plaintiffs do not challenge the first factor, and all three factors are met with respect to the deponents of which they complain.[8]

Plaintiffs' primary contention is that the corporate testimony is inadmissible because "the depositions do not establish the witnesses' personal knowledge." (Mem. at 12–13.) Plaintiffs' argument lacks merit. All of the challenged deponents testified regarding their knowledge of the topics for which their testimony has been designated.[9] Even if they had not done so, Plaintiffs' own cited case law from this district belies their assertion that deposition testimony of a Rule 30(b)(6) witness is inadmissible because the corporate designee's testimony is not based on personal knowledge. In the *Sara Lee* decision, Kraft — as a defendant in that false advertising case — objected to the deposition testimony of a Rule 30(b)(6) witness who had testified on

---

[8] Mr. Dowling (California), Ms. Littlefield (Colorado); Mr. Moran (Pennsylvania); Mr. Pontius (Idaho); Ms. Brown (Virginia); and Mr. Daga (New Jersey) all easily meet the unavailability requirement in Civ.R. 32(a)(4)(B). *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2020 WL 10505198, at *1 (N.D. Ill. Dec. 4, 2020) (slip op.) (allowing non-party 30(b)(6) deposition testimony at trial where deponent located more than 100 miles from the trial); *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 502 (N.D. Ill. 2011) (location of the witness (not the entity they represent) is what matters when determining whether the witness is more than 100 miles from Chicago).

[9] For example, Mr. Dowling worked at Safeway in his current position since 1979 (Ex. KK, Dowling Dep. 18:8-11) and has been in Safeway's corporate office as Vice President responsible for external affairs since 1998 (*id.* at 21:3-5), focusing specifically on animal welfare issues (*id.* at 23:18-20). Ms. Littlefield has managed animal welfare, including vendor audits, at Safeway since 2005 (Ex. LL, Littlefield Dep. 13:7-14), after starting with the company in 2000 as quality-control coordinator (*id.* at 11:21–12:5). Mr. Pontius started with Albertsons in 1986 (Ex. MM, Pontius Dep. 11:12-14) and was personally responsible for Albertsons' egg purchases (*id.* at 22:9-10), and he testified to his knowledge of Albertsons' requirements for UEP Certified eggs (*id.* at 26:15–27:9). Ms. Brown worked for FMI for 40 years before her 2009 retirement (Ex. B, Brown Dep. 21:6-11), was a senior vice president whose "portfolio" of responsibilities included animal welfare (*id.* at 21:15-21), and explained that her knowledge of the retail food industry came from "research, education, colleagues . . . visiting stores, [and] talking with members about issues they were concerned with." (*id.* at 24:2-11.)

behalf of a non-party, asserting the same lack-of-personal-knowledge complaint that Kraft and the other Plaintiffs lodge here. *Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500, 501 (N.D. Ill. 2011). This Court held, however, that the witness's deposition testimony "may be admitted for purposes of explaining [the non-party's] licensing policies and establishing whether [the non-party] had violated those policies." *Id.* at 503. Thus, admission of non-party Rule 30(b)(6) testimony is "particularly suitable" for "matters about which the corporation's official position is relevant, such as corporate policies and procedures, or the corporation's opinion about whether a business partner complied with the terms of a contract." *Id.*; *see also Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2020 WL 10505198, at *1 (N.D. Ill. Dec. 4, 2020) (slip op.) (holding "Federal Rule of Evidence 602's personal knowledge requirement does not preclude 30(b)(6) testimony that is in the nature of 'corporate knowledge'"). Here, the supermarkets' Rule 30(b)(6) testimony concerns their official policies, procedures, and positions about animal welfare, and whether they required their suppliers to comply with them. That testimony falls squarely within the contours of *Sara Lee* and is admissible under Rule 32.[10]

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion *in Limine* No. 5 (ECF No. 180), which improperly seeks to exclude highly relevant, admissible, and non-prejudicial evidence from the nation's largest supermarkets regarding the origin and purpose of the UEP Certified Program.

---

[10] Just this year, the District of West Virginia cited *Sara Lee* and Seventh Circuit precedent that the preparation undertaken by Rule 30(b)(6) designees satisfies the personal-knowledge requirement, even on matters preceding the witness's time in a particular position. *City of Huntington v. AmerisourceBergen Drug Corp.*, D.W.Va. No. 3:17-01362, 2022 U.S. Dist. LEXIS 26997, at *17–22 (Feb. 15, 2022) (slip op.) (citing, *inter alia*, *Sara Lee* and *Agfa-Gevaert*, *A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989)).

Dated: September 16, 2022                          Respectfully submitted,

*/s/ Jay L. Levine*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

**Counsel for Defendant Rose Acre Farms, Inc.**

*/s/ Patrick M. Otlewski*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
Andrew Chinsky (achinsky@kslaw.com)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

**Counsel for Defendant Cal-Maine Foods, Inc.**

16

*/s/ Robin P. Sumner*

Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS
LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS
LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Robert E. Browne, Jr.
(robert.browne@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS
LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United Egg Producers,
Inc. & United States Egg Marketers, Inc.***

17

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants registered to receive service in this action.

/s/ *Jay L. Levine*

21278524v1