UNITED STATES DISTRICT COURT
IN THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., ) ) ) ) Plaintiffs, ) ) v. ) ) UNITED EGG PRODUCERS, INC., ) UNITED STATES EGG MARKETERS, ) INC., CAL-MAINE FOODS, INC., ) MICHAEL FOODS INC., and ROSE ACRE ) FARMS, INC. ) ) Defendants. ) | No. 1:11-cv-08808  Judge Charles R. Norgle |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE (1) LIABILITY EVIDENCE CONCERNING CONDUCT OR EVENTS AFTER 2008 AND (2) EVIDENCE NOT PRODUCED IN DISCOVERY**

**I.     INTRODUCTION**

In three separate, duplicative motions *in limine*,[1] Plaintiffs ask this Court to exclude large swathes of Defendants' post-2008 evidence. Plaintiffs pick and choose what is relevant and prejudicial based on their improperly narrow definition of what they deem "liability evidence," with a self-serving carve out of all evidence "relating to post-2008 damages." Plaintiffs' argument that post-2008 evidence regarding support for the UEP Certified Program is categorically irrelevant to "the agreements Defendants reached between 1998 and 2008" fails to recognize that this evidence is relevant to every aspect of Plaintiffs' allegations. First, the evidence is relevant to show that joining and continuing to participate in the UEP Certified

---

[1] Plaintiffs' Motion *in Limine* No. 1 discusses in detail the same topics at issue in Plaintiffs' Motion *in Limine* No. 2, which seeks to exclude post-2008 state laws, and Plaintiffs' Motion *in Limine* No. 3, which seeks to exclude a November 2011 segment about Sparboe Farms and Sparboe's decision to re-join the UEP Certified Program. Defendants expressly incorporate herein each of the arguments Defendants raise in opposition to those motions.

Program is not an agreement to reduce supply. Second, the evidence is relevant to the Program's procompetitive benefits, which include satisfying customer demand, improving product quality, and increasing customer choice, and which the jury must weigh to determine whether the Program constitutes an unreasonable restraint on trade. And Plaintiffs' argument that "other post-2008" should be categorically excluded as irrelevant is premature because, as Judge Pratter determined correctly, whether such "evidence is prejudicial or relevant will greatly depend on the purpose for which it is being offered" and "[t]his will not be known until trial." *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 [hereinafter "MDL Court"], Order at 1 n.1, ECF No. 1977 (E.D. Pa. Sept. 23, 2019).

Plaintiffs' reliance on a December 31, 2008 discovery cut-off fails for the simple reason that the MDL Court never imposed such a cutoff. The majority of post-2008 documents challenged by Plaintiffs were produced during discovery, and many were discussed at depositions and in expert reports. Moreover, despite the parties' agreement to conduct targeted post-2008 discovery, Plaintiffs never propounded any document requests seeking post-2008 discovery and thus cannot claim credibly that their lack of production justifies their exclusion here. Besides, any alleged failure to disclose or supplement is harmless given that many of the challenged documents were actually used in depositions, and Plaintiffs have had these documents since 2019 when they were copied on pre-trial exchanges with the Direct Action Plaintiffs ("DAPs") in the last trial. These facts wholly contradict Plaintiffs' claims of "unfair surprise" or prejudice.

Because no factual or legal basis exists to impose a categorical bar on Defendants' right to introduce post-2008 evidence, Defendants respectfully request that the Court deny this Motion

2

and adopt Judge Pratter's measured approach to considering the admissibility of post-2008 evidence at trial.

## II. ARGUMENT

### A. The Post-2008 Evidence Plaintiffs Seek to Exclude Is Relevant to the Core Issues in this Case

In an effort to have their cake and eat it too, Plaintiffs claim damages through 2012 and include on their exhibit list a host of records after 2008, yet move to bar Defendants' post-2008 evidence that directly undermines Plaintiffs' core allegations. Specifically, Plaintiffs seek to exclude the following evidence solely because it concerns events after 2008: (1) customer support for the UEP Certified Program and the continued pressure on producers to adopt animal welfare initiatives; (2) the return of Sparboe Farms ("Sparboe") to UEP in 2011 and Sparboe's adoption of the UEP Certified Program and the 100 percent rule; and (3) state legislation requiring that producers adhere to the UEP Certified Guidelines or meet even more aggressive animal welfare standards.

This post-2008 evidence is relevant for many reasons. Most significantly, as the MDL Court found repeatedly, this evidence goes directly to the core issue in this case—whether the UEP Certified Program was a *bona fide* animal welfare program that implemented industry standards designed to meet customer demand and a rapidly changing political and legislative landscape that threatened the industry's very existence, or a pretext for an illegal agreement to reduce supply in order to raise prices to supracompetitive levels.

#### 1. Post-2008 Evidence Is Relevant to Whether Defendants Agreed to Reduce Supply

To meet their burden under Section 1 of the Sherman Act, Plaintiffs must prove an illegal agreement among Defendants in restraint of trade. In an attempt to cast post-2008 evidence as inadmissible, Plaintiffs narrowly frame the question as whether Defendants entered into an

3

agreement or otherwise conspired to restrict the supply of eggs between 1998 through 2008. Pls.' Mot. Lim. No. 1 at 2, 10, ECF No. 173. At the same time, however, Plaintiffs assert that the conspiracy is "persistent and continuing" and seek injunctive relief on that basis. Second Am. Compl. ¶ 212, ECF No. 25/73-17 (seeking injunctive relief). Given Plaintiffs' claim that the conspiracy is ongoing to this day, post-2008 evidence of customer demand and animal welfare pressure is highly relevant to explain why certain Defendants, in their exercise of independent business judgment, continued to participate in the UEP Certified Program, as the MDL Court previously recognized. *See* MDL Court, Order at 1 n.1, ECF No. 1985 (E.D. Pa. Sept. 25, 2019) ("[A]ny DAP demands after the Program's creation could be relevant should the defendants attempt to prove their continued involvement in the Program was in response to customer demand . . . .").[2]

As the MDL Court repeatedly held,[3] evidence that customers demanded, and continue to demand, UEP Certified eggs is relevant to why Defendants implemented and continued to participate in the UEP Certified Program. It goes directly to the nature of the alleged agreement itself. Further, Defendants' continued participation in the UEP Certified Program – even after the *Wall Street Journal* published an article in September 2008 concerning an unrelated

---

[2] The entire impact on production allegedly caused by the Certified Program results from producers joining the Program and adhering to its Guidelines. Given that a producer must re-join annually, to seek damages after 2008 or to obtain an injunction, Plaintiffs must prove that producers agreed to join each and every year. Thus, as far as the Certified Program goes, the alleged conspiracy did not end prior to 2008.

[3] MDL Court, Order at 1 n.1, ECF No. 1982 (E.D. Pa. Sept. 24, 2019) ("The DAPs assert that the true purpose of the UEP Certified Program is to reduce supply, not to address the defendants' animal welfare concerns. The demand for, motivation behind, and actual effects of the UEP Certified Program are therefore entirely probative as to whether the Program was a pretext for an agreement to reduce supply."); MDL Court, Order, ECF No. 1985 (E.D. Pa. Sept. 25, 2019) ("Evidence that the DAPs requested UEP Certified eggs goes to the heart of that dispute because it is relevant to any claims that defendants may make that they joined the UEP Certified Program for non-conspiratorial reasons . . . .").

4

investigation[4] and the first of the MDL lawsuits was filed in 2008 – directly refutes Plaintiffs' claim that the Program is a pretextual cover for a supply reduction conspiracy.

Plaintiffs allege that "to further artificially restrict the egg supply, producers added to the guidelines the '100% rule.'" Pls.' Mot. Lim. at 5, ECF No. 173. In support, Plaintiffs will introduce a letter authored by legal counsel for UEP member Sparboe and sent to UEP in November 2003. In that letter, Sparboe's counsel challenged the UEP Certified Program, and in particular the 100 percent rule, as having a "hidden agenda" "to reduce outputs in an effort to increase prices" and describing it as "price fixing" and "tantamount to an unfair trade practice." *See* Ex. A, UE0906543 (Nov. 5, 2003 Letter from Sparboe). Sparboe then adopted a competing program, which did not have a 100 percent rule. Defendants should be permitted to introduce relevant evidence to establish the pro-competitive benefits of the 100 percent rule and to rebut Plaintiffs' suggestion that there was a less restrictive alternative. Defendants intend to do that by showing that the 100 percent rule was adopted to ensure purchaser and consumer confidence in the Program.[5] If a UEP Certified producer was not required to adhere to the standards on all of its facilities, the media could publicize non-compliant conditions on certain facilities of a producer that held itself out as UEP Certified, which would gut the certification's value, with

---

[4] Plaintiffs erroneously contend that the *Wall Street Journal* article entitled *Federal Prosecutors Probe Food-Price Collusion* "disclos[ed] that governmental regulators had opened an investigation into Defendants' actions." Pls.' Mot. Lim. No. 1 at 1, ECF No. 173. This is not true. The article makes clear on its face that the government was investigating egg processors and does not suggest that the government investigation related to the allegations in this case. To the contrary, the article expressly distinguishes the civil claims filed by Plaintiffs here, and indeed, no criminal probe was ever launched into the activity at the center of this case or into the activities of the Defendants who remain in this case.

[5] The record will reflect that without the 100 percent rule, customers would not have viewed the Certified Program as an appropriate vehicle to demonstrate a commitment to animal welfare to assuage the concern of animal rights activists that precipitated the need for the Certified Program.

purchasers and consumers questioning whether they were getting the product for which they demanded and paid.

That is exactly what happened to Sparboe in 2011 when an undercover investigator filmed footage on one of its facilities and that footage aired on 20/20. Sparboe quickly lost all of its key customers, jettisoned its competing animal welfare program that lacked a 100 percent rule, and became UEP Certified. This evidence supports Defendants' proffered rationale for the 100 percent rule and undermines Plaintiffs'. It also calls into question the probative value of Sparboe's 2003 letter. Not surprisingly, Plaintiffs seek to exclude the video based on its 2011 date because it rebuts both of Plaintiffs' key contentions about the Sparboe story and supports Defendants'. That Sparboe adopted the UEP Certified Program, including the 100 percent rule, after its competing program failed to protect adequately against the risks the UEP Certified Program was designed to minimize, is highly relevant to the legitimacy of the Certified Program.

As such, the evidence goes directly to a key issue Plaintiffs have to prove—whether Defendants created and joined the UEP Certified Program for the purpose of reducing supply and raising the price of eggs.

### 2. The Post-2008 Evidence Plaintiffs Seek to Exclude Is Relevant to the UEP Certified Program's Procompetitive Benefits

Plaintiffs' narrowly articulated liability standard also ignores the fact that in order to prevail, Plaintiffs also must prove that the UEP Certified Program was an unreasonable restraint on trade. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1043-44 (E.D. Pa. 2016). To do so, Plaintiffs must prove that the Program's anticompetitive effects outweighed its procompetitive benefits. *Id.* at 1044; *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 348 (7th Cir. 2022). Evidence that customers continue to demand and pay for UEP Certified eggs even after, according to Plaintiffs, the alleged pretextual purpose was out in

the open, is powerful evidence of the Program's procompetitive benefits, which are to be weighed by the jury.[6] So too is evidence that federal and state lawmakers continued to embrace the Guidelines and to push for even more restrictive standards, and that entities that had questioned the Program's intent ultimately joined it. Defendants will argue that demand for more humanely produced eggs grew over time, further supporting a finding that the Program had, and continues to have, substantial procompetitive benefits. And evidence of increasing demand for cage-free eggs sheds light on the UEP Certified Program's procompetitive benefits because it demonstrates the increasing willingness of customers, including Plaintiffs, to pay a premium for products produced more humanely and the existence of a market rich with competing alternatives.[7]

Plaintiffs argue that evidence relating to product quality and consumer demand is irrelevant because neither "are defenses to anticompetitive conduct." Pls.' Mot. Lim. No. 1 at 11, ECF No. 173. However, as the MDL Court repeatedly held,[8] this argument is completely off the mark because improving the quality of a product and satisfying consumer demand are both

---

[6] Plaintiffs admit in their responses to Defendants' requests for admission that Plaintiffs Kraft, Kellogg, and Nestlé sought to purchase, and in fact required, UEP Certified egg products prior to 2009. *See* Ex. B at 4-5 (Pls.' Objections and Responses to Defs.' First Set of Requests for Admission, Nos. 2 & 6). Even after filing the initial Complaint in this action in 2011, these Plaintiffs continued to demand UEP Certified eggs and made a commitment to switch to cage-free eggs, an even more expensive product, in response to the growing animal rights movement.

[7] Evidence relating to demand for cage-free eggs and the marketplace's ultimate movement toward cage-free production is also relevant to the issue of whether the alleged restraints harmed competition. The fact that an alternative production method, which is also premised on the humane treatment of hens, is now flourishing demonstrates that choice was not restricted by the UEP Certified Program.

[8] *See In re Processed Eggs Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016) (holding that the UEP Certified Program provided procompetitive benefits); MDL Court, Order, ECF No. 1982 (E.D. Pa. Sept. 24, 2019) ("Increasing output, widening consumer choice, and meeting customer demand can well be procompetitive."); MDL Court, Order, ECF No. 1658 (E.D. Pa. Mar. 22, 2018) ("The UEP Certified Program enhances consumer welfare because it gives people eggs that they demand—namely, eggs that come from humanely-treated chickens.").

relevant procompetitive benefits. *See NCAA v. Board of Regents*, 468 U.S. 85, 102 (1984) (widening consumer choice is a procompetitive benefit); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1072-73 (9th Cir. 2015) (finding response to consumer demand for amateurism in college sports to be a legitimate procompetitive justification); *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003) (recognizing that improving industrial customers' choice is a procompetitive justification); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (satisfying "the public's desire for [a] product or service" benefits competition); *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 283 (S.D.N.Y. 2015) ("Contract provisions that result in a better or more efficient product to meet consumer demand are procompetitive.") (citing *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–55 (1977)). Indeed, the jury instructions from the prior two trials recognized that meeting customer demand and improving product quality are both legally cognizable procompetitive benefits.[9]

Despite this overwhelming body of law, Plaintiffs rely on *PLS.COM, LLC v. National Association of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022), for the proposition that improved product quality is not a procompetitive justification. That case is readily distinguishable. There, the defendant argued that a policy requiring realtors to post all real estate listings on multiple listing services controlled by the defendant improved quality by saving consumers the need to patronize competing firms. *Id.* The Ninth Circuit held that such a justification was not procompetitive because it was not clear from the policy's face that it in fact enhanced

---

[9] Ex. C, Jun. 5, 2018 DPP Trial Tr. 135:25-136:4 ("In considering whether the challenged restraints benefitted competition, you may consider various factors, including, but not limited to, whether the challenged restraints were demanded by customers, increased production, decreased prices, or improved product quality."); Ex. D, Dec. 10, 2019 DAP Trial Tr. 258:3-8 ("In considering whether the challenged restraints benefitted competition, you may consider various factors, including, but not limited to, whether the challenged restraints were demanded by customers, whether they increased production, increased consumer choice, decreased prices, or improved product quality.").

8

*competition. Id.* The Ninth Circuit did not rule that improved product quality could never enhance competition. Rather, it found only that a defendant failed to explain persuasively how a policy that on its face eliminated competition, in fact enhanced it.

Here, the Certified Program is entirely voluntary, and there are egg producers who have chosen not to join. The Certified Program provides an option to buy eggs produced by hens that are treated according to a prescribed set of welfare standards, which enhances consumer choice and gives consumers an objective basis on which to compare competing products. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308-09 (3d Cir. 2007). To the extent Plaintiffs' argument hinges upon the notion that the 100 percent rule itself cannot be viewed as procompetitive as a matter of law, the MDL Court already considered and rejected that argument. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045-46 (E.D. Pa. 2016) (recognizing that the 100 percent rule has "plausibly… procompetitive benefits" because it is "a response to consumer demand for humanely produced eggs" and the increased value of a Certified egg is "ultimately based upon the defendant's ability to certify not only their compliance with the standards as articulated by the UEP, but also their total renunciation of the harmful practices these standards sought to remedy").

As the MDL Court previously held, evidence relating to customer demand and the animal welfare movement is relevant to the procompetitive benefits of the UEP Certified Program regardless of the timeframe. *See* MDL Court, Order, ECF No. 1985 (E.D. Pa. Sept. 25, 2019).

### 3. Post-2008 Evidence Is Relevant to the Equal Involvement Defense

Plaintiffs' last-ditch argument to exclude the post-2008 evidence raises the red herring of a prohibition on *in pari delicto* as a defense. As Judge Pratter previously recognized,[10] this

---

[10] MDL Court, Order at 1 n.1, ECF No. 1985 (E.D. Pa. Sept. 25, 2019) (rejecting "[t]he DAPs claim that admitting their requests for UEP Certified eggs would allow the defendants to blame the DAPs for the

9

argument misses the mark because the Seventh Circuit "has accepted and endorsed the equal responsibility defense" to antitrust liability. *Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995); *Gen. Leaseways v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720 (7th Cir. 1987). Here, the equal involvement and/or complete involvement defenses have been raised by all Defendants. UEP's Answer with Affirmative Defenses at 89 ¶ 40, ECF No. 29/73-20; USEM's Answer with Affirmative Defenses at 66 ¶ 40, ECF No. 30/73-21; Cal-Maine's Answer, Affirmative Defenses, and Counterclaim at 55 ¶ 31, ECF No. 35/73-26; Rose Acre's Answer, Affirmative Defenses, and Counterclaim at 30 ¶ 24, ECF No. 37/73-28. That customers, including these very Plaintiffs, continue to require and pay for UEP Certified eggs today is essential evidence supporting this defense.

### 4. The Relevance of Other Post-2008 Evidence Should Be Reserved for Trial

Plaintiffs also seek to exclude "[o]ther post-2008 evidence."[11] Pls.' Mot. Lim. No. 1 at 9, ECF No. 173. Plaintiffs make no specific argument as to why these documents should be excluded categorically. Instead, Plaintiffs argue that these documents should not be admitted unless Defendants can satisfy the applicable rules of evidence. Defendants agree—all Defendants intend to follow the Federal Rules of Evidence, as the Court would expect, and as Plaintiffs should be expected. To the extent Plaintiffs have specific objections to the relevance or prejudice of these documents, they can and should raise them at trial. As Judge Pratter correctly recognized, it is premature for the Court to impose a categorical bar on the introduction

---

defendants' anticompetitive conduct, which amounts to an *in pari delicto* defense" because such evidence is relevant "for the purposes of establishing a complete involvement defense").

[11] This evidence is listed on pages 8-9 of Plaintiffs' Exhibit 35. Notably, several items included on this list are relevant for the reasons discussed in Section II.A.1-2 because they show customer demand for UEP Certified eggs.

of post-2008 evidence. *See* MDL Court, Order at 1 n.1, ECF No. 1977 (E.D. Pa. Sept. 23, 2019). Any decision on this evidence can be made only in the particular context in which it is sought to be introduced.[12] Moreover, should the Plaintiffs call a witness who makes statements on direct that are contradicted by other statements after 2008, Defendants should be free to use that evidence on cross-examination. The date when a particular piece of evidence was created or when a contradictory statement was made should not dictate whether it can be used to impeach a witness.

Accordingly, any objections to "other" post-2008 evidence should be reserved for and ruled upon at trial.

### B. Introduction of Post-2008 Evidence is Not Unfair in Light of the Discovery Record

Plaintiffs in this case ask the Court to preclude Defendants from using post-2008 evidence on the ground that the MDL Court cut off discovery on December 31, 2008. This same request by the DAPs was rejected by Judge Pratter, who oversaw discovery in the MDL and was very familiar with its precise contours. Plaintiffs' request also should be rejected here.

*First*, the MDL Court did not impose a 2008 discovery cut-off. More than half of the documents challenged in the instant motion were produced in the course of discovery. *See* Pls.' Mot. Lim. No. 1 at Ex. 35, ECF No. 173. MDL Case Management Order No. 14 limited the parties' preservation obligation to documents created between January 1, 1999, and December 31, 2008, and stated clearly, "[t]his Order does not address, limit, or determine the relevance, discoverability or admission into evidence of any Record . . . regardless of whether the Record is required to be preserved pursuant to the terms of this Order." MDL Court, Case Management

---

[12] For example, Plaintiffs challenge the inclusion of Rose Acre's financial statements from 2009-2011 on the exhibit list. Defendants intend to introduce these documents to show that Rose Acre expanded its production during the period in which Plaintiffs claim Defendants were conspiring to reduce supply.

11

Order, ECF No. 83 (E.D. Pa. Mar. 29, 2009). Contrary to Plaintiffs' contention, discovery was had on each of the specific types of documents Plaintiffs ask this Court to exclude based solely on their date, including (i) ongoing customer demand and support for the UEP Certified Program,[13] (ii) the Sparboe exposé that prompted Sparboe's return to UEP,[14] and (iii) post-2008 legislative activity.[15]

*Second*, Plaintiffs cannot claim to be prejudiced by the alleged "lack of discovery after 2008" because these Plaintiffs did not propound a single document request in this matter seeking targeted post-2008 discovery, nor did they seek to compel the production of any additional post-2008 documents.[16] Plaintiffs had the opportunity to seek post-2008 discovery. In responding to Defendants' document requests, Plaintiffs agreed to produce documents consistent with the agreement made between Defendants and the DPPs. *See* Ex. E (Aug. 13, 2012 Letter from

---

[13] Numerous exhibits challenged in the "Post-2008 Support for UEP Program and Pressure Related to Animal Welfare Initiatives" section of Exhibit 35 to this Motion were marked and/or discussed in depositions, including, but not limited to: (i) the 3/02/09 Publix 2009 Notice of Annual Meeting of Stockholders (final version of PUB_EGGS_011874, which was discussed in the Publix Rule 30(b)(6) deposition); (ii) the 00/00/10 Animal Welfare Newsletter 2010- Consumer Preferences for farm animal welfare: results from a telephone survey of U.S. households (authored by Plaintiffs' rebuttal animal welfare expert and marked as Exhibit 3 in his deposition); (iii) the 2/02/12 Kroger's 2013 Sustainability Report (marked as Exhibit 40 in the deposition of Kroger's Vice President Payton Pruett); and (iv) the 2/10/12 AHA Animal Welfare Standards for Layers-Enriched Colony Housing (discussed in depositions of Defendants' animal welfare expert and Plaintiffs' rebuttal animal welfare expert).

[14] The exhibits challenged in the "2011 Sparboe Expose and Return to UEP" section of Exhibit 35 to this Motion relate to a three-week period in late 2011 that was extensively covered in the depositions of Sparboe's President, Beth Schnell, and Sparboe's former Director of Government Relations and Animal Welfare, Ken Klippen, and also addressed in the prior trial testimony of Mr. Klippen and Sparboe's Vice President, Garth Sparboe.

[15] Post-2008 animal welfare legislation was discussed at length in the depositions of Plaintiffs' rebuttal animal welfare expert and Plaintiffs' damages expert.

[16] Plaintiffs cite as Exhibit 30 Rose Acre's Objections and Response to the First Set of Requests for Production of Documents by the DAPs to All Defendants. These document requests were propounded by the DAPs (not including Plaintiffs) on May 6, 2011, before Plaintiffs had even filed this action. Plaintiffs never propounded document requests in this matter.

12

Plaintiffs' counsel attaching letters from DPP counsel). That agreement provided in relevant part that "documents (other than transactional data) will be produced for the period from January 1, 1999 through December 31, 2008, but *any party may make targeted requests for documents created after December 31, 2008, and such targeted requests will be reasonably considered by the party receiving the requests*." Id. at 2 (August 1, 2012 (corrected) Letter from DPP counsel) (emphasis added); *see also* Ex. F (Sept. 10, 2012 Letter from Defendants' Counsel to Plaintiffs' Counsel) (summarizing Plaintiffs' agreement to produce certain post-2008 documents and "to consider in good faith specific requests for documents dated after December 31, 2008"). Plaintiffs' intentional decision not to seek additional post-2008 discovery precludes them from now claiming prejudice as a result.

*Third,* Plaintiffs' argument is hypocritical. Despite alleging that post-2008 evidence is irrelevant, Plaintiffs' exhibit list (excluding transactional data) includes approximately 120 exhibits that are dated after 2008. *See* Ex. G (Excerpts from Plaintiffs' exhibit list). For example, Plaintiffs' exhibit list includes several videos and photos taken by animal activists after 2008. *See id.* at 1; *see also* ECF Nos. 161 & 161-1 (identifying six exhibits which purport to be videos taken after 2008). Plaintiffs also will seek to introduce UEP Certified producer audit records dated between 2009 and 2011. *See* Ex. G at 9-10. Plaintiffs' exhibit list even includes several post-2008 publicly available resources that were not produced during the course of discovery, such as retailers' and producers' websites. *See id.* at 3-7. Ironically, Plaintiffs' own exhibit list belies their claim that a 2008 discovery cut-off was imposed in the case, as it includes several documents produced by Plaintiff Kraft that are dated after 2008. *See id.* at 8-9. No legitimate basis exists to allow this evidence to be introduced at trial while at the same time categorically barring Defendants from introducing comparable evidence.

13

*Fourth,* the cases Plaintiffs cite suggesting that documents not produced during discovery should be excluded are inapposite because they all involved an underlying violation of Rule 26. Here, Plaintiffs did not propound any targeted document requests seeking post-2008 discovery, and therefore, production of the documents they now seek to exclude was not required under Rule 26. Without an obligation to produce, Plaintiffs cannot prove a discovery rule violation, which is needed to trigger the exclusion under Rule 37(c)(1) that Plaintiffs seek here. Moreover, most of the challenged documents were used, or discussed, in depositions. Thus, Plaintiffs not only were aware of these documents during discovery, but they also had the opportunity to question witnesses about them and to propound targeted discovery requests related to them (which they never did). And with respect to documents dated after fact discovery concluded on April 30, 2014, the vast majority were included on the defendants' exhibit list in the DAP trial, and those defendants provided the Plaintiffs here with copies of these documents more than three years ago. *See* Ex. H (August 2019 emails providing Plaintiffs' counsel (Jenner) with an FTP link to DAP trial exhibits). As such, Plaintiffs cannot claim unfair surprise or prejudice.

*Finally,* Plaintiffs' attempt to distinguish Judge Pratter's prior rulings fails. As discussed in Section II.A.1-2 *supra*, Judge Pratter repeatedly held that evidence, including evidence dated after 2008, relating to customer demand and pressure from activists is relevant to whether the UEP Certified Program was a pretext for a supply reduction scheme and whether the Program's procompetitive benefits outweigh the anticompetitive effects—and the MDL Court admitted that evidence at trial. Plaintiffs' claim that they seek to bar the same evidence on more limited grounds does not make sense. Further, Plaintiffs' characterization of the DAPs' motion ignores that the DAPs raised (and Judge Pratter rejected) the precise arguments Plaintiffs raise here. Specifically, the DAPs sought to preclude evidence after the December 31, 2008 "Discovery

14

Period" because it would be "unfairly prejudicial" given that the "DAPs had no opportunity to test any of Defendants' purported defenses related to documents that were not produced during the discovery process" and because preclusion was purportedly required by Rule 37. MDL Court, Mem. Supp. Mot. Lim. at 3-5, ECF No. 1891-2 (E.D. Pa. Jul. 12, 2019). Yet Judge Pratter was "unconvinced of the evidence's prejudicial nature." MDL Court, Order, ECF No. 1977 (E.D. Pa. Sept. 23, 2019).

To the extent this motion seeks to preclude post-2008 evidence based on the way discovery occurred in the MDL, Defendants respectfully submit that the Court should afford significant weight to Judge Pratter's prior decision on the same issue, given her first-hand knowledge of discovery having presided over this complex case for over a decade. *See WH Holdings, LLC, v. Ace Am. Ins. Co.*, No. 09C7133, 2010 WL 3732149, at *2 (N.D. Ill. Sept. 17, 2010) (finding "deference" to another judge's discovery ruling to be "warranted, particularly because there is such a substantial similarity between the [previous] motion and the one filed here and because the [previous] litigation has been so lengthy and complex").

### III. CONCLUSION

For the above reasons, Plaintiffs' Motion *in Limine* to Exclude (1) Liability Evidence Concerning Conduct or Events after 2008 and (2) Evidence Not Produced in Discovery should be denied.

Dated: September 16, 2022        Respectfully submitted,

/s/ Robin P. Sumner
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding (whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Robert E. Browne, Jr. (robert.browne@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

*Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.*

*/s/ Jay L. Levine*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

*Counsel for Defendant Rose Acre Farms, Inc.*

*/s/ Patrick M. Otlewski*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)

>Andrew Chinsky (achinsky@kslaw.com)
>KING & SPALDING LLP
>1180 Peachtree Street, NE, Suite 1600
>Atlanta, GA 30309
>Tel: (404) 572-2812
>
>Brian E. Robison (brian@brownfoxlaw.com)
>(pro hac vice)
>BROWN FOX PLLC
>6303 Cowboys Way, Suite 450
>Frisco, TX 75034
>Tel: (972) 707-2809
>
>***Counsel for Defendant Cal-Maine Foods, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants registered to receive service in this action.

                                                   */s/ Robin P. Sumner*
                                                   Robin P. Sumner