UNITED STATES DISTRICT COURT
IN THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. )<br><br>Defendants. ) | No. 1:11-cv-08808<br><br>Judge Charles R. Norgle |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 3 TO PRECLUDE EVIDENCE AND TESTIMONY ABOUT A NOVEMBER 2011 NEWS SEGMENT ABOUT NON-PARTY SPARBOE FARMS**

**INTRODUCTION**

The centerpiece of Plaintiffs' case is their allegation that the UEP Certified Program ("the Program") was a pretext for an illegal agreement to reduce supply. Defendants will argue to the jury that the Program was a legitimate response to customer demands who faced aggressive, public demands for better treatment of egg-laying hens. One provision of the Program was the so-called 100 percent rule. Under that rule, for an egg producer to qualify for the Program and use the Certified label on its egg cartons, the producer had to follow the Program's guidelines on all of its hens. Defendants will argue to the jury that large retailers and FMI, their powerful trade association, supported the 100 percent rule to bolster the Program's integrity. Large retailers needed to placate animal rights groups like PETA and the HSUS, who were putting public pressure on the retailers; a program that treated less than 100 percent of the hens humanely—and left other hens to suffer in worse conditions—would not suffice.

In an effort to support their argument that the Program was a sham designed solely to reduce egg supply and raise egg prices, Plaintiffs intend to rely heavily on evidence from Sparboe Farms, Inc. ("Sparboe"). Sparboe served on the UEP committee that developed the Program, but Sparboe later opposed the 100 percent rule. Plaintiffs plan to show the jury a 2003 letter from Sparboe's general counsel to UEP provocatively asserting that the 100 percent rule was an antitrust violation. In response, Defendants will demonstrate that Sparboe had economic reasons for opposing the 100 percent rule that had nothing to do with antitrust concerns. The evidence will further show that Sparboe eventually withdrew from UEP and the Program and created its own animal welfare program that was nearly identical to the Program except it did not have a 100 percent rule.

However, through Motion *in Limine* No. 3, Plaintiffs want to keep the jury from hearing the rest of the story that revealed, **in Sparboe's own words and deeds**, the necessity of the 100 percent rule. This evidence, which was admitted in both of the two previous trials over Plaintiffs' objections, should be admitted here.

Specifically, in 2011, ABC News ran an exposé on Sparboe that included an undercover video taken at a Sparboe facility that showed deplorable treatment of hens. A massive and immediate backlash ensued, and Sparboe immediately lost its largest customers and had to sell some of its facilities. As a result, Sparboe admitted that, in 2002 when the Program was formed, UEP was right and Sparboe was wrong about the need for the 100 percent rule. A contrite Sparboe even asked to rejoin UEP and the very same Program (with the 100 percent rule) that Sparboe had once attacked. In a *mea culpa* letter to UEP, Sparboe's President and owner wrote:

> Regrettably, some decisions that appeared to be in our customers' best interests put us at times in disagreement with other egg producers and the UEP. We realize that the core values we held and some of the decisions we made put a target on us. The resulting media and customer response has been overwhelming to our company.

2

> This has been a very painful lesson. ***While UEP correctly foresaw the issues which Sparboe Farms is now confronting, we did not.*** It is a new day at Sparboe Farms. ***We believe the United Egg Producers negotiated the most workable agreement for the egg the [sic] industry based on all options available.*** We have learned from this experience and realize the value of being an active and engaged member of the United Egg Producers. . . . We would like to get our operations audited and approved for the UEP certified program as soon as possible.
>
> I respectfully ask that you reinstate Sparboe Farms' membership in the United Egg Producers. I assure you that we will be positive and supportive.

Ex. A, CF0005892 (Dec. 1, 2011 Letter from B. Schnell to G. Gregory) (emphases added). In both prior trials, the MDL Court allowed those juries to hear the entire Sparboe story, including evidence about the exposé. This Court should do likewise and deny Plaintiffs' Motion *in Limine* No. 3 because the Motion is designed to give the jury a slanted, partial version of the Sparboe story. The jury is entitled to hear the full Sparboe story and decide whether Sparboe's 2003 attacks on the Certified Program were genuine, whether Sparboe would ask to rejoin a Program that it truly thought was an ongoing antitrust violation, or whether Sparboe had other motives for its 2003 criticisms. Having placed Sparboe and the basis for the 100 percent rule in issue, Plaintiffs cannot now exclude evidence that is unfavorable to their position.

## BACKGROUND

Through their exhibits and witness designations, Plaintiffs have made it clear that they intend to highlight the story of Sparboe's decision to support and then leave the Program. Their motion fundamentally seeks to deny the jury key information about Sparboe's later return to the Program and their public acknowledgment of the validity of the 100 percent rule, from the Program's inception in 2002.

This trilogy of events started in 2001 when Sparboe served on the UEP committee that developed the Program. Like other egg producers, Sparboe joined the Program in 2002 in response to mounting pressure from animal rights activists, as Sparboe "believed that the animal care

3

program was designed to deal with the animal rights, desires, for our company to comply with husbandry guidelines that were acceptable to that community." Ex. B, Schnell Dep. 122:23-123:4 (April 22, 2014); Ex. C, Schnell Dep. 153:15-22 (Feb. 17, 2014).

After Sparboe joined the Program, things began to change. As Sparboe brought its facilities in compliance with the Program, Sparboe began to lobby for permission to implement the guidelines on only some of its production and still qualify as a UEP Certified Producer. Ex. D, May 5, 2018 DPP Trial Tr. 158:19-159:20. Over time, Sparboe's efforts escalated. In late 2003, Sparboe's then-General Counsel, John Mueller, sent a letter to UEP's counsel accusing the Program of having a "hidden agenda" to "reduce outputs in an effort to increase prices," and stating his opinion that requiring "100% participation in the production of standards to the Animal Welfare Program maybe [sic] tantamount to an unfair trade practice." Ex. E, UE0906543 (Nov. 5, 2003 Letter from Sparboe). Despite these "vocal concerns raised," Sparboe remained part of the Program through July 1, 2005—though Sparboe did ultimately cease its participation. Ex. F, Nov. 6, 2019 DAP Trial Tr. 188:4-25.[1]

In 2011, Sparboe once again reversed course. ABC News broadcasted a 20/20 segment featuring an undercover video of one of Sparboe's facilities. Ex. B, Schnell Dep. 92:25 – 93:16 (April 22, 2014); Ex. H, Gregory Dep. 916:5-917:4 (June 27, 2013). The fallout was immediate and disastrous. Sparboe lost more than half of its business—including McDonald's, Target, and Walmart—and eventually had to sell some its facilities. Ex. G, May 7, 2018 DPP Trial Tr. 29:12-30:8; Ex. B, Schnell Dep. 92:16-93:16 (April 22, 2014). To stop the hemorrhaging of its business

---

[1] Upon leaving the Certified Program, Sparboe attempted to create its own animal welfare program that mirrored the Certified Program but did not require 100 percent of a producer's facilities to meet those standards. Ex. G, May 7, 2018 DPP Trial Tr. 28:22-29:5. Plaintiffs intend to introduce evidence to suggest that Sparboe's alternative program was acceptable and indeed preferred by Sparboe's customers. *See id.* at 147:22-158:19.

and to pacify its customers, Sparboe decided to rejoin the Program, which still had the 100 percent rule and was substantively identical to the program Sparboe criticized in 2003. Indeed, in a letter dated December 1, 2011, Sparboe's President wrote to the UEP: "Regrettably, some decisions that appeared to be in our customers' best interests put us at times in disagreement with other egg producers and the UEP," and that "[t]his has been a very painful lesson. While UEP correctly foresaw the issues which Sparboe Farms is now confronting, we did not." Ex. A, CF0005892 (Dec. 1, 2011 Letter from B. Schnell to G. Gregory).

By their Motion, Plaintiffs want the jury to hear the first two parts of the story without the concluding chapter.

## ARGUMENT

**I.     The 20/20 News Segment Is Directly Relevant to *The* Core Issue at Trial.**

Plaintiffs' Motion ignores the reason why the 20/20 news segment is relevant. Specifically, Plaintiffs argue that Defendants will use the video to show "that the 100% rule was necessary to ensure egg producers treated hens humanely on all their farms." Pls.' Mot. Lim. No. 3 at 5, ECF No. 175. But Plaintiffs are mistaken. Defendants do not intend to introduce the 20/20 segment as evidence of the effect of the 100 percent rule on animal welfare. Instead, the 20/20 segment will help the jury understand the complete Sparboe story, the customer pressure to join the Program, and the impact to producers of joining vs. not joining the Program. ***In Sparboe's own words***:

| Before the 20/20 Segment:<br>Nov. 5, 2003 Letter from Sparboe to UEP<br>(Ex. E, UE906543) (excerpts) | After the 20/20 Segment:<br>Dec. 1, 2011 Letter from Sparboe to UEP<br>(Ex. A, CF0005892) (excerpts) |
|---|---|
| As we have relayed from time-to-time to the UEP executive staff, the "hidden agenda" of the Animal Welfare Program is concerning to us. In short, we believe if not carried forward properly a strong case could be made that the Animal Welfare Program is, in essence, a program being offered by our trade association and its members to reduce outputs in an effort | Sparboe Farms has a long tradition of making decisions based on meeting our customers' expectations. Regrettably, some decisions that appeared to be in our customers' best interests put us at times in disagreement with other egg producers and the UEP. We realize that the core values we held and some of the decisions we made put a target on us. The resulting |

5

| | |
|---|---|
| to increase prices. Naturally, that strikes as price fixing and, we have concerns about future claims of this sort being made against the association and its members. … <br><br> Additionally, we feel that, ultimately, the UEP mandate (it truly is not voluntary) of a 100% participation in the production of standards to the Animal Welfare Program maybe [sic] tantamount to an unfair trade practice. … <br><br> Justice departments will be alerted. Attorney General watchdog groups will be alerted, etc. Investigations may be launched stating that criminal activity is afoot and that these people are conspiring to fix prices. Civilly, Plaintiffs' lawyers will tell these smaller producers that these folks owe you money, treble damages would be available in some states and, let's sue these folks and see what happens. Your response to these concerns, please. … <br><br> Naturally, you get the message. … | media and customer response has been overwhelming to our company. <br><br> This has been a very painful lesson. While UEP correctly foresaw the issues which Sparboe Farms is now confronting, we did not. It is a new day at Sparboe Farms. We believe the United Egg Producers negotiated the most workable agreement for the egg the [sic] industry based on all options available. We have learned from this experience and realize the value of being an active and engaged member of the United Egg Producers. <br><br> … Going forward, Sparboe Farms will support industry initiatives in scientific research, legislative and regulatory efforts. We would like to get our operations audited and approved for the UEP certified program as soon as possible. <br><br> I respectfully ask that you reinstate Sparboe Farms' membership in the United Egg Producers. I assure you that we will be positive and supportive. |

As the MDL Court recognized, "[t]he demand for, motivation behind, and actual effects of the UEP Certified Program are [] entirely probative as to whether the Program was a pretext for an agreement to reduce supply." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, Order, ECF No. 1982 (E.D. Pa. Sept. 9, 2019). The Sparboe story bears on these issues. Plaintiffs will use the November 2003 letter authored by Mr. Mueller, the former general counsel at Sparboe *who is on Plaintiffs' witness list*, to argue that the Certified Program was a pretext to reduce supply. Defendants will counter with the December 2011 letter by Sparboe's President asking to rejoin UEP and the Certified Program—which in substance was the *same* Program that Sparboe criticized years earlier. The December 2011 letter undermines the credibility of the October 2003 letter and shows that Sparboe has withdrawn its critique of the Program and embraced the necessity of the

6

100 percent rule from its 2002 adoption. It is only through the lens of the 20/20 segment that the jury can fully comprehend the context and timing of the December 2011 letter and Sparboe's changing opinions of the Program.

Finally, for similar reasons, Plaintiffs fail to distinguish their case from the DAP trial, where the 20/20 news segment was admitted into evidence. Plaintiffs argue that the DAPs "argued that Sparboe's program was stricter and more humane than the UEP Certified Program," but in "contrast, the merits of Sparboe's program are not at issue in this trial." Pls.' Mot. Lim. No. 3 at 5, ECF No. 175. Plaintiffs include zero citations in support of this argument. Indeed, their Motion suggests differently as it makes clear that Plaintiffs intend to argue that UEP's efforts to educate buyers about the superior benefits of the UEP Certified Program over Sparboe's "evidence anticompetitive intent." *Id.* at 6. But in any event, Plaintiffs' argument is a *non sequitur*: even if the merits of Sparboe's program are not at issue in this trial, which is not clear, that is not the only reason the 20/20 segment is relevant. Instead, it is relevant to show the purposes of the Program and what Sparboe thought about the Program's 100 percent rule—and why. That Sparboe ultimately reversed its decision and rejoined both UEP and the UEP Certified Program bears directly on whether the Program is an unreasonable restraint on trade.

## II. Plaintiffs' Other Proposed Grounds for Exclusion Are Meritless.

Through their Motion, Plaintiffs seek to exclude evidence relating to the 20/20 news segment and its aftermath because the evidence: (1) would suggest that Plaintiffs support animal abuse; (2) was supposedly "out of bounds in discovery;" (3) might confuse the jury in numerous hypothetical ways; and (4) would require a "mini-trial" about facts underlying the 20/20 segment and its aftermath. *Id*. at 6-8. Plaintiffs greatly overstate these risks, which did not arise in the prior two trials and are wholly speculative.

7

*Plaintiffs' views on animal abuse*. According to their witness list, Plaintiffs plan to call several witnesses from each company, each of whom will be able to explain his or her company's position on animal welfare. The Plaintiffs' positions on animal welfare standards were the subject of extensive questioning during their depositions, and the same is likely to occur at trial. If the Plaintiffs testify that they think it is acceptable for some hens to be housed under humane conditions while others are not, then it is entirely possible (even likely) that the jury will conclude that Plaintiffs are not concerned with animal welfare and that the 100 percent rule is a necessary component of a bona fide animal welfare program that meets customer demand for producers to treat all of their animals humanely. That is exactly the point Defendants are entitled to make. The possibility that a jury may not agree with the Plaintiffs' view of the 100 percent rule is not grounds for excluding relevant evidence.

*The scope of discovery on post-2008 Sparboe issues*. As explained in detail in briefing on other motions *in limine*, Plaintiffs are simply wrong in arguing that the MDL Court banned all post-2008 discovery.[2] The MDL Court relieved all parties of an ongoing, continuing preservation obligation post-2008, but that court allowed post-2008 discovery and the parties engaged in it. In fact, the 20/20 news segment and Sparboe's subsequent decision to rejoin the UEP Certified Program were the subject of extensive discovery and were introduced at both prior trials. Defendants and Sparboe produced documents related to the events at issue, including the very documents challenged by Plaintiffs in Motion *in Limine* Number 1, and these events were the subject of extensive questioning in the depositions of Beth Schnell (Sparboe President) and Ken Klippen (former Sparboe Director of Government Relations and Animal Welfare). *See* Ex. B,

---

[2] *See* Defendants' Opposition to Plaintiffs' Motion *in Limine* No. 1 at pages 12-13, which is being contemporaneously filed, for a discussion of the parties' agreement to permit targeted post-2008 discovery.

Schnell Dep. 92-100 (April 22, 2014); Ex. C, Schnell Dep. 257-277 (Feb. 17, 2014); Ex. I, Klippen Dep. 334-347 (Apr. 29, 2014); *see also* Ex. H, Gregory Dep. 916-917 (June 27, 2013). In addition, Sparboe witnesses were questioned at length on these topics during the prior DPP and DAP trials. As such, Plaintiffs cannot claim credibly that they were deprived of the opportunity to take discovery on the events at issue.

*Potential jury confusion*. Plaintiffs' fears of jury confusion are misconceived. There is no indication that the two juries in the MDL were somehow confused by seeing and hearing the evidence that Plaintiffs seek to exclude. The evidence that Defendants seek to introduce does not suggest that rogue employees no longer exist when the 100 percent rule is implemented. Rather, the evidence shows, as Sparboe's 2011 *mea culpa* letter says, that animal activists are more likely to target companies that do not employ minimum humane standards on 100 percent of their facilities, and companies that have been targeted by animal activists are more capable of responding to undercover videos when they follow the UEP Certified Program, which requires improved treatment for all hens.

*A supposed mini-trial*. Finally, Plaintiffs' fear of a mini-trial over the 20/20 exposé is greatly exaggerated. Again, Plaintiffs speculate about a potential problem that did not arise in either prior trial. Evidence about the 20/20 exposé, the disastrous fallout, and Sparboe's decision to rejoin the UEP Certified Program was admitted in both the DPP and DAP trials without derailing or unnecessarily extending them. The DPP and DAP trials, at which this evidence was admitted and addressed, lasted no longer than this trial is expected to last, and the time involved in presenting the 20/20 episode to the jury will be minimal. Speculative concerns about extending the length of this trial, when those concerns did not come to pass in two prior trials, are not a valid reason to exclude clearly relevant evidence.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion *in Limine* Number 3, which improperly seeks to exclude highly relevant, admissible evidence regarding the November 2011 20/20 news story about Sparboe, the loss of business as a result of the story, and Sparboe's decision to rejoin UEP and the UEP Certified Program after the segment aired.

Dated: September 16, 2022      Respectfully submitted,

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding (whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Robert E. Browne, Jr. (robert.browne@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***

*/s/ Jay L. Levine*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)

Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***

*/s/ Patrick M. Otlewski*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
Andrew Chinsky (achinsky@kslaw.com)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants registered to receive service in this action.

*/s/ Robin P. Sumner*
Robin P. Sumner