# EXHIBIT G

1     IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4

5 IN RE: PROCESSED EGG PRODUCTS:   MDL NO. 2002
  ANTITRUST LITIGATION      08-MDL-02002

6

7
          - - - - -

8

9       PHILADELPHIA, PA

10

        MAY 7, 2018
11        DAY FOUR

12

13 BEFORE:   THE HONORABLE GENE E.K. PRATTER, J.

14

15       - - - - -

16      TRIAL TRANSCRIPT

17       - - - - -

18

19

20

21    KATHLEEN FELDMAN, CSR, CRR, RPR, CM
     Official Court Reporter
22    Room 1234 - U.S. Courthouse
     601 Market Street
23    Philadelphia, PA  19106
     (215) 779-5578
24

25
   (Transcript produced by mechanical shorthand via C.A.T.)

1  didn't it?

2  A.   No.  It -- I'll tell you exactly what happened.

3  Q.   Well, my question is --

4  A.   It wasn't a train wreck.

5  Q.   In 2011 -- 2011, did -- Sparboe came back to the UEP,

6  right?

7  A.   It came -- it came back to UEP after an ABC story ran

8  that the United Egg Producers -- nobody in our industry would

9  buy eggs from us.  We had 75 trailer loads of eggs.  Nobody

10 would buy eggs from us, but we had complied with every aspect

11 of the United Egg Producers Program right down the line, and

12 we had passed all of McDonald's audits for seven years.  Every

13 audit was passed.  Every aspect of our program was identical

14 to the UEP Program in every single step.

15        There were three individuals that were employed in

16 our company from the state of Pennsylvania, ironically, that

17 disappeared the day that story ran on UEP and we never heard

18 from them again.  And many of the atrocities that happened in

19 that story were self-induced by these people.  They were not

20 our long-term employees.  They became employees of our company

21 just before that story ran.

22 Q.   To be clear for the ladies of gentlemen of the jury,

23 2005, Sparboe dropped out of the Certified Program; correct?

24 A.   Correct.

25 Q.   Dropped out of UEP?

1    A.    Correct.

2    Q.    2000- -- and you have your process verified program that

3    you say mirrors the UEP Certified Program except it doesn't

4    require the 100% rule, right?

5    A.    Correct.

6    Q.    You have certain facilities for those customers that

7    wanted to have minimum level of animal welfare standards, and

8    then for the others, you don't have those standards, correct?

9    A.    I wouldn't say minimum level of standards.  Our program

10   mirrored the UEP Program, and we were willing to dedicate that

11   program to every customer that wanted it.  Absolutely.

12   Q.    And in 2011, as you mentioned in response to my question,

13   there was an ABC story on 20/20 that featured Sparboe, right?

14   A.    Correct.

15   Q.    The Sparboe farm?

16   A.    At the McDonald's farm.

17   Q.    And the Sparboe farm at which employees were videotaped

18   abusing hens?

19   A.    Three people who left the day of that story, who came on

20   to our employment two months before the story ran, they were

21   plants.

22   Q.    And as a consequence of that story, Sparboe lost the

23   business with McDonald's, right?

24   A.    And we had just passed their audit, three months before

25   completely passed their audit.

1    Q.    Sparboe lost the business --

2    A.    Correct.

3    Q.    -- to McDonald's?

4    A.    Correct.

5    Q.    Lost it with Target?

6    A.    Correct.

7    Q.    It was a crisis, wasn't it?

8    A.    It was a crisis.

9    Q.    And after that, UEP came back -- I mean, excuse me --

10   Sparboe came back to the UEP and rejoined the Certified

11   Program, right?

12   A.    We did.  I don't know the exact date, but my sister had

13   no choice.

14   Q.    Had no choice and in -- and today, Sparboe is a UEP

15   Certified producer; correct?

16   A.    We are.

17   Q.    Sir, you're aware that there's nothing in the UEP

18   Certified Program that says anything about expansion, right?

19   A.    Correct.

20   Q.    There's not a page, a paragraph, a single word that

21   limits any member of the UEP Certified Program from building

22   new henhouses?

23   A.    Correct.

24   Q.    Building new farms?

25   A.    Correct.

1    specifications.

2    Q.    And do you recall what -- at this time when the bidding

3    process started, what the Walmart specifications required

4    about animal welfare?

5    A.    I do.  At that point in time when the process started, we

6    had been using something that had been in place for several

7    years at Walmart.  And in the specifications for animal

8    welfare it required that they participate in the FMI and the

9    UEP Certified process.

10   Q.    And what was your understanding of why Walmart had that

11   requirement?

12   A.    Yeah, so my understanding is that it had been in place

13   for several years.  The suppliers in the industry for the most

14   part used it, and because of that I really didn't think about

15   it very much.  It just kind of was in place and that's what we

16   started off the process with.

17   Q.    Again, when you started off the process with those

18   specifications, did you have an understanding that those

19   guidelines, the UEP Guidelines, in particular, required a

20   producer to follow some 100% rule?

21   A.    No, I had no idea of that.

22   Q.    Now, was there a point during the 2008 bidding process

23   that Walmart changed its specifications with regard to animal

24   welfare?

25   A.    Yes, we did.

1    Q.    And when did that occur?

2    A.    Yeah, so shortly after beginning the new bidding process,

3    where we had a more formal process, we identified some

4    potential suppliers in the industry, one of which was Sparboe

5    Farms, who were not using the Certified process.  And after

6    having some time to work with them, we understood that they

7    were using different processes that we believed that were as

8    good or better than the UEP process.  And so, therefore, we

9    changed our specs to include -- to not say it had to be FMI

10   and UEP, but that they could be something like that or better.

11   Q.    Okay.  So you referred to Walmart changing its

12   specifications?

13   A.    That's correct.

14   Q.    Let me hand you our first exhibit.

15   A.    Okay.

16   Q.    And for identification purposes, this is Plaintiffs'

17   Exhibit 246.

18          And, Mr. Airoso, let's just first see if you can

19   identify the exhibit.

20   A.    I can.

21   Q.    Okay.  And what is this document?

22   A.    Yeah, so this was a letter that was sent out by the egg

23   buyer, Clay Adams, to potential producers of eggs and/or

24   brokers who could sell eggs to Walmart, and he copied me on

25   this e-mail.

1    Q.   Okay.   And can you describe what type of information

2    Mr. Adams included in that?

3    A.   Yes.   So this e-mail was provided to the potential

4    suppliers to provide them with updates and information that

5    would help them in the bidding process, to include anything

6    that was new and different that we had made changes to as the

7    process was starting.

8    Q.   So essentially, Walmart is responding to some questions

9    from its suppliers?

10   A.   That is correct.   Providing clarification.

11   Q.   And this is an e-mail that you received at the time?

12   A.   That is correct.

13   Q.   And do you recall this e-mail?

14   A.   I do.

15   Q.   And in this e-mail, did Walmart provide the potential

16   suppliers with some information about specifications?

17   A.   We did.

18        MR. OLSON:   With that, Your Honor, we would move for

19   the admission of Exhibit 246.

20        MR. DESTEFANO:   We would object to the first page on

21   hearsay grounds, Your Honor, the first page being an e-mail.

22        THE COURT:   I can see it.   It's a multi-page

23   document.   You're only objecting to the first page?

24        MR. DESTEFANO:   Yes.

25        MR. OLSON:   Your Honor --

1          THE COURT:  The first page does appear to be

2    hearsay.

3          MR. OLSON:  Well, we would welcome a limiting

4    instruction.  We're not introducing it for the truth of what's

5    stated.

6          THE COURT:  What is the purpose of it?

7          MR. OLSON:  The purpose is, as the witness

8    testified, this is when Walmart communicated to its suppliers

9    a change of specifications, and it's also when those suppliers

10   learned who else was in the bidding process.  So whether any

11   of that was true or not, it -- the information was provided.

12         THE COURT:  Well, you can use the remainder of the

13   exhibit, but there's still -- I'm not quite sure what the

14   point is of the transmittal e-mail?

15         MR. OLSON:  Okay.

16   BY MR. OLSON:

17   Q.   You can put that document aside.

18         Do you -- you referred to the information getting

19   out to Walmart's current suppliers.  Do you recall when that

20   occurred?

21   A.   In this e-mail it would have been when we would have made

22   the changes known to the specifications in or around late May

23   of 2008.

24   Q.   And would this have been when Walmart's incumbent

25   suppliers learned that Walmart was considering using Sparboe

1    Farms as a new supplier?

2    A.    That is correct.  All the potential suppliers were sent a

3    single e-mail where they were all on copy.  So all of the

4    current suppliers and incumbent suppliers would have known

5    about any additional potential suppliers like Sparboe Farms.

6    Q.    And you also referenced Walmart communicating information

7    where they changed specifications.

8    A.    That is correct.

9    Q.    How did Walmart change its specifications with regard to

10   the animal welfare requirements?

11   A.    Yes, specifically we changed the specification to say

12   that animal welfare needed to be the UEP Certified process,

13   equivalent or better.

14            In this case, in the e-mail, we said better, and

15   later on we changed that, but, yeah, UEP or better.

16   Q.    So the change at this time was from not UEP and FMI

17   exclusively, but to --

18   A.    A broader set of programs could be used as long as the

19   animal welfare requirements were as good as the UEP or better.

20   Q.    Okay.  All right, let's talk about Sparboe Farms a bit.

21            What did you know about Sparboe Farms at the time

22   you gave them an opportunity to bid for the business?

23   A.    Yes, so Sparboe Farms was a new potential supplier to

24   Walmart, and they were not using the UEP Certified process.

25   So I felt it would be prudent to take the egg buyer and a

1    group of Walmart associates.  We went up and visited them on

2    one of their farms.  We met the team that ran

3    Sparboe's business at the time.  We reviewed their farms,

4    looked at all of their facilities.  And we also went through

5    their PVP program, and what they were going to do to certify

6    that food safety and animal welfare was being taken care of.

7    And we came back from that meeting feeling very good about

8    what they had done and that they could be a supplier to

9    Walmart.

10   Q.    So you referred to the PVP program.  Was that a program

11   that Sparboe had?

12   A.    That's correct.

13   Q.    And what was your general understanding of the PVP

14   program?

15   A.    Yeah, so the PVP program was a program that was going to

16   be audited and is audited by the USDA, and as they had

17   designed it, it provided for the animal welfare requirements

18   that we wanted at Walmart.  And we felt like the program was a

19   very good program and potentially better than the UEP

20   Certified process program.

21        And the one thing that I do remember specifically,

22   though, is that it did not have a 100 percent requirement of

23   like all of your eggs and all of your farms.  It was

24   specifically just the eggs that they were going to be selling

25   to Walmart from those farms that were going to sell to Walmart

1   would be certified.

2   Q.   So your understanding is that one of the differences

3   between the PVP program and the UEP Program was that the UEP

4   Program had the 100% rule and the Sparboe program did not?

5   A.   That is correct.

6   Q.   And what was your reaction to that difference?

7   A.   Um, it seemed reasonable to me.  Um, you know, again, at

8   Walmart, we were specifically worried about the hens that were

9   laying eggs and how they were treated and that they were

10  treated within the specifications that we had, that they were

11  treated humanely.

12         But we didn't really believe that we should be

13  making decisions for other folks about what they should do in

14  terms of how they handled their business.  Felt really that

15  should be something based on other customers' demands.

16  Q.   Did you have any concerns about the fact that the Sparboe

17  Farms' program did not have a 100 percent compliance?

18  A.   No, not at all.

19  Q.   Did you make an effort to learn information or request

20  information from Sparboe about their program so you could be

21  educated about it?

22  A.   We did, yes.

23  Q.   And what do you recall in that regard?  How did you go

24  about doing that?

25  A.   Yeah, so we met with several folks from Sparboe,

1   specifically with the -- I'm probably saying his last name

2   incorrectly, Regensburger, I think is how you pronounce it.

3   He was the lead for Sparboe Farms.  We met with Sparboe Farms

4   to understand and get a detail around their Process Verified

5   Program, and they specifically provided information to myself

6   and to Clay Adams, the buyer, in various ways to include

7   things like e-mail and other ways to get us information.

8   Q.   Okay.  And let me hand you, for identification purposes,

9   an exhibit that we have marked Plaintiffs' Exhibit 251.

10  A.   Okay.

11  Q.   Mr. Airoso, can you identify Exhibit 251 for us?

12  A.   Yeah.  This was an e-mail -- an e-mail chain between Lee

13  Regensburger, Clay Adams and myself.

14  Q.   And how did the e-mail chain begin?

15  A.   It began with me asking the -- for information regarding

16  their programs, the PVP program, specifically, and how it

17  related to animal health and welfare, and how I might be able

18  to explain that information to folks at Walmart.

19  Q.   And is that the e-mail on May 28, 2008?

20  A.   That's correct.

21       Let me verify that real quick, please.

22       Yes.

23  Q.   I think you'll find yours is on the back of the chain.

24  A.   Okay, yes.

25  Q.   And is that -- is that an e-mail that you recall sending

1    at that time?

2    A.    I do.

3    Q.    And did you express your views about

4    Walmart's requirements at that time?

5    A.    I did.

6          MR. OLSON:  Your Honor, we move for the admission of

7    Plaintiffs' Exhibit 251.

8          MR. DESTEFANO:  Objection, again, on hearsay

9    grounds, Your Honor.

10         THE COURT:  Overruled.

11         MR. OLSON:  Can we publish the document?

12         THE COURT:  You may.

13         MR. OLSON:  Thank you.  Hopefully we're pulling it

14   up.

15   BY MR. OLSON:

16   Q.    Okay, and let's look at the page 4 of the e-mail at the

17   top, which Mr. Airoso, that's the one you wrote that began the

18   chain; is that right?

19   A.    Yes, sir.

20   Q.    And the first line of the e-mail that you wrote says:  As

21   we have told you, we do not expect you to become part of the

22   UEP.

23         What were you communicating there, sir?

24   A.    Yeah, so I think Sparboe Farms had some questions about

25   whether or not we would force them to use the UEP Certified

1   process, and they had asked us some questions verbally and I

2   was responding to Lee letting him know that I did not expect

3   them to be part of the UEP Certified process, as we had put in

4   our specs, that we would allow several different potential

5   processes to be in effect.

6   Q.    And then the second sentence states:  However, I do have

7   to explain the differences internally to our senior

8   management, as some of the other producers will try to use the

9   UEP as a barrier to entry for you guys.

10          Do you see that?

11  A.    Yes, sir.

12  Q.    And what were you expressing there, sir?

13  A.    Yeah, so I had already had communication with others

14  about this program and felt that since they were not part of

15  the UEP, that the UEP leadership, as well as our current

16  incumbent producers would try to say that not being part of

17  the Certified process would -- would disqualify them from

18  shipping to Walmart, that we should disqualify them.  And so

19  based on that, I wanted to let them know that I felt like I

20  was going to have that pressure, and, therefore, I wanted to

21  be able to explain to my senior leaders at Walmart why we were

22  doing what we were doing and how the program matched up to the

23  UEP Certified process.

24  Q.    Okay.  And then did Mr. Regensburger respond with some

25  information?

1    A.    He did.

2    Q.    And generally, how would you describe the information he

3    provided?

4    A.    Yes, so very forthcoming.

5          MR. DESTEFANO:  I would object, again, on hearsay

6    grounds.

7          THE COURT:  Sustained.

8    BY MR. OLSON:

9    Q.    Okay, let's look at the cover e-mail, where you respond

10   to Mr. Regensburger on May 30, 2008.

11         Do you see that?

12   A.    I do.

13   Q.    Is that an e-mail that you wrote, sir?

14   A.    It is.  Yep.

15   Q.    And do you recall writing this e-mail?

16   A.    I do.

17   Q.    And you say:  Thanks for the note, I appreciate the

18   information.  I think you have responded well.  It helps me to

19   clarify to our internal folks.  Walmart does not have a

20   preference for the UEP Program versus another program.

21         Do you see that?

22   A.    That is correct, yes.

23   Q.    And what were you expressing there?

24   A.    Yeah, I was expressing to Lee the fact that we had made a

25   determination that the UEP Certified process was not the only

1    process that we would use, that we'd be willing to use other

2    processes similar to their PVP process, and that that's where

3    we were at.

4    Q.    And do you recall whether Sparboe provided the types of

5    further information that you were interested in reviewing?

6    A.    They did.

7    Q.    And what was your reaction to the information you

8    received?

9    A.    Yeah, so basically when we had a chance to review all of

10   the information, I determined that the PVP program was as good

11   or better than the UEP Program in many ways.  The only -- the

12   only exception to that may be that it didn't cover 100 percent

13   of all flocks.

14   Q.    The only difference between the programs?

15   A.    That is correct.  Where the UEP Program required

16   100 percent of all birds and all farms, where the PVP program

17   that Sparboe was potentially going to use did not have that

18   requirement.  Other than that, it was at least good in every

19   level and in some cases better.

20   Q.    Okay.  So you mentioned that you were -- you had some

21   concerns that Walmart's current suppliers, having learned that

22   Sparboe was in the process, might use the UEP Certified

23   Program as a barrier to entry?  Do you recall that?

24            MR. DESTEFANO:  Objection.

25            MR. BIZAR:  Objection.

1           MS. CRABTREE:  Thank you.

2           THE COURT:  Mr. Bizar is ready to go.  He's now

3    thanked me twice.

4           See you all tomorrow.

5           MR. BIZAR:  See you tomorrow.

6           (Court adjourned).

7

8

                     C E R T I F I C A T E

9

10       I certify that the foregoing is a correct transcript

11   from the record of the proceedings in the above-entitled

12   matter.

13

14

15                        _____

16                        Kathleen Feldman, CSR, CRR, RPR, CM
                         Official Court Reporter

17

18   Date: _____

19

20

21

22

23

24

25