| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) | Judge Charles R. Norgle |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) | |
| Defendants. | ) | |

**RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CERTAIN
VIDEOS AND PHOTOGRAPHS**

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 South Flower
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Terrence J. Truax
Joel T. Pelz
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
ttruax@jenner.com
jpelz@jenner.com
aallen@jenner.com

*Attorneys for Kraft Foods Global, Inc.; The Kellogg Company;
General Mills, Inc.; and Nestlé USA, Inc.*

## INTRODUCTION

Defendants, who conspired to restrain the domestic supply of eggs under the guise of improving animal welfare, move to exclude videos and photographs exposing Defendants' real treatment of hens and the conditions of Defendants' egg production facilities.[1]

Defendants do not want the jury to see their exploitation of hens because the videos, in depicting the abuse, neglect, and poor conditions, show their so-called animal welfare program-- the UEP Certified Program--was a sham. The program was *not* primarily concerned with animal welfare, nor primarily designed to respond to customer demands for animal welfare, but instead was a pretext to restrict egg supply. As Judge Pratter held in the DAP Trial, "this sort of animal abuse evidence is relevant and admissible because it supports the argument that the UEP Certified Program's animal welfare motives were merely pretext for decreasing supply."[2]

Many of Defendants contentions need no referee. Indeed, much of Defendants' motion involves them merely shadowboxing against an opponent who is not there. Defendants point to portions of the videos that Plaintiffs have committed to not use, such as "ominous voiceovers," "captions" and references to "salmonella outbreaks," to argue inadmissibility and prejudice.[3] To state it plainly as possible, Plaintiffs do not and will not seek to introduce the voiceovers, captions, or commentary. Similarly, Defendants argue that any footage in the videos and photographs related to non-conspirator Rembrandt should be excluded. Plaintiffs agreed to not use this material in Trial Stipulation 9, which is reflected in this Court's order.[4]

Defendants focus their motion on these aspects of the exhibits because Defendants know that the videos and photographs are otherwise admissible, even though portions may be graphic. Indeed, if the Court were to exclude this evidence, Plaintiffs would be prejudiced because Defendants could then describe themselves as animal welfare proponents without this highly relevant material to rebut Defendants' portrayal.

---

[1] Defendants' Motion *In Limine* to Exclude Certain Videos and Photographs, Dkt. 161 ("MIL") at 2.
[2] *In re Processed Egg Prods.,* Case No. 08-md-2002 (E.D. Pa.), Dkt. 2004.
[3] MIL at 1-2.
[4] Dkt. 182 at Trial Stipulation 9.

# BACKGROUND

## Facts Relevant to this Motion *in Limine*

In 2002, Defendant UEP announced the creation of a new industry-wide initiative among egg producers called the UEP Certified Program, which it marketed to consumers under an "Animal Care Certified" label. In promotional materials for customers and consumers, Defendants billed the UEP Certified Program as an ██████████████████████████████████████ ███████████████████████████████████████████████[5] ██████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[6] ███████████████████████ ██████████████████████████████████████████████████████████[7]

But Defendants' rhetoric did not reflect the reality inside their egg production facilities.[8] Plaintiffs obtained discovery from the Humane Society of the United States ("Humane Society"), a nonprofit organization that investigates and exposes abuse of animals, including at egg producer facilities. The Humane Society produced videos and photographs of several UEP Certified producers, including videos for each of the three producer defendants in this case, Rose Acre, Cal-Maine, and Michael Foods.

Because Rose Acre was the only egg producer defendant in the DAP Trial (Cal-Maine and Michael Foods had settled), the Humane Society exhibits depicting mistreatment of hens and poor conditions reflected only what was occurring at Rose Acre. The parties agreed in Trial Stipulation 9 that with respect to Rose Acre, Plaintiffs only will seek to introduce what was previously

---

[5] Ex. 1, ████████████████.

[6] *Id.*

[7] *Id.*

[8] In 2004, the Federal Trade Commission investigated Defendants' misleading portrayal of the program as being beneficial to hens' welfare. (*See* Plaintiffs' Response To Defendants' Motion *In Limine* To Exclude Prior Complaints, Investigations, And Settlements, at 2-3.) To avoid further scrutiny, Defendants changed the name of their program from the "Animal Care Certified" program to the "UEP Certified Program." (*Id.* at 3.) The FTC decided not to proceed with an enforcement action based on the change but told Defendant UEP it would continue to monitor the UEP's use and advertising of the rebranded program. (*Id.*)

admitted in the DAP Trial and that there will be a limiting instruction that the evidence is only admissible against Rose Acre.

## ARGUMENT

### I.     The Videos and Photos are Admissible.

As an initial matter, Defendants' request that the Court rule on the authenticity of the videos and photos is premature. Whether a party "can meet Rule 901's authentication standard with respect to [] challenged exhibits is a question best answered at trial" and "[t]here simply is no basis to prejudge [the party]'s ability to meet that standard." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 488 (S.D.N.Y. 2015). Accordingly, courts routinely defer questions of authentication to trial to allow the document's proponent the opportunity to lay a foundation. *See, e.g.*, *McGreal v. Vill. of Alsip*, No. 98 C 3958, 2004 WL 2066915, at *5 (N.D. Ill. Sept. 9, 2004) (ruling that a pretrial motion challenging a party's ability to authenticate document was "premature and must be denied . . . until foundation for the evidence [was] presented at trial").[9]

In any event, contrary to Defendants' claims, Plaintiffs *will* be able to authenticate these videos and photos at trial. Federal Rule of Evidence 901(a) requires that a party authenticate an item like a video by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Authentication can be established in a variety of ways, including by testimony of a witness with knowledge . . . that a matter is what it claimed to be . . . and by distinctive characteristics such as 'appearance, contents, substance, or internal patterns . . . taken in conjunction with the circumstances." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012) (internal quotations and citations omitted). "Only a prima facie showing of

---

[9] *See also United States v. Bereznak*, No. 3:18-CR-39, 2018 WL 1993904, at *4 (M.D. Pa. Apr. 27, 2018), *aff'd*, 860 F. App'x 805 (3d Cir. 2021) (collecting cases where courts denied pretrial motions to exclude evidence based on authenticity and reserving the issue for trial); *Bianco v. Hultsteg AB*, No. 05 C 0538, 2009 WL 347002, at *10 (N.D. Ill. Feb. 5, 2009) ("[W]e do not think it appropriate to grant plaintiff's motion and deprive [defendant] of any chance to lay a proper foundation for use of the [documents]."); *Hilborn v. Chaw Khong Techs.*, Co., No. CIV A 03-CV-71726, 2008 WL 4225783, at *2 (E.D. Mich. Sept. 10, 2008) (denying pretrial motion challenging authenticity where the document might be authenticated by circumstantial evidence at trial); *Superhighway Consulting, Inc. v. Techwave, Inc.*, No. 98 CV 5502, 1999 WL 1044870, at *2 (N.D. Ill. Nov. 16, 1999) (denying pretrial motion to bar unauthenticated evidence and reserving issue for trial); *Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*, No. 90 C 6933, 1996 WL 284940, at *4 (N.D. Ill. May 23, 1996) ("[M]atters of authentication … must await trial.").

genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *Id.* (citing *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997)).

Here, there is no question what these videos and pictures are or where they came from. The Humane Society produced the videos pursuant to subpoenas, the parties deposed two Humane Society witnesses, both Paul Shapiro and James Carlson, and the Humane Society provided a declaration, in addition to live witness testimony of the actual undercover operative, with respect to the video involving Rose Acre. That, in conjunction with the videos' "distinctive characteristics" is more than enough to meet the "prima facie showing of genuineness" for admissibility. *See id.* Even absent all that, these videos could be admitted through testimony from representatives of Defendants themselves. The videos do not purport to show any specific event or series of events, but rather the general, day-to-day conditions at Defendants' facilities. Presumably Defendants would know whether the videos Plaintiffs seek to admit are representative of their operations at the time and, indeed, they have not suggested otherwise in their Motion.

On this point, *United States v. Cejas*, 761 F.3d 717 (7th Cir. 2014), is instructive. There, the defendants sought to exclude video evidence because the proponent did not call the person who filmed the video as an authenticating witness. *Id.* at 725. The court rejected that challenge and the Seventh Circuit affirmed, noting that the defendants could not exclude the video by "simply argu[ing] that [the witness] was not the proper person to establish the genuineness of the video because he … did not personally witness the events the recording captured." *Id*. The appellate court noted that the defendants could not contest that the video showed what the proponents claimed it showed nor give the court any other "sound reason to doubt the video's authenticity." *Id.* at 724. That is the case here. Nowhere do Defendants allege in their Motion that these videos are not images from within their egg production facilities, nor can they. Instead, Defendants cite *Griffin v. Bell*, 694 F.3d 817, 826-27 (7th Cir. 2012), to suggest erroneously that Plaintiffs must "produce the maker of the video before allowing admission of the evidence." (Mot. at 6.) *Griffin* says no such thing. There, a friend of the plaintiff emailed a video of the altercation at issue to plaintiff's lawyer, and the video appeared to be heavily edited. *Griffin*, 694 F.3d at 820. As trial

approached, plaintiff lost contact with the friend, leaving no one with knowledge of "how the video was made, or whether it had ever been altered." *Id.* at 827. Without a way to answer even the most basic questions about the production of the video, the court affirmed exclusion of the video. *Id.*

But, as the court in *United States v. Washington*, No. 16-cr-477, 2017 WL 3642112 (N.D. Ill. Aug. 24, 2017), explained, Rule 901 does not require the person who filmed the video for authentication. In *Washington*, the defendant argued that a law enforcement officer could not authenticate a YouTube video because he "(1) was not present for the recording; (2) c[ould] not testify about the circumstances under which it was filmed, such as where or when it was record (sic.); and (3) lack[ed] personal knowledge about who operated the camera to film the video, what camera he or she used, or whether video was altered after filming." *Id.*at *2. The court rejected that argument, explaining that "[w]hile a witness with such knowledge *could* authenticate th[e] video, Rule 901 does not *require* it." *Id.* (emphases in original); *accord Cejas*, 761 F.3d at 725 As the *Washington* court explained, "evidence that is found by someone else is *routinely* authenticated." *Washington*, 2017 WL 3642112, at *2 (emphasis added).

The Seventh Circuit took a similar approach to the admission of emails in *Fluker*, discussed *supra*. There, the court affirmed the admission of several emails where "neither Borders [the purported author] nor anyone who saw Borders author the emails testified that the emails were actually sent by Borders." 698 F.3d at 999. Instead, the proponent relied on "circumstantial evidence" of the emails' authenticity and authorship, including internal indicia of authenticity and the context of the emails. *Id*.

Here, Plaintiffs already have introduced evidence authenticating the videos and they are prepared to do so again at trial. Beyond that, the videos largely speak for themselves. The jury will see footage of the day-to-day operations within Defendants' facilities. If Defendants feel the videos are not an accurate depiction, they are "free to suggest other interpretations of this evidence," but they cannot exclude them merely by asserting that they "*might* be fake" or otherwise altered. *See Washington*, 2017 WL 3642112, at *3. In short, Plaintiffs can easily meet the "prima facia showing of genuineness" under Rule 901 and the videos are admissible.

## II. The Videos are More Probative than Prejudicial.

Not only are the videos admissible, they also are highly relevant. The depiction of Defendants' mistreatment of hens and poor conditions at their egg production facilities contradicts Defendants' contention that the UEP Certified Program was designed and implemented to improve animal welfare. The heart of the defense is that the egg producers were motivated not by supply restriction or price fixing, but instead by animal welfare concerns, and customer demands related to the same. Defendants want the jury to believe they adopted the UEP Certified Program and its focus on cage size restrictions, the 100% rule, the backfilling ban, and their audits to improve the lives of egg-laying hens. As Judge Pratter ruled in the DAP Trial, "this sort of animal abuse evidence is relevant and admissible because it supports the argument that the UEP Certified Program's animal welfare motives were merely pretext for decreasing supply."[10] The videos and photographs are the best evidence to demonstrate this pretext and rebut Defendants' assertions about their motives and intent because the evidence depicts Cal-Maine and Rose Acre abusing and neglecting hens, and housing them in poor conditions, all while trumpeting their UEP Certified Program as an animal welfare program to egg purchasers.

That the videos and photographs are damning is of no consequence. "[M]ost relevant evidence is, by its very nature, prejudicial." *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010) (internal quotations omitted). Under Rule 403, the Court should exclude relevant evidence only if the probative value of the evidence **substantially** outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. "The Rule does not exclude detrimental relevant evidence, only evidence where its *unfair* prejudice substantially outweighs its relevancy." *United States v. Bright*, 578 F.3d 547, 551 (7th Cir. 2009) (emphasis added). Nor is unfair prejudice satisfied when the evidence is merely adverse to the opposing party. *See Baker v. Canadian Nat'l/Illinois Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008).

Defendants lament that the videos are graphic, even requiring YouTube "content warnings," and were designed to "inflame passions and garner opposition to modern egg

---

[10] *In re Processed Egg Prods.,* Case No. 08-md-2002 (E.D. Pa.), Dkt. 2004.

farming."[11] But "[g]ruesomeness alone does not make photographs inadmissible." *United States v. Naranjo,* 710 F.2d 1465, 1468 (10th Cir. 1983). A gruesome photograph or image does not eliminate the image's probative value. *See Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 718-19 (N.D. Ill. 2009) (denying a motion to bar "gruesome photographs" because "[o]nly a picture can convey the extent and severity of the injury and thus the legitimacy of the plaintiff's claimed physical suffering . . . .").

Defendants also argue that Plaintiffs should not be able to introduce portions of the videos that include captions, commentary, interviews with third parties, and "ominous music." (Mot. at 3.) This argument is a red herring. Plaintiffs already have informed Defendants that they will not seek to admit any captions, commentary, music, or the like. The parties agree on that. For that reason, many of the cases Defendants cite in their Motion do not apply here. *See Church of Universal Love & Music v. Fayette Cnty.*, No. CIV.A. 06-872, 2009 WL 159272, at *2 (W.D. Pa. Jan. 22, 2009) (excluding video clip from television show that contained interviews, slanted commentary, and a laugh track); *Walker v. Cnty. of Cook*, No. 05 C 5634, 2009 WL 65621, at *4 (N.D. Ill. Jan. 9, 2009) (requiring prior court approval to admit newspaper write-ups and other "media accounts"); *Kallstrom v. City of Columbus*, 165 F. Supp. 2d. 686, 692-93 (S.D. Ohio 2001) (striking references to television news broadcasts).

The other cases Defendants rely upon do not support excluding this evidence. Defendants again cite *Griffin*, where the Seventh Circuit affirmed exclusion of a video showing only a small part of a larger altercation between the plaintiff and the defendant. *See* 694 F.3d at 826-27. Much of the case in *Griffin* hinged on the exact sequence of events in the altercation that led to the suit, but the proffered video "showed only a small part of the incident and included gaps where the camera was not pointed at the struggle." *Id.* at 820. "For example, the video did not show the beginning of the altercation, when Griffin attacked Bell, but showed only parts of the scuffle that appeared favorable to Griffin." *Id.* The situation here is much different. Unlike in *Griffin*, Plaintiffs

---

[11] MIL at 2, 9.

do *not* purport that these videos document a specific "incident at the heart of this trial," where it is crucial that the videographer captured the beginning, the middle, and the end without interruption. *See Washington*, 2017 WL 3642112, at *3-4 (distinguishing admission of YouTube video from video at issue in *Griffin*). Rather, these videos show imagery representative of the day-to-day conditions within Defendants' operations. Even if the videos only depict how *some* of the hens at the facility were treated, the fact that those hens suffered through deplorable treatment and conditions shows Defendants' claims about the animal welfare benefits of the UEP Certified Program are a pretext. Defendants may argue as to the videos' weight or significance, but that does not mean they are inauthentic. *See id.* at *3.

Defendants' reliance on *Mills v. Riggsbee*, No. CIV.A. 05:12-148-KKC, 2013 WL 6243951 (E.D. Ky. Dec. 3, 2013), similarly is misplaced. As in *Griffin*, the plaintiff in Mills sought to introduce video of a specific event—namely a mishap with a fire hose that caused the plaintiff injury. *Id.* at *1. There was just one problem: *none of the proffered video actually captured the event. Id.* After reviewing the exhibit, the court found that the video showed "four separate scenes recorded from different angles by four different security cameras, *none of which were focused on the side of the fire truck where the accident occurred.*" *Id.* (emphasis added). Understandably, the court excluded the video as it was little more than "confusing security footage that show[ed] an incomplete view of the accident scene." *Id.* at *3. *Mills* is completely inapplicable here.

And, for largely the same reason, so is *Holland v. Walter Kidde Portable Equip., Inc.*, No. 2:05-CV-325-TMP, 2008 WL 11375379 (N.D. Ala. Apr. 17, 2008). *Holland* was a suit over an allegedly defective smoke alarm. The plaintiff sought to introduce a 20/20 news report about smoke alarms but the court found the report pertained to "other smoke alarms" not at issue in the case and reported on circumstances "dissimilar" to the facts in *Holland*. *Id.* at *1. Accordingly, the court found the proffered video to be "irrelevant." *Id.* Here, Plaintiffs seek to introduce videos of the very Cal-Maine and Rose Acre facilities at issue in this case.

Defendants also cite *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, but that case too is irrelevant. In *Johnson*, the plaintiff's son died when his head was caught in a cotton press he

was operating. *See* 604 F.2d 950, 952 (5th Cir. 1979). The plaintiff sought to admit a video taken in the factory where his son died, but the court refused to admit it. *Id.* at 958. On appeal, the circuit court affirmed the exclusion of the video because (i) "only a small portion of it portrayed the particular part of the press involved in [the] accident"; and (ii) it showed that guards had been installed on the press after the accident. *Id.* Neither concern is present here. First, every second of the videos Plaintiffs seek to admit is relevant to a crucial point in this case: Defendants' animal welfare rhetoric surrounding the UEP Certified Program is belied by their mistreatment of hens and poor conditions, undermining the very core of their defense. Second, this is not a tort case where Defendants might be unfairly prejudiced by evidence that they have taken steps to improve the conditions that caused the harm—indeed, the Court *should* bar evidence about the producers' subsequent improvements in their facilities. *Accord* FED. R. EVID. 407 (restricting admissibility of "measures taken that would have made an earlier injury or harm less likely to occur"). The videos certainly do not depict those improvements.[12]

In short, Defendants have not shown any reason why the video or photographic evidence should be excluded in this trial. The videos can and will be authenticated, they are highly relevant, and they will not cause undue prejudice. The videos and photos will not contain commentary, music, or captions—only images of Defendants' own facilities. That those images may be disturbing is not a bar to admission. *See Thakore*, 670 F. Supp. at 718. Sometimes the truth hurts, but that is not reason enough for Defendants to exclude relevant evidence from the jury's purview. The videos and photographs here are highly relevant and belong in this case. The Motion should be denied.

---

[12] The cases cited in footnote 4 of the Motion also are unavailing for Defendants. In *Bolstridge v. Cent. Maine Power Co.*, 621 F. Supp. 1202 (D. Me. 1985), a personal injury plaintiff sought to admit a video demonstrating how her injury had impacted her daily life. The court noted that the plaintiff's knowledge "of being videotaped for such a purpose [was] likely to cause self-serving behavior," and the editing of the tape similarly raised questions about its self-serving nature. *Id.* at 1203-04. Here, Defendants had no idea their facilities were being taped so there is no concern they were altering their conduct for the camera. Defendants also cite *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W. Va. 492, 345 S.E.2d 791 (1986), but in that case the court *admitted* video evidence over many of the same objections Defendants make here. *Id.* at 497. The court found the video to be relevant and the danger of undue prejudice was low where there was "no artistic highlighting that emphasize[d] some scenes or photographs more than others." *Id.* that is the case here, where Plaintiffs intend to submit video evidence of Defendants' facilities without comment or artistic license.

## CONCLUSION

For these reasons, Plaintiffs respectfully ask this Court to deny Defendants' motion *in limine* to exclude certain videos and photographs from the trial. The images are highly relevant to Defendants' underlying defense, the probative value of the evidence far outweighs its prejudicial nature, and Defendants will not be unfairly prejudiced by the admission of this significantly probative evidence.

September 16, 2022

Respectfully submitted,

**Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company**

/s/ Brandon D. Fox
Brandon D. Fox
Amy M. Gallegos (*pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
aallen@jenner.com