# EXHIBIT G

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 6

 7
                             - - - - -
 8

 9                         PHILADELPHIA, PA

10
                             MAY 9, 2018
11                             DAY SIX

12

13   BEFORE:     THE HONORABLE GENE E.K. PRATTER, J.

14

15                           - - - - -

16                        TRIAL TRANSCRIPT

17                           - - - - -

18

19

20

21          KATHLEEN FELDMAN, CSR, CRR, RPR, CM
            Official Court Reporter
22          Room 1234 - U.S. Courthouse
            601 Market Street
23          Philadelphia, PA  19106
            (215) 779-5578
24

25
        (Transcript produced by mechanical shorthand via C.A.T.)
```

1    A.    Correct.

2    Q.    And how those costs were allocated or passed on or how

3    they were negotiated in a pricing formula was the subject of

4    negotiation?

5    A.    Yes.

6    Q.    You mentioned Walmart.

7    A.    Yes.

8    Q.    And you noted that Michael Foods joined the UEP Certified

9    Program in 2006, correct?

10    A.    Correct.

11    Q.    That was to accommodate Walmart, correct?

12    A.    Oh, yeah, among a couple others, but that was one of the

13    drivers, I think.

14    Q.    What were the others that you were accommodating?

15    A.    Well, I think some of these were these retail accounts

16    that we've just been discussing.  I'm trying to think who

17    else.  There probably was more, they're just not coming to

18    mind at the moment.  But there were some others who were in

19    the wings or waiting or looking into it, so...

20    Q.    Walmart required Michael Foods to become UEP Certified --

21    A.    Yes.

22    Q.    -- in order to sell eggs to Walmart; is that correct?

23    A.    Yes.

24    Q.    Were you involved in those discussions?

25    A.    Yeah.  I was in Bentonville, Arkansas in a meeting with,

1  I think the buyer was Gary Pickett, I think his name was, he
2  was the egg buyer for corporate Walmart in those days.  And so
3  one of our retail sales vice-presidents and I went down and
4  had a meeting with Gary just to try to understand exactly what
5  we needed to do and what he would accept or -- you know.  And
6  at the end of the day, it was, we needed to be UEP Certified
7  with a logo, which UEP Certified has a logo or had a logo, and
8  that logo had to be on their cartons.  And, again, this was
9  the liquid egg products, the better than egg product that was
10 on the -- that would be in the dairy case.
11 Q.   And was the logo important to Walmart?
12 A.   It was at that point, yes, it was.
13 Q.   And --
14 A.   It probably still is today.  I'm just not familiar with
15 it.
16 Q.   You understood that from your meetings with the Walmart
17 people?
18 A.   Yes.  Yes.
19 Q.   Were you talking with any other companies that were also
20 trying to get into Walmart at this time?
21 A.   Yeah.  There was -- our competitors were from ConAgra.
22 Q.   Okay.  Did you talk to Sparboe?
23 A.   Yes.  And there was some conversation, we had some
24 correspondence with Sparboe.
25 Q.   And did you talk --

1  A.    They're on the shell side of it.
2  Q.    Right.
3        Did you talk to Beth Schnell?
4  A.    I did.
5  Q.    Who is Beth Schnell?
6  A.    Beth Schnell was the -- I believe she -- she was the
7  president or vice-president of -- of Sparboe Farms based in
8  Minnesota.  And the reason I'm hesitating, she -- her father
9  was the founder, Robert -- Bob Sparboe was the founder, and
10 she was -- that was her dad.  And I can't remember when he --
11 he passed away suddenly and his daughter became the president
12 of the company.  I don't know if that was '06 or if that
13 was -- it was sometime right after, maybe.  That's my only
14 hesitancy.  I just don't remember the day.  But anyway, she
15 was very active in the Sparboe -- their business and their
16 customer base.
17 Q.    And do you recall whether Beth Schnell was trying to
18 convince Walmart to purchase non-certified eggs?
19 A.    Yes, she -- she went down -- she had meetings with them
20 and specifically tried to convince them that there was
21 proprietary programs of animal welfare that were comparable to
22 UEP's in most -- in almost every way.  But Walmart was really,
23 really locked into the UEP Certified at that point in time.
24 Q.    So you know that Beth Schnell was going down to Walmart
25 trying to negotiate an exception or a change from

1   Walmart's demand for Certified eggs and the logo you
2   described?
3   A.   Yes.
4   Q.   Were you part of those discussions?
5   A.   Not -- not with her.  We independently, when we were
6   there, we brought up the same issue, a similar kind of
7   question about a comparable program or proprietary program.
8   But they had already really locked and loaded onto the logo
9   and the UEP Certified Program.
10  Q.   Did Ms. Schnell tell you about her efforts?
11  A.   Yes, she did share some of the -- some -- some of the
12  pieces of her visit and her endeavors, so...
13           MR. CALLOW:  May I approach the witness, Your Honor?
14           THE COURT:  Yes.
15  BY MR. CALLOW:
16  Q.   Mr. Baker, I've handed you what I've marked as
17  Defendants' Cross Exhibit 210.
18           Can you identify this document?
19  A.   Yes, I can.
20  Q.   What is this document?
21  A.   It was an e-mail from our CEO in November of 2005.  The
22  CEO at that time was Gregg Ostrander, and it was sent to
23  Mr. Clarkson, myself, our general managers for food ingredient
24  retail, Vince O'Brien, and our food service VP, Michael Elliot
25  and our retail VP, along with our CFO, Mark Westphal.

1    Q.   And he asked you to review Ms. Schnell's report; is that
2    correct?
3    A.   Yes.
4         MR. CALLOW:  Your Honor, I'd like to move
5    Exhibit 210 into evidence and show it to the jury.
6         MR. NEUWIRTH:  No objection, Your Honor.
7         THE COURT:  Very well, 210 is admitted.
8    BY MR. CALLOW:
9    Q.   So Ms. Schnell provided Michael Foods with the summary of
10   her meetings with individuals at Walmart, including Gary
11   Pickett, who you identified, and Betty Marshall.  Do you see
12   that, sir?
13   A.   Yes, I do.
14   Q.   And there were discussions regarding not only the
15   Certified Program, but Walmart's insistence on having the seal
16   as well, correct?
17   A.   Yes.
18   Q.   All right.  And the dilemma what you were facing at
19   Michael Foods is at this point in time, you're not part of the
20   Certified Program, correct?
21   A.   Not at this juncture we were not.
22   Q.   And your competitors, like Sunny Fresh and ConAgra, are
23   also trying to get the Walmart business?
24   A.   Yes.
25   Q.   And Michael Foods has to decide whether to join the

1   Certified Program in order to accommodate Walmart's demands at
2   this point, correct?
3   A.   Yes.
4   Q.   Ms. Schnell was agitated that she could not convince
5   Walmart to change its mind; is that correct?
6   A.   Yes, I think that's a good description.
7   Q.   She made all sorts of arguments, she tried different
8   things.  Walmart would not change its mind to be UEP
9   Certified; is that correct?
10  A.   Yes.  Right.
11  Q.   And eventually is that why Michael Foods chose to be part
12  of the Certified Program?
13  A.   That among other things, but this was a big piece of it,
14  yes.
15            MR. CALLOW:  Your Honor, may I approach?
16            THE COURT:  Yes.
17  BY MR. CALLOW:
18  Q.   Sir, I've handed you what, for trial purposes, I've
19  marked as Defendants' Cross Exhibit 213, February 2006 e-mail
20  chain.  Do you see that, sir?
21  A.   Yes.
22  Q.   Can you identify this for the record?
23  A.   Yes.  This was an e-mail from Jeff Thomas to myself
24  regarding the UEP Certified issue and a meeting with Sam's,
25  and then this was occurring in February of 2006.

1  Q.  So this helps give us a time frame for when you went down
2  to Bentonville to talk with the Walmart/Sam's people?
3  A.  Yes.
4  Q.  Do you recall more than one meeting with Walmart?
5  A.  I was only at one personally, but I think there might
6  have been -- I'm sure there were others with our sales team
7  and from retail, but I was only at one that I can recall.
8          MR. CALLOW:  Your Honor, I'd like to admit this
9  exhibit into evidence and display it to the jury.
10         MR. NEUWIRTH:  No objection, Your Honor.
11         THE COURT:  Okay.  213 is admitted.
12 BY MR. CALLOW:
13 Q.  Sir, I want you to focus on the bottom e-mail that's sort
14 of starts this chain --
15 A.  Okay.
16 Q.  -- which has some of the questions that they wanted to
17 ask about.  Do you see that?
18 A.  Yes.
19 Q.  And you'll see that there's a second paragraph that
20 starts:  We have had three go-arounds with the buyer at Sam's
21 as it pertains to UEP.  It was made very clear to us, without
22 exception, that the largest retailer in the world is going to
23 sell UEP eggs.  They don't care what kind of carton they are
24 in, with the shell on or not, this is coming down from
25 corporate and it is a final conversation.

```
 1              Do you see that?
 2   A.   Yes, I do.
 3   Q.   And that was the pushback you were getting in your
 4   discussions as well, correct?
 5   A.   Yes.  Yes.
 6   Q.   There's a reference here that:  Some UEP Certified
 7   vendors are telling Walmart that they are getting more eggs
 8   since they started following the guidelines which has lowered
 9   their cost of eggs.
10              Do you see that?
11   A.   Yes.
12   Q.   Do you recall any discussions that you had with Walmart
13   in Bentonville in the March 2006 time frame on that particular
14   issue?
15   A.   I don't recall specifically, no.
16   Q.   There's another question that was asked:  Does Michael
17   Foods follow UEP Guidelines?  And if so, what has it done to
18   their cost of eggs?
19              Do you see that?
20   A.   Yes.
21   Q.   Was that one of the discussions that you had at your
22   Walmart meeting in March of 2006?
23   A.   Yeah, I believe there were those kinds of questions that
24   were asked.
25   Q.   Did you know what the cost was going to be at that time?
```

1   A.   No.  We were just estimating at that point.  We didn't
2   know for sure.  We knew that -- when you increased the density
3   or lowered -- how depending on the context, if you give the
4   birds more space, you do get a small increase in production or
5   productivity.  But it doesn't offset the overall costs.  But
6   there were people who -- who experienced higher levels of
7   production on a per-bird basis because of the additional
8   space.  But, again, it doesn't really equalize out with the
9   higher cost, the facility cost and the capital cost.  So at
10  the end of the day, there was still a cost increase to do UEP
11  Certified.
12             MR. CALLOW:  Your Honor, may I approach?
13             THE COURT:  Yes.
14  BY MR. CALLOW:
15  Q.   Sir, I've handed you what I've marked for trial purposes
16  as Defendants' Cross Exhibit 214.  Is that your name at the
17  top of this document?
18  A.   Yes, it is.
19  Q.   Can you identify this document for the record?
20             MR. NEUWIRTH:  Your Honor, before it's identified,
21  may we approach at a sidebar, please?  There's a significant
22  issue with this document.
23             THE COURT:  Yes.  Come on up.
24             (The following transpired at sidebar:)
25             THE COURT:  Oh, sure, well, I'll tell you what,

1  since we've got -- two, four, six -- a half a dozen, you go
2  sit down and we'll give the jury a break.
3         So don't talk about the case.  Come on back in five,
4  six minutes.
5         (End of sidebar.)
6         THE COURT:  Okay, what's up?
7         MR. NEUWIRTH:  Your Honor, during the testimony of
8  Mr. Airoso from -- oh, can we excuse the witness?
9         THE COURT:  Oh, sure.
10        Why don't you step down, Mr. Baker, and go enjoy the
11 hallway.
12        (Witness steps out of the courtroom.)
13        THE COURT:  You all can sit down.  I'm just standing
14 up because I'm tired.
15        MR. NEUWIRTH:  The issue, Your Honor, is this:
16 During the testimony of Mr. Airoso from Walmart, there were
17 documents handed to the witness by the Plaintiffs' counsel,
18 including a letter from Mr. Poole and -- of Walmart, and the
19 Defendants stood up and objected that because the letter was
20 unsigned and because of their concern that it was hearsay,
21 even though this was a witness from Walmart, that that letter
22 should not be introduced, it should not even be discussed by
23 Mr. Airoso, who wanted to address the authenticity of that
24 document that the UEP was -- this is counsel for -- this is
25 counsel for Michael Foods.

```
 1                THE COURT:  We've met before.
 2                MR. NEUWIRTH:  Yes.  And if Ms. Anderson is going to
 3    be here, I hope there will be an instruction that what we are
 4    discussing cannot be shared by --
 5                MS. MAHAN:  If you'd like me to leave, Your Honor,
 6    I'm happy to leave.
 7                THE COURT:  Well, I mean --
 8                MS. MAHAN:  Carrie Mahan.
 9                MR. NEUWIRTH:  I'm sorry.  I apologize.
10                MS. MAHAN:  I'll wait in the hall.  But I do have a
11    timing question before we come back.
12                MR. NEUWIRTH:  But you sustained that objection.
13    Now the Defendants in, I think, in overt violation of the
14    goose/gander rule, are seeking to show this witness an
15    unsigned letter, which does have a cover e-mail on it, but so
16    did the document that Mr. Olson tried to review with
17    Mr. Airoso, and you granted the Defendants' motion on hearsay
18    grounds, he could not even talk about that letter from his own
19    company.  And so we would object.  We believe that it's only
20    fair that the same treatment be given to this unsigned
21    letter --
22                MR. OLSON:  Can I make a clarification?  Your Honor,
23    I think what we request, this comes in with an explicit
24    limiting instruction --
25                THE COURT:  Well, I would have thought that the
```

1  objection was going to be that this is really just redundant

2  because we've already gone over the Walmart view and

3  Mr. Baker's knowledge of Walmart having a particular approach.

4  I mean, this is just cumulative.

5        MR. OLSON:  But, Your Honor, it's actually much

6  worse than that from our perspective.  This is -- the reality

7  is, for what it's worth, Your Honor --

8        THE COURT:  The last time I'm going to do

9  anybody's work for them.

10       MR. OLSON:  We believe these letters were forged.

11       THE COURT:  Well, I'm not going there right now.

12       MR. OLSON:  I understand that.  That's what we would

13  have brought out --

14       THE COURT:  I have no basis on which to --

15       MR. OLSON:  I'm just letting you know where we're

16  going.  I'm letting you know where we're going.

17       THE COURT:  And if we're going to have a side

18  hearing on that issue, then we're going to do that either at

19  the end of the day after school is out or something else,

20  but --

21       MR. OLSON:  I'm not asking you to agree.  I'll just

22  let you know where we're going.

23       THE COURT:  I think it's cumulative.

24       MR. NEUWIRTH:  If that's a basis to keep it out,

25  fine.  But the concern -- just please, if I might just say

1   this.

2           THE COURT:  Okay.

3           MR. NEUWIRTH:  The concern is that we were denied
4   the opportunity to let the witness from Walmart explain the
5   basis for --

6           THE COURT:  And I recall that, I recall that.

7           MR. NEUWIRTH:  -- saying that these were misleading.
8   And so for the Defendants now to try to use these same types
9   of letters seems totally prejudicial to the Plaintiffs, and
10  I'll just use the word goose/gander rather than a word with
11  the H.

12          MR. OLSON:  And if I may, if the Defendants are
13  doing this, which they're doing, they've already presented
14  Walmart things.  We had Chad Gregory on the stand.  All we'd
15  ask from the goose/gander perspective, because he was involved
16  in all of this, that we are allowed to establish with
17  Mr. Gregory the basis for why we believe these letters are
18  inauthentic.

19          MR. CALLOW:  I don't know anything about Chad
20  Gregory or this issue.

21          Terry Baker has an e-mail that was produced by
22  Michael Foods, that the attachment is associated with it.  I
23  intend to ask the witness if he received an e-mail and
24  attachment.  That's the sole basis.  If it's cumulative, I
25  understand, Your Honor.

1           THE COURT:  How can it not be cumulative?  I've been
2    sitting here for -- I don't know how long.
3           MR. CALLOW:  I understand.
4           THE COURT:  And we've talked a lot about Walmart and
5    Walmart's views and whether they're a big customer or not big
6    customer.
7           MR. CALLOW:  I will move on.
8           THE COURT:  Good.  Okay, so you're not going to be
9    offering 214?
10          MR. CALLOW:  No, I will not.
11          THE COURT:  All right.  Now, if we do need to
12   revisit -- well, let me step back.
13          I've not heard that anybody is saying that any
14   counsel involved in this trial has any reason to believe or to
15   be offering or proposing or be proponents of documents known
16   to be false or fraudulent.  Is that correct?
17          MR. OLSON:  May I?  May I?
18          THE COURT:  I'm not hearing that.
19          MR. NEUWIRTH:  I was just going to say, the issue is
20   not an issue about any of the counsel here.  It's about what
21   happened factually at the time by the people at the UEP.
22          THE COURT:  Okay.  If that becomes important with
23   Chad, then let's talk about that separately.
24          MR. NEUWIRTH:  Okay.
25          MR. OLSON:  Okay, thank you, Your Honor.

```
 1             MR. CALLOW:  I will move on from Walmart,
 2   Your Honor.
 3             THE COURT:  I think we covered Walmart.
 4             MR. CALLOW:  I understand.
 5             MR. DESTEFANO:  Can we have a break?
 6             THE COURT:  Oh, yes, by all means bring the jury
 7   back.  If you all need a break, I mean, very quickly.
 8             (After recess:)
 9             THE DEPUTY CLERK:  All rise.
10             (Jury in.)
11             THE COURT:  All right, everybody take their seats.
12             Mr. Callow, you may resume.
13             MR. CALLOW:  Thank you.
14   BY MR. CALLOW:
15   Q.   Mr. Baker, do you recall any discussions that you had
16   with Yum! Corporation, which owns Taco Bell, in the 2003 time
17   frame regarding Animal Welfare Guidelines?
18   A.   I don't recall, to be honest.
19   Q.   Do you recall discussions with Ben & Jerry's when Ben &
20   Jerry's wanted to have Animal Welfare Guideline eggs?
21   A.   Yes, I do Ben & Jerry's.  And then the Ben & Jerry's
22   relates to Unilever, since they're owned by Unilever, and they
23   still are today.  And so we were having conversations with Ben
24   & Jerry's and Unilever.
25   Q.   And what other products does Unilever manufacture for
```