# EXHIBIT I

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 6

 7                           - - - - -

 8

 9                      PHILADELPHIA, PA

10

                           MAY 7, 2018
11                          DAY FOUR

12

13   BEFORE:       THE HONORABLE GENE E.K. PRATTER, J.

14

15                           - - - - -

16                      TRIAL TRANSCRIPT

17                           - - - - -

18

19

20

21              KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                Official Court Reporter
22              Room 1234 - U.S. Courthouse
                601 Market Street
23              Philadelphia, PA  19106
                (215) 779-5578
24

25
            (Transcript produced by mechanical shorthand via C.A.T.)
```

 1                    THE WITNESS:  Thank you.

 2                    (Witness exits.)

 3                    THE COURT:  Plaintiff may call its next witness.

 4                    MR. OLSON:  Your Honor, Plaintiffs call Anthony

 5      Airoso.

 6                    THE DEPUTY CLERK:  Would you please remain standing

 7      and raise your right hand.

 8                    (Witness sworn.)

 9                    THE WITNESS:  I do.

10                    THE DEPUTY CLERK:  Would you please have a seat and

11      state your full name and spell your last name for the record.

12                    THE WITNESS:  Anthony Airoso, A-I-R-O-S-O.

13                    THE COURT:  Mr. Airoso, how are you today?

14                    THE WITNESS:  I am good.  How are you?

15                    THE COURT:  So far so good.

16                    THE WITNESS:  Good.

17                    THE COURT:  Stay tuned.

18                    THE WITNESS:  Okay.

19                    THE COURT:  Make sure you're comfortable and keep

20      your voice up so everybody can hear you.

21                    THE WITNESS:  Yes, ma'am.

22                    THE COURT:  You may proceed.

23                              DIRECT EXAMINATION

24      BY MR. OLSON:

25      Q.   Good afternoon, Mr. Airoso.

1    A.   Good afternoon.

2    Q.   Could you please tell the jury who your current employer

3    is?

4    A.   Yes.  I'm currently employed with Walmart.

5    Q.   And what is your current job position?

6    A.   I am the senior vice president of foods strategic

7    sourcing for Walmart.

8    Q.   And in that role as senior vice-president, do you have

9    nationwide responsibilities?

10   A.   I do.

11   Q.   And what sort of presence does Walmart here have in

12   Pennsylvania?

13   A.   Yes, in Pennsylvania, we have about 160 stores.  We

14   employ about 52,000 associates and we purchase about

15   $9 billion in goods and services from companies that are from

16   Pennsylvania.

17   Q.   All right.  Let's go back in time a bit.  Please tell the

18   jury when you started working at Walmart and what your job was

19   at that time.

20   A.   Yes.  I started with Walmart in May of 2006 and I was

21   part of the Finance Department.

22   Q.   Was there a point in time when you became involved in

23   purchasing eggs for Walmart?

24   A.   Yes.  In the fall of 2007, I became the divisional

25   merchandising manager for dairy, and eggs were part of the

1    dairy department.

2    Q.    Okay.  And who did you report to in that role?  What was

3    the name of the person?

4    A.    I reported to Pam Kohn.  She was the general merchandise

5    manager for fresh foods.

6    Q.    So you were the DMM and she was the GMM; is that right?

7    A.    That is correct.

8    Q.    And who did you replace as the DMM?

9    A.    Yeah, I replaced Scott Poole.

10   Q.    Were there folks who reported to you that had specific

11   responsibility for purchasing eggs?

12   A.    When I took over, for a short period of time, a gentleman

13   named Tommy Reed was buying eggs, and he was replaced in short

14   order by Clay Adams.

15   Q.    Okay.  So -- and was Mr. Adams then in that role

16   reporting to you with responsibility for purchasing eggs for

17   some time?

18   A.    That is correct.

19   Q.    Okay, so you mentioned Pam Kohn, Scott Poole, and Clayton

20   Adams.  Are any of those folks still employed by Walmart

21   today?

22   A.    No, they are not.

23   Q.    Now, when you took over the position in 2007 with

24   responsibility for buying eggs at Walmart, what was the

25   general process that Walmart used for purchasing eggs?

1    A.    So at that point in time, it was kind of an ad hoc

2    process.  We had incumbent suppliers in each of our 41

3    distribution centers, and it was kind of an ad hoc process in

4    terms of understanding what the prices were and whether or not

5    they would continue to have each of the distribution centers

6    they had.

7    Q.    And when you say "incumbent suppliers," are you referring

8    to the current producers who were selling eggs to Walmart?

9    A.    That is correct.  So that would have been folks like

10   Cal-Maine and CCF, or Country Creek Farms, folks like that.

11   Q.    And what is CCF?

12   A.    CCF, Country Creek Farms, they were a broker of eggs for

13   the most part, and they sold us eggs on behalf of folks like

14   Rose Acre and other producers.

15   Q.    So was it the case that Walmart was purchasing eggs that

16   were produced by Rose Acre through Country Creek Farms?

17   A.    That is correct.

18   Q.    Okay.  So when you came into the role at this time, was

19   Walmart buying from Sparboe Farms?

20   A.    We were not.

21   Q.    Now, did you, in your new role, make any changes to

22   Walmart's process for buying eggs?

23   A.    I did.  Yes.  So shortly after taking the role, I

24   determined that we should change the way we're buying eggs,

25   and so we went to a process where we decided to bid out the

1    eggs in a formal bid process and to have that length of

2    contract be closer to three years versus kind of an ad hoc

3    situation.  So the changes were made in shortly after I

4    started.

5    Q.    So essentially, you made the bidding process more formal

6    and went to longer-term contracts?

7    A.    That is correct.

8    Q.    And what criteria did Walmart use in awarding business

9    within that formal bidding process for eggs?

10   A.    Yeah.  So the three major components of deciding who to

11   award the business to would be food safety, quality and price,

12   and we were looking for competitive prices.

13   Q.    And did you have an understanding of whether Walmart was

14   one of the larger egg producers while you were in that role?

15   A.    Yeah.  We may have been the largest, yeah.

16   Q.    Do you have an understanding, sir, about whether Walmart

17   is a member of the Class on behalf of who has brought this

18   case?

19   A.    I believe we are part of the Class, yes.

20   Q.    Okay.  Let's talk about something called the UEP

21   Certified Program.  Are you familiar with that term?

22   A.    I am.

23   Q.    When do you recall first learning about the UEP Certified

24   Program?

25   A.    Okay, in -- shortly after starting as a DMM of the dairy

1    department, I began having meetings with all the key suppliers

2    over all the various departments, yogurt, juice, milk,

3    whatever it might be.  I met with our key suppliers in eggs,

4    Cal-Maine and Country Creek Farms, and during one of the

5    meetings with Country Creek Farms, they recommended that I

6    meet with UEP and with their leadership, specifically Gene

7    Gregory.  I did have one of those meetings and at that point

8    in time, they explained to me about what the UEP Certified

9    process was.

10   Q.   And when you say you met with UEP, that's the United Egg

11   Producers?

12   A.   That is correct.

13   Q.   And so you did meet with Mr. Gregory?

14   A.   I did.

15   Q.   Did you have an understanding of what his role was at the

16   time at UEP?

17   A.   Yes.  So he would have been the president of the

18   organization.

19   Q.   And in the course of learning about the Certified

20   Program, did you come to learn whether Walmart had been a

21   supporter of the UEP Guidelines?

22   A.   I did.  So going through that process and meeting with

23   Mr. Gregory, I did learn that Walmart had been a supporter of

24   the UEP Certified process for several years.

25   Q.   Now, did you understand at this time that the UEP

1    Certified Program included a requirement, sometimes called the

2    100% rule, which provided that a producer, in order to be

3    certified to sell to any customers who wanted certified eggs

4    would have to be certified on all of their facilities

5    regardless of whether all their customers wanted certified?

6    A.    Yeah, I was not.  What I understood it to be was a set of

7    guidelines that were based on scientific information that were

8    put in place to protect the animal welfare of the hens that

9    were laying, and that farms needed to be certified so they

10   could sell eggs.  And that was part of the Walmart

11   specifications at the time.

12   Q.    And did you gain any understanding of whether prior folks

13   at Walmart in your role had any knowledge of this 100% rule?

14   A.    Yes.  So, you know, speaking with Mr. Poole and others at

15   Walmart, nobody ever mentioned anything about the 100% rule or

16   anything to that end around certified process.

17   Q.    Okay.  Let's put that 100% rule to one side for a moment.

18         Do you recall your reaction to the Certified Program

19   when you learned about the guidelines?

20   A.    Yeah, in general, at Walmart, we were supportive of it.

21   We were happy that the industry was using scientific-based

22   processes to understand how they should be treating the hens,

23   the welfare that they would have, and that that would improve

24   that, and for several years, at that point in time, we had

25   been requiring improved animal welfare at Walmart.

1  Q.   Mr. Airoso, did Walmart, to your knowledge, ever ask the

2  United Egg Producers or its members to put together a

3  certified program for their hens?

4  A.   Yeah, absolutely not.  There's no question in my mind

5  that the program was put together by the UEP.  It was brought

6  to Walmart; it was shared with us as a program to improve

7  animal welfare, and we adopted those practices.

8  Q.   Do you recall Walmart, while you were in this role,

9  receiving pressure from animal rights groups to sell certified

10  eggs?

11  A.   No.

12  Q.   Let's talk briefly about how eggs are priced at Walmart.

13  Have you heard of something called the Urner Barry price?

14  A.   I have.

15  Q.   And can you describe for us lay-folks and to the jury

16  what the Urner Barry price is?

17  A.   I'm kind of a lay-folk too.  So I'll do my best.  Urner

18  Barry is a publication that's put out daily by the Urner Barry

19  publications group, and it's used within the industry to set

20  pricing for eggs at the producer level, processor level,

21  distribution level, and like somebody buying eggs like Walmart

22  for a retail -- retail store.  It's used throughout the supply

23  chain, and it would have been part of the basis for how

24  Walmart would have purchased eggs.

25  Q.   Is it something like a benchmark price?

1  A.  It is.

2  Q.  And did the Urner Barry price affect what Walmart itself

3  would pay for eggs?

4  A.  It did.  The Urner Barry was the baseline, and then our

5  price at Walmart would be either a discount to or a plus up to

6  the Urner Barry price, and that's kind of the benchmark we

7  would start from.

8  Q.  So, Mr. Airoso, if egg producers had engaged in conduct

9  that would reduce supply and affect this benchmark price,

10  would that increase the price that Walmart would pay for eggs?

11  A.  Absolutely.

12          MR. DESTEFANO:  Objection.

13          MR. BIZAR:  Objection.  Leading, Your Honor.

14          THE COURT:  Sustained.

15  BY MR. OLSON:

16  Q.  Would changes, Mr. Airoso, in the Urner Barry benchmark

17  price affect the price that Walmart would pay for eggs?

18  A.  They would.

19  Q.  And is that both up and down?

20  A.  That is correct.

21  Q.  Okay.  You've mentioned earlier that when you came into

22  the role, you didn't hear about the 100% rule.

23  A.  Correct.

24  Q.  Was there a time when you became -- when you first heard

25  of that requirement?

1    A.    I did.  In May of 2008.  So at that point in time began

2    the process of doing the bidding process, and we began to look

3    at some suppliers that were not currently supplying to

4    Walmart, and one of those suppliers was not using the

5    certified process.  And at that point in time, we began to

6    look at them as a candidate to be in our big pool.

7              That information got out to other suppliers in the

8    industry.  At that point in time, the UEP leadership as well

9    as leadership from Cal-Maine and CCF and others came to see

10   us, called us, and talked to us about the Certified Program

11   and that it needs to be 100 percent compliant and how

12   important that was.

13   Q.    And what was your personal reaction when you first

14   learned about this 100% rule?

15   A.    Yeah, I didn't -- my first reaction was it wasn't

16   necessary, right?  I felt like it was appropriate for Walmart

17   to have specifications for the hens that were being used to

18   produce eggs for us, but I didn't feel it was appropriate for

19   Walmart to make decisions for the producers about how they

20   dealt with the rest of the industry.  I felt like that should

21   be something that they dealt with individually.

22   Q.    Okay.  You just referenced the bidding process --

23   A.    Yep.

24   Q.    -- in the spring of 2008.  So let's -- I mean spring and

25   summer.

1    A.    Yeah.

2    Q.    Let's now turn to that.  You generally recall this

3    bidding process that Walmart conducted?

4    A.    I do.  I recall it very well.

5    Q.    Why do you recall it well some ten years later?

6    A.    Yeah, so a couple of reasons.  First, it was a new

7    process.  Like I said, we were doing something different.  The

8    buyer that was working for me at the time was relatively new,

9    so I wanted to make sure that he had the support he needed.

10         And then the third thing, as you mentioned, it was

11   kind of spring into the summer.  It became a very contentious

12   process with a lot going on.  And so I remember it very well.

13   Q.    And the buyer who was new, you referred to that as

14   Mr. Adams?

15   A.    Correct.

16   Q.    Okay, so as part of the bidding process, would Walmart

17   require potential suppliers to submit bids that complied with

18   Walmart requirements?

19   A.    That is correct.  We would.

20   Q.    And were those called specifications?

21   A.    Yes.  So we had a set of specifications associated with

22   our egg purchasing, and those specifications would have had a

23   number of different things that we would require, and then the

24   companies can look at those bids and decide whether or not

25   they wanted to bid on the business based on those

1    specifications.

2    Q.    And do you recall what -- at this time when the bidding

3    process started, what the Walmart specifications required

4    about animal welfare?

5    A.    I do.  At that point in time when the process started, we

6    had been using something that had been in place for several

7    years at Walmart.  And in the specifications for animal

8    welfare it required that they participate in the FMI and the

9    UEP Certified process.

10   Q.    And what was your understanding of why Walmart had that

11   requirement?

12   A.    Yeah, so my understanding is that it had been in place

13   for several years.  The suppliers in the industry for the most

14   part used it, and because of that I really didn't think about

15   it very much.  It just kind of was in place and that's what we

16   started off the process with.

17   Q.    Again, when you started off the process with those

18   specifications, did you have an understanding that those

19   guidelines, the UEP Guidelines, in particular, required a

20   producer to follow some 100% rule?

21   A.    No, I had no idea of that.

22   Q.    Now, was there a point during the 2008 bidding process

23   that Walmart changed its specifications with regard to animal

24   welfare?

25   A.    Yes, we did.

1   Q.   And when did that occur?

2   A.   Yeah, so shortly after beginning the new bidding process,

3   where we had a more formal process, we identified some

4   potential suppliers in the industry, one of which was Sparboe

5   Farms, who were not using the Certified process.  And after

6   having some time to work with them, we understood that they

7   were using different processes that we believed that were as

8   good or better than the UEP process.  And so, therefore, we

9   changed our specs to include -- to not say it had to be FMI

10  and UEP, but that they could be something like that or better.

11  Q.   Okay.  So you referred to Walmart changing its

12  specifications?

13  A.   That's correct.

14  Q.   Let me hand you our first exhibit.

15  A.   Okay.

16  Q.   And for identification purposes, this is Plaintiffs'

17  Exhibit 246.

18           And, Mr. Airoso, let's just first see if you can

19  identify the exhibit.

20  A.   I can.

21  Q.   Okay.  And what is this document?

22  A.   Yeah, so this was a letter that was sent out by the egg

23  buyer, Clay Adams, to potential producers of eggs and/or

24  brokers who could sell eggs to Walmart, and he copied me on

25  this e-mail.

1   Q.   Okay.  And can you describe what type of information

2   Mr. Adams included in that?

3   A.   Yes.  So this e-mail was provided to the potential

4   suppliers to provide them with updates and information that

5   would help them in the bidding process, to include anything

6   that was new and different that we had made changes to as the

7   process was starting.

8   Q.   So essentially, Walmart is responding to some questions

9   from its suppliers?

10  A.   That is correct.  Providing clarification.

11  Q.   And this is an e-mail that you received at the time?

12  A.   That is correct.

13  Q.   And do you recall this e-mail?

14  A.   I do.

15  Q.   And in this e-mail, did Walmart provide the potential

16  suppliers with some information about specifications?

17  A.   We did.

18            MR. OLSON:  With that, Your Honor, we would move for

19  the admission of Exhibit 246.

20            MR. DESTEFANO:  We would object to the first page on

21  hearsay grounds, Your Honor, the first page being an e-mail.

22            THE COURT:  I can see it.  It's a multi-page

23  document.  You're only objecting to the first page?

24            MR. DESTEFANO:  Yes.

25            MR. OLSON:  Your Honor --

1          THE COURT:  The first page does appear to be

2    hearsay.

3          MR. OLSON:  Well, we would welcome a limiting

4    instruction.  We're not introducing it for the truth of what's

5    stated.

6          THE COURT:  What is the purpose of it?

7          MR. OLSON:  The purpose is, as the witness

8    testified, this is when Walmart communicated to its suppliers

9    a change of specifications, and it's also when those suppliers

10   learned who else was in the bidding process.  So whether any

11   of that was true or not, it -- the information was provided.

12         THE COURT:  Well, you can use the remainder of the

13   exhibit, but there's still -- I'm not quite sure what the

14   point is of the transmittal e-mail?

15         MR. OLSON:  Okay.

16   BY MR. OLSON:

17   Q.   You can put that document aside.

18         Do you -- you referred to the information getting

19   out to Walmart's current suppliers.  Do you recall when that

20   occurred?

21   A.   In this e-mail it would have been when we would have made

22   the changes known to the specifications in or around late May

23   of 2008.

24   Q.   And would this have been when Walmart's incumbent

25   suppliers learned that Walmart was considering using Sparboe

1    Farms as a new supplier?

2    A.    That is correct.  All the potential suppliers were sent a

3    single e-mail where they were all on copy.  So all of the

4    current suppliers and incumbent suppliers would have known

5    about any additional potential suppliers like Sparboe Farms.

6    Q.    And you also referenced Walmart communicating information

7    where they changed specifications.

8    A.    That is correct.

9    Q.    How did Walmart change its specifications with regard to

10   the animal welfare requirements?

11   A.    Yes, specifically we changed the specification to say

12   that animal welfare needed to be the UEP Certified process,

13   equivalent or better.

14           In this case, in the e-mail, we said better, and

15   later on we changed that, but, yeah, UEP or better.

16   Q.    So the change at this time was from not UEP and FMI

17   exclusively, but to --

18   A.    A broader set of programs could be used as long as the

19   animal welfare requirements were as good as the UEP or better.

20   Q.    Okay.  All right, let's talk about Sparboe Farms a bit.

21           What did you know about Sparboe Farms at the time

22   you gave them an opportunity to bid for the business?

23   A.    Yes, so Sparboe Farms was a new potential supplier to

24   Walmart, and they were not using the UEP Certified process.

25   So I felt it would be prudent to take the egg buyer and a

1    group of Walmart associates.  We went up and visited them on

2    one of their farms.  We met the team that ran

3    Sparboe's business at the time.  We reviewed their farms,

4    looked at all of their facilities.  And we also went through

5    their PVP program, and what they were going to do to certify

6    that food safety and animal welfare was being taken care of.

7    And we came back from that meeting feeling very good about

8    what they had done and that they could be a supplier to

9    Walmart.

10   Q.   So you referred to the PVP program.  Was that a program

11   that Sparboe had?

12   A.   That's correct.

13   Q.   And what was your general understanding of the PVP

14   program?

15   A.   Yeah, so the PVP program was a program that was going to

16   be audited and is audited by the USDA, and as they had

17   designed it, it provided for the animal welfare requirements

18   that we wanted at Walmart.  And we felt like the program was a

19   very good program and potentially better than the UEP

20   Certified process program.

21           And the one thing that I do remember specifically,

22   though, is that it did not have a 100 percent requirement of

23   like all of your eggs and all of your farms.  It was

24   specifically just the eggs that they were going to be selling

25   to Walmart from those farms that were going to sell to Walmart

1    would be certified.

2    Q.   So your understanding is that one of the differences

3    between the PVP program and the UEP Program was that the UEP

4    Program had the 100% rule and the Sparboe program did not?

5    A.   That is correct.

6    Q.   And what was your reaction to that difference?

7    A.   Um, it seemed reasonable to me.  Um, you know, again, at

8    Walmart, we were specifically worried about the hens that were

9    laying eggs and how they were treated and that they were

10    treated within the specifications that we had, that they were

11    treated humanely.

12         But we didn't really believe that we should be

13    making decisions for other folks about what they should do in

14    terms of how they handled their business.  Felt really that

15    should be something based on other customers' demands.

16    Q.   Did you have any concerns about the fact that the Sparboe

17    Farms' program did not have a 100 percent compliance?

18    A.   No, not at all.

19    Q.   Did you make an effort to learn information or request

20    information from Sparboe about their program so you could be

21    educated about it?

22    A.   We did, yes.

23    Q.   And what do you recall in that regard?  How did you go

24    about doing that?

25    A.   Yeah, so we met with several folks from Sparboe,

1    specifically with the -- I'm probably saying his last name

2    incorrectly, Regensburger, I think is how you pronounce it.

3    He was the lead for Sparboe Farms.  We met with Sparboe Farms

4    to understand and get a detail around their Process Verified

5    Program, and they specifically provided information to myself

6    and to Clay Adams, the buyer, in various ways to include

7    things like e-mail and other ways to get us information.

8    Q.   Okay.  And let me hand you, for identification purposes,

9    an exhibit that we have marked Plaintiffs' Exhibit 251.

10   A.   Okay.

11   Q.   Mr. Airoso, can you identify Exhibit 251 for us?

12   A.   Yeah.  This was an e-mail -- an e-mail chain between Lee

13   Regensburger, Clay Adams and myself.

14   Q.   And how did the e-mail chain begin?

15   A.   It began with me asking the -- for information regarding

16   their programs, the PVP program, specifically, and how it

17   related to animal health and welfare, and how I might be able

18   to explain that information to folks at Walmart.

19   Q.   And is that the e-mail on May 28, 2008?

20   A.   That's correct.

21        Let me verify that real quick, please.

22        Yes.

23   Q.   I think you'll find yours is on the back of the chain.

24   A.   Okay, yes.

25   Q.   And is that -- is that an e-mail that you recall sending

1   at that time?

2   A.   I do.

3   Q.   And did you express your views about

4   Walmart's requirements at that time?

5   A.   I did.

6           MR. OLSON:  Your Honor, we move for the admission of

7   Plaintiffs' Exhibit 251.

8           MR. DESTEFANO:  Objection, again, on hearsay

9   grounds, Your Honor.

10          THE COURT:  Overruled.

11          MR. OLSON:  Can we publish the document?

12          THE COURT:  You may.

13          MR. OLSON:  Thank you.  Hopefully we're pulling it

14  up.

15  BY MR. OLSON:

16  Q.   Okay, and let's look at the page 4 of the e-mail at the

17  top, which Mr. Airoso, that's the one you wrote that began the

18  chain; is that right?

19  A.   Yes, sir.

20  Q.   And the first line of the e-mail that you wrote says:  As

21  we have told you, we do not expect you to become part of the

22  UEP.

23          What were you communicating there, sir?

24  A.   Yeah, so I think Sparboe Farms had some questions about

25  whether or not we would force them to use the UEP Certified

1    process, and they had asked us some questions verbally and I

2    was responding to Lee letting him know that I did not expect

3    them to be part of the UEP Certified process, as we had put in

4    our specs, that we would allow several different potential

5    processes to be in effect.

6    Q.    And then the second sentence states:  However, I do have

7    to explain the differences internally to our senior

8    management, as some of the other producers will try to use the

9    UEP as a barrier to entry for you guys.

10          Do you see that?

11   A.    Yes, sir.

12   Q.    And what were you expressing there, sir?

13   A.    Yeah, so I had already had communication with others

14   about this program and felt that since they were not part of

15   the UEP, that the UEP leadership, as well as our current

16   incumbent producers would try to say that not being part of

17   the Certified process would -- would disqualify them from

18   shipping to Walmart, that we should disqualify them.  And so

19   based on that, I wanted to let them know that I felt like I

20   was going to have that pressure, and, therefore, I wanted to

21   be able to explain to my senior leaders at Walmart why we were

22   doing what we were doing and how the program matched up to the

23   UEP Certified process.

24   Q.    Okay.  And then did Mr. Regensburger respond with some

25   information?

1    A.    He did.

2    Q.    And generally, how would you describe the information he

3    provided?

4    A.    Yes, so very forthcoming.

5              MR. DESTEFANO:  I would object, again, on hearsay

6    grounds.

7              THE COURT:  Sustained.

8    BY MR. OLSON:

9    Q.    Okay, let's look at the cover e-mail, where you respond

10   to Mr. Regensburger on May 30, 2008.

11             Do you see that?

12   A.    I do.

13   Q.    Is that an e-mail that you wrote, sir?

14   A.    It is.  Yep.

15   Q.    And do you recall writing this e-mail?

16   A.    I do.

17   Q.    And you say:  Thanks for the note, I appreciate the

18   information.  I think you have responded well.  It helps me to

19   clarify to our internal folks.  Walmart does not have a

20   preference for the UEP Program versus another program.

21             Do you see that?

22   A.    That is correct, yes.

23   Q.    And what were you expressing there?

24   A.    Yeah, I was expressing to Lee the fact that we had made a

25   determination that the UEP Certified process was not the only

1    process that we would use, that we'd be willing to use other

2    processes similar to their PVP process, and that that's where

3    we were at.

4    Q.    And do you recall whether Sparboe provided the types of

5    further information that you were interested in reviewing?

6    A.    They did.

7    Q.    And what was your reaction to the information you

8    received?

9    A.    Yeah, so basically when we had a chance to review all of

10   the information, I determined that the PVP program was as good

11   or better than the UEP Program in many ways.  The only -- the

12   only exception to that may be that it didn't cover 100 percent

13   of all flocks.

14   Q.    The only difference between the programs?

15   A.    That is correct.  Where the UEP Program required

16   100 percent of all birds and all farms, where the PVP program

17   that Sparboe was potentially going to use did not have that

18   requirement.  Other than that, it was at least good in every

19   level and in some cases better.

20   Q.    Okay.  So you mentioned that you were -- you had some

21   concerns that Walmart's current suppliers, having learned that

22   Sparboe was in the process, might use the UEP Certified

23   Program as a barrier to entry?  Do you recall that?

24             MR. DESTEFANO:  Objection.

25             MR. BIZAR:  Objection.

1    BY MR. OLSON:

2    Q.   I believe you testified --

3              THE COURT:   Overruled.

4              MR. OLSON:   Thank you.

5    BY MR. OLSON:

6    Q.   Do you recall that testimony?

7    A.   I do.

8    Q.   And did that, in fact, happen, sir?

9    A.   It did.

10   Q.   And what occurred?

11   A.   Yeah, so shortly after this time period, in June and July

12   of 2008, I began to receive calls from the United Egg

13   Producers as well as Country Creek Farms representing Rose

14   Acre, and Cal-Maine and others, basically indicating that

15   Sparboe Farms was trying to destroy the UEP Certified process

16   that we were facilitating that, and that there was some other

17   things that potentially could happen from things like animal

18   groups hearing about this and putting pressure on this.  It

19   could be reporters doing things.  There could be lawsuits

20   filed, potentially federal lawsuits.  Things like that.  So

21   there was a lot of information over a couple-month period that

22   came to us, came to me specifically from those groups.

23   Q.   Just to be clear, those things you just referred to --

24   and we can circle back on this stuff -- potential lawsuits,

25   press, these were things you were being told by who?

1   A.   They would have came from the UEP, Cal-Maine, and CCF, as

2   the top three that I can remember, yes.

3   Q.   Okay.  All right.  So I believe we're basically in the

4   early summer of 2008?

5   A.   Correct.

6   Q.   Was there a time that Walmart made a formal change to its

7   specifications with regard to its animal welfare requirements?

8   A.   There was.  We did.

9   Q.   And do you recall what the change was?

10  A.   I do.  In our formal specifications, we wrote

11  specifically in the specs that the UEP and FMI were not

12  required, that other processes could be used in place of

13  those.

14  Q.   Okay.  And then the bids start rolling in, I assume?

15  A.   That's correct.

16  Q.   Did Sparboe make a bid?

17  A.   They did.

18  Q.   And did these other companies that you mentioned also

19  make bids?

20  A.   They did, yes.

21  Q.   And what did Walmart decide to do when it looked at the

22  bids from Sparboe and others in terms of awarding the Walmart

23  business?

24  A.   Yeah, so based on the specifications in the bids we

25  received, we made a decision to award five distribution

1    centers to Sparboe Farms, and that was going to be supplied by

2    two of their five farms.

3    Q.   And so Walmart would have a new supplier?

4    A.   That's correct.

5    Q.   And for the jury's sake, when you refer to distribution

6    centers, can you just explain what those are and generally

7    what the state of distribution centers were at this time at

8    Walmart?

9    A.   Yeah, so there were 41 distribution centers in the

10   United States, kind of put it out geographically to get

11   products to our stores.  And of those 41 distribution centers,

12   on average, they might serve 150 or 200 stores.  And in this

13   case, we awarded five of those distribution centers to Sparboe

14   Farms for them to send eggs into, and for us to distribute

15   those eggs then to our stores.

16   Q.   And why did you award the business to Sparboe?

17   A.   Yeah, so they had a very good competitive price.  We felt

18   comfortable with their food safety and animal welfare programs

19   and felt like in every way they would be a really good

20   supplier to Walmart.

21   Q.   And did you have any concerns about having to defend the

22   fact that Walmart was choosing a supplier that did not have a

23   100 percent requirement?

24   A.   I did not.  Sparboe, at that point in time, had told us

25   that they would be certified on the farms that were going to

1    be supplying to us and that in the near future, they were

2    going to have the other three additional farms that were not

3    going to be shipping to Walmart, that they would have those

4    certified under their PVP program to ensure that they had the

5    cage space density requirements that were in our

6    specifications taken care of.

7                And so they already told me that.  So as part of

8    that, I really wasn't worried because the other option to get

9    those other three farms immediately within spec would be to

10   slaughter a whole bunch of hens, right?  And I didn't feel

11   like that was the right choice, and I didn't think that other

12   groups were going to come to us and say, Why didn't you force

13   the slaughter of a bunch of birds?

14   Q.   Let me make sure that I have my math right.  I think you

15   said that Walmart awarded five distribution centers from two

16   Sparboe Farms?

17   A.   Right.

18   Q.   And then you referred to Sparboe having three other

19   farms; is that right?

20   A.   Yes.

21   Q.   So it's five total?

22   A.   Correct.

23   Q.   And I believe what you just said that Sparboe,

24   immediately for the supply to Walmart, was going to comply

25   with these guidelines and then they were going to bring the

1   other three into compliance over time?

2   A.    In the future, they said, yes.

3   Q.    And then you -- you expressed some concern about what

4   would happen if Sparboe had to bring those other three

5   immediately into compliance?  What was that concern?

6   A.    Correct.  Yes.  So if they had to immediately bring those

7   other farms, there's a certain amount of hens per cage, and if

8   you wanted to give each hen more space, the only way to do

9   that would be to remove hens from the barn.  And the way that

10  they would do that would be to slaughter a certain amount of

11  hens and get rid of them and give the hens that are remaining

12  more space.

13  Q.    And did that seem like a good idea to you?

14  A.    It did not.  It would not have been part of what we would

15  be expecting.  If you think of our specs and animal welfare

16  that we wanted for the hens, that would not be part of what we

17  would have been expecting.

18  Q.    All right.  So what happened after Walmart -- well,

19  strike that.

20          Let me ask it this way:  Did Walmart make an

21  announcement of this decision, that it was awarding business

22  to Sparboe?

23  A.    We made an announcement that we were awarding business to

24  all of our suppliers and that information was made public,

25  yes.

1  Q.   And that included Sparboe?

2  A.   That is correct.

3  Q.   And what happened next?

4  A.   The -- at that point in time, soon after we awarded the

5  business to Sparboe Farms, I again began to get another round

6  of calls, e-mails, visits from folks at the UEP, Cal-Maine,

7  CCF on behalf of Rose Acre and other -- and other folks

8  indicating that, again, that Sparboe Farms was trying to

9  destroy the Certified process, that it was going to be bad for

10  the industry and that it would be bad for Walmart, and that we

11  should rethink what we're doing.

12  Q.   And who from the United Egg Producers called you and said

13  something like that?

14  A.   Gene Gregory.

15  Q.   Who else called you?

16  A.   Um, so Ron Whaley from CCF called me.  Jeff Hardin from

17  Cal-Maine called me.  Those are two of the ones I can

18  definitely remember.

19  Q.   Mr. Whaley, he's at the broker for Rose Acre; is that

20  right?

21  A.   Yeah.  He was the leadership of CCF and would have called

22  on behalf of Rose Acre, yes.

23  Q.   And did you receive any visits in person?  Did people fly

24  down to Bentonville and meet you in person?

25  A.   We did.  One such visit that I remember was actually one

1    that I was not initially invited to.  Gene Gregory from the

2    UEP tried to schedule a visit with my boss, Pam Kohn, and told

3    her he wanted to meet with her to discuss some information

4    about what we were doing and sent her a long e-mail and things

5    like that.

6              I wasn't on copy to the e-mail, but my boss made

7    sure I was at the meeting and she shared that e-mail with me

8    so I knew what Gene was saying and what we might be in store

9    for when he came to visit.  And that would have happened -- I

10   reviewed this.  It would have happened in August 8 of 2008.

11   Q.   Okay.  And was it Gene Gregory who showed up in person?

12   A.   No.  Actually that is different.  So Gene had scheduled

13   the whole meeting and kind of got that whole process started,

14   but then he was not able to attend the meeting and so his son

15   Chad Gregory came in his place.

16   Q.   Okay.  And was Chad Gregory, to your knowledge,

17   associated with the United Egg Producers as well?

18   A.   He was.  He was part of the leadership team.

19   Q.   You were at the meeting?

20   A.   I was.

21   Q.   And do you recall what type of arguments Chad Gregory

22   made, Mr. Gregory made, when he showed up at the meeting with

23   Walmart?

24   A.   I do.  Yes.

25   Q.   And what do you recall?

1    A.    Yeah, so, you know, the thing that I remember more than

2    anything was I felt threatened, right?  So Chad came in and

3    had conversations with us and I felt threatened.  He spoke

4    specifically of bad press, about animal welfare groups folks

5    like that that were going to potentially do something publicly

6    to give bad press to Walmart or bad PR.

7              I remember him specifically talking about the

8    Federal Trade Commission, the FTC, that they were watching us,

9    they were watching this, and that they might file a lawsuit.

10             And then the last thing I remember is specifically

11   they mentioned Scott Poole, who I replaced as the DMM over

12   dairy and specifically eggs.  They mentioned him and they

13   mentioned how he had promised to support the Certified

14   process, that he had supported the 100% rule, and that I was

15   backing out on those promises that we had made and things of

16   that nature, and, again, it was very threatening.

17   Q.    Okay.  So Chad Gregory showed up and suggested that

18   Walmart's use of Sparboe might face a lawsuit from the Federal

19   Trade Commission?

20             MR. DESTEFANO:  Objection.

21             MR. BIZAR:  Objection.  Leading.

22             THE COURT:  Sustained.

23   BY MR. OLSON:

24   Q.    Okay.  What was your understanding -- when you say you

25   were threatened, what was your understanding of what Walmart

1    was being threatened with by Mr. Greg?

2              MR. DESTEFANO:  Asked and answered.

3              THE COURT:  Well, I think the question is he said he

4    felt threatened.  Do you want to repeat your question?

5    BY MR. OLSON:

6    Q.    You perceived threats made.  What was your understanding

7    of what threats were made?

8    A.    Yeah.  So at the time, I felt like Mr. Gregory was

9    threatening to make sure that the industry, the folks who were

10   interested in the welfare of the industry like PETA and

11   others, animal activists groups, I felt like he was saying

12   that there was press that would be interested in understanding

13   that Walmart was not requiring 100 percent of all hens be --

14   to be UEP Certified, that they would reach out to those groups

15   or somehow those groups would be notified, and then that was

16   threatening.  And then specifically he said that the FTC -- he

17   said, The FTC is watching.  They're looking at this and they

18   may file a lawsuit against Walmart.

19   Q.    And is this a common experience, sir, where a trade

20   association representative comes and threatens Walmart?

21   A.    And that is not a normal situation.  I've met with lots

22   of trade associations from lots of groups and have never had

23   one that was anything like this.

24   Q.    Okay.  And you also mentioned Mr. Gregory -- and I want

25   to make sure I characterize what you said accurately --

1    suggested Walmart had backed out of some commitments that

2    Mr. Poole had made?

3    A.    That is correct.

4    Q.    And, again, what do you recall Mr. Gregory suggesting

5    about Walmart backing out of prior commitments?

6    A.    Specifically he said that Scott Poole had agreed to

7    support the UEP Certified Program, that Scott knew of the

8    100% rule that they had, that all farms had to be in

9    compliance.  I think I said earlier -- if I didn't, correct

10   me, but I think I said earlier that I didn't know about that

11   as we went through this process.  Scott never told me about

12   that as I took over the dairy department.  It was something I

13   was unaware of and would have expected that Scott or somebody

14   had told me about, but I didn't know anything about it.  They

15   said that Scott had actually supported that, and that I was

16   backing away from that, and that we were breaking our promises

17   basically.

18   Q.    And just to be clear, your boss Ms. Kohn was at this

19   meeting as well?

20   A.    That's correct.

21   Q.    Okay.  Let me hand you, for identification purposes now,

22   what has been mark Plaintiffs' Exhibit 270 and 271, and that's

23   because -- well, I'll explain that in a moment.

24         MR. OLSON:  Okay.  And to explain, Exhibit 270 is an

25   e-mail.  I'll ask the witness to identify it, but just for the

1    record, 271 is the attachment to the e-mail.  We probably

2    unnecessarily stamped the e-mail and the attachment as

3    separate exhibits, but they were generated together.  So

4    that's why we're introducing them together.

5           THE COURT:  Well, what am I going to do with you?

6           MR. OLSON:  I'll take the blame.

7    BY MR. OLSON:

8    Q.   All right.  So, Mr. Airoso, have you seen -- have you

9    looked at the e-mails here and the attachment here today?

10   A.   I have, yes.

11   Q.   And while you're not a recipient -- well, let me ask you

12   this:  Who sent the e-mail?

13   A.   The e-mail was sent by Gene Gregory to my boss, Pam Kohn.

14   Q.   And who is copied?  Who are those folks?

15   A.   Yeah, so the copies were Ron Whaley, from Country Creek

16   Farms and Dolph Baker, who I believe at the time was the

17   president of Cal-Maine.

18   Q.   Did you mention Chad Gregory, the last e-mail?

19   A.   Yes.  And I'm sorry.  Chad Gregory from United Egg

20   Producers.

21   Q.   And that's who came in person?

22   A.   Chad did come visit in person, yes.

23   Q.   And do you see where Mr. Gregory says:  Walmart's support

24   for the --

25           MR. DESTEFANO:  Your Honor, I object on hearsay

 1  grounds.

 2            MR. OLSON:  Your Honor, the last thing we are doing

 3  is introducing this document for its truth, as I will

 4  establish.

 5            THE COURT:  What are you establishing?

 6            MR. OLSON:  For its lack of truth.  Your Honor, if

 7  the Court will allow me to lay the foundation.

 8            THE COURT:  Then why don't you start with that.

 9            MR. OLSON:  Okay.

10  BY MR. OLSON:

11  Q.   So Mr. Gregory claimed he was attaching --

12            THE COURT:  No, I don't mean an argument.

13            MR. OLSON:  I apologize.

14            THE COURT:  The Exhibit 270 is clearly hearsay.  Do

15  you want to talk about 271?

16            MR. OLSON:  Okay, let's talk about 271, which is the

17  attached letter.

18            MR. DESTEFANO:  We would also have an objection as

19  to 271.

20            THE COURT:  And what's your objection?

21            MR. DESTEFANO:  Hearsay.

22            MR. OLSON:  Again, I'm not even moving to admit it

23  yet.

24            THE COURT:  Okay, then fine.  We're not going to

25  talk about it.

```
 1              MR. OLSON:  We do need to talk about it, but we
 2    won't admit it or show it to the jury until I lay a basis --
 3              THE COURT:  Go ahead.
 4              MR. OLSON: --  why this is not introduced for
 5    hearsay reasons.
 6    BY MR. OLSON:
 7    Q.   So this attachment you've seen this before?
 8    A.   I have.
 9    Q.   And it's on the Walmart letterhead?
10    A.   It is.
11    Q.   And whose name is on the letter?
12    A.   In terms of who it's addressed to?
13    Q.   Well, whose name is at the bottom as the person --
14    A.   Yes, so it would have been Scott Poole, my predecessor.
15    Q.   Mr. Poole's name is on it?
16    A.   That's correct.
17    Q.   And this purports to be a letter from Mr. Poole?
18    A.   That's correct.
19    Q.   And without getting much into the substance at all, do
20    you see there's a reference to some 100 percent of hens being
21    protected?
22    A.   Correct, yes.
23    Q.   Now, were you aware, sir -- oh, one question before we
24    get there.  And the date of this letter on the Walmart
25    letterhead is what?
```

1    A.    December 5th, 2006.

2    Q.    So this was a couple of years ago?

3    A.    That's correct.

4    Q.    Were you aware, sir, that Mr. Poole had written a letter

5    like this referencing the 100% rule?

6    A.    Yeah, no, I was not aware of that, and I find it highly

7    unlikely that he did.

8    Q.    And why do you find it highly unlikely that Mr. Poole

9    wrote this letter?

10              MR. DESTEFANO:  Objection.

11              THE COURT:  Sustained.  Okay, you can move on.

12              MR. OLSON:  Okay.  All right.

13   BY MR. OLSON:

14   Q.    Are you aware of Mr. Poole -- do you have any personal

15   knowledge that Mr. Poole ever wrote a letter expressing

16   support for the 100% rule?

17   A.    I do not.

18   Q.    Do you have information that anyone from Walmart ever

19   wrote a letter expressing support for the 100% rule?

20   A.    I do not.

21   Q.    Have you seen letters that were sent to Walmart that

22   purported to be Mr. Poole expressing support for the

23   100% rule?

24   A.    I have.

25              MR. DESTEFANO:  Objection.

```
 1                MR. BIZAR:  Objection.

 2                THE COURT:  Overruled.

 3                THE WITNESS:  I have.

 4     BY MR. OLSON:

 5     Q.   And do you have any reason to believe or doubt that those

 6     letters were actually written by Mr. Poole from Walmart?

 7     A.   I do.

 8                MR. DESTEFANO:  Objection.

 9     BY MR. OLSON:

10     Q.   And what is -- sorry.

11                THE COURT:  I'm going to sustain the objection at

12     this point.  I'm not quite sure what you're -- you're trying

13     to -- I don't think you're advancing the progress of the

14     trial, so I would encourage you to do that.

15                MR. OLSON:  We will certainly take note of that,

16     Your Honor.  Thank you.

17                THE COURT:  Good.

18                MR. OLSON:  Okay.

19     BY MR. OLSON:

20     Q.   All right.  So you had the in-person meeting with Chad

21     Gregory, and we spoke about that.  It was on August 8,

22     correct?

23     A.   Correct.

24     Q.   After that meeting with Chad Gregory, did Walmart end up

25     changing course with regard to the award of the egg business
```

1    that had been out for bid?

2    A.   Yeah, we did.  Specifically, even with the threats that

3    we had received from Chad, I -- it didn't change my mind.  I

4    wanted to continue with the process we had.  I wanted to award

5    the business to Sparboe Farms.  But Ms. Kohn made the decision

6    to not do that, and to -- we -- at that point in time, we

7    agreed that we felt it would be safer, since Sparboe was going

8    to go ahead and do all five of their farms at some point in

9    time, we felt it would be safer to make sure that they did all

10   the audits for all five farms, specifically making sure the

11   animal welfare requirements were in place to include kind of

12   the cage space density requirements, making sure all of that

13   was in place before we awarded business -- any business to

14   Sparboe Farms, even from the two farms that were going to be

15   Certified, so we made that decision.

16   Q.   And would Walmart have made that decision to not proceed

17   with the award of business to those two farms without the

18   meetings and phone calls it was receiving?

19             MR. DESTEFANO:  Objection.  Calls for speculation.

20             THE WITNESS:  No.

21             THE COURT:  It does --

22             MR. DESTEFANO:  The decision was made --

23             THE COURT:  It does.  Sustain.

24             You can ask your question differently.

25   BY MR. OLSON:

1  Q.   You, sir, what was your role in making the decision about

2  whether -- and to whom to award business to under this bidding

3  process?

4  A.   Yes, so under the bidding process, it was my decision to

5  award the business.  And at the end of this process, it was

6  Pam Kohn and myself, together, making the decision to delay

7  the award to Sparboe Farms until after the audits had taken

8  place.

9  Q.   And based on your involvement in that process, would

10  Walmart have changed its mind about the award of business

11  absent the phone calls and meetings it had received?

12           MR. DESTEFANO:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  No, we would not have.

15  BY MR. OLSON:

16  Q.   Okay, so I believe the timeline is this:  There was the

17  award of business to Sparboe from the two farms.  Then we just

18  talked about Walmart changed and said it's not going to do

19  that until all five farms are audited; is that correct, sir?

20  A.   Yes.

21           MR. DESTEFANO:  Objection.

22           MR. OLSON:  I just restated his testimony.

23           THE COURT:  I'm going to overrule the objection just

24  because you're trying to move this along.

25           MR. OLSON:  Thank you.  Absolutely.

```
 1            THE COURT:  If you really were trying to move it
 2    along, we would be moving along.
 3            MR. OLSON:  Okay.
 4    BY MR. OLSON:
 5    Q.    So last question on this.
 6    A.    Yes, sir.
 7    Q.    Was Sparboe able to complete the audits of all five farms
 8    in order to start delivering product to Walmart?
 9    A.    They were not, no.
10    Q.    All right.  And moving along to another short topic.
11    We've talked about United Egg Producers giving you information
12    about the UEP Certified Program, correct?
13    A.    Correct.
14    Q.    Did the United Produces, Gene Gregory, Chad Gregory, any
15    of the members ever tell you about any other programs at UEP
16    that involved reducing supply?
17    A.    No, they did not.
18    Q.    Were you ever told anything about an early molt program?
19    A.    No.
20    Q.    Were you ever told anything about early slaughter
21    programs?
22    A.    No.
23    Q.    And you -- did you have expectations as the buyer of eggs
24    at Walmart about how suppliers would treat their hens?
25    A.    We did, yes.
```

1    Q.    Would it have been consistent with those expectations for

2    your suppliers to be slaughtering hens in order to reduce

3    supply?

4    A.    No, sir.

5              MR. DESTEFANO:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  No, it would not have been.

8    BY MR. OLSON:

9    Q.    Okay, last topic.  While you were buying eggs for

10   Walmart, were you buying other products as well?

11   A.    I was.  Milk, eggs, cheese, butter, yogurt, things like

12   that.

13   Q.    In all of those other products in the course of your

14   buying responsibilities, did you come across a 100% rule in

15   any other environment?

16   A.    No, I did not.

17   Q.    In buying other products, for example, some of the ones

18   you just mentioned, does Walmart encounter other types of

19   certifications program?

20   A.    We do, yes.  It's pretty common.

21   Q.    What's an example?

22   A.    Organic milk in the milk industry would be an example.

23   Q.    So if someone wants to sell organic milk, they have to

24   get certified?

25   A.    That's correct.

1    Q.    And does the certification program for organic milk have

2    a 100% rule?

3    A.    It does not.

4    Q.    Is there any requirement that if someone wants to sell

5    Walmart some organic milk, it can only sell organic milk?

6    A.    No.

7    Q.    And based on your experience at Walmart, sir, are you

8    aware of any reason why egg producers could not have a

9    Certified program that's similarly operated without a

10   100% rule?

11   A.    I'm not.  I don't know why they would be --

12              MR. DESTEFANO:  Objection.

13              THE COURT:  Sustained.

14              MR. OLSON:  Pass the witness.

15              THE COURT:  Fine.  You can do cross-examination.

16                          CROSS-EXAMINATION

17   BY MR. DESTEFANO:

18   Q.    Hi.

19   A.    Hi.

20   Q.    Mr. Airoso, I'm William DeStefano.  I represent Rose Acre

21   Farms, along with some other gentlemen here.  I'd like to ask

22   you some questions.

23   A.    Okay.

24   Q.    I believe during your direct examination, you stated that

25   you -- that Walmart changed the specifications, and did you

1   say it was in the spring of 2008?

2   A.  Um, that process would have started in the spring and

3   gone through the summer, yes.

4   Q.  Can you pinpoint exactly when those specifications were

5   changed to go from UEP and FMI approved to something broader

6   than that?

7   A.  It would have been before the e-mail, I think, we looked

8   at earlier, in late May, because that was the official

9   communication out to everybody for clarification.  But it

10  would have occurred sometime before that.

11  Q.  Well, I'm looking at the specifications that were

12  approved in April 2008, and they still have the UEP, FMI in

13  them.

14          If I show you those specifications, would your

15  recollection possibly be refreshed?

16  A.  No, I don't think so.  It would have been between the

17  time those specifications were approved and May 24th, whatever

18  the date is of that e-mail where we sent out clarification to

19  make sure -- we would have made a decision at some point in

20  time in that period, yes.

21  Q.  Okay, and when you say "we," who specifically --

22  A.  Clay Adams and myself.

23  Q.  All right, you have to kind of wait until I finish the

24  question --

25  A.  Sorry.  I thought you were done.

1  Q.   -- before you jump in with the answer.

2            THE COURT:  Okay, both of you wait.

3            THE WITNESS:  Sorry about that.

4            THE COURT:  One, two, one, two.

5            THE WITNESS:  Yes, sorry.

6            MR. DESTEFANO:  Okay.

7  BY MR. DESTEFANO:

8  Q.   So the decision would have been made by Clay Adams and

9  you to broaden the specifications to require something equal

10 or better than the UEP, FMI program?

11 A.   Correct.

12 Q.   And the incumbent suppliers for those five distribution

13 centers that you ultimately awarded to Sparboe didn't think

14 you ought to change the specifications, correct?

15 A.   I don't remember who had those five DCs, so I couldn't

16 tell you that.

17 Q.   Where were those five DCs?

18 A.   I don't remember.

19 Q.   So this was five out of 41?

20 A.   Correct.

21 Q.   So there was substantial number of other distribution

22 centers that were buying eggs, I take it?

23 A.   Correct.

24 Q.   And you only awarded five of the 41 to Sparboe?

25 A.   Correct.

```
1   Q.   Why not the others?

2   A.   As I said before, it was based on price, quality, and

3   food safety, and felt those were the five correct DCs for

4   Sparboe.

5   Q.   CCF is Country Creek Farms?

6   A.   Correct.

7   Q.   Isn't that a buying group retained by Walmart to buy eggs

8   for Walmart?

9   A.   I don't know what you're talking about.

10  Q.   You don't know what I'm talking about?

11  A.   No, sir.

12  Q.   Okay.  You called them a broker.

13  A.   Yes.

14  Q.   Okay.  And do you know that Walmart used them as a broker

15  or retained them as a broker to buy eggs on behalf of Walmart?

16  A.   No.

17  Q.   You don't know one way or the other?

18  A.   We didn't.

19  Q.   Okay.  Do you know whether CCF had more than one

20  supplier?

21  A.   I believe so, but I'm not sure.

22  Q.   You believe they had more than one supplier?

23  A.   But I'm not 100 percent sure.  I believe so, yes.

24  Q.   Okay.

25  A.   I believe there would have been several, but, again, I
```

1    can't quote that for sure.

2    Q.   Okay.  So your best belief here is they had several

3    suppliers.  So when CCF was acting either on your behalf,

4    Walmart's behalf, or behalf of the suppliers as a broker, was

5    CCF independent from Walmart?

6    A.   Yes.

7    Q.   Or was it independent from the producers?

8    A.   I don't know.

9    Q.   Don't know, okay.

10           In any event, sir, you only mentioned Rose Acre.

11   You didn't mean to imply to this jury that Rose Acre was

12   CCF's only supplier, did you?

13   A.   I did not.  I do know that they were one of their

14   largest, if not their largest supplier, because Cal-Maine --

15   I'm sorry -- CCF did mention that at one point in time.

16   Q.   But every time you mentioned CCF, in the next breath, you

17   mentioned Rose Acre.  Did somebody tell you to do it that way,

18   sir?

19   A.   No, sir.

20   Q.   Why did you do it that way?

21   A.   Because that's my recollection.

22   Q.   Let me ask you this, sir:  Did you meet with your

23   attorneys or the attorneys for the Class here sitting in this

24   courtroom or some of them to prepare your testimony for today?

25   A.   I did meet with my attorney.

1    Q.    Okay.  And how long ago did you meet with your attorney?

2    A.    Over the last day.  I flew in from California, spent a

3    few minutes with them and --

4    Q.    And prior to that, did you meet with your attorney or any

5    attorneys here representing the Class?

6    A.    I did.

7    Q.    And when was that, and where was that?

8    A.    In Bentonville about a month or two ago for about

9    30 minutes.

10   Q.    Okay.  And without getting into the substance of what you

11   discussed, was the purpose of that meeting to prepare you for

12   your testimony here today in court?

13   A.    It was not.

14   Q.    What was the purpose?

15   A.    To find out what I knew about the case.

16   Q.    Were you aware that you were designated as a witness in

17   this case more than a month ago?

18   A.    No.

19   Q.    Did they tell you they had you down as a witness in this

20   case more than a month ago?

21   A.    When I -- I don't remember when I met with them.  But

22   when I met with them, we discussed that I did have some

23   knowledge of the case and that it might make sense for me to

24   be a witness.

25   Q.    When you did meet with them in -- is it Bentonville?

1   A.   Yes.

2            MR. OLSON:   Your Honor, I hate to interrupt, but

3   this seems covered by the same stipulation.

4            THE COURT:   I think we're okay for now.   Thank you.

5   BY MR. DESTEFANO:

6   Q.   Walmart, I think you said, and I think -- do you know

7   Ms. Crossland?

8   A.   Yes.  Yes.

9   Q.   And is she your boss or do you work for her or --

10  A.   Crossland?

11  Q.   Yes.

12  A.   No, she's not my boss.  I don't work for her at all.

13  Q.   How do you know her then?

14  A.   We're familiar.  We work in the same general area of

15  food.

16  Q.   You both were in dairy at the same time?

17  A.   No, sir.

18  Q.   Was she ever in dairy?

19  A.   Yes, she was in dairy, but I believe that would have been

20  before I ever even started at Walmart.

21  Q.   Okay.  When did you start at Walmart?

22  A.   In 2006.

23  Q.   All right.  In any event, you acknowledged that Walmart

24  is the biggest purchaser, retail purchaser of eggs at present?

25  A.   I believe we're one of the largest.  I couldn't tell you

1    if we're the largest.

2    Q.    Okay.  In fact, at the time in question, which I think

3    we're talking primarily 2008, was Walmart then the biggest

4    grocery supplier in the United States?

5    A.    We may have been.

6    Q.    And hence, the biggest egg purchaser in the

7    United States?

8    A.    I don't know that.

9    Q.    You do know, however, that Walmart is a member of the

10   Class --

11   A.    Yes.

12   Q.    -- of Plaintiffs in this case?

13   A.    I do, yes.

14   Q.    And if you were either the biggest or one of the biggest

15   purchaser of eggs during the time in question, then if

16   Plaintiffs were successful in obtaining a monetary award in

17   this case, you would agree with me, would you not, is that

18   Walmart would get the largest percentage of that award?

19   A.    I have no idea what it will get as a percentage.

20   Q.    Would you agree with me with the concept that the largest

21   purchaser is probably going to get the largest percentage of

22   any award that might be given?

23   A.    I don't know how this works.  I couldn't tell you.

24   Q.    Does that seem to be at least logical to you?

25   A.    I have no idea.  I really don't.

1   Q.   You have no idea?

2   A.   I really don't, no.

3   Q.   You didn't need a subpoena to appear today in court, did

4   you?

5   A.   Um, I don't think I was subpoenaed, no.

6   Q.   How about do you know if Ms. Crossland was subpoenaed?

7   A.   I have no knowledge of that.

8   Q.   You're appearing here voluntarily without any Court

9   demand that you appear here?

10   A.   Yes, that's correct.  Yes.

11   Q.   Now, you do know, do you not, that although you started

12   purchasing eggs from Sparboe in 2008 -- I take it because you

13   wanted all five of Sparboe's growing facilities to be

14   certified, it was probably very late 2008?  Would that be

15   accurate, sir?

16   A.   I apologize.  The question was really long.

17   Q.   It was a bad question?

18   A.   I don't know what you asked.  I'm sorry.

19   Q.   I've been accused of that before.  When did you actually

20   start purchasing eggs from Sparboe?

21   A.   It wasn't until -- by the time they got audited and where

22   we would make changes in our purchasing organization, it would

23   have been spring of 2009, I believe.

24   Q.   Okay.  Spring of 2009?

25   A.   Something like that, yes.

1    Q.   And then would you agree with me, sir, that in 2011 you

2    stopped purchasing eggs from Sparboe?

3    A.   We did.

4    Q.   Do you know whether Sparboe rejoined the UEP after you

5    stopped purchasing eggs from them in 2011?

6    A.   I don't know what they did.

7    Q.   Do you know if Sparboe has ever come back to you and

8    asked you or requested an opportunity to bid on one or more

9    distribution centers after 2011?

10   A.   I don't know.

11   Q.   You're not involved in eggs anymore?

12   A.   I'm not.

13   Q.   What are you doing now?

14   A.   Foods, strategic sourcing.

15   Q.   What's strategic sourcing?

16   A.   Um, confidential programs and plans, things that we may

17   be working on, sourcing stuff.  I apologize.  I don't know if

18   I can be -- okay.

19   Q.   Okay.  Back when you were in purchasing, wouldn't it be

20   true, sir, that lots of different suppliers competed against

21   each other for Walmart's business?

22   A.   In general.

23   Q.   In general?

24   A.   Yes.  In general, yeah.

25   Q.   In the case of eggs, while you were involved in buying

1    eggs, would it be accurate to say that the incumbent suppliers

2    were competing against Sparboe for those five distribution

3    centers?

4    A.   I don't know that I can speak for what the incumbents

5    were doing or saying or thinking.

6    Q.   If they wanted your business at those five distribution

7    centers?

8    A.   I will assume so.

9    Q.   And so did Sparboe?

10   A.   Yes, they did.

11   Q.   And there's nothing wrong with competing for a large

12   customer's business, is there, sir?

13   A.   I think it's fine.

14            MR. DESTEFANO:  Thank you.  That's all I have.

15            MR. BIZAR:  Just a couple, Your Honor.

16            THE COURT:  Sure.  Go ahead.

17                         CROSS-EXAMINATION

18   BY MR. BIZAR:

19   Q.   Mr. Airoso, just a couple of questions, if I may.  My

20   name is Steve Bizar.

21            You were asked about CCF. The CCF brand, Country

22   Creek Farm brand, is that the company or the entity?

23   A.   I think so.  I don't remember that.

24   Q.   You're not aware of the membership of -- or the

25   composition of CCF brands?

1   A.   I don't know what you mean.

2   Q.   Who are the people that CCF is representing, who are the

3   entities that CCF is representing?

4   A.   I had some knowledge of that, as I spoke earlier.

5   Q.   So, for example, you wouldn't know that they have nothing

6   to do with R.W. Sauder, right, as you sit here today?

7   A.   I have no idea one way or the other.

8   Q.   Okay.  And you never heard any conversations to the

9   effect that Paul Sauder ever tried to preclude or prevent

10  anybody from seeking Walmart business, right?

11  A.   No, sir.

12  Q.   Am I right?

13  A.   Yes, you're correct.  I don't know anything about that.

14           MR. BIZAR:  That's all I have.  Thank you,

15  Your Honor.

16           THE COURT:  Anything else?

17           MR. CALLOW:  Nothing, Your Honor.

18           THE COURT:  Any redirect?

19           MR. OLSON:  Nothing further, Your Honor.  Thank you.

20           THE COURT:  Okay.  You may return to California.

21           THE WITNESS:  All right.  Thank you so much.

22           THE COURT:  Travel safely.

23           THE WITNESS:  Thank you.  Should I leave these

24  documents here.

25           THE COURT:  No.  You can leave everything there.