# EXHIBIT 3

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 6

 7
                              - - - - -
 8

 9                         PHILADELPHIA, PA

10
                             MAY 7, 2018
11                            DAY FOUR

12

13   BEFORE:     THE HONORABLE GENE E.K. PRATTER, J.

14

15                            - - - - -

16                         TRIAL TRANSCRIPT

17                            - - - - -

18

19

20

21          KATHLEEN FELDMAN, CSR, CRR, RPR, CM
            Official Court Reporter
22          Room 1234 - U.S. Courthouse
            601 Market Street
23          Philadelphia, PA  19106
            (215) 779-5578
24

25
        (Transcript produced by mechanical shorthand via C.A.T.)
```

```
 1    APPEARANCES:

 2              QUINN EMANUEL
                BY:  STEPHEN R. NEUWIRTH, ESQUIRE
 3              JOSEPH N. KIEFER, ESQUIRE
                ALEXEE DEEP CONROY, ESQUIRE
 4              DUANE R. LYONS, ESQUIRE
                STEIG D. OLSON, ESQUIRE
 5              ALEX J. TSCHUMI, ESQUIRE
                DAVID B. ADLER, ESQUIRE
 6              51 Madison Avenue, 22nd Floor
                New York, NY  10010
 7              For Direct Purchaser Class

 8

 9              WOLLMUTH MAHER & DEUTSCH LLP
                BY:  RONALD J. ARANOFF, ESQUIRE
10              500 Fifth Avenue
                New York, NY  10110
11              For Direct Purchaser Class

12

13              LITE DEPALMA GREENBERG
                BY:  MINDEE J. REUBEN, ESQUIRE
14              1521 Locust Street, 7th Floor
                Philadelphia, PA  19102
15              For Direct Purchaser Class

16

17              HAUSFELD, LLP
                BY:  JAMES J. PIZZIRUSSO, ESQUIRE
18              NATHANIEL C. GIDDINGS, ESQUIRE
                JEANNINE M. KENNEY, ESQUIRE
19              1700 K Street, NW, Suite 650
                Washington, DC  20006
20              For Direct Purchaser Plaintiffs

21

22              BERNSTEIN LIEBHARD LLP
                BY:  STANLEY D. BERNSTEIN, ESQUIRE
23              DANA STATSKY SMITH, ESQUIRE
                10 E. 40th St.
24              New York, NY  10016
                For Direct Purchaser Plaintiffs
25
                (CONT.)
```

```
 1   APPEARANCES:  (CONT.)

 2
             SUSMAN GODFREY LLP
 3           BY:  STEPHEN D. SUSMAN, ESQUIRE
             1301 Avenue of the Americas
 4           32nd Floor
             New York, NY  10019-6023
 5                 And
             TERRY OXFORD, ESQUIRE
 6           1000 Louisiana
             Suite 5100
 7           Houston, TX  77002
             For Direct Purchaser Plaintiffs
 8

 9
             PORTER WRIGHT MORRIS & ARTHUR LLP
10           BY:  JAY L. LEVINE, ESQUIRE
             DONALD M. BARNES, ESQUIRE
11           JAMES A. KING, ESQUIRE
             JETTA C. SANDIN, ESQUIRE
12           ALLEN T. CARTER, ESQUIRE
             MOLLY S. CRABTREE, ESQUIRE
13           1900 K Street NW, Suite 1110
             Washington, D.C.  20006
14                 And
             STEVENS & LEE
15           BY:  WILLIAM A. DESTEFANO, ESQUIRE
             TERRI A. PAWELSKI, ESQUIRE
16           1818 Market Street, 29th Floor
             Philadelphia, PA 19103
17           For Rose Acre Farms

18

19           KEATING MUETHING & KLEKAMP PLL
             BY:  JOSEPH M. CALLOW, JR., ESQUIRE
20           One East Fourth Street, Suite 1400
             Cincinnati, OH  45202
21           For Ohio Fresh Eggs

22

23           (CONT.)

24

25
```

                                                                    4

```
 1   APPEARANCES:  (CONT.)

 2

 3            DECHERT LLP
              BY:  CHRISTINE C. LEVIN, ESQUIRE
 4            STEVEN E. BIZAR, ESQUIRE
              JULIA CHAPMAN, ESQUIRE
 5            Cira Centre
              2929 Arch Street
 6            Philadelphia, Pennsylvania  19104-2808
              For R.W. Sauder
 7

 8            OTHER COUNSEL IN ATTENDANCE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  department, I began having meetings with all the key suppliers
2  over all the various departments, yogurt, juice, milk,
3  whatever it might be.  I met with our key suppliers in eggs,
4  Cal-Maine and Country Creek Farms, and during one of the
5  meetings with Country Creek Farms, they recommended that I
6  meet with UEP and with their leadership, specifically Gene
7  Gregory.  I did have one of those meetings and at that point
8  in time, they explained to me about what the UEP Certified
9  process was.
10 Q.   And when you say you met with UEP, that's the United Egg
11 Producers?
12 A.   That is correct.
13 Q.   And so you did meet with Mr. Gregory?
14 A.   I did.
15 Q.   Did you have an understanding of what his role was at the
16 time at UEP?
17 A.   Yes.  So he would have been the president of the
18 organization.
19 Q.   And in the course of learning about the Certified
20 Program, did you come to learn whether Walmart had been a
21 supporter of the UEP Guidelines?
22 A.   I did.  So going through that process and meeting with
23 Mr. Gregory, I did learn that Walmart had been a supporter of
24 the UEP Certified process for several years.
25 Q.   Now, did you understand at this time that the UEP

1   Certified Program included a requirement, sometimes called the
2   100% rule, which provided that a producer, in order to be
3   certified to sell to any customers who wanted certified eggs
4   would have to be certified on all of their facilities
5   regardless of whether all their customers wanted certified?
6   A.   Yeah, I was not.  What I understood it to be was a set of
7   guidelines that were based on scientific information that were
8   put in place to protect the animal welfare of the hens that
9   were laying, and that farms needed to be certified so they
10  could sell eggs.  And that was part of the Walmart
11  specifications at the time.
12  Q.   And did you gain any understanding of whether prior folks
13  at Walmart in your role had any knowledge of this 100% rule?
14  A.   Yes.  So, you know, speaking with Mr. Poole and others at
15  Walmart, nobody ever mentioned anything about the 100% rule or
16  anything to that end around certified process.
17  Q.   Okay.  Let's put that 100% rule to one side for a moment.
18           Do you recall your reaction to the Certified Program
19  when you learned about the guidelines?
20  A.   Yeah, in general, at Walmart, we were supportive of it.
21  We were happy that the industry was using scientific-based
22  processes to understand how they should be treating the hens,
23  the welfare that they would have, and that that would improve
24  that, and for several years, at that point in time, we had
25  been requiring improved animal welfare at Walmart.

1   Q.   Mr. Airoso, did Walmart, to your knowledge, ever ask the
2   United Egg Producers or its members to put together a
3   certified program for their hens?
4   A.   Yeah, absolutely not.  There's no question in my mind
5   that the program was put together by the UEP.  It was brought
6   to Walmart; it was shared with us as a program to improve
7   animal welfare, and we adopted those practices.
8   Q.   Do you recall Walmart, while you were in this role,
9   receiving pressure from animal rights groups to sell certified
10  eggs?
11  A.   No.
12  Q.   Let's talk briefly about how eggs are priced at Walmart.
13  Have you heard of something called the Urner Barry price?
14  A.   I have.
15  Q.   And can you describe for us lay-folks and to the jury
16  what the Urner Barry price is?
17  A.   I'm kind of a lay-folk too.  So I'll do my best.  Urner
18  Barry is a publication that's put out daily by the Urner Barry
19  publications group, and it's used within the industry to set
20  pricing for eggs at the producer level, processor level,
21  distribution level, and like somebody buying eggs like Walmart
22  for a retail -- retail store.  It's used throughout the supply
23  chain, and it would have been part of the basis for how
24  Walmart would have purchased eggs.
25  Q.   Is it something like a benchmark price?

1   A.   It is.

2   Q.   And did the Urner Barry price affect what Walmart itself

3   would pay for eggs?

4   A.   It did.  The Urner Barry was the baseline, and then our

5   price at Walmart would be either a discount to or a plus up to

6   the Urner Barry price, and that's kind of the benchmark we

7   would start from.

8   Q.   So, Mr. Airoso, if egg producers had engaged in conduct

9   that would reduce supply and affect this benchmark price,

10   would that increase the price that Walmart would pay for eggs?

11   A.   Absolutely.

12          MR. DESTEFANO:  Objection.

13          MR. BIZAR:  Objection.  Leading, Your Honor.

14          THE COURT:  Sustained.

15   BY MR. OLSON:

16   Q.   Would changes, Mr. Airoso, in the Urner Barry benchmark

17   price affect the price that Walmart would pay for eggs?

18   A.   They would.

19   Q.   And is that both up and down?

20   A.   That is correct.

21   Q.   Okay.  You've mentioned earlier that when you came into

22   the role, you didn't hear about the 100% rule.

23   A.   Correct.

24   Q.   Was there a time when you became -- when you first heard

25   of that requirement?

1  A.   I did.  In May of 2008.  So at that point in time began
2  the process of doing the bidding process, and we began to look
3  at some suppliers that were not currently supplying to
4  Walmart, and one of those suppliers was not using the
5  certified process.  And at that point in time, we began to
6  look at them as a candidate to be in our big pool.
7         That information got out to other suppliers in the
8  industry.  At that point in time, the UEP leadership as well
9  as leadership from Cal-Maine and CCF and others came to see
10 us, called us, and talked to us about the Certified Program
11 and that it needs to be 100 percent compliant and how
12 important that was.
13 Q.   And what was your personal reaction when you first
14 learned about this 100% rule?
15 A.   Yeah, I didn't -- my first reaction was it wasn't
16 necessary, right?  I felt like it was appropriate for Walmart
17 to have specifications for the hens that were being used to
18 produce eggs for us, but I didn't feel it was appropriate for
19 Walmart to make decisions for the producers about how they
20 dealt with the rest of the industry.  I felt like that should
21 be something that they dealt with individually.
22 Q.   Okay.  You just referenced the bidding process --
23 A.   Yep.
24 Q.   -- in the spring of 2008.  So let's -- I mean spring and
25 summer.

1   specifications.
2   Q.   And do you recall what -- at this time when the bidding
3   process started, what the Walmart specifications required
4   about animal welfare?
5   A.   I do.  At that point in time when the process started, we
6   had been using something that had been in place for several
7   years at Walmart.  And in the specifications for animal
8   welfare it required that they participate in the FMI and the
9   UEP Certified process.
10  Q.   And what was your understanding of why Walmart had that
11  requirement?
12  A.   Yeah, so my understanding is that it had been in place
13  for several years.  The suppliers in the industry for the most
14  part used it, and because of that I really didn't think about
15  it very much.  It just kind of was in place and that's what we
16  started off the process with.
17  Q.   Again, when you started off the process with those
18  specifications, did you have an understanding that those
19  guidelines, the UEP Guidelines, in particular, required a
20  producer to follow some 100% rule?
21  A.   No, I had no idea of that.
22  Q.   Now, was there a point during the 2008 bidding process
23  that Walmart changed its specifications with regard to animal
24  welfare?
25  A.   Yes, we did.

1               THE COURT:  The first page does appear to be
2    hearsay.
3               MR. OLSON:  Well, we would welcome a limiting
4    instruction.  We're not introducing it for the truth of what's
5    stated.
6               THE COURT:  What is the purpose of it?
7               MR. OLSON:  The purpose is, as the witness
8    testified, this is when Walmart communicated to its suppliers
9    a change of specifications, and it's also when those suppliers
10   learned who else was in the bidding process.  So whether any
11   of that was true or not, it -- the information was provided.
12              THE COURT:  Well, you can use the remainder of the
13   exhibit, but there's still -- I'm not quite sure what the
14   point is of the transmittal e-mail?
15              MR. OLSON:  Okay.
16   BY MR. OLSON:
17   Q.   You can put that document aside.
18              Do you -- you referred to the information getting
19   out to Walmart's current suppliers.  Do you recall when that
20   occurred?
21   A.   In this e-mail it would have been when we would have made
22   the changes known to the specifications in or around late May
23   of 2008.
24   Q.   And would this have been when Walmart's incumbent
25   suppliers learned that Walmart was considering using Sparboe

1   Farms as a new supplier?
2   A.   That is correct.  All the potential suppliers were sent a
3   single e-mail where they were all on copy.  So all of the
4   current suppliers and incumbent suppliers would have known
5   about any additional potential suppliers like Sparboe Farms.
6   Q.   And you also referenced Walmart communicating information
7   where they changed specifications.
8   A.   That is correct.
9   Q.   How did Walmart change its specifications with regard to
10  the animal welfare requirements?
11  A.   Yes, specifically we changed the specification to say
12  that animal welfare needed to be the UEP Certified process,
13  equivalent or better.
14          In this case, in the e-mail, we said better, and
15  later on we changed that, but, yeah, UEP or better.
16  Q.   So the change at this time was from not UEP and FMI
17  exclusively, but to --
18  A.   A broader set of programs could be used as long as the
19  animal welfare requirements were as good as the UEP or better.
20  Q.   Okay.  All right, let's talk about Sparboe Farms a bit.
21          What did you know about Sparboe Farms at the time
22  you gave them an opportunity to bid for the business?
23  A.   Yes, so Sparboe Farms was a new potential supplier to
24  Walmart, and they were not using the UEP Certified process.
25  So I felt it would be prudent to take the egg buyer and a

1   group of Walmart associates.  We went up and visited them on
2   one of their farms.  We met the team that ran
3   Sparboe's business at the time.  We reviewed their farms,
4   looked at all of their facilities.  And we also went through
5   their PVP program, and what they were going to do to certify
6   that food safety and animal welfare was being taken care of.
7   And we came back from that meeting feeling very good about
8   what they had done and that they could be a supplier to
9   Walmart.
10  Q.   So you referred to the PVP program.  Was that a program
11  that Sparboe had?
12  A.   That's correct.
13  Q.   And what was your general understanding of the PVP
14  program?
15  A.   Yeah, so the PVP program was a program that was going to
16  be audited and is audited by the USDA, and as they had
17  designed it, it provided for the animal welfare requirements
18  that we wanted at Walmart.  And we felt like the program was a
19  very good program and potentially better than the UEP
20  Certified process program.
21          And the one thing that I do remember specifically,
22  though, is that it did not have a 100 percent requirement of
23  like all of your eggs and all of your farms.  It was
24  specifically just the eggs that they were going to be selling
25  to Walmart from those farms that were going to sell to Walmart

1  would be certified.
2  Q.   So your understanding is that one of the differences
3  between the PVP program and the UEP Program was that the UEP
4  Program had the 100% rule and the Sparboe program did not?
5  A.   That is correct.
6  Q.   And what was your reaction to that difference?
7  A.   Um, it seemed reasonable to me.  Um, you know, again, at
8  Walmart, we were specifically worried about the hens that were
9  laying eggs and how they were treated and that they were
10 treated within the specifications that we had, that they were
11 treated humanely.
12          But we didn't really believe that we should be
13 making decisions for other folks about what they should do in
14 terms of how they handled their business.  Felt really that
15 should be something based on other customers' demands.
16 Q.   Did you have any concerns about the fact that the Sparboe
17 Farms' program did not have a 100 percent compliance?
18 A.   No, not at all.
19 Q.   Did you make an effort to learn information or request
20 information from Sparboe about their program so you could be
21 educated about it?
22 A.   We did, yes.
23 Q.   And what do you recall in that regard?  How did you go
24 about doing that?
25 A.   Yeah, so we met with several folks from Sparboe,

1  specifically with the -- I'm probably saying his last name
2  incorrectly, Regensburger, I think is how you pronounce it.
3  He was the lead for Sparboe Farms.  We met with Sparboe Farms
4  to understand and get a detail around their Process Verified
5  Program, and they specifically provided information to myself
6  and to Clay Adams, the buyer, in various ways to include
7  things like e-mail and other ways to get us information.
8  Q.   Okay.  And let me hand you, for identification purposes,
9  an exhibit that we have marked Plaintiffs' Exhibit 251.
10 A.   Okay.
11 Q.   Mr. Airoso, can you identify Exhibit 251 for us?
12 A.   Yeah.  This was an e-mail -- an e-mail chain between Lee
13 Regensburger, Clay Adams and myself.
14 Q.   And how did the e-mail chain begin?
15 A.   It began with me asking the -- for information regarding
16 their programs, the PVP program, specifically, and how it
17 related to animal health and welfare, and how I might be able
18 to explain that information to folks at Walmart.
19 Q.   And is that the e-mail on May 28, 2008?
20 A.   That's correct.
21      Let me verify that real quick, please.
22      Yes.
23 Q.   I think you'll find yours is on the back of the chain.
24 A.   Okay, yes.
25 Q.   And is that -- is that an e-mail that you recall sending

1    at that time?

2    A.   I do.

3    Q.   And did you express your views about

4    Walmart's requirements at that time?

5    A.   I did.

6          MR. OLSON:  Your Honor, we move for the admission of

7    Plaintiffs' Exhibit 251.

8          MR. DESTEFANO:  Objection, again, on hearsay

9    grounds, Your Honor.

10         THE COURT:  Overruled.

11         MR. OLSON:  Can we publish the document?

12         THE COURT:  You may.

13         MR. OLSON:  Thank you.  Hopefully we're pulling it

14    up.

15    BY MR. OLSON:

16    Q.   Okay, and let's look at the page 4 of the e-mail at the

17    top, which Mr. Airoso, that's the one you wrote that began the

18    chain; is that right?

19    A.   Yes, sir.

20    Q.   And the first line of the e-mail that you wrote says:  As

21    we have told you, we do not expect you to become part of the

22    UEP.

23          What were you communicating there, sir?

24    A.   Yeah, so I think Sparboe Farms had some questions about

25    whether or not we would force them to use the UEP Certified

1   centers to Sparboe Farms, and that was going to be supplied by
2   two of their five farms.
3   Q.   And so Walmart would have a new supplier?
4   A.   That's correct.
5   Q.   And for the jury's sake, when you refer to distribution
6   centers, can you just explain what those are and generally
7   what the state of distribution centers were at this time at
8   Walmart?
9   A.   Yeah, so there were 41 distribution centers in the
10  United States, kind of put it out geographically to get
11  products to our stores.  And of those 41 distribution centers,
12  on average, they might serve 150 or 200 stores.  And in this
13  case, we awarded five of those distribution centers to Sparboe
14  Farms for them to send eggs into, and for us to distribute
15  those eggs then to our stores.
16  Q.   And why did you award the business to Sparboe?
17  A.   Yeah, so they had a very good competitive price.  We felt
18  comfortable with their food safety and animal welfare programs
19  and felt like in every way they would be a really good
20  supplier to Walmart.
21  Q.   And did you have any concerns about having to defend the
22  fact that Walmart was choosing a supplier that did not have a
23  100 percent requirement?
24  A.   I did not.  Sparboe, at that point in time, had told us
25  that they would be certified on the farms that were going to

1  be supplying to us and that in the near future, they were
2  going to have the other three additional farms that were not
3  going to be shipping to Walmart, that they would have those
4  certified under their PVP program to ensure that they had the
5  cage space density requirements that were in our
6  specifications taken care of.
7          And so they already told me that.  So as part of
8  that, I really wasn't worried because the other option to get
9  those other three farms immediately within spec would be to
10 slaughter a whole bunch of hens, right?  And I didn't feel
11 like that was the right choice, and I didn't think that other
12 groups were going to come to us and say, Why didn't you force
13 the slaughter of a bunch of birds?
14 Q.   Let me make sure that I have my math right.  I think you
15 said that Walmart awarded five distribution centers from two
16 Sparboe Farms?
17 A.   Right.
18 Q.   And then you referred to Sparboe having three other
19 farms; is that right?
20 A.   Yes.
21 Q.   So it's five total?
22 A.   Correct.
23 Q.   And I believe what you just said that Sparboe,
24 immediately for the supply to Walmart, was going to comply
25 with these guidelines and then they were going to bring the

1             MS. CRABTREE:  Thank you.
2             THE COURT:  Mr. Bizar is ready to go.  He's now
3     thanked me twice.
4             See you all tomorrow.
5             MR. BIZAR:  See you tomorrow.
6             (Court adjourned).
7
8
                          C E R T I F I C A T E
9
10        I certify that the foregoing is a correct transcript
11    from the record of the proceedings in the above-entitled
12    matter.
13
14
15                              _____
16                              Kathleen Feldman, CSR, CRR, RPR, CM
                                Official Court Reporter
17
18    Date: _____
19
20
21
22
23
24
25