**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves an alleged conspiracy about not enough eggs. In 2011, a group of food manufacturers filed this federal antitrust lawsuit about the production of eggs. The theory is that a group of egg producers and trade associations conspired to restrict the supply of eggs, which increased the prices. And the plaintiffs – Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. – use a lot of eggs.

Plaintiffs originally filed suit in this district, but the case was soon transferred to the Eastern District of Pennsylvania as part of multidistrict litigation proceedings. Judge Pratter presided over the MDL proceedings, including discovery, expert disclosures, and dispositive motions. After resolving the last motion for summary judgment, Judge Pratter remanded the case to this district for trial.

Meanwhile, Judge Pratter tried two similar cases arising from the MDL proceedings. In each case, Judge Pratter bifurcated the trial into a liability phase and a damages phase. Each trial ended with defense verdicts. So there was no need for a damages phase.

Defendants now seek to follow the same path here. Defendants moved to bifurcate the upcoming trial into a liability phase and a damages phase. Like the other cases from this MDL, they want to crack the trial in two. Plaintiffs oppose the motion.

For the following reasons, the Court grants Defendants' motion to bifurcate the trial into a liability phase and a damages phase.

## Background

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. It's hard to say how many eggs they use each year, but whatever the number is, it's big.

Plaintiffs allege that Defendants United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

Plaintiffs alleged that they paid higher prices for the eggs as a result of the artificial restriction in the supply. But Plaintiffs do not allege that they purchased eggs like those packaged in cartons at the supermarket. Instead, they are purchasers of egg *products*.

Broadly speaking, commercially produced eggs "proceed through one of two principal distribution channels." *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 264 (3d Cir. 2018). The first distribution channel is for shell eggs. *Id.* The reader is undoubtedly familiar with shell eggs. They are the eggs you buy in a paper or Styrofoam tray at the grocery store, usually a dozen at a time. *Id.*

The second distribution channel is for egg products, meaning the type of eggs that Plaintiffs purchased here. *Id.* "Egg products are eggs, either whole or separated, that have been removed from their shells and are then processed into dried, frozen, or liquid forms." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 502 (E.D. Pa. 2019). Consumers are not the typical buyers of egg products. "The primary purchasers of egg products are food manufacturers that use the egg products as ingredients in goods ranging from frozen waffles to salad dressing to mayonnaise." *Id.*

So, both shell eggs and egg products are made from eggs. Shell eggs are the uncracked eggs themselves. And shell eggs "are a necessary prerequisite to egg products." *Id.* at 507. But "it also takes more than [shell] eggs to make egg products." *Id.* (quoting *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 200 (E.D. Pa. 2015)). For example, "it takes infrastructure to process those eggs" into egg products. *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 200.

Plaintiffs filed suit in December 2011, and then amended the complaint twice. *See* Cplt. (Dckt. No. 1). The second amended complaint alleges that Defendants conspired to limit the supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). Specifically, Plaintiffs alleged that Defendants agreed to limit egg supply through three anticompetitive practices.

First, Defendants allegedly agreed to adopt animal-welfare guidelines that increased the size of the enclosures housing egg-laying hens. *Id.* at ¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

Second, Defendants allegedly agreed to increase egg exports, leaving fewer eggs for the domestic market. *Id.* at ¶¶ 140–45. The exported eggs were sold at prices lower than the then-current prices in the United States. *Id.* at ¶ 142. Needless to say, selling at *lower* prices is not usually the first preference of sellers. But defendants allegedly made up for the lost revenue with the higher prices in the supply-constrained U.S. market. *Id.*

Third, Defendants allegedly agreed to "use short-term measures to control supply and artificially maintain and increase the price of eggs." *Id.* at ¶ 146. For example, Defendants allegedly agreed "to reduce the national flock by seven million hens in an effort to increase prices." *Id.* at ¶ 148. Again, fewer hens means fewer eggs, and fewer eggs means higher egg prices.

The complaint alleges that Defendants used all three anticompetitive tactics to restrict the supply of eggs, and successfully increased egg prices. *Id.* at ¶ 167. In sum, Plaintiffs alleged that Defendants artificially reduced the supply, and increased the prices, of eggs in violation of the federal antitrust laws. *Id.* at ¶¶ 194–96.

Soon after Plaintiffs filed their complaint, the case was transferred to the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation. *See* 1/3/12 Transfer Order (Dckt. No. 13). Plaintiffs' case was one of a series of lawsuits alleging that Defendants and other egg producers violated the federal antitrust laws by conspiring to reduce the supply of eggs. *See* Defs.' Mtn. to Bifurcate, at 2–3 (Dckt. No. 153).

In 2008, the first egg antitrust case was transferred to the MDL court. *See* Transfer Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2008) (Dckt. No. 1). In 2012, the case at hand was transferred to the MDL court, too, and the cases were consolidated for pretrial proceedings. *See* Case Mgmt. Order No. 1, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2008) (Dckt. No. 3); Conditional Transfer Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2011) (Dckt. No. 605).

For the next seven and a half years, the parties litigated before Judge Pratter in the Eastern District of Pennsylvania. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.). Judge Pratter divided the plaintiffs in the consolidated cases into three groups: (1) a class of wholesale egg and egg products purchasers, known as Direct Purchaser Plaintiffs (for those who like acronyms, the "DPPs"); (2) wholesale purchasers who opted out of the class, known as Direct Action Plaintiffs ("DAPs"); and (3) a class of consumers who did not purchase directly from the defendants, known as Indirect Purchaser Plaintiffs ("IPPs"). *See* Case Mgmt. Order No. 20, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2013) (Dckt. No. 822). Judge Pratter placed Plaintiffs in the case at hand with the Direct Action Plaintiffs. *See* Defs.' Mtn. to Bifurcate, at 4 (Dckt. No. 153).

While the case was part of the MDL proceedings, the parties completed discovery and filed dispositive pretrial motions. *See* Joint Status Report, at 2 (Dckt. No. 234). The MDL court narrowed the case some. The MDL court granted Defendants' motion to dismiss claims for damages for the period before September 24, 2004. *See In re Processed Egg Prods. Antitrust Litig.*, 2013 WL 4504768, at *8 (E.D. Pa. 2013).

The MDL court initially granted Defendants' motion for summary judgment, dismissing all claims based on purchases of egg products for lack of antitrust standing. *See In re Processed*

*Egg Prods. Antitrust Litig.*, 2016 WL 4670983, at *4 (E.D. Pa. 2016). The Third Circuit reversed on appeal. *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 276 (3d Cir. 2018).

Following remand, Defendants again moved for summary judgment. Defendants argued that Plaintiffs had not demonstrated "that a reduction in the overall supply of eggs *caused* an increase in the price of egg products." *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 506 (E.D. Pa. 2019) (emphasis in original).

Plaintiffs' theory of the case was that "there was a conspiracy to reduce the total supply of eggs, which led to an increase in the price of both shell eggs and egg products." *Id.* Defendants contended that the MDL court should not "consider shell eggs and egg products together," and should instead "consider a number of factors that make them inherently different." *Id.* That is, Defendants argued that Plaintiffs' evidence on the total supply of *eggs* did not show that the price of *egg products* increased.

Judge Pratter denied Defendants' second motion for summary judgment. The MDL court concluded that Plaintiffs had "produced evidence that allows them to argue that an overall reduction in the supply of eggs could have affected egg products prices." *Id.* at 507. So, evidence about the overall reduction in egg supply was relevant to the price of egg products.

When denying Defendants' motion, the MDL court raised doubts about the strength of Plaintiffs' case. In particular, the court questioned the analysis of Plaintiffs' economics expert, Dr. Baye. The court noted that Dr. Baye did not analyze egg products "with the same depth that he considered shell eggs." *Id.* at 509. "There is no doubt that the DAPs could have – *and perhaps will later find they should have* – focused more on the ins and outs of the egg products industry." *Id.* (emphasis added).

The MDL court had been "troubled in the past by the relative lack of attention the DAPs have paid to the differences between shell eggs and egg products." *Id.* at 511. In fact, it was "clear enough that the [c]ourt is not thoroughly convinced of the DAPs' case." *Id.* at 512. But at the summary judgment stage, the court "need not be" convinced. *Id.* Though the Defendants made "compelling arguments" about the Plaintiffs' lack of attention to the two distribution channels, those arguments were "better suited for a jury." *Id.*

After denying Defendants' second motion for summary judgment, Judge Pratter suggested that the case be remanded to this district, where it was originally filed. *See* Remand Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1917). "Pretrial proceedings in this case have been completed, and this case is ready for trial in the transferor district." *Id.* at 1.

The Judicial Panel on Multidistrict Litigation agreed and remanded the case. *See* Conditional Remand Order (Dckt. No. 14). The case was originally assigned to Judge Norgle, who presided over the case until he retired from public service in October 2022. *See* 9/16/19 Exec. Comm. Order (Dckt. No. 15); 10/5/22 Exec. Comm. Order (Dckt. No. 226). A spate of reassignments followed, until the case was ultimately assigned to this Court. *See* 11/21/22 Exec. Comm. Order (Dckt. No. 236).

Meanwhile, back in the Eastern District of Pennsylvania, Judge Pratter presided over two trials in cases brought by different plaintiffs in the MDL proceedings.

First, Judge Pratter tried the claims brought by the class of wholesale egg and egg products purchasers (*i.e.*, the Direct Purchaser Plaintiffs). Rose Acre Farms, a defendant in the case before this Court, was one of three defendants in the trial before Judge Pratter. The jury returned a defense verdict, finding that a conspiracy existed but that the conspiracy did not

impose an unreasonable restraint on supply. *See* Joint Status Report, at 3 (Dckt. No. 234) ("That trial resulted in a defense verdict during the liability phase, with the jury finding the existence of a conspiracy but that the restrictions were reasonable."); Judgment Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1767). The Third Circuit upheld the judgment on appeal. *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020).

Second, Judge Pratter tried the claims brought by wholesale purchasers who opted out of the class (*i.e.*, the Direct Action Plaintiffs). That is, that case involved plaintiffs in the same group as Plaintiffs here, but who originally filed their case in the Eastern District of Pennsylvania.

The defendants were also similar. Defendants at the second trial were three of the defendants here – Rose Acre Farms, United Egg Producers, and United States Egg Marketers. Cal-Maine was not a defendant in that trial, having settled before trial. *See* Pls.' Resp., at 8 (Dckt. No. 185). Plaintiffs' expert, Dr. Baye, testified for the Direct Action Plaintiffs at trial. *See* Notice of Filing, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2075).

Once again, the jury returned a defense verdict. After one day of deliberation, the jury determined that a conspiracy to reduce the supply of eggs did not exist. *See* Joint Status Report, at 3 (Dckt. No. 234) ("The second trial began in October 2019. . . . That trial also resulted in a defense verdict during the liability phase, with the jury finding that no conspiracy existed."). The Third Circuit upheld that judgment, too. *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x 142 (3d Cir. 2021).

In addition to defense verdicts, both trials shared an important procedural ruling. Judge Pratter bifurcated each trial into a liability phase and a damages phase. *See* Case Mgmt. Order

No. 24, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2017) (Dckt. No. 1560) (DPP trial); 10/4/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2003) (the Direct Action Plaintiffs trial). The plaintiffs in the trial with the Direct Action Plaintiffs did not object to bifurcation. *See* Defs.' Reply, at 2 (Dckt. No. 238). In the end, each trial involved only a liability phase because each jury returned defense verdicts.

In the case at hand, Defendants now seek to follow the same route. They filed a motion to bifurcate the trial into a liability phase and a damages phase. *See* Defs.' Mtn. to Bifurcate (Dckt. No. 153). Unlike in the earlier trial involving the Direct Action Plaintiffs, Plaintiffs here oppose the motion to bifurcate. *See* Pls.' Resp. (Dckt. No. 185). That motion is now before the Court.

## Legal Standard

Under Rule 42(b) of the Federal Rules of Civil Procedure, "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." *See* Fed. R. Civ. P. 42(b). The Rule permits district courts to bifurcate the liability and damages phases of a trial. *See Fetzer v. Wal-Mart Stores, Inc.*, 2016 WL 6833912, at *6 (N.D. Ill. 2016); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, at § 2390 (3d ed. Apr. 2023 update) ("The separation of issues of liability from those relating to damages is an obvious use for Federal Rule 42(b)."). The moving party has the burden "to show that bifurcation is proper." *Fetzer*, 2016 WL 6833912, at *3 (quotation marks omitted).

The Seventh Circuit has developed a three-part test to determine whether to bifurcate issues for trial. "First, the trial judge must determine whether separate trials would avoid

prejudice to a party or promote judicial economy." *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999). A district court needs to find only that one of these criteria – avoiding prejudice, or promoting judicial economy – is met to grant a motion to bifurcate. *See Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007). "Next, the court must be satisfied that the decision to bifurcate does not unfairly prejudice the non-moving party. Finally, separate trials must not be granted if doing so would violate the Seventh Amendment." *Houseman*, 171 F.3d at 1121 (citation omitted).

Applying this test requires the court to "balance considerations of convenience, economy, expedition, and prejudice, depending on the peculiar facts and circumstances of each case." *See Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008); *see also* Fed. Jud. Ctr., Manual for Complex Litigation, at § 11.632 (4th ed. May 2023 update) ("The court should balance the advantages of separate trials, however, against the potential for increased cost, delay (including delay in reaching settlement), and inconvenience, particularly if the same witnesses may be needed to testify at both trials."). Given the wide range of case-specific factors, "determining whether to bifurcate [issues] is a fact-intensive determination over which the Court has considerable discretion." *Est. of Loury ex rel. Hudson v. City of Chicago*, 2020 WL 1491141, at *1 (N.D. Ill. 2020); *see also Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013) ("A district court's decision to bifurcate or to hold separate trials is reviewable for an abuse of discretion.").

Typically, "bifurcation remains the exception, not the rule." *Fetzer*, 2016 WL 6833912, at *3 (quotation marks omitted). "The piecemeal trial of separate issues in a single lawsuit . . . is not to be the usual course." *See* 9A Wright & Miller, *supra*, at § 2388. But "[w]hile separation of issues should not be customary, it is important that it be encouraged where the experience has

demonstrated its worth." *Est. of McIntosh v. City of Chicago*, 2015 WL 5164080, at *2 (N.D. Ill. 2015) (St. Eve, J.) (quotation marks omitted).

## Analysis

### I. Promoting Judicial Economy and Avoiding Prejudice

Step one requires the Court to consider whether bifurcation would promote judicial economy *or* avoid prejudice. Again, only one of the two criteria must be met to bifurcate the trial. *See Chlopek*, 499 F.3d at 700.

The Court begins with whether bifurcation would promote judicial economy. The Court first considers "the likelihood that a finding of no liability will actually occur: where the movant can make a *prima facie* showing of success, this Court is more likely to grant bifurcation in the interests of judicial economy." *Fetzer*, 2016 WL 6833912, at *3 (quotation marks omitted).

"[W]here substantial time and effort will be saved by a finding of no liability, the Court is more likely to grant bifurcation." *Id.* (quotation marks omitted). In other words, "if the movant can show that the additional issues avoided by a finding of no liability are complex and time consuming, the Court is more likely to bifurcate." *Id.* (quotation marks omitted).

Defendants argue that there is a likelihood of no liability at trial. They offer two reasons why they will likely prevail at trial. The first reason is about the jury verdicts in two Pennsylvania trials. The second reason is about concerns raised by Judge Pratter about the strength of the case.

First, both cases tried by the MDL court resulted in defense verdicts. In Defendants' view, "[t]he outcome of the two earlier trials is more than enough to establish that Plaintiffs face a significant likelihood that a jury will find no liability in this case." *See* Defs.' Mtn. to Bifurcate, at 8 (Dckt. No. 153). Defendants believe that the result of these trials is especially

11

informative because the "juries weighed the same theories of antitrust liability advanced by these Plaintiffs." *Id.* at 9.

The Court agrees that the prior trials provide useful data points when evaluating whether bifurcation would promote judicial economy. Judge Pratter bifurcated each trial, and the jury found for the defendants in each trial. Bifurcation saved everyone the burden and expense of presenting and sitting through the evidence about damages.

The second trial before Judge Pratter is especially instructive. For starters, that case involved similar plaintiffs. That trial involved claims by Direct Action Plaintiffs, the same type of plaintiff as Plaintiffs in this case. So, the plaintiffs in the second MDL trial were the same sort of buyers as the Plaintiffs here – wholesalers who purchased directly from defendants and opted out of the class.

The case before Judge Pratter had similar theories of liability, too. Like Plaintiffs here, the Direct Action Plaintiffs in the second trial alleged a conspiracy to increase the price of egg products. In fact, because of the strong similarities, Plaintiffs here and the Direct Action Plaintiffs in the second trial were subject to the same summary judgment order on their claims related to egg products. *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. at 501 n.2. Those Direct Action Plaintiffs that remained in the Eastern District of Pennsylvania then lost at trial. *See* Judgment Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2090).

Plaintiffs in the case at hand plan to rely on similar evidence to support a similar theory. Plaintiffs' expert, Dr. Baye, testified for the Direct Action Plaintiffs during the liability phase of the second MDL trial. *See* Notice of Filing, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2075). Dr. Baye is expected to testify in this trial, too. *See* Defs.' Mtn. to Preclude Pls.' Expert from

12

Offering Factual Narrative (Dckt. No. 171); Pls.' Resp. to Defs.' Mtn. to Preclude (Dckt. No. 208) (opposing Defendants' motion to limit Dr. Baye's testimony).

As Plaintiffs acknowledge, "Dr. Baye was jointly retained by the plaintiffs in this case and the grocer plaintiffs in the MDL." *See* Pls.' Resp. to Defs.' Mtn. to Preclude, at 3 (Dckt. No. 208). As a jointly retained expert, Dr. Baye "prepared a *single report* that applied to both the grocer plaintiffs and the plaintiffs in this case." *Id.* (emphasis added). On the basis of that report, "[i]n December 2019, Dr. Baye testified in the Direct Action Plaintiff (grocer) trial." *Id.*

The cases are similar on the other side of the "*v*," too. Defendants at the second MDL trial were three of the defendants here – Rose Acre Farms, United Egg Producers, and United States Egg Marketers. So, the Defendants in this case are the same as the second MDL trial, plus Defendant Cal-Maine. (Again, instead of going to trial in the other action with the Direct Action Plaintiffs, Cal-Maine settled.)

So, during the second trial before Judge Pratter, a group of similar plaintiffs pursued the same theories of liability against three of the four Defendants while relying on the same expert witness. That's a lot of overlap with the case at hand.

In the end, the jury sided with the defendants in that case, so there was no need for a damages phase. It is not much of a stretch to think that the same thing could happen here, too. Maybe past will be prologue. At the very least, it creates a reasonable likelihood that bifurcating the trial could lead to significant savings of time and money.

Plaintiffs argue that the outcome of the prior trials is irrelevant. *See* Pls.' Resp., at 7 (Dckt. No. 185). Plaintiffs note that those trials involved different plaintiffs and a different subset of defendants. *Id.* at 8–9. Cal-Maine was not a defendant at the earlier trial, so "[n]o jury

13

has ever found in favor of this collection of Defendants and Cal-Maine in particular was one of the chief architects of Defendants' anticompetitive scheme." *Id.* at 8.

So, in Plaintiffs' view, these prior "cases have nothing to do with the bifurcation proposal before the Court in *this* case." *Id.* at 9 (emphasis in original). As they see it, if the Court bifurcates based on the outcomes of the prior trials, then bifurcation is based "on the unremarkable proposition that Plaintiffs might lose on liability." *Id.*

Not so. It's true that generally "[t]he court will not preclude a party from presenting evidence relevant to both liability and damages in the same proceeding *merely because* that party may not ultimately obtain a favorable judgment." *Keyes Fibre Co. v. Packaging Corp. of Am.*, 763 F. Supp. 374, 376 (N.D. Ill. 1991) (emphasis added). A plaintiff might lose anytime a case goes to trial, but "bifurcation remains the exception, not the rule." *Fetzer*, 2016 WL 6833912, at *3 (quotation marks omitted).

But that's not this case. There is a track record, and it points in a direction that is telling. The earlier trials shed light that is more penetrating than the "unremarkable proposition" that someone will lose at trial. *See* Pls.' Resp., at 9 (Dckt. No. 185). The point is not simply that the Plaintiffs might lose the next hand – the point is that other plaintiffs already lost the first two hands.

The Pennsylvania trial involving the Direct Action Plaintiffs is a factually and legally similar case that was part of the same MDL proceeding. It was brought by the same type of plaintiffs as grouped by Judge Pratter – wholesale purchasers (Direct Action Plaintiffs). It was brought against three of the four defendants in this case. It raised the same legal theory at issue in this case. So, it was subject to the same substantive summary judgment ruling "on the DAPs'

14

egg product-related claims." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. at 501. And it featured the same expert on anticompetitive harm – Dr. Baye.

In short, this trial is not much different than the trial that already took place before Judge Pratter. And that trial ended with a defense verdict. That track record supports the "likelihood that a finding of no liability will actually occur." *Fetzer*, 2016 WL 6833912, at *3

Maybe the trial in the case at hand will end differently. Time will tell. But for now, it is enough to conclude that there is a reasonable probability that the jury will return a defense verdict. Juries have already done so in similar cases – twice.

Second, Defendants contend that there is a likelihood of no liability because Judge Pratter identified shortcomings in Plaintiffs' case when ruling on summary judgment. *See* Defs.' Mtn. to Bifurcate, at 9–10 (Dckt. No. 153). For example, Judge Pratter noted that Plaintiffs were "unable to point to any evidence" that the animal-welfare guidelines that increased the size of the egg-laying hen enclosures "constituted an express agreement among competitors to restrict egg supply." *Id.* at 9 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016)).

Judge Pratter also identified issues with Plaintiffs' evidence of anticompetitive harm. The record "suggest[ed]" that features of the animal-welfare guidelines "do plausibly have procompetitive benefits." *Id.* (quoting *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d at 1045).

The potential problems with Plaintiffs' case extended to Plaintiffs' expert, Dr. Baye. Judge Pratter "was 'troubled' by 'the relative lack of attention the [Plaintiffs] have paid to the differences between shell eggs and egg products.'" *Id.* at 10 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. at 511).

The Court begins by noting that Judge Pratter's comments were made at the summary judgment stage. And Judge Pratter ultimately held that Plaintiffs' claims *survived* summary judgment. *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. at 514; *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d at 1053. So, Plaintiffs' claims have an avenue for success. That's why we're headed to trial.

Regardless, Judge Pratter's comments are instructive on the likelihood that this trial would proceed past a liability phase. In the latest round of summary judgment rulings, Judge Pratter put it bluntly: it was "clear enough that the [c]ourt is not thoroughly convinced of [Plaintiffs'] case." *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. at 512. In separate rulings, Judge Pratter questioned *both* the Plaintiffs' ability to prove a conspiracy and Dr. Baye's ability to show that the conspiracy caused anticompetitive harm. *See id.* at 511–12; *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d at 1045.

Judge Pratter's comments may have foreshadowed the eventual failure by the other Direct Action Plaintiffs to prove liability. But ultimately what matters is the evidence from the trial itself. The outcome of that trial is evidence that "litigation of the first issue [liability] might eliminate the need to litigate the second issue [damages]." *Fetzer*, 2016 WL 6833912, at *3 (quoting *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999)).

Based on the outcome of the prior two trials, especially the trial with the Direct Action Plaintiffs, and Judge Pratter's comments on the strength of Plaintiffs' case, the Court finds that there is a reasonable likelihood that this trial would not move past a liability phase.

A finding of no liability at the damages phase would save considerable resources. "The bifurcation of trials has been approved as an effective method of simplifying factual presentation, reducing costs, and saving time." *MCI Comm'cns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081,

1167 (7th Cir. 1983). That's especially true given "[t]he fact that evidence of damage frequently changes depending upon the findings of liability." *Id.* And even if the jury finds defendants liable, bifurcation can "result in savings insofar as the deliberations regarding liability will not be sidetracked by extraneous and potentially confusing evidence relating to [plaintiff's] damages." *Brom v. Bozell, Jacobs, Kenyon & Eckhardt, Inc.*, 867 F. Supp. 686, 690 (N.D. Ill. 1994).

Defendants argue that a bifurcated trial will streamline the presentation of evidence. *See* Defs.' Mtn. to Bifurcate, at 10–11 (Dckt. No. 153). The parties can "defer introducing damages evidence" which will simplify the liability phase of the trial. *Id.* at 10.

Plaintiffs disagree that a bifurcated trial will save judicial resources. They point to "the truism that one trial is more efficient than two." *See* Pls.' Resp., at 3 (Dckt. No. 185). Plaintiffs contend that in the antitrust context that rule is important because "proof of liability requires the presentation of proof of loss." *Id.*

Defendants acknowledge that issues of liability and damages are not completely separable in this case. As a result, "the parties' economics experts will still be testifying on issues related to liability if trial is bifurcated." *See* Defs.' Mtn. to Bifurcate, at 11 n.6 (Dckt. No. 153). So, both sides agree that the economics experts will be required to testify at both phases of the trial if the jury finds Defendants liable.

This Court does not write on a blank slate when addressing this issue. Judge Pratter twice confronted it when bifurcating the trials in the MDL court.

As Judge Pratter acknowledged, "[t]o show the elements for a Sherman Act claim, [Plaintiffs] must prove the existence of damages." *See* Order at 1 n.1, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1667). "To prove injury, [Plaintiffs] could present evidence that they paid more for eggs than they otherwise would have

in the purported non-conspiracy world." *See* Order at 1 n.1, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2003). To do so "necessarily requires a discussion of damages." *Id.* (quotation marks omitted). Likewise, "[t]o prove anticompetitive effects" – another element of Plaintiff's case – "similarly necessitates a discussion of damages." *Id.*

To address this issue, Judge Pratter "decline[d] to categorically prohibit a discussion of damages during the liability phase." *Id.* But "the *amount* of damages, if any, will be proven in the damages phase, not the liability phase." *Id.* (emphasis in original).

So, Judge Pratter permitted the parties to introduce evidence of damages (or the lack of damages) at trial. But she did not permit the parties to get into the nitty-gritty. That is, she did not permit the parties to introduce evidence of the specific amount of damages.

Judge Pratter's ruling laying out what was fair game at each phase of the trial fits with the Seventh Circuit's instructions on bifurcating antitrust trials. "In order to be effective, separate trials of liability and damages in antitrust cases must be grounded upon a clear understanding between the court and the parties of the issues and proof involved in each phase of the trial." *MCI Comm'cns*, 708 F.2d at 1168.

By all appearances, that practice worked – twice. Plaintiffs do not point to any issues during either trial with permitting evidence of loss but excluding evidence of the specific amount of damages. And because the juries returned defense verdicts, the parties' economics experts did not need to present evidence of the amount of damages. That saved judicial time and resources. *See* 8 James W. Moore *et al.*, Moore's Federal Practice, at § 42.20[6][b] (3d ed. 2022) ("Bifurcation of the issues of liability and damages may be granted when a determination of no liability will negate the need to reach the issue of damages.").

It is not quite right to say that one trial is more efficient than two. Framing the issue that way overlooks the fact that there might not *be* a second trial. The choice is not between one trial or two trials. The choice is between one trial and the possibility of two trials. Or to be more precise, the choice is between one longer trial (liability + damages) or one shorter trial (liability) plus the possibility of a second trial (damages).

In fact, the one-trial route could be *less* efficient – if Plaintiffs lose on liability, then all of the trial time on damages will go down the drain. The bird in the hand could outweigh the one in the bush.

Moreover, even if the jury returns a partial defense verdict, bifurcation might save judicial resources. If the jury determines that some, but not all, Plaintiffs have prevailed, then the jury can consider damages only for those Plaintiff(s). *See MCI Comm'cns*, 708 F.2d at 1167. So, the parties and the Court can save resources at a damages phase by focusing on the damages that are actually in play after the jury's liability verdict.

The Court acknowledges the potential inconvenience to the parties' expert witnesses who may need to testify twice. But Plaintiff's economics expert (Dr. Baye) is the same expert used by the Direct Action Plaintiffs in the bifurcated trial before Judge Pratter. He ultimately did not testify twice because the defendants prevailed at the liability stage of the trial.

So, bifurcation saved judicial time and resources because Dr. Baye did not present evidence of the amount of damages to the jury. When it comes to bifurcating trials from this MDL, "experience has demonstrated its worth." *Est. of McIntosh*, 2015 WL 5164080, at *3 (quotation marks omitted).

Plaintiffs also contend that antitrust cases writ large are not good candidates for bifurcation because liability requires some showing of damages. *See* Pls.' Resp., at 3–4 (Dckt.

No. 185). That argument swims against the current of the case law. Although bifurcation is not the default in any case, antitrust cases are often strong candidates for bifurcation. A leading treatise notes that courts have regularly bifurcated liability and damages in antitrust cases. *See* 9A Wright & Miller, *supra*, at § 2390 (noting that "a significant number of federal courts, in many different kinds of civil litigation, have ordered the questions of liability and damages to be tried separately, for example *in cases involving antitrust*") (emphasis added) (footnote omitted).

Arguing in an antitrust case that "the issues on liability could not be separated from the issues on damages . . . confuse[s] the questions of causation and calculation of damages." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1984). "In finding causation, the jury must find the nexus between the act and the injury." *Id.* But "[o]nce a jury has properly found causation of antitrust injury from unlawful activity, however, the damages in [the] case may be determined without strict proof of what act caused which injury as long as the damages are not based upon speculation or guesswork." *Id.*

Likewise, the Seventh Circuit has suggested that bifurcation may streamline issues in complex antitrust cases. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 666 (7th Cir. 2002) ("No doubt in view of the complexity of [this antitrust] case the judge will also want to bifurcate the trial, that is, to have a trial on liability first and only if the jury finds that the defendants violated the law to conduct a trial to determine the plaintiffs' damages."); *see also Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998) (granting a motion to bifurcate an antitrust case when it "would enhance the jury's understanding of the issues in this complex case").

The fact that the case involves antitrust is instructive, but not dispositive. It is directionally significant. But at the end of the day, the question turns on case-specific factors,

not the substance of the case alone. *See Houskins*, 549 F.3d at 495; *see also Daniels v. City of Sioux City*, 294 F.R.D. 509, 511 (N.D. Iowa 2013) ("Bright-line rules [regarding bifurcation] are not appropriate as, instead, a case-by-case analysis of the relevant facts and circumstances is required."). And here, the experience has shown that bifurcation saved judicial time and resources.

In sum, the Court finds that bifurcating liability and damages would promote judicial economy. Because the Court finds that bifurcation would promote judicial economy, it need not consider whether bifurcation would avoid prejudice.

## II. Unfair Prejudice to Plaintiffs

Next, the Court considers whether bifurcation would unfairly prejudice Plaintiffs. Defendants again point to the bifurcated trials before Judge Pratter to argue that Plaintiffs will not be prejudiced. Those earlier trials provide "this Court and the parties . . . a clear roadmap to follow for ensuring efficient bifurcation." *See* Defs.' Mtn. to Bifurcate, at 12 (Dckt. No. 153).

Plaintiffs contend that they would be unduly prejudiced by bifurcation. *See* Pls.' Resp., at 12–14 (Dckt. No. 185). Their argument again centers on the need to prove damages during the liability phase of an antitrust trial. "Dividing the issues of liability and damages here would force Plaintiffs to put their liability case to a jury without damages evidence that is inextricably linked with the question of liability." *Id.* at 13.

Plaintiffs also believe that prohibiting them from discussing an amount of damages during the liability phase will confuse the jury. Preventing Plaintiffs "from discussing dollar amounts of damages during the liability phase" will "make it much harder for the jury to understand the evidence and place it in its context." *Id.*

21

This Court doesn't see much risk of confusion.  Judge Pratter demonstrated that juries can decide the issue of liability without getting in the weeds about the amount of damages. Plaintiffs won't be hamstrung, either.  They will have the latitude to present evidence to the jury that they suffered an antitrust injury.  They can present what they need to present to establish liability, including the existence of a loss.  They simply won't need to get into the amount of damages.

Realistically speaking, the jury will have a lot on its plate already.  Trial is expected to last more than a month.  That's a long time for any group of jurors to sit through a trial.  And the issues here will be complex (although the Court encourages the parties to try to make it simple and digestible).  Adding the amount of damages to the jury's to-do list would add another layer of complexity to an already complex trial.

Plaintiffs do not put forward case-specific arguments why bifurcation would unduly prejudice them.  Notably, Plaintiffs' expert witness (Dr. Baye) already testified in a bifurcated trial, and there is no reason to think that he could not do so again.

In sum, the Court finds that Plaintiffs would not be unduly prejudiced by bifurcation.

## III.    Seventh Amendment Concerns

The last hurdle is the constitutional right to a jury trial.  The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined."  *See* U.S. Const. amend. VII.  To comply with the Amendment, "questions in a single suit can only be tried by different juries if they are 'so distinct and separable from the others that a trial of [them] alone may be had without injustice.'"  *Houseman*, 171 F.3d at 1126

22

(alteration in original) (quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)).

"In other words, the district court must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Id.* (quotation marks omitted). Though "both juries can examine overlapping evidence, they may not decide factual issues that are common to both trials and essential to the outcome." *Id.*

Here, neither side argues that bifurcating the trial raises issues under the Seventh Amendment. The Court does not see an issue, either. Liability and damages are different questions. A jury can decide liability without getting into damages. And if necessary, a second jury could decide damages without second-guessing or under-cutting the first jury's finding of liability.

The Seventh Circuit has noted that "the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). "The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." *Id.*

Presenting the same evidence in the second trial does not raise Seventh Amendment concerns – what matters is whether two juries decide the same *issue*. *See Houseman*, 171 F.3d at 1128 ("Houseman's Seventh Amendment argument boils down to an assertion that much of the evidence presented in the first trial would have been re-examined in the second. Yet, this alone does not raise constitutional concerns. The Seventh Amendment is concerned about factual conclusions, not evidence: 'The prohibition is not against having two juries review the same

23

evidence, but rather against having two juries decide the same essential issues.'") (citation omitted).

Applying this standard, courts have used different juries in liability and damages phases of the same trial. Courts have held that the damages-phase jury need not re-examine any issue decided by the liability-phase jury. *See, e.g.*, *Zollicoffer v. Gold Standard Baking, Inc.*, 335 F.R.D. 126, 164 (N.D. Ill. 2020) ("The caselaw endorsing bifurcated proceedings for individualized damage assessments should make it clear that Plaintiffs' proposal for a separate damages proceeding will not violate the Seventh Amendment because the second trier of fact would not need to reconsider the central question of liability."); *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 38 (E.D.N.Y. 2001) (collecting cases and noting that "trial judges have routinely and properly severed issues for trial before separate juries pursuant to Rule 42(b)"; *EEOC v. McDonnell Douglas Corp.*, 960 F. Supp. 203, 205 (E.D. Mo. 1996) ("Although some of the evidence may overlap, the issues to be decided at the separate trials are wholly distinct. At the liability trial, the question is whether the employer engaged in a pattern or practice of discrimination. . . . At the damages trial, the question is whether the individual class members are entitled to relief. The fact issues for the jury to decide are whether the individual employment decisions were made pursuant to the previously established discriminatory policy."); *Carroll-McCreary Co., Inc. v. N.J. Steel Corp.*, 1981 WL 2030 (E.D.N.Y.1981) (denying defendants' motion to reconsider order bifurcating antitrust suit into liability and damages and holding that even though there is no "neat dividing line" between the issues, defendants' Seventh Amendment rights would be preserved).

If push came to shove, the Court could eliminate any Seventh Amendment concerns by "utilizing the same jury for both liability and damages" if a damages trial is needed. *See Fetzer*,

24

2016 WL 6833912, at *3; *see also* 9A Wright & Miller, *supra*, at § 2391 ("[I]t seems to be accepted that the better and preferred practice is to use the same jury for all of the issues in an action, even though it may hear those issues at different times. This certainly is the safer course for the court to follow."); Fed. Jud. Ctr., *supra*, at § 11.632 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated.").[1]

With an available solution to satisfy the Seventh Amendment, the Court finds that bifurcating the trial does not raise Seventh Amendment concerns.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion to bifurcate the trial into a liability phase and a damages phase.

Date: August 11, 2023

_____
Steven C. Seeger
United States District Judge

---

[1] But that solution would create problems of its own. The jury probably wouldn't be thrilled to hear at the end of the liability trial that they have to sit through a damages trial, too. And telling the jury at the beginning of the trial that they have to sit through a second trial (on damages) if and only if they find for Plaintiffs on liability could infect their decision-making. It could plant unhelpful seeds in their heads.