## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, ) ) Plaintiffs, ) ) v. ) ) UNITED EGG PRODUCERS, INC., *et al.*, ) ) Defendants. ) ) | Case No. 11-cv-8808 Hon. Steven C. Seeger |

## **MEMORANDUM OPINION AND ORDER**

A group of food manufacturers filed this federal antitrust lawsuit about the production of eggs. Relevant here, Plaintiffs allege that Defendants agreed to export eggs, leaving fewer eggs for the domestic market. The exported eggs were then sold at *lower* prices than the then-current price in the United States.

Exporting eggs at lower prices, instead of selling the eggs domestically at higher prices, does not sound like a winning business strategy. But as Plaintiffs tell it, the egg exports were a back-door way to decrease domestic supply. Exporting eggs meant that there were fewer eggs to go around in the United States. So, Plaintiffs allege that Defendants made up for the lost revenue with higher prices in the supply-constrained U.S. market.

Defendants seek to exclude evidence of egg exports at trial. They argue that Plaintiffs cannot prove that the exports increased the price of eggs or that they suffered any antitrust injury because of the exports. Specifically, Defendants believe that Plaintiffs' economics expert, Dr. Michael Baye, conceded at an earlier trial in the MDL court that Plaintiffs never suffered any harm. Plaintiffs oppose the motion.

For the following reasons, the Court denies Defendants' motion *in limine* to exclude evidence regarding egg exports.

**Background**

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc., are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. They're big egg buyers.

Plaintiffs allege that Defendants United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

Plaintiffs are purchasers of egg *products*, meaning "eggs, either whole or separated, that have been removed from their shells and are then processed into dried, frozen, or liquid forms." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 502 (E.D. Pa. 2019). They allege that Defendants' conspiracy to reduce the supply of eggs raised the price of egg products. *Id.* at 506.

Plaintiffs filed suit in December 2011, and then amended the complaint twice. *See* Cplt. (Dckt. No. 1). The second amended complaint alleges that Defendants conspired to limit the supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). Specifically, Plaintiffs alleged that Defendants agreed to limit egg supply through three anticompetitive practices.

First, Defendants allegedly agreed to adopt animal-welfare guidelines (known as the UEP Certified Program) that increased the size of the enclosures housing egg-laying hens. *Id.* at

¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

Second, Defendants allegedly agreed to increase egg exports, leaving fewer eggs for the domestic market. *Id.* at ¶¶ 140–45. The exported eggs were sold at prices lower than the then-current prices in the United States. *Id.* at ¶ 142. Needless to say, selling at *lower* prices is not usually the sellers' first preference. But defendants allegedly made up for the lost revenue with the higher prices in the supply-constrained U.S. market. *Id.*

Third, Defendants allegedly agreed to "use short-term measures to control supply and artificially maintain and increase the price of eggs." *Id.* at ¶ 146. For example, Defendants allegedly agreed "to reduce the national flock by seven million hens in an effort to increase prices." *Id.* at ¶ 148. Again, fewer hens meant fewer eggs, and fewer eggs meant higher egg prices.

The complaint alleges that Defendants used all three anticompetitive tactics to restrict the supply of eggs, and successfully increased egg prices. *Id.* at ¶ 167. In sum, Plaintiffs alleged that Defendants artificially reduced the supply – and thus increased the prices – of eggs in violation of the federal antitrust laws. *Id.* at ¶¶ 194–96.

Soon after Plaintiffs filed their complaint, the case was transferred to the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation. *See* 1/3/12 Transfer Order (Dckt. No. 13). While the case was part of the MDL proceedings, the parties completed discovery and filed dispositive pretrial motions. *See* Joint Status Report, at 2 (Dckt. No. 234).

3

After the MDL court denied Defendants' second motion for summary judgment, the case was transferred back to this district for trial. *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498 (E.D. Pa. 2019); Conditional Remand Order (Dckt. No. 14).

Meanwhile, back in the Eastern District of Pennsylvania, Judge Pratter presided over two trials in cases brought by other plaintiffs in the MDL proceedings. This Court summarized the history of these trials in more depth in its Opinion granting Defendants' motion to bifurcate the trial. *See* 8/11/23 Mem. Order & Order, at 7–9 (Dckt. No. 272). So, the Court will be brief.

The first trial was brought by a class of wholesale egg and egg products purchasers. The second trial was brought by wholesale purchasers who opted out of the class (known as Direct Action Plaintiffs) and originally filed their case in the Eastern District of Pennsylvania. During pretrial proceedings, Judge Pratter grouped the Plaintiffs with the Direct Action Plaintiffs. *Id.* at 5.

Plaintiffs' economics expert in this case, Dr. Baye, testified for the Direct Action Plaintiffs at trial in the MDL court. *See* Notice of Filing, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 2075). "Dr. Baye was jointly retained by the plaintiffs in this case and the grocer plaintiffs in the MDL." *See* Pls.' Resp. to Defs.' Mtn. to Preclude, at 3 (Dckt. No. 208). As a jointly retained expert, Dr. Baye "prepared a single report that applied to both the grocer plaintiffs and the plaintiffs in this case." *Id.* On the basis of that report, "[i]n December 2019, Dr. Baye testified in the Direct Action Plaintiff (grocer) trial." *Id.*

At trial in the MDL court, Dr. Baye testified about Defendants' egg exports and their effect on egg prices. *See* Defs.' Mtn. to Exclude Exports, at 5–6 (Dckt. No. 159); Pls.' Resp., at 6 (Dckt. No. 207). As here, the Direct Action Plaintiffs alleged that the defendants "hatched a plot to reduce egg supply" by agreeing to "a coordinated export program to maintain a deflated

4

domestic supply." *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x 142, 144 (3d Cir. 2021). The jury ultimately returned a defense verdict. *See* Joint Status Report, at 3 (Dckt. No. 234).

Based largely on what happened in the MDL court, Defendants moved to exclude evidence of egg exports at the upcoming trial in the case at hand. *See* Defs.' Mtn. to Exclude Exports (Dckt. No. 159). Plaintiffs oppose the motion. *See* Pls.' Resp. (Dckt. No. 207).

**Legal Standard**

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Regardless of the Court's initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of trial. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).

A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child*

*& Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). It "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.*

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this Court's assessment of the admissibility of the evidence. But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See* Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). In short, Rule 401 defines relevance broadly. *See United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907.

The Court, however, may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted).

## Analysis

This motion is about evidence of Defendants' egg exports, meaning the second of Defendants' allegedly anticompetitive practices. Basically, Defendants believe that Plaintiffs had their chance to prove that the egg exports caused anticompetitive harm during the Direct Action Plaintiff trial in the MDL court. In Defendants' view, Plaintiffs (through their economics expert Dr. Baye) failed to show that the egg exports had a sustained effect on prices. So, because Plaintiffs failed to make this showing, any evidence of egg exports is irrelevant and would confuse the jury.

Defendants argue that "Plaintiffs have tried – and failed – to prove that [egg] exports were part of any conspiracy." *See* Defs.' Mtn. to Exclude Exports, at 3 (Dckt. No. 159). Based on Dr. Baye's testimony during the Direct Action Plaintiff trial, "Plaintiffs have not and cannot prove that [egg] exports increased egg products prices, or that they suffered antitrust injury or damages as a result of [the egg] exports." *Id.*

Specifically, Defendants point to Dr. Baye's testimony during cross examination. Defendants believe that Dr. Baye "conceded that there were only a 'handful' of exports and the effect, *if any*, would last about a month." *Id.* at 5 (emphasis in original). Defendants argue that any restraint on trade identified by Dr. Baye was too short lived to violate the antitrust laws. *Id.* at 3.

In response, Plaintiffs contend that evidence of egg exports is directly relevant to their theory of a multi-faceted conspiracy. "Defendants agreed to a series of coordinated exports to limit domestic supply, exported eggs to markets with prices lower than then-current domestic prices, and agreed to share resulting losses so that producers that exported their production would be reimbursed for the difference in price." *See* Pls.' Resp., at 3–4 (Dckt. No. 207).

7

Plaintiffs also argue that Dr. Baye's testimony "confirm[s] that Defendants' coordinated exports resulted in higher domestic egg prices." *Id.* at 5.

Taking a step back, Plaintiffs' operative complaint alleges that "Defendants agreed to use a series of coordinated exports to control domestic supply." *See* Second Am. Cplt., at ¶ 141 (Dckt. No. 73-17). United States Egg Manufacturers "members were required to participate in exports as a condition of membership." *Id.*

In Plaintiffs' view, the exports were not just a way to expand into new markets. Instead, "[t]hese exports were timed to occur when they would benefit Defendants by raising egg prices in the United States." *Id.*

Sometimes the exports did not make good business sense, standing alone. "As part of this export scheme, Defendants often exported eggs to markets with prices lower than the then-current prices in the United States." *Id.* at ¶ 142. So, Defendants agreed to jointly shoulder the lost revenue. "An integral part of Defendants' export scheme was the agreement to share resulting losses so that producers that physically exported their production were reimbursed for the difference between prevailing United States prices and the lower prices in export markets." *Id.*

The second amended complaint cites five instances when Defendants exported eggs to limit domestic supply. Plaintiffs allege that Defendants exported eggs in August 2002, November 2002, February 2003, late 2006 to early 2007, and March 2008 "in furtherance of the conspiracy." *Id.*

Manipulating egg exports was only one prong of a three-pronged strategy to "control supply and artificially maintain and increase the price of eggs." *Id.* at ¶ 119. The UEM Certified Program and short-term measures like reducing the hen flock were other components of a *single*

conspiracy to reduce egg supply. *See* Pls.' Resp., at 1 (Dckt. No. 207) ("Plaintiffs' complaint pleads that the export program was one of the measures adopted as part of Defendants' conspiracy to restrict supply.").

Like Plaintiffs here, the Direct Action Plaintiffs in the MDL court alleged that Defendants' coordinated export program was part of their three-pronged strategy. *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 144. As Plaintiffs note, Defendants "never moved for summary judgment" on the issue whether Plaintiffs made a sufficient showing to present evidence of egg exports to the jury. *See* Pls.' Resp., at 4 (Dckt. No. 207). So, the Direct Action Plaintiffs introduced evidence about egg exports at trial.

Judge Pratter instructed the jury to consider Defendants' three allegedly anticompetitive practices together. When it came to finding the existence of a conspiracy that restrained trade, "[t]hese three alleged restraints *must all be part of a single conspiracy*, as opposed to, for example, three different conspiracies that were independent of each other." *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 145 (emphasis added) (quoting the jury instructions). In instructing the jury, Judge Pratter "repeatedly emphasized that the *agreement* was the important component, not the acts used to carry out that agreement." *Id.* at 146 (emphasis in original).

And when it came to finding whether the conspiracy's restraints on trade were unreasonable, Judge Pratter instructed the jury to consider "whether the [three] restraints challenged here . . . *are together unreasonable*." *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 145 (emphasis added) (quoting the jury instructions). The Third Circuit rejected challenges to Judge Pratter's jury instructions on appeal. *Id.* at 146.

So, Judge Pratter instructed the jury to consider the three allegedly anticompetitive practices as a whole. The jury was instructed to determine whether Defendants agreed to restrain trade – not whether "all the means or methods that were agreed upon were actually used or put into operation." *Id.* at 146 (quotation marks omitted).[1]

The jury was not permitted to divide and conquer, by considering each of the three allegedly anticompetitive practices standing alone. Instead, the jury had to determine whether the practices *together* formed a single conspiracy and were *together* unreasonable. Unlike the cheese, the (exported) egg does not stand alone.

Defendants' motion to exclude evidence of egg exports takes the divide-and-conquer approach. Defendants argue that the egg exports, standing alone, had only a short-term effect on shell egg prices. *See* Defs.' Mtn. to Exclude Exports, at 3 (Dckt. No. 159). They contend that the exports "had only relatively modest effects on domestic egg prices," and that attempts to

---

[1] The Court recognizes that in both trials in the MDL court, Judge Pratter "looked at the components of the alleged conspiracy separately" when deciding whether the conduct was *per se* illegal, or subject to the rule of reason. *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 726 (3d Cir. 2020); *see also In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 145; *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) ("We draw on several analytical frameworks to assess whether a contract amounts to an unreasonable restraint of trade: among them, the per se, rule of reason, and quick look analyses."). "The plaintiffs' characterization of the defendants' conduct – whether as a single overarching conspiracy or as three separate conspiracies – does not determine how a court is to assess differing actions that the defendants are accused of taking. When different stratagems are alleged to have furthered an antitrust conspiracy, the court is free to determine which analytical standard should apply to each." *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d at 728. So, Judge Pratter considered the allegedly anticompetitive conduct separately when deciding the correct legal analysis (*per se* illegality or the rule of reason). *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1036 (E.D. Pa. 2016) ("For the reasons outlined below, the Court finds that the UEP Certified Program must be evaluated under the rule of reason."), *aff'd*, 962 F.3d 719. After Judge Pratter's ruling, the plaintiffs "opted to try the case under the theory that there was one overarching conspiracy subject to rule of reason analysis." *Id.* at 728 n.9. So, at trial Judge Pratter instructed the jury to consider whether "there was a single overarching conspiracy to reduce supply comprised of all three" allegedly anticompetitive practices. *Id.* at 725 (quotation marks omitted); *see also In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 145. And then the jury was instructed to determine whether "the conspiracy imposed an unreasonable restraint on supply." *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d at 725; *see also In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x at 145.

export eggs before February 2005 "had temporary and imperfect effects, resulting only in short-term increases in prices and profits and were not sustained." *Id.* at 4–5 (quotation marks and footnote omitted).

But egg exports could have contributed something to the conspiracy, even if they were not enough viewed in isolation to achieve the price increases. Plaintiffs' theory of anticompetitive behavior has several strands, and egg exports represented one of them. That strand can contribute something, even if it was not strong enough to hold the conspiracy together.

As Plaintiffs note, "[t]he export program was one *part of* Defendants' conspiracy to restrict domestic egg supply." *See* Pls.' Reply, at 4 (Dckt. No. 207) (emphasis added). Plaintiffs' evidence of egg exports is not irrelevant, even if Defendants can show that it is not enough to prove anticompetitive effect alone.

Defendants' argument also acknowledges that Dr. Baye testified that egg exports *did* increase the price of eggs. The effects were simply limited to the month that the exports occurred. *See* Defs.' Mtn. to Exclude Exports, at 5 (Dckt. No. 159). So, after Defendants sent a batch of eggs overseas, the domestic price would increase for "about a month." *Id.* (quotation marks omitted).

This evidence is consistent with Plaintiffs' allegation that "[t]hese exports were timed to occur when they would benefit Defendants by raising egg prices in the United States." *See* Second Am. Cplt., at ¶ 141 (Dckt. No. 73-17). And these price increases allegedly occurred sporadically from 2002 to 2008. *Id.* at ¶ 144. So, even if egg exports increased prices only for a short period after the sale, Plaintiffs intend to present evidence that Defendants exported eggs multiple times over many years. And based on Judge Pratter's instructions to the jury, the

11

exports' effects need to be considered in conjunction with the Defendants' other allegedly anticompetitive practices.

That said, this Court is *not* ruling on what the appropriate jury instructions should be in this case. That question is for a later day. And the Court is bound by certain rulings made in the MDL court. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1036 (E.D. Pa. 2016), *aff'd*, 962 F.3d 719 (holding that the rule of reason applies to the UEP Certified Program); Joint Status Report, at 2 (Dckt. No. 234) (listing Judge Pratter's ruling on the rule of reason as a "[s]ubstantive ruling[] involving Parties to this case"). The Court is simply noting that evidence of egg exports is relevant to Plaintiffs' theory that the three anticompetitive practices formed a single conspiracy. And Judge Pratter instructed the jury to consider the joint effects of these allegedly anticompetitive practices.

On that basis alone, evidence of egg exports easily meets the low bar for relevance under the Federal Rules of Evidence. Plaintiffs can introduce evidence showing that egg exports, in conjunction with Defendants' other practices, were part of an unreasonable restraint of trade. Defendants can argue to the jury that Plaintiffs have not proved that the restraints had an anticompetitive effect. And, if Defendants landed some punches during cross examination of Dr. Baye on the first go-around, they can have it at the upcoming trial.

Moreover, Plaintiffs' export theory is part of what binds these Defendants together. For example, Defendant United States Egg Marketers "is a cooperative *involved in the export of eggs*" and it "did not sell egg products in any capacity, let alone to the DAPs." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d at 504 (emphasis added). So, Plaintiffs' theory of liability against United States Egg Marketers is based, in part, on its role in coordinating exports. Plaintiffs may present that evidence of that role to the jury.

Both parties point to an earlier ruling by Judge Pratter on this issue. *See* Defs.' Mtn. to Exclude Exports, at 5 (Dckt. No. 159); Pls.' Resp., at 4 (Dckt. No. 207). But that ruling is not on point.

Judge Pratter faced a motion to exclude evidence of egg exports for an entirely different reason: because plaintiffs "materially changed their theory." *See* Defs.' Mem. on Exports, at 2, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1931). Judge Pratter did not rule on a motion to exclude evidence of egg exports because Plaintiffs' evidence did not prove antitrust injury.

In the MDL court, the defendants argued that the Direct Action Plaintiffs had "abandon[ed]" their theory about egg exports and "have now elected to pursue a case based solely on the UEP Certified Program." *Id.* at 2–3. "Because DAPs have now elected to pursue a case based solely on the UEP Certified Program, evidence relating to . . . [United States Egg Marketers egg] exports must be excluded as irrelevant, improper propensity evidence that would be unfairly prejudicial if admitted." *Id.* at 3.

Judge Pratter disagreed. She described defendants' motion as "assert[ing] that the DAPs are no longer arguing that the [United States Egg Marketers] Export Program . . . [is] part of the alleged conspiracy." *See* 9/23/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1973). Judge Pratter ruled that plaintiffs had "sufficiently communicated to both the defendants and the Court that they have not changed their theory that the conspiracy consists of three elements: the UEP Animal Care Certified Program, UEP Supply Management Recommendations, and [United States Egg Marketers] Exports." *Id.* Judge Pratter then denied defendants' motion to exclude evidence of egg exports. *Id.*

13

So, Judge Pratter ruled on a motion arguing that the plaintiffs had abandoned their theory that egg exports were part of the alleged conspiracy. She ruled that plaintiffs had not abandoned this theory. Judge Pratter did not rule on whether the plaintiffs' evidence was irrelevant because it failed to show antitrust injury.

Defendants here do not argue that Plaintiffs have abandoned their theory about egg exports. So, Judge Pratter's ruling is not particularly on point when compared to the issue at hand.

In sum, Defendants' motion has the flavor of a summary judgment motion. Defendants believe that Plaintiffs' evidence of egg exports should be excluded because Plaintiffs have not come forward with enough evidence to prove their case (and the Direct Action Plaintiffs did not prove their case in the MDL court). Plaintiffs failed to prove their case on the last go-around. Past might be prologue – or maybe not.

A failure to prove a case in a previous trial does not make the evidence irrelevant or a waste of time. The evidence supports one of Plaintiffs' core theories of liability supporting a single conspiracy to restrain trade. The jury will decide who to believe.

## Conclusion

For the foregoing reasons, the Court denies Defendants' motion *in limine* to exclude evidence of egg exports.

Date: August 21, 2023

Steven C. Seeger
United States District Judge