# EXHIBIT A

1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
    ANTITRUST LITIGATION                   08-MDL-02002
5

6

7                             - - - - -

8                         PHILADELPHIA, PA

9                             - - - - -

10                       DECEMBER 10, 2019

11                            - - - - -

12

13  BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.

14                            - - - - -

15                 TRANSCRIPT OF TRIAL PROCEEDINGS

16                            DAY 24

17                            - - - - -

18

19

20

21            KATHLEEN FELDMAN, CSR, CRR, RPR, CM
              Official Court Reporter
22            Room 1234 - U.S. Courthouse
              601 Market Street
23            Philadelphia, PA  19106
              (215) 779-5578
24

25
              (Transcript Produced By Mechanical Shorthand Via C.A.T.)

```
 1   APPEARANCES:

 2
                     KENNY NACHWALTER, P.A.
 3                   BY:  RICHARD ALAN ARNOLD, ESQUIRE
                     WILLIAM J. BLECHMAN, ESQUIRE
 4                   DOUGLAS H. PATTON, ESQUIRE
                     MICHAEL A. PONZOLI, ESQUIRE
 5                   BRANDON S. FLOCH, ESQUIRE
                     201 South Biscayne Boulevard, Suite 1100
 6                   Miami, Florida  33131
                     For Plaintiffs The Kroger Co., Safeway Inc.,
 7                   Roundy's Supermarkets, Inc., Walgreen Co.,
                     Hy-Vee, Inc., Albertsons LLC, The Great
 8                   Atlantic & Pacific Tea Company, Inc., H.E Butt
                     Grocery Company, and Conopco, Inc.
 9

10                   SPERLING & SLATER
                     BY:  PAUL E. SLATER, ESQUIRE
11                   JOSEPH M. VANEK, ESQUIRE
                     DAVID P. GERMAINE, ESQUIRE
12                   JOHN P. BJORK, ESQUIRE
                     55 West Monroe Street, Suite 3200
13                   Chicago, Illinois  60603
                     For Plaintiffs Publix Super Markets, Inc.
14                   and SuperValu Inc.

15
                     MARCUS & SHAPIRA, LLP
16                   BY:  MOIRA CAIN-MANNIX, ESQUIRE
                     BRIAN C. HILL, ESQUIRE
17                   One Oxford Centre 35th Floor
                     301 Grant Street
18                   Pittsburgh, PA  15219
                     For Plaintiff Giant Eagle, Inc.
19

20                   AHERN & ASSOCIATES, P.C.
                     BY:  PATRICK J. AHERN, ESQUIRE
21                   THEODORE BELL, ESQUIRE
                     8 South Michigan Avenue, Suite 3600
22                   Chicago, Illinois  60603
                     For Plaintiff Winn-Dixie Stores, Inc.,
23                   H.J. Heinz Company, L.P., C&S Wholesale
                     Grocers, Inc.
24

25                   (CONT.)
```

```
 1   APPEARANCES:  (CONT.)

 2
                     PEPPER HAMILTON LLP
 3                   BY:  JAN P. LEVINE, ESQUIRE
                     ROBIN P. SUMNER, ESQUIRE
 4                   ALEXANDER L. HARRIS, ESQUIRE
                     WHITNEY R. REDDING, ESQUIRE
 5                   KAITLIN MEOLA, ESQUIRE
                     LACEY D. REEDER, ESQUIRE
 6                   3000 Two Logan Square
                     18th & Arch Streets
 7                   Philadelphia, PA  19103
                     For Defendants United Egg Producers, Inc.
 8                   and United States Egg Marketers, Inc.

 9
                     PORTER WRIGHT MORRIS & ARTHUR LLP
10                   BY:  JAY L. LEVINE, ESQUIRE
                     DONALD M. BARNES, ESQUIRE
11                   ALLEN T. CARTER, ESQUIRE
                     2020 K Street, NW
12                   Suite 600
                     Washington, DC  20006
13                         And
                     PORTER WRIGHT MORRIS & ARTHUR LLP
14                   BY:  JAMES A. KING, ESQUIRE
                     ARLENE BORUCHOWITZ, ESQUIRE
15                   ERIC B. GALLON, ESQUIRE
                     41 South High Street
16                   Suite 2900
                     Columbus, OH  43215
17                   For Defendant Rose Acre Farms, Inc.

18

19

20

21

22

23

24

25
```

```
 1                    (Deputy Clerk opened court)
 2              THE COURT:  Hello, everybody.  Please take your
 3      seats.
 4              Anything to address or discuss or -- anything before
 5      I bring in the jury?  No?
 6              MR. GERMAINE:  Not from Plaintiffs, Your Honor.
 7              THE COURT:  How about Mr. Blechman?
 8              MR. GERMAINE:  He'll be coming momentarily.
 9              THE COURT:  Well, that was one thing I think we
10      should have in place -- one person.
11              MR. BLECHMAN:  I'm sorry, Your Honor.
12              THE COURT:  No problem.
13              There was one minor question I had on the
14      instructions.
15              Devin, do we have that one about --
16              THE LAW CLERK:  Yes.
17              THE COURT:  It was -- which number?
18              THE LAW CLERK:  Oh, I'm sorry.
19              THE COURT:  It was page 21, but --
20              THE LAW CLERK:  Instruction Number 8.
21              THE COURT:  Instruction Number 8 has to do with
22      whether the last clause in that particular instruction, in
23      terms of allocating to Rose Acre, having the burden to prove
24      such a demand or requirement.  Although there was some
25      discussion about there not being affirmative defenses, it
```

1    seems to me that this is accurate to say that, but I wanted to

2    make sure everybody was aware of that language.

3                MR. LEVINE:  We are, Your Honor.

4                THE COURT:  Okay.  "We are" and --

5                MR. LEVINE:  And no objection.

6                THE COURT:  Okay.  Okay.  Thank you very much.

7                So we can bring the jury in.

8                All of your electronics hooked up and everything?

9                MR. BLECHMAN:  Yes.  Thank you.

10               THE DEPUTY CLERK:  All rise.

11               (Jury in.)

12               THE COURT:  Okay, everybody.  You may take your

13   seats.

14               Good morning, ladies and gentlemen.  I take it

15   you -- well, I note that you all got the message that we were

16   working here all day yesterday in order to make the day and

17   thereafter go a little bit more smoothly, so thank you very

18   much.  I hope you all were able to do something equally

19   productive with your day yesterday.  Thank you for being back

20   here.  We expect this to be a very full day, where you will be

21   hearing the closing arguments of the lawyers.

22               Now, as I mentioned, there's a difference between

23   the opening statements and the closing arguments.  What you're

24   going to hear here, of course, is very important, and I trust

25   you will continue to pay very close attention to it, but this

1  is the part where the lawyers are actually saying what they

2  think that the evidence actually addressed, and then they're

3  hoping to persuade you to think along the same lines as they

4  are in terms of interpreting the evidence.

5       Again, what the lawyers say is super important, and

6  they've worked very hard on their closing statements, but it's

7  not evidence either.  It's going to be up to you to decide

8  what to do with all of the evidence once you do begin to

9  deliberate.  Nonetheless, it's an extremely important part, as

10  each part of the case is.

11       And what you will hear is the lawyers each in turn,

12  pretty much the same kind of turn that you saw during the

13  trial, will be speaking, and then after the closing arguments,

14  then I will tell you what the law is.  That's -- and in

15  between, there's going to be a lunch break, obviously.  And if

16  anybody needs a break at any particular point, let me know,

17  but the natural breaks have to do with, you know, when one

18  lawyer is done before we start another.

19       So that's basically what we're going to do.  I'm

20  sure you've figured all of that out.

21       And with that, I will call on Mr. Blechman.

22       MR. BLECHMAN:  Thank you, Your Honor.

23       May it please the Court, counsel, ladies and

24  gentlemen, and ladies and gentlemen of the jury, good morning.

25       I want to begin by thanking you for your

1   extraordinary service over the last five or six weeks.  You

2   have been inconvenienced.  We have taken you out of your

3   lives, away from your work.  We have disrupted your schedule,

4   probably more often than not, and I know I speak for everyone

5   in this courtroom when I say to you that we are enormously

6   grateful for the time, the dedication, and the sacrifices that

7   each of you have made to uphold your solemn duty to sit as

8   jurors, to consider the evidence, and ultimately to deliberate

9   and render a verdict.

10          You have been presented with a great deal of

11  evidence in this case.  Some of it has been by way of video,

12  which lasted probably longer than any of us would have liked,

13  but please recognize that the videotapes that were presented

14  to you as evidence in this case by witnesses who were not

15  available contained questions that were being asked not just

16  by the Plaintiffs, but also by the Defendants, which accounts,

17  in part, for the duration of those videos.

18          You heard from witnesses live, including

19  representative examples from each of the Plaintiffs in this

20  case.  You heard from witnesses from Rose Acre, you heard from

21  Dr. Armstrong, and you heard from economic experts on both

22  sides.  And now the time has come for you to consider the

23  testimony that you heard, the documents that are in evidence,

24  and for you to consider that evidence through the lens of the

25  law which will be provided to you by the Court upon the -- at

1  the conclusion of closing arguments and instructions that Her

2  Honor will present to you.

3          In considering the evidence that is contained within

4  this lens of the law, you consider the law as it is distilled

5  by looking through that lens at the facts that are in evidence

6  now, and I believe the Court will instruct you that you

7  consider the law and you also take into account your common

8  sense.  And then at that point, all of us turn to all of you

9  to deliberate and to render a verdict.

10          At this point, we're hopeful that you have a pretty

11  good understanding of what this case is about from having

12  heard quite a bit of evidence.  You know that the Defendants,

13  UEP, USEM, and Rose Acre, participated in a conspiracy

14  which -- which you're going to hear in a little bit is

15  actually an agreement, which we will define, which the Court

16  will ultimately define for you in the law, which is actually

17  not something that has to be in writing, but actually doesn't

18  have to be in writing.

19          And you know that UEP, USEM, and Rose Acre

20  participated in a conspiracy or agreement to reduce the U.S.

21  supply of eggs in order to increase egg prices.  They

22  implemented this conspiracy or agreement through one or more

23  of three anticompetitive actions that have been presented to

24  you through the evidence:  organized exports, organized

25  short-term measures, and the 100% rule contained in the

1    Certified Program as applied to the cage space allowance in

2    the guidelines, the backfilling ban, and enforced by what I

3    submit to you at this point is a demonstrably rigged audit.

4    You'll recall the testimony from Dr. Armstrong on that point.

5           With regard to these three parts of the conspiracy,

6    we will present you with evidence, and you have heard

7    evidence, that the Defendants and co-conspirators participated

8    in one or more of these anticompetitive actions.

9           Now, I want to stop for a moment to talk to you just

10   briefly about the Certified Program, that third -- that third

11   anticompetitive activity that I described to you.  And I want

12   to urge you, please, to pay particular attention in listening

13   to the closing arguments to whether defense counsel conflates

14   the guidelines which you've heard much about with the

15   Certified Program about which you have heard much, with the

16   portions of these -- of these measures, of these programs that

17   we are actually saying are anticompetitive.

18          I want to tell you right up front, and I'll talk to

19   you more about this later -- you heard about the

20   recommendations from the Scientific Advisory Committee.  If

21   they had stopped there, we wouldn't be here.  You heard about

22   the guidelines and the 2002 guidelines.  If they had just

23   stopped there, we wouldn't be here.  But they crossed a very

24   bright line, and they adopted in the Certified Program the

25   100% rule which, when it was applied to the cage space

1    allowance in the guidelines and the backfilling ban in the

2    guidelines and enforced by the rigged audit, converted the

3    guidelines and the supply reduction measures in it, including

4    the cage space allowance and the backfilling ban into a

5    mandatory supply reduction program.  And that's what happened.

6              Now, you've heard a number of witnesses, and there

7    are a number of people who have appeared in this court.  And

8    we've told you about the way in which this conspiracy

9    operated.  But timing here will matter.  Pay attention to the

10   timing of events.  Beware of the conflation of events by

11   referring to just years or generalities without looking at the

12   order in which events occur.

13             And timing will also matter, as a practical matter.

14   Because it bears noting that we sit here and I stand here in

15   2019, while you have heard evidence about anticompetitive

16   actions that have occurred in 1999, in 2000, in 2001, in 2002.

17   And it bears remembering that the sensibilities and all that

18   we have today, while surely informing your judgment and

19   thinking about the facts, you should remind yourself that what

20   we're talking about are events that occurred 16 and 17 and 18

21   and 19 years ago.

22             And what really happened?  Ladies and gentlemen, the

23   best evidence of what really happened here is -- the truth of

24   what really happened here, I submit to you, is what is

25   revealed in the candid writings and e-mails and documents that

1   were written by the conspirators at the time of the events in

2   question.

3          As I said to you in opening, we live in an Internet

4   age.  People talk with their fingers, and they did so in this

5   case back at the time the conspiracy started and periodically

6   during the conspiracy.  You don't expect to find an enormous

7   number of documents where -- in a conspiracy, where people are

8   candidly telling each other behind the scenes what's going on.

9   You have to look pretty hard and close to find the truth, but

10  it's in the evidence that's in this case.

11         Remember that if we take a look at the January 30,

12  2002 e-mail from Greg -- from Mr. Gregory of the UEP to

13  Mr. Looper, recall that he said to him back then -- this is at

14  the time when the UEP was passing the 100% rule as part of the

15  Certified Program, and Mr. Gregory writes to Mr. Looper, A

16  number of producers have asked me when the issue changed from

17  an animal welfare issue to a supply/demand program.

18         They were spot on.  That was exactly what happened,

19  is that when they passed and adopted the 100% rule, this group

20  of competitors who sat around the Board of Directors of the

21  UEP and voted and agreed to implement the 100% rule, they

22  converted the guidelines from, as Mr. Gregory writes here,

23  channeling what producers are telling him, an animal welfare

24  issue to a supply/demand program.  Recall the March 14, 2002

25  memo from Mr. Ky Hendrix to Mr. Rust and others in which he

1    acknowledges that he doesn't really know what the whole motive

2    is, but I think referring to the Certified Program, There's

3    more to it than animal welfare.  I think some people think

4    that it will make them rich or something.

5              I'm going to come back to this document in a little

6    bit.

7              Remember the March 27, 2002 note from Lois Rust to

8    Mr. Hendrix responding, in which she acknowledges that there

9    are concerns about the Certified Program and the guidelines.

10   They knew what they were getting into.  I'm going to talk more

11   about that in a little bit.

12             Then there's, for example, the April 17, 2002 e-mail

13   from Mr. Gregory to Mr. Bell in which he acknowledges that

14   they need to be careful about what -- how they are describing

15   the animal welfare -- the supply reduction program that is the

16   Certified Program.  So he cautions Mr. Bell.

17             The UEP cage density reduction proposal, I would

18   prefer that we focus upon these changes as being Animal

19   Husbandry Guidelines which results in increased space per hen.

20   I don't want anyone to think of this as a supply reduction

21   even though we know the effect will be the same in the short

22   term.  They knew.

23             Consider, for example, the April -- and this is, by

24   the way, this is all in the time period where they are also

25   attempting to woo FMI and supermarkets to endorse the

1    guidelines.  They didn't tell them about the Certified

2    Program.  They didn't tell them about the 100% rule.  And

3    Mr. Gregory was cautioning Mr. Bell about the messaging so

4    that others wouldn't find out actually what they were doing.

5            Consider, for example, the November 5, 2003 letter

6    from Mr. Mueller -- from Mr. Mueller to Mr. Isaacson, one

7    lawyer to another.  And by the way, I'm going to -- let me

8    pause for a moment.

9            I'm going to endeavor to tell you exhibit numbers,

10   if I remember.  At the conclusion of the -- of closing and

11   after the Court instructs the jury, you'll go back and

12   deliberate, and you have the -- you can ask to see the

13   exhibits.  And if you do, and we hope you do, we hope you take

14   your time to look through the evidence.  I'm going to endeavor

15   to give you exhibit numbers which, if you choose to note them,

16   you can go back and check -- I know you'll go back and check

17   on this yourselves.  So the ones I've covered so far, just

18   since I haven't covered many, let me just give it to you.

19   April 30, 2002 is Plaintiffs' Exhibit 100.  March 14, 2002 is

20   Plaintiffs' Exhibit 104.  The March 27, 2002 is PX-116.

21   Mr. Gregory's letter to -- e-mail to Mr. Bell is PX-122.  And

22   now we're on Mr. Mueller of Sparboe's letter to the UEP of

23   November 5, 2003, and that's PX-691.

24           And look at what -- at what Sparboe's lawyer is

25   writing in 2003, while the 100% rule is being geared up.  He

1   writes about a hidden agenda of animal welfare in order to

2   reduce outputs in an effort to increase prices naturally.

3   That strikes me as price fixing.

4           You heard Mr. Mueller testify.  You can judge for

5   yourself what he said, and you have a document that he wrote

6   at the time reflecting what they were thinking.

7           Consider the February 10, 2004 e-mail from

8   Mr. Gregory to a friend of his, Robert Pierre.  This is

9   Plaintiffs' Exhibit 214.  This is a particularly revealing

10  e-mail, ladies and gentlemen, because Mr. Gregory is writing

11  to a friend, nobody's looking over his shoulder.  His friend

12  wants some information about Cal-Maine because he's thinking

13  of buying stock in Cal-Maine, so he's asking Mr. Gregory for a

14  little bit of help, is this a good investment or not?  And

15  look at what Mr. Gregory of the UEP writes to him.  He says:

16  We've tried to downplay exports and the Animal Welfare Program

17  as reasons for improved prices and have gladly -- gladly, note

18  how he uses the word "gladly" there, ladies and gentlemen --

19  and have gladly used the Atkins diet and increased demand as

20  the reason for improved prices.

21          And then this next sentence is the one that I think

22  is striking.  This is our statement to the media type.

23          In other words, to people in the public, the media,

24  others, who want to know how do we explain what's going on

25  with egg pricing and all, this is -- this is the smoke screen,

1    this is the fabricated story that they're telling him.  But

2    then look what he goes on to write.  In reality, the exotic

3    Newcastle -- by the way, that was a disease, you heard about

4    catastrophes and how they never happened, which is why the

5    backfilling ban, 90 percent exception couldn't possibly occur.

6    Here's an example right there of a catastrophe with a disease

7    breaking out that you know has occurred.  I'll talk more about

8    that later.

9            In reality, the exotic Newcastle and Animal Welfare

10   Guidelines have been the major reasons why Cal-Maine and all

11   other egg producers are enjoying good times.

12           Consider the January 24, 2006 UEP Board of Directors

13   meeting that is attended not just by Mr. Rust, but also by

14   Rose Acre's Ky Hendrix.  And here you have three producers,

15   executives from three producers, who are speaking candidly

16   about what they think about the 100% rule and note that Amon

17   Baer, from -- that's one producer, he writes that he's

18   supportive -- or the minutes reflect that he believed he was

19   supportive of the Animal Welfare Program but believed the

20   program has become a brand, as such franchised, and market

21   restrictive.  He recommends the 100% rule be terminated.

22           Gary Stoller supports the Animal Welfare Program --

23   this is another producer, but has lots of concerns and

24   questions with the motive of the Scientific Committee,

25   Producer Committee, and audit.  Believes the Certified Program

1    has proven to be deceptive and dishonest to both producers and

2    their customers, opposes the 100% rule.

3          By the way, this concept about deception and

4    dishonesty, we're going to see that show up in the

5    February 2007 e-mail -- 2008 e-mail that goes to Marcus Rust

6    from his brother in a moment.

7          And then there's Bob Krouse from Midwest Poultry.

8    He writes that he supports the Scientific Committee and the

9    Committee's recommendations but is concerned with some

10   provisions including the 100% rule.  Nobody told the

11   Plaintiffs about these views.  There's no evidence that the

12   Plaintiffs were told in 1999, in 2000, in 2001, in 2002, when

13   all this was going on, that behind the scenes, this is really

14   what the producers were thinking, this is really what Gene

15   Gregory of the UEP was thinking.  This is really what was

16   going on.  Nobody told them.

17         Now, it is Defendants -- the Defendants' defense is

18   what -- is what -- is to blame the victims.  I submit to you,

19   when you think about what is their defense, it is to blame the

20   victims who are the Plaintiffs in this case.  And I will talk

21   more about that in a bit.

22         Their defense -- and I'm going to summarize, I may

23   not hit every one of these points, but in general, blame the

24   victims because they asked for certified eggs, even though

25   they did so after the market was broken.  I'll talk about

1    that.  Blame the victims because they're big companies, as if

2    big companies cannot be victimized by suppliers of a commodity

3    product who, when they get together, manipulate the market,

4    leaving companies, big and small, with limited or no choices

5    about where they can get the products that they actually want.

6    They blame the victims.

7            Now, I want to say this.  And I want to be clear

8    about this.  Plaintiffs do not contend that the Defendants are

9    bad people.  It has not been lost on us, as I'm sure it has

10   not been lost on you, for example, that members of the Rust

11   family have been in this courtroom almost every day, maybe

12   there have been members of their family here every day.  We

13   respect the fact that they've been here.  We don't think

14   they're bad people.  But Rose Acre and the UEP, and the USEM

15   have crossed a bright line.  The evidence of which, some of

16   which you've seen and more of which I will discuss, that

17   bright line you will learn is established by the antitrust law

18   as provided to you by the Court, and we believe the evidence

19   shows that the application of those facts and the law will

20   demonstrate by more than a preponderance of the evidence, but

21   that's all we have to do is just show slightly above, we'll

22   talk about that, that the Defendants have violated the United

23   States antitrust laws by entering into an agreement to reduce

24   the supply of eggs in order to increase egg prices.

25           This is my closing statement.  This is only the

1    second time that I get to talk to you.  The first time having

2    been in opening.  And what I'm going to do, and as Her Honor

3    has indicated to you some, I'm going to be talking to you

4    about what the evidence shows and why a Plaintiffs' verdict in

5    this case is called for.  I will have an opportunity to make a

6    brief rebuttal.  You'll hear from defense counsel as well.

7    But that's the process that is going on here, and then you'll

8    be instructed and you'll get a verdict form for you all to

9    deliberate along with the instructions.

10           As I was -- as I was thinking about what to say to

11   you in closing, I was looking at documents in the case,

12   there's so many, none of us can possibly show you all the

13   documents.  We can show you examples.  If I don't show you

14   some documents, it doesn't mean that we're cherry-picking or

15   ignoring them.  It means as a practical matter.  There's only

16   so much you can do in a limited amount of time with the record

17   the size that we have.  But I want to suggest to you that

18   there's a document along with these -- these -- what I refer

19   to as documents of deception that I just went through with you

20   that I think is really revealing of a number of very important

21   facts in this case.

22           So if we can please bring up PX-109.

23           This is Ky Hendrix's e-mail to Lois Rust, Anthony

24   Rust, Marcus Rust.  Do we have that?

25           You have that on the screen.  And I want to go

1  through this document with you, ladies and gentlemen, it

2  occurs to me, because when you step through it, much of the

3  evidence showing Rose Acre's participation, what was going on,

4  that there was a conspiracy, that they knew what they were

5  getting into and what others were doing, and qualities about

6  this conspiracy shines through.

7        So he starts off in the first paragraph writing

8  about how he provides them with an example of the audit, the

9  rigged audit about which you've heard much.  And he says to

10  them:  I want each of you to give me some advice that I can

11  compile together to support RAF, Rose Acre Farms' stance.

12        So this rigged audit that you now know quite a bit

13  about, this wasn't something that came as a surprise to them.

14  They got -- they got an example.  The brain trust at Rose

15  Acre.  And they thought about it.  And he goes on to write:

16  This audit is only a sample, and you can add or take away

17  anything that you want.  They want us to come up with a point

18  system similar to an ASI audit form, meaning that some items

19  will carry more weight than others.

20        They knew.  They knew at the time they joined the

21  conspiracy that the audit was going to be rigged.

22        Please look over carefully and give me your best

23  idea no later than Friday, March 23rd, so I will have some

24  time to sort through your ideas myself and come up with a

25  logical plan that would combine all of Rose Acre Farms' ideas.

1    So they thought about this.  They thought about it a

2    lot.  Then he goes on in the next paragraph to say:  I do know

3    the pressure is on to get signed up by April 1, 2002.  I think

4    because of the FMI position in June 2002, that UEP thinks that

5    they, FMI, will sign if most of the producers agree.

6    So here's part of the story that's going on at the

7    time in 2002 about UEP's effort to try to woo FMI into

8    endorsing the guidelines.  You know from the evidence that at

9    the end of the day, despite pressure from UEP, FMI only

10   endorsed the portion of the 2002 guidelines.  2002 guidelines.

11   Did not contain the 100% rule.  I'll talk more about that.

12   He goes on to write:  I do know that a company can

13   opt out of this anytime they want.

14   That's a really important sentence.  Why?  Because

15   Rose Acre has never opted out of this thing.  Rose Acre is

16   going to come before you and say that everything they did,

17   they did independently, that they didn't participate in the

18   conspiracy.  But they had all the information, they knew it,

19   they were active, and they understood internally, the senior

20   executives, that, as Mr. Hendrix said, a company can opt out

21   of this anytime they want.  And they never did.  So this

22   notion of excuse by saying that you were just along for the

23   ride is really a fiction.

24   He writes further, Mr. Hendrix does:  I do know that

25   some farms are not worried as much as we should be because

1    they have European cages that are more appealing to the humane

2    rearing of chickens, plus I think they will not lose as many

3    birds.

4            So they knew when they joined the Certified Program

5    that they were going to have to reduce the number of hens they

6    had.  Reduction in supply.

7            He goes on to write, in the next paragraph, at the

8    very last sentence:  I think the stores -- referring -- will

9    be in stiff competition if some do the FMI audit and some

10   don't.  He's referring to the supermarkets.  He's

11   acknowledging that in the absence of this Certified Program,

12   the 100% rule, there would be, as he puts it, stiff

13   competition at supermarkets -- stiff competition among

14   producers, excuse me, for the business of supermarkets to sell

15   certified as opposed to uncertified eggs.  Stiff competition.

16   They know that that's what would happen if there wasn't this

17   program.  They know that in the absence -- that with this

18   program, the stiff competition goes away, which we demonstrate

19   to you it has.

20           He then writes in the next paragraph, They're

21   looking for a sticker or emblem to place on the carton that

22   will show the customer that these eggs meet FMI standards.  I

23   wonder if we should wait and look at the sticker and come up

24   with one of our own that is similar in design but different,

25   showing that our eggs meet our standards, which is already

1    high.

2            So, in other words, they recognized at the time,

3    before they chose to join the UEP and the Certified Program,

4    that if they were truly interested in the humane treatment of

5    hens, they could have come up with their own logo or sticker

6    or seal to put on their eggs.  But once again, they didn't do

7    that.

8            And then he writes:  I don't know if the common

9    person is really going to notice the sticker until they get to

10   the cash register line and they have to pay 20 to 30 cents

11   more per dozen.  I think this is when the price discovery will

12   hit the customers, supply and demand will kick in then.  The

13   customer has the final say-so on egg price.  They will think

14   twice when they see the price difference.

15           So here we have a revealing statement that bears on

16   the issue of injury later on.  They recognize that if they

17   join this program, if they eliminate the stiff competition

18   that he acknowledges would otherwise exist, that prices are

19   going to go up for eggs at the supermarket, and the excuse

20   that he gives at the very end is he explains that he doesn't

21   think that people will really recognize that until they get to

22   the cash register, by which point in time it will be too late.

23           I want to talk to you briefly about what is the

24   Plaintiffs' burden here.  Our burden of proof is called the

25   preponderance of evidence.  And I think we have a slide on

1    that point.  There we go.

2            The preponderance of the evidence -- the

3    instructions, I believe, will show you -- explain that all we

4    have to do is we have to make the scales tip even ever so

5    slightly on its side to prevail on any issue or claim as to

6    which we have the burden of proof.  Ever so slightly.  Not --

7    not disproportionate.  Ever so slightly.  I submit to you,

8    ladies and gentlemen, the evidence is way more compelling than

9    that, but please remember, when you are deliberating and

10   asking yourself about which way to go, our burden on a

11   particular issue is simply to demonstrate to you that the

12   evidence supports the Plaintiffs' position ever so slightly

13   more.

14           So, let's get at it.  Is there a conspiracy?  What

15   is a conspiracy?  There's an instruction that will guide you

16   as to what is a conspiracy.  Let me tell you the first

17   question is -- that you'll be asked to decide is, is there a

18   contract, agreement, combination, or conspiracy between at

19   least two entities -- between or among at least two entities.

20   Excuse me.

21           So what is an agreement?

22           If we could take a look at the next instruction.

23           The basis of a conspiracy is an agreement.  That

24   will be Instruction Number 17.  What is an agreement?

25           If we could see the next slide.

1          I'm going to spend a moment on this Instruction 17

2    because the law is very different than what you have heard

3    earlier in this case about what can be an agreement that is

4    unlawful.  The law is very broad and forgiving about defining

5    what is an agreement.  And I think it will inform your

6    thinking about this.

7          An agreement doesn't require writing; that is to

8    say, an unlawful agreement.  It doesn't require knowledge by a

9    participant of all details or all participants or the role

10   that they played.  It does not require the people meet in

11   person.  It doesn't require that a conspirator joined at the

12   start.  That's what the instructions will tell you.  That's

13   the law.

14         So, for example, the fact that Rose Acre joined the

15   conspiracy by joining the Certified Program on April 1st,

16   2002, and by doing other conspiratorial acts thereafter is not

17   a get-out-of-jail-free or get-out-of-court-free pass.  Excuse

18   me.  The fact that it joined late does not mean that it's part

19   of the conspiracy.  It is.  And we will show you the acts by

20   Rose Acre to demonstrate that it knowingly participated in the

21   conspiracy.

22         An agreement -- an unlawful agreement does not

23   require that everyone agree at the same time.  It doesn't

24   require that all of the conspirators act alike.  It does not

25   require that all the conspirators have the same motive.  And

1    the unlawful agreement can be carried out by different means,

2    by different participants in the conspiracy.  Instruction 17,

3    I recommend it to you to read as a starting point for

4    saying -- for asking:  Is there an agreement?

5           So, what is the evidence that there is an agreement?

6    Once again, this record is way too large for anybody in a

7    short period of time to reasonably present to you all the

8    evidence.  That is, I am glad to say, going to be your job

9    after we finish closing.  But I want to give you some

10   examples, just some examples.  This isn't to say -- these are

11   hardly all the examples, but I want to give you some examples

12   of what is in the record that gets you starting to think about

13   the fact that there is evidence that there were unlawful

14   agreements here.

15          Let's talk about the Certified Program first.  To

16   become a member of the Certified Program, a producer, in this

17   instance, Rose Acre, but all the other members of the

18   Certified Program, had to and did sign in a commitment

19   agreement.  Now, here we actually have a written agreement.

20   Had to and did sign a commitment agreement agreeing to abide

21   by the conditions in the Certified Program and the guidelines.

22   So this commitment agreement is the tie that binds.

23          And when they signed on to the Certified Program and

24   agreed to do so, they then agreed to the 100% rule, the

25   backfilling ban, the rigged audits, all designed to reduce

1    supply.

2            Here's an example, which is PX-712.  This is Rose

3    Acre's commitment agreement signed by Rose Acre.  Rose Acre is

4    not the only one.  Cal-Maine, others, signed the commitment

5    agreements, but this is an example for Rose Acre.

6            Let me talk to you about short-term measures and

7    examples of evidence that there is an agreement with regard to

8    short-term measures.  With regard to short-term measures,

9    remember this:  The UEP is a trade organization that operates

10   through its members who are competitors of one another.  And

11   when those competitors get around the table, as they did here,

12   as you saw in the minutes of UEP meetings, and they vote and

13   agree to the 100% rule and others --

14           If we can move to the next slide.  That's an export,

15   so we're getting ahead of ourselves.

16           In any event, when they sat around the table and

17   agreed to the 100% rule, the backfilling ban, the rigged

18   audit, which are all agreed to in measures that are passed by

19   the UEP Board of Directors, they have agreed to a

20   supply-reduction measure, 100% rule, backfilling ban, the

21   rigged audit, which enforced those supply-reduction measures.

22           So with regard to the supply-reduction measures, not

23   only do you have evidence from the agreements reached by the

24   Board of Directors on short-term measures, but you also have,

25   in some instances, UEP producers, UEP Certified producers, who

1    signed separate commitment agreements to adhere to the

2    short-term measures.

3           So Exhibit 66- -- let's see.  So Exhibit 258 is

4    actually a document that comes from United Voices, in which it

5    lists producers who have indicated their intentions, made them

6    known, with regard to short-term measures.  Then there's

7    Exhibit -- Defense Exhibit 666.  This is an example of a

8    producer, in this instance, Cal-Maine, who signed a commitment

9    agreement separate with regard to a short-term measure.

10          Let's talk about exports.  With regard to exports,

11   once again, remember, the USEM is a trade organization that

12   operates through its members who are competing producers.  And

13   when they agree to an export event, it is an event by

14   competing producers to reduce supply.

15          And let me just say this once, because I've said it

16   a lot in opening and I am confident that you all understand

17   this:  Whether it's the export event or it's the short-term

18   measures or it's the supply-reduction features in the 100%

19   rule applied to the backfilling ban, the cage space allowance,

20   and enforced by the audit, when you reduce the number of hens,

21   fewer hens means fewer eggs, and fewer eggs means higher egg

22   prices.  So with regard to these export events which exported

23   any -- millions and millions of eggs out of the U.S., they

24   were reducing supply.

25          Another example of evidence of the exports is

1    provided by Plaintiffs' Exhibits 51 and Plaintiffs' Exhibits

2    150.  Plaintiffs' Exhibit 51, which you have on your screen,

3    is a document that makes clear the fact that producers should

4    export because it's going to reduce supply and increase the

5    price of eggs.  And Exhibit 150 is a document from Gene

6    Gregory to all USEM members congratulating them on the fact

7    that, as a result of this export event in November of 2002,

8    they were able to improve domestic prices.

9         Next question:  Was there a commitment to a common

10   scheme?  If we go back to Instruction 17, it asks whether

11   there was an agreement and what is the agreement, and the

12   agreement is a commitment to a common scheme.

13        What evidence do you have, what examples are there

14   of evidence that there was a commitment to a common scheme?

15   Ladies and gentlemen, I submit to you that the United Voices

16   newsletters that are in evidence, of which there are a great

17   many, are what I refer to as a diary of the conspiracy.  It is

18   a essentially contemporaneous document, newsletter, that is

19   produced about every two weeks written by Gene Gregory or

20   overseen by Gene Gregory, in which it accounts for what is

21   happening with regard to reducing supply, to increasing

22   prices, including times when, despite the efforts of the

23   conspirators to reduce supply to get egg prices up, didn't

24   necessarily -- wasn't necessarily all that effective.  We

25   acknowledge that, and we take that on.  And there's no better

1    and more compelling evidence of that than the economic

2    analysis that was presented to you by Professor Baye, who

3    candidly acknowledged to you that despite the fact that this

4    conspiracy started, the three parts, export, short-term, the

5    100% rule and all, with the May 15, 2000 meeting of the

6    Producer Committee -- we'll go over that -- that the

7    conspiracy did not generate sustained measurable effects until

8    later.  We own that.  And we acknowledge that.  But it is a

9    measure of our candor in presenting the evidence to tell you

10   when this conspiracy was effective and times when it wasn't.

11          And the United Voices -- to get back to what I was

12   saying -- as a diary of this conspiracy, chronicles at times

13   when supply didn't go down as much and prices didn't go up as

14   much, and that's where the backfilling story comes in and the

15   hangman's noose where they then close the trap door and that.

16   I'll talk more about that in a moment.

17          So the United Voices, all of those United Voices are

18   a diary of the conspiracy and provide you with a running

19   account of the commitment to the common scheme by UEP members

20   who were certified members of which you've come to learn

21   included most all of them, to reduce supply of eggs for the

22   purpose -- in order to get egg prices up.

23          You can take a look at those United Voices in an

24   efficient way, I submit to you, by taking a look at summary

25   exhibit, which is Plaintiffs' Exhibit 767.  Remember, I want

1    to try to maybe answer a burning question you may still have

2    lingering about what was Kirsten Flanagan, the summary

3    witness, doing with all those timelines in the short

4    examination that she -- she was on the witness stand, where

5    she sponsored a number of exhibits and summaries?  Those are

6    in evidence, including Exhibit 767.  They are -- she and her

7    office spent somewhere in the order of 270 to 280 hours

8    confirming the accuracy of the information in that summary

9    exhibit and the others that she -- she presented.  And they

10   provide you with a ready, efficient way for you to see what --

11   information in United Voices that shows efforts by these

12   conspirators to increase -- to reduce the egg supply in order

13   to increase prices.

14        Another example of the commitment to the common

15   scheme is shown by exhibit -- Plaintiffs' Exhibit --

16        If we can look at the next slide.  Do we have that?

17        Ah, Plaintiffs' Exhibit 174.  So this document,

18   which comes from the United Voices, shows a few of the con --

19   anticompetitive activities that they were doing, shows this

20   commitment to the common scheme.  It refers to, you'll see,

21   exports.  It refers to animal welfare, both as accounting for

22   reduced supply and increase in price.

23        Another example is from -- if we take a look at

24   Plaintiffs' Exhibit 767.  This is a 2007 document from United

25   Voices in which it refers to Animal Welfare Guidelines

1   continue to reduce the number of hens per house, producers

2   reduce their egg supply during the weeks between Easter and

3   Labor Day.  That's a short-term measure.  And timely exports

4   of shell eggs by United Egg Marketers.  So here's a document

5   where all three of these are identified in explaining the

6   reduction in supply in order to increase egg prices.

7           Was the UEP, the USEM, and Rose Acre knowing

8   participants in the conspiracy?  Let's turn to that subject

9   next.  And I want to talk first about the UEP.  The UEP, as I

10  explained to you, is a trade organization.  It works through

11  its members.  The United Voices is a diary of the conspiracy

12  so you can take a look at just how much it was participating.

13          Now, let me step away for a second and just talk to

14  you about the UEP to just review with you briefly the history

15  here, that chronicles its knowing participation in the

16  conspiracy.  What I'm going to tell you, you know, I'm not

17  going to necessarily refer to a lot of documents because I

18  think you all know this.

19          In 1999, the egg industry was suffering a financial

20  crisis.  It was hemorrhaging money, they were losing millions

21  of dollars a day.  And so on July 1, 1999, Gene Gregory writes

22  to Don Bell.  They knew each other.  Don Bell had been working

23  for the UEP for years.  You've heard about that, doing

24  economic consulting work for them.  And he writes to Don Bell

25  and he says:  We need an idea here.

1        Why?

2        Because the short-term measures and the exports,

3    those were short term in their effect.  They weren't

4    sustained.  And the UEP and Mr. Gregory were looking for

5    something to try for a permanent solution to deal with these

6    kinds of financial crises.

7        So he writes to Mr. Bell and within 24 hours, Don

8    Bell writes him back.  And that document you will find at

9    Plaintiffs' Exhibit 23.  That's the July 2, 1999 memo that Don

10   Bell sends to Gene Gregory.  And in that document, take a look

11   at it, at the back page, he described what in his terms were a

12   permanent solution to the oversupply problem with eggs --

13   permanent solution to oversupply, which is the way to get

14   prices -- in order to try -- in order to get prices down.  And

15   he acknowledges that the short-term measures are stopgap,

16   those are his words, and at the end of the document, he tells

17   Mr. Gregory:  The way for you all, the UEP and the producers,

18   to have a permanent solution is to provide for a cage space

19   allowance that has fewer hens in cages and in that way, you

20   remove millions and millions of hens from the market.

21       And I said I wouldn't say it, but I guess I will:

22   Fewer hens means fewer eggs and fewer eggs means higher

23   prices.

24       The reason Mr. Bell was able to come back to him in

25   24 hours is because he had been studying these issues for

1    years.  Don Bell submits this information to Mr. Gregory.

2    Mr. Gregory then, in August, sends in a newsletter to all UEP

3    members, Mr. Bell's recommendations for a permanent solution.

4    Here's the United Voices in which it's literally reprinted

5    from that July 2, 1999 letter, and that's PX-27.  So now all

6    the producers are told about what the plan is, and then

7    Mr. Gregory waits for the opportunity that he already knows is

8    there to come up with a supply management program by using

9    animal welfare as a smoke screen.  And how does he know this?

10   He knows this, and you know this because by July of 1999, Don

11   Bell and Gene Gregory were both members of the UEP's Science

12   Advisory Committee that was examining and considering to make

13   recommendations, Animal Welfare Guidelines, for hens to UEP

14   members in response to animal welfare activists' activities in

15   Europe that UEP was concerned would ultimately migrate to the

16   United States.

17          Now, let me say this.  We do not doubt the

18   earnestness of people of the academics who were sitting on the

19   Science Advisory Committee meeting to try to come up with

20   solutions with recommendations -- recommended guidelines to

21   improve the treatment of hens.  We don't doubt their

22   earnestness.  But we also don't doubt -- and we believe the

23   evidence is overwhelming to show you that that effort provided

24   Gene Gregory and the UEP with the perfect smoke screen to be

25   able to explain a supply reduction program in animal welfare

1    terms.  And you know this from a great deal of evidence in the

2    case, ladies and gentlemen, but one piece of evidence that

3    tells you this is the May 15, 2000 UEP Producer Committee

4    meeting that is attended not just by Mr. Gregory and Sparboe,

5    Garth Sparboe was there and other UEP Producers, Rose Acre

6    wasn't there yet, I'm not saying they were, but they joined

7    the conspiracy later under the law you know that doesn't

8    get -- that doesn't give them a pass.  You'll see that in the

9    law.  But other producers, including major producers were

10   there.

11           And who else was there?  He told you on the witness

12   stand.  He, Dr. Armstrong.  He and other -- and some of the

13   other members of the Science Advisory Committee.  So they

14   knew -- they understood the relationship between Animal

15   Welfare Guidelines as an effort by the Science Advisory

16   Committee and a supply reduction program that could be a

17   permanent solution to the oversupply of eggs and low egg

18   prices in the financial crisis that was plaguing the egg

19   industry by 1999.

20           So on May 15, 2000, you have this meeting.  It's

21   Plaintiffs' Exhibit 45.  Go back and take a look at that

22   document.  Note how they go through all the different options

23   that they have to consider insofar as the cage space allowance

24   is concerned.  Even one of those options that they considered

25   was to allow free market competition to determine what

1    happens.  And what they did is instead of allowing for market

2    competition, they chose to manipulate the market.  That

3    document, PX-45, refers to the effort -- early on in the

4    documents, it refers to efforts in the '80s to try to get

5    some -- some measure of control over flock size.  And you saw

6    evidence in this case that back in the '80s, the UEP and

7    producers tried to get the Department of Agriculture to allow

8    them to, in an organized way, control and reduce the flock

9    size when supply got too high.  And you saw evidence that the

10   Department of Justice wouldn't allow that because it was

11   market manipulation.

12          So the UEP producers vote and agree that they're

13   going to use cage space as the way in which they're going to

14   reduce supply.

15          May 15, 2000 is that point, we submit, where the

16   reduction -- where the 100% rule and -- excuse me, I misspoke.

17   Where the idea of an Animal Welfare Program to reduce supply

18   along with the short-term measures, which had already been

19   ongoing, along with the exports, which had already been

20   ongoing, where all this comes together.  And with the goal

21   being to reduce supply in order to increase egg prices.

22          I want to talk to you some about USEM's knowing

23   participation.  Remember, the USEM is run by many of the same

24   people who were running the UEP.  Including, notably, Gene

25   Gregory.  They have overlapping competitors.

1          Take a look at Plaintiffs' Exhibit 766, which

2    identifies, just as an example, producers who were involved in

3    the USEM along with the UEP.  And you know from the USEM

4    documents you've seen and that you can look at it when you

5    deliberate, that the idea with the USEM was to export to

6    reduce quantity in order to increase price.

7          So now let me talk to you about Rose Acre's knowing

8    participation.  And, ladies and gentlemen, I submit to you

9    that the evidence on this is overwhelming.  First of all, Rose

10   Acre is not a trade group, it is a private company, and so the

11   Jury Instruction 22 will describe to you how a company can

12   participate in a conspiracy.  Let me review for you some of

13   the evidence.

14         You know that Rose Acre joined the UEP February

15   of 2002.  When it joined in 2002, it had concerns, especially

16   later in April of 2002 when it joined the Certified Program.

17   You've already seen Ky Hendrix's March 14, 2002 e-mail to

18   Marcus Rust raising concerns about -- about the program and

19   thinking some people think they're going to get rich.

20         On March 26, 2002, remember Marcus Rust goes and

21   personally attends a Producer Committee meeting.  Take a look

22   at those meeting minutes where they discuss the 100% rule and

23   he then speaks with his mother, Lois Rust, about concerns

24   about the Certified Program and she then, on March 27, 2002,

25   writes a letter, handwritten note back to Ky Hendrix about the

1    concerns that people have about -- about the program.  And

2    despite all that, they joined.

3            They signed a commitment agreement.  That is

4    Plaintiffs' Exhibit 712, Rose Acre signed a commitment

5    agreement to the Certified Program.  And when it signed the

6    commitment agreement, it did so knowing that all the other

7    producers -- many of these other producers had already done so

8    in the two weeks preceding and joining the UEP.  Plaintiffs'

9    Exhibit 112 will show 56 UEP producers who had already joined.

10           And the point of this, ladies and gentlemen, is that

11    that means that when Rose Acre joined the UEP Certified

12    Program, it knew at the time that 56 of its competitors had

13    already done so and agreed to the same supply reduction

14    conditions that are contained inside the Certified Program.

15           And then on the next issue, PX-120, you'll see that

16    Rose Acre is identified as Number 98 of 100 companies that had

17    signed up for the Certified Program by April of 2002.  That's

18    how quickly they got producers to sign up.  That's how quickly

19    they broke the market.

20           They didn't stop there.  Marcus Rust joined the UEP

21    Board of Directors, where he participated in votes, approving

22    the 100% rule.  Ky Hendrix, he joined the Producer Committee,

23    where he considered and participated in votes on the 100% rule

24    and other supply reduction.  Greg Hinton, he joined the

25    marketing committee.  Rose Acre, with Mr. Rust, voted to

1    approve the 100% rule.

2           Mr. Rust testified in this trial -- you'll recall

3    his testimony -- that he wanted the 100% rule to prevent

4    competitors from underpricing Rose Acre.  That is classic

5    anticompetitive conduct to agree to a restraint that has the

6    effect of insulating you as a firm from price competition from

7    your competitors.  Rose Acre voted for a short-term measure.

8    That's Plaintiffs' Exhibit 326.

9           Now, I told you earlier, we're not saying Rose Acre

10   actually implemented a short-term measure, but Rose Acre was

11   on a meeting of the UEP Board of Directors where they voted

12   unanimously to agree to a short-term measure.  So Rose Acre

13   agreed to this, even if it didn't -- even if it didn't do the

14   short-term measure.

15          Furthermore, you know that Rose Acre knowingly

16   participated because it knew that the audit was rigged.  I

17   reviewed with you earlier that March 14, 2002 e-mail from

18   Mr. Hendrix to Mr. Rust and others where he talked about the

19   audit.  Remember that, that document?  Well, you also know

20   that Rose Acre not only knew going into this program that the

21   audit was rigged, but once it was inside the program, it

22   deliberately took steps -- withdrawn.  Let me say this

23   differently.

24          Once it joined the program, it deliberately was

25   willing to sacrifice points in the audit that meant it was

1    treating hens inhumanely as long as it didn't lose enough

2    points for it to fail the audit.  And in that regard, you saw

3    Plaintiffs' Exhibit 459, which is an audit that Rose Acre was

4    written up for conduct which was unhealthy for hens, and Ky

5    Hendrix testified to you, and you saw a document, where they

6    were willing to lose points as long as they were willing to

7    pass the audit.

8              And finally, you had direct visual evidence provided

9    by the video and the photographs that you saw that Rose Acre

10   was -- was mistreating hens in facilities that were covered by

11   its Certified Program, and yet it still continued to be

12   certified.  We acknowledge that Rose Acre took steps to try to

13   solve -- to ameliorate that problem, but the point is that

14   that kind of mistreatment of hens was -- that was documented

15   and that you can see with your own eyes, was going on while it

16   was a certified producer.  So the Certified Program was

17   allowing that kind of conduct to go on and still be able to

18   pass as a certified producer.

19             Rose Acre's defense to this is to say that it

20   expanded.  And the evidence on this, we believe, shows that

21   there's very good reason to doubt whether it did, and if it

22   did, it didn't matter, it didn't change the fact that it was

23   still participating in the conspiracy.

24             You saw, for example, the reason to doubt that Rose

25   Acre expanded was Plaintiffs' Exhibit 602, which is the

1    January 27, 2007 letter that Rose Acre wrote to the United

2    States, wrote to the federal government, in which it explained

3    in the letter that it had been -- it was a 2007 letter, but it

4    explained that it had reduced hens, by my memory, is -- by the

5    millions.  There's reason to doubt that Rose Acre expanded

6    because the evidence shows that in a great many instances all

7    it was doing was buying existing egg producers and their

8    facilities, which meant that they weren't doing anything to

9    change the overall output of eggs in the market.

10            And it's the overall market here, ladies and

11   gentlemen, that mattered.  Did Rose Acre take actions that

12   actually demonstrably increased the output of eggs in the

13   market?  Because it's the overall market that affects the

14   price of eggs.

15            And Marcus Rust himself gave you, in some ways,

16   really compelling evidence that the answer to that question I

17   just posed to you is no.  Why?  Because he answered on the

18   witness stand his description of how Rose Acre expanded was

19   you could measure it by putting your finger in a five-gallon

20   bucket of water.  Where I come from, the change in the volume

21   of the water, if it changes at all, it is imperceptible, and

22   that's the point, is that, to the extent that Rose Acre had

23   any expansion that -- any other kinds of expansion, it was

24   imperceptible in actually moving the overall market for

25   eggs -- or supply of eggs in the United States.

1    And finally, you heard from Professor Baye, who

2    measured whether there was an increase in output, who

3    explained to you that his models and his analysis took into

4    account whether any additional expansion of eggs offset the

5    reduction in eggs that was caused by keeping fewer hens in

6    cages.  As Dr. David, Rose Acre's own expert, told you, it's

7    simple math.  And we disagree on many things, but on this one

8    point, we agree, that it's simple math, that if you remove

9    under a supply reduction program, hens sufficient to drop the

10   supply of eggs more than you do in adding hens or eggs to the

11   market, then the overall -- then the supply reduction program

12   has, by simple math, reduced the supply of eggs, and that's

13   what happened.

14   Rose Acre also contends that it acted independently.

15   There are a number of reasons why that's not correct.  First,

16   you heard economic testimony explaining to you that it would

17   not be rationally an economic move for a producer to reduce

18   the supply of hens and reduce the number of eggs it's

19   producing unless it knew that everybody else or most everybody

20   else was doing it.  So just on the pure economics, it doesn't

21   make business sense.

22   But you know also from this evidence, from the Ky

23   Hendrix memo of March 14, 2002 -- that's why I spent some time

24   with you on this -- that Rose Acre and its senior executives

25   went into this conspiracy with their eyes wide open.  They

1    understood the rigged audit.  They understood that this was

2    going to increase prices.  They understood that they had

3    choices.  And time and again, they chose to not take the path

4    of acting independently.

5         Remember in that memo where it said, We can -- I'm

6    paraphrasing now -- We can get out of this anytime?  They

7    never did.  Instead, what did they do?  Marcus Rust joined the

8    Board of Directors of the UEP, where he not only could learn

9    about what was going on but was voting, was actively

10   participating in the adoption and the enforcement of the 100%

11   rule and other supply reduction measures.  They joined the

12   Producer Committee, where they continued to monitor and were

13   active in participating in votes on the 100% rule, dealing

14   with the backfilling ban and so forth, that were supply

15   reduction measures.

16        If what Rose Acre is saying is true, that they acted

17   independently, then, as Mr. Hendrix said in that March 14,

18   2002 memo, ladies and gentlemen, they could have just

19   joined -- as much as that -- the program was unlawful as a

20   supply restraint, they could have joined, and they could have

21   sat back and not done all of these other active events that

22   the evidence is indisputed that they did to participate in the

23   conspiracy.

24        They did not choose that path.  They chose the path

25   of being active and did so knowing exactly what they were

1    getting into, and then once they got into this conspiracy,

2    they took affirmative steps to make sure that the 100% rule

3    was enforced and that it prevented Rose Acre competitors for

4    underpricing Rose Acre on price.

5         I want to talk briefly about co-conspirators,

6    because it's -- I'll be brief about this.  This is where

7    Ms. Flanagan, the summary witness, comes into play again.  She

8    has given you -- let me back up here and say this, that this

9    trial is about UEP, USEM, and Rose Acre.  But, as I said to

10   you in opening, there are other producers -- other UEP

11   Certified producers who participated in the conspiracy, but

12   the trial we're focusing on these three Defendants.

13        But they weren't alone.  We haven't been shy about

14   telling you that.  And the co-conspirators whom we've

15   identified and who are identified in Ms. Flanagan's summary

16   exhibits are the co-conspirators who -- and you heard this

17   from Professor Baye -- who sold eggs to the Plaintiffs.

18   That's what we chose to focus on.

19        But there were others.  And you get -- you have an

20   idea -- you know about this.  You know, you have compelling

21   evidence of just how -- how wide the conspiracy -- the net it

22   spread in terms of UEP Certified producers.  Because of --

23   remember -- remember the United Voices, the two weeks before

24   Rose Acre joined, and then the April 2002 after it joined it

25   went from, like, I don't know, 56, whatever the number was, to

1    100?  That's how quickly, how effectively the UEP was able to

2    use the power of its platform and its -- exhorting its members

3    by essentially saying to them, If you're not part of the

4    solution to reducing supply and getting egg prices, then you

5    are a part of the problem.  And it got them all to join.

6           Now, let me also be clear about this:  Ladies and

7    gentlemen, we are not saying that simply because you join and

8    don't do anything doesn't mean -- it means you're a

9    co-conspirator.  It doesn't.  But you know the audits are

10   rigged.  The evidence on this is overwhelming.  Remember the

11   exercise we went through with Dr. Armstrong, about the

12   difference in how those audits value hen health as opposed to

13   the supply issues, like cage space and backfilling.

14          And yet -- so producers who joined the Certified

15   Program and were audited knew about the rigged audits.  They

16   knew, but they -- there are other co-conspirators who

17   participated in exports, who participated in short-term

18   measures, and I recommend to you that you look at

19   Ms. Flanagan's summary exhibits, the numbers of which are up

20   here on the board.  You can write them down if you choose to.

21          Now, the Defendants are going to tell you that you

22   shouldn't look at these summary exhibits because the

23   Plaintiffs' lawyers had something to do with them.  And we

24   have never been shy about that.  We have acknowledged that

25   from the very beginning.  There are procedures -- the Court

1    explained to you that there are summary procedures that allow,

2    in certain instances, for a witness to come into court, having

3    reviewed an enormous volume of documents, and to prepare

4    summaries of what is contained in those documents so that all

5    of those documents don't need to go into the record as

6    evidence.

7           So you heard Ms. Flanagan reviewed -- I think it was

8    something like 20,000 pages.  She reviewed all the Plaintiffs'

9    exhibits that were available at the time.  There were a few

10   that came in late, but most all of them.  We never said that

11   it was the Defendants' exhibits.  These were the Plaintiffs'

12   exhibits of what we showed from the United Voices and the

13   Board of Directors meetings and the Producer Committee

14   meetings.  And she chronicles all of that in detail in these

15   summary exhibits.

16          So when you want to find out what Cal-Maine did,

17   when you want to find out what Sparboe did, when you want to

18   find out what any of these co-conspirators did, I recommend to

19   you, ladies and gentlemen, that you look at the summary

20   exhibits because they are accurate -- they may have a few

21   mistakes here and there, but you can judge for yourself.  You

22   are the judge here of Ms. Flanagan's credibility and her

23   earnestness and the diligence with which she and her staff

24   worked to get the information in here.  It is -- these are a

25   resource for you, and we urge you to use them when you have

1   questions about who are the co-conspirators and what did they

2   do.

3          And by the way, I want to just touch on this.  I

4   told you that Sparboe was in there.  Two Sparboe witnesses

5   came in and testified here, and one of them -- my memory is it

6   was Garth Sparboe -- he was asked a question on

7   cross-examination about whether they thought they were

8   conspiring the May 15, 2000 meeting.  I remember that.  And my

9   memory is he said no, they didn't think they were conspiring.

10  But Rose Acre said it's not conspiring either.  What drives

11  the facts here is what these companies did.  And that's what

12  informs our evidentiary presentation to you.  And the fact of

13  the matter is, and the summary exhibit for Sparboe will show

14  you, that it engaged in one or more of these anticompetitive

15  activities that are the subject of this unlawful agreement.

16         I want to talk to you now about relevant market.

17  You're going to hear about that.  You're going to see it in

18  the verdict form, and so I want to talk to you some about it.

19  Remember, relevant market came up at the end with the

20  economists.  And here I'm going to talk some economics, you'll

21  forgive me, but a relevant market consists of what's called

22  the relevant geographic market and the relevant product

23  market.  It's an economic and legal term to describe sort of

24  the playing field within which activities are being analyzed.

25         I don't think there's any dispute in this case the

1   relevant geographic market is the United States.  There is a

2   dispute about what is the relevant product market.

3   Professor Baye, he opined that the relevant product market is

4   shell eggs and egg products.  And the Defendants' Exhibit --

5   Dr. Walker disagrees.  But I'm going to show you the evidence

6   to show you why the Plaintiffs are correct or why, at a

7   minimum, there's slightly more evidence to support Plaintiffs'

8   position than there is Defendants' position.

9          First, think about shell eggs and egg products on

10  the supply side, who makes the products.  There is something

11  that is called, ladies and gentlemen, supply side

12  substitution.  Consider Rose Acre.  The evidence is that Rose

13  Acre produces shell eggs and it produces egg products.  And

14  depending on what's going on in the marketplace, Rose Acre may

15  produce more of egg products than it does of shell eggs.  Egg

16  products being the eggs that are broken, remember?  And here

17  I'm hopeful you'll remember my stunning artwork, which

18  displayed to you the egg that comes out of the hen -- out of

19  the cage layer and it can go one of two paths, egg products --

20  excuse me, shell eggs in the grocery stores or the eggs are

21  broken and become egg products.  And so a decision can be made

22  and is made by Rose Acre and by Sparboe and by Michael Foods.

23  You have testimony on all of this in the record.  That

24  depending on market conditions, they may send some of those

25  eggs -- more of those eggs to become shell eggs than they do

1   breakers.  And at other times they may do -- they may change

2   that around.  So they substitute between the egg product --

3   between the egg that becomes an egg product and the egg that

4   becomes a shell egg, depending on what's happening in the

5   marketplace.

6           Gene Gregory, his testimony was that an egg -- that

7   shell eggs and egg products are, in his term, one big pie.

8           Mr. Hinton, when he testified in this trial, he

9   testified that Rose Acre switches production from shell eggs

10  to egg products or vice versa depending upon demand.  And you

11  have an example of his testimony on the screen.

12          And finally, on this point -- no, it's not the

13  finally.  Additionally, on the supply side, it's staring right

14  in front of all of us about why the Plaintiffs, I submit to

15  you, are right about this issue.  The 100% rule, the unlawful

16  restraint here, one of the unlawful restraints here, the

17  evidence is undisputed, it applies to both eggs that are made

18  that become shell eggs, that you get in the supermarket, or

19  eggs that are broken and become egg products.  The 100% rule,

20  I submit to you, is determinative of this issue.  It's right

21  in front of all of us.

22          Dr. Walker and the Defendants base their position on

23  this issue focusing exclusively on the demand side.  And where

24  they come from is they say, Supermarkets don't substitute

25  shell eggs for egg products and they impliedly make the

1   argument that consumers don't substitute egg products for

2   shell eggs.

3           I want to be clear about this.  I was born at night

4   but not last night.  We are not -- Plaintiffs are not

5   maintaining that every kind of egg product is substitutable

6   for shell eggs.  We don't have to make -- that's not our

7   burden -- we don't need to prove that.  Remember, we just need

8   to show it's slightly more substitutable, that we're right and

9   that they're not right.  And so the question to ask

10  yourself -- and here, remember I talked about common sense and

11  experience before, earlier on, a question to ask yourself is,

12  whether, in the making of, you know, our egg products, like

13  Egg Beaters and shell eggs, are they substitute?  I submit to

14  you -- just everyday experience we know that Egg Beaters,

15  which are egg products, and shell eggs are substitutable for

16  one another to make a cake, to make pancakes, to make waffles,

17  to make a quiche.  So there is substitution between them.  It

18  doesn't need to be perfect substitution.

19          Finally, you have Defendants' Exhibit 459.  And

20  Exhibit 459 -- take a look at what is I think the next-to-last

21  paragraph.  I won't spend a lot of time on it.  I urge you to

22  read it.  But this is a memo from Publix in which Publix is

23  acknowledging that producers will buy more shell eggs -- when

24  producers buy more shell eggs to break, there are fewer shell

25  eggs to be bought and then sold in the supermarkets.

1         I said to you earlier that Dr. Baye, his testimony

2    is that an egg is an egg is an egg.  And he has defined the

3    relevant market as all eggs for human consumption.  But he has

4    also told you that relevant markets can have what are called

5    submarkets or subgroups.  And so he says, you could have --

6    you could have subgroups of shell eggs and egg products.  And

7    that's --

8         If we go to the next slide, I think -- I think that

9    comes through in his testimony.  We have -- do we have the

10   next slide?  No.  Okay.

11        Well, then, it was at page 68, lines 12 to 22.  I'll

12   rely on your memory for this.  I asked him in rebuttal to

13   respond to Dr. Walker's testimony that there could be no --

14   that these products are not substitutable.  In which in

15   response, Professor Baye explained that a relevant market can

16   have economic subsets which can include shell eggs and egg

17   products.

18        Dr. Walker, by the way, testified that he does not

19   apply -- opine that there's no supply side substitution.

20        Do we have that?

21        I asked him on -- on my examination about this

22   relevant market issue and -- and notably, importantly, he

23   acknowledges that he is not -- he is not opining that there is

24   no supply side substitution.  And ladies and gentlemen, I

25   submit to you that the supply side substitution in and of

1    itself is more than sufficient to show you why there is a

2    relevant market.

3          The verdict form is going to ask you to decide

4    whether the relevant market is -- whether there's one relevant

5    market consisting of egg products and shell eggs, or two

6    relevant markets consisting of one has egg products and one

7    has shell eggs.  Or whether there's one relevant market that's

8    just shell eggs or one relevant market of egg products and you

9    will have a choice of saying, there's no relevant market.  We

10   think the evidence is quite compelling that there's a relevant

11   market here.  But ultimately this decision is yours.

12         Professor Baye, it is his opinion that the relevant

13   market consists of shell eggs and egg products.  If you needed

14   an alternative, you could look at a relevant market for shell

15   eggs, which has been what a lot of this trial has -- the

16   testimony and the documents have focused on, not to the

17   exclusion of egg products, but as I told you in the opening,

18   much of the evidence you will hear will be about shell eggs

19   and I think your memory will confirm that.

20         Now, next issue.  The conspiracy imposes an

21   unreasonable restraint of trade in the relevant market.  In

22   order to prove that, we have to show an anticompetitive

23   effect.  An anticompetitive effect is defined as lower prices,

24   lower output, anticompetitive restraints, or market power.

25   And with regard to lower prices -- lower prices of eggs and --

1    excuse me, higher prices of eggs and lower -- lower supply of

2    eggs, we've reviewed a number of documents and testimony

3    already that shows that this occurred in the record.

4           With regard to the purpose of the restraint being

5    anticompetitive, I've talked quite a bit -- you know already

6    about the supply reducing nature of not just exports and the

7    short-term measures, but also the 100% rule applied to the

8    backfilling ban and the cage space allowance.

9           Professor Baye, he testified, that the -- as a

10   result of the restraints here, there was actually a reduction

11   in the supply of eggs.  And you may recall a slide from him,

12   if we have it -- well, let me remind you of what the numbers

13   were.  Your notes may reflect this.  That there -- well,

14   here -- I'm -- let me just keep going.  You'll recall that he

15   measured the reduction in the number of eggs that occurred --

16   he didn't find that there was a reduction early on, but there

17   was a reduction that was measurable, that occurs -- here we

18   go.

19          Remember this slide?  Starting really with August

20   2005, the reduction in eggs, production and it's statistically

21   significant to the 95th percentile.  I'm going to talk more

22   about the dueling economists in a little bit.  But I just want

23   to remind you that this is what Professor Baye found.

24          He also found that to the extent that there was any

25   expansion, it did not offset the reduction in the egg supply.

1          Do we have a slide on that?  Maybe the preceding

2   one.  There we go.

3          Remember he testified -- he showed you this slide,

4   and the blue line is what Professor Baye explained to you is

5   what happened -- is what should have happened to -- excuse me.

6          The red line is what he explained to you is what

7   should have happened with the egg supply had there been no

8   conspiracy.  The top line, had there been no conspiracy.  And

9   what he pointed out to you -- remember this?  Is he circled

10  and he pointed out to you how it's -- there's ups and downs,

11  but it's relatively -- it's relatively -- I don't want to use

12  the word "flat" because that's not completely correct.  But

13  it's not sloping up like this.  It's measured.  And the reason

14  for that is because his model took into account expansion and

15  a number of other things as well.

16         Then there's the backfilling ban, which is also

17  ahead -- excuse me.

18         UEP also had the power to get its producers to sign

19  up.  This is another example in terms of the market power.

20  Remember we saw those United Voices.  By April of 2002, UEP

21  had signed up 100 producers to the Certified Program, and that

22  number grew, I want to say it was something like 80 percent by

23  September of 2002.  You have the documents, you can get the

24  exact numbers.  But it was profoundly effective in terms of

25  how they were able to amass this market power to lock up the

1    industry.

2            The purpose of the restraints, I think I've already

3    covered that, in terms of their ability to reduce supply.

4            And the backfilling ban, I've already covered that.

5    You know that that was designed to reduce supply.  Recall the

6    exercise that I went through with Dr. Armstrong with regard to

7    how -- the rigged audit and the backfilling ban.

8            And two points on this.  First, that backfilling and

9    the cage space reduction were -- let's say the cage space

10   reduction was measured at 16.67 times more important than if

11   somebody were to break the legs of hens when they were

12   removing them and handling.  The backfilling ban and the cage

13   space allowance, they were automatic failures.

14           And then in terms of catastrophic events, remember

15   that 90 percent exception in the backfilling ban?

16   Dr. Armstrong testified that that, in and of itself, reflected

17   a 10 percent reduction in supply.  Because when the

18   catastrophic event occurred and a producer backfilled, it

19   could only do so up to 90 percent of what had been in the

20   henhouse.  And the only reason for that, Dr. Armstrong

21   admitted, was in order to reduce supply.  The excuse that the

22   Defendants offered to you and that Dr. Armstrong feebly tried

23   to tell you while he was testifying is that these are

24   catastrophic events, they never happened.  But you have heard

25   testimony in this case about catastrophic events.  Remember I

1    showed you the document earlier about one kind of bird flu

2    that occurred?  Mr. Gregory wrote about the exotic Newcastle

3    disease.  That's Plaintiffs' Exhibit 214.

4            And Greg Hinton of Rose Acre testified regarding

5    tornadoes in 2002 that wiped out henhouses in Iowa.  And the

6    avian influenza in 2015.

7            Now, if we -- because we've demonstrated to you that

8    there are anticompetitive effects, the decision about whether

9    there's an unreasonable restraint of trade is made by a

10   balancing, the Court will instruct you, of the anticompetitive

11   effects with any claimed procompetitive justifications.

12           So are there any procompetitive justifications?  The

13   jury instruction will tell you about that.  A procompetitive

14   justification can be an increase in production.  But there was

15   no increase in production market wide as a result of the

16   conspiracy.  It was the opposite.  It could be a decrease in

17   egg prices, but you know from the economic evidence that egg

18   prices increased as a result of the conspiracy.  It can be an

19   increase in consumer choice, but you know that consumer choice

20   has been limited or eliminated because the 100% rule prevents

21   producers from producing certified eggs.

22           There can be improved quality, but there's no

23   evidence that the egg that comes out of the caged hen from --

24   that has a little more space is actually -- literally

25   empirically a better-quality egg.

1          So then you get to meeting customer demand, which is

2     the last thing that's in the jury instruction.  And here we

3     meet Rose Acre's blame-the-victim defense.  The evidence is

4     that no customer demanded the short-term measures, no

5     customers demanded the exports.  And the Defendants contend

6     that the Plaintiffs, through FMI, or individually, demanded

7     certified eggs.  Now, once again, we have been very up front

8     about this.  The Plaintiffs, in supply agreement after supply

9     agreement, after the market broke after 2002, specified

10    certified eggs in their contracts.  But you know the evidence

11    is that they did so because the Certified Program and the UEP

12    had been so successful in signing up producers, including most

13    of the major producers, that Plaintiffs were not left with

14    choices to be able to get uncertified eggs from producers who

15    had the supply capacity to meet their considerable needs.

16         So this notion that you could go buy the eggs

17    somewhere else, it's a fiction.  Let me give you some

18    examples.  You heard argument from defense counsel through

19    questions, Well, what about Rembrandt?  You could have gone to

20    Rembrandt.  But the testimony is Rembrandt started business in

21    1999 or 2000, when all these events were going on.  And the

22    likes of Kroger and Publix and SuperValu and H-E-B, a company

23    that's just starting in business is not going to have the

24    capacity to meet their needs.

25         Now, the guidelines, the UEP Guidelines -- remember,

1    November 2000 are the first guidelines.  Then in 2001 and

2    2002, UEP then develops the Certified Program, and on a

3    parallel track it engages with FMI on Animal Welfare

4    Guidelines because the supermarkets wanted FMI to respond to

5    PETA, which had contacted them about a number of animal

6    welfare issues regarding a number of different products --

7    food products.

8          So what happens is that the UEP presents FMI with

9    UEP's 2002 guidelines.  Ladies and gentlemen, this is really

10   important.  The guidelines that UEP presented to FMI to

11   consider were the 2002 guidelines.  They do not contain the

12   100% rule.  And that is -- those are the guidelines that

13   FMI's advisory group considered and a portion of the

14   guidelines that UEP -- excuse me, that FMI ultimately endorsed

15   to its members to decide on a voluntary basis what they wanted

16   to do.

17         There's evidence to show this.

18         If we could take a look at --

19         Oh, so, let me say that in July of 2002, UEP itself

20   acknowledged -- take a look at Plaintiffs' Exhibit 134.  It

21   acknowledged that there was no customer demand for certified

22   eggs.  So the demand that you're going to hear from Rose Acre

23   and UEP and USEM and they talk about, it is demand that they

24   generated as a result of their unlawful conduct.

25         In the end, FMI endorsed a portion of the 2002

1    guidelines, and it didn't endorse the Certified Program, and

2    you heard Dr. Hollingsworth on the witness stand very clearly

3    tell you that they did not endorse the UEP Guideline -- the

4    Certified Program or the 100% rule.

5            Now, I anticipate that UEP is going to try, by way

6    of excuse, to compare itself with what FMI did.  And to be

7    clear and to be candid, there are similarities between the two

8    trade organizations.  For starters, they're both trade groups.

9    For another, they consist of members who are competitors with

10   each other.

11           But the critical fundamental difference between what

12   UEP did and what FMI did is that FMI, in June of 2000,

13   Dr. Hollingsworth told you, you saw the documents -- I believe

14   it was June of 2000 -- sent a memo to all of its members

15   recommending on a voluntary basis that they could accept

16   portions of the UEP Guidelines if they chose to or not.  It

17   was up to each of them to decide.

18           But what happens is that FMI, when it passed the

19   100% rule, it converted the guidelines into mandatory

20   provisions to reduce supply based on the backfilling ban and

21   the cage space allowance.  So the UEP Program actually became

22   mandatory for every producer that signed on, whereas with FMI,

23   their recommendations were not.

24           The evidence is that while FMI and supermarkets were

25   considering what to do in this period in 2002, UEP didn't tell

1    them about the 100% rule.  UEP didn't tell the Plaintiffs or

2    FMI about the Certified Program.  UEP and the Defendants

3    didn't tell the Plaintiffs or FMI that there was an agreement

4    among the producers and UEP and USEM to reduce the supply in

5    order to increase egg prices.  The absence of the disclosure

6    here is compelling, and it's very important.

7           UEP will also tell you, I think, that all this was

8    publicly available on websites.  Well, we went back to look.

9    The evidence is that it wasn't.  If you take a look at --

10   compare Plaintiffs' Exhibit 211 and 212.  Plaintiffs'

11   Exhibit 211 is the 2003 guidelines.  This is a year after the

12   market was broken.  And then Plaintiffs' Exhibit 2002 [sic] is

13   the 2004 guidelines.  And if you look on the page, the 2003

14   guidelines, there's no reference to the website.  On the 2004

15   guidelines, in paragraph number 7, there is.  So if what

16   they're saying is correct, it doesn't happen until then.

17          Rose Acre contends that it told Kroger and Walmart

18   that it would join the UEP and the Certified Program -- excuse

19   me.  Rose Acre contends that Kroger and Walmart told it that

20   it needed to join the program.  The evidence is overwhelming,

21   ladies and gentlemen, that that's not what happened.  There

22   are no documents, there is not a single shred of piece of

23   paper that supports Rose Acre's contention.  It tells you that

24   this was a major decision.  It tells you that they were going

25   to join UEP, with whom they had been in litigation, a lawsuit.

1    You'd think that these are important decisions that they're

2    going to make.  It acknowledges that if it joined, it was

3    going to have to remove hens -- or excuse me, it was going to

4    have to keep fewer hens, and it was going to cost them more

5    money.

6           And what do they do?  Mr. Hinton tells you that he

7    talked to Mr. Marcus [sic] and he talked to the Board of

8    Directors.  There is not a single piece of paper to support

9    this.  It's not like they didn't produce documents earlier

10   than 2002 when this -- or 2001, when this arguably might have

11   happened.  If you take a look at Plaintiffs' Exhibit 54 --

12   this is a document dated November -- excuse me --

13   September 28, 2000, in which they're talking about Rose Acre

14   and the UEP.  So you know that they had documents back in 2000

15   about this subject.  And yet there are none.

16          We know Mr. Hinton can write e-mails to Kroger.

17   You'll recall that he testified that he wrote e-mails to

18   Kroger in 2014, prior to the phone call between him and

19   Mr. Rust, with Kroger's egg buyer and egg executive about

20   changing their contract.  There were e-mails he testified

21   about then, but there's no e-mails now.  Five years ago,

22   Mr. Hinton testified that he remembered that he had

23   conversation.  I'm not -- I'll rely on your memory here

24   because my time is short, that he testified about having a

25   conversation, but he couldn't remember the date.  But he

1    acknowledged in this court that his memory five years later,

2    sitting in this courtroom, is better than it was five years

3    earlier.

4         So what's happened?  I submit to you -- we respect

5    Mr. Hinton.  He seems like -- we respect Mr. Hinton, but the

6    evidence shows is he's been with Rose Acre for 39 years.  We

7    do not doubt his loyalty to the company.  I submit to you, you

8    should not doubt his loyalty to the company either in deciding

9    on whether Kroger and Walmart actually had these calls.

10   There's no evidence that Walmart had this conversation with --

11   no documentary evidence that Walmart had this conversation

12   with Rose Acre either.

13        And there is documentary evidence and testimonial

14   evidence in this courtroom that explain to you that Kroger did

15   not decide what it was going to do about the Certified Program

16   and the guidelines -- I said the Certified Program; I should

17   say didn't decide what it was going to do about the Animal

18   Welfare Guidelines, excuse me if I misspoke -- until May 31,

19   2002, which was after Rose Acre joined the UEP and after it

20   joined the Certified Program.

21        Finally, Rose Acre contends that these -- Kroger and

22   other companies are big, so it's telling them what to do.  But

23   being big is not an excuse.  I've covered that before.  After

24   they broke the market.

25        So I said there's this balancing test,

```
 1    procompetitive, anticompetitive.  I submit to you that the
 2    weight of the evidence here squarely shows that the
 3    anticompetitive effects of the challenged activities here far
 4    outweighs any procompetitive benefits.
 5            But let's assume, for purposes of discussion, that
 6    there is -- that you find that the scales are even.  Well,
 7    then what you do is you then have to decide whether there's
 8    any other procompetitive benefits that might explain this.
 9    Excuse me.
10            Backfilling ban is not a procompetitive benefit.
11    Presumably producers know that when they backfill -- to the
12    extent that there's risks, they know about that, but they've
13    been backfilling for decades.  So the idea that backfilling
14    would be procompetitive is belied by the evidence and by
15    common sense.
16            They didn't -- you know on the balancing they
17    didn't -- they didn't need the recommendations.  They could
18    have stopped with the recommendations and done nothing more,
19    and that would be fine.  They could have stopped with the
20    guidelines.  They didn't do that either.  They didn't need the
21    100% rule.  They could have had the guidelines without the
22    Certified Program.  They could have had alternate programs.
23    You heard about, from Mr. Klippen and the PVP program, that
24    met a poor fate because Sparboe ended up having a problem with
25    one of its facilities, the result of which is that it ended up
```

1    having to go back to the UEP, and the PVP program never got

2    any kind of traction.

3            But you also know from the evidence that UEP did

4    everything it could to try to squash that PVP program.  They

5    called on customers, including Walmart.  They wrote to the

6    federal government.  And Dr. Armstrong testified that he

7    actually went out to Walmart to talk to them about this.

8            Let me talk to you briefly now, because I only have

9    a few minutes, about the economics and injury.  And here, I

10   just -- I want to just -- I want to sympathize.  I put myself

11   in your position.  You've got capable, experienced economists

12   on both sides who have testified, and how do you -- how do

13   you -- how do you decide this?

14           Well, here's -- let me -- I want to briefly explain

15   to you what Dr. Baye did, first.  He determined that there was

16   a relation between egg supply and egg prices.  That was that

17   elasticity concept that he talked about.  And then he prepared

18   a model to measure whether the change in the price of eggs is

19   explained by conventional forces of supply and demand.

20   Remember all those indicators?  He had like a dozen or so with

21   fuel and the economy and all sorts of things that he was

22   looking at.  All of those are designed to test whether the

23   change in price and the change in egg supply is explained by

24   the forces of supply and demand in the marketplace.  And he

25   determined that they're not.  He determined, based on the

1    model, that there was -- that there was more going on and that

2    the egg supply had actually been reduced as a result of the

3    conduct that you've seen here.

4           He then took that model that showed the relationship

5    between egg supply and price, and he ran it against 60 -- all

6    68 egg types that were bought by all the Plaintiffs here from

7    one or more -- from Rose Acre and from the other

8    co-conspirators.  And he let the model do the talking with the

9    results, and he demonstrated to you with a chart that had

10   every one of the Plaintiffs listed and all -- and Rose Acre

11   and other co-conspirators from whom they bought egg products

12   or shell eggs, and he testified to you very directly that as a

13   result of the -- as a result of the challenged conduct here,

14   as a result of the unlawful conduct, it caused egg prices to

15   each of the Plaintiffs to be higher than they should have

16   been.

17          Now, let me say this:  You've heard a lot of

18   testimony about the fact that the guidelines, excuse me, were

19   going to cause prices to go up a little bit.  You've seen

20   documents that show that a producer showed a supermarket, for

21   example, that egg prices might go up a little bit.  I trust at

22   this point you understand that that's not what we're talking

23   about here.  What no Plaintiff bargained for, what no

24   Plaintiff understood it was getting at the time was that with

25   these Animal Welfare Guidelines, prices were going to go up as

1    a result of the absence of competition or the diminishment of

2    competition among the egg producers.  So instead of having

3    these little, very small incremental changes in egg price,

4    what Professor Baye told you, what he measured empirically is

5    that egg prices went much higher as a result of the

6    conspiracy.

7              How do you decide this with the economists?

8              I'm almost done here.

9              You've got experienced people on both sides, as I

10   said.  There are a few objective things you know.  You know --

11   you know Professor Baye spent five years working, studying the

12   record, evaluating, preparing models, looking at results that

13   told him to a 99th percentile that the results were certain

14   and relying on those.  And despite his distinguished record

15   and the fact that he is unquestionably a very skilled

16   economist, the fact is, Dr. Walker spent seven weeks before he

17   signed a report with his opinions in this case.  He worked

18   with other people in his firm, all of whom are very skilled

19   people as well, and we do not challenge that.  But there's no

20   question that Professor Baye has been studying and thinking

21   about this record for a long time in informing his decision

22   about the economics.

23             Dr. -- Professor Baye called it like it was.  And

24   you can decide whose opinion you're going to rely on.  You can

25   decide who -- who you think gives you more comfort about the

1    results.  I trust you will not consider in making that

2    judgment any particular witness's preferences about football

3    teams or otherwise, and that you will -- you will consider the

4    evidence based on what you've heard.

5          I just want to show you one -- one slide on what

6    Professor Baye said about calling it the way he sees it.  On

7    rebuttal -- to me -- I don't know if you remember this, but

8    this was, I thought, a significant moment to me.  And as I

9    thought about how to explain to you how should you decide who

10   to rely on the economists, I thought to remind you of what

11   Professor Baye said in rebuttal when I asked him a question

12   about his analysis.  And as part of his response, he said to

13   you -- and I can tell you, ladies and gentlemen, I was every

14   bit as surprised to hear what he said as maybe some of you

15   were.  But he said, I can tell you, and Plaintiffs may break

16   out into hives, but I am absolutely certain that the effect is

17   not exactly 2.1 percent of the backfilling ban, okay?  That

18   was when I was asking him about the 4.7, 2.1.  He's telling

19   you what the results show base on having done a lot of work in

20   this case.

21         So in conclusion, I want to leave you with three

22   questions that I challenge the Defendants to answer to your

23   satisfaction.  First, if the defense of the Certified Program

24   and the 100% rule and backfilling ban are science-based animal

25   welfare, then why did not any of the actual scientific experts

1    on the Science Advisory Committee testify, as opposed to

2    Dr. Armstrong, who told you that he was not a poultry expert?

3           Second, is there any testimony or other evidence

4    that Rose Acre, UEP, or USEM disclosed to any Plaintiff that

5    they believed the Certified Program or 100% rule or

6    backfilling ban had another agenda besides animal welfare?

7           And, third, decide whether you believe that UEP and

8    USEM and Rose Acre are saying now -- in other words, decide

9    whether you believe what they're saying now in this court, in

10   this trial, or what they stated in writing at the time of the

11   events in question, for example, in 1999 and 2000 and 2001 --

12          If you can put that slide up.

13          -- and 2002, about using the short-term measures,

14   the exports and the 100% rule to reduce the egg supply to

15   increase prices.

16          You decide whether the written word at the time

17   reveals to you what actually happened here.  Based on all of

18   this evidence, ladies and gentlemen, we respectfully submit

19   that you should return a verdict for the Plaintiffs by

20   answering yes to the various questions in the verdict form.

21          Thank you very, very much for your time and for your

22   attention.

23          Thank you, Your Honor.

24          THE COURT:  Okay.  Is there an additional closing

25   argument on behalf of any of the Plaintiffs?

```
1              MS. CAIN-MANNIX:  Yes, there is, Your Honor.

2              THE COURT:  Okay.  As I understand it, it's a

3    relatively brief one.  The only reason I'm saying that -- one

4    of the reasons, the primary reason of saying that is whether

5    or not to have a break now.  But I think --

6              MS. CAIN-MANNIX:  If all goes as planned, it's nine

7    and a half minutes.

8              THE COURT:  Well, okay.  Are you sure about that

9    half?

10             MS. CAIN-MANNIX:  Give me up to ten.

11             THE COURT:  Okay, thank you, Ms. Cain-Mannix.  Go

12   ahead.

13             MS. CAIN-MANNIX:  Good morning, ladies and

14   gentlemen, and the jury.  As you may recall, my name is Moira

15   Cain-Mannix and I represent Giant Eagle in this matter.

16             First, like Mr. Blechman, I want to thank all of you

17   for your patience over these last six weeks.  And also I just

18   want to note, I've really enjoyed watching your comradery over

19   these last several weeks, too.  It's been fun.

20             I will try not to repeat ground that my colleague

21   Bill Blechman has covered.  And I want to say that I agree

22   with everything he has just said to you on behalf of all of

23   the Plaintiffs.

24             I have a few more things to add on behalf of my

25   client, Giant Eagle.  Giant Eagle purchased commodity shell
```

1    eggs from Hillandale and Weaver Bros., two very large egg

2    companies.

3            First, with respect to Weaver Bros., you heard the

4    testimony of Tim Weaver.  Mr. Weaver testified at the start of

5    his deposition that Weaver Bros. joined the UEP Certified

6    Program for animal welfare reasons and for its customers.  But

7    these are the reasons that Mr. Weaver gave after the lawsuit

8    was filed.  Here's what Mr. Weaver said before the lawsuit was

9    filed.

10           Show the first slide, please.

11           He wrote a letter to Mr. Gregory.  And when he

12   testified about this letter, he admitted he was pitching to

13   the UEP a two-tier pricing system that would let customers

14   make the choice between the UEP and non-UEP Certified eggs.

15   And he told Gene Gregory that if they were really concerned

16   about animal welfare, and not supply management, that is what

17   they should do.  However, that never happened.  And Weaver

18   Bros. stayed in the program anyway.

19           And a few months after Weaver Bros. joined the UEP

20   Certified Program, Weaver participated in an export at a loss.

21   And that's shown on one of Ms. Flanagan's timelines.

22           In 2004 Weaver also committed to a short-term

23   measure.  Tim Weaver also served on the UEP Price Discovery

24   Committee with several of his competitors.

25           The final point on Weaver.  While Mr. Weaver now

1    claims that Weaver Bros. joined the UEP Certified Program

2    because of animal welfare concerns and because its customers

3    wanted it, when I cross-examined Mr. Weaver about Giant Eagle

4    and Topco, here's what he admitted.

5                        (Audio clip starts.)

6               Question:  So I take it you don't recall either

7    Giant Eagle or Topco calling you to say, How are you

8    addressing animal welfare?

9               Answer:  No, I don't recall that.

10                       (Audio clip stops.)

11              MS. CAIN-MANNIX:  All of this evidence shows that

12   Weaver, like the other Defendants and co-conspirators

13   Mr. Blechman discussed with you, participated in the UEP

14   Certified Program which admittedly reduced customer choice for

15   non-certified eggs and was a supply management program.

16              Weaver Bros. also participated in exports at a loss

17   and short-term measures, neither of which had anything to do

18   with animal welfare but which had everything to do with

19   controlling supply and increasing the price of eggs.

20              Let's turn to Hillandale.

21              The evidence you have seen shows that Hillandale

22   also participated in the export program.

23              Bring that slide up.

24              In addition, Hillandale representatives attended

25   many UEP meetings where they discussed short-term supply

1   measures.

2          Syed Rizvi, Hillandale's production manager,

3   admitted that the cage space requirements were designed to

4   reduce flock size.

5                    (Audio clip starts.)

6          Question:  Sir, you can achieve the density

7   limitations by decreasing the number of birds?

8          Answer:  That's how it started.  That's what the UEP

9   Program was designed.

10                   (Audio clip stops.)

11         MS. CAIN-MANNIX:  But after the lawsuit was filed,

12  at their depositions, Hillandale witnesses claimed they joined

13  the UEP Certified Program because their customers wanted it.

14         But once again, when I asked Gary Bethel about Giant

15  Eagle's chief egg buyer and director of dairy at the time,

16  Paul Moran, here's what Mr. Bethel said:

17                   (Audio clip starts.)

18         Question:  Did you request that meeting with Paul?

19         Answer:  Might have.

20         Question:  Were they -- was Giant Eagle purchasing

21  UEP Certified eggs at that time?

22         Answer:  This was right at the beginning of the

23  program.  And at that time everybody was just getting into it.

24  It was the very beginning.  I wouldn't -- it's not because

25  you're from Giant Eagle, but I wouldn't let them fall behind

1    all the other retailers.

2                      (Audio clip stops.)

3         MS. CAIN-MANNIX:  So the truth is that Hillandale

4    went to Giant Eagle to get them on the program and not the

5    other way around.

6              We submit that all of the evidence, ladies and

7    gentlemen, leads to the conclusion that Hillandale, too,

8    willingly participated in this conspiracy.

9              We understand that Defendants are contending that

10   Plaintiffs, including Giant Eagle, asked for what happened in

11   this case, as Bill Blechman said, the blame-the-victim defense

12   through their purchases of UEP Certified eggs.  That's

13   preposterous.  No one asked for a supply management program

14   that would drive egg prices up.

15             And as for animal welfare, the inhumane treatment at

16   some of the farms that was allowed under this very program --

17   and I'm not going to show you photos again, because they're

18   sickening and we've all seen enough of them -- if this was a

19   legitimate Animal Welfare Program, that would not have

20   happened.  Or the companies that did that would have been

21   sanctioned.  They were not.  Enough said.

22             We understand one thing Defendants will point to is

23   the FMI.  Again, we agree with everything Mr. Blechman has

24   said about that.  I will just point out that from Giant

25   Eagle's perspective, the FMI story shows what a trade

1    association is supposed to do.  Giant Eagle was a member of

2    FMI and one of dozens of companies represented on its board.

3    And all FMI ever did was recommend some guidelines for its

4    customers -- I mean, excuse me, for its members to consider.

5    That's how it's supposed to work.  That does not excuse in any

6    way the Defendants and others engaging in antitrust

7    violations.

8           We also understand Defendants may point to a

9    checkbox on the Topco RFPs for Giant Eagle.  You will recall

10   Jim Rohr testified about this as well.  And as he pointed out,

11   the important question is not whether there was a checkbox.

12   The question is, what would happen if a vendor did not check

13   the box?  And we don't have to speculate.  Mr. Rohr explained

14   that Kreider Farms was not certified.  But this did not stop

15   Topco from giving Kreider's bid to Giant Eagle.  This did not

16   stop Giant Eagle from considering Kreider's bid.  Kreider was

17   right in it until the end.  And even though they were not UEP

18   Certified, Giant Eagle was satisfied after visiting its farm,

19   that its facilities were industry standard.  And that is all

20   that Giant Eagle truly cared about, ladies and gentlemen.

21   They don't want to sell eggs that are not industry standard.

22   But they do not care about whether companies joined the UEP

23   Certified Program.

24           Okay, so eventually during discovery, the

25   investigation or pretrial phase in this lawsuit, Giant Eagle

1    found out about all of these documents, some of which you've

2    seen today, again, now in evidence, where these companies were

3    talking about reducing supply and increasing egg prices.  And

4    we learned that they were talking about the prices customers

5    like Giant Eagle and the other Plaintiffs were paying.  And,

6    in fact, you heard Professor Baye testify it took him five

7    years and a lot of hours, but you heard him explain how all

8    this work showed that Giant Eagle, along with all of its

9    co-Plaintiffs, have been overcharged for the eggs they bought

10   from Weaver and Hillandale and others.

11          And here are the Giant Eagle specific purchases

12   mentioned.

13          Finally, we also learned about things like the audit

14   point system, which Rose Acre helped design through its

15   representatives on the audit subcommittee, and how despite

16   what the guidelines said, a company could even do what

17   happened in Maine and still remain UEP Certified.  That is

18   proof that supply reduction and increased pricing were the

19   important aspects to Defendants, not humane treatment.

20          You also heard from Dr. Walker, and his theory is

21   that in a case like this, what Giant Eagle should have done is

22   vertically integrate, by which he means Giant Eagle should

23   become an egg farmer.  Giant Eagle is not in the farming

24   business.  Giant Eagle does not know how to farm and does not

25   know the egg production business.  In short,

1    Dr. Walker's testimony on this point is ridiculous.

2              But Dr. Walker eventually admitted that Giant Eagle

3    had a rational alternative.  Giant Eagle and the other

4    Plaintiffs could file a lawsuit under the Sherman Antitrust

5    Act.  We respectfully submit that the Sherman Act says what

6    these companies did is illegal.  The antitrust laws of the

7    United States allow companies like Giant Eagle and its

8    co-Plaintiffs to sue for overcharges caused by such a

9    conspiracy.

10             So we ask that when you get to the questions on the

11   verdict form that refer to Giant Eagle, you answer them yes.

12             Thank you, again, so much for your time in this

13   matter.

14             THE COURT:  Thank you very much.

15             Are there any other closing arguments on behalf of

16   any of the Plaintiffs?

17             MR. BLECHMAN:  There will not be, Your Honor.

18             THE COURT:  All righty.  Why don't we just take a

19   very brief break.  Ten minutes, we'll be back.

20             For your planning purposes, and I didn't speak with

21   Mr. Coyle about what time lunch was being delivered, but my

22   estimation is that lunch will be a little bit on the late

23   side, just where the natural breaks are going to be.

24             Enjoy your break.  See you back here in ten minutes.

25             THE DEPUTY CLERK:  All rise.

 1                    (Jury out.)

 2                    THE COURT:  The same for you.

 3                    MR. BLECHMAN:  Thank you, Your Honor.

 4                    THE COURT:  I'm guessing that maybe like around --

 5     are you going to go first, Mr. King?

 6                    MR. KING:  No, Ms. Levine will go.

 7                    THE COURT:  Oh, okay.  Well, maybe, then, I was

 8     wrong.  You're about an hour.

 9                    MS. LEVINE:  A little over.

10                    THE COURT:  What is it?

11                    MS. LEVINE:  So 11:30, 12 -- by quarter of.

12                    THE COURT:  If you had your druthers, who then would

13     be second?

14                    MR. KING:  I think USEM's going to go second.

15                    THE COURT:  Okay, that might work, then, perfectly.

16     Yay.  Not to be too, you know, sort of compulsive about it,

17     but thanks.

18                    (After recess:)

19                    THE COURT:  Okay, is everybody ready?  You can bring

20     back our jury.

21                    THE DEPUTY CLERK:  All rise.

22                    (Jury in.)

23                    THE COURT:  Okay, everybody, you may take your

24     seats.

25                    And I was reminded, ladies and gentlemen, I

1    neglected to ask if any of you were out in the rain at the

2    Linc last night or if you were watching TV or watching the

3    game?  Yes?

4            Okay, well, all's well there that ends well, I

5    guess.

6            So next we turn to -- Ms. Levine, it is?

7            MS. LEVINE:  Thank you, Your Honor.

8            THE COURT:  Go ahead.  Come on up.

9            MS. LEVINE:  Well, good mid-morning.  May it please

10   the Court, counsel, and members of the jury, as you know, my

11   name is Jan Levine.  I represent UEP.  And as I told you about

12   six weeks ago, I would be back to summarize the evidence.  So

13   here we are.

14           But before I do, I want to thank each of you

15   individually and collectively for your attention, your

16   consideration, and your good humor.  This case is very

17   important to UEP.  On behalf of UEP and my colleagues, we

18   greatly appreciate your valuable time.

19           UEP has waited a very long time to tell its story

20   and to defend itself from these allegations, so we are very

21   appreciative that you are such an attentive jury.

22           What I'm going to do over the next hour or so is,

23   I'm going to try to do my best to put the evidence in the

24   buckets in context to track the basic elements of an antitrust

25   claim that Judge Pratter is going to instruct you on.  I hope

1   that that will be helpful during your deliberations, and I

2   welcome your reviewing the documents and testimony because

3   they will tell an entirely different story from the one you

4   just heard.

5           When you deliberate, I also want you to remember

6   three key items for this case.  I'm going to put a board up.

7           Now, there's a lot of information in this case and a

8   lot of documents.  But these three key items I think will show

9   you that you should find for Defendants.

10          The Certified Program was science driven.  It was

11  not a pretextual Animal Welfare Program.

12          Plaintiffs got exactly what they asked for.  This is

13  not a blame game, but they asked for a single -- it's a really

14  important word, a single set of Animal Welfare Guidelines.

15  They did not want multiple ones.  They did not want to compete

16  for animal welfare.  They wanted a single set of Animal

17  Welfare Guidelines.  And I'm going to take you carefully

18  through those documents so that you don't have to believe me,

19  you can look at what the Plaintiffs actually said at the time

20  and what their trade association, FMI, said at the time.

21          And at the end of the day, supply went up, not down.

22  Hard to believe that we're here for a conspiracy to reduce the

23  supply of eggs when the supply went up, not down.

24          And as I told you in my opening, and as

25  Judge Pratter will instruct you, you can and you should rely

1    on your common sense in weighing the evidence.

2            Now, Plaintiffs have the burden of proof.  Let me

3    explain what that is.  Plaintiffs have the burden of proof by

4    a preponderance of the evidence, as Judge Pratter will

5    instruct you.  Preponderance means that Plaintiffs must prove

6    that every element of their antitrust claim is more likely so

7    than not so.  In other words, if Plaintiffs fail to meet their

8    burden, that is, if the scales remain evenly or tip just

9    slightly for the Defendants, then the verdict must be in favor

10   of the Defendants, because it is the Plaintiffs' burden of

11   proof.

12           So when you look at the elements, Plaintiffs have

13   the burden of proof for all of these elements.  So don't lose

14   sight of this burden.  Plaintiffs have the burden to prove

15   that there was a conspiracy between two or more entities to

16   reduce the supply of eggs.

17           Plaintiffs have the burden of proof that the

18   conspiracy unreasonably restrained trade.

19           And Plaintiffs have the burden of proof that the

20   restraint caused injury to each of the Plaintiffs.

21           What I'm going to focus on in this next hour or so

22   are the first two elements, conspiracy and unreasonable

23   restraint.  And so not to be repetitive, I'm going to rely on

24   Mr. King, when he gets up to address you, to talk about the

25   third-prong injury.  I am not going to address that.

1          Okay, now, what is a conspiracy?  As you probably

2     know, not all agreements are conspiracies.  We make agreements

3     all the time and they are not conspiracies.

4          A conspiracy is an agreement or understanding to do

5     something illegal.  And, again, Judge Pratter will instruct

6     you on that.  But basically, it means that Plaintiffs must

7     prove that UEP shared a common commitment to a common scheme

8     to achieve an unlawful purpose.

9          And the Defendant must knowingly join a conspiracy.

10    "Knowingly" means deliberately and not because of mistake,

11    accident, or other innocent reason.

12         Now, I want to take a little step back here and talk

13    to you about industry associations.  An industry association

14    is not a walking conspiracy.  It seems that Plaintiffs and

15    their expert, Professor Baye, are trying to convince you that

16    industry associations, by definition, are conspiracies.  And

17    that is simply not true.  We have talked a lot about three

18    industry associations over these last five weeks or so.  We

19    have FMI, which is the industry association made up of retail

20    members, we have NCCR, which is an industry association made

21    up of chain restaurants, and we have United Egg Producers,

22    which is actually an agricultural cooperation made up of

23    farmer members, as I explained and as the evidence has shown

24    you.

25         Now, industry associations made up of competitors

1    are not illegal.  Businesses that are actual or potential

2    competitors may lawfully form into associations to advance

3    common interests.  And you saw many examples of that.  For

4    example, you heard a lot of testimony about Plaintiffs' trade

5    association, FMI.  And who did you hear that from?  You heard

6    that from Lynn Marmer, vice president of corporate affairs at

7    Kroger.  She testified that through FMI, Kroger got together

8    with its competitors, including other Plaintiffs, SuperValu,

9    Albertsons, Publix, and other grocery store chains, which all

10   together agreed to advance retailers' interests.

11            You also heard from Ms. Marmer at Kroger that

12   industry associations make voluntary recommendations to their

13   competitors.  So let's compare FMI and UEP here.  FMI is a

14   group of retail chain competitors meeting to discuss industry

15   issues.  UEP is a group of egg producers -- egg producer

16   competitors meeting to discuss industry issues.

17            FMI created voluntary recommendations that its

18   members could choose to follow or not follow, because they

19   were voluntary.

20            UEP had voluntary recommendations for its members

21   that they could choose to follow or not follow because they

22   were voluntary.

23            Now, let's look at some of these voluntary

24   recommendations that Plaintiffs claim are conspiracies.

25            Now, you recall the Plaintiffs' attempt, and I think

1    Mr. Blechman raised, about these short-term measures.

2    Remember, these were recommendations regarding how to deal

3    with surplus, particularly when demand for eggs was low during

4    certain times of the year.  I think you probably remember

5    that.

6             To be clear, supply recommendations do not equal

7    agreements to reduce supply.  First, FMI and UEP each made

8    voluntary recommendations to its members.  So recommendations

9    alone are not agreements in restraint of trade.

10            The evidence demonstrate that these voluntary

11   recommendations were, in fact, not agreements to reduce

12   supply.  First of all, there was no enforcement mechanism.

13   Now, you heard both experts, both Dr. Walker and Professor

14   Baye, explain to you that a conspiracy and restraint of trade

15   needed an enforcement mechanism to make it work.  There is no

16   dispute on this record that these supply recommendations had

17   no enforcement mechanism.  So on that alone, between both of

18   the experts, you can find that the supply recommendations were

19   not agreements because they had no enforcement mechanisms, and

20   that is not in dispute in the record.

21            Furthermore, these were not agreements.  And if you

22   take a look -- because nobody agreed to them.  If you take a

23   look at one of the United Voices, D-0926, you can hear that

24   Mr. Gregory is very frustrated, and he says:  Did anyone

25   follow the recommendation to dispose of flocks six weeks

1    early?  Do these wide market swings do a disservice to our

2    problem?  Am I wasting my time writing about this and urging

3    producers to be more responsive?

4            Urge is not an agreement.

5            And if you look at the producer testimony that you

6    have heard, the Plaintiffs did not bring in a single producer

7    to testify here that they agreed to these supply

8    recommendations.  You heard from Garth Sparboe, who said --

9    questioned by the lawyer:  My question to you, Mr. Sparboe, is

10   that you have no knowledge that Sparboe Farms ever did a

11   single one of these recommendations; is that correct?

12           Answer:  Correct.

13           Question:  And you don't know that any other egg

14   producer actually implemented any actions suggested in the

15   supply demand alert?

16           Remember those supply demand alerts that you saw?

17           Did you?

18           I don't.  I don't know of anyone.

19           And you heard Marcus Rust say that he never agreed

20   to these recommendations.  So there is no testimony from a

21   producer that said they agreed to any of these

22   recommendations.

23           And furthermore --

24           Go back.

25           -- there was no measurable effect from these supply

1    recommendations.  And who testified to that?  Professor Baye,

2    Plaintiffs' expert.  Dr. Baye testified, the question by the

3    lawyer was:  Are you saying, in other words, that there's no

4    sustained measurable effect of the short-term measures on

5    output or on price?

6            Answer:  That's correct.

7            So I really think that we can give these supply

8    recommendations as agreements to reduce supply short shrift.

9            To recap, they were just supply recommendations,

10   they were not agreements to reduce supply.

11           Okay, let's talk about FMI and its members' goals.

12   FMI -- I'm going to go through the evidence with you -- wanted

13   a single animal welfare standard so its members were not

14   competing against each other.  FMI -- FMI members wanted to

15   avoid competition.  They did not want to compete with each

16   other on animal welfare.  That is why they wanted an

17   industry-wide standard.

18           Plaintiffs got exactly what they asked for:  a

19   single set of Animal Welfare Guidelines.  And you heard lots

20   of evidence about this.  Kroger testified very clearly and

21   openly about this.

22           Lynn Marmer, Question:  All right.  With regard to

23   the first point you make in the paragraph -- and the point

24   was:  Do not allow advocacy groups to pit one retailer against

25   another -- what did you mean by that passage?

1          Answer by Kroger:  I was explaining to our egg

2    merchants that we do not want to be in a McDonald's/Burger

3    King kind of situation where one of us was getting pitted

4    against another.

5          "One of us" means other retailers.  The retailers

6    didn't want to get pitted against each other on animal

7    welfare.  They didn't want to compete for animal welfare.

8    They wanted one standard.

9          And I think Karen Brown, the senior vice president

10   of FMI, could not have explained this better.

11                    (Audio clip starts.)

12         Answer:  That they could avoid having any company

13   singled out specifically by activist groups, that individual

14   companies don't have to duplicate efforts, and that would also

15   apply to the producer community, and that individual companies

16   are not leveraged by the actions of one.

17         Question:  What do you mean by that, "that

18   individual companies are not leveraged by the actions of one"?

19         Answer:  Company A did -- if PETA comes to -- which

20   they did with the quick-serve industry:  Company A did X, you

21   know.  What are you going to do about it?  Are you going to do

22   better?  Are you going to do less?  Trying to up the game.

23   That is a common tactic on the part of activist organizations.

24   That is what they were trying -- that was one of the things

25   they were trying to avoid.

1                    (Audio clip stops.)

2          MS. LEVINE:  I think that evidence could not be

3     clearer coming from FMI and coming from Kroger, that the goal

4     was to have a single standard that the industry could adopt on

5     animal welfare, considering the environment that they were in.

6               And what was FMI's response to the animal activists?

7     It was to rely on science.  FMI wanted uniform animal welfare

8     standards based on science.

9               My first point:  The Certified Program was science

10    driven, just like FMI wanted.

11              And as you know, FMI had their own scientific

12    committee, and there was a lot of overlap between the

13    scientists on the UEP Scientific Advisory Committee and the

14    FMI Scientific Advisory Committee.

15              Dr. Hollingsworth, from FMI, was also very clear on

16    this point.  Question:  So why did FMI and its members

17    consider the avoidance of market-driven competition on this

18    issue to be an advantage of a single-industry approach?

19              She does not deny that.  She answers readily:

20    Because we believed that working together with the experts, we

21    could come to an agreement on what were the best practices,

22    and we didn't have to deal with individuals coming up with

23    best practices that were not based on science but, rather,

24    pushed by things as activist groups.

25              So she was saying that she wanted them based on

1    science, and she didn't want them based on just emotions of

2    the animal activists.

3              UEP was on the same page.  You remember that UEP

4    believed that science was the key for having a bona fide

5    animal welfare program.  Scientists are the ones that study

6    what causes stress to hens and productivity and mortality.

7    And you recall lots of testimony -- I don't have to repeat it

8    all -- that UEP reached out to Dr. Armstrong, and

9    Dr. Armstrong put together a scientific committee, and he put

10   together the dream team.  Dr. Mench was the go-to animal

11   welfare scientist for egg-laying hens regarding behavior and

12   space allotment.  Dr. Newberry had deep expertise.

13   Dr. Swanson was well known in animal welfare across a wide

14   range of species, and there was also Dr. Hester.

15             And as I just said, Dr. Mench, Dr. Swanson, Adele

16   Davis (sic) from the American Humane Association, and

17   Dr. Golab, who later joined the UEP Scientific Advisory

18   Committee, was also on the FMI Scientific Advisory Committee.

19             So what did the Science Advisory Committee do?  They

20   developed their scientific recommendations in September

21   of 2000.  And the UEP Producer Committee for Animal Welfare

22   adopted the Scientific Advisory Committee's recommendation.

23             Now, it was the role of the UEP Producers Committee

24   for Animal Welfare to translate the Scientific Advisory

25   Committee's recommendations into guidelines that farmers could

1    actually implement.  It really doesn't do anybody any good if

2    the Scientific Advisory Committee's recommendations just sit

3    on a shelf.  They had to be usable.  They had to meet customer

4    demands.  They had to be practicable so the farmers could

5    actually use them.

6               And I just want to be clear about this.  The UEP

7    Producer Committee for Animal Welfare did not reject any of

8    the core Scientific Advisory Committee recommendations.  To

9    the contrary, they worked with the Scientific Advisory

10   Committee.

11              And if you look at this document, which is D-0382,

12   it is a document from the Scientific Advisory Committee, and

13   it says, quote:  The committee commends you on your support of

14   science-based guidelines.

15              This is talking to the Animal Welfare Committee.

16              We have repeatedly been told by the producers that

17   UEP's guidelines must remain as closely aligned to the

18   Scientific Committee recommendations as possible.  This has

19   occurred to date, not because you have always agreed with the

20   recommendations, because you have remained committed to the

21   science and thus the Scientific Committee.

22              So I just want to be clear that the Scientific

23   Advisory Committee commended the UEP Producer Committee and

24   that the UEP Producer Committee did adopt the Scientific

25   Advisory Committee recommendations.

1          Now, I also want to be clear that Plaintiffs

2   collaborated with UEP early on.  This idea that UEP just

3   shoved these guidelines and the Certified Program on to FMI

4   just is belied by the record.  So I want to take you through

5   some of the documents.

6          And I want to emphasize that several of these very

7   Plaintiffs here and FMI worked closely with UEP and the

8   scientists even before the Certified Program began.

9          And this document is really worth taking a look at.

10  It is D-0346.  And I think the date is important.  This is a

11  Kroger document.  This is a Kroger PR statement:  Kroger

12  endorses the Food Marketing Institute's program addressing

13  animal welfare.

14         And I've highlighted the parts rather than reading

15  the whole letter:  FMI is working cooperatively with

16  producers.  That's UEP.  Processors and independent animal

17  welfare experts to promote best practices.

18         If you read down:  Kroger and other members of FMI

19  have been working together to develop the trade group's

20  program.  Animal welfare is an important issue to our

21  company -- that is, Kroger -- our customers and our

22  associates.  We believe this collaborative approach which

23  brings together processors, producers -- that's UEP --

24  retailers, and animal welfare experts will raise the standards

25  in the meat and poultry industries.  So it is very clear that

1   early on, there was this collaborative effort.

2           And I was curious by something that Mr. Blechman

3   just said.  If the animal welfare program was really a supply

4   agreement, well, then, FMI knew that, too, from the very

5   beginning.  Mr. Blechman said that the DAPs say that this

6   conspiracy -- this alleged conspiracy started at May 15, 2000,

7   at the May 15, 2000 animal welfare committee.  But at that

8   committee were the FMI scientists.  Dr. Mench, Dr. Swanson

9   attended this very meeting.  If you want to look at that

10  document, it is PX-44.

11          And this collaboration -- this document over here,

12  on July 3rd, 2001, this collaboration was before the FMI-NCCR

13  report came out with their report.  So, again, early on.

14          And I really just don't understand this idea that

15  FMI did not adopt the guidelines.  The written record could

16  not be clearer.  I put them on a single page for you.  These

17  are the FMI-NCCR animal welfare --

18          Whoopsie-do.  Shouldn't have done that.  All right,

19  I need help, someone.

20          THE DEPUTY CLERK:  Put that back on.

21          MS. LEVINE:  Very good.  Okay.  I'm not going to

22  touch anything.

23          FMI and NCCR Animal Welfare Guidelines status

24  reports.  These are the FMI Animal Welfare Guidelines status

25  reports.  So you don't have to believe me.  They're in 2003,

1    2004, 2007.  And the numbers are D-0282, D-0291, and D-0284.

2    And as there was testimony about this in the beginning, if you

3    look at it, the FMI-NCCR animal welfare group looked at the

4    UEP Guidelines, just like they looked at other industry

5    guidelines, and they wanted some improvements made.  That's

6    the first document.

7            And then the second document, the improvements,

8    because there was a collaborative effort, got smaller.  And by

9    2007, they had no areas of difference.  So by 2007, there was

10   complete endorsement by FMI of the UEP Guidelines.

11           And FMI, as you can see, reviewed and endorsed the

12   guidelines every year.  And the 100% rule and the ban on

13   backfilling are in the guidelines.  And the guidelines and the

14   100% rule and the ban on backfilling are on the UEP's website

15   for all the public to see and for the retailers to see and for

16   any customers to see:  2004, 2005, 2006, 2007, 2008, 2009,

17   2010, 2011, 2012, all the way to the present day.  So this

18   idea that there's not notice is just not true.

19           Okay, now, I just gave you a background on how this

20   sort of all evolved, and I think you heard testimony about

21   this.  Yet Plaintiffs want you to believe that this was a

22   program whose goal was to achieve an agreement to reduce

23   supply.  But it is not.  It is voluntary.  The structure of

24   the Certified Program demonstrates that there is no agreement.

25   Not all UEP members are UEP Certified.

1          Now, I just want to stop here.  This is a

2     commonsense issue.  If you wanted to have a conspiracy to

3     reduce the supply of eggs, you would have made sure that if

4     you're a UEP member, you were required to join the UEP

5     Certified Program.  What kind of conspiracy is it when a UEP

6     member does not have to -- completely voluntary, does not have

7     to join the UEP Certified Program?

8          Moreover, you did not have to be a UEP member to be

9     UEP Certified.  You could decide to be UEP Certified and not

10    ever go to UEP meetings.  These were not tied together.

11         And, third, not all producers are UEP members or UEP

12    Certified.  So you could be a producer and be neither.

13         If this was an agreement to reduce supply, the

14    structure would have been different.  Think about that when

15    you deliberate.  Moreover, the UEP Program imposes no

16    restrictions on egg supply.  How could a program that puts no

17    restriction on supply be an agreement to reduce supply?  That

18    does not make sense.

19         You have heard from several witnesses that the UEP

20    Program imposes no restriction on egg supply.  Let me just

21    quickly go through that.  There is no restriction on the

22    number of farms a producer can have or the number of houses.

23    There is no restriction on the number of cages.  There is no

24    restriction on the number of hens.  There is no restriction on

25    the number of eggs.

1          Moreover, there is no limit on the supply of

2     non-certified eggs, which is very important.  Non-certified

3     egg producers grew.  Kreider doubled during this period.

4     Marcus Rust testified about that.

5          Rembrandt entered the market at the beginning of the

6     conspiracy and became one of the third or fourth largest

7     producers and it was non-certified.  You heard Dr. Walker talk

8     about that.  And certified producers could buy and sell

9     non-certified eggs.  So that means if you were a certified

10    producer and your customer wanted non-certified eggs, you

11    could buy non-certified -- you couldn't produce them

12    yourselves because all of your henhouses had to comply, but

13    you could buy non-certified eggs and resell them to the

14    customer.  So there was no limit on the supply of

15    non-certified eggs.  Again, the structure really does not make

16    sense for Plaintiffs' theory of an agreement to reduce supply.

17         Now, I want you to really think -- again, this is

18    one of the commonsense slides to think through that there is

19    just an internal inconsistency about Plaintiffs' theory.  The

20    UEP Certified requirements do not fit Plaintiffs' supply

21    control theory.

22         What did UEP do?  They actually tried to protect the

23    market from disruption.  They did a phase-in.  They didn't

24    have to do a phase-in.  They could have just said, Do you know

25    what, we've got these great Animal Welfare Guidelines, let's

1    start them next week, let's go from 48 inches to 67.  That

2    would have disrupted the market.  UEP did not do that.

3            In fact, UEP wanted a ten-year phase-in, a very long

4    phase-in and it was FMI, the retailers, that wanted three

5    years.  They were like hurry up, we need these guidelines, the

6    animal activists are coming after us.  UEP didn't want to do

7    that, because they had some concern there would be an effect

8    on the market and they wanted to slow it down.

9            So as you heard the evidence, the phase-in ended up

10   being six years, not ten years.

11           House averaging is another example, and you heard

12   Gene Gregory talk about house averaging, that, you know, in

13   the egg industry, some cages are configured different than

14   other cages, and so you could, you know, whether it's six or

15   seven hens in a cage, as he described, until you could do a

16   transition period.  Well, if you wanted to reduce the supply

17   of eggs, you never would have done that.  You would have just

18   said, too bad.  You've got to keep to the exact 67.

19           And while we're on the subject of inches,

20   UEP's required cage density was 67 inches.  You've heard a lot

21   of evidence that McDonald's was 72, I think Burger's was 75.

22   So UEP actually did the reverse of what can be considered a

23   supply reduction.  They actually had parts of the program that

24   slowed down any effect on the market.

25           UEP actually pushed back because it wanted to ensure

1    that there would be no market disruption.

2              Now, these facts go directly to the credibility of

3    Plaintiffs' case, which you should consider when you think

4    about whether or not it makes sense to say that the UEP

5    Certified Program was an agreement to reduce the supply of

6    eggs.  And this also really destroys Plaintiffs' conspiracy

7    theory that somehow Don Bell, back in 1999, was the driving

8    force for some alleged industry-wide conspiracy to limit the

9    supply of eggs, which completely ignores these facts and

10   completely ignores all of the evidence I just told you about

11   FMI and Kroger.  There's no Don Bell there.

12             Okay.  Now we're going to move to the second prong.

13   I'm finished talking about whether there was an agreement of a

14   conspiracy.  I'm going to move to the second prong.  We're

15   going to talk about unreasonable restraint of trade, which,

16   again, is Plaintiffs' burden of proof.

17             In considering whether or not the alleged conspiracy

18   unreasonably restrained trade, you will be asked to weigh the

19   beneficial or procompetitive aspects with any harm to

20   competition.  You're going to weigh that, if you get to this

21   prong.  And sorry that I'm going to now sound like a real

22   boring lawyer, but I want to explain to you -- explain this to

23   you a little more.  A restraint is unreasonable only if it

24   produces substantial harm to competition that is not

25   outweighed by procompetitive benefits.  If the restraint does

1    not harm competition or if the procompetitive benefits

2    outweigh any anticompetitive effects, it is not unreasonable.

3         In considering whether the challenged restraints

4    benefitted competition, you may consider various factors,

5    including whether the challenged restraints were demanded by

6    the customers, increased production, increased consumer

7    choice, decreased price or improved product quality. Those

8    are all procompetitive benefits of the Certified Program.

9         Okay, the Certified Program, as I just said, has

10   procompetitive benefits. It met customer demand. It

11   protected its customers against animal welfare activists. It

12   developed a uniform animal welfare industry standard based on

13   science as FMI and the retailers wanted and as the producers

14   wanted. Certified Program was science driven, Plaintiffs got

15   what they asked for, a single set of Animal Welfare

16   Guidelines.

17        Certified Program also increased consumer choice,

18   you now had to certify an egg. And it also increased

19   productivity. You have heard evidence that when hens are

20   given more room, they are actually more productive. That is

21   also another procompetitive benefit. In fact, the very items

22   that Plaintiffs complained about support the positive

23   procompetitive benefits. The challenged features support the

24   procompetitive benefits. Plaintiffs really make much of this

25   100% rule, but the 100% rule and the audits enhanced the

1    program's integrity and house averaging and the phase-in

2    minimized market disruption.

3          Now, I want to spend a little time on the 100% rule

4    because from Plaintiffs' case and what Mr. Blechman said, a

5    lot of their case is based on this 100% rule, that it rigged

6    the system, that it was a conspiracy, and nothing could be

7    further from the truth.  So I'm going to walk through those,

8    because I think this is really the heart of the Plaintiffs'

9    case.

10          Let's be clear about this.  FMI required 100 percent

11    humane treatment of all laying hens.  FMI would not endorse

12    any program that did not treat all laying hens humanely

13    regardless of the use of the hens.  You have seen this

14    testimony.  Remember in discussions with Ken Klippen, there

15    was a letter where Sparboe asked about the 100% rule.  And the

16    response from FMI was:  Our goal is enhanced animal welfare

17    for all animals in food production, not animals used only for

18    certain products or product categories.  This is our position

19    for all producer groups.

20          And, again, I think Karen Brown could not have been

21    clearer.

22                 (Audio clip starts.)

23          Question:  You answered Number 2.  Our goal is

24    enhanced animal welfare for all animals in food production,

25    not animals used only for certain products or product

1    categories.  This is our position for all producer groups.

2              Answer:  That's true.

3              Question:  That was indeed your position?

4              Answer:  Yes.

5              Question:  And why was that FMI's position?

6              Answer:  Because all animals -- what difference does

7    it make what product they're going to be?  They're all animals

8    who are in a system which needed to be improved significantly.

9              So if I'm a chicken whose eggs are going into this

10   product versus a chicken whose eggs are going into that

11   product, why should that make any difference as to how I'm

12   handled as an animal?  Why should I be less humanely handled

13   because of what product I end up in?  So if you come back as

14   an animal, you'd better make sure what kind of animal you come

15   back as.

16                        (Audio clip stops.)

17             MS. LEVINE:  I think that really ends the story.

18   But if you need to be convinced more, you need only look at

19   Tim Hammonds, who is the president and CEO.

20             He writes at D-0454:  We are writing you today for

21   clarification regarding those eggs produced for use in

22   processed products.

23             Now, these are processed products, like the

24   breakers.

25             Our FMI members have taken the position -- who are

1    the FMI members?  The retailers, the Plaintiffs.

2              -- as we state in our FMI-NCCR press release that

3    the Animal Welfare Guidelines will apply both to shell eggs

4    and those produced for use as ingredients in food products.

5              The processed eggs.

6              We would greatly appreciate a progress report on the

7    success of your program with the egg product sector.  Our

8    members would welcome reassurance that all UEP Egg Producers

9    are following your guidelines, even for eggs to be used as

10   ingredients.

11             I really think this letter from the CEO of FMI and

12   Karen Brown's testimony could not be clearer.  FMI endorsed

13   and supported the 100% rule.  They just didn't use the word

14   100%.  The concept is exactly the same.

15             And likewise, the Scientific Committee also endorsed

16   the 100% rule.

17             Again, at D-0709, the UEP, Scientific Advisory

18   Committee:  We believe it is imperative that all hens in

19   non-cage or cage systems should receive housing and care that

20   meets or exceeds the minimum science-based guidelines provided

21   by our committee.

22             That is clear as day.

23             So in short, the 100% rule cannot possibly be a

24   supply control as Plaintiffs posit.  But, rather, it was

25   required by FMI, its retail members, the scientists, and

```
1     common sense.  I mean, really, if you're having an Animal

2     Welfare Program, how can you have half your chickens have

3     humane conditions and half your chickens not?  So common sense

4     supports, as well, that the 100% rule was not a supply

5     control.

6              And I really think that defeats really a central or

7     the central aspect of this concept that somehow the Certified

8     Program was an agreement to reduce the supply of eggs.  It was

9     supported.

10             Okay.  The next aspect of this 100% rule is somehow

11    Plaintiffs posit that there was disagreement over the 100%

12    rule.  But disagreement over the 100% rule is not some hidden

13    agenda.  First of all, it was out loud, as we have showed to

14    you in minutes.  But these were about the producers' own

15    financial interests.  You saw -- heard from Sparboe Farms very

16    honest about the 100% rule would be more expensive for Sparboe

17    Farms.  They would have to provide a better and more humane

18    treatment, which is more expensive to the breakers, their

19    breakers, and to their contract farms.  He was very open about

20    that.  It's a financial interest.  It has nothing to do with

21    the supply control.

22             And Ken Klippen testified, when I asked him:  When

23    you were deposed under oath, you testified that you couldn't

24    name anyone, that you didn't know anyone that thought that the

25    program was objectionable, an unfair trade practice or an
```

1    antitrust violation; isn't that true, sir?

2              That's true.

3              So "disagreement" does not mean hidden agenda.

4              And furthermore, I think you heard from Dr. Walker

5    that when you're looking at a procompetitive analysis, you

6    don't look at the producer, the seller; you look at the buyer.

7    It's what the buyer thinks is procompetitive, not whether the

8    seller thinks it's more expensive.

9              Okay, and finally, Mr. Mueller.  Well, whose hidden

10   agenda was that?  It's Mr. Mueller that used that word,

11   "hidden agenda" -- that's the only time you saw it -- as a

12   threat for individual business reasons.  He was the lawyer for

13   Sparboe.  Sparboe didn't want the 100% rule because it would

14   cost more, so he wrote to Irving that this was some hidden

15   agenda.

16             Now, you will note when I asked him when UEP

17   meetings were going on and he was there with Sparboe, he never

18   objected to anything at the meetings or any of the motions.

19   And, in fact, he permitted Sparboe, his client, to remain a

20   member of the Certified Program from 2002 to 2005, and then,

21   of course, you know that Sparboe came back to the program in

22   2011.  So if you thought that this was an antitrust violation,

23   you would not allow your client to sit and join it.  So ask

24   yourself, who really has the hidden agenda here?

25             Moreover, after Irving writes back to Mr. Mueller,

1  Mr. Mueller basically says:  Oops, never mind, I take it back.

2  If you look at his e-mail, he says:  I wanted you to know that

3  I was simply asking questions and not making allegations

4  concerning the motivations of UEP in promulgation of the

5  guidelines.

6         And that e-mail, it's interesting.  Plaintiffs

7  didn't show you that e-mail on direct.  Mr. King brought that

8  e-mail out on cross.

9         Okay.  I think we're finished now with the 100%

10  rule, with this idea that if you disagree with the 100% rule,

11  somehow it's a conspiracy, which it is not, and we're going to

12  move to the audit.  Plaintiffs have spent a lot of time about

13  this audit.

14         First, I want to be very clear:  Plaintiffs complain

15  about the audit, but everyone has testified that you need an

16  audit.  It's common sense.  If you want to have a viable

17  program, you need to have an audit.  So the idea that you need

18  to have an audit is really not at issue.  There really is no

19  debate here.

20         And likewise, the UEP Scientific Advisory Committee

21  also believed that the system needed audits and really

22  demanded audits.  Dr. Armstrong testified that.

23         And of course you've heard testimony that many of

24  the retailers actually demanded a copy of the audit.  They

25  actually got the audit because they were so important.

1          And Dr. Hollingsworth also testifies about the

2     audit.  Dr. Hollingsworth testified that FMI Scientific

3     Advisers said they have to have an audit; otherwise, you were

4     really not having an impact on welfare.  That's what the

5     scientists said.  And Dr. Hollingsworth further agreed that by

6     June 7th, FMI's expert advisors had recommended that FMI

7     proceed by working with the producer audits and abandoning the

8     FMI audits.  So by June of 2000, even their own scientists

9     told them to go work with the producer audits.

10          And then I can just click through this quickly.

11     These are documents from H-E-B that talked about that they

12     routinely audited their UEP Certified suppliers.  They got the

13     audits.  And also from Publix, demanded the audits.  So I

14     think there's no question that the concept of an audit was

15     agreed to by all.

16          What Plaintiffs are really focusing on are the

17     features of the audit.  And they particularly focus on

18     automatic failures in cage space, no backfilling.  There was

19     also an automatic failure for non-feed-withdrawal molting,

20     which I'll get to in a minute.

21          Now, there was very good reason for why these three

22     in particular had an automatic fail.  It's because they

23     related to mortality.  Dr. Armstrong told you that they

24     were -- these three were clearly detrimental to animal welfare

25     and had a significant individual animal welfare consequence.

1  So these are the three that really led to mortality, and so

2  they were the most important to make sure that people abided

3  by.

4      And it's very interesting that in all of this

5  discussion, you've heard a lot about automatic failure for

6  cage space, automatic failure for no backfilling.  But you

7  haven't heard a word about automatic failure for

8  non-feed-withdrawal molting.  Well, I wonder why that is.

9  It's because it doesn't fit Plaintiffs' theory.

10  Non-feed-withdrawal molting has nothing to do with supply.

11      Now, what I'm going to do is I'm going to go back

12  through cage space and explain to you why the automatic

13  failure on cage space is not an agreement to reduce the supply

14  of eggs, and then I'm going to do the same with backfilling.

15      Okay.  Cage space.  You've heard about the PVP

16  program.  That was the alternative program that Plaintiffs now

17  claim would create substantially less harm to competition.  So

18  I want to show you -- this is in evidence.  Plaintiffs put

19  this document in evidence.  Mr. Klippen testified to it.  This

20  is the PVP program.  He had a client, Sparboe.  And Sparboe,

21  for a period of time, was on the PVP program.  Do you remember

22  this?  And then when the cameras came rolling in, they left

23  the PVP program, and they came to the UEP Program.

24      If you look at this document, at the back of the

25  document, there's actually an audit.  PVP had an audit, and

1    here it is.  I'm going to hold this up rather than this, but

2    it goes together.

3            Okay.  And this audit actually was for Sparboe Farms

4    on the Humboldt, Iowa, location.  Okay.  You should look at

5    this carefully.  Talking about cage space, cage free,

6    free-range space requirements, we're talking about the cage

7    space density.  It says:  Do the chickens housed average

8    67 square inches per bird, calculated by determining the

9    number of birds placed, divided by the number of cages.

10   That's house averaging.  So any complaint from the Plaintiffs

11   about house averaging, the PVP program house averaged.

12           You can also notice on this page that the cage space

13   requirement had the highest points.  It had 50 points compared

14   to the other points.  Why?  Because cage space has the highest

15   level of mortality.

16           And then when you go down and look at the audit

17   features on the PVP audit, you fail if you get less than

18   75 percent.  What's interesting on the UEP audit, you fail if

19   you get less than 85 percent.  So UEP actually had more

20   rigorous standards than the PVP.

21           But what I really want to point out to you is on

22   this alternate program.  You fail if you get less than

23   75 percent or did not meet the space requirement of Section 5.

24   Automatic failure for cage space.  You would fail the PVP

25   audit, just like UEP.

1          And, moreover, sorry -- and not only was there an
2     automatic failure for the cage space, but Mr. Klippen clearly
3     testified, when I asked him, that if there was a single bird
4     over, that bird would have to be removed.  And that is what
5     Mr. Klippen said:  And, in fact, on your program, if there was
6     one extra bird in your 67 inches, you would have to remove the
7     bird, right?

8          Yes.

9          Remember that testimony about Linda Reickard?  One
10    bird.  It's true on the PVP program as well.

11         Now, I really want you to focus on this, because you
12    have heard throughout this trial that the UEP cage space
13    automatic failure and the UEP monthly compliance reports
14    regarding strict compliance with the bird numbers was an
15    important element of Plaintiffs' alleged supply conspiracy.
16    Well, the PVP program is held up at times as better, less
17    restrictive, but it has the exact same features.

18         You may weigh that when thinking about the
19    credibility of Plaintiffs' allegations.

20         Moreover, FMI also thought the cage space was
21    critical and gave it very high points in its audit.

22         Okay, let's move on to backfilling.  There is ample
23    support in the record that the restriction on backfilling was
24    supported by animal welfare concerns.  The Scientific Advisory
25    Committee letter supported the ban on backfill.  There it is

 1    for you, if you want to look at it.  D-0665.  It is with

 2    utmost urgency that the Producers Committee for the Animal

 3    Welfare advises egg producers who participate in the UEP

 4    Animal -- Certified Program to eliminate the practice of

 5    backfilling.  It is essential that you maintain science-based

 6    guidelines.

 7            And I think you remember a lot of testimony from

 8    Dr. Armstrong that explained how disease could be increased if

 9    there was backfilling.  Remember, if you bring in a chicken

10    and it gets diseased, it can wipe out the whole flock.  So,

11    you know, it did protect the flock and protect supply.

12            And because the UEP Guidelines are based in science,

13    UEP adopted the Scientific Advisory Committee's

14    recommendation.  They have to show you how they recommended

15    it, and they adopt it.

16            Okay.  So the rest of the evidence on the support

17    for the restriction on the backfilling ban is FMI endorsed the

18    2006 guidelines, which I showed you, which includes the ban on

19    backfilling.  So their scientists look at those guidelines,

20    they knew it, and they approved of it or they endorsed it.

21    Dr. Mench, Dr. Swanson, Dr. Golab, and Dr. Adele Douglass, on

22    both the FMI and the UEP Advisory Committee, believed that the

23    ban on backfilling was based on science.

24            I think you heard Dr. Hurd -- Mr. Hurd from Rose

25    Acre testify that he knew about state legislation and also

1    about other Animal Welfare Guidelines.  And this document is

2    evidence -- in evidence, D-1002, Animal Welfare Standards for

3    Layer Enriched Colony Housing.  And it says right here:

4    Backfilling policy:  Colonies must not be backfilled to

5    replace mortality.

6           And also the Maine best practices, that is also in

7    evidence, at DCX-0101.  It also bans backfilling.  It says:

8    Other than a catastrophic event, backfilling, the practice of

9    placing new birds into an existing flock of cages to replace

10   mortality, is prohibited.  A catastrophic event is defined as

11   a natural disaster, disease problem, or other event beyond the

12   control of the producer.  Under these circumstances,

13   backfilling of hens up to 90 percent of the original flock

14   capacity is permitted.  Prior approval must be obtained.

15          Just like the UEP Program.

16          And I want to be clear:  I think Plaintiff said

17   something -- a catastrophic event is not the complete loss of

18   the house.  If it's a complete loss of the house -- is lost,

19   you build a new house.  You know, backfilling is when you fill

20   in and there's existing flocks.

21          Also, when analyzing the Certified Program's audit

22   point system, you know that they did not use it as a supply

23   reduction as well, because there is no failure for adding more

24   hens.  There is no failure for -- you don't get any deductions

25   for adding hens.  If it was a supply control, you would fail

1    if you added hens.

2           Okay.  We're going to move on to notice.  Okay.  I

3    think I've heard the Plaintiffs say that they didn't know

4    about the audits, they didn't know about the automatic fail,

5    they didn't know about the ban on backfilling and if they had

6    known, they never would have joined the Certified Program.

7           Well, first, I'd like to say that they took this

8    case in 2008.  It is now 2019.  They've known about this at

9    least, by their own admission, for 11 years.  And they're

10   still on the Certified Program.  I think we can all agree that

11   that is tacit acceptance of these aspects.  But if you look at

12   the record, the UEP Guidelines themselves include these

13   automatic pass/fails that include the audit.  So everybody has

14   had notice.  Every year these guidelines come out, and when

15   there's a new audit procedure, they're in the audits.  And

16   retailers receive the audits.  There's lots of testimony.

17          Mr. Hinton says:  Did Kroger require -- being one of

18   their commodity shell eggs suppliers require Rose Acre to

19   furnish Kroger with the audits that were undertaken -- whoops,

20   under the UEP Program.  I messed up again.

21          It's like children that we have to delegate for

22   that.

23          Okay, so the retailers actually got the audit.  So I

24   don't know what the complaint is that you didn't know about

25   the audits.  And, moreover, the retailers put the UEP logo

1    with the website on the cartons so that the consumers would

2    know about the guidelines and the audit.  And certainly the

3    retailers know what's in their store.

4           Now, Mr. Blechman just told you that there was

5    overwhelming evidence that the audits were rigged.  That is

6    the word he used.  Nothing could be further from the truth,

7    and that is why I took so much of your time to go through the

8    audits and the features that are being complained of to show

9    that they were well known, well grounded, and accepted.

10          We can all agree that the audits were needed, you

11   saw that.  UEP's audit was open and available to all.

12   UEP's audit was based on science, and perhaps as I've shown

13   you, some of the most rigorous for ensuring animal welfare.

14   And you saw that all three -- FMI, PVP, and UEP -- came down

15   very hard on cage space, which totally undermines Plaintiffs'

16   theory of the audit being somehow rigged by UEP.

17          Let's move on quickly.  I just want to dispense of

18   this idea that the PV Program was a market alternative.  So

19   quickly, it did not have the 100% rule and it allowed the

20   farmers to treat some hens humanely and some not humanely.

21   We've already gone through that FMI would not accept that.

22   Karen Brown could not have been clearer about that and Tim

23   Hammonds.

24          The Scientific Committee would not accept -- would

25   not accept -- okay.  Here, this is a letter from -- from the

1    Scientific Advisory Committee to Gene Gregory.  It says:  It

2    has come to our attention that individuals within the industry

3    are attempting to develop a program that would use the USDA

4    process verified seal but result in less than 100 percent of

5    the chickens subject to science-based guidelines.

6            In other words, a given producer or company would

7    not be required to maintain all hens under science-based

8    guidelines.  We are adamantly opposed to that approach.

9            So the Scientific Committee would not accept the PVP

10   program.  Animal activists would not accept the PVP program.

11   And Sparboe rejected the PVP program, as you recall, and then

12   rejoined the UEP Program.  Sparboe gave notice to UEP of this,

13   that it left the PVP program.

14           After that, no retailer ever requested to be on the

15   PVP program.  So I think it's pretty clear that the market

16   never adopted the PVP program as an alternative.  It had

17   nothing to do with UEP.

18           All right.  I'm going to return to this burden of

19   proof.  Now, we have just talked about all the procompetitive

20   benefits of the UEP Certified Program.  I've just gone through

21   them all.  And remember, you need to balance those against any

22   harm to competition.  Plaintiffs have not met their burden to

23   prove that the conspiracy reduced the supply of eggs as they

24   must.  Therefore, they have not shown anticompetitive harm.

25   Let's recall what the experts said.

1        Dr. Walker testified that there was no competitive

2    harm, no reduction in supply or increase in price.  Let's look

3    at that chart.  Okay.  So flock size increased.  And he shows

4    you that 24 million more hens were in the domestic market from

5    the beginning of the conspiracy in 2000 until 2014.  So that

6    goes to the third point.  Supply went up, not down.

7        Egg production increased.  That's Dr. Walker's

8    chart.

9        One billion more eggs per month came into the market

10    during the beginning of the conspiracy period.  That's a lot

11    of eggs.  Prices stayed low.  This is really important.  This

12    case is about an agreement to reduce the supply so that the

13    prices go up.  We've heard this over and over again, supply

14    down, price up.  Look at what happened to the prices adjusted

15    for inflation.

16        In 2006, the alleged conspiracy starts in 2000, look

17    at the prices, they're going down.  They plummet, plummet six

18    years into the conspiracy.  That level of pricing is lower

19    than in 1972.  The lowest prices since 1972, six years into

20    this conspiracy.  Farmers are going out of business.  Historic

21    lows.  And while the prices are plummeting, Plaintiffs argue

22    that production should have gone up by increasing amounts.

23        Now, does that make sense to you?  I think this

24    chart is very telling when you are in your deliberations.

25        Okay.  Finally, let's analyze what Dr. Baye said.

1   Okay, this is what -- Professor, I apologize.

2          This is what Professor Baye says.  Professor Baye

3   offers no opinion -- no opinion on whether the 100% rule is

4   anticompetitive.  He offers no opinion on that.  Professor

5   Baye admits that the 100% rule had no effect on supply.

6   Dr. Baye's only opinion is that the 100% rule shut off a

7   channel for production of non-certified eggs.

8          Now, we know that that is not correct because of the

9   evidence in the record.  Many producers were not certified.

10  Rembrandt, which Dr. Walker told you is the third or fourth

11  largest egg producer in the country, entered the market in

12  2000 and produces certified eggs.

13         Mr. Rohr from Giant Eagle told you Kreider produces

14  non-certified eggs.  And Rose Acre testified that it bought

15  non-certified eggs and sold non -- Kreider's eggs when its

16  customers wanted non-certified eggs.  So you could certainly

17  get non-certified eggs.

18         And Wegmans has its own farms and producers.

19         Second, Plaintiffs have not produced -- proven that

20  any of them was injured by not being able to buy non-certified

21  eggs.  Mr. Rohr from Giant Eagle told you Kreider could supply

22  Giant Eagle.  Remember when he said that?  That he could have

23  gotten non-certified eggs, but Giant Eagle -- but the

24  non-certified eggs were more expensive than the certified

25  eggs, so he went with the certified company.  I don't know if

1    you remember that testimony, but it was very telling.  So

2    there was no injury here.

3            And Mr. Hill from H-E-B said that he couldn't get

4    non-certified eggs, but you know that that is not true because

5    there was Kreider, there's Sparboe, and he could have just

6    told Cal-Maine, I'm going to get non-certified eggs from

7    another supplier.

8            Okay.  So common sense supports the conclusion that

9    UEP Certified Program did not reduce the supply.

10           Let's just recap.  UEP Certified Program did not

11   restrict the expansion or growth.  We've gone through that.

12   The Plaintiff egg buyers have bargaining power here.  This is

13   not a case where the buyers have no bargaining power.  I think

14   that is pretty clear.

15           The Plaintiffs demanded and they continued to demand

16   UEP Certified eggs.  You know, it's one thing if you find out

17   about a conspiracy and then say, I am going to buy from

18   someone else, but it's another thing if you continue to demand

19   certified eggs for the past 11 years.

20           Egg production was moving to increased space

21   allowances from other welfare practices with or without UEP.

22   UEP certainly wasn't the only animal welfare.  In fact, it was

23   one of the most conservative.  So when you look at the market,

24   there were lots of others with animal welfare programs.  And

25   several states required cage space allowances meeting or

1    exceeding the UEP Guidelines for the 100 percent of eggs

2    produced, and when you got to the state, of course, it has the

3    100% rule and sold into that state.

4            Let's look at the map of that.

5            Okay.  Arizona, Washington, and Oregon had adopted

6    the UEP Guidelines.  Maine and Ohio had 67 inches.  New

7    Jersey, California, and Michigan exceeded the 67 inches.  In

8    fact, I think you heard about California having about

9    116 inches.  So all of these things were playing out in the

10   market, and those statutes show consumer demand for Animal

11   Welfare Guidelines.

12           I want to pause just a minute and respond to what

13   Mr. Blechman said that United Voices are a diary of the

14   conspiracy.

15           Now, United Voices, you remember, is a newsletter.

16   It's like four pages.  It's got a lot of editorial, a lot of

17   opinions.  A lot of these things that people say, Gene Gregory

18   said were editorials, were opinions, if when you deliberate,

19   you can't agree to an editorial.  An editorial is not an

20   agreement.  An editorial is an opinion.  It is not an

21   agreement in restraint of trade.

22           And furthermore, those UEP, United Voices were no

23   secret.  They were circulated widely to the USDA, to

24   universities, to trade magazines, and to egg producers.  So

25   they cannot -- editorials cannot be considered agreements.

1    And if you actually look in the record, there's testimony to

2    that.  You heard people say -- Greg Hinton said?  And I don't,

3    I don't have to agree with what Gene Gregory writes here.

4           Again, he says:  Just because Gene Gregory thought

5    what he believes is not what I believe.

6           When asked, Gene Gregory was asked about an

7    editorial and asked what that meant, and he said:  I'm

8    expressing an opinion.

9           Question:  As opposed to relating a fact?

10          Answer:  Yes.

11          So the concept that the United Voices are somehow

12   agreements, I think you can set that aside.  But let's talk

13   about Gene Gregory.  Gene Gregory was the man caught in the

14   middle of all of this.  There's been a lot of discussion in

15   this trial about Gene Gregory.  And let's review all of the

16   pressure that Mr. Gregory was under.  He had the retailers

17   pointing at him, demanding science-based uniform standards and

18   to protect them against the animal activists.  He had the UEP

19   members demanding.  He had European legislation that people

20   were reacting to.  He had state legislation that people were

21   reacting to.  And he had NCCR and McDonald's and Burger King,

22   and he had to juggle all of these things.

23          Mr. Gregory worked tirelessly to bring humane

24   standards to the egg industry, and he was very proud of the

25   work he did.

1        Let's end with Mr. Gregory.

2                  (Audio clip starts.)

3        Question:  And are you proud of the program,

4   Mr. Gregory?

5        Answer:  Honestly, in my 50-some years in the egg

6   industry, I have never been more proud of anything than this.

7                  (Audio clip stops.)

8        MS. LEVINE:  Ladies and gentlemen, when all is said

9   and done and you look at all of the evidence, Plaintiffs got

10  what they wanted, and now they want more.

11       Thank you very much for your time.

12       THE COURT:  Okay.  What do we know about the timing

13  in the next --

14       MR. HARRIS:  About 10 to 15 minutes, Your Honor.

15       THE COURT:  Okay.  Are you guys okay, or do you --

16  do you need your lunch break to start right now?  No meaning

17  yes, you're okay?

18       A JUROR:  We're good.  Good.

19       THE COURT:  Okay, all right, not to put any pressure

20  on counsel.  I'm simply playing -- I'm looking at the clock

21  and working backwards because I know what we're trying to

22  accomplish here.

23       Let's hear from USEM.

24       MR. HARRIS:  May it please the Court, Your Honor,

25  counsel, members of the jury.

```
 1              Before I begin, I'd like to reintroduce myself
 2     because it's been a few weeks since I had the opportunity to
 3     address you.  My name is Alex Harris, and I represent the
 4     Defendant US Egg Marketers.  And I also want to thank you, as
 5     Mr. Blechman and Ms. Levine did, for your time and attention
 6     on this case.  As they have echoed, and I'm sure the Court has
 7     echoed already to you as well, everyone in this room really
 8     appreciates the time and energy that you have put into this,
 9     your attentiveness, the note-taking, and we are just very
10     grateful for your work on this case.
11              Now, as promised, you didn't hear very much from me
12     during trial, and that's because you didn't hear very much
13     about US Egg Marketers.  And I sat through this entire trial
14     with you at the little shorter table and the little shorter
15     chair that the Court kindly got out of its supply closet,
16     added to the other tables that are normally in the courtroom,
17     and entire days went by where I sat there and did not hear US
18     Egg Marketers or Exports mentioned once.
19              And at the end of the day, what I said during my
20     opening is what the evidence at trial showed, that US Egg
21     Marketers is a separate organization that helps export eggs to
22     other countries.  And those exports had no real impact on the
23     price or market for eggs.  It did not show that US Egg
24     Marketers shared a commitment to a common scheme to achieve an
25     illegal purpose, and it did not show that US Egg Marketers
```

1    knowingly joined any single unified conspiracy that consisted

2    of all the other things that we've heard about during the

3    majority of this trial.

4            So what did the evidence show?  The evidence showed

5    that exports are just another market for eggs.  You heard

6    Mr. Rust, for example, of Rose Acre testify that surplus

7    eggs -- again, you could sell them to the retailers, you could

8    sell them to the breaker markets, or you could export them.

9    It's just another market for eggs.  And exports are common and

10   not illegal.

11           Now, when the judge gives you the instructions on

12   the law, she is not going to tell you that exports are

13   illegal.  And that's common sense.  Think about it.  From cars

14   to pharmaceuticals, you hear about exports all the time.

15           Now, Mr. Rust was asked this question during his

16   testimony.  He said:  We export corn.  We export soybeans.

17   Are you trying to say we can't export eggs?

18           The Plaintiffs never answered him then, and they

19   never answered that question in their closing because the

20   answer is of course they can.  Of course you can export eggs.

21           Now, these eggs were surplus eggs, extra eggs,

22   excess.  You saw that word "surplus" over and over again in

23   the documents in this trial, and you heard that word "surplus"

24   over and over again from the witnesses.

25           Now, there's no evidence that the Plaintiff

1    Supermarkets in this case would have or could have bought

2    these eggs.  The egg farmers met the demands of the

3    supermarkets and then had eggs left over.  These were the eggs

4    that were subject of these exports.

5         Now, let's go through what the farmers, what the

6    chain supermarkets, and what the experts said about exports.

7         So what did the egg farmers say?  The producers that

8    you heard from said that they made export decisions based upon

9    their own independent judgment.  Now, three of the egg farmers

10   in this case were asked about their participation in US Egg

11   Marketers.  Rose Acre testified that it had been exporting

12   eggs on its own since the 1980s but joined US Egg Marketers in

13   late 2006.  And they said they did that for two reasons.  The

14   first was that they had an additional farm coming online, and

15   so they thought they would have a greater amount of surplus

16   eggs, and the second was that foreign buyers and brokers were

17   starting to ask for larger orders which they couldn't fill

18   themselves, so it made sense for their business.  It was an

19   independent decision.

20        Sparboe was also asked -- or witnesses from Sparboe

21   Farms were also asked about their participation in US Egg

22   Marketers.  And Mr. Mueller testified that the decisions were

23   made independently on its own and not as part of some single

24   conspiracy.  Now, you also heard that Sparboe left US Egg

25   Marketers in July 2005.

1            Now, there was a third producer that was also asked

2    about their participation, and that was Michael Foods.  You

3    heard Michael Foods mentioned quite a bit during this trial

4    because they're such a large egg farmer as well, even though

5    they're not here in the courtroom.  And Terry Baker,

6    testifying by video from Michael Foods, said that Michael

7    Foods was never a member of US Egg Marketers.

8            So what kind of conspiracy is this?  Michael Foods

9    was never a member.  Sparboe left in 2005.  Then months, years

10   later, Rose Acre joined.  They weren't even members at the

11   same time.

12           Now let's see what the supermarkets chains said

13   about exports or about US Egg Marketers.  Now, most of the

14   supermarket chains that are Plaintiffs in this case, you

15   didn't hear from.  Most of them didn't even bother coming, and

16   they didn't even testify by video.  You heard no witnesses

17   from most of those supermarket chains.

18           Now, for those who did show up, here's what they

19   said.  James Rohr of Giant Eagle said nothing.  Lynn Marmer of

20   Kroger said nothing.  James Wilson of Publix said nothing.

21   And then Mitch Hill of H-E-B -- Mitch Hill has been involved

22   in this case as H-E-B's representative for years.  When asked

23   about US Egg Marketers, he answered:  I don't even know what

24   that is.

25           What does that tell you about the role of US Egg

1    Marketers in this case?

2         Now, let's go on to what the experts say.  Now,

3    Dr. Baye testified that -- he spent most of his time

4    testifying about his econometric models, as he called them,

5    but when it came to exports, he said that his model wouldn't

6    work.  He said that he couldn't put the exports into a model

7    and actually show any type of injury.  He said that they

8    were -- the exports, because they are more or less occurring

9    randomly in time and they were one-off short-term things, that

10   he just couldn't model that impact.  They were too few, too

11   small, and too sporadic.

12        And remember Professor Baye spent years on this

13   case, spent years working on it with a team of PhD economists,

14   and he couldn't come up with a model that would show that

15   exports caused any injury.

16        Now, what Dr. Baye did say is that, Well, if you

17   look at these six exports during a very limited time frame

18   that was mostly around 2007 -- I think it was late 2006 to

19   early 2008 -- well, if you just look at these six and then you

20   look at these elasticities I calculated, well, maybe there's a

21   short-term effect there that he said lasted less than one

22   month.  That's not enough to meet Plaintiffs' burden.  And

23   let's look at that a little closer.  Again, he said it would

24   only last a few weeks.  No lasting impact on price, if any.

25        The other thing he said was that because he couldn't

1    model this, because he couldn't do what he did for most of

2    what he talked about with the econometric modeling, what he

3    did was he based these on the elasticity calculations.  Now,

4    I'm going to leave most of the explanation of

5    Dr. Baye's testimony to my colleagues sitting at the big kids'

6    tables, but there are two small points about exports that I

7    did want to point out.

8              The first is that Dr. Baye testified that his

9    assumption was that every single egg that was in the US Egg

10   Marketers export would have been sold into the United States.

11   That -- that assumption by Dr. Baye has no basis in the

12   evidence.  Again, you heard Rose Acre say that they were doing

13   exports on their own.  The fact that they joined US Egg

14   Marketers doesn't mean that those eggs would have been sold

15   into the United States.  Those were eggs they were exporting

16   on their own, and now they're exporting through US Egg

17   Marketers.

18             And also you heard -- you heard a very brief

19   reference during trial from Linda Reickard during her

20   testimony that mentioned the term "nest-run eggs."  Because

21   many of these exports were for nest-run eggs.  She said

22   sometimes it was nest-run; sometimes it was the graded eggs

23   that you did hear about, like large brown or medium white

24   eggs.

25             Now, you didn't hear any explanation from the

1    Plaintiffs during trial as to what a nest-run egg even is.  We

2    don't know if that's something that Plaintiff supermarket

3    chains would buy, if that's something they wouldn't buy, if

4    that's something that has a different cost structure, a

5    different price than the shell eggs that we talked about

6    during this trial.  Dr. Baye, none of his 68 elasticities

7    mentioned nest-run eggs at all.

8           In going back to the documents for a second, during

9    the Plaintiffs' closing, they showed you a couple of documents

10   about exports.  And, again, those documents were actually all

11   from the early 2000s, not the time period where Dr. Baye is

12   opining on.  Dr. Baye says, well, he can't even calculate any

13   sort of impact for the documents that the Plaintiffs are

14   talking about.

15          But let's go through one of the export documents, a

16   different export document, very quickly.  Because, yes, there

17   is some of the armchair economics that you've seen elsewhere

18   in the export documents, but also if you take a look at the

19   documents from US Egg Marketers, again, you'll notice that the

20   majority of the container loads in this export are for

21   nest-run eggs, again, a term that was never defined by

22   Plaintiffs, never explained by Plaintiffs, and therefore the

23   Plaintiffs have failed their burden of both showing injury

24   and, when you get the instructions, of showing what a relevant

25   market would be for the exports.

1          And, again, you'll see that the members of US Egg

2     Marketers are talking about how they export eggs elsewhere,

3     outside of US Egg Marketers.  Because, again, not every egg

4     that was sold in export would have otherwise gone to these

5     Plaintiff Supermarkets or even would have otherwise gone into

6     the United States.

7          Now, before I end, I want to go back to something

8     else that the Plaintiffs said during their closing.  And one

9     of the first things that Mr. Blechman said is that if it

10    weren't for the Certified Program, we wouldn't be here.  Then

11    ask yourself, why is US Egg Marketers here?  Why are they in

12    this case?  And ask yourself whether Plaintiffs' arguments

13    even matches their own claim, which was that there was a

14    single conspiracy.

15         Now, at the end of this case, when you get your

16    deliberation forms, you'll get a verdict form that looks like

17    this.  And on behalf of US Egg Marketers, I ask that you check

18    "no" to the first box.  Check "no" that there was not a

19    conspiracy, a single conspiracy, that involves the other

20    things you heard about at trial and exports.  Because exports

21    is not shown to be part of any of this.  And US Egg Marketers

22    did not have any involvement in certified programs, in

23    short-term recommendations, or anything else.  And so,

24    therefore, I ask that you check "no" on that first box.

25         If you do make it to the second page where there are

 1    the different Defendants listed, I would ask that you check

 2    "no" next to the entry for US Egg Marketers.  As the Judge

 3    will instruct you on the law, even if exports had any impact

 4    on price, which they didn't, and we've seen no evidence of, US

 5    Egg Marketers had to knowingly involve themselves in some type

 6    of single, broad conspiracy with the intent of actually

 7    participating in something illegal, and there is simply no

 8    evidence of that in this record.

 9         Thank you.

10         THE COURT:  Thank you very much, Mr. Harris.

11         We will take our lunch break now, ladies and

12    gentlemen.  It's going to be a relatively short one.  I've

13    been doing some figuring in terms of the amount of time that

14    we need.  I'm going to give you a little bit of a warning that

15    we might go beyond the 4:30 time period.  I'll try super hard

16    to keep it manageable, but I just wanted you to know that

17    that's a possibility.

18         Let's say a 35-minute, 40-minute lunchtime.  I know

19    that lunch is being brought in for you all.  It should be

20    here.  I am told that you've got a, you know, a microwave or

21    something to heat up the soups that might have gotten

22    lukewarm.  That's great.  If you need anything more, you let

23    us know, please.

24         One thing you need to remember, it is not time to

25    deliberate.  Enjoy lunch.  You know, make a note of where we

 1    should get lunch the next time or whatever, but just don't

 2    talk about the case.  If somebody needs to go outside, run

 3    around the block or something, that's great, but let's resume

 4    here as close to like 1:35, 1:40 as we possibly can.

 5            Thanks very much.  Enjoy lunch.

 6            THE DEPUTY CLERK:  All rise.

 7            (Jury out.)

 8            THE COURT:  The same to you all.

 9            Mr. Harris, you're --

10            MR. BLECHMAN:  Your Honor, before we break -- before

11    we break for lunch, if I might just address the Court briefly.

12            THE COURT:  Sure.

13            MR. BLECHMAN:  Thank you.  I did not want to

14    interrupt counsel during closing argument, but I am compelled

15    to lodge an objection to references in the UEP's closing

16    statement to the State of Maine legislation and also to other

17    state legislations, not -- specifically with regard to quoting

18    about the 90 percent feature and putting that up on the board,

19    and then also in commentary along with the slides about other

20    states having the 100% rule.

21            The Court has worked hard, I think, to try to

22    balance the Plaintiffs' genuine concern with undue prejudice

23    with the statutes being published to the jury or quoted to the

24    jury, with the ability of the Defendants to at least let the

25    jury know that these statutes are out there.  I know the Court

1   remembers the actions and the rulings it has made in that

2   regard, and to my ear, based on my eyes, and what I was

3   seeing, but particularly what I heard, respectfully, the

4   UEP's comments to the jury on this subject, I believe, crossed

5   the line in terms of what the Court was doing, and we do

6   object and request a curative instruction.

7           THE COURT:  Of what -- of what sort?

8           MR. BLECHMAN:  Well, I'd like the opportunity to

9   confer with my colleagues about this.

10          THE COURT:  Okay.

11          MR. BLECHMAN:  Because I realize the Court has --

12          THE COURT:  And then, of course, Ms. Levine can

13  respond.

14          MR. BLECHMAN:  Sure.  I don't in any way mean to cut

15  that off.  But I wanted to look at the final instruction which

16  I hadn't caught up with that I'm told there's something in the

17  statutes -- in the jury instructions about this.  I could be

18  confusing that with enforcement actions, so --

19          THE COURT:  I think you are, but --

20          MR. BLECHMAN:  Okay.

21          THE COURT:  -- I'm not going to say definitively

22  what is in there on that point, but I don't recall as I'm

23  sitting here any specific addressing of the state statutes.

24          MR. BLECHMAN:  Then in that event, I'd like to

25  confer with counsel -- co-counsel about a curative

 1    instruction.

 2            THE COURT:  Okay.

 3            MS. CAIN-MANNIX:  I just wanted to add an additional

 4    objection they showed, I believe the passage date of the laws,

 5    regulations, or best management practices.

 6            THE COURT:  There was testimony -- in the evidence.

 7            MS. CAIN-MANNIX:  Right.  But they didn't show the

 8    effective dates of those, which happened later.

 9            MS. LEVINE:  I think the Maine regulation came

10    clearly into evidence.  It was used with a witness.  It is in

11    evidence.  I would not use a document that's not in evidence.

12    That was not one of the documents that was set aside.  It was

13    already discussed and published to the jury.  Certainly you

14    can use it in closing.  I think the Plaintiffs have way opened

15    the door on their cross of Dr. Armstrong implying that somehow

16    the ban on backfilling was not supported by science.  They

17    certainly show that.  But that document came in and certainly

18    can be used and it had already been shown to the jury.

19            THE COURT:  Okay.  Well, contemplate this while

20    you're, you know, chewing or eating your yogurt or whatever.

21    Okay.  Sometimes things look a little bit different when

22    you're not also growling because you're hungry.

23            And if you need to double check the transcripts of

24    the closing, I'm sure you can double check, too.  I'll be

25    happy to hear any proposals and weigh them at that time.

1        MR. BLECHMAN:  Thank you, Your Honor.

2        THE COURT:  Okay.  Mr. King, without holding you to

3    a stopwatch.

4        MR. LEVINE:  72 minutes.

5        THE COURT:  Yeah, about 72 minutes -- roughly,

6    because I'm working backwards.  I know about how much time I

7    need.

8        MR. KING:  I think roughly 90 minutes, Your Honor,

9    I'm going to see if I can make any cuts during the break.

10        THE COURT:  And then going back on the rebuttal,

11    which I would expect to be quite brief.

12        MR. BLECHMAN:  It will be -- it will be brief, but I

13    think it's hard for me to give the Court a good answer -- an

14    answer that I think would be meaningful without hearing what

15    Rose Acre's arguing.  I would think -- I would think, Your

16    Honor --

17        THE COURT:  You don't really expect to be wildly

18    shocked, do you?

19        MR. BLECHMAN:  15 to 20 minutes, Your Honor, that's

20    the number I think I've --

21        THE COURT:  Well, we've got an order of magnitude.

22        Thank you very much.  Enjoy your lunch.

23        Mr. Coyle, Mr. Boyle is coming with his friends from

24    the marshals, correct?

25        THE DEPUTY CLERK:  He's right here.

 1          THE COURT:  So we need to give him some spots.

 2    There is one Defendant who's coming here from that door.  You

 3    don't have to clean up everything, just give him a little bit

 4    of space.

 5                    (Luncheon recess taken.)

 6                    (After luncheon recess:)

 7          THE COURT:  So, please take your seats, everybody.

 8          Mr. Blechman, what did you accomplish over the lunch

 9    break?

10          MR. BLECHMAN:  Your Honor, we find ourselves in a

11    bit of a difficult -- I don't know if it's a Hobson's choice.

12    The mentioning, curative instruction then just highlights the

13    problem.

14          On the other hand, I will just tell you as an

15    observation, as I was watching, when the Maine statute went

16    up, what provoked me to actually focus on this is, when the

17    Maine statute came up on the screen, I was -- I'm sitting over

18    here close to the jury box, I watched as Juror Number 9

19    pointed to the screen and Juror Number 10 looked at it, which

20    then made me look at the screen, and that's when I realized

21    what was on there.

22          So I have reason to believe one or more jurors have

23    absorbed this.  My -- I think the request is that the Court

24    inform the jury that it has heard some argument about state

25    statutes and what states do and statutes many years after the

```
1   fact is -- I want to say is not probative, but in candor, I
2   don't think that's quite the concept I'm searching for as a
3   matter of fairness to what the Court might do.
4           THE COURT:  Um-hum.
5           MR. BLECHMAN:  But something -- something to the
6   effect of the jury being instructed to understand that the
7   references to the statutes actually years and years later
8   doesn't speak to whether what happened earlier in time is --
9   whether it is a violation of the law or something to that
10  effect.
11          THE COURT:  That's an awful lot.  That's a big
12  mouthful.
13          MR. BLECHMAN:  I'm candidly thinking out loud.
14          MR. AHERN:  Your Honor, I believe -- I believe that
15  the import of Your Honor's ruling on the motion in limine
16  directed to this subject related to the fact that they were
17  probative for the purpose of possibly showing animal activist
18  pressure, and the reason that Your Honor allowed them in was
19  because there was this delay and when that pressure may have
20  occurred and then when the law may have been enacted.
21          What Ms. Levine said was that they were evidence of
22  consumer demand.  That's clearly outside the scope of Your
23  Honor's ruling.  So I guess really, we would just like --
24          THE COURT:  Well, that's a different issue than what
25  Mr. Blechman is raising.  I understand -- it's an extension of
```

1    what he's brought to my attention.

2            MR. AHERN:  With respect to what he's brought -- I

3    mean, I think the issue of Ms. Levine referring to it as

4    evidence of consumer demand obviously needs to be dealt with.

5            With respect to the curative instruction, it would

6    just be -- it would just follow Your Honor's language in the

7    motion in limine, that it -- these can be considered --

8            THE COURT:  Do you think -- I'm very sorry,

9    Mr. Ahern.

10           Do you think, Mr. Blechman, that you have not --

11   well, do you think that you might be able to deal with this in

12   your rebuttal?  That's just a thought.  I'm not asking you to

13   answer me.  I'll take a look at the -- I mean, I want to hear

14   what Ms. Levine has to say.

15           MR. BLECHMAN:  Sure.

16           THE COURT:  And then I think where I will leave this

17   for now is that I'll take a look at the instructions while I

18   listen to Mr. King and --

19           MR. BLECHMAN:  And I must say, Your Honor, that I

20   think it is most helpful that the Court is allowing us to

21   think about this rather than deciding this right this moment.

22           THE COURT:  Yes.

23           MR. BLECHMAN:  And I second the motion.

24           THE COURT:  Ms. Levine, your thoughts?

25           MS. LEVINE:  Yes.  This is a document that was in

1    evidence and already read to the jury.  It was read

2    word-for-word, what they're complaining about, to the jury,

3    it's been published to the jury.  I think you can use on

4    closing.

5            THE COURT:  What is it?

6            MS. LEVINE:  It's the Maine -- Plaintiffs did object

7    and Your Honor overruled the objection, and it was read by

8    Ms. Whitney into the record and published with the witness

9    that they brought, Dr. Fraser, from the Maine Department of

10   Agriculture, on November 20, 2019, at page 88 to 90.

11   Dr. Fraser explained that Quality Egg of New England was

12   subject to monitoring to ensure compliance as part of its plea

13   bargain with industry guidelines.  And she agreed that the

14   industry guidelines were set forth in Maine's best practices.

15           This is not a statute, like they're talking about,

16   it's Maine's best practice.  She was shown it, there was a

17   discussion about backfilling, it was put into evidence, and it

18   was read and published to the jury.  And the objection was

19   overruled.

20           THE COURT:  Okay, yes.

21           MR. LEVINE:  Just on the topic, just to reorient,

22   when the motion in limine was brought, Plaintiffs argued that

23   somehow they thought the jury would think that if there's

24   these laws that somehow retroactively the conduct would have

25   become unlawful, and we've never ever made that argument.  And

```
1    the argument we have maintained and continue to make is that
2    these laws are enacted in the past as, again, as this sort of
3    trend of preference for animal welfare.  And it is -- it is
4    probative that there is the demand and desire for animal
5    welfare, and it's probative in all of these statutes --
6              THE COURT:  Well, we're just talking about Maine.
7              MR. LEVINE:  Oh.
8              THE COURT:  There were additional arguments as to
9    California and Arizona and the timing of that.
10             MR. LEVINE:  Right.
11             THE COURT:  We're not even --
12             MR. LEVINE:  Okay.  If we're not talking about that,
13   then my arguments really are more to that, because as you
14   know, Dr. Walker was using --
15             THE COURT:  Right.  No, I understand that part.
16             Okay, thanks so much.
17             MR. AHERN:  I will just tender up a copy.  I only
18   have one of Your Honor's ruling.  It refers only to animal
19   activist pressure.
20             MS. LEVINE:  I think -- I think the time to admit --
21   I mean, there was an objection, it was overruled.  It's in
22   front of the jury.  It's been read, it's been published.  I
23   think you get to use that in closing.  And I think that the
24   statutes are a different issue.  This has been used with a
25   number of witnesses, as you know, Your Honor.
```

1          THE COURT:  The map?

2          MS. LEVINE:  The map.  And I did --

3          THE COURT:  It wasn't the map that was the object of

4     the --

5          MS. LEVINE:  Yes, it's just the Maine statute.  Our

6     answer is, it's in evidence, it's been read, it's been

7     published.  And it was used with Plaintiffs' witness.

8          THE COURT:  Okay.

9          MR. AHERN:  I do think there needs to be some sort

10    of curative instruction since it would indicate --

11         THE COURT:  Well, that goes into the bucket of one

12    sometimes has to be careful for what one wishes for.  You

13    don't really want to let me be completely on my own on this.

14         MR. AHERN:  We appreciate the chance.  It would be a

15    curative instruction that they have to disregard the argument

16    that the laws are evidence of a consumer demand.

17         THE COURT:  That is not going to happen.  That's, I

18    think, making too much of something under the circumstances.

19         MS. LEVINE:  Just for Your Honor's convenience --

20         THE COURT:  But I'm considering some kind of a

21    cotton padding.

22         MS. LEVINE:  Just for Your Honor's convenience, if

23    you want the document, and those are the transcripts.

24         THE COURT:  Okay.  Anything more for my convenience?

25         Can we bring the jury back?

1          THE DEPUTY CLERK:  All rise.

2          (Jury in.)

3          THE COURT:  Okay, everybody, take your seats.  How

4   was lunch?

5          THE JURORS:  Good.  Good.

6          THE COURT:  Okay, glad to hear it.  I can enjoy just

7   imagining it.

8          We are going to -- by the way, I thank you very much

9   for your flexibility.  It's terrific.

10          Mr. King.

11          MR. KING:  And then there was one.

12          May it please the Court, counsel, ladies and

13   gentlemen of the jury, I get to go last.  And there's always a

14   risk in going last because when you go last, you run the risk

15   of repeating what you've already heard.  And lawyers often get

16   criticized by jurors for repeating things, and I'm sure you've

17   heard a lot of things over and over during the course of this

18   trial.

19          I will try not to repeat too much of what you've

20   already heard from both Plaintiffs and the other two

21   Defendants, but I am going to begin by repeating, and that is,

22   I want to thank you.  Thank you sincerely for your service,

23   for your patience.  We know how difficult and how burdensome a

24   case of this length can be both personally, at your home, with

25   your family, your employer.

1          And I bet you didn't think when you came in here on

2     October 31st you'd be here for nearly six weeks, but it's been

3     nearly six weeks, Thursday will be six weeks since you've been

4     here.  But this case is important.  As Judge Pratter has said

5     and what she'll say again in the instructions, this case is

6     very important.  It's certainly important to the Plaintiffs,

7     it's important to the Defendants, and it certainly is

8     important to Rose Acre Farms.  And your role is important.

9     Your role is important as jurors as part of the system.

10          I am very inspired by walking into this courtroom.

11     I'm from Ohio and Ohio has some history, it usually deals with

12     the presidents that nobody can remember, you know, Harrisons

13     or Benjamin, Rutherford Hayes, those you can't remember on

14     your middle school tests.  But here, this is real history

15     here.  Right across the street from Independence Hall, where

16     the founding of our country is and one of the first courts

17     that was actually founded in the United States.  You heard

18     about James Wilson, who was one of the Supreme Court -- one of

19     the founding Supreme Court justices.  It's really inspiring to

20     be here, to be in front of you, to be part of this trial.

21          And I can't help but say, but we have a great

22     system.  The system of justice that we have -- the Plaintiffs

23     can bring a lawsuit.  They have that right.  They have the

24     right to bring a lawsuit.  And when they come and bring a

25     lawsuit, they get all kinds of rights.  They get the right to

1    counsel.  They get the right to obtain discovery, get

2    information from their adversary, take depositions, examine

3    witnesses under oath.  They have a right to a fair and

4    impartial judge, which they have.  They have a right to a fair

5    and impartial jury, which they have.  And remember, we picked

6    you; you didn't pick us.

7         And they have the right to come here to court and

8    put on their evidence, present their exhibits, their

9    documents, present their witnesses, show you the deposition

10   testimony.  And with that right that they have, they have a

11   responsibility.  And that responsibility is they have the

12   burden of proof.

13        The Defendants don't have the burden of proof.  We

14   could have sat here during the entire trial and done nothing.

15   It's their burden.  They brought this claim, they brought this

16   lawsuit approximately ten years ago.  And after ten years of

17   litigation, it's now time for them to prove to you, each one

18   of you -- and your verdict has to be unanimous, as the Judge

19   is going to explain.  It has to be all 12 of you.  You have to

20   find for every element that they have to prove as part of

21   their case in chief.

22        And what the Court's going to be giving you -- the

23   Court's going to be giving you a road map.  And that road map

24   will be instructions on what the law is, and it will be up to

25   you to look at the evidence and apply the law as the Judge

1    instructs you and determine whether they have proven their

2    case.

3            And you're also going to be given a verdict form.

4    This verdict form actually has eight questions, but it boils

5    down to five.  And you'll have a better understanding once you

6    see the verdict form.  And what the Plaintiffs have to prove

7    and what you have to determine after you complete your

8    deliberations back there, you've got to answer these questions

9    based on the evidence that you've heard during the course of

10   this trial that lasted approximately six weeks.

11           Envision a canyon -- oops, what happened to my --

12   technical glitch.  Here we go.

13           All right.  Envision -- envision a canyon, and the

14   Plaintiffs have brought their lawsuit over here on the left,

15   and in order to show and prove their case, which is

16   represented by that check mark, they have to cross over each

17   one of these canyons, each one of the elements that they have

18   to prove to you, by the greater weight of the evidence, which

19   Judge Pratter will tell you is -- the technical term is

20   "preponderance of the evidence."

21           And the things they have to prove is, first, there

22   was one conspiracy, one conspiracy involving these three

23   restraints that we've heard so much about:  the UEP Certified

24   Program, the UEP short-term supply recommendations or measures

25   that you've heard about, and these exports.  That all three

1   have to be part of one single conspiracy, and we'll talk about

2   that in a minute.

3          The second -- the second canyon or thing they have

4   to prove, second element they have to prove is they have to

5   prove that Rose Acre participated in that conspiracy, that

6   single conspiracy that involves these three things.

7          Third, they have to demonstrate the relevant market.

8   What is the market in which Rose Acre and UEP and USEM and

9   these alleged co-conspirators -- what is the market that they

10  supposedly affected the price in?  We know it has to do with

11  eggs, but what kinds of eggs?  And we're going to talk about

12  that further.

13         Fourth, they have to prove that the restraints were

14  unreasonable, this balancing of any competitive benefits

15  associated with the restraints against any anticompetitive

16  effect.

17         And if they're able to prove all four of these, then

18  finally they have to prove that they were, in fact, harmed,

19  that they were injured.

20         And, ladies and gentlemen, we would respectfully

21  submit to you that Plaintiffs have not met their burden of

22  proof with respect to each one of these elements, certainly as

23  it applies to Rose Acre.

24         Now, before I talk about the specific evidence in

25  this case, I want to talk about -- just make two general

1   observations in considering whether the Plaintiffs have met

2   their burden of proof.

3           Now, as I said earlier, you've all been here since

4   October 31.  Thursday will be six weeks.  You've been here

5   every day.  You've been diligent.  You've listened to all of

6   us.  You've been here on time.  You've been here for long

7   days.

8           David Hurd, the representative of Rose Acre Farms,

9   the vice president of Flock, has been here every day.  Every

10  day, same as you.  Over here -- I guess that would be the

11  groom section.  Over here, there are -- there are -- there

12  were -- as Mr. Blechman referred, there were members of the

13  Rust family and executives and employees of Rose Acre who have

14  sat here every day, every day of the trial, just like you did.

15          But, ladies and gentlemen, what -- who didn't show

16  up?

17          Now, I don't know whether you fully appreciate this,

18  because I'm not sure how clear it has been, but there are 12

19  Plaintiffs in this case.  Not four; there are 12.  And they're

20  identified by their logos here on this slide.

21          The four you heard from were Kroger, Giant Eagle,

22  Publix, and H-E-B.  You heard witnesses from them, just like

23  you heard witnesses from Rose Acre.  You heard from the

24  president of Rose Acre, Marcus Rust.  You heard from their

25  vice president of sales, Greg Hinton.  You heard from Greg

1    Marshall, their chief financial officer.  You heard from

2    Mr. Hurd.

3            You heard from Rose Acre.  They came here to explain

4    to you why they believe they did nothing wrong, why they

5    believe they did not conspire to reduce the supply of eggs in

6    order to raise egg prices.

7            But other than these four Plaintiffs -- Kroger,

8    Giant Eagle, Publix, and H-E-B -- the remaining eight didn't

9    show up.  They didn't come here.  They didn't come here on any

10   of the days over the past six weeks to explain to you why they

11   believe they should recover.  Not a single witness, not a

12   single deposition transcript or video from Safeway.  Not a

13   single witness from Winn-Dixie.  Not a single witness from

14   Albertsons.  Not a single witness from Hy-Vee.  Not a single

15   witness from Walgreens.  Not a single witness from SuperValu.

16   Not a single witness from Roundy's.  Not a single witness from

17   A&P.  Ladies and gentlemen, they're the absent eight.

18   Consider, when you have to decide whether the Plaintiffs have

19   met their proof, the fact that eight of them didn't even

20   bother to show up.

21           The second observation.  You've seen these before.

22   I think you saw them today.  And this is where I'm repeating

23   myself, but it's worth mentioning again.  We are here today,

24   we've been here since October 31st, because the Plaintiffs

25   allege a conspiracy to restrain egg supply, reduce egg supply,

1    in order to raise prices.

2              And what did we learn during the course of this

3    trial?  We learned that flock sizes, the U.S. laying flock,

4    and shell egg production during the relevant period -- the

5    relevant period at issue in this case is 2000 to 2012 -- we

6    learned that the U.S. egg-laying flock went up; it didn't go

7    down.  Shell egg production went up; it didn't go down.

8              If there truly was a conspiracy to reduce egg

9    supplies, you would expect to see these lines going down.

10   They're going up.

11             And I'll repeat what Ms. Levine indicated earlier

12   today.  You saw this.  You saw this.  What about egg prices?

13   Wholesale shell egg prices, adjusted for inflation, price per

14   dozen, during the relevant period went down.  You heard from

15   Dr. Walker they not only went down, they were down at historic

16   levels.  Dr. Walker looked at the prices of eggs per dozen,

17   almost 50 years back now, back from 1972.  And he said the

18   lowest price he saw during this entire period was smack dab in

19   the middle of this alleged conspiracy.  Prices are going down.

20             You see all these United Voices from 2004, 2003

21   where Gene Gregory's proclaiming his opinion:  Hey, look at

22   all the great things we're doing for prices.  Look what

23   actually happened to prices.

24             Finally, ladies and gentlemen, what about Rose Acre?

25   Rose Acre didn't reduce anything.  During the alleged

1    conspiracy period, Rose Acre's egg production, measured by

2    dozens produced from 2000 to 2012, a low of 330 million in

3    2001 going up to 517 million dozens of eggs produced in

4    2011 -- Rose Acre is not reducing anything.

5         Oops.

6         Okay.  So let's walk through the various things that

7    Plaintiffs have to prove to you by a preponderance of the

8    evidence.  First of all, they have to prove a conspiracy, a

9    conspiracy to reduce egg supplies by raising -- in order to

10   raise egg prices.

11        Well, what is the conspiracy?  And did Plaintiffs

12   prove it?  I have a number of analogies I'm going to be using.

13   This is number two, and there will be a few more coming up.

14        Picture a pine forest.  It looks like a Christmas

15   tree forest, actually, that time of year.  Picture a pine

16   forest.  And you've heard the expression "missing the forest

17   for the trees."  The Plaintiffs' evidence in this case, in

18   order to establish this alleged conspiracy, they want you to

19   focus on the trees rather than the forest.  They want you to

20   say, Well, look at what Gene Gregory said here.  That's an

21   elm.  Look at what Donald Bell said over here, that's a maple.

22   Look at this e-mail, that's a bush.

23        But what they don't want you to see is the bigger

24   picture, the bigger picture of the Certified Program.  The

25   bigger picture that -- in fact, that these large Fortune 500,

1    Fortune 50, Fortune 20 companies knew exactly what they were

2    asking for and they continued to ask for the Certified Program

3    year in and year out.

4            What the Plaintiffs have done, and what I heard this

5    morning, I would respectfully submit, they've concocted a

6    story.  They've concocted a story that's one-sided, that

7    ignores the evidence, that ignores the greater picture, in

8    order to obfuscate, to cloud what really happened so you don't

9    see the forest for the trees.

10           And they even started that today.  Not only with the

11   evidence, they read instructions to you.  But if you'll

12   notice, they're very selective on what they say.  For example,

13   Mr. Blechman, during the closing today, referenced this

14   instruction, and this is the instruction that will tell you

15   how you determine whether there was a conspiracy.  The

16   technical term is a contract combination or conspiracy.

17           And the instruction reads:  The basis of a

18   conspiracy is an agreement or understanding between two or

19   more persons.

20           That's true.  It has to be an agreement.

21   "Conspiracy" is just a big word for an agreement.  There has

22   to be an agreement.  It doesn't have to be in writing, but

23   there's got to be some meeting of the minds.  There's going to

24   have to be an agreement among Rose Acre and these other

25   conspirators to do exactly what they claim Rose Acre did.

1       But then it goes on to say:  Here an agreement or

2   understanding between two or more persons exists when they

3   share a commitment to a common scheme.

4       That's where Mr. Blechman stopped.  He didn't read

5   the rest of it:  a commitment to a common scheme to achieve an

6   unlawful purpose.

7       It can't simply be that Rose Acre agreed to be a UEP

8   Certified or that Rose Acre agreed to join the UEP in 2002.

9   There has to be a commitment to a common scheme to achieve an

10  unlawful purpose.

11      Further, the instructions say that the -- Judge

12  Pratter will read to you, it will say:  Mere similarity of

13  conduct among various persons, like persons who belong to UEP,

14  or the fact that they may have associated with one another and

15  may not -- may have met or assembled together in meetings or

16  otherwise does not by itself establish the existence of a

17  conspiracy.  They have to show more than that.  And we would

18  submit that they failed to show more than that.

19      One of the first questions you're going to have to

20  answer when evaluating the conspiracy, is there one or three?

21  That's a question that the jury instructions are going to ask

22  you to answer.  Again, this has to be a single conspiracy,

23  part of one conspiracy.  It can't be three, it can't be the

24  Certified Program and the UEP exports or the USEM exports

25  separated.  They have to be part of some combined effort.

1    Single conspiracy.  Because if they don't prove that these

2    three alleged restraints were part of the single conspiracy,

3    they haven't proven that there was a conspiracy.  It can't be

4    three.  It's got to be one.  And they have to prove that to

5    you with the evidence.

6           The second question with respect to whether they've

7    met their burden and whether -- on the existence of a

8    conspiracy, who's in it?  Well, you heard from Dr. Baye, he

9    claims that 177 producers were members of the Certified

10   Program, at its height.  I'm not sure of the exact date, but

11   that's the figure he gave, 177.  Those are represented by

12   these barns.

13          But the alleged conspirators, the universe of

14   alleged conspirators is much smaller.  Plaintiffs are claiming

15   that there are only 20 producers who were part of this

16   conspiracy.  20.  And here they are:  Cal-Maine, County Charm,

17   Hickman's, Hillandale, Michael Foods, et cetera, et cetera.

18   Here are the 20.  And during the course of this trial, you

19   heard evidence from five of them.  You didn't hear evidence

20   about the other 15 -- I mean, excuse me, six, if you include

21   Rose Acre.  Six.  Hillandale, Quality Egg, Weaver Eggs,

22   Sparboe Farms, Michael Foods, and Rose Acre.  That's all you

23   ever -- you didn't hear from anyone else.

24          Rather, what they have done in order to meet their

25   burden with respect to the other 14, to prove that these other

1  14 are part of the conspiracy which is their burden, they

2  relied on these summaries that you heard their summary

3  witness, Kirsten Flanagan, who came here a couple -- a few

4  weeks ago, I think it was before Thanksgiving.  Came here and

5  she was on the stand and she said that she created these

6  summaries by producer that evidences their participation in

7  this conspiracy.  And so the Plaintiffs are relying on this

8  analysis by -- by Ms. Flanagan.

9          But you also heard Ms. Flanagan got involved in this

10  case literally just before you all did.  She was retained in

11  September.  And she's admitted that she didn't know anything

12  about agriculture, she didn't know anything about egg-laying

13  hens, she actually didn't know anything about antitrust.  But,

14  nevertheless, she and her team reviewed what she said a stack

15  of documents four feet high that consisted of the Plaintiffs'

16  trial exhibits.  And based on that, she and her team created

17  these summaries.  And they got a head start.  They got a big

18  head start because these peach-colored ones were the ones that

19  were first given to her and said, hey, model your summaries

20  after these.  They came from the counsel, counsel for

21  Plaintiffs.  And she took them, and, in fact, you saw

22  examples, she copied them.  A lot of them she copied.  She

23  even copied typos.  And that's the analysis -- they want you

24  to rely on the analysis.

25          Actually called your attention to the analysis that

1    Ms. Flanagan, who got involved in this case about six weeks

2    before you did, who has no experience, no involvement in the

3    case, had very little knowledge of the case itself, they want

4    you to rely on her.  And, in fact, you heard there were lots

5    of things, not surprisingly, because counsel's fingerprints

6    were all over these things, lots of things that she just

7    didn't even take into account.  She didn't take into account

8    certain United Voices that had articles or stories or opinions

9    or statements from Gene Gregory that were flatly inconsistent

10   with what they were attempting to advocate.  She said nothing

11   about the contracts.

12           How can you evaluate whether Cal-Maine, for example,

13   or Midwest Poultry, who were involved in this conspiracy,

14   without considering the fact that Kroger repeatedly asked them

15   to provide certified eggs?  No knowledge of it.  Not included.

16           We would respectfully submit that these summaries

17   are as valuable as evidence as the closing argument you heard

18   from the Plaintiffs.

19           And then of these 20 -- just to finish this

20   analysis.  Of the 20 alleged producers of the 77, Rose

21   Acre's the lucky one.  We're the one here defending ourselves

22   here in court.

23           You've already heard a lot about this from

24   Ms. Levine, and I won't belabor it, and I don't want to

25   repeat, but let's just talk about the three legs of the stool.

1          I think you remember when I opened, I used three

2     pillars.  I think the stool, actually after hearing the

3     evidence, works a little better here.  So let's talk about the

4     three legs of the stool.  The first leg is the short-term

5     supply measures, short-term supply recommendations that UEP

6     would issue from time to time during periods of low demand.

7     Well, you're going to see in the jury instructions -- jury

8     instruction, I believe it's Number 19, that to prove that the

9     challenged restraints are unreasonable, the Plaintiffs must

10    first demonstrate that the restraints have resulted in a

11    substantial harm to competition.  Substantial harm.  It can't

12    be fleeting, it can't be short-term, it has to be substantial.

13         And what did their expert on harm say?  Ms. Levine

14    already referred to this, Dr. Baye was asked:  Are you saying,

15    in other words, that there's no sustained measurable effect of

16    the short-term measures on output or on price?

17         Answer:  That's correct.

18         Further, who did these?  Tell us who did these.  Do

19    you feel confident that you know who actually carried out one

20    of these short-term measures?  Because the evidence you heard,

21    Rose Acre didn't do one.  Sparboe didn't do one.  Michael

22    Foods didn't do one.  Quality Egg didn't do one.  The only

23    evidence you heard was, at best, vague and equivocal.  And

24    that was from Weaver Bros. and Hillandale.

25         Tim Weaver was asked during one of the video

1    depositions you were shown:  Do you believe you fulfilled the

2    intention if you signed it?

3            Answer:  I don't recall.

4            Question:  Do you have any reason to doubt you

5    didn't do it?

6            Answer:  That's very possible.

7            Question:  It's possible you didn't do it?

8            Answer:  Um-hum.  Um-hum.

9            Question:  From Gary Bethel at Hillandale farms, did

10   you dispose of old hens and molting and increasing number as

11   he suggests in the following paragraph?  Again, referring to

12   one of these short-term measures.

13           Answer:  I do not think we did, no.

14           Question:  Did Hillandale of Pennsylvania do that?

15           Answer:  Definitely not.

16           Question:  Or did Hillandale-Gettysburg do that?

17           Answer:  I do not think we did.  No.

18           Let's talk about the second leg of the stool, USEM

19   exports.  Again, for the same reasons, Dr. Baye considers

20   these not to have a substantial effect on competition.

21           Question he was asked:  And you testified towards

22   the end of your examination about USEM exports, and I just

23   want to be sort of clear that you've also called USEM exports

24   short-term measures, correct?

25           Answer:  That's correct.

1          And as he said:  Are you saying, in other words,

2     there's no sustained measurable effect of the short-term

3     measures on output or price?

4          Answer:  That's correct.

5          They don't have any long-term effect.  They're not

6     sustainable.  They don't have -- he indicated at most they

7     would be part of a month, but they were too short lived as

8     Mr. Harris said, too short lived to be even measured.  And he

9     didn't measure them under his econometric analysis that he

10    presented here last week.

11         Finally, I need to spend a little time -- I'll try

12    not to repeat what you've already heard -- some time about the

13    centerpiece, the heart of the Plaintiffs' case.

14         The vast majority of the evidence in this case, as

15    you've heard, deals with this Certified Program, this Animal

16    Welfare Program that was designed for egg-laying hens, that

17    the producer community, through the UEP, had adopted.  And you

18    heard a lot about the history, the whole history in Europe,

19    the protests against McDonald's, and then PETA's protests in

20    the United States, McDonald's, Burger King, Wendy's, adopting

21    animal welfare standards, the UEP getting involved.  The FMI,

22    the Food Marketing Institute, the trade group for the

23    supermarket chains, they got involved.  And then ultimately

24    UEP issues a revised set of guidelines in 2002, April 2002,

25    and those guidelines were endorsed, if you look at the other

1    document, as the report from the FMI, and the National Council

2    of Chain Restaurants where they endorsed those guidelines.

3    You heard about that whole history.

4            And you heard a lot about what this program

5    requires.  But I just want to emphasize what the program

6    doesn't require.  You're going to have copies of all these --

7    if you want to see them, you have copies of the Certified

8    Guidelines, the Animal Husbandry Guidelines, the various

9    iterations of them from 2000, 2002, on.  You'll have those.

10   And I'll invite you to look at them.  And you'll see that

11   there's not a sentence, not a word, not a paragraph, not a

12   page that limits a producer's ability to grow and expand.

13   There's nothing.

14           And as Dr. Walker said:  In the absence of something

15   that limits a producer's ability to grow, what are we doing

16   here?

17           There's no limit on hens.  There's no limit on eggs,

18   no limit on cages, no limits on houses, no limits on farms.

19   Nothing.  A producer is free to grow and expand as much as it

20   wants or as little as it wants and the Certified Program

21   doesn't have any effect on that.  They're free to do it.

22   Producer decisions -- production decisions are left with the

23   producer, not the UEP, and are not dictated by the Certified

24   Program.

25           Finally, ladies and gentlemen, in considering

1  whether there's a conspiracy, the Plaintiffs have a problem.

2  And the problem is, we have a stack of documents that high,

3  that show repeatedly Kroger, Publix, Giant Eagle requiring

4  certified eggs.  Requiring compliance with the Certified

5  Program.  Kroger requires certified eggs from the very

6  beginning.  In early 2003, right after the Certified Program

7  went into effect, right after the first cage space

8  requirement, the phase-in from 48 to 56 inches, right after

9  that goes into effect, Kroger is putting in its contracts a

10  requirement that producers, including Rose Acre, comply with

11  the Certified Program.  Be certified.  Certified means you

12  comply with the 100% rule.  They didn't say just comply with

13  the FMI Guidelines.  They said be certified.

14        Pace Dairy, the first contract that entered into

15  with Rose Acre, Pace Dairy, which was the agent for Kroger in

16  2003, February 2003 contract, Rose Acre Farms must show that

17  they are a certified company under the UEP Guidelines.  That

18  is what Kroger asked for.  If Kroger claims that it didn't

19  want certified eggs, then why in the heck are they putting it

20  in their contracts?

21        September 2003 addendum, which you saw where Kroger

22  agreed to a price increase with Rose Acre Farms due to the

23  Certified Program.

24        February 2004, Kroger, again, asked for certified

25  eggs.

1          February 2007, Kroger asked for certified eggs.

2          April 2008, Kroger asked for certified eggs.

3          And then a 2000 letter to producers, Kroger makes

4   clear at facilities that supply eggs for Kroger -- all

5   facilities that supply eggs to Kroger must be certified.  To

6   the most recent edition of the UEP Animal Husbandry

7   Guidelines.  Not the 2002 version, the most recent version.

8   The most recent version, including the version that would have

9   the backfill ban because that was incorporated into the

10  Certified Program in 2005.  The version that would include the

11  100% rule because that was incorporated into the Certified

12  Program in 2003.  Kroger knows very well what's in these

13  versions of the Certified Program.  It is up to you to weigh

14  the evidence and determine the weight of the evidence.  And I

15  would ask, is it credible?  Is it believable that Kroger, one

16  of the largest companies in the world, one of the largest

17  companies in the United States, the largest stand-alone

18  supermarket chain in the United States, a Fortune 20 company,

19  that they don't know what they're asking for?  This isn't

20  blame the victim, this is the marketplace.  They make a

21  demand, they have a requirement, and the producers have to

22  comply, if they want to sell Kroger the eggs.  Kroger --

23  Kroger required this not just from Rose Acre -- you saw they

24  required it -- there's a December 2003 request for bid that

25  said to the bidders anybody who wanted to supply eggs to

1   Kroger had to be certified.  Cal-Maine had a contract:  be

2   certified.  Midwest Poultry had a contract:  be certified.

3   National Food Corporation:  You have to be certified.  Moark:

4   You have to be certified.

5          Oops, there we go.

6          And finally, you saw this document.  This is a

7   Kroger quality and safety manual laying out what are the

8   requirements that Kroger has for its egg producers.  And

9   Kroger makes crystal clear in this document, which was

10  introduced into evidence, all egg plants supplying Kroger are

11  required to show proof they are a certified company.

12         Giant Eagle, they required certified eggs.  How do

13  we know that?  We know that from their agreements.  Topco is

14  their buyer.  You heard about Topco.  Topco is a big

15  cooperative whose members include the supermarket -- large

16  supermarket chains like Giant Eagle, and they pool their

17  resources in order to get the best leverage, the best prices.

18         And Topco, acting on behalf of Giant Eagle in

19  September 2003, said -- told potential bidders, This program

20  is a non-USDA shielded program as well as a UEP Certified

21  Animal Husbandry Program.  Telling prospective bidders this.

22         And then April 2005, Topco.  Topco agreement:

23  Provide your certification number.  And then it further

24  explains the current Giant Eagle program is a UEP Certified

25  Program.

1          April 2005:  The current Giant Eagle program is a

2     UEP Certified Program.

3          August 2007:  All U.S. egg suppliers are expected to

4     comply with the UEP -- UEP Guidelines for U.S. egg-laying

5     flocks.

6          Publix.  Publix is another Plaintiff who provided

7     testimony here.  What did Publix say, and what do you see here

8     from Publix?  A July 2002 letter to producers.  This was

9     introduced into evidence.  And it says:  In keeping with

10    Publix's desire to set a higher standard in all our business

11    endeavors and to fully meet the needs of the communities we

12    serve, Publix has adopted the FMI-NCCR Animal Welfare

13    Guidelines.  That's what it was telling its producers in

14    July of 2002.  Heads-up:  We're expecting you to comply with

15    this.

16         And then what did Publix do with its specifications

17    for eggs?  Here's an example from December 2004, for eggs:

18    Product shall be in accordance with the industry's Animal

19    Welfare Guidelines, and carton shall bear the Animal Care

20    Certified logo.

21         I had my props, and I forgot to use them.

22         This is the Giant Eagle -- this is Giant Eagle.

23    This is the Giant Eagle.  This is a Giant Eagle carton that's

24    got the UEP Certified logo right there.  Right there.  That's

25    what they want.  You walk into a Giant Eagle; that's what you

1    see when you want to go buy eggs.

2              And then what did you hear from Publix's witness?

3    James Wilson is Publix's witness who took the stand, and this

4    is what he said under oath before you, on November 19, 2019.

5              Question:  And has Publix also relied on its

6    purchase of UEP Certified eggs to respond to animal rights

7    concerns?

8              Answer:  Yes, sir.

9              Question:  And why?

10             Answer:  It's the industry standard.  It's FMI

11   industry-adopted standard, and that's the truth.  That's what

12   we do.  We -- we provide eggs that are UEP Certified and

13   sealed.

14             Ladies and gentlemen, actions speak louder than

15   words.  When it came to purchasing eggs by these Plaintiffs

16   Supermarket chains, they wanted certified eggs.

17             Finally, let's talk about H-E-B.  H-E-B, H.E. Butt

18   company is a supermarket chain that you heard from Texas.  I

19   think they were one of their first witnesses that they put on

20   the stand.  And their witness was a gentleman by the name of

21   Mitchel Hill.  And Mr. Hill said, you know, We had this great

22   relationship with Cal-Maine.  Cal-Maine was our egg producer,

23   and Cal-Maine only produced certified eggs.  We didn't want

24   it, but that's what they gave us.  You know, we didn't want to

25   jeopardize our relationship with Cal-Maine.  We're way down

1    here in Texas.  We can't find anybody to supply us eggs,

2    and -- given our needs, so we just stuck with Cal-Maine.  We

3    didn't have it in our contracts.  We knew that they were doing

4    it, but we stuck with them.

5           But when it came to their being pressed, when H-E-B

6    was asked by consumers, customers of H-E-B, animal rights

7    activists, H-E-B embraced the Certified Program.  You saw that

8    through e-mails from Mr. Hill himself.  He provided a response

9    to one of these inquiries in July 2007, and he wrote:

10   Here's what you need to respond.  This is what we need to tell

11   anyone who asks.  A hundred percent of the eggs that H-E-B

12   sells are raised under guidelines that have been developed

13   using science-based research.  An independent, unpaid

14   Scientific Advisory Committee recommended industry-wide

15   guidelines for producing eggs.  H-E-B carries -- eggs carry

16   the UEP certification seal.

17          You saw this.  This is an H-E-B Hill Country Farm

18   egg carton.  It's got the certified seal on it.  They want

19   certified eggs.

20          Similarly, in March of 2009, Mr. Hill writes another

21   e-mail where they get another inquiry about H-E-B's commitment

22   to animal welfare:  What are you doing about animal welfare?

23   And Mr. Hill said:  Well, this is how we should respond.  We

24   should say:  At H-E-B our egg supplier is United Egg Producers

25   Certified.  Produced in compliance with the UEP's Animal

1    Husbandry Guidelines, the UEP worked with the USDA, the FDA,

2    and an independent Scientific Advisory Committee to develop

3    the guidelines which is recognized within the grocery and food

4    service industries in the U.S. as humane,

5    www.uepcertified.com.  And Mr. Hill came here and told you he

6    didn't know what was in the -- what the requirements were,

7    even though he himself is citing the website.

8           And what do we know about these Plaintiffs?  I've

9    already mentioned it.  They're big companies.  They're really

10   big companies.  Rose Acre is a big egg producer.  We don't

11   deny that.  They're the second biggest.  They've grown.

12   They've become the second biggest.  But they ain't Kroger or

13   Publix.

14          Kroger's revenues from 2002 to 2012 were

15   $781 billion.  Publix, Safeway, SuperValu, Albertsons, all

16   these companies, are massive.  They have the leverage.  Marcus

17   Rust told you, they -- they dictate what they buy.  Rose Acre

18   doesn't dictate what they -- what they sell.  These companies

19   dictate what they buy.

20          And they knew what the Certified Program included.

21   Despite what counsel has argued here today, they knew.  It's

22   up to you.  You decide the credibility of the jurors -- I mean

23   of the witnesses, excuse me, the witnesses.  It's up to you to

24   believe what they say.  It's simply not credible to believe

25   that these large companies that included these requirements

1   didn't know what they were asking for, didn't know what was in

2   the Certified Program.

3           Go back, and look at -- let's just talk just a

4   little bit of history.  FMI -- FMI, the trade group for the

5   grocery chains, early on during the negotiations and the

6   development of their recommendations that ultimately, when

7   they recommended the UEP Guidelines, they had a work group

8   that -- remember Liz -- Lynn Marmer, excuse me -- Lynn Marmer,

9   the former vice president for corporate affairs at Kroger who

10  testified here, she was part of this working group at FMI.

11  She was one of the leaders of this working group on animal

12  welfare at FMI.

13          And Karen Brown, the executive vice president, sent

14  a letter -- I mean, excuse me, sent a memo to Ms. Marmer and

15  others in July of 2001 that included meeting minutes from

16  FMI's own Scientific Advisory Panel.  And this Scientific

17  Advisory Panel of FMI was looking at the various Animal

18  Husbandry Guidelines, including the UEP, and provided comments

19  on it.

20          And one of the things that this FMI Scientific Panel

21  recognized is that you needed to have audits.  Guidelines are

22  a good start, but real progress has only been since the

23  initiation of audits.  You need to have audits.  FMI wanted

24  audits.

25          And, moreover, this focus on cage space, it was

1    central to any Animal Welfare Guidelines dealing with

2    egg-laying hens.  It's what prompted the protests against

3    McDonald's in Europe.  It's what caused McDonald's and Burger

4    King and Wendy's to change -- to adopt Animal Welfare

5    Guidelines.  It was the focus of complaints by PETA.  You saw

6    all that.

7            And the scientific panel of FMI in their meeting

8    notes said -- in reviewing the UEP Guidelines, they said:

9    Cage size of egg layers is big issue.  That is the big issue.

10   That's the central thing that had to be complied with, that

11   had to be adhered to in order to have any meaningful Animal

12   Welfare Guidelines when it comes to egg-laying hens.

13           And what else do we know?  We know that, despite the

14   suggestion that you heard from Mr. Blechman, these guidelines

15   were not intended to be a snapshot in time.  The 2002 UEP

16   Guidelines were not intended to be frozen in time.  They were

17   intended to evolve.  FMI expected to see development,

18   evolution of those guidelines as the science evolved.

19           Jill Hollingsworth, a former employee of FMI, took

20   the stand and she said this.  And one of the things we had

21   hoped to do was to develop more of a sense of this as

22   something that isn't going to be a one-time shot.  It's going

23   to be constantly improving.

24           And how did FMI make sure it was constantly

25   improving?  They kept their panel in place, the scientific

1    panel, and they affirmatively reviewed annually later editions

2    of the guidelines, including the UEP Certified Guidelines.  We

3    know that from the documents.

4            This is a memo from Karen Brown at FMI to Lynn

5    Marmer.  Again, Kroger, who was involved with FMI's working

6    group, dated May 14, 2008.  It's entitled:  Update FMI-NCCR

7    Animal Welfare Program.  And in this memo she makes clear --

8    Karen Brown makes clear that:  Our panel's reviewing the

9    updated guidelines, including the UEP Guidelines.  Guideline

10   review -- the FMI-NCCR Animal Welfare Expert Advisory Panel

11   meets regularly by conference call and in person to review

12   current and revised Animal Welfare Guidelines of the producer

13   community.  Below is the result of their 2007 review.  Their

14   2008 review is scheduled for later this year.  And one of the

15   things they were reviewing, the latest edition of the UEP

16   guidelines.

17           This was a big issue for Kroger.  You heard about

18   it.  Kroger was very concerned about it.  You saw a press

19   release in July of 2001 where Kroger said:  We're embracing

20   these guidelines, because they want to get PETA off their

21   back.  The FMI didn't even come out with its report until June

22   of 2002, and when is it that Kroger issued the press release

23   saying that they're going to adopt the guidelines?  May

24   of 2002.  They were out ahead of this.  Out ahead of this.

25           Finally, you heard this -- a lot about this.  If

1    they had any questions about what was on the -- what this logo

2    requires, this logo that actually contains

3    www.uepcertified.com on it.  They should look at the website.

4    And do you know what?  The witnesses who testified didn't even

5    bother to look.

6            James Wilson, Publix:  And, in fact, that website

7    publishes not only UEP Certified Guidelines but also the

8    requirements for a company to become UEP Certified, correct?

9            Answer:  Yes, sir.

10           And all the time you were the eggs buyer, you chose

11   not to seek information out by looking at that website?

12           Answer:  No, sir.

13           Question:  Okay, you never bothered to look at the

14   guidelines, notwithstanding the importance of the product you

15   were purchasing, correct?

16           Answer:  No, sir.

17           And then what did H-E-B say?  Remember, H-E-B in

18   that e-mail actually referenced the www.uepcertified.com.

19   Mitch Hill was asked these questions:

20           Now, again, you've testified that you purchased

21   $100 million worth of eggs and that eggs is a very important

22   commodity at H-E-B, correct?

23           Answer:  Yes.

24           Remember that?  He came in and said:  Eggs are

25   important.  We spend a hundred million dollars a year on eggs.

1    They're an important staple for our consumers, for our

2    customers.

3            Nonetheless, he was asked this question, and he gave

4    this answer:

5            Mr. Hill, is it your testimony that you never looked

6    at uepcertified.com and never reviewed the material on that

7    website, even though you were the buyer of $100 million in

8    product?

9            Answer:  There's a lot of websites I don't look at

10   that pertain to my category, so, yes, that's my testimony.

11           Again, it's up to you to believe the credibility of

12   the witnesses.  Is that believable?  Hundred million dollars

13   of product, citing the website.  The website -- the logo

14   includes the website and they never even looked at it.

15           And then finally, what are the producers?  Why did

16   the producers join the Certified Program?

17           You didn't hear from the absent eight why they --

18   why they claim that they didn't want the Certified Program,

19   but you did hear from some on video.  And I would respectfully

20   submit the reason why we sat through the equivalent of

21   Godfather I and II without a plot, watching these videos, is

22   because the absent eight didn't want to be cross-examined.

23   Where were they?  Instead we had to sit here and watch video

24   after video of their witnesses.  Witnesses that they called in

25   their case.

1          And here's one of the videos you saw.  Tim Weaver,

2     of Weaver Bros.  This is what he said.

3               (Audio clip begins.)

4          Question:  Did you view it as important for

5     publicity reasons to join the UEP and become a member of that

6     cooperative?

7               Answer:  No.

8               Joining the certification program, yes.

9               Question:  Okay.

10              Answer:  Because customers were demanding certified

11    eggs.

12                   (Audio clip ends.)

13         MR. KING:  Syed Rizvi at Hillandale, another

14    deposition they played, here's what he said:

15                   (Audio clip begins.)

16         Question:  Was it your decision to join the UEP?

17         Answer:  We were approached by their marketing that

18    we were supplying eggs to Walmart and Costco, some of those

19    big customers.  And we were told that in order for us to keep

20    supplying eggs, selling eggs to them, we have to join the UEP

21    Program, because they were endorsing, so it was not our choice

22    but we were asked to do that.  And in order to sell the eggs

23    to the -- those customers, we needed to do that.

24                   (Audio clip ends.)

25         MR. KING:  And then you heard from Terry Baker,

1    Michael Foods.

2                        (Audio clip starts.)

3            Question:  Do you, Terry Baker, as a person familiar

4    with your own understanding, have an understanding of why

5    Mr. Ostrander determined in 2006 that Michael Foods should, at

6    that time, join the UEP Certified Program?

7            Answer:  I think there's only one reason, and that's

8    to meet customer demand.  That was my thought.  It was all

9    customer driven, over and over again.  So it was always

10   customer driven for us.

11                       (Audio clip ends.)

12           Under the first question on the verdict form that

13   you're going to be receiving from the Court, the first

14   question is:  Do you unanimously find by a preponderance of

15   the evidence that there was a conspiracy to reduce the supply

16   of eggs comprised of one, recommended short-term supply

17   measures; two, the United Egg Producers, UEP Certified Program

18   as challenged; and three, United States Egg Marketers, USEM

19   exports?

20           Ladies and gentlemen, we would submit that after

21   considering the evidence, we would suggest that the answer to

22   Question Number 1 is no.

23           Question Number 2.  Question Number 2 is going to be

24   asking:  Do you find -- do you unanimously find by a

25   preponderance of the evidence that the following Defendants

1    participated in a conspiracy to reduce supply by engaging in

2    conduct referenced in question 1, on page 1?

3           And it identifies the three Defendants, including

4    Rose Acre.  So let's look at the evidence with respect to

5    Question Number 2.

6           If you answer Question Number 1, if they prove to

7    you Question Number 1 in their favor, now we have to turn to

8    Question Number 2.  Did Rose Acre conspire?

9           And what evidence did we hear about Rose Acre?

10          Well, it seems like there were days, certainly hours

11   of this trial when it appeared that Rose Acre was more of an

12   afterthought.  We heard a lot about Don Bell, we heard a lot

13   about Gene Gregory, we heard a lot about Hillandale, we heard

14   about Weaver Bros., but I sat here and I was wondering when

15   Rose Acre was even going to be mentioned.

16          Rose Acre eventually was mentioned, primarily in the

17   last week of the trial.  But what we contend you heard is what

18   Rose Acre did.  Everything that Rose Acre did with respect to

19   the UEP and these other things that they're challenging Rose

20   Acre on, was in response to the marketplace.  It was acting in

21   response to the marketplace, in particular, responding to the

22   demands of its customers.

23          Rose Acre joined the UEP and the UEP Certified

24   Program for two reasons -- oops, I got ahead of myself.

25   Sorry.

1          Actually, let's talk about what it is they have to

2     show with respect to Question Number 2, participation and

3     intent.  This is the jury instruction that you need to look at

4     in determining whether the evidence shows that Rose Acre

5     conspired.  Whether Plaintiffs have met their burden of proof

6     with respect to Question Number 2 as it pertains to Rose Acre.

7          And Jury Instruction Number 22 will guide you on how

8     you determine whether Rose Acre was part of this conspiracy.

9     And it says -- it says:  As to each individual Defendant, that

10     each Defendant knowingly joined in the unlawful plan, either

11     at its inception or at some later time, with the intent to

12     further the purpose of the conspiracy.  And you must evaluate

13     each Defendant separately.

14          You have to look at evidence about -- about that

15     particular Defendant's statements and conduct.  You have to

16     evaluate what Rose Acre did.  Look at Rose Acre's statements.

17     Look at Rose Acre's conduct to determine whether Rose Acre was

18     truly part of this conspiracy as the Plaintiffs have alleged

19     in this case.

20          Back to the question that I posed, that I got ahead

21     of myself on.

22          Rose Acre joined the UEP and the UEP Certified

23     Program for two reasons, Kroger and Walmart.  At the time,

24     they were two of the largest customers of Rose Acre Farms.

25          And prior to February of 2002, Greg Hinton told you

1   that Country Creek Farms, CCF, the buyer of eggs for Walmart,

2   told him that, hey, we're part of this FMI process, you need

3   to get on board.  The UEP Guidelines are coming down.

4           Kroger said the same thing.  Remember,

5   Kroger's issuing press releases about this six months before.

6   It's not a secret.  Certainly within Kroger because they told

7   Greg Hinton.  And any suggestion that Greg Hinton was confused

8   or not telling the truth, hopefully he addressed that to you

9   in front of you when he testified.

10          I asked him:  Is there any doubt in your mind --

11  look at the ladies and gentlemen of the jury, is there any

12  doubt in your mind that you had that conversation with the

13  Kroger company representative before February of 2002 that

14  Kroger was going to require its egg suppliers be part of the

15  Certified Program?

16          His answer was:  No, sir.  I know it was before we

17  joined the program.

18          And then look what happened.  Kroger and Walmart put

19  in their contracts just as they told Greg Hinton, that you

20  have to be certified.  You have to join the program.

21          And what did Marcus Rust say?  He told you that if

22  it weren't for customer demand, they never would have even

23  joined the UEP or the UEP Certified Program.  Remember, they

24  weren't members until -- until this Animal Welfare Program was

25  pretty far along.  They had a rocky history with UEP, a lot of

1  members of the Rust family didn't like UEP because they got

2  sued by members of UEP a few years before that.  They had to

3  defend themselves, they won that lawsuit, as Mr. Rust said,

4  but, you know, getting sued doesn't make for good friends.

5  And a number of the members of the Rust family didn't forget

6  that.  They didn't want to be a part of a group, an

7  association that had once sued them.

8          But Marcus Rust said, no, we've got to do this.  We

9  have to do this because of customer demand.  And Marcus Rust

10  told you that if it weren't for that customer demand, they

11  never would have done this.

12          Question:  If Kroger and Walmart had not told Rose

13  Acre Farms that it had to get on the Certified Program, would

14  Rose Acre have joined the Certified Program?

15          Answer:  I doubt if we would have.

16          Question:  Would Rose Acre have even joined the UEP?

17          Answer:  No.

18          Question:  Was everything that Rose Acre did was in

19  response -- was that in response to customer demand?

20          Answer:  Yes.

21          And then you heard from Dr. Jesse David.  Dr. David

22  was one of the two economists that Rose Acre put on,

23  including -- including Dr. Walker.  Dr. David, PhD in

24  economics from Stanford University, he came here and he said,

25  I've looked at the facts and evidence related to Rose Acre,

1    and it's my conclusion that they were acting in their own

2    unilateral self-interest.  That they weren't conspiring.  They

3    were doing the opposite of what you would expect of somebody

4    who's conspiring with their competitors.  They're acting in

5    their own unilateral self-interest.

6              What about the other legs of stool?  Rose Acre

7    didn't do a single supply recommendation, none, zero, nada,

8    nothing.  Not one.

9              Gene Gregory said -- he confirmed, I'm going a

10   little further, I don't think Rose Acre Farms ever agreed to

11   any supply recommendation.  That was part of the testimony

12   that was played here in the trial of Mr. Gregory.

13             And the one about the exports, Greg Hinton said, we

14   export surplus eggs when we don't have a domestic market for

15   them.  There are times of the year, like after the holidays or

16   in the summertime when egg demand is low, when we can count on

17   we're going to have too many eggs and we don't throw them

18   away.

19             And one of the outlets for exports -- I mean, one of

20   the outlets for surplus eggs is exports.  They've been

21   exporting for a long time.  They exported long before the

22   USEM.  They weren't trying to reduce supply in order to raise

23   egg prices.  They joined the USEM in 2006 as an outlet for

24   surplus eggs.

25             And Mr. Hinton said that there's no way we did this

1   in order to raise egg prices.

2          Question:  Mr. Hinton, to your knowledge, did Rose

3   Acre agree to export through the USEM as an effort in order to

4   reduce supply in order to raise egg prices?

5          Answer:  No, sir.

6          Question:  Was that ever mentioned to you or

7   discussed with Mr. Rust or with Rose Acre's Board of

8   Directors, anyone at Rose Acre, did they mention that we

9   should join this export program in order to raise egg prices?

10         Answer:  No, sir.

11         And then what else did we hear about Rose Acre?

12  They were growing.  During this entire period that Plaintiffs

13  claim that Rose Acre and its competitors were deliberately

14  restraining egg supplies in order to raise egg prices, what

15  was Rose Acre doing?  It was growing.  It was expanding.  It

16  built new farms.  Added henhouses to existing farms.  Expanded

17  existing houses, expanded acquired farms.

18         And Rose Acre didn't reduce its flock size.  This is

19  a chart that Dr. David showed you, and the red shows you the

20  increase of -- the increase of Rose Acre's flock size, the

21  number of egg-laying hens it had from 2002 to 2012.  It grew

22  by 23.6 percent.

23         The green is Dr. Baye's projection of what the flock

24  size would have grown, the percentage it would have grown were

25  it not for this alleged conspiracy in the Certified Program.

1    Rose Acre grew far more than even Dr. Baye projected.

2            But you've heard Mr. Blechman criticize that

3    argument like, well, wait a minute, you're not adding to the

4    overall national flock size because part of Rose Acre's growth

5    had to do with acquiring existing farms that had existing hens

6    or acquiring contracts that had existing hens, so you're not

7    adding to the nation's flock size.

8            And Dr. David said, okay, fine.  I'll take those

9    out.  I'll take out the acquisitions of existing farms and the

10   contracts.  And even then I see an increase in Rose

11   Acre's flock size, which is represented by the blue bar, of

12   13.2 percent, still higher than what Dr. Baye had projected.

13           And Dr. David showed you this graph.  The red line

14   shows the total layer inventory of Rose Acre, it's growing

15   throughout the period.  And then you see the blue line, which

16   is the number of hens, its growth that excludes the contracts

17   and acquisitions.

18           And then you saw this already.  Rose Acre's egg

19   production increased dramatically from 330 million hens in

20   2001 -- I mean, dozen eggs produced, excuse me, to 517 million

21   dozen eggs produced.  Again, it wasn't reducing anything.

22           So as we heard, there's no restrictions on growth

23   under the UEP Certified Program.  So what did Rose Acre do?

24   It spent upwards of $215 million.  You heard from Greg

25   Marshall, they grew so much they almost went bankrupt.

1    Lenders were calling out their loans.  Growing during these

2    times of the lowest egg prices in history.  Struggling to make

3    it, they continued to grow.

4              From 2002 to 2012, they added seven and a half

5    million hens.  They built a new farm in Hyde County, North

6    Carolina.  They expanded cage space in existing layer houses,

7    built new layer houses, expanded acquired farms, and they

8    finished a 3 million cage-free facility in Arizona, such that

9    now Rose Acre today is the largest cage-free producer in the

10   United States.  None of this was prohibited by any provision

11   of the Certified Program.  Rose Acre grew.

12             And finally, Dr. David took the stand and said --

13   with respect to this evidence of growth, he said:  Then in

14   general, the way I would sum up all of these conclusions that

15   Rose Acre's actions were consistent with following its

16   individual economic interests and inconsistent with

17   participating in a conspiracy to reduce supply because it

18   expanded supply.  It's not part of any conspiracy.

19             The third question -- if you answer 1 and 2, the

20   third question you would get to is a question of a relevant

21   market.  This is where the verdict form gets a little

22   interesting, but you'll sort it out.

23             The relevant market -- what is the relevant market?

24   The relevant market, as I said at the outset, is the market in

25   which the alleged anticompetitive behavior took place.  And

1    Plaintiffs have to define, it's their burden to define what

2    that relevant market is.  The relevant market consists of two

3    things:  relevant product market and the relevant geographic

4    market.

5            I'm not an economist, but I'll give you a simple

6    example.  If you have a market for soda pop, all right?  All

7    right, what's the market for soda pop?  As part of this

8    analysis, you have to look at substitutes.  What are the

9    things that could substitute for soda pop?  If Coca-Cola gets

10   too high, what would you substitute for?  Would you include

11   sports drinks?  Bottled water?  Juices?  Tea?  Milk?  I don't

12   know the answer to these questions, but those are the

13   questions you have to look at.  If somebody's alleged there's

14   an allegation that Coke and Pepsi and whatever other soda

15   companies are acting anticompetitively in the soda market,

16   what's the relevant market for soda?  What does it include?

17   And it has to include substitutes.

18           Well, the relevant market that the Plaintiffs

19   believe exist here in which Rose Acre and its alleged

20   co-conspirators acted anticompetitively is eggs.  It places

21   burden of proof on relevant market.

22           This is what Dr. Baye said:

23           What is your opinion?

24           It's my opinion that the relevant product market is

25   eggs, shell eggs for human consumption.

1          All right.  Are egg products included in the

2     relevant market?

3          Answer:  Yes.

4          All right.  Do you have an opinion about what is the

5     relevant geographic market?

6          The answer:  Yes.

7          What's your opinion?

8          The United States.

9          All eggs, shell eggs and egg products in the United

10    States.  That's what they claim.  That's the only opinion that

11    Dr. Baye gave on the relevant market -- in defining the

12    relevant market for purposes of his analysis.  And that's what

13    the Plaintiffs claim it is.

14         The problem is, it doesn't make any sense.  Because

15    eggs and egg products are not the same.  They're not

16    interchangeable.  Actually, eggs and Egg Beaters are really

17    the same product.  We're talking about shell eggs and salt

18    yolk and egg whites and egg yellows -- egg yolks, things that

19    are bought by large food producers, like Kraft, Tootsie Roll,

20    M&M Mars, Betty Crocker, dried powdered eggs.  Those aren't --

21    shell eggs aren't -- those aren't substitutes for shell eggs.

22         You heard from Greg Hinton.  Greg Hinton told you

23    these products are different.  The markets are different.  The

24    reality is, eggs and egg products, it's not one market.  You

25    have different products.  You have different customers.  You

1    have different uses.  You have different pricing.  And you

2    have different demand.

3         If Kraft needs a tanker -- like that big truck,

4    needs a tanker of egg whites in order to make mayonnaise, and

5    they can't get it, they're not going to go down to the Giant

6    Eagle or the Kroger or the Walmart and buy cartons of eggs.

7    They need that egg product.  Betty Crocker needs powdered

8    dried eggs.  They're not going to go down to the local grocery

9    store and buy a carton of eggs.  They're different products.

10   They're different markets.  It's not one market.  We would

11   submit Dr. Baye is incorrect.  But that's the definition --

12   that's the definition, the only market Dr. Baye tried to

13   define.

14        Moreover, you'll see in the instructions that not

15   only do the Plaintiffs have to prove that there's a market

16   power, you have to look at whether the Defendants, including

17   Rose Acre, and these other conspirators, had power within that

18   market, that relevant market.  Did they have the power to

19   raise prices?

20        And you heard from Dr. Walker that no producer has

21   sufficient market power to control prices.  In fact, if you

22   look at all of the alleged conspirators, these 20, they have

23   40 percent of the egg market.  There's a whole 60 percent of

24   the egg market that's not included as part of the Plaintiffs'

25   allegations.  They don't have the market power.

1    The fourth element.  The fourth element that they

2    have to prove to you by a preponderance of the evidence in

3    order to -- in order to prevail in their claims is what's

4    known -- is unreasonable restraint.  Did the restraints --

5    were they unreasonable?  And in doing that, the jury

6    instructions are going to tell you that you have to weigh

7    competitive harm versus the competitive benefits.  What are

8    the competitive harms of these alleged restraints?  Plaintiffs

9    say -- make up this single conspiracy.  And what are the

10   competitive benefits that you've heard?

11   And the jury instructions are pretty clear.  They

12   say:  In considering whether the challenged restraints

13   benefitted competition, you may consider various factors

14   including, but not limited to, whether the challenged

15   restraints were demanded by customers, increased production,

16   increased consumer choice, decreased prices, or improved

17   product quality.

18   Do those procompetitive benefits, as outlined here

19   in this instruction, as you heard the evidence -- do they

20   outweigh any anticompetitive effect the Plaintiffs have

21   submitted into evidence?  Well, I'm not going to keep beating

22   this dead horse, but -- customer demand.  One of the things

23   you look at is whether it was demanded by customers.  The

24   Certified Program was demanded by customers, over and over and

25   over and over again.

1          This is a slide we just used with Greg Hinton, and

2     he told you each one of these producers, including many of the

3     Plaintiffs, demanded certified eggs.

4          And what else did you hear?  What are the other

5     benefits of the program?  You heard that you get increased

6     production per hen by giving them more cage space, giving the

7     hens more cage space.  You get better-quality eggs, the shells

8     aren't as brittle, as fragile.  You heard about decreased

9     mortality.  You lose fewer hens in the henhouse.

10          And finally, Dr. Walker told you that the Certified

11     Program actually created, in his view, the -- a new product,

12     the certified egg, an egg that the consumer can buy that has

13     this logo that says at least these animal welfare standards --

14     minimum animal welfare standards were complied with.

15          And what did you hear in response?  I think you've

16     heard variations on the term "smoke screen" or "sham."  They

17     claim that the Certified Program is a sham.  And one of the

18     things that they -- even though they said at the outset this

19     really isn't an animal welfare program, they came blasting out

20     of the gates here, and they showed you these photographs

21     involving Rose Acre that were taken by the Humane Society of

22     the United States.  They showed you these photographs.  It's

23     all a distraction.

24          Rose Acre looked at these things.  They made

25     adjustments.  They addressed the issues.  David Hurd said

1    that, We addressed it.  They made -- made it known what they

2    were doing, what their customers -- during this time in 2010,

3    Kroger was asking about it, because Rose Acre was bidding on a

4    new contract with Kroger.  Rose Acre had a third-party audit

5    done, as you heard Mr. Hurd say, gave it to Kroger, and guess

6    what?  They got the contract.  This was blown completely out

7    of context in this trial.

8            Further, out of the 177 producers in the Certified

9    Program, they found the one who was run by a crook.  Jack

10   DeCoster.  They played his video.  You saw these photographs

11   and things from Quality Egg of New England.  The guy was a

12   crook.  We showed you and presented in evidence a Department

13   of Justice press release that said Mr. DeCoster actually ended

14   up going to jail, not for what -- actually what happened with

15   respect to this animal welfare stuff, but for other things,

16   for deceit.  Look at that press release.  It's in evidence.

17   For deceiving companies like Walmart on quality.  They

18   deceived Walmart.  They were bribing -- he got caught bribing

19   USDA inspectors.  And they're claiming, Well, UEP should have

20   known about this, too.  The guy was a crook.  This is all just

21   a distraction from the main issues in the case.

22           You heard about Ky Hendrix's memo.  You've seen this

23   many times.  Ky Hendrix, who at the time in 2002 was an

24   employee of Rose Acre Farms and in March of 2002, one month

25   after Rose Acre joined the Certified Program, and about one

1    month or a few weeks before they decided -- I mean joined

2    UEP -- about a month after they joined UEP and about a month

3    before they joined the Certified Program, Ky Hendrix is

4    looking at the terms of the Certified Program.  He's looking

5    at it.

6            Remember, as I said, Rose Acre wasn't involved in

7    this.  They weren't involved in the development of the

8    program.  They don't know the background.  They're kicking the

9    tires.  They're asking questions.  They want to know, what is

10   this thing about?  We don't know what it's about.  And Ky

11   Hendrix is asking questions.

12           You know, one of the questions he asked -- he says,

13   you know, I think some people are going to think this is going

14   to make money, and Lois Rust said it won't.  And ultimately,

15   whatever he said in March of 2002 when they're evaluating it,

16   Ky Hendrix concluded that it was a good program.  That's what

17   he said.  And that's what he testified to.  Here's -- here's

18   an excerpt from his deposition.

19                   (Audio clip starts.)

20           Answer:  The program's a good program, though.  It

21   works.  The program's a good program.

22           (Audio clip stops.)

23           MR. KING:  And if this program -- Certified Program

24   was truly a sham, then why are we getting state laws that

25   require not only restrictions as -- restrictions that are

1   similar to those that are in the UEP Program, we're getting

2   even greater restrictions.  Consumers are demanding this.

3   Legislatures are demanding this.  Citizens are demanding this

4   from California, Washington, Oregon, Michigan, Ohio, New

5   Jersey, Massachusetts.

6           Moreover, the retailers demanded -- demanded

7   certified eggs almost from the beginning.  You heard -- you

8   weren't shown this United Voices.  Here's a United Voices that

9   identifies the retail grocery chains that accept the Animal

10  Welfare Guidelines, including Kroger, Albertsons, Publix,

11  Safeway, A&P, some of the Plaintiffs in this case.  This is

12  early on from December of 2002.  And then in June of 2003, you

13  see even more:  Albertsons, Kroger, Safeway, H-E-B, Publix,

14  Winn-Dixie, Topco.

15          And the Plaintiffs claim, I heard -- and I wrote

16  this down.  Mr. Blechman told you that the demand the

17  producers generated, the demand they generated -- that he said

18  that the demand for the Certified Program is demand that the

19  producers generated -- the demand they generated as a result

20  of their unlawful conduct.  He claims that the producer

21  community and UEP convinced all these Plaintiffs to join the

22  program -- I mean to require certified eggs.  It wasn't their

23  decision.  This was thrust upon them.

24          Oh, really?  Is that true?  This lawsuit's been

25  pending for almost ten years.  If you get on H-E-B's website

1    and -- to buy eggs, they have a website, like a lot of grocery

2    chains do now, where you can buy eggs on the Internet, what do

3    they sell?  They sell eggs that are UEP Certified.

4              Giant Eagle has a similar service, they sell eggs

5    that are UEP certified.  This is today.

6              Publix sells eggs -- oops -- that are UEP Certified.

7    And Publix advertises to the public that it's committed to

8    animal welfare because it requires its producers to be UEP

9    certified.  Here is the Publix animal welfare policy as it

10   appears on their website today.  What is Publix's position on

11   animal welfare?  They require industry best practices and they

12   cite to United Egg Producers Animal Husbandry Guidelines for

13   U.S. Egg-Laying Flocks.

14             Finally, if this is a sham, then why in the world is

15   Kroger putting on its animal welfare policy -- its current

16   animal welfare policy that as part of its commitment to animal

17   welfare, it requires its producers to comply with the United

18   Egg Producers Guidelines, Certified Program?

19             We have been litigating this case for ten years and

20   Kroger issued this in June of 2019.  Six months ago.  I said

21   this during the opening statement and I'm going to say it

22   again, Mr. Blechman and the Plaintiffs' lawyers can claim all

23   they want that the UEP Certified Program is a sham.  Their

24   clients don't believe it.  Because actions speak louder than

25   words.

1            The fifth thing you have to find, were Plaintiffs

2      injured?  Were they harmed?  That's the fifth question on the

3      verdict form.  If you answer the first four in favor of the

4      Plaintiff, you find unanimously that the Plaintiffs have met

5      their burden of proof on those first four questions, then you

6      need to determine whether the Plaintiffs were injured.  And on

7      that, you heard testimony, expert testimony, but you also

8      heard a lot from -- on these -- these newsletters, these

9      never-ending United Voices newsletters where Greg -- Gene

10     Gregory is expressing opinions on the price of eggs or

11     what's -- you know, look at all the great things we're doing.

12            Well, first of all, you can't rely on anything that

13     Gene Gregory said.  And I'm going to get to this in a minute.

14     But you'll see Dr. Baye -- Dr. Baye's analysis, he finds

15     there's no effect until the backfilling ban.  He doesn't find

16     any effect until, I think the end of -- going into 2000 -- if

17     I have this date correct, he finds that there's no effect on

18     egg prices or egg production until earliest would be sometime

19     in late 2005.  After the backfilling ban comes -- goes into

20     effect.

21            But you see all these -- we've been sitting here for

22     days looking at Gene Gregory's opinions from 2000, 2001, 2002,

23     2003, 2004.  We saw some today, where he's talking about, look

24     at all the great things going on with egg prices.  And

25     Dr. Baye got on the stand last week and he said, I don't see

1    anything until 2005, 2006.  Why are we talking about this?

2    It's wrong.  It's wrong according to their own expert.

3    Because he couldn't even find an effect.

4           Moreover, if you look at what Gene Gregory

5    actually -- if you look at what he said, he admits he's wrong.

6    This is -- the one -- one of the few United Voices that they

7    didn't try to introduce, and this is in 2004, and Gene

8    Gregory's talking about low egg prices and talks about all of

9    these great things he was talking about, the effects would be

10   of the UEP Certified Program.  And then what does he say?  He

11   says, how wrong could we have been?  Gene Gregory was

12   repeatedly wrong.  That none of this stuff is reliable.

13          And who's reading this stuff?  These are

14   newsletters, they come in the mail, they come electronically.

15   And they want to -- they want to tattoo Rose Acre with a

16   newsletter.  And we respectfully submit, that isn't enough.

17          So what did we hear?  We heard about the experts,

18   Dr. Baye, Professor Baye -- I'm sorry.  Professor Baye,

19   Dr. Baye, he's a Professor in Indiana and he comes up with

20   what he called several times the but-for world.  Not the real

21   world, the but-for world.  That but for the anticompetitive

22   effects of the Certified Program -- and he's only looking at

23   the Certified Program, but for, this is what would have

24   happened to egg production, this is what would have happened

25   to flock sizes, and this is what would have happened to

1    prices.  He says, U.S. flock size would have been larger, but

2    for the Certified Program, more eggs would have been produced

3    in his but-for world, and but-for prices would have been 15.8

4    to 199 percent lower.  Lower even though we saw some of the

5    lowest egg prices in history.  He thinks they would have been

6    upwards of 200 percent lower.

7          Well, you heard from Dr. Walker.  Dr. Walker, a PhD

8    in economics from MIT, he said, listen, I've looked at this,

9    and I see Dr. Baye's opinions do not reflect the real world.

10   His but-for world is not the real world.  His models are

11   inconsistent and his models are unreliable and flawed.

12         And one of his main criticisms is that Dr. Baye does

13   not -- he failed to control for the real world.  There are a

14   number of things that have happened since the conspiracy

15   period began that Dr. Baye simply did not control for.

16         First of all, Dr. Baye's but-for world

17   essentially -- I don't know of any other way to describe it,

18   if he's claiming the Certified Program was the cause of all

19   this, he's assuming that the world would have stayed at 48

20   square inches, right?  48 square inches, the world would not

21   have changed.  Who here thinks that the world would have

22   stayed at 48 square inches with McDonald's, Burger King,

23   Wendy's, PETA, FMI?  That world was gone.  There weren't going

24   to be inevitable cage space changes.  Dr. Baye doesn't

25   consider that.  State laws, he doesn't account for the fact

```
1    that states are now requiring cage space density requirements.
2    They have cage space density requirements.  He doesn't account
3    for that.  He doesn't account for the fact that egg prices
4    collapsed to the lowest levels in history in 2004, 2005, 2006.
5    He doesn't even account for the Great Recession according to
6    Dr. Walker.
7            And finally, he doesn't account for the fact that
8    there's even increased animal welfare activism after the
9    Certified Program came into effect that's resulted now in more
10   and more cage free.  Cage free is now more popular.  It's
11   being required more and more.  Dr. -- excuse me, Marcus Rust
12   talked about that, how the customers are now asking for cage
13   free.  He doesn't account for that.
14           And then here's his production model.  Here's the
15   essence of his testimony, where he says that this is what
16   should have happened in the but-for world.  And he comes up
17   with two calculations.  He had two calculations, one on the
18   cage space requirements of the Certified Program and the other
19   one is a calculation that looks solely at the backfilling ban.
20   And as you can see at the very top, what he did is he looked
21   at the phase-in schedule for the cage space requirements of
22   the Certified Program and he slices them into five different
23   periods.  And he says, well, I'm looking at the first
24   restriction in 2002, 2004, the jump from an average of 48 to
25   56, which is probably the most dramatic jump in cage space
```

1    density in the industry.  He finds no effect.

2              And you can see you already have the cage space

3    requirements, you already have the audit requirements.  You

4    already have the 100% rule in effect.  He finds no effect.

5    You have monthly reporting.

6              And then he looks -- he looks at the second phase-in

7    period, Restriction 2, '04, '05, he still finds no effect.

8    And he claims he doesn't find any effect even though the 100%

9    rule's in effect, the audit requirements are in effect, the

10   cage space requirements are in effect.  He says he doesn't see

11   any impact until the backfilling ban is implemented, put in

12   the Certified Program in 2005.

13             And then he's says, I've got a 99 percent confidence

14   that there's a 2.4 percent reduction in the third phasing

15   period, 5.5 percent reduction in egg production during the

16   fourth phase-in period.  And the fifth he finds a 5.2 percent

17   reduction.  That's what -- I think he called it his main

18   specification.  That's really his basic analysis on this

19   econometric model.

20             There were a couple of problems with this that you

21   heard from -- several problems you heard with this from

22   Dr. Walker.  It appears this is all backfilling.  Because

23   again, the 100% rule and these other requirements are already

24   in effect starting in 2002 when he doesn't see any impact.

25   But he doesn't tell us who, when, how much is being reduced

1    because of backfilling, and he doesn't account for the fact

2    that there's still no restrictions on growth.  Even though

3    there was a limitation on backfilling, there's still growth

4    that you can do under the Certified Program.  He doesn't take

5    into account that at all.

6            And then he does another calculation.  He does

7    another calculation just based on the backfilling ban.  And

8    here he says to a 99 percent confidence level there's a

9    2.1 percent reduction in egg production.  As compared to these

10   total -- oops, I can get it back -- those totals for

11   restriction three and four, the last three phases of the

12   phase-in schedule for the cage density requirements, he finds

13   a 99 percent confidence level that you get these reductions.

14           Well, as Dr. Walker said, that don't make any sense.

15   You have a 2.1 percent with respect to one calculation and

16   then you have a much higher in another one, something's off.

17   Something's not working.  These inconsistent results is a

18   fundamental flaw in your model.

19           Moreover, if you paid attention, if you looked

20   closely, and what Dr. Walker explained is that he rigged the

21   system.  He rigged his model.  And do you know how he did

22   that?  By slicing up the conspiracy period.  The conspiracy,

23   according to the Plaintiffs -- and what you'll be told in the

24   instructions, the conspiracy allegedly began in May of 2000

25   and continued to the end of 2012.  That's the period.

1          Dr. Walker slices it up.  And in so doing, slicing

2     up so he can get these reduction numbers, if he had looked at

3     the entire period, you get a 1 percent increase.

4          I'm almost done.

5          When you weigh the evidence in this case, ladies and

6     gentlemen, we would submit that Plaintiffs have not met their

7     burden of proof.  They've relied on five of the 12 producers,

8     all of whom required certified eggs.  They relied on

9     half-truths and misrepresentations.  They've relied on

10    Dr. Baye and they relied largely on these UEP newsletters.

11         And the evidence on the other side, you've got

12    customer demand, supermarket commitment to the Certified

13    Program by touting it, as showing their commitment to animal

14    welfare.  You have Rose Acre's growth, Rose Acre didn't do a

15    single supply recommendation, Rose Acre only exported eggs

16    that were surplus.  You have the absent eight, eight who

17    didn't even bother to show up during one day of the six-week

18    trial.  And you have Dr. Baye's conclusions are unreliable.

19         I asked Marcus Rust whether Rose Acre conspired.

20    And Marcus Rust said -- Mr. Rust, again, one more question for

21    you.  Did Rose Acre agree with its competitors at any time

22    from 2000 to 2012 or even to today -- 2000 to today, did Rose

23    Acre at any time agree with its competitors to reduce its

24    supply of eggs in order to raise the egg prices?

25         Answer:  No, never.

1      And then I asked Greg Hinton this question:  Do you

2  understand one of the Plaintiffs in this case is the Kroger

3  Company?

4      Answer:  Yes, sir.

5      Question:  Do you find that to be ironic?

6      Answer:  Yes, sir, I do.

7      Question:  Why?

8      Answer:  Well, the fact they require us and still

9  require us to be part of the UEP program and then sued us for

10  being part of it, I find that pretty ironic.

11      This is the graph I used at the outset.  If you look

12  at the evidence with respect to each of the elements that they

13  have to prove, was there one conspiracy?

14      Plaintiffs cannot meet their burden.  Rose Acre

15  participated and -- I mean Plaintiffs can't meet their burden.

16      Did they meet their burden on establishing a

17  relevant market?

18      They can't meet their burden.  On reasonable

19  restraint, they can't meet their burden.  And the harm.  They

20  can't meet their burden.

21      This is our last time to talk.  Plaintiffs get the

22  last word.  When I sit down, Mr. Blechman's going to come up

23  and he's going to do a brief rebuttal.  But as Mr. Blechman

24  offers his final words ask yourself:  Rose Acre was growing.

25  Rose Acre was expanding.  They don't look like a company that

1    is trying to conspire to reduce egg supplies.  And what about

2    their demand, their consistent demand?  What about the fact

3    that, in June of 2019, the Kroger Company identifies in its

4    animal welfare policy the UEP Certified Program as evidence of

5    their commitment to animal welfare?

6              This case has been going on for -- the trial's been

7    going on for six weeks.  It's a long time.  Six weeks from

8    now, you'll be on with your lives, hopefully.  The Court will

9    be on to new cases.  The lawyers will be off on to new

10   matters.

11             But, ladies and gentlemen, this case hasn't been six

12   weeks for Rose Acre.  It's been ten years.  Rose Acre, for the

13   past ten years, has had to live with the allegations from its

14   major customers, from some massive large companies, saying

15   that, You conspired.  You rigged the marketplace.  You reduced

16   supply in order to raise egg prices.

17             It strikes at the heart of the company that David

18   and Lois Rust founded in the 1950s and that their children and

19   their grandchildren have built and grown.  The case has taken

20   a massive toll not only on their time, their expenses,

21   everything.  Rose Acre firmly believes that it did nothing

22   wrong, that all it did was respond to the demands of its

23   customers.  They wanted their day in court, and they thank

24   you, we thank you, for giving them that day in court.

25             Ladies and gentlemen, Rose Acre's fate and future

1   are now in your hands.  We would ask, in the name of justice,

2   that you render a verdict in favor of the Defendant Rose Acre

3   Farms.

4          Thank you.

5          THE COURT:  Thank you, Mr. King.

6          Mr. Blechman.

7          MR. BLECHMAN:  Your Honor, would it be possible for

8   me to take about a three-minute break?

9          THE COURT:  Take five.

10         MR. BLECHMAN:  Thank you.

11         THE COURT:  All right.  You can all go out and take

12  a break.  We're going to bring you straightaway back in, and

13  we'll see you then, but don't talk about the case.  Just use

14  the three to five minutes for your own whatever.  Okay.

15         THE DEPUTY CLERK:  All rise.

16         (Jury out.)

17         THE COURT:  Okay.

18         MR. BARNES:  Your Honor, we have one request on

19  behalf of the Rust family.  They would like to be in the

20  courtroom when the verdict is published, and they would

21  request a half-an-hour advance notice, if possible.

22         THE COURT:  Well, it's probably not going to be

23  tonight.

24         MR. BARNES:  No, I understand that.  Whenever it is,

25  if they could get a 30-minute advance notice to get them all

1    collected back in the courtroom.

2         THE COURT:  I think that's probably practical.  It

3    would take that basically to collect everybody.  Without it

4    being anybody's special needs or requests, I think, you know,

5    it takes -- sometimes it takes me 30 minutes to walk from my

6    desk here.

7         MR. BARNES:  Thank you, Your Honor.

8         (After recess:)

9         THE COURT:  Okay, folks.  What Ms. Davis is giving

10   you a very modest change that I'm contemplating to Instruction

11   Number 14.  It's very obvious what it is and why it is.

12        If anybody has any publishable thought about it, let

13   me know now.

14        MR. BLECHMAN:  Your Honor, thank you for giving me a

15   minute.  I appreciate it.

16             (Discussion off the record.)

17        THE COURT:  Oh, yes.  Yes, no, nothing, something,

18   what?

19        MR. BLECHMAN:  I was waiting -- we have a question.

20   Plaintiffs have a question.

21        THE COURT:  You want to make sure you're listening

22   to Mr. Blechman.

23        MR. BARNES:  Yes.  Jim, speech.

24        MR. BLECHMAN:  Plaintiffs want to know whether the

25   Court will, in fact, give this instruction, because depending

1    on whether the Court does so or not informs whether I say

2    anything in rebuttal.

3            THE COURT:  Ah.  It doesn't work that way.  I'm

4    giving the instruction depending upon what you say in your

5    rebuttal.  You're the captain of your ship on this.

6            MR. BLECHMAN:  Thank you, Your Honor.  Let me

7    confer.  That was why -- I just wanted to understand.

8            THE COURT:  Fair enough.  No, no, no.  That's why I

9    said I'm considering it.

10           MR. PATTON:  Just, it's not argument, but I did

11   point out that Mr. King did say, If the Certified Program was

12   truly a sham, then why are we getting state law that required

13   not only -- and then it goes on, so I think --

14           THE COURT:  Okay.  I see.  I heard it too.

15           MR. PATTON:  Okay.

16           THE COURT:  So, that's why I said I'm considering

17   it, but I'm not going to consider doing anything else other

18   than this, if I do anything.  That's why I gave it to you.

19   And the good news/bad news is I get the last word.

20           MR. BLECHMAN:  Right.

21           THE COURT:  It's the only benefit that I've been

22   able to find here.

23           MR. BLECHMAN:  It's -- my judgment is it's very hard

24   to unring the bell that has now been rung.

25           THE COURT:  Yes.

 1          MR. BLECHMAN:  But I do acknowledge, in candor, that

 2     the Court's suggested instruction --

 3          THE DEPUTY CLERK:  All rise.

 4          MR. BLECHMAN:  I'm sorry.

 5          (Jury in.)

 6          THE COURT:  Okay, everybody, have a seat.

 7          Ladies and gentlemen, if you don't mind, I'm going

 8     to finish a thought.  The lawyers know what it relates to and

 9     you shouldn't worry about it.  My sense, folks, is that it

10     does not involve the Court lining up on any side of it, except

11     to sort of level the playing field.  That is my thought.

12          Okay, we have one final short argument, which is

13     what we call a rebuttal.  That happens in virtually every

14     case, and it allows the Plaintiff to address anything that

15     sort of was new that came up in the course of the defense

16     closings, not unlike when I allowed the Plaintiffs to have a

17     rebuttal case.

18          So, Mr. Blechman, you may proceed, and I know you

19     have taken my request seriously.

20          MR. BLECHMAN:  Yes, Your Honor, most seriously.

21          THE COURT:  Okay.

22          MR. BLECHMAN:  I want to start in rebuttal by

23     talking about who's here and who's not here.  Because every

24     Plaintiff is here, is represented by their counsel, and every

25     Plaintiff, with their counsel, have been involved in this case

1  for more than ten years.  I don't fault defense counsel for

2  not knowing the names and recognizing Plaintiffs'

3  representatives who have been in the courtroom from time to

4  time during the course of this trial, including today where we

5  have a representative from Winn-Dixie.  Earlier in the case in

6  opening when Kroger had had representatives here, as well as

7  other Plaintiffs did.

8          When one is facing a case with this many Plaintiffs,

9  with a record that is of the size as is this record, when

10  faced with the challenge of presenting as efficient but

11  informative a trial as is possible, to inform the judgment of

12  a jury in considering the evidence, one necessarily must take

13  into account how many people are going to go to the witness

14  box or be played on video in order for a jury to get a

15  reasonable representation of what the facts are as they

16  concern each and every Plaintiff.  And so as I told you up

17  front in both opening and in my closing statement earlier, we

18  consciously provided, ladies and gentlemen of the jury, with

19  representative examples of the Plaintiffs who are before you.

20          You have Kroger who is the largest traditional

21  grocery store chain in the United States.  And you had someone

22  from Publix which is a large chain in the southeastern United

23  States.  You also had H-E-B, which is a supermarket chain in

24  Texas.  And you had Giant Eagle.  And these Plaintiffs provide

25  you with a representative sampling of what is -- and I must

1    say this in a sense of celebration -- what is the competition

2    that we are -- we are fighting to try to maintain and preserve

3    by virtue of this lawsuit?  Because there are differences

4    among these Plaintiffs, and you heard some of those

5    differences, and those differences, ladies and gentlemen, are

6    a reflection of the differences that lie across this entire

7    country with regard to the regions that are serviced by each

8    and every one of these Plaintiffs.  And how do you know that?

9    You know that because, for example, you heard Mitch Hill of

10   H-E-B who came in here, who comes from Texas where livestock

11   and the raising of cattle and chickens and other animals are a

12   source of food for the food chain for all of us.  And you

13   heard from him in his testimony that in Texas, in Texas, the

14   customers there at the time -- and remember I told you about

15   keeping in mind time frame, context, because that matters here

16   in so many different ways.  But back then in Texas, the

17   customers there are sensitized to the fact that livestock is a

18   way of doing business.  And for them the demand for Animal

19   Care Certified eggs was a very low factor.  That's not to say

20   people don't care about animal welfare, because I dare say

21   that if you stop anyone walking down the streets of Lubbock,

22   Texas, or Houston or Brownsville, and you said to them, do you

23   care about the fact that hens are being mistreated?

24   Everybody's going to say of course we care.  Because we're

25   human beings and we're empathetic and of course we care.

1          But when people go to the grocery store and they

2     march down the aisle and they look to see what are their

3     choices and what are the prices and what are they going to

4     buy, and they get to the racks of eggs, you know from H-E-B

5     that that decision calculus is different than it may be for

6     somebody who is shopping maybe in Philadelphia, maybe in the

7     outskirts, in rural Pennsylvania, in Iowa, where Hy-Vee is

8     located, where you also have a robust livestock business where

9     Rose Acre itself has told you they have a whole bunch of

10    henhouses.

11          So the Plaintiffs whom we have brought before you

12    are representative of so many important issues in this case,

13    including the competition among them for business from

14    customers and the need that each of them has to have

15    competition in the pricing and production of the products they

16    buy.

17          You know, when you go to a supermarket, and you walk

18    down an aisle, I dare say to you, ladies and gentlemen, that

19    the aisles of the supermarkets are like Main Street U.S.A.

20    I'm a competition lawyer and so when I walk down the aisle of

21    a supermarket, what I see, and I submit what consumers see

22    when they're shopping, is, they're seeing a variety of

23    products made available in a variety of prices for which

24    shoppers have choices.

25          But the problem here is that in 2002, Rose Acre, for

1    all of -- for all of -- however -- for all the good their

2    family has, and as I said to you in opening and in closing, we

3    respect the fact that they have been here every day and we

4    don't attach any bad motives to it.  But Your Honor will

5    instruct you, emotion has nothing to do with your

6    consideration of these facts here.  It's based on the

7    evidence.

8             And in 2002, Rose Acre and the UEP broke the egg

9    market.  UEP was the ringleader here.  If I haven't said that

10   clearly, let me say it to you now.  And in 2002, without

11   telling the Plaintiffs, without telling FMI, make no mistake

12   about it, that they knowingly and willingly and deliberately

13   set out to break the egg market.  And how did they do it?

14   They did it behind their closed doors in passing in January

15   of 2002 the 100% rule, in formulating the Certified Program,

16   which, by the way, did not happen overnight, you know.  What

17   they did -- in some ways you have to admire the ingenuity of

18   it, the cleverness of it, because this started back in 1999.

19            Don Bell writing to Gene Gregory and the permanent

20   solution.  And that's where it hatched, this conspiracy.  It

21   comes together in terms of these issues in May of 2000, but

22   from -- in 2001, part of 2002, it takes time to form and

23   implement the Certified Program.  So that's why you've got

24   this period of time.

25            But by 2002, ladies and gentlemen, in a matter of

1    months, with the 100% rule as their tailwind and the rigged

2    audit formed in April as their enforcement mechanism, they

3    broke the egg market.  And how do you know that?  You know

4    that because you can look at those United Voices and see that

5    Rose Acre wasn't just -- wasn't the only producer who

6    signed -- who signed a commitment agreement to abide by the

7    Certified Program, and in doing so, agreed to the 100% rule,

8    the backfilling ban, the cage space allowance enforced by the

9    audit.  Rose Acre was joined in that regard by some of the

10   biggest egg producers in the United States:  Cal-Maine,

11   Midwest Poultry, Sparboe.  These are names you've heard.

12           And why does that matter?  That matters because

13   these are the producers who had the production capacity

14   sufficient to be able to meet the supply needs of the Krogers

15   and the Publixes and the SuperValus and the Hy-Vees and the

16   Giant Eagles.  And so when you take these companies off the

17   table the way they did, in a matter of months, you remove from

18   the supermarkets the choice they have to be able to get lower

19   costs, uncertified eggs from producers who were not part of

20   those -- of that program, and who did not -- excuse me -- who

21   were not part of that program.  And therefore, when you sit

22   here and listen for almost an hour and a half -- almost three

23   hours, the major theme for the Defendants here, the Plaintiffs

24   asked for it.  It is so simple in its elegance, you have to

25   admire it.  But it is so wrong in terms of what the facts are

1    here.

2           We have never denied, not for one second, that after

3    this market broke in 2003, the first -- that's the first

4    Kroger contract you saw.  You think it's a coincidence that

5    it's 2003 instead of 2002?  Really?  It's not.  It's because

6    after the market broke, these companies didn't have choices.

7    And so the choices, where are you going to get your eggs from?

8    And the sources of where they can get their eggs:  The big

9    producers.  Rose Acre, Cal-Maine, Sparboe, Midwest Poultry,

10   and other names.  You've heard them tell you, oh, there were a

11   whole bunch of other egg producers out there that weren't part

12   of this.  Go back and look at the evidence.  Remember what

13   Dr. Walker told you.  They're small.  They're not going to be

14   able to meet the needs of Giant Eagle or Publix.  So that's

15   what happened here.

16          And so they come before you -- and remember I told

17   you in my closing, pay attention to timing and to their

18   efforts at conflating the guidelines and the Certified

19   Program.  Remember I told you that.  It was on display for you

20   in these closing arguments.

21          2001, Kroger writes a memo saying that it's

22   supportive of the FMI's effort or program, defense counsel

23   referred to that as saying it was supportive of the Certified

24   Program or the guidelines.  You'll look at the documents,

25   you'll see it's not there.

1          Defense counsel told you that FMI endorsed the 2006

2   guidelines.  Go back and look at the documents.  Look at the

3   FMI documents.  Look at the documents marked in Lynn

4   Marmer's trial testimony.  What FMI endorsed, it is in black

5   and white in the documents, is the 2002 UEP Guidelines.  Do

6   not let them fool you.  Do not let them conflate timing.  Do

7   not let them conflate the Certified Program and the

8   guidelines.

9          Other defense counsel did it when you were told that

10  the guidelines contain the 100% rule.  False.  The guidelines

11  do not contain the 100% rule.  We've been at this for more

12  than ten years and every time I hear that, I get steam out of

13  my ears, because it's in the Certified Program.  And that,

14  with respect to the animal welfare component of this

15  conspiracy, is why we are here.

16         Defense counsel alluded to the fact that I made a

17  comment like that to suggest that exports and short-term

18  measures aren't part of this, and I didn't think so and we

19  don't think so.  That's just not true.  I mean, we've been

20  here too long, you know that.

21         My comment was in the context of talking about and

22  explaining the Animal Welfare Guidelines.  And I will say to

23  you now what I said to you before.  If they -- if they, the

24  Defendants and their co-conspirators, if they had stopped with

25  the guidelines, and not included the 100% rule, and not

1    included the backfilling ban, and they had come up with a

2    legitimate audit instead of the rigged one that they have

3    undeniably been using here, then, ladies and gentlemen, with

4    respect to that part of this challenge, we would not be making

5    it.

6              Now, why does that matter?  It matters because based

7    on the instructions you will get from the Court, under this --

8    this determination by the ladies and gentlemen of the jury of

9    whether the restraints we're challenging are anticompetitive

10   or procompetitive, you will be instructed that the law

11   provides that in the event that basically you decide it's a

12   tie, and we submit to you the procompetitive -- excuse me, the

13   anticompetitive effects here far outweigh the procompetitive

14   benefits.  But let's assume for purposes of discussion that

15   you decide in the exercise of your sound discretion that it's

16   a tie, well, then what do you do?

17             The question you ask, that the Court will instruct

18   you on is, could the claimed procompetitive benefits been

19   achieved with a less restrictive alternative?  Fancy legal

20   word.  Fancy legal words for meaning.  Could this restraint

21   have been -- could the claim benefits they're claiming

22   increased production, lowered prices, although prices were

23   higher, increased production, although production would have

24   gone higher, whatever other things they're saying -- they're

25   going to say, this matters because these -- these claimed

1    procompetitive justifications could have been achieved without

2    the 100% rule, without the backfilling ban, without the rigged

3    audit.

4            You heard about the PVP program, and you can decide

5    when you look at it whether it is equally, if not more robust

6    than the guidelines in the Certified Program that are before

7    you.  By the way, the PVP program didn't have a 100% rule.

8    But putting that aside, putting that aside, if we just have to

9    stay within our lane here in terms of what's here is the

10   guidelines in the Certified Program, if they had just stopped

11   with the guidelines.

12           I asked Dr. Armstrong -- I don't know if you

13   remember, when I was cross-examining him, I said, you know,

14   they didn't -- the Science Advisory Committee, they didn't

15   have anything to do with writing the audits.  By the way,

16   defense counsel told you they did.  Not true.  I said, in

17   substance, Could you have stopped there and did you hope that

18   producers would sign on?  And he testified, in substance, yes.

19   I don't have time, frankly, to put it all up, but you will be

20   the determiners of that.

21           So they could have stopped there.  But they didn't.

22   And now they come to you, and they -- and they say to you that

23   after they break the market, that you should somehow now

24   decide that, well, they didn't really do anything wrong,

25   because after they did so, these very large Plaintiffs -- and,

1    by the way, we've never run from that -- these very large

2    Plaintiffs with large supply needs now can't get their eggs

3    from the primary producers who have been supplying them

4    because they're all tied into the Certified Program.

5              So they show you contracts in 2004 and 2005 and

6    2006, and they show you memos from 2007, as if somehow that

7    actually matters.  Really?  Once they broke the program --

8    once they broke the market, the Plaintiffs were left without

9    choices, and so, too, were their customers.

10             The result of which is, according to Professor Baye,

11   since -- and I don't have the exact dates in my head, but

12   2005, 2006, he found that egg prices did not decline nearly as

13   much as they should have because of the supply restraints.

14   The cumulative effect of these restraints, by the way, he told

15   you, very candidly, that when it came to the short-term

16   measures and the exports, he did not find statistically

17   significant measurable effects.  Ladies and gentlemen, if that

18   is not a measure of the credibility of Professor

19   Baye's opinions and work in this case, then I submit -- then I

20   don't know what is.  We'd love for him to come in and tell you

21   as of 2000 or 2001 or 2002, he found effects and, oh, boy, the

22   production should have been higher, and prices should have

23   been lower.  Professor Baye called it the way the economics

24   show.

25             And what that means in the context of this

1    conspiracy, ladies and gentlemen, is that it starts -- we

2    think the engine starts running for all three May 15, 2000.

3    The short-term measures and the exports, they are stopgap

4    measures.  That's what Don Bell wrote in his July 2nd, 1999

5    letter to Gene Gregory.  You go find that letter.  You'll see.

6    I think the word he uses is "stopgap."  Because it's not

7    sustained.  And that's the term -- economic term of art that

8    Professor Baye used, and that was read to you by defense

9    counsel.  He said, I didn't find any sustained effect.

10   Because those are measures that are designed -- like I told

11   you in opening and as the evidence showed, they're designed to

12   just try to stem the tide.  When -- by the -- well, they're

13   designed to stem the tide.

14          But he found that the cumulative effect of the

15   short-term measures and the exports and the 100% rule applied

16   to the backfilling ban and the cage space allowance.  By the

17   time that happens, and after the backfilling ban went in, you

18   look at the -- you look -- search your mind and remember the

19   evidence, and you will see how this thing takes off.

20          If we could look at the chart, please, of flock, and

21   then we'll go to price.

22          This is -- you've seen this before.  I used it in

23   opening.  You saw Professor Baye uses it.  And defense counsel

24   puts up a chart, and they talk about the fact that things were

25   going low.  Well, the red line, this is -- this is flock size.

1    And this is showing you before 2002 -- 2001, 2002, the blue

2    line is showing you what flock size did, including from 2002

3    to 2012.  Do you see that?  That's the line underneath.  And

4    the red line shows you based on his analysis where flock size

5    should have gone.

6          I mean, look, we don't have to be economists to

7    believe that's -- that's a believable -- believable.  Look at

8    the trend line there.  Look at the slope of the line from 1990

9    until about 2001, 2002.  It's like this and suddenly like

10   that.

11         Now, Professor Baye doesn't say the flock size

12   should have gone back up like that because he was credible and

13   honest with you, and he said, I took into account all of these

14   things that Dr. Walker says were supposed to be taken into

15   account in the market.  All those variables, you name them, he

16   took into account, which is why this red line, instead of

17   looking like this, ladies and gentlemen, it's more like -- it

18   goes up, and then it kind of goes like that, because those --

19   those other factors are explaining what happened.

20         Let's look at pricing, please, next.

21         This is the pricing.  This is another demonstrative

22   you've seen from Professor Baye.  The blue line shows you, if

23   I've got this right -- egg production.  Okay.  So this is egg

24   production, and it's showing you the blue line where it was;

25   the red line above shows you where it should have gone.  Same

1    principles.

2            Do we have a pricing one?

3            Let me just talk to you instead.

4            They put up a graph you've seen in opening and with

5    the experts.  And -- and I can't believe they keep showing

6    this to you.  They show you these graphs of the pricing that

7    happened in the market.  They show you that egg prices went

8    down or production went up.

9            But there's a really important line that's missing

10   there.  You know what it is already.  The but-for line.  That

11   in the absence of this conspiracy, what would have happened to

12   egg prices?  What would have happened to the egg supply and

13   flock production?  And that's what their graphs conspicuously

14   leave out.  You have to ask yourself why they don't tell you

15   that when they show you these graphs time and time again.  And

16   it's because they're trying, with all due respect, to pull the

17   wool over your eyes and try to get you to believe that because

18   the line is going down, that you must think that means the

19   prices are low when, in fact, the economic analysis shows the

20   line should have gone down more in price.  Or production is

21   going up, so they want you to think, Oh, production's going

22   up, there couldn't have been anything wrong.  But they pull

23   the wool over your eyes because they're not telling you that

24   in the absence of what the unlawful conduct they did, that

25   line should have been going higher.

1          Time and context matter here.  And when you think

2     about the evidence, think, please, about those concepts.

3          Oh, I've got to just say one thing about this:

4     UEP's counsel told you that the reason why the audits are

5     decidedly weighted in favor of the backfilling ban and the

6     cage space allowance is because those are the only two

7     measures in the audit form that deal with mortality.  Really?

8          So, for example, the criteria that says:  Remove

9     dead or injured hens daily, that's not part of it?  So, for

10    example, ammonia levels that you all know at this point if

11    they go too high can kill a hen and certainly badly injure it

12    don't matter.  If, in handling a hen, their legs or other

13    bodily parts are broken, that certainly increases the

14    likelihood of mortality, that doesn't matter?  That doesn't

15    fly.

16         Exports.  I thought Defendants' counsel did a nice

17    job of trying to marginalize the role that the USEM has here.

18    The fact of the matter is, you've been presented with evidence

19    that the competitors at board meetings, they agreed.  The same

20    people -- excuse me, same producers at USEM are over there at

21    UEP doing the same darn thing, reducing supply in order to

22    increase price of eggs.

23         And here's the one fact they didn't tell you:

24    There's an e-mail that -- you saw it while it was in evidence.

25    It's an e-mail between Marcus Rust and another producer.  If

1  we could put that up.  And that is dated August 9, 2007.  It

2  is Plaintiffs' Exhibit 413.

3          Remember this one?  Mr. Rust is talking about the

4  exports, and he says to his colleague, his competitor, he

5  says, in substance, Look, if we're going to talk about

6  exports, it's going to affect the supply.  We shouldn't be

7  talking quite so publicly about the fact that what we're doing

8  is manipulating the supply.  This is what I'm saying in

9  substance, but you read that.

10          Rose Acre knew that what it was doing was

11  manipulating the supply, and they knew that it was a part of

12  the overall effort to reduce the supply of eggs in order to

13  increase prices.

14          How did it know?  Marcus Rust was on the Board of

15  Directors of the UEP.  Other people were on these committees.

16  Go back and look at Ky Hendrix's March 14, I think it is, 2002

17  memo to Mr. Rust and others.  I implore you to read that.  It

18  tells you everything you need to know about what they knew

19  going into this and how they knew that what they were stepping

20  into was a supply restraint.

21          When you look, when you consider the economics -- I

22  just want to tell you a document that I urge you to take a

23  look at.  It is Plaintiffs' Exhibit 446.  This is a document

24  titled PEPA Annual Convention March 2008 Egg Economics Report,

25  by Gene Gregory.  You know who he is.  And he's reporting --

1   it's a very interesting document because it gives you

2   historically what has happened.

3          Page 6:  UEP Certified Program reduces flock size.

4   Not my words, not in the Plaintiffs' document, not from a

5   Plaintiffs' expert; from Gene Gregory in 2008.  And he goes

6   through how they reduced -- they used the Certified Program to

7   reduce flock size, and they ended up reducing flock size even

8   with expansion.  Look at that document.

9          And then turn to page 7 and look at it.  It's about

10  backfilling cages, and it gives you, in summary fashion, the

11  chronology of just how they used backfilling to close the trap

12  door on their supply restraint and get supply to start going

13  down of eggs and prices to start going up.

14         You've heard a mention or two about state law.  I'm

15  just going to say one or two -- I'm going to say one thing.

16  What happens in states years later is not relevant to what

17  happened in 1999 and 2000 and 2001 and 2002 and so forth.

18  Don't be -- don't be confused by that.  Because that effort is

19  an effort to conflate these things.

20         On the verdict form, you're going to go through it,

21  but I want to just talk with you briefly about Instruction

22  Number 3.  That's the one about the unreasonable restraint of

23  trade.  And I want to just try to give you a very brief primer

24  about what this means because I've been practicing antitrust

25  law for about 35 years, and you've been doing it for about 35

1    days now, and it's a daunting task.

2            So here's the test, and this is -- but what you

3    should rely on in this moment is not what I'm about to tell

4    you but what Her Honor tells you about the law.  But in

5    substance, what's going on here is this:  Plaintiffs come

6    forward with the burden to establish that these restraints

7    that we've been talking about create an anticompetitive effect

8    which can be in a number of different ways, any one of a

9    number of different ways:  prices go up, production goes down,

10   competition is precluded, and so forth.

11           And if -- then the next thing you have to do under

12   this unreasonable restraint test is you have to take a look

13   and see whether there are any procompetitive benefits.  Rose

14   Acre has spent -- counsel has spent a whole bunch of time, as

15   did UEP's counsel, talking about what they contend are the

16   procompetitive benefits.  I'm not going to -- you've heard

17   what I have to say.  I'm not going to double down repeat that.

18           But then what happens, and this I alluded to before,

19   if it's a tie, and that's where the least restrictive

20   alternative comes in.  And if you find, by a preponderance of

21   the evidence -- what does that mean?  It doesn't mean like

22   this.  It means just slightly more -- that a least restrictive

23   alternative could have achieved whatever procompetitive

24   benefits they're claiming, then you move to Question Number 5,

25   or it may be a different question, depending upon your

1    relevant-market decision, in which you're deciding about

2    whether -- whether each of the Plaintiffs was injured.  So in

3    just very quick form, that's what's going on there.

4              I leave you with two last thoughts.  And thank you

5    for your patience in bearing with me.

6              The first is, when I finish my closing, I put up

7    there -- I challenged the Defendants on three questions.  Do

8    you remember?  Three questions, about why we didn't hear from

9    anybody on the Science Advisory Committee who are supposedly

10   the experts -- oh, by the way, you didn't hear from -- UEP

11   asked questions at depos and things like that.  You didn't

12   hear anybody live come in for UEP other than Dr. Armstrong.

13   So bear that in mind when you're thinking about what defense

14   counsel said to you about witnesses coming in.

15             Let me move past that.

16             Three questions that I asked, and those three

17   questions were:  If the defense of the Certified Program and

18   the 100% rule and backfilling ban are science based, then

19   where are the science advise -- the academics who supposedly

20   championed that?  They weren't here.  You never heard an

21   explanation.  I submit to you that you can infer something

22   from that.

23             Second, is there any testimony or other evidence

24   that Rose Acre, UEP, or USEM disclosed to any Plaintiff, to

25   any Plaintiff, that Rose Acre, UEP, or USEM believed the

1   Certified Program or the 100% rule or backfilling ban had an

2   agenda other than animal welfare?  I can't believe that they

3   didn't have the courage to take that question on, because

4   their failure to do so speaks volumes to you about how what

5   we're telling you is the truth.  That in 2002, when they got

6   all these Plaintiffs to sign up, they did not tell Kroger and

7   Safeway and Albertsons and H-E-B and Hy-Vee and Publix and the

8   other Plaintiffs, about what they were doing behind the scenes

9   that is revealed in the e-mails, which is where I'm going to

10  turn to last and where I leave you.

11          Question Number 3.  You -- decide whether you

12  believe what UEP and USEM and Rose Acre are saying now or what

13  they were saying in writing at the time of the events in

14  question in 1999, in 2000, in 2001, 2002, about using

15  short-term measures and exports and the 100% rule to reduce

16  the egg supply to increase egg prices.  I'm amazed that they

17  didn't have the courage to answer that question for you

18  either.  What they did instead is they gave you -- they

19  provided you with -- with argument that conflated timing,

20  which I talked to you about before, about how something

21  happened in 2007 but you should read into that 2001, or a

22  document from 2001 says something about the Certified Program

23  when it's talking about FMI and what it did with the

24  guidelines.  You're going to look at the evidence you're going

25  to decide, but I submit to you the reason they deflect there,

1    the reason -- it's like watch the shiny -- watch the shiny

2    object while with the other hand -- this is what they did,

3    with the other hand, watch the shiny object, animal welfare,

4    you all are interested in it.  And you heard the supermarkets

5    genuinely cared about animal welfare.

6            FMI, on their behalf, was trying to do the right

7    thing.  Watch the shiny object, but behind their back they

8    were talking to each other and they were -- they were telling

9    each other what the real truth was.  And that real truth,

10   ladies and gentlemen, comes through in clear and uncertain

11   terms, in the February 13, 2008 e-mail, from John Rust, one of

12   the owners of Rose Acre, to Marcus Rust, Plaintiffs'

13   Exhibit 445.  And this, ladies and gentlemen, is where I leave

14   you.

15           Mr. Rust, one of the owners of Rose Acre, writes to

16   his brother, Marcus Rust, and he states in part, and you can

17   read the whole e-mail.  I know you will.  That what they're

18   doing with the cage space allowance is being done to boost

19   prices under the alleged agenda of animal rights.  We lose the

20   moral right to argue for the continued right of low-cost

21   production costs when we, Rose Acre, ourselves are

22   manipulating the system under false pretenses.  It is because

23   the Plaintiffs in this case discovered a number of years after

24   they were deceived into entering into specifying the certified

25   eggs, that they filed this lawsuit.  The court system takes a

1    long time to work through, notwithstanding the best efforts of

2    the courts.  But we are here today, and I stand in front of

3    you at this hour proudly representing these Plaintiffs to tell

4    you that they did not know at the time that they were being

5    deceived, but they now know they were, and they have taken the

6    rational and responsible steps that are afforded to them by

7    the law after learning about what happened.

8         They filed this lawsuit.  They continue to have to

9    serve their customers, so they need to continue to specify

10   certified eggs because they don't have any other place really

11   to turn.  But they come before you now, a jury of 12 people,

12   in what is one of the glorious aspects of our system to decide

13   whether the exports, the short-term measures and the 100% rule

14   apply to the backfilling ban and the cage space allowance and

15   enforced by the rigged audit is an unreasonable restraint of

16   trade in violation of the United States' antitrust laws.  And

17   because it is, and because we have met our burden by the

18   preponderance of the evidence as to each one of the elements

19   that are set forth in the verdict form, we respectfully submit

20   that the proper result here is an answer "yes" to the verdict

21   questions and for you to return a verdict in favor of the

22   Plaintiffs in this trial.

23        Thank you very much.

24        THE COURT:  Thank you, Mr. Blechman.

25        Okay, folks, my estimate, reasonably reliable, is

1    that it will take me about an hour to give you my

2    instructions.  I will tell you, candidly, I would prefer to do

3    that now rather than start tomorrow because I'd like you all

4    to be able to begin deliberating as soon as possible.

5    However, if that timing puts any of you in jeopardy or brings

6    any kind of very serious impediment for your travel or

7    whatever it is you're doing this evening, I will live by

8    whatever works best for you all.  Now is not the time for me

9    to start getting bossy, at least as to you all.  I'm good to

10   go, but -- okay, great.

11            THE JUROR:  Let's go.

12            THE COURT:  So you've heard the evidence that's been

13   admitted at trial, and you've heard the uniformly skilled

14   arguments of counsel, so it's my job to give you the

15   instructions for you to use as guides in your deliberations.

16   All these instructions of the law that I gave you -- well,

17   those I gave you at the beginning and during the trial and now

18   are supposed to guide you and govern your deliberations.  In

19   fact, it's your duty to follow the law as stated in these

20   instructions and to apply the rules of law to the facts as you

21   find them and you find the facts from the evidence that's been

22   received during the trial.

23            The lawyers have referred to some of the principles

24   and the applicable rules of law, and, in fact, they've told

25   you about some of my instructions.  That's fine.  They are

1    permitted to do that.  In fact, I gave them copies ahead of

2    time.  So there's nothing unusual about that.  But if there's

3    any difference that appears to you between what the lawyers

4    have told you or shown you and what I'm telling you, then you

5    have to follow the Court's instructions.

6           Okay.  So on top of that, you're not supposed to

7    single out any one instruction as alone stating what the law

8    is, you have to take these instructions as a whole and apply

9    them as you reach your decisions.

10          Likewise, you shouldn't -- you should not be

11   concerned with the wisdom of any of the rules of law that I'm

12   going to be explaining to you.  In fact, regardless of any

13   opinion you might have about what the law ought to be, it

14   would be a violation of your duty and your obligation here to

15   base your decision on any view of what the law ought to be or

16   what you think it is other than what I'm telling you about.

17          On the same token, it would be a violation of your

18   sworn duty as the judges of the facts if you were to base your

19   verdict on anything but the evidence that's been admitted here

20   and your common sense.

21          One other preliminary thought, as I'm sure you've

22   come to realize:  Whatever you think you knew about trials or

23   about evidence or about the law as resulting from watching TV

24   or movies or reading books, as such, that really has no place

25   here.  It's obvious -- maybe it's not obvious, but nobody came

1    here from central casting and there was no preset script here.

2    The trial was not scripted ahead of time.  You were chosen to

3    be -- to decide a case of real life and to evaluate all the

4    evidence that's been received and to decide all these factual

5    questions.

6            It's not uncommon, especially in long trials like

7    this, on top of everything else I'm telling you, for there to

8    be some light-hearted moments.  But as I know you know, this

9    is an important matter, it's a very serious matter, and you

10   must not be persuaded by any bias, prejudice, or sympathy for

11   or against anybody or any notion of what you think public

12   opinion is or ought to be.

13           Now, the evidence that you need to use to find the

14   facts consisted of the testimony from the witnesses, including

15   not only the witnesses who appeared here, but those who

16   appeared by video.  Also the evidence are the documents and

17   the other things that have been received as exhibits.  And

18   also stipulated facts that have been agreed to by the parties.

19           Equally important is what's not evidence.  As

20   important as it all was, the statements, arguments, and

21   questions from the lawyers, even if it sounded like they were

22   talking about facts, that's not evidence.  Unless I told you

23   that you can consider it to be such.  That even includes those

24   times when the lawyers might have said or suggested that they

25   thought they were summarizing testimony or exhibits.  It just

1    is not evidence when the lawyers say it.

2           Their objections, even if their objections sounded

3    like it was factual, that's not evidence either.  Nor is any

4    testimony I told you to disregard or anything that I kept out

5    of the evidence.  And then anything that you saw or heard

6    outside of the courtroom.

7           Finally, there was some things we called

8    demonstrative material that were shown to you and were used as

9    aids for some of the testimony to help explain the testimony.

10   In this regard, the testimony is the evidence, but not the

11   visual aids that were used.

12          You must make your decision only on the evidence and

13   not let rumors, suspicion, or anything else that you may have

14   seen or heard outside of court influence your decision.

15          But you should use your common sense in weighing the

16   evidence, and you should consider the evidence in light of

17   your everyday experiences with people and events, and then

18   give it whatever weight you think it deserves.

19          So, if your experience tells you that certain

20   evidence reasonably leads to some other conclusion, you are

21   indeed free to reach that conclusion.

22          As I think you've realized, there are rules that

23   control what is admitted into evidence.  When a lawyer asked a

24   question or offered an exhibit and the lawyer on the other

25   side thought it was not permitted by the rules, then that

1    lawyer might have objected.  Indeed, you did hear a number of
2    objections during the trial.  That simply meant that the
3    lawyers were asking me to make a ruling on whether the
4    evidence was properly admitted or not.  The objections, as
5    I've said, whether they were short objections or longer
6    objections, were not evidence.  The lawyers do have an
7    obligation to their clients to make objections when they think
8    something is not proper under the rules.  Sometimes they're
9    right, sometimes they're not.
10            You should not be influenced by the fact that
11   somebody made an objection or made lots of objections.  All
12   that really matters is how I ruled on it.  If I did what we
13   call sustained an objection, that meant the evidence was not
14   properly available.  If I overruled an objection, then the
15   evidence came on in and it can be used just like every other
16   piece of evidence by you.
17            You were instructed that some items of evidence were
18   received for a limited purpose only.  You'll recall that
19   phrase that was used somewhat during the trial.  You must
20   follow that instruction and may only consider the evidence for
21   the limited purpose.  And more about that a little bit later.
22            You may have heard parties referencing that concept
23   throughout the trial.  For the evidence that was admitted, as
24   an example, only for notice to UEP members or merely because
25   something was announced or otherwise circulated, you then can

1   consider that evidence only for the limited purpose of what

2   was being communicated or to whom in particular -- to whom the

3   particular document was directed for whatever weight you think

4   it deserves.

5           However, you cannot use such, quote, limited purpose

6   evidence to prove either directly or indirectly the truth of

7   what was actually said in the communication.  For example, and

8   this is kind of an -- it's awkward -- to someone who doesn't

9   live with this concept every day, it can be kind of a tough

10  issue, but let me give you an example.

11          If a document is admitted for a limited purpose

12  along those lines that says, quote, It will be cold on

13  January 1st, you can only use that for the purpose of showing

14  that the author said that, that people were told that, and may

15  or may not have acted on the basis of what they were being

16  told.  Perhaps you could use it as evidence that the person

17  who got such a notice put on a coat on January 1st relying on

18  such a forecast.  Or maybe they changed their travel plans as

19  a result of the forecast.

20          However, you could not use it to prove, either

21  directly or circumstantially, that it was actually cold on

22  January 1st.

23          For some reason, judges use a lot of the weather for

24  a lot of these examples, and I'll be doing that a little bit

25  more frequently.

1          So jumping to the conclusion that it was actually

2     cold on January 1st would require that the evidence is being

3     offered for the truth of the matter asserted.  You heard that

4     phrase.  Okay.

5          I tried to notify you of that kind of a distinction

6     during the trial, and certain exhibits were admitted for those

7     kinds of limited purposes for that -- in that category.  They

8     are being -- the exhibits that were in that category have been

9     collected and kept in that category for your use, should you

10    wish to see them.  In fact, pretty much all of the exhibits

11    are available to you if you wish them -- if you wish to see

12    them.  And more on that later.

13         Also, as a general proposition here, if certain

14    testimony or evidence was ordered stricken or struck from the

15    record, then you have to disregard it.  That didn't happen

16    much at all, I don't think, but if it did, you must not

17    consider any such testimony or exhibit that was excluded, and

18    you must not speculate about it.

19         In deciding what the facts are, you might have to

20    decide what testimony you believe and what you don't believe.

21    You are the sole, the only judges of the credibility or

22    believability of the witnesses.  You may believe everything

23    that a witness says, only part of it, or none of it.  It's up

24    to you.

25         In deciding what you believe, as I mentioned to you

1    at the start of the trial, you can consider a number of

2    factors, such as the opportunity and the ability of the

3    witness to actually see or hear or know the things they're

4    talking about.  You can consider the quality of the witness's

5    understanding and memory or the witness's manner while

6    testifying, whether the witness has an interest in the outcome

7    of the case or has anything that you perceive as a motive,

8    bias, or prejudice.

9          You might consider whether the witness has been

10   contradicted by anything the witness said earlier, years ago,

11   for example, or might have written or said before the trial;

12   if the witness could be contradicted, in your view, by other

13   evidence or by other witnesses.  You may want to consider how

14   reasonable the testimony is when you consider it in light of

15   all the other evidence that you do believe.  And then, of

16   course, there could be any number of other bases on which

17   you -- that you use to evaluate believability.  That's fine.

18         The weight of the evidence to prove a fact does not

19   necessarily depend on the number of witnesses who testified.

20   What's much more important is how believable the witnesses

21   were and how much weight you think it deserves.  You can be

22   guided by the appearance and conduct of a witness or by the

23   manner in which they testify or the character or tone of the

24   testimony that's given or the other evidence in the case that

25   you believe.  Carefully examine all this testimony as well as

1    the circumstances under which each witness testified and

2    consider every matter in evidence tending to show whether a

3    witness is worthy of belief.

4         These factors that I'm mentioning are really just a

5    suggestion list.  They're not a checklist for you.  It's for

6    you to think about.

7         You should consider whether a witness impresses you

8    as having an accurate recollection of what they're talking

9    about.  Consider any relationship they may have to either

10   side, how they might be affected by the verdict, or the extent

11   to which their testimony is supported by other -- or

12   contradicted by other evidence.

13        It is quite proper for the lawyers to meet with any

14   witness in preparation for trial.  Inconsistencies or

15   discrepancies in the testimony of different witnesses or

16   between different witnesses may or may not cause you to

17   discredit the testimony.

18        Frankly, two or more people seeing an event may just

19   see it differently, or they may hear it differently.  However,

20   in weighing the effect of such discrepancies, you should

21   consider whether it pertains to a matter of great importance

22   or something that's unimportant.  And you should consider

23   whether the discrepancy results from what appears to you to be

24   an innocent error or perhaps an intentional falsehood.

25        Give the testimony of every witness such weight, if

1    any, you think it deserves.  In short, you can accept or

2    reject the testimony of any witness in whole or in part.

3            Keep in mind, though, that the quality and the

4    weight of the evidence is not necessarily determined by the

5    number of witnesses testifying about the existence or

6    nonexistence of a fact.  Indeed, you might find the testimony

7    of a small number of witnesses or even just one witness as to

8    any fact is more credible than the testimony of a number of

9    witnesses to the contrary.

10           You should consider and decide this case as a

11   dispute between and among persons of equal standing or equal

12   worth in the community holding the same or similar stations in

13   life.  A corporation, a partnership, or an unincorporated

14   association or similar entity or organization is entitled to

15   the very same fair trial as a private individual.  All

16   persons, including corporations, partnerships, unincorporated

17   associations, and other organizations, stand equal before the

18   law, and they are to be treated as equals.  Therefore, you

19   should consider and decide this case as a dispute between

20   persons of equal standing, equal worth, and holding the same

21   or similar stations.

22           Under the law, a corporation, an association, or a

23   similar body is a person -- is considered to be a legal

24   person, but it acts only through its agents.  Agents for such

25   an organization include its directors, officers, employees,

1    and others acting on its behalf.  An organization -- and what

2    I'm going to use now, so I don't keep repeating "corporation"

3    and "partnership," et cetera, I'm going to use the word

4    "organization," but I mean it to cover this category:

5    corporations, partnerships, unincorporated associations,

6    entities of that sort.

7            An organization is not capable under the law of

8    conspiring with its own agents, its unincorporated divisions,

9    or its wholly owned subsidiaries.  It cannot conspire with

10   itself.  Through its agents, however, such an organization is

11   capable of conspiring with other outside persons or

12   independent organizations.  Such an organization is legally

13   bound by the acts and statements of its agents done or made

14   within the scope of the agent's employment or apparent

15   authority.

16           Acts and statements done within the scope of

17   employment or with apparent authority are those performed or

18   made on behalf of the organization and directly related to the

19   performance of the duties the agent has general authority to

20   perform.  Furthermore, "apparent authority" is the authority

21   that persons outside the organization could reasonably believe

22   the agent would have, judging from his or her position within

23   the organization and judging from their responsibilities that

24   the person has previously exercised and been entrusted with,

25   or their position, their office, their title, circumstances

1  surrounding their position in the organization.  Therefore, an

2  agent can have apparent authority even when, despite these

3  appearances, the agent is actually acting out in some sort of

4  dishonest, fraudulent, or anticompetitive manner.

5        To summarize on that point, an organization to be --

6  for an organization to be legally responsible for the acts or

7  statements of its agents, you must find that the agent was

8  acting within the scope of his or her employment with actual

9  or apparent authority to do so.  The fact that an organization

10  has instructed its agents not to violate the antitrust laws

11  does not excuse the organization from responsibility for the

12  unlawful acts of its agents done within the scope of their

13  employment or apparent authority.

14        Again, an organization is entitled to the same fair

15  trial as a private individual.  Its acts are to be judged by

16  the same standard as the acts of a private individual, and you

17  may hold an organization liable only if such liability is

18  established by a preponderance of the evidence.  And, once

19  again, that's because all persons including organizations are

20  equal before the law.

21        For obvious reasons, folks, I'm going to apologize

22  ahead of time for being -- for chewing on a lozenge while I do

23  the rest of this.  I'm sorry, but I am.

24        This is a civil case.  For the issues you will

25  consider, the Plaintiffs are the parties who brought the

1    lawsuit, namely, Albertsons; Giant Eagle; the Great Atlantic

2    and Pacific Tea Party; H.E. Butt Grocery Company; Hy-Vee,

3    Incorporated; the Kroger Company; Publix Super Markets;

4    Roundy's Supermarkets; Safeway, Incorporated; SuperValu,

5    Incorporated; Walgreen Company; and Winn-Dixie Stores.

6           Rose Acre Farms, the United Egg Producers, also

7    referred to as "UEP," and the United States Egg Marketers,

8    USEM, are the parties against whom the lawsuit was filed.

9    They are the Defendants.

10          Generally, the primary questions you'll be

11   addressing are these:  First, was there a contract, agreement,

12   combination, or conspiracy between or among at least two

13   entities?

14          Second, did the contract, agreement, combination, or

15   conspiracy unreasonably restrain trade?

16          And finally, if unreasonable, did the restraints

17   cause the Plaintiffs to suffer an injury to their businesses?

18   I will provide you more in-depth instructions as to these

19   questions shortly.

20          As to these claims, the Plaintiffs have the burden

21   of proving their case against the Defendants by what is called

22   the preponderance of the evidence.  This means that to prevail

23   on a claim, the parties asserting the claim will have to prove

24   to you, in light of all the evidence, that what they claim is

25   more likely so than not.  To put it differently, as you

1    consider the claims of each Plaintiff against each individual

2    Defendant, you can think about the burden of proof this way:

3    If you put all of the evidence favorable to the Plaintiff

4    regarding each individual Defendant and the evidence in favor

5    of the Defendant on opposite sides of the pan of justice, the

6    scales of justice -- these pans are always used, I mean, with

7    weather and the pans of justice.

8            If -- the Plaintiff would have to make the scales

9    tip ever so slightly in their favor in order to sustain the

10   burden of proof by a preponderance of the evidence.  And

11   that's through, by the way -- more about this later, as to

12   each and every individual Defendant.  So you have to go

13   through this weighing process as to each Plaintiff and each

14   Defendant.  Okay.

15           I'm going to summarize for you rather in a short way

16   what the parties' contentions are.  And I know you've just

17   heard the lawyers' arguments and what they think the evidence

18   proves or doesn't prove.  Of course, that's for you to

19   evaluate.  But in order to set the stage for the rest of my

20   instructions, I am going to briefly summarize the contentions

21   and issues.

22           You've heard a lot about other egg producer

23   companies that are not parties in this case and they're not

24   here.  The only verdicts for you to consider are between the

25   parties who are here.  Remember I told you that there's

1    certain issues for the jury and there's certain issues for the

2    Judge.  The presence or nonpresence of other claims and

3    whether they impact this case at all are the issues that I

4    have to deal with, and the law accounts for that rather

5    frequent circumstance.  It happens in a lot of cases.

6              The only claims for you all to decide are those

7    between the named Plaintiffs and the three named Defendants

8    here.

9              A couple of other basic rules.  Returning for a

10   moment to the matter of burdens.  If the Plaintiffs fail to

11   meet their burden, that is, if the scales remain evenly

12   balanced or if they tip ever so slightly to the Defendants'

13   side, then the verdict must be in favor of that Defendant on

14   the issue or matter as to which the Plaintiff has the burden.

15             If you find after considering all of the evidence

16   that a claim or fact is more likely so than not, thus making

17   the scales tip ever so slightly in the Plaintiffs' favor, then

18   the claim or facts have been proved by a preponderance of the

19   evidence.

20             In determining whether any fact has been proved,

21   thusly, you may, unless I tell you differently, consider the

22   testimony of all the witnesses regardless of who called them

23   and all of the exhibits that have been received regardless of

24   who offered them.

25             Now, you might have heard the term -- in fact, I'm

1    sure you did in other matters -- the term "proof beyond a

2    reasonable doubt."  That's a very much stricter standard, and

3    it applies only in criminal cases.  It does not apply to civil

4    cases like this.  So put that concept out of your mind.  It

5    doesn't apply here.

6          And because this is a private civil antitrust case,

7    the presence or lack of a government investigation or

8    prosecution is of no relevance and you should not consider as

9    a factor in determining liability in this case.

10          Turning to the parties' contentions.  Each of the

11   Plaintiffs contend that the Defendants and one or more

12   co-conspirators participated in an unlawful agreement or a

13   conspiracy to restrict the supply of eggs and raise the price

14   of eggs in violation of Section 1 of the Sherman Antitrust

15   Act.  That act is a federal law.  The time period of this

16   agreement or conspiracy is alleged by the Plaintiffs to have

17   occurred from May 15 of the year 2000, to at least

18   December 31, 2012.  Plaintiffs claim this agreement or

19   conspiracy included one or more of the following components:

20   Short-term supply measures, a USEM program for exporting eggs

21   at a loss, and the combination of the so-called 100% rule as

22   applied to cage space restrictions and the backfilling ban as

23   incorporated into the UEP Certified Program and enforced by

24   producer-designed audits.

25          Continuing on with the Plaintiffs' contentions.

1    They claim that Defendants, Rose Acre, UEP, and USEM, along

2    with their co-conspirators, each knowingly agreed to

3    participate in one or more components of this conspiracy.  The

4    Plaintiffs claim this agreement or conspiracy was ultimately

5    effective in reducing the supply of eggs below where it would

6    have otherwise been without the agreement or conspiracy.

7          Moreover, they claim that any expansions, including

8    any expansions claimed by Rose Acre, were insufficient to

9    counteract the market-wide effects of the conspiracy.  The

10   result in supply restriction or restrictions raised the market

11   price for eggs, including eggs bought by each of the

12   Plaintiffs, causing them each -- causing each of them injury

13   of the type the Sherman Act was intended to prevent.

14          According to Plaintiffs, there were no

15   procompetitive benefits to the short-term supply measures or

16   the USEM exports at a loss.  To the extent there were any

17   theoretical procompetitive benefits to having Animal Welfare

18   Guidelines for the egg-laying hen industry, the Plaintiffs say

19   that those procompetitive benefits could have been achieved

20   through other means, such as simply having Animal Welfare

21   Guidelines available for buyers to use or not use as they see

22   fit when negotiating the purchase of eggs.  You have heard

23   what Plaintiffs claim could have been done instead.

24          So Plaintiffs contend that what they see as the

25   anticompetitive aspects of the UEP Certified Program,

1    including the reduction in output and increase in price,

2    outweigh the Defendants' claimed procompetitive benefits.

3          Furthermore, Plaintiffs say that any such claimed

4    procompetitive benefits could have been achieved without the

5    anticompetitive harm caused by the Defendants.

6          In addition to Rose Acre, UEP, and USEM, the

7    Plaintiffs also contend that each of the following UEP

8    Certified companies knowingly participated in the conspiracy

9    through one or more of the previously described components.

10          The list of the alleged co-conspirators are

11    Cal-Maine Foods, Country Charm Egg, Hickman's Egg Ranch,

12    Hillandale Farms, ISE America, Michael Foods, Midwest Poultry

13    Services, Moark, National Food Corporation, Norco Ranch,

14    Oakdell Egg Farm, Ohio Fresh Eggs, Quality Eggs of New

15    England, R.W. Sauder, Sparboe Farms, Tampa Farms, Weaver

16    Bros., Wilcox Farms, and Zephyr Egg Company.

17          According to the Plaintiffs, these are the alleged

18    co-conspirators you have heard mentioned from time to time

19    during the trial.  Some, of course, more than others.

20          Rose Acre denies that it's combined -- turning to

21    the Defense contentions.  Rose Acre Farms denies that it

22    combined, agreed, or conspired to raise egg prices.

23    Specifically, Rose Acre Farms denies that it joined and

24    participated in UEP and became a certified -- and became

25    certified for the purpose or with the intent of reducing the

1    supply of eggs or raising egg prices.  Rose Acre Farms

2    contends that its intent in agreeing to join the UEP and

3    become a certified producer in 2002 was only to satisfy the

4    demands of two of its largest customers and that it remained a

5    certified producer only because those customers and other

6    customers continued to demand certified eggs.

7            Rose Acre further contends that after it joined UEP,

8    it joined UEP's Board and various committees only because its

9    Certified Program would have a major impact on Rose

10   Acre's business operations.  Rose Acre Farms also contends

11   that it never followed or agreed to follow any of

12   UEP's short-term supply recommendations and Rose Acre Farms

13   contends that it agreed to join USEM's coordinated exports in

14   2006 only to sell surplus eggs that it would produce during

15   times of low egg demand, eggs for which it had no domestic

16   customers.

17           Rose Acre Farms also contends that its growth during

18   the alleged conspiracy period shows that it never intended to

19   reduce the supply of eggs.  Rose Acre also contends that it

20   could not be found to have conspired to reduce egg supply or

21   raise egg prices through the Certified Program for a number of

22   reasons.  Rose Acre Farms contends that the UEP Certified

23   Program was developed in consultation with a trade -- with the

24   trade association representing the Plaintiffs.  This is the

25   Food Marketing Institute, or FMI that you've heard about.

1       Rose Acre Farms contends that most of the Plaintiffs

2   in this case were leaders of FMI and actively participated in

3   FMI's development of the animal welfare recommendations given

4   to its members, among which included recommendations to follow

5   the UEP Certified Program.

6       Rose Acre Farms further contends that it could not

7   have conspired to reduce the supply of eggs or raise egg

8   prices through this UEP Certified Program given what Rose Acre

9   claims was the Plaintiffs' relative bargaining power, and,

10  again, according to Rose Acre, Plaintiffs' demand for

11  certified eggs.  On this issue, Rose Acre claims that the size

12  of the Plaintiffs and their financial revenues and profits

13  gave them what's been called superior bargaining power,

14  compared to Rose Acre Farms.

15      Finally, Rose Acre Farms contends that the

16  Plaintiffs did not show they were injured for several reasons.

17      First, Rose Acre contends that the Plaintiffs'

18  expert witness, Dr. Michael Baye, testified that UEP's supply

19  management recommendations had no measurable effect on prices.

20  And that each of the six USEM exports that Dr. Baye -- that

21  Dr. Baye analyzed would have increased egg prices at most for

22  only one month.

23      Rose Acre contends that its expert witness,

24  Dr. Jonathan Walker, demonstrated that Dr. Baye's estimates of

25  injury from the Certified Program were what they call flawed

1    and unreliable.

2            Second, Rose Acre contends that Plaintiffs cannot

3    prove that they were injured by any alleged conspiracy because

4    Dr. Baye's analysis, which is the Plaintiffs' proof of injury,

5    even if valid, estimates the effects on egg production of

6    every certified producer adhering to the guidelines, but, says

7    Rose Acre, Plaintiffs have not proven that every certified

8    producer was a member of the alleged conspiracy.

9            Finally, Rose Acre Farms contends that any Plaintiff

10   that deemed or required certified eggs cannot claim that it

11   was injured by the Certified Program, and on this point Rose

12   Acre would have the burden to prove such a demand or

13   requirement.

14           Turning to UEP.  It contends that it did not

15   orchestrate, join, or participate in any conspiracy to reduce

16   the supply of eggs or egg products and thereby raise their

17   price.  UEP contends that it developed the Certified Program

18   in the early 2000s at the request of its members whose

19   customers, including the Supermarket Plaintiffs in this case,

20   were reportedly demanding a single industry-wide Animal

21   Welfare Program to respond to what's described as intense

22   pressure from animal activists.

23           In response to that demand, UEP commissioned a

24   committee of animal welfare scientists to make science-based

25   recommendations to address the welfare of egg-laying hens.

1          UEP then goes on to contend that this committee

2     worked cooperatively with the Plaintiffs Supermarket chains,

3     both individually and through the Plaintiffs' trade

4     association, FMI, to develop and implement Animal Welfare

5     Guidelines that FMI endorsed as, quote, best practices.

6          Therefore, UEP contends that the resulting Certified

7     Program was not an agreement to reduce supply but, rather, a

8     voluntary, bona fide, science-based animal welfare program

9     that imposed no restriction on the number of eggs any producer

10    could produce or the number of birds any producer could own.

11         A producer did not have to be a member of UEP to

12    participate in the program, and not all members of UEP chose

13    to participate.  The Certified Program had what UEP describes

14    and calls the procompetitive benefits of meeting customer

15    demand and increasing customer choice with UEP Certified eggs.

16         Again, according to UEP, the Certified Program

17    requirements ensured customer confidence by requiring regular

18    audits and humane treatment for all hens and minimized market

19    disruption by allowing for gradual phase-in.

20         UEP contends that its Certified Program has been

21    transparent with the requirements for the program and the

22    underlying recommendations from the Scientific Advisory

23    Committee posted publicly on its website and shared with its

24    members, customers with FMI, with certain government agencies

25    and others.

1     UEP further contends that the Certified Program had

2   no impact on supply of eggs.  During the relevant time period,

3   in absolute numbers, the nation's flock size and egg supply

4   increased.  According to UEP, both the certified and

5   non-certified eggs remained available to meet customer demand.

6   Some large producers chose not to become certified sellers of

7   eggs or egg products.  Certified producers remained free to

8   sell non-certified eggs and certified producers could choose

9   to become non-certified at any time.

10     In some instances, the UEP points out certified eggs

11   were actually cheaper than non-certified eggs.  Thus, the UEP

12   contends that the Certified Program was not part of an

13   unlawful agreement to reduce supply.

14     UEP also contends that its short-term supply

15   recommendations were simply that, suggestions to help its

16   members plan supply and avoid surplus eggs during times of low

17   demand.  The recommendations were not agreements to reduce

18   supply, UEP contends, and that, in any event, the suggestions

19   generally were not followed by its members and therefore had

20   no impact on the supply of eggs.  Moreover, even if they had

21   been followed, UEP contends any impact would have been short

22   lived and insufficient to cause market-wide effect.

23     USEM contends that it did not knowingly join a

24   conspiracy to reduce the supply of eggs and raise their price.

25   USEM is a separate organization, it says.  It did not conspire

1    with UEP, with Rose Acre, or any other entity to restrict the

2    supply of eggs in the United States.  USEM is separately

3    incorporated with its own Board of Directors, its own

4    committees, rules, and members.

5            USEM, it says, did not participate in any short-term

6    supply recommendations at issue in this case or participate in

7    the Certified Program.  Rather, USEM's sole activity was to

8    receive and evaluate exports opportunities from willing buyers

9    located overseas.  USEM contends that export opportunities

10   were taken only when a majority of its members, each acting in

11   their independent self-interest, voted in favor of them.

12           USEM contends that participation in USEM was and is

13   voluntary and its members may leave at any time, if exports no

14   longer make sense for their business model.  USEM also

15   contends that its exports had no material impact on the supply

16   or price of eggs in the United States because the exports were

17   too few, too sporadic, too small, and any impact was short

18   lived and insufficient to cause market-wide effect.

19           As I told you, and as you've seen, there are two

20   types of evidence that you can use.  One type is called direct

21   evidence.  That is when a witness testifies to something that

22   they saw, they smelled, they said themselves, the fact they

23   heard something, they might have touched, or something they

24   did.

25           If a witness testified that he -- going back to the

1    weather.  If a witness testified that he or she saw it raining

2    outside, and you believed him or her, that would be direct

3    evidence that it was raining.

4         Another form of direct evidence is an exhibit where

5    the fact to be proved is the document's very existence or its

6    current condition.  That's the direct evidence.

7         Another type of evidence is circumstantial evidence.

8    This is proof of one fact or another or more from which you

9    can find or deduce another fact.  For example, I hope you will

10   remember the old raincoat example I gave.  You know, you're

11   sitting here, you don't know what's going on outside -- we

12   have no windows -- and you see somebody coming in wearing a

13   raincoat, droplets of water when they shake their umbrella,

14   and water droplets come off.  That would be circumstantial

15   evidence from which you could, but are not required to,

16   conclude it's raining outside.

17        You can and should consider both kinds of evidence,

18   direct and circumstantial.  The law makes no distinction

19   between them, and they are both equally effective or usable by

20   you.  You decide how much weight to give any evidence.

21        You did hear the lawyers use the term "inference."

22   Essentially in their arguments they've asked you to infer on

23   the basis of your reason, your experience, your common sense,

24   from one or more established facts, the existence of some

25   other fact.

1          An acceptable inference for your purposes is

2    something that's not a suspicion or a guess.  It must be a

3    reasoned, logical decision to find that a disputed fact exists

4    on the basis of another fact which has been shown to exist.

5          There are times when different inferences can be

6    drawn from facts, whether direct or circumstantial.  The

7    Plaintiffs might ask you to draw one set of inferences while a

8    Defendant asks you to draw a different inference.  It's for

9    you and you alone to decide what inferences, if any, to draw.

10          This process, though, as I said, is not a matter for

11   guesswork or speculation.  It has to be a deduction or

12   conclusion which you, the jury, are permitted to draw, but

13   you're not required to, and to draw from the facts that have

14   been established.  Use your common sense in this process.  So

15   while you consider the evidence that's been presented, you are

16   permitted to draw from the facts you find such reasonable

17   inferences as would be justified in light of your experiences.

18          Some witnesses, because of their education or their

19   experience, are permitted to testify as experts, and then they

20   can state their opinions and the reasons for their opinions.

21   Opinion testimony should be judged just like any other

22   evidence or any other testimony.  You may accept it, you may

23   reject it, give it as much weight as you think it deserves,

24   considering the witness's education and experience, the

25   reasons given for the opinion, and all of the other evidence

1    in the case.

2          Your evaluation of an expert witness's credibility

3    can be based, and should be based, on the same basis for

4    evaluating the credibility you apply to anybody else who is a

5    witness, such as their possible motives for testifying and

6    such.

7          You've heard from a number of experts in this case,

8    three, in particular.  The Plaintiffs called Professor Baye,

9    an expert in economics.  The Defendants called Dr. Walker and

10   Dr. David, both experts in economics and econometrics.

11         Another word about expert witnesses.  These

12   witnesses were referred to as experts.  They testified in

13   order to assist you in reaching a decision on certain issues.

14   It is your obligation to determine the expertise, if any, of

15   such a witness and to establish or evaluate their credibility

16   and the reliability of their opinions.

17         Sometimes expert witnesses' testimony is in

18   conflict; that is, they disagree.  You have to remember that

19   you are the trier of facts, and only you, and where their

20   testimony relates to a question of fact, it's your job to

21   resolve the disagreement.  And the way you do so is the same

22   way you would decide any other fact question.

23         Now, because they gave their opinions, you can

24   consider the soundness of their opinions, their reasons for

25   giving them, and where they may be coming from, so to speak,

1    their motive, if any.  You can give their testimony whatever

2    weight you think it deserves.

3         Don't permit, though, their opinion testimony to be

4    a substitute for your own reason, your own judgment, and your

5    own common sense.  You may reject the testimony of any opinion

6    witness, in whole or in part, if you conclude that the reasons

7    given in support of the opinion are not sound or if you, for

8    some other reason, don't believe the witness.  The

9    determination of the facts in this case rests solely with you.

10        Turning to the specific law of antitrust, the

11   Plaintiffs here bring this suit under a federal law called the

12   Sherman Act.  The case does not concern whether anyone or any

13   act was required or prohibited by any state law during the

14   time at issue here.  The purpose of the federal Sherman Act is

15   to preserve free and unfettered competition in the

16   marketplace.  The Sherman Act rests on a central premise that

17   competition produces the best allocation of our economic

18   resources, the lowest prices, the highest quality, and the

19   greatest material progress.

20        The Plaintiffs challenged the Defendants -- Rose

21   Acre, United Egg Producers, and the United Egg Marketers --

22   under Section 1 of the Sherman Act.  That section prohibits

23   contracts, combinations, and conspiracies that unreasonably

24   restrain trade.

25        One of the technical requirements of this law is

1    that the restraint of trade affects interstate commerce.  I am

2    instructing you that I have already determined that this

3    requirement concerning interstate commerce has been met, and,

4    therefore, you need not consider that technical requirement of

5    interstate commerce in your deliberations.

6              In light of that, then, to establish a violation of

7    Section 1 of the Sherman Act, the Plaintiffs still must prove

8    the following:

9              First, the existence of a contract, agreement,

10   combination, or conspiracy between or among at least two

11   separate entities.

12             Second, that the contract, agreement, combination,

13   or conspiracy unreasonably restrains trade.

14             Third, that the restraints caused the Plaintiffs to

15   suffer an injury to their businesses.

16             Under the Sherman Act, a restraint of trade is

17   illegal only if it is found to be unreasonable.  Therefore,

18   you must determine, first, whether there was a contract,

19   agreement, combination, or conspiracy that restrained trade;

20   and if so, second, whether the restraints challenged here --

21   that is, A, the UEP recommended short-term measures; B, the

22   UEP Certified Program as challenged; and, C, the USEM export

23   program -- are together unreasonable.

24             These three alleged restraints must all be part of a

25   single conspiracy, as opposed to, for example, three different

1    conspiracies that were each independent of each other.

2         To determine whether these three alleged restraints

3    constitute one conspiracy, you must look to, one, whether

4    there was a common goal among the conspirators; second,

5    whether their agreement contemplated bringing to pass a

6    continuous result that will not continue without the

7    continuation -- the continuous cooperation of the

8    conspirators; and, three, the extent to which the participants

9    overlap in their various dealings.

10        If, after considering these factors, you find that

11   the alleged restraints were part of the same conspiracy to

12   reduce the supply of eggs, only then must you determine if the

13   actions taken were reasonable or unreasonable.

14        There are a number of steps to this inquiry, which I

15   will first summarize before going into each in detail.

16        In making this determination, you must first

17   determine whether the Plaintiffs have proven that the

18   challenged restraints have resulted in a substantial harm to

19   competition in a relevant product and geographic market.  If

20   you find that the Plaintiffs have proven that the challenged

21   restraints resulted in a substantial harm to competition in a

22   relevant market, then you must consider whether the restraints

23   produced countervailing competitive benefits.  If you find

24   that they do, then you must balance the competitive harm

25   against the competitive benefit.  The challenged restraints

1   are illegal under Section 1 of the Sherman Act only if you

2   find that the competitive harm substantially outweighs the

3   competitive benefit.

4            Before going into each of that -- those analyses in

5   more detail, let me first address how you determine if

6   companies conspired together.

7            A conspiracy is an agreement or understanding

8   between two or more persons to do something illegal.  In this

9   case, the Plaintiffs claim that illegal purpose or goal was to

10  restrain trade by limiting egg supplies.  They claim this

11  occurred from between May 15, 2000 until at least December 31

12  of the year 2012.  Specifically, the Plaintiffs allege that

13  Rose Acre Farms, UEP, and the USEM and others participated in

14  a conspiracy to restrain trade by limiting egg supply.  The

15  Plaintiffs must prove both of the following two elements by a

16  preponderance of the evidence:

17           First, the alleged conspiracy to restrain egg

18  supplies existed.

19           And, second, as to each individual Defendant, that

20  Defendant knowingly became a member of that conspiracy.  To

21  act knowingly means to participate deliberately not because of

22  some mistake, accident or other innocent reason.  The basis of

23  a conspiracy is an agreement or understanding between two or

24  more persons.  Remember, companies, associations, and similar

25  organizations are considered persons.

1       Here an agreement or understanding between two or

2   more persons exists if they share a commitment to a common

3   scheme to achieve an unlawful purpose.

4       To establish the existence of a conspiracy, the

5   evidence need not show that its members entered into some

6   formal or written agreement.  The agreement itself may have

7   been entirely unspoken and unwritten.  A person can become a

8   member of a conspiracy without full knowledge of all of the

9   details of the conspiracy or the identity of all of its

10  members or the parts of each member or such members played in

11  the conspiracy.  The members of a conspiracy need not

12  necessarily have met together, directly stated what their

13  object or purpose was to one another, or stated the details or

14  the means by which they would accomplish their common purpose.

15      To prove a conspiracy existed, however, the evidence

16  must show that the alleged members of the conspiracy came to

17  an agreement or an understanding among themselves to

18  accomplish a common purpose.  To be a conspirator, the member,

19  though, does not need to have been involved from the very

20  start.

21      A conspiracy may be found without all parties coming

22  to an agreement at the same time, such as where competitors

23  separately accept invitations to participate in a plan to

24  restrain trade.

25      Similarly, it's not essential that all persons acted

1    exactly alike nor is it necessary that they all possess the

2    same reason or purpose for entering into the agreement.

3            It's also not necessary that all of the means or

4    methods claimed by the Plaintiffs were agreed upon by each

5    individual Defendant to carry out the alleged conspiracy, nor

6    that all the means or methods that were agreed upon were

7    actually used or put into operation.  Nor that all persons

8    alleged to be members of the conspiracy actually were members.

9    It is the agreement or the understanding to restrain trade by

10   limiting egg supply that can constitute a conspiracy.

11   Therefore, you may find a conspiracy existed regardless of

12   whether it succeeded or failed.

13           The Plaintiffs may prove the existence of the

14   alleged conspiracy through direct evidence, through

15   circumstantial evidence, or both.

16           Direct evidence is explicit and requires no

17   inferences to establish the existence of the alleged

18   conspiracy.

19           Direct evidence of an agreement may not be

20   available, and, therefore, a conspiracy may also be shown

21   through circumstantial evidence.  You may infer the existence

22   of a conspiracy from the circumstances including what you find

23   the alleged members actually did or the words they used.

24           However, mere similarity of conduct among various

25   persons or the fact that they may have associated with one

1 another and may have met or assembled together at meetings or

2 otherwise does not, by itself, establish the existence of a

3 conspiracy.  If they acted similarly but independently of one

4 another, without agreement among them, then there would not be

5 a conspiracy.

6 　　　　　In determining whether an agreement or understanding

7 between two or more persons has been proved, you must view the

8 evidence as a whole and not piecemeal.

9 　　　　　The fact that one or more producers -- egg producers

10 may have participated in the UEP-recommended short-term

11 measures, the Certified Program, or the export program does

12 not, by itself, establish the existence of a conspiracy among

13 the Defendants.

14 　　　　　The egg producers' behavior may be no more than the

15 result of the exercise of independent judgment and response to

16 identical or similar market conditions.  That's up for you to

17 consider.

18 　　　　　For example, everyone -- back to the weather -- for

19 example, everybody might open their umbrellas on a rainy day,

20 but that similar behavior would not necessarily mean that they

21 had agreed or conspired to open their umbrellas.

22 　　　　　A business may lawfully adopt the same prices,

23 conditions of sale, or other practices as its competitors so

24 long as it does so independently and not part of an agreement

25 or understanding with one or more of its competitors.

1          So, if the Defendants or the alleged co-conspirators

2     acted similarly, but independently of one another, without an

3     agreement or understanding between two or more of them, then

4     there would not be a conspiracy.  You must decide whether the

5     egg producers' similar conduct was more probably than not the

6     result of an agreement or an understanding between or among

7     them or with other co-conspirators who are not presently in

8     this lawsuit to reduce egg supply.  In doing so, you may

9     consider the Defendants' similar conduct along with all the

10    other evidence.

11         Let me turn back to the requirements of the Sherman

12    Act.  As I previously mentioned, to prove that the challenged

13    restraints are unreasonable, the Plaintiffs must first

14    demonstrate that the restraints have resulted in a substantial

15    harm of competition.  Although it can be relevant to your

16    evaluation of this issue, harm that merely occurs to the

17    individual business of a Plaintiff is not sufficient by itself

18    to demonstrate harm to competition generally.

19         Furthermore, the Plaintiffs must show that the harm

20    to competition occurred in an identified market known as the

21    relevant -- as a relevant market.

22         There are two aspects to a relevant market.  The

23    first aspect is known as the relevant product market.  This

24    means that the Plaintiffs must show that there was harm in a

25    relevant product market or markets.  The Plaintiffs contend

1    shell eggs and egg products are part of the same market.  The

2    Defendants contend that there are multiple relevant markets.

3         One common way to think about the relevant market is

4    whether the various products are interchangeable for one

5    reason or another or considered substitutes, one for the

6    other.  If they are, then it is likely they're part of a

7    single-product market.  You must determine whether these

8    restraints caused such harm.

9         The second aspect is known as the relevant

10   geographic market.  A relevant geographic market is simply a

11   geographic area where the Plaintiffs must show harm.  It's the

12   Plaintiffs' burden to prove the existence of a relevant

13   market.  If you find they have proven the existence of a

14   relevant market, then you must determine whether the

15   Plaintiffs have also proven that the challenged restraints

16   have caused or have had a substantial harmful effect on

17   competition in that market.

18        A harmful effect on competition, or what we call

19   competitive harm, refers to a reduction in competition that

20   results in the loss of some of the benefits of competition,

21   such as lower prices, increased output, or higher product

22   quality.

23        If the challenged conduct has not resulted in higher

24   prices, decreased output, lower quality or the loss of some

25   other competitive benefit, then there has been no competitive

1   harm and you should find that the challenged conduct was not

2   unreasonable.

3           In determining whether the challenged restraints

4   have produced competitive harm, you may look at the following

5   factors:  the effect of the restraint on prices, output,

6   product quality, or service.

7           The purpose and nature of a restraint.

8           The nature and structure of the relevant market.

9           The number of competitors in the relevant market.

10          And the level of competition among them, both before

11  and after the restraint was imposed.

12          And/or whether the Defendant and its alleged

13  co-conspirators together possessed market power.

14          This last factor, market power, has been defined as

15  an ability to profitably raise prices for a sustained period

16  of time above those that would otherwise be charged in a

17  competitive market.

18          A firm that possesses market power generally can

19  charge higher prices for the same goods or services than a

20  firm in the same market that does not have -- that does not

21  have or possess market power.  The ability to charge higher

22  prices for better products or services, however, is not market

23  power.

24          An important factor in determining whether the

25  Defendants and their alleged co-conspirators together

1    possessed market power is to look at their combined market

2    share.  That is, their percentage of share of the products

3    sold in the relevant market by all the competitors.

4           Other factors you can consider in determining

5    whether the Defendants and their alleged co-conspirators have

6    market power include whether there are barriers to entry into

7    the egg market for potential competitors, the threat of

8    substitute products for eggs, the market power of outside

9    competitors who were not part of the alleged conspiracy,

10   and/or the percentage of market covered by the alleged members

11   of the conspiracy.

12          If the Defendants and their alleged co-conspirators

13   do not possess substantial market share, it is less likely,

14   though not necessarily possible, that the Defendants and their

15   alleged co-conspirators possessed market power.

16          If they do not possess this market power, it is less

17   likely that the challenged restraints have resulted in a

18   substantial harmful effect on competition in the market.

19          On the other hand, if you were to conclude that the

20   Defendants and their alleged co-conspirators possessed this

21   market power, you could conclude that it is more likely that

22   the challenged restraints have resulted in a substantial

23   harmful effect on competition in the market.

24          If you find the Plaintiffs have proven the

25   challenged restraints resulted in substantial harm to

1   competition in a relevant market, then you next must determine

2   whether the restraints also benefit competition in other ways.

3           In considering whether the challenged restraints

4   benefitted competition, you may consider various factors

5   including, but not limited to, whether the challenged

6   restraints were demanded by customers, whether they increased

7   production, increased consumer choice, decreased prices, or

8   improved product quality.

9           Evidence regarding the ethical treatment of laying

10  hens may be considered with respect to issues such as whether

11  it challenged restraint, increased output, improved product

12  quality, widened customer choice, or met customer demand.

13          However, the ethical treatment of laying hens as a

14  societal benefit, standing alone, is not, in and of itself, a

15  procompetitive benefit.  If you find that the challenged

16  restraints do result in competitive benefits, then you must

17  also consider whether the restraints were reasonably necessary

18  to achieve the benefits.  If the Plaintiffs prove that the

19  same benefits could have been readily achieved by other

20  reasonably available alternative means that create

21  substantially less harm to competition, then those claimed

22  benefits cannot be used to justify the restraints.

23          If you find that the challenged restraints were

24  reasonably necessary to achieve competitive benefits, then you

25  must balance those competitive benefits against the

1    competitive harm resulting in the same -- from the same

2    restraints.  If the competitive harm substantially outweighs

3    the competitive benefits, then the challenged restraints are

4    unreasonable.  If the competitive harm does not substantially

5    outweigh the competitive benefits, then the challenged

6    restraints are not unreasonable.

7            In conducting this analysis, you must consider the

8    benefits and harm to competition and consumers.  The

9    Plaintiffs bear the burden of proving that the anticompetitive

10   effect of the conduct substantially outweighs its benefits.

11           Before you could find Rose Acre Farms, United Egg

12   Producers, and/or United States Egg Marketers were members of

13   a conspiracy alleged by the Plaintiffs, the evidence must show

14   as to each individual Defendant that each Defendant knowingly

15   joined the unlawful plan, either at its inception, the start,

16   or at some later time, with the intent to further the purpose

17   of the conspiracy.  You must evaluate each Defendant

18   separately.

19           To act knowingly means to act deliberately, not

20   because of some mistake, accident, or innocent reason, as I

21   said.  A person may become a member of a conspiracy, again, as

22   I've pointed out, without the full knowledge of all of the

23   details of the conspiracy, the identity of every member, or

24   the parts those members were playing.  Knowledge of the

25   essential nature of the plan is enough.

1       On the other hand, a person who has no knowledge of

2   a conspiracy but happens to act in a way that helps the

3   conspiracy succeed does not thereby become a member of the

4   conspiracy.  A person who knowingly joins an existing

5   conspiracy or who participates only in part of a conspiracy

6   with knowledge of the overall conspiracy is just as

7   responsible as if he, she, or it had been one of those who

8   formed or began the conspiracy and participated in every part

9   of it.

10      In determining whether a Defendant was a member of

11  the alleged conspiracy, you should consider only the evidence

12  about that particular Defendant's statements and conduct,

13  including any evidence of that Defendant's knowledge and

14  participation in the events involved and any other evidence of

15  that particular Defendant's participation in the alleged

16  conspiracy.

17      You may not find that a Defendant was a member of a

18  conspiracy based only on its association with others who you

19  find were conspiring or based only on the knowledge that some

20  wrongdoing was occurring, but these are factors that you can

21  consider in determining whether a Defendant was a member of

22  the alleged conspiracy.

23      If you find that the alleged conspiracy existed,

24  then the acts and statements of the conspirators made in

25  furtherance of the conspiracy are binding on all of those whom

1   you find were members of the conspiracy at any time during its

2   existence until they actually withdrew from the conspiracy.

3          If you have found that a Defendant is a member of a

4   conspiracy, that Defendant is presumed to remain a member and

5   is responsible for all the actions taken by all the

6   co-conspirators during and in furtherance of the conspiracy,

7   unless and until it is shown that the conspiracy has been

8   completed or abandoned or that the Defendant has withdrawn

9   from the conspiracy.

10         Motive is not an element of any of the unlawful

11  conduct with which the Defendants are accused by the

12  Plaintiffs here.  This means that proof of bad motive is not

13  required.  Furthermore, proof of bad motive alone does not

14  establish that a Defendant is liable, just as proof of good

15  motive alone does not establish that it is not liable.

16         Evidence of a Defendant's motive may, however, help

17  you to find its intent.  In other words, intent and motive are

18  different concepts.  Motive is what prompts a person to act.

19  Intent refers only to the state of mind with which a

20  particular act is done.

21         So, personal advancement and financial gain, for

22  example, are motives for much of human conduct.  However,

23  those motives might prompt one person to intentionally do

24  something perfectly acceptable while prompting another person

25  to intentionally do an act that is not.

1          Businesses that are actual -- I'm sorry.  Businesses

2     that are actual or potential competitors may lawfully form

3     into associations to advance their common interests.  You have

4     heard two such examples here, the United Egg Producers and the

5     United States Egg Marketers.  Such associations may keep

6     members informed of new services or technology in the industry

7     or perform other valuable services, such as cooperative

8     research, publication of trade journals, or joint

9     representation before a legislative or administrative body.

10    They are permitted to seek new members.

11         However, an association's actions are not immune

12    from the antitrust laws, and an association is capable of

13    being a co-conspirator in violation of the antitrust laws.

14    The actions of competitors taken through an association to

15    which they belong presents the same issues as the actions of

16    competitors who have not created a formal organization such as

17    an association.

18         An association or similar industry group cannot

19    lawfully act to facilitate the raising, stabilizing, or

20    maintaining of prices in the market in which their members

21    compete with one another to reduce the members' collective

22    output of products.

23         If an association exchanges with its members

24    confidential competitively sensitive information such as

25    current or future prices or current or future output

1    information, that is evidence that you may consider along with

2    all of the other evidence in deciding whether the association

3    conspired in violation of the antitrust laws.

4            A person or a business that belongs to an

5    association does not become liable for violating the antitrust

6    laws simply because the association is liable for such a

7    violation.  Instead, the Plaintiffs must prove that the

8    Defendant in question knew of and intentionally participated

9    in the specific conduct you find that is unlawful.

10           If you find that one or more of the Defendants

11   violated the Sherman Act, then you must decide if the

12   Plaintiffs were injured by the violation.  You must make this

13   determination separately for each Plaintiff.  A Plaintiff is

14   entitled to recover damages for an injury to its business if

15   it can establish three elements of injury and what we call

16   causation.

17           One, the Plaintiff was, in fact, injured as a result

18   of the Defendants' and alleged co-conspirators' alleged

19   violation of the antitrust laws;

20           Second, that the alleged illegal conduct was a

21   material cause of that Plaintiff's injury;

22           And, third, that Plaintiff's injury is an injury of

23   the type that the antitrust laws were intended to prevent.

24           The first element is actually referred sometimes as

25   injury in fact, or the fact of damage.

1          Each Plaintiff must prove that it was injured as a

2     result of the alleged violation of the antitrust laws.  This

3     does not require each Plaintiff to prove the dollar value of

4     its injury.  In fact, I've told the parties not to address

5     that issue at this time.  For now, it requires only that each

6     Plaintiff prove that it was, in fact, injured by the alleged

7     antitrust violation.

8          Each Plaintiff must also offer evidence that

9     establishes by the preponderance of the evidence that the

10    alleged illegal conduct was a material cause of that

11    Plaintiff's injury.  This means that the Plaintiff must prove

12    that some damage occurred to it as a result of the alleged

13    antitrust violation and not some other cause.

14         The Plaintiff is not required to prove the alleged

15    antitrust violation was the sole cause of its injury, nor need

16    that Plaintiff eliminate all other possible causes of injury.

17    It's enough if the Plaintiff has proved that the alleged

18    antitrust violation by any of the Defendants and

19    co-conspirators was a material cause of its injury.

20         Finally, each Plaintiff must establish that its

21    injury is the type of injury that the antitrust laws are

22    designed or intended to prevent.  This is sometimes called an

23    antitrust injury.

24         If the Plaintiff's injuries were caused by a

25    reduction in competition, acts that would lead to a reduction

1    in competition, by having to pay an inflated price for goods,

2    or by acts that would otherwise harm consumers and customers,

3    then the Plaintiff's injuries are what we call antitrust

4    injuries.

5           On the other hand, if the Plaintiff's injuries were

6    caused by heightened competition, the competitive process

7    itself, or by acts that would benefit customers and consumers,

8    then the Plaintiff's injuries are not antitrust injuries, and

9    the Plaintiff may not recover for such injuries under the

10   antitrust laws.

11          In summary, if a Plaintiff can establish that it

12   was, in fact, injured by the alleged co-conspiratorial conduct

13   of the Defendants and alleged co-conspirators, that conduct

14   was a material cause of the Plaintiff's injury, and it is

15   injury of the type that the antitrust laws were intended to

16   prevent, then that Plaintiff is entitled to recover for the

17   injury to its business.

18          The term "business," by the way, includes any

19   commercial interest or venture.  A Plaintiff has been injured

20   in its business if you find that it has suffered injury to any

21   of its commercial interests or enterprises as a result of the

22   Defendants' alleged antitrust violation.

23          In this case, you've been permitted to take notes.

24   Most of you, I think all of you at some point or another, have

25   done so.  And you may have your notes available to you during

1   your deliberations, but you should make use of them only as an

2   aid -- a personal aid for your own memory.  Do not give your

3   notes any precedence over your independent recollection of the

4   evidence or the lack of evidence, and neither should you be

5   unduly influenced by the notes of others.  I emphasize that

6   the notes you may have taken are not evidence, and they're not

7   entitled to any greater weight than your memory or your

8   impression of each -- that each of you have as to what the

9   testimony and exhibits and other evidence was.

10          As I mentioned at the start of the trial, we will

11  not be replaying or reciting any of the video or live

12  testimony of the witnesses.  You will be given a list of the

13  witnesses in the order in which they appeared.

14          Furthermore, if at some point you request the

15  documentary evidence, the exhibits, that were admitted as to

16  evidence, those exhibits will be provided to you.

17          When you return -- when you retire to the jury room

18  to deliberate, you may take with you your notes and you will

19  have this list of witnesses.  There will also be several

20  written copies of these instructions should you wish to reread

21  them for yourselves in some part.  I urge you, however, not to

22  see that as an opportunity for some sort of quickie law school

23  career.  Use the written instructions only as an aid to do

24  your job.

25          I strongly recommend that you select one of your

1    members to serve as a foreperson.  That person can preside

2    over your deliberations and then speak for you here in open

3    court.

4           You have two jobs.  The first one is to decide the

5    facts and what the facts are from the evidence that you saw

6    and heard here.  Deciding what the facts are is just your job.

7    It is not mine.  I have no part in it.  And nothing I've said

8    or done during the trial was meant to or should influence you

9    in any way in terms of your decision.

10          Your second duty, though, is to take the law as I

11   have explained it to you, and then apply it to the facts and

12   to decide if, under the appropriate burden of proof, the

13   parties have established their claims.

14          It was my job to tell you about the law.  You are

15   bound by the oath that you took to follow these instructions,

16   even if you disagree with them.

17          Perform these duties fairly, I'm sure you will.  Do

18   not let any bias, sympathy, or prejudice that you may feel

19   toward one side or the other to influence your decision in any

20   way.

21          You should and have the duty to consult with each

22   other and to deliberate with the intention of reaching a

23   verdict.  Each of you must decide the case for yourself but

24   only after full and impartial consideration of all the

25   evidence with your fellow jurors.

1          I urge you to listen to each other carefully.  In

2     the course of your deliberations, you should feel free to

3     reexamine your own views, maybe even change your own opinion

4     based upon the evidence.  But don't give up your honest

5     convictions about the evidence just because of opinions of

6     others, nor should you change your mind just for the purpose

7     of obtaining enough votes for a verdict.

8          When you start deliberating, you mustn't talk to

9     Mr. Coyle or any other jury Officer or to me or to anybody but

10    each other about the case.  If you have any questions or

11    messages for me, write them down on a piece of paper, have

12    your foreperson sign it, perhaps put the time on it, and give

13    it to Mr. Coyle or any other Officer who's providing service

14    for you.

15         Mr. Coyle will give your questions to me and I will

16    respond as soon as I can.  I may have to talk -- I most likely

17    will have to talk to the lawyers about what you've asked, so

18    it can take some time for me to get back to you.  In the

19    meantime, while you're waiting for a response, if you can at

20    all, I encourage you to keep working on your deliberations.

21         Another thought about messages.  Never write down or

22    tell anybody how you are standing on some sort of tentative

23    vote.  For example, don't write down or tell anybody that a

24    certain number is voting one way or another.  Your votes

25    really have to stay completely secret until you are all done.

1       Your vote -- your verdict has to represent the
2  considered judgment of each of you.  In order for you as a
3  jury to return a verdict, each juror must agree to it.  Your
4  verdict, in other words, must be unanimous in all respects.
5  That means all of you, all of you, must agree with the verdict
6  in each of its component parts.

7       So whatever your verdict is as to each Plaintiff and
8  each Defendant, you all have to agree.  In saying that,
9  however, I do not mean that your verdicts as to each Plaintiff
10  or each Defendant must be the same as the other verdicts or
11  the same as to all Defendants.

12       A verdict form has been prepared for you.  It is a
13  series of questions for you to answer, and there's some
14  instructions in front of and following each of the questions.
15  Hopefully the instructions explain the questions.

16       You will take -- there's a couple of copies of the
17  form for you to use and to review.  But you should take the
18  form with you to the jury room and when you've reached a
19  unanimous agreement as to your verdict, you will fill it in
20  and have your foreperson date and sign the form.  Then you
21  will return to the courtroom and your foreperson will provide
22  the verdict.

23       Unless I direct you otherwise, do not reveal your
24  answers until you are discharged.  After you've reached a
25  verdict, you are not required to talk to anybody about the

1    case unless -- unless you want to or I order you to do so.

2           Once again, I want to remind you that nothing about

3    my instructions, nothing about the form of the verdict or

4    anything I've done or said is intended to suggest or convey in

5    any way or manner what I think your verdict should be.  I

6    don't have an opinion, and even if I did, it wouldn't matter

7    one whit.  It's your job and only your job and duty to

8    determine the verdict.

9           Let me first ask counsel if I have read the

10   instructions as I disclosed them ahead of time?

11          MR. BLECHMAN:  For the Plaintiffs, yes, Your Honor.

12          MR. KING:  The same for Rose Acre.

13          MR. HARRIS:  And for USEM.

14          MS. LEVINE:  For UEP.

15          THE COURT:  Okay.  So, folks, let's talk a little

16   bit about how we're going to organize ourselves.  It took a

17   little longer than I thought, sorry.  It's now about eight

18   minutes to six.  I serve at your pleasure.  And you can do

19   what you want about tonight.  I would guess, but I'm not

20   telling you one way or the other what you want to do, that you

21   will be returning in the morning.  You may prefer just to

22   collect yourselves, you know, get whatever figured out and

23   then come back here.  Tomorrow, I recommend that you agree to

24   come back maybe at 9, 9:30ish, whatever works.

25          I'm told, I don't know what the latest is, and I'm

1    not sure that I would believe it even with my compulsion about

2    the weather, that I would really know what the weather's going

3    to be like tomorrow.  What matters is you get here safely.  So

4    don't do anything rash if there's inclement weather.

5              Unless and until you are all 12 here, however, you

6    cannot begin to deliberate.  You can only deliberate when all

7    of you are together.  But once you all get here, you could

8    start straightaway.  So we're not going to require you to come

9    in here and say good morning to you.  There will be the usual

10   refreshments.  And we will order lunch for you if that is your

11   desire.  But don't start deliberating until you're all here.

12             There may be a little bit of lag time if you have

13   anything early that you want to ask, unless it is to ask for

14   the exhibits, in which case that's easy to comply with.  But

15   generally I'll be available to answer your questions, just not

16   straightaway in the morning.

17             So the rules are the same, you know, when you're all

18   together, you can deliberate now, but only when you're all

19   together.

20             Do have a safe journey home.  Whatever you decide

21   about organizing yourselves works for us.  You're very much in

22   control now.

23             So with that, I will excuse you to go back to your

24   favorite room there.  And I'll see you tomorrow.  Or later, if

25   you want, I'll be here too for a bit.

1           Thank you.

2           THE DEPUTY CLERK:  All rise.

3           (Jury out.)

4           THE COURT:  Mr. Coyle, you're the Court Officer,

5    right, we don't have to swear anybody else in?

6           THE DEPUTY CLERK:  Yes.  Yes.

7           THE COURT:  Okay.  I'm going to stick around a

8    while, just to -- but I truly don't expect anything, to hear

9    anything other than that they are departing for the evening.

10          I kept them a little longer than I would have liked,

11   but they seem to be good sports.

12          Okay, if you would stick around for a few minutes,

13   Mr. Coyle has something for you all.  And I take it we have

14   the ability to hunt you down if we need you.

15          MR. KING:  I don't know.

16          MR. BLECHMAN:  Your Honor, I was about to suggest

17   what defense counsel did, is perhaps we should just provide

18   him with contact information and all.

19          MR. GERMAINE:  I think the law clerks have done a

20   good job of --

21          THE COURT:  Excuse me.

22          (Discussion off the record.)

23          THE COURT:  There's no checks there.

24          THE LAW CLERK:  Sorry.

25          THE COURT:  It just occurred to me as I looked at

```
1    them, I said, Oh, my goodness.
2              MR. BLECHMAN:  Your Honor, I was starting to sweat.
3              THE COURT:  No, no, no, that would be a new one.
4              The law clerks have your e-mail, don't they?
5              ALL COUNSEL:  Yes.
6              THE COURT:  And you do those little green blobby
7    things?
8              MR. BLECHMAN:  I don't know what that is.
9              THE COURT:  As opposed to an e-mail, there's the
10   other method.
11             MR. KING:  Text?
12             THE COURT:  Text.
13             MR. BLECHMAN:  Yes, text would be great.  Little
14   green blobby.
15             THE COURT:  Before you all go, and before we hear
16   anything, handshakes all around.
17             MR. PATTON:  Your Honor, we have exhibits.
18             THE COURT:  Okay, be sure to put them someplace.
19   Are they in notebooks?  How are they done?
20             MR. PATTON:  Would you like to see them?
21             THE COURT:  Would I like -- what was that question?
22             MR. PATTON:  Should we coordinate with Mr. Coyle?
23             THE COURT:  Put them someplace where we can find
24   them.
25             MR. PATTON:  But --
```

```
 1              MS. LEVINE:  Oh, the exhibits.

 2              MR. PATTON:  They're in exhibit binders.

 3              THE COURT:  You all -- okay.

 4              Mr. Coyle, just make sure you know what the boxes

 5    are.

 6              THE DEPUTY CLERK:  Okay.

 7              THE COURT:  Is that all?  Is that it?  Just two

 8    little bankers boxes?

 9              Where would you like the boxes, Michael?

10              THE DEPUTY CLERK:  Are they going back right away?

11              THE COURT:  Not until they ask for them.

12              MR. PATTON:  Put them on the side.

13              THE DEPUTY CLERK:  Yeah, right here is good.

14              MR. LEVINE:  Your Honor?

15              THE COURT:  Yes.

16              MR. LEVINE:  Can I put one thing on the record?

17    Because everything was happening so fast, I couldn't actually

18    register.  We did have a little bit of a concern with the

19    addendum Your Honor put on 14, because I think it essentially

20    instructs them to disregard it, the state laws entirely.

21              THE COURT:  No, I didn't say that.

22              MR. LEVINE:  No, no, I understand.  But when read in

23    black and white and they get the copy of the instructions,

24    they may take it that way.  And therefore, I'd like to suggest

25    a slight modification.  The Court put the cases --
```

1          THE COURT:  Listen up, everybody.

2          MR. LEVINE:  The Court's addendum was:  The case

3    does not concern -- and so I would modify it to:  The case

4    does not turn on whether anyone or any act was required or

5    prohibited by any state law, but they can be considered as

6    part of your analysis of the evidence.

7          So that way it addresses the Plaintiffs' concern

8    that somehow they'll think that the enactment of the state law

9    itself somehow legalizes everything, but also addresses our

10   concern that they may consider it as part of the evidence

11   because, as the Court well knows, it's certainly relevant and

12   probative and it is certainly part of Dr. Walker's analysis

13   and criticism of Dr. Baye's evidence, and I just fear that in

14   black and white, the jury may think that they're not even

15   allowed to think about it.

16         THE COURT:  I'm actually rather satisfied with the

17   single sentence, and the reason -- and I think the use of the

18   words "required or prohibited" respond to your concern.

19         MR. LEVINE:  Okay.

20         THE COURT:  That's why I was trying to keep it to a

21   bare minimum.

22         MR. LEVINE:  No, I understand.

23         THE COURT:  But you certainly have that articulated.

24         MR. LEVINE:  Thank you very much.

25         THE COURT:  Absolutely.  No problem.

1          I want to thank you all.  You know, as I say, win,

2     lose, or draw, it was really a valued experience from my

3     standpoint.

4          MR. HILL:  Thank you, Your Honor.

5          THE COURT:  So far.  You all can leave or not if you

6     want.  If I were you, I wouldn't take a thing with me tonight.

7                    (Court adjourned.)

8

                    C E R T I F I C A T E

9

10        I certify that the foregoing is a correct transcript

11    from the record of the proceedings in the above-entitled

12    matter.

13                          _____

14                          Kathleen Feldman, CSR, CRR, RPR, CM
                          Official Court Reporter

15

16    Date: _____

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 165:21, 166:7
**$215** [1] - 175:24
**$781** [1] - 161:15

## '

**'04** [1] - 190:7
**'05** [1] - 190:7
**'80s** [2] - 35:4, 35:6

## 0

**08-MDL-02002** [1] - 1:4

## 1

**1** [13] - 20:3, 31:21, 168:22, 169:2, 169:6, 169:7, 176:19, 192:3, 235:14, 247:22, 248:7, 250:1
**10** [5] - 1:9, 14:7, 54:17, 117:14, 131:19
**100** [7] - 13:19, 37:16, 44:1, 53:21, 97:10, 111:4, 115:1
**100%** [84] - 8:25, 9:25, 11:14, 11:19, 11:21, 13:2, 13:25, 15:16, 15:21, 16:2, 16:10, 20:11, 21:12, 25:24, 26:13, 26:17, 26:20, 27:18, 29:5, 35:16, 36:22, 37:22, 37:23, 38:1, 38:3, 42:10, 42:13, 43:2, 48:15, 48:19, 52:7, 55:20, 57:12, 58:4, 58:19, 59:1, 62:21, 66:24, 67:5, 67:14, 91:12, 91:14, 96:25, 97:3, 97:5, 97:15, 99:13, 99:14, 99:16, 99:23, 100:4, 100:10, 100:11, 100:12, 100:16, 101:13, 102:9, 102:10, 110:19, 113:3, 113:5, 113:6, 115:3, 127:20, 155:12, 156:11, 190:4, 190:8, 190:23, 202:15, 203:1, 203:7, 205:10, 205:11,

205:25, 207:2, 207:7, 209:15, 216:18, 217:1, 217:15, 219:13, 235:21
**104** [1] - 13:20
**11** [2] - 109:9, 114:19
**1100** [1] - 2:5
**112** [1] - 37:9
**116** [1] - 115:9
**11:30** [1] - 76:11
**12** [8] - 50:11, 76:11, 139:19, 142:18, 142:19, 192:7, 219:11, 271:5
**1234** [1] - 1:22
**13** [1] - 218:11
**13.2** [1] - 175:12
**134** [1] - 57:20
**14** [12] - 11:24, 13:19, 36:17, 38:17, 41:23, 42:17, 148:25, 149:1, 164:6, 196:11, 213:16, 274:19
**15** [13] - 29:5, 34:3, 34:20, 35:15, 46:8, 90:6, 90:7, 117:14, 130:19, 148:20, 209:2, 235:17, 250:11
**15.8** [1] - 188:3
**150** [2] - 28:2, 28:5
**15219** [1] - 2:18
**16** [1] - 10:20
**16.67** [1] - 54:10
**17** [6] - 10:20, 12:12, 23:24, 24:1, 25:2, 28:10
**174** [1] - 30:17
**177** [3] - 148:9, 148:11, 182:8
**18** [1] - 10:20
**18th** [1] - 3:6
**19** [3] - 10:21, 151:8, 159:4
**19103** [1] - 3:7
**19106** [1] - 1:23
**1950s** [1] - 194:18
**1972** [3] - 112:19, 144:17
**1980s** [1] - 120:12
**199** [1] - 188:4
**1990** [1] - 210:8
**1999** [15] - 10:16, 16:12, 31:19, 31:21, 32:9, 33:5, 33:10, 34:19, 56:21, 67:11, 95:7, 202:18, 209:4, 214:17, 217:14
**1:35** [1] - 127:4
**1:40** [1] - 127:4
**1st** [5] - 24:15,

225:13, 225:17, 225:22, 226:2

## 2

**2** [11] - 32:9, 33:5, 97:23, 168:23, 169:5, 169:8, 170:2, 170:6, 176:19, 190:7
**2.1** [4] - 66:17, 66:18, 191:9, 191:15
**2.4** [1] - 190:14
**20** [11] - 22:10, 130:19, 134:10, 146:1, 148:15, 148:16, 148:18, 150:19, 150:20, 156:18, 179:22
**20,000** [1] - 45:8
**200** [1] - 188:6
**2000** [37] - 10:16, 16:12, 29:5, 34:3, 34:20, 35:15, 46:8, 56:21, 57:1, 58:12, 58:14, 60:13, 60:14, 67:11, 87:21, 90:6, 90:7, 103:8, 112:5, 112:16, 113:12, 144:5, 145:2, 154:9, 156:3, 186:16, 186:22, 191:24, 192:22, 202:21, 208:21, 209:2, 214:17, 217:14, 235:17, 250:11
**20006** [1] - 3:12
**2000s** [2] - 124:11, 240:18
**2001** [20] - 10:16, 16:12, 57:1, 60:10, 67:11, 90:12, 145:3, 162:15, 164:19, 175:20, 186:22, 202:22, 204:21, 208:21, 210:1, 210:9, 214:17, 217:14, 217:21, 217:22
**2002** [84] - 1:4, 9:22, 10:16, 11:12, 11:24, 12:7, 12:12, 13:19, 13:20, 16:12, 20:3, 20:4, 20:7, 20:10, 24:16, 28:7, 36:15, 36:16, 36:17, 36:20, 36:24, 37:17, 38:17, 41:23, 42:18, 43:24, 53:20, 53:23, 55:5, 56:9, 57:2, 57:9, 57:11, 57:19, 57:25, 58:25, 59:12, 60:10,

61:19, 67:13, 101:20, 147:8, 153:24, 154:9, 156:7, 158:8, 158:14, 161:14, 163:15, 164:22, 164:24, 170:25, 171:13, 174:21, 176:4, 182:23, 182:24, 183:15, 184:12, 186:22, 189:24, 190:24, 201:25, 202:8, 202:10, 202:15, 202:22, 202:25, 204:5, 205:5, 208:21, 210:1, 210:2, 210:9, 213:16, 214:17, 217:5, 217:14, 238:3
**2003** [18] - 13:5, 13:23, 13:25, 59:11, 59:13, 90:25, 144:20, 155:6, 155:16, 155:21, 156:12, 156:24, 157:19, 184:12, 186:23, 204:3, 204:5
**2004** [14] - 14:7, 59:13, 59:14, 69:22, 91:1, 91:16, 144:20, 155:24, 158:17, 186:23, 187:7, 189:4, 189:24, 208:5
**2005** [14] - 52:20, 91:16, 101:20, 120:25, 121:9, 156:10, 157:22, 158:1, 186:19, 187:1, 189:4, 190:12, 208:5, 208:12
**2006** [14] - 15:12, 91:16, 107:18, 112:16, 120:13, 122:18, 168:5, 173:23, 187:1, 189:4, 205:1, 208:6, 208:12, 238:14
**2007** [16] - 16:5, 30:24, 40:1, 40:3, 91:1, 91:9, 91:16, 122:18, 156:1, 158:3, 160:9, 164:13, 208:6, 213:1, 217:21
**2008** [10] - 16:5, 91:16, 109:8, 122:19, 156:2, 164:6, 164:14, 213:24, 214:5, 218:11
**2009** [2] - 91:16, 160:20
**201** [1] - 2:5
**2010** [2] - 91:17,

182:2
**2011** [3] - 91:17, 101:22, 145:4
**2012** [11] - 91:17, 144:5, 145:2, 161:14, 174:21, 176:4, 191:25, 192:22, 210:3, 235:18, 250:12
**2014** [2] - 60:18, 112:5
**2015** [1] - 55:6
**2019** [7] - 1:9, 10:15, 109:8, 134:10, 159:4, 185:20, 194:3
**2020** [1] - 3:11
**21** [1] - 4:19
**211** [2] - 59:10, 59:11
**212** [1] - 59:10
**214** [2] - 14:9, 55:3
**215** [1] - 1:23
**22** [3] - 36:11, 50:11, 170:7
**23** [1] - 32:9
**23.6** [1] - 174:22
**23rd** [1] - 19:23
**24** [5] - 1:16, 15:12, 32:7, 32:25, 112:4
**258** [1] - 27:3
**26** [1] - 36:20
**27** [4] - 12:7, 13:20, 36:24, 40:1
**270** [1] - 30:7
**28** [1] - 60:13
**280** [1] - 30:7
**2900** [1] - 3:16
**2nd** [1] - 209:4

## 3

**3** [3] - 176:8, 214:22, 217:11
**30** [4] - 11:11, 13:19, 22:10, 196:5
**30-minute** [1] - 195:25
**3000** [1] - 3:6
**301** [1] - 2:17
**31** [4] - 61:18, 142:4, 235:18, 250:11
**31st** [2] - 138:2, 143:24
**3200** [1] - 2:12
**326** [1] - 38:8
**330** [2] - 145:2, 175:19
**33131** [1] - 2:6
**35** [2] - 214:25
**35-minute** [1] - 126:18

**35th** [1] - 2:17
**3600** [1] - 2:21
**39** [1] - 61:6
**3rd** [1] - 90:12

## 4

**4.7** [1] - 66:18
**40** [1] - 179:23
**40-minute** [1] - 126:18
**41** [1] - 3:15
**413** [1] - 213:2
**43215** [1] - 3:16
**445** [1] - 218:13
**446** [1] - 213:23
**45** [1] - 34:21
**459** [3] - 39:3, 49:19, 49:20
**48** [6] - 94:1, 155:8, 188:19, 188:20, 188:22, 189:24
**4:30** [1] - 126:15

## 5

**5** [4] - 13:5, 13:23, 105:23, 215:24
**5.2** [1] - 190:16
**5.5** [1] - 190:15
**50** [3] - 105:13, 144:17, 146:1
**50-some** [1] - 117:5
**500** [1] - 145:25
**51** [2] - 28:1, 28:2
**517** [2] - 145:3, 175:20
**54** [1] - 60:11
**55** [1] - 2:12
**56** [5] - 37:9, 37:12, 43:25, 155:8, 189:25

## 6

**6** [1] - 214:3
**60** [2] - 64:5, 179:23
**600** [1] - 3:12
**601** [1] - 1:22
**602** [1] - 39:25
**60603** [2] - 2:13, 2:22
**66** [1] - 27:3
**666** [1] - 27:7
**67** [7] - 94:1, 94:18, 94:20, 105:8, 106:6, 115:6, 115:7
**68** [3] - 50:11, 64:6, 124:6

## 7

**7** [2] - 59:15, 214:9
**712** [1] - 37:4
**72** [3] - 94:21, 130:4, 130:5
**75** [3] - 94:21, 105:18, 105:23
**766** [1] - 36:1
**767** [3] - 29:25, 30:6, 30:24
**77** [1] - 150:20
**779-5578** [1] - 1:23
**7th** [1] - 103:6

## 8

**8** [3] - 2:21, 4:20, 4:21
**80** [1] - 53:22
**85** [1] - 105:19
**88** [1] - 134:10

## 9

**9** [3] - 131:18, 213:1, 270:24
**90** [7] - 15:5, 54:15, 54:19, 108:13, 127:18, 130:8, 134:10
**95th** [1] - 52:21
**98** [1] - 37:16
**99** [3] - 190:13, 191:8, 191:13
**99th** [1] - 65:13
**9:30ish** [1] - 270:24

## A

**A&P** [2] - 143:17, 184:11
**abandoned** [1] - 261:8
**abandoning** [1] - 103:7
**abide** [2] - 25:20, 203:6
**abided** [1] - 104:2
**ability** [8] - 54:3, 127:24, 154:12, 154:15, 227:2, 256:15, 256:21, 272:14
**able** [16] - 5:18, 28:8, 32:24, 33:25, 39:17, 44:1, 53:25, 56:14, 113:20, 133:11,
141:17, 197:22, 203:14, 203:18, 204:14, 220:4
**above-entitled** [1] - 276:11
**absence** [7] - 21:11, 21:17, 59:5, 65:1, 154:14, 211:11, 211:24
**absent** [4] - 143:17, 166:17, 166:22, 192:16
**absolute** [1] - 242:3
**absolutely** [2] - 66:16, 275:25
**absorbed** [1] - 131:23
**academics** [2] - 33:18, 216:19
**accept** [10] - 58:15, 110:21, 110:24, 110:25, 111:9, 111:10, 184:9, 229:1, 245:22, 251:23
**acceptable** [2] - 245:1, 261:24
**acceptance** [1] - 109:11
**accepted** [1] - 110:9
**accident** [3] - 80:11, 250:22, 259:20
**accomplish** [4] - 117:22, 131:8, 251:14, 251:18
**accordance** [1] - 158:18
**according** [9] - 187:2, 189:5, 191:23, 208:10, 236:14, 237:17, 239:10, 241:16, 242:4
**account** [18] - 8:7, 29:19, 41:4, 53:14, 150:7, 188:25, 189:2, 189:3, 189:5, 189:7, 189:13, 191:1, 191:5, 199:13, 210:13, 210:15, 210:16
**accounting** [1] - 30:21
**accounts** [3] - 7:16, 28:20, 234:4
**accuracy** [1] - 30:8
**accurate** [3] - 5:1, 45:20, 228:8
**accused** [1] - 261:11
**achieve** [9] - 71:6, 80:8, 91:22, 118:24, 147:5, 147:9, 251:3, 258:18, 258:24
**achieved** [6] - 206:19, 207:1, 215:23, 236:19, 237:4, 258:19
**acknowledge** [4] - 28:25, 29:8, 39:12, 198:1
**acknowledged** [5] - 29:3, 44:24, 57:20, 57:21, 61:1
**acknowledges** [7] - 12:1, 12:8, 12:13, 22:18, 32:15, 50:23, 60:2
**acknowledging** [2] - 21:11, 49:23
**acquired** [2] - 174:17, 176:7
**acquiring** [2] - 175:5, 175:6
**acquisitions** [2] - 175:9, 175:17
**Acre** [205] - 3:17, 4:23, 7:20, 8:13, 8:19, 17:14, 19:11, 19:15, 19:25, 20:15, 24:14, 24:20, 25:17, 26:3, 26:5, 31:7, 34:5, 36:10, 36:14, 37:4, 37:11, 37:16, 37:25, 38:4, 38:7, 38:9, 38:10, 38:12, 38:15, 38:20, 39:3, 39:9, 39:12, 39:25, 40:1, 40:5, 40:11, 40:18, 40:22, 41:14, 41:24, 42:16, 43:3, 43:4, 43:9, 43:24, 46:10, 47:12, 47:13, 47:14, 47:22, 48:9, 55:4, 57:22, 59:17, 59:19, 60:13, 61:6, 61:12, 61:19, 61:21, 64:7, 64:10, 67:4, 67:8, 74:14, 107:25, 109:18, 113:14, 119:6, 120:11, 121:10, 123:12, 138:8, 141:5, 141:8, 141:23, 142:8, 142:13, 142:23, 142:24, 143:3, 144:24, 144:25, 145:4, 146:24, 146:25, 147:7, 147:8, 148:21, 148:22, 151:21, 155:10, 155:15, 155:16, 155:22, 156:23, 161:10, 161:17,
169:4, 169:8, 169:9, 169:11, 169:15, 169:16, 169:18, 169:20, 169:23, 170:4, 170:6, 170:8, 170:16, 170:17, 170:22, 170:24, 172:13, 172:14, 172:16, 172:18, 172:22, 172:25, 173:6, 173:10, 174:3, 174:8, 174:11, 174:13, 174:15, 174:18, 175:1, 175:14, 175:23, 176:9, 176:11, 177:19, 179:17, 181:21, 181:24, 182:3, 182:4, 182:24, 182:25, 183:6, 187:15, 192:14, 192:15, 192:19, 192:21, 192:23, 193:14, 193:24, 193:25, 194:12, 194:21, 195:2, 201:9, 201:25, 202:8, 203:5, 203:9, 204:9, 213:10, 215:14, 216:24, 216:25, 217:12, 218:12, 218:15, 218:21, 232:6, 236:1, 236:8, 237:6, 237:20, 237:21, 237:23, 238:1, 238:7, 238:10, 238:12, 238:17, 238:19, 238:22, 239:1, 239:6, 239:8, 239:10, 239:11, 239:14, 239:15, 239:17, 239:23, 240:2, 240:7, 240:9, 240:12, 243:1, 247:21, 250:13, 259:11, 270:12
**Acre's** [22] - 15:14, 19:3, 26:3, 36:7, 39:19, 41:6, 56:3, 59:23, 130:15, 145:1, 150:21, 170:16, 170:17, 174:7, 174:20, 175:4, 175:11, 175:18, 176:15, 192:14, 194:25, 238:10
**Act** [13] - 75:5, 235:15, 236:13, 247:12, 247:14, 247:16, 247:22, 248:7, 248:16, 250:1, 254:12, 263:11

**act** [12] - 24:24, 235:15, 247:13, 250:21, 259:19, 260:2, 261:18, 261:20, 261:25, 262:19, 275:4
**acted** [7] - 41:14, 42:16, 177:20, 225:15, 251:25, 253:3, 254:2
**acting** [10] - 42:4, 157:18, 169:20, 173:1, 173:4, 177:15, 230:1, 231:3, 231:8, 243:10
**actions** [17] - 8:23, 9:8, 10:16, 40:11, 83:14, 85:16, 85:18, 128:1, 128:18, 159:14, 176:15, 185:24, 249:13, 261:5, 262:11, 262:14, 262:15
**active** [4] - 20:19, 42:13, 42:21, 42:25
**actively** [2] - 42:9, 239:2
**activism** [1] - 189:8
**activist** [5] - 85:13, 85:23, 86:24, 132:17, 135:19
**activists** [8] - 86:6, 87:2, 94:6, 96:11, 111:10, 116:18, 160:7, 240:22
**activists'** [1] - 33:14
**activities** [5] - 30:19, 33:14, 46:15, 46:24, 62:3
**activity** [2] - 9:11, 243:7
**acts** [13] - 24:16, 24:19, 229:24, 230:13, 230:16, 231:6, 231:12, 231:15, 231:16, 260:24, 264:25, 265:2, 265:7
**actual** [5] - 66:25, 81:1, 231:8, 262:1, 262:2
**adamantly** [1] - 111:8
**add** [3] - 19:16, 68:24, 129:3
**added** [4] - 109:1, 118:16, 174:16, 176:4
**addendum** [2] - 155:21, 274:19, 275:2
**adding** [5] - 41:10,

108:23, 108:25, 175:3, 175:7
**addition** [2] - 70:24, 237:6
**additional** [5] - 41:4, 67:24, 120:14, 129:3, 135:8
**additionally** [1] - 48:13
**address** [9] - 4:4, 79:24, 79:25, 118:3, 127:11, 198:14, 240:25, 250:5, 264:4
**addressed** [4] - 6:2, 171:8, 181:25, 182:1
**addresses** [2] - 275:7, 275:9
**addressing** [4] - 70:8, 89:12, 128:23, 232:11
**Adele** [2] - 87:15, 107:21
**adhere** [1] - 27:1
**adhered** [1] - 163:11
**adhering** [1] - 240:6
**adjourned** [1] - 276:7
**adjusted** [2] - 112:14, 144:13
**adjustments** [1] - 181:25
**administrative** [1] - 262:9
**admire** [2] - 202:17, 203:25
**admission** [1] - 109:9
**admit** [1] - 135:20
**admits** [2] - 113:5, 187:5
**admitted** [14] - 54:21, 69:12, 70:4, 71:3, 75:2, 149:11, 220:13, 221:19, 223:23, 224:4, 224:23, 225:11, 226:6, 266:15
**admittedly** [1] - 70:14
**adopt** [7] - 86:4, 88:24, 90:15, 107:15, 163:4, 164:23, 253:22
**adopted** [9] - 9:24, 11:19, 87:22, 107:13, 111:16, 115:5, 153:17, 158:12, 159:11
**adopting** [1] - 153:20
**adoption** [1] - 42:10
**advance** [5] - 81:2,

81:10, 195:21, 195:25, 262:3
**advancement** [1] - 261:21
**advantage** [1] - 86:18
**adversary** [1] - 139:2
**advertises** [1] - 185:7
**advice** [1] - 19:10
**advise** [1] - 216:19
**Advisers** [1] - 103:3
**advises** [1] - 107:3
**advisors** [1] - 103:6
**Advisory** [33] - 9:20, 33:12, 33:19, 34:13, 34:15, 67:1, 86:13, 86:14, 87:17, 87:18, 87:19, 87:22, 87:24, 88:2, 88:8, 88:9, 88:12, 88:23, 88:25, 99:17, 102:20, 106:24, 107:13, 107:22, 111:1, 160:14, 161:2, 162:16, 162:17, 164:10, 207:14, 216:9, 241:22
**advisory** [1] - 57:13
**advocacy** [1] - 84:24
**advocate** [1] - 150:10
**affairs** [2] - 81:6, 162:9
**affect** [1] - 213:6
**affected** [2] - 141:10, 228:10
**affects** [2] - 40:13, 248:1
**affirmatively** [1] - 164:1
**afforded** [1] - 219:6
**afterthought** [1] - 169:12
**age** [1] - 11:4
**agencies** [1] - 241:24
**agenda** [10] - 14:1, 67:6, 100:13, 101:3, 101:10, 101:11, 101:15, 101:24, 217:2, 218:19
**agent** [6] - 155:15, 230:19, 230:22, 231:2, 231:3, 231:7
**agent's** [1] - 230:14
**agents** [8] - 229:24, 230:8, 230:10, 230:13, 231:7, 231:10, 231:12

**ago** [7] - 10:21, 60:21, 77:12, 139:16, 149:4, 185:20, 227:10
**agree** [21] - 20:5, 24:23, 26:13, 27:13, 35:12, 38:5, 38:12, 41:8, 68:21, 72:23, 109:10, 110:10, 115:19, 116:3, 174:3, 192:21, 192:23, 269:3, 269:5, 269:8, 270:23
**agreed** [31] - 11:21, 25:24, 26:17, 26:18, 26:19, 37:13, 38:13, 81:10, 82:22, 83:7, 83:19, 83:21, 88:19, 103:5, 103:15, 134:13, 147:7, 147:8, 155:22, 173:10, 203:7, 212:19, 222:18, 236:2, 237:22, 238:11, 238:13, 252:4, 252:6, 253:21
**agreeing** [2] - 25:20, 238:2
**agreement** [87] - 8:15, 8:20, 8:22, 17:23, 23:18, 23:21, 23:23, 23:24, 24:3, 24:5, 24:7, 24:8, 24:22, 25:1, 25:4, 25:5, 25:19, 25:20, 25:22, 26:3, 26:7, 27:9, 28:11, 28:12, 37:3, 37:5, 37:6, 46:15, 56:8, 56:9, 59:3, 80:4, 83:4, 86:21, 90:4, 91:22, 91:24, 92:13, 92:17, 93:16, 95:5, 95:13, 100:8, 104:13, 112:12, 115:20, 115:21, 146:18, 146:20, 146:21, 146:22, 146:24, 147:1, 157:22, 203:6, 232:11, 232:14, 235:12, 235:16, 235:18, 236:4, 236:6, 241:7, 242:13, 248:9, 248:12, 248:19, 249:5, 250:7, 250:23, 251:1, 251:6, 251:17, 251:22, 252:2, 252:9, 252:19, 253:4, 253:6, 253:24, 254:3, 254:6, 269:19
**agreements** [17] -

25:14, 26:5, 26:23, 27:1, 80:2, 82:7, 82:9, 82:11, 82:19, 82:21, 84:8, 84:10, 115:25, 116:12, 157:13, 242:17
**agricultural** [1] - 80:22
**agriculture** [1] - 149:12
**Agriculture** [2] - 35:7, 134:10
**ahead** [12] - 26:15, 53:17, 68:12, 77:8, 164:24, 169:24, 170:20, 221:1, 222:2, 231:22, 270:10
**AHERN** [7] - 2:20, 2:20, 132:14, 133:2, 135:17, 136:9, 136:14
**Ahern** [1] - 133:9
**aid** [3] - 266:2, 266:23
**aids** [2] - 223:9, 223:11
**ain't** [1] - 161:12
**aisle** [3] - 201:2, 201:18, 201:20
**aisles** [1] - 201:19
**ALAN** [1] - 2:3
**Albertsons** [8] - 2:7, 81:9, 143:14, 161:15, 184:10, 184:13, 217:7, 232:1
**alert** [1] - 83:15
**alerts** [1] - 83:16
**Alex** [1] - 118:3
**aLEXANDER** [1] - 3:4
**aligned** [1] - 88:17
**alike** [2] - 24:24, 252:1
**ALL** [1] - 273:5
**all's** [1] - 77:4
**allegation** [1] - 177:14
**allegations** [5] - 77:20, 102:3, 106:19, 179:25, 194:13
**allege** [2] - 143:25, 250:12
**alleged** [63] - 90:6, 95:8, 95:17, 106:15, 112:16, 141:9, 144:19, 144:25, 145:18, 148:2, 148:13, 148:14, 150:20, 170:18, 174:25, 176:25, 177:13, 177:19,

179:22, 180:8,
218:19, 235:16,
237:10, 237:17,
238:18, 240:3, 240:8,
248:24, 249:2,
249:11, 250:17,
251:16, 252:5, 252:8,
252:14, 252:17,
252:23, 254:1,
256:12, 256:25,
257:5, 257:9, 257:10,
257:12, 257:15,
257:20, 259:13,
260:11, 260:15,
260:22, 260:23,
263:18, 263:20,
264:2, 264:6, 264:10,
264:12, 264:14,
264:17, 265:12,
265:13, 265:22
**allegedly** [1] -
191:24
**aLLEN** [1] - 3:11
**allocating** [1] - 4:23
**allocation** [1] -
247:17
**allotment** [1] - 87:12
**allow** [7] - 34:25,
35:7, 35:10, 45:1,
75:7, 84:24, 101:23
**allowance** [14] - 9:1,
10:1, 10:4, 27:19,
32:19, 34:23, 52:8,
54:13, 58:21, 203:8,
209:16, 212:6,
218:18, 219:14
**allowances** [2] -
114:21, 114:25
**allowed** [5] - 72:16,
110:19, 132:18,
198:16, 275:15
**allowing** [4] - 35:1,
39:17, 133:20, 241:19
**allows** [1] - 198:14
**alluded** [2] - 205:16,
215:18
**almost** [9] - 17:11,
65:8, 144:17, 175:25,
184:7, 184:25, 192:4,
203:22
**alone** [9] - 43:13,
82:9, 82:17, 156:17,
221:7, 245:9, 258:14,
261:13, 261:15
**alternate** [2] - 62:22,
105:22
**alternative** [9] -
51:14, 75:3, 104:16,
110:18, 111:16,
206:19, 215:20,

215:23, 258:20
**amass** [1] - 53:25
**amazed** [1] - 217:16
**ameliorate** [1] -
39:13
**America** [1] - 237:12
**American** [1] - 87:16
**ammonia** [1] -
212:10
**Amon** [1] - 15:16
**amount** [3] - 18:16,
120:15, 126:13
**amounts** [1] - 112:22
**ample** [1] - 106:22
**analogies** [1] -
145:12
**analyses** [1] - 250:4
**analysis** [20] - 29:2,
41:3, 66:12, 101:5,
149:8, 149:23,
149:24, 149:25,
150:20, 153:9, 177:8,
178:12, 186:14,
190:18, 210:4,
211:19, 240:4, 259:7,
275:6, 275:12
**analyze** [1] - 112:25
**analyzed** [2] - 46:24,
239:21
**analyzing** [1] -
108:21
**Animal** [56] - 12:18,
14:16, 15:9, 15:19,
15:22, 30:25, 33:13,
34:14, 35:17, 57:3,
61:17, 64:25, 72:19,
78:11, 78:14, 78:16,
84:19, 87:21, 87:24,
88:7, 88:15, 90:23,
90:24, 93:25, 96:15,
99:3, 100:1, 107:2,
107:4, 108:1, 108:2,
115:10, 153:15,
154:8, 156:6, 157:21,
158:12, 158:18,
158:19, 160:25,
162:17, 163:1, 163:4,
163:11, 164:7,
164:10, 164:12,
171:24, 184:9,
185:12, 200:18,
205:22, 236:17,
236:20, 240:20, 241:4
**animal** [88] - 11:17,
11:23, 12:3, 12:15,
14:1, 30:21, 33:9,
33:14, 33:25, 57:5,
66:24, 67:6, 69:6,
69:16, 70:2, 70:8,
70:18, 72:15, 78:16,

84:13, 84:16, 85:6,
85:7, 86:5, 86:6, 86:7,
87:2, 87:5, 87:10,
87:13, 89:13, 89:16,
89:20, 89:24, 90:3,
90:7, 90:17, 91:3,
94:6, 96:11, 96:12,
97:16, 97:24, 98:12,
98:14, 103:24,
103:25, 106:24,
110:13, 111:10,
114:22, 114:24,
116:18, 132:17,
135:3, 135:4, 135:18,
153:21, 159:6, 160:6,
160:22, 162:11,
181:13, 181:14,
181:19, 182:15,
185:8, 185:9, 185:11,
185:15, 185:16,
189:8, 192:13, 194:4,
194:5, 200:20,
205:14, 217:2, 218:3,
218:5, 218:19, 239:3,
240:22, 240:24, 241:8
**animals** [7] - 97:17,
97:24, 97:25, 98:6,
98:7, 200:11
**announced** [1] -
224:25
**Annual** [1] - 213:24
**annually** [1] - 164:1
**answer** [65] - 30:1,
40:16, 66:22, 70:9,
71:19, 71:22, 75:11,
83:12, 84:6, 85:1,
98:2, 98:4, 98:6,
116:10, 117:5,
119:20, 130:13,
130:14, 133:13,
136:6, 140:8, 147:20,
147:22, 151:17,
152:3, 152:6, 152:8,
152:13, 152:15,
152:17, 152:25,
153:4, 159:8, 159:10,
165:9, 165:12,
165:16, 165:23,
166:4, 166:9, 167:7,
167:10, 167:17,
168:7, 168:21, 169:6,
171:16, 172:15,
172:17, 172:20,
174:5, 174:10,
176:19, 177:12,
178:3, 178:6, 186:3,
192:25, 193:4, 193:6,
193:8, 217:17,
219:20, 269:13,
271:15

**Answer** [4] - 71:8,
85:12, 85:19, 183:20
**answered** [5] -
40:17, 97:23, 119:18,
119:19, 121:23
**answering** [1] -
67:20
**answers** [2] - 86:19,
269:24
**Anthony** [1] - 18:23
**anticipate** [1] - 58:5
**anticompetitive** [30]
- 8:23, 9:8, 9:11, 9:17,
10:15, 30:19, 38:5,
46:14, 51:22, 51:23,
51:24, 52:5, 55:8,
55:10, 62:1, 62:3,
96:2, 111:24, 113:4,
141:15, 176:25,
180:20, 187:21,
206:9, 206:13, 215:7,
231:4, 236:25, 237:5,
259:9
**anticompetitively**
[2] - 177:15, 177:20
**ANTITRUST** [1] - 1:4
**Antitrust** [2] - 75:4,
235:14
**antitrust** [32] - 17:17,
17:23, 73:6, 75:6,
77:24, 79:6, 101:1,
101:22, 149:13,
214:24, 219:16,
231:10, 235:6,
247:10, 262:12,
262:13, 263:3, 263:5,
263:19, 263:23,
264:2, 264:7, 264:13,
264:15, 264:18,
264:21, 264:23,
265:3, 265:8, 265:10,
265:15, 265:22
**anytime** [3] - 20:13,
20:21, 42:6
**anyway** [1] - 69:18
**apologize** [2] -
113:1, 231:21
**apparent** [6] -
230:14, 230:17,
230:20, 231:2, 231:9,
231:13
**appealing** [1] - 21:1
**appearance** [1] -
227:22
**APPEARANCES** [2] -
2:1, 3:1
**appearances** [1] -
231:3
**appeared** [5] - 10:7,
169:11, 222:15,

222:16, 266:13
**applicable** [1] -
220:24
**application** [1] -
17:19
**applied** [6] - 9:1,
9:25, 27:19, 52:7,
209:15, 235:22
**applies** [3] - 48:17,
141:23, 235:3
**apply** [11] - 50:19,
85:15, 99:3, 139:25,
219:14, 220:20,
221:8, 235:3, 235:5,
246:4, 267:11
**appreciate** [5] -
77:18, 99:6, 136:14,
142:17, 196:15
**appreciates** [1] -
118:8
**appreciative** [1] -
77:21
**approach** [3] - 86:18,
89:22, 111:8
**approached** [1] -
167:17
**appropriate** [1] -
267:12
**approval** [1] - 108:14
**approve** [1] - 38:1
**approved** [1] -
107:20
**approving** [1] -
37:21
**April** [14] - 12:12,
12:23, 13:19, 20:3,
24:15, 36:16, 37:17,
43:24, 53:20, 153:24,
156:2, 157:22, 158:1,
203:2
**Arch** [1] - 3:6
**area** [1] - 255:11
**areas** [1] - 91:9
**arguably** [1] - 60:10
**argue** [2] - 112:21,
218:20
**argued** [2] - 134:22,
161:21
**arguing** [1] - 130:15
**argument** [13] - 49:1,
56:18, 67:25, 127:14,
131:24, 134:25,
135:1, 136:15,
150:17, 175:3,
197:10, 198:12,
217:19
**arguments** [14] -
5:21, 5:23, 6:13, 8:1,
9:13, 75:15, 125:12,
135:8, 135:13,

204:20, 220:14, 222:20, 233:17, 244:22

**Arizona** [3] - 115:5, 135:9, 176:8

**ARLENE** [1] - 3:14

**armchair** [1] - 124:17

**Armstrong** [18] - 7:21, 9:4, 34:12, 44:11, 54:6, 54:16, 54:20, 54:22, 63:6, 67:2, 87:8, 87:9, 102:22, 103:23, 107:8, 129:15, 207:12, 216:12

**ARNOLD** [1] - 2:3

**art** [1] - 209:7

**ARTHUR** [2] - 3:9, 3:13

**articles** [1] - 150:8

**articulated** [1] - 275:23

**artwork** [1] - 47:17

**ASI** [1] - 19:18

**aside** [4] - 116:12, 129:12, 207:8

**aspect** [4] - 100:7, 100:10, 254:23, 255:9

**aspects** [6] - 74:19, 95:19, 109:11, 219:12, 236:25, 254:22

**assembled** [2] - 147:15, 253:1

**asserted** [1] - 226:3

**asserting** [1] - 232:23

**assist** [1] - 246:13

**associated** [3] - 141:15, 147:14, 252:25

**ASSOCIATES** [1] - 2:20

**associates** [1] - 89:22

**association** [20] - 73:1, 78:20, 80:13, 80:19, 80:20, 81:5, 172:7, 229:14, 229:22, 238:24, 241:4, 260:18, 262:12, 262:14, 262:17, 262:18, 262:23, 263:2, 263:5, 263:6

**Association** [1] - 87:16

**association's** [1] - 262:11

**associations** [11] -

80:13, 80:16, 80:18, 80:25, 81:2, 81:12, 229:17, 230:5, 250:24, 262:3, 262:5

**assume** [2] - 62:5, 206:14

**assuming** [1] - 188:19

**assumption** [2] - 123:9, 123:11

**Atkins** [1] - 14:19

**Atlantic** [2] - 2:8, 232:1

**attach** [1] - 202:4

**attempt** [1] - 81:25

**attempting** [3] - 12:25, 111:3, 150:10

**attended** [4] - 15:13, 34:4, 70:24, 90:9

**attends** [1] - 36:21

**attention** [11] - 5:25, 9:12, 10:9, 67:22, 77:15, 111:2, 118:5, 133:1, 149:25, 191:19, 204:17

**attentive** [1] - 77:21

**attentiveness** [1] - 118:9

**audio** [11] - 70:5, 70:10, 71:10, 71:17, 97:22, 98:16, 167:12, 167:15, 167:24, 168:2, 168:11

**Audio** [9] - 71:5, 72:2, 85:11, 86:1, 117:2, 117:7, 167:3, 183:19, 183:22

**audit** [61] - 9:3, 10:2, 15:25, 19:8, 19:9, 19:12, 19:16, 19:18, 19:21, 21:9, 26:18, 26:21, 27:20, 38:16, 38:19, 38:21, 38:25, 39:2, 39:3, 39:7, 42:1, 54:7, 74:13, 74:15, 102:12, 102:13, 102:15, 102:16, 102:17, 102:18, 102:24, 102:25, 103:2, 103:3, 103:14, 103:17, 104:25, 105:3, 105:16, 105:18, 105:25, 106:21, 108:21, 109:13, 109:15, 109:23, 110:2, 110:11, 110:12, 110:16, 182:4, 190:3, 190:9, 203:2, 203:9, 206:2,

207:3, 212:7, 219:15

**audited** [2] - 44:15, 103:12

**audits** [28] - 25:25, 44:9, 44:12, 44:15, 96:25, 102:21, 102:22, 103:7, 103:8, 103:9, 103:13, 109:4, 109:15, 109:16, 109:19, 109:25, 110:5, 110:8, 110:10, 162:21, 162:23, 162:24, 207:15, 212:4, 235:24, 241:18

**August** [4] - 33:2, 52:19, 158:3, 213:1

**author** [1] - 225:14

**authority** [8] - 230:15, 230:17, 230:19, 230:20, 231:2, 231:9, 231:13

**automatic** [13] - 54:13, 103:18, 103:19, 103:22, 104:5, 104:6, 104:7, 104:12, 105:24, 106:2, 106:13, 109:4, 109:13

**available** [13] - 7:15, 45:9, 59:8, 110:11, 201:23, 224:14, 226:11, 236:21, 242:5, 252:20, 258:20, 265:25, 271:15

**Avenue** [1] - 2:21

**average** [2] - 105:7, 189:24

**averaged** [1] - 105:11

**averaging** [5] - 94:11, 94:12, 97:1, 105:10, 105:11

**avian** [1] - 55:6

**avoid** [2] - 84:15, 85:12, 85:25, 242:16

**avoidance** [1] - 86:17

**aware** [1] - 5:2

**awful** [1] - 132:11

**awkward** [1] - 225:8

---

# B

**B's** [3] - 121:22, 160:21, 184:25

**backfill** [3] - 62:11, 106:25, 156:9

**backfilled** [2] -

54:18, 108:4

**backfilling** [65] - 9:2, 10:1, 10:4, 15:5, 25:25, 26:17, 26:20, 27:19, 29:14, 42:14, 44:13, 52:8, 53:16, 54:4, 54:7, 54:8, 54:12, 54:15, 58:20, 62:10, 62:13, 66:17, 66:24, 67:6, 91:13, 91:14, 103:18, 104:6, 104:14, 106:22, 106:23, 107:5, 107:9, 107:17, 107:19, 107:23, 108:4, 108:7, 108:8, 108:13, 108:19, 109:5, 129:16, 134:17, 186:15, 186:19, 189:19, 190:11, 190:22, 191:1, 191:3, 191:7, 203:8, 206:1, 207:2, 209:16, 209:17, 212:5, 214:10, 214:11, 216:18, 217:1, 219:14, 235:22

**bankers** [1] - 274:8

**bankrupt** [1] - 175:25

**bans** [1] - 108:7

**bar** [1] - 175:11

**bare** [1] - 275:21

**bargain** [1] - 134:13

**bargained** [1] - 64:23

**bargaining** [4] - 114:12, 114:13, 239:9, 239:13

**BARNES** [5] - 3:10, 195:18, 195:24, 196:7, 196:23

**barns** [1] - 148:12

**barriers** [1] - 257:6

**base** [4] - 48:22, 66:19, 221:15, 221:18

**based** [58] - 58:20, 63:25, 66:4, 66:24, 67:17, 86:8, 86:23, 86:25, 87:1, 88:14, 96:12, 97:5, 99:20, 107:5, 107:12, 107:23, 110:12, 111:5, 111:7, 116:17, 120:8, 123:3, 128:2, 140:9, 149:16, 160:13, 191:7, 202:6, 206:6, 210:4, 216:18, 240:24, 241:8, 246:3, 260:18, 260:19, 268:4

**bases** [1] - 227:16

**basic** [3] - 77:24, 190:18, 234:9

**basis** [10] - 23:23, 57:15, 58:15, 123:11, 146:17, 225:15, 244:23, 245:4, 246:3, 250:22

**Baye** [63] - 29:2, 41:1, 43:17, 47:3, 50:1, 50:15, 51:12, 52:9, 52:23, 53:4, 63:15, 65:4, 65:11, 65:20, 65:23, 66:6, 66:11, 74:6, 80:15, 82:14, 84:1, 84:2, 112:25, 113:2, 113:5, 122:3, 122:12, 122:16, 123:8, 123:11, 124:6, 124:11, 124:12, 148:8, 151:14, 152:19, 175:1, 175:12, 177:22,

**background** [2] - 91:19, 183:8

**backwards** [2] - 117:21, 130:6

**bad** [6] - 17:9, 17:14, 94:18, 202:4, 261:12, 261:13

**badly** [1] - 212:11

**Baer** [1] - 15:17

**Baker** [3] - 121:5, 167:25, 168:3

**balance** [4] - 111:21, 127:22, 249:24, 258:25

**balanced** [1] - 234:12

**balancing** [4] - 55:10, 61:25, 62:16, 141:14

**ban** [44] - 9:2, 10:1, 10:4, 15:5, 25:25, 26:17, 26:20, 27:19, 42:14, 52:8, 53:16, 54:4, 54:7, 54:12, 54:15, 58:20, 62:10, 66:17, 66:24, 67:6, 91:12, 91:14, 106:25, 107:17, 107:18, 107:23, 109:5, 129:16, 156:9, 186:15, 186:19, 189:19, 190:11, 191:7, 203:8, 206:1,

178:11, 179:11, 179:12, 186:14, 186:25, 187:18, 187:19, 188:12, 188:15, 188:24, 192:10, 208:10, 208:23, 209:8, 209:23, 210:11, 210:22, 239:18, 239:20, 239:21, 246:8

**Baye's** [11] - 113:6, 123:5, 174:23, 186:14, 188:9, 188:16, 192:18, 208:19, 239:24, 240:4, 275:13

**bear** [3] - 158:19, 216:13, 259:9

**bearing** [1] - 216:5

**bears** [3] - 10:14, 10:17, 22:15

**beaters** [2] - 49:13, 49:14

**Beaters** [1] - 178:16

**beating** [1] - 180:21

**became** [5] - 58:21, 93:6, 237:24, 250:20

**become** [18] - 15:20, 25:16, 47:21, 47:25, 48:18, 48:19, 74:23, 134:25, 161:12, 165:8, 167:5, 238:3, 242:6, 242:9, 251:7, 259:21, 260:3, 263:5

**becomes** [2] - 48:3, 48:4

**BEFORE** [1] - 1:12

**began** [4] - 89:8, 188:15, 191:24, 260:8

**begin** [6] - 6:8, 6:25, 118:1, 137:21, 220:4, 271:6

**beginning** [11] - 44:25, 71:22, 71:24, 90:5, 91:2, 93:5, 112:5, 112:10, 155:6, 184:7, 220:17

**begins** [2] - 167:3, 167:15

**behalf** [11] - 67:25, 68:22, 68:24, 75:15, 77:17, 125:17, 157:18, 195:19, 218:6, 230:1, 230:18

**behavior** [4] - 87:11, 176:25, 253:14, 253:20

**behind** [6] - 11:8, 16:13, 71:25, 202:14, 217:8, 218:7

**beings** [1] - 200:25

**belabor** [1] - 150:24

**belied** [2] - 62:14, 89:4

**belief** [1] - 228:3

**believability** [2] - 226:22, 227:17

**believable** [5] - 156:15, 166:12, 210:7, 227:20

**believes** [3] - 15:25, 116:5, 194:21

**bell** [1] - 197:24

**BELL** [1] - 2:21

**Bell** [19] - 12:13, 12:16, 13:3, 13:21, 31:22, 31:24, 32:7, 32:8, 32:10, 32:24, 33:1, 33:11, 95:7, 95:11, 145:21, 169:12, 202:19, 209:4

**Bell's** [1] - 33:3

**belong** [2] - 147:13, 262:15

**belongs** [1] - 263:4

**below** [2] - 164:13, 236:5

**beneficial** [1] - 95:19

**benefit** [10] - 62:10, 96:21, 197:21, 249:25, 250:3, 255:25, 258:2, 258:14, 258:15, 265:7

**benefits** [38] - 62:4, 62:8, 95:25, 96:1, 96:8, 96:10, 96:23, 96:24, 111:20, 141:14, 180:7, 180:10, 180:18, 181:5, 206:14, 206:18, 206:21, 215:13, 215:16, 215:24, 236:15, 236:17, 236:19, 237:2, 237:4, 241:14, 249:23, 255:20, 258:16, 258:18, 258:19, 258:22, 258:24, 258:25, 259:3, 259:5, 259:8, 259:10

**benefitted** [3] - 96:4, 180:13, 258:4

**Benjamin** [1] - 138:13

**best** [18] - 10:23, 19:22, 77:23, 86:21, 86:23, 89:17, 108:6, 129:5, 134:14, 134:16, 151:23,

157:17, 185:11, 219:1, 220:8, 241:5, 247:17

**bet** [1] - 138:1

**Bethel** [3] - 71:14, 71:16, 152:9

**better** [12] - 28:25, 55:25, 61:2, 85:10, 85:22, 98:14, 100:17, 106:16, 140:5, 151:3, 181:7, 256:22

**better-quality** [2] - 55:25, 181:7

**Betty** [1] - 178:20, 179:7

**between** [37] - 5:22, 6:15, 23:18, 23:19, 31:2, 34:14, 48:2, 48:3, 49:17, 58:7, 58:11, 60:18, 63:16, 64:5, 69:14, 79:15, 82:17, 86:12, 146:18, 147:2, 212:25, 221:3, 228:16, 229:11, 229:19, 232:12, 233:24, 234:7, 244:19, 248:10, 250:8, 250:11, 250:23, 251:1, 253:7, 254:3, 254:6

**beware** [1] - 10:10

**beyond** [3] - 108:11, 126:15, 235:1

**bias** [3] - 222:10, 227:8, 267:18

**bid** [3] - 73:15, 73:16, 156:24

**bidders** [3] - 156:25, 157:19, 157:21

**bidding** [1] - 182:3

**big** [20] - 17:1, 17:2, 17:4, 48:7, 61:22, 61:23, 123:5, 132:11, 146:21, 149:17, 157:14, 161:9, 161:10, 163:9, 164:17, 167:19, 179:3, 204:8

**bigger** [3] - 145:23, 145:24, 145:25

**biggest** [5] - 161:11, 161:12, 203:10

**Bill** [2] - 68:21, 72:11

**billion** [2] - 112:9, 161:15

**binders** [1] - 274:2

**binding** [1] - 260:25

**binds** [1] - 25:22

**bird** [8] - 55:1, 105:8, 106:3, 106:4, 106:6,

106:7, 106:10, 106:14

**birds** [5] - 21:3, 71:7, 105:9, 108:9, 241:10

**Biscayne** [1] - 2:5

**bit** [26] - 5:17, 8:12, 8:14, 12:6, 12:11, 14:14, 16:21, 19:12, 52:5, 52:22, 64:19, 64:21, 66:14, 75:22, 121:3, 126:14, 129:21, 131:3, 131:11, 162:4, 224:21, 225:24, 270:16, 271:12, 271:25, 274:18

**BJORK** [1] - 2:12

**black** [3] - 205:4, 274:23, 275:14

**blame** [9] - 16:18, 16:19, 16:23, 17:1, 17:6, 56:3, 72:11, 78:13, 156:20

**blame-the-victim** [2] - 56:3, 72:11

**blasting** [1] - 181:19

**Blechman** [30] - 4:7, 6:21, 68:16, 68:21, 70:13, 72:11, 72:23, 82:1, 90:2, 90:5, 97:4, 110:4, 115:13, 118:5, 125:9, 131:8, 132:25, 133:10, 142:12, 146:13, 147:4, 163:14, 175:2, 184:16, 185:22, 193:23, 195:6, 196:22, 198:18, 219:24

**BLECHMAN** [39] - 2:3, 4:11, 5:9, 6:22, 75:17, 76:3, 127:10, 127:13, 128:8, 128:11, 128:14, 128:20, 128:24, 130:1, 130:12, 130:19, 131:10, 132:5, 132:13, 133:15, 133:19, 133:23, 195:7, 195:10, 196:14, 196:19, 196:24, 197:6, 197:20, 197:23, 198:1, 198:4, 198:20, 198:22, 270:11, 272:16, 273:2, 273:8, 273:13

**Blechman's** [1] - 193:22

**blobby** [2] - 273:6, 273:14

**block** [1] - 127:3

**blown** [1] - 182:6

**blue** [6] - 53:4, 175:11, 175:15, 210:1, 210:22, 210:24

**Board** [12] - 11:20, 15:12, 26:19, 26:24, 37:21, 38:11, 42:8, 45:13, 60:7, 174:7, 213:14, 243:3

**board** [7] - 44:20, 73:2, 78:6, 127:18, 171:3, 212:19, 238:8

**Bob** [1] - 16:7

**bodily** [1] - 212:13

**body** [2] - 229:23, 262:9

**boils** [1] - 140:4

**bona** [2] - 87:4, 241:8

**books** [1] - 221:24

**boost** [1] - 218:18

**boring** [1] - 95:22

**born** [1] - 49:3

**BORUCHOWITZ** [1] - 3:14

**bossy** [1] - 220:9

**bother** [4] - 121:15, 143:20, 165:5, 192:17

**bothered** [1] - 165:13

**bottled** [1] - 177:11

**bought** [8] - 49:25, 64:6, 64:11, 74:9, 113:14, 120:1, 178:19, 236:11

**Boulevard** [1] - 2:5

**bound** [2] - 230:13, 267:15

**box** [5] - 73:13, 125:18, 125:24, 131:18, 199:14

**boxes** [3] - 274:4, 274:8, 274:9

**boy** [1] - 208:21

**Boyle** [1] - 130:23

**brain** [1] - 19:14

**brand** [1] - 15:20

**BRANDON** [1] - 2:5

**break** [18] - 6:15, 6:16, 49:24, 54:11, 66:15, 68:5, 75:19, 75:24, 117:16, 126:11, 127:10, 127:11, 130:9, 131:9, 195:8, 195:12, 202:13, 207:23

**breaker** [1] - 119:8

**breakers** [4] - 48:1, 98:24, 100:18, 100:19

breaking [1] - 15:7
breaks [2] - 6:17,
75:23
BRIAN [1] - 2:16
bribing [2] - 182:18
brief [9] - 18:6, 43:6,
68:3, 75:19, 123:18,
130:11, 130:12,
193:23, 214:23
briefly [9] - 9:10,
22:23, 31:14, 43:5,
63:8, 63:14, 127:11,
214:21, 233:20
bright [3] - 9:24,
17:15, 17:17
bring [14] - 4:5, 5:7,
18:22, 70:23, 76:19,
83:6, 107:9, 116:23,
136:25, 138:23,
138:24, 195:12,
247:11
bringing [1] - 249:5
brings [2] - 89:23,
220:5
brittle [1] - 181:8
broad [2] - 24:4,
126:6
broke [9] - 37:19,
56:9, 61:24, 202:8,
203:3, 204:3, 204:6,
208:7, 208:8
broken [6] - 16:25,
47:16, 47:21, 48:19,
59:12, 212:13
brokers [1] - 120:16
Bros [11] - 69:1,
69:3, 69:5, 69:18,
69:19, 70:1, 70:16,
151:24, 167:2,
169:14, 237:16
brother [2] - 16:6,
218:16
brought [11] - 102:7,
126:19, 133:1, 133:2,
134:9, 134:22,
139:15, 140:14,
201:11, 231:25
Brown [6] - 85:9,
97:20, 110:22,
162:13, 164:4, 164:8
brown [1] - 123:23
Brown's [1] - 99:12
Brownsville [1] -
200:22
bucket [2] - 40:20,
136:11
buckets [1] - 77:24
build [1] - 108:19
built [4] - 174:16,
176:5, 176:7, 194:19

bunch [3] - 201:9,
204:11, 215:14
burden [50] - 4:23,
22:24, 23:6, 23:10,
49:7, 79:2, 79:3, 79:8,
79:10, 79:13, 79:14,
79:17, 79:19, 95:16,
111:18, 111:22,
122:22, 124:23,
139:12, 139:13,
139:15, 141:21,
142:2, 148:7, 148:25,
149:1, 170:5, 177:1,
177:21, 186:5, 192:7,
193:14, 193:15,
193:16, 193:18,
193:19, 193:20,
215:6, 219:17,
232:20, 233:2,
233:10, 234:11,
234:14, 240:12,
255:12, 259:9, 267:12
burdens [1] - 234:10
burdensome [1] -
137:23
Burger [4] - 116:21,
153:20, 163:3, 188:22
Burger's [1] - 94:21
burning [1] - 30:1
bush [1] - 145:22
business [22] -
21:14, 41:21, 56:20,
56:23, 74:24, 74:25,
101:12, 112:20,
120:18, 158:10,
200:18, 201:8,
201:13, 238:10,
243:14, 253:22,
254:17, 263:4,
263:14, 265:17,
265:18, 265:20
businesses [5] -
81:1, 232:17, 248:15,
262:1
but-for [8] - 187:20,
187:21, 188:3,
188:10, 188:16,
189:16, 211:10
Butt [3] - 2:8, 159:17,
232:2
buy [20] - 49:23,
49:24, 56:16, 93:8,
93:11, 93:13, 113:20,
114:17, 124:3, 159:1,
161:17, 161:19,
179:6, 179:9, 181:12,
185:1, 185:2, 201:4,
201:16
buyer [8] - 60:19,
71:15, 101:6, 101:7,

157:14, 165:10,
166:7, 171:1
buyers [5] - 114:12,
114:13, 120:16,
236:21, 243:8
buying [2] - 14:13,
40:7
BY [6] - 2:10, 2:16,
2:20, 3:3, 3:10, 3:14

C

C&S [1] - 2:23
C.A.T [1] - 1:25
Cage [1] - 163:9
cage [61] - 9:1, 9:25,
10:4, 12:17, 27:19,
32:18, 34:23, 35:13,
44:13, 47:19, 52:8,
54:9, 54:12, 58:21,
71:3, 94:15, 94:20,
99:19, 103:18, 104:6,
104:12, 104:13,
104:15, 105:5, 105:6,
105:12, 105:14,
105:24, 106:2,
106:12, 106:20,
110:15, 114:25,
155:7, 162:25, 176:6,
176:8, 176:9, 181:6,
181:7, 188:24, 189:1,
189:2, 189:10,
189:12, 189:18,
189:21, 189:25,
190:2, 190:10,
191:12, 203:8,
209:16, 212:6,
218:18, 219:14,
235:22
cage-free [2] - 176:8,
176:9
caged [1] - 55:23
cages [10] - 21:1,
32:19, 41:6, 92:23,
94:13, 94:14, 105:9,
108:9, 154:18, 214:10
CAIN [10] - 2:16,
68:1, 68:6, 68:10,
68:13, 70:11, 71:11,
72:3, 129:3, 129:7
Cain [2] - 68:11,
68:15
CAIN-MANNIX [10] -
2:16, 68:1, 68:6,
68:10, 68:13, 70:11,
71:11, 72:3, 129:3,
129:7
Cain-Mannix [2] -
68:11, 68:15
cake [1] - 49:16

Cal [18] - 14:12,
14:13, 15:10, 26:4,
27:8, 45:16, 114:6,
148:16, 150:12,
157:1, 159:22,
159:23, 159:25,
160:2, 203:10, 204:9,
237:11
Cal-Maine [18] -
14:12, 14:13, 15:10,
26:4, 27:8, 45:16,
114:6, 148:16,
150:12, 157:1,
159:22, 159:23,
159:25, 160:2,
203:10, 204:9, 237:11
calculate [1] -
124:12
calculated [2] -
105:8, 122:20
calculation [4] -
189:19, 191:6, 191:7,
191:15
calculations [3] -
123:3, 189:17
calculus [1] - 201:5
California [4] -
115:7, 115:8, 135:9,
184:4
cameras [1] - 104:22
candid [1] - 10:25,
58:7
candidly [6] - 11:8,
15:15, 29:3, 132:13,
208:15, 220:2
candor [3] - 29:9,
132:1, 198:1
cannot [12] - 17:2,
99:23, 115:25,
193:14, 225:5, 230:9,
240:2, 240:10,
258:22, 262:18, 271:6
canyon [3] - 140:11,
140:13, 141:3
canyons [1] - 140:17
capable [4] - 63:11,
230:7, 230:11, 262:12
capacity [4] - 56:15,
56:24, 108:14, 203:13
captain [1] - 197:5
Care [2] - 158:19,
200:19
care [6] - 73:22,
99:19, 200:20,
200:23, 200:24,
200:25
cared [2] - 73:20,
218:5
career [1] - 266:23
careful [2] - 12:14,

136:12
carefully [5] - 19:22,
78:17, 105:5, 227:25,
268:1
Carolina [1] - 176:6
carried [2] - 25:1,
151:19
carries [1] - 160:15
carry [3] - 19:19,
160:15, 252:5
cars [1] - 119:13
CARTER [1] - 3:11
carton [5] - 21:21,
158:19, 158:23,
160:18, 179:9
cartons [2] - 110:1,
179:6
case [102] - 6:10,
7:11, 7:14, 7:20, 8:11,
11:5, 11:10, 16:20,
18:5, 18:11, 18:21,
24:3, 34:2, 35:6,
46:25, 54:25, 65:17,
66:20, 72:11, 74:21,
77:16, 78:6, 78:7,
95:3, 97:4, 97:5, 97:9,
109:8, 112:12,
114:13, 118:6,
118:10, 120:1,
120:10, 121:14,
121:22, 122:1,
122:13, 125:12,
125:15, 127:2,
137:24, 138:4, 138:5,
139:21, 140:2,
140:15, 141:25,
142:19, 144:5,
145:17, 149:10,
150:1, 150:3, 153:13,
153:14, 166:25,
170:19, 182:21,
184:11, 185:19,
192:5, 193:2, 194:6,
194:11, 194:19,
195:13, 198:14,
198:17, 198:25,
199:5, 199:8, 201:12,
208:19, 218:23,
222:3, 227:7, 227:24,
229:10, 229:19,
231:24, 232:21,
233:23, 234:3, 235:6,
235:9, 239:2, 240:19,
243:6, 246:1, 246:7,
247:9, 247:12, 250:9,
265:23, 267:23,
268:10, 270:1,
271:14, 275:2, 275:3
cases [5] - 194:9,
234:5, 235:3, 235:4,

274:25
**cash** [2] - 22:10, 22:22
**casting** [1] - 222:1
**catastrophe** [1] - 15:6
**catastrophes** [1] - 15:4
**catastrophic** [7] - 54:14, 54:18, 54:24, 54:25, 108:8, 108:10, 108:17
**categories** [2] - 97:18, 98:1
**category** [5] - 166:10, 226:7, 226:8, 226:9, 230:4
**cattle** [1] - 200:11
**caught** [3] - 116:13, 128:16, 182:18
**causation** [1] - 263:16
**caused** [12] - 41:5, 64:14, 75:8, 79:20, 122:15, 163:3, 237:5, 248:14, 255:8, 255:16, 264:24, 265:6
**causes** [2] - 87:6, 264:16
**causing** [2] - 236:12
**cautioning** [1] - 13:3
**cautions** [1] - 12:16
**CCF** [1] - 171:1
**celebration** [1] - 200:1
**centerpiece** [1] - 153:13
**central** [6] - 100:6, 100:7, 163:1, 163:10, 222:1, 247:16
**Centre** [1] - 2:17
**cents** [1] - 22:10
**CEO** [2] - 98:19, 99:11
**certain** [15] - 45:2, 65:13, 66:16, 82:4, 97:18, 97:25, 150:8, 223:19, 226:6, 226:13, 234:1, 241:24, 246:13, 268:24
**certainly** [16] - 110:2, 113:16, 114:22, 129:13, 129:17, 138:6, 138:7, 141:22, 169:10, 171:6, 212:11, 212:13, 275:11, 275:12, 275:23
**certification** [3] -

157:23, 160:16, 167:8
**Certified** [190] - 9:1, 9:10, 9:15, 9:24, 11:15, 12:2, 12:9, 12:16, 13:1, 15:25, 21:4, 21:11, 22:3, 24:15, 25:15, 25:16, 25:18, 25:21, 25:23, 36:16, 36:24, 37:5, 37:11, 37:14, 37:17, 39:11, 39:16, 43:11, 43:22, 44:14, 53:21, 56:11, 57:2, 58:1, 58:4, 59:2, 59:18, 61:15, 61:16, 61:20, 62:22, 66:23, 67:5, 69:5, 69:14, 69:20, 70:1, 70:14, 71:13, 71:21, 72:12, 73:18, 73:23, 74:17, 78:10, 86:9, 89:3, 89:8, 91:24, 91:25, 92:5, 92:7, 92:9, 92:12, 93:20, 95:5, 96:8, 96:9, 96:14, 96:17, 100:7, 101:20, 103:12, 107:4, 108:21, 109:6, 109:10, 111:20, 114:9, 114:10, 114:16, 125:10, 140:23, 145:24, 146:2, 147:8, 147:24, 148:9, 153:15, 154:7, 154:20, 154:23, 155:4, 155:6, 155:11, 155:23, 156:10, 156:11, 156:13, 157:20, 157:24, 158:2, 158:20, 158:24, 159:6, 159:12, 160:7, 160:25, 161:20, 162:2, 164:2, 165:7, 165:8, 166:16, 166:18, 168:6, 168:17, 169:23, 170:22, 171:15, 171:23, 172:13, 172:14, 174:25, 175:23, 176:11, 180:24, 181:10, 181:17, 182:8, 182:25, 183:3, 183:4, 183:23, 184:18, 185:3, 185:6, 185:18, 185:23, 187:10, 187:22, 187:23, 188:2, 188:18, 189:9, 189:18, 189:22, 190:12, 191:4,

192:12, 194:4, 197:11, 200:19, 202:15, 202:23, 203:7, 204:18, 204:23, 205:7, 205:13, 207:6, 207:10, 208:4, 214:3, 214:6, 216:17, 217:1, 217:22, 235:23, 236:25, 237:8, 238:9, 238:21, 238:22, 239:5, 239:8, 239:25, 240:11, 240:17, 241:6, 241:13, 241:15, 241:16, 241:20, 242:1, 242:12, 243:7, 248:22, 253:11
**certified** [91] - 16:24, 21:15, 26:25, 29:20, 39:12, 39:16, 39:18, 55:21, 56:7, 56:10, 57:21, 70:15, 73:14, 93:2, 93:7, 93:8, 93:9, 93:10, 93:11, 93:13, 93:15, 113:7, 113:9, 113:12, 113:14, 113:15, 113:16, 113:17, 113:20, 113:23, 113:24, 113:25, 114:4, 114:6, 114:19, 125:22, 150:15, 155:4, 155:5, 155:11, 155:13, 155:17, 155:19, 155:24, 156:1, 156:2, 156:5, 157:1, 157:2, 157:3, 157:4, 157:11, 157:12, 159:16, 159:23, 160:18, 160:19, 167:10, 171:20, 181:3, 181:12, 184:7, 184:22, 185:5, 185:9, 192:8, 218:24, 219:10, 237:24, 237:25, 238:3, 238:5, 238:6, 239:11, 240:6, 240:7, 240:10, 242:4, 242:5, 242:6, 242:7, 242:8, 242:9, 242:10, 242:11
**certify** [2] - 96:18, 276:10
**cetera** [3] - 148:17, 230:3
**chain** [9] - 80:21, 81:14, 120:6, 156:18, 159:18, 199:21, 199:22, 199:23, 200:12

**Chain** [1] - 154:2
**chains** [12] - 81:9, 121:12, 121:14, 121:17, 124:3, 153:23, 157:16, 159:16, 162:5, 184:9, 185:2, 241:2
**chair** [1] - 118:15
**challenge** [4] - 65:19, 66:22, 199:10, 206:4
**challenged** [31] - 62:3, 64:13, 96:3, 96:5, 96:23, 151:9, 168:18, 180:12, 180:14, 216:7, 247:20, 248:20, 248:22, 249:18, 249:20, 249:25, 254:12, 255:15, 255:23, 256:1, 256:3, 257:17, 257:22, 257:25, 258:3, 258:5, 258:11, 258:15, 258:23, 259:3, 259:5
**challenging** [2] - 169:19, 206:9
**championed** [1] - 216:20
**chance** [1] - 136:14
**change** [15] - 39:22, 40:9, 40:20, 48:1, 63:18, 63:23, 163:4, 196:10, 268:3, 268:6
**changed** [3] - 11:16, 188:21, 225:18
**changes** [4] - 12:18, 40:21, 65:3, 188:24
**changing** [1] - 60:20
**channel** [1] - 113:7
**channeling** [1] - 11:23
**character** [1] - 227:23
**charge** [2] - 256:19, 256:21
**charged** [1] - 256:16
**Charm** [2] - 148:16, 237:11
**chart** [7] - 64:9, 112:3, 112:8, 112:24, 174:19, 209:20, 209:24
**cheaper** [1] - 242:11
**check** [10] - 13:16, 73:12, 125:17, 125:18, 125:24, 126:1, 129:23, 129:24, 140:16
**checkbox** [2] - 73:9,

73:11
**checklist** [1] - 228:5
**checks** [1] - 272:23
**cherry** [1] - 18:14
**cherry-picking** [1] - 18:14
**chewing** [2] - 129:20, 231:22
**Chicago** [2] - 2:13, 2:22
**chicken** [3] - 98:9, 98:10, 107:9
**chickens** [6] - 21:2, 100:2, 100:3, 105:7, 111:5, 200:11
**chief** [3] - 71:15, 139:21, 143:1
**children** [2] - 109:21, 194:18
**choice** [14] - 51:9, 55:19, 69:14, 70:14, 96:7, 96:17, 131:11, 167:21, 180:16, 203:18, 241:15, 258:7, 258:12
**choices** [8] - 17:4, 42:3, 56:14, 201:3, 201:24, 204:6, 204:7, 208:9
**choose** [6] - 13:15, 42:24, 44:20, 81:18, 81:21, 242:8
**chose** [9] - 22:3, 35:2, 42:3, 42:24, 43:18, 58:16, 165:10, 241:12, 242:6
**chosen** [1] - 222:2
**Christmas** [1] - 145:14
**chronicles** [3] - 29:12, 31:15, 45:14
**chronology** [1] - 214:11
**circled** [1] - 53:9
**circulated** [2] - 115:23, 224:25
**circumstance** [1] - 234:5
**circumstances** [5] - 108:12, 136:18, 228:1, 230:25, 252:22
**circumstantial** [6] - 244:7, 244:14, 244:18, 245:6, 252:15, 252:21
**circumstantially** [1] - 225:21
**cite** [1] - 185:12
**citing** [2] - 161:7, 166:13

**citizens** [1] - 184:3
**civil** [3] - 231:24, 235:3, 235:6
**claim** [29] - 23:5, 77:25, 79:6, 81:24, 104:17, 125:13, 139:15, 146:25, 166:18, 174:13, 178:10, 178:13, 181:17, 184:15, 185:22, 206:21, 232:23, 232:24, 234:16, 234:18, 235:18, 236:1, 236:4, 236:7, 236:23, 240:10, 250:9, 250:10
**claimed** [9] - 55:11, 71:12, 206:18, 206:25, 236:8, 237:2, 237:3, 252:4, 258:21
**claiming** [5] - 148:14, 182:19, 188:18, 206:21, 215:24
**claims** [13] - 70:1, 148:9, 155:18, 180:3, 184:20, 190:8, 232:20, 233:1, 234:2, 234:6, 239:9, 239:11, 267:13
**clarification** [1] - 98:21
**classic** [1] - 38:4
**clause** [1] - 4:22
**clean** [1] - 131:3
**clear** [25] - 17:7, 28:3, 44:6, 49:3, 58:7, 82:6, 86:15, 88:6, 88:22, 89:1, 89:25, 97:10, 99:22, 102:14, 108:16, 111:15, 114:14, 142:18, 152:23, 156:4, 157:9, 164:7, 164:8, 180:11, 218:10
**clearer** [5] - 86:3, 90:16, 97:21, 99:12, 110:22
**clearly** [7] - 58:2, 84:20, 103:24, 106:2, 129:10, 132:22, 202:10
**Clerk** [1] - 4:1
**CLERK** [18] - 4:16, 4:18, 4:20, 5:10, 75:25, 76:21, 90:20, 127:6, 130:25, 137:1, 195:15, 198:3, 272:2, 272:6, 272:24, 274:6, 274:10, 274:13

**clerks** [2] - 272:19, 273:4
**cleverness** [1] - 202:18
**click** [1] - 103:10
**client** [4] - 68:25, 101:19, 101:23, 104:20
**clients** [2] - 185:24, 224:7
**clip** [20] - 70:5, 70:10, 71:5, 71:10, 71:17, 72:2, 85:11, 86:1, 97:22, 98:16, 117:2, 117:7, 167:3, 167:12, 167:15, 167:24, 168:2, 168:11, 183:19, 183:22
**clock** [1] - 117:20
**close** [6] - 5:25, 11:9, 29:15, 127:4, 131:18, 214:11
**closed** [1] - 202:14
**closely** [3] - 88:17, 89:7, 191:20
**closer** [1] - 122:23
**closet** [1] - 118:15
**closing** [28] - 5:21, 5:23, 6:6, 6:13, 8:1, 9:13, 13:10, 17:25, 18:11, 25:9, 67:24, 75:15, 119:19, 124:9, 125:8, 127:14, 127:15, 129:14, 129:24, 134:4, 135:23, 146:13, 150:17, 199:17, 202:2, 204:17, 204:20, 216:6
**closings** [1] - 198:16
**cloud** [1] - 146:8
**CM** [2] - 1:21, 276:14
**Co** [2] - 2:6, 2:7
**co** [35] - 9:7, 43:5, 43:14, 43:16, 44:9, 44:16, 45:18, 46:1, 64:8, 64:11, 70:12, 74:9, 75:8, 128:25, 141:9, 177:20, 205:24, 235:12, 236:2, 237:10, 237:18, 254:1, 254:7, 256:13, 256:25, 257:5, 257:12, 257:15, 257:20, 261:6, 262:13, 263:18, 264:19, 265:12, 265:13
**co-conspirator** [2] -

44:9, 262:13
**co-conspiratorial** [1] - 265:12
**co-conspirators** [28] - 9:7, 43:5, 43:14, 43:16, 44:16, 45:18, 46:1, 64:8, 64:11, 70:12, 141:9, 177:20, 205:24, 235:12, 236:2, 237:10, 237:18, 254:1, 254:7, 256:13, 256:25, 257:5, 257:12, 257:15, 257:20, 261:6, 264:19, 265:13
**co-conspirators'** [1] - 263:18
**co-counsel** [1] - 128:25
**co-Plaintiffs** [2] - 74:9, 75:8
**coat** [1] - 225:17
**Coca** [1] - 177:9
**Coca-Cola** [1] - 177:9
**coincidence** [1] - 204:4
**Coke** [1] - 177:14
**Cola** [1] - 177:9
**cold** [3] - 225:12, 225:21, 226:2
**collaborated** [1] - 89:2
**collaboration** [2] - 90:11, 90:12
**collaborative** [3] - 89:22, 90:1, 91:8
**collapsed** [1] - 189:4
**colleague** [2] - 68:20, 213:4
**colleagues** [3] - 77:17, 123:5, 128:9
**collect** [2] - 196:3, 270:22
**collected** [2] - 196:1, 226:9
**collective** [1] - 262:21
**collectively** [1] - 77:15
**colonies** [1] - 108:4
**Colony** [1] - 108:3
**colored** [1] - 149:18
**Columbus** [1] - 3:16
**combination** [8] - 23:18, 146:16, 232:12, 232:14, 235:21, 248:10, 248:12, 248:19
**combinations** [1] -

247:23
**combine** [1] - 19:25
**combined** [4] - 147:25, 237:20, 237:22, 257:1
**comfort** [1] - 65:25
**coming** [15] - 4:8, 86:3, 86:22, 94:6, 120:14, 121:15, 130:23, 131:2, 145:13, 171:3, 216:14, 244:12, 246:25, 251:21
**commended** [1] - 88:23
**commends** [1] - 88:13
**comment** [2] - 205:17, 205:21
**commentary** [1] - 127:19
**comments** [2] - 128:4, 162:18
**commerce** [3] - 248:1, 248:3, 248:5
**commercial** [2] - 265:19, 265:21
**commissioned** [1] - 240:23
**commitment** [28] - 25:18, 25:20, 25:22, 26:3, 26:4, 27:1, 27:8, 28:9, 28:12, 28:14, 29:19, 30:14, 30:20, 37:3, 37:4, 37:6, 80:7, 118:24, 147:3, 147:5, 147:9, 160:21, 185:16, 192:12, 192:13, 194:5, 203:6, 251:2
**committed** [3] - 69:22, 88:20, 185:7
**Committee** [48] - 9:20, 15:24, 15:25, 16:8, 29:6, 33:12, 33:19, 34:3, 34:13, 34:16, 36:21, 37:22, 42:12, 45:13, 67:1, 69:24, 86:13, 86:14, 87:18, 87:19, 87:21, 87:23, 88:7, 88:8, 88:10, 88:12, 88:15, 88:18, 88:21, 88:23, 88:24, 88:25, 99:15, 99:18, 102:20, 106:25, 107:2, 107:22, 110:24, 111:1, 111:9, 160:14, 161:2, 207:14, 216:9, 241:23

**committee** [9] - 37:25, 86:12, 87:9, 88:13, 90:7, 90:8, 99:21, 240:24, 241:1
**Committee's** [5] - 16:9, 87:22, 87:25, 88:2, 107:13
**committees** [3] - 213:15, 238:8, 243:4
**commodity** [4] - 17:2, 68:25, 109:18, 165:22
**common** [36] - 8:7, 22:8, 28:9, 28:12, 28:14, 29:19, 30:14, 30:20, 49:10, 62:15, 79:1, 80:7, 81:3, 85:23, 100:1, 100:3, 102:16, 114:8, 118:24, 119:9, 119:13, 147:3, 147:5, 147:9, 221:20, 223:15, 244:23, 245:14, 247:5, 249:4, 251:2, 251:14, 251:18, 255:3, 262:3
**commonsense** [2] - 92:2, 93:18
**communicated** [1] - 225:2
**communication** [1] - 225:7
**communities** [1] - 158:11
**community** [5] - 85:15, 153:17, 164:13, 184:21, 229:12
**companies** [33] - 17:1, 17:2, 17:4, 37:16, 46:11, 61:22, 69:2, 72:20, 73:2, 73:22, 74:2, 75:6, 75:7, 85:14, 85:15, 85:18, 146:1, 156:16, 156:17, 161:9, 161:10, 161:16, 161:18, 161:25, 177:15, 182:17, 194:14, 203:16, 204:6, 233:23, 237:8, 250:6, 250:24
**Company** [9] - 2:8, 2:8, 2:23, 193:3, 194:3, 232:2, 232:3, 232:5, 237:16
**company** [22] - 20:12, 20:20, 36:10, 36:11, 56:22, 61:7, 61:8, 74:16, 85:12,

85:19, 85:20, 89:21, 111:6, 113:25, 155:17, 156:18, 157:11, 159:18, 165:8, 171:13, 193:25, 194:17

**compare** [3] - 58:6, 59:10, 81:13

**compared** [3] - 105:13, 191:9, 239:14

**compelled** [1] - 127:14

**compelling** [6] - 23:8, 29:1, 40:16, 43:20, 51:10, 59:6

**compete** [4] - 78:15, 84:15, 85:7, 262:21

**competing** [3] - 27:12, 27:14, 84:14

**competition** [49] - 21:9, 21:13, 21:15, 21:18, 22:17, 34:25, 35:2, 38:6, 65:1, 65:2, 84:15, 86:17, 95:20, 95:24, 96:1, 96:4, 104:17, 111:22, 151:11, 152:20, 180:13, 200:1, 201:13, 201:15, 201:20, 215:10, 247:15, 247:17, 249:19, 249:21, 254:15, 254:18, 254:20, 255:17, 255:18, 255:19, 255:20, 256:10, 257:18, 257:23, 258:1, 258:2, 258:4, 258:21, 259:8, 264:25, 265:1, 265:6

**competitive** [25] - 112:1, 141:14, 180:7, 180:8, 180:10, 249:23, 249:24, 249:25, 250:2, 250:3, 255:19, 255:25, 256:4, 256:17, 258:16, 258:24, 258:25, 259:1, 259:2, 259:3, 259:4, 259:5, 265:6

**competitively** [1] - 262:24

**competitor** [1] - 213:4

**competitors** [31] - 11:20, 26:10, 26:11, 35:25, 37:12, 38:4, 38:7, 43:3, 58:9, 69:24, 80:25, 81:2,

81:8, 81:13, 81:14, 81:16, 173:4, 174:13, 192:21, 192:23, 212:19, 251:22, 253:23, 253:25, 256:9, 257:3, 257:7, 257:9, 262:2, 262:14, 262:16

**compile** [1] - 19:11

**complain** [1] - 102:14

**complained** [2] - 96:22, 110:8

**complaining** [1] - 134:2

**complaint** [2] - 105:10, 109:24

**complaints** [1] - 163:5

**complete** [4] - 91:10, 108:17, 108:18, 140:7

**completed** [1] - 261:8

**completely** [7] - 53:12, 92:6, 95:9, 95:10, 136:13, 182:6, 268:25

**compliance** [5] - 106:13, 106:14, 134:12, 155:4, 160:25

**complied** [2] - 163:10, 181:14

**comply** [9] - 93:12, 155:10, 155:12, 156:22, 158:4, 158:14, 185:17, 271:14

**component** [2] - 205:14, 269:6

**components** [3] - 235:19, 236:3, 237:9

**comprised** [1] - 168:16

**compulsion** [1] - 271:1

**compulsive** [1] - 76:16

**comradery** [1] - 68:18

**con** [1] - 30:18

**concept** [10] - 16:3, 63:17, 99:14, 100:7, 103:14, 116:11, 132:2, 224:22, 225:9, 235:4

**concepts** [2] - 212:2, 261:18

**concern** [9] - 94:7, 127:22, 199:16, 247:12, 274:18,

275:3, 275:7, 275:10, 275:18

**concerned** [6] - 16:9, 33:15, 34:24, 69:15, 164:18, 221:11

**concerning** [2] - 102:4, 248:3

**concerns** [9] - 12:9, 15:23, 36:15, 36:18, 36:23, 37:1, 70:2, 106:24, 159:7

**conclude** [4] - 244:16, 247:6, 257:19, 257:21

**concluded** [1] - 183:16

**conclusion** [10] - 8:1, 13:10, 66:21, 72:7, 114:8, 173:1, 223:20, 223:21, 226:1, 245:12

**conclusions** [2] - 176:14, 192:18

**concocted** [2] - 146:5, 146:6

**condition** [1] - 244:6

**conditions** [6] - 25:21, 37:14, 47:24, 100:3, 253:16, 253:23

**conduct** [29] - 38:5, 39:4, 39:17, 57:24, 64:3, 64:13, 64:14, 134:24, 147:13, 169:2, 170:15, 170:17, 184:20, 211:24, 227:22, 252:24, 254:5, 254:9, 255:23, 256:1, 259:10, 260:12, 261:11, 261:22, 263:9, 263:20, 264:10, 265:12, 265:13

**conducting** [1] - 259:7

**confer** [3] - 128:9, 128:25, 197:7

**conference** [1] - 164:11

**confidence** [4] - 190:13, 191:8, 191:13, 241:17

**confident** [2] - 27:16, 151:19

**confidential** [1] - 262:24

**configured** [1] - 94:13

**confirm** [1] - 51:19

**confirmed** [1] -

173:9

**confirming** [1] - 30:8

**conflate** [3] - 205:6, 205:7, 214:19

**conflated** [1] - 217:19

**conflates** [1] - 9:13

**conflating** [1] - 204:18

**conflation** [1] - 10:10

**conflict** [1] - 246:18

**confused** [2] - 171:7, 214:18

**confusing** [1] - 128:18

**congratulating** [1] - 28:6

**Conopco** [1] - 2:8

**consciously** [1] - 199:18

**consequence** [1] - 103:25

**conservative** [1] - 114:23

**consider** [60] - 7:8, 7:22, 7:24, 8:4, 8:7, 12:23, 13:5, 14:7, 15:12, 34:23, 47:12, 57:11, 66:1, 66:3, 73:4, 86:17, 95:3, 96:4, 143:18, 180:13, 188:25, 197:17, 213:21, 222:23, 223:16, 224:20, 225:1, 226:17, 227:1, 227:4, 227:9, 227:13, 227:14, 228:2, 228:7, 228:9, 228:21, 228:22, 229:10, 229:19, 231:25, 233:1, 233:24, 234:21, 235:8, 244:17, 245:15, 246:24, 248:4, 249:22, 253:17, 254:9, 257:4, 258:4, 258:17, 259:7, 260:11, 260:21, 263:1, 275:10

**considerable** [1] - 56:15

**consideration** [3] - 77:16, 202:6, 267:24

**considered** [12] - 34:24, 37:23, 57:13, 94:22, 115:25, 133:7, 229:23, 250:25, 255:5, 258:10, 269:2, 275:5

**considering** [20] -

8:3, 33:12, 58:25, 73:16, 86:5, 95:17, 96:3, 136:20, 142:1, 150:14, 154:25, 168:21, 180:12, 197:9, 197:16, 199:12, 234:15, 245:24, 249:10, 258:3

**considers** [1] - 152:19

**consist** [1] - 58:9

**consisted** [3] - 119:1, 149:15, 222:14

**consistent** [2] - 176:15, 194:2

**consisting** [2] - 51:5, 51:6

**consists** [3] - 46:21, 51:13, 177:2

**conspicuously** [1] - 211:13

**conspiracies** [6] - 80:2, 80:3, 80:16, 81:24, 247:23, 249:1

**conspiracy** [201] - 8:13, 8:20, 8:22, 9:5, 10:8, 11:5, 11:6, 11:7, 19:4, 19:6, 19:21, 20:18, 23:14, 23:15, 23:16, 23:18, 23:23, 24:15, 24:19, 24:21, 25:2, 28:17, 29:4, 29:7, 29:10, 29:12, 29:18, 31:8, 31:11, 31:16, 34:7, 36:12, 39:23, 41:25, 42:23, 43:1, 43:11, 43:21, 51:20, 53:8, 55:16, 55:18, 65:6, 72:8, 75:9, 78:22, 79:15, 79:18, 79:22, 80:1, 80:4, 80:9, 80:14, 82:14, 90:6, 92:2, 92:5, 93:6, 95:6, 95:8, 95:14, 95:17, 97:6, 102:11, 106:15, 111:23, 112:5, 112:10, 112:16, 112:18, 112:20, 114:17, 115:14, 119:1, 120:24, 121:8, 125:14, 125:19, 126:6, 140:22, 141:1, 141:5, 141:6, 143:25, 144:8, 144:19, 145:1, 145:8, 145:9, 145:11, 145:18, 146:15, 146:16, 146:18, 146:21, 147:17, 147:20, 147:22,

147:23, 148:1, 148:2, 148:3, 148:8, 148:16, 149:1, 149:7, 150:13, 155:1, 168:15, 169:1, 170:8, 170:12, 170:18, 174:25, 176:17, 176:18, 180:9, 188:14, 191:22, 191:24, 193:13, 202:20, 205:15, 209:1, 211:11, 232:12, 232:15, 235:13, 235:16, 235:19, 236:3, 236:4, 236:6, 236:9, 237:8, 238:18, 240:3, 240:8, 240:15, 242:24, 248:10, 248:13, 248:19, 248:25, 249:3, 249:11, 250:7, 250:14, 250:17, 250:20, 250:23, 251:4, 251:8, 251:9, 251:11, 251:15, 251:16, 251:21, 252:5, 252:8, 252:10, 252:11, 252:14, 252:18, 252:20, 252:22, 253:3, 253:5, 253:12, 254:4, 257:9, 257:11, 259:13, 259:17, 259:21, 259:23, 260:2, 260:3, 260:4, 260:5, 260:6, 260:8, 260:11, 260:16, 260:18, 260:22, 260:23, 260:25, 261:1, 261:2, 261:4, 261:6, 261:7, 261:9

**conspirator** [4] - 24:11, 44:9, 251:18, 262:13

**conspiratorial** [2] - 24:16, 265:12

**conspirators** [41] - 9:7, 11:1, 24:24, 24:25, 28:23, 30:12, 43:5, 43:14, 43:16, 44:16, 45:18, 46:1, 64:8, 64:11, 70:12, 141:9, 146:25, 148:13, 148:14, 177:20, 179:17, 179:22, 205:24, 235:12, 236:2, 237:10, 237:18, 249:4, 249:8, 254:1, 254:7, 256:13, 256:25, 257:5,

257:12, 257:15, 257:20, 260:24, 261:6, 264:19, 265:13

**conspirators'** [1] - 263:18

**conspire** [5] - 143:5, 169:8, 194:1, 230:9, 242:25

**conspired** [9] - 170:5, 192:19, 194:15, 237:22, 238:20, 239:7, 250:6, 253:21, 263:3

**conspiring** [8] - 46:8, 46:9, 46:10, 173:2, 173:4, 230:8, 230:11, 260:19

**constantly** [2] - 163:23, 163:24

**constitute** [2] - 249:3, 252:10

**consult** [1] - 267:21

**consultation** [1] - 238:23

**consulting** [1] - 31:24

**consumer** [11] - 55:19, 96:6, 96:17, 115:10, 132:22, 133:4, 136:16, 180:16, 181:12, 258:7

**consumers** [9] - 49:1, 110:1, 160:6, 166:1, 184:2, 201:21, 259:8, 265:2, 265:7

**consumption** [2] - 50:3, 177:25

**CONT** [2] - 2:25, 3:1

**contact** [1] - 272:18

**contacted** [1] - 57:5

**contain** [4] - 20:11, 57:11, 205:10, 205:11

**contained** [5] - 7:15, 8:3, 8:25, 37:14, 45:4

**container** [1] - 124:20

**contains** [1] - 165:2

**contemplate** [1] - 129:19

**contemplated** [1] - 249:5

**contemplating** [1] - 196:10

**contemporaneous** [1] - 28:18

**contend** [10] - 17:8, 56:5, 169:17, 215:15, 235:11, 236:24, 237:7, 241:1, 254:25, 255:2

**contending** [1] - 72:9

**contends** [31] - 41:14, 59:17, 59:19, 61:21, 238:2, 238:7, 238:10, 238:13, 238:17, 238:19, 238:22, 239:1, 239:6, 239:15, 239:17, 239:23, 240:2, 240:9, 240:14, 240:17, 241:6, 241:20, 242:1, 242:12, 242:14, 242:18, 242:21, 242:23, 243:9, 243:12, 243:15

**contention** [1] - 59:23

**contentions** [5] - 233:16, 233:20, 235:10, 235:25, 237:21

**context** [6] - 77:24, 182:7, 200:15, 205:21, 208:25, 212:1

**continuation** [1] - 249:7

**continue** [7] - 5:25, 31:1, 114:18, 135:1, 219:8, 219:9, 249:6

**continued** [8] - 39:11, 42:12, 114:15, 146:2, 176:3, 191:25, 218:20, 238:6

**continuing** [1] - 235:25

**continuous** [2] - 249:6, 249:7

**contract** [16] - 23:18, 60:20, 100:19, 146:16, 155:14, 155:16, 157:1, 157:2, 182:4, 182:6, 204:4, 232:11, 232:14, 248:9, 248:12, 248:18

**contracts** [11] - 56:10, 150:11, 155:9, 155:20, 160:3, 171:19, 175:6, 175:10, 175:16, 208:5, 247:23

**contradicted** [3] - 227:10, 227:12, 228:12

**contrary** [2] - 88:9, 229:9

**control** [13] - 35:5, 35:8, 93:21, 99:24, 100:5, 100:21, 108:12, 108:25,

179:21, 188:13, 188:15, 223:23, 271:22

**controlling** [1] - 70:19

**convenience** [3] - 136:19, 136:22, 136:24

**Convention** [1] - 213:24

**conventional** [1] - 63:19

**conversation** [5] - 60:23, 60:25, 61:10, 61:11, 171:12

**converted** [3] - 10:2, 11:22, 58:19

**convey** [1] - 270:4

**convictions** [1] - 268:5

**convince** [1] - 80:15

**convinced** [2] - 98:18, 184:21

**cooperation** [2] - 80:22, 249:7

**cooperative** [3] - 157:15, 167:6, 262:7

**cooperatively** [2] - 89:15, 241:2

**coordinate** [1] - 273:22

**coordinated** [1] - 238:13

**copied** [3] - 149:22, 149:23

**copies** [5] - 154:6, 154:7, 221:1, 266:20, 269:16

**copy** [3] - 102:24, 135:17, 274:23

**core** [1] - 88:8

**corn** [1] - 119:16

**corporate** [2] - 81:6, 162:9

**corporation** [3] - 229:13, 229:22, 230:2

**Corporation** [2] - 157:3, 237:13

**corporations** [2] - 229:16, 230:5

**correct** [18] - 41:15, 47:6, 53:12, 59:16, 83:11, 83:12, 84:6, 113:8, 130:24, 151:17, 152:24, 152:25, 153:4, 165:8, 165:15, 165:22, 186:17, 276:10

**cost** [4] - 60:4, 101:14, 124:4, 218:20

**Costco** [1] - 167:18

**costs** [2] - 203:19, 218:21

**cotton** [1] - 136:21

**Council** [1] - 154:1

**counsel** [33] - 6:23, 9:13, 18:6, 56:18, 77:10, 117:20, 117:25, 127:14, 128:25, 137:12, 139:1, 149:20, 161:21, 198:24, 198:25, 199:1, 204:22, 205:1, 205:9, 205:16, 207:16, 209:9, 209:23, 212:4, 212:16, 215:14, 215:15, 216:14, 220:14, 270:9, 272:17

**COUNSEL** [1] - 273:5

**counsel's** [1] - 150:5

**count** [1] - 173:16

**counteract** [1] - 236:9

**countervailing** [1] - 249:23

**countries** [1] - 118:22

**country** [3] - 113:11, 138:16, 200:7

**Country** [3] - 160:17, 171:1, 237:11

**County** [2] - 148:16, 176:5

**couple** [5] - 124:9, 149:3, 190:20, 234:9, 269:16

**courage** [2] - 217:3, 217:17

**course** [19] - 5:24, 101:21, 102:23, 115:2, 119:20, 128:12, 137:17, 140:9, 144:2, 148:18, 198:15, 199:4, 200:24, 200:25, 227:16, 233:18, 237:19, 268:2

**COURT** [113] - 1:1, 4:2, 4:7, 4:9, 4:12, 4:17, 4:19, 4:21, 5:4, 5:6, 5:12, 67:24, 68:2, 68:8, 68:11, 75:14, 75:18, 76:2, 76:4, 76:7, 76:10, 76:12, 76:15, 76:19, 76:23, 77:8, 117:12, 117:15, 117:19, 126:10, 127:8, 127:12, 128:7,

128:10, 128:12, 128:19, 128:21, 129:2, 129:6, 129:19, 130:2, 130:5, 130:10, 130:17, 130:21, 131:1, 131:7, 132:4, 132:11, 132:24, 133:8, 133:16, 133:22, 133:24, 134:5, 134:20, 135:6, 135:8, 135:11, 135:15, 136:1, 136:3, 136:8, 136:11, 136:17, 136:20, 136:24, 137:3, 137:6, 195:5, 195:9, 195:11, 195:17, 195:22, 196:2, 196:9, 196:17, 196:21, 197:3, 197:8, 197:14, 197:16, 197:21, 197:25, 198:6, 198:21, 219:24, 220:12, 270:15, 272:4, 272:7, 272:21, 272:23, 272:25, 273:3, 273:6, 273:9, 273:12, 273:15, 273:18, 273:21, 273:23, 274:3, 274:7, 274:11, 274:15, 274:21, 275:1, 275:16, 275:20, 275:23, 275:25, 276:5

**court** [13] - 4:1, 10:7, 24:17, 45:2, 61:1, 67:9, 139:7, 150:22, 194:23, 194:24, 218:25, 223:14, 267:3

**Court** [37] - 1:21, 6:23, 7:25, 8:6, 8:15, 13:11, 17:18, 44:25, 55:10, 77:10, 117:24, 118:6, 118:15, 127:11, 127:21, 127:25, 128:5, 128:11, 130:13, 131:23, 132:3, 133:20, 137:12, 138:18, 138:19, 168:13, 194:8, 196:25, 197:1, 198:10, 206:7, 206:17, 272:4, 274:25, 275:11, 276:7, 276:14

**Court's** [5] - 139:22, 139:23, 198:2, 221:5, 275:2

**Courthouse** [1] - 1:22

**courtroom** [12] - 7:5, 17:11, 61:2, 61:14, 118:16, 121:5, 138:10, 195:20, 196:1, 199:3, 223:6, 269:21

**courts** [2] - 138:16, 219:2

**cover** [1] - 230:4

**covered** [8] - 13:17, 13:18, 39:10, 54:3, 54:4, 61:23, 68:21, 257:10

**Coyle** [9] - 75:21, 130:23, 268:9, 268:13, 268:15, 272:4, 272:13, 273:22, 274:4

**create** [3] - 104:17, 215:7, 258:20

**created** [5] - 81:17, 149:5, 149:16, 181:11, 262:16

**credibility** [10] - 45:22, 95:2, 106:19, 161:22, 166:11, 208:18, 226:21, 246:2, 246:4, 246:15

**credible** [4] - 156:15, 161:24, 210:12, 229:8

**Creek** [1] - 171:1

**criminal** [1] - 235:3

**crises** [1] - 32:6

**crisis** [2] - 31:20, 34:18

**criteria** [1] - 212:8

**critical** [2] - 58:11, 106:21

**criticism** [1] - 275:13

**criticisms** [1] - 188:12

**criticize** [1] - 175:2

**criticized** [1] - 137:16

**Crocker** [2] - 178:20, 179:7

**crook** [3] - 182:9, 182:12, 182:20

**cross** [7] - 46:7, 70:3, 102:8, 129:15, 140:16, 166:22, 207:13

**cross-examination** [1] - 46:7

**cross-examined** [2] - 70:3, 166:22

**cross-examining** [1] - 207:13

**crossed** [3] - 9:23, 17:15, 128:4

**CRR** [2] - 1:21, 276:14

**crystal** [1] - 157:9

**CSR** [1] - 1:21, 276:14

**cumulative** [2] - 208:14, 209:14

**curative** [6] - 128:6, 128:25, 131:12, 133:5, 136:10, 136:15

**curious** [1] - 90:2

**current** [7] - 157:24, 158:1, 164:12, 185:15, 244:6, 262:25

**customer** [25] - 21:22, 22:13, 56:1, 56:4, 57:21, 70:14, 88:3, 93:10, 93:14, 96:10, 168:8, 168:9, 168:10, 171:22, 172:9, 172:10, 172:19, 180:22, 192:12, 241:14, 241:15, 241:17, 242:5, 258:12

**customers** [44] - 16:2, 22:12, 56:5, 63:5, 69:6, 69:13, 70:2, 71:13, 73:4, 74:4, 89:21, 91:16, 96:6, 96:11, 113:16, 160:6, 166:2, 167:10, 167:19, 167:23, 169:22, 170:24, 178:25, 180:15, 180:23, 180:24, 182:2, 189:12, 194:14, 194:23, 200:14, 200:17, 201:14, 208:9, 219:9, 238:4, 238:5, 238:6, 238:16, 240:19, 241:24, 258:6, 265:2, 265:7

**cut** [1] - 128:14

**cuts** [1] - 130:9

# D

**D-0282** [1] - 91:1
**D-0284** [1] - 91:1
**D-0291** [1] - 91:1
**D-0346** [1] - 89:10
**D-0382** [1] - 88:11
**D-0454** [1] - 98:20
**D-0665** [1] - 107:1
**D-0709** [1] - 99:17
**D-0926** [1] - 82:23
**D-1002** [1] - 108:2

**dab** [1] - 144:18

**daily** [1] - 212:9

**Dairy** [2] - 155:14, 155:15

**dairy** [1] - 71:15

**damage** [2] - 263:25, 264:12

**damages** [1] - 263:14

**DAPs** [1] - 90:5

**dare** [2] - 200:20, 201:18

**darn** [1] - 212:21

**date** [7] - 60:25, 88:19, 89:10, 129:4, 148:10, 186:17, 269:20

**Date** [1] - 276:16

**dated** [3] - 60:12, 164:6, 213:1

**dates** [2] - 129:8, 208:11

**daunting** [1] - 215:1

**DAVID** [1] - 2:11

**David** [12] - 41:6, 142:8, 172:21, 172:23, 174:19, 175:8, 175:13, 176:12, 181:25, 194:17, 246:10

**Davis** [2] - 87:16, 196:9

**DAY** [1] - 1:16

**days** [6] - 118:17, 142:7, 143:10, 169:10, 186:22, 215:1

**DC** [1] - 3:12

**DCX-0101** [1] - 108:7

**dead** [2] - 180:22, 212:9

**deal** [8] - 7:10, 32:5, 34:1, 82:2, 86:22, 133:11, 212:7, 234:4

**dealing** [2] - 42:13, 163:1

**dealings** [1] - 249:9

**deals** [2] - 138:11, 153:15

**dealt** [1] - 133:4

**debate** [1] - 102:19

**decades** [1] - 62:13

**deceit** [1] - 182:16

**deceived** [3] - 182:18, 218:24, 219:5

**deceiving** [1] - 182:17

**December** [5] - 156:24, 158:17, 184:12, 235:18, 250:11

**DECEMBER** [1] - 1:9

**deception** [2] - 16:3, 18:19

**deceptive** [1] - 16:1

**decide** [41] - 6:7, 23:17, 51:3, 57:15, 58:17, 61:15, 61:17, 62:7, 63:13, 65:7, 65:24, 65:25, 66:9, 67:7, 67:8, 67:16, 92:9, 143:18, 161:22, 206:11, 206:15, 207:4, 207:24, 217:11, 217:25, 219:12, 222:3, 222:4, 226:20, 229:10, 229:19, 234:6, 244:20, 245:9, 246:22, 254:4, 263:11, 267:4, 267:12, 267:23, 271:20

**decided** [1] - 183:1

**decidedly** [1] - 212:5

**deciding** [7] - 61:8, 133:21, 216:1, 226:19, 226:25, 263:2, 267:6

**decision** [17] - 47:21, 51:11, 55:8, 59:24, 65:21, 120:19, 167:16, 184:23, 201:5, 216:1, 221:15, 223:12, 223:14, 245:3, 246:13, 267:9, 267:19

**decisions** [6] - 60:1, 120:8, 120:22, 154:22, 221:9

**decline** [1] - 208:12

**DeCoster** [2] - 182:10, 182:13

**decrease** [1] - 55:16

**decreased** [5] - 96:7, 180:16, 181:8, 255:24, 258:7

**decreasing** [1] - 71:7

**dedication** [1] - 7:6

**deduce** [1] - 244:9

**deduction** [1] - 245:11

**deductions** [1] - 108:24

**deemed** [1] - 240:10

**deep** [1] - 87:12

**defeats** [1] - 100:6

**defend** [2] - 77:20, 172:3

**Defendant** [32] - 3:17, 80:9, 118:4,

131:2, 170:9, 170:10, 170:13, 195:2, 233:2, 233:4, 233:5, 233:12, 233:14, 234:13, 245:8, 250:19, 250:20, 252:5, 256:12, 259:14, 259:17, 260:10, 260:17, 260:21, 261:3, 261:4, 261:8, 261:14, 263:8, 269:8, 269:10

**Defendant's** [5] - 170:15, 260:12, 260:13, 260:15, 261:16

**Defendants** [55] - 3:7, 7:16, 8:12, 9:7, 16:17, 17:8, 17:22, 43:12, 44:21, 48:22, 54:22, 56:5, 59:2, 66:22, 70:12, 72:9, 72:22, 73:6, 73:8, 74:19, 78:9, 79:9, 79:10, 126:1, 127:24, 137:21, 138:7, 139:13, 168:25, 169:3, 179:16, 203:23, 205:24, 216:7, 232:9, 232:21, 234:7, 235:11, 236:1, 237:5, 246:9, 247:20, 253:13, 254:1, 255:2, 256:25, 257:5, 257:12, 257:14, 257:20, 261:11, 263:10, 264:18, 265:13, 269:11

**Defendants'** [11] - 16:17, 45:11, 47:4, 47:8, 49:19, 212:16, 234:12, 237:2, 254:9, 263:18, 265:22

**defending** [1] - 150:21

**Defense** [3] - 27:7, 205:1, 205:16

**defense** [21] - 9:13, 16:17, 16:19, 16:22, 18:6, 39:19, 56:3, 56:18, 66:23, 72:11, 198:15, 199:1, 204:22, 205:9, 207:16, 209:8, 209:23, 216:13, 216:17, 237:21, 272:17

**defenses** [1] - 4:25
**define** [5] - 8:15, 8:16, 177:1, 179:13

**defined** [5] - 50:2, 51:23, 108:10, 124:21, 256:14
**defining** [2] - 24:4, 178:11
**definitely** [1] - 152:15
**definition** [3] - 80:16, 179:11, 179:12
**definitively** [1] - 128:21
**deflect** [1] - 217:25
**delay** [1] - 132:19
**delegate** [1] - 109:21
**deliberate** [15] - 6:9, 7:8, 8:9, 13:12, 18:9, 36:5, 78:5, 92:15, 115:18, 126:25, 266:18, 267:22, 271:6, 271:18
**deliberately** [7] - 38:22, 38:24, 80:10, 174:13, 202:12, 250:21, 259:19
**deliberating** [4] - 23:9, 220:4, 268:8, 271:11
**deliberation** [1] - 125:16
**deliberations** [10] - 78:1, 112:24, 140:8, 220:15, 220:18, 248:5, 266:1, 267:2, 268:2, 268:20
**delivered** [1] - 75:21
**demand** [50] - 4:24, 14:19, 22:12, 48:10, 48:23, 56:1, 57:21, 57:22, 57:23, 63:19, 63:24, 82:3, 83:15, 83:16, 96:10, 114:15, 114:18, 115:10, 132:22, 133:4, 135:4, 136:16, 151:6, 156:21, 168:8, 171:22, 172:9, 172:10, 172:19, 173:16, 179:2, 180:22, 184:16, 184:17, 184:18, 184:19, 192:12, 194:2, 200:18, 238:6, 238:15, 239:10, 240:12, 240:23, 241:15, 242:5, 242:17, 258:12
**demanded** [15] - 56:4, 56:5, 56:6, 96:5, 102:22, 102:24, 103:13, 114:15,

180:15, 180:23, 180:24, 181:3, 184:6, 258:6
**demanding** [7] - 116:17, 116:19, 167:10, 184:2, 184:3, 240:20
**demands** [5] - 88:4, 120:2, 169:22, 194:22, 238:4
**demonstrably** [2] - 9:3, 40:12
**demonstrate** [9] - 17:20, 21:18, 23:11, 24:20, 82:10, 141:7, 151:10, 254:14, 254:18
**demonstrated** [3] - 55:7, 64:9, 239:24
**demonstrates** [1] - 91:24
**demonstrative** [2] - 210:21, 223:8
**denied** [1] - 204:2
**denies** [3] - 237:20, 237:21, 237:23
**density** [8] - 12:17, 71:6, 94:20, 105:7, 189:1, 189:2, 190:1, 191:12
**deny** [2] - 86:19, 161:11
**departing** [1] - 272:9
**Department** [4] - 35:7, 35:10, 134:9, 182:12
**depos** [1] - 216:11
**deposed** [1] - 100:23
**deposition** [5] - 69:5, 139:9, 143:12, 167:14, 183:18
**depositions** [3] - 71:12, 139:2, 152:1
**depth** [1] - 232:18
**DEPUTY** [14] - 5:10, 75:25, 76:21, 90:20, 127:6, 130:25, 137:1, 195:15, 198:3, 272:2, 272:6, 274:6, 274:10, 274:13
**deputy** [1] - 4:1
**describe** [3] - 36:11, 46:23, 188:17
**described** [5] - 9:11, 32:11, 94:15, 237:9, 240:21
**describes** [1] - 241:13
**describing** [1] - 12:14

**description** [1] - 40:18
**deserves** [6] - 223:18, 225:4, 227:21, 229:1, 245:23, 247:2
**design** [2] - 21:24, 74:14
**designed** [11] - 25:25, 54:5, 63:22, 71:3, 71:9, 153:16, 209:10, 209:11, 209:13, 235:24, 264:22
**desire** [3] - 135:4, 158:10, 271:11
**desk** [1] - 196:6
**despite** [9] - 20:9, 28:22, 29:3, 37:2, 65:14, 74:15, 161:21, 163:13, 231:2
**destroys** [1] - 95:6
**detail** [3] - 45:14, 249:15, 250:5
**details** [4] - 24:9, 251:9, 251:13, 259:23
**determination** [4] - 206:8, 247:9, 249:16, 263:13
**determinative** [1] - 48:20
**determine** [18] - 34:25, 140:1, 140:7, 146:15, 156:14, 170:8, 170:17, 186:6, 246:14, 248:18, 249:2, 249:12, 249:17, 250:5, 255:7, 255:14, 258:1, 270:8
**determined** [6] - 63:15, 63:25, 168:5, 229:4, 248:2
**determiners** [1] - 207:20
**determining** [10] - 105:8, 170:4, 234:20, 235:9, 253:6, 256:3, 256:24, 257:4, 260:10, 260:21
**detrimental** [1] - 103:24
**develop** [5] - 89:19, 111:3, 161:2, 163:21, 241:4
**developed** [5] - 87:20, 96:12, 160:12, 238:23, 240:17
**development** [4] - 162:6, 163:17, 183:7, 239:3

**develops** [1] - 57:2
**Devin** [1] - 4:15
**diary** [5] - 28:17, 29:12, 29:18, 31:11, 115:13
**dictate** [3] - 161:17, 161:18, 161:19
**dictated** [1] - 154:23
**diet** [1] - 14:19
**difference** [8] - 5:22, 22:14, 44:12, 58:11, 91:9, 98:6, 98:11, 221:3
**differences** [4] - 200:3, 200:5, 200:6
**different** [37] - 21:24, 24:2, 25:1, 25:2, 34:22, 57:6, 78:3, 92:14, 94:13, 124:4, 124:5, 124:16, 126:1, 129:21, 132:24, 135:24, 178:23, 178:25, 179:1, 179:2, 179:9, 179:10, 189:22, 200:16, 201:5, 215:8, 215:9, 215:25, 228:15, 228:16, 245:5, 245:8, 248:25, 261:18
**differently** [5] - 38:23, 228:19, 232:25, 234:21
**difficult** [2] - 131:11, 137:23
**diligence** [1] - 45:23
**diligent** [1] - 142:5
**diminishment** [1] - 65:1
**direct** [12] - 39:8, 102:7, 243:20, 244:2, 244:4, 244:6, 244:18, 245:6, 252:14, 252:16, 252:19, 269:23
**directed** [2] - 132:16, 225:3
**directly** [6] - 64:12, 95:2, 225:6, 225:21, 230:18, 251:12
**director** [1] - 71:15
**Directors** [12] - 11:20, 15:12, 26:19, 26:24, 37:21, 38:11, 42:8, 45:13, 60:8, 174:8, 213:15, 243:3
**directors** [1] - 229:25
**disagree** [4] - 41:7, 102:10, 246:18, 267:16

**disagreement** [4] - 100:11, 100:12, 101:3, 246:21
**disagrees** [1] - 47:5
**disaster** [1] - 108:11
**discharged** [1] - 269:24
**disclosed** [3] - 67:4, 216:24, 270:10
**disclosure** [1] - 59:5
**discovered** [1] - 218:23
**discovery** [3] - 22:11, 73:24, 139:1
**Discovery** [1] - 69:23
**discredit** [1] - 228:17
**discrepancies** [2] - 228:15, 228:20
**discrepancy** [1] - 228:23
**discretion** [1] - 206:15
**discuss** [5] - 4:4, 17:16, 36:22, 81:14, 81:16
**discussed** [4] - 70:13, 70:25, 129:13, 174:7
**Discussion** [1] - 196:16
**discussion** [7] - 4:25, 62:5, 104:5, 116:14, 134:17, 206:14, 272:22
**discussions** [1] - 97:14
**disease** [5] - 15:3, 15:6, 55:3, 107:8, 108:11
**diseased** [1] - 107:10
**dishonest** [2] - 16:1, 231:4
**dishonesty** [1] - 16:4
**dispense** [1] - 110:17
**display** [1] - 204:19
**displayed** [1] - 47:18
**dispose** [2] - 82:25, 152:10
**disproportionate** [1] - 23:7
**dispute** [6] - 46:25, 47:2, 82:16, 82:20, 229:11, 229:19
**disputed** [1] - 245:3
**disregard** [4] - 136:15, 223:4, 226:15, 274:20
**disrupted** [2] - 7:3,

94:2
**disruption** [4] - 93:23, 95:1, 97:2, 241:19
**disservice** [1] - 83:1
**distilled** [1] - 8:7
**distinction** [2] - 226:5, 244:18
**distinguished** [1] - 65:14
**distraction** [2] - 181:23, 182:21
**DISTRICT** [2] - 1:1, 1:2
**divided** [1] - 105:9
**divisions** [1] - 230:8
**Dixie** [5] - 2:22, 143:13, 184:14, 199:5, 232:5
**document** [48] - 12:5, 14:5, 18:18, 19:1, 27:4, 28:3, 28:5, 28:18, 30:17, 30:24, 31:4, 32:8, 32:10, 32:16, 34:22, 35:3, 38:19, 39:5, 55:1, 60:12, 88:11, 88:12, 89:9, 89:11, 90:10, 90:11, 91:6, 91:7, 104:19, 104:24, 104:25, 108:1, 124:16, 129:11, 129:17, 133:25, 136:23, 154:1, 157:6, 157:9, 213:22, 213:23, 214:1, 214:4, 214:8, 217:22, 225:3, 225:11
**document's** [1] - 244:5
**documentary** [3] - 61:11, 61:13, 266:15
**documented** [1] - 39:14
**documents** [46] - 7:23, 10:25, 11:7, 18:11, 18:13, 18:14, 18:19, 31:17, 35:4, 36:4, 45:3, 45:4, 45:5, 51:16, 52:2, 53:23, 58:13, 59:22, 60:9, 60:14, 64:20, 74:1, 78:2, 78:8, 78:18, 89:5, 103:11, 119:23, 124:8, 124:9, 124:10, 124:13, 124:15, 124:18, 124:19, 129:12, 139:9, 149:15, 155:2, 164:3, 204:24, 205:2, 205:3,

205:5, 222:16
**dollar** [1] - 264:3
**dollars** [3] - 31:21, 165:25, 166:12
**domestic** [4] - 28:8, 112:4, 173:14, 238:15
**Don** [12] - 31:22, 31:24, 32:7, 32:9, 33:1, 33:10, 95:7, 95:11, 169:12, 202:19, 209:4
**Donald** [1] - 145:21
**dONALD** [1] - 3:10
**done** [29] - 6:18, 37:7, 37:13, 42:21, 62:18, 65:8, 66:19, 74:21, 90:18, 94:17, 117:9, 139:14, 146:4, 148:24, 172:11, 182:5, 192:4, 218:18, 230:13, 230:16, 231:12, 236:23, 261:20, 265:25, 267:8, 268:25, 270:4, 272:19, 273:19
**door** [4] - 29:15, 129:15, 131:2, 214:12
**doors** [1] - 202:14
**double** [3] - 129:23, 129:24, 215:17
**doubled** [1] - 93:3
**doubt** [13] - 33:17, 33:21, 33:22, 39:21, 39:24, 40:5, 61:7, 61:8, 152:4, 171:10, 171:12, 172:15, 235:2
**DOUGLAS** [1] - 2:4
**Douglass** [1] - 107:21
**down** [41] - 29:13, 32:14, 44:20, 78:21, 78:23, 89:18, 94:8, 94:24, 105:16, 110:14, 112:6, 112:14, 112:17, 140:5, 144:7, 144:9, 144:14, 144:15, 144:19, 159:25, 171:3, 179:5, 179:8, 184:16, 193:22, 200:21, 201:2, 201:18, 201:20, 211:8, 211:18, 211:20, 214:13, 215:9, 215:17, 268:11, 268:21, 268:23, 272:14
**downplay** [1] - 14:16
**downs** [1] - 53:10
**dozen** [6] - 22:11,

63:20, 144:14, 144:16, 175:20, 175:21
**dozens** [3] - 73:2, 145:2, 145:3
**Dr** [125] - 7:21, 9:4, 34:12, 41:6, 44:11, 47:5, 48:22, 50:1, 50:13, 50:18, 54:6, 54:16, 54:20, 54:22, 58:2, 58:13, 63:6, 63:15, 65:16, 65:23, 67:2, 74:20, 75:1, 75:2, 82:13, 84:2, 86:15, 87:8, 87:9, 87:10, 87:12, 87:13, 87:14, 87:15, 87:17, 90:8, 93:7, 101:4, 102:22, 103:1, 103:2, 103:5, 103:23, 107:8, 107:21, 107:24, 112:1, 112:7, 112:25, 113:6, 113:10, 122:3, 122:16, 123:5, 123:8, 123:11, 124:6, 124:11, 124:12, 129:15, 134:9, 134:11, 135:14, 144:15, 144:16, 148:8, 151:14, 152:19, 154:14, 172:21, 172:23, 174:19, 174:23, 175:1, 175:8, 175:12, 175:13, 176:12, 177:22, 178:11, 179:11, 179:12, 179:20, 181:10, 186:14, 186:25, 187:18, 187:19, 188:7, 188:9, 188:12, 188:15, 188:16, 188:24, 189:6, 189:11, 190:22, 191:14, 191:20, 192:1, 192:10, 192:18, 204:13, 207:12, 210:14, 216:12, 239:18, 239:20, 239:21, 239:24, 240:4, 246:9, 246:10, 275:12, 275:13
**dramatic** [1] - 189:25
**dramatically** [1] - 175:19
**draw** [7] - 245:7, 245:8, 245:9, 245:12, 245:13, 245:16, 276:2
**drawn** [1] - 245:6

**dream** [1] - 87:10
**dried** [2] - 178:20, 179:8
**drinks** [1] - 177:11
**drive** [1] - 72:14
**driven** [6] - 78:10, 86:10, 86:17, 96:14, 168:9, 168:10
**drives** [1] - 46:10
**driving** [1] - 95:7
**drop** [1] - 41:9
**droplets** [2] - 244:13, 244:14
**druthers** [1] - 76:12
**due** [2] - 155:22, 211:16
**dueling** [1] - 52:22
**duplicate** [1] - 85:14
**duration** [1] - 7:17
**during** [57] - 6:12, 11:6, 31:2, 73:24, 78:1, 82:3, 93:3, 112:10, 118:12, 118:19, 119:2, 119:15, 121:3, 122:17, 123:19, 124:1, 124:6, 124:8, 125:8, 127:14, 130:9, 137:17, 139:14, 140:9, 144:2, 144:4, 144:14, 144:18, 144:25, 146:13, 148:18, 151:6, 151:25, 162:5, 174:12, 176:1, 182:2, 185:21, 190:15, 192:17, 199:4, 220:17, 220:22, 224:2, 224:19, 226:6, 237:19, 238:14, 238:17, 242:2, 242:16, 247:13, 261:1, 261:6, 265:25, 267:8
**duties** [2] - 230:19, 267:17
**duty** [7] - 7:7, 220:19, 221:14, 221:18, 267:10, 267:21, 270:7

**E**

**e-mail** [23] - 11:12, 12:12, 13:21, 14:7, 14:10, 16:5, 18:23, 36:17, 38:17, 102:2, 102:6, 102:7, 102:8, 145:22, 160:21,

165:18, 212:24,
212:25, 218:11,
218:17, 273:4, 273:9
**e-mails** [7] - 10:25,
60:16, 60:17, 60:20,
60:21, 160:8, 217:9
**E.K** [1] - 1:12
**Eagle** [51] - 2:18,
68:15, 68:25, 70:3,
70:7, 71:20, 71:25,
72:4, 72:10, 73:1,
73:9, 73:15, 73:16,
73:18, 73:20, 73:25,
74:5, 74:8, 74:11,
74:21, 74:22, 74:23,
74:24, 75:2, 75:3,
75:7, 75:11, 113:13,
113:21, 113:22,
113:23, 121:19,
142:21, 143:8, 155:3,
157:12, 157:16,
157:18, 157:24,
158:1, 158:22,
158:23, 158:25,
179:6, 185:4, 199:24,
204:14, 232:1
**Eagle's** [2] - 71:15,
72:25
**Eagles** [1] - 203:16
**ear** [1] - 128:2
**earliest** [1] - 186:18
**early** [13] - 35:3,
52:16, 83:1, 89:2,
90:1, 90:13, 122:19,
124:11, 155:6, 162:5,
184:12, 240:18,
271:13
**earnestness** [3] -
33:18, 33:22, 45:23
**ears** [1] - 205:13
**Easter** [1] - 31:2
**EASTERN** [1] - 1:2
**easy** [1] - 271:14
**eating** [1] - 129:20
**echoed** [2] - 118:6,
118:7
**econometric** [4] -
122:4, 123:2, 153:9,
190:19
**econometrics** [1] -
246:10
**economic** [12] -
7:21, 29:1, 31:24,
41:16, 41:17, 46:23,
50:16, 55:17, 176:16,
209:7, 211:19, 247:17
**Economics** [1] -
213:24
**economics** [11] -
41:20, 46:20, 63:9,

65:22, 124:17,
172:24, 188:8,
208:23, 213:21,
246:9, 246:10
**economist** [2] -
65:16, 177:5
**economists** [8] -
46:20, 52:22, 63:11,
65:7, 66:10, 122:13,
172:22, 210:6
**economy** [1] - 63:21
**edition** [2] - 156:6,
164:15
**editions** [1] - 164:1
**editorial** [5] - 115:16,
115:19, 115:20, 116:7
**editorials** [2] -
115:18, 115:25
**education** [2] -
245:18, 245:24
**effect** [52] - 12:21,
32:3, 38:6, 51:23,
66:16, 83:25, 84:4,
94:7, 94:24, 113:5,
122:21, 132:6,
132:10, 141:16,
151:15, 152:20,
153:2, 153:5, 154:21,
155:7, 155:9, 180:20,
186:15, 186:16,
186:17, 186:20,
187:3, 189:9, 190:1,
190:4, 190:7, 190:8,
190:9, 190:10,
190:24, 208:14,
209:9, 209:14, 215:7,
228:20, 239:19,
242:22, 243:18,
255:16, 255:18,
256:5, 257:18,
257:23, 259:10
**effective** [6] - 28:24,
29:10, 53:24, 129:8,
236:5, 244:19
**effectively** [1] - 44:1
**effects** [12] - 29:7,
55:8, 55:11, 62:3,
96:2, 187:9, 187:22,
206:13, 208:17,
208:21, 236:9, 240:5
**efficient** [3] - 29:24,
30:10, 199:10
**effort** [13] - 14:2,
20:7, 33:23, 34:15,
35:3, 90:1, 91:8,
147:25, 174:3,
204:22, 213:12,
214:18, 214:19
**efforts** [6] - 28:22,
30:11, 35:4, 85:14,

204:18, 219:1
**egg** [203] - 8:21,
14:25, 15:11, 17:24,
22:13, 27:21, 28:23,
29:22, 30:12, 31:2,
31:6, 31:19, 34:17,
34:18, 35:21, 40:7,
44:4, 47:4, 47:9,
47:13, 47:15, 47:18,
47:19, 47:21, 48:2,
48:3, 48:4, 48:6, 48:7,
48:10, 48:19, 48:25,
49:1, 49:5, 49:12,
49:13, 49:14, 49:15,
50:2, 50:6, 50:16,
51:5, 51:6, 51:8,
51:13, 51:17, 52:25,
53:7, 55:17, 55:23,
55:25, 59:5, 60:19,
63:16, 63:23, 64:2,
64:5, 64:6, 64:11,
64:14, 64:21, 65:2,
65:3, 65:5, 67:14,
69:1, 71:15, 72:14,
74:3, 74:23, 74:25,
81:15, 83:13, 85:1,
87:11, 92:16, 92:20,
93:3, 94:13, 96:18,
99:7, 107:3, 112:7,
113:11, 114:12,
114:20, 115:24,
116:24, 117:5, 120:2,
120:7, 120:9, 121:4,
123:9, 124:1, 125:3,
143:6, 143:25, 144:4,
144:6, 144:7, 144:8,
144:12, 144:13,
145:1, 145:9, 145:10,
149:12, 153:16,
157:8, 157:10, 158:3,
158:4, 159:22,
160:18, 160:24,
161:10, 163:2, 163:9,
163:12, 171:14,
173:16, 173:23,
174:1, 174:4, 174:9,
174:14, 174:21,
175:18, 176:2, 178:1,
178:9, 178:15,
178:18, 178:24,
179:4, 179:7, 179:23,
179:24, 181:12,
186:18, 186:24,
187:8, 187:24, 188:5,
189:3, 190:15, 191:9,
192:24, 194:1,
194:16, 202:8,
202:13, 203:3,
203:10, 204:11,
208:12, 210:23,
211:7, 211:12,

217:16, 233:22,
236:18, 237:22,
238:1, 238:15,
238:20, 238:21,
239:7, 239:21, 240:5,
240:16, 240:25,
242:3, 242:7, 250:10,
250:14, 250:17,
252:10, 253:9,
253:14, 254:5, 254:8,
255:1, 257:7
**Egg** [54] - 3:7, 3:8,
31:4, 80:21, 99:8,
118:4, 118:13,
118:18, 118:20,
118:23, 118:25,
120:10, 120:12,
120:21, 120:24,
121:7, 121:13,
121:23, 121:25,
123:9, 123:13,
123:16, 124:19,
125:1, 125:3, 125:11,
125:17, 125:21,
126:2, 126:5, 134:11,
148:21, 151:22,
160:24, 168:17,
168:18, 178:16,
182:11, 185:12,
185:13, 185:18,
213:24, 232:6, 232:7,
237:11, 237:14,
237:16, 247:21,
259:11, 259:12,
262:4, 262:5
**EGG** [1] - 1:4
**egg-laying** [10] -
87:11, 144:6, 149:12,
153:16, 158:4, 163:2,
163:12, 174:21,
236:18, 240:25
**Egg-Laying** [1] -
185:13
**Eggs** [3] - 148:21,
237:14
**eggs** [271] - 8:21,
16:24, 17:24, 21:15,
21:22, 21:25, 22:6,
22:19, 27:21, 27:23,
28:5, 29:21, 31:4,
32:12, 32:22, 34:17,
40:9, 40:12, 40:14,
40:25, 41:4, 41:5,
41:10, 41:12, 41:18,
43:17, 47:4, 47:9,
47:13, 47:15, 47:16,
47:20, 47:25, 48:7,
48:9, 48:17, 48:18,
48:19, 48:25, 49:2,
49:6, 49:13, 49:15,

49:23, 49:24, 49:25,
50:3, 50:6, 50:16,
51:5, 51:7, 51:8,
51:13, 51:15, 51:18,
51:25, 52:1, 52:2,
52:11, 52:15, 52:20,
55:21, 56:7, 56:10,
56:14, 56:16, 57:22,
63:18, 64:12, 69:1,
69:14, 70:15, 70:19,
71:21, 72:12, 73:21,
74:9, 78:23, 79:16,
82:3, 92:3, 92:25,
93:2, 93:9, 93:10,
93:13, 93:15, 94:17,
95:6, 95:9, 98:9,
98:10, 98:21, 99:3,
99:5, 99:9, 100:8,
104:14, 109:18,
111:23, 112:9,
112:11, 113:7,
113:12, 113:14,
113:15, 113:16,
113:17, 113:21,
113:23, 113:24,
113:25, 114:4, 114:6,
114:16, 114:19,
115:1, 118:21,
118:23, 119:5, 119:7,
119:9, 119:17,
119:20, 119:21,
120:2, 120:3, 120:12,
120:16, 123:14,
123:15, 123:20,
123:21, 123:22,
123:24, 124:5, 124:7,
124:21, 125:2,
141:11, 143:5,
144:16, 145:3,
150:15, 154:17,
155:4, 155:5, 155:19,
155:25, 156:1, 156:2,
156:4, 156:5, 156:22,
156:25, 157:12,
158:17, 159:1, 159:6,
159:12, 159:15,
159:16, 159:23,
160:1, 160:11,
160:15, 160:19,
165:10, 165:21,
165:24, 165:25,
167:11, 167:18,
167:20, 167:22,
168:16, 171:1,
173:14, 173:17,
173:20, 173:24,
175:20, 175:21,
177:20, 177:25,
178:9, 178:15,
178:16, 178:17,
178:20, 178:21,

178:24, 179:6, 179:8, 179:9, 181:3, 181:7, 184:7, 184:22, 185:1, 185:2, 185:3, 185:4, 185:6, 186:10, 188:2, 192:8, 192:15, 192:24, 200:19, 201:4, 203:19, 204:7, 204:8, 208:2, 212:22, 213:12, 214:13, 218:25, 219:10, 235:13, 235:14, 235:20, 236:5, 236:11, 236:22, 238:1, 238:6, 238:14, 238:15, 238:19, 239:7, 239:11, 240:10, 240:16, 241:9, 241:15, 242:2, 242:5, 242:7, 242:8, 242:10, 242:11, 242:16, 242:20, 242:24, 243:2, 243:16, 249:12, 255:1, 257:8

**eight** [9] - 140:4, 143:8, 143:17, 143:19, 166:17, 166:22, 192:16, 270:17

**either** [13] - 6:7, 46:10, 61:8, 61:12, 62:20, 70:6, 170:10, 217:18, 223:3, 225:6, 225:20, 228:9, 259:15

**elasticities** [2] - 122:20, 124:6

**elasticity** [2] - 63:17, 123:3

**electronically** [1] - 187:14

**electronics** [1] - 5:8

**elegance** [1] - 203:24

**element** [8] - 79:6, 106:15, 139:20, 141:4, 180:1, 261:10, 263:24

**elements** [10] - 77:24, 79:12, 79:13, 79:22, 140:17, 141:22, 193:12, 219:18, 250:15, 263:15

**eliminate** [3] - 22:17, 107:4, 264:16

**eliminated** [1] - 55:20

**elm** [1] - 145:21

**elsewhere** [2] -

124:17, 125:2

**emblem** [1] - 21:21

**embraced** [1] - 160:7

**embracing** [1] - 164:19

**emotion** [1] - 202:5

**emotions** [1] - 87:1

**empathetic** [1] - 200:25

**emphasize** [3] - 89:6, 154:5, 266:5

**empirically** [2] - 55:25, 65:4

**employee** [2] - 163:19, 182:24

**employees** [2] - 142:13, 229:25

**employer** [1] - 137:25

**employment** [4] - 230:14, 230:17, 231:8, 231:13

**enacted** [2] - 132:20, 135:2

**enactment** [1] - 275:8

**encourage** [1] - 268:20

**end** [15] - 20:9, 22:20, 32:16, 46:19, 57:25, 73:17, 78:21, 98:13, 117:1, 118:19, 125:7, 125:15, 152:22, 186:16, 191:25

**endeavor** [2] - 13:9, 13:14

**endeavors** [1] - 158:11

**ended** [5] - 62:24, 62:25, 94:9, 182:13, 214:7

**ending** [1] - 186:9

**endorse** [4] - 12:25, 58:1, 58:3, 97:11

**endorsed** [13] - 20:10, 57:14, 57:25, 91:11, 99:12, 99:15, 107:17, 107:20, 153:25, 154:2, 205:1, 205:4, 241:5

**endorsement** [1] - 91:10

**endorses** [1] - 89:12

**endorsing** [2] - 20:8, 167:21

**ends** [5] - 77:4, 98:17, 167:12, 167:24, 168:11

**energy** [1] - 118:8

**enforced** [8] - 9:2, 10:2, 26:21, 27:20, 43:3, 203:8, 219:15, 235:23

**enforcement** [7] - 42:10, 82:12, 82:15, 82:17, 82:19, 128:18, 203:2

**engaged** [1] - 46:14

**engages** [1] - 57:3

**engaging** [2] - 73:6, 169:1

**engine** [1] - 209:2

**England** [3] - 134:11, 182:11, 237:15

**enhanced** [3] - 96:25, 97:16, 97:24

**enjoy** [5] - 75:24, 126:25, 127:5, 130:22, 137:6

**enjoyed** [1] - 68:18

**enjoying** [1] - 15:11

**enormous** [2] - 11:6, 45:3

**enormously** [1] - 7:5

**Enriched** [1] - 108:3

**ensure** [2] - 94:25, 134:12

**ensured** [1] - 241:17

**ensuring** [1] - 110:13

**entered** [4] - 93:5, 113:11, 155:14, 251:5

**entering** [3] - 17:23, 218:24, 252:2

**enterprises** [1] - 265:21

**entire** [7] - 118:13, 118:17, 139:14, 144:18, 174:12, 192:3, 200:6

**entirely** [3] - 78:3, 251:7, 274:20

**entities** [6] - 23:19, 79:15, 230:6, 232:13, 248:11

**entitled** [7] - 164:6, 229:14, 231:14, 263:14, 265:16, 266:7, 276:11

**entity** [2] - 229:14, 243:1

**entrusted** [1] - 230:24

**entry** [2] - 126:2, 257:6

**environment** [1] - 86:5

**envision** [3] - 140:11, 140:13

**equal** [7] - 82:6,

229:11, 229:17, 229:20, 231:20

**equally** [4] - 5:18, 207:5, 222:19, 244:19

**equals** [1] - 229:18

**equivalent** [1] - 166:20

**equivocal** [1] - 151:23

**ERIC** [1] - 3:15

**error** [1] - 228:24

**especially** [2] - 36:15, 222:6

**ESQUIRE** [25] - 2:3, 2:3, 2:4, 2:4, 2:5, 2:10, 2:11, 2:11, 2:12, 2:16, 2:16, 2:20, 2:21, 3:3, 3:3, 3:4, 3:4, 3:5, 3:5, 3:10, 3:10, 3:11, 3:14, 3:14, 3:15

**essence** [1] - 189:15

**essential** [3] - 107:5, 251:25, 259:25

**essentially** [5] - 28:18, 44:3, 188:17, 244:22, 274:19

**establish** [14] - 145:18, 147:16, 215:6, 246:15, 248:6, 251:4, 252:17, 253:2, 253:12, 261:14, 261:15, 263:15, 264:20, 265:11

**established** [5] - 17:17, 231:18, 244:24, 245:14, 267:13

**establishes** [1] - 264:9

**establishing** [1] - 193:16

**estimate** [1] - 219:25

**estimates** [2] - 239:24, 240:5

**estimation** [1] - 75:22

**et** [3] - 148:17, 230:3

**ethical** [2] - 258:9, 258:13

**Europe** [3] - 33:15, 153:18, 163:3

**European** [2] - 21:1, 116:19

**evaluate** [9] - 150:12, 170:12, 170:16, 222:3, 227:17, 233:19, 243:8, 246:15, 259:17

**evaluating** [4] - 65:12, 147:20,

183:15, 246:4

**evaluation** [2] - 246:2, 254:16

**evening** [2] - 220:7, 272:9

**evenly** [2] - 79:8, 234:11

**event** [14] - 26:16, 27:13, 27:17, 28:7, 54:18, 108:8, 108:10, 108:11, 108:17, 128:24, 206:11, 228:18, 242:18

**events** [15] - 10:10, 10:12, 10:20, 11:1, 27:22, 42:21, 54:14, 54:24, 54:25, 56:21, 67:11, 217:13, 223:17, 260:14

**eventually** [3] - 73:24, 75:2, 169:16

**everyday** [2] - 49:14, 223:17

**evidence** [271] - 6:2, 6:4, 6:7, 6:8, 7:8, 7:11, 7:14, 7:23, 7:24, 8:3, 8:5, 8:12, 8:24, 9:6, 9:7, 10:15, 10:23, 11:10, 13:14, 16:11, 17:15, 17:18, 17:20, 18:4, 19:3, 20:8, 22:25, 23:2, 23:8, 23:12, 25:5, 25:8, 25:13, 26:7, 26:23, 27:25, 28:13, 28:14, 28:16, 29:1, 29:9, 30:6, 33:23, 34:1, 34:2, 35:6, 35:9, 36:9, 36:13, 39:8, 39:20, 40:6, 40:16, 41:22, 42:22, 43:21, 44:10, 45:6, 47:5, 47:7, 47:12, 48:17, 51:10, 51:18, 55:17, 55:23, 56:3, 56:10, 57:17, 58:24, 59:9, 59:20, 61:6, 61:10, 61:11, 61:13, 61:14, 62:2, 62:14, 63:3, 66:4, 67:3, 67:18, 70:11, 70:21, 72:6, 74:2, 77:12, 77:23, 79:1, 79:4, 80:23, 82:10, 84:12, 84:20, 86:2, 94:9, 94:21, 95:10, 96:19, 104:18, 104:19, 107:16, 108:2, 108:7, 110:5, 113:9, 117:9, 118:20, 119:4, 119:25,

123:12, 126:4, 126:8, 129:6, 129:10, 129:11, 132:21, 133:4, 134:1, 134:17, 136:6, 136:16, 139:8, 139:25, 140:9, 140:18, 140:20, 141:24, 145:8, 145:17, 146:7, 146:11, 148:5, 148:19, 150:17, 151:3, 151:20, 151:23, 153:14, 156:14, 157:10, 158:9, 168:15, 168:21, 168:25, 169:4, 169:9, 170:4, 170:14, 172:25, 176:13, 180:2, 180:19, 180:21, 182:12, 182:16, 192:5, 192:11, 193:12, 194:4, 199:12, 202:7, 204:12, 209:11, 209:19, 212:2, 212:18, 212:24, 215:21, 216:23, 217:24, 219:18, 220:12, 220:21, 221:19, 221:23, 222:4, 222:13, 222:16, 222:19, 222:22, 223:1, 223:3, 223:5, 223:10, 223:12, 223:16, 223:20, 223:23, 224:4, 224:6, 224:13, 224:15, 224:16, 224:17, 224:20, 224:23, 225:1, 225:6, 225:16, 226:2, 226:14, 227:13, 227:15, 227:18, 227:24, 228:2, 228:12, 229:4, 231:18, 232:22, 232:24, 233:3, 233:4, 233:10, 233:17, 234:15, 234:19, 243:20, 243:21, 244:3, 244:4, 244:6, 244:7, 244:15, 244:17, 244:20, 245:15, 245:22, 245:25, 250:16, 251:5, 251:15, 252:14, 252:15, 252:16, 252:19, 252:21, 253:8, 254:10, 258:9,

259:13, 260:11, 260:13, 260:14, 261:16, 263:1, 263:2, 264:8, 264:9, 266:4, 266:6, 266:9, 266:15, 266:16, 267:5, 267:25, 268:4, 268:5, 275:6, 275:10, 275:13
**evidences** [1] - 149:6
**evidentiary** [1] - 46:12
**evolution** [1] - 163:18
**evolve** [1] - 163:17
**evolved** [2] - 91:20, 163:18
**exact** [5] - 53:24, 94:18, 106:17, 148:10, 208:11
**exactly** [9] - 11:18, 42:25, 66:17, 78:12, 84:18, 99:14, 146:1, 146:25, 252:1
**examination** [4] - 30:4, 46:7, 50:21, 152:22
**examine** [2] - 139:2, 227:25
**examined** [2] - 70:3, 166:22
**examining** [2] - 33:12, 207:13
**example** [41] - 12:12, 12:23, 13:5, 15:6, 17:10, 19:8, 19:14, 24:14, 26:2, 26:5, 27:7, 27:25, 30:14, 30:23, 36:2, 39:24, 48:11, 53:19, 64:21, 67:11, 81:4, 94:11, 119:6, 146:12, 150:12, 158:17, 177:6, 200:9, 212:8, 212:10, 224:24, 225:7, 225:10, 227:11, 244:9, 244:10, 244:25, 253:18, 253:19, 261:22, 268:23
**examples** [14] - 7:19, 18:13, 25:10, 25:11, 26:7, 28:13, 56:18, 81:3, 149:22, 199:19, 225:24, 262:4
**exceeded** [1] - 115:7
**exceeding** [1] - 115:1
**exceeds** [1] - 99:20
**except** [1] - 198:10

**exception** [2] - 15:5, 54:15
**excerpt** [1] - 183:18
**excess** [1] - 119:22
**exchanges** [1] - 262:23
**excluded** [1] - 226:17
**excludes** [1] - 175:16
**exclusion** [1] - 51:17
**exclusively** [1] - 48:23
**excuse** [34] - 20:22, 21:14, 22:19, 23:20, 24:17, 35:16, 47:20, 52:1, 53:5, 53:17, 54:21, 57:14, 58:6, 59:18, 60:3, 60:12, 61:18, 61:23, 62:9, 64:18, 73:4, 73:5, 148:20, 161:23, 162:8, 162:14, 175:20, 189:11, 203:20, 206:12, 212:20, 231:11, 271:23, 272:21
**executive** [2] - 60:19, 162:13
**executives** [4] - 15:15, 20:20, 41:24, 142:13
**exercise** [4] - 44:11, 54:6, 206:15, 253:15
**exercised** [1] - 230:24
**exhibit** [10] - 13:9, 13:15, 29:25, 30:9, 30:15, 46:13, 223:24, 226:17, 244:4, 274:2
**Exhibit** [34] - 13:19, 13:20, 14:9, 27:3, 27:7, 28:2, 28:5, 29:25, 30:6, 30:15, 30:17, 30:24, 32:9, 34:21, 36:1, 37:4, 37:9, 38:8, 39:3, 39:25, 47:4, 49:19, 49:20, 55:3, 57:20, 59:10, 59:11, 59:12, 60:11, 213:2, 213:23, 218:13
**Exhibits** [2] - 28:1
**exhibits** [24] - 13:13, 30:5, 43:16, 44:19, 44:22, 45:9, 45:11, 45:12, 45:15, 45:20, 139:8, 149:16, 222:17, 222:25, 226:6, 226:8, 226:10,

234:23, 266:9, 266:15, 266:16, 271:14, 273:17, 274:1
**exhorting** [1] - 44:2
**exist** [3] - 22:18, 177:19, 245:4
**existed** [4] - 250:18, 251:15, 252:11, 260:23
**existence** [15] - 147:16, 148:7, 229:5, 244:5, 244:24, 248:9, 251:4, 252:13, 252:17, 252:21, 253:2, 253:12, 255:12, 255:13, 261:2
**existing** [11] - 40:7, 108:9, 108:20, 174:16, 174:17, 175:5, 175:6, 175:9, 176:6, 260:4
**exists** [3] - 147:2, 245:3, 251:2
**exotic** [3] - 15:2, 15:9, 55:2
**expand** [2] - 154:12, 154:19
**expanded** [9] - 39:20, 39:25, 40:5, 40:18, 174:16, 174:17, 176:6, 176:7, 176:18
**expanding** [2] - 174:15, 193:25
**expansion** [7] - 40:23, 41:4, 52:25, 53:14, 114:11, 214:8
**expansions** [2] - 236:7, 236:8
**expect** [5] - 5:20, 11:6, 130:11, 130:17, 144:9, 173:3, 272:8
**expected** [2] - 158:3, 163:17
**expecting** [1] - 158:14
**expenses** [1] - 194:20
**expensive** [4] - 100:16, 100:18, 101:8, 113:24
**experience** [8] - 49:11, 49:14, 150:2, 223:19, 244:23, 245:19, 245:24, 276:2
**experienced** [2] - 63:11, 65:9
**experiences** [2] - 223:17, 245:17
**expert** [15] - 41:6,

67:2, 80:15, 84:2, 103:6, 151:13, 186:7, 187:2, 214:5, 239:18, 239:23, 246:2, 246:9, 246:11, 246:17
**Expert** [1] - 164:10
**expertise** [2] - 87:12, 246:14
**experts** [17] - 7:21, 66:25, 82:13, 82:18, 86:20, 89:17, 89:24, 111:25, 120:6, 122:2, 187:17, 211:5, 216:10, 245:19, 246:7, 246:10, 246:12
**explain** [18] - 14:24, 23:3, 33:25, 61:14, 62:8, 63:14, 66:9, 74:7, 79:3, 82:14, 95:22, 104:12, 139:19, 143:3, 143:10, 223:9, 269:15
**explained** [18] - 31:10, 40:2, 40:4, 41:3, 45:1, 50:15, 53:4, 53:6, 63:19, 63:23, 73:13, 80:23, 85:10, 107:8, 124:22, 134:11, 191:20, 267:11
**explaining** [6] - 31:5, 41:16, 85:1, 205:22, 210:19, 221:12
**explains** [2] - 22:20, 157:24
**explanation** [3] - 123:4, 123:25, 216:21
**explicit** [1] - 252:16
**export** [30] - 26:14, 27:13, 27:17, 27:22, 28:4, 28:7, 29:4, 36:5, 69:20, 70:22, 118:21, 119:8, 119:16, 119:17, 119:20, 120:8, 123:10, 124:15, 124:16, 124:18, 124:20, 125:2, 125:4, 173:14, 174:3, 174:9, 243:9, 248:22, 253:11
**exported** [3] - 27:22, 173:21, 192:15
**exporting** [5] - 120:11, 123:15, 123:16, 173:21, 235:20
**exports** [61] - 8:24, 14:16, 27:10, 27:25, 30:21, 31:3, 32:2, 35:19, 44:17, 52:6,

56:5, 67:14, 70:16,
118:22, 119:5, 119:9,
119:12, 119:14,
120:4, 120:6, 121:13,
122:5, 122:6, 122:8,
122:15, 122:17,
123:6, 123:13,
123:21, 124:10,
124:25, 125:20,
126:3, 140:25,
147:24, 152:19,
152:22, 152:23,
168:19, 173:13,
173:19, 173:20,
205:17, 208:16,
209:3, 209:15,
212:16, 213:4, 213:6,
217:15, 219:13,
236:16, 238:13,
239:20, 243:8,
243:13, 243:15,
243:16

**Exports** [1] - 118:18
**expressing** [2] -
116:8, 186:10
**expression** [1] -
145:16
**extension** [1] -
132:25
**extent** [6] - 40:22,
52:24, 62:12, 228:10,
236:16, 249:8
**extra** [1] - 106:6,
119:21
**extraordinary** [1] -
7:1
**extremely** [1] - 6:9
**eyes** [5] - 39:15,
41:25, 128:2, 211:17,
211:23

**F**

**fabricated** [1] - 15:1
**faced** [1] - 199:10
**facilitate** [1] - 262:19
**facilities** [6] - 39:10,
40:8, 62:25, 73:19,
156:4, 156:5
**facility** [1] - 176:8
**facing** [1] - 199:8
**fact** [79] - 17:13,
24:14, 24:18, 25:13,
28:3, 28:6, 29:3,
39:22, 46:12, 64:18,
65:15, 65:16, 74:6,
82:11, 94:3, 96:21,
101:19, 106:5,
114:22, 115:8, 116:9,
123:13, 132:1,

132:16, 141:18,
143:19, 145:25,
147:14, 149:21,
150:4, 150:14, 165:6,
179:21, 188:25,
189:3, 189:7, 191:1,
193:8, 194:2, 196:25,
200:17, 200:23,
202:3, 205:16,
209:24, 211:19,
212:18, 212:23,
213:7, 220:19,
220:24, 221:1,
221:12, 224:10,
226:10, 227:18,
229:6, 229:8, 231:9,
234:16, 234:20,
234:25, 243:22,
244:5, 244:8, 244:9,
244:25, 245:3, 245:4,
246:20, 246:22,
252:25, 253:9,
263:17, 263:25,
264:4, 264:6, 265:12
**factor** [4] - 200:19,
235:9, 256:14, 256:24
**factors** [10] - 96:4,
180:13, 210:19,
227:2, 228:4, 249:10,
256:5, 257:4, 258:4,
260:20
**facts** [29] - 8:5,
10:19, 17:19, 18:21,
46:11, 95:2, 95:9,
172:25, 199:15,
202:6, 203:25,
220:20, 220:21,
221:18, 222:14,
222:18, 222:22,
226:19, 234:18,
244:24, 245:6,
245:13, 245:16,
246:19, 247:9, 267:5,
267:6, 267:11
**factual** [2] - 222:4,
223:3
**fail** [10] - 39:2, 79:7,
103:22, 105:17,
105:18, 105:22,
105:24, 108:25,
109:4, 234:10
**failed** [4] - 124:23,
147:18, 188:13,
252:12
**failure** [11] - 103:19,
104:5, 104:6, 104:7,
104:13, 105:24,
106:2, 106:13,
108:23, 108:24, 217:4
**failures** [2] - 54:13,

103:18
**fair** [5] - 139:3,
139:4, 197:8, 229:15,
231:14
**fairly** [1] - 267:17
**fairness** [1] - 132:3
**fall** [1] - 71:25
**false** [2] - 205:10,
218:22
**falsehood** [1] -
228:24
**familiar** [1] - 168:3
**family** [8] - 17:11,
17:12, 137:25,
142:13, 172:1, 172:5,
195:19, 202:2
**fancy** [2] - 206:19,
206:20
**far** [6] - 13:17, 62:3,
171:25, 175:1,
206:13, 276:5
**Farm** [2] - 160:17,
237:14
**farm** [4] - 73:18,
74:24, 120:14, 176:5
**farmer** [3] - 74:23,
80:23, 121:4
**farmers** [8] - 87:25,
88:4, 110:20, 112:20,
120:2, 120:5, 120:7,
120:9
**farming** [1] - 74:23
**farms** [13] - 20:25,
72:16, 92:22, 100:19,
113:18, 152:9,
154:18, 174:16,
174:17, 175:5, 175:9,
176:7
**Farms** [37] - 3:17,
73:14, 83:10, 100:15,
100:17, 105:3,
120:21, 138:8, 142:8,
148:22, 155:16,
155:22, 170:24,
171:1, 172:13,
173:10, 182:24,
195:3, 232:6, 237:12,
237:15, 237:16,
237:21, 237:23,
238:1, 238:10,
238:12, 238:17,
238:22, 239:1, 239:6,
239:14, 239:15,
240:9, 250:13, 259:11
**Farms'** [2] - 19:11,
19:25
**fashion** [1] - 214:10
**fast** [1] - 274:17
**fate** [2] - 62:24,
194:25

**fault** [1] - 199:1
**favor** [11] - 79:9,
169:7, 186:3, 195:2,
212:5, 219:21, 233:4,
233:9, 234:13,
234:17, 243:11
**favorable** [1] - 233:3
**favorite** [1] - 271:24
**FDA** [1] - 161:1
**fear** [1] - 275:13
**feature** [1] - 127:18
**features** [6] - 27:18,
96:23, 103:17,
105:17, 106:17, 110:8
**February** [9] - 14:7,
16:5, 36:14, 155:16,
155:24, 156:1,
170:25, 171:13,
218:11
**federal** [5] - 40:2,
63:6, 235:15, 247:11,
247:14
**feebly** [1] - 54:22
**feed** [3] - 103:19,
104:8, 104:10
**feet** [1] - 149:15
**FELDMAN** [1] - 1:21
**Feldman** [1] - 276:14
**fellow** [1] - 267:25
**few** [17] - 30:18,
45:9, 45:20, 63:9,
65:10, 68:24, 69:19,
118:2, 122:10,
122:24, 145:13,
149:3, 172:2, 183:1,
187:6, 243:17, 272:12
**fewer** [11] - 27:21,
32:19, 32:22, 41:5,
49:24, 60:4, 181:9
**fiction** [2] - 20:23,
56:17
**fide** [2] - 87:4, 241:8
**field** [2] - 46:24,
198:11
**fifth** [3] - 186:1,
186:2, 190:16
**fighting** [1] - 200:2
**figure** [1] - 148:11
**figured** [2] - 6:20,
270:22
**figuring** [1] - 126:13
**file** [1] - 75:4
**filed** [6] - 69:8, 69:9,
71:11, 218:25, 219:8,
232:8
**fill** [3] - 108:19,
120:17, 269:19
**final** [5] - 22:13,
69:25, 128:15,
193:24, 198:12

**finally** [26] - 39:8,
41:1, 48:12, 48:13,
49:19, 61:21, 74:13,
101:9, 112:25,
141:18, 144:24,
153:11, 154:25,
157:6, 159:17,
164:25, 166:15,
176:12, 181:10,
185:14, 189:7, 223:7,
232:16, 239:15,
240:9, 264:20
**financial** [8] - 31:19,
32:6, 34:18, 100:15,
100:20, 143:1,
239:12, 261:21
**fine** [4] - 62:19,
175:8, 220:25, 227:17
**finger** [1] - 40:19
**fingerprints** [1] -
150:5
**fingers** [1] - 11:4
**finish** [4] - 25:9,
150:19, 198:8, 216:6
**finished** [3] - 95:13,
102:9, 176:8
**firm** [4] - 38:6, 65:18,
256:18, 256:20
**firmly** [1] - 194:21
**first** [63] - 18:1, 19:7,
23:16, 25:15, 31:9,
36:9, 41:15, 47:9,
54:8, 57:1, 63:15,
66:23, 68:16, 69:3,
69:10, 76:5, 79:22,
82:7, 82:12, 84:23,
86:9, 91:6, 100:13,
102:14, 109:7,
120:14, 123:8, 125:9,
125:18, 125:24,
138:16, 140:21,
145:8, 147:19,
149:19, 151:4,
151:10, 155:7,
155:14, 159:19,
168:12, 168:13,
186:3, 186:5, 186:12,
188:16, 189:23,
204:3, 216:6, 232:11,
239:17, 248:9,
248:18, 249:15,
249:16, 250:5,
250:17, 254:13,
254:23, 263:24,
267:4, 270:9
**fit** [3] - 93:20, 104:9,
236:22
**five** [14] - 7:1, 40:19,
60:21, 61:1, 61:2,
65:11, 74:6, 80:18,

140:5, 148:19,
189:22, 192:7, 195:9,
195:14
**five-gallon** [1] -
40:19
**fixing** [1] - 14:3
**Flanagan** [7] - 30:2,
43:7, 45:7, 149:3,
149:8, 149:9, 150:1
**Flanagan's** [4] -
43:15, 44:19, 45:22,
69:21
**flat** [1] - 53:12
**flatly** [1] - 150:9
**flaw** [1] - 191:18
**flawed** [2] - 188:11,
239:25
**fleeting** [1] - 151:12
**flexibility** [1] - 137:9
**FLOCH** [1] - 2:5
**Flock** [1] - 142:9
**flock** [29] - 35:5,
35:8, 71:4, 107:10,
107:11, 108:9,
108:13, 112:3, 144:3,
144:6, 174:18,
174:20, 174:23,
175:4, 175:7, 175:11,
187:25, 188:1,
209:20, 209:25,
210:2, 210:4, 210:11,
211:13, 214:3, 214:7,
242:3
**Flocks** [1] - 185:13
**flocks** [3] - 82:25,
108:20, 158:5
**Floor** [1] - 2:17
**Florida** [1] - 2:6
**flu** [1] - 55:1
**fly** [1] - 212:15
**FMI** [114] - 12:25,
20:4, 20:5, 20:7, 20:9,
21:9, 21:22, 56:6,
57:3, 57:4, 57:8,
57:10, 57:14, 57:25,
58:6, 58:12, 58:18,
58:22, 58:24, 59:2,
59:3, 72:23, 72:25,
73:2, 73:3, 78:20,
80:19, 81:5, 81:7,
81:13, 81:17, 82:7,
84:11, 84:12, 84:14,
85:10, 86:3, 86:7,
86:10, 86:11, 86:14,
86:15, 86:16, 87:18,
89:3, 89:7, 89:15,
89:18, 90:4, 90:8,
90:12, 90:15, 90:17,
90:23, 90:24, 91:3,
91:10, 91:11, 94:4,

95:11, 96:13, 97:10,
97:11, 97:16, 98:25,
99:1, 99:2, 99:11,
99:12, 99:25, 103:2,
103:6, 103:8, 106:20,
107:17, 107:22,
110:14, 110:21,
153:21, 154:1,
155:13, 158:12,
159:10, 162:4,
162:10, 162:12,
162:17, 162:20,
162:23, 163:7,
163:17, 163:19,
163:24, 164:4, 164:6,
164:10, 164:21,
171:2, 188:23,
202:11, 205:1, 205:3,
205:4, 217:23, 218:6,
238:25, 239:2, 241:4,
241:5, 241:24
**FMI's** [8] - 57:13,
86:6, 98:5, 103:6,
162:16, 164:5,
204:22, 239:3
**FMI-NCCR** [7] -
90:12, 90:17, 91:3,
99:2, 158:12, 164:6,
164:10
**focus** [9] - 12:18,
43:18, 79:21, 103:17,
106:11, 131:16,
145:19, 162:25, 163:5
**focused** [1] - 51:16
**focusing** [3] - 43:12,
48:23, 103:16
**folks** [5] - 196:9,
198:9, 219:25,
231:21, 270:15
**follow** [12] - 81:18,
81:21, 82:25, 133:6,
220:19, 221:5,
224:20, 238:11,
239:4, 267:15
**followed** [3] -
238:11, 242:19,
242:21
**following** [10] - 99:9,
152:11, 168:25,
176:15, 235:19,
237:7, 248:8, 250:15,
256:4, 269:14
**food** [8] - 57:7,
97:17, 97:24, 99:4,
161:3, 178:19, 200:12
**Food** [5] - 89:12,
153:22, 157:3,
237:13, 238:25
**Foods** [13] - 47:22,
121:2, 121:3, 121:6,

121:7, 121:8, 148:17,
148:22, 151:22,
168:1, 168:5, 237:11,
237:12
**fool** [1] - 205:6
**football** [1] - 66:2
**FOR** [1] - 1:2
**force** [1] - 95:8
**forces** [2] - 63:19,
63:24
**forecast** [2] - 225:18,
225:19
**foregoing** [1] -
276:10
**foreign** [1] - 120:16
**foreperson** [4] -
267:1, 268:12,
269:20, 269:21
**forest** [6] - 145:14,
145:15, 145:16,
145:19, 146:9
**forget** [1] - 172:5
**forgive** [1] - 46:21
**forgiving** [1] - 24:4
**forgot** [1] - 158:21
**form** [26] - 18:8,
19:18, 46:18, 51:3,
67:20, 75:11, 81:2,
125:16, 140:3, 140:4,
140:6, 168:12,
176:21, 186:3,
202:22, 212:7,
214:20, 216:3,
219:19, 244:4, 262:2,
269:12, 269:17,
269:18, 269:20, 270:3
**formal** [2] - 251:6,
262:16
**formed** [2] - 203:2,
260:8
**former** [2] - 162:9,
163:19
**forms** [1] - 125:16
**formulating** [1] -
202:15
**forth** [5] - 42:14,
134:14, 214:17,
215:10, 219:19
**Fortune** [4] - 145:25,
146:1, 156:18
**forward** [1] - 215:6
**founded** [2] - 138:17,
194:18
**founding** [2] -
138:16, 138:19
**four** [9] - 115:16,
141:17, 142:19,
142:21, 143:7,
149:15, 186:3, 186:5,
191:11

**fourth** [6] - 93:6,
113:10, 141:13,
180:1, 190:16
**fragile** [1] - 181:8
**frame** [2] - 122:17,
200:15
**franchised** [1] -
15:20
**frankly** [2] - 207:19,
228:18
**Fraser** [2] - 134:9,
134:11
**fraudulent** [1] -
231:4
**free** [16] - 24:17,
34:25, 105:5, 105:6,
154:19, 154:21,
176:8, 176:9, 189:10,
189:13, 223:21,
242:7, 247:15, 268:2
**free-range** [1] -
105:6
**frequent** [1] - 234:5
**frequently** [1] -
225:25
**Fresh** [1] - 237:14
**Friday** [1] - 19:23
**friend** [3] - 14:8,
14:11
**friends** [1] - 130:23,
172:4
**front** [10] - 9:18,
48:14, 48:21, 56:7,
135:22, 138:20,
171:9, 199:17, 219:2,
269:14
**frozen** [1] - 163:16
**frustrated** [1] - 82:24
**fuel** [1] - 63:21
**fulfilled** [1] - 152:1
**full** [4] - 5:20, 251:8,
259:22, 267:24
**fully** [2] - 142:17,
158:11
**fun** [1] - 68:19
**fundamental** [2] -
58:11, 191:18
**furnish** [1] - 109:19
**furtherance** [2] -
260:25, 261:6
**furthermore** [10] -
38:15, 82:21, 83:23,
101:4, 115:22,
230:20, 237:3,
254:19, 261:13,
266:14
**future** [3] - 194:25,
262:25

**G**

**gain** [1] - 261:21
**gallon** [1] - 40:19
**GALLON** [1] - 3:15
**game** [3] - 77:3,
78:13, 85:22
**Garth** [1] - 34:5,
46:6, 83:8
**Gary** [3] - 15:22,
71:14, 152:9
**gates** [1] - 181:20
**geared** [1] - 13:25
**GENE** [1] - 1:12
**Gene** [35] - 16:14,
28:5, 28:19, 28:20,
31:21, 32:10, 33:11,
33:24, 35:24, 48:6,
69:15, 94:12, 111:1,
115:17, 116:3, 116:4,
116:6, 116:13,
116:15, 144:21,
145:20, 150:9,
169:13, 173:9, 186:9,
186:13, 186:22,
187:4, 187:7, 187:11,
202:19, 209:5,
213:25, 214:5
**general** [5] - 16:23,
141:25, 176:14,
226:13, 230:19
**generalities** [1] -
10:11
**generally** [5] -
232:10, 242:19,
254:18, 256:18,
271:15
**generate** [1] - 29:7
**generated** [5] -
57:24, 184:17, 184:19
**gentleman** [1] -
159:20
**gentlemen** [52] -
5:14, 6:24, 10:22,
14:10, 14:18, 19:1,
23:8, 28:15, 34:2,
36:8, 37:10, 40:11,
42:18, 44:7, 45:19,
47:11, 50:24, 57:9,
59:21, 66:13, 67:18,
68:14, 72:7, 73:20,
76:25, 117:8, 126:12,
137:13, 141:20,
142:15, 143:17,
144:24, 154:25,
159:14, 168:20,
171:11, 192:6,
194:11, 194:25,
198:7, 199:18, 200:5,

201:18, 202:25,
206:3, 206:8, 208:17,
209:1, 210:17,
218:10, 218:13
**genuine** [1] - 127:22
**genuinely** [1] - 218:5
**geographic** [8] -
46:22, 47:1, 177:3,
178:5, 249:19,
255:10, 255:11
**GERMAINE** [4] -
2:11, 4:6, 4:8, 272:19
**get-out-of-court-
free** [1] - 24:17
**get-out-of-jail-free**
[1] - 24:17
**Gettysburg** [1] -
152:16
**Giant** [54] - 2:18,
68:15, 68:25, 70:3,
70:7, 71:14, 71:20,
71:25, 72:4, 72:10,
72:24, 73:1, 73:9,
73:15, 73:16, 73:18,
73:20, 73:25, 74:5,
74:8, 74:11, 74:21,
74:22, 74:23, 74:24,
75:2, 75:3, 75:7,
75:11, 113:13,
113:21, 113:22,
113:23, 121:19,
142:21, 143:8, 155:3,
157:12, 157:16,
157:18, 157:24,
158:1, 158:22,
158:23, 158:25,
179:5, 185:4, 199:24,
203:16, 204:14, 232:1
**given** [12] - 43:8,
96:20, 111:6, 140:3,
149:19, 160:2,
227:24, 239:3, 239:8,
245:25, 247:7, 266:12
**glad** [2] - 25:8, 137:6
**gladly** [4] - 14:17,
14:18, 14:19
**glitch** [1] - 140:12
**glorious** [1] - 219:12
**go-to** [1] - 87:10
**goal** [7] - 35:20,
86:3, 91:22, 97:16,
97:23, 249:4, 250:9
**goals** [1] - 84:11
**Godfather** [1] -
166:21
**Golab** [2] - 87:17,
107:21
**goodness** [1] - 273:1
**goods** [2] - 256:19,
265:1

**govern** [1] - 220:18
**government** [4] -
40:2, 63:6, 235:7,
241:24
**graded** [1] - 123:22
**gradual** [1] - 241:19
**grandchildren** [1] -
194:19
**Grant** [1] - 2:17
**graph** [3] - 175:13,
193:11, 211:4
**graphs** [3] - 211:6,
211:13, 211:15
**grateful** [2] - 7:6,
118:10
**Great** [2] - 2:7, 232:1
**great** [17] - 7:10,
28:16, 34:1, 40:6,
93:25, 126:22, 127:3,
138:21, 144:22,
159:21, 186:11,
186:24, 187:9, 189:5,
220:10, 228:21,
273:13
**greater** [5] - 120:15,
140:18, 146:7, 184:2,
266:7
**greatest** [1] - 247:19
**greatly** [2] - 77:18,
99:6
**green** [3] - 174:23,
273:6, 273:14
**Greg** [17] - 11:12,
37:24, 55:4, 116:2,
142:25, 170:25,
171:7, 171:19,
173:13, 175:24,
178:22, 181:1, 186:9,
193:1
**Gregory** [55] - 11:12,
11:15, 11:22, 12:13,
13:3, 14:8, 14:10,
14:13, 14:15, 16:15,
28:6, 28:19, 28:20,
31:21, 32:4, 32:10,
32:17, 33:1, 33:2,
33:7, 33:11, 33:24,
34:4, 35:25, 48:6,
55:2, 69:11, 69:15,
82:24, 94:12, 111:1,
115:17, 116:3, 116:4,
116:6, 116:13,
116:15, 116:16,
116:23, 117:1, 117:4,
145:20, 150:9,
169:13, 173:9,
173:12, 186:10,
186:13, 187:4,
187:11, 202:19,
209:5, 213:25, 214:5

**Gregory's** [4] -
13:21, 144:21,
186:22, 187:8
**grew** [6] - 53:22,
93:3, 174:21, 175:1,
175:25, 176:11
**Grocers** [1] - 2:23
**Grocery** [2] - 2:8,
232:2
**grocery** [9] - 47:20,
81:9, 161:3, 162:5,
179:8, 184:9, 185:1,
199:21, 201:1
**groom** [1] - 142:11
**ground** [1] - 68:20
**grounded** [1] - 110:9
**group** [14] - 11:19,
36:10, 57:13, 81:14,
81:15, 91:3, 153:22,
162:4, 162:7, 162:10,
162:11, 164:6, 172:6,
262:18
**group's** [1] - 89:19
**groups** [6] - 58:8,
84:24, 85:13, 86:24,
97:19, 98:1
**grow** [4] - 154:12,
154:15, 154:19, 176:3
**growing** [5] - 174:12,
174:15, 175:14,
176:1, 193:24
**growling** [1] - 129:22
**grown** [4] - 161:11,
174:24, 194:19
**growth** [9] - 114:11,
175:4, 175:16,
175:22, 176:13,
191:2, 191:3, 192:14,
238:17
**guess** [7] - 32:21,
77:5, 132:23, 142:10,
182:5, 245:2, 270:19
**guessing** [1] - 76:4
**guesswork** [1] -
245:11
**guide** [3] - 23:15,
170:7, 220:18
**guided** [1] - 227:22
**Guideline** [2] - 58:3,
164:9
**Guidelines** [55] -
12:19, 15:10, 30:25,
33:13, 34:15, 56:25,
57:4, 58:16, 61:18,
64:25, 78:14, 78:17,
84:19, 90:23, 90:24,
91:4, 91:10, 93:25,
96:16, 99:3, 107:12,
108:1, 109:12, 115:1,
115:6, 115:11, 154:8,

155:13, 155:17,
156:7, 158:4, 158:13,
158:19, 161:1, 162:7,
162:18, 163:1, 163:5,
163:8, 163:12,
163:16, 164:2, 164:9,
164:12, 165:7, 171:3,
184:10, 185:12,
185:18, 205:5,
205:22, 236:18,
236:21, 241:5
**guidelines** [83] - 9:2,
9:14, 9:22, 10:1, 10:2,
10:3, 11:22, 12:9,
13:1, 20:8, 20:10,
25:21, 33:20, 56:25,
57:1, 57:9, 57:10,
57:11, 57:12, 57:14,
58:1, 58:19, 59:11,
59:13, 59:14, 59:15,
61:16, 62:20, 62:21,
64:18, 73:3, 74:16,
87:25, 88:14, 88:17,
89:3, 90:15, 91:5,
91:12, 91:13, 94:5,
99:9, 99:20, 102:5,
107:6, 107:18,
107:19, 109:14,
110:2, 111:5, 111:8,
134:13, 134:14,
153:24, 153:25,
154:2, 160:12,
160:15, 161:3,
162:21, 163:14,
163:18, 164:2, 164:9,
164:16, 164:20,
164:23, 165:14,
204:18, 204:24,
205:2, 205:8, 205:10,
205:25, 207:6,
207:10, 207:11,
217:24, 240:6
**guides** [1] - 220:15
**guy** [2] - 182:11,
182:20
**guys** [1] - 117:15

---

## H

**H-E-B** [2] - 142:22,
159:17
**H-E-B's** [3] - 121:22,
160:21, 184:25
**H.E** [3] - 2:8, 159:17,
232:2
**H.J** [1] - 2:23
**half** [8] - 68:7, 68:9,
100:2, 100:3, 176:4,
192:9, 195:21, 203:22
**half-an-hour** [1] -

195:21
**half-truths** [1] -
192:9
**Hall** [1] - 138:15
**HAMILTON** [1] - 3:2
**Hammonds** [2] -
98:19, 110:23
**hand** [6] - 131:14,
218:2, 218:3, 257:19,
260:1, 265:5
**handled** [2] - 98:12
**handling** [2] - 54:12,
212:12
**hands** [1] - 195:1
**handshakes** [1] -
273:16
**handwritten** [1] -
36:25
**hangman's** [1] -
29:15
**happy** [1] - 129:25
**hard** [8] - 6:6, 11:9,
78:22, 110:15,
126:15, 127:21,
130:13, 197:23
**hardly** [1] - 25:11
**harm** [34] - 95:19,
95:24, 96:1, 104:17,
111:22, 111:24,
112:2, 151:11,
151:13, 180:7,
193:19, 237:5,
249:18, 249:21,
249:24, 250:2,
254:15, 254:16,
254:18, 254:19,
254:24, 255:8,
255:11, 255:19,
256:1, 256:4, 257:25,
258:21, 259:1, 259:2,
259:4, 259:8, 265:2
**harmed** [2] - 141:18,
186:2
**harmful** [4] - 255:16,
255:18, 257:18,
257:23
**harms** [1] - 180:8
**Harris** [4] - 118:3,
126:10, 127:9, 153:8
**HARRIS** [4] - 3:4,
117:14, 117:24,
270:13
**Harrisons** [1] -
138:12
**hatched** [1] - 202:20
**Hayes** [1] - 138:13
**head** [3] - 149:17,
149:18, 208:11
**heads** [1] - 158:14
**heads-up** [1] -

158:14
**health** [1] - 44:12
**hear** [41] - 5:24, 6:11, 8:14, 18:6, 46:17, 51:18, 57:22, 66:14, 81:5, 82:23, 117:23, 118:11, 118:12, 118:17, 119:14, 121:15, 123:23, 123:25, 129:25, 133:13, 137:6, 148:19, 148:23, 159:2, 166:17, 166:19, 169:9, 174:11, 181:4, 181:15, 187:17, 205:12, 216:8, 216:10, 216:12, 224:1, 227:3, 228:19, 244:21, 272:8, 273:15
**heard** [164] - 7:18, 7:20, 7:21, 7:23, 8:12, 9:6, 9:14, 9:15, 9:19, 9:21, 10:6, 10:15, 14:4, 15:3, 19:9, 24:2, 31:23, 41:1, 41:16, 43:16, 45:7, 54:24, 56:18, 58:2, 62:23, 64:17, 66:4, 69:3, 74:6, 74:7, 74:20, 78:4, 81:4, 81:5, 81:11, 82:13, 83:6, 83:8, 83:19, 84:19, 91:20, 92:19, 93:7, 94:9, 94:11, 94:20, 96:19, 100:15, 101:4, 102:23, 104:5, 104:7, 104:15, 106:12, 107:24, 109:3, 112:13, 115:8, 116:2, 119:2, 119:5, 119:23, 120:8, 120:24, 121:3, 121:16, 123:12, 123:18, 125:20, 128:3, 131:24, 137:15, 137:17, 137:20, 138:17, 140:9, 140:23, 140:25, 142:21, 142:22, 142:23, 142:24, 142:25, 143:1, 143:3, 144:14, 145:16, 146:4, 148:8, 148:19, 149:2, 149:9, 150:4, 150:17, 150:23, 151:20, 151:23, 153:12, 153:15, 153:18, 154:3, 154:4, 157:14, 159:18, 163:14, 164:17, 164:25,

167:25, 169:12, 169:13, 169:17, 172:21, 175:2, 175:22, 175:24, 178:22, 179:20, 180:10, 180:19, 181:5, 181:8, 181:16, 182:5, 182:22, 184:7, 184:15, 186:7, 186:8, 187:17, 188:7, 190:21, 197:14, 200:4, 200:9, 200:13, 203:11, 204:10, 207:4, 214:14, 215:16, 216:20, 218:4, 220:12, 220:13, 223:5, 223:14, 224:22, 226:3, 233:17, 233:22, 234:25, 236:22, 237:18, 238:25, 243:23, 246:7, 262:4, 267:6
**hearing** [3] - 5:21, 130:14, 151:2
**heart** [3] - 97:8, 153:13, 194:17
**hearted** [1] - 222:8
**heat** [1] - 126:21
**HEB** [21] - 56:22, 103:11, 114:3, 121:21, 143:8, 159:17, 160:5, 160:6, 160:7, 160:11, 160:15, 160:17, 160:24, 165:17, 165:22, 184:13, 199:23, 200:10, 201:4, 217:7
**heck** [1] - 155:19
**height** [1] - 148:10
**heightened** [1] - 265:6
**Heinz** [1] - 2:23
**held** [1] - 106:16
**hello** [1] - 4:2
**help** [6] - 14:14, 90:19, 138:21, 223:9, 242:15, 261:16
**helped** [1] - 74:14
**helpful** [2] - 78:1, 133:20
**helps** [2] - 118:21, 260:2
**hemorrhaging** [1] - 31:20
**hen** [8] - 12:19, 44:12, 47:18, 55:23, 181:6, 212:11, 212:12, 236:18

**Hendrix** [15] - 11:25, 12:8, 15:14, 20:20, 20:24, 36:25, 37:22, 38:18, 39:5, 41:23, 42:17, 182:23, 183:3, 183:11, 183:16
**Hendrix's** [4] - 18:23, 36:17, 182:22, 213:16
**henhouse** [2] - 54:20, 181:9
**henhouses** [4] - 55:5, 93:12, 174:16, 201:10
**hens** [58] - 21:5, 22:5, 27:20, 27:21, 31:1, 32:19, 32:20, 32:22, 33:13, 33:21, 39:1, 39:4, 39:10, 39:14, 40:4, 41:5, 41:9, 41:10, 41:18, 54:11, 60:3, 60:4, 87:6, 87:11, 92:24, 94:15, 96:19, 97:11, 97:12, 97:13, 99:18, 108:13, 108:24, 108:25, 109:1, 110:20, 111:7, 112:4, 149:13, 152:10, 153:16, 154:17, 163:2, 163:12, 174:21, 175:5, 175:6, 175:16, 175:19, 176:5, 181:7, 181:9, 200:23, 212:9, 240:25, 241:18, 258:10, 258:13
**Hester** [1] - 87:14
**Hickman's** [2] - 148:17, 237:11
**hidden** [7] - 14:1, 100:12, 101:3, 101:9, 101:11, 101:14, 101:24
**High** [1] - 3:15
**high** [7] - 22:1, 35:9, 106:21, 149:15, 155:2, 177:10, 212:11
**higher** [16] - 27:21, 32:22, 52:1, 64:15, 65:5, 158:10, 175:12, 191:16, 206:23, 206:24, 208:22, 211:25, 255:21, 255:23, 256:19, 256:21
**highest** [3] - 105:13, 105:14, 247:18
**highlighted** [1] - 89:14
**highlights** [1] -

131:12
**Hill** [13] - 114:3, 121:21, 159:21, 160:8, 160:17, 160:20, 160:23, 161:5, 165:19, 166:5, 200:9
**HILL** [2] - 2:16, 276:4
**Hillandale** [17] - 69:1, 70:20, 70:21, 70:24, 71:12, 72:3, 72:7, 74:10, 148:17, 148:21, 151:24, 152:9, 152:14, 152:16, 167:13, 169:13, 237:12
**Hillandale's** [1] - 71:2
**Hillandale-Gettysburg** [1] - 152:16
**himself** [3] - 40:15, 160:8, 161:7
**Hinton** [22] - 37:24, 48:8, 55:4, 60:6, 60:16, 60:22, 61:5, 109:17, 116:2, 142:25, 170:25, 171:7, 171:19, 173:13, 173:25, 174:2, 178:22, 181:1, 193:1
**historic** [2] - 112:20, 144:15
**historically** [1] - 214:2
**history** [11] - 31:14, 138:11, 138:14, 153:18, 154:3, 162:4, 171:25, 176:2, 188:5, 189:4
**hit** [2] - 16:23, 22:12
**hives** [1] - 66:16
**Hobson's** [1] - 131:11
**hold** [2] - 105:1, 231:17
**holding** [3] - 130:2, 229:12, 229:20
**holidays** [1] - 173:15
**Hollingsworth** [7] - 58:2, 58:13, 86:15, 103:1, 103:2, 103:5, 163:19
**home** [2] - 137:24, 271:20
**honest** [3] - 100:16, 210:13, 268:4
**honestly** [1] - 117:5
**Honor** [39] - 4:6,

4:11, 5:3, 6:22, 8:2, 18:2, 67:23, 68:1, 75:17, 76:3, 77:7, 117:14, 117:24, 127:10, 130:1, 130:8, 130:16, 130:19, 131:10, 132:14, 132:18, 133:19, 134:7, 135:25, 195:7, 195:18, 196:7, 196:14, 197:6, 198:20, 202:4, 215:4, 270:11, 272:16, 273:2, 273:17, 274:14, 274:19, 276:4
**Honor's** [6] - 132:15, 132:23, 133:6, 135:18, 136:19, 136:22
**HONORABLE** [1] - 1:12
**hooked** [1] - 5:8
**hope** [6] - 5:18, 13:13, 77:25, 207:17, 244:9
**hoped** [1] - 163:21
**hopeful** [2] - 8:10, 47:17
**hopefully** [3] - 171:8, 194:8, 269:15
**hoping** [1] - 6:3
**horse** [1] - 180:22
**hour** [7] - 76:8, 77:22, 79:21, 195:21, 203:22, 219:3, 220:1
**hours** [6] - 30:7, 32:7, 32:25, 74:7, 169:10, 203:23
**house** [10] - 31:1, 94:11, 94:12, 97:1, 105:10, 105:11, 108:18, 108:19
**housed** [1] - 105:7
**houses** [5] - 92:22, 154:18, 174:17, 176:6, 176:7
**housing** [1] - 99:19
**Housing** [1] - 108:3
**Houston** [1] - 200:22
**hum** [1] - 132:4, 152:8
**human** [4] - 50:3, 177:25, 200:25, 261:22
**Humane** [2] - 87:16, 181:21
**humane** [9] - 21:1, 22:4, 74:19, 97:11, 100:3, 100:17, 116:23, 161:4, 241:18

**humanely** [4] - 97:12, 98:12, 110:20
**Humboldt** [1] - 105:4
**humor** [1] - 77:16
**hundred** [3] - 160:11, 165:25, 166:12
**hungry** [1] - 129:22
**hunt** [1] - 272:14
**Hurd** [6] - 107:24, 142:8, 143:2, 181:25, 182:5
**hurry** [1] - 94:5
**Husbandry** [7] - 12:19, 154:8, 156:6, 157:21, 161:1, 162:18, 185:12
**Hy** [6] - 2:7, 143:14, 201:7, 203:15, 217:7, 232:2
**Hy-Vee** [5] - 2:7, 143:14, 201:7, 217:7, 232:2
**Hy-Vees** [1] - 203:15
**Hyde** [1] - 176:5

**I**

**idea** [12] - 19:23, 31:25, 35:17, 36:5, 43:20, 62:13, 89:2, 90:14, 91:18, 102:10, 102:17, 110:18
**ideas** [2] - 19:24, 19:25
**identical** [1] - 253:16
**identified** [6] - 31:5, 37:16, 43:15, 142:20, 254:20
**identifies** [4] - 36:2, 169:3, 184:9, 194:3
**identity** [2] - 251:9, 259:23
**ignores** [4] - 95:9, 95:10, 146:7
**ignoring** [1] - 18:15
**II** [1] - 166:21
**illegal** [13] - 75:6, 80:5, 81:1, 118:25, 119:10, 119:13, 126:7, 248:17, 250:1, 250:8, 250:9, 263:20, 264:10
**Illinois** [2] - 2:13, 2:22
**imagining** [1] - 137:7
**immune** [1] - 262:11
**impact** [15] - 103:4, 118:22, 122:10,

122:24, 124:13, 126:3, 190:11, 190:24, 234:3, 238:9, 242:2, 242:20, 242:21, 243:15, 243:17
**impartial** [1] - 139:4, 139:5, 267:24
**impediment** [1] - 220:6
**imperative** [1] - 99:18
**imperceptible** [2] - 40:21, 40:24
**implement** [4] - 11:21, 88:1, 202:23, 241:4
**implemented** [4] - 8:22, 38:10, 83:14, 190:11
**impliedly** [1] - 48:25
**implore** [1] - 213:17
**implying** [1] - 129:15
**import** [1] - 132:15
**importance** [2] - 165:14, 228:21
**important** [38] - 5:24, 6:5, 6:9, 18:20, 20:14, 54:10, 57:10, 59:6, 60:1, 73:11, 74:19, 77:17, 78:14, 89:10, 89:20, 93:2, 102:25, 104:2, 106:15, 112:11, 138:4, 138:6, 138:7, 138:8, 138:9, 165:21, 165:25, 166:1, 167:4, 201:12, 211:9, 222:9, 222:19, 222:20, 227:20, 256:24
**importantly** [1] - 50:22
**imposed** [2] - 241:9, 256:11
**imposes** [3] - 51:20, 92:15, 92:20
**impresses** [1] - 228:7
**impression** [1] - 266:8
**improve** [2] - 28:8, 33:21
**improved** [8] - 14:17, 14:20, 55:22, 96:7, 98:8, 180:16, 258:8, 258:11
**improvements** [2] - 91:5, 91:7
**improving** [2] - 163:23, 163:25

**IN** [2] - 1:1, 1:4
**in-depth** [1] - 232:18
**Inc** [13] - 2:6, 2:7, 2:7, 2:8, 2:8, 2:13, 2:14, 2:18, 2:22, 2:23, 3:7, 3:8, 3:17
**inception** [2] - 170:11, 259:15
**inches** [12] - 94:1, 94:19, 94:20, 105:8, 106:6, 115:6, 115:7, 115:9, 155:8, 188:20, 188:22
**inclement** [1] - 271:4
**include** [11] - 50:16, 109:12, 109:13, 148:20, 156:10, 157:15, 177:10, 177:16, 177:17, 229:25, 257:6
**included** [1] - 29:21, 150:15, 161:20, 161:25, 162:15, 178:1, 179:24, 205:25, 206:1, 235:19, 239:4
**includes** [4] - 107:18, 166:14, 222:23, 265:18
**including** [37] - 7:18, 10:3, 16:10, 28:22, 30:6, 34:9, 35:24, 56:12, 63:5, 72:10, 81:8, 96:5, 155:10, 156:8, 162:18, 164:2, 164:9, 169:3, 172:23, 179:16, 180:14, 181:2, 184:10, 199:4, 201:13, 210:2, 222:14, 229:16, 231:19, 236:7, 236:11, 237:1, 240:19, 252:22, 258:5, 260:13
**inconsistencies** [1] - 228:14
**inconsistency** [1] - 93:19
**inconsistent** [4] - 150:9, 176:16, 188:11, 191:17
**inconvenienced** [1] - 7:2
**incorporated** [4] - 156:9, 156:11, 235:23, 243:3
**Incorporated** [3] - 232:3, 232:4, 232:5
**incorrect** [1] - 179:11

**increase** [27] - 8:21, 14:2, 17:24, 28:4, 30:12, 30:13, 30:22, 31:6, 35:21, 36:6, 41:2, 42:2, 55:14, 55:15, 55:19, 59:5, 67:15, 112:2, 155:22, 174:20, 175:10, 192:3, 212:22, 213:13, 217:16, 237:1
**increased** [26] - 12:19, 14:19, 40:12, 55:18, 74:18, 96:6, 96:17, 96:18, 107:8, 112:3, 112:7, 114:20, 175:19, 180:15, 180:16, 181:5, 189:8, 206:22, 206:23, 239:21, 242:4, 255:21, 258:6, 258:7, 258:11
**increases** [1] - 212:13
**increasing** [6] - 28:21, 70:19, 74:3, 112:22, 152:10, 241:15
**incremental** [1] - 65:3
**indeed** [4] - 98:3, 223:21, 224:1, 229:6
**Independence** [1] - 138:15
**independent** [10] - 89:16, 120:9, 120:19, 160:13, 161:2, 230:12, 243:11, 249:1, 253:15, 266:3
**independently** [8] - 20:17, 41:14, 42:4, 42:17, 120:23, 253:3, 253:24, 254:2
**Indiana** [1] - 187:19
**indicate** [1] - 136:10
**indicated** [4] - 18:3, 27:5, 144:11, 153:6
**indicators** [1] - 63:20
**indirectly** [1] - 225:6
**indisputed** [1] - 42:22
**individual** [17] - 85:13, 85:15, 85:18, 101:12, 103:25, 170:9, 176:16, 229:15, 231:15, 231:16, 233:1, 233:4, 233:12, 250:19, 252:5, 254:17, 259:14
**individually** [3] - 56:6, 77:15, 241:3

**individuals** [2] - 86:22, 111:2
**industries** [2] - 89:25, 161:4
**industry** [37] - 31:19, 34:19, 54:1, 73:19, 73:21, 80:13, 80:16, 80:18, 80:19, 80:20, 80:25, 81:12, 81:14, 81:16, 84:17, 85:20, 86:4, 86:18, 91:4, 94:13, 95:8, 96:12, 111:2, 116:24, 117:6, 134:13, 134:14, 159:10, 159:11, 160:14, 185:11, 190:1, 236:18, 240:20, 262:6, 262:18
**industry's** [1] - 158:18
**industry-adopted** [1] - 159:11
**industry-wide** [4] - 84:17, 95:8, 160:14, 240:20
**inevitable** [1] - 188:24
**infer** [3] - 216:21, 244:22, 252:21
**inference** [3] - 244:21, 245:1, 245:8
**inferences** [5] - 245:5, 245:7, 245:9, 245:17, 252:17
**inflated** [1] - 265:1
**inflation** [2] - 112:15, 144:13
**influence** [3] - 223:14, 267:8, 267:19
**influenced** [2] - 224:10, 266:5
**influenza** [1] - 55:6
**inform** [3] - 24:5, 131:24, 199:11
**information** [12] - 14:12, 20:18, 30:8, 30:11, 33:1, 45:24, 78:7, 139:2, 165:11, 262:24, 263:1, 272:18
**informative** [1] - 199:11
**informed** [1] - 262:6
**informing** [2] - 10:18, 65:21
**informs** [2] - 46:12, 197:1
**ingenuity** [1] - 202:17
**ingredients** [2] - 99:4, 99:10

inhumane [1] - 72:15
inhumanely [1] -
39:1
initiation [1] - 162:23
injure [1] - 212:11
injured [15] - 113:20,
141:19, 186:2, 186:6,
212:9, 216:2, 239:16,
240:3, 240:11,
263:12, 263:17,
264:1, 264:6, 265:12,
265:19
injuries [7] - 264:24,
265:3, 265:4, 265:5,
265:8, 265:9
injury [31] - 22:16,
63:9, 79:20, 79:25,
114:2, 122:7, 122:15,
124:23, 232:17,
236:12, 239:25,
240:4, 248:15,
263:14, 263:15,
263:21, 263:22,
263:25, 264:4,
264:11, 264:15,
264:16, 264:19,
264:21, 264:23,
265:14, 265:15,
265:17, 265:20
innocent [4] - 80:11,
228:24, 250:22,
259:20
inquiries [1] - 160:9
inquiry [2] - 160:21,
249:14
inside [2] - 37:14,
38:21
insofar [1] - 34:23
inspectors [1] -
182:19
inspired [1] - 138:10
inspiring [1] - 138:19
instance [2] - 25:17,
27:8
instances [4] -
26:25, 40:6, 45:2,
242:10
instead [11] - 35:1,
42:7, 65:2, 166:23,
204:5, 206:2, 210:16,
211:3, 217:18,
236:23, 263:7
Institute [2] - 153:22,
238:25
Institute's [1] - 89:12
instruct [9] - 8:6,
55:10, 77:25, 78:25,
79:5, 80:5, 126:3,
202:5, 206:17
instructed [5] - 18:8,

132:6, 206:10,
224:17, 231:10
instructing [1] -
248:2
Instruction [7] -
23:24, 24:1, 28:10,
36:11, 170:7, 196:10,
214:21
instruction [26] -
4:20, 4:21, 4:22,
23:15, 23:22, 25:2,
55:13, 56:2, 128:6,
128:15, 129:1,
131:12, 133:5,
136:10, 136:15,
146:14, 146:17,
151:8, 170:3, 180:19,
196:25, 197:4, 198:2,
221:7, 224:20
instructions [37] -
4:14, 8:1, 18:9, 23:3,
24:12, 119:11,
124:24, 128:17,
133:17, 138:5,
139:24, 146:11,
147:11, 147:21,
151:7, 179:14, 180:6,
180:11, 191:24,
206:7, 220:2, 220:15,
220:16, 220:20,
220:25, 221:5, 221:8,
232:18, 233:20,
266:20, 266:23,
267:15, 269:14,
269:15, 270:3,
270:10, 274:23
instructs [3] - 13:11,
140:1, 274:20
insufficient [3] -
236:8, 242:22, 243:18
insulating [1] - 38:6
integrate [1] - 74:22
integrity [1] - 97:1
intended [9] -
163:15, 163:16,
163:17, 236:13,
238:18, 263:23,
264:22, 265:15, 270:4
intense [1] - 240:21
intent [9] - 126:6,
170:3, 170:11,
237:25, 238:2,
259:16, 261:17,
261:19
intention [2] - 152:2,
267:22
intentional [1] -
228:24
intentionally [3] -
261:23, 261:25, 263:8

intentions [1] - 27:5
interchangeable [2]
- 178:16, 255:4
interest [6] - 100:20,
173:2, 173:5, 227:6,
243:11, 265:19
interested [2] - 22:4,
218:4
interesting [5] -
102:6, 104:4, 105:18,
176:22, 214:1
interests [6] - 81:3,
81:10, 100:15,
176:16, 262:3, 265:21
internal [1] - 93:19
internally [1] - 20:19
Internet [2] - 11:3,
185:2
interpreting [1] - 6:4
interrupt [1] - 127:14
interstate [2] - 248:1,
248:3, 248:5
introduce [1] - 187:7
introduced [2] -
157:10, 158:9
inventory [1] -
175:14
investigation [2] -
73:25, 235:7
investment [1] -
14:14
invitations [1] -
251:23
invite [1] - 154:10
involve [2] - 126:5,
198:10
involved [13] - 36:2,
121:21, 149:9, 150:1,
150:13, 153:21,
153:23, 164:5, 183:6,
183:7, 198:25,
251:19, 260:14
involvement [2] -
125:22, 150:2
involves [2] -
125:19, 141:6
involving [2] -
140:22, 181:21
Iowa [3] - 55:5,
105:4, 201:7
ironic [2] - 193:5,
193:10
Irving [2] - 101:14,
101:25
Isaacson [1] - 13:6
ISE [1] - 237:12
issue [31] - 11:16,
11:17, 11:24, 22:16,
23:5, 23:11, 37:15,
48:15, 48:20, 48:23,

50:22, 51:20, 86:18,
89:20, 92:2, 102:18,
132:24, 133:3,
135:24, 144:5, 151:6,
163:9, 164:17,
225:10, 234:14,
239:11, 243:6,
247:14, 254:16, 264:5
issued [2] - 164:22,
185:20
issues [18] - 32:25,
44:13, 57:6, 81:15,
81:16, 153:24,
181:25, 182:21,
201:12, 202:21,
231:24, 233:21,
234:1, 234:3, 246:13,
258:10, 262:15
issuing [1] - 171:5
items [5] - 19:18,
78:6, 78:8, 96:21,
224:17
iterations [1] - 154:9
itself [16] - 51:1,
54:16, 57:19, 58:6,
77:20, 147:16, 150:3,
201:9, 230:10, 251:6,
253:2, 253:12,
254:17, 258:14,
265:7, 275:9

## J

Jack [1] - 182:9
jail [2] - 24:17,
182:14
JAMES [1] - 3:14
James [5] - 121:19,
121:20, 138:18,
159:3, 165:6
Jan [1] - 77:11
JAN [1] - 3:3
January [8] - 11:11,
15:12, 40:1, 202:14,
225:13, 225:17,
225:22, 226:2
JAY [1] - 3:10
jeopardize [1] -
159:25
jeopardy [1] - 220:5
Jersey [2] - 115:7,
184:5
Jesse [1] - 172:21
Jill [1] - 163:19
Jim [2] - 73:10,
196:23
job [10] - 25:8,
212:17, 220:14,
246:20, 266:24,

267:6, 267:14, 270:7,
272:20
jobs [1] - 267:4
jOHN [1] - 2:12
John [1] - 218:11
join [24] - 22:3,
22:17, 44:5, 44:7,
59:18, 59:20, 59:25,
80:9, 92:4, 92:7,
101:23, 147:8,
166:16, 167:5,
167:16, 167:20,
168:6, 171:20, 174:9,
184:21, 238:2,
238:13, 240:15,
242:23
joined [54] - 19:20,
21:4, 24:11, 24:14,
24:18, 34:6, 36:14,
36:15, 36:16, 37:2,
37:9, 37:11, 37:20,
37:22, 37:24, 38:24,
42:7, 42:11, 42:19,
42:20, 43:24, 44:14,
60:2, 61:19, 61:20,
69:5, 69:19, 70:1,
71:12, 73:22, 87:17,
109:6, 119:1, 120:12,
121:10, 123:13,
169:23, 170:10,
170:22, 171:17,
171:23, 172:14,
172:16, 173:23,
182:25, 183:1, 183:2,
183:3, 203:9, 237:23,
238:7, 238:8, 259:15
joining [3] - 24:15,
37:8, 167:8
joins [1] - 260:4
joint [2] - 262:8
Jonathan [1] -
239:24
JOSEPH [1] - 2:11
journals [1] - 262:8
journey [1] - 271:20
judge [5] - 14:4,
45:21, 45:22, 119:11,
139:4
Judge [11] - 77:25,
78:25, 79:4, 80:5,
126:2, 138:4, 139:18,
139:25, 140:19,
147:11, 234:2
judged [2] - 231:15,
245:21
judges [3] - 221:18,
225:23, 226:21
judging [2] - 230:22,
230:23
judgment [8] - 10:18,

66:2, 120:9, 197:23, 199:11, 247:4, 253:15, 269:2
**juggle** [1] - 116:22
**juices** [1] - 177:11
**July** [13] - 31:21, 32:9, 33:5, 33:10, 57:19, 90:12, 120:25, 158:8, 158:14, 160:9, 162:15, 164:19, 209:4
**jump** [2] - 189:24, 189:25
**jumping** [1] - 116:22
**June** [9] - 20:4, 58:12, 58:14, 103:6, 103:8, 164:21, 184:12, 185:20, 194:3
**juror** [1] - 269:3
**JUROR** [2] - 117:18, 220:11
**Juror** [2] - 131:18, 131:19
**jurors** [6] - 7:8, 131:22, 137:16, 138:9, 161:22, 267:25
**JURORS** [1] - 137:5
**jury** [49] - 4:5, 5:7, 6:24, 13:11, 55:13, 56:2, 68:14, 76:20, 77:10, 77:21, 117:25, 127:23, 127:24, 127:25, 128:4, 128:17, 129:13, 129:18, 131:18, 131:24, 132:6, 134:1, 134:2, 134:3, 134:18, 134:23, 135:22, 136:25, 137:13, 139:5, 147:21, 151:7, 170:3, 171:11, 180:5, 180:11, 199:12, 199:14, 199:18, 206:8, 219:11, 234:1, 245:12, 266:17, 268:9, 269:3, 269:18, 275:14
**Jury** [10] - 5:11, 36:11, 76:1, 76:22, 127:7, 137:2, 170:7, 195:16, 198:5, 272:3
**justice** [5] - 138:22, 195:1, 233:5, 233:6, 233:7
**Justice** [2] - 35:10, 182:13
**justices** [1] - 138:19
**justification** [1] - 55:14
**justifications** [3] - 55:11, 55:12, 207:1

**justified** [1] - 245:17
**justify** [1] - 258:22

## K

**KAITLIN** [1] - 3:5
**Karen** [7] - 85:9, 97:20, 99:12, 110:22, 162:13, 164:4, 164:8
**Kathleen** [1] - 276:14
**KATHLEEN** [1] - 1:21
**keep** [12] - 52:14, 60:4, 94:18, 126:16, 167:19, 180:21, 211:5, 229:3, 230:2, 262:5, 268:20, 275:20
**keeping** [3] - 41:5, 158:9, 200:15
**Ken** [2] - 97:14, 100:22
**KENNY** [1] - 2:2
**kept** [4] - 163:25, 223:4, 226:9, 272:10
**key** [3] - 78:6, 78:8, 87:4
**kick** [1] - 22:12
**kicking** [1] - 183:8
**kids'** [1] - 123:5
**kill** [1] - 212:11
**kind** [16] - 6:12, 39:14, 39:17, 49:5, 55:1, 63:2, 85:3, 92:5, 98:14, 121:8, 136:20, 210:18, 220:6, 225:8, 225:9, 226:5
**kindly** [1] - 118:15
**kinds** [6] - 32:6, 40:23, 138:25, 141:11, 226:7, 244:17
**King** [13] - 76:5, 79:24, 85:3, 102:7, 116:21, 130:2, 133:18, 137:10, 153:20, 163:4, 188:22, 195:5, 197:11
**KING** [11] - 3:14, 76:6, 76:14, 130:8, 137:11, 167:13, 167:25, 183:23, 270:12, 272:15, 273:11
**Kirsten** [2] - 30:2, 149:3
**Klippen** [6] - 62:23, 97:14, 100:22, 104:19, 106:2, 106:5
**knowing** [7] - 31:7, 31:15, 35:22, 36:7,

37:6, 42:25, 199:2
**knowingly** [16] - 24:20, 38:15, 80:9, 80:10, 119:1, 126:5, 170:10, 202:12, 236:2, 237:8, 242:23, 250:20, 250:21, 259:14, 259:19, 260:4
**knowledge** [12] - 24:8, 83:10, 150:3, 150:15, 174:2, 251:8, 259:22, 259:24, 260:1, 260:6, 260:13, 260:19
**known** [11] - 27:6, 87:13, 109:6, 109:8, 110:9, 180:4, 182:1, 182:20, 254:20, 254:23, 255:9
**knows** [4] - 33:7, 33:10, 156:12, 275:11
**Kraft** [2] - 178:19, 179:3
**Kreider** [6] - 73:14, 73:16, 93:3, 113:13, 113:21, 114:5
**Kreider's** [3] - 73:15, 73:16, 113:15
**Kroger** [80] - 2:6, 56:22, 59:17, 59:19, 60:16, 60:18, 61:9, 61:14, 61:21, 81:7, 81:11, 84:20, 85:1, 86:3, 89:11, 89:18, 89:21, 95:11, 109:17, 109:19, 121:20, 142:21, 143:7, 150:14, 153:3, 155:5, 155:9, 155:15, 155:18, 155:21, 155:24, 156:1, 156:2, 156:3, 156:4, 156:5, 156:12, 156:15, 156:22, 156:23, 157:1, 157:7, 157:8, 157:9, 157:10, 161:12, 162:9, 164:5, 164:17, 164:18, 164:19, 164:22, 170:23, 171:4, 171:6, 171:13, 171:14, 171:18, 172:12, 179:6, 182:3, 182:4, 182:5, 184:10, 184:13, 185:15, 185:20, 193:2, 194:3, 199:6, 199:20, 204:4, 204:21, 217:6, 232:3
**Kroger's** [3] - 60:19, 161:14, 171:5

**Krogers** [1] - 203:14
**Krouse** [1] - 16:7
**Ky** [14] - 11:25, 15:14, 18:23, 36:17, 36:25, 37:22, 39:4, 41:22, 182:22, 182:23, 183:3, 183:10, 183:16, 213:16

## L

**L.P** [1] - 2:23
**Labor** [1] - 31:3
**LACEY** [1] - 3:5
**lack** [2] - 235:7, 266:4
**ladies** [52] - 5:14, 6:23, 6:24, 10:22, 14:10, 14:18, 19:1, 23:8, 28:15, 34:2, 36:8, 37:10, 40:10, 42:18, 44:6, 45:19, 47:11, 50:24, 57:9, 59:21, 66:13, 67:18, 68:13, 72:6, 73:20, 76:25, 117:8, 126:11, 137:12, 141:20, 142:15, 143:17, 144:24, 154:25, 159:14, 168:20, 171:11, 192:5, 194:11, 194:25, 198:7, 199:18, 200:5, 201:18, 202:25, 206:3, 206:8, 208:17, 209:1, 210:17, 218:10, 218:13
**lag** [1] - 271:12
**lane** [1] - 207:9
**language** [2] - 5:2, 133:6
**large** [14] - 25:6, 69:1, 121:4, 123:23, 145:25, 157:15, 161:25, 178:19, 194:14, 199:22, 207:25, 208:1, 208:2, 242:6
**largely** [1] - 192:10
**larger** [2] - 120:17, 188:1
**largest** [9] - 93:6, 113:11, 156:16, 156:17, 170:24, 176:9, 199:20, 204:4, 204:21, 217:6, 232:3
**last** [24] - 4:22, 7:1, 21:8, 49:4, 49:20, 56:2, 68:17, 68:19, 77:2, 80:18, 122:24,

137:13, 137:14, 153:10, 169:17, 186:25, 191:11, 193:21, 193:22, 197:19, 216:4, 217:10, 256:14
**lasted** [3] - 7:12, 122:21, 140:10
**lasting** [1] - 122:24
**late** [7] - 22:22, 24:18, 45:10, 75:22, 120:13, 122:18, 186:19
**latest** [2] - 164:15, 270:25
**law** [52] - 6:14, 7:25, 8:4, 8:7, 8:16, 17:17, 17:19, 24:2, 24:4, 24:13, 34:7, 34:9, 119:12, 126:3, 132:9, 132:20, 139:24, 139:25, 197:12, 206:10, 214:14, 214:25, 215:4, 219:7, 220:16, 220:19, 220:20, 220:24, 221:7, 221:11, 221:13, 221:15, 221:23, 229:18, 229:22, 230:7, 231:20, 234:4, 235:15, 244:18, 247:10, 247:11, 247:13, 247:25, 266:22, 267:10, 267:14, 272:19, 273:4, 275:5, 275:8
**LAW** [4] - 4:16, 4:18, 4:20, 272:24
**lawfully** [4] - 81:2, 253:22, 262:2, 262:19
**laws** [21] - 17:23, 75:6, 129:4, 134:24, 135:2, 136:16, 183:24, 188:25, 219:16, 231:10, 262:12, 262:13, 263:3, 263:6, 263:19, 263:23, 264:2, 264:21, 265:10, 265:15, 274:20
**lawsuit** [18] - 59:25, 69:7, 69:8, 71:11, 73:25, 75:4, 138:23, 138:24, 138:25, 139:16, 140:14, 172:3, 200:3, 218:25, 219:8, 232:1, 232:8, 254:8
**lawsuit's** [1] - 184:24

**lawyer** [11] - 6:18, 13:7, 13:24, 83:9, 84:3, 95:22, 101:12, 201:20, 223:23, 223:24, 224:1
**lawyers** [19] - 5:21, 6:1, 6:5, 6:11, 44:23, 137:15, 185:22, 194:9, 198:8, 220:23, 221:3, 222:21, 222:24, 223:1, 224:3, 224:6, 228:13, 244:21, 268:17
**lawyers'** [1] - 233:17
**Layer** [1] - 108:3
**layer** [4] - 47:19, 175:14, 176:6, 176:7
**layers** [1] - 163:9
**Laying** [1] - 185:13
**laying** [16] - 87:11, 97:11, 97:12, 144:3, 144:6, 149:12, 153:16, 157:7, 158:4, 163:2, 163:12, 174:21, 236:18, 240:25, 258:9, 258:13
**lead** [1] - 264:25
**leaders** [2] - 162:11, 239:2
**leads** [2] - 72:7, 223:20
**learn** [4] - 17:17, 29:20, 42:8, 144:2
**learned** [4] - 74:4, 74:13, 144:3, 144:6
**learning** [1] - 219:7
**least** [12] - 23:19, 109:9, 127:24, 181:13, 215:19, 215:22, 220:9, 232:12, 235:17, 248:10, 250:11
**leave** [9] - 66:21, 123:4, 133:16, 211:14, 216:4, 217:10, 218:13, 243:13, 276:5
**leaving** [1] - 17:4
**led** [1] - 104:1
**left** [9] - 56:13, 104:22, 111:13, 120:3, 120:24, 121:9, 140:14, 154:22, 208:8
**leg** [2] - 151:4, 152:18
**legal** [4] - 46:23, 206:19, 206:20, 229:23
**legalizes** [1] - 275:9
**legally** [2] - 230:12,

231:6
**legislation** [4] - 107:25, 116:19, 116:20, 127:16
**legislations** [1] - 127:17
**legislative** [1] - 262:9
**legislatures** [1] - 184:3
**legitimate** [2] - 72:19, 206:2
**lenders** [1] - 176:1
**length** [1] - 137:24
**lens** [3] - 7:24, 8:4, 8:5
**less** [14] - 85:22, 98:12, 104:17, 105:17, 105:19, 105:22, 106:16, 111:4, 122:8, 122:21, 206:19, 257:13, 257:16, 258:21
**letter** [20] - 13:5, 13:21, 13:22, 33:5, 36:25, 40:1, 40:3, 69:11, 69:12, 89:15, 97:15, 99:11, 106:25, 110:25, 156:3, 158:8, 162:14, 209:5
**level** [6] - 105:15, 112:18, 191:8, 191:13, 198:11, 256:10
**levels** [3] - 144:16, 189:4, 212:10
**leverage** [2] - 157:17, 161:16
**leveraged** [2] - 85:16, 85:18
**Levine** [12] - 76:6, 77:6, 77:11, 118:5, 128:12, 132:21, 133:3, 133:14, 133:24, 144:11, 150:24, 151:13
**LEVINE** [34] - 3:3, 3:10, 5:3, 5:5, 76:9, 76:11, 77:7, 77:9, 86:2, 90:21, 98:17, 117:8, 129:9, 130:4, 133:25, 134:6, 134:21, 135:7, 135:10, 135:12, 135:20, 136:2, 136:5, 136:19, 136:22, 270:14, 274:1,

274:14, 274:16, 274:22, 275:2, 275:19, 275:22, 275:24
**liability** [2] - 231:17, 235:9
**liable** [5] - 231:17, 261:14, 261:15, 263:5, 263:6
**lie** [1] - 200:6
**life** [2] - 222:3, 229:13
**light** [6] - 222:8, 223:16, 227:14, 232:24, 245:17, 248:6
**light-hearted** [1] - 222:8
**likelihood** [1] - 212:14
**likely** [8] - 79:6, 232:25, 234:16, 255:6, 257:13, 257:17, 257:21, 268:16
**likewise** [3] - 99:15, 102:20, 221:10
**limine** [3] - 132:15, 133:7, 134:22
**limit** [6] - 93:1, 93:14, 95:8, 154:17, 154:18
**limitation** [1] - 191:3
**limitations** [1] - 71:7
**limited** [12] - 17:4, 18:16, 55:20, 122:17, 180:14, 224:18, 224:21, 225:1, 225:5, 225:11, 226:7, 258:5
**limiting** [3] - 250:10, 250:14, 252:10
**limits** [4] - 154:12, 154:15, 154:18
**Linc** [1] - 77:2
**Linda** [2] - 106:9, 123:19
**line** [25] - 9:24, 17:15, 17:17, 22:10, 53:4, 53:6, 53:8, 128:5, 175:13, 175:15, 209:25, 210:2, 210:3, 210:4, 210:8, 210:16, 210:22, 210:24, 210:25, 211:9, 211:10, 211:18, 211:20, 211:25
**lines** [4] - 6:3, 50:11, 144:9, 225:12
**lingering** [1] - 30:2
**lining** [1] - 198:10

**list** [4] - 228:5, 237:10, 266:12, 266:19
**listed** [2] - 64:10, 126:1
**listen** [5] - 133:18, 188:8, 203:22, 268:1, 275:1
**listened** [1] - 142:5
**listening** [2] - 9:12, 196:21
**lists** [1] - 27:5
**literally** [3] - 33:4, 55:24, 149:10
**litigating** [1] - 185:19
**LITIGATION** [1] - 1:4
**litigation** [2] - 59:25, 139:17
**live** [7] - 7:18, 11:3, 194:13, 216:12, 220:7, 225:9, 266:11
**lived** [4] - 153:7, 153:8, 242:22, 243:18
**lives** [2] - 7:3, 194:8
**livestock** [3] - 200:10, 200:17, 201:8
**Liz** [1] - 162:8
**LLC** [1] - 2:7
**LLP** [4] - 2:15, 3:2, 3:9, 3:13
**loads** [1] - 124:20
**loans** [1] - 176:1
**local** [1] - 179:8
**located** [2] - 201:8, 243:9
**location** [1] - 105:4
**lock** [1] - 53:25
**lodge** [1] - 127:15
**Logan** [1] - 3:6
**logical** [2] - 19:25, 245:3
**logo** [8] - 22:5, 109:25, 158:20, 158:24, 165:1, 165:2, 166:13, 181:13
**logos** [1] - 142:20
**Lois** [5] - 12:7, 18:23, 36:23, 183:14, 194:18
**long-term** [1] - 153:5
**look** [124] - 11:9, 11:11, 13:14, 13:24, 14:15, 15:2, 19:22, 21:23, 23:22, 29:23, 29:24, 30:16, 30:23, 31:12, 32:10, 34:21, 36:1, 36:4, 36:21, 44:18, 44:22, 45:19, 49:20, 51:14, 57:18, 57:20, 59:8, 59:9,

59:13, 60:11, 78:19, 79:12, 81:23, 82:22, 82:23, 83:5, 88:11, 89:9, 90:9, 91:3, 98:18, 101:6, 102:2, 104:24, 105:4, 105:16, 107:1, 107:19, 109:11, 112:2, 112:14, 112:16, 114:23, 115:4, 116:1, 117:9, 122:17, 122:19, 122:20, 122:23, 124:18, 128:15, 129:21, 131:20, 133:13, 133:17, 139:25, 144:21, 144:22, 145:20, 145:21, 145:22, 153:25, 154:10, 162:3, 165:3, 165:5, 165:13, 166:9, 169:4, 170:3, 170:14, 170:16, 170:17, 171:11, 171:18, 177:8, 177:13, 179:16, 179:22, 180:23, 182:16, 186:11, 186:23, 187:4, 187:5, 193:11, 193:25, 201:2, 203:4, 204:12, 204:24, 205:2, 205:3, 207:5, 209:18, 209:20, 210:6, 210:7, 210:8, 210:20, 213:16, 213:21, 213:23, 214:8, 214:9, 215:12, 217:24, 249:3, 256:4, 257:1
**Look** [1] - 213:5
**looked** [13] - 91:3, 91:4, 131:19, 144:16, 166:5, 166:14, 172:25, 181:24, 188:8, 189:20, 191:19, 192:2, 272:25
**looking** [18] - 8:5, 10:11, 14:11, 18:11, 21:21, 32:4, 63:22, 65:12, 105:5, 117:20, 162:17, 165:11, 183:4, 186:22, 187:22, 189:23, 210:17
**looks** [5] - 125:16, 145:14, 189:19, 190:6
**Looper** [2] - 11:13, 11:15
**lose** [7] - 21:2, 39:1,

39:6, 79:13, 181:9,
218:19, 276:2
**losing** [1] - 31:20
**loss** [8] - 69:20,
70:16, 108:17,
108:18, 235:21,
236:16, 255:20,
255:24
**lost** [3] - 17:9, 17:10,
108:18
**loud** [2] - 100:13,
132:13
**louder** [2] - 159:14,
185:24
**love** [1] - 208:20
**low** [13] - 34:17,
82:3, 112:11, 145:2,
151:6, 173:16, 187:8,
200:19, 209:25,
211:19, 218:20,
238:15, 242:16
**low-cost** [1] - 218:20
**lower** [14] - 51:23,
51:24, 51:25, 52:1,
112:18, 188:4, 188:6,
203:18, 208:23,
255:21, 255:24
**lowered** [1] - 206:22
**lowest** [6] - 112:19,
144:18, 176:2, 188:5,
189:4, 247:18
**lows** [1] - 112:21
**loyalty** [2] - 61:7,
61:8
**lozenge** [1] - 231:22
**Lubbock** [1] - 200:21
**lucky** [1] - 150:21
**lukewarm** [1] -
126:22
**lunch** [4] - 6:15,
75:21, 75:22, 117:16,
126:11, 126:19,
126:25, 127:1, 127:5,
127:11, 130:22,
131:8, 137:4, 271:10
**luncheon** [2] - 131:5,
131:6
**lunchtime** [1] -
126:18
**Lynn** [7] - 81:6,
84:22, 121:19, 162:8,
164:4, 205:3

## M

**M&M** [1] - 178:20
**magazines** [1] -
115:24
**magnitude** [1] -

130:21
**mail** [24] - 11:12,
12:12, 13:21, 14:7,
14:10, 16:5, 18:23,
36:17, 38:17, 102:2,
102:6, 102:7, 102:8,
145:22, 160:21,
165:18, 187:14,
212:24, 212:25,
218:11, 218:17,
273:4, 273:9
**mails** [7] - 10:25,
60:16, 60:17, 60:20,
60:21, 160:8, 217:9
**Main** [1] - 201:19
**main** [3] - 182:21,
188:12, 190:17
**Maine** [29] - 14:12,
14:13, 15:10, 26:4,
27:8, 45:16, 74:17,
108:6, 114:6, 115:6,
127:16, 129:9,
131:15, 131:17,
134:6, 134:9, 135:6,
136:5, 148:16,
150:12, 157:1,
159:22, 159:23,
159:25, 160:2,
203:10, 204:9, 237:11
**Maine's** [2] - 134:14,
134:16
**maintain** [3] - 107:5,
111:7, 200:2
**maintained** [1] -
135:1
**maintaining** [2] -
49:5, 262:20
**major** [7] - 15:10,
34:9, 56:13, 59:24,
194:14, 203:23, 238:9
**majority** [4] - 119:3,
124:20, 153:14,
243:10
**man** [1] - 116:13
**manageable** [1] -
126:16
**management** [6] -
33:8, 69:16, 70:15,
72:13, 129:5, 239:19
**manager** [1] - 71:2
**mandatory** [3] -
10:5, 58:19, 58:22
**manipulate** [2] -
17:3, 35:2
**manipulating** [3] -
213:8, 213:11, 218:22
**manipulation** [1] -
35:11
**manner** [4] - 227:5,
227:23, 231:4, 270:5

**MANNIX** [10] - 2:16,
68:1, 68:6, 68:10,
68:13, 70:11, 71:11,
72:3, 129:3, 129:7
**Mannix** [2] - 68:11,
68:15
**manual** [1] - 157:7
**map** [6] - 115:4,
136:1, 136:2, 136:3,
139:23
**maple** [1] - 145:21
**march** [1] - 201:2
**March** [16] - 11:24,
12:7, 13:19, 13:20,
19:23, 36:17, 36:20,
36:24, 38:17, 41:23,
42:17, 160:20,
182:24, 183:15,
213:16, 213:24
**Marcus** [22] - 16:5,
18:24, 36:18, 36:20,
37:20, 40:15, 42:7,
60:7, 83:19, 93:4,
142:24, 161:16,
171:21, 172:8, 172:9,
189:11, 192:19,
192:20, 212:25,
213:14, 218:12,
218:16
**MARCUS** [1] - 2:15
**marginalize** [1] -
212:17
**mark** [1] - 140:16
**marked** [1] - 205:3
**Market** [1] - 1:22
**market** [154] - 15:20,
16:25, 17:3, 32:20,
34:25, 35:1, 35:2,
35:11, 37:19, 40:9,
40:10, 40:13, 40:24,
41:11, 46:16, 46:19,
46:21, 46:22, 46:23,
47:1, 47:2, 47:3,
47:24, 50:3, 50:15,
50:22, 51:2, 51:4,
51:5, 51:7, 51:8, 51:9,
51:11, 51:13, 51:14,
51:21, 51:24, 53:19,
53:25, 55:15, 56:9,
59:12, 61:24, 83:1,
86:17, 93:5, 93:23,
94:2, 94:8, 94:24,
95:1, 97:2, 110:18,
111:15, 112:4, 112:9,
113:11, 114:23,
115:10, 118:23,
119:5, 119:9, 124:25,
141:7, 141:8, 141:9,
173:14, 176:21,
176:23, 176:24,

177:2, 177:3, 177:4,
177:6, 177:7, 177:15,
177:16, 177:18,
177:21, 177:24,
178:2, 178:5, 178:11,
178:12, 178:24,
179:10, 179:12,
179:15, 179:18,
179:21, 179:23,
179:24, 179:25,
193:17, 202:9,
202:13, 203:3, 204:3,
204:6, 207:23, 208:8,
210:15, 211:7, 216:1,
236:9, 236:10,
241:18, 242:22,
243:18, 249:19,
249:22, 253:16,
254:20, 254:21,
254:22, 254:23,
254:25, 255:1, 255:3,
255:7, 255:10,
255:13, 255:14,
255:17, 256:8, 256:9,
256:13, 256:14,
256:17, 256:18,
256:20, 256:21,
256:22, 257:1, 257:3,
257:6, 257:7, 257:8,
257:10, 257:13,
257:15, 257:16,
257:18, 257:21,
257:23, 258:1, 262:20
**market-driven** [1] -
86:17
**market-wide** [3] -
236:9, 242:22, 243:18
**Marketers** [32] - 3:8,
31:4, 118:4, 118:13,
118:18, 118:21,
118:24, 118:25,
120:11, 120:12,
120:22, 120:25,
121:7, 121:13,
121:23, 122:1,
123:10, 123:14,
123:17, 124:19,
125:2, 125:3, 125:11,
125:17, 125:21,
126:2, 126:5, 168:18,
232:7, 247:21,
259:12, 262:5
**Marketing** [3] -
89:12, 153:22, 238:25
**marketing** [2] -
37:25, 167:17
**marketplace** [8] -
47:14, 48:5, 63:24,
156:20, 169:20,
169:21, 194:15,

247:16
**markets** [7] - 50:4,
51:6, 119:8, 178:23,
179:10, 254:25, 255:2
**Markets** [2] - 2:13,
232:3
**Marmer** [8] - 81:6,
81:11, 84:22, 121:19,
162:8, 162:14, 164:5
**Marmer's** [1] - 205:4
**Mars** [1] - 178:20
**Marshall** [2] - 143:1,
175:25
**marshals** [1] -
130:24
**Massachusetts** [1] -
184:5
**massive** [3] - 161:16,
194:14, 194:20
**matches** [1] - 125:13
**material** [8] - 166:6,
223:8, 243:15,
247:19, 263:21,
264:10, 264:19,
265:14
**math** [3] - 41:7, 41:8,
41:12
**matter** [27] - 10:9,
10:13, 18:15, 39:22,
46:13, 68:15, 75:13,
132:3, 202:25,
203:12, 203:17,
206:6, 212:1, 212:12,
212:14, 212:18,
222:9, 226:3, 228:2,
228:21, 234:10,
234:14, 245:10,
270:6, 276:12
**mattered** [1] - 40:11
**matters** [9] - 194:10,
200:15, 203:12,
206:6, 206:25, 208:7,
224:12, 235:1, 271:3
**mayonnaise** [1] -
179:4
**McDonald's** [7] -
94:21, 116:21,
153:19, 153:20,
163:3, 188:22
**McDonald's/Burger**
[1] - 85:2
**MDL** [1] - 1:4
**mean** [29] - 18:14,
24:18, 44:8, 73:4,
84:25, 85:17, 100:1,
101:3, 123:14,
128:14, 133:3,
133:13, 135:21,
148:20, 161:22,
162:14, 173:19,

175:20, 183:1,
184:22, 193:15,
205:19, 210:6,
215:21, 230:4, 233:6,
253:20, 269:9

**meaning** [3] - 19:18,
117:16, 206:20

**meaningful** [2] -
130:14, 163:11

**means** [31] - 18:15,
25:1, 27:21, 32:22,
37:11, 44:8, 74:22,
79:5, 80:6, 80:10,
85:5, 93:9, 155:11,
208:25, 211:18,
214:24, 215:22,
232:22, 236:20,
250:21, 251:14,
252:3, 252:6, 254:24,
258:20, 259:19,
261:12, 264:11, 269:5

**meant** [6] - 38:25,
40:8, 116:7, 224:2,
224:13, 267:8

**meantime** [1] -
268:19

**measurable** [8] -
29:7, 52:17, 83:25,
84:4, 151:15, 153:2,
208:17, 239:19

**measure** [14] - 26:20,
27:9, 29:9, 31:3, 35:5,
38:7, 38:10, 38:12,
38:14, 40:19, 63:18,
69:23, 153:9, 208:18

**measured** [7] - 41:2,
52:15, 53:13, 54:10,
65:4, 145:1, 153:8

**measures** [47] - 8:25,
9:16, 10:3, 26:6, 26:8,
26:18, 26:21, 26:22,
26:24, 27:2, 27:6,
27:18, 32:2, 32:15,
35:18, 42:11, 42:15,
44:18, 52:7, 56:4,
67:13, 70:17, 71:1,
82:1, 84:4, 140:24,
151:5, 151:16,
151:20, 152:12,
152:24, 153:3,
168:17, 205:18,
208:16, 209:3, 209:4,
209:10, 209:15,
212:7, 217:15,
219:13, 235:20,
236:15, 248:21,
253:11

**meat** [1] - 89:25

**Mechanical** [1] -
1:25

**mechanism** [4] -
82:12, 82:15, 82:17,
203:2

**mechanisms** [1] -
82:19

**media** [2] - 14:22,
14:23

**medium** [1] - 123:23

**meet** [24] - 21:22,
21:25, 24:10, 56:3,
56:15, 56:24, 79:7,
88:3, 105:23, 122:22,
148:24, 158:11,
168:8, 193:14,
193:15, 193:16,
193:18, 193:19,
193:20, 203:14,
204:14, 228:13,
234:11, 242:5

**meeting** [19] - 15:13,
29:5, 33:19, 34:4,
34:20, 36:21, 36:22,
38:11, 46:8, 56:1,
71:18, 81:14, 81:16,
90:9, 114:25, 146:23,
162:15, 163:7, 241:14

**meetings** [10] -
26:12, 45:13, 45:14,
70:25, 92:10, 101:17,
101:18, 147:15,
212:19, 253:1

**meets** [2] - 99:20,
164:11

**member** [23] - 25:16,
73:1, 92:4, 92:6, 92:8,
101:20, 121:7, 121:9,
167:5, 240:8, 241:11,
250:20, 251:8,
251:10, 251:18,
259:21, 259:23,
260:3, 260:10,
260:17, 260:21,
261:3, 261:4

**members** [72] -
17:10, 17:12, 25:17,
26:10, 27:12, 28:6,
29:19, 29:20, 31:11,
33:3, 33:11, 33:14,
34:13, 44:2, 57:15,
58:9, 58:14, 73:4,
77:10, 80:20, 80:23,
81:18, 81:20, 82:8,
84:13, 84:14, 86:16,
89:18, 91:25, 92:11,
98:25, 99:1, 99:8,
99:25, 116:19,
117:25, 121:10,
125:1, 142:12, 148:9,
157:15, 171:24,
172:1, 172:2, 172:5,

224:24, 239:4,
240:18, 241:12,
241:24, 242:16,
242:19, 243:4,
243:10, 243:13,
251:5, 251:10,
251:11, 251:16,
252:8, 252:23,
257:10, 259:12,
259:24, 261:1, 262:6,
262:10, 262:20,
262:23, 267:1

**members'** [2] -
84:11, 262:21

**memo** [13] - 11:25,
32:9, 41:23, 42:5,
42:18, 49:22, 58:14,
162:14, 164:4, 164:7,
182:22, 204:21,
213:17

**memory** [10] - 40:4,
46:5, 46:9, 50:12,
51:19, 60:23, 61:1,
227:5, 266:2, 266:7

**memos** [1] - 208:6

**Mench** [4] - 87:10,
87:15, 90:8, 107:21

**mention** [2] - 174:8,
214:14

**mentioned** [14] -
5:22, 74:12, 118:18,
121:3, 123:20, 124:7,
161:9, 169:15,
169:16, 174:6,
226:25, 237:18,
254:12, 266:10

**mentioning** [3] -
131:12, 143:23, 228:4

**MEOLA** [1] - 3:5

**merchants** [1] - 85:2

**mere** [1] - 252:24

**Mere** [1] - 147:12

**merely** [2] - 224:24,
254:16

**message** [1] - 5:15

**messages** [2] -
268:11, 268:21

**messaging** [1] - 13:3

**messed** [1] - 109:20

**met** [17] - 62:24,
96:10, 111:22, 120:2,
141:21, 142:1,
143:19, 147:15,
148:7, 170:5, 186:4,
192:6, 219:17, 248:3,
251:12, 253:1, 258:12

**method** [1] - 273:10

**methods** [2] - 252:4,
252:6

**Miami** [1] - 2:6

**Michael** [14] - 47:22,
121:2, 121:3, 121:6,
121:8, 148:17,
148:22, 151:21,
168:1, 168:5, 237:12,
239:18, 274:9

**MICHAEL** [1] - 2:4

**Michigan** [3] - 2:21,
115:7, 184:4

**microwave** [1] -
126:20

**mid** [1] - 77:9

**mid-morning** [1] -
77:9

**middle** [3] - 116:14,
138:14, 144:19

**Midwest** [6] - 16:7,
150:13, 157:2,
203:11, 204:9, 237:12

**might** [23] - 60:10,
62:8, 64:21, 71:19,
76:15, 126:15,
126:21, 127:11,
132:3, 133:11,
221:13, 222:24,
224:1, 226:19, 227:9,
227:11, 228:10,
229:6, 234:25,
243:23, 245:7,
253:19, 261:23

**migrate** [1] - 33:15

**milk** [1] - 177:11

**million** [12] - 112:4,
145:2, 145:3, 165:21,
165:25, 166:7,
166:12, 175:19,
175:20, 175:24,
176:5, 176:8

**millions** [6] - 27:23,
31:20, 32:20, 40:5

**mind** [11] - 102:1,
171:10, 171:12,
198:7, 200:15,
209:18, 216:13,
229:3, 235:4, 261:19,
268:6

**minds** [1] - 146:23

**mine** [1] - 267:7

**minimized** [2] - 97:2,
241:18

**minimum** [4] - 47:7,
99:20, 181:14, 275:21

**minor** [1] - 4:13

**minute** [7] - 103:20,
115:12, 141:2, 175:3,
186:13, 195:8, 196:15

**minutes** [18] - 15:18,
26:12, 36:22, 63:9,
68:7, 75:19, 75:24,
100:14, 117:14,

130:4, 130:5, 130:8,
130:19, 162:15,
195:14, 196:5,
270:18, 272:12

**misrepresentations**
[1] - 192:9

**missing** [2] - 145:16,
211:9

**misspoke** [2] -
35:16, 61:18

**mistake** [4] - 80:10,
202:11, 250:22,
259:20

**mistakes** [1] - 45:21

**mistreated** [1] -
200:23

**mistreating** [1] -
39:10

**mistreatment** [1] -
39:14

**MIT** [1] - 188:8

**Mitch** [4] - 121:21,
165:19, 200:9

**Mitchel** [1] - 159:21

**Moark** [2] - 157:3,
237:13

**model** [16] - 53:14,
63:18, 64:1, 64:4,
64:8, 122:5, 122:6,
122:10, 122:14,
123:1, 149:19,
189:14, 190:19,
191:18, 191:21,
243:14

**modeling** [1] - 123:2

**models** [5] - 41:3,
65:12, 122:4, 188:10,
188:11

**modest** [1] - 196:10

**modification** [1] -
274:25

**modify** [1] - 275:3

**Moira** [1] - 68:14

**MOIRA** [1] - 2:16

**molting** [4] - 103:19,
104:8, 104:10, 152:10

**moment** [9] - 9:9,
13:8, 16:6, 24:1,
29:16, 66:8, 133:21,
215:3, 234:10

**momentarily** [1] -
4:8

**moments** [1] - 222:8

**money** [3] - 31:20,
60:5, 183:14

**monitor** [1] - 42:12

**monitoring** [1] -
134:12

**Monroe** [1] - 2:12

**month** [8] - 112:9,

122:22, 153:7, 182:24, 183:1, 183:2, 239:22

**monthly** [2] - 106:13, 190:5

**months** [6] - 69:19, 121:9, 171:5, 185:20, 203:1, 203:17

**moral** [1] - 218:20

**Moran** [1] - 71:16

**moreover** [14] - 92:8, 92:15, 93:1, 101:25, 106:1, 106:20, 109:25, 162:25, 179:14, 184:6, 187:4, 191:19, 236:7, 242:20

**morning** [8] - 5:14, 6:24, 68:13, 77:9, 146:5, 270:21, 271:9, 271:16

**MORRIS** [2] - 3:9, 3:13

**mortality** [9] - 87:6, 103:23, 104:1, 105:15, 108:5, 108:10, 181:9, 212:7, 212:14

**most** [25] - 20:5, 29:21, 41:19, 45:10, 56:12, 104:2, 110:13, 114:23, 121:13, 121:15, 121:17, 122:3, 123:1, 123:4, 133:20, 153:6, 156:6, 156:7, 156:8, 189:25, 198:20, 239:1, 239:21, 265:24, 268:16

**mostly** [1] - 122:18

**mother** [1] - 36:23

**motion** [4] - 132:15, 133:7, 133:23, 134:22

**motions** [1] - 101:18

**motivations** [1] - 102:4

**motive** [12] - 12:1, 15:24, 24:25, 227:7, 247:1, 261:10, 261:12, 261:13, 261:15, 261:16, 261:17, 261:18

**motives** [4] - 202:4, 246:5, 261:22, 261:23

**mouthful** [1] - 132:12

**move** [10] - 26:14, 41:17, 95:12, 95:14, 102:12, 106:22, 109:2, 110:17, 215:24, 216:15

**movies** [1] - 221:24

**moving** [2] - 40:24, 114:20

**MR** [86] - 4:6, 4:8, 4:11, 5:3, 5:5, 5:9, 6:22, 75:17, 76:3, 76:6, 76:14, 117:14, 117:24, 127:10, 127:13, 128:8, 128:11, 128:14, 128:20, 128:24, 130:1, 130:4, 130:8, 130:12, 130:19, 131:10, 132:5, 132:13, 132:14, 133:2, 133:15, 133:19, 133:23, 134:21, 135:7, 135:10, 135:12, 135:17, 136:9, 136:14, 137:11, 167:13, 167:25, 183:23, 195:7, 195:10, 195:18, 195:24, 196:7, 196:14, 196:19, 196:23, 196:24, 197:6, 197:10, 197:15, 197:20, 197:23, 198:1, 198:4, 198:20, 198:22, 270:11, 270:12, 270:13, 272:15, 272:16, 272:19, 273:2, 273:8, 273:11, 273:13, 273:17, 273:20, 273:22, 273:25, 274:2, 274:12, 274:14, 274:16, 274:22, 275:2, 275:19, 275:22, 275:24, 276:4

**MS** [27] - 68:1, 68:6, 68:10, 68:13, 70:11, 71:11, 72:3, 76:9, 76:11, 77:7, 77:9, 86:2, 90:21, 98:17, 117:8, 129:3, 129:7, 129:9, 133:25, 134:6, 135:20, 136:2, 136:5, 136:19, 136:22, 270:14, 274:1

**Mueller** [9] - 13:6, 13:22, 14:4, 101:9, 101:10, 101:25, 102:1, 120:22

**multiple** [2] - 78:15, 255:2

**must** [60] - 79:5, 79:9, 80:6, 80:9,

88:17, 108:4, 108:14, 111:24, 133:19, 151:9, 155:16, 156:5, 170:12, 199:12, 199:25, 211:18, 222:10, 223:12, 224:19, 226:16, 226:18, 231:7, 234:13, 245:2, 248:7, 248:18, 248:24, 249:3, 249:12, 249:16, 249:22, 249:24, 250:15, 251:16, 253:7, 254:4, 254:13, 254:19, 254:24, 255:7, 255:11, 255:14, 258:1, 258:16, 258:25, 259:7, 259:13, 259:17, 263:7, 263:11, 263:12, 264:1, 264:8, 264:11, 264:20, 267:23, 269:3, 269:4, 269:5, 269:10

**mustn't** [1] - 268:8

## N

**NACHWALTER** [1] - 2:2

**nada** [1] - 173:7

**name** [7] - 68:14, 77:11, 100:24, 118:3, 159:20, 195:1, 210:15

**named** [2] - 234:7

**namely** [1] - 232:1

**names** [3] - 199:2, 203:11, 204:10

**nation's** [2] - 175:7, 242:3

**National** [3] - 154:1, 157:3, 237:13

**national** [1] - 175:4

**natural** [3] - 6:17, 75:23, 108:11

**naturally** [1] - 14:2

**nature** [4] - 52:6, 256:7, 256:8, 259:25

**NCCR** [10] - 80:20, 90:12, 90:17, 90:23, 91:3, 99:2, 116:21, 158:12, 164:6, 164:10

**nearly** [3] - 138:2, 138:3, 208:12

**necessarily** [9] - 28:24, 31:17, 199:12, 227:19, 229:4, 251:12, 253:20, 257:14

**necessary** [4] - 252:1, 252:3, 258:17, 258:24

**need** [41] - 12:14, 31:25, 45:5, 49:7, 49:18, 62:17, 62:20, 90:19, 94:5, 98:18, 102:15, 102:17, 111:21, 117:16, 126:14, 126:22, 126:24, 129:23, 130:7, 131:1, 153:11, 160:10, 162:23, 170:3, 171:2, 179:7, 186:6, 201:14, 213:18, 219:9, 222:13, 248:4, 251:5, 251:11, 251:19, 264:15, 272:14

**needed** [8] - 51:13, 59:20, 82:15, 98:8, 102:21, 110:10, 162:21, 167:23

**needs** [15] - 6:16, 56:15, 56:24, 127:2, 133:4, 136:9, 158:11, 160:2, 179:3, 179:4, 179:7, 196:4, 203:14, 204:14, 208:2

**neglected** [1] - 77:1

**negotiating** [1] - 236:22

**negotiations** [1] - 162:5

**nest** [6] - 123:20, 123:21, 123:22, 124:1, 124:7, 124:21

**nest-run** [6] - 123:20, 123:21, 123:22, 124:1, 124:7, 124:21

**net** [1] - 43:21

**never** [37] - 15:4, 20:15, 20:21, 42:7, 44:24, 45:10, 54:24, 63:1, 69:17, 83:19, 94:17, 101:17, 102:1, 109:6, 111:16, 117:6, 119:18, 119:19, 121:7, 121:9, 124:21, 124:22, 134:25, 165:13, 166:5, 166:6, 166:14, 171:22, 172:11, 186:9, 192:25, 204:2, 208:1, 216:20, 238:11, 238:18, 268:21

**never-ending** [1] - 186:9

**nevertheless** [1] -

149:14

**New** [5] - 115:6, 134:11, 182:11, 184:4, 237:14

**new** [14] - 108:9, 108:19, 109:15, 174:16, 176:5, 176:7, 181:11, 182:4, 194:9, 198:15, 262:6, 262:10, 273:3

**Newberry** [1] - 87:12

**Newcastle** [3] - 15:3, 15:9, 55:2

**news** [1] - 197:19

**news/bad** [1] - 197:19

**newsletter** [4] - 28:18, 33:2, 115:15, 187:16

**newsletters** [5] - 28:16, 186:8, 186:9, 187:14, 192:10

**next** [26] - 14:21, 20:2, 21:7, 21:20, 23:22, 23:25, 26:14, 28:9, 30:16, 31:9, 37:15, 49:20, 50:8, 50:10, 51:20, 77:6, 77:22, 79:21, 94:1, 100:10, 117:13, 126:2, 127:1, 210:20, 215:11, 258:1

**next-to-last** [1] - 49:20

**nice** [1] - 212:16

**night** [3] - 49:3, 49:4, 77:2

**nine** [1] - 68:6

**NO** [1] - 1:4

**nobody** [5] - 16:10, 16:16, 82:22, 138:12, 221:25

**nobody's** [1] - 14:11

**non** [30] - 69:14, 70:15, 93:2, 93:7, 93:9, 93:10, 93:11, 93:13, 93:15, 99:19, 103:19, 104:8, 104:10, 113:7, 113:14, 113:15, 113:16, 113:17, 113:20, 113:23, 113:24, 114:4, 114:6, 157:20, 242:5, 242:8, 242:9, 242:11

**non-cage** [1] - 99:19

**non-certified** [23] - 70:15, 93:2, 93:7, 93:9, 93:10, 93:11, 93:13, 93:15, 113:7,

113:14, 113:15, 113:16, 113:17, 113:20, 113:23, 113:24, 114:4, 114:6, 242:5, 242:8, 242:9, 242:11

**non-feed-withdrawal** [3] - 103:19, 104:8, 104:10

**non-UEP** [1] - 69:14

**non-USDA** [1] - 157:20

**none** [9] - 18:12, 60:15, 124:6, 173:7, 176:10, 187:12, 226:23

**nonetheless** [2] - 6:9, 166:3

**nonexistence** [1] - 229:6

**nonpresence** [1] - 234:2

**noose** [1] - 29:15

**Norco** [1] - 237:13

**normally** [1] - 118:16

**North** [1] - 176:5

**notably** [2] - 35:24, 50:22

**note** [11] - 5:15, 12:7, 13:15, 14:17, 15:16, 34:22, 36:25, 68:18, 101:16, 118:9, 126:25

**note-taking** [1] - 118:9

**notebooks** [1] - 273:19

**notes** [8] - 52:13, 163:8, 265:23, 265:25, 266:3, 266:5, 266:6, 266:18

**nothing** [22] - 62:18, 97:6, 100:20, 104:10, 110:6, 111:17, 121:19, 121:20, 139:14, 143:4, 150:10, 154:13, 154:19, 173:8, 194:21, 196:17, 202:5, 221:2, 267:7, 270:2, 270:3

**notice** [12] - 22:9, 91:18, 105:12, 109:2, 109:14, 111:12, 124:19, 146:12, 195:21, 195:25, 224:24, 225:17

**notify** [1] - 226:5

**noting** [1] - 10:14

**notion** [3] - 20:22, 56:16, 222:11

**notwithstanding** [2] - 165:14, 219:1

**November** [7] - 13:5, 13:23, 28:7, 57:1, 60:12, 134:10, 159:4

**number** [55] - 4:17, 10:6, 10:7, 11:7, 11:16, 18:20, 21:5, 27:20, 30:5, 31:1, 41:15, 41:18, 43:25, 52:2, 52:15, 53:15, 53:22, 57:5, 57:6, 59:15, 71:7, 92:22, 92:23, 92:24, 92:25, 105:9, 130:20, 135:25, 145:12, 145:13, 152:10, 157:23, 172:5, 174:21, 175:16, 188:14, 215:8, 215:9, 218:23, 224:1, 227:1, 227:16, 227:19, 229:5, 229:7, 229:8, 238:21, 241:9, 241:10, 246:7, 249:14, 256:9, 268:24

**Number** [22] - 4:20, 4:21, 23:24, 37:16, 97:23, 131:18, 131:19, 151:8, 168:22, 168:23, 169:5, 169:6, 169:7, 169:8, 170:2, 170:6, 170:7, 196:11, 214:22, 215:24, 217:11

**numbers** [9] - 13:9, 13:15, 44:19, 52:12, 53:24, 91:1, 106:14, 192:2, 242:3

**NW** [1] - 3:11

## O

**Oakdell** [1] - 237:14

**oath** [4] - 100:23, 139:3, 159:4, 267:15

**obfuscate** [1] - 146:8

**object** [7] - 128:6, 134:6, 136:3, 218:2, 218:3, 218:7, 251:13

**objected** [2] - 101:18, 224:1

**objection** [9] - 5:5, 127:15, 129:4, 134:7, 134:18, 135:21, 224:11, 224:13, 224:14

**objectionable** [1] - 100:25

**objections** [8] - 223:2, 224:2, 224:4, 224:5, 224:6, 224:7, 224:11

**objective** [1] - 65:10

**obligation** [3] - 221:14, 224:7, 246:14

**observation** [2] - 131:15, 143:21

**observations** [1] - 142:1

**obtain** [1] - 139:1

**obtained** [1] - 108:14

**obtaining** [1] - 268:7

**obvious** [4] - 196:11, 221:25, 231:21

**obviously** [2] - 6:15, 133:4

**occur** [2] - 10:12, 15:5

**occurred** [14] - 10:16, 10:20, 15:7, 52:3, 52:15, 54:18, 55:2, 88:19, 132:20, 235:17, 250:11, 254:20, 264:12, 272:25

**occurring** [2] - 122:8, 260:20

**occurs** [3] - 19:2, 52:17, 254:16

**October** [3] - 138:2, 142:4, 143:24

**OF** [2] - 1:2, 1:15

**offer** [1] - 264:8

**offered** [4] - 54:22, 223:24, 226:3, 234:24

**offers** [3] - 113:3, 113:4, 193:24

**office** [2] - 30:7, 230:25

**officer** [3] - 143:1, 268:9, 268:13

**Officer** [1] - 272:4

**officers** [1] - 229:25

**official** [1] - 1:21

**Official** [1] - 276:14

**offset** [2] - 41:4, 52:25

**often** [2] - 7:4, 137:15

**OH** [1] - 3:16

**Ohio** [3] - 115:6, 138:11, 184:4, 237:14

**old** [2] - 152:10, 244:10

**once** [18] - 6:8, 22:6, 25:6, 27:11, 27:15, 38:21, 38:24, 43:1, 56:7, 71:14, 118:18,

140:5, 172:7, 208:7, 208:8, 231:18, 270:2, 271:7

**one** [191] - 2:17, 4:9, 4:10, 4:13, 4:15, 6:17, 8:22, 9:8, 13:6, 14:21, 15:17, 16:23, 21:24, 26:4, 26:10, 34:2, 34:24, 41:7, 46:5, 46:14, 47:19, 48:7, 48:16, 49:16, 51:4, 51:6, 51:7, 51:8, 53:2, 55:1, 62:25, 64:7, 64:10, 66:5, 68:3, 69:21, 72:13, 72:22, 73:2, 78:3, 82:23, 83:11, 84:24, 85:3, 85:5, 85:8, 85:16, 85:18, 85:24, 93:6, 93:18, 106:6, 106:9, 109:17, 112:9, 114:16, 114:23, 122:9, 122:21, 124:15, 125:8, 126:12, 126:24, 129:12, 131:2, 131:22, 135:18, 136:11, 136:12, 137:11, 138:16, 138:18, 139:17, 140:17, 140:22, 141:1, 141:22, 146:6, 147:14, 147:19, 147:20, 147:23, 148:4, 150:21, 151:19, 151:21, 151:22, 151:25, 152:12, 156:15, 156:16, 159:19, 160:9, 162:11, 162:20, 163:20, 163:22, 164:14, 167:1, 168:7, 168:16, 172:22, 173:8, 173:13, 173:19, 178:24, 179:10, 180:22, 181:2, 181:17, 182:9, 182:24, 182:25, 183:12, 187:6, 188:12, 189:17, 189:19, 191:15, 191:16, 192:17, 192:20, 193:2, 193:13, 195:18, 198:12, 199:8, 199:12, 200:8, 204:2, 206:2, 211:2, 212:3, 212:23, 213:3, 214:15, 214:22, 215:8, 218:11,

218:15, 219:12, 219:18, 221:7, 221:21, 229:7, 235:11, 235:19, 236:3, 237:9, 239:22, 243:20, 244:8, 244:24, 245:7, 247:25, 249:3, 251:13, 252:25, 253:3, 253:9, 253:25, 254:2, 255:3, 255:4, 255:5, 260:7, 261:23, 262:21, 263:10, 263:17, 266:25, 267:4, 267:19, 268:24, 270:7, 270:20, 273:3, 274:16

**one-off** [1] - 122:9

**one-sided** [1] - 146:6

**one-time** [1] - 163:22

**ones** [5] - 13:17, 78:15, 87:5, 149:18

**ongoing** [2] - 35:19, 35:20

**online** [1] - 120:14

**oops** [7] - 102:1, 140:11, 145:5, 157:5, 169:24, 185:6, 191:10

**open** [6] - 41:25, 100:19, 110:11, 253:19, 253:21, 267:2

**opened** [3] - 4:1, 129:14, 151:1

**opening** [15] - 5:23, 11:3, 18:2, 27:16, 43:10, 51:17, 78:24, 118:20, 185:21, 199:6, 199:17, 202:2, 209:11, 209:23, 211:4

**openly** [1] - 84:21

**operated** [1] - 10:9

**operates** [2] - 26:9, 27:12

**operation** [1] - 252:7

**operations** [1] - 238:10

**opine** [1] - 50:19

**opined** [1] - 47:3

**opining** [2] - 50:23, 124:12

**opinion** [23] - 51:12, 65:24, 113:3, 113:4, 113:6, 115:20, 116:8, 144:21, 177:23, 177:24, 178:4, 178:7, 178:10, 221:13, 222:12, 245:21, 245:25, 247:3, 247:5, 247:7, 268:3, 270:6

**opinions** [14] -

65:17, 115:17, 115:18, 150:8, 186:10, 186:22, 188:9, 208:19, 245:20, 246:16, 246:23, 246:24, 268:5
**opportunities** [2] - 243:8, 243:9
**opportunity** [6] - 18:5, 33:7, 118:2, 128:8, 227:2, 266:22
**opposed** [7] - 21:15, 44:12, 67:1, 111:8, 116:9, 248:25, 273:9
**opposes** [1] - 16:2
**opposite** [3] - 55:16, 173:3, 233:5
**opt** [2] - 20:13, 20:20
**opted** [1] - 20:15
**options** [2] - 34:22, 34:24
**orchestrate** [1] - 240:15
**order** [49] - 5:16, 8:21, 10:12, 14:1, 17:24, 29:22, 30:7, 30:12, 31:6, 32:14, 35:21, 36:6, 51:22, 54:21, 59:5, 130:21, 140:15, 143:6, 144:1, 145:9, 145:18, 146:8, 148:24, 157:17, 163:11, 167:19, 167:22, 173:22, 174:1, 174:3, 174:4, 174:9, 174:14, 179:4, 180:3, 192:24, 194:16, 199:14, 212:21, 213:12, 233:9, 233:19, 246:13, 266:13, 269:2, 270:1, 271:10
**ordered** [1] - 226:14
**orders** [1] - 120:17
**Oregon** [2] - 115:5, 184:4
**organization** [23] - 26:9, 27:11, 31:10, 118:21, 229:14, 229:25, 230:1, 230:4, 230:7, 230:10, 230:12, 230:18, 230:21, 230:23, 231:1, 231:5, 231:6, 231:9, 231:11, 231:14, 231:17, 242:25, 262:16
**organizations** [6] - 58:8, 85:23, 229:17, 230:12, 231:19,

250:25
**organize** [1] - 270:16
**organized** [3] - 8:24, 35:8
**organizing** [1] - 271:21
**original** [1] - 108:13
**Ostrander** [1] - 168:5
**otherwise** [12] - 22:18, 66:3, 103:3, 125:4, 125:5, 147:16, 224:25, 236:6, 253:2, 256:16, 265:2, 269:23
**ought** [3] - 221:13, 221:15, 222:12
**ourselves** [5] - 26:15, 131:10, 150:21, 218:21, 270:16
**outcome** [1] - 227:6
**outlet** [1] - 173:23
**outlets** [2] - 173:19, 173:20
**outlined** [1] - 180:18
**output** [14] - 40:9, 40:12, 41:2, 51:24, 84:5, 151:16, 153:3, 237:1, 255:21, 255:24, 256:5, 258:11, 262:22, 262:25
**outputs** [1] - 14:2
**outset** [3] - 176:24, 181:18, 193:11
**outside** [11] - 125:3, 127:2, 132:22, 223:6, 223:14, 230:11, 230:21, 244:2, 244:11, 244:16, 257:8
**outskirts** [1] - 201:7
**outweigh** [5] - 96:2, 180:20, 206:13, 237:2, 259:5
**outweighed** [1] - 95:25
**outweighs** [4] - 62:4, 250:2, 259:2, 259:10
**overall** [9] - 40:9, 40:10, 40:13, 40:24, 41:11, 175:4, 213:12, 260:6
**overcharged** [1] - 74:9
**overcharges** [1] - 75:8
**overlap** [2] - 86:12, 249:9
**overlapping** [1] - 35:25
**overnight** [1] -

202:16
**overruled** [4] - 134:7, 134:19, 135:21, 224:14
**overseas** [1] - 243:9
**overseen** [1] - 28:20
**oversupply** [3] - 32:12, 32:13, 34:17
**overwhelming** [5] - 33:23, 36:9, 44:10, 59:20, 110:5
**own** [33] - 21:24, 22:5, 29:8, 39:15, 41:6, 86:11, 100:14, 103:8, 109:9, 113:18, 120:9, 120:12, 120:23, 123:13, 123:16, 125:13, 136:13, 162:16, 168:4, 173:1, 173:5, 187:2, 195:14, 230:8, 241:10, 243:3, 247:4, 247:5, 266:2, 268:3
**owned** [1] - 230:9
**owners** [2] - 218:12, 218:15
**Oxford** [1] - 2:17

---

# P

**P.A** [1] - 2:2
**P.C** [1] - 2:20
**PA** [4] - 1:7, 1:23, 2:18, 3:7
**Pace** [2] - 155:14, 155:15
**Pacific** [2] - 2:8, 232:2
**padding** [1] - 136:21
**page** [13] - 4:19, 32:11, 50:11, 59:13, 87:3, 90:16, 105:12, 125:25, 134:10, 154:12, 169:2, 214:3, 214:9
**pages** [2] - 45:8, 115:16
**paid** [1] - 191:19
**pan** [1] - 233:5
**pancakes** [1] - 49:16
**Panel** [4] - 162:16, 162:17, 162:20, 164:10
**panel** [3] - 163:7, 163:25, 164:1
**panel's** [1] - 164:8
**pans** [2] - 233:6, 233:7
**paper** [3] - 59:23,

60:8, 268:11
**paragraph** [9] - 19:7, 20:2, 21:7, 21:20, 49:21, 59:15, 84:23, 152:11, 154:11
**parallel** [1] - 57:3
**paraphrasing** [1] - 42:6
**part** [65] - 6:1, 6:9, 6:10, 7:17, 11:14, 20:6, 24:18, 44:3, 44:5, 66:12, 85:23, 120:23, 125:21, 134:12, 135:15, 138:9, 138:20, 139:20, 141:1, 147:23, 147:25, 148:2, 148:15, 149:1, 153:7, 162:10, 170:8, 170:18, 171:2, 171:14, 172:6, 173:11, 175:4, 176:18, 177:7, 179:24, 185:16, 193:9, 193:10, 202:22, 203:19, 203:21, 204:11, 205:18, 206:4, 212:9, 213:11, 218:16, 226:23, 229:2, 242:12, 247:6, 248:24, 249:11, 253:24, 255:1, 255:6, 257:9, 260:5, 260:8, 266:21, 267:7, 275:6, 275:10, 275:12
**participant** [1] - 24:9
**participants** [4] - 24:9, 25:2, 31:8, 249:8
**participate** [12] - 20:17, 36:12, 42:22, 107:3, 236:3, 240:15, 241:12, 241:13, 243:5, 243:6, 250:21, 251:23
**participated** [26] - 8:13, 8:20, 9:7, 24:20, 37:21, 37:23, 38:16, 43:11, 44:17, 69:20, 70:13, 70:16, 70:22, 72:8, 141:5, 169:1, 193:15, 235:12, 237:8, 237:24, 239:2, 250:13, 253:10, 260:8, 263:8
**participates** [1] - 260:5
**participating** [6] - 31:12, 39:23, 42:10,

42:13, 126:7, 176:17
**participation** [12] - 19:3, 31:15, 35:23, 36:8, 120:10, 120:21, 121:2, 149:6, 170:2, 243:12, 260:14, 260:15
**particular** [14] - 4:22, 6:16, 9:12, 23:11, 66:2, 103:22, 169:21, 170:15, 225:2, 225:3, 246:8, 260:12, 260:15, 261:20
**particularly** [4] - 14:9, 82:3, 103:17, 128:3
**parties** [10] - 222:18, 224:22, 231:25, 232:8, 232:23, 233:23, 233:25, 251:21, 264:4, 267:13
**parties'** [2] - 233:16, 235:10
**partnership** [2] - 229:13, 230:3
**partnerships** [2] - 229:16, 230:5
**parts** [8] - 9:5, 29:4, 89:14, 94:23, 212:13, 251:10, 259:24, 269:6
**Party** [1] - 232:2
**party** [1] - 182:4
**pass** [5] - 24:17, 34:8, 39:7, 39:18, 249:5
**pass/fails** [1] - 109:13
**passage** [2] - 84:25, 129:4
**passed** [3] - 11:19, 26:18, 58:18
**passing** [2] - 11:14, 202:14
**past** [5] - 114:19, 135:2, 143:10, 194:13, 216:15
**path** [3] - 42:3, 42:24
**paths** [1] - 47:19
**patience** [3] - 68:17, 137:23, 216:5
**PATRICK** [1] - 2:20
**PATTON** [9] - 2:4, 197:10, 197:15, 273:17, 273:20, 273:22, 273:25, 274:2, 274:12
**Paul** [2] - 71:16, 71:18
**PAUL** [1] - 2:10
**pause** [2] - 13:8,

115:12
**pay** [6] - 5:25, 9:12, 10:9, 22:10, 204:17, 265:1
**paying** [1] - 74:5
**peach** [1] - 149:18
**peach-colored** [1] - 149:18
**pending** [1] - 184:25
**PENNSYLVANIA** [1] - 1:2
**Pennsylvania** [2] - 152:14, 201:7
**people** [31] - 10:7, 11:4, 11:7, 12:3, 14:23, 17:9, 17:14, 22:21, 24:10, 33:18, 35:24, 36:19, 37:1, 65:9, 65:18, 65:19, 104:2, 115:17, 116:2, 116:19, 116:20, 183:13, 199:13, 200:20, 201:1, 212:20, 213:15, 219:11, 223:17, 225:14, 228:18
**PEPA** [1] - 213:24
**PEPPER** [1] - 3:2
**Pepsi** [1] - 177:14
**per** [8] - 12:19, 22:11, 31:1, 105:8, 112:9, 144:13, 144:16, 181:6
**perceive** [1] - 227:7
**percent** [30] - 15:5, 53:22, 54:15, 54:17, 54:19, 66:17, 97:10, 105:18, 105:19, 105:23, 108:13, 111:4, 115:1, 127:18, 160:11, 174:22, 175:12, 179:23, 188:4, 188:6, 190:13, 190:14, 190:15, 190:16, 191:8, 191:9, 191:13, 191:15, 192:3
**percentage** [3] - 174:24, 257:2, 257:10
**percentile** [2] - 52:21, 65:13
**perfect** [2] - 33:24, 49:18
**perfectly** [2] - 76:15, 261:24
**perform** [3] - 230:20, 262:7, 267:17
**performance** [1] - 230:19
**performed** [1] - 230:17

**perhaps** [5] - 110:12, 225:16, 228:24, 268:12, 272:17
**period** [28] - 12:24, 25:7, 58:25, 93:3, 94:16, 104:21, 112:10, 124:11, 126:15, 144:4, 144:5, 144:14, 144:18, 145:1, 174:12, 175:15, 188:15, 190:7, 190:15, 190:16, 191:22, 191:25, 192:3, 202:24, 235:15, 238:18, 242:2, 256:15
**periodically** [1] - 11:5
**periods** [2] - 151:6, 189:23
**permanent** [7] - 32:5, 32:12, 32:13, 32:18, 33:3, 34:17, 202:19
**permit** [1] - 247:3
**permitted** [9] - 101:19, 108:14, 221:1, 223:25, 245:12, 245:16, 245:19, 262:10, 265:23
**person** [18] - 4:10, 22:9, 24:11, 164:11, 168:3, 225:16, 229:23, 229:24, 230:24, 251:7, 259:21, 260:1, 260:4, 261:18, 261:23, 261:24, 263:4, 267:1
**personal** [2] - 261:21, 266:2
**personally** [2] - 36:21, 137:24
**persons** [18] - 146:19, 147:2, 147:13, 229:11, 229:16, 229:20, 230:11, 230:21, 231:19, 250:8, 250:24, 250:25, 251:2, 251:25, 252:7, 252:25, 253:7
**perspective** [1] - 72:25
**persuade** [1] - 6:3
**persuaded** [1] - 222:10
**pertain** [1] - 166:10
**pertains** [2] - 170:6, 228:21

**PETA** [5] - 57:5, 85:19, 163:5, 164:20, 188:23
**PETA's** [1] - 153:19
**pharmaceuticals** [1] - 119:14
**phase** [13] - 73:25, 93:23, 93:24, 94:3, 94:4, 94:9, 97:1, 155:8, 189:21, 190:6, 190:16, 191:12, 241:19
**phase-in** [12] - 93:23, 93:24, 94:3, 94:4, 94:9, 97:1, 155:8, 189:21, 190:6, 190:16, 191:12, 241:19
**phases** [1] - 191:11
**phasing** [1] - 190:14
**PhD** [3] - 122:13, 172:23, 188:7
**PHILADELPHIA** [1] - 1:7
**Philadelphia** [3] - 1:23, 3:7, 201:6
**phone** [1] - 60:18
**photographs** [4] - 39:9, 181:20, 181:22, 182:10
**photos** [1] - 72:17
**phrase** [2] - 224:19, 226:4
**pick** [1] - 139:6
**picked** [1] - 139:5
**picking** [1] - 18:14
**picture** [6] - 145:14, 145:15, 145:24, 145:25, 146:7
**pie** [1] - 48:7
**piece** [5] - 34:2, 59:22, 60:8, 224:16, 268:11
**piecemeal** [1] - 253:8
**Pierre** [1] - 14:8
**pillars** [1] - 151:2
**pine** [2] - 145:14, 145:15
**pit** [1] - 84:24
**pitching** [1] - 69:12
**pitted** [2] - 85:3, 85:6
**Pittsburgh** [1] - 2:18
**place** [6] - 4:10, 21:21, 163:25, 176:25, 219:10, 221:24
**placed** [1] - 105:9
**places** [1] - 177:20
**placing** [1] - 108:9

**plaguing** [1] - 34:18
**Plaintiff** [41] - 2:18, 2:22, 67:4, 108:16, 114:12, 119:25, 124:2, 125:5, 158:6, 186:4, 198:14, 198:24, 198:25, 199:16, 216:24, 216:25, 233:1, 233:3, 233:8, 233:13, 234:14, 240:9, 254:17, 263:13, 263:17, 264:1, 264:3, 264:6, 264:8, 264:11, 264:14, 264:16, 264:17, 264:20, 265:9, 265:11, 265:16, 265:19, 269:7, 269:9
**plaintiff** [2] - 64:23, 64:24
**Plaintiff's** [8] - 263:21, 263:22, 264:11, 264:24, 265:3, 265:5, 265:8, 265:14
**plaintiffs** [1] - 199:8
**Plaintiffs** [198] - 2:6, 2:13, 4:6, 7:16, 7:19, 16:11, 16:12, 16:20, 17:8, 43:17, 47:6, 48:14, 49:4, 56:6, 56:8, 56:13, 59:1, 59:3, 64:6, 64:10, 64:15, 66:15, 67:19, 67:25, 68:23, 72:10, 74:5, 74:9, 75:4, 75:8, 75:16, 78:12, 78:19, 79:2, 79:3, 79:5, 79:7, 79:12, 79:14, 79:17, 79:19, 79:20, 80:6, 80:14, 81:8, 81:24, 83:6, 84:18, 89:1, 89:7, 91:21, 96:14, 96:22, 96:24, 99:1, 99:24, 100:11, 102:6, 102:12, 102:14, 103:16, 104:16, 104:18, 105:10, 109:3, 111:22, 112:21, 113:19, 114:15, 117:9, 119:18, 121:14, 124:1, 124:13, 124:22, 124:23, 125:8, 129:14, 134:6, 134:22, 137:20, 138:6, 138:22, 140:6, 140:14, 141:21, 142:1, 142:19, 143:7,

143:18, 143:24, 145:7, 145:11, 146:4, 148:14, 149:7, 149:21, 150:18, 151:9, 151:1, 159:15, 161:8, 170:5, 170:18, 174:12, 177:1, 177:18, 178:13, 179:15, 180:8, 180:20, 181:3, 184:11, 184:15, 184:21, 186:1, 186:4, 186:6, 191:23, 192:6, 193:2, 193:14, 193:15, 193:21, 196:20, 196:24, 198:16, 199:7, 199:19, 199:24, 200:4, 200:8, 201:11, 202:11, 203:23, 207:25, 208:2, 208:8, 215:5, 216:2, 217:6, 217:8, 218:23, 219:3, 219:22, 231:25, 232:17, 232:20, 234:7, 234:10, 235:11, 235:16, 235:18, 236:4, 236:12, 236:14, 236:18, 236:23, 236:24, 237:3, 237:7, 237:17, 238:24, 239:1, 239:12, 239:16, 240:2, 240:7, 240:19, 241:2, 245:7, 246:8, 247:11, 247:20, 248:7, 248:14, 249:17, 249:20, 250:9, 250:12, 250:15, 252:4, 252:13, 254:13, 254:19, 254:24, 254:25, 255:11, 255:15, 257:24, 258:18, 259:9, 259:13, 261:12, 263:7, 263:12, 270:11
**Plaintiffs'** [72] - 13:19, 13:20, 14:9, 18:4, 22:24, 23:12, 28:1, 28:2, 29:25, 30:15, 30:17, 30:24, 32:9, 34:21, 36:1, 37:4, 37:8, 38:8, 39:3, 39:25, 44:23, 45:8, 45:11, 47:7, 55:3, 57:20, 59:10, 59:12, 60:11, 79:10, 81:4, 81:25, 84:2, 93:16, 93:19, 93:20, 95:3,

95:6, 95:16, 97:4, 97:8, 104:9, 106:15, 106:19, 110:15, 122:22, 124:9, 125:12, 127:22, 136:7, 145:17, 149:15, 153:13, 179:24, 185:22, 199:2, 213:2, 213:23, 214:4, 214:5, 218:12, 234:17, 235:25, 239:9, 239:10, 239:17, 240:4, 241:3, 255:12, 275:7

**plan** [7] - 19:25, 33:6, 170:10, 242:16, 251:23, 259:15, 259:25

**planned** [1] - 68:6
**planning** [1] - 75:20
**plans** [1] - 225:18
**plants** [1] - 157:10
**platform** [1] - 44:2
**play** [1] - 43:7
**played** [6] - 24:10, 167:14, 173:12, 182:10, 199:14, 251:10

**playing** [5] - 46:24, 115:9, 117:20, 198:11, 259:24
**plea** [1] - 134:12
**pleasure** [1] - 270:18
**plot** [1] - 166:21
**plummet** [2] - 112:17
**plummeting** [1] - 112:21

**plus** [1] - 21:2
**point** [37] - 6:16, 8:8, 8:10, 9:3, 9:4, 19:17, 22:22, 23:1, 25:3, 35:15, 37:10, 39:13, 40:22, 41:8, 48:12, 64:22, 69:25, 72:22, 72:24, 73:8, 74:14, 75:1, 84:23, 86:9, 86:16, 105:21, 108:22, 112:6, 123:7, 128:22, 197:11, 212:10, 231:5, 240:11, 265:24, 266:14

**pointed** [5] - 53:9, 53:10, 73:10, 131:19, 259:22

**pointing** [1] - 116:17
**points** [11] - 16:23, 38:25, 39:2, 39:6, 54:8, 105:13, 105:14, 106:21, 123:6, 242:10

**policy** [5] - 108:4, 185:9, 185:15, 185:16, 194:4
**PONZOLI** [1] - 2:4
**pool** [1] - 157:16
**poor** [1] - 62:24
**pop** [3] - 177:6, 177:7, 177:9
**popular** [1] - 189:10
**PORTER** [1] - 3:9
**pORTER** [1] - 3:13
**portion** [3] - 20:10, 57:13, 57:25
**portions** [2] - 9:16, 58:16
**posed** [2] - 40:17, 170:20
**posit** [2] - 99:24, 100:11
**position** [15] - 20:4, 23:12, 47:8, 48:22, 63:11, 97:18, 98:1, 98:3, 98:5, 98:25, 185:10, 230:22, 230:25, 231:1
**positive** [1] - 96:22
**possess** [4] - 252:1, 256:21, 257:13, 257:16
**possessed** [4] - 256:13, 257:1, 257:15, 257:20
**possesses** [1] - 256:18
**possibility** [1] - 126:17
**possible** [10] - 88:18, 152:6, 152:7, 195:7, 195:21, 199:11, 220:4, 246:5, 257:14, 264:16
**possibly** [5] - 15:5, 18:12, 99:23, 127:4, 132:17
**posted** [1] - 241:23
**potential** [4] - 81:1, 157:19, 257:7, 262:2
**Poultry** [6] - 16:7, 150:13, 157:2, 203:11, 204:9, 237:12
**poultry** [2] - 67:2, 89:25
**powdered** [2] - 178:20, 179:7
**power** [25] - 44:2, 51:24, 53:18, 53:19, 53:25, 114:12, 114:13, 179:16, 179:17, 179:18, 179:21, 179:25,

239:9, 239:13, 256:13, 256:14, 256:18, 256:21, 256:23, 257:1, 257:6, 257:8, 257:15, 257:16, 257:21
**PR** [1] - 89:11
**practicable** [1] - 88:4
**practical** [3] - 10:13, 18:15, 196:2
**practice** [4] - 100:25, 107:4, 108:8, 134:16
**practices** [10] - 86:21, 86:23, 89:17, 108:6, 114:21, 129:5, 134:14, 185:11, 241:5, 253:23
**practicing** [1] - 214:24
**Pratter** [7] - 77:25, 78:25, 79:4, 80:5, 138:4, 140:19, 147:12
**PRATTER** [1] - 1:12
**precedence** [1] - 266:3
**preceding** [2] - 37:8, 53:1
**precluded** [1] - 215:10
**prefer** [3] - 12:18, 220:2, 270:21
**preference** [1] - 135:3
**preferences** [1] - 66:2
**prejudice** [4] - 127:22, 222:10, 227:8, 267:18
**preliminary** [1] - 221:21
**premise** [1] - 247:16
**preparation** [1] - 228:14
**prepare** [1] - 45:3
**prepared** [2] - 63:17, 269:12
**preparing** [1] - 65:12
**preponderance** [18] - 17:20, 22:25, 23:2, 79:4, 79:5, 140:20, 145:7, 168:14, 168:25, 180:2, 215:20, 219:18, 231:18, 232:22, 233:10, 234:18, 250:16, 264:9
**preposterous** [1] - 72:13
**presence** [2] - 234:2, 235:7

**present** [6] - 8:2, 9:6, 25:7, 91:17, 139:8, 139:9
**presentation** [1] - 46:12
**presented** [10] - 7:10, 7:13, 8:23, 29:2, 30:9, 57:10, 153:10, 182:12, 212:18, 245:15
**presenting** [2] - 29:9, 199:10
**presently** [1] - 254:7
**presents** [2] - 57:8, 262:15
**preserve** [2] - 200:2, 247:15
**preset** [1] - 222:1
**preside** [1] - 267:1
**president** [8] - 81:6, 85:9, 98:19, 142:9, 142:24, 142:25, 162:9, 162:13
**presidents** [1] - 138:12
**press** [6] - 99:2, 164:18, 164:22, 171:5, 182:13, 182:16
**pressed** [1] - 160:5
**pressure** [8] - 20:3, 20:9, 116:16, 117:19, 132:18, 132:19, 135:19, 240:22
**presumably** [1] - 62:11
**presumed** [1] - 261:4
**pretenses** [1] - 218:22
**pretextual** [1] - 78:11
**pretrial** [1] - 73:25
**pretty** [9] - 6:12, 8:10, 11:9, 111:15, 114:14, 171:25, 180:11, 193:10, 226:10
**prevail** [3] - 23:5, 180:3, 232:22
**prevent** [5] - 38:3, 236:13, 263:23, 264:22, 265:16
**prevented** [1] - 43:3
**prevents** [1] - 55:20
**previously** [3] - 230:24, 237:9, 254:12
**Price** [1] - 69:23
**price** [40] - 14:3, 22:11, 22:13, 22:14, 28:5, 30:22, 36:6, 38:6, 40:14, 43:4, 63:18, 63:23, 64:5,

65:3, 70:19, 84:5, 96:7, 112:2, 112:14, 118:23, 122:24, 124:5, 126:4, 141:10, 144:13, 144:18, 151:16, 153:3, 155:22, 186:10, 209:21, 211:20, 212:22, 235:13, 236:11, 237:1, 240:17, 242:24, 243:16, 265:1
**prices** [103] - 8:21, 14:2, 14:17, 14:20, 17:24, 22:18, 27:22, 28:8, 28:22, 28:23, 29:13, 29:22, 30:13, 31:6, 32:14, 32:23, 34:18, 35:21, 42:2, 44:4, 51:23, 51:25, 52:1, 55:17, 55:18, 59:5, 63:16, 64:14, 64:19, 64:21, 64:25, 65:5, 67:15, 72:14, 74:3, 74:4, 112:11, 112:13, 112:14, 112:17, 112:19, 112:21, 143:6, 144:1, 144:12, 144:13, 144:16, 144:19, 144:22, 144:23, 145:10, 157:17, 173:23, 174:1, 174:4, 174:9, 174:14, 176:2, 179:19, 179:21, 180:16, 186:18, 186:24, 187:8, 188:1, 188:3, 188:5, 189:3, 192:24, 194:16, 201:3, 201:23, 206:22, 208:12, 208:22, 211:7, 211:12, 211:19, 213:13, 214:13, 215:9, 217:16, 218:19, 237:22, 238:1, 238:21, 239:8, 239:19, 239:21, 247:18, 253:22, 255:21, 255:24, 256:5, 256:15, 256:19, 256:22, 258:7, 262:20, 262:25
**pricing** [10] - 14:25, 69:13, 74:18, 112:18, 179:1, 201:15, 210:20, 210:21, 211:2, 211:6

**primarily** [1] - 169:16
**primary** [3] - 68:4, 208:3, 232:10

**primer** [1] - 214:23
**principles** [2] - 211:1, 220:23
**private** [5] - 36:10, 229:15, 231:15, 231:16, 235:6
**probative** [5] - 132:1, 132:17, 135:4, 135:5, 275:12
**problem** [13] - 4:12, 32:12, 39:13, 44:5, 62:24, 83:2, 108:11, 131:13, 155:1, 155:2, 178:14, 201:25, 275:25
**problems** [2] - 190:20, 190:21
**procedure** [1] - 109:15
**procedures** [2] - 44:25, 45:1
**proceed** [2] - 103:7, 198:18
**proceedings** [1] - 276:11
**PROCEEDINGS** [1] - 1:15
**process** [7] - 18:7, 111:4, 171:2, 233:13, 245:10, 245:14, 265:6
**processed** [3] - 98:22, 98:23, 99:5
**PROCESSED** [1] - 1:4
**processors** [2] - 89:16, 89:23
**proclaiming** [1] - 144:21
**procompetitive** [35] - 55:11, 55:12, 55:13, 62:1, 62:4, 62:8, 62:10, 62:14, 95:19, 95:25, 96:1, 96:8, 96:10, 96:21, 96:23, 96:24, 101:5, 101:7, 111:19, 180:18, 206:10, 206:12, 206:13, 206:18, 207:1, 215:13, 215:16, 215:23, 236:15, 236:17, 236:19, 237:2, 237:4, 241:14, 258:15
**produce** [5] - 47:15, 60:9, 93:11, 238:14, 241:10
**produced** [14] - 28:19, 98:21, 99:4, 113:19, 115:2, 145:2, 145:3, 159:23,

160:25, 175:20, 175:21, 188:2, 249:23, 256:4
**Produced** [1] - 1:25
**producer** [50] - 15:17, 15:23, 25:16, 27:8, 39:16, 39:18, 41:17, 54:18, 58:22, 64:20, 81:15, 83:5, 83:6, 83:14, 83:21, 85:15, 92:12, 92:22, 93:10, 97:19, 98:1, 101:6, 103:7, 103:9, 108:12, 111:6, 113:11, 121:1, 149:6, 153:17, 154:19, 154:22, 154:23, 159:22, 161:10, 164:12, 176:9, 179:20, 184:20, 203:5, 212:25, 233:22, 235:24, 238:3, 238:5, 240:6, 240:8, 241:9, 241:10, 241:11
**Producer** [11] - 15:25, 29:6, 34:3, 36:21, 37:22, 42:12, 45:13, 87:21, 88:7, 88:23, 88:24
**producer's** [2] - 154:12, 154:15
**producer-designed** [1] - 235:24
**Producers** [14] - 3:7, 34:5, 80:21, 87:23, 99:8, 107:2, 160:24, 168:17, 185:12, 185:18, 232:6, 247:21, 259:12, 262:4
**producers** [90] - 11:16, 11:23, 15:11, 15:14, 15:15, 16:1, 16:14, 20:5, 21:14, 26:25, 27:5, 27:12, 27:14, 28:3, 31:1, 32:17, 33:6, 34:9, 35:7, 35:12, 36:2, 37:7, 37:9, 37:18, 40:7, 43:10, 43:11, 43:22, 44:14, 49:23, 49:24, 53:18, 53:21, 55:21, 56:12, 56:13, 56:14, 59:4, 62:11, 65:2, 81:15, 83:3, 88:16, 89:16, 89:23, 92:11, 93:3, 93:7, 93:8, 96:13, 107:3, 113:9, 113:18, 115:24, 120:7, 148:9,

148:15, 150:20, 155:10, 156:3, 156:21, 157:8, 158:8, 158:13, 166:15, 166:16, 178:19, 181:2, 182:8, 184:17, 184:19, 185:8, 185:17, 192:7, 203:10, 203:13, 203:19, 204:9, 204:11, 207:18, 208:3, 212:20, 242:6, 242:7, 242:8, 253:9
**producers'** [3] - 100:14, 253:14, 254:5
**produces** [6] - 47:13, 95:24, 113:12, 113:13, 247:17
**producing** [3] - 41:19, 55:21, 160:15
**product** [33] - 17:3, 46:22, 47:2, 47:3, 48:2, 48:3, 49:5, 96:7, 97:18, 97:25, 98:7, 98:10, 98:11, 98:13, 99:7, 158:18, 165:14, 166:8, 166:13, 177:3, 177:24, 178:17, 179:7, 180:17, 181:11, 249:19, 254:23, 254:25, 255:7, 255:21, 256:6, 258:8, 258:11
**production** [40] - 48:9, 52:20, 55:14, 55:15, 71:2, 74:25, 96:6, 97:17, 97:24, 112:7, 112:22, 113:7, 114:20, 144:4, 144:7, 145:1, 154:22, 175:19, 180:15, 181:6, 186:18, 187:24, 189:14, 190:15, 191:9, 201:15, 203:13, 206:22, 206:23, 208:22, 210:23, 210:24, 211:8, 211:13, 211:20, 215:9, 218:21, 240:5, 258:7
**production's** [1] - 211:21
**productive** [2] - 5:19, 96:20
**productivity** [2] - 87:6, 96:19
**products** [49] - 17:5, 47:4, 47:9, 47:10, 47:13, 47:15, 47:16,

47:19, 47:21, 48:7, 48:10, 48:19, 48:25, 49:1, 49:12, 49:15, 50:6, 50:14, 50:17, 51:5, 51:6, 51:8, 51:13, 51:17, 57:6, 57:7, 64:11, 97:18, 97:25, 98:22, 98:23, 99:4, 178:1, 178:9, 178:15, 178:23, 178:24, 178:25, 179:9, 201:15, 201:23, 240:16, 242:7, 255:1, 255:4, 256:22, 257:2, 257:8, 262:22
**PRODUCTS** [1] - 1:4
**Professor** [35] - 29:2, 41:1, 43:17, 47:3, 50:15, 51:12, 52:9, 52:23, 53:4, 65:4, 65:11, 65:20, 65:23, 66:6, 66:11, 74:6, 80:15, 82:13, 84:1, 113:1, 113:2, 113:4, 122:12, 187:18, 187:19, 208:10, 208:18, 208:23, 209:8, 209:23, 210:11, 210:22, 246:8
**profitably** [1] - 256:15
**profits** [1] - 239:12
**profoundly** [1] - 53:24
**Program** [181] - 9:1, 9:10, 9:15, 9:24, 11:15, 12:2, 12:9, 12:16, 13:2, 14:16, 15:19, 15:22, 15:25, 21:4, 21:11, 22:3, 24:15, 25:15, 25:16, 25:18, 25:21, 25:23, 35:17, 36:16, 36:24, 37:5, 37:12, 37:14, 37:17, 39:11, 39:16, 44:15, 53:21, 56:11, 57:2, 58:1, 58:4, 58:21, 59:2, 59:18, 61:15, 61:16, 61:20, 62:22, 66:23, 67:5, 69:6, 69:20, 70:1, 70:14, 71:9, 71:13, 72:19, 73:23, 78:10, 78:11, 86:9, 89:3, 89:8, 91:24, 92:5, 92:7, 92:15, 92:20, 95:5, 96:8, 96:9, 96:14, 96:17, 100:2, 100:8, 101:20,

104:23, 107:4, 108:15, 109:6, 109:10, 109:20, 111:12, 111:20, 114:9, 114:10, 125:10, 140:24, 145:24, 146:2, 147:24, 148:10, 153:15, 153:16, 154:20, 154:24, 155:5, 155:6, 155:11, 155:23, 156:10, 156:12, 156:13, 157:21, 157:25, 158:2, 160:7, 161:20, 162:2, 164:7, 166:16, 166:18, 167:21, 168:6, 168:17, 169:24, 170:23, 171:15, 171:23, 171:24, 172:13, 172:14, 174:25, 175:23, 176:11, 180:24, 181:11, 181:17, 182:9, 182:25, 183:3, 183:4, 183:23, 184:1, 184:18, 185:18, 185:23, 187:10, 187:22, 187:23, 188:2, 188:18, 189:9, 189:18, 189:22, 190:12, 191:4, 192:13, 194:4, 197:11, 202:15, 202:23, 203:7, 204:19, 204:24, 205:7, 205:13, 207:6, 207:10, 208:4, 214:3, 214:6, 216:17, 217:1, 217:22, 235:23, 236:25, 238:9, 238:21, 238:23, 239:5, 239:8, 239:25, 240:11, 240:17, 240:21, 241:7, 241:13, 241:16, 241:20, 242:1, 242:12, 243:7, 248:22, 253:11
**program** [92] - 10:5, 11:17, 11:24, 12:15, 15:20, 21:17, 21:18, 22:17, 33:8, 33:25, 34:16, 36:18, 37:1, 38:20, 38:21, 38:24, 41:9, 41:11, 42:19, 59:20, 62:23, 63:1, 63:4, 69:18, 70:15, 70:22, 71:23, 72:4, 72:13, 72:16, 87:5,

89:12, 89:20, 90:3, 91:22, 92:16, 94:23, 97:12, 99:7, 100:25, 101:21, 102:17, 104:16, 104:20, 104:21, 104:23, 105:11, 105:22, 106:5, 106:10, 106:16, 110:18, 111:3, 111:10, 111:11, 111:13, 111:15, 111:16, 117:3, 154:4, 154:5, 157:19, 157:20, 157:24, 158:1, 167:8, 171:17, 171:20, 174:9, 181:5, 181:19, 183:8, 183:16, 183:20, 183:21, 183:23, 184:22, 193:9, 203:20, 203:21, 204:22, 207:4, 207:7, 208:7, 235:20, 241:8, 241:12, 241:21, 248:23, 253:11

**program's** [3] - 97:1, 183:20, 183:21

**Program's** [1] - 108:21

**programs** [4] - 9:16, 62:22, 114:24, 125:22

**progress** [3] - 99:6, 162:22, 247:19

**prohibited** [5] - 108:10, 176:10, 247:13, 275:5, 275:18

**prohibits** [1] - 247:22

**projected** [2] - 175:1, 175:12

**projection** [1] - 174:23

**promised** [1] - 118:11

**promote** [1] - 89:17

**prompt** [1] - 261:23

**prompted** [1] - 163:2

**prompting** [1] - 261:24

**prompts** [1] - 261:18

**promulgation** [1] - 102:4

**prong** [4] - 79:25, 95:12, 95:14, 95:21

**proof** [30] - 22:24, 23:6, 74:18, 79:2, 79:3, 79:11, 79:13, 79:17, 79:19, 95:16, 111:19, 139:12,

139:13, 141:22, 142:2, 143:19, 157:11, 170:5, 177:21, 186:5, 192:7, 233:2, 233:10, 235:1, 240:4, 244:8, 261:12, 261:13, 261:14, 267:12

**proper** [3] - 219:20, 224:8, 228:13

**properly** [2] - 224:4, 224:14

**proposal** [1] - 12:17

**proposals** [1] - 129:25

**proposition** [1] - 226:13

**props** [1] - 158:21

**prosecution** [1] - 235:8

**prospective** [1] - 157:21

**protect** [4] - 93:22, 107:11, 116:18

**protected** [1] - 96:11

**protests** [3] - 153:19, 163:2

**proud** [3] - 116:24, 117:3, 117:6

**proudly** [1] - 219:3

**prove** [50] - 4:23, 49:7, 51:22, 79:5, 79:14, 80:7, 111:23, 139:17, 139:20, 140:6, 140:15, 140:18, 140:21, 141:4, 141:5, 141:13, 141:17, 141:18, 145:7, 145:8, 145:12, 148:1, 148:4, 148:25, 151:8, 169:6, 179:15, 180:2, 193:13, 225:6, 225:20, 227:18, 232:23, 233:18, 240:3, 240:12, 248:7, 250:15, 251:15, 252:13, 254:12, 255:12, 258:18, 263:7, 264:1, 264:3, 264:6, 264:11, 264:14

**proved** [5] - 234:18, 234:20, 244:5, 253:7, 264:17

**proven** [10] - 16:1, 113:19, 140:1, 148:3, 240:7, 249:17, 249:20, 255:13, 255:15, 257:24

**proves** [1] - 233:18

**provide** [11] - 29:18,

30:10, 32:18, 100:17, 150:15, 157:23, 159:12, 199:24, 232:18, 269:21, 272:17

**provided** [12] - 7:25, 17:18, 28:1, 33:23, 39:8, 99:20, 158:6, 160:8, 162:18, 199:18, 217:19, 266:16

**provides** [2] - 19:8, 206:11

**providing** [1] - 268:13

**proving** [2] - 232:21, 259:9

**provision** [1] - 176:10

**provisions** [2] - 16:10, 58:20

**provoked** [1] - 131:16

**public** [4] - 14:23, 91:15, 185:7, 222:11

**publication** [1] - 262:8

**publicity** [1] - 167:5

**publicly** [1] - 59:8, 213:7, 241:23

**publishable** [1] - 196:12

**published** [8] - 127:23, 129:13, 134:3, 134:8, 134:18, 135:22, 136:7, 195:20

**publishes** [1] - 165:7

Publix [29] - 2:13, 49:22, 56:22, 81:9, 103:13, 121:20, 142:22, 143:8, 155:3, 158:6, 158:7, 158:8, 158:12, 158:16, 159:5, 161:13, 161:15, 165:6, 184:10, 184:13, 185:6, 185:7, 185:9, 199:22, 204:14, 217:7, 232:3

**Publix's** [4] - 158:10, 159:2, 159:3, 185:10

**Publixes** [1] - 203:15

**pull** [2] - 211:16, 211:22

**purchase** [2] - 159:6, 236:22

**purchased** [2] - 68:25, 165:20

**purchases** [2] - 72:12, 74:11

**purchasing** [3] - 71:20, 159:15, 165:15

**pure** [1] - 41:20

**purpose** [26] - 29:22, 52:4, 54:2, 80:8, 118:25, 132:17, 147:6, 147:10, 170:12, 224:18, 224:21, 225:1, 225:5, 225:11, 225:13, 237:25, 247:14, 250:9, 251:3, 251:13, 251:14, 251:18, 252:2, 256:7, 259:16, 268:6

**purposes** [6] - 62:5, 75:20, 178:12, 206:14, 226:7, 245:1

**pushed** [2] - 86:24, 94:25

**put** [36] - 22:6, 63:10, 67:12, 77:23, 78:6, 87:9, 90:16, 90:20, 104:18, 109:25, 117:19, 118:8, 122:6, 134:17, 139:8, 159:19, 171:18, 172:22, 190:11, 207:19, 211:4, 213:1, 216:6, 225:17, 232:25, 233:3, 235:4, 252:7, 268:12, 273:18, 273:23, 274:12, 274:16, 274:19, 274:25

**puts** [4] - 21:12, 92:16, 209:24, 220:5

**putting** [7] - 40:19, 127:18, 155:9, 155:19, 185:15, 207:8

**PV** [1] - 110:18

**PVP** [23] - 62:23, 63:1, 63:4, 104:15, 104:20, 104:21, 104:23, 104:25, 105:11, 105:17, 105:20, 105:24, 106:10, 106:16, 110:14, 111:9, 111:10, 111:11, 111:13, 111:15, 111:16, 207:4, 207:7

**PX-109** [1] - 18:22

**PX-116** [1] - 13:20

**PX-120** [1] - 37:15

**PX-122** [1] - 13:21

**PX-27** [1] - 33:5

**PX-44** [1] - 90:10

**PX-45** [1] - 35:3

**PX-691** [1] - 13:23

**PX-712** [1] - 26:2

**Q**

**qualities** [1] - 19:5

**quality** [16] - 55:22, 55:25, 96:7, 151:22, 157:7, 180:17, 181:7, 182:17, 227:4, 229:3, 247:18, 255:22, 255:24, 256:6, 258:8, 258:12

**Quality** [4] - 134:11, 148:21, 182:11, 237:14

**quantity** [1] - 36:6

**quarter** [1] - 76:11

**questioned** [1] - 83:9

**questions** [35] - 7:15, 15:24, 46:1, 56:19, 66:22, 67:20, 75:10, 102:3, 140:4, 140:8, 147:19, 165:1, 165:19, 177:12, 177:13, 183:9, 183:11, 183:12, 186:5, 216:7, 216:8, 216:11, 216:16, 216:17, 219:21, 222:5, 222:21, 232:10, 232:19, 268:10, 268:15, 269:13, 269:14, 269:15, 271:15

**quiche** [1] - 49:17

**quick** [2] - 85:20, 216:3

**quick-serve** [1] - 85:20

**quickie** [1] - 266:22

**quickly** [8] - 37:18, 44:1, 92:21, 103:10, 110:17, 110:19, 124:16

**quite** [9] - 8:12, 19:12, 51:10, 52:5, 121:3, 130:11, 132:2, 213:7, 228:13

**quote** [4] - 88:13, 225:5, 225:12, 241:5

**quoted** [1] - 127:23

**quoting** [1] - 127:17

**R**

**R.W** [1] - 237:15

**racks** [1] - 201:4

**RAF** [1] - 19:11

**rain** [1] - 77:1

**raincoat** [1] - 244:10, 244:13

**raining** [3] - 244:1, 244:3, 244:16

**rainy** [1] - 253:19

**raise** [19] - 89:24, 143:6, 144:1, 145:10, 173:22, 174:1, 174:4, 174:9, 174:14, 179:19, 192:24, 194:16, 235:13, 237:22, 238:21, 239:7, 240:16, 242:24, 256:15

**raised** [3] - 82:1, 160:12, 236:10

**raising** [6] - 36:18, 132:25, 145:9, 200:11, 238:1, 262:19

**ran** [1] - 64:5

**Ranch** [2] - 237:11, 237:13

**randomly** [1] - 122:9

**range** [2] - 87:14, 105:6

**rash** [1] - 271:4

**rather** [13] - 86:23, 89:14, 99:24, 105:1, 133:21, 145:19, 148:24, 220:3, 233:15, 234:4, 241:7, 243:7, 275:16

**rational** [2] - 75:3, 219:6

**rationally** [1] - 41:17

**RE** [1] - 1:4

**reach** [2] - 221:9, 223:21

**reached** [4] - 26:23, 87:8, 269:18, 269:24

**reaching** [2] - 246:13, 267:22

**reacting** [2] - 116:20, 116:21

**read** [19] - 25:3, 49:22, 89:18, 134:1, 134:7, 134:18, 135:22, 136:6, 146:11, 147:4, 147:12, 209:8, 213:9, 213:17, 217:21, 218:17, 270:9, 274:22

**readily** [2] - 86:19, 258:19

**reading** [3] - 89:14, 187:13, 221:24

**reads** [1] - 146:17

**ready** [2] - 30:10, 76:19

**real** [11] - 95:21, 118:22, 138:14, 162:22, 187:20, 188:9, 188:10, 188:13, 218:9, 222:3

**reality** [3] - 15:2, 15:9, 178:24

**realize** [2] - 128:11, 221:22

**realized** [2] - 131:20, 223:22

**really** [67] - 10:22, 10:23, 10:24, 12:1, 16:13, 16:14, 16:15, 18:20, 20:14, 20:23, 22:9, 22:21, 40:16, 52:19, 57:9, 68:18, 69:15, 78:13, 84:7, 88:1, 89:9, 90:3, 90:14, 93:15, 93:17, 95:6, 96:24, 97:8, 98:17, 99:11, 100:1, 100:6, 101:24, 102:18, 102:21, 103:4, 103:16, 104:1, 105:21, 106:11, 112:11, 118:7, 130:17, 132:23, 135:13, 136:13, 138:19, 146:8, 161:9, 178:16, 181:19, 184:24, 190:18, 204:5, 207:24, 208:7, 211:9, 212:7, 219:10, 221:24, 224:12, 228:4, 268:25, 271:2, 276:2

**rearing** [1] - 21:2

**reason** [28] - 14:20, 32:24, 39:21, 39:24, 40:5, 53:13, 54:20, 68:3, 68:4, 80:11, 103:21, 131:22, 132:18, 152:4, 166:20, 168:7, 212:4, 217:25, 218:1, 225:23, 244:23, 247:4, 247:8, 250:22, 252:2, 255:5, 259:20, 275:17

**reasonable** [6] - 193:18, 199:15, 227:14, 235:2, 245:16, 249:13

**reasonably** [7] - 25:7, 219:25, 223:20, 230:21, 258:17, 258:20, 258:24

**reasoned** [1] - 245:3

**reasons** [19] - 14:17, 15:10, 41:15, 68:4,

69:6, 69:7, 101:12, 120:13, 152:19, 167:5, 169:24, 170:23, 231:21, 238:22, 239:16, 245:20, 245:25, 246:24, 247:6

**reassurance** [1] - 99:8

**rebuttal** [12] - 18:6, 50:12, 66:7, 66:11, 130:10, 133:12, 193:23, 197:2, 197:5, 198:13, 198:17, 198:22

**recap** [2] - 84:9, 114:10

**receive** [3] - 99:19, 109:16, 243:8

**received** [5] - 220:22, 222:4, 222:17, 224:18, 234:23

**receiving** [1] - 168:13

**recent** [3] - 156:6, 156:7, 156:8

**recess** [4] - 76:18, 131:5, 131:6, 196:8

**recession** [1] - 189:5

**reciting** [1] - 266:11

**recognize** [3] - 7:13, 22:16, 22:21

**recognized** [3] - 22:2, 161:3, 162:21

**recognizing** [1] - 199:2

**recollection** [2] - 228:8, 266:3

**recommend** [6] - 25:3, 44:18, 45:18, 73:3, 266:25, 270:23

**recommendation** [6] - 82:25, 87:22, 107:14, 173:7, 173:11, 192:15

**recommendations** [46] - 9:20, 16:9, 33:3, 33:13, 33:20, 58:23, 62:17, 62:18, 81:12, 81:17, 81:20, 81:24, 82:2, 82:6, 82:8, 82:11, 82:16, 82:18, 83:8, 83:11, 83:20, 83:22, 84:1, 84:8, 84:9, 87:20, 87:25, 88:2, 88:8, 88:18, 88:20, 88:25, 125:23, 140:24, 151:5, 162:6, 238:12, 239:3, 239:4,

239:19, 240:25, 241:22, 242:15, 242:17, 243:6

**recommended** [8] - 33:20, 103:6, 107:14, 160:14, 162:7, 168:16, 248:21, 253:10

**recommending** [1] - 58:15

**recommends** [1] - 15:21

**record** [26] - 18:16, 25:6, 25:12, 45:5, 47:23, 52:3, 65:12, 65:14, 65:21, 82:16, 82:20, 89:4, 90:15, 106:23, 109:12, 113:9, 116:1, 126:8, 134:8, 196:16, 199:9, 226:15, 272:22, 274:16, 276:11

**recover** [1] - 143:11, 263:14, 265:9, 265:16

**red** [7] - 53:6, 174:19, 175:13, 209:25, 210:4, 210:16, 210:25

**REDDING** [1] - 3:4

**reduce** [71] - 8:20, 14:2, 17:23, 21:5, 25:25, 27:14, 27:20, 28:4, 28:23, 29:21, 30:12, 31:1, 31:2, 35:8, 35:14, 35:17, 35:21, 36:6, 41:17, 41:18, 54:3, 54:5, 54:21, 58:20, 59:4, 67:14, 71:4, 78:22, 79:16, 82:7, 82:11, 84:8, 84:10, 91:22, 92:3, 92:13, 92:17, 93:16, 94:16, 95:5, 100:8, 104:13, 112:12, 114:9, 143:5, 143:25, 144:8, 144:25, 145:9, 168:15, 169:1, 173:22, 174:4, 174:18, 176:17, 192:23, 194:1, 213:12, 214:7, 217:15, 238:19, 238:20, 239:7, 240:15, 241:7, 242:13, 242:17, 242:24, 249:12, 254:8, 262:21

**reduced** [9] - 30:22, 40:4, 41:12, 64:2,

70:14, 111:23, 190:25, 194:15, 214:6

**reduces** [1] - 214:3

**reducing** [11] - 27:24, 28:21, 44:4, 52:6, 74:3, 145:4, 175:21, 212:21, 214:7, 236:5, 237:25

**reduction** [43] - 10:3, 10:5, 12:15, 12:17, 12:20, 21:6, 26:20, 26:21, 26:22, 27:18, 31:6, 33:25, 34:16, 35:16, 37:13, 37:24, 41:5, 41:9, 41:11, 42:11, 42:15, 52:10, 52:15, 52:16, 52:17, 52:20, 52:25, 54:9, 54:10, 54:17, 74:18, 94:23, 108:23, 112:2, 190:14, 190:15, 190:17, 191:9, 192:2, 237:1, 255:19, 264:25

**reductions** [1] - 191:13

**REEDER** [1] - 3:5

**reexamine** [1] - 268:3

**refer** [4] - 18:18, 28:17, 31:17, 75:11

**reference** [2] - 59:14, 123:19

**referenced** [3] - 146:13, 165:18, 169:2

**references** [2] - 127:15, 132:7

**referencing** [1] - 224:22

**referred** [7] - 142:12, 151:14, 204:23, 220:23, 232:7, 246:12, 263:24

**referring** [6] - 10:11, 12:2, 21:8, 21:10, 133:3, 152:11

**refers** [8] - 30:20, 30:21, 30:25, 35:3, 35:4, 135:18, 255:19, 261:19

**reflect** [3] - 15:18, 52:13, 188:9

**reflected** [1] - 54:16

**reflecting** [1] - 14:6

**reflection** [1] - 200:6

**refreshments** [1] - 271:10

**regard** [19] - 9:5, 26:7, 26:8, 26:22, 27:6, 27:9, 27:10, 27:22, 28:21, 39:2,

51:25, 52:4, 54:6, 84:22, 127:17, 128:2, 200:7, 203:9, 223:10

**regarding** [8] - 55:4, 57:6, 82:2, 87:11, 98:21, 106:14, 233:4, 258:9

**regardless** [5] - 97:13, 221:12, 234:22, 234:23, 252:11

**regions** [1] - 200:7

**register** [3] - 22:10, 22:22, 274:18

**regular** [1] - 241:17

**regularly** [1] - 164:11

**regulation** [1] - 129:9

**regulations** [1] - 129:5

**Reickard** [2] - 106:9, 123:19

**reintroduce** [1] - 118:1

**reject** [4] - 88:7, 229:2, 245:23, 247:5

**rejected** [1] - 111:11

**rejoined** [1] - 111:12

**related** [4] - 103:23, 132:16, 172:25, 230:18

**relates** [2] - 198:8, 246:20

**relating** [1] - 116:9

**relation** [1] - 63:16

**relationship** [5] - 34:14, 64:4, 159:22, 159:25, 228:9

**relative** [1] - 239:9

**relatively** [4] - 53:11, 68:3, 126:12

**release** [5] - 99:2, 164:19, 164:22, 182:13, 182:16

**releases** [1] - 171:5

**relevance** [1] - 235:8

**relevant** [68] - 46:16, 46:19, 46:21, 46:22, 47:1, 47:2, 47:3, 50:3, 50:4, 50:15, 50:22, 51:2, 51:4, 51:6, 51:7, 51:8, 51:9, 51:10, 51:12, 51:14, 51:21, 124:24, 141:7, 144:4, 144:5, 144:14, 176:20, 176:23, 176:24, 177:2, 177:3, 177:16, 177:18, 177:21, 177:24, 178:2, 178:5, 178:11,

178:12, 179:18, 193:17, 214:16, 216:1, 242:2, 249:19, 249:22, 254:15, 254:21, 254:22, 254:23, 254:25, 255:2, 255:3, 255:9, 255:10, 255:12, 255:14, 256:8, 256:9, 257:3, 258:1, 275:11

**relevant-market** [1] - 216:1

**reliability** [1] - 246:16

**reliable** [2] - 187:12, 219:25

**relied** [6] - 149:2, 159:5, 192:7, 192:8, 192:9, 192:10

**rely** [11] - 50:12, 60:23, 65:24, 66:10, 78:25, 79:23, 86:7, 149:24, 150:4, 186:12, 215:3

**relying** [3] - 65:14, 149:7, 225:17

**remain** [6] - 74:17, 79:8, 88:17, 101:19, 234:11, 261:4

**remained** [4] - 88:20, 238:4, 242:5, 242:7

**remaining** [1] - 143:8

**Rembrandt** [5] - 56:19, 56:20, 93:5, 113:10

**remember** [68] - 11:11, 12:7, 13:10, 23:9, 26:9, 27:11, 29:25, 35:23, 36:20, 38:19, 42:5, 43:23, 44:10, 46:8, 46:19, 47:16, 47:17, 49:7, 49:10, 52:19, 53:3, 53:9, 53:20, 54:14, 54:25, 56:25, 60:25, 63:20, 66:7, 78:5, 82:2, 82:4, 83:16, 87:3, 97:14, 104:21, 106:9, 107:7, 107:9, 111:21, 113:22, 114:1, 115:15, 122:12, 126:24, 138:12, 138:13, 139:5, 151:1, 162:8, 165:17, 165:24, 171:4, 171:23, 183:6, 200:14, 204:12, 204:16, 204:19, 207:13, 209:18, 213:3, 216:8, 233:25,

244:10, 246:18, 250:24

**remembered** [1] - 60:22

**remembering** [1] - 10:17

**remembers** [1] - 128:1

**remind** [5] - 10:19, 52:12, 52:23, 66:10, 270:2

**reminded** [1] - 76:25

**remove** [5] - 32:20, 41:8, 60:3, 106:6, 203:17

**Remove** [1] - 212:8

**removed** [1] - 106:4

**removing** [1] - 54:12

**render** [3] - 7:9, 8:9, 195:2

**reorient** [1] - 134:21

**repeat** [7] - 68:20, 87:7, 137:19, 144:11, 150:25, 153:12, 215:17

**repeatedly** [4] - 88:16, 150:14, 155:3, 187:12

**repeating** [5] - 137:15, 137:16, 137:21, 143:22, 230:2

**repetitive** [1] - 79:23

**replace** [2] - 108:5, 108:9

**replaying** [1] - 266:11

**Report** [1] - 213:24

**report** [6] - 65:17, 90:13, 99:6, 154:1, 164:21

**reportedly** [1] - 240:20

**Reporter** [2] - 1:21, 276:14

**reporting** [2] - 190:5, 213:25

**reports** [3] - 90:24, 90:25, 106:13

**represent** [4] - 68:15, 77:11, 118:3, 269:1

**representation** [2] - 199:15, 262:9

**representative** [8] - 7:19, 121:22, 142:8, 171:13, 199:5, 199:19, 199:25, 201:12

**representatives** [4] - 70:24, 74:15, 199:3,

199:6

**represented** [5] - 73:2, 140:16, 148:11, 175:11, 198:24

**representing** [2] - 219:3, 238:24

**reprinted** [1] - 33:4

**request** [9] - 71:18, 128:6, 131:23, 156:24, 195:18, 195:21, 198:19, 240:18, 266:14

**requested** [1] - 111:14

**requests** [1] - 196:4

**require** [19] - 24:7, 24:8, 24:10, 24:11, 24:23, 24:24, 24:25, 109:17, 109:18, 154:6, 171:14, 183:25, 184:22, 185:11, 193:8, 193:9, 226:2, 264:3, 271:8

**required** [22] - 92:4, 94:20, 97:10, 99:25, 111:7, 114:25, 156:23, 156:24, 157:11, 157:12, 189:11, 192:8, 197:12, 240:10, 244:15, 245:13, 247:13, 261:13, 264:14, 269:25, 275:4, 275:18

**requirement** [9] - 4:24, 105:13, 105:23, 155:8, 155:10, 156:21, 240:13, 248:3, 248:4

**requirements** [21] - 71:3, 93:20, 105:6, 157:8, 161:6, 161:25, 165:8, 189:1, 189:2, 189:18, 189:21, 190:3, 190:9, 190:10, 190:23, 191:12, 241:17, 241:21, 247:25, 254:11

**requires** [7] - 154:5, 155:5, 165:2, 185:8, 185:17, 252:16, 264:5

**requiring** [4] - 155:3, 155:4, 189:1, 241:17

**reread** [1] - 266:20

**research** [2] - 160:13, 262:8

**resell** [1] - 93:13

**resolve** [1] - 246:21

**resource** [1] - 45:25

**resources** [2] -

157:17, 247:18

**respect** [22] - 17:13, 61:4, 61:5, 69:3, 133:2, 133:5, 141:22, 148:6, 148:25, 169:4, 169:18, 170:2, 170:6, 176:13, 182:15, 191:15, 193:12, 202:3, 205:14, 206:4, 211:16, 258:10

**respectfully** [9] - 67:18, 75:5, 128:3, 141:20, 146:5, 150:16, 166:19, 187:16, 219:19

**respects** [1] - 269:4

**respond** [11] - 50:13, 57:4, 115:12, 128:13, 159:6, 160:10, 160:23, 194:22, 240:21, 268:16, 275:18

**responding** [2] - 12:8, 169:21

**response** [14] - 33:14, 50:15, 66:12, 86:6, 97:16, 160:8, 169:20, 169:21, 172:19, 181:15, 240:23, 253:15, 268:19

**responsibilities** [1] - 230:23

**responsibility** [3] - 139:11, 231:11

**responsible** [4] - 219:6, 231:6, 260:7, 261:5

**responsive** [1] - 83:3

**rest** [4] - 107:16, 147:5, 231:23, 233:19

**restaurants** [1] - 80:21

**Restaurants** [1] - 154:2

**restrain** [8] - 143:25, 232:15, 247:24, 250:10, 250:14, 250:17, 251:24, 252:9

**restrained** [3] - 79:18, 95:18, 248:19

**restraining** [1] - 174:14

**restrains** [1] - 248:13

**restraint** [28] - 38:5, 42:20, 48:16, 51:21, 52:4, 55:9, 79:20, 79:23, 82:9, 82:14, 95:15, 95:23, 95:25, 115:21, 180:4,

193:19, 206:20,
213:20, 214:12,
214:22, 215:12,
219:15, 248:1,
248:16, 256:5, 256:7,
256:11, 258:11
  **restraints** [48] -
48:16, 51:24, 52:10,
54:2, 96:3, 96:5,
140:23, 141:13,
141:15, 148:2, 151:9,
151:10, 180:4, 180:8,
180:12, 180:15,
206:9, 208:13,
208:14, 215:6,
232:16, 248:14,
248:20, 248:24,
249:2, 249:11,
249:18, 249:21,
249:22, 249:25,
254:13, 254:14,
255:8, 255:15, 256:3,
257:17, 257:22,
257:25, 258:2, 258:3,
258:6, 258:16,
258:17, 258:22,
258:23, 259:2, 259:3,
259:6
  **restrict** [3] - 114:11,
235:13, 243:1
  **Restriction** [1] -
190:7
  **restriction** [12] -
92:17, 92:20, 92:21,
92:23, 92:24, 106:23,
107:17, 189:24,
191:11, 236:10, 241:9
  **restrictions** [8] -
92:16, 175:22,
183:25, 184:2, 191:2,
235:22, 236:10
  **restrictive** [5] -
15:21, 106:17,
206:19, 215:19,
215:22
  **rests** [2] - 247:9,
247:16
  **result** [27] - 28:7,
52:10, 55:15, 55:18,
57:24, 62:25, 64:2,
64:13, 64:14, 65:1,
65:5, 111:4, 164:13,
184:19, 208:10,
219:20, 225:19,
236:10, 249:6,
253:15, 254:6,
258:16, 263:17,
264:2, 264:12, 265:21
  **resulted** [9] - 151:10,
189:9, 249:18,

249:21, 254:14,
255:23, 257:17,
257:22, 257:25
  **resulting** [3] -
221:23, 241:6, 259:1
  **results** [9] - 12:19,
64:9, 65:12, 65:13,
66:1, 66:19, 191:17,
228:23, 255:20
  **resume** [1] - 127:3
  **retail** [4] - 80:19,
81:14, 99:25, 184:9
  **retailer** [2] - 84:24,
111:14
  **retailers** [16] - 72:1,
85:5, 89:24, 91:15,
94:4, 96:13, 99:1,
102:24, 109:16,
109:23, 109:25,
110:3, 116:16, 119:7,
184:6
  **retailers'** [1] - 81:10
  **retained** [1] - 149:10
  **retire** [1] - 266:17
  **retroactively** [1] -
134:24
  **return** [6] - 67:19,
111:18, 219:21,
266:17, 269:3, 269:21
  **returning** [2] - 234:9,
270:21
  **reveal** [1] - 269:23
  **revealed** [2] - 10:25,
217:9
  **revealing** [3] - 14:9,
18:20, 22:15
  **reveals** [1] - 67:17
  **revenues** [2] -
161:14, 239:12
  **reverse** [1] - 94:22
  **review** [8] - 31:14,
36:12, 116:15,
164:10, 164:11,
164:13, 164:14,
269:17
  **reviewed** [9] - 38:17,
45:3, 45:7, 45:8, 52:2,
91:11, 149:14, 164:1,
166:6
  **reviewing** [4] - 78:2,
163:8, 164:8, 164:15
  **revised** [2] - 153:24,
164:12
  **RFPs** [1] - 73:9
  **rich** [2] - 12:4, 36:19
  **RICHARD** [1] - 2:3
  **ride** [1] - 20:23
  **ridiculous** [1] - 75:1
  **rigged** [24] - 9:3,
10:2, 19:9, 19:12,

19:21, 25:25, 26:17,
26:21, 38:16, 38:21,
42:1, 44:10, 44:15,
54:7, 97:5, 110:5,
110:16, 191:20,
191:21, 194:15,
203:1, 206:2, 207:2,
219:15
  **rights** [4] - 138:25,
159:6, 160:6, 218:19
  **righty** [1] - 75:18
  **rigorous** [2] -
105:20, 110:13
  **ringleader** [1] -
202:9
  **rise** [8] - 5:10, 75:25,
76:21, 127:6, 137:1,
195:15, 198:3, 272:2
  **risk** [2] - 137:14
  **risks** [1] - 62:12
  **Rizvi** [2] - 71:2,
167:13
  **road** [2] - 139:23
  **Robert** [1] - 14:8
  **ROBIN** [1] - 3:3
  **robust** [2] - 201:8,
207:5
  **rocky** [1] - 171:25
  **Rohr** [5] - 73:10,
73:13, 113:13,
113:21, 121:19
  **role** [6] - 24:9, 87:23,
121:25, 138:8, 138:9,
212:17
  **Roll** [1] - 178:19
  **rolling** [1] - 104:22
  **room** [6] - 1:22,
96:20, 118:7, 266:17,
269:18, 271:24
  **Rose** [227] - 3:17,
4:23, 7:20, 8:13, 8:19,
15:14, 17:14, 19:3,
19:11, 19:14, 19:25,
20:15, 24:14, 24:20,
25:17, 26:2, 26:3,
26:5, 31:7, 34:5, 36:7,
36:9, 36:14, 37:4,
37:11, 37:16, 37:25,
38:4, 38:7, 38:9,
38:10, 38:12, 38:15,
38:20, 39:3, 39:9,
39:12, 39:19, 39:24,
40:1, 40:5, 40:11,
40:18, 40:22, 41:6,
41:14, 41:24, 42:16,
43:3, 43:4, 43:9,
43:24, 46:10, 47:12,
47:14, 47:22, 48:9,
55:4, 56:3, 57:22,
59:17, 59:19, 59:23,

60:13, 61:6, 61:12,
61:19, 61:21, 64:7,
64:10, 67:4, 67:8,
74:14, 107:24,
109:18, 113:14,
119:6, 120:11,
121:10, 123:12,
130:15, 138:8, 141:5,
141:8, 141:23, 142:8,
142:13, 142:23,
142:24, 143:3,
144:24, 144:25,
145:1, 145:4, 146:24,
146:25, 147:7, 147:8,
148:21, 148:22,
150:20, 151:21,
155:10, 155:15,
155:16, 155:22,
156:23, 161:10,
161:17, 169:4, 169:8,
169:9, 169:11,
169:15, 169:16,
169:18, 169:19,
169:23, 170:4, 170:6,
170:8, 170:16,
170:17, 170:22,
170:24, 172:12,
172:14, 172:16,
172:18, 172:22,
172:25, 173:6,
173:10, 174:2, 174:7,
174:8, 174:11,
174:13, 174:15,
174:18, 174:20,
175:1, 175:4, 175:10,
175:14, 175:18,
175:23, 176:9,
176:11, 176:15,
177:19, 179:17,
181:21, 181:24,
182:3, 182:4, 182:24,
182:25, 183:6,
187:15, 192:14,
192:15, 192:19,
192:21, 192:22,
193:14, 193:24,
193:25, 194:12,
194:21, 194:25,
195:2, 201:9, 201:25,
202:8, 203:5, 203:9,
204:9, 213:10,
215:13, 216:24,
216:25, 217:12,
218:12, 218:15,
218:21, 232:6, 236:1,
236:8, 237:6, 237:20,
237:21, 237:23,
238:1, 238:7, 238:9,
238:10, 238:12,
238:17, 238:19,
238:22, 239:1, 239:6,

239:8, 239:10,
239:11, 239:14,
239:15, 239:17,
239:23, 240:2, 240:7,
240:9, 240:11, 243:1,
247:20, 250:13,
259:11, 270:12
  **roughly** [2] - 130:5,
130:8
  **Roundy's** [3] - 2:7,
143:16, 232:4
  **routinely** [1] - 103:12
  **RPR** [2] - 1:21,
276:14
  **rule** [82] - 8:25, 9:25,
11:14, 11:19, 11:21,
13:2, 13:25, 15:16,
15:21, 16:2, 16:10,
20:11, 21:12, 25:24,
26:13, 26:17, 26:20,
27:19, 29:5, 35:16,
36:22, 37:22, 37:23,
38:1, 38:3, 42:11,
42:13, 43:2, 48:15,
48:19, 52:7, 55:20,
57:12, 58:4, 58:19,
59:1, 62:21, 66:24,
67:5, 67:14, 91:12,
91:14, 96:25, 97:3,
97:5, 97:15, 99:13,
99:16, 99:23, 100:4,
100:10, 100:12,
100:16, 101:13,
102:10, 110:19,
113:3, 113:5, 113:6,
115:3, 127:20,
155:12, 156:11,
190:4, 190:23,
202:15, 203:1, 203:7,
205:10, 205:11,
205:25, 207:2, 207:7,
209:15, 216:18,
217:1, 217:15,
219:13, 235:21
  **rule's** [1] - 190:9
  **ruled** [1] - 224:12
  **rules** [9] - 220:20,
220:24, 221:11,
223:22, 223:25,
224:8, 234:9, 243:4,
271:17
  **ruling** [4] - 132:15,
132:23, 135:18, 224:3
  **rulings** [1] - 128:1
  **rumors** [1] - 223:13
  **run** [11] - 35:23,
123:20, 123:21,
123:22, 124:1, 124:7,
124:21, 127:2,
137:14, 182:9, 208:1

**rung** [1] - 197:24
**running** [3] - 29:18, 35:24, 209:2
**rural** [1] - 201:7
**Rust** [47] - 11:25, 12:7, 15:13, 16:5, 17:10, 18:23, 18:24, 36:18, 36:20, 36:23, 37:20, 37:25, 38:2, 38:18, 40:15, 42:7, 60:19, 83:19, 93:4, 119:6, 119:15, 142:13, 142:24, 161:17, 171:21, 172:1, 172:3, 172:5, 172:8, 172:9, 174:7, 183:14, 189:11, 192:19, 192:20, 194:18, 195:19, 212:25, 213:3, 213:14, 213:17, 218:11, 218:12, 218:15, 218:16
**Rutherford** [1] - 138:13

## S

**sacrifice** [1] - 38:25
**sacrifices** [1] - 7:6
**safe** [1] - 271:20
**safely** [1] - 271:3
**safety** [1] - 157:7
**Safeway** [7] - 2:6, 143:12, 161:15, 184:11, 184:13, 217:7, 232:4
**sale** [1] - 253:23
**sales** [1] - 142:25
**salt** [1] - 178:17
**sample** [1] - 19:16
**sampling** [1] - 199:25
**sanctioned** [1] - 72:21
**sat** [9] - 11:20, 26:16, 42:21, 118:13, 118:17, 139:14, 142:14, 166:20, 169:14
**satisfaction** [1] - 66:23
**satisfied** [2] - 73:18, 275:16
**satisfy** [1] - 238:3
**Sauder** [1] - 237:15
**saw** [41] - 6:12, 26:12, 35:5, 35:9, 39:2, 39:5, 39:9,

39:24, 53:20, 58:13, 81:3, 83:16, 100:15, 101:11, 110:11, 110:14, 119:22, 143:22, 144:12, 144:18, 149:21, 155:21, 156:23, 157:6, 160:7, 160:17, 163:5, 164:18, 167:1, 175:18, 182:10, 186:23, 188:4, 204:4, 209:23, 212:24, 223:5, 243:22, 244:1, 267:5
**say-so** [1] - 22:13
**scales** [7] - 23:4, 62:6, 79:8, 233:6, 233:8, 234:11, 234:17
**scenes** [3] - 11:8, 16:13, 217:8
**schedule** [3] - 7:3, 189:21, 191:12
**scheduled** [1] - 164:14
**scheme** [12] - 28:10, 28:12, 28:14, 29:19, 30:15, 30:20, 80:7, 118:24, 147:3, 147:5, 147:9, 251:3
**school** [2] - 138:14, 266:22
**science** [27] - 66:24, 78:10, 86:7, 86:8, 86:9, 86:23, 87:1, 87:4, 88:14, 88:21, 96:13, 96:14, 99:20, 107:5, 107:12, 107:23, 110:12, 111:5, 111:7, 116:17, 129:16, 160:13, 163:18, 216:18, 216:19, 240:24, 241:8
**Science** [8] - 33:11, 33:19, 34:13, 34:15, 67:1, 87:19, 207:14, 216:9
**science-based** [10] - 66:24, 88:14, 99:20, 107:5, 111:5, 111:7, 116:17, 160:13, 240:24, 241:8
**Scientific** [32] - 9:20, 15:24, 16:8, 86:13, 86:14, 87:17, 87:18, 87:22, 87:24, 88:2, 88:8, 88:9, 88:12, 88:18, 88:21, 88:22, 88:24, 99:15, 99:17, 102:20, 103:2, 106:24, 107:13,

10:24, 111:1, 111:9, 160:14, 161:2, 162:16, 162:20, 241:22
**scientific** [6] - 66:25, 86:11, 87:9, 87:20, 163:7, 163:25
**scientist** [1] - 87:11
**scientists** [9] - 86:13, 87:5, 89:8, 90:8, 99:25, 103:5, 103:8, 107:19, 240:24
**scope** [5] - 132:22, 230:14, 230:16, 231:8, 231:12
**screen** [10] - 14:25, 18:25, 28:2, 33:9, 33:24, 48:11, 131:17, 131:19, 131:20, 181:16
**script** [1] - 222:1
**scripted** [1] - 222:2
**seal** [4] - 22:6, 111:4, 160:16, 160:18
**sealed** [1] - 159:13
**search** [1] - 209:18
**searching** [1] - 132:2
**seat** [1] - 198:6
**seats** [5] - 4:3, 5:13, 76:24, 131:7, 137:3
**second** [33] - 18:1, 31:13, 67:3, 76:13, 76:14, 91:7, 95:12, 95:14, 113:19, 120:16, 124:8, 125:25, 133:23, 141:3, 141:4, 143:21, 148:6, 152:18, 161:11, 161:12, 190:6, 204:2, 216:23, 232:14, 240:2, 248:12, 248:20, 249:4, 250:19, 255:9, 263:20, 267:10
**secret** [3] - 115:23, 171:6, 268:25
**Section** [5] - 105:23, 235:14, 247:22, 248:7, 250:1
**section** [2] - 142:11, 247:22
**sector** [1] - 99:7
**see** [63] - 13:12, 16:4, 22:14, 23:25, 27:3, 30:10, 30:20, 34:8, 37:15, 39:15, 46:17, 75:24, 91:11, 91:15, 91:16, 121:12, 125:1, 130:9, 140:6, 144:9, 144:20,

145:23, 146:9, 151:7, 154:7, 154:10, 158:7, 159:1, 163:17, 175:10, 175:15, 179:14, 184:13, 186:14, 186:21, 186:25, 188:9, 189:20, 190:2, 190:10, 190:24, 195:13, 197:14, 201:2, 201:21, 203:4, 204:25, 209:5, 209:19, 210:3, 215:13, 226:10, 226:11, 227:3, 228:19, 236:21, 236:24, 244:12, 266:22, 271:24, 273:20
**seeing** [3] - 128:3, 201:22, 228:18
**seek** [2] - 165:11, 262:10
**seem** [1] - 272:11
**sees** [1] - 66:6
**select** [1] - 266:25
**selective** [1] - 146:12
**self** [3] - 173:2, 173:5, 243:11
**self-interest** [3] - 173:2, 173:5, 243:11
**sell** [13] - 21:14, 73:21, 93:8, 119:7, 119:8, 156:22, 161:18, 167:22, 185:3, 185:4, 238:14, 242:8
**seller** [2] - 101:6, 101:8
**sellers** [1] - 242:6
**selling** [1] - 167:20
**sells** [2] - 160:12, 185:6
**send** [1] - 47:24
**sends** [2] - 32:10, 33:2
**senior** [3] - 20:19, 41:24, 85:9
**sense** [26] - 8:8, 41:21, 49:10, 62:15, 79:1, 92:18, 93:16, 95:4, 100:1, 100:3, 102:16, 112:23, 114:8, 119:13, 120:18, 163:21, 178:14, 191:14, 198:9, 200:1, 221:20, 223:15, 243:14, 244:23, 245:14, 247:5
**sensibilities** [1] -

10:17
**sensitive** [1] - 262:24
**sensitized** [1] - 200:17
**sent** [3] - 58:14, 162:13, 162:14
**sentence** [5] - 14:21, 20:14, 21:8, 154:11, 275:17
**separate** [5] - 27:1, 27:9, 118:21, 242:25, 248:11
**separated** [1] - 147:25
**separately** [5] - 170:13, 243:2, 251:23, 259:18, 263:13
**September** [6] - 53:23, 60:13, 87:20, 149:11, 155:21, 157:19
**series** [1] - 269:13
**serious** [2] - 220:6, 222:9
**seriously** [2] - 198:19, 198:20
**serve** [5] - 85:20, 158:12, 219:9, 267:1, 270:18
**served** [1] - 69:23
**service** [6] - 7:1, 137:22, 161:4, 185:4, 256:6, 268:13
**serviced** [1] - 200:7
**services** [4] - 256:19, 256:22, 262:6, 262:7
**Services** [1] - 237:13
**set** [13] - 78:14, 78:16, 84:19, 96:15, 116:12, 129:12, 134:14, 153:24, 158:10, 202:13, 219:19, 233:19, 245:7
**seven** [3] - 65:16, 94:15, 176:4
**several** [9] - 68:19, 69:24, 89:6, 92:19, 114:25, 187:20, 190:21, 239:16, 266:19
**shake** [1] - 244:13
**shall** [2] - 158:18, 158:19
**sham** [6] - 181:16, 181:17, 183:24, 185:14, 185:23, 197:12
**SHAPIRA** [1] - 2:15

**share** [5] - 147:3, 251:2, 257:2, 257:13
**shared** [3] - 80:7, 118:24, 241:23
**shelf** [1] - 88:3
**shell** [41] - 31:4, 47:4, 47:9, 47:13, 47:15, 47:20, 47:25, 48:4, 48:7, 48:9, 49:6, 49:13, 49:15, 49:23, 49:24, 50:6, 50:16, 51:5, 51:7, 51:8, 51:13, 51:14, 51:18, 64:12, 68:25, 99:3, 109:18, 124:5, 144:4, 144:7, 144:13, 177:25, 178:9, 178:17, 178:21, 255:1
**shells** [1] - 181:7
**Sherman** [13] - 75:4, 75:5, 235:14, 236:13, 247:12, 247:14, 247:16, 247:22, 248:7, 248:16, 250:1, 254:11, 263:11
**shielded** [1] - 157:20
**shines** [1] - 19:6
**shiny** [4] - 218:1, 218:3, 218:7
**ship** [1] - 197:5
**shocked** [1] - 130:18
**shoppers** [1] - 201:24
**shopping** [2] - 201:6, 201:22
**short** [70] - 8:25, 12:21, 25:7, 26:6, 26:8, 26:24, 27:2, 27:6, 27:9, 27:17, 29:4, 29:4, 30:3, 31:3, 32:2, 32:3, 32:15, 35:18, 38:7, 38:10, 38:12, 38:14, 44:17, 52:7, 56:4, 60:24, 67:13, 69:22, 70:17, 70:25, 74:25, 82:1, 84:4, 84:8, 99:23, 122:9, 122:21, 125:23, 126:12, 140:24, 151:4, 151:5, 151:12, 151:16, 151:20, 152:12, 152:24, 153:2, 153:7, 153:8, 168:16, 198:12, 205:17, 208:15, 209:3, 209:15, 217:15, 219:13, 224:5, 229:1, 233:15, 235:20, 236:15,

238:12, 242:14, 242:21, 243:5, 243:17, 248:21, 253:10
**short-term** [53] - 8:25, 26:6, 26:8, 26:24, 27:2, 27:6, 27:9, 27:17, 29:4, 31:3, 32:2, 32:15, 35:18, 38:7, 38:10, 38:12, 38:14, 44:17, 52:7, 56:4, 67:13, 69:22, 70:17, 70:25, 82:1, 84:4, 122:9, 122:21, 125:23, 140:24, 151:4, 151:5, 151:12, 151:16, 151:20, 152:12, 152:24, 153:2, 168:16, 205:17, 208:15, 209:3, 209:15, 217:15, 219:13, 235:20, 236:15, 238:12, 242:14, 243:5, 248:21, 253:10
**shorter** [2] - 118:14
**Shorthand** [1] - 1:25
**shortly** [1] - 232:19
**shot** [1] - 163:22
**shoulder** [1] - 14:11
**shoved** [1] - 89:3
**show** [62] - 16:4, 17:21, 18:12, 18:13, 21:22, 23:3, 24:19, 33:23, 37:9, 46:13, 47:5, 47:6, 49:8, 51:1, 51:22, 57:17, 64:20, 66:5, 66:19, 69:10, 72:17, 78:8, 102:7, 104:18, 107:14, 110:8, 115:10, 118:23, 118:25, 119:4, 121:18, 122:7, 122:14, 129:7, 129:17, 139:9, 140:15, 142:15, 143:9, 143:20, 147:17, 147:18, 153:3, 155:16, 157:11, 170:2, 192:17, 208:5, 208:6, 208:24, 211:6, 211:7, 211:15, 228:2, 239:16, 251:5, 251:16, 254:19, 254:24, 255:11, 259:13
**showed** [18] - 45:12, 53:3, 55:1, 64:4,

64:20, 74:8, 100:13, 107:18, 118:20, 119:4, 124:9, 129:4, 174:19, 175:13, 181:20, 181:22, 182:12, 209:11
**showing** [11] - 19:3, 21:25, 124:23, 124:24, 132:17, 192:13, 210:1, 210:2, 210:24, 211:5, 225:13
**shown** [15] - 30:15, 69:21, 80:23, 110:12, 111:24, 125:21, 129:18, 134:16, 152:1, 184:8, 221:4, 223:8, 245:4, 252:20, 261:7
**shows** [22] - 17:19, 18:4, 30:11, 30:18, 30:19, 39:20, 40:6, 52:3, 61:6, 62:2, 70:11, 70:21, 72:25, 112:3, 170:4, 174:19, 175:14, 210:4, 210:22, 210:25, 211:19, 238:18
**shred** [1] - 59:22
**shrift** [1] - 84:8
**shut** [1] - 113:6
**shy** [2] - 43:13, 44:24
**sic** [3] - 59:12, 60:7, 87:16
**sickening** [1] - 72:18
**side** [16] - 23:5, 47:10, 47:11, 48:13, 48:23, 50:19, 50:24, 50:25, 75:23, 192:11, 198:10, 223:25, 228:10, 234:13, 267:19, 274:12
**sided** [1] - 146:6
**sides** [4] - 7:22, 63:12, 65:9, 233:5
**sight** [1] - 79:14
**sign** [9] - 20:5, 25:18, 25:20, 37:18, 53:18, 207:18, 217:6, 268:12, 269:20
**signed** [16] - 20:3, 25:23, 26:3, 26:4, 27:1, 27:8, 37:3, 37:4, 37:5, 37:17, 53:21, 58:22, 65:17, 152:2, 203:6
**significant** [4] - 52:21, 66:8, 103:25, 208:17
**significantly** [1] - 98:8

**signing** [1] - 56:12
**similar** [14] - 19:18, 21:24, 184:1, 185:4, 229:12, 229:14, 229:21, 229:23, 250:24, 253:16, 253:20, 254:5, 254:9, 262:18
**similarities** [1] - 58:7
**similarity** [2] - 147:12, 252:24
**similarly** [4] - 160:20, 251:25, 253:3, 254:2
**simple** [5] - 41:7, 41:8, 41:12, 177:5, 203:24
**simply** [14] - 23:11, 44:7, 80:17, 102:3, 117:20, 126:7, 147:7, 161:24, 188:15, 224:2, 236:20, 242:15, 255:10, 263:6
**sincerely** [1] - 137:22
**single** [42] - 59:22, 60:8, 78:13, 78:14, 78:16, 83:6, 83:11, 84:13, 84:19, 86:4, 86:18, 90:16, 96:15, 106:3, 119:1, 120:23, 123:9, 125:14, 125:19, 126:6, 141:1, 141:6, 143:11, 143:12, 143:13, 143:14, 143:15, 143:16, 147:22, 148:1, 148:2, 173:7, 180:9, 192:15, 221:7, 240:20, 248:25, 255:7, 275:17
**single-industry** [1] - 86:18
**single-product** [1] - 255:7
**singled** [1] - 85:13
**sit** [7] - 7:7, 10:14, 88:2, 101:23, 166:23, 193:22, 203:21
**sitting** [7] - 33:18, 61:2, 123:5, 128:23, 131:17, 186:21, 244:11
**situation** [1] - 85:3
**six** [27] - 7:1, 68:17, 77:12, 82:25, 94:10, 94:14, 112:17, 112:19, 122:17, 122:19, 138:2, 138:3, 140:10, 142:4,

143:10, 148:20, 148:21, 150:1, 171:5, 185:20, 192:17, 194:7, 194:11, 239:20, 270:18
**six-week** [1] - 192:17
**size** [23] - 18:17, 35:5, 35:9, 71:4, 112:3, 163:9, 174:18, 174:20, 174:24, 175:4, 175:7, 175:11, 188:1, 199:9, 209:25, 210:2, 210:4, 210:11, 214:3, 214:7, 239:11, 242:3
**sizes** [2] - 144:3, 187:25
**skilled** [3] - 65:15, 65:18, 220:13
**SLATER** [2] - 2:10, 2:10
**slices** [1] - 189:22, 192:1
**slicing** [2] - 191:22, 192:1
**slide** [16] - 22:25, 23:25, 26:14, 30:16, 50:8, 50:10, 52:11, 52:19, 53:1, 53:3, 66:5, 67:12, 69:10, 70:23, 142:20, 181:1
**slides** [2] - 93:18, 127:19
**slight** [1] - 274:25
**slightly** [12] - 17:21, 23:5, 23:6, 23:7, 23:12, 47:7, 49:8, 79:9, 215:22, 233:9, 234:12, 234:17
**slope** [1] - 210:8
**sloping** [1] - 53:13
**slow** [1] - 94:8
**slowed** [1] - 94:24
**smack** [1] - 144:18
**small** [7] - 17:4, 65:3, 122:11, 123:6, 204:13, 229:7, 243:17
**smaller** [2] - 91:8, 148:14
**smelled** [1] - 243:22
**smoke** [4] - 14:25, 33:9, 33:24, 181:16
**smoothly** [1] - 5:17
**snapshot** [1] - 163:15
**so-called** [1] - 235:21
**societal** [1] - 258:14
**Society** [1] - 181:21
**soda** [6] - 177:6,

177:7, 177:9, 177:14, 177:15, 177:16
**sold** [8] - 43:17, 49:25, 113:15, 115:3, 123:10, 123:14, 125:4, 257:3
**sole** [3] - 226:21, 243:7, 264:15
**solely** [2] - 189:19, 247:9
**solemn** [1] - 7:7
**solution** [8] - 32:5, 32:12, 32:13, 32:18, 33:3, 34:17, 44:4, 202:20
**solutions** [1] - 33:20
**solve** [1] - 39:13
**someone** [4] - 90:19, 114:18, 199:21, 225:8
**someplace** [2] - 273:18, 273:23
**something's** [2] - 191:16, 191:17
**sometime** [1] - 186:18
**sometimes** [10] - 123:22, 129:21, 136:12, 196:5, 224:8, 224:9, 246:17, 263:24, 264:22
**somewhat** [1] - 224:19
**somewhere** [2] - 30:7, 56:17
**soon** [2] - 220:4, 268:16
**sorry** [12] - 4:11, 4:18, 95:21, 106:1, 133:8, 169:25, 187:18, 198:4, 231:23, 262:1, 270:17, 272:24
**sort** [16] - 19:24, 46:23, 76:16, 91:20, 124:13, 128:7, 135:2, 136:9, 152:23, 176:22, 198:11, 198:15, 230:6, 231:3, 266:22, 268:22
**sorts** [1] - 63:21
**sound** [3] - 95:21, 206:15, 247:7
**sounded** [2] - 222:21, 223:2
**soundness** [1] - 246:24
**soups** [1] - 126:21
**source** [1] - 200:12
**sources** [1] - 204:8
**South** [3] - 2:5, 2:21,

3:15
**southeastern** [1] - 199:22
**soybeans** [1] - 119:16
**space** [55] - 9:1, 9:25, 10:4, 12:19, 27:19, 32:18, 34:23, 35:13, 44:13, 52:8, 54:9, 54:13, 55:24, 58:21, 71:3, 87:12, 103:18, 104:6, 104:12, 104:13, 104:15, 105:5, 105:6, 105:7, 105:12, 105:14, 105:23, 105:24, 106:2, 106:12, 106:20, 110:15, 114:20, 114:25, 131:4, 155:7, 162:25, 176:6, 181:6, 181:7, 188:24, 189:1, 189:2, 189:18, 189:21, 189:25, 190:2, 190:10, 203:8, 209:16, 212:6, 218:18, 219:14, 235:22
**Sparboe** [35] - 34:4, 34:5, 45:17, 46:4, 46:6, 46:13, 47:22, 62:24, 83:8, 83:9, 83:10, 97:15, 100:15, 100:16, 101:13, 101:17, 101:19, 101:21, 104:20, 105:3, 111:11, 111:12, 114:5, 120:20, 120:24, 121:9, 148:22, 151:21, 203:11, 204:9, 237:15
**Sparboe's** [2] - 13:22, 13:24
**speaking** [2] - 6:13, 15:15
**speaks** [2] - 36:23, 217:4
**special** [1] - 196:4
**species** [1] - 87:14
**specific** [5] - 74:11, 128:23, 141:24, 247:10, 263:9
**specifically** [4] - 85:13, 127:17, 237:23, 250:12
**specification** [1] - 190:18
**specifications** [1] - 158:16

**specified** [1] - 56:9
**specify** [1] - 219:9
**specifying** [1] - 218:24
**speculate** [2] - 73:13, 226:18
**speculation** [1] - 245:11
**speech** [1] - 196:23
**spend** [5] - 24:1, 49:21, 97:3, 153:11, 165:25
**spent** [11] - 30:7, 41:23, 65:11, 65:16, 102:12, 122:3, 122:12, 122:13, 175:24, 215:14
**SPERLING** [1] - 2:10
**sponsored** [1] - 30:5
**sporadic** [2] - 122:11, 243:17
**sports** [2] - 177:11, 272:11
**spot** [1] - 11:18
**spots** [1] - 131:1
**spread** [1] - 43:22
**Square** [1] - 3:6
**square** [4] - 105:8, 188:20, 188:22
**squarely** [1] - 62:2
**squash** [1] - 63:4
**stabilizing** [1] - 262:19
**stack** [2] - 149:14, 155:2
**staff** [1] - 45:23
**stage** [1] - 233:19
**stance** [1] - 19:11
**stand** [14] - 10:14, 30:4, 34:12, 40:18, 58:2, 149:5, 156:17, 159:3, 159:20, 163:20, 176:12, 186:25, 219:2, 229:17
**stand-alone** [1] - 156:17
**standard** [12] - 73:19, 73:21, 84:13, 84:17, 85:8, 86:4, 96:12, 158:10, 159:10, 159:11, 231:16, 235:2
**standards** [10] - 21:22, 21:25, 86:8, 89:24, 105:20, 116:17, 116:24, 153:21, 181:13, 181:14
**Standards** [1] - 108:2

**standing** [4] - 229:11, 229:20, 258:14, 268:22
**standpoint** [1] - 276:3
**Stanford** [1] - 172:24
**staple** [1] - 166:1
**staring** [1] - 48:13
**start** [20] - 6:18, 24:12, 69:4, 94:1, 117:16, 149:17, 149:18, 162:22, 198:22, 214:12, 214:13, 220:3, 220:9, 227:1, 251:20, 259:15, 266:10, 268:8, 271:8, 271:11
**started** [7] - 11:5, 29:4, 56:20, 71:8, 90:6, 146:10, 202:18
**starters** [1] - 58:8
**starting** [7] - 25:3, 25:12, 52:19, 56:23, 120:17, 190:24, 273:2
**starts** [12] - 19:7, 70:5, 71:5, 71:17, 85:11, 97:22, 112:16, 117:2, 168:2, 183:19, 209:1, 209:2
**State** [1] - 127:16
**state** [18] - 99:2, 107:25, 115:2, 115:3, 116:20, 127:17, 128:23, 131:24, 183:24, 188:25, 197:12, 214:14, 245:20, 247:13, 261:19, 274:20, 275:5, 275:8
**statement** [7] - 14:22, 17:25, 22:15, 89:11, 127:16, 185:21, 199:17
**statements** [11] - 5:23, 6:6, 150:9, 170:15, 170:16, 222:20, 230:13, 230:16, 231:7, 260:12, 260:24
**STATES** [1] - 1:1
**States** [27] - 3:8, 17:23, 33:16, 40:2, 40:25, 47:1, 75:7, 123:10, 123:15, 125:6, 138:17, 153:20, 156:17, 156:18, 168:18, 176:10, 178:8, 178:10, 181:22, 199:21, 199:23,

203:10, 232:7, 243:2, 243:16, 259:12, 262:5
**states** [6] - 114:25, 127:20, 131:25, 189:1, 214:16, 218:16
**States'** [1] - 219:16
**stating** [1] - 221:7
**stations** [2] - 229:12, 229:21
**statistically** [2] - 52:20, 208:16
**status** [2] - 90:23, 90:24
**statute** [4] - 131:15, 131:17, 134:15, 136:5
**statutes** [10] - 115:10, 127:23, 127:25, 128:17, 128:23, 131:25, 132:7, 135:5, 135:24
**stay** [2] - 207:9, 268:25
**stayed** [4] - 69:18, 112:11, 188:19, 188:22
**steam** [1] - 205:12
**stem** [2] - 209:12, 209:13
**step** [3] - 19:2, 31:13, 80:12
**stepping** [1] - 213:19
**steps** [5] - 38:22, 39:12, 43:2, 219:6, 249:14
**stick** [2] - 272:7, 272:12
**sticker** [4] - 21:21, 21:23, 22:5, 22:9
**stiff** [6] - 21:9, 21:12, 21:13, 21:15, 21:18, 22:17
**still** [12] - 30:1, 39:11, 39:17, 39:23, 74:17, 109:10, 175:12, 190:7, 191:2, 191:3, 193:8, 248:7
**stipulated** [1] - 222:18
**stock** [1] - 14:13
**Stoller** [1] - 15:22
**stool** [5] - 150:25, 151:2, 151:4, 152:18, 173:6
**stop** [6] - 9:9, 37:20, 73:14, 73:16, 92:1, 200:21
**stopgap** [3] - 32:15, 209:3, 209:6
**stopped** [9] - 9:21, 9:23, 62:18, 62:19,

147:4, 205:24, 207:10, 207:17, 207:21

**stops** [7] - 70:10, 71:10, 72:2, 86:1, 98:16, 117:7, 183:22

**stopwatch** [1] - 130:3

**store** [5] - 81:9, 110:3, 179:9, 199:21, 201:1

**stores** [2] - 21:8, 47:20

**Stores** [2] - 2:22, 232:5

**stories** [1] - 150:8

**story** [9] - 15:1, 20:6, 29:14, 72:25, 77:19, 78:3, 98:17, 146:6

**straightaway** [3] - 195:12, 271:8, 271:16

**Street** [6] - 1:22, 2:12, 2:17, 3:11, 3:15, 201:19

**street** [1] - 138:15

**streets** [1] - 200:21

**Streets** [1] - 3:6

**stress** [1] - 87:6

**stricken** [1] - 226:14

**strict** [1] - 106:14

**stricter** [1] - 235:2

**strikes** [2] - 14:3, 194:17

**striking** [1] - 14:22

**strongly** [1] - 266:25

**struck** [1] - 226:14

**structure** [5] - 91:23, 92:14, 93:15, 124:4, 256:8

**struggling** [1] - 176:2

**stuck** [2] - 160:2, 160:4

**study** [1] - 87:5

**studying** [3] - 32:25, 65:11, 65:20

**stuff** [3] - 182:15, 187:12, 187:13

**stunning** [1] - 47:17

**subcommittee** [1] - 74:15

**subgroups** [2] - 50:5, 50:6

**subject** [9] - 31:8, 46:15, 60:15, 94:19, 111:5, 120:4, 128:4, 132:16, 134:12

**submarkets** [1] - 50:5

**submit** [33] - 9:3,

10:24, 16:18, 23:7, 28:15, 29:24, 35:15, 36:8, 48:14, 48:20, 49:13, 50:25, 61:4, 61:7, 62:1, 67:18, 72:6, 75:5, 141:21, 146:5, 147:18, 150:16, 166:20, 168:20, 179:11, 187:16, 192:6, 201:21, 206:12, 208:19, 216:21, 217:25, 219:19

**submits** [1] - 33:1

**submitted** [1] - 180:21

**subsets** [1] - 50:16

**subsidiaries** [1] - 230:9

**substance** [5] - 207:17, 207:18, 213:5, 213:9, 215:5

**substantial** [13] - 95:24, 151:11, 151:12, 152:20, 249:18, 249:21, 254:14, 255:16, 257:13, 257:18, 257:22, 257:25

**substantially** [6] - 104:17, 250:2, 258:21, 259:2, 259:4, 259:10

**substitutable** [4] - 49:5, 49:8, 49:15, 50:14

**substitute** [8] - 48:2, 48:24, 49:1, 49:13, 177:9, 177:10, 247:4, 257:8

**substitutes** [4] - 177:8, 177:17, 178:21, 255:5

**substitution** [6] - 47:12, 49:17, 49:18, 50:19, 50:24, 50:25

**succeed** [1] - 260:3

**succeeded** [1] - 252:12

**success** [1] - 99:7

**successful** [1] - 56:12

**suddenly** [1] - 210:9

**sue** [1] - 75:8

**sued** [4] - 172:2, 172:4, 172:7, 193:9

**suffer** [2] - 232:17, 248:15

**suffered** [1] - 265:20

**suffering** [1] - 31:19

**sufficient** [5] - 41:9, 51:1, 179:21, 203:14, 254:17

**suggest** [6] - 18:17, 168:21, 205:17, 270:4, 272:16, 274:24

**suggested** [3] - 83:14, 198:2, 222:24

**suggestion** [3] - 163:14, 171:7, 228:5

**suggestions** [2] - 242:15, 242:18

**suggests** [1] - 152:11

**suit** [1] - 247:11

**Suite** [5] - 2:5, 2:12, 2:21, 3:12, 3:16

**sum** [1] - 176:14

**summaries** [7] - 30:5, 45:4, 149:2, 149:6, 149:17, 149:19, 150:16

**summarize** [6] - 16:22, 77:12, 231:5, 233:15, 233:20, 249:15

**summarizing** [1] - 222:25

**summary** [14] - 29:24, 30:2, 30:8, 43:7, 43:15, 44:19, 44:22, 45:1, 45:15, 45:19, 46:13, 149:2, 214:10, 265:11

**summertime** [1] - 173:16

**SUMNER** [1] - 3:3

**super** [2] - 6:5, 126:15

**Super** [2] - 2:13, 232:3

**superior** [1] - 239:13

**supermarket** [16] - 22:19, 48:18, 64:20, 121:14, 121:17, 124:2, 153:23, 156:18, 157:15, 157:16, 159:16, 159:18, 192:12, 199:23, 201:17, 201:21

**Supermarket** [2] - 240:19, 241:2

**supermarkets** [13] - 12:25, 21:10, 21:13, 21:14, 49:25, 57:4, 58:24, 120:3, 120:6, 121:12, 201:19, 203:18, 218:4

**Supermarkets** [5] -

2:7, 48:24, 120:1, 125:5, 232:4

**SuperValu** [6] - 2:14, 56:22, 81:8, 143:15, 161:15, 232:4

**SuperValus** [1] - 203:15

**supplier** [2] - 114:7, 160:24

**suppliers** [5] - 17:2, 103:12, 109:18, 158:3, 171:14

**supplies** [6] - 144:9, 145:9, 174:14, 194:1, 250:10, 250:18

**supply** [193] - 8:21, 10:3, 10:5, 12:15, 12:20, 17:24, 21:6, 22:12, 26:1, 26:20, 26:21, 26:22, 27:14, 27:18, 27:24, 28:4, 28:21, 28:23, 29:13, 29:21, 30:12, 30:22, 31:2, 31:6, 33:8, 33:25, 34:16, 35:9, 35:14, 35:17, 35:21, 37:13, 37:24, 40:25, 41:9, 41:10, 41:11, 41:12, 41:18, 42:11, 42:14, 42:20, 44:4, 44:13, 47:10, 47:11, 48:13, 50:19, 50:24, 50:25, 52:1, 52:6, 52:11, 52:25, 53:7, 54:3, 54:5, 54:17, 54:21, 56:8, 56:15, 58:20, 59:4, 63:16, 63:19, 63:23, 63:24, 64:2, 64:5, 67:14, 69:16, 70:15, 70:19, 70:25, 72:13, 74:3, 74:18, 78:21, 78:23, 79:16, 82:6, 82:7, 82:12, 82:16, 82:18, 83:7, 83:15, 83:16, 83:25, 84:7, 84:8, 84:9, 84:10, 90:3, 91:23, 92:3, 92:13, 92:16, 92:17, 92:20, 93:1, 93:14, 93:16, 93:20, 94:16, 94:23, 95:5, 95:9, 99:24, 100:4, 100:8, 100:21, 104:10, 104:13, 106:15, 107:11, 108:22, 108:25, 111:23, 112:2, 112:6, 112:12, 112:13, 113:5, 113:21, 114:9, 118:15, 140:24,

143:5, 143:25, 151:5, 156:4, 156:5, 156:25, 160:1, 168:15, 168:16, 169:1, 173:7, 173:11, 173:22, 174:4, 176:17, 176:18, 192:15, 192:24, 194:16, 203:14, 208:2, 208:13, 211:12, 212:21, 213:6, 213:8, 213:11, 213:12, 213:20, 214:12, 217:16, 235:13, 235:20, 236:5, 236:10, 236:15, 238:1, 238:12, 238:19, 238:20, 239:7, 239:18, 240:16, 241:7, 242:2, 242:3, 242:13, 242:14, 242:16, 242:18, 242:20, 242:24, 243:2, 243:6, 243:15, 249:12, 250:14, 252:10, 254:8

**supply-reduction** [4] - 26:20, 26:21, 26:22, 27:18

**supply/demand** [2] - 11:17, 11:24

**supplying** [4] - 157:10, 167:18, 167:20, 208:3

**support** [9] - 19:11, 47:7, 60:8, 88:13, 96:22, 96:23, 106:23, 107:16, 247:7

**supported** [6] - 99:13, 100:9, 106:24, 106:25, 129:16, 228:11

**supportive** [4] - 15:18, 15:19, 204:22, 204:23

**supports** [6] - 15:22, 16:8, 23:12, 59:23, 100:4, 114:8

**supposed** [5] - 73:1, 73:5, 210:14, 220:18, 221:6

**supposedly** [3] - 141:10, 216:9, 216:19

**Supreme** [2] - 138:18, 138:19

**surely** [1] - 10:18

**surplus** [12] - 82:3, 119:6, 119:21, 119:22, 119:23, 120:15, 173:14,

173:20, 173:24,
192:16, 238:14,
242:16
  **surprise** [1] - 19:13
  **surprised** [1] - 66:14
  **surprisingly** [1] -
150:5
  **surrounding** [1] -
231:1
  **suspicion** [2] -
223:13, 245:2
  **sustain** [1] - 233:9
  **sustainable** [1] -
153:6
  **sustained** [9] - 29:7,
32:4, 84:4, 151:15,
153:2, 209:7, 209:9,
224:13, 256:15
  **Swanson** [4] - 87:13,
87:15, 90:8, 107:21
  **swear** [1] - 272:5
  **sweat** [1] - 273:2
  **swings** [1] - 83:1
  **switches** [1] - 48:9
  **sworn** [1] - 221:18
  **Syed** [2] - 71:2,
167:13
  **sympathize** [1] -
63:10
  **sympathy** [2] -
222:10, 267:18
  **system** [14] - 19:18,
69:13, 74:14, 97:6,
98:8, 102:21, 108:22,
138:9, 138:22,
191:21, 218:22,
218:25, 219:12
  **systems** [1] - 99:19

---

## T

  **table** [4] - 26:11,
26:16, 118:14, 203:17
  **tables** [2] - 118:16,
123:6
  **tacit** [1] - 109:11
  **tactic** [1] - 85:23
  **tailwind** [1] - 203:1
  **talks** [1] - 187:8
  **Tampa** [1] - 237:15
  **tanker** [2] - 179:3,
179:4
  **task** [1] - 215:1
  **tattoo** [1] - 187:15
  **Tea** [2] - 2:8, 232:2
  **tea** [1] - 177:11
  **team** [4] - 87:10,
122:13, 149:14,
149:16

  **teams** [1] - 66:3
  **technical** [5] -
140:12, 140:19,
146:16, 247:25, 248:4
  **technology** [1] -
262:6
  **ten** [13] - 68:10,
75:19, 75:24, 94:3,
94:10, 139:16,
184:25, 185:19,
194:12, 194:13,
199:1, 205:12
  **ten-year** [1] - 94:3
  **tender** [1] - 135:17
  **tending** [1] - 228:2
  **tentative** [1] - 268:22
  **term** [69] - 8:25,
12:22, 26:6, 26:8,
26:24, 27:2, 27:6,
27:9, 27:17, 29:4,
31:3, 32:2, 32:3,
32:15, 35:18, 38:7,
38:10, 38:12, 38:14,
44:17, 46:23, 48:7,
52:7, 56:4, 67:13,
69:22, 70:17, 70:25,
82:1, 84:4, 122:9,
122:21, 123:20,
124:21, 125:23,
140:19, 140:24,
146:16, 151:4, 151:5,
151:12, 151:16,
151:20, 152:12,
152:24, 153:2, 153:5,
168:16, 181:16,
205:17, 208:15,
209:3, 209:7, 209:15,
217:15, 219:13,
234:25, 235:1,
235:20, 236:15,
238:12, 242:14,
243:5, 244:21,
248:21, 253:10,
265:18
  **terminated** [1] -
15:21
  **terms** [17] - 4:23, 6:4,
32:11, 34:1, 43:22,
53:19, 53:24, 54:3,
54:14, 126:13, 128:5,
183:4, 202:21,
203:25, 207:9,
218:11, 267:9
  **terrific** [1] - 137:9
  **Terry** [3] - 121:5,
167:25, 168:3
  **test** [4] - 61:25,
63:22, 215:2, 215:12
  **testified** [51] - 38:2,
39:5, 46:5, 48:8, 48:9,

50:18, 52:9, 53:3,
54:16, 55:4, 60:17,
60:20, 60:22, 60:24,
63:6, 63:12, 64:12,
69:4, 69:12, 73:10,
81:7, 84:1, 84:2,
84:20, 93:4, 100:22,
100:23, 102:15,
102:22, 103:2,
104:19, 106:3, 112:1,
113:14, 120:11,
120:22, 122:3, 123:8,
152:21, 162:10,
165:4, 165:20, 171:9,
183:17, 207:18,
227:19, 228:1,
239:18, 243:25,
244:1, 246:12
  **testifies** [2] - 103:1,
243:21
  **testify** [9] - 14:4,
67:1, 74:6, 83:7,
107:25, 119:6,
121:16, 227:23,
245:19
  **testifying** [6] - 54:23,
121:6, 122:4, 227:6,
229:5, 246:5
  **testimonial** [1] -
61:13
  **testimony** [77] -
7:23, 9:4, 38:3, 41:16,
47:23, 48:6, 48:11,
50:1, 50:9, 50:13,
51:16, 52:2, 54:25,
56:20, 64:18, 67:3,
69:4, 75:1, 78:2, 81:4,
83:5, 83:20, 87:7,
91:2, 91:20, 97:14,
99:12, 102:23, 106:9,
107:7, 109:16, 114:1,
116:1, 119:16, 123:5,
123:20, 129:6,
139:10, 158:7, 166:5,
166:10, 173:11,
186:7, 189:15,
200:13, 205:4,
216:23, 222:14,
222:25, 223:4, 223:9,
223:10, 226:14,
226:17, 226:20,
227:14, 227:24,
227:25, 228:11,
228:15, 228:17,
228:25, 229:2, 229:6,
229:8, 234:22,
245:21, 245:22,
246:17, 246:20,
247:1, 247:3, 247:5,
266:9, 266:12

  **tests** [1] - 138:14
  **Texas** [8] - 159:18,
160:1, 199:24,
200:10, 200:13,
200:16, 200:22
  **text** [3] - 273:11,
273:12, 273:13
  **thanking** [1] - 6:25
  **Thanksgiving** [1] -
149:4
  **THE** [135] - 1:1, 1:2,
1:12, 4:2, 4:7, 4:9,
4:12, 4:16, 4:17, 4:18,
4:19, 4:20, 4:21, 5:4,
5:6, 5:10, 5:12, 67:24,
68:2, 68:8, 68:11,
75:14, 75:18, 75:25,
76:2, 76:4, 76:7,
76:10, 76:12, 76:15,
76:19, 76:21, 76:23,
77:8, 90:20, 117:12,
117:15, 117:19,
126:10, 127:6, 127:8,
127:12, 128:7,
128:10, 128:12,
128:19, 128:21,
129:2, 129:6, 129:19,
130:2, 130:5, 130:10,
130:17, 130:21,
130:25, 131:1, 131:7,
132:4, 132:11,
132:24, 133:8,
133:16, 133:22,
133:24, 134:5,
134:20, 135:6, 135:8,
135:11, 135:15,
136:1, 136:3, 136:8,
136:11, 136:17,
136:20, 136:24,
137:1, 137:3, 137:5,
137:6, 195:5, 195:9,
195:11, 195:15,
195:17, 195:22,
196:2, 196:9, 196:17,
196:21, 197:3, 197:8,
197:14, 197:16,
197:21, 197:25,
198:3, 198:6, 198:21,
219:24, 220:11,
220:12, 270:15,
272:2, 272:4, 272:6,
272:7, 272:21,
272:23, 272:24,
272:25, 273:3, 273:6,
273:9, 273:12,
273:15, 273:18,
273:21, 273:23,
274:3, 274:6, 274:7,
274:10, 274:11,
274:13, 274:15,

274:21, 275:1,
275:16, 275:20,
275:23, 275:25, 276:5
  **theme** [1] - 203:23
  **themselves** [6] -
109:12, 120:18,
126:5, 172:3, 243:22,
251:17
  **tHEODORE** [1] -
2:21
  **theoretical** [1] -
236:17
  **theory** [7] - 74:20,
93:16, 93:19, 93:21,
95:7, 104:9, 110:16
  **thereafter** [2] - 5:17,
24:16
  **thereby** [2] - 240:16,
260:3
  **therefore** [13] -
111:24, 124:22,
125:24, 203:21,
229:18, 231:1, 241:6,
242:19, 248:4,
248:17, 252:11,
252:20, 274:24
  **they've** [14] - 6:6,
17:13, 62:12, 109:8,
146:5, 146:6, 148:6,
161:11, 161:12,
173:20, 192:7, 192:9,
220:24, 244:22
  **thinking** [12] - 10:19,
14:6, 14:12, 16:14,
16:15, 18:10, 24:6,
36:19, 65:20, 106:18,
132:13, 216:13
  **thinks** [5] - 20:4,
101:7, 101:8, 188:5,
188:21
  **third** [16] - 9:10,
67:7, 79:25, 92:11,
93:6, 112:6, 113:10,
121:1, 141:7, 176:19,
176:20, 182:4,
190:14, 248:14,
263:22
  **third-party** [1] -
182:4
  **third-prong** [1] -
79:25
  **thoughts** [2] -
133:24, 216:4
  **threat** [2] - 101:12,
257:7
  **three** [46] - 8:23, 9:5,
15:14, 15:15, 29:4,
31:5, 43:12, 66:21,
78:6, 78:8, 80:17,
94:4, 103:21, 103:24,

104:1, 110:14, 120:9,
140:22, 140:25,
141:6, 147:20,
147:23, 148:2, 148:4,
150:25, 151:1, 151:4,
168:18, 169:3,
191:11, 195:8,
195:14, 203:22,
209:2, 216:7, 216:8,
216:16, 234:7, 246:8,
248:24, 248:25,
249:2, 249:8, 263:15

**three-minute** [1] -
195:8

**throughout** [3] -
106:12, 175:15,
224:23

**throw** [1] - 173:17

**thrust** [1] - 184:23

**Thursday** [2] - 138:3,
142:4

**thusly** [1] - 234:21

**tide** [2] - 209:12,
209:13

**tie** [4] - 25:22,
206:12, 206:16,
215:19

**tied** [2] - 92:10,
208:4

**tier** [1] - 69:13

**Tim** [6] - 69:4, 69:23,
98:19, 110:22,
151:25, 167:1

**timelines** [2] - 30:3,
69:21

**timely** [1] - 31:3

**timing** [9] - 10:9,
10:10, 10:13, 117:12,
135:9, 204:17, 205:6,
217:19, 220:5

**tip** [5] - 23:4, 79:8,
233:9, 234:12, 234:17

**tirelessly** [1] -
116:23

**tires** [1] - 183:9

**title** [1] - 230:25

**titled** [1] - 213:24

**today** [17] - 10:18,
74:2, 98:20, 143:22,
143:23, 144:12,
146:10, 146:13,
161:21, 176:9, 185:5,
185:10, 186:23,
192:22, 199:4, 219:2

**together** [23] - 17:3,
19:11, 35:20, 81:7,
81:10, 86:20, 87:9,
87:10, 89:19, 89:23,
92:10, 105:2, 147:15,
202:21, 248:23,

250:6, 251:12, 253:1,
256:13, 256:25,
271:7, 271:18, 271:19

**token** [1] - 221:17

**toll** [1] - 194:20

**tomorrow** [4] -
220:3, 270:23, 271:3,
271:24

**tone** [1] - 227:23

**tonight** [3] - 195:23,
270:19, 276:6

**took** [18] - 38:22,
39:12, 41:3, 43:2,
53:14, 64:4, 74:6,
109:7, 110:7, 149:21,
159:3, 163:19,
176:12, 176:25,
210:13, 210:16,
267:15, 270:16

**Tootsie** [1] - 178:19

**top** [4] - 53:8,
189:20, 221:6, 222:7

**Topco** [1] - 70:4,
70:7, 73:9, 73:15,
157:13, 157:14,
157:18, 157:22,
184:14

**topic** [1] - 134:21

**tornadoes** [1] - 55:5

**total** [2] - 175:14,
191:10

**totally** [1] - 110:15

**totals** [1] - 191:10

**touch** [2] - 46:3,
90:22

**touched** [1] - 243:23

**tough** [1] - 225:9

**touting** [1] - 192:13

**toward** [1] - 267:19

**towards** [1] - 152:21

**track** [2] - 57:3,
77:24

**traction** [1] - 63:2

**trade** [38] - 26:9,
27:11, 31:10, 36:10,
51:21, 55:9, 58:8,
72:25, 78:20, 79:18,
81:4, 82:9, 82:14,
89:19, 95:15, 95:18,
100:25, 115:21,
115:24, 153:22,
162:4, 214:23,
219:16, 232:15,
238:23, 238:24,
241:3, 247:24, 248:1,
248:13, 248:16,
248:19, 250:10,
250:14, 251:24,
252:9, 262:8

**traditional** [1] -

199:20

**transcript** [2] -
143:12, 276:10

**TRANSCRIPT** [1] -
1:15

**Transcript** [1] - 1:25

**transcripts** [2] -
129:23, 136:23

**transition** [1] - 94:16

**translate** [1] - 87:24

**transparent** [1] -
241:21

**trap** [2] - 29:15,
214:11

**travel** [2] - 220:6,
225:18

**treat** [2] - 97:12,
110:20

**treated** [1] - 229:18

**treating** [1] - 39:1

**treatment** [9] - 22:4,
33:21, 72:15, 74:19,
97:11, 100:18,
241:18, 258:9, 258:13

**tree** [1] - 145:15

**trees** [3] - 145:17,
145:19, 146:9

**trend** [2] - 135:3,
210:8

**trial** [52] - 6:13, 38:2,
43:9, 43:12, 48:8,
51:15, 67:10, 106:12,
116:15, 118:12,
118:13, 118:20,
119:3, 119:23, 121:3,
123:19, 124:1, 124:6,
125:20, 137:18,
138:20, 139:14,
140:10, 142:14,
144:3, 148:18,
149:16, 169:11,
169:17, 173:12,
182:7, 192:18, 199:4,
199:11, 205:4,
219:22, 220:13,
220:17, 220:22,
222:2, 224:2, 224:19,
224:23, 226:6, 227:1,
227:11, 228:14,
229:15, 231:15,
237:19, 266:10, 267:8

**TRIAL** [1] - 1:15

**trial's** [1] - 194:6

**trials** [2] - 221:22,
222:6

**tried** [6] - 14:16,
35:7, 54:22, 93:22,
179:12, 226:5

**trier** [1] - 246:19

**truck** [1] - 179:3

**true** [12] - 42:16,
80:17, 91:18, 98:2,
101:1, 101:2, 106:10,
114:4, 146:20,
184:24, 205:19,
207:16

**truly** [7] - 22:4,
73:20, 144:8, 170:18,
183:24, 197:12, 272:8

**trust** [4] - 5:24,
19:14, 64:21, 66:1

**truth** [12] - 10:23,
11:9, 72:3, 97:7,
110:6, 159:11, 171:8,
217:5, 218:9, 225:6,
226:3

**truths** [1] - 192:9

**try** [20] - 20:7, 30:1,
32:5, 32:14, 33:19,
35:4, 39:12, 58:5,
63:4, 68:20, 77:23,
126:15, 127:21,
137:19, 153:11,
187:7, 200:2, 209:12,
211:17, 214:23

**trying** [12] - 80:15,
85:22, 85:24, 85:25,
117:21, 119:17,
173:22, 194:1,
211:16, 212:17,
218:6, 275:20

**turn** [12] - 6:11, 6:12,
8:8, 31:8, 70:20, 77:6,
169:7, 214:9, 217:10,
219:11, 254:11, 275:4

**turning** [4] - 235:10,
237:20, 240:14,
247:10

**TV** [2] - 77:2, 221:23

**twice** [1] - 22:14

**Two** [1] - 3:6

**two** [48] - 23:19,
28:19, 37:8, 43:23,
46:4, 47:19, 51:5,
54:8, 58:7, 69:1,
69:13, 79:15, 79:22,
120:13, 123:6,
137:20, 141:25,
145:13, 146:18,
147:2, 168:17,
169:24, 170:23,
170:24, 172:22,
177:2, 189:17, 212:6,
214:14, 214:15,
216:4, 228:18,
232:12, 238:4,
243:19, 248:10,
250:8, 250:15,
250:23, 251:1, 253:7,
254:3, 254:22, 262:4,

267:4, 274:7

**two-tier** [1] - 69:13

**type** [9] - 14:22,
122:7, 126:5, 236:13,
243:20, 244:7,
263:23, 264:21,
265:15

**types** [2] - 64:6,
243:20

**typos** [1] - 149:23

## U

**U.S** [10] - 1:22, 8:20,
27:23, 144:3, 144:6,
158:3, 158:4, 161:4,
185:13, 188:1

**U.S.A** [1] - 201:19

**UEP** [288] - 8:13,
8:19, 11:12, 11:14,
11:21, 12:17, 13:22,
14:15, 15:12, 16:15,
17:14, 20:4, 20:9,
22:3, 26:9, 26:12,
26:19, 26:25, 29:19,
31:7, 31:9, 31:14,
31:23, 32:4, 32:17,
33:2, 33:13, 33:15,
33:24, 34:3, 34:5,
35:6, 35:12, 35:24,
36:3, 36:14, 37:8,
37:9, 37:11, 37:20,
38:11, 42:8, 43:9,
43:10, 43:22, 44:1,
53:18, 53:20, 56:11,
56:25, 57:2, 57:8,
57:10, 57:14, 57:19,
57:23, 58:3, 58:5,
58:12, 58:16, 58:21,
58:25, 59:1, 59:2,
59:4, 59:7, 59:18,
59:25, 60:14, 61:19,
63:1, 63:3, 67:4, 67:7,
69:5, 69:13, 69:14,
69:19, 69:23, 70:1,
70:13, 70:25, 71:8,
71:13, 71:21, 72:12,
73:17, 73:22, 74:17,
77:11, 77:17, 77:19,
80:7, 81:13, 81:15,
81:20, 82:7, 86:13,
87:3, 87:8, 87:17,
87:21, 87:23, 88:6,
88:23, 88:24, 89:2,
89:7, 89:16, 89:23,
91:4, 91:10, 91:25,
92:4, 92:5, 92:7, 92:8,
92:9, 92:10, 92:11,
92:15, 92:19, 93:20,
93:22, 94:2, 94:3,

94:6, 94:22, 94:25, 95:4, 99:8, 99:17, 101:16, 102:4, 102:20, 103:12, 104:23, 105:18, 105:19, 105:25, 106:12, 106:13, 107:3, 107:12, 107:13, 107:22, 108:15, 109:12, 109:20, 109:25, 110:14, 110:16, 111:12, 111:17, 111:20, 114:9, 114:10, 114:16, 114:21, 114:22, 115:1, 115:6, 115:22, 116:18, 140:23, 140:24, 141:8, 147:7, 147:8, 147:13, 147:24, 151:5, 153:17, 153:21, 153:24, 154:23, 155:17, 156:6, 157:20, 157:24, 158:2, 158:4, 158:24, 159:6, 159:12, 160:16, 161:1, 162:7, 162:18, 163:8, 163:15, 164:2, 164:9, 164:15, 165:7, 165:8, 167:5, 167:16, 167:20, 168:6, 168:17, 169:19, 169:23, 170:22, 171:3, 171:23, 171:25, 172:1, 172:2, 172:16, 175:23, 182:19, 183:2, 184:1, 184:21, 185:3, 185:5, 185:6, 185:8, 185:23, 187:10, 192:10, 193:9, 194:4, 202:8, 202:9, 205:5, 212:21, 213:15, 214:3, 216:10, 216:12, 216:24, 216:25, 217:12, 224:24, 232:7, 235:23, 236:1, 236:25, 237:6, 237:7, 237:24, 238:2, 238:7, 238:22, 239:5, 239:8, 240:14, 240:17, 240:23, 241:1, 241:6, 241:11, 241:12, 241:13, 241:15, 241:16, 241:20, 242:1, 242:4, 242:10, 242:11, 242:14, 242:18, 242:21, 243:1, 248:21,

248:22, 250:13, 253:10, 270:14
**UEP's** [16] - 20:7, 33:11, 57:9, 88:17, 91:14, 94:20, 110:11, 110:12, 127:15, 128:4, 160:25, 212:4, 215:15, 238:8, 238:12, 239:18
**UEP-recommended** [1] - 253:10
**uepcertified.com** [1] - 166:6
**ultimately** [9] - 7:8, 8:16, 33:15, 51:11, 57:14, 153:23, 162:6, 183:14, 236:4
**um-hum** [3] - 132:4, 152:8
**umbrella** [1] - 244:13
**umbrellas** [2] - 253:19, 253:21
**unanimous** [3] - 139:18, 269:4, 269:19
**unanimously** [4] - 38:12, 168:14, 168:24, 186:4
**uncertain** [1] - 218:10
**uncertified** [3] - 21:15, 56:14, 203:19
**uncommon** [1] - 222:6
**undeniably** [1] - 206:3
**under** [32] - 34:7, 41:9, 72:16, 75:4, 100:23, 108:12, 109:20, 111:7, 116:16, 136:18, 139:3, 153:9, 155:17, 159:4, 160:12, 168:12, 175:23, 191:4, 206:7, 215:11, 218:19, 218:22, 224:8, 228:1, 229:22, 230:7, 247:11, 247:22, 248:16, 250:1, 265:9, 267:12
**underlying** [1] - 241:22
**undermines** [1] - 110:15
**underneath** [1] - 210:3
**underpricing** [2] - 38:4, 43:4
**understood** [6] - 20:19, 34:14, 42:1, 42:2, 64:24

**undertaken** [1] - 109:19
**undisputed** [1] - 48:17
**undue** [1] - 127:22
**unduly** [1] - 266:5
**unfair** [1] - 100:25
**unfettered** [1] - 247:15
**unhealthy** [1] - 39:4
**unified** [1] - 119:1
**uniform** [3] - 86:7, 96:12, 116:17
**uniformly** [1] - 220:13
**unilateral** [2] - 173:2, 173:5
**unimportant** [1] - 228:22
**unincorporated** [4] - 229:13, 229:16, 230:5, 230:8
**United** [66] - 3:7, 3:8, 17:22, 27:4, 28:15, 29:11, 29:17, 29:23, 30:11, 30:18, 30:24, 31:4, 31:11, 33:4, 33:16, 40:1, 40:25, 43:23, 45:12, 47:1, 53:20, 75:7, 80:21, 82:23, 115:13, 115:15, 115:22, 116:11, 123:10, 123:15, 125:6, 138:17, 144:20, 150:8, 153:20, 156:17, 156:18, 160:24, 168:17, 168:18, 176:10, 178:8, 178:9, 181:22, 184:8, 185:12, 185:17, 186:9, 187:6, 199:21, 199:22, 203:4, 203:10, 219:16, 232:6, 232:7, 243:2, 243:16, 247:21, 259:11, 259:12, 262:4, 262:5
**UNITED** [1] - 1:1
**universe** [1] - 148:13
**universities** [1] - 115:24
**University** [1] - 172:24
**unlawful** [25] - 24:4, 24:8, 24:22, 25:1, 25:13, 42:19, 46:15, 48:15, 48:16, 57:24, 64:14, 80:8, 134:25, 147:6, 147:10,

170:10, 184:20, 211:24, 231:12, 235:12, 242:13, 251:3, 259:15, 261:10, 263:9
**unless** [9] - 41:19, 222:22, 234:21, 261:7, 269:23, 270:1, 271:5, 271:13
**unlike** [1] - 198:16
**unpaid** [1] - 160:13
**unquestionably** [1] - 65:15
**unreasonable** [21] - 51:21, 55:9, 79:22, 95:15, 95:23, 96:2, 141:14, 151:9, 180:4, 180:5, 214:22, 215:12, 219:15, 232:16, 248:17, 248:23, 249:13, 254:13, 256:2, 259:4, 259:6
**unreasonably** [5] - 79:18, 95:18, 232:15, 247:23, 248:13
**unreliable** [3] - 188:11, 192:18, 240:1
**unring** [1] - 197:24
**unspoken** [1] - 251:7
**unusual** [1] - 221:2
**unwritten** [1] - 251:7
**up** [117] - 5:8, 6:7, 9:18, 13:25, 16:4, 18:22, 19:17, 19:24, 20:3, 21:23, 22:5, 22:19, 28:23, 29:13, 29:22, 33:8, 33:19, 37:17, 37:18, 39:4, 43:8, 44:19, 46:19, 53:13, 53:19, 53:21, 53:25, 54:19, 56:7, 56:12, 58:17, 62:24, 62:25, 64:19, 64:21, 64:25, 67:12, 68:10, 70:23, 72:14, 77:8, 78:6, 78:21, 78:23, 79:24, 80:19, 80:21, 80:22, 80:25, 85:22, 86:22, 94:5, 94:9, 98:13, 105:1, 106:16, 108:13, 109:20, 112:6, 112:13, 112:14, 112:22, 121:18, 122:14, 126:21, 127:18, 128:16, 131:3, 131:16, 131:17, 135:17, 139:24, 142:16, 143:9,

143:20, 144:6, 144:7, 144:10, 145:3, 145:13, 156:13, 158:14, 161:22, 161:23, 166:11, 176:14, 180:9, 182:14, 187:19, 189:16, 191:22, 192:1, 192:2, 192:17, 193:22, 198:10, 198:15, 199:16, 206:1, 207:19, 209:24, 210:12, 210:18, 211:4, 211:8, 211:21, 211:22, 213:1, 214:7, 214:13, 215:9, 216:6, 217:6, 226:23, 253:16, 268:4, 275:1
**Update** [1] - 164:6
**updated** [1] - 164:9
**uphold** [1] - 7:7
**ups** [1] - 53:10
**upwards** [2] - 175:24, 188:6
**urge** [7] - 9:12, 45:25, 49:21, 83:4, 213:22, 266:21, 268:1
**urgency** [1] - 107:2
**urging** [1] - 83:2
**US** [25] - 118:4, 118:13, 118:17, 118:20, 118:23, 118:25, 120:10, 120:12, 120:21, 120:24, 121:7, 121:13, 121:23, 121:25, 123:9, 123:13, 123:16, 124:19, 125:1, 125:3, 125:11, 125:17, 125:21, 126:2, 126:4
**usable** [2] - 88:3, 244:19
**USDA** [1] - 111:3, 115:23, 157:20, 161:1, 182:19
**USEM** [47] - 8:13, 8:19, 17:14, 27:11, 28:6, 31:7, 35:23, 36:3, 36:5, 43:9, 57:23, 59:4, 67:4, 67:8, 117:23, 141:8, 147:24, 152:18, 152:22, 152:23, 168:18, 173:22, 173:23, 174:3, 212:17, 212:20, 216:24, 216:25, 217:12, 232:8,

235:20, 236:1, 236:16, 237:6, 239:20, 242:23, 242:25, 243:2, 243:5, 243:9, 243:12, 243:14, 248:22, 250:13, 270:13

**USEM's** [4] - 35:22, 76:14, 238:13, 243:7

**uses** [4] - 14:18, 179:1, 209:6, 209:23

**usual** [1] - 271:9

**utmost** [1] - 107:2

---

**V**

**vague** [1] - 151:23

**valid** [1] - 240:5

**valuable** [3] - 77:18, 150:17, 262:7

**value** [2] - 44:12, 264:3

**valued** [1] - 276:2

**VANEK** [1] - 2:11

**variables** [1] - 210:15

**variations** [1] - 181:16

**variety** [2] - 201:22, 201:23

**various** [12] - 67:20, 96:4, 145:6, 147:13, 154:8, 162:17, 180:13, 238:8, 249:9, 252:24, 255:4, 258:4

**vast** [1] - 153:14

**Vee** [5] - 2:7, 143:14, 201:7, 217:7, 232:2

**Vees** [1] - 203:15

**vendor** [1] - 73:12

**venture** [1] - 265:19

**verdict** [41] - 7:9, 8:9, 18:4, 18:8, 46:18, 51:3, 67:19, 67:20, 75:11, 79:9, 125:16, 139:18, 140:3, 140:4, 140:6, 168:12, 176:21, 186:3, 195:2, 195:20, 214:20, 219:19, 219:20, 219:21, 221:19, 228:10, 234:13, 267:23, 268:7, 269:1, 269:3, 269:4, 269:5, 269:7, 269:12, 269:19, 269:22, 269:25, 270:3, 270:5, 270:8

**verdicts** [3] - 233:24,

269:9, 269:10

**verified** [1] - 111:4

**versa** [1] - 48:10

**version** [5] - 156:7, 156:8, 156:10

**versions** [1] - 156:13

**versus** [2] - 98:10, 180:7

**vertically** [1] - 74:22

**Via** [1] - 1:25

**viable** [1] - 102:16

**vice** [7] - 48:10, 81:6, 85:9, 142:9, 142:25, 162:9, 162:13

**victim** [3] - 56:3, 72:11, 156:20

**victimized** [1] - 17:2

**victims** [5] - 16:18, 16:20, 16:24, 17:1, 17:6

**video** [13] - 7:11, 39:9, 121:6, 121:16, 143:12, 151:25, 166:19, 166:23, 166:24, 182:10, 199:14, 222:16, 266:11

**videos** [3] - 7:17, 166:21, 167:1

**videotapes** [1] - 7:13

**view** [5] - 167:4, 181:11, 221:15, 227:12, 253:7

**views** [2] - 16:11, 268:3

**violate** [1] - 231:10

**violated** [2] - 17:22, 263:11

**violating** [1] - 263:5

**violation** [19] - 101:1, 101:22, 132:9, 219:16, 221:14, 221:17, 235:14, 248:6, 262:13, 263:3, 263:7, 263:12, 263:19, 264:2, 264:7, 264:13, 264:15, 264:18, 265:22

**violations** [1] - 73:7

**virtually** [1] - 198:13

**virtue** [1] - 200:3

**visiting** [1] - 73:18

**visual** [2] - 39:8, 223:11

**Voices** [26] - 27:4, 28:15, 29:11, 29:17, 29:23, 30:11, 30:18, 30:25, 31:11, 33:4, 43:23, 45:12, 53:20, 82:23, 115:13,

115:15, 115:22, 116:11, 144:20, 150:8, 184:8, 186:9, 187:6, 203:4

**volume** [2] - 40:20, 45:3

**volumes** [1] - 217:4

**voluntary** [14] - 57:15, 58:15, 81:12, 81:17, 81:19, 81:20, 81:22, 81:23, 82:8, 82:10, 91:23, 92:6, 241:8, 243:13

**vote** [4] - 26:12, 35:12, 268:23, 269:1

**voted** [1] - 11:21, 137:25, 38:7, 38:11, 243:11

**votes** [5] - 37:21, 37:23, 42:13, 268:7, 268:24

**voting** [2] - 42:9, 268:24

---

**W**

**waffles** [1] - 49:16

**wait** [2] - 21:23, 175:3

**waited** [1] - 77:19

**waiting** [2] - 196:19, 268:19

**waits** [1] - 33:7

**Walgreen** [2] - 2:7, 232:5

**Walgreens** [1] - 143:15

**walk** [6] - 97:7, 145:6, 158:25, 196:5, 201:17, 201:20

**Walker** [29] - 47:5, 48:22, 50:18, 65:16, 74:20, 75:2, 82:13, 93:7, 101:4, 112:1, 113:10, 135:14, 144:15, 144:16, 154:14, 172:23, 179:20, 181:10, 188:7, 189:6, 190:22, 191:14, 191:20, 192:1, 204:13, 210:14, 239:24, 246:9

**Walker's** [4] - 50:13, 75:1, 112:7, 275:12

**walking** [3] - 80:14, 138:10, 200:21

**Walmart** [15] - 59:17, 59:19, 61:9, 61:10, 61:11, 63:5, 63:7,

167:18, 170:23, 171:1, 171:18, 172:12, 179:6, 182:17, 182:18

**wants** [3] - 14:12, 154:20

**warning** [1] - 126:14

**Washington** [3] - 3:12, 115:5, 184:4

**wasting** [1] - 83:2

**watch** [5] - 166:23, 218:1, 218:3, 218:7

**watched** [1] - 131:18

**watching** [6] - 68:18, 77:2, 131:15, 166:21, 221:23

**water** [5] - 40:20, 40:21, 177:11, 244:13, 244:14

**ways** [6] - 40:15, 200:16, 202:17, 215:8, 215:9, 258:2

**wearing** [1] - 244:12

**weather** [6] - 225:23, 233:7, 244:1, 253:18, 271:2, 271:4

**weather's** [1] - 271:2

**Weaver** [26] - 69:1, 69:3, 69:4, 69:5, 69:7, 69:8, 69:17, 69:19, 69:20, 69:22, 69:23, 69:25, 70:1, 70:3, 70:12, 70:16, 74:10, 148:21, 151:24, 151:25, 167:1, 167:2, 169:14, 237:15

**website** [15] - 59:14, 91:14, 110:1, 161:7, 165:3, 165:6, 165:11, 166:7, 166:13, 166:14, 184:25, 185:1, 185:10, 241:23

**websites** [2] - 59:8, 166:9

**week** [5] - 94:1, 153:10, 169:17, 186:25, 192:17

**weeks** [25] - 7:1, 28:19, 31:2, 37:8, 43:23, 65:16, 68:17, 68:19, 77:12, 80:18, 82:25, 118:2, 122:24, 138:2, 138:3, 140:10, 142:4, 143:10, 149:4, 150:1, 183:1, 194:7, 194:12

**Wegmans** [1] - 113:18

**weigh** [7] - 95:18, 95:20, 106:18,

129:25, 156:13, 180:6, 192:5

**weighing** [4] - 79:1, 223:15, 228:20, 233:13

**weight** [14] - 19:19, 62:2, 140:18, 156:14, 223:18, 225:3, 227:18, 227:21, 228:25, 229:4, 244:20, 245:23, 247:2, 266:7

**weighted** [1] - 212:5

**welcome** [2] - 78:2, 99:8

**welfare** [77] - 11:17, 11:23, 12:3, 12:15, 14:1, 30:21, 33:9, 33:14, 33:25, 57:6, 66:25, 67:6, 69:6, 69:16, 70:2, 70:8, 70:18, 72:15, 78:16, 84:13, 84:16, 85:7, 86:5, 86:7, 87:5, 87:11, 87:13, 89:13, 89:17, 89:20, 89:24, 90:3, 90:7, 90:17, 91:3, 96:11, 96:12, 97:16, 97:24, 103:4, 103:24, 103:25, 106:24, 110:13, 114:21, 114:22, 114:24, 135:3, 135:5, 153:21, 160:22, 162:12, 181:13, 181:14, 181:19, 182:15, 185:8, 185:9, 185:11, 185:15, 185:16, 185:17, 189:8, 192:14, 194:4, 194:5, 200:20, 205:14, 217:2, 218:3, 218:5, 239:3, 240:24, 240:25, 241:8

**Welfare** [46] - 14:16, 15:9, 15:19, 15:22, 30:25, 33:13, 34:15, 35:17, 57:3, 61:18, 64:25, 72:19, 78:11, 78:14, 78:17, 84:19, 87:21, 87:24, 88:7, 88:15, 90:23, 90:24, 93:25, 96:15, 99:3, 100:2, 107:3, 108:1, 108:2, 115:11, 153:16, 158:12, 158:19, 163:1, 163:4, 163:12, 164:7, 164:10, 164:12, 171:24, 184:10,

205:22, 236:17,
236:20, 240:21, 241:4
**Wendy's** [3] -
153:20, 163:4, 188:23
**West** [1] - 2:12
**whereas** [1] - 58:22
**whit** [1] - 270:7
**white** [4] - 123:23,
205:5, 274:23, 275:14
**whites** [2] - 178:18,
179:4
**Whitney** [1] - 134:8
**WHITNEY** [1] - 3:4
**whole** [14] - 12:1,
89:15, 107:10,
153:18, 154:3,
179:23, 201:9,
204:11, 215:14,
218:17, 221:8, 229:2,
247:6, 253:8
**wholesale** [1] -
144:13
**Wholesale** [1] - 2:23
**wholly** [1] - 230:9
**whoops** [1] - 109:19
**whoopsie** [1] - 90:18
**whoopsie-do** [1] -
90:18
**wide** [12] - 41:25,
43:21, 55:15, 83:1,
84:17, 87:13, 95:8,
160:14, 236:9,
240:20, 242:22,
243:18
**widely** [1] - 115:23
**widened** [1] - 258:12
**Wilcox** [1] - 237:16
**wildly** [1] - 130:17
**WILLIAM** [1] - 2:3
**willing** [4] - 38:25,
39:6, 243:8
**willingly** [2] - 72:8,
202:12
**Wilson** [4] - 121:20,
138:18, 159:3, 165:6
**win** [1] - 276:1
**windows** [1] -
244:12
**Winn** [5] - 2:22,
143:13, 184:14,
199:5, 232:5
**Winn-Dixie** [5] -
2:22, 143:13, 184:14,
199:5, 232:5
**wipe** [1] - 107:10
**wiped** [1] - 55:5
**wisdom** [1] - 221:11
**wish** [4] - 226:10,
226:11, 266:20
**wishes** [1] - 136:12

**withdrawal** [3] -
103:19, 104:8, 104:10
**withdrawn** [2] -
38:22, 261:8
**withdrew** [1] - 261:2
**witness** [46] - 30:3,
30:4, 34:11, 40:18,
43:7, 45:2, 58:2,
129:10, 134:8, 136:7,
143:11, 143:13,
143:14, 143:15,
143:16, 149:3, 159:2,
159:3, 159:20,
199:13, 226:23,
227:3, 227:6, 227:9,
227:10, 227:12,
227:22, 228:1, 228:3,
228:7, 228:14,
228:25, 229:2, 229:7,
239:18, 239:23,
243:21, 243:25,
244:1, 246:5, 246:15,
247:6, 247:8
**witness's** [5] - 66:2,
227:4, 227:5, 245:24,
246:2
**witnesses** [41] -
7:14, 7:18, 7:20, 10:6,
46:4, 71:12, 92:19,
119:24, 120:20,
121:16, 135:25,
139:3, 139:9, 142:22,
142:23, 159:19,
161:23, 165:4,
166:12, 166:24,
216:14, 222:14,
222:15, 226:22,
227:13, 227:19,
227:20, 228:15,
228:16, 229:5, 229:7,
229:9, 234:22,
245:18, 246:11,
246:12, 266:12,
266:13, 266:19
**witnesses'** [1] -
246:17
**won** [1] - 172:3
**wonder** [2] - 21:23,
104:8
**wondering** [1] -
169:14
**woo** [2] - 12:25, 20:7
**wool** [2] - 211:17,
211:23
**word** [20] - 14:18,
53:12, 67:16, 78:14,
99:13, 101:10, 104:7,
110:6, 119:22,
119:23, 134:2,
146:21, 154:11,

193:22, 197:19,
206:20, 209:6, 230:3,
246:11
**word-for-word** [1] -
134:2
**words** [18] - 14:23,
22:2, 32:16, 67:8,
79:7, 84:3, 111:6,
151:15, 153:1,
159:15, 185:25,
193:24, 206:20,
214:4, 252:23,
261:17, 269:4, 275:18
**works** [6] - 31:10,
151:3, 183:21, 220:8,
270:24, 271:21
**world** [16] - 156:16,
185:14, 187:20,
187:21, 188:3, 188:9,
188:10, 188:13,
188:16, 188:19,
188:20, 188:21,
188:23, 189:16
**worried** [1] - 20:25
**worry** [1] - 198:9
**worth** [5] - 89:9,
143:23, 165:21,
229:12, 229:20
**worthy** [1] - 228:3
**WRIGHT** [2] - 3:9,
3:13
**write** [9] - 15:2,
19:15, 20:12, 21:7,
44:20, 60:16, 268:11,
268:21, 268:23
**writes** [20] - 11:15,
11:22, 14:1, 14:15,
15:17, 16:8, 20:24,
21:20, 22:8, 31:21,
31:24, 32:7, 32:8,
36:25, 98:20, 101:25,
116:3, 160:20,
204:21, 218:15
**writing** [13] - 8:17,
8:18, 13:25, 14:10,
19:7, 24:7, 67:10,
83:2, 98:20, 146:22,
202:19, 207:15,
217:13
**writings** [1] - 10:25
**written** [10] - 11:1,
25:19, 28:19, 39:4,
67:16, 90:15, 227:11,
251:6, 266:20, 266:23
**wrongdoing** [1] -
260:20
**wrote** [11] - 14:5,
40:1, 40:2, 55:2,
60:17, 63:5, 69:11,
101:14, 160:9,

184:15, 209:4
**www.uepcertified.
com** [3] - 161:5, 165:3,
165:18

**Y**

**year** [13] - 59:11,
82:4, 91:12, 94:3,
109:14, 145:15,
146:3, 164:14,
165:25, 173:15,
235:17, 250:12
**years** [39] - 10:11,
10:21, 31:23, 33:1,
60:21, 61:1, 61:2,
61:6, 65:11, 74:7,
94:5, 94:10, 109:9,
112:18, 112:19,
114:19, 117:5, 121:9,
121:22, 122:12,
122:13, 131:25,
132:7, 139:16,
144:17, 172:2,
184:25, 185:19,
194:12, 194:13,
199:1, 205:12,
214:16, 214:25,
218:23, 227:10
**yellows** [1] - 178:18
**yesterday** [2] - 5:16,
5:19
**yogurt** [1] - 129:20
**yolk** [1] - 178:18
**yolks** [1] - 178:18
**yourself** [12] - 10:19,
14:5, 23:10, 45:21,
49:10, 49:11, 101:24,
125:11, 125:12,
193:24, 211:14,
267:23
**yourselves** [5] -
13:17, 93:12, 266:21,
270:22, 271:21

**Z**

**Zephyr** [1] - 237:16
**zero** [1] - 173:7

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THESE INSTRUCTIONS APPLY TO:*** | : | **No. 08-md-2002** |
| **ALL DIRECT ACTION PLAINTIFFS** | : | |

# JURY INSTRUCTIONS

# TABLE OF CONTENTS

INSTRUCTION NO. 1 ................................................................................................................ 1

INSTRUCTION NO. 2 ................................................................................................................ 3

INSTRUCTION NO. 3 ................................................................................................................ 7

INSTRUCTION NO. 4 .............................................................................................................. 10

INSTRUCTION NO. 5 .............................................................................................................. 11

INSTRUCTION NO. 6 .............................................................................................................. 13

INSTRUCTION NO. 7 .............................................................................................................. 16

INSTRUCTION NO. 8 .............................................................................................................. 19

INSTRUCTION NO. 9 .............................................................................................................. 22

INSTRUCTION NO. 10 ............................................................................................................ 25

INSTRUCTION NO. 11 ............................................................................................................ 26

INSTRUCTION NO. 12 ............................................................................................................ 28

INSTRUCTION NO. 13 ............................................................................................................ 29

INSTRUCTION NO. 14 ............................................................................................................ 30

INSTRUCTION NO. 15 ............................................................................................................ 31

INSTRUCTION NO. 16 ............................................................................................................ 32

INSTRUCTION NO. 17 ............................................................................................................ 34

INSTRUCTION NO. 18 ............................................................................................................ 37

INSTRUCTION NO. 19 ............................................................................................................ 38

INSTRUCTION NO. 20 ............................................................................................................ 42

INSTRUCTION NO. 21 ............................................................................................................ 43

INSTRUCTION NO. 22 ............................................................................................................ 44

INSTRUCTION NO. 23 ............................................................................................................ 46

INSTRUCTION NO. 24 ............................................................................................................ 47

INSTRUCTION NO. 25 ............................................................................................................ 48

INSTRUCTION NO. 26 ............................................................................................................ 49

INSTRUCTION NO. 27 ............................................................................................................ 52

INSTRUCTION NO. 28 ............................................................................................................ 53

**INSTRUCTION NO. 1**

Members of the Jury:

Now that you have heard all of the evidence that's been admitted in this trial and the arguments of counsel, it's my duty to give you the final instructions as to the law that is applicable to this case. Use these instructions to guide you in your deliberations.

All of the instructions of law I gave you at the beginning of the trial, during the trial, and these final instructions must guide and govern your deliberations. It is your duty to follow the law, as stated in all of the instructions of the Court and to apply these rules of law to the facts as you find them from the evidence received during the trial. Counsel has referred to some of the applicable rules of law and the Court's instructions. They are permitted to do so. In fact, I gave them copies of these instructions yesterday. However, if any difference appears to you between the law as stated by counsel and that as stated by the Court, you are to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but you must consider the instructions as a whole in reaching your decisions. Likewise, you are not to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any view or

1

opinion of the law other than those provided in the Court's instructions, just as it would be a violation of your sworn duty, as the judges of the facts, to base your verdict upon anything but the evidence received in the case and your common sense.

As I am sure you have come to realize, whatever you think you knew about trials, about evidence, or about the law as a result of watching T.V. shows or movies, or reading novels and such has no place here. No one involved in this case should be compared to any T.V. show, any movie or any actor or actress. This trial was not scripted in that fashion ahead of time. You were chosen as jurors for this real life trial to evaluate all of the evidence received and to decide each of the factual questions present to you. As I mentioned, it is not uncommon — especially in long trials like this one — for there to be some light-hearted moments. But, as I know you know, this is an important and serious matter. You must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.

**INSTRUCTION NO. 2**

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses, including the testimony presented via video deposition;

2. Documents and other things received as exhibits; and

3. Stipulated facts that have been agreed to by the parties.

The following things are **not** evidence:

1. Statements, arguments, and questions of the lawyers, even if the lawyers' questions sounded like they were based on facts. What the lawyers said is not evidence unless I told you specifically you could consider it so. This even includes those times when the lawyers may have said they were summarizing testimony for example;

2. Objections by lawyers, even if their objections sounded as though they were based on something sounding like facts;

3. Any testimony I told you to disregard or which I excluded from evidence;

4. Anything you may have seen or heard about this case outside the courtroom; and

5. Demonstrative materials shown to you and used as an aid to explain testimony. (In this regard, the testimony is the evidence but not the visual aid used to help explain or portray the testimony.)

3

You must make your decision based only on the evidence that you saw and heard in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

You can and should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. So, if your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected. Indeed, you did hear objections in this trial. Objections simply meant that the lawyer was requesting that I make a decision on a particular rule of evidence. Objections to questions – whether short or lengthy – are not evidence. Lawyers have an obligation to their clients to make objections when they believe that the evidence being offered is improper under the rules of evidence. Sometimes they are right, sometimes they are not. You should not be influenced by the fact that there was an objection. If the objection was sustained, you are to ignore the question and any whole or partial answer to it. If the objection was overruled, treat the answer like any other.

You were instructed that some items of evidence were received for a limited purpose only. You must follow that instruction and may only consider the evidence for that limited purpose.

You may have heard the parties referencing it throughout the trial. For the evidence that was admitted only for notice to UEP members, or merely because something was announced or otherwise circulated, you may only consider it for the limited purpose of what was being communicated and to whom in the particular document, for whatever weight you think it deserves. However, you cannot use such "limited purpose" evidence to prove, either directly or circumstantially, the truth of what was said in the communication.

For example, if a document admitted for a limited purpose along those lines states that it "will be cold on January 1," you can only use it for the purpose of showing that the author said that, that people were told that—and may or may not have acted based off of that statement. Perhaps you could use it as evidence that the person who received the letter put on a coat on January 1 in reliance on the forecast, or changed travel plans as a result of the weather forecast. However, you cannot use it to prove, either directly or circumstantially, that it was *actually* cold on January 1. Such a jump would require evidence offered for the truth of the matter asserted. I have noted such evidence for you throughout trial. The exhibits that were admitted for these kinds of limited purposes are collected in such a category should you wish

to see them. In fact, pretty much all of the exhibits are available for you if you wish them. More on that later.

Also, if certain testimony or other evidence was ordered struck from the record, you must disregard that evidence. Do not consider any testimony or other evidence that was excluded. Do not speculate about what a witness might have said or what an exhibit might have shown.

**INSTRUCTION NO. 3**

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief. You may believe everything a witness says, only part of it, or none of it. In deciding what to believe, as I mentioned to you at the start of the trial, you may consider a number of factors, including the following:

1. The opportunity and ability of the witness to see or hear or know the things the witness testifies to;

2. The quality of the witness's understanding and memory;

3. The witness's manner while testifying;

4. Whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

5. Whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

6. How reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

7. Any other factors that bear on believability.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were and how much weight you think their testimony deserves.

You may be guided by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character or tone of the testimony given, or by evidence contrary to the testimony.

You should carefully examine all the testimony, the circumstances under which each witness has testified, and every matter in evidence tending to show whether a witness is worthy of belief. The factors that I just listed a moment ago also work in evaluating possible discrepancies in testimony.

You should consider whether the witness impresses you as having an accurate recollection of the matters about which he or she testified. Consider any relation each witness may have with either side of the case, the manner in which each witness might be affected by the verdict, and the extent to which the testimony of each witness is either supported or contradicted by other evidence in the case. It is quite proper for a lawyer to meet with any witness in preparation for trial.

Inconsistencies or discrepancies in the testimony of a witness, or between different witnesses, may or may not cause you to discredit such testimony. Two or more people seeing an event may see or hear it differently. However, in weighing the effect of a discrepancy, always consider whether it pertains to a matter of

importance or an unimportant detail, and whether the discrepancy results from innocent error or perhaps an intentional falsehood.

Give the testimony of each witness such weight, if any, that you may think it deserves. In short, you may accept or reject the testimony of any witness, in whole or in part.

Keep in mind that the quality or weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. Indeed, you may find that the testimony of a small number of witnesses—or even one witness alone—as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

**INSTRUCTION NO. 4**

You should consider and decide this case as a dispute between persons of equal standing or of equal worth in the community, and holding the same or similar stations in life. A corporation, partnership, or unincorporated association or similar entity is entitled to the same fair trial as a private individual. All persons, including corporations, partnerships, unincorporated associations, and other organizations stand equal before the law, and are to be treated as equals. Therefore, you should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

### INSTRUCTION NO. 5

Under the law, a corporation, an association, or similar body is a person, but it acts only through its agents. Agents for such an organization include its directors, officers, employees, or others acting on its behalf. An organization is not capable, under the law, of conspiring with its own agents, unincorporated divisions, or its wholly owned subsidiaries. Through its agents, however, such an organization is capable of conspiring with other outside persons or independent organizations.

A corporation or other such organization is legally bound by the acts and statements of its agents done or made within the scope of the agent's employment or apparent authority.

Acts and statements done within the scope of employment are those performed or made on behalf of the organization entity and directly related to the performance of the duties the agent has general authority to perform. "Apparent authority" is the authority that persons outside the organization could reasonably believe the agent would have, judging from his or her position with the organization, the responsibilities previously entrusted to the person or the office and the circumstances surrounding his or her past conduct. Therefore, an agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

To summarize, for an organization to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment with actual or apparent authority.

The fact that an organization has instructed its agents not to violate the antitrust laws does not excuse the organization from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.

Again, an organization is entitled to the same fair trial as a private individual. Its acts are to be judged by the same standard as the acts of a private individual, and you may hold an organization liable only if such liability is established by the preponderance of the evidence. Once again, that is because all persons, including corporations, are equal before the law.

**INSTRUCTION NO. 6**

This is a civil case. For the issues you will consider, the plaintiffs are the parties who brought this lawsuit, namely, Albertsons LLC, Giant Eagle, Inc., The Great Atlantic & Pacific Tea Company, Inc., H.E. Butt Grocery Company, Hy-Vee, Inc., The Kroger Co., Publix Super Markets, Inc., Roundy's Supermarkets, Inc., Safeway, Inc., SuperValu Inc., Walgreen Co., and Winn-Dixie Stores, Inc.

Rose Acre Farms, United Egg Producers, Inc. (UEP), and United States Egg Marketers, Inc. (USEM) are parties against whom the lawsuit was filed. They are the defendants.

Generally, the primary questions you will be addressing are these: First, was there a contract, agreement, combination, or conspiracy between or among at least two entities? Second, did the contract, agreement, combination, or conspiracy unreasonably restrain trade? And finally, if unreasonable, did the restraints cause the plaintiffs to suffer an injury to their businesses?

I will provide you more in-depth instruction as to these questions shortly. As to these claims, the plaintiffs have the burden of proving their case against the defendants by what is called the preponderance of the evidence. Preponderance of the evidence means that, to prevail on a claim, the party asserting the relevant claim will have to prove to you, in light of all the evidence, that what they claim is more likely so than not so. To put it differently, as you consider the claims of each plaintiff

13

against each individual defendant, you may think about the burden of proof this way: if you were to put the evidence favorable to the plaintiff regarding each individual defendant and the evidence favorable to each of the individual defendants on opposite sides of the pan scales that are frequently used to signify the scales of justice, the plaintiff would have to make the scales tip even ever so slightly on its side to prevail on any issue or claim as to which it has the burden of proof, and this is true independently, that is, individually, for each defendant.

In a moment I'm going to summarize for you in a rather short form the parties' contentions. I know you've just heard the lawyers' arguments about what they think the evidence proves or doesn't prove. Of course, all of that is for you to evaluate. In order to set the stage for the rest of my instructions, I'm going to briefly summarize the contentions and issues.

You have heard a lot about other egg producer companies that are not parties here. The only verdicts for you to consider are between the parties who are here. Remember that I told you there are certain issues for the jury, and certain issues for the Judge. The presence or non-presence of other claims and whether they impact this case at all are issues that I must deal with, and the law accounts for that rather frequent circumstance. The only claims for you to decide are those between the named plaintiffs and the 3 named defendants here.

A couple of additional "basic rules" before I summarize the contentions and talk about the particulars of the law. Returning to the matter of burdens: If the plaintiffs fail to meet their burden, that is, if the scales remain evenly balanced or if the scales tip to a defendant's side, the verdict must be in favor of that defendant on the issue or matter as to which a plaintiff has the burden. If you find after considering all the evidence that a claim or fact is more likely so than not so, thus making the scales tip in favor of the plaintiffs, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this, so you should put that concept out of your mind.

And because this is a private civil antitrust case, the presence or lack of a government investigation or prosecution is of no relevance, and you should not consider it as a factor in determining liability in this matter.

INSTRUCTION NO. 7

Turning to the parties' contentions, each of the Plaintiffs contend that the Defendants and one or more co-conspirators participated in an unlawful agreement, or conspiracy, to restrict the supply of eggs and raise the price of eggs in violation of Section 1 of the Sherman Antitrust Act. That Act is a federal law. The time period of this agreement, or conspiracy is May 15, 2000 to at least December 31, 2012. They claim this agreement or conspiracy included one or more of the following components: short-term supply measures; a USEM program for exporting eggs at a loss; and the combination of the 100% Rule as applied to the cage-space restrictions and the backfilling ban as incorporated into the UEP Certified Program, and enforced by producer-designed audits. The Plaintiffs claim that Defendants Rose Acre, UEP and USEM, along with their co-conspirators, each knowingly agreed to participate in one or more components of this conspiracy.

Plaintiffs claim this agreement or conspiracy was ultimately effective in reducing the supply of eggs below where it would have otherwise been without the agreement or conspiracy. Moreover, Plaintiffs claim that any expansions, including any expansions claimed by Rose Acre, were insufficient to counteract the market-wide effects of the conspiracy. The resulting supply restriction or restrictions raised the market price for eggs, including eggs bought by each of the plaintiffs, causing each of them injury of the type the Sherman Act was intended to prevent.

16

According to Plaintiffs, there were no procompetitive benefits to the short-term supply measures or the USEM exports at a loss. To the extent there were any theoretical procompetitive benefits to having animal welfare guidelines for the egg-laying hen industry, Plaintiffs say that those procompetitive benefits could have been achieved through other means, such as simply having animal welfare guidelines available for buyers to use or not use, as they see fit, when negotiating the purchase of eggs. You have heard what Plaintiffs claim could have been done instead.

So, Plaintiffs contend that what they see as the anticompetitive aspects of the UEP Certified Program, including the reduction in output and increase in price, outweighed Defendants' claimed procompetitive benefits. Furthermore, Plaintiffs say any such claimed procompetitive benefits could have been achieved without the anticompetitive harm caused by Defendants.

In addition to Defendants Rose Acre, UEP and USEM, Plaintiffs also contend that each of the following UEP Certified companies knowingly participated in the conspiracy through one or more of the previously described components:

Cal-Maine Foods

Country Charm Egg

Hickman's Egg Ranch

Hillandale Farms

ISE America

Michael Foods

Midwest Poultry Services

Moark

National Food Corporation

Norco Ranch

Oakdell Egg Farm

Ohio Fresh Eggs

Quality Egg of New England

RW Sauder

Sparboe Farms

Tampa Farms

Weaver Bros.

Wilcox Farms

Zephyr Egg Co.

According to the Plaintiffs, these are the alleged co-conspirators you have heard mentioned from time to time during the trial, some, or course, more than others.

**INSTRUCTION NO. 8**

Defendant Rose Acre Farms denies that it combined, agreed, or conspired to raise egg prices. Specifically, Rose Acre Farms denies that it joined and participated in UEP and became Certified for the purpose or with the intent of reducing the supply of eggs or raising egg prices. Rose Acre Farms contends that its intent in agreeing to join UEP and become a Certified producer in 2002 was only to satisfy the demands of two of its largest customers and that it remained a Certified producer only because those customers and other customers continued to demand Certified eggs. Rose Acre further contends that, after it joined UEP, it joined UEP's Board and various committees only because the Certified Program would have a major impact on Rose Acre's business operations. Rose Acre Farms also contends that it never followed or agreed to follow any of UEP's short-term supply recommendations. And Rose Acre Farms contends that it agreed to join USEM's coordinated exports in 2006 only to sell the surplus eggs that it would produce during times of low egg demand – eggs for which it had no domestic customers. Rose Acre Farms also contends that its growth during the alleged conspiracy period shows that it never intended to reduce the supply of eggs.

Rose Acre Farms contends that it could not be found to have conspired to reduce egg supply or raise egg prices through the Certified Program for a number of reasons. Rose Acre Farms contends that the UEP Certified Program was developed

in consultation with the trade association representing the plaintiffs – the Food Marketing Institute ("FMI"). Rose Acre Farms contends that most of the plaintiffs in this case were leaders of FMI and actively participated in FMI's development of the animal welfare recommendations given to its members, among which included recommendations to follow the UEP Certified Program. Rose Acre Farms further contends that it could not have conspired to reduce the supply of eggs or raise egg prices through the Certified Program, given what Rose Acre claims was the plaintiffs' relative bargaining power and, again, according to Rose Acre, Plaintiffs' demand for Certified eggs. On this issue, Rose Acre claims that the size of the plaintiffs and their financial revenues and profits gave them what's been called "superior bargaining power" compared to Rose Acre Farms.

Finally, Rose Acre Farms contends that the plaintiffs did not show they were injured, for several reasons. First, Rose Acre Farms contends that the plaintiffs' expert witness, Dr. Michael Baye, testified that UEP's supply management recommendations had no measurable effect on prices, and that each of the six USEM exports he analyzed would have increased egg prices, at most, for only one month. Rose Acre Farms contends that its expert witness, Dr. Jonathan Walker, demonstrated that Dr. Baye's estimates of injury from the Certified Program were, what they call, flawed and unreliable. Second, Rose Acre contends that plaintiffs cannot prove that they were injured by any alleged conspiracy because Dr. Baye's

20

analysis, which is plaintiffs' proof of injury, even if valid, estimates the effects on egg production of every Certified producer adhering to the Certified Guidelines, but, says Rose Acre, plaintiffs have not proven that every Certified producer was a member of the alleged conspiracy. Finally, Rose Acre Farms contends that any plaintiff that demanded or required Certified eggs cannot claim that it was injured by the Certified Program, and on this point, Rose Acre would have the burden to prove such a demand or requirement.

INSTRUCTION NO. 9

UEP contends that it did not orchestrate, join or participate in any conspiracy to reduce the supply of eggs or egg products and thereby raise their prices.

UEP contends that it developed the UEP Certified Program in the early 2000s at the request of its members, whose customers, including the supermarket plaintiffs in this case, were reportedly demanding a single, industry wide animal welfare program to respond to intense pressure from animal activists. In response to that demand, UEP commissioned a committee of animal welfare scientists to make science-based recommendations to address the welfare of egg laying hens. UEP contends that its committee worked cooperatively with the plaintiff supermarket chains, both individually and through plaintiffs' trade association, FMI, to develop and implement animal welfare guidelines that FMI endorsed as "best practices." Therefore, UEP contends that the resulting UEP Certified Program was not an agreement to reduce supply, but rather a voluntary, bona fide science-based animal welfare program that imposed no restriction on the number of eggs any producer could produce or the number of birds any producer could own. A producer did not have to be a member of UEP to participate in the program, and not all members of UEP chose to participate. The UEP Certified Program had what UEP describes and calls the procompetitive benefits of meeting customer demand and increasing customer choice with UEP-Certified eggs. According to UEP, the Certified

22

Program's requirements ensured customer confidence by requiring regular audits and humane treatment for all hens, and minimized market disruption by allowing for a gradual phase-in. UEP contends that its UEP Certified Program has been transparent, with the requirements for the program and the underlying recommendations from the scientific advisory committee posted publicly on its website and shared with its members' customers, with FMI, with certain government agencies, and others. UEP further contends that the Certified Program had no impact on the supply of eggs. During the relevant time period, in absolute numbers the nation's flock size and egg supply increased. According to UEP, both UEP-Certified and non-Certified eggs remained available to meet customer demand. Some large producers chose not to become UEP Certified sellers of eggs or egg products, UEP Certified Producers remained free to sell non-Certified eggs, and Certified Producers could choose to become non-Certified at any time. In some instances, the UEP points out, Certified eggs were actually cheaper than non-Certified eggs. Thus, the UEP contends that the UEP Certified Program was not part of any unlawful agreement to reduce supply.

UEP also contends that its short-term supply recommendations were simply that – suggestions to help its members plan supply and avoid surplus eggs during times of low demand. The recommendations were not agreements to reduce supply. UEP further contends, that in any event, these suggestions generally were not

followed by its members and therefore had no impact on the supply of eggs. Moreover, even if they had been followed, UEP claims any impact would have been short-lived and insufficient to cause a market-wide effect.

INSTRUCTION NO. 10

USEM contends that it did not knowingly join a conspiracy to reduce the supply of eggs and thereby raise their price. USEM is a separate organization that did not conspire with UEP, Rose Acre, or any other entity to restrict the supply of eggs in the United States. USEM is separately incorporated, with its own Board of Directors, committees, rules, and members. USEM did not participate in any short-term supply recommendations at issue in this case or participate in the UEP Certified Program.

Rather, USEM's sole activity was to receive and evaluate exports opportunities from willing buyers located overseas. USEM contends that exports opportunities were taken only when a majority of USEM members, each acting in their independent self-interest, voted in favor of them. USEM contends that participation in USEM was and is voluntary, and its members may leave any time if exports no longer make sense for their business model. USEM also contends that its exports had no material impact on the supply or the price of eggs in the United States because the exports were too few, too sporadic, and too small, and any impact was short-lived and insufficient to cause a market-wide effect.

### Instruction No. 11

As I told you in the beginning of this trial — and as you've seen — there are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." An example of "direct evidence" is when a witness testifies about something that the witness knows through his or her own senses — something the witness has seen, felt, touched, heard or done. If a witness testified that he or she saw it raining outside, and you believed him or her, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is the document's very existence or its current condition.

The other type of evidence is circumstantial evidence. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could, but are not required to, conclude that it was raining outside.

You can and should consider both kinds of evidence—direct and circumstantial. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

During the trial, you may have heard the attorneys use the term "inference." Essentially, in their arguments they have asked you to infer on the basis of your

reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An acceptable inference is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact which has been shown to exist. There are times when different inferences may be drawn from facts, whether by direct or circumstantial evidence. The plaintiffs ask you to draw one set of inferences, while a defendant or the defendants ask you to draw other inferences. It is for you, and you alone, to decide what inferences you will draw.

Again, the process of drawing inferences from facts in evidence is not a matter for guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw – but not required to draw – from the facts that have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense. So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience.

### INSTRUCTION NO. 12

Some witnesses, because of education or experience, are permitted to testify as experts and then state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case. Your evaluation of their credibility may be based on the same bases for evaluating credibility that you apply to other witnesses, such as their possible motives for testifying and such. You have heard from a number of experts in this case.

The plaintiffs called Dr. Baye, an expert in economics.

The defendants called Dr. Walker and Dr. David, both experts in economics and econometrics.

### INSTRUCTION NO. 13

A further word about expert witnesses. These witnesses were referred to by the parties as experts. These witnesses testified to assist you in reaching a decision on certain issues. It is your obligation to determine the expertise, if any, of such witnesses, the credibility of such witnesses, and the reliability of their opinions. The testimony of these witnesses is sometimes in conflict, that is, they disagree at times. You must remember that you are the sole trier of the facts and where their testimony relates to a question of fact, it is your job to resolve the disagreements. The way you resolve the conflict between these witnesses is the same way that you decide other fact questions and the same way that you decide whether to believe ordinary witnesses.

In addition, because they gave their opinions, you should consider the soundness of each opinion, reasons for the opinion, and the witness' motive, if any, for testifying. You may give the testimony of each of these witnesses such weight, if any, that you think it deserves in the light of all the evidence. You should not permit a witness' opinion testimony to be a substitute for your own reason, judgment and common sense. You may reject the testimony of any opinion witness in whole or in part, if you conclude the reasons given in support of an opinion are unsound or, if you, for other reasons, do not believe the witness. The determination of the facts in this case rests solely with you.

### INSTRUCTION NO. 14

I now want to turn to the specific law of antitrust. The plaintiffs here bring this suit under a federal law called the Sherman Act.

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

### INSTRUCTION NO. 15

The plaintiffs challenge defendants Rose Acre Farms, United Egg Producers, Inc., and United States Egg Marketers, Inc. under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. One of the technical requirements of this law is that the restraint of trade affects interstate commerce. I am instructing you that I have already determined that this requirement concerning interstate commerce is met, and therefore you need not consider that technical requirement of interstate commerce in your deliberations.

In light of that, to establish a violation of Section 1 of the Sherman Act, the plaintiffs still must prove the following:

(1)     the existence of a contract, agreement, combination, or conspiracy between or among at least two separate entities;

(2)     that the contract, agreement, combination, or conspiracy unreasonably restrains trade;

(3)     that the restraints caused the plaintiffs to suffer an injury to their businesses.

31

INSTRUCTION No. 16

Under the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must therefore determine (1) whether there was a contract, agreement, combination or conspiracy that restrained trade and, if so, (2) whether the restraints challenged here—(a) the UEP recommended short-term measures, (b) the UEP Certified Program as challenged, and (c) the USEM export programs—are, together, unreasonable.

These three alleged restraints must all be part of a single conspiracy, as opposed to, for example, three different conspiracies that were each independent of each other. To determine whether these three alleged restraints constitute one conspiracy, you must look to (1) whether there was a common goal among the conspirators; (2) whether their agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of conspirators; and (3) the extent to which the participants overlap in the various dealings. If, after considering these factors, you find that these alleged restraints were part of the same conspiracy to reduce supply of eggs, only then must you determine if the actions taken were reasonable or unreasonable. There are a number of steps to this inquiry, which I will first summarize before going into each in detail.

In making this determination, you must first determine whether the plaintiffs have proven that the challenged restraints have resulted in a substantial harm to

32

competition in a relevant product and geographic market. If you find that the plaintiffs have proven that the challenged restraints resulted in a substantial harm to competition in a relevant market, then you must consider whether the restraints produce countervailing competitive benefits. If you find that they do, then you must balance the competitive harm against the competitive benefit. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit. Before going into each step of the analysis in more detail, I first want to address how you determine if companies conspire together.

INSTRUCTION NO. 17

A conspiracy is an agreement or understanding between two or more persons to do something illegal. In this case, the plaintiffs claim that illegal purpose or goal was to restrain trade by limiting egg supplies. They claim this occurred from May 15, 2000 until at least December 31, 2012. Specifically, the plaintiffs allege that Rose Acre Farms, United Egg Producers, and United States Egg Marketers and others participated in a conspiracy to restrain trade by limiting eggs supply.

The plaintiffs must prove both of the following two elements by a preponderance of the evidence:

(1) the alleged conspiracy to restrain egg supplies existed; and

(2) as to each individual defendant, that defendant knowingly became a member of that conspiracy. To act knowingly means to participate deliberately, not because of a mistake, accident or other innocent reason.

The basis of a conspiracy is an agreement or understanding between two or more persons. Remember: companies, associations and similar organizations are considered "persons." Here, an agreement or understanding between two or more persons exists when they share a commitment to a common scheme to achieve an unlawful purpose.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may

34

have been entirely unspoken and unwritten. A person can become a member of a conspiracy without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. To prove a conspiracy existed, however, the evidence must show that the alleged members of the conspiracy came to an agreement or understanding among themselves to accomplish a common purpose. To be a conspirator, the member does not need to have been involved at the start.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same reason or purpose for entering the agreement. It is also not necessary that all of the means or methods claimed by the plaintiffs were agreed upon by each individual defendant to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade by limiting egg supply that can constitute a

conspiracy. Therefore, you may find a conspiracy existed regardless of whether it succeeded or failed.

The plaintiffs may prove the existence of the alleged conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy.

Direct evidence of an agreement may not be available, and therefore, a conspiracy may also be shown through circumstantial evidence. You may infer the existence of a conspiracy from the circumstances, including what you find the alleged members actually did and the words they used. However, mere similarity of conduct among various persons, or the fact that they may have associated with one another and may have met or assembled together, at meetings or otherwise, does not by itself establish the existence of a conspiracy. If they acted similarly but independently of one another, without agreement among them, then there would not be a conspiracy.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

INSTRUCTION NO. 18

The fact that one or more egg producers may have participated in the UEP recommended short-term measures, the UEP Certified Program, or the USEM Export Program does not by itself establish the existence of a conspiracy among defendants. The egg producers' behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions. That is up to you to consider.

For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had agreed or conspired to open their umbrellas. A business may lawfully adopt the same prices, conditions of sale, or other practices as its competitors, so long as it does so independently and not as part of an agreement or understanding with one or more of its competitors. So, if the defendants or alleged co-conspirators acted similarly, but independently, of one another, without any agreement or understanding between two or more of them, then there would not be a conspiracy.

You must decide whether the egg producers' similar conduct was, more probably than not, the result of an agreement or understanding, between or among them or with other co-conspirators who are not presently in the lawsuit, to reduce egg supply. In doing so, you may consider the defendants' similar conduct along with other evidence.

37

## INSTRUCTION NO. 19

I will now turn back to the requirements of the Sherman Act. As I previously mentioned, to prove that the challenged restraints are unreasonable, the plaintiffs must first demonstrate that the restraints have resulted in a substantial harm to competition. Although it can be relevant to your evaluation of this issue, harm that occurs merely to the individual business of a plaintiff is not sufficient, by itself, to demonstrate harm to competition generally.

Furthermore, the plaintiffs must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market:

The first aspect is known as the relevant product market. This means that the plaintiffs must show that there was harm in a relevant product market or markets. The plaintiffs contend shell eggs and egg products are part of the same market. The defendants contend there are multiple relevant markets. One common way to think about the relevant market is whether the various products are interchangeable for one reason or another or considered substitutes, one for the other. If they are, then it is likely they are part of a single product market. You must determine if these restraints caused such harm.

The second aspect is known as the relevant geographic market. A relevant geographic market is simply a given geographic area where the plaintiffs must show harm.

It is the plaintiffs' burden to prove the existence of a relevant market. If you find that the plaintiffs have proven the existence of a relevant market, then you must determine whether the plaintiffs have also proven that the challenged restraints have had a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and/or service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether the defendant and its alleged co-conspirators, together, possess market power.

The last factor, market power, has been defined as an ability to profitably raise prices for a sustained period of time above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether the defendants and their alleged co-conspirators together possess market power is to look at their combined market share, that is, their percentage share of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether the defendants and their alleged co-conspirators have market power include: barriers to entry into the egg market for potential competitors, the threat of substitute products for eggs, the market power of outside competitors who were not part of the alleged conspiracy, and/or the percentage of the market covered by alleged members of this conspiracy. If the defendants and their alleged co-conspirators do not possess a substantial market share, it is less

likely (though not necessarily impossible) that the defendants and their alleged co-conspirators possess market power.

If they do not possess this market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market. On the other hand, if you were to conclude that the defendants and their alleged co-conspirators possess this market power, you could conclude that it is more likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

INSTRUCTION NO. 20

If you find that the plaintiffs have proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraints also benefit competition in other ways.

In considering whether the challenged restraints benefitted competition, you may consider various factors including, but not limited to: whether the challenged restraints were demanded by customers, increased production, increased consumer choice, decreased prices, or improved product quality. Evidence regarding the ethical treatment of laying hens may be considered with respect to issues such as whether a challenged restraint increased output, improved product quality, widened customer choice, or met customer demand. However, the ethical treatment of laying hens as a societal benefit standing alone is not in and itself a procompetitive benefit.

If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraints were reasonably necessary to achieve the benefits. If the plaintiffs prove that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then those claimed benefits cannot be used to justify the restraints.

42

INSTRUCTION NO. 21

If you find that the challenged restraints were reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraints.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraints are unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraints are not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers. The plaintiffs bear the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

### INSTRUCTION NO. 22

Before you can find that Rose Acre Farms, United Egg Producers, and United States Egg Marketers were members of the conspiracy alleged by the plaintiffs, the evidence must show, as to each individual defendant, that each defendant knowingly joined in the unlawful plan, either at its inception, or at some later time, with the intent to further the purpose of the conspiracy. You must evaluate each defendant separately.

To act "knowingly" means to participate deliberately and not because of a mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he, she or it had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a defendant was a member of the alleged conspiracy, you should consider only the evidence about that particular defendant's statements

and conduct, including any evidence of that defendant's knowledge and participation in the events involved and any other evidence of that particular defendant's participation in the conspiracy alleged.

You may not find that a defendant was a member of a conspiracy based only on its association with others who you find were conspiring or based only on knowledge of wrongdoing, but these are factors you may consider to determine whether a defendant was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators made in furtherance of the conspiracy are binding on all of those whom you find were members of the conspiracy at any time during its existence until they actually withdrew from the conspiracy.

If you have found that a defendant is a member of a conspiracy, that defendant is presumed to remain a member and is responsible for all actions taken by all coconspirators during, and in furtherance, of the conspiracy until it is shown that the conspiracy has been completed or abandoned or that that defendant has withdrawn from the conspiracy.

## INSTRUCTION NO. 23

Motive is not an element of any of the unlawful conduct with which the defendants are accused by Plaintiffs here. This means proof of bad motive is not required. Further, proof of bad motive alone does not establish that a defendant is liable, just as proof of good motive alone does not establish that it is not liable. Evidence of a defendant's motive may, however, help you find its intent.

In other words, intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done.

Personal advancement and financial gain, for example, are motives for much of human conduct. However, these motives may prompt one person to intentionally do something perfectly acceptable, while prompting another person to intentionally do an act that is not.

INSTRUCTION NO. 24

Businesses that are actual or potential competitors may lawfully form into associations to advance common interests. You have heard of two such examples here, United Egg Producers and United States Egg Marketers. Associations may keep members informed of new services or technology in the industry or perform other valuable services such as cooperative research, publication of trade journals, or joint representation before legislative or administrative bodies. They are permitted to seek new members.

However, an association's actions are not immune from antitrust laws, and an association is capable of being a co-conspirator in violating antitrust laws. The actions of competitors, taken through an association to which they belong, present the same issues as the actions of competitors who have not created a formal organization such as an association. An association or similar industry group cannot lawfully act to facilitate the raising, stabilizing, or maintaining of prices in the market in which its members compete with one another, to reduce members' collective output of products.

If an association exchanges with its members confidential, competitively sensitive information, such as current or future prices, or current or future output information, that is evidence which you may consider, along with all the other evidence, in deciding whether the association conspired in violation of the antitrust laws.

47

**INSTRUCTION NO. 25**

A person or business that belongs to an association does not become liable for violating the antitrust laws simply because the association is liable for such violation. Instead, the plaintiffs must prove that the defendant in question knew of and intentionally participated in the specific conduct that you find unlawful.

## INSTRUCTION NO. 26

If you find that one or more defendants have violated the Sherman Act, then you must decide if the plaintiffs were injured by the violation. You must make this determination separately for each plaintiff.

A plaintiff is entitled to recover damages for an injury to its business if it can establish three elements of injury and causation:

(1) the plaintiff was in fact injured as a result of the defendants' and alleged co-conspirators' alleged violation of the antitrust laws;

(2) the alleged illegal conduct was a material cause of the plaintiff's injury; and

(3) the plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

This first element is sometimes referred to as "injury in fact" or "fact of damage." Each plaintiff must prove that it was injured as a result of the alleged violation of the antitrust laws. This does not require each plaintiff to prove the dollar value of its injury—in fact, I have told the parties not to address that at this time. For now, it requires only that each plaintiff prove that it was, in fact, injured by the alleged antitrust violation.

Each plaintiff must also offer evidence that establishes by a preponderance of the evidence that the alleged illegal conduct was a material cause of that plaintiff's

49

injury. This means that the plaintiff must have proved that some damage occurred to it as a result of the alleged antitrust violation, and not some other cause. The plaintiff is not required to prove that the alleged antitrust violation was the sole cause of its injury; nor need the plaintiff eliminate all other possible causes of injury. It is enough if the plaintiff has proved that the alleged antitrust violation by any of the defendants and co-conspirators was a material cause of its injury.

Finally, each plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury."  If the plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition by having to pay an inflated price for goods, or by acts that would otherwise harm consumers and customers, then the plaintiff's injuries are antitrust injuries. On the other hand, if the plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers and customers, then the plaintiff's injuries are not antitrust injuries and the plaintiff may not recover for those injuries under the antitrust laws.

In summary, if a plaintiff can establish that it was in fact injured by the alleged co-conspiratorial conduct of the defendants and alleged co-conspirators, that conduct was a material cause of the plaintiff's injury, and that the injury was the type that the

antitrust laws were intended to prevent, then that plaintiff is entitled to recover for the injury to its business.

The term "business" includes any commercial interest or venture. A plaintiff has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of a defendant's alleged antitrust violation.

**INSTRUCTION NO. 27**

In this case you have been permitted to take notes during the course of the trial, and most of you – perhaps all of you at one point or another – have taken advantage of that opportunity. You may have your notes available to you during your deliberations, but you should make use of them only as an aid to your own memory. Don't give your notes any precedence over your independent recollection of the evidence or lack of evidence; and neither should you be unduly influenced by the notes of other jurors. I emphasize that the notes you may have taken are not entitled to any greater weight than the memory or impression of each juror as to what the testimony or other evidence may have been.

As I mentioned at the start of the trial, we will not be replaying or reciting any of the video or live testimony of the witnesses. You will be given a list of the witnesses in the order in which they appeared. Furthermore, if at some point you request the documentary evidence that was admitted as evidence, the exhibits will be provided to you.

## INSTRUCTION NO. 28

When you retire to the jury room to deliberate, you may take with you your notes. You will have the list of witnesses. There will be several written copies of my instructions should you wish to re-read for yourselves some part of the instructions. I urge you, however, not to see this as an opportunity for a fast law school career. Please use the written instructions only as an aid for doing your job. I strongly recommend that you select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It was my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to Mr. Coyle, to any other jury officer, to me, or to anyone but each other about the case. If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer or Mr. Coyle. Mr. Coyle will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. In the meantime, while you await a response, if you can, please continue deliberating.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay completely secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you, as a jury, to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous. That means you all—all of you—must agree with the verdict, in all of its respects. So, whatever your verdict as to each plaintiff and each defendant, you all must agree. In saying that, however, I do not mean that your verdicts as to each plaintiff must be the same as the other verdicts or the same as to all defendants.

A verdict form has been prepared for you. It has a series of questions for you to answer. There are a number of instructions that explain the questions. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in and have your foreperson date and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.

# EXHIBIT C

1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4

5    IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
6

7                            - - - - -

8

9                        PHILADELPHIA, PA

10

                             JUNE 5, 2018
11                           DAY TWENTY-ONE

12

13   BEFORE:       THE HONORABLE GENE E.K. PRATTER, J.

14

15                         - - - - -

16                     TRIAL TRANSCRIPT

17                         - - - - -

18

19

20

21             KATHLEEN FELDMAN, CSR, CRR, RPR, CM
               Official Court Reporter
22             Room 1234 - U.S. Courthouse
               601 Market Street
23             Philadelphia, PA  19106
               (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)

```
 1   APPEARANCES:

 2           QUINN EMANUEL
             BY:   STEPHEN R. NEUWIRTH, ESQUIRE
 3           JOSEPH N. KIEFER, ESQUIRE
             ALEXEE DEEP CONROY, ESQUIRE
 4           DUANE R. LYONS, ESQUIRE
             STEIG D. OLSON, ESQUIRE
 5           ALEX J. TSCHUMI, ESQUIRE
             DAVID B. ADLER, ESQUIRE
 6           51 Madison Avenue, 22nd Floor
             New York, NY  10010
 7           For Direct Purchaser Class

 8

 9           WOLLMUTH MAHER & DEUTSCH LLP
             BY:   RONALD J. ARANOFF, ESQUIRE
10           500 Fifth Avenue
             New York, NY  10110
11           For Direct Purchaser Class

12

13           LITE DEPALMA GREENBERG
             BY:  MINDEE J. REUBEN, ESQUIRE
14           1521 Locust Street, 7th Floor
             Philadelphia, PA  19102
15           For Direct Purchaser Class

16

17           HAUSFELD, LLP
             BY:   JAMES J. PIZZIRUSSO, ESQUIRE
18           NATHANIEL C. GIDDINGS, ESQUIRE
             JEANNINE M. KENNEY, ESQUIRE
19           1700 K Street, NW, Suite 650
             Washington, DC  20006
20           For Direct Purchaser Plaintiffs

21

22           BERNSTEIN LIEBHARD LLP
             BY:   STANLEY D. BERNSTEIN, ESQUIRE
23           DANA STATSKY SMITH, ESQUIRE
             10 E. 40th St.
24           New York, NY  10016
             For Direct Purchaser Plaintiffs
25
             (CONT.)
```

```
1   APPEARANCES:  (CONT.)

2
                SUSMAN GODFREY LLP
3               BY:  STEPHEN D. SUSMAN, ESQUIRE
                1301 Avenue of the Americas
4               32nd Floor
                New York, NY  10019-6023
5                       And
                TERRY OXFORD, ESQUIRE
6               1000 Louisiana
                Suite 5100
7               Houston, TX  77002
                        And
8               LINDSEY GODFREY ECCLES
                Suite 3800
9               1201 Third Avenue
                Seattle, WA  98101
10              For Direct Purchaser Plaintiffs

11

12              PORTER WRIGHT MORRIS & ARTHUR LLP
                BY:  JAY L. LEVINE, ESQUIRE
13              DONALD M. BARNES, ESQUIRE
                JAMES A. KING, ESQUIRE
14              JETTA C. SANDIN, ESQUIRE
                ALLEN T. CARTER, ESQUIRE
15              MOLLY S. CRABTREE, ESQUIRE
                1900 K Street NW, Suite 1110
16              Washington, D.C.  20006
                        And
17              STEVENS & LEE
                BY:  WILLIAM A. DESTEFANO, ESQUIRE
18              TERRI A. PAWELSKI, ESQUIRE
                1818 Market Street, 29th Floor
19              Philadelphia, PA 19103
                For Rose Acre Farms
20

21
                KEATING MUETHING & KLEKAMP PLL
22              BY:  JOSEPH M. CALLOW, JR., ESQUIRE
                SARAH V. GEIGER, ESQUIRE
23              One East Fourth Street, Suite 1400
                Cincinnati, OH  45202
24              For Ohio Fresh Eggs

25
                (CONT.)
```

```
 1   APPEARANCES:  (CONT.)

 2

 3           DECHERT LLP
             BY:  CHRISTINE C. LEVIN, ESQUIRE
 4           STEVEN E. BIZAR, ESQUIRE
             JULIA CHAPMAN, ESQUIRE
 5           Cira Centre
             2929 Arch Street
 6           Philadelphia, Pennsylvania  19104-2808
             For R.W. Sauder
 7

 8           OTHER COUNSEL IN ATTENDANCE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                THE COURT:  Okay.  Good morning, everybody.  Please

 2      take your seats.  Make yourselves comfortable.  It's so nice

 3      outside, it was tempting to, you know, move outside and do

 4      this in the park or something.  But alas.

 5                Anything I need to hear from anyone?

 6                MR. NEUWIRTH:  We have one issue, Your Honor.  You

 7      will recall, perhaps, that when we had our conference in

 8      chambers with you about the charge on May 30th, Ms. Levin,

 9      counsel for Sauder, had expressly said to the Court that on

10      the issue of the instruction regarding a single overarching

11      conspiracy, she said -- and this is on the May 30th

12      transcript, page 223, beginning at line 5 -- she said:  We

13      were suggesting that there should be an additional sentence

14      that most of the cases have which is the issue that they

15      analyze, and that's where the various parts of the scheme are

16      dependent on one another or interdependent.  It is language we

17      put in our proposed charge, and it is, in fact, the issue that

18      virtually all of our cases, the whole list, is whether one

19      piece of the scheme is dependent upon the outcome of another

20      piece of the scheme.

21                And in the pages that followed and in the discussion

22      that followed, Your Honor expressly rejected adding that to

23      the charge.  And yesterday, as reflected in yesterday's

24      transcript on page 149, continuing to page 150, Mr. Bizar said

25      to the jury:  "Now to be a single agreement, to be an

1 overarching conspiracy, each part of the agreement, each of

2 these three components has to depend on the success of the

3 other."

4    Which is the very thing that Your Honor did not

5 include in the charge and had rejected.

6    And we were not looking to interrupt Mr. Bizar

7 during his closing, but we believe a corrective statement from

8 the Court to the jury on that issue would be appropriate, if

9 that would please the Court.

10    THE COURT:  Other thoughts?  Anybody?

11    MS. LEVIN:  Your Honor, it was our understanding

12 that, because I think Your Honor went on to say, less is more,

13 and that you felt that you did not need to add any additional

14 language to the charge.

15    I believe that what Mr. Bizar said in his closing

16 yesterday is, in fact, accurate under the case law.  And we

17 didn't understand Your Honor necessarily to disagree with the

18 proposition so much as to just be of the view that all that

19 was necessary for the charge was the three-part test and not

20 any further elaboration.

21    THE COURT:  Anybody else have anything they want to

22 say on this?

23    The charge -- my standard charge always emphasizes

24 to the jury that counsel -- all counsel are given ahead of

25 time the Court's description of the law and the verdict form,

1    and that it is permissible for counsel to make their closing

2    arguments, but that the only thing that counts in terms of the

3    description of the law is what the Court presents.  And I

4    don't think that there's any need under the circumstances here

5    for me to go through, line by line, everybody's closing

6    arguments.

7            So I'm not going to do that, but I will absolutely

8    emphasize that what is important for the jury to incorporate

9    and apply is the Court's description of what the law is.  And

10   I appreciate all of the professional restraint in terms of

11   interrupting closings.

12           Okay.  Anything else from anybody?

13           Who's going to be next, just so I don't look stupid

14   in front of the jury.  You're going to be the next one up?

15           MR. CALLOW:  Yes, Your Honor.

16           THE COURT:  Okay.  Bongos or no bongos?

17           MR. CALLOW:  No bongos.

18           THE COURT:  Okay.  We can bring the jury in.

19           Do we have, by the way, the stack of exhibits

20   getting ready or are they in process?

21           MR. KING:  Yes, Your Honor.

22           THE COURT:  Along with the list of limited

23   admissions?

24           MR. KING:  Yes, Your Honor.

25           THE COURT:  And you've shared that with each other?

1           MS. REUBEN:  Yes, Your Honor.

2           THE COURT:  Great.

3           THE DEPUTY CLERK:  All rise.

4           (Jury in.)

5           THE COURT:  All right.  Everybody, you may take your

6     seats.  Good morning, ladies and gentlemen.  Thank you for the

7     sunshine.  You did a good job today.  Sorry we don't have any

8     windows here for you to look out and enjoy what is, I think,

9     probably the best weather day we've had since we've all been

10    together.  We are ready to resume the closing arguments.

11          Mr. Callow, you may proceed.

12          MR. CALLOW:  May it please the Court, ladies and

13    gentlemen, everyone in the audience.

14          I want to echo what Mr. Bizar and Mr. Neuwirth said

15    yesterday, and thank you for your time.  I know this has been

16    a long trial.  It's been long for everybody, and you've been

17    attentive; you've paid attention, you've taken lots of notes,

18    and I really appreciate that.

19          I have to be honest to start.  I have never sat this

20    long in a courtroom and been this quiet for so long in my

21    entire career.  I have not had the opportunity to speak and

22    say a lot.  I sat in my corner.  I made some forts with my

23    binder.  I bit my tongue some afternoons to stay awake.  I

24    haven't had the opportunity to say a lot.  And I told you this

25    at the beginning, but I've got a lot to say.

1    And so far, you've not been able to talk about this

2    case, and I've not been able to talk but it changes today,

3    because this afternoon you're going to get an opportunity to

4    talk about it, and this morning I'm going to get an

5    opportunity to talk as well.

6        Now, I've waited a long time for this trial.  I've

7    waited to find out what is the evidence against OFE.  Why is

8    OFE a Defendant in this case?

9        And you heard the case.  We had witness after

10   witness testify by deposition or live.  There wasn't a witness

11   by OFE called by deposition or live by the plaintiff.

12       We heard hundreds of e-mails.  We saw all these

13   e-mails that, is this what you said, or, didn't you say this

14   at the time?  And then sometimes someone would whisper into

15   the microphone, you didn't say that at that time for effect.

16   There's not a single e-mail written by an OFE person that was

17   put forth in this case.

18       You have hundreds of exhibits.  You're going to get

19   a mountain of exhibits that were presented during this case.

20   Not one came from OFE production.  Not a single document that

21   we produced in this case was admitted into evidence.  I heard

22   all these statements about what happened in 1999 and 2001 and

23   2000 and 2002.  My client wasn't in existence.  I don't know

24   about those statements.  None of my clients saw those

25   statements.  I heard all these things in United Voices.  Any

1    evidence that anyone at OFE saw anything in United Voice?

2            What is there?  Actually, Mr. Neuwirth summarized it

3    in three slides yesterday, everything that we heard about OFE.

4    Mr. Mousa attended some UEP meetings.  Yes, he did.  He was

5    paid to attend by UEP.  He was a guest or a member.  He didn't

6    say anything.  He didn't vote on anything.  There's no

7    statement in a minute that says he took any action, and

8    there's no evidence he received any of those minutes to review

9    them.  But Mr. Mousa attended some UEP meetings.

10           There's a reference to OFE in two United Voices,

11   P-14 and P-141.  Both of which were admitted for a limited

12   purpose, neither of which is allowed for the truth of what's

13   contained.

14           Mr. Mueller mentioned OFE, trying to say OFE was on

15   a Board.  I at least perked up, because I listened.  I heard

16   my name, but OFE wasn't on the Board.  OFE was never on the

17   UEP Board.  Never on the Marketing Committee.  Never on the

18   Scientific Advisory Committee.  It doesn't help.

19           And there's P-15, this one-page letter from

20   Mr. Gregory that was put into evidence through Chad Gregory,

21   who knew nothing about it.

22           And that's it.  Check your memory.  Check your

23   notes.  Mr. Neuwirth's closing.  I don't think I missed

24   anything.  That's it.

25           And from that, you're supposed to determine OFE is

1    liable for this single overarching, massive, multiyear

2    conspiracy.  I don't think so.

3            I say all that because I want to frame the issues

4    we're going to talk about this morning.  And I want to go to

5    the jury instructions.  Those are the instructions that

6    Mr. Bizar talked a little bit about yesterday that you're

7    going to receive this afternoon, and those instructions frame

8    what you're going to be doing in this case.

9            Instruction Number 7 specifically says:  The Direct

10   Purchaser Plaintiff Class has the burden of proving their case

11   against the Defendants by what is called the preponderance of

12   the evidence.

13           That's the weighing of the scales of justice that

14   we've all talked about.  But remember, it's their burden of

15   proof.  I don't have to do anything.  I can sit in the corner

16   and play with my paper clips and rearrange my binders.  It's

17   up to them to put in evidence to prove liability, and I'd

18   suggest they haven't done it.

19           Instruction Number 2 on evidence, one of the first

20   instructions you're going to receive, talks about these

21   documents that were admitted for a limited purpose, and this

22   language is important:  In this trial, a lot of evidence has

23   been admitted for a limited purpose.  You may have heard the

24   parties referring to it throughout.  For the evidence that was

25   admitted for notice to UEP members, you may only consider it

1    for the limited purpose of what was being communicated to

2    members in the particular document for whatever weight you

3    think it deserves; however, you cannot use it to prove, either

4    directly or circumstantially, the truth of what it says.

5            All those United Voices, all those documents that

6    are in for notice, nothing said therein can be used for the

7    truth, either directly or circumstantially.

8            So I don't care what Gene Gregory says.  I don't

9    care what Al Pope says.  That's notice to someone, but it

10   doesn't mean that it's true.

11           Most importantly, the definition and existence of

12   this conspiracy.  The Direct Purchaser Plaintiff Class must

13   prove both of the following elements by a preponderance of the

14   evidence:  One, the alleged conspiracy to restrain egg supply

15   existed, and, two, as to each individual Defendant, that

16   Defendant knowingly became a member of that conspiracy.

17           To act knowingly means to participate deliberately,

18   not because of a mistake, accident, or innocent reason.  To

19   prove a conspiracy existed, the evidence must show that the

20   alleged members of the conspiracy came to an agreement or an

21   understanding among themselves to accomplish that purpose.

22           The mere fact that the Defendants may have

23   participated in the UEP short-term supply reductions, the UEP

24   Certified Program, or the UEM export program does not, by

25   itself, establish the existence of a conspiracy among

1    Defendants.

2              Their behavior may be no more than the result of the

3    exercise of independent judgment in response to identical or

4    similar market conditions.

5              If the Defendants or alleged coconspirators acted

6    similarly but independently of one another, without any

7    agreement or understanding between two or more of them, then

8    there would be no conspiracy.

9              That's the instructions you're going to be given.

10   And there's more.  But that's the case.

11             What evidence is there that OFE entered into an

12   agreement with any other Defendant to do anything?

13             There's evidence that OFE acted with independent

14   judgment.  There's evidence that OFE took actions, but not in

15   conjunction with anyone else.

16             When you go back and read that definition, when you

17   look at those instructions, you're not going to find anything

18   that shows, and no evidence is going to prove, that OFE

19   entered into an agreement with Rose Acre, with Sauder, or with

20   any other egg producer.

21             Now, the interesting part when I read you that

22   two-part test, Defendant acknowledged, Defendant actions is

23   actually the second thing you find.  The first thing you have

24   to figure out is whether there was even a conspiracy to start

25   with.  We heard yesterday, and the Plaintiffs talked a little

1    bit, about general conspiracy law.  If you join a conspiracy

2    late, you could be liable for the whole conspiracy.  If you

3    join a part of the conspiracy, you could be liable for the

4    whole conspiracy.

5          Those questions all presuppose we're all talking

6    about a conspiracy, or that we know what that conspiracy is.

7          We don't in this case.  Plaintiffs have alleged a

8    single overarching conspiracy that involves exports, the

9    Certified Program, and this supply reduction things that

10   appear in United Voices.  They have that chart with all of

11   those different bullet points, and there's 18 different

12   exports over nine years.  There's 12 different

13   molt-and-slaughter recommendations.  There's one Certified

14   Program.  And the argument is that's all one single

15   overarching conspiracy.

16         I don't know who did what when.  I don't know who

17   was involved in some of those exports.  I don't know who was

18   involved in some of those molt reductions.

19         If you don't know the contours of that conspiracy,

20   you can't determine whether anyone agreed to it.  And that's

21   going to the verdict form, and that's the first question you

22   have to work through.

23         Mr. Bizar showed you this yesterday.  This is the

24   verdict form (indicating).  And at the end of the day, there's

25   four questions to answer.  The second question asks:  Do you

1    unanimously find, by a preponderance of the evidence, that any

2    of the following Defendants participated in the conspiracy to

3    reduce supply?

4              And you have a "yes" or "no" for Ohio Fresh, you

5    have a "yes" or "no" for Rose Acre, you have a "yes" or "no"

6    for Sauder.  You have to make individual findings for each

7    Defendant; and you can find any way you want for each

8    individual Defendant.

9              But you don't get to that question unless you answer

10   the first one.  And the first question says:  Do you

11   unanimously find, by a preponderance of the evidence, that

12   there was a single overarching conspiracy to reduce supply

13   comprised of all three of short-term supply recommendations,

14   the United Egg Producers UEP Certified Program, and United

15   States Egg Marketers USEM exports?  "Yes" or "no"?

16             Now, if you answer "yes" to Question 1, then you go

17   to Question 2 to see if any individual Defendant participated.

18             If you answer "no" to Question 1, do not answer any

19   further questions.  Have your foreperson sign the last page of

20   the verdict form, and notify the courtroom deputy that you've

21   completed your deliberations.

22             If you cannot conclude that there is a single

23   overarching conspiracy comprised of every element that

24   Plaintiff said was part of it, you don't even get to the rest

25   of the questions on this verdict form.

1          So what is that single overarching conspiracy?

2   Let's talk about that, the three-legged stool that we talked

3   about earlier.

4          One was exports.  OFE doesn't export.  OFE wasn't a

5   member of USEM.  I sat quietly for days listening to all this

6   stuff about exports.  But here's what I know, and here's what

7   I heard:  There's 18 different exports.  Some were in 1999 and

8   2000, some were in 2007, 2008.  Where's the linkage between

9   those two?

10          Forget whether or not 200 members of a certified

11   program over time had any conspiracy with all of this USEM

12   activity, which I don't think there's any evidence of.  How do

13   you relate that temporally, the activities from '99 and 2007?

14   Who are the different people?  What did they do?  What were

15   the sales, what were the -- what evidence do you have of any

16   of that activity?  And what's the relationship between them?

17          I heard USEM has its own board.  I heard USEM

18   members pay their own dues.  I heard USEM members take a vote

19   of when to export.  How does any of that relate to UEP?  A UEP

20   member of the Certified Program over here, how are they part

21   of any activity of USEM over here?  I don't think they are.

22          These short-term supply restrictions that we talked

23   about; there's 12 of them over a nine-year period, right?

24   Sauder didn't do any of them.  Rose Acre didn't do any of

25   them.  We didn't do 11.  But the argument has been made that

1    we did one in 2004.  So let's talk about that.

2             The document I have to deal with, the only document

3    I have to deal with is this Gene Gregory letter marked P-15,

4    that supposedly says OFE committed to an early slaughter.

5             Let's talk about that.  The letter was introduced

6    through Chad Gregory, who had no idea what that letter was.

7    Never seen it before.  Never seen anything like it.

8             Okay.  It's written by Gene Gregory.  Gene Gregory

9    didn't testify about it.  You didn't hear Gene Gregory say

10   anything about that letter or identify why it was sent to

11   whoever.  There's no evidence that the letter was actually

12   sent.  It comes from the UEP files, not from OFE files.

13   There's no evidence that anyone from OFE ever even saw that

14   letter.

15            The letter says that you sign an intentions form.

16   Did anyone see that?  I've waited ten years to see an

17   intentions form.  It wasn't in evidence.

18            The letter asks for OFE to sign a commitment form.

19   Anyone see that?  Never seen anything.

20            I get what the letter says.  But where's the

21   evidence outside of it related to that letter?

22            And it didn't come in through the Plaintiffs' case.

23   So I presented you Mr. Mousa.  Mr. Mousa testified by video

24   for a short half hour or so, 35 minutes.  Mr. Mousa, guardian

25   of the hens.  According to Mr. Gregory, one of the best bird,

1   poultry people in the country.  He takes care of the hens.

2           The guy studies poultry manure to better understand

3   the nutrients to feed the birds.  His whole life was taking

4   care of birds.  He wanted to give them more space.  He said:

5   Birds have rights.

6           He knows Dr. Armstrong.  He supported the Animal

7   Welfare Program and talked about it going to Europe.  And they

8   want you to believe that that guy agreed to slaughter hens

9   four weeks early because Gene Gregory asked him to do so to

10  help supply.

11          Really?  Let's pull out our scales of justice here

12  and think about preponderance of the evidence.  They've got a

13  letter signed by Mr. Gregory with no evidence that it went

14  anywhere but in UEP's production.

15          I've got Mr. Mousa's deposition testimony, which is

16  unrefuted by any witness in this case.  I've got a man who

17  devotes his life to protecting birds who they want to allege

18  killed them four weeks early.

19          I have no corroborating evidence from any numbers

20  that OFE actually did what that letter says.  There's no

21  intentions formed, there's no commitment form, there's no

22  testimony from Mr. Gregory.  There's nothing.

23          You're the trier of fact.  You have to decide what

24  happened.  And based on that record, I don't think there is

25  any way you conclude that OFE actually did what Gene Gregory

1   said.

2            And if you conclude that, no one did any short-term

3   supply restrictions.  There's no evidence anyone did any of

4   those 12 short-term supply restrictions.  How can there be a

5   single overarching conspiracy when there's no evidence that

6   anyone did any part of that?

7            Certified Program.  I know Mr. King's going to talk

8   a lot about it so I'm going to be brief in my discussion.

9   UEP -- Ohio Fresh joined the Certified Program in 2004.  Yes,

10  we did.  Why?  Because our customer wanted it.

11           You've heard all about FMI, you've heard about

12  Publix and Kroger.  You've heard about all this development of

13  Animal Welfare Program.  I think all that evidence is

14  credible.  I believe it's important.  But for OFE, there's

15  only one customer that mattered.  That was Hillandale Farms.

16           We had one agreement with Hillandale Farms, a

17  marketing and output agreement.  It's a stipulated fact.

18  Hillandale purchases all the eggs we produce.  It's

19  stipulated.  If our one customer wants us to be certified,

20  we're going to be certified.  Mr. Hershey said

21  Hillandale's customers wanted the logo.  Our job's to get the

22  logo.  And we did.  From our inception.

23           If there's anyone that's got unilateral

24  self-interest who's got an independent business judgment to

25  join the Certified Program, it has to be OFE.  I've got one

1    customer I care about.  They've got one demand they want of

2    me, and we took care of that.

3          Because all this stuff out there about the Certified

4    Program, backfilling -- Mr. Mousa said we don't backfill.  We

5    didn't backfill beforehand, we didn't backfill afterwards.

6          Forced molts.  We didn't force molt.  We didn't do

7    it beforehand; we didn't do it afterwards.  You heard about

8    this 100% rule, how important the 100% rule was.  All of our

9    eggs are sold to one customer.  100% rule didn't matter to us.

10          A-frames.  Manure falling down.  You heard about

11    that for hours.  We don't have any A-frames.  Okay?  Surplus

12    eggs.  I don't have any surplus eggs.  They're all sold to one

13    customer.

14          Animal welfare.  Animal welfare is important.  It's

15    the fundamental purpose of this program.  I believe that.  But

16    at the end of the day, if my customer wanted it, I did it, and

17    that's what we did.

18          And then there's this idea of supply reduction, that

19    joining the Certified Program was a means to reduce supply.

20    And as Mr. Bizar said, and as every one of us is obligated to

21    say, there's nothing in the Certified Program that talks about

22    construction or remodeling of barns.

23          What do you have in the record about OFE?  You have

24    Mr. Mousa saying that the remodeling was going for 74,000 hens

25    to 170,000 hens.  You have him saying that we had empty cages,

1   so we moved birds to fill those empty cages to comply with the

2   Certified Program.  He told you OFE was remodeling, and

3   Mr. Hershey told you OFE was remodeling.  That's what we were

4   doing.

5           Now, yesterday, my friends on the Plaintiffs side

6   made the comment in one of their charts -- at least made the

7   charts, that was good -- Joe didn't call Jeff Barcus to the

8   stand.  I didn't call Jeff Barcus to the stand.  Why do I need

9   to call Jeff Barcus when that was their case-in-chief before.

10          I called Mr. Mousa, had a fun little reading on

11  Mr. Hershey.  I didn't need anything else in the record.  But

12  I did go back to the openings because I did think that was

13  important, and I went back and read what the plaintiffs said

14  in their opening.

15          The evidence will also show that Sauder

16  substantially reduced the number of hens to comply with the

17  Certified Program, and that Defendant Ohio Fresh reduced its

18  number of hens substantially to comply with the Certified

19  Program.

20          Page 215, Day 3.

21          Did you hear that?  I didn't hear it.  There is no

22  such evidence.

23          If joining the Certified Program was intended to

24  reduce the supply of eggs, you would think there would be

25  evidence in the record that the Defendant actually did that.

1    And there's not.

2              And it's their burden, and they didn't meet it.

3              I don't think there's any evidence of a single

4    overarching conspiracy.  There's no evidence of a relationship

5    or a connection between these different entities.  But let's

6    look at what the jury instruction says so we're clear.

7              Under the Sherman Act, a restraint of trade is

8    illegal only if it is found to be unreasonable.  You must

9    therefore determine whether the restraints challenged here,

10   the UEP recommendations of early molt and early slaughter, the

11   UEP Certified Program, and the USEM export programs are

12   together unreasonable.

13             These three programs must all be part of a single

14   overarching conspiracy as opposed to, for example, three

15   different conspiracies that were each independent of each

16   other.

17             To determine whether these three restraints

18   constitute one conspiracy, you must look to, one, whether

19   there was a common goal among the conspirators; two, whether

20   the agreement contemplated bringing to pass a continuous

21   result that will not continue without the continuous

22   cooperation of the conspirators; and, three, the extent to

23   which the participants overlapped in the various dealings.

24             If, after considering these factors, you find that

25   all three of these programs were part of the same conspiracy

1    to reduce supply, only then must you determine if the actions

2    taken were reasonable.  And if you can't do that, you don't

3    even get by Question 1.

4         If you can't figure out who all these coconspirators

5    are, if you don't see continuous cooperation over the

6    nine-year period, if you can't figure out the overlap between

7    the participants, there's not been established a single

8    overarching conspiracy.  And as a result, you answer "no" to

9    the first question.

10        The OFE story is very simple, straightforward, not

11   much evidence, and I'm sure you're going to do the right

12   thing.

13        I'd be remiss, however, if I didn't take at least a

14   couple minutes this morning and talk about my friend,

15   Dr. Rausser.  I didn't do a lot in this case, but I spent an

16   hour with Dr. Rausser sometime in week two or week three of

17   this case.  And it was a pretty interesting hour.

18        You know, I heard about peer-reviewed articles and

19   how important it was that he had peer-reviewed articles in the

20   economic literature.  Do you think any of his peers know about

21   his investing habits?  Do you think any of his peers knows

22   what he does on the side?

23        He testifies in lots of cases.  I'm sure he does.

24   Do you want to know why he testifies in lots of cases?

25   Because he has a business on the side where he buys the claims

1    of the Class Members and makes money off them.  He's not only

2    paid $850 to sit there and rattle off statements and comments

3    and whatever he comes up with, he then goes back and buys the

4    claims of Class Members and helps other people buy them to

5    make money off of that.  And he didn't disclose it to anyone.

6    And he didn't disclose it to the people at that table.  He

7    didn't think it was relevant.

8          Do you know what's relevant in this case?  Let me

9    tell you what's relevant.  It's relevant when you secretly

10   signed a consulting agreement to offer services to a company

11   whose goal is to buy the claims of Class Members.  And you say

12   because you're an expert, you're going to get paid three

13   different ways to do that.  It's relevant when your company

14   signs a modeling agreement that talks about potential

15   conflicts of interest that you ignore because you want to get

16   paid to do modeling for that company that's going to buy those

17   services.

18         When you get an e-mail from the people of that

19   company saying you are our strategic partner and advisor, they

20   were counting on him to identify the cases.  They were

21   counting on his reputation and his experience to help get

22   investors to buy these claims.  And what does he do?  He

23   invests.  Over a million dollars in the purchase of those

24   claims.  At a discount.  To make money off those claims.  Then

25   he gets two promissory notes because they bought his other

1    company associated with doing this.

2            And when he didn't get paid, he writes them an

3    e-mail saying, I'm doing everything you asked me to do.  I am

4    meeting with investors.  I've told you which cases to invest

5    in, including the Rail Freight case, which is the case he was

6    testifying in.

7            And then he goes to England and meets with

8    Mr. Tabatznik in London and can't really make it back to the

9    Sundance Festival where he was going to meet again.  And,

10   well, there was this generic pharmaceutical investment, and he

11   was just nauseating.

12           But do you know what he was meeting with them about?

13   To invest in Fund Two.  And do you know what's in Fund Two?

14   Claims in this case.  That's obnoxious.  He's been testifying

15   year after year in this case, and he's trying to profit on it

16   on the side.  And do you want to know why it's relevant?

17   Because the jury instruction tells you that it is.  Jury

18   instruction on experts says that you can reject the expert

19   testimony for any reason.

20           Now, I think Dr. Walker gave you a ton of reasons to

21   reject Dr. Rausser.  And after spending a day on

22   cross-examination, I think all his reasons stand up.  I think

23   witness after witness that came into that stand, whether it

24   was Terry Daniels or Bob Krouse, or all these individuals

25   talking about what actually happens that's different than what

1  Dr. Rausser said was going to happen, I think all those are

2  reasons to reject him.

3         I know Mr. King's going to talk about the economics

4  and the charts, but honestly, I don't care how many charts he

5  does.  I don't care how many lines he draws.  I don't care how

6  many reports he does.  The man's biased.  He's doing it for

7  personal gain.  He's manipulating the benchmarks.  He will do

8  anything and say anything because he wants to make money.

9         Reject him.  Don't reward him.  Reject him.  Don't

10  believe anything he says.  We're not going to have trial by

11  Rausser.  I've dealt with litigation by Rausser.  Nothing he

12  says or does can be trusted in this case.  And I urge you not

13  to give him credence given the secret investment history that

14  he didn't tell us about, that they didn't tell us about, but

15  we found out about it.

16         So I've got some things off my chest and I got to

17  talk and I got to tell you everything you need to know and

18  you're going to get the case this afternoon.

19         There's a lot of jury instructions.  There's a lot

20  to go through.  The verdict form is really simple.

21         The first question, if you can't find a single

22  overarching conspiracy, you don't even have to worry about

23  anything else.  If you do find a single overarching

24  conspiracy, then you have to answer for each individual

25  Defendant below.  And I'd urge you that there's simply no

1    evidence in the record upon which Defendant OFE entered into

2    any conspiracy.

3              I think the actions are reasonable.  I think the

4    other questions are "no's" as well.  But, honestly, I don't

5    think you get past the first one.

6              Thank you for your time.

7              THE COURT:  Thank you, Mr. Callow.

8              Mr. King, I take it that you are next?

9              MR. KING:  Yes, Your Honor.

10             THE COURT:  And I urge everybody to double-check

11   their cell phones and make sure they are off.

12             MR. KING:  May it please the Court, counsel, ladies

13   and gentlemen of the jury, I'm going to say what every other

14   person who came up here said, and thank you for your service.

15   We know it was long.  We know it was probably a lot longer

16   than you thought when you walked into the ceremonial courtroom

17   on May 2nd.  It's been a slog, but we appreciate, sincerely,

18   your attention, your service, and, most importantly, your

19   patience.  And we're coming to a close.

20             We know how -- your sacrifices.  We know how

21   difficult this is on both you and your employers and your

22   family, and we're really, really grateful.  This case is

23   important.  Your role is important.

24             I feel very lucky to do what I do, walking in this

25   courtroom with the -- you know, the swinging door, seeing the

1    Great Seal of the United States up here.  It's a great system.

2    It's a system that a Plaintiff can bring a case.  And when a

3    Plaintiff, like the Plaintiffs here, bring a case, they get

4    all kinds of rights.

5         They get the right to a fair and impartial judge, a

6    fair and impartial jury; and they have one.  They have a right

7    to counsel.  They have a right to obtain discovery and gather

8    up their evidence.  And after ten years of litigation, they

9    have the right to present their evidence.  Present their

10   witnesses.  Present the documents.  Present the deposition

11   testimony.

12        Ladies and gentlemen, with every right comes a

13   responsibility, and Plaintiffs have the responsibility to meet

14   the burden of proof.  It is their burden.  It's always the

15   Plaintiffs burden.  It's not our burden to prove anything.

16   It's their burden to prove their claims.  They had an

17   opportunity over the past five weeks of this trial to put on

18   whatever witnesses they wanted, whatever exhibits they wanted,

19   whatever deposition testimony they wanted in order to prove

20   their case, to prove their claims.  And the task for you now

21   is to determine whether they met their burden, and we

22   respectfully submit that they have not.

23        Now, the Judge is going to give you a road map.

24   You've already seen it referred to by Mr. Neuwirth, Mr. Bizar,

25   Mr. Callow.  This is the verdict form.  The verdict form lays

1    out the questions that you have to answer.  And the Judge is

2    going to give you more detailed instructions that will guide

3    your deliberations and guide your -- your way to answer these

4    questions.

5            And it's up to the Judge.  As she said, she'll be

6    giving those instructions.  She's going to tell you what the

7    law is.  But this verdict form that you are going to have to

8    deliberate over once these closing arguments are done has four

9    simple questions.

10           The first question is:  Was there an overarching

11   conspiracy to reduce supply comprising these three things that

12   we've talked about, the UEP Certified Program, the USEM

13   exports, and the short-term supply recommendations.

14           That's the first question.  And you need to find

15   unanimously, all 11, for the Plaintiffs in order for them to

16   prevail.  In fact, you have to find unanimously for the

17   Plaintiffs with respect to all four questions in order for

18   them to prevail.

19           And the second question is whether any of the

20   Defendants participated in this conspiracy.  I'm here on

21   behalf of Rose Acre.  I'm going to talk about Rose Acre in a

22   few minutes.

23           The third question is whether these were -- whether

24   these restraints were unreasonable.  Whether they were

25   unreasonable.  And whether they -- whether the restraints had

1    an unreasonable restraint on supply.

2              And, fourth, did the conspiracy injure the Plaintiff

3    Class in this case?

4              If you answer any one of those four, you find for

5    the -- any one of those four, "no," you find for the

6    Defendants.  But in order to find for the Plaintiffs, you have

7    to answer all four unanimously for the Plaintiffs.

8              Now, I'm going to structure my closing around those

9    four questions, and in particular, what is the evidence that

10   we've heard about over the past five weeks with respect to

11   those four questions that you're going to have to deliberate

12   on and answer at the end of your deliberations.

13             They're the elements of the overarching conspiracy.

14   Let's start with the very basics.  I showed you these slides,

15   these boards when I opened, and it's based on the evidence

16   that was -- I expected to present, or we expected to present,

17   and based on the evidence that we did present.

18             They allege a conspiracy to reduce the supply of

19   eggs.  Boiled down to its essence, the lowest common

20   denominator in this case is, was there a reduction in supply

21   and an increase in prices?

22             Ladies and gentlemen, the evidence showed the answer

23   to that question is "no."  From 2000 to the end of 2013, egg

24   production per month was at 6.1 bill in 2000; and in 2013, it

25   was at 6.9 bill.  It went up.  Egg production went up during

1    the period the Plaintiffs allege there was a conspiracy.

2            The number of hens.  They claim, as part of this

3    conspiracy, the Defendants reduced the supply of hens.  You

4    reduce the supply of hens, you have fewer eggs; you have fewer

5    eggs, you raise the price.

6            In 2000, when this alleged conspiracy began,

7    according to the Plaintiffs, the nation's flock size was 271

8    million hens.  By the end of 2013, the nation's flock size was

9    295 million hens.  Sure, there's ups and downs throughout, but

10   the trend is up.

11           And what about egg prices?  The price per dozen of

12   eggs on the wholesale market, adjusted for inflation for

13   wholesale, Grade A, large-shell eggs in 2000 was a $1.61 a

14   dozen.  At the end of 2013, it was a $1.44 a dozen.

15           Does this look like a conspiracy to reduce the

16   supply of eggs?  Does this look like a conspiracy, an

17   overarching conspiracy to raise egg prices?  It doesn't make

18   any sense.

19           The first question on the verdict form that you need

20   to answer, as I indicated, is whether there was an overarching

21   conspiracy to reduce the supply of eggs.  Let me talk about

22   the overarching conspiracy part.  We talked -- I talked a

23   little bit about whether there was a reduction in supply of

24   eggs.  Let's talk about this overarching conspiracy.

25           The three-legged stool.  I referenced it during my

1    opening.  Picture a stool, a bar stool.  It's got three legs.

2    That stool is the conspiracy, the overarching conspiracy the

3    Plaintiffs allege in this case.  The three legs are the three

4    actions, the three types of activities and conduct that

5    comprise that conspiracy:  Certified Program, USEM exports,

6    and the UEP supply recommendations.

7            That's what they have to prove.  They have to prove

8    one conspiracy.  That is their charge.  Not three, one.  One

9    overarching conspiracy.  And to prove their case, ladies and

10   gentlemen, we would submit that they concocted a story.  They

11   came forward with a story based on theories.  And the main

12   storyteller is Dr. Rausser.

13           It was Dr. Rausser who Mr. Neuwirth said yesterday

14   is the foundation for why they contend prices are higher --

15   egg prices are higher than they should have been, and egg

16   supplies are lower than they should have been.  It was

17   Dr. Rausser who made that calculation.  It was

18   Dr. Rausser's opinion.  As Mr. Callow said, Dr. Rausser is a

19   hired gun.

20           If this was so straightforward and so simple, as

21   Mr. Neuwirth would make it appear yesterday, why did it take

22   Dr. Rausser, who has a Ph.D. in economics, as you heard, he

23   spent over a million dollars in this case, a million dollars

24   in this case coming up with his theories, coming up with his

25   opinions.  It doesn't sound very straightforward if they have

1    to get a Ph.D. in economics to expend over a million dollars

2    to come up with his theories.

3            But as Mr. Callow said -- I won't repeat what

4    Mr. Callow said -- it's up to you to decide whether

5    Dr. Rausser's believable.  Not only is he a million-dollar man

6    when it comes to coming up with his opinions, as Mr. Callow

7    said, he has a side business.  And in that side business, he

8    invests in Class Actions.

9            He invested over a million dollars in a fund that

10   invests in Plaintiffs Class Action claims, and he was

11   contemplating working with someone who was putting together --

12   contemplating putting together planning a fund that would

13   invest in other claims.  And he had these communications with

14   this individual after he had been retained in this case.

15           And one of the funds -- excuse me.  One of the

16   pieces of litigation that Dr. Rausser was contemplating

17   investing in with this other person, in this other fund, was

18   the eggs case.  You saw this in one of the e-mails that

19   Mr. Callow brought out during his cross-examination.  The eggs

20   case.  That is this case that he was contemplating investing

21   in after he had been retained by the plaintiffs' lawyers to be

22   an expert witness.

23           Ladies and gentlemen, we would submit that

24   Dr. Rausser's damaged goods.  You can't believe anything.

25   He's biased.  He's got a stake in this case.  And he'll say

1    anything, and he did say anything in order to support the

2    theories that Plaintiffs have espoused in this case to show

3    why, despite the fact that flock sizes went up nationally,

4    despite the fact that egg prices went down, he's going to

5    contend otherwise.  He wants you to disbelieve reality.

6            And I'll talk a little bit more about Dr. Rausser as

7    we go along.

8            But let's talk about this overarching conspiracy.

9    What is it?  Do you know what it is?  Now, the Judge is going

10   to give you instructions on how to evaluate what a conspiracy

11   is.  A conspiracy is, basically, an agreement -- you can show

12   it either directly or circumstantially or indirectly -- an

13   agreement to do something unlawful.  What's the agreement?

14   What's the agreement here?

15           Listen to the Judge's instructions on this point.

16   Listen to all of her instructions, but listen carefully to her

17   instructions on what is a conspiracy?  What is it they have to

18   prove in order to show that there was a conspiracy involving

19   these three Defendants?

20           Have they met their burden?  This is

21   Dr. Rausser's timeline.  He showed this to you.  You've seen

22   it several times throughout the course of this trial.

23   Here's his timeline.  And this purports to show all the

24   various things that Plaintiffs contend comprise the

25   conspiracy.  The three-legged stool.  Right?  You've got the

1   UEP Certified Program up here, you've got the USEM exports
2   down here, and you have the short-term supply recommendations
3   here.  Right?  And they start in 1999.  Right?
4           Who did these?  Who did these short-term supply
5   recommendations?  We'll get to this in a little bit more
6   detail in a moment.  Did anybody testify on that stand?  Was
7   there a single producer who's testified on that stand who said
8   that they did any of these?
9           You have all these exports from 2000 to 2003.  Was
10  there any evidence about that?  Who did these exports?  Rose
11  Acre didn't join USEM until 2006.  We know they did some
12  exports.  Sauder didn't join the USEM until 2006.  They did
13  some.  OFE didn't do any.
14          In fact, OFE didn't even exist in 2002 when the
15  Certified Program came into existence.  Rose Acre didn't join
16  UEP until 2002, although there's all this other stuff that
17  goes on.  They didn't have any role in creating the Certified
18  Program.  Who did this stuff?  Where are they?
19          Which gets to my next point.  We'll get to that in a
20  minute.
21          Who's in this conspiracy?  Who's in it?
22          Dr. Rausser, on cross-examination, said that the
23  conspiracy could very well include the 200 producers who
24  joined the UEP.  As long as they didn't get fully paid for
25  what they did in order to comply with the UEP, yeah, it could

1    be up to 200 producers.  Okay.  200 producers.  Well,

2    Plaintiffs emphasized in their opening that actually there

3    were 11.  Not 200.  There were 11 who are -- some of them were

4    Defendants in this case, and they include the three here.

5           What distinguishes Sauder, Ohio Fresh and Rose Acre

6    from the 11, from the 200?  Why are we the lucky ones to have

7    to defend this litigation for the past ten years?  Has that

8    been answered for you?  Do you feel comfortable knowing that,

9    going back into your deliberations?

10          And let me talk about this three-legged stool.  This

11   overarching conspiracy.  You'll be instructed in Jury

12   Instruction Number 13 that you have to find that there was,

13   again, one overarching conspiracy.  Not three, one.  If you

14   find none, or if you find three, they can't prevail.  You have

15   to find one.

16          And the judge will give you an instruction, it will

17   be Instruction Number 13, on how you determine whether there

18   was a single conspiracy or whether there were multiple

19   conspiracies, because again, they have to show it's single.

20          Mr. Callow read this to you, I'll read it to you

21   again:  One, whether there was a common goal among the

22   conspirators; two, whether the agreement contemplated bringing

23   to pass a continuous result that will not continue without the

24   continuous cooperation of the conspirators.

25          It's got to be continuous.  All right.  They're

1    looking for a continuous result.  Continuous cooperation.

2    With all this stuff going on, you don't know who's doing what,

3    who's doing the supply recommendations, who's doing the

4    exports?  Is that continuous?  Are you seeing continuous

5    cooperation?  Again, the extent to which the participants

6    overlap in the various dealings.  We don't know who did all

7    this stuff.  They just claim that we did but what about these

8    others?

9             So you have your three-legged stool.  It's got to be

10   one conspiracy.  Not three.  And, in fact, we would submit

11   that they don't even have evidence to show that there are

12   three; that the Certified Program was a conspiracy, or the

13   USEM exports were a conspiracy, or the supply recommendations.

14            Finally, with respect to this conspiracy -- I'll put

15   this over here -- the 11, the 11 who were originally sued in

16   this case.  The 11 include us three.  Do they really have the

17   market power, the market power to affect egg prices?

18   Dr. Walker testified, no, they don't.

19            In order to have the market power, you need at least

20   60 percent.  60 percent of the market share.  And if you look

21   at the market share based on flock sizes, the 11, the big 11

22   that they claim were the coconspirators of this case, they

23   only had 47 percent of the flock size, far short of the

24   60 percent.  Do they have the power to affect egg prices?

25   Dr. Walker said no.

1    So let's talk about a little further each of the

2  legs of the stool.  You've already heard a lot about it.  I'll

3  try not to repeat too much what you've already heard.

4    Let's first talk about the short-term supply

5  recommendations, all right.  These recommendations, the flock

6  size, early molt, slaughters that Plaintiffs discussed during

7  their case, as I said, not a single producer who took the

8  stand in this case, not one did one.  Rose Acre didn't do one.

9  Sauder didn't do one.  Sparboe Farms didn't do one.  Michael

10  Foods didn't do one.

11    Who are doing these?

12    Garth Sparboe said, philosophically, we never did.

13  That's what he testified to here in the trial.  Terry Baker of

14  Michael Foods:  This was a function that we did not

15  participate in as Michael Foods.

16    Chad Gregory.  Chad Gregory, UEP president, was

17  asked this question and gave this answer:  To your knowledge,

18  has Rose Acre ever agreed to any early slaughter of hens,

19  early molt, or reduced chick hatch, which may have been

20  suggested by UEP or anyone else?

21    His answer on May 11th:  Answer:  No, sir.  Never.

22    What they have, what the Plaintiffs have to show,

23  and what they hope to prove, are based on these United Voices

24  newsletters.  These are newsletters.  How many of us belong to

25  an organization or a group and you get a newsletter in the

1    e-mail or the mail.  Does everyone here read those

2    newsletters?  Do we feel like we're bound by those

3    newsletters, what anyone says for an organization that we may

4    belong to?  If I join Amazon Prime, am I going to be beholden

5    to Amazon Prime with their newsletter?  Rose Acre sometimes

6    read these newsletters; sometimes they didn't.

7            But these newsletters, they're not evidence that you

8    can consider for the truth.  Mr. Callow indicated that.  Every

9    time one of these newsletters was introduced, the Court gave

10   an instruction that you can consider them only for notice, not

11   for the truth.

12           And Jury Instruction Number 2 makes that clear.  You

13   cannot use it to prove, either directly or circumstantially,

14   the truth of what it says.  Plaintiffs' reliance, their heavy

15   reliance on these United Voices newsletters can't be used to

16   prove the contents of them.  The judge will make that clear in

17   her instructions.

18           Let's talk about the USEM exports, the second leg of

19   the stool.

20           What are the Plaintiffs claiming?  Well, the

21   Plaintiffs are claiming that throughout the conspiracy

22   period -- I'm going to put this back up.  Throughout the

23   conspiracy period, 19- -- 2000 to 2008, there were these

24   exports.  But, again, we heard nothing about these exports in

25   2000, 2013.  Zero.  Nothing.

1          What were they?  Who did them?  What were their

2    amounts?  Who participated in them?  What was the price?  Did

3    we hear anything about those?

4          Then we have from 2003 to 2006, where nothing is

5    happening in exports.  Then we have, aha, 2006, Rose Acre

6    joins, Sauder joins, we have some exports.  Those are the

7    exports that they focus on.

8          Well, you heard, ladies and gentlemen, you heard

9    from both Rose Acre and you heard from Sauder that these

10   exports were of surplus eggs.  They're eggs that they can't

11   sell.  During down times, when demand is down, after the

12   holidays, after Easter, in the fall, they've got too many eggs

13   and they have to get rid of them.

14         It's either what -- you've heard it several times,

15   the expression "sell them or smell them."  You can't keep eggs

16   for long.  And so USEM was an option to export; that those are

17   the eggs that were sold, eggs that they didn't have a customer

18   that would buy them.  You can't sell any more of these to

19   Walmart.  They're only going to take so much.  You can't sell

20   all of these to Kroger or Costco.  They've got too many of

21   them.  That's what they did.

22         And as Dr. Walker said, these exports were a

23   pittance.  They were so small that they would not have any

24   effect on egg prices.  They were just too small to have the

25   effect that Dr. Rausser is talking about.  They range from

1    about one half of one percent of one month's consumption to

2    about one-and-a-half percent of one month's consumption.

3    They're too small.

4              And then you saw these summaries.  We spent all this

5    time on these dots.  What do they mean?

6              And the Plaintiffs, I believe, that they were

7    offering them to show, hey, Rose Acre, Sauder, they were

8    selling eggs at a price lower through the exports than they

9    were getting from the commercial customers, assuming that they

10   could have sold these surplus eggs that they were already

11   excess they didn't have a customer for.  They said, hey, you

12   could have sold these for a higher price, but they

13   cherry-picked.

14             They showed you some Rose Acre ones where the red

15   dot, the USEM export price, was lower than some of the prices

16   for the commercial customers.  And they showed you some Sauder

17   ones, but they didn't show you all the Sauder ones.

18   Mr. Bizar, during his redirect of Mr. Sauder, showed you all

19   these other summaries where Sauder is getting a higher price.

20   You didn't see that.  They're being very selective in what

21   they show you.

22             Moreover, where are the egg sales from the other 58

23   members of USEM?  Sauder's not a member of USEM.  Rose Acre

24   is.  Where are the other 58?  Did you see those?  How do you

25   know whether these exports would have any effect on egg prices

1  if you're only seeing a snapshot?  You just saw a snapshot of

2  certain sales during select certain time periods that

3  Plaintiffs and their lawyers selected.

4       You didn't see all of these.  These are all the

5  other members.  This sheet shows all the other members of

6  USEM.  It shows all the other nonmembers, like Sauder, who

7  participated in an export.  You didn't see any evidence with

8  regard to any of these.  Have Plaintiffs satisfied their

9  burden of proof?

10       Let's talk about the third leg, the Certified

11  Program.  You've heard it was based on science.  Dr. Armstrong

12  was here for a day, day and a half.  Chair of the Scientific

13  Advisory Committee, president of California State University,

14  St. Luis Obispo.  Former chair of an agricultural department

15  with Purdue University and Michigan State University.  He said

16  that these recommendations are based on science.

17       The Scientific Advisory Committee's report came out,

18  and you'll have an opportunity to read this, this document,

19  during your deliberations, saying agriculture is changing.

20  There was a need to better understand the welfare of a hen.

21  The Committee, as well as the UEP's goal, was that production

22  be socially, economically, and environmentally sustainable.

23       And did you hear a single word about why these

24  recommendations, why the UEP guidelines were developed in the

25  first instance?  Was there anything that you heard about that

1    yesterday, because I didn't hear it.  Maybe I missed it.

2            Was there any discussion about the whole history of

3    animal rights activism that led to these?  Was there any

4    discussion with McDonald's?  What was McDonald's doing?  Was

5    McDonald's in this, because McDonald's announced in 2000 that

6    it was increasing its cage space requirements for its

7    producers to 72 square inches.  That was McDonald's.

8            McDonald's, as you heard from Mr. Sparboe say, is

9    the largest egg buyer in the United States.  They were

10   pressured from animal rights groups.  Cage space was a big

11   deal.  As Mr. -- excuse me -- as Dr. Armstrong said, that's

12   where they live.  At a minimum, in order to satisfy basic

13   standards of humane treatment, you've got to give the hens

14   more room.  That's what the animal rights activists were

15   protesting over.  That's why McDonald's changed.  That's why

16   Burger King followed suit after McDonald's announced that they

17   were requiring 75 square inches per hen.  Wendy's followed

18   suit, and then the grocery chains.  Is that all UEP?  What did

19   UEP have to do with McDonald's?  What did UEP have to do with

20   PETA, the People For the Ethical Treatment of Animals,

21   lobbying or waging these protests?  And it was a real concern.

22           Here's a letter that you saw that was introduced

23   through the testimony of one of the Safeway witnesses who

24   testified by video.  And it's a letter from October 17, 2001.

25   And it's to the CEO of Safeway, and it's from PETA, and it

1    says:  The time for empty promises and public relations

2    rhetoric is over.  PETA is preparing for a sustained and

3    focused campaign against Safeway.  If PETA does not receive a

4    written pledge by December 1, 2001, stating that Safeway will

5    not -- will -- excuse me -- will meet or exceed the Animal

6    Welfare Guidelines adopted by McDonald's, Burger King, and

7    Wendy's, and do so in a verifiable and timely manner, Safeway

8    will become a target of activists nationwide.

9          UEP's not doing this.  Three Defendants aren't doing

10   this.  They're not putting this pressure on egg buyers.  This

11   is coming from the animal rights activists.  That's what led

12   to all of this.  There were real concerns, and real concerns

13   among the animal rights activists, and real concerns among the

14   egg buyers that prompted this change.

15         So UEP establishes the Certified Program.

16   Plaintiffs like to suggest that, oh, this was a way -- this

17   was a long-term solution for the egg producers.  But you heard

18   over and over in the testimony in this trial that this was not

19   an economic tool.

20         Mr. Krouse, Robert Krouse, Midwest Poultry, he came

21   here.  Remember these witnesses from -- that the Plaintiffs

22   introduced from Sparboe and from Midwest Poultry.  They were

23   once Defendants and they settled the case.  They wanted out of

24   this case, and so as an exchange they had to cooperate.  They

25   had to come here.  They didn't want to come here but they had

1    to come here.

2          But they came here, and Plaintiffs brought them

3    here.  And what did Mr. Krouse say?  Mr. Krouse said, in

4    answer to the question:  Do you believe that the Animal

5    Welfare Program literally was something that wasn't intended

6    to further animal welfare goals, but rather was a way to

7    reduce and increase supply prices?

8          The answer here, on May 10th, was:  That's a fallacy

9    that was made up somewhere along the line.  I was involved in

10   the Animal Welfare Program from its inception in 1999.  I was

11   at almost every single meeting, and I know well what the

12   intentions of it were and why we worked with the best

13   Scientific Advisory Committee, the best animal welfare experts

14   in the country to develop these.  It was never, it never had

15   anything to do with commitment to reduce supply.

16         It was always voluntary, a voluntary program.

17   Nobody had to join this.  Nobody had to follow these

18   guidelines.  Nobody ever had any agreements within the

19   program, or outside the program, as far as I know, to limit

20   how many birds they had.  That was Plaintiffs' witness.

21   That's what he said.

22         Don Bell.  Don Bell, the architect, the mastermind

23   of cage space production.  You heard so much about Don Bell.

24   Don Bell was on the Scientific Advisory Committee.  What did

25   Don Bell say when he testified under oath at his deposition?

1           Can you play that?

2           (Video excerpt played.)

3           Question:  Mr. Bell, do you think the Scientific

4   Advisory Committee was just a sham to rubber stamp an effort

5   by egg producers to inflate prices?

6           Answer:  Now am I supposed to answer?  I said

7   absolutely not.

8           Question:  At any time, while the Committee was

9   doing its work, did anyone ever tell you that the Scientific

10  Advisory Committee was a sham designed to rubber stamp a

11  conspiracy to inflate egg prices?

12          Answer:  No.

13          Question:  Did any members of the Scientific

14  Advisory Committee ever say that they felt their role was to

15  help the industry suppress the supply of eggs and thereby

16  increase egg prices?

17          Answer:  No.

18          (Video excerpt stopped.)

19          MR. KING:  You heard, over and over, there's no

20  limit on growth or expansion in the Certified Program.

21  There's no limit on the number of hens you can have.  No limit

22  on the number of cages you can have.  No limit on the number

23  of eggs.  No limit on the number of houses.  No limits on

24  farms.  You can grow to the extent you need to grow.  Nothing

25  in the Certified Program prohibits growth.

 1          THE COURT:  Mr. King, would you mind if I

 2   interrupted you to give the jury a bit of a break that, I

 3   think, we need.

 4          MR. KING:  Yes, that's fine.

 5          THE COURT:  I apologize for interrupting, but we

 6   will take a ten-minute break and resume then.

 7          THE DEPUTY CLERK:  All rise.

 8          (Jury out.)

 9          THE COURT:  You all may enjoy the break as well.

10          (After recess:)

11          THE COURT:  Okay.

12          THE DEPUTY CLERK:  All rise.

13          (Jury in.)

14          THE COURT:  Okay.  Everyone, you may take your

15   seats.

16          Mr. King, you may resume.

17          MR. KING:  Thank you, Your Honor.

18          Again, the Certified Program, there was no limit on

19   growth, no restrictions on growth.  Nothing in any of the

20   iterations of the UEP Animal Husbandry Guidelines that said

21   anything about restricting growth.

22          And, in fact, Bob Krouse -- Robert Krouse, excuse

23   me -- a witness called by the plaintiffs, said here at trial:

24   Our company and others were adding more cages to make up for

25   the cage space that was being allocated to the UEP Program.

 1          Producers were growing, despite belonging to the

 2    Certified Program.

 3          And, in fact, if you remember, when the Certified

 4    Program was being put together, when it was being developed,

 5    UEP began talks with the Food Marketing Institute, the trade

 6    association that represents all the supermarkets, the big

 7    supermarkets:  Walmart, Kroger, Albertsons, et cetera.

 8          And originally, back in 2000, 2001 time period, UEP

 9    had proposed that these cage space density requirements going

10    from 54- to 67-square-inch per bird, they recommended that the

11    phase-in be over the span of ten years.  Ten years.  It makes

12    you think, if this is something that was intended to reduce

13    supply, why aren't they -- why isn't UEP recommending a much

14    shorter implementation period?  No.  They wanted ten years, a

15    long period of time.

16          But in their negotiations with the Food Marketing

17    Institute, Food Marketing Institute said:  No.  We're getting

18    letters from PETA.  We're getting protests.  You've got to do

19    this quicker.

20          They wanted three years.  So the compromise was six.

21    Six.  Again, this wasn't something that was intended to reduce

22    supply; otherwise, UEP would have called for a much earlier

23    implementation period.  They wanted a longer one, but it was

24    only the customers who demanded a shorter implementation

25    period.

1     And then after the Certified Program came into being

2   in 2002, what happened?  Customers demanded.  They continued

3   to demand it.  They demand it to this day.

4     It's a who's-who of egg buyers.  Grocery chains,

5   food processors, Costco, Kraft, Nestle, Kroger, Giant,

6   Winn-Dixie, Target, Giant Eagle.  Over and over you heard

7   about these.  Ralph's, Roger's, Nob Hill, Marsh, Smith's, Food

8   Club.  They all demand it.  They all require it from their egg

9   producers.

10    Even Kroger -- I mean, excuse me -- Walmart, Walmart

11   representative who testified here several weeks ago,

12   Kelli Crossland, the egg buyer at the time the Certified

13   Program came into being, she testified under oath here on

14   May 7th.  The question:  And did you have an understanding

15   about whether the UEP certified program was mandatory or

16   voluntary?

17    And she said:

18    Answer:  Well, that depended on what side you were

19   on.  It was voluntary for Walmart to decide if we wanted to

20   use it.  And once we decided that we were going to use it

21   because we did care about the welfare of animals, then it was

22   mandatory for our suppliers to have to make the certifications

23   for us to buy the eggs from them.

24    Walmart, one of the largest companies in the world,

25   demanded it.  They still demand it.

1          Kroger and Publix, you heard deposition testimony

2     from the buyers there indicating that Kroger demanded.  Publix

3     demanded it.

4          All right.  So let's get to the second question that

5     you have to answer under this verdict form:  Did any of the

6     Defendants -- specifically here, Rose Acre -- participate in

7     this conspiracy?

8          What was Rose Acre's role with respect to this

9     overarching conspiracy and these three legs of the

10    three-legged stool?

11         I said at the outset, in my opening statement:  Look

12    at Rose Acre's actions.  Look at what they did.  Actions speak

13    louder than words.  What did they do during this conspiracy

14    period?  Don't look at what people said.  Don't look at what

15    Gene Gregory said.

16         By the way, where was Gene Gregory?  Gene Gregory

17    was at the focal point, the centerpiece of their case.  Over

18    and over you heard about Gene Gregory.  Gene Gregory and the

19    United Voices.  Gene Gregory said this.  Gene Gregory said

20    that.  No deposition testimony.

21         Where was he?  You didn't hear from him.  And it's

22    Plaintiffs that have the burden of proof.

23         You'll be instructed under the jury instructions

24    that to prove a conspiracy, that Rose Acre engaged in this

25    agreement to reduce supply in violation of the law, that

 1    Plaintiffs have to prove as to each individual Defendant --

 2    the evidence against Rose Acre, the evidence against Sauder,

 3    evidence against Ohio Fresh, as to each individual Defendant,

 4    that the Defendant knowingly became a member of that

 5    conspiracy.  And what evidence do we have here?

 6           We have no evidence of an agreement.  There's not --

 7    there are no documents that show Rose Acre agreed to some

 8    conspiracy, some agreement with its competitors to reduce

 9    supply.  There was no testimony showing that.  There was no

10    verbal agreement.  There wasn't a handshake.  There wasn't a

11    wink.  There wasn't a nod.  There was nothing.

12           What did Rose Acre do during the conspiracy period?

13    What Rose Acre did is that they grew.  They increased their

14    production of hens.  From 2001, they were producing 300 --

15    they had 300 -- they were producing, excuse me, more and more

16    eggs.  They produced 330 million dozen eggs in 2000, and in --

17    by 2011, it was producing 517 million eggs.

18           Is this a company that is restricting supply,

19    limiting supply, reducing supply, or is this a company

20    growing?  Growing, despite the restrictions of the Certified

21    Program.

22           Marcus Rust.  You heard a lot about Marcus Rust.

23    Marcus Rust was here on the stand for several days.  He said

24    here on the stand:  From 2002 to 2008, did Rose Acre grow?

25           Answer:  Yes, we grew.  We added.  We never -- to my

1    knowledge, we didn't lose a bird space total per year.

2           David Hurd, corporate representative who's been here

3    every day of the trial, he said:  Yes, live birds increased

4    each year, when he testified.

5           Greg Marshall, the chief financial officer said:

6    When I started there, we had 11 or 12 million layers -- those

7    are the hens -- and today we have, approximately, 24.

8           They doubled.

9           Our employees have basically doubled since I've been

10   there.

11          Greg Hinton:  Ever since I've been with the company,

12   since 1980, we've grown.

13          That's what he said here on the stand.

14          Marcus Rust:  We added about a million birds

15   capacity at our Pulaski County farm.  We added a half a

16   million birds at our White County farm.  We added a half a

17   million birds at our Johnson County farm.  We added, I think,

18   400,000 maybe, half a million to Germantown farm.  Any place

19   that we could get a permit, we added the bird space, provided

20   we had the money at the time.

21          Greg Marshall, again, over and over you heard this,

22   that Rose Acre grew.  Even when the Plaintiffs cross-examined

23   Mr. Marshall, what did Mr. Marshall say?  He was asked:

24          Question:  Is it fair to say, sir, that this remodel

25   and building new houses and even acquiring new farms, was Rose

1   Acre's way of doing business, at least from the time you were

2   there, from 1995 through 2002?

3           Answer:  We grew.

4           And was it your practice to grow?

5           Answer:  Yes.

6           Again, they built the Hyde County farm.  Total

7   construction cost was $75 million, approximately.  How many

8   birds did they add?  They added three and a half million

9   layers in Hyde County, North Carolina.

10          The Certified Program, it has the restrictions on

11  growth.  And Rose Acre, you heard, spent upwards of

12  $140 million during this conspiracy period to grow, and they

13  grew constantly.

14          They added 9 million hens from 2002 to 2014.  They

15  built the Hyde County farm, a new greenfield facility.  They

16  expanded their cage spaces in many existing farms.  They built

17  new layer houses at existing facilities.  They expanded

18  acquired farms.  They bought farms.  And they announced in

19  October 2014, plans for a new facility in Arizona.

20          And you heard Dr. Jesse David, the other -- the

21  third economist who testified.  He said:  Well, the obvious

22  conclusion is that Rose Acre grew more; not just more than

23  what the rest of the industry was doing, but that Rose Acre

24  grew more than what Dr. Rausser said the industry should have

25  done if there had been no conspiracy, as they allege.

1          And he had this graph.  It's another squiggly-line

2    graph.  And if you look at this graph carefully, you can see

3    the black line here.  The black line on the bottom is the

4    flock size that actually -- the growth in the flock size that

5    actually occurred over the period from 2000 to -- it looks

6    like 2014.

7          In the green line, the next line, is what

8    Dr. Rausser projected the growth should have been in his

9    but-for world.  Growth was at 13.3 percent.  He predicted that

10   it should have been at 20.8 percent.

11         In the blue line, Dr. Rausser criticizes that:  Oh,

12   they're -- it includes acquisitions and contracts of existing

13   farms.

14         Okay.  We'll take that out.  We'll take that out.

15   Even then it's 33.3 percent.  Rose Acre grew.

16         Briefly, I'll talk about the short-term supply

17   recommendations.  There isn't much to talk about with Rose

18   Acre because they didn't do one.  Not one.  Not all this stuff

19   you heard about early molts, early slaughters.  Chick hatch

20   reduction.  Not a single one did Rose Acre do.  Didn't make

21   sense.

22         Mr. Rust said:  You know, to me, it was dumb.

23         Didn't fit within their business model.  You molt

24   hens early, they're going to produce more eggs later.  You pay

25   now or you pay later.  It doesn't make any sense.  Thought it

1   was stupid.  And they didn't do it, more importantly.

2           Mr. Hurd said the same thing.  They didn't do it.

3   No, we have not.  No, we have not.  No, we have not, with

4   respect to each of these supply recommendations.  The person

5   who's responsible for managing the flocks at Rose Acre.

6           Let's talk about the exports.  Again, you heard Rose

7   Acre joined USEM in the end of 2006.  They joined because they

8   expected, anticipated that, as the Hyde County farm came

9   online, they were going to have more surplus eggs.  And Hyde

10  County is on the coast, and they thought they might be having

11  an opportunity to export those surplus eggs.  They had one

12  house built in 2006, they kept building it out, and they were

13  planning for possibly more exports.  But they had surplus

14  eggs.  They always have surplus eggs.

15          Greg Hinton said:  Every year, have there ever been

16  any years when you've been the vice president of sales at Rose

17  Acre when Rose Acre did not have surplus eggs at certain times

18  throughout the year?  No, sir.

19          They were surplus eggs, and they wanted a way to

20  sell them because they can't sell them to any new customer.

21  No one else is going to buy them.  They want to get rid of

22  them.  Sell them or smell them.

23          You heard a lot about what -- that Rose Acre could

24  have sold these eggs for a higher price.  To whom?

25  Where's the customer who's going to buy these eggs for a

1    higher price?  That's the whole point of surplus eggs.

2    There's nobody to sell them to.

3          They said, well, you sold them to somebody else for,

4    you know, double the price.  Well, are they going to buy them?

5    Did they produce or show any evidence of a willing buyer who

6    would have bought these eggs here domestically for that price?

7    There's only so many eggs some of these buyers are going to

8    buy.  They don't need every egg Rose Acre produces.  They're

9    not going to buy them.

10         Marcus Rust said:  To your knowledge, did Rose Acre

11   ever sell an egg in a USEM export for a loss?

12         Not at a loss compared to what we could have got

13   someplace else.  If he had the ability to sell them someplace

14   else, he would have, but he didn't, because they're surplus

15   eggs.  That's the definition of them.

16         And you saw their variation of this scattergraph,

17   these dots, that Dr. Saioc prepared.  Dr. Saioc works for

18   Dr. Rausser.  He's also a Ph.D.; he had to get a Ph.D. to do

19   this and come up with all these scatter dots.

20         And you heard from Greg Hinton that Rose

21   Acre's summaries are not reliable.  They don't include all the

22   price that -- of the USEM export.  They don't include freight.

23   Some of the black dots include freight.  Some of the black --

24   but the red dots don't.

25         And they compare different kinds of customers.  They

1    compare customers who buy like 200 cartons versus, you know,

2    the much larger sales that went through the USEM exports.

3    Some mom-and-pop grocery store, or a bakery buying these eggs

4    compared to the larger exports.  Yeah, they pay a higher price

5    because they're not buying in volume.

6              And if you look through all those summaries,

7    where -- where's the Walmart?  Where's Kroger?  Where are the

8    others who buy in bulk?  Compare them to those prices.  We

9    don't have that.  They didn't -- we didn't see any of that.

10   But the bottom line is, as Greg Hinton said, these are not

11   reliable.  They don't reflect what actually occurred in Rose

12   Acre.

13             The Certified Program.  Why did Rose Acre join the

14   Certified Program?  You heard from multiple witnesses Rose

15   Acre joined the Certified Program to satisfy customer demand.

16   And you heard that Rose Acre was following the animal welfare

17   protests that were happening in Europe in the mid to late

18   '90s.

19             You heard from Greg Hinton that he -- that he

20   attended an International Egg Commission in 1996 where he

21   actually saw protests over egg-laying hens and use of cages.

22   And they were concerned about it.  They started monitoring it.

23             But what did it for Rose Acre is that in the summer

24   of 2000, one of its trucks was firebombed at its Jen Acres

25   farm in Indiana.  And on the walls of one of the buildings was

1   spray-painted:  polluter, animal exploiter, your turn to pay,

2   ALF, the Animal Liberation Front.

3          You're the owner of a business.  You're the

4   executive of the business and one of your trucks gets

5   firebombed.  You see this on the walls of one of your

6   facilities.  What are you thinking?  Oh, this is really not

7   that big of a deal?  It's a big deal.  The safety of your

8   employees are at risk.

9          Rose Acre becomes concerned.  It knows about what

10  UEP is doing; that UEP is in negotiations with FMI to create

11  an Animal Welfare Program.  But what turned it for Rose Acre

12  and why it decided it had to join the UEP and why it had to

13  join the Certified Program were two reasons:  Walmart and

14  Kroger.

15         Greg Hinton took the stand.  He testified under oath

16  and he told you that early 2002, Country Creek, the buyer for

17  Walmart said Walmart is going to demand its suppliers be on

18  the Certified Program.  You've got to join.  Kroger told him

19  the same thing.  Greg Hinton meets with Marcus Rust, they

20  confer and said we've got to join the UEP.  We've got to join

21  the Certified Program or we're going to lose these customers,

22  two of our biggest customers.

23         Here's what Greg Hinton said:  And do you know why

24  Rose Acre joined the UEP and then ultimately the Certified

25  Program?

1          Answer:  Yes, sir.

2          Question:  Why?

3          Um, because our customers required us to.  And if I

4   wanted to keep the customers that we had, I had to join the

5   program.

6          Question:  Now you mentioned a little bit ago that

7   you understood that, through Country Creek, that Walmart was

8   going to require the suppliers to be a member of the Certified

9   Program?

10          Answer:  Yes, sir.

11          Is that one of the customers, Walmart?

12          Answer:  Yes.

13          And who was the other customer?

14          Kroger.

15          So Country -- so in 2002 Country Creek -- the fall

16   of 2002, Country Creek starts communicating with its

17   suppliers, including Rose Acre, and says, hey, we've got to

18   come up with a cost now to comply with the Certified Program.

19   We know it's going to cost you some, we need to come up with a

20   cost.

21          And by January of 2003, they come up with a cost.

22   Gentlemen, good news.  Walmart has notified us today that they

23   will be giving a 2 cent adjustment in your egg prices to

24   adjust for the additional costs associated with the Animal

25   Care Program.  It happened almost immediately after joining

1    the Certified Program.

2            2003, at the time Kroger was buying its eggs through

3    Pace Dairy -- excuse me -- and they agreed to amend the

4    contract to cover the costs for Rose Acre to comply with the

5    Certified Program.  Customers are demanding it.  Walmart and

6    Kroger are demanding it.

7            And then it turns out afterwards, many other

8    customers of Rose Acre demanded it.  We went through with Greg

9    Hinton, again, it's a who's who:  Costco, Walgreens, Nestle,

10   Kraft, et cetera, et cetera.  They all require their producers

11   to supply eggs that comply with the Certified Program.

12           You also heard another reason why Rose Acre -- it

13   was important for Marcus Rust to join the Certified Program.

14   He wanted to save cage production.  He wanted to save that.

15   It's a battle he said he's lost now because everyone's going

16   cage free.  But he thought cage production was the most

17   efficient, most cost effective, and the best way to raise hens

18   for egg production.

19           He saw what happened in Europe.  Europe got rid of

20   cage production.  He didn't want to see that here.  He wanted

21   to defend that and hopefully keep our right to produce eggs

22   from cages.  That was one of his chief goals in joining the

23   Certified Program, that we have to do this, times have

24   changed, and we need to change with it.

25           And you heard yesterday, Ah, Marcus Rust, he was

1    more concerned about Michael Foods, about, you know, leveling

2    the playing field.  And yeah, that's true.  Michael Foods, at

3    the time, one of the producers, was thinking about joining --

4    was considering joining the Certified Program.  They had to,

5    as you heard.  Terry Baker said they had to because of

6    Walmart.  Walmart was demanding it.  So they decided they've

7    got to join the Certified Program, and they were going to get

8    a special deal.

9           They wouldn't have to -- have to abide by the cage

10   space restrictions on the same timeline as Rose Acre had to,

11   and others who joined the program.  And Marcus Rust thought

12   that was unfair.  Wait a minute.  This is a voluntary program.

13   You don't have to join.  But if you're going to join, you need

14   to abide by the program.  That's what he was concerned about.

15          Yeah, he was concerned that Michael Foods would

16   undercut him in price.  But what does that have to do with a

17   conspiracy to reduce supply; that Rose Acre's concern about

18   one of its competitors not having to live by the same

19   standards and comply with the same requirements that they had

20   to.

21          His view, if Michael Foods wants to do this, then

22   they've got to be all in.  If they don't want to join, they

23   don't have to join.  But if they're going to join, why do they

24   get a benefit?  Why do they get a different schedule?  That's

25   what his concern was.

1          But also Rose Acre, Marcus Rust, Rose Acre was

2     concerned about companies trying to join the Certified Program

3     that would be able to keep eggs -- produce eggs that weren't

4     compliant with the certified standards; having two sets of

5     standards for one company that allegedly had become part of

6     the Certified Program.  And what he said then, in 2005, he

7     made it known during a meeting at the UEP that the Certified

8     Program is not an economic tool.  It should never be used as

9     an economic tool.

10          And this is what he said.  Excuse me.  This is what

11     Roger Deffner said in June 2005, another member of the UEP who

12     was serving with Marcus Rust.  And he e-mailed Marcus Rust in

13     June 2005, and he said:  Marcus, I want to take a minute to

14     thank you for voicing the position that many of us agree with

15     regarding using the ACC program, the Certified Program, as an

16     economic tool.  I could not agree with you more, and I will do

17     everything I can to be sure this does not happen on my farm.

18          And then what did Marcus Rust say here on the stand?

19     He said:  I was adamantly opposed to it, the use of the

20     Certified Program as an economic tool, because you know why?

21     We were taking the program that was designed to be an animal

22     welfare program and trying to attempt to make it into an

23     economic program, and that was a no-no for me.  There's no

24     inconsistency.  What he said in 2005 is exactly what he said

25     here in 2018.

1          So what did Rose Acre do in response to Certified

2    Program?  It planned for it.  It knew it was going -- it knew

3    that it was going to lose hens if it didn't do anything.  You

4    pull a chicken out of a -- out of a cage, you're going to have

5    less birds per cage, you'll have less birds per house, and

6    they have to satisfy their customers.

7          So they started looking at it, back in 2002.  Right

8    after they joined the program they started studying, what's

9    the effect of the program going to be?  Because they need to

10   overcome it.  They need to grow in response to it.  And you

11   saw this chart.  They start looking at it in 2002, and lo and

12   behold, by 2008, they had grown.  They grew their hen layers

13   by 15 percent in order to address the shortfall that they

14   would get if they didn't do anything because they hadn't

15   complied with the Certified Program.

16         And what did Marcus Rust say here on the stand in

17   response to questions from Mr. Neuwirth?  He said:  What

18   Mr. Neuwirth here is failing to understand is we had to spend

19   lots of money to build extra facilities so we could produce

20   more eggs out of those other farms to make up for the birds

21   that we pulled out of the first group of houses.

22         And then Dr. David, what did he say with respect to

23   what Rose Acre did in response to the Certified Program?

24   Tried to keep its customers, responding to customer demand.

25   Rose Acre's actions were consistent with its individual

1    economic interest and inconsistent with participation in a

2    conspiracy to reduce supply.

3              Now, you heard -- you heard this during

4    Mr. Marcus -- Mr. Marcus Rust's testimony, you heard it again

5    yesterday.  There were a couple of letters that the general

6    counsel of Rose Acre sent to the Department of Agriculture in

7    2007.

8              And Mr. Neuwirth suggested, oh, Rose Acre wasn't

9    really growing.  Despite all the data we saw and the graphs we

10   saw, the numbers don't lie.  Rose Acre grew.  He said, well,

11   they're telling the Department of Agriculture something

12   different.  No, they're not.

13             Rose Acre, in the letter to the Department of

14   Agriculture, is telling the Department of Agriculture what the

15   effects of the Certified Program are.  The effects of the

16   Certified Program are you're going to pull hens out of cages

17   and you're going to have fewer hens per cage, fewer hens per

18   house if you don't do something.  You lose birds.  Rose Acre

19   studied this.  It's a fact.

20             That's all Mr. Miller was saying, to comply with the

21   requirements of the Certified Program, you have to reduce the

22   number of birds per cage, which is amounted to a reduction of

23   literally millions of birds from our operation.  That is true.

24   They studied it.  It results in the loss of birds.

25             He didn't explain, yeah, and we had to spend a whole

1    bunch of money and expand and grow and acquire new farms.

2    He's talking about the effects of the Certified Program.

3    Which everyone agrees, the Certified Program results in a loss

4    of birds if you don't grow.

5           This is simple.  This is a graph I used during the

6    opening statement.  The Certified Program, the cage space

7    requirements.  You pull birds out of the cages, out of the

8    houses, you have fewer birds.  It's this left side -- it's

9    this left side of the graph that Mr. Miller's talking about.

10   That's the effect.

11          This is what we've heard Plaintiffs spouting the

12   entire trial about Don Bell.  This is what Don Bell was

13   saying:  You reduce the number of hens per cage, you're going

14   to reduce -- you're going to reduce your population of hens.

15   It's not -- you don't have to be a Ph.D. in economics to

16   understand that.

17          The same thing with the Kraft letter and the Cracker

18   Barrel e-mail that Mr. Neuwirth pointed out.  Where the letter

19   to Kraft back in 2007, complying with the new UEP Animal Care

20   Certified guidelines has caused a decrease in their overall

21   bird numbers and resulted in increase of production costs.

22          It did.  That's the effect.  It increased their

23   costs.  The new Animal Care Certified Program means less birds

24   per house, which will lower overall production.  That's what

25   the program does.  That's what Rose Acre said to Cracker

1    Barrel.  They're just describing:  We've got this program.

2    These are the effects.  We're incurring a lot of costs to

3    overcome it.

4            The bank presentation, you heard about this bank

5    presentation that Rose Acre presented in 2007 where they talk

6    about the effects of the Certified Program.  You're right,

7    they're talking about the effect of the Certified Program.

8    They need money to grow.  They need money to open up Hyde

9    County.  They're showing the effects of the Certified Program.

10           This isn't a mystery.  This isn't Rose Acre talking

11   out of both sides of its mouth.  We need to grow because the

12   Certified Program is reducing the number of hens per cage.

13           Finally, you heard a little bit about John Rust's

14   e-mail.  You heard from Marcus Rust that he and his brother

15   John got -- disagreed a lot.

16           John Rust, while a member of the Rust family, did

17   not have any role in the UEP.  Didn't have any role in the UEP

18   -- no, excuse me -- in egg production.  Didn't participate in

19   any UEP meetings.  Had no role with regard to the Certified

20   Program.

21           And he had concerns about the Certified Program.  He

22   had concerns about animal rights activists.  And he thought:

23   We either ought to be cage free or cage.  He thought the whole

24   cage density thing was silly.

25           Marcus Rust disagreed.  Marcus Rust, who's the head

1    of the company, who actually runs egg production, who oversees

2    the hens, who participates in the UEP, who was administering

3    implementation of the UEP Program, he disagreed.  He said

4    that, plain and simple.

5          We have to have a defensible dimension that bears

6    out the numbers so we can prove we are not hurting the bird,

7    which is something around 63 to 70 is a very defensible

8    position, scientifically and numerically provable.

9          60 and under is not definitive.  Higher mortality

10   rate and less production per chicken.  We can defend the

11   67-inch and justify pricing to consumer.  Egg market is not

12   high -- this is in 2007.  It's not high because it reduced

13   birds because of the economic meltdown we had.

14         Sure, John said it.  Marcus disagreed.  Marcus, the

15   one who's in charge of running the operation, disagreed.

16         The third question you have to answer is whether

17   these restraints -- whether conspiracy imposed an unreasonable

18   restraint on supply.  Unreasonable.  What's an unreasonable

19   restraint on supply?

20         Jury Instruction Number 13 the Court will give you,

21   and it says:  You must therefore determine whether the

22   restraints challenged here, the three, the UEP Program, the

23   early molt-and-slaughter recommendations, and the USEM

24   exports, are together unreasonable.  Are they, together,

25   unreasonable?

1           And on this, Jury Instruction 18 talks about

2   something known as the Rule of Reason.  You have to balance

3   the competitive harm.  You've heard all kinds of claims of

4   competitive harm related to this conspiracy of the Certified

5   Program, and look at the competitive benefits.  It's up to

6   Plaintiffs to prove that the competitive harm outweighs the

7   competitive benefits.  And you balance them.

8           Well, let's look at some of the competitive benefits

9   of this alleged conspiracy.  In terms of competitive benefits,

10  Jury Instruction 17 says:  You can look at -- in considering

11  whether the challenged restraints benefitted competition, you

12  may consider various factors, including, but not limited to,

13  whether the challenged restraints were demanded by customers,

14  increased production, decreased prices, or improved quality.

15          Well, what do we know?  Certified Program, customers

16  demand it.  They want it.  They want it to this day.  We heard

17  from Dr. Armstrong, the program increased production.  Get

18  better-quality eggs.  It decreased mortality.  And you've got

19  a new product that customers demanded:  Certified egg.

20          Customers wouldn't be demanding it if it wasn't

21  something that they wanted.  They wanted this new product.

22  And that's what you got out of the Certified Program.

23          And, in fact, you heard that states now recognize

24  the benefits of the Certified Program.  Arizona and Washington

25  passed laws that require their egg producers not just to meet

1    certain cage space density requirements, they require

2    producers to satisfy the UEP Animal Husbandry Guidelines.

3    They expressly adopted those requirements.  It's become the

4    standard in the industry.

5           And you heard from Dr. Rausser -- you heard from

6    Dr. Rausser:  Wait a minute.  Wait a minute.  These couldn't

7    have had any effect on egg prices or egg production because

8    they didn't go into effect until way in the future.

9           Well, what's going on with cage free?  Cage free --

10   cage free, Marcus Rust testified that egg customers are going

11   cage free by 2022 to 2025, and they're building facilities to

12   this day to satisfy that, even though it's in the future.

13   Just because it's not into effect yet doesn't mean producers

14   aren't going to plan for it.  And that's what happened in

15   response to the state laws.

16          Well, Plaintiffs make a lot of complaints about the

17   100% rule.  They say:  Well, listen, in look -- balancing this

18   stuff out, in looking at the competitive benefits and the

19   alleged harm, you didn't need the 100% rule.  The 100% rule

20   was too restrictive.  You didn't need to have that in order to

21   satisfy the benefits that you claim that you want.  The 100%

22   rule.

23          Ladies and gentlemen, the 100% rule was in place

24   because it was to maintain the integrity of the Certified

25   Program.  It made no sense.  You could not claim, as you heard

1    witness after witness say, that you are in favor of animal

2    welfare if you're treating some hens differently than others.

3    For some customers, you're going to stuff as many hens as you

4    want into the cages, but for others, you'll provide more

5    space.  It's the same chicken.

6             And what Jury Instruction Number 17 says, that --

7    what the Plaintiffs argue, is that the 100% rule was overly

8    restrictive.  It says that:  If the Direct Purchaser

9    Plaintiffs proves that the same benefits could have been

10   readily achieved by other reasonable, available, alternative

11   means that create substantial less harm to competition, then

12   they cannot be used to justify the restraints.

13            And they're saying the 100% rule is too restrictive.

14   Well, what did Dr. Armstrong say?  He said:  We felt minimum

15   guidelines should apply to all birds.  Dr. Armstrong, the head

16   of the Scientific Advisory Committee, Plaintiffs now chastise

17   because he got -- he got paid, in part, for being a consultant

18   for UEP.  Over the period 1999 to 2011, I think he made, what,

19   upwards of $50,000 during that whole time period?

20            Dr. Walker -- Dr. Rausser's been in this courtroom

21   just about every day at $850 an hour, and he probably made

22   more during this trial than Dr. Armstrong made in 12 years.

23            FMI thought the 100% rule was the right thing to do.

24            You can play that video.

25            (Video excerpt played.)

1          Question:  Did FMI consider guidelines that were

2    required to be implemented on less than 100% of production

3    houses to be weaker than the UEP guidelines?

4          Answer:  If you mean 100% of the houses for

5    egg-laying hens that -- whose products -- whose eggs were

6    going to be divided into two different channels, and the

7    animals whose -- whose eggs are going into shell eggs, and

8    those were the animals whose handling was going to follow the

9    UEP guidelines, and the other animals who the eggs were going

10   into manufactured product, those animals' handling was not

11   going to be following the UEP guidelines.  That was a concept

12   that we would not agree with.

13          You can't treat the same birds differently just

14   because you have different customers.  That was the whole

15   point.  Otherwise, you're undermining the integrity of the

16   Certified Program.  Marcus Rust thought it was the right thing

17   to do, the 100% rule was the right thing.

18          In an e-mail he wrote back in 2005, and he said it

19   pretty colorfully, talking about Sparboe:  McDonald's money in

20   one hand, Michaels money in the other; a whore for sale at

21   whatever price for whatever the fantasy.

22          I never thought I would see Bob -- Bob Sparboe stoop

23   so low.  You're either in favor of animal welfare or you're

24   not.  Doctor -- or, excuse me.

25          Marcus Rust said at trial:  What are you talking

1    about there?

2              Answer:  Sparboe was selling eggs from 45-inch birds

3    to Michaels, and they was selling and proclaiming it to be an

4    animal rights company to McDonald's.

5              The hypocrisy.  And Marcus Rust knew that some day,

6    you're going to get found out; claiming that you're a

7    certified producer, but for other customers, you're not

8    treating your hens humanely.

9              Bob Krouse said the same thing; the 100% rule was

10   the right thing to do.  You can't say we're kind of half

11   animal welfare and we're half not.  You should be treating all

12   of your birds under these guidelines.

13             And about Michaels Foods, Michael Foods wanted this

14   special deal whereby they could sell non-certified eggs but

15   still be part of the Certified Program.  Marcus Rust didn't

16   think that was the right thing.

17             You just can't be part of an animal welfare program

18   and not treat your animals the same, sir.

19             He believed that.  But if there's any evidence why

20   the 100% rule was essential for the integrity of the program,

21   it was shown by the first witness that Plaintiffs called to

22   the stand, Garth Sparboe.  And that's the Sparboe story.

23             If you remember, Sparboe, although they were an

24   original member of the UEP Certified Program, they dropped out

25   of the UEP in 2005 and they dropped out of the Certified

1   Program in 2005 and they established their own competing

2   program.

3           Their own competing program, this process verified

4   program that included all the elements of the Certified

5   Program except one; the 100% rule.  They wanted that

6   flexibility to have different treatment of hens for different

7   customers, and they went off on their own.  And from 2005 to

8   2011, they did that.  They had their own program.  They

9   supplied their customers.

10          But in 2011, ABC, 20/20 -- you heard from

11  Garth Sparboe about this -- they ran a story, a story that

12  showed at one of Sparboe's farms, employees mistreating hens.

13  Animal cruelty at one of their farms.  Overnight, overnight,

14  literally, Sparboe lost McDonald's.  They lost Target.  It was

15  a crisis.  And what did Sparboe do?

16          Beth Schnell, the sister of Garth Sparboe, came back

17  to the UEP, hat in hand.  And what did she say in her letter

18  back in December of 2011?

19          The resulting media and customer response has been

20  overwhelming to our company.  This has been a very painful

21  lesson.  We would like to get our operations audited and

22  approved for the UEP Certified Program as soon as possible.

23          They came back.  They understood why this 100% rule

24  was necessary.  The fear that Marcus Rust and others had, as

25  to what would happen if you didn't comply with the 100% rule,

1  came true for Sparboe.  And Sparboe, today, is a member of the

2  UEP Certified Program.

3          Backfilling.  I'll just touch upon this very

4  quickly.  Again, this was recommended by Jeff Armstrong,

5  Dr. Armstrong, head of the Scientific Advisory Committee.

6          He thought the Scientific Advisory Committee was

7  extremely concerned about the industry's current practice of

8  backfilling.  There was potential for disease.  There was

9  potential for pecking -- pecking order and cannibalism by

10  introducing new hens.  And they recommended that the animal

11  welfare program include a ban on backfilling.  It was all

12  based on science.

13          The final question you have to answer, the final

14  question you have to answer under this verdict form is whether

15  you unanimously find, by preponderance of the evidence, that

16  conspiracy injured the Direct Purchaser Plaintiff Class.

17          You heard that Walmart's a member of this Class.

18  Are they injured?  They've asked for this.  They wanted this.

19  Demanded this.  Walmart, again, one of the largest companies

20  in the world.

21          Not only did they want the Certified eggs, they were

22  a champion of the Certified Program very early on.  There's a

23  piece of evidence that I'm not sure whether we focused on

24  enough during the trial.

25          Beth Schnell, again, the president of Sparboe,

1    around the time that they're getting out of the UEP, the UEP

2    Certified Program, she goes down to Arkansas and visits with

3    the egg buyer at Walmart, and she's trying to sell them.  Hey,

4    we're going to do an alternative program that we think is just

5    as good as the Certified Program, except we don't have the

6    100% rule, and we'd like to sell you eggs.

7             So she went down there to talk.  And she reported

8    back.  She writes an e-mail that she reports back, an e-mail

9    that ultimately gets forwarded to Terry Baker, one of the

10   witnesses here, at Michael Foods.

11            And what does she say about Walmart's commitment to

12   the Certified Program back in 2005 in her report?  She says,

13   Gary Pickett, the category manager at Walmart, routinely

14   referred to Walmart's commitment to the UEP Program.  Clearly

15   Walmart is a giant in egg sales.  Gary clearly understands his

16   power -- his power to influence the industry participation in

17   the ACC program, the Certified Program.  He said that Walmart

18   and Kroger will push the program through and force compliance

19   from producers.

20            She said that Walmart was intensely committed to

21   using the seal; that Sparboe was the only "divisive company"

22   because they were dropping out of the Certified Program.  They

23   hammered on the fact that they want the logo, the Certified

24   Program logo.

25            And then she concluded:  Walmart's militant

1    commitment to the UEP Certified Program mission and use of the

2    logo.  I have never -- this is her words -- I have never

3    witnessed a program -- excuse me -- never witnessed a customer

4    with such devotion to a program.  That's Walmart.  The largest

5    member of this Class.

6              But the real damages story is with the experts,

7    Dr. Rausser versus Dr. Walker.  You heard yesterday they've

8    been battling reports for years.  Yes, no, no, yes.  You're

9    right, you're wrong, you're wrong, you're right.

10             And Dr. Rausser concludes that the U.S. flock size

11   would have been 6.1 percent larger but for the supply

12   recommendation, this conspiracy.  He believes that the larger

13   flock size would have resulted in 4.3 percent more eggs

14   produced, and he believes that there was an overcharge; that

15   the members of the Class were overcharged during the Class

16   Period by 19.81 percent.

17             And you heard Dr. Walker, who was here on the stand.

18   He says that Dr. Rausser's opinions don't reflect the real

19   world, his opinions are not reliable, they're biased, and that

20   he improperly included information, data after 2008, a

21   contention that, at the end of the day, was never rebutted by

22   Dr. Rausser's two visits to the stand.

23             What did Dr. Walker say?  Well, he found a number of

24   things with respect to Dr. Rausser's opinions.  And picture a

25   Scale of Justice, right?  You saw it at the very beginning of

1    my opening.  You've seen it.  A lot of us have used it, the

2    Scale of Justice.  Dr. Rausser puts his finger on the scale in

3    his analysis.  And how does he do that?  He does it in two

4    ways.  Two ways.  One he uses the wrong benchmark period.

5            Now, maybe you got this, and I apologize if I'm

6    repeating it, if you already understand it, but this is what

7    Dr. Rausser does.  He comes up with a benchmark period, all

8    right, a representative period that he finds before the

9    conspiracy, and then he compares egg prices and flock sizes

10   before that benchmark period.  Actually, this one has to do

11   with egg prices, looks at egg prices before this conspiracy

12   period, finds a representative period and a benchmark period,

13   and he compares that benchmark period prices then to the

14   prices during the alleged conspiracy period.  And based on

15   that, he comes up with a 19.81 percent overcharge.

16           And the benchmark period that he uses before the

17   conspiracy, if you can look on this graph, is from 1997 to

18   2000.  The first question:  Why in the world is he using 2000?

19   Here's his timeline.  His timeline.  He says the supply

20   recommendations began in 1999.  He picked 2000.  In fact, how

21   many times in this case did Plaintiffs pull out documents,

22   United Voices newsletters, from 1999?  Say, look at this, this

23   shows the conspiracy.  Look at this.  1999.

24           It's not what Dr. Rausser did.  Do you know why?

25   Because if he would have started the conspiracy period in

1    1999, like he does with his timeline, like the Plaintiffs did

2    with their evidence, there's no overcharge.  His 19.81 percent

3    overcharge that he used in his analysis disappears if you

4    start the conspiracy in 1999.  To comport with his own

5    timeline, to comport with their evidence.  That's finger one

6    on the scale.

7         What else did he do?  He examined the wrong period

8    after the conspiracy.  He looked at information going all the

9    way to 2013.  2013.  I thought the Class Period ends in 2008.

10   We heard that multiple times, 2008.  He skipped over that.

11   Ah, I'm going to go to 2013.  Well, why would he do that?  I

12   thought we were talking about 2008?  Because if he looked up

13   to 2008, his overcharge disappears.  Egg prices were

14   3.5 percent lower if he goes to 2008.

15        Dr. Rausser -- Dr. Rausser's opinions are not

16   reliable.  They're biased.  He had a mission, the mission was

17   to come up with a conclusion, and he came up with one.  And he

18   skewed the result.

19        Let's look at his flock model.  Dr. Rausser, you saw

20   these squiggly lines.  We heard lots of testimony, lots of

21   questioning of Dr. Rausser and both Dr. Walker about all these

22   squiggly lines, these squiggly lines that show that, according

23   to Dr. Rausser, the nation's flock size would have grown by

24   this much, and had there not been this conspiracy.  The red

25   line on this graph shows what Dr. Rausser projects the hen

1    population would have been, and then the blue line shows what

2    actually happened, okay.

3            We saw, heard lots of questioning about various

4    dates.  And Mr. Neuwirth put little lines over part of the

5    squiggly lines, you know, during the conspiracy period.  What

6    he didn't really point out is, wait a minute, wait a minute,

7    this is the -- here's the period up to -- that's being looked

8    at here up to 2000 to 2008, all right.  But if you look at the

9    lines, the blue and red lines during this conspiracy period,

10   when all this stuff is going on, 2001, 2005, 2006, Certified

11   Program, exports, reduced flock and hatch supply

12   recommendations, nothing's happening.  Nothing's going on.  It

13   isn't until 2007 when you actually see something, according to

14   Dr. Rausser's analysis.

15           But the only thing that's going on in 2007, the

16   Certified Program's been in existence since 2002.  The only

17   thing that's going on are these exports.  And exports don't

18   reduce flock size.  You're exporting eggs, you're not reducing

19   your hens.  You're just selling eggs internationally.  None of

20   this makes sense.  You heard Dr. Walker say it.  And none of

21   this stuff, none of this stuff, all of these supply

22   recommendations, all of these exports, these supply

23   recommendations, Rose Acre's not doing a single one.

24           Also, Dr. Rausser says that when he did his

25   analysis, he took into account all the various prices, all the

1   various inputs that go into egg prices, all the things that

2   would affect egg prices:  labor costs, fuel costs, grain cost,

3   et cetera, et cetera.  He said I have I've accounted for

4   everything.  I've accounted for everything, everything that

5   can affect egg prices.  Is that true?

6          Dr. Walker said, No, you didn't.  You didn't take

7   into account the fact that cage spaces were going to be

8   reduced, whether -- whether you had the Certified Program or

9   not.  McDonald's proved that.  FMI's work proved that.  Burger

10  King proved that.  You didn't take any of that into account.

11         You didn't take into account environmental activism.

12  You didn't take into account state laws, that states were now

13  requiring this.  You didn't take into account increased animal

14  welfare activism.  You didn't take into account growth of

15  non-USEM exports.  You didn't take into account the Great

16  Recession, one of the greatest economic calamities in our

17  lifetime, which happened right around 2007, 2008, 2009.  And

18  you didn't account for the egg price collapse, the price of

19  eggs collapse in the 2005, 2006 time period.  None of this was

20  taken into account.

21         So what do Plaintiffs have?  Their burden of proof,

22  as Mr. Callow said, we didn't have to do anything.  We could

23  have sat there during this whole trial and done nothing.  It's

24  not our burden.  It's their burden.

25         So what do they have?  They've got these UEP

1    statements, they've got United Voices newsletters, which are

2    not admissible to show the truth.  They're only admissible for

3    a limited purpose.  They have Dr. Rausser, and then they have

4    a bunch of evidence that they mischaracterize, misrepresent.

5    They provide half truths.  They only give you half the story

6    on certain things.  Distortions.

7         And what else did you hear from the Defendants'

8    side?  You heard about customer demand, you heard about

9    growth.  Rose Acre grew.  You heard about the Certified

10   Program was not an economic tool; that Rose Acre and others

11   didn't do any supply recommendations.

12        You heard about sales of surplus eggs.  You heard

13   about -- you heard from Plaintiffs' fact witnesses who weren't

14   offering testimony that was consistent with their theories.

15   And then you heard that Dr. Rausser's conclusions are biased

16   and unreliable.

17        There was no conspiracy, ladies and gentlemen.

18   Marcus Rust made that clear.

19        Mr. Rust, did Rose Acre ever agree with any of its

20   competitors to reduce egg supplies?

21        Answer:  Never.

22        Greg Hinton.  Mr. Hinton, just a final few

23   questions.  You've been with Rose Acre for 38 years.  During

24   that entire time period, did Rose Acre ever once agree with

25   any of its competitors to reduce egg supplies?

1          Answer:  No, sir.

2          Did Rose Acre agree with any other egg producer to

3    join the Certified Program?

4          Answer:  No, sir.

5          There's no evidence of a conspiracy.  They grew

6    consistently.  The national flock size grew.  Rose Acre's own

7    flock size increased.  Egg production increased.  Egg prices

8    decreased, and the Certified Program was demanded by

9    customers.

10          This is my last time to talk.  After I sit down, in

11    a few minutes, Plaintiffs are going to get their opportunity

12    to come up.  Mr. Neuwirth's going to come up and give a slight

13    rebuttal.  But when he's talking, I want you to ask yourself

14    what you've heard about Rose Acre.  Does Rose Acre exhibit the

15    signs of a company that's engaged in a conspiracy?

16          You heard a new theory yesterday for the first time.

17    You heard Mr. Neuwirth say, Well, they might have grown, but

18    they didn't tell everybody they were growing, they were trying

19    to keep that hidden to take advantage of high egg prices.

20          What?  What?  Through the letters to the Department

21    of Agriculture, they're engaged in a conspiracy and they're

22    writing the U.S. Government?  They're telling their customers

23    this?  This doesn't make any sense.  And if they're growing,

24    if they're growing, how are they part of any conspiracy?  How

25    are they part of any agreement to reduce supply when they're

1    not doing it?  They're not reducing supply, they're increasing

2    supply.

3            Rose Acre isn't a company that's engaged in

4    conspiracy.  They grew.  They spent over $100 million.

5            It's not a company that's engaged in a conspiracy.

6            And when you look at -- you look at the elements of

7    this three-legged stool, Certified Program was not part of any

8    conspiracy, exports weren't any part of any conspiracy, the

9    supply recommendations weren't part of any conspiracy.  The

10   conspiracy, this overarching conspiracy that they allege, that

11   they have the obligation to prove, collapses.

12           We've been together for five weeks.  And for you,

13   this case is five years old.  For Rose Acre, it's ten years

14   old.  They've been having to live with these allegations,

15   these accusations that they violated the law for ten years.

16           And sitting back here during most of this trial have

17   been Rose Acre employees, have been members of the Rust family

18   who have been under tremendous pressure by these allegations,

19   whose ethics, integrity have been challenged, have been under

20   assault by these allegations in this case.

21           Rose Acre firmly believes it didn't do anything

22   wrong.  You heard from witnesses from producers who settled,

23   who resolved the case, didn't want any part of this.  Not Rose

24   Acre.  Rose Acre wanted its day in court.  It wanted to be

25   able to show that it wasn't doing anything to violate the law,

1    it was doing things to satisfy its customers.  It was growing

2    its business.  It wasn't out to join with its competitors to

3    reduce supply.  It never reduced supply.

4           Five weeks from now, this case will be, probably,

5    hopefully, a distant memory, a faded memory.  Court will be on

6    new cases, we'll be on doing other things.  But what you do in

7    that deliberation room will forever impact this company.  It

8    will forever impact Rose Acre.  It will forever impact members

9    of the Rust family.  This business, this business which was

10   founded for the past 50 or 60 years, is now in your hands.

11          When you go back to that -- back to your

12   deliberation room, just like Mr. Callow said, that first

13   question, that first question asks whether you find

14   unanimously, all 11 of you, by preponderance of the evidence,

15   that there was overarching conspiracy to reduce supply.  And

16   we would ask, that after you consider all the evidence, that

17   you would mark that answer "no."  If you mark that answer

18   "no," you're done.  We're done.

19          We ask, ladies and gentlemen of the jury, in the

20   name of fairness, in the name of justice, you return a verdict

21   in favor of the Defendant Rose Acre Farms and against the

22   Plaintiffs.  Thank you.

23          THE COURT:  Thank you, Mr. King.

24          Mr. Neuwirth, you may have a brief rebuttal.

25          MR. NEUWIRTH:  Good morning, ladies and gentlemen.

1    As everyone has mentioned, and as you know well, we have been

2    here together for four to five weeks, and over that time

3    period, you have had an opportunity to see the evidence,

4    including all of the materials that were prepared at the time

5    the conduct at issue occurred.

6            And you have to ask yourself whether you can ignore

7    what was happening at the time, because what the Defendants

8    are largely asking you to do is ignore what the documents from

9    the time show.  And documents sometimes are the best witnesses

10   because the one thing they cannot do is change their story

11   later.  They say what happened.  It's what the people wrote

12   and felt at the time, and those documents give the best

13   insight into what was really going on during the relevant

14   period.

15           Now, I think we've all had an opportunity to see

16   over and over again what the story was.  We saw that prices

17   were dropping in the years 1997, 1998, 1999.  We saw that

18   there were short-term steps being taken, like early molting

19   and early slaughter, that were for -- expressly said to be for

20   the purpose of reducing supply to get prices up.

21           And you heard witness after witness say that's what

22   those steps were for, including Marcus Rust, who said that

23   they knew this, and that's one of the reasons they were

24   worried about the UEP when they joined it.

25           We know that Don Bell then recommended in 1999,

1    without any reference to animal welfare, that something had to

2    be done to control supply for the long-term, and that one of

3    the steps to do that would be to increase the cage space per

4    hen because that would eliminate millions of hens.  And we

5    know that that was then announced to all the members of the

6    UEP through the United Voices newsletter.  And the UEP is the

7    United Egg Producers.

8              We then know that a scientific committee was created

9    that in 2000 recommended a set of guidelines that, among other

10   things, had no recommendation for 100% rule, and no

11   recommendation for a ban on backfilling.  And we know that

12   right after that, those guidelines weren't adopted in the way

13   the Scientific Committee wrote them.

14             There was a producers committee created that came up

15   with the guidelines that would actually be implemented that

16   included a 100% rule and that created an audit process where

17   the only way you could automatically fail at the outset was if

18   you failed to comply with the cage space requirements and the

19   100% rule.  You could do all sorts of things that weren't good

20   for the hens and still pass.  That was the way that you could

21   fail.

22             And you heard the testimony from people who were on

23   that committee that, although things started out with some

24   focus on animal welfare, ultimately, the overarching focus was

25   to control supply.

1        We also know, and you saw the evidence, that

2   notwithstanding all the claims that are being made, there is

3   not a shred of evidence that any customer prior to the

4   adoption of these guidelines was calling for adoption of

5   guidelines with 100% rule.  We know that.  The evidence told

6   us that.

7        And you saw, we showed you, that the companies that

8   supposedly we were told again today, motivated Rose Acre to

9   join this program, Kroger and Walmart, we saw that the

10  documents that they were relying on, in fact, came from

11  several years later.  There's no evidence that prior to Rose

12  Acre joining this program, or prior to these rules being

13  adopted with the 100% rule, that any company asked for that.

14       And you heard Ms. Brown from FMI, Food Marketing

15  Institute, testify yesterday.  We played her video, that the

16  Food Marketing Institute never supported the 100% rule and no

17  members ever supported the 100% rule.

18       Now, we also know that -- and we saw it again

19  today -- that the companies that said they would pay for

20  certified eggs said they would only pay cents a dozen.  We saw

21  that again today in the evidence that you were shown.  And we

22  have all the evidence that, to comply with the Certified

23  Program was well understood, it would cost 5, 6, 7, 8 cents a

24  dozen.

25       It only makes sense to participate in a program like

1    that where you are getting paid 2 cents for something that

2    costs 5, 6, or 7 cents per dozen to do if you know that the

3    price of eggs is going to go up enough to make up the

4    difference.  Otherwise, it is irrational to do this, and

5    contrary to anyone's self-interest.

6              And remember, we're talking about a couple of cents

7    a dozen, but we're talking about billions of eggs.  You saw

8    the charts.  Billions of eggs a year.  Millions of dozens of

9    eggs per week.  This is big business.  These are giant

10   companies making a lot of money selling millions, and over

11   time, billions of eggs.

12             We also know that Mr. Rust testified that when he

13   joined the program, his concern was making sure that no other

14   producers would be able to produce eggs at a lower cost.  You

15   heard him tell you that it was cheapest to produce eggs if you

16   had hens crammed in at 45 inches per -- square inches per hen.

17   And he said to you that if he was going to take on the cost to

18   give more space to a hen, he wanted to make sure that every

19   other company had to do the same thing, and that's what that

20   100% rule ensured.  The 100% rule ensured that it would be

21   possible to make everyone have the same costs.  Those

22   increased costs would lead to increased prices and cause

23   prices to go up.

24             And, in fact, we saw all of the evidence that in

25   2002, once you had these short-term supply restrictions and

1    the Certified Program going into effect, prices did go up.

2    And the UEP announced to its members over and over again that

3    prices were going up because of the combination of these

4    different steps, the short-term steps, the exports, and the

5    Certified Program.  You saw it over and over again.

6             And this was not just sporadic.  It was happening

7    over and over again.  And you saw this being discussed at the

8    UEP meetings, that the members of the UEP and these Defendants

9    were attending.  You saw that over and over again.  And you

10   would have to suspend what you saw to conclude that this was

11   not happening.

12            Now, it is true, it is true, as we've seen, that

13   once 2004 came, there was some drop in prices.  But what

14   happened?  There was a reaction to that.  Remember, that

15   Mr. -- that Don Bell said, backfilling is causing more eggs.

16   And the UEP, Mr. Pope, sent out a message to the members

17   saying, is this the noose around our neck of this success that

18   we're having otherwise?  And in December of 2004, a

19   backfilling ban was implemented.

20            And remember what the evidence showed.  This had

21   never been recommended by the scientific committee.  And it

22   was only after Mr. Armstrong started getting paid that he sent

23   a memo that you saw.  He sent a memo to the other members of

24   the scientific committee saying, We have to help the UEP get

25   this through.  The memo did not say, we have to do this

1   because of the science.

2           And remember there was no answer.  You weren't even

3   shown the document that we looked at yesterday where when the

4   producer guidelines came out, the members of the scientific

5   committee, through a memo that Mr. Armstrong wrote, said, Do

6   not put our names on these guidelines.  Do not put our name on

7   these guidelines.

8           These producer guidelines were something different

9   from what was recommended.  For years, there was no ban on

10  backfilling.  The scientific committee never said a word about

11  it.  It was only after Dr. Armstrong wrote to the other

12  members of the scientific committee and said we have to help

13  the UEP get this through.

14          And remember, Dr. Armstrong had documents from the

15  time where he said to Mr. Gregory, Please, I don't want a

16  contract because I don't want to have to tell anyone I have a

17  contract to be paid by the UEP.

18          We also know that in early 2005, Michael Foods and

19  Midwest Poultry were complaining.  They were complaining about

20  the Certified Program.  And you'll recall that they referred

21  to the Certified Program and the 100% rule as a -- something

22  that would restrain free trade of eggs.

23          And then once Michael Foods got on the program, and

24  you had the backfilling ban in place, and the exports started

25  up again, we saw that prices started to rise again.  That's

1    what the evidence shows.  And you heard that even Mr. Marshall

2    from Rose Acre had to admit that, by 2008, Rose Acre was

3    earning record prices.  Record prices.

4           Now, you were shown charts.  They said, Look, if you

5    compare the year 2000 to the year 2013, supply went up.  If

6    you look at the year 2000 and compare it to the year 2013,

7    prices went down.  But remember, this is a case about what

8    happened from September of 2004 until December of 2008.

9           And you saw all the evidence of what was happening.

10   You saw the charts that, after all of these programs were in

11   place, the exports, the short-term supply reductions, and the

12   Certified Program from 2002 to 2004, prices went up.  You saw

13   that.  And then after they started to drop, when the exports

14   started again, when they got Michael Foods on the program, and

15   when they banned backfilling, prices went up again until 2008.

16   That's the period you're looking at.

17          Now, as you've heard, and as the instructions will

18   make clear, it's not necessary for every Defendant to be

19   involved in every aspect of this program.  We know that Rose

20   Acre was in the Certified Program.  We know that they

21   participated in exports, and we know that at least once, they

22   are recorded as having voted in favor of a short-term supply

23   restriction.

24          We know that Sauder was on the Certified Program and

25   participated in all seven of the USEM exports from 2006 to

1    2008.

2              We know that Ohio Fresh was on the Certified

3    Program -- and we'll come back in a minute to what they did

4    with respect to short-term supply.

5              But remember this chart (indicating).  This chart

6    shows that the Defendants in this case, including Hillandale

7    Farms, the company that was buying the eggs from Ohio Fresh,

8    just by themselves they controlled 47 percent of the market.

9              And remember all the evidence that showed that

10   within a year, 80 percent of the layers of the United States

11   were on the Certified Program.  These companies clearly had

12   the ability to work together to control supply.

13             Remember that all of these programs were touted by

14   the UEP as having the benefit of raising prices and helping

15   people earn money, and they were all talked about together.

16   This is just one example of it.

17             Now, you've been told:  Well, all of these United

18   Voices were admitted for a limited purpose; not to prove the

19   truth of what they say, but to prove that they were -- that

20   this information was shared.

21             Well, in a conspiracy case, what people were telling

22   each other is the most important evidence because it shows

23   what people knew about what was going on.

24             You've heard evidence, testimony that the United

25   Voices were widely distributed.  You've seen the evidence that

1    these Defendants received those newsletters, and it gave them

2    an opportunity to understand exactly what was happening, and

3    it was fully consistent with what was being said at the UEP

4    committee meetings and board meetings that they were

5    attending.

6              You saw those minutes.  You saw that evidence.  They

7    were discussing these programs as a way to reduce supply and

8    get prices up.  And they didn't just do it randomly; they did

9    it over and over and over again, month after month, year after

10   year.

11             Now, you've heard throughout this trial that these

12   newsletters just represented the opinion of Gene Gregory.

13   Well, who is Gene Gregory?  He was an officer of the United

14   Egg Producers who served at the pleasure of the Board of

15   Directors.  Over all those years, not only was he never told

16   to stop what he was doing, but he got promoted to president in

17   the middle of the period we're looking at.

18             And remember, we asked Mr. Rust, who was a member of

19   the Board:  What about Gene Gregory?

20             And what did he tell us?

21             Gene was a fighter for all egg farmers.  I don't

22   know of any reason anyone would have wanted to remove him.

23             He spoke for the members of the UEP who were the egg

24   producers -- the people who went to the board meetings.  The

25   people who regularly attended those meetings, including the

1    three Defendants.

2              And remember, you were told that Mr. Krouse came

3    here and testified about the virtues of this program.  But at

4    the time, and let's keep in mind, the Plaintiffs had to call

5    somebody who was there, and we called the people that we

6    could.

7              When companies settled with us, we got the

8    opportunity to insist that their witnesses come.  But these

9    are people who participated in this alleged conspiracy, and

10   they were in here.  You saw, they were not friendly witnesses

11   to the Plaintiffs.  We had to fight with them.  And often it

12   sounded like, when they were asked questions by the

13   Defendants, that they were ready to go with a set of talking

14   points.

15             But look at what the documents say.  Mr. Krouse

16   pointed out in documents that he wrote at the time that:  The

17   100% rule does not have anything to do with animal welfare.

18   It was implemented by the industry to address other issues

19   long after the scientific review committee made their

20   recommendation.

21             That's what he said.

22             And remember that Michael Foods, Sparboe, and

23   Mr. Krouse's company, Midwest Poultry, when they tried to

24   change the 100% rule in 2005 said, as highlighted there:  It

25   limits the free trade of eggs.

1              That's what the documents say.

2              And where are all the documents?  We talked about

3    lots of documents that didn't even come up in the Defendants'

4    presentation.  The K.Y. Hendrix memo when Rose Acre joined the

5    program, saying:  There seems to be an agenda other than

6    animal welfare.

7              The Lois Rust memo, saying that she had concerns

8    about the true purpose of the program.

9              The John Rust document, they mentioned it.

10   John Rust said that the program seemed to have a totally

11   different purpose.

12             Now, one of the key documents that we talked about

13   that never came up in the Sauder presentation, was

14   Mr. Sauder's letter.

15             Mr. Sauder's letter from 2008 about the exports,

16   where, as you'll recall, he calculated the exact amount of the

17   increase in prices that the exports caused, where he

18   acknowledged that the purpose of the exports was to get prices

19   up domestically.  And where he told the farmers that were

20   supplying him eggs that there had been losses on these

21   exports, and that they were going to have to chip in to make

22   up the difference.

23             You didn't hear a word about that document which

24   totally contradicts the entire Defense of this case by Sauder.

25             MR. BIZAR:  Objection.  It mischaracterizes my

1    closing.

2            THE COURT:  Then it will be up to the jury to

3    remember everybody's closings.

4            MR. NEUWIRTH:  This document speaks for itself.  It

5    tells you what Mr. Sauder's position was at the time, not what

6    he came and said at this trial when there was an effort to

7    convince you that there was some other purpose for this

8    conduct.  And remember, the only explanation Mr. Sauder could

9    give was that he wrote this document in a rush.

10           I mentioned the backfilling document where

11   Mr. Armstrong strong said:  We need to support UEP in their

12   quest to terminate backfilling.

13           Now let's talk about -- quickly, about Ohio Fresh.

14           First of all, we know that after Ohio Fresh joined

15   the program, they were present at the meeting of the Board of

16   Directors in 2004.  Mr. Mousa was there talking about industry

17   discipline through these different programs, the Certified

18   Program and other steps to reduce supply.

19           We know that United Voices in June 2004, reported to

20   members that Ohio Fresh reported that they will dispose of

21   spent hens between 80 to 84 weeks.  And then a few months

22   later, it was reported that Ohio Fresh was one of the

23   companies that had made its intentions known during the

24   meeting, that it would agree to participate in early

25   slaughter.  And then there was a document the next week, where

1  Mr. Gregory said:  You signed an intention form for the

2  following.

3          Now, the Plaintiffs can only use the evidence that's

4  produced by the Defendants in this case.  There were two

5  announcements to everyone in the industry that Ohio Fresh had

6  made these commitments.  There's no document indicating that

7  Ohio Fresh disagreed with these announcements, is there?

8  None.

9          There's no evidence from anyone that Ohio Fresh did

10  not follow through on these commitments.  And, in fact, you

11  heard from Mr. Hershey, when his testimony was read here, that

12  they were able to comply with these types of commitments

13  because they had empty barns that allowed them to satisfy the

14  commitments that they made to UEP.

15          And Mr. Mousa's testimony had lots of reasons to be

16  questioned.  He said he only attended three meetings, when he

17  attended many more.  He told you that he was there being paid

18  by -- you were told today that he was there being paid by UEP,

19  but even Mr. Mousa had to admit that UEP was paying him with

20  money that Ohio Fresh had given.

21          And you saw earlier that this one customer to which

22  Ohio Fresh was selling eggs was Hillandale Farms, one of the

23  companies that participated in this conspiracy.  One of the

24  companies that was agreeing with all of these supply

25  recommendations.  It's one of the companies that was

1    previously in this case.

2            Now, you were told yesterday that we had somehow

3    misrepresented things about Mr. Sauder, supposedly claiming

4    that Mr. Sauder had been killing hens.  That's not what we

5    said.  What we said is what I'm putting up now.

6            That Mr. Sauder had testified that the UEP

7    guidelines included a provision that said producers could

8    immediately kill their hens to meet the cage space guidelines,

9    and that Mr. Sauder had testified that he and representatives

10   of Rose Acre were on the producers' committee when this was

11   approved.

12           The point was that these people were participating

13   in meetings where decisions were being made that were

14   inconsistent with a purported total care for the safety and

15   health of the hens.  That was the point; that these companies

16   were undertaking steps that were inconsistent with what the

17   scientific committee had recommended, and with their purported

18   commitment -- 100% to nothing more than the care of the hens.

19           Now, you'll recall that there was a group called

20   Compassion Over Killing.  It was an animal welfare group.  It

21   brought claims against the UEP that -- calling the UEP Program

22   an animal care program was false advertising.  You heard that

23   from Chad Gregory when he was here.

24           And you also heard and saw that the United Egg

25   Producers was totally involved in the exports that were taking

1    place at USEM.  They repeatedly wrote about it in their

2    newsletters.  Repeatedly.  And we showed you yesterday the

3    management contract where UEP was controlling USEM.

4              You saw -- you had the opportunity to see that the

5    same companies involved in UEP were the companies that were

6    involved in the exports at USEM.

7              MR. BIZAR:  Objection.  Misstates the evidence.

8              THE COURT:  Once again, the jury, of course, has the

9    job of recalling the evidence.

10             And after lunch, you'll be hearing my instructions

11   about what you do with all of it, and how you order and

12   evaluate everything that you've heard.

13             You may finish up here, Mr. Neuwirth.

14             MR. NEUWIRTH:  Thank you.

15             And then you heard today, some attacks on

16   Dr. Rausser.  But you were here when Dr. Rausser testified,

17   both times.  And what you heard today was a repetition of the

18   theory of what was wrong with what Dr. Rausser purportedly did

19   without a discussion of what Dr. Rausser actually testified.

20             You'll recall that Dr. Rausser said that he did make

21   an investment in a company, that it was his understanding that

22   that company would never do anything related to cases in which

23   he was involved, and that when it turned out that that was not

24   the case, he donated anything he had left in that company to

25   charity.

 1          And the second part of what you were told was that

 2   Dr. Rausser was, purportedly, trying to encourage someone else

 3   to make an investment in a fund that was interested in claims

 4   in this case.  But you'll recall that that theory crumbled in

 5   front of your eyes when Dr. Rausser pointed out that the

 6   meeting at issue took place six months before the document was

 7   created that mentioned this case.

 8          Remember Dr. Rausser talked about being on

 9   sabbatical, and that the timing of this supposed meeting

10   relative to that document made no sense.  That was all left

11   out today.  Because the spin that you're being asked to

12   believe is that Dr. Rausser, one of the most distinguished

13   agricultural economists in the United States, somehow did

14   everything here with bias and a lack of integrity.

15          Well, the evidence doesn't support that.  What the

16   evidence shows is that Dr. Rausser's analysis, as we saw over

17   and over again, completely complies with the facts of what

18   happened during the relevant period, from 2004 to 2008.  And

19   he explained to you that what he did, the reason he looked at

20   that broader period was because he used all of the transaction

21   data, all of the data on every transaction that was produced

22   in this case, and Dr. Walker decided to only use half of it.

23          Now, the Defendants come up here and tell you:  How

24   can it be that Dr. Rausser looked at the period through 2013,

25   when at the same time, they show you charts that compare

1    prices between 2000 and 2013.  Which is it?

2         Dr. Rausser looked at all of the data.  Dr. Walker

3    looked at half of it.  And his reason, he said, for looking at

4    half of it were that there were supposedly all these factors

5    that might have affected prices.  And you heard all the

6    testimony that Dr. Walker never tested these factors, and that

7    Dr. Walker couldn't even tell you how one would test them.

8         And you heard Dr. Rausser explain that this is not

9    scientific method.  It does matter.  It does matter that

10   Dr. Rausser is a leading agricultural economist who has

11   repeatedly published in journals that are reviewed by other

12   leading economists.  It does matter that Dr. Rausser was the

13   dean of one of the leading agricultural economic schools in

14   the world at Berkley.  It does matter that Dr. Rausser is not

15   someone who just works for a company that does this type of

16   work, but that he is someone who is known in the academic

17   world, in the Government world, as someone who is a leading

18   agricultural economist and you heard him, and you can assess

19   the credibility of his testimony.

20        Everything that you've been told about these

21   investments, if you look at what really happened, is noise.

22   The question is, what did the economist show you and which

23   economists are telling you something that can be reconciled

24   with the facts.  With the facts.

25        You heard the facts.  You will have the opportunity

1    to decide what is the correct way to interpret the evidence.

2           Now, it's true that this case has been going on for

3    ten years, because litigation is sometimes slow, but it's also

4    been going on for ten years because it's such an important

5    case.  It involves a gigantic industry that has a huge impact

6    on many, many businesses, large and small, people from

7    restaurant owners to big companies, all of whom buy eggs.

8           And we all know that eggs are a very important food

9    staple in our country.  Billions of eggs at issue.  This is an

10   important case.  We've all been working hard on it because

11   it's so important.

12          And as I told you at the outset, it's been a

13   tremendous honor to have the opportunity to talk to you about

14   this case.  This is now in your hands, and you will have to

15   decide whether companies that engaged in the conduct that you

16   saw will get a free pass or whether they will be held

17   accountable.

18          You've been -- you've heard about the verdict form,

19   and you've seen the questions.  Remember, whether the answer

20   is "yes" or "no" to any of these questions, you need to be

21   unanimous.  We believe that the evidence strongly compels a

22   "yes" to each of the four questions that you will be asked,

23   and that it compels a "yes" for the three Defendants who are

24   here.

25          And you will hear the Judge's instructions.  You

1   will hear that what this case is about is whether there was a

2   conspiracy, an overarching conspiracy to limit the supply of

3   eggs, to cause the supply of eggs to be less than it otherwise

4   would have been.

5           And you will, under the law, need to find that there

6   was an injury to the Class if you determine that the Class had

7   to pay prices that were higher than they otherwise would have

8   been.  That's the test.

9           And remember when you think about that question,

10  remember what Don Bell said in 2004.  Even during a period

11  when prices were starting to go down, it would have been much

12  worse, much worse without the Certified Program.

13          You can find an agreement when two or more persons

14  share a commitment to a common scheme.  You know that's what

15  was going on here.  You saw that in all of the evidence.

16  There doesn't need to be a written agreement.  There doesn't.

17  You don't have to have a formal agreement to conspire.  In

18  fact, as we heard from Dr. Armstrong, he didn't even want a

19  written agreement to show he was being paid.  People who are

20  conspiring typically don't write written agreements to

21  conspire.  What they do is they share a common purpose, and

22  that's what the evidence shows here.

23          And finally, as you'll hear from Judge Pratter, a

24  person can become a member of a conspiracy without full

25  knowledge of all the details of the conspiracy.  It's not

1    necessary that all parties come to an agreement at the same

2    time.  You will hear those exact words in the charge from

3    Judge Pratter.

4            It's not necessary that all persons acted exactly

5    alike.  It's not necessary that all persons possess the same

6    motive for entering the agreement.  And it's not necessary

7    that all of the means or methods claimed by the Plaintiffs

8    were agreed upon by each Defendant to carry out the alleged

9    conspiracy.

10           There was a conspiracy here involving all aspects

11   that have been discussed.  You saw that.  You saw that in the

12   evidence.

13           And the question then becomes, at some point in

14   time, did each of the three Defendants here join the

15   conspiracy.  The Plaintiffs would win if the scale barely

16   tipped by a feather in favor of "yes" on these questions.

17   That's the standard.  It just has to tip.

18           We respectfully submit to all of you that the

19   evidence shows the scale tips very heavily, very heavily in

20   the Plaintiffs' favor.

21           With deep gratitude for your attention, thank you

22   very much.

23           THE COURT:  Thank you, Mr. Neuwirth.

24           All right.  Ladies and gentlemen, we're going to

25   take a lunch break of an hour and five minutes.  I hope that

1    that's enough for you all to enjoy the outdoors or whatever

2    and come back, because then I will, in fact, be presenting to

3    you the description of the law that you must apply as part of

4    your deliberations.

5           That means a number of things.  Number one, have a

6    nice lunchtime.  Number two, be back here at a quarter of

7    2:00, and, number three, you haven't yet been authorized to

8    begin to deliberate because you haven't heard from me what the

9    law is.

10          See you at a quarter of.

11          THE DEPUTY CLERK:  All rise.

12          (Jury out.)

13          THE COURT:  Okay.  I think you all could use some

14   nourishment.

15          MR. NEUWIRTH:  Thank you, Your Honor.

16          ALL COUNSEL:  Thank you, Your Honor.

17          THE COURT:  Thank you, all.  I'll see you in about

18   an hour.

19                  (After recess:)

20          THE COURT:  Please take your seats.

21          Thank you all for the edit on the verdict form.  It

22   was a good catch.

23          Everybody ready?

24          MR. KING:  Yes, Your Honor.

25          THE COURT:  You've got your popcorn?

1        Okay.  You can bring them back.

2        THE DEPUTY CLERK:  All rise.

3        (Jury in.)

4        THE COURT:  Everyone, you may take your seats.

5        I hope you had a nice lunch, that it wasn't too

6   filling, because I don't want to see anybody dropping off from

7   having eaten too much at lunchtime.  Because now, members of

8   the jury, you've heard all of the evidence that's been

9   admitted in the trial, and you've heard the arguments of the

10  lawyers.

11       So it's my duty to give you the final instructions

12  as to the law that is applicable in this case.  I trust that

13  you will use these instructions to guide you in your

14  deliberations.

15       Now, all of the instructions that I gave you at the

16  beginning of the trial, during the trial, and now these

17  instructions, must guide and govern your deliberations.  It

18  is, in fact, your duty to follow the law as I state it to you

19  in all of my instructions, and to apply these rules of law to

20  the facts, as you find them, from the evidence that has been

21  received during the trial.

22       The lawyers have referred to many of the applicable

23  rules of law and to my instructions.  They are permitted to do

24  that.  In fact, some of the times that we met -- that I met

25  with the lawyers while you all were absent, were occasions

1  when the lawyers and I went over what the instructions would

2  be.  So they were all told ahead of time what my instructions

3  would be.  And, in fact, they have even now the most recent

4  copy of the instructions.

5          But if there's any difference that appears to you

6  between the law as any of the lawyers have stated it and as I

7  state it here to you now, you are to be governed by my

8  instructions, the Court's instructions.  You are not to single

9  out any one instruction alone as stating the law, but you must

10  consider these instructions as a whole in reaching your

11  decision.

12          Likewise, you are not to concern yourself with the

13  wisdom of any rule of law as I state it.  Regardless of any

14  opinion that you might have as to what the law ought to be, it

15  would be a violation of your sworn duty to base any part of

16  your verdict upon any view or opinion of the law other than

17  those provided in the Court's instructions; just as it would

18  be a violation of your sworn duty as the judges of the facts

19  to base your verdict on anything other than the evidence that

20  has been received in this case.

21          As I am sure you have come to realize, whatever you

22  think you knew about trials or about evidence or about the law

23  as a result of watching TV or movies or reading books has no

24  place here.  Nobody involved in this case should be compared

25  to any TV show, any movie, or any actor or actress.  Nobody

1  came from Central Casting, and no script was written ahead of

2  time.

3         You were chosen as jurors for this real-life trial

4  in order to evaluate all of the evidence that's been received,

5  and to decide each of the factual questions presented to you.

6  You must not be persuaded by any bias, any prejudice, or any

7  sympathy for or against any of the parties in this case, or by

8  any public opinion.

9         The evidence from which you are to find the facts

10 consists of the following:  The testimony of the witnesses,

11 including the testimony of witnesses presented via the video

12 depositions or other depositions.

13        The evidence also consists of any stipulated facts

14 that were agreed to by the parties, and there were some of

15 those, as you will recall.

16        The evidence also includes documents and other

17 things that were received as exhibits.

18        The following things are not evidence:  As you heard

19 me say before, the statements, the arguments, and the

20 questions of the lawyers for the parties in this case, even if

21 what they said sounded as though it was based on facts, what

22 the lawyers had to say is not, in and of itself, evidence.

23 There were, as I recall, other than stipulations, no

24 circumstances where I told you that what the lawyers were

25 saying was evidence.

1          The objections by the lawyers, even if their

2    objections sounded as though they were based on something that

3    sounded like fact, the objections are not evidence either.

4          Any testimony I told you to disregard or that I

5    excluded from evidence is not evidence for the case.

6          And then anything, of course, that you may have seen

7    or heard about the case outside of the courtroom is not

8    evidence.

9          You must make your decision based only on the

10   evidence that you saw and heard here in court.  Do not let

11   rumors, suspicions, or anything else that you may have seen or

12   heard outside of court influence your decision in any way.

13         You can and should use your common sense in weighing

14   the evidence.  Consider the evidence in light of your everyday

15   experience with people and events, and give it -- namely, your

16   common sense -- whatever weight you believe it deserves.  If

17   your experience tells you that certain evidence reasonably

18   leads to a conclusion, you are free to reach that conclusion.

19         There are rules that control what has been received

20   into evidence.

21         When a lawyer asked a question or offered an exhibit

22   into evidence, and the lawyer on the other side thought that

23   it was not permitted by the rules of evidence, that lawyer may

24   have objected.  Indeed, you did hear several objections in

25   this trial.  Objections simply meant that the lawyer was

1    requesting that I make a decision on a particular rule of

2    evidence.  Objections to questions, whether short or long, are

3    not evidence.

4         The lawyers do have an obligation to their clients

5    to make objections when they believe that some of the evidence

6    being offered is not proper under the rules of evidence.

7    Sometimes they're right, sometimes they are not.  You should

8    not be influenced by the fact that there was an objection.

9         If the objection was sustained, then you are free to

10   ignore the question and any whole or partial answer to it.

11        If the objection was overruled, then you may treat

12   the answer like any other.

13        You were instructed, and I instruct you now, again,

14   that some items of evidence are received for a limited purpose

15   only, and you must follow that instruction, and you may only

16   consider such evidence for that limited purpose.  In this

17   trial, some evidence has been admitted for a limited purpose.

18   You may have heard the parties referencing it throughout the

19   trial and you've also heard the Court make similar statements.

20        For the evidence that was admitted for notice, for

21   example, to UEP members, or merely because something was

22   announced or otherwise circulated, you may only consider that

23   evidence for the limited purpose of what was being

24   communicated to members in a particular document for whatever

25   weight you think it deserves.

1        However, you cannot use such limited purpose

2   evidence to prove, either directly or circumstantially, the

3   truth of what it says.

4        For example, if a document admitted for a limited

5   purpose along those lines states that:  "It will be cold on

6   January 1st," you can only use such a document for the purpose

7   of showing that people were told that and may have -- may or

8   may not have acted based off of that statement.

9        Perhaps you could use it as evidence that the person

10  who received a letter put on a coat on January 1st in reliance

11  of the forecast, or perhaps they changed their travel plans as

12  a result of the weather forecast.  However, you could not use

13  such a document to prove, either directly or circumstantially,

14  that it was actually cold on January 1st.

15       Such a jump would require evidence offered for the

16  truth of the matter that's been asserted in the document.

17  I've noted such evidence for you throughout the trial, and the

18  lawyers together have provided a list, for your convenience,

19  of the exhibits that were admitted for these kinds of limited

20  purposes.

21       Also, if certain testimony or other evidence was

22  ordered stricken from the record, you must disregard that

23  evidence.  Do not consider any evidence or any other -- any

24  testimony or any other evidence that was excluded.

25       And do not speculate about what a witness might have

1    said or what an exhibit might have shown if I had excluded it.

2              In deciding what the facts are, you may have to

3    decide what testimony you believe and what testimony you do

4    not believe.  You are the sole judges of the credibility of

5    the witnesses.  Credibility means whether a witness is worthy

6    of belief.  You may believe everything a witness says or only

7    part of it or none of it.

8              In deciding what to believe, as I mentioned to you

9    at the very start of this trial, you may consider a number of

10   factors, including the following -- this is by no means an

11   exclusive list.  It's merely suggestions:  You can consider

12   the opportunity and ability of the witness to see or hear or

13   know the things about which the witness is testifying.

14             You might consider the quality of the witness'

15   understanding and memory or the witness' manner while

16   testifying.  You may consider whether the witness has an

17   interest in the outcome of the case, or has any motive, bias,

18   or prejudice.

19             You might consider whether a witness is contradicted

20   by anything that witness said or wrote before the trial or

21   contradicted by other evidence.

22             You might consider how reasonable the witness'

23   testimony is when you consider it in light of all the other

24   evidence that you believe.  And, of course, then you may

25   consider any other factor that bears on the believability of

1    the witness.

2            The weight of the evidence to prove a fact does not

3    necessarily depend on the number of witnesses who testify

4    about it.  What is more important is how believable the

5    witnesses were and how much weight you think their testimony

6    deserves.  You may be guided by the appearance and conduct of

7    the witness, or by the manner in which the witness testified,

8    or by the character or tone of the testimony that's been

9    given, or by evidence that's contrary to the witness

10   testimony.

11           You should carefully examine all the testimony

12   that's been given, as well as the circumstances under which

13   each witness has testified, and every matter in evidence

14   tending to show whether a witness is worthy of belief.

15           The factors as I said that I just listed in

16   considering how to evaluate a witness' credibility also work

17   in evaluating possible discrepancies in testimony.

18           You should consider whether a witness impresses you

19   as having an accurate recollection of the matters about which

20   she or he testified.

21           Also, consider any relationship each witness may

22   have with either side of the case, the manner in which each

23   witness might be affected by the verdict, and the extent to

24   which the testimony of each witness is either supported or

25   contradicted by other evidence.

1          Inconsistencies or discrepancies in the testimony of

2   a witness or between the testimony of different witnesses may

3   or may not cause you to discredit their testimony.

4          Frankly, two or more people seeing the same event

5   might see or hear it differently.  However, in weighing the

6   effect of a discrepancy, always consider whether it pertains

7   to a matter of importance or if it is an unimportant detail,

8   and also consider whether the discrepancy results from what

9   appears to you to be an innocent error or an intentional

10  falsehood.

11         After making your own judgment, you should give the

12  testimony of each witness such weight, if any, that you think

13  it deserves.  In short, you may accept or reject the testimony

14  of any witness in whole or in part.

15         Keep in mind, ladies and gentlemen, that the quality

16  of the weight of the evidence is not necessarily determined by

17  the number of witnesses testifying to the existence or

18  nonexistence of any fact.  Indeed, you might find that the

19  testimony of a small number of witnesses, or even one witness,

20  as to any particular fact is more credible than the testimony

21  of a larger number of witnesses to the contrary.

22         You should consider this case to be a dispute

23  between persons of equal standing or of equal worth in the

24  community and holding the same or similar stations in life.

25         A corporation, partnership, or unincorporated

1   association is entitled to the very same fair trial as an

2   individual or private individual.  All persons, including

3   corporations, partnerships, unincorporated associations, and

4   other organizations, stand equal before the law, and they are

5   to be treated as equals.  Therefore, you should consider and

6   decide this case as a dispute between persons of equal

7   standing in the community, of equal worth, and holding the

8   same or similar stations in life.

9           Under the law, a corporation is a person, but it

10  acts only through its agents.  A corporation's agents include

11  its directors, officers, employees, or others acting on its

12  behalf.

13          A corporation is not capable under the law of

14  conspiring with its own agents or unincorporated divisions or

15  its wholly-owned subsidiaries.  Through its agents, however, a

16  corporation is capable of conspiring with other persons or

17  independent corporations.

18          A corporation is legally bound by the acts and

19  statements of its agents or employees done or made within the

20  scope of the agent's employment or apparent authority.  Acts

21  done within the scope of employment are acts performed on

22  behalf of a corporation and directly related to the

23  performance of the duties the agent has general authority to

24  perform.

25          Apparent authority is the authority that persons

1    outside the corporation could reasonably believe the agent

2    would have, judging from his or her position in the company,

3    the responsibilities previously entrusted to that person, or

4    the office and the circumstances surrounding his or her past

5    conduct.  An agent can have apparent authority even when,

6    despite these appearances, the agent is actually acting in a

7    dishonest, fraudulent, or anticompetitive manner.

8           To summarize, for a corporation to be legally

9    responsible for the acts or statements of its agents, you must

10   find that the agent was acting within the scope of his or her

11   employment with apparent authority.  The fact that a

12   corporation has instructed its agents not to violate the

13   antitrust laws does not excuse the corporation from

14   responsibility for the unlawful acts of its agents done within

15   the scope of their employment or apparent authority.

16          Now, once again, a corporation is entitled to the

17   same fair trial as a private individual.  The acts of a

18   corporation are to be judged by the same standard as the acts

19   of a private individual, and you may hold a corporation liable

20   only if such liability is established by the preponderance of

21   the evidence.  All persons, including corporations, are equal

22   before the law.

23          As I explained to you at the start of this case,

24   this is a Class Action.  A Class Action allows the filing of

25   one lawsuit by a few representatives on behalf of all

1    similarly-situated individuals who have similar legal claims

2    against Defendants.

3           You heard testimony from these Class Representatives

4    during this trial.  There are many reasons for this, but the

5    main reason is economy or efficiency of effort.  It is far

6    easier for everyone involved to resolve all of these claims in

7    one trial as opposed to requiring each individual Plaintiff to

8    file its, his, or her own claim, and then requiring the

9    Defendant to defend against the same claims in courts all

10   around the country.

11          The Class here consists of those companies who

12   directly purchased commodity shell eggs, both from the

13   Defendants here and the other alleged coconspirators.  The

14   Class in this case is represented here by the named

15   Plaintiffs, Eby-Brown Company, John Lisciandro of the

16   Lisciandro's Restaurant and T.K. Ribbing's Family Restaurant.

17          There are many more members in the Direct Purchaser

18   Plaintiff Class than just these named representatives.  So

19   when I refer to Plaintiffs, or when I refer to the Class or to

20   the Direct Purchaser Plaintiff Class throughout these

21   instructions, I mean all Plaintiffs in the Class, including

22   those you heard from and those you did not.

23          Thus, in a Class Action like this one, it becomes

24   the Plaintiffs' burden to prove that the alleged conspiracy

25   caused an increase in the price of eggs that affected the

1  Class generally.

2          This is a civil case.  For the issues you will

3  consider, a Direct Purchaser Class are the parties who brought

4  the lawsuit.  As you know, they are called the Plaintiffs.

5  Rose Acre Farms, Ohio Fresh Eggs, and R.W. Sauder are the

6  parties against whom the lawsuit has been filed and is

7  proceeding here.  They are the Defendants.

8          The questions you will be addressing in your

9  deliberations are these:  First, was there a contract,

10  combination, or conspiracy between or among at least two

11  separate entities?

12          Second, did the contract, combination, or conspiracy

13  unreasonably restrain trade?

14          And finally, did the restraints cause the Direct

15  Purchaser Plaintiff Class to suffer an injury to its business

16  or property?

17          I will provide you more in-depth instructions on

18  these questions shortly.  As to these claims, the Direct

19  Purchaser Plaintiff Class has the burden of proving the case

20  against the Defendants by what is called the preponderance of

21  the evidence.

22          Preponderance of the evidence means that in order to

23  prevail on a claim, the Direct Purchaser Plaintiff Class must

24  prove to you in light of all of the evidence that what they

25  claim is more likely so than not so.

1        To put it differently, as you consider the claims

2    against each individual Defendant, you may think about the

3    burden of proof this way:  If you were to put the evidence

4    favorable to the Direct Purchaser Plaintiff Class regarding

5    each individual Defendant and the evidence favorable to each

6    of the individual Defendants on opposite sides of the pan or

7    scales that are frequently used to signify the Scales of

8    Justice, the Direct Purchaser Plaintiff Class would have to

9    make the scales tip ever so slightly to their side in order to

10   prevail on any issue or claim as to which the Class has what

11   we call the burden of proof.

12       And this is true individually; that is,

13   independently as to each Defendant.  So you have to decide

14   this for each Defendant separately.

15       Here, the Direct Purchaser Plaintiff Class alleges

16   that between 2004 and 2008, they paid higher prices for eggs

17   purchased from the Defendants and other egg producers because

18   the Defendants, along with these other alleged coconspirators,

19   conspired to limit the nation's supply of eggs, which then

20   drove up the prices for eggs.

21       The Defendants deny these allegations, and they

22   assert that all of the actions were done for legitimate

23   business reasons.  They also claim that the supply of eggs

24   actually increased during the alleged conspiracy period.

25       We've heard a lot about other egg producer companies

1   that are not here today.  Those parties are not an issue in

2   this lawsuit as individuals -- as Defendants, and you should

3   not concern yourself with any claims against those parties,

4   whether they are -- there are other pending or resolved

5   lawsuits or anything along those lines.

6           Remember that I told you that there are certain

7   issues for the jury and certain issues for the judge.  The

8   presence or nonpresence of other claims and whether they would

9   impact on this case are issues that I have to deal with, and

10  the law accounts for these types of interrelated claims.  The

11  only question before you is the claim between this Direct

12  Purchaser Plaintiff Class and these Defendants here today.

13          If the Direct Purchaser Plaintiff Class failed to

14  meet its burden; that is, if the scales remain evenly

15  balanced, or if they tip to a Defendant's side, then your

16  verdict must be in favor of that Defendant on the issue or

17  matter as to which the Direct Purchaser Plaintiff Class has

18  the burden.

19          If you find, after considering all the evidence,

20  that a claim or a fact is more likely so than not so, making

21  the scales then tip in favor of the Plaintiff, then that claim

22  or fact has been proved by a preponderance of the evidence.

23          You've seen a lot about the pictures of scales, and

24  I know that that proposition has been explained to you.  But

25  in determining whether any fact has been proved by a

1    preponderance of the evidence in this case, you may, unless I

2    otherwise instruct you, consider the testimony of all of the

3    witnesses, regardless of who called them.  And you may

4    consider all of the exhibits received into evidence,

5    regardless of who may have produced it or offered it here

6    during the trial.

7         You may have heard the term "proof beyond a

8    reasonable doubt."  That's a much stricter standard of proof

9    and it applies only in criminal cases.  It does not apply in

10   civil cases, such as this one, so you should put that concept

11   out of your mind.

12        There are two types of evidence that you can use in

13   reaching your verdict.  One type of evidence is called direct

14   evidence.  An example of direct evidence is when a witness

15   testifies about something that the witness knows through his

16   or her own senses; something the witness himself or herself

17   said, has seen, has heard, or has done or touched.

18        If a witness testifies that he or she saw it raining

19   outside and you believed him or her, that would be direct

20   evidence that it's raining.

21        Another form of direct evidence is an exhibit where

22   the fact to be proved is the document's very existence or its

23   current condition.

24        Another type of evidence is circumstantial evidence.

25   Circumstantial evidence is proof of one or more facts from

1    which you can find another fact.

2          For example, the -- for some reason, judges are

3    really into weather and raining -- but as I mentioned, if

4    somebody walked into the courtroom wearing a raincoat covered

5    with droplets of water, carrying a wet umbrella, that would be

6    circumstantial evidence from which you could, but are not

7    required to, conclude that it was raining outside.

8          You should consider both kinds of evidence, direct

9    and circumstantial, that have been presented to you.  The law

10   makes no distinction in the weight to be given to either

11   direct or circumstantial evidence.  You, ladies and gentlemen,

12   are to decide how much weight to give any evidence.

13         During the trial and the arguments, you heard the

14   lawyers use the term "inference."  In their arguments, they've

15   asked you to infer on the basis of your reason, experience, or

16   common sense from one or more established facts, the existence

17   of some other fact.

18         An inference is not a suspicion or a guess.  It must

19   be a reasoned, logical decision to find that a disputed fact

20   exists on the basis of some other fact that has been shown to

21   exist.

22         There are times when different inferences can be

23   drawn from facts, whether direct or circumstantial.  The

24   Direct Purchaser Plaintiff Class asks you to draw one set of

25   inferences while a Defendant or the Defendants ask you to draw

1    other inferences.  It's up to you, ladies and gentlemen, and

2    only you, to decide what inference that you will draw.

3             The process of drawing inferences from facts in

4    evidence is not a matter for guesswork or speculation.  An

5    inference must be a deduction or a conclusion that you, the

6    jury, are permitted to draw, but you're not required to, from

7    the facts that have been established by either direct or

8    circumstantial evidence.

9             In drawing inferences, you should exercise your

10   common sense, please.  So while you're considering the

11   evidence that's been presented to you, you are permitted to

12   draw from the facts which you find to be proven, such

13   reasonable inferences as would be justified in light of your

14   experiences.

15            Now, some witnesses, because of education or

16   experience, are permitted to testify as experts.  And they are

17   permitted to state opinions, and they give the reasons for

18   their opinions.

19            Opinion testimony should be judged just like any

20   other testimony.  You may accept it or reject it, and give it

21   as much weight as you think it deserves considering the

22   witness' education and experience, the reasons given for the

23   opinion, and all of the evidence in the case.

24            Your evaluation of a witness' credibility may be

25   based on the very same bases for evaluating credibility that

1  you apply to other witnesses, such as their possible motives

2  for testifying and such.

3       You have heard from a number of experts in this

4  case.  The Direct Purchaser Plaintiff Class called

5  Dr. Rausser, an expert in agricultural economics,

6  econometrics, and statistics.  The Defendants called

7  Dr. Walker and Dr. David, both experts in economics and

8  econometrics.

9       A further word about experts:  These witnesses were

10  referred to by the parties as experts.  The witnesses

11  testified in order to assist you in reaching a decision on

12  certain issues.  It is your obligation to determine the

13  expertise, if any, of such witnesses, as well as their

14  credibility and the reliability of their opinion.

15       The testimony of these witnesses is sometimes in

16  conflict.  They disagree at times.  You must remember that you

17  are the sole trier of the facts, and where their testimony

18  relates to a question of fact, it is your job to resolve the

19  disagreement.

20       The way you resolve the conflict between these

21  experts is the same way you would decide any other facts or

22  factual questions and the same way you decide whether to

23  believe a nonexpert witness.

24       In addition, because experts gave their opinions,

25  you should consider the soundness of each opinion, the reasons

1    given for it, and the witness' motive, if any, for testifying.

2           You may give the testimony of each of these

3    witnesses such weight, if any, that you think it deserves in

4    the light of all of the evidence.  You should not permit a

5    witness' opinion testimony to be a substitute for your own

6    reason, your own judgment, and your own common sense.  You may

7    reject the testimony of any opinion witness in whole or in

8    part.

9           If you conclude the reasons given in support of an

10   opinion are unsound or if you, for any other reason, do not

11   believe the witness, the determination of the facts in this

12   case rest solely with you.

13          I now want to turn to the specific law of antitrust.

14          The Direct Purchaser Plaintiff Class here brings

15   this lawsuit under a federal law called the Sherman Act.  The

16   purpose of the Sherman Act is to preserve free and unfettered

17   competition in the marketplace.

18          The Sherman Act rests on a central premise that

19   competition produces the best allocation of our economic

20   resources, the lowest prices, the highest quality, and the

21   greatest material progress.

22          The Direct Purchaser Class challenges Defendants

23   Ohio Fresh Eggs, Rose Acre Farms, and R.W. Sauder's conduct

24   under Section 1 of the Sherman Act.  Section 1 prohibits

25   contracts, combinations, and conspiracies that unreasonably

1    restrain trade.

2            One of the technical requirements of this law is

3    that the restraint of trade affects interstate commerce.  I am

4    instructing you that I have determined that this requirement

5    concerning interstate commerce has been met; and, therefore,

6    you need not consider that technical requirement as part of

7    your deliberation.

8            In light of that, in order to establish a violation

9    of Section 1 of the Sherman Act, the Direct Purchaser

10   Plaintiff Class still must prove the following:

11           First, the existence of a contract, combination, or

12   a conspiracy between or among at least two separate entities.

13           Second, that the contract, combination, or

14   conspiracy unreasonably restrains trade.

15           Third, that the restraints caused the Direct

16   Purchaser Plaintiff Class to suffer an injury to business or

17   property.

18           Under the Sherman Act, a restraint of trade is

19   illegal only if it is found to be unreasonable.  You must,

20   therefore, determine whether the restraints challenged here:

21           One, that the UEP recommendations of early molt and

22   early slaughter and other supply recommendations;

23           Second, that the UEP Certified Program;

24           And, third, that the USEM export programs are,

25   together, unreasonable.

1        These three programs must all be part of a single

2   overarching conspiracy as opposed to, for example, three

3   different conspiracies that were each independent of each

4   other.

5        To determine whether these three restraints

6   constitute one conspiracy, you must look to whether there was

7   a common goal among the conspirators.

8        Second, whether the agreement contemplated bringing

9   to pass a continuous result that will not continue without the

10  continuous cooperation of the conspirators.

11       And, third, the extent to which the participants

12  overlap in the various dealings.

13       If, after considering these factors, you find that

14  all three of these programs were part of the same conspiracy

15  to reduce the supply of eggs, only then must you determine if

16  the actions taken were reasonable.

17       There are a number of steps to this inquiry, which I

18  will now first summarize before going into each of them in

19  detail.

20       In making this determination, you must first

21  determine whether the Direct Purchaser Plaintiff Class has

22  proven that the challenged restraints have resulted in a

23  substantial harm to competition in a relevant product and

24  geographic market.

25       If you find that Direct Purchaser Plaintiff Class

1   has proven that the challenged restraints resulted in a

2   substantial harm to competition in a relevant market, then you

3   must consider whether the restraints produced countervailing

4   competitive benefits.

5           If you find they do, then you must balance the

6   competitive harm against the competitive benefits.  The

7   challenged restraints are illegal under Section 1 of the

8   Sherman Act only if you find that the competitive harm

9   substantially outweighs the competitive benefit.

10          Before going into each step of this analysis in more

11  detail, let me first talk to you a moment about how to

12  determine if companies are conspiring together.

13          A conspiracy is an agreement or understanding

14  between two or more persons to do something illegal.  In this

15  case, the Direct Purchaser Plaintiff Class claims that

16  illegal -- that that illegal goal was to restrain trade by

17  limiting egg supply.  The Direct Purchaser Plaintiff Class

18  alleges that Ohio Fresh Eggs, Rose Acre Farms, and R.W. Sauder

19  participated in a conspiracy to restrain trade by limiting egg

20  supply.

21          The Direct Purchaser Plaintiff Class must prove both

22  of the following elements by a preponderance of the evidence:

23          One, that the alleged conspiracy to restrain egg

24  supply existed.

25          And, second, as to each individual Defendant, that

1  Defendant knowingly became a member of that conspiracy.

2          To act knowingly means to participate deliberately,

3  not because of some mistake or accident or other innocent

4  reason.

5          The basis of a conspiracy is an agreement or an

6  understanding between two or more persons or companies.  Here,

7  an agreement or understanding between two or more persons or

8  companies exists when they share a commitment to a common

9  scheme to achieve an unlawful purpose.

10          To establish the existence of a conspiracy, the

11  evidence need not show that its members entered into any kind

12  of formal or written agreement.  The agreement itself may have

13  been entirely unspoken.  A person can become a member without

14  full knowledge of all of the details of a conspiracy or the

15  identity of all of its members or the parts that each member

16  played in the alleged conspiracy.

17          The members of the conspiracy need not necessarily

18  have met together, directly stated what their object or

19  purpose was to one another, or stated the details or the means

20  by which they would accomplish their purpose.

21          To prove a conspiracy existed, however, the evidence

22  must show that the alleged members of the conspiracy came to

23  an agreement or an understanding among themselves to

24  accomplish a common purpose.

25          A conspiracy may be formed without all of the

1    parties coming to an agreement at the same time, such as where

2    a competitor separately accepts invitations to participate in

3    a plan to restrain trade.

4         Similarly, it is not essential that all persons act

5    exactly alike, nor is it necessary that they all possess the

6    same motive for entering the agreement.

7         It's also not necessary that all of the means or

8    methods claimed by the Direct Purchaser Plaintiff Class were

9    agreed upon by each individual Defendant to carry out the

10   alleged conspiracy, nor that all of the means or methods that

11   were agreed upon were actually used or put into operation, nor

12   that all persons alleged to be members of the conspiracy were

13   actually members.

14        It is the agreement or the understanding to restrain

15   trade by limiting egg supply that would constitute the

16   conspiracy.  Therefore, you may find a conspiracy existed,

17   regardless of whether it succeeded or failed.

18        The Direct Purchaser Plaintiff Class may prove the

19   existence of the alleged conspiracy through direct evidence,

20   through circumstantial evidence, or both.

21        Direct evidence is explicit and would require no

22   inference as to establish the existence of the alleged

23   conspiracy.

24        Direct evidence of an agreement may not be available

25   and, therefore, a conspiracy can also be shown through

1    circumstantial evidence.

2            You may infer the existence of a conspiracy from

3    circumstances, including what you find the alleged members

4    actually did or the words they actually used.  However, mere

5    similarity of conduct among various persons, or the fact that

6    they may have associated with one another and may have met or

7    assembled together at meetings or otherwise, does not, by

8    itself, establish the existence of a conspiracy.  If they

9    acted similarly, but independently of one another without any

10   agreement among them, then there would not be a conspiracy.

11           In determining whether an agreement or understanding

12   between two or more persons has been proved, you must view the

13   evidence as a whole and not piecemeal.

14           The mere fact that the Defendants may have

15   participated in the UEP short-term supply reduction

16   recommendations in the UEP Certified Program or in the USEM

17   export program does not, by itself, establish the existence of

18   a conspiracy among the Defendants.  Their behavior may be no

19   more than the result of the exercise of independent judgment

20   in response to identical or similar market conditions.

21           For example, once again, using the rain, the

22   weather, everyone might open up their umbrellas on a rainy

23   day, but that similar behavior would not necessarily mean that

24   they had agreed or conspired to open their umbrellas.  A

25   business may lawfully adopt the same prices, the conditions of

1    sale or other practices as its competitors do so long as it

2    does so independently and not part of some agreement or

3    understanding with one or more of its competitors.

4            If the Defendants or the alleged coconspirators

5    acted similarly, but independently, of one another without an

6    agreement or understanding between two or more of them, then

7    there would not be a conspiracy.

8            You must decide whether the Defendants' similar

9    conduct was more probably than not the result of an agreement

10   or understanding among them or other coconspirators who are

11   not present here.

12           Having discussed how to determine a conspiracy, let

13   me turn back to the requirements of the Sherman Act.  As I

14   previously mentioned, to prove that a challenged restraint is

15   unreasonable, the Direct Purchaser Plaintiff Class must first

16   demonstrate that the restraints had resulted in substantial

17   harm to competition.  Although it may be relevant to the

18   inquiry, harm that occurs merely to an individual business of

19   the Direct Purchaser Plaintiff Class is not sufficient by

20   itself to demonstrate harm to competition generally.

21           Furthermore, the Direct Purchaser Plaintiff Class

22   must show that the harm to competition occurred in an

23   identified market known as the relevant market.

24           There are two aspects to the idea of a relevant

25   market.

1          The first aspect is known as the relevant product

2     market.  This means that the Direct Purchaser Plaintiff Class

3     must show that there was harm to a relevant product market.

4     Here, the Direct Purchaser Plaintiff Class claimed harm to the

5     commodity shell egg market.

6          You must determine if these restraints caused harm

7     in this product market.

8          The second aspect is known as the relevant

9     geographic market.  A relevant geographic market is simply a

10    given geographic area where the Direct Purchaser Plaintiff

11    Class must show harm.

12         It's the Direct Purchaser Plaintiff Class' burden to

13    prove the existence of a relevant market.  If you find that

14    the Plaintiffs have proven the existence of a relevant market,

15    then you must determine whether the Direct Purchaser Plaintiff

16    Class has also proven that the challenged restraints have had

17    a substantial harmful effect on competition in that market.

18         A harmful effect on competition or competitive harm

19    refers to a reduction in competition that results in the loss

20    of some of the benefits of competition, such as lower prices,

21    increased output, or higher product quality.

22         If the challenged conduct has not resulted in higher

23    prices, decreased output, lower quality, or the loss of some

24    other competitive benefits, then there's been no competitive

25    harm and you should find that the challenged conduct was not

1    unreasonable.

2          In determining whether the challenged restraints

3    have produced competitive harm, you may look at the following

4    factors:  The effects of the restraint on prices, output,

5    product quality, and service, the purpose and nature of the

6    restraint, the nature and structure of the relevant market,

7    the number of competitors in the relevant market and the level

8    of competition among them, both before and after the restraint

9    was imposed.

10          And you can consider whether a Defendant and its

11    alleged conspirators -- coconspirators together possessed

12    market power.

13          This last factor, market power, has been defined as

14    an ability to profitably raise prices for a substantial period

15    of time above those that would be charged in a competitive

16    market.  A firm that possesses market power generally can

17    charge higher prices for the same goods or services than a

18    firm in the same market that does not possess market power.

19    The ability to charge higher prices for better products or

20    services, however, is not market power.

21          An important factor in determining whether the

22    Defendants and their alleged coconspirators together possessed

23    market power is their combined market share; that is, its

24    percentage of the product or services sold in their relevant

25    market by all the competitors.

1          Other factors that you might consider in determining

2     whether the Defendants and their alleged coconspirators have

3     market power include barriers to entry into the egg market for

4     potential competitors, the threat of substitute products for

5     eggs, outside competitors who were not part of the alleged

6     conspiracy, and the percentage of the market covered by the

7     alleged members of the conspiracy.

8          If the Defendants and their alleged coconspirators

9     do not possess a substantial market share, it is less likely

10    that the Defendants and their alleged coconspirators possessed

11    market power.

12         If they do not possess market power, then it's less

13    likely that the challenged restraints have resulted in a

14    substantial harmful effect on competition in the market.

15         On the other hand, if you were to conclude that the

16    Defendants and their alleged coconspirators possessed market

17    power, you could conclude that it is more likely that the

18    challenged restraints have resulted in a substantial harmful

19    effect on competition in the market.

20         If you find that the Direct Purchaser Plaintiff

21    Class has proven that the challenged restraints resulted in

22    substantial harm to competition in a relevant market, then you

23    must determine whether the restraints also benefits

24    competition in other ways.

25         In considering whether the challenged restraints

1    benefitted competition, you may consider various factors,

2    including, but not limited to, whether the challenged

3    restraints were demanded by customers, increased production,

4    decreased prices, or improved product quality.  If you find

5    that the challenged restraints do result in competitive

6    benefits, then you must also consider whether the restraints

7    were reasonably necessary to achieve the benefits.

8             If the Direct Purchaser Plaintiff Class proves that

9    the same benefits could have been readily achieved by other

10   reasonably available alternative means that create

11   substantially less harm to competition, then they could not be

12   used to justify the restraints.

13            If you find that the challenged restraints were

14   reasonably necessary to achieve competitive benefits, then you

15   must balance those competitive benefits against the

16   competitive harm resulting from the same restraints.

17            If the competitive harm substantially outweighs the

18   competitive benefit, then the challenged restraints are

19   unreasonable.  If the competitive harm does not substantially

20   outweigh the competitive benefits, then the challenged

21   restraints are not unreasonable.

22            In conducting this analysis, you must consider the

23   benefits and the harm to competition and to consumers.  The

24   Direct Purchaser Plaintiff Class bears the burden of proving

25   that the anticompetitive effect of the conduct substantially

1    outweighs its benefits.

2              Before you can find that Ohio Fresh Eggs, Rose Acre

3    Farms, and/or R.W. Sauder were members of the conspiracy

4    alleged by the Class, the evidence must show as to each

5    individual Defendant that each Defendant knowingly joined in

6    the unlawful plan, either at its inception or at some later

7    time, with the intent to further the purpose of the

8    conspiracy.

9              As I've mentioned, you must evaluate each Defendant

10   separately.

11             To act knowingly means to participate deliberately

12   and not because of a mistake, accident, or some other innocent

13   reason.

14             A person may become a member of a conspiracy with

15   full knowledge of all the details of the conspiracy, the

16   identity -- I'm sorry -- a person may become a member of a

17   conspiracy without full knowledge of all of the details of the

18   conspiracy, the identity of all the members, or the parts that

19   they all play.  Knowledge of the essential nature of the plan

20   is enough.

21             On the other hand, a person who has no knowledge of

22   a conspiracy, but happened to act in a way that helps the

23   conspiracy succeed, does not thereby become a member.

24             A person who knowingly joins an existing conspiracy,

25   or who participates only in part of a conspiracy with

1    knowledge of the overall conspiracy, is just as responsible as

2    if he or she or it had been one of those who formed or began

3    the conspiracy and participated in every part.

4            In determining whether a Defendant was a member of

5    the alleged conspiracy, you should consider only the evidence

6    about that particular Defendant's statements and conduct,

7    including any evidence of that Defendant's knowledge and

8    participation in the events involved, and any other evidence

9    of that particular Defendant's participation in the alleged

10   conspiracy.

11           You may not find that a Defendant was a member of a

12   conspiracy based only on its association with or knowledge of

13   wrongdoing, but that's a factor you may consider to determine

14   whether a Defendant was a member of the alleged conspiracy.

15           If you find that the alleged conspiracy existed,

16   then the acts and statements of the conspirators are binding

17   on all of those whom you find were members of the conspiracy.

18           Once you have found that a Defendant is a member of

19   a conspiracy, it is presumed to remain a member and is

20   responsible for all of the actions taken by all of the

21   coconspirators during and in furtherance of the conspiracy

22   until it is shown that the conspiracy has been completed or

23   abandoned, or that Defendant has withdrawn from the

24   conspiracy.

25           Businesses that are actual or potential competitors

1    may lawfully form into associations to advance common

2    interests.  You've heard of two such examples here:  the

3    United Egg Producers and the United States Egg Marketers.

4           Trade associations may keep members informed of new

5    services or technology in the industry or perform other

6    valuable services, such as cooperative research, publication

7    of trade journals, or joint representation before legislative

8    or administrative bodies.

9           However, a trade association's actions are not

10   immune from antitrust laws.  And an association is capable of

11   being a coconspirator in violating antitrust laws.

12          The actions of a group of competitors taken through

13   an association to which they belonged present the same issue

14   as the actions of a group of competitors who have not created

15   a formal organization, such as a trade association.

16          A trade association or similar industry group cannot

17   lawfully act to facilitate the raising, stabilizing, or

18   maintaining of prices in the market in which its members

19   compete with one another to reduce members' collective output

20   of product or services, or to allocate territories among

21   members that are in a horizontal competition with each other.

22          If a trade association exchanges with its members

23   confidential, competitively sensitive information, such as

24   current or future prices or current or future output

25   information, that is evidence of which you may consider, along

1    with all the other evidence, in deciding whether the

2    association is conspiring in violation of the antitrust laws.

3            A person or business that belongs to a trade

4    association does not become liable for violating the antitrust

5    laws simply because the trade association is liable for a

6    violation.

7            Instead, the Direct Purchaser Plaintiff Class must

8    prove that the Defendant in question knew of and participated

9    in the specific conduct that you find to be unlawful.

10           If you find that a Defendant had violated the

11   Sherman Act, then you must decide if the Purchaser Plaintiff

12   Class was injured by that violation.  The Direct Purchaser

13   Plaintiff Class is entitled to recover damages for an injury

14   to their business or property if they can establish three

15   elements of injury and causation:

16           Number one, that the Direct Purchaser Plaintiff

17   Class was, in fact, injured as a result of the alleged

18   violation of the antitrust laws.

19           Second, that the Defendants' alleged illegal conduct

20   was a material cause of the injury.

21           And, third, that the Direct Purchaser Class' injury

22   is an injury of the type that the antitrust laws were intended

23   to prevent.

24           This first element is sometimes referred to as

25   injury in fact, or fact of damage.

1          The Direct Purchaser Plaintiff Class must prove that

2    it was injured as a result of the Defendants' alleged

3    violation of the antitrust laws.  This does not require the

4    Direct Purchaser Plaintiff Class to prove the dollar value of

5    an injury.  In fact, I've told the parties not to address that

6    at this time.

7          For now, it requires only that the Direct Purchaser

8    Plaintiff Class prove that it was, in fact, injured by the

9    Defendants' alleged antitrust violation.

10          The Class must also offer evidence that establishes,

11    by a preponderance of the evidence, that the Defendants' or a

12    Defendant's alleged illegal conduct was a material cause of

13    the Direct Purchaser Plaintiff Class' injury.

14          This means that the Direct Purchaser Plaintiff Class

15    must have proved that some damage occurred to it as a result

16    of the Defendants' alleged antitrust violation and not some

17    other fault.  The Direct Purchaser Plaintiff is not required

18    to prove that the Defendants' alleged antitrust violation was

19    the sole cause of its injury, nor need the Class eliminate all

20    other possible causes of injury.

21          It's enough if the Direct Purchaser Plaintiff Class

22    has proved that the alleged antitrust violation was a material

23    cause of the injury.

24          Finally, the Direct Purchaser Plaintiff Class must

25    establish that its injury is the type of injury that the

1   antitrust laws were intended to prevent.  This is sometimes

2   called antitrust injury.

3           If the Direct Purchaser Plaintiff Class' injury were

4   caused by a reduction in competition, acts that would lead to

5   a reduction in competition, or acts that would otherwise harm

6   consumers, then the Class' injuries were antitrust injuries.

7           On the other hand, if the Direct Purchaser Plaintiff

8   Class' injuries were caused by heightened competition, the

9   competitive process itself, or by acts that would benefit

10  consumers, then the Direct Purchaser Plaintiff Class' injuries

11  are not antitrust injuries, and the Direct Purchaser Class may

12  not recover for those injuries under the antitrust laws.

13          In summary, if the Direct Purchaser Plaintiff Class

14  can establish that it was, in fact, injured by the Defendants'

15  conduct, that the Defendants' conduct was a material cause of

16  the Direct Purchaser Plaintiff Class' injury, and that the

17  injury was the type that the antitrust laws were intended to

18  prevent, then the Direct Purchaser Plaintiff Class is entitled

19  to recover for the injury to business or property.

20          The term "business" includes any commercial interest

21  or venture.  The Class has been injured in its business if you

22  find that it has suffered injury to any of its commercial

23  interests or enterprises as a result of the Defendants'

24  alleged antitrust violation.

25          The term "property" includes anything of value

1    members of the Direct Purchaser Plaintiff Class own, possess,

2    or in which members of the Direct Purchaser Plaintiff Class

3    have a protectable legal interest.

4         The Direct Purchaser Plaintiff Class has been

5    injured in its property if you find that anything of value

6    they possess, own, or has a legal interest in has been damaged

7    as a result of alleged antitrust violations by Defendants and

8    their coconspirators.

9         The Class has been injured in its property if you

10   find that its members have paid an inflated price for goods,

11   services, any legal interest of value, or that it has lost

12   money as a result of alleged antitrust violations by the

13   Defendants and their coconspirators.

14        In this case, you have been permitted to take notes

15   during the course of the trial, and most of you, perhaps all

16   of you, at one point or another, have taken advantage of that

17   opportunity.  You may, of course, have your notes available to

18   you during your deliberations, but you should make use of them

19   only as an aid to your individual memory.

20        In other words, you should not give your notes any

21   precedence over your independent recollection of the evidence

22   or the lack of evidence, and neither should you be unduly

23   influenced by the notes of each other.

24        I emphasize that the notes you have -- you may have

25   taken are not evidence, and they're not entitled to any

1  greater weight than your own memory and your own impression of

2  each other as to what the testimony or other evidence may have

3  been.

4          When you retire to the jury room to deliberate, you

5  may take with you your notes and the various exhibits which

6  have been compiled, along with a list of the names of the

7  witnesses in the order in which they appeared, which we're

8  providing to you, and a list of certain of the exhibits that

9  were limited -- that were admitted for limited purposes.

10         You will not be given a copy of the trial

11  transcript; however, you will be given a copy of these

12  instructions that I've just read to you.

13         I strongly recommend that you select one member of

14  your group to serve as the foreperson.  That person can

15  preside over your deliberations and then speak for you here in

16  court.

17         You have two main duties as jurors.

18         The first one is, of course, to decide what the

19  facts are from the evidence that you saw and heard here in

20  court.  Deciding what the facts are is your job, not mine, and

21  nothing -- nothing that I have said or done during the trial

22  was meant to influence you in any way at all as to what your

23  decision about the facts should be.

24         Your second duty is to take the law as I have

25  presented it to you, and apply the law to the facts.  And then

1    decide if, under the appropriate burden of proof, the parties

2    have established their claims.

3            It's my job to instruct you about the law, and you

4    are bound by the oath that you took to follow these

5    instructions as I gave it to you, even if you personally

6    disagree with them.

7            Perform these duties fairly.  Don't let any bias,

8    sympathy, or prejudice that you might feel toward one side or

9    the other influence you in any way.

10           As jurors, you do have the duty to consult with each

11   other, and to deliberate with the intention of reaching a

12   verdict.  Each of you needs to decide the case for yourself,

13   but only after a full and impartial consideration of all of

14   the evidence with your fellow jurors.

15           I urge you, as I'm sure you would be inclined to do

16   anyway, to listen to each other carefully.  In the course of

17   your deliberations, you should feel free to reexamine your own

18   views, and to change your opinion based on the evidence.  But

19   don't give up your honest convictions about the evidence just

20   because of the opinions of others, nor should you change your

21   mind just for the purpose of getting enough votes for a

22   verdict.

23           When you start to deliberate, don't talk with the

24   jury officer -- which I'm sure will be Mr. Coyle -- or to me

25   or to anybody, except with each other, about this case.

1          If you have questions or messages for me, you must

2     write them down on a piece of paper, have your foreperson sign

3     them -- I urge you to write legibly so that we can read

4     them -- and then give them to the jury officer, Mr. Coyle.  He

5     will give them to me, and I will respond as quickly as I can.

6          I almost certainly will have to talk to the lawyers

7     about any question that you have or any comment that you have.

8     So it might take a little bit of time for me to get back to

9     you, and I urge you to keep your deliberating while you're

10    waiting to hear back from me, if that's at all possible.

11         One more thing about messages:  Never write down or

12    tell anybody about how you stand on any kind of a tentative

13    voting or assessing of the lay of the land, so to speak.

14         For example, do not write down or tell anybody that

15    a certain number of you are voting one way or another.  Your

16    votes really must stay secret until you have finished.

17         Your verdict needs to represent the considered

18    judgment of every juror.  In order for you as the jury to

19    return a verdict, each juror must agree to the verdict.  Your

20    verdict has to be unanimous on each of the questions that is

21    going to be presented to you in the verdict form.

22         The lawyers were given a copy of the verdict form,

23    and they've used it a lot in their closings.  You've seen it.

24    It's relatively short.  It is, I trust, self-explanatory.  You

25    will be given several copies of it to look at and to use, but

1    ultimately only one copy should be returned, signed by the

2    foreperson, and returned here when you have finished this part

3    of the trial.

4          Unless I direct you otherwise, do not reveal your

5    answers until you have been discharged.  We'll talk again

6    after there has been a rendering of the verdict.

7          So, once again, let me remind you that nothing in my

8    instructions, nothing about the form of the verdict is

9    intended to suggest or convey to you in any way or any manner

10   what I think your verdict should be.  It's your job, ladies

11   and gentlemen, it's your exclusive duty, and it is your

12   responsibility to determine a verdict on a unanimous basis.

13         Counsel, knowing that you've been following along,

14   are there any further objections or anything else that we need

15   to discuss about instructions that we haven't covered already?

16         MR. BIZAR:  No, Your Honor.

17         MR. CALLOW:  No, Your Honor.

18         MR. KING:  No, Your Honor.

19         MR. NEUWIRTH:  No, Your Honor.

20         THE COURT:  Okay.  Then is Mr. Coyle still here or

21   is he hiding in the back -- yep, there he is.

22         Mr. Coyle, you may take the jury to begin their

23   deliberations.

24         THE DEPUTY CLERK:  Yes, Judge.  All rise.

25         (Jury out.)

1          THE COURT:  Where are the exhibits, folks?  Are they

2     up here somewhere?

3          MS. REUBEN:  Good afternoon, Your Honor.  Pardon me.

4     Sorry.

5          MR. KING:  Okay.  The Plaintiffs have their set of

6     exhibits, the Defense have theirs.

7          MS. REUBEN:  Yes.  There's one small issue because

8     it's this trial.  The parties have all agreed on the limited

9     purpose exhibits that are limited purpose.  There's a little

10    bit of a discrepancy.

11         The Defendants have indicated they want to add a

12    description of the limited purpose documents.  It was our

13    understanding that Your Honor just wanted a very simple list

14    without characterizations or descriptions or anything like

15    that.

16         THE COURT:  My vision --

17         MS. REUBEN:  Yes.

18         THE COURT:  -- was that it would be a simple list by

19    designation, you know, P-1, P-5, whatever.

20         MR. KING:  Okay.  Then we'll go with Plaintiffs.

21         MS. REUBEN:  Right.  Then we have everything again.

22         THE COURT:  I would like a copy of that, by the way.

23         MS. REUBEN:  Absolutely.  We have that, Your Honor.

24    And we have a copy of our exhibit list as well.

25         THE COURT:  I don't know where you all like to hang

1    out, just make sure that we can find you.  Or at least we can

2    find one of each of you.

3              MR. KING:  Your Honor, I assume that they're going

4    to be at least here until 4:30.

5              THE COURT:  Well...

6              MR. KING:  Are they going to go past 4:30 or are

7    they going to --

8              THE COURT:  I don't know that they've -- I mean, I

9    don't know.  The answer is I'm not going to kick them out, but

10   I also am not going to lean on them to stay if they haven't --

11   if they're not asking to stay.  It's, you know, they're now

12   going to exercise a little bit of their own power, so I don't

13   know.  The answer is I don't know.  But it would be -- I

14   wouldn't say to them you've got to stay here until 7 o'clock

15   no matter what.

16             If they want to go at the end of the day, I haven't

17   heard about anybody having any particular personal obligation,

18   but I don't know.

19             Do you know, Mike?

20             THE DEPUTY CLERK:  I haven't.

21             THE COURT:  We don't know.

22             The only thing I ask is that it would be astonishing

23   if they didn't come back with a question or two, and so I'd

24   like to be able to get somebody, you know, as quickly as

25   possible.

1          MR. KING:  Okay.  I think on -- at least on the Rose

2     Acre side, we'll have somebody here.

3          THE COURT:  Oh, good.

4          MR. CALLOW:  We'll be in the court.  I'm going to

5     hang out in the court.

6          MS. REUBEN:  We can stay.  We can either stay --

7          MR. NEUWIRTH:  We'll be in court.

8          THE COURT:  As long as somebody knows.  I mean I

9     don't know if you tell each other how to get ahold of you.

10    I'm not your babysitter.  Okay.

11         MR. CALLOW:  Thank you, Your Honor.

12         THE COURT:  Do you all have a view about whether the

13    exhibits should go back straightaway or wait until they ask?

14         MR. NEUWIRTH:  We believe they should go

15    straightaway.

16         MR. CALLOW:  We believe we should wait until they

17    ask.

18         MR. NEUWIRTH:  Your Honor, we understood they were

19    going in.  I think you had told them they were going in.

20         THE COURT:  I don't understand.  But they're ready

21    to go.  I don't know why we'd have to go through a routine.  I

22    mean the only question is they are getting several copies of

23    the instructions.  Do they have that already?

24         THE DEPUTY CLERK:  No.

25         THE COURT:  They have several copies of the

1    instructions, several copies of the verdict form.

2              MR. NEUWIRTH:  We assumed the corrected one that

3    everybody agreed to.

4              THE COURT:  No, it's a 1983 case about -- yes.  Yes,

5    the same one.  Of course.  I'm sorry.  After doing that, you

6    get kind of goofy with words, reading all of them.  Yes, the

7    same set.

8              I think we'll just send the two notebooks out and

9    just -- rather than make them go through the routine of asking

10   for it.  Frankly, I would be uneasy if they didn't ask for

11   them, so, I mean, we might as well send them back.

12             MR. NEUWIRTH:  Thank you, Your Honor.

13             THE COURT:  Have you exchanged the exhibit list?

14             MR. NEUWIRTH:  Yes.

15             THE COURT:  We can put one exhibit list in the front

16   of each notebook.

17             MR. NEUWIRTH:  Yes.

18             ALL COUNSEL:  Yes, Your Honor.

19             THE COURT:  That's fine.  Anything that limits the

20   amount of time the jury has to spend ferreting stuff out is a

21   good idea.

22             Just so you all know, I have a guilty plea to do

23   tomorrow morning at 9 o'clock --

24             Mike, is the Defendant tomorrow detained or is he --

25             THE DEPUTY CLERK:  No, he's out on bail.

1          THE COURT:  Okay.  So you can leave your stuff here,

2     if you wish.

3          MR. NEUWIRTH:  Thank you.

4          THE COURT:  It's not -- the reason I ask if

5     somebody's detained, the marshals get a little bit nervous

6     when they see a lot of stuff around, but this is somebody

7     that's out, right?

8          THE DEPUTY CLERK:  Correct.

9          THE COURT:  That's at 9 o'clock.  I'm assuming, I'm

10    going to tell the jury at the end of today, if they're coming

11    back tomorrow, that to come back at 9:30 unless they want to

12    come earlier.

13         The one question I have for you all, I often like to

14    count noses when they're all here and kind of eyeball the jury

15    and say, hi, you know, good morning, now you can go back and

16    start deliberating because I don't really like them to be

17    tempted to deliberate until they're all together.  You all

18    have the freedom to be here or not when I go through that good

19    morning routine.  It's up to you.

20         MR. NEUWIRTH:  Is it correct to assume that that

21    would not be before 9:30 tomorrow?

22         THE COURT:  It would be, unless -- when do they get

23    here?  Do you know what their routine has been?

24         (Discussion off the record with the Clerk.)

25         THE COURT:  Okay.  It would be 9:30.

1          MR. NEUWIRTH:  Okay.  Thank you.

2          THE COURT:  The only wrinkle is because I have the

3    guilty plea at 9 o'clock, it would be a little bit unusual for

4    me to interrupt that and welcome them.

5          MR. NEUWIRTH:  Understood.  We just don't want to be

6    here late.  That's all.

7          THE COURT:  If the jury can get here by 9:00, we can

8    do the greeting thing at 9:00 before the guilty plea.

9          The other thing is --

10         (Discussion off the record.)

11         THE COURT:  It would be unusual for me to be able to

12   do it before 9:30.  And we may just take a break in the other

13   thing.  The other alternative is we don't have to greet them

14   at all.

15         MR. NEUWIRTH:  My only question was to just make

16   sure we're here whenever the Court chose to do it.

17         THE COURT:  Do you all have a strong view one way or

18   the other about whether or not we say good morning to them at

19   all?

20         MR. BIZAR:  I think we should.

21         THE COURT:  I mean that's my usual routine.

22         (Recess.)

23         THE COURT:  Make yourselves comfortable.

24         THE DEPUTY CLERK:  All rise.

25         (Jury in.)

1             THE COURT:  Okay.  Everybody, you may take your

2       seats.

3             And, ladies and gentlemen, I understand that you

4       believe that you ought to head out, adjourn for the day.

5       That's great.  No problem.  Please be back by 9:30.  I will

6       greet you at 9:30 here in the courtroom.  Those of you who get

7       here earlier, please remember you cannot deliberate unless and

8       until all 11 of you are together.  And Mr. Coyle will be here,

9       you know, as usual, and I'll see you then.

10            Meanwhile, it's important that you continue to honor

11      your obligation only to deliberate when you're all together

12      and just enjoy the evening, enjoy the nice weather, and we'll

13      see you tomorrow morning at 9:30.  Thank you so much.

14            THE DEPUTY CLERK:  All rise.

15            (Jury out.)

16            THE COURT:  See those of you who I see tomorrow.

17      Okay?

18            ALL COUNSEL:  Thank you, Your Honor.

19            THE COURT:  When you get here, there will probably

20      be others at the desk.  They won't disturb your things, just

21      don't be alarmed.

22            ALL COUNSEL:  Thank you, Your Honor.

23            THE COURT:  Have a nice evening.

24            ALL COUNSEL:  Thank you, Your Honor.

25            (Court adjourned.)

1                        C E R T I F I C A T E

2

3           I certify that the foregoing is a correct

4    transcript from the record of the proceedings in the

5    above-entitled matter.

6                          _____

7                          Kathleen Feldman, CSR, CRR, RPR, CM
                           Official Court Reporter

8

9    Date: _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.44** [1] - 31:14
**$1.61** [1] - 31:13
**$100** [1] - 83:4
**$140** [1] - 53:12
**$50,000** [1] - 70:19
**$75** [1] - 53:7
**$850** [2] - 24:2, 70:21

## '

**'90s** [1] - 57:18
**'99** [1] - 16:13

## 0

**08-MDL-02002** [1] - 1:5

## 1

**1** [8] - 15:16, 15:18, 23:3, 44:4, 125:24, 126:9, 128:7
**10** [1] - 2:23
**100%** [33] - 20:8, 20:9, 69:17, 69:19, 69:21, 69:23, 70:7, 70:13, 70:23, 71:2, 71:4, 71:17, 72:9, 72:20, 73:5, 73:23, 73:25, 75:6, 86:10, 86:16, 86:19, 87:5, 87:13, 87:16, 87:17, 88:20, 90:21, 94:17, 94:24, 98:18
**1000** [1] - 3:6
**10010** [1] - 2:6
**10016** [1] - 2:24
**10019-6023** [1] - 3:4
**10110** [1] - 2:10
**10th** [1] - 45:8
**11** [13] - 16:25, 29:15, 36:3, 36:6, 37:15, 37:16, 37:21, 52:6, 84:14, 154:8
**1110** [1] - 3:15
**11th** [1] - 38:21
**12** [5] - 14:12, 16:23, 19:4, 52:6, 70:22
**1201** [1] - 3:9
**1234** [1] - 1:22
**13** [3] - 36:12, 36:17, 67:20
**13.3** [1] - 54:9
**1301** [1] - 3:3

**1400** [1] - 3:23
**149** [1] - 5:24
**15** [1] - 63:13
**150** [1] - 5:24
**1521** [1] - 2:14
**17** [3] - 43:24, 68:10, 70:6
**170,000** [1] - 20:25
**1700** [1] - 2:19
**18** [3] - 14:11, 16:7, 68:1
**1818** [1] - 3:18
**19** [1] - 39:23
**19.81** [3] - 76:16, 77:15, 78:2
**1900** [1] - 3:15
**19102** [1] - 2:14
**19103** [1] - 3:19
**19104-2808** [1] - 4:6
**19106** [1] - 1:23
**1980** [1] - 52:12
**1983** [1] - 151:4
**1995** [1] - 53:2
**1996** [1] - 57:20
**1997** [2] - 77:17, 85:17
**1998** [1] - 85:17
**1999** [12] - 9:22, 16:7, 35:3, 45:10, 70:18, 77:20, 77:22, 77:23, 78:1, 78:4, 85:17, 85:25
**1st** [3] - 111:6, 111:10, 111:14

## 2

**2** [5] - 11:19, 15:17, 39:12, 59:23, 88:1
**20.8** [1] - 54:10
**20/20** [1] - 73:10
**200** [7] - 16:10, 35:23, 36:1, 36:3, 36:6, 57:1
**2000** [22] - 9:23, 16:8, 30:23, 30:24, 31:6, 31:13, 35:9, 39:23, 39:25, 43:5, 48:8, 51:16, 54:5, 57:24, 77:18, 77:20, 79:8, 86:9, 91:5, 91:6, 101:1
**20006** [2] - 2:19, 3:16
**2001** [6] - 9:22, 43:24, 44:4, 48:8, 51:14, 79:10
**2002** [11] - 1:5, 9:23, 35:14, 35:16, 49:2, 51:24, 53:2, 53:14,

58:16, 59:15, 59:16, 63:7, 63:11, 79:16, 88:25, 91:12
**2003** [4] - 35:9, 40:4, 59:21, 60:2
**2004** [11] - 17:1, 19:9, 89:13, 89:18, 91:8, 91:12, 96:16, 96:19, 100:18, 103:10, 119:16
**2005** [13] - 62:6, 62:11, 62:13, 62:24, 71:18, 72:25, 73:1, 73:7, 75:12, 79:10, 80:19, 90:18, 94:24
**2006** [9] - 35:11, 35:12, 40:4, 40:5, 55:7, 55:12, 79:10, 80:19, 91:25
**2007** [9] - 16:8, 16:13, 64:7, 65:19, 66:5, 67:12, 79:13, 79:15, 80:17
**2008** [19] - 16:8, 39:23, 51:24, 63:12, 76:20, 78:9, 78:10, 78:12, 78:13, 78:14, 79:8, 80:17, 91:2, 91:8, 91:15, 92:1, 95:15, 100:18, 119:16
**2009** [1] - 80:17
**2011** [5] - 51:17, 70:18, 73:8, 73:10, 73:18
**2013** [12] - 30:23, 30:24, 31:8, 31:14, 39:25, 78:9, 78:11, 91:5, 91:6, 100:24, 101:1
**2014** [3] - 53:14, 53:19, 54:6
**2018** [2] - 1:10, 62:25
**2022** [1] - 69:11
**2025** [1] - 69:11
**215** [2] - 1:23, 21:20
**223** [1] - 5:12
**22nd** [1] - 2:6
**24** [1] - 52:7
**271** [1] - 31:7
**2929** [1] - 4:5
**295** [1] - 31:9
**29th** [1] - 3:18
**2:00** [1] - 105:7
**2nd** [1] - 27:17

## 3

**3** [1] - 21:20
**3.5** [1] - 78:14

**300** [2] - 51:14, 51:15
**30th** [2] - 5:8, 5:11
**32nd** [1] - 3:4
**33.3** [1] - 54:15
**330** [1] - 51:16
**35** [1] - 17:24
**38** [1] - 81:23
**3800** [1] - 3:8

## 4

**4.3** [1] - 76:13
**400,000** [1] - 52:18
**40th** [1] - 2:23
**45** [1] - 88:16
**45-inch** [1] - 72:2
**45202** [1] - 3:23
**47** [1] - 37:23, 92:8
**4:30** [2] - 149:4, 149:6

## 5

**5** [4] - 1:10, 5:12, 87:23, 88:2
**50** [1] - 84:10
**500** [1] - 2:10
**51** [1] - 2:6
**5100** [1] - 3:6
**517** [1] - 51:17
**54** [1] - 48:10
**58** [2] - 41:22, 41:24

## 6

**6** [2] - 87:23, 88:2
**6.1** [2] - 30:24, 76:11
**6.9** [1] - 30:25
**60** [5] - 37:20, 37:24, 67:9, 84:10
**601** [1] - 1:22
**63** [1] - 67:7
**650** [1] - 2:19
**67-inch** [1] - 67:11
**67-square-inch** [1] - 48:10

## 7

**7** [4] - 11:9, 87:23, 88:2, 149:14
**70** [1] - 67:7
**72** [1] - 43:7
**74,000** [1] - 20:24
**75** [1] - 43:17
**77002** [1] - 3:7
**779-5578** [1] - 1:23

**7th** [2] - 2:14, 49:14

## 8

**8** [1] - 87:23
**80** [2] - 92:10, 96:21
**84** [1] - 96:21

## 9

**9** [4] - 53:14, 151:23, 152:9, 153:3
**98101** [1] - 3:9
**9:00** [2] - 153:7, 153:8
**9:30** [7] - 152:11, 152:21, 152:25, 153:12, 154:5, 154:6, 154:13

## A

**A-frames** [2] - 20:10, 20:11
**abandoned** [1] - 138:23
**ABC** [1] - 73:10
**abide** [2] - 61:9, 61:14
**ability** [5] - 56:13, 92:12, 112:12, 134:14, 134:19
**able** [8] - 9:1, 9:2, 62:3, 83:25, 88:14, 97:12, 149:24, 153:11
**above-entitled** [1] - 155:5
**absent** [1] - 106:25
**absolutely** [3] - 7:7, 46:7, 148:23
**academic** [1] - 101:16
**ACC** [2] - 62:15, 75:17
**accept** [2] - 114:13, 123:20
**accepts** [1] - 130:2
**accident** [3] - 12:18, 129:3, 137:12
**accomplish** [3] - 12:21, 129:20, 129:24
**according** [4] - 17:25, 31:7, 78:22, 79:13
**account** [10] - 79:25, 80:7, 80:10, 80:11, 80:12, 80:13, 80:14, 80:15, 80:18, 80:20

**accountable** [1] - 102:17

**accounted** [2] - 80:3, 80:4

**accounts** [1] - 120:10

**accurate** [2] - 6:16, 113:19

**accusations** [1] - 83:15

**achieve** [3] - 129:9, 136:7, 136:14

**achieved** [2] - 70:10, 136:9

**acknowledged** [2] - 13:22, 95:18

**acquire** [1] - 65:1

**acquired** [1] - 53:18

**acquiring** [1] - 52:25

**acquisitions** [1] - 54:12

**Acre** [91] - 3:19, 13:19, 15:5, 16:24, 29:21, 35:11, 35:15, 36:5, 38:8, 38:18, 39:5, 40:5, 40:9, 41:7, 41:14, 41:23, 50:6, 50:24, 51:2, 51:7, 51:12, 51:13, 51:24, 52:22, 53:11, 53:22, 53:23, 54:15, 54:18, 54:20, 55:5, 55:7, 55:17, 55:23, 56:8, 56:10, 57:12, 57:13, 57:15, 57:16, 57:23, 58:9, 58:11, 58:24, 59:17, 60:4, 60:8, 60:12, 61:10, 62:1, 63:1, 63:23, 64:6, 64:8, 64:10, 64:13, 64:18, 65:25, 66:5, 66:10, 81:9, 81:10, 81:19, 81:23, 81:24, 82:2, 82:14, 83:3, 83:13, 83:17, 83:21, 83:24, 84:8, 84:21, 87:8, 87:12, 91:2, 91:20, 95:4, 98:10, 118:5, 125:23, 128:18, 137:2, 150:2

**Acre's** [8] - 50:8, 50:12, 53:1, 56:21, 61:17, 63:25, 79:23, 82:6

**Acres** [1] - 57:24

**act** [6] - 12:17, 129:2, 130:4, 137:11, 137:22, 139:17

**Act** [10] - 22:7, 125:15, 125:16,

125:18, 125:24, 126:9, 126:18, 128:8, 132:13, 140:11

**acted** [6] - 13:5, 13:13, 104:4, 111:8, 131:9, 132:5

**acting** [3] - 115:11, 116:6, 116:10

**Action** [4] - 33:10, 116:24, 117:23

**action** [1] - 10:7

**actions** [14] - 13:14, 13:22, 23:1, 27:3, 32:4, 50:12, 63:25, 119:22, 127:16, 138:20, 139:9, 139:12, 139:14

**Actions** [1] - 33:8

**activism** [3] - 43:3, 80:11, 80:14

**activists** [5] - 43:14, 44:8, 44:11, 44:13, 66:22

**activities** [2] - 16:13, 32:4

**activity** [3] - 16:12, 16:16, 16:21

**actor** [1] - 107:25

**actress** [1] - 107:25

**acts** [12] - 115:10, 115:18, 115:20, 115:21, 116:9, 116:14, 116:17, 116:18, 138:16, 142:4, 142:5, 142:9

**actual** [1] - 138:25

**adamantly** [1] - 62:19

**add** [3] - 6:13, 53:8, 148:11

**added** [8] - 51:25, 52:14, 52:15, 52:16, 52:17, 52:19, 53:8, 53:14

**adding** [2] - 5:22, 47:24

**addition** [1] - 124:24

**additional** [3] - 5:13, 6:13, 59:24

**address** [3] - 63:13, 94:18, 141:5

**addressing** [1] - 118:8

**adjourn** [1] - 154:4

**adjourned** [1] - 154:25

**adjust** [1] - 59:24

**adjusted** [1] - 31:12

**adjustment** [1] - 59:23

**ADLER** [1] - 2:5

**administering** [1] - 67:2

**administrative** [1] - 139:8

**admissible** [2] - 81:2

**admissions** [1] - 7:23

**admit** [2] - 91:2, 97:19

**admitted** [12] - 9:21, 10:11, 11:21, 11:23, 11:25, 92:18, 106:9, 110:17, 110:20, 111:4, 111:19, 144:9

**adopt** [1] - 131:25

**adopted** [4] - 44:6, 69:3, 86:12, 87:13

**adoption** [2] - 87:4

**advance** [1] - 139:1

**advantage** [2] - 82:19, 143:16

**advertising** [1] - 98:22

**advisor** [1] - 24:19

**Advisory** [11] - 10:18, 42:13, 42:17, 43:15, 45:24, 46:4, 46:10, 46:14, 70:16, 74:5, 74:6

**affect** [4] - 37:17, 37:24, 80:2, 80:5

**affected** [3] - 101:5, 113:23, 117:25

**affects** [1] - 126:3

**afternoon** [4] - 9:3, 11:7, 26:18, 148:3

**afternoons** [1] - 8:23

**afterwards** [3] - 20:5, 20:7, 60:7

**agenda** [1] - 95:5

**agent** [5] - 115:23, 116:1, 116:5, 116:6, 116:10

**agent's** [1] - 115:20

**agents** [8] - 115:10, 115:14, 115:15, 115:19, 116:9, 116:12, 116:14

**ago** [2] - 49:11, 59:6

**agree** [8] - 62:14, 62:16, 71:12, 81:19, 81:24, 82:2, 96:24, 146:19

**agreed** [12] - 14:20, 18:8, 38:18, 51:7, 60:3, 104:8, 108:14, 130:9, 130:11, 131:24, 148:8, 151:3

**agreeing** [1] - 97:24

**agreement** [43] - 5:25, 6:1, 12:20, 13:7, 13:12, 13:19, 19:16, 19:17, 22:20, 24:10, 24:14, 34:11, 34:13, 34:14, 36:22, 50:25, 51:6, 51:8, 51:10, 82:25, 103:13, 103:16, 103:17, 103:19, 104:1, 104:6, 127:8, 128:13, 129:5, 129:7, 129:12, 129:23, 130:1, 130:6, 130:14, 130:24, 131:10, 131:11, 132:2, 132:6, 132:9

**agreements** [2] - 45:18, 103:20

**agrees** [1] - 65:3

**agricultural** [6] - 42:14, 100:13, 101:10, 101:13, 101:18, 124:5

**Agriculture** [5] - 64:6, 64:11, 64:14, 82:21

**agriculture** [1] - 42:19

**aha** [1] - 40:5

**ahead** [3] - 6:24, 107:2, 108:1

**ahold** [1] - 150:9

**aid** [1] - 143:19

**AI** [1] - 12:9

**alarmed** [1] - 154:21

**alas** [1] - 5:4

**Albertsons** [1] - 48:7

**ALEX** [1] - 2:5

**ALEXEE** [1] - 2:3

**ALF** [1] - 58:2

**alike** [2] - 104:5, 130:5

**ALL** [5] - 105:16, 151:18, 154:18, 154:22, 154:24

**allegations** [4] - 83:14, 83:18, 83:20, 119:21

**allege** [6] - 18:17, 30:18, 31:1, 32:3, 53:25, 83:10

**alleged** [47] - 12:14, 12:20, 13:5, 14:7, 31:6, 68:9, 69:19, 77:14, 94:9, 104:8, 117:13, 117:24, 119:18, 119:24, 128:23, 129:16, 129:22, 130:10, 130:12, 130:19,

130:22, 131:3, 132:4, 134:11, 134:22, 135:2, 135:5, 135:7, 135:8, 135:10, 135:16, 137:4, 138:5, 138:9, 138:14, 138:15, 140:17, 140:19, 141:2, 141:9, 141:12, 141:16, 141:18, 141:22, 142:24, 143:7, 143:12

**allegedly** [1] - 62:5

**alleges** [2] - 119:15, 128:18

**ALLEN** [1] - 3:14

**allocate** [1] - 139:20

**allocated** [1] - 47:25

**allocation** [1] - 125:19

**allowed** [2] - 10:12, 97:13

**allows** [1] - 116:24

**almost** [3] - 45:11, 59:25, 146:6

**alone** [1] - 107:9

**alternative** [4] - 70:10, 75:4, 136:10, 153:13

**Amazon** [2] - 39:4, 39:5

**amend** [1] - 60:3

**Americas** [1] - 3:3

**amount** [2] - 95:16, 151:20

**amounted** [1] - 64:22

**amounts** [1] - 40:2

**analysis** [7] - 77:3, 78:3, 79:14, 79:25, 100:16, 128:10, 136:22

**analyze** [1] - 5:15

**Animal** [12] - 18:6, 19:13, 44:5, 45:4, 45:10, 47:20, 58:2, 58:11, 59:24, 65:19, 65:23, 69:2

**animal** [27] - 20:14, 43:3, 43:10, 43:14, 44:11, 44:13, 45:6, 45:13, 57:16, 58:1, 62:21, 66:22, 70:1, 71:23, 72:4, 72:11, 72:17, 73:13, 74:10, 80:13, 86:1, 86:24, 94:17, 95:6, 98:20, 98:22

**animals** [5] - 49:21, 71:7, 71:8, 71:9, 72:18

**Animals** [1] - 43:20

animals' [1] - 71:10
announced [6] -
43:5, 43:16, 53:18,
86:5, 89:2, 110:22
announcements [2]
- 97:5, 97:7
Answer [1] - 49:18
answer [46] - 14:25,
15:9, 15:16, 15:18,
23:8, 26:24, 29:1,
29:3, 30:4, 30:7,
30:12, 30:22, 31:20,
38:17, 38:21, 45:4,
45:8, 46:6, 46:12,
46:17, 50:5, 51:25,
53:3, 53:5, 59:1,
59:10, 59:12, 67:16,
71:4, 72:2, 74:13,
74:14, 81:21, 82:1,
82:4, 84:17, 90:2,
102:19, 110:10,
110:12, 149:9, 149:13
answered [1] - 36:8
answers [1] - 147:5
anticipated [1] - 55:8
anticompetitive [2] -
116:7, 136:25
ANTITRUST [1] - 1:5
antitrust [22] -
116:13, 125:13,
139:10, 139:11,
140:2, 140:4, 140:18,
140:22, 141:3, 141:9,
141:16, 141:18,
141:22, 142:1, 142:2,
142:6, 142:11,
142:12, 142:17,
142:24, 143:7, 143:12
anyway [1] - 145:16
apologize [2] - 47:5,
77:5
apparent [5] -
115:20, 115:25,
116:5, 116:11, 116:15
appear [2] - 14:10,
32:21
appearance [1] -
113:6
APPEARANCES [3] -
2:1, 3:1, 4:1
appearances [1] -
116:6
appeared [1] - 144:7
applicable [2] -
106:12, 106:22
applies [1] - 121:9
apply [7] - 7:9,
70:15, 105:3, 106:19,
121:9, 124:1, 144:25
appreciate [3] - 7:10,

8:18, 27:17
appropriate [2] - 6:8,
145:1
approved [2] - 73:22,
98:11
ARANOFF [1] - 2:9
Arch [1] - 4:5
architect [1] - 45:22
area [1] - 133:10
argue [1] - 70:7
argument [2] -
14:14, 16:25
arguments [8] - 7:2,
7:6, 8:10, 29:8, 106:9,
108:19, 122:13,
122:14
Arizona [2] - 53:19,
68:24
Arkansas [1] - 75:2
Armstrong [15] -
18:6, 42:11, 43:11,
68:17, 70:14, 70:15,
70:22, 74:4, 74:5,
89:22, 90:5, 90:11,
90:14, 96:11, 103:18
ARTHUR [1] - 3:12
articles [2] - 23:18,
23:19
aspect [3] - 91:19,
133:1, 133:8
aspects [2] - 104:10,
132:24
assault [1] - 83:20
assembled [1] -
131:7
assert [1] - 119:22
asserted [1] - 111:16
assess [1] - 101:18
assessing [1] -
146:13
assist [1] - 124:11
associated [3] -
25:1, 59:24, 131:6
association [1] -
48:6, 115:1, 138:12,
139:10, 139:13,
139:15, 139:16,
139:22, 140:2, 140:4,
140:5
association's [1] -
139:9
associations [3] -
115:3, 139:1, 139:4
assume [2] - 149:3,
152:20
assumed [1] - 151:2
assuming [2] - 41:9,
152:9
astonishing [1] -
149:22

attacks [1] - 99:15
attempt [1] - 62:22
attend [1] - 10:5
ATTENDANCE [1] -
4:8
attended [6] - 10:4,
10:9, 57:20, 93:25,
97:16, 97:17
attending [2] - 89:9,
93:5
attention [3] - 8:17,
27:18, 104:21
attentive [1] - 8:17
audience [1] - 8:13
audit [1] - 86:16
audited [1] - 73:21
authority [7] -
115:20, 115:23,
115:25, 116:5,
116:11, 116:15
authorized [1] -
105:7
automatically [1] -
86:17
available [4] - 70:10,
130:24, 136:10,
143:17
Avenue [4] - 2:6,
2:10, 3:3, 3:9
awake [1] - 8:23

## B

babysitter [1] -
150:10
backfill [3] - 20:4,
20:5
backfilling [12] -
20:4, 74:3, 74:8,
74:11, 86:11, 89:15,
89:19, 90:10, 90:24,
91:15, 96:10, 96:12
bail [1] - 151:25
Baker [3] - 38:13,
61:5, 75:9
bakery [1] - 57:3
balance [4] - 68:2,
68:7, 128:5, 136:15
balanced [1] -
120:15
balancing [1] - 69:17
ban [5] - 74:11,
86:11, 89:19, 90:9,
90:24
bank [2] - 66:4
banned [1] - 91:15
bar [1] - 32:1
Barcus [3] - 21:7,
21:8, 21:9

barely [1] - 104:15
BARNES [1] - 3:13
barns [2] - 20:22,
97:13
Barrel [2] - 65:18,
66:1
barriers [1] - 135:3
base [2] - 107:15,
107:19
based [17] - 18:24,
30:15, 30:17, 32:11,
37:21, 38:23, 42:11,
42:16, 74:12, 77:14,
108:21, 109:2, 109:9,
111:8, 123:25,
138:12, 145:18
bases [1] - 123:25
basic [1] - 43:12
basics [1] - 30:14
basis [4] - 122:15,
122:20, 129:5, 147:12
battle [1] - 60:15
battling [1] - 76:8
bears [3] - 67:5,
112:25, 136:24
became [3] - 12:16,
51:4, 129:1
become [9] - 44:8,
62:5, 69:3, 103:24,
129:13, 137:14,
137:16, 137:23, 140:4
becomes [3] - 58:9,
104:13, 117:23
BEFORE [1] - 1:13
beforehand [2] -
20:5, 20:7
began [4] - 31:6,
48:5, 77:20, 138:2
begin [2] - 105:8,
147:22
beginning [4] - 5:12,
8:25, 76:25, 106:16
behalf [4] - 29:21,
115:12, 115:22,
116:25
behavior [3] - 13:2,
131:18, 131:23
behold [1] - 63:12
beholden [1] - 39:4
belief [2] - 112:6,
113:14
believability [1] -
112:25
believable [2] - 33:5,
113:4
believes [3] - 76:12,
76:14, 83:21
Bell [11] - 45:22,
45:23, 45:24, 45:25,
46:3, 65:12, 85:25,

89:15, 103:10
belong [2] - 38:24,
39:4
belonged [1] -
139:13
belonging [1] - 48:1
belongs [1] - 140:3
below [1] - 26:25
benchmark [6] -
77:4, 77:7, 77:10,
77:12, 77:13, 77:16
benchmarks [1] -
26:7
benefit [5] - 61:24,
92:14, 128:9, 136:18,
142:9
benefits [21] - 68:5,
68:7, 68:8, 68:9,
68:24, 69:18, 69:21,
70:9, 128:4, 128:6,
133:20, 133:24,
135:23, 136:6, 136:7,
136:9, 136:14,
136:15, 136:20,
136:23, 137:1
benefitted [2] -
68:11, 136:1
Berkley [1] - 101:14
bERNSTEIN [1] -
2:22
BERNSTEIN [1] -
2:22
best [8] - 8:9, 17:25,
45:12, 45:13, 60:17,
85:9, 85:12, 125:19
Beth [2] - 73:16,
74:25
better [4] - 18:2,
42:20, 68:18, 134:19
better-quality [1] -
68:18
between [21] - 13:7,
16:8, 16:16, 22:5,
23:6, 96:21, 101:1,
107:6, 114:2, 114:23,
115:6, 118:10,
119:16, 120:11,
124:20, 126:12,
128:14, 129:6, 129:7,
131:12, 132:6
beyond [1] - 121:7
bias [4] - 100:14,
108:6, 112:17, 145:7
biased [5] - 26:6,
33:25, 76:19, 78:16,
81:15
big [7] - 37:21,
43:10, 48:6, 58:7,
88:9, 102:7
biggest [1] - 58:22

**bill** [2] - 30:24, 30:25
**billions** [4] - 88:7, 88:8, 88:11, 102:9
**binder** [1] - 8:23
**binders** [1] - 11:16
**binding** [1] - 138:16
**bird** [6] - 17:25, 48:10, 52:1, 52:19, 65:21, 67:6
**birds** [27] - 18:3, 18:4, 18:5, 18:17, 21:1, 45:20, 52:3, 52:14, 52:16, 52:17, 53:8, 63:5, 63:20, 64:18, 64:22, 64:23, 64:24, 65:4, 65:7, 65:8, 65:23, 67:13, 70:15, 71:13, 72:2, 72:12
**bit** [14] - 8:23, 11:6, 14:1, 31:23, 34:6, 35:5, 47:2, 59:6, 66:13, 146:8, 148:10, 149:12, 152:5, 153:3
**BIZAR** [5] - 4:4, 95:25, 99:7, 147:16, 153:20
**Bizar** [9] - 5:24, 6:6, 6:15, 8:14, 11:6, 14:23, 20:20, 28:24, 41:18
**black** [4] - 54:3, 56:23
**blue** [3] - 54:11, 79:1, 79:9
**board** [3] - 16:17, 93:4, 93:24
**Board** [6] - 10:15, 10:16, 10:17, 93:14, 93:19, 96:15
**boards** [1] - 30:15
**Bob** [5] - 25:24, 47:22, 71:22, 72:9
**bodies** [1] - 139:8
**boiled** [1] - 30:19
**bongos** [3] - 7:16, 7:17
**books** [1] - 107:23
**bottom** [2] - 54:3, 57:10
**bought** [3] - 24:25, 53:18, 56:6
**bound** [3] - 39:2, 115:18, 145:4
**break** [5] - 47:2, 47:6, 47:9, 104:25, 153:12
**brief** [2] - 19:8, 84:24
**briefly** [1] - 54:16
**bring** [4] - 7:18, 28:2,

28:3, 106:1
**bringing** [3] - 22:20, 36:22, 127:8
**brings** [1] - 125:14
**broader** [1] - 100:20
**brother** [1] - 66:14
**brought** [4] - 33:19, 45:2, 98:21, 118:3
**Brown** [1] - 117:15
**brown** [1] - 87:14
**build** [1] - 63:19
**building** [3] - 52:25, 55:12, 69:11
**buildings** [1] - 57:25
**built** [4] - 53:6, 53:15, 53:16, 55:12
**bulk** [1] - 57:8
**bullet** [1] - 14:11
**bunch** [2] - 65:1, 81:4
**burden** [24] - 11:10, 11:14, 22:2, 28:14, 28:15, 28:16, 28:21, 34:20, 42:9, 50:22, 80:21, 80:24, 117:24, 118:19, 119:3, 119:11, 120:14, 120:18, 132:12, 136:24, 145:1
**Burger** [3] - 43:16, 44:6, 80:9
**business** [22] - 19:24, 23:25, 33:7, 53:1, 54:23, 58:3, 58:4, 84:2, 84:9, 88:9, 118:15, 119:23, 126:16, 131:25, 132:18, 140:3, 140:14, 142:19, 142:20, 142:21
**businesses** [2] - 102:6, 138:25
**but-for** [1] - 54:9
**buy** [14] - 24:4, 24:11, 24:16, 24:22, 40:18, 49:23, 55:21, 55:25, 56:4, 56:8, 56:9, 57:1, 57:8, 102:7
**buyer** [5] - 43:9, 49:12, 56:5, 58:16, 75:3
**buyers** [5] - 44:10, 44:14, 49:4, 50:2, 56:7
**buying** [4] - 57:3, 57:5, 60:2, 92:7
**buys** [2] - 23:25, 24:3
**BY** [10] - 2:2, 2:9,

2:13, 2:17, 2:22, 3:3, 3:12, 3:17, 3:22, 4:3

---

# C

**C.A.T** [1] - 1:25
**cage** [30] - 43:6, 43:10, 45:23, 47:25, 48:9, 53:16, 60:14, 60:16, 60:20, 61:9, 63:4, 63:5, 64:17, 64:22, 65:6, 65:13, 66:12, 66:23, 66:24, 69:1, 69:9, 69:10, 69:11, 80:7, 86:3, 86:18, 98:8
**cages** [9] - 20:25, 21:1, 46:22, 47:24, 57:21, 60:22, 64:16, 65:7, 70:4
**calamities** [1] - 80:16
**calculated** [1] - 95:16
**calculation** [1] - 32:17
**California** [1] - 42:13
**Callow** [12] - 8:11, 27:7, 28:25, 32:18, 33:3, 33:4, 33:6, 33:19, 36:20, 39:8, 80:22, 84:12
**CALLOW** [8] - 3:22, 7:15, 7:17, 8:12, 147:17, 150:4, 150:11, 150:16
**campaign** [1] - 44:3
**cannibalism** [1] - 74:9
**cannot** [8] - 12:3, 15:22, 39:13, 70:12, 85:10, 111:1, 139:16, 154:7
**capable** [3] - 115:13, 115:16, 139:10
**capacity** [1] - 52:15
**care** [13] - 12:8, 12:9, 18:1, 18:4, 20:1, 20:2, 26:4, 26:5, 49:21, 98:14, 98:18, 98:22
**Care** [3] - 59:25, 65:19, 65:23
**career** [1] - 8:21
**carefully** [4] - 34:16, 54:2, 113:11, 145:16
**Carolina** [1] - 53:9
**carry** [2] - 104:8, 130:9
**carrying** [1] - 122:5

**CARTER** [1] - 3:14
**cartons** [1] - 57:1
**case** [92] - 6:16, 9:2, 9:8, 9:9, 9:17, 9:19, 9:21, 11:8, 11:10, 13:10, 14:7, 17:22, 18:16, 21:9, 23:15, 23:17, 24:8, 25:5, 25:14, 25:15, 26:12, 26:18, 27:22, 28:2, 28:3, 28:20, 30:3, 30:20, 32:3, 32:9, 32:23, 32:24, 33:14, 33:18, 33:20, 33:25, 34:2, 36:4, 37:16, 37:22, 38:7, 38:8, 44:23, 44:24, 50:17, 77:21, 83:13, 83:20, 83:23, 84:4, 91:7, 92:6, 92:21, 95:24, 97:4, 98:1, 99:24, 100:4, 100:7, 100:22, 102:2, 102:5, 102:10, 102:14, 103:1, 106:12, 107:20, 107:24, 108:7, 108:20, 109:5, 109:7, 112:17, 113:22, 114:22, 115:6, 116:23, 117:14, 118:2, 118:19, 120:9, 121:1, 123:23, 124:4, 125:12, 128:15, 143:14, 145:12, 145:25, 151:4
**case-in-chief** [1] - 21:9
**cases** [10] - 5:14, 5:18, 23:23, 23:24, 24:20, 25:4, 84:6, 99:22, 121:9, 121:10
**Casting** [1] - 108:1
**catch** [1] - 105:22
**category** [1] - 75:13
**causation** [1] - 140:15
**caused** [7] - 65:20, 95:17, 117:25, 126:15, 133:6, 142:4, 142:8
**causes** [1] - 141:20
**causing** [1] - 89:15
**cell** [1] - 27:11
**cent** [1] - 59:23
**centerpiece** [1] - 50:17
**Central** [1] - 108:1
**central** [1] - 125:18
**Centre** [1] - 4:5
**cents** [5] - 87:20,

87:23, 88:1, 88:2, 88:6
**CEO** [1] - 43:25
**ceremonial** [1] - 27:16
**certain** [12] - 42:2, 55:17, 69:1, 81:6, 109:17, 111:21, 120:6, 120:7, 124:12, 144:8, 146:15
**certainly** [1] - 146:6
**certifications** [1] - 49:22
**certified** [9] - 16:10, 19:19, 19:20, 49:15, 62:4, 68:19, 72:7, 72:14, 87:20
**Certified** [113] - 12:24, 14:9, 14:13, 15:14, 16:20, 19:7, 19:9, 19:25, 20:3, 20:19, 20:21, 21:2, 21:17, 21:18, 21:23, 22:11, 29:12, 32:5, 35:1, 35:15, 35:17, 37:12, 42:10, 44:15, 46:20, 46:25, 47:18, 48:2, 48:3, 49:1, 49:12, 51:20, 53:10, 57:13, 57:14, 57:15, 58:13, 58:18, 58:21, 58:24, 59:8, 59:18, 60:1, 60:5, 60:11, 60:13, 60:23, 61:4, 61:7, 62:2, 62:6, 62:7, 62:15, 62:20, 63:1, 63:15, 63:23, 64:15, 64:16, 64:21, 65:2, 65:3, 65:6, 66:7, 66:9, 66:12, 66:19, 66:21, 68:4, 68:15, 68:22, 68:24, 69:24, 71:16, 72:15, 72:24, 72:25, 73:4, 73:22, 74:2, 74:21, 74:22, 75:2, 75:5, 75:12, 75:17, 75:22, 75:23, 76:1, 79:10, 79:16, 80:8, 81:9, 82:3, 82:8, 83:7, 87:22, 89:1, 89:5, 90:20, 90:21, 91:12, 91:20, 91:24, 92:2, 92:11, 96:17, 103:12, 126:23, 131:16
**certify** [1] - 155:3
**cetera** [5] - 48:7, 60:10, 80:3
**Chad** [5] - 10:20,

17:6, 38:16, 98:23

**chains** [2] - 43:18, 49:4

**chair** [2] - 42:12, 42:14

**challenged** [23] - 22:9, 67:22, 68:11, 68:13, 83:19, 126:20, 127:22, 128:1, 128:7, 132:14, 133:16, 133:22, 133:25, 134:2, 135:13, 135:18, 135:21, 135:25, 136:2, 136:5, 136:13, 136:18, 136:20

**challenges** [1] - 125:22

**chambers** [1] - 5:8

**champion** [1] - 74:22

**change** [6] - 44:14, 60:24, 85:10, 94:24, 145:18, 145:20

**changed** [3] - 43:15, 60:24, 111:11

**changes** [1] - 9:2

**changing** [1] - 42:19

**channels** [1] - 71:6

**CHAPMAN** [1] - 4:4

**character** [1] - 113:8

**characterizations** [1] - 148:14

**charge** [13] - 5:8, 5:17, 5:23, 6:5, 6:14, 6:19, 6:23, 32:8, 67:15, 104:2, 134:17, 134:19

**charged** [1] - 134:15

**charity** [1] - 99:25

**chart** [4] - 14:10, 63:11, 92:5

**charts** [8] - 21:6, 21:7, 26:4, 88:8, 91:4, 91:10, 100:25

**chastise** [1] - 70:16

**cheapest** [1] - 88:15

**check** [3] - 10:22, 27:10

**cherry** [1] - 41:13

**cherry-picked** [1] - 41:13

**chest** [1] - 26:16

**chick** [2] - 38:19, 54:19

**chicken** [3] - 63:4, 67:10, 70:5

**chief** [3] - 21:9, 52:5, 60:22

**chip** [1] - 95:21

**chose** [1] - 153:16

**chosen** [1] - 108:3

**CHRISTINE** [1] - 4:3

**cincinnati** [1] - 3:23

**Cira** [1] - 4:5

**circulated** [1] - 110:22

**circumstances** [5] - 7:4, 108:24, 113:12, 116:4, 131:3

**circumstantial** [9] - 121:24, 121:25, 122:6, 122:9, 122:11, 122:23, 123:8, 130:20, 131:1

**circumstantially** [6] - 12:4, 12:7, 34:12, 39:13, 111:2, 111:13

**civil** [2] - 118:2, 121:10

**claim** [13] - 31:2, 37:7, 37:22, 69:21, 69:25, 117:8, 118:23, 118:25, 119:10, 119:23, 120:11, 120:20, 120:21

**claimed** [3] - 104:7, 130:8, 133:4

**claiming** [4] - 39:20, 39:21, 72:6, 98:3

**claims** [25] - 23:25, 24:4, 24:11, 24:22, 24:24, 25:14, 28:16, 28:20, 33:10, 33:13, 68:3, 87:2, 98:21, 100:3, 117:1, 117:6, 117:9, 118:18, 119:1, 120:3, 120:8, 120:10, 128:15, 145:2

**Class** [85] - 2:7, 2:11, 2:15, 11:10, 12:12, 24:1, 24:4, 24:11, 30:3, 33:8, 33:10, 74:16, 74:17, 76:5, 76:15, 78:9, 103:6, 116:24, 117:3, 117:11, 117:14, 117:18, 117:19, 117:20, 117:21, 117:23, 118:1, 118:3, 118:15, 118:19, 118:23, 119:4, 119:8, 119:10, 119:15, 120:12, 120:13, 120:17, 122:24, 124:4, 125:14, 125:22, 126:10, 126:16, 127:21, 127:25, 128:15, 128:17, 128:21, 130:8, 130:18,

132:15, 132:19, 132:21, 133:2, 133:4, 133:11, 133:16, 135:21, 136:8, 136:24, 137:4, 140:7, 140:12, 140:13, 140:17, 141:1, 141:4, 141:8, 141:10, 141:14, 141:19, 141:21, 141:24, 142:11, 142:13, 142:18, 142:21, 143:1, 143:2, 143:4, 143:9

**Class'** [8] - 133:12, 140:21, 141:13, 142:3, 142:6, 142:8, 142:10, 142:16

**clear** [5] - 22:6, 39:12, 39:16, 81:18, 91:18

**clearly** [3] - 75:14, 75:15, 92:11

**CLERK** [12] - 8:3, 47:7, 47:12, 105:11, 106:2, 147:24, 149:20, 150:24, 151:25, 152:8, 153:24, 154:14

**Clerk** [1] - 152:24

**client** [1] - 9:23

**clients** [2] - 9:24, 110:4

**clips** [1] - 11:16

**close** [1] - 27:19

**closing** [9] - 6:7, 6:15, 7:1, 7:5, 8:10, 10:23, 29:8, 30:8, 96:1

**closings** [3] - 7:11, 96:3, 146:23

**Club** [1] - 49:8

**CM** [2] - 1:21, 155:7

**coast** [1] - 55:10

**coat** [1] - 111:10

**coconspirator** [1] - 139:11

**coconspirators** [16] - 13:5, 23:4, 37:22, 117:13, 119:18, 132:4, 132:10, 134:11, 134:22, 135:2, 135:8, 135:10, 135:16, 138:21, 143:8, 143:13

**cold** [2] - 111:5, 111:14

**collapse** [2] - 80:18, 80:19

**collapses** [1] - 83:11

**collective** [1] - 139:19

**colorfully** [1] - 71:19

**combination** [5] - 89:3, 118:10, 118:12, 126:11, 126:13

**combinations** [1] - 125:25

**combined** [1] - 134:23

**comfortable** [3] - 5:2, 36:8, 153:23

**coming** [7] - 27:19, 32:24, 33:6, 44:11, 130:1, 152:10

**comment** [2] - 21:6, 146:7

**comments** [1] - 24:2

**commerce** [2] - 126:3, 126:5

**commercial** [4] - 41:9, 41:16, 142:20, 142:22

**Commission** [1] - 57:20

**commitment** [9] - 17:18, 18:21, 45:15, 75:11, 75:14, 76:1, 98:18, 103:14, 129:8

**commitments** [4] - 97:6, 97:10, 97:12, 97:14

**committed** [2] - 17:4, 75:20

**committee** [12] - 86:8, 86:14, 86:23, 89:21, 89:24, 90:5, 90:10, 90:12, 93:4, 94:19, 98:10, 98:17

**Committee** [14] - 10:17, 10:18, 42:13, 42:21, 45:13, 45:24, 46:4, 46:8, 46:10, 46:14, 70:16, 74:5, 74:6, 86:13

**Committee's** [1] - 42:17

**commodity** [2] - 117:12, 133:5

**common** [14] - 22:19, 30:19, 36:21, 103:14, 103:21, 109:13, 109:16, 122:16, 123:10, 125:6, 127:7, 129:8, 129:24, 139:1

**communicated** [2] - 12:1, 110:24

**communicating** [1] - 59:16

**communications** [1] - 33:13

**community** [2] - 114:24, 115:7

**companies** [22] - 49:24, 62:2, 74:19, 87:7, 87:19, 88:10, 92:11, 94:7, 96:23, 97:23, 97:24, 97:25, 98:15, 99:5, 102:7, 102:15, 117:11, 119:25, 128:12, 129:6, 129:8

**company** [27] - 24:10, 24:13, 24:16, 24:19, 25:1, 47:24, 51:18, 51:19, 52:11, 62:5, 67:1, 72:4, 73:20, 75:21, 82:15, 83:3, 83:5, 84:7, 87:13, 88:19, 92:7, 94:23, 99:21, 99:22, 99:24, 100:15, 116:2

**Company** [1] - 117:15

**compare** [6] - 56:25, 57:1, 57:8, 91:5, 91:6, 100:25

**compared** [3] - 56:12, 57:4, 107:24

**compares** [2] - 77:9, 77:13

**Compassion** [1] - 98:20

**compels** [2] - 102:21, 102:23

**compete** [1] - 139:19

**competing** [2] - 73:1, 73:3

**competition** [25] - 68:11, 70:11, 125:17, 125:19, 127:23, 128:2, 132:17, 132:20, 132:22, 133:17, 133:18, 133:19, 133:20, 134:8, 135:14, 135:19, 135:22, 135:24, 136:1, 136:11, 136:23, 139:21, 142:4, 142:5, 142:8

**competitive** [27] - 68:3, 68:4, 68:5, 68:6, 68:7, 68:8, 68:9, 69:18, 128:4, 128:6, 128:8, 128:9, 133:18, 133:24, 134:3, 134:15, 136:5, 136:14, 136:15,

136:16, 136:17, 136:18, 136:19, 136:20, 142:9
**competitively** [1] - 139:23
**competitor** [1] - 130:2
**competitors** [14] - 51:8, 61:18, 81:20, 81:25, 84:2, 132:1, 132:3, 134:7, 134:25, 135:4, 135:5, 138:25, 139:12, 139:14
**compiled** [1] - 144:6
**complaining** [2] - 90:19
**complaints** [1] - 69:16
**completed** [2] - 15:21, 138:22
**completely** [1] - 100:17
**compliance** [1] - 75:18
**compliant** [1] - 62:4
**complied** [1] - 63:15
**complies** [1] - 100:17
**comply** [13] - 21:1, 21:16, 21:18, 35:25, 59:18, 60:4, 60:11, 61:19, 64:20, 73:25, 86:18, 87:22, 97:12
**complying** [1] - 65:19
**components** [1] - 6:2
**comport** [2] - 78:4, 78:5
**comprise** [2] - 32:5, 34:24
**comprised** [2] - 15:13, 15:23
**comprising** [1] - 29:11
**compromise** [1] - 48:20
**concept** [2] - 71:11, 121:10
**concern** [6] - 43:21, 61:17, 61:25, 88:13, 107:12, 120:3
**concerned** [7] - 57:22, 58:9, 61:1, 61:14, 61:15, 62:2, 74:7
**concerning** [1] - 126:5
**concerns** [6] - 44:12, 44:13, 66:21, 66:22,

95:7
**conclude** [8] - 15:22, 18:25, 19:2, 89:10, 122:7, 125:9, 135:15, 135:17
**concluded** [1] - 75:25
**concludes** [1] - 76:10
**conclusion** [5] - 53:22, 78:17, 109:18, 123:5
**conclusions** [1] - 81:15
**concocted** [1] - 32:10
**condition** [1] - 121:23
**conditions** [3] - 13:4, 131:20, 131:25
**conduct** [18] - 32:4, 85:5, 96:8, 102:15, 113:6, 116:5, 125:23, 131:5, 132:9, 133:22, 133:25, 136:25, 138:6, 140:9, 140:19, 141:12, 142:15
**conducting** [1] - 136:22
**confer** [1] - 58:20
**conference** [1] - 5:7
**confidential** [1] - 139:23
**conflict** [2] - 124:16, 124:20
**conflicts** [1] - 24:15
**conjunction** [1] - 13:15
**connection** [1] - 22:5
**CONROY** [1] - 2:3
**consider** [41] - 11:25, 39:8, 39:10, 68:12, 71:1, 84:16, 107:10, 109:14, 110:16, 110:22, 111:23, 112:9, 112:11, 112:14, 112:16, 112:19, 112:22, 112:23, 112:25, 113:18, 113:21, 114:6, 114:8, 114:22, 115:5, 118:3, 119:1, 121:2, 121:4, 122:8, 124:25, 126:6, 128:3, 134:10, 135:1, 136:1, 136:6, 136:22, 138:5, 138:13, 139:25
**consideration** [1] - 145:13
**considered** [1] -

146:17
**considering** [9] - 22:24, 61:4, 68:10, 113:16, 120:19, 123:10, 123:21, 127:13, 135:25
**consistent** [3] - 63:25, 81:14, 93:3
**consistently** [1] - 82:6
**consists** [3] - 108:10, 108:13, 117:11
**conspiracies** [4] - 22:15, 36:19, 125:25, 127:3
**conspiracy** [180] - 5:11, 6:1, 11:2, 12:12, 12:14, 12:16, 12:19, 12:20, 12:25, 13:8, 13:24, 14:1, 14:2, 14:3, 14:4, 14:6, 14:8, 14:15, 14:19, 15:2, 15:12, 15:23, 16:1, 16:11, 19:5, 22:4, 22:14, 22:18, 22:25, 23:8, 26:22, 26:24, 27:2, 29:11, 29:20, 30:2, 30:13, 30:18, 31:1, 31:3, 31:6, 31:15, 31:16, 31:17, 31:21, 31:22, 31:24, 32:2, 32:5, 32:8, 32:9, 34:8, 34:10, 34:11, 34:17, 34:18, 34:25, 35:21, 35:23, 36:11, 36:13, 36:18, 37:10, 37:12, 37:13, 37:14, 39:21, 39:23, 46:11, 50:7, 50:9, 50:13, 50:24, 51:5, 51:8, 51:12, 53:12, 53:25, 61:17, 64:2, 67:17, 68:4, 68:9, 74:16, 76:12, 77:9, 77:11, 77:14, 77:17, 77:23, 77:25, 78:4, 78:8, 78:24, 79:5, 79:9, 81:17, 82:5, 82:15, 82:21, 82:24, 83:4, 83:5, 83:8, 83:9, 83:10, 84:15, 92:21, 94:9, 97:23, 103:2, 103:24, 103:25, 104:9, 104:10, 104:15, 117:24, 118:10, 118:12, 119:24, 126:12, 126:14, 127:2, 127:6, 127:14, 128:13,

128:19, 128:23, 129:1, 129:5, 129:10, 129:14, 129:16, 129:17, 129:21, 129:22, 129:25, 130:10, 130:12, 130:16, 130:19, 130:23, 130:25, 131:2, 131:8, 131:10, 131:18, 132:7, 132:12, 135:6, 135:7, 137:3, 137:8, 137:14, 137:15, 137:17, 137:18, 137:22, 137:23, 137:24, 137:25, 138:1, 138:3, 138:5, 138:10, 138:12, 138:14, 138:15, 138:17, 138:19, 138:21, 138:22, 138:24
**conspirators** [8] - 22:19, 22:22, 36:22, 36:24, 127:7, 127:10, 134:11, 138:16
**conspire** [2] - 103:17, 103:21
**conspired** [2] - 119:19, 131:24
**conspiring** [5] - 103:20, 115:14, 115:16, 128:12, 140:2
**constantly** [1] - 53:13
**constitute** [3] - 22:18, 127:6, 130:15
**construction** [2] - 20:22, 53:7
**consult** [1] - 145:10
**consultant** [1] - 70:17
**consulting** [1] - 24:10
**consumer** [1] - 67:11
**consumers** [3] - 136:23, 142:6, 142:10
**consumption** [2] - 41:1, 41:2
**CONT** [1] - 3:25
**cONT** [3] - 2:25, 3:1, 4:1
**contained** [1] - 10:13
**contemplated** [3] - 22:20, 36:22, 127:8
**contemplating** [4] - 33:11, 33:12, 33:16, 33:20
**contend** [3] - 32:14, 34:5, 34:24
**contention** [1] -

76:21
**contents** [1] - 39:16
**continue** [4] - 22:21, 36:23, 127:9, 154:10
**continued** [1] - 49:2
**continuing** [1] - 5:24
**continuous** [12] - 22:20, 22:21, 23:5, 36:23, 36:24, 36:25, 37:1, 37:4, 127:9, 127:10
**contours** [1] - 14:19
**contract** [8] - 60:4, 90:16, 90:17, 99:3, 118:9, 118:12, 126:11, 126:13
**contracts** [2] - 54:12, 125:25
**contradicted** [3] - 112:19, 112:21, 113:25
**contradicts** [1] - 95:24
**contrary** [3] - 88:5, 113:9, 114:21
**control** [4] - 86:2, 86:25, 92:12, 109:19
**controlled** [1] - 92:8
**controlling** [1] - 99:3
**convenience** [1] - 111:18
**convey** [1] - 147:9
**convictions** [1] - 145:19
**convince** [1] - 96:7
**cooperate** [1] - 44:24
**cooperation** [6] - 22:22, 23:5, 36:24, 37:1, 37:5, 127:10
**cooperative** [1] - 139:6
**copies** [4] - 146:25, 150:22, 150:25, 151:1
**copy** [7] - 107:4, 144:10, 144:11, 146:22, 147:1, 148:22, 148:24
**corner** [2] - 8:22, 11:15
**corporate** [1] - 52:2
**corporation** [3] - 114:25, 115:9, 115:13, 115:16, 115:18, 115:22, 116:1, 116:8, 116:12, 116:13, 116:16, 116:18, 116:19
**corporation's** [1] - 115:10
**corporations** [3] -

115:3, 115:17, 116:21
**correct** [4] - 102:1,
152:8, 152:20, 155:3
**corrected** [1] - 151:2
**corrective** [1] - 6:7
**corroborating** [1] -
18:19
**cost** [10] - 53:7,
59:18, 59:19, 59:20,
59:21, 60:17, 80:2,
87:23, 88:14, 88:17
**Costco** [3] - 40:20,
49:5, 60:9
**costs** [10] - 59:24,
60:4, 65:21, 65:23,
66:2, 80:2, 88:2,
88:21, 88:22
**COUNSEL** [6] - 4:8,
105:16, 151:18,
154:18, 154:22,
154:24
**counsel** [8] - 5:9,
6:24, 7:1, 27:12, 28:7,
64:6, 147:13
**count** [1] - 152:14
**countervailing** [1] -
128:3
**counting** [2] - 24:20,
24:21
**country** [4] - 18:1,
45:14, 102:9, 117:10
**Country** [5] - 58:16,
59:7, 59:15, 59:16
**counts** [1] - 7:2
**County** [9] - 52:15,
52:16, 52:17, 53:6,
53:9, 53:15, 55:8,
55:10, 66:9
**couple** [3] - 23:14,
64:5, 88:6
**course** [9] - 34:22,
99:8, 109:6, 112:24,
143:15, 143:17,
144:18, 145:16, 151:5
**court** [8] - 83:24,
109:10, 109:12,
144:16, 144:20,
150:4, 150:5, 150:7
**COURT** [59] - 1:1,
5:1, 6:10, 6:21, 7:16,
7:18, 7:22, 7:25, 8:2,
8:5, 27:7, 27:10, 47:1,
47:5, 47:9, 47:11,
47:14, 84:23, 96:2,
99:8, 104:23, 105:13,
105:17, 105:20,
105:25, 106:4,
147:20, 148:1,
148:16, 148:18,
148:22, 148:25,

149:5, 149:8, 149:21,
150:3, 150:8, 150:12,
150:20, 150:25,
151:4, 151:13,
151:15, 151:19,
152:1, 152:4, 152:9,
152:22, 152:25,
153:2, 153:7, 153:11,
153:17, 153:21,
153:23, 154:1,
154:16, 154:19,
154:23
**Court** [14] - 1:21, 5:9,
6:8, 6:9, 7:3, 8:12,
27:12, 39:9, 67:20,
84:5, 110:19, 153:16,
154:25, 155:7
**Court's** [4] - 6:25,
7:9, 107:8, 107:17
**Courthouse** [1] -
1:22
**courtroom** [8] - 8:20,
15:20, 27:16, 27:25,
70:20, 109:7, 122:4,
154:6
**courts** [1] - 117:9
**cover** [1] - 60:4
**covered** [3] - 122:4,
135:6, 147:15
**Coyle** [5] - 145:24,
146:4, 147:20,
147:22, 154:8
**CRABTREE** [1] -
3:15
**Cracker** [2] - 65:17,
65:25
**crammed** [1] - 88:16
**create** [3] - 58:10,
70:11, 136:10
**created** [5] - 86:8,
86:14, 86:16, 100:7,
139:14
**creating** [1] - 35:17
**credence** [1] - 26:13
**credibility** [7] -
101:19, 112:4, 112:5,
113:16, 123:24,
123:25, 124:14
**credible** [2] - 19:14,
114:20
**Creek** [4] - 58:16,
59:7, 59:15, 59:16
**criminal** [1] - 121:9
**crisis** [1] - 73:15
**criticizes** [1] - 54:11
**cross** [4] - 25:22,
33:19, 35:22, 52:22
**cross-examination**
[3] - 25:22, 33:19,
35:22

**cross-examined** [1]
- 52:22
**Crossland** [1] -
49:12
**CRR** [2] - 1:21, 155:7
**cruelty** [1] - 73:13
**crumbled** [1] - 100:4
**CSR** [2] - 1:21, 155:7
**current** [4] - 74:7,
121:23, 139:24
**customer** [19] -
19:10, 19:15, 19:19,
20:1, 20:9, 20:13,
20:16, 40:17, 41:11,
55:20, 55:25, 57:15,
59:13, 63:24, 73:19,
76:3, 81:8, 87:3,
97:21
**customers** [30] -
19:21, 41:9, 41:16,
48:24, 49:2, 56:25,
57:1, 58:21, 58:22,
59:3, 59:4, 59:11,
60:5, 60:8, 63:6,
63:24, 68:13, 68:15,
68:19, 68:20, 69:10,
70:3, 71:14, 72:7,
73:7, 73:9, 82:9,
82:22, 84:1, 136:3

## D

**D.C** [1] - 3:16
**Dairy** [1] - 60:3
**damage** [2] - 140:25,
141:15
**damaged** [2] - 33:24,
143:6
**damages** [2] - 76:6,
140:13
**dANA** [1] - 2:23
**Daniels** [1] - 25:24
**data** [5] - 64:9,
76:20, 100:21, 101:2
**Date** [1] - 155:9
**dates** [1] - 79:4
**David** [4] - 52:2,
53:20, 63:22, 124:7
**dAVID** [1] - 2:5
**DAY** [1] - 1:11
**days** [2] - 16:5, 51:23
**DC** [1] - 2:19
**deal** [8] - 17:2, 17:3,
43:11, 58:7, 61:8,
72:14, 120:9
**dealings** [3] - 22:23,
37:6, 127:12
**dealt** [1] - 26:11
**dean** [1] - 101:13

**December** [4] - 44:4,
73:18, 89:18, 91:8
**DECHERT** [1] - 4:3
**decide** [18] - 18:23,
33:4, 49:19, 102:1,
102:15, 108:5, 112:3,
115:6, 119:13,
122:12, 123:2,
124:21, 124:22,
132:8, 140:11,
144:18, 145:1, 145:12
**decided** [4] - 49:20,
58:12, 61:6, 100:22
**deciding** [4] - 112:2,
112:8, 140:1, 144:20
**decision** [7] -
107:11, 109:9,
109:12, 110:1,
122:19, 124:11,
144:23
**decisions** [1] - 98:13
**decrease** [1] - 65:20
**decreased** [5] -
68:14, 68:18, 82:8,
133:23, 136:4
**deduction** [1] - 123:5
**deep** [1] - 104:21
**DEEP** [1] - 2:3
**defend** [4] - 36:7,
60:21, 67:10, 117:9
**Defendant** [41] - 9:8,
12:15, 12:16, 13:12,
13:22, 15:7, 15:8,
15:17, 21:17, 21:25,
26:25, 27:1, 51:1,
51:3, 51:4, 84:21,
91:18, 104:8, 117:9,
119:2, 119:15, 119:13,
119:14, 120:16,
122:25, 128:25,
129:1, 130:9, 134:10,
137:5, 137:9, 138:4,
138:11, 138:14,
138:18, 138:23,
140:8, 140:10, 151:24
**Defendant's** [5] -
120:15, 138:6, 138:7,
138:9, 141:12
**Defendants** [47] -
11:11, 12:22, 13:1,
13:5, 15:2, 29:20,
30:6, 31:3, 34:19,
36:4, 44:9, 44:23,
50:6, 85:7, 89:8, 92:6,
93:1, 94:1, 94:13,
97:4, 100:23, 102:23,
104:14, 117:2,
117:13, 118:7,
118:20, 119:6,
119:17, 119:18,

119:21, 120:2,
120:12, 122:25,
124:6, 125:22,
131:14, 131:18,
132:4, 134:22, 135:2,
135:8, 135:10,
135:16, 143:7,
143:13, 148:11
**Defendants'** [12] -
81:7, 95:3, 132:8,
140:19, 141:2, 141:9,
141:11, 141:16,
141:18, 142:14,
142:15, 142:23
**Defense** [2] - 95:24,
148:6
**defensible** [2] - 67:5,
67:7
**Deffner** [1] - 62:11
**defined** [1] - 134:13
**definition** [2] - 12:11,
13:16, 56:15
**definitive** [1] - 67:9
**deliberate** [9] - 29:8,
30:11, 105:8, 144:4,
145:11, 145:23,
152:17, 154:7, 154:11
**deliberately** [3] -
12:17, 129:2, 137:11
**deliberating** [2] -
146:9, 152:16
**deliberation** [3] -
84:7, 84:12, 126:7
**deliberations** [13] -
15:21, 29:3, 30:12,
36:9, 42:19, 105:4,
106:14, 106:17,
118:9, 143:18,
144:15, 145:17,
147:23
**demand** [11] - 20:1,
40:11, 49:3, 49:8,
49:25, 57:15, 58:17,
63:24, 68:16, 81:8
**demanded** [11] -
48:24, 49:2, 49:25,
50:2, 50:3, 60:8,
68:13, 68:19, 74:19,
82:8, 136:3
**demanding** [4] -
60:5, 60:6, 61:6,
68:20
**demonstrate** [2] -
132:16, 132:20
**denominator** [1] -
30:20
**density** [3] - 48:9,
66:24, 69:1
**deny** [1] - 119:21
**DEPALMA** [1] - 2:13

**department** [1] - 42:14

**Department** [5] - 64:6, 64:11, 64:13, 64:14, 82:20

**depended** [1] - 49:18

**dependent** [2] - 5:16, 5:19

**deposition** [8] - 9:10, 9:11, 18:15, 28:10, 28:19, 45:25, 50:1, 50:20

**depositions** [2] - 108:12

**depth** [1] - 118:17

**DEPUTY** [12] - 8:3, 47:7, 47:12, 105:11, 106:2, 147:24, 149:20, 150:24, 151:25, 152:8, 153:24, 154:14

**deputy** [1] - 15:20

**describing** [1] - 66:1

**description** [5] - 6:25, 7:3, 7:9, 105:3, 148:12

**descriptions** [1] - 148:14

**deserves** [7] - 12:3, 109:16, 110:25, 113:6, 114:13, 123:21, 125:3

**designation** [1] - 148:19

**designed** [2] - 46:10, 62:21

**desk** [1] - 154:20

**despite** [6] - 34:3, 34:4, 48:1, 51:20, 64:9, 116:6

**DESTEFANO** [1] - 3:17

**detail** [4] - 35:6, 114:7, 127:19, 128:11

**detailed** [1] - 29:2

**details** [5] - 103:25, 129:14, 129:19, 137:15, 137:17

**detained** [2] - 151:24, 152:5

**determination** [2] - 125:11, 127:20

**determine** [21] - 10:25, 14:20, 22:9, 22:17, 23:1, 28:21, 36:17, 67:21, 103:6, 124:12, 126:20, 127:5, 127:15, 127:21, 128:12, 132:12, 133:6,

133:15, 135:23, 138:13, 147:12

**determined** [2] - 114:16, 126:4

**determining** [6] - 120:25, 131:11, 134:2, 134:21, 135:1, 138:4

**DEUTSCH** [1] - 2:9

**develop** [1] - 45:14

**developed** [2] - 42:24, 48:4

**development** [1] - 19:12

**devotes** [1] - 18:17

**devotion** [1] - 76:4

**difference** [3] - 88:4, 95:22, 107:5

**different** [23] - 14:11, 14:12, 16:7, 16:14, 22:5, 22:15, 24:13, 25:25, 56:25, 61:24, 64:12, 71:6, 71:14, 73:6, 89:4, 90:8, 95:11, 96:17, 114:2, 122:22, 127:3

**differently** [4] - 70:2, 71:13, 114:5, 119:1

**difficult** [1] - 27:21

**dimension** [1] - 67:5

**Direct** [68] - 2:7, 2:11, 2:15, 2:20, 2:24, 3:10, 11:9, 12:12, 70:8, 74:16, 117:17, 117:20, 118:3, 118:14, 118:18, 118:23, 119:4, 119:8, 119:15, 120:11, 120:13, 120:17, 122:24, 124:4, 125:14, 125:22, 126:9, 126:15, 127:21, 127:25, 128:15, 128:17, 128:21, 130:8, 130:18, 132:15, 132:19, 132:21, 133:2, 133:4, 133:10, 133:12, 133:15, 135:20, 136:8, 136:24, 140:7, 140:12, 140:16, 140:21, 141:1, 141:4, 141:7, 141:13, 141:14, 141:17, 141:21, 141:24, 142:3, 142:7, 142:10, 142:11, 142:13, 142:16, 142:18, 143:1, 143:2, 143:4

**direct** [12] - 121:13, 121:14, 121:19, 121:21, 122:8, 122:11, 122:23, 123:7, 130:19, 130:21, 130:24, 147:4

**directly** [9] - 12:4, 12:7, 34:12, 39:13, 111:2, 111:13, 115:22, 117:12, 129:18

**Directors** [2] - 93:15, 96:16

**directors** [1] - 115:11

**disagree** [3] - 6:17, 124:16, 145:6

**disagreed** [4] - 66:15, 66:25, 67:3, 67:14, 67:15, 97:7

**disagreement** [1] - 124:19

**disappears** [2] - 78:3, 78:13

**disbelieve** [1] - 34:5

**discharged** [1] - 147:5

**discipline** [1] - 96:17

**disclose** [2] - 24:5, 24:6

**discount** [1] - 24:24

**discovery** [1] - 28:7

**discredit** [1] - 114:3

**discrepancies** [2] - 113:17, 114:1

**discrepancy** [3] - 114:6, 114:8, 148:10

**discuss** [1] - 147:15

**discussed** [4] - 38:6, 89:7, 104:11, 132:12

**discussing** [1] - 93:7

**discussion** [6] - 5:21, 19:8, 43:2, 43:4, 99:19, 153:10

**Discussion** [1] - 152:24

**disease** [1] - 74:8

**dishonest** [1] - 116:7

**dispose** [1] - 96:20

**dispute** [2] - 114:22, 115:6

**disputed** [1] - 122:19

**disregard** [2] - 109:4, 111:22

**distant** [1] - 84:5

**distinction** [1] - 122:10

**distinguished** [1] - 100:12

**distinguishes** [1] -

36:5

**distortions** [1] - 81:6

**distributed** [1] - 92:25

**DISTRICT** [2] - 1:1, 1:2

**disturb** [1] - 154:20

**divided** [1] - 71:6

**divisions** [1] - 115:14

**divisive** [1] - 75:21

**Dixie** [1] - 49:6

**doctor** [1] - 71:24

**document** [20] - 9:20, 12:2, 17:2, 42:18, 90:3, 95:9, 95:23, 96:4, 96:9, 96:10, 96:25, 97:6, 100:6, 100:10, 110:24, 111:4, 111:6, 111:13, 111:16

**document's** [1] - 121:22

**documents** [18] - 11:21, 12:5, 28:10, 51:7, 77:21, 85:8, 85:9, 85:12, 87:10, 90:14, 94:15, 94:16, 95:1, 95:2, 95:3, 95:12, 108:16, 148:12

**dollar** [2] - 33:5, 141:4

**dollars** [5] - 24:23, 32:23, 33:1, 33:9

**domestically** [2] - 56:6, 95:19

**Don** [10] - 45:22, 45:23, 45:24, 45:25, 65:12, 85:25, 89:15, 103:10

**dONALD** [1] - 3:13

**donated** [1] - 99:24

**done** [13] - 11:18, 29:8, 53:25, 80:23, 84:18, 86:2, 115:19, 115:21, 116:14, 119:22, 121:17, 144:21

**door** [1] - 27:25

**dot** [1] - 41:15

**dots** [5] - 41:5, 56:17, 56:19, 56:23, 56:24

**double** [2] - 27:10, 56:4

**double-check** [1] - 27:10

**doubled** [2] - 52:8, 52:9

**doubt** [1] - 121:8

**down** [14] - 20:10, 30:19, 34:4, 35:2, 40:11, 75:2, 75:7, 82:10, 91:7, 103:11, 146:2, 146:11, 146:14

**downs** [1] - 31:9

**dozen** [8] - 31:11, 31:14, 51:16, 87:20, 87:24, 88:2, 88:7

**dozens** [1] - 88:8

**Dr** [91] - 18:6, 23:15, 23:16, 25:20, 25:21, 26:1, 32:12, 32:13, 32:17, 32:18, 32:22, 33:5, 33:16, 33:24, 34:6, 34:21, 35:22, 37:18, 37:25, 40:22, 40:25, 42:11, 43:11, 53:20, 53:24, 54:8, 54:11, 56:17, 56:18, 63:22, 68:17, 69:5, 69:6, 70:14, 70:15, 70:20, 70:22, 74:5, 76:7, 76:10, 76:17, 76:18, 76:22, 76:23, 76:24, 77:2, 77:7, 77:24, 78:15, 78:19, 78:21, 78:23, 78:25, 79:14, 79:20, 79:24, 80:6, 81:3, 81:15, 90:11, 90:14, 99:16, 99:18, 99:19, 99:20, 100:2, 100:5, 100:8, 100:12, 100:16, 100:22, 100:24, 101:2, 101:6, 101:7, 101:8, 101:10, 101:12, 101:14, 103:18, 124:5, 124:7

**draw** [5] - 122:24, 122:25, 123:2, 123:6, 123:12

**drawing** [2] - 123:3, 123:9

**drawn** [1] - 122:23

**draws** [1] - 26:5

**drop** [2] - 89:13, 91:13

**droplets** [1] - 122:5

**dropped** [2] - 72:24, 72:25

**dropping** [3] - 75:22, 85:17, 106:6

**drove** [1] - 119:20

**DUANE** [1] - 2:4

**dues** [1] - 16:18

**dumb** [1] - 54:22

**during** [40] - 6:7, 9:19, 30:25, 31:25, 33:19, 38:6, 40:11,

41:18, 42:2, 42:19,
50:13, 51:12, 53:12,
62:7, 64:3, 65:5,
70:19, 70:22, 74:24,
76:15, 77:14, 79:5,
79:9, 80:23, 81:23,
83:16, 85:13, 96:23,
100:18, 103:10,
106:16, 106:21,
117:4, 119:24, 121:6,
122:13, 138:21,
143:15, 143:18,
144:21
  **duties** [3] - 115:23,
144:17, 145:7
  **duty** [7] - 106:11,
106:18, 107:15,
107:18, 144:24,
145:10, 147:11

**E**

  **e-mail** [9] - 9:16,
24:18, 25:3, 39:1,
65:18, 66:14, 71:18,
75:8
  **e-mailed** [1] - 62:12
  **e-mails** [3] - 9:12,
9:13, 33:18
  **E.K** [1] - 1:13
  **Eagle** [1] - 49:6
  **early** [20] - 17:4,
18:9, 18:18, 22:10,
38:6, 38:18, 38:19,
54:19, 54:24, 58:16,
67:23, 74:22, 85:18,
85:19, 90:18, 96:24,
126:21, 126:22
  **earn** [1] - 92:15
  **earning** [1] - 91:3
  **easier** [1] - 117:6
  **East** [1] - 3:23
  **Easter** [1] - 40:12
  **EASTERN** [1] - 1:2
  **eaten** [1] - 106:7
  **Eby** [1] - 117:15
  **Eby-Brown** [1] -
117:15
  **ECCLES** [1] - 3:8
  **echo** [1] - 8:14
  **econometrics** [2] -
124:6, 124:8
  **economic** [13] -
23:20, 44:19, 62:8,
62:9, 62:16, 62:20,
62:23, 64:1, 67:13,
80:16, 81:10, 101:13,
125:19
  **economically** [1] -

42:22
  **economics** [6] -
26:3, 32:22, 33:1,
65:15, 124:5, 124:7
  **economist** [4] -
53:21, 101:10,
101:18, 101:22
  **economists** [3] -
100:13, 101:12,
101:23
  **economy** [1] - 117:5
  **edit** [1] - 105:21
  **education** [2] -
123:15, 123:22
  **effect** [18] - 9:15,
40:24, 40:25, 41:25,
63:9, 65:10, 65:22,
66:7, 69:7, 69:8,
69:13, 89:1, 114:6,
133:17, 133:18,
135:14, 135:19,
136:25
  **effective** [1] - 60:17
  **effects** [7] - 64:15,
65:2, 66:2, 66:6, 66:9,
134:4
  **efficiency** [1] - 117:5
  **efficient** [1] - 60:17
  **effort** [3] - 46:4, 96:6,
117:5
  **Egg** [8] - 15:14,
15:15, 57:20, 86:7,
93:14, 98:24, 139:3
  **egg** [64] - 12:14,
13:20, 30:23, 30:25,
31:11, 31:17, 32:15,
34:4, 37:17, 37:24,
40:24, 41:22, 41:25,
43:9, 44:10, 44:14,
44:17, 46:5, 46:11,
46:16, 49:4, 49:8,
49:12, 56:8, 56:11,
57:21, 59:23, 60:18,
66:18, 67:1, 67:11,
68:19, 68:25, 69:7,
69:10, 71:5, 75:3,
75:15, 77:9, 77:11,
78:13, 80:1, 80:2,
80:5, 80:18, 81:20,
81:25, 82:2, 82:7,
82:19, 93:21, 93:23,
119:17, 119:25,
128:17, 128:19,
128:23, 130:15,
133:5, 135:3
  **EGG** [1] - 1:5
  **egg-laying** [2] -
57:21, 71:5
  **eggs** [90] - 19:18,
20:9, 20:12, 21:24,

30:19, 31:4, 31:5,
31:12, 31:13, 31:16,
31:21, 31:24, 33:18,
33:19, 40:10, 40:12,
40:15, 40:17, 41:8,
41:10, 46:15, 46:23,
49:23, 51:16, 51:17,
54:24, 55:9, 55:11,
55:14, 55:17, 55:19,
55:24, 55:25, 56:1,
56:6, 56:7, 56:15,
57:3, 60:2, 60:11,
60:21, 62:3, 63:20,
68:18, 71:5, 71:7,
71:9, 72:2, 72:14,
74:21, 75:6, 76:13,
79:18, 79:19, 80:19,
81:12, 87:20, 88:3,
88:7, 88:8, 88:9,
88:11, 88:14, 88:15,
89:15, 90:22, 92:7,
94:25, 95:20, 97:22,
102:7, 102:8, 102:9,
103:3, 117:12,
117:25, 119:16,
119:19, 119:20,
119:23, 127:15, 135:5
  **Eggs** [5] - 3:24,
118:5, 125:23,
128:18, 137:2
  **either** [16] - 12:3,
12:7, 34:12, 39:13,
40:14, 66:23, 71:23,
109:3, 111:2, 111:13,
113:22, 113:24,
122:10, 123:7, 137:6,
150:6
  **elaboration** [1] -
6:20
  **element** [2] - 15:23,
140:24
  **elements** [6] - 12:13,
30:13, 73:4, 83:6,
128:22, 140:15
  **eliminate** [2] - 86:4,
141:19
  **EMANUEL** [1] - 2:2
  **emphasize** [2] - 7:8,
143:24
  **emphasized** [1] -
36:2
  **emphasizes** [1] -
6:23
  **employees** [6] -
52:9, 58:8, 73:12,
83:17, 115:11, 115:19
  **employers** [1] -
27:21
  **employment** [4] -
115:20, 115:21,

116:11, 116:15
  **empty** [4] - 20:25,
21:1, 44:1, 97:13
  **encourage** [1] -
100:2
  **end** [10] - 14:24,
20:16, 30:12, 30:23,
31:8, 31:14, 55:7,
76:21, 149:16, 152:10
  **ends** [1] - 78:9
  **engaged** [6] - 50:24,
82:15, 82:21, 83:3,
83:5, 102:15
  **England** [1] - 25:7
  **enjoy** [5] - 8:8, 47:9,
105:1, 154:12
  **ensured** [2] - 88:20
  **entered** [4] - 13:11,
13:19, 27:1, 129:11
  **entering** [2] - 104:6,
130:6
  **enterprises** [1] -
142:23
  **entire** [4] - 8:21,
65:12, 81:24, 95:24
  **entirely** [1] - 129:13
  **entities** [3] - 22:5,
118:11, 126:12
  **entitled** [6] - 115:1,
116:16, 140:13,
142:18, 143:25, 155:5
  **entrusted** [1] - 116:3
  **entry** [1] - 135:3
  **environmental** [1] -
80:11
  **environmentally** [1]
- 42:22
  **equal** [6] - 114:23,
115:4, 115:6, 115:7,
116:21
  **equals** [1] - 115:5
  **error** [1] - 114:9
  **espoused** [1] - 34:2
  **ESQUIRE** [29] - 2:2,
2:3, 2:3, 2:4, 2:4, 2:5,
2:5, 2:9, 2:13, 2:17,
2:18, 2:18, 2:22, 2:23,
3:3, 3:5, 3:12, 3:13,
3:13, 3:14, 3:14, 3:15,
3:17, 3:18, 3:22, 3:22,
4:3, 4:4, 4:4
  **essence** [1] - 30:19
  **essential** [3] - 72:20,
130:4, 137:19
  **establish** [9] - 12:25,
126:8, 129:10,
130:22, 131:8,
131:17, 140:14,
141:25, 142:14
  **established** [6] -

23:7, 73:1, 116:20,
122:16, 123:7, 145:2
  **establishes** [2] -
44:15, 141:10
  **et** [5] - 48:7, 60:10,
80:3
  **Ethical** [1] - 43:20
  **ethics** [1] - 83:19
  **Europe** [4] - 18:7,
57:17, 60:19
  **evaluate** [5] - 34:10,
99:12, 108:4, 113:16,
137:9
  **evaluating** [2] -
113:17, 123:25
  **evaluation** [1] -
123:24
  **evening** [2] - 154:12,
154:23
  **evenly** [1] - 120:14
  **event** [1] - 114:4
  **events** [2] - 109:15,
138:8
  **everyday** [1] -
109:14
  **evidence** [189] - 9:7,
9:21, 10:1, 10:8,
10:20, 11:12, 11:17,
11:19, 11:22, 11:24,
12:14, 12:19, 13:11,
13:13, 13:14, 13:18,
15:1, 15:11, 16:12,
16:15, 17:11, 17:13,
17:17, 17:21, 18:12,
18:13, 18:19, 19:3,
19:5, 19:13, 21:15,
21:22, 21:25, 22:3,
22:4, 23:11, 27:1,
28:8, 28:9, 30:9,
30:15, 30:17, 30:22,
35:10, 37:11, 39:7,
42:7, 51:2, 51:3, 51:5,
51:6, 56:5, 72:19,
74:15, 74:23, 78:2,
78:5, 81:4, 82:5,
84:14, 84:16, 85:3,
87:1, 87:3, 87:5,
87:11, 87:21, 87:22,
88:24, 89:20, 91:1,
91:9, 92:9, 92:22,
92:24, 92:25, 93:6,
97:3, 97:9, 99:7, 99:9,
100:15, 100:16,
102:1, 102:21,
103:15, 103:22,
104:12, 104:19,
106:8, 106:20,
107:19, 107:22,
108:4, 108:9, 108:13,
108:16, 108:18,

108:22, 108:25,
109:3, 109:5, 109:8,
109:10, 109:14,
109:17, 109:20,
109:22, 109:23,
110:2, 110:3, 110:5,
110:6, 110:14,
110:16, 110:17,
110:20, 110:23,
111:2, 111:9, 111:15,
111:17, 111:21,
111:23, 111:24,
112:21, 112:24,
113:2, 113:9, 113:13,
113:25, 114:16,
116:21, 118:21,
118:22, 118:24,
119:3, 119:5, 120:19,
120:22, 121:1, 121:4,
121:12, 121:13,
121:14, 121:20,
121:21, 121:24,
121:25, 122:6, 122:8,
122:11, 122:12,
123:4, 123:8, 123:11,
123:23, 125:4,
128:22, 129:11,
129:21, 130:19,
130:20, 130:21,
130:24, 131:1,
131:13, 137:4, 138:5,
138:7, 138:8, 139:25,
140:1, 141:10,
141:11, 143:21,
143:22, 143:25,
144:2, 144:19,
145:14, 145:18,
145:19

**exact** [2] - 95:16,
104:2

**exactly** [4] - 62:24,
93:2, 104:4, 130:5

**examination** [3] -
25:22, 33:19, 35:22

**examine** [1] - 113:11

**examined** [2] -
52:22, 78:7

**example** [9] - 22:14,
92:16, 110:21, 111:4,
121:14, 122:2, 127:2,
131:21, 146:14

**examples** [1] - 139:2

**exceed** [1] - 44:5

**except** [3] - 73:5,
75:5, 145:25

**excerpt** [3] - 46:2,
46:18, 70:25

**excess** [1] - 41:11

**exchange** [1] - 44:24

**exchanged** [1] -

151:13

**exchanges** [1] -
139:22

**excluded** [3] - 109:5,
111:24, 112:1

**exclusive** [2] -
112:11, 147:11

**excuse** [12] - 33:15,
43:11, 44:5, 47:22,
49:10, 51:15, 60:3,
62:10, 66:18, 71:24,
76:3, 116:13

**executive** [1] - 58:4

**exercise** [4] - 13:3,
123:9, 131:19, 149:12

**exhibit** [7] - 82:14,
109:21, 112:1,
121:21, 148:24,
151:13, 151:15

**exhibits** [13] - 7:19,
9:18, 9:19, 28:18,
108:17, 111:19,
121:4, 144:9, 144:8,
148:1, 148:6, 148:9,
150:13

**exist** [2] - 35:14,
122:21

**existed** [6] - 12:15,
12:19, 128:24,
129:21, 130:16,
138:15

**existence** [17] - 9:23,
12:11, 12:25, 35:15,
79:16, 114:17,
121:22, 122:16,
126:11, 129:10,
130:19, 130:22,
131:2, 131:8, 131:17,
133:13, 133:14

**existing** [4] - 53:16,
53:17, 54:12, 137:24

**exists** [2] - 122:20,
129:8

**expand** [1] - 65:1

**expanded** [2] -
53:16, 53:17

**expansion** [1] -
46:20

**expected** [3] - 30:16,
55:8

**expend** [1] - 33:1

**experience** [6] -
24:21, 109:15,
109:17, 122:15,
123:16, 123:22

**experiences** [1] -
123:14

**expert** [4] - 24:12,
25:18, 33:22, 124:5

**expertise** [1] -

124:13

**experts** [10] - 25:18,
45:13, 76:6, 123:16,
124:3, 124:7, 124:9,
124:10, 124:21,
124:24

**explain** [2] - 64:25,
101:8

**explained** [3] -
100:19, 116:23,
120:24

**explanation** [1] -
96:8

**explanatory** [1] -
146:24

**explicit** [1] - 130:21

**exploiter** [1] - 58:1

**export** [12] - 12:24,
16:4, 16:19, 22:11,
40:16, 41:15, 42:7,
55:11, 56:11, 56:22,
126:24, 131:17

**exporting** [1] - 79:18

**exports** [48] - 14:8,
14:12, 14:17, 15:15,
16:4, 16:6, 16:7,
29:13, 32:5, 35:1,
35:9, 35:10, 35:12,
37:4, 37:13, 39:18,
39:24, 40:5, 40:6,
40:7, 40:10, 40:22,
41:8, 41:25, 55:6,
55:13, 57:2, 57:4,
67:24, 79:11, 79:17,
79:22, 80:15, 83:8,
89:4, 90:24, 91:11,
91:13, 91:21, 91:25,
95:15, 95:17, 95:18,
95:21, 98:25, 99:6

**expression** [1] -
40:15

**expressly** [4] - 5:9,
5:22, 69:3, 85:19

**extent** [5] - 22:22,
37:5, 46:24, 113:23,
127:11

**extra** [1] - 63:19

**extremely** [1] - 74:7

**eyeball** [1] - 152:14

**eyes** [1] - 100:5

# F

**facilitate** [1] - 139:17
**facilities** [1] - 53:17,
58:6, 63:19, 69:11
**facility** [2] - 53:15,
53:19
**fact** [49] - 5:17, 6:16,

12:22, 18:23, 19:17,
29:16, 34:3, 34:4,
35:14, 37:10, 47:22,
48:3, 64:19, 68:23,
75:23, 77:20, 80:7,
81:13, 87:10, 88:24,
97:10, 103:18, 105:2,
106:18, 106:24,
107:3, 109:3, 110:8,
113:2, 114:18,
114:20, 116:11,
120:20, 120:22,
120:25, 121:22,
122:1, 122:17,
122:19, 122:20,
122:18, 131:5,
131:14, 140:17,
140:25, 141:5, 141:8,
142:14

**factor** [4] - 112:25,
134:13, 134:21,
138:13

**factors** [10] - 22:24,
68:12, 101:4, 101:6,
112:10, 113:15,
127:13, 134:4, 135:1,
136:1

**facts** [23] - 100:17,
101:24, 101:25,
106:20, 107:18,
108:9, 108:13,
108:21, 112:2,
121:25, 122:16,
122:23, 123:3, 123:7,
123:12, 124:17,
124:21, 125:11,
144:19, 144:20,
144:23, 144:25

**factual** [2] - 108:5,
124:22

**faded** [1] - 84:5

**fail** [2] - 86:17, 86:21

**failed** [3] - 86:18,
120:13, 130:17

**failing** [1] - 63:18

**fair** [5] - 28:5, 28:6,
52:24, 115:1, 116:17

**fairly** [1] - 145:7

**fairness** [1] - 84:20

**fall** [2] - 40:12, 59:15

**fallacy** [1] - 45:8

**falling** [1] - 20:10

**false** [1] - 98:22

**falsehood** [1] -
114:10

**Family** [1] - 117:16

**family** [4] - 27:22,
66:16, 83:17, 84:9

**fantasy** [1] - 71:21

**far** [4] - 9:1, 37:23,

45:19, 117:5

**farm** [9] - 52:15,
52:16, 52:17, 52:18,
53:6, 53:15, 55:8,
57:25, 62:17

**farmers** [2] - 93:21,
95:19

**Farms** [11] - 3:19,
19:15, 19:16, 38:9,
84:21, 92:7, 97:22,
118:5, 125:23,
128:18, 137:3

**farms** [10] - 46:24,
52:25, 53:16, 53:18,
54:13, 63:20, 65:1,
73:12, 73:13

**fault** [1] - 141:17

**favor** [8] - 70:1,
71:23, 84:21, 91:22,
104:16, 104:20,
120:16, 120:21

**favorable** [2] - 119:4,
119:5

**fear** [1] - 73:24

**feather** [1] - 104:16

**federal** [1] - 125:15

**feed** [1] - 18:3

**Feldman** [1] - 155:7

**FELDMAN** [1] - 1:21

**fellow** [1] - 145:14

**felt** [4] - 6:13, 46:14,
70:14, 85:12

**ferreting** [1] - 151:20

**Festival** [1] - 25:9

**few** [5] - 29:22,
81:22, 82:11, 96:21,
116:25

**fewer** [5] - 31:4,
64:17, 65:8

**field** [1] - 61:2

**Fifth** [1] - 2:10

**fight** [1] - 94:11

**fighter** [1] - 93:21

**figure** [3] - 13:24,
23:4, 23:6

**file** [1] - 117:8

**filed** [1] - 118:6

**files** [1] - 17:12

**filing** [1] - 116:24

**fill** [1] - 21:1

**filling** [1] - 106:6

**final** [4] - 74:13,
81:22, 106:11

**finally** [5] - 37:14,
66:13, 103:23,
118:14, 141:24

**financial** [1] - 52:5

**findings** [1] - 15:6

**fine** [2] - 47:4,
151:19

finger [2] - 77:2, 78:5
finish [1] - 99:13
finished [2] - 146:16, 147:2
firebombed [2] - 57:24, 58:5
firm [2] - 134:16, 134:18
firmly [1] - 83:21
first [29] - 11:19, 13:23, 14:21, 15:10, 23:9, 26:21, 27:5, 29:10, 29:14, 31:19, 38:4, 42:25, 63:21, 72:21, 77:18, 82:16, 84:12, 84:13, 96:14, 118:9, 126:11, 127:18, 127:20, 128:11, 132:15, 133:1, 140:24, 144:18
fit [1] - 54:23
five [7] - 28:17, 30:10, 83:12, 83:13, 84:4, 85:2, 104:25
flexibility [1] - 73:6
flock [17] - 31:7, 31:8, 34:3, 37:21, 37:23, 38:5, 54:4, 76:10, 76:13, 77:9, 78:19, 78:23, 79:11, 79:18, 82:6, 82:7
flocks [1] - 55:5
Floor [4] - 2:6, 2:14, 3:4, 3:18
FMI [5] - 19:11, 58:10, 70:23, 71:1, 87:14
FMI's [1] - 80:9
focal [1] - 50:17
focus [3] - 40:7, 86:24
focused [2] - 44:3, 74:23
folks [1] - 148:1
follow [6] - 45:17, 71:8, 97:10, 106:18, 110:15, 145:4
followed [4] - 5:21, 5:22, 43:16, 43:17
following [12] - 12:13, 15:2, 57:16, 71:11, 97:2, 108:10, 108:18, 112:10, 126:10, 128:22, 134:3, 147:13
Food [6] - 48:5, 48:16, 48:17, 49:7, 87:14, 87:16
food [2] - 49:5, 102:8
Foods [14] - 38:10,

38:14, 38:15, 61:1, 61:2, 61:15, 61:21, 72:13, 75:10, 90:18, 90:23, 91:14, 94:22
FOR [1] - 1:2
force [2] - 20:6, 75:18
forced [1] - 20:6
forecast [2] - 111:11, 111:12
foregoing [1] - 155:3
foreperson [4] - 15:19, 144:14, 146:2, 147:2
forever [3] - 84:7, 84:8
forget [1] - 16:10
form [25] - 6:25, 14:21, 14:24, 15:20, 15:25, 17:15, 17:17, 17:18, 18:21, 26:20, 28:25, 29:7, 31:19, 50:5, 74:14, 97:1, 102:18, 105:21, 121:21, 139:1, 146:21, 146:22, 147:8, 151:1
formal [1] - 103:17, 129:12, 139:15
formed [3] - 18:21, 129:25, 138:2
former [1] - 42:14
forth [1] - 9:17
forts [1] - 8:22
forward [1] - 32:11
forwarded [1] - 75:9
foundation [1] - 32:14
founded [1] - 84:10
four [12] - 14:25, 18:9, 18:18, 29:8, 29:17, 30:4, 30:5, 30:7, 30:9, 30:11, 85:2, 102:22
fourth [1] - 30:2
Fourth [1] - 3:23
frame [2] - 11:3, 11:7
frames [2] - 20:10, 20:11
frankly [2] - 114:4, 151:10
fraudulent [1] - 116:7
free [13] - 60:16, 66:23, 69:9, 69:10, 69:11, 90:22, 94:25, 102:16, 109:18, 110:9, 125:16, 145:17
freedom [1] - 152:18
freight [2] - 56:22,

56:23
Freight [1] - 25:5
frequently [1] - 119:7
Fresh [21] - 3:24, 15:4, 19:9, 21:17, 36:5, 51:3, 92:2, 92:7, 96:13, 96:14, 96:20, 96:22, 97:5, 97:7, 97:9, 97:20, 97:22, 118:5, 125:23, 128:18, 137:2
friend [1] - 23:14
friendly [1] - 94:10
friends [1] - 21:5
front [3] - 7:14, 100:5, 151:15
Front [1] - 58:2
fuel [1] - 80:2
full [5] - 103:24, 129:14, 137:15, 137:17, 145:13
fully [2] - 35:24, 93:3
fun [1] - 21:10
function [1] - 38:14
fund [4] - 33:9, 33:12, 33:17, 100:3
Fund [2] - 25:13
fundamental [1] - 20:15
funds [1] - 33:15
furtherance [1] - 138:21
furthermore [1] - 132:21
future [4] - 69:8, 69:12, 139:24

# G

gain [1] - 26:7
Garth [4] - 38:12, 72:22, 73:11, 73:16
Gary [2] - 75:13, 75:15
gather [1] - 28:7
GEIGER [1] - 3:22
GENE [1] - 1:13
Gene [18] - 12:8, 17:3, 17:8, 17:9, 18:9, 18:25, 50:15, 50:16, 50:18, 50:19, 93:12, 93:13, 93:19, 93:21
general [3] - 14:1, 64:5, 115:23
generally [3] - 118:1, 132:20, 134:16
generic [1] - 25:10
gentlemen [19] - 8:6,

8:13, 27:13, 28:12, 30:22, 32:10, 33:23, 40:8, 59:22, 69:23, 81:17, 84:19, 84:25, 104:24, 114:15, 122:11, 123:1, 147:11, 154:3
geographic [4] - 127:24, 133:9, 133:10
Germantown [1] - 52:18
Giant [2] - 49:5, 49:6
giant [2] - 75:15, 88:9
GIDDINGS [1] - 2:18
gigantic [1] - 102:5
given [15] - 6:24, 13:9, 26:13, 97:20, 113:9, 113:12, 122:10, 123:22, 125:1, 125:9, 133:10, 144:10, 144:11, 146:22, 146:25
goal [6] - 22:19, 24:11, 36:21, 42:21, 127:7, 128:16
goals [2] - 45:6, 60:22
GODFREY [3] - 3:2, 3:8
goods [3] - 33:24, 134:17, 143:10
goofy [1] - 151:6
govern [1] - 106:17
governed [1] - 107:7
Government [2] - 82:22, 101:17
Grade [1] - 31:13
grain [1] - 80:2
graph [7] - 54:1, 54:2, 65:5, 65:9, 77:17, 78:25
graphs [1] - 64:9
grateful [1] - 27:22
gratitude [1] - 104:21
great [3] - 8:2, 28:1, 154:5
Great [2] - 28:1, 80:15
greater [1] - 144:1
greatest [2] - 80:16, 125:21
green [1] - 54:7
GREENBERG [1] - 2:13
greenfield [1] - 53:15
greet [2] - 153:13, 154:6
greeting [1] - 153:8

Greg [12] - 52:5, 52:11, 52:21, 55:15, 56:20, 57:10, 57:19, 58:15, 58:19, 58:23, 60:8, 81:22
Gregory [28] - 10:20, 12:8, 17:3, 17:6, 17:8, 17:9, 17:25, 18:9, 18:13, 18:22, 18:25, 38:16, 50:15, 50:16, 50:18, 50:19, 90:15, 93:12, 93:13, 93:19, 97:1, 98:23
grew [14] - 51:13, 51:25, 52:22, 53:3, 53:13, 53:22, 53:24, 54:15, 63:12, 64:10, 81:9, 82:5, 82:6, 83:4
grocery [3] - 43:18, 49:4, 57:3
group [8] - 38:25, 63:21, 98:19, 98:20, 139:12, 139:14, 139:16, 144:14
groups [1] - 43:10
grow [10] - 46:24, 51:24, 53:4, 53:12, 63:10, 65:1, 65:4, 66:8, 66:11
growing [8] - 48:1, 51:20, 64:9, 82:18, 82:23, 82:24, 84:1
grown [4] - 52:12, 63:12, 78:23, 82:17
growth [11] - 46:20, 46:25, 47:19, 47:21, 53:11, 54:4, 54:8, 54:9, 80:14, 81:9
guardian [1] - 17:24
guess [1] - 122:18
guesswork [1] - 123:4
guest [1] - 10:5
guide [4] - 29:2, 29:3, 106:13, 106:17
guided [1] - 113:6
guidelines [20] - 42:24, 45:18, 65:20, 70:15, 71:1, 71:3, 71:9, 71:11, 72:12, 86:9, 86:12, 86:15, 87:4, 87:5, 90:4, 90:6, 90:7, 90:8, 98:7, 98:8
Guidelines [3] - 44:6, 47:20, 69:2
guilty [3] - 151:22, 153:3, 153:8
gun [1] - 32:19
guy [2] - 18:2, 18:8

# H

**habits** [1] - 23:21
**half** [15] - 17:24, 41:1, 41:2, 42:12, 52:15, 52:16, 52:18, 53:8, 72:10, 72:11, 81:5, 100:22, 101:3, 101:4
**hammered** [1] - 75:23
**hand** [5] - 71:20, 73:17, 135:15, 137:21, 142:7
**handling** [2] - 71:8, 71:10
**hands** [2] - 84:10, 102:14
**handshake** [1] - 51:10
**hang** [2] - 148:25, 150:5
**hard** [1] - 102:10
**harm** [27] - 68:3, 68:4, 68:6, 69:19, 70:11, 127:23, 128:2, 128:6, 128:8, 132:17, 132:18, 132:20, 132:22, 133:3, 133:4, 133:6, 133:11, 133:18, 133:25, 134:3, 135:22, 136:11, 136:16, 136:17, 136:19, 136:23, 142:5
**harmful** [4] - 133:17, 133:18, 135:14, 135:18
**hat** [1] - 73:17
**hatch** [3] - 38:19, 54:19, 79:11
**HAUSFELD** [1] - 2:17
**head** [4] - 66:25, 70:15, 74:5, 154:4
**health** [1] - 98:15
**hear** [18] - 5:5, 17:9, 21:21, 40:3, 42:23, 43:1, 50:21, 81:7, 95:23, 102:25, 103:1, 103:23, 104:2, 109:24, 112:12, 114:5, 146:10
**heard** [121] - 9:9, 9:12, 9:21, 9:25, 10:3, 10:15, 11:23, 13:25, 16:7, 16:17, 16:18, 19:11, 19:12, 20:7, 20:10, 23:18, 30:10,

32:22, 38:2, 38:3, 39:24, 40:8, 40:9, 40:14, 42:11, 42:25, 43:8, 44:17, 45:23, 46:19, 49:6, 50:1, 50:18, 51:22, 52:21, 53:11, 53:20, 54:19, 55:6, 55:23, 56:20, 57:14, 57:16, 57:19, 60:12, 60:25, 61:5, 64:3, 64:4, 65:11, 66:4, 66:13, 66:14, 68:3, 68:16, 68:23, 69:5, 69:25, 73:10, 74:17, 76:7, 76:17, 78:10, 78:20, 79:3, 79:20, 81:8, 81:9, 81:12, 81:13, 81:15, 82:14, 82:16, 82:17, 83:22, 85:21, 86:22, 87:14, 88:15, 91:1, 91:17, 92:24, 93:11, 97:11, 98:22, 98:24, 99:12, 99:15, 99:17, 101:5, 101:8, 101:18, 101:25, 102:18, 103:18, 105:8, 106:8, 106:9, 108:18, 109:7, 109:10, 109:12, 110:18, 110:19, 117:3, 117:22, 119:25, 121:7, 121:17, 122:13, 124:3, 139:2, 144:19, 149:17
**hearing** [1] - 99:10
**heavily** [2] - 104:19
**heavy** [1] - 39:14
**heightened** [1] - 142:8
**held** [1] - 102:16
**help** [6] - 10:18, 18:10, 24:21, 46:15, 89:24, 90:12
**helping** [1] - 92:14
**helps** [2] - 24:4, 137:22
**hen** [7] - 42:20, 43:17, 63:12, 78:25, 86:4, 88:16, 88:18
**Hendrix** [1] - 95:4
**hens** [45] - 17:25, 18:1, 18:8, 20:24, 20:25, 21:16, 21:18, 31:2, 31:3, 31:4, 31:8, 31:9, 38:18, 43:13, 46:21, 51:14, 52:7, 53:14, 54:24, 57:21, 60:17, 63:3, 64:16, 64:17, 65:13, 65:14,

66:12, 67:2, 70:2, 70:3, 71:5, 72:8, 73:6, 73:12, 74:10, 79:19, 86:4, 86:20, 88:16, 96:21, 98:4, 98:8, 98:15, 98:18
**herself** [1] - 121:16
**Hershey** [4] - 19:20, 21:3, 21:11, 97:11
**hi** [1] - 152:15
**hidden** [1] - 82:19
**hiding** [1] - 147:21
**high** [3] - 67:12, 82:19
**higher** [14] - 32:14, 32:15, 41:12, 41:19, 55:24, 56:1, 57:4, 67:9, 103:7, 119:16, 133:21, 133:22, 134:17, 134:19
**highest** [1] - 125:20
**highlighted** [1] - 94:24
**Hill** [1] - 49:7
**Hillandale** [5] - 19:15, 19:16, 19:18, 92:6, 97:22
**Hillandale's** [1] - 19:21
**himself** [1] - 121:16
**Hinton** [11] - 52:11, 55:15, 56:20, 57:10, 57:19, 58:15, 58:19, 58:23, 60:9, 81:22
**hired** [1] - 32:19
**history** [2] - 26:13, 43:2
**hold** [1] - 116:19
**holding** [2] - 114:24, 115:7
**holidays** [1] - 40:12
**honest** [2] - 8:19, 145:19
**honestly** [2] - 26:4, 27:4
**Honor** [30] - 5:6, 5:22, 6:4, 6:11, 6:12, 6:17, 7:15, 7:21, 7:24, 8:1, 27:9, 47:17, 105:15, 105:16, 105:24, 147:16, 147:17, 147:18, 147:19, 148:3, 148:13, 148:23, 149:3, 150:11, 150:18, 151:12, 151:18, 154:18, 154:22, 154:24
**honor** [2] - 102:13, 154:10

**HONORABLE** [1] - 1:13
**hope** [3] - 38:23, 104:25, 106:5
**hopefully** [2] - 60:21, 84:5
**horizontal** [1] - 139:21
**hour** [6] - 17:24, 23:16, 23:17, 70:21, 104:25, 105:18
**hours** [2] - 20:11
**house** [4] - 55:12, 63:5, 64:18, 65:24
**houses** [7] - 46:23, 52:25, 53:17, 63:21, 65:8, 71:3, 71:4
**Houston** [1] - 3:7
**huge** [1] - 102:5
**humane** [1] - 43:13
**humanely** [1] - 72:8
**hundreds** [2] - 9:12, 9:18
**Hurd** [2] - 52:2, 55:2
**hurting** [1] - 67:6
**Husbandry** [2] - 47:20, 69:2
**Hyde** [5] - 53:6, 53:9, 53:15, 55:8, 55:9, 66:8
**hypocrisy** [1] - 72:5

# I

**idea** [4] - 17:6, 20:18, 132:24, 151:21
**identical** [2] - 13:3, 131:20
**identified** [1] - 132:23
**identify** [2] - 17:10, 24:20
**identity** [3] - 129:15, 137:16, 137:18
**ignore** [4] - 24:15, 85:6, 85:8, 110:10
**illegal** [8] - 22:8, 126:19, 128:7, 128:14, 128:16, 140:19, 141:12
**immediately** [2] - 59:25, 98:8
**immune** [1] - 139:10
**impact** [5] - 84:7, 84:8, 102:5, 120:9
**impartial** [3] - 28:5, 28:6, 145:13
**implementation** [4] - 48:14, 48:23, 48:24,

67:3
**implemented** [4] - 71:2, 86:15, 89:19, 94:18
**importance** [1] - 114:7
**important** [18] - 7:8, 11:22, 19:14, 20:8, 20:14, 21:13, 23:19, 27:23, 60:13, 92:22, 102:4, 102:8, 102:10, 102:11, 113:4, 134:21, 154:10
**importantly** [3] - 12:11, 27:18, 55:1
**imposed** [2] - 67:17, 134:9
**impresses** [1] - 113:18
**impression** [1] - 144:1
**improperly** [1] - 76:20
**improved** [2] - 68:14, 136:4
**IN** [3] - 1:1, 1:5, 4:8
**in-depth** [1] - 118:17
**inception** [2] - 19:22, 45:10, 137:6
**inches** [2] - 43:7, 43:17, 88:16
**inclined** [1] - 145:15
**include** [10] - 6:5, 35:23, 36:4, 37:16, 56:21, 56:22, 56:23, 74:11, 115:10, 135:3
**included** [4] - 73:4, 76:20, 86:16, 98:7
**includes** [4] - 54:12, 108:16, 142:20, 142:25
**including** [15] - 25:5, 59:17, 68:12, 85:4, 85:22, 92:6, 93:25, 108:11, 112:10, 115:2, 116:21, 117:21, 131:3, 136:2, 138:7
**inconsistencies** [1] - 114:1
**inconsistency** [1] - 62:24
**inconsistent** [3] - 64:1, 98:14, 98:16
**incorporate** [1] - 7:8
**increase** [7] - 30:21, 45:7, 46:16, 65:21, 86:3, 95:17, 117:25
**increased** [13] - 51:13, 52:3, 65:22,

68:14, 68:17, 80:13, 82:7, 88:22, 119:24, 133:21, 136:3
**increasing** [2] - 43:6, 83:1
**incurring** [1] - 66:2
**indeed** [2] - 109:24, 114:18
**independent** [8] - 13:3, 13:13, 19:24, 22:15, 115:17, 127:3, 131:19, 143:21
**independently** [5] - 13:6, 119:13, 131:9, 132:2, 132:5
**Indiana** [1] - 57:25
**indicated** [3] - 31:20, 39:8, 148:11
**indicating** [2] - 50:2, 97:6
**indicating)** [2] - 14:24, 92:5
**indirectly** [1] - 34:12
**individual** [22] - 12:15, 15:6, 15:8, 15:17, 26:24, 33:14, 51:1, 51:3, 63:25, 115:2, 116:17, 116:19, 117:7, 119:2, 119:5, 119:6, 128:25, 130:9, 132:18, 137:5, 143:19
**individually** [1] - 119:12
**individuals** [3] - 25:24, 117:1, 120:2
**industry** [11] - 46:15, 53:23, 53:24, 69:4, 75:16, 94:18, 96:16, 97:5, 102:5, 139:5, 139:16
**industry's** [1] - 74:7
**infer** [2] - 122:15, 131:2
**inference** [5] - 122:14, 122:18, 123:2, 123:5, 130:22
**inferences** [6] - 122:22, 122:25, 123:1, 123:3, 123:9, 123:13
**inflate** [2] - 46:5, 46:11
**inflated** [1] - 143:10
**inflation** [1] - 31:12
**influence** [4] - 75:16, 109:12, 144:22, 145:9
**influenced** [2] - 110:8, 143:23
**information** [5] -

76:20, 78:8, 92:20, 139:23, 139:25
**informed** [1] - 139:4
**injure** [1] - 30:2
**injured** [10] - 74:16, 74:18, 140:12, 140:17, 141:2, 141:8, 142:14, 142:21, 143:5, 143:9
**injuries** [6] - 142:6, 142:8, 142:10, 142:11, 142:12
**injury** [22] - 103:6, 118:15, 126:16, 140:13, 140:15, 140:20, 140:21, 140:22, 140:25, 141:5, 141:13, 141:19, 141:20, 141:23, 141:25, 142:2, 142:3, 142:16, 142:17, 142:19, 142:22
**innocent** [4] - 12:18, 114:9, 129:3, 137:12
**inputs** [1] - 80:1
**inquiry** [1] - 127:17, 132:18
**insight** [1] - 85:13
**insist** [1] - 94:8
**instance** [1] - 42:25
**instead** [1] - 140:7
**Institute** [5] - 48:5, 48:17, 87:15, 87:16
**instruct** [3] - 110:13, 121:2, 145:3
**instructed** [4] - 36:11, 50:23, 110:13, 116:12
**instructing** [1] - 126:4
**Instruction** [9] - 11:9, 11:19, 36:12, 36:17, 39:12, 67:20, 68:1, 68:10, 70:6
**instruction** [8] - 5:10, 22:6, 25:17, 25:18, 36:16, 39:10, 107:9, 110:15
**instructions** [39] - 11:5, 11:7, 11:20, 13:9, 13:17, 26:19, 29:2, 29:6, 34:10, 34:15, 34:16, 34:17, 39:17, 50:23, 91:17, 99:10, 102:25, 106:11, 106:13, 106:15, 106:17, 106:19, 106:23, 107:1, 107:2, 107:4,

107:8, 107:10, 107:17, 117:21, 118:17, 144:12, 145:5, 147:8, 147:15, 150:23, 151:1
**integrity** [5] - 69:24, 71:15, 72:20, 83:19, 100:14
**intended** [8] - 21:23, 45:5, 48:12, 48:21, 140:22, 142:1, 142:17, 147:9
**intensely** [1] - 75:20
**intent** [1] - 137:7
**intention** [2] - 97:1, 145:11
**intentional** [1] - 114:9
**intentions** [5] - 17:15, 17:17, 18:21, 45:12, 96:23
**interdependent** [1] - 5:16
**interest** [9] - 19:24, 24:15, 64:1, 88:5, 112:17, 142:20, 143:3, 143:6, 143:11
**interested** [1] - 100:3
**interesting** [2] - 13:21, 23:17
**interests** [2] - 139:2, 142:23
**International** [1] - 57:20
**internationally** [1] - 79:19
**interpret** [1] - 102:1
**interrelated** [1] - 120:10
**interrupt** [2] - 6:6, 153:4
**interrupted** [1] - 47:2
**interrupting** [2] - 7:11, 47:5
**interstate** [2] - 126:3, 126:5
**introduced** [4] - 17:5, 39:9, 43:22, 44:22
**introducing** [1] - 74:10
**invest** [3] - 25:4, 25:13, 33:13
**invested** [1] - 33:9
**investing** [3] - 23:21, 33:17, 33:20
**investment** [4] - 25:10, 26:13, 99:21, 100:3
**investments** [1] -

101:21
**investors** [2] - 24:22, 25:4
**invests** [3] - 24:23, 33:8, 33:10
**invitations** [1] - 130:2
**involved** [11] - 14:17, 14:18, 45:9, 91:19, 98:25, 99:5, 99:6, 99:23, 107:24, 117:6, 138:8
**involves** [2] - 14:8, 102:5
**involving** [2] - 34:18, 104:10
**irrational** [1] - 88:4
**issue** [13] - 5:6, 5:10, 5:14, 5:17, 6:8, 85:5, 100:6, 102:9, 119:10, 120:1, 120:16, 139:13, 148:7
**issues** [7] - 11:3, 94:18, 118:2, 120:7, 120:9, 124:12
**items** [1] - 110:14
**iterations** [1] - 47:20
**itself** [8] - 12:25, 96:4, 108:22, 129:12, 131:8, 131:17, 132:20, 142:9

---

**J**

**JAMES** [2] - 2:17, 3:13
**January** [4] - 59:21, 111:6, 111:10, 111:14
**JAY** [1] - 3:12
**JEANNINE** [1] - 2:18
**Jeff** [4] - 21:7, 21:8, 21:9, 74:4
**Jen** [1] - 57:24
**Jesse** [1] - 53:20
**jETTA** [1] - 3:14
**job** [6] - 8:7, 99:9, 124:18, 144:20, 145:3, 147:10
**job's** [1] - 19:21
**Joe** [1] - 21:7
**John** [7] - 66:13, 66:15, 66:16, 67:14, 95:9, 95:10, 117:15
**Johnson** [1] - 52:17
**join** [27] - 14:1, 14:3, 19:25, 35:11, 35:12, 35:15, 39:4, 45:17, 57:13, 58:12, 58:13, 58:18, 58:20, 59:4,

60:13, 61:7, 61:13, 61:22, 61:23, 62:2, 82:3, 84:2, 87:9, 104:14
**joined** [13] - 19:9, 35:24, 55:7, 57:15, 58:24, 61:11, 63:8, 85:24, 88:13, 95:4, 96:14, 137:5
**joining** [7] - 20:19, 21:23, 59:25, 60:22, 61:3, 61:4, 87:12
**joins** [3] - 40:6, 137:24
**joint** [1] - 139:7
**JOSEPH** [2] - 2:3, 3:22
**journals** [2] - 101:11, 139:7
**JR** [1] - 3:22
**judge** [4] - 28:5, 36:16, 39:16, 120:7
**Judge** [28] - 28:23, 29:1, 29:5, 34:9, 103:23, 104:3, 147:24
**Judge's** [2] - 34:15, 102:25
**judged** [2] - 116:18, 123:19
**judges** [3] - 107:18, 112:4, 122:2
**judging** [1] - 116:2
**judgment** [7] - 13:3, 13:14, 19:24, 114:11, 125:6, 131:19, 146:18
**jULIA** [1] - 4:4
**jump** [1] - 111:15
**jUNE** [1] - 1:10
**June** [3] - 62:11, 62:13, 96:19
**juror** [2] - 146:18, 146:19
**jurors** [4] - 108:3, 144:17, 145:10, 145:14
**jury** [30] - 5:25, 6:8, 6:24, 7:8, 7:14, 7:18, 11:5, 22:6, 25:17, 26:19, 27:13, 28:6, 47:2, 50:23, 84:19, 96:2, 99:8, 106:8, 120:7, 123:6, 144:4, 145:24, 146:4, 146:18, 147:22, 151:20, 152:10, 152:14, 153:7
**Jury** [14] - 8:4, 36:11, 39:12, 47:8, 47:13, 67:20, 68:1, 68:10, 70:6, 105:12, 106:3,

147:25, 153:25, 154:15

**Justice** [3] - 76:25, 77:2, 119:8
**justice** [3] - 11:13, 18:11, 84:20
**justified** [1] - 123:13
**justify** [3] - 67:11, 70:12, 136:12

# K

**K.Y** [1] - 95:4
**kATHLEEN** [1] - 1:21
**Kathleen** [1] - 155:7
**KEATING** [1] - 3:21
**keep** [10] - 40:15, 59:4, 60:21, 62:3, 63:24, 82:19, 94:4, 114:15, 139:4, 146:9
**Kelli** [1] - 49:12
**KENNEY** [1] - 2:18
**kept** [1] - 55:12
**key** [1] - 95:12
**kick** [1] - 149:9
**KIEFER** [1] - 2:3
**kill** [1] - 98:8
**killed** [1] - 18:18
**killing** [1] - 98:4
**Killing** [1] - 98:20
**kind** [5] - 72:10, 129:11, 146:12, 151:6, 152:14
**kinds** [5] - 28:4, 56:25, 68:3, 111:19, 122:8
**King** [7] - 27:8, 43:16, 44:6, 47:1, 47:16, 80:10, 84:23
**KING** [15] - 3:13, 7:21, 7:24, 27:9, 27:12, 46:19, 47:4, 47:17, 105:24, 147:18, 148:5, 148:20, 149:3, 149:6, 150:1
**King's** [2] - 19:7, 26:3
**KLEKAMP** [1] - 3:21
**knowing** [2] - 36:8, 147:13
**knowingly** [8] - 12:16, 12:17, 51:4, 129:1, 129:2, 137:5, 137:11, 137:24
**knowledge** [12] - 38:17, 52:1, 56:10, 103:25, 129:14, 137:15, 137:17,

137:19, 137:21, 138:1, 138:7, 138:12
**known** [7] - 62:7, 68:2, 96:23, 101:16, 132:23, 133:1, 133:8
**knows** [5] - 18:6, 23:21, 58:9, 121:15, 150:8
**Kraft** [4] - 49:5, 60:10, 65:17, 65:19
**Kroger** [15] - 19:12, 40:20, 48:7, 49:5, 49:10, 50:1, 50:2, 57:7, 58:14, 58:18, 59:14, 60:2, 60:6, 75:18, 87:9
**Krouse** [10] - 25:24, 44:20, 45:3, 47:22, 72:9, 94:2, 94:15
**Krouse's** [1] - 94:23

# L

**labor** [1] - 80:2
**lack** [2] - 100:14, 143:22
**ladies** [18] - 8:6, 8:12, 27:12, 28:12, 30:22, 32:9, 33:23, 40:8, 69:23, 81:17, 84:19, 84:25, 104:24, 114:15, 122:11, 123:1, 147:10, 154:3
**land** [1] - 146:13
**language** [3] - 5:16, 6:14, 11:22
**large** [2] - 31:13, 102:6
**large-shell** [1] - 31:13
**largely** [1] - 85:8
**larger** [5] - 57:2, 57:4, 76:11, 76:12, 114:21
**largest** [4] - 43:9, 49:24, 74:19, 76:4
**last** [3] - 15:19, 82:10, 134:13
**late** [3] - 14:2, 57:17, 153:6
**law** [36] - 6:16, 6:25, 7:3, 7:9, 14:1, 29:7, 50:25, 83:15, 83:25, 103:5, 105:3, 105:9, 106:12, 106:18, 106:19, 106:23, 107:6, 107:9, 107:13, 107:14, 107:16, 107:22, 115:4, 115:9,

115:13, 116:22, 120:10, 122:9, 125:13, 125:15, 126:2, 144:24, 144:25, 145:3
**lawfully** [3] - 131:25, 139:1, 139:17
**laws** [14] - 68:25, 69:15, 80:12, 116:13, 139:10, 139:11, 140:2, 140:5, 140:18, 140:22, 141:3, 142:1, 142:12, 142:17
**lawsuit** [3] - 116:25, 118:4, 118:6, 120:2, 125:15
**lawsuits** [1] - 120:5
**lawyer** [4] - 109:21, 109:22, 109:23, 109:25
**lawyers** [16] - 33:21, 42:3, 106:10, 106:22, 106:25, 107:1, 107:6, 108:20, 108:22, 108:24, 109:1, 110:4, 111:18, 122:14, 146:6, 146:22
**lay** [1] - 146:13
**layer** [1] - 53:17
**layers** [4] - 52:6, 53:9, 63:12, 92:10
**laying** [2] - 57:21, 71:5
**lays** [1] - 28:25
**lead** [2] - 88:22, 142:4
**leading** [4] - 101:10, 101:12, 101:13, 101:17
**leads** [1] - 109:18
**lean** [1] - 149:10
**least** [11] - 10:15, 21:6, 23:13, 37:19, 53:1, 91:21, 118:10, 126:12, 149:1, 149:4, 150:1
**leave** [1] - 152:1
**led** [2] - 43:3, 44:11
**LEE** [1] - 3:17
**left** [4] - 65:8, 65:9, 99:24, 100:10
**leg** [2] - 39:18, 42:10
**legal** [4] - 117:1, 143:3, 143:6, 143:11
**legally** [2] - 115:18, 116:8
**legged** [7] - 16:2, 31:25, 34:25, 36:10, 37:9, 50:10, 83:7
**legibly** [1] - 146:3

**legislative** [1] - 139:7
**legitimate** [1] - 119:22
**legs** [4] - 32:1, 32:3, 38:2, 50:9
**less** [11] - 6:12, 63:5, 65:23, 67:10, 70:11, 71:2, 103:3, 135:9, 135:12, 136:11
**lesson** [1] - 73:21
**letter** [22] - 10:19, 17:3, 17:5, 17:6, 17:10, 17:11, 17:14, 17:15, 17:18, 17:20, 17:21, 18:13, 18:20, 43:22, 43:24, 64:13, 65:17, 65:18, 73:17, 95:14, 95:15, 111:10
**letters** [3] - 48:18, 64:5, 82:20
**level** [1] - 134:7
**leveling** [1] - 61:1
**LEVIN** [2] - 4:3, 6:11
**Levin** [1] - 5:8
**LEVINE** [1] - 3:12
**liability** [2] - 11:17, 116:20
**liable** [6] - 11:1, 14:2, 14:3, 116:19, 140:4, 140:5
**Liberation** [1] - 58:2
**lie** [1] - 146:10
**LIEBHARD** [1] - 2:22
**life** [5] - 18:3, 18:17, 108:3, 114:24, 115:8
**lifetime** [1] - 80:17
**light** [6] - 109:14, 112:23, 118:24, 123:13, 125:4, 126:8
**likely** [5] - 118:25, 120:20, 135:9, 135:13, 135:17
**likewise** [1] - 107:12
**limit** [9] - 45:19, 46:20, 46:21, 46:22, 46:23, 47:18, 103:2, 119:19
**limited** [21] - 7:22, 10:11, 11:21, 11:23, 12:1, 68:12, 81:3, 92:18, 110:14, 110:16, 110:17, 110:23, 111:1, 111:4, 111:19, 136:2, 144:9, 148:8, 148:9, 148:12
**limiting** [4] - 51:19, 128:17, 128:19, 130:15
**limits** [3] - 46:23,

94:25, 151:19
**LINDSEY** [1] - 3:8
**line** [13] - 5:12, 7:5, 45:9, 54:1, 54:3, 54:7, 54:11, 57:10, 78:25, 79:1
**lines** [10] - 26:5, 78:20, 78:22, 79:4, 79:5, 79:9, 111:5, 120:5
**linkage** [1] - 16:8
**Lisciandro** [1] - 117:15
**Lisciandro's** [1] - 117:16
**list** [11] - 5:18, 7:22, 111:18, 112:11, 144:6, 144:8, 148:13, 148:18, 148:24, 151:13, 151:15
**listed** [1] - 113:15
**listen** [5] - 34:15, 34:16, 69:17, 145:16
**listened** [1] - 10:15
**listening** [1] - 16:5
**LITE** [1] - 2:13
**literally** [3] - 45:5, 64:23, 73:14
**literature** [1] - 23:20
**LITIGATION** [1] - 1:5
**litigation** [5] - 26:11, 28:8, 33:16, 36:7, 102:3
**live** [6] - 9:10, 9:11, 43:12, 52:3, 61:18, 83:14
**LLP** [6] - 2:9, 2:17, 2:22, 3:2, 3:12, 4:3
**lo** [1] - 63:11
**lobbying** [1] - 43:21
**Locust** [1] - 2:14
**logical** [1] - 122:19
**logo** [5] - 19:21, 19:22, 75:23, 75:24, 76:2
**Lois** [1] - 95:7
**London** [1] - 25:8
**long-term** [2] - 44:17, 86:2
**Look** [1] - 91:4
**look** [31] - 7:13, 8:8, 13:17, 22:6, 22:18, 31:15, 31:16, 37:20, 50:11, 50:12, 50:14, 54:2, 57:6, 68:5, 68:8, 68:10, 69:17, 77:17, 77:22, 77:23, 78:19, 79:8, 83:6, 91:6, 94:15, 101:21, 127:6, 134:3, 146:25

**looked** [8] - 78:8, 78:12, 79:7, 90:3, 100:19, 100:24, 101:2, 101:3
**looking** [8] - 6:6, 37:1, 63:7, 63:11, 69:18, 91:16, 93:17, 101:3
**looks** [2] - 54:5, 77:11
**lose** [4] - 52:1, 58:21, 63:3, 64:18
**loss** [6] - 56:11, 56:12, 64:24, 65:3, 133:19, 133:23
**losses** [1] - 95:20
**lost** [4] - 60:15, 73:14, 143:11
**louder** [1] - 50:13
**Louisiana** [1] - 3:6
**low** [1] - 71:23
**lower** [8] - 32:16, 41:8, 41:15, 65:24, 78:14, 88:14, 133:20, 133:23
**lowest** [2] - 30:19, 125:20
**lucky** [1] - 27:24, 36:6
**Luis** [1] - 42:14
**lunch** [3] - 99:10, 104:25, 106:5
**lunchtime** [2] - 105:6, 106:7
**LYONS** [1] - 2:4

**M**

**Madison** [1] - 2:6
**MAHER** [1] - 2:9
**mail** [10] - 9:16, 24:18, 25:3, 39:1, 65:18, 66:14, 71:18, 75:8
**mailed** [1] - 62:12
**mails** [3] - 9:12, 9:13, 33:18
**main** [3] - 32:11, 117:5, 144:17
**maintain** [1] - 69:24
**maintaining** [1] - 139:18
**man** [2] - 18:16, 33:5
**man's** [1] - 26:6
**management** [1] - 99:3
**manager** [1] - 75:13
**managing** [1] - 55:5
**mandatory** [2] -

49:15, 49:22
**manipulating** [1] - 26:7
**manner** [6] - 44:7, 112:15, 113:7, 113:22, 116:7, 147:9
**manufactured** [1] - 71:10
**manure** [2] - 18:2, 20:10
**map** [1] - 28:23
**marcus** [3] - 51:22, 67:14
**Marcus** [27] - 51:22, 51:23, 52:14, 56:10, 58:19, 60:13, 60:25, 61:11, 62:1, 62:12, 62:13, 62:18, 63:16, 64:4, 66:14, 66:25, 69:10, 71:16, 71:25, 72:5, 72:15, 73:24, 81:18, 85:22
**mark** [2] - 84:17
**marked** [1] - 17:3
**market** [47] - 13:4, 31:12, 37:17, 37:19, 37:20, 37:21, 67:11, 92:8, 127:24, 128:2, 131:20, 132:23, 132:25, 133:2, 133:3, 133:5, 133:7, 133:9, 133:13, 133:14, 133:17, 134:6, 134:7, 134:12, 134:13, 134:16, 134:18, 134:20, 134:23, 134:25, 135:3, 135:6, 135:9, 135:11, 135:12, 135:14, 135:19, 135:19, 135:22, 139:18
**Market** [2] - 1:22, 3:18
**Marketers** [2] - 15:15, 139:3
**marketing** [1] - 19:17
**Marketing** [6] - 10:17, 48:5, 48:16, 48:17, 87:14, 87:16
**marketplace** [1] - 125:17
**Marsh** [1] - 49:7
**Marshall** [5] - 52:5, 52:21, 52:23, 91:1
**marshals** [1] - 152:5
**massive** [1] - 11:1
**mastermind** [1] - 45:22
**material** [5] - 125:21, 140:20, 141:12,

141:22, 142:15
**materials** [1] - 85:4
**matter** [12] - 20:9, 101:9, 101:12, 101:14, 111:16, 113:13, 114:7, 120:17, 123:4, 149:15, 155:5
**mattered** [1] - 19:15
**matters** [1] - 113:19
**McDonald's** [14] - 43:4, 43:5, 43:7, 43:8, 43:15, 43:16, 43:19, 44:6, 71:19, 72:4, 73:14, 80:9
**MDL** [1] - 1:5
**mean** [12] - 12:10, 41:5, 49:10, 69:13, 71:4, 117:21, 131:23, 149:8, 150:8, 150:22, 151:11, 153:21
**means** [17] - 12:17, 20:19, 65:23, 70:11, 104:7, 105:5, 112:5, 112:10, 118:22, 129:2, 129:19, 130:7, 130:10, 133:2, 136:10, 137:11, 141:14
**meant** [2] - 109:25, 144:22
**meanwhile** [1] - 154:10
**mechanical** [1] - 1:25
**media** [1] - 73:19
**meet** [7] - 22:2, 25:9, 28:13, 44:5, 68:25, 98:8, 120:14
**meeting** [8] - 25:4, 25:12, 45:11, 62:7, 96:15, 96:24, 100:6, 100:9
**meetings** [11] - 10:4, 10:9, 66:19, 89:8, 93:4, 93:24, 93:25, 97:16, 98:13, 131:7
**meets** [2] - 25:7, 58:19
**meltdown** [1] - 67:13
**member** [27] - 10:5, 12:16, 16:5, 16:20, 41:23, 51:4, 59:8, 62:11, 66:16, 72:24, 74:1, 74:17, 76:5, 93:18, 103:24, 129:1, 129:13, 129:15, 137:14, 137:16, 137:23, 138:4, 138:11, 138:14,

138:18, 138:19, 144:13
**members** [45] - 11:25, 12:2, 12:20, 16:10, 16:18, 41:23, 42:5, 46:13, 76:15, 83:17, 84:8, 86:5, 87:17, 89:2, 89:8, 89:16, 89:23, 90:4, 90:12, 93:23, 96:20, 106:7, 110:21, 110:24, 117:17, 129:11, 129:15, 129:17, 129:22, 130:12, 130:13, 131:3, 135:7, 137:3, 137:18, 138:17, 139:4, 139:18, 139:21, 139:22, 143:1, 143:2, 143:10
**Members** [3] - 24:1, 24:4, 24:11
**members'** [1] - 139:19
**memo** [6] - 89:23, 89:25, 90:5, 95:4, 95:7
**memory** [6] - 10:22, 84:5, 112:15, 143:19, 144:1
**mentioned** [10] - 10:14, 59:6, 85:1, 95:9, 96:10, 100:7, 112:8, 122:3, 132:14, 137:9
**mere** [3] - 12:22, 131:4, 131:14
**merely** [3] - 110:21, 112:11, 132:18
**message** [1] - 89:16
**messages** [2] - 146:1, 146:11
**met** [7] - 28:21, 34:20, 106:24, 126:5, 129:18, 131:6
**method** [1] - 101:9
**methods** [3] - 104:7, 130:8, 130:10
**Michael** [13] - 38:9, 38:14, 38:15, 61:1, 61:2, 61:15, 61:21, 72:13, 75:10, 90:18, 90:23, 91:14, 94:22
**Michaels** [3] - 71:20, 72:3, 72:13
**Michigan** [1] - 42:15
**microphone** [1] - 9:15
**mid** [1] - 57:17
**middle** [1] - 93:17

**Midwest** [4] - 44:20, 44:22, 90:19, 94:23
**might** [17] - 55:10, 82:17, 101:5, 107:14, 111:25, 112:1, 112:14, 112:19, 112:22, 113:23, 114:5, 114:18, 131:22, 135:1, 145:8, 146:8, 151:11
**Mike** [2] - 149:19, 151:24
**militant** [1] - 75:25
**Miller** [1] - 64:20
**Miller's** [1] - 65:9
**million** [20] - 24:23, 31:8, 31:9, 32:23, 33:1, 33:5, 33:9, 51:16, 51:17, 52:6, 52:14, 52:16, 52:17, 52:18, 53:7, 53:8, 53:12, 53:14, 83:4
**million-dollar** [1] - 33:5
**millions** [4] - 64:23, 86:4, 88:8, 88:10
**mind** [5] - 47:1, 94:4, 114:15, 121:11, 145:21
**MINDEE** [1] - 2:13
**mine** [1] - 144:20
**minimum** [2] - 43:12, 70:14
**minute** [10] - 10:7, 35:20, 47:6, 61:12, 62:13, 69:6, 79:6, 92:3
**minutes** [7] - 10:8, 17:24, 23:14, 29:22, 82:11, 93:6, 104:25
**mischaracterize** [1] - 81:4
**mischaracterizes** [1] - 95:25
**misrepresent** [1] - 81:4
**misrepresented** [1] - 98:3
**missed** [2] - 10:23, 43:1
**mission** [3] - 76:1, 78:16
**misstates** [1] - 99:7
**mistake** [3] - 12:18, 129:3, 137:12
**mistreating** [1] - 73:12
**model** [2] - 54:23, 78:19
**modeling** [2] - 24:14,

24:16

**MOLLY** [1] - 3:15

**molt** [9] - 14:13, 14:18, 20:6, 22:10, 38:6, 38:19, 54:23, 67:23, 126:21

**molt-and-slaughter** [2] - 14:13, 67:23

**molting** [1] - 85:18

**molts** [2] - 20:6, 54:19

**mom** [1] - 57:3

**mom-and-pop** [1] - 57:3

**moment** [2] - 35:6, 128:11

**money** [15] - 24:1, 24:5, 24:24, 26:8, 52:20, 63:19, 65:1, 66:8, 71:19, 71:20, 88:10, 92:15, 97:20, 143:12

**monitoring** [1] - 57:22

**month** [3] - 30:24, 93:9

**month's** [2] - 41:1, 41:2

**months** [2] - 96:21, 100:6

**moreover** [1] - 41:22

**morning** [11] - 5:1, 8:6, 9:4, 11:4, 23:14, 84:25, 151:23, 152:15, 152:19, 153:18, 154:13

**MORRIS** [1] - 3:12

**mortality** [2] - 67:9, 68:18

**most** [10] - 5:14, 12:11, 27:18, 60:16, 60:17, 83:16, 92:22, 100:12, 107:3, 143:15

**motivated** [1] - 87:8

**motive** [4] - 104:6, 112:17, 125:1, 130:6

**motives** [1] - 124:1

**mountain** [1] - 9:19

**Mousa** [10] - 10:4, 10:9, 17:23, 17:24, 20:4, 20:24, 21:10, 96:16, 97:19

**Mousa's** [2] - 18:15, 97:15

**mouth** [1] - 66:11

**move** [1] - 5:3

**moved** [1] - 21:1

**movie** [1] - 107:25

**movies** [1] - 107:23

**MR** [43] - 5:6, 7:15,

7:17, 7:21, 7:24, 8:12, 27:9, 27:12, 46:19, 47:4, 47:17, 84:25, 95:25, 96:4, 99:7, 99:14, 105:15, 105:24, 147:16, 147:17, 147:18, 147:19, 148:5, 148:20, 149:3, 149:6, 150:1, 150:4, 150:7, 150:11, 150:14, 150:16, 150:18, 151:2, 151:12, 151:14, 151:17, 152:3, 152:20, 153:1, 153:5, 153:15, 153:20

**MS** [8] - 6:11, 8:1, 148:3, 148:7, 148:17, 148:21, 148:23, 150:6

**Mueller** [1] - 10:14

**MUETHING** [1] - 3:21

**multiple** [3] - 36:18, 57:14, 78:10

**multiyear** [1] - 11:1

**must** [53] - 12:12, 12:19, 22:8, 22:13, 22:18, 23:1, 67:21, 105:3, 106:17, 107:9, 108:6, 109:9, 110:15, 111:22, 116:9, 118:23, 120:16, 122:18, 123:5, 124:16, 126:10, 126:19, 127:1, 127:6, 127:15, 127:20, 128:3, 128:5, 128:21, 129:22, 131:12, 132:8, 132:15, 132:22, 133:3, 133:6, 133:11, 133:15, 135:23, 136:6, 136:15, 136:22, 137:4, 137:9, 140:7, 140:11, 141:1, 141:10, 141:15, 141:24, 146:1, 146:16, 146:19

**mystery** [1] - 66:10

## N

**name** [4] - 10:16, 84:20, 90:6

**named** [2] - 117:14, 117:18

**namely** [1] - 109:15

**names** [2] - 90:6, 144:6

**nATHANIEL** [1] - 2:18

**nation's** [4] - 31:7, 31:8, 78:23, 119:19

**national** [1] - 82:6

**nationally** [1] - 34:3

**nationwide** [1] - 44:8

**nature** [3] - 134:5, 134:6, 137:19

**nauseating** [1] - 25:11

**necessarily** [5] - 6:17, 113:3, 114:16, 129:17, 131:23

**necessary** [11] - 6:19, 73:24, 91:18, 104:1, 104:4, 104:5, 104:6, 130:5, 130:7, 136:7, 136:14

**neck** [1] - 89:17

**need** [32] - 5:5, 6:13, 7:4, 21:8, 21:11, 26:17, 29:14, 31:19, 37:19, 42:20, 46:24, 47:3, 56:8, 59:19, 60:24, 61:13, 63:9, 63:10, 66:8, 66:11, 69:19, 69:20, 96:11, 102:20, 103:5, 103:16, 126:6, 129:11, 129:17, 141:19, 147:14

**needs** [2] - 145:12, 146:17

**negotiations** [2] - 48:16, 58:10

**nervous** [1] - 152:5

**Nestle** [2] - 49:5, 60:9

**Neuwirth** [14] - 8:14, 10:2, 28:24, 32:13, 32:21, 63:17, 63:18, 64:8, 65:18, 79:4, 82:17, 84:24, 99:13, 104:23

**NEUWIRTH** [19] - 2:2, 5:6, 84:25, 96:4, 99:14, 105:15, 147:19, 150:7, 150:14, 150:18, 151:2, 151:12, 151:14, 151:17, 152:3, 152:20, 153:1, 153:5, 153:15

**Neuwirth's** [2] - 10:23, 82:12

**never** [28] - 8:19, 10:16, 10:17, 17:7, 17:19, 38:12, 38:21, 45:14, 51:25, 62:8, 71:22, 76:2, 76:3, 76:21, 81:21, 84:3,

87:16, 89:21, 90:10, 93:15, 95:13, 99:22, 101:6, 146:11

**new** [17] - 2:6, 2:24, 52:25, 53:15, 53:17, 53:19, 55:20, 65:1, 65:19, 65:23, 68:19, 68:21, 74:10, 82:16, 84:6, 139:4

**New** [2] - 2:10, 3:4

**news** [1] - 59:22

**newsletter** [3] - 38:25, 39:5, 86:6

**newsletters** [13] - 38:24, 39:2, 39:3, 39:6, 39:7, 39:9, 39:15, 77:22, 81:1, 93:1, 93:12, 99:2

**next** [6] - 7:13, 7:14, 27:8, 35:19, 54:7, 96:25

**nice** [5] - 5:2, 105:6, 106:5, 154:12, 154:23

**nine** [4] - 14:12, 16:23, 23:6

**nine-year** [2] - 16:23, 23:6

**NO** [1] - 1:5

**no's** [1] - 27:4

**Nob** [1] - 49:7

**nobody** [6] - 45:17, 45:18, 56:2, 107:24, 107:25

**noise** [1] - 101:21

**non** [2] - 72:14, 80:15

**non-certified** [1] - 72:14

**non-USEM** [1] - 80:15

**none** [8] - 9:24, 36:14, 79:19, 79:20, 79:21, 80:19, 97:8, 112:7

**nonexistence** [1] - 114:18

**nonexpert** [1] - 124:23

**nonmembers** [1] - 42:6

**nonpresence** [1] - 120:8

**noose** [1] - 89:17

**North** [1] - 53:9

**noses** [1] - 152:14

**notebook** [1] - 151:16

**notebooks** [1] - 151:8

**noted** [1] - 111:17

**notes** [9] - 8:17, 10:23, 24:25, 143:14, 143:17, 143:20, 143:23, 143:24, 144:5

**nothing** [17] - 10:21, 12:6, 18:22, 20:21, 26:11, 39:24, 39:25, 40:4, 46:24, 47:19, 51:11, 80:23, 98:18, 144:21, 147:7, 147:8

**nothing's** [2] - 79:12

**notice** [5] - 11:25, 12:6, 12:9, 39:10, 110:20

**notified** [1] - 59:22

**notify** [1] - 15:20

**notwithstanding** [1] - 87:2

**nourishment** [1] - 105:14

**Number** [7] - 11:9, 11:19, 36:12, 36:17, 39:12, 67:20, 70:6

**number** [25] - 21:16, 21:18, 31:2, 46:21, 46:22, 46:23, 64:22, 65:13, 66:12, 76:23, 105:5, 105:6, 105:7, 112:9, 113:3, 114:17, 124:3, 127:17, 134:7, 140:16, 146:15

**numbers** [4] - 18:19, 64:10, 65:21, 67:6

**numerically** [1] - 67:8

**nutrients** [1] - 18:3

**NW** [2] - 2:19, 3:15

**NY** [4] - 2:6, 2:10, 2:24, 3:4

## O

**o'clock** [4] - 149:14, 151:23, 152:9, 153:3

**oath** [4] - 45:25, 49:13, 58:15, 145:4

**Obispo** [1] - 42:14

**object** [1] - 129:18

**objected** [1] - 109:24

**objection** [5] - 95:25, 99:7, 110:8, 110:9, 110:11

**objections** [8] - 109:1, 109:2, 109:3, 109:24, 109:25, 110:2, 110:5, 147:14

**obligated** [1] - 20:20

**obligation** [5] -

83:11, 110:4, 124:12, 149:17, 154:11

**obnoxious** [1] - 25:14

**obtain** [1] - 28:7
**obvious** [1] - 53:21
**occasions** [1] - 106:25

**occurred** [5] - 54:5, 57:11, 85:5, 132:22, 141:15

**occurs** [1] - 132:18
**October** [2] - 43:24, 53:19

**OF** [1] - 1:2
**OFE** [34] - 9:7, 9:8, 9:11, 9:16, 9:20, 10:1, 10:3, 10:10, 10:14, 10:16, 10:25, 13:11, 13:13, 13:14, 13:18, 16:4, 17:4, 17:12, 17:13, 17:18, 18:20, 18:25, 19:14, 19:25, 20:23, 21:2, 21:3, 23:10, 27:1, 35:13, 35:14

**offer** [2] - 24:10, 141:10

**offered** [4] - 109:21, 110:6, 111:15, 121:5

**offering** [2] - 41:7, 81:14

**office** [1] - 116:4
**officer** [4] - 52:5, 93:13, 145:24, 146:4
**officers** [1] - 115:11
**Official** [1] - 155:7
**official** [1] - 1:21
**often** [2] - 94:11, 152:13

**OH** [1] - 3:23
**Ohio** [21] - 3:24, 15:4, 19:9, 21:17, 36:5, 51:3, 92:2, 92:7, 96:13, 96:14, 96:20, 96:22, 97:5, 97:7, 97:9, 97:20, 97:22, 118:5, 125:23, 128:18, 137:2

**old** [2] - 83:13, 83:14
**OLSON** [1] - 2:4
**once** [13] - 29:8, 44:23, 49:20, 81:24, 88:25, 89:13, 90:23, 91:21, 99:8, 116:16, 131:21, 138:18, 147:7

**ONE** [1] - 1:11
**one** [135] - 3:23, 5:6, 5:16, 5:18, 7:14, 9:20, 10:19, 11:19, 12:14,

13:6, 14:13, 14:14, 15:10, 16:4, 17:1, 17:25, 19:2, 19:15, 19:16, 19:19, 19:25, 20:1, 20:9, 20:12, 20:20, 21:6, 22:18, 27:5, 28:6, 30:4, 30:5, 32:8, 33:15, 33:18, 36:13, 36:15, 36:21, 37:10, 38:8, 38:9, 38:10, 39:9, 41:1, 41:2, 43:23, 48:23, 49:24, 54:18, 54:20, 55:11, 55:21, 57:24, 57:25, 58:4, 58:5, 59:11, 60:22, 61:3, 61:18, 62:5, 67:15, 71:20, 73:5, 73:12, 73:13, 74:19, 75:9, 77:4, 77:10, 78:5, 78:17, 79:23, 80:16, 85:10, 85:23, 86:2, 92:16, 95:12, 96:22, 97:21, 97:22, 97:23, 97:25, 100:12, 101:7, 101:13, 105:5, 107:9, 114:19, 116:25, 117:7, 117:23, 121:10, 121:13, 121:25, 122:16, 122:24, 126:2, 126:21, 127:6, 128:23, 129:19, 131:6, 131:9, 132:3, 132:5, 138:2, 139:19, 140:16, 143:16, 144:13, 144:18, 145:8, 146:11, 146:15, 147:1, 148:7, 149:2, 151:2, 151:5, 151:15, 152:13, 153:17

**one-and-a-half** [1] - 41:2

**one-page** [1] - 10:19
**ones** [4] - 36:6, 41:14, 41:17

**online** [1] - 55:9
**open** [3] - 66:8, 131:22, 131:24
**opened** [1] - 30:15
**opening** [6] - 21:14, 32:1, 36:2, 50:11, 65:6, 77:1

**openings** [1] - 21:12
**operation** [3] - 64:23, 67:15, 130:11
**operations** [1] - 73:21

**opinion** [13] - 32:18,

93:12, 107:14, 107:16, 108:8, 123:19, 123:23, 124:14, 124:25, 125:5, 125:7, 125:10, 145:18

**opinions** [10] - 32:25, 33:6, 76:18, 76:19, 76:24, 78:15, 123:17, 123:18, 124:24, 145:20

**opportunity** [17] - 8:21, 8:24, 9:3, 9:5, 28:17, 42:18, 55:11, 82:11, 85:3, 85:15, 93:2, 94:8, 99:4, 101:25, 102:13, 112:12, 143:17

**opposed** [4] - 22:14, 62:19, 117:7, 127:2

**opposite** [1] - 119:6
**option** [1] - 40:16
**order** [20] - 28:19, 29:15, 29:17, 30:6, 34:1, 34:18, 35:25, 37:19, 43:12, 63:13, 69:20, 74:9, 99:11, 108:4, 118:22, 119:9, 124:11, 126:8, 144:7, 146:18

**ordered** [1] - 111:22
**organization** [3] - 38:25, 39:3, 139:15
**organizations** [1] - 115:4

**original** [1] - 72:24
**originally** [2] - 37:15, 48:8

**OTHER** [1] - 4:8
**otherwise** [12] - 34:5, 48:22, 71:15, 88:4, 89:18, 103:3, 103:7, 110:22, 121:2, 131:7, 142:5, 147:4

**ought** [6] - 66:23, 107:14, 154:4
**outcome** [2] - 5:19, 112:17

**outdoors** [1] - 105:1
**output** [6] - 19:17, 133:21, 133:23, 134:4, 139:19, 139:24
**outset** [3] - 50:11, 86:17, 102:12
**outside** [10] - 5:3, 17:21, 45:19, 109:7, 109:12, 116:1, 121:19, 122:7, 135:5

**outweigh** [1] - 136:20

**outweighs** [4] - 68:6, 128:9, 136:17, 137:1
**overall** [3] - 65:20, 65:24, 138:1
**overarching** [31] - 5:10, 6:1, 11:1, 14:8, 14:15, 15:12, 15:23, 16:1, 19:5, 22:4, 22:14, 23:8, 26:22, 26:23, 29:10, 30:13, 31:17, 31:20, 31:22, 31:24, 32:2, 32:9, 34:8, 36:11, 36:13, 50:9, 83:10, 84:15, 86:24, 103:2, 127:2

**overcharge** [5] - 76:14, 77:15, 78:2, 78:3, 78:13
**overcharged** [1] - 76:15

**overcome** [2] - 63:10, 66:3
**overlap** [3] - 23:6, 37:6, 127:12
**overlapped** [1] - 22:23

**overly** [1] - 70:7
**overnight** [2] - 73:13
**overruled** [1] - 110:11
**oversees** [1] - 67:1
**overwhelming** [1] - 73:20

**own** [21] - 16:17, 16:18, 73:1, 73:3, 73:7, 73:8, 78:4, 82:6, 114:11, 115:14, 117:8, 121:16, 125:5, 125:6, 143:1, 143:6, 144:1, 145:17, 149:12
**owned** [1] - 115:15
**owner** [1] - 58:3
**owners** [1] - 102:7
**OXFORD** [1] - 3:5

---

**P**

**P-1** [1] - 148:19
**P-14** [1] - 10:11
**P-141** [1] - 10:11
**P-15** [2] - 10:19, 17:3
**P-5** [1] - 148:19
**PA** [4] - 1:9, 1:23, 2:14, 3:19
**Pace** [1] - 60:3
**page** [6] - 5:12, 5:24, 10:19, 15:19, 21:20
**pages** [1] - 5:21
**paid** [16] - 8:17, 10:5,

24:2, 24:12, 24:16, 25:2, 35:24, 70:17, 88:1, 89:22, 90:17, 97:17, 97:18, 103:19, 119:16, 143:10

**painful** [1] - 73:20
**painted** [1] - 58:1
**pan** [1] - 119:6
**paper** [2] - 11:16, 146:2

**pardon** [1] - 148:3
**park** [1] - 5:4
**part** [37] - 6:1, 6:19, 13:21, 13:22, 14:3, 15:24, 16:20, 19:6, 22:13, 22:25, 31:2, 31:22, 62:5, 70:17, 72:15, 72:17, 79:4, 82:24, 82:25, 83:7, 83:8, 83:9, 83:23, 100:1, 105:3, 107:15, 112:7, 114:14, 125:8, 126:6, 127:1, 127:14, 132:2, 135:5, 137:25, 138:3, 147:2

**partial** [1] - 110:10
**participants** [4] - 22:23, 23:7, 37:5, 127:11

**participate** [9] - 12:17, 38:15, 50:6, 66:18, 87:25, 96:24, 129:2, 130:2, 137:11

**participated** [14] - 12:23, 15:2, 15:17, 29:20, 40:2, 42:7, 91:21, 91:25, 94:9, 97:23, 128:19, 131:15, 138:3, 140:8
**participates** [2] - 67:2, 137:25

**participating** [1] - 98:12

**participation** [4] - 64:1, 75:16, 138:8, 138:9

**particular** [8] - 12:2, 30:9, 110:1, 110:24, 114:20, 138:6, 138:9, 149:17

**parties** [15] - 11:24, 104:1, 108:7, 108:14, 108:20, 110:18, 118:3, 118:6, 120:1, 120:3, 124:10, 130:1, 141:5, 145:1, 148:8
**partner** [1] - 24:19
**partnership** [1] - 114:25

**partnerships** [1] -

115:3
**parts** [3] - 5:15, 129:15, 137:18
**pass** [5] - 22:20, 36:23, 86:20, 102:16, 127:9
**passed** [1] - 68:25
**past** [7] - 27:5, 28:17, 30:10, 36:7, 84:10, 116:4, 149:6
**patience** [1] - 27:19
**PAWELSKI** [1] - 3:18
**pay** [8] - 16:18, 54:24, 54:25, 57:4, 58:1, 87:19, 87:20, 103:7
**paying** [1] - 97:19
**pecking** [2] - 74:9
**peer** [2] - 23:18, 23:19
**peer-reviewed** [2] - 23:18, 23:19
**peers** [2] - 23:20, 23:21
**pending** [1] - 120:4
**Pennsylvania** [1] - 4:6
**PENNSYLVANIA** [1] - 1:2
**People** [1] - 43:20
**people** [21] - 16:14, 18:1, 24:4, 24:6, 24:18, 50:14, 85:11, 86:22, 92:15, 92:21, 92:23, 93:24, 93:25, 94:5, 94:9, 98:12, 102:6, 103:19, 109:15, 111:7, 114:4
**per** [19] - 30:24, 31:11, 43:17, 48:10, 52:1, 63:5, 64:17, 64:22, 65:13, 65:24, 66:12, 67:10, 86:3, 88:2, 88:9, 88:16
**percent** [18] - 37:20, 37:23, 37:24, 41:1, 41:2, 54:9, 54:10, 54:15, 63:13, 76:11, 76:13, 76:16, 77:15, 78:2, 78:14, 92:8, 92:10
**percentage** [2] - 134:24, 135:6
**perform** [3] - 115:24, 139:5, 145:7
**performance** [1] - 115:23
**performed** [1] - 115:21
**perhaps** [4] - 5:7,

111:9, 111:11, 143:15
**Period** [2] - 76:16, 78:9
**period** [43] - 16:23, 23:6, 31:1, 39:22, 39:23, 48:8, 48:14, 48:15, 48:23, 48:25, 50:14, 51:12, 53:12, 54:5, 70:18, 70:19, 77:4, 77:7, 77:8, 77:10, 77:12, 77:13, 77:14, 77:16, 77:25, 78:7, 79:5, 79:7, 79:9, 80:19, 81:24, 85:3, 85:14, 91:16, 93:17, 100:18, 100:20, 100:24, 103:10, 119:24, 134:14
**periods** [1] - 42:2
**perked** [1] - 10:15
**permissible** [1] - 7:1
**permit** [2] - 52:19, 125:4
**permitted** [7] - 106:23, 109:23, 123:6, 123:11, 123:16, 123:17, 143:14
**person** [15] - 9:16, 27:14, 33:17, 55:4, 103:24, 111:9, 115:9, 116:3, 129:13, 137:14, 137:16, 137:21, 137:24, 140:3, 144:14
**personal** [2] - 26:7, 149:17
**personally** [1] - 145:5
**persons** [16] - 103:13, 104:4, 104:5, 114:23, 115:2, 115:6, 115:16, 115:25, 116:21, 128:14, 129:6, 129:7, 130:4, 130:12, 131:5, 131:12
**persuaded** [1] - 108:6
**pertains** [1] - 114:6
**PETA** [5] - 43:20, 43:25, 44:2, 44:3, 48:18
**Ph.D** [5] - 32:22, 33:1, 56:18, 65:15
**pharmaceutical** [1] - 25:10
**phase** [1] - 48:11
**phase-in** [1] - 48:11
**PHILADELPHIA** [1] - 1:9

**Philadelphia** [4] - 1:23, 2:14, 3:19, 4:6
**philosophically** [1] - 38:12
**phones** [1] - 27:11
**picked** [2] - 41:13, 77:20
**Pickett** [1] - 75:13
**picture** [2] - 32:1, 76:24
**pictures** [1] - 120:23
**piece** [4] - 5:19, 5:20, 74:23, 146:2
**piecemeal** [1] - 131:13
**pieces** [1] - 33:16
**pittance** [1] - 40:23
**PIZZIRUSSO** [1] - 2:17
**place** [7] - 52:18, 69:23, 90:24, 91:11, 99:1, 100:6, 107:24
**plain** [1] - 67:4
**Plaintiff** [64] - 11:10, 12:12, 15:24, 28:2, 28:3, 30:2, 74:16, 117:7, 117:18, 117:20, 118:15, 118:19, 118:23, 119:4, 119:8, 119:15, 120:12, 120:13, 120:17, 120:21, 122:24, 124:4, 125:14, 126:10, 126:16, 127:21, 127:25, 128:15, 128:17, 128:21, 130:8, 130:18, 132:15, 132:19, 132:21, 133:2, 133:4, 133:10, 133:12, 133:15, 135:20, 136:8, 136:24, 140:7, 140:11, 140:13, 140:16, 141:1, 141:4, 141:8, 141:13, 141:14, 141:17, 141:21, 141:24, 142:3, 142:7, 142:10, 142:13, 142:16, 142:18, 143:1, 143:2, 143:4
**plaintiff** [1] - 9:11
**plaintiffs** [2] - 21:13, 47:23
**Plaintiffs** [57] - 2:20, 2:24, 3:10, 13:25, 14:7, 21:5, 28:13, 28:15, 29:15, 29:17, 30:6, 30:7,

31:1, 31:7, 32:3, 33:10, 34:2, 34:24, 36:2, 38:6, 38:22, 39:20, 39:21, 41:6, 42:3, 42:8, 44:16, 44:21, 45:2, 50:22, 51:1, 52:22, 65:11, 68:6, 69:16, 70:7, 70:9, 70:16, 72:21, 77:21, 78:1, 80:21, 82:11, 84:22, 94:4, 94:11, 97:3, 104:7, 104:15, 117:15, 117:19, 117:21, 118:4, 133:14, 148:5, 148:20
**Plaintiffs'** [6] - 17:22, 39:14, 45:20, 81:13, 104:20, 117:24
**plaintiffs'** [1] - 33:21
**plan** [4] - 69:14, 130:3, 137:6, 137:19
**planned** [1] - 63:2
**planning** [2] - 33:12, 55:13
**plans** [2] - 53:19, 111:11
**play** [4] - 11:16, 46:1, 70:24, 137:19
**played** [4] - 46:2, 70:25, 87:15, 129:16
**playing** [1] - 61:2
**plea** [3] - 151:22, 153:3, 153:8
**pleasure** [1] - 93:14
**pledge** [1] - 44:4
**PLL** [1] - 3:21
**point** [10] - 34:15, 35:19, 50:17, 56:1, 71:15, 79:6, 98:12, 98:15, 104:13, 143:16
**pointed** [3] - 65:18, 94:16, 100:5
**points** [2] - 14:11, 94:14
**polluter** [1] - 58:1
**pop** [1] - 57:3
**popcorn** [1] - 105:25
**Pope** [2] - 12:9, 89:16
**population** [2] - 65:14, 79:1
**PORTER** [1] - 3:12
**position** [4] - 62:14, 67:8, 96:5, 116:2
**possess** [7] - 104:5, 130:5, 134:18, 135:9, 135:12, 143:1, 143:6
**possessed** [4] - 134:11, 134:22,

135:10, 135:16
**possesses** [1] - 134:16
**possible** [7] - 73:22, 88:21, 113:17, 124:1, 141:20, 146:10, 149:25
**possibly** [1] - 55:13
**potential** [5] - 24:14, 74:8, 74:9, 135:4, 138:25
**poultry** [2] - 18:1, 18:2
**Poultry** [4] - 44:20, 44:22, 90:19, 94:23
**power** [17] - 37:17, 37:19, 37:24, 75:16, 134:12, 134:13, 134:16, 134:18, 134:20, 134:23, 135:3, 135:11, 135:12, 135:17, 149:12
**practice** [2] - 53:4, 74:7
**practices** [1] - 132:1
**Pratter** [2] - 103:23, 104:3
**PRATTER** [1] - 1:13
**precedence** [1] - 143:21
**predicted** [1] - 54:9
**prejudice** [3] - 108:6, 112:18, 145:8
**premise** [1] - 125:18
**prepared** [2] - 56:17, 85:4
**preparing** [1] - 44:2
**preponderance** [14] - 11:11, 12:13, 15:1, 15:11, 18:12, 74:15, 84:14, 116:20, 118:20, 118:22, 120:22, 121:1, 128:22, 141:11
**presence** [1] - 120:8
**present** [10] - 28:9, 28:10, 30:16, 30:17, 96:15, 132:11, 139:13
**presentation** [4] - 66:4, 66:5, 95:4, 95:13
**presented** [9] - 9:19, 17:23, 66:5, 108:5, 108:11, 122:9, 123:11, 144:25, 146:21
**presenting** [1] - 105:2
**presents** [1] - 7:3

**preserve** [1] - 125:16
**preside** [1] - 144:15
**president** [5] - 38:16, 42:13, 55:16, 74:25, 93:16
**pressure** [2] - 44:10, 83:18
**pressured** [1] - 43:10
**presumed** [1] - 138:19
**presuppose** [1] - 14:5
**pretty** [2] - 23:17, 71:19
**prevail** [5] - 29:16, 29:18, 36:14, 118:23, 119:10
**prevent** [3] - 140:23, 142:1, 142:18
**previously** [3] - 98:1, 116:3, 132:14
**price** [20] - 31:5, 31:11, 40:2, 41:8, 41:12, 41:15, 41:19, 55:24, 56:1, 56:4, 56:6, 56:22, 57:4, 61:16, 71:21, 80:18, 88:3, 117:25, 143:10
**prices** [65] - 30:21, 31:11, 31:17, 32:14, 32:15, 34:4, 37:17, 37:24, 40:24, 41:15, 41:25, 45:7, 46:5, 46:11, 46:16, 57:8, 59:23, 68:14, 69:7, 77:9, 77:11, 77:13, 77:14, 78:13, 79:25, 80:1, 80:2, 80:5, 82:7, 82:19, 85:16, 85:20, 88:22, 88:23, 89:1, 89:3, 89:13, 90:25, 91:3, 91:7, 91:12, 91:15, 92:14, 93:8, 95:17, 95:18, 101:1, 101:5, 103:7, 103:11, 119:16, 119:20, 125:20, 131:25, 133:20, 133:23, 134:4, 134:14, 134:17, 134:19, 136:4, 139:18, 139:24
**pricing** [1] - 67:11
**Prime** [2] - 39:4, 39:5
**private** [3] - 115:2, 116:17, 116:19
**problem** [1] - 154:5
**proceed** [1] - 8:11
**proceeding** [1] - 118:7

**proceedings** [1] - 155:4
**process** [5] - 7:20, 70:3, 86:16, 123:3, 142:9
**PROCESSED** [1] - 1:5
**processors** [1] - 49:5
**proclaiming** [1] - 72:3
**produce** [8] - 19:18, 54:24, 56:5, 60:21, 62:3, 63:19, 88:14, 88:15
**produced** [9] - 1:25, 9:21, 51:16, 76:14, 97:4, 100:21, 121:5, 128:3, 134:3
**producer** [8] - 13:20, 35:7, 38:7, 72:7, 82:2, 90:4, 90:8, 119:25
**Producers** [5] - 15:14, 86:7, 93:14, 98:25, 139:3
**producers** [20] - 35:23, 36:1, 43:7, 44:17, 46:5, 48:1, 49:9, 60:10, 61:3, 68:25, 69:2, 69:13, 75:19, 83:22, 86:14, 88:14, 93:24, 98:7, 119:17
**producers'** [1] - 98:10
**produces** [2] - 56:8, 125:19
**producing** [3] - 51:14, 51:15, 51:17
**product** [12] - 68:19, 68:21, 71:10, 127:23, 133:1, 133:3, 133:7, 133:21, 134:5, 134:24, 136:4, 139:20
**production** [22] - 9:20, 18:14, 30:24, 30:25, 42:21, 45:23, 51:14, 60:14, 60:16, 60:18, 60:20, 65:21, 65:24, 66:18, 67:1, 67:10, 68:14, 68:17, 69:7, 71:2, 82:7, 136:3
**PRODUCTS** [1] - 1:5
**products** [2] - 71:5, 134:19, 135:4
**professional** [1] - 7:10
**profit** [1] - 25:15
**profitably** [1] -

134:14
**Program** [121] - 12:24, 14:9, 14:14, 15:14, 16:20, 18:7, 19:7, 19:9, 19:13, 19:25, 20:4, 20:19, 20:21, 21:2, 21:17, 21:19, 21:23, 22:11, 29:12, 32:5, 35:1, 35:15, 35:18, 37:12, 42:11, 44:15, 45:5, 45:10, 46:20, 46:25, 47:18, 47:25, 48:2, 48:4, 49:1, 49:13, 51:21, 53:10, 57:13, 57:14, 57:15, 58:11, 58:13, 58:18, 58:21, 58:25, 59:9, 59:18, 59:25, 60:1, 60:5, 60:11, 60:13, 60:23, 61:4, 61:7, 62:2, 62:6, 62:8, 62:15, 62:20, 63:2, 63:15, 63:23, 64:15, 64:16, 64:21, 65:2, 65:3, 65:6, 65:23, 66:6, 66:7, 66:9, 66:12, 66:20, 66:21, 67:3, 67:22, 68:5, 68:15, 68:22, 68:24, 69:25, 71:16, 72:15, 72:24, 73:1, 73:5, 73:22, 74:2, 74:22, 75:2, 75:5, 75:12, 75:14, 75:17, 75:22, 75:24, 76:1, 79:11, 80:8, 81:10, 82:3, 82:8, 83:7, 87:23, 89:1, 89:5, 90:20, 90:21, 91:12, 91:20, 91:24, 92:3, 92:11, 96:18, 98:21, 103:12, 126:23, 131:16
**program** [46] - 12:24, 16:11, 20:15, 45:16, 45:19, 49:15, 59:5, 61:11, 61:12, 61:14, 62:15, 62:21, 62:22, 62:23, 63:8, 63:9, 65:25, 66:1, 68:17, 72:17, 72:20, 73:2, 73:3, 73:4, 73:8, 74:11, 75:4, 75:17, 75:18, 76:3, 76:4, 87:9, 87:12, 87:25, 88:13, 90:23, 91:14, 91:19, 94:3, 95:5, 95:8, 95:10, 96:15, 98:22, 131:17
**Program's** [1] - 79:16

**programs** [10] - 22:11, 22:13, 22:25, 91:10, 92:13, 93:7, 96:17, 126:24, 127:1, 127:14
**progress** [1] - 125:21
**prohibits** [2] - 46:25, 125:24
**projected** [1] - 54:8
**projects** [1] - 78:25
**promises** [1] - 44:1
**promissory** [1] - 24:25
**promoted** [1] - 93:16
**prompted** [1] - 44:14
**proof** [11] - 11:15, 28:14, 42:9, 50:22, 80:21, 119:3, 119:11, 121:7, 121:8, 121:25, 145:1
**proper** [1] - 110:6
**property** [7] - 118:16, 126:17, 140:14, 142:19, 142:25, 143:5, 143:9
**proposed** [2] - 5:17, 48:9
**proposition** [2] - 6:18, 120:24
**protectable** [1] - 143:3
**protecting** [1] - 18:17
**protesting** [1] - 43:15
**protests** [4] - 43:21, 48:18, 57:17, 57:21
**provable** [1] - 67:8
**prove** [39] - 11:17, 12:3, 12:13, 12:19, 13:18, 28:15, 28:16, 28:19, 28:20, 32:7, 32:9, 34:18, 38:23, 39:13, 39:16, 50:24, 51:1, 67:6, 68:6, 83:11, 92:18, 92:19, 111:2, 111:13, 113:2, 117:24, 118:24, 126:10, 128:21, 129:21, 130:18, 132:14, 133:13, 140:8, 141:1, 141:4, 141:8, 141:18
**proved** [9] - 80:9, 80:10, 120:22, 120:25, 121:22, 131:12, 141:15, 141:22
**proven** [6] - 123:12,

127:22, 128:1, 133:14, 133:16, 135:21
**proves** [2] - 70:9, 136:8
**provide** [3] - 70:4, 81:5, 118:17
**provided** [2] - 52:19, 107:17, 111:18
**providing** [1] - 144:8
**proving** [3] - 11:10, 118:19, 136:24
**provision** [2] - 44:1, 108:8
**public** [2] - 44:1, 108:8
**publication** [1] - 139:6
**published** [1] - 101:11
**Publix** [3] - 19:12, 50:1, 50:2
**Pulaski** [1] - 52:15
**pull** [5] - 18:11, 63:4, 64:16, 65:7, 77:21
**pulled** [1] - 63:21
**purchase** [1] - 24:23
**purchased** [2] - 117:12, 119:17
**Purchaser** [69] - 2:7, 2:11, 2:15, 2:20, 2:24, 3:10, 11:10, 12:12, 70:8, 74:16, 117:17, 117:20, 118:3, 118:15, 118:19, 118:23, 119:4, 119:8, 119:15, 120:12, 120:13, 120:17, 122:24, 124:4, 125:14, 125:22, 126:9, 126:16, 127:21, 127:25, 128:15, 128:17, 128:21, 130:8, 130:18, 132:15, 132:19, 132:21, 133:2, 133:4, 133:10, 133:12, 133:15, 135:20, 136:8, 136:24, 140:7, 140:11, 140:12, 140:16, 140:21, 141:1, 141:4, 141:7, 141:13, 141:14, 141:17, 141:21, 141:24, 142:3, 142:7, 142:10, 142:11, 142:13, 142:16, 142:18, 143:1, 143:2, 143:4
**purchases** [1] -

19:18
**Purdue** [1] - 42:15
**purported** [2] -
98:14, 98:17
**purportedly** [2] -
99:18, 100:2
**purports** [1] - 34:23
**purpose** [32] - 10:12,
11:21, 11:23, 12:1,
12:21, 20:15, 81:3,
85:20, 92:18, 95:8,
95:11, 95:18, 96:7,
103:21, 110:14,
110:16, 110:17,
110:23, 111:1, 111:5,
111:6, 125:16, 129:9,
129:19, 129:20,
129:24, 134:5, 137:7,
145:21, 148:9, 148:12
**purposes** [2] -
111:20, 144:9
**push** [1] - 75:18
**put** [17] - 5:17, 9:17,
10:20, 11:17, 28:17,
37:14, 39:22, 48:4,
79:4, 90:6, 111:10,
119:1, 119:3, 121:10,
130:11, 151:15
**puts** [1] - 77:2
**putting** [4] - 33:11,
33:12, 44:10, 98:5

## Q

**quality** [9] - 68:14,
68:18, 112:14,
114:15, 125:20,
133:21, 133:23,
134:5, 136:4
**quarter** [2] - 105:6,
105:10
**quest** [1] - 96:12
**questioned** [1] -
97:16
**questioning** [2] -
78:21, 79:3
**questions** [26] -
14:5, 14:25, 15:19,
15:25, 27:4, 29:1,
29:4, 29:9, 29:17,
30:9, 30:11, 63:17,
81:23, 94:12, 102:19,
102:20, 102:22,
104:16, 108:5,
108:20, 110:2, 118:8,
118:18, 124:22,
146:1, 146:20
**quicker** [1] - 48:19
**quickly** [4] - 74:4,

96:13, 146:5, 149:24
**quiet** [1] - 8:20
**quietly** [1] - 16:5
**QUINN** [1] - 2:2

## R

**R.W** [5] - 4:6, 118:5,
125:23, 128:18, 137:3
**Rail** [1] - 25:5
**rain** [1] - 131:21
**raincoat** [1] - 122:4
**raining** [4] - 121:18,
121:20, 122:3, 122:7
**rainy** [1] - 131:22
**raise** [4] - 31:5,
31:17, 60:17, 134:14
**raising** [2] - 92:14,
139:17
**Ralph's** [1] - 49:7
**ran** [1] - 73:11
**randomly** [1] - 93:8
**range** [1] - 40:25
**rate** [1] - 67:10
**rather** [2] - 45:6,
151:9
**rattle** [1] - 24:2
**Rausser** [49] - 23:15,
23:16, 25:21, 26:1,
26:11, 32:12, 32:13,
32:17, 32:18, 32:22,
33:16, 34:6, 35:22,
40:25, 53:24, 54:8,
54:11, 56:18, 69:5,
69:6, 76:7, 76:10,
77:2, 77:7, 77:24,
78:15, 78:19, 78:21,
78:23, 78:25, 79:24,
81:3, 99:16, 99:18,
99:19, 99:20, 100:2,
100:5, 100:8, 100:12,
100:24, 101:2, 101:8,
101:10, 101:12,
101:14, 124:5
**Rausser's** [12] -
32:18, 33:5, 33:24,
34:21, 70:20, 76:18,
76:22, 76:24, 78:15,
79:14, 81:15, 100:16
**RE** [1] - 1:5
**reach** [1] - 109:18
**reaching** [4] -
107:10, 121:13,
124:11, 145:11
**reaction** [1] - 89:14
**read** [11] - 13:16,
13:21, 21:13, 36:20,
39:1, 39:6, 42:18,
97:11, 144:12, 146:3

**readily** [2] - 70:10,
136:9
**reading** [3] - 21:10,
107:23, 151:6
**ready** [5] - 7:20,
8:10, 94:13, 105:23,
150:20
**real** [7] - 43:21,
44:12, 44:13, 76:6,
76:18, 108:3
**real-life** [1] - 108:3
**reality** [1] - 34:5
**realize** [1] - 107:21
**really** [15] - 8:18,
18:11, 25:8, 26:20,
27:22, 37:16, 58:6,
64:9, 79:6, 85:13,
101:21, 122:3,
146:16, 152:16
**rearrange** [1] - 11:16
**reason** [14] - 12:18,
25:19, 60:12, 93:22,
100:19, 101:3, 117:5,
122:2, 122:15, 125:6,
125:10, 129:4,
137:13, 152:4
**Reason** [1] - 68:2
**reasonable** [7] -
23:2, 27:3, 70:10,
112:22, 121:8,
123:13, 127:16
**reasonably** [5] -
109:17, 116:1, 136:7,
136:10, 136:14
**reasoned** [1] -
122:19
**reasons** [12] - 25:20,
25:22, 26:2, 58:13,
85:23, 97:15, 117:4,
119:23, 123:17,
123:22, 124:25, 125:9
**rebuttal** [2] - 82:13,
84:24
**rebutted** [1] - 76:21
**recalling** [1] - 99:9
**receive** [3] - 11:7,
11:20, 44:3
**received** [10] - 10:8,
93:1, 106:21, 107:20,
108:4, 108:17,
109:19, 110:14,
111:10, 121:4
**recent** [1] - 107:3
**Recess** [1] - 153:22
**recess** [2] - 47:10,
105:19
**Recession** [1] -
80:16
**recognize** [1] - 68:23
**recollection** [2] -

113:19, 143:21
**recommend** [1] -
144:13
**recommendation** [4]
- 76:12, 86:10, 86:11,
94:20
**recommendations**
[26] - 14:13, 15:13,
22:10, 29:13, 32:6,
35:2, 35:5, 37:3,
37:13, 38:5, 42:16,
42:24, 54:17, 55:4,
67:23, 77:20, 79:12,
79:22, 79:23, 81:11,
83:9, 97:25, 126:21,
126:22, 131:16
**recommended** [8] -
48:10, 74:4, 74:10,
85:25, 86:9, 89:21,
90:9, 98:17
**recommending** [1] -
48:13
**reconciled** [1] -
101:23
**record** [11] - 18:24,
20:23, 21:11, 21:25,
27:1, 91:3, 111:22,
152:24, 153:10, 155:4
**recorded** [1] - 91:22
**recover** [3] - 140:13,
142:12, 142:19
**red** [4] - 41:14,
56:24, 78:24, 79:9
**redirect** [1] - 41:18
**reduce** [32] - 15:3,
15:12, 20:19, 21:24,
23:1, 29:11, 30:18,
31:4, 31:15, 31:21,
45:7, 45:15, 48:12,
48:21, 50:25, 51:8,
61:17, 64:2, 64:21,
65:13, 65:14, 79:18,
81:20, 81:25, 82:25,
84:3, 84:15, 93:7,
96:18, 127:15, 139:19
**reduced** [8] - 21:16,
21:17, 31:3, 38:19,
67:12, 79:11, 80:8,
84:3
**reducing** [5] - 51:19,
66:12, 79:18, 83:1,
85:20
**reduction** [10] - 14:9,
20:18, 30:20, 31:23,
54:20, 64:22, 131:15,
133:19, 142:4, 142:5
**reductions** [3] -
12:23, 14:18, 91:11
**reexamine** [1] -
145:17

**refer** [2] - 117:19
**reference** [2] - 10:10,
86:1
**referenced** [1] -
31:25
**referencing** [1] -
110:18
**referred** [6] - 28:24,
75:14, 90:20, 106:22,
124:10, 140:24
**referring** [1] - 11:24
**refers** [1] - 133:19
**reflect** [2] - 57:11,
76:18
**reflected** [1] - 5:23
**regard** [2] - 42:8,
66:19
**regarding** [3] - 5:10,
62:15, 119:4
**regardless** [4] -
107:13, 121:3, 121:5,
130:17
**regularly** [1] - 93:25
**reject** [8] - 25:18,
25:21, 26:2, 26:9,
114:13, 123:20, 125:7
**rejected** [2] - 5:22,
6:5
**relate** [2] - 16:13,
16:19
**related** [4] - 17:21,
68:4, 99:22, 115:22
**relates** [1] - 124:18
**relations** [1] - 44:1
**relationship** [3] -
16:16, 22:4, 113:21
**relative** [1] - 100:10
**relatively** [1] -
146:24
**relevant** [23] - 24:7,
24:8, 24:9, 24:13,
25:16, 85:13, 100:18,
127:23, 128:2,
132:17, 132:23,
132:24, 133:1, 133:3,
133:8, 133:9, 133:13,
133:14, 134:6, 134:7,
134:24, 135:22
**reliability** [1] -
124:14
**reliable** [4] - 56:21,
57:11, 76:19, 78:16
**reliance** [3] - 39:14,
39:15, 111:10
**relying** [1] - 87:10
**remain** [2] - 120:14,
138:19
**remember** [25] -
11:14, 44:21, 48:3,
72:23, 88:6, 89:14,

89:20, 90:2, 90:14, 91:7, 92:5, 92:9, 92:13, 93:18, 94:2, 94:22, 96:3, 96:8, 100:8, 102:19, 103:9, 103:10, 120:6, 124:16, 154:7

**remind** [1] - 147:7

**remiss** [1] - 23:13

**remodel** [1] - 52:24

**remodeling** [4] - 20:22, 20:24, 21:2, 21:3

**remove** [1] - 93:22

**rendering** [1] - 147:6

**repeat** [2] - 33:3, 38:3

**repeatedly** [3] - 99:1, 99:2, 101:11

**repeating** [1] - 77:6

**repetition** [1] - 99:17

**report** [2] - 42:17, 75:12

**reported** [4] - 75:7, 96:19, 96:20, 96:22

**Reporter** [2] - 1:21, 155:7

**reports** [2] - 26:6, 75:8, 76:8

**represent** [1] - 146:17

**representation** [1] - 139:7

**representative** [4] - 49:11, 52:2, 77:8, 77:12

**representatives** [3] - 98:9, 116:25, 117:18

**Representatives** [1] - 117:3

**represented** [2] - 93:12, 117:14

**represents** [1] - 48:6

**reputation** [1] - 24:21

**requesting** [1] - 110:1

**require** [8] - 49:8, 59:8, 60:10, 68:25, 69:1, 111:15, 130:21, 141:3

**required** [5] - 59:3, 71:2, 122:7, 123:6, 141:17

**requirement** [2] - 126:4, 126:6

**requirements** [10] - 43:6, 48:9, 61:19, 64:21, 65:7, 69:1, 69:3, 86:18, 126:2,

132:13

**requires** [1] - 141:7

**requiring** [4] - 43:17, 80:13, 117:7, 117:8

**research** [1] - 139:6

**resolve** [3] - 117:6, 124:18, 124:20

**resolved** [2] - 83:23, 120:4

**resources** [1] - 125:20

**respect** [8] - 29:17, 30:10, 37:14, 50:8, 55:4, 63:22, 76:24, 92:4

**respectfully** [2] - 28:22, 104:18

**respond** [1] - 146:5

**responding** [1] - 63:24

**response** [8] - 13:3, 63:1, 63:10, 63:17, 63:23, 69:15, 73:19, 131:20

**responsibilities** [1] - 116:3

**responsibility** [4] - 28:13, 116:14, 142:12

**responsible** [4] - 55:5, 116:9, 138:1, 138:20

**rest** [3] - 15:24, 53:23, 125:12

**Restaurant** [1] - 117:16

**restaurant** [1] - 102:7

**restrain** [9] - 12:14, 90:22, 118:13, 126:1, 128:16, 128:19, 128:23, 130:3, 130:14

**restrains** [1] - 126:14

**restraint** [11] - 7:10, 22:7, 30:1, 67:18, 67:19, 126:3, 126:18, 132:14, 134:4, 134:6, 134:8

**restraints** [34] - 22:9, 22:17, 29:24, 29:25, 67:17, 67:22, 68:11, 68:13, 70:12, 118:14, 126:15, 126:20, 127:5, 127:22, 128:1, 128:3, 128:7, 132:16, 133:6, 133:16, 134:2, 135:13, 135:18, 135:21, 135:23, 135:25, 136:3, 136:5, 136:6, 136:12, 136:13, 136:16,

136:18, 136:21

**restricting** [2] - 47:21, 51:18

**restriction** [1] - 91:23

**restrictions** [8] - 16:22, 19:3, 19:4, 47:19, 51:20, 53:10, 61:10, 88:25

**restrictive** [3] - 69:20, 70:8, 70:13

**rests** [1] - 125:18

**result** [18] - 13:2, 22:21, 23:8, 36:23, 37:1, 78:18, 107:23, 111:12, 127:9, 131:19, 132:9, 136:5, 140:17, 141:2, 141:15, 142:23, 143:7, 143:12

**resulted** [9] - 65:21, 76:13, 127:22, 128:1, 132:16, 133:22, 135:13, 135:18, 135:21

**resulting** [2] - 73:19, 136:16

**results** [4] - 64:24, 65:3, 114:8, 133:19

**resume** [3] - 8:10, 47:6, 47:16

**retained** [2] - 33:14, 33:21

**retire** [1] - 144:4

**return** [2] - 84:20, 146:19

**returned** [2] - 147:1, 147:2

**REUBEN** [8] - 2:13, 8:1, 148:3, 148:7, 148:17, 148:21, 148:23, 150:6

**reveal** [1] - 147:4

**review** [2] - 10:8, 94:19

**reviewed** [3] - 23:18, 23:19, 101:11

**reward** [1] - 26:9

**rhetoric** [1] - 44:2

**Ribbing's** [1] - 117:16

**rid** [3] - 40:13, 55:21, 60:19

**rights** [9] - 18:5, 28:4, 43:3, 43:10, 43:14, 44:11, 44:13, 66:22, 72:4

**rise** [9] - 8:3, 47:7, 47:12, 90:25, 105:11, 106:2, 147:24,

153:24, 154:14

**risk** [1] - 58:8

**road** [1] - 28:23

**Robert** [2] - 44:20, 47:22

**Roger** [1] - 62:11

**Roger's** [1] - 49:7

**role** [7] - 27:23, 35:17, 46:14, 50:8, 66:17, 66:19

**RONALD** [1] - 2:9

**room** [5] - 1:22, 43:14, 84:7, 84:12, 144:4

**Rose** [99] - 3:19, 13:19, 15:5, 16:24, 29:21, 35:10, 35:15, 36:5, 38:8, 38:18, 39:5, 40:5, 40:9, 41:7, 41:14, 41:23, 50:6, 50:8, 50:12, 50:24, 51:2, 51:7, 51:12, 51:13, 51:24, 52:22, 52:25, 53:11, 53:22, 53:23, 54:15, 54:17, 54:20, 55:5, 55:6, 55:16, 55:17, 55:23, 56:8, 56:10, 56:20, 57:11, 57:13, 57:14, 57:16, 57:23, 58:9, 58:11, 58:24, 59:17, 60:4, 60:8, 60:12, 61:10, 61:17, 62:1, 63:1, 63:23, 63:25, 64:6, 64:8, 64:10, 64:13, 64:18, 65:25, 66:5, 66:10, 79:23, 81:9, 81:10, 81:19, 81:23, 81:24, 82:2, 82:6, 82:14, 83:3, 83:13, 83:17, 83:21, 83:23, 83:24, 84:8, 84:21, 87:8, 87:11, 91:2, 91:19, 95:4, 98:10, 118:5, 125:23, 128:18, 137:2, 150:1

**routine** [5] - 150:21, 151:9, 152:19, 152:23, 153:21

**routinely** [1] - 75:13

**RPR** [2] - 1:21, 155:7

**rubber** [2] - 46:4, 46:10

**rule** [32] - 20:8, 20:9, 69:17, 69:19, 69:22, 69:23, 70:7, 70:13, 70:23, 71:17, 72:9, 72:20, 73:5, 73:23, 73:25, 75:6, 86:10, 86:16, 86:19, 87:5,

87:13, 87:16, 87:17, 88:20, 90:21, 94:17, 94:24, 107:13, 110:1

**Rule** [1] - 68:2

**rules** [6] - 87:12, 106:19, 106:23, 109:19, 109:23, 110:6

**rumors** [1] - 109:11

**running** [1] - 67:15

**runs** [1] - 67:1

**rush** [1] - 96:9

**Rust** [36] - 51:22, 51:23, 52:14, 54:22, 56:10, 58:19, 60:13, 60:25, 61:11, 62:1, 62:12, 62:18, 63:16, 66:14, 66:16, 66:25, 69:10, 71:16, 71:25, 72:5, 72:15, 73:24, 81:18, 81:19, 83:17, 84:9, 85:22, 88:12, 93:18, 95:7, 95:9, 95:10

**Rust's** [2] - 64:4, 66:13

## S

**sabbatical** [1] - 100:9

**sacrifices** [1] - 27:20

**safety** [2] - 58:7, 98:14

**Safeway** [5] - 43:23, 43:25, 44:3, 44:4, 44:7

**Saioc** [2] - 56:17

**sale** [2] - 71:20, 132:1

**sales** [7] - 16:15, 41:22, 42:2, 55:16, 57:2, 75:15, 81:12

**SANDIN** [1] - 3:14

**SARAH** [1] - 3:22

**sat** [4] - 8:19, 8:22, 16:5, 80:23

**satisfied** [1] - 42:8

**satisfy** [8] - 43:12, 57:15, 63:6, 69:2, 69:12, 69:21, 84:1, 97:13

**Sauder** [29] - 4:6, 5:9, 13:19, 15:6, 16:24, 21:15, 35:12, 36:5, 38:9, 40:6, 40:9, 41:7, 41:16, 41:17, 41:18, 41:19, 42:6, 51:2, 91:24, 95:13, 95:24, 96:8, 98:3,

98:4, 98:6, 98:9, 118:5, 128:18, 137:3
**Sauder's** [5] - 41:23, 95:14, 95:15, 96:5, 125:23
**save** [2] - 60:14
**saw** [49] - 9:12, 9:24, 10:1, 17:13, 33:18, 41:4, 42:1, 43:22, 56:16, 57:21, 60:19, 63:11, 64:9, 64:10, 76:25, 78:19, 79:3, 85:16, 85:17, 87:1, 87:7, 87:9, 87:18, 87:20, 88:7, 88:24, 89:5, 89:7, 89:9, 89:10, 89:23, 90:25, 91:9, 91:10, 91:12, 93:6, 94:10, 97:21, 98:24, 99:4, 100:16, 102:16, 103:15, 104:11, 109:10, 121:18, 144:19
**Scale** [2] - 76:25, 77:2
**scale** [4] - 77:2, 78:6, 104:15, 104:19
**scales** [7] - 11:13, 18:11, 119:7, 119:9, 120:14, 120:21, 120:23
**Scales** [1] - 119:7
**scatter** [1] - 56:19
**scattergraph** [1] - 56:16
**schedule** [1] - 61:24
**scheme** [5] - 5:15, 5:19, 5:20, 103:14, 129:9
**Schnell** [2] - 73:16, 74:25
**schools** [1] - 101:13
**science** [4] - 42:11, 42:16, 74:12, 90:1
**scientific** [9] - 86:8, 89:21, 89:24, 90:4, 90:10, 90:12, 94:19, 98:17, 101:9
**Scientific** [12] - 10:18, 42:12, 42:17, 45:13, 45:24, 46:3, 46:9, 46:13, 70:16, 74:5, 74:6, 86:13
**scientifically** [1] - 67:8
**scope** [4] - 115:20, 115:21, 116:10, 116:15
**script** [1] - 108:1
**seal** [1] - 75:21

**Seal** [1] - 28:1
**seats** [6] - 5:2, 8:6, 47:15, 105:20, 106:4, 154:2
**Seattle** [1] - 3:9
**second** [14] - 13:23, 14:25, 29:19, 39:18, 50:4, 100:1, 118:12, 126:13, 126:23, 127:8, 128:25, 133:8, 140:19, 144:24
**secret** [2] - 26:13, 146:16
**secretly** [1] - 24:9
**Section** [4] - 125:24, 126:9, 128:7
**see** [28] - 15:17, 17:16, 17:19, 23:5, 41:20, 41:24, 42:4, 42:7, 54:2, 57:9, 58:5, 60:20, 71:22, 79:13, 85:3, 85:15, 99:4, 105:10, 105:17, 106:6, 112:12, 114:5, 152:6, 154:9, 154:13, 154:16
**seeing** [4] - 27:25, 37:4, 42:1, 114:4
**select** [2] - 42:2, 144:13
**selected** [1] - 42:3
**selective** [1] - 41:20
**self** [3] - 19:24, 88:5, 146:24
**self-explanatory** [1] - 146:24
**self-interest** [2] - 19:24, 88:5
**sell** [13] - 40:11, 40:15, 40:18, 40:19, 55:20, 55:22, 56:2, 56:11, 56:13, 72:14, 75:3, 75:6
**selling** [6] - 41:8, 72:2, 72:3, 79:19, 88:10, 97:22
**send** [2] - 151:8, 151:11
**sense** [13] - 31:18, 54:21, 54:25, 69:25, 79:20, 82:23, 87:25, 100:10, 109:13, 109:16, 122:16, 123:10, 125:6
**senses** [1] - 121:16
**sensitive** [1] - 139:23
**sent** [6] - 17:10, 17:12, 64:6, 89:16, 89:22, 89:23

**sentence** [1] - 5:13
**separate** [2] - 118:11, 126:12
**separately** [3] - 119:14, 130:2, 137:10
**September** [1] - 91:8
**serve** [1] - 144:14
**served** [1] - 93:14
**service** [3] - 27:14, 27:18, 134:5
**services** [9] - 24:10, 24:17, 134:17, 134:20, 134:24, 139:5, 139:6, 139:20, 143:11
**serving** [1] - 62:12
**set** [5] - 86:9, 94:13, 122:24, 148:5, 151:7
**sets** [1] - 62:4
**settled** [3] - 44:23, 83:22, 94:7
**seven** [1] - 91:25
**several** [10] - 34:22, 40:14, 49:11, 51:23, 87:11, 109:24, 146:25, 150:22, 150:25, 151:1
**sham** [2] - 46:4, 46:10
**share** [7] - 37:20, 37:21, 103:14, 103:21, 129:8, 134:23, 135:9
**shared** [2] - 7:25, 92:20
**sheet** [1] - 42:5
**shell** [4] - 31:13, 71:7, 117:12, 133:5
**Sherman** [10] - 22:7, 125:15, 125:16, 125:18, 125:24, 126:9, 126:18, 128:8, 132:13, 140:11
**short** [22] - 12:23, 15:13, 16:22, 17:24, 19:2, 19:4, 29:13, 35:2, 35:4, 37:23, 38:4, 54:16, 85:18, 88:25, 89:4, 91:11, 91:22, 92:4, 110:2, 114:13, 131:15, 146:24
**short-term** [17] - 12:23, 15:13, 16:22, 19:2, 19:4, 29:13, 35:2, 35:4, 38:4, 54:16, 85:18, 88:25, 89:4, 91:11, 91:22, 92:4, 131:15
**shorter** [2] - 48:14,

48:24
**shortfall** [1] - 63:13
**shorthand** [1] - 1:25
**shortly** [1] - 118:18
**show** [29] - 12:19, 21:15, 34:2, 34:11, 34:18, 34:23, 36:19, 37:11, 38:22, 41:7, 41:17, 41:21, 51:7, 56:5, 78:22, 81:2, 83:25, 85:9, 100:25, 101:22, 103:19, 107:25, 113:14, 129:11, 129:22, 132:22, 133:3, 133:11, 137:4
**showed** [12] - 14:23, 30:14, 30:22, 34:21, 41:14, 41:16, 41:18, 73:12, 87:7, 89:20, 92:9, 99:2
**showing** [3] - 51:9, 66:9, 111:7
**shown** [8] - 72:21, 87:21, 90:3, 91:4, 112:1, 122:20, 130:25, 138:22
**shows** [12] - 13:18, 42:5, 42:6, 77:23, 78:25, 79:1, 91:1, 92:6, 92:22, 100:16, 103:22, 104:19
**shred** [1] - 87:3
**side** [16] - 21:5, 23:22, 23:25, 25:16, 33:7, 49:18, 65:8, 65:9, 81:8, 109:22, 113:22, 119:9, 120:15, 145:8, 150:2
**sides** [2] - 66:11, 119:6
**sign** [4] - 15:19, 17:15, 17:18, 146:2
**signed** [4] - 18:13, 24:10, 97:1, 147:1
**signify** [1] - 119:7
**signs** [2] - 24:14, 82:15
**silly** [1] - 66:24
**similar** [9] - 13:4, 110:19, 114:24, 115:8, 117:1, 131:20, 131:23, 132:8, 139:16
**similarity** [1] - 131:5
**similarly** [5] - 13:6, 117:1, 130:4, 131:9, 132:5
**similarly-situated** [1] - 117:1
**simple** [8] - 23:10,

26:20, 29:9, 32:20, 65:5, 67:4, 148:13, 148:18
**simply** [4] - 26:25, 109:25, 133:9, 140:5
**sincerely** [1] - 27:17
**single** [26] - 5:10, 5:25, 9:16, 9:20, 11:1, 14:8, 14:14, 15:12, 15:22, 16:1, 19:5, 22:3, 22:13, 23:7, 26:21, 26:23, 35:7, 36:18, 36:19, 38:7, 42:23, 45:11, 54:20, 79:23, 107:8, 127:1
**sister** [1] - 73:16
**sit** [3] - 11:15, 24:2, 82:10
**sitting** [1] - 83:16
**situated** [1] - 117:1
**six** [4] - 48:20, 48:21, 100:6
**size** [12] - 31:7, 31:8, 37:23, 38:6, 54:4, 76:10, 76:13, 78:23, 79:18, 82:6, 82:7
**sizes** [3] - 34:3, 37:21, 77:9
**skewed** [1] - 78:18
**skipped** [1] - 78:10
**slaughter** [9] - 14:13, 17:4, 18:8, 22:10, 38:18, 67:23, 85:19, 96:25, 126:22
**slaughters** [2] - 38:6, 54:19
**slides** [2] - 10:3, 30:14
**slight** [1] - 82:12
**slightly** [1] - 119:9
**slog** [1] - 27:17
**slow** [1] - 102:3
**small** [6] - 40:23, 40:24, 41:3, 102:6, 114:19, 148:7
**smell** [2] - 40:15, 55:22
**SMITH** [1] - 2:23
**Smith's** [1] - 49:7
**snapshot** [2] - 42:1
**socially** [1] - 42:22
**sold** [8] - 20:9, 20:12, 40:17, 41:10, 41:12, 55:24, 56:3, 134:24
**sole** [3] - 112:4, 124:17, 141:19
**solely** [1] - 125:12
**solution** [1] - 44:17
**someone** [7] - 9:14,

12:9, 33:11, 100:2, 101:15, 101:16, 101:17
**someplace** [2] - 56:13
**sometime** [1] - 23:16
**sometimes** [10] - 9:14, 39:5, 39:6, 85:9, 102:3, 110:7, 124:15, 140:24, 142:1
**somewhere** [2] - 45:9, 148:2
**soon** [1] - 73:22
**sorry** [4] - 8:7, 137:16, 148:4, 151:5
**sorts** [1] - 86:19
**sound** [1] - 32:25
**sounded** [4] - 94:12, 108:21, 109:2, 109:3
**soundness** [1] - 124:25
**space** [16] - 18:4, 43:6, 43:10, 45:23, 47:25, 48:9, 52:1, 52:19, 61:10, 65:6, 69:1, 70:5, 86:3, 86:18, 88:18, 98:8
**spaces** [2] - 53:16, 80:7
**span** [1] - 48:11
**Sparboe** [19] - 38:9, 38:12, 43:8, 44:22, 71:19, 71:22, 72:2, 72:22, 72:23, 73:11, 73:14, 73:15, 73:16, 74:1, 74:25, 75:21, 94:22
**Sparboe's** [1] - 73:12
**speaks** [1] - 96:4
**special** [2] - 61:8, 72:14
**specific** [2] - 125:13, 140:9
**specifically** [2] - 11:9, 50:6
**speculate** [1] - 111:25
**speculation** [1] - 123:4
**spend** [1] - 63:18, 64:25, 151:20
**spending** [1] - 25:21
**spent** [6] - 23:15, 32:23, 41:4, 53:11, 83:4, 96:21
**spin** [1] - 100:11
**sporadic** [1] - 89:6
**spouting** [1] - 65:11
**spray** [1] - 58:1
**spray-painted** [1] -

58:1
**square** [3] - 43:7, 43:17, 88:16
**squiggly** [5] - 54:1, 78:20, 78:22, 79:5
**squiggly-line** [1] - 54:1
**St** [2] - 2:23, 42:14
**stabilizing** [1] - 139:17
**stack** [1] - 7:19
**stake** [1] - 33:25
**stamp** [2] - 46:4, 46:10
**stand** [18] - 21:8, 25:22, 25:23, 35:6, 35:7, 38:8, 51:23, 51:24, 52:13, 58:15, 62:18, 63:16, 72:22, 76:17, 76:22, 115:4, 146:12
**standard** [5] - 6:23, 69:4, 104:17, 116:18, 121:8
**standards** [4] - 43:13, 61:19, 62:4, 62:5
**standing** [2] - 114:23, 115:7
**STANLEY** [1] - 2:22
**staple** [1] - 102:9
**start** [10] - 8:19, 13:24, 30:14, 35:3, 63:11, 78:4, 112:9, 116:23, 145:23, 152:16
**started** [11] - 52:6, 57:22, 63:7, 63:8, 77:25, 86:23, 89:22, 90:24, 90:25, 91:13, 91:14
**starting** [1] - 103:11
**starts** [1] - 59:16
**state** [6] - 69:15, 80:12, 106:18, 107:7, 107:13, 123:17
**State** [2] - 42:13, 42:15
**statement** [5] - 6:7, 10:7, 50:11, 65:6, 111:8
**statements** [11] - 9:22, 9:24, 9:25, 24:2, 81:1, 108:19, 110:19, 115:19, 116:9, 138:6, 138:16
**STATES** [1] - 1:1
**States** [6] - 15:15, 28:1, 43:9, 92:10, 100:13, 139:3

**states** [3] - 68:23, 80:12, 111:5
**stating** [2] - 44:4, 107:9
**stations** [2] - 114:24, 115:8
**statistics** [1] - 124:6
**STATSKY** [1] - 2:23
**stay** [7] - 8:23, 146:16, 149:10, 149:11, 149:14, 150:6
**STEIG** [1] - 2:4
**step** [1] - 128:10
**STEPHEN** [2] - 2:2, 3:3
**steps** [8] - 85:18, 85:22, 86:3, 89:4, 96:18, 98:16, 127:17
**STEVEN** [1] - 4:4
**STEVENS** [1] - 3:17
**still** [5] - 49:25, 72:15, 86:20, 126:10, 147:20
**stipulated** [3] - 19:17, 19:19, 108:13
**stipulations** [1] - 108:23
**stool** [12] - 16:2, 31:25, 32:1, 32:2, 34:25, 36:10, 37:9, 38:2, 39:19, 50:10, 83:7
**stoop** [1] - 71:22
**stop** [1] - 93:16
**stopped** [1] - 46:18
**store** [1] - 57:3
**story** [10] - 23:10, 32:10, 32:11, 72:22, 73:11, 76:6, 81:5, 85:10, 85:16
**storyteller** [1] - 32:12
**straightaway** [2] - 150:13, 150:15
**straightforward** [3] - 23:10, 32:20, 32:25
**strategic** [1] - 24:19
**Street** [7] - 1:22, 2:14, 2:19, 3:15, 3:18, 3:23, 4:5
**stricken** [1] - 111:22
**stricter** [1] - 121:8
**strong** [2] - 96:11, 153:17
**strongly** [2] - 102:21, 144:13
**structure** [2] - 30:8, 134:6
**studied** [2] - 64:19, 64:24
**studies** [1] - 18:2

**studying** [1] - 63:8
**stuff** [15] - 16:6, 20:3, 35:16, 35:18, 37:2, 37:7, 54:18, 69:18, 70:3, 79:10, 79:21, 151:20, 152:1, 152:6
**stupid** [2] - 7:13, 55:1
**submit** [5] - 28:22, 32:10, 33:23, 37:10, 104:18
**subsidiaries** [1] - 115:15
**substantial** [10] - 70:11, 127:23, 128:2, 132:16, 133:17, 134:14, 135:9, 135:14, 135:18, 135:22
**substantially** [7] - 21:16, 21:18, 128:9, 136:11, 136:17, 136:19, 136:25
**substitute** [2] - 125:5, 135:4
**succeed** [1] - 137:23
**succeeded** [1] - 130:17
**success** [2] - 6:2, 89:17
**sued** [1] - 37:15
**suffer** [2] - 118:15, 126:16
**suffered** [1] - 142:22
**sufficient** [1] - 132:19
**suggest** [3] - 11:18, 44:16, 147:9
**suggested** [2] - 38:20, 64:8
**suggesting** [1] - 5:13
**suggestions** [1] - 112:11
**suit** [2] - 43:16, 43:18
**Suite** [5] - 2:19, 3:6, 3:8, 3:15, 3:23
**summaries** [4] - 41:4, 41:19, 56:21, 57:6
**summarize** [2] - 116:8, 127:18
**summarized** [1] - 10:2
**summary** [1] - 142:13
**summer** [1] - 57:23
**Sundance** [1] - 25:9
**sunshine** [1] - 8:7

**supermarkets** [2] - 48:6, 48:7
**supplied** [1] - 73:9
**suppliers** [4] - 49:22, 58:17, 59:8, 59:17
**supplies** [3] - 32:16, 81:20, 81:25
**supply** [2] - 12:14, 12:23, 14:9, 15:3, 15:12, 15:13, 16:22, 18:10, 19:3, 19:4, 20:18, 20:19, 21:24, 23:1, 29:11, 29:13, 30:1, 30:18, 30:20, 31:3, 31:4, 31:16, 31:21, 31:23, 32:6, 35:2, 35:4, 37:3, 37:13, 38:4, 45:7, 45:15, 46:15, 48:13, 48:22, 50:25, 51:9, 51:18, 51:19, 54:16, 55:4, 60:11, 61:17, 64:2, 67:18, 67:19, 76:11, 77:19, 79:11, 79:21, 79:22, 81:11, 82:25, 83:1, 83:2, 83:9, 84:3, 84:15, 85:20, 86:2, 86:25, 88:25, 91:5, 91:11, 91:22, 92:4, 92:12, 93:7, 96:18, 97:24, 103:2, 103:3, 119:19, 119:23, 126:22, 127:15, 128:17, 128:20, 128:24, 130:15, 131:15
**supplying** [1] - 95:20
**support** [4] - 34:1, 96:11, 100:15, 125:9
**supported** [4] - 18:6, 87:16, 87:17, 113:24
**supposed** [3] - 10:25, 46:6, 100:9
**supposedly** [4] - 17:4, 87:8, 98:3, 101:4
**suppress** [1] - 46:15
**surplus** [13] - 20:11, 20:12, 40:10, 41:10, 55:9, 55:11, 55:13, 55:14, 55:17, 55:19, 56:1, 56:14, 81:12
**surrounding** [1] - 116:4
**sUSMAN** [1] - 3:2
**SUSMAN** [1] - 3:3
**suspend** [1] - 89:10
**suspicion** [1] - 122:18
**suspicions** [1] -

109:11
**sustainable** [1] -
42:22
**sustained** [2] - 44:2,
110:9
**swinging** [1] - 27:25
**sworn** [2] - 107:15,
107:18
**sympathy** [2] -
108:7, 145:8
**system** [2] - 28:1,
28:2

# T

**T.K** [1] - 117:16
**Tabatznik** [2] - 25:8
**table** [1] - 24:6
**talks** [5] - 11:20,
20:21, 24:14, 48:5,
68:1
**Target** [2] - 49:6,
73:14
**target** [1] - 44:8
**task** [1] - 28:20
**technical** [2] - 126:2,
126:6
**technology** [1] -
139:5
**temporally** [1] -
16:13
**tempted** [1] - 152:17
**tempting** [1] - 5:3
**ten** [11] - 17:16, 28:8,
36:7, 47:6, 48:11,
48:14, 83:13, 83:15,
102:3, 102:4
**ten-minute** [1] - 47:6
**tending** [1] - 113:14
**tentative** [1] - 146:12
**term** [23] - 12:23,
15:13, 16:22, 19:2,
19:4, 29:13, 35:2,
35:4, 38:4, 44:17,
54:16, 85:18, 86:2,
88:25, 89:4, 91:11,
91:22, 92:4, 121:7,
122:14, 131:15,
142:20, 142:25
**terminate** [1] - 96:12
**terms** [3] - 7:2, 7:10,
68:9
**tERRI** [1] - 3:18
**territories** [1] -
139:20
**TERRY** [1] - 3:5
**Terry** [4] - 25:24,
38:13, 61:5, 75:9
**test** [4] - 6:19, 13:22,

101:7, 103:8
**tested** [1] - 101:6
**testified** [22] - 17:23,
35:7, 37:18, 38:13,
43:24, 45:25, 49:11,
49:13, 52:4, 53:21,
58:15, 69:10, 88:12,
94:3, 98:6, 98:9,
99:16, 99:19, 113:7,
113:13, 113:20,
124:11
**testifies** [4] - 23:23,
23:24, 121:15, 121:18
**testify** [6] - 9:10,
17:9, 35:6, 87:15,
113:3, 123:16
**testifying** [7] - 25:6,
25:14, 112:13,
112:16, 114:17,
124:2, 125:1
**testimony** [50] -
18:15, 18:22, 25:19,
28:11, 28:19, 43:23,
44:18, 50:1, 50:20,
51:9, 64:4, 78:20,
81:14, 86:22, 92:24,
97:11, 97:15, 101:6,
101:19, 108:10,
108:11, 109:4,
111:21, 111:24,
112:3, 112:23, 113:5,
113:8, 113:10,
113:11, 113:17,
113:24, 114:1, 114:2,
114:3, 114:12,
114:13, 114:19,
114:20, 117:3, 121:2,
123:19, 123:20,
124:15, 124:17,
125:2, 125:5, 125:7,
144:2
**THE** [73] - 1:1, 1:2,
1:13, 5:1, 6:10, 6:21,
7:16, 7:18, 7:22, 7:25,
8:2, 8:3, 8:5, 27:7,
27:10, 47:1, 47:5,
47:7, 47:9, 47:11,
47:12, 47:14, 84:23,
96:2, 99:8, 104:23,
105:11, 105:13,
105:17, 105:20,
105:25, 106:2, 106:4,
147:20, 147:24,
148:1, 148:16,
148:18, 148:22,
148:25, 149:5, 149:8,
149:20, 149:21,
150:3, 150:8, 150:12,
150:20, 150:24,
150:25, 151:4,

151:13, 151:15,
151:19, 151:25,
152:1, 152:4, 152:8,
152:9, 152:22,
152:25, 153:2, 153:7,
153:11, 153:17,
153:21, 153:23,
153:24, 154:1,
154:14, 154:16,
154:19, 154:23
**theirs** [1] - 148:6
**themselves** [3] -
12:21, 92:8, 129:23
**theories** [5] - 32:11,
32:24, 33:2, 34:2,
81:14
**theory** [3] - 82:16,
99:18, 100:4
**thereby** [2] - 46:15,
137:23
**therefore** [7] - 22:9,
67:21, 115:5, 126:5,
126:20, 130:16,
130:25
**therein** [1] - 12:6
**they've** [14] - 18:12,
20:1, 40:12, 40:20,
61:6, 61:22, 74:18,
76:7, 80:25, 81:1,
83:14, 122:14,
146:23, 149:8
**thinking** [2] - 58:6,
61:3
**third** [8] - 29:23,
42:10, 53:21, 67:16,
126:15, 126:24,
127:11, 140:21
**Third** [1] - 3:9
**thoughts** [1] - 6:10
**threat** [1] - 135:4
**three** [46] - 6:2, 6:19,
10:3, 15:13, 16:2,
22:13, 22:14, 22:17,
22:22, 22:25, 23:16,
24:12, 29:11, 31:25,
32:1, 32:3, 32:4, 32:8,
34:19, 34:25, 36:4,
36:10, 36:13, 36:14,
37:9, 37:10, 37:12,
37:16, 44:9, 48:20,
50:9, 50:10, 53:8,
67:22, 83:7, 94:1,
97:16, 102:23,
104:14, 105:7, 127:1,
127:2, 127:5, 127:14,
140:14
**three-legged** [7] -
22:17, 31:25, 34:25,
36:10, 37:9, 50:10,
83:7

**three-part** [1] - 6:19
**throughout** [10] -
11:24, 31:9, 34:22,
39:21, 39:22, 55:18,
93:11, 110:18,
111:17, 117:20
**timeline** [7] - 34:21,
34:23, 61:10, 77:19,
78:1, 78:5
**timely** [1] - 44:7
**timing** [1] - 100:9
**tip** [4] - 104:17,
119:9, 120:15, 120:21
**tipped** [1] - 104:16
**tips** [1] - 104:19
**today** [15] - 8:7, 9:2,
52:7, 59:22, 74:1,
87:8, 87:19, 87:21,
97:18, 99:15, 99:17,
100:11, 120:1,
120:12, 152:10
**together** [21] - 8:10,
22:12, 33:11, 33:12,
48:4, 67:24, 83:12,
85:2, 92:12, 92:15,
111:18, 126:25,
128:12, 129:18,
131:7, 134:11,
134:22, 152:17,
154:8, 154:11
**tomorrow** [6] -
151:23, 151:24,
152:11, 152:21,
154:13, 154:16
**ton** [1] - 25:20
**tone** [1] - 113:8
**tongue** [1] - 8:23
**took** [8] - 10:7,
13:14, 20:2, 38:7,
58:15, 79:25, 100:6,
145:4
**tool** [6] - 44:19, 62:8,
62:9, 62:16, 62:20,
81:10
**total** [3] - 52:1, 53:6,
98:14
**totally** [3] - 95:10,
95:24, 98:25
**touch** [1] - 74:3
**touched** [1] - 121:17
**touted** [1] - 92:13
**toward** [1] - 145:8
**trade** [21] - 22:7,
48:5, 90:22, 94:25,
118:13, 126:1, 126:3,
126:14, 126:18,
128:16, 128:19,
130:3, 130:15, 139:4,
139:7, 139:9, 139:15,
139:16, 139:22,

140:3, 140:5
**transaction** [2] -
100:20, 100:21
**transcript** [4] - 5:12,
5:24, 144:11, 155:4
**TRANSCRIPT** [1] -
1:16
**Transcript** [1] - 1:25
**travel** [1] - 111:11
**treat** [3] - 71:13,
72:18, 110:11
**treated** [1] - 115:5
**treating** [3] - 70:2,
72:8, 72:11
**treatment** [2] -
43:13, 73:6
**Treatment** [1] - 43:20
**tremendous** [2] -
83:18, 102:13
**trend** [1] - 31:10
**trial** [40] - 8:16, 9:6,
11:22, 26:10, 28:17,
34:22, 38:13, 44:18,
47:23, 52:3, 65:12,
70:22, 71:25, 74:24,
80:23, 83:16, 93:11,
96:6, 106:9, 106:16,
106:21, 108:3,
109:25, 110:17,
110:19, 111:17,
112:9, 112:20, 115:1,
116:17, 117:4, 117:7,
121:6, 122:13,
143:15, 144:10,
144:21, 147:3, 148:8
**TRIAL** [1] - 1:16
**trials** [1] - 107:22
**tried** [2] - 63:24,
94:23
**trier** [2] - 18:23,
124:17
**trucks** [2] - 57:24,
58:4
**true** [10] - 12:10,
61:2, 64:23, 74:1,
80:5, 89:12, 95:8,
102:2, 119:12
**trust** [2] - 106:12,
146:24
**trusted** [1] - 26:12
**truth** [10] - 10:12,
12:4, 12:7, 39:8,
39:11, 39:14, 81:2,
92:19, 111:3, 111:16
**truths** [1] - 81:5
**try** [1] - 38:3
**trying** [7] - 10:14,
25:15, 62:2, 62:22,
75:3, 82:18, 100:2
**TSCHUMI** [1] - 2:5

turn [3] - 58:1, 125:13, 132:13
turned [2] - 58:11, 99:23
turns [1] - 60:7
TV [2] - 107:23, 107:25
TWENTY [1] - 1:11
TWENTY-ONE [1] - 1:11
Two [2] - 25:13
two [33] - 10:10, 12:15, 13:7, 13:22, 16:9, 22:19, 23:16, 24:25, 36:22, 58:13, 58:22, 62:4, 71:6, 76:22, 77:3, 77:4, 97:4, 103:13, 105:6, 114:4, 118:10, 121:12, 126:12, 128:14, 129:6, 129:7, 131:12, 132:6, 132:24, 139:2, 144:17, 149:23, 151:8
two-part [1] - 13:22
TX [1] - 3:7
type [6] - 101:15, 121:13, 121:24, 140:22, 141:25, 142:17
types [4] - 32:4, 97:12, 120:10, 121:12
typically [1] - 103:20

U

U.S [3] - 1:22, 76:10, 82:22
UEM [1] - 12:24
UEP [90] - 10:4, 10:5, 10:9, 10:17, 11:25, 12:23, 15:14, 16:19, 17:12, 19:9, 22:10, 22:11, 29:12, 32:6, 35:1, 35:16, 35:24, 35:25, 38:16, 38:20, 42:24, 43:18, 43:19, 44:15, 47:20, 47:25, 48:5, 48:8, 48:13, 48:22, 49:15, 58:10, 58:12, 58:20, 58:24, 62:7, 62:11, 65:19, 66:17, 66:19, 67:2, 67:3, 67:22, 69:2, 70:18, 71:3, 71:9, 71:11, 72:24, 72:25, 73:17, 73:22, 74:2, 75:1, 75:14, 76:1, 80:25, 85:24, 86:6, 89:2, 89:8, 89:16,

89:24, 90:13, 90:17, 92:14, 93:3, 93:23, 96:11, 97:14, 97:18, 97:19, 98:6, 98:21, 99:3, 99:5, 110:21, 126:21, 126:23, 131:15, 131:16
UEP's [3] - 18:14, 42:21, 44:9
ultimately [4] - 58:24, 75:9, 86:24, 147:1
umbrella [1] - 122:5
umbrellas [2] - 131:22, 131:24
unanimous [3] - 102:21, 146:20, 147:12
unanimously [7] - 15:1, 15:11, 29:15, 29:16, 30:7, 74:15, 84:14
under [24] - 6:16, 7:4, 22:7, 45:25, 49:13, 50:5, 50:23, 58:15, 67:9, 72:12, 74:14, 83:18, 83:19, 103:5, 110:6, 113:12, 115:9, 115:13, 125:15, 125:24, 126:18, 128:7, 142:12, 145:1
undercut [1] - 61:16
undermining [1] - 71:15
understood [5] - 59:7, 73:23, 87:23, 150:18, 153:5
undertaking [1] - 98:16
unduly [1] - 143:22
uneasy [1] - 151:10
unfair [1] - 61:12
unfettered [1] - 125:16
unilateral [1] - 19:23
unimportant [1] - 114:7
unincorporated [3] - 114:25, 115:3, 115:14
UNITED [1] - 1:1
United [25] - 9:25, 10:1, 10:10, 12:5, 14:10, 15:14, 28:1, 38:23, 39:15, 43:9, 50:19, 77:22, 81:1, 86:6, 86:7, 92:10, 92:17, 92:24, 93:13, 96:19, 98:24, 100:13, 139:3

University [3] - 42:13, 42:15
unlawful [5] - 34:13, 116:14, 129:9, 137:6, 140:9
unless [6] - 15:9, 121:1, 147:4, 152:11, 152:22, 154:7
unreasonable [16] - 22:8, 22:12, 29:24, 29:25, 30:1, 67:17, 67:18, 67:24, 67:25, 126:19, 126:25, 132:15, 134:1, 136:19, 136:21
unreasonably [3] - 118:13, 125:25, 126:14
unrefuted [1] - 18:16
unreliable [1] - 81:16
unsound [1] - 125:10
unspoken [1] - 129:13
unusual [2] - 153:3, 153:11
up [65] - 7:14, 10:15, 11:17, 24:3, 25:22, 27:14, 28:1, 28:8, 29:5, 30:25, 31:10, 32:24, 33:2, 33:4, 33:6, 34:3, 35:1, 36:1, 39:22, 45:9, 47:24, 56:19, 59:18, 59:19, 59:21, 63:20, 66:8, 68:5, 77:7, 77:15, 78:12, 78:17, 79:7, 79:8, 82:12, 85:20, 86:14, 88:3, 88:23, 89:1, 89:3, 90:25, 91:5, 91:12, 91:15, 93:8, 95:3, 95:13, 95:19, 95:22, 96:2, 98:5, 99:13, 100:23, 119:20, 123:1, 131:22, 145:19, 148:2, 152:19
ups [1] - 31:9
upwards [2] - 53:11, 70:19
urge [6] - 26:12, 26:25, 27:10, 145:15, 146:3, 146:9
USEM [32] - 15:15, 16:5, 16:11, 16:17, 16:18, 16:21, 22:11, 29:12, 32:5, 35:1, 35:11, 35:12, 37:13, 39:18, 40:16, 41:15, 41:23, 42:6, 55:7, 56:11, 56:22, 57:2,

67:23, 80:15, 91:25, 99:1, 99:3, 99:6, 126:24, 131:16
uses [2] - 77:4, 77:16
usual [2] - 153:21, 154:9

V

valuable [1] - 139:6
value [4] - 141:4, 142:25, 143:5, 143:11
variation [1] - 56:16
various [12] - 5:15, 22:23, 34:24, 37:6, 68:12, 79:3, 79:25, 80:1, 127:12, 131:5, 136:1, 144:5
venture [1] - 142:21
verbal [1] - 51:10
verdict [33] - 6:25, 14:21, 14:24, 15:20, 15:25, 26:20, 28:25, 29:7, 31:19, 50:5, 74:14, 84:20, 102:18, 105:21, 107:16, 107:19, 113:23, 120:16, 121:13, 145:12, 145:22, 146:17, 146:19, 146:20, 146:21, 146:22, 147:6, 147:8, 147:10, 147:12, 151:1
verifiable [1] - 44:7
verified [1] - 73:3
versus [2] - 57:1, 76:7
via [2] - 1:25, 108:11
vice [1] - 55:16
Video [2] - 46:2, 70:25
video [6] - 17:23, 43:24, 46:18, 70:24, 87:15, 108:11
view [6] - 6:18, 61:21, 107:16, 131:12, 150:12, 153:17
views [1] - 145:18
violate [2] - 83:25, 116:12
violated [2] - 83:15, 140:10
violating [2] - 139:11, 140:4
violation [14] - 50:25, 107:15, 107:18, 126:8, 140:2, 140:6, 140:12,

140:18, 141:3, 141:9, 141:16, 141:18, 141:22, 142:24
violations [2] - 143:7, 143:12
virtually [1] - 5:18
virtues [1] - 94:3
vision [1] - 148:16
visits [2] - 75:2, 76:22
Voice [1] - 10:1
Voices [13] - 9:25, 10:10, 12:5, 14:10, 38:23, 39:15, 50:19, 77:22, 81:1, 86:6, 92:18, 92:25, 96:19
voicing [1] - 62:14
volume [1] - 57:5
voluntary [5] - 45:16, 49:16, 49:19, 61:12
vote [2] - 10:6, 16:18
voted [1] - 91:22
votes [2] - 145:21, 146:16
voting [2] - 146:13, 146:15

W

WA [1] - 3:9
waging [1] - 43:21
wait [7] - 61:12, 69:6, 79:6, 150:13, 150:16
waited [3] - 9:6, 9:7, 17:16
waiting [1] - 146:10
Walgreens [1] - 60:9
walked [2] - 27:16, 122:4
Walker [16] - 25:20, 37:18, 37:25, 40:22, 70:20, 76:7, 76:17, 76:23, 78:21, 79:20, 80:6, 100:22, 101:2, 101:6, 101:7, 124:7
walking [1] - 27:24
walls [2] - 57:25, 58:5
Walmart [24] - 40:19, 48:7, 49:10, 49:19, 49:24, 57:7, 58:13, 58:17, 59:7, 59:11, 59:22, 60:5, 61:6, 74:19, 75:3, 75:13, 75:15, 75:17, 75:20, 76:4, 87:9
Walmart's [4] - 74:17, 75:11, 75:14, 75:25

**wants** [4] - 19:19, 26:8, 34:5, 61:21
**Washington** [3] - 2:19, 3:16, 68:24
**watching** [1] - 107:23
**water** [1] - 122:5
**ways** [4] - 24:13, 77:4, 135:24
**weaker** [1] - 71:3
**wearing** [1] - 122:4
**weather** [5] - 8:9, 111:12, 122:3, 131:22, 154:12
**week** [4] - 23:16, 88:9, 96:25
**weeks** [9] - 18:9, 18:18, 28:17, 30:10, 49:11, 83:12, 84:4, 85:2, 96:21
**weighing** [3] - 11:13, 109:13, 114:5
**weight** [12] - 12:2, 109:16, 110:25, 113:2, 113:5, 114:12, 114:16, 122:10, 122:12, 123:21, 125:3, 144:1
**welcome** [1] - 153:4
**welfare** [19] - 20:14, 42:20, 45:6, 45:13, 49:21, 57:16, 62:22, 70:2, 71:23, 72:11, 72:17, 74:11, 80:14, 86:1, 86:24, 94:17, 95:6, 98:20
**Welfare** [6] - 18:7, 19:13, 44:6, 45:5, 45:10, 58:11
**well..** [1] - 149:5
**Wendy's** [2] - 43:17, 44:7
**wet** [1] - 122:5
**whereby** [1] - 72:14
**whisper** [1] - 9:14
**White** [1] - 52:16
**who's-who** [1] - 49:4
**whole** [16] - 5:18, 14:2, 14:4, 18:3, 43:2, 56:1, 64:25, 66:23, 70:19, 71:14, 80:23, 107:10, 110:10, 114:14, 125:7, 131:13
**wholesale** [2] - 31:12, 31:13
**wholly** [1] - 115:15
**wholly-owned** [1] - 115:15
**whore** [1] - 71:20
**widely** [1] - 92:25

**WILLIAM** [1] - 3:17
**willing** [1] - 56:5
**win** [1] - 104:15
**windows** [1] - 8:8
**wink** [1] - 51:11
**Winn** [1] - 49:6
**Winn-Dixie** [1] - 49:6
**wisdom** [1] - 107:13
**wish** [1] - 152:2
**withdrawn** [1] - 138:23
**witness** [43] - 9:9, 9:10, 18:16, 25:23, 33:22, 45:20, 47:23, 70:1, 72:21, 85:21, 111:25, 112:5, 112:6, 112:12, 112:13, 112:16, 112:19, 112:20, 113:1, 113:7, 113:9, 113:13, 113:14, 113:18, 113:21, 113:23, 113:24, 114:2, 114:12, 114:14, 114:19, 121:14, 121:15, 121:16, 121:18, 124:23, 125:7, 125:11
**witness'** [8] - 112:14, 112:15, 112:22, 113:16, 123:22, 123:24, 125:1, 125:5
**witnessed** [2] - 76:3
**witnesses** [29] - 28:10, 28:18, 43:23, 44:21, 57:14, 75:10, 81:13, 83:22, 85:9, 94:8, 94:10, 108:10, 108:11, 112:5, 113:3, 113:5, 114:2, 114:17, 114:19, 114:21, 121:3, 123:15, 124:1, 124:9, 124:10, 124:13, 124:15, 125:3, 144:7
**WOLLMUTH** [1] - 2:9
**word** [4] - 42:23, 90:10, 95:23, 124:9
**words** [6] - 50:13, 76:2, 104:2, 131:4, 143:20, 151:6
**works** [2] - 56:17, 101:15
**world** [8] - 49:24, 54:9, 74:20, 76:19, 77:18, 101:14, 101:17
**worried** [1] - 85:24
**worry** [1] - 26:22
**worse** [2] - 103:12
**worth** [2] - 114:23,

115:7
**worthy** [2] - 112:5, 113:14
**WRIGHT** [1] - 3:12
**wrinkle** [1] - 153:2
**write** [5] - 103:20, 146:2, 146:3, 146:11, 146:14
**writes** [2] - 25:2, 75:8
**writing** [1] - 82:22
**written** [8] - 9:16, 17:8, 44:4, 103:16, 103:19, 103:20, 108:1, 129:12
**wrongdoing** [1] - 138:13
**wrote** [9] - 71:18, 85:11, 86:13, 90:5, 90:11, 94:16, 96:9, 99:1, 112:20

---

# Y

**year** [16] - 16:23, 23:6, 25:15, 52:1, 52:4, 55:15, 55:18, 88:8, 91:5, 91:6, 92:10, 93:9, 93:10
**years** [22] - 14:12, 17:16, 28:8, 36:7, 48:11, 48:14, 48:20, 55:16, 70:22, 76:8, 81:23, 83:13, 83:15, 84:10, 85:17, 87:11, 90:9, 93:15, 102:3, 102:4
**yesterday** [19] - 5:23, 6:16, 8:15, 10:3, 11:6, 13:25, 14:23, 21:5, 32:13, 32:21, 43:1, 60:25, 64:5, 76:7, 82:16, 87:15, 90:3, 98:2, 99:2
**yesterday's** [1] - 5:23
**York** [4] - 2:6, 2:10, 2:24, 3:4
**yourself** [5] - 82:13, 85:6, 107:12, 120:3, 145:12
**yourselves** [2] - 5:2, 153:23

---

# Z

**zero** [1] - 39:25

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THESE INSTRUCTIONS APPLY TO:*** | : | **No. 08-md-2002** |
| **ALL DIRECT PURCHASER ACTIONS** | : | |

# JURY INSTRUCTIONS

# TABLE OF CONTENTS

Instructions 1-10: Background Information……………………………..1-22

Instructions 11-13: Overview of Antitrust law…………………….....23-26

Instructions 14 & 15: Conspiracy Law……………………………....27-30

Instructions 16-22: Antitrust Law……………………….…….……..31-45

Instructions 23-24: Closing Information……………...……………...46-49

TABLE OF CONTENTS ................................................................ ii

Instruction No. 1 ....................................................................1

Instruction No. 2 ....................................................................3

Instruction No. 3 ....................................................................7

Instruction No. 4 ....................................................................10

Instruction No. 5 ........................................................................................11

Instruction No. 6 ........................................................................................13

Instruction No. 7 ........................................................................................15

Instruction No. 8 ........................................................................................18

Instruction No. 9 ........................................................................................20

Instruction No. 10 ......................................................................................21

Instruction No. 11 ......................................................................................23

Instruction No. 12 ......................................................................................24

Instruction No. 13 ......................................................................................25

Instruction No. 14 ......................................................................................27

Instruction No. 15 ......................................................................................30

Instruction No. 16 ......................................................................................31

Instruction No. 17 ......................................................................................35

Instruction No. 18 ......................................................................................36

Instruction No. 19 ......................................................................................37

Instruction No. 20 ......................................................................................39

Instruction No. 21 ......................................................................................41

Instruction No. 22 ........................................................................................42

Instruction No. 23 ........................................................................................46

Instruction No. 24 ........................................................................................47

**INSTRUCTION NO. 1**

Members of the Jury:

Now that you have heard all of the evidence that's been admitted in this trial and the arguments of counsel, it's my duty to give you the final instructions as to the law that is applicable to this case. Use these oral instructions to guide you in your deliberations.

All of the instructions of law I gave you at the beginning of the trial, during the trial, and these final instructions must guide and govern your deliberations. It is your duty to follow the law, as stated, in all of the instructions of the Court and to apply these rules of law to the facts as you find them from the evidence received during the trial. Counsel has referred to some of the applicable rules of law and the Court's instructions. They are permitted to do so. However, if any difference appears to you between the law as stated by counsel and that as stated by the Court, you are to be governed by the instructions told to you by the Court.

You are not to single out any one instruction alone as stating the law, but you must consider the instructions as a whole in reaching your decisions. Likewise, you are not to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any

1

view or opinion of the law other than those provided in the Court's instructions, just as it would be a violation of your sworn duty, as the judges of the facts, to base your verdict upon anything but the evidence received in the case.

As I am sure you have come to realize, whatever you think you knew about trials, about evidence, or about the law as a result of watching T.V. shows or movies, has no place here as you perform your duties as jurors in this case. No one involved in this case should be compared to any T.V. show, any movie or any actor or actress. You were chosen as jurors for this real life trial to evaluate all of the evidence received and to decide each of the factual questions presented by the allegations brought by the parties. In resolving the issues presented to you for decision in this trial, as I have told you, you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.

2

**INSTRUCTION NO. 2**

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses including the testimony presented via deposition;

2. Stipulated facts that have been agreed to by the parties; and

3. Documents and other things received as exhibits.

The following things are *not* evidence:

1. Statements, arguments, and questions of the lawyers for the parties in this case, even if the lawyers' questions sounded like they were based on facts as described by the lawyers—what the lawyers said is not evidence unless I told you specifically you could consider it so;

2. Objections by lawyers, even if their objections sounded as though they were based on something sounding like facts.

3. Any testimony I told you to disregard or which I excluded from evidence; and

4. Anything you may have seen or heard about this case outside the courtroom.

3

You must make your decision based only on the evidence that you saw and heard in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

You can, and should, use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected. Indeed, you heard several objections in this trial. Objections simply meant that the lawyer was requesting that I make a decision on a particular rule of evidence. Objections to questions – whether short or lengthy – are not evidence. Lawyers have an obligation to their clients to make objections when they believe that the evidence being offered is improper under the rules of evidence. Sometimes they are right, sometimes they are not. You should not be influenced by the objection or by the Court's ruling on it. If the objection was sustained, you are

4

to ignore the question and any whole or partial answer to it. If the objection was overruled, treat the answer like any other.

If you were instructed – or if I instruct you now – that some item of evidence is received for a limited purpose only, you must follow that instruction and may only consider the evidence for that limited purpose.

In this trial, a lot of evidence has been admitted for a limited purpose—you may have heard the parties referencing it throughout. For the evidence that was admitted for notice to UEP members, you may only consider it for the limited purpose of what was being communicated to members in the particular document, for whatever weight you think it deserves. However, you cannot use it to prove, either directly or circumstantially, the truth of what it says.

For example, if a document admitted for that purpose states that it "will be cold on January 1," you can only use it for the purpose of showing that people were told that and may or may not have acted based off of that information. Perhaps you can use it as evidence that the person who received the letter put on a coat on January 1 in reliance on the forecast, or changed travel plans as a result of the weather forecast. However, you cannot use it to prove, either directly or circumstantially, that it was actually cold on January 1. Such a jump would require

5

evidence offered for the truth of the matter. I have noted such evidence for you throughout trial.

Also, if certain testimony or other evidence was ordered struck from the record, you must disregard that evidence. Do not consider any testimony or other evidence that was excluded. Do not speculate about what a witness might have said or what an exhibit might have shown.

**INSTRUCTION NO. 3**

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief. You may believe everything a witness says, only part of it, or none of it. In deciding what to believe, as I mentioned to you at the start of the trial, you may consider a number of factors, including the following:

1. the opportunity and ability of the witness to see or hear or know the things the witness testifies to;

2. the quality of the witness's understanding and memory;

3. the witness's manner while testifying;

4. whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

5. whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

6. how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

7. any other factors that bear on believability.

7

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were and how much weight you think their testimony deserves.

You may be guided by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character or tone of the testimony given, or by evidence contrary to the testimony.

You should carefully examine all the testimony given, the circumstances under which each witness has testified, and every matter in evidence tending to show whether a witness is worthy of belief. The factors that I just listed a moment ago in considering how to evaluate a witness's credibility also work in evaluating possible discrepancies in testimony.

You should consider whether the witness impresses you as having an accurate recollection of the matters about which he or she testified. Also, consider any relation each witness may have with either side of the case, the manner in which each witness might be affected by the verdict, and the extent to which the testimony of each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimonies of different witnesses, may or may not cause you to discredit such

testimony. Two or more persons seeing an event may see or hear it differently. However, in weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you should give the testimony of each witness such weight, if any, that you may think it deserves. In short, you may accept or reject the testimony of any witness, in whole or in part.

Keep in mind, ladies and gentlemen, that the quality or weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. Indeed, you may find that the testimony of a small number of witnesses—or even one witness alone—as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

9

**INSTRUCTION NO. 4**

You should consider and decide this case as a dispute between persons of equal standing or of equal worth in the community, and holding the same or similar stations in life. A corporation, partnership, or unincorporated association is entitled to the same fair trial as a private individual. All persons, including corporations, partnerships, unincorporated associations, and other organizations stand equal before the law, and are to be treated as equals. Therefore, you should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

INSTRUCTION NO. 5

Under the law, a corporation is a person, but it acts only through its agents. A corporation's agents include its directors, officers, employees, or others acting on its behalf. A corporation is not capable, under the law, of conspiring with its own agents, unincorporated divisions, or wholly owned subsidiaries. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporation and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporation could reasonably believe the agent would have, judging from his or her position with the company, the responsibilities previously entrusted to the person or the office and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

11

To summarize, for a corporation to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment with apparent authority.

The fact that a corporation has instructed its agents not to violate the antitrust laws does not excuse the corporation from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.

A corporation is entitled to the same fair trial as a private individual. The acts of a corporation are to be judged by the same standard as the acts of a private individual, and you may hold a corporation liable only if such liability is established by the preponderance of the evidence. All persons, including corporations, are equal before the law.

## INSTRUCTION NO. 6

As I explained to you at the outset of this trial, this is a class action. A class action allows the filing of one lawsuit by a few representatives on behalf of all similarly situated individuals who have similar legal claims against the defendants. You heard testimony from these "class representatives" during trial.

There are many reasons for this, but the main reason is economy, or efficiency of effort. It is far easier for everyone involved to resolve all of these claims in this one trial, as opposed to requiring each individual plaintiff to file his or her own claim, and requiring the defendants to defend against the same claims, in courts around the country. Thus, in a class action like this one, it becomes the plaintiff's burden to prove that the alleged conspiracy caused an increase in the prices of eggs that affected the class generally.

The class here consists of those companies who directly purchased commodity shell eggs, both from the defendants here and other alleged co-conspirators. The class was represented here by the named plaintiffs Eby-Brown Co., John Lisciandro of Lisciandro's Restaurant, and T.K. Ribbings Family Restaurant. There are many more members in the Direct Purchaser Plaintiff Class than just these named representatives. When I refer to "plaintiffs," the "class," or the "Direct Purchaser Plaintiff Class" throughout these instructions, I

13

mean all plaintiffs of the class, including those you heard from and those you did not.

**INSTRUCTION NO. 7**

This is a civil case. For the issues you will consider, the Direct Purchaser Class are the parties who brought this lawsuit. They are the plaintiffs.

Rose Acre Farms, Ohio Fresh Eggs and R.W. Sauder are the parties against whom the lawsuit was filed. They are the defendants.

The questions you will be addressing in your deliberations are these: First, was there a contract, combination, or conspiracy between or among at least two separate entities? Second, did the contract, combination, or conspiracy unreasonably restrain trade? And finally, did the restraints cause the Direct Purchaser Plaintiff Class to suffer an injury to its business or property?

I will provide you more in depth instruction as to these counts shortly. As to these claims, the Direct Purchaser Plaintiff Class has the burden of proving their case against the defendants by what is called the preponderance of the evidence. Preponderance of the evidence means that, to prevail on a claim or affirmative defense, the party asserting the relevant claim or affirmative defense will have to prove to you, in light of all the evidence, that what they claim is more likely so than not so. To put it differently, as you consider the claims against each individual defendant, you may think about the burden of proof this way: if you were to put the evidence favorable to the Direct Purchaser Plaintiff Class regarding each

15

individual defendant and the evidence favorable to each of the individual defendants on opposite sides of the pan scales that are frequently used to signify justice, the Direct Purchaser Plaintiff Class would have to make the scales tip even ever so slightly on their side to prevail on any issue or claim as to which they have what we call the burden of proof, and this is true independently for each defendant.

Here, the Direct Purchaser Plaintiff Class alleges that between 2004 and 2008, it paid higher prices for eggs purchased from the defendants and other egg producers because the defendants, along with these other alleged co-conspirators, conspired to limit the nation's egg supply, which drove up egg prices. The defendants deny these allegations, and assert that all of the actions were done for legitimate business reasons. They also claim that the supply of eggs actually increased during the alleged conspiracy.

We have heard a lot about other companies not here today. Those parties are not at issue in this lawsuit, and you should not concern yourself with any claims against those parties, whether there are other pending or resolved lawsuits, or anything of the sort. Remember that I told you there are certain issues for the jury, and certain issues for the Judge. The presence or non-presence of other claims and whether they impact this case are issues that I must deal with, and the law accounts

16

for these type of interrelated claims. The only question before you is the claim between this Direct Purchaser Plaintiff Class and the defendants here today.

If the Direct Purchaser Plaintiff Class fails to meet this burden, that is, if the scales remain evenly balanced or if they tip to a defendant's side, the verdict must be in favor of that defendant on the issue or matter as to which the Direct Purchaser Plaintiff Class has the burden. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this, so you should put that concept out of your mind.

17

INSTRUCTION NO. 8

There are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." An example of "direct evidence" is when a witness testifies about something that the witness knows through his or her own senses — something the witness has seen, felt, touched, heard or done. If a witness testified that he or she saw it raining outside, and you believed him or her, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is the document's existence or its current condition.

The other type of evidence is circumstantial evidence. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining outside.

You should consider both kinds of evidence—direct and circumstantial— that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

18

During the trial, you may have heard the attorneys use the term "inference." In their arguments they have asked you to infer on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact which has been shown to exist. There are times when different inferences may be drawn from facts, whether by direct or circumstantial evidence. The Direct Purchaser Plaintiff Class asks you to draw one set of inferences, while the defendants ask you to draw other inferences. It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter for guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw – but not required to draw – from the facts that have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense. So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience.

19

## INSTRUCTION NO. 9

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case. You have heard from a number of experts in this case.

The Direct Purchaser Plaintiff Class brought Dr. Rausser, an expert in agricultural economics, econometrics and statistics.

The defendants brought forth Dr. Walker and Dr. David, both experts in economics and econometrics.

20

## INSTRUCTION NO. 10

You have heard testimony of these witnesses who the parties refer to as experts. These witnesses testified to assist you in reaching a decision on certain issues. It is your obligation to determine the expertise, if any, of such witnesses, the credibility of such witnesses, and the reliability of their opinions. The testimony of these witnesses is sometimes in conflict. They disagree at times. You must remember that you are the sole trier of the facts and where their testimony relates to a question of fact, it is your job to resolve the disagreements. The way you resolve the conflict between these witnesses is the same way that you decide other fact questions and the same way that you decide whether to believe ordinary witnesses.

In addition, because they gave their opinions, you should consider the soundness of each opinion, reasons for the opinion, and the witness' motive, if any, for testifying. You may give the testimony of each of these witnesses such weight, if any, that you think it deserves in the light of all the evidence. You should not permit a witness' opinion testimony to be a substitute for your own reason, judgment and common sense. You may reject the testimony of any opinion witness in whole or in part, if you conclude the reasons given in support of an opinion are

unsound or, if you, for other reasons, do not believe the witness. The determination of the facts in this case rests solely with you.

## INSTRUCTION NO. 11

I now want to turn to the specific law of antitrust. The Direct Purchaser Plaintiff Class here brings this suit under the Sherman Act.

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

INSTRUCTION NO. 12

The Direct Purchaser Class challenges defendants Ohio Fresh Eggs, Rose Acre Farms and R. W. Sauder's conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. One of the requirements of this law is that the restraint of trade affects interstate commerce. I am instructing you that I have determined this requirement concerning interstate commerce is met, and therefore you need not consider that in your deliberations.

In light of that, to establish a violation of Section 1 of the Sherman Act, the Direct Purchaser Class still must prove the following:

(1)      the existence of a contract, combination, or conspiracy between or among at least two separate entities;

(2)      that the contract, combination, or conspiracy unreasonably restrains trade;

(3)      that the restraints caused the Direct Purchaser Plaintiff Class to suffer an injury to its business or property.

24

INSTRUCTION NO. 13

Under the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must therefore determine whether the restraints challenged here—(1) the UEP recommendations of early molt and early slaughter, (2) the UEP Certified Program, and (3) the USEM export programs—are, together, unreasonable.

These three programs must all be part of a single, overarching conspiracy, as opposed to, for example, three different conspiracies that were each independent of each other. To determine whether these three restraints constitute one conspiracy, you must look to (1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and (3) the extent to which the participants overlap in the various dealings. If, after considering these factors, you find that all three of these programs were part of the same conspiracy to reduce supply, only then must you determine if the actions taken were reasonable. There are a number of steps to this inquiry, which I will first summarize before going into each in detail.

In making this determination, you must first determine whether the Direct Purchaser Plaintiff Class has proven that the challenged restraints have resulted in

25

a substantial harm to competition in a relevant product and geographic market. If you find that the Direct Purchaser Plaintiff Class has proven that the challenged restraints resulted in a substantial harm to competition in a relevant market, then you must consider whether the restraints produce countervailing competitive benefits. If you find that they do, then you must balance the competitive harm against the competitive benefit. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit. Before going into each step of the analysis in more detail, I first want to talk to you about how you determine if companies are conspiring together.

26

INSTRUCTION NO. 14

A conspiracy is an agreement or understanding between two or more persons to do something illegal. In this case, the Direct Purchaser Plaintiff Class claims that illegal goal was to restrain trade by limiting egg supply. The Direct Purchaser Class alleges that Ohio Fresh Eggs, Rose Acre Farms, and R.W. Sauder participated in a conspiracy to restrain trade by limiting egg supply.

The Direct Purchaser Plaintiff Class must prove both of the following elements by a preponderance of the evidence:

(1) the alleged conspiracy to restrain egg supply existed; and

(2) as to each individual defendant, that defendant knowingly became a member of that conspiracy. To act knowingly means to participate deliberately, not because of a mistake, accident or other innocent reason.

The basis of a conspiracy is an agreement or understanding between two or more persons or companies. Here, an agreement or understanding between two or more persons or companies exists when they share a commitment to a common scheme to achieve an unlawful purpose.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken. A person can become a member without full

27

knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. To prove a conspiracy existed, the evidence must show that the alleged members of the conspiracy came to an agreement or understanding among themselves to accomplish a common purpose.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by the Direct Purchaser Plaintiff Class were agreed upon by each individual defendant to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade by limiting egg supply that constitutes a conspiracy. Therefore, you may find a conspiracy existed regardless of whether it succeeded or failed.

28

The Direct Purchaser Class may prove the existence of the alleged conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy.

Direct evidence of an agreement may not be available, and therefore, a conspiracy may also be shown through circumstantial evidence. You may infer the existence of a conspiracy from the circumstances, including what you find the alleged members actually did and the words they used. However, mere similarity of conduct among various persons, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a conspiracy. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

### INSTRUCTION NO. 15

The mere fact that the defendants may have participated in the UEP short term supply reduction recommendations, the UEP Certified Program, or the USEM Export Program does not by itself establish the existence of a conspiracy among defendants. Their behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions.

For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had agreed or conspired to open their umbrellas. A business may lawfully adopt the same prices, conditions of sale, or other practices as its competitors, so long as it does so independently and not as part of an agreement or understanding with one or more of its competitors. If the defendants or alleged co-conspirators acted similarly but independently of one another, without any agreement or understanding between two or more of them, then there would not be a conspiracy.

You must decide whether the defendants' similar conduct was, more probably than not, the result of an agreement or understanding among them or other co-conspirators who are not present here.

30

## INSTRUCTION NO. 16

Now that I have discussed how to determine conspiracy, I will turn back to the requirements of the Sherman Act. As I previously mentioned, to prove that the challenged restraints are unreasonable, the Direct Purchaser Plaintiff Class must first demonstrate that the restraints have resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of the Direct Purchaser Plaintiff Class is not sufficient, by itself, to demonstrate harm to competition generally.

Furthermore, the Direct Purchaser Plaintiff Class must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market:

The first aspect is known as the relevant product market. This means that the Direct Purchaser Plaintiff Class must show that there was harm in a relevant product market. Here, the Direct Purchaser Plaintiff Class claims harm to the commodity shell egg market. You must determine if these restraints caused harm in this product market.

The second aspect is known as the relevant geographic market. A relevant geographic market is simply a given geographic area where the Direct Purchaser Plaintiff Class must show harm.

31

It is the Direct Purchaser Plaintiff Class's burden to prove the existence of a relevant market. If you find that the Direct Purchaser Plaintiff Class has proven the existence of a relevant market, then you must determine whether the Direct Purchaser Plaintiff Class has also proven that the challenged restraints have had a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether the defendant and its alleged co-conspirators, together, possess market power.

The last factor, market power, has been defined as an ability to profitably raise prices for a sustained period of time above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether the defendants and their alleged co-conspirators together possess market power is their combined market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether the defendants and their alleged co-conspirators have market power include barriers to entry into the egg market for potential competitors, the threat of substitute products for eggs, outside competitors who were not part of the alleged conspiracy, and the percentage of the market covered by alleged members of this conspiracy. If the defendants and their

33

alleged co-conspirators do not possess a substantial market share, it is less likely that the defendants and their alleged co-conspirators possess market power.

If they do not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market. On the other hand, if you were to conclude that the defendants and their alleged co-conspirators possess market power, you could conclude that it is more likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

### INSTRUCTION NO. 17

If you find that the Direct Purchaser Plaintiff Class has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraints also benefit competition in other ways.

In considering whether the challenged restraints benefitted competition, you may consider various factors including, but not limited to: whether the challenged restraints were demanded by customers, increased production, decreased prices, or improved product quality.

If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraints were reasonably necessary to achieve the benefits. If the Direct Purchaser Plaintiff Class proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraints.

## INSTRUCTION NO. 18

If you find that the challenged restraints were reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraints.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraints are unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraints are not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers. The Direct Purchaser Plaintiff Class bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

### INSTRUCTION NO. 19

Before you can find that Ohio Fresh Eggs, Rose Acre Farms, and R.W. Sauder were members of the conspiracy alleged by the Direct Purchaser Class, the evidence must show, as to each individual defendant, that each defendant knowingly joined in the unlawful plan either at its inception, or at some later time, with the intent to further the purpose of the conspiracy.

To act "knowingly" means to participate deliberately and not because of a mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a defendant was a member of the alleged conspiracy, you should consider only the evidence about that particular defendant's statements

37

and conduct, including any evidence of that defendant's knowledge and participation in the events involved and any other evidence of that particular defendant's participation in the conspiracy alleged.

You may not find that a defendant was a member of a conspiracy based only on its association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether a defendant was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy.

Once you have found that a defendant is a member of a conspiracy, it is presumed to remain a member and is responsible for all actions taken by all coconspirators during, and in furtherance, of the conspiracy until it is shown that the conspiracy has been completed or abandoned.

INSTRUCTION NO. 20

Businesses that are actual or potential competitors may lawfully form into associations to advance common interests. You have heard of two such examples here, United Egg Producers and United States Egg Marketers. Trade associations may keep members informed of new services or technology in the industry or perform other valuable services such as cooperative research, publication of trade journals, or joint representation before legislative or administrative bodies.

However, a trade association's actions are not immune of antitrust laws, and an association is capable of being a co-conspirator in violating antitrust laws. The actions of a group of competitors, taken through an association to which they belong, present the same issues as the actions of a group of competitors who have not created a formal organization such as a trade association. A trade association or similar industry group cannot lawfully act to facilitate the raising, stabilizing, or maintaining of prices in the market in which its members compete with one another, to reduce members' collective output of products or services, or to allocate territories among members that are in horizontal competition with one another.

If a trade association exchanges with its members confidential, competitively sensitive information, such as current or future prices, or current or

39

future output information, that is evidence which you may consider, along with all the other evidence, in deciding whether the association is in violation of the antitrust laws.

**INSTRUCTION NO. 21**

A person or business that belongs to a trade association does not become liable for violating the antitrust laws simply because the trade association is liable for such violation. Instead, the Direct Purchaser Class must prove that the defendant in question knew of and participated in the specific conduct that you find unlawful.

## INSTRUCTION NO. 22

If you find that defendant has violated the Sherman Act, then you must decide if the Direct Purchaser Plaintiff Class was injured by the violation.

The Direct Purchaser Plaintiff Class is entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

(1) the Direct Purchaser Plaintiff Class was in fact injured as a result of the defendants' alleged violation of the antitrust laws;

(2) the defendants' alleged illegal conduct was a material cause of the Direct Purchaser Plaintiff Class's injury; and

(3) the Direct Purchaser Plaintiff Class's injury is an injury of the type that the antitrust laws were intended to prevent.

This first element is sometimes referred to as "injury in fact" or "fact of damage." The Direct Purchaser Plaintiff Class must prove that it was injured as a result of the defendants' alleged violation of the antitrust laws. This does not require the Direct Purchaser Plaintiff Class to prove the dollar value of its injury— in fact, I have asked them not to address that at this time. It requires only that the Direct Purchaser Plaintiff Class prove that it was, in fact, injured by the defendants' alleged antitrust violation.

42

The Direct Purchaser Plaintiff Class must also offer evidence that establishes by a preponderance of the evidence that the defendants' alleged illegal conduct was a material cause of the Direct Purchaser Plaintiff Class's injury. This means that the Direct Purchaser Plaintiff Class must have proved that some damage occurred to it as a result of the defendants' alleged antitrust violation, and not some other cause. The Direct Purchaser Plaintiff Class is not required to prove that the defendants' alleged antitrust violation was the sole cause of its injury; nor need the Direct Purchaser Plaintiff Class eliminate all other possible causes of injury. It is enough if the Direct Purchaser Plaintiff Class has proved that the alleged antitrust violation was a material cause of its injury.

Finally, the Direct Purchaser Plaintiff Class must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the Direct Purchaser Plaintiff Class's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the Direct Purchaser Plaintiff Class's injuries are antitrust injuries. On the other hand, if the Direct Purchaser Plaintiff Class's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then the Direct Purchaser Plaintiff Class's injuries are not antitrust

injuries and the Direct Purchaser Plaintiff Class may not recover damages for those injuries under the antitrust laws.

In summary, if the Direct Purchaser Plaintiff Class can establish that it was in fact injured by defendants' conduct, that defendants' conduct was a material cause of the Direct Purchaser Plaintiff Class's injury, and that the defendants' injury was the type that the antitrust laws were intended to prevent, then the Direct Purchaser Plaintiff Class is entitled to recover damages for the injury to its business or property.

The term "business" includes any commercial interest or venture. The Direct Purchaser Plaintiff Class has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of a defendant's alleged antitrust violation. The term property includes anything of value members of the Direct Purchaser Plaintiff Class own, possess, or in which members of the Direct Purchaser Plaintiff Class have a protectable legal interest.

The Direct Purchaser Plaintiff Class has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of alleged antitrust violations by defendants and their co-conspirators. The Direct Purchaser Plaintiff Class has been injured in its property if you find that its members have paid an inflated price for goods, services, any legal

44

interest of value, or that it has lost money as a result of alleged antitrust violations by the defendants and their co-conspirators.

## INSTRUCTION NO. 23

In this case you have been permitted to take notes during the course of the trial, and most of you – perhaps all of you – have taken advantage of that opportunity. You may have your notes available to you during your deliberations, but you should make use of them only as an aid to your own memory. In other words, you should not give your notes any precedence over your independent recollection of the evidence or lack of evidence; and neither should you be unduly influenced by the notes of other jurors. I emphasize that the notes you may have taken are not entitled to any greater weight than the memory or impression of each juror as to what the testimony or other evidence may have been.

INSTRUCTION NO. 24

When you retire to the jury room to deliberate, you may take with you your notes and certain exhibits that the Court has admitted into evidence. I strongly recommend that you select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your

47

fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me, or to anyone but each other about the case. If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer, Mr. Coyle. Mr. Coyle will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you, as a jury, to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

48

A verdict form has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in and have your foreperson date and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.