## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

A group of food manufacturers filed this federal antitrust lawsuit about the production of eggs. Relevant here, Plaintiffs allege that egg producers adopted animal-welfare guidelines known as the UEP Certified Program to reduce the supply of eggs. The guidelines increased the size of the enclosures housing egg-laying hens. Bigger henhouses meant fewer hens. Fewer hens meant fewer eggs, and fewer eggs meant higher prices.

Plaintiffs claim that Defendants did not adopt the UEP Certified Program because of animal-welfare concerns. Instead, they agreed to the measures as part of a conspiracy to reduce the supply of eggs.

Defendants respond that everything was on the up-and-up. In fact, they received pressure from grocers to adopt animal-welfare guidelines, not the other way around. According to them, consumers demanded humanely raised eggs from the grocers, and the grocers then passed along that pressure to the egg producers. To prove the point, they seek to introduce evidence showing that certain grocers (like Safeway, Publix, and Kroger) demanded eggs that complied with the UEP Certified Program.

Plaintiffs seek to exclude evidence about the grocers' preferences at trial. They believe that this evidence is irrelevant and prejudicial, and that certain depositions of non-party witnesses designated under Rule 30(b)(6) are not admissible. Defendants oppose the motion.

For the following reasons, the Court denies in part Plaintiffs' motion *in limine* to exclude evidence about grocers and certain Rule 30(b)(6) witness testimony. The testimony is relevant and not prejudicial. But the deposition testimony is admissible only if the Rule 30(b)(6) witnesses had personal knowledge as required by Rule 602 of the Federal Rules of Evidence.

## Background

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. They're big egg buyers.

Plaintiffs allege that Defendants United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

Plaintiffs are purchasers of egg *products*, meaning "eggs, either whole or separated, that have been removed from their shells and are then processed into dried, frozen, or liquid forms." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 502 (E.D. Pa. 2019). They allege that Defendants' conspiracy to reduce the supply of eggs raised the price of egg products. *Id.* at 506.

Plaintiffs filed suit in December 2011, and then amended the complaint twice. *See* Cplt. (Dckt. No. 1). The second amended complaint alleges that Defendants conspired to limit the

supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). Specifically, Plaintiffs alleged that Defendants agreed to limit egg supply through three anticompetitive practices.

First, Defendants allegedly agreed to adopt animal-welfare guidelines (known as the UEP Certified Program) that increased the size of the enclosures housing egg-laying hens. *Id.* at ¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

Second, Defendants allegedly agreed to increase egg exports, leaving fewer eggs for the domestic market. *Id.* at ¶¶ 140–45. The exported eggs were sold at prices lower than the then-current prices in the United States. *Id.* at ¶ 142. Needless to say, selling at *lower* prices is not usually the first preference of sellers. But Defendants allegedly made up for the lost revenue with the higher prices in the supply-constrained U.S. market. *Id.*

Third, Defendants allegedly agreed to "use short-term measures to control supply and artificially maintain and increase the price of eggs." *Id.* at ¶ 146. For example, Defendants allegedly agreed "to reduce the national flock by seven million hens in an effort to increase prices." *Id.* at ¶ 148. Again, fewer hens leads to fewer eggs, and fewer eggs leads to higher egg prices.

The complaint alleges that Defendants used all three anticompetitive tactics to restrict the supply of eggs and successfully increase egg prices. *Id.* at ¶ 167. In sum, Plaintiffs allege that

Defendants artificially reduced the supply and increased the prices of eggs in violation of the federal antitrust laws. *Id.* at ¶¶ 194–96.

Soon after Plaintiffs filed their complaint, the case was transferred to the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation. *See* 1/3/12 Transfer Order (Dckt. No. 13). While the case was part of the MDL proceedings, the parties completed discovery and filed dispositive pretrial motions. *See* Joint Status Report, at 2 (Dckt. No. 234). After the MDL court denied Defendants' second motion for summary judgment, the case was transferred back to this district for trial. *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498; Conditional Remand Order (Dckt. No. 14).

Meanwhile, back in the Eastern District of Pennsylvania, Judge Pratter presided over two trials in cases brought by different plaintiffs in the MDL proceedings. This Court summarized the history of these trials in more depth in its Opinion granting Defendants' motion to bifurcate the trial. *See* 8/11/23 Mem. Opin. & Order, at 7–9 (Dckt. No. 272). So, the Court will be brief.

The first trial was brought by a class of wholesale egg and egg products purchasers. The second trial was brought by wholesale purchasers who opted out of the class (known as Direct Action Plaintiffs) and originally filed their case in the Eastern District of Pennsylvania. During pretrial proceedings, Judge Pratter grouped the Plaintiffs here with the Direct Action Plaintiffs. *Id.* at 5.

Some of the Direct Action Plaintiffs in the second trial were grocery stores who purchased both eggs and egg products. *See* Joint Status Report, at 3 (Dckt. No. 234) ("The second trial began in October 2019. It involved supermarket Direct Action Plaintiffs . . . ."); *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d at 501–02 ("The DAPs are purchasers of egg products who claim that they paid more for those egg products than they should have

because of the defendants' alleged conspiracy.") (footnote omitted).  Both trials ended in defense verdicts.  *Id.* at 7–8.

During discovery, the parties developed evidence about certain grocers' preferences for the animal-welfare guidelines in the UEP Certified Program.  For example, the parties took the depositions of representatives from grocery stores and developed evidence about whether the grocers "supported or required UEP certified eggs."  *See* Pls.' Mtn. to Exclude, at 6 (Dckt. No. 180); *see also id.* at 5 nn.2–5, 6 n.6.  Documents produced in discovery showed that certain grocers "required that their egg suppliers meet the UEP Guidelines."  *See* Defs.' Resp., at 7 (Dckt. No. 194).

Plaintiffs at both trials filed motions before Judge Pratter to exclude evidence that the defendants joined the UEP Certified Program because of customer demand.  *See* 3/22/18 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1658); 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982).  Judge Pratter denied both motions and permitted the defendants to introduce evidence of grocer demand for UEP-certified eggs.  *Id.*

Following in the footsteps of the other plaintiffs in the MDL, Plaintiffs here moved to exclude or limit evidence about the grocers' views on the UEP Certified Program.  *See* Pls.' Mtn. to Exclude (Dckt. No. 180).  Defendants oppose the motion.  *See* Defs.' Resp., at 9 (Dckt. No. 194).

## Legal Standard

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014).  "Although the Federal Rules of

5

Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Regardless of the Court's initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of trial. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).

A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). It "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.*

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this Court's assessment of the admissibility of the evidence. But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See* Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d

901, 907 (7th Cir. 2012). In short, Rule 401 defines relevance broadly. *See United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907.

The Court, however, may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted).

### Analysis

This motion is about evidence of grocers' preferences for the UEP Certified Program, meaning the first of Defendants' allegedly anticompetitive practices. Basically, the parties dispute who demanded the UEP Certified Program. Plaintiffs say that Defendants forced egg buyers to purchase eggs that met the Program's standards. On the flipside, Defendants say that grocers demanded the Program to meet consumer demand for humanely raised eggs. It's a chicken-and-egg problem, of sorts.

During pretrial designations, Defendants "designated over 300 exhibits and numerous deposition excerpts relating exclusively to grocers, pressure allegedly put on grocery stores by animal activists, and the grocers' involvement in purportedly requesting and approving certain

7

aspects of the UEP Certified Program." *See* Pls.' Mtn. to Exclude, at 4 (Dckt. No. 180). Defendants designated deposition testimony from sixteen grocer-related witnesses. *Id.* And their "initial exhibit list contains <u>328</u> exhibits either produced by the grocers or relating to the grocers." *Id.* at 6 (emphasis in original).

Plaintiffs seek to exclude this grocer-related evidence on two grounds. First, they argue that the evidence is irrelevant and unfairly prejudicial. *Id.* at 7–12. Second, they argue that the depositions of non-party witnesses designated under Rule 30(b)(6) of the Federal Rules of Civil Procedure are inadmissible. *Id.* at 12–15. The Court takes each argument in turn.

## I.     Relevance and Prejudice

Plaintiffs first argue that evidence of grocers' preferences for the UEP Certified Program "has nothing to do with the issues in this case." *Id.* at 7. As they see it, evidence that "the UEP Certified Program was demanded by grocers who wanted to put some type of 'animal welfare' seal on egg cartons to appease animal welfare activists" is irrelevant. *Id.*

Plaintiffs point out that, unlike the plaintiffs in the Direct Action Plaintiff trial in the MDL court, they "are not grocers, they are food manufacturers." *Id.* And unlike the grocer plaintiffs, "Plaintiffs do not purchase shell eggs and do not sell cartons of shell eggs to consumers." *Id.* So, Plaintiffs believe that the preferences for shell eggs by non-parties are irrelevant.

Defendants see things differently. In their view, evidence about the pressure from grocers "is directly relevant to the two most critical issues that the jury will decide at trial: (1) whether a conspiracy existed and (2) whether the alleged anticompetitive effects of the Certified Program substantially outweigh the Certified Program's procompetitive benefits." *See* Defs.' Resp., at 9 (Dckt. No. 194).

The Court agrees with Defendants that evidence of the grocers' preferences for eggs produced under the UEP Certified Program is squarely relevant. At the end of the day, the case is about why Defendants did what they did. So Defendants can offer evidence to explain why they did what they did.

It is hard to see how Plaintiffs could fault Defendants for adopting the UEP Certified Program, without giving Defendants a chance to explain why. If Defendants agreed to the UEP Certified Program because of grocer demand, that explanation would undercut Plaintiffs' theory that the Program was a pretext to reduce supply. The jury is entitled to hear and weigh this competing evidence.

It makes no difference that the grocers bought shell eggs, but Plaintiffs here bought egg products. Shell eggs and egg products aren't the same thing. But they're not completely different, either. Like an omelet, you can't have egg products without cracking shell eggs. And in fact, Plaintiffs' entire case is built on the assumption that there is a connection between the market for shell eggs and the market for egg products.

"Supply and demand factors affect shell eggs and egg products in very similar ways." *See* Second Am. Cplt., at ¶ 94 (Dckt. No. 73-17). When prices for shell eggs increase, so do prices for egg products because "[s]hell eggs are the key input for egg products." *Id.* "Prices for shell eggs and egg products are correlated." *Id.* at ¶ 95. So, the "[r]eduction or control of eggs supply artificially increased prices for both shell eggs and egg products." *Id.*

In the MDL court, Judge Pratter recognized the connection between the markets for shell eggs and egg products, too. The egg manufacturers moved for summary judgment on the grounds that there was no evidence linking the supply of shell eggs to the price of egg products. They argued that the plaintiffs had not demonstrated "that a reduction in the overall supply of

eggs *caused* an increase in the price of egg products." *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d at 506 (emphasis in original). In response, the grocer plaintiffs in the MDL court argued that "there was a conspiracy to reduce the total supply of eggs, which led to an increase in the price of both shell eggs and egg products." *Id.*

Judge Pratter agreed, concluding that plaintiffs had "produced evidence that allows them to argue that an overall reduction in the supply of eggs could have affected egg products prices." *Id.* at 507. So, evidence about the overall reduction in egg supply was relevant to the price of egg products.

Based on Judge Pratter's ruling, the jury in the upcoming trial will hear evidence about the supply of eggs, not merely the supply of egg products. Evidence about the supply of eggs is relevant. So evidence about why Defendants took actions that restricted the supply of eggs is relevant, too. If Defendants took those actions in response to grocer demands, then the jury can hear that explanation. The jury will decide which story to believe.

Plaintiffs also contend that "egg *products* customers were not demanding UEP certified eggs." *See* Pls.' Mtn. to Exclude, at 7–8 (Dckt. No. 180) (emphasis added). At best, Defendants intend to introduce evidence that shell egg customers – not egg *products* customers like Plaintiffs – demanded eggs produced under the UEP Certified Program. So, "[f]or this reason alone, evidence about what grocers wanted is irrelevant and inadmissible." *Id.* at 8.

It does not matter who did the lobbying. Plaintiffs' theory is that a restriction in the supply of Product A increased the price of Product B. So, Defendants can explain why they took action that affected the supply of Product A. It makes no difference if Defendants were responding to buyers of Product A or buyers of Product B.

10

Plaintiffs counter that "[j]ust because some customers wanted some aspects of the program does not justify a 100% rule imposing supply-restriction measures on all participating producers' flocks whether their customers wanted them or not." *Id.* Maybe so. But that's an argument best left for a jury. The evidence of what egg customers wanted, and how those preferences affected egg production, flies well over the low bar of relevance under the Federal Rules.

Maybe these Plaintiffs did not support the UEP Certified Program. But what matters is whether the UEP Certified Program was a conspiracy to raise prices for shell eggs and egg products. Defendants can explain why they did what they did.

Judge Pratter denied similar motions *in limine* in the MDL trials. Judge Pratter twice denied motions to exclude evidence that the defendants joined the UEP Certified Program because of customer demand. *See* 3/22/18 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1658); 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982).

In the Direct Purchaser trial, the plaintiffs moved to "exclude (1) evidence of the animal welfare benefits of the UEP Certified Program and (2) evidence of external pressures to join the UEP Certified Program." *See* 3/22/18 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1658). In response, the egg producers argued that "both pieces of evidence show that the program made good business sense, which shows it was not a pretext to decrease supply." *Id.*

Judge Pratter denied plaintiffs' motion *in limine*, noting that the plaintiffs' motion to exclude this evidence "misse[d] the mark." *Id.* "The UEP Certified Program enhances consumer welfare because it gives people eggs that they demand – namely, eggs that come from humanely-

treated chickens.  It need not decrease prices for consumers because it purportedly gave them the benefit of humanely-farmed eggs."  *Id.*

In the trial by the Direct Action Plaintiffs, the plaintiffs similarly moved to exclude evidence of the animal welfare benefits of the UEP Certified Program.  They argued that "the true purpose of the UEP Certified Program is to reduce supply, not to address the defendants' animal welfare concerns."  *See* 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982).

Again, Judge Pratter disagreed.  "The demand for, motivation behind, and actual effects of the UEP Certified Program are . . . entirely probative as to whether the Program was a pretext for an agreement to reduce supply."  *Id.*  The defendants were entitled "to present evidence that the UEP Certified Program produced a higher-quantity of higher-quality eggs, all while meeting customer demands for humanely-produced eggs."  *Id.*  The jury could "consider this evidence to determine (1) whether the Program was a pretext for a supply reduction scheme and (2) whether the Program's anticompetitive effects outweigh its procompetitive effects."  *Id.*

This Court agrees with those rulings.  Plaintiffs are pursuing a theory that "there was a conspiracy to reduce the total supply of eggs, which led to an increase in the price of both shell eggs and egg products."  *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d at 506.  In response to that theory, Defendants can present evidence that they were responding to consumer demand from buyers of shell eggs.

Plaintiffs contend that the grocer-demand arguments are pretextual, and that "pretextual justifications have no place in an antitrust case."  *See* Pls.' Mtn. to Exclude, at 12 (Dckt. No. 180) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015)). That argument begs the question.  Defendants' argument is pretextual only if Plaintiffs' theory of

the case is right. That's what the jury is here to decide. The whole point is to figure out *if* Plaintiffs' theory of the case is right.

Whether the UEP Certified Program was a pretext to reduce supply, or a response to consumer demands, is a question for the jury. If Plaintiffs will argue that the UEP Certified Program was a pretext to reduce supply, then Defendants can tell their side of the story to the jury.

Defendants also should be able to point to grocer demand for another reason. Defendants did not merely sell egg products. They also sold shell eggs. So, they may have responded to the preferences of shell-egg customers (*i.e.*, grocers).

For example, Defendant Cal-Maine never sold *any* egg products to Plaintiffs. *See* Defs.' Resp., at 2 (Dckt. No. 194). Instead, Cal-Maine's top-ten largest customers all purchased shell eggs. *Id.* Likewise, Defendant Rose Acre primarily sold shell eggs. Though "Rose Acre sold egg products, approximately 70% of its revenue came from selling shell eggs to customers like Wal-Mart, Kroger, and Publix." *Id.*; *see also id.* at 6 n.3 (listing Cal-Maine's and Rose Acre's sales of shell eggs).

So, under Plaintiffs' theory, Cal-Maine is liable because it conspired to reduce the supply of eggs writ large, and the resulting supply restriction led to higher prices for egg products. Cal-Maine therefore should be allowed to introduce evidence showing that it agreed to the UEP Certified Program because of its consumers' preferences, not as a conspiracy to restrain trade.

Evidence about the preferences of grocers passes muster under Rule 403, too. The probative value is significant. There is no prejudice, let alone unfair prejudice, in letting the jury hear why Defendants adopted the UEP Certified Program. If there is evidence that Defendants adopted animal-welfare rules in response to customer demand, the jury should hear it.

In sum, Defendants' grocer-related evidence is relevant and not unfairly prejudicial. Defendants may present it at trial.

## II.     Rule 30(b)(6) Deposition Designations of Non-Party Witnesses

Next, Plaintiffs challenge the admissibility of some of the depositions of the grocers taken under Rule 30(b)(6). They argue that the depositions are inadmissible because the Rule 30(b)(6) depositions do not satisfy the personal knowledge requirement of the Federal Rules of Evidence.

Rule 30(b)(6) permits a party to depose an organization through its representative. If a party names an organization "as the deponent" under Rule 30(b)(6), the "named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify." *See* Fed. R. Civ. P. 30(b)(6). And then, the witness will "testify about information known or reasonably available to the organization." *Id.*

Under Rule 30(b)(6), a corporation (or other business entity) testifies through a person sitting as its designee. A Rule 30(b)(6) witness is the mouthpiece for the organization. That is, a Rule 30(b)(6) witness is essentially a spokesperson for the company, and testifies in a corporate rather than personal capacity. *Id.*

Selecting the witness(es) is up to the entity who testifies. Rule 30(b)(6) expressly entitles the entity to select the representative who will testify on behalf of the company. The "named organization" who receives the deposition notice – not the party who requests the deposition – "must designate" someone to testify. *See* Rule 30(b)(6).

The entity does not have to pick the most knowledgeable person as its Rule 30(b)(6) witness. All too often, a company might have good reasons for picking someone else.

Sometimes the person who knows the most isn't the best public speaker, or isn't the most savvy witness, or isn't willing or available, and so on. The company might prefer to have someone else do the talking, and handle the give-and-take of live questioning. The company could pick the CEO, or an employee, or a retiree, or a Muppet, or anyone else – the key is to offer a spokesperson who is prepared to answer questions about specific topics on behalf of the company.

For that reason, the Rule 30(b)(6) witness does not need personal knowledge of the content of the testimony. *See PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004; *see also* 8A Charles Alan Wright *et al.*, Federal Practice and Procedure, at § 2103 (3d ed. 2023) ("There is no obligation to select a person with personal knowledge of the events in question . . . ."); 7 James W. Moore *et al.*, Moore's Federal Practice, at § 30.25 (3d ed. 2023) ("There is no requirement that the deponent have firsthand knowledge and involvement in the underlying transaction."). A Rule 30(b)(6) deposition is about collective knowledge, not personal knowledge.

The text of the rule confirms the point – the witness testifies about information "known or reasonably available to the *organization*," not the witness. *See* Fed. R. Civ. P. 30(b)(6) (emphasis added). Instead, the witness gains knowledge by preparing before the deposition, and then answers questions at deposition based on the corporate knowledge of the entity itself.

Rule 30(b)(6) lays down the ground rules for the deposition of an entity. But Rule 30(b)(6) does not govern the admissibility of Rule 30(b)(6) depositions at trial. That topic is the province of Rule 32. Rule 30 is about the taking of depositions, and Rule 32 is about the use of depositions at trial.

15

"At a hearing or trial, all or part of a deposition may be used against a party" if three "conditions" are met. *See* Fed. R. Civ. P. 32(a)(1). First, "the party was present or represented at the taking of the deposition or had reasonable notice of it." *See* Fed. R. Civ. P. 32(a)(1)(A). Second, the deposition testimony "is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." *See* Fed. R. Civ. P. 32(a)(1)(B). Third, "the use is allowed" by any provision in Rules 32(a)(2)–(8). *See* Fed. R. Civ. P. 32(a)(1)(C).

The question of admissibility is straightforward when a party wants to use the 30(b)(6) deposition of the opposing party at trial. A Rule 30(b)(6) deposition is a statement of a party opponent. *See* Fed. R. Evid. 802(d)(2). And Rule 32(a)(3) expressly allows an adverse party to "use for any purpose the deposition of a party or anyone who, when deposed, was the party's . . . designee under Rule 30(b)(6)." *See* Fed. R. Civ. P. 32(a)(3).

The issue is more complicated when a party wants to use the Rule 30(b)(6) deposition of a non-party at trial. Unlike the situation for parties, the Federal Rules include no special dispensation for Rule 30(b)(6) depositions of non-parties. The Federal Rules give the green light for using a Rule 30(b)(6) deposition of an adverse party. But at first glance, the signals are hazier when the situation involves non-parties.

That's the situation here. Defendants seek to introduce deposition testimony from the grocers' corporate representatives who testified under Rule 30(b)(6). *See* Pls.' Mtn. to Exclude, at 4–6 (Dckt. No. 180); Defs.' Resp., at 14 (Dckt. No. 194). The grocers are non-parties, so Defendants want to present their testimony by offering their Rule 30(b)(6) depositions.

The first requirement under Rule 32(a)(1) is that the other parties had an opportunity to participate in the deposition. *See* Fed. R. Civ. P. 32(a)(1)(A). That issue is a non-issue here.

Plaintiffs do not dispute that they had an opportunity to participate in the depositions of the grocers. *See* Pls.' Mtn. to Exclude, at 12–15 (Dckt. No. 180); Defs.' Resp., at 14 (Dckt. No. 194) ("Plaintiffs do not challenge the first factor . . . .").

The second requirement under Rule 32(a)(1) is about the admissibility of the depositions under the Federal Rules of Evidence. *See* Fed. R. Civ. P. 32(a)(1)(B). A party can use a deposition transcript "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." *Id.*

Rule 602 of the Federal Rules of Evidence imposes a personal knowledge requirement for trial testimony. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *See* Fed. R. Evid. 602.

Plaintiffs argue that the Rule 30(b)(6) depositions are inadmissible because they do not satisfy the personal knowledge requirement of the Federal Rules of Evidence. *See* Pls.' Mtn. to Exclude, at 13 (Dckt. No. 180). In Plaintiffs' view, when an entity's representative gives testimony under Rule 30(b)(6), "the entity is the deponent and the witness testifies about information within the knowledge of the entity." *Id.* So, the witness's "testimony is often not based on personal knowledge." *Id.*

In this district, courts seem to follow a flexible, pragmatic approach when it comes to Rule 30(b)(6) testimony at trial. Under that line of thinking, the whole point of Rule 30(b)(6) depositions is to find a corporate spokesperson who can offer the definitive position of the company. If that testimony were inadmissible (because the witness lacks personal knowledge), then much of the purpose of a Rule 30(b)(6) deposition would go down the drain. The whole point of taking a deposition is to get a transcript that parties can *use*. And using a deposition

transcript at trial is one of the main reasons for taking a deposition. Maybe it's not the only reason, but it's high on the list.

Requiring personal knowledge could inject some dissonance into the Federal Rules. It might seem a little strange if Rule 32(a)(1)(B) and Rule 602 essentially prevent parties from using at trial many of the depositions that Rule 30(b)(6) expressly authorizes.

For that reason, several courts in this district have held that "Federal Rule of Evidence 602's personal knowledge requirement does not preclude 30(b)(6) testimony that is in the nature of corporate knowledge." *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 2020 WL 10505198, at *1 (N.D. Ill. 2020) (quotation marks omitted); *see also Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("Although Plaintiff is correct that Rule 30(b)(6) by its terms refers only to depositions, courts have held that a Rule 30(b)(6) witness may testify at trial as to matters within corporate knowledge to which he testified in deposition. That is, a Rule 30(b)(6) witness may testify both in a deposition and at trial to matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602.") (cleaned up). "When it comes to using Rule 30(b)(6) depositions at trial, strictly imposing the personal knowledge requirement would only recreate the problems that Rule 30(b)(6) was created to solve." *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011).

That conclusion is not a complete outlier. Other courts across the country have held that Rule 602's personal knowledge requirement does not apply to Rule 30(b)(6) depositions because the whole point is to elicit corporate knowledge. *See, e.g.*, *Russell v. Walmart, Inc.*, 2023 WL 2628699, at *13 (C.D. Cal. 2023) ("The Court also briefly addresses the personal knowledge requirement given the issue was discussed at length in Walmart's Opposition. The Court

18

acknowledges the split in authority as to whether a corporate witness must have personal knowledge of the topics he or she will testify to at trial.  This Court tends to agree with the courts that have concluded that strictly imposing the personal knowledge requirement would only recreate the problems that Rule 30(b)(6) was created to solve, by allowing a corporation to designate particular individuals that can testify to a wide range of topics.") (cleaned up); *Abbott Lab'ys v. Feinberg*, 2020 WL 7706571, at *2 (S.D.N.Y. 2020) (permitting a Rule 30(b)(6) witness "to testify on direct and cross-examination as to matters within corporate knowledge to which she testified at deposition"); *Sherwin-Williams Co. v. PPG Indus., Inc.*, 2020 WL 6803077, at *4 (W.D. Pa. 2020) ("The court is persuaded that the better rule, in the corporate setting, is that the personal knowledge requirement set forth in Federal Rule of Evidence 602 does not require first-hand observation or experience with respect to a corporate entity."); *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 2014 WL 4829173, at *6 (W.D. Wis. 2014) (permitting Rule 30(b)(6) testimony because "[t]he dates on which Intel made certain products publicly available and the publication date of one of its product handbooks are matters known by Intel or reasonably available to it").

There is something to be said for that line of thinking.  Even so, the stronger current of the case law flows in the other direction.  Most courts across the country have concluded that the personal knowledge requirement of Rule 602 applies to all trial testimony, including depositions under Rule 30(b)(6).  *See, e.g.*, *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) ("Federal Rule of Civil Procedure 30(b)(6) allows corporate representatives to testify to matters within the corporation's knowledge during deposition, and Rule 32(a)(3) permits an *adverse* party to use that deposition testimony during trial.  However, a corporate representative may not testify to matters outside his own personal knowledge to the

extent that information is hearsay not falling within one of the authorized exceptions.")[1]
(emphasis in original) (cleaned up); *Antero Res. Corp. v. C&R Downhole Drilling, Inc.*, 2019
WL 13193894, at *3 (N.D. Tex. 2019) ("Judges in this district and elsewhere have therefore
interpreted *Union Pump* to mean that while Rule 30(b)(6) permits a corporate witness'
deposition testimony to be based on matters outside his personal knowledge, Rule 602 limits his
trial testimony to matters that are within his personal knowledge.") (cleaned up); *FTC v. Vyera
Pharms., LLC*, 2021 WL 5300019, at *1–2 (S.D.N.Y. 2021) ("This personal knowledge
requirement extends to Rule 30(b)(6) trial testimony when the corporation that responded to the
Rule 30(b)(6) subpoena is not a party at the trial. . . . Unless the deponents were competent to
testify about the matters discussed in the designations based on their personal knowledge, the
designated portions must be stricken."); *Liquid Cap. Exch., Inc. v. BDC Grp., Inc.*, 2022 WL
18583841, at *8 (N.D. Iowa 2022) ("As a preliminary matter, the Court rejects plaintiff's
argument that Thompson-So did not need personal knowledge of the facts he testified about.");
*Hipwell v. Air & Liquid Sys. Corp.*, 2022 WL 3999955, at *5 (D. Utah 2022) ("Thus, a corporate
representative may not testify to matters outside his own personal knowledge to the extent that
information is hearsay not falling within one of the authorized exceptions.") (cleaned up);
*IOENGINE, LLC v. PayPal Holdings, Inc.*, 2022 WL 2800911, at *5 (D. Del. 2022) ("Ingenico
and PayPal argue that because Mr. Sobol was deposed as WD's Rule 30(b)(6) witness, he need
not have personal knowledge of the facts on which he gives testimony.  That is true for
depositions, but at trial, a non-party 30(b)(6) witness must have personal knowledge of matters

---

[1] The Fifth Circuit used some sweeping language in the often-cited *Brazos River.  See Brazos River Auth.
v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006); *see also Whitehouse Hotel Ltd. P'Ship v. C.I.R.*, 615
F.3d 321, 342 (5th Cir. 2010).  But in *Union Pump*, the Fifth Circuit appears to have walked it back, and
confined *Brazos River* to cases involving parties.  *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F.
App'x 899, 907–08 (5th Cir. 2010).

about which he testifies, as required by Federal Rule of Evidence 602."); *Waldrop v. Johnson City*, 2022 WL 20439383, at *2 (E.D. Tenn. 2022) ("The Court will limit the testimony of Defendant's employees and officers to matters about which they have personal knowledge, including matters specifically covered during a given witness's Rule 30(b)(6) deposition, and other matters that are not based on personal knowledge to the extent that they are otherwise admissible pursuant to a hearsay exception."); *City of Huntington v. AmerisourceBergen Drug Corp.*, 2022 WL 468183, at *3 (S.D. W. Va. 2022) ("The fact that a witness will testify in a Rule 30(b)(6) capacity does not obviate Rule 602's requirement that the witness have personal knowledge of the subject matter of his testimony."); *In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*, 575 F. Supp. 3d 924, 939 (S.D. Ohio 2021) ("Federal Rule of Evidence 602 provides that witnesses may only testify regarding matters of which they have personal knowledge.  This rule extends to Federal Rule of Civil Procedure 30(b)(6) designees . . . .") (citation omitted); *In re RFC & RESCAP Liquidating Tr. Action*, 2020 WL 504661, at *6 (D. Minn. 2020) ("Thus, notwithstanding that Plaintiff produced Ms. Farley in response to a Rule 30(b)(6) notice, Ms. Farley's testimony at trial will still have to comply with the Rules of Evidence in order to be admitted.  To the extent that such information is within Ms. Farley's knowledge, the Court will not exclude her from testifying."); *Brooks v. Caterpillar Glob. Mining Am., LLC*, 2017 WL 3426043, at *5 (W.D. Ky. 2017) ("Thus, contrary to Defendant's argument, Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement.  Based on this case law, to the extent that such information is based on Klein's personal knowledge and not on hearsay, or to the extent that an exception to the hearsay rule applies, the testimony will be admissible."); *Stryker Corp. v. Ridgeway*, 2016 WL 6585007, at *3 (W.D. Mich. 2016) ("Accordingly, to the extent that Blouin's testimony is based not on her

personal knowledge, but instead on hearsay not falling within one of the authorized exceptions, the testimony will be inadmissible at trial. To the extent that Stryker can establish that Blouin's testimony is based on personal knowledge and not on hearsay, or that an exception to the hearsay rule applies, the testimony will be admissible."); *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, 2014 WL 4983912, at *3 (M.D. Fla. 2014) ("While Rule 30(b)(6) permits Newman's deposition testimony to be based on matters outside his personal knowledge, Rule 602 limits his trial testimony to matters that are within his personal knowledge. . . . Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement."); *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 72 F. Supp. 3d 131, 146 (D.D.C. 2014) (holding that a party "may not offer the live testimony of [a Rule 30(b)(6) witness] on any matter for which he lacks personal knowledge").

Based on the text of the Federal Rules, it is hard to avoid the conclusion that the personal knowledge requirement applies to all depositions used at trial, including Rule 30(b)(6) depositions of non-parties. Rule 32(a)(1) imposes "conditions" on the "use[]" of a deposition at a "hearing or trial." *See* Fed. R. Civ. P. 32(a)(1). One of the conditions is that the deposition must be "admissible under the Federal Rules of Evidence." *See* Fed. R. Civ. P. 32(a)(1)(B).

Rule 602 of the Federal Rules of Evidence imposes a personal knowledge requirement for a "witness." *See* Fed. R. Evid. 602. "A witness may testify to a matter *only if* evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Id.* (emphasis added). The text includes only one exception – for expert witnesses. *Id.* Similarly, Rule 32(a)(3) gives special treatment for Rule 30(b)(6) depositions of adverse *parties*, but includes no comparable accommodation for Rule 30(b)(6) depositions of *non-parties*. *See* Fed. R. Evid. 32(a)(3).

22

The drafters of the Federal Rules knew how to treat certain kinds of witnesses and certain kinds of depositions differently. Rule 602 treats expert witnesses differently than fact witnesses. And Rule 32(a)(3) treats Rule 30(b)(6) depositions of adverse parties differently than other depositions, too. But the Federal Rules do not include any express lane for Rule 30(b)(6) depositions of non-parties when the witness lacks personal knowledge.

At the end of the day, courts seem to differ on which rule is the highest in the pecking order. Which rule provides the default rule? Under one reading, Rule 30(b)(6) expressly authorizes depositions based on corporate knowledge, so that rule implicitly carves an exception to the personal knowledge requirement of Rule 602. Under the other reading, Rule 602 imposes a baseline requirement for all trial testimony, and Rule 30(b)(6) testimony must satisfy that requirement like any other testimony. Which rule bows to the other?

This Court concludes that Rule 30(b)(6) must yield to Rule 602. Again, Rule 30(b)(6) is about the *taking* of depositions, but does not govern the *use* of depositions. That's the domain of Rule 32. Rule 32(a)(1)(B), in turn, requires depositions to pass muster under the Federal Rules of Evidence. And Rule 602 requires all trial witnesses to have personal knowledge. So, putting it all together, Rule 602 rules the roost.

A Rule 30(b)(6) deposition of a non-party is inadmissible at trial unless the witness had personal knowledge of the subject matter. From a practical perspective, that conclusion might undermine some of the value of a Rule 30(b)(6) deposition. And it can create chaos for parties who want to get their hands on definitive testimony from a third party that they can actually use at trial.

The text of the Federal Rules seems in tension with one of the animating purposes of Rule 30(b)(6). It creates practical problems, too. After all, what is a party supposed to do if that

party wants to use a Rule 30(b)(6) deposition at trial, and a third party offers a Rule 30(b)(6) witness who lacks personal knowledge? Is that party supposed to depose someone *else* from that company, too, even though the Rule 30(b)(6) witness from that company already gave definitive testimony? (Good luck convincing the third party to voluntarily produce *another* witness, after a Rule 30(b)(6) deposition.)

Rule 30(b)(6) is designed to elicit authoritative testimony on behalf of an organization, without taking scores of depositions. But if Rule 602 requires personal knowledge for trial testimony – even though Rule 30(b)(6) does not require personal knowledge for deposition testimony – then the deposing party might get its hands on a transcript that is useless at trial. It could put pressure on that party to take yet another deposition, to obtain admissible testimony. It is hard to square that conclusion with one of the purposes of Rule 30(b)(6): avoiding unnecessary depositions and obtaining definitive testimony that a party can take to the bank (and the courtroom).

Even so, the situation may not be as bleak as it sounds. Corporate knowledge and personal knowledge are not mutually exclusive. The circles of knowledge can overlap. A company could designate as its Rule 30(b)(6) witness a person who has lots of personal knowledge about a given topic. A corporate spokesperson can know what he or she is talking about, personally.

As a practical matter, that's what companies often do. After all, preparing a Rule 30(b)(6) witness for deposition is a daunting task. It is a whole lot easier to prepare a witness who knows something about the topic than it is to prepare someone who is starting from scratch.

There is a significant risk in offering a witness who doesn't know much, too. An uninformed witness is more likely to give bad answers. And offering a witness with no personal

24

knowledge creates a risk that the party taking the deposition will cry foul, and press for a do-over with a more knowledgeable witness (or worse, sanctions).

What's more, in certain situations, a witness could gain personal knowledge when preparing for the Rule 30(b)(6) deposition. What matters is the knowledge of the witness at the time of the testimony. And a witness could gain knowledge between receiving the Rule 30(b)(6) deposition notice and sitting down for testimony. A good example might be testifying about the company's policies and procedures – a witness might be able to learn them when preparing for the deposition, even if the witness had no personal knowledge beforehand.

Many courts have recognized that a Rule 30(b)(6) witness can gain personal knowledge when preparing for the deposition, and thus satisfy the Rule 602 requirement for personal knowledge through that route. "[I]f in preparing for his or her Rule 30(b)(6) deposition, a witness gained personal knowledge which would not require them to rely upon hearsay, the witness would be permitted to testify regarding such matters." *Waldrop v. Johnson City*, 2022 WL 20439383, at *2 (E.D. Tenn. 2022); *see also Corcoran v. CVS Pharmacy, Inc.*, 2021 WL 633809, at *7 (N.D. Cal. 2021) ("It is this Court's view that persons who have been designated to testify on behalf of the corporation may be examined on specifically articulated topics whether the representative obtained the information by personal experience or upon investigation in their corporate capacity.").

"There is . . . nothing in Rule 602 that dictates how a witness may acquire personal knowledge." *City of Huntington v. AmerisourceBergen Drug Corp.*, 2022 WL 468183, at *3 (S.D. W. Va. 2022); *see also id.* at *5 ("In this case, Prevoznik spent more than 100 hours over a four-month period preparing for his deposition. In so doing, talked to more than 30 people and spent more than 50 hours reviewing documents. Prevoznik's personal knowledge appears to be

25

the result of compiling and assimilating information he gleaned from many sources and there is nothing before the court to suggest that he is merely repeating (without attribution) a statement made wholesale to him by another.") (cleaned up); *In re RFC & RESCAP Liquidating Tr. Action*, 2020 WL 504661, at *6 (D. Minn. 2020) ("Indeed, 'personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry practice, is a sufficient foundation for lay opinion testimony.'") (cleaned up) (quoting *Quest Corp. v. City of Santa Fe*, 2013 WL 12239494, at *1 (D.N.M. 2013)).

All of this is a long way of making a simple point. The Court agrees that a Rule 30(b)(6) deposition of a non-party is inadmissible at trial unless the witness had personal knowledge. That's what Rule 602 of the Federal Rules of Evidence requires.

That conclusion might create practical problems. And it might not be intuitive given that the purpose of Rule 30(b)(6) is to elicit corporate knowledge, not personal knowledge. But it does serve an overriding purpose: it promotes the truth-seeking function of litigation by ensuring that people who testify at trial know what they're talking about.

Even so, this Court cannot draw bright lines when it comes to the Rule 30(b)(6) depositions of the grocers. Maybe the witnesses had personal knowledge about the substance of their testimony. Or maybe not. Time will tell.

The Court will need to hear more from the parties. The Court will address the testimony on a case-by-case, witness-by-witness basis. And the party offering the Rule 30(b)(6) depositions must carry the burden of showing that the deponents had personal knowledge.

The third and final requirement under Rule 32(a)(1) is the need to satisfy one of the uses "allowed by Rule 32(a)(2) through (8)." *See* Fed. R. Civ. P. 32(a)(1)(C). Plaintiffs argue only that the deposition testimony does not fall within Rule 32(a)(3) for deposition testimony of an

adverse party's officer, director, managing agent, or designee. *See* Pls.' Mtn. to Exclude, at 14–15 (Dckt. No. 180).

It is true that Defendants' designated deposition testimony does not fall under Rule 32(a)(3). The grocers' representatives were not the Plaintiffs' "officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." *See* Fed. R. Civ. P. 32(a)(3).

Defendants point to Rule 32(a)(4), which permits a party to "use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." *See* Fed. R. Civ. P. 32(a)(4)(B); *see also* Defs.' Resp., at 14 n.8 (Dckt. No. 194).

Defendants contend that the Rule 30(b)(6) deponents "all easily meet the unavailability requirement." *See* Defs.' Resp., at 14 n.8 (Dckt. No. 194). For example, the six deponents challenged by Plaintiffs live in California, Colorado, Pennsylvania, Idaho, Virginia, and New Jersey. *Id.* So, no matter how you slice it, they live more than 100 miles from the Dirksen Federal Building.

The grocer deponents live more than 100 miles away. They are unavailable for purposes of Rule 32(a)(4). So Defendants appear to have satisfied the third requirement.

In sum, the Court concludes that the grocers' Rule 30(b)(6) deposition testimony is admissible under Rule 32(a)(1), if the witness had personal knowledge. The Court will rule on the admissibility of the Rule 30(b)(6) depositions on a deposition-by-deposition, line-by-line basis as necessary.

**Conclusion**

For the foregoing reasons, the Court denies in part Plaintiffs' motion *in limine* to exclude evidence regarding grocers and certain Rule 30(b)(6) witness testimony (Dckt. No. 180). The evidence is relevant and not prejudicial, but the Court reserves a ruling on the admissibility of any particular deposition transcript.

Date:   August 31, 2023       _____

Steven C. Seeger
United States District Judge