**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

The Court grants in part and denies in part Plaintiffs' motion *in limine* to exclude evidence about state statutes enacted after 2008 (Dckt. No. 174). The admissibility of evidence about state statutes enacted after 2008 depends in large part on the purpose for offering the evidence.

The parties may offer evidence of post-2008 state statutes to prove or disprove Plaintiffs' antitrust injury or damages. But Defendants may not offer the post-2008 state statutes as evidence that their pre-2008 adoption of the UEP Certified Program was not pretextual. Decisions by state legislatures after 2008 do not shed much light on why Defendants did what they did before 2008.

**Background**

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. They're big egg buyers.

Plaintiffs allege that Defendants United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

The Court has summarized the procedural history and Plaintiffs' allegations in greater depth in its Orders resolving other pretrial motions. *See, e.g.*, 8/21/23 Mem. Opin. & Order, at 2–5 (Dckt. No. 277); 8/11/23 Mem. Order & Order, at 2–9 (Dckt. No. 272). So, the Court will be brief.

The second amended complaint alleges that Defendants conspired to limit the supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). For the motion at hand, the timing is especially important. Plaintiffs allege that the conspiracy ended in 2008. But the effects of the conspiracy lasted until 2012.

Plaintiffs allege that Defendants agreed to limit egg supply through three anticompetitive practices. One of those practices involved the size of enclosures for hens, ostensibly for animal-welfare reasons.

Defendants allegedly agreed to adopt animal-welfare guidelines (known as the UEP Certified Program) that increased the size of the enclosures housing egg-laying hens. *Id.* at ¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

During the two trials held in the MDL court, the defendants introduced evidence of state animal-welfare laws enacted after 2008 that adopted aspects of the UEP Certified Program. Both sets of plaintiffs filed motions *in limine* to exclude "any reference to state laws enacted after 2008 that adopt the UEP Guidelines on Animal Husbandry, UEP Certified Program, or similar requirements." *See* 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1981); *see also* 3/29/18 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1672) ("The DPPs argue that the existence of state laws enacted after the conspiracy period should be excluded as irrelevant and prejudicial . . . .").

Judge Pratter denied both motions. She found that evidence of state laws enacted after 2008 was relevant for two reasons.

First, "[w]hile the mere existence of the laws may not be relevant to the [plaintiffs'] prima facie case, the laws are relevant to the defendants' claim that they created this animal welfare program under intense outside pressure from animal rights groups. In that type of environment, it could possibly make sense for companies to coordinate some kind of 'self-legislation' rather than wait for lawmakers to do so. These laws then could be evidence of the supposed pressure that animal rights groups were applying to egg producers and lawmakers regarding hen welfare." *See* 3/29/18 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1672); *see also* 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1981) ("The defendants intend to argue that they were under intense pressure from animal welfare groups and undertook the animal welfare guidelines as a way to combat that pressure. These later-enacted laws may be probative on that point.").

Judge Pratter recognized that evidence of the state laws might support multiple inferences. So, plaintiffs would "be well within their right to counter-argue that the laws are solely the result of the defendants' own lobbying efforts." *See* 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1981). But the jury would decide "which side to believe and how much they believe." *Id.*

Second, evidence of post-2008 state laws was relevant to the testimony of the plaintiffs' economics experts. The experts opined that the conspiracy reduced the supply of eggs. *See In re Processed Eggs Antitrust Litig.*, 392 F. Supp. 3d 498, 504 (E.D. Pa. 2019) ("Dr. Baye concluded that the conspiracy – in particular, the cage-size restrictions and ban on backfilling – was statistically significant in reducing the overall flock size and egg production.").

To reach this conclusion, the experts needed to control for *other* factors that reduced the supply of eggs. *Id.* That is, other factors might have caused a reduction in egg supply, too. The experts needed to account for those factors, so that the alleged conspiracy was not to blame for a reduction in supply caused by something else. State laws were one such factor, because state laws might have reduced the supply of eggs.

For example, in the Direct Action Plaintiff trial, the plaintiffs offered the analysis of their expert, Dr. Baye (he is Plaintiffs' expert in this case, too). They argued that Dr. Baye "adequately controlled for the impact of state laws in his analysis." *Id.* The defendants disagreed.

"To attack his modeling," Judge Pratter permitted the defendants to discuss whether Dr. Baye "disentangled the production effects of the alleged conspiracy from these laws in several states." *See* 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019)

4

(Dckt. No. 1981). To do so, the defendants needed to introduce evidence of the state laws, including what they enacted, and when.

Judge Pratter concluded that "[t]he probative value in evaluating the defendants' alleged response to animal welfare groups and the legitimacy of Dr. Baye's analysis is not outweighed by any danger of unfair prejudice, confusing the issues, or misleading the jury." *Id.*

Following in the footsteps of the plaintiffs in the MDL court, Plaintiffs in the case at hand moved to exclude evidence of laws enacted after 2008 when it comes to liability. *See* Pls.' Mtn. to Exclude State Laws (Dckt. No. 174). Defendants oppose the motion. *See* Defs.' Resp. (Dckt. No. 193).

## Legal Standard

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Regardless of the Court's

initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of trial. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).

A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). It "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.*

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this Court's assessment of the admissibility of the evidence. But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See* Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). In short, Rule 401 defines relevance broadly. *See United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907.

The Court, however, may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice."

*Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted).

### Analysis

This motion is about a specific type of post-2008 evidence: state animal-welfare laws passed after 2008.[1] Basically, after 2008, some states enacted animal-welfare laws setting ground rules for raising hens. In doing so, the state legislatures took a page out of UEP's book.

Some of the laws expressly required producers to comply with the UEP Certified Program. *See, e.g.*, Ariz. Admin. Code § R3-2-907(A)–(B) (2009) ("All egg-laying hens in this state shall be raised according to United Egg Producers Animal Husbandry Guidelines. . . . All eggs sold in this state produced by hens shall be from hens raised according to the United Egg Producers Animal Husbandry Guidelines."); *see also* Defs.' Resp., at 5 (Dckt. No. 193) (collecting statutes); Pls.' Mtn. to Exclude State Laws, at 1 (Dckt. No. 174) (same).

Plaintiffs seek to exclude evidence of post-2008 state laws "when offered to refute claims that Defendants are liable for their conspiracy to raise the price of eggs." *See* Pls.' Mtn. to Exclude State Laws, at 1 (Dckt. No. 174). In their view, "the enactment of any such laws is not relevant to whether Defendants are liable for their conspiracy to restrict the number of laying hens and thus increase the price of eggs, which was firmly in place by 2008." *Id.*

---

[1] The Court notes that the evidence at issue in this motion is also part of Plaintiffs' motion *in limine* to exclude liability evidence after 2008. *See* Pls.' Mtn. to Exclude Evidence After 2008, at 14–15 (Dckt. No. 173); *see also* Defs.' Resp. to Pls.' Mtn. to Exclude Evidence After 2008, at 1 (Dckt. No. 195) ("In three separate, duplicative motions *in limine*, Plaintiffs ask this Court to exclude large swathes of Defendants' post-2008 evidence.") (footnote omitted). The Court will rule on that motion by separate Order.

The Court starts with a point of (relative) agreement between the parties. Plaintiffs concede that evidence of state laws enacted after 2008 is relevant to questions about antitrust injury and damages. *Id.* at 8–9. And in particular, it is relevant when cross-examining their expert.

"To state a claim for relief under § 1, a plaintiff must show the following three prongs: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021).

This Court recently bifurcated the trial. The first stage will cover liability (including antitrust injury), and the second stage will cover the amount of damages (if necessary). *See* 8/11/23 Mem. Opin. & Order, at 18 (Dckt. No. 272).

Plaintiffs allege that the conspiracy ended in 2008, and they seek damages through December 2012. *Id.* at 8–9; *see also* Pls.' Mtn. to Exclude State Laws, at 9 (Dckt. No. 174) (noting that "Dr. Baye ended his analysis in 2012"); 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1981).

Plaintiffs offer Dr. Baye to prove that the alleged conspiracy caused an injury and damages. So, Dr. Baye will need to account for other factors that might have caused a supply restriction and increased prices, including state laws enacted after 2008. *See* Pls.' Mtn. to Exclude State Laws, at 9 (Dckt. No. 174) ("Plaintiffs believe any attempt to cross-examine Dr. Baye on the later-enacted State laws will be ineffective as Dr. Baye properly controlled for any later-enacted laws.").

Plaintiffs acknowledge that evidence about post-2008 state laws may be relevant to questions about antitrust injury and damages. They concede that Defendants could use

8

post-2008 state laws as fodder to cross-examine Dr. Baye. "Plaintiffs do not at this time move in limine to exclude any use of the State laws for purposes of cross-examining Plaintiffs' economics expert, Dr. Michael R. Baye." *Id.* at 9. That is, "Plaintiffs do not seek a categorical bar on evidence concerning post-2008 laws for all purposes." *Id.* at 10.

Defendants agree that evidence about post-2008 state laws is relevant to Dr. Baye's analysis. "Although Plaintiffs assert that Dr. Baye adequately controlled for the impact of all of the state laws that were passed, Defendants are entitled to both test and refute this claim. Defendants will contend, for example, that Dr. Baye's model fails to disentangle the alleged conspiracy's production effects from the effects of state animal welfare laws." *See* Defs.' Resp., at 11 (Dckt. No. 193).

The Court agrees with the parties. State laws adopted after 2008 could have caused supply restrictions and thus impacted prices. It is fair game to cross-examine Plaintiffs' expert and probe whether he adequately took that possibility into account. Evidence about the legal landscape after 2008 has a bearing on whether Plaintiffs suffered an antitrust injury, and if so, the extent of that injury (*i.e.*, the amount of damages).

In a nutshell, state laws after 2008 might have reduced egg supply. Any reduction in supply caused by the state laws should not be attributed to the alleged conspiracy.

Later, at the damages phase of the trial (if any), Plaintiff would have the burden to prove the *amount* of damages. *Id.* So, Dr. Baye's model and conclusions would become relevant again.

At both phases of the trial, the parties may introduce evidence of state laws that affected the supply of eggs. Those laws might be relevant to whether Plaintiffs suffered an injury, and if so, the amount of damages.

Plaintiffs concede that Defendants should be permitted to introduce evidence of state laws enacted after 2008 to cross-examine Dr. Baye. But they propose that the Court vet any evidence before it is introduced.

"Plaintiffs request that before Defendants challenge Dr. Baye's analysis using later-enacted laws, Defendants must first identify the laws that they assert were effective during Dr. Baye's damages period so the Court can decide before the evidence is presented to the jury that the State law was even applicable during the Damage Period." *See* Pls.' Mtn. to Exclude State Laws, at 9 (Dckt. No. 174). "Next, the Court should conduct a voir dire outside of the presence of the jury to decide whether Dr. Baye controlled for the impact of the laws." *Id.* at 9–10. Only if the Court determines that "Dr. Baye did not address the impact of the State laws" should it permit Defendants to introduce the evidence. *Id.* at 10.

The Court declines the invitation to preemptively review and preclear evidence about post-2008 state laws. The Court is not wild about pre-vetting lines of cross-examination at this level of granularity (for this issue, anyway). The line of questioning is not particularly prejudicial or explosive. If this Court got into the habit of preclearing cross-examinations generally, the trial could last longer than the alleged conspiracy (or it might feel like it, anyway).

Moreover, Plaintiffs' proposed voir dire method may impermissibly put the Court in the jury's shoes. Deciding "whether Dr. Baye controlled for the impact of the laws" is a question for the jury. *Id.* at 9–10. The jury will decide whether Dr. Baye's model adequately controlled for relevant factors, like state laws. "An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–66 (7th Cir. 2013).

To be sure, the Court can exclude evidence (or end a line of questioning) about an irrelevant or prejudicial matter. If Defendants bring up irrelevant state laws, the Court could exclude that evidence. Plaintiffs are free to object at trial to the introduction of state-law evidence. The Court will reserve judgment on statute-specific issues or objections. The Court declines to preemptively adopt a special procedure for the admission of state-law evidence about injury or damages.

The Court moves to the meatier bone of contention. Basically, Plaintiffs argue that evidence of state laws enacted after 2008 does not inform why Defendants agreed to the UEP Certified Program. Defendants counter that the post-2008 state laws show that their decision to adopt the Program was not pretextual.

Plaintiffs argue that evidence of state laws enacted after 2008 is not relevant to determining whether Defendants conspired to restrain trade. "Evidence concerning later-enacted state laws adopting the UEP Guidelines or Certification, or similar provisions, has no bearing on whether Defendants' conduct years earlier, beginning in 1998, violated the Sherman Act." *See* Pls.' Mtn. to Exclude State Laws, at 4 (Dckt. No. 174).

In Plaintiffs' view, "[t]he conspiracy was fully formed by 2006, if not earlier. There are no overt acts after 2008 alleged in the complaint." *Id.* at 5. So, "[n]one of the laws or regulations at issue can justify or explain conduct that took place before the statutes were passed." *Id.*

Defendants contend that they do *not* want to introduce evidence of the state laws "to prove that the UEP Certified Program is *per se* lawful." *See* Defs.' Resp., at 3 (Dckt. No. 193). Instead, they believe that "evidence regarding state laws enacted after 2008 that dictate animal welfare guidelines demonstrate the type of pressure faced by supermarkets and producers that led

11

to the creation of, and the participation in, the Certified Program." *Id.* They also contend that the evidence is "relevant to showing that the Certified Program is reasonable under a Rule of Reason analysis." *Id.*

Defendants argue that "[t]he enactment of state laws requiring egg producers to comply with the UEP Guidelines or provide greater space per hen undermines Plaintiffs' allegations that Defendants entered into . . . a conspiracy" to restrain trade. *Id.* at 6. As they see it, the state laws are probative evidence of the demand for animal-welfare guidelines. *Id.* And "although they went into effect after 2008, [the laws] were being introduced, discussed, debated, and lobbied a few years before their enactment." *Id.*

The Court begins by noting that evidence of pressure to adopt animal-welfare guidelines *during the time the conspiracy was allegedly in effect* is relevant. The Court has already ruled that Defendants may introduce evidence of grocer demand for the UEP Certified Program to prove that the Program was not pretextual. *See* 8/31/23 Mem. Opin. & Order (Dckt. No. 285). Other evidence – like pressure put on state legislatures by animal-welfare groups – might also shed light on that issue. Defendants can explain why they did what they did.

For example, evidence about public pressure – and the responses by state legislatures – is relevant to why Defendant adopted the UEP Certified Program. That evidence could support Defendants' theory that they received pressure to adopt the UEP Certified Program based on animal-welfare concerns. But the evidence must be *contemporaneous*. That is, the evidence must be about pressure from advocacy groups during the alleged conspiracy.

Maybe animal-welfare groups were putting pressure on state legislatures to adopt laws for better chicken coops – better pens for hens. Maybe there was buzz about the need to improve the conditions for hens. If so, a groundswell of support might help to explain why Defendants

12

did what they did. It could support the argument that Defendants did not make up animal-welfare concerns out of thin air.

The jury could weigh the evidence, and decide for itself what motivated the Defendants. Did they adopt the UEP Certified Program because they were concerned about the lives and deaths of chickens, like other people? Or, was it all a ruse about the roost to restrict supply for anticompetitive reasons? The jury can figure it out.

So, the parties can present evidence of information in the public domain and in public discourse about animal welfare during the time of the alleged conspiracy, meaning 2008 and earlier. If state legislatures were considering adopting laws to improve the conditions for hens, those debates are relevant. Evidence of contemporaneous debates about animal welfare is relevant to why Defendants adopted the Program.

That said, the passage of laws *after* the end of the alleged conspiracy does not seem especially probative. On this point, the Court respectfully sees things differently than Judge Pratter.

The enactment of state statutes *after* 2008 does not inform whether Defendants adopted the UEP Certified Program for pretextual reasons *before* 2008. The post-2008 passage of state statutes similar to the UEP Certified Program has limited probative value. The passage of the statutes, after the conspiracy ended, does not inform whether the UEP Certified Program was a pretext to reduce the supply of eggs. Actions by a third party tomorrow don't explain why a party did something yesterday.

The passage of state laws after 2008 does not inform why Defendants agreed to the UEP Certified Program before 2008. Even if the state legislatures adopted the same program, it does

13

not matter. After-the-fact actions by someone else do not shed light on why Defendants did what they did years earlier.

Maybe the state legislatures enacted the UEP Certified Program to help chickens. But that reality would not mean that Defendants adopted the UEP Certified Program to help chickens. The motivations of the state legislatures could be different than the motivations of the Defendants, even if they adopted the same proposals. The fact that state legislatures passed a restriction does not mean that Defendants agreed to the same restriction for legitimate reasons.

State legislatures aren't bound by the same rules as private parties, either. State laws could restrict supply to increase egg prices, if that's what state legislators want to do.

Consider, for example, car dealerships. Car dealers could not agree among themselves to close all dealerships on Sundays. But state legislatures could impose that rule – in fact, they could do so to increase profits for dealerships. A supply restriction to increase profits is permissible if imposed by the state, but impermissible if agreed to by private parties. State legislatures can take action for reasons that would be impermissible if done by industry participants.

At the end of the day, the jury must decide why Defendants adopted the UEP Certified Program before 2008. The enactment of state laws after 2008 has little probative value when deciding that question. State laws after 2008 involve a different group of people (legislators vs. egg producers) at a different time (post-2008 vs. pre-2008). Legislatures are not bound by the same restrictions as private parties.

The probative value seems slight. And introducing evidence of post-2008 state laws would come at a price, too. It could confuse and mislead the jury. State laws adopting portions of the UEP Certified Program could mislead the jury into believing that Defendants' actions

14

were legitimate because they would later be required by law. The jury may believe that Defendants' actions were above board because state legislatures took the same action years later.

The question for the jury is not whether the conduct passed muster under state law. It will be complicated enough to help the jury understand that evidence of state laws is admissible for a limited purpose only (*i.e.*, to evaluate the expert's conclusions about antitrust injury and damages).

Likewise, introducing the state statutes could bog the trial down in the minutiae of state law. The exact animal-welfare rules adopted by state legislatures are not relevant to Defendants' liability. Introducing the state statutes risks mini trials over the contents and efficacy of specific state statues, none of which is relevant to Defendants' liability.

The Court recognizes that this ruling creates some practical challenges. Evidence of state statues enacted after 2008 is relevant to Plaintiffs' injury and damages, but not to whether Defendants conspired to restrict the supply of eggs. So, the evidence is admissible only for some purposes. The limited admissibility of the evidence means that the Court must instruct the jury on the proper role of the evidence.

In sum, evidence of state statutes enacted after 2008 is admissible to resolve issues of antitrust injury and damages (or the lack thereof). But evidence of post-2008 state laws is not admissible to show that Defendants did not engage in anticompetitive behavior pre-2008 by adopting the UEP Certified Program. The Court will work with the parties to craft an appropriate limiting instruction for trial.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion *in limine* to exclude evidence of state laws enacted after 2008 (Dckt. No. 174).

Date:   August 31, 2023

_____

Steven C. Seeger
United States District Judge