UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED EGG PRODUCERS, INC., *et al.*, ) <br> ) <br> Defendants. ) <br> _____) | Case No. 11-cv-8808 <br><br> Hon. Steven C. Seeger |

## MEMORANDUM OPINION AND ORDER

Plaintiffs' motion *in limine* to exclude evidence about the November 2011 Sparboe Farms news segment (Dckt. No. 175) is hereby granted in part and denied in part. The Court agrees with Plaintiffs that evidence about animal abuse at Sparboe Farms (a former defendant) in 2011 – three years after the alleged conspiracy ended in 2008 – is irrelevant and unduly prejudicial, at least in the abstract.

That said, the Court also agrees with Defendants that this evidence *might* become relevant if Plaintiffs open the door. Plaintiffs might seek to introduce evidence that Sparboe Farms originally believed in 2003 that the UEP Certified Program was a conspiracy to restrain trade. If Plaintiffs offer evidence that Sparboe Farms thought that the UEP Certified Program was a conspiracy (and if it is admitted), then Defendants potentially could respond with evidence that Sparboe Farms later thought that the UEP Certified Program was not a conspiracy. And then, the jury could hear a high-level explanation of why, without hearing and seeing the details of the alleged abuse of chickens.

**Background**

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc., are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. They're big egg buyers.

Plaintiffs allege that Defendants United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

The Court has summarized the procedural history and Plaintiffs' allegations in more depth in its Orders resolving other pretrial motions. *See, e.g.*, 8/21/23 Mem. Opin. & Order, at 2–5 (Dckt. No. 277); 8/11/23 Mem. Order & Order, at 2–9 (Dckt. No. 272). So, the Court will be brief.

The second amended complaint alleges that Defendants conspired to limit the supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). Specifically, Plaintiffs alleged that Defendants agreed to limit egg supply through three anticompetitive practices.

Relevant here, Defendants allegedly agreed to adopt animal-welfare guidelines (known as the UEP Certified Program) that increased the size of the enclosures housing egg-laying hens. *Id.* at ¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

The UEP Certified Program created an all or nothing approach for members. "Defendants adopted a rule that required each participant *to produce all of its eggs in compliance with the Guidelines*, including eggs that Defendants purchased for resale. This was referred to as the '100% Rule.'" *Id.* at ¶ 7(F) (emphasis added); *see also id.* at ¶ 125. In short, membership in the UEP Certified Program required producers to follow the animal-welfare guidelines in all of their facilities. Partial compliance was not permitted.

Plaintiffs allege that "[c]ustomer demand was not the driving force behind the 100% Rule." *Id.* at ¶ 126. Instead, producer preferences led UEP to require total compliance with the Certified Program. According to Plaintiffs, "many producers said they would only commit to the program if 100% of facilities were required." *Id.* (cleaned up).

In Plaintiffs' view, the 100% rule was part of a conspiracy to restrict egg supply. Plaintiffs allege that Defendants' decision to "[a]gree[] to adopt the 100% Rule, requiring that each egg producer raise all of its eggs in compliance with the Guidelines, including all eggs purchased for resale," promoted their conspiracy to reduce the supply of eggs. *See* Second Am. Cplt., at ¶ 196(D) (Dckt. No. 73-17).

On the complaint's telling, not everyone was happy with the 100% rule. Then-UEP member (and former defendant) Sparboe Farms objected to the 100% rule. Sparboe Farms "privately expressed concern to UEP and others about the justification for adopting the 100% Rule as part of the UEP Certified Guidelines." *Id.* at ¶ 127.

"Sparboe Farms drafted a letter to UEP stating that the program had evolved into a production supply program, which requires producers to commit 100 percent of their flock." *Id.* (quotation marks omitted). Plaintiffs allege that Sparboe Farms "was concerned that the 100% rule may be seen as an intentional effort to reduce supply and increase prices." *Id.* The company's "in-house counsel expressed concerns that the 100% Rule was a 'sham' that could be viewed as an unlawful attempt to manipulate supply." *Id.* (cleaned up).

Sparboe ultimately left the UEP Certified Program and developed an alternative set of animal-welfare guidelines. *See* 11/6/19 Trial Tr., at 3:19-20 (Dckt. No. 199-6) (noting that Sparboe left the UEP Certified Program on July 1, 2005). Consistent with its objections, "[t]he main difference between Sparboe's program and the UEP Certified Program was that Sparboe's program had no 100% rule." *See* Pls.' Mtn. to Exclude Sparboe Evidence, at 3 (Dckt. No. 175); *see also* Defs.' Resp., at 2 (Dckt. No. 199) ("The evidence will further show that Sparboe eventually withdrew from UEP and the Program and created its own animal welfare program *that was nearly identical to the Program except it did not have a 100 percent rule*.") (emphasis added).

Years later, in November 2011, ABC News ran a segment on its 20/20 program about an undercover video of one of Sparboe's facilities. The video showed the abuse of hens by workers at Sparboe Farms. *See* Pls.' Mtn. to Exclude Sparboe Evidence, at 4 (Dckt. No. 175). The video showed workers tying hens to ropes and "twirl[ing them] around like a lasso on the end of the rope." *See* 11/19/19 Trial Tr., at 7:10-12 (Dckt. No. 175-4).

After the news broke, several key customers, including McDonald's, Target, and Walmart, dropped Sparboe as their egg supplier. *Id.* at 7:13-21.

4

Sparboe responded by seeking readmission to the UEP Certified Program. In a letter to UEP's president, Sparboe's CEO Beth Sparboe Schnell stated that the incident had "been a very painful lesson" for the company. *See* 12/1/11 Letter (Dckt. No. 199-1). The CEO wrote: "While UEP correctly foresaw the issues which Sparboe Farms is now confronting, we did not. It is a new day at Sparboe Farms. We believe the United Egg Producers negotiated the most workable agreement for the egg industry based on all options available. We have learned from this experience and realize the value of being an active and engaged member of the United Egg Producers." *Id.*

Sparboe noted that it "would like to get [its] operations audited and approved for the UEP certified program as soon as possible." *Id.* The CEO "respectfully ask[ed] that [UEP] reinstate Sparboe Farms' membership in the United Egg Producers." *Id.* Schnell "assure[d]" UEP's president that Sparboe's membership would be "positive and supportive." *Id.*

During the earlier trials in the MDL court, the parties admitted evidence of the ABC News story and Sparboe's decision to rejoin the UEP Certified Program. *See* 5/7/18 Trial Tr., at 3:5 – 4:25 (Dckt. No. 199-7) (Direct Purchase Plaintiff trial); 11/19/19 Trial Tr., at 3:15 – 4:13 (Dckt. No. 175-4) (Direct Action Plaintiff trial). At least in the Direct Action Plaintiff trial, the plaintiffs did not move to exclude this evidence (at least not with a specifically targeted motion). *See* Pls.' Mtn. to Exclude Sparboe Evidence, at 5 (Dckt. No. 175).

But in the case at hand, Plaintiffs moved to exclude evidence of the November 2011 news segment about Sparboe Farms. *See* Pls.' Mtn. to Exclude Sparboe Evidence (Dckt. No. 175). Defendants oppose the motion. *See* Defs.' Resp. (Dckt. No. 199).

5

**Legal Standard**

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Regardless of the Court's initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of trial. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).

A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). It "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.*

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this

6

Court's assessment of the admissibility of the evidence. But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See* Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). In short, Rule 401 defines relevance broadly. *See United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907.

The Court, however, may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted).

## Analysis

This motion is about a specific piece of post-2008 evidence: the ABC News report on Sparboe Farm's alleged animal abuse, and Sparboe Farm's decision to seek readmission to the UEP Certified Program.[1] Basically, years after deciding to leave the UEP Certified Program

---

[1] The Court notes that the evidence at issue in this motion is also part of Plaintiffs' motion *in limine* to exclude liability evidence after 2008. *See* Pls.' Mtn. to Exclude Evidence After 2008, at 13–14 (Dckt. No.

7

over concerns that the 100% rule was a ruse to restrict supply, Sparboe Farms rejoined the Program after ABC News publicized abuse at one of its facilities.

Plaintiffs argue that the 2011 "news segment about purported animal abuse is irrelevant to any issue in this trial." *See* Pls.' Mtn. to Exclude Sparboe Evidence, at 4 (Dckt. No. 175). They note that Sparboe is no longer a party in this case, and in any event, the news segment aired in November 2011 (nearly three years after the conspiracy ended). Also, no Plaintiff purchased eggs from Sparboe. *Id.* at 4–5.

Plaintiffs also contend that evidence of the news segment is unfairly prejudicial because it could confuse and mislead the jury. *Id.* at 6–8. For example, it might lead the jury to "improperly believe that the only way for a farm to produce eggs humanely was through the UEP program." *Id.* at 7. The evidence would also open the door to "mini-trials about the facts underlying the 20/20 segment" and "the treatment of hens at Sparboe-owned farms." *Id.* at 8.

At the outset, the Court notes that any instances of animal abuse at Sparboe Farms in 2011 (and the associated media coverage) have no direct relevance to the question of liability. The case is about the number of eggs, not the treatment of chickens.

And in particular, the case is not about the treatment of chickens by a former defendant years after the alleged conspiracy ended. Sparboe Farms settled with Plaintiffs in 2014, so it is not a defendant. *See* Stipulation of Dismissal, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2014) (Dckt. No. 995). The effectiveness of Sparboe's animal-welfare practices is not directly at issue in this case. And the alleged abuses occurred in November 2011, nearly three years after Defendants' alleged conspiracy had concluded.

---

173); *see also* Defs.' Resp. to Pls.' Mtn. to Exclude Evidence After 2008, at 1 (Dckt. No. 195) ("In three separate, duplicative motions *in limine*, Plaintiffs ask this Court to exclude large swathes of Defendants' post-2008 evidence.") (footnote omitted). The Court will rule on that motion by separate Order.

8

Evidence of animal abuse also could distract and confuse the jury. It might lead the jury to get caught up with questions about whether the conduct amounted to animal abuse, and who is culpable. And it could lead the jury to focus on the effectiveness of the UEP Certified Program and other animal-welfare guidelines. For example, the jury might question whether the 100% rule was necessary to ensure animal welfare.

The video evidence from the ABC News segment is likely to be particularly prejudicial. Video of animal abuse could be highly upsetting, jarring, and distracting. Showing the jury footage of abuse is likely to evoke an emotional reaction. That's a classic reason to exclude evidence as unfairly prejudicial. *See Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) ("Unfair prejudice is an undue tendency to suggest decision on an improper basis, *commonly, though not necessarily, an emotional one*.") (emphasis added) (quotation marks omitted).

So, the Court finds that details about the November 2011 animal abuse at Sparboe Farms, including the segment from ABC News, are irrelevant and unduly prejudicial, standing alone. The evidence is not relevant to the jury's task, and any marginal relevance is outweighed by the risk of unfair prejudice and distracting and confusing the jury.

Decisions by Sparboe Farms in 2011 don't shed much light on whether Defendants conspired from 1999 to 2008. Even so, Defendants argue that the evidence might become relevant if Plaintiffs open the door.

Specifically, Defendants argue that this evidence is necessary to paint a complete picture of Sparboe's decision to oppose the UEP Certified Program in 2003. Defendants "do not intend to introduce the [ABC News] segment as evidence of the effect of the 100 percent rule on animal welfare." *See* Defs.' Resp., at 5 (Dckt. No. 199). Instead, the evidence "will help the jury

9

understand the complete Sparboe story, the customer pressure to join the Program, and the impact to producers of joining vs. not joining the Program." *Id.*

Plaintiffs intend to offer evidence of a 2003 letter from Sparboe's then-general counsel to UEP. The letter states that the "'hidden agenda' of the Animal Welfare Program is concerning to us." *See* 11/5/03 Letter (Dckt. No. 199-5). In his view, a "strong case could be made" that the UEP Certified Program "is, in essence, a program being offered by our trade association and its members to reduce outputs in an effort to increase prices." *Id.* Sparboe's counsel viewed the UEP Certified Program as "price fixing," and viewed the 100% rule as "tantamount to an unfair trade practice." *Id.*

Years later, Sparboe changed its tune. After ABC News ran the story in November 2011, Sparboe changed course and sought readmission to the UEP Certified Program.

Defendants believe that evidence of the 2011 ABC News segment places Sparboe's earlier criticism of the UEP Certified Program in context. In short, Defendants believe that the "December 2011 letter undermines the credibility of the October 2003 letter and shows that Sparboe has withdrawn its critique of the Program and embraced the necessity of the 100 percent rule." *See* Defs.' Resp., at 6–7 (Dckt. No. 199).

The relevance of the November 2011 incident, and Sparboe's decision to rejoin the UEP Certified Program, depends on what evidence Plaintiffs introduce at trial about Sparboe's 2003 criticisms of the Program. If Plaintiffs ultimately do not introduce evidence of Sparboe's 2003 criticisms, then evidence of the 2011 incident at Sparboe Farms is not relevant. Plaintiffs would not have opened the door.

If Plaintiffs seek to introduce evidence of Sparboe's 2003 criticisms, and if the Court lets it in, the Court will consider allowing evidence of its decision to rejoin the UEP Certified

10

Program in 2011.[2]  Sparboe's 2003 statements might be put into context by its statements in 2011.  It may be relevant to know that Sparboe Farms seemingly had an about-face.  That is, if the views of Sparboe matter at all, then maybe all of the views of Sparboe matter.

But the Court reserves judgment on this issue until trial.  The Court wants to have a fuller picture of the evidence.

That said, even if this Court allowed the jury to hear about Sparboe's change of heart in 2011, the jury would not need to see the ABC News segment itself.  The jury would not need to see the gory detail to provide context for why Sparboe later sought readmission to the UEP Certified Program. The parties can set the stage for Sparboe's decision to rejoin the UEP Certified Program without showing the jury the footage of alleged animal abuse.  At most, the relevant evidence is Sparboe's *decision to rejoin the Program*, and why, not the specifics of the animal abuse at its facility.

Finally, Plaintiffs argue that evidence of the 2011 incident should be excluded because post-2008 evidence was "out of bounds in discovery."  *See* Pls.' Mtn. to Exclude Sparboe Evidence, at 7 (Dckt. No. 175).  From this Court's vantage point, it appears that the parties were not required to preserve evidence after 2008.  But no one prohibited the parties from gathering facts about post-2008 events, either.

In fact, the incident involving Sparboe Farms came up during the depositions of multiple Sparboe employees during discovery.  *See* 4/22/14 Schnell Dep. (Dckt. No. 199-2); 2/17/14 Schnell Dep. (Dckt. No. 199-3); 6/27/13 Gregory Dep. (Dckt. No. 199-8); 4/29/14 Klippen Dep. (Dckt. No. 199-9).  And the evidence was admitted in both trials before the MDL court.  *See*

---

[2]  This Court has not made any ruling on the admissibility of any evidence about the concerns that Sparboe Farms expressed in 2003.

5/7/18 Trial Tr., at 3:5 – 4:25 (Dckt. No. 199-7); 11/19/19 Trial Tr., at 3:15 – 4:13 (Dckt. No. 175-4).

Plaintiffs had an opportunity to explore this issue during discovery. Any testimony related to the 2011 Sparboe incident will not be excluded on that basis.

In sum, the Court reserves judgment on whether evidence of the 2011 incident at Sparboe Farms is admissible. The Court would consider allowing this evidence depending on the evidence introduced by Plaintiffs about Sparboe's 2003 reaction to the UEP Certified Program.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion *in limine* to exclude evidence about the November 2011 Sparboe Farms news segment (Dckt. No. 175). The ABC News video footage will not come into evidence. Any evidence about the decision by Sparboe Farms to rejoin the UEP Certified Program in 2011 is presumptively inadmissible, unless Plaintiffs open the door.

Date:   August 31, 2023

Steven C. Seeger
United States District Judge

12