**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Court grants in part and denies in part Plaintiffs' motion *in limine* to exclude liability evidence after 2008 (Dckt. No. 173). The conspiracy allegedly ended in 2008, so Plaintiffs seek to draw a bright dividing line when it comes to evidence about liability.

The motion overlaps with a few other motions filed by Plaintiffs about post-2008 evidence, including a motion about state laws enacted after 2008 and a motion about Sparboe Farms. This Court already ruled on those motions. *See* 8/31/23 Mem. Opin. & Order (Dckt. No. 286) (state laws enacted after 2008); 8/31/23 Mem. Opin. & Order (Dckt. No. 287) (incident at Sparboe Farms). This Opinion addresses what's left.

The Court will not permit the parties to introduce evidence after 2008 to show that Defendants did not conspire to restrain trade from 1999 to 2008. Evidence after 2008 does not shed much light on why Defendants did what they did before 2008.

But Defendants may introduce post-2008 evidence to show that the UEP Certified Program had procompetitive benefits after 2008. Plaintiffs are alleging an injury and seeking damages from 2009 to 2012. So Defendants can present evidence that the UEP Certified

Program had procompetitive benefits – not anticompetitive effects – from 2009 to 2012. Plaintiffs have opened the door, so Defendants can walk through it.

Plaintiffs also objected to evidence from 2009 to 2012 on the grounds that the parties did not conduct discovery about that period. Based on this Court's understanding of what took place in the MDL, Plaintiffs have had a sufficient opportunity to obtain information about events after 2008. Plaintiffs have had adequate notice about what Defendants seek to present. And Plaintiffs put the post-2008 period in play by seeking damages after 2008.

The parties also discuss a few dozen documents from the post-2008 period in the abstract, but the Court will reserve a ruling on those documents until trial. The Court will call balls and strikes, but wants to see the pitches first.

## Background

This case is about an alleged conspiracy to limit the supply of eggs. Plaintiffs Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc., are global food processing companies. They purchase eggs for use as ingredients in the foods that they manufacture. They're big egg buyers.

Plaintiffs allege that Defendants United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. conspired to limit egg production. *See* Joint Status Report, at 2 (Dckt. No. 234). From a supply-and-demand perspective, less production meant higher prices.

The Court has summarized the procedural history and Plaintiffs' allegations in greater depth in its Opinions resolving other pretrial motions. *See, e.g.*, 8/21/23 Mem. Opin. & Order, at 2–5 (Dckt. No. 277); 8/11/23 Mem. Opin. & Order, at 2–9 (Dckt. No. 272). So, the Court will be brief.

The second amended complaint alleges that Defendants conspired to limit the supply of eggs and increase egg prices from at least 1999 through 2008. *See* Second Am. Cplt., at ¶ 119 (Dckt. No. 73-17). For the motion at hand, that timing is especially important. Plaintiffs allege that the conspiracy ended in 2008. But the effects of the conspiracy lasted until 2012.

Plaintiffs allege that Defendants agreed to limit egg supply through three anticompetitive practices. One of those practices involved the size of enclosures for hens, ostensibly for animal-welfare reasons.

Defendants allegedly agreed to adopt animal-welfare guidelines (known as the UEP Certified Program) that increased the size of the enclosures housing egg-laying hens. *Id.* at ¶¶ 120–39. According to Plaintiffs, the agreement was not based on animal welfare. Instead, it was a ruse to reduce the total space available to house egg-laying hens.

The animal-welfare guidelines allegedly reduced the total supply of eggs. *Id.* at ¶¶ 121–22. Less space for hens meant fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher egg prices.

During discovery, the parties developed evidence about certain grocers' preferences for the animal-welfare guidelines in the UEP Certified Program. For example, the parties took the depositions of representatives from grocery stores and developed evidence about whether the grocers "supported or required UEP certified eggs." *See* Pls.' Mtn. to Exclude Grocer Evidence, at 6 (Dckt. No. 180); *see also id.* at 5 nn.2–5, 6 n.6. Documents produced in discovery showed that certain grocers "required that their egg suppliers meet the UEP Guidelines." *See* Defs.' Resp. to Grocer Evidence, at 7 (Dckt. No. 194).

Some of that evidence is from after 2008. *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence, at 9–10 (Dckt. No. 173). That is, the evidence is from after the alleged conspiracy ended.

In both trials before Judge Pratter, the plaintiffs filed motions to exclude evidence that the defendants joined the UEP Certified Program because of customer demand. *See* 3/22/18 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1658); 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982). Judge Pratter denied both motions and permitted the defendants to introduce evidence of grocer demand for UEP-certified eggs. *See* 3/22/18 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018); 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019). Judge Pratter's rulings did not address the timing of the grocer-related evidence.

In the case at hand, Plaintiffs moved to exclude liability evidence after 2008, including evidence of support for and pressure to adopt the UEP Certified Program. *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence (Dckt. No. 173). Defendants oppose the motion. *See* Defs.' Resp. (Dckt. No. 195).

### Legal Standard

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr.*, *Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("The Federal Rules of Civil

Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Regardless of the Court's initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of trial. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).

A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). It "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.*

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this Court's assessment of the admissibility of the evidence. But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See* Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). In short, Rule 401 defines relevance broadly. *See United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014). Rule 402 "provides the corollary that, with certain

exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907.

The Court, however, may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted).

**Analysis**

This motion is about evidence of conduct or events after 2008. A few other motions touched on specific pieces of post-2008 evidence, too.

This Court already ruled on a motion about state laws enacted after 2008, and on a motion about the 2011 incident at Sparboe Farms. *See* 8/31/23 Mem. Opin. & Order (Dckt. No. 286) (state laws enacted after 2008); 8/31/23 Mem. Opin. & Order (Dckt. No. 287) (incident at Sparboe Farms). As a refresher, the Court will offer a brief recap.

On the issue of post-2008 state laws, the parties may offer evidence of post-2008 state statutes to prove or disprove Plaintiffs' antitrust injury or damages. Plaintiffs seek damages through 2012. That is, the theory is that the anticompetitive effects continued through 2012, even though the alleged conspiracy ended in 2008.

That theory opens the door to evidence that something else explains the elevated egg prices after 2008. And in particular, Defendants can point to state laws enacted after 2008 as the reason why the prices were what they were. If prices after 2008 are at issue, then each side can offer evidence to explain the prices after 2008. Defendants can offer evidence of state laws enacted after 2008 to explain egg prices after 2008.

But Defendants may not offer the post-2008 state statutes as evidence that the pre-2008 adoption of the UEP Certified Program was above board. *See* 8/31/23 Mem. Opin. & Order, at 1 (Dckt. No. 286). Laws after 2008 cannot explain conduct before 2008.

On the issue of Sparboe Farms, the admissibility of the evidence depends on how trial plays out. If Plaintiffs introduce evidence of Sparboe's opposition to the UEP Certified Program in 2003, and if the Court admits it, then the Court will consider allowing evidence of Sparboe's later decision to rejoin the UEP Certified Program in 2011. It might provide needed context, and avoid a misimpression by the jury.

The Court reserves judgment on the Sparboe issue until trial. *See* 8/31/23 Mem. Opin. & Order, at 1 (Dckt. No. 287). But the jury will not see the ABC News segment. The jury does not need to see footage of animal mistreatment.

The motion at hand raises those two issues yet again, even though other motions covered the terrain. So the Court will set those issues aside, and will rule on the remainder.

The motion also addresses other kinds of post-2008 evidence, and they fall into two baskets. The first basket of evidence is about customer support for animal-welfare initiatives after 2008. *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence, at 9–13 (Dckt. No. 173). The second basket of evidence is about a grab-bag of post-2008 documents. *Id.* at 15. Part of the objection has to do with a purported lack of discovery.

The Court will handle each basket separately.

## I.     Evidence about Post-2008 Animal-Welfare Initiatives

Plaintiffs seek to exclude evidence of customer support for the UEP Certified Program and pressure to adopt animal-welfare initiatives after 2008.  As they see it, pressure to adopt animal-welfare initiatives after the conspiracy ended is irrelevant.  *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence, at 9–13 (Dckt. No. 173).

Plaintiffs contend that "[t]his evidence is irrelevant to liability, which concerns whether Defendants entered into an agreement or otherwise conspired to restrict the supply of eggs beginning in 1998."  *Id.* at 10.  In their view, "[d]ocuments showing that grocers wanted certified eggs and were under pressure from animal welfare activists after 2008 has no bearing on the economic justifications for the agreements Defendants reached between 1998 and 2008."  *Id.*

Defendants offer three justifications for offering evidence of support for the UEP Certified Program after 2008.  The first rationale involves the existence of a conspiracy before 2008.  The second rationale involves the procompetitive benefits.  The third rationale is about an *in pari delicto* defense, meaning a defense based on equal fault.

The Court will address each in turn.

### A.     The Existence of a Conspiracy

First, Defendants argue that evidence of public support for the UEP Certified Program is relevant to whether Defendants conspired to reduce supply.  *See* Defs.' Resp., at 3–9 (Dckt. No. 195).  As they see it, "evidence that customers demanded, and continue to demand, UEP

Certified eggs is relevant to why Defendants implemented and continued to participate in the UEP Certified Program." *Id.* at 4.

Taking a step back, evidence about pressure to adopt animal-welfare initiatives before 2008 is fair game. Each side has a story to tell. Plaintiffs allege that Defendants supported the UEP Certified Program to restrict supply and raise prices. On the flipside, Defendants contend that they adopted the UEP Certified Program in response to pressure from the grocers and the public at large.

Each side can tell its story and offer evidence to support its theory of the case. And in particular, Defendants can offer evidence from the alleged conspiracy period (1999 to 2008) to explain their actions during the alleged conspiracy period.

But the evidence must be contemporaneous. Pressure from grocers, animal-welfare activists, or the public at large after 2008 does not explain why Defendants did what they did before 2008. Evidence about pressure from eggs buyers or anyone else before 2008 is fair game. Evidence about pressure after 2008 is not (not for this purpose, anyway). Pressure after 2008 does not explain conduct before 2008.

The Court touched on this topic in earlier rulings. The Court previously ruled that Defendants can present evidence that they acted in response to pressure from the grocers. *See* 8/31/23 Mem. Opin. & Order (Dckt. No. 285). In a separate ruling, this Court excluded evidence of state laws enacted after 2008, except to show antitrust injury and damages. Evidence about state laws before 2008 is germane to conduct before 2008, but evidence of state laws after 2008 is not germane to conduct before 2008.

"[E]vidence of pressure to adopt animal-welfare guidelines *during the time the conspiracy was allegedly in effect* is relevant." *See* 8/31/23 Mem. Opin. & Order, at 12 (Dckt.

No. 286) (emphasis in original).  "But the evidence must be *contemporaneous*.  That is, the evidence must be about pressure from advocacy groups during the alleged conspiracy."  *Id.* (emphasis in original).

That ruling applies across the board.  That is, the Court will hew to the same line.

Defendants can present evidence that they adopted the UEP Certified Program in response to outside pressure.  Defendants can offer evidence of any pressure that they received from 1999 to 2008.  But pressure *later* does not explain actions *before*.

At the end of the day, the jury must decide why Defendants adopted the UEP Certified Program before 2008.  Post-2008 pressure from animal-rights activists, grocers, or anyone else has little probative value when deciding that question.  What matters is the pressure that Defendants faced during the alleged conspiracy period.  Pressure after 2008 does not explain behavior before 2008.

## B.    The Procompetitive Benefits

Second, Defendants argue that post-2008 support for the UEP Certified Program is relevant to show its procompetitive benefits.  *See* Defs.' Resp., at 3–9 (Dckt. No. 195).  Defendants contend that "[e]vidence that customers continue to demand and pay for UEP Certified eggs even after, according to Plaintiffs, the alleged pretextual purpose was out in the open, is powerful evidence of the Program's procompetitive benefits, which are to be weighed by the jury."  *Id.* at 6–7.

One of the wrinkles in the case is the allegation that the injuries lasted for years after the conspiracy ended.  According to Plaintiffs, the conspiracy ended in 2008, but they suffered damages from elevated prices until 2012.  For the sake of clarity, the Court will refer to 1999 to 2008 as the (alleged) conspiracy period, and will refer to 2009 to 2012 as the injury tail period.

10

The issue at hand involves two separate questions. One question is whether Defendants can offer evidence about procompetitive benefits after 2008 when the conspiracy ended in 2008. The next question is whether satisfying consumer demand for hen-friendly eggs is a procompetitive benefit within the meaning of the federal antitrust laws.

 "To state a claim for relief under § 1 [of the Sherman Act], a plaintiff must show the following three prongs: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021).

Here, a rule of reason analysis applies. Courts "draw on several analytical frameworks to assess whether a contract amounts to an unreasonable restraint of trade: among them, the per se, rule of reason, and quick look analyses." *Id.* at 704. Judge Pratter held that the rule of reason applies to determine whether the UEP Certified Program is an unreasonable restraint of trade. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1036 (E.D. Pa. 2016), *aff'd*, 962 F.3d 719 (3d Cir. 2020).

The rule of reason is a burden-shifting framework. Basically, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect. Should the plaintiff carry that burden, *the burden then shifts to the defendant to show a procompetitive rationale for the restraint*. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021) (emphasis added) (quotations marks and citations omitted).

Defendants argue that the UEP Certified Program had procompetitive benefits. In their view, "demand for more humanely produced eggs grew over time, further supporting a finding

that the Program had, and continues to have, substantial procompetitive benefits." *See* Defs.' Resp., at 7 (Dckt. No. 195).

Needless to say, Defendants are free to present evidence about the procompetitive benefits of the UEP Certified Program through the end of the alleged conspiracy in 2008. Evidence about the competitive upside of the Program before 2008 is fair game.

The question at hand is whether Defendants can present evidence of the procompetitive benefits from 2009 to 2012, during the injury tail period. Again, Plaintiffs allege that the conspiracy ended in 2008, and they seek damages through December 2012. *Id.* at 8–9; *see also* Pls.' Mtn. to Exclude State Laws, at 9 (Dckt. No. 174) (noting that "Dr. Baye ended his analysis in 2012"); 9/24/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1981).

Plaintiffs allege that the anticompetitive effects – higher prices – continued through 2012. In response, Defendants want to present evidence that the procompetitive effects – satisfying consumer demand for products that respect animal welfare – continued through 2012.

According to Defendants, maybe prices were higher, but consumers got something in exchange. Consumers gained something new: the value of a certification that hens received better treatment.

As the Court understands it, the egg cartons contained a symbol with a certification of compliance with animal-welfare guidelines of the UEP Certified Program. That certification meant that the egg cartons were a new product because they contained new information, and provided a new guarantee about animal welfare. And as technical matter, the eggs were new, too – they were produced by happy chickens, not unhappy chickens.[1]

---

[1] In the MDL before Judge Pratter, the plaintiffs argued that the happier chickens produced *more* eggs, not fewer eggs. *See In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa.) (Dckt. No. 1628, at 3–

Defendants seek to present evidence of the competitive upside (a new product) to counter the evidence about the competitive downside (higher prices). From one vantage point, a supply restriction is anticompetitive because it leads to higher prices. From another vantage point, a supply restriction is not anticompetitive because it satisfies consumer demand for better animal welfare. As Defendants see it, a supply restriction from 2009 to 2012 might be procompetitive because the benefits (satisfying consumer demand for a product that promotes animal welfare) might outweigh the costs (higher prices).

By alleging that anticompetitive effects continued through 2012, Plaintiffs opened the door to evidence that procompetitive benefits continued through 2012. If Plaintiffs intend to present evidence that the UEP Certified Program had an anticompetitive effect through the injury tail period, then Defendants must be allowed present evidence of the Program's purported procompetitive benefits during that period, too. Evidence that customers continued to demand the UEP Certified Program during that period is relevant to whether the Program had procompetitive benefits.

This Court reached a similar conclusion on the motion about grocer demand for the UEP Certified Program. Defendants are "entitled 'to present evidence that the UEP Certified Program produced a higher-quantity of higher-quality eggs, all while meeting customer demands for humanely-produced eggs.'" *See* 8/31/23 Mem. Opin. & Order, at 12 (Dckt. No. 285) (quoting 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982)). The jury can consider evidence from the period after the alleged conspiracy

---

4) (quoting the expert's opinion that "healthy, stress-free birds produce more eggs"). Under that theory, the UEP Certified Program increased the size of the pens, and reduced the number of egg-laying hens. But the hens with roomier accommodations produced more eggs. So more room for egg-laying led to more eggs, not fewer eggs. If that theory is correct, then the UEP Certified Program increased supply, not decreased supply. This Court does not know if the current Plaintiffs intend to pursue that theory. But if so, it's fair game. Increased production is a classic procompetitive benefit.

ended to determine "whether the Program's anticompetitive effects outweigh its procompetitive effects." *Id.* (quoting 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1982)).

A different approach would lead to an asymmetry in the evidence. Plaintiffs want to prove an antitrust injury and damages during both the conspiracy period (1999 to 2008) and the injury tail period (2009 to 2012). If Plaintiffs want damages for the injury tail period, then Plaintiffs must show that the restraint on trade was unreasonable during that period. Plaintiffs should not be allowed to present evidence that a restraint on trade was unreasonable during the injury tail period, unless Defendants can present evidence that the restraint on trade had procompetitive benefits during the injury tail period.

The Court concludes that evidence of procompetitive benefits from 2009 to 2012 is fair game, because Plaintiffs are alleging an injury and seeking damages from 2009 to 2012. Plaintiffs cannot recover damages for the injury tail period unless they suffered an injury caused by an unreasonable restraint of trade. So Defendants can argue that the restraint of trade had procompetitive benefits during injury tail period.

The next question, then, is what sort of "benefits" are cognizable. It is not enough to say that a restraint on trade had societal benefits. Only some benefits count. The benefits must be "procompetitive" benefits. *See Alston*, 141 S. Ct. at 2160. That is, the benefits must be something that the antitrust laws recognize. *See generally* Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017) (entitled "Legitimate Objectives").

14

"In applying the rule of reason . . . antitrust tribunals always consider defensive claims that an alleged restraint serves legitimate objectives – so-called redeeming virtues. The main problem lies in deciding which exculpatory claims are 'legitimate.'" *Id.*

The Supreme Court "has regularly refused . . . requests from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition." *See NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021); *see also United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993) ("A restraint on competition cannot be justified solely on the basis of social welfare concerns.").

For example, in *National Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679 (1978), the Supreme Court rejected a defense to a restraint of trade by engineers based on a need to ensure quality work and protect public safety. The Supreme Court called the restriction "nothing less than a frontal assault on the basic policy of the Sherman Act." *Id.* at 695.

The rule of reason "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *Id.* at 688.

In *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 463 (1986), the Supreme Court brushed aside an argument about improving patient care. A dental association tried to defend a rule against providing x-rays to insurers. They argued that insurers might second-guess dental decisions based only on the x-rays, even though they had not seen the patients, and thus might foul up dental care. The Supreme Court set that argument aside, concluding that it made no difference that providing information to insurers might lead to "unwise and even dangerous choices." *Id.* at 463.

In *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), the Supreme Court rejected an argument by criminal defense lawyers that a group boycott about inadequate legal fees would improve the representation of criminal defendants. That explanation was not an "acceptable justification for an otherwise unlawful restraint of trade." *Id.* at 423. "The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful. The statutory policy underlying the Sherman Act 'precludes inquiry into the question whether competition is good or bad.'" *Id.* (quoting *National Soc. of Prof. Eng'rs*, 435 U.S. at 695).

Most recently, in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Supreme Court refused to give special leniency to the NCAA based on the need to "maintain amateurism in college sports." *Id.* at 2158. A desire to serve the "societally important non-commercial objective of higher education" was not enough to exempt the NCAA "from the usual operation of the antitrust laws." *Id.*; *id.* at 2160.

Only *procompetitive* benefits count, meaning the type of benefits that would promote competition itself and help consumers. Traditional examples of procompetitive benefits include higher output, lower costs, greater efficiency, and more consumer choice and customer satisfaction. *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984) ("If the NCAA's television plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games."); *see also id.* at 102 ("[T]he NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, [the NCAA's] actions widen consumer choice – not only the choices available to sports fans but also those available to athletes – and hence can be viewed as procompetitive."); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986) ("Absent some countervailing procompetitive virtue – such as, for

example, the creation of efficiencies in the operation of a market or the provision of goods and services – such an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained under the Rule of Reason.") (citation omitted); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (stating that "procompetitive justification[s]" include "greater efficiency or enhanced consumer appeal") (quoting *United States v. Microsoft*, 253 F.3d 35, 59 (D.C. Cir. 2001)); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 309 (3d Cir. 2007) ("Each of these efficiencies enhances consumer welfare and competition in the marketplace and is, therefore, consistent with the procompetitive aspirations of antitrust law."); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 283 (S.D.N.Y. 2015) ("Contract provisions that result in a better or more efficient product to meet consumer demand are procompetitive."); 1 Julian Kalinowski, Antitrust Laws and Trade Regulation § 12.02[1] (2d ed. 2023) ("A wide range of competitive benefits have been found to justify restraints. These include: increasing interbrand competition 'by allowing the manufacturer to achieve certain efficiencies' in distributing its products; increasing output; generating operating efficiencies; making a new product available; increasing consumer choice; enhancing quality.") (quoting *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54 (1977)).

The antitrust inquiry "is confined to a consideration of impact on competitive conditions." *Nat'l Soc. of Prof. Eng'rs*, 435 U.S. at 690. "[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively while yet permitting them to take advantage of every available economy that comes from internal or jointly created production efficiencies, or from innovation producing new processes or new or improved products." *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of

Antitrust Principles and Their Application ¶ 100a (5th ed. 2006). The best of intentions will not carry the day – even if the societal goal is valuable – because "good motives will not validate an otherwise anticompetitive practice." *Board of Regents*, 468 U.S. at 101 n.23.

In particular, the Supreme Court has recognized the potential procompetitive benefits of standard-setting by industry groups. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988). On the one hand, members of trade associations have an incentive to restrict competition. *Id.* at 500 ("There is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm."). And a product standard is, by definition, an agreement *not* to produce in violation of that standard. *Id.* ("Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny.").

Even so, industry standards can have procompetitive benefits for consumers. That's why a rule-of-reason analysis applies. "When, however, private associations promulgate safety standards based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition . . . those private standards can have significant procompetitive advantages. It is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations." *Id.* at 501.

Overall, the goal of a rule-of-reason analysis is to "'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition

18

that are in the consumer's best interest.'" *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

Judge Pratter explained the point during jury instructions in the Direct Action Plaintiff trial. In considering whether restraints were procompetitive, Judge Pratter directed the jury to "consider various factors including, but not limited to, whether the challenged restraints were demanded by customers, whether they increased production, increased consumer choice, decreased prices, or improved product quality." *See* 12/10/19 Trial Transcript, *In re Processed Eggs Antitrust Litig.*, 08-md-2002, at 258:3-8 (E.D. Pa.) (filed on the docket in the case before this Court at Dckt No. 195-4).

Judge Pratter added that "[e]vidence regarding the ethical treatment of laying hens may be considered with respect to issues such as whether it challenged restraint, increased output, improved product quality, widened customer choice, or met customer demand." *Id.* at 258:9-12. "However, the ethical treatment of laying hens as a societal benefit, standing alone, is not, in and of itself, a procompetitive benefit." *Id.* at 258:13-15.

Tying it all together, Defendants can present evidence of the procompetitive benefits of the UEP Certified Program from 2009 to 2012. Plaintiffs allege that they suffered an antitrust injury from the anticompetitive effects of that Program during that time period. So Defendants can argue that the Program was not an unreasonable restraint of trade because of its procompetitive benefits.

But Defendants must do more than appeal to an interest in animal welfare. The antitrust laws have nothing to say about the happiness of chickens. Animal welfare may be a laudable goal, but it is not the sort of procompetitive benefit that the antitrust laws have in mind. A raw desire to help chickens isn't going to cut it. Consumer welfare counts; chicken welfare does not.

19

At the end of the day, evidence about the UEP Certified Program from 2009 to 2012 is relevant for some purposes (*i.e.*, to show procompetitive effects) but not others (*i.e.*, to disprove the existence of a conspiracy from 1999 to 2008). The parties can offer a limiting instruction, so that the jury understands the purpose of the evidence.

### C.     The Equal Involvement Defense

Defendants also argue that post-2008 evidence is germane to their equal involvement defense. *See* Defs.' Resp., at 9–10 (Dckt. No. 195). In their view, the fact that "customers, including these very Plaintiffs, continue to require and pay for UEP Certified eggs today is essential evidence supporting this defense." *Id.* at 10.

Plaintiffs respond that an *in pari delicto* defense – meaning "in equal fault" – is out of bounds in antitrust cases. *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence, at 12 (Dckt. No. 173). As Plaintiffs see it, their purchasing decisions after 2008 are irrelevant.

Strictly speaking, "the Supreme Court [has] held that the common law doctrine of '*in pari delicto*, with its complex scope, contents, and effects' . . . was 'not to be recognized as a defense to an antitrust action.'" *Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995) (quoting *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968)). But the Supreme Court has "endorsed a more narrow defense which would bar a plaintiff from recovering damages for violations for which he was substantially equally responsible." *Id.* The Seventh Circuit "has accepted and endorsed the equal responsibility defense." *Id.*

The Seventh Circuit explained that the equal responsibility defense prevents a conspirator from profiting off of its own wrongdoing, meaning a conspiracy that it joined and promoted. A party cannot contribute to raising prices, profit from the higher prices, and then sue based on the higher prices.

20

"Without this bar to treble damages, an equally culpable party to an illegal agreement who defects first could not only profit from his own wrongdoing, but would be assured of doing so. The availability of treble damages would encourage rather than deter violations of the anti-trust law, by offering a potential oligopolist the option of more than covering his losses with treble damages from his cohort if their agreement to cooperate proved unprofitable." *Id.*

Based on the record at hand, the post-2008 evidence would not support an equal responsibility defense. Maybe Plaintiffs continued to buy eggs. But there is no evidence that Plaintiffs *joined the conspiracy*.

Plaintiffs are egg buyers, not egg sellers. Nothing in the record suggests that Plaintiffs agreed to restrict the supply of eggs, and are somehow trying to profit off of the conspiracy. They did not restrict the supply of eggs – they bought eggs from egg suppliers.

Plaintiffs are not responsible for the conspiracy by buying products at elevated prices. The argument, it seems, is only one step away from a blame-the-victim defense. Buying a product sold by the conspirators does not make the buyer partly responsible for the conspiracy.

If buying a product is the basis for a defense by a seller, it is hard to see how most antitrust claims could get off the ground. After all, the plaintiffs in antitrust cases tend to be injured buyers. *See, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

The evidence in question does not seem to fit within the equal responsibility defense. But it does potentially speak to the Plaintiffs' prima facie case. That is, customer demand may be relevant to whether Defendants engaged in specific conduct as a result of a conspiracy to restrain trade.

There is a difference between buying the product (without more), and requesting an attribute of the product that is allegedly the result of a conspiracy. A buyer of a product is not

responsible for the conspiracy simply by making the purchase. But if the buyer requests a specific attribute – say, stronger material, or better fuel efficiency, or improved recyclability, or better labeling, or fewer preservatives, and so on – then that request might support the notion that the existence of that attribute was not the result of a conspiracy.

If a buyer requests Attribute X, then the seller could point to that request to defeat the notion that Attribute X was the byproduct of a conspiracy. Basically, the seller could respond: you asked for it, you got it. Evidence that a customer expressly requested a product with Attribute X is evidence that the existence of Attribute X is attributable to customer demand, not a conspiracy to restrain trade.

Here, Plaintiffs contend that Defendants adopted the UEP Certified Program to restrict supply and raise prices. On the flipside, Defendants argue that they adopted the UEP Certified Program to meet customer demand. That is, customers wanted it, so customers got it.

In other words, if Plaintiffs demanded eggs that complied with the UEP Certified Program, then Defendants could point to that demand as evidence that the UEP Certified Program is a response to customer demand. It would support the notion that the UEP Certified Program does not exist to restrain trade, but rather meets the demands of egg buyers.

Judge Pratter faced a similar motion to exclude evidence supporting an equal involvement defense in the Direct Action Plaintiff trial. *See* 9/25/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2009) (Dckt. No. 1985). There, the plaintiffs sought to exclude evidence of "their requests for UEP Certified eggs" because this evidence "would allow the defendants to blame the DAPs [Direct Action Plaintiffs] for the defendants' anticompetitive conduct." *Id.* The plaintiffs argued that admitting this evidence would "amount[] to an *in pari delicto* defense," which is "impermissible in antitrust cases." *Id.*

Judge Pratter did not rule on whether the defendants were entitled to present an *in pari delicto* defense. *Id.* ("However, the Court need not resolve that issue here because the DAPs [Direct Action Plaintiffs] have put the cart before the horse.").  Instead, she ruled that evidence showing that the plaintiffs requested UEP Certified eggs was relevant to whether the UEP Certified Program was a conspiracy to restrain trade.  "Evidence that the DAPs [Direct Action Plaintiffs] requested UEP Certified eggs goes to the heart of that dispute because it is relevant to any claims that the defendants may make that they joined the UEP Certified Program for non-conspiratorial reasons, such as to meet customer demand."  *Id.*

Putting it all together, the existence of a purchase is not a defense.  The fact that a buyer purchased a product does not mean that the buyer is complicit in the conspiracy.  So the equal responsibility defense would not apply based on the mere fact of a purchase.

But if the buyer requested some special product attribute or condition from the sellers, and if the sellers responded to that customer demand, then the sellers could point to that request in response to an antitrust claim.  The sellers could argue that Attribute X came in response to consumer demand, and was not the offspring of a conspiracy to restrain trade.

That principle carries through 2009 to 2012 (in addition to the conspiracy period).  If Plaintiffs expressly requested eggs produced under the auspices of the UEP Certified Program, then Defendants can present that evidence to the jury.  The evidence speaks to whether the UEP Certified Program was an unreasonable restraint of trade, or instead was a legitimate attempt to satisfy consumer demand.

But the cut-off is 2012.  Defendants want to present evidence that Plaintiffs continue to demand UEP-certified eggs "today."  *See* Defs.' Resp., at 10 (Dckt. No. 195).  This Court will allow evidence of customer demand through 2012, because Plaintiffs are alleging an injury and

seeking damages through 2012. But current conduct is not relevant, and is likely to be more confusing and prejudicial than probative. *See* Fed. R. Evid. 403.

## II.      Other Post-2008 Evidence

Plaintiffs also seek to exclude a swath of documents that they call "other post-2008 evidence." *See* Pls.' Mtn. to Exclude Post-2008 Liability Evidence, at 15 (Dckt. No. 173). Plaintiffs believe that Defendants "intend to seek to introduce around two dozen documents from after 2008 that have no obvious relevance." *Id.*

Defendants respond that they "intend to follow the Federal Rules of Evidence, as the Court would expect, and as Plaintiffs should [have] expected." *See* Defs.' Resp., at 10 (Dckt. No. 195). Defendants believe that the Court should reserve judgment on other post-2008 evidence until trial. "To the extent Plaintiffs have specific objections to the relevance or prejudice of these documents, they can and should raise them at trial." *Id.*

The Court agrees with Defendants. Plaintiffs can raise objections to specific pieces of post-2008 evidence that they believe are irrelevant at trial. This Court's rulings should set the ground rules for many types of post-2008 evidence. The parties will be expected to follow those marching orders. If there is a dispute about any of the remaining documents, the parties can raise it down the road.

Finally, Plaintiffs argue that post-2008 evidence should be excluded because it was beyond the discovery period in the MDL court. This Court ruled on a similar argument when deciding Plaintiffs' motion to exclude evidence of the 2011 incident at Sparboe Farms. *See* 8/31/23 Mem. Opin. & Order, at 11–12 (Dckt. No. 287).

From this Court's vantage point, it appears that the parties were not required to preserve evidence from after 2008. *See* Case Mgmt. Order No. 14, at 9, *In re Processed Eggs Antitrust*

*Litig.*, 08-md-2002 (E.D. Pa. 2009) (Dckt. No. 83). But no one *prohibited* the parties from gathering facts about post-2008 events, either. *Id.* at 1 ("This Order does not address, limit, or determine the relevance, discoverability or admission into evidence of any Record . . . regardless of whether the Record is required to be preserved pursuant to the terms of this Order."). The parties conducted some discovery on post-2008 matters, including the 2011 Sparboe Farms incident. *See* 8/31/23 Mem. Opin. & Order, at 11–12 (Dckt. No. 287).

So, any post-2008 documents that were produced in discovery in the MDL court are fair game. The MDL court's preservation order did not prohibit discovery of materials after 2008. Any documents that the parties exchanged are in the field of play.

On the other hand, documents that were *not* produced in discovery are a different matter. The Federal Rules require the pretrial disclosure of evidence, as the parties know all too well after enduring years of discovery. Typically, a party may not use at trial documents that were not disclosed in discovery. "The discovery provisions in the Federal Rules of Civil Procedure attempt to prevent such surprises at trial." *Hirlston v. Costco Wholesale Corp.*, 2023 WL 5659691, at *8 (7th Cir. 2023).

Rule 26(a)(3)(A)(iii) requires disclosure of "each document or other exhibit" that the party expects to offer or may offer if the need arises. *See* Fed. R. Civ. P. 26(a)(3)(A)(iii). "Rule 37(c)(1) provides that if a party has failed to provide information required under Rule 26(a), 'the party is not allowed to use that information . . . to supply evidence . . . at trial, unless the failure was substantially justified or is harmless.'" *Hirlston*, 2023 WL 5659691, at *8 (alteration in original) (quoting Fed. R. Civ. P. 37(c)(1)). "These requirements may be modified by the district court, and their enforcement is left to the court's sound discretion." *Id.*

In deciding whether to admit evidence not produced in discovery, "[t]he following factors . . . should guide district courts in making Rule 37 determinations:  '(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfullness involved in not disclosing the evidence at an earlier date.'"  *Uncommon LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quoting *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012)).

Judge Pratter addressed a similar motion to exclude evidence from after discovery closed in the Direct Action Plaintiff trial.  There, the plaintiffs moved to exclude "evidence dated later than 2012, which is after the DAPs damages period . . . because the documents were not produced in discovery."  *See* 9/23/19 Order, *In re Processed Eggs Antitrust Litig.*, 08-md-2002 (E.D. Pa. 2014) (Dckt. No. 1977).

Judge Pratter denied the motion and declined to impose a blanket rule prohibiting documents not produced in discovery.  "[W]hether any individual piece of non-produced or post-2012 evidence is prejudicial or relevant will greatly depend on the purpose for which it is being offered.  This will not be known until trial.  Imposing the two categorical bars the DAPs seek at this stage would be overly broad and premature."  *Id.*

Like Judge Pratter, this Court declines to rule in the abstract on the admissibility of documents not produced in discovery.  Under the Federal Rules, documents not produced in discovery presumptively may not be introduced at trial.  But maybe the party seeking to admit the evidence can show that the failure to produce it during discovery "was substantially justified or is harmless."  *See* Fed. R. Civ. P. 37(c)(1).  The Court will consider the issue document-by-document when the time comes.

26

But the Court notes that a party seeking to introduce a document not produced during discovery bears the burden to show why it should be introduced under Rule 37(c)(1).

In sum, evidence of post-2008 customer demand is inadmissible to show that Defendants did not engage in anticompetitive behavior pre-2008 by adopting the UEP Certified Program. But evidence of post-2008 customer demand for the UEP Certified Program is admissible to show that the Program had procompetitive benefits. The Court will work with the parties to craft an appropriate limiting instruction for trial. The Court also declines to impose a blanket rule excluding evidence from after 2008 or that was not produced in discovery. The Court will consider the issue on a document-by-document basis at trial.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion *in limine* to exclude liability evidence after 2008 (Dckt. No. 173).

Date:   September 15, 2023

Steven C. Seeger
United States District Judge