## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-8808 |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | Hon. Steven C. Seeger |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

This case is about an alleged conspiracy among egg producers to restrict the domestic egg supply. Plaintiffs allege that Defendants – all major players in the American egg industry – engaged in a decade-long, multi-pronged effort to raise prices by restricting supply. Plaintiffs allege that they paid artificially high prices for egg products as a result of the conspiracy.

Plaintiffs have made a *Santiago* proffer to establish the admissibility of statements made by the alleged co-conspirators. For the following reasons, the Court finds that the proffer is sufficient to meet Plaintiffs' burden under Rule 801(d)(2)(E), and conditionally admits many (but not quite all) of the statements.

### Background

### I.    The Parties

This sprawling and long-lived antitrust action pits the nation's egg makers against its egg breakers. Plaintiffs are four multinational food manufacturers: Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestle USA, Inc. *See* Second Am. Cplt., at ¶¶ 14–17 (Dckt. No. 73-17). They make grocery store staples like cake mixes, cereal, and waffles, which

contain eggs or egg products. *See* Pls.' Proffer, at 1 (Dckt. No. 164). You probably have some of their food in your house.

Defendants are significant players in the domestic egg industry. Cal-Maine Foods, Inc. and Rose Acre Farms, Inc. are the two largest egg producers in the country. *Id.* at 1. According to the complaint, in 2013, Cal-Maine possessed more 26.8 million egg-laying hens and sold approximately 821 million dozen shell eggs, accounting for about 18% of the domestic shell egg consumption. *See* Second Am. Cplt., at ¶ 19 (Dckt. No. 73-17). Rose Acre possessed 20 million egg-laying hens, or nearly 6% of the United States hen flock. *Id.* at ¶ 48.

The remaining Defendants – United Egg Producers, Inc. ("UEP") and United States Egg Marketers, Inc. ("USEM") – are egg industry trade associations. *Id.* UEP is a non-profit corporation whose membership consists exclusively of egg producers. *Id.* at 18. As of August 2008, UEP had 205 members, representing approximately 270 million hens, or 97% of the domestic flock. *Id.*

United Egg Producers, Inc. (again, "UEP") provides, among other things, lobbying and marketing services to its members. *See In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 5656101, at *1 (E.D. Pa. 2019). Its work primarily involves animal welfare, food safety, and environmental issues relating to egg production. *Id.* UEP conducts its work in part through a board of directors and various committees, each with representatives from its member companies.

United States Egg Marketers, Inc. (again, "USEM") is a non-profit trade association organized to coordinate egg exports. *Id.* In August 2000, USEM and UEP entered into a management agreement under which UEP "assumed the management" of USEM, "primarily for the purpose of coordinating industry-wide export shipments." *See* Ex. 50 (Dckt. No. 164-1, at

286 of 638). Under UEP's management, USEM handled the shell egg export program for egg producers across the country. *Id.* (Dckt. No. 164-1, at 289 of 638).

Together, Defendants control the majority of the nation's egg production. *See* Pls.' Proffer, at 9 (Dckt. No. 164).

## II.     The Alleged Conspiracy

In the pages that follow, the Court will drill down into the nitty-gritties of the evidence. In the meantime, the Court will set the stage with a high-level overview of the case, beginning with the economics of the egg market.

Consumer demand for eggs and egg products is inelastic, meaning that price has minimal impact on demand. As any self-respecting baker knows, there is no good substitute for an egg. So, when the price of eggs goes up, consumers continue to buy eggs, without much change in consumption. Usually, when you need an egg, only an egg will do.

When demand for a product is inelastic (like it is for eggs), even a small change in supply can spur a dramatic change in price. Consumers want eggs. And consumers are willing to pay more when there are fewer eggs to go around. According to Plaintiffs' expert, a 1 percent drop in egg production could increase egg prices by as much as 8 to 12 percent. *See* Baye Report, at 19 (Dckt. No. 164-1, at 37 of 638). An egg producer has a lot to gain when egg supply is low.

Conversely, when there is a surplus of eggs in the demand basket, prices can plummet. Plaintiffs allege that egg prices were in a slump in 1998. A competitive egg market had put egg producers up against the ropes: egg supply was high, and so egg prices were low. *See* Pls.' Proffer, at 10 (Dckt. No. 164). Egg producers had too many hens laying too many eggs.

Defendants allegedly worked together to come up with ways to limit the egg supply and raise prices. *Id.* at 10. Plaintiffs allege that beginning in 1998, Defendants began to coordinate

efforts to restrict the national egg supply, raise the prices of their shell eggs and egg products, and increase profits. *See* Pls.' Proffer, at 1 (Dckt. No. 164).

The main player at the head of the alleged conspiracy was UEP. As a trade association representing the vast majority of egg producers, UEP was well-placed to coordinate these efforts. It regularly communicated with its members through its periodic newsletter, "*United Voices.*" And its members, all competing egg producers, interacted with each other through various roles on the UEP board of directors and its committees. UEP was a natural industry clearinghouse of ideas.

According to Plaintiffs, UEP allegedly took advantage of its central role to urge its members to do their part to reduce the egg supply. *Id.* at 20. UEP eventually began to develop, and then promote, coordinated action among its members to achieve that end. *Id.* at 20–21.

Plaintiffs allege that UEP's efforts led to a conspiracy to restrict egg supply and thereby increase prices. The alleged conspiracy included four main initiatives: (1) early slaughter and molting of hens; (2) implementing industry rules designed to decrease the number of egg-laying hens per facility under the guise of an animal welfare program; (3) banning "backfilling" (the practice of replacing dead hens); and (4) exporting eggs at a loss. *Id.* at 1–2. Defendants and their co-conspirators also allegedly implemented policing and enforcement practices to ensure compliance. *Id.* at 2.

### A. Short-Term Measures: Early Slaughter and Molting

Beginning in 1998, UEP coordinated several short-term measures to control flock size. These measures included (1) slaughtering hens early, and (2) inducing hens to molt earlier than

they naturally would.[1] *Id.* at 10. Both measures reduced the number of eggs. Dead chickens don't lay eggs, and neither do molting hens.

Additionally, UEP set up a committee to develop a "hatch reduction program" that might restrict the supply of hens over the long haul. *Id.* at 11.

UEP was not discrete about the collective necessity of these measures, and was not subtle in its encouragement to members. Through its periodic newsletters, UEP would implore members to adopt the recommended programs. And according to Plaintiffs, UEP members answered that call and successfully implemented the slaughter and molting initiatives in the years that followed. *Id.*

### B. Long-Term Measures: The UEP Certified Program

The short-term measures were successful as a stopgap, but UEP was looking for a permanent answer. *Id.* at 13. It soon turned to long-term solutions to restrict egg supply.

UEP and its members eventually adopted the "UEP Certified Program." It was an industry-wide program designed to reduce egg supply, but marketed under the guise of improving the welfare of hens. *Id.* at 13–14.

The hallmark feature of the program, and the primary mechanism through which it reduced supply, was a requirement about increasing cage space per hen. *Id.* at 14. More space per hen meant fewer hens. And fewer hens meant fewer eggs.

Eventually, UEP supplemented the Certified Program with two additional requirements that ensured that the Program would have its intended effect of reducing egg supply: (1) a ban on "backfilling," a practice in which producers replaced dead or unproductive hens; and (2) the

---

[1] When a hen molts, it loses its feathers and regrows them. The hen temporarily stops laying eggs during this process.

"100% Rule," which required that every single facility of a given producer comply with the program's requirements in order to qualify for certification.

UEP enforced compliance with the program through periodic audits. *See, e.g.*, *id.* at 31, 38–39. Once again, UEP vocally encouraged its members to adopt the Certified Program, and many of its members complied.

### C. Egg Exports

The final prong of the alleged conspiracy was the coordinated export of domestic eggs. *Id.* at 11. Plaintiffs allege that the program called on producers to export their eggs into foreign markets to drive up the price of eggs domestically. *Id.* The scheme allegedly required producers to export their eggs – even at a *loss* – and even if they had no eggs to spare. *Id.* at 6, 11–12, 25. USEM (under UEP's management) played a central role in carrying out this aspect of the scheme. *Id.* at 23–25.

## III. Procedural History

A lot of water has flowed under the bridge since this case hit the docket in 2011. Soon after Plaintiffs filed their complaint in this district, the case was transferred to the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation. *See* Transfer Order (Dckt. No. 13). The case was one of a series of lawsuits alleging that Defendants and other egg producers had violated federal antitrust laws by conspiring to reduce the supply of eggs. *See* Defs.' Mtn. to Bifurcate, at 2–3 (Dckt. No. 153).

The case was consolidated with similar cases for pretrial proceedings. *See* Case Mgmt. Order No. 1, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2008) (Dckt. No. 3); Conditional Transfer Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2011) (Dckt. No. 605). For the next seven and a half years, the parties litigated before

6

Judge Pratter in the Eastern District of Pennsylvania. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.).

As part of the MDL proceedings, the parties completed discovery and filed dispositive pretrial motions. *See* Joint Status Report, at 2 (Dckt. No. 234). But eventually, the Judicial Panel on Multidistrict Litigation remanded the case to this district for trial. *See* Conditional Remand Order (Dckt. No. 14).

Meanwhile, back in the Eastern District of Pennsylvania, Judge Pratter presided over two trials in cases brought by different plaintiffs in the MDL proceedings. The second of those two trials was brought by wholesale purchasers who had opted out of the class. That is, that case was brought by plaintiffs similar to the Plaintiffs here. The main difference is that those plaintiffs originally filed suit in the Eastern District of Pennsylvania.

Several of the defendants in that case are defendants in the case at hand, too. The second trial in Pennsylvania included three entities that are Defendants in the case before this Court: Rose Acre Farms, United Egg Producers, and United States Egg Marketers. Cal-Maine settled the Pennsylvania case before trial, but it is one of the Defendants here and now. *See* Pls.' Resp. to Mtn. to Bifurcate, at 8 (Dckt. No. 185).

To prove the conspiracy at the second trial, the plaintiffs sought to conditionally admit co-conspirator statements against the defendants. *See In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 5656101 (E.D. Pa. 2019). Judge Pratter conducted a detailed review of the record, and found that the statements were preliminarily admissible. *Id.* at *20. In short, Judge Pratter found that the plaintiffs had met their evidentiary burden of showing the existence of a conspiracy, and the participation by each defendant. *Id.* at *1.

## IV.     Plaintiffs' *Santiago* Proffer

This Court now finds itself at a similar fork in the road.  To prove the alleged conspiracy, Plaintiffs hope to introduce a variety of statements by members of the conspiracy.  Those statements came from Defendants themselves, as well as from non-defendants who allegedly were co-conspirators, including (1) Moark, LLC; (2) Wabash Valley Produce, Inc.; and (3) Michael Foods, Inc.[2]

To that end, Plaintiffs seek a pretrial ruling on the admissibility of Defendants' co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).  They submitted a *Santiago* proffer of their evidence supporting the admissibility of the statements.  *See* Pls.' Proffer (Dckt. No. 164).  Defendants responded (Dckt. No. 203), and Plaintiffs replied (Dckt. No. 239).

### Legal Standard

Out-of-court statements offered for the truth of the matter asserted are typically inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802.  But the Federal Rules of Evidence recognize plenty of carve-outs and exceptions.

Under Rule 801(d)(2)(E), an out-of-court statement is not hearsay if it (1) "is offered against an opposing party," and (2) "was made by the party's coconspirator during and in furtherance of the conspiracy."  *See* Fed. R. Evid. 801(d)(2)(E); *see also United States v. Cardena*, 842 F.3d 959, 993 (7th Cir. 2016).  The co-conspirator exception to the hearsay rule

---

[2]  Michael Foods was originally a defendant in this action.  *See* Second Am. Cplt., at ¶ 30 (Dckt. No. 73-17).  Plaintiffs settled against Michael Foods after filing their proffer.  *See* Stipulation of Dismissal (Dckt. No. 219).  Even though Michael Foods is no longer a defendant in this case, Plaintiffs still seek a ruling on the admissibility of Michael Foods's statements against the remaining Defendants.  *See* Pls.' Reply, at 1 n.1 (Dckt. No. 239).

applies to both civil and criminal cases. *See United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979).

In the Seventh Circuit, district courts may make a preliminary ruling on the admissibility of co-conspirator statements based on the plaintiff's pretrial proffer of evidence, known as a *Santiago* proffer. *See United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (citing *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 438 U.S. 171 (1987)). A *Santiago* proffer allows a district court to "'conditionally admit coconspirator statements' if the [plaintiff] makes a showing that it can and will meet the requirements for admissibility during trial." *Cardena*, 842 F.3d at 994 (quoting *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999)).

The proffer must satisfy all three elements of Rule 801(d)(2)(E). A district court may conditionally admit a statement against a party where the plaintiff has made a preliminary showing that (1) a conspiracy existed, (2) the defendants and the declarants were members of the conspiracy, and (3) the proffered statements were made during the course of and in furtherance of the conspiracy. *See United States v. DeKelaita*, 875 F.3d 855, 859–60 (7th Cir. 2017); *see also* Fed. R. Evid. 801(d)(2)(E). If the district court finds that the statements satisfy the rule, then the statements are not hearsay, and the jury may consider them for any purpose, including the truth of the matter asserted. *See United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Plaintiffs must prove these elements by a preponderance of the evidence. *See Santiago*, 582 F.2d at 1134 ("[I]f it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible."). The inquiry "is not whether the

proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied." *Bourjaily*, 483 U.S. at 175.

"*Santiago* proffers are, by nature and necessity, argumentative and summary." *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). The proponent faces a "relatively low burden of proof," and need only summarize the evidence that it expects to adduce at trial in order to establish that a conspiracy existed. *See United States v. Shah*, 2023 WL 22140, at *2 (N.D. Ill. 2023) (quoting *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987)); *United States v. Bouzanis*, 2003 WL 22143278, at *6 (N.D. Ill. 2003) (citing *Santiago*, 582 F.2d at 1128).

In making its conditional admissibility determination, a district court may consider the statements themselves. *See Bourjaily*, 438 U.S. at 180; *see also United States v. Williams*, 44 F.3d 614, 617 (7th Cir. 1995). But a district court may not rely on the statements alone. The record also must contain some independent evidence corroborating the existence of the conspiracy and the defendant's participation in that conspiracy, above and beyond the co-conspirator's statements. *See Davis*, 845 F.3d at 286 (citing *United States v. Harris*, 585 F.3d 394, 399 (7th Cir. 2009)).

That independent evidence may be direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 744–45 (7th Cir. 2010) ("[T]he government may prove a conspiracy on circumstantial evidence alone."); *see also United States v. Pust*, 798 F.3d 597, 603 (7th Cir. 2015) ("Circumstantial evidence may be used to establish the existence of a conspiracy and a defendant's involvement in the conspiracy."); *United States v. Viezca*, 265 F.3d 593, 597 (7th Cir. 2001) ("The [plaintiff] may prove these elements entirely by way of circumstantial evidence.").

Admission of the statements following a *Santiago* proffer is conditional.  The proponent must still "close the evidentiary loop at trial" and prove the admissibility of the statements. *Davis*, 845 F.3d at 286.  "If at the close of its case the [proponent] has not met its burden to show that the statements are admissible, the defendant[s] can move for a mistrial or have the statements stricken."  *Haynie*, 179 F.3d at 1050.

## Analysis

### I.    The Existence of a Conspiracy

As a starting point, Plaintiffs must establish by a preponderance of the evidence that a conspiracy existed.  *See Davis*, 845 F.3d at 286.

Allegations about the existence of an anticompetitive agreement in violation of the Sherman Act "'usually take one of two forms:  (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed.'"  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quoting *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019)); *see also Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984) ("[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.") (quotation marks and citations omitted).  "The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement . . . ."  *Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018).

Direct evidence is rare in Sherman Act cases.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295

F.3d 651, 654 (7th Cir. 2002)).  Circumstantial evidence, on the other hand, "is the lifeblood of antitrust law," since direct evidence is usually not available to prove the existence of an anticompetitive conspiracy.  *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019).

Again, when determining whether a conspiracy existed, the Court may consider the co-conspirator statements themselves, but also must find support for the conspiracy in independent, corroborating evidence.  *See Davis*, 845 F.3d at 286.  In addition to the statements themselves, the Court must consider the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, and the evidence corroborating the contents of the statement.  *See United States v. Azteca Supply Co.*, 2010 WL 4962828, at *4 (N.D. Ill. 2010) (Dow, J.) (citing *United States v. Zambrana*, 841 F.2d 1320, 1344–45 (7th Cir. 1988)).

The punchline is that Plaintiffs have met their burden and shown by a preponderance of the evidence that a conspiracy existed between Cal-Maine, Rose Acre Farms, Michael Foods, Moark, Wabash Valley, USEM, and UEP.  That conspiracy – coordinated by the trade associations and joined by their members – consisted of an agreement to restrict the national supply of eggs, thereby raising prices.

At the outset, the Court notes that Judge Pratter came to the same conclusion facing a similar record and many of the same defendants in the second MDL trial.  *See In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 5656101, at *6–12 (E.D. Pa. 2019).  That holding is not preclusive.  Even so, it has special resonance given the high degree of overlap with the case at hand, and given her intimate, longstanding familiarity with the facts.

Even so, this Court will not merely adopt Judge Pratter's conclusion, and call it a day. This Court has engaged in its own analysis, and ultimately lands in the same place.

The alleged conspiracy hatched 25 years ago. In 1998, egg producers faced a competitive and oversaturated market. There were too many eggs in the market, and prices were at a "record low." *See* Ex. 9 (Dckt. No. 164-1, at 48 of 638).

UEP began to sound the alarm to its members. It warned that the industry was losing "$25 million per day," and "urg[ed] the industry to manage the egg supply to meet demand." *Id.* And as it beat the drum to warn of the threat of oversupply, UEP also began to roll out initiatives to decrease the number of eggs in the market and put prices back on track.

## A. Short-Term Measures: Early Slaughter and Molting

In its early days, the conspiracy's initiatives took the form of short-term measures to control the hen-flock size. Plaintiffs primarily focus on two practices.

First, UEP encouraged egg producers to implement "early slaughter" practices, meaning the premature killing of still-productive hens. *See* Ex. 11 (Dckt. No. 164-1, at 59 of 638); Ex. 12 (Dckt. No. 164-1, at 61 of 638). Second, UEP promoted "early molting," a practice in which producers caused hens to lose their feathers and temporarily stop laying eggs. *See* Ex. 12.

UEP was aggressive in its efforts to recruit members to adopt its recommended slaughter and molting plans. *Id.* ("The increased egg production . . . will likely create a period of supply exceeding demand during the first few months of 1998. WORKING TOGETHER WE CAN CHANGE THIS!"). In one notice to its members, UEP sought "high member participation" in its slaughter and molting "recommended programs," so that the industry could "reduce the egg supply week-by-week thereby assuring much improved prices." *Id.* Some members, including Cal-Maine, heeded the call and adopted those plans. *See* Ex. 11 (Dckt. No. 164-1, at 59 of 638).

13

By 1999, UEP's board undertook a more concerted effort to restrict egg supply among its members. *See* Ex. 13 (Dckt. No. 164, at 65 of 638). In a meeting in the late fall of that year, the UEP board considered a motion to ask members to immediately reduce their flock sizes by 5% "as quickly as possible" through early slaughters, and to molt 5% of their hen flocks. *Id.* The motion also sought to establish a committee to review a "hatch reduction program" that might restrict the supply of hens over the long term. *Id.* The motion passed unanimously. *Id.*

Defendants argue that UEP's recommendations were routine, voluntary, and far from clandestine. *See* Defs.' Resp., at 10–11 (Dckt. No. 203). But as the MDL court recognized, "albeit voluntary, these joint actions taken by competing members of a trade association can be evidence of a conspiracy." *In re Processed Egg Prods.*, 2019 WL 5656101, at *8 (citing *Weiss v. York Hosp.*, 745 F.2d 786, 815–16 (3d Cir. 1984)). Indeed, "voluntary participation of UEP members further *substantiates* the conspiracy." *Id.* at *11 (emphasis in original).

And although molting and slaughter may be routine husbandry practices viewed in isolation, the collective nature of the practice – and UEP's vocal encouragement – support the existence of a conspiracy. *See Omnicare*, 629 F.3d at 705 ("To show concerted action, antitrust plaintiffs must produce evidence that would allow a jury to infer that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'") (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *Kleen Prods.*, 910 F.3d at 936 ("The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement . . . ."). Regardless of the voluntary and routine nature of the requested actions, "UEP's communications suggest that the plan would only work if the members worked together." *In re Processed Egg Prods.*, 2019 WL 5656101, at *8.

14

True, there is not evidence that every single one of the alleged co-conspirators participated in the short-term supply recommendations. But at least some producers, Cal-Maine among them, did adopt the recommendations. And UEP aggressively and expressly promoted those recommendations as methods of reducing the market supply of eggs. *See* Ex. 11 (Dckt. No. 164-1, at 59 of 638); Ex. 12 (Dckt. No. 164-1, at 61 of 638). So, as far as the existence of the conspiracy goes, the Court is satisfied that Plaintiffs have met their burden to show that the short-term measures were efforts to advance the broader agreement to restrict the hen population.

Finally, Defendants provide no case law to support their assertion that the public dissemination of UEP's recommendations undermines, rather than supports, the existence of the conspiracy. Defendants' failure to keep their conspiracy a secret does not automatically negate its conspiratorial nature.

In sum, based on this evidence, the Court finds that Plaintiffs have shown by a preponderance of the evidence that the early molt and slaughter initiatives were methods employed in pursuit of the conspiracy to reduce egg supply.

### B. The Certified Animal Welfare Program

By August 1999, UEP began to focus on long-term solutions to its perceived oversupply of domestic hens. *See* Ex. 24 (Dckt. No. 164-1, at 108 of 638). In a newsletter to members that year, UEP chairman Ken Looper stressed that molt and slaughter programs were only "stopgap way[s] of correcting the problem." *See* Ex. 24 (Dckt. No. 164-1, at 110 of 638). The hen population remained "too high." *Id.*

The only solution – and the "key to profits" – was "hen disappearance." *See* Ex. 23 (Dckt. No. 164-1, at 101 of 638); *see also id.* ("Extra birds must be removed from the nation's

flock permanently."). The trick was coming up with an industry-wide plan that would reduce hens, and eggs, permanently. *See* Ex. 24 (Dckt. No. 164-1, at 110 of 638).

UEP batted around several supply-limiting programs, but ultimately, one idea rose to the top: "[a]n industry-wide policy of a minimum floor space allowance." *Id.* At the time, 15 to 20 percent of the nation's hens were housed at less than 48 square inches per hen. *Id.* If UEP encouraged producers to increase their minimum space allowance to 48 square inches, "millions of extra birds would be eliminated." *Id.*

This program had the added bonus of marketability to consumers, who had become increasingly sensitive to animal welfare. *See* Ex. 26 (Dckt. No. 164-1, at 117 of 638) ("There is a growing concern among our customers that farming must be done in a manner that meets certain standards of animal welfare."). Customers wanted humanely raised hens. The minimum cage space program would not only appease consumer concern over animal welfare, but it also would "result in a more ideal nation [sic] flock size." *See* Ex. 24 (Dckt. No. 164-1, at 110 of 638); *see also* Ex. 26 (Dckt. No. 164-1, at 117 of 638) ("[Customer] concerns can be addressed in a manner, which will not only address the concerns of our customers but also return us a better price for our products."). Two birds with one stone.

UEP dubbed the initiative the "UEP Certified Program." *See* Ex. 33 (Dckt. No. 164-1, at 166 of 638). Under the program, egg producers meeting certain requirements would receive a UEP certification that could appear on their products.

Chief among the UEP Certified Program's guidelines was a minimum cage space requirement, or a "cage density" requirement. *Id.* at 15; *see also* Ex. 32 (Dckt. No. 164-1, at 163 of 638). That requirement was also supplemented by two additional requirements: (1) a ban on a practice called "backfilling," which is the replacement of dead or unproductive hens; and

16

(2) the "100% Rule," which required producers to implement the program's cage density requirements and backfilling ban at *all* of the producer's facilities in order to receive certification. *See* Ex. 34 (Dckt. No. 164-1, at 169 of 638) (backfilling prohibition); Ex. 35 (Dckt. No. 164-1, at 177 of 638) (100% Rule). Under the 100% Rule, certification became an all-or-nothing affair: producers had to completely commit to increasing cage space and eliminating backfilling. *See* Ex. 34.

UEP publicly touted the program as a science-backed initiative that implemented best practices for animal welfare. But internally, it signaled that its real goal was to slow hen flock growth and restrict the domestic supply of eggs. *See* Ex. 26 (Dckt. No. 164-1, at 117 of 638).

UEP regularly described the program's benefits in supply-reducing (and profit-increasing) terms. In one communication to its members, UEP advertised that the cage-density requirement would "result in fewer birds" and "a higher market." *See* Ex. 26 (Dckt. No. 164-1, at 117 of 638). Another memorandum promoted the Certified Program as a surefire way to "put money in your pocket!" *See* Ex. 32 (Dckt. No. 164-1, at 163 of 638). That memo urged that "[i]f at least 50% of the industry took the actions[,] Producers could make a dollar to two a bird." *Id.*

In 2004, UEP president Gene Gregory told members about the profit potential of the program: "If you stay true to the program and manage it to meet the market demand, it can provide the industry with prolonged profits." *See* Ex. 1 (Dckt. No. 164-1, at 2 of 638). And as late as March 2008, in a presentation to another egg trade association, Gregory highlighted that the "market now reflects the benefits" of UEP's Certified Program. *See* Ex. 38 (Dckt. No. 164-1, at 192 of 638). In other words, "animal welfare" was a guise for a program designed to decrease competition – and the number of eggs – in the market.

Defendants assert that the UEP Certified Program initiatives, including the cage-space requirements, the 100% Rule, and the backfilling ban, were legitimate responses to customer demand for humanely raised hens.  *See* Defs.' Reply, at 13–16 (Dckt. No. 203).  These initiatives, according to Defendants, were science-backed and customer-driven.  *Id.*  A UEP-commissioned Scientific Advisory Committee led to the development of the guidelines.  *Id.* at 14 (citing Ex. 140 (Dckt. No. 203-26)).  And producers joined the program not because of any tacit agreement not to compete, but because "large customers" (like Walmart and Kroger) "demanded UEP Certified eggs."  *Id.* at 16 (citing Ex. 156 (Dckt. No. 203-42)).

The MDL court rejected these arguments, as does this Court.  *See In re Processed Egg Prods.*, 2019 WL 5656101, at *11 ("Overall, the defendants do present evidence that the implementation of the UEP Guidelines and Certified Program could have been a response to customer demands, and they will be presenting such evidence and arguments to the jury.  However, for the purpose of admitting co-conspirator statements, the evidence presented by the [plaintiffs] ultimately overcomes the argument now.").  On balance, Plaintiffs have shown that it was more likely than not that Defendants "acted upon a great opportunity to hide their true supply-reducing motivations under the guise of reacting to public animal welfare concerns."  *Id.*

Plaintiffs' evidence shows that, at its roots, the Certified Program grew out of industry concern about oversupply.  The fact that the program also aligned with a market demand for more humanely raised eggs does not change those original, supply-driven motivations.

The evidence shows that UEP never lost sight of the program's ability to increase profits.  To its members, UEP repeatedly pushed the Certified Program as a means of keeping egg prices high, not appeasing customer concerns about animal welfare.  The Court therefore finds that

18

Plaintiffs have met their burden of showing that UEP's implementation of, and membership participation in, the Certified Program was part of the broader conspiracy to reduce egg supply.

### C.    Egg Exports

The third prong of the alleged conspiracy involved exporting eggs at a loss.  Under UEP's management, USEM repeatedly coordinated egg exports by UEP members to remove eggs from the domestic market.  *See* Ex. 20 (Dckt. No. 164-1, at 89 of 638); Ex. 55 (Dckt. No. 164-1, at 317 of 638).

Like its Certified Program, UEP touted the export program in supply-reducing terms. When UEP took over management of USEM in 2000, then-UEP President Gene Gregory shared with UEP members his hope that "all UEP members including those not previously committed will recognize the benefit of the industry having a legal means by which we can collectively move eggs from the domestic supply to improve domestic prices."  *See* Ex. 19 (Dckt. No. 164-1, at 87 of 638).  He implored producers to "help yourself improve your egg price."  *Id.*

UEP, through USEM, pressured producers to export eggs at a loss in service of the greater goal to realize higher domestic egg prices.  *See* Ex. 51 (Dckt. No. 164-1, at 290 of 638) (describing the export price as "not usually attractive," and explaining that producers would take "share[s] of the loss incurred in the export sale").  Indeed, Gregory told producers:  "The greater the loss, the better the export.  The very reason for taking the export is to remove domestic surplus on a timely basis that will have the greatest impact on the domestic market."  *See* Ex. 20, at 1 (Dckt. No. 164-1, at 89 of 638).

UEP clearly communicated that the end goal was to reduce domestic supply in order to raise prices.  *See* Ex. 51 (Dckt. No. 164-1, at 289 of 638) ("The primary reason to be a supporter

of the export effort is to <u>help improve your egg price and thereby create a greater return for your</u> <u>business.</u>") (emphasis in original).

Defendants argue that the "sporadic export[]" of eggs is a routine mechanism to remove excess eggs from the domestic market. *See* Defs.' Reply, at 12 (Dckt. No. 203). They also point to evidence that the economic effects of any given export were short lived, and "certainly not the type of impact required for an antitrust violation." *Id.* at 12–13.

But Plaintiffs' evidence shows that UEP promoted egg exports as a mechanism to boost the domestic price of eggs. And damages arguments go to the merits, not the existence of a conspiracy. As the MDL court recognized, "the success of a particular conspiratorial action is irrelevant to the larger inquiry into whether the conspiracy existed in the first place." *In re Processed Egg Prods.*, 2019 WL 5656101, at *12.

Based on the evidence, the Court finds that Plaintiffs have sufficiently established by a preponderance of the evidence that the export program served as a means of reducing domestic supply and increasing profits.

### D. Defendants' Arguments Against the Broader Conspiracy

Defendants raise several more arguments against the existence of the conspiracy. None moves the needle.

First, Defendants argue that Plaintiffs are pulling a fast one. They think that Plaintiffs have changed their theory of conspiracy at the eleventh hour. "[I]n shifting theories on the eve of trial, Plaintiffs diverge from the conspiracy alleged in their Complaint." *See* Defs.' Resp., at 2 (Dckt. No. 203).

In their complaint, Plaintiffs alleged a single, overarching conspiracy with three components: (1) short-term supply reducing measures; (2) the Certified Program; and (3)

20

exports.  According to Defendants, the *Santiago* proffer moves away from that characterization.  Defendants think that Plaintiffs "hedge their bets" in the *Santiago* proffer "by not committing to a consistent characterization of the conspiracy, describing separate conspiracies with the same end goal."  *Id.*

In particular, Defendants latch on to Plaintiffs' allegations about UEP's recommended backfilling plan.  *Id.* at 6.  They think backfilling is a new face in the conspiratorial cast.  As Defendants see it, Plaintiffs' *Santiago* Proffer "adds a new, fourth prong" to the conspiracy, because Plaintiffs had originally alleged that the backfilling ban was a part of the UEP Certified Program, "not a separate prong of the conspiracy."  *Id.*

Plaintiffs' *Santiago* proffer, however, is consistent with their second amended complaint, and their theory of the case so far.  Plaintiffs have continually alleged a *single* conspiracy to restrict egg supply.  *See* Second Am. Cplt., at ¶ 3 (Dckt. No. 73-17) ("Starting in at least 1999 and continuing through at least 2008, Defendants unlawfully agreed to and did engage in a conspiracy to control supply and artificially maintain and increase the price of eggs."); Pls.' Proffer, at 1 (Dckt. No. 164) ("Beginning in 1998, Defendants and their co-conspirators hatched a conspiracy to restrict the national egg supply and raise prices of shell eggs and egg products.").

To be sure, the alleged conspiracy is multi-pronged.  Plaintiffs allege that Defendants furthered the conspiracy's ends through several means.  Defendants allegedly restricted egg supply through short-term supply reduction measures like molting and early slaughter, the Certified Program and its backfilling ban and cage-space requirements, and the export of eggs at a loss.  One conspiracy, one end goal, but multiple routes to get there.

Plaintiffs have been consistent on that front as well.  They have consistently alleged the existence of a multi-pronged conspiracy.  The Second Amended Complaint alleged that

Defendants implemented their conspiracy "through a series of collective actions, including short-term measures, the UEP Certified Guidelines, and coordinated, large-scale exports." *See* Second Am. Cplt., at ¶ 7 (Dckt. No. 73-17). Plaintiffs highlighted Defendants' prohibition on backfilling. *Id.* at ¶ 7(J). And in their proffer, Plaintiffs note that the conspiracy "had four main initiatives," which included short-term measures, overseas exports, cage density restrictions, and the ban on backfilling. *See* Pls.' Proffer, at 1–2 (Dckt. No. 164).

Backfilling may have gained greater prominence as the case has rolled along, but it has been there all along. More importantly, Plaintiffs' theory of conspiracy – a single conspiracy consisting of multiple initiatives championed by USEM and UEP – has remained consistent.

Second, Defendants point to the lack of a smoking gun. Defendants argue that Plaintiffs have not proven a single conspiracy because the proffer "cites no evidence that any one egg producer agreed with another egg producer (much less several producers) to reduce the supply of eggs." *See* Defs.' Resp., at 19 (Dckt. No. 203). Defendants fault the proffer for failing to provide any "direct communications between the egg producers who supposedly joined the conspiracy" or any "evidence of overarching agreement among them." *Id.*

Plaintiffs allege a "hub and spoke" conspiracy, in which "a core conspirator . . . moves from 'spoke to spoke, directing the functions of the conspiracy.'" *United States v. Bustamonte*, 493 F.3d 879, 885 (7th Cir. 2007), *overruled on other grounds by United States v. Tinsley*, 62 F.4th 376 (7th Cir. 2023). Here, the trade associations – UEP and USEM – acted as the hub for the operation, guiding the flock of egg producers (the spokes) to greater profits.

"[T]o prove a single conspiracy in the hub-and-spoke context, the [plaintiff] must show that 'a rim . . . connect[s] the spokes together, for otherwise the conspiracy is not one by many.'" *United States v. Orlando*, 819 F.3d 1016, 1022 (7th Cir. 2016) (quoting *United States v. Avila*,

557 F.3d 809, 815 (7th Cir. 2009)).  "The 'rim' is an agreement to further a single design or purpose."  *Id.*

Plaintiffs do not need to show direct communications between the spokes to prove their hub-and-spoke conspiracy.  Rather, Plaintiffs only need to show by a preponderance of the evidence that the individual spokes – here, the producers – were aligned, and in agreement.

That is, Plaintiffs must show that the producers "knew the essential nature and scope of the overarching conspiracy."  *Id.*  "[T]hose people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise."  *Bustamonte*, 593 F.3d at 885–86 (quoting *United States v. Levine*, 546, F.2d 658, 663 (5th Cir. 1977)).

Plaintiffs have met their burden here.  There is evidence that the egg producer co-conspirators knew of the overarching conspiracy, and of each other, because UEP regularly communicated to them through its newsletters.

As just one example, in a 2004 newsletter, UEP reported that "[c]ompanies with ownership of approximately 230 million hens or 80% of the industry" were "committed" to the Certified Program.  *See* Ex. 44, at 1 (Dckt. No. 164-1, at 243 of 638).  The newsletter went on to list companies that had completed audits with passing grades that year.  *Id.* at 1–2.  A list of the conspiracy's honor roll shows that egg producers "knew that the conspiracy extended beyond a single, isolated" agreement between UEP and a given producer.  *Orlando*, 819 F.3d at 1022.

There is other evidence beyond the UEP newsletters.  Not only did co-conspirators receive updates on the conspiracy's success and participation from UEP, they also actively participated in UEP's business.  Several alleged co-conspirators placed executives in positions on UEP's board and committees.  *See, e.g.*, Ex. 42 (Dckt. No. 164-1, at 228 of 638).

23

There, the co-conspirators brushed shoulders, and cross-pollinated ideas. They sat on committees that ultimately developed, approved, and executed the conspiracy's price-fixing initiatives. *See, e.g.*, Ex. 28 (Dckt. No. 164-1, at 113 of 638) (approving the 100% Rule). Co-conspirator collaboration in UEP leadership is further evidence of the "rim" connecting the egg producers here.

Third, Defendants argue that a producer's participation in UEP or USEM cannot establish a conspiracy. *See* Defs.' Resp., at 21 – 22 (Dckt. No. 203). They point out that, in the Seventh Circuit, "a trade association is not, just because it involves collective action by competitors, a 'walking conspiracy.'" *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) (quoting *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (7th Cir. 1988)).

As a general matter, "[m]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Ass'ns,* 819 F.2d 693, 712 (7th Cir. 1987) (quotation marks omitted). A trade association, its membership, and its attendant activities standing alone cannot establish a conspiracy. *See Kleen Prods., LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 834 (N.D. Ill. 2017) ("Defendants' participation in trade associations is legitimate activity."); *In re High Fructose Corn Syrup Antitrust Litig.,* 156 F. Supp. 2d 1017, 1040 (C.D. Ill. 2001) ("Membership in a trade association and participation in its activities, without something more, does not tend to exclude the possibility of legitimate, legal activity."), *rev'd on other grounds,* 295 F.3d 651 (7th Cir. 2002); *In re Chocolate Confectionary Antitrust Litig.,* 999 F. Supp. 2d 777, 804 (M.D. Pa. 2014) ("The court rejects the suggestion that the contemporaneous presence of defendants' officers at a trade association meeting permits an inference of conspiracy.").

24

When it comes to trade associations, guilt by association isn't a thing.

As the MDL court explained it, "[c]ommon membership, meeting attendance, and 'adoption of the trade groups' suggestions' can . . . evidence 'an *opportunity* to conspire.'" *In re Processed Egg Prods.*, 2019 WL 5656101, at *6 (emphasis in original) (quoting *Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010), and collecting cases). But it is well-settled that "having the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*." *Kleen Prods. LLC*, 910 F.3d at 938 (emphasis in original); *see also Weit v. Cont'l Illinois Nat'l Bank & Tr. Co.*, 641 F.2d 457, 462 (7th Cir. 1981) ("[T]he mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence."); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application, at ¶ 1417 (4th & 5th eds. 2023) ("Mere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding.").

Above and beyond establishing an opportunity to conspire, a plaintiff must show that the conspirator "act[ed] upon [the opportunity] to establish the common agreement." *In re Processed Egg Prods.*, 2019 WL 5656101, at *6. There must be evidence that alleged co-conspirators "'acted other than independently' in adhering to the trade association's programming or guidelines." *Id.* (quoting *Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010)).

For example, "[j]oint action taken by competing members of a trade association on behalf of the association as an entity can satisfy the conspiratorial element of a Section 1 claim." *Id.* (citing *Weiss v. York Hosp.*, 745 F.2d 786, 815–16 (3d Cir. 1984)). Additionally, when a trade association "urge[s] its members to substitute 'co-opetition' [*i.e.*, cooperative competition] for

competition," participation in the association may be a plus factor. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

In other words, membership in a trade association may not *per se* establish an anti-competitive conspiracy, but it also does not insulate a conspiracy from coming into existence. Some trade association activities, in conjunction with other evidence, may support the existence of a conspiracy. *See In re Turkey Antitrust Litig.*, 2022 WL 17093359, at *10 (N.D. Ill. 2022) ("Although opportunities to cooperate in trade associations are not ipso facto evidence of a conspiracy, when one considers them in the broader context, evidence of these opportunities 'plausibly help[s] to fill-out the picture' of an alleged conspiracy.") (alteration in original) (quoting *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 779–80 (N.D. Ill. 2017)).

Here, producers went above and beyond run-of-the-mill membership and participation. By placing their executives in various roles on UEP and USEM boards and committees, they played key roles in developing and approving the conspiracy's supply-reducing initiatives. Then, as UEP vocally implored members to play along, the competing companies adopted and participated in them, nearly in unison.

Defendants undertook these actions with the understanding and intent that their measures would boost egg prices industry wide. That joint action, taken at the direction and with the encouragement of the trade associations, satisfies the conspiratorial element. *See In re Text Messaging*, 782 F.3d at 878 (noting that opportunities for the defendants' executives to meet privately "would be more compelling if the immediate sequel to any of these meetings had been a simultaneous or near-simultaneous price increase by the defendants"); *see also Wilk*, 895 F.2d at 374 (noting that a trade association may act anticompetitively where its functions are "merely a ploy to obscure a conspiracy").

Fourth, Defendants argue that Plaintiffs fail to provide the Court with evidence establishing when the conspiracy began and ended. *See* Defs.' Resp., at 22 (Dckt. No. 203). According to Defendants, that shortcoming is problematic because Rule 801(d)(2)(E) makes "[s]tatements by coconspirators made either before the formation of a conspiracy or after its termination" inadmissible. *See* Fed. R. Evid. 801(d)(2)(E).

But Plaintiffs' proffer is clear. The conspiracy "began in 1998, was implemented in a series of actions of the conspirators from 1998 until no later than 2008, and continued to affect the price of eggs throughout the damage period." *See* Pls.' Proffer, at 17 (Dckt. No. 164).

Defendants take issue with Plaintiffs' evidence of that timeline, starting with the conspiracy's inception date. They identify two 1998 documents – a Cal-Maine memorandum, and a UEP "Notice" to members – as "far too slender a reed" to support Plaintiffs' alleged conspiracy starting date. *See* Defs.' Resp., at 23 (Dckt. No. 203).

For present purposes, however, the documents leave the Court satisfied that the conspiracy began as early as 1998. The UEP notice informed members that its Marketing Committee recommended an "immediate" slaughter and "early molt" plan, which the Court has already concluded were dimensions of the broader conspiracy to restrict supply. *See* Ex. 12 (Dckt. No. 164-1, at 61 of 638). The notice further urged that "with a high member participation in the recommend program, we should be able to reduce the egg supply week-by-week thereby assuring much improved prices over what would otherwise be undesirable levels." *Id.*

Likewise, the Cal-Maine memorandum stated the company's intention to adopt "early slaughter/early molt programs supported by both UEP and USEM." *See* 5/13/08 Mem. (Dckt. No. 164-1, at 59 of 638). Cal-Maine signaled its intent to "follow the program 100%." *Id.*

27

In other words, the two documents show UEP's encouragement and at least one member's adoption of a proposal to restrict egg supply in an explicit attempt to increase egg prices. Viewed against the backdrop of the alleged conspiracy as a whole, that kind of circumstantial evidence supports the conclusion that the conspiracy began in at least 1998. *See Pust*, 798 F.3d at 603 (noting that "circumstantial evidence is often the only proof available" to establish the existence of a conspiracy).

Defendants also take issue with Plaintiffs' characterization of the conspiracy's end date. Plaintiffs argue that the conspiracy went "until no later than 2008," yet allege that the conspiracy continued to "affect the price of eggs throughout the damage period" ending in 2012. *See* Pls.' Proffer, at 17 (Dckt. No. 164). Defendants assert that this claim is not only contradictory, but unsupported by evidence. *See* Defs.' Resp., at 23 (Dckt. No. 203).

However, the proffer is clear in its allegation that the conspiracy endured until 2008, with effects that lingered for the next few years. *See* Pls.' Proffer, at 17 (Dckt. No. 164) ("That conspiracy began in 1998, *was implemented in a series of actions of the conspirators from 1998 until no later than 2008*, and continued to affect the price of eggs throughout the damage period.") (emphasis added). Moreover, Plaintiffs present evidence of conspiratorial activity occurring up until 2008. *See* March 2008 Egg Economics Report (Dckt. No. 164-1, at 186–200 of 638) (noting that flock reduction, prohibited backfilling, cage space requirements, and exports had impacted 2007 egg prices).

In sum, Plaintiffs have shown a supply-reducing conspiracy by a preponderance of the evidence.

## II.      Membership in the Conspiracy

Plaintiffs have carried the burden of showing the existence of a conspiracy.  The next step is to present evidence that the declarants joined it.  *See Davis*, 845 F.3d at 286.

"To show that a defendant was involved in the conspiracy, the [plaintiff] must show that he '(1) knew of the conspiracy, and (2) intended to associate himself with the criminal scheme.'" *United States v. Stephenson,* 53 F.3d 836, 843 (7th Cir. 1995) (quoting *United States v. Sullivan,* 903 F.2d 1093, 1098 (7th Cir.1990)).  Courts often refer to this kind of involvement as a defendant's "participatory link."  *United States v. Campbell*, 985 F.2d 341, 345 (7th Cir. 1993).

For purposes of a *Santiago* proffer, "once the conspiracy is established, 'only slight evidence is required to link a defendant to it.'"  *Shoffner*, 826 F.2d at 627 (quoting *United States v. Garver*, 809 F.2d 1291, 1295 (7th Cir. 1987)).  "The [proponent] is not required to prove that there was a formal agreement, and circumstantial evidence indicating the defendant's membership in the conspiracy can also be considered."  *Stephenson*, 53 F.2d at 1098 (citing *United States v. Schumpert*, 958 F.2d 770, 773 (7th Cir. 1992)).

Circumstantial evidence is enough.  "Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence."  *United States v. Sasson*, 62 F.3d 874, 888 (7th Cir. 1995) (quoting *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir. 1984)).

In the antitrust context, "[t]he Supreme Court has explained that a party progresses from mere knowledge of an endeavor to intent to join it when there is informed and interested cooperation, stimulation, instigation.  And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy."  *In re Vitamins Antitrust*

*Litig.*, 320 F. Supp. 2d 1, 17 (D.D.C. 2004) (internal quotation marks omitted) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943)).

Here, Plaintiffs assert that Defendants UEP, USEM, Rose Acre, and Cal-Maine – as well as non-defendants Michael Foods, Moark, and Wabash Valley – were members of the conspiracy. The Court divides those entities into two groups. The first group includes entities already considered by the MDL court (UEP, USEM, Rose Acre, Cal-Maine, and Moark). The other group includes entities who are new to the analysis (Michael Foods and Wabash Valley). The Court considers each group in turn.

### A.     UEP, USEM, Rose Acre, Cal-Maine, and Moark

After an extensive review of the record, the MDL court concluded that UEP, USEM, Rose Acre, Cal-Maine, and Moark were members of the anticompetitive conspiracy to restrict egg supply. *See In re Processed Egg Prods.*, 2019 WL 5656101, at *7–19. This Court agrees and adopts that holding here with respect to those entities.

In brief, Plaintiffs have presented evidence showing that UEP and USEM encouraged and instructed their members to participate in several coordinated initiatives designed to reduce the national egg supply. Those members – including Rose Acre, Cal-Maine, and Moark – ultimately participated in one or more of UEP's proposed programs.

Executives from the member companies often played key roles in the development and approval of the conspiratorial initiatives, too. Executives from UEP member companies sat on various UEP and USEM committees and boards. In these roles, they voted to adopt key aspects of the conspiracy. They did so with the understanding that the programs were supply-reducing efforts.

For example, Rose Acre joined UEP in 2002. *See* Ex. 57 (Dckt. No. 164-1, at 331 of 638). Executives were present at UEP board and committee meetings when key features of the Certified Program were discussed and developed. *See* Ex. 68 (Dckt. No. 164-1, at 521–23 of 638); Ex. 34 (Dckt. No. 164-1, at 170–74 of 638). The company eventually joined the Certified Program in 2002 with the understanding that the program was designed, in part, to decrease supply and increase profits. *See* Ex. 57; Ex. 4 (Dckt. No. 164-1, at 23 of 638) ("I don't really know what this whole motive is but I think there is more to it than Animal Welfare. I think some people think it will make them rich or something.").

The same goes for both Cal-Maine and Moark. Both companies helped develop the conspiracy's initiatives. *See, e.g.*, Ex. 41 (Dckt. No. 164-1, at 218 of 638) (showing that Cal-Maine CEO Dolph Baker was present at a UEP board meeting discussing a "supply adjustment program" calling for "early molt/early slaughter"); Ex. 13 (Dckt. No. 164-3, at 67–68 of 220) (showing that Moark executive director Paul Osborne was a member of the committee developing the UEP Certified Program). And both signed up for one or more of the conspiracy's initiatives, including the Certified Program. *See* Ex. 74 (Dckt. No. 164-1, at 551 of 638) (confirming Cal-Maine's participation in the UEP Certified Program); Ex. 100 (Dckt. No. 164-3, at 63 of 220) (showing that Moark completed an application for certification under the Certified Program).

Defendants argue that the producers' participation in trade associations and attendance of committee meetings do not, by themselves, establish their agreement to join the conspiracy. *See* Defs.' Resp., at 24–27 (Dckt. No. 203). "That producers like Cal-Maine, Rose Acre, Michael Foods, Moark, and Wabash Valley may have participated in various committees does not

31

establish that they shared an unlawful purpose with anyone else." *Id.* at 25 (citing *United States v. Quintana*, 508 F.2d 867, 880 (7th Cir. 1975)).

Defendants point out that UEP had more than 200 members at the time of the alleged conspiracy. Some committees, like the influential Marketing Committee, had as many as 24 members. *Id.* And because Plaintiffs do not argue that *all* UEP members were part of the conspiracy – they focus on only five producers – Defendants assert that "Plaintiffs fail to offer evidence of an *agreement* among these five producers, UEP, and USEM to follow the UEP's supply recommendations and/or the Certified Program." *Id.* at 22 (emphasis added).

Again, "pertinent legal authority is clear that participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of agreement to the conspiracy." *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 722 (E.D. Pa. 2011); *see also Quintana*, 508 F.2d at 880 ("[N]either association with conspirators nor knowledge that something illegal is going on by themselves constitute proofs of participation in a conspiracy."). A trade association member who simply shows up doesn't tie itself to the conspiratorial mast.

Something more is required, above and beyond trade association membership. There must be "some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member." *Moore*, 819 F.2d at 712 (internal quotation marks omitted). "[A]ctive participation, rather than merely passive presence, becomes key in inferring agreement to the conspiracy and potential liability." *In re Processed Egg Prods.*, 821 F. Supp. 2d at 723.

32

Here, the evidence shows a degree of active involvement sufficient to establish the producers' participatory link to the conspiracy. Rose Acre, Cal-Maine, and Moark all placed executives on UEP or USEM committees. In those committees, the executives played important roles in the development and adoption of the conspiracy's supply-reducing initiatives. Their positions within UEP also made them privy to UEP's clear characterizations of the programs' supply-reducing virtues. And at the end of the day, each company implemented at least one of the programs that UEP was encouraging.

UEP and USEM may have created opportunities to conspire by getting everyone together, but in helping design and then participating in the Certified Program and other initiatives, the producers seized those opportunities. That kind of participation goes above and beyond "mere observation." *Id.* In taking these actions, the companies hitched themselves to the conspiracy. *In re Processed Egg Prods.*, 2019 WL 5656101, at *13 ("A defendant's decision to act on the illicit opportunities it discovered through its associations and meeting attendance . . . can show agreement.").

In sum, there is evidence that UEP, USEM, Cal-Maine, Moark, and Rose Acre participated in and contributed to the conspiracy's initiatives, primarily the Certified Program. As the MDL court concluded, "[b]ecause these entities at least participated in the Certified Program, [Plaintiffs] have sufficiently shown their knowing involvement in the conspiracy." *In re Processed Egg Prods.*, 2019 WL 5656101, at *19.

Defendants also argue that there were other, legitimate reasons why producers like Rose Acre and Cal-Maine participated in the UEP Certified Program. They assert that "the evidence indicates that [producers] joined the Certified Program out of their own self-interest and

responsive to customer demand." *See* Defs.' Resp., at 27 (Dckt. No. 203). After all, customers wanted humanely raised eggs. UEP certification simply delivered on those expectations.

Maybe there were other legitimate reasons for the conduct. But Plaintiffs' evidence shows that another motive was high in the minds of UEP, USEM and its member companies: reducing supply and keeping prices high. UEP and its members routinely described the conspiracy's initiatives in those terms. Documents suggest that ethical animal husbandry concerns were an afterthought. *See, e.g.*, Ex. 46 (Dckt. No. 164-1, at 263 of 638) ("If all the Industry were to follow the guidelines through the first step this would result in a flock size reduction of 13 million hens. . . . [T]he payback for making this step to a 'house average' of 56 square inches is tremendous.").

The Court therefore concludes that Plaintiffs presented sufficient evidence to show that the companies knew that the Certified Program and other initiatives were part of a supply-reducing conspiracy.

### B.     Michael Foods and Wabash Valley

The Court comes to the same conclusion for non-defendants Michael Foods and Wabash Valley. Like UEP, USEM, and the egg producers already discussed, both Michael Foods and Wabash Valley had representatives at UEP board meetings when the supply-restricting measures were developed and recommended. And both ultimately participated in the Certified Program.

As early as 2000, Michael Foods executives sat on committees that developed various aspects of the program. *See, e.g.*, Ex. 35 (Dckt. No. 164-1, at 176 of 638) (showing executive Tim Bebee's membership on the Animal Welfare Committee). Even so, the company was reluctant to sign on for the first few years of the initiative, and its executives often voted "no" on

motions relating to the program. *See* Ex. 94 (Dckt. No. 164-3, at 42 of 220); Ex. 86 (Dckt. No. 164-3, at 2–4 of 220) (application to join the Certified Program dated June 28, 2006).

As they plotted their resistance, several Michael Foods executives, including CEO Gregg Ostrander, recognized that the Certified Program raised anticompetition concerns. Ostrander sent one email to fellow executives suggesting that they "determine what legal grounds we have to fight this [Certified Program] resolution in terms of restraint of trade." *See* Ex. 91 (Dckt. No. 164-3, at 29 of 220). In another email, executive Terry Baker informed Ostrander that "we have discussed internally if any of these scenarios would be considered restraint of trade issues." *See* Ex. 3 (Dckt. No. 164-1, at 20 of 638).

Michael Foods ultimately joined the Certified Program – and the conspiracy – in 2006. *See* Ex. 86 (Dckt. No. 164-3, at 2–4 of 220). The company's internal communications reveal that it understood the Certified Program as a means of limiting egg supply and increasing prices – not furthering animal welfare. For example, a 2002–2003 internal production forecast highlighted that the program would "reduce U.S. Flock size by 20 million layers," and that "[r]educed layers translate into reduced egg supply in turn higher prices." *See* Ex. 89, at 5, 9 (Dckt. No. 164-3, at 17, 21 of 220).

Michael Foods's eventual participation in the Certified Program, coupled with its internal communications, is enough for the Court to conclude that Plaintiffs have met their burden of showing the company's membership in the anticompetitive conspiracy.

Wabash Valley also played an active role in the development of the Certified Program and UEP's short-term measures. Wabash Valley executive Larry Seger sat on both the UEP Shell Egg Marketing Committee and the USEM Export Committee. *See* Ex. 63 (Dckt. No. 164-1, at 402 of 638); Ex. 16 (Dckt. No. 164-1, at 77 of 638). Seger helped to approve the 100%

Rule as a part of the Certified Program. *See* Ex. 112 (Dckt. No. 164-3, at 207–10 of 220). And later, he approved UEP's early molt and slaughter recommendations as a member of the UEP Marketing Committee. *See* Ex. 15 (Dckt. No. 164-1, at 74 of 638).

Another Wabash Valley executive, Roger Seger, sat on the UEP Spent Hen Committee. *See* Ex. 111 (Dckt. No. 164-3, at 189 of 220). He was also present as a member at a UEP Committee for Animal Welfare meeting when the committee recommended the ban on backfilling – a measure Larry Seger would later approve as a member of the UEP board. *See* Ex. 34 (Dckt. No. 164-1, at 170 of 638); Ex. 113 (Dckt. No. 164-3, at 213 of 220).

Wabash Valley joined the UEP Certified Program in 2002. *See* Ex. 107 (Dckt. No. 164-3, at 139 of 220). It also participated in the export program. *See* Ex. 108, at 3 (Dckt. No. 164-3, at 164 of 220).

The Court is thus satisfied that Wabash Valley's participation in the Certified Program and other USEM/UEP supply-restricting measures is enough to show by a preponderance of the evidence the company's membership in the conspiracy.

## III. Statements Made in the Course of the Conspiracy

The next hurdle is about timing. The declarant must have made the statement during the course of the conspiracy to be admissible under Rule 801(d)(2)(E). *See DeKelaita*, 875 F.3d at 859–60. "Statements by coconspirators made either before the formation of a conspiracy or after its termination are not admissible under the coconspirator hearsay exception." *United States v. Coe*, 718 F.2d 830, 840 (7th Cir. 1983) (collecting cases).

Plaintiffs allege that the conspiracy began in 1998 and continued to affect the price of eggs until 2012. *See* Pls.' Proffer, at 17 (Dckt. No. 154). From this Court's review, the documents and statements Plaintiffs seek to admit are dated between 1998 and 2012. For

purposes of the *Santiago* proffer, the Court is satisfied that the statements were made during the course of the conspiracy.

There is one caveat. Although all the proffered statements were made in that time frame, not all were made by declarants who had joined the conspiracy at the time that the declarants made them.

In particular, Plaintiffs proffer two statements that Michael Foods made in 2002 and 2005. *See* Pls.' Proffer, at 36 (Dckt. No. 164) (citing exhibits 94 and 95). But as this Court has already concluded, Michael Foods joined the conspiracy in 2006, when it signed up to participate in the Certified Program. Michael Foods was not a co-conspirator when it made the statements in 2002 and 2005, so those statements are inadmissible under Rule 801(d)(2)(E). *See* Fed. R. Evid. 801(d)(2)(E) (requiring that the statement be "made by the party's coconspirator"); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002) ("As a general proposition, the statements of a non-conspirator are not admissible under Rule 801(d)(2)(E).").

Plaintiffs argue that Michael Foods joined the conspiracy long before 2006, by virtue of its executives' presence on the committees that developed the Certified Program and other initiatives. *See* Pls.' Reply, at 17–18 (Dckt. No. 239). But as the Court has already discussed, an entity's passive association with a conspiratorial entity and the *opportunity* to join a conspiracy does not rise to the level of joining the conspiracy. *See Moore*, 819 F.2d at 712. Again, there is no guilt by (trade) association.

In fact, the evidence shows that Michael Foods actively resisted participating in the conspiracy's initiatives. Executives voted against Certified Program initiatives on multiple occasions. *See, e.g.*, Ex. 94 (Dckt. No. 164-3, at 42 of 220) ("As you might expect I was one of the few bad guys often voting against the motions made."). And internal discussions reveal that

the company was willing to sit-out the conspiracy in its initial stages. *Id.* ("This will be an interesting movie to watch form [sic] the sidelines as we aren't affected . . . .").

Michael Foods ultimately relented and joined the Certified Program in 2006. *See* Ex. 86 (Dckt. No. 164-3, at 2–4 of 220). Before 2006, the evidence shows that Michael Foods was only a bystander, if not someone standing in the way.

In sum, with those exceptions, the Court finds that the statements were made during the course of the conspiracy. The Court finds that Michael Foods's statements made before 2006 are inadmissible as co-conspirator statements under Rule 801(d)(2)(E).

## IV. Statements Made in Furtherance of the Conspiracy

The final hurdle under Rule 801(d)(2)(E) is the "in furtherance" requirement. Plaintiffs must show that the statements were made in furtherance of the conspiracy. *See Cardena*, 842 F.3d at 993.

The proponent faces a "relatively low burden of proof" to meet the "in furtherance" requirement. *See Shoffner*, 826 F.2d at 628. "In order to satisfy the 'in furtherance requirement', the coconspirator's statement 'need not have been exclusively, or even primarily, made to further the conspiracy.'" *Cruz-Rea*, 626 F.3d at 937 (quoting *United States v. Singleton*, 125 F.3d 1097, 1107 (7th Cir. 1997)). The proponent satisfies its burden so long as "some reasonable basis" exists for concluding that the statement furthered the conspiracy, even if the statement is susceptible to alternative interpretations. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000) ("[T]he record need only contain some reasonable basis for concluding that the statement in question furthered the conspiracy in some respect.").

So, "in furtherance" under Rule 801(d)(2)(E) casts a wide net. As a general matter, statements that promote the conspiracy's objectives are "in furtherance" of that conspiracy. *Gajo*, 290 F.3d at 929. If the statement keeps the wheels of the conspiracy turning, it furthers the conspiracy.

Statements satisfying the rule can come in a variety of forms. For instance, any statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the requirement. *See United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009). Additionally, courts have held that comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent desertion of other members all amount to statements in furtherance of the conspiracy. *See Johnson*, 200 F.3d at 533. "[D]iscussions about supply, demand, transportation, and finances" also further the conspiracy. *See United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) (citations omitted).

A statement does not further a conspiracy merely because it was shared between co-conspirators. "[M]ere idle chatter, narrative declarations, and superfluous casual remarks" do not satisfy the requirement. *Johnson*, 200 F.3d at 533 (citations omitted). "This is true even when . . . the declarant makes what can be construed as an offhand admission of culpability." *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991); *see also Schalk*, 515 F.3d at 774 ("'[I]dle chatter' . . . d[oes] not seek to further the conspiracy, as required for admission."); *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990) ("Mere chitchat, casual admission of culpability, and other noise and static in the information stream are not admissible.").

Finally, the inquiry requires a court to examine both the statement's content and context in determining whether it was made in furtherance of the conspiracy. *See Gajo*, 290 F.3d at 929; *see also Johnson*, 200 F.3d at 533 ("Courts assess a statement's ability to advance the conspiracy in the context in which the statement was made.").

Plaintiffs here seek to admit two categories of statements: (1) intra-company communications of the producer-coconspirators, and (2) UEP newsletters and trade association publications distributed to members. The Court will separately address each category.

### A.    Intra-Company Statements

Plaintiffs offer a number of statements that Rose Acre, Cal-Maine, Moark, Michael Foods, and Wabash Valley made in internal communications. The Court briefly summarizes them below.

Rose Acre executive KY Hendrix, in a memorandum to other Rose Acre executives, informed his colleagues that "there have been 83 million chickens sign[ed] up" for the Certified Program, and that the "pressure is on to get signed up by April 1st 2002." *See* Ex. 4 (Dckt. No. 164-1, at 22–23 of 638). He went on to say, "I don't really know what this whole motive is but I think there is more to it than Animal Welfare. I think some people think it will make them rich or something. I have never been or never will be for quotas an[d] it seems to me that is somewhat of the path they are taking." *Id.*

Cal-Maine had similar internal discussions about the conspiracy's ongoings. During a board meeting on March 28, 2003, executive Ken Looper told the company's directors that the Certified Program would remove around four million hens from the national flock, which allowed for "an opportunity for improvement in the economics of the egg industry." *See* Ex. 79 (Dckt. No. 164-1, at 596 of 638).

40

Another Cal-Maine executive, Dolph Baker, informed the board that the company had succeeded in its efforts to recover the Program's increased production costs from customers.  *Id.* (Dckt. No. 164-1, at 598 of 638).  And in July 2004, Cal-Maine CEO Fred Adams shared his "hope" that the Certified Program would "reduce the supply side" for the next five years.  *See* Baker Dep., at 318:23 – 319:2 (Dckt. No. 164-1, at 572–73 of 638).

Moark also discussed the conspiracy's status internally.  In an email dated October 19, 2007, executives discussed their opposition to a recent USEM export, but nevertheless acknowledged that "[a]s cooperative members, we will support it," and expressed an expectation that the company would "see improving markets into the holidays" as a result.  *See* Ex. 104 (Dckt. No. 164-3, at 105 of 220).

So too with Michael Foods, as the company internally discussed whether to commit to the Certified Program.  In one email, executive Tim Bebee acknowledged that "most all [in the UEP Animal Welfare Committee] agree that at this point [the Certified Program] is a tool to resurrect the market problems."  *See* Ex. 94 (Dckt. No. 164-3, at 42 of 220).  And in an April 2005 email before an Animal Welfare Committee meeting, Catherman wrote that efforts to increase participation in the Program "[r]aise[] the question about the original purpose . . . : a husbandry practice program now managing the marketing and economic restriction of movement of product."  *See* Ex. 96 (Dckt. No. 164-3, at 47 of 220).

Finally, Plaintiffs put forward internal statements from Wabash Valley.  In an email from CEO Larry Seger to UEP chairman Gene Gregory dated August 8, 2008, Seger asked UEP to encourage shell egg and egg products producers to "work together" to "share the theory of producing eggs at a profit."  *See* Ex. 114 (Dckt. No. 164-3, at 220 of 220).  He warned that all

producers should stick together, "like it or not." *Id.* "Ideally it is preferable this is done at a profit." *Id.*

These representative statements are all admissible as statements in furtherance of the conspiracy.

In many of the statements, company executives informed their counterparts about the conspiracy's status. The executives commented on who had joined, what the costs were, and what the company could expect the benefits to be. These statements kept the conspirators "advised about the conspiracy's progress" and were in furtherance of the conspiracy. *Stephenson*, 53 F.3d at 845 ("[S]tatements made to keep coconspirators informed about the progress of the conspiracy . . . are in furtherance of the conspiracy."); *see also United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987) (holding that discussions about a conspirator's prison drug service, amounts owed him, how he was to be paid, and how he could help furthered the conspiracy); *United States v. Williams*, 2021 WL 2212747, at *3 (N.D. Ill. 2021) (statements discussing logistics and status were in furtherance of the conspiracy).

Other statements, like Larry Seger's email to UEP Chairman Gene Gregory, sought to unify the conspirators. *See* Ex. 114 (Dckt. No. 164-3, at 220 of 220). This statement was not simply "idle chatter," or a "general narrative about the shell egg and egg products markets." *See* Defs.' Resp., at 41 (Dckt. No. 203). Instead, it was directed to the hub of the conspiracy, and sought to keep the conspiratorial gang together. *See* Ex. 114 ("The egg industry is one."). That kind of statement furthers the conspiracy. *See United States v. Rea*, 621 F.3d 585, 604 (7th Cir. 2010) (statements made "to control damage" to the conspiracy satisfy the "in furtherance" requirement).

Defendants attack these statements categorically. As they point out, all the proffered communications took place between employees of a single company in the context of internal emails or board meetings. According to Defendants, these "purely internal" company communications are inadmissible because they do not pass between more than one conspirator. *See* Defs.' Resp., at 31–32 (Dckt. No. 203).

Defendants assert that a company cannot further a conspiracy by talking amongst itself. *Id.* ("[A] company cannot conspire with its employees, nor can employees of the same company conspire when they act within the scope of their authority.") (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017)). So, although the intra-company statements may be admissible as party-opponent statements against each co-conspirator individually, they are not admissible against all Defendants as co-conspirator statements under Rule 801(d)(2)(E).

Conditional admissibility under Rule 801(d)(2)(E), however, does not turn on the identity of a statement's recipient. Co-conspirator statements may be admissible under the Rule if they satisfy three requirements. The proponent must make a preliminary showing that (1) "a conspiracy existed," (2) "the defendant and the declarant were members thereof," and (3) "the proffered statement(s) were made during the course of and in furtherance of the conspiracy." *See DeKalaita*, 875 F.3d at 859–60.

None of the requirements of admissibility involve the statement's target. The identity of the speaker matters: he must be a co-conspirator. But the identity of the listener does not.

So long as the co-conspirator's statement furthers the conspiracy, it is admissible regardless of who heard it. Courts have therefore routinely admitted intra-company statements under Rule 801(d)(2)(E). *See, e.g.*, *United States v. Perkins*, 596 F. Supp. 528, 533–35 (E.D. Pa. 1984) (finding a defendant's statements to his own employees admissible because the employees

were "essential figures in the process by which [defendant's] directives were carried out" and "not mere bystanders" or "errand runners"); *United States v. Penn*, 2022 WL 489417, at *1 (D. Colo. 2022) (admitting internal company email messages between employees); *MM Steel, LP v. Reliance Steel & Aluminum Co.*, 2013 WL 6588836, at *2 (S.D. Tex. 2013) (same).

This Court comes to the same conclusion here. The internal nature of the statements provides no basis for the Court to exclude them.

### B.      UEP Newsletters and Trade Association Publications

The second bucket is full of statements from the trade associations. Plaintiffs assert that "[t]he primary way UEP communicated with its members and with participants in the conspiracy was through its newsletter, named '*United Voices*,' and other similar member communications." Pls.' Proffer, at 19–20 (Dckt. No. 164). Plaintiffs' proffer contains various statements from *United Voices*, USEM memorandums to members, and other trade association communications.

Plaintiffs assert that these communications furthered the conspiracy by updating members on the status of the group's price-fixing efforts. *Id.* at 19–23. According to Plaintiffs, the communications were little more than newsletters informing the co-conspirators of the goings-on of the conspiracy.

Defendants argue that the newsletters cannot have furthered the conspiracy because they were widely distributed to an audience that extended beyond the co-conspirators or even UEP members more broadly. *See* Defs.' Resp., at 33 (Dckt. No. 203). The *United Voices* newsletters didn't go out only to co-conspirators. And it went beyond the mailboxes of UEP members, too. It also reached universities, academics, scientists, government agencies, media, customers, and other industry stakeholders. *Id.* According to Defendants, the wide distribution is fatal because broadly disseminated statements do not qualify as the "normal informational flow between

44

co-conspirators." *Id.* at 33–34 (quoting *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994)).

The MDL court considered that argument and rejected it, and so does this Court. For starters, the argument is unsupported. As in the MDL proceedings, Defendants here "cite no case law to support this narrow reading, and the Court has not uncovered any." *In re Processed Egg Prods.*, 2019 WL 5656101, at *19.

Moreover, the statements were, at some level, between co-conspirators. Although not every recipient was a member of the conspiracy, Plaintiffs have established that at least some were. UEP and USEM, both conspirators, sent the messages, and a conspirator received them. At bottom, the statements "were a form of communication to and among, and between co-conspirators." *Id.*

Secrecy may be a hallmark of a conspiracy, but not every statement needs to be in secret. Secrecy is not necessary for each and every communication. It may be in the conspirators' best interest to keep the conspiracy under wraps. But an anticompetitive agreement can violate the antitrust laws even if everyone knows about it, and even if the co-conspirators conduct their business in the public. *See, e.g.*, *Fed. Trade Comm'n v. Superior Ct. Tr. Laws. Ass'n*, 493 U.S. 411, 414 (1990) (lawyers' "well-publicized plan" to refuse to represent indigent criminal defendants until their compensation was increased constituted a conspiracy); *San Juan Racing Ass'n v. Ass'n De Jinetes De P.R., Inc.*, 590 F.2d 31, 32 (1st Cir. 1979) (horse jockeys' public refusal to race until their fees were increased could constitute illegal anticompetitive conduct, as "openness [did] not immunize agreement").

That's especially true when public statements appear against the backdrop of private communications. The public message can gain added resonance when the listener knows the

private chatter.  Like the Bat Signal, a public message can convey a special meaning to someone with the inside scoop.

In other words, the "in furtherance" requirement does not have a baked-in expectation of clandestineness.  Statements that promote the conspiracy's objectives, including statements reflecting the flow of information between conspirators, further the conspiracy.  That remains true no matter how far and widely they are broadcast.  The content of the statement bears more on admissibility than its reach.  This Court will not exclude the statements "on the grounds of who they were made by or made to."  *In re Processed Egg Prods.*, 2019 WL 5656101, at *19.

The Court notes that some of these trade association communications were not directed to the UEP network of members at all.  For example, one statement comes from a presentation given by UEP President Gene Gregory at the convention of an entirely separate trade association, PEPA.  *See* Ex. 38 (Dckt. No. 164-1, at 186–200 of 638).  Another comes from a meeting at the Watt Poultry Summit, which both UEP and non-UEP members attended.  *See* Ex. 47 (Dckt. No. 164-1, at 268–272 of 638).

However, there is a reasonable basis to believe that the statements furthered the conspiracy by advertising UEP's initiatives in the hopes that others would join.  *See* Ex. 38 (Dckt. No. 164-1, at 187 of 638) (advertising "exports," "flock reduction," "prohibited backfilling of cages," and the "UEP Certified Cage Space Requirements" as factors that attributed to 2007 egg prices); Ex. 47 (Dckt. No. 164-1, at 272 of 638) ("Put money in your pocket!!!! . . .  Give your animal welfare program a jump start by reducing the cage density to meet UEP's Industry Animal Husbandry Guidelines.").  They were, in some sense, promotional. Attempts to draft new members into the conspiracy are in furtherance of it.  *See Cruz-Rea*, 626

F.3d at 937 ("This court has repeatedly held that a statement attempting to recruit new members to the conspiracy is 'in furtherance' of the conspiracy.") (collecting cases).

Defendants also argue that the newsletters were not in furtherance of the conspiracy because they were innocuous updates about the egg industry generally. As Defendants see it, these newsletters merely provided "narrative discussions of past events, which do not satisfy the in furtherance requirement." *See* Defs.' Resp., at 34 (Dckt. No. 203) (quoting *Santos*, 20 F.3d at 286).

The newsletters, however, go beyond describing past activities or offering generalized overviews of the egg industry. They weren't just water cooler chitchat.

For starters, as Defendants admit, the newsletters updated UEP members on enrollment in the Certified Program. *Id.* ("[T]he newsletters merely provided updates to recipients about the membership of the animal welfare program . . . .").

The newsletters kept all the conspirators in the know about who was on board with the conspiracy's initiatives. They served as a roll call for the conspiracy. *See, e.g.*, Ex. 44 (Dckt. No. 164-1, at 243 of 638) (listing certified producers and stating that "[c]ompanies with ownership of approximately 230 million hens or 80% of the industry are committed to the program and are therefore awarded the opportunity to market their eggs as Animal Care Certified"). That fact alone makes the statements admissible. *See Potts*, 840 F.2d at 371 (statements that kept the conspirators "advised about the conspiracy's progress" were in furtherance of the conspiracy); *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985) ("updates on the status of the conspiracy" admissible); *Shoffner*, 826 F.2d at 628 (statements to prospective co-conspirators for membership purposes are acts in furtherance of the conspiracy).

The newsletters also kept conspirators up to date on how the conspiracy was changing, and whether it was working as intended. They described new initiatives adopted by the UEP board, as well as how their efforts had impacted egg prices. *See, e.g.*, Ex. 45, at 4 (Dckt. No. 164-1, at 254 of 638) (citing "[i]mplementing space allowance to meet the industry's Animal Welfare Guidelines" as a "major reason" for high prices). Courts regularly admit comparable statements that provide progress updates. *See United States v. Elder*, 840 F.3d 455, 459 (7th Cir. 2016) ("Some examples [of statements in furtherance of the conspiracy] include comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, or to instill confidence and prevent the desertion of other members.").

Finally, the newsletters sought to keep the conspiracy together, and keep everyone on board. *See, e.g.*, Ex. 49 (Dckt. No. 164-1, at 283–84 of 638) ("You should not get discouraged. We believe with 225 million hens committed to the program . . . and the flock reduction that has begun to take effect, egg prices have and will continue to reflect the impact of these welfare guidelines."); Ex. 56 (Dckt. No. 164-1, at 326 of 638) ("You did what you intended and that was to improve domestic egg prices with your decision to accept the 250-container export order. . . . [S]ee how your company benefitted."). Clarion calls to "stay the course" further the conspiracy and are admissible. *See Cox*, 923 F.2d at 527 (statements of reassurance a "classic example[]" of a statement made in furtherance of a conspiracy); *see also United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (holding that a statement intended to reassure the listener about the progress or stability of the conspiracy satisfied the "in furtherance" requirement); *United States v. Lacey*, 1988 WL 96578, at *6 (6th Cir. 1988) (affirming district court's ruling that statements to "keep the organization together" were in furtherance of the conspiracy).

In sum, the Court finds that Plaintiffs have met their burden to establish that the representative statements were made in furtherance of the conspiracy.

\* \* \*

The Court reminds the parties that its holding here is only preliminary. *See United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985) ("[T]he *Santiago* determination is subject to change during the trial."). Plaintiffs must still "close the evidentiary loop at trial," and meet their burden of showing that each statement satisfies the requirements of Rule 801(d)(2)(E). *See Davis*, 845 F.3d at 286. But for now, the Court is satisfied that Plaintiffs have sufficiently previewed the evidence bringing the statements within the co-conspirator rule. *See Rodriguez*, 975 F.2d at 410.

One last point deserves repetition. At this point, the Court is simply evaluating whether Plaintiffs have presented enough evidence to satisfy their burden for admissibility under Rule 801(d)(2)(E). The Court is acting as an evidentiary gatekeeper, of sorts.

The Court is not picking winners or losers, or making any prediction about how the case will come out, or offering any suggestion about how the case should come out. That's a question for the jury, the ultimate finder of fact. And after hearing all of the evidence, the jury might see things completely differently.

## Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have met their burden to justify the potential admission of most of the proffered co-conspirator statements under Rule 801(d)(2)(E). Except for the statements made by Michael Foods before it joined the conspiracy, the Court conditionally admits the co-conspirator statements.

Date:  September 18, 2023

Steven C. Seeger
United States District Judge