UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>ORDER</u>

Defendants' motion *in limine* to exclude any statements or arguments about prior complaints, investigations, or settlements (Dckt. No. 169) is hereby granted in large part.

There are three issues. The first issue is about advertising-related complaints by an animal welfare group, and the investigations that followed. The second issue is about the settlement between United Egg Producers and 16 state attorneys general. The third issue is about a criminal investigation by the Department of Justice.

First, Defendants seek to exclude references to a complaint by an animal-rights group, Compassion Over Killing Inc., and to the regulatory decisions that followed.

By way of background, Compassion Over Killing filed a complaint with the Better Business Bureau in June 2003 about the United Egg Producers' Animal Care Certified certification program. The group alleged false advertising.

Compassion Over Killing complained that the logo misled consumers by suggesting that the Animal Care Certified program (as the program was called at the time) required egg producers to raise hens in a humane fashion. In its view, the logo "is misleading because it communicates a level of care and humane treatment for hens that is superior to the actual conditions permitted under the certification program." *See* 9/30/05 FTC Letter (Dckt. No. 202-2, at 2–3 of 5).[1]

---

[1] By the look of things, the parties described the complaint by Compassion Over Killing, but did not file it. Judge Pratter issued a ruling about the same issue, and she apparently didn't have a copy either. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2018 WL 1725802, at *1 (E.D. Pa. Apr. 6, 2018). Maybe the Court is missing something (besides the complaint itself). Maybe the parties don't have it, and can't get it. Anyway, the Court is relying on the FTC's description of the complaint by the animal-welfare group. It is possible that the Court might see things differently after reading the complaint.

The National Advertising Division of the Council of the Better Business Bureau agreed that the logo conveyed a misleading image. UEP appealed to the National Advertising Review Board, the appellate body responsible for reviewing decisions of the National Advertising Division. The National Advertising Review Board affirmed.

At that point, the dispute was referred to the FTC. But before the FTC made a decision, UEP voluntarily changed the seal from Animal Care Certified to "United Egg Producers Certified, Produced in Compliance with the United Egg Producers Animal Husbandry Guidelines."

On September 22, 2005, the USDA sent a letter to the FTC, expressing support for the proposed change in the logo. *See* 9/22/05 USDA Letter (Dckt. No. 202-2, at 4 of 5). The USDA expressed the view that the new logo "accurately represents that the seal program is conducted pursuant to guidelines established by UEP, and makes no representations that are likely to mislead consumers as to the program's requirements." *Id.* The USDA opined that the new logo complied with its regulations, adding that the USDA "would approve the use of such a logo on shell egg labels, containers, or packing materials" in place of the old logo. *Id.*

The FTC accepted that change in the logo. In a letter to United Egg Producers dated September 30, 2005, the FTC confirmed that the revised seal resolved any concerns about whether the old logo was misleading. In the end, the FTC did not weigh-in on the old logo.

"We believe that these changes directly address the deception identified in the NARB decision. For this reason, we find that no further Commission action is warranted in response to the petition filed by Compassion Over Killing." *Id.* The Commission's staff "has decided not to recommend enforcement action on Compassion Over Killing's complaint at this time." *Id.*

About a year later, UEP settled claims from 16 attorneys general, who alleged that the Animal Care Certified seal misled consumers.

Taking a step back, the jury will decide whether the UEP Certified Program was an unreasonable restraint of trade. Plaintiffs will argue that the whole thing was a ruse to restrict the supply of eggs. For their part, Defendants will argue that the UEP Certified Program was a response to consumer demand for eggs produced with better animal-welfare standards.

As this Court previously ruled, the parties can present evidence about why Defendants did what they did. Defendants can present evidence that they responded to concerns about animal welfare. And Plaintiffs can present evidence that the whole thing was bogus, and that the real motivation was anticompetitive. For that reason, evidence about consumer demand is fair game.

That said, the evidence at hand is not exactly on point. And it could be confusing, too. As the Court understands it, Compassion Over Killing complained about whether a logo was misleading consumers. The question was about the level of care required by industry standards. That is, the question was whether the logo suggested that egg producers were meeting a higher level of animal welfare than they were actually delivering.

2

Compassion Over Killing complained about the logo, not the conduct. That is, Compassion Over Killing complained that the logo created a misimpression that producers were doing enough to protect animal welfare. The problem was the accuracy of the *message* about the conduct, not the sufficiency of the conduct itself.

The complaint by Compassion Over Killing did not address whether the UEP Certified Program satisfied animal-welfare concerns. The issue was not whether the Program helped chickens. The complaint addressed whether the Animal Care Certified seal conveyed a level of care for animal welfare that was above and beyond the level of care actually provided. *See* Pls.' Resp., at 2 (Dckt. No. 202) ("The NAD investigated the COK Complaints and found that UEP's ACC logo conveyed a misleading message that hens raised in compliance with the UEP program were treated more humanely than the level of care reflected by the UEP guidelines.").

Compassion Over Killing does not appear to have complained that egg producers were not doing anything to protect animal welfare. They were complaining that egg producers weren't doing *as much as the logo suggested they were doing*.

Even if the complaint was about the sufficiency of the remedial action – meaning the adequacy of the animal-welfare protections under the UEP Certified Program – the Court is not so sure that it would add anything of value. Defendants contend that they adopted the UEP Certified Program to meet demand for animal welfare. Evidence that some people thought that egg producers should do *more* doesn't really call into question why the egg producers did what they did. There is a difference between doing nothing, and not doing *enough*.

A company can make environmental improvements even if an environmental group thinks that the improvements aren't enough. A federal agency can adopt a rule for child safety even if a public interest group thinks that the rule isn't tough enough. And so on. The fact that someone else believes that an action is inadequate does not reveal much about why someone did what they did.

Dissatisfaction by a public interest group is not evidence of doing nothing. Dissatisfaction does not shed much light on a person's motivation, either. Dissatisfaction by someone else doesn't mean that the action was pretextual. The connection between "you aren't doing enough" and "the whole thing is a sham" is a bit of a stretch, and then some. The probative value is slight.

Maybe things would be different if the evidence showed that the UEP Certified Program had no benefits for animal welfare at all. For example, imagine a world in which egg producers said that they were increasing the size of the pens, but in reality, they did nothing.

That scenario does not fit with Plaintiffs' theory of the case. After all, the whole point is that Defendants *did* increase the size of the pens, and that expansion led to fewer hens and fewer eggs.

Alternatively, imagine a world in which egg producers said that they were increasing the size of the pens, and *did* increase the size of the pens, but the expansion of the pens *didn't*

improve animal welfare. Under that scenario, maybe someone could offer evidence that animal welfare was not the true motivation for increasing the size of the pens, because increasing the size of the pens did not improve life for the hens.

The Court would allow evidence that increasing the size of the pens did not improve animal welfare. But the complaint by Compassion Over Killing does not shed much light on the true motivations for the UEP Certified Program. By all appearances, the group's complaint did not address whether increasing the size of the pens improved animal welfare.

As things stand, it appears that Compassion Over Killing complained about the accuracy of the advertising. It was not about the adequacy of the conduct itself. And even if it was, the adequacy of the conduct does not seem to be relevant unless Compassion Over Killing was saying that egg producers did not improve animal welfare by increasing the size of the pens.

This Court will allow evidence that animal welfare groups put pressure on Defendants to do X, Y, or Z. For example, imagine a world in which Compassion Over Killing lobbied egg producers to give each chicken its own acre to lay eggs. That pressure would be admissible, just like evidence of any other pressure by animal welfare groups.

But by the look of things, the complaint by Compassion Over Killing is not about pressure to take certain steps to protect chickens. The complaint was not about what egg producers should do to promote animal welfare. It was about the message conveyed by the logo.

The accuracy of the logo seems far afield from the issues for the jury. Compassion Over Killing complained about advertising. Getting into the accuracy of a logo might distract the jury, create confusion, and lead them to take their eyes off the ball. Focusing on a logo could turn into a mini-trial on a side issue.

This case is about antitrust, not false advertising. Both areas involve harm to consumers, but false advertising is not an antitrust violation (and vice versa). It would take some work to make sure that the jury keeps things straight. And in the meantime, the probative value of a discussion about the accuracy of a logo is slight, too. *See* Fed. R. Evid. 403.

The regulatory decisions about the complaint by Compassion Over Killing are even further afield. The reaction by the Better Business Bureau to a complaint about a logo would not help the jury decide whether Defendants violated the antitrust laws. The FTC's reaction, after the USDA chimed in, to the UEP's new logo is even less helpful. All of it is way too far downstream. *See* Fed. R. Evid. 401, 403.

Overall, Plaintiffs believe that animal welfare concerns were pretextual, and that the UEP Certified Program was a ruse for a supply restriction. The Court will allow Plaintiffs to present evidence to the jury that animal-welfare concerns were not the motivation behind the UEP Certified Program. Plaintiffs could argue that the Program did not help chickens, and was not adopted to help chickens. But the complaint by Compassion Over Killing does not move the ball very far. And if anything, it might move the ball in the wrong direction. *See* Fed. R. Evid. 403.

4

Second, Plaintiffs seek to exclude evidence about UEP's settlement with the state attorneys general about the Animal Care Certified seal. The Court agrees that any such evidence is inadmissible. *See* Fed. R. Evid. 401, 403, 408. The Federal Rules encourage settlements by creating evidentiary protections. Settlements aren't admissible to prove the validity of a claim. And in any event, UEP settled false advertising claims, not antitrust claims.

Third, Plaintiffs seek to exclude evidence about any federal criminal investigations. They point to an article in the Wall Street Journal from September 2008, revealing that the Department of Justice had opened a criminal investigation into possible price-fixing by egg producers.

The Court agrees that any reference to a federal criminal investigation is out of bounds. *See* Fed. R. Evid. 403. Any reference to a criminal investigation could inject electricity into the courtroom, heightening the level of seriousness. All sorts of questions would inevitably follow, and most of them would go unanswered.

A typical juror might think that the Department of Justice would not have looked into the situation unless there was something there. The DOJ saw smoke, a juror might think, so maybe there was fire.

Once that can of worms is opened, the jury inevitably would wonder what happened. Some jurors might speculate that someone was charged, or even convicted. Worse yet, maybe some jurors would get confused, and think that an investigation *was* an indictment.

The jury would want answers. Letting important questions go unanswered would frustrate the jury, too. Confusion could follow. Speculation could fill the void. Jurors would wonder, and minds would wander.

Any mention of a criminal investigation would cast a cloud over the Defendants. To disperse the cloud, and clear the air, Defendants would want to present evidence that the Department of Justice never brought any charges. Mentioning a criminal investigation – without letting Defendants explain how it ended – would inject unfairness into the trial. The prejudice is substantial, and obvious.

But giving an explanation would run afoul of this Court's ruling that the parties cannot mention the government's decision not to bring civil or criminal charges. *See* 9/19/23 Order (Dckt. No. 296). Telling the jury about a criminal investigation would invite questions, but the parties can't give answers.

The existence of a criminal investigation does not say much about the merits, either. The Department of Justice investigates lots of potential crimes. Many times, there isn't anything there. The DOJ does not simply investigate guilty people.

There is risk that the jury might put too much weight on the existence of a criminal investigation. Trial will be long and complicated enough, so the parties must keep the jury on target and on track.

That said, Plaintiffs believe that the existence of the criminal investigation provides "context" for later statements made by Defendants about the purpose of the UEP Certified Program. *See* Pls.' Resp., at 2 (Dckt. No. 202).

The Court is skeptical of the "context" argument. It is hard to see how a need for "context" could justify something as prejudicial and distracting as a mention of a criminal investigation.

Even so, it is easier to evaluate the need for "context" in the courtroom, after hearing the testimony. For that reason, Plaintiffs can raise the point at trial if they so choose. But presenting evidence of a criminal investigation is a tough row to hoe.

Date:   September 19, 2023

_____

Steven C. Seeger
United States District Judge

6