UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### **ORDER**

Defendants' motion *in limine* to exclude certain videos and photographs (Dckt. No. 161) is hereby granted.

The motion is about videos and photographs that undercover activists took surreptitiously at various egg production facilities. Many of the videos were prepared by investigators from the Humane Society or from Compassion Over Killing. The pictures offer an inside-the-henhouse look at what life is like for the hens. The images aren't pretty.

The videos show rows and rows of an unimaginable number of chickens. In the first video, each of the barns had 100,000 chickens. The chickens were crammed into what appear to be small wire cages, with multiple hens in each cage. Some of the hens were active and perky, clucking away. But a number of hens had a much different experience.

This Court watched all of the videos. The Court saw crowded chickens, injured chickens, bleeding chickens, suffering chickens, trapped chickens, trampled chickens, immobilized chickens, blind chickens, distended chickens, filth-covered chickens, and near-featherless chickens.

Some chickens were hanging on for dear life. Other chickens had crossed the divide. The Court saw plenty of dead chickens. Even *mummified* chickens. Some chickens were left for dead so long in the cages that the corpses turned into hard objects.

The videos show lots of dead chickens. Many of the bodies showed signs of trauma. Sometimes eggs – the image of life – gently rolled by dead mother birds.

Some chickens had their heads trapped in the bars of the cages. Some hens were so injured that they could barely move. Some injured birds suffered as other chickens stomped on them in small wire cages. The videos had a lot of red.

Even the healthy-looking chickens had a rough go of things. In light of the chicken-density, there wasn't much room to move. They weren't exactly packed like sardines, but they didn't have room to spread their wings, either.

Life in the henhouse was crowded, poor, nasty, brutish, and short. *Cf.* Thomas Hobbes, Leviathon (1651). The videos have an inescapable aura of suffering and mistreatment.

Maybe the videos were intended to elicit an emotional reaction, and provoke a feeling of disgust. Mission accomplished.

Some of the videos were taken at facilities operated by Defendants. For example, one of the videos was taken at Rose Acre Farms in 2010. Another video was shot at Cal-Maine in 2010. Others videos were taken at Defendant Michael Farms in 2006 and in 2009. *See* Ex. A (Dckt. No. 161-1).

Defendants move to exclude the videos and pictures on a number of grounds. They object to the undercover videos based on a lack of authentication. They make hearsay arguments. They object to the voiceovers and the ominous music, too.

Defendants also move to exclude the images as irrelevant and unfairly prejudicial. "The videos and photographs are irrelevant to Plaintiffs' case, which involves allegations that the Defendants violated the antitrust laws by restraining the supply of eggs. Injecting alleged mistreatment of hens at various egg producers, Plaintiffs want to invite the jury to decide this case on emotion, not objective facts." *See* Defs.' Mtn., at 2 (Dckt. No. 161). As they see it, "the videos are designed to shock and create an emotional response." *Id.* at 1.

Plaintiffs respond that the videos demonstrate that the animal-welfare concerns of the UEP Certified Program were pretextual. "Defendants do not want the jury to see their exploitation of hens because the videos, in depicting the abuse, neglect, and poor conditions, show their so-called animal welfare program – the UEP Certified Program – was a sham. The program was not primarily concerned with animal welfare, nor primarily designed to respond to customer demands for animal welfare, but instead was a pretext to restrict egg supply." *See* Pls.' Resp., at 2 (Dckt. No. 205).

As Plaintiffs see it, Defendants want to portray themselves as proponents of animal welfare. But truth be told, "Defendants' rhetoric did not reflect the reality inside their egg production facilities." *Id.* at 3.

In the trial involving the Direct Action Plaintiffs in Pennsylvania, Judge Pratter largely denied a motion *in limine* to exclude the videos and photos. "The Court has already held that this sort of animal abuse evidence is relevant and admissible because it supports the argument that the UEP Certified Program's animal welfare motives were merely pretext for decreasing supply." *See In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, at ECF No. 2004 (September 5, 2019 Order).

But Judge Pratter put some limits on the evidence. Judge Pratter excluded the voiceovers, and the videos from Rembrandt Enterprises (a non-defendant and non-conspirator). The court also made clear that plaintiffs could not belabor the point, and play the video excessively. "The defendants may raise their Rule 403 objection again during trial if DAPs attempt to take a mile where the Court has allowed an inch." *Id.*

After watching the videos, this Court sees things differently and lands in a different place.

For starters, the probative value of the videos is slight. Part of the problem is the timing. The videos were taken at various times from 2006 to 2010. But Defendants allegedly formed the conspiracy in 1999, and started using the UEP Certified label a few years later. Videos taken between 2006 to 2010 don't shed much light on the motivations for actions taken years earlier.

Other videos point out that the facilities were *not* complying with industry standards. For example, the narrator in the video about Michael Foods proclaimed: "As the factory farm manager told the undercover investigator, 100,000 chickens are confined in each of Michael Foods' 11 barns. The result? Michael Foods provides even less space for its birds than the industry standard."

The video then showed pictures of how much space each hen should get, based on the industry standard. The narrator explained that "Michael Foods cuts that number by nearly a third."

It is hard to see how that video could call into question the motives for the industry standard, when the video shows *non*-compliance with the industry standard. A video about breaking a rule does not shed much light on why someone passed the rule.

As an aside, one has to wonder if the other videos showed non-compliance with industry standards, too. Did those facilities comply with industry standards? Or were they going rogue?

The videos would not add much value even if they were taken at the relevant time, and even if they showed compliance with the industry standard. Plaintiffs basically argue that animal welfare was not the motivation for the UEP Certified Program, because animal welfare was bad even after the expansion of the cages.

Maybe the pens were too small even after the egg industry increased the size of the enclosures. After watching the videos, it is hard to avoid the conclusion that hens don't have enough space.

Even so, a conclusion that the rule didn't go far enough does not tell you much about why the industry adopted the rule. The fact that the chickens don't have enough space under the new standard does not shed much light on why the industry gave the chickens more space.

And again, Plaintiffs' theory of the case is not that Defendants promised to increase the size of the enclosures, but didn't. Quite the opposite. Plaintiffs' theory is that Defendants *did* increase the size of the enclosures, which meant fewer hens and fewer eggs. So, if the videos

3

show life and death under the UEP Certified Program, then life and death under the old standard was worse. One wonders what it looked like *before*.

The probative value is slight. Whatever probative value the images may have, the value is substantially outweighed by the risk of unfair prejudice and confusing and distracting the jury. *See* Fed. R. Evid. 403.

The videos are hard to watch. The pictures are hard to take. The images are shocking, upsetting, and disturbing. The videos are chock-full of graphic images of suffering birds. Watching the videos is a stomach-churning, heart-wrenching, mind-boggling, breakfast-changing experience.

The videos are bound to provoke an emotional reaction from the jury. Frankly, the Court would worry about anyone who isn't more than a little upset by what they see.

Once someone watches the videos, they can't be un-watched. The images will stick in their heads, linger in their memories, and weigh on their minds. People connect with pictures differently – and more deeply – than with words. A picture resonates with people in ways that words can never capture. And if jurors see the videos, they will bring images of suffering into the jury room, with minds full of dying, dead chickens.

In fact, the videos themselves confirm how alarming the content is. One narrator said that images show "egregious acts of animal cruelty." In another video, the narrator commented that "the video footage in this investigation shows several animal abuse."

The risk of unfair prejudice is extreme. After watching the videos, it would not take much for jurors to believe that the egg industry abuses chickens. That conclusion could lead to anger, distress, disgust, resentment, and a desire to punish. It could stoke a feeling that there is a need for revenge for the mistreated hens.

And the egg industry will be sitting only a few feet away.

The videos will be distracting for the jury during the rest of trial, too. The jury is going to listen to countless hours of deposition designations. Sitting through deposition designations is not for the faint of heart. Minds will wander. And minds will inevitably wander to the pictures of animal suffering when the jury is supposed to be listening to other testimony.

The case is about antitrust. But if the jury sees the videos, a case about antitrust could turn into a case about animal cruelty. If the videos see the light of day, they will take on a life of their own. They will overshadow so much else that will take place in the courtroom. The images of animal cruelty will be a lot more riveting and impactful than the countless hours of substantive testimony through deposition designations.

The fact that a trial involves upsetting material isn't an automatic reason to keep it out. After all, sometimes a trial is *about* upsetting events. Courtrooms often involve hard things.

Even so, district courts need to ensure that upsetting material doesn't come into the courtroom unnecessarily. Displaying disturbing footage should not be gratuitous. Before allowing graphic images into a trial, a district court must ensure that there is a good reason for it. And here, there isn't.

Maybe the videos would have some probative value. But whatever probative value there may be, the value would pale in comparison to the bad energy created by showing the jury graphic images of animal suffering. *See* Fed. R. Evid. 403.

Plaintiffs are free to argue at trial that the desire to promote animal welfare was a pretext. But they don't need these videos and pictures to prove the point. They're too distracting, too prejudicial, and too explosive.

In the end, trial is supposed to be about the search for truth. After personally watching all of the videos, the Court is convinced that the videos would undermine the truth-seeking function of the trial. The videos would detract from the trial more than they would contribute to it – by a wide margin. The videos would interfere with the fact-finding, so unlike Court, the jury isn't going to watch them.

Date: September 19, 2023

Steven C. Seeger
United States District Judge