# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., </br></br>Plaintiffs, </br></br>v. </br></br>UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. </br></br>Defendants. | No. 1:11-cv-08808 </br></br> Judge Steven C. Seeger |

## PLAINTIFFS' RENEWED MOTION TO PRECLUDE POST-2008 EVIDENCE IN THE LIABILITY PHASE

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com

*Attorneys for Kraft Foods Global, Inc.; The Kellogg Company;
General Mills, Inc.; and Nestlé USA, Inc.*

At the September 28, 2023 status conference, Plaintiffs advised the Court, as they had advised Defendants, that in light of the Court's ruling that Plaintiffs' position on injury opens the door to Defendant's evidence of post-2008 anticompetitive effects, Plaintiffs seek to limit their evidence in the liability phase of the trial to injury they suffered during the conspiracy period: 1998 to 2008. The discussion at the pre-trial conference, and the Court's September 28, 2023 minute order, Dkt. 311, raised the following questions:

- What is Plaintiffs' proposal, and is it consistent with Plaintiffs' prior positions?
- May Plaintiffs limit the case as they propose?
- Is Plaintiffs' proposal consistent with Dr. Baye's and other experts' disclosed opinions?
- What impact does this approach have on post-2008 damages?

This brief is structured to answer those questions.

In short, Plaintiffs' position is consistent with the Court's rulings on bifurcation and the motion *in limine* regarding post-2008 evidence. Dkt. 272, 292. Plaintiffs request a ruling from this Court that, with Plaintiffs' case narrowed as Plaintiffs propose, Defendants' post-2008 evidence of purported procompetitive benefits, consumer demand, and state laws on animal welfare is inadmissible. Whether that evidence may be introduced in the second phase of the trial, and whether Plaintiffs are entitled to damages up to 2012, can be addressed at a later time.[1] This result is fair to both parties and consistent with the law.

**1.      Plaintiffs Propose To Prove The Conspiracy Alleged in The Complaint And Collect the Damages Caused By That Conspiracy.**

Plaintiffs have consistently contended that the last overt act in the conspiracy took place in September 2008 and the conspiracy caused damage through 2012. They also have consistently

---

[1] Plaintiffs agree that, if this is a rule of reason case, Defendants will be able to introduce this evidence in the second phase. But Plaintiffs maintain that the evidence will support instructing the jury on a *per se* theory of liability and that consideration of procompetitive justifications will not be relevant.

2

contended that Defendants' attempts to defeat liability with evidence after 2008 do not bear on decisions made before that time. This is the position Plaintiffs continue to advance, although, as explained below, Plaintiffs now propose to limit the evidence of injury during the liability phase in response to the Court's ruling on post-2008 evidence.

***Plaintiffs' Complaint***. The first lawsuits challenging Defendants' practices were filed in 2008. Informed by public disclosures regarding Defendants' conspiratorial actions, egg purchasers sued egg producers alleging the existence of an antitrust conspiracy. *See* Transfer Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2008) (Dkt. No. 1). The Kraft plaintiffs later alleged a conspiracy and identified overt acts through 2008. Dkt. 73-17 at 144. Consistent with the second amended complaint in this case, at trial, Plaintiffs anticipate that they will prove that the conspiracy continued through the last overt acts in September 2008. *Id*. These overt acts were emails exchanged by coconspirators in which they discussed the Wall Street Journal article and cautioned one another against sharing information about their restraint of trade. Ex. A (attaching this correspondence).

As Plaintiffs developed their case after the complaint's filing, the economic evidence showed the conspiracy continued to affect prices into 2012.

***Prior Trials***. In prior trials, Defendants introduced extensive post-2008 evidence, including video deposition testimony about alleged animal-welfare pressure and customer demand for humanely-raised eggs after 2008. Based on their designations of depositions and identification of experts in the pre-trial order in this case, it appears Defendants intend to pursue the same strategy in this trial. Dkt. 289-6; 289-7; 173 at 12–13, 19–20.

***Plaintiffs Have Consistently Contended Post-2008 Evidence Is Irrelevant***. Plaintiffs have consistently sought to preclude the introduction of post-2008 liability evidence and have taken care, not only to communicate this position to Defendants, but to delineate post-2008 evidence and

preserve objections to it, including in deposition designations and exhibits. In the first pretrial exchange on July 22, 2022, Plaintiffs informed Defendants:

> Plaintiffs anticipate filing motions *in limine* to exclude certain evidence, including evidence created after December 31, 2008. Plaintiffs' deposition designations, exhibit list and witness list are subject to the outcome of such motions. Plaintiffs designate testimony and identify exhibits and witnesses about post-2008 events, and the other subjects sought to be excluded in Plaintiffs' anticipated motions *in limine* only in the event, and to the extent, plaintiffs' respective motions are denied.

Ex. B. Plaintiffs included a similar disclaimer with the first exchange of objections to designations and exhibits on August 5, 2022, and identified post-2008 evidence with a unique objection code. Ex. C. It did the same in exchanging objections to counter-designations at the reply stage, on August 16, 2022. Ex. D.[2]

Next, Plaintiffs made clear their objections to post-2008 evidence in their motion *in limine* filed on August 26, 2022. Such evidence should be excluded, Plaintiffs submitted, because it would allow Defendants to argue that no conspiracy existed from 1998 to 2008 based on later events. Dkt. 173. For the ***entirety of the last year***, the parties did not know whether the Court would grant the motion, and what post-2008 evidence, if any, was admissible and the basis for its admissibility. It is only with the Court's rulings on Defendants' motion to bifurcate and Plaintiffs' motion to preclude post-2008 liability evidence that both sides are finalizing their trial strategy regarding that evidence.

***The Court's Rulings***. This Court has now held, as of September 15, 2023, that it will not "permit the parties to introduce evidence after 2008 to show the Defendants did not conspire to restrain trade from 1999 to 2008." Dkt. 292 at 1. To give one example, the Court explained that

---

[2] The parties initially shorthanded the objection to post-2008 evidence as "OSD," which is a holdover from the DAP trials where "OSD" was defined as "Outside scope of Discovery – post 2008 Ex." After this Court's ruling on Plaintiffs' post-2008 motions *in limine*, the parties have endeavored to replace "OSD" with "post-2008."

4

"[p]ost-2008 pressure from animal rights activists, grocers, or anyone else has little probative value when deciding" if the Defendants entered into a conspiracy before that date. Dkt. 292 at 9. "[T]he evidence must be contemporaneous." *Id*. at 9; *see also id.* at 10 (explaining the Court will "hew to the same line," requiring contemporaneous evidence, in evaluating whether evidence explains the existence and formation of the conspiracy).

The Court's ruling reflects the commonsense realization that evidence from 2009, 2010, or beyond does not shed light on whether earlier actions—such as a coordinated early-slaughter or molting program in 1999 or the decision to enact the 100% rule in 2002—were in furtherance of a conspiracy to limit supply and thereby raise prices. This is because Defendants changed course in late 2008 after articles were published about the conspiracy and the first lawsuit was filed, including by stopping coordinated early slaughter and exports.

The Court's ruling had an important caveat. While noting later evidence is ***not*** relevant to justify earlier decisions, it held that it ***may*** be relevant to measuring their effects. The Court ruled that—because "Plaintiffs are alleging an injury and seeking damages from 2009 to 2012"— "Defendants may introduce post-2008 evidence to show that the UEP Certified Program had procompetitive benefits after 2008." *Id*. at 1. "Plaintiffs have opened the door," the Court explained, "so Defendants can walk through it." *Id*. at 2; *see also id.* at 6-7 ("[T]he theory is that the anticompetitive effects continued through 2012, even though the alleged conspiracy ended in 2008. That theory opens the door to evidence that something else explains the elevated egg prices after 2008 . . . . If prices after 2008 are at issue, then each side can offer evidence to explain the prices after 2008."). The Court reasoned:

> By alleging that anticompetitive effects continued through 2012, Plaintiffs opened the door to evidence that procompetitive benefits continued through 2012. *If Plaintiffs intend to present evidence that the UEP Certified Program had an anticompetitive effect through the injury tail period, then Defendants must be allowed present evidence of the Program's purported procompetitive benefits during that period, too.* Evidence that customers

5

>continued to demand the UEP Certified Program during that period is relevant to whether the Program had procompetitive benefits.

*Id*. at 10 (emphasis added).

***Plaintiffs' Intention***. Responding to the Court's orders, Plaintiffs propose to structure their proof to avoid opening the door to post-2008 defense evidence in the first phase of the trial. Plaintiffs have not changed their theory of the case. They have consistently sought to make this a case about the conspiracy they have alleged, not the one Defendants would like to justify. They have not changed the nature of fact or expert testimony they intend to present.

Defendants focus on the expert testimony of Dr. Baye, who considered factors from 1990 (years before the conspiracy) to 2012 and whose report calculated the impact of the conspiracy over particular periods. As discussed in Section 4, Dr. Baye's analysis has always measured the impact in phases, and his report measures the amount of injury before August 2008 and after. Plaintiffs will simply end his liability testimony in August 2008 without proving antitrust injury or damages in his final period of analysis. Accordingly, Plaintiffs have opted to narrow their case, which they are permitted to do. They are electing not to present evidence that does not bear on liability—including injury past the last overt act in September 2008—in the liability phase of trial.

**2.    Plaintiffs Are Entitled to Define Their Case And Doing So Would Not Be Unfair.**

The first question Defendants posed at the pretrial conference was whether Plaintiffs could pursue this approach. The answer is "Yes." A plaintiff is the master of its own case. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 395 (1987); *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 877 (7th Cir. 2016). The plaintiff may decide which claims to pursue and which claims to abandon. *Hobbs v. Pollock*, 280 U.S. 168, 172 (1929) ("The Judge was clearly right in treating the plaintiffs in the several cases as masters to decide what they would ask and . . . [nothing prevented] them from presenting a narrower claim[.]"); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005) ("[A]s master of the case, the plaintiff may limit his claims[.]").

6

A complaint must put defendant on notice of the claim, but a plaintiff at trial need not prove all allegations of her complaint to sustain her burden of proof. *Maulding v. Louisville & N. R. Co.*, 168 F.2d 880, 882 (7th Cir. 1948) ("[H]e is not bound to prove each paragraph of the complaint in order to entitle him to a verdict. He may recover if one paragraph is sufficient and it is supported by the proofs."); *Hayes v. Dep't of Educ. of City of New York*, 20 F. Supp. 3d 438, 446 (S.D.N.Y. 2014) ("[P]laintiffs need not prove the truth of every paragraph in a complaint to succeed in their suits[.]"). The same has been found in antitrust cases, *U.S. Football League v. Nat'l Football League*, 1986 WL 10620, at *12 (S.D.N.Y. July 31, 1986) (holding "the plaintiffs are not required to prove every one of their specific allegations of anticompetitive behavior"), and in the context of a conspiracy, *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 C 864, 2023 WL 4305901, at *3 (N.D. Ill. June 29, 2023) (allowing antitrust case to proceed even though "[n]ot all of the claims asserted in those complaints are still live"); *see also Treppel v. Biovail Corp.*, 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005). The proof of the conspiracy—including injury—can be more limited than that alleged in the complaint.

Nor is it unfair to narrow a case for trial. A plaintiff may prove a "subset of the allegations" and "prov[e] a conspiracy or scheme that is smaller than the one alleged, so long as that subset is itself illegal." *United States v. Campbell*, 709 F. App'x 815, 824 (7th Cir. 2017); *see also United States v. Li Xin Wu*, 668 F.3d 882, 886 (7th Cir. 2011). Even in the criminal context where a variance from an indictment can cause constitutional injury, courts allow the government to "prov[e] a conspiracy smaller than the one alleged." *United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996); *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000).

For this reason and others, there is no unfairness here. Defendants claim surprise. They should not be surprised. Plaintiffs have always made conduct before late 2008 the focus of the case. Plaintiffs have consistently—including for more than a year—told Defendants they object to

7

post-2008 evidence. Plaintiffs have coded their post-2008 objections in a way that makes the evidence easy to identify. And now, Plaintiffs are responding to the Court's ruling—less than two weeks after that ruling—by proposing to limit their case to account for the ruling.

The alternative would be absurd: Defendants cannot force Plaintiffs to present evidence just so that Defendants can rebut it, especially given that the "exculpatory" evidence Plaintiffs seek to foreclose comes after the initial lawsuits and reports of a federal investigation, neither of which, this Court has ruled, the jury will be permitted to learn. To require Plaintiffs to argue post-2008 injury while not allowing them to tell the story of what actually occurred in 2008 (the lawsuits, the federal investigation, and related articles) would be manifestly unfair.

3. **Plaintiffs' Evidence of the Alleged Conspiracy Will Satisfy All Elements of A Sherman Act § 1 Conspiracy and Will Permit Recovery of Post-2008 Damages.**

The Court's September 28 minute order asked if this approach would limit Plaintiffs' ability to collect post-2008 damages. It would not.

*First*, Plaintiffs' proposed evidence will satisfy the obligation to prove liability. To prove liability under § 1 of the Sherman Act, a plaintiff must prove the existence of an agreement to restrain trade, that agreement must be unlawful, and the agreement must result in injury. Plaintiffs will meet this burden. Evidence of the economic impact of Defendants' actions—even if limited to periods before 2009—will be sufficient to prove injury. The case law does not require proof of injury every week, day, or hour. Courts have long held that it is sufficient to show *an injury* "at some point in the case." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 n.6 (5th Cir. 1983) (emphasis added); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (noting that plaintiffs must show "*an* accompanying injury") (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)) (emphasis added). This is made clear by the ABA Proposed Jury Instructions for Civil Antitrust Cases and each party's proposed instructions: Plaintiffs must prove "an injury"—not a continuing injury that was felt every single

8

day for which damages will later be sought. *See* ABA Model Jury Instructions In Civil Antitrust Cases, Inst. 6.A.1. Thus, evidence showing injury during the conspiracy period (1998 to 2008), coupled with evidence of an unlawful conspiracy, is sufficient to establish liability.

*Second*, although Plaintiffs believe the issue is premature and can be decided by the Court at a later time, they respectfully submit they will be able to prove damages through 2012 in the damages phase. If the jury finds Defendants liable, Plaintiffs will ask this Court to permit them to introduce evidence of economic harm they suffered that extended to 2012. This is proper. Where a "trial is bifurcated between liability and damages, there must be *some evidence* showing a causal link between the violation and alleged injury in phase I, before a plaintiff may enter phase II." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1321 (5th Cir. 1976). This causal link will be established by Plaintiffs' evidence in the first phase: Because of the conspiracy, Plaintiffs paid overcharges prior to the end of 2008. The finding of liability, including the finding of "an" injury, permits the jury in the second phase of the trial to consider evidence showing damages resulting from the conspiracy.

The Ninth Circuit's opinion in *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F. 4th 466 (9th Cir. 2021), is illustrative. In that case, a jury found the defendants liable for antitrust violations relating to an acquisition. While the last conspiratorial act occurred in 2016 when parties entered into the relevant agreements, the plaintiff alleged, and the district court found, the harm to the plaintiff continued thereafter. The Ninth Circuit affirmed. It explained that, even if the conspiracy ended in 2016, Orion was entitled to post-2016 damages stemming from the pre-2016 overt acts. "[W]here an antitrust plaintiff suffers continuing antitrust injuries from anticompetitive changes to market structure that arose from a proven antitrust violation," the court explained, "the violation may be a material cause of that injury, and so recovery of damages is permitted, even after the last proven date of the violative conduct." *Id*. at 487–88. While that case was not

bifurcated, the Ninth Circuit's analysis makes clear that a party may claim continuing injuries that resulted from an unlawful action at an earlier date.

Plaintiffs intend a similar approach to the presentation of evidence in this case. They will demonstrate the existence of an unlawful agreement, which violated the relevant antitrust standard and caused them injury, up to the last overt act in September 2008. If the jury agrees, Plaintiffs will seek this Court's permission to present evidence in the second phase on the nature of their damages, which extended to 2012, and Defendants of course will be free to try to refute that showing. Contrary to Defendants' argument at the September 28, 2023 hearing, this approach will not require repetition of testimony. In the liability phase, the jury will hear evidence relating to what Defendants did and the economic consequences of those actions up through 2008. If the case proceeds to the second phase of trial, the jury will hear evidence regarding damages that flowed from the conspiracy as opposed to price increases caused by other factors. If the Defendants intend to offer evidence relating to potential causes of price increases during the late 2008 to 2012 period, they may do so at that time. This simplifies, rather than complicates, the presentation of evidence.

That said, Plaintiffs do not ask the Court to decide now whether they may introduce injury between 2009 and 2012 in the damages phase—that is premature. It asks only for this Court to hold that, in light of the permissible limiting of Plaintiffs' injury evidence in the first phase, Defendants are not permitted to introduce post-2008 evidence of procompetitive benefits.

**4.     Plaintiffs' Approach Is Consistent With The Testimony, Particularly Of Dr. Baye.**

At the hearing on September 28, 2023, Defendants complained that Plaintiffs' suggested approach would be inconsistent with Dr. Baye's prior report. In the Court's minute order, it asked for a proffer on how and whether Plaintiffs' approach would affect Dr. Baye's testimony. It would not, other than narrowing it to reflect certain periods he already delineated in his analysis.

As set forth in his report, Dr. Baye analyzed Defendants' actions by evaluating economic impact in five defined temporal periods, each corresponding with the introduction of a restriction by Defendants. The start dates of these periods correspond with the stages of cage space restrictions and are as follows: (1) August 2002; (2) February 2004; (3) August 2005; (4) February 2007; and (5) August 2008. Plaintiffs intend to present testimony from Dr. Baye in the liability phase about these temporal periods, ending in September 2008 with the last overt act.

Dr. Baye's analysis can be divided to address injury only through September 2008. This is illustrated by the charts below. The exhibit on the left shows Dr. Baye's analysis of but-for prices through 2012. The exhibit on the right shows Dr. Baye's analysis of but-for prices through September 2008 and is an example of what Dr. Baye will present at the liability phase of trial.




There is no prejudice in this: Dr. Baye's testimony will be narrowed, not broadened, re-run, or otherwise altered. If the jury finds liability, Dr. Baye again will take the stand, and with the Court's permission, will testify about injury through 2012; but, again, the scope of that later testimony is premature and Plaintiffs are not asking the Court to decide the issue now.

Defendants' apparent concern about narrowing Dr. Baye's testimony, as reflected in their statements at the pretrial hearing, is that Dr. Baye's regressions include data from outside the

11

conspiracy period. In performing his economic analysis in this matter, Dr. Baye looked at data from 1990 through 2012. Dr. Baye ran economic regressions over that entire period and showed the economic effects of Defendants' conspiracy. His regression analysis, like any regression, is dependent on data across many years, so, for example, data from 1990 affects the analysis of the conspiracy years, as does data from 2012.

Defendants' position appears to be that Plaintiffs are not allowed to narrow Dr. Baye's analysis to injury sustained prior to September 2008, because his regressions depend on post-2008 data. This is nonsensical. Dr. Baye considered data as early as 1990—which is indisputably outside the conspiracy period—yet Defendants have never suggested that his regression analysis is invalid for that reason, or that Plaintiffs must present evidence of a conspiracy dating back to 1990, or that Defendants are somehow prejudiced by the regression. This is simply part of regression methodology: In performing a regression to identify market effects in a particular period, a researcher considers dates before and after the alleged restriction to demonstrate impact within the affected period.

The data underlying the regression does not mean that Plaintiffs somehow are opening the door to post-2008 liability evidence, no more than they are opening the door to evidence that predates the conspiracy. Nor does it mean that, if Plaintiffs do not introduce post-2008 evidence, Dr. Baye should be precluded from presenting his regression analysis (the presentation of which, as set forth above, will be narrowed to reflect the pre-2009 period even though the regression used a broader dataset). As is proper, Dr. Baye analyzed data before, during, and after the conspiracy to show the effects of the conspiracy on the market and on these plaintiffs. To the extent Defendants believe Dr. Baye's approach was improper, they can cross-examine him about it, including that he considered data outside the conspiracy period.

**5.     In Light of Plaintiffs' Intended Narrowing of Proof of Injury During the Liability Phase, Defendants Should Be Precluded From Introducing Post-2008 Evidence of Procompetitive Effects.**

Plaintiffs' choice of how to present their case obviously impacts Defendants' ability to offer evidence in response. That is the consequence of the Court's bifurcation order and having resolved the parties' motions *in limine*.

As the Court previously explained, Plaintiffs' claim of injury in the tail period—late 2008 to 2012—would open the door to Defendants' evidence relevant to assessing anticompetitive effects during that timeframe. Dkt. 292. "If Plaintiffs intend to present evidence that the UEP Certified Program had an anticompetitive effect through the injury tail period, then Defendants must be allowed present evidence of the Program's purported procompetitive benefits during that period, too." *Id*. at 10. The converse, of course, is that if Plaintiffs do ***not*** elect to present evidence regarding the injury tail period in the first phase, Defendants should ***not*** be allowed to present evidence of purported precompetitive justifications in that phase. This Court found that Plaintiffs opened a door by alleging injury through 2012; but doors can be closed, and Plaintiffs want to close the door.

Plaintiffs therefore request that this Court hold as follows: If Plaintiffs do not present evidence during the liability phase that the UEP Certified Program had an anticompetitive effect through the injury tail period, Defendants are limited in the post-2008 evidence they may introduce. Unlike the prior trials, this trial should not focus on post-2008 evidence about state laws, grocers, and other evidence created after the landscape changed. As this Court has thoroughly explained, evidence after 2008 sheds no light on the decisions made by Defendants prior to that time. It is irrelevant to whether Defendants formed and engaged in a conspiracy prior to 2008, and in light of Plaintiffs' proposal set forth above, it also is irrelevant to establishing procompetitive benefits during the injury tail period. Dkt. 292. Accordingly, Defendants should be precluded from

13

introducing post-2008 evidence about state laws enacted, consumer demand, grocers, and other claimed procompetitive benefits felt during the post-2008 timeframe.

This is not an eleventh-hour change, for all the reasons already discussed. Plaintiffs have consistently defined the conspiracy as lasting until 2008 (when the lawsuit was initiated and the Wall Street Journal article was published). Plaintiffs have, since the start of trial preparations more than a year ago, taken the position that post-2008 evidence is not admissible and identified the evidence impacted by that position. Limiting the evidence in this way is a narrowing of the case and is consistent with the general rule discussed above that a plaintiff may streamline its allegations for trial. The Court should allow Plaintiffs to be the masters of their case, and should reject Defendants' attempt to cloud the jury's consideration of evidence of liability in the first phase through introduction of evidence from the post-2008 period.

**CONCLUSION**

For all the reasons discussed, this Court should hold that, if Plaintiffs do not introduce post-2008 evidence of injury, Defendants, too, are precluded from introducing evidence of post-2008 procompetitive impact.

October 2, 2023

Respectfully submitted,
*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company*

/s/ *Brandon D. Fox*
Brandon D. Fox
Amy M. Gallegos (*pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com