UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. <br><br> Defendants. | No. 1:11-cv-08808 <br><br> Judge Steven C. Seeger |

**Defendants' Opposition to Plaintiffs' "Renewed" Motion**

**Introduction**

Plaintiffs seek upwards of $300 million jointly and severally, plus attorneys' fees, from Defendants, based on allegations of a supply control conspiracy that already were tried to—and rejected by—two separate juries. Plaintiffs no doubt want a different result here. But their last-minute request, based on tortured definitions of "injury" and "damages" and a misreading of antitrust law, forecloses the relief they so desperately want: to keep out compelling and admissible evidence.

There is no basis in the law or fact for the relief Plaintiffs seek—to limit evidence to certain elements of liability in Phase I (the liability phase), and reserve evidence on other aspects of liability for Phase II (the damages phase). Plaintiffs' proposal contravenes the notion of bifurcation and the law. Phase II —if there is a Phase II—is about how much money Plaintiffs can recover.

Acceding to Plaintiffs' untimely demand will wreak practical havoc on this trial at the eleventh hour—from having to revisit hours upon hours of deposition designations to upending the orderly presentation of the evidence. Plaintiffs cannot prevent Defendants from presenting relevant evidence that exonerate Defendants from liability and defeat Plaintiffs' claims.

In short, there is no basis for Plaintiffs to recast this twelve-year-old case days before the trial is set to begin and do so in a manner inconsistent with the established evidence, their expert's opinion, and even their previous characterization of the conspiracy to the Court.

Plaintiffs' motion should be denied.

Relevant Procedural History

On July 18, 2023, this Court entered an order bifurcating trial into two phases. (ECF No. 261). That order provides that in Phase I, the parties will present ***all*** evidence related to liability. If the jury returns a finding of liability after Phase I, the case will proceed to Phase II, in which the ***sole*** question will be the monetary damages flowing from the jury's liability finding. Everything else belongs in Phase I.

Argument

I. **Plaintiffs' Last-Minute Gamesmanship Should Not Be Allowed.**

Plaintiffs lay bare their intentions saying their goal is "to structure their proof to avoid opening the door to post-2008 defense evidence in the first phase of the trial." (Mot. at 6). Essentially, Plaintiffs hope to foreclose Defendants from presenting to the jury relevant, admissible evidence amounting to defenses to liability—evidence that undercuts Plaintiffs' theory of the conspiracy, the alleged unreasonable restraint on trade, and injury—through a last-second Hail Mary pass. This is wishful thinking on their part. They are not entitled to make that evidentiary call.

Evidence of continued and increasing customer demand from 2002 through 2012 for the UEP Certified Program is relevant to, *inter alia*, Defendants' proving the procompetitive effects of the alleged restraint and cannot be considered solely as "injury" evidence. The same is true of state laws, which go to injury, but also to whether there were less restrictive means to accomplish the same goals as the Certified Program. There are other examples, including the fact that the Certified Program continued into 2012 (and beyond) with the same components Plaintiffs contend were "anticompetitive" in 2008. All of this evidence seriously calls into

2

question Plaintiffs' claim that the Certified Program was a sham and that it was the centerpiece of a supply control conspiracy. Defendants are entitled to rebut that claim in Phase I – the liability phase of the trial.

Plaintiffs misstate the record when they insist that they "have consistently contended that the last overt act in the conspiracy took place in 2008 and that the conspiracy caused damage through 2012." (Mot. at 6.) To avoid Defendants' motion for summary judgment on damages after 2008, Plaintiffs told the MDL court,

> During the Winter of 2013, each DAP filed second amended complaints alleging that **Defendants and their co-conspirators had engaged in a continuing agreement**, understanding and conspiracy to reduce the output of eggs in order to raise prices, **through the date of their amended complaints**, with impact continuing thereafter.

Mem. in Opp. to Defs.' Mot. for Part. Summ. Judg., *In re Processed Egg Products Antitrust Litig.*, No. 08-md-02002, at 2 (E.D. Pa. Aug. 13, 2015) (relevant excerpts attached hereto as Exhibit 1); *see also id.* at 5-6 (stating in support of Plaintiffs' claim for damages after 2008 that "[s]ince 2008, the UEP has continued to promulgate the [ ] Certified Program . . . . These basic tenets of the Certified Program remain in effect today. Audit procedures have remained the same since the pre-2008 time period . . . . [Defendants] … continue to participate in the Certified Program today. No Defendant has demonstrated any effort to withdraw from the [ ] Certified Program and its output-restricting scheme.").

The MDL court relied on Plaintiffs' representations about their "ongoing" conspiracy claims to deny Defendants' motion for partial summary judgment. As such, Plaintiffs are properly estopped from using their belatedly revised conspiracy to preclude relevant post-2008 evidence.

3

II.  **Neither the Court's Bifurcation Order Nor the Law Provides for (1) a Partial Liability Phase and (2) a Partial Liability Plus Damages Phase.**

Attempting to avoid evidence that demonstrates the pro-competitive benefits of the Certified Program, Plaintiffs proffer a novel theory of antitrust law: That they may recover damages for multiple years without establishing corresponding injury. That is legally incorrect.

A. **Plaintiffs Cannot Seek Damages After 2008 Without Proving Injury After 2008 in the Liability Phase.**

For starters, Plaintiffs cannot split liability into two. Although they bob and weave in response to this Court's direct question on the topic (*see* ECF 311), Plaintiffs are seeking damages after 2008. (Mot. at 2-3). Therefore, Plaintiffs must introduce evidence of any such alleged "injury" in Phase I of the trial. "[A]lthough a court may bifurcate the liability and damages issues, it may not bifurcate elements of the prima facie case." *Young v. Lehigh Corp.*, No. 80 C 4376, 1989 U.S. Dist. LEXIS 11575, at *63-64 n.37 (N.D. Ill. Sep. 26, 1989). Injury is unquestionably a necessary element to establish liability in a Section 1 case. *See, e.g.*, ABA Model Instruction Ch 1, Section B, Instruction No. 2; *Always Towing & Recover, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 3d 328, 338 n.4 (7th Cir. 2021). The meaning of "liability" does not change when a trial is bifurcated. *Id.*

Contrary to Plaintiffs' representation (Mot. at 9), *Response of Carolina* explicitly rejected the proposition that "'fact of damage' belongs in Phase II of a bifurcated trial on liability and damages." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1320 (5th Cir. 1976) (overruled on other grounds by *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 44 (1977) ("To be 'liable' under the

antitrust laws, therefore, means that one has violated the antitrust laws and that violation has resulted in an injury to the business or property of the plaintiffs"). Thus, the answer to this Court's question as to whether Plaintiffs need to present proof of injury after 2008 in the injury phase of the trial is *yes*, as a matter of law.

Just as Plaintiffs cannot defer proof of injury to Phase II, they also cannot prove injury for the period only through 2008 and then proceed to seek damages through 2012. "Proof of antitrust injury or impact is analytically distinct from proof of antitrust damages." *In re Niasapan Antitrust Litig.*, 464 F. Supp 3d 678, 710-11 (E.D. Pa. 2020) (citing *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) ("We have consistently distinguished injury from damages."); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury).")). Private antitrust plaintiffs must prove both injury-in-fact and antitrust injury. Antitrust injury is an injury of the type the antitrust laws were intended to prevent, *i.e.*, one that flows directly from a lack of competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977). If Plaintiffs' supposed injury was caused by acts that increased competition, including by meeting consumer or customer demand, it is not antitrust injury. *See James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006); *Tyler Techs., Inc. v. Lexur Enters. Inc.*, No. 4:20-cv-00173-TWP-DML, 2021 U.S. Dist. LEXIS 120935, at *12 (S.D. Ind. June 29, 2021) ("To show antitrust injury, a plaintiff must prove that

5

its loss flows from an anticompetitive *effect* of the defendant's behavior since it betrays the Sherman Act's purpose to award damages for losses stemming from acts that do not hurt competition. In other words, when an injury flows from aspects of a defendant's conduct that are beneficial or neutral to competition—even if the defendant's conduct is illegal *per se*—there is no antitrust injury."). Indisputably relevant to proof of antitrust injury is whether the alleged restraint—the Certified Program—was reasonable, which necessarily implicates whether the Certified Program increased competition and met consumer and customer demand. Plaintiffs' request to preclude any evidence after 2008 means they cannot prove antitrust injury through 2012, and without proof of injury, they cannot proceed to a Phase II and ask jurors to award damages through 2012.

**B.     Plaintiffs' Authority Does Not Support the Result They Seek.**

None of the case law Plaintiffs cite supports their contention that they can proceed to ask a jury to award damages after 2008 simply by proving that "[b]ecause of the conspiracy, Plaintiffs paid overcharges prior to the end of 2008." (Mot. at 9.) For example, in *Optronic Techs. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021), the Ninth Circuit observed that the plaintiff "could prevail by showing that an overt pre-2016 conspiracy had residual market effects that resulted in post-2016 damages." *Id.* at 488. The court did not hold, nor even suggest, that the plaintiff did not have to establish both injury-in-fact ***and*** antitrust injury for that post-2016 damages period. To the contrary, the court found that the plaintiff offered substantial evidence to support a finding that the conspiracy continued after 2016 and noted that

6

even if the conspiracy ended in 2016, the plaintiff "could still recover post-2016 damages because it continued to suffer economic harm from the harm to competition caused by the illegal concerted activity." *Id.* at 487.[1] It is precisely that requisite showing of continued harm to competition central to the Ninth Circuit's *Optronic* decision that Plaintiffs seek to avoid here.

Should this Court accept Plaintiffs' contention that the conspiracy ended in September 2008 and the last overt act in furtherance of the conspiracy occurred at that time—a contention that is flatly contradicted by the opinions of their liability expert, Dr. Baye—the law would still not absolve Plaintiffs of their obligation to prove in the liability phase of the trial that those overt acts caused an injury to competition during the entire period for which they seek damages. To recover damages extending beyond the last overt act in the conspiracy, Plaintiffs must show "a continuing injury to *competition*, not merely a continuing pecuniary injury to a plaintiff." *See, e.g.*, *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1055 (5th Cir. 1982) (quoting *Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980) (emphasis in original) and dismissing plaintiff's antitrust claim

---

[1] Similarly, Plaintiffs point to a footnote in *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983) which when read in context stands for the unremarkable proposition that in a private antitrust suit brought under Section 4 of the Clayton Act, the private plaintiff must prove both an injury to competition in the marketplace and pecuniary injury to itself. *See, id.* at n.6. Moreover, *Multiflex* was abrogated on its finding that "conspiring in restraint of trade is illegal, even if the conspiracy does not in fact lead to an actual restraint of trade." *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir. 1985). Plaintiffs' citation to *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 at n.4 (7th Cir. 2012), is equally inapposite. Plaintiffs rely again on a footnote reciting boilerplate language describing the elements of a Section 1 claim under the Sherman Act. *See id.* While that reference uses the article "an" to modify the injury that is an essential element of a Section 1 claim, the case does not stand for, nor even discuss, the bold proposition that the injury proved can be something less than the injury for which plaintiffs seek and may be awarded damages.

when plaintiff failed to show a continuing injury to competition as opposed to pecuniary injury to plaintiff itself); *Young*, No. 80 C 4376, 1989 U.S. Dist. LEXIS 11575, at *58.

This Court has recognized that proving continuing injury to competition requires proof of anticompetitive effects for the 2009 through 2012 time period. *See* ECF No. 292 at 12-20. If, for example, the evidence shows that from 2009 to 2012 the alleged restraint benefitted competition by meeting customer demand (or otherwise) or had no impact on the price Plaintiffs paid for egg products, Plaintiffs will not have met their burden to send the question of damages post-2008 to the jury in Phase II. Thus, the answer to the salient question posed by the Court in its Minute Order (ECF 311)—if Plaintiffs seek damages for the post-2008 period, doesn't the proof of antitrust injury post-2008 need to come in the liability phase—is ***yes***.

## III. Plaintiffs Cannot Prevent Defendants from Presenting Post-2008 Evidence.

This Court ruled that post-2008 evidence is admissible and relevant, particularly for competitive effects and injury. (*See*, *e.g.*, ECF No. 292) No matter what Plaintiffs now plan to present at trial, Defendants' post-2008 evidence remains relevant to rebut the inference of a conspiracy, especially as Plaintiffs now articulate it, and to challenge the credibility and reliability of Dr. Baye's opinions.

### A. Post-2008 Evidence Is Relevant to Issues Beyond Injury.

In addition to injury, evidence after 2008 is relevant to determine product market boundaries, geographic market boundaries, entry conditions and market structure. As an example, a pattern of exports before and after the conspiracy period

8

is relevant to whether the market is national or global. Similarly, entry before or after the conspiracy period is informative about whether it was possible during the conspiracy period. Several of the analyses in the report of Defendants' econometrics opinion witness, Dr. Walker, relied on data outside of the newly truncated conspiracy period to draw inferences about what the relevant market was and whether the market was conducive to an effective conspiracy. Likewise, that states and other organizations adopted the Certified Program and its supposedly supply-restricting elements after 2008 is probative of the "reasonableness" of the program and that the Certified Program might be the least restrictive way of achieving the procompetitive benefits.

Plaintiffs cannot be permitted to preclude the introduction of this relevant evidence by gerrymandering their own proof.

### B. Post-2008 Evidence Rebuts the Inference of a Conspiracy.

Plaintiffs intend to ask the jury to infer a conspiracy based, in part, on a supposed change in Defendants' conduct after publication of an inadmissible and unduly prejudicial Wall Street Journal article. (*See* Mot., Ex. A.)[2] Plaintiffs allege that Defendants "changed course in late 2008 after articles were published about the conspiracy and the first lawsuit was filed[.]"[3] (ECF No. 314 at 5.)

Defendants contend the evidence does not support that argument. The

---

[2] Defendants reserve argument related to this article and email, as resolution of this issue is not necessary for the Court to resolve Plaintiffs' motion.

[3] By referencing the first lawsuit that was filed against Defendants, Plaintiffs are opening the door to the fact of the previous lawsuits and possibly even the results of the previous two trials.

9

Certified Program (and exports) continued unchanged after the alleged conspiracy purportedly dissolved in September 2008. That is one of the reasons why Judge Pratter denied a motion by certain defendant egg producers for summary judgment after September 2008. The MDL court commented: "as recently as 2014, the UEP issued a revised set of guidelines which continue to mandate 100% compliance, provide for audits, and ban backfilling." ECF 1439, at 7. The continuation of the Certified Program after 2008; continued and increased customer demand for Certified eggs; and the enactment of state laws that required egg producers to abide by animal welfare standards modeled after the UEP program all directly rebut Plaintiffs' "things-changed" argument. Rather than close the door to post-2008 evidence, Plaintiffs' motion keeps it wide open.

### C. Plaintiffs Cannot Preclude Defendants from Introducing Post-2008 Evidence, Particularly if They Intend to Present Dr. Baye's Injury Analysis.

Plaintiffs argue that prohibiting Defendants from "introducing post-2008 evidence about state laws enacted, consumer demand, grocers, and other claimed procompetitive benefits felt during the post-2008 timeframe" (Mot. at 14) would not affect Plaintiff's expert, Dr. Michael Baye, who will provide econometrics opinion testimony.[4] "Dr. Baye's analysis," Plaintiffs' claim, "can be divided to address injury only through September 2008." (*Id.* at 11.) In support, Plaintiffs show one "but-for price" chart from Dr. Baye's report, hiding the right edge of the chart that shows his analysis from October 2008 to December 2012. (*See id.*)

---

[4] Defendants attach excerpts of Dr. Baye's expert report ("Baye Rep.") as Exhibit 2.

10

Plaintiffs' cropping of charts created by Dr. Baye does not solve any problem wrought by Plaintiffs' last-minute proposal. All of Dr. Baye's analyses regarding competitive effects and injury (reflected by his pricing charts, among other things, are based on a multi-step analysis involving numerous econometric analyses run on data from 1990-2012, including regressions that purport to demonstrate that adherence to the UEP Certified Program's requirements reduced layer flock size and egg production below what it otherwise would have been. Given how these regressions work, events after September 2008 affect Dr. Baye's results throughout the *entire period* he analyzed—not just his results after September 2008. Plaintiffs concede as much, saying "data from 1990 affects the analysis of the conspiracy years, *as does data from 2012.*" (Mot. at 12 (emphasis added).) As explained below, granting Plaintiffs' motion means Dr. Baye cannot present any of his econometric analyses at trial, but evidence of events after 2008 would still be relevant to Defendants' defense of this case.

### 1. Overview of Dr. Baye's Econometrics Analyses.

Dr. Baye's conclusions concerning Plaintiffs' injury rest on a multi-step analysis. Dr. Baye first conducted multiple econometric analyses (regressions) to determine the extent to which producers following the Certified Program allegedly reduced the supply of eggs produced in the United States between August 2002 and December 2012.[5] He used January 1990 to July 2002 as a "benchmark period", and

---

[5] *See* Baye Rep. ¶ 149 and Exhibit 17 thereto (attached hereto as Ex. 2). Dr. Baye ran numerous versions of analyses on both nationwide flock size and nationwide egg production. All of his many regressions used the same 1990-2012 dataset.

11

then divided the "conspiracy" period into 5 sub-parts to correspond to the phasing in of Certified Program's cage-density limitations. Based on his regression, Dr. Baye concludes that adherence to the Certified Program did not actually reduce the nationwide supply of eggs until Phase 3 of the Certified Program, commencing approximately August 2005. Dr. Baye estimates a supposed shortfall in actual egg production of 2.4% in Phase 3 (August 2005 to January 2007); 5.5% in Phase 4 (February 2007—July 2008); and 5.2% in Phase 5 (August 2008 to December 2012). (*Id.* at ¶¶ 173-174, 177). Dr. Baye used these estimates to estimate price increases allegedly caused from 2005 through 2012.

Dr. Baye used data back to 1990 as a benchmark for prices not impacted by the alleged conspiracy later in time. Dr. Baye then used data through 2012 because he assumed the conspiracy persisted through *at least* 2015, the time of his report. *See* Baye Rep. ¶ 123 ("The final phase of the conspiracy began around February 2005, and is still in effect today"); *id.* at ¶ 150 ("I end my analysis in December 2012 because of unique, potentially significant events that could have impacted flock size and production in 2013 and beyond. This is not to say that that the alleged conspiracy ended in 2012, but rather that these events preclude me from reliably estimating potential post-2012 effects of the alleged conspiracy.").

> **2. Plaintiffs' Artificial Framing Cannot Prevent Defendants from Introducing Post-2008 Evidence to Defend Themselves.**

Plaintiffs' tactical decision to introduce evidence (or not) cannot preclude Defendants from introducing post-2008 evidence as Plaintiffs suggest. Nor can Plaintiffs mend the hold on Dr. Baye by simply terminating his testimony before he

12

<mark>
</mark>
<mark>
</mark>
<mark>
</mark>
<mark>
</mark>
<mark>
</mark>
<mark>
</mark>
<mark>
</mark>

discusses his results in Phase 5 (September 2008 to December 2012). The issue is not that the data after July 2008 is outside Plaintiffs' conspiracy period, which is how Plaintiffs (incorrectly) frame the problem (*see* Mot. at 11-12). Rather, the issue is that, as Plaintiffs concede, data after 2008 helped generate all of the estimates created by Dr. Baye's models, before, during and after 2008 – *i.e.*, data in 2010 affects Dr. Baye's finding of a 5.5% production shortfall from February 2007 to July 2008. Consequently, Plaintiffs cannot excise from Dr. Baye's analyses post-2008 data, and evidence of the market conditions that accompany such data, merely by refraining from talking about post-2008 injury and damages.

Thus, it is critical that Defendants be able to present evidence regarding the demand and supply conditions that influenced the post-2008 data in order to demonstrate that all of Dr. Baye's models, periods pre- and post-2008, are unreliable.[6]

As one example, there were new animal welfare laws for egg-laying hens in California (in 2008 and 2010), in Maine (in 2010), in Michigan (in 2009), in Ohio (in 2010), in Oregon (in 2011), in Washington (in 2011), as well as in other states. Defendants intend to cross-examine Dr. Baye (and offer expert testimony) regarding how these laws affected the statistical reliability and relevance of ***all*** of Dr. Baye's estimates.[7] But that highly relevant and admissible evidence would be precluded

---

[6] At the DAP trial, Dr. Walker explained this concept and how events after 2008 undermined the reliability of Dr. Baye's analyses. Tr. Dec. 5, 2019 at 35-36, 38-39 (excerpts attached as Exhibit 3).

[7] Plaintiffs likely would argue that Dr. Baye adequately controls for these laws, as well as other post-2008 events. But that is their *argument*. Assuming Dr. Baye would be permitted to testify, Defendants are entitled to present their contrary evidence and allow the jury to determine the facts.

13

under Plaintiffs' proposal. Defendants are entitled to explain why his model, based on the data he used, is unreliable due to market and regulatory differences that arose from 2009 to 2012.

### 3. Additional Prejudice to Defendants' Econometrics Expert Would Flow from Plaintiffs' Proposal.

Plaintiffs' last-minute proposal would also affect the analysis of Defendants' econometrics opinion witness, Dr. Walker. Dr. Walker developed his opinions in response to the opinions expressed by Dr. Baye in his report. That included performing various economic and econometric analyses on Dr. Baye's opinions and models, all of which were predicated on Dr. Baye's: (a) own assumption that the conspiracy continued well past 2008, and (b) use of data from 1990-2012. To be clear, Dr. Baye has never authored an expert report in which he assumes the "conspiracy" ended in 2008. That concept is new. Nor has he ever disclosed any analysis that uses data only through 2008, and he has never opined that a conspiracy that ended in 2008 would have lingering effects through 2012. Consequently, Dr. Walker has not been afforded the opportunity to assess what issues those opinions or analyses would create. Limiting Dr. Walker's analyses and opinions based on post-2008 data or allowing new opinions or analyses by Dr. Baye mere days before trial, would be unfair, unreasonable, and unmanageable.

Thus, the response to the Court's question of how Plaintiffs' proposal affects the opinions and testimony of Professor Baye (ECF 311) is clear: Plaintiffs' proposal requires Defendants to present post-2008 evidence, and for Plaintiffs to forego Dr. Baye all together.

14

## IV. Plaintiffs' Unsound Approach Would Add Undue Burden and Complexity.

Beyond being legally unsound, Plaintiffs' new-fashioned proposal would be inefficient and confusing to the jury. Allowing Plaintiffs to defer until Phase II proof of injury for the 2009 to 2012 time period would result in significant duplication, burden, and waste of time. For example, witnesses who testify in Phase I about the presence (or absence) of the alleged restraint would have to artificially omit from their testimony conduct or events taking place in 2009 through 2012, and then resume such testimony in Phase II. This is not an isolated issue. Plaintiffs have now lodged new "post-2008" objections to the designations of *twenty* witnesses. Playing and replaying twenty sets of designations and calling and recalling live fact witnesses in two phases of a lengthy, complex trial is certainly not what this Court envisioned when it granted Defendants' motion for bifurcation.

## Conclusion

For the foregoing reasons, Defendants respectfully request that the Motion be denied.

Dated: October 6, 2023   Respectfully submitted,

/s/ Livia M. Kiser
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

15

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

*/s/ Robin P. Sumner*
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

16

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***

*/s/ Donald M. Barnes*
Donald M. Barnes
(dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***