# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | Docket No: 08-md-02002<br>MDL 2002 |
| THIS DOCUMENT APPLIES TO:<br><br>DIRECT ACTION PLAINTIFFS' CASES | |

<u>**FILED UNDER SEAL**</u>

**MEMORANDUM OF LAW IN OPPOSITION TO
CERTAN DEFENDANTS' MOTION FOR PARTIAL SUMMARY
<u>JUDGMENT AGAINST DIRECT ACTION PLAINTIFFS ON DAMAGES</u>**

## II.  STATEMENT OF FACTS

DAPs filed their complaints between November 16, 2010 and January 25, 2011.  CSF 305.[4]  At the time of filing their complaints, a document discovery cut-off of December 31, 2010 had already been established by the parties and the Court.  *Id*.  As of January 2009, Defendants were relieved of any obligations to preserve documents generated after December 31, 2008.  *Id.*  During the Winter of 2013, each DAP filed second amended complaints alleging that Defendants and their co-conspirators had engaged in a continuing agreement, understanding and conspiracy to reduce the output of eggs in order to raise prices, through the date of their amended complaints, with impact continuing thereafter.  *Id.*  DAPs sought to expand the document discovery cut-off date to dates coinciding with the filings of DAPs' Complaints; but Defendants steadfastly refused claiming that to do so would be burdensome.  *Id.*  Nevertheless, the parties created an exception for transactional sales and purchase data because they acknowledged the need for such data in order for their experts to perform economic analyses and damage estimates.  *Id.*  Thereafter, the parties agreed to continue the process of exchanging transactional data beyond 2011 and presented a Stipulation and Proposed Order to the Court providing for the annual exchange of transactional data in subsequent years "through the time of trial."  *Id.*

Defendants' anticompetitive conduct has had a continuing impact beyond the dates of DAPs' amended complaints.  An essential component of Defendants' efforts to restrict output and raise domestic egg prices was the development of the UEP Guidelines and later the UEP Certified Program.  CSF 157 – CSF 235.  These supply-restricting features of the UEP Guidelines were modified over time with the 100% Rule and the prohibition on backfilling being adopted in

---

[4] Citations to "CSF" are to DAPs' Counter-Statement of Facts In Support of Their Opposition to Certain Defendants' Motion for Summary Judgment Against Direct Action Plaintiffs on Liability.

2

2008-December 2012 reflects a 6.7% reduction in the nation's flock size. *Id.* Correspondingly, his methodology shows that the reduced output relative to what it would have been but for these restraints amounted to "about 5.5 percent between February 2007 and July 2008, and about 5.2 percent between August 2008 and December 2012." *Id.*

One of the most dramatic depictions of the impact of Defendants' output restriction continuing through 2012, is set forth in Exhibit 18 to Dr. Baye's Report, which shows the difference between the nation's actual flock size and but-for flock sizes. CSF 293. This chart, prepared by Dr. Baye, reflects the results of standard VAR models typically utilized by economists to test the robustness of one's methodological findings. *Id.* The results of the VAR model show a profound difference between flock sizes extending through 2012. Further, Dr. Baye found that the 5.2% reduction in output between August 2008 and December 2012 had the effect of raising the market price for eggs by 172%. *Id.* Based on the model, Dr. Baye concluded that: "For the first year or two after the UEP Guidelines were introduced, they did not have a specifically significant effect on flock size. However, beginning around 2005, the predicted but-for flock size diverges significantly from the actual flock size." *Id.*

Since 2008, the UEP has continued to promulgate the UEP Certified Program, which requires a minimum cage space requirement of 67 square inches, bans backfilling and requires that suppliers comply with the 100% Rule in order to market certified eggs. CSF 299. The UEP enforces the Certified Program's requirements through mandatory audits and compliance measures. *Id.* These basic tenets of the Certified Program remain in effect today. *Id.* Audit procedures have remained the same since the pre-2008 time period: participants in the program need only 180 out of 200 points to pass an audit, but failure to fulfill the minimum cage space requirement of 67 square inches and the prohibition on backfilling both result in automatic failure. *Id.*

Cal-Maine, Rose Acre, Michael Foods and Sauder continue to participate in the Certified Program today. CSF 300. No Defendant has demonstrated any effort to withdraw from the UEP Certified Program and its output-restricting scheme.

## III. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment should be granted only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Davis v. Mountainaire Farms*, 453 F.3d 554, 556 (3d Cir. 2006). On summary judgment, it is the movant's burden to "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, … admissions, interrogatory answers, or other materials," and persuade the district court that "the movant is entitled to judgment as a matter of law." Rule 56; *see also Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir. 1988). It is appropriate to grant summary judgment only if no reasonable juror could find for the non-movant. *Matsushita v. Zenith*, 475 U.S. 574, 587 (1986). At the summary judgment stage, the district judge must not "weigh the evidence and determine the truth of the matter but … determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in the non-movant's favor. *Hugh v. Butler Cty. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005).

## IV. ARGUMENT

### A. DAPs Are Entitled to Recover Damages Through 2012 Due to the Continuing Effects of Defendants' Conspiracy

Defendants have created an erroneous straw-man argument in an over-simplified attempt to avoid accountability for their actions. Under their approach, if Plaintiffs are unable

6