UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MOTION TO LIMIT CERTAIN TESTIMONY OF
<u>DR. JEFFREY ARMSTRONG</u>**

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 South Flower
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com

*Attorneys for Kraft Foods Global, Inc.; The Kellogg Company;
General Mills, Inc.; and Nestlé USA, Inc.*

Plaintiffs seek to limit certain testimony of Defendants' hybrid fact and expert witness, Dr. Jeffrey Armstrong. Based on Defendants' disclosures, Plaintiffs anticipate Dr. Armstrong will testify regarding animal welfare subjects the Court has ruled irrelevant, including: (1) whether compliance with minimum UEP guidelines, including the 100% rule, is necessary to ensure the humane treatment of hens, and (2) his subjective intent or motivations, and that of others associated with UEP. The Court has considered and excluded similar testimony, and Plaintiffs seek for Dr. Armstrong's testimony to conform to the Court's rulings.

## BACKGROUND

***Court's Opinions on Animal Welfare and Animal Cruelty Evidence.*** This Court has issued a number of opinions in which it has excluded evidence related to the cruel treatment of hens. It has excluded video and photographic evidence of animal abuses, as captured by animal welfare activists at egg production facilities, including those of Defendants Rose Acre and Cal-Maine. Dkt. 302 at 1, 5. It has excluded prior complaints about the adequacy of animal welfare protections under the UEP Certified Program on grounds that it is not valuable to distinguish at trial "between doing nothing, and not doing *enough*." Dkt. 297 at 3 (emphasis in original). And it has excluded evidence about Sparboe's alleged animal abuses on grounds that this "case is about the number of eggs, not the treatment of chickens." Dkt. 287 at 1, 8.

Most pertinent here, in its ruling on the Sparboe evidence, this Court explained that "[e]vidence of animal abuse … could distract and confuse the jury" and

> could lead the jury to focus on the effectiveness of the UEP Certified Program and other animal-welfare guidelines. For example, the jury might question whether the 100% rule was necessary to ensure animal welfare.

*Id.* at 9.

***Dr. Jeffrey Armstrong.*** Around 1998, then-UEP President Al Pope asked Dr. Armstrong to constitute and chair the UEP Scientific Advisory Committee on Animal Welfare. Ex. A, DAP

1

Trial Tr. Day 16 at 30:1-16. Dr. Armstrong was a member and chair of the UEP Scientific Advisory Committee until 2011. *Id.* at 127:22-24. He holds a Ph.D. in physiology and was a university professor while he was a member of the Scientific Advisory Committee.

Dr. Armstrong was deposed and testified at the DPP and DAP trials. Defendants used Dr. Armstrong as a "hybrid or expert" witness at the DAP trial. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, (E.D. Pa. Sept. 23, 2019), ECF No. 1975. His prior testimony spanned subjects that included: the UEP Scientific Advisory Committee's creation and activities; the content and development of the UEP Scientific Advisory Committee Animal Welfare Recommendations; the relationship between the UEP Producer Committee and the UEP Scientific Advisory Committee; and the establishment of the UEP Animal Husbandry Guidelines for Egg Laying Hens. On October 3, 2023, Defendants disclosed Dr. Armstrong's anticipated testimony will be consistent with the scope and substance of his prior testimony. Ex. B, Oct. 3, 2023 Letter.

## ARGUMENT

Some of Dr. Armstrong's anticipated testimony is inconsistent with this Court's rulings.[1] Specifically, in prior trials, Dr. Armstrong has testified that the 100% rule was necessary because the alternative would not be humane to hens. He also has testified about the effectiveness of the UEP certification program and the subjective beliefs and motivations of the Scientific Advisory Committee and UEP—that they were attempting to do the right thing for hens. Plaintiffs respectfully submit that this testimony, if introduced, would be inconsistent with this Court's orders.

---

[1] Plaintiffs understand that Defendants may file a motion related to Dr. Lusk, who will rebut Dr. Armstrong's testimony. To the extent that Defendants believe portions of Dr. Lusk's testimony are inadmissible, the same rules should apply to Dr. Armstrong. Accordingly, additional inadmissible testimony may be identified later.

1. **The Court's Orders Foreclose Dr. Armstrong's Anticipated Testimony That Compliance With UEP Guidelines, Including the 100% Rule, Was Necessary To Ensure Animal Welfare.**

The 100% rule is a mandatory feature of the UEP Certified Program, under which certified producers were required to implement welfare guidelines on 100% of their production facilities. At the DAP trial, Dr. Armstrong testified at length about how he and the Scientific Advisory Committee viewed industry-wide compliance with UEP guidance, including the 100% rule, as integral to animal welfare. According to Dr. Armstrong, for example, the Scientific Advisory Committee "absolutely" believed the 100% rule was necessary because the Committee "did not believe it was humane for hens to be housed in those same conditions [they observed on production facility tours], and [they] felt if [they] were going to be involved with science-based guidelines and evolving science-based guidelines, that it needed to be for all – all hens." Ex. A at 128:25-129:9. The Committee viewed its impact, at least in part, in terms of the percentage of the nation's flock affected by their recommendations. *See* Ex. A at 39:2-5 ("If we made guidelines that only, you know, reflected 1 percent of 250 million hens at the time, it wouldn't be practical and wouldn't really affect welfare.")

Dr. Armstrong has repeatedly and explicitly linked adherence to minimum guidelines with animal welfare. At the DAP trial, Dr. Armstrong testified the Scientific Advisory Committee's view was "that not following the minimum guidelines with cages is not humane for the hen." Ex. A at 124:14-15. Similarly, Dr. Armstrong agreed the Committee "believe[d] that the failure to adhere to the minimum guidelines would be inconsistent with the humane treatment of hens," Ex. A at 130:18-21, and "view[ed] it as inappropriate to produce eggs in a manner inconsistent with the minimum guidelines," Ex. A at 131:5-8; *see also* 134:15-20.

Finally, Dr. Armstrong testified about the Scientific Advisory Committee's opposition to another purported animal welfare program spearheaded by Sparboe Farms that did not employ a

3

100% rule. *See generally* Ex. A at 135:16-139:14. Dr. Armstrong previously testified regarding a November 29, 2006 letter he wrote to UEP leadership that expressed the Scientific Advisory Committee's opposition to a program without a 100% requirement. Ex. A at 137:22-139:14; Ex. C, Nov. 29, 2006 Letter. In the letter he wrote: "We view the UEP guidelines as grounded in sound science that represents the threshold for maintaining caged layers humanely. Housing hens at less than UEP minimum standards is neither scientifically justified nor humane." *Id*. The letter concludes: "[W]e believe failure to ensure 100% implementation threatens the welfare of laying hens and the overall credibility of our science-based guidelines." *Id*.

This testimony is inconsistent with this Court's ruling that evidence about "whether the 100% rule was necessary to ensure animal welfare." Dkt. 287 at 9. This is an antitrust case about a conspiracy to reduce the supply of eggs—not a case about the humane treatment of hens. *Id*. at 1, 8. On that ground, the Court excluded undercover videos detailing the treatment of hens at Defendants' facilities and the Sparboe news segment. It should do the same with respect to Dr. Armstrong's testimony.

        **2.**        **Testimony Regarding Dr. Armstrong's Subjective Views of the Committee's Actions and UEP's Motivations Is Inadmissible.**

At the DAP trial, Dr. Armstrong agreed "treating all hens consistent with the minimum space guidelines was the right thing to do." Ex. A at 130:22-24. And he testified that he and the Scientific Advisory Committee "firmly believe[d] in what [they] were doing and very much focused on the science and what we [did] to try to make life better." *Id*. at 146:18-20. Dr. Armstrong also testified he accepted the appointment to chair the UEP's Scientific Advisory Committee because he "believed [the UEP] were sincere"; and that former UEP President Gene Gregory was someone who "deeply cared about science-based guidelines, but [who] didn't always understand the science. . . . But . . . deeply cared about the animal welfare issue." Ex. A at 31:10-12, 102:6-103:4.

4

Dr. Armstrong's views on whether the Committee was doing "the right thing" or "mak[ing] life better" are irrelevant. Dr. Armstrong's subjective views on the Scientific Advisory Committee's motivations, and those of Mr. Gregory, are also irrelevant. As this Court has held, "[t]he fact that someone else believes that an action is inadequate does not reveal much about why someone did what they did." Dkt. 297 at 3. At trial, Defendants may "offer evidence to explain why they did what they did." Dkt. 285 at 9. But Dr. Armstrong's subjective beliefs about the Scientific Advisory Committee's motivations do not shed light on Defendants' motivations. The connection here between 'we believed we did the right thing' and therefore Defendants 'did the right thing' is "a bit of a stretch" like the connection between not "doing enough" and "the whole thing is a sham."[2] Dkt. 297 at 3.

\* \* \* \*

Dr. Armstrong previously testified about specific topics that this Court has excluded—for example, the campaign by Compassion Over Killing. Plaintiffs assume that Dr. Armstrong's testimony will comport with those rulings, and they reserve the right to object to any testimony that is inconsistent with this Court's prior rulings.

---

[2] In the same vein, Dr. Armstrong's understanding of others' perception of him is irrelevant. For example, testimony that PETA sent Dr. Armstrong a letter to congratulate him on his appointment to the McDonald's animal welfare panel but publicly disparaged him in a letter to McDonald's Executive Vice President or that the pork and beef industries viewed Dr. Armstrong as a radical do not explain why Defendants did what they did.

5

## CONCLUSION

For the foregoing reasons, the Court should exclude portions of Dr. Armstrong's anticipated testimony regarding the 100% rule and his subjective opinions about the Scientific Advisory Committee's and UEP's motivations. This testimony is irrelevant and impermissible based on the Court's prior rulings.

October 6, 2023

Respectfully submitted,

*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company*

 /s/ *Brandon Fox*
James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 South Flower
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

6