UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION TO LIMIT CERTAIN TESTIMONY OF DR. JEFFREY ARMSTRONG**

Plaintiffs' effort to exclude highly relevant, probative testimony from Dr. Jeffrey Armstrong, the chair of the United Egg Producers ("UEP") Scientific Advisory Committee ("SAC"), about the key issue in this case—whether the UEP Certified Program incorporates bona fide, science-based animal welfare guidelines that improve the well-being of hens and meet customer demand for eggs produced by hens that are treated humanely, or is a mere pretext for an agreement to reduce supply—should be denied for several reasons. First, Plaintiffs' motion is extraordinarily untimely and granting it less than a week before trial would be highly prejudicial to Defendants. Second, Plaintiffs failed to meet and confer with Defendants prior to filing this motion *in limine*, as required by the Court's rules and procedures. Third, Plaintiffs' mischaracterizations of this Court's prior rulings and Dr. Armstrong's testimony do not provide a basis for this Court to exclude highly probative evidence that goes to the heart of Defendants' defense.

163770972v4

I.      **This Court Should Deny Plaintiffs' Motion as Untimely**

Defendants incorporate by reference the procedural history set forth in the simultaneously filed opposition to Plaintiffs' similarly late and prejudicial motion to exclude the testimony of Dr. Jesse David and do not repeat it here. Plaintiffs' motion to limit testimony from Dr. Armstrong, filed more than 400 days after the deadline to file *in limine* motions, seeks to exclude testimony of which Plaintiffs have been aware for more than five years. Dr. Armstrong testified for the defendants in the 2018 Direct Purchaser Plaintiffs trial. Dr. Armstrong testified again for the defendants in the 2019 Direct Action Plaintiffs trial. Dr. Armstrong has appeared on every single iteration of Defendants' witness list exchanged in this matter, and the subject matter of his anticipated testimony always has been identical to his testimony in the two prior trials. Any suggestion that Plaintiffs only recently became aware of Dr. Armstrong's anticipated testimony is flat out false.

Moreover, as has been clear at every turn in this case, Dr. Armstrong's testimony is central to Defendants' defense. While Dr. Armstrong is a well-regarded animal science expert, he is also a fact witness who will testify about his work as chair of the SAC. The SAC issued the formal recommendations for animal welfare guidelines that UEP used to create the Certified Program, and Dr. Armstrong will testify as to why the SAC made the recommendations it did, and why and how those recommendations evolved over time. Dr. Armstrong's work on the UEP SAC will constitute the gravamen of his testimony.[1]

Excluding any portion of Dr. Armstrong's testimony at this late stage will unduly and unfairly prejudice Defendants. *See, e.g.*, *Pearl v. Keystone Consol. Indus., Inc.*, 884 F.2d 1047,

---

[1] For the Court's convenience, a transcript of Dr. Armstrong's testimony offered at the DAP trial is attached hereto as Exhibit A.

1052 (7th Cir. 1989) (a district court does not abuse its discretion by denying a motion *in limine* filed eleven days before trial and three days after the deadline set by the court); *Williams v. Schwarz*, No. 15-cv-1691, 2018 U.S. Dist. LEXIS 92754, at *14-15 (N.D. Ill. June 1, 2018) (denying motion *in limine* as untimely because it was first raised at the final pretrial conference, two weeks after the court's deadline); *Rizzo v. Mr. Coffee, Inc.*, No. 94-cv-5825, 1996 U.S. Dist. LEXIS 1745, at *31 (N.D. Ill. Feb. 12, 1996) (denying motion *in limine* as untimely because it was filed on the first day of trial, one month after the court's deadline). As such, the Court should go no further and simply deny Plaintiffs' motion as untimely.

**II.     This Court Should Deny Plaintiffs' Motion Because It Violates the Court's Standing Order Requiring Meet and Confers Well in Advance of Trial and Before Filing a Motion to Exclude Evidence**

Not only is Plaintiffs' motion extraordinarily untimely, it also directly contravenes Paragraph 16(a) of this Court's Standing Order on Preparation of Final Pretrial Order for Civil Cases, which requires the parties to meet and confer in good faith before filing motions *in limine*. No meet and confer took place regarding this motion. Indeed, until Plaintiffs filed this motion, Defendants had no idea that Plaintiffs would seek to exclude any testimony by Dr. Armstrong. For that reason, too, Plaintiffs' motion should be denied summarily.

**III.    This Court's Prior Rulings Do Not Warrant the Exclusion of Dr. Armstrong's Testimony**

Finally, while Plaintiffs style this motion as a request to limit Dr. Armstrong's testimony in a manner that conforms with the Court's prior rulings, Plaintiffs are not asking for conformity; rather, they seek to contort (and sidestep) the Court's prior rulings regarding the Certified Program's benefits. Indeed, Plaintiff's motion makes little sense unless understood as part of a larger eleventh-hour tactic to excise large swaths of evidence that undermine their theory of this

3

case and the factual findings they will ask the jury to make. Ironically, Plaintiffs' extraordinary efforts underscore the clear relevance of the evidence they seek to exclude.

### A. Dr. Armstrong's testimony goes directly to key issues in the case.

Dr. Armstrong's testimony goes directly to what this Court has rightly recognized are key issues in this case: whether the Certified Program was a legitimate animal welfare program designed to meet customer demand for eggs produced by hens treated humanely and whether there was a less restrictive alternative. (*See, e.g.*, ECF No. 292 at 11-13 (permitting Defendants to present evidence that the alleged "supply restriction is not anticompetitive because it satisfies consumer demand for better animal welfare"); ECF No. 285 at 13 ("Whether the UEP Certified Program was a pretext to reduce supply, or a response to consumer demands, is a question for the jury. If Plaintiffs will argue that the UEP Certified Program was a pretext to reduce supply, then Defendants can tell their side of the story to the jury.").) Clearly relevant to those questions is testimony from the chair of the SAC about whether each of the challenged restraints were designed to improve animal welfare, as opposed to a pretextual strategy to limit supply, and whether the SAC would have recommended, supported and/or endorsed any guidelines without them.

When the Court observed that evidence of animal abuse could lead the jury to question whether the 100% rule was necessary to ensure animal welfare, Defendants did not understand the Court to mean that in response to an attack by Plaintiffs on the 100% Rule, Defendants would be precluded from admitting evidence that the 100% Rule in fact improved animal welfare and/or was necessary to achieve the Program's procompetitive benefits. But that is exactly what Plaintiffs are asking the Court to do here, which would be inconsistent with this Court's prior rulings. In addition, this Court has held already, as did Judge Pratter, that "[t]he demand for, motivation behind, and actual effects of the UEP Certified Program are . . . entirely probative as to whether the Program was a pretext for an agreement to reduce supply." *See* ECF No. 285 (quoting 9/24/19

4

Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (ECF No. 1982)). Testimony by Dr. Armstrong regarding his personal knowledge of the intent and motivation behind the Certified Program, and the SAC's recommendations that formed that basis for that Program, falls squarely within that category of admissible evidence.

  **B.**  **Defendants are entitled to rebut Plaintiffs' allegations that the UEP Certified Program was a pretext for an agreement to reduce supply.**

Plaintiffs' *Santiago* proffer, on which this Court relied to conditionally admit scores of documents at Plaintiffs' request, reveals that Plaintiffs will ask the jury to find that:

- "UEP touted the program as the work of an independent scientific advisory committee that had examined best practices or animal husbandry, but that was not the case." (ECF No. 164 at 14.)

- "[T]he producers jettisoned many of the animal welfare standards put forward by the scientific committee." (*Id.*)

- "[The SAC] asked the UEP to remove their names from the guidelines" because they were so upset with producers "gutting their recommendations." (*Id.*)

- What did make it into the UEP Certified Program were anticompetitive measures conceived by the producers themselves, including the ban on backfilling and the 100% rule. (*Id.* at 15.)

- "[L]arded with anticompetitive requirements, the UEP Certified Program achieved its true aim of higher egg and egg product prices." (*Id.* at 17.)

Defendants must be permitted to introduce evidence to rebut these allegations and the inferences that Plaintiffs will ask the jury to draw from them, including testimony from the chair of the UEP SAC detailing:

- The SAC's examination of the available scientific literature and its resulting recommendations;

- How the SAC's recommendations changed over time and why;

- The discussions between the SAC and the egg farmers about the recommendations, including that ultimately the UEP Guidelines implemented all of the SAC's recommendations;

- The SAC's views that the Guidelines, including the restraints challenged by Plaintiffs, provided the baseline minimum for the humane treatment of eggs laying hens;

- The SAC's views on cage space and its importance relative to other guidelines;

- The SAC's recommendation of a ban on backfilling and its importance relative to other guidelines; and

- The SAC's support for the 100% rule, the reasons for that support, and its importance relative to other guidelines.

As this Court has said, "Plaintiffs believe that animal welfare concerns were pretextual, and that the UEP Certified Program was a ruse for a supply restriction. The Court will allow Plaintiffs to present evidence to the jury that animal-welfare concerns were not the motivation behind the UEP Certified Program. Plaintiffs could argue that the Program did not help chickens, and was not adopted to help chickens." (ECF No. 297 at 4.) And Plaintiffs have said multiple times that this is what they intend to do.

To rebut this, Defendants must be permitted to present evidence that the UEP Certified Program was anything but a ruse, but rather a legitimate animal welfare program constructed around science-based animal husbandry guidelines designed to meet both the criticisms of animal welfare activists and the demands of egg producers' customers for the improved treatment of egg-laying hens. For example, Plaintiffs cite the fact that UEP did not immediately implement all of the SAC recommendations as evidence that the Certified Program was not legitimate. Dr. Armstrong thus must be permitted to testify regarding the nature of the SAC's recommendations, the SAC's discussions with UEP and others about them, and whether their later adoption undermined the Program's credibility.

Plaintiffs contend that the Court's prior rulings amount to a blanket ban on all testimony about animal welfare. Plaintiffs miss the distinction between "doing nothing and doing *enough*." (ECF No. 169 at 3, emphasis in original.) As the Court explained, "[e]vidence that some people

6

thought that egg producers should do *more* doesn't really call into question why the egg producers did what they did. There is a difference between doing nothing and doing *enough*." (*Id.*) Dr. Armstrong's testimony will not concern whether UEP could have done *more*. But it will rebut Plaintiffs' contentions that the ban on backfilling and the 100% Rule did not improve animal welfare (*i.e.*, did nothing) by demonstrating that they actually improved animal welfare. That testimony also will help answer the question "why the egg producers did what they did." (*See* ECF No. 285 (quoting 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (ECF No. 1982) ("The actual effects of the UEP Certified Program are . . . entirely probative as to whether the Program was a pretext for an agreement to reduce supply."))).

Under the Court's prior rulings, Defendants are entitled to present testimony from the SAC chair that the Program did in fact help egg-laying hens, from which a jury may infer, among other things, that it was in fact adopted to help egg-laying hens and thereby satisfy customer demand. (*See id.*) The UEP SAC's views that the Guidelines improve animal welfare and provide baseline minimum standards for the humane treatment of hens, and the fact that the SAC would not have supported anything less, go directly to the question of whether the Guidelines were nothing but a ruse.

      **C.**    **Defendants are entitled to rebut Plaintiffs' contentions with evidence that the UEP Certified Program achieved procompetitive benefits and that there was no lesser alternative.**

In addition, this Court has made clear that the procompetitive benefits of the program also are fair game. (ECF No. 285 at 11 ("The evidence of what egg customers wanted, and how those preferences affected egg production, flies well over the low bar of relevance under the Federal Rules."); ECF No. 292 at 19 ("Plaintiffs allege that they suffered an antitrust injury from the anticompetitive effects of [the Certified] Program during that time period. So Defendants can argue that the Program was not an unreasonable restraint of trade because of its procompetitive

7

benefits.").) The jury will hear from UEP, its producer members, their customers, and their customers' trade associations, that having guidelines backed by science was (1) an important part of meeting customer demand, and (2) a strategy to avoid more restrictive (and varying) alternatives imposed by states and individual customers. It will hear that competing animal welfare programs, including McDonald's and others being considered by the Food Marketing Institute ("FMI")[2], and indeed FMI itself, all had scientific advisory committees, which they viewed as necessary to establish the legitimacy of any animal welfare standards and to meet market demand for competitive animal welfare products. In other words, the testimony will show that an animal welfare program not backed by a scientific advisory committee was indeed no animal welfare program at all.

Evidence Plaintiffs seek to exclude here—*i.e.*, the SAC's views on and support for the components of the Certified Program that Plaintiffs challenge, namely the cage space requirements, the backfilling ban, and the 100% rule—goes directly to whether those alleged restraints were necessary to meet customer demand. While Defendants expect Plaintiffs to argue that UEP could have developed a program without those restraints, Defendants will argue that they could not have, and the SAC's views on the necessity of the alleged restraints and whether the SAC would have recommended, supported, or endorsed a program without them, is critical to that argument.

### D. Dr. Armstrong's testimony has already twice been admitted at trial.

Nothing in this Court's prior rulings precludes Dr. Armstrong's testimony in the form in which it has already been admitted twice. Consistent with prior testimony, Dr. Armstrong will testify that each of the restraints Plaintiffs challenge improved animal welfare and was in fact

---

[2] FMI is a membership association for supermarket retailers and suppliers.

necessary to provide a baseline minimum for the humane treatment of egg laying hens. The SAC would have recommended nothing less. Plaintiffs will ask the jury to conclude that the Guidelines were a pretext for a supply restriction scheme based on what Plaintiffs will argue is evidence that the Guidelines as adopted do not improve animal welfare, were not necessary to improve animal welfare, and/or were not recommended, endorsed and required by the SAC. The UEP SAC's views to the contrary are highly relevant and probative because they directly rebut Plaintiffs' contentions.

Similarly, as both Judge Pratter and this Court have recognized, intent is relevant, and motive may be probative of intent. (*See, e.g.,* ECF No. 285 (agreeing with Judge Pratter's ruling that "[t]he demand for, motivation behind, and actual effects of the UEP Certified Program are . . . entirely probative as to whether the Program was a pretext for an agreement to reduce supply") (quoting 9/24/19 Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (ECF No. 1982)).) Dr. Armstrong is a fact witness who chaired UEP's SAC. As such, Dr. Armstrong has direct, personal knowledge about what the SAC did and why, which is relevant to UEP's intent in creating the UEP Certified Program, the first step of which was commissioning the SAC.

Dr. Armstrong also has relevant, personal knowledge of events that Plaintiffs will argue constitute evidence from which the jury should infer a conspiracy to reduce supply. For example, Defendants expect Plaintiffs to argue that UEP and the egg farmers questioned certain of the SAC's initial recommendations because those recommendations did not comport with their purported intent to limit to supply. What Dr. Armstrong observed and his recollection of the conversations where the SAC and the UEP Producer Committee addressed the concerns raised by the egg farmer members of UEP, is highly relevant, probative evidence admissible to rebut Plaintiffs' arguments regarding Defendants' motive and intent.

9

IV. **Conclusion**

Plaintiffs' untimely motion *in limine* that fails to comport with this Court's well set out pre-trial procedures and that seeks to exclude highly relevant evidence that undermines Plaintiffs' theory of the case, should not be countenanced. To do so not only would severely prejudice Defendants, it also would result in the jury having a misleading view of the facts on which they will be asked to decide this case. For these reasons, this Court should deny Plaintiffs' motion and permit Dr. Armstrong to testify on identical issues as he has in the two prior trials.

Dated: October 10, 2023

Respectfully submitted:

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1926

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***

163770972v4

/s/ Patrick M. Collins
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(admitted *pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(admitted *pro hac vice*)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

/s/ Donald M. Barnes
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***

11