```
 1                  IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
         ANTITRUST LITIGATION                 08-MDL-02002
 5

 6
                              - - - - -
 7
                          PHILADELPHIA, PA
 8
                              - - - - -
 9
                          NOVEMBER 25, 2019
10
                              - - - - -
11

12
     BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14                            - - - - -

15                 TRANSCRIPT OF TRIAL PROCEEDINGS

16                            DAY 16

17                            - - - - -

18

19

20

21               KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                 Official Court Reporter
22               Room 1234 - U.S. Courthouse
                 601 Market Street
23               Philadelphia, PA  19106
                 (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)
```

```
 1   APPEARANCES:

 2
                     KENNY NACHWALTER, P.A.
 3                   BY:  RICHARD ALAN ARNOLD, ESQUIRE
                     WILLIAM J. BLECHMAN, ESQUIRE
 4                   DOUGLAS H. PATTON, ESQUIRE
                     MICHAEL A. PONZOLI, ESQUIRE
 5                   BRANDON S. FLOCH, ESQUIRE
                     201 South Biscayne Boulevard, Suite 1100
 6                   Miami, Florida  33131
                     For Plaintiffs The Kroger Co., Safeway Inc.,
 7                   Roundy's Supermarkets, Inc., Walgreen Co.,
                     Hy-Vee, Inc., Albertsons LLC, The Great
 8                   Atlantic & Pacific Tea Company, Inc., H.E Butt
                     Grocery Company, and Conopco, Inc.
 9

10                   SPERLING & SLATER
                     BY:  PAUL E. SLATER, ESQUIRE
11                   JOSEPH M. VANEK, ESQUIRE
                     DAVID P. GERMAINE, ESQUIRE
12                   JOHN P. BJORK, ESQUIRE
                     55 West Monroe Street, Suite 3200
13                   Chicago, Illinois  60603
                     For Plaintiffs Publix Super Markets, Inc.
14                   and SuperValu Inc.

15
                     MARCUS & SHAPIRA, LLP
16                   BY:  MOIRA CAIN-MANNIX, ESQUIRE
                     BRIAN C. HILL, ESQUIRE
17                   One Oxford Centre 35th Floor
                     301 Grant Street
18                   Pittsburgh, PA  15219
                     For Plaintiff Giant Eagle, Inc.
19

20                   AHERN & ASSOCIATES, P.C.
                     BY:  PATRICK J. AHERN, ESQUIRE
21                   THEODORE BELL, ESQUIRE
                     8 South Michigan Avenue, Suite 3600
22                   Chicago, Illinois  60603
                     For Plaintiff Winn-Dixie Stores, Inc.,
23                   H.J. Heinz Company, L.P., C&S Wholesale
                     Grocers, Inc.
24

25                   (CONT.)
```

```
 1    APPEARANCES:  (CONT.)

 2
                       PEPPER HAMILTON LLP
 3                     BY:  JAN P. LEVINE, ESQUIRE
                       ROBIN P. SUMNER, ESQUIRE
 4                     ALEXANDER L. HARRIS, ESQUIRE
                       WHITNEY R. REDDING, ESQUIRE
 5                     KAITLIN MEOLA, ESQUIRE
                       LACEY D. REEDER, ESQUIRE
 6                     3000 Two Logan Square
                       18th & Arch Streets
 7                     Philadelphia, PA  19103
                       For Defendants United Egg Producers, Inc.
 8                     and United States Egg Marketers, Inc.

 9
                       PORTER WRIGHT MORRIS & ARTHUR LLP
10                     BY:  JAY L. LEVINE, ESQUIRE
                       DONALD M. BARNES, ESQUIRE
11                     ALLEN T. CARTER, ESQUIRE
                       2020 K Street, NW
12                     Suite 600
                       Washington, DC  20006
13                            And
                       PORTER WRIGHT MORRIS & ARTHUR LLP
14                     BY:  JAMES A. KING, ESQUIRE
                       ARLENE BORUCHOWITZ, ESQUIRE
15                     41 South High Street
                       Suite 2900
16                     Columbus, OH  43215
                       For Defendant Rose Acre Farms, Inc.
17

18

19

20

21

22

23

24

25
```

1    Plaintiffs' Exhibit 497 against the USEM only.

2              And last, Your Honor, Plaintiffs offer Plaintiffs'

3    Exhibit 53 against all parties.

4              Your Honor, I'm sorry, I missed one and I'm

5    reminded.  Plaintiffs offer Exhibit 101 against the USEM only.

6    Thank you, Your Honor.

7              THE COURT:  Thank you.

8              And next, please?

9              MR. BLECHMAN:  Your Honor, subject to agreement with

10   Defense Counsel to our calling Professor Baye, Monday after

11   Thanksgiving, subject to that agreement with counsel on the

12   other side, Plaintiffs rest.

13             THE COURT:  Okay, so what that means, folks, is that

14   because of scheduling issues, there is one additional

15   Plaintiffs' witness who will be coming next week.  But other

16   than that, the Plaintiff has rested, meaning they are done

17   with presenting their direct case subject to calling this

18   other witness.

19             Which of the Defendants wishes to proceed?

20             MS. SUMNER:  We do, Your Honor.  We'd like to call

21   Dr. Jeffrey Armstrong at this time.

22             THE COURT:  Very well.

23             THE DEPUTY CLERK:  Please remain standing and raise

24   your right hand.

25             (Witness sworn.)

```
 1                    JEFFREY ARMSTRONG, MD,
 2   Called as a witness herein by the Defendants, having been
 3   first duly sworn, was examined and testified as follows:
 4              THE WITNESS:  I do.
 5              THE DEPUTY CLERK:  Would you please have a seat.
 6   Please state your full name and spell your last name for the
 7   record.
 8              THE WITNESS:  Jeffrey D Armstrong,
 9   A-R-M-S-T-R-O-N-G.
10              THE COURT:  Good morning, Mr. -- Dr. Armstrong, how
11   are you today?
12              THE WITNESS:  Good morning, Judge, I'm doing well.
13   How are you?
14              THE COURT:  Did you have a nice weekend?
15              THE WITNESS:  I did.
16              THE COURT:  Okay.  So here you are, make yourself
17   comfortable, keep your voice up so everybody can hear you.
18              And, Ms. Sumner, you may proceed.
19              MS. SUMNER:  Thank you, Your Honor.
20                          DIRECT EXAMINATION
21   BY MS. SUMNER:
22   Q.   Good morning, Dr. Armstrong.
23   A.   Good morning.
24   Q.   The jury has heard at this point a lot about the United
25   Egg Producers' Certified Program and they've heard a little
```

1    bit about you.  Could you please tell the jury this morning

2    what was your involvement with the development of the UEP

3    Certified Program.

4    A.    In 1997, I moved to Purdue University as head of the

5    Department of Animal Science, so I got to know the egg

6    industry in Indiana.  And then in 1998, after some meetings,

7    they asked me to constitute and chair the Scientific Committee

8    on Animal Welfare.

9    Q.    And what was the Scientific Advisory Committee on Animal

10   Welfare?

11   A.    This was a group of scientists, also other individuals,

12   that were charged with evaluating the current science, what

13   does science say how we should treat hens in cages or various

14   other types of housing situations.

15   Q.    And when was that Scientific Advisory Committee formed?

16   A.    It was formed in 1998.

17   Q.    Before we get into your work on the Scientific Advisory

18   Committee, I would like the jury to hear a little bit about

19   your background.  What do you do professionally today,

20   Dr. Armstrong?

21   A.    Today, I'm president of California Polytechnic State

22   University.  It's in San Luis Obispo, California, halfway

23   between San Francisco and Los Angeles.

24   Q.    Could you describe for the jury a little bit about what

25   you do as president of Cal Poly?

1    A.    We have around 21,500 students, all undergraduate and

2    master's, so I'm responsible for the vision, leadership, and

3    education of all of those students.  It involves being on

4    campus, attending events, working with students, working with

5    the system.  We're part of California State University system,

6    23 campuses, 480,000 students.  And I'm also involved with

7    fundraising and working with alumni and typical things that

8    University presidents do.  I enjoy it.

9    Q.    How long have you been the president of Cal Poly?

10   A.    In my ninth year.

11   Q.    And what did you do professionally prior to assuming the

12   position as president of Cal Poly?

13   A.    From -- from 2001 to 2011, I was Dean of Agriculture and

14   Natural Resources at Michigan State University.  Prior to

15   that, I was head of animal sciences at Purdue University from

16   1997 until 2001, and then from 1981 to 1997 I was grad student

17   assistant associate full professor at North Carolina State

18   University at College of Ag and Life Sciences.

19   Q.    Prior to becoming the president of Cal Poly, were you

20   involved in academic research and teaching?

21   A.    Yes.

22   Q.    And can you describe what you did in that position for

23   the jury, please?

24   A.    My Master's in PhD work involved pigs, different aspects

25   of lactation, nutrition, and reproduction interactions, trying

1    to help producers do a better job.  I was also involved

2    working with beef cattle, again, with nutrition and

3    reproduction, worked with beef cattle producers in North

4    Carolina.  And then as head of animal science at Purdue I

5    switched more into really being involved in social

6    responsibility in the food system.  That really first started

7    with environmental issues with pigs and hog lagoons, how they

8    handle the waste, in North Carolina in the '80s and '90s, and

9    then animal welfare was really starting to take off in the

10   early '90s as a big issue for animal agriculture.

11   Q.   And can you explain to the jury, please, how you got

12   involved in animal science?

13   A.   Well, I grew up on a farm in Kentucky.  My older brother

14   and I were the first in our family to go to college.  And I

15   wanted to either be a veterinarian or an ag teacher.  I was in

16   the FFA and I ended up going to Murray State in Western

17   Kentucky, it was close to home, and I got excited about

18   reproductive physiology of animals through a course I took at

19   Murray State, and then I ended up at graduate school at North

20   Carolina State.

21   Q.   And can you explain to the jury briefly what reproductive

22   physiology is?

23   A.   Physiology is just how the Mammalia or any system works.

24   And so reproduction is, you know, the male and the female

25   reproduction.  And from a farm animal perspective and from a

1    producer consumer perspective, you want that to be efficient,

2    to keep the costs of food as low as possible, because we, you

3    know, we -- we're part of the food chain and we depend on

4    plants and animals and we need that to be as efficient as

5    possible.

6    Q.   How did you come to lead the Scientific Advisory

7    Committee for Animal Welfare?

8    A.   So in 1997, July 1 of 1997, I started at Purdue, and I

9    traveled around the state to get to know the beef cattle

10   industry in the southern part, and then egg production was

11   really all over the state, and Indiana had a very vibrant egg

12   production industry.  So I met a lot of the different

13   producers, got to know them, asked them what the issues were.

14   Purdue at the time had a USDA group working in animal welfare

15   and it was a very new science compared to nutrition or

16   reproduction or other aspects or veterinary medicine --

17   welfare, animal behavior was new.  A lot of scientists at the

18   time actually didn't think it was a real science.  But animal

19   welfare was an increasingly important issue and it was driven

20   largely by animal activists, animal rights activists that did

21   not want us to consume animals at all, or at least house them

22   in confinement.  It was all driven by the food industry.

23   McDonald's was one of the leaders in really pushing that

24   forward, but they were, like a lot of the food industry, the

25   animal rights activists caught them a bit off guard.

1  Q.   At some point did UEP approach you about chairing the

2  Scientific Advisory Committee?

3  A.   Yes, actually the first thing that happened -- there was

4  a meeting in late '97 or early '98, I can't recall, in which

5  the -- Al Pope and Gene Gregory asked to just come and meet

6  with us.  There were a couple producers.  I asked Joy Mench

7  from UC Davis to join us, I believe, as well as Scotti or

8  Patricia Hester is her -- not her nickname -- to join us and

9  we just had a discussion about the current state of animal

10  welfare and we looked at their guidelines and we said,

11  basically, you do not have science-based guidelines.  You've

12  just recorded how you do business, you've just recorded best

13  practices, and it's really not science-based.

14         A few months after that, I got a call from Al Pope

15  asking if I would constitute and chair a committee to look at

16  science-based animal welfare for the laying hen industry.

17  Q.   Did you have an understanding at that time as to why UEP

18  asked for science-based guidelines?

19  A.   It's the tail end of a cold.  I'm sorry.

20  Q.   That's okay.

21  A.   It's the good end of the cold.  And I almost spilled

22  water all over myself.

23         They were being really hit hard.  It was -- the

24  Internet had been invented by that time and they were being

25  hit hard with animal rights activists, and in particular one

1    group, Compassion Over Killing, and there were a lot of

2    pictures of laying hens in cages, crammed together, no

3    feathers, looked really bad, and that's the same type of thing

4    that was hitting the food industry.

5              In the egg industry was one of the first areas,

6    other than the slaughter -- I don't know how -- a better way

7    to put it other than the harvesting industry or the

8    slaughterhouse industry had actually been pushed first, and

9    change was needed.

10   Q.   What made you accept the appointment as chair of the

11   Scientific Advisory Committee?

12   A.   Well, first of all, I believed they were sincere and I

13   consulted with some scientists that I trusted, Scotti Hester

14   at Purdue, Joy Mench at UC Davis, who's probably one of the,

15   in our generation, the expert in hen welfare, hen behavior,

16   and I felt they were serious.  I had been involved with some

17   other interactions with the pork industry, and they were not

18   serious about it.  They were more -- they were gearing their

19   efforts really more -- I don't think intentionally, but they

20   were gearing their efforts more to maintaining the status quo,

21   and it was clear the status quo was not going to be

22   maintained.  It was just a matter of how that was going to

23   change.

24   Q.   At this time, were there other companies that had begun

25   addressing animal welfare issues?

1    A.    Yes, McDonald's was one of the first.  In fact, I worked

2    a lot with Bob Langert, and he has since written a book about

3    his efforts in sustainability, and he basically chronicles

4    that in the '80s, McDonald's was taken a bit off guard with

5    the push.  They worked with Temple Grandin.  Temple Grandin is

6    an individual well known for her work in behavior.  She has a

7    PhD and she also has autism, and so Temple worked with

8    McDonald's.  I also served on the McDonald's welfare panel

9    with her and she helped McDonald's put pressure on the

10   slaughterhouses to make sure that, you know, we use the

11   animals, we consume the animals, but to make sure that they

12   were harvested humanely.

13         And Temple really led that effort to push -- I mean,

14   single-handedly made huge changes.  And so McDonald's and then

15   FMI, the Food Marketing Institute, the National Council of

16   Chain Restaurants, they were all involved because their

17   constituent members knew this was coming and they were being

18   bombarded with it.

19   Q.    Dr. Armstrong, what was the hot issues in animal welfare

20   at this time?

21   A.    The hot issues at that time were the slaughter issues,

22   how animals were treated near the end of their life, gestation

23   crates -- pregnancy is another -- gestation's another word for

24   pregnancy.  Gestation crates for confined sows, mother of

25   little pigs, and then cages and veal.  Veal production.

1   Q.   When you formed the Scientific Advisory Committee in

2   1999, what was the state of animal welfare science, generally?

3   A.   When I arrived at Purdue in 1997, there had been an

4   individual there many years, Jack Albright, and he was the

5   only one in the department of over 50 that was an ethologist.

6   And ethologist is another name for animal welfare person, and

7   there were very few people in the United States working in

8   animal behavior.  There were more in Canada and more in the

9   European Union.  So it was very -- in some ways, it was new as

10  being applied to commercial production, especially in the U.S.

11  So -- and it wasn't as well respected as it is today.

12  Q.   And at that time, was there a demand for animal

13  science -- or Animal Welfare Guidelines that were supported by

14  science?

15  A.   Yes.  As we worked on the guidelines, I was in

16  communication with Bob Langert at McDonald's.  They wanted to

17  know what we were learning and then later I was asked and

18  several of our members were asked to serve on their advisory

19  council.  The American Humane Association, Adele Douglass,

20  they were working on guidelines for more extensive production.

21  And then FMI and NCCR, they were really pushing for -- one set

22  of guidelines for poultry, one set of guidelines for broilers,

23  one set of guidelines for different areas.

24  Q.   What was your impression of what was deriving the demand

25  at that time?

1    A.    I think it was driven by a couple of things.  First of

2    all, it was being reactionary to activists.  And activists

3    play a very important role in society.  We have student

4    activists.  Activists sometimes -- you know, they make us

5    think about things that we should sooner than we do, but it

6    was really driven by activists.  But I also think it was

7    driven by, you know, sometimes people talk about where the

8    puck is going to be, skate to where the puck's going to go.

9    Some people were trying to be proactive and really figure out

10   where consumers are going.  Ultimately where are consumers

11   going and do consumers care.

12   Q.    You mentioned McDonald's a little bit.  At this time, did

13   you have any interaction with customers of animal agricultural

14   products other than McDonald's?

15   A.    At the time we started the committee, I had interacted

16   with -- at the time we started the committee just started

17   interacting with McDonald's, had some interactions with a lot

18   of companies, but not much in that topic.

19   Q.    So in 1999, Mr. Pope, the president of UEP, asked you to

20   chair the Scientific Advisory Committee for animal welfare.

21   What did you do first?

22   A.    Well, I first asked questions and wanted to make sure

23   that they were really serious about change, because it was

24   clear that there were really no science behind the space

25   allowance for the birds, there was really not science

1    around -- it wasn't clear can cages really be the way to raise

2    hens in the future.  And I wanted to be clear that, you know,

3    a group of scientists could do their work and be

4    scientifically independent, so to speak.

5    Q.   And at some point, did you have to constitute the

6    committee?

7    A.   Yes, I did.

8    Q.   Okay, and can you explain that process, please, to the

9    jury?

10   A.   I consulted with Scotti Hester, Joy Mench, and I also

11   consulted with UEP.  You know, I put the committee together

12   but didn't do it in a vacuum, and that's how we arrived at the

13   members.

14   Q.   Okay.

15   A.   I also brought in Janice Swanson, who was then at Kansas

16   State, into the discussion very early.

17            MS. SUMNER:  May I approach the witness, Your Honor?

18            THE COURT:  Yes, you may.

19   BY MS. SUMNER:

20   Q.   Dr. Armstrong, I've handed you a binder of documents

21   which are tabbed that we're going to refer to today as we go

22   through your testimony.  I'd like you to turn to Tab 1 of the

23   binder.

24            And do you recognize this document, Dr. Armstrong?

25   A.   Yes.

1    Q.    What is this?

2    A.    This is a recommendations for UEP Animal Welfare

3    Guidelines September 2000.

4          MS. SUMNER:  Your Honor, this document's already

5    been admitted into evidence.  May I publish it to the jury?

6          THE COURT:  Yes.

7    BY MS. SUMNER:

8    Q.    And, Dr. Armstrong, is this a copy of the September 2002

9    recommendations by the Scientific Advisory Committee?

10   A.    September 2000.

11   Q.    Yes.  September 2000?

12   A.    Um-hum, yes.

13   Q.    And who authored this document?

14   A.    The committee and myself.

15   Q.    Okay.  Could you turn to page 3 of the document, please.

16   And use the Bates numbers that are at the very bottom center

17   of the page.

18   A.    Yes.

19   Q.    So the one that says PX-52.003 -- and those are the

20   numbers we're going to use this morning as we walk through

21   some documents.

22          Is this an accurate and complete list of the team

23   you initially selected?

24   A.    Yes.

25   Q.    Can you please explain to the jury why you chose these

1  particular members to be on the Scientific Advisory Committee

2  at the beginning?

3  A.    Yes.  So Don Bell was the University of California

4  Riverside.  He was involved in extension and he knew about as

5  much about commercial egg production as anybody alive at the

6  time.  He -- extension works with producers to help them be

7  better and be more efficient.  So he was very practically

8  oriented, and he was someone that the UEP had recommended and

9  I agreed.  And again, I was consulting with Joy and Janice.

10        And Dr. Bill Chase is a private veterinarian that

11  has worked years with the industry, knew a lot about

12  production and animal health.

13        And then Adele Douglass is Director of the American

14  Humane Association.  The American Humane Association is very

15  interested in animal welfare, and so this, I wouldn't consider

16  as an activist group but a group that's very, very concerned

17  about animal welfare.  So we wanted a balance of views on the

18  committee.

19        And then Scotti Hester was an animal scientist,

20  poultry scientist at Purdue University, knows a lot about

21  bone, physiology of avian or birds, turkeys, laying hens.

22        Joy Mench, as I mentioned earlier, is an expert in

23  animal behavior especially in laying hens.

24        Dr. Ruth Newberry is a professor at Washington State

25  University.  She was very well versed in euthanasia, handling

1    all of the different aspects of animal welfare of laying hens

2    and other species.

3            And then Dr. Larry Stanker was at USDA ARS at the

4    time.  Dr. Stanker was someone that I asked USDA for an expert

5    on food safety, the interplay of are eggs going to be safe as

6    a food and how we treat the animals.  And unfortunately, he

7    wasn't able -- for some reasons totally independent, he wasn't

8    able to attend that many meetings.

9            And then Dr. Janice Swanson is a well-known expert

10   in animal behavior in a variety of species, and she and Joy

11   and Scotti were the ones that I talked to first.

12           And then support or advisory, Barrie Wilcox, he was

13   the producer representative.

14           And then Gene Gregory at the time was a vice

15   president or executive vice president.  I don't recall the

16   title for UEP.

17   Q.   And can you explain to the jury what role the two support

18   members associated with UEP had on the Scientific Advisory

19   Committee?

20   A.   Yeah.  We discussed from the beginning several things

21   that, you know, we're using animals, it's going to impinge on

22   the welfare.  We consume them, but we need to make sure that

23   that's appropriate.  We also knew as a group of scientists,

24   other than Don Bell and Bill Chase, we were not involved in

25   production, and we felt it was our role to develop

1    science-based guidelines but they had to be practical.

2           So you needed advice from the producers.  If we made

3    guidelines that only, you know, reflected 1 percent of

4    250 million hens at the time, it wouldn't be practical and

5    wouldn't really affect welfare.  So we were trying to be

6    practical and understand the industry.

7    Q.   Did UEP decide who would be on the Scientific Advisory

8    Committee?

9    A.   No.

10   Q.   Did you ever have to replace members on the committee?

11   A.   Yes, we did.

12   Q.   And when you did, how did you do that?

13   A.   We had a discussion among the group.  I would recommend

14   individuals after a discussion or we would just simply say,

15   you know, Adele, Adele Douglass, she left, not for any bad

16   reason, but she moved on to something else.  So we had a

17   discussion, let's bring somebody in.  So, for example, we

18   brought in Gail Golab from the American Veterinary Medical

19   Association.

20   Q.   Was the Scientific Advisory Committee part of UEP?

21   A.   No.  It was a standing committee, but I would say we were

22   scientifically independent.  We all came from different

23   organizations, and especially those of us from universities or

24   USDA, I mean, that's what we do.  We interact with industry,

25   we -- we try to solve problems, and that's in effect what

1    we're paid to do at the university in some sense.

2    Q.   Did UEP ever recommend or tell the committee what

3    conclusions to reach?

4    A.   No.

5    Q.   Did UEP review the original Scientific Advisory Committee

6    recommendations before they were finalized?

7    A.   Oh, yes.  It was an iterative process, and, again, we

8    wanted to make sure it was practical and there would always be

9    back and forth within the committee, but it was really an

10   analysis all the science was accepted.

11   Q.   Did UEP comment on the initial recommendations?

12   A.   Yes.

13   Q.   And were those recommendations modified based on those

14   comments?

15   A.   I don't recall, but I can tell you the main scientific

16   recommendations were not modified.  The main points, they

17   evolved over time, but the main points were never adjusted to

18   reflect the status quo or what only producers could do.

19   Q.   And in your view, did those comments by UEP impact the

20   Scientific Advisory Committee's independence?

21   A.   No.

22   Q.   Why not?

23   A.   Well, if this group we put together ever felt that they

24   were being told what to do, they would have walked.  They

25   literally would have quit and would have left us.  I

1    personally have left some other efforts with some other groups

2    because I didn't feel like it was meaningful and was going to

3    head in a direction for meaningful change.

4            So these individuals, many of them are still on the

5    committee, they would literally have walked if they felt

6    anyone was trying to tell them what to do based on the

7    science.

8    Q.   How much time did you and other members of the Scientific

9    Advisory Committee spend on your work for the Scientific

10   Advisory Committee?

11   A.   We met a couple of times a year, but then each member

12   would have assignments.  So it's really difficult to say how

13   many hours they put in, but it was quite a bit because each

14   individual reviewed the literature, what's going on, what had

15   been reported, and so it's hard to say.

16           It was many, many hours, and we felt from the

17   beginning that we were doing something very meaningful and

18   groundbreaking.

19   Q.   Were you and your team compensated for your time?

20   A.   No, we weren't compensated, but we were given an

21   honorarium, which is typical.  You know, you give a talk or

22   you do things, and that's sort of a thank you and that was --

23   that occurred after it was constituted.  That is never

24   mentioned upfront.

25           I didn't say that -- I told them:  You will serve on

1    this committee and your expenses will be reimbursed.  That's

2    all that was stated upfront.  And then after we got going, I

3    made a suggestion, you know, it would be good to give an

4    honorarium.

5    Q.    Do you recall what the amount of the honoraria you

6    received were?

7    A.    I don't think it was ever over a thousand dollars.  It

8    was maybe 5 or 6 or $700.  I don't think it occurred every

9    year.  And then we sometimes met in not-so-nice places, and

10   sometimes we met in nice places.  And that was also a positive

11   aspect and a thank you, so to speak.

12   Q.    Do you recall how many honoraria you and the other

13   members of the Scientific Advisory Committee received over the

14   course of your work on the Scientific Advisory Committee?

15   A.    I really don't.  I really don't recall.  It was no more

16   frequent than annual, and I'm fairly confident it didn't

17   happen every year.

18   Q.    Did anyone ever raise a concern about the payment of

19   honoraria to the Scientific Advisory Committee?

20   A.    Only once.  Later, as you look at this list, we -- we

21   added Paul Thompson.  I knew Paul Thompson from Purdue and

22   then he was at Michigan State.  Paul Thompson is a philosophy

23   professor and works in ethics, and he just has a personal

24   value that he never accepts honoraria from anyone.

25             So he returned his, and that was the only time, but

1   that happened sometimes.  That's -- the majority of -- the

2   majority of researchers or educators at universities will

3   accept honorarium and they'll also do consulting.

4   Q.   Now, Dr. Armstrong, you referenced also that the expenses

5   of the Scientific Advisory Committee members were paid by UEP.

6   Did those expenses include travel to nice places?

7   A.   Yes.

8   Q.   And can you give the jury an example?

9   A.   In fact, the first time my wife and I ever traveled to

10  Hawaii was in 2006, and that was a UEP Committee.  So I

11  remember that one because we had never traveled to the islands

12  before, and it also included my wife's travel as well.  And so

13  spouses and partners were sometimes included and sometimes

14  not.  Sometimes we met in like a hotel in Chicago, worked for

15  a couple of days and then, you know, went home.

16  Q.   And was the purpose of each of those trips to conduct

17  business of the Scientific Advisory Committee?

18  A.   Oh, yes.

19  Q.   Did you report the honoraria and expense payments to the

20  IRS?

21  A.   I -- yes, honoraria you would, but we typically -- most

22  universities, you don't report the honoraria to the

23  university.

24  Q.   Did you consider the Scientific Advisory Committee

25  members to be unpaid?

1  A.   I considered them to be unpaid because they were not, you

2  know, under consulting agreement.  And, again, you know, I go

3  to Ohio and I give a speech to the Ohio pork producers and

4  they give me a 500 honorarium and they pay my expenses.

5  Neither I nor the university consider that payment.

6  Q.   Did the compensation that you and the other committee

7  members received from UEP that we discussed in any way

8  influence the animal welfare recommendations that the

9  Scientific Advisory Committee made?

10  A.   No.

11  Q.   Was the compensation that you and the other members

12  received from UEP in any way contingent on the views you

13  expressed or the recommendations that you made?

14  A.   No.   In fact, I don't think we received any honorarium.

15  It was after the first guidelines were produced.

16  Q.   Did you ever do any work for UEP separate and apart from

17  your work on the Scientific Advisory Committee?

18  A.   Yes, I did.

19  Q.   What was that work?

20  A.   Well, it started small and then grew, and as we -- you

21  know, post 2000 or around that time, we started getting

22  involved with letting people know.  For example, I traveled

23  with a reporter to an egg farm in Wisconsin and we ended up

24  getting a front page story, US Today, about egg production.

25  And it was a small operation, 1 million birds.  That's the

1    minimum level that you need as a family operation to be viable

2    in the egg industry if you're selling your own eggs.

3         We also did a video on mother and daughter who had

4    never been on an egg farm.  We did an interview before and

5    after, did a lot of media, gave a lot of presentations.  It

6    was really separate of my work as chair.

7    Q.   And were you paid for that work, Dr. Armstrong?

8    A.   Yes.  I was not at first, and then later I asked to be

9    paid because I realized there were other consultants for UEP,

10   and I felt it was fair to me and my family to be paid.

11   Q.   Did you have a consulting arrangement for that work with

12   UEP?

13   A.   I did.

14   Q.   And what years was that arrangement in place?

15   A.   I don't recall, but it -- I think it started about -- I

16   think -- I think it was for about ten years, from 2001 to

17   2011, something like that.

18   Q.   And was that arrangement in writing?

19   A.   No, just an e-mail back and forth.

20   Q.   Why wasn't it in writing?

21   A.   Well, I had gotten to know Gene Gregory really well and I

22   was also raised to be, you know, kind of quiet about money,

23   and I -- Gene would frequently put things in United Voices,

24   that's the newsletter of the industry, and I, frankly, did not

25   want that in the newsletter, in the industry.

1          The other thing that happened, when I joined the

2    McDonald's panel, which was before this started, on the day it

3    was announced that I had joined the McDonald's animal welfare

4    panel I got a letter from PETA congratulating me, People for

5    Ethical Treatment of Animals.  I got a letter from them

6    congratulating me.  That same day or the next day Bob Langert

7    sent me a letter -- Bob Langert being the executive vice

8    president for sustainability of McDonald's, he got a letter

9    from PETA disparaging me and saying how did you put this

10   person on the committee?

11             MR. BLECHMAN:  Your Honor?

12             THE COURT:  Hold on, Dr. Armstrong.

13             MR. BLECHMAN:  Objection.  Hearsay.

14             THE COURT:  Okay.

15   BY MS. SUMNER:

16   Q.   Dr. Armstrong, try to confine your answers to sort of

17   what you understood at the time and refrain from talking about

18   what other people told you.

19   A.   Yeah.  So I was concerned about animal rights activists,

20   and later on, I was also accused of being a radical by the

21   pork and the beef industry.

22   Q.   Did you disclose this consulting arrangement with UEP to

23   others?

24   A.   Yeah, I told a couple of my committee members.  And I

25   disclosed it to the university.

1   Q.   And do you still do consulting work for UEP today?

2   A.   No.

3   Q.   When was the last time you did consulting work for UEP?

4   A.   2011, that's the year I became president of Cal Poly.

5   Q.   Approximately how much time did you spend doing this

6   consulting work for UEP?

7   A.   Oh, I'd average three or four hours a month easy.

8   Q.   And how much did you earn total for that work?

9   A.   I think, in total, over ten years, it was about $80,000.

10  I think in my entire career, in consulting, I've earned

11  probably a little less than $100,000 total.

12  Q.   And annually, about how much did you earn each year

13  during this consulting arrangement?

14  A.   I can't recall exact numbers, but maybe 8 to 12, to 15,

15  it depended on the year.

16  Q.   And do you know approximately how much you were paid per

17  hour for this work?

18  A.   Not enough.  I do not know.  But it -- it was really --

19  there were some other people doing consulting just in egg

20  economics or also in environment.  And, you know, I had a

21  daughter in college and a son in high school and I felt it was

22  appropriate, as it was very different work, it was separate

23  from the committee.

24  Q.   Did you report those consulting fees as income?

25  A.   Yes.

1    Q.    And did the universities that you worked for at the time

2    have disclosure requirements?

3    A.    Yes, they did.

4    Q.    And did you comply with those requirements?

5    A.    Yes, I did; and actually reported in California and later

6    found that it actually wasn't required, but I went above and

7    beyond, I believe.

8    Q.    Now, did this consulting income in any way influence the

9    opinions or recommendations or conclusions that you reached

10   while on the Scientific Advisory Committee with respect to the

11   guidelines?

12   A.    Absolutely not.

13   Q.    Did you receive any payments from UEP other than the

14   honoraria, the expense reimbursement and the consulting fees

15   we have discussed?

16   A.    No.

17   Q.    You personally?

18   A.    No.

19   Q.    Did UEP ever make donations to your

20   department's discretionary fund at Michigan State?

21   A.    Yes.

22   Q.    Could you explain to the jury, please, what a

23   discretionary fund is?

24   A.    Yes, as a department head or dean or president part of

25   your responsibility is to raise funds, and when we talk about

1    discretionary funds, it's funds that a department head or, in

2    that case, dean, you could use to help a student in need,

3    take, you know, individuals out to a dinner, host donors, it's

4    discretionary but still within the rules of the university.

5    And so that's one of the measures.  We're measured on how much

6    money we raise.  And so I thought it was appropriate to

7    provide some support for the university.

8    Q.   Could those funds be used in any way for your personal

9    benefit?

10   A.   No.

11   Q.   And in your experience, are such donations typical?

12   A.   Oh, yes.  While I was at Michigan State, we raised, my

13   ten years there, $180 million.  And to date, at Cal Poly we've

14   raised 650 million -- $650 million since I've been at Cal

15   Poly.

16   Q.   And do the donations that UEP made to Michigan State in

17   any way influence your work on the Scientific Advisory

18   Committee?

19   A.   No.

20   Q.   All right, let's turn back to your work on the Scientific

21   Advisory Committee in particular.  Once you have formed the

22   committee and had the team in place, what happened next?

23   A.   We met for the first time and we -- I established some

24   ground rules that we all agreed with.  First of all, that

25   we're using animals and we use animals as a society.  We're

1    part of the food chain, that it does impinge upon their

2    welfare.  We discussed that.  We also then had asked Joy Mench

3    in advance to review the different types of housing, laying

4    hen cages, which is -- which was 98 percent of the laying hens

5    in the U.S. at the time, different types of housing, modified

6    or enriched cages, outdoor, organic and she reviewed all of

7    those and the pros and cons.  And so we then made -- we'd

8    already made some assignments before we met in the different

9    areas, and we just listened to each member talk about the

10   literature, what do we know and what do we not know.  That's

11   what universities do.  We figure out what we know and we often

12   challenge that, and then we try to figure out what we don't

13   know.  And it's a bit like an investigation and that's what

14   got me excited about research over the years.

15   Q.   Did the committee tour an egg facility as part of that

16   initial early work?

17   A.   Yes.  UEP, of course, provided that tour.  We toured egg

18   facilities in Iowa, and we toured facilities, I think at least

19   a couple of different locations, and I commented that I hope

20   nothing happens to this group because it would be devastating

21   to animal welfare work in the U.S. because we had so many of

22   the scientists in one location.  That's how few people were

23   working in animal welfare at the time.  So we toured the

24   facilities.

25   Q.   Can you tell the jury what you learned while on those

1   tours?

2   A.   I had been in egg facilities before and we -- we learned

3   that there were many things that needed to be improved.

4   Ammonia levels were elevated.  Manure was dropping from one

5   cage down on birds in another cage.  The feather cover of the

6   birds in some cases looked like the animal activists' photos.

7   There were -- there were some other issues with regard to how

8   the industry talked about the -- they called the beak trimming

9   debeaking.  There were just a lot of issues that we found on

10  that tour.

11  Q.   How did the Scientific Advisory Committee determine what

12  areas of animal welfare to focus on?

13  A.   They basically looked at the normal production and we

14  discussed those different areas.  And I don't recall exactly

15  how that fell out, but it fell out pretty quickly, and we

16  divided up the work, typically with one person in lead,

17  somebody perhaps second.  And that's how scientists do a lot

18  of work, a lead and a second, and then everyone else critiques

19  it and you reach a conclusion.

20  Q.   What options were on the table for the committee at that

21  time?

22  A.   There were no constraints put on the table.  I

23  specifically said, you know, I bring this committee together,

24  there's no guarantee that this committee will say that cages

25  as they exist today are humane.  And the industry said, you

1    know, the representatives said, We want to know.

2    Q.   Did anyone at UEP give you any instruction as to how you

3    should come out on any of the issues you were addressing?

4    A.   No.

5    Q.   And did there come a time when the Scientific Advisory

6    Committee shared its work plan with UEP's members?

7    A.   Yes.

8    Q.   When?

9    A.   October of 1999.  I presented our preliminary work to the

10   United Egg Producers' annual meeting.  Bob Langert from

11   McDonald's also spoke and was in attendance at that meeting

12   and I presented the preliminary recommendations at that time.

13   Q.   And what was the membership's reaction?

14   A.   It ranged.  There were some people that came up to me

15   afterward and said, You're ruining the industry, we cannot

16   make these changes.  But some people stood up and said, We

17   need to be on the offensive, we need to make changes.  And

18   they also referenced the industry's experience with

19   cholesterol in the past, the industry -- many years ago,

20   cholesterol was bad and they invested in research at

21   universities, independent research, and really, we are where

22   we are today, that an egg is a healthy meal with balance.  And

23   so they -- the majority said we've got to do what's right.

24   But there were people that pushed back severely.

25   Q.   Among those who pushed back severely, what was your

1   understanding as to why they were resistant?

2   A.   Well, I think it's just like anything else, some of it

3   was just being resistant to change.  I mean, I've been in a

4   lot of university organizations and, you know, we all

5   experience change.  It's really good unless it's happening to

6   us.  But there were also some very serious economic

7   considerations in making changes to facilities and, you know,

8   one particular group said, I don't see how we can get ammonia

9   below 100 parts per million in the winter in our facilities,

10  below 100 parts per million.

11  Q.   Do you recall any specific producers who were among those

12  who were resistant to these changes at that time?

13  A.   Bob Sparboe, Garth Sparboe, a producer in Ohio, some

14  other producers in Iowa.

15  Q.   Now, how did the committee get from its initial meeting

16  to creating a set of scientific recommendations for the egg

17  producers?

18  A.   We took those initial guidelines, they did not change

19  significantly.  Initially, we said 72 square inches per bird

20  and then we had a discussion that, look, this is -- well,

21  first of all, we decided that with proper management, the

22  different housing systems could be humane.  So then we said

23  let's work on cages.  Because at the time 98 percent of the

24  well over 200 million laying hens in the country were in

25  cages.  So that was not a given, that was something we

1    discussed.  So then we started making recommendations for

2    cages.  And then -- and it fell into place as we went through

3    talking about what do we know, what conclusions can we draw,

4    and based on what we know, what recommendations can we make

5    for each individual topic?

6    Q.   At the time that the Scientific Advisory Committee was

7    discussing these recommendations and talking specifically

8    about the cage space requirements that you just referenced,

9    were you aware that Don Bell had proposed minimum floor space

10   as a way to correct the nation's flock size and decrease the

11   supply of eggs?

12   A.   I really don't recall.  Don Bell made a lot of different

13   recommendations, many -- several of which, you know, we would

14   listen to.  I mean, he even made the recommendation that we

15   use water withholding as a way to induce a molt.  And I said

16   there's no way the committee would, you know, entertain that.

17   So I -- I don't recall any discussions in the committee with

18   regard to space and flock size.

19   Q.   Dr. Armstrong, can you explain for the jury the criteria

20   that the committee used generally to measure animal welfare?

21   A.   Yeah, that's a -- that's not an easy thing because many

22   different people have many different views, but from a

23   scientific perspective, we looked at all the pros and cons of

24   the different housing systems.  If a bird is confined, they

25   can't move around as much, but there are advantages because

1    fewer will die.  So what we decided at the very beginning is

2    we should make these recommendations, we're not in the

3    position to say when they should be applied because we're not

4    producers, but we made these recommendations, and we decided

5    to take a very conservative approach to animal welfare.  One

6    would be, what is the hen producing?  So how many eggs will a

7    hen produce?  So a hen produces an egg not quite every day but

8    24, 26, 28 hours, right.  So how many eggs are being produced,

9    productivity.

10          Number two, do they live?  And we call that

11    mortality.  So that's a very fundamental and conservative

12    measure of animal welfare.

13          We also looked, do they have enough space to sit

14    down?  Now, you go beyond that and you get into different

15    behaviors of wing flapping, birds like to sit on a perch, they

16    like to dust bathe.  They don't have to do those things, but

17    they're biologically tuned to do those things.  They want to

18    flap their wings.  They want to dust bathe and they like a

19    nest box, they like a dark place to lay their eggs.  So those

20    were beyond the conservative views of animal welfare.  So,

21    again, how many live, and what did they produce?

22    Q.    Did the Scientific Advisory Committee include scientific

23    references or citations in its recommendations?

24    A.    Yes.  A really good example is there were studies

25    conducted over many years where individuals had looked at what

1    this might have been, a nutritional diet or how much light the

2    birds get.  There were all these studies done over the years

3    at universities.  And they always measured mortality and they

4    always measured per hen egg production.  So one paper in

5    particular, published in '84, took studies from 1971 to 1983.

6              MR. BLECHMAN:  Your Honor, Objection.  Hearsay.

7              THE COURT:  Well, I think -- is this question not

8    the basis of what they were looking at?

9              MS. SUMNER:  Yes, Your Honor.

10             THE COURT:  All right.  Within that limitation, I'll

11   overrule the objection.

12             THE WITNESS:  So the bottom line is there were years

13   of work that demonstrated when birds had very little space,

14   more would -- more would die and they'd produce fewer eggs.

15   You'd give them more space within reason, so 48 inches up to

16   80 inches, that was the range.  Then you'd get fewer birds

17   dying and more eggs produced.  So we looked at per hen egg

18   production and did they live or die, and the data was really

19   clear.  I can give you more detail than that, but more than

20   you may want to know.

21   BY MS. SUMNER:

22   Q.   We'll get into more detail in a little bit.  Thank you.

23   Did the Scientific Advisory Committee anticipate that their

24   recommendations would be published more broadly than UEP?

25   A.   We talked about that and I've actually led an effort

1    early on because we felt that -- especially initially, when

2    the United Egg Producers accepted the guidelines in principle

3    and said, yes, we -- we accept these guidelines, I recommended

4    and we actually had a paper published in Feedstuffs that

5    chronicled everything that we had done.

6               And Feedstuffs is a magazine that -- not -- it's not

7    a scientific journal, but it's the industry -- everybody in

8    the universities, everybody reads it.  And we wanted to impact

9    other animal ag groups, and we wanted to really document what

10   we had done.

11   Q.   Let's turn back now to the September 2000 version of the

12   Scientific Advisory Committee's recommendations which is at

13   Tab 1 of your binder.  And this is Plaintiffs' Exhibit 52.

14               Was the September 2000 version the first draft that

15   was circulated by the Scientific Advisory Committee?

16   A.   I believe so.

17   Q.   Do you recall a draft being circulated in May of 2000?

18   A.   Oh, yes.  Yes.  Yeah, that -- yes.

19   Q.   And was that May 2000 draft shared with UEP?

20   A.   Yes.

21   Q.   Okay.  And were they discussed with UEP?

22   A.   Yes.

23   Q.   Did the recommendations change as a result of those

24   discussions with the producers?

25   A.   Not -- never -- the main recommendations never really

1    changed.  They evolved, but they didn't change relative to
2    those discussions.
3    Q.    Do you recall anything about -- specifically about those
4    discussions between May and September with the producers?
5    A.    I know the initial discussion we discussed 72 and then
6    went to a range, but I'm not -- I don't recall.  That's a long
7    time ago.
8    Q.    Did UEP ever instruct or require the Scientific Advisory
9    Committee to change the recommendations?
10   A.    No.
11   Q.    Look at page 2 of this document.  It says:  Mission
12   statement from the Scientific Advisory Committee on animal
13   welfare.
14         Do you see that, Dr. Armstrong?
15   A.    Yes.
16   Q.    Who wrote this?
17   A.    I wrote it, but I never wrote anything in a vacuum.
18   Anything that we ever -- anything that ever left the committee
19   was reviewed by the committee.  It could have been edited, it
20   could have been -- and we reached a consensus.  So I was the
21   primary author is the way we would say it in scientific terms.
22   Q.    I'd like to direct your attention to a sentence that's in
23   the middle of the second paragraph on this page that reads:
24   UEP's charge was simple.  They asked for a committee that
25   could provide them with science-based welfare guidelines.

1              Do you see that, Dr. Armstrong?

2    A.   Yes.

3    Q.   And was that your understanding of the charge that you

4    were given by UEP in 1999?

5    A.   Yes.

6    Q.   Turn to page 4 of these recommendations which is entitled

7    Public Perceptions and Attitudes.  And I'd like you to focus

8    here on the third paragraph.  And this is under the header

9    Literature Review.

10             Do you see that?

11   A.   Yes.

12   Q.   Did the literature review that was undertaken by the

13   committee lead the committee to the understanding that surveys

14   and polls showed that consumers have clearly indicated that

15   they retain confidence in farmers and ranchers to make

16   responsible decisions concerning the welfare of their animals?

17   A.   Yes.

18   Q.   And did it also lead the committee to the understanding

19   that consumers regard the humane treatment of farm animals

20   important and that their ethical perspectives on animal

21   treatment are continuing to evolve?

22   A.   Yes.

23   Q.   And I'd like now to focus on the recommendations that are

24   at the bottom of this page.  There are three enumerated

25   recommendations.

1           Do you see those?

2    A.   Yes.

3    Q.   Were these, in fact, the general recommendations that

4    were made by the Scientific Advisory Committee at this time?

5    A.   Yes.

6    Q.   Okay.  Let's talk through each one of these just briefly.

7    Why did the Scientific Advisory Committee recommend that the

8    UEP should regularly review and revise their guidelines for

9    hen welfare to take into account current scientific knowledge

10   about hen welfare?

11   A.   Well, we all -- we recognize as scientists there are

12   things we know and things we don't know, and we wanted to make

13   sure the producers understood that here are the guidelines

14   based on what we know now.  And things change.  We do more

15   research.  And also public attitude changes.

16   Q.   Looking at the second recommendation, why did the

17   Scientific Advisory Committee recommend that the

18   recommendations in the UEP Guidelines should be designed to

19   foster high standards of hen welfare while still maintaining

20   the economic vitality of the industry?

21   A.   Yes, one of the things that I really kind of pushed the

22   committee and the committee was in total agreement, that we

23   look at sustainability from a.

24           Holistic perspective.  If we had guidelines that

25   said, well, all birds should be outside, there should not be

1   cages, that wasn't practical, and the science also said with

2   proper husbandry, cages are okay.

3           And so guidelines that are not practical, you know,

4   they can't be implemented.  Plus we had -- we are also

5   concerned as a group of scientists that egg is a very

6   nutritious food, and if you do things and add regulations such

7   that the price of eggs doubles, triples, quadruples or

8   quintuples, then it might not be accessible for those that

9   need the protein.  So affordability to the consumer was a

10  value that we included and that we have really pushed, and you

11  see a lot of companies talking about that.

12  Q.   Finally, Dr. Armstrong, why did the Scientific Advisory

13  Committee recommend that the UEP should promote scientific

14  research on methods to evaluate and improve hen well-being?

15  A.   Well, to simply get at what we don't know, and there were

16  some guidelines that were very -- recommendations that were

17  very clear and some that weren't as clear because we didn't

18  have that depth of information.

19  Q.   In your view, were these recommendations consistent with

20  the concept of continuous improvement to the guidelines?

21  A.   Yes.

22  Q.   I now want to walk through each of the recommendations

23  that the Scientific Advisory Committee made.

24          THE COURT:  So, Ms. Sumner, would it be all right

25  with you and your -- everybody else here if the jury took a

1   break?

2              MS. SUMNER:  It would be a great time for a break.

3              THE COURT:  Okay, so we'll take a ten-minute break,

4   ladies and gentlemen.  And the same rules apply, but I'll see

5   you back here in about ten minutes.

6              THE DEPUTY CLERK:  All rise.

7              (Jury out.)

8              THE COURT:  And you, also, can enjoy the break.

9              THE WITNESS:  Thank you, Judge.

10             THE COURT:  No problem.

11             As may all of you.

12             (After recess:)

13             THE DEPUTY CLERK:  All rise.

14             (Jury in.)

15             THE COURT:  Okay, everybody, you may take your

16  seats.

17             And, Ms. Sumner, you may proceed.

18             MS. SUMNER:  Thank you, Your Honor.

19  BY MS. SUMNER:

20  Q.   Dr. Armstrong, before the break we talked about getting

21  into the specific recommendations that were made by the

22  committee and the guidelines, so I'd like to go there now.  If

23  you can please turn to the first recommendation at page 5.

24  This recommendation deals with beak trimming.  The jury has

25  heard a lot about beak trimming at this point.  Could you just

1    briefly explain for the jurors why hens in cages are

2    beak-trimmed?

3    A.   Regardless of the system, hens will peck each other.

4    It's feather pecking or cannibalistic pecking.  So from an

5    animal welfare perspective, almost all systems you have to

6    beak trim in order to prevent mortalities from reaching 30, 40

7    percent or higher.

8    Q.   What was the state of play with respect to the science on

9    beak trimming and the practice of beak trimming when the

10   Scientific Advisory Committee began its work?

11   A.   Beak trimming occurred quite -- it happened one, two, or

12   three times during a year and a half, or multiple if they

13   molt, multiple years, and they would do that in order to

14   prevent the pecking, but it also affected behavior of the

15   bird.  And so it was also called debeaking, which is not

16   really a correct term, because the tip of the beak is cut off

17   or -- with a very hot knife, cut off or burned off, and so

18   it's not really debeaking.

19   Q.   I'd like to direct your attention to the Literature

20   Review section of this recommendation, and ask whether the

21   literature -- whether the committee came to understand as a

22   result of this literature review that there were advantages

23   and disadvantages to beak trimming?

24   A.   Now, the advantages included the suppression of the

25   negative pecking, and the long-term -- I mean, that's an

1   advantage.  But long-term pain resulting from the beak trim

2   was one of the big disadvantages for the bird.  There's also

3   short-term stress no matter when a beak trim occurs, but when

4   it results in long-term or chronic pain, that's when it

5   becomes more of an animal welfare disadvantage to the

6   individual bird.  But there's an animal welfare advantage to

7   the flock or the group of birds in a cage because it really

8   limits the pecking to feather pecking and doesn't get to

9   cannibalistic pecking as often.

10  Q.   If you look at the Conclusions section of this

11  recommendation, could you please tell the jury what

12  conclusions the Scientific Advisory Committee reached

13  regarding beam trimming.

14  A.   Well, the first thing we stated is that for the

15  long-term, those that produce the birds, the genetic stock,

16  should pay attention to behavior, and try, for the long-term,

17  to have birds that don't require beak trimming.  Those

18  genetics did not exist at that time, and I don't believe they

19  exist now.  That was one comment that we made.

20          And then we also mentioned that therapeutic beak

21  trimming is important in case cannibalism breaks out.  If

22  there's a lot of pecking going on in an older flock, then one

23  should step in.

24          And then we made a conclusion that the first trim

25  for a chick should occur before ten days of age.  Because

1    there was really clear evidence that a trim after ten days of

2    age would result in chronic pain for the bird.  So the initial

3    beak trim should be before ten days of age.

4    Q.   Did the committee conclude at this time that the

5    advantages of beak trimming outweighed its disadvantages?

6    A.   Absolutely.

7    Q.   And then turning on page 6, please, to the specific

8    recommendations by the committee, could you explain to the

9    jury what the committee recommended with respect to beak

10   trimming at this time in September of 2000?

11   A.   So this is where we turn what we know and believe we have

12   good evidence for into guidelines.  So first of all, we said,

13   you know, the genetic companies should look in the future,

14   let's try to avoid beak trimming altogether, that means

15   changing the nature of the bird.  So that's number one.

16            Number two, training personnel.  People have to know

17   what they're doing dealing with a baby chick, any type of

18   animal practice.  And we then had recommendations for single

19   trim, lots of details, and then we said for a second trim, if

20   needed, in order to prevent mortality from spiking or death

21   occurring, and we gave -- we gave recommendations there.

22   Q.   Now, just to be clear, Dr. Armstrong, at this time, was

23   it possible to select birds that needed no beak trimming?

24   A.   No.

25   Q.   Did that ever become possible during your time on the

1   Scientific Advisory Committee?

2   A.   No.

3   Q.   And is it, in fact, possible today?

4   A.   Not to my knowledge, but I'm not up on the details.

5   Q.   Let's turn next to the cage space recommendations on

6   page 8.  Why did the Scientific Advisory Committee issue

7   recommendations for cage production?

8   A.   Well, after we went through the advantages and

9   disadvantages of all the systems, we felt that all systems

10  could be humane with proper husbandry practices.  So we

11  started with cages, because at that time 98 percent of the 200

12  million-plus birds in the U.S. were housed in cages.  Just a

13  plain cage.  That's why we started there.

14  Q.   Just very briefly, Dr. Armstrong, could you explain to

15  the jury what the committee concluded at this time about the

16  relative advantages and disadvantages of cages as compared to

17  other available production systems?

18  A.   So cages result in a lower mortality, more hen egg

19  production, and the ability for a bird to perform basic

20  behaviors with the proper space, standing, and eating.  The

21  big disadvantage of a cage is a bird can't perform some of the

22  natural behaviors that they want to perform, perching, wing

23  flapping and they like to lay their eggs in a nest box or in a

24  dark area.  On the other hand, a noncage system has usually

25  about double or more mortality than a cage system.  So twice

1    as many birds will die.  But the birds can exhibit a lot more

2    behaviors.  They can perch and they'll do that more at night

3    but they'll perch any time, and they like to dust bathe, but

4    they especially like to lay the eggs in a nest box.  So those

5    are the primary advantages and disadvantages.

6    Q.   Was there any disagreement among the members of the

7    Scientific Advisory Committee at this time about whether or

8    not to recommend guidelines for caged productions

9    specifically?

10   A.   No.

11   Q.   And in these early years, did the Scientific Advisory

12   Committee use the word "humane" to describe caged production?

13   A.   No.  We -- we actually said that all the systems could be

14   humane with the proper advantages, but we did not really talk

15   about that and we didn't use the phrase or word "inhumane" at

16   that time because, again, we were just trying to get the

17   guidelines introduced, get them accepted and we looked at --

18   and I gave many presentations around the country of the

19   advantages and disadvantages of the different systems.

20   Q.   And did that change over time?

21   A.   Yes, it did.

22   Q.   Why?

23   A.   Well, there were some things that happened with producers

24   after the guidelines had been introduced that we did not

25   foresee, and basically the producers were shortcutting the

1   guidelines in that they started backfilling.  They also --

2   some wanted to use it as a marketing tool; that is, if the

3   consumer didn't care or the person buying the eggs didn't

4   care, then why should you have the minimum welfare standards.

5   And the committee was vehemently opposed to those.

6   Q.   Did the committee at some point in time begin to use the

7   word "humane" to refer to or to describe caged production?

8   A.   Yes.

9   Q.   And why did the committee's comfort with using that term

10  evolve over time?

11  A.   Well, as it evolved -- and first of all, the producers,

12  the UEP accepted the guidelines and they were moving forward

13  and they were transitioning and we understood a transition,

14  but when you're only using it basically when

15  someone's looking, if they're buying your eggs, or if you're

16  backfilling, which you're putting birds into cages with other

17  birds and they fight, that's really circumventing -- really

18  circumventing the Animal Welfare Guidelines.

19         So the committee basically said, we set minimum

20  welfare guidelines for cages; that is, what do they produce,

21  how many birds die, and if you don't do that, then it's

22  inhumane.  I mean, it got to that point because we felt we had

23  to.  At the beginning we didn't need to because we didn't --

24  we didn't anticipate the people would cheat.

25  Q.   Why did the Scientific Advisory Committee focus on the

1    amount of space for the hens in a cage?

2    A.   Well, space is really important in a cage for two big

3    reasons.  One is we felt a minimum behavior, again, is staying

4    alive, being able to eat and produce and to be able to sit

5    down.  And at the time, 48 square inches did not do that.

6    48 inches -- 48 square inches did not allow all birds to sit

7    down at the same time.

8            There was clear evidence from the literature review

9    that if you housed birds at 48 square inches or 60 square

10   inches, that they produce fewer eggs and more die than if you

11   give them a bigger amount, 80 square inches.  And it's a

12   straight line, 48 -- mortality is 48, 60, 80.  Egg production

13   is 48, 60, 80.

14           And so the egg industry didn't evolve that way

15   because they didn't care about the birds, but the total cost

16   to produce an egg was maximized by having the birds at

17   48 square inches.  So the amount of money that a producer,

18   what it cost to produce that dozen eggs was maximized because

19   the feed efficiency, all those factors.

20           So it wasn't that they didn't care about welfare.

21   They just evolved to the most efficient system, but it wasn't

22   good for the individual bird.

23   Q.   Who conducted the literature review for this section of

24   the recommendations?

25   A.   Joy Mench was in the lead, but Janice, Scotti -- Janice

1    Swanson, Scotti Hester, and Ruth Newberry were very involved.

2    Q.   Dr. Armstrong, I'd like to show you two different-sized

3    areas that I believe you have referred to.  This one is

4    48 square inches?

5    A.   Um-hum.

6    Q.   And this one is 67 square inches.  These don't look very

7    different, do they?

8    A.   Not from just looking at a piece of paper.

9              MS. SUMNER:  May I approach the witness, Your Honor?

10             THE COURT:  Yes.

11   BY MS. SUMNER:

12   Q.   Dr. Armstrong, can you just take a minute and explain to

13   the jury what the difference -- or what the Scientific

14   Advisory Committee discovered through its work about the

15   differences in welfare for birds housed at each of those

16   densities?

17   A.   So for one thing, the research was there that said for

18   the average-sized bird -- and there's a range of birds -- at

19   the time, they could sit here and not here (indicating).  So

20   they could sit and they also need to be able to stand.  So

21   they couldn't sit comfortably here, and they should all be

22   able to sit at the same time, right?

23             The other thing is that egg production was lower

24   here than here.  And more birds die here than here.  And it

25   was pretty clear.  If you take a million birds, which is, you

1   know, minimal production size, that's about 80,000 birds over

2   a -- over a year and a half, two-year period, more birds that

3   will die.

4           Then at the same time, manure was dropping down on

5   the birds and ammonia levels were elevated.  So it has to do

6   with being able to eat, being able to perform basic functions.

7   So again, our welfare measurements were very conservative, how

8   many birds lived and what did they produce, and that's the big

9   difference in these.  Somewhat -- you know, 80,000 birds is a

10  big -- that's a big difference.

11  Q.   I'd like to direct your attention back to the

12  recommendations of the committee, specifically, and to the

13  Conclusions section and ask you:  What conclusions did the

14  Scientific Advisory Committee reach at this time about space

15  allowance for egg-laying hens?

16  A.   Well, first of all, as I mentioned earlier, we said there

17  are many different systems and each has advantages and

18  disadvantages, and the committee, later on, developed

19  guidelines for different systems.  And then because 98 percent

20  of the birds were in cages, we considered space allowance in

21  great detail and we felt 67 to 86 square inches a range.

22  Because there are different strains of birds, we said a range

23  versus 72, which is about the average.

24          And we also talked about feeder space.  We felt --

25  and the research wasn't clear, but we felt it needed to be at

1    least 4 inches in the trough per bird.  And then we also made

2    comments about modified or enriched cages as being something

3    for the future.  And then we talked about housing for other

4    types of birds, and then we also discussed different types of

5    systems.

6    Q.   Let's look now specifically at the recommendations, the

7    number of recommendations which begin on page 10.  And I'd

8    like specifically to direct your attention to the second one.

9    This deals with the hens being able to stand comfortably

10   upright in their cage without having their heads protruding

11   into the cage above.

12        Did these guidelines recommend a strict minimum for

13   cage height?

14   A.   When you get into guidelines and animal welfare

15   standards, you can have a performance standard or a

16   prescriptive standard.  In this case we just used more a

17   performance standard.  A bird should be able to stand.  It's

18   difficult to just say an inch height because cages are sloped.

19   So the eggs roll down and can be collected.  And so there's a

20   different height.  It's not like this room.  It's a different

21   height.

22        So a bird should be able to stand in any part of the

23   cage, and that -- that's allowed, that also is connected with

24   the space.  It can't be -- you know, it can't be this much

25   space and this.  They can't stand up.  It has to be -- they

1   have to be able to stand up in all of that space.

2   Q.   Dr. Armstrong, looking at the third recommendation, the

3   committee recommended a space allowance in the range of 67 to

4   86 square inches of usable space per bird depending upon the

5   type of cage and the type of bird.

6           Why did the committee recommend a range?

7   A.   We recommended a range because of the different types of

8   birds used.  Most of us think about a white chicken laying

9   eggs.  That's the Leghorn.  And a lot of them are that strain,

10  but there's increasingly demand because consumers like brown

11  eggs, and different strains lay brown shell-colored eggs and

12  there's just a lot of differences.  So there's a lot of

13  different strains.

14  Q.   And was this a change from the Scientific Advisory

15  Committee's initial thinking?

16  A.   Yeah.  Our initial -- when I initially presented in

17  October of '99, I said 72, and then we had back and forth,

18  lots of discussion, and we settled on a range.  McDonald's

19  later said 72, but McDonald's was dealing about 4 to 5 percent

20  of the eggs in the country.  Whereas UEP was dealing with over

21  90 percent of the eggs.  So a range made sense for the

22  committee based on the range and size of birds.

23  Q.   There are references in this -- in these guidelines and

24  this one in particular to small Leghorn strains.

25          Can you explain to the jury what that reference is

1   to and what percentage of hens housed in egg production at

2   that time were considered small Leghorn strain hens?

3   A.    Yeah, there were different types, and some might have a

4   number, like a W36 strain of Leghorn hens.  I don't recall the

5   percentage, but it was a high percentage of these Leghorn hens

6   that produced eggs.  But, again, we felt like we couldn't make

7   the recommendations just for even the majority because this

8   was for all egg -- all that were voluntary members of the

9   United Egg Producers.

10  Q.    When these white Leghorn hens are given the minimum

11  amount of space recommended in these guidelines, the 67 square

12  inches, are they able to flap their wings?

13  A.    Maybe one at a time, but not -- not all together, but the

14  wing flapping is -- that's one of the disadvantages of cages

15  and wing flapping is limited.

16  Q.    Do you consider that an animal welfare problem?

17  A.    It is an animal welfare problem, but you have to balance

18  the whole.  It's a bigger problem when more hens die.  And

19  that's why we, again, set the guidelines for cages.  Where

20  mortality is low, the bird can't express as many behaviors.

21  That's where public perception can change over time.

22  Q.    Now, Dr. Armstrong, did the Scientific Advisory Committee

23  consider the potential impact on flock size when it made its

24  cage space recommendations?

25  A.    No.

1    Q.    Did the Scientific Advisory Committee consider the

2    potential impact on overall egg supply when it made its cage

3    space recommendations?

4    A.    No.  We just simply wanted to be practical, but not that.

5    Q.    And could you please tell the jury how important was the

6    cage space allowance relative to the committee's other

7    recommendations?

8    A.    Well, this was the biggest one because -- and it also

9    affected the actual facilities because the facilities that we

10   visited in Iowa were these A-frame, the manure dropped down on

11   the birds, the manure stayed in the building, and these

12   facilities had been built -- and there were a lot of birds,

13   especially in the breaker industry -- at 48-square inches.

14          So that's why we stayed away from setting time

15   lines.  That wasn't our role.  We said here's what should

16   happen, but it wasn't up to a group of scientists to say when

17   it should happen because that's a major change going from 48

18   to 67 square inches.

19   Q.    You mentioned feeder space a little earlier.  Why is

20   feeder space an important consideration for the welfare of

21   these hens?

22   A.    Well, studies have shown in situations where there's

23   crowding that one of the causes of death is starvation.  So

24   you think about the phrase "pecking order," well, that's a

25   pecking order.  So if there's too tight a space, not a lot of

1   birds can get to cage.  The wisdom at that time was the

2   pecking order, well, that would contribute to emaciation and

3   death, not being able to eat enough.

4           You could also see it from the view of the flock in

5   that, again, the birds with the higher -- the cages with the

6   higher density, fewer eggs were produced which meant they

7   consumed less food, they consumed less feed.

8   Q.   Look at page 10, again, of the specific recommendations.

9   What was the Scientific Advisory Committee's initial

10  recommendation regarding feeder space?

11  A.   4 inches.

12  Q.   And why was that?

13  A.   That's the best we knew at the time.  Based on the

14  research, based on what we knew, we felt 4 inches was

15  appropriate.

16  Q.   And at that time, did the committee believe that 4 inches

17  was needed so that all birds could feed simultaneously?

18  A.   Yes.

19  Q.   Did the Scientific Advisory Committee's views on the

20  feeder space recommendation change over time?

21  A.   Yes, it did change over time, but only after research was

22  conducted at Purdue University that demonstrated that the

23  birds did not need to eat all at the same time.

24  Q.   How did the recommendation change?

25  A.   It changed to more of a performance standard.  So all

1    birds need to eat, should be able to eat at the same time
2    instead of a specific linear inch.
3    Q.    And did the research show that that was achievable with
4    fewer than 4 inches?
5    A.    Yes.  And what happened is --
6             THE COURT:  Don't worry.  I'm just getting more --
7             THE WITNESS:  -- as the producers implemented their
8    guidelines and gave birds more space, they saw that fewer
9    birds died and there was better productivity.  So they said
10   this 4 inches doesn't make sense because with better
11   productivity, they're getting more feed, and in the end, the
12   research, the scientific results really came in on the side of
13   performance standard.
14   BY MS. SUMNER:
15   Q.    Now, on the next page of these recommendations, the
16   Scientific Advisory Committee discussed air quality.  Can you
17   explain to the jury why air quality is an important
18   consideration in animal welfare?
19   A.    So there's several gases that are produced by animals,
20   but, more importantly, produced when manure is sitting around.
21   Methane, we've heard about that from global warming, ammonia,
22   also hydrogen sulfide.  The biggest issue at that time was
23   ammonia and we -- based on our research, we said the ammonia
24   should not be above 25 parts per million.
25   Q.    What was your perception at the time as to where the

1   industry was on air quality prior to the Scientific Advisory

2   Committee issuing its recommendations?

3   A.   I think there was -- it's hard to say, but the ammonia

4   levels were, you know, 50 parts per million or higher and

5   could sometimes spike to 100 parts per million.  And if you

6   want to get a feel for that, it's a very eye-watering, tearing

7   experience when you're up above 75 or 100.  The OSHA standards

8   for human beings for eight hours is 50.  And so it was really

9   related to leaving the manure in the buildings that produced

10  that level of ammonia.  I think some realized that was a

11  problem and some felt they didn't feel they could achieve that

12  in any reasonable time or any reasonable format without

13  redoing their whole facilities.

14  Q.   Did you have an understanding as to why those who

15  believed that it would be very difficult to achieve the

16  Scientific Advisory Committee's recommendation felt that it

17  would be so difficult?

18            MR. BLECHMAN:  Your Honor, objection.  Foundation.

19            THE COURT:  Do you want to rephrase that question?

20            MS. SUMNER:  Sure.

21  BY MS. SUMNER:

22  Q.   Did you have an understanding, Dr. Armstrong, as to why

23  producers thought air quality was a difficult thing to manage

24  at the time?

25  A.   One of -- I'll just give you a conversation or facts that

1    were shared with producers that, you know, we're in a cold

2    climate, we really can't afford to heat the barn and move the

3    air through there and get ammonia down below 50 in the winter

4    in Iowa or cold climates.  And, you know, that wasn't our role

5    to say whether you could do it or not, but from an animal

6    welfare perspective, it needed at some point to get below

7    25 parts per million because it is not good for the birds or

8    the humans working there.

9    Q.   Let's look briefly at the recommendation that the

10   Scientific Advisory Committee made on lighting.  What was the

11   Scientific Advisory Committee's recommendation with respect to

12   lighting?

13   A.   It would be -- it would be provided to allow effective

14   inspection of all birds and it should be conducted daily.

15   Every bird should be viewed daily.  And then we talked about

16   light intensity.  And birds produce more eggs when there's

17   more light, and so typically the lights will be on in a

18   facility, you know, 16, 18 hours, eight hours of dark, six

19   hours of dark.  But our major concern was for animal welfare

20   to be able to view and pull out mortalities and inspect the

21   birds and make sure everything's okay.  Make sure the feeder

22   wasn't broken, make sure water is there, and to inspect every

23   day, every level, and these are barns with multiple levels.

24   Q.   Thank you.

25            Let's turn next to page 13 where the committee

1    addressed molting.  Now, the jury's heard a lot about molting

2    at this point.  Can you briefly explain, Dr. Armstrong, what

3    the purpose of a molt is?

4    A.   The advantage of a molt is you take a flock of birds that

5    have been producing for many weeks, and you take them out of

6    egg production, and you rejuvenate the bird.  They lose

7    weight, their reproductive organs are rejuvenated and you

8    don't have to bring in another whole round of baby chicks,

9    which means euthanizing the roosters -- the males -- that

10   hatch, so you have a real positive from the whole flock

11   mortality or flock welfare, I should say.  So that's a

12   positive, rejuvenation.  They're ready to lay again.

13          The negative is how it was induced.  Originally it

14   would be water withdrawal and feed withdrawal.  No feed or

15   water for several days up to two weeks.  At the time that we

16   were looking at this, there was water -- all they wanted, ad

17   libitum, but the typical practice was to reduce feed to zero,

18   to zero.  The problem with that is the immune system is

19   suppressed.  And birds lose too much weight, you have an

20   increase in mortality, birds die, and, again, think about it

21   from the perspective of basic animal welfare, you're eating,

22   you're producing and you're living, and so that's -- that was

23   the negative side of molting.

24   Q.   Now, at this time, Dr. Armstrong, was there a commercial

25   viable alternative to a feed-withdrawal molt?

1    A.   There were lots of ideas on the street, but there were

2    not any commercially viable methods that had gone through

3    research practices.

4    Q.   I'd like to direct your attention to page 15 of the

5    guidelines, the committee conclusion sections, and ask you to

6    please explain to the jury, what did the Scientific Advisory

7    Committee conclude at this time regarding molting as a result

8    of its research?

9    A.   And so again, this is 2000, and again, we're dealing with

10   98 percent of the birds in cages and we said:  Producers and

11   researchers are encouraged to come up with alternatives to

12   feed withdrawal/starvation.  The alternatives should include

13   nutrition that is equal to what a bird needs when it's not

14   producing eggs.

15           Because you can imagine a bird's producing eggs,

16   they need a lot more energy and protein than if the bird is

17   not.  They produce an egg about every 28 hours.

18           Body weight could be lost, but not to compromise

19   mortality.  And the mortality shouldn't spike.

20           So that -- that was our recommendation.

21           And then we said:  Until those alternatives are

22   available, then it should be a minimum, and then we provided

23   guidelines.

24           So we didn't -- we wanted to get rid of the

25   feed-withdrawal molt but we didn't say do it tomorrow.  That

1    was not our role.  And we said we know this is going to be

2    around, so here are the guidelines on how to do it in the best

3    way possible in a transition.

4    Q.   Was additional research done?

5    A.   Yes, UEP funded research at several places, North

6    Carolina State, Nebraska, several other universities.  I think

7    it was four or five, and they all came up with different

8    methods to meet those guidelines.  So you could induce a molt

9    without starving the bird.  You could give them enough food to

10   knock them off of production, but that they would not have a

11   spike in mortality.

12   Q.   So the research, did it show that farmers were able to

13   work with nutritionists and provide hens with a diet that

14   would allow them to feed and molt at the same time?

15   A.   Yes.

16   Q.   And did the Scientific Advisory Committee's

17   recommendations with respect to molting change as a result of

18   that research?

19   A.   Yeah.  As a result of that, I think by at least 2008,

20   feed withdrawal/starvation was not allowed, was not permitted

21   under our guidelines and recommendations.

22   Q.   Dr. Armstrong, I'd like you to take a look at Tab 2 in

23   your binder.  This is Plaintiffs' Exhibit 663.  Did you attend

24   a meeting of the Producer Committee for Animal Welfare on

25   April 19, 2005, in Chicago?

1   A.   Yes.

2   Q.   And is the document that you're looking at, Plaintiffs'

3   Exhibit 663, a copy of the minutes of that meeting that you

4   have attended?

5   A.   Yes.

6        MS. SUMNER:  Your Honor, I would like to move for

7   the admission of Plaintiffs' 663 into evidence.

8        MR. BLECHMAN:  Your Honor, we have no objection.

9        THE COURT:  663 is admitted.

10       (Exhibit received in evidence.)

11       MS. SUMNER:  May we publish it to the jury?

12       THE COURT:  Yes, you may.

13  BY MS. SUMNER:

14  Q.   Dr. Armstrong, I'd like you to take a look at the bottom

15  half of the first page where it says, Recommendation for

16  Molting.  Do you see that?

17  A.   Yes.

18  Q.   And I'd like you to read the italicized passage under

19  Recommendation for Molting.

20  A.   Producers must eliminate the use of feed withdrawal to

21  induce a molt.  If a molt is induced, the nonfeed withdrawal

22  method must meet all the following criteria:  The hens should

23  be able to consume nutritionally adequate and palatable feed

24  suitable for a nonproducing hen.  Bodyweight loss should be

25  sufficient so as not to compromise hen welfare.  And mortality

1    during the molt should not substantially exceed normal flock

2    mortality.  The committee recommends that this be considered

3    as a pass-fail in the audit.  In other words, if the producer

4    uses feed withdrawal to molt, they fail the audit.

5    Q.    And was this, in fact, the Scientific Advisory

6    Committee's recommendation for molting as of 2005?

7    A.    Yes.

8              MS. SUMNER:  We can take that down.

9    BY MS. SUMNER:

10   Q.    Now, the next topic I want to talk about is backfilling.

11   And again, the jurors have heard a lot about backfilling.  Why

12   is it that the Scientific Advisory Committee's original

13   recommendations in 2000 said nothing on the subject of

14   backfilling?

15   A.    We didn't anticipate backfilling.  We're not involved in

16   day-to-day commercial and we didn't think through all the

17   day-to-day commercial applications of instituting the

18   guidelines.  So we didn't talk about it.

19   Q.    At some point was the practice of backfilling brought to

20   the Scientific Advisory Committee's attention?

21   A.    Yes, by several producers in UEP.

22   Q.    And did the Scientific Advisory Committee address

23   backfilling?

24   A.    Vehemently.  The Scientific Committee was very opposed to

25   backfilling.

1    Q.   I'd like to show you, Dr. Armstrong, if you could turn to

2    Tab 3 of your binder, please.  This is a document that's been

3    marked as Defendants' Exhibit 665.  It's already in evidence.

4            MS. SUMNER:  May we publish it to the jury?

5            THE COURT:  Yes.

6    BY MS. SUMNER:

7    Q.   Dr. Armstrong, do you recognize this document?

8    A.   Yes.

9    Q.   And what is it?

10   A.   It's a letter from -- signed by me as the chair, but

11   coming from the full committee and I never produced anything

12   that the committee did not review, edit, part of, to then Paul

13   Bahan, who was the chair of the Producers Committee for Animal

14   Welfare.

15   Q.   So did you write this letter, Dr. Armstrong?

16   A.   Yes, in consultation with the committee.

17   Q.   And did anyone in particular from the committee help you

18   with this letter that you recall?

19   A.   Scotti Hester and Joy Mench.

20   Q.   And did you send this letter on or about October 4, 2004?

21   A.   Yes.

22   Q.   Now, I'd like you to take a look at the first paragraph

23   of the letter.  At this time, was the Scientific Advisory

24   Committee extremely concerned about the industry's current

25   practice of backfilling?

```
 1   A.   Yes.

 2   Q.   And at the time, the Scientific Advisory Committee

 3   established the original recommendations for the guidelines,

 4   was it the intention to allow for backfilling of cages with

 5   spare birds?

 6   A.   No.  No.  We did not anticipate they would do that.

 7   Q.   And are there animal welfare issues, Dr. Armstrong,

 8   associated with backfilling?

 9   A.   Yes.

10   Q.   And in this letter, did you explain to Mr. Bahan those

11   issues?

12   A.   Yes.

13   Q.   And can you explain them for the jury, please?

14   A.   Well, it's in the second paragraph.  First of all, bird

15   welfare is compromised when it's done every month to replace

16   mortality.  And the whole idea is to keep the houses full,

17   keep egg production up.  And what we know from science is that

18   if you mix flock -- mix birds from other flocks and different

19   ages, it increases susceptibility to disease.  So older birds

20   may transmit diseases to the younger birds that are brought

21   in.  They may not have been vaccinated, their immune system

22   may not be fully kicked in.

23            In addition, you get social competitiveness.  You

24   get feather pecking and cannibalistic pecking when new birds

25   are introduced to an existing group.  So there's eight birds,
```

1   two die, you put two young birds in there, it's not a pretty

2   scene.  And there was no equivocation.  Once we heard about

3   this, there was no equivocation from the committee that this

4   is not a good practice.

5   Q.   Can you explain to the jury the source of the information

6   that's reflected in the second paragraph of this letter?

7   A.   Yeah.  Scotti -- or Patricia Hester is a faculty member

8   at Purdue on the committee.  In fact, at the same time, she

9   was writing a review paper for a peer review journal on

10  various aspects of animal welfare, and she -- she is really

11  recognized as an expert in that area and validated by the rest

12  of the committee.

13  Q.   And can you just explain to the jury briefly what a peer

14  review journal is?

15  A.   So you have a review of all the literature or you have

16  original research that you've done.  You submit it to a

17  journal and they send it to anonymous four or five reviewers,

18  they review it, they critique it, and it takes four or five

19  months, sometimes even six to eight months to go through the

20  system, and it's validated.  And it has to go through that

21  process.  That's peer reviewed.  So that's how researchers at

22  universities are viewed.  How many peer-reviewed journal

23  articles did you have or review articles?

24  Q.   And was Ms. Hester's article from which this second

25  paragraph was taken, in fact, published in a peer review

 1   journal?

 2   A.   Yes, it was published in the Poultry Science Journal.

 3   Q.   Now, did the Scientific Advisory Committee make a

 4   recommendation to UEP with respect to backfilling in this

 5   letter?

 6   A.   Well, we said, that they -- with utmost urgency, that

 7   they should eliminate backfilling, and we said your customers

 8   as well as Food Marketing Institute and National Council of

 9   Chain Restaurants will not approve of this practice.  So we

10   said it's essential to maintain science-based guidelines, and

11   we said it's important that they respond.

12          And we also -- this is where public perception comes

13   in, that -- what if you're consuming eggs and you find out

14   your eggs comes from this practice and an increased number of

15   birds are killed above what normally occurs, and that's our --

16   mortality spiked.  So it's a public perception issue, too.

17   Q.   And did the recommendation in this letter, in fact,

18   reflect the Scientific Advisory Committee's view at this time?

19   A.   Yes.

20   Q.   Now, did UEP ask for this recommendation?

21   A.   They didn't ask for the recommendation.  When we heard

22   about what was happening, the committee was really incensed.

23   They were angry from the perspective that how could they do

24   this.

25   Q.   I'd like you to turn to Tab 4r in your binder, please,

1   Dr. Armstrong.

2           Now, did you attend a meeting of the Producer

3   Committee for Animal Welfare on December 7 and 8, 2004, in

4   Chicago?

5   A.   Yes.

6   Q.   And is this document at Tab 4, which is marked as

7   Plaintiffs' Exhibit 260, a copy of the minutes of that meeting

8   that you attended?

9   A.   Yes.

10          MS. SUMNER:  Your Honor, I'd like to move at this

11  time for the admission of Plaintiffs' Exhibit 260 into

12  evidence.

13          MR. BLECHMAN:  Your Honor, Plaintiffs have no

14  objection.

15          THE COURT:  260 is admitted.

16          (Exhibit received in evidence.)

17          MS. SUMNER:  May I publish it to the jury?

18          THE COURT:  Yes, you may.

19  BY MS. SUMNER:

20  Q.   Dr. Armstrong, at this meeting in December of 2004 in

21  Chicago, did you share the Scientific Advisory

22  Committee's views on backfilling with the Producer Committee

23  for Animal Welfare?

24  A.   Yes.

25  Q.   And if you could look, please, at the first page of these

1    minutes, under the heading Backfilling, do you see that?

2    A.   Yes.

3    Q.   Does that first paragraph accurately summarize what you

4    told the Producer Committee at this meeting?

5    A.   Yes.  And that represented a normal back and forth.  I

6    met with the Producer Committee earlier, then we had a

7    conference call with the Scientific Committee, and then I

8    reported back.

9    Q.   And can you explain to the jury, please, what views of

10   the Scientific Advisory Committee were communicated at this

11   time?

12   A.   Yeah, the producers had said, you know, we've got surplus

13   pullets.  So the pullets are the young hens ready to --

14            MR. BLECHMAN:  Excuse me, Your Honor.  I think we're

15   about to hear hearsay.

16            THE COURT:  Well, the -- I think the question is:

17   What views of the Scientific Advisory Committee were

18   communicated at this time?

19            Do you want to at least rephrase the question?

20   BY MS. SUMNER:

21   Q.   Yes, if you could stick, Dr. Armstrong, to the

22   committee's views.

23   A.   So the committee discussed is it appropriate for

24   unexpected surplus of pullets to be used in backfilling to

25   replace mortality and we said no.

1  Q.   And were you asked at this meeting about the Scientific

2  Advisory Committee's views on whether backfilling would be

3  acceptable if a catastrophic event occurred?

4  A.   Yes.

5  Q.   And what did you understand the catastrophic event to be?

6  A.   You have a really serious outbreak of cannibalism or

7  malfunction or something that caused the big increase in

8  mortality, not a monthly event, a single event, that was

9  viewed as catastrophic.

10 Q.   And did you take that exception, so to speak, back to the

11 Scientific Advisory Committee?

12 A.   Yes.

13 Q.   And what were the Scientific Advisory Committee's views

14 on that exception?

15 A.   They were comfortable with that.  It had some pros and

16 cons, but like anything else, it was more of a wholistic

17 balance and in a catastrophic situation, there needed to be a

18 way to move forward and continue to produce eggs.

19 Q.   Did anyone ever tell you that the ban on backfilling was

20 needed to reduce the nation's flock size or the

21 nation's supply of eggs?

22 A.   No.

23 Q.   Did you ever discuss with UEP the impact that the

24 practice of backfilling was having on egg supply or egg price?

25 A.   No.

1  Q.   In 2004, when the Scientific Advisory Committee

2  recommended that backfilling be eliminated, were you aware

3  that Al Pope had written an editorial on backfilling?

4  A.   I really don't recall.  I received United Voices and

5  didn't read anything that came across.

6  Q.   Let's turn now to the section of the guidelines that

7  deals with handling and slaughter and that is on page 18.  It

8  begins on page 18.

9           MR. BLECHMAN:  Excuse me, Counsel.  Which document

10  are you referring to?

11           MS. SUMNER:  We're back to Tab 1e, the

12  recommendations, Plaintiffs' Exhibit 52.

13           MR. BLECHMAN:  Thank you.

14  BY MS. SUMNER:

15  Q.   Dr. Armstrong, can you explain for the jury what a spent

16  hen is?

17  A.   So at the end of the first laying cycle or the end of the

18  second or third after molting, the hen is no longer viable for

19  producing eggs.  Typically the shells get so the brittle that

20  they can't even move through the system.  So the hen's useful

21  lifetime is over.  So at some point, you know, we use animals.

22  They have to be harvested or euthanized.

23  Q.   Is there consensus as to exactly when a hen becomes

24  spent?

25  A.   I think from a commercial perspective there is.  I think

1    from an animal welfare perspective, that might be not be such

2    a consensus, but a practical consensus, when their ability to

3    lay viable eggs has ended.

4    Q.   And does it depend in part on whether or not the flock is

5    molted?

6    A.   Yes, because if you molt, you can get additional laying

7    cycles from individual hens.

8    Q.   You can turn to page 20 of these recommendations to the

9    specific recommendation on handling transportation and

10   slaughter.

11           Can you explain briefly what the Scientific Advisory

12   Committee recommended with respect to slaughter, specifically?

13   A.   Well, throughout all of the handling and transportation,

14   there's an aspect of training, treating the animals with care,

15   providing adequate food up until the point, but I -- I don't

16   see the exact number where we're talking about slaughtering.

17   Q.   Maybe Number 12?

18   A.   Oh, down at the bottom.  Yeah, thank you.  And we talk

19   about training and that's on farm euthanasia.  So what

20   happened over time is that the market for a spent hen to go

21   into the food chain, either for humans or for other uses

22   dropped such that the value of a bird was not viable to

23   transport them.  So producers developed ways to euthanize the

24   birds on the premises and appropriately do that.

25           So we talked about training, we talked about

1    cervical dislocation as a way to euthanize small numbers, and

2    an MAK cart is one where they use a gas to basically euthanize

3    the numbers of birds in a cart.  And then we also said we

4    really need to evaluate new technologies for euthanasia to

5    make sure that they are welfare friendly.  And so we're

6    ending -- as I mentioned before, we're using the birds, we

7    terminate their life, but that should be done in the most

8    humane way possible.

9    Q.   What role, if any, did the egg producers' economics play

10   in the Scientific Advisory Committee's recommendations that

11   were issued in September of 2000?

12   A.   From a broad perspective, again, we looked at the

13   affordability, the practicality, but we really looked at the

14   science-based guidelines.  And in the case of what we just

15   talked about, we're looking at how can that be done from a

16   science-based perspective without respect as to why the bird

17   was being euthanized.

18   Q.   Did the committee have a view on guidelines that would be

19   too expensive or impossible for the industry to implement?

20   A.   Well, yes.  There's a lot of examples where, for example,

21   molting, we didn't feel it was practical to eliminate feed

22   withdrawal as a molt immediately.  So we came up with

23   guidelines to make it as humane as possible, but we needed the

24   research to get to the point and we did.

25          We also knew that birds were not in a good situation

1    being at 48, and they needed to be at 67 square inches, but we

2    couldn't snap our fingers and make that happen overnight.  So

3    we put the recommendations in place.  We had no influence on

4    the timing, and we discussed that upfront, that it was not our

5    role to get into the timing of any recommendations that we

6    make.  Now, we did intervene when we saw there was -- when we

7    would find an animal welfare issue that was very blatant, as

8    some examples already have been given.

9    Q.   Was it important to the committee that the guidelines not

10   be too expensive or impossible to implement?

11   A.   Well, yes.  If they were impractical, we're really not

12   going to affect the welfare of birds.  And if you look what

13   happened over time, the industry had proposed 12 years to

14   phase in the space because of the market, because of pressure

15   of FMI, NCCR, McDonald's, Burger King.  That was produced to

16   six years.  We didn't have anything to do with the timeline of

17   getting to that space.  That was not our role.

18   Q.   In your view, did the conservative approach of focusing

19   on mortality and productivity make the recommendations more

20   likely to be implemented?

21   A.   Yes.  Absolutely.

22   Q.   Now, did the Scientific Advisory Committee do its work on

23   these recommendations in isolation?

24   A.   Oh, no.

25   Q.   Can you explain to the jury how not?

1   A.   Well, first of all, we -- we had a UEP representative,

2   Gene Gregory, and we had a producer representative, and that

3   changed over time.  We also had different members of the

4   committee that had experience in commercial.  We had some

5   members of the committee -- Paul Thompson had no experience

6   with birds.  He was there from the ethics and public

7   perception perspective.

8          We all also were members of different departments

9   and colleges and we interacted with individuals.  The members

10  were actively doing research and publishing in these areas.

11  So nothing happened in a vacuum, but -- but when we say we're

12  independent, we were scientifically independent, in that we

13  based our guidelines on what we knew at the time and in some

14  cases that evolved.

15  Q.   Did the Scientific Advisory Committee have interaction

16  with FMI and NCCR during this process?

17  A.   Yes.  We heard very strong signals from FMI early on that

18  we would like for each animal sector, broilers, pork, laying

19  hens, have one uniform set of guidelines.  And, in fact, FMI

20  formed a group and Adele Douglass, Janice Swanson, and Joy

21  Mench became members of that group.  So we had a lot of back

22  and forth and knew what was going on.

23  Q.   Now, from time to time, did you attend UEP meetings?

24  A.   Yes.

25  Q.   And did those include UEP board meetings?

1    A.    Yes.

2    Q.    And UEP committee meetings as well?

3    A.    Yes.

4    Q.    Were the nation's flock size or eggs supply or egg price

5    discussed in those meetings?

6    A.    Well, they discussed a wide range of topics, yes.

7    Q.    And did you receive UEP's newsletter, United Voices?

8    A.    Yes.

9    Q.    And did you read it?

10   A.    I'd scan it and I'd particularly read the animal welfare

11   materials, but inboxes of e-mail get pretty full.

12   Q.    Did it contain articles that discussed the nation's flock

13   size and egg supply and egg prices?

14   A.    I'm sure it did.

15   Q.    Did the Scientific Advisory Committee ever consider those

16   issues when making its initial recommendations?

17   A.    Absolutely not.  And as I've said before, if anything had

18   been pre-ordained or someone trying to push our committee in

19   any one direction, not based on animal welfare or wholistic

20   view of animal welfare, the committee would have disbanded.

21   And that committee that was founded in 1999 is still active

22   today with some of the same members still on that committee.

23   That is extremely very -- that's positive.

24   Q.    Did any of those issues ever influence the

25   recommendations that the Scientific Advisory Committee made at

1    any time?

2    A.    No.

3    Q.    Did anyone from UEP ever ask the Scientific Advisory

4    Committee to consider those issues when making its

5    recommendations?

6    A.    No.

7    Q.    Did anyone from UEP ever tell you that the reason UEP

8    wanted to implement Animal Welfare Guidelines was to manage

9    the nation's flock size?

10   A.    No.

11   Q.    Or to manage the nation's egg supply?

12   A.    No.

13   Q.    Or to impact the egg price in the U.S.?

14   A.    No.  And, in fact, why would they have been backfilling?

15   Because backfilling was a way to keep egg production up.  So

16   that really doesn't make sense to me.

17   Q.    Did UEP and its members take steps to make use of the

18   Scientific Advisory Committee recommendations?

19   A.    Yes.

20   Q.    What did they do?

21   A.    Well, first, they formed a producer Animal Welfare

22   Committee, which we encouraged because other groups which I

23   was involved, there would be producers and scientists in the

24   same room, and there would be equal numbers and a lot of push

25   for status quo.  So we had our Scientific Committee that

1   didn't operate in a vacuum, we had the Producer Committee and

2   then they took our recommendations and guidelines and put them

3   into Producer Guidelines and then they also then developed an

4   audit program.

5   Q.   Do you recall, Dr. Armstrong, who sat on the Producers

6   Committee for Animal Welfare?

7   A.   Oh, there was a range of individuals, Barrie Wilcox, Bob

8   Krouse, Mark Oldenkamp for many years, Paul Bahan were some of

9   them, were the chairs, but there were a lot of different

10  producers on the committee.

11  Q.   Do you recall whether any representative from Rose Acre

12  Farms sat on or participated in the Producer Committee?

13  A.   Oh, I'm sure they did, but I don't recall.

14  Q.   Was Garth Sparboe active on the Producers Committee?

15  A.   I think he was originally.

16  Q.   And who did Garth Sparboe represent on that committee?

17  A.   Sparboe Farms.

18  Q.   And did you form an impression of Sparboe Farms' interest

19  in implementing Animal Welfare Guidelines?

20  A.   Yes.

21        MR. BLECHMAN:  Excuse me, Your Honor, objection.

22  Foundation.

23        MS. SUMNER:  He testified he attended the meetings.

24        THE COURT:  Well, it may be -- may or may not relate

25  to an interest in implementing the guidelines.  Do you want to

1    rephrase your question?

2    BY MS. SUMNER:

3    Q.   At the Producer Committee meetings, did you gain an

4    understanding as to various producers' interest in the Animal

5    Welfare Guidelines as a result of the discussions in which you

6    participated at those meetings?

7    A.   Yes.

8    Q.   And in particular, did you form an impression of Sparboe

9    Farms' interest in implementing the Animal Welfare Guidelines

10   through your participation and discussion at those meetings?

11   A.   Yes.

12   Q.   Can you please explain to the jury what impression you

13   formed with respect to Sparboe Farms', in particular, interest

14   in implementing Animal Welfare Guidelines?

15   A.   There was -- there was pushback in particular with regard

16   to ammonia levels and space and also just, in general, the

17   science-based guidelines.

18   Q.   And did you have a role with respect to the Producers

19   Committee on Animal Welfare?

20   A.   Yes, I was liaison from the Scientific Committee.

21   Q.   At any of those meetings, did you ever hear anyone

22   discuss the Animal Welfare Guidelines as a means to reduce the

23   nation's flock size or egg supply?

24   A.   No.

25   Q.   At those meetings, did you ever hear anyone discuss the

1   impact that the guidelines would have on the price of eggs?

2   A.   No.

3   Q.   Were other members of the Scientific Advisory Committee

4   involved with the Producer Committee for Animal Welfare?

5   A.   Yes, from time to time they would join in person, or I

6   would bring them in on a conference call.

7   Q.   So you testified earlier that this committee developed

8   guidelines.  Are the Scientific Advisory

9   Committee's recommendations and the UEP Guidelines two

10   different documents?

11   A.   Yes.

12   Q.   Do you recall an issue arising where members of the

13   Scientific Advisory Committee did not want their names on the

14   UEP Guidelines as published?

15   A.   Yes.

16   Q.   Why is it that you and your colleagues on the Scientific

17   Advisory Committee did not want your names to be listed in the

18   guidelines as published to the industry?

19   A.   It was really a very simple issue.  As scientists, we're

20   very sensitive about what our names are on, and this was

21   during transition.  And so the egg producers were going from

22   48 to 67, they were dealing with ammonia, they were dealing

23   with a lot of issues, that was not -- that's not what we were

24   about.  We weren't part of that transition.  So we didn't want

25   our names on it.  Once everything had transitioned, we put our

1    names back on it.  It was a matter of that transition.

2    Q.    Do you recall when the Scientific Advisory

3    Committee's view regarding having their names published on the

4    UEP Guidelines changed?

5    A.    I don't know, 2008 or 2010.

6    Q.    Dr. Armstrong, the jury's heard a lot about Gene Gregory.

7    Can you tell the jury a little bit about your experience with

8    Gene Gregory as it relates to the Producer Committee for

9    Animal Welfare, as well as Mr. Gregory's participation on the

10   Scientific Advisory Committee?

11   A.    Yeah.  I have a lot of interactions with Gene for many,

12   many years, and Gene deeply cared about the industry, and Gene

13   deeply cared about science-based guidelines, but he didn't

14   always understand the science.  So there would be frequent

15   back and forth with the scientists, but then there would also

16   be frequent back and forth with producers.  And Gene didn't

17   have much of a filter and he sometimes was an equal

18   opportunity offender.  And he and Joy Mench would go

19   toe-to-toe on things.  And today, I don't know if they see

20   each other since Gene's retired, but before Gene retired they

21   were very good friends, because it's just the dynamics of

22   Gene's personality.  But he deeply -- he deeply cared about

23   the animal welfare issue and -- now when we first went on that

24   tour it would have been easy to take us to a facility that was

25   not 48 square inches with ammonia that made you cry and manure

1    dropping on the birds, and it was really illustrative of the

2    industry at that time.  And so I believe that, you know, Gene

3    indeed cared about animal welfare, and the science, but as

4    much as he understood the science.

5    Q.   I'd like you to turn, Dr. Armstrong, please, to Tab 5 in

6    your binder.  This is a document that is mark as Defendants'

7    Exhibit 175.

8            MS. SUMNER:  This document is already in evidence.

9    May I publish it to the jury?

10           THE COURT:  Yes.

11   BY MS. SUMNER:

12   Q.   Dr. Armstrong, do you recognize this document?

13   A.   Yes.

14   Q.   Can you tell the jury what it is, please.

15   A.   This is the Animal Husbandry Guidelines for the U.S.

16   laying flock, and I don't remember if it's the first or

17   second, but it's 2002 edition and so this is the translation

18   of the committee of our work to the industry.

19   Q.   So just to be clear, these are the UEP Guidelines?

20   A.   These are UEP Guidelines.

21   Q.   Generally, were there some differences between the

22   Scientific Advisory Committee's September 2000 recommendations

23   and the UEP Guidelines?

24   A.   Yes.  There were some differences, largely due to A, a

25   transition; B, not understanding what, you know, what we know

1   and what we don't know, the research.  And those were the

2   two -- the two main reasons.  But the industry accepted our

3   guidelines in principle in 2000 and then they worked through,

4   how do we transition to get to that point.

5   Q.   So did the Scientific Advisory

6   Committee's recommendations provide a time period for

7   implementation of the guidelines?

8   A.   We did not.

9   Q.   Did the UEP Guidelines provide a time period for

10  implementation?

11  A.   Yes, they did.

12  Q.   Did the Scientific Advisory Committee recommendations

13  provide for an audit program?

14  A.   No.  We anticipated there would be one but we -- we

15  didn't think about it at the beginning.  We anticipated that

16  there would be later, but we did not recommend that at the

17  beginning.

18  Q.   And did the UEP Guidelines contain an audit?

19  A.   Oh, yes.  And there were many groups, FMI, NCCR,

20  McDonald's, Burger King calling, and they set up their own,

21  some of them set up their own.

22  Q.   Did the Scientific Advisory Committee's recommendations

23  provide any provisions or recommendations for certification of

24  producers who complied with the recommendations?

25  A.   No.

1    Q.    Did the UEP Guidelines?

2    A.    Yes.

3    Q.    And what is your understanding of the reason for these

4    differences?

5    A.    Well, again, we provided the science basis for what

6    should happen, and the industry, they're dealing with the

7    customers, and the customers were demanding, well, if you have

8    guidelines, how do you prove it?  And customers were saying,

9    we want to know.  Shareholders were saying we want to know.

10            MR. BLECHMAN:  Excuse me, Your Honor, we're getting

11    hearsay without foundation.  So if we're going to have the

12    kind of testimony, we request the foundation, please.

13            THE COURT:  Well, the question is:  What is your

14    understanding of the reason of these differences?

15            So from that standpoint.

16            MR. BLECHMAN:  I can deal with this on cross.  I'm

17    hearing about customers and things --

18            THE COURT:  Okay.  Okay, I've got it.

19            MR. BLECHMAN:  Thank you.

20            MS. SUMNER:  You can continue, Dr. Armstrong.

21            THE WITNESS:  Oh, I think I made my point.

22    BY MS. SUMNER:

23    Q.    Did the egg producers implement the full minimum cage

24    space recommendations in the guidelines immediately?

25    A.    No.

1    Q.    Do you have an understanding as to why not?

2    A.    It wasn't practical.

3    Q.    Did you and the Scientific Advisory Committee want the

4    producers to implement the minimum cage space requirements

5    sooner?

6    A.    Oh, from the -- from the Scientific Committee

7    perspective, from the individual bird perspective, yes, we

8    would have wanted that, but we also had to deal with what was

9    practical.

10   Q.    And do you recall what the initial phase-in period for

11   the minimum cage space requirements was in the guidelines?

12   A.    I believe it was 12 years, originally.

13   Q.    And was that shortened?

14   A.    Yes, it was shortened to half that, six years.

15   Q.    And do you have an understanding as to why?

16   A.    Dynamics of the industry, consumer -- I'm not sure, but

17   they wanted to move it sooner.

18   Q.    Now, we've heard some testimony during this case about

19   something called the house average rule.  Do you have an

20   understanding of what that is?

21   A.    Yes.

22   Q.    Can you explain that to the jury.

23   A.    Well, as they were transitioning from 48 to 67, it wasn't

24   feasible to just get the full house, even to whatever their

25   phase-in, and we just viewed it as a transition.  We viewed it

1   as movement in the right direction and a transition.  So we

2   weren't too concerned about house averaging.

3   Q.   So how can a rule involving averaging be part of a

4   welfare program?

5   A.   Because they're transitioning, and they're -- they're --

6   we're trying to get at what's best for the individual birds,

7   what's best for the flock from a science-based perspective.

8   But, again, we did not get into the timeline, and so we viewed

9   that as a transition.

10  Q.   Was it important to the Scientific Advisory Committee

11  that there be an end date for the transition?

12  A.   Yes, I think they felt -- well, it's one thing for the

13  industry to say in 2000, we -- we agree, we're going to live

14  with science, but then if they just kept putting it off, then

15  that would have been shallow.  So by putting the end date on

16  space, which was one of the biggest issues, that said to us

17  that they're serious about it.

18  Q.   So how did the Scientific Advisory Committee feel about

19  the transition period adopted in the UEP Guidelines?

20  A.   We -- you know, we had interactions and back and forth,

21  but overall, we were comfortable with the transition.

22            MS. SUMNER:  Your Honor, I'm getting ready to move

23  into another line of questioning that might take a while.

24            THE COURT:  Okay, then I think the jury might be

25  ready to move into lunch.  So we will take an hour lunch

```
1    break, folks.  Back here at 1:30 to resume.  And as you might

2    recall, I said we're going to end the day around 3:30-ish.

3    Closer to 3:30 than four, probably.  So enjoy lunch.  The same

4    rules apply.  Don't talk about the case.  And we will be back

5    here in an hour.

6              THE DEPUTY CLERK:  All rise.

7              (Jury out.)

8              THE COURT:  After lunch, about how long?

9              MS. SUMNER:  At least another hour.

10             THE COURT:  Okay.  I just want to know.  All right,

11   enjoy lunch, everybody.

12             MR. BLECHMAN:  Thank you, Your Honor.

13             MR. LEVINE:  Thank you, Your Honor.

14             THE COURT:  See you in an hour.

15                  (Luncheon recess taken.)

16                  (After luncheon recess:)

17             THE DEPUTY CLERK:  All rise.

18             THE COURT:  Okay, ready to resume.

19             MR. BLECHMAN:  Yes, Your Honor.

20             (Witness resumes the stand.)

21             THE DEPUTY CLERK:  All rise.

22             (Jury in.)

23             THE COURT:  All right.  Everybody, you may take your

24   seats.

25                  And, Ms. Sumner, you may resume.
```

1          MS. SUMNER:  Thank you.

2   BY MS. SUMNER:

3   Q.   Dr. Armstrong, before the lunch break, we were discussing

4   the documents that's at Tab 105 of your binder.  This is the

5   copy of the UEP Animal Husbandry Guidelines For U.S.

6   Egg-Laying Flocks, 2002 edition.  If you could turn to that,

7   and at the same time have handy the document that's behind

8   Tab 1 in your binder, you might actually just want to take it

9   out of the binder for ease of reference or at least have it

10  available to flip back and forth.

11          These are the Scientific Advisory Committee's

12  September 2000 recommendations, and we were discussing the

13  differences between the two and I just would like to discuss a

14  few specifics.

15          To start, if you could turn to page 5 of the 2002

16  guidelines, these are the recommendations on housing and space

17  allowance.

18  A.   Yes.

19  Q.   Are you there?

20  A.   Yes.

21  Q.   And I'd like to discuss the differences with respect to

22  cage space.  So if I could direct your attention to the second

23  guideline, which reads:  All hens should be able to stand

24  comfortably upright in their cage.  The slope of the cage

25  floor should not exceed 8 degrees.

1          Do you see that?

2     A.   Yes.

3     Q.   So the guidelines required that hens be able to stand in

4     their cage but didn't include the 16- to 17-inch specific

5     number.  And if you could just take a look at the

6     recommendation of the Scientific Advisory Committee on this

7     same issue, and can you -- do you have an understanding as to

8     why the guidelines did not include the 16 to 17 inches?

9     A.   Yes.  The main part of our guidelines said that hens

10    should be able to stand comfortably upright in their cage

11    without having their hens protruding in the cage above, and

12    then we said a cage height of 16 to 18 inches will generally

13    be acceptable and while larger strains would require more.  So

14    we were comfortable with the performance standard in not

15    mentioning 16 to 17.

16    Q.   And do you have an understanding as to why the producer

17    guidelines did not include the specific language that a cage

18    height of 16 to 17 inches will generally be acceptable?

19    A.   Well, it would be very, very hard to audit with the slope

20    of the floor, with the different strains of birds, with the

21    different cage configurations, and so it was much better to

22    realistically stick with the performance standard, as I

23    recall.

24    Q.   Now, I'd like to direct your attention in this same set

25    of recommendations in the 2002 guidelines to the one on feeder

1    space which is at -- at Number 4.

2    A.    Um-hum.

3    Q.    And then I would like you to take a look at the

4    Scientific Advisory Guidelines recommendation on feeder space

5    which is at page 10 of the recommendations, also Number 4.

6    A.    Um-hum.

7    Q.    And can you explain to the jury what is the difference

8    between the two?

9    A.    Yeah, the committee at that time believed the best

10   information we had possible is that birds should have 4 inches

11   of linear space in order to be able to eat properly.  The

12   producers just kept pushing back and did not implement that

13   and there was a back and forth, back and forth.  So there was

14   a difference of opinion with regard to this temporary

15   difference of opinion with regard to this guideline.

16   Q.    So how did the Scientific Advisory Committee feel about

17   this guideline recommendation in 2002?

18   A.    We felt it should be 4 inches per bird.

19   Q.    And did you have an understanding as to why the producers

20   drafted the guideline this way at that time?

21   A.    They -- and I guess in 2002, they were already -- some

22   people were already implementing more space, and they weren't

23   seeing a problem in the field and we can't base guidelines on

24   the field.  We have to -- on commercial observations, we have

25   to stick with the science, and so there was a difference in

1   what they were observing, I think, and what we were

2   recommending.

3   Q.   And did the Scientific Advisory Committee's view on this

4   producer guideline change at some point in time?

5   A.   Yes, it did.

6   Q.   And how did it change?

7   A.   Well, we asked the UEP to fund a study conducted at

8   Purdue University and it involved different -- the same

9   genetics but a genetic that was used by a lot of the industry,

10  a white bird.  And they looked at different feeder space, they

11  looked at different cage configuration, and they video'd the

12  birds and watched their behavior, and they found that the

13  bird's behavior, they would eat asynchronously.  There was not

14  any evidence of negative animal welfare, and there was no

15  evidence of egg production or feed consumption.  So these

16  birds started to eat asynchronously.  So the recommendation

17  was then changed after that research -- after that research

18  study.

19  Q.   And what was the recommendation changed to?

20  A.   To a performance standard so that birds could have

21  sufficient space to consume the food.

22  Q.   And at that point in time, was the recommendation

23  consistent with the guideline?

24  A.   Yes.  Yeah, in the end analysis, all our guidelines lined

25  up.  During the transition there were some differences.

1  Q.  Do you recall when that change in recommendation was made

2  with respect to feeder space?

3  A.  2006, I think.  It was discussed a lot in '05, '04, but I

4  think the study was done in '06, but there's a lot of dates in

5  my head.

6  Q.  Let's discuss the air quality recommendation next.  If

7  you could turn to page 6 of the producer guidelines --

8  A.  Yes.

9  Q.  -- recommendation Number 7, and then compare that to the

10  2002 recommendation on air quality, which is found at page 11,

11  Item Number 9.

12        Could you explain to the jury, please, what the

13  difference was between the Scientific Advisory Committee's air

14  quality recommendation and the 2002 producer guideline with

15  respect to air quality?

16  A.  So the Producer Committee strove for ideally less than 25

17  and should not exceed 50 parts per million, and we had said it

18  should ideally be less than ten parts per million and should

19  not exceed 25 parts per million.

20  Q.  And that's with respect to ammonia?

21  A.  That was the major difference with respect to ammonia.

22        MR. BLECHMAN:  Excuse me, Counsel.  If we could just

23  have a better cite to the page that we're dealing with.  I'm

24  just not seeing a Number 9 on the page that we're looking at,

25  and I may very well be looking at the incorrect page.

1          MS. SUMNER:  We're looking at page 11 in Plaintiffs'

2     Exhibit 52.

3          MR. BLECHMAN:  2002?

4          MS. SUMNER:  Number 52 is the 2000 Scientific

5     Advisory Committee recommendations.

6          MR. BLECHMAN:  Got it.

7          MS. SUMNER:  Are you there?

8          MR. BLECHMAN:  I got confused because I thought you

9     said 2002 before.

10          Thank you, Your Honor.  Excuse me.

11     BY MS. SUMNER:

12     Q.   Do you have an understanding as to why the producers

13     varied from the Scientific Advisory Committee's 2000

14     recommendation on ammonia?

15     A.   Yeah, the ability to reduce ammonia was significantly

16     related to the type of housing and these A-frame houses where

17     the manure was left in the building, and so just like space,

18     we knew that it would take time.  So the committee -- we

19     discussed this and the committee was comfortable with this as

20     a transition.

21          We were also aware of some new facilities being

22     built in operation at that time with belts and others, some of

23     which were McDonald's, some were others, that consistently had

24     ammonia less than ten.  So there were clearly new facilities

25     in the future that would be no problem less than ten.  So it

1   was, again, a transitionary type of thing that just

2   practicality had to come into play.

3   Q.   Did the producer guideline change over time?

4   A.   Yes.

5   Q.   And at some point, did it fully align with the Scientific

6   Advisory Committee's original recommendation?

7   A.   Yes.

8   Q.   And do you recall when that was?

9   A.   '8 or '10, 2008 or 2010.

10  Q.   Let's talk next about beak trimming.  If you could turn,

11  Dr. Armstrong, please, to page 7 in the 2002 guidelines, and

12  compare that with page 6 of the 2000 Scientific Advisory

13  Committee recommendations.

14  A.   Okay.

15  Q.   Did the producers include a specific guideline requiring

16  the selection of a more docile bird strain?

17  A.   No.

18  Q.   Do you have an understanding as to why they did not?

19  A.   Absolutely.  That's very aspirational and takes many

20  generations of birds to impact that.  Once the breeders of the

21  birds decide to do it, and they're pushed to select birds for

22  a lot of different things.  Egg production, all sorts of

23  things.  So it was an aspirational goal, not a practical item

24  to be put in Animal Welfare Guidelines at the level of the

25  commercial operation.

1   Q.   Other than the Scientific Advisory Committee

2   recommendation regarding the more docile bird strain, did the

3   producers adopt in this 2002 version the Scientific Advisory

4   Committee's recommendations with respect to beak trimming?

5   A.   Yes.

6   Q.   And how did the Scientific Advisory Committee feel about

7   the Producers' Guidelines with respect to beak trimming in

8   2002?

9   A.   Very positive.

10  Q.   And did the scientific research regarding the selection

11  or the possibility of breeding a more docile strain that

12  didn't need beak trimming change after 2002?

13  A.   Not that I'm aware.

14  Q.   If you could focus next on the lighting Guideline.

15  That's found on page 6 of the 2002 Producer Guidelines, Item

16  Number 8, and compare that, please, Dr. Armstrong, to the

17  Scientific Advisory Committee's recommendation found on

18  page 11.

19  A.   Yes.

20  Q.   And could you explain to the jury if there is a

21  difference between these recommendation and guideline?

22  A.   They're identical except for our sentence that discusses

23  light intensity and flocks should average .5 to 1 foot-candle

24  for all birds at all feeding levels.

25  Q.   And did that difference concern the Scientific Advisory

1   Committee?

2   A.   Not that I recall at this time.

3   Q.   Do you recall why not?

4   A.   Because if you're going to inspect the birds and you're

5   going to be able to see the birds, that light will be there.

6   And so again, it's a performance standard, and you really

7   can't inspect the birds if you're not within that range.  And

8   that's what we were after, inspecting the birds, being able to

9   see a mortality or a sick bird.

10  Q.   Next I'd like you to turn to page 14 in the 2002 Producer

11  Guidelines.  And this page is entitled Compliance, and then

12  under Compliance, there are a couple of paragraphs and a

13  provision for an audit.  Do you see that?

14  A.   Yes.

15  Q.   Did the Scientific Advisory Committee's recommendations

16  in September of 2002 include a provision for an audit?

17  A.   No.

18  Q.   Why not?

19  A.   Well, that wasn't part of our purview.  Individual

20  members of the committee worked with auditing companies.  So

21  they used experts, but our committee, that was not our role.

22  Our role was not to get into timing, to tell them when to do

23  something and we were very supportive of the audit and we

24  would comment on an audit if some major issue became an animal

25  welfare concern.

1  Q.   Did the Scientific Advisory Committee have a view on

2  whether there should be an audit?

3  A.   Oh, we were all very much in favor, and once we got

4  started and with a lot of discussion in the entire food chain,

5  it was very clear that the system needed audits and really

6  demanded audits.

7  Q.   When you say, It was very clear that the system needed

8  and demanded audits, what do you mean?

9  A.   Well, for example, I mentioned that Bob Langert from

10  McDonald's was at the October 1999 meeting.

11       MR. BLECHMAN:  Excuse me, Your Honor.  Excuse me,

12  Your Honor, this sounds like we're about to hear hearsay.

13       THE COURT:  Are you making an anticipatory

14  objection?

15       MR. BLECHMAN:  I'm objecting on the basis of hearsay

16  based on what the -- the witness's testimony.

17       THE COURT:  Are you asking him?

18       MS. SUMNER:  I'm asking him for his understanding

19  and if that understanding is based on something someone told

20  him, I think he's allowed to explain that to the jury.  It's

21  not really being offered for the truth of what was told to

22  him, but rather to show his state of mind and understanding at

23  the time.

24       THE COURT:  Okay, with that explanation, which, of

25  course, is very standard, I'm going to overrule the objection

1    which was on the way to being made.

2          THE WITNESS:  And so I interacted with McDonald's.

3    I served on their Advisory Board Committee.  Members of our

4    committee served on multiple groups, so it was very clear that

5    Walmart and others who I met with in the past wanted auditing.

6    BY MS. SUMNER:

7    Q.   From time to time, did the Scientific Advisory Committee

8    discuss the audit with UEP?

9    A.   Yes, we did.

10   Q.   And did the Scientific Advisory Committee have an

11   understanding at some point that violations of certain

12   guidelines would result in an automatic fail?

13   A.   Yes, we did.

14   Q.   And did the Scientific Advisory Committee have an

15   understanding that among those automatic fail provisions were

16   100 percent compliance with cage space, backfilling, and

17   feed-withdrawal molting?

18   A.   Yes.

19   Q.   What was the Scientific Advisory Committee's view on

20   those automatic fail provisions?

21   A.   Well, it was also, once it was phased in the space

22   allowance, we felt they were really clearly detrimental to

23   animal welfare if the answer was not yes.  Or in the case of

24   feed-withdrawal molting, if you're doing feed withdrawal,

25   removing feed, that is a significant animal welfare situation.

1    So all four of those have significant individual animal

2    welfare consequences.

3    Q.   Did the Scientific Advisory Committee also have an

4    understanding that producers could lose points for not

5    complying with certain provisions of the guideline and still

6    pass the audit?

7    A.   Yes, we did.

8    Q.   And what was the Scientific Advisory Committee's view on

9    that?

10   A.   Well, they understood that, again, we were in a

11   transition in the case of ammonia, in the case of house

12   averaging, those types of things, but once we got to a final

13   end point it was much more clear.  And you also look at bird

14   feed consumption, you look at bird -- how much they're

15   producing.  If ammonia is very high it will impact the bird.

16   So they were comfortable with it.  And as I mentioned, several

17   of the members, independent of their work with UEP, were

18   involved with the different audit groups because audit groups

19   always -- they talked with the animal welfare community and it

20   was a small community.

21   Q.   Now, on this same page, below the audit, in the 2002

22   Producer Guidelines, there's a provision for certification.

23   Do you see that?

24   A.   Yes.

25   Q.   Did the Scientific Advisory Committee recommendations

1   include a provision for a certified program?

2   A.   No.

3   Q.   Why not?

4   A.   That wasn't a part of our purview.  We focused on

5   science-based guidelines.

6   Q.   And did the Scientific Advisory Committee understand that

7   the producers included provisions for a certification program

8   in their guidelines?

9   A.   Yes, the Scientific Committee, for the most part,

10   understood that a certification program was a natural outcome

11   of an audit, or could be.

12   Q.   Now, Dr. Armstrong, I'd like you to turn to Tab 6 in your

13   binder, please.

14   A.   Yes.

15   Q.   And do you recognize this document?

16   A.   Yes.

17   Q.   What is this?

18   A.   It's the 2005 version of the Animal Husbandry Guidelines

19   for UEP and it includes the UEP Certified Program.

20   Q.   And were you still chair of the Scientific Advisory

21   Committee in 2005?

22   A.   Yes.

23   Q.   And is this a document that you were familiar with at

24   that time?

25   A.   Yes.

1          MS. SUMNER:  Your Honor, I'd like to move for the

2    admission of Defendants' Exhibit 180 into evidence.

3          MR. BLECHMAN:  Plaintiffs have no objection.

4          THE COURT:  180 is admitted.

5          (Exhibit received in evidence.)

6          MS. SUMNER:  May I publish to the jury, please?

7          THE COURT:  Yes.

8    BY MS. SUMNER:

9    Q.   Dr. Armstrong, did the 2005 edition of the UEP Producer

10   Guidelines address backfilling?

11   A.   Yes.

12   Q.   And how did these guidelines address backfilling?

13   A.   We -- we had recommended that backfilling not be allowed,

14   so their guidelines reflected that.

15   Q.   So was the guideline on backfilling that's included in

16   this 2005 edition of the UEP Guidelines consistent with the

17   Scientific Advisory Committee's recommendation on backfilling

18   as of 2005?

19   A.   Yes.

20   Q.   I'd like you to turn to page 11 of these 2005 Guidelines

21   as well.  And molting is addressed on this page, correct?

22   A.   Yes.

23   Q.   Did the 2005 Guidelines address molting effective

24   January 1, 2006?

25   A.   Yes.

1    Q.    And how so?

2    A.    Well, effective January 1, 2006, only nonfeed-withdrawal

3    molt methods would be permitted, and that was after the

4    research had been conducted and we knew that it was practical.

5    Q.    So as of January 1, 2006, the guidelines banned

6    feed-withdrawal molting?

7    A.    Yes.

8    Q.    And was that consistent with the Scientific Advisory

9    Committee's recommendation on molting at that time?

10   A.    Yes.

11   Q.    You can put that to the side, Dr. Armstrong.

12         How did you feel about the UEP Producer Guidelines?

13   A.    I think the committee and I, and we discussed this, felt

14   good about the entire process and we felt that -- and I made

15   many public statements that UEP was really ahead of the rest

16   of animal agriculture in being proactive in accepting science

17   and making changes.  So the committee overall felt very good,

18   and I think they still do to this day.

19   Q.    Did you believe that they improved animal welfare?

20   A.    Oh, no question.  I mean, mortality dropped

21   significantly, per hen production increased, manure was no

22   longer dropping on birds, ammonia levels -- you could walk

23   into a barn and not tear up.  It definitely impacted animal

24   welfare for individual hens.

25   Q.    Did you believe that they set a baseline or minimum for

1   the humane treatment of egg-laying hens?

2   A.   Yes, I did, and we particularly pointed that out after,

3   you know, the transition was coming to a close, and it became

4   apparent that some did not believe that that was a minimum and

5   they didn't need to be at that minimum and that really caused

6   the committee to react to that as well.

7   Q.   And who were those who had that view?

8   A.   Well, a large part of it was the breaker industry, the

9   fluid eggs don't have as direct a customer, and it was also

10  consistent with the same producers that were pushing back at

11  the very beginning.  And that even to this day, I've had

12  producers say if the customer does not demand the UEP

13  guidelines then we should still be able to produce at 48

14  square inches.  And our view today is that not following the

15  minimum guidelines with cages is not humane for the hen.

16  Q.   Did you raise that issue with McDonald's at any point in

17  time?

18  A.   I did.  As I served on McDonald's panel, I had individual

19  conversations with Bob Langert and I was very blunt.  I said,

20  Could you imagine a 60 Minutes story where they're looking at

21  your production facility in Michigan, it's very -- very

22  amazing, less than ten parts per million ammonia, and then you

23  flash forward to the liquid side and you see birds that are at

24  48 or less square inches, manure dropping on them or just the

25  birds not in the same animal welfare condition, how would that

1    be viewed?  And that was part of it, public perception.

2    Q.    And did McDonald's do anything after you had that

3    discussion with Bob Langert?

4    A.    Well, McDonald's, their guidelines evolved all along.

5    When they first announced their guidelines, it was right after

6    we had used 72, they said 72, they also immediately, oh, set a

7    date for no longer using a feed-withdrawal molt.  And over

8    time the number of providers to McDonald's decreased from over

9    two dozen to down to about three, because they had to be able

10   to adapt those guidelines and be able to produce eggs

11   according to those guidelines.

12   Q.    Do you have an understanding as to whether McDonald's

13   requires its eggs that are used for breaking or egg products

14   to be produced in accordance with Animal Welfare Guidelines?

15   A.    Oh, yes, they do, and McDonald's has also announced that

16   all their eggs in the future will be cage-free, which means a

17   aviary where you may have a thousand birds in a very, very

18   large cage.  And they actually participated in a study with

19   Cargill looking at different types of housing and the

20   difference -- the differences.

21   Q.    Now, in this 2002 and forward time period, did you

22   continue interacting with retailers and others who purchased

23   eggs?

24   A.    Yes, I did.

25   Q.    What was your impression of their response to the

1   guidelines?

2   A.   Well, my impression is that people were very positive

3   about the program, and would love to see others follow suit.

4   In fact, there's efforts going on right now in the pork

5   industry to have a universal audit instead of multiple audits

6   so they only have one.  So people like uniformity, something

7   they can measure to make sure that things are done properly.

8   Q.   Did some farmers decide not to implement the guidelines

9   on their egg production?

10  A.   Yes.  Yes.  First of all, being a member of UEP is not

11  required, and no, a producer does not have to use the UEP

12  Program.  If they do and they want to participate, then they

13  follow the guidelines.

14  Q.   But was the program voluntary?

15  A.   Not for UEP members, I don't think.  But we viewed it as

16  a -- we viewed it as setting up the science-based guidelines.

17  We didn't really worry about, again, the timeline and

18  everything beyond that.

19  Q.   Did UEP members have to implement the guidelines on their

20  production?

21  A.   Yes.

22  Q.   Are you sure about that, Dr. Armstrong?

23  A.   No.

24  Q.   Okay.

25  A.   But, I mean, I'm not - I'm not on a day-to-day basis, but

1    UEP, if they don't want to do it, they don't have to be a UEP

2    member.  So UEP is not a mandatory membership organization.  I

3    do know that.

4    Q.    Did the 2002 guidelines or any other edition of the

5    UEP Guidelines restrict in any way egg farmers' ability to

6    expand their operations?

7    A.    Not that I'm aware of, but I'm not an expert in that

8    field.

9    Q.    Once the Certified Program was rolled out, what became of

10   the Scientific Advisory Committee?

11   A.    Oh, we continued to work.  We then set about developing

12   guidelines for noncage, and so we wanted to do that because it

13   was 98 percent cage; a few years later, it's 95 percent.  It's

14   probably about 90 percent.  In 2008 California passed a

15   referendum that said basically plain cages wouldn't work, and

16   in 2018, they've now said clearly noncage.  So a lot of

17   different states changed in that regard.

18          That's another driver that was happening in multiple

19   states, the activists were working state by state to try to

20   get voters to vote against cages, gestation crates, various

21   animal welfare.  That was very active.

22   Q.    Did the Scientific Advisory Committee continue to meet?

23   A.    Yes, we continued to meet.  When I left the committee in

24   2011, Scotti Hester became chair.  She retired and I believe

25   Joy Mench is now chair of the committee.

1  Q.   And did the committee continue to do further animal

2  research to further animal welfare?

3  A.   Yes.

4  Q.   Were the guidelines and the UEP Certified Program

5  designed to evolve and improve over time?

6  A.   Oh, absolutely.  The feeder space, the methods to induce

7  a molt with nonfeed withdrawal, and then the future, being

8  able to change the sex of the baby chicks when they're born,

9  because right now half the chicks are born male, half are born

10  female, and the male chicks are disposed.  So if a scientist

11  could develop a way to have all female chicks, that would be a

12  very positive animal welfare perspective from a broad area.

13  So there's a lot of research going on.

14  Q.   Are you familiar with something called the 100% rule?

15  A.   Yes.

16  Q.   And was the 100% rule included in the Scientific Advisory

17  Committee's 2000 recommendations?

18  A.   No.

19  Q.   Why not?

20  A.   We anticipated that if UEP supported the guidelines as

21  the board did very early on in 2000 in principal, they voted

22  to accept the guidelines, that those guidelines were for all

23  laying hens with regard to UEP.  We never anticipated that it

24  wouldn't be.

25  Q.   Did you and the members of the Scientific Advisory

1    Committee believe that the 100% rule was necessary?

2    A.    Absolutely.

3    Q.    Why?

4    A.    Because we did not believe it was humane for hens to be

5    housed in those same conditions that we observed on our tour

6    late in the last century, and we felt if we were going to be

7    involved with science-based guidelines and evolving

8    science-based guidelines, that it needed to be for all -- all

9    hens.  And I am very confident our committee would have walked

10   and would have disbanded.  They felt very strongly about that.

11   They felt very strongly about all the areas, and that's why

12   we're very proud that there was consistent agreement with UEP

13   and the science over the long haul.

14   Q.    In January 2006, was that the Scientific Advisory

15   Committee's view on the 100% rule?

16   A.    Yes, that's about the time.

17   Q.    And did the Scientific Advisory Committee believe that

18   science-based guidelines developed by the Scientific Advisory

19   Committee and accepted by UEP should be viewed as minimum

20   standards?

21   A.    Yes.

22   Q.    Did you believe that it was essential that egg production

23   and cages follow science-based guidelines?

24   A.    Yes.  I believe that for several reasons.  One is that I

25   felt that the cage or an enriched cage which has a perch and a

1    nest box, I felt that was the most welfare-friendly, most

2    holistic way to produce eggs, and if we did not implement the

3    minimum in cages, that that would be lost.  And it's probably

4    lost now.

5            In California it's now noncage.  And in a noncage

6    operation, two times as many birds die that is in an enriched

7    cage or a cage system.  And what's happened is the view of

8    being able to exhibit natural behaviors is a bigger issue than

9    whether the bird dies or not, and that's where public

10   perception -- McDonald's made that decision, for example, and

11   they had research data showing all the aspects that we just

12   talked about, and Europe has a big influence on that as well.

13   The EU banned cages several years ago.

14   Q.   Did the Scientific Advisory Committee in 2006 believe it

15   was critical that all hens be managed using science-based

16   guidelines?

17   A.   Yes.

18   Q.   And did the Scientific Advisory Committee at that time

19   believe that the failure to adhere to the minimum guidelines

20   would be inconsistent with the humane treatment of hens?

21   A.   Yes.

22   Q.   And did you believe that treating all hens consistent

23   with the minimum space guidelines was the right thing to do?

24   A.   Absolutely.

25   Q.   And did the Scientific Advisory Committee have a strong

1    opinion that if industry failed to adhere to those minimum

2    guidelines, the Government would impose stricter mandatory

3    guidelines or ban cages altogether?

4    A.    Yes.

5    Q.    And did the Scientific Advisory Committee view it as

6    inappropriate to produce eggs in a manner inconsistent with

7    the minimum guidelines?

8    A.    Yes.

9    Q.    Did the Scientific Advisory Committee believe at that

10   time that UEP had adopted the Scientific Advisory

11   Committee's core recommendations?

12   A.    Yes.

13   Q.    And did you give notice to UEP in January 2006 of those

14   views?

15   A.    I did.

16   Q.    How did you give notice to UEP?

17   A.    I sent several communications to UEP and anything that I

18   would send was always reviewed by the committee and whether I

19   signed it or everyone signed it, it was the voice of the

20   committee.  And so we laid out in no uncertain terms our view

21   on the 100% rule.  We also addressed, as we discussed earlier,

22   backfilling.  And we were very clear about it.

23   Q.    Dr. Armstrong, I'd like you to take a look at the

24   document that is behind Tab 7 in your binder.  And

25   specifically the document that's at pages 3, 4, and -- I guess

1  3 through 7 of that document.  It's a document that's been

2  marked as Defendants' Exhibit 382.

3  A.    Yes.

4  Q.    And my question is:  Is this the communication in which

5  you gave notice in January 2006 to UEP of the Scientific

6  Advisory Committee's views that we just discussed?

7  A.    Yes.

8          MS. SUMNER:  Your Honor, I'd like to offer

9  Defendants' Exhibit 382 into evidence.

10         MR. BLECHMAN:  Your Honor, Plaintiffs object.

11         THE COURT:  Well, are you focusing, Ms. Sumner, on

12  only that part of the exhibit that starts at page 3 --

13         MS. SUMNER:  Um.

14         THE COURT:  -- of the composite?

15         MS. SUMNER:  I think that and the bottom e-mail,

16  which is the second e-mail in the chain which actually shows

17  the transmission of the document.  So it starts on the very

18  bottom of page 1.  It's dated Friday, January 20, 2006, at

19  9:00 a.m.

20         THE COURT:  It's the first, fourth and fifth of

21  page 1 --

22         MS. SUMNER:  Yes.

23         THE COURT:  -- that you're not offering.

24         MS. SUMNER:  We would be amenable to having this

25  moved into evidence in the redacted form.  There was a request

1    for that.

2              THE COURT:  How about a ruling?

3              MS. SUMNER:  Or a ruling.  That works.

4              THE COURT:  Mr. Blechman, is your objection really

5    only to the -- the top four-fifths or five-sixths of the first

6    page?

7              MR. BLECHMAN:  It is, Your Honor.

8              THE COURT:  Okay, so there is no objection to 382

9    starting at the bottom inch and a half of the first page

10   through the end of the exhibit, which is at MFI0361839.  I'm

11   really sorry about that numbers business, but it just works

12   for this community.  All right?

13             MS. SUMNER:  Yes.

14             THE COURT:  So if it's going to be published, if

15   you're going to ask for any kind of a publication, we have to

16   be careful that not the first page of this is taken care of,

17   right?

18             MS. SUMNER:  May we publish it in redacted form as

19   Your Honor just described?

20             THE COURT:  If that's possible.

21             MS. SUMNER:  It is possible.  We came prepared.

22             THE COURT:  Okay.  Well, then, why offer the whole

23   thing?

24             MS. SUMNER:  Just testing the waters.

25             THE COURT:  Roll them.

1   BY MS. SUMNER:

2   Q.   Dr. Armstrong, if we could look at page 3 of this

3   document, please.

4   A.   Mine's not numbered.  So is that like 1835 down in the

5   bottom right corner?

6   Q.   Yes, it is 1835, exactly.  And I'd like you to

7   specifically focus on the first paragraph, which notes:  This

8   communication is provided on behalf of the Scientific Advisory

9   Committee.  Is that correct?

10  A.   Um-hum.  Yes.  That's correct.

11  Q.   And then I'd like you to turn to the next page which is

12  the one that ends in 836.  It's page 4 of the exhibit.

13  A.   Um-hum.

14  Q.   And focus on the first full paragraph there.

15          Is this the paragraph in which you gave notice to

16  UEP of the Scientific Advisory Committee's view that failure

17  to adhere to the Scientific Advisory Committee's minimum

18  guidelines is not consistent with the humane treatment of

19  laying hens?

20  A.   Yes.

21  Q.   And then I'd like to focus your attention on the first

22  bullet at the bottom of the page there, the same page.

23  A.   Yes.

24  Q.   And is this where you communicated to UEP the Scientific

25  Advisory Committee's belief that the UEP board has accepted

1   the Scientific Advisory Committee's core recommendations in
2   2000 and that while the recommendations have been refined over
3   time, those core recommendations and their acceptance by UEP
4   have not changed?
5   A.   Yes.  And that's what I related several times today.  The
6   core recommendations were accepted early on.
7   Q.   So we just covered -- you can put that document to the
8   side -- how you informed UEP in January 2006 that the
9   Scientific Advisory Committee believed that the Animal Welfare
10  Guidelines should apply to all hens.
11          Did you believe that UEP was committed to the
12  Scientific Advisory Committee's science-based recommendations?
13  A.   Yes.  We believed that for the most part, but we felt
14  there were animal activists as well as some members that were
15  pushing back.
16  Q.   And did there come a time when you learned that others in
17  the egg industry were attempting to develop a program that was
18  based upon the Scientific Advisory Committee's recommendations
19  but among other differences would not apply to 100 percent of
20  a farmer's hens?
21  A.   Yes.
22  Q.   And was this an alternative program using the USDA
23  Process Verified seal?
24  A.   Yes.
25  Q.   Will you understand what I mean if I refer to that

1    program as the PVP program?

2    A.   Yes.

3    Q.   Did you have an understanding at the time who was

4    spearheading the approach for that competing program?

5    A.   Yes.

6    Q.   And who -- what was your understanding?

7    A.   Garth Sparboe.

8    Q.   Did you and the Scientific Advisory Committee oppose this

9    approach?

10   A.   Yes.

11   Q.   Why?

12   A.   Because for the same reason, the 100% rule, the same

13   reason for backfilling that we felt Animal Welfare Guidelines

14   were a science-based conservative minimum and not a marketing

15   tool.  Of course you would use it to let people know that your

16   birds were treated well, but we felt that that minimum level

17   was a very conservative minimum level.

18   Q.   Did you believe that such a program would threaten the

19   credibility of the science-based guidelines that you helped

20   develop for UEP?

21   A.   We believed that it threatened the credibility of the

22   science-based guidelines and also threatened the history of --

23   over the long haul.

24   Q.   Was it the Scientific Advisory Committee's belief that

25   any program approved by either UEP or the USDA should require

1  100 percent implementation and apply to all hens?

2  A.   Yes, the committee was unanimous in that.

3  Q.   And did you give notice of your thoughts to UEP?

4  A.   Multiple times.

5  Q.   Okay.  And how did you do that?

6  A.   Well, first verbally and then various letters.  I can't

7  remember -- recall the number, but we stated our opinion on a

8  number of occasions.

9  Q.   Dr. Armstrong, I'd like you to turn to Tab 8 in your

10 binder.  This is Defendants' Exhibit 690.

11       Is this a letter in which you gave notice to UEP of

12 the beliefs we just discussed?

13 A.   Yes.

14       MS. SUMNER:  And, Your Honor, I'd like to offer

15 Defendants' 690 into evidence at this time.

16       MR. BLECHMAN:  Your Honor, we have no objection.

17       THE COURT:  690's admitted.

18       (Exhibit received in evidence.)

19       MS. SUMNER:  May I publish it to the jury?

20       THE COURT:  Yes.

21 BY MS. SUMNER:

22 Q.   Dr. Armstrong, are the views expressed in this letter

23 those of the Scientific Advisory Committee as well as your

24 own?

25 A.   Yes.

1    Q.   I'd like to direct your attention to the second full

2    paragraph on page 2, which starts with the words:  It has come

3    to our attention.

4    A.   Yes.

5    Q.   Is this where you expressed the Scientific Advisory

6    Committee's opposition to a PVP program that resulted in fewer

7    than 100 percent of hens being subject to science-based

8    guidelines?

9    A.   Yes, in this case, we were objecting to the PVP program,

10   but we were opposed to that in any situation with UEP.

11   Q.   And can you read to the jury what you wrote to UEP in

12   that paragraph, please.

13   A.   It has come to our attention that individuals within the

14   industry are attempting to develop a program that would use

15   the USDA Process Verified seal but result in less than 100

16   percent of the hens subject to science-based guidelines.  In

17   other words, a given producer or company would not be required

18   to maintain all hens under science-based guidelines.  We are

19   adamantly opposed to this approach.  We view the UEP

20   Guidelines as grounded in sound science that represents the

21   threshold for maintaining caged layers humanely.  Housing hens

22   at less than UEP minimum standards is neither scientifically

23   justified nor humane.  Consequently, we believe any producer

24   or company marketing eggs bearing either the UEP Certified or

25   USDA Process Verified seal is making a statement about the

1   company and the care provided to 100 percent of the hens, not

2   just a few.

3   Q.   Thank you, Dr. Armstrong.  I'd like you to focus on the

4   next paragraph that begins with:  It is our collective and

5   firm belief.

6          Do you see that?

7   A.   Yes.

8   Q.   Is this where you explained further to UEP why the

9   Scientific Advisory Committee opposed this approach of a

10  program that would not apply to 100 percent of egg-laying

11  hens?

12  A.   Yes, we stated that, number one, it threatens the welfare

13  of laying hens, and, also, it threatens overall credibility of

14  our science-based guidelines.

15         The other thing that I want everybody to be aware of

16  is, most -- most of us worked at land-grant universities that

17  had a strong connection with USDA.  So that is another --

18  United States Department of Agriculture.  So we were also

19  concerned about the credibility of the USDA.  Which we are

20  also connected with from a university perspective.

21  Q.   Now, at any time, did anyone ever ask you or the

22  Scientific Advisory Committee to reject the PVP because of its

23  potential impact on flock size or egg supply?

24  A.   No, and that was never discussed by the committee.

25  Q.   Now, after 2006, did the issue of whether the Animal

1   Welfare Guidelines should apply to all hens continue to be an

2   ongoing issue for the egg industry?

3   A.   I don't remember for how long, but we kept -- I don't

4   remember for how long, but it didn't go away quickly.

5   Q.   By 2008, had the Scientific Advisory Committee's views on

6   the 100% rule changed?

7   A.   No.

8   Q.   Now, just to clarify a point about this PVP program and

9   other alternatives, were you or the Scientific Advisory

10  Committee opposed to other independent groups coming out with

11  guidelines for egg-laying hens?

12  A.   No.  In fact, when we developed the noncage guidelines,

13  we were very much consistent and looked at the American

14  Humane, and there were other programs, and, again, it's a

15  small community of scientists, some of the same scientists

16  were on those different groups.  So there was consistency.

17  Q.   Did the Scientific Advisory Committee believe that any

18  science-based guidelines should be transparent?

19  A.   Absolutely.

20  Q.   How did the Scientific Advisory Committee feel about a

21  program that claimed to be scientifically based but would not

22  disclose its guidelines?

23  A.   Well, we -- we said in the letter, while both seals

24  represent marketing programs, you know, it's one thing to

25  market process verified, but yet, here's other birds that are

1    not being treated humanely, that is -- we felt that would be

2    disingenuous.

3    Q.   Would a program that claimed to be scientifically based

4    but did not disclose its guidelines, wouldn't make them

5    available for review, be acceptable to the Scientific Advisory

6    Committee?

7    A.   Our committee members would never be part of something

8    like that.

9    Q.   Why not?

10   A.   Because openness and transparency is important as part of

11   science, peer review, and we were trying to influence the rest

12   of animal agriculture.  We -- we cared dearly about animal

13   welfare and we felt strongly and supported the animal

14   industry, but we knew there were changes that needed to be

15   made in the laying hen industry and other animal industries

16   and they needed to be science-driven.

17   Q.   In or about August 2008, did you, again, give notice to

18   UEP of your beliefs that the guidelines should apply to 100

19   percent of hens and that any guidelines should be both

20   scientifically based and transparent?

21   A.   That sounds about right.

22   Q.   And how did you give that notice?

23   A.   Probably in a letter.  And again, we sent several letters

24   regarding multiple topics.

25   Q.   I'd like you, Dr. Armstrong, to turn to the document

1    that's behind Tab 9 in your binder.  This is Defendants'

2    Exhibit 709.  And is this the letter in which you gave notice

3    to UEP of the beliefs we just discussed?

4    A.   Yes, August 2, 2008.

5            MS. SUMNER:  Your Honor, I'd like to offer

6    Defendants' Exhibit 709 into evidence.

7            MR. BLECHMAN:  No objection, Your Honor.

8            THE COURT:  709 is admitted.

9            (Exhibit received in evidence.)

10           MS. SUMNER:  May I publish it to the jury?

11           THE COURT:  Yes.

12   BY MS. SUMNER:

13   Q.   Dr. Armstrong, I'd like to direct your attention to the

14   last paragraph on the first page, the second underlined

15   passage in that paragraph.

16   A.   Yes.

17   Q.   And first let me ask you, did you write this letter?

18   A.   Well, like everything else, I was the primary author of

19   this but the committee members participated and this letter

20   had their full support and likely edits.  I don't recall how

21   much, but we firmly supported this letter.

22   Q.   And if you look at page 3 of the letter, am I correct

23   that this bears your signature?

24   A.   Yes.

25   Q.   As well as the other names of the Scientific Advisory

1  Committee members at that time?

2  A.  Yes.

3  Q.  Going back to the first page, to that second underlined

4  passage, did you underline those sentences before providing

5  this letter to UEP?

6  A.  Oh, I remember this.  We underlined that as a committee,

7  and then we underlined it and sent it to them to -- underline

8  was to add emphasis.

9  Q.  So you emphasized before sending this to UEP that in your

10  view:  It was imperative that all hens in noncage or cage

11  systems should receive housing and care that meets or exceeds

12  the minimum science-based guidelines provided by our

13  committee?

14         MR. BLECHMAN:  Objection, Your Honor.  Leading.

15         THE COURT:  It is leading.

16  BY MS. SUMNER:

17  Q.  Dr. Armstrong, before you sent this to UEP, did you, in

18  fact, underline and emphasize the sentence that reads:  We

19  believe it is imperative that all hens in noncage or cage

20  systems should receive housing and care that meets or exceeds

21  the minimum science-based guidelines provided by our

22  committee?

23  A.  Yes.  And the committee had been discussing this for at

24  least over a year and a half.

25  Q.  Did you ever hear anyone suggest that the 100% rule was

1    the means to produce the nation's flock size or egg supply?

2    A.   No.

3    Q.   I'd like you to turn to page 10 -- sorry, Tab 10 in your

4    binder.  This is Defendants' Exhibit 182, which has already

5    been admitted into evidence.

6              MS. SUMNER:  May I publish this to the jury?

7              THE COURT:  Yes.

8    BY MS. SUMNER:

9    Q.   Do you recognize this document, Dr. Armstrong?

10   A.   Yes.

11   Q.   And can you tell the jury what this is, please?

12   A.   This is the 2007-2008 version of the Producer Animal

13   Husbandry Guidelines for U.S. laying flocks.

14   Q.   And were you still the chair of the Scientific Advisory

15   Committee at this time?

16   A.   Yes.

17   Q.   And were you familiar with this document in the course of

18   your work as chair of the Scientific Advisory Committee?

19   A.   Yes.

20   Q.   If you could turn, please, Dr. Armstrong, to page 13 of

21   this document.  And I'd like you to focus specifically on the

22   seventh guideline there, which is under the Housing and Space

23   Guidelines.  Do you see that?

24   A.   Yes.

25   Q.   And my question is:  By 2007, had the producers changed

1    the guideline on ammonia concentration to reflect the

2    Scientific Advisory Committee's original recommendation that

3    ammonia levels be less than ten parts per million ideally and

4    not exceed 25 parts per million?

5    A.   Yes.

6    Q.   Dr. Armstrong, what relationship, if any, do you have

7    with UEP today?

8    A.   None.

9    Q.   What relationship, if any, do you have with egg producers

10   today?

11   A.   Nothing professional.

12   Q.   Did we speak and meet prior to your testimony today?

13   A.   Yes.

14   Q.   How many times?

15   A.   A couple of times.

16   Q.   Can you estimate how much time in total we spent?

17   A.   Probably ten hours.

18   Q.   Did I or anyone else provide you a script for your

19   testimony here today?

20   A.   No.

21   Q.   And have I or any of the lawyers that you see here

22   representing any of the Defendants or any of the Defendants

23   themselves offered you anything for your testimony here today?

24   A.   No.

25   Q.   Who paid for your expenses associated with your testimony

1   today?

2   A.   No one has yet.  I hope it's -- I hope --

3   Q.   Do you anticipated that someone will pay for your

4   expenses?

5   A.   My expenses will be paid by the law firm, UEP, whomever.

6   Q.   Are you here today voluntarily, Dr. Armstrong?

7   A.   Yes.

8   Q.   And finally, can you please tell the jury why you're here

9   today voluntarily?

10   A.   Well, this committee started in 1999, and we're still

11   colleagues and friends, and we all felt deeply about a lot of

12   things happening in animal agriculture and the opportunity to

13   work with the egg industry was very exciting from a

14   professional perspective because it was clear that they were

15   willing to make changes.  And they had demonstrated their

16   faith in research based on the cholesterol issue, and we had a

17   good group of people that -- wish it were possible for you to

18   hear from every one of them -- but we firmly believe in what

19   we were doing and very much focused on the science and what we

20   do to try to make life better.  So I'm here today because of

21   the credibility of that group of scientists, I'm here today

22   because of the credibility of the Scientific Advisory

23   Committee; just independently, the science side is independent

24   of UEP but it's certainly culled by UEP and we care deeply

25   about that.  And if at any time something other than

1   science-based guidelines had come up, I can tell you it

2   wouldn't matter what I would have said, that group would have

3   disbanded without question.

4           MS. SUMNER:  May I take a moment to confer with my

5   colleagues?

6           THE COURT:  Yes.

7           MS. SUMNER:  Okay, thank you very much,

8   Dr. Armstrong, for your testimony.  I will pass the witness.

9           THE COURT:  Okay.  To whom?

10          MS. SUMNER:  I think Mr. Blechman.

11          THE COURT:  Okay.  Well --

12          MS. SUMNER:  Right?

13          THE COURT:  Do you want -- would you prefer, folks,

14  anybody is going to be questioning?

15          MR. KING:  No, Your Honor.

16          MR. HARRIS:  No, Your Honor.

17          THE COURT:  Whatever you'd want to call it.

18          MR. BLECHMAN:  Your Honor, would it be possible to

19  take a brief recess and then I'm ready to go?

20          THE COURT:  Yes.  Yes.

21          MR. BLECHMAN:  Thank you.

22          THE COURT:  Under ten minutes, folks, and we're

23  going to break for the day in about an hour.  So same rules

24  apply.  Come on back promptly.

25          THE DEPUTY CLERK:  All rise.

```
 1              (Jury out.)

 2              THE COURT:  Okay.

 3              (After recess:)

 4              THE COURT:  Everybody comfortable now?  Michael, do

 5    you want to get our friends?

 6              (Witness resumes the stand.)

 7              THE DEPUTY CLERK:  All rise.

 8              (Jury in.)

 9              THE COURT:  Okay.  Thank you, everybody, for coming

10    right on back.

11              Mr. Blechman, you may proceed.

12              MR. BLECHMAN:  Thank you, Your Honor.

13                            CROSS-EXAMINATION

14    BY MR. BLECHMAN:

15    Q.   Dr. Armstrong, you and I have never met, have we?

16    A.   No, I don't recall.  I don't think so.

17    Q.   I can assure you we have not.

18    A.   Okay.

19    Q.   My name is Bill Blechman, and I represent a number of the

20    Plaintiffs who are in this case and I have -- I have some

21    questions for you.  And I want to begin with what I thought I

22    heard you to make as pretty clear declarative, definitive

23    statements, that no one from UEP in your presence discussed

24    cage space allowance and reducing the hen flock supply,

25    correct?
```

1    A.   In the context of the Animal Welfare Committee, the

2    Scientific Animal Welfare Committee, I attended a lot of UEP

3    meetings and I paid attention when I had to.  So I -- there

4    may have been a lot of things said in my presence.

5    Q.   Right.  But I was listening very carefully, and I thought

6    I heard you to say, for example, sir, that at Producer

7    Committee meetings, no one in your presence spoke about cage

8    space allowance and reducing the flock supply.  That's your

9    testimony, correct, in substance?

10   A.   In substance.

11   Q.   In fact -- in fact, your testimony in substance is that

12   had anybody at, say, a Producer Committee meeting talked in

13   your presence about reducing -- about using cage space

14   allowance to reduce the flock size, you'd get up and you'd

15   walk out, right?

16   A.   No, sir, that's not what I said.

17   Q.   But is that your view?  Is that what you would have done?

18   Had anybody talked about that subject in your presence at,

19   say, a Producer Committee meeting, you would have gotten up

20   and walked out, yes or no?

21   A.   No, I did not say that.  I said that our Scientific

22   Advisory Committee would have walked if there were factors

23   such as that influencing us.  I could not tell you what all

24   was stated in front of Producer Committees.  And I -- I only

25   know what affected the guidelines and what affected the

1    committee members, and so your characterization of that is not

2    what I meant to portray.

3    Q.   I hear you.  But you and I are talking different pronouns

4    now, because my question wasn't about generally what does the

5    Scientific Committee do when, in fact, the whole committee

6    doesn't attend Producer Committee meetings, does it?

7    A.   No.

8    Q.   In fact, you're the liaison between the Scientific

9    Advisory Committee of the UEP and the UEP's Producer

10   Committee.  You are the liaison, right?

11   A.   That's correct.

12   Q.   So you attend these meetings on behalf of the Scientific

13   Advisory Committee, correct?

14   A.   That's correct.

15   Q.   Not other members of the committee.  Let's put aside

16   Mr. Bell and Mr. Gregory, but you as the academic on the

17   committee, you're the guy who's there, right?

18   A.   That's correct.

19   Q.   Okay.  So when I'm asking you questions a moment or two

20   ago about whether you would get up and walk out if anybody in

21   the Producer Committee meeting were to discuss in your

22   presence cage space allowance and reducing the supply of the

23   flock size or eggs, I was talking about you individually, sir.

24   Do you understand that is my question?

25   A.   I understand that.

1    Q.    And with that understanding in mind, do we have an

2    understanding from your testimony that were the subject matter

3    of cage space allowance and reducing the flock size, where

4    cage space allowance and reducing the egg supply, were that

5    subject to come up, you would get up and you would walk out of

6    the room, true or false?

7    A.    That's false.

8    Q.    Okay.

9    A.    Because --

10   Q.    Go ahead.

11   A.    If I had felt there was anything of that nature, I would

12   have reported -- of significance, I would have reported back

13   to the Scientific Committee and I can tell you without

14   equivocation, our discussions, I can't -- I can't -- my

15   Scientific Committee and I cannot be held accountable for what

16   producers are saying, but I can tell you what we did and we

17   stuck to the science-based guidelines.

18   Q.    Got it.

19   A.    And if I had had an accumulation or anything of that

20   nature, I would report back to the committee anything that

21   bothered us, and I don't recall at any time that being at a

22   level where I would go back to the committee and say, hey,

23   they're doing something other than what we had planned.

24   Q.    Okay.

25   A.    That's what I can tell you.

1   Q.   Okay.  And I'm going to try to stay specific with the

2   pronoun referring to you as opposed to this Scientific

3   Advisory Committee that doesn't attend Producer Committee

4   meetings, right?

5   A.   True.

6   Q.   Okay.  Is it your testimony, sir, that the subject matter

7   of cage space allowance and reducing the U.S. flock supply or

8   cage space allowance and reducing the U.S. egg supply did not

9   occur in your presence at Producer Committee meetings?

10  A.   I cannot tell you it did or did not occur in my presence.

11  I do not recall any situation where I felt it was impinging on

12  our scientific guidelines.  If I had, I would have gone back

13  to the committee, and that's the point where they would have

14  walked and I would have walked with them.  But I was

15  representing the committee.  And I, frankly, paid attention to

16  what I had to, and UEP talked about a lot of things, a lot --

17  hours of meetings.

18  Q.   Okay.  We're going to get to that.  But for the time

19  being, let's say on Producer Committee meetings that you

20  attend and this subject matter of cage space allowance and the

21  reduction of U.S. flock supply or U.S. egg supply, let me show

22  you what has previously been marked as Plaintiffs' Exhibit 44.

23            MR. BLECHMAN:  If we can please put that up for the

24  witness and for the Court and counsel and publish it to the

25  jury.  It's in evidence.

1           THE WITNESS:  Is it possible to have a copy of it?

2    BY MR. BLECHMAN:

3    Q.   It is possible, but -- in fact, it's not only possible,

4    but I will deliver like the mail.  Sir?

5    A.   Thank you.

6    Q.   You're welcome.

7           Dr. Armstrong, I've handed you what's been marked as

8    Plaintiffs' Exhibit 44.  It is a copy of the UEP Producer

9    Committee for Animal Welfare meeting held on May 15, 2000.

10           Do you have that in front of you?

11   A.   I do.

12   Q.   Now, you'll notice underneath the call to order, there's

13   three categories, the second of which is consultants.

14           Do you see that?

15   A.   Yes.

16   Q.   Are you the Dr. Jeff Armstrong who is referred to there

17   as being a person in attendance at this May 15, 2000, Producer

18   Committee meeting?

19   A.   I would have been there.  I was there.

20   Q.   I'm sorry, sir?

21   A.   Yes.

22   Q.   Okay.

23           MS. SUMNER:  May I ask, do you have a copy for us?

24           MR. BLECHMAN:  Sure.  Bear with me one second.  I

25   figured if it was up on the screen, that would be good.

```
 1              MS. SUMNER:  Thank you.

 2              THE COURT:  This is why the computers don't save a

 3   single tree.

 4              MR. BLECHMAN:  I get it.  Old habits die hard.

 5   BY MR. BLECHMAN:

 6   Q.   Dr. Armstrong, let me hand you now what has been marked

 7   as Plaintiffs' Exhibit 45, which are notes from the UEP Animal

 8   Welfare Committee meeting of May 15, 2000.

 9              MR. BLECHMAN:  This document is in evidence and we

10   would like it published to the jury as well.

11   BY MR. BLECHMAN:

12   Q.   Do you have that in front of you?

13   A.   Yes, I do.

14   Q.   Okay.  Dr. Armstrong, you'll note, in these notes of the

15   May 15, 2000, Animal Welfare Committee meeting, the subject

16   matter of the notes is Cage Space Allowance Considerations.

17   Do you see that?

18   A.   Yes.

19   Q.   All right.  And you'll note that in the first paragraph,

20   it refers to the fact that over the last 20 years, the

21   greatest amount of egg income minus feed and pullet cost were

22   derived from the least space allowance in small cages, but the

23   opposite in larger cages.

24              Do you see that?

25   A.   Yes.
```

1   Q.   All right.  And then if you'll look down in paragraph

2   Number 5, please, on the first page, that paragraph reads:

3   Increasing space allowances would have two major effects.

4              And then small paragraph B reads:  An increase in

5   space allowance would inevitably reduce the layer population

6   and thereby reduce the surplus production problems affecting

7   the industry over the past 20 years.

8              Do you see that reference?

9   A.   Yes, sir.

10  Q.   All right, this was at the May 15, 2000, Producer

11  Committee meeting, correct?

12  A.   Yes.

13  Q.   All right.  And then on the next page, sir --

14  A.   Um-hum.

15  Q.   -- at the bottom, in paragraph C, as in cowboy,

16  paragraph -- Subparagraph Number 3, under Comments, and I'll

17  just read the beginning and then the subparagraph:  Uniform

18  application of minimum space requirements within the U.S.

19  would -- it would reduce the overproduction problem that has

20  plagued the egg industry every three to five years.

21             Do you see that?

22  A.   Yes, I do.

23  Q.   And that was a comment that was made at the Animal

24  Welfare Producer Committee meeting on May 15, 2000, correct?

25  A.   Apparently so, yes.

1    Q.    This is a meeting that you attended in person, correct?

2    A.    Yes.

3    Q.    All right.  When these -- when this subject arose at the

4    meeting, did you get up and walk out?

5    A.    What I can tell you is Dr. Joy Mench and Dr. Janice

6    Swanson, Donald Bell were also there.  I never recall any of

7    our Scientific Committee meetings where we had concerns of

8    what UEP was discussing with regard to flock size and space.

9          I can tell you with Joy and Janice being there, I

10   would remember if they had or we had raised a concern about

11   that.  UEP --

12   Q.    Dr. Armstrong --

13   A.    -- talked about information all the time.

14   Q.    Forgive me.  If you need to fully answer by saying more,

15   I won't stop you.  But my question was pretty simple and

16   straightforward.  Did you, sir, get up and walk out when the

17   subject of cage space allowance and reducing the U.S. flock

18   size or cage space allowance and reducing the U.S. supply of

19   eggs came up at this Producer Committee meeting that you

20   attended on May 15, 2000?

21   A.    No, I did not get up and walk out, but I can tell you

22   that my reference to walking out has to do with the Scientific

23   Advisory Committee and our meetings.  It's a big stretch to

24   put it towards this meeting.

25   Q.    I don't understand what you mean by that answer.  What do

1   you mean by the reference to the Scientific Advisory

2   Committee?

3   A.    What I'm saying is that we made our recommendations based

4   on science, what we knew, and it was up to the industry to put

5   it in place.

6   Q.    Did --

7   A.    The papers --

8   Q.    I'm sorry.

9   A.    The research that was done between '71 and '83

10  established the relationships between mortality and

11  productivity per hen.  Everybody knew that.  Anyone could come

12  up with this.  What I can tell you is our group, our

13  science-based group, we weren't affected by that.  It's really

14  clear where we had back and forth on guidelines and everything

15  else.  So if I had felt the Producer Committee was being

16  nefarious, and using us, I would have told the committee.  I

17  never felt that.

18  Q.    This isn't the only time, Dr. Armstrong, that someone

19  from the UEP in your presence discussed using cage space

20  allowance to reduce the U.S. egg supply; isn't that true?

21  A.    I have no idea.  I tell you, I pay attention to my

22  reports, sometimes I leave the room, sometimes I'm in the back

23  of the room.  You put this one in front of me and there was

24  Janice Swanson and Joy Mench in there, three of us, and I

25  would recall if my committee members had a concern about that

1   being a driving force for affecting us.

2   Q.   I'm talking about you.

3   A.   Yes, I don't --

4   Q.   And your testimony --

5   A.   I do not recall a Producer Committee where I had a

6   concern with regard to their discussions and impacting our

7   guidelines in a manner that I felt badly about.

8   Q.   Okay.

9   A.   Now, I can't tell you everything that was discussed in

10  those meetings.  And we have records.  So I -- obviously

11  certain things were discussed.

12  Q.   And why are the records important, Dr. Armstrong?  You

13  said -- you said, We have records.  Why does that matter here?

14  A.   Well, the record I look at is the bigger story.

15  Q.   No, no, no, I didn't ask you what records you looked at,

16  with all due respect.

17  A.   It is records are important --

18  Q.   My question -- if I might.

19  A.   -- as far as what we did as a science-based committee.  I

20  cannot attest to what the Producer Committee was doing other

21  than we dealt with, when there were interactions of the

22  guidelines, how quick you phase in, all of that.

23  Q.   The records, would you agree, are the best evidence of

24  what you were thinking of doing at the time, yes?

25  A.   No.

1   Q.   Well, you just finished telling the jury that we have

2   records, and I took from your comment that the fact that there

3   are records means something.  It means that there's a way to

4   verify what people were thinking, what people were doing.

5   Would you agree with that?

6   A.   Yeah, the record is a piece of the puzzle.

7   Q.   All right.

8   A.   But I look at the whole story.

9   Q.   And we're going to get to that.

10  A.   And the whole story is pretty clear, sir.

11  Q.   And we're going to get to that, I promise.

12  A.   From the scientist perspective, I know our story has a

13  group of scientists.

14  Q.   Let's just stay on this subject just a little bit longer,

15  and then we'll move to another one.  Don Bell, remind the jury

16  who -- well, you know what?  The jury knows who's Don Bell.

17          You served on the animal welfare -- excuse me, the

18  Scientific Advisory Committee with Mr. Bell from the

19  University of California Davis, right?

20  A.   Yes.

21  Q.   He was, I think you told the jury, somebody who -- and

22  I'm paraphrasing here -- but basically somebody who knows more

23  about flock production, the relation with price and economics

24  than anybody that you knew in the industry, true?

25  A.   He knew a lot about egg production, just about any

1   category.

2   Q.   And is there anybody, Dr. Armstrong, who knew more about

3   that subject than Don Bell, in your experience?

4   A.   I don't know.  I don't --

5   Q.   Sitting here right now, you don't know?

6   A.   All I know is at that time, the industry viewed Don as a

7   go-to person.  That's all I know.

8   Q.   Okay, and you viewed him as a go-to person, true?

9   A.   Well, Don was an individual who could help us understand,

10  you know, modern production and it was important not just to

11  have animal welfare people on the committee.  So we needed

12  people that understood the industry, we needed some industry

13  advice.

14  Q.   Is that a yes?

15  A.   Yes, we invited Don to be on the committee, yes.

16  Q.   All right.  And Gene Gregory, we know who Gene Gregory is

17  from the UEP?

18  A.   Um-hum.  Yes.

19  Q.   And he also served on the Science Advisory Committee,

20  correct?

21  A.   As an advisor ex officio, yes.

22  Q.   Attended meetings with you?

23  A.   Yes.

24  Q.   Was on phone calls with you?

25  A.   Yes.  He was very engaged.

```
 1   Q.   Excuse me, I'm sorry?

 2   A.   He was very engaged.

 3   Q.   Communicated by e-mail?

 4   A.   And phone.

 5   Q.   And phone?

 6   A.   Um-hum.

 7   Q.   The same for Don Bell, phone?

 8   A.   I didn't have a lot of phone or e-mail contact with Don

 9   Bell.  Mainly, my interactions with Don were largely at the

10   committee.

11   Q.   Okay.  Let's talk about Mr. Gregory then.  You testified

12   that -- and I want you to correct me if I'm not remembering

13   this right, but in substance, you testified that in 1997 or

14   1998, Gene Gregory contacted you to explore the possibility of

15   you setting up a Science Advisory Committee, true?

16   A.   I think the first contact was Al Pope.  I don't recall.

17   Q.   All right.  At some point in that process did you

18   transition to talking to Mr. Gregory?

19   A.   We did start talking to Gene after we started forming the

20   committee, certainly.

21   Q.   About how long after you formed the committee did you

22   start talking to Don -- excuse me, Gene Gregory?

23   A.   I don't remember.  We started talking to Gene fairly

24   soon.

25   Q.   Okay.
```

1    A.    So I was engaged with Gene.  There's no -- that's clear.

2    Q.    And you've given us your impression of Mr. Gregory in the

3    course of your testimony earlier today, correct?

4    A.    Yes, but --

5    Q.    Okay.  That's fine.

6    A.    -- a few sentences do not pay Gene justice, but --

7    Q.    Fair enough.  You spoke with Mr. Gregory frequently?

8    A.    Yes.

9    Q.    You communicated with Mr. Gregory by e-mail with some

10   regularity?

11   A.    Yes.  And phone.

12   Q.    And phone.  Did you meet with him in person -- committee

13   meetings aside, did you meet with him in person to discuss the

14   work of the UEP or your Science Advisory Committee at any

15   time?

16   A.    We talked about things one-on-one frequently.

17   Q.    Okay, and did your -- your, as you say, frequent talking

18   to Mr. Gregory about UEP matters, and e-mailing with him, and

19   occasionally meeting with him in person, did that begin by

20   January of 1999?

21   A.    Somewhere around there.

22   Q.    Okay.  And then did that pattern of communication and

23   frequency of communication with him then continue over a

24   period of years thereafter?

25   A.    Yeah, depending on what was going on and how busy I was,

1    whether we were, you know, having a meeting or not.

2    Q.   Including in 1999, yes?

3    A.   I do believe so.

4    Q.   And in 2000, yes?

5    A.   Yes.

6    Q.   And in 2001, correct?

7    A.   Yes.

8    Q.   And in 2002, correct?

9    A.   Years thereafter.

10   Q.   In 2003, correct?

11   A.   Yes.

12   Q.   All right.  So did Mr. Gregory tell you, prior to July

13   of 1999, that he reached out to Don Bell to ask for some ideas

14   about how to deal with the financial crisis in the egg

15   industry and did he have any ideas how to deal with that?

16   A.   I don't recall a discussion.

17   Q.   Don't recall that at all?

18   A.   I do not.

19   Q.   Do you recall Mr. Gregory telling you that on July 2,

20   1999, he, Mr. Gregory, received a document from Mr. Bell that

21   recommended using cage space allowance as a permanent

22   industrywide measure to reduce flock size and egg supply in

23   order to address the financial problems in the egg industry,

24   do you remember that?

25   A.   Yeah, Don made a lot of recommendations, I think he may

1   have used 56 square inches, I'm not sure, but Don made a lot

2   of recommendations to the committee, many of whom were

3   discussed a little bit or not very -- not very -- not very

4   much.

5   Q.   Okay.

6   A.   Because Don was not an animal welfare scientist.

7   Q.   But you thought enough of Don Bell to include him on your

8   Science Advisory Committee; isn't that true?

9   A.   Yeah, we had a wide range of views, certainly.

10  Q.   Okay, so he's somebody whose view you respected,

11  otherwise you wouldn't have invited him to be on your

12  committee, true?

13  A.   Yeah, but I think if you asked our committee members what

14  influence Don had on our scientific recommendations that are

15  at core here, he had minimal impact.

16  Q.   Well, we'll talk about that --

17  A.   Because --

18  Q.   I promise we'll get to that.

19  A.   Because he's not a behavioral scientist.

20  Q.   I understand that.

21  A.   And when --

22  Q.   Do you know what --

23  A.   Let me finish.

24  Q.   Of course.

25  A.   And when you recommend to me that I didn't even take to

1    the committee that we should remove water as a withdrawal

2    method was an idea stuck way back in time.

3    Q.   You said Don Bell is not a behavioral -- what was it not,

4    a behavioral --

5    A.   Ethologist.

6    Q.   No, you used a different word.

7    A.   Behavioral scientist.

8    Q.   Forgive me, I don't have the live note.

9         Are you a behavioral scientist?

10   A.   I'm a physiologist.

11   Q.   Is that -- in other words, the answer to my question is,

12   no, you're not a behavioral scientist?

13   A.   That's correct.

14   Q.   Okay.  Let me show you, if I might, Exhibit --

15   Plaintiffs' Exhibit 23.

16        MR. BLECHMAN:  Your Honor, may I approach?  Thank

17   you.  This document is in evidence and we would request that

18   it be published to the jury.

19        THE COURT:  Go ahead.

20        MR. BLECHMAN:  Thank you.

21   BY MR. BLECHMAN:

22   Q.   Okay.  Mr. -- Dr. Armstrong, excuse me, you have

23   Plaintiffs' Exhibit 23 in front of you?

24   A.   Yes.

25   Q.   All right.  This is Don Bell's document to Gene Gregory

1    dated July 2, 1999.  And I just -- I just want to orient you,

2    and if you need to take a moment to look at the document, then

3    I'll most surely pause.  But I want you to know my intention

4    is to ask you about a few passages on just the last two pages

5    of this document.

6                 MS. SUMNER:  Objection, Your Honor.  Foundation.

7                 MR. BLECHMAN:  Well, I've got to get there first.

8                 THE COURT:  Well, what I'm looking at is the cover

9    note here.  So I take it there are questions about something

10   more than just the --

11                MR. BLECHMAN:  Yes.

12                THE COURT:  -- transmittal?

13                MR. BLECHMAN:  Yes, Your Honor, I --

14                THE COURT:  Well, let's wait and see what the

15   questions are.  This is, though, cross-examination, so we'll

16   see what the question is.

17   BY MR. BLECHMAN:

18   Q.   I'm just waiting for you to get there.

19   A.   No, I'm ready.

20   Q.   Okay, last two pages of the document.  Have you had a

21   chance to skim it?

22   A.   Go ahead and ask, I'll skim it as you ask.

23   Q.   Okay.

24   A.   One particular section.

25   Q.   Okay.  My question to you, just a moment or two ago, was

1   with regard to Gene Gregory discussing with you the

2   recommendation that he received on July 2, 1999, from Don

3   Bell, proposing as a permanent solution to the problem of the

4   financial problem of the egg industry, a cage space allowance

5   to reduce the number of hens in cages.  And you gave an

6   answer, and it covered different periods of time.  I'm asking,

7   sir, whether this document and the passages on page -- page --

8   Bates Number 11, for example, help you in pinpointing in time

9   whether Mr. Gregory spoke with you on that subject in or about

10  July 2, or thereafter, 1999?

11  A.   If he did, I don't recall.  If Don brought this paper to

12  the committee, I don't recall.  And I can tell you, like a lot

13  of recommendations that came from Don, they were listened to,

14  but, again, we did not have discussions in the Scientific

15  Committee about supply or Don's -- I don't even remember if it

16  came up, but we were focused on animal welfare and the

17  science-based guidelines.  What does the literature say, not

18  what Don said economic output would be.  That, I'm certain.

19  Q.   Outside the presence of the Scientific Advisory

20  Committee -- withdrawn.

21       Your last answer was expressing certainty about what

22  was discussed within the Scientific Advisory Committee.  So

23  let me ask you a broader question, sir.

24       Outside of the Scientific Advisory Committee, did

25  you have any discussions with Gene Gregory on the subject of

1    cage space allowance to reduce the U.S. flock supply or the

2    U.S. egg supply?

3    A.   No, nothing of substance that I remember.

4    Q.   Nothing of substance.  I don't know what to do with that

5    answer.  What do you mean "nothing of substance"?

6    A.   I don't recall.  I do not recall.

7    Q.   So sitting here right now, your sworn testimony is that

8    you have no memory of that?

9    A.   I do not recall.

10   Q.   Is that a subject matter that you consider in the context

11   of this case that you have now flown to and now are taking the

12   witness stand to testify?  Would you consider that to be a

13   somewhat important subject matter?

14   A.   If Gene had brought or anyone had brought that up to me

15   of consequence, I would have taken it to the committee and I

16   don't recall it ever happening.  Did I receive an e-mail from

17   Don?  Did I receive something from Gene?  I may have, but I

18   can tell you, that did not affect what we were doing.  That's

19   all I can tell you.

20   Q.   We'll come back to that.  Let's shift gears.

21        Your preparation for your testimony today, you

22   testified in response to Defense Counsel that you met with

23   Defense Counsel for about ten hours before you testified,

24   correct?

25   A.   Yeah.  With in-person and some phone calls.

```
 1   Q.   Okay.  In the in-person meeting, when did that occur?

 2   A.   With counsel?

 3   Q.   Yes.  Yes.

 4   A.   Earlier this month.

 5   Q.   Earlier this month?

 6   A.   Um-hum.

 7   Q.   How early?

 8   A.   November.

 9   Q.   In November, so a few weeks ago?

10   A.   Yes.

11   Q.   Forgive me for asking, but I actually am a little curious

12   about this.  When -- when did you meet with Defense Counsel

13   this month, approximately when?

14   A.   I'm a creature of my phone.  I'd have to look it up, and

15   I don't have it with me.

16   Q.   A week ago --

17   A.   If you saw my calendar, it is packed.

18   Q.   And I respect that.

19   A.   It was close -- really close to the beginning of the

20   month.

21   Q.   Okay.  Was anyone else in attendance at the meeting

22   besides counsel who questioned you today?

23   A.   Whitney.

24   Q.   Okay.  Was anyone on the phone?

25   A.   No.
```

1   Q.   Okay.  You said you also had several phone conversations?

2   A.   Just with Whitney and Robin.

3   Q.   Okay.

4   A.   That was it.

5   Q.   Have you read any documents before you testified today to

6   refresh your memory of any facts or events about which you've

7   testified?

8   A.   I got them on my own computer.  I'm an e-mail pack rat,

9   so -- and also electronic, I looked at a lot of things, and I

10  also looked at some things in the past.

11  Q.   What things?

12  A.   Previous testimony.

13  Q.   Anything else?

14  A.   No.

15  Q.   Okay.

16            THE WITNESS:  Your Honor, can I get some water?

17            THE COURT:  Oh, sure.

18            Mr. Coyle, can we get some more good Government

19  water?

20            MR. BLECHMAN:  Do you know what --

21            THE WITNESS:  The tail end of that cold.

22            MR. BLECHMAN:  Yeah.  I've got it.

23            THE WITNESS:  Thank you, sir.

24            MR. BLECHMAN:  You're welcome.

25            THE WITNESS:  That one, too.

```
 1              MR. BLECHMAN:  You got it.

 2              THE WITNESS:  Thank you, sir.

 3              MR. BLECHMAN:  You're welcome.

 4    BY MR. BLECHMAN:

 5    Q.   Tell me when you're ready.

 6    A.   Um-hum.

 7    Q.   When you met with counsel, did you review any documents?

 8    I'm not asking you to tell me which.  I'm just asking if you

 9    did.

10    A.   We reviewed documents from UEP in the past.

11    Q.   Okay.

12    A.   All right.

13    Q.   About how many documents did you review?

14    A.   I don't recall.  It was, you know, quite a few and I --

15    if you add up what I have on my computer and what I've

16    reviewed myself, I have every PowerPoint I've ever presented,

17    I have all of that.

18    Q.   Did you yourself make any notes when you met with counsel

19    with respect to what you reviewed?  Did you make any

20    handwritten notes?

21    A.   Yeah.

22    Q.   A page, two pages?  What are we talking?

23    A.   Not that many.  I'd sit and type and then do other

24    things.

25    Q.   When you --
```

1   A.   But I -- yeah, I made some notes.

2   Q.   Did you make your notes on your computer or did you

3   handwrite?

4   A.   Most of them are handwritten.

5   Q.   Okay.  Do you have your computer with you?  Does it

6   travel with you like most of us?

7   A.   Of course.

8   Q.   Okay.  Dr. Armstrong, you are a university president now,

9   are you not?

10  A.   Yes.

11  Q.   But you had a past life, did you not?

12  A.   Yes.

13  Q.   All right.  And in your past life, you had a CV or

14  resume?

15  A.   Yes.

16  Q.   It's a document that generally you prepare, yes?

17  A.   Yes.

18  Q.   All right.

19       MR. BLECHMAN:  May I approach, Your Honor?

20       THE COURT:  Yes.

21  BY MR. BLECHMAN:

22  Q.   Dr. Armstrong, I have handed you what has been marked as

23  Defendants' Exhibit 700, the first page of which is an e-mail,

24  the most -- the latest of which is from Chad Gregory to Gene

25  Gregory and others, forwarding a resume of Dr. Armstrong, and

1    then there is a curriculum vitae of a Jeffrey Dyer Armstrong

2    contained within?

3    A.    Yes.

4    Q.    Do you recognize the CV that is contained beginning on

5    the second page of Exhibit 700?

6    A.    Yes.

7    Q.    All right.  And you -- you provided this resume or CV to

8    the UEP at the time, did you not?

9    A.    Apparently in reference to the International Egg

10   Commission, I think, but I'm not sure.

11   Q.    And from the e-mail, the earliest e-mail on the first

12   page of Exhibit 700, it appears to my eye that you provided it

13   to the UEP on June 22, 2007; is that correct?

14   A.    Yes.

15   Q.    And you provided this resume to the UEP with an

16   expectation that it was going to the UEP, true?

17   A.    It was going to the IEC, yes.

18   Q.    But you provided it to the UEP, correct?

19   A.    Yes.

20          MR. BLECHMAN:  Your Honor, we offer Defendants'

21   Exhibit 700 in evidence.

22          MS. SUMNER:  No objection.

23          MR. KING:  No objection.

24          THE COURT:  Okay, D-700 is admitted.

25          (Exhibit received in evidence.)

```
 1              MR. BLECHMAN:  Permission to publish, Your Honor.

 2              THE COURT:  Yes.  Go ahead.

 3              MR. BLECHMAN:  Thank you.

 4    BY MR. BLECHMAN:

 5    Q.   Dr. Armstrong, let me give you a moment, if you'd like.

 6    This is your 2000 -- well, you'll tell me.  The e-mail is from

 7    2007.

 8              Is this your 2007 resume?

 9    A.   Yes.

10    Q.   Okay.  Did you prepare it, this document?

11    A.   Yes.

12    Q.   When?

13    A.   Constantly evolving document.

14    Q.   When you prepared it, did you endeavor to be accurate?

15    A.   I tried.

16    Q.   As far as you know, were you?

17    A.   I hope so.

18    Q.   Did you endeavor --

19    A.   To the best of my ability, but, yes.

20    Q.   Okay.  The resume indicates a number of articles which I

21    want to talk to you about, but I want to ask you a couple of

22    questions about your background first.

23              Have you done any research in the housing conditions

24    of hens?  And when I say "have you done research," I want to

25    be really clear what I mean, Dr. Armstrong.  I mean you --
```

```
1    A.    No.

2    Q.    -- Dr. Jeffrey Armstrong?

3    A.    No.

4    Q.    Okay.  Have you done any research on the relationship

5    between the space -- cage space for hens and hen welfare?

6    A.    No.

7    Q.    Have you done any research on how to measure hen welfare?

8    A.    No.

9    Q.    Have you done any research on back trimming --

10   backfilling -- let's try that again.  Backfilling?

11   A.    No.  No.

12   Q.    Have you done any research on beak trimming, which is

13   what I meant to say the first time?

14   A.    No.

15   Q.    Have you done any research on the relationship between

16   cage space and hen production?

17   A.    No.

18   Q.    Have you done any research on the relationship between

19   cage space and mortality?

20   A.    No.

21   Q.    Have you done any research on the ability of hens to be

22   able to sit in 48 inches as opposed to 67 inches?

23   A.    No.

24   Q.    Have you done any research on feeder space and hen

25   welfare?
```

1    A.   No.

2    Q.   Have you done any research on ammonia levels and manure

3    in henhouses?

4    A.   No.

5    Q.   Have you done any research on methods of slaughtering

6    hens?

7    A.   No.

8    Q.   Have you done any research on methods of slaughtering

9    hens and hen welfare?

10   A.   No.

11   Q.   Have you done any research on euthanasia of hens?

12   A.   No.

13   Q.   Have you done any research on euthanasia and animal

14   welfare of hens?

15   A.   No.

16   Q.   Have you done any research on the handling of hens?

17   A.   No.

18   Q.   Have you done any research on the handling of hens and

19   hen welfare, sir?

20   A.   No.

21   Q.   In the course of your testimony on direct exam, I thought

22   I heard you to say that with regard to feeder space, that the

23   science -- that the standard had shifted from science-based to

24   performance-based.

25            Do you recall in substance that testimony or that

1   subject matter?

2   A.   I recall the matter.  I don't recall saying it like that.

3   Prescription versus performance is what I said.

4   Q.   Okay.  I want to stick on performance because --

5   A.   Performance --

6   Q.   I was looking -- just trying to lay a foundation to get

7   to performance and you've done that for me.

8   A.   Sure.

9   Q.   Would you please explain what you mean by

10  performance-based in terms of measuring feeder space?

11  A.   What you want to achieve is that all hens can eat, and

12  originally we said at the same time and that all hens could

13  stand.  So that's a performance standard.

14          A prescriptive standard would be this amount, this

15  amount, or this amount, this amount (indicating).

16  Q.   Have you done any research on that, sir?

17  A.   Not personally.

18  Q.   Okay.

19  A.   But members of the committee have done research on

20  everything you mentioned.

21  Q.   I appreciate you volunteering that, but I'm asking about

22  whether you have because you are the person who has come into

23  this courtroom and is testifying before this jury.

24  A.   That's correct, and all those answers were no.

25  Q.   Thank you.

1    A.    That's correct.

2    Q.    Looking further in your resume --

3    A.    Um-hum.

4    Q.    -- let me direct your attention to -- it's towards the

5    back.  I'll give you an exact page in a moment.  Let me try to

6    help find it for you.  It's a list of the articles.  That's

7    the one I'm looking for.

8    A.    Is it the one that you have circled?

9    Q.    I don't know.  It may be that somebody copied my version,

10   but I'm going to ask you about it anyway.

11   A.    Okay.

12   Q.    So hold that thought and let's start with what is page --

13   I'll use the D-20, which has publication list, refereed

14   journals and chapters and books.

15             Do you see that?

16   A.    Yes, sir.

17             MR. BLECHMAN:  Okay, if we can show that to the

18   jury, too.

19   BY MR. BLECHMAN:

20   Q.    This as a backdrop, I thought I heard you to testify that

21   peer-reviewed articles are essentially the gold standard in --

22   when it comes to academic publications; is that true?

23   A.    Yes.  For individuals in an individual area, that is very

24   positive.

25   Q.    Okay.

1   A.   Yeah.  A lot of people's promotion and tenure, a lot of

2   things depend on that.

3   Q.   Okay.  Now, this is a 2007 resume.  I'm telling you that

4   upfront.  But the very last page is -- shows 46, a 2000

5   article.

6            Do you see that?

7   A.   Yeah.

8   Q.   Okay.  And so my question is:  Have you had any

9   peer-review articles published on the subject of animal

10  welfare since -- since 2000?

11  A.   I'm a physiologist.  I'm not an ethologist animal welfare

12  scientist.

13  Q.   So does that mean the answer to my question is no?

14  A.   The answer to the question is no, and I was chair of the

15  committee and brought in the experts.  I agree with you, the

16  answer is no.

17  Q.   Thank you.

18  A.   Yes.

19  Q.   Now, because you have my copy of this exhibit, I'm going

20  to ask you --

21  A.   You can have it back.

22  Q.   That's all right.  I'm good.  I'm good.

23           So I just -- I have a question that I freely admit

24  to you, Dr. Armstrong, is more curiosity than anything else,

25  but in the context of this case, I indulge you and the Court

```
 1   and the jury just to ask.  Article Number 44, let me start.
 2   You're a physiologist, right?
 3   A.   Right.
 4   Q.   You've got a PhD, right?
 5   A.   Yeah.
 6   Q.   Okay.  So Article 44 is titled Strategies to Facilitate
 7   Collegewide Development of Online Course Materials Using the
 8   Worldwide Web.
 9           Did I read that correctly?
10   A.   Um-hum.
11   Q.   Is that a yes?
12   A.   That's a yes.  I apologize.
13   Q.   No, no, no, no worries.  The court reporter can only take
14   down the verbal answers.
15           Is this article in Number 44, is this a
16   peer-reviewed article?
17   A.   Yes.
18   Q.   Okay.  Does this have anything to do with animals
19   whatsoever?
20   A.   No.  And I won't give you a 50-minute classroom answer.
21   Q.   Thank you.
22   A.   That has to do with teaching.
23   Q.   Okay.
24   A.   That's an agriculture teaching journal.  It's about
25   teaching.
```

1    Q.    Very well, thank --

2    A.    And learning.

3    Q.    Thank you.

4          THE COURT:  For humans?

5          THE WITNESS:  For humans.  We haven't been able to

6    have chickens to get on the Web yet.  I'm sure somebody's

7    working on it, though.

8    BY MR. BLECHMAN:

9    Q.    Well, at Disney World, maybe.

10         Let me -- allow me to move to another subject, if I

11   might.  Tours of henhouses, you provided testimony in response

12   to direct questions about your prior tours of henhouses?

13   A.    Yes.

14   Q.    And I'd like us to understand what you're referring to.

15   First, in terms of relative timing, when, approximately, is

16   the first time you ever stepped foot into a henhouse?

17   A.    When I was a little kid.

18   Q.    And that's fair, because that's how I asked the question.

19   So let's move now to 1997 or so.

20   A.    You don't want to hear my snake story?  Okay, I'm sorry.

21   Q.    I -- I do, but not right now.

22         If we could go, move to 1997, 1998, when you, in

23   substance, were explaining to the jury earlier, that you went

24   on tours of henhouses as part of -- my words, not yours --

25   initiation or orientation into hens and eggs -- laying eggs.

1    Do you recall generally that testimony?

2    A.   Yes, sir.

3    Q.   All right.  Approximately when is the first tour of a

4    henhouse that you made at that time?

5    A.   In my career --

6    Q.   No, no.

7    A.   -- as a professional?

8    Q.   I'm sorry, I was --

9    A.   I --

10   Q.   I will ask the question --

11   A.   I apologize.

12   Q.   No, that's all right.  It's late afternoon and I was

13   probably less than clear in my question.

14           After you were approached by the UEP in about 1997

15   or 1998, you went on tours of henhouses, correct?

16   A.   Correct.

17   Q.   All right.  You went to more than one henhouse on these

18   tours, correct?

19   A.   As I recall, it was more than one, I can't remember how

20   many.

21   Q.   Ballpark?  Can you help us any?

22   A.   Two or three.

23   Q.   Two or three?

24   A.   It wasn't a huge number.

25   Q.   Where were they located?

```
 1    A.    I think Iowa.

 2    Q.    Anyplace else?

 3    A.    I don't recall.

 4    Q.    So did you -- did you fly to Iowa and then take a tour of

 5    some henhouses with the committee?

 6    A.    We were in a van, um-hum.

 7    Q.    Okay.  But -- so you went out there and then toured some

 8    henhouses, correct?

 9    A.    Yes, wherever we went.

10    Q.    What is the name or names of the -- of the companies that

11    owned the henhouses that you toured?

12    A.    I really don't recall.  I do not recall.

13    Q.    Okay.  Do you remember -- and you said this was Iowa?

14    A.    I think.

15    Q.    Okay, that's fine.

16    A.    Yeah.

17    Q.    No, no, it's fine.

18    A.    Yeah.

19    Q.    And you were with other members of your committee?

20    A.    Yeah.  I'm pretty sure everybody was able to go.  Maybe

21    not Larry Stanker, but pretty much everybody else.

22    Q.    Did you make notes while you were going through the

23    henhouse?

24    A.    Um, I don't recall making notes, but I -- I just remember

25    the tour and then we talked about it at our next meeting or
```

1    when we met at -- after the tour.

2    Q.   Okay.  Did you take any photographs?

3    A.   I don't -- I don't think I did.  We didn't have cell

4    phones with cameras then.

5    Q.   Okay.

6    A.   So I am not - I'm not sure.

7    Q.   That's fine.  Are there any searing images that you

8    recall from these tours that you took?

9    A.   Yeah, yes.

10   Q.   Tell us, please.

11   A.   You could -- the feeling of ammonia.  Birds sticking

12   their heads out of the top of the cage, manure dropping on

13   birds.  And just that birds were at about 48 square inches, so

14   it was pretty packed.  But that was not my first time in a

15   commercial henhouse.

16   Q.   I gather you're referring now to when you were younger?

17   A.   No.

18   Q.   Oh.

19   A.   When I was in North Carolina, NC State.

20   Q.   Okay.

21   A.   And before I was at Purdue.

22   Q.   Okay.

23   A.   But it -- but I was not -- I did my research more in pigs

24   and cattle, so it would have been in the same type of thing as

25   a tour.

1    Q.    Okay.

2    A.    Orientation as a new faculty member, that type of thing.

3    Q.    Right.  And -- and do you know what the ammonia levels

4    were in the henhouses that you went into where you described

5    your eyes burning and the other sensations that you

6    experienced?

7    A.    I don't -- yeah, when I recalled -- when I said having

8    ammonia levels, I have experienced that.  I don't remember the

9    ammonia levels that day, but I have experienced personally

10   ammonia levels that were high enough to make you tear up in a

11   house.  I honestly don't -- you know, that day, the ammonia

12   levels were pretty high but I don't remember how high, and I

13   don't think anyone took a measurement.  I'm pretty sure no one

14   did.

15   Q.    Dr. Armstrong, did you visibly see the source or sources

16   of the ammonia -- excuse me -- yeah, withdrawn.

17          Did you see the source or sources of the ammonia

18   causing the -- causing the ammonia that you were smelling?

19   A.    Yeah, in that type of production, the manure is not

20   removed on a regular basis, so the manure piles up, so that's

21   the source of the ammonia, by and large.  You get some from

22   the fresh feces, but by and large, it's, as I understand it,

23   from the --

24   Q.    Okay.

25   A.    -- the pile-up of the manure.

1   Q.   And let me say upfront, I don't mean to be unreasonably

2   graphic in what I'm about to ask you, but this jury has seen

3   some things.  Would you please describe in more detail what

4   you saw and what you mean by the manure piled up.  What did

5   you see?  Take us in that henhouse with you, please, sir, and

6   describe for us what you saw in that regard.

7   A.   As best as I can remember --

8   Q.   Yes.

9   A.   -- it was a big long pile of manure.  I don't know how to

10  get any more graphic than that.

11  Q.   Were -- were these individual piles of manure or was it

12  just one enormous pile of manure?  And again, I don't mean --

13  I'm going to move on, I don't mean to be --

14  A.   I really don't recall.

15  Q.   Okay.

16  A.   It's been a while.

17  Q.   Okay.  If hens are exposed to ammonia at levels like you

18  experienced, would you consider that to be inhumane?

19  A.   If -- if -- the research shows that --

20  Q.   Dr. Armstrong, forgive me.  I'm not asking you about the

21  research.  We'll get there.  My question is simply direct.

22  Did you consider the ammonia levels in the henhouse that you

23  were in, in Iowa in 1997, '98 on these tours, did you consider

24  the ammonia levels to be inhumane for the hens, yes or no?

25  A.   I considered the entire situation not to be optimal.  I

1   didn't put it in that -- in that -- in those terms at the

2   time.  We were on a fact-finding mission.  The committee had

3   not really been through our discussions, so I honestly didn't

4   think whether it was humane or inhumane.  I felt it was

5   definitely not sustainable.  Not sustainable.

6   Q.   Okay.  I'm now asking you about your review today,

7   though, and so knowing what you know, my question to you, sir,

8   is:  Did you consider -- do you consider the ammonia levels in

9   the henhouse that you toured in 1997, '98, to be inhumane to

10  hens, yes or no?

11  A.   It depends on the duration, so, I would -- I would not.

12  I didn't think about it at that time --

13  Q.   Okay.  Let --

14  A.   -- as it being humane or not.

15  Q.   Let me see if I understand.  Are you saying that there's

16  any amount of time -- that there's any duration to a hen being

17  exposed to 100 parts per million of ammonia, let's say, that

18  would determine the difference between it being humane and

19  inhumane?

20  A.   Well, that's why we have guidelines.  If you look at OSHA

21  guidelines for humans --

22  Q.   Dr. Armstrong, please.

23  A.   -- it is exposure --

24  Q.   Dr. Armstrong?

25  A.   I'm addressing it as best I know.

1    Q.   I promise I'm going to ask you about OSHA and PPMs and

2    all of that.  But I'm asking you a very direct straightforward

3    question.  Is knowing what you know about ammonia levels and

4    hens, did you regard -- do you regard the ammonia levels in

5    the henhouse that you toured in 1997, 1998 to be inhumane to

6    hens, yes or no?

7    A.   I did not think about it as inhumane at that time.  I

8    felt that the entire situation was not sustainable.  I am not

9    an expert on ammonia.  That's why I relied on the discussion

10   of the committee, not my view.

11   Q.   Sitting here today, looking back, Dr. Armstrong, do you

12   regard the ammonia levels in that henhouse that you toured in

13   1997, 1998, to be inhumane to hens --

14          MS. SUMNER:  Objection.

15   BY MR. BLECHMAN:

16   Q.   -- yes or no?

17   A.   I've already answered the question.

18          MS. SUMNER:  Asked and answered.

19          THE COURT:  Okay.  You can move on.

20          MR. BLECHMAN:  I'll move on.  I'll move on.  That's

21   fine.

22          You --

23          Your Honor, I have other subjects, but this next

24   subject is relatively short and then I'll be guided by the

25   Court, of course, but I wanted to just tell you in case you're

1    looking for a time to call for a break.

2              THE COURT:  Let's see how short.

3              MR. BLECHMAN:  Yes, that's fine.  Nothing like that

4    to incentivize me here.

5    BY MR. BLECHMAN:

6    Q.   You mentioned in your testimony earlier about consumer

7    studies.  Do you recall that testimony?

8    A.   We talked about public perception, it was a section of

9    the guidelines where we talked about public perception.

10   Q.   You also -- I thought I heard you talk about consumer

11   studies.  Do you have knowledge of any consumer studies

12   regarding hen welfare?

13   A.   I have knowledge of consumer responses and I have

14   knowledge from what -- you know, that our committee members

15   and others have said, but I have not done direct research on

16   consumer responsiveness to hen welfare.  I have anecdotal

17   information and then I relied on the committee.

18   Q.   Okay.  Approximately when, the year will be fine, did you

19   first receive information about consumer studies regarding

20   animal welfare?

21   A.   The Center for Food Integrity has been --

22   Q.   The question is approximately when?

23   A.   Hmm, I -- I don't know exactly.  There's -- there have

24   been studies and we have seen them.  I can't tell you the

25   year.  I can't tell you the year.

```
 1   Q.   Okay.

 2   A.   I would have to ask Janice Swanson, who was our leading

 3   expert in that area.

 4   Q.   I'm just looking to try to fix in time your testimony on

 5   the subject, which is why I was following up.

 6             THE COURT:  Okay, I'm going to fix in time.

 7             MR. BLECHMAN:  And, Your Honor, that covers the

 8   subject.

 9             THE COURT:  Okay, well, there we go.

10             So, ladies and gentlemen, as I mentioned, we have to

11   end early today, but we are going to resume straightaway 9:30

12   tomorrow, after whatever celebratory gathering is going to be

13   for you-all in the deliberating room.  So once again, same

14   rules at night.  Just safe and sound travel, and coming back

15   here.  You have indeed been spectacular, so keep your record

16   intact and we'll see you tomorrow.

17             THE DEPUTY CLERK:  All rise.

18             (Jury out.)

19             MR. BLECHMAN:  Your Honor, we request or reiterate

20   for the witness to not talk to counsel about the testimony.

21             THE COURT:  Okay, well, you know, it's interesting

22   because I've not said that to anybody, so I wouldn't want

23   anybody to think I was singling anyone out.  But I think that

24   it will be fine.

25             So you just have a nice evening, all right, just
```