```
1                  IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
5

6
                              - - - - -
7
                          PHILADELPHIA, PA
8
                              - - - - -
9
                          NOVEMBER 26, 2019
10
                              - - - - -
11

12
     BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14                            - - - - -

15                TRANSCRIPT OF TRIAL PROCEEDINGS

16                           DAY 17

17                            - - - - -

18

19

20

21            KATHLEEN FELDMAN, CSR, CRR, RPR, CM
              Official Court Reporter
22            Room 1234 - U.S. Courthouse
              601 Market Street
23            Philadelphia, PA  19106
              (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)
```

```
 1   APPEARANCES:

 2
                     KENNY NACHWALTER, P.A.
 3                   BY:  RICHARD ALAN ARNOLD, ESQUIRE
                     WILLIAM J. BLECHMAN, ESQUIRE
 4                   DOUGLAS H. PATTON, ESQUIRE
                     MICHAEL A. PONZOLI, ESQUIRE
 5                   BRANDON S. FLOCH, ESQUIRE
                     201 South Biscayne Boulevard, Suite 1100
 6                   Miami, Florida  33131
                     For Plaintiffs The Kroger Co., Safeway Inc.,
 7                   Roundy's Supermarkets, Inc., Walgreen Co.,
                     Hy-Vee, Inc., Albertsons LLC, The Great
 8                   Atlantic & Pacific Tea Company, Inc., H.E Butt
                     Grocery Company, and Conopco, Inc.

 9

10                   SPERLING & SLATER
                     BY:  PAUL E. SLATER, ESQUIRE
11                   JOSEPH M. VANEK, ESQUIRE
                     DAVID P. GERMAINE, ESQUIRE
12                   JOHN P. BJORK, ESQUIRE
                     55 West Monroe Street, Suite 3200
13                   Chicago, Illinois  60603
                     For Plaintiffs Publix Super Markets, Inc.
14                   and SuperValu Inc.

15
                     MARCUS & SHAPIRA, LLP
16                   BY:  MOIRA CAIN-MANNIX, ESQUIRE
                     BRIAN C. HILL, ESQUIRE
17                   One Oxford Centre 35th Floor
                     301 Grant Street
18                   Pittsburgh, PA  15219
                     For Plaintiff Giant Eagle, Inc.

19

20                   AHERN & ASSOCIATES, P.C.
                     BY:  PATRICK J. AHERN, ESQUIRE
21                   THEODORE BELL, ESQUIRE
                     8 South Michigan Avenue, Suite 3600
22                   Chicago, Illinois  60603
                     For Plaintiff Winn-Dixie Stores, Inc.,
23                   H.J. Heinz Company, L.P., C&S Wholesale
                     Grocers, Inc.

24

25                   (CONT.)
```

```
 1   APPEARANCES:  (CONT.)

 2
                     PEPPER HAMILTON LLP
 3                   BY:  JAN P. LEVINE, ESQUIRE
                     ROBIN P. SUMNER, ESQUIRE
 4                   ALEXANDER L. HARRIS, ESQUIRE
                     WHITNEY R. REDDING, ESQUIRE
 5                   KAITLIN MEOLA, ESQUIRE
                     LACEY D. REEDER, ESQUIRE
 6                   3000 Two Logan Square
                     18th & Arch Streets
 7                   Philadelphia, PA  19103
                     For Defendants United Egg Producers, Inc.
 8                   and United States Egg Marketers, Inc.

 9
                     PORTER WRIGHT MORRIS & ARTHUR LLP
10                   BY:  JAY L. LEVINE, ESQUIRE
                     DONALD M. BARNES, ESQUIRE
11                   ALLEN T. CARTER, ESQUIRE
                     2020 K Street, NW
12                   Suite 600
                     Washington, DC  20006
13                        And
                     PORTER WRIGHT MORRIS & ARTHUR LLP
14                   BY:  JAMES A. KING, ESQUIRE
                     ARLENE BORUCHOWITZ, ESQUIRE
15                   41 South High Street
                     Suite 2900
16                   Columbus, OH  43215
                     For Defendant Rose Acre Farms, Inc.
17

18

19

20

21

22

23

24

25
```

1  can find something.

2        MR. BLECHMAN:  We need to move in a different

3  direction.

4        THE COURT:  Nobody wants to be shaped like an egg,

5  for goodness sakes.

6        THE DEPUTY CLERK:  All rise.

7        (Jury in.)

8        THE COURT:  Okay, we've got a little bit of a blue

9  thing going.  Have a seat, everybody.

10        Michael.

11        (Discussion off the record.)

12        THE COURT:  We had a little bit of a housekeeping

13  matter to attend to, so I hope it gave you all a moment, an

14  extra moment to begin your celebrations, which I understand

15  are in order.  Nobody looks a day older than they did

16  yesterday.  The good news.  And Dr. Armstrong is back on the

17  stand.

18        You're still under oath, as you know, of course.

19        And, Mr. Blechman, you may resume.

20        MR. BLECHMAN:  Thank you, Your Honor.

21           CROSS-EXAMINATION (continuation)

22  BY MR. BLECHMAN:

23  Q.  Dr. Armstrong, good morning.

24  A.  Good morning.

25  Q.  I want to pick up where we left off yesterday and we'll

1 move through a number of subjects over the course of the

2 remainder of my cross-examination. I want to -- I want to

3 begin with the subject of payments that you received from UEP,

4 it's a subject about which you were questioned on direct

5 examination yesterday. Do you remember that subject?

6 A. Yes, sir.

7 Q. All right. In February of 2004, you asked Gene Gregory

8 to be paid as a consultant outside of the work that you were

9 doing for the Science Advisory Committee, true?

10 A. Yes.

11 Q. You asked him to keep the fact of you being paid

12 confidential, or as you put it, strictly between you and

13 Mr. Gregory; is that true?

14 A. I believe so, yes.

15 Q. You told him you didn't want a contract, correct?

16 A. That's correct.

17 Q. You didn't want a contract, you told him, because if you

18 were asked by your colleagues on the Scientific Advisory

19 Committee, if you had a contract with the UEP, you could

20 truthfully answer to them, no, true?

21 A. That I was not an employee of UEP.

22 Q. And you had no contract with UEP?

23 A. No, we did not have a contract.

24 Q. And you wanted to be able to tell your colleagues on the

25 Scientific Advisory Committee that you didn't have a contract,

1    you weren't an employee, you were like them?

2    A.   I actually told a couple of members on the Scientific

3    Advisory Committee.  I just wanted my consulting to be private

4    and I did not really want Gene to put it in United Voices.

5              MR. BLECHMAN:  543, please.

6              Your Honor, may I approach?

7              THE COURT:  Yes.

8    BY MR. BLECHMAN:

9    Q.   Mr. Armstrong -- excuse me, Dr. Armstrong -- I

10   apologize -- I've handed you what's been marked as Plaintiffs'

11   Exhibit 543.  It's an e-mail from you to Mr. Gregory dated

12   February 24, 2004, at 6:19 p.m.  Do you have that there?

13   A.   I do.

14   Q.   Sir, did you, in fact, send this e-mail to Gene Gregory

15   in connection with your work for UEP?

16   A.   Yes, I did.

17             MR. BLECHMAN:  Your Honor, Plaintiffs offer

18   Exhibit 543 in evidence.

19             THE COURT:  Any objection?

20             MS. SUMNER:  Yes, Objection.  Hearsay.

21             THE COURT:  Overruled.

22             (Exhibit received in evidence.)

23   BY MR. BLECHMAN:

24   Q.   Dr. Armstrong, directing your attention to the first

25   e-mail in this chain -- excuse me.

1          MR. BLECHMAN:  Permission to publish to the jury.

2          THE COURT:  Go ahead.

3   BY MR. BLECHMAN:

4   Q.   Dr. Armstrong, directing your attention to the first

5   e-mail in the chain at the very top, you write to him:

6   Gene -- that's Mr. Gregory, correct?

7   A.   Yes.

8   Q.   And you describe the fact that you want to be paid money

9   from the UEP in addition to the money you were receiving as a

10  member of the Science Advisory Committee, correct?

11  A.   Yes.

12  Q.   And in the last -- next-to-last paragraph, you write:  I

13  think this arrangement is better for you and I.  If I am asked

14  if I am an UEP employee or on a contract then I can truthfully

15  say no.

16          That's what you wrote to him, correct?

17  A.   That's accurate.

18  Q.   But you were, in fact, consulting for UEP or

19  contemplating consulting for UEP, were you not?

20  A.   Yes, I did, because as I mentioned yesterday, I did not

21  want this to be in the United Voices, and I frankly didn't

22  want to be a target of animal rights activists, and for other

23  reasons.

24  Q.   Do you think that -- withdrawn.

25          Ultimately you, in fact, consummated an arrangement

1  with Mr. Gregory and the UEP to be paid on a consulting basis,

2  correct?

3  A.    Yes, for work I was doing separate of the Scientific

4  Committee.

5  Q.    Without a contract, correct?

6  A.    Yes.  And that's not atypical for a university person.

7  Q.    Without anything in writing, correct?

8  A.    Just back and forth in e-mail.

9  Q.    If asked by the members of the Scientific Advisory

10 Committee if you had any other kind of financial arrangement

11 with the UEP, your -- you did not want a contract so that you

12 could answer, no, I don't have a contract with the UEP,

13 correct?

14 A.    No, not to those individuals.  I did not want the animal

15 rights activists -- in fact, I told some of the members of the

16 Advisory Committee that I was doing that.

17 Q.    In fact, you didn't say that in your e-mail, did you?

18 A.    No, I didn't.  This is one snapshot in time and it is

19 what it is.  But I can tell you that I told several members --

20 some members of the Advisory Committee.

21 Q.    Do you think it was being transparent with the UEP to not

22 have a contract with them, something in writing that reflected

23 the fact that you had a consulting arrangement with the UEP

24 separate from the work you were doing for the Science Advisory

25 Committee?

1    A.    Oh, I fully believed, and I'm sure that Gene and UEP

2    were -- beyond Gene were aware of it because they approved the

3    budget.

4    Q.    How about other members of the, say, UEP Producer --

5    Producer Committee, did they know?

6    A.    I don't know.  I don't know unless Gene told them.

7    Q.    You didn't tell them, did you?

8    A.    I did not, but they knew I was a consultant.  I was

9    listed on the minutes as a consultant at times.

10   Q.    In February of 2004, Mr. Gregory agreed to pay you 11 to

11   $12,000 a year for your consulting arrangement, correct?

12   A.    That's correct.  All totaled, it was probably over ten

13   years, about 70, $75,000.

14   Q.    Right.  You explained that yesterday.  So you were paid

15   11 to $12,000 a year, each year until through 2011, correct?

16   A.    I don't know how much I was paid and I don't remember if

17   it was every year, but it probably was every year.

18   Q.    Okay.  Mr. Gregory wanted to use you as a media

19   spokesperson for the UEP's public relations people, true?

20   A.    Yes.  I went on egg farms with reporters, I did

21   interviews, interviewed members of the public.  I did a lot of

22   work.  And what caused me to want to do this is I was spending

23   the time --

24   Q.    Dr. Armstrong, I didn't ask you what you caused you, I

25   just wanted to establish that's what you did.

1   A.   That's what I did.

2   Q.   And that was a role you were comfortable in as a media

3   spokesperson for the UEP, as you described just now, correct?

4   A.   I did a lot of work for them in overarching social

5   responsibility in the food chain, and I was comfortable with

6   that, yes.

7   Q.   All right.  So you had a consulting arrangement with the

8   UEP that lasted for years, true?

9   A.   Yes.  It did.

10  Q.   Without a contract, true?

11  A.   Yeah, that's true.

12  Q.   During the course --

13  A.   That's not atypical for a university faculty member to do

14  that without a contract.  That -- that would be more abnormal

15  for a university person to have a contract.

16  Q.   Did I ask you if it was typical or atypical for a

17  university president [sic]?

18  A.   You asked me about my relationship with UEP and I'm

19  explaining it.

20  Q.   Thank you.

21            And in connection with this noncontractual

22  relationship you had, you did public relations for them, true?

23  A.   I did public relations, I did a lot of things.

24  Q.   You did TV interviews for them, true?

25  A.   Um-hum.

1   Q.   Is that a yes?

2   A.   That's a yes.

3   Q.   And you did our work as well, true?

4   A.   Yes.

5   Q.   In addition to this sort of off-the-book, noncontract

6   consulting arrangement that you had with the UEP, you also

7   asked the UEP to pay $18,000 a year to a discretionary fund

8   that you had at Michigan State University, correct?

9   A.   Yes.

10  Q.   And the discretionary fund at MSU, did any of those

11  dollars make their way to any sort of activity at MSU with

12  which you had some academic involvement?

13  A.   I honestly don't recall how I used those funds, but being

14  discretionary means a university department head, a dean or

15  president, you can use it at your discretion but according to

16  the rules.

17  Q.   UEP paid you -- excuse me.  Withdrawn.

18       UEP paid the MSU, Michigan State University

19  discretionary fund $18,000 a year beginning in or about March

20  of 2004, true?

21  A.   Yes.

22  Q.   And it did so, that is to say, paid $18,000 a year to the

23  MSU discretionary fund every year from 2004 until you finished

24  your work for UEP in about 2011, true?

25  A.   Yes.  Which is common for companies to donate to

1   universities, very common.  And that was all very transparent

2   and reported, as was my relationship with UEP was reported to

3   Michigan State.

4   Q.  Did you tell members of the Science Advisory Committee,

5   sir, that UEP was paying MSU an $18,000 a year contribution to

6   the MSU discretionary fund?

7   A.  Yeah, I told Joy and Janice about all of that.  And, in

8   fact, later, we sought UEP's help in securing donations for a

9   research building at Michigan State and we asked the industry

10  to help do that.  That's what you do at university --

11  Q.  When did you solicit this additional contribution from

12  UEP for Michigan State University?

13  A.  Oh, the building wasn't even -- wasn't completed when I

14  left, so it was much later.

15  Q.  Give us -- give us a ballpark of the timing, please.

16  A.  Probably '09 or so.

17  Q.  2009?

18  A.  We would have to ask to ask Janice Swanson, who was

19  leading the project.

20  Q.  But I have you here.  Does 2009 sound about right?

21  A.  I'm not sure.  That sounds about right.

22  Q.  Okay.  And how much money are we talking about that you

23  were asking UEP to contribute to MSU?

24  A.  I don't think UEP contributed anything to the building.

25  I think we -- we talked to a lot of members in the industry,

1    but I don't have access to MSU donations anymore, but --

2    Q.   What --

3    A.   -- the industry in Michigan and others contributed, which

4    is the normal thing.

5    Q.   Dr. Armstrong, do you have a memory of what was the ask

6    of UEP in terms of dollars?

7    A.   I do not.

8    Q.   Okay.

9    A.   Because we did not -- I don't think UEP contributed

10   directly to the building, but the animal -- the animal welfare

11   research was such a state that there were really not buildings

12   to do the work.

13   Q.   Dr. Armstrong, all I'm trying to do for the benefit of

14   the jury is to establish in rough terms when this happened --

15   you told us about 2009 -- and some idea of how much money

16   we're talking about.

17   A.   I don't recall the exact year.  You said 2009, sir.  I

18   really don't recall.

19   Q.   Okay.  It was -- the ask was made while you were still at

20   Michigan State, true?

21   A.   That's true, the building project started.

22   Q.   And when did you leave Michigan State?

23   A.   2011.

24   Q.   Okay.  So sometime before 2011.  And my other question to

25   you -- and if you don't remember, you just tell us -- is

1    some -- approximately how much money are we talking about in

2    terms of the ask --

3    A.    I don't --

4    Q.    -- from UEP?

5    A.    I do not recall --

6    Q.    Okay.

7    A.    -- that we even asked money from UEP.  I -- we raised

8    about $180 million in ten years when I was at Michigan State.

9    So I don't remember specific donations.

10   Q.    Okay.

11   A.    That's part of how you're judged, is how much money you

12   raise.

13   Q.    And that's partly why I was asking you, Dr. Armstrong,

14   because as you volunteered to the jury on your direct exam, as

15   the president of the university, you're very involved in

16   fundraising, it's a big part of your job, right?

17   A.    Yes, it is.

18   Q.    So having some idea of how much money you're asking for

19   people to contribute is something that's part of your job

20   duties, correct?

21   A.    It is.

22   Q.    All right.  And so keeping track of how much you're

23   asking from whom is something that would matter in connection

24   with fundraising, true?

25   A.    It would, and I could tell you a lot that's going on

```
 1   right now, but ten years ago, is ten years ago.

 2   Q.   Let's move to another subject, if we might.  Backfilling.

 3   I want to start by just orienting everyone to what is

 4   backfilling.

 5            Am I correct that you believe backfilling is a

 6   practice where birds die in a cage over a period of time and

 7   then birds are replaced?

 8   A.   That was the way the committee and we viewed -- we viewed

 9   it, replacing birds that were mortalities.

10   Q.   And it's also the way you, sir, define backfilling, true?

11   A.   Yes.

12   Q.   Okay.  Now, yesterday, you were shown Defendants'

13   Exhibit 409.

14            MR. BLECHMAN:  If we might put that up for the

15   jury's benefit, please.  We're getting there.  Ah, okay.

16   BY MR. BLECHMAN:

17   Q.   Exhibit 409, Dr. Armstrong, this is the letter that you

18   identified yesterday as one that you wrote to Paul Bahan,

19   the -- of the UEP's Producer Committee dated October 4, 2004,

20   true?

21   A.   Yes.

22   Q.   And this letter, you explained to Mr. Bahan your

23   opposition to the -- to backfilling, true?

24   A.   I explained the committee's opposition to backfilling.

25   Q.   The committee opposition to backfilling.  That's
```

1   contained in Exhibit D-409, true?

2   A.   I have D-0665, but it's October 4th letter.

3   Q.   Oh, I'm sorry.

4   A.   I just wanted to make sure we're talking about the same

5   letter.

6   Q.   I think we are, and what's on the screen is, I believe,

7   the identical letter?

8   A.   That's the same one.  We're talking about the same

9   letter.

10  Q.   Perfect, okay.

11  A.   Yeah.

12  Q.   So I just wanted to have you identify that first.  So we

13  set -- we set a temporal reference, context for what we're

14  going to talk about next.

15       MR. BLECHMAN:  Could you -- would you mind moving

16  that easel right over here?

17       Excuse me, Your Honor.

18  BY MR. BLECHMAN:

19  Q.   All right.  So, Dr. Armstrong, what I want to do now is,

20  with your help, I'd like to go over the timeline for -- that

21  ends with your October 4, 2004, letter to the UEP's Producer

22  Committee explaining your and the committee's -- the Science

23  Advisory Committee's opposition to the backfilling ban.

24       Are you with me?

25  A.   Yes.

```
 1   Q.   Okay.  So let's start.  Okay, I'm going to just write

 2   "backfilling" up at the top.  Hopefully my scribble is

 3   decipherable.  And let's begin by stepping back to January 23

 4   of 2003.  In January -- on January 23, 2003, the UEP Producer

 5   Committee, it actually allows for backfilling, does it not?

 6   Do you have a memory of that, sir?

 7   A.   I know -- what I know is we substantially set the

 8   guidelines in 2000.  They did not --

 9   Q.   Dr. Armstrong --

10   A.   I'm answering your question.  They did not substantially

11   change --

12   Q.   Excuse me, Dr. Armstrong.  I want to try to --

13   A.   -- and we were not aware of backfilling until it was

14   brought to our attention.

15   Q.   Dr. Armstrong --

16   A.   I'm not sure what date.

17   Q.   Sir, please.  I'm going to -- I want to try to move this

18   through.

19   A.   Sure.

20   Q.   If you've got other things to say, your attorney can

21   bring it out.

22          My question to you was:  In January -- on or about

23   January 23, 2003, were you aware that the UEP Producer

24   Committee actually allowed backfilling?

25   A.   We were aware that backfilling was occurring and the
```

1    committee did not like it.

2         MR. BLECHMAN:  Okay.  Exhibit -- Plaintiffs'

3    Exhibit 164, let's publish that for the jury -- it's in

4    evidence -- please.  And directing -- well, let me wait until

5    it's up.

6    BY MR. BLECHMAN:

7    Q.   Turning to the third page of Plaintiffs' Exhibit 164,

8    there we go, one, two -- third paragraph, which is -- reads:

9    Backfill of layer houses.

10        Do you see that?  Third page?

11   A.   It's hard to read on the screen.

12   Q.   No, no, for sure.  Let me give you --

13        MR. BLECHMAN:  Your Honor, may I approach?

14        THE COURT:  Yes, you may.

15   BY MR. BLECHMAN:

16   Q.   Let me give you a hard copy.

17   A.   Um-hum.

18   Q.   We're having an issue, I think, with the screen.  Third

19   page.  All right.  Let me move on and just -- you can follow

20   with me.

21        On the third page, do you see a reference there to

22   backfill of layer houses:  Gregory reported that several

23   producers have asked for the status of being allowed to

24   backfill layer houses.  He reported that backfilling was

25   allowed of any houses regardless of whether the hatch occurred

1    before or after April 1, 2002, so long as the layers per house

2    did not exceed the required house average space allowance.

3            Do you see that?

4    A.   I do.

5    Q.   He asked if anyone wanted to speak to changing this

6    policy.  There was no recommendation for change.

7            Do you see that?

8    A.   I do.

9    Q.   Were you aware of this communication by -- excuse me.

10   Withdrawn.

11           Were you aware of this action and communication by

12   the UEP Producer Committee on or about January 21, 2003?

13   A.   I don't know if I was in attendance.  I do not recall

14   what -- how the producers were dealing with backfilling.  What

15   I do recall is when it was brought to the

16   committee's attention and we discussed it, we felt it was a

17   very negative process.

18   Q.   And I promise you we're going to get there.

19   A.   Yeah.

20   Q.   But on January 23rd --

21   A.   The committee --

22   Q.   Dr. Armstrong --

23   A.   -- the Animal Welfare Committee meeting obviously took

24   this action.

25   Q.   Okay.  So let me ask you one other question on this

1    document.  Turn to the first page, please.

2    A.   Yes.

3    Q.   You'll notice under -- under Call to Order, the second

4    paragraph, it says:  Staff and guests.

5            Do you see that there?

6    A.   Yes.

7    Q.   And do you see in the very last line, first word, it says

8    Marcus Rust?

9    A.   Yes.

10   Q.   Do you see that?  Do you know Marcus Rust as being the

11   president of Rose Acre?

12   A.   I do know that.

13   Q.   Okay.  And this document shows his attendance at this

14   meeting, true?

15   A.   Yes.

16   Q.   Okay.  So let's move on now to May 12, 2003.

17           MR. BLECHMAN:  If we could please see Plaintiffs'

18   Exhibit 186.  Excuse me.  Actually, Plaintiffs' Exhibit 186 is

19   not in evidence, but it is a stipulated as a business record,

20   Your Honor.

21           May I have a copy for the Court?  Oh, it's in

22   evidence already.  That makes it simpler.

23           Thank you, Mr. King.

24           Your Honor, I'm informed that Plaintiffs' 186 is

25   actually in evidence.

```
1               THE COURT:  Okay.

2               MR. BLECHMAN:  If we might publish that for the

3    jury.

4               THE COURT:  Go ahead.

5               MR. BLECHMAN:  May I approach the witness?

6               THE COURT:  Yes.

7    BY MR. BLECHMAN:

8    Q.   This may be easier.

9    A.   Thank you.

10   Q.   Yes.  So now we're up to May 12 -- excuse me -- yeah,

11   May 12, 2003.  This is another minute of the meeting, of the

12   Producer Committee of the UEP, right?

13   A.   Yes.  And it appears that I was not in attendance at this

14   meeting either.

15   Q.   But -- but let's look at who was in attendance.

16          Do you see under Members, third line down, it says

17   Ky Hendrix of Rose Acre?

18   A.   Yes.

19   Q.   And also Gene Gregory under Staff and Guests, do you see

20   that?

21   A.   Yes, I do.

22   Q.   Okay, and then if you turn, please, to the second page,

23   there's a reference to backfilling, isn't there?

24   A.   There is.

25   Q.   All right.  And -- and on that page, it shows once again
```

1    that the UEP Producer Committee considered backfilling and

2    it's allowed, right?

3    A.    Yes.

4    Q.    Okay.

5    A.    That's what the Producer Committee decided.

6    Q.    Okay.  We're going to get to you.  I promise.  And then

7    for context, if we might, Dr. Armstrong, I'm going to show you

8    what's been marked as Plaintiffs' Exhibit 195.

9                MR. BLECHMAN:  May I approach, Your Honor?

10               THE COURT:  Yes, you may.

11               MR. BLECHMAN:  Thank you.

12   BY MR. BLECHMAN:

13   Q.    Plaintiffs' Exhibit -- Plaintiffs' Exhibit 195, this is a

14   United Voices issue from August 27, 2003, and in this issue --

15   in this issue, if you turn, please, sir, to page 4, you'll see

16   just as a point of context, nothing more, that there's --

17   there's -- in the second -- about the first third of the page,

18   there's an article about why egg prices are so high.

19               Do you see that?

20   A.    I do.

21   Q.    Okay.  And look at the third paragraph there, which --

22   which discusses factors as to why -- likely factors or likely

23   major reasons for price levels being as high as they are.  The

24   third factor there, would you read that to the jury, please?

25   A.    Implementing space allowance to meet the industry's

1    Animal Welfare Guidelines, guidelines that were endorsed by

2    the Food Marketing Institute and the National Council of Chain

3    Restaurants.

4    Q.   All right, so egg prices appear to be -- according to

5    United Voices -- tracking what's going on in the market, egg

6    prices in or about August of 2003 are high, true?  That's what

7    it's reflecting.

8    A.   Yes.  That's what's stated here, sure, yes.

9    Q.   Right.  And there's -- now let's move to May 20, 2004,

10   all right?  In May 20, 2004 -- I'm going to show you another

11   document that's been previously marked as Plaintiffs'

12   Exhibit 232.

13            MR. BLECHMAN:  Permission to approach?

14            THE COURT:  Yes, go ahead.

15   BY MR. BLECHMAN:

16   Q.   (Handing.)

17            This is another United Voices newsletter, correct,

18   sir?

19   A.   Yes, sir.

20   Q.   All right, and this May 20, 2004, United Voices

21   newsletter, if you look at page 3 -- actually, right, on

22   page 3 -- let me get you oriented first.

23            Actually let's go to page 2 first, if we might,

24   towards the bottom.  Do you see the reference to an editorial

25   by Gene Gregory?

1    A.    Yes.

2    Q.    This is the Gene Gregory you know, correct?

3    A.    Yes.

4    Q.    And the title of the article -- excuse me.  The title of

5    the editorial is:  Are You Committed?  Correct?

6    A.    Yes.

7    Q.    All right, and then if you turn to the next page, sir,

8    you'll note the third paragraph, it reads:  The industry built

9    an egg inventory prior to Easter expecting increasing demand.

10   The inventory was far too large, demand was far less than

11   expected, and we began panic -- and panic is in bold and

12   underlined -- selling to rid ourselves of the inventory.  We

13   caused the market to free-fall in all regions by as much as

14   $0.60 or more.

15         Did I read that correctly?

16   A.    Yes.

17   Q.    All right, so according to this editorial in United

18   Voices in May of 2004, egg prices have now started going down

19   and they -- according to this editorial, they started going

20   down quite a bit, true?

21   A.    Yes.

22   Q.    All right, so I wrote down, Egg prices are going down.

23         And then, Mr. Gregory writes more than just about

24   egg prices going down.  If you look -- if you'll turn back one

25   page again, to the preceding page, page 2, all the way at the

1    bottom, starting there with the paragraph that begins, While

2    never intended.  Tell me when you see that.

3    A.   I see it.

4    Q.   All right, and Mr. Gregory writes in this editorial,

5    quote:  While never intended as a supply adjustment program,

6    the Animal Care Certified Program is the only road map the

7    industry has ever had for future planning.

8              Did I read that correctly?

9    A.   Yes.

10   Q.   He goes on to say:  That if you -- excuse me.  He goes on

11   to write:  If you stay true to the program and manage it to

12   meet the market demand, it can provide the industry with

13   prolonged profits.  For many people, backfilling to replace

14   mortality was a new production practice and may be necessary

15   to maximize profits, but it is now time to rethink this

16   position.  Backfilling into unprofitable periods certainly

17   doesn't make good business sense.

18             That's what Mr. Gregory wrote in this editorial,

19   true?

20   A.   True.

21   Q.   Okay.  So now, as of May of 2004, I'm going to write down

22   here, Gregory editorial, Are You Committed?  So what we have

23   is January 2003 backfilling is going on, it's been reviewed by

24   the Producer Committee, it continues.  By August of 2003, egg

25   prices have gone up, but about nine months later, egg prices

```
1   are now coming down, true?  That's the pattern we see here.
2   A.   Yes.
3   Q.   All right, so now let's take a look at what happens --
4   actually, let me stop and ask you a question.
5        With regard to Mr. Gregory's editorial, Are You
6   Committed?  And where he's talking about backfilling can --
7   can actually lead to excess -- additional supply which means
8   prices come down and it's not -- it's not going to help if
9   everybody's backfilling, did you have any discussions with
10  Mr. Gregory in or about May of 2004 on the subject of
11  backfilling, yes or no?
12  A.   We had discussions with UEP and a lot of producers about
13  backfilling from the Scientific Welfare Committee perspective.
14  Q.   And my question to you, sir, is, in or about May of 2004,
15  did you have any discussions, any communications with
16  Mr. Gregory on the subject of backfilling?
17  A.   I don't recall, but -- exactly when backfilling came
18  before the committee, but very likely did.  I had a lot of
19  communications with Gene.  So I do not recall when the
20  committee first reviewed backfilling as a welfare issue.
21  Q.   Dr. Armstrong, excuse me --
22  A.   And so I can't -- I can't tell you whether we talked
23  about it in May or not.  We probably did.
24  Q.   So -- so I've heard two answers from you, first, I don't
25  recall, and then, we probably did.
```

1   A.   I --

2   Q.   Which -- for purposes of what I'm going to ask you next,

3   which answer are you standing by, I don't recall or we

4   probably did?

5   A.   I don't recall when we first started talking about

6   backfilling.

7   Q.   Okay.  Would it be accurate to say that you don't recall

8   whether in May of 2004 you spoke -- you had any communication

9   with Mr. Gregory on the subject of backfilling?

10  A.   I can tell you if we had discussion on backfilling, it

11  had to do with the nature of what's in this letter,

12  October 4th, with regard to the animal welfare aspects of

13  backfilling.  The committee or I did not have discussions

14  about supply.  I'd like to think I'm a good --

15  Q.   Dr. Armstrong, please.  I'm asking you a pretty narrow

16  question, I think.

17  A.   You are asking me when -- what -- when we talked about

18  backfilling and I explained --

19  Q.   Is it possible --

20  A.   -- I don't know the exact date and I'm giving you the

21  rationale of why I don't know the exact date.

22  Q.   And I can ask -- thank you for that.

23        Is it possible, sir, that in or about May of 2004,

24  you, in fact, did have a discussion with Mr. Gregory on the

25  subject of backfilling?  Is that possible, sir?

```
 1              MS. SUMNER:  Objection.  Asked and answered.

 2              THE COURT:  Overruled.

 3              MR. BLECHMAN:  I'm going to move on.  Thank you,

 4    Your Honor.

 5              THE COURT:  Okay.

 6              THE WITNESS:  Do you want me to answer?

 7              THE COURT:  Well, you may answer.

 8              THE WITNESS:  Yes, as I said, it is possible, and

 9    any discussions would have been along the lines of animal

10    welfare perspective from the committee.  I never acted alone.

11    BY MR. BLECHMAN:

12    Q.  All right, so now let's move to August of 2004.  In

13    August of 2004, Plaintiffs' Exhibit 243 --

14              MR. BLECHMAN:  If we might have that published,

15    please.

16              Your Honor, may I approach?

17              THE COURT:  Yes.

18              MR. BLECHMAN:  Thank you.

19    BY MR. BLECHMAN:

20    Q.  Here.

21    A.  Yes.

22    Q.  Once again, I'm showing you a --

23              Is that up?

24              Once again, I'm showing you a United Voices

25    newsletter.  This is dated August 12, 2004.  That's in
```

1    evidence, Dr. Armstrong.  Both to establish context and also

2    to ask you some specific questions.  Actually -- do you have

3    624?  No -- I misspoke.  I'd actually like to use a different

4    exhibit first.  So if we might withdraw that.

5              And let me ask you a different question.

6    Dr. Armstrong, you may -- please just kindly put that to the

7    side for a moment.

8    A.   Yes, sir.

9    Q.   In August of 2000 -- excuse me, in October -- okay.  I

10   stand corrected.

11             Exhibit 243, I'm good with that.  Let's go with it.

12             MR. BLECHMAN:  So if we can please put that back up.

13   BY MR. BLECHMAN:

14   Q.   Do you have Exhibit 243 in front of you, Dr. Armstrong?

15   A.   Yes, sir.

16   Q.   All right, and this is another United Voices newsletter

17   dated August 12, 2004, correct?

18   A.   Yes.

19   Q.   All right, and directing your attention to the second

20   page, please, if we might see that, there is at the top of the

21   page another editorial, this time by Al Pope.  Do you see

22   that?

23   A.   I do.

24   Q.   All right, and remind everybody, who's Al Pope?

25   A.   I think at the time he was the leader of UEP.

```
 1   Q.   And by "leader," you mean the president?

 2   A.   Yes.

 3   Q.   And what's the title of that article, sir?

 4   A.   Backfilling - A Loophole of a Hangman's Noose, editorial

 5   by Al Pope.

 6   Q.   Al Pope, just to remind everybody, he's the person who

 7   invited you to participate in the UEP work back initially in

 8   1997, 1998, correct?

 9   A.   Yes.

10   Q.   Okay.  And take a look at the third paragraph, please, of

11   Mr. Pope's editorial.  Do you see that?

12   A.   Yes.

13   Q.   All right, he writes, a year later, so now let's just set

14   context, this is August 12, 2004, he writes, a year later:

15   And while the ACC program was never a supply management

16   program, the, quote, backfill, unquote, provision, paren, in

17   my opinion, close paren, is contributing or even causing some

18   of the disorderly marketing and poor egg prices that we are

19   currently experiencing.

20            Did I read that correctly?

21   A.   Yes.

22   Q.   He writes further:  We have a shot -- excuse me.  Have we

23   shot ourselves in the foot with this well-intended provision?

24            Do you see that?

25   A.   Yes.
```

1   Q.   And then he concludes this paragraph by writing:  It is

2   a, quote, noose, unquote, that is strangling -- and that word

3   is in quotation marks -- the opportunity of enjoying, once

4   again, the favorable prices for our product we expected this

5   fall.

6            Did I read that correctly?

7   A.   Yes.

8   Q.   Did you and Mr. Pope have a conversation -- withdrawn.

9            Did you and Mr. Pope have any communication in or

10  about August 12 of 2004 on the subject of backfilling

11  contributing or causing poor egg prices, yes or no?

12  A.   I don't recall.  I had very few conversations with Al

13  Pope.

14  Q.   Now -- and I promised you we'd get there -- let's talk

15  about October 10 -- excuse me, October 4, 2004.  That is the

16  date of the letter that you wrote to the UEP Producer

17  Committee on behalf of yourself and the committee, you

18  explained --

19  A.   Um-hum.

20  Q.   -- explaining the opposition to backfilling, true?

21  A.   Yes.

22  Q.   All right, I want to show you a document that same day,

23  dated earlier in the day, that you haven't seen from Defense

24  Counsel yet, but that reflects an e-mail that went from Don

25  Bell to you.  Let me begin by asking, you know who Don Bell

1   is, correct?

2   A.   I do.

3   Q.   All right, and in October 4, 2004, you were the chair of

4   the Science Advisory Committee, correct?

5   A.   Yes.

6   Q.   And by this time you also had a consulting arrangement

7   with UEP, true?

8   A.   Yes.

9   Q.   All right.

10          MR. BLECHMAN:  Your Honor, may I -- the Defense

11  Exhibit 624, I'd like to just show the witness, if I might

12  approach.

13          THE COURT:  Go ahead.

14  BY MR. BLECHMAN:

15  Q.   Okay.  Dr. Armstrong, you have in front of you

16  Defendants' Exhibit 624, correct?

17  A.   Yes.

18  Q.   And this is an e-mail from Don Bell to you and others

19  dated October 4, 2004, true?

20  A.   It's a letter to the committee from me.

21  Q.   Are you looking at the letter or are you looking at

22  Exhibit 624, which is the e-mail I just handed you?

23  A.   I'm looking at the e-mail.

24  Q.   Okay.  I thought I heard you say it was the letter.  You

25  may have misspoke.

1   A.   No, the e-mail -- this is an e-mail that I sent to all

2   the members of the committee, and it was a copy -- attached

3   copy of the letter, October 4th, and I asked them to review

4   the letter.

5   Q.   Okay.  So what I've handed you is just the e-mail right

6   now, correct?

7   A.   That's correct.

8   Q.   All right, and based on your testimony just now and the

9   other questions that you've answered on this document --

10          MR. BLECHMAN:  Your Honor, Plaintiffs offer

11   Defendants' Exhibit 624 in evidence.

12          MS. SUMNER:  No objection.

13          THE COURT:  624 is admitted.

14          (Exhibit received in evidence.)

15          MR. BLECHMAN:  Okay.  If we might publish that to

16   the jury, Your Honor, please.

17          THE COURT:  Go ahead.

18          MR. BLECHMAN:  Thank you.

19   BY MR. BLECHMAN:

20   Q.   Dr. Armstrong, let's -- let's go through this e-mail that

21   you wrote just for a moment.  This is from you to Don Bell and

22   others, true?

23   A.   Yes.  It's a letter to the committee.

24   Q.   We're talking about the e-mail, sir.  The e-mail --

25   A.   It's an e-mail, yes.

1    Q.    I promise --

2    A.    E-mail, I apologize.  It's an e-mail to the committee.

3    Q.    Thank you.

4    A.    Yes, I understand.

5    Q.    All right, and you sent the e-mail to, among other

6    people, Scotti Hester, correct?

7    A.    Yes.

8    Q.    And you've identified who she is yesterday, true?

9    A.    Yes.

10   Q.    And you sent this e-mail also to Gene Gregory, correct?

11   A.    Yes.

12   Q.    All right.  And in the e-mail, you -- the subject is,

13   Welfare Producer Committee, October 2004 Letter on

14   Backfilling.doc, D-O-C.  Correct?

15   A.    Yes.

16   Q.    And that's the letter -- the attachment, the letter to

17   which you refer, correct?

18   A.    Yes.

19   Q.    And in the e-mail, you write to this group:  Please

20   review the attached letter, Scotti.

21         That's Dr. Hester, correct?

22   A.    Correct.

23   Q.    Scotti assisted in providing the first draft of a letter

24   asking producers to cease the practice of backfilling.

25         Did I read that correct?

 1   A.   Correct.

 2   Q.   And then you write:  We need to support UEP in their

 3   quest to terminate this practice.

 4          Did I read that correctly?

 5   A.   You did.

 6   Q.   And the phrase "this practice" refers to the backfilling,

 7   correct?

 8   A.   That's correct.  For the reasons noted in the letter.

 9   Q.   Thank you.  All right.

10          And then on October 4, 2004, first there's the

11   e-mail about the UEP quest to terminate backfilling, and then

12   there's your letter that same day, true?

13   A.   That's correct.

14   Q.   All right.  And after you sent that letter of October 4,

15   2004, to the UEP, the Producer Committee and then the Board of

16   Directors met to consider your letter, true?

17   A.   Yes.

18   Q.   All right.  And, in fact, the Producer Committee met on

19   December 7 and 8 -- my handwriting's terrible.  The Producer

20   Committee met that date and considered, among other things,

21   the backfilling, correct?

22   A.   Correct.

23   Q.   All right.  Now, Exhibit 260, Plaintiffs', please.

24          MR. BLECHMAN:  Your Honor, may I approach?

25          THE COURT:  Yes, you may.

1          MR. BLECHMAN:  Thank you.

2     BY MR. BLECHMAN:

3     Q.   Dr. Armstrong, I've handed you what's been marked as

4     Plaintiffs' Exhibit 260.  This is in evidence, I believe.

5          THE COURT:  It is.

6          MR. BLECHMAN:  Thank you.  May we publish it?

7          THE COURT:  Yes.

8          MR. BLECHMAN:  Thank you.

9     BY MR. BLECHMAN:

10    Q.   All right.  Do you see that there?

11    A.   Yes.

12    Q.   All right.  And if you look, you'll see on the first

13    page -- well, first of all, let's set the stage a little bit

14    more.

15         You attended this meeting, did you not?

16    A.   Yes.

17    Q.   Also in attendance at this meeting is Ky Hendrix of Rose

18    Acre, true?

19    A.   True.

20    Q.   And Gene Gregory, correct?

21    A.   Yes.

22    Q.   And other people who were there, true?

23    A.   Yes.

24    Q.   All right.  And at this meeting, the UEP Producer

25    Committee considered and ultimately passed a motion to ban

1    backfilling, true?

2    A.    True.

3    Q.    Okay.  And then on December 16, 2004, Exhibit 261, on

4    that day the UEP Board of Directors meets and it bans

5    backfilling by motion that is passed, correct?

6    A.    Correct.

7    Q.    Okay.  So -- and that will be Exhibit 261, please.

8          MR. BLECHMAN:  And, Your Honor, it's in evidence, if

9    I might approach.

10         THE COURT:  Yes.

11         THE WITNESS:  Thank you.

12   BY MR. BLECHMAN:

13   Q.    You're welcome.

14         So I'm giving you that just so you have context for

15   what -- this timeline.  Do you got that Dr. Armstrong?

16   A.    Yes.

17   Q.    Okay.  Now, I want to ask you a couple of questions about

18   what the UEP Producer Committee that you attended and the UEP

19   Board of Directors meeting, what they did.  So now -- and I

20   also want to go back to -- to your letter of October 4.  So I

21   want to do two things and I want to orient you because I'm

22   going to go back with some documents.  So where we're going to

23   go first is your October 4 letter, and I want to take a look

24   at the two -- at the November -- excuse me -- September 2000

25   Science Advisory Committee recommendations, which is already

 1    in evidence, Exhibit 52.  Okay?

 2            So -- I think you'll -- it's probably behind like

 3    Tab 1 or 2 that Defense Counsel gave you yesterday, and I'm

 4    just going to have a few questions for you, but let me allow

 5    you to get oriented.

 6    A.    September 2000?

 7    Q.    Yes.  Is that the final recommendations?

 8    A.    It's the September 2000, yes.

 9    Q.    And those are the final recommendations, true?

10    A.    Yeah, the main -- it evolved after that point, but this

11    is the -- yes, this is the recommendations, September 2000.

12    Q.    And those were the final recommendations.  I thought

13    that's your testimony.  I don't think this is in dispute.  I'm

14    just looking to establish --

15    A.    My testimony was that the guidelines evolved, but the

16    core guidelines, frankly, didn't change over time.

17    Q.    Okay.

18    A.    It was more of a phase-in and how they dealt with it.  So

19    I'm sorry.  I'm an academician.  The guidelines evolved.

20    Q.    Okay.  But we're in court, so I'm going to try to stick

21    with this.

22    A.    This is the September 2000 guidelines.

23    Q.    You have Plaintiffs' Exhibit 52?

24    A.    Yes, sir.  Yes, sir.  And I'm not trying to be difficult.

25    Q.    That's okay.

1        And you have -- you have your letter of October 4 in

2   front of you?

3   A.   Yes, sir.

4   Q.   All right.  So what I want to do with the next series of

5   questions is I want to review the -- the stated information

6   that is apparent to all of us that was relied on by the

7   Science Advisory Committee in the recommendations on the

8   backfilling ban.  That's the context.  Do you understand?

9   A.   Yes.

10  Q.   All right.  In your Exhibit 52, turn to page 13 to 16 on

11  molting.  Let's just take that.

12  A.   Yes.

13       MR. BLECHMAN:  All right.  And on pages 16, if we

14  might put up that page, please.  Thank you.

15  BY MR. BLECHMAN:

16  Q.   On page 16, in the last few pages -- the last few

17  paragraphs there, do you see a number of citations to

18  literature that are cited on that page in support of the

19  Science Advisory Committee's recommendation regarding molting?

20  Do you see the literature cites?

21  A.   That's page 16.  But there's --

22  Q.   13 to 16?

23  A.   There's literature cited all throughout, yes.

24  Q.   I'm asking you about molting and page 16.  Do you have

25  that in front of you?

1    A.    This is page 16.

2            MR. BLECHMAN:  May I approach, Your Honor?

3            THE COURT:  Yes, you may.

4    BY MR. BLECHMAN:

5    Q.    I may be giving you the wrong page.  I believe you.  Are

6    we looking at the right document?  Okay.  This is slaughter --

7    do you know what, we're looking at different pages.  Would you

8    find -- let me do it this way:  Would you find the page in the

9    document regarding molting.  It's going to be page 14 that has

10   that PX at the bottom.  Tell me when you're there.

11   A.    I have it.

12   Q.    Okay.

13   A.    Yes.

14   Q.    The numbering, there's different numbering.  So we're

15   missing each other.  So you have page PX and ends .0014 of

16   Exhibit 52 in front of you, yes?

17   A.    Correct.

18   Q.    And this deals with molting, correct?

19   A.    Yes.

20   Q.    All right.  Now, I will tell you, there's a number of

21   literature cites there to support what the Science Advisory

22   Committee is recommending with regard to molting, true?

23   A.    Yes.

24   Q.    All right.  By my count, and I may be off by a number or

25   two, but I counted 16 different literature cites supporting

1    the Science Advisory Committee's recommendation regarding

2    molting.

3            Does that sound about right to you?

4    A.    There are probably that many references cited in this

5    section, yes.

6    Q.    Okay.  So now let's take a look at Exhibit -- what I'm

7    calling D-409, your October 4, 2004, letter to the UEP

8    Producer Committee on behalf of the Science Advisory Committee

9    recommending a backfilling ban.

10           Do you have that in front of you?

11   A.    Yes, I do.

12   Q.    Do you see any literature cites in this document?

13   A.    No.

14   Q.    Now, let's go to Exhibit 260, which you've seen already.

15   That's the Producer Committee meeting of December 7, 2008.

16   Tell me when you have that in front of you, sir.

17   A.    Yes, I have it.

18   Q.    Good.  I'll give counsel a chance to catch up.  Okay.

19           There's something about the backfilling ban that I

20   need to -- I want to ask you about.  On the very first page at

21   the bottom, the backfilling ban motion that passes by the

22   Producer Committee, it reads in part, if I might:  Backfilling

23   is prohibited under the Animal Care Certified Program.  An

24   exception shall be made for flocks that have experienced

25   catastrophic mortality.  A catastrophic event is defined as a

1    natural disaster, disease problem, or other event beyond the

2    control of the producer.

3              Did I read that correctly?

4    A.   You did.

5    Q.   And you testified on direct examination yesterday about

6    the catastrophic event exception to the backfilling ban,

7    didn't you?

8    A.   Yes.

9    Q.   But what I didn't hear in your testimony yesterday --

10   maybe I missed it -- was a reference to -- under these

11   circumstances, if you continue looking at Exhibit 260, the

12   resolution -- the motion provides:  Under these circumstances,

13   backfilling of hens up to 90 percent of the original flock

14   capacity shall be permitted.

15             Did you see that?

16   A.   I see it in the motion.

17   Q.   Did I read that correctly?

18   A.   Yes, you did.

19   Q.   Is there some 90 percent provision in your October 4,

20   2004, letter?

21   A.   The Scientific Advisory Committee --

22   Q.   Sir?  Sir?

23   A.   -- did not address a provision of percentage.

24   Q.   And by "percentage," you mean 90 percent, 80 percent, any

25   percentage?

1   A.   We did not.  And, in fact, at the time that they made

2   this statement --

3   Q.   Okay.

4   A.   -- we had not discussed the catastrophic, and we later

5   amended our guidelines --

6   Q.   Right.

7   A.   -- to allow this.

8   Q.   Right.

9   A.   But they didn't know for sure we would at that time.  I

10  told them I thought they would.

11  Q.   Okay.  Well, I want to ask you about that now.  You

12  attended this meeting December 7, 2004, of the Producer

13  Committee in Chicago, right?

14  A.   I did.

15  Q.   And you were present for the discussion about the

16  backfilling ban, true?

17  A.   Yes.

18  Q.   All right.  So let's -- let's talk about what this

19  90 percent means.  So, in other words -- you tell me if I've

20  got this right -- if a producer suffers, unfortunately, a

21  catastrophic event where a henhouse is wiped out for some

22  reason, then in those circumstances, it's allowed to backfill,

23  but it can't put back in the henhouse the same number of birds

24  or hens that it had before the catastrophic event, it can only

25  put back in the henhouse 90 percent of that number, true?

```
1    A.    That's what the producers were recommending.

2    Q.    So, in other words, if there's a catastrophic event that

3    allows for an exception to the backfilling ban, this

4    resolution that passes by the Producer Committee and then by

5    the board later, actually in connection with the 90 percent

6    provision, in and of itself imposes a 10 percent reduction in

7    the number of hens that can be put back into the henhouse in

8    the event that there's a catastrophic event, true?

9    A.    Which are very rare.

10   Q.    That's not what I asked you.  Is my -- is what I said

11   true?

12   A.    Yeah, what you said is true.

13   Q.    Thank you.

14   A.    And that was the Producer Committee, not the Scientific

15   Committee.

16   Q.    I'm curious, Dr. Armstrong.  At this meeting on

17   December 7, 2008 -- excuse me -- 2004, of the Producer

18   Committee --

19   A.    Um-hum.

20   Q.    -- when you heard the Producer Committee talking about

21   the fact that they would have an exception to backfilling that

22   would provide explicitly for a reduction in supply of

23   10 percent of hens, did you get up and walk out of the room?

24   Yes or no?

25   A.    I wished my memory was good enough to tell you what I
```

1    thought about.  I remember taking the backfilling to the

2    Animal Producer Committee.

3    Q.   Dr. Armstrong, if you don't have a memory, then with all

4    due respect --

5    A.   I do recall, if I walked -- if I got up and walked out of

6    the room, it was to go answer a phone call or do something

7    else, because I don't recall this detail being discussed.

8    Q.   But do you acknowledge --

9    A.   If I had heard that, and it being a rare event, I don't

10   know that it would have even registered.  I don't even know

11   that I would have paid attention to it.

12   Q.   Dr. Armstrong, do you acknowledge, sir, that the

13   90 percent catastrophic exception to the backfilling ban, by

14   its -- literally by its terms provides for a 10 percent

15   reduction in the supply of hens in henhouses if the

16   catastrophic event exception is triggered?  Do you acknowledge

17   that?

18   A.   I recognize that, and it's such a rare event, I didn't

19   really think about it at the time.  I didn't worry about it.

20   Q.   And -- and you base your testimony that it's such a rare

21   event based on your many years of experience dealing with

22   hens.  Is that -- is that your testimony?

23   A.   Based on the definition of "catastrophic."

24   Q.   I see.

25   A.   Catastrophic is rare, just based on my common sense.  I

 1    would just leave it at that.

 2    Q.   I see.  All right.

 3             And just to button this up, on December 16, 2004,

 4    Exhibit 261, do you have that in front of you?

 5    A.   Um-hum.

 6    Q.   Is that a yes?

 7    A.   That's a yes, I'm sorry.

 8    Q.   Okay.

 9    A.   I was swallowing.

10    Q.   Both of us serve --

11    A.   I'm on the back end of that cold.  So I apologize for my

12    scratchy voice.

13    Q.   Both of us serve at the pleasure of the court reporter,

14    so I hear you.

15             Exhibit 261, this is the UEP Board of Directors

16    meeting of December 16, 2004, correct?

17    A.   That's correct.

18    Q.   All right.  And at this meeting, you see at the bottom of

19    the page that the UEP board passes the backfilling ban with

20    this 90 percent catastrophic exception providing for supply

21    reduction.

22             Do you see that?

23    A.   Yes, I see that and I was not in attendance.

24    Q.   Right.  And I think you explained that subsequent to the

25    UEP board passing the backfilling ban with this 90 percent,

1  10 percent supply reduction provision, that then got literally

2  baked into and written into the UEP Guidelines thereafter in

3  2005, true?

4  A.   What was put in the scientific guidelines was

5  backfilling.  I -- I don't know what the producer did.  I

6  don't recall.

7  Q.   I didn't think this was actually controverted, but let's

8  just establish it.  After the board of UEP votes in December

9  of 2004 to implement the backfilling ban, that backfilling ban

10  then gets included expressly in the UEP Guidelines that are

11  issued in 2005; isn't that true?

12  A.   Yes.

13  Q.   Okay.

14  A.   I'm not disputing the Animal Welfare Guidelines.  I'm

15  being specific about the science-based guidelines.

16  Q.   I just -- I hear you.  And -- and isn't it also true,

17  sir, that the 2005 UEP Guidelines include in the backfilling

18  ban this 90 percent or 10 percent reduction of supply

19  provision with regard to backfilling, true?  Yes?

20  A.   I assume so, yes.

21  Q.   Okay.  Okay.

22  A.   I don't have it in front of me.

23  Q.   Well, okay.  Let's -- let's not have any doubt about

24  this.

25            Is this in evidence?  Okay.

1          MR. BLECHMAN:  Your Honor, I -- the Plaintiffs offer

2     Defendants' Exhibit 180, which is the 2005 UEP Guidelines.

3               This is a business record, stipulated?

4               Your Honor, I'm advised the parties have stipulated

5     to this being a business record.

6               THE COURT:  Not only that but it's in evidence.

7               MR. BLECHMAN:  Thank you, Your Honor.  May I

8     approach?

9               THE COURT:  Yes.

10              THE WITNESS:  Yes, I see it on page 6.  On page 7,

11    actually.

12    BY MR. BLECHMAN:

13    Q.   And by -- and by "it" --

14    A.   I see it -- it's the language that they -- the same

15    language that was passed at the Board meeting is in the animal

16    guidelines.

17    Q.   In 2005?

18    A.   Yes, it's right here.

19    Q.   With the 90 percent and 10 percent supply reduction

20    provision included, correct?

21    A.   The 90 percent is there, yes.

22    Q.   Right.  And meaning that there's a 10 percent reduction

23    in supply of the hens that go into the henhouse in the event

24    there's a catastrophic event, true?

25    A.   True.

1    Q.    Okay.

2            MR. BLECHMAN:  Your Honor, I'm moving to another

3    subject.

4            THE COURT:  Then we're going to take a break.

5            MR. BLECHMAN:  Thank you, Your Honor.

6            THE COURT:  And the break will be about 10,

7    12 minutes or thereabouts.  Once again, the same rules apply.

8    See you in about 10, 12 minutes, everybody.

9            THE DEPUTY CLERK:  All rise.

10           (Jury out.)

11           THE COURT:  Okay, enjoy the break.

12           Does it seem chilly in here to you?  Once again,

13   it's a gender-based response.

14           MS. SUMNER:  It's cooler than usual but I wouldn't

15   say it's chilly.

16           MR. BLECHMAN:  For those of us working up here, it

17   feels good.

18           THE COURT:  You're the only ones moving around.

19           MR. BLECHMAN:  That's why I say that.

20           THE COURT:  Well, I may fire up my little heater up

21   here.  Enjoy the break.

22           MR. BLECHMAN:  Thank you, Your Honor.

23           (After recess:)

24           THE COURT:  Okay, can you bring the jury back?

25           (Witness resumes the stand.)

```
 1                THE DEPUTY CLERK:  All rise.

 2                (Jury in.)

 3                THE COURT:  Okay, you all may take your seats.

 4                And, Mr. Blechman, you may resume.

 5                MR. BLECHMAN:  Thank you, Your Honor.

 6  BY MR. BLECHMAN:

 7  Q.   Dr. Armstrong, new subject, audits.

 8                You know that audits exist in the UEP Certified

 9  Program, true?

10  A.   Yes.

11  Q.   The Scientific Advisory Committee did not develop the

12  audit under the UEP Certified Program, correct?

13  A.   Yes.

14  Q.   Audit is a mechanism to ensure compliance with the UEP

15  Guidelines, true?

16  A.   Yes.

17  Q.   The audit, in fact, enforces the UEP Guidelines, true?

18  A.   True.

19  Q.   And the audit is part of the Certified Program, correct?

20  A.   Yes.

21  Q.   For a UEP Certified producer to pass an audit, it must

22  score a certain number of points, true?

23  A.   Yes.

24  Q.   That number of points is 170, correct?

25  A.   I assume so.  I -- I actually do not know.
```

1  Q.   Okay.  We'll go over that in just a moment.

2            You have said several times, but let me just ask you

3  the declarative question, the UEP Guidelines in -- withdrawn.

4            The UEP Guidelines you've explained are

5  science-based, correct?

6  A.   Yes.

7  Q.   If you are saying that you have science-based guidelines

8  and you're not following science, then that is false, correct?

9  A.   If you say you have science-based guidelines and you're

10 not following them, then that is false.  We had a transition

11 period which the guidelines were phased in.

12 Q.   I want to make sure we're communicating.  If you're

13 saying that you have science-based guidelines and you're not

14 following science, then that is false to say that your

15 guidelines are science-based, correct?

16 A.   With the context that science evolves and you -- there

17 are some areas where you know more and others you don't.  So

18 you're asking for a zero or a one or a yes or a no for a gray

19 area.

20 Q.   Well, let me try again.  If you're saying that you have

21 science-based guidelines and you're not following science,

22 then that is false; is that correct?

23 A.   Yes, you would want to follow science, yes.

24 Q.   And if you don't follow science, then that is false,

25 correct?

1  A.  If you don't follow the advice of experts, then -- then

2  you're not in compliance.

3  Q.  If you don't follow science -- if you're saying that you

4  have science-based guidelines and you're not following

5  science, then that is false, correct?

6  A.  What I'm saying is, we have a group of experts that make

7  recommendations --

8  Q.  I'm listening to you, sir.

9  A.  -- and based on the scientist's interpretation of the

10  science at that time that's how the guidelines were set up.

11  Q.  Okay.

12          MR. BLECHMAN:  Your Honor, may I approach?

13          THE COURT:  Yes.

14          MR. BLECHMAN:  Counsel, this is the witness's

15  deposition testimony, March 13, 2004.  Do you have copies for

16  counsel?

17          THE COURT:  Mr. Coyle.

18          (Discussion held off the record.)

19  BY MR. BLECHMAN:

20  Q.  All right.  Dr. Armstrong, you were deposed previously in

21  this matter on March 13, 2004, do you recall?

22  A.  Yes.

23  Q.  And when you were deposed, you -- you swore to testify

24  truthfully at the time, correct?

25  A.  Yes.

1   Q.   And you did so, correct?

2   A.   Yes.

3   Q.   All right.  Turn, if you would, to page 154.  Tell me

4   when you're there.

5   A.   Yes.

6   Q.   And I'm looking at lines 13 to 18.  And I -- I want to

7   just make sure we've got this straight, and I'm going to show

8   this to you because it's not -- I'm not sure we have.  Is it

9   correct that you were asked the following question and gave

10  the following answer as reflected on page 154, lines 13 to 18

11  of your deposition on March 13, 2004.  Question --

12          THE COURT:  Counsel, what was the date of the

13  deposition?

14          MR. BLECHMAN:  March 13, 2014.

15          THE COURT:  '04 -- '14?

16          MR. BLECHMAN:  I apologize.  I'm -- March 13, 2004.

17  BY MR. BLECHMAN:

18  Q.   You were asked the following question and gave the

19  following answer.  Question:  Why was it a huge mistake, in

20  your view?

21          Answer:  Because if you are -- Answer:  If you are

22  saying that you have science-based guidelines and you're not

23  following science, that's false.

24          You gave that answer under oath previously, correct?

25  A.   Um-hum.  I answered it clearly as a 01 and that's what I

1   said.

2   Q.   Okay, you can shut the book.  Thank you, sir.

3   A.   Yes.

4            MR. BLECHMAN:  Exhibit 547.

5   BY MR. BLECHMAN:

6   Q.   Let me show you now an audit form.

7            MR. BLECHMAN:  Counsel, it's Plaintiffs'

8   Exhibit 547, which we've actually blown up.

9            May I approach, Your Honor?

10           THE COURT:  Yes.

11           MR. BLECHMAN:  Thank you.

12  BY MR. BLECHMAN:

13  Q.   Dr. Armstrong, what, actually, I want to do with this

14  document is to cover with you what's on the attached pages.

15  But let me start by handing you Exhibit -- Plaintiffs'

16  Exhibit 547.  This is an e-mail from Gene Gregory to Mike

17  Bynum and others on animal husbandry audits.  And directing

18  your attention to pages 2, 3 and 4 inside, do you recognize

19  the form inside as being a cage layers audit checklist under

20  the UEP Certified Program?

21  A.   Yes.

22           MR. BLECHMAN:  Your Honor, Plaintiffs offer

23  Exhibit 547 as a UEP business record.

24           MR. KING:  We would object to at least the cover

25  e-mail.

 1          MR. BLECHMAN:  If that will satisfy the counsel,

 2    then I'm fine to have it removed.

 3          THE COURT:  I've only heard from one.

 4          MR. BLECHMAN:  Sorry.  I should turn around.

 5          MS. SUMNER:  There's no objection to the admission

 6    of the three pages, but I think we agree it's a business

 7    record.

 8          THE COURT:  Okay, you're not -- you're no longer

 9    teeing it up as a business record?

10          MR. BLECHMAN:  Correct, Your Honor.

11          THE COURT:  Okay, and we are taking off the first

12    page?

13          MR. BLECHMAN:  Correct, Your Honor.

14          THE COURT:  Okay.  So, if you will remark the

15    exhibit so it does not include the first page, and it is --

16    the newly constituted P-547 is admitted.

17          (Exhibit received in evidence.)

18          MR. BLECHMAN:  Thank you, Your Honor.  And on the

19    recess we'll remark the document, with the Court's permission.

20          THE COURT:  Okay.

21          MR. BLECHMAN:  Thank you.

22    BY MR. BLECHMAN:

23    Q.   Dr. Armstrong, I want to show you now, what we have blown

24    up, so it's a little easier -- can you --

25          MR. BLECHMAN:  You can -- you can publish it for the

1    jury, but the jury may find this easier to look at.  Thanks

2    for your help.  Okay.  Let me -- if we could just move this a

3    tad closer so the witness --

4    BY MR. BLECHMAN:

5    Q.    And, Dr. Armstrong, I'm going to let you decide whether

6    you want to look at the blow-up or the document,

7    whichever's easier for you, okay?

8              All right.  So let's go through this audit form, if

9    we might, Dr. Armstrong, and first let me begin by directing

10   your attention to the second page of the audit form, which

11   refers to total points.  Do you see that?  Actually it's the

12   first page where it says:  Total points.  Do you see, it says

13   170 for total points?  It's -- it's on the first page, sort of

14   on the right-hand side, it's in gray under Scoring System.

15   A.    Yes.

16   Q.    Do you see 170 points?

17   A.    Yes, I see -- I see a total possible of 200 and 170

18   points to pass.

19   Q.    Okay.  And so does that help refresh your memory that you

20   need 170 points to pass the audit?

21   A.    Yes.

22   Q.    Okay.

23   A.    I did not -- other members of the committee dealt with

24   the audit program.  I did not get into the details of the

25   audit program.

1    Q.   Okay.  Now, with regard to backfilling, with respect to

2    the audit, and what the UEP did, we saw UEP board minutes

3    earlier.  If a producer backfills under the UEP Guidelines

4    now, that's an automatic fail under the audit, correct?

5    A.   Yes.

6    Q.   Okay.  And, in fact, if you'll note under Section 1,

7    Housing and Space Allowance, is there evidence prohibited

8    backfilling, yes or no?

9              If the answer's yes, the producer's done, it fails,

10   right?

11   A.   Yes.

12   Q.   Okay.  Now, and -- and one other thing, just to orient

13   everybody.  If you go a little bit further down, under Housing

14   and Space Allowance, it refers to white layers and brown

15   layers, this is the cage space allowance, and the total points

16   that is assessed to a producer if they violate the cage space

17   allowance is 50 points, right?

18   A.   Yes.

19   Q.   And so, by my math -- by my math, 200 minus 50 gives you

20   150, right?

21   A.   Yes.

22   Q.   150 is a failure of the UEP audit, right?

23   A.   Yes.

24   Q.   Okay.  So we know that backfilling --

25   A.   I'm assuming that it's a zero or 50 that they receive in

1    the audit.  I don't know if a producer could receive 40 or 30

2    or 20.  I just -- I'm not up on the details of that.

3    Q.   What you do know is that backfill -- excuse me, is that

4    if you don't follow the cage space allowance, that, like

5    backfilling, is an automatic fail under the audit, right?

6    A.   Correct.  Correct.  Correct.  That was deemed very

7    important by the committee.

8    Q.   Okay, and we're going to get to that.

9    A.   Yes.

10   Q.   Now, one of the -- one of the criteria on the checklist

11   in the backfilling ban, take a look at -- let me do this.

12   Take a look at Section 1, Number 10.  Section 1, which is

13   Housing and Space, Number 10.  And would you read that for the

14   jury, please?

15   A.   Are ammonia concentration levels maintained at 25 parts

16   per million or less and corrective action taken when level is

17   exceeded?

18   Q.   And you've testified about ammonia levels in the

19   testimony yesterday, true?

20   A.   I did, yes.

21   Q.   And in 2007, 2008 the UEP Guidelines provided that

22   ammonia levels had to be less than or equal to 25 parts per

23   million, correct?

24   A.   Yes.

25   Q.   Okay.  All right, well, now let me show you -- I want to

1    show you a photo.

2           MR. BLECHMAN:  If we could please bring up PX-07.

3    This is a document that is in evidence already.  This is a

4    still photo of --

5           MR. KING:  Objection, Your Honor.  403 and

6    foundation.

7           THE COURT:  Well, what -- let me hear what the

8    question is.

9           MR. BLECHMAN:  Based on this witness's experience

10   touring henhouses and his knowledge about the guidelines and

11   the application with the audit, does -- would this -- would

12   this level of manure in a henhouse generate ammonia levels --

13          THE COURT:  There's no foundation for him to be able

14   to compute ammonia level from a photograph.

15          MR. BLECHMAN:  Okay.  Let me ask, and if not, I'll

16   move on.

17          MR. KING:  Well --

18          MR. BLECHMAN:  I'm not going to show him the

19   photograph, if that's what you're concerned about.

20          THE COURT:  No, that --

21          MR. BLECHMAN:  I would -- I would --

22          MR. KING:  Is that in front of the jury?

23          MR. BLECHMAN:  Okay, we can take it down then.

24          THE COURT:  Yes.  Take it down.  There is no

25   foundation at this point, and it seems to me the answer can --

1    the -- what the obvious answer is going to be.

2              MR. BLECHMAN:  I'm going to ask the foundation

3    questions.

4              And it's off the screen?  Okay, that was my intent

5    then.  All right.

6    BY MR. BLECHMAN:

7    Q.   Based on your experience -- you've toured henhouses,

8    right?

9    A.   Yes.

10   Q.   You've seen henhouses that have had piles of manure in

11   them.  And I apologize for asking you these kinds of

12   questions, but it's part of the case.  Is that true?

13   A.   Oh, yes, it piles up.

14   Q.   Okay.  And -- and you have -- you have smelled the

15   ammonia in a henhouse that is the result of manure that piles

16   up, as you say, correct?

17   A.   Yes.

18   Q.   All right.  Based on your actual experience, and any

19   other experience that you've had, do you think you'd have the

20   ability to look at -- at piles of manure in a henhouse and be

21   able to tell us whether you thought, just from a visual

22   inspection, whether the ammonia levels generated from these

23   manure piles would exceed the 25 parts per million that are in

24   the UEP Guidelines?

25   A.   No.

1   Q.   Okay.  That's fine.  Let's stay with this anyway.  Let's

2   assume for purposes of my question that a producer has ammonia

3   levels in its henhouse that exceed 25 parts per million.  With

4   me?

5   A.   Yes.

6   Q.   All right.  Under the UEP Guidelines -- excuse me, under

7   the UEP audit, that producer would receive a mark off of five

8   points, correct?

9   A.   Yes.

10  Q.   Okay.  Let's now turn to -- oh, and -- and ammonia levels

11  above 25 parts per million, is that inhumane treatment of

12  hens?

13  A.   The guidelines state that -- I have to go back and look,

14  but consistent, prolonged over that would not be good.  But

15  the guidelines and the committee addressed ammonia and we

16  addressed housing and we addressed it during the transition

17  phase.  And we addressed --

18  Q.   Is ammonia --

19  A.   -- transitional increases in ammonia.

20  Q.   Just a baseline.  If hens are exposed, for sustained

21  periods, to ammonia levels above 25 parts per million, is

22  that, in your judgment, consistent with the humane treatment

23  of hens?

24  A.   What's sustained?  I mean, if it is on and on and on,

25  then that could be a problem for the hen.

1   Q.   Could be -- wait --

2   A.   What I will tell you is --

3   Q.   Could be or --

4   A.   -- I am not in a position to answer that, because I'm not

5   an expert on ammonia.  That's why we had experts on the

6   committee.  That -- our experts on the committee were

7   comfortable with the audit and how it was being conducted.

8   Q.   Thank you for that.  Could be or would be in your answer?

9   A.   I gave you my answer.

10  Q.   I'm going to move on after this.

11  A.   I gave you my answer, that I would rely on the experts on

12  my committee to tell me what was in that category.

13  Q.   Dr. Armstrong, they are not in this courtroom testifying

14  in front of this jury.

15  A.   I'm representing them and you've established --

16  Q.   Sir --

17  A.   -- that I'm not an expert in poultry, so...

18  Q.   Sir, I'm asking you -- all I can do is ask you what you

19  know and what you think.

20  A.   And I told you -- and I told you, with all due respect --

21  Q.   Let me move on.

22  A.   -- I would rely on the committee experts to help me

23  understand that.

24  Q.   Thank you.  Dr. Armstrong, let me move to the next

25  subject matter.

1    A.    Yes.

2    Q.    Pullets and layers handled in a manner to avoid bone

3    breakage or injury.  That is -- well, actually, sorry.  I got

4    ahead of myself.  Section 1, Number 13:  Dead or injured

5    layers removed from cages daily.  Dead -- are dead or injured

6    layers removed from cages daily?

7              Do you see that there?

8    A.    I see that, yes.

9    Q.    All right.  And that's another five-pointer, right?

10   A.    Yes.

11   Q.    All right.  So if a UEP producer has dead or injured

12   layers that have not been removed from cages daily, they're

13   assessed five points, correct?

14   A.    Correct.

15   Q.    And would you recognize, sir, based on your experience

16   touring henhouses and otherwise, the condition of a hen, a

17   dead hen in a cage that had not been taken out daily?

18   A.    Would I be able to recognize that?

19   Q.    Yes.

20   A.    Yes.

21   Q.    Okay.

22   A.    It's very obvious.

23   Q.    Okay.  So let's take a look then, with that foundation,

24   at Plaintiffs' Exhibit 52.

25              THE COURT:  Before you put it up --

```
 1          MR. BLECHMAN:  Yes.

 2          THE COURT:  -- I want to know what the question is.

 3          MR. BLECHMAN:  Looking at that photo and based on

 4   the experience that he's explained, would that be a -- would

 5   that violate the provision in the checklist regarding dead or

 6   injured layers removed from cages daily.

 7          MR. KING:  Objection.  403.  Also relevance.  And

 8   foundation.

 9          THE COURT:  Well, the issue -- I think the issue is

10   whether or not the witness had any responsibility either for

11   conducting an audit or evaluating the audit form and then how

12   one divines how long something has been in a place from a

13   photo is a question.

14          MR. BLECHMAN:  I'm going to move on and --

15          THE COURT:  Okay.

16          MR. BLECHMAN:  -- to do what I need to do, we don't

17   need to look at the photo.

18   BY MR. BLECHMAN:

19   Q.   All right.  So if a UEP Certified producer has not

20   removed dead or injured layers from cages daily, that would

21   cost it five points in the audit; is that right?

22   A.   Yes.  In that snapshot of the audit, they would lose the

23   points, my understanding, but I did not conduct the audits.

24   Q.   I understand.  Now let's look at Section 4, which is on

25   the next page, Section 4, Number 3.  So Section 4 has to do
```

1    with handling and transportation.

2            Do you see that?  Let me wait until you get there.

3    Tell me when you're there.

4    A.   Yes.

5    Q.   And Number 3 reads:  Were pullets and layers handled in a

6    manner to avoid bone breakage or injury?

7            Do you see that?

8    A.   Yes.

9    Q.   All right.  And if -- if a producer handled pullets --

10   what are pullets?  Those are like baby hens that haven't

11   become --

12   A.   Juvenile hens.

13   Q.   Juvenile hens, okay.

14   A.   In between a chick and a hen.

15   Q.   All right.  So if a producer handled juvenile hens or

16   layers in a manner that broke bones or injured the juvenile

17   hen or the layer, that would be a violation of this provision

18   in the audit, correct?

19   A.   Correct.

20   Q.   And for that they would be scored against -- they would

21   be deducted three points, right?

22   A.   Yes.

23   Q.   Okay.  So let's see if I can get this math right.  Stay

24   with me.  We're going to -- we're going to do a little bit

25   higher math after I get past this.  So right now, assume that

1    we've got -- somebody starts with 200 points and they lose

2    five for the ammonia, they lose five for failing to remove

3    dead or injured hens daily, and they lose three for breaking

4    bones or injuring juvenile hens or layers.

5             They would receive a score of 187 or they would

6    receive 187 points in the audit, correct?

7    A.    Yes.

8    Q.    And that would be a pass under the audit, right?

9    A.    Yes.

10   Q.    Sir, isn't it true that you were concerned that producers

11   would disregard recommendations -- let me stand over here.

12            Isn't it true that you were concerned that producers

13   would disregard recommendations from the Science Advisory

14   Committee by giving up points?

15            Let me ask again.  Isn't it true that you were

16   concerned about producers disregarding recommendations by the

17   Science Advisory Committee by giving up points in the audit?

18   A.    I'm sure the committee -- well, let me just back up.

19   With the audits in general, we had several of our committee

20   members who were the animal welfare experts that worked with

21   the audits.  They were involved with the audits.  We only got

22   involved with the big picture.  The items that were pass/fail

23   were very -- you know, yes or no, very negative toward animal

24   welfare.

25   Q.    So my question to you now is:  Isn't it true that you

1    were concerned that producers would disregard recommendations

2    by giving up points in the audit?  Isn't that true?

3    A.   I am sure we probably -- I am sure we had those

4    discussions because this was a number of years and it ebbed

5    and flowed, but overall, the committee members, the experts

6    were very comfortable of the UEP audit.  When we had

7    problems --

8    Q.   Dr. Armstrong --

9    A.   -- with implementing the guidelines, which is pertaining

10   to your audit question, then we would go back and tell the

11   producers --

12   Q.   Right.

13   A.   -- big-picture issues.

14   Q.   The fact that I put a word in my question, please, I'm

15   not intending for you to then go into the area.  Let's stay

16   with my question.

17            Isn't it true, sir, that you yourself were concerned

18   that producers would disregard recommendations by giving up

19   points in the audit, yes or no?

20   A.   I'm sure I -- I -- you know, I actually don't recall.

21   Q.   Okay.  Well, then, let me see if I can help you.

22   Plaintiffs' Exhibit --

23   A.   Like I said, it's a long -- it's a long --

24   Q.   There's no question pending, sir.

25   A.   Yes.

1    Q.   Exhibit 223.

2                MR. BLECHMAN:  Your Honor, may I approach?

3                THE COURT:  Yes.

4    BY MR. BLECHMAN:

5    Q.   Dr. Armstrong, directing your attention to Plaintiffs'

6    Exhibit 223, this is a document that contains two e-mails.

7    And directing your attention to the second page and the third

8    page, this is an e-mail from you to Dr. Hester dated April 23,

9    2004.

10               Do you see that?

11   A.   Yes.  Yes.

12   Q.   Did you, in fact, write this e-mail?

13   A.   Yes.

14   Q.   And did you, in fact, send it to Dr. Hester on or

15   about -- excuse me -- on April 23, 2004?

16   A.   On the front page?

17   Q.   Well, the second -- the second page e-mail.

18               April 23, 2004, do you see that?

19   A.   Yes.  This was a -- yeah, this was back and forth, I

20   think, with the whole committee.

21   Q.   Okay.  So -- so you -- by "committee," you mean the

22   Science Advisory Committee, correct?

23   A.   As best I can gather.

24   Q.   Okay.  And when you wrote your e-mail to Dr. Hester, both

25   the first e-mail and the second e-mail, for that matter, you

1  were the chairperson of the Science Advisory Committee,

2  correct?

3  A.    Yes.

4  Q.    And you were writing these e-mails in connection with the

5  business of the Science Advisory Committee, correct?

6  A.    Yes.

7  Q.    And you were writing these e-mails in discharging your

8  responsibilities as chairperson of the Science Advisory

9  Committee at the time, correct?

10  A.    Yes.

11          MR. BLECHMAN:  All right.  Your Honor, Plaintiffs

12  offer Plaintiffs' Exhibit 223 in evidence.

13          THE COURT:  Which part of 223?

14          MR. BLECHMAN:  Well, actually, based on what the

15  witness said, we'll offer both.

16          THE COURT:  All right.  Any objection?

17          MS. SUMNER:  No objection, Your Honor.

18          THE COURT:  Then Plaintiffs' 223 is admitted.

19          (Exhibit received in evidence.)

20          MR. BLECHMAN:  Thank you, Your Honor.  May we

21  publish to the jury?

22          THE COURT:  Yes.

23          MR. BLECHMAN:  All right.

24  BY MR. BLECHMAN:

25  Q.    Okay.  Dr. Armstrong, first, let's orient you and the

1    jury.  On page 2 is the beginning of your e-mail to

2    Dr. Hester, 10:20 a.m. on April 23, 2004.

3              Do you see that?

4    A.   Yes, I do.

5    Q.   Okay.  And then directing your attention to page 3,

6    please.  That's the only page we need up right this moment.

7    A.   Yes.

8    Q.   All right.  And you are writing to Dr. Hester and you're

9    writing to her -- if you look at the lower -- sort of in the

10   middle of the page, you have text to her about the hen cage

11   configuration, correct?

12   A.   Yes.

13   Q.   All right.  And you write to her:  In regard to cage

14   configuration, the committee believes it is critically

15   important to protect hens in lower cages from manure dropping

16   from upper cages.  We set no exact measurements of cages and

17   did not recommend any cage design.  It is up to the cage

18   manufacturers to design a cage that avoids birds in lower

19   cages being dirty from droppings of hens in upper cages.

20             And here's what I want to direct your attention to,

21   but I want to give the full paragraph.

22             You then go on to write:  The key point here is that

23   we must protect the hens.  If this can be done with some

24   exposed area, then fine, so long as the birds are protected.

25             And then here's where I want to direct your

1    question, the key point in terms of this document and e-mail.

2              We believe it would be a serious mistake for

3    producers to simply disregard this recommendation by saying

4    they will give up the points in the audit.

5              And then you go on to express at the last paragraph:

6    I will stress that we view, quote, losing points, unquote, as

7    unacceptable.

8              You wrote those words to Dr. Hester, correct?

9    A.   Actually, I think I wrote those words to the entire

10   committee.

11   Q.   Okay.  And you believed those words at the time, did you

12   not?

13   A.   Yes.  Yes.

14   Q.   Okay.  Now --

15   A.   May I comment further?

16   Q.   There's no question, but I'll get to you.  Give me a

17   moment.  You criticized the UEP -- withdrawn.

18              You criticized the audit and the UEP Certified

19   Program to Gene Gregory in 2003, didn't you?

20   A.   I assume so.

21   Q.   You realized that the audit was not requiring producers

22   to treat hens humanely, true?

23   A.   I -- you're asking me about something in 2003 and you're

24   asking me to be specific.  It was very helpful to have this to

25   refresh my memory.

1   Q.   Okay.  All right.  Well, then, let's see if I can't help

2   you some more.

3           Do you have a memory of Gene Gregory responding to

4   you that you should focus on science and not on how or when

5   the UEP implements audits in the Certified Program?

6           Do you recall that?

7   A.   That's very likely, because Gene and I had a lot of back

8   and forth and it was a long going -- ongoing story.  And in

9   the case of manure, for example, they developed manure

10  shields.

11  Q.   Okay.

12  A.   So we had ups and downs, but the overall story is very

13  clear.

14  Q.   Okay.  Well, my question to you is pretty specific.  With

15  regard to you criticizing the audit, Mr. Gregory responded to

16  you that you should focus on science and not on how or when

17  the UEP implements audits in the Certified Program, true?

18  A.   Oh, that's -- I'm sure that's exactly something Gene

19  would say.

20  Q.   Okay.

21  A.   Yes.

22           MR. BLECHMAN:  May I approach, Your Honor?

23           THE COURT:  Yes.

24  BY MR. BLECHMAN:

25  Q.   I'm handing the witness Exhibit 181.

1      Dr. Armstrong, I've handed you what has been marked

2 as Plaintiffs' Exhibit 181.  This is a document, a letter from

3 Gene Gregory to you dated March 13, 2003.

4      Do you see that?

5 A.  I do.

6 Q.  It is addressed to you, is it not?

7 A.  It is.

8 Q.  And the address there is College of Agriculture and

9 Natural Resources, 102 Agriculture Hall, Michigan State

10 University, East Lansing, Michigan 48824-1039.

11      Is that accurate?

12 A.  Yes.

13 Q.  That was your address at the time, correct?

14 A.  Yes.

15 Q.  And on March 13, 2003, were you the chairperson of the

16 Science Advisory Committee?

17 A.  Yes.

18 Q.  And was Gene Gregory an executive at the UEP?

19 A.  Yes.

20 Q.  All right.  And you recall this -- you recall this

21 letter, do you not?

22 A.  I do now.

23      MR. BLECHMAN:  Okay.  Your Honor, we offer --

24 Plaintiffs offer Exhibit 181 in evidence.

25      THE COURT:  Any objection?

```
 1              MS. SUMNER:  No objection.

 2              THE COURT:  181 is admitted.

 3              (Exhibit received in evidence.)

 4              MR. BLECHMAN:  May we publish, Your Honor?

 5              THE COURT:  Yes.

 6  BY MR. BLECHMAN:

 7  Q.   Okay.  Directing your attention, Dr. Armstrong, to the

 8  fifth paragraph down, tell me when you're there.

 9  A.   I am.

10  Q.   Gene Gregory writes to you in response to your criticism

11  about the audit:  We did not envision the committee doing a

12  critique and making suggested changes to the audit procedures.

13              He wrote that to you, correct?

14  A.   He did.

15  Q.   We believe -- he writes further -- these are decisions to

16  be made by USDA, ARPAS, and UEP.  The committee should have

17  been more respectful.

18              He wrote those words to you, right?

19  A.   Yes.

20  Q.   And the reference to "committee" in that last sentence,

21  that refers to the Science Advisory Committee?

22  A.   Yes.

23  Q.   All right.  And then he writes further to you:  The

24  committee should focus upon the science and not how or when

25  the industry implements or audits the program.  Remember, this
```

1    audit program is a function to assure UEP that producers are

2    fulfilling their commitment to the Animal Care Certified

3    Program and our customers.

4              Did I read that correctly?

5    A.    Yes.

6    Q.    Is the reference to "committee" in that paragraph that I

7    just read the Science Advisory Committee?

8    A.    Yes.

9    Q.    Thank you, sir.

10              All right, so now, we're going to move to the higher

11    math I promised you we would do.  Under the UEP audit for the

12    Certified Program that we looked at, cage space is 50 points.

13    You validated that earlier, correct?

14    A.    Yes.

15    Q.    All right.  Backfilling is an automatic fail.  You said

16    that earlier, right?

17    A.    Yes.

18    Q.    All right, and since you need 170 points to pass, then

19    let's just assume conservatively that if one -- if a producer

20    backfilled then they would be assessed at least 31 points,

21    which would take you below the 170 mark, correct?

22    A.    Yes.

23    Q.    Okay.  So, again, being conservative, since it's an

24    automatic fail anyway, let's call backfilling 31 points.  With

25    me?

1   A.   Yes.

2   Q.   Okay.  Now, ammonia, that's five points, correct?

3   A.   Yes.

4   Q.   All right.  And dead or injured hens, not removed daily,

5   that's five points, correct?

6   A.   Yes.

7   Q.   Broken bones or other injuries of juvenile or layers,

8   that's three points, right?

9   A.   Yes.

10  Q.   So I'd like you to validate my math then.  I'm looking at

11  the relative relationship in points in the checklist between

12  cage space or backfilling, let's start there, and ammonia or

13  dead hens.  I go 50, divided by five, and I get ten.  So, in

14  other words, in the audit, the audit weights cage space at ten

15  times the value of ammonia in the henhouse or dead hens or

16  injured hens not removed daily.  True?  That's what the math

17  shows, correct?

18  A.   Math shows and the committee was overall very comfortable

19  with the audit.  I mean, your math --

20  Q.   Dr. Armstrong?

21  A.   -- your math and this document, we should point out, is

22  during a transition phase.

23  Q.   Dr. Armstrong?

24  A.   Ammonia is very variable.

25  Q.   Dr. Armstrong?

1   A.   Yes.

2   Q.   I appreciate you volunteering that, but I want to just

3   stay with the math here if we could for a moment.

4   A.   Yeah, I won't dispute your math.

5   Q.   Thank you.

6   A.   You're good on your math.

7   Q.   And then for broken bones, broken bones or injured hens,

8   juvenile or mature layers, there's -- that's three points,

9   right?  Yes?

10  A.   Yes.

11  Q.   Okay.  And so now I want to compare the relative values

12  in the audit of cage space allowance with handling of juvenile

13  hens or layers in which bones are broken or they're injured,

14  which is three.  And by my math, I get 16.67 times the value

15  of cage space.  Is my math correct?

16          THE WITNESS:  Your Honor, it's very difficult for me

17  to talk about a audit and not talk about the underlying

18  science welfare guidelines behind it.

19          THE COURT:  Okay.

20          THE WITNESS:  And I can do all the math and I can

21  agree yes or no, Your Honor, but I also don't want to give

22  lengthy answers.

23          THE COURT:  Okay.  Well, I'll tell you what will

24  happen is we all just live with the answers overall.

25  Mr. Blechman is asking you cross-examination and Ms. Sumner or

1   whatever can come back --

2               THE WITNESS:  Thank you, Your Honor.

3               THE COURT:  -- for the time for explaining, if she

4   wishes, okay?

5               THE WITNESS:  Thank you.

6               THE COURT:  All right, no problem.

7   BY MR. BLECHMAN:

8   Q.   Is my math correct, 16.67 -- excuse me.  Is my math

9   correct that broken bones for juvenile or layers is --

10  compared to cage space, cage space is 16.67 times more points

11  than for the points that are assessed if there are juvenile

12  layers or layers who sustained broken bones or injured in

13  handling, true?

14  A.   Yes.  Based on your math of the audit.

15  Q.   Okay.  Now, we're good.  We're good.

16              Cage space in the audit, that measures whether there

17  are too many hens in a cage, right?

18  A.   Yes.

19  Q.   So it's a measure of the supply of hens in the cage,

20  true?

21  A.   Number of hens per area of the cage.

22  Q.   Supply of hens per area in the cage, true?

23  A.   Number of hens in the area of the cage is the way I think

24  about it.

25  Q.   Is what I'm saying and you saying the same thing?

1   A.   Yes, you can use different words.

2   Q.   Okay.  Which mean the same thing?  Yes?

3   A.   Yes.

4   Q.   Okay.  That's cool.  And backfilling, backfilling is --

5   that measure is checking on the number of hens in cages.  In

6   other words, whether a producer is, as you testified earlier

7   from your definition of backfilling, adding hens to cages if

8   there are -- to replace dead or sick hens, true?

9   A.   True.

10  Q.   Okay.

11  A.   And that's what causes an animal welfare problem --

12  Q.   Thank you.

13  A.   -- of significance.

14  Q.   Thank you.  And backfilling, like cage space, backfilling

15  is measuring the number of hens in cages or -- excuse me.

16  Backfilling is also measuring -- excuse me, withdrawn.

17          Backfilling is also assessing the number of hens in

18  cages, true?

19  A.   Yes, it is involving --

20  Q.   All right.

21  A.   -- the changing the number of birds in a cage, yes.

22  Q.   And so, in other words, backfilling is addressing the

23  supply of hens in a cage, true?

24  A.   That's not language we would ever use.  We would look at

25  the number.  And if you wanted -- if you want to use supply,

1    I -- yes.

2    Q.    Thank you.  Now, ammonia in a -- in a henhouse, ammonia

3    is dealing with the air quality in the henhouse, correct?

4    A.    Yes, it's dealing with air quality in a henhouse and it's

5    highly correlated with the style of the building.

6    Q.    I got it.

7    A.    Which can't be changed overnight.

8    Q.    But -- but ammonia is -- excuse me.

9          The criteria of ammonia is addressing the health of

10   the hen based on whether there's too high an ammonia level,

11   true?

12   A.    Yes.

13   Q.    And whether a producer removes dead or injured hens from

14   a cage daily is also addressing the health of the hens in the

15   cage, true?

16   A.    True.

17   Q.    And whether -- this is self-evident, I would imagine, but

18   let's be clear, whether a producer in its handling of juvenile

19   hens or layers causes them to sustain broken bones or injury,

20   that, too, is assessing the health of the hens there, correct?

21   A.    Correct.

22   Q.    So with that in mind, then, what I'm wondering is

23   whether, in your opinion, based on your testimony, it would be

24   more accurate to -- withdrawn.

25          With that in mind, and mindful of the math that you

1   validated that we went through earlier, whether you think,

2   sir, it would be more accurate to title this checklist, which

3   is in evidence, Cage Layers Supply Audit Checklist.  I'm

4   curious if you agree with that?

5   A.   I do not agree, and that's not what the committee --

6   that's not how the committee viewed it.

7   Q.   Okay.

8   A.   But, again, I wasn't involved with the audits.

9   Q.   I believe I'm going to move on to another subject now,

10  Dr. Armstrong.  Bear with me just a moment.  We're going to

11  stay with math just a little bit more.

12         House averaging, that's a concept you're familiar

13  with, right?

14  A.   Yes.

15  Q.   All right.  Describe for the jury house averaging,

16  please.

17  A.   The best I understand it, so, for example, if you had, as

18  we discussed, hens in 2003, they would be at 59 square inches.

19  It's hard -- and again, with the configuration of the cages,

20  you can't get every cage 59.  Some may be 59, some may be 62,

21  some may be other.  But you're talking about putting those

22  birds in at the beginning and they're used to each other, and

23  it's, again, during the house averaging was during the

24  transition.  Changing the space for the bird is very

25  significant because that, again, has that impact on mortality,

1   and how much -- how many eggs --

2   Q.   Dr. Armstrong?

3   A.   I'm answering your question.  And so house averaging was

4   done in a transitional period and the committee accepted that

5   during the transition.

6   Q.   House averaging, tell me if I've got the basic concept

7   correct.  You could have a thousand cages in a henhouse.

8   That's not an unusual number, would it be?

9   A.   No.  That's not unusual.

10  Q.   Okay.  Okay.  You could have a thousand cages in the

11  henhouse, and under the guidelines that certified producer has

12  to keep all thousand of those hens in cages so that each hen

13  has 67 square inches, right?

14  A.   Yes.

15  Q.   Okay.  Now, let's -- let's assume -- well, let's assume

16  that 5 percent of the cages in this thousand cage henhouse,

17  let's assume 5 percent of them break, require maintenance,

18  have to be cleaned out, for whatever the reason, basically are

19  out of service because of their age or their condition and so

20  forth.  That happens, true?

21  A.   I suppose.

22  Q.   Sure.  And so in that situation, where you've got, in

23  this example, a thousand hens in -- or however many cages

24  there are to do the math for 67 inches a piece and 5 percent

25  of those cages aren't able to house the hens, the hens that

1   are in those 5 percent of the cages are taken out and put in

2   to other cages in the henhouse.  With me?  With me so far?

3   A.   I am not -- we didn't get to that level of detail in the

4   committee in discussing that.

5   Q.   This is --

6   A.   So it's theoretically, hypothetically possible.

7   Q.   Okay, I was hoping this might be straightforward math,

8   but maybe not.  So you've got a thousand hens, they're all in

9   cages with 67 inches in a henhouse, and the house averaging

10  says, does it not, that the average space per hen in the

11  henhouse with all the cages involved have to be 67 inches,

12  right?

13  A.   Yes, quite frankly, on house averaging, I do not know the

14  details of house averaging.  I know the committee accepted it.

15  And I am not an expert in housing birds and when they do it,

16  the time they do it and I just don't feel comfortable

17  answering that.

18  Q.   Okay, well, stay with me and --

19  A.   The committee was comfortable with house averaging during

20  the transition.

21  Q.   Stay with me just a minute or two more.  I don't think

22  this is complicated, but you'll tell me.  So if all the cages,

23  including the 5 percent that are taken out of commission

24  because they require maintenance or cleaning out, if those

25  stay in the henhouse but the birds that were in those 5

1   percent of the cages are then put into other cages inside the

2   henhouse, then the house average for all the cages in the

3   henhouse still would be 67 square inches, true?

4   A.   I honestly don't know.  And the other question is, a

5   producer may choose to euthanize those hens.  So you're asking

6   me a hypothetical question and you've established that I've

7   only toured laying egg henhouses.  I really can't answer it.

8   Q.   Okay, let me try it this way and then I'll move on.

9   Under the house averaging rule, a producer can keep more hens

10  in cages that have less than 67 square inches as long as the

11  average for per hen in the entire henhouse is 67 square

12  inches; isn't that true?

13  A.   So my understanding of house averaging is that we had

14  experts on the committee that worked with us during the

15  transition, they paid attention to the audit.  I really don't

16  know a lot about house averaging other than I know the

17  committee was comfortable with it because you couldn't change

18  the space overnight.  You have to transition.

19  Q.   Okay.  Okay.

20  A.   So I apologize, I just don't have that detail and I don't

21  feel comfortable.  I don't know whether the producer would

22  euthanize the birds, what they would do.  I didn't conduct the

23  audits.  I'm sorry.

24  Q.   Okay, I told you I'd move on.  New subject.  Sparboe.

25  Let me get you -- take a drink.

```
1              You testified yesterday about Sparboe, do you
2    recall?
3    A.   Yes.
4    Q.   All right.  In August of 2008 -- August of 2008, you
5    were -- withdrawn.
6              In August of 2008, you paid a visit to Walmart, did
7    you not?
8    A.   Apparently I visited Walmart --
9    Q.   Right.
10   A.   -- from time to time.
11   Q.   From time to time.
12             And do you recall visiting Walmart in or about
13   August of 2008?
14   A.   I probably did.
15   Q.   Okay.  And when you visited Walmart in August of 2008,
16   you were at Michigan State University, true?
17   A.   Yes.
18   Q.   You were also, at that time, chair of the Science
19   Advisory Committee, right?
20   A.   Yes.
21   Q.   All right.  And you went to visit Walmart, and you went
22   there to talk to them about Sparboe; isn't that true?
23   A.   I recall visiting Walmart to talk about a lot of
24   different things.  We, in fact, had an alumnus there.  So if
25   you can refresh my memory, I'm happy to --
```

1  Q.   Sure.

2  A.   -- to look at it.

3  Q.   Okay.  Well, let's start by taking a look at your

4  deposition from March 13, 2014.  That's in that big book you

5  have in front of you.  Tell me when you have it in front of

6  you.  And for reference, I'm going to move to page 316,

7  lines 9 to 17.  Tell me when you have it.

8  A.   I see it.

9  Q.   All right.  And this was -- again, for reference, this

10  was a deposition that you gave in these proceedings March 13,

11  2014, correct?

12  A.   Um-hum.

13  Q.   Is that a yes?

14  A.   Yes.

15  Q.   And when you testified, you did so truthfully at the

16  time, true?

17  A.   I did.

18  Q.   All right.  And you gave the following answer to the

19  following question on that day, lines 9 through 17:

20  Question --

21           MR. KING:  Your Honor, objection.  I don't think

22  this is proper impeachment.

23           MR. BLECHMAN:  All right.  Let me try it a different

24  way.

25           THE COURT:  Go ahead.

1   BY MR. BLECHMAN:

2   Q.   Dr. Armstrong, I'd like you to look at your answer at

3   line 9 through 17 and tell us whether that refreshes your

4   memory about visiting Walmart in or about August of 2014.

5   A.   I think my memory was better in '14 than it is today.

6   Q.   Okay.  But for the clarity of the record, is your memory

7   now refreshed that in or about August of 2008, you paid a

8   visit on Walmart?

9   A.   I did.

10  Q.   Okay.  Now, did Gene Gregory at UEP ask you to go visit

11  Sparboe?

12  A.   I don't recall.  I visited a lot of different companies,

13  talking about the holistic approach to social responsibility

14  in the food chain.

15  Q.   Right.

16  A.   I went there wearing multiple hats.

17  Q.   Okay.  So the answer is you don't recall whether Gene

18  Gregory asked you to go down there, correct?

19  A.   He may have.  I don't recall.

20  Q.   Okay.

21  A.   I really do not recall.

22  Q.   And you went down there to talk -- excuse me.  Withdrawn.

23          In August of 2008, you went to Walmart to talk to

24  them about their commercial relationship with Sparboe, true?

25  A.   I don't recall what I talked about, but I likely talked

1   about UEP and all the things that were going on at that time.

2   Q.   In the context of Walmart having a commercial

3   relationship with Sparboe, true?

4   A.   I do not recall.

5   Q.   Do you deny that in August of 2008, sir, you went to

6   Sparboe and talked to them about its -- excuse me.  You went

7   to Walmart and talked to people at Walmart about its

8   commercial relationship with Sparboe?

9   A.   I -- I don't recall what I talked about that day.  I

10  don't.

11  Q.   Okay.  Do you have a memory of ever visiting Walmart and

12  discussing with Walmart its commercial relationship with

13  Sparboe?  Do you have any memory of that whatsoever?

14  A.   I would have talked about -- I do not have a memory of

15  talking about Sparboe specifically.  I do not recall.  I don't

16  recall the conversation.  In 2008 I was -- I was giving a lot

17  of presentations, I was talking to a lot of companies, and I

18  would have been talking about whatever were the hot topics in

19  the industry at that time.

20  Q.   Did someone from Walmart invite you to visit with them in

21  August of 2008?  You're not saying that, are you?

22  A.   I do not recall.

23  Q.   Okay.

24  A.   Like I said, I recall that there was a Cal Poly graduate

25  there which was how I was able to set up the meeting, I think.

1   Q.   With regard to Sparboe now -- withdrawn.

2        You testified earlier that in connection with your

3   consulting agreement -- or arrangement, I should say, with

4   UEP, you did media relations, correct?

5   A.   Yes.

6   Q.   You did an interview, was it for CBS?  60 Minutes or

7   something like that?

8   A.   Yeah, I took a USA Today reporter to an egg farm, things

9   of that nature.

10  Q.   Okay.  So you have -- you have some -- and of course

11  today you're a university president, right?

12  A.   Yes.

13  Q.   You deal with the media, yes?

14  A.   Yes.

15  Q.   All right.  So you have -- you have some idea of the

16  impact that the mass media has on consumers, true?

17  A.   True.

18  Q.   And on companies, yes?

19  A.   Yes.

20  Q.   All right.  So you testified yesterday about this Sparboe

21  video that the jury's heard about previously.

22        Do you recall that testimony?  The subject matter?

23  A.   Sparboe video?

24  Q.   Do you recall a video that was shown of Sparboe on

25  ABC 20/20?  Do you know anything about that?  If you don't,

```
 1   I'll stop asking you about it.

 2   A.   I don't recall mentioning a video yesterday, and I don't

 3   recall that video.  I could have seen it then.

 4   Q.   Okay.  If I misremembered, then I apologize.  But let

 5   me -- let me keep moving.

 6            Based on your experience and your savvy dealing with

 7   media and TV, I'm interested in your opinion, sir, if you have

 8   one, about what impact you think a video of a -- a video of

 9   the mistreatment of hens in a henhouse showing dead hens

10   laying in cages, showing, you know, mishandling of hens when

11   they're being pulled out of cages and being put into disposal

12   containers, of manure piles that stretch as far as the eye can

13   see 4 and 5 feet tall.  Imagine, sir, if a video like that

14   were aired on 20/20.  You're familiar with that show, yes?

15   A.   Yes.

16   Q.   Or 60 Minutes, you're familiar with that show?

17   A.   Um-hum.

18   Q.   Is that a yes?

19   A.   Yes, I'm familiar with those shows.

20   Q.   What do you think the impact would be on consumers?

21            MR. KING:  Objection.  No foundation.

22            MS. SUMNER:  Objection.  Foundation.

23            THE COURT:  This is beyond the scope of the direct

24   examination.

25            MR. BLECHMAN:  Your Honor, I'll move on.
```

1              Plaintiffs' Exhibit 96, please.

2              May I approach, Your Honor?

3              THE COURT:  Yes, you may.

4              MR. BLECHMAN:  Thank you.

5    BY MR. BLECHMAN:

6    Q.   Dr. Armstrong, I've handed you an e-mail that is dated

7    January 6, 2002, from you to Gene Gregory on the subject of

8    concerns from the committee.

9              Do you see that?

10   A.   I do.

11   Q.   Did you write this e-mail?

12   A.   Yes.

13   Q.   Did you do so in your capacity as chairperson of the

14   Science Advisory Committee for the UEP?

15   A.   Yes.

16   Q.   And did you send this e-mail to Gene Gregory?

17   A.   Yes, and copied the committee.

18   Q.   Thank you.

19             And Gene Gregory at the time was an executive at the

20   UEP, correct?

21   A.   Yes.

22             MR. BLECHMAN:  All right.  Your Honor, Plaintiffs

23   offer Exhibit 96 in evidence.

24             MS. SUMNER:  No objection.

25             THE COURT:  P-96 is admitted.

1          (Exhibit received in evidence.)

2          MR. BLECHMAN:  May we publish, please?

3          THE COURT:  Yes.

4          MR. BLECHMAN:  Thank you.

5    BY MR. BLECHMAN:

6    Q.   Directing your attention to third paragraph,

7    Dr. Armstrong, about halfway down the page, tell me when

8    you're there.

9    A.   Yes.

10   Q.   The sentence that begins:  That being the case...

11   A.   Yes.

12   Q.   All right.  You write to Mr. Gregory:  That being the

13   case, it was requested that the Scientific Committee members'

14   names were to be used only -- and that word is in caps -- on

15   the scientific document.  Under no circumstances does the

16   committee want its name used on the producer guidelines nor

17   any other guidelines that the UEP comes up with, unless

18   permission is asked in advance by each member.

19          Did I read that correctly?

20   A.   Yes.

21   Q.   And, sir, you sent this -- this e-mail to all the

22   committee members, true?

23   A.   Yes, during the transition in 2002.

24   Q.   All right.  And did you send this e-mail to all the

25   committee members with their knowledge and prior consent?

1   A.   Oh, yeah.  Absolutely.  Yes, absolutely.

2   Q.   Okay.  I'm done with that document.

3   A.   And they later put their names on.

4   Q.   Thank you for volunteering that.  Let's move to another

5   subject.

6          MR. BLECHMAN:  Your Honor, the next subject I'm

7   going to move to will take us, depending on when the Court

8   wants to break for lunch, past 12:30.  I can start or --

9          THE COURT:  How far past?

10         MR. BLECHMAN:  This is -- it's not this long in

11   terms of the number.  There's thick documents inside.  Oh, how

12   far past lunch?  I think it could -- this could take another

13   half hour, Your Honor.

14         THE COURT:  All right, then why don't we break early

15   for lunch, recognizing that we are ending today at four.

16         MR. BLECHMAN:  Yes.

17         THE COURT:  Okay.  So, ladies and gentlemen, enjoy

18   lunchtime.  Same rules apply.  Let's be back here at no later

19   than 1:15.  An hour lunch.  Does the hour work for you guys?

20   Is that a reasonable time?  Great.  See you in an hour.

21         THE DEPUTY CLERK:  All rise.

22         (Jury out.)

23         THE COURT:  Dr. Armstrong, you can step down and

24   maybe if you wouldn't mind going out into the hall.

25         Have a seat, everybody.

1          (Witness left the courtroom.)

2          THE COURT:  I'm just curious, are we going to spend

3   any more time verifying addresses of university offices that

4   don't appear to be in dispute?

5          MR. BLECHMAN:  Your Honor, I did that because I was

6   not sure whether the document would be disputed.

7          THE COURT:  It's only a --

8          MR. BLECHMAN:  But I'd like to answer the Court's

9   question.

10         THE COURT:  It takes a lot of time to read all these

11  long addresses.

12         MR. BLECHMAN:  Your Honor, I don't use a minute that

13  I don't need to.  In the Class trial, that document was

14  offered and there were -- there were issues.  It's not clear

15  to me that it was admitted in evidence.  There were objections

16  that were lodged by the Defense at the time, and so I asked

17  the questions I did.

18         THE COURT:  I think my point is pretty obvious.

19         MR. BLECHMAN:  I understand, Your Honor.

20         THE COURT:  Okay.  I mean, I didn't say anything at

21  the time.

22         MR. BLECHMAN:  No.

23         THE COURT:  It was almost a comment made on the way

24  to being in jest.

25         MR. BLECHMAN:  I understand that.

1          THE COURT:  Not completely in jest, just a little

2    bit of a tweak as opposed to a beak.

3          MR. BLECHMAN:  Got it.

4          THE COURT:  Also then is a segue to my next

5    question, which is --

6          MR. BLECHMAN:  I have two other subjects, the next

7    of which is going to be longer.

8          THE COURT:  About a half hour.

9          MR. BLECHMAN:  I would say 30 to 40 minutes and then

10   I should be done.

11         THE COURT:  Okay, do you envision much redirect?

12         MS. SUMNER:  Not much.

13         THE COURT:  Okay.  Is there going to be anything

14   more from anybody on this, this Dr. Armstrong?

15         MR. KING:  I'll confer with cocounsel.

16         THE COURT:  Okay.  Well, the point is, it seems

17   likely then we'll have time for another witness, who will

18   be --

19         MR. KING:  It looks like it's going to be

20   Mr. Marshall.

21         THE COURT:  Okay.  And will that probably take up

22   the rest of the afternoon?

23         MR. KING:  I think we anticipate that his direct

24   will take about an hour and then I don't know how long the

25   cross would last.  It could leave us -- it could leave us shy

1   of 4 o'clock.  Mr. Hurd's testimony is pretty lengthy.

2            THE COURT:  There's no way that will be completed, I

3   understand that.

4            MR. KING:  And we could start it --

5            THE COURT:  It depends upon how shy as to whether or

6   not we're going to get started.

7            MR. KING:  Yes.

8            THE COURT:  Okay, well, let's just stay, you know,

9   stay limber.

10           Do any of you people use like the gym or do Pilates

11  while you're doing this?

12           MR. SLATER:  In our spare time.

13           THE COURT:  No, I mean, that could be restful.

14           MR. BLECHMAN:  It would be.

15           THE COURT:  Some of the best thinking happens in the

16  shower following the exercise.

17           Okay, see you.  Have a nice lunch.

18           MR. BLECHMAN:  Thank you, Your Honor.

19                     (Luncheon recess.)

20                     (After luncheon recess:)

21           THE COURT:  Okay, are you ready to return?

22           MR. BLECHMAN:  Yes, Your Honor.

23           THE DEPUTY CLERK:  All rise.

24           (Jury in.)

25           THE COURT:  It looks like you guys are going to

 1   float away.

 2              Okay, everybody have a seat.

 3              Mr. Blechman --

 4              By the way, I hope you had a nice lunchtime.  We are

 5   going to go until pretty close to 4 o'clock, as I mentioned,

 6   and then -- and there probably will be time for a brief break

 7   in between, you know, between now and then.

 8              Mr. Blechman, you may resume.

 9              MR. BLECHMAN:  Thank you, Your Honor.

10   BY MR. BLECHMAN:

11   Q.   I have two other subjects, Dr. Armstrong, I want to cover

12   with you.  In working into the first one, first a few

13   questions about the Science Advisory Committee.  Would you

14   agree that you and your colleagues were conscientious in the

15   work you did?

16   A.   Yes.

17   Q.   Were you diligent?

18   A.   Yes.

19   Q.   Were you thoughtful?

20   A.   Yes.

21   Q.   Did you pay attention to details?

22   A.   Yes.

23   Q.   You took, by my count, 21 months from the time the

24   committee came together in about January of 2019 -- January

25   of 2000 -- excuse me.  January of 1999 until September of 2000

1    when you issued the September 2000 recommendations, correct?

2    A.   Yes.

3    Q.   Twenty-one months, yes?

4    A.   Yes.

5    Q.   And the September 2000 recommendations were a revision of

6    the May 2000 recommendation, true?

7    A.   Yes.

8    Q.   So after the May 2000 -- excuse me, withdrawn.

9             And before the May 2000 recommendations, you've

10   testified that you provided a preliminary report -- and I'm

11   not sure if you used the word "report," so I use that word

12   loosely -- to the UEP board about -- or Producer Committee

13   about what you were doing, correct?

14   A.   Yes.

15   Q.   Okay.  And after the preliminary report to the UEP, you

16   and the committee continued to work, right?

17   A.   Correct.

18   Q.   And after the May 2000 recommendations that came out, you

19   and the committee continued to work, right?

20   A.   Yes.

21   Q.   Now let's take a look at Plaintiffs' Exhibit 43, sir.

22   That is the recommendations that you spoke of for May 2000

23   which is in evidence.

24             MR. BLECHMAN:  If we might publish that, please.

25   BY MR. BLECHMAN:

```
 1   Q.   And, Dr. Armstrong, I believe you'll find that on the

 2   screen, but you're welcome to look at the document in hard

 3   copy.  Just tell me when you're ready.

 4   A.   I would prefer a hard copy.

 5   Q.   That's fine.

 6   A.   Thank you.  I don't think I have that one.

 7             MR. BLECHMAN:  May I approach, Your Honor?

 8             THE COURT:  Sure.

 9   BY MR. BLECHMAN:

10   Q.   I'm handing the witness what has been marked as

11   Plaintiffs' Exhibit 43.

12   A.   Okay, thank you.

13   Q.   Sure.  Do you have that document in front of you?

14   A.   Yes.

15   Q.   Dr. Armstrong, you're familiar with Plaintiffs'

16   Exhibit 43, the May 2000 recommendation, yes?

17   A.   Yes.

18   Q.   You had a hand in writing it, true?

19   A.   Yes.

20   Q.   Sir, am I correct that the words "100% rule" appear

21   nowhere in the May 2000 recommendations?

22   A.   That's correct.

23   Q.   Okay.  I'm done with that document.

24             Let's move to the September 2000 recommendations.

25   That is Plaintiffs' Exhibit 52, which is also in evidence, and
```

1    that might be in your -- do you have that?

2    A.   I have it.

3            MR. BLECHMAN:  All right, if we might put that up

4    for the jury.

5    BY MR. BLECHMAN:

6    Q.   Dr. Armstrong, the words "100% rule" appear nowhere in

7    the September 2000 recommendation, true?

8    A.   Correct.

9    Q.   Would you agree, sir, that if the 100% rule were somehow

10   implied into the -- withdrawn actually.

11           Let me take you through another.  Let's take a look

12   at Plaintiffs' Exhibit 57, which is the 2000 edition of the

13   Animal Husbandry Guidelines.  Tell me if you have that handy.

14   Let me give you a hard copy to make it easier for you.

15           MR. BLECHMAN:  May I approach?

16           THE COURT:  Yes.

17           THE WITNESS:  Thank you.

18   BY MR. BLECHMAN:

19   Q.   Sir, I've handed you what has been marked as the 2000

20   Animal Husbandry Guidelines for the UEP, correct?

21   A.   Correct.

22   Q.   And you're familiar with this document?

23   A.   Yes.

24   Q.   Correct?

25   A.   Yes.

1   Q.   Am I correct, sir, that the words "100% rule" appear

2   nowhere in the 2000 UEP Animal Guidelines?

3   A.   Correct.

4   Q.   All right.  And let's take a look now at Plaintiffs'

5   Exhibit 93, which is the 2002 edition of UEP Guidelines, which

6   is Exhibit -- excuse me, which is Exhibit D-175, which is

7   already in evidence.

8            MR. BLECHMAN:  If we might bring that up.

9   BY MR. BLECHMAN:

10  Q.   Do you have that handy?

11  A.   Yes.

12  Q.   Okay.  Sir, am I correct that the words "100% rule"

13  appear nowhere in the 2002 UEP Animal Husbandry Guidelines?

14  A.   Correct.

15  Q.   Your testimony, however, is that the 100% rule is somehow

16  implied or read into the 2000 and 2002 guidelines, true?

17  A.   We didn't consider it.  We assumed that it would be for

18  all.  We didn't -- we didn't talk about it.  We didn't -- we

19  did not talk about it.

20  Q.   Okay.  Is your testimony in this trial that the 100% rule

21  should be read into the 2000 UEP Guidelines?

22  A.   Yes.  I think it was the --

23  Q.   Okay.

24  A.   -- expectation of the Scientific Committee that these

25  would be guidelines for all -- all UEP hens.

1   Q.   And --

2   A.   But we did not talk about it.

3   Q.   Is your answer -- so next question is:  Is your testimony

4   that the 100% rule should be read into the UEP Guidelines for

5   2002?

6   A.   No.  I -- I -- all I -- I can only answer how I answered.

7   We did not anticipate that producers would not certify or use

8   the guidelines on all their birds, so we did not talk about

9   it.  So I can't --

10  Q.   Okay.

11  A.   -- speak for the committee, but when we learned about it,

12  we acted.

13  Q.   I may have misheard you but I thought -- I thought in

14  response to my question about whether the 100% rule, you

15  thought it should be read into the 2000 guidelines, I thought

16  you said correct.  Did I misunderstand?

17  A.   Well, it's a matter of how you word it.

18  Q.   Okay, well, here's --

19  A.   I think -- I think if you ask the Scientific Committee

20  when we started talking about it, we didn't talk about it,

21  because we assumed --

22  Q.   Right.

23  A.   -- we assumed that it would pertain to all birds.

24  Q.   Okay.  Let's work with that.

25  A.   And that's all I can -- that's all I can say.

1  Q.   So let's work with that testimony.  You assumed it.  So

2  do I take it from your answer just now that you think the 100%

3  rule should be read into the 2000 guidelines?

4           MS. SUMNER:  Objection.  Asked and answered.

5           THE COURT:  It seems to me that you did ask him the

6  question.

7  BY MR. BLECHMAN:

8  Q.   All right, let me try the 2002 then, because I'm not sure

9  we got an answer on that one.

10          Is it your testimony, sir, that the 100% rule should

11 be read into the 2002 guidelines?  In other words, should we

12 read it and perceive that it's implied in these 2002

13 guidelines, yes or no?

14          MS. SUMNER:  Objection.  Asked and answered.

15          THE WITNESS:  Well, my --

16          THE COURT:  Well, he's going through different

17 documents.

18 BY MR. BLECHMAN:

19 Q.   Um-hum.

20 A.   My response to that is that the committee did not discuss

21 it and the response is that the science-based guidelines

22 evolved as we learned more and knew more.

23 Q.   Understand.  But what I'm trying to understand is,

24 whether it's your testimony now in 2019, that when we look

25 back at the 2002 guidelines, that we should read them and

1  assume the 100% rule and assume the 100% rule into the reading

2  of those 2002 guidelines?

3  A.   Our group of scientists would never say that, because we

4  don't go back and assume.  We have the guidelines as they

5  existed.  When we learned about producers that would not

6  provide those guidelines to birds, that's when we took action.

7  That's all I can answer.  I don't -- don't -- I don't --

8  Q.   Well, here's what I'm trying to figure out.  Here's what

9  I'm trying to figure out.

10  A.   I'm not trying to be difficult, I'm just trying to

11  answer --

12  Q.   And I appreciate it.

13  A.   -- as I experienced it.

14  Q.   Thank you, sir.

15       Here's what I'm trying to figure out, is, in January

16  of 2002, the UEP Board of Directors takes up and passes a

17  motion for 100 percent of producer packer facilities to be

18  certified as on the UEP Welfare Program starting April 1,

19  2002.  And my question to you is:  If the 100% rule should be

20  assumed in the 2002 guidelines or the 2000 guidelines or

21  should be read into the 2000 or the 2002 guidelines, then why

22  was it necessary for the UEP board in January of 2002 to take

23  up, consider and pass a motion to approve the 100% rule?

24  A.   I -- all I can tell you is that our committee did not

25  discuss the 100% rule until it came -- until it came up at the

1    time.

2    Q.   Okay.

3    A.   And it was an animal welfare concern.

4    Q.   Thank you.

5    A.   And the committee -- we didn't talk about it because no

6    one thought that producers would -- would separate it out but

7    we didn't talk about it.  So as a group of scientists we're

8    not going to read something into guidelines that we didn't do.

9    Q.   I get it.

10   A.   The guidelines are the guidelines at that time and they

11   evolve.  I can't answer it any differently.

12   Q.   I get it that you didn't talk about it.

13            So let me turn then to April of 2002.  If -- if the

14   100% rule should be assumed to be in or read into the 2000 or

15   the 2002 guidelines, then why was it that on April 4, 2002,

16   the UEP board took up a motion and passed with regard to

17   changing the status of a Certified Program company from 100

18   percent producer packer facilities to 100 percent of company

19   facilities regardless of where or how eggs may be marketed?

20            MS. SUMNER:  Objection.  Foundation.

21            THE COURT:  Well, it's a very, very long question --

22            MR. BLECHMAN:  I'll rephrase.

23            THE COURT:  -- Mr. Blechman.  Why don't you try and

24   rephrase it.

25            MR. BLECHMAN:  Sure.  I will.

1    BY MR. BLECHMAN:

2    Q.   If the 100% rule should be read into -- withdrawn.

3         If the 100% rule should be assumed in, say, the 2000

4    guidelines, then what is your understanding, if any, as to why

5    the UEP Board of Directors would be taking up a motion to

6    approve an expanded version of the 100% rule on April 4, 2002?

7    A.   I've already addressed the science side of it, and you'd

8    have to ask the producers, I do not know.

9    Q.   Finally in this -- in this sequence, if the 100% rule

10   should be assumed in the reading of the 2000 UEP Guidelines or

11   the 2002 UEP Guidelines, then, sir, what is your

12   understanding, if any, of why on October 9, 2002, the UEP

13   Animal Welfare Committee took up and passed a motion with

14   regard to implementing the Welfare Guidelines and 100% of all

15   production facilities regardless of how or where eggs may be

16   marketed?

17   A.   So that was -- that was 2009?

18   Q.   October 9, 2002.

19   A.   I don't recall when we -- when we first brought it up,

20   but we brought it up as a committee at some point in time.

21   Q.   With regard to the recommendations that you played a role

22   in preparing, am I correct that there is no provision in the

23   May or the September 2000 recommendations for producers must

24   agree to the recommendations, correct?

25   A.   We --

1   Q.   Do you want me to restate the question?

2   A.   We provided the guidelines.  The UEP executive group,

3   they voted unanimously to accept them.  That's my

4   understanding.

5   Q.   And is it your understanding, sir, that there's no

6   provision in the May or September 2000 recommendations that

7   producers must agree to the recommendations?

8   A.   Are you talking about the producer guidelines?

9   Q.   I'm talking about the recommendations of the Science

10  Advisory Committee of which you served as the chairperson.

11  A.   We never -- at the beginning, we talked about what are

12  the best -- what do we know, what we don't know in the

13  different areas, we developed the guidelines.

14  Q.   And my question to you, Dr. Armstrong, is:  Isn't it true

15  that there are no words in the May or the September 2000

16  recommendations stating that producers must agree to these

17  recommendations?  Isn't that true?

18  A.   Yeah, that would be unusual for scientists to say you

19  must do that.  So yes, you're right.

20  Q.   Thank you.

21       And isn't it true that there's no provision in these

22  recommendations for May and September of 2000 requiring

23  producers to sign a commitment agreement to comply with the

24  recommendations?

25  A.   That's UEP, not the Scientific Committee.

1    Q.   Is that your way of answering my question?

2    A.   Yes.

3    Q.   Yes.

4    A.   Yes.

5    Q.   Thank you.

6           Isn't it true, sir, that in the May and the 2000

7    recommendations, there's no provision in either of these

8    documents for an audit?

9    A.   Correct.

10   Q.   Isn't it true, sir, that in the May and the 2000

11   recommendations, there's no provision in either of these

12   documents for a marketing program?

13   A.   Correct.

14   Q.   Isn't it true, sir, that in the May and the

15   September 2000 recommendations, the word "backfilling" appear

16   nowhere?

17   A.   That's correct.

18   Q.   Isn't it true that in May and September of 2000, you

19   hoped that producers would abide by the recommendations; isn't

20   that true?

21   A.   Yes.

22   Q.   Okay.

23   A.   Yes.

24   Q.   But there was no requirement, sir, was there, in either

25   the May or the 2000 recommendations that producers comply with

1   the recommendations, true?

2   A.   That would be extremely unusual for a group of scientists

3   to try to impose a set of science on producers, so you're

4   correct.

5   Q.   Thank you.

6          Now, with regard to the guidelines for 2000 and

7   2002, isn't it true that there is no provision in the 2000 and

8   2002 guidelines for producers must agree to the guidelines?

9   Isn't that true?

10   A.   Correct.

11   Q.   Isn't it true, sir, that there's no provision in the 2000

12   or the 2002 guidelines for producers to sign a commitment

13   agreement to comply with the guidelines?

14   A.   And you're talking about the science-based guidelines.

15   Q.   I'm talking about the 2000 and 2002 UEP Guidelines, sir.

16   Isn't it true that there is no provision in either of those

17   guidelines for producers to -- a requirement that producers

18   sign a commitment agreement to comply with the guidelines?

19   A.   I would assume you're correct.

20   Q.   You know that to be true, don't you?

21   A.   Yes.

22   Q.   Okay.  Isn't it true, sir, that in the 2000 and the 2002

23   UEP Guidelines, the word "backfilling" appear nowhere?

24   A.   Correct.

25   Q.   And isn't it true, sir, that you yourself hoped that

1 producers would comply with the 2000 and 2002 guidelines?

2 A.   Oh, we started at the very beginning and we obviously

3 were very delighted that they accepted the science guidelines

4 and so, yes, we hoped they would implement everything.

5 Q.   Isn't it also true, though, Dr. Armstrong, that there was

6 no requirement in the 2000 or the 2002 guidelines that

7 producers follow the guidelines?

8 A.   Correct.

9 Q.   Dr. Armstrong, isn't it true that in the April 2004

10 period, you participated in discussions with others about

11 trying to convince producers to add more feeder space for

12 hens?

13 A.   Yes, that seems -- yes.

14 Q.   You worked with Patricia -- excuse me, withdrawn.

15      You worked with Dr. Hester on that issue, true?

16 A.   And the rest of the committee.  Yes.

17 Q.   Dr. Hester -- Dr. Hester wrote to you in the April 2004

18 time period in your capacity as chairperson of the Science

19 Advisory Committee about managing the message to use in per --

20 in trying to persuade producers to add more feeder space for

21 hens, true?

22 A.   Yes.

23 Q.   She told you, did she not -- well, let me back up.  Let

24 me show you what is already in evidence.

25      MR. BLECHMAN:  Plaintiffs' Exhibit 223, if we might

1    have that brought up.

2    BY MR. BLECHMAN:

3    Q.   This is -- it's a three-page e-mail at the top of which

4    is an e-mail from Dr. Hester to you, Dr. Armstrong, and

5    others.  We reviewed it earlier today.  Tell me when you've

6    got it.

7    A.   What number is it?

8    Q.   223.

9              MR. BLECHMAN:  Your Honor, may I approach --

10             THE COURT:  Yes.

11             MR. BLECHMAN:  Let me make it easier for you.

12             THE WITNESS:  There it is.

13   BY MR. BLECHMAN:

14   Q.   You got it?

15   A.   It was on the bottom.

16   Q.   No worries.

17   A.   I'm sorry.

18   Q.   No worries.

19             Do you have Exhibit 223 in front of you?

20   A.   I do.

21   Q.   All right.  The first -- I asked you some questions

22   earlier about the second e-mail in this document, which is

23   earlier time, but now we're going to shift to the first e-mail

24   which is on the first page.

25             Do you have the first page in front of you, sir?

1   A.   Yes.

2   Q.   All right.  This is an e-mail from Dr. Hester to you and

3   others dated April 23, 2004.

4            Do you see that?

5   A.   Yes.

6   Q.   And the subject is:  UEP Scientific Advisory Committee

7   for Animal Welfare.  Correct?

8   A.   Yes.

9   Q.   All right.  Let's identify a few people.  One of the

10  people to whom Dr. Hester sent this e-mail to is you, true?

11  A.   Yes.

12  Q.   Another is Paul Bahan.  He was chair of the UEP Producer

13  Committee at the time?

14  A.   Yes.

15  Q.   And another person who receives this e-mail is Gene

16  Gregory, he being the executive at the UEP, correct?

17  A.   Yes.

18  Q.   All right.  And feeder space was an issue that you-all

19  were looking at at the time, correct?

20  A.   Yes.

21  Q.   You regarded feeder space as an animal welfare issue,

22  true?

23  A.   True.

24  Q.   Okay.  Now, let's take a look at the one, two -- three

25  paragraphs down, if you would.  And starting in the fourth

1    line, directing your attention to the following passage, this

2    is what Dr. Hester writes, in part, to you in this e-mail:

3            The UEP newsletter yesterday lamented the recent

4    drop in egg prices.  Is it really due to a lost interest in

5    the Atkins diet or is it due to the beginning stages of

6    oversupply of eggs?  If it is the latter, then recommendation

7    of providing 4 inches of feeder space will reduce the supply

8    of eggs ensuring profits for another year or two before the

9    industry oversupplies again.  The producer wins, the hen wins,

10   and the consumer who is concerned about hen welfare and is

11   willing to pay higher prices for eggs wins.  Eggs are

12   considered an inelastic product anyway, so consumers buy eggs

13   regardless of costs.

14           Did I read that correctly?

15   A.   You did.

16   Q.   All right.  Upon -- the reference to costs at the end of

17   that paragraph that I just read to you --

18   A.   Yes.

19   Q.   -- do you interpret the word "costs" there to refer to

20   price?

21   A.   I --

22   Q.   Where it reads:  Eggs are considered an inelastic product

23   anyway, so consumers buy eggs regardless of costs.  That's

24   costs to the consumer, the price to the consumer, correct?

25   A.   I think that's what she was referencing, yes.

1    Q.    Okay.  And that's what you -- that's fair to believe,

2    that that's --

3    A.    That's the way I read it today, yes.

4    Q.    Fair enough.

5          Upon reading this e-mail from Dr. Hester, did you

6    communicate with her that she should not justify an animal

7    welfare measure based on reducing the egg supply and

8    increasing profits to producers?

9    A.    I don't recall what I said to her, but I can tell you

10   that feeder space, any changes were made based on the

11   scientific recommendations and hen welfare.

12   Q.    But here -- but here --

13   A.    She made the statement.  I don't recall what I said to

14   her, if I said anything about it.

15   Q.    Okay.  But -- but I want to work with your expanded

16   answer, because you said you don't recall, but then you gave

17   more of an answer.  So this is what I want to try to work with

18   you on.

19          Is -- is your testimony you don't recall what, if

20   anything, you said to Dr. Hester in response to this e-mail?

21   A.    Correct.

22   Q.    Okay.  My next question is:  After you received this

23   e-mail from Dr. Hester, did you have a communication with Gene

24   Gregory of the UEP and discuss with him using animal welfare

25   issues to justify reducing supply and increasing egg prices to

1  consumers?

2  A.   No.

3  Q.   Okay.  Dr. Armstrong, were you aware -- withdrawn.

4          In January of 2002, you were on the Science Advisory

5  Committee, correct?

6  A.   Yes.

7  Q.   And you were working with UEP, correct?

8  A.   Yes.

9  Q.   And you know who Ken Looper is from Cal-Maine?

10  A.   I do.

11  Q.   All right.  He was also on the UEP Board of Directors,

12  true?

13  A.   Yes.

14  Q.   Were you aware, sir, that on January 30, 2002,

15  Mr. Gregory of UEP wrote to Ken Looper about the Certified

16  Program that:  A number of producers have asked me when the

17  issue changed from animal welfare issue to a supply/demand

18  program.

19          Do you have any memory of that communication?

20  A.   I do not recall that.

21  Q.   Did Mr. Gregory discuss with you, in or about January or

22  February of 2002, the fact that there were producers on the

23  UEP who were expressing concern about when the issue of animal

24  welfare and the guidelines changed to supply/demand production

25  in the Certified Program?  Do you have any memory of that?

1   A.   I don't recall.

2   Q.   You never talked to him about that?

3   A.   No, that I recall.

4   Q.   All right.  So you weren't aware of it.

5   A.   I'm not aware of Mr. Looper's -- I don't recall

6   Mr. Looper's statements.

7   Q.   Okay.

8   A.   There were a lot of statements made like Scotti's

9   statement and others, but I can tell you what we did over the

10  long haul.  We really focused on the science from the

11  Scientific Advisory Committee.

12  Q.   Thank you.

13           But for the sake of clarity, you weren't aware of

14  that communication, were you?

15  A.   Not that I recall.

16  Q.   Okay.  In March of 2002, you were also head of the

17  Science Advisory Committee of the UEP, correct?

18  A.   Correct.

19  Q.   And you were the liaison to the Producer Committee of the

20  UEP during that time as well, correct?

21  A.   That's correct.

22  Q.   And you identified earlier, in Producer Committee

23  minutes, Ky Hendrix of Rose Acre, correct?

24  A.   Yes, we talked about that earlier.

25  Q.   And you identified earlier that you knew of Marcus Rust

1   as the president of Rose Acre, correct?

2   A.   Yes, because I knew most of the producers.

3   Q.   Were you aware, sir, that in March of 2002, a Rose Acre

4   executive expressed to the company president that he thought

5   there was more to the Certified Program than animal welfare?

6            MR. KING:  Objection.  Foun- --

7            THE WITNESS:  No, I do not recall.

8            THE COURT:  Wait.  There was an objection.  It's a

9   hearsay objection?

10            MR. KING:  There's no foundation.  He's asking about

11   internal Rose Acre communications.

12            MR. BLECHMAN:  Mr. Hendrix, I'm sorry.

13            THE COURT:  Okay, do you want to --

14            This is Dr. Armstrong.

15   BY MR. BLECHMAN:

16   Q.   Let me try it a different way.

17            You attended Producer Committee meetings with

18   Mr. Hendrix of Rose Acre, correct?

19   A.   Correct.

20   Q.   All right.  And you attended Producer Committee meetings

21   in March of 2002, correct?

22   A.   Correct.

23   Q.   You met Ky Hendrix of Rose Acre at Producer Committee

24   meetings, true?

25   A.   True.

1   Q.   All right.  So my question to you is based on the fact

2   that you knew Mr. Hendrix, that you attended meetings with

3   him, whether in March of 2002 he ever told you that he had

4   expressed to Rose Acre's president concern about whether there

5   was more to the Certified Program than animal welfare, yes or

6   no?

7               THE COURT:  Wait.

8               THE WITNESS:  I do not recall.

9               THE COURT:  Whoa, whoa, whoa.  Wait.

10              MR. KING:  He answered it.

11              THE COURT:  Okay, go ahead.  Sorry.

12  BY MR. BLECHMAN:

13  Q.   Okay.  You've -- you've identified Sparboe in -- in some

14  answers to questions both today and earlier, correct?

15  A.   Yes.

16  Q.   This is a company that you're familiar with?

17  A.   Yes, as well as any in the UEP.

18  Q.   Okay.  Did Mr. Gregory of UEP -- withdrawn.

19              In 2003 you were the chairperson of the Science

20  Advisory Committee of the UEP, correct?

21  A.   Yes.

22  Q.   And during that period, you'd have communications with

23  Mr. Gregory, correct?

24  A.   Yes.

25  Q.   All right.  In 2003 did Mr. Gregory of the UEP tell you

1    that Sparboe had written to UEP's lawyers expressing the view

2    that the Animal Welfare Program had a hidden agenda and was

3    being used to reduce output in an effort to increase prices?

4              MS. SUMNER:  Objection.

5              THE COURT:  What is the objection?

6              MS. SUMNER:  Foundation.

7              MR. BLECHMAN:  I think I --

8              THE COURT:  Well, it's really just a question did

9    Mr. Gregory say something to Dr. Armstrong.

10             MR. BLECHMAN:  Yes.

11             THE COURT:  Okay, then I'm going to overrule the

12   objection.

13             And you may answer the question.

14             THE WITNESS:  Yeah, I do not recall discussions or

15   the Animal Welfare Committee -- the science-based guidelines

16   were being twisted into something else.  If I had had that, I

17   would have taken it to the committee.

18             Now, could I have heard comments like that off the

19   cuff, listening to the many committee meetings, I'm sitting

20   there doing e-mail, I don't know what all was stated.  But I

21   can tell you that never at any time did it affect our

22   Scientific Committee's work or the guidelines.  They were

23   substantially in place in 1999, modified in May and in

24   September.  The main points of the science-based guidelines

25   didn't change over time.

1    BY MR. BLECHMAN:

2    Q.   Dr. Armstrong, so I thought I heard in your testimony

3    that you just said that you may have heard those kinds of

4    concerns about --

5    A.   Well --

6    Q.   Let me -- you might have heard, at that time, concerns

7    expressed by UEP Producers about the Animal Welfare Program

8    having a hidden agenda and other words to that effect.

9    A.   I don't recall ever hearing anything about a hidden

10   agenda.

11   Q.   Okay.

12   A.   But -- but I attended a lot of producer meetings.

13   There's a lot of comments made in the notes, in the minutes.

14   I can tell you if I had heard of a hidden agenda, I would have

15   taken it to our committee, because we believed that deeply in

16   those science-based guidelines that were basically formed in

17   '99, early 2000.

18   Q.   You would have taken it to your committee, yes?

19   A.   Yes, if I felt it was systemic, if I felt there was

20   something going on.

21   Q.   So I can't help but ask you then, going back to

22   Dr. Hester's e-mail to you of April 23, 2004, that when you

23   get an e-mail from her that is expressly explaining that the

24   committee -- excuse me, that is expressly explaining that an

25   animal welfare measure in this case with regard to feeder

1    space for hens should be justified based -- based on being

2    able to reduce the egg supply and ensure profits for egg

3    producers, did you take that communication to the committee?

4    A.    As I answered earlier, that was her comment, and you're

5    taking multivolume books, of chapters, and looking at one

6    page.

7    Q.    Well, we've actually looked at more than one page.

8    A.    Oh, I fully agree with that.

9    Q.    Let's -- let's -- let's move to February --

10   A.    But I can tell you, committee members made comments,

11   other committee members could make comments, but that's not

12   something we talked about.

13   Q.    Okay.

14   A.    I mean, in this e-mail, obviously, Scotti said it.

15   Q.    So then it is something that was discussed in -- we know

16   at least in one e-mail it was discussed, right?

17   A.    Well, there's a difference in the committee discussing it

18   versus someone mentioning it in an e-mail.

19   Q.    Right.  And so what we have to work on --

20   A.    It's not in our guidelines and did not influence our

21   guidelines.

22   Q.    And what we have to work with now are the written records

23   that were created at the time of what people were thinking and

24   saying and telling to each other.  We don't have any other

25   documents at that point, right?

```
 1            THE COURT:  Okay, was that a question?
 2            MR. BLECHMAN:  Right?
 3            THE WITNESS:  That's why I worked really hard --
 4   BY MR. BLECHMAN:
 5   Q.   Okay.
 6   A.   -- with the committee to document our scientific
 7   guidelines along the way.
 8   Q.   Okay.  You said you knew Marcus Rust from Rose Acre,
 9   correct?
10   A.   I don't know him well, but I know most of the producers
11   at UEP, just to be -- just set the stage.
12   Q.   I'm just asking to lay a foundation here to ask you one
13   or two other questions.
14   A.   Sure.  Sure, yeah.
15   Q.   Do you have knowledge of -- withdrawn.
16            Did -- did anyone from Rose Acre tell you in words
17   or substance in February of 2008, that an owner of Rose Acre
18   had expressed concerns about the Certified Program and whether
19   it was manipulating supply of eggs under false pretenses?
20            MR. KING:  Objection.  Foundation.
21            THE WITNESS:  No.
22            THE COURT:  No, does he have knowledge of anything
23   or did anyone -- did anyone from Rose Acre say this to him?
24            THE WITNESS:  No, not that I recall.
25   BY MR. BLECHMAN:
```

1  Q.   Okay.  Dr. Armstrong --

2  A.   I think I would remember that.

3  Q.   Dr. Armstrong, do you know that the Supermarket

4  Plaintiffs in this case also had no knowledge of those

5  communications; do you know that?

6            MR. KING:  Objection.

7            MS. SUMNER:  Objection.

8            MR. KING:  Argumentative.

9            THE COURT:  Sustained.  That's a rather

10 argumentative question.

11           MR. BLECHMAN:  Your Honor, with that, I'll pass the

12 witness.

13           THE COURT:  Okay.  Is there -- anybody else want to

14 do anything here before we do a redirect?

15           MR. HARRIS:  No, Your Honor.

16           THE COURT:  Okay, there's one no.

17           What about here?  It's a no, thank you?

18           MR. LEVINE:  No, thank you.

19           MR. KING:  Well.

20           THE COURT:  Or maybe?

21           MR. KING:  Yeah, I just have --

22           THE COURT:  Go ahead.

23           MR. BLECHMAN:  Your Honor?

24           THE COURT:  Yes.

25           MR. BLECHMAN:  May we approach the sidebar just for

1    who is not questioning, and we ask we just be treated the

2    same -- that the Defendants' counsel be treated the same as

3    the Plaintiffs' counsel in this regard.

4           THE COURT:  Okay, I don't remember it quite that

5    way, but the reason I'm going to allow counsel for Rose Acre

6    to ask any questions is because in the last ten minutes there

7    were some very pointed series of questions about whether

8    anybody from Rose Acre ever said anything.

9           MR. BLECHMAN:  Correct.

10          THE COURT:  That is the limit of what I'm going to

11   allow.  It's not going to be a redo of the direct, okay, or

12   whatever -- or whatever it would be, you know, to follow the

13   entire panoply.  You got what you wanted.  You can go sit

14   down.

15          (End of sidebar.)

16                      CROSS-EXAMINATION

17   BY MR. KING:

18   Q.   Dr. Armstrong, I just have a couple of questions.  When

19   you were working as the chair of the Scientific Advisory

20   Committee for UEP, did you -- you had some interactions with

21   buyers of eggs on the wholesale market?

22   A.   Unless they attended the UEP meeting and I ran into them,

23   no.

24   Q.   Did you have any dealings with any companies that bought

25   eggs, like in the supermarket chains?

1   A.   No.

2   Q.   You did not.  All right.

3             The -- are you aware of a website

4   www.UEPcertified.com?

5   A.   Yes.

6             MR. BLECHMAN:  Excuse me, Your Honor, is this about

7   Rose Acre?

8             THE COURT:  I think it's leading up to Rose Acre.

9   Right?

10            MR. KING:  Well, it's responsive to the -- it was --

11  it's not directly related to Rose Acre.  Let me ask another

12  question.

13            THE COURT:  Okay.

14  BY MR. KING:

15  Q.   When you were -- when you were appointed to chair the

16  Scientific Advisory Committee, to your knowledge, was Rose

17  Acre a member of the UEP, if you know?

18  A.   I assume so.

19  Q.   All right.

20  A.   I didn't know that for a fact because I was learning.

21  Q.   Okay, and if -- if it's already been established that

22  Rose Acre joined in 2002, would that be a surprise to you that

23  they didn't join UEP until 2002?

24  A.   I did not keep up with who joined when, so --

25  Q.   So if Rose Acre -- assume for the moment Rose Acre did

1   not join the UEP until 2002, did Rose Acre have any

2   involvement in the development of the recommendations that

3   ultimately went into the UEP Certified Program in early 2002?

4   A.   The main pillars of the guidelines really didn't change

5   after 2000.  It was a matter of some evolution, feeder space,

6   for example, we learned more about the birds, but the main

7   points were established in 2000.

8   Q.   All right.  And in the 2000 time frame, do you have any

9   recollection of having any dealings with anyone at Rose Acre,

10  whether it be Marcus Rust, Ky Hendrix, or anyone else?

11  A.   The only time I would have interacted with them would

12  have been in 1997 as I'm touring the state as a new department

13  head, but I really don't recall.  But I don't --

14  Q.   You don't have any recollection --

15  A.   I don't have any recollection.

16  Q.   -- dealing with anyone at Rose Acre in 1997?

17  A.   If I dealt with them during the time -- I was a new

18  department head in 1997.  If I did it was just meeting them

19  and touring the state, but I didn't have any interactions --

20  if they weren't UEP members, I wouldn't have interacted with

21  them --

22  Q.   You mean a new department head for the --

23  A.   I was a new department head at Purdue in 1997.  1997 to

24  2001 I was at Purdue, which is in West Lafayette, Indiana.

25  And as the head of Animal Sciences we would tour around the

1    state and get to know all the animal industries.

2              MR. KING:  Nothing further, thank you, Your Honor.

3              THE COURT:  Redirect.

4              MS. SUMNER:  Thank you.

5                        REDIRECT EXAMINATION

6    BY MS. SUMNER:

7    Q.   Good afternoon, Dr. Armstrong.  I just want to follow-up

8    on a few things that you discussed with Mr. Blechman yesterday

9    afternoon and this morning.  The first thing I want to cover

10   is the difference between a prescriptive and a

11   performance-based standard.  Can you explain to the jury the

12   difference?

13   A.   So a prescriptive standard would be in the case of cage

14   height, the 16, 17 -- 16 in the front, whatever the number

15   would be in the back.

16             A performance standard would be all birds can stand

17   without their heads protruding through the top of the cage.

18   That's an example.  Prescriptive versus performance.

19   Q.   Is one of those preferred over the other by animal

20   scientists?

21   A.   Actually the animal welfare scientists prefer the

22   performance standards, but it's harder to audit.  But they

23   prefer the performance standards because it allows the bird to

24   exhibit that behavior, standing up.

25   Q.   Are the prescriptive standards used more frequently?

1   A.   They tend to be, because of just the nature of the

2   industry and it's hard to, again, audit.  We had a lot of

3   demand for not only Animal Welfare Guidelines, but at that

4   time FMI and NCCR were wanting guidelines that could be

5   audited so they could tell their consumers that the eggs were

6   produced properly.

7   Q.   But the scientists prefer the performance standards?

8   A.   Right.  But they recognize that prescriptive is needed

9   many times in order to really be able to audit and monitor.

10  Q.   Thank you.

11       I want to go over a few documents that Mr. Blechman

12  showed you.  If we could bring up together, please,

13  Plaintiffs' Exhibit 44 and 45.  You may recall early on in

14  your testimony, Dr. Armstrong, on cross-examination,

15  Mr. Blechman asked you about this May 15, 2000, Producer

16  Committee for Animal Welfare meeting in Washington, D.C.,

17  which you attended.  Do you recall that?

18  A.   Yes.

19  Q.   Okay.  And did other members of the Scientific Advisory

20  Committee attend this meeting with you?

21  A.   Yes.  Dr. Joy Mench, Dr. Janice Swanson, Mr. Don Bell

22  were in attendance.

23  Q.   Were Drs. Mench and Swanson also on the FMI expert

24  Scientific Advisory Committee?

25  A.   Yes, along with Adele Douglass, so we had three members

1    that were overlapping.

2    Q.   And looking at the document that's been marked as

3    Plaintiffs' Exhibit 45, which is entitled UEP Animal Welfare

4    Committee Meeting May 15, 2000, do you recall ever seeing this

5    document before your testimony yesterday?

6    A.   No.

7    Q.   Do you know whether you received a copy of this document

8    at the meeting you attended on May 15, 2000?

9    A.   If I did, I don't recall.

10   Q.   Sitting here today, do you have any recollection as to

11   whether the topics that are outlined on this handout were

12   actually discussed at that meeting?

13   A.   I don't recall.

14   Q.   I'd like to bring up Plaintiffs' Exhibit 164.  Let me

15   know when you're there, Dr. Armstrong.

16   A.   I think I can see it.

17   Q.   Okay, I'm just going to ask you a very brief question

18   about this document.  This is -- these are notes from an

19   Animal Welfare Committee meeting on January 21, 2003; is that

20   correct?

21   A.   Yes.

22   Q.   And did you attend this meeting?

23   A.   I do not see my name listed, no.

24   Q.   And you have no recollection of attending this meeting;

25   is that correct?

1  A.   No.

2            MS. SUMNER:  I'd like to bring up Plaintiffs'

3  Exhibit 186.

4  BY MS. SUMNER:

5  Q.   These are minutes from a UEP Producer Committee meeting

6  for animal welfare dated May 12, 2003, in Washington, D.C.

7  again.  Mr. Blechman asked you some questions about this

8  meeting.  Do you recall that?

9  A.   I recall the questions, yes.

10  Q.   And did you attend this meeting, Dr. Armstrong?

11  A.   Thank you for the blow-up.  No.

12  Q.   The next one is Plaintiffs' Exhibit 261.  These are

13  minutes from a UEP Board of Directors conference call on

14  December 16, 2004, about which Mr. Blechman also asked you.

15  Did you participate in this conference call, Dr. Armstrong?

16  A.   No.

17            MS. SUMNER:  You can take that down.

18  BY MS. SUMNER:

19  Q.   Dr. Armstrong, Mr. Blechman asked you about several

20  articles in United Voices during his examination of you that

21  dealt with egg prices.

22            Do you recall those questions?

23  A.   Yes.

24  Q.   Do you have any independent knowledge of what egg prices

25  were doing at the times that you were questioned about them in

1   the United Voices articles?

2   A.   No.

3   Q.   And do you have any knowledge about whether the

4   statements that Mr. Blechman was reading to you out of United

5   Voices were, in fact, true statements?

6   A.   I do not know.

7   Q.   I'd like to show you an article that -- from United

8   Voices and ask you if you have knowledge of this particular

9   one.

10          MS. SUMNER:  Could we bring up just for the witness,

11   please, Defendants' Exhibit 903.  I don't believe this has

12   been admitted yet.

13          MR. BLECHMAN:  Thank you.

14          MS. SUMNER:  May I approach the witness, Your Honor?

15          THE COURT:  Yes.

16   BY MS. SUMNER:

17   Q.   (Handing.)

18   A.   Thank you.

19   Q.   Dr. Armstrong, I'd like to direct your attention to the

20   second page of this United Voices.

21   A.   Yes.

22   Q.   The article that begins on that page, do you recognize

23   that article?

24   A.   Yes, I do.

25   Q.   And can you tell me what that is?

1   A.   It's an opinion piece that I wrote, and it was also

2   reviewed and edited by the Scientific Committee entitled Egg

3   Industry Needs to Be United on Animal Welfare.

4           MS. SUMNER:  Your Honor, I'd like to offer this

5   exhibit into evidence at this time.

6           MR. BLECHMAN:  Your Honor, Plaintiffs have no

7   objection.

8           THE COURT:  All right.  Then D-903 is admitted.

9           (Exhibit received in evidence.)

10          MS. SUMNER:  Can you -- may I publish it to the

11  jury?

12          THE COURT:  Yes.

13  BY MS. SUMNER:

14  Q.   Could you please read for the jury the title of this

15  editorial that you wrote, Dr. Armstrong?

16  A.   Egg Industry Needs to Be United on Animal Welfare.

17  Q.   And could you explain for the jury what the purpose was

18  of writing this editorial?

19  A.   What I had -- what you could see in the first paragraph,

20  I talked about the history.  When I was asked to chair the

21  committee, to bring experts together, our objective was to

22  develop husbandry guidelines for all producers, not just for

23  those serving a niche market or only those customers desiring

24  welfare guidelines.  An industry set of guidelines should be

25  that, industrywide.

1  Q.   I'd like to direct your attention to the last sentence of

2  this article on page 3.

3          MS. SUMNER:  If we could below that up, please.

4  BY MS. SUMNER:

5  Q.   That sentence reads:  Developing a separate program that

6  permits eggs to be produced under conditions that do not meet

7  the humane standards found in the UEP Guidelines is a huge

8  mistake for the egg industry and one that could have

9  repercussions for all of animal agriculture.

10          Do you see that, Dr. Armstrong?

11  A.   Yes.

12          MS. SUMNER:  And for completeness sake, I'd like to

13  direct the witness back to a passage from his deposition

14  testimony that Mr. Blechman read on the false science-based

15  guideline and just have the witness put it in context.

16          THE COURT:  You may, go ahead.

17  BY MS. SUMNER:

18  Q.   Do you still have your deposition testimony in front of

19  you, Dr. Armstrong?

20  A.   Yes.

21  Q.   I'd like to direct your attention to the passage --

22  Mr. Blechman asked you about page 154, if you could go there,

23  please.

24          MR. BLECHMAN:  Excuse me, Counsel.  If I can just

25  get -- if you'll give me a second.

```
 1                MS. SUMNER:  Oh, sure.

 2                MR. BLECHMAN:  Just give me 15 seconds to catch up

 3    with you.

 4                MS. SUMNER:  Yes.  Let me know when you're ready.

 5                MR. BLECHMAN:  Thank you.  Thank you.  What page?

 6                MS. SUMNER:  154.

 7                MR. BLECHMAN:  Okay.  Thank you.

 8    BY MS. SUMNER:

 9    Q.   Are you there, Dr. Armstrong?

10    A.   Yes.

11    Q.   And do you recall being asked about your answer to a

12    question where your response was:  If you are saying that you

13    have science-based guidelines and you're not following

14    science, that's false.

15                Do you remember that?

16    A.   Yes.

17    Q.   Okay.  I'd like you to back up here to page 153, line 16.

18    You were asked, question --

19                MR. BLECHMAN:  Excuse me, Your Honor.  I showed the

20    witness this portion of the transcript to refresh his memory.

21    I don't think it went any further than that.

22                THE COURT:  Yes.  Except that the jury heard --

23                MR. BLECHMAN:  Okay.

24                THE COURT:  -- you -- everybody reading everything.

25                MR. BLECHMAN:  Fine.
```

1           THE COURT:  So in the interest of --

2           MR. BLECHMAN:  Then I withdraw my request.

3           THE COURT:  -- lengthy completeness, I'll allow it.

4           MR. BLECHMAN:  Okay.

5    BY MS. SUMNER:

6    Q.   So you were asked the question, Dr. Armstrong -- last

7    sentence of this editorial reads:  Developing a separate

8    program that permits eggs to be produced under conditions that

9    do not meet the humane standards found in the UEP Guidelines

10   is a huge mistake for the egg industry and one that could have

11   repercussions for all animal agriculture.

12          And you were asked:  Did you write that sentence?

13          Answer:  Yes.

14          Question:  Okay, and what did you mean when you

15   wrote that sentence?

16          Answer:  Exactly what it says.  I cannot accentuate

17   it any better than exactly what that says.  Developing a

18   separate program that permits eggs to be produced under

19   conditions that do not meet the humane standards found in the

20   UEP Guidelines is a huge mistake for the egg industry and one

21   that could have repercussions for all of animal agriculture.

22          Question:  Was it a huge mistake in your view?

23          And this is where you gave your answer.

24          Answer:  Because if you are -- if you are saying

25   that you have science-based guidelines and you're not

1   following science, that's false.  That's a huge mistake, you

2   will lose the trust of retailers and consumers that value

3   science-based guidelines.

4            Did I read that correctly, Dr. Armstrong?

5   A.   Yes, you did.

6   Q.   And was that indeed your testimony?

7   A.   That was indeed my testimony, and it wasn't the

8   difference of whether ammonia spiked or not; it was the

9   difference of whether some eggs were produced under one

10  producer according to the guidelines and then they were still

11  being produced at 48.

12           And we didn't feel we had to talk about the humane

13  and other things until this happened, when producers started,

14  you know, talking about a program that would keep birds at

15  48 square inches.

16  Q.   You can go ahead and put that to the side, Dr. Armstrong.

17           Do you recall being asked a series of questions

18  about your CV and a number of topics in which you do not have

19  academic research expertise?

20  A.   Yes.

21  Q.   Was there a member of the Scientific Advisory Committee

22  who did, in fact, have expertise in hen animal welfare?

23  A.   Yeah.  We really got the dream team, so to speak.  We

24  got -- we were able to get all the experts that we wanted.

25  Whether it was Washington State, UC Davis, Kansas State,

 1  Purdue, they covered all those topics.

 2  Q.   And who in particular was your expert or were your

 3  experts on hen animal welfare?

 4  A.   Joy Mench -- Joy Mench, Ruth Newberry, Janice Swanson.

 5  Scotti Hester is a physiologist, and she worked in the

 6  physiology of birds.  So she's an animal welfare expert as

 7  well.

 8  Q.   Did you have an expert on beak trimming?

 9  A.   We did.

10  Q.   And who was that?

11  A.   That was Scotti Hester, Ruth Newberry and Joy and others,

12  but Scotti, I believe, led the effort in beak trimming.

13  Q.   Did you have experts who participated in research on

14  feeder space?

15  A.   Yes.

16  Q.   And who were those experts?

17  A.   So on feeder space, I don't remember all of Joy and

18  everybody's CV, but there was a study conducted at Purdue with

19  Scotti Hester and a graduate student where they looked at

20  feeder space in response to the push and pull we had, should

21  it be three, should it be four, or should it be a performance

22  standard.  And the research revealed performance

23  standard's fine because the birds had no problems eating when

24  they wanted to.

25  Q.   Dr. Armstrong, did you have an expert on euthanasia?

1    A.    Yes.  Ruth Newberry.

2    Q.    And what about on slaughter?

3    A.    Ruth Newberry.

4    Q.    Do you recall Mr. Blechman asking you a question as to

5    the absence of any research citations in your October 4, 2004,

6    letter with the Scientific Advisory Committee's position on

7    backfilling?

8    A.    Yes.

9    Q.    Okay.

10          MS. SUMNER:  If we could bring up that exhibit, the

11   October 4 letter, it's Defendants' Exhibit 665, please.

12          Your Honor, may I approach the witness?

13          THE COURT:  Yes.

14   BY MS. SUMNER:

15   Q.    Dr. Armstrong, I showed you -- I've just handed a

16   document to you.  Do you recognize that document?

17   A.    I do.

18   Q.    Can you tell me generally what this is, please?

19   A.    This is a review article written by PY Hester, Scotti

20   Hester, on the impact of science and management on the welfare

21   of egg-laying strains of hens.

22   Q.    And is this the article that you testified yesterday was

23   the source for the second paragraph of the October 4 letter

24   that is marked as Defendants' 665?

25   A.    Yes.

1   Q.   And is the specific paragraph that was the source for

2   your letter the second paragraph on the second page of this

3   article under the heading Biosecurity and Health?

4   A.   Yes.

5   Q.   Are there scientific references or citations in that

6   paragraph?

7   A.   Yes.  And this is a peer-reviewed article.

8   Q.   How many scientific references are there in that

9   paragraph in the article from which you took the second

10  paragraph of your October 4, 2004 letter?

11  A.   Let me find it again.  Okay, I have it.  There are three

12  in that paragraph.

13  Q.   Why didn't you put those scientific references in your

14  October 4, 2004, letter?

15  A.   Because the letter's coming from a group of experts that

16  know the literature, and we normally wouldn't put that in a

17  letter or an e-mail.  It's not a common practice.

18  Q.   Thank you.  You can put that to the side.

19          You testified earlier that the air quality and

20  ammonia in a henhouse is highly correlated with the style of

21  the building.  Can you explain what you meant by that?

22  A.   So a big factor on the ammonia level in the building is

23  whether the manure is left in the building or not and it is

24  also the ability to ventilate.  So, again, just from a common

25  sense perspective, I'm not an expert on ventilation or

1    ammonia, you move more air, you're going to get the ammonia

2    out.  When it's really cold, it's very difficult to move air

3    because it's expensive to heat the air.

4              And so when we looked at ammonia, when we looked at

5    the space allowance, we looked at molting, there was a

6    transition recognized because there's a lot of practices and,

7    in particular, for ammonia in the space per bird, it's

8    correlated with the housing type, which can't be changed

9    overnight.

10   Q.   And was it your understanding that the industry would

11   address the ammonia problem through a transition in the style

12   of buildings that were built?

13   A.   Yes.  Yes.  And we observed that on several occasions.

14   Actually touring some of the facilities.

15             MS. SUMNER:  Thank you very much, Dr. Armstrong.  I

16   have no further questions.

17             THE COURT:  Mr. Blechman, any recross?

18             MR. BLECHMAN:  Very short.

19                         RECROSS-EXAMINATION

20   BY MR. BLECHMAN:

21   Q.   Dr. Armstrong, did you consider yourself a member of this

22   dream team that you described?

23   A.   Not so much, because they were the animal welfare

24   experts.  I was the chair of the committee.

25   Q.   Not so much.  Does that mean you considered yourself a

1    part of the dream team but not as much as maybe others?

2    A.   When I've used the phrase "dream team" I'm not referring

3    to myself to be exact.  I'm referring to the scientists on the

4    committee.

5    Q.   Okay.

6    A.   And I typically wouldn't talk about myself in that way.

7    Q.   Have you in the past?

8    A.   Talked about the dream team.

9    Q.   Including yourself in that reference?

10   A.   I -- I may or may not have, but this is my frame of mind

11   today.

12   Q.   Ah, okay.

13   A.   Yeah.

14   Q.   Might you have, under oath, previously?

15   A.   I may have.

16   Q.   Okay.

17   A.   Yeah.

18   Q.   All right.  Next subject.  Rose Acre and the points

19   audit.  Sir, you were asked some questions by Rose

20   Acre's counsel about the audit and what you knew or didn't

21   know.  Here's my question to you.

22            MR. KING:  Objection.

23            THE COURT:  I'm not sure that I recall the word

24   "audit."  It had to do with a chronology.

25            MR. BLECHMAN:  Oh, do you know what, if I misspoke

1   then I -- I was passed a note.  I'm just actually going to

2   move on because I'm not understanding the note that I have.

3   So I withdraw the remark.

4   BY MR. BLECHMAN:

5   Q.   This is the other subject matter I wanted to cover with

6   you.  With regard to your October 4, 2004, letter to the UEP

7   Producer Committee, Exhibit 409.  Do you have that?

8   A.   I have it in front of me.

9   Q.   Okay.  First off, let's talk about timing.  You send this

10  letter, it's dated October 4, 2004, correct?

11  A.   Yes.

12  Q.   All right.  The publication that you referred to -- and

13  forgive me, I didn't --

14            MR. BLECHMAN:  Is this in evidence, the article,

15  or --

16            MS. SUMNER:  I didn't move it.

17            MR. BLECHMAN:  Okay.  All right.

18  BY MR. BLECHMAN:

19  Q.   Do you have the article in front of you?

20  A.   I do.

21  Q.   This is the article that Dr. Hester wrote that you

22  alluded to -- that you referred to in your answers to

23  counsel's questions a few minutes ago, yes?

24  A.   Yes.

25  Q.   All right.  This article's published in 2005, correct?

1   A.   That's correct.

2   Q.   Okay.  Now, I actually have a copy of it, so let's just

3   do this one exercise, if we might.  We've already

4   established -- you've already confirmed that your letter to

5   the UEP Producer Committee contains no literature cites at

6   all, right?

7   A.   That is not a typical practice for us to put literature

8   cited in the letter.

9   Q.   So the answer is yes, correct?

10  A.   Correct, there's no references.

11  Q.   Okay.  And we've already been through the Exhibit 52,

12  Plaintiffs' Exhibit 52.  That's the September 2005

13  recommendations -- excuse me, I misspoke.

14         That's the September 2000 recommendations that your

15  committee presented to the UEP?

16  A.   Um-hum.

17  Q.   Correct?

18  A.   Correct.

19  Q.   And we went through the number of literature cites that

20  were in molting, which was used as an example, right?

21  A.   Correct.

22  Q.   All right.  Now, the article that you're referring to by

23  Dr. Hester in 2005, that you're relying on as being the

24  academic literature support for this backfilling explanation

25  you've given, on page 2, third paragraph, last few lines of

1    that paragraph, those are the literature cites that Dr. Hester

2    provides in this article about backfilling, correct?

3    A.    Correct.

4    Q.    All right.  And those cites are provided on the last two

5    lines of the third paragraph on this second page of the

6    article, correct?

7    A.    Correct.

8    Q.    All right.  Would you tell the jury what are the years of

9    the publication -- of the articles that are cited by

10   Dr. Hester for her backfilling references in this article that

11   you've explained that you're relying on?  What are the years

12   of those academic articles?

13   A.    1961, 1969, and 1969.

14   Q.    Now, let's compare that, if we might, Dr. Armstrong, with

15   the quality of the academic literature that you and your group

16   relied on in the recommendations for, say, September of 2000,

17   with regard to each of the measures that are contained

18   therein.  Let's go back to the page that you and I discussed

19   earlier regarding molting.  Do you have page 14 in front of

20   you?  Just tell me when you do.

21   A.    Yes.

22   Q.    Okay.  And that -- just to make sure we're on the same

23   page, that's the page that ends with PX and then the last two

24   digits on the very bottom center are 14.  Do you have that?

25   A.    Yes.

1   Q.   All right.  Now, this last paragraph, which you looked at

2   earlier --

3            MR. BLECHMAN:  If we might put that up.

4   BY MR. BLECHMAN:

5   Q.   -- that contains the literature cites that your group

6   relied on for the molting recommendations, right?

7   A.   Yes.

8   Q.   All right.  Go through this paragraph.  And if you would

9   confirm for me, the literature cites for the academic

10  literature that was deemed to be relied on by the Scientific

11  Advisory Committee in their recommendations in the

12  September 2000 recommendations for molting included articles

13  from 1999?  Correct?

14  A.   Yeah, the last paragraph, '99, '93, '99.

15  Q.   Slow down, slow down.

16  A.   '90.

17  Q.   1993, yes?

18  A.   '92, '95, '95, '98, '99, '92, '99, '99, '83, '92, and

19  '95.

20           MR. BLECHMAN:  Thank you, sir.

21           No other questions, Your Honor.

22           MS. SUMNER:  Nothing further, Your Honor.

23           MR. HARRIS:  Nothing from USEM.

24           MR. KING:  No.

25           THE COURT:  Okay, Dr. Armstrong, you may step down.