# EXHIBIT A

## SUPPLY AGREEMENT

This Supply Agreement (this "Agreement") is entered into as of this ___ day of _____, by and between Rose Acre Farms ("RA") and CCF BRANDS, LLC ("Customer").

WITNESSETH

WHEREAS, Customer desires RA to, and RA desires to manufacture the Products (as defined below in Exhibit 1.1) for distribution and sale to the Customer's customer base listed in **Exhibit 1.2 ("Customer's Customer Base")**, all according to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the above recitals and the terms and conditions set forth below, the parties hereby agree as follows:

1. APPOINTMENT OF CUSTOMER.

    1.1    Customer hereby appoints RA, and RA hereby accepts such appointment, as the exclusive manufacturer and distributor during the Term (as defined in Section 18) of this Agreement of the Products and locations listed in **Exhibit 1.1 ("Product and Pricing Schedule")**, subject to the terms and conditions of this Agreement.

    1.2    RA, or any of its affiliates, related parties or successors, cannot, for the purpose of addressing the business provided to Customer, contact any of the Customer's customers listed on **Exhibit 1.2 ("Customer's Customer Base")**.   If RA is contacted by any of the Customer's customers listed in **Exhibit 1.2 ("Customer's Customer Base")** regarding a potential business relationship, Customer must be notified, in writing, immediately.  Customer must, in writing, grant approval to RA before RA can contact or respond to contact from any customer on **Exhibit 1.2 ("Customer's Customer Base")**.

    1.3    If Customer is no longer doing business with such customer listed in **Exhibit 1.2 ("Customer's Customer Base")** this will not be effective.

    1.4    If Customer does not provide RA with any new piece of business within a consecutive 12 month period RA has the right to sit down with Customer and determine what circumstances have created the situation and what can be done to obtain new business.  If RA does not gain additional new business within a consecutive 24 month period this contract will become void at the conclusion of that 24 month period.  Each time a new piece of business is awarded to RA the above mentioned 12 and 24 month periods will renew.

2. PRODUCTION OF THE PRODUCTS.

    2.1    During the Term of this Agreement, RA agrees to produce the Products for purchase by Customer in accordance with Customer's CCF Business Guidelines set forth on **Exhibit 1.3** hereto (the "**CCF Business Guide**"), and Customer agrees to purchase the Products from RA on the terms hereinafter set forth.

    2.2    Any changes in Product Specifications must be consented to in writing, executed by both parties and attached as an addendum to **Exhibit 1.3 ("CCF Business Guide")**.

    2.3    Any overlapping information between this supply agreement and the CCF Business guidelines shall be superseded by the supply agreement version.

HIGHLY CONFIDENTIAL

RA0012803

DEFENDANTS'
EXHIBIT
Case No. 1:11-cv-08808
**D-0374**

D-0374-0001 of 0040

3. ORDERS; PRODUCT FORECASTS.

3.1    Customer will provide RA with an order(s) on a daily basis, or a no order confirmation for the day. If RA proves incapable of providing consistent 100% fill rates in a timely manner, Customer can deem a material breach under Section 18.

3.2    RA shall produce the quantity of Products to be delivered to Customer in accordance with the orders provided by the Customer.

3.3    Products shall be available for shipment within the timeframe listed on the order received from Customer.

4. RAW MATERIALS FOR PRODUCTS.

4.1    Unless otherwise set forth herein, RA shall be responsible for ordering and paying for all raw materials, packaging materials and supplies to be utilized in producing the Products, including ordering of the labels and miscellaneous packaging, if any (collectively, the "Raw Materials").

4.2    Customer is responsible for the legal compliance of text and artwork, including Customer trademarks and copyrighted language, which appears on the Product labels.

4.3    RA will provide joint responsibility with Customer on product nutrition facts and ingredient lists.

5. MANUFACTURING EQUIPMENT FOR PRODUCTS.

5.1    In the event that any of the manufacturing equipment used in the production of the Products requires any repairs or maintenance of any nature, RA shall control, and be responsible for all costs related to, all such maintenance and repair of such manufacturing equipment. RA shall maintain and repair such manufacturing equipment so that such equipment is, and remains, in substantially the same condition as when Agreement was entered, reasonable wear and tear and damage by unavoidable casualty excepted.

6. PRICE AND TERMS OF SALE TO CUSTOMER.

6.1    The sale of the Products to Customer hereunder shall be invoiced in accordance with the pricing schedule set forth on **Exhibit 1.1** (the **"Product and Pricing Schedule"**), or any new pricing letters attached as addendums to Exhibit 1.1.

6.2    The current pricing structure listed in **Exhibit 1.1 ("Product and Pricing Schedule")** for the products listed in **Exhibit 1.1 ("Product and Pricing Schedule")** must remain in effect unless otherwise agreed to in writing by the customer. If changes are made to the pricing structure pricing letters must be submitted to Customer by RA and attached to Exhibit 1.1 as addendums.  The pricing letters must clearly state the new pricing as well as effective dates.

6.3    Pricing for future business must be competitive to the marketplace and be reasonably close to that of the existing pricing structure in place for the current business.

6.4    Payment by Customer for any invoice pursuant to this Agreement shall be net twenty-one (21) days from the date of invoice.

HIGHLY CONFIDENTIAL

RA0012804

**D-0374-0002 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

6.5 Products produced in accordance with Section 3 herein shall be invoiced to Customer when product is shipped and confirmed by a signed Bill of Lading. Upon any agreed upon change to Product Specifications in accordance with Section 2.2 herein, the parties agree to review the Pricing Schedule. The Pricing Schedule shall be adjusted upward or downward, as the case may be, to cover the change in the cost of production of the Products as a result of any such change in Product Specifications. Any revised Pricing Schedule shall be attached as an addendum to **Exhibit 1.1 ("Product and Pricing Schedule")**.

6.6 Each invoice to Customer for Products shall reference SKU, item code and Product name, number of cases, unit price per case and amount due.

7. DELIVERY AND DISTRIBUTION OF PRODUCTS:

7.1 Delivery of Products and transfer of risk of loss shall be F.O.B. Origin from RA's manufacturing facilities as approved by Customer and listed on Exhibit 3, unless product is delivered by RA and therefore risk of loss shall be F.O.B. Destination. Any approved plant listed on Exhibit 3 can be utilized by RA to pack product for any of the Customer's locations regardless of the primary location it packs products for.

7.2 Notwithstanding Section 7.1 above, any additional costs (transportation or otherwise) that may be incurred as a result of rush orders or other special handling requirements that are due to short lead times on orders placed by Customers with RA shall be the responsibility of the Customer, and, to the extent such costs are incurred by RA, RA shall invoice Customer for such costs.

7.3 Claims for non-conforming Products must be made by Customer against RA within thirty (30) days of delivery.

7.4 Unless otherwise mutually agreed in writing, the Products will be shipped by RA in full pallet quantities on non exchanged pallets (preferably a leased pallet program pallet), unless otherwise verified in writing by Customer.

8. FORCE MAJEURE.

8.1 Neither party shall be liable to the other for any loss or damage, including without limitation, incidental or consequential damage or commercial losses of any sort, for failure to perform under the terms of this Agreement if such failure results from a contingency beyond its reasonable control, including, but not limited to, contingencies such as war, riot, accident, fire, or flood; labor, materials, transportation or utility shortage or curtailment; governmental regulations, or strike, lockout or labor disputes (a "Force Majeure Event").

8.2 If a Force Majeure Event occurs, the party who is delayed or fails in the performance of its obligations as a result of such event shall immediately notify the other party, which other party may suspend its obligations hereunder for a period equal to the Force Majeure Event. In addition, if, within 90 days after the occurrence of the Force Majeure Event, the party who was delayed or fails in the performance of its obligations as a result of such event is still unable to perform in accordance with this Agreement, the other party may terminate this Agreement upon written notice to the party who is unable to perform in accordance with this Agreement.

8.3 If a Force Majeure Event occurs, the party who is delayed or fails in the performance of its obligations as a result of such event agrees that it shall use its commercially reasonable efforts to eliminate the cause of such event or otherwise take actions so that it is able to

HIGHLY CONFIDENTIAL

RA0012805

**D-0374-0003 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

perform under this Agreement in accordance with its terms as promptly as is reasonably practicable.

9. DISTRIBUTION OF PRODUCTS

9.1    Customer shall report promptly to RA each material complaint received by the Customer from any user of the Products and any Product spoilage.

9.2    Customer shall assume and pay all expenses incurred in its promotion of the Products and its performance under this Agreement, including expenses to obtain and maintain all licenses and permits requisite to such promotions and performance.

9.3    Customer shall neither incur nor attempt to incur any obligation in the name of or on behalf of RA, unless otherwise mutually agreed upon in writing.

9.4    Customer shall provide, unless otherwise agreed to in writing by RA, all artwork or completed labels and/or design and package requirements for production.

10. PRODUCTION FACILITIES FOR THE PRODUCTS.

10.1   The Products will be manufactured at the RA facilities agreed upon between RA and Customer as listed in Exhibit 3. If alternative locations are necessary to meet the demand of the orders this must be from other approved plants listed in Exhibit 3.

11. MANUFACTURING STANDARDS FOR THE PRODUCTS.

11.1   Customer and RA agree that the manufacturing of the Products shall be in accordance with the Product Specifications.

12. GRANT OF LICENSE TO, AND USE OF INTELLECTUAL PROPERTY BY, RA.

12.1   Subject to the terms and conditions of this Agreement, Customer hereby grants RA, who accepts the same, a non-exclusive, non-assignable, indivisible and royalty-free right and license to manufacture the Products for the Customer's customer base listed in **Exhibit 1.2 ("Customer's Customer Base")**.  The license includes the right to use the Product Specifications and any other technical know-how, formulas, manufacturing processes, and other technical and confidential information useful or necessary for the manufacture of the Products.  This license will remain in effect until the expiration or other termination of this Agreement and may not be assigned, transferred (including any transfer by operation of law), subcontracted, or sublicensed to any third party without the prior written consent of Customer, which consent may be withheld in the sole discretion of the Customer, except where RA may contract for the manufacture of the Products at a facility other than RA's approved facilities as set forth in Section 10 herein.

13. CONFIDENTIAL INFORMATION.

13.1   For the purpose of this Agreement, "Confidential Information" shall mean all written information related to the Products and all pricing information, formulas, manufacturing processes, data, know-how, technical and non-technical materials, and product samples and specifications (including the Product Specifications) which either party has disclosed to the other party prior to this Agreement or which either party may disclose to the other pursuant to or in connection with this Agreement.

4

HIGHLY CONFIDENTIAL

RA0012806

**D-0374-0004 of 0040**

**0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803**

13.2   Notwithstanding the foregoing, Confidential Information shall not include any information which the non-disclosed party can demonstrate by reasonable evidence:  (i) is or becomes public knowledge through no fault or omission of the non-disclosing party; otherwise known to the non-disclosing party without restrictions as to use or disclosure; or (ii) is developed independently by the non-disclosing party and without reliance upon the Confidential Information disclosed hereunder.  The burden of proving any such exceptions to the definition of the Confidential Information will reside with the non-disclosing party.

13.3   The non-disclosing party agrees to hold all Confidential Information of the disclosing party in confidence and not to disclose any Confidential Information to any third party except (i) those with a need to know in order to assist in the manufacture of the Products, (ii) as may be required by law; or (iii) to accountants, attorney, bankers and other professional advisors of a party.  The non-disclosing party agrees not to make any use of the Confidential Information except as provided herein.

13.4   The non-disclosing party agrees that its directors, officers, employees, agents and other representatives who have access to the Confidential Information of the disclosing party will be made aware of the obligations of confidentiality and non-disclosing party agrees that it shall be responsible for any breach of the obligations of confidentiality or non-use by any person to who such information is disclosed by the non-disclosing party.

13.5   The Confidential Information of the disclosing party shall remain the exclusive property of the disclosing party, and the non-disclosing party acquires no interest in or rights thereto under this Agreement or otherwise.  Upon termination of this Agreement, or at any time upon the disclosing party's request, the non-disclosing party shall, at its sole option, either promptly return all tangible forms of Confidential Information of the disclosing party (including copies) to the disclosing party then in the non-disclosing party's possession or under its control to destroy such Confidential Information and deliver a certificate to the disclosing party certifying such destruction.  Upon termination of this Agreement, to the extent that any document prepared by or on behalf of the non-disclosing party incorporates any Confidential Information of the disclosing party, the non-disclosing party shall destroy such documentation and deliver a certificate to the disclosing party certifying such destruction.

13.6   The non-disclosing party shall be liable to the disclosing party for all loss, liability, claim, damage, cost and expense (including, without limitation, reasonable attorney's fees) incurred as a result of the breach of the confidentiality and/or non-use provisions of Section 13 of this Agreement by the non-disclosing party.  The non-disclosing party also acknowledges and agrees that, in the event of such a breach, money damages may not be an adequate remedy and that the disclosing party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

13.7   The non-disclosing party acknowledges that the Confidential Information disclosed or to be disclosed by the disclosing party represents the disclosing party's valuable property, which is intended to be maintained in perpetuity as trade secret property.  Accordingly, the confidentiality and non-use obligations of Section 13 of this Agreement shall be continuing in nature and shall survive termination of this Agreement.

14.  QUALITY ASSURANCE INSPECTIONS AND TESTING.

14.1   Representatives of Customer shall have the right to inspect, during normal business hours, the facilities and to observe its procedures prior to and during the period of manufacturing, packaging, storing, and handling the Products.  RA reserves the right to guide such inspections in order to protect the confidential nature of other products being manufactured by RA.

HIGHLY CONFIDENTIAL

RA0012807

**D-0374-0005 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

15. WARRANTIES; CURE OF NON-CONFORMANCE.

15.1  RA warrants that at the time of delivery as provided in Section 7 herein, all Products shall conform to and be manufactured and packaged in accordance with the Product Specifications.  THE WARRANTIES OF RA SET FORTH IN THIS AGREEMENT ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES NOT EXPRESSLY SET FORTH HEREIN, WHETHER EXPRESS OR IMPLIED BY LAW, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

15.2  In the event it is determined by the parties that Products are not in conformance to the Product Specifications, RA shall cure such non-conformance by (i) replacing such non-conforming Products with Products conforming to the Product Specifications; (ii) crediting to Customer any amounts paid by Customer for the non-conforming Products; or (iii) refunding to Customer any amount paid by Customer for the non-conforming Products.  Such method of cure shall be in the sole discretion of RA.

15.3  Customer warrants that it has all requisite right, title and interest in and/or to the Intellectual Property licensed by Customer to RA in accordance with Section 12 herein.

16. INSURANCE.

Each party shall maintain at all times during this Agreement general liability insurance with limits of not less than $1,000,000 per occurrence and $2,000,000 general aggregate. Customer will require an annual certificate of insurance naming us Customer as additional insured.

17. INDEMNIFICATION.

17.1  Customer will indemnify and save RA and its officers, directors, stockholders, employees, agents, and affiliates (collectively, "Representatives") harmless from and against any and all liabilities, obligations, losses, damages (excluding, to the extent permitted by law, consequential and incidental damages), injuries, claims (including without limitation claims involving strict or absolute liability) demands, penalties, costs and expenses (including reasonable attorneys' fees) of whatever kind and nature (collectively, "Losses"), imposed or asserted against RA or its Representatives arising out of (a) any act or omission of the Customer or its Representatives, (b) any breach by the Customer of its warranties, representations, covenants or agreements hereunder or (c) any actual or alleged infringement or violation of any Intellectual Property or other proprietary rights used by RA in the manufacturing of the Products; provided, however, that in no event shall RA or any of its Representatives be indemnified with respect to any matter involving the willful acts or negligence of RA or any of its Representatives; provided, further, that RA's remedies under this Agreement shall not include any claim for lost profits, indirect, incidental or consequential damages or multiple damages.

17.2  RA will indemnify and save Customer and its officers, directors, stockholders, employees, agents and affiliates (collectively, "Representatives") harmless from and against any and all liabilities, obligations, losses, damages (excluding, to the extent permitted by law, consequential and incidental damages), injuries, claims (including without limitations claims involving strict or absolute liability) demands, penalties, costs and expenses (including reasonable attorneys' fees) of whatever kind and nature (collectively, "Losses"), imposed or asserted against the Customer or its Representatives arising out of (a) any act or omission of RA or its Representatives, or (b) any breach by RA of its warranties, representations,

P:\jwhaley\My Documents\CCF Business\Supplier Contracts\CCF Supply Agreement Rose Acres.DOC

HIGHLY CONFIDENTIAL

RA0012808

**D-0374-0006 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

covenants or agreements hereunder; provided, however, that in no event shall the Customer or any of its Representatives be indemnified with respect to any matter involving the willful acts or negligence of Customer or any of its Representatives; provided, further, that Customer's remedies under this Agreement shall not include any claim for lost profits, indirect, incidental or consequential damages or multiple damages.

18. TERM.

18.1  This Agreement shall be effective as of _____ and shall continue in effect until _____ (the "Term") unless earlier terminated as hereinafter provided.  This agreement shall be renewable, upon the consent of both parties, for another 5 years with at least 180 days advance notice.

18.2  Either party may terminate this agreement if:

    18.2.1  If for a material breach of any of the warranties, representations, covenants or agreement hereunder, after delivery by either Customer or RA of written notice of such breach and expiration of a thirty (30) day period the breach has not been cured; or

    18.2.2  One hundred eighty (180) days prior written notice.

    18.2.3  If RA chooses to terminate the agreement based on Section 18.2.2, and Customer still has any of the business or customer listed in Exhibit 1.2, RA cannot contact any of these businesses or customers for a period of 12 months following the termination day.

    18.2.4  If Customer's Customer requires a change of supply from the current manufacturing location for any reason and RA does not have an alternate location that is satisfactory to the Customer's customer requirements the business may be moved to an alternate supplier with 30 days advance notice.

    18.2.5  If Customer is no longer doing business with any of the Customers listed in Exhibit 1.2 this contract shall de deemed void and RA will not be subject to any restrictions listed in this agreement.

18.3  The Customer may terminate this Agreement upon failure of RA to fulfill purchase orders within the timeframe required on the purchase order if this failure places Customer's business at a risk of loss.

18.4  Upon the termination of this Agreement, (i) all amounts owed by, either party to shall become due and payable by the termination date, (ii) both parties shall immediately cease using the other's Intellectual Property, shall cease from representing to third parties that this Agreement is in effect and shall either destroy or return to any and all Intellectual Property, or any other property, in its possession to the owner thereof and (iii) the Customer shall purchase from RA all Raw Materials purchased by RA in accordance with Section 4 herein, unfinished Products and finished Products not yet delivered at RA's costs.  If the Agreement is terminated by RA pursuant to Section 18.2 or by Customer pursuant to Section 18.3, the breaching party shall bear all expenses in connection with the return of the Intellectual Property, Confidential Information and other property of the owner thereof.

18.5  Termination of this Agreement shall not affect any order of the Customer which has been accepted by RA and is in effect upon such termination; the Customer shall be entitled to use the Intellectual Property and Confidential Information and distribute the Products for the time period such distribution would take in the normal course of business, consistent with the past practices, of the sale of Products.

HIGHLY CONFIDENTIAL

RA0012809

**D-0374-0007 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

18.6  The termination of this Agreement shall not relieve either party of any obligation or liability accrued prior to termination, or rescinds or gives rise to any right to rescind anything, done by either party prior to such termination.  The termination of this Agreement shall not in any way affect the confidentiality and non-use obligations under Section 13 of this Agreement or any other obligations which are expressly stated herein to be continuing or are by their nature continuing.

19.  GUARANTEE

19.1  In the event any other entity or party acquires, as a whole or any portion thereof, RA, or any other related party, the acquiring entity or party shall, as a related party and successor to RA, guarantee the performance and terms of this agreement and agrees not to compete with the Customer in any business listed in **Exhibit 1.2 ("Customer's Customer Base")** unless consented to in writing by the Customer.

19.2  In the event any other entity or party acquires, as a whole or any portion thereof, Customer, or any other related party, the acquiring entity or party shall, as a related party and successor to Customer, guarantee the performance and terms of this agreement.

20.  NOTICES AND APPROVALS.

20.1  All notices, authorizations, consents and approvals provided for in this Agreement shall be in writing and shall be deemed given: (i) on the date received by telex, telecopy, or other electronic device, (ii) on the date delivered by any commercially reasonable overnight courier services providing a receipt of delivery, or (iii) four days after the date mailed by registered or certified mail, postage prepaid, in any case sent to the appropriate party at its address listed below or to such other address as is furnished in writing from time to time by either party to the other.

If to RA:

Rose Acre Farms
Attention:  Joe Miller
P.O. Box 1250
Seymour, IN  47274

With a copy to:
Rose Acre Farms
Attn: Greg Hinton
P.O. Box 1250
Seymour, IN  47274

If to Customer:

CCF Brands, LLC
5509 Walsh Lane
Rogers, Arkansas 72758
Attention:  Justin Whaley
Facsimile:  (479) 845-6393

With a copy to:
Wright, Lindsey & Jennings LLP
Attn: M. Sean Hatch, Esq.
200 West Capitol Avenue
Suite 2300

8

P:\jwhaley\My Documents\CCF Business\Supplier Contracts\CCF Supply Agreement Rose Acres.DOC

HIGHLY CONFIDENTIAL

RA0012810

**D-0374-0008 of 0040**

Little Rock, AR 72201

21. MISCELLANEOUS.

21.1 Except only as otherwise specifically provided in this Agreement, this Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior and contemporaneous agreements and understandings whether written, oral or implied between RA and Customer or their affiliates with respect to the subject matter hereto.

21.2 This Agreement may not be amended, modified, superseded or altered, except by a written agreement or modification signed by authorized representatives of both parties.

21.3 This Agreement may not be assigned by Customer without the prior written consent of RA. All covenants and agreements contained in this Agreement by or on behalf of the parties shall bind and insure to the benefit of their respective successors and assigns.

21.4 No waiver of any provision of this Agreement by either party shall be effective unless it is in writing and signed by such party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given and is mutually agreed upon by both parties.

21.5 The titles of the various sections of this Agreement are solely for convenience and are not part of the Agreement for the purpose of interpreting its provisions.

21.6 Unless otherwise specified, all reference to this Agreement refers to this entire Agreement, including schedules and exhibits.

21.7 The parties to this Agreement hereby acknowledge and agree that this Agreement, and any other document or instrument delivered or to be delivered hereunder, shall be governed by, and construed and interpreted in accordance with, the local laws of the State of Arkansas without regard to the conflicts of laws rules thereof.

21.8 If any provisions of this Agreement is or becomes invalid or unenforceable under any law or mandatory application, it is the intent of the parties that such provision be deemed severed and omitted from the Agreement, the remaining portions of the Agreement to remain in full force and effect as written.

21.9 This Agreement may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, constitute a single document.

IN WITNESS WHEREOF, RA and Customer have caused this Agreement to be executed by their duly authorized officers to be effective as of the date first set forth above.

CUSTOMER

By: _____

Name: _____

9

P:\jwhaley\My Documents\CCF Business\Supplier Contracts\CCF Supply Agreement Rose Acres.DOC

HIGHLY CONFIDENTIAL

RA0012811

**D-0374-0009 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

Title: _____

RA

By: _____

Name: _____

Title: _____

P:\jwhaley\My Documents\CCF Business\Supplier Contracts\CCF Supply Agreement Rose Acres.DOC

HIGHLY CONFIDENTIAL

RA0012812

**D-0374-0010 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

Exhibit 1.1

Product and Pricing Schedule

Rose Acres

| Farm Name | DC # | DC Name | WM Item # | DC State | Item Description | UPC | Farm Shipping to WHDC | Price From Farmer Down | Price | US Market |
|---|---|---|---|---|---|---|---|---|---|---|
| Rose Acres | 6656 | Monroe | 9047918 | GA | FRESH LARGE 12 A EGG | 7051410024054 | ROSE ACRES - DOONE | | $1.520 | |
| | | | 9070345 | | CCF LG BROWN 12 A EGG | 9-3985-00045-5 | ROSE ACRES - DOONE | 0.0045 OVER THE SOUTHEAST LARGE WHITE MARKET | | US Market |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-1 | ROSE ACRES - DOONE | | | SOUTHEAST LARGE MARKET |
| | | | 9070298 | | CCF LARGE 12 A EGG | 9-3985-00061-5 | ROSE ACRES - DOONE | 0.195 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST LARGE MARKET |
| | | | 9071777 | | CCF MEDIUM 12 A EGG | 9-3985-00062-2 | ROSE ACRES - DOONE | 0.195 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST MEDIUM MARKET |
| | | | 9070376 | | CCF LARGE 18 A EGG | 9-3985-00064-6 | ROSE ACRES - DOONE | 0.1195 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST LARGE MARKET |
| | | | 9070315 | | CCF JUMBO 12 A EGG | 9-3985-00069-1 | ROSE ACRES - DOONE | 0.985 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST JUMBO MARKET |
| | | | 9070336 | | CCF LARGE 6 A EGG | 9-3985-00068-4 | ROSE ACRES - DOONE | 0.045 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST LARGE MARKET |
| | | | 9070337 | | CCF LARGE 30 A DOWNP | 9-3985-00079-0 | ROSE ACRES - DOONE | 0.96 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST LARGE MARKET |
| | | | 9070385 | | CCF LARGE 60 A CDC | 9-3985-00074-5 | ROSE ACRES - DOONE | 0.96 BACK OF THE SOUTHEAST LARGE MARKET | | SOUTHEAST LARGE MARKET |
| | 6657 | Robert Hammond | 9098718 | LA | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / CORT ACRES | | $1.470 | |
| | 6659 | Chicy | 9098718 | IL | CHRISTOPHER LG A EGG | 8-7228-30202-3 | MIDWEST POULTRY* | | $1.470 | |
| | | | 9071777 | | CCF LG BRWN 12 A EGG | 9-3985-00098-1 | MIDWEST POULTRY* | | $1.100 | MIDWEST LARGE MARKET |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-1 | MIDWEST POULTRY* | | $1.480 | |
| | | | 9047918 | | FRESH LARGE 12 A EGG | 7-5141-00345-4 | MIDWEST POULTRY* | | | |
| | 6662 | Shelbyville | 9098718 | TN | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / CORT ACRES | | $1.470 | |
| | 6672 | New Albany | 9098718 | MS | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / JOHNSON CO | | $1.470 | |
| | | | 9070345 | | CCF LG BROWN 12 A EGG | 9-3985-00045-5 | ROSE ACRES / JOHNSON CO | 0.0045 ABOVE THE MIDWEST LARGE WHITE MARKET | | MIDWEST LARGE MARKET |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-1 | ROSE ACRES / JOHNSON CO | | | |
| | | | 9070298 | | CCF LARGE 12 A EGG | 9-3985-00061-5 | ROSE ACRES / JOHNSON CO | 0.195 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9071777 | | CCF MEDIUM 12 A EGG | 9-3985-00062-2 | ROSE ACRES / JOHNSON CO | 0.485 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070376 | | CCF LARGE 18 A EGG | 9-3985-00064-6 | ROSE ACRES / JOHNSON CO | 0.1195 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070315 | | CCF LARGE 12 A EGG | 9-3985-00069-1 | ROSE ACRES / JOHNSON CO | 0.425 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070336 | | CCF LARGE 6 A EGG | 9-3985-00068-4 | ROSE ACRES / JOHNSON CO | 0.985 BACK OF THE MIDWEST JUMBO MARKET | | JUMBO MARKET |
| | | | 9070337 | | CCF LARGE 30 A DOWNP | 9-3985-00079-0 | ROSE ACRES / JOHNSON CO | 0.195 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070385 | | CCF LARGE 60 A CDC | 9-3985-00074-5 | ROSE ACRES / JOHNSON CO | 0.155 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9047918 | | FRESH LARGE 12 A EGG | 7-5141-00345-4 | ROSE ACRES / JOHNSON CO | 0.13 BACK OF THE MIDWEST LARGE MARKET | $1.550 | MIDWEST LARGE MARKET |
| | 6673 | Pageboro | SC | | 9098718 | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / CORT ACRES | | $1.470 | |
| | 6674 | Auburn / Garrett | IN | 9098718 | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / JOHNSON CO | | $1.470 | |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-1 | ROSE ACRES / JOHNSON CO | | $1.550 | |
| | 6677 | Midway | MO | 9098718 | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / CORT ACRES | 0.0115 ABOVE THE MIDWEST LARGE WHITE MARKET | $1.470 | |
| | | | 9070345 | | CCF LG BROWN 12 A EGG | 9-3985-00045-5 | ROSE ACRES (WANTERS) | | | MIDWEST LARGE MARKET |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-1 | ROSE ACRES (WANTERS) | 0.1495 BACK OF THE MIDWEST LARGE MARKET | $1.555 | MIDWEST LARGE MARKET |
| | | | 9070298 | | CCF LARGE 12 A EGG | 9-3985-00061-5 | ROSE ACRES (WANTERS) | 0.1495 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9071777 | | CCF MEDIUM 12 A EGG | 9-3985-00062-2 | ROSE ACRES (WANTERS) | 0.485 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST MEDIUM MARKET |
| | | | 9070376 | | CCF LARGE 18 A EGG | 9-3985-00064-6 | ROSE ACRES (WANTERS) | 0.1475 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070315 | | CCF JUMBO 12 A EGG | 9-3985-00069-1 | ROSE ACRES (WANTERS) | 0.985 BACK OF THE MIDWEST JUMBO MARKET | | MIDWEST JUMBO MARKET |
| | | | 9070336 | | CCF LARGE 6 A EGG | 9-3985-00068-4 | ROSE ACRES (WANTERS) | 0.195 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070337 | | CCF LARGE 30 A DOWNP | 9-3985-00079-0 | ROSE ACRES (WANTERS) | 0.195 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | | | 9070389 | | CCF LARGE 60 A CDC | 9-3985-00074-5 | ROSE ACRES (WANTERS) | 0.13 BACK OF THE MIDWEST LARGE MARKET | | MIDWEST LARGE MARKET |
| | 6685 | Tomah | VA | 9070340 | | CCF LG BRWN 12 A EGG | 9-3985-00098-1 | S & R | | $0.865 | MIDWEST BROWN LARGE / QUARTERLY PRICING |
| | | | 9071544 | | CCF CAGEFREE BRWN A | 9-3985-00098-6 | S & R | | $1.120 | QUARTERLY PRICING |
| | 6691 | Henderson | NC | 9047918 | | FRESH LARGE 12 A EGG | 7-5141-00345-4 | ROSE ACRES / CORT ACRES | | | |
| | | | 9098718 | | CHRISTOPHER LG A EGG | 8-7228-30202-3 | S & R | | $1.470 | |
| | 6697 | London | KY | 9098718 | | CHRISTOPHER LG A EGG | 8-7228-30202-3 | MIDWEST POULTRY | | $1.490 | |
| | 7016 | Gonzounule | VA | 9098718 | | CHRISTOPHER LG A EGG | 8-7228-30202-3 | ROSE ACRES / CORT ACRES | | $1.470 | |
| | 7034 | Sterling | IL | 9070342 | | CCF CAGEFREE BRWN A | 9-3985-00098-6 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $1.080 | QUARTERLY PRICING |
| | | | 9070345 | | CCF LG BRWN 12 A EGG | 9-3985-00098-1 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.775 | QUARTERLY PRICING |
| | | | 9070298 | | CCF LARGE 12 A EGG | 9-3985-00061-5 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.725 | QUARTERLY PRICING |
| | | | 9071777 | | CCF MEDIUM 12 A EGG | 9-3985-00062-2 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.695 | QUARTERLY PRICING |
| | | | 9070315 | | CCF JUMBO 12 A EGG | 9-3985-00069-1 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.755 | QUARTERLY PRICING |
| | | | 9070376 | | CCF LARGE 18 A EGG | 9-3985-00064-6 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.985 | QUARTERLY PRICING |
| | | | 9070336 | | CCF LARGE 6 A EGG | 9-3985-00068-4 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.365 | QUARTERLY PRICING |
| | | | 9070385 | | CCF LARGE 60 A CDC | 9-3985-00074-5 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.719 | QUARTERLY PRICING |
| | | | 9070362 | | CCF LARGE 30 A DOWNP | 9-3985-00079-0 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $0.590 | QUARTERLY PRICING |
| | | | 9047918 | | FRESH LARGE 12 A EGG | 7-5141-00345-4 | ROSE ACRES (NEWTON COUNTY EGG FARM | | $1.480 | QUARTERLY PRICING |

Page 1 of 1

HIGHLY CONFIDENTIAL

## EXHIBIT 1.2

### Customer Base

Any Wal-Mart Distribution Center within a 250-mile radius of the any production facility owned or partnered with, in any way, by RA.
Any Sam's Club warehouse business within a 250-mile radius of owned or partnered with, in any way, by RA.
Any other mutually agreed upon business.

HIGHLY CONFIDENTIAL

RA0012814

**D-0374-0012 of 0040**

**0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803**

Exhibit 1.3
CCF Business Guidelines



# Business Guide

*For*

*CCF Brands, LLC*
*Supplying Partners*

CONFIDENTIAL
CCF BRANDS, LLC   BUSINESS GUIDE REVISED 12/2006

HIGHLY CONFIDENTIAL

RA0012815

D-0374-0013 of 0040

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

### *CCF Brands/WM expectations*

We require all supplying partners have good business practices, be trustworthy, and provide the highest quality product and services in all facets of the business. We operate this way and we expect all our partners to operate with the same level of integrity. We require that all companies be a member of the United Egg Producers Animal Care Certified (ACC) program. We require a copy of your current certificate be on hand in our office at all times.

Once we enter into a partnership agreement and a piece of business is awarded that particular piece of business will be yours to keep so long as business is properly taken care of and issues that are detrimental to the business do not arise. Wal-Mart holds us to this same level of expectation and we in turn expect the same from our partners. If at any time these issues do arise CCF Brands will have the option to look for alternative supplying partners to service the business.

### *Wal-Mart product specifications and requirements*

Following are the product specifications that Wal-Mart has set forth for all suppliers to follow. There are no exceptions to these requirements unless expressed written permission is given by Wal-Mart. There are two sets of specifications. One is for USDA Grade A product and the other is for USDA Grade AA product. If you will be servicing a piece of business in states that require Grade AA product you will be expected to follow the Grade AA specifications. Otherwise the Grade A specifications will need to be followed:

HIGHLY CONFIDENTIAL

RA0012816

**D-0374-0014 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

**Wal-Mart Stores, Inc.**
**702 Southwest 8th Street**
**Bentonville AR 72716-9102**

**Grade A Shell Egg Specifications**                    Date Issued: _____August 16, 2004_____

Shell Eggs supplied to Wal-Mart Stores               Revision #: _____4_____
(applicable brand names include Country Creek,
Sunny Meadows, Oceanside, and Wilcox) shall be U.S.  Revision Date: ____August 20, 2004____
Grade A as outlined in the current edition of the
Regulations Governing the Voluntary Grading of       Page _____1____ of _____3____
Shell Eggs, 7 CFR, Part 56 and the U.S. Standards,
Grades, and Weight Classes for Shell Eggs, AMS
56, and should conform to the following specifications:

Plant facilities, equipment, and all processing operations must comply with a minimum of all
USDA requirements.

I.      **Product Description**

    A.  <u>General</u>:   All shell eggs (white and brown) produced for Wal-Mart, with the
        exception of Jumbo's and "specialty eggs", must be inspected by a
        USDA Grader and must meet the following Wal-Mart specifications:

- All shell eggs must be washed, sanitized, and dried according to
  USDA guidelines.

- Shell protection (oil treatment) is optional.

- "Specialty eggs" are not subject to USDA grading guidelines.
  Specialty eggs will be classified as Eggland's Best, Cage Free
  Eggland's, Egg Plus, Free Roam, Christopher Eggs and Vita Eggs.
  (These eggs can be graded, but not required.)

- Organic eggs are also classified as "specialty", but they must meet
  the requirements of the USDA Organic requirements and bear that
  seal.

    A combination of In-Line / Off-Line production will be allowed in the
      following manner:
**          --At least 70% must come from In-Line production. The
      exceptions are brown eggs, and "Specialty Eggs". These eggs
      are allowed to come from Off-Line production. Any deviation
      from this must be documented in writing to the Wal-Mart for
      approval.

HIGHLY CONFIDENTIAL                                              RA0012817

**D-0374-0015 of 0040**

\*\*  However, a plan must be put into place to move to 100% In-Line production
for future everyday supply. The exceptions are the holidays (Easter, Thanksgiving and Christmas), brown eggs, and "Specialty Eggs".

B.  Grade: Lot average shall not be less than the following standards:

1. At Origin

90% A Quality

The balance (10%) may be within the next lower grades. Within this

tolerance (10%) not more than 4% may be checks. Individual cases may not contain less than 85% Grade A quality and not over 15% B quality. No individual case may contain over 8% checks.

2. At Destination

85% A Quality

The balance (15%) may be within the next lower grades. Within this tolerance (15%) no more than 5% may be checks. Individual cases may not contain less than 80% Grade A quality and not over 20% B quality. No individual case may contain over 10% checks.

C.  Weight: All product shall meet USDA minimum weight requirements for the applicable size. It is permissible to pack the next larger size of eggs into cartons (for example, large packed in medium cartons) provided they are not intermingled in the same carton with the lower marked weight class.

D.  Age: All eggs must be of current production from in-line facilities and must be packed within 24 hours of the day of lay. All others must be packed within 168 hours (no more than 7 days old).

E.  Packing and Packaging:

1. Cartons – Eggs shall be packed in new consumer size packages bearing Wal-Mart's approved brand name(s) and the USDA official grade mark except for Jumbos and "specialty eggs". All federal regulatory information must be stated on cartons.
\*\*Additionally, any other labeling information required by State egg Laws must be present.

2. Cases – Eggs shall be packed in new cases. After filling, each case shall be

HIGHLY CONFIDENTIAL

RA0012818

**D-0374-0016 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

fully taped across the length of the top and extending down each end by at least 2.5 inches. Tape may be gummed or plastic, 2-3 inches wide. Bottoms of cases are to be stapled or taped.

3. Case Labeling – Each shipping container must be clearly identified with:
   - Name and address of packer or distributor
   - Grade and size
   - UPC Number
   - Best By Date or Use By Date or Exp. Date or Sell By Date as applicable
   - "Keep Refrigerated" statement
   - Label must be color coded so the different sizes can be easily identified
   - Labels must be visible on all pallets

F.  Code Dating: Cartons must bear the Julian pack date as required by USDA. Additionally, cartons must bear an expiration (Exp) date not to exceed 30 days (including date of pack). The expiration date is to be shown as follows:

Exp 8-3-04
or
Best By 8-3-04
or
Use  By 8-3-04
or
Sell By 8-3-04

For Alaska, eggs can have a "Use By" Date, therefore they can be packed with 45 days.


**       Grade A eggs must have at least 23 days of shelf life when they arrive at the warehouse unless approved by Wal-Mart. Keep in mind that the 23 days is actually counted the day after it arrives since those eggs would have already missed billing that day, therefore when the reach the DC they must have 24 days.


G.  Handling & Storage: All processed eggs at the packing facilities must be stored at temperature between 38ºF and 45ºF.

Eggs on a pallet must be within 1 day of each other and the oldest eggs must be on the top layers of the pallet.

**       Pallets must be stacked straight and tight. Shrink wrap must be around all pallets for transporting. If the
eggs are hot then you are allowed to cris cross the shrink wrap to make an "X" so the pallet is still
supported but also allows for cooling. Pallets on trucks must be secure.


**       All processed eggs must be transported at temperature between 38ºF and 42ºF.


II.  **Other Requirements**:

HIGHLY CONFIDENTIAL

RA0012819

**D-0374-0017 of 0040**

\*\*      A. <u>HACCP</u>: All suppliers must use a HACCP program for established standards and controls for the following areas:

Pre-Processing:

- Feed, Chickens, Housing, Vaccination, and Pest (flies, beetles, etc.) and Rodent Control.

\*\*      B. <u>Biosecurity</u>: Suppliers must have a strict policy regarding visitors to production facilities according to HACCP.
For example,

Clean shoes, sanitized hands, and special clothing for laying area. Visitors may not be connected with the raising of chickens due to possible spread of disease.

\*\*      C. <u>General</u>: Suppliers must have the ability to perform product tracking whenever necessary.

Wal-Mart Stores, Inc. will perform audits periodically at the farms/plants as well.

Traceability is very important—we must have on record your procedures and we should be working towards being able to trace to the house and the chicken in the future.

Suppliers must be willing to submit to annual (or more frequent) on-site inspections as determined by Wal-Mart.

Suppliers must also abide by the FMI and UEP Animal Care guidelines.

Fines for No Dates, No or Incorrect UPC's, Wrong Brand Labels, or Loose Eggs, etc.— any non stop sale reason for stores not being able to sell the product will result in a $25 fine plus the cost of the product.

(\*\*) Not certified by USDA. Responsibility of plant management.

HIGHLY CONFIDENTIAL

**Wal-Mart Stores, Inc.**
**702 Southwest 8ᵗʰ Street**
**Bentonville AR 72716-9102**

<u>Grade AA Shell Egg Specifications</u>                    Date Issued: ____August 16,
2004_____

Shell Eggs supplied to Wal-Mart Stores                    Revision #:
_____4_____
(applicable brand names include Country Creek,
Sunny Meadows, Oceanside and Wilcox) shall be U.S.    Revision Date: ___August 20,
2004
Grade AA as outlined in the current edition of the
Regulations Governing the Voluntary Grading of         Page ____1_____ of
_____3_____
Shell Eggs, 7 CFR, Part 56 and the U.S. Standards,
Grades, and Weight Classes for Shell Eggs, AMS
56, and should conform to the following specifications:

Plant facilities, equipment, and all processing operations must comply with a minimum of all
USDA requirements.

I.      **Product Description**

     A.  <u>General</u>:    All shell eggs (white and brown) produced for Wal-Mart, with the
exception of Jumbo's and "specialty eggs", must be inspected by a
USDA Grader and must meet the following Wal-Mart specifications:

- All shell eggs must be washed, sanitized, and dried according to
USDA guidelines.

- Shell protection (oil treatment) is optional.

- "Specialty eggs" are not subject to USDA grading guidelines.
Specialty eggs will be classified as Eggland's Best, Cage Free
Eggland's, Egg Plus, Free Roam, Christopher Eggs and Vita Eggs.
(These eggs can be graded, but not required.)

- Organic eggs are also classified as "specialty", but they must meet
the requirements of the USDA Organic requirements and bear that
seal.

    A combination of In-Line / Off-Line production will be allowed in the
following manner:
    **   --At least 70% must come from In-Line production. The
exceptions are brown eggs, and "Specialty Eggs". These eggs
are allowed to come from Off-Line production. Any deviation
from this must be documented in writing to the Wal-Mart for
approval.

HIGHLY CONFIDENTIAL

RA0012821

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

**        However, a plan must be put into place to move to 100% In-Line production
for future everyday supply. The exceptions are the holidays (Easter, Thanksgiving and Christmas), brown eggs, and "Specialty Eggs".

B.    Grade: Lot average shall not be less than the following standards:

     1. At Origin

         90% AA Quality
         No individual case may contain less than 83% AA Quality

         The balance (10%) may be within the next lower grades. Within this tolerance (10%) not more than 4% may be checks. Individual cases may not exceed 8% checks.

     2. At Destination

         85% AA Quality
         No individual case may contain less than 80% AA Quality

         The balance (15%) may be within the next lower grades. Within this tolerance (15%) no more than 5% may be checks. Individual cases may not exceed 10% checks.

C.    Weight: All product shall meet USDA minimum weight requirements for the applicable size. It is permissible to pack the next larger size of eggs into cartons (for example, large packed in medium cartons) provided they are not intermingled in the same carton with the lower marked weight class.

D.    Age: All eggs must be of current production from in-line facilities and must be packed within 24 hours of the day of lay. All others must be packed within 168 hours (no more than 7 days old).

E.    Packing and Packaging:

     1. Cartons – Eggs shall be packed in new consumer size packages bearing Wal-Mart's approved brand name(s) and the USDA official grade mark except for Jumbos and "Specialty Eggs". All federal regulatory information must be stated on cartons.
**Additionally, any other labeling information required by State Egg Laws must be present.

     2. Cases – Eggs shall be packed in new cases. After filling, each case shall be fully taped across the length of the top and extending down each end by at least 2.5 inches. Tape may be gummed or plastic, 2-3 inches wide. Bottoms of cases are to be stapled or taped.

HIGHLY CONFIDENTIAL

4. Case Labeling – Each shipping container must be clearly identified with:
- Name and address of packer or distributor
- Grade and size
- UPC Number
- Best By Date or Use By Date or Exp. Date or Sell By Date as applicable
- "Keep Refrigerated" statement
- Label must be color coded so the different sizes can be easily identified
- Labels must be visible on all pallets

F. Code Dating: Cartons must bear the Julian pack date as required by USDA. Additionally, cartons must bear an expiration (Exp) date not to exceed 24 days (including date of pack). The expiration date is to be shown as follows:

Exp 8-3-04
or
Best By 8-3-04
or
Use By 8-3-04
or
Sell By 8-3-04

For Alaska, eggs can have a "Use By" Date, therefore they can be packed with 45 days.

** Grade AA eggs must have at least 19 days of shelf life in Arizona and 23 days in other states when they arrive at the warehouse unless approved by Wal-Mart. Keep in mind that the 19 or 23 days is actually counted the day after it arrives since those eggs would have already missed billing that day, therefore when the reach the DC they must have 20 or 24 days.

G. Handling & Storage: All processed eggs at the packing facilities must be stored at temperature between 38ºF and 45ºF.

** All processed eggs must be transported at temperature between 38ºF and 42ºF.

Eggs on a pallet must be within 1 day of each other and the oldest eggs must be on the top layers of the pallet.

** Pallets must be stacked straight and tight. Shrink wrap must be around all pallets for transporting. If the eggs are hot then you are allowed to cris cross the shrink wrap to make an "X" so the pallet is still supported but also allows for cooling. Pallets on trucks must be secure.

II. **Other Requirements:**

HIGHLY CONFIDENTIAL

**     A. <u>HACCP</u>: All suppliers must use a HACCP program for established standards and controls for the following areas;

       Pre-Processing:

       ▪ Feed, Chickens, Housing, Vaccination, and Pest (flies, beetles, etc.) Rodent Control.

**     B. <u>Biosecurity</u>: Suppliers must have a strict policy regarding visitors to production facilities according to HACCP.
For example,

Clean shoes, sanitized hands, and special clothing for laying area. Visitors may not be connected with the raising of chickens due to possible spread of disease.

**     C. <u>General</u>: Suppliers must have the ability to perform product tracking whenever necessary.

Wal-Mart Stores, Inc. will perform audits periodically at the farms/plants as well.

Traceability is very important—we must have on record your procedures and we should be working towards being able to trace to the house and the chicken in the future.

Suppliers must be willing to submit to annual (or more frequent) on-site inspections as determined by Wal-Mart.

Suppliers must also abide by the FMI and UEP Animal Care guidelines.
Fines for No Dates, No or Incorrect UPC's, Wrong Brand Labels, or Loose Eggs, etc.—any non stop sale reason for stores not being able to sell the product will result in a $25 fine plus the cost of the product.               (**) Not certified by USDA. Responsibility of plant management

HIGHLY CONFIDENTIAL

RA0012824

**D-0374-0022 of 0040**

### Other Wal-Mart product requirements

These are other Wal-Mart requirements that are not a part of the USDA/Wal-Mart specifications.

All product, with the exception of the 2.5 dozen sleeve, must be packed in 15 dozen cases with perforated tops, including Jumbos. The Jumbos will be packed 12 dozen per 15 dozen case. Wal-Mart requires the tops to be perforated for reduced labor when merchandising the product in the display shelves.

All cases must be clearly identified with the UPC number in addition to the requirements listed in the Wal-Mart specifications. All cases must be labeled with two labels, one on each side opposite of the other. See Exhibit B in the Appendix.

All products are to be shipped on some type of leased pallet. Pallet exchange has been completely phased out at all Wal-Mart DC locations. If you are not currently utilizing a leased pallet program you must be in the process of moving in that direction. You will be required to be on a leased pallet system starting with the first shipment or be under the understanding you will not receive any pallets back that are shipped.

You must also be willing to submit to unannounced Wal-Mart requested audits of your packing facilities. A copy of the USDA Audit Release Form will be attached in the Appendix as Exhibit C. Please fill out and forward to CCF Brands.

Wal-Mart orders product 7 days a week, 365 days a year. There will be a couple of days during each Thanksgiving and Christmas holiday's that Wal-Mart may decide to cancel ordering on those selected days. Unless otherwise noted or communicated you will receive an order every day of the year and if there are no orders for that day it will be communicated.

All orders will be generated on day one and will need to be ready for pick-up on day three for delivery into the warehouse on day four. For example, Monday's purchase orders will be sent to you as soon as they are received by CCF Brands, usually by 9 to 10 AM CST. They will be forwarded to you within minutes thereafter via email. It will then be your responsibility to have the order packed and ready for shipment by Wednesday for Wal-Mart to deliver into the DC on Thursday, unless otherwise noted. It is your responsibility to coordinate the pick-up time with the backhaul coordinator at the DC. This process works a little differently at each DC and it is your responsibility to make sure this is coordinated at your particular DC. You will be provided with the contact information at each DC you will be servicing. Please see Exhibit D in the appendix for an example of the CCF Brands Purchase Order.

***In the case of any shortage of product, attempt to replace shorted product or delay in shipment CCF Brands must be notified immediately.*** An accurate Bill of Lading (BOL) must be emailed or faxed, preferably emailed, to CCF no later than 12:00 P.M. CST the day the product is due into the DC.

HIGHLY CONFIDENTIAL

It is also imperative that all shipments are properly recorded before an invoice is sent to CCF Brands. CCF requires these invoices be received in its' office no later than 12:00 P.M. CST the day after the product ships or is delivered to the customer. If product is shorted the invoice must reflect the shortage. In the event CCF Brands begins to see deductions from our customers based on shipments that were actually shorted and not properly reflected on the invoice we will be forced to review our partnership and/or implement fines for improper billing. The first offense of such a deduction will result in a warning. The second offense will be followed up with a $250 fine. The third offense will be a $500 fine. The fourth offense will result in a $1000 fine and possible termination of the business if a fourth offense takes place within a 3-month period of the first offense. CCF also requires that you take a picture, preferably digital, of each loaded trailer before the doors are closed and the trailer is sealed. The picture must have the PO number of the load attached to it in some manner to identify the uniqueness of that load. Please make sure the driver signs the picture at the same time they sign the bill of lading. It is also imperative that each driver secures and seals the trailers and identifies whether load straps/ bars are being utilized to secure the load before the BOL is signed and the load is transported. In the event these procedures are not followed and damage occurs CCF will not take the responsibility for any associated damages to that load. Refer to exhibit E.

Wal-Mart also has a policy on holding up appointment times that are made for the pick-up of the product. If an appointment is made the product must be loaded and ready to go on the appointment time. If a driver has to sit and wait for the trailer to be loaded for more than 4 hours past the appointment time Wal-Mart will start fining us at a rate of $25 per hour. These deductions will be charged back to the supplying facilities. If a driver is asked to go to a secondary pickup location, there will be a charge of $60 for each secondary location that will be charged back to the supplier.

Wal-Mart has also implemented, as of November 22, 2002, a system of fines for incorrect dating of eggs. They include, but are not limited to, wrong dates on cartons, two different dates on cartons, and/or one date on the carton and another date on the outer case. The first three offenses will be $1000 per occurrence and $1000 per SKU. After the third occurrence the fines will double. After ten total occurrences within one year warehouses will be taken away and given to another supplier. Wal-Mart could opt to charge only a $50 fine per occurrence for the labor of correcting the problem but this is not a given. It depends on the situation and is totally at their discretion. CCF will pass long whatever monetary fines it incurs due to these issues.

CCF Brands reserves the right to nullify our partnership with our suppliers before the tenth occurrence to avoid losing the business. If the problem can't be corrected before ten occurrences then we will see that as a bigger problem anyway.
We understand that issues will arise because humans are involved. Wal-Mart will not use this as a profit center but rather as a measure to make sure these issues are addressed immediately. Unless an initial occurrence is severe we do not anticipate being fined for the first incident. However, if this issue is not corrected the door will be open to the

HIGHLY CONFIDENTIAL

fines.

### CCF Brands requirements

You must be willing to allow CCF Brands personnel to conduct inspections or audits of their own to ensure the requirements are being followed at all times. You must also be willing to share any information pertaining to records of these requirements. It is CCF Brands intention to make sure that we are monitoring quality control procedures at all times.

You must also supply CCF Brands with a list of any co-packers you may be using to supplement the supply you are using to service the Wal-Mart business for authorization. You must also agree that any facility in which you obtain external supply to supplement your needs must meet the same established criteria for CCF product. These facilities must also be willing to undergo audits or inspections of their own. In the event that Wal-Mart or CCF Brands learns of product that has been packed at any unauthorized location the business will be subject to termination.

CCF Brands also conducts periodic retail inspections at the store level to monitor our quality. These inspection results will be sent to you as we receive them. In the event we find issues relating to the quality and/or safety of the product we will require an explanation as to what you will be doing to address and correct the issue. If you do not provide CCF Brands with an acceptable solution within the requested timeframe we will consider this a negligent act against the business and the business will be subject to termination. CCF also periodically incurs stop sales from its' customers due to any number of issues. If the stop sale is deemed to be the fault of the supplying location the monetary effect of this will be charged back to the supplier.

In the case that pick-up/delivery change requests are made the following procedure must be followed. If the procedure is not followed and it results in a deduction the supplying facility will be responsible for the deduction charges. If you would like to request a change in the pick-up/delivery of a load you must first contact the DC and cancel the appointment that you already have. Once this step has been accomplished contact CCF Brands and notify us of the change that you would like to make. After Wal-Mart makes the changes and notifies CCF Brands we will forward the information on to you for you to remake the appointment for pick-up/delivery.

CCF Brands also requires its' suppliers to adhere to the Food Safety Program, beyond the Wal-Mart HAACP requirement, that is outlined in Exhibits H1, H2 and H3.

### Pricing / Payments

Pricing is set off the Thursday market for the period of Saturday through Friday. Invoices should be priced off Purchase Order date with the exception of the specialty loads. (See orders section under specialty loads.)

HIGHLY CONFIDENTIAL

RA0012827

**D-0374-0025 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

CCF Brands pays each supplying partner based on the agreed upon terms Monday through Friday via Electronic Funds Transfer. The pricing will be based on Purchase Order date. CCF Brands will need all related account information in order to properly set up the transfer of payment transaction.

### Bidding Process

Before a bid will be accepted by CCF it must be accompanied with proof that you are and ACC approved supplier or are making the commitment to do so if the business is awarded.

Wal-Mart requires that the packing facility that will be used to service the distribution center be geographically located within a 250-mile radius of the distribution center. There might possibly be exceptions to this rule but before a bid is submitted you must obtain the authorization from CCF Brands.

If you agree to abide by all the requirements listed to this point and would like to submit a bid to CCF Brands you can do so in the following manner.

Contact us at the following numbers to let us know you are interested in moving forward with a bid. At this point we will let you know the timeframe that we must work within to get the bids turned in for review. We would like all bids to be in an allowance of cents per dozen form based on the Urner-Barry market. There may also be exceptions to this and you will be notified if that is the case. If you are not told otherwise please follow the Urner-Barry method.

We will also need an information sheet filled out with company information and information on the facility that will be packing Wal-Mart product. An example will be attached to this packet. Please see Exhibit F in the appendix for the information sheet example.

You can contact our office in Rogers, AR. The contact information is as follows:

Rogers, AR Office
Attn: Justin Whaley, Kevin Whaley or Bill Bradley
5417 Pinnacle Point Drive
Tower 1
Suite 300
Rogers, AR 72758
479-464-0544

After your bid is received we will let you know the timeframe on awarding business.

### Awarding Business

HIGHLY CONFIDENTIAL

Once you are notified that a piece of business has been awarded to you we will provide you with a timeframe of when the business will start and try to give a forecast that will be as accurate as we can obtain.

Once you receive this information you will be expected to have all the requirements in place and be ready to service the business at the appropriate time from the location that was submitted in the bidding process. Any failure to accomplish either of these will be grounds for termination of our contract.

### Everyday Business

Once the business starts you will be expected to communicate with us in an expedient manner. We require that the line of communication be constantly open and utilized. The more we communicate with each other the lesser the risk of having issues arise.

It is CCF Brands preference that you have e-mail capability, as this is our preferred method of communication. This is not to say that we would not rather talk in person but we can get information out quicker via e-mail. Our phone lines are always open for live communication.

In the event that issues do happen to arise we have an "Incident Report" form that we like to use to communicate in detail what the issues are and require a follow up on what will be done to address/correct the issue. Once you receive one of these reports you will be required to follow up in the requested manner within the amount of time requested. Failure to address these issues in a timely manner could lead to potential termination of the business. Please see Exhibit G in the appendix for an example of the report.

### Holiday Planning

CCF Brands will provide you with a detailed plan on what the projected orders will be for each respective holiday period. These plans usually end up fairly close to what actually happens. These are provided to you as a means to help plan for the increased demand and are not intended to be confirmed orders. These will be provided to you well in advance of each holiday period.

### Conclusion

The requirements mentioned in this packet are more difficult and stringent than most programs you'll work in but it is CCF Brands intention to make sure we set ourselves apart from our competition. We believe the only way to accomplish this goal is to set the standards at the highest possible level. We will assure you any partnership that we enter into will be treated with the highest level of integrity possible. We expect a high degree of integrity from ourselves and we expect no less from our partners. We hope you decide to move forward and we look forward to a long-term and prosperous partnership for all of us.

HIGHLY CONFIDENTIAL

By signing the following I agree that I have read the requirements contained in this packet and that our company understands and is willing to conform to these requirements in order to do business with CCF Brands.

Accepted by:

CCF Brands, LLC:               Company:
Title:                              Title:
Date:                              Date:

*APPENDIX*

| | |
|---|---|
| Exhibit B | CCF Brands Case Label Example |
| Exhibit C | USDA Audit Release Form |
| Exhibit D | CCF Brands Purchase Order Example |
| Exhibit E | CCF Brands Sign, Secure, Seal example |
| Exhibit F | CCF Brands Information Sheet |
| Exhibit G | CCF Brands Incident Report |
| Exhibit H1 | CCF Brands Eggs Food Safety Program |
| Exhibit H2 | SE Quality Assurance Programs for Commercial Egg Layers |
| Exhibit H3 | SE Quality Assurance Programs for Commercial Egg Layers—Response to Positive Plan |

HIGHLY CONFIDENTIAL

RA0012830

**D-0374-0028 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

# Exhibit B
# COUNTRY CREEK FARMS
## CASE LABEL EXAMPLES

COUNTRY CREEK
GRADE A LARGE
EXP DEC 06
PCK DATE NOV 07
0 41179 01060 5
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420



COUNTRY CREEK
GRADE A LG 18-PK
EXP DEC 06
PCK DATE NOV 07
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A LG SLEEVE
EXP DEC 06
PCK DATE NOV 07
0 41179 01070 4
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A 6-PK LG
EXP DEC 06
PCK DATE NOV 07
0 41179 01069 8
PK BY TEXAS LICENSEE No.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A X-LARGE
EXP DEC 06
PCK DATE NOV 07
0 41179 01060 5
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A MEDIUM
EXP DEC 06
PCK DATE NOV 07
0 41179 01062 9
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A JUMBO
EXP DEC 06
PCK DATE NOV 07
0 41179 01068 1
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

COUNTRY CREEK
GRADE A LG BROWN
EXP DEC 06
PCK DATE NOV 07
0 41179 01067 4
PK BY TEXAS LICENSEE NO.P1522A
RT 1 BOX 31 JULIAN 312
BOLING TEXAS 77420

HIGHLY CONFIDENTIAL

RA0012831

**D-0374-0029 of 0040**



# Exhibit C
## USDA – AMS Shell Egg Plant Audit Program
## Application/Release Form
## 2002



| Supplier Name: | Country Creek Farms (Your name/facilty) Packing Facility | USDA Plant Number | |
|---|---|---|---|
| Address: | | | |
| | | | |
| Contact Name: | | | |
| Phone: | | Fax: | |

This form serves as a request to complete the annual Shell Egg Plant Systems audit for the facility identified above.

Our company agrees to maintain the production plant used to pack shell eggs to the minimum levels prescribed in the USDA Shell Egg Systems Auditing Program and agree to have the audits completed between January 1 and December 31, 2002.

I, _____ provide authorization to USDA-AMS Poultry Programs, Grading Branch to audit the facility identified above and release the results of the independent audit(s) to volume food buying entities listed below using the standard audit formats.

☐ **SYSCO Corporation** (requires SYSCO Release Form)

☐ **Wal-Mart Stores, Inc.**

☐ **Alliant Foodservice**

☐ **Publix**

☐ **U.S. Foodservice**

☐ **Other** _____

Print Name: _____   Title: _____

Signed: _____   Date: _____

This agreement must be completed annually. All audits are <u>unannounced</u>. Mail or fax this application/release form to:

**USDA-AMS**
**Poultry Programs, Grading Branch**
**Stop 0258**
**P.O. Box 96456**
**Washington DC 20090-6456**

Phone:   202/720-4411

Fax:   202-690-3165

| Return original Application/Release Form to USDA-AMS by 01/31/02. |
|---|

Confidential                                                             November 27, 2001

Country Creek Farms, LLC Business Guide Revised 3/2002        USDA Application and Release Form CCF Exh C

HIGHLY CONFIDENTIAL

RA0012832

**D-0374-0030 of 0040**

**Retain a copy of the Application/Release Form for your records.**

Confidential

Country Creek Farms, LLC Business Guide Revised 3/2002

November 27, 2001

USDA Application and Release Form CCF Exh C

HIGHLY CONFIDENTIAL

RA0012833

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

# Exhibit E

**Utilize a label or stamp on the shipping memo with the required information to insure that a driver secures, seals and signs for the product.**

## <u>Example</u>

## SIGNATURE:

_____

## I THE DRIVER WILL
### SET REEFER AT 40 DEGREES
### SECURE AND SEAL
### THIS LOAD

**Load Locks  YES  NO**
**Load Straps  YES  NO**

HIGHLY CONFIDENTIAL

RA0012834

**D-0374-0032 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

## Exhibit E



## COUNTRY CREEK FARMS PACKING LOCATION INFORMATION

Following is the information that we need to fill out all appropriate paperwork:

Name of Company:
Corporate Address:
Corporate Contact:
Email Address:
Corporate Phone:
Corporate Fax:

Name of Packing Facility(s):
Square Footage:
Physical Address:
City:
State:
Zip Code:
County/Perish:
Time Zone:
Do you conform to daylight savings time?
Directions to facility:




Phone:
Fax:
Appointment Contact and phone:


HIGHLY CONFIDENTIAL

RA0012835

**D-0374-0033 of 0040**

E-mail address:
Loading Hours:
Plant Manager:
Phone:
E-Mail:
QA Manager:
Phone:
E-Mail:
Sanitation Manager:
Phone:
E-Mail:

Where you would like the orders to go?
Fax Number:
Contact(s):

HIGHLY CONFIDENTIAL

RA0012836

D-0374-0034 of 0040

# COUNTRY CREEK FARMS    INCIDENT REPORT

**ALL FIELDS MUST BE FILLED IN BEFORE PAPERWORK CAN BE AUTHORIZED, FILED, AND COPIES MAILED TO RESPONSIBLE PARTY
**INITIAL REPORT WILL BE FAXED ON THE DATE THE INCIDENT IS REPORTED

Incident Date:
Date Reported
Store Number:
Store Location:
Warehouse

Reference Number:

Reason for report:

| | Stop Sale | Incorrect Dating | Shipped Wrong Product | UM | Other | Explanation of other |
|---|---|---|---|---|---|---|

SKU | Item # | Qty

Will this result in a Co-Op agreement? (Yes or No)
If Yes, Co-Op number and date Co-Op signed
Amount of Co-Op
Will this result in a deduction from the supplier?

Was the supplier notified to see if they wanted to pick up the product?
If Yes, who was contacted?
Date and time contacted

***Action Plan of supplier:

Comments / Details:

***SUPPLIER MUST GIVE COUNTRY CREEK AN ACTION PLAN ON PICKING UP THE PRODUCT OR NOT BY THE CLOSE OF BUSINESS ON THE DAY THEY ARE CONTACTED IF CONTACT IS BEFORE 12PM. IF AFTER 12PM NO LATER THAN 12PM THE NEXT BUSINESS DAY. FAILURE TO DO SO WILL RESULT IN A DEDUCTION.

Actions taken:
Faxed to responsible party?
Faxed to load or Am Mang?
Mailed to responsible party?
Copy Temporarily Filed?

Actions taken:
Copy of Co-Op attached?
Copy of Stop Sale or email attached?
Was product picked-up?
Was product destroyed?

SIGNED:                    DATED:

Any further action necessary?
If yes, what and when?

Has all action necessary been taken and satisfactory solution found?    (CCF) Authorized by:
Can the paperwork be permanently filed?    Date:
INITIAL SIGNATURE MUST BE SIGNED AND FAXED BACK TO CCF BY THE CLOSE OF BUSINESS ON THE DAY RECEIVED IF RECEIVED BEFORE 12PM. IF AFTER 12PM THEN NO LATER THAN 12PM THE NEXT BUSINESS DAY.

After Initial Fax
Initial Supplier Signature:    CCF Faxed on:    After Hard Copy receipt    Mailed on:    Due on:
    Final Supplier Signature:    Date Signature Received by CCF:
Time Faxed:    Date:    Date:
Date and time signature received by CCF:    FINAL SIGNATURE MUST BE SIGNED AND FAXED BACK TO CCF WITHIN 7 BUSINESS DAYS OF THE TIME IT WAS MAILED.

IF YOU HAVE QUESTIONS OR COMMENTS ABOUT THIS REPORT CONTACT DIANA SPARKS AT 479-464-0544

HIGHLY CONFIDENTIAL

RA0012837

**D-0374-0035 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

**Exhibit H2**

SE Quality Assurance Programs For Commercial Egg Layers
Country Creek Farms

1. Grow Period

   A. Best Management Practices
      1. Clean and disinfect facilities using hot water/high pressure with detergent and disinfectant if the facilities or prior pullet flock was SE positive. If facilities were negative dry cleaning with fumigation is acceptable.
      2. Use chicks from NPIP SE monitored breeders
      3. Rodent control—use cultural, biological and chemical control methods
      4. Bio-security for people, equipment and dead bird disposal
      5. Fly control use cultural, biological and chemical control methods
      6. Vaccination
         a. 2 live vaccines and 1 bacterin
         b. 3 live vaccines (currently Ft. Dodge and Biomune are the two companies with the approved live vaccines).
   B. Pre-Lay House Verification
      1. Manure samples—3-4 weeks prior to move to the lay facilities, 2 swabs per row of cages or swabs from 100 pullets at random but to include pullets from all cage rows.
      2. Pullet egg samples using 480 pullet eggs per flock, pooling 20 eggs to each sample. Procedure is in the PA Pre-harvest information mailed earlier.
      3. Rodent indices—monthly, 7 day count total from live traps.
      4. Fly count done from sticky tape, fly spot cards, or traps.

2. Lay Period (Post Molt)

   A. Best Management Practices
      1. Clean and disinfect facilities using hot water/high pressure with a detergent and disinfectant if the facilities or prior layer flock was SE positive. If facilities were negative dry cleaning with fumigation is acceptable.
      2. Bio-Security for people, equipment, visitors, bird handling and egg handling equipment and dead bird disposal.
      3. Rodent control use cultural, biological and chemical control methods.
      4. Fly control use cultural, biological and chemical control methods.
   B. Lay House Verification ( to be completed before flock reaches 50% rate of lay )
      Verification may be done using one of the two following methods.
         1. Drag swabs of manure pits or manure on the manure belts. Two drag swabs for each row of cages or two swabs for

HIGHLY CONFIDENTIAL

**D-0374-0036 of 0040**

each manure pit in a high rise house or one swab for each belt tested.

2. Egg submissions in pooled samples of 20 egg samples per pool.
3. Use rodent indices and fly counts to measure the quality of vector control.

HIGHLY CONFIDENTIAL

RA0012839

**D-0374-0037 of 0040**

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803

## Appendix H1

FOOD SAFETY PROGRAM FOR CCF BRAND EGGS

The application for all possible methods of protecting CCF and it's Partners from a product recall for Salmonella enteritidis contamination is a very complex issue. However, this outline will help with the most critical steps and also designate the verification procedures necessary. There will be a detailed out line provided to each partner outlining the procedure and programs expected from each partner to accomplish these goals.

1. All layers used in the production of CCF brand eggs will be sourced from hatcheries and breeder flocks that are apart of the National Poultry Improvement Plan Monitored for all Salmonella contamination. The complying hatcheries are to issue a form that accompanies each delivery of day old chicks.
2. All facilities that will be used produce pullets and eggs for the CCF brand will have a strict "Restricted Access" policy enforced. No unauthorized or unaccompanied visitors will be allowed on the premises. All service personal will be required to do a complete disinfection procedure and utilize proper protective clothing and footwear upon entering any premises.
3. There will be a rodent control program in effect at each facility. This is the most important aspect to protect the chickens from being exposed to SE. The utilization of a professional agency for this purpose and or the utilization of an in-house program is acceptable but all programs must be verified by a outside authority or from a trained and qualified in-house manager.
4. The layers used in the CCF egg program will us either of two SE vaccination programs: a live Salmonella typhimurium (double gene-deleted) vaccine that will give the layers competitive exclusion and cellular immunity or a SE bacterin to create circulating antibodies.
5. Eggs produced for the CCF program will be kept at proper temperatures and at a minimum of 45 degrees F.. This program is verified by the USDA Food Safety Inspection Service.
6. The layers and or the facilities will be monitored for SE by utilizing bacterial cultures from either the chicken, eggs or environment. These samples are to be analyzed by an outside USDA/FDA approved lab. Testing will be conducted during the grow period and the lay period per CCF's SE Quality Assurance Programs (to be received from CCF).
7. A flock record and portfolio containing all the validated information will be maintained for each flock producing eggs for CCF.

HIGHLY CONFIDENTIAL

**Exhibit H3**

SE Quality Assurance Programs For Commercial Layers (Country Creek Farms)
Response Plan to SE Positive

1. Grow Period
   A. SE positive chick box papers
      1. Destroy the flock immediately
         a. clean and disinfect the house with hot water and high pressure detergent wash plus disinfection and formalin fumigation.
         b. verify the house is negative before placement of next flock.
      2. Quarantine the flock until determination of the flock's future and retest
         a. if retest is negative, continue with routine program
         b. if retest is positive
            1.destroy the flock and clean and disinfect the house with hot water and high pressure detergent wash plus disinfection and formalin fumigation . Verify the house is negative before placement of the next flock.
            2.continue with lay program but test eggs monthly from the start of lay and if positive divert to breaker for pasteurization. Intensify bio-security, rodent control, and fly control. The flock must test negative three consecutive months before being considered for use in cartoned eggs.
   B. SE positive manure or pullet swab samples
      1. Destroy the flock
      2. Move the flock to a SE positive facility or single age farm. Test monthly from the start of lay testing the manure, birds or 1000 egg pooled samples. Move eggs to the breaker for pasteurization until three consecutive months of negative test before being considered for use in cartoned eggs.
      3. Clean and disinfect the pullet house with hot water and high pressure wash plus detergent plus disinfection and fumigation with formalin.
2. Lay Period
   A. SE positive manure or positive pooled egg samples
      1. Retest eggs 1000 pooled eggs three consecutive test two weeks apart Or retest birds or manure samples monthly for the life of the flock.
      2. If any pooled egg samples or bird or manure samples are positive, Divert the eggs to pasteurization for the life of the flock.
      3. Clean and disinfect the lay house by using hot water with high Pressure plus detergent plus disinfection and fumigation using formalin.
      4. Intensify bio-security, rodent control and fly control.

HIGHLY CONFIDENTIAL

**D-0374-0039 of 0040**

## ..iibit 3
## Approved Manufacturing Facilities

| Farm | DC # | DC Name | Plant Name | Plant Address | Plant Contact | Plant Contact Ph |
|---|---|---|---|---|---|---|
| Rose Acres | 6055 | Monroe, GA | Rose Acres - Oconee | 864 Reed Road NW Madison, GA 30650 | Brenda / Tim | 706-342-3467 / 706-342-3132 |
| Rose Acres | 6055 | Monroe, GA | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6055 | Monroe, GA | Rose Acres - Jenasres | 1855 E 200 N. North Vernon, IN | | 812-522-9692 |
| Rose Acres | 6057 | Hammond, LA | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6059 | Olney, IL | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6059 | Olney, IL | Rose Acres - Jenacres | 1855 E 200 N. North Vernon, IN | | 812-522-9692 |
| Rose Acres | 6060 | Shelbyville, TN | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6071 | Winterhaven, FL | Rose Acres - Cort Acre Breaking Plant | PO Box 111 Cortland, IN 47228 | | 812-522-3984 |
| Rose Acres | 6072 | New Albany, MS | Rose Acres - Johnson Co. | 1275 SW Hwy 7 Kingsinoster, MO 65336 | Jason Schroeder | 660-563-2276 |
| Rose Acres | 6072 | New Albany, MS | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6072 | New Albany, MS | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6072 | New Albany, MS | Rose Acres - Jenacres | 1855 E 200 N. North Vernon, IN | | 812-522-9692 |
| Rose Acres | 6073 | Pageland, SC | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6074 | Garrett, IN | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6074 | Garrett, IN | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6077 | Moberly, Mo | Rose Acres - Johnson Co. | 1275 SW Hwy 7 Kingsinoster, MO 65336 | Jason Schroeder | 660-563-2276 |
| Rose Acres | 6077 | Moberly, Mo | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6077 | Moberly, Mo | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6082 | Clarksville, AR | Rose Acres - Cort Acre Breaking Plant | PO Box 111 Cortland, IN 47228 | | 812-522-3984 |
| Rose Acres | 6085 | Tomah, WI | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 6085 | Tomah, WI | Rose Acres - Jenacres | 1855 E 200 N. North Vernon, IN | | 812-522-9692 |
| Rose Acres | 6091 | Henderson, NC | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 6096 | Johnstown, NY | Rose Acres - Cort Acre Breaking Plant | PO Box 111 Cortland, IN 47228 | | 812-522-3984 |
| Rose Acres | 6097 | London, KY | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 7016 | Gordonsville, VA | Rose Acres - Cortacres | 4687 E. Co. Rd 800 N Seymour, IN 47274-3850 | Ty Harweger | 812-497-2557 |
| Rose Acres | 7017 | Wintersville, OH | Rose Acres - Cort Acre Breaking Plant | PO Box 111 Cortland, IN 47228 | | 812-522-3984 |
| Rose Acres | 7024 | Sterling, IL | Rose Acres - Newton County Egg Farm | 9685 S. State Road 55 Brook, IN 47922 | | |
| Rose Acres | 7024 | Sterling, IL | Rose Acres - Donovan | 2628 E. US 50 Donovan, IL 60931 | Rick Conn | 815-486-7107 |
| Rose Acres | 7024 | Sterling, IL | Rose Acres - Jenacres | 1855 E 200 N. North Vernon, IN | | 812-522-9692 |

HIGHLY CONFIDENTIAL

RA0012842

D-0374-0040 of 0040

0374 2006.12.00_Supply Agm Rose Acre and CCF Brand_RA0012803