UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **ORDER**

Plaintiffs' motion to limit certain testimony of Dr. Jeffrey Armstrong (Dckt. No. 331) is hereby denied.

The motion is about testimony about animal welfare. Plaintiffs seek to limit the testimony of Dr. Armstrong, who they refer to as a "hybrid fact and expert witness." *Id.* at 1.

Dr. Armstrong chaired the UEP Scientific Advisory Committee on Animal Welfare from roughly 1998 to 2011. He testified in both trials in the MDL in Philadelphia. Part of the testimony involved the so-called "100% rule," which was "a mandatory feature of the UEP Certified Program, under which certified producers were required to implement welfare guidelines on 100% of their production facilities." *Id.* at 3.

According to Plaintiffs, "Dr. Armstrong has testified that the 100% rule was necessary because the alternative would not be humane to hens. He also has testified about the effectiveness of the UEP certification program and the subjective beliefs and motivations of the Scientific Advisory Committee and UEP—that they were attempting to do the right thing for hens." *Id.* at 2. "Dr. Armstrong testified at length about how he and the Scientific Advisory Committee viewed industry-wide compliance with UEP guidance, including the 100% rule, as integral to animal welfare." *Id.* at 3.

Plaintiffs object to his testimony on two grounds.

First, Plaintiffs believe that his testimony is inconsistent with this Court's rulings on various animal welfare topics. Plaintiffs point to this Court's rulings on several motions *in limine*, including the ruling about prior complaints, investigations, and settlements (Dckt. No. 297), the ruling about Sparboe Farms (Dckt. No. 287), and the ruling about the videos showing the mistreatment of chickens (Dckt. No. 302).

This Court does not view the anticipated testimony from Dr. Armstrong as out of bounds. Based on what the Court has seen, Dr. Armstrong's testimony would not violate this Court's rulings on the motions *in limine*. This Court has never said that any and all evidence about animal welfare is out of bounds and off limits. In fact, the avowed desire to protect animal welfare is central to the defense.

As a general matter, this Court has recognized that animal welfare considerations will play a role at the upcoming trial. Defendants contend that they implemented the UEP Certified Program to promote animal welfare and thus satisfy consumer demand. And Plaintiffs contend that the whole thing was bogus, and was just a ruse for a restriction of supply.

In a number of rulings, this Court gave the parties the green light to present evidence on why Defendants did what they did. And more specifically, this Court has allowed the parties to offer evidence about why Defendants agreed to increase the size of the pens and adopted the 100% rule.

For example: "There is no prejudice, let alone unfair prejudice, in letting the jury hear why Defendants adopted the UEP Certified Program. If there is evidence that Defendants adopted animal-welfare rules in response to customer demand, the jury should hear it." *See* 8/31/23 Order, at 13 (Dckt. No. 285); *see also id.* at 12 ("Plaintiffs are pursuing a theory that 'there was a conspiracy to reduce the total supply of eggs, which led to an increase in the price of both shell eggs and egg products.' *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d at 506. In response to that theory, Defendants can present evidence that they were responding to consumer demand from buyers of shell eggs."); *id.* at 9 ("It is hard to see how Plaintiffs could fault Defendants for adopting the UEP Certified Program, without giving Defendants a chance to explain why. If Defendants agreed to the UEP Certified Program because of grocer demand, that explanation would undercut Plaintiffs' theory that the Program was a pretext to reduce supply. The jury is entitled to hear and weigh this competing evidence.").

As a second example: "Needless to say, Defendants are free to present evidence about the procompetitive benefits of the UEP Certified Program through the end of the alleged conspiracy in 2008. Evidence about the competitive upside of the Program before 2008 is fair game." *See* 9/15/23 Order (Dckt. No. 292).

As a third example: "evidence about public pressure – and the responses by state legislatures – is relevant to why Defendant adopted the UEP Certified Program. That evidence could support Defendants' theory that they received pressure to adopt the UEP Certified Program based on animal-welfare concerns." *See* 8/31/23 Order, at 12 (Dckt. No. 286).

In the order about prior complaints, investigations, and settlements (Dckt. No. 297), this Court expressly ruled that testimony about animal welfare was fair game (as a general matter, that is). "As this Court previously ruled, the parties can present evidence about why Defendants did what they did. Defendants can present evidence that they responded to concerns about animal welfare. And Plaintiffs can present evidence that the whole thing was bogus, and that the real motivation was anticompetitive." *Id.* at 2.

2

But this Court precluded the parties from offering evidence about the dissatisfaction by Compassion Over Killing, an animal welfare group. This Court basically ruled that that group's disappointment with the animal welfare standards does not call into question why the Defendants did what they did. "Evidence that some people thought that egg producers should do *more* doesn't really call into question why the egg producers did what they did. There is a difference between doing nothing, and not doing *enough*." *Id.* at 3 (emphasis in original).

"Dissatisfaction by a public interest group is not evidence of doing nothing. Dissatisfaction does not shed much light on a person's motivation, either. Dissatisfaction by someone else doesn't mean that the action was pretextual. The connection between 'you aren't doing enough' and 'the whole thing is a sham' is a bit of a stretch, and then some. The probative value is slight." *Id.*

That ruling is not inconsistent with the anticipated testimony of Dr. Armstrong. Dr. Armstrong can testify about the recommendations made by the Scientific Advisory Committee to the UEP. He can testify about why the UEP did what it did (assuming that he has personal knowledge over that topic). That's much different than the level of satisfaction by an outside public interest group.

In the order about Sparboe Farms (Dckt. No. 287), this Court ruled that evidence about animal abuse at Sparboe Farms would be irrelevant and unduly prejudicial. Sparboe Farms is a former defendant, and the conduct took place in 2011, meaning three years after the alleged conspiracy ended in 2008. Mistreatment of chickens in 2011 by Sparboe Farms does not shed much light on whether the UEP Certified Program was anticompetitive, or whether Defendants engaged in a conspiracy that lasted until 2008. So the probative value was slight. And the evidence raised Rule 403 problems, too.

That ruling is not inconsistent with Dr. Armstrong's anticipated testimony, either. Again, Dr. Armstrong will testify about the creation of animal welfare guidelines and the requirement of the 100% rule. That's not inconsistent with this Court's exclusion of testimony about the mistreatment of chickens by Sparboe Farms years after the alleged conspiracy ended.

In the order about the undercover videos (Dckt. No. 302), this Court excluded the footage of the mistreatment of chickens at various facilities, years after the adoption of the UEP Certified Program. The probative value was slight, because the mistreatment of chickens years later does not shed much light on the motivations of industry players years earlier. And more importantly, the footage was too shocking and too distracting for the jury. The footage seems designed to elicit an emotional response from the jury, and a desire to punish.

That ruling is not inconsistent with Dr. Armstrong's testimony either. It's apples and oranges.

Taking a step back, this Court has not prohibited the parties from presenting evidence about animal welfare considerations. Plaintiffs believe that the UEP Certified Program was motivated by a desire to restrict supply. And Defendants contend that the Program had

procompetitive benefits, such as satisfying consumer demand for greater animal protections. That testimony is fair game.

But saying that evidence about animal welfare is fair game does not mean that any and all evidence about animal welfare is fair game. The evidence must be probative, and must overcome the hurdle of Rule 403. This Court excluded some of Plaintiffs' evidence because the probative value was slight, or it was too prejudicial and too distracting to present to the jury. Basically, evidence about the disappointment by Compassion Over Killing would not advance the ball. Neither would evidence about the mistreatment of chickens years after the conspiracy ended. And so on.

The testimony by Dr. Armstrong is probative of why the industry implemented the UEP Certified Program, and why the industry adopted the 100% rule. It explains why Defendants did what they did. And it does not raise Rule 403 problems. So it can come in.

Second, Plaintiffs seek to exclude Dr. Armstrong's subjective views of the Committee's action, and the motivations of the UEP. This objection seems premature. This Court can cross that bridge when it comes to it.

Suffice it to say that Dr. Armstrong must have personal knowledge about the subject of his testimony. This Court will not allow Dr. Armstrong to speculate about why the Committee and the UEP did what it did. But Dr. Armstrong can testify about what he heard, and what others said. And so on.

Two final notes.

First, Defendants point out that Plaintiffs failed to meet and confer, in violation of this Court's Standing Order. Going forward, this Court expects all parties to meet and confer before filings motions. The meet-and-confer process exists for good reason. A failure to comply may lead to summary denial of future motions.

Second, Defendants once again object that Plaintiffs' motion comes late in the game. The Court fully appreciates the amount of time that is left on the clock before trial.

Even so, the Court views Plaintiffs' motion as a request to apply this Court's recent rulings on motions *in limine* to Dr. Armstrong. They basically want the shoe to go on the other foot. This Court is denying the motion on the merits, but does not fault Plaintiffs for filing the follow-up motion (putting aside the issue of the need for a meet and confer). Plaintiffs could not have asked this Court to apply its other rulings to the testimony of Dr. Armstrong before they received the rulings.

Date: October 16, 2023

_____
Steven C. Seeger
United States District Judge