**Rulings on Deposition Designations – Don Bell Vol. I**

| Testimony | Objection | Ruling |
|---|---|---|
| | | |
| 42:2-17 | 701(a) & (c) (Improper lay opinion) starting at 42:16 | |
| 42:19-43:2 | 701(a) & (c) (Improper lay opinion) | |
| 45:21-46:17 | 701(a) & (c) (Improper lay opinion) and 602 (foundation/speculation) starting at 46:10 | |
| 46:21-47:1 | 701(a) & (c) (Improper lay opinion); 602 (foundation) | |
| 47:4-10 | 701(a) & (c) (Improper lay opinion); 602 (foundation) | |
| 47:12-23 | 701(a) & (c) (Improper lay opinion); 602 (foundation) as to 47:12-13 | |
| 48:2-6 | 701(a) & (c) (Improper lay opinion); 602 (foundation) | |
| 50:24-51:8 | 402 (relevance); 802 (hearsay); MIL (pre-conspiracy) | |
| 70:21-71:20 | Defendants object to Plaintiffs' redactions to Bell-3 (Plf. Tr. Ex. 272) for the reasons discussed in the pending motion to limit redactions [ECF 363] | |
| 88:12-88:20 | MIL (pre-conspiracy) | |
| 97:16-101:20 | *802 (hearsay)*\*; 105 (as to RAF) (99:13-100:8, 100:24-101:7) | |
| 101:23-102:17 | 602 (Foundation) | |

1

| | | |
|---|---|---|
| 105:1-106:24 | *802 (hearsay)\*;* Defendants object to Plaintiffs' redactions to Bell-8 (Plf. Tr. Ex. 1) for the reasons discussed in the pending motion to limit redactions [ECF 363] | |
| 107:1-18 | *802 (hearsay)\** | |
| 135:12-13 | 802 (Hearsay) (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
| 135:17-136:2 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
| 136:21-138:23 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
| 138:25-140:2 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
| 140:4-140:13 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
| 141:22-142:13 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |

| 142:18-25 | *802 (hearsay)\** (as to all parties because Mr. Bell drafted in his capacity as a U. Cal. Poultry Specialist, prior to becoming a consultant for UEP) | |
|---|---|---|
| 144:18 | *802 (hearsay)\** | |
| 146:17-148:1 | *802 (hearsay)\** | |
| 148:18-151:16 | *802 (hearsay)\** | |
| 151:20-25 | *802 (hearsay)\** | |
| 152:2-16 | *802 (hearsay)\** | |

**Rulings on Deposition Designations – Don Bell Vol. II**

| Testimony | Objection | Ruling |
|---|---|---|
|  |  |  |
| 175:23-24 | Defendants object to Plaintiffs' redactions to Bell-16 (Plf. Tr. Ex. 824) for the reasons discussed in the pending motion to limit redactions [ECF 363] |  |
| 176:4-179:1 | *802 (hearsay)** |  |
| 180:15-22 | 701(a)-(c) (Improper lay opinion); 611 (form) |  |
| 180:25-181:3 | 701(a)-(c) (Improper lay opinion); 611 (form) |  |
| 181:15-18 | 701(a)-(c) (Improper lay opinion); 611 (form) |  |
| 185:22-186:18 | *802 (hearsay)** |  |
| 186:21-187:17 | *802 (hearsay)** |  |
| 189:7-9 | 701(a)-(c) (Improper lay opinion); 802 (Hearsay) |  |
| 189:12-190:1 | *802 (hearsay)** (as to 189:12-18); 701(a)-(c) (Improper lay opinion); 802 (Hearsay) |  |
| 190:3-9 | *802 (hearsay)**; 701(a)-(c) (Improper lay opinion); 802 (Hearsay) |  |
| 192:13-18 | 701(a)-(c) (Improper lay opinion); 802 (Hearsay); 611 (form) |  |
| 192:20-193:9 | *802 (hearsay)** 701(a)-(c) (Improper lay opinion); 802 (Hearsay); 611 (form) |  |

| | | |
|---|---|---|
| 195:9-196:16 | *802 (hearsay)** | |
| 197:4-199:23 | *802 (hearsay)** | |
| 203:10-13 | *802 (hearsay)** | |
| 203:17-20 | *802 (hearsay)** | |
| 204:6-20 | *802 (hearsay)** | |
| 205:6-25 | *802 (hearsay)** | |
| 206:6-22 | *802 (hearsay)** | |
| 210:1-212:12 | *802 (hearsay)** | |
| 216:2-5 | *802 (hearsay)** | |
| 216:8-217:10 | *802 (hearsay)** | |
| 221:4-8 | 701(a)-(c) (Improper lay opinion); 602 (Foundation) | |
| 224:2-225:25 | 802 (hearsay); 602 (foundation) as to 224:2-12; *802 (hearsay)** as to 225:22-25 | |
| 226:3-227:8 | *802 (hearsay)** | |
| 228:12-19 | *805 (hearsay within hearsay)** | |
| 229:17-230:10 | *805 (hearsay within hearsay)** | |
| 231:3-21 | *805 (hearsay within hearsay)** | |

| | | |
|---|---|---|
| 231:25-232:5 | *805 (hearsay within hearsay)** | |
| 232:7-8 | *805 (hearsay within hearsay)** | |
| 244:18-245:15 | *802 (hearsay)** Defendants object to Plaintiffs' heavily redacted version of Bell-24 (Plf. Tr. Ex. 32). The unredacted version is attached as Exhibit A at Dkt. 374. | |
| 245:22-246:15 | *802 (hearsay)** | |
| 252:10-18 | *802 (hearsay)** | |
| 252:23-254:6 | *802 (hearsay)** | |
| 255:4-7 | *802 (hearsay)** | |
| 255:9-256:13 | *802 (hearsay)** | |
| 256:16-24 | 602 (foundation) | |
| 318:18-320:2 | 602, NR, NARR | |
| 321:2-9 | 802 (Hearsay) | |
| 324:3-6 | 403, MIL | |
| 336:1-5 | 403 | |

# EXHIBIT A

**HIGHLY CONFIDENTIAL**

1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3     _____

                                    )

4     IN RE:  PROCESSED EGG         )

      PRODUCTS ANTITRUST            )

5     LITIGATION                    )

      _____)MDL No. 2002

6                                   )08-MD-0200

      THIS DOCUMENT APPLIES TO:     )

7     ALL ACTIONS                   )

      _____)

8

9

10

11

12

13              -- HIGHLY CONFIDENTIAL --

14      VIDEOTAPED DEPOSITION OF DONALD L. BELL

15              Riverside, California

16            Tuesday, August 20, 2013

17

18

19

20

21   Reported by:

22   DENISE BARDSLEY

23   CSR No. 11241

24

25

**HIGHLY CONFIDENTIAL**

**2**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3    _____
                           )
4    IN RE:  PROCESSED EGG      )
     PRODUCTS ANTITRUST         )
5    LITIGATION                 )
     _____)MDL No. 2002
6                        )08-MD-0200
     THIS DOCUMENT APPLIES TO:    )
7    ALL ACTIONS                )
                               )
8    _____)
9
10
11
12         Videotaped deposition of DONALD L. BELL,
13   taken on behalf of The Direct Purchaser Plaintiffs,
14   at 3500 Market Street, Riverside, California,
15   beginning at 10:01 a.m. and ending at 1:16 p.m.
16   on Tuesday, August 20, 2013, before DENISE
17   BARDSLEY, Certified Shorthand Reporter No. 11241.
18
19
20
21
22
23
24
25
```

**3**

```
1    APPEARANCES:
2
3    For The Direct Purchaser Plaintiffs:
4        QUINN EMANUEL URQUHART & SULLIVAN, LLP
5        BY:  STEIG D. OLSON
6        Attorney at Law
7        51 Madison Avenue, 22nd Floor
8        New York, New York  10010
9        (212) 849-7152
10       steigolson@quinnemanuel.com
11
12   For The Direct Purchaser Plaintiffs:
13       HAUSFELD, LLP
14       BY:  JAMES J. PIZZIRUSSO
15       Attorney at Law
16       1604 Locust Street, 2nd Floor
17       Philadelphia, Pennsylvania  19103
18       (215) 985-3270
19       jpizzirusso@hausfeldllp.com
20
21
22
23
24
25
```

**4**

```
1    APPEARANCES (continued):
2
3    For The Indirect Purchaser Plaintiffs:
4        MILBERG LLP
5        One Pennsylvania Plaza
6        New York, New York  10119
7        (646) 733-5727
8        (No appearance.)
9
10   For Indirect Action Plaintiffs:
11       LOVELL STEWART HALEBIAN & JACOBSON LLP
12       BY:  MERRICK SCOTT RAYLE
13       Attorney at Law
14       61 Broadway, Suite 501
15       New York, New York  10006
16       (212) 608-1900
17       msrayle@sbcglobal.net
18
19   For Weaver Brothers:
20       DISNMORE & SHOHL LLP
21       1100 Courthouse Plaza SW
22       10 North Ludlow Street
23       Dayton, Ohio  45402
24       (937) 463-4928
25       (No appearance.)
```

**5**

```
1    APPEARANCES (continued):
2
3    For the Deponent:
4        UNIVERSITY OF CALIFORNIA
5        BY:  MICHAEL R. GOLDSTEIN
6        Attorney at Law
7        1111 Franklin Street, 8th Floor
8        Oakland, California  94607
9        (510) 987-9895
10       michael.goldstein@ucop.edu
11
12   For Midwest Poultry Services:
13       FAEGRE BAKER DANIELS
14       BY:  KATHY L. OSBORN
15       Attorney at Law
16       300 North Meridian Street, Suite 2700
17       Indianapolis, Indiana  46204-1750
18       (317) 237-1144
19       kathy.osborn@faegrebd.com
20       (Telephonic appearance.)
21
22
23
24
25
```

2 (Pages 2 to 5)

**HIGHLY CONFIDENTIAL**

**6**

1    APPEARANCES (continued):
2
3    For RW Sauder, Inc.:
4        DECHERT LLP
5        2929 Arch Street
6        Philadelphia, Pennsylvania  19104
7        (215) 994-2421
8        (No appearance.)
9
10   For United Egg Producers and the United States Egg
11   Marketers:
12       PEPPER HAMILTON, LLP
13       BY:  WHITNEY REDDING
14       Attorney at Law
15       3000 Two Logan Square
16       Philadelphia, Pennsylvania  19103
17       (215) 981-4714
18       reddingw@pepperlaw.com
19       (Telephonic appearance.)
20
21
22
23
24
25

**8**

1    APPEARANCES (continued):
2
3    For Rose Acre Farms:
4        PORTER, WRIGHT, MORRIS & ARTHUR
5        BY:  KARRI ALLEN
6        Attorney at Law
7        1919 Pennsylvania Avenue NW, Suite 500
8        Washington, D.C.  20006
9        (202) 778-3056
10       kallen@porterwright.com
11       (Telephonic appearance.)
12
13   For Nu-Cal Foods, Inc.:
14       KASOWITZ BENSON TORRES & FRIEDMAN, LLP
15       BY:  JASON S. TAKENOUCHI
16       Attorney at Law
17       101 California Street
18       San Francisco, California  94111
19       (415) 655-4335
20       jtakenouchi@kasowitz.com
21
22
23
24
25

**7**

1    APPEARANCES (continued):
2
3    For Giant Eagle, Inc.:
4        MARCUS & SHAPIRA LLP
5        One Oxford Center, 35th Floor
6        Pittsburgh, Pennsylvania  15219
7        (412) 338-3344
8        (No appearance.)
9
10   For Cal-Maine Foods, Inc.:
11       GIBSON, DUNN & CRUTCHER LLP
12       2100 McKinney Avenue
13       Dallas, Texas  75201-6912
14       (214) 698-3279
15       (No appearance.)
16
17   For Sparboe Farms, Inc.:
18       BRIGGS AND MORGAN
19       2200 IDS Center
20       80 South 8th Street
21       Minneapolis, Minnesota  55402
22       (612) 977-8415
23       (No appearance.)
24
25

**9**

1    APPEARANCES (continued):
2
3    For Hillandale Farms, Inc., Hillandale Farms East,
4    Inc., Hillandale Gettysburg LP and Hillandale Farms
5    of Pa., Inc.:
6        BUCHANAN, INGERSOLL & ROONEY
7        Two Liberty Place
8        50 South 16th Street, Suite 3200
9        Philadelphia, Pennsylvania  19102
10       (215) 665-3884
11       (No appearance.)
12
13   For the Direct Action Plaintiffs:
14       JENNER & BLOCK
15       BY:  STEPHEN R. BROWN
16       BY:  RICHARD CAMPBELL (Telephonic appearance)
17       Attorneys at Law
18       353 North Clark Street, Suite 4500
19       Chicago, Illinois  60654-3456
20       (312) 840-7282
21       stephenbrown@jenner.com
22       richardcampbell@jenner.com
23
24
25

3 (Pages 6 to 9)

**HIGHLY CONFIDENTIAL**

10

1  APPEARANCES (continued):
2
3  For Michael Foods:
4    LEONARD, STREET & DEINARD
5    BY: PETER J. SCHWINGLER
6    Attorney at Law
7    150 South Fifth Street, Suite 2300
8    Minneapolis, Minnesota 55402
9    612 335-7023
10   peterschwingler@leonard.com
11   (Telephonic appearance.)
12
13 For Moark LLC and Norco Ranch, Inc.
14   EIMER STAHL, LLP
15   BY: TRAVIS KENNEDY
16   Attorney at Law
17   224 South Michigan Avenue, Suite 1300
18   Chicago, Illinois 60604
19   (312) 660-7604
20   tkennedy@eimerstahl.com
21   (Telephonic appearance.)
22
23
24
25

11

1  APPEARANCES (continued):
2
3  For Winn-Dixie, Inc., Roundy's Supermarkets, Inc.,
4  C&S Wholesaler Grocers, Inc., and H.J. Heinz
5  Company, L.P.:
6    BAKER & McKENZIE LLP
7    300 East Randolph Street
8    Chicago, Illinois 60601
9    (312) 861-3735
10   (No appearance.)
11
12 For Ohio Fresh Eggs:
13   KEATING MUETHING & KLEKAMP PLL
14   BY: JOSEPH M. CALLOW, JR.
15   Attorney at Law
16   One East Fourth Street, Suite 1400
17   Cincinnati, Ohio 45202-3752
18   (513) 579-6400
19   jcallow@kmklaw.com
20   (Telephonic appearance.)
21
22 Videographer:
23   SCOTT SLATER, VERITEXT
24
25

12

1                    INDEX
2  WITNESS                        EXAMINATION
3  DONALD L. BELL
4
5
6      BY MR. OLSON                    19
7
8
9
10                  EXHIBITS
11 EXHIBIT        DESCRIPTION        PAGE
12 Exhibit 1   E-mail from Gene Gregory to    22
13    Jeff Armstrong, et al., 4/13/09
14    Bates No. SF003886
15
16 Exhibit 2   Managing the Nation's Laying    51
17    Flock 1992 by Don Bell
18    Bates Nos. BELL-D-00031284 to -295
19
20 Exhibit 3   UEP United Voices, 2/22/99    70
21    Bates Nos. UE0064537 to -539
22
23
24
25

13

1  INDEX (Continued):
2
3                  EXHIBITS
4  EXHIBIT        DESCRIPTION        PAGE
5  Exhibit 4   Cooperative Extension, University    83
6    of California, Egg Economics
7    Update, No. 154, 4/15/94
8    Bates Nos. KRGEG00020640 to -43
9
10 Exhibit 5   UEP Fax to Don Bell and Lee    85
11    Schrader from Gene W. Gregory,
12    7/1/99
13    Bates Nos. BEL-D-00026787 to -788
14
15 Exhibit 6   Cooperative Extension, University    92
16    of California letter to Al Pope
17    from Donald Bell, 3/17/95
18    Bates No. BEL-D-0032755
19
20 Exhibit 7   Cooperative Extension, University    93
21    of California letter to Gene
22    Gregory from Don Bell, 7/2/99
23    Bates Nos. BELL007698 to -709
24
25

4 (Pages 10 to 13)

**HIGHLY CONFIDENTIAL**

---

**14**

1  INDEX (Continued):
2
3              EXHIBITS
4  EXHIBIT        DESCRIPTION          PAGE
5  Exhibit 8   UEP United Egg Voices, 8/2/99    104
6              Bates Nos. UE0064456 to -459
7
8  Exhibit 9   E-mail to Animal Welfare         108
9              Committee from Don Bell, 12/22/99
10             Bates Nos. BELL004041 to -42
11
12 Exhibit 10  United States Egg Marketers,     114
13             Inc. Letter to Don Bell from
14             Jerry Faulkner
15             Bates Nos. BELL004353 to -354
16
17 Exhibit 11  Recommendations for UEP Animal   116
18             Welfare Guidelines Submitted by
19             a Scientific Advisory Committee
20             on Animal Welfare, 9/2000
21             Bates Nos. UE0208684 to -703
22
23
24
25

---

**15**

1  INDEX (Continued):
2
3              EXHIBITS
4  EXHIBIT        DESCRIPTION          PAGE
5  Exhibit 12  E-mail from Gene Gregory to      132
6              Don Bell, 12/12/00
7              Bates Nos. UE0840403 to -404
8
9  Exhibit 13  Economic Consultant Agreement    133
10             with Donald Bell
11             Bates Nos. UE0790640, UE0790641,
12             UE0790542
13
14 Exhibit 14  Cooperative Extension, University 135
15             of California, An Egg Economics
16             Update, 12/31/00
17             Bates Nos. BELL-D-000028020 to -031
18
19 Exhibit 15  Don Bell's Table Egg Layer        144
20             Flock Projections and Economic
21             Commentary - 2002, 4/15/02
22             Bates Nos. BELL002774 to -777
23
24
25

---

**16**

1        Riverside, California, Tuesday, August 20, 2013
2            10:01 a.m.
3
4        THE VIDEOGRAPHER:  Good morning.
5        We are on the record at 10:01 a.m. on
6   August 20th, 2013.  This is the video-recorded
7   deposition of Mr. Donald Bell.  My name is Scott
8   Slater, here with our court reporter, Denise
9   Bardsley.  We are here from Veritext Legal Solutions
10  at the request of counsel for direct purchaser
11  plaintiffs.  This deposition is being held at 3500
12  Market Street in the city of Riverside, California
13  92501.
14       The caption of this case is In Re:
15  Processed Egg Products Antitrust Litigation, Case
16  No. 2002 08-MD-0200.
17       Please note that audio and video recording
18  will take place unless all parties agree to go off
19  the record.  The microphones are sensitive and may
20  pick up whispers, private conversations or cellular
21  interference.
22       I am not authorized to administer an oath,
23  I am not related to any party in this action, nor am
24  I financially interested in the outcome in any way.
25       May I please have an agreement from all

---

**17**

1   parties that we may proceed.
2        MR. OLSON:  Yes.
3        THE VIDEOGRAPHER:  Agreed?
4        MR. GOLDSTEIN:  Yes.
5        MR. TAKENOUCHI:  Yes.
6        THE VIDEOGRAPHER:  Thank you.
7        At this time will counsel and all present
8   please identify themselves for the record.
9        MR. OLSON:  Why don't we start with the
10  people on the phone.  Can you guys identify
11  yourselves?
12       MR. CAMPBELL:  Richard Campbell, Jenner &
13  Block, for the Kraft plaintiffs.
14       MS. REDDING:  Whitney Redding, Pepper
15  Hamilton, for United Egg Producers and United States
16  Egg Marketers.
17       MR. SCHWINGLER:  Peter Schwingler,
18  Leonard, Street & Deinard, for Michael Foods.
19       MR. OLSON:  Anyone else on the phone?
20       MR. KENNEDY:  Travis Kennedy from Eimer
21  Stahl for Moart, LLC, and Norco Ranch, Inc.
22       MS. ALLEN:  Kari Allen from Porter, Wright,
23  Morris & Arthur on behalf of Rose Acre Farms, Inc.
24       MR. CALLOW:  Joe Callow for Ohio Fresh
25  Eggs.

**5 (Pages 14 to 17)**

**HIGHLY CONFIDENTIAL**

18

1        MR. OLSON:  Anyone else?
2        MS. OSBORN:  Kathy Osborn for Midwest
3    Poultry Services.
4        MR. OLSON:  Anyone else?
5        All right.  This is Steig Olson from Quinn
6    Emanuel Urquhart & Sullivan for the direct purchaser
7    plaintiffs.
8        MR. PIZZIRUSSO:  James Pizzirusso, Hausfeld
9    LLP, for the direct purchaser plaintiffs.
10       MR. BROWN:  Stephen Brown from Jenner &
11   Block for Direct Action Plaintiffs, Kraft, Kellogg,
12   General Mills and Nestle.
13       MR. RAYLE:  Merrick Rayle, Lovell, Stewart,
14   Halebian & Jacobson, for the indirect plaintiffs.
15       MR. TAKENOUCHI:  Jason Takenouchi,
16   Kasowitz, Benson, Torres & Friedman, for Defendant
17   Nu-Cal Foods.
18       MR. GOLDSTEIN:  Michael Goldstein from the
19   Regents of the University of California.  I'm
20   counsel for Mr. Bell.
21       And with us here today is Kristen Erving, a
22   paralegal.
23       THE WITNESS:  Donald Bell.
24       MR. OLSON:  You don't need to do that yet.
25       THE VIDEOGRAPHER:  Thank you very much.

19

1        Will the court reporter please administer
2    the oath.
3
4           DONALD L. BELL,
5    having been administered an oath, was examined and
6    testified as follows:
7
8           EXAMINATION
9    BY MR. OLSON:
10   Q   Good morning, Mr. Bell.
11   A   Good morning.
12   Q   Could you please state your full name and
13   current address for the record.
14   A   Donald D. Bell, B-e-l-l.  5918 Intervale,
15   I-n-t-e-r-v-a-l-e, Drive, Riverside, California
16   92506.
17   Q   Thank you.
18       Have you ever been deposed before?
19   A   Yes.
20   Q   When was the last time you were deposed?
21   A   Oh, maybe 15 years ago.
22   Q   What type of case was it?
23   A   Let's see, several different types of
24   cases.  I think we've had individual lawsuits about
25   the feeding of any flocks, about the indemnification

20

1    with the United States Department of Agriculture.
2    We had one here in Riverside, I can't remember what
3    the details of that one were, but that was a two-day
4    hearing of some kind.  Maybe less than six.
5    Q   Okay.  Well, let me go over just a couple
6    ground rules, since it's been awhile.
7        First of all, at any time today if you need
8    to take a break for any reason, don't hesitate to
9    let us know.  Understood?
10   A   Uh-huh.
11   Q   I'm going to do my best to ask clear
12   questions today.  If I ask a question that's unclear
13   to you, I'd ask that you stop me and ask for a
14   clarification.
15       Is that fair?
16   A   Uh-huh.  That's fine.
17       MR. GODLSTEIN:  Before we go on, was that
18   uh-huh a yes or no?
19       THE WITNESS:  Yes.
20       MR. GODLSTEIN:  Thank you.
21   BY MR. OLSON:
22   Q   If you don't ask for a clarification, I'll
23   assume you understood the question.
24       Is that fair?
25   A   Yes.

21

1    Q   You're doing a great job of this, but just
2    to reiterate the point, because we have a court
3    reporter today, we have to do our best not to speak
4    over each other.  And in answering questions, please
5    answer verbally, and yes or no as opposed to
6    gestures.
7        Fair enough?
8    A   Yes.
9    Q   All right.  Now, how are you feeling today,
10   sir?
11   A   I'm feeling about normal for me, a little
12   backache, but that's okay.
13   Q   Okay.  And, as I said, if you need to
14   stretch your back or anything, let us know.
15       Is there anything today about your health
16   or otherwise that would stop you from being able to
17   answer my questions truthfully to the best of your
18   knowledge?
19   A   Not to the best of my knowledge.
20   Q   And if you ever start to tire and your mind
21   is feeling fuzzy or anything, again, I'd ask that
22   you stop and let us know.
23       Will you do that?
24   A   Yes.
25   Q   Thank you.

6 (Pages 18 to 21)

**HIGHLY CONFIDENTIAL**

22

1    Are you employed today?
2    A  No.  I'm retired.
3    Q  How long have you been retired?
4    A  Since 2001.
5    Q  When was the last time that you received
6    any compensation for any type of job or consulting
7    project involving the egg industry?
8    A  There's correspondence to that effect when
9    I gave the United Egg Producers a wish to terminate
10   my relationship because of my age and lack of close
11   contact with the industry.  That might have been --
12   I'd hate to give it to you, because it is in
13   correspondence.
14   Q  Okay.  And so I think I know what you're
15   referring to, so why don't we just introduce the
16   document that goes to that.
17       From time to time today I'll hand you
18   documents.  Sometimes I'll -- it will be important
19   for you to look at the whole document, other times
20   maybe just portions.  But if you ever think you need
21   to look at the whole document, just let us know.
22       (Deposition Exhibit 1 was marked for
23       identification by the court reporter
24       and is attached hereto.)
25   BY MR. OLSON:

23

1    Q  I'm handing you what's been marked Bell 1.
2        MR. TAKENOUCHI:  Steig, for housekeeping
3    purposes, can you note the Bates number?
4        MR. OLSON:  We already talked about that.
5        MR. TAKENOUCHI:  Okay.
6        MR. OLSON:  And Bell 1 is Bates-stamped
7    SF003886.
8    Q  And you can keep it in front of you.
9        Can you just start by identifying this as
10   an e-mail written by Gene Gregory on April 13, 2009
11   and you were copied and it was sent to a number of
12   people?
13   A  That's true, yes.
14   Q  Okay.  Is this the type of correspondence
15   that you're referring to?
16   A  Yes, this is what I was referring to.
17   Q  All right.  And this indicates that you had
18   informed UEP in early 2009 that you were going to
19   finally retire effective July 1, 2009, correct?
20       MR. TAKENOUCHI:  Objection to form.
21       THE WITNESS:  Yes.
22       MR. OLSON:  What's the objection?
23       MR. TAKENOUCHI:  Leading.
24   BY MR. OLSON:
25   Q  The answer is yes?

24

1    A  The answer is yes.
2    Q  Okay.  After that date of July 1, 2009,
3    have you done any work or consulting in the egg
4    industry that you were paid for?
5    A  No.
6    Q  Now, you referred to retiring in 2001.
7        What did you retire from in 2001?
8    A  Well, my position was University of
9    California poultry specialist statewide.  Now my
10   title is emeritus in that same title.
11   Q  Okay.  So after 2001 you became emeritus?
12   A  Yes.
13   Q  And what is a poultry specialist?
14   A  A poultry specialist is one of the staff of
15   the state land grant institution in the cooperative
16   extension, not university extension, but cooperative
17   extension.
18       This organization is part of the role of
19   the university to teach, research and extend
20   information.
21       My role was to work with the poultry
22   industry of California, mostly in educational,
23   research areas.
24   Q  Did you teach courses in that position?
25   A  Just adult courses from time to time, but

25

1    nothing formal.
2    Q  And over what period did you hold that
3    position?
4    A  55 years.
5    Q  Does that go through 2001 or through to the
6    present?
7    A  Can I correct myself?
8    Q  Yes.
9    A  I had several positions in the same general
10   area.  As I got older, I got -- I had changes in
11   title.  Okay?  But it is all doing the same thing.
12   Q  Okay.  And approximately when did you start
13   in that position?
14   A  1958.
15   Q  Now, over the course of your career in that
16   position and afterwards, did you make any
17   contributions to UEP and its members?
18       MR. TAKENOUCHI:  Objection.
19       MR. OLSON:  What's the objection?
20       MR. TAKENOUCHI:  Contributions, what does
21   that mean?
22       THE WITNESS:  I don't know what that means
23   either.
24   BY MR. OLSON:
25   Q  Okay.  Did you contribute any reports or

7 (Pages 22 to 25)

**HIGHLY CONFIDENTIAL**

26

1 analyses to UEP and its members?
2     A   Yes.
3         MR. GODLSTEIN:  I'm sorry, Steve.  Before
4 you go on, I want to move his microphone up a little
5 because he's folding his arms and he may be
6 impairing the record.
7         THE WITNESS:  I'll keep it down.
8         MR. GOLDSTEIN:  I want you to be able to
9 fold your arms if you want to.
10        I'm sorry.
11 BY MR. OLSON:
12    Q   Over approximately what -- strike that.
13 Approximately when did you start
14 contributing reports and analyses to UEP's members?
15        MR. TAKENOUCHI:  Object to form,
16 contributing reports and analyses.
17        MR. GOLDSTEIN:  Go ahead.
18        THE WITNESS:  I'll try to answer that
19 question.
20        Since the formation of UAP.  I don't know
21 what year that was, but since the beginning.
22 BY MR. OLSON:
23    Q   And approximately when did you stop doing
24 that?
25    A   Theoretically, I'm still doing it today.

27

1     Q   And why do you say that?
2     A   Because I'm still working 20 hours a week.
3     Q   And what do you do in those 20 hours a
4 week?
5     A   We write, edit and publish industry-wide
6 newsletters.
7     Q   You say "We," who is we?
8     A   The Iowa State Egg Industry Center.  I'm on
9 the board of directors.
10    Q   And are those newsletters sent to UEP?
11    A   Sent to 1,000 egg producers in the United
12 States and their allied industries.
13    Q   How long were you affiliated with UEP,
14 specifically?
15        MR. TAKENOUCHI:  Objection to form,
16 "affiliated," the term is vague.
17        MR. OLSON:  I'll ask when I want a
18 clarification; otherwise you can just object to
19 form.
20        MR. TAKENOUCHI:  Okay.  You asked me for
21 clarification before.
22        MR. OLSON:  No -- right.  I didn't ask this
23 time or the last time.
24        THE WITNESS:  As I say, I began working in
25 cooperation at the beginning of their organization

28

1 with their chairperson.  And, of course, I've always
2 had the relationship with their members on a
3 one-on-one basis in my regular duties.
4 BY MR. OLSON:
5     Q   But was there a period when you were
6 retained to provide industry statistics and economic
7 reports for UEP?
8     A   Yes.
9     Q   When did that cease?
10    A   Cease or start?
11    Q   Cease.
12    A   Cease.  I assume it's the same date we just
13 talked about, 2009 when I terminated.
14    Q   And when did that start?
15    A   I was afraid you'd ask me that.
16    Q   Approximately.
17    A   I would say it might have been a ten-year
18 relationship.
19    Q   Now, what type of reports did you prepare
20 for UEP and its members?
21    A   Prior to my working with UEP, in fact since
22 the beginning of 1958, I've always written economic
23 reports for the industry.  And UEP asked that I
24 continue this work with them and with their members.
25 And the Iowa State Egg Center now is continuing that

29

1 work also.
2     Q   And so you referred to economic reports
3 that UEP asked you to provide.  How would you
4 describe those economic reports?
5     A   Well, we had three regular newsletters on
6 economics -- pardon me, four.  And they would be on
7 anything to do with the egg industry, primarily the
8 table egg industry.
9        And then when we worked out a relationship
10 with UEP.  We started what we called a memo,
11 m-e-m-o, along the same lines, but everything was
12 different or from a different approach.
13    Q   What do you mean from a different approach?
14    A   Just looking at it from the right side and
15 the left side and from an economic standpoint, from
16 a sociological standpoint, from local, regional,
17 international views.  Any one subject, you don't
18 want to put it all on one piece of paper.  So you
19 might have a series of papers on a given part of one
20 of the discussions.
21    Q   Now, of the reports that you prepared for
22 UEP and its members, did you prepare reports that
23 projected the size of the nation's table egg laying
24 flock?
25    A   Yes, we do that.  We've done that since the

8 (Pages 26 to 29)

**HIGHLY CONFIDENTIAL**

30

1  beginning every month.
2      Q   Did you prepare analyses of the
3  relationship between flock size and income in the
4  egg industry?
5      A   Yes.
6          MR. TAKENOUCHI:  Objection to form.
7  BY MR. OLSON:
8      Q   And what was the purpose of those types of
9  reports and analyses?
10     A   Well, they are all aimed at maintaining a
11 healthy industry.  Healthy is usually interpreted as
12 being economically sound.  And you're working with a
13 mass audience as opposed to individuals.
14         Individual consulting without a fee is
15 available at all times for any of these discussions,
16 but as we feel -- as I feel the needs of the
17 industry, along with any given line, I will tend to
18 emphasize that for a time period.
19     Q   And how did analyses of the relationship --
20         (Interruption in the proceedings.)
21         MR. OLSON:  Who joined?  Who joined the
22 deposition?  Did someone join?
23     Q   All right.  How did the analyses that you
24 prepared of the relationship between flock size and
25 income relate to maintaining a healthy industry?

31

1      A   Well, first of all, we have to be concerned
2  about costs, and then we have to be concerned about
3  income.
4          The greatest income is from eggs in this
5  particular case: that's almost 100 percent of it.
6  At times it might have been as low as 90 percent,
7  but it is normally -- today it is about a hundred.
8          Costs are predominantly feed.  And so we
9  place a lot of emphasis on feed costs and feed
10 consumption, factors affecting feed consumption and
11 so on.  And then the other costs make up the balance
12 of -- and so between the two, costs and income, we
13 have a measure of the well-being of the industry.
14     Q   And what was the purpose of projecting the
15 size of the nation's table egg laying flock and
16 looking at flock size?
17         MR. TAKENOUCHI:  Objection: form.
18         THE WITNESS:  Well -- excuse me.
19 BY MR. OLSON:
20     Q   You can answer the question.
21     A   I can answer it?
22         There are many, many reasons why prices
23 change.  And the main one that's recognized is the
24 size of the flock.  More eggs, less price; less
25 eggs, more price.

32

1      Q   Now, would it be fair to say that one focus
2  of your work was providing sound data that UEP could
3  use to help persuade its members to manage egg
4  supply?
5          MR. TAKENOUCHI:  Objection to form.
6          THE WITNESS:  Yes.
7  BY MR. OLSON:
8      Q   And based on your years of experience being
9  affiliated with UEP, would it be fair to say that
10 one of the things that UEP did was to try to
11 persuade its members to manage egg supply?
12         MR. TAKENOUCHI:  Objection to form,
13 "affiliated."
14         THE WITNESS:  Would you state the question
15 again, please?
16 BY MR. OLSON:
17     Q   Sure.  Based on your years of experience
18 being affiliated with UEP, would it be fair to say
19 that one of the things that UEP did was to try to
20 persuade its members to manage egg supply?
21     A   Yes.
22         MR. TAKENOUCHI:  Same objection.
23 BY MR. OLSON:
24     Q   And did you think that was an important
25 thing to do?

33

1      A   Yes.
2      Q   And did UEP, from time to time, ask for
3  your assistance in doing that?
4          MR. TAKENOUCHI:  Objection to form.
5          THE WITNESS:  I'd say yes and no.
6  BY MR. OLSON:
7      Q   Did UEP, from time to time, ask for you to
8  prepare reports or analyses that would help it
9  persuade its members to manage egg supply?
10         MR. TAKENOUCHI:  Objection to form.
11         THE WITNESS:  I'd have to say yes and no
12 again.
13 BY MR. OLSON:
14     Q   And what's the yes part?
15     A   The yes part is that everyone associated
16 with the egg industry recognizes the relationship
17 between volume of production, bird members and
18 price.  And it's -- the relationships are fairly
19 well established.
20         Anything that I would say -- that we have
21 too many chickens, that we don't have enough
22 chickens -- in a hundred examples, not just in so
23 many words, but in a hundred different examples,
24 applications, that that would be one of my roles,
25 uh-huh.

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430

**HIGHLY CONFIDENTIAL**

---

34

1    Q   And one of your roles was to provide data
2    that would help the industry balance the supply of
3    eggs with the demand for eggs, right?
4    A   That's right.  We provided a one-source
5    place to go for statistics.  The statistics didn't
6    start with me, but they were focused by me on the
7    problem.
8    Q   And were there times that UEP or its
9    leaders, like Gene Gregory, for example, would ask
10   you to develop plans for the industry at times when
11   there was an oversupply of eggs in the market?
12       MR. TAKENOUCHI:  Objection to form.
13       THE WITNESS:  Yes.
14   BY MR. OLSON:
15   Q   And were there times when you were invited
16   to give presentations to the UEP board of directors
17   regarding ideas for how to balance supply of eggs
18   with demand?
19   A   Yes.
20   Q   And were there times when you were invited
21   to USEM meetings?  And are you familiar with what
22   USEM is?
23   A   I've never been invited to their meetings.
24   Q   Are you sure?
25   A   Are you talking about the egg

---

35

1    marketing association -- producers --
2    Q   Sorry.  United States Egg Marketers.
3    A   I may have been to their meeting once,
4    but -- I think I'll have to say I may have been.
5    There are so many different organizations, and --
6    associated with the egg industry, including Urner
7    Barry and so on.
8        But I seem to recall that I might have had
9    a meeting with the marketing association, but
10   certainly nothing routinely.
11   Q   But do you recall being asked to provide
12   data and analyses to help support USEM with the
13   flock reduction program?
14   A   Yes and no.  I guess you'll have to explain
15   what the flock reduction program is.
16   Q   Well, to your knowledge, what is a flock
17   reduction program?
18   A   Well, it could be cage density.  That's
19   probably the most visible.  It could be when we
20   worked with them for a national marketing order to
21   license production and I wrote several papers, so
22   it's a difficult one to answer with one word.
23   Q   It could include a number of different
24   things, is that your point?
25   A   Yes, I guess.

---

36

1    Q   Now, the first one you mentioned is cage
2    density.  How can cage density be used in a flock
3    reduction program?
4        MR. TAKENOUCHI:  Objection to form.  We are
5    just talking about --
6        MR. OLSON:  Please no speaking objections.
7    You objected to form.  Thank you.
8        MR. TAKENOUCHI:  I'm trying to
9    understand --
10       MR. OLSON:  You objected to form, and
11   that's fine.
12       THE WITNESS:  Cage density to most people
13   means how much space do you give your chickens, and
14   that also is related to how many birds you put in
15   the cage.  It's not necessarily the number of birds
16   you have in the nation, that's not cage density.
17   That's hen population.
18       Cage density, I first started my research
19   with the extension service in about 1963 with cage
20   density experiments.  At that time most cages held
21   one bird.  The industry readily found that that was
22   not the way to go, it was not the economic way to go
23   and so they went to two.
24       What does that do?  That increases the
25   population by a hundred percent.  And then they went

---

37

1    to three, and so on, and so on.
2        So cage density is one of the easiest
3    things to correct and to demonstrate that this is
4    too much or too little.
5    BY MR. OLSON:
6    Q   And how does cage density relate to flock
7    reduction, specifically?
8    A   The same thing.  The -- if we're interested
9    in reducing the flock size because the profitability
10   of the industry is absent, that's one of the first
11   things that anybody can do.  And it's also not only
12   useful to the industry as a whole, but it is
13   extremely useful to the individual who is going
14   bankrupt.
15       There's always the individual --
16   individual's needs as opposed to the industry's
17   needs.
18   Q   Now, are these points about cage density
19   that you were just making ones that you communicated
20   to UEP and its members?
21   A   All the time --
22       MR. TAKENOUCHI:  Objection to form.
23       THE WITNESS:  All the time, yes.
24   BY MR. OLSON:
25   Q   And it would be fair to say that -- that

---

10 (Pages 34 to 37)

**HIGHLY CONFIDENTIAL**

---

**38**

1  you recognize, based on your work for the industry,
2  that one way UEP members could manage egg supply was
3  by adopting guidelines relating to cage density?
4      MR. TAKENOUCHI:  Objection to form.
5      THE WITNESS:  Yes.
6  BY MR. OLSON:
7      Q  And one way of adopting those guidelines
8  would be to adopt welfare guidelines?
9      MR. TAKENOUCHI:  Objection to form.
10      THE WITNESS:  Welfare guidelines is a broad
11  series of management tools that does not just
12  include cage density, but cage density is one of the
13  issues that can contribute to this.
14      So -- go ahead.
15  BY MR. OLSON:
16      Q  And one of the things that welfare
17  guidelines could be used for is to manage supply?
18      MR. TAKENOUCHI:  Objection to form.
19      THE WITNESS:  That is an outcome of
20  managing cage density, would be to manage the flock
21  size, but it's also a way of managing the flock's
22  health and welfare and other issues that are in
23  demand by the industry, by the people associated
24  with the industry.
25  BY MR. OLSON:

---

**39**

1      Q  Now, you -- we were talking about factors
2  that impact national egg supply and we've been
3  talking about cage density.
4      I take it, as a result of your work in the
5  industry, you identified other factors that would
6  affect national egg supply; is that right?
7      A  Yes.
8      Q  And let me identify a factor, and you let
9  us know if it's one you identified as playing a
10  major role --
11      A  Yes.
12      Q  -- in affecting national egg production.
13      The degree of flock recycling, is that a
14  factor?
15      A  Yes.
16      Q  And that refers to the molting process,
17  correct?
18      A  Recycling means molting, yes.
19      Q  And as part of your work, you recognized
20  that molting could be a way of impacting national
21  egg production?
22      MR. TAKENOUCHI:  Objection to form.
23      THE WITNESS:  That would not be the goal of
24  anything I've ever done on molting.  The goal of
25  using molting is to reduce costs and, therefore,

---

**40**

1  improve margins for the individual producers.
2  BY MR. OLSON:
3      Q  But you recognize that molting also
4  affected output, right?
5      A  Everything affects output.
6      Q  Molting does?
7      A  Go ahead with the rest of them, but
8  everything affects output.
9      Q  Including molting, right?
10      A  Yes, up and down.
11      Q  But, in general, your work indicated to you
12  that using molting affected output down?
13      MR. TAKENOUCHI:  Objection to form.
14  BY MR. OLSON:
15      Q  Right?
16      A  One of the outcomes of the replacement
17  program which includes molting, is average egg
18  production will be less.
19      Q  And were there times when UEP, as part of
20  its efforts to address supply issues, would
21  recommend early molting programs to its members?
22      MR. TAKENOUCHI:  Objection; lacks
23  foundation.
24  BY MR. OLSON:
25      Q  To your knowledge?

---

**41**

1      A  Yes.
2      Q  And what is the purpose of recommending an
3  early molting program in order -- how does that
4  relate to managing supply?
5      MR. TAKENOUCHI:  Objection; foundation.
6      THE WITNESS:  When you molt chickens, that
7  particular flock goes to zero production.  And if
8  the country is overproducing, then a number of
9  farmers going to zero production over given a period
10  of time is beneficial to the industry because it
11  reduces egg members.
12  BY MR. OLSON:
13      Q  Is there an additional way that molting can
14  be used to manage supply, other than that period
15  when there is zero production?
16      A  The average rate of lay would be about 10
17  percent less year in, year out.
18      And if we have 10 percent too many
19  chickens, that's one way of remedying that problem.
20      Q  So would it be fair to say that in times of
21  low margins in the egg industry, molting can make
22  economic sense?
23      A  Absolutely, yes, yes.
24      Q  Thank you.  But in terms of high profits,
25  high margins, molting makes less sense?

---

11 (Pages 38 to 41)

**HIGHLY CONFIDENTIAL**

**42**

1    A  Well, the answer is yes.
2    Q  Now, as far as other factors that affect
3 the size of national egg production, how about the
4 age of hens?
5    A  Yes.
6    Q  How does that affect the size of national
7 egg production?
8    A  Well, the older the chickens, the fewer the
9 eggs.
10       And so if you do molt, you're going to
11 increase their average age by 30 or 40 weeks, which
12 is considerable.  Or if you let your flocks go
13 without molting, you're going to keep them for a
14 longer period without molting, and so the same thing
15 is going to happen.
16    Q  And how about the use of exports, can that
17 have a large impact on national egg production?
18       MR. TAKENOUCHI:  Objection to form.
19       THE WITNESS:  Yes.
20 BY MR. OLSON:
21    Q  And how does the use of exports affect the
22 size of national egg production?
23    A  Well, the current problem in Mexico is a
24 prime example.  They are short of eggs because of a
25 disease problem.  They go to their neighbor, the

**43**

1 United States, and buy eggs.  And when you take eggs
2 off the market, your market goes up.
3    Q  And, to your knowledge, did UEP, or
4 affiliated groups with UEP, engage in exports for
5 that reason?
6       MR. TAKENOUCHI:  Objection to form,
7 foundation.
8       THE WITNESS:  I can't tell you the motive
9 of UEP or their organizations to do that.
10 Obviously, there are eggs that don't move on the
11 local market and, therefore, new markets have to be
12 sought.
13 BY MR. OLSON:
14    Q  And, really, I'm just trying to ask a
15 question about your level of knowledge.  How
16 knowledgeable were you about UEP or USEM's export
17 practices?
18       MR. TAKENOUCHI:  Objection to form.
19       MR. OLSON:  What's the objection?
20       MR. TAKENOUCHI:  Compound.
21       THE WITNESS:  Just what I read in the trade
22 press.
23 BY MR. OLSON:
24    Q  Fair enough.
25       Now, based on your work in the egg

**44**

1 industry, you understood that the egg industry could
2 make more money with fewer birds, right?
3    A  Yes.
4    Q  That's something you mentioned before
5 today, right?
6    A  Yes.
7    Q  And that's a fact that you would stress to
8 UEP and its members?
9    A  Yes.
10    Q  Now, as part of your work for the egg
11 industry, did you also come to understand that
12 increasing floor space allowances could be difficult
13 for an individual producer on its own to justify?
14    A  Yes.
15    Q  Because if a producer just increases floor
16 space allowances on its own, that might reduce its
17 profits, right?
18    A  Reduces volume of production, yes.
19    Q  But did you also recognize that increasing
20 floor space allowances could be justified for a
21 producer if it knew that a significant number of
22 other producers were also going to do it?
23       MR. TAKENOUCHI:  Objection to form,
24 speculation.
25       THE WITNESS:  First of all, if you take the

**45**

1 range of modifying your density from low to high,
2 you can go too far on either end, too few or too
3 many.
4       My concern in evaluating this is what does
5 it return for dollar invested.  And four birds in a
6 three-bird cage is too many, one or two birds is too
7 few.  So the answer is yes and no.
8       To the individual, the industry is mainly
9 interested in modifying the total population, and
10 they have to have individual people to cooperate and
11 do that.
12 BY MR. OLSON:
13    Q  But I just want to focus on this problem of
14 increasing floor space allowances across the
15 industry.
16    A  Sure.
17    Q  It might be good for everyone in the
18 industry, as long as you don't go too far, right?
19       MR. TAKENOUCHI:  Objection to form.
20 BY MR. OLSON:
21    Q  Is that the point you were making?
22    A  Each farmer has to judge for his own sake.
23       You would only benefit three eggs per bird
24 if you reduce your density.  I might be involved in
25 20 eggs.  Your answer is different than my answer.

**12 (Pages 42 to 45)**

**HIGHLY CONFIDENTIAL**

---

46

1      The nation has to look at the averages.
2   And if someone is going to recommend, such as myself
3   or UEP or anyone else that's in the advisory
4   business, you have to be talking to the average
5   company.  And the average is not necessarily for you
6   or for him.  But, using a model, computer model,
7   what have you, you can say that, well, on the
8   average, it doesn't pay to put the fourth bird in
9   the cage.
10      Q   Okay.  So let's say that recommendation is
11  made.  Now, looking at the individual -- an
12  individual producer, if they are worried that they
13  are going to do it but they are going to be the only
14  one to do it, that may be hard to justify because
15  they're reducing their volume but not getting a
16  larger benefit, fair?
17      A   Uh-huh.
18      MR. TAKENOUCHI:  Objection to form.
19      MR. OLSON:  You have to say yes.
20      MR. GODLSTEIN:  Say yes.
21      THE WITNESS:  Yes.
22  BY MR. OLSON:
23      Q   But that same producer might be more
24  willing to follow that recommendation if it knew
25  that a large percentage of the industry was also

---

47

1   going to do it, fair?
2      MR. TAKENOUCHI:  Objection to form,
3   speculation.
4      THE WITNESS:  They are all competitors to
5   each other, and they don't want a different set of
6   rules for me than for you.
7   BY MR. OLSON:
8      Q   So the answer is that is fair, one might be
9   more willing to do it if you knew that others were
10  going to do it as well?
11      MR. TAKENOUCHI:  Objection to form.
12      THE WITNESS:  I think that would -- yes,
13  the answer is yes.
14  BY MR. OLSON:
15      Q   And that's one of the problems that faced
16  UEP in working with its members to manage egg
17  supply, right?
18      A   Yes.
19      Q   In other words, if an individual producer
20  is doing it on its own, it might be against its
21  self-interest to increase floor space allowance, but
22  would be in its interest if it was done jointly
23  across the industry?
24      MR. TAKENOUCHI:  Objection: misstates prior
25  testimony.

---

48

1   BY MR. OLSON:
2      Q   Is that fair?
3      A   It would be, quote unquote, more fair if
4   everyone followed exactly the same rules.  But it's
5   not economically fair to impose a rule on you when
6   you don't need that rule or to me when I do.
7      Q   Maybe my use of the word "fair" was
8   confusing the question.  I'm sorry.
9      A   Okay.
10      Q   I'm asking if I'm describing the problem
11  fairly.  And the problem facing UEP is that you want
12  to increase floor space allowance to manage egg
13  supply.  It's not in an individual producer's
14  self-interest to do that on its own, but it might be
15  if producers were doing it jointly?
16      MR. TAKENOUCHI:  Objection: lacks
17  foundation, speculation.
18      THE WITNESS:  I think you have a very
19  difficult question there, because in all degrees of
20  fairness or current experiences, cage density, you
21  only get three eggs, I get 20, that's why we analyze
22  each company by itself.
23      And then once you have all that knowledge
24  of all these companies, you never have a hundred
25  percent, of course, as you know, but you say, well,

---

49

1   this is the rule of thumb or this is what most
2   people are doing and they are going down the wrong
3   path.  For their personal success or failure, if
4   they are going down the wrong track, if you use the
5   model.
6      But this person over here, that's an
7   exceedingly good manager or this person is a
8   terrible manager, they have totally different
9   reactions.  These people over here will go broke --
10  bankrupt.  These people over here may make a very
11  good living.  So it's a matter of audience.  And
12  when I use the word "average," there really is no
13  such thing.  But you do have variable audience out
14  there that these things we are talking about affect
15  everybody differently.
16  BY MR. OLSON:
17      Q   Did you have ideas for how UEP could help
18  egg producers manage egg supply jointly?
19      MR. TAKENOUCHI:  Objection to form.
20      THE WITNESS:  Clarify your question.
21  BY MR. OLSON:
22      Q   Did you have ideas for how UEP could help
23  egg producers work together to manage egg supply?
24      MR. TAKENOUCHI:  Same objection.
25      THE WITNESS:  Well, I've used the

---

13 (Pages 46 to 49)

HIGHLY CONFIDENTIAL

**50**

1  expression persuasion as opposed to regulation.
2  There are examples of regulation where you and I
3  both must do the same thing. Europe is a good
4  example of that going on right now. Cages are
5  disallowed in countries that still wish to run
6  cages.
7       So persuasion without penalty is a pretty
8  good tool. If you can do it by friendship and
9  relationship, if you can do it by example, but
10  you're trying to persuade people to look at their
11  books, look at their records, look at it from this
12  viewpoint and this viewpoint. Are you considering
13  taxes, are you considering labor costs, and so on.
14  So persuasion and education is a very important part
15  of this.
16  BY MR. OLSON:
17     Q  Do you recall making a recommendation that
18  UEP take a stronger stand on the issue of space
19  allowances?
20     A  Sure, yes.
21     Q  And what was the reason for that
22  recommendation?
23        MR. TAKENOUCHI: Objection to form.
24        THE WITNESS: Because I know that if we
25  reduce the number of birds in the United States,

**51**

1  that the egg producers in the United States will
2  have a more profitable relationship, set of results.
3       I've looked at costs and income and profits
4  for 55 years, and I've done studies every year for
5  55 years, so I feel like I have a feel for the
6  general health of this industry. And, therefore, I
7  think I'm entitled to use my experience to make
8  recommendations.
9        (Deposition Exhibit 2 was marked for
10        identification by the court reporter
11        and is attached hereto.)
12  BY MR. OLSON:
13     Q  Let me hand you what we've marked Bell 2.
14     A  Sure. Yeah, I've seen this.
15     Q  Okay. Just give me a moment here.
16        And Bell 2 is Bates-stamped, for the
17  record, BELL-D-00031284 through -31295.
18        Mr. Bell, can you identify this document
19  for us: in other words, just generally describe what
20  it is?
21     A  This is, obviously, a speech and these are,
22  obviously, slides, and it was done in 1992, and I
23  don't know where.
24     Q  And the title of this speech was "Managing
25  the Nation's Laying Flock"?

**52**

1     A  That's true.
2     Q  And that's the topic you spoke on over the
3  course of your 55 years, correct?
4     A  Yes.
5     Q  So we touched on a lot of these issues, but
6  I just wanted to go over a couple of them.
7        Let's look at slide 8 on the second page.
8  The slide is entitled, "Production Change vs Egg
9  Income"?
10     A  Yes.
11     Q  And there is a little graph here, and the
12  reference to a 1:4.5 ratio.
13        Can you just describe what information is
14  conveyed on slide 8?
15     A  This is titled, "Production Change vs Egg
16  Income," and then it says, "(1:4.15 ratio)."
17        It says that for each 1 percent change in
18  production, that the egg price will change in the
19  opposite direction 4 1/2 percent. Percent, not
20  cents. Percent, not cents. And then the graph
21  depicts that relationship.
22     Q  So, in other words -- okay. Fair enough.
23  Let's move on.
24        Let's look at slide 14 titled "Factors" --
25     A  14?

**53**

1     Q  Yes. It is titled, "Factors Which Have
2  Largest Impact on National Egg Production."
3     A  Uh-huh.
4     Q  And listed are "Cage Density," "Flock
5  Recycling," "Age" and "Exports."
6        Do you see that?
7     A  That's where you got your questions from.
8     Q  And we discussed those factors already,
9  right?
10     A  Yes.
11     Q  Under "Exports" you wrote, "'Release valve'
12  for surplus production."
13        Can you explain what that means?
14     A  Release valve is when pressure gets a
15  little high -- a little too high for your cooking or
16  whatever it is you're running a plant of some kind.
17  Release valve allows some of the volume to escape,
18  and I guess that's why I used that term.
19     Q  And was that something that was practiced
20  in the U.S. egg industry, to your knowledge?
21        MR. TAKENOUCHI: Objection to form.
22        THE WITNESS: The percentage of eggs that
23  have gone overseas, which includes Mexico, it's
24  usually the Asian market, and we have product eggs,
25  as well as shellings.

14 (Pages 50 to 53)

**HIGHLY CONFIDENTIAL**

---

54

1      Historically, it's been about 2 percent.
2  That's not much, but if you apply that 2 percent to
3  the formula that we just looked at, it becomes 9,
4  doesn't it?  4 1/2 times 2.
5  BY MR. OLSON:
6      Q.  Right.
7      A.  That 2 was the total.  If you change the 2
8  to the 4 and increase your exports, that's what
9  we're talking about.
10      Now, nobody says our eggs have to stay
11  within our boundaries, because that's a market too,
12  t-o-o.  And, therefore, individual companies will
13  choose that market, especially if the price is
14  depressed.
15      Q.  All right.  Let's look at slide 37.  It is
16  titled "Supply Management Systems."
17      A.  37?  Okay.
18      Q.  Are you there?
19      A.  Uh-huh -- yes.
20      Q.  And I think we've touched on some of these
21  points as well.  Here you lay out in bullet form
22  four different supply management systems, right?
23      A.  Yes.
24      Q.  The first one is "Quota schemes," and you
25  say that they've usually failed; is that right?

---

55

1      A.  Yes.
2      Q.  The second one is "Voluntary -
3  Self-Interest."  The third is "Guidelines," it says
4  "(e.g. welfare)"?
5      A.  Yes.
6      Q.  And the last one is, "Persuasion based upon
7  sound data," and it says, "e.g. UEP"?
8      A.  Yes.
9      Q.  The point you're making, particularly the
10  last bullet, is that as of this time, early 1990,
11  UEP, UEP supply management system, was a
12  persuasion-based approach using data?
13      MR. TAKENOUCHI:  Objection to form,
14  foundation.
15      THE WITNESS:  Not exclusively.  I think
16  they were involved -- this would also be involved in
17  voluntary -- I think they would also be involved in
18  guidelines.
19  BY MR. OLSON:
20      Q.  Okay.  And here is a place where you're
21  pointing out that welfare guidelines can be used as
22  a supply management system, correct?
23      MR. TAKENOUCHI:  Objection to form.
24      THE WITNESS:  I'm not giving you a -- I'm
25  not weighting these or they are not in any

---

56

1  specific -- well, they are in a specific order.  But
2  I'm not giving more weight to one versus the other,
3  I guess, is what I'm trying to say.
4      The welfare question has certain natural
5  outcomes, many outcomes, positive and negative.  And
6  so I don't want you to get the opinion that that's
7  the only reason why we have welfare.
8  BY MR. OLSON:
9      Q.  We're going to get into those.
10      A.  Okay.
11      Q.  But I just wanted to -- as far as the
12  information being conveyed on this slide 37 --
13      A.  Basically, yes.
14      Q.  -- in the early 1990s was one possible
15  supply management system using welfare guidelines?
16      A.  That's an example, yes.
17      Q.  And that's something that you recognized at the
18  time, right?
19      A.  Yes.
20      Q.  And is that something that you discussed
21  with the folks at UEP, like Mr. Gregory or Al Pope?
22      MR. TAKENOUCHI:  Objection; form.
23      THE WITNESS:  This was written in 1992,
24  right?  When did Mr. Gregory come on board?
25      I'm not supposed to ask questions.

---

57

1  BY MR. OLSON:
2      Q.  You know, that's a fair one, and I should
3  know.  Maybe we'll try to get the answer to that for
4  you.  But I'm referring to at any time.  Speak at
5  any time.
6      A.  Ask the question again.
7      Q.  Okay.  This idea of using welfare
8  guidelines as part of a supply management system, is
9  that one you recall discussing at any time with
10  Al Pope or Gene Gregory?
11      MR. TAKENOUCHI:  Objection; form.
12      THE WITNESS:  Well, the fact that it's here
13  in this document and then they receive this document
14  and they may send this document to their membership
15  and they have a board of directors.  So I would
16  expect this particular slide, as you selected this
17  particular slide, to be discussed.
18  BY MR. OLSON:
19      Q.  And is it possible that on other occasions
20  you would have discussed that topic with UEP
21  officers or its board of directors?
22      MR. TAKENOUCHI:  Objection; form,
23  speculation.
24      THE WITNESS:  This slide?
25  BY MR. OLSON:

---

15 (Pages 54 to 57)

**HIGHLY CONFIDENTIAL**

58

1    Q   No, just that concept.
2    A   That concept?
3        MR. TAKENOUCHI:  Objection to form.
4        THE WITNESS:  Well, I know what you're
5   driving at, but --
6   BY MR. OLSON:
7    Q   Well, I'm actually just wondering, and it's
8   fair whenever I ask a question to say "I just don't
9   recall."  I asked you a question if you recall
10  discussing it.  You pointed to a slide --
11   A   I don't have a photographic memory.
12       MR. GODLSTEIN:  Don, you're doing a great
13  job, but try to remember what Steig said to you
14  about not talking over him when he's talking, and
15  he'll do the same for you, so we don't drive our
16  court reporter crazy.  Okay?
17       THE WITNESS:  Thank you.
18       In the conversations with UEP officials
19  and/or members, board members, or just plain old
20  members, I'm sure we spelled out that if you do this
21  from a welfare standpoint, that it's going to have
22  effects on price.
23       And if you allow 67 square inches -- are
24  you familiar with that number?
25  BY MR. OLSON:

59

1    Q   Yes.
2    A   And Don Bell says you should give them 72,
3   you know there's -- or the other direction, that you
4   can affect it up or down, the results, because
5   Don Bell is not going to say that 72 is the number,
6   nor is the welfare committee or anything like that.
7       So I hope, in my discussions with UEP, that
8   the principles will be on the table and that we will
9   give an equal fairness to too many chickens or too
10  few chickens, because they are both involved.
11   Q   And would it be fair to say that you
12  recognized at some point that the primary way to
13  reduce nationwide chick hatch was through a
14  long-term cage space program?
15       MR. TAKENOUCHI:  Objection to form.
16       THE WITNESS:  Cage space program, is that
17  what you said?
18       Hatches hasn't even come into the
19  discussion yet, so you brought it in there.
20  BY MR. OLSON:
21   Q   Okay.  Sorry.  We're just talking about
22  nationwide egg production.
23       Would it be fair to say that, based on your
24  work, at a certain point you recognized that the
25  primary way the industry could manage nationwide egg

60

1   production was to use a long-term cage space
2   program?
3    A   That's one of the easiest ways, easiest to
4   demonstrate.
5    Q   Just to pause there, do you recall
6   approximately when you reached the conclusion that
7   that would be one of the easiest ways to accomplish
8   that goal?
9    A   Well, the question of optimum cage space,
10  one of the outcomes is it is going to change the
11  volume of eggs.  And we've already discussed the
12  volume of egg relationship to egg price.
13       So the very first experiment I did in the
14  early '60s that showed a dramatic difference in egg
15  numbers, but from the same cage, that's the start of
16  a 55-year recommendation, and it still exists today.
17   Q   And was there a time when you concluded
18  that in the United States an industry-wide program
19  involving cage space guidelines was the best way to
20  manage U.S. egg supply?
21       MR. TAKENOUCHI:  Object to form.
22       THE WITNESS:  It would result -- it would
23  get results the fastest, it would be the easiest to
24  apply, but everyone wouldn't be in agreement with
25  it.

61

1   BY MR. OLSON:
2    Q   And were these concepts about that type of
3   approach being fast and easy to apply ones that you
4   discussed with UEP and its officials from time to
5   time?
6    A   Yes, uh-huh.
7    Q   Now, we've talked about animal welfare
8   briefly.
9        MR. GODLSTEIN:  Steig, before we go on,
10  we've been going about an hour now.  Would this be a
11  convenient time to take a ten-minute break?
12       MR. OLSON:  Sure, if the witness would like
13  that, that would be fine.
14       MR. GODLSTEIN:  Thanks.
15       THE VIDEOGRAPHER:  We are off the record.
16  The time is 11:00 a.m.
17       (Recess.)
18       THE VIDEOGRAPHER:  We are back on the
19  record.  The time is 11:15 a.m.
20       MR. GODLSTEIN:  So let's go for another
21  hour or so, and then at that point I'd like to step
22  out with Mr. Bell and see where we are and whether
23  we can keep going a little longer or what, and then
24  we'll make a decision at that point.  Okay?
25       MR. OLSON:  Absolutely.

16 (Pages 58 to 61)

**HIGHLY CONFIDENTIAL**

---

**62**

1  Q  Mr. Bell, if you don't even make an hour
2  and want to break before then, let us know.
3  A  Keep at it.
4  Q  Okay.  Now, before the break, this concept
5  of chick hatch came up.  Now, is one way to reduce
6  egg supply focusing on reducing chick hatch?
7  A  Yes.
8  Q  And what is -- generally speaking, what is
9  chick hatch reduction?
10  A  Chick hatch is adult chickens six months
11  pre, prior to the adult chicken.  So it takes six
12  months to grow.  So if you have an indication that
13  you have an increase in chick hatch, this is also an
14  indication you're going to have more adult chickens
15  six months later.
16  And so it was given a lot of attention in
17  earlier years, the direction of chick hatch, but
18  there are so many factors -- if a person is going
19  broke, he doesn't buy as many chicks, and that's the
20  same as the total volume, it's the whole industry.
21  If the industry is in trouble, they won't buy as
22  many chicks.  They don't buy as many chicks, and
23  that's what gives us cycles.  The cycle in the
24  industry is about five years, and that's why we talk
25  about five-year averages, because that's the period

---

**63**

1  of time when you have to consider all these issues.
2  Q  And was this a challenge in the industry,
3  how to try to address the cyclical nature of chick
4  hatch and egg production?
5  A  It is a cyclical fact of life, and you
6  can -- I've got charts I've used in my speeches
7  where you can see a profitable industry, too many
8  chicks, too many adults, too many eggs, an
9  unprofitable industry and then back around.
10  And so this has got to be realized, because
11  it is a cyclic industry.  You can't just look at one
12  year at a time and say it means anything.
13  Q  Now, did you give some thought as part of
14  your work for the egg industry on how to overcome
15  the cyclical nature and have a long-term solution to
16  the supply issue?
17  A  Yes, we've made a proposal with UEP and
18  presented at one of their meetings about quotas.  A
19  quota is a regulatory concept.
20  Q  And --
21  A  Go ahead.
22  Q  And aside from quotas, did you have other
23  ideas about how to address the long-term solution
24  for the supply issue?
25  A  The entire list that you have copies of

---

**64**

1  factors affecting egg price, all of these have to be
2  considered collectively.
3  Q  And when you refer to that list, you're
4  referring to the list in Bell Exhibit 2, the slide
5  you prepared in the early '90s?
6  A  Which one was it?
7  Q  Exhibit 2, slide 37?
8  A  37.  That and other documents that you
9  folks all have.  You came to my house and took all
10  my documents, remember?
11  Q  We didn't take all your documents.
12  A  Oh, yes, you did, you did.  You searched
13  under my carpet.
14  Q  We'll hold that to one side.
15  A  Okay.
16  Q  Would it be fair to say that one way that
17  was discussed to provide a long-term solution to the
18  supply issue was to have a long-term cage space
19  program?
20  MR. TAKENOUCHI:  Objection to form.
21  THE WITNESS:  I'm sure it was discussed by
22  some people.  I don't -- I'm trying to think if I
23  did it.  You want to know if I did it?
24  BY MR. OLSON:
25  Q  Yes, if you were involved in the

---

**65**

1  discussions.
2  A  Well, obviously, I am concerned about
3  managing the nation's laying flock from the
4  standpoint of the health of the industry.  And if
5  that's one -- we listed four of them over here, or
6  whatever it is, there is a longer list someplace
7  else that you've got.  Many, many, many factors.
8  Anything that the farmer does to reduce
9  cost or increase income, bird numbers are involved.
10  Q  All right.  Let's talk about the --
11  actually, another issue came up before the break.
12  You were talking about cage sizes, and you mentioned
13  67 inches versus 72 inches.
14  A  Right.
15  Q  Now, you were a member of the Scientific
16  Advisory Committee, correct?
17  A  Yes.
18  Q  Why didn't the Scientific Advisory
19  Committee just insist on a minimum of 72 inches for
20  every hen?
21  MR. TAKENOUCHI:  Objection: leading.
22  THE WITNESS:  The optimum numbers battered
23  around the industry worldwide and the United States
24  varies from 150 inches to 50 inches.  So the
25  committee -- now we're talking about the industry

---

**17 (Pages 62 to 65)**

**HIGHLY CONFIDENTIAL**

---

66

1  advisory committee, right?
2  BY MR. OLSON:
3      Q   We'll call it the Scientific Advisory
4  Committee --
5      A   Scientific, that's fine.
6          Several people were assigned this question,
7  to take a look at the research.
8          Well, the research is just enormous on this
9  question.  And all the answers aren't the same.
10     Q   But no one is really -- there's no
11 reputable research saying 50 inches is optimal for
12 the welfare of hens, is there?
13         MR. TAKENOUCHI:  Objection to form.
14         THE WITNESS:  I said economically optimal.
15 BY MR. OLSON:
16     Q   Oh, economically optimal?  Understood.
17     A   Most of the research went on pre humane
18 society, if you understand what I'm talking about.
19 All the research that went on before that had to do
20 with production efficiencies, economics, how many
21 eggs, you know, mortality, all those things.
22         The human society insisted that you needed
23 to bring in welfare issues, such as frustration,
24 peck order, a totally different ball game than I was
25 involved with.

---

67

1          We had measurable things.  I don't know
2  whether you're frustrated right this moment or not,
3  you see, we're supposed to do that with the chicken.
4  I can't tell humans if they are frustrated or if
5  you're high on the peck order or low on the peck
6  order.  But there is about 20 different behavioral
7  characteristics that the scientists who work in that
8  area are concerned about.
9          Well, on the advisory committee we had one
10 or two that had that background.  I didn't have that
11 background.  I didn't -- I was only interested in
12 egg numbers, egg size, mortality and what it all
13 meant economically.
14     Q   And is that why you were chosen for the
15 Scientific Advisory Committee, to your knowledge?
16         MR. TAKENOUCHI:  Objection; foundation.
17         THE WITNESS:  I was asked to be on the
18 committee by UEP.
19 BY MR. OLSON:
20     Q   By who at UEP?
21     A   Good question.  Gene or Al, I'm not sure
22 which.  The rest of the committee was appointed by
23 the appointed chair.
24     Q   And what do you recall about being asked by
25 UEP to be on the committee?

---

68

1      A   What do I recall?
2      Q   I mean, do you recall the conversation, do
3  you recall how it happened, do you recall anything
4  about it?
5      A   No.  It's just a long-term relationship
6  with these people, all the way to the farmer, that
7  they endorsed me to be on the committee and they
8  wished me to be on the committee because of my
9  experience.
10     Q   Your experience with economic issues?
11     A   All issues, all the welfare issues, except
12 for these frustration issues, yeah.
13     Q   That's what I want to understand.
14     A   I mean, density, molting, beak trimming,
15 housing, all those issues.
16     Q   If we talk about density, for example --
17     A   Sure.
18     Q   -- did you have experience on how density
19 would affect the welfare of the chicken?
20         MR. TAKENOUCHI:  Objection to form,
21 definition of "welfare."
22         THE WITNESS:  It is what you include in the
23 welfare.
24         As far as frustration is concerned, no.  As
25 far as egg numbers are concerned, yes.  As far as

---

69

1  mortality -- mortality is a welfare issue, and
2  mortality, yes.
3  BY MR. OLSON:
4      Q   Okay.  So your experience with those types
5  of issues that you --
6      A   Measurable issues.
7      Q   Measurable and economic issues?
8      A   Yes.  Together, yes.
9      Q   All right.  Now, wouldn't it be fair to say
10 that from the standpoint of the hen, a minimum of 72
11 inches is required to let a hen do any of the
12 natural behaviors that a hen does, like stretch its
13 wings?
14         MR. TAKENOUCHI:  Objection; leading.  It
15 doesn't distinguish between different types of hens.
16         THE WITNESS:  That question when you added
17 stretch their wings is a matter of physical size and
18 movability around the cage.  Part of the rules say
19 they can't even touch each other.
20 BY MR. OLSON:
21     Q   Which rule?
22     A   Part of the Proposition 2.
23     Q   Okay.  But I'm just talking --
24     A   I know you're not, but that's a welfare --
25     Q   Isn't the scientific consensus that for a

---

18 (Pages 66 to 69)

**HIGHLY CONFIDENTIAL**

70

1  hen just to stretch out its wings it needs a minimum
2  of 72 inches?  No?
3      A  No.
4      Q  Okay.  Now, over what period -- do you
5  recall when you started working on the Scientific
6  Advisory Committee?
7      A  Day 1.
8      Q  So this is sometime in 1999?
9      A  You have the record.
10     Q  I believe we have February 1999.  Does that
11 sound about right?
12     A  (No audible response.)
13     MR. OLSON:  I'll introduce that.
14     THE WITNESS:  When you are retired, years
15 go very fast.
16     MR. OLSON:  That's fair.
17         (Deposition Exhibit 3 was marked for
18         identification by the court reporter
19         and is attached hereto.)
20 BY MR. OLSON:
21     Q  Let me hand you what we marked Bell 3.
22 This was previously Gregory 6.
23     A  Thank you.
24     Q  It is a United Voices publication.
25         Mr. Bell, did you receive United Voices

71

1  publications?
2      A  Yes.
3      Q  All right.  And this publication is dated
4  February 22nd, 1999.
5         Do you see that?
6      A  Yes.
7      Q  And it refers to --
8      A  The first meetings.
9      Q  -- the first meeting, the February 12th and
10 13th?
11     A  Yes.
12     Q  Does that refresh your recollection about
13 when you started?
14     A  Yes.
15     Q  Now, this has a list of the members of the
16 Scientific Advisory Committee on the right-hand
17 side --
18     A  Yes.
19     Q  -- do you see that?
20     A  Yes.
21     Q  Is that an accurate list, to your
22 knowledge, of who the members --
23     A  At that time, yes.
24     MR. GODLSTEIN:  Just slow down a little bit
25 because you're jumping before he gets to finish his

72

1  question.
2      THE WITNESS:  Sorry.
3  BY MR. OLSON:
4      Q  So just to be clear, the members listed on
5  the right-hand side of this document, to your
6  knowledge, were the members of the Scientific
7  Advisory Committee as of February 1999, correct?
8      A  They were not the only members.
9      Q  Were there other members?
10     A  I don't remember when Bill Chase became a
11 member.
12     Q  Okay.
13     A  But Bill Chase was one of the early
14 members, and he was veterinarian from a private
15 company.
16     Q  But as of early 1999, at least these people
17 identified --
18     A  At least, yeah.
19     Q  -- were members of the committee, correct?
20     A  Right.
21     Q  Now, when you served -- you can put that
22 down.
23         When did you stop serving on the Scientific
24 Advisory Committee?
25     A  Isn't that part of the termination?

73

1      Q  Was that when you finally retired July 1,
2  2009?
3      A  Did it say anything about the committee?
4      Q  Yes, it does.  It says it will end your
5  role.
6      A  Yes, as a member of the Scientific Advisory
7  Committee, so that will be the date.
8      Q  So you served on that committee over
9  approximately early 1999 through July 2009, correct?
10     A  Sounds like ten years, right.
11     Q  About ten years.
12         During the period that you served on the
13 Scientific Advisory Committee, were you paid any
14 form of compensation by UEP?
15     A  I believe all I received was expenses to go
16 to the meetings, because I had no family otherwise.
17     Q  Mr. Bell, isn't it the case that you were
18 paid by UEP --
19     A  Oh, I was on retainer, of course.
20     Q  That's what I want to talk about.
21     A  You didn't ask it that way.
22     Q  Oh, sorry.
23         So during this period -- during most of the
24 period you were on the Scientific Advisory
25 Committee, you were on retainer by UEP?

19 (Pages 70 to 73)

**HIGHLY CONFIDENTIAL**

74

1    A   Yes.
2    Q   And as part of that retainer, you were paid
3  approximately $15,000 a year, correct?
4    A   Approximately, yes.
5    Q   Okay.  And you received compensation to
6  attend Scientific Advisory Committee meetings as
7  well?
8        MR. TAKENOUCHI:  Objection to form,
9  "compensation."
10       THE WITNESS:  Expenses were the only
11 additional to my retainer fee.  My retainer fee paid
12 for about two days of my time a month, and I gave
13 them a lot more than two days.
14 BY MR. OLSON:
15   Q   So when you say "expenses," you're
16 referring to things like travel expenses?
17   A   To get to Chicago, or wherever it was.
18   Q   As part of your work for UEP during that
19 period, you were -- did you also go on other trips
20 unrelated to the Scientific Advisory Committee?
21   A   Other trips?
22       MR. TAKENOUCHI:  Objection; misstates prior
23 testimony.
24       THE WITNESS:  About 400 of them.
25 BY MR. OLSON:

75

1    Q   Okay.  And UEP would compensate you for
2  those --
3    A   No, no, no.  The inviter would pay my
4  expenses to go to other meetings.  That's the
5  question you asked.
6    Q   Okay.  And from time to time UEP would
7  invite you to attend meetings?
8    A   To attend the annual meeting and make a
9  presentation.
10   Q   And you would be paid for that as well?
11   A   Just transportation, just the expenses.
12   Q   Okay.  What do you recall about what you
13 were told was the initial assignment of the
14 Scientific Advisory Committee?
15   A   I suppose it has a lot to do with
16 recommendations.
17   Q   And I don't want you to speculate at all.
18   A   Okay.  Okay.  All right.
19       No, I don't remember it at all.
20   Q   Okay.  Do you recall whether the mandate of
21 that committee changed over time?
22   A   The mandate of the committee?
23       MR. TAKENOUCHI:  Objection to form.
24       THE WITNESS:  The mandate, yes, changed
25 over time as we finished one section and added a

76

1  new.  For example, we started out with adult hens,
2  we then moved to growing pullets, which are younger
3  chickens, and then we went to alternative housing.
4  Alternative housing wasn't part of the original
5  mandate.
6        So there was four or five categories in the
7  original mandate, and as we -- I don't know what
8  they are talking about today, but the committee
9  still exists and they are addressing current issues,
10 I guess.
11 BY MR. OLSON:
12   Q   Now, let's talk about, particularly, the
13 early years of the committee.  How often would the
14 committee meet, generally?
15   A   Oh, I don't think more than twice a year,
16 maybe.
17   Q   And would those be in-person meetings?
18   A   In person?
19   Q   Yes.
20   A   Always.
21   Q   And was there any -- were there any formal
22 rules that you were aware of that governed how the
23 meetings would take place?
24   A   No.  Same kind of meeting as we have right
25 here.  We have a chairperson, and if somebody has

77

1  something to say, they raise their hand, I guess.
2    Q   So an open discussion?
3    A   An open discussion, right.
4    Q   Do you recall there being any procedure for
5  taking notes of those discussions or minutes of the
6  meetings?
7    A   We didn't have a stenographer, somebody --
8  I think the chair would ask somebody to take some
9  notes.  Or each of us had an assignment in the first
10 place, and you're supposed to bring copies of what
11 you're -- of what your report is.
12       If it is cage density, this person is
13 supposed to bring a report on cage density or
14 transportation or whatever it may be.
15       But as far as word for word or anything,
16 no.
17   Q   So if we wanted to look for a collection of
18 minutes or notes of the meetings, do you have an
19 idea of where we would look?
20   A   Well, I would assume UEP would have a file
21 on us.  I've got a partial file.  I don't -- I can't
22 store everything, but the chairperson probably has a
23 file, that would be Jeff Armstrong.  And UEP -- I
24 mean, if they are doing their business, they would
25 certainly have a file.

**20 (Pages 74 to 77)**

**HIGHLY CONFIDENTIAL**

---

78

1      Q   And a representative of UEP would always
2   attend the meetings; is that right?
3          MR. TAKENOUCHI:  Objection; form.
4          MR. OLSON:  Strike that.
5      Q   Would a representative from UEP attend the
6   meetings?
7          MR. TAKENOUCHI:  Objection to form.
8          THE WITNESS:  Most or all.
9   BY MR. OLSON:
10     Q   Was that Gene Gregory?
11     A   Most or all.
12     Q   Did you have an understanding of why
13  Mr. Gregory attended the Scientific Advisory
14  Committee meetings?
15         MR. TAKENOUCHI:  Objection to form,
16  foundation.
17         THE WITNESS:  Yes.
18  BY MR. OLSON:
19     Q   What was your understanding?
20     A   Wanted to see how we were progressing on a
21  multitude of topics.  Not just animal welfare, per
22  se, not just the cage density, per se, but the total
23  assignment of recommending the ways we handle our
24  chickens.
25     Q   And would Mr. Gregory participate in the

---

79

1   discussion of -- that occurred at these meetings?
2      A   I think he took a pretty low key -- he
3   didn't want to interfere with what we said, or he
4   certainly wouldn't tell us what to say.  We were a
5   bunch of people who each had 20, 30, 40 years of
6   experience doing research and communications and so
7   on, and I think he took a back seat.
8      Q   But from time to time would he share his
9   views?
10     A   He would do what?
11     Q   Share his views?
12     A   We knew his views because he had his
13  newsletter that you showed me here, and we all
14  received that.  And he's interviewed or given
15  speeches all over the place, so we have a pretty
16  good idea what his views were.
17     Q   And would he share those views from time to
18  time at the meetings?
19     A   With the committee?
20     Q   Yes.
21     A   He might report back to us that the UEP
22  board of directors or their Animal Welfare Committee
23  thinks you're being too hard on your recommendations
24  or that you haven't discussed this part of the
25  recommendation.  Sure, he would have comments, but

---

80

1   that wasn't -- that wasn't the big feature.
2      Q   Now, as part of your work on the Scientific
3   Advisory Committee, did you believe it was important
4   to be practical and realistic about the changes egg
5   producers were asked to make?
6      A   I'm always that way, yes.
7      Q   And you were that way on the committee as
8   well?
9      A   Yes.
10     Q   Did you believe, as part of your work on
11  that committee, that it was important to consider
12  how any changes would impact the profitability of
13  the industry?
14     A   Absolutely, yes.
15     Q   And as part of your work on the committee,
16  did you consider whether any changes would be
17  acceptable to egg producers?
18     A   Well, obviously, I gave a different weight
19  to each item.  Some I thought would be readily
20  acceptable by the industry, and they were, and
21  others I thought -- well, an example, 72 inches, as
22  you brought up, that was the opinion of one of our
23  committee persons who did the report that that's as
24  far as you have to go space wise.
25     Q   That that should be the minimum?

---

81

1      A   That should be the maximum.
2      Q   The minimum?
3      A   Maximum.
4      Q   You didn't set the maximum height --
5      A   Oh, pardon me.  That that number would be
6   the -- let me just think what you're saying here.
7      Q   Let me try it.
8      A   Go ahead.
9      Q   I think you're saying it is phased in over
10  time?
11     A   Yes, of course.
12     Q   There is an ultimate number.  Someone
13  thought that ultimate number should be 72?
14     A   I thought that our evidence showed that it
15  could go higher than 72, and I didn't win that
16  argument.
17         So the person who wrote this paper reviewed
18  all the literature she could find and decided that
19  67 would be the number.
20         Now I read in the press today that they
21  want to give one chicken per acre.
22     Q   And who is this person you're referring to?
23     A   Right now?
24     Q   No, when you said that --
25     A   That would be the person who did the

---

**21 (Pages 78 to 81)**

**HIGHLY CONFIDENTIAL**

---

**82**

1  report, Joy Mench.
2      Q   Just to be clear, you believe Ms. Mench
3  said that --
4          MR. GODLSTEIN:  Doctor.
5  BY MR. OLSON:
6      Q   Doctor, thank you.
7          Dr. Mench said the number in the guidelines
8  should not be 72, it should be 67?
9      A   67.  That's where she plateaus the response
10 of the chickens.  Nobody has worked with the 140 or
11 150.
12         Europeans, they have rules of that nature,
13 but we are now talking about colony cages, and
14 nobody has worked with, nobody has -- when I say
15 they haven't worked with them, they haven't done
16 statistically valid replicated studies with
17 replications.  Replications, meaning you repeat the
18 results, repeat the results, and you are consistent
19 with your answer.
20         People who do anecdotal-type things, I
21 don't pay attention to them.  They are not science.
22     Q   So how was this decision where you were
23 saying it should be 72 and she was saying it should
24 be 67, how was the decision ultimately made?
25     A   It was finally made to use the 67 inch.

---

**83**

1      Q   But what was the process of resolving that
2  dispute?
3      A   I suppose she took -- I don't know if she
4  took all the research she could pull together -- I
5  need to differentiate here between my research and
6  her research.  Okay?
7          But she pulled together all the published
8  data that she could find and plotted against
9  production, or whatever it was that she was looking.
10 I'm sure she didn't look at it from an economic
11 standpoint, because most scientists don't use the
12 dollar sign.  I do, and that's where my optimum
13 might be different than her optimum or maximum, or
14 whatever you want to say.
15         So my work, by the way, is not published as
16 often as her work, because she's used to publishing
17 in all the journals.  I publish in these newsletters
18 that you have right there in front of you.  That's
19 where I publish my results.
20         (Deposition Exhibit 4 was marked for
21         identification by the court reporter
22         and is attached hereto.)
23 BY MR. OLSON:
24     Q   All right.  Let me hand you what we've
25 marked Bell 4.

---

**84**

1      A   "When More Means Less."  Okay.
2      Q   This is a document that is Bates-stamped
3  KRGEG00020640 through -43, and is Pope Exhibit 3.
4          Are you familiar with this document,
5  Mr. Bell?
6      A   Yes, I wrote it.
7      Q   This is an Egg Economics Update that you
8  wrote in April of 1994?
9      A   Number 154, yes.
10     Q   And it is titled, "When More Means Less"?
11     A   Yes.
12     Q   And what is the point that you are making
13 here?
14     A   When we have more chickens, the industry
15 makes less money.  And it is all spelled out in the
16 graphics form.  That's the justification that's
17 stated.
18     Q   And the conclusion that you have here is
19 "that for each 1 million hen change," that is in the
20 number of hens, "prices change in the opposite
21 direction by about 1 cent per dozen"?
22     A   I don't see where you're seeing that, but
23 you should show me -- oh, here down at the bottom.
24 That's exactly right.
25     Q   All right.  You can put that aside.

---

**85**

1          (Deposition Exhibit 5 was marked for
2          identification by the court reporter
3          and is attached hereto.)
4  BY MR. OLSON:
5      Q   Let me hand you what we marked Bell 5.
6      A   Remember, that was written in 1994.  Okay?
7      Q   But I take it the fundamental conclusion
8  that you made in that point about more meaning less,
9  that never changed, right?
10         MR. TAKENOUCHI:  Objection to form.
11         THE WITNESS:  It changes individual years,
12 that's why I stress the need to look at five years
13 at a time.
14         So if you just take one year, that rule
15 doesn't apply.  You have to look at a series of
16 years.  And it's over time that that rule applies.
17         Now, with our egg prices today versus what
18 they were ten years ago, the answer is going to be
19 different because we have dollar eggs now and we had
20 50 cent eggs then.
21 BY MR. OLSON:
22     Q   Is the specific number of the change going
23 to be different, or is the conclusion about more
24 meaning less going to be different?
25     A   I think more meaning less will hold true

---

22 (Pages 82 to 85)

**HIGHLY CONFIDENTIAL**

---

86

1 forever, unless you have regulatory government
2 involvement, or something like that. But free
3 enterprise, I think, it holds forever.
4        What do we have here?
5    Q I've handed you what's been marked Bell 5.
6 It is Bates-stamped BELL-D-00032755.
7        And let me know when you've reviewed it.
8    A You want me to read it in detail?
9    Q Just skim it and let us know when you're
10 done.
11        MALE VOICE ON THE TELEPHONE: I'm sorry.
12 Can you repeat that number again, please?
13        MR. OLSON: BELL-D-00032755.
14        MALE VOICE ON THE TELEPHONE: Thank you.
15        THE WITNESS: Okay. I think I understand.
16 BY MR. OLSON:
17    Q Now, can you identify this as a letter you
18 sent to Al Pope on March 17, 1995?
19    A Yes, uh-huh.
20    Q And it refers to some UEP members bashing
21 molting.
22        Do you know what that's referring to?
23    A It's a controversial subject that everyone
24 went from no molting to practically everyone went to
25 molting.

---

87

1        And during that transition period there is
2 going to be considerable disagreement. And talking
3 about -- let's see.
4        "Molting is not responsible for
5 overproduction any more than feed is," that's sort
6 of my concluding sentence there in the middle of the
7 discussion.
8    Q I take it during this transition period
9 some people thought molting was the cause of
10 overproduction?
11    A Some people would blame everything but
12 themselves, of course, yes.
13    Q And the point you make here is that, in
14 fact, molting --
15    A Reduces costs?
16    Q -- reduces costs?
17    A But it lowers production as an outcome.
18 But what is the individual poultryman concerned
19 about? His profitability. And if he loses some
20 production, then he grits or bites his teeth, or
21 whatever you say, and says, well, that's just one of
22 the costs of molting. But the main thing is he
23 doesn't have to buy so many chickens.
24    Q And so for those reasons, you wrote to
25 Mr. Pope that you think UEP would do its membership

---

88

1 a much greater service by recommending an increase
2 in the use of molting rather than its elimination,
3 right?
4        MR. TAKENOUCHI: Objection to form.
5        THE WITNESS: That's what it says.
6 BY MR. OLSON:
7    Q And that was your view at the time?
8    A Do I still agree with it?
9    Q No. Was that your view at the time?
10    A That's what it says. That was my view,
11 yeah.
12    Q And molting -- at this time when you're
13 talking about molting you're talking about -- it's
14 called induced molting?
15    A That's the new term, yeah.
16    Q And that involves not giving a hen any feed
17 for a period of time?
18    A At that time, that was the way to do it.
19 And it's always been the best way, but it is also
20 more controversial.
21    Q And then you say, "another option would be
22 for UEP to take a stronger stand on the question of
23 space allowances."
24        Do you see that?
25    A Getting my longstanding recommendation,

---

89

1 again, to this person.
2    Q So your point is this is the type of
3 recommendation you made to Mr. Pope on multiple
4 occasions?
5    A I wouldn't just stop talking to him just
6 about molting if I had a chance to dig him on the
7 other.
8    Q And what did you mean by "UEP taking a
9 stronger stand on the question of space allowances"?
10    A This was written before the advisory
11 committee, right, 1997?
12    Q Right.
13    A That's the time limits. When it was
14 written was before any of these recommendations, 67
15 inches, any of that was brought forward.
16        So at that time people were going 48
17 inches, 45 inches. And, you know, that's way beyond
18 our analyses, economic or otherwise. And you could
19 lose 30, 40 eggs per bird.
20    Q What did you have in mind about UEP taking
21 a stronger stand on that question?
22    A In their persuasion capability with their
23 newsletters, wherever that one went, Industry Voices
24 it is called, to encourage people or persuade people
25 to take a harder look at your density question. If

---

23 (Pages 86 to 89)

HIGHLY CONFIDENTIAL

**90**

1  you look at the NAHMS study, N-A-H-M-S study, it was
2  a federal study of density across the United States,
3  and molting, by the way, and you see this wide range
4  of participation and, therefore, you have a lot of
5  opportunity for people going overboard or not doing
6  it enough and putting in too many chickens, putting
7  in too few chickens.
8      And it takes a national survey to
9  demonstrate that. And then if UEP is on the ball,
10  they'll say, well, this portion of our industry has,
11  obviously, gone too far.
12  Q  So this was written in mid-1995. Would it
13  be fair to say that by the end of the 1990s UEP was
14  prepared to take your advice to take a stronger
15  stand on the question of space allowances?
16      MR. TAKENOUCHI: Objection to form,
17  misstates prior testimony.
18      THE WITNESS: Well, the fact that they --
19  the fact that they put together an advisory
20  committee means they needed scientific evidence for
21  their recommendation. That's the way they looked at
22  it.
23      There was also extreme pressure from the
24  humane society that UEP do these -- make these
25  decisions. We've never satisfied the humane society

**91**

1  completely, but they are coming and at least talking
2  to each other.
3  BY MR. OLSON:
4  Q  But the cage space guidelines that UEP
5  ultimately put into place --
6      A  Yes.
7  Q  -- was an example of UEP taking a stronger
8  stand in this question of space allowances, right?
9      MR. TAKENOUCHI: Objection to form,
10  misstates prior testimony.
11      THE WITNESS: They -- they took the
12  intermediate road and got the outside specialists to
13  come in and study these issues, otherwise it
14  wouldn't have been done. So I think UEP did a
15  tremendous thing to pull the committee together, let
16  them do their work, make their recommendations and
17  follow them as much as they could.
18  BY MR. OLSON:
19  Q  And that was an example of UEP taking a
20  stronger stand on the question of cage space
21  allowances?
22      MR. TAKENOUCHI: Objection to form, asked
23  and answered, misstates prior testimony.
24      THE WITNESS: Yes, that was one of the
25  issues, yes.

**92**

1      (Deposition Exhibit 6 was marked for
2      identification by the court reporter
3      and is attached hereto.)
4  BY MR. OLSON:
5  Q  All right. Let me hand you what we marked
6  Bell 6.
7      So I'm really just focused on the first
8  page. I'll identify this as a document --
9      A  Which one is the first page? It says June
10  29th?
11  Q  No, the July 1, 1999.
12      A  That's the second one.
13  Q  It is Bates-stamped BELL-D-00026787 through
14  -88.
15      A  Okay.
16  Q  Mr. Bell, can you identify this as a fax
17  correspondence you received from Gene Gregory on
18  July 1, 1999?
19      A  Yes, that's one that I received, yes.
20  Q  And it refers to an emergency meeting of
21  UEP's marketing committee.
22      Do you see that?
23      A  Yes, I see that.
24  Q  From time to time did you attend meetings
25  of UEP's marketing committee?

**93**

1      A  I can't recall.
2  Q  Mr. Gregory asks, in connection with that
3  upcoming meeting, that you and Mr. Schrader prepare
4  something for UEP.
5      Do you see that?
6      A  Yes.
7  Q  And he describes it as a 12-month supply
8  plan to meet the market needs that provides a
9  reasonable return on investment.
10      Do you see that?
11      A  Yes, uh-huh.
12  Q  And how did you understand that request?
13  What was Mr. Gregory asking for, to your knowledge?
14      MR. TAKENOUCHI: Objection; foundation.
15      THE WITNESS: I have no recollection of
16  sending a report of this type to Gene Gregory, or
17  anyone else, unless there are components of it which
18  might have come out of some of our flock's modeling.
19  Our models tell us some of those answers, but I
20  don't find in my files anywhere this particular
21  response.
22      (Deposition Exhibit 7 was marked for
23      identification by the court reporter
24      and is attached hereto.)
25  BY MR. OLSON:

**24 (Pages 90 to 93)**

HIGHLY CONFIDENTIAL

94

1     Q   All right.  Well, let me hand you what we
2  marked Bell 7.
3     A   Okay.
4         That's from me.
5     Q   And you see it is dated the next day?
6     A   That's a pretty good response, isn't it?
7     Q   It's fast work.
8         So let me identify this for the record as
9  Bates stamp BELL007698 through -7709.
10    A   These are right out of my regular
11 newsletter.
12    Q   Okay.  Well, first, can you just identify
13 this document as one that you sent to --
14    A   Yes.
15    Q   -- Mr. Gregory on July 2nd, 1999, right?
16    A   Yes.
17    Q   And at the beginning you have some tables,
18 and those are the ones you're saying are right out
19 of your newsletter?
20    A   Yes.
21    Q   And if you keep paging through and get
22 through --
23    A   The last page?
24    Q   -- the second-to-the-last page --
25    A   Right.

95

1     Q   -- it is titled, "Estimated Break-even
2  Beginning Hen Inventory for 1999" --
3     A   Yes.
4     Q   -- "to 2000 for Break-even or Better
5  Situation."
6         Do you see that?
7     A   Yes.
8     Q   Have you reviewed this page?
9     A   No, I haven't read it, but it's, obviously,
10 an editorial add-on to the statistics pages.
11    Q   Okay.
12    A   So he asked us for the statistics and the
13 plan, and I sent him what was immediately available,
14 and in one day that is pretty fast.  And the rest of
15 it I sat down at probably 3:00 in the morning and
16 typed out my editorial about that.
17    Q   Okay.
18    A   And I haven't read it in years, so I don't
19 know --
20    Q   All right.  Let's look at that page.
21    A   Okay.  Go ahead.
22    Q   You're talking about how to achieve a
23 break-even or better situation?
24    A   Uh-huh.
25    Q   So that means either break even or make

96

1  some profits, right?
2     A   That's what it says, yeah.
3     Q   Okay.  If you look at the opening sentences
4  do you see where you say, "Correction in the size of
5  the nation's layer flock can be obtained by one of
6  several ways"?
7     A   Yes.
8     Q   And then under that you give four different
9  ways that the egg industry can correct the size of
10 its flock, right?
11    A   I have to read that.
12    Q   Please do.  Let me know when you're done.
13    A   Yeah, I read the four of them, yes.
14    Q   So you're giving four ways of correcting
15 the size of the nation's -- four ideas?
16    A   Right.
17    Q   And what's going on here is the industry is
18 facing extremely low egg prices --
19    A   I assume so.
20    Q   Well, in fact, you say that, right?
21    A   Okay.  I said it, that's fine.
22    Q   "Extremely low egg prices," so your idea is
23 to change supply to correct that problem, right?
24    A   Yes.
25    Q   Just looking at number 2, it says, "Extra

97

1  birds must be removed from the nation's flock
2  permanently."
3     A   Yes.
4     Q   What were you referring to there?
5     A   Surplus birds, over demand.
6     Q   Do what with surplus birds?
7     A   Get rid of them.
8     Q   How do you do them?
9     A   Kill them.
10    Q   Mr. Bell, do you find any irony in the fact
11 that while you were a member of the Scientific
12 Advisory Committee you were recommending just
13 disposing of hens?
14        MR. TAKENOUCHI:  Objection to form,
15 speculation.
16        THE WITNESS:  No, I have never been able to
17 separate my brain into 20 percent and 80 percent, so
18 I'm me.  And you get the whole thing.  I'm either on
19 the committee or my day-by-day life.  Since I'm paid
20 for two days of my time, I think I have 20 other
21 days that I can do whatever I want and think
22 whatever I want, write whatever I want, communicate.
23 Okay?  So, no, I don't -- I think this is totally
24 within my realm.
25 BY MR. OLSON:

25 (Pages 94 to 97)

**HIGHLY CONFIDENTIAL**

98

1     Q   Number 4 refers to an industry-wide policy
2   of a minimum floor space allowance that would result
3   in a more ideal national flock size?
4     A   Right.
5     Q   And that was a suggestion that you were
6   making at this time for UEP?
7     A   Yeah.
8     Q   And, in fact, UEP ended up adopting that?
9     A   No.  The 48 inches at that time was what 15
10  to 20 percent of the birds were kept, at less than
11  48 inches.
12        So I suggested here that if 48 were adopted
13  as the minimum space allowance, but you know what
14  happened is it became 67 eventually.
15    Q   It became a higher number?
16    A   Yeah.
17    Q   Right.
18    A   And I've recommended early stages 72.  72
19  square inches -- early stages of a recommendation,
20  but those recommendations change.
21    Q   But putting the specific numbers aside, the
22  gist of the recommendation here was to adopt a
23  minimum floor space allowance to help the
24  profitability of the industry?
25    A   Of course, yes.

99

1     Q   And the suggestion, as it's laid out here,
2   doesn't relate to animal welfare, right?
3     A   I wouldn't say that.
4     Q   Well, here there is no -- it's not being
5   suggested --
6     A   The word isn't used in there, not being
7   used in the text.
8     Q   The outcome of this suggestion is an
9   economic one?
10    A   That's what causes the suggestion, is that
11  the -- my experience with cage density shows that
12  that's an extreme that we shouldn't recommend.
13    Q   Now, if you turn to the next page, this one
14  is entitled, "A Twelve Month Supply Plan to Meet the
15  Market Needs that Provides a Reasonable Return on
16  Investment."
17        Do you see that?
18    A   Yes.
19    Q   And that's specifically what Mr. Gregory
20  asked you to prepare, correct?
21    A   That's part of the request, yes.
22    Q   Do you recall other times that Mr. Gregory,
23  or others in UEP, requested you propose plans for
24  managing egg output?
25    A   I would say frequently, because that was a

100

1   major issue, was that we have too many chickens.  So
2   that's always going to be a question, that's always
3   going to be a target.
4     Q   And in this one, again, you suggest that
5   molting should be included as part of a national
6   program, because that results in a lower level of
7   egg production, right?
8     A   Yes, of course.  Yes.
9     Q   Now, you talked about UEP making efforts to
10  persuade its members --
11    A   Uh-huh.
12    Q   -- and identified the newsletters
13  Mr. Gregory edited?
14    A   Uh-huh.
15    Q   Beyond the newsletters, to your knowledge,
16  what other types of efforts did UEP make to persuade
17  its members to manage egg supply?
18    A   Well, all of their programs are voluntary,
19  so I'm not just sure where voluntary comes into
20  persuasion.
21        You know, whether you reduce your bird
22  numbers, that was a voluntary decision on each
23  person's part.
24    Q   Were you ever at UEP meetings where members
25  were asked to sign commitment forms about following

101

1   programs, to your knowledge, to your recollection?
2     A   I don't recall it personally.  Of course,
3   the progress of having people participate was
4   reported in their newsletters, that we now have
5   50 percent, we now have 70 percent, we now have
6   90 percent.  And those -- that's all anybody really
7   needs to know.
8     Q   Why do you say that?
9     A   Because the rest of it is confidential
10  company information.  I don't want you to know that
11  I'm participating or not participating.
12    Q   By name?
13    A   By name.
14    Q   But it's helpful to know that others are
15  participating?
16    A   And that's where the 70 percent comes in,
17  the 80 percent comes in, yeah.
18    Q   And why is it helpful for an individual
19  producer to know that 70 percent or 80 percent of
20  others are participating?
21        MR. TAKENOUCHI:  Objection; foundation,
22  calls for speculation.
23        THE WITNESS:  You said that earlier.  You
24  want to know you're in step.  You want to know this
25  has a good chance of working.  It starts out in

26 (Pages 98 to 101)

**HIGHLY CONFIDENTIAL**

### 102

1  somebody's mind, and they put it down on paper and
2  they have a committee and eventually you get a --
3  what do you call it? --
4  BY MR. OLSON:
5      Q  Program?
6      A  No.
7      Q  Proposal?
8      A  Where everybody votes -- referendum.
9      You eventually have a referendum and you
10  may do a national referendum on some law, and laws
11  have been thrown out added to a national referendum.
12      But you don't want to put yourself out
13  there without having some idea what the industry is
14  doing as a whole.  And I think that kind of a
15  progress that we now have 50, we now have 70, that's
16  enough to encourage people to say, well, I guess I
17  should get on board too.
18      Q  Now, Mr. Gregory, you've worked --
19      A  I'm not Mr. Gregory.
20      Q  I apologize.
21      Mr. Bell, you've worked in the egg industry
22  for over 45 years?
23      A  Yes.
24      Q  And you've been affiliated with a variety
25  of organization that do work for the egg industry?

### 103

1      A  Yes.
2      MR. TAKENOUCHI:  Objection to form.
3  BY MR. OLSON:
4      Q  And you've worked for and done consulting
5  work for a number of individual egg producers?
6      A  Yes.
7      Q  What number would you put that at?
8      A  Well, it started out with a county, 400
9  producers with all of them.  You go statewide with
10  2,000 producers, I may work with 25 percent of them,
11  because they are too far away from my office.  Okay?
12      When I began as a statewide specialist,
13  then I started to branch out nationally, and now you
14  start to do newsletters to everybody, no -- getting
15  stuff out intentionally.
16      And then when I get to do international,
17  that involves organizations in other countries,
18  so --
19      Q  Now, in addition to this national work --
20      A  Yes.
21      Q  -- did you continue to do some consulting
22  for individual egg producers?
23      A  Yes.
24      Q  You've done that your whole career?
25      A  Whenever we get a request from somebody

### 104

1  that their barn burned down and they need some
2  values for their chickens, they get a hold of me,
3  because we've developed computer models to calculate
4  these things.  So I'm not the only person out there
5  giving advice, as you know.
6      (Deposition Exhibit 8 was marked for
7      identification by the court reporter
8      and is attached hereto.)
9  BY MR. OLSON:
10      Q  Let me hand you what's been marked Bell
11  8 -- actually, could you put that down for a moment.
12      A  Okay.
13      Q  Going back to Bell 7, these ideas that you
14  gave to Mr. Gregory --
15      A  Okay.
16      Q  -- do you recall specifically the ideas
17  about different ways to correct the size of the
18  nation's layer flock?  Do you recall discussing
19  these with Mr. Gregory or others at UEP after you
20  provided --
21      A  After I gave him this?
22      Q  Right.
23      A  Probably no.
24      Q  I'm just asking if you recall.
25      A  Well, I don't recall, no.

### 105

1      Q  All right.  Now I've handed you what we've
2  marked Gregory 8 -- Bell 8.  Sorry.
3      A  Which one are we looking at?  Molting?
4      Q  This is a UEP publication.  Let me read the
5  Bates number into the record.
6      It is UE0064456 through -64459.  It was
7  Gregory Exhibit 11.  That's why I have Gregory on
8  the brain.
9      All right.  Let me just first ask if you
10  can identify this as United Voices --
11      A  That's their regular every two weeks, I
12  believe it is.
13      Q  And you received these generally, correct?
14      A  I keep about half of them, throw half of
15  them away.
16      Q  All right.  So if you look at beginning at
17  the bottom right of the second page there is a part
18  that said, "Roller Coaster Egg Price Quotes," and
19  maybe if you could just skim that --
20      A  Okay.
21      Q  -- and skim page 3.
22      A  Who wrote it?
23      Q  Well, I believe this is Mr. Gregory.
24      A  Him.  Okay.  Boy, that's a terrible --
25  there it is over there, market outlook.

27 (Pages 102 to 105)

**HIGHLY CONFIDENTIAL**

---

106

1      Do I have to read the whole thing?
2   Q  If you just skim it.
3   A  Okay.  Go ahead.
4   Q  Just the question is can you see that -- if
5  you look at the top right of page 3, Mr. Gregory
6  says, "You will also be asked if you would
7  participate in a supply adjustment program."
8      Do you see where it says that?
9   A  Yes, I see that.
10  Q  And then underneath do you see where
11 Mr. Gregory has reproduced the suggestions you made
12 about the corrections in the nation's flock size?
13  A  Yes.
14  Q  And it has those four including the
15 industry-wide policy of a --
16  A  Is this shortly after those other letters?
17  Q  It is the next month.
18  A  The next month.  Okay.  Go ahead.
19  Q  And it includes this one about the minimum
20 floor space allowance.
21  A  Uh-huh.
22  Q  Now, based on your knowledge of the
23 industry, do you have an understanding of who would
24 have received this type of document?
25      MR. TAKENOUCHI:  Objection; foundation.

---

107

1      THE WITNESS:  Are those four points the
2  same exact points that I had in my letter?
3  BY MR. OLSON:
4   Q  Right.
5   A  Okay.  Part of my editorial?
6   Q  Right.
7   A  Okay.
8   Q  So this is just a background question.  I
9  mean, I take it you're aware that this United Voices
10 was sent to UEP members and even others?
11  A  Well, it's sent to their entire membership
12 list, to my knowledge, and I don't remember this
13 being a response to my earlier letter.  I don't read
14 some of these things --
15  Q  So you don't recall seeing this at the
16 time?
17  A  I don't recall, but it is right out of
18 here, so it's okay.
19  Q  Just my question is:  Does this refresh
20 your recollection about any follow-up discussions
21 you had with, really, anyone about these ideas?
22  A  This is the first I've known about it.
23  Q  Okay.  Put that aside.
24  A  I'm sure it's been the subject of
25 discussion, but I have no personal knowledge.

---

108

1      (Deposition Exhibit 9 was marked for
2      identification by the court reporter
3      and is attached hereto.)
4  BY MR. OLSON:
5   Q  Let me hand you what we've marked Bell 9.
6      Why don't you briefly review this, please.
7      It is Bates-stamped BELL004041 through -42.
8      Why don't we change tape now.
9      THE VIDEOGRAPHER:  Okay.  Off the record.
10 We are off the record.  The time is 12:11 p.m. on
11 August 20th, 2013.  This is the end of video number
12 1 of the continuing deposition of Mr. Donald Bell.
13      (Recess.)
14      THE VIDEOGRAPHER:  We are on the record.
15 The time is 12:16 p.m. on August 20th, 2013.  This
16 is the beginning of video number 2 of the deposition
17 of Mr. Donald Bell.
18 BY MR. OLSON:
19  Q  Mr. Bell, can you identify Exhibit 9 as an
20 e-mail you wrote to what you were calling the Animal
21 Welfare Committee on December 22nd, 1999?
22  A  Yes, I do.
23  Q  This is what we called today the Scientific
24 Advisory Committee?
25  A  Yes.

---

109

1      MR. TAKENOUCHI:  Objection; form.
2  BY MR. OLSON:
3   Q  And what you discuss in this e-mail is the
4  issue of cage space and how much cage space the
5  committee should recommend generally, correct?
6   A  Yes.
7   Q  And you begin that discussion by saying,
8  "Even though the subject is mainly one on selecting
9  cage density based on current economic parameters,"
10 and you go on.
11      What were you referring to when you say,
12 "based on current economic parameters"?
13  A  I think we probably were looking at
14 averages, which vary from year to year, as opposed
15 to a set of recommendations which would be over a
16 long time period.  So I think that's probably where
17 emphasis there.
18  Q  But what economic parameters was the
19 committee considering in this regard?
20  A  That -- the committee, at that time, in
21 early sitting of the committee, would probably have
22 placed most of its emphasis on egg production and
23 mortality, and not until they were pressured into
24 welfare-type issues much later by the humane
25 society.

---

28  (Pages 106 to 109)

**HIGHLY CONFIDENTIAL**

---

110

1      So I would assume that "current economic
2  parameters" means the cost of production and the
3  price of eggs.
4      Q  And one of the points you make here is that
5  in putting together the guidelines, the committee
6  needs to recognize that the egg producer is in
7  business to make a living, right?
8      A  Yes.
9      Q  And the Scientific Advisory Committee needs
10  to think about investments, cost, performance and
11  profits, and consider all those things in the
12  program that was going to be adopted, right?
13      A  I'm not finding your keywords.
14      Q  Oh, sorry.  If you look at point 2.
15      A  Point 2 down here.  Okay.  Yes, I see it.
16  Okay.
17      Q  Point 2 and 3, what you're saying is when
18  the committee makes its recommendations, it needs to
19  consider that the egg producer is in business to
20  make a living and it needs to consider investments,
21  cost, performance and profits, right?
22      A  I guess there is a word -- "consider" or
23  "consideration" might need to be explained, but
24  that's what I wrote, so that's what they got.
25  "Consider" means one of many things that you have to

---

111

1  consider.
2      Q  Okay.  But these are things that needed to
3  be considered --
4      A  Exactly.
5      Q  -- in your view?
6      And the committee did consider those
7  things?
8      MR. TAKENOUCHI:  Objection; foundation.
9      THE WITNESS:  Among the welfare issues that
10  we're primarily concerned with.  The economics would
11  be more important to me, probably, because, as I
12  said, as a main reason people change is economic
13  reasons.  That's why they change anything, and we
14  are talking about change here.
15  BY MR. OLSON:
16      Q  And one of the points you make here in that
17  regard is you thought an unrealistically high
18  recommendation would fail to persuade anyone, right?
19      A  Where did you read that now?
20      Q  The third full paragraph.
21      A  The third full paragraph.
22      Q  Do you see where you say, "I'm also
23  concerned that an unrealistically high
24  recommendation would fail to persuade anyone"?
25      A  You're in the second part of that?  Where

---

112

1  are you in the third one?  I can't see it in the
2  third paragraph.
3      Q  Do you see the paragraph that says, "I am
4  primarily concerned"?
5      A  Yes, okay.
6      Q  The third sentence there.
7      A  Oh, third sentence, you said "third
8  paragraph."
9      Q  It is the third sentence in the third
10  paragraph.
11      A  "I am also concerned."  Okay.  I was
12  reading down here, number 3.
13      Q  Do you see that?
14      A  That's saying that if you allowed an acre
15  of land for each chicken, that you wouldn't persuade
16  anybody to make any changes, because you've given
17  them way more than is required to satisfy the
18  welfare.
19      Q  And, in fact, has this document refreshed
20  your recollection that at this time some on the
21  committee were thinking that 72 inches was the right
22  number?
23      A  Yes.  72 inches is sort of a magic number.
24  Because of the size of cages that were present at
25  the time, you divide the total space of the cage by

---

113

1  1, 2, 3 or 4, or some other number, and 72 comes out
2  a good, usable number.
3      Q  And you made the point on the second page
4  of this that you were against 72 square inches as a
5  number because it could not be economically
6  justified, right?
7      A  Yes.  And it also goes back to the question
8  of a standard for everybody, 72 inches for you might
9  be the right number, for me it is the wrong number.
10  So we have methods of analyzing the issue for you
11  and for me separately.
12      And if we want to use something for the
13  entire industry, well, then, we'll develop a set of
14  parameters, and we'll say that that's too much or
15  that's too little.
16      Q  And you thought in coming up with the
17  parameters, the committee had to consider practical
18  issues and be realistic, right?
19      A  Absolutely, yes.
20      Q  And not recommend practices that weren't
21  economically justified?
22      A  Especially in the next paragraph where it
23  says such as Economic Union of Europe to just copy
24  what they do verbatim and thinking that's going to
25  apply to the United States.  That's a very important

---

29 (Pages 110 to 113)

**HIGHLY CONFIDENTIAL**

114

1  statement.
2      And that's what we've done, we've adopted
3  some of their technology and management from Europe
4  word for word, and it's not for the United States.
5      Q  Okay.  All right.  I think that's all on
6  this document.  Do you want to take a break now?
7      MR. GODLSTEIN:  Yes, let's take a break.
8      THE VIDEOGRAPHER:  We are off the record.
9  The time is 12:23 p.m.
10     (Recess.)
11     THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 12:36 p.m.
13     (Deposition Exhibit 10 was marked for
14         identification by the court reporter
15         and is attached hereto.)
16 BY MR. OLSON:
17     Q  I've handed you what's been marked Bell
18 Exhibit 10.  It's Bates-stamped BELL004353 through
19 -4354.
20     And can you identify this as a document
21 that you received from Jerry Faulkner of the United
22 States Egg Marketers sometime prior to January 18th,
23 2000?
24     A  Yes, it was -- it is.
25     Q  And it references you agreeing to come

115

1  present a report to the USEM membership on January
2  18th, 2000, correct?
3      A  Yes.
4      Q  And does that refresh your recollection
5  that you were invited to --
6      A  Yes.
7      Q  -- present to USEM?
8      Okay.  Just briefly, at the bottom of page
9  1, do you see where it says, "Following your
10 presentation, the membership will take up the
11 subject of reducing each member's total hen numbers
12 during this year through slaughter, rendering, et
13 cetera, as well as cutting chick placements"?
14     A  Yes.
15     Q  It says, "Your presentation will 'set the
16 stage' for consideration of these flock reduction
17 programs."
18     Do you see that?
19     A  Yes.
20     Q  Do you recall this meetings?
21     A  Vaguely.  I think I mentioned it earlier
22 that I thought I had been to one.  And when I saw
23 Faulkner's name, then I recognized it.  I was,
24 frankly, thinking of one of his successor, and
25 that's why I couldn't relate it.

116

1      But I don't know if this has got the hard
2  copy set of slides or anything like that.
3      Q  I don't think I have that.
4      A  Okay.
5      Q  And if you look at the next page where it
6  says "Also, Don" -- do you see that?
7      A  Yes.
8      Q  -- "let me know how to adequately
9  compensate you for your time and effort for this
10 presentation."
11     Do you recall how you were compensated?
12     A  I have no idea.  At least expenses.
13     Q  Okay.  You can put that aside.
14     (Deposition Exhibit 11 was marked for
15         identification by the court reporter
16         and is attached hereto.)
17 BY MR. OLSON:
18     Q  Now let me hand you what's been marked Bell
19 11.
20     A  Thank you.  Okay.
21     Q  This is a document entitled,
22 "Recommendations for UEP Animal Welfare Guidelines,"
23 dated September 2000, Bates-stamped UE0208684
24 through -208703.
25     And can you generally identify this

117

1  document for us, Mr. Bell?
2      A  Well, it appears to be a set of guidelines
3  that the advisory committee gave to UEP, but I don't
4  know whether it was a final copy of this particular
5  document or whether it was -- the fact that it says
6  "confidential" at the bottom makes me think it was
7  an in-progress report.
8      Q  Well, I can tell you that it was
9  represented to us by UEP counsel and Gene Gregory
10 that this is the final copy.
11     A  This is the final?
12     Q  If that's helpful.
13     A  This is an old copy, of course.  The
14 current one is around 210 -- 2010, or something.
15     Q  Okay.  Let's just look at a couple -- but,
16 in any case, this document, to the extent it was the
17 final one, would have been the initial set of
18 recommendations?
19     A  It follows our first meeting in 1999,
20 right.
21     Q  Right.
22     A  So it would be -- I'm sure this is the
23 first document, quote unquote.
24     Q  That was the official recommendations
25 of the Scientific Advisory Committee?

30 (Pages 114 to 117)

**HIGHLY CONFIDENTIAL**

---

118

1  A  But I don't know how far this goes.  Has
2  UEP accepted this at this point?
3  Q  Well, I can't answer that one for you.
4  A  Okay.
5  Q  Let's just page through it a little bit.
6  If you go a few pages in, there is a headline that
7  says, "Beak Trimming Laying Strains of Chickens"?
8  A  Yes.
9  Q  Were you involved in forming
10  recommendations about beak trimming?
11  A  In this particular -- wait.  I probably
12  commented on it, because we've done a lot of
13  research on it in the committee, but I think this
14  was written by Scotti Hester, one of the members, I
15  believe this is, and she's fantastic.  And I don't
16  think there is any aspect that I would have
17  disagreed with.
18  Q  All right.  So if you look at where it says
19  "Beak Trimming Recommendations for UEP Guidelines,"
20  probably the next page.
21  A  Oh, next page?  Go ahead.
22  Q  The first recommendation there, do you see
23  it?  "Where possible, producers should select
24  genetic stocks that require little or no beak
25  trimming"?

---

119

1  A  That's the easy way out, yes.
2  Q  And that's the recommendation of the
3  Scientific Advisory Committee, correct?
4  MR. TAKENOUCHI:  Objection to form.
5  THE WITNESS:  That would be the first
6  recommendation.  I don't --
7  BY MR. OLSON:
8  Q  Their first recommendation?
9  A  Yes.
10  Q  And do you know if UEP adopted that
11  recommendation --
12  A  Doesn't this represent the final copy, or
13  not?
14  Q  Well, this is the Scientific Advisory
15  Committee guidelines.  I'm saying in the UEP
16  producer guidelines, do you know if --
17  A  I don't think they would have changed that.
18  That's not an argumentative thing.
19  Q  That was not a controversial
20  recommendation?
21  A  It's like motherhood, you wouldn't complain
22  about motherhood, would you?
23  Q  I certainly wouldn't.
24  All right.  If we look at the next heading,
25  this is the one that says, "Housing, Space

---

120

1  Allowances, and Environment."
2  A  On the page -- there we go.
3  Q  Do you see that heading?
4  A  Got it.
5  Q  Now, I take it, Mr. Bell, that with regard
6  to housing, cage space density wasn't the only issue
7  the scientific committee thought was important?
8  A  I would hope not.
9  Q  The committee also thought feeder space was
10  important, right?
11  MR. TAKENOUCHI:  Objection to form.
12  THE WITNESS:  I personally did, because I
13  was -- I was one of the first ones to do work with
14  feeder space, and we demonstrated up to 6 inches.
15  But if you look at the final part of this thing, I'm
16  not sure whether we wound up with 4 inches or we
17  wound up with enough space for all the birds to eat
18  at the same time.
19  BY MR. OLSON:
20  Q  If you look -- go ahead and page towards
21  the recommendations, "Housing Recommendations For
22  Caged Hens for the UEP Guidelines"?
23  A  Where are we?  Conclusion, or what?
24  "Housing Recommendations" -- go ahead.
25  Q  If you look at point 4 --

---

121

1  A  Go ahead.
2  Q  What does point 4 indicate about the
3  consensus of the Scientific Advisory Committee?
4  A  Well, it says 4 inches.
5  Q  Minimum 4 inches per bird?
6  A  Yes.  Do you want me to continue or you've
7  had enough answer?
8  Q  Let me try a couple questions.
9  A  Go ahead.  You forget you're talking to an
10  extension person.
11  Q  And who, on the committee, was principally
12  responsible for this section, to your knowledge?
13  A  This was written, like I say, by Scotti
14  Hester.  If you go to the front of the page --
15  Q  The beak trimming?
16  A  Scotti Hester.
17  Q  That's a woman?
18  A  That's a lady.
19  Q  Okay.  Did Dr. Hester also draft the
20  housing --
21  A  We're on housing now?
22  Q  Yes.
23  A  Okay.  Pardon me.
24  Housing, if it involves a lot of cage
25  density, it was probably done by Joy Mench, and I

---

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL

122

1  think she probably had a co-writer.  It wasn't me, I
2  think, even though -- let me see, did I -- I
3  probably submit -- yeah, we were all asked to submit
4  our thinking about each person's original draft.
5      Q  And then you all signed off on the final?
6      A  We all signed off on the final.  I don't
7  think we were antagonistic about anything at that
8  point.
9      Q  And would it be fair to say that the
10  consensus of the advisory committee is that feeder
11  space was a critical element affecting welfare?
12      MR. TAKENOUCHI:  Objection; form, leading,
13  foundation.
14      THE WITNESS:  The committee, I don't think,
15  was as firm as I was.  Remember, we had -- worldwide
16  we had over 50 million chickens working on the
17  feeder space part of that.  And they bought and
18  built all over the world.  And up to that point, up
19  to that point, 4 inches was kind of the exception.
20  BY MR. OLSON:
21      Q  And if you look back at the prior page, the
22  one that ends in -92?
23      MR. GODLSTEIN:  Go one page.
24      THE WITNESS:  Okay.
25      MR. GODLSTEIN:  Back.

123

1      THE WITNESS:  The other way?
2      MR. GODLSTEIN:  Yes.
3      THE WITNESS:  Okay.  Go ahead.
4  BY MR. OLSON:
5      Q  All right.  Do you see where it says
6  towards the top, "The research on space allowances
7  can be summarized as follows"?
8      A  Yes.  Go ahead.
9      Q  And if you look at the last bullet there,
10  second sentence says, "Feeder space is a critical
11  element affecting" --
12      A  Yes.
13      Q  -- "affecting welfare," right?
14      Was that the view of the committee?
15      MR. TAKENOUCHI:  Objection; foundation.
16      THE WITNESS:  I believed it was, but not to
17  the point of the exact number.
18  BY MR. OLSON:
19      Q  Well, if you look at the bottom of that
20  bullet --
21      A  Yeah.
22      Q  -- doesn't it say 4 inches of feed- --
23      A  It does, but eventually not too much later
24  this became enough so that all the chickens could
25  eat at the same time, and the 4 inches was

124

1  abandoned.  I went as far as 6.
2      Q  Now, did the UEP producer guidelines, to
3  your knowledge, ever accept this recommendation that
4  4 inches of feeder space must be provided to hens?
5      A  Well, unless this is -- this is not -- you
6  say this is not the first document?  You say it's a
7  draft from the committee, right?
8      Q  This is the final --
9      A  Draft?
10      Q  Well, the final -- it's not a draft.  It's
11  the final initial guidelines.
12      A  It's not the publication?
13      Q  It is not the UEP publication.  This is the
14  Scientific Advisory Committee --
15      A  Scientific Advisory Committee, at this
16  point, but I don't think the first published one to
17  the general public used the word 4 inches.  Okay?
18      Q  Are you talking about the UEP guidelines?
19      A  No, I'm talking about the UEP published
20  guidelines in -- definitely in 2010 and 2008, and
21  there's been about three or four versions of this
22  thing.
23      The very first one of these things that was
24  publicly released to their members, to their
25  members, I'm not sure whether it says 4 or enough

125

1  for all the chickens.
2      Q  Fair enough.
3      Now, feeder space is important, as I
4  understand it, because within hens there is a
5  pecking order, right?
6      A  Go ahead.
7      Q  And there's some --
8      A  Demonstrate your knowledge.
9      Q  Let me try and tell me if I'm right.
10      There are some that are socially dominant?
11      A  Yes.
12      Q  And there are some that are socially --
13      A  Recessive.
14      Q  -- recessive?
15      And the concern is that the socially
16  dominant ones won't let the socially recessive ones
17  eat enough unless there is enough feeder space for
18  all the hens?
19      MR. TAKENOUCHI:  Objection to form.
20  BY MR. OLSON:
21      Q  Is that a fair characterization?
22      A  That's fair.  It is more complex than that,
23  but go ahead.
24      Q  How would you describe it, the importance
25  of feeder space?

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

**HIGHLY CONFIDENTIAL**

---

126

1      A   First of all, you have dominant birds
2  picking over the food and taking out the -- mostly
3  the grain, which is like dessert, you know, they
4  prefer that.  And that's where the carbohydrate --
5  that's where the energy is.
6          So you are starting to imbalance the diet
7  by limiting the feeder space.
8          Pictures that we drew about the original
9  cage space issue is that maybe three birds would be
10  at the feed trough and one bird would have to stand
11  in the back.
12          And when you change the bird numbers, you
13  change about four things.  You change the colony
14  size, you change the feeder space, you change the
15  amount of water -- watering per bird.
16          So to separate the feeder space from the
17  floor space, that's a difficult exercise, to
18  separate which is most important.  All the eggs that
19  you lose are feeder space, all the eggs you lose are
20  floor space, it is very difficult.
21          We developed formulas in our research where
22  you could assign numbers to each element, because we
23  had all kinds of cases.  You go out in the field and
24  the farmer doesn't have a clue.
25      Q   Now, as far as the floor space aspect, the

---

127

1  first bullet here indicates that the conclusion of
2  the research, and it says, "Numerous studies" --
3      A   Go ahead.
4      Q   -- "have shown that decreasing space
5  allowances in cages to below approximately 72 square
6  inches per hen significantly reduces henhouse egg
7  production and increases mortality," right?
8          MR. TAKENOUCHI:  Objection: misstates the
9  document.
10          THE WITNESS:  Yes.  That's an open-ended
11  amount of space.
12  BY MR. OLSON:
13      Q   72 square inches?
14      A   72 is one, but then we got below that.  You
15  are talking about the -- where are we at here?  The
16  different study, "numerous studies."  Okay.  There
17  was a range of about 67 to 86.
18          Okay.  So 67, 80, 86, you're going to get a
19  curve of the issue here.
20          70 -- now, what Joy Mench says is that once
21  you get to 72, you're just about done.  Well, the
22  problem -- just about done all the effective.  You
23  could add a square foot to that and you wouldn't add
24  any more eggs.
25          And why does she say that?  Because most of

---

128

1  the research has been in that range.
2          I personally have done research beyond that
3  range, and I've -- I gave her copies showing
4  continuing decrease in production beyond 72, and
5  certainly beyond 67.
6      Q   Continuing decrease?
7      A   Decrease in production -- pardon me,
8  increase in production --
9      Q   Increase in production?
10      A   -- as you went to the higher numbers.
11          You picked me up on that one quick.
12      Q   Right.  So above -- your research indicated
13  that above 72, the hens keep producing more.
14          Did your research look at the mortality
15  issue?
16      A   Oh, yeah, always does.
17      Q   Above 72?
18      A   Always does that.
19      Q   And the mortality rates get better above
20  72 --
21      A   They get better, go down with increasing
22  space.
23      Q   Yes.  And if you look at the fourth bullet
24  here, the committee says, "Measurements of white
25  leghorn hens show that they require about 65 to 83

---

129

1  square inches to perform even the most basic
2  behaviors, standing comfortably and resting, and
3  more room is required to perform other" --
4      A   Yeah.
5      Q   Was that consistent with your research too?
6      A   Well, we didn't look at the wing flapping,
7  you know, we didn't look at behavioral things.  We
8  did practical research that the farmer could
9  duplicate.
10          And he can count eggs and he can weigh the
11  eggs and he can weigh the chickens and he can look
12  at the mortality, but he can't sit out there with a
13  TV camera determining how many flaps per hour the
14  chickens wave their wings.  That's got to be done in
15  a laboratory.
16      Q   All right.  One more quick question on this
17  document.  If you turn to the molting section --
18      A   Got it.
19      Q   -- and I'm looking at the recommendation
20  part, the document ends in -98.  It says, "Molting
21  Recommendations for UEP Guidelines."
22      A   Yeah.
23      Q   Basically the committee concluded that
24  there were animal welfare concerns with molting
25  through forced starvation, right?

---

**33 (Pages 126 to 129)**

**HIGHLY CONFIDENTIAL**

---

**130**

1    A   Feed withdrawal.
2    Q   And that that feed withdrawal raised
3  genuine animal welfare concerns; is that fair?
4        MR. TAKENOUCHI:  Object to the form.
5        THE WITNESS:  Say that again.
6  BY MR. OLSON:
7    Q   The committee concluded that the feed
8  withdrawal raised animal welfare concerns?
9    A   Yes.
10    Q   And encouraged producers and researchers to
11  develop alternatives?
12    A   Yes.
13    Q   And recommended that in the meantime the
14  shortest period of feed withdrawal period should be
15  used?
16    A   Yes.
17    Q   And did you have an understanding at that
18  time of what the shortest period of feed withdrawal
19  possible was?
20    A   Yes.
21    Q   And what was that?
22    A   Oh, you don't want me to do that, do you?
23  You said yes or no.  That's okay.  I'm kidding you.
24        We experimented with as short as four or
25  five days and as long as 16 days.

---

**131**

1        When I first heard anybody was using ten
2  days, I was amazed, I didn't believe it.  But as we
3  did maybe 30 or 40 experiments a year, it sort of
4  appeared that you could improve results by going up
5  to ten days, maybe in some cases 12 days.
6        So we put a set of conditions.  We said
7  that you could only have so much body weight loss,
8  so that means they had to weigh the chickens every
9  day.  You could only have so much mortality, so you
10  count the dead birds until you got to a certain
11  level, or you say definitely don't go more than 14
12  or 16 days.
13    Q   But my question is:  Was there an
14  understanding at the time of what the shortest
15  period --
16    A   Well, that's what I told you.  I said --
17    Q   Four or five days?
18    A   -- we started with four or five days.
19  You've got to get the birds out of production and
20  into a rest.  And the shortest you can do is put
21  them right back on a laying mesh and you get this
22  flush of production right at the beginning, but they
23  poop out towards the end.
24    Q   So it's possible to induce hens into a molt
25  by depriving them of food for only four or five

---

**132**

1  days?
2    A   We've done away with that.  We don't take
3  feed away at all today.
4    Q   I'm talking about this time.
5    A   Back then, I don't think anybody would have
6  gone that short.  It was experimental.
7    Q   Wasn't McDonald's insisting --
8    A   I don't know about McDonald's.  I've gotten
9  their letters through the years.  They probably
10  didn't want us to take the feed away at all.  I
11  don't know.
12        (Deposition Exhibit 12 was marked for
13        identification by the court reporter
14        and is attached hereto.)
15  BY MR. OLSON:
16    Q   Let me hand you what we've marked
17  Exhibit 12.
18    A   What do we have here?
19        MR. GODLSTEIN:  Do you have one more?
20        THE WITNESS:  I've seen this before.
21  BY MR. OLSON:
22    Q   This is Bates-stamped UE0840403 through
23  -404.
24        And can you identify it as an e-mail
25  Mr. Gregory wrote to you on December 12, 2000?

---

**133**

1    A   Yes.
2    Q   And it's referring to the terms of your
3  contract with UEP?
4    A   That's correct.
5    Q   And it indicates you had proposed to be
6  paid about $18,000 a year, and Mr. Gregory had --
7  offered to compromise at $15,000, correct?
8    A   Let me see.  Where does it say -- there it
9  is -- you have proposed 18-.  Could we reach a
10  compromise at 15- -- that's what we wound up doing,
11  yeah.  I think it was 1,250 a month.  I think that's
12  15-, isn't it?
13    Q   Right.  You can put that down.
14        (Deposition Exhibit 13 was marked for
15        identification by the court reporter
16        and is attached hereto.)
17  BY MR. OLSON:
18    Q   Let me hand you what's marked Bell
19  Exhibit 13 very briefly.
20        This is Bates-stamped UE0790540 through
21  -542.
22        I'll just ask if you can identify this as
23  the executed financial consulting agreement between
24  you and UEP?
25    A   Yes, it is.

---

**34  (Pages 130 to 133)**

**HIGHLY CONFIDENTIAL**

---

134

1    Q   And it indicates that you would be paid at
2  a rate of --
3    A   Yes.
4    Q   -- $1,250 per month?
5    A   I'm not supposed to interrupt you.  I'm
6  sorry.
7        Yes.
8    Q   And also that if you are requested to
9  attend UEP committee and board of director meetings,
10 you would be reimbursed at a rate of 500 per day,
11 plus travel and lodging expenses.
12       Do you see that?
13   A   Yes.
14   Q   Is that consistent with how you were paid
15 over the years?
16   A   I don't recall the 500-per-day part of it.
17 The travel and lodging, obviously they paid for it.
18 The 500 a day is essentially, I guess, of what I'm
19 being paid up here for a month of 2 1/2 days a month
20 or something like that.  But it's just to take care
21 of the extra, the extra costs, my time.  I've
22 already given them the 1,250's worth, and going to
23 this special meeting, they have to pay for that too.
24   Q   Yeah, I just wanted you to verify this is
25 the terms of the --

---

135

1    A   I'm sorry.  I haven't seen this letter for
2  ages.
3    Q   Okay.  You can put that aside.
4    A   Okay.
5        What is this on the back?  Anything?  Oh,
6  it is taxpayer identification.
7        Go ahead.
8        (Deposition Exhibit 14 was marked for
9        identification by the court reporter
10       and is attached hereto.)
11 BY MR. OLSON:
12   Q   Let me hand you what we've marked as Bell
13 14.
14   A   Something I remember.
15   Q   This is a document Bates-stamped
16 BELL-D-00028020 through -31.
17       And I'll ask if you can identify this as an
18 Egg Economics Update dated December 31, 2000 that
19 you authored?
20   A   Yes, yes.
21   Q   Okay.  And you recall this particular
22 update?
23   A   Yes.
24   Q   And what it addresses is the economic
25 implications of reducing cage density in the U.S.,

---

136

1  right?
2    A   Yes.
3    Q   And that's what was being proposed by the
4  advisory committee at this time?
5        MR. TAKENOUCHI:  Objection; form, misstates
6  prior testimony.
7  BY MR. OLSON:
8    Q   Right?
9    A   The proposal that we have here, we talked
10 about earlier, was dated 2000, was it?
11   Q   September 2000.
12   A   September 2000?
13       This letter was dated December 2000.  So it
14 was probably my attempt to show both sides of the
15 issue from an economic standpoint or several sides
16 of the issue, which is my normal obligation to my
17 clients.
18       And I do not know whether this was a
19 specific request on the part of anybody or whether
20 it just became my idea and something to comment on.
21   Q   Okay.  Now, if you look at the third
22 paragraph -- I
23   A   Go ahead.
24   Q   Why don't you review that third paragraph
25 that starts, "The guidelines."

---

137

1    A   On the first page?
2    Q   Yes.  Let me know when you're done.
3    A   Okay.
4    Q   All right.  You end it by saying, "Major
5  economic issues are involved with the question of
6  space and compliance with the specific space
7  allowance recommendations will be difficult to
8  accomplish by persuasion alone."
9        Do you see that?
10   A   Yes.
11   Q   And what did you mean by that?
12   A   This is very -- at the root issue of bird
13 numbers that I can have in my chicken house.
14       And everything that I do on this farm has
15 to do with efficient use of facilities, egg
16 processing plants, feed mills, chicken houses, and
17 so on, and so it's a multi-faceted question and
18 problem.
19       And it would be, and I think it has turned
20 out to be, one of the most difficult for people to
21 accept all aspects of that.  I think they lost
22 membership because -- because of too -- these
23 requirements are too stringent.  But that's why I
24 said.
25   Q   All right.  And if you look at page 4,

---

35 (Pages 134 to 137)

**HIGHLY CONFIDENTIAL**

138

1  there is a heading that says, "Economic Benefits
2  From Reducing Cage Density"?
3      A  Yes, yes.
4      Q  And there is a subheading that says,
5  "National Participation to Balance Supply With
6  Demand."
7          Do you see that?
8      A  Uh-huh.
9      Q  You say, "A broad industry-wide acceptance
10  of the historically proven fact that the industry
11  makes more with less (more profits with less hens)
12  would be the greatest windfall of following the UEP
13  proposed guidelines."
14          Do you see that?
15      A  I sure do.
16      Q  And that was your view at the time, right?
17      A  Yes.
18      Q  And then in bold underlined it says, "The
19  task is to devise the method and motivation to
20  accomplish it voluntarily."
21          Do you see that?
22      A  Yes.
23      Q  And how was that ultimately done?
24          MR. TAKENOUCHI:  Object to form.
25          THE WITNESS:  How is what?

140

1  identified, to your knowledge, or how was that
2  solved?
3          MR. TAKENOUCHI:  Objection to form.
4          THE WITNESS:  Well, it says, "Following the
5  UEP proposed guidelines."  Then it says, "The task
6  is to devise the method and motivation to accomplish
7  it voluntarily."
8          And that still exists today, it existed
9  when the program was first introduced.
10  BY MR. OLSON:
11      Q  When you say "the program," you're talking
12  about the UEP-certified program?
13      A  Yes, yes.
14      Q  And that was the method to accomplish this?
15          MR. TAKENOUCHI:  Objection to form.
16  BY MR. OLSON:
17      Q  That program?
18          MR. TAKENOUCHI:  Objection to form.
19          THE WITNESS:  Let me think what you're
20  saying here.
21          "To devise the method and motivation to
22  accomplish it voluntarily."
23  BY MR. OLSON:
24      Q  Right.
25      A  To make more money with less hens.

139

1  BY MR. OLSON:
2      Q  Ultimately done.
3      A  Ultimately done?
4      Q  Yes.
5      A  What are you saying?  I'm not sure.
6      Q  How was that task of encouraging national
7  participation --
8      A  Well, I assume --
9      Q  -- accomplished?
10      A  -- at the time this was written maybe
11  20 percent of the industry was acceptable to the
12  idea, eventually maybe 80 percent.
13          Windfall is something that's unexpected.
14  Unexpected, so it is not planned.  It is an
15  unexpected result that these things happen.
16          We didn't go in there -- nobody went in
17  there and said let's reduce the bird numbers by
18  20 million.  Because back here someplace we said
19  that they are paying for a million.  So we didn't
20  have a target.
21      Q  I don't want to focus on the windfall part.
22  This idea of devising a method and motivation to
23  accomplish --
24      A  Uh-huh, yes.
25      Q  -- was that method and motivation ever

141

1      Q  Right.  My question is:  The UEP-certified
2  program was the method that was devised to
3  accomplish that goal, correct?
4          MR. TAKENOUCHI:  Objection; misstates prior
5  testimony, speculation.
6          THE WITNESS:  I claim there the task is to
7  devise, which means it hasn't been accomplished at
8  that point --
9  BY MR. OLSON:
10      Q  Right.
11      A  -- or accepted at that point.
12      Q  And at this point, the certified
13  certification expert --
14      A  I don't even use the word "certified."
15      Q  So do you know what you're referring to,
16  the method that was devised to accomplish this?
17      A  I say it's a task.  And I didn't come right
18  in there and say the only way to do this is to
19  reduce the cages, I didn't say that.  But we've
20  referred to that with examples within this whole
21  document.
22      Q  Let me try this way.  You say, "The task to
23  devise the method and motivation to accomplish it
24  voluntarily," was that task ever accomplished?
25      A  I would say it was accomplished 80 percent,

36 (Pages 138 to 141)

HIGHLY CONFIDENTIAL

142

1  yeah.
2      Q   And you were referring to the UEP certified
3  program participation?
4      A   Well, we are talking about cage density now
5  and we're talking about the size of requirements,
6  yes, and that was accomplished X percent by the
7  auditing procedure.
8      Are you familiar with that?
9      Q   Yes.
10     A   That the farms were audited by outside
11  auditors, and did you meet your goal, did you meet
12  your target.  And I don't know what the penalty was
13  if you didn't, but, anyway.
14     Q   All right.  Now, if you look at page 11 --
15     A   Yeah.
16     Q   -- in your summary.
17     A   Got it.
18     Q   The third sentence says, "Increasing floor
19  space allowances are difficult to justify for the
20  individual farm, but if enough producers follow this
21  practice, industry profits will be considerably
22  higher as supply and demand reach a more optimum
23  balance."
24     Do you see that?
25     A   Yes.

143

1      Q   And I know we've touched on this before,
2  but what were you referring to there?  What's the
3  point you're making there?
4      MR. TAKENOUCHI:  Objection to form.
5      THE WITNESS:  One thing follows another.
6  Increasing space means you reduce the population.
7  Reducing the population reduces the production.
8  Reducing the production brings profitability back
9  into line or a reasonable profitability.  Not
10  excessive profitability, a reasonable.
11  BY MR. OLSON:
12     Q   But this aspect about increasing floor
13  space allowances are difficult to justify for the
14  individual farm --
15     A   That's because he's got a hundred-case-
16  an-hour machine and now you want him to run it at 80
17  cases because you're going to reduce his burden
18  numbers.  He knows that right off the bat.  He knows
19  his feed mill is going to be shut down one day a
20  week.  He knows he's going to have to lay off some
21  labor, and they've been working for him for 25
22  years.
23     So, you know, it's easy to say that and
24  easy for me to recommend something like that, but
25  they have to implement it.  I mean, that's what the

144

1  whole thing is about, you follow the guidelines.
2      And you tell a person he has to reduce his
3  flock size by 20 percent, sure he can go build
4  another chicken house for that 20 percent, he can do
5  that --
6      Q   But that's expensive?
7      A   But that's expensive.  And he's got -- he's
8  already got the chickens and he's got a transition
9  period to shift from 100 to 80.  But when it comes
10  time in the deadline and the audit says you still
11  have 100 percent, and whatever the penalty is, I'm
12  not aware of, but that's the issue.
13     Q   All right.  You can put that aside.
14     (Deposition Exhibit 15 was marked for
15     identification by the court reporter
16     and is attached hereto.)
17  BY MR. OLSON:
18     Q   Let me hand you what we've marked Bell 15.
19     MR. GODLSTEIN:  Can we make that the last
20  document for the day?
21     MR. OLSON:  Yes.
22     Unfortunately, this is a document I just
23  have two extra copies of.
24     It is Bates-stamped BELL002774 through
25  -2777.

145

1      Q   And can you identify this as a document
2  that you authored on April 15th, 2002?
3      A   This is called a memo, and this was started
4  with my first relationship with UEP, which I've told
5  them that I would do, and it would be all economic,
6  it would be -- it would parallel some of the other
7  reports that we also told them we would continue to
8  produce.
9      I'm not sure about this particular -- well,
10  you want to go ahead and ask questions.  Go ahead.
11     Q   That's helpful.
12     This memo is something that UEP -- that you
13  were compensated by UEP for writing?
14     MR. TAKENOUCHI:  Objection to form,
15  misstates prior testimony.
16     THE WITNESS:  That's what we promised to
17  include in our services.
18  BY MR. OLSON:
19     Q   That's a better way of putting it.  Thank
20  you.
21     You say this was written under the
22  sponsorship of UEP?
23     A   Yes.
24     Q   Just backing up, this Egg Economics Update
25  from the last exhibit, how would you describe this

37 (Pages 142 to 145)

**HIGHLY CONFIDENTIAL**

146

1  type of document?
2      A  Well, that was, I believe, started in 1983.
3  And it grew out of all of our surveys and studies
4  about the price of eggs and the cost of production.
5      So it was intended to cover a broad range
6  of subjects dealing with economics of the egg
7  industry.
8      Q  And who would you send it to, typically?
9      A  Every producer and the allied industry
10  person that requested to be on the mailing list.
11      Q  Was it a large mailing list?
12      A  Our original, when that thing was started,
13  it was probably a thousand.  Today we are -- we have
14  a totally different industry that's shrunk, and
15  we're still at a thousand.
16      Q  Okay.  All right.  Sorry.
17      Now, back to Bell Exhibit 15, what you call
18  the memo?
19      A  Yes.
20      Q  This is sometimes called a flock
21  projection?
22      A  No, it isn't.
23      Q  Okay.
24      A  It says there "flock projection," but this
25  is not the official -- this is a memo.

147

1      Q  A memo, okay.  All right.
2      And the subject of this one was the effect
3  on egg prices and flock performance of reducing cage
4  density, right?
5      A  Yes.
6      Q  And the first thing you say is, "Reducing
7  the nation's average cage density can have numerous
8  positive effects on the income and costs of
9  individual producers in the industry as a whole,"
10  right?
11      A  Yes.
12      Q  Now, who are these memos distributed to?
13      A  I have no idea, but I believe UEP sent it
14  to all their members.
15      Q  So you would send it to UEP, and they
16  would --
17      A  Yes, I sent the original to UEP.
18      Q  All right.
19      Let's just go to the fourth paragraph that
20  starts, "A one-million hen reduction."
21      A  Yes.
22      Q  You say, "We commonly hear the excuse that
23  'If we do it, there is no guarantee that my
24  competitor will do it.'"
25      Do you see that?

148

1      A  Uh-huh.
2      Q  What are you referring to there?
3      MR. TAKENOUCHI:  Objection; foundation.
4      THE WITNESS:  Where do you see -- oh,
5  competitor, next paragraph.  Okay.
6      You notice that we are talking about 69
7  points instead of one cent, and that's because we
8  are talking about a different time period.
9  BY MR. OLSON:
10      Q  Okay.
11      A  Today that number is probably somewhat
12  less.
13      1 million is possible within several
14  individual companies, but half of its reduction
15  could be accomplished by two to five companies in
16  the whole United States by just reducing their bird
17  numbers count by one.
18      Q  And then I want to focus to the next
19  sentence.
20      A  "We commonly hear the excuse 'If we do it,
21  there is no guarantee my competitor would do it.'
22  So I gained a competitive advantage because I didn't
23  do it.  The one guy has a hundred birds in his house
24  and I've only got 80 and I've lost competitive
25  advantage.

149

1      Q  So is that the type of thing you would hear
2  expressed --
3      A  That's the type of thing.
4      Q  -- by producers during the course of your
5  work?
6      A  That's right.
7      Q  Now let's look at page 3.
8      A  Page 3?  Okay.
9      Q  These are some data you provided.
10      A  Statistics, right.
11      Q  Statistic.  I wanted to look at number 6
12  called "Force Molting."
13      A  You are on page 33?
14      Q  Yes.
15      A  Excuse me.  Go ahead.
16      Q  All right.  And there is data regarding
17  force molting?
18      A  Yes.
19      Q  Now, this force molting, that's the forced
20  starvation of feed withdrawal from the hen, right?
21      A  At that time that was a very common way,
22  yes.
23      Q  And what this indicates is that from 2000
24  to 2001 molting increased, right?
25      A  Let me explain something.  Okay?

38  (Pages 146 to 149)

**HIGHLY CONFIDENTIAL**

---

150

1        This does not say what percentage of the
2   chickens are molted, it says what percentage of the
3   chickens have been molted or are being molted.
4        Q   Okay.
5        A   Actually, at this point in time probably
6   two-thirds to 70 percent of all chickens were
7   molted.
8        Q   Okay.
9        A   Do you follow the difference between that
10  statement?
11       Q   I think so.
12       A   Okay.  Go ahead.
13       Q   And what you show here is from 2000 to
14  2001 --
15       A   There was a slight increase.
16       Q   -- force molting, there was an increase?
17       A   In January and for the two months.  And we
18  would start to think, well, January and February, is
19  this thing going to go three or four months, is it
20  going to keep going?  If it keeps going, then people
21  will start to say, well, maybe it is going to result
22  in less eggs.
23       Q   And also there was more molting happening
24  in January and February of 2002 than January and
25  February of 2000?

---

151

1        A   That's what it says, yeah.  And then 2002
2   you went back down.
3        Q   No, but 2002 is still more than what's
4   happening in 2000?
5        A   Oh, yeah, yeah, yeah.  This is normal
6   fluctuation.
7        Q   Okay.  But it's an increase -- just stick
8   with me for a moment.
9        A   Go ahead.
10       Q   In both 2001 and 2002 there was more
11  molting happening than in the same period --
12       A   Yes, exactly.
13       Q   And isn't it kind of odd that was happening
14  when the guidelines say that force molting has
15  animal welfare problems?
16       A   No.
17           MR. TAKENOUCHI:  Objection to form,
18  misstates prior testimony.
19  BY MR. OLSON:
20       Q   Why did molting increase if the Scientific
21  Advisory Committee --
22       A   Because they decided economically that it
23  was justified.
24       Q   And it wasn't prohibited either, was it?
25       A   Never prohibited.

---

152

1           MR. TAKENOUCHI:  Objection to form.
2           THE WITNESS:  That's the one letter we
3   wrote way back here that says it is not a matter of
4   molting versus not molting, it is a matter of egg
5   production.
6   BY MR. OLSON:
7        Q   And if you look at point 7, slaughter -- do
8   you see that?
9        A   Go ahead.
10       Q   That's the number of birds that are
11  slaughtered?
12       A   In a USDA slaughter plant.
13       Q   Yes.  And from 2000 to 2002 there was an
14  increase in the number of birds that were
15  slaughtered --
16       A   That's what it says.
17       Q   -- as well?
18           All right.  That's all.  We can take a
19  break.
20           THE VIDEOGRAPHER:  Off the record.
21           We are off the record.  The time is 1:16
22  p.m.
23           (TIME NOTED:  1:16 p.m.)
24
25

---

153

1           ACKNOWLEDGMENT OF DEPONENT
2        I, DONALD L. BELL, do hereby certify
3   that I have read the foregoing transcript of my
4   testimony, and further certify that it is a true
5   and accurate record of my testimony (with the
6   exception of the corrections listed below):
7   Page  Line              Correction
8   ____|____|_____|_____
9   ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20
21           _____
             DONALD L. BELL
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
25  _____         _____
    (NOTARY PUBLIC)         MY COMMISSION EXPIRES:

---

39 (Pages 150 to 153)

**HIGHLY CONFIDENTIAL**

154

1       I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4       That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were placed under oath; that a

8   true and correct record of the proceedings was made

9   by me using machine shorthand which was thereafter

10  transcribed under my direction; further, that the

11  foregoing is an accurate transcription thereof.

12      I further certify that I am neither

13  financially interested in the action nor a relative

14  or employee of any attorney of any of the parties.

15      IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17  Dated:  8/23/13

18

19

20      _____

        DENISE BARDSLEY

        CSR No. 11241

21

22

23

24

25

40 (Page 154)

# EXHIBIT B

**HIGHLY CONFIDENTIAL**

155

1　　　　　　IN THE UNITED STATES DISTRICT COURT

2　　　　FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3　　_____

　　　　　　　　　　　　　　　　　　)

4　IN RE:　PROCESSED EGG　　　　　)

　PRODUCTS ANTITRUST　　　　　　　)

5　LITIGATION　　　　　　　　　　　　)

　_____)MDL No. 2002

6　　　　　　　　　　　　　　　　　　)08-MD-0200

　THIS DOCUMENT APPLIES TO:　　　)

7　ALL ACTIONS　　　　　　　　　　　)

　_____)

8

9

10

11

12

13　　　　　　　-- HIGHLY CONFIDENTIAL --

14　　　VIDEOTAPED DEPOSITION OF DONALD L. BELL

15　　　　　　　　Riverside, California

16　　　　　　Wednesday, August 21, 2013

17　　　　　　　　　　Volume II

18

19

20

21　Reported by:

22　DENISE BARDSLEY

23　CSR No. 11241

24

25

**HIGHLY CONFIDENTIAL**

**156**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   _____
                                 )
 4   IN RE:  PROCESSED EGG       )
     PRODUCTS ANTITRUST          )
 5   LITIGATION                  )
     _____)MDL No. 2002
 6                    )08-MD-0200
     THIS DOCUMENT APPLIES TO:   )
 7   ALL ACTIONS                 )
     _____)
 8
 9
10
11
12          Videotaped deposition of DONALD L. BELL,
13   Volume II, taken on behalf of The Direct Purchaser
14   Plaintiffs, at 3500 Market Street, Riverside,
15   California, beginning at 10:09 a.m. and ending at
16   3:53 p.m. on Wednesday, August 21, 2013, before
17   DENISE BARDSLEY, Certified Shorthand Reporter
18   No. 11241.
19
20
21
22
23
24
25
```

**157**

```
 1   APPEARANCES:
 2
 3   For The Direct Purchaser Plaintiffs:
 4      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 5      BY:  STEIG D. OLSON
 6      Attorney at Law
 7      51 Madison Avenue, 22nd Floor
 8      New York, New York  10010
 9      (212) 849-7152
10      steigolson@quinnemanuel.com
11
12   For The Direct Purchaser Plaintiffs:
13      HAUSFELD, LLP
14      BY:  JAMES J. PIZZIRUSSO
15      Attorney at Law
16      1604 Locust Street, 2nd Floor
17      Philadelphia, Pennsylvania  19103
18      (215) 985-3270
19      jpizzirusso@hausfeldllp.com
20
21
22
23
24
25
```

**158**

```
 1   APPEARANCES (continued):
 2
 3   For The Indirect Purchaser Plaintiffs:
 4      MILBERG LLP
 5      One Pennsylvania Plaza
 6      New York, New York  10119
 7      (646) 733-5727
 8      (No appearance.)
 9
10   For Indirect Purchaser Plaintiffs
11      LOVELL STEWART HALEBIAN & JACOBSON LLP
12      BY:  MERRICK SCOTT RAYLE
13      Attorney at Law
14      61 Broadway, Suite 501
15      New York, New York  10006
16      (212) 608-1900
17      msrayle@sbcglobal.net
18
19
20
21
22
23
24
25
```

**159**

```
 1   APPEARANCES (continued):
 2
 3   For the Deponent:
 4      UNIVERSITY OF CALIFORNIA
 5      BY:  MICHAEL R. GOLDSTEIN
 6      Attorney at Law
 7      1111 Franklin Street, 8th Floor
 8      Oakland, California  94607
 9      (510) 987-9895
10      michael.goldstein@ucop.edu
11
12   For Midwest Poultry Services:
13      FAEGRE BAKER DANIELS
14      BY:  KATHY L. OSBORN
15      Attorney at Law
16      300 North Meridian Street, Suite 2700
17      Indianapolis, Indiana  46204-1750
18      (317) 237-1144
19      kathy.osborn@faegrebd.com
20      (Telephonic appearance.)
21
22
23
24
25
```

**2 (Pages 156 to 159)**

**HIGHLY CONFIDENTIAL**

160

1  APPEARANCES (continued):
2
3  For RW Sauder,Inc.:
4      DECHERT LLP
5      2929 Arch Street
6      Philadelphia, Pennsylvania  19104
7      (215) 994-2421
8      (No appearance.)
9
10 For United Egg Producers and the United States Egg
11 Marketers:
12     PEPPER HAMILTON, LLP
13     BY:  WHITNEY REDDING
14     Attorney at Law
15     3000 Two Logan Square
16     Philadelphia, Pennsylvania  19103
17     (215) 981-4714
18     reddingw@pepperlaw.com
19     (Telephonic appearance.)
20
21
22
23
24
25

161

1  APPEARANCES (continued):
2
3  For Giant Eagle, Inc.:
4      MARCUS & SHAPIRA LLP
5      One Oxford Center, 35th Floor
6      Pittsburgh, Pennsylvania  15219
7      (412) 338-3344
8      (No appearance.)
9
10 For Cal-Maine Foods, Inc.:
11     GIBSON, DUNN & CRUTCHER LLP
12     2100 McKinney Avenue
13     Dallas, Texas  75201-6912
14     (214) 698-3279
15     (No appearance.)
16
17 For Sparboe Farms, Inc.:
18     BRIGGS AND MORGAN
19     2200 IDS Center
20     80 South 8th Street
21     Minneapolis, Minnesota  55402
22     (612) 977-8415
23     (No appearance.)
24
25

162

1  APPEARANCES (continued):
2
3  For Rose Acre Farms:
4      PORTER, WRIGHT, MORRIS & ARTHUR
5      BY:  KARRI ALLEN
6      BY:  JOHN C. MONICA, JR.
7      Attorneys at Law
8      1919 Pennsylvania Avenue NW, Suite 500
9      Washington, D.C.  20006
10     (202) 778-3056
11     kallen@porterwright.com
12     (Telephonic appearance.)
13
14 For Nu-Cal Foods, Inc.:
15     KASOWITZ BENSON TORRES & FRIEDMAN, LLP
16     BY:  JASON S. TAKENOUCHI
17     Attorney at Law
18     101 California Street
19     San Francisco, California  94111
20     (415) 655-4385
21     jtakenouchi@kasowitz.com
22
23
24
25

163

1  APPEARANCES (continued):
2
3  For Hillandale Farms, Inc., Hillandale Farms East,
4  Inc., Hillandale Gettysburg LP and Hillandale Farms
5  of Pa., Inc.:
6      BUCHANAN, INGERSOLL & ROONEY
7      Two Liberty Place
8      50 South 16th Street, Suite 3200
9      Philadelphia, Pennsylvania  19102
10     (215) 665-3884
11     (No appearance.)
12
13 For the Direct Action Plaintiffs:
14     JENNER & BLOCK
15     BY:  STEPHEN R. BROWN
16     BY:  RICHARD CAMPBELL (Telephonic appearance)
17     Attorneys at Law
18     353 North Clark Street, Suite 4500
19     Chicago, Illinois  (312) 840-7282
20     (312) 840-7282
21     stephenbrown@jenner.com
22     richardcampbell@jenner.com
23
24
25

3  (Pages 160 to 163)

**HIGHLY CONFIDENTIAL**

164

1   APPEARANCES (continued):
2
3   For Defendant Michael Foods:
4       WEIL, GOTSHAL & MANGES LLP
5       1300 Eye Street N.W., Suite 900
6       Washington, D.C.  20005
7       (202) 682-7231
8       (No appearance.)
9
10  For Weaver Brothers:
11      DISNMORE & SHOHL LLP
12      1100 Courthouse Plaza SW
13      10 North Ludlow Street
14      Dayton, Ohio  45402
15      (937) 463-4928
16      (No appearance.)
17
18
19
20
21
22
23
24
25

166

1   APPEARANCES (continued):
2
3   For Michael Foods:
4       LEONARD, STREET & DEINARD
5       BY: PETER J. SCHWINGLER
6       Attorney at Law
7       150 South Fifth Street, Suite 2300
8       Minneapolis, Minnesota  55402
9       612 335-7023
10      peterschwingler@leonard.com
11      (Telephonic appearance.)
12
13  For Ohio Fresh Eggs:
14      KEATING MUETHING & KLEKAMP PLL
15      BY:  BRYCE YODER
16      Attorney at Law
17      One East Fourth Street, Suite 1400
18      Cincinnati, Ohio  45202-3752
19      (513) 579-6400
20      jcallow@kmklaw.com
21      (Telephonic appearance.)
22
23
24
25

165

1   APPEARANCES (continued):
2
3   For Moark LLC and Norco Ranch, Inc.
4       EIMER STAHL, LLP
5       BY:  TRAVIS KENNEDY
6       Attorney at Law
7       224 South Michigan Avenue, Suite 1300
8       Chicago, Illinois  60604
9       (312) 660-7604
10      tkennedy@eimerstahl.com
11      (Telephonic appearance.)
12
13  For Winn-Dixie, Inc., Roundy's Supermarkets, Inc.,
14  C&S Wholesaler Grocers, Inc., and H.J. Heinz
15  Company, L.P.:
16      BAKER & McKENZIE LLP
17      300 East Randolph Street
18      Chicago, Illinois  60601
19      (312) 861-3735
20      (No appearance.)
21
22
23
24
25

167

1   APPEARANCES (continued):
2
3   Videographer:
4       SCOTT SLATER, VERITEXT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 164 to 167)

**HIGHLY CONFIDENTIAL**

**168**

```
1                 INDEX
2    WITNESS              EXAMINATION
3    DONALD L. BELL
     Volume II
4
5
6         BY MR. OLSON        175
7         BY MR. RAYLE        257
8         BY MR. TAKENOUCHI   263
9
10
11
12             EXHIBITS
13   EXHIBIT      DESCRIPTION      PAGE
14   Exhibit 16  United Voices newsletter,   174
15               7/29/02
16
17   Exhibit 17  Animal Welfare Report for   202
18               2003 Area Meetings
19               Bates Nos. CM00430620 - -633
20
21   Exhibit 18  Don Bell's Table Egg Layer  208
22               Flock Projections and Economic
23               Commentary - 2003, No. 35
24               Bates Nos. BELL002761 - -763
25
```

**170**

```
1    INDEX (Continued):
2
3               EXHIBITS
4    EXHIBIT      DESCRIPTION      PAGE
5    Exhibit 23  Unresolved Animal Welfare   236
6               Issues (Feeder Space)
7               Bates Nos. BELL-D-00028597 - -599
8
9    Exhibit 24  E-mail string               244
10              Bates Nos. UE0918791 - -796
11
12   Exhibit 25  University of Illinois letter   246
13              to Gene Gregory from Ken W.
14              Koelkebeck, 10/2/02, with
15              attachment
16              Bates Nos. BELL-D-00028111 - -131
17
18   Exhibit 26  E-mail string               252
19              Bates No. UC_E00055875
20
21   Exhibit 27  Introduction to the US Table-Egg   257
22              Industry
23              Bates Nos. BELL-D-00000024 - -042
24
25
```

**169**

```
1    INDEX (Continued):
2
3               EXHIBITS
4    EXHIBIT      DESCRIPTION      PAGE
5    Exhibit 19  E-mail from Don Bell to Al   214
6               Pope, 3/24/04, with attachment
7               Bates Nos. UE0880125 - -127
8
9    Exhibit 20  Don Bell's Table Egg Layer   219
10              Flock Projections and Economic
11              Commentary - 2004, No. 44
12              Bates Nos. BELL-D-00028600 - -611
13
14   Exhibit 21  Shell Egg Marketing Committee,   227
15              10/20/04, New Orleans Minutes
16              Bates Nos. UE0153245 - -246
17
18   Exhibit 22  Joint Meeting of UEP Scientific   232
19              Advisory Committee and UEP
20              Producer Committee For Animal
21              Welfare, June 10-11, 2004,
22              Chicago, Illinois, Minutes
23              Bates Nos. UE0294465 - -468
24
25
```

**171**

```
1    INDEX (Continued):
2
3               EXHIBITS
4    EXHIBIT      DESCRIPTION      PAGE
5    Exhibit 28  U.S. Farm and Retail Egg Price   260
6               Relationships - 1982 to 2005,
7               Changing Share of the Consumer's
8               Egg Dollar
9               Bates Nos. UE0155821 - -831
10
11   Exhibit 29  Cooperative Extension, University   325
12              of California, No. 217, 7/12/99,
13              An Egg Economics Update, Donald
14              Bell, Poultry Specialist
15
16
17
18
19
20
21
22
23
24
25
```

**VERITEXT REPORTING COMPANY**
(212) 279-9424     www.veritext.com     (212) 490-3430

**HIGHLY CONFIDENTIAL**

---

**172**

1  Riverside, California, Wednesday, August 21, 2013
2  10:09 a.m.
3
4  THE VIDEOGRAPHER:  Good morning.
5  We are on the record at approximately 10:09
6  a.m. on August 21st, 2013.
7  This is the video-recorded deposition of
8  Don Bell, Volume II.  My name is Stan Beverly, here
9  with our court reporter, Denise Bardsley.  We're
10 here from Veritext National Deposition and
11 Litigation Services at the request of counsel for
12 the Direct Purchaser Plaintiffs.
13 This deposition is being held at 3500
14 Market Street in the city of Riverside.  The caption
15 of this case is In Re:  Processed Egg Products
16 Antitrust Litigation, Case No. 200208-MB-200.
17 Please note that audio and video recording
18 will take place unless all parties agree to go off
19 the record.  Microphones are sensitive and may pick
20 up whispers, private conversations and cellular
21 interference.
22 I'm not authorized to administer an oath, I
23 am not related to any party in this action, nor am I
24 financially interested in the outcome in any way.
25 May I please have an agreement from all

---

**173**

1  parties that we can proceed.
2  MR. OLSON:  Yes.
3  MR. GODLSTEIN:  Yes.
4  MR. RAYLE:  Yes.
5  THE VIDEOGRAPHER:  At this time will
6  counsel and all present identify themselves for the
7  record.
8  MR. OLSON:  Let's start on the phone.
9  Could the folks on the phone identify themselves.
10 MR. CAMPBELL:  Richard Campbell, Jenner &
11 Block for the Kraft plaintiffs.
12 MS. REDDING:  Whitney Redding, Pepper
13 Hamilton, for United Egg Producers and United States
14 Egg Marketers.
15 MR. SCHWINGLER:  Peter Schwingler, Leonard,
16 Street & Deinard, for Michael Foods.
17 MS. OSBORN:  Kathy Osborn for Midwest
18 Poultry, with Faegre Baker Daniels.
19 MR. MONICA:  John Monica and Kerri Allen
20 from Porter, Wright, Morris & Arthur, Rose Acre
21 Farms.
22 MS. KENNEDY:  Travis Kennedy from Eimer
23 Stahl, for Moart, LLC, and Norco Ranch, Inc.
24 MR. YODER:  Bryce Yoder from Keating
25 Muething & Klekamp, on behalf of Ohio Fresh Eggs.

---

**174**

1  MR. OLSON:  Anyone else?
2  All right.  This is Steig Olson from Quinn
3  Emanuel Urquhart & Sullivan for the Direct Purchaser
4  Plaintiffs.
5  MR. PIZZIRUSSO:  James Pizzirusso, Hausfeld
6  LLP, Direct Purchaser Plaintiffs.
7  MR. BROWN:  Stephen Brown from Jenner &
8  Block for Direct Action Plaintiff, Kraft, General
9  Mills and Nestle.
10 MR. RAYLE:  Merrick Rayle from Lovell
11 Stewart Halebian & Jacobson for the Indirect
12 Purchaser Plaintiffs.
13 MR. TAKENOUCHI:  Jason Takenouchi of
14 Kasowitz Benson Torres & Friedman, LLP, for
15 Defendant Nu-Cal Foods, Inc.
16 MR. GODLSTEIN:  Michael Goldstein with the
17 Regents of the University of California for the
18 witness, Mr. Bell.  And with me here today is
19 Kristen Erving, our paralegal.
20 THE VIDEOGRAPHER:  The witness will be
21 sworn in and counsel may begin the examination.
22 //
23 //
24
25

---

**175**

1  DONALD L. BELL,
2  having been administered an oath, was examined and
3  testified as follows:
4
5  EXAMINATION
6  BY MR. OLSON:
7  Q  Good morning, Mr. Bell.
8  A  Good morning.
9  Q  How are you today?
10 A  Feeling good.
11 Q  Good.  Are you prepared to testify
12 truthfully to the best of your knowledge today?
13 A  Yes.
14 Q  Okay.  And as with yesterday, if at any
15 time you need to take a break or do anything to
16 refresh yourself, just let us know.
17 A  Yes.
18 (Deposition Exhibit 16 was marked for
19 identification by the court reporter
20 and is attached hereto.)
21 BY MR. OLSON:
22 Q  Thank you.
23 All right.  I've handed you what's been
24 marked Bell Exhibit 16.  This is a document
25 Bates-stamped UE0135717 through -135726.

---

**6 (Pages 172 to 175)**

HIGHLY CONFIDENTIAL

176

1     And, Mr. Bell, have you had a chance to
2  briefly look at this document?
3     A  Very briefly, uh-huh.
4     Q  Okay.  Can you identify it as a United
5  Voices publication dated July 29, 2002?
6     A  Yes, I can.
7     Q  And it attaches a -- what you've referred
8  to as a memoranda that you've prepared under the
9  sponsorship of UEP; is that right?
10    A  That's correct.  We called it a memo, but
11  that's okay.
12    Q  A memo.
13    And the date of this memo is July 16, 2002;
14  is that --
15    A  Yes, sir.
16    Q  All right.  And the title of it is,
17  "Several Possible Scenarios Resulting From UEP's New
18  Husbandry Guidelines"; is that right?
19    A  Yes.
20    Q  And, specifically, it is a discussion of
21  what aspect of the husbandry guidelines?
22    A  The introduction refers to the effects of
23  the industry's potential reduction of cage
24  densities.  That seems to be the foremost --
25    Q  So, in other words, what you're looking at

177

1  are scenarios regarding the cage density aspect of
2  the guidelines?
3     A  Yes.  Yes, sir.
4     Q  Okay.  And who asked you, if anyone, to
5  prepare this memo?
6     A  Well, the introduction says, "Gene Gregory
7  asked me," and at that time I'm not sure whether he
8  was president or vice president of UEP.
9     Q  So Mr. Gregory from UEP had asked you to
10  prepare --
11    A  Yes, sir.
12    Q  -- this memo?
13    And at this time you were on retainer by
14  UEP to prepare these types of documents, correct?
15    A  Yes.
16    Q  All right.  If you look at the "Background"
17  section it refers to the cage space standards that
18  UEP had developed.
19    Do you see that?
20    A  Yes.
21    Q  And it says, "The standards described the
22  stepwise introduction of increased space
23  allowances."
24    What were you referring to there?
25    A  "Standards described the stepwise" -- in

178

1  other words, it would be a transition period under
2  which everyone has an opportunity to get their goal.
3     It's impossible to get to your goal
4  overnight, so it's a -- apparently it's about a
5  six-year -- in the table, a six-year period to
6  eventually get to your goal.
7     Q  And you refer, actually, to a seven-year
8  period in this discussion?
9     A  Okay.  That's --
10    Q  Do you see that?
11    A  Well, I don't see where -- where is that --
12  I see that, yes.
13    Q  Do you see where you write, "the producer's
14  committee has advised that such changes shall take
15  place over a seven-year period from 2002 to 2008 in
16  order to cause the least disruption in production
17  and marketing processes."
18    Do you see that?
19    A  That would be the UEP's committee and not
20  the Scientific Advisory Committee.
21    Q  Right.  And is that consistent with your
22  knowledge of why the UEP producer committee decided
23  that there should be this seven-year period?
24    A  It could have been more, it could have been
25  less.  I assume this was some kind of a compromise

179

1  among the members.
2     Q  But the goal was to avoid or to minimize
3  disruption in production?
4     MR. TAKENOUCHI:  Objection; foundation.
5     THE WITNESS:  Yes.
6  BY MR. OLSON:
7     Q  Did you attend meetings of the UEP producer
8  committee?
9     A  No.
10    Q  Never?
11    A  Never, never, never?  They may have been
12  part of the annual meeting where I made a
13  presentation.  There was no formal attendance at
14  their meetings.  I don't think they really
15  encouraged it.  They may have had the chairperson of
16  our -- of the scientific committee.
17    If I attended, it would have been in
18  association with their annual meeting.
19    Q  Now, strictly from the standpoint of supply
20  management, did you anticipate any benefit from the
21  fact that the guidelines involved this stepwise
22  increase of cage space allowances over a seven-year
23  period?
24    MR. TAKENOUCHI:  Objection to form.
25    THE WITNESS:  Obviously, the intent of

7 (Pages 176 to 179)

**HIGHLY CONFIDENTIAL**

---

180

1  reducing the overpopulation of chickens was intended
2  to take time. This was an animal welfare issue, and
3  it couldn't be done without extreme disruption of
4  individual companies' replacement policies.
5      It takes five to six months to grow a young
6  chicken. And then there's another eight or ten
7  flocks alive that are producing eggs for the
8  company. And overnight would totally disrupt the
9  marketing of eggs and the supply of eggs in the
10 United States.
11 BY MR. OLSON:
12     Q  Let me try it again.
13         Putting the disruption issue to one side --
14     A  Okay. Go ahead.
15     Q  As we discussed yesterday, the goal of
16 supply management and balancing supply and demand
17 was one you thought was important?
18     A  I do.
19     Q  Focusing on that goal, did you anticipate
20 benefits to the industry resulting from the fact
21 that the guidelines contemplated a seven-year
22 stepwise increase of cage space allowances?
23         MR. TAKENOUCHI: Objection to the extent
24 the term "benefits" is unclear.
25         THE WITNESS: I anticipated a partial

---

181

1  benefit the first year, more benefit the second year
2  and final benefit the seventh year. That would be
3  the ultimate benefit.
4  BY MR. OLSON:
5      Q  And how about years three through six?
6      A  The same, I'm not giving you every single
7  year, but --
8      Q  Okay. So just to be clear --
9      A  -- progressively.
10     Q  -- a progressive benefit over the course of
11 the seven years?
12     A  Yes.
13         MR. TAKENOUCHI: Objection to form.
14 BY MR. OLSON:
15     Q  And just to be clear, you anticipated a
16 progressive benefit over the course of the seven
17 years?
18     A  Yes.
19     Q  And why was that?
20     A  Because everyone was not required to comply
21 every year to the same extent. They were required
22 to comply by the seventh year. And that's when
23 everyone should have gotten to their goal of flock
24 size, density, the whole issue.
25     Q  But even for those folks who were signed up

---

182

1  from day 1, did you anticipate a benefit from their
2  stepwise increase over each of the seven years, a
3  benefit in the industry?
4      MR. TAKENOUCHI: Objection; speculation.
5      THE WITNESS: The benefits could only go to
6  year 7. If you started the very first year and took
7  care of your entire responsibility, then you were
8  going to have the lower density for the entire seven
9  years. But you didn't have to meet the obligations,
10 except for these dates here that are on this chart.
11 So you were not required to do it in the first year.
12 BY MR. OLSON:
13     Q  Right. Well, let's make sure we're
14 speaking the same language.
15     A  Go ahead.
16     Q  Your point is under the program, a producer
17 wasn't required to get to 67 inches right away?
18     A  Right.
19     Q  But there were requirements for each year
20 under the program, right?
21     A  Yes. That's what is spelled out here.
22 There is a different total allowance for each year.
23     Q  Right. And those numbers are going up; in
24 other words, each year a producer had to increase
25 the space allowance?

---

183

1      A  Uh-huh -- yes.
2      Q  So my question is, for those producers who
3  signed up on year 1 and met their space allowance
4  for year 1 and then for year 2, year 3, did you
5  anticipate a benefit to the industry that was
6  progressive over those years?
7      A  A partial benefit, yes.
8         MR. TAKENOUCHI: Objection to form.
9  BY MR. OLSON:
10     Q  And why do you say "a partial benefit"?
11     A  Because it's not 100 percent.
12     Q  Okay. But it would be a progressive
13 benefit?
14     A  Progressive benefit, based upon the entire
15 population and which ones decided to go all the way
16 at the beginning or only go, as the table shows, up
17 to a certain level of square inches.
18         No one is required to have 67 square inches
19 in the first year or the second. The question of
20 logistics, how do you accomplish this, is an
21 independent problem for every producer because they
22 don't all have the same size cage.
23         You cannot reduce everybody the same amount
24 each year because they are starting with larger
25 cages and smaller cages.

---

8 (Pages 180 to 183)

**HIGHLY CONFIDENTIAL**

184

1    Q   And now stepping back for the industry as a
2  whole, did you anticipate, based on the work and
3  analysis you had done, a progressive benefit over
4  the course of the seven years for the industry as a
5  whole?
6        MR. TAKENOUCHI:  Objection to form.
7        THE WITNESS:  I think I've said that
8  already, yes.
9  BY MR. OLSON:
10   Q   And that benefit would be in terms of
11 better management of supply and better prices?
12       MR. TAKENOUCHI:  Objection; restates prior
13 testimony.  Objection to form.
14       THE WITNESS:  The result of -- of the
15 animal welfare plan and the implementation of it and
16 the dates of it and the individual companies'
17 responses, all of these things have to be taken into
18 consideration.
19 BY MR. OLSON:
20   Q   And the benefit of that plan was what?
21   A   It would have accrued to the entire
22 industry.
23   Q   And the benefit that would have accrued to
24 the entire industry was what?
25   A   Higher prices.

185

1    Q   Now, in this piece you mention a couple of
2  variables that you looked at in your modeling, true?
3    A   Yes.
4    Q   Sometimes I have to ask just preliminary
5  questions like that.
6    A   Okay.
7    Q   And one of those was this concept of
8  backfilling: is that right?
9    A   Yes.
10   Q   You anticipated that some backfilling would
11 occur and that it was variable in how this would
12 unfold?
13   A   Would you refer to the comment about
14 backfilling?
15   Q   Yes.  If you look at page 2.
16   Q   Page 2?
17       MR. TAKENOUCHI:  Counsel, I'm just going to
18 object to the form of these questions.  It's unclear
19 whether he's reading from the document or --
20       MR. OLSON:  You can just object to form.
21 That's fine.
22   Q   Now, on page 2 --
23   A   Item 1 here?
24   Q   Yes.  You say, "Increases in hen counts by
25 backfilling cages at 'push-out' time or by utilizing

186

1  previously unused farms or houses may have
2  occurred."
3        Do you see that?
4    A   Yes, sir.
5    Q   And so this concept of backfilling was
6  something that you anticipated might occur?
7    A   That would -- that would make the analysis
8  less certain because it's an individual choice to
9  backfill or not to backfill, and it would probably
10 never make the final outcome off by more than 5 or
11 10 percent, because you only have so many empty
12 cages.  And, also, it's a policy for many companies
13 not to backfill at all.
14   Q   But just as a preliminary point --
15   A   Uh-huh.
16   Q   -- the idea that some companies might
17 backfill was a possibility you recognized?
18   A   Yes.
19       MR. TAKENOUCHI:  Objection to form.
20 BY MR. OLSON:
21   Q   Now, if you turn to the next page -- well,
22 actually, still at the bottom of 2, another variable
23 you mentioned was the introduction of new houses or
24 farms.
25       Do you see that --

187

1    A   Yes.
2    Q   -- heading?
3        And then it's discussed a little bit more
4  on the next page.
5    A   Uh-huh.
6    Q   And --
7    A   Yes, sir.
8    Q   -- if you look, there is a large paragraph
9  there that starts "The model looks at."
10       Why don't you review that paragraph to
11 yourself?
12   A   I did.
13   Q   Okay.
14   A   The model looks at different growth rates
15 in the industry, beginning in 2002 going to 2010.
16   Q   And when you refer to growth rates, what --
17   A   Numbers of chickens or numbers of eggs.
18       MR. GODLSTEIN:  Don, you're doing a really
19 great job, but I want to remind you to wait for
20 Steig to get his entire question out before you jump
21 in with your answer.
22       THE WITNESS:  Okay.
23 BY MR. OLSON:
24   Q   At the end of that paragraph you write, "It
25 is hoped that the industry will be able to sustain

9 (Pages 184 to 187)

**HIGHLY CONFIDENTIAL**

188

1  an improved supply/demand relationship as a result
2  of these major changes."
3      Do you see that?
4    A  Yes.
5    Q  Why was that the hope?
6    A  Due to the average or annual variation of
7  profitability in the industry, it's not considered
8  to be 100 percent profitable, and my own
9  interpretation of this is that it's -- it has a lot
10  of problems with earnings, and therefore, price.
11    Q  And why was there hope at this time that
12  the cage space guidelines could lead to a sustained
13  improvement in the supply/demand relationship?
14      MR. TAKENOUCHI:  Objection; lack of
15  personal knowledge to the extent he's speaking for
16  anyone other than himself.
17      THE WITNESS:  The existence of a single
18  chicken house has a maximum capacity and it has a
19  UEP recommended capacity.  And until -- and once
20  you've reached the UEP number, the only way that you
21  can affect the population in the United States is
22  either through productivity of the individual
23  chicken, which it does increase every year, or by
24  someone building a new complex or new houses,
25  because the new capacity of that house is a

189

1  constant.
2  BY MR. OLSON:
3    Q  Now, this possibility of producers building
4  new complexes and housing is something that you
5  considered as well, in your work?
6    A  Yes, that's the growth factor.
7    Q  And one of the factors that you point out
8  here is that that type of -- or building new housing
9  was going to be more expensive?
10      MR. TAKENOUCHI:  Objection; misstates the
11  document.
12      THE WITNESS:  Does it actually say that?
13  BY MR. OLSON:
14    Q  Well, do you see where you say in the next
15  sentence, "More expensive housing" --
16    A  I see it, I see it, yeah.
17    Q  -- "(as a result of lower cage density)
18  should delay start-up decisions and financing"?
19    A  Immediately if you build --
20      MR. GODLSTEIN:  Wait for him to finish the
21  question.
22      THE WITNESS:  Excuse me.  I thought he was
23  finished.
24  BY MR. OLSON:
25    Q  I was.

190

1      Go ahead.
2      MR. TAKENOUCHI:  Objection to form.
3      THE WITNESS:  Immediately the house is
4  going to cost more per bird as you remove 20 percent
5  of the birds.  The per-bird cost is going to go up.
6      Costs, in general, go up annually with the
7  economics of the time.  Lumber costs go up and the
8  metal costs go up, and so on, so that, I think, is a
9  very conservative estimate.
10  BY MR. OLSON:
11    Q  What's a conservative estimate?
12    A  The numbers that are quoted.
13    Q  About how --
14    A  $15 versus 10.
15    Q  Okay.  So you -- in other words, it's
16  possible that housing costs were even going to be
17  more expensive than you estimated here as a result
18  of the guidelines?
19      MR. TAKENOUCHI:  Objection --
20      THE WITNESS:  No, I think that's taken that
21  into consideration.  I think that's what we're
22  talking about.
23  BY MR. OLSON:
24    Q  I'm just trying to understand what you are
25  saying was conservative.

191

1    A  I think the $15 is a conservative result of
2  what we're talking about.
3    Q  Now, in order for the egg industry to
4  benefit as a whole from these guidelines, was there
5  any limit, in your view, on how many new housing
6  complexes should be built?
7    A  Well, we have to keep up with the human
8  population in the United States.  As the human
9  population goes up 1 percent a year, which is
10  3 million, theoretically you need 3 million more
11  chickens, just to keep the status quo.
12      Now, if the consumption of eggs goes down,
13  and, of course, those numbers are going to change.
14      You have to take into consideration the
15  increasing productivity of the chickens at the rate
16  of half a percent a year.  Over that seven-year
17  period, you would be projecting another 3 1/2
18  percent production, and that's -- and that's a lot.
19  That's 10 million birds.
20    Q  So, in other words, the egg industry, even
21  under the guidelines, might need to increase
22  production to some extent?
23    A  If you look at the statistics that we
24  produce in our newsletter, you'll see that the layer
25  numbers in the United States have been very

10 (Pages 188 to 191)

HIGHLY CONFIDENTIAL

**192**

1  constant, very constant layer numbers.  Now,
2  remember I told you productivity of each chicken has
3  changed --
4      So all these factors, you've got the
5  consumers' reaction to newspaper clippings about
6  cholesterol or other factors, other health factors.
7  You have some disease epidemics that have occurred
8  that will scare people away from eating eggs.  And
9  so, you know, there's multiple factors going on.
10  And all of these -- if we considered every single
11  one of them, the story might be totally different,
12  but you have to take a center position.
13      Q  Well, I'd like to focus on this factor of
14  building new housing complexes.
15      A  Yes.
16      Q  Are you aware of efforts by UEP to persuade
17  its members not to overbuild as a result of the
18  increased space allowances under the guidelines?
19      MR. TAKENOUCHI:  Objection; form.
20      THE WITNESS:  There are several answers to
21  that question.  Do you want them all?
22  BY MR. OLSON:
23      Q  Yes.  Let's start with the first one.
24      A  One suggestion and recommendation to
25  members is that they don't build brand-new -- add on

**193**

1  facilities to what they've already got and that they
2  buy someone else out.
3      Q  And that was a suggestion and
4  recommendation made by UEP?
5      A  UEP, right.
6      So the intent there is to try to stabilize
7  the bird numbers.  Once you accomplish the stable
8  bird numbers, you don't want people going out there
9  and doubling their number of houses, do you?  And --
10      You have to say yes or no.  He can't get
11  you -- you're nodding your head.
12      MR. GODLSTEIN:  You can't ask him questions
13  unless it is to clarify something.
14      Go ahead.
15      THE WITNESS:  Okay.  Go ahead.  That's
16  another one.
17  BY MR. OLSON:
18      Q  Okay.  So that was the first suggestion and
19  recommendation?
20      A  Can I add on?
21      Q  Sure.
22      MR. TAKENOUCHI:  Objection; lacks
23  foundation.
24      THE WITNESS:  Houses only last so long, and
25  equipment, and therefore, they are only efficient

**194**

1  for so many years and then they start to fall down.
2  So there is ongoing replacement of houses all the
3  time.
4      And when they have a requirement to have 80
5  percent of the population in any given house, the
6  new house will be designed with that in mind and it
7  will be a new hundred percent.  It won't be an 80
8  percent, it will be a hundred percent of that new
9  house.
10  BY MR. OLSON:
11      Q  Okay.  So we were talking about your
12  knowledge of efforts by UEP to persuade its members
13  not to overbuild as a result of the increased space
14  allowances under the guidelines, and you just
15  identified one, but you indicated there were others.
16      A  I --
17      MR. TAKENOUCHI:  Objection to form.
18      THE WITNESS:  -- have no knowledge --
19      MR. TAKENOUCHI:  Mr. Bell, could you let me
20  finish the objection; please?
21      Objection to the form he's not identified
22  who at UEP is supposedly making these
23  recommendations.
24      THE WITNESS:  I have no knowledge of
25  them -- to your specific question about building

**195**

1  houses.  Their recommendations would be that we do
2  not -- do not grow in numbers of birds or
3  production.  Those are two different things.
4  BY MR. OLSON:
5      Q  Okay.  And what do you recall about
6  caution -- or UEP cautioning its members not to grow
7  in numbers of birds or production?
8      MR. TAKENOUCHI:  Objection to form.
9      THE WITNESS:  Well, that's for my own
10  personal opinion -- viewpoint.  The fact that they
11  send out my newsletter with my recommendations on
12  that means that they are in somewhat of an agreement
13  with what I'm saying.
14  BY MR. OLSON:
15      Q  Because you personally cautioned against
16  producers growing in numbers of birds and
17  production?
18      A  Yes.  I cannot point to their actual
19  document.  Maybe this kind of a newsletter here, it
20  would say something to that effect.  But the add on,
21  which is my letter, certainly would, over time, say
22  that too many birds is detrimental.
23      Q  And, specifically in the context of the
24  increased space allowances under the program, you
25  cautioned against reacting to that by growing the

**11 (Pages 192 to 195)**

**HIGHLY CONFIDENTIAL**

196

1  number of birds and production and cautioned against
2  doing that?
3      A   The two are independent of one another.
4  Once you get to this lower number, and then you have
5  no recommendations, regulations or anything else
6  that keeps you from -- other than maintaining the
7  capacity of those houses, you have nothing that will
8  keep you from building the second house.  And that's
9  what you're cautioning the industry not to do.
10     Q   All right.  Now let's look at page 4 of the
11 document in front of you.  There is a heading that
12 says "Results" --
13     A   Okay.
14     Q   -- and you're summing up some of your work
15 here.  Have you had a chance to just briefly review
16 the "Results" section?
17     A   You want me to read it?
18     Q   Please.
19     A   Okay.  I've glanced through it.
20     Q   All right.  I want to make sure that we
21 understand this.
22         So you are modeling the effect here -- or
23 you're reporting possible outcomes from the effect
24 of the cage space guidelines, right?
25         MR. TAKENOUCHI:  Objection; misstates the

197

1  document.
2          THE WITNESS:  Partially.
3  BY MR. OLSON:
4      Q   Yeah.  And you have a couple different ways
5  of looking at it.  One is the results, if there was
6  100 percent compliance and no growth?
7      A   Yes.
8      Q   And then you also look at 50 percent
9  compliance and 10 percent sustained growth rate.
10 Those are basically the two ways you look at it
11 here, right?
12     A   I assume you're correct.  I haven't read it
13 in detail.
14     Q   Well, just what you report here in the
15 "Results" section?
16     A   Okay.  Well, you'll have to show the
17 specific sentence you are talking about.
18         Are you in "Results"?  Which item?
19     Q   Okay.  So number 1 says with a hundred
20 percent compliance and no growth, right?
21     A   Uh-huh.
22     Q   You estimated that chicks hatched in 2009
23 would be down over 26 percent, correct?
24     A   Yes, sir.
25     Q   And then if you look at number 4 you say

198

1  even with 50 percent compliance and at a 10 percent
2  sustained growth rate, the nation's flock in 2009
3  would still be smaller than it was today?
4      A   Yes.
5      Q   So you had maybe an aggressive assumption
6  and a conservative assumption there showing a range?
7      A   I would have tried to bracket the possible
8  conditions, yes.
9      Q   All right.  And when you say in number 6,
10 "total industry farm egg income," subtracting -- and
11 you subtract 35 cents per dozen.
12         Do you see that?
13     A   I see that.
14     Q   Why are you subtracting 35 cents per dozen?
15     A   I'm not sure I know.
16     Q   Fair enough.  In your "Comments" section at
17 the bottom --
18     A   Yes.
19     Q   -- you say, "We don't expect everyone to
20 believe the precise numbers that are listed in the
21 tables, but the general directions should be of
22 interest to everyone in table-egg production."
23         Do you see that?
24     A   Yes, sir.
25     Q   Why did you believe the general direction

199

1  would be of interest?
2      A   Well, this is always -- there is always a
3  disclaimer in most everything we write.  So you
4  don't want to say this is a black-and-white
5  situation, so you do use a disclaimer statement.
6          But in looking at different scenarios, the
7  direction is what's important.  It's -- is it a
8  factual direction, and I believe it was, I believe
9  it is.
10     Q   And what's the direction that you're
11 reporting here?
12     A   Well, we're basically, once again, talking
13 about the egg numbers or bird numbers and price, and
14 so we're talking about the gross income of the
15 industry here in item 7, or whatever.  So we're
16 looking at multiplying bird numbers, times
17 productivity, times price, holding, we'll say, feed
18 price constant, so you can look at the effective
19 income.  And you can run your models through
20 different scenarios, that's what we've done, and
21 saying, well, the general direction is with
22 reduction of bird numbers, income of industry will
23 rise.
24     Q   And the direction is the more producers
25 that participate --

12  (Pages 196 to 199)

**HIGHLY CONFIDENTIAL**

200

1    A  That's part of it.
2    Q  Let me just finish this one.
3        And the direction is the more producers
4    that participate, the better prices and the better
5    profits for all producers?
6    A  I would say that's a generally true
7    statement, but it still goes back to eggs, total
8    eggs, whether there are more producers, that may or
9    may not be the case.
10       As you know, we have this tremendous
11   concentration.  If we have one more large farm, that
12   affects the price of all eggs in the United States.
13   Q  With that caveat noted, the direction
14   you're referring to here is the more participation,
15   the better for everyone?
16   A  Well, the fewer eggs you produce, the
17   better it is for everyone.  Participation -- let's
18   just say you have 95 percent participation and they
19   were all tiny little farms.  That wouldn't --
20   Q  Okay.
21   A  -- accomplish much.
22   Q  But if you measure participation in terms
23   of -- and I take it this was your point, so I'll
24   start again.
25       If you measure participation in terms of

201

1    eggs --
2    A  Yes.
3    Q  -- the more producers -- the more eggs that
4    are produced under the program --
5    A  Yes.
6    Q  -- the more -- the better prices and the
7    better profits for all producers?
8        MR. TAKENOUCHI:  Objection to form,
9    misstates prior testimony.
10       THE WITNESS:  Yes, but I'd like to add to
11   that.
12   BY MR. OLSON:
13   Q  Sure.
14   A  Okay.  There's only so much history
15   involving extremely high egg prices or high egg
16   prices, period, so the analyses have to deal with
17   history.
18       And history says that, within a range,
19   these events are related.
20       When you go to conditions like we have
21   today, and we have totally different cost structure,
22   totally different price structure and you have
23   nothing to predict it on.
24       It's just like I read the other day that
25   Mexico prices of eggs were 80 -- no, $2.00 -- $8.00

202

1    a dozen, that's what they were when they had this
2    disease problem.  That's totally unpredictable.  No
3    one would have predicted that, and it's the same
4    thing with when our feed prices double, no one would
5    have predicted that would have happened or the
6    results, just the general.
7    Q  We'll circle back to that, but just so your
8    testimony is clear, the direction that you were
9    saying in July of 2002 that should be of interest to
10   everyone is that the more eggs that are produced
11   under the UEP program, the better prices for the
12   industry as a whole?
13   A  The fewer eggs, not the more.  You said
14   "more."
15   Q  The higher percentage of eggs that are
16   subject to the program.
17   A  That makes fewer eggs.
18   Q  Right.
19   A  Okay.  You didn't say that.
20   Q  All right.  So the higher percentage of
21   eggs that are subject to the program, the better
22   prices and profits for all producers?
23   A  Yes.
24   Q  You can set that aside.
25       Before I hand you this document, you

203

1    testified yesterday that you would generally receive
2    Gene Gregory's United Voices publication.  Would,
3    from time to time, you review editorials by Gene
4    Gregory that he wrote on these topics?
5    A  Yes.
6        (Deposition Exhibit 17 was marked for
7         identification by the court reporter
8         and is attached hereto.)
9    BY MR. OLSON:
10   Q  Let me hand you what we marked Bell 17.
11       And I'm only going to ask you to look at a
12   portion of this, which is towards where you are.  It
13   is towards the back.
14       MR. TAKENOUCHI:  Can we have the Bates
15   number, please?
16   BY MR. OLSON:
17   Q  And it's -- the heading is, "Reason Why
18   Industry Could Have Period of Profitability.
19   Editorial By:  Gene Gregory."
20   A  Yes.
21   Q  And the Bates number --
22   A  Go ahead.
23   Q  You can start looking at it while I read
24   this.
25       The Bates number is CM00430620 through

**13 (Pages 200 to 203)**

**HIGHLY CONFIDENTIAL**

204

1    -633.
2        So why don't you just briefly skim that
3    editorial and let me know when you're done, and then
4    later if you want to read it in more depth, you can.
5        A  All right.
6        Q  All right.  Now, do you recall, after
7    looking at this, whether you've seen this editorial
8    before?
9        A  Having read this editorial?
10       Q  Yes.
11       A  I would do it automatically.
12       Q  Okay.  So -- okay.
13           Now, in this editorial Mr. Gregory is
14   referring to the fact that egg prices have reached
15   very high levels.
16       A  And the date is 2003?
17       Q  August of 2003.
18       A  August.  Okay.
19       Q  Do you see that?
20       A  I see it.
21       Q  And is that consistent with your knowledge?
22       MR. TAKENOUCHI:  Objection to foundation.
23   It's not clear he's testifying he's actually read
24   this particular editorial.
25       MR. OLSON:  All right.  Thank you.  We

205

1    don't need speaking objections.
2        THE WITNESS:  I can never recall the price
3    of eggs three months ago.
4    BY MR. OLSON:
5        Q  All right.  Fair enough.
6            In any case, just to orient ourselves, it
7    appears in August 2003 eggs prices have --
8        A  And, of course, that's the summertime, and
9    summertime is usually the lowest price for the year.
10       Q  Right.  And, in fact, Mr. Gregory reports
11   the Urner Barry quote had reached a level in the
12   summer of 2003 that had never previously been
13   recorded.
14           Do you see that right at the very
15   beginning?
16       A  That's -- well, he had a quote of a dollar.
17   Urner Barry quoted, not what the producer gets, by
18   any means.  It's a benchmark.
19           So if he's comparing apples and apples, and
20   then I guess he's made -- he's researched the
21   subject.
22           I would have my own data on the monthly egg
23   prices that I maintain, and I could go back and
24   verify it if you want me to.  I didn't make any
25   attempt to verify it.

206

1        Q  That's fine.  Let's put that aside.
2            All right.  If you look at the paragraph in
3    the middle of this page, it says, "UEP's Animal
4    Husbandry Guidelines."
5        A  Yes.
6        Q  And in there Mr. Gregory writes, "the fact
7    that approximately 200 companies have begun
8    implementing the program, this has caused a flock
9    production and will continue to do so for some
10   time."
11           Do you see that?
12       A  Yes.
13       Q  And then in the next paragraph do you see
14   where he says, "The hatch reduction to meet the
15   Animal Husbandry Guidelines began with chicks
16   hatched after April 1, 2002"?
17       A  Yes.
18       Q  Now based -- to your knowledge, is there a
19   relevant distinction between flock reduction and a
20   hatch reduction in this context?
21       A  They should be -- they should be
22   correlated.
23           Remember there is a six-year -- five- to
24   six-month delay when one occurs and the other --
25   they become hens.

207

1            I think I indicated yesterday the hatch
2    used to be a very important indicator of what's
3    going to happen in the future.
4            I report the hatch every month.  It comes
5    in the United States Department of Agriculture
6    figures.
7            In most cases I believe their numbers, but
8    some things they are a little weak on.
9        Q  All right.  So -- but would it be fair to
10   say the cage space guidelines were expected to lead
11   to both a flock reduction and a hatch reduction?
12       A  Not necessarily a hatch reduction, but the
13   objective of reducing the flock size would affect
14   the total number of eggs that are laid.
15           As far as affecting hatch, the hatch goes
16   up and down as a result of the failure to make
17   enough earnings.
18           And you want to cut that back in the
19   future.  I can't afford my chicks today, so I don't
20   hatch them.
21       Q  All right.  I want to focus on one point
22   here where, at the top of the next page, the one
23   that ends in -631 --
24       A  Okay.
25       Q  This is just a preliminary question.  Do

14  (Pages 204 to 207)

**HIGHLY CONFIDENTIAL**

208

1   you see in the first couple of paragraphs there
2   Mr. Gregory is making the point that to the extent
3   the industry needs to build new facilities --
4        A   Let's see --
5        Q   -- that it should only be done to replace
6   the loss reduction?
7        A   In the first three paragraphs someplace?
8        MR. GODLSTEIN:   Are you starting from the
9   bottom of the page?
10       MR. OLSON:   Well, hold on.  Hold on.
11       Q   All right.  Let's try it this way.  In the
12  middle of the page Mr. Gregory says, "Two companies
13  have recently provided UEP with performance of
14  farms.  We have attempted to use this as a model to
15  calculate how many hens we need to replace the low
16  reduction."
17       A   Yes.
18       Q   Do you know if you worked on that model?
19       A   Did I?
20       Q   Yes.
21       A   I don't believe so.  I think this is --
22  they named the company, didn't they?
23       Q   Well, if you look two pages, it is the last
24  page in the document, it ends in -633?
25       A   Yes.

209

1        Q   There is this model for replacement of loss
2   production.
3        A   Well, if he had developed it, then I didn't
4   develop it.
5        Q   Just my question is, looking at this, do
6   you know if that's something that you worked on?
7        A   Well --
8        MR. GODLSTEIN:   See the model?
9        THE WITNESS:   This model down here?
10       MR. GOLDSTEIN:   Yes.
11  BY MR. OLSON:
12       Q   Right.
13       A   I think he's basing that on gathering data
14  from two of his cooperating farms, and I don't do
15  that.  I based it on larger samples of the entire
16  nation or all of California, or whatever it is.  I
17  don't just take two farms and say that it means
18  anything.
19  BY MR. OLSON:
20       Q   Okay.  You can put that aside.  I just
21  wanted to know if you've worked on that model.
22       (Deposition Exhibit 18 was marked for
23       identification by the court reporter
24       and is attached hereto.)
25  BY MR. OLSON:

210

1        Q   Let me hand you what we marked Bell 18.
2        A   Okay.  "High Egg Prices and Molting."
3        Go ahead.
4        Q   And this is a document Bates-stamped
5   BELL002761 through -2763.
6        And can you identify this, Mr. Bell, as one
7   of the memos you wrote under the sponsorship of UEP
8   dated December 10th, 2003?
9        A   Yes, sir.
10       Q   It's titled, "High Egg Prices and Molting
11  How Egg Prices Affect the Decision to Molt," right?
12       A   Yes.
13       Q   Now, from the first sentence of your memo
14  you're indicating that based on the data that you
15  looked at, the industry, by the end of 2003, was
16  experiencing some of the highest producer egg prices
17  in history, right?
18       A   That's what it says, yes.
19       Q   And then in the document you look at how
20  that affects decisions, the economics of the
21  decision of a producer to molt?
22       A   Yes.
23       Q   And if you look at page 2 at the end of the
24  second paragraph from the top, you write, "Obviously
25  current egg price levels do not justify molting."

211

1        Do you see that?
2        A   When it underlines "current" -- what does
3   it say about current?  -- it underlines the word
4   "current"?
5        Q   Right.
6        A   So it says -- the other statement is
7   relative to general prices and so on.
8        The current says that the relationship at
9   this moment is that you shouldn't molt, right, "do
10  not justify molting."
11       So if you look at all of the possibilities
12  of molting price there is a relationship, but you
13  can go too far and you don't go far enough.
14       Individual companies can make a lot more
15  money molting, other companies can make a lot more
16  money not molting and so you can condemn it -- I
17  think we had another document that some of the
18  members were condemning it, per se.  Well, that's
19  just not --
20       Q   But from the point of view of economics,
21  the point you make here is that, in general, molting
22  appears to be justified only under low margin
23  combinations of low egg prices and high pullet
24  prices?
25       A   Did I say "only"?

15  (Pages 208 to 211)

HIGHLY CONFIDENTIAL

212

1    Q  Do you see where you say, "In general,
2  molting appears to be just identified only under low
3  margin combinations of low prices and high" --
4    A  I did say "only," yeah.
5    Q  And that was your view at the time?
6    A  Obviously, yes.
7    Q  And the point you're making here is under
8  these very high egg prices --
9    A  These are not high egg prices.
10   Q  Well, you referred to them as the
11  highest --
12   A  I mean compared to today.
13   Q  Okay.  Well, let's just talk -- in late
14  2003 the where egg prices were the highest in
15  history, the point you're making here is you no
16  longer justify molting as an economic matter; is
17  that right?
18   A  I don't think so.
19       MR. TAKENOUCHI:  Objection to form,
20  misstates prior testimony.
21       THE WITNESS:  I'll have to read it a third
22  time and make sure I'm understanding you -- "appears
23  to be justified" --
24       MR. GODLSTEIN:  I don't think your answer
25  got on the record.

213

1       Did you hear him say "I don't think so"?
2       You have to speak up.
3       THE WITNESS:  I don't think so.
4  BY MR. OLSON:
5    Q  Let's just try the question again so we
6  can -- so the point you're making here is that as an
7  economic matter, in general, molting appears to be
8  justified only under low margin combinations of low
9  egg prices and high pullet prices, right?
10       MR. TAKENOUCHI:  Objection to form,
11  misstates prior testimony.
12       THE WITNESS:  Well, the question of
13  "appears" means with the evidence that we have
14  available in front of us, which this is a
15  newsletter, it appears that way.  I'm making a case
16  for that it doesn't apply to everybody, it doesn't
17  apply to every set of high prices and low prices and
18  costs and income and so on.
19       The title of the entire paper has to do
20  with high egg prices and molting.  Well, they are
21  experiencing high egg prices apparently at this
22  time.  People are questioning should we be molting,
23  and we are talking about generalities that the
24  molting is primarily a benefit under low-profit
25  situations or no-profit situations.

214

1       So in my thinking when we have 40 percent
2  of our years are below cost, we're selling eggs to
3  our buyers below cost 40 -- 40 percent of the time,
4  then what -- how are we supposed to determine what
5  we're going to do with the next flock about molting?
6  It is not a matter of the next flock, it is a matter
7  of the company's policy.  The company's policy is to
8  molt or not to molt.  And you can't look at just ups
9  and downs of a moment in time.
10      So it's -- I don't know.  I don't see that
11  I've done anything wrong.
12  BY MR. OLSON:
13   Q  Oh, no, I don't mean to suggest you did
14  anything wrong.  I was just -- these questions are
15  just to make sure we're understanding what was being
16  said here.
17   A  Have I explained it?
18   Q  Well, what you're saying here is that in
19  light of the current egg price levels, molting was
20  not economically justified?
21      MR. TAKENOUCHI:  Objection to form.
22      THE WITNESS:  I would have to know what the
23  current egg price was at the time, because, like I
24  say, in general, molting is done during low margin
25  periods -- pardon me, that's not a good statement.

215

1  It's more justifiable under low margin periods.
2       In California it's always been the thing to
3  do, and everybody did it.  And it started in
4  Washington state where they did it every flock once
5  or twice, once or twice molting.
6       California followed into it.  And now there
7  are parts of the country, New England, for example,
8  nobody molts.
9  BY MR. OLSON:
10   Q  Okay.  You can put that aside.
11      (Deposition Exhibit 19 was marked for
12       identification by the court reporter
13       and is attached hereto.)
14      MR. OLSON:  I've handed you what we've
15  marked Bell 19.
16      MR. GODLSTEIN:  Before we start with Bell
17  19, why don't we take a break.
18      MR. OLSON:  Okay.
19      THE VIDEOGRAPHER:  The time is
20  approximately 11:03 a.m., and we're going off the
21  record.
22      (Recess.)
23      THE VIDEOGRAPHER:  The time is
24  approximately 11:19 a.m., and we're back on the
25  record.

16  (Pages 212 to 215)

HIGHLY CONFIDENTIAL

216

BY MR. OLSON:

1   Q   All right, Mr. Bell, we're looking at Bell
Exhibit 19.  Can you identify this as an e-mail you
sent to Al Pope and Gene Gregory on March 24th, 2004
with an attachment that's one of your memos.
6       MR. TAKENOUCHI:  Can we get a Bates number?
7       MR. OLSON:  UE00088125 through -127.
8   Q   And do you recall preparing this memo?
9   A   Yes.
10  Q   Do you recall discussing it with Al Pope
11 and Gene Gregory?
12  A   Only in e-mail form.
13  Q   Do you recall discussions other than what
14 we're looking at here in Bell 19?
15  A   About this same subject?
16  Q   Right.
17  A   About this newsletter?
18  Q   Right.
19  A   No, I don't recall any discussion about it,
20 except for the e-mail.
21  Q   Okay.  Fair enough.  So let's look at the
22 memo.  And it is dated March 1, 2004, and it's
23 titled, "What a Difference a Year Makes," and it is
24 one you prepared, correct?
25  A   Yes.

217

1   Q   When you say "What a Difference a Year
2  Makes," you're referring to, at least in part, the
3  prices that were at favorable levels at the time?
4   A   I would say I was looking at total margin,
5  total net income.  That's the number we're quoting
6  here.
7   Q   When you say "net income," that means
8  profits?
9   A   Good question.  It would be income minus
10 costs.
11  Q   Okay.
12  A   But not taxes or anything of that.
13  Q   But for a layperson sometimes that's
14 just --
15  A   I think you're okay.
16  Q   -- it is just referred to as profits?
17      And what you report here is over the course
18 of the year, the conditions in the industry that
19 prevailed led to an improvement in industry revenue
20 of $1 billion or more?
21      MR. TAKENOUCHI:  Objection to form.
22 BY MR. OLSON:
23  Q   Is that right?
24  A   That's conclusions.  The table indicates it
25 is mostly egg price was the reason.

218

1   Q   The improved egg price led to --
2   A   Yes.
3   Q   -- an improvement in revenue of a billion
4  dollars or more?
5   A   Yes.
6   Q   And as far as the reasons for those
7  improved prices, you identify various factors,
8  including that the industry successfully held hen
9  numbers down, right?
10      MR. TAKENOUCHI:  Objection to form.
11      THE WITNESS:  In Dallas it shows a very
12 small up to your appearance reduction in bird
13 numbers and a considerable elevation in price, and
14 that's the concept of a ratio of a production change
15 to price that we talked about earlier.
16 BY MR. OLSON:
17  Q   And one thing that you observed during this
18 period is that the industry had successfully held
19 hen numbers down, correct?
20  A   That's what the statement says, yes.
21  Q   And that no increases in production had
22 been made to compensate for a larger human
23 population?
24  A   Right, that would have taken another
25 3 million, as I indicated earlier, annually.

219

1   Q   And those results were consistent with your
2  expectations of the results of the cage space
3  program being implemented?
4       MR. TAKENOUCHI:  Objection to form,
5  misstates prior testimony.
6  BY MR. OLSON:
7   Q   Is that right?
8   Q   Would you restate it?
9   Q   Yes.  Those results about hen numbers and
10 production, were those consistent with your
11 expectations about the implementation of the
12 increased cage space allowance guidelines?
13      MR. TAKENOUCHI:  Objection; form, misstates
14 prior testimony.
15      THE WITNESS:  I don't think I state that in
16 the letter itself.  I say there are many theories
17 why prices exceeded everyone's expectations, but we
18 believe they were affected by a combination of
19 supply and demand, circumstances that elevated
20 prices beyond historical experience, so I don't
21 think I can agree with your premise.
22 BY MR. OLSON:
23  Q   But putting aside what's stated in the
24 document, your expectation, based on the work you've
25 done, was that the implementation of the cage space

17  (Pages 216 to 219)

**HIGHLY CONFIDENTIAL**

**220**

1  guidelines was going to affect supply in a manner
2  consistent with what's reported here?
3      A  We -- in other -- in other reports that
4  we've already discussed, that would be the
5  relationship that we would expect.
6      Q  All right.  You can put that aside.
7          (Deposition Exhibit 20 was marked for
8          identification by the court reporter
9          and is attached hereto.)
10 BY MR. OLSON:
11     Q  Let me hand you what we've marked Bell 20.
12 This is Bates-stamped BELL-D-0028600 through -28605.
13         And, Mr. Bell, can you identify this as a
14 memo that you wrote dated July 23, 2004 and titled,
15 "Arguments For and Against Back Filling Table Egg
16 Layer Flocks"?
17     A  Yes.
18     Q  Now, we've seen in some other memos that
19 you say that Gene Gregory had asked you to look at
20 the subject of the memo.  Do you recall whether
21 Mr. Gregory asked you to look at backfilling?
22     A  I --
23         MR. TAKENOUCHI:  Objection to form.
24         THE WITNESS:  I have a feeling that he
25 asked me to write this one, because I don't usually

**221**

1  use the word "backfilling."  I think that's more of
2  an industry word than one I would use.
3  BY MR. OLSON:
4      Q  And do you recall at this time that
5  backfilling was something that Gregory was concerned
6  about?
7      A  He would be concerned with anything that
8  diluted the effects of their cage density policies.
9      Q  And would it be fair to say that there was
10 some concern by Mr. Gregory and others at this time
11 that backfilling was a loophole of sorts in those
12 cage density policies?
13     A  I personally would be opposed to
14 backfilling, more from a social, chicken social, and
15 from a disease potential.  Historically, we never
16 recommend backfilling.
17         Also from identification of a flock, we
18 lose total identification when we mix birds from
19 other flocks.  And I depend very heavily on flock
20 identity and flock performance in all of our
21 studies, model building, and so on.
22         So this, I'm pretty sure, I was asked to
23 talk about this, and I hope -- I haven't reread it
24 today, but I hope it was fair to both sides.
25     Q  Well -- and we'll get to that.  But just as

**222**

1  these preliminary questions going back to
2  Mr. Gregory's interest in this, and you referred to
3  Mr. Gregory being concerned with anything that
4  diluted the effects of the cage density policies.
5      A  Yes.
6      Q  Just to refocus on that for a moment, my
7  question was, were you aware of a concern by
8  Mr. Gregory at this time that backfilling was a
9  loophole of sorts in those cage density policies?
10         MR. TAKENOUCHI:  Objection; lack of
11 personal knowledge.
12         THE WITNESS:  The recommendations of UEP
13 and the agreements that people made relative to
14 density were for a maximum number of birds.
15         If a person had normal mortality versus a
16 catastrophic mortality, there's two different
17 thoughts about backfilling.
18         If your house is only -- if you're only
19 allowed 80 percent of your original, you originally
20 had 100 percent, now 80, and you lost half of them
21 due to a catastrophic emergency, then he would make
22 a very big claim to somebody to replace those
23 missing birds, because they are going to be missing
24 for one or two years.  That's the whole concept.
25         So you have people that are having

**223**

1  excessive mortality.  And what I mean by "excessive
2  mortality," it would be, say, from 10 points -- .1
3  percent a week to 40 or 50, and so that's a four- to
4  fivefold difference in mortality.
5          So it's an offer from the system to the
6  individual members who need to do this, who need to
7  do this because it reduces their hen numbers way
8  more than normal.
9  BY MR. OLSON:
10     Q  Okay.  Let's put aside the issue of
11 excessive mortality.
12     A  Okay.
13     Q  Putting aside that issue, were you aware of
14 a concern at this time in 2004 that the use of
15 backfilling in cases of normal mortality was
16 undercutting the purposes of the cage density
17 guidelines?
18         MR. TAKENOUCHI:  Objection to form.
19         THE WITNESS:  Any backfilling would
20 increase the population and would defeat the
21 original effect of reducing the profitability.
22 BY MR. OLSON:
23     Q  And that was a concern that Mr. Gregory had
24 at this time, was it --
25         MR. TAKENOUCHI:  Objection to form.

18 (Pages 220 to 223)

HIGHLY CONFIDENTIAL

224

1          MR. OLSON: Strike that.
2      Q  Was that a concern that Mr. Gregory had at
3  this time, to your knowledge?
4      A  He would have been confronted with -- from
5  individual members that this is a concern to me as
6  an individual member, and if there is enough of
7  that, then it is a concern to UEP as well. And if
8  there is enough concern to that, then he would turn
9  it over to somebody else.
10         These are my pros and cons, my advantages,
11  my disadvantages, as I perceive them, but there are
12  undoubtedly others.
13     Q  If you look at just -- I think to get to
14  your summary here, if you look at the sentence at
15  the bottom of page 3 that's cut off there, it starts
16  with, "If enough producers adopt the practice of" --
17  and then it continues on to the next page
18  "backfilling, we would be faced with an additional 2
19  to 2.5 percent laying hens and a resultant egg price
20  depression of 10 percent or 5 to 6 cents per dozen
21  (or more)."
22         Do you see that?
23     A  Yes.
24     Q  And was that a concern that you had at this
25  time, that the practice of backfilling could lead to

225

1  that?
2      A  After he asked me to give some thought to
3  this subject, and this -- a paper like this might
4  take me a day's worth of thought, as opposed to five
5  minutes here, but that's my conclusions about that
6  one issue of the backfilling.
7      Q  And that raised concerns for you?
8      A  Well, that's a significant amount of money.
9      Q  And you then, in bold, underlined --
10  basically cautioned individual producers not to
11  engage in that practice, right?
12     A  Yes. I'm concerned about multiple small
13  amounts giving us a large amount. And if you just
14  look at one little thing and say that it only
15  affects the industry by a penny a hen, well, you
16  multiply that by almost 300,000 -- 300 million, and
17  then you are talking about the real money. But if
18  you are also relating it to the profitability of the
19  industry where you're talking about maybe 25 to 50
20  cents, well, 1 cent a hen is several percentage
21  points.
22     Q  And do you recall whether at this time
23  Mr. Gregory shared your concern that the use of
24  backfilling in the industry could hurt the
25  industry's profitability?

226

1          MR. TAKENOUCHI: Objection; asked and
2  answered.
3          THE WITNESS: He asked me to give a
4  two-sided viewpoint in the first place. So he was
5  concerned, enough of his people were concerned, that
6  they should address it. And he didn't feel like he
7  was capable of doing it himself and I was available,
8  and so he, undoubtedly, asked me to give it some
9  thought.
10  BY MR. OLSON:
11     Q  All right. And then you attach, as you'll
12  see on page 5, an article entitled, "Potential
13  Health Risks of Backfilling at Molt."
14         Do you see that?
15     A  Yes.
16     Q  By Kenton Kreager of Hy-Line International?
17     A  Yes.
18     Q  What is Hy-Line International?
19     A  Yes.
20     Q  What is Hy-Line International?
21     A  It is the largest producer of baby chicks.
22     Q  So it's an egg producer?
23         MR. TAKENOUCHI: No --
24  BY MR. OLSON:
25     Q  Oh, chick producer?

227

1      A  Chick producer.
2      Q  And do you see at the bottom Mr. Kreager,
3  the bottom paragraphs says, "Transfers of back-fill
4  hens from within the same complex should be safe, as
5  all houses within a complex are usually of the same
6  vaccination history and exposure."
7          Do you see that?
8      A  Yes, I see that.
9      Q  Was that consistent with your knowledge?
10     A  Say it again.
11     Q  Was that consistent with your knowledge?
12         MR. TAKENOUCHI: Objection to form.
13         THE WITNESS: I would not be -- he's a
14  veterinarian, by the way, so he's a doctor.
15         I feel highly that he's a very experienced
16  person, and he visits many, many more farms than I
17  do and gets involved in their individual problems.
18         I would have been more strongly -- I
19  wouldn't have said the same vaccination history
20  between houses, maybe similar, but not the same.
21  Most companies have a vaccination policy, but it
22  does change over time.
23         The chickens on a given farm at any point
24  in time in a complex -- the definition of a complex
25  is multiple ages and there may be eight to ten

19 (Pages 224 to 227)

**HIGHLY CONFIDENTIAL**

228

1 different houses, eight to ten different ages and
2 they are -- that's also a two-year span.
3    So what's being recommended today has not
4 been recommended two years ago.
5 BY MR. OLSON:
6    Q  All right.  Thank you.  You can put that
7 aside.
8    (Deposition Exhibit 21 was marked for
9    identification by the court reporter
10   and is attached hereto.)
11 BY MR. OLSON:
12   Q  I'm handing you what's been marked Bell 21.
13 I'm going to have to get the Bates stamp of
14 this document.
15   It is UE0153245 through -246.
16   Mr. Bell, can you identify this as the
17 minutes of a shell egg marketing committee meeting
18 in October 20th, 2004 that you attended?
19   A  Yes.
20   Q  And do you recall why you attended this
21 meeting?
22   A  This was nine years ago; is that right?
23 Nine years ago.  I made presentations at three or
24 four or five of their annual meetings.  I would have
25 to go back in my diary and figure out what the

229

1 subject was.  I don't see it listed here.
2    Q  You know, Mr. Bell, if I ask you if you
3 recall something and you don't, you're entitled to
4 say that.  You don't have to --
5    A  I don't have to give you an explanation?
6    Q  If you don't know the answer, that's fine.
7    A  I want to give you an explanation.  Okay.
8 I do not recall what the subject was.
9    Q  I appreciate your willingness to be
10 helpful.  I just want you to know that I have to ask
11 the questions.  If you don't recall something from
12 nine years ago, that's fair.
13   A  That doesn't help you much, but go ahead.
14   Q  Okay.  Thank you.
15   But if we look through it and it jogs your
16 memory, let us know.
17   I just want to look at the -- there is a
18 heading at the bottom that says, "Industry
19 Statistics and Economics," the bottom of page 1 and
20 spills over to page 2.
21   Why don't you just review that section.
22   A  Ken Looper was their vice president.  He
23 presented -- he was a very big man on statistics.
24   We corresponded -- his company is the
25 largest company in the United States, it was then

230

1 also, and he and I correspond quite a bit because we
2 do have common interest.
3    He reported the Chilson report, Chilson is
4 an accounting firm that, at that time, was heavily
5 used in the industry and he had a lot of company
6 data across the country.  All that was treated
7 confidentially between companies.
8    "Gregory presented further reports and
9 pleaded with the attendees to take care of business
10 by reducing their flock age" --
11   MR. TAKENOUCHI:  Just for the record, it
12 seems like Mr. Bell --
13   MR. OLSON:  Please, do not interrupt the
14 witness.
15   MR. TAKENOUCHI:  Well, there is no question
16 here.
17   MR. OLSON:  Okay.  But what are you doing
18 speaking?
19   MR. TAKENOUCHI:  Objection; there is no
20 question pending.
21   MR. OLSON:  You're going to object in the
22 middle of him talking?
23   THE WITNESS:  I thought I was supposed to
24 go over what it says.
25 BY MR. OLSON:

231

1    Q  Okay.  And have you read it?
2    A  I'm trying to read it.
3    Q  Okay.  You don't have to read it out loud.
4    A  Okay.  Okay.  There is a statement about
5 stop backfilling.
6    Is that your question?
7    Q  Well, that was going to be my question.
8    All right.  So you see a reference to Gene
9 Gregory pleading with the attendees at the meeting
10 to take care of business by reducing their flock
11 age, stop backfilling and the use of old depreciated
12 houses?
13   A  Yes, I do see that.
14   Q  Does that refresh your recollection on
15 views expressed by Mr. Gregory at the time about
16 this use of backfilling?
17   A  This was four months beyond -- four or five
18 months beyond my complete article here that we just
19 talked about.
20   Now, the problem has not been resolved in
21 four months.
22   MR. GODLSTEIN:  Don, Steig's question was
23 does that refresh your recollection about --
24 BY MR. OLSON:
25   Q  About Mr. Gregory's views on backfilling in

**HIGHLY CONFIDENTIAL**

232

1  2004.
2      A   I understand he's still concerned.
3      Q   And Mr. Gregory, at this meeting that you
4  attended, pleaded with producers to stop
5  backfilling: is that your understanding?
6      MR. TAKENOUCHI:  Objection to form.
7      THE WITNESS:  Along with several other
8  things.
9  BY MR. OLSON:
10     Q   And these other things are reducing their
11 flock age.
12     What does that refer to?
13     MR. TAKENOUCHI:  Objection to form.
14     THE WITNESS:  I'm trying to think what
15 reducing the flock age would result in.
16     To me it would result in higher
17 productivity per bird.
18 BY MR. OLSON:
19     Q   If you're not sure what Mr. Gregory is
20 referring to, that's fine.
21     A   Okay.  I don't know.
22     Q   Okay.  And when Mr. Gregory pleaded with
23 the attendees to take care of business by -- and
24 refers to the use of old depreciated houses, do you
25 know what that was referring to?

233

1      A   I can't -- I do not know what he is getting
2  at.
3      Q   Okay.  You can put that aside.
4      (Deposition Exhibit 22 was marked for
5      identification by the court reporter
6      and is attached hereto.)
7  BY MR. OLSON:
8      Q   Let me hand you what is marked Bell 22, and
9  this document is Bates-stamped UE0294465 through
10 -4468.
11     I'll ask you, Mr. Bell, if you can identify
12 this as the minutes of a joint meeting of the UEP
13 Scientific Advisory Committee and UEP Producer
14 Committee For Animal Welfare dated June 10th and
15 11th, 2004?
16     A   Yes.
17     Q   And do you recall this meeting?
18     A   Vaguely.
19     Q   Do you recall why a joint meeting of the
20 Scientific Advisory Committee and the producer
21 committee was held at this time?
22     A   No, I don't.
23     Q   Do you recall discussions about the issue
24 of feeder space guidelines around this time?
25     A   Apparently we discussed it at this meeting

234

1  and would have discussed it in our own Scientific
2  Advisory Committee.
3      Q   And in the Scientific Advisory Committee,
4  and I believe we went over this yesterday, do you
5  recall that that committee said that there should be
6  a minimum of 4 inches of feeder space per hen?
7      MR. TAKENOUCHI:  Objection; vague as to
8  time.
9      THE WITNESS:  Yes.
10 BY MR. OLSON:
11     Q   But the producer committee at UEP didn't
12 put that 4 inch requirement in the guidelines?
13     MR. TAKENOUCHI:  Objection to form.
14     THE WITNESS:  I don't know about the
15 manuscript that you've handed out here yesterday,
16 whether that was the final member copy or if that
17 was a draft copy.
18 BY MR. OLSON:
19     Q   I believe you're referring to the
20 scientific committee guidelines and not the producer
21 guidelines.
22     But, in any case, do you recall that the
23 Scientific Advisory Committee learned that under the
24 cage space guidelines that were being implemented by
25 UEP, birds were actually getting less feeder space

235

1  than they had previously?
2      MR. TAKENOUCHI:  Objection; form.
3  BY MR. OLSON:
4      Q   Well, actually, why don't I refer you to --
5  if you look at the opening comments by Chairman
6  Bahan.
7      Do you see that?
8      A   Yes.
9      Q   Who is Paul Bahan?
10     A   He is a producer.  And he was the chairman
11 of the UEP animal welfare committee.
12     Q   And do you see where Mr. Bahan -- the
13 minutes say he stated that the scientific committee
14 had supported UEP's feeder space guidelines until it
15 became known that the new deeper cage was actually
16 reducing feeder space?
17     MR. TAKENOUCHI:  Objection; misstates the
18 document.
19     THE WITNESS:  I think that that's a true
20 statement.  The cage manufacturers did start to
21 change the shape of their cages in order to, more or
22 less, address this issue, but they never did get to
23 the 4 inches of feeder space.
24 BY MR. OLSON:
25     Q   So would it be correct to say that under

**HIGHLY CONFIDENTIAL**

236

1  the UEP program as of mid-2004, as that program was
2  implemented, birds are actually getting less feeder
3  space, in some cases, than they had before?
4      MR. TAKENOUCHI: Objection; foundation,
5  lacks personal knowledge. Objection to form.
6  BY MR. OLSON:
7      Q  Was that your understanding?
8      A  I don't know of anybody that's made that --
9  drawn that conclusion, because they were getting
10 less than 4 inches before until a much earlier stage
11 when they got 4 inches of feeder space. Then the
12 changes of the cage dimensions itself, I don't think
13 anybody has said that this is equal to this or
14 anything like that.
15     (Deposition Exhibit 23 was marked for
16     identification by the court reporter
17     and is attached hereto.)
18 BY MR. OLSON:
19     Q  Let me hand you what we've marked Bell 23.
20     A  Are you through with this one?
21     Q  Yes.
22     This is Bates-stamped BELL-D-00028597
23 through -28599.
24     And why don't you briefly review the
25 document and let us know when you're done.

237

1      A  Are we only concerned about the feeder
2  space at this point?
3      Q  No.
4      A  Go ahead and you can give it a try.
5      Q  Do you recall -- well, first can you
6  identify this as a document that you prepared titled
7  "Unresolved Animal Welfare Issues"?
8      A  I believe I did, but I don't see any
9  indication of that.
10     Q  I can tell you that in the metadata that
11 came with the documents it is indicated it is dated
12 August 2004?
13     A  2004?
14     Q  Yes.
15     So there is a heading that says "Feeder
16 Space."
17     A  Yes.
18     Q  And what this report says is the Scientific
19 Advisory Committee wrote in their September 2000
20 recommendations, which is the date of the document,
21 the exhibit we've looked at previously, and that is that a
22 following regarding feeder space, and that is that a
23 minimum feeder space of 4 inches per bird should be
24 allocated such that all birds can feed
25 simultaneously.

238

1      Do you see that?
2      A  Yes.
3      Q  But then when UEP adopted its guideline, it
4  took out the "4 inches per bird," right?
5      MR. TAKENOUCHI: Objection; foundation.
6      THE WITNESS: That's what I recognized,
7  yes.
8  BY MR. OLSON:
9      Q  And then if you read the rest of this, does
10 it refresh your recollection that under the UEP
11 program that was implemented, it actually became a
12 concern that feeder space was being reduced from
13 what it was previously?
14     A  Up through the fourth paragraph -- fourth
15 paragraph, we're progressing with time, so it is a
16 chronological discussion up to that point. We
17 haven't resolved -- well go ahead to the next
18 paragraph.
19     Q  What the fourth paragraph says is the
20 majority of cage equipment at the time of the
21 program being introduced provided 2.8 inches of
22 feeder space.
23     A  Yes.
24     Q  For 56 square inches.
25     So that's less than 4 inches?

239

1      A  That's correct.
2      Q  And the next paragraph says with the new
3  cages that were being implemented, feeder space was
4  actually being produced -- was actually being
5  reduced and sometimes only providing 2.23 inches of
6  feeder space, correct?
7      MR. TAKENOUCHI: Objection to form.
8      THE WITNESS: No, I don't see that in the
9  fourth -- one, two, three, fourth paragraph.
10 BY MR. OLSON:
11     Q  Fifth paragraph.
12     A  I'm on the fourth. We talked about going
13 from 2.8 to 3.35. So that's during the transition
14 period as you're increasing from 56 inches to 67.
15     Q  And that's what was -- that's what --
16     A  At that point we still haven't -- let me
17 finish my thought.
18     That hasn't gotten into the manufacturers
19 reshaping the cage.
20     Q  All right. Now look at the next paragraph.
21     A  Okay. I understand that paragraph.
22     Q  All right. So the next one says that,
23 actually, feeder space was being reduced under some
24 of the cages that met the UEP guidelines.
25     MR. TAKENOUCHI: Objection; form, no

**22 (Pages 236 to 239)**

**HIGHLY CONFIDENTIAL**

240

1  question pending.
2  BY MR. OLSON:
3      Q   Right?
4      A   They were heading in a direction away from
5  where they were originally on feeder space.
6      Q   So on feeder space things were getting
7  worse?
8      A   Not getting rosy.
9      Q   All right.  Now, on cage configuration,
10 that's the next topic of this document --
11     A   Okay.  Got it.
12     Q   -- the scientific committee wrote that,
13 "Cage configuration should be such that manure from
14 birds in upper cage levels does not drop on birds in
15 lower level cages."
16         And that's --
17     A   Common sense.
18     Q   -- common sense from a welfare standpoint,
19 right?
20     A   Yes.
21     Q   But what this lays out is that producers
22 hadn't been meeting that recommendation under the
23 program either, right?
24         MR. TAKENOUCHI:  Objection to form,
25 leading, misstates the record.

241

1          THE WITNESS:  I never thought of this
2  before, but the individual components saying that
3  there is eight components or ten components of the
4  guidelines, I assume that the timetable applies to
5  all of them.  No?  How do you come to that
6  conclusion?
7  BY MR. OLSON:
8      Q   Well, we don't need to go back and forth on
9  this.
10     A   Okay.
11     Q   But what this says is in June of 2004 there
12 had been a recognition that producers had not
13 followed that recommendation about manure dropping
14 directly on birds in lower cages.
15     A   May I comment?
16     Q   Let's just state that's what this document
17 indicates, right?
18     A   All right.
19     Q   What's your comment?
20     A   You do not have the ability to change
21 overnight.  If the cage house was designed that way,
22 it's going to stay that way until you tear the house
23 down.
24         But on the bird density question, you can
25 change that overnight by just removing a bird.  So

242

1  it's a different procedure that you can accomplish.
2          I don't believe anybody has been shut down
3  for his manure to be continuing to be dropping
4  through on years 1, 2, 3, 4, 5 and 6.
5      Q   I don't either.
6          Do you see the next heading, "Usable Floor
7  Space and Cage Height"?
8      A   Let's see -- yes, yes.
9      Q   And this refers to what the Scientific
10 Advisory Committee recommended about floor space and
11 cage height.  And I'll let you read that to
12 yourself.
13     A   Go ahead.  I understand.
14     Q   And then it says, "UEP adopted the
15 following recommendation," and in doing so it took
16 out two sentences of what the advisory committee
17 recommended, didn't it?
18         MR. TAKENOUCHI:  Objection to form, lack of
19 foundation.
20 BY MR. OLSON:
21     Q   Well, and to be specific, the Scientific
22 Advisory Committee referred to, "A cage height of 16
23 to 17 inches generally being acceptable for small
24 Leghorn strains, while larger strains will require
25 taller cages."

243

1          Do you see that?
2      A   I see it.
3      Q   And the UEP guidelines took that aspect
4  out, right?
5          MR. TAKENOUCHI:  Objection to form.
6          THE WITNESS:  I believe they substituted
7  "to stand comfortably upright."  I don't see that --
8  well, no, that's part of the advisory committee's
9  also.
10         So what was left out is what you just said,
11 the cage height issue --
12 BY MR. OLSON:
13     Q   And that being left out raised concerns as
14 well from a welfare standpoint, right?
15         MR. TAKENOUCHI:  Objection to form, lack of
16 personal knowledge.
17         THE WITNESS:  I'm not following what you're
18 saying.
19 BY MR. OLSON:
20     Q   We can move on.  Do you see the section on
21 the last page entitled "Back Filling"?
22     A   Yes.
23     Q   And it says, "When the original guidelines
24 were written, backfilling was allowed only when
25 unexpected starter pullets were grown."

23 (Pages 240 to 243)

**HIGHLY CONFIDENTIAL**

---

**244**

1      Do you see that?
2      A   I have no idea what that means.
3      Q   That's what I was going to ask.  All right.
4   You can put that aside.
5      I need to take a break.
6      Let's go off the record.
7      THE VIDEOGRAPHER:  The time is
8   approximately 11:54 a.m., and we're going off the
9   record.
10      (Recess.)
11      (Deposition Exhibit 24 was marked for
12      identification by the court reporter
13      and is attached hereto.)
14      THE VIDEOGRAPHER:  The time is
15   approximately 1:10 p.m., and we're back on the
16   record.
17   BY MR. OLSON:
18      Q   Okay.  Mr. Bell, I've handed you what has
19   been marked Bell Exhibit 24.  It is Bates-stamped
20   UE0918791 through -796.
21      I can see you flipping through the
22   document.  When you've had a brief chance to
23   familiarize yourself with the document, please let
24   me know.
25      And I want to really focus, if I can, just

---

**245**

1   on one e-mail.  This is going to be brief.
2      A   Go ahead.
3      Q   It is the one on the second page that is
4   from Don Lucy Bell dated Friday, May 30th, 2008 at
5   1:02 p.m.
6      A   Yes.
7      Q   Now, donlucybell@charter.net, is that your
8   e-mail address?
9      A   That's our personal address, yes.
10      Q   That's one that you use?
11      A   Now a hundred percent.
12      Q   And so can you identify that e-mail as one
13   you wrote and sent to Gene Gregory on May 30, 2008?
14      A   Yes, I wrote the individual -- part of
15   this.
16      MR. GODLSTEIN:  By the way, before you ask
17   another question, the noise next door, Don, is that
18   distracting you?
19      THE WITNESS:  No.
20   BY MR. OLSON:
21      Q   If it is, let us know.
22      Now, I just want to look at the -- I
23   believe it is the third full paragraph of your
24   e-mail that starts "I recall."
25      A   What page?

---

**246**

1      Q   The next page, and it is in -93.
2      A   Third, "I recall."
3      Q   I would just like you to confirm that these
4   were your words.
5      It says, "I recall many years ago that we
6   also recommended 72 square inches for cages.  We
7   also recommended against molting.  Then, we
8   suggested that molting gives better returns and now,
9   under present economic conditions, we'll be
10   emphasizing no-molt programs.  Things change,
11   assumptions need to be changed, economics plays a
12   major role in all such decisions," and then it
13   continues.
14      Were those your words?
15      A   Yes.
16      Q   Okay.  You can put that aside.
17      (Deposition Exhibit 25 was marked for
18      identification by the court reporter
19      and is attached hereto.)
20   BY MR. OLSON:
21      Q   Let me hand you what we marked Bell
22   Exhibit 25.
23      And this document was produced from your
24   file.  And, for the record, there is a Bates stamp
25   at the bottom of the BELL-D-0002811.

---

**247**

1      And I would just like you to generally
2   identify this document for us.
3      A   It appears to be a letter from Ken
4   Koelkebeck at the University of Illinois to Gene
5   relative to molting, non-feed withdrawal molting.
6      Q   And Mr. Koelkebeck had been involved in
7   2002 doing research on the effectiveness of non-feed
8   withdrawal molting:  is that --
9      A   Yes.
10      MR. TAKENOUCHI:  Objection to form.
11   BY MR. OLSON:
12      Q   And you were familiar with his research?
13      A   Yes.
14      Q   Let's just turn to page 18 of the research.
15   That's the summary.  There is the heading "Summary
16   and Take Home Message."
17      Q   And it begins -- well, actually, before we
18   get there, at the bottom there is acknowledgment.
19   It says, "The authors would like to thank Don Bell
20   at the University of California, Robert Pierre,
21   California Egg Commission, Dr. Mark Farmer, Sr., of
22   Ridley Feed Ingredients, Inc., and Gene Gregory of
23   United Egg Producers for their financial support" --
24      A   This is his letter and this is his

---

24  (Pages 244 to 247)

**HIGHLY CONFIDENTIAL**

248

1    acknowledgement.
2        Q   Right.
3        A   But I differentiate between my part of that
4    acknowledgement and others.
5        Q   Okay.  And do you know why you were being
6    thanked?
7        A   Thanked for advice and literature and
8    research.
9            But it sounds like that I'm involved in the
10   financial support.
11       Q   And you weren't?
12       A   No.
13       Q   Okay.  So, to your understanding, he's
14   thanking you for advice and --
15       A   Whatever -- yes.
16       Q   Okay.  All right.  Back to the "Summary and
17   Take Home Message."
18       A   Okay.
19       Q   I'm going to read the first sentence.  It
20   says, "In summary, the results of this study
21   indicate that feeding a wheat middlings diet, wheat
22   middlings and corn combination diet, or corn gluten
23   feed molt diet to initiate a molt in commercial
24   layers may be effective alternative feeding programs
25   compared to traditional feed removal methods."

249

1            Do you see that?
2        A   Yes.
3        Q   Was that your understanding of the summary
4    of the research that Mr. --
5        A   In his particular research --
6            MR. TAKENOUCHI:  Objection; lack of
7    personal knowledge about whether he's reading it.
8            THE WITNESS:  Yes.
9    BY MR. OLSON:
10       Q   Okay.  Thank you.
11           Now, Mr. Bell, did you ever have
12   discussions with Mr. Gregory -- that is,
13   Gene Gregory -- or Al Pope about any limits on what
14   could be done to manage supply in the United States
15   under the antitrust laws?
16           MR. TAKENOUCHI:  Objection to form.
17           THE WITNESS:  First of all, there was an
18   assumption that they were exempt because they were a
19   cooperative.  That's my assumption.  I've never
20   asked an attorney for their opinion about that
21   question.
22   BY MR. OLSON:
23       Q   And did you ever discuss with Gene Gregory
24   or Al Pope whether there were any limits about what
25   could be done to manage supply in the United States

250

1    under the antitrust laws?
2        A   Well, yes, in many of our manuscripts that
3    we've gone through already, many ideas are
4    submitted, many of the relationships are discussed.
5    Most of it boils down to that we need to -- the
6    industry -- excuse me for using the word "we."
7            The industry needs to reduce the number of
8    eggs they produce, especially during hard times.
9        Q   And did you have any discussions with
10   Gene Gregory or Al Pope about whether there were any
11   limits or prohibitions under the antitrust laws
12   about what could be done to have the industry reduce
13   the number of eggs that they produce?
14       A   I'm not an expert in laws about -- of that
15   nature.  We -- or I felt it was perfectly within my
16   realm to be concerned about their economic
17   well-being, and that this was a subject of managing
18   the industry as opposed to managing the individual
19   farm and that we were not doing anything illegal.
20       Q   And let me just try to focus you
21   specifically on my question.  I appreciate what --
22   your efforts to be helpful, but just try to focus on
23   this specific aspect.
24       A   Okay.
25       Q   I'm asking whether you recall specifically

251

1    anything Gene Gregory or Al Pope told you about
2    limits on what could be done or things that could
3    not be done?
4        A   No.
5        Q   And so this would include during the period
6    you were on retainer by UEP to write your memos, you
7    never received any guidance about what could be done
8    or said under the antitrust laws?
9            MR. TAKENOUCHI:  Objection; misstates prior
10   testimony.  Objection to form.
11           THE WITNESS:  No discussion was ever made
12   with me of the antitrust laws.
13   BY MR. OLSON:
14       Q   Now, when you -- let's talk about the
15   process of you preparing these memos while you were
16   on retainer by UEP.  We've seen that sometimes
17   Mr. Gregory would suggest a topic for you, right?
18       A   Yes.
19       Q   Sometimes would you come up with a topic on
20   your own?
21       A   95 percent of the time, yes.
22       Q   And then when you finished the memo, what
23   would you do?
24       A   I would e-mail it to Mr. Gregory.
25       Q   And would Mr. Gregory -- were there ever

**25 (Pages 248 to 251)**

**HIGHLY CONFIDENTIAL**

---

**252**

1  times that Mr. Gregory wrote back to you and asked
2  you to make changes in what you had prepared?
3      A   No.
4      Q   That never happened?
5      A   Not to my knowledge.
6          (Deposition Exhibit 26 was marked for
7          identification by the court reporter
8          and is attached hereto.)
9  BY MR. OLSON:
10     Q   Let me hand you what we've marked Bell 26.
11         And why don't you take out Exhibit 15.
12     A   1-5?
13     Q   Yes.
14     A   What do we have here, a new one?
15     Q   Yes.
16     A   You want to talk about that first?
17     Q   Pull out 15 and put that to the side, and
18  I'd like you to look at what we've marked as 26.
19         MR. TAKENOUCHI:  Can we get the Bates
20  number?
21         MR. OLSON:  Yes.  The Bates -- Number 26 is
22  UC_E00055875.
23     Q   Now, Mr. Bell, can you identify Bell 26 as
24  an e-mail you received from Gene Gregory on April
25  17th, 2002?

---

**253**

1      A   Yes.
2      Q   And Mr. Gregory is responding to an e-mail
3  that you sent to him on April 16th, 2002 in which
4  you had attached one of your economic memos; is that
5  right?
6      A   Yes, yes.
7      Q   And that's the memo that's Exhibit 15,
8  right?
9      A   Yes.
10     Q   And does Bell Exhibit 26 refresh your
11  recollection about Mr. Gregory requesting that you
12  make changes?
13     A   Yes.  I interpreted that as editorial
14  suggestions, not necessarily that I responded to
15  that, but he was suggesting this.
16     Q   So in Bell Exhibit 26 Mr. Gregory is making
17  a suggestion about changes in your economic memo in
18  regard to your discussion of the -- what he calls
19  UEP cage density reduction proposal.
20         Do you see that?
21     A   Let me have a minute, please?
22     Q   Sure.
23     A   Do you have the original?
24     Q   I don't know if 15 is the original or not.
25  Do you?

---

**254**

1      A   My draft that I would have sent him, this
2  is a finished product.
3      Q   How can you tell it is a finished product?
4      A   It is what we are talking about.  It is an
5  evolution.  I wrote something, he's giving comments
6  about it and there must be a product.
7          Did I respond to his suggestion?
8      Q   We haven't found that in your e-mails.
9      A   Okay.
10     Q   Do you know whether you did or not?
11     A   Let me look at the dates again.  This is
12  written on April 15 and he's come back on the 17th
13  two days later and made his comments, and then what
14  happened?
15     Q   That's what I was going to ask you.
16     A   I don't know -- I don't know what the -- he
17  wanted me to respond.
18         Do I have a response here?  Here we go.
19         No, that's not a response to that letter.
20         There is a 16, but that's one day earlier.
21         So do we have anything on the 18th or 19th
22  that would say I disagree with you or that I prefer
23  my own wording?
24     Q   We've looked.  We haven't seen whether you
25  did or not?

---

**255**

1      A   Okay.
2      Q   So let's back up a little bit.
3      A   Okay.  Go ahead.
4      Q   For the sake of the record, what
5  Mr. Gregory asks you to do is to make a change in
6  how you discussed UEP's cage density reduction
7  proposal, right?
8          MR. TAKENOUCHI:  Objection to form.
9          THE WITNESS:  That's the way I read it,
10  yes.
11  BY MR. OLSON:
12     Q   And he says that, "I would prefer that we
13  focus upon these changes being animal husbandry
14  guidelines, which results in increased space for
15  hens," right?
16     A   That's what he says.
17     Q   And he says, "I don't want anyone to think
18  of this as the supply reduction program, even though
19  we know the effect will be the same in the short
20  term," that's what he says, right?
21     A   That's what he says.
22     Q   And you, sitting here today, do you
23  remember how you responded?
24     A   No, but I think I responded to you often
25  enough here that I don't consider -- that I do

---

**26 (Pages 252 to 255)**

**HIGHLY CONFIDENTIAL**

256

1   consider it an economic issue. And to separate
2   cause and effect which came first, the chicken or
3   the egg, and these questions, I'm just not sure how
4   to respond to you -- as a supply reduction program,
5   some people -- some people may have suggested this,
6   some people may have worked with this, some people
7   have -- may have voted for it, but in my role we
8   weren't working on welfare.
9       Q  And do you --
10      A  Go ahead.
11      Q  Did you have an understanding that
12  Gene Gregory was concerned about the program being
13  discussed as a supply reduction program?
14      MR. TAKENOUCHI:  Objection; lack of
15  personal knowledge.
16      THE WITNESS:  I think editor, and he is the
17  ultimate editor, because he has to put it out, would
18  be concerned about somebody's phraseology and
19  emphasis, degrees of emphasis relative to his own
20  emphasis.
21      I wrote it from my viewpoint, and it's not
22  perfect. So he apparently thought the tone or the
23  emphasis was somewhat controversial and wanted me to
24  reconsider it in his letter.
25  BY MR. OLSON:

257

1       Q  Do you recall any other times that
2   Mr. Gregory warned you about how to characterize the
3   program?
4       MR. TAKENOUCHI:  Objection to form,
5   misstates prior testimony.
6       THE WITNESS:  Of all the correspondence
7   that we've had, I really can't recall anything
8   specific.
9       MR. OLSON:  Okay. So at this point I'm
10  prepared to pass the witness on the understanding
11  that we've reserved some time today in case we need
12  it, hopefully we won't, but just in case we do, and
13  on the understanding that we have with Mr. Goldstein
14  that after we complete our review of the documents
15  that have been recently produced and are yet to be
16  produced, that we can come back for some amount of
17  time, additional time, that we'll discuss.
18      MR. GODLSTEIN:  Agreed.
19
20          EXAMINATION
21  BY MR. RAYLE:
22      Q  Good afternoon, sir, my name is Merrick
23  Rayle. As I told you earlier, I represent the
24  Indirect Purchaser Plaintiffs.
25      (Deposition Exhibit 27 was marked for

258

1       identification by the court reporter
2       and is attached hereto.)
3   BY MR. RAYLE:
4       Q  I'll hand you a document, Exhibit 27 for
5   identification, and ask you to turn to page 26. The
6   last two digits of the Bates number is -26.
7       A  Got you.
8       Go ahead.
9       MR. TAKENOUCHI:  For the record, it is
10  Bates BELL-D-00000024.
11      MR. RAYLE:  Thank you.
12      Q  And particularly section 49-B?
13      A  Go ahead.
14      Q  Generally, can you identify what this
15  document is, sir?
16      A  A chapter in the textbook.
17      Q  And the name of the textbook is?
18      A  "Commercial Meat" -- "Poultry, Meat and Egg
19  Production."
20      Q  Thank you.
21      And did you author this particular --
22      A  I was the senior editor, and I authored
23  about a third of the book.
24      Q  Okay. And in the third paragraph of
25  section 49-B, it starts out, "In the United States,

259

1   United Egg Producers Association makes a strong
2   effort" -- that section right there --
3       A  Yes.
4       Q  Down a little bit there is a -- I think the
5   last sentence of that paragraph reads, "Even though
6   the recommendations are not heeded by everyone,
7   generally it has enough impact on the nation's flock
8   size to result in higher egg prices for everyone."
9       Do you see that, sir?
10      A  Yes.
11      Q  Can you tell us what was meant by the
12  phrase "to result in higher egg prices for
13  everyone"?
14      A  "To result in higher egg prices for
15  everyone"?
16      As I've indicated before, every egg affects
17  every other egg, and so microscopically one farm
18  increasing their flock by 100,000 chickens is going
19  to affect everybody else, because that's just more
20  eggs to sell. So I believe that is a true
21  statement.
22      Q  And would you include in the phrase
23  "everyone," would that include any consumer who
24  purchases shell eggs from retail stores?
25      A  Obviously, consumers pay more than farmers

**HIGHLY CONFIDENTIAL**

260

1  get. And so if the farmer is trying to cover his
2  costs and he tries to increase his price, who pays
3  for it? The consumer.
4      Q  Thank you. You can put that aside, sir.
5      (Deposition Exhibit 28 was marked for
6      identification by the court reporter
7      and is attached hereto.)
8  BY MR. RAYLE:
9      Q  This is the last exhibit, for me, at least.
10     Exhibit 28, for identification, is titled,
11 "U.S. Farm and Retail Price Relationships - 1982 to
12 2005."
13     Have I correctly read that, sir?
14     A  Yes.
15     Q  The Bates number is UE0155821 and it goes
16 through -831.
17     I'd ask you to turn, if you would, please,
18 to page 10 in the upper right-hand corner where the
19 Bates number ends in -30.
20     A  10 and what else?
21     Q  The lower right-hand corner, the last three
22 numbers are -830.
23     A  Yes.
24     Q  First, can you identify what this document
25 is?

261

1      A  This page or the entire document?
2      Q  The entire document.
3      A  This was the subject of a speech I gave --
4  I'm not sure where, I usually don't put that down --
5  on the subject of marketing.
6      Q  Under -- sorry.
7      A  My sources for U.S. farm prices are
8  different than my sources for retailing prices. I
9  believe I indicate sources somewhere.
10     Q  On --
11     A  The emphasis of this article is how the
12 differences are changing.
13     Q  All right. Under the category "General
14 Conclusions," there are four bullets there.
15     A  Yes.
16     Q  And then under that is written, "The
17 increases in spread between farm prices and retail
18 prices appears to be a permanent change."
19     Do you see that, sir?
20     A  Oh, you're down in the bottom now?
21     Q  Yes, sir.
22     A  It's a true statement.
23     Q  Thank you.
24     Now, go to the very first page, fifth
25 paragraph, last sentence.

262

1      A  I'm on the graph here.
2      Q  No, the very first page.
3      A  Oh, the very first page.
4      Go ahead.
5      Q  The fifth paragraph, last sentence, "This
6  rather close agreement between the changes in price
7  between the two series indicates that retailers are
8  generally responding to changes in the marketplace
9  with comparable shelf prices changes."
10     Do you see that, sir?
11     A  It is saying it is basically parallel.
12     MR. RAYLE: Nothing further, sir.
13     Thank you for your time and patience.
14     THE WITNESS: That's it?
15     MR. RAYLE: That's it.
16     THE WITNESS: Thank you, sir.
17     MR. RAYLE: Thank you.
18     MR. OLSON: Let's go off the record.
19     THE VIDEOGRAPHER: This concludes media
20 number 1 in the video deposition of Don Bell, Volume
21 II. The time is approximately 1:37 p.m., and we are
22 going off the record.
23     (Recess.)
24     THE VIDEOGRAPHER: This marks the beginning
25 of media number 2 in the video deposition of

263

1  Don Bell, Volume II. The time is approximately 1:51
2  p.m., and we're back on the record.
3
4      EXAMINATION
5  BY MR. TAKENOUCHI:
6      Q  Good afternoon, Mr. Bell. Thanks for
7  taking the time out of your day for this.
8      My name is Jason Takenouchi. I'm here on
9  behalf of Nu-Cal Foods. I'm going to ask you some
10 questions to try and clarify some of your testimony
11 from today and also from yesterday. And there are
12 also some other areas we'll talk about.
13     A  Fine.
14     Q  Now initially I'm going to go through a few
15 documents you've already seen and just ask you some
16 follow-up questions.
17     If at any point you need to take a break,
18 please let me know.
19     Is there any reason you can't give your --
20 continue to give your full and fair and complete
21 testimony today?
22     A  I didn't quite hear that.
23     Q  Is there any reason you can't give your
24 full and complete --
25     A  No, there isn't.

28  (Pages 260 to 263)

HIGHLY CONFIDENTIAL

264

1    Q  -- testimony today?
2    A  No, I'm fine.
3    Q  Okay.  Look at Bell 17.  And the Bates
4    number on the first page is CM430620.  I think it is
5    in front of you.
6    A  Yes.
7    Q  I think your questions earlier about an
8    editorial that's in the middle of that packet there,
9    the Bates number is -630 at the end --
10   A  Yes.
11   Q  It is the one that says the reasons why.
12   Now, if you look on there, a little below the middle
13   part of the page, do you see a paragraph starting
14   "UEP's Animal Husbandry Guidelines"?
15   A  Yes.
16   Q  Could you read that first sentence there?
17   A  "UEP's animal husbandry guidelines were
18   never intended as a supply management program."
19   Q  Okay.  Now, I think when you were
20   questioned about that before you weren't paying
21   attention to some other language there, but for that
22   particular portion of that sentence, did you
23   understand that to be the case?
24   A  That was what I understand to be our
25   mission as a committee.

265

1    Q  Okay.  So this statement here was
2    consistent with what your understanding of the
3    mission was?
4    A  Yes.
5    MR. OLSON:  Objection to form.
6    BY MR. TAKENOUCHI:
7    Q  And when you say, "our mission as a
8    committee," what do you mean?
9    A  The committee's mission that they were
10   requested to study and recommend was not a supply
11   management program, but, instead, it was an animal
12   welfare committee, and that's what we emphasized.
13   Q  And you're referring to the Scientific
14   Advisory Committee, correct?
15   A  Yes.
16   Q  Are there any animal welfare benefits to
17   reduce the cage density?
18   A  Yes.
19   Q  And what are those?
20   A  Chickens would have -- would produce less
21   eggs at more dense conditions.  They will die at a
22   higher rate, they will crack more eggs.  They will
23   have more health problems, as they are crowded, and
24   they may pick at each other more if they are
25   crowded.

266

1        Is this your question?
2    Q  Yes.
3    A  Yes.  And that's why the committee on
4    animal welfare, Scientific Advisory Committee for
5    animal welfare, we placed as much emphasis as they
6    did on the question of cage density.
7    Q  Now, is this knowledge about the benefits
8    of cage density, was this something that only
9    happened in the 2000 time frame or was this
10   something that there was research on before 2000?
11   MR. OLSON:  Objection to form.
12   THE WITNESS:  I started my research in
13   about 1960 on cage density, and over time you still
14   see people researching this question.
15   The current issue is very difficult to
16   scientifically address.
17   BY MR. TAKENOUCHI:
18   Q  But before 2000, had there been research on
19   the benefits of cage density?
20   A  Oh, yes, much research.
21   Q  And were you aware of that research?
22   A  Oh, yes.
23   Q  Do you know why cage density came up in the
24   context of the Scientific Advisory Committee's work?
25   A  Like I indicated, because of its impact on

267

1    the welfare of the chickens.  The research -- I
2    listed half a dozen right now, reasons, and the
3    drive behind the committee's formation was the
4    result of the humane society's concern about animal
5    welfare.  And that was the pressure, tens of
6    thousands of dollars were being spent to argue their
7    point, the humane society, as well as United Egg
8    Producers.  It had to be resolved, and it still has
9    to be resolved.
10   Q  Around that time were there other entities
11   that were making changes or demanding changes about
12   animal welfare?
13   A  There's just a list as long as your arm of
14   activist organizations that are promoting animal
15   welfare as they interpret it.  Some of it may
16   emphasize cages, some of it may emphasize molting,
17   some may emphasize beak trimming, some of it
18   just they don't like animals to be used.  That's a
19   very big problem.
20   Q  And was this an issue back in 2000, 1999?
21   A  Yes, it was.  Yes, it was.
22   MR. GODLSTEIN:  Don, if you could just try
23   to remember with Jason, as you did with Steig, to
24   let him get his full question out before you begin
25   to answer.

29 (Pages 264 to 267)

HIGHLY CONFIDENTIAL

268

1        THE WITNESS:  I'm sorry.
2        MR. OLSON:  And even if you would give me a
3    pause in case I have an objection, that would be
4    great too.
5    BY MR. TAKENOUCHI:
6        Q   You can put that away for now, and let's
7    look at Bell 16.
8        A   16?
9        Q   Yes.
10        This is Bates number UE135717 on the first
11    page.
12        I think you were asked a little bit -- you
13    were questioned a little bit about this document.
14    The first part of it is United Voices and the second
15    part looks like a copy of commentary you did in
16    2002.
17        A   Yes.
18        Q   Okay.  So looking at your commentary in
19    2002 --
20        A   Yes.
21        Q   -- I just wanted to draw your attention to
22    the fourth page here, the second -- the fourth page.
23        A   I have the fourth page now.
24        Q   It has the comments on the bottom there?
25        A   Comments, yes.

269

1        Q   Underneath that comments section there is a
2    website address, animalscience.ucdavis.edu/avian.
3        A   Yes.
4        Q   What is that?
5        A   It's a website.
6        Q   Do you know what website that is?
7        A   Avian sciences, all relating to poultry.
8        Q   And how are you familiar with that website?
9        A   I contribute to it, I promote it.  It's our
10    communication tools of computer literate clients.
11        Q   And what, exactly, is on that website?
12        A   Everything on poultry -- turkeys, broilers,
13    eggs, hatchery, feed, management, disease, et
14    cetera, et cetera, et cetera.
15        Q   So are reports like this one on the
16    website?
17        A   I believe the memos -- is that what we're
18    talking about, this memo?
19        Q   This here.
20        A   I believe it is on there, I can't swear to
21    it.  The website was basically retired when
22    Dr. Ernst, who controlled the website, retired about
23    five or seven years ago.
24        It was updated, I noticed, by somebody, and
25    I hadn't figured out who, maybe once or twice since

270

1    then until now.
2        And so if you want to see current, we'll
3    say, 2007, '8, '9, '10, and so on, that those
4    documents may not be in there.
5        Q   Okay.  So looking a back at this particular
6    report from July of 2002, do you believe this report
7    was on the website?
8        MR. OLSON:  Objection to form.
9        THE WITNESS:  2002?  It would be under a
10    memo, and I guess Dr. Ernst would have considered
11    that a newsletter, and so there is a heading
12    "Newsletters."  And then there is all the names of
13    all of our newsletters, there may be six or eight
14    different newsletters that we write.
15        I do not know for sure whether he would
16    include memos or not.
17    BY MR. TAKENOUCHI:
18        Q   Okay.  It's possible?
19        MR. OLSON:  Objection to form.
20        THE WITNESS:  I think strongly possible,
21    yes, but it was his decision.  These are all
22    original, so I assume he would have thought they
23    should be on the website.
24    BY MR. TAKENOUCHI:
25        Q   And you say you promoted this website,

271

1    correct?
2        A   In our newsletters, this statement right
3    there is promoting it.
4        Q   Did you promote it in any other ways?
5        A   With this particular letter here every
6    time, I would write an article from time to time
7    saying why you should get into our website, what are
8    the subjects on our website.  I would feel there
9    is -- we've communicated enough times that people
10    would know that it exists, but it exists with 20 or
11    30 or 50 other websites in poultry that are produced
12    by other universities and so on.
13        Q   Okay.  Now, looking at this document the
14    first part is the United Voices newsletter and the
15    second part --
16        A   Yes.
17        Q   -- is your memo.
18        Now, this did not come from your
19    production.
20        Do you have any basis to believe that your
21    memo was distributed to people along with this
22    United Voices newsletter attached?
23        A   I do not know why it is attached here with
24    a staple unless it was at the top "Don Bell's"
25        It was -- at the top "Don Bell's"

30 (Pages 268 to 271)

**HIGHLY CONFIDENTIAL**

272

1  newsletter," right there, so it was sent to
2  everybody on their mailing list that gets the United
3  Voices.
4      Q  Well, did you receive a copy of United
5  Voices attaching your report to it?
6      A  Well, I assume I did if everyone else did.
7      Q  Okay.  Do you remember getting that?  As
8  you sit here today, do you remember getting a copy
9  of your report attached to United Voices?
10     A  I cannot specifically if I got the one
11  dated July 29, 2002, specifically.
12     Q  Okay.
13     A  But I do get all of their newsletters.
14     Q  Yeah, I understand that.
15        I want to show you -- referring back to --
16  take a look at Bell 19.  This is Bates-numbered UE
17  880125.
18        And this is another -- it's a commentary
19  you wrote in March 2004.
20     A  Yes.
21     Q  Do you remember being asked about this
22  earlier today?
23     A  Yes.  Yes, we talked about it.
24     Q  And so on here, on the last page here,
25  there, again, is that same website.

273

1        Do you see that?
2      A  Yes, yes it is.
3      Q  And it says, "New items are added monthly."
4        Do you see that language?
5      A  Yes.
6      Q  Do you think this memo was on the website?
7        MR. OLSON:  Objection; form.
8        THE WITNESS:  If it was on the website, it
9  would be under newsletters and not under new items.
10  New items refers to miscellaneous things.
11  BY MR. TAKENOUCHI:
12     Q  Do you see any reason why this newsletter
13  won't have been on the website?
14        MR. OLSON:  Objection to form.
15        THE WITNESS:  Well, it is one of the
16  series, I don't know how many we wrote altogether,
17  but I don't know if he would be selective in leaving
18  things out or putting things in, I don't know.  I
19  don't know that.
20  BY MR. TAKENOUCHI:
21     Q  Okay.  So this memo talks about some egg
22  prices around this time in March 2004?
23     A  Yes.
24     Q  After March 2004, was there a change in egg
25  prices?

274

1      A  Let me read that here.
2        There's about 20 to 30 egg price changes a
3  year in the nation.  Half of them --
4      Q  Let's look -- go ahead.
5      A  Half of them go up and half of them go
6  down.
7        Now you're asking specifically 2004?
8      Q  The period after this, mid to late 2004
9  going into 2005, was there a price trend in that
10  period that you recall?
11        MR. OLSON:  Objection to form.
12        THE WITNESS:  Well, this time is right
13  after the avian influenza problem on the East Coast
14  where 2 million birds, I believe, were disposed or
15  killed.  That, in itself, raised the price of eggs
16  for the next year or two for the nation.
17        After that was over with and production
18  came back to normal, the rest of the nation took
19  their retail egg prices down to where it was.
20  California left it where it was because they had
21  shown that that pricing policy that they used at
22  that time was effective.
23  BY MR. TAKENOUCHI:
24     Q  So after the avian influenza in effect in
25  2004, prices dropped again?

275

1        MR. TAKENOUCHI:  Objection to form.
2        THE WITNESS:  But not in California.
3  BY MR. TAKENOUCHI:
4      Q  Except in California.
5        MR. OLSON:  Same objection.
6  BY MR. TAKENOUCHI:
7      Q  Go ahead and put that aside.
8        If you could pull out Bell 27.  And I
9  believe you testified this was a chapter of a book
10  you wrote --
11     A  Yes.
12     Q  -- you wrote this chapter in a book?
13     A  Yes.
14     Q  Was this book publicly available?
15     A  Oh, yes, if you could afford it.
16     Q  Did you write this for any particular
17  client?
18     A  No.  This is an exercise that those of us
19  in academia, the need to publish or perish, you
20  know.  Occasionally you write a book or chapter of a
21  book and the -- the predecessor -- I think this was
22  the 5th edition of this book, by the way.  It was
23  started by another individual back in the '70s, I
24  think, and then this is the 5th edition.  This is
25  the first edition that had any pictures -- is there

31 (Pages 272 to 275)

**HIGHLY CONFIDENTIAL**

---

276

1 any pictures in that? I don't see any pictures.
2 Anyway, this is a 1,400 page book. The
3 previous one, I think, was around 7- or 800. And we
4 brought in 18 authors, total, including myself, as
5 opposed to one.
6 And so what we were trying to do here is be
7 more comprehensive, get more opinions, more subject
8 specialization. I think we have 52 chapters, each
9 one on a different subject.
10 Q So this was an academic exercise as opposed
11 to something you wrote for a particular entity or
12 person; is that correct?
13 MR. OLSON: Objection to form.
14 THE WITNESS: It was a continuation of a
15 book that had been in existence for 30 years or so.
16 So when the publisher comes to you and
17 says, "Will you update this book?" you try to fight
18 that as much as you can, and then finally you agree,
19 but you're going to do it in a different way, you're
20 going to change the name of the book, you're going
21 to get your coauthors, you're going to make the book
22 bigger and more comprehensive. And as editor --
23 senior editor, all those differentiations were put
24 into place.
25 BY MR. TAKENOUCHI:

---

277

1 Q I think when you were asked earlier about
2 this particular book and some of the phrases in
3 here, you talked about pricing.
4 Are there different levels of pricing, you
5 said?
6 A Absolutely.
7 Q Okay. And are those different levels?
8 A Way more than you can add up. You have to
9 read one of my papers on pricing.
10 Q Are you trying to sell me a paper?
11 A No. There is an encyclopedia that you can
12 read the whole chapter on pricing that I wrote and
13 one on marketing.
14 But, anyway, they start with the base price
15 that the farmer gets for given egg size, weight. So
16 you start off with a peewee egg, which is the
17 smallest egg we sell. At the farm level that price
18 may be 10, 15 cents a dozen. But you don't sell
19 them to the consumer, you sell them bulk or
20 whatever.
21 And then you get six sizes altogether, all
22 the way up to extra large -- jumbo, pardon me. Each
23 one of those has a different price, you get more
24 weight with each one. That's at the farm level.
25 Q Okay.

---

278

1 A He sells them to a -- either he has his own
2 processing plant or he sells them to the distributor
3 who does the processing.
4 So you have to tack on the processing costs
5 to this price. This is the price I'm most familiar
6 with. It is called the production price. It does
7 not include processing, it does not include an egg
8 carton, it does not include transportation, it does
9 not include shelving or retailing. So these other
10 costs that I just tried to list here that can go all
11 the way to specialty eggs.
12 Q Now, I think you said the focus of your
13 work was on the farmer, the producer price?
14 A That's right.
15 Q Did you -- strike that.
16 A Uh-huh.
17 Q Go ahead and put that aside, and let's talk
18 about Bell 22, Bates number BELL-D-28597.
19 Do you remember being questioned about
20 this?
21 A Today or yesterday, yes.
22 Q Okay. Now, at the time when the Scientific
23 Advisory Committee was looking at feeder space
24 issues, how old was the research that the committee
25 was using in doing its analysis?

---

279

1 A How old was the research --
2 Q The research.
3 A -- that they were considering?
4 I think my paper, written in '76 or so,
5 you'd have to go to the bibliography to find out.
6 But that was the one that stimulated the discussion
7 of more feeder space systems. It had a biological
8 benefit, performance wise and economic, but the
9 industry went so far with their adoption of this
10 procedure and we went all the way to 6 inches, by
11 the way, and then they started to experience it, and
12 most of the experience was positive on the
13 biological.
14 But when they started to pencil it out
15 economically, they said, well I have to buy 2 more
16 inches of feeder space, that's feed trough. That
17 costs money.
18 Q I'm just focusing on --
19 MR. OLSON: Hold on. Were you finished?
20 THE WITNESS: What do you want?
21 MR. OLSON: Oh, I thought you were still
22 continuing with your answer.
23 THE WITNESS: Well, I was.
24 MR. OLSON: I thought so too.
25 BY MR. TAKENOUCHI:

---

**HIGHLY CONFIDENTIAL**

280

1  Q  Just focusing on this period in 2004, if I
2  could refer you to that heading "Scientific Studies
3  on Feeder Space" --
4  A  Yes, go ahead.
5  Q  -- do you see that sentence in the middle
6  there, "They confirmed that most of the research was
7  more than 20 years old"?
8  A  Yes.
9  Q  Do you see that?
10  A  Yes.
11  Q  So it said, "They confirmed that most of
12  the research was more than 20 years old and that
13  genetics and production practices had certainly
14  changed since the last research project."
15  So at this point in 2004, was the research
16  on feeder space outdated?
17  MR. OLSON:  Objection to form.
18  THE WITNESS:  I would have problems with
19  this no research for 20 years, something like that.
20  "They confirmed most of the research was more than
21  20 years old."
22  I have files of research after my original
23  research that confirmed our results, and I don't
24  consider that none.
25  BY MR. TAKENOUCHI:

281

1  Q  Okay.  And your original research was 1976;
2  is that right?
3  A  I think that's the date I had.  It's in all
4  of my documents someplace.
5  Q  I think you testified yesterday about hen
6  density.
7  A  Yes.
8  Q  And I can't remember if you testified about
9  hen population.
10  Do you remember that?
11  A  I'm sure we said something about total hen
12  numbers versus birds in a cage, I'm sure we talked
13  about that.
14  Q  So what's the difference, if there is any,
15  between hen density and hen population?
16  A  Well, hen population you are talking about
17  a farm or a state or a region or a country.  That's
18  the total numbers of birds in that definition.
19  Density, it usually refers to in a given
20  unit or given enclosure -- enclosure is probably a
21  better word.  Humane people don't like the word
22  cages, by the way.  And cages have been around since
23  the '30s, the 1930s.
24  But anyway, density refers to how much
25  space they have and how many birds are in that unit

282

1  and so on.
2  And all these factors -- the feeder space,
3  the water, the height, the depth, the shape -- this
4  is a regular cage shaped like that.  The reverse
5  cage is shaped like that.  And so the feeder trough
6  is here, now it's here.  So shape is a big important
7  thing.
8  So three or four or five elements of
9  describing a cage, and they all fit together.  They
10  all have a role.
11  Q  You're talking about cage configuration and
12  design, right?
13  A  Go ahead.
14  Q  But I guess what I'm asking about is the
15  distinction between hen density and I guess cage
16  density versus the hen population.
17  Are those different concepts?
18  A  Well, the first two that you mentioned, hen
19  density and cage density, I think would be the
20  same --
21  Q  Okay.
22  A  -- they are just synonymous.
23  The population is a totally different
24  thing.  It is how many birds, not in one cage.
25  The rest of it has to do with how many

283

1  birds you put in here and how dense are they and the
2  space, whatever the size is, that's an enclosure.
3  It could be as few as three or four birds,
4  it could be as many as 50 to a hundred.  But that's
5  density.
6  But population is how many of these do you
7  have all over the place.  And you are counting for
8  five birds here, five birds there, five birds there,
9  five birds there, all over the United States.
10  Q  Now, I think you testified earlier about
11  some of the benefits of giving hens more space?
12  A  Yes.
13  Q  And I think you said something about
14  productivity.
15  Do you remember that?
16  A  Productivity means eggs.
17  Q  Okay.  So how does giving hens more space
18  result in more eggs?
19  MR. OLSON:  Objection to form.
20  THE WITNESS:  It is their response to being
21  crowded.  What's the total length of time?  Normally
22  there is good evidence in the 50- to 80-square-inch
23  range per bird that there is a step-by-step
24  regression relationship in that question, so -- have
25  I answered your question yet or do you want to

33 (Pages 280 to 283)

**HIGHLY CONFIDENTIAL**

284

```
1   restate it?
2   BY MR. TAKENOUCHI:
3       Q   Okay.  I'll restate it.
4           Does giving hens more space result in more
5   eggs?
6       MR. OLSON:  Objection to form.
7       THE WITNESS:  Yes.
8   BY MR. TAKENOUCHI:
9       Q   And how, exactly, does it --
10      A   How does it happen?
11      Q   Yes.
12      A   It is part of the peck order, which is a
13  sociological phenomena, that relates to chicken or
14  people, or whatever.  It relates to access to the
15  feed and to the water.  It relates to -- I think
16  that's enough.
17      Q   So let me refer you to Bell 9.  I think it
18  was yesterday.
19          The Bates number is BELL 4041, and this is
20  a December 22nd, 1999 e-mail.
21          I want to draw your attention to the second
22  page here.
23      A   Second page?
24      Q   You testified to some of this yesterday.
25  But that second-to-the-last paragraph there, and the
```

285

```
1   last sentence of that paragraph, it says, "What
2   would be real exciting would be to see entire new
3   complexes built on these principles."
4           Do you remember what you meant by that?
5       A   Sure.  Yeah, it's basically -- it would be
6   exciting if everybody listened to me and did what I
7   said, that would be the most exciting things.  So if
8   I've said I've done research on reverse cages, for
9   example, or molting or any of these things, if
10  everybody read it, everybody followed it through,
11  that would be very exciting to me.
12      Q   Go ahead and put that away.  I understand
13  what you're saying.
14      A   You understand what I'm saying?
15      Q   Let's look at Bell 2 for a second.  This is
16  Bates number BELL-D-31284.  We looked at this
17  yesterday.
18      A   Got it.  Go ahead.
19      Q   It is a slide.  It looks like it is
20  PowerPoint or something.
21      A   I've given the slide talks all my life, so
22  I suppose so -- it looks like PowerPoint.
23      Q   Okay.  So the first page there has a date
24  of 1992.
25          Do you see that?
```

286

```
1       A   Yes.
2       Q   Do you think that's when you produced this
3   or created this slide --
4       MR. OLSON:  Objection to form.
5       THE WITNESS:  It looks like I didn't -- oh,
6   here it is up here, in the title it says 1992.
7   January 1992.  Down here it was just substantiation
8   of the date.  Up at the top corner you'll see a
9   handwritten 92/12.
10  BY MR. TAKENOUCHI:
11      Q   So do you think you wrote this in 1992?
12      A   Well, it looks like 12 would be December,
13  maybe, of '92.  I don't know what the 12 is.  I
14  really don't.  They have January '92 and over here
15  you've got 12.  I don't know what the difference is.
16      Q   Do you think you wrote this in 1992?
17      A   Yes, 1992 is definitely --
18      Q   So 1992 was 21 years ago, roughly?
19      MR. OLSON:  Objection to form.
20  BY MR. TAKENOUCHI:
21      Q   Do you remember creating this particular
22  slide?
23      A   I gave many talks on this subject.  I gave
24  over 450 talks in my career.  It is very difficult
25  to remember which one is which.
```

287

```
1           This is in my own documentation at my
2   house.
3       Q   Okay.  Do you remember sitting down 21
4   years ago and creating this?
5       A   No, no.  This could have been in any
6   location, and we'll assume '92 is correct.
7       Q   Do you remember giving this particular
8   presentation or copy of this to any particular
9   person?
10      A   I might have given this to five different
11  groups, so I don't know right today what group this
12  was given to first, second, third, fourth or fifth.
13      Q   Let's say there were five, do you know
14  which five groups you may have given it to?
15      A   I do --
16      MR. OLSON:  Hold on.  Objection to form.
17      THE WITNESS:  I have it in my records every
18  single talk I've ever given at my house.  It does
19  not say it on this document.
20  BY MR. TAKENOUCHI:
21      Q   So sitting here today you don't have
22  independent recollection who you may have given this
23  to?
24      A   I have no idea.
25      Q   Is it possible you never gave this to
```

**HIGHLY CONFIDENTIAL**

288

1  anyone at UEP?
2       MR. OLSON:  Objection to form.
3       THE WITNESS:  Say that again.
4  BY MR. TAKENOUCHI:
5       Q  Is it possible you never gave this slide to
6  anyone at UEP?
7       A  It's possible, it's possible.
8       Q  So apologies for going backwards, but let's
9  look at Bell 21 and also Bell 22.  If you could have
10  those two in front of you?
11      A  21 and 22.
12      Q  These are minutes of, it looks like,
13  different meetings in 2004?
14      A  Yes.
15      Q  If you look in the bottom right of both
16  these documents there is a Bates number which is
17  fancy speak for a numbering system to show who
18  produced it.  And these are both produced by United
19  Egg.
20         Do you see that?
21      A  They were provided by United Egg?
22      Q  Yes, United Egg.
23         Do you see that?
24      A  Go ahead.
25      Q  I think you testified before you may have

289

1  attended these meetings?
2       A  I did.  I think my name is on the list.
3       Q  Okay.  It's on the list.
4          Did you prepare these minutes?
5       A  No.
6       Q  Do you remember ever receiving a copy of
7  these minutes?
8       A  Well, I should have, as a member of the
9  committee.  I'm sure -- I'm sure -- I don't know
10  whether I could find them today, but I think they
11  usually have the courtesy of giving everyone who
12  attended a copy of the minutes, yes.
13      Q  So I that you're referring to Bell 22.
14  Maybe let's put that aside for now.
15         Looking at Bell 21 --
16      A  Okay.
17      Q  -- it is the Shell Egg Marketing Committee
18  minutes for October 20, 2004.
19      A  Okay.
20      Q  So this is not the Scientific Advisory
21  Committee?
22      A  It is not the Scientific Advisory, and I
23  don't see my name on it and, therefore, I guess I
24  wasn't --
25      Q  Well, your name is on here, but here is my

290

1  question --
2       A  It is?  Where is my name?  There it is.
3  Okay.
4       Q  Sitting here today, do you remember getting
5  a copy of these minutes?
6       A  No, I don't remember specifically getting
7  stacks of paper, no.
8       Q  And you wouldn't have created these
9  minutes, right?
10      A  I did not create it.
11      Q  Okay.  And now going to Bell 22 --
12      A  May we stay with 21 for a minute?
13      Q  Sure.
14      A  If this is nine years ago -- is that right?
15  Nine years ago? -- I believe I was asked to give a
16  talk on a -- on a subject, and I don't want to tell
17  you the subject because I'm not sure, but I think
18  that's why I was invited in the first place, not for
19  any other reason.
20      Q  Okay.  So looking at Bell 22 now --
21      A  Uh-huh.
22      Q  -- now again, this is Bates number
23  UE294465 --
24      A  Yes.
25      Q  -- sitting here today do you remember

291

1  receiving these particular minutes?
2       A  Do I remember receiving these minutes?  I
3  can't say.  I do not recall this specific, but I
4  would expect 99 percent chance that I did.
5       Q  So sitting here today, do you have any
6  independent recollection, other than just reading
7  the document about what happened at this meeting?
8       A  I was in Chicago --
9       Q  Other than reading the document, do
10  you remember the --
11         MR. OLSON:  Let's have him just answer the
12  question.
13         MR. TAKENOUCHI:  Is that the objection,
14  Counsel?  You can object if you'd like.
15         MR. OLSON:  Yes, it is an objection.  You
16  are interrupting him when he gives an answer you
17  don't like.
18  BY MR. TAKENOUCHI:
19      Q  Other than reading the document, do you
20  have any independent recollection of what happened
21  at this meeting in 2004, other than reading the
22  document?
23         MR. OLSON:  And he started to say, "I was
24  in Chicago."
25         THE WITNESS:  All I can recall is that we

35 (Pages 288 to 291)

**HIGHLY CONFIDENTIAL**

292

1  had a meeting of this group in Chicago somewhere in
2  that time period. But like most meetings, I don't
3  recall what they said.
4  BY MR. TAKENOUCHI:
5      Q  Okay. So sitting here today you don't
6  recall what happened at this meeting?
7      A  No.
8      MR. GODLSTEIN: You mean correct? You said
9  "No," and your answer may be ambiguous given the way
10 the question is asked.
11     THE WITNESS: You're right, you're right,
12 you're right. So I do not remember specifically
13 what went on at this meetings except from these
14 minutes.
15 BY MR. TAKENOUCHI:
16     Q  Let's go to Bell 3, if you could.
17     A  Which one?
18     Q  Bell 3.
19     A  3?
20     Q  And, actually, let's pull out Bell 11, too,
21 while we're at it.
22     So focusing -- let's focus on Bell 11 to
23 start off with.
24     A  That's the wrong one.  11?
25     Q  Yes, September 2000, "Recommendations for

293

1  UEP Animal Welfare Guidelines."
2      A  Yes.
3      Q  Do you remember being asked about this
4  yesterday?
5      A  Yes.
6      Q  I want to direct your attention to the
7  third page in this document.
8      A  Third page?
9      Q  It is the one that has --
10     A  The list?
11     Q  Yes, the list.
12     A  Go ahead.
13     Q  Now, at the bottom of this list after
14 Dr. Janice Swanson's name and her affiliation --
15     A  Yes.
16     Q  -- there is a line that says "Support."
17     A  Yes.
18     Q  And then it lists two names.
19     A  Yes.
20     Q  Do you know what "support" meant?
21     A  If we have any questions that they could
22 help us with. We were independent as far as the
23 welfare issues. They were there to listen and I
24 suppose to report back to their members, what have
25 you.

294

1      I think Barrie Wilcox probably was
2  president at that time, and we know about Gene.
3      Q  When you say "president," president of
4  what?
5      A  President of United Egg Producers.
6      Q  Okay.
7      A  They have a hired, full-time general
8  manager, Al Pope and Gene Gregory. I don't see his
9  title here, but it's a hired person.
10     Q  Were Wilcox and Gregory voting members of
11 the Scientific Advisory Committee?
12     A  No, no, neither one were voting members.
13     MR. OLSON: Objection to form.
14 BY MR. TAKENOUCHI:
15     Q  Let me restate the question. If you could
16 let me finish --
17     A  I got your question.
18     Q  No, I got you. You're getting ahead of me.
19 Let me finish just for the record.
20     A  Go ahead.
21     Q  Were Barrie Wilcox and Gene Gregory voting
22 members of the Scientific Advisory Committee?
23     MR. OLSON: Objection to form.
24     THE WITNESS: No.
25 BY MR. TAKENOUCHI:

295

1      Q  Now, referring you to Bell Number 3 --
2      A  3?
3      Q  -- which is the United Voices newsletter.
4      A  I got it.
5      Q  Do you see how there is a list on that
6  first page of members of the committee?
7      A  Yes, yes.
8      Q  Okay. So it shows "Gene Gregory's - UEP
9  Staff Support."
10     Do you see that?
11     A  Yes.
12     Q  It doesn't list Barrie Wilcox --
13     A  Yes, it does, it lists it under "Staff
14 Support." I guess it is more important that he's
15 got his own farm --
16     Q  Sure. But was Wilcox a voting member of
17 the --
18     A  No.
19     Q  -- Scientific Advisory Committee?
20     MR. OLSON: Objection to form.
21     THE WITNESS: Excuse me.
22     No.
23 BY MR. TAKENOUCHI:
24     Q  Just to clean it up, was Barrie Wilcox a
25 member of the Scientific Advisory Committee --

36 (Pages 292 to 295)

**HIGHLY CONFIDENTIAL**

296

1       MR. OLSON: Objection to form.
2   BY MR. TAKENOUCHI:
3       Q  -- a voting member?
4       A  No.
5       Q  So go ahead and put those to the side.
6       A  You'll note the names are slightly
7   different on the two lists.
8       Q  Okay. Yes, thank you.
9          Let's look at Bell 13.
10      A  13.
11      Q  This is the economic consultant agreement.
12      A  Oh.
13      Q  The Bates is UE 790540.
14      A  Okay.
15      Q  Now, this agreement on that second
16  paragraph with the numbers, actually --
17      A  Yes.
18      Q  -- there's four numbers there --
19      A  Yes.
20      Q  -- what are you listing there? What's
21  being listed there?
22      A  These are all --
23      MR. OLSON: Objection -- objection to form.
24      THE WITNESS: These are all newsletters. I
25  do not see the memo in there. It might have been

297

1   added later. The Egg Economics Update went back to
2   about 1983, I believe. It started out as a weekly,
3   they became a monthly.
4          The U.S. Monthly Flock Projection was an
5   attempt to take the statistics that the USDA
6   provided and make a projection of how many layers
7   that would result in the next -- it could be as
8   long as two years.
9          The next one is "Statistical," that's just
10  a bunch of tables and graphs from a variety of
11  sources, not just the USDA, but a variety of
12  sources.
13         The last one, "Regional Egg Production Cost
14  Estimates," that would involve -- it says feed is a
15  big cost. We would get -- we would get cost
16  estimates from the industry on either finished feed
17  for a long number of years, we did it that way, by
18  sampling feed mills, and the emphasis was
19  California.
20         And then later on we started to synthesis
21  feed costs by looking at the ingredients and the
22  formula of the feed.
23         So those are the four basic things that are
24  still being carried on today, and they started as
25  much as 20 to 30 years ago.

298

1   BY MR. TAKENOUCHI:
2       Q  So your -- so this consultant agreement
3   lists those things, those reports you just
4   mentioned.
5          Did your consultant agreement with UEP
6   include compensation for your service on the
7   Scientific Advisory Committee?
8       A  No. I was on a retainer for just my time.
9   I think I said earlier that I received expenses. I
10  don't recall ever receiving an honorarium or a
11  special check or anything like that.
12         So it was my -- it was assumed that I would
13  attend the committee meeting, that's why they wanted
14  me on there in the first place.
15         And that was just part of my regular
16  activity.
17      Q  Okay. You mean part of your regular
18  activities was to serve on the Scientific Advisory
19  Committee?
20      MR. OLSON: Objection to form.
21      THE WITNESS: And to -- let me see how you
22  said that.
23  BY MR. TAKENOUCHI:
24      Q  I'll withdraw that and clean it up a little
25  bit.

299

1       A  Okay.
2       Q  I'm just focusing now on the task you
3   agreed to do as part of your economic consultant
4   agreement.
5       A  Yes.
6       Q  And try to differentiate that from the
7   tasks outside the agreement.
8          So was the service on the Scientific
9   Advisory Committee part of this agreement or was it
10  something outside of this agreement?
11      MR. OLSON: Objection to form.
12      THE WITNESS: No, the task on the
13  Scientific Advisory Committee, I guess, started in
14  '99, right?
15         This agreement here is dated 2001. That
16  coincides with my retirement period. And I
17  continued to do these newsletters through Iowa State
18  University, counterpart -- the industry needs this
19  information, but the lawsuits and everything going
20  on have prevented UEP from continuing this type of
21  activity, statistical activity, pricing and so on,
22  cost of production.
23         So now it's done at the Egg Industry Center
24  at Iowa State University, with a fellow editor, and
25  it is financed by the American Egg Board. And I

37 (Pages 296 to 299)

**HIGHLY CONFIDENTIAL**

**300**

1 never did require financing when I did it, but they
2 make things bigger and better.
3 But -- so it's continuing because the
4 industry said without this kind of information we'd
5 be lost.
6 BY MR. TAKENOUCHI:
7 Q And that was the information that you
8 agreed to --
9 A Those things.
10 Q And those things being this list here on
11 this economic consultant agreement?
12 MR. OLSON: Objection to form.
13 THE WITNESS: Yes.
14 MR. TAKENOUCHI: Okay.
15 Q The transcript doesn't pick up --
16 A I'm being bad.
17 Q That's all right, that's all right. We'll
18 take care of it.
19 So, again, I just wanted to understand the
20 distinction here and understand whether -- whether
21 the services you were providing pursuant to this
22 agreement that are listed here -- correct?
23 A Uh-huh.
24 Q Now, the Scientific Advisory Committee is
25 not listed on this agreement, correct?

**301**

1 MR. OLSON: Objection to form.
2 THE WITNESS: The fourth, fifth
3 paragraph -- second one from the bottom and the
4 bottom one, it talks about special events or special
5 projects or attending meetings, and it is spelled
6 out there that we'd even negotiate compensation for
7 that extra time. That's all extra time.
8 BY MR. TAKENOUCHI:
9 Q Were you ever paid, other than expenses and
10 lodging, for your services on the Scientific
11 Advisory Committee?
12 MR. OLSON: Objection to form.
13 THE WITNESS: I don't think so. Just the
14 travel expenses and my ongoing relationship --
15 ongoing agreement.
16 BY MR. TAKENOUCHI:
17 Q That answer was a little unclear to me.
18 A You want more?
19 Q Okay. Other than expenses and lodging,
20 taking that out of the equation --
21 A Okay, okay.
22 Q -- were you ever paid for your services on
23 the Scientific Advisory Committee?
24 MR. OLSON: Objection to form.
25 THE WITNESS: As a member of the Scientific

**302**

1 Advisory Committee, was I ever paid for that --
2 BY MR. TAKENOUCHI:
3 Q Yes.
4 A -- separately? No.
5 Q Let's put that aside and look at Bell
6 Exhibit 4.
7 MR. OLSON: Do you have an estimate how
8 much longer we're going here?
9 MR. TAKENOUCHI: I do not.
10 THE WITNESS: Okay.
11 BY MR. TAKENOUCHI:
12 Q So I think this is a document you were
13 questioned about yesterday. This is a 1994 Egg
14 Economics Update.
15 Do you see that?
16 A Yes.
17 Q Now, a couple things I'd like to ask you
18 about this document.
19 If you look at the upper left of the first
20 page here --
21 A Go ahead.
22 Q -- it says "Cooperative Extension"?
23 A Yes.
24 Q What does that refer to?
25 MR. OLSON: Objection to form, asked and

**303**

1 answered.
2 THE WITNESS: You want the answer?
3 BY MR. TAKENOUCHI:
4 Q Yes.
5 A You'll notice there's two things on the
6 upper line, "Cooperative Extension," "University of
7 California." It's a part, a department, a group of
8 people who do extension work, which means you extend
9 the university from the campus, away from the
10 campus.
11 And cooperative extension, originally it
12 was all agriculture, all agriculture.
13 It now -- it also at some point in time
14 picked up the 4H -- our 4H program for the youth
15 related to agriculture, also home advisors, which is
16 the homemaker.
17 And I believe around this time period we
18 might have had a staff of 4- to 500 statewide.
19 And there is an extension service --
20 cooperative extension in every land grant university
21 state.
22 Q So let me break it up in two parts here.
23 What is a land grant university?
24 A Land grant is where the state got money
25 from the federal government to establish a

38 (Pages 300 to 303)

**HIGHLY CONFIDENTIAL**

---

**304**

1  University of California or Arizona State
2  University, or whatever, and that was an educational
3  format. It included three things, research, on-site
4  teaching, like UC Riverside here, and the third
5  would be cooperative extension.
6  Now we also have university extension,
7  which is night classes --
8  THE VIDEOGRAPHER: We have to go off the
9  record. The power shut down.
10  MR. TAKENOUCHI: Okay.
11  THE VIDEOGRAPHER: The time is
12  approximately 2:39 p.m., and we're going off the
13  record.
14  (Recess.)
15  THE VIDEOGRAPHER: This marks the beginning
16  of media number 3 in the video deposition of
17  Don Bell, Volume II.
18  The time is approximately 3:06 p.m., and
19  we're back on the record.
20  And just to let you know, we lost power for
21  a few minutes, and we may have lost the last
22  question and answer, so I think we're going to
23  repeat the last question and answer.
24  MR. TAKENOUCHI: For the folks on the
25  phone, we're just going to go back to the last full

---

**305**

1  answer we have on video to recap it so the witness
2  has it in context and then I'll just reask the
3  question that got interrupted by the power outage.
4  So if the court reporter could read back
5  the response to --
6  MR. OLSON: Didn't we get an answer to what
7  a land grant university was?
8  MR. TAKENOUCHI: So the tape got cut off.
9  So what do you want?
10  MR. OLSON: I'll stipulate to what a land
11  grant university is.
12  MR. TAKENOUCHI: What is a land grant
13  university, Steig?
14  MR. OLSON: What do you think it is?
15  Whatever it says in the dictionary, we'll stipulate
16  to.
17  MR. TAKENOUCHI: Could you read back the
18  last full answer he had -- question and answer.
19  I'll just reask it.
20  Q  Mr. Bell, what is a land grant university?
21  A  A land grant university originated in 1859,
22  or something of that type. It established an
23  institution of higher learning for each state.
24  It was called a land grant because the
25  federal government provided land for each state of

---

**306**

1  which they could develop their institution. Well,
2  it's only one per state.
3  Go ahead.
4  Q  So what's the relationship between the
5  cooperative extension and the land grant university?
6  A  A land grant university has three basic
7  roles. One is on-site teaching, and we think in
8  terms of younger students. We have a research role,
9  which is a major role in every kind of field. The
10  third is extension, which is -- follows all the
11  others over time and so on, and it's a matter of
12  taking what's at the university campus itself to all
13  corners of the state and -- with an emphasis in
14  agriculture, but not exclusively.
15  Q  And what funds the cooperative extension?
16  Where does the money come from?
17  A  Well, it varies, but it usually is
18  considered to come from federal sources, the county
19  that you're in for the local program and for the
20  state of California -- for the University of
21  California. My salary, for example, comes from --
22  originally from the State of California to the
23  University of California.
24  The local expenses of maintaining an office
25  and staff is usually the county's. The normal

---

**307**

1  breakdown is something like 25/25/50 percent. So
2  the University of California through the -- the
3  State of California through the University of
4  California would be the highest portion of that,
5  about half, and tied directly to the USDA and grants
6  to work on universal problems of the entire country.
7  Q  So just so I understand, you said 25/25/50.
8  50 was California, what is the other 25/25?
9  A  County and federal would be each about 25.
10  Q  And what's the source of the federal funds?
11  MR. OLSON: Objection to form.
12  THE WITNESS: Your taxes.
13  BY MR. TAKENOUCHI:
14  Q  I guess what egg does it come out of? Does
15  it come out of the Department of Agriculture or --
16  A  The U.S. Department of Agriculture uses
17  funds to do this, this, this and this, and part of
18  it has to do with research at the local level.
19  And I can't give you the exact breakdown of
20  everything that they do, but there are all kinds of
21  national programs of which the nation, as a whole,
22  supports the local expenses.
23  Q  Who was your employer before 2001?
24  A  University of California.
25  Q  Okay. So was the cooperative extension --

---

39 (Pages 304 to 307)

**HIGHLY CONFIDENTIAL**

---

308

1    A  Always there.
2    Q  Okay.  But was the cooperative extension
3  your employer too or was it --
4    A  The cooperative extension is part of the
5  University of California.
6    Q  Okay.
7    A  My immediate supervisor would be a
8  University of California person in an administrative
9  role, each of the offices of which we have 50 or
10  more.
11    Q  And what was your title?
12    A  It's been two different titles through my
13  career.  It started out as a farm advisor in a given
14  county.  Then it became a multi-county position.
15  Then it went back to a one-county position.  And
16  then it became statewide poultry specialist.
17    Q  So during your employment with the
18  cooperative extension, what were you supposed to do?
19  What were the goals of your job?
20    A  Education from a technological standpoint,
21  solution of problems of our farmers.  When I started
22  out, we had 400 egg farmers in one county, so in the
23  state we had over 2,000.
24    And so those are the people we worked with.
25  Some were very good cooperators, sought you out,

---

309

1  asked you problems, phoned you up, very close
2  relationships.  Others had nothing to do with you
3  because they didn't think that the -- that the,
4  quote unquote, government should be doing these
5  kinds of things free, these are free services,
6  sponsored by the University of California.
7    Q  So was there government oversight over what
8  you did for the cooperative exchange -- or the
9  cooperative extension?
10    MR. OLSON:  Objection to form.
11    THE WITNESS:  I would say the federal
12  government would look at the statewide programs,
13  fund them or not.  Probably funding or not is the
14  way you control your programs.  If you don't give
15  them money, you're not going to have a program.
16    Your supervisor, in my case, would be a
17  regional director, and he would have -- each one
18  would have more or less knowledge of what you're
19  doing on a day-by-day basis.
20    So there is a reporting system, of course,
21  we have to report what we're doing.
22    You shouldn't work into your write-up while
23  you're doing it, how you're doing it, what's the
24  industry payoff of what you're doing, why are you
25  doing that, this question you asked, why are you

---

310

1  working with the egg producers.  That's a major
2  commodity in California.  Why are you working on a
3  particular project, economics?  Because I've
4  convinced my administrators that that's a very
5  important subject for the egg industry, and so on.
6  BY MR. TAKENOUCHI:
7    Q  And you talked about a write-up.  What do
8  you mean by a write-up?
9    A  I guess I said write-up.
10    Write-up would be the proposal in the first
11  place to do something and to redo -- continue in the
12  second year and so on through whatever time period.
13  And then the so what, the write-up would be so what.
14    Q  Would these be written reports you would
15  distribute to someone?
16    A  They'd be mainly in-house.  I didn't
17  have -- some people have a committee of farmers that
18  they communicate with in some way, around a table or
19  report sharing or whatever it may be.
20    I did so much extensive writing, as we've
21  been pulling out here, that the flow of information
22  is pretty well documented.
23    Whether anybody looks at this particular
24  newsletter and says, "Don, I don't think you should
25  be doing that," no.  You have pretty much control

---

311

1  over what you do.
2    Q  Did any of your supervisors have access to
3  the reports you did, like this Bell Number 4?
4    A  They all do, all my supervisors.  You would
5  usually only have one supervisor at a time, but
6  there's a chain all the way up to the president of
7  the university.  He doesn't read many reports.
8    Q  Did you have any contact with the USDA
9  during your time working for the cooperative
10  extension?
11    A  Most of the hard data on a national basis
12  comes from them or other agencies of the federal
13  government.  We also have state government.  We do
14  the same thing with them.  We have access to their
15  groups, agencies.
16    Go ahead.
17    Q  Okay.  So looking at this document, Bell
18  Number 4, this is a 1994 Egg Economics Update.
19    A  Yes.
20    Q  And maybe you can explain this to me.  I'm
21  looking at the bottom of the first page here.  Do
22  you see in the very small type -- I apologize for
23  that -- it says, "In accordance with applicable
24  federal laws and university policy, University of
25  California does not discriminate"?

**HIGHLY CONFIDENTIAL**

---

312

1      Do you see that language?
2    A  Yes.
3    Q  On the very bottom it says, "University of
4  California and the United States Department of
5  Agriculture cooperating."
6      What does that mean?
7    A  That means they are sharing on the
8  expenses.  They don't list the county, because
9  that's not required in this particular format.
10     This is required on every document that we
11  do, this particular statement.  I don't think it's
12  going to be on the e-mail, but on any kind of
13  official publication they want to know who to blame
14  and who not to discriminate against and so on.
15     I'd rather say who we didn't
16  discriminate -- who we did discriminate is a shorter
17  list than who we don't discriminate.  That's my
18  personal view.
19    Q  So you were instructed that you had to put
20  this disclaimer --
21    A  Absolutely.
22    Q  -- at the bottom of every report?
23    A  Yes.
24    Q  Now, in this period, 1994, were you on
25  contract with UEP?

---

313

1    A  No, I don't -- I think we decided that we
2  started that in 2001, didn't we, on contract?
3    Q  So 1994 --
4    A  Another document here.
5    Q  So in 1994 you were just working for the
6  cooperative extension?
7    A  No, no -- yes, I was working for the
8  cooperative extension, and the UEP relationship
9  didn't start until -- what did we say, 2001?
10    Q  Yes.
11    A  Purely cooperative extension.  My title
12  was, at this point in time, poultry specialist.
13    Q  So looking at this report with the
14  disclaimer at the bottom there, was this report a
15  result of federal financing?
16    MR. OLSON:  Objection; form.
17    THE WITNESS:  Indirectly.  Indirectly.  You
18  helped pay for it too, thank you.
19    The fact that they may have had 25 percent
20  participation in the University of California,
21  period, it doesn't imply that 25 percent of my
22  expenses, no.  It may be a quarter of a percent.
23  But, you know, that's a grand total.  So the fact
24  that it says USDA cooperating, I suppose if you
25  started to get off base or you started to lie to

---

314

1  your clients, or whatever, that eventually the USDA
2  people would come in and say that person is not
3  doing what they are supposed to be doing.  That
4  would be their control -- ultimate control.  I've
5  never been involved in anybody questioning my
6  program.
7  BY MR. TAKENOUCHI:
8    Q  But did they have the ability at the USDA
9  to question what you are doing?
10    MR. OLSON:  Objection to form.
11    THE WITNESS:  I'm not going to comment on
12  that because I don't know how the government works.
13  BY MR. TAKENOUCHI:
14    Q  Most of us don't.
15     But your understanding was that the USDA
16  would have the ability to regulate what you're
17  doing?
18    MR. OLSON:  Objection to form.
19  BY MR. TAKENOUCHI:
20    Q  Is that correct?
21    A  Purely theoretical.  Purely theoretical.
22    The concern of this statement in here, it
23  has to do that no one can be exempt from your
24  services.
25    Q  Okay.  And that was because there were

---

315

1  strings attached to getting federal funds and state
2  funds?
3    MR. OLSON:  Objection to form.
4    THE WITNESS:  Well, they have the final
5  say-so.  If they don't get the funds, we're going to
6  be 25 percent short of funds.  So we follow all the
7  national programs, don't we.
8    If -- we were taking about sexual
9  orientation here a long, long time ago.
10  BY MR. TAKENOUCHI:
11    Q  I think we're a little far afield on that.
12    A  Is that far afield?
13    Q  I think for this discussion.
14    A  Go ahead.
15    Q  But -- so taking you back to 1994, was the
16  USDA aware of these reports you were putting out?
17    MR. OLSON:  Objection form.
18    THE WITNESS:  This report.
19  BY MR. TAKENOUCHI:
20    Q  The reports in general, was --
21    A  The reports in general?
22    Q  Yes.
23    A  Individual department people would be, the
24  poultry specialist for the United States would be.
25  But once you get into wheat farmers, wheat

---

41 (Pages 312 to 315)

**HIGHLY CONFIDENTIAL**

---

**316**

1  specialists, or departments of engineering, whatever
2  it may be, at the USDA level there is no such thing,
3  but other departments that have very little to do
4  with chickens, they would not be exposed at all to
5  this and they couldn't absorb it even if they were.
6      Q   Are there USDA departments that focus on
7  chickens?
8      A   Absolutely, yes.
9      Q   Okay.  So in those departments that focus
10 on chickens, would those folks have been aware of
11 these reports you're putting out?
12         MR. OLSON:  Objection to form.
13         THE WITNESS:  Some would.  Some would.
14     There's all kinds of interest in chickens.
15 Like my cousins would say, you're a chicken
16 inspector.  No, I'm not a chicken inspector.
17     So there's all different people who work
18 with chickens.  I'm talking about thousands at the
19 federal level, institutional level, and so on.
20     So people who are interested in egg laying
21 chickens in California, we would have no problem
22 with covering them, but --
23 BY MR. TAKENOUCHI:
24     Q   So looking at some of the reports you've
25 already talked about --

---

**317**

1      A   Yes.
2      Q   -- and I think you've mentioned kind of
3  your history of writing these kinds of analyses for
4  a while --
5      A   Yes.
6      Q   -- this analysis here in Bell 4 talking
7  about supply of eggs and possible price effects, is
8  that something that you just discovered in 1994 or
9  did you have some knowledge of that before 1994?
10         MR. OLSON:  Objection; form.
11         THE WITNESS:  We have been tracking this
12 kind of information since I began in 1958.
13 BY MR. TAKENOUCHI:
14     Q   Okay.
15     A   It starts with the original source.  And
16 the original source is the farmer.
17     USDA would be a parallel source, but they
18 go back to the farmer.  The farmer is the one who
19 has these kinds of numbers.
20     Now, some of these numbers are constructed
21 by me, taking what's reported, what you know from
22 this source and this source and this source, and
23 it's very difficult to find this last column, for
24 example, on page 1.
25     Q   Okay.

---

**318**

1      A   It is the theme behind the whole
2  newsletter.
3      Q   Okay.  And so this theme about supply and
4  price issues, is that what you're talking about?
5      A   Yes.
6         MR. OLSON:  Objection to form.
7  BY MR. TAKENOUCHI:
8      Q   This theme about supply and price issues,
9  was that in just this report or did you have many
10 reports over time that dealt with that issue?
11         MR. OLSON:  Objection; form.
12         THE WITNESS:  It's been discussed by me in
13 multiple reports.  I can't say many, but the concept
14 here of a production versus the value of that
15 production right here, that's what that is, has been
16 the subject of several reports.
17 BY MR. TAKENOUCHI:
18     Q   Do you know when you first started
19 recommending to producers that they might want to
20 look at their supply issues if they were concerned
21 about being a viable business?
22     A   I didn't -- I haven't said this before, but
23 it was inferred, that 40 percent of the time your
24 clients are losing money.  And that is a repeatable
25 concept as far as I went back in my career.  And I

---

**319**

1  started in 1957 with the year '57 analysis, and I
2  started in January of '58.
3      My experience was that that was frequent
4  enough, either -- either one month after another,
5  one year after another, or for that period that
6  that's a serious problem.
7      And when you relate it to the number of
8  eggs that are produced and the size of the flock and
9  all that, it's a very important relationship.
10     So much of my program had to do with
11 bringing that into line.
12     Approximately in a five-year period -- I
13 believe I testified to this yesterday, five or
14 six-year period is a cycle.
15     What I mean by a cycle, it means from good
16 to poor to bad to poor back to good annually.
17     And so I would say that there's two years
18 of poor, two years of fair, one year of good in
19 every cycle.  That's an important concept that maybe
20 outsiders don't realize, is that it's not a
21 continuously good or bad industry.  It's an
22 up-and-down situation.
23     One of the highest peaks of profitability
24 we had was in the last four or five years, and it
25 had to do with the high cost of corn and so on.  But

---

**42 (Pages 316 to 319)**

HIGHLY CONFIDENTIAL

320

1  the up was in three months and the down was in three
2  months.
3      Q   And just to take that issue for a second,
4  you said the high price of corn?
5      A   Yes.
6      Q   Don't farmers -- do farmers have to pay for
7  corn?  I'm not sure how -- prices may have gone
8  high, but didn't costs go up as well?
9          MR. OLSON:  Objection; form.
10         THE WITNESS:  Well, corn is the cost.  Corn
11 is 65 percent of your cost.
12         So the price of corn being sold overseas
13 went way up.  It went up to 30, 35 percent of the
14 total.
15         The amount that went into ethanol
16 production for fuel, that takes off a portion of the
17 feed stuffs that the poultrymen are used to using
18 and elevates the price of the remainder.
19         And so those things happening, and some of
20 those were -- you could blame on the federal
21 government for policies on fuel and so on.  But
22 there's only so many acres to grow corn.  And so I
23 got -- I started thinking maybe we're going to have
24 to contract with the corn grower to supply me only
25 with my corn.

321

1  BY MR. TAKENOUCHI:
2      Q   Okay.  So going back to the reports you did
3  for the cooperative extension, I think I'd asked if
4  you remembered when you first started telling
5  individual farmers or writing in newsletters that
6  there is a relationship between the supply of eggs
7  and the price of eggs?
8      A   Soon as I was convinced that this was an
9  ongoing problem.
10     Q   And when was that?
11     A   Well, I can't tell you.  It would have been
12 post 1958, because I would have to experience these
13 records coming in from my cooperators that said that
14 this is happening so often that it's pushing people
15 out of business.
16     Q   And I understand past 1958, but can you put
17 it roughly in time?  Is it the '70s, the '60s, the
18 '80s?
19     A   Now, remember I told you that the cycles
20 are five years, so -- and you have two bad years in
21 a row and here is five years later you have it
22 again.
23         I can't tell you which year at the
24 beginning that this whole thing started, but it was
25 there long enough, frequently enough to start to say

322

1  something about that issue.  I can't tell you the
2  first letter I ever wrote about that, I can't tell
3  you.
4      Q   Was this before this Bell number 4 in 1994?
5      A   Probably.
6      Q   Do you think it is fair to say that the
7  USDA was aware of the recommendations made for
8  dealing with supply and price during this period?
9          MR. OLSON:  Objection; form.
10         THE WITNESS:  The economists were in the
11 nation -- in the USDA, rather, there might have been
12 10 or 20 economists that were concerned about
13 poultry.
14         Today it's just two or three statisticians,
15 but not Ph.D. economists working in poultry.
16 BY MR. TAKENOUCHI:
17     Q   Looking back at this period in the 1990s,
18 did you see it as part of your job at the
19 cooperative extension to give advice to farmers
20 about how to deal with supply and price issues?
21     A   Yes, I felt that was part of my
22 responsibility, yes.
23     Q   Did you feel it was part of your mission?
24         MR. OLSON:  Objection to form.
25         THE WITNESS:  Mission is a broader concept

323

1  than procedures.  I've felt -- I've always felt that
2  the -- that my mission is to work for a healthy
3  industry economically, and that's a moving target.
4  BY MR. TAKENOUCHI:
5      Q   Do you think that the USDA was aware of the
6  recommendations you were making in the 1990s about
7  how to better match supply and, therefore, increase
8  price?
9      A   The economists --
10         MR. OLSON:  Objection to form.
11         THE WITNESS:  There are economists I've
12 worked with all my life would be, yes.
13 BY MR. TAKENOUCHI:
14     Q   And why do you say that?
15     A   Why do I say that?  Because it's true.
16     Q   Did you talk with anyone about that?
17     A   Oh, yes.  There are so few economists
18 involved -- remember, all my data comes from the
19 USDA -- not all of it, but some of the bare material
20 comes -- because they have a better collection
21 system.  I can get on the phone and find out what
22 one person is doing, but they have a thorough
23 collection system.  I don't always agree with it,
24 their sampling procedures and so on.
25         But if I don't agree with it, then I modify

43 (Pages 320 to 323)

**HIGHLY CONFIDENTIAL**

---

**324**

1   it.  I modify it and I say this is my
2   interpretation.
3       Q   But you talk with USDA economists about
4   your recommendation about how to better match supply
5   and demand and, therefore, affect prices?
6       A   Yes.
7           MR. OLSON:  Objection to form.
8   BY MR. TAKENOUCHI:
9       Q   Did anyone at the USDA ever tell you that
10  you shouldn't be making these kind of
11  recommendations?
12      A   No.
13      Q   Did anyone at any other government entity
14  ever tell you you shouldn't be making those
15  recommendations?
16      A   No.
17      Q   Sir, I want to refer you to Bell 8.
18      A   8.
19      Q   This is that August 2nd, 1999 United
20  Voices.
21      A   Okay.  Go ahead.
22      Q   And I think what we were looking at in this
23  document was on page 3, and I believe there's four
24  numbers there -- 1, 2, 3, 4 -- those
25  recommendations.  I don't know how to characterize

---

**325**

1   those.
2           Can I have this marked next in order,
3   please.
4           (Deposition Exhibit 29 was marked for
5           identification by the court reporter
6           and is attached hereto.)
7   BY MR. TAKENOUCHI:
8       Q   Sir, you've been handed what has been
9   marked as Bell 29.
10      A   Are we looking at 3 or 29?
11      Q   Let's look at 29, but leave 3 on the table.
12      A   Leave that for later?
13      Q   Yes.
14          MR. OLSON:  We're looking at 8?
15          THE WITNESS:  29.
16  BY MR. TAKENOUCHI:
17      Q   Yes, 8.  Leave 8 on the table, but we're
18  looking at 29.
19      A   Okay.
20      Q   Do you recognize this document?
21      A   Yes.
22          MR. TAKENOUCHI:  For the record, this is
23  Egg Economics Update dated July 12, 1999.
24      Q   What is this document?
25      A   Yes -- pardon me.

---

**326**

1       Q   What is this?
2       A   It's a newsletter.
3       Q   Okay.
4       A   Number 217 in a series.
5       Q   Okay.
6           MR. OLSON:  Does this document have a Bates
7   number?
8           MR. TAKENOUCHI:  It does not have a Bates
9   number.
10          MR. OLSON:  It hasn't been produced?
11          MR. TAKENOUCHI:  It was on the public
12  website for the cooperative extension.
13          MR. OLSON:  But it hasn't been produced?
14          MR. TAKENOUCHI:  No.
15      Q   So drawing your attention here to this
16  document --
17          MR. OLSON:  All right.  We'll just have a
18  standing objection to the questions about the
19  document that apparently hasn't been produced.
20          MR. TAKENOUCHI:  Okay.
21      Q   So looking at this document, on the first
22  page there, Mr. Bell, do you see that headline
23  there?
24      A   Yes.
25      Q   It says, "California's Egg Industry Record

---

**327**

1   One Week Loss - $2 million"?
2       A   Yes, I see that.
3       Q   What does that mean?
4       A   That means that the eggs were being sold at
5   a price $2 million less than it cost them to produce
6   them.
7       Q   And was that a problem?
8       A   Was that a problem?  What do you think?
9   Excuse me, I'm not supposed to ask that.
10          It's a problem if you lose money, yes, in
11  anything.
12      Q   Was it a particular problem for the egg
13  industry?  People lose money all the time, right?
14          MR. OLSON:  Objection to form.
15          THE WITNESS:  At those levels, I think you
16  see as much as a 22-cent loss per dozen.  Every
17  dozen eggs you produce, you lose 22 cents a dozen.
18  It doesn't take too long before you can't pay your
19  feed bill or any of the other costs, and it's part
20  of being pushed out of business.
21  BY MR. TAKENOUCHI:
22      Q   I want to draw your attention to the second
23  page.
24      A   Go ahead.  The second page.
25      Q   The title here is, "Removing Flocks Early

---

44  (Pages 324 to 327)

**HIGHLY CONFIDENTIAL**

---

**328**

1 That Fail to Cover Variable Costs of Production."
2   A  Uh-huh.
3   Q  Do you remember making this recommendation?
4   A  Yes.
5   Q  And what is the recommendation?
6   A  That if you're not covering your costs and
7 you don't have any foreseeable future that you will,
8 you'd better get rid of them.
9   Q  Now, why would you have to recommend this?
10 Isn't that basic economics or basic business sense?
11     MR. OLSON:  Objection to form.
12     THE WITNESS:  Well, thank you.
13 BY MR. TAKENOUCHI:
14   Q  Why do you have to recommend this?
15 Shouldn't people know that anyway?
16   A  Why do you have to refresh people on the
17 facts of life?  That's what this is.  This is a
18 demonstration of these relationships.  And you are
19 trying to give an example, and what you're really
20 trying to do is encourage them to run the analysis
21 themselves.
22     And the way you run the analysis yourself
23 is you take one flock at a time, not the entire
24 company, one flock at a time, and determine what its
25 costs are and what its income is.

---

**329**

1     Now, its income is going to be varied -- we
2 talked about this yesterday -- egg quality goes
3 down, egg production goes down so every flock is
4 unique.
5     So you then have to step forward and say
6 what's it going to be next week and the month after
7 and the month after.
8     And if they don't match, then you should
9 get rid of them now before they've accumulated
10 losses.
11   Q  So drawing your attention to the third page
12 of this document --
13   A  Third page.  Okay.  Is there a third page?
14   Q  Yes.
15   A  There it is.  Go ahead.
16   Q  There you are.
17     So if you look at that, do you see those
18 four bullet points there?
19   A  Yes.
20   Q  Do you recognize this?
21   A  I did this report, yes.
22   Q  Okay.  Are these the same bullet points
23 that are in Bell Number 8?
24     MR. OLSON:  Objection; form.
25     THE WITNESS:  We have to get Bell Number 8

---

**330**

1 out, I guess.
2 BY MR. TAKENOUCHI:
3   Q  I think it is right there in front of you.
4   A  This one?  Yes, here is number 8.  Go
5 ahead.
6   Q  If you can compare what you have in the
7 document in front of you, Bell 29, with that page in
8 Bell 8, do those look like the same recommendations?
9     MR. OLSON:  Objection; form.
10     THE WITNESS:  I'm sure the general tone is
11 the same.  The numbers are monthly versus annually.
12 It would take a while to -- what's the dates on
13 these two reports?  '99 and -- '99 -- they are
14 almost exactly the same date.  This one -- is this
15 one from this one?  This date here is August '99.
16 This date is July '99.  So this one preempts this
17 one.  And I can't imagine that my thinking process
18 has changed.
19 BY MR. TAKENOUCHI:
20   Q  So referring to Bell Number 29 with the
21 date of July 12th, 1999 --
22   A  Okay.  Go ahead.
23   Q  -- you'll notice that this one has that
24 University of California disclaimer on the bottom
25 there?

---

**331**

1   A  On the letter itself.
2   Q  Would this document have been pubically
3 available back in 1999?
4     MR. OLSON:  Objection to form.
5     THE WITNESS:  Oh, yeah.  This is page 4 --
6 page 3 of a single cover sheet, so this entire --
7 this document down at the bottom is one sheet, but
8 it is in two or three articles, two or three
9 comments.
10 BY MR. TAKENOUCHI:
11   Q  And these are the kinds of articles and
12 reports that you would make pubically available?
13   A  Sure, I would prefer to do one subject at a
14 time, but what we're talking about, losses and where
15 we are headed as a result and removing flocks early
16 as an alternative or possibility.  So it's just a
17 series of thoughts leading to solution of the first
18 thought.
19     MR. OLSON:  Objection to form.
20 BY MR. TAKENOUCHI:
21   Q  So referring to -- so with reference to
22 Bell Number 29 here, this July 12th, 1999 --
23   A  That's what I'm looking at.
24   Q  Okay.  At that point when you wrote this
25 document, were you a contractor for UEP?

**45 (Pages 328 to 331)**

**HIGHLY CONFIDENTIAL**

332

1    A   No.  I don't think I became a contractor
2  with UEP until 2001, did I?  Isn't that right?
3    Q   Yes, it is.
4    A   Nobody is listening.
5    Q   We're listening.
6    A   There is a document here that says when I
7  did become.  I think it was 2001.  That's when I
8  retired, so it makes sense.
9    Q   Okay.  So I just have one more line of
10  questions here.
11       MR. GODLSTEIN:  Before you start, at some
12  point I'm going to ask you for a time of testimony
13  because I feel like we're starting to get close to
14  our seven-hour mark, and at that point I want to be
15  able to put an objection on the record.
16       MR. TAKENOUCHI:  Do a break and we'll get a
17  count.
18       MR. OLSON:  Do we really need a break?  Why
19  don't we put the objection on now and he can finish.
20       MR. TAKENOUCHI:  We're just burning up
21  time.  Let's take a two-minute break.
22       Let's go off record.
23       THE VIDEOGRAPHER:  The time is
24  approximately 3:42 p.m.  We're going off the record.
25       (Recess.)

333

1        THE VIDEOGRAPHER:  The time is
2  approximately 3:44 p.m., and we're back on the
3  record.
4  BY MR. TAKENOUCHI:
5    Q   Mr. Bell, directing your attention to Bell
6  Number 14, Bates number BELL-D-28020, if you look on
7  the eighth page of this document, do you see at the
8  bottom there it says, "The Europeans have" --
9    A   I'm trying to find the Number 8.
10    Q   The Bates numbers.
11    A   My page number, not yours.  I got it.
12       Go ahead.
13    Q   Do you see that bottom paragraph saying,
14  "The Europeans have recognized"?
15    A   Yes.
16    Q   Okay.  What were you saying in this
17  paragraph?
18    A   Basically how long to implement the
19  recommendations or requirements of the plan, the
20  animal welfare plan.
21       The Europeans recognized the need that you
22  couldn't do it overnight, that it would take some
23  time, and this is the application of that same
24  principle to enacting these rules in the United
25  States.

334

1    Q   What would have happened if there hadn't
2  been this phasing-in period for these cage space
3  guidelines?
4        MR. OLSON:  Objection; form.
5        THE WITNESS:  Well, an example is you might
6  get all the attorneys in the United States getting
7  after the regulators and saying that you're going to
8  put the whole business -- whole business out of
9  business.
10       There's an example of that when the United
11  States Department of Agriculture came into
12  de-populate chickens that had a disease.  The
13  Californians said wait a minute, you can't do that
14  overnight and went to court and it stopped it.  The
15  USDA was stopped.
16       And so then they said, well, we have to
17  have more time to make these decisions and develop
18  policy.  That's what's going on here.  You just
19  don't make changes overnight with six-month-old
20  bunch of birds, you don't kill six-month-old birds.
21       So just from logistic standpoint, the
22  transition period is very critical.
23  BY MR. TAKENOUCHI:
24    Q   If there hadn't been that transition period
25  for the cage space portion of the guidelines, what

335

1  would the effect have been on egg prices?
2        MR. OLSON:  Object to form.
3        THE WITNESS:  Well, I don't think it would
4  be enforceable to think that anybody could do it
5  overnight.  Transition can be as much as one day,
6  one year, ten years, whatever.
7        We know what this was requested here as far
8  as transition period, but if it was a transition
9  period of one year, it would have been a
10  catastrophe.
11  BY MR. TAKENOUCHI:
12    Q   And what would be the price effects of that
13  catastrophe?
14    A   Probably you couldn't pay for the eggs, and
15  then the market would be disrupted, eggs would not
16  travel across the country.
17       Price would escalate, the consumer would
18  have to foot the bill, and then you might even have
19  a shortage.
20       You might have a shortage to the point that
21  a supermarket chain might just run out of eggs,
22  period, for a day or two, if there was no orderly
23  transition.
24    Q   You can put that aside.  I just have a
25  couple final questions here.

46  (Pages 332 to 335)

**HIGHLY CONFIDENTIAL**

---

336

1      Mr. Bell, do you think the Scientific
2  Advisory Committee was a sham designed to just
3  rubber-stamp an effort by egg producers to inflate
4  prices?
5      A  Absolutely not.
6      MR. OLSON:  Object to form.
7  BY MR. TAKENOUCHI:
8      Q  Let me ask it again.  Give him a second to
9  object and you can answer.
10      A  Go ahead.
11      Q  Mr. Bell, do you think the Scientific
12  Advisory Committee was just a sham to rubber-stamp
13  an effort by egg producers to inflate prices?
14      MR. OLSON:  Objection to form.
15      THE WITNESS:  Now am I supposed to answer?
16  I said "Absolutely not."
17  BY MR. TAKENOUCHI:
18      Q  At any time while the committee was doing
19  its work, did anyone ever tell you that the
20  Scientific Advisory Committee was a sham designed to
21  rubber-stamp a conspiracy to inflate egg prices?
22      MR. OLSON:  Objection to form.
23      THE WITNESS:  No.
24  BY MR. TAKENOUCHI:
25      Q  Did any members of the Scientific Advisory

---

337

1  Committee ever say that they felt their role was to
2  help the industry suppress the supply of eggs and,
3  thereby, increase egg prices?
4      A  No.
5      MR. OLSON:  Objection to form.
6  BY MR. TAKENOUCHI:
7      Q  If the goal of the Scientific Advisory
8  Committee had been to inflate egg prices, do you
9  think the members of the Scientific Advisory
10  Committee would have participated in the committee?
11      A  Not the specific members --
12      MR. OLSON:  Objection to form.
13      THE WITNESS:  The composition of the
14  committee would be totally different.  If the issue
15  was health of the industry or economic health or
16  what have you, this committee had its expertise in
17  animal welfare, period.
18      I was the only one that ever was concerned
19  about the economics of what was going on or being
20  recommended, but animal welfare was the driver in
21  this committee.
22      MR. GODLSTEIN:  It is getting late in the
23  day.  Just try to remember Steig.  Give him a minute
24  after his question.
25      THE WITNESS:  How much longer?

---

338

1      MR. GODLSTEIN:  Don't just jump over Jason
2  and answer.  So pause before you answer.
3      THE WITNESS:  Well, I thought we were
4  limited on time here.
5      MR. GODLSTEIN:  We're not limited on time,
6  but everybody has to say something.
7      THE WITNESS:  That's fine, and I'll stay as
8  long as I can.  I thought people can't say what
9  they're objecting to.
10      MR. OLSON:  He's asking you to take a brief
11  pause after the question.
12  BY MR. TAKENOUCHI:
13      Q  Mr. Bell, did you initiate any discussions
14  during your service on the Scientific Advisory
15  Committee where you had the goal of increasing egg
16  prices?
17      A  I didn't have the role of increasing egg
18  prices as a member of the committee.
19      I'm able to separate -- I'm able to
20  separate topics, and today we're going to talk about
21  animal welfare and tomorrow I'm going to still be
22  concerned about egg prices.
23      Q  That's all.  I think there might be some on
24  the phone who might have questions.  Thank you.
25      MR. MONICA:  This is John Monica.  We're

---

339

1  not going to be asking questions.  We've got an
2  annoying fire alarm, so we're waiving it.
3      THE WITNESS:  I didn't think the topic was
4  that hot.
5      MR. TAKENOUCHI:  Is there anyone else on
6  the phone?
7      Okay.  I don't hear anything.
8      THE WITNESS:  Are they all together in one
9  place?
10      MR. OLSON:  So for the sake of everyone,
11  Mr. Bell, we don't have any pressing need for
12  additional questions at this time.
13      As we've discussed with Mr. Bell's counsel,
14  documents are still being produced that we're going
15  to review.  We understand that we're going to be
16  given the opportunity to come back for some
17  additional time that we'll discuss with Mr. Bell's
18  counsel.
19      MR. GODLSTEIN:  Correct.
20      MR. OLSON:  Thank you.
21      THE VIDEOGRAPHER:  This concludes today's
22  video deposition of Don Bell, Volume II.  The total
23  number of media used was 3.  The time is
24  approximately 3:53 p.m., and we're off the record.
25      (TIME NOTED:  3:53 p.m.)

---

47 (Pages 336 to 339)

**HIGHLY CONFIDENTIAL**

340

1        ACKNOWLEDGMENT OF DEPONENT
2      I, DONALD L. BELL, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true
5  and accurate record of my testimony (with the
6  exception of the corrections listed below):
7  Page  Line       Correction
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20
21      _____
        DONALD L. BELL
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20____.
24
    _____  _____
25  (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

341

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were placed under oath; that a
8  true and correct record of the proceedings was made
9  by me using machine shorthand which was thereafter
10  transcribed under my direction; further, that the
11  foregoing is an accurate transcription thereof.
12      I further certify that I am neither
13  financially interested in the action nor a relative
14  or employee of any attorney of any of the parties.
15      IN WITNESS WHEREOF, I have this date
16  subscribed my name.
17  Dated:  8/26/13
18
19
      _____
20      DENISE BARDSLEY
      CSR No. 11241
21
22
23
24
25

48 (Pages 340 to 341)