Page 595

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2              EASTERN DIVISION
 3   KRAFT FOODS GLOBAL, INC.; THE    )
     KELLOGG COMPANY; GENERAL         )
 4   MILLS, INC.; and NESTLÉ USA,    )
     INC.,                            )
 5                                    )
            Plaintiffs,   )
 6                        ) Case No. 11 CV 8808
        -vs-              )
 7                        ) Chicago, Illinois
     UNITED EGG PRODUCERS, INC.;    ) October 19, 2023
 8   UNITED STATES EGG MARKETERS,   ) 9:04 a.m.
     INC.; CAL-MAINE FOODS, INC.;   )
 9   and ROSE ACRE FARMS, INC.,     )
                                    )
10          Defendants.   )
11              VOLUME 3-A
           TRANSCRIPT OF PROCEEDINGS - Trial
12      BEFORE THE HONORABLE STEVEN C. SEEGER, and a Jury
13
     APPEARANCES:
14
     For the Plaintiffs: JENNER & BLOCK, LLP
15                       BY: MR. BRANDON FOX
                             MS. SATI HARUTYUNYAN
16                           MS. AMY GALLEGOS
                         515 South Flower Street
17                       Suite 3300
                         Los Angeles, CA 90071-2246
18
                         JENNER & BLOCK, LLP
19                       BY: MR. MATTHEW SUMMERS
                         455 Market Street
20                       Suite 2100
                         San Francisco, CA 94105-2453
21
22   Court Reporter:    AMY M. KLEYNHANS, CSR, RPR, CRR
                        Federal Official Court Reporter
23                      United States District Court
                        219 South Dearborn Street, Room 2318A
24                      Chicago, IL 60604
                        Telephone: (312) 818-6531
25                      amyofficialtranscripts@gmail.com
```

Page 596

```
 1   APPEARANCES (CONT'D):
 2   For the Plaintiffs: JENNER & BLOCK, LLP
                         BY: MS. ANDRIANNA D. KASTANEK
 3                           MS. ANGELA ALLEN
                             MR. MICHAEL BRODY
 4                           MR. CHRISTOPHER SHEEHAN
                             MS. MARGARET M. HLOUSEK
 5                           MR. CHRISTIAN PLUMMER
                             MR. JAMES T. MALYSIAK
 6                           MR. JOEL T. PELZ
                             MR. JOHN D. VanDEVENTER
 7                           MS. REANNE ZHENG
                             MS. SAVANNAH McNEILY
 8                           MR. STEVEN TINETTI
                         353 North Clark Street
 9                       Chicago, IL 60654
10   For Defendants United TROUTMAN PEPPER HAMILTON SANDERS, LLP
     Egg Producers, Inc., BY: MS. ROBIN SUMNER
11   and United States       MS. KAITLIN L. MEOLA
     Egg Marketers, Inc.: 3000 Two Logan Square
12                       18th and Arch Streets
                         Philadelphia, PA 19103
13
                         TROUTMAN PEPPER HAMILTON SANDERS, LLP
14                       BY: MS. WHITNEY REDDING
                         501 Grant Street
15                       Suite 300
                         Union Trust Building
16                       Pittsburgh, PA 15219
17                       TROUTMAN PEPPER HAMILTON SANDERS, LLP
                         BY: MS. JESSICA RING
18                           MS. MOLLY DiRAGO
                         227 West Monroe Street
19                       Suite 3900
                         Chicago, IL 60606
20
     For Defendant        KING & SPAULDING
21   Cal-Maine Foods,     BY: MR. PATRICK M. COLLINS
     Inc.:                    MR. PATRICK OTLEWSKI
22                           MS. LIVIA KISER
                             MS. TATUM ELLIS
23                           MS. ABIGAIL HOVERMAN TERRY
                             MR. JORDAN BLOCK
24                           MS. LEILA M. MORGAN
                         110 North Wacker Drive
25                       Suite 3800
                         Chicago, IL 60606
```

Page 597

```
 1   APPEARANCES (CONT'D):
 2   For Defendant        KING & SPAULDING
     Cal-Maine Foods,     BY: MS. REBECCA L. PARADIS
 3   Inc.:                    MR. HERSHEL WANJCER
                         1700 Pennsylvania Avenue, NW
 4                       Suite 900
                         Washington, D.C. 20006
 5
                         BROWN FOX PLLC
 6                       BY: MR. ERIC WOOD
                             MR. BRIAN E. ROBISON
 7                       8111 Preston Road
                         Suite 300
 8                       Dallas, Texas 75225
 9   For Defendant Rose   PORTER, WRIGHT, MORRIS & ARTHUR, LLP
     Acre Farms, Inc.:    BY: MR. JAMES A. KING
10                           MR. ALLEN T. CARTER
                             MR. ERIC B. GALLON
11                           MS. GRACE E. KARABINUS
                         41 South High Street
12                       Suite 2900
                         Columbus, OH 43215
13
                         PORTER, WRIGHT, MORRIS & ARTHUR, LLP
14                       BY: MR. JAY L. LEVINE
                             MR. DONALD M. BARNES
15                       2020 K Street, NW
                         Suite 600
16                       Washington, D.C. 20006
17                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                         BY: MR. JOSHUA M. DILLE
18                       321 North Clark Street
                         Suite 400
19                       Chicago, IL 60654
20                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                         BY: MS. ANA P. CRAWFORD
21                       250 East Fifth Street
                         Suite 2200
22                       Cincinnati, OH 45202
23
24
25
```

Page 598

```
 1                     I N D E X
 2   WITNESS:                            PAGE
 3   Opening Statement By Mr. Fox        653
 4
 5
 6              INDEX TO EXHIBITS
 7
     PLAINTIFF'S EXHIBIT                 RECEIVED
 8
 9              None.
10   DEFENDANT'S EXHIBIT                 RECEIVED
11
                None.
12
     JOINT EXHIBIT                       RECEIVED
13
14              None.
```

Page 715

1   Not one of these laws affected the defendants'
2   operations during the conspiracy from 1998 to 2008. I showed
3   you where their facilities were, south, some smaller
4   Midwestern states. These laws were being really implemented
5   in the coastal areas, California, New Jersey, Washington,
6   Michigan, but they don't have facilities in Michigan. It
7   didn't affect their operations. Some of these laws, in fact,
8   didn't take effect until 2016 or later. It didn't affect this
9   conspiracy. Nothing to do with it.
10   I expect the Court will instruct you that state laws
11  at most can be used by the defendants to try to argue that the
12  plaintiffs somehow weren't injured after the laws were passed.
13   That's an overview of the facts that we're going to
14  be providing to you. I just want to quickly go over how we're
15  going to prove it to you. What is our evidence going to be?
16   So if we're going to prove the case to you beyond a
17  reasonable -- beyond a reasonable doubt is not the standard.
18  Excuse me. That's the criminal standard. We have to do it by
19  preponderance of the evidence. More likely than not. More
20  probable than not. That's our standard. Here's how we're
21  going to prove it to you.
22   You're going to hear from UEP's economic consultant
23  Don Bell. He'll be on videotape testimony from years ago.
24  He's passed. Many people involved in this case have passed.
25  The case is so old.

Page 716

1   So Don Bell, you'll hear his own words talking about
2   it. And he's talking about being on the animal welfare
3   committee. He didn't have the background. He wasn't an
4   animal welfare specialist. He wasn't an expert. He was only
5   interested in egg numbers, egg size, mortality, and what it
6   meant economically. That's what he will say about his
7   involvement in the animal welfare committee.
8   He wasn't an expert.
9   He will talk about his reasons for his
10  recommendations, the economic reasons. I know that if we
11  reduced the number of birds in the U.S., the egg producers in
12  the United States will have a more profitable relationship set
13  of results.
14   An e-mail from Don Bell to the animal welfare
15  committee before the certified guidelines started. He
16  mentioned 72 square inches calling it an arbitrary
17  recommendation. That's ultimately what the largest size was
18  that they came up with, arbitrary. But then he says,
19  absolutely no one would make this much of a change
20  voluntarily. That's the last line. It needs to be mandatory.
21  It's not in any individual's interest. We need to make the
22  industry agree to it.
23   You'll also hear from Linda Reickard again on
24  videotape deposition that occurred years ago. She will tell
25  you about the backfilling issue that I mentioned, how there

Page 717

1   was the zero tolerance policy, they would tell the owner of
2   the facility to destroy the bird if they had been backfilling,
3   yes.
4   You'll hear from Cal-Maine executives. In fact, one
5   of our first witnesses will be Dolph Baker himself, step up to
6   the witness stand. It will be as early as tomorrow. I expect
7   that he will admit when questioned about Cal-Maine's
8   participation in these programs from the beginning, early
9   slaughter, early molting, henhouse density restrictions,
10  backfilling bans, how his marketing committee ran these
11  programs, came up with the policies, their leadership on the
12  boards, how Cal-Maine was involved in this from the beginning.
13   How he advocated for his competitors to agree to
14  engage in all of these programs, the exports, everything else.
15  And how Cal-Maine was one of the first egg producers to sign
16  on to that certified program and the extent that Cal-Maine
17  profited and how much he profited from it.
18   You'll also hear, along with Dolph Baker, from Rose
19  Acre executives, including Marcus Rust, who was leading Rose
20  Acre at the time. He will admit in a videotaped deposition,
21  videotaped testimony, that he was concerned that UEP was
22  coordinating egg producers to restrict the supply of eggs to
23  boost prices before he joined. They knew what was happening,
24  and then they joined the program to have a say over it.
25   He made sure that they were on every committee that

Page 718

1   mattered. The board of directors, marketing, animal welfare
2   committee, price discovery committee.
3   All of these committees mattered. And the marketing
4   committee was the one, Dolph Baker's committee, that would
5   have recommended the early molts and early kills, correct?
6   Yes.
7   They engaged in the backfilling ban even though they
8   historically backfilled. Why did they do it?
9   Well, he knew that the UEP was recommending that
10  producers stop backfilling. He knew that that recommendation
11  was essentially for economic reasons, so they produced less
12  eggs. You could assume that from that recommendation. And
13  that they always backfilled until they couldn't. They stopped
14  because of the program. Even he won't say that was voluntary.
15   You'll also be able to see -- I've shown you some,
16  but there will be a lot of documents that you'll see, articles
17  from the United Voices, minutes from the board meetings,
18  records from the USEM and UEP, and also defendants' e-mails
19  back and forth talking about all these programs.
20   You'll hear from the plaintiffs' purchasers. You'll
21  hear from General Mills and Kellogg. You'll learn from them
22  that they never requested certified eggs. In fact, the
23  testimony you'll hear from General Mills is that they don't
24  think that they ever purchased certified eggs. That was not
25  their intent.

Page 719

1  In other words, the plaintiffs didn't make the
2  defendants do it.
3  Until 2011, Nestlé only requested certified eggs in
4  one of its products, Häagen-Dazs ice cream. That was it.
5  Again, after the conspiracy was over. They might point that
6  out, but that was after the conspiracy was over.
7  Only one plaintiff, Kraft, requested certified eggs
8  in all of its products, and that was after Rose Acre sold them
9  on the program in some of the ways that they sold the others
10 on the program, touted the animal welfare benefits, said how
11 great this was from an animal welfare standpoint, said it
12 wouldn't affect supply. You'll see documents on this. It
13 won't short the market.
14 And Kraft took the bait. It had been looking at
15 animal welfare issues on a number of -- a number of different
16 programs, meats, et cetera, and it decided to include the UEP
17 certification as part of its specs for egg purchases.
18 But only two years later, Rose Acre changed course.
19 Kraft was saying, what's going on with these high prices? A
20 couple years before that, they said it won't affect the
21 market, it won't affect their supply. And Rose Acre came back
22 and said to Kraft, the prices were high because supply had
23 reduced based on the program. The UEP certified guidelines
24 had caused a decrease in Rose Acre's overall bird numbers.
25 That's what they told Kraft at the time, and resulted in an

Page 720

1  increase in production costs. A bait and switch.
2  But it was consistent with the economist's analysis
3  that I mentioned earlier, the flock sizes overall had gone
4  down, prices went up.
5  You'll hear from Dr. Baye, again, the economist at
6  Indiana University, he will explain to you the comprehensive
7  regression analysis he did. He will explain how small
8  fluctuation in the egg market can affect prices greatly
9  because demand is about the same, demand is pretty constant.
10 He'll talk to you about how the conspiracy caused there to be
11 billions of fewer eggs but for this conspiracy, 20 million
12 flock size reduced.
13 And he'll talk to you about how he determined that
14 Kraft, Kellogg, Nestlé, and General Mills were injured from
15 this conduct, injured from the conspiracy because the
16 defendants' actions raised the price of egg products that they
17 paid.
18 It's an overview of some of the evidence you're going
19 to be hearing over the next several weeks now that the
20 plaintiffs have finally gotten their day, really weeks, in
21 court.
22 You'll hear all this evidence about how the
23 defendants conspired to artificially raise prices, restrict
24 the number of eggs in the market, cheated their customers.
25 And at the conclusion of this evidence, we'll come

Page 721

1  back up here in a few weeks, and we'll ask you to deliver a
2  verdict that will be consistent, the only verdict that will be
3  consistent with the evidence, and that's the defendants
4  cheated their system and their customers. The defendants
5  artificially raised the price of eggs by restricting the
6  supply of eggs. They took actions that restricted the number
7  of eggs in the market; that Kraft, General Mills, Nestlé, and
8  Kellogg were injured by this conduct; and that the defendants
9  are liable to the plaintiffs for their conduct.
10 Thank you very much.
11 THE COURT: Thank you, Counsel.
12 Members of the jury, it's lunchtime. It is 12:16.
13 We're going to come back at 1:20. So we're going to go just a
14 little more than an hour.
15 The cafeteria is on the second floor, as you may
16 know. Maybe you've been there already. There is a variety of
17 food there you can get.
18 You are free to leave the building if you'd like to
19 leave the building. There are all sorts of places near the
20 building that you can eat if you'd like. If you want to eat
21 in the building and then just go for a walk, that's fine, too.
22 Whatever you'd like. You can use your time as you choose as
23 long as you come back and be ready and raring to go at 1:20.
24 Please take your notepads with you today. Don't
25 leave them in the courtroom. Please take them. If you leave

Page 722

1  the jury room, please leave your notepads in the jury room.
2  Please do not talk to anyone, even your fellow
3  jurors, about what you've just heard. Don't talk to anyone
4  about the case. But do enjoy lunch and do keep an open mind,
5  and we'll see you in an hour. Okay?
6  THE CLERK: All rise.
7  (Jury out at 12:17 p.m.)
8  THE COURT: All right, have a seat, everybody. I
9  don't have much to cover.
10 Mr. Fox, you were an hour and 35 minutes, really
11 close to your estimate, so that was well within range of your
12 estimate. So thank you for being consistent with what you
13 predicted.
14 You know, defense team, you'll start up at 1:20. I'm
15 going to let you talk until you're done. I've got a sense of
16 what your estimates are. You know, I let Mr. Fox talk. I'm
17 going to let you talk. All right?
18 Mr. Collins, you're still going to speak first for
19 Cal-Maine, obviously?
20 MR. COLLINS: Yes, Your Honor.
21 THE COURT: You're welcome to do what Mr. Fox did.
22 You can have your slide deck ready to go. You can have the
23 first slide up if you choose. If you want it to be dark
24 first, if that's what you prefer, you're welcome to do that,
25 but I was always worried that the technological gods would