**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL Docket No. 2002 08-md-02002 (GP) |
| THIS DOCUMENT APPLIES TO:<br><br>Kraft Foods Global, Inc. et al v. United Egg Producers, Inc., et al.<br>Civil Action No. 2:12-cv-00088 | |

<u>**DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION**</u>
<u>**TO KRAFT PLAINTIFFS**</u>

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, defendants Cal-Maine Foods, Inc.; Daybreak Foods, Inc.; Hillandale Foods Inc.; Michael Foods, Inc.; Midwest Poultry Services, L.P.; National Food Corp.; NuCal Foods, Inc.; Ohio Fresh Eggs, LLC; R.W. Sauder, Inc.; Rose Acre Farms, Inc.; United Egg Producers, Inc.; United States Egg Marketers, Inc.; and Sparboe Farms, Inc. hereby request that Plaintiffs Kraft Foods Global, Inc.; The Kellogg Company; General Mills, Inc.; and Nestlé USA, Inc. (collectively, "Plaintiffs") respond to the following Requests for Admission within the time prescribed by the applicable rules.

<u>**INSTRUCTIONS AND DEFINITIONS**</u>

The following instructions and definitions apply to each of the Requests for Admission set forth below, and are incorporated into each of the following Requests:

1.      The terms "Plaintiff," "You," and "Your" means Plaintiffs Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA, Inc., including their past and present partners, partnerships, joint ventures, affiliates, subsidiaries, parents, officers, directors, employees, agents, attorneys, experts, members, retail owners, representatives, and all other persons acting or purporting to act on behalf of each plaintiff at any time.

2. The term "Defendants" means the named defendants in the above-captioned case.

3. The term "Lawsuit" refers to the above-captioned case.

4. The term "Complaint" refers to Your Second Amended Complaint dated March 6, 2013.

5. "UEP" means Defendant United Egg Producers, Inc.

6. "USEM" means Defendant United States Egg Marketers, Inc.

7. The singular includes the plural and the plural includes the singular whenever such inclusion would result in any additional information and/or documents being responsive to any request.

8. "Any" and "all" mean "each and every," and vice versa.

9. The past tense includes the present tense, and vice versa.

10. For purposes of these Requests, the term "UEP Certified" includes and refers to UEP's animal welfare program during all relevant times, whether that program was known as the UEP Certified program, the Animal Care Certified program, the Animal Husbandry Certified program, or by any other name.

11. Unless otherwise noted, the relevant time period for these Requests is January 1, 1999 through December 31, 2008.

## REQUESTS FOR ADMISSION

1. Admit that You have purchased UEP Certified eggs or egg products.

2. Admit that You have sought to purchase UEP Certified eggs or egg products.

3. Admit that You have communicated with one or more of Your suppliers regarding the purchase of eggs or egg products that were UEP Certified.

4.      Admit that You have requested that one or more of Your suppliers provide You with UEP Certified eggs or egg products.

5.      Admit that You have requested that one or more of the Defendants provide You with eggs or egg products that were UEP Certified.

6.      Admit that You have required that one or more of Your suppliers provide You with eggs or egg products that were UEP Certified.

7.      Admit that You have required that one or more of the Defendants provide You with eggs or egg products that were UEP Certified.

8.      Admit that one or more of the suppliers who sold UEP Certified eggs or egg products to You explained its costs of production to You.

9.      Admit that one or more of the Defendants who sold UEP Certified eggs or egg products to You explained its costs of production to You.

10.      Admit that one or more of the suppliers who sold UEP Certified eggs or egg products to You explained that its costs of production for eggs or egg products were increased as a result of participating in the UEP Certified program.

11.      Admit that one or more of the Defendants who sold UEP Certified eggs or egg products to You explained that its costs of production for eggs or egg products were increased as a result of participating in the UEP Certified program.

12.      Admit that one ore more of the suppliers who sold UEP Certified eggs or egg products to You explained that the UEP Certified program was designed to increase the average cage space per bird to approximately 67 square inches per laying hen.

13.     Admit that one or more of the Defendants who sold UEP Certified eggs or egg products to You explained that the UEP Certified program was designed to increase the average cage space per bird to approximately 67 square inches per laying hen.

14.      Admit that You knew that You would pay an additional price for one or more UEP Certified eggs or egg products sold to You.

15.     Admit that You knew that You would pay an additional price for one or more UEP Certified eggs or egg products sold to You by one or more of the Defendants.

16.     Admit that You have sold UEP Certified eggs or egg products.

17.     Admit that You have advertised or marketed one or more eggs or egg products as being UEP Certified.

18.     Admit that one or more of Your customers has requested that You sell UEP Certified eggs or egg products.

19.     Admit that one or more entities or organizations has requested that You sell UEP Certified eggs or egg products.

20.     Admit that You have purchased one or more eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

21.     Admit that You have sought to purchase one or more eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

22.     Admit that You have communicated with one or more of Your suppliers regarding the purchase of eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

23.     Admit that You have requested that one or more of Your suppliers provide You with eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

24.     Admit that You have requested that one or more Defendant provide You with eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

25.     Admit that You have sold eggs or egg products that are labeled or otherwise marketed as "Certified Humane."

26.     Admit that you have advertised or marketed one or more eggs or egg products as being "Certified Humane."

27.     Admit that one or more of Your customers has requested that You sell eggs or egg products that are "Certified Humane."

28.     Admit that one or more entities or organizations has requested that You sell eggs or egg products that are "Certified Humane."

29.     Admit that You have purchased one or more eggs or egg products that are marketed as having been produced in a humane manner.

30.     Admit that You have sought to purchase one or more eggs or egg products that are marketed as having been produced in a humane manner.

31.     Admit that You have communicated with one or more of Your suppliers regarding the purchase of one or more eggs or egg products that are marketed as having been produced in a humane manner.

32.     Admit that You have requested that one or more of Your suppliers provide You with eggs or egg products that are marketed as having been produced in a humane manner.

33.     Admit that You have requested that one or more of the Defendants provide You with eggs or egg products that are marketed as having been produced in a humane manner.

34.     Admit that You have sold one or more eggs or egg products that are marketed as having been produced in a humane manner.

35.    Admit that you have advertised or marketed one or more eggs or egg products as having been produced in a humane manner.

36.    Admit that one or more of Your customers has requested that You sell eggs or egg products produced in a humane manner.

37.    Admit that one or more entities or organizations has requested that You sell eggs or egg products produced in a humane manner.

38.    Admit that You have purchased one or more eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

39.    Admit that You have sought to purchase one or more eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

40.    Admit that You have communicated with one or more of Your suppliers regarding the purchase of eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

41.    Admit that You have requested that one or more of Your suppliers provide You with eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

42.    Admit that You have requested that one or more of the Defendants provide You with eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

43.     Admit that You have sold one or more eggs or egg products that are marketed as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

44.     Admit that You have advertised or marketed one or more eggs or egg products as having been produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

45.     Admit that one or more of Your customers has requested that You sell eggs or egg products produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

46.     Admit that one or more entities or organizations has requested that You sell eggs or egg products produced in a manner that is beneficial to the well-being, welfare, comfort, health, or safety of animals.

47.     Admit that You have purchased cage-free eggs or egg products.

48.     Admit that You have sought to purchase cage free eggs or egg products.

49.     Admit that You have communicated with one or more of Your suppliers regarding the purchase of cage-free eggs or egg products.

50.     Admit that You have requested that one or more of Your suppliers provide You with cage-free eggs or egg products.

51.     Admit that You have requested that one or more of the Defendants provide You with cage-free eggs or egg products.

52.     Admit that You have sold cage-free eggs or egg products.

53.     Admit that You have advertised or marketed one or more eggs or egg products as being cage-free.

54.      Admit that one or more of Your customers has requested that You sell cage-free eggs or egg products.

55.      Admit that one or more entities or organizations has requested that You sell cage-free eggs or egg products.

56.      Admit that You have purchased free-range eggs or egg products.

57.      Admit that You have sought to purchase free-range eggs or egg products.

58.      Admit that You have communicated with one or more of Your suppliers regarding the purchase of free-range eggs or egg products.

59.      Admit that You have requested that one or more of Your suppliers provide You with free-range eggs or egg products.

60.      Admit that You have requested that one or more of the Defendants provide You with free-range eggs or egg products.

61.      Admit that You have sold free-range eggs or egg products.

62.      Admit that You have advertised or marketed one or more eggs or egg products as being free-range.

63.      Admit that one or more of Your customers has requested that You sell free-range eggs or egg products.

64.      Admit that one or more entities or organizations has requested that You sell free-range eggs or egg products.

65.      Admit that, prior to September 2004, You were aware of the existence of the UEP Certified program.

66.      Admit that, prior to September 2004, You were aware that the UEP Certified program required that certain egg producers provide egg-laying hens additional cage space.

8

67.     Admit that, prior to September 2004, You were aware of some of the requirements of the UEP Certified program.

68.     Admit that, prior to September 2004, You were aware that some egg producers were exporting eggs outside the United States through USEM.

69.     Admit that for at least part of the period from January 1, 1999 to December 31, 2008, Kraft Food Group, Inc. was a subsidiary of Kraft Foods Inc. ("Kraft").

70.     Admit that for the fiscal year ended December 31, 2001, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $1,882,000,000.  (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 41 (Mar. 14, 2002)).

71.     Admit that for the fiscal year ended December 31, 2002, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $3,394,000,000.  (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 46, Exh. 13 (Mar. 25, 2003)).

72.     Admit that for the fiscal year December 31, 2003, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $3,476,000,000.  (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 42, Exh. 13 (Mar. 12, 2004)).

73.     Admit that for the fiscal year ended December 31, 2004, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $2,665,000,000.  (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 51 (Mar. 11, 2005)).

74.     Admit that for the fiscal year ended December 31, 2005, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $2,632,000,000.  (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 55 (Mar. 10, 2006)).

75.     Admit that for the fiscal year ended December 31, 2006, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $3,060,000,000. (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 58 (Mar. 1, 2007)).

76.     Admit that for the fiscal year ended December 31, 2007, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $2,590,000,000. (*See* Kraft Foods Inc., Amended Annual Report (Form 10-K), at 48 (Feb. 26, 2008)).

77.     Admit that for the fiscal year ended December 31, 2008, Kraft's reported earnings before deferred income tax, depreciation, and amortization were $2,901,000,000. (*See* Kraft Foods Inc., Annual Report (Form 10-K), at 51 (Feb. 27, 2009)).

78.     Admit that for the fiscal year 1999, the Kellogg Company's ("Kellogg") reported earnings, before interest, taxes, depreciation, and amortization, were $388,300,000. (*See* Kellogg Company, Annual Report (Form 10-K), at 19, Exh. 13.01, Annual Report to Share Owners (Mar. 24, 2000)).

79.     Admit that for the fiscal year December 31, 2000, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization, were $587,700,000. (*See* Kellogg Company, Annual Report (Form 10-K), at 14, Exh. 13.01, Pages from the Company's Annual Report (Mar. 13, 2001)).

80.     Admit that for the fiscal year ended December 31, 2001, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $473,600,000. (*See* Kellogg Company, Annual Report (Form 10-K), at 29, Exh. 13.01 (Mar. 25, 2002)).

81.     Admit that for the fiscal year ended December 28, 2002, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $720,900,000. (*See* Kellogg Company, Annual Report (Form 10-K), at 32, Exh. 13.01, (Mar. 14, 2003)).

82.     Admit that for the fiscal year December 27, 2003, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $787,100,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 34, Exh. 13.01, Annual Report to Share Owners for the Fiscal Year(Mar. 10, 2004)).

83.     Admit that for the fiscal year ended January 1, 2005, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $890,600,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 36, Exh. 13.01, Annual Report to Share Owners for the Fiscal Year: Consolidated Statement of Cash Flows (Mar. 14, 2005)).

84.     Admit that for the fiscal year ended December 31, 2005, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $980,400,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 26 (Feb. 28, 2006)).

85.     Admit that for the fiscal year ended December 30, 2006, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $1,004,100,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 30 (Feb. 23, 2007)).

86.     Admit that for the fiscal year ended December 29, 2007, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $1,103,000,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 33 (Feb. 25, 2008)).

87.     Admit that for the fiscal year ended January 3, 2009, Kellogg's reported earnings, before interest, taxes, depreciation, and amortization were $1,148,000,000.  (*See* Kellogg Company, Annual Report (Form 10-K), at 31 (Feb. 24, 2009)).

88.     Admit that for the fiscal year ended May 30, 1999, General Mills Inc.'s ("General Mills") reported earnings before taxes, depreciation, and amortization were $534,500,000.  (*See* General Mills Inc., Amended Annual Report (Form 10-K) (Aug. 23, 1999)).

89.     Admit that for the fiscal year ended May 28, 2000, General Mills' reported earnings before taxes, depreciation, and amortization were $614,400,000.  (*See* General Mills Inc., Amended Annual Report (Form 10-K), at 24, Exh. 13, Portions of 2000 Annual Report (Nov. 3, 2000)).

90.     Admit that for the fiscal year ended May 27, 2001, General Mills' reported earnings before taxes, depreciation, and amortization were $665,100,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 25, Exh. 13, 2001 Annual Report to Stockholders (Aug. 15, 2001)).

91.     Admit that for the fiscal year ended May 26, 2002, General Mills' reported earnings before taxes, depreciation, and amortization were $458,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 28, Exh. 13, 2002 Annual Report to Stockholders ((Aug. 14, 2002)).

92.     Admit that for the fiscal year ended May 25, 2003, General Mills' reported earnings before taxes, depreciation, and amortization were $917,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 24 (Aug. 5, 2003)).

93.     Admit that for the fiscal year ended May 30, 2004, General Mills' reported earnings before taxes, depreciation, and amortization were $1,055,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 23 (July 29, 2004)).

94.     Admit that for the fiscal year ended May 29, 2005, General Mills' reported earnings before taxes, depreciation, and amortization were $1,240,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 30 (July 28, 2005)).

95.     Admit that for the fiscal year ended May 28, 2006, General Mills' reported earnings before taxes, depreciation, and amortization were $1,090,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 34 (July 27, 2006)).

96.     Admit that for the fiscal year ended May 27, 2007, General Mills' reported earnings before taxes, depreciation, and amortization were $1,144,000,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 22 (July 26, 2007)).

97.     Admit that for the fiscal year ended May 25, 2008, General Mills' reported earnings before taxes, depreciation, and amortization were $1,294,700,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 25 (July 11, 2008)).

98.     Admit that for the fiscal year ended May 31, 2009, General Mills' reported earnings before taxes, depreciation, and amortization were $1,304,400,000.  (*See* General Mills Inc., Annual Report (Form 10-K), at 30 (July 13, 2009)).

99.     Admit that for the fiscal year ending in 1999, Nestlé USA, Inc.'s ("Nestlé") sales were greater than or equal to $8,000,000,000.

100.    Admit that for the fiscal year ending in 2000, Nestlé's sales were greater than or equal to $8,000,000,000.

101.    Admit that for the fiscal year ending in 2001, Nestlé's sales were greater than or equal to $8,000,000,000.

102.    Admit that for the fiscal year ending in 2002, Nestlé's sales were greater than or equal to $8,000,000,000.

103.    Admit that for the fiscal year ending in 2003, Nestlé's sales were greater than or equal to $12,000,000,000. (*See Nestle Launches NESTLE® Good Start® Supreme Soy DHA &*

*ARA*, PR NEWSWIRE, HTTP://WWW.PRNEWSWIRE.COM/NEWS-RELEASES/NESTLE-LAUNCHES-

NESTLER-GOOD-STARTR-SUPREME-SOY-DHA--ARA-75362602.HTML, last visited Aug. 2, 2013).

104.    Admit that for the fiscal year ending in 2004, Nestlé's sales were greater than or

equal to $12,000,000,000. (*See Bitter Holidays for Nestle USA*, WASHTECH, Dec. 2, 2005,

http://archive.washtech.org/news/industry/display.php?ID_Content=5027, last visited Aug. 2,

2013).

105.    Admit that for the fiscal year ending in 2005, Nestlé's sales were greater than or

equal to $8,000,000,000. (*See Nestle FoodServices 'Breaks Ground' on New Culinary*

*Innovation Center in Solon*, THOMASNET, Oc. 6, 2006,

http://news.thomasnet.com/companystory/Nestle-FoodServices-Breaks-Ground-on-New-

Culinary-Innovation-Center-in-Solon-507624, last visited Aug. 2, 2013).

106.    Admit that for the fiscal year ending in 2006, Nestlé's sales were greater than or

equal to $8,000,000,000.  (*See Half A Million Free Candy Bars!*, PR NEWSWIRE,

http://www.prnewswire.com/news-releases/half-a-million-free-candy-bars-52747272.html, last

visited Aug. 2, 2013).

107.    Admit that for the fiscal year ending in 2007, Nestlé's sales were greater than or

equal to $8,000,000,000.  (*See Nestle USA Announces Official Name Change for Butterfinger®*

*Candy Bar*, THE FREE LIBRARY, Apr. 1, 2008,

http://www.thefreelibrary.com/Nestle+USA+Announces+Official+Name+Change+for+BUTTE

RFINGER(R)+Candy...-a0177307589, last visited Aug. 2, 2013).

108.    Admit that for the fiscal year ending in 2008, Nestlé's sales were greater than or

equal to $8,000,000,000.  (*See Day in the life interview:  Nestle USA Brand Manager*, JOBS IN

PODS, Aug. 9, 2009, http://jobsinpods.com/2009/08/05/day-in-the-life-interview-nestle-usa-brand-manager/).

Dated:  August 5, 2013                               Respectfully submitted,


                                                     /s/ Christopher E. Ondeck
                                                     Christopher E. Ondeck
                                                     Matthew J. McBurney
                                                     CROWELL & MORING LLP
                                                     1001 Pennsylvania Ave., NW
                                                     Washington, DC 20004
                                                     Telephone: (202) 624-2500
                                                     Facsimile: (202) 628-5116

                                                     *Counsel for Defendant Daybreak Foods, Inc.*


/s/ Kathy L. Osborn                                  /s/ Donald M. Barnes
Kathy L. Osborn                                      Donald M. Barnes
Ryan M. Hurley                                       Salvatore A. Romano
E. Jason Burke                                       PORTER, WRIGHT, MORRIS & ARTHUR, LIP
FAEGRE BAKER DANIELS, LLP                            1919 Pennsylvania Avenue N.W., Suite 500
300 North Meridian Street, Suite 2700                Washington, DC  20006-3434
Indianapolis, IN 46204                               Telephone:  (202) 778-3056
Telephone: (317) 237-0300                            Facsimile:  (202) 778-3063
Facsimile: (317) 237-1000

                                                     *Counsel for Defendant Rose Acre Farms, Inc.*
*Counsel for Defendant Midwest Poultry*
*Services, L.P.*

/s/ Carrie M. Anderson
Carrie M. Anderson
John E. Scribner
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street NW
Washington, DC  20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

William L. Greene
Douglas R. Boettge
Peter J. Schwingler
LEONARD, STREET & DEINARD, P.A.
150 South Fifth Street, Suite 2300
Minneapolis, MN  55402
Telephone:  (612)335-7252
Facsimile:  (612) 335-1657

*Counsel for Defendant Michael Foods, Inc.*

/s/ Christine C. Levin
Joseph A. Tate
Christine C. Levin
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: 215-994-2421
Fax: 215-994-2222

*Counsel for R.W. Sauder, Inc.*

/s/ Brian E. Robison
Veronica Smith Lewis
Brian E. Robison
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Fax: (214) 698-3400

Robin Nagele
POST & SCHELL, P.C.
Attorney I.D. 36992
Four Penn Center, 14th Floor
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103
Telephone: (215) 587-1155
Facsimile: (215) 587-1444

*Counsel for Defendant Cal-Maine Foods, Inc.*

/s/ Marvin L. Gray
Marvin L. Gray
DAVIS WRIGHT TREMAINE LLP
1201 3rd Avenue, Suite 2200
Seattle, WA  98101
Telephone:  (206) 757-8098
Facsimile:  (206)757-7098

*Counsel  for Defendant National Food Corporation*

/s/ Wendelynne Newton
Wendelynne Newton
Samuel Braver
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410
Telephone: (412) 562-8800
Facsimile: (412) 562-1041

/s/ Samantha L. Southall
Samantha L. Southall
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
Telephone: (215) 665-8700
Facsimile: (215) 665-8760

*Counsel for Defendants Hillandale Foods Inc.*

/s/ Joseph M. Callow, Jr.
Joseph M. Callow, Jr.
Brian M. Babb
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Telephone: (513) 579-6400
Facsimile: (513) 579-6457

*Counsel for Defendant Ohio Fresh Eggs, LLC*

/s/ Troy J. Hutchinson
Troy J. Hutchinson
BRIGGS AND MORGAN
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 977-8415
Facsimile: (612) 977-8650

*Counsel for Defendant Sparboe Farms, Inc.*

/s/ Jan P. Levine
Jan P. Levine
Robin P. Sumner
PEPPER HAMILTON LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
Telephone: (215) 981-4000
Facsimile: (215) 981-4750

*Counsel for Defendants United Egg
Producers, Inc. and United States Egg
Marketers, Inc.*

/s/ William M. Goodman
William M. Goodman
Jason S. Takenouchi
Margaret A. Ziemianek
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

*Counsel for Defendant NuCal Foods, Inc.*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2013, a true and accurate copy of the foregoing was served upon counsel for Plaintiffs Kraft Foods Global, Inc.; The Kellogg Company; General Mills, Inc.; and Nestlé USA, Inc. by electronic mail.

<u>/s/ Elisa F. Kantor</u>