# ATTACHMENT 2

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE:  PROCESSED EGG PRODUCTS     )

ANTITRUST LITIGATION               )

                                   )  MDL No. 2002

                                   )  08-md-02002

                                   )    HIGHLY

THIS DOCUMENT RELATES TO:          ) CONFIDENTIAL

Kraft Foods Global, Inc., et al., )

v. United Egg Producers, Inc.,     )

et al., No. 2:12-cv-00088-GP       )



        The highly confidential

videotaped discovery deposition of

CURTIS MILES AMUNDSON, PhD, taken in the

above-entitled cause, before Deralyn Gordon, a

notary public of Cook County, Illinois, on the

3rd day of April, 2014, at 353 North Clark Street,

Chicago, Illinois, beginning at approximately

8:48 a.m., pursuant to Notice.


REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

LICENSE NO:  084-003957

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                     April 3, 2014

2 (Pages 2 to 5)

---

**2**

PRESENT:

JENNER & BLOCK LLP
BY RICHARD CAMPBELL, ESQ., and
SARAH S. ANSARI, ESQ.,
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
campbell@jenner.com
sansari@jenner.com
    appeared on behalf of Kraft Foods
    Global, Inc.;

CROWELL MORING
BY KATHLEEN M. CLAIR, ESQ.,
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2951
kclair@crowell.com
    appeared on behalf of
    Daybreak Foods, Inc.;

ALSO PRESENT:
    Mr. Stephan Hoog, Videographer.

---

**3**

PRESENT TELEPHONICALLY:

PORTER WRIGHT MORRIS & ARTHUR, LLP
BY JOHN MONICA, ESQ.,
1919 Pennsylvania Avenue, NW, Suite 500
Washington DC 20069
(202) 778-3000
jmonica@porterwright.com
    appeared on behalf of Rose Acre
    Farms;

STINSON LEONARD STREET LLP
BY SHARON R. MARKOWITZ, ESQ.,
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
(612) 335-1974
sharon.markowitz@stinsonleonard.com
    appeared on behalf of Michael Foods.

---

**4**

I N D E X
VOLUME I
HIGHLY CONFIDENTIAL

Thursday, April 3, 2014

WITNESS                          EXAMINATION
CURTIS MILES AMUNDSON, PhD
By Ms. Clair              8, 98
By Mr. Monica            91, 99
By Ms. Ansari            93


DEPOSITION EXHIBITS
CURTIS MILES AMUNDSON, PhD

NUMBER        DESCRIPTION        IDENTIFIED
Exhibit 1  Draft Animal Welfare Policy and      19
           Program Recommendation April 2006
           Bates KRA00000019 - KRA00000039
Exhibit 2  Draft Animal Welfare Task Force      21
           Charter January 2004
           Bates KRA00014698
Exhibit 3  Draft Animal Welfare Task Force      26
           Charter April 28, 2005
           Bates KRA00025493

---

**5**

DEPOSITION EXHIBITS
CURTIS MILES AMUNDSON, PhD

NUMBER        DESCRIPTION        IDENTIFIED
Exhibit 4  Animal Welfare Task Force      27
           Charter May 2, 2005
           Bates KRA00014700 - KRA00014701
Exhibit 5  Email from Claire Regan to      32
           Curtis Amundson dated 5/23/05
           Bates KRA00049798
Exhibit 6  Animal Welfare Task Force      35
           June 1, 2005, Meeting Summary
           and Follow Ups
           Bates KRA00049819 - KRA00049820

Exhibit 7  Animal Welfare Task Force      37
           August 24, 2005 Meeting Summary
           & Follow Ups
           Bates KRA00014673 - KRA00014676
Exhibit 8  Animal Welfare Task Force      40
           December 8, 2005, Meeting Summary
           & Follow Ups
           Bates KRA00014916 - KRA00014918

Exhibit 9  Email, Subject: Animal Welfare      44
           Presentation, start 4/24/06
           Bates KRA00000018 - KRA00000039

Exhibit 10 Kraft Animal Welfare Policy      51
           Bates KRA00014791 - KRA00014794
Exhibit 11 Kraft Approved Animal Welfare      56
           3rd Party Auditors
           Bates KRA00014900

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles

April 3, 2014

3 (Pages 6 to 9)

---

**6**

DEPOSITION EXHIBITS
CURTIS MILES AMUNDSON, PhD

NUMBER        DESCRIPTION        IDENTIFIED
Exhibit 12 Email from Amundson to Jose Rojo    57
    dated 1/20/05
    Bates KRA00027934
Exhibit 13 Email from Greg Hinton to        60
    Curtis Amundson dated 5/31/05
    Bates KRA00027999
Exhibit 14 Letter from Bryan Hendrix to        63
    Curtis Amundson
    Bates KRA00049855 - KRA00049858
Exhibit 15 Oscar Mayer Animal Well-Being    66
    October 19, 2004
    Bates KRA00004845 - KRA0004936
Exhibit 16 Status FMI-NCCR Animal Welfare    72
    Guidelines Updated May 2005
    Bates KRA00049658
Exhibit 17 Letter from Charles Link to        75
    Whom It May Concern
    Bates KRA00026002 - KRA00026003
Exhibit 18 Email, Subject: Prep meeting        77
    dated 5/8/07
    Bates KRA00000040 - KRA00000094
Exhibit 19 Email from William Paulos to        88
    Curtis Amundson dated 2/13/08
    Bates KRA000000949 - KRA000000950

---

**7**

THE VIDEOGRAPHER:  This is Steven Hoog representing Henderson Legal Services.  I'm the operator of this camera.

We are on the record April 3, 2014.  The time is 8:48 a.m., as indicated on the video screen.

This is the videotaped deposition of Curtis Amundson.  We are at 353 North Clark Street, Chicago, Illinois.

This case is captioned In Re:  Processed Egg Products Antitrust Litigation, case number 08-md-02002.

Will the attorneys please identify themselves for the video record.

MS. ANSARI:  Sarah Ansari for Jenner & Block on behalf of the deponent and Kraft Foods.

MR. CAMPBELL:  Richard Campbell of Jenner & Block on behalf of Kraft Foods.

MS. CLAIR:  Kathleen Clair of Crowell Moring on behalf of Daybreak Foods.

THE VIDEOGRAPHER:  The court reporter today is Deralyn Gordon.  Please swear in the witness.

---

**8**

(Whereupon the witness was sworn.)

CURTIS MILES AMUNDSON, PhD, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. CLAIR:

Q.  Good morning, Mr. Amundson.

A.  Good morning.

Q.  Have you ever been deposed before?

A.  No, I have not.

Q.  Okay.  So we'll go over just a few ground rules, procedural matters.

You'll see there's a court reporter here and a videographer.  They're making a record.  Your testimony today is under oath and in some circumstances could be used at trial.

Because the court reporter has to write everything down, it's best if we try not to talk over one another, and it's best to remember to respond verbally, rather than nodding or saying uh-huh or uh-huh, all of those things.

If you ever don't understand a question, just let me know, I'll clarify.  And if you ever need to take a break, just say so.  You're in

---

**9**

charge of that.

A.  Okay.

Q.  Is there any reason why you can't give your best testimony today?

A.  No.

Q.  Are you currently employed, Mr. Amundson?

A.  I am not.  I'm retired.

Q.  And when did you retire?

A.  I retired on December 30, 2012.

Q.  Was that from --

A.  I was severed on December 30, 2012, voluntarily, and retired January 1, 2013 officially.

Q.  Okay.  And was your employer Kraft at the time of your retirement?

A.  Yes.

Q.  What was your job title at Kraft?

A.  I was Associate Director of Procurement.

Q.  And what were your responsibilities in that title?

A.  Well, there were several different responsibilities.  First and foremost was the management of the formula system, and that is the least cost optimization program for Kraft meats, Oscar Mayer plants.

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles

April 3, 2014

4 (Pages 10 to 13)

---

**10**

1 Secondly, I dealt with some materials
2 coming in and out of the freezer correcting the
3 operations, and that was just optimal use of
4 raw materials. Thirdly, I had a scientific issues
5 role, and that included a number of issues, of
6 which animal welfare was one of them, from a
7 procurement standpoint.
8 Let's see, what else did I do? In a
9 nutshell that covers the three main areas.
10 Q. Okay. And when did you begin in that role
11 at Kraft?
12 A. I became the Director of Procurement in
13 1999.
14 Q. Okay.
15 A. And then as a job evaluation Kraftwide,
16 it became an assistant director post a year or
17 two later.
18 Q. Okay. And what's the highest level of
19 education that you achieved?
20 A. I have a PhD in Meat Science from
21 Iowa State.
22 Q. Okay. Were you involved -- I wonder if
23 you could tell me a little bit more about your
24 involvement in animal welfare issues at Kraft.
25 What specifically did you do with regard

---

**11**

1 to animal welfare at Kraft?
2 A. I was, I was basically a scientific issues
3 liaison for the procurement group specifically.
4 I had an interest in animal welfare,
5 and so that started out by exploring issues, such
6 as cloning, that was, you know, topics that arose
7 that were important to the company that I might
8 have been able to contribute to or learn about.
9 And so that actually -- I consider it a
10 more scientific issues than animal welfare,
11 because it really started that way.
12 And then one of those issues that
13 arose was animal welfare as related to primarily
14 Oscar Mayer meat animals.
15 Q. Okay. And I wanted to talk about some
16 of the other people at Kraft that were involved
17 in animal welfare issues, if I could go through a
18 couple of names. You could let me know, if you
19 know, what they did with respect to animal
20 welfare.
21 The first name is John Gregorich. Are you
22 familiar with John Gregorich?
23 A. Yes.
24 Q. What was his role with respect to animal
25 welfare issues?

---

**12**

1 A. Not much.
2 Q. Uh-huh.
3 A. He was the ingredients buyer. And so
4 there might have been -- there was a small
5 confluents with eggs, because that was one of his
6 responsibilities.
7 But he was more on the buying,
8 contracting, procurement than on animal welfare
9 issues specifically.
10 Q. Okay. And what about Scott Manion?
11 A. I don't really know Scott.
12 Q. Okay. Javier Maneses?
13 A. Javier Maneses has been pretty much the
14 same role as John Gregorich, only at a different
15 time.
16 Q. Okay.
17 A. And so he would have had the same
18 peripheral.
19 Q. Peripheral role.
20 How about Jose Rojo?
21 A. Jose Rojo was recently became -- or
22 recently came and then left as senior director.
23 Before that he was mostly involved with red meat.
24 I believe he would have not much animal welfare
25 role.

---

**13**

1 Q. Okay. What about William Paulos?
2 A. Yes, his predecessor had more.
3 Q. More, okay.
4 A. He was the person I reported to, and I
5 served as his scientific ears and eyes and this
6 type of thing.
7 Q. If you were his scientific ears, did he
8 have a nonscientific role with respect to animal
9 welfare?
10 A. Up until the last couple of years, he
11 was -- he managed the entire meat procurement
12 department. He was the Senior Director of
13 Meat Procurement and managed that department.
14 So there would be some interaction between
15 him and upper management, especially as we
16 developed some of these possible positions.
17 Q. Okay.
18 A. Most recently he was very involved in
19 the Road to Real project, which brought animal
20 welfare to a stronger place.
21 And, as a result, when Jose was named
22 Senior Director, Bill took the role as Senior
23 Director of Animal Welfare. So he had, for the
24 last year, a very significant role especially
25 with gestation crates.

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

---

**14**

1  Q.  Okay.
2  **A.  Resolution of that issue, gestation**
3  **crates.**
4  Q.  You mentioned did you say Road to Real?
5  **A.  Yes.**
6  Q.  What is that?
7  **A.  It's a line of -- it's a project for a**
8  **line of meat products that Oscar Mayer has brought**
9  **out a couple of years ago.  And the idea was to**
10 **have less procuring agents, more natural, if you**
11 **were.**
12 Q.  Okay.  Did it have to do with eggs at all?
13 **A.  No.  It was all meat products.**
14 Q.  Okay.  All right.  When did you first
15 become involved in animal welfare issues at Kraft?
16 Do you remember the year?
17 **A.  I don't know the exact year.  It had to be**
18 **around the 2004ish time frame.**
19 Q.  Okay.  Did your responsibilities with
20 respect to animal welfare change over the years
21 that you were involved in it?
22 **A.  I need clarification on that.**
23 Q.  Sure.
24     MR. CAMPBELL:  Sorry.
25     MS. MARKOWITZ:  Hello, this is

---

**15**

1  Sharon Markowitz on the phone for Michael Foods.
2     MS. CLAIR:  Good morning, Sharon.
3     MR. CAMPBELL:  Sharon, this is
4  Dick Campbell.  We started with some of the
5  preliminary questions because we weren't sure
6  that you were joining us today, but nothing
7  substantive has occurred.  All right?
8     MS. MARKOWITZ:  Okay.  Great.  Do we have
9  the same people appearing as yesterday?
10    MR. CAMPBELL:  Yes.
11    MS. CLAIR:  Yes.
12    MR. CAMPBELL:  Although John is not on the
13 phone.
14    MS. CLAIR:  Yes, John is not on the phone.
15    MR. CAMPBELL:  Maybe we'll give him
16 another couple of minutes, but...
17    MS. CLAIR:  Yes, it's 2 minutes before.
18    MS. MARKOWITZ:  Great.
19    MS. CLAIR:  I apologize for starting a
20 little bit early.
21    MR. CAMPBELL:  We were ready.
22    MS. CLAIR:  Rules of the road here.
23    MS. MARKOWITZ:  I understand.  People want
24 to leave early.
25    MS. CLAIR:  Yeah.  Thanks for

---

**16**

1  understanding.  Okay.  Sure thing.
2  BY MS. CLAIR:
3     Q.  So the question is did your role with
4  respect to animal welfare evolve over the years
5  that you were involved in animal welfare issues?
6     **A.  The issues changed, my approaches to**
7  **them really didn't because the issues -- in fact,**
8  **if you start with the scientific start, it was the**
9  **first start into science with BSE.**
10    Q.  What is BSE?
11    **A.  Bovine Spongiform Encephalopathy think.**
12    Q.  Okay.
13    **A.  So that was the start into the scientific**
14 **issue.**
15    **My role was to learn as much as I could**
16 **and suggest or make a recommendation or inform**
17 **other people who didn't do that.**
18    **That was the same role that I had with**
19 **animal welfare.  It was to understand issues as**
20 **they came up almost exclusively related to meat**
21 **and slaughter animals, but -- and then work**
22 **with others to inform them and try to formulate**
23 **potential solutions or recommendations.**
24    Q.  Okay.  Thank you.  That's helpful.
25    Did Kraft have an animal welfare task

---

**17**

1  force?
2     **A.  Kraft had a meat and poult- -- the**
3  **Oscar Mayer division of Kraft had a meat and**
4  **poultry committee that put together an animal task**
5  **force to look at those issues.**
6     Q.  Okay.  And did the Oscar Mayer division
7  have responsibility for egg procurement as --
8  along with meat procurement?
9     **A.  It did for a short period of time.  And**
10 **I don't know the exact dates, but there was a**
11 **period of time where Kraft decided to have all**
12 **animal proteins purchased through the Oscar Mayer**
13 **meat procurement, and that included eggs.**
14    Q.  Okay.  And were you a member of that task
15 force that was under the Oscar Mayer umbrella?
16    **A.  Yes.**
17    Q.  Okay.  When was that task force formed,
18 do you recall?
19    **A.  There were two different -- there was an**
20 **earlier task force that looked into companywide.**
21    Q.  Okay.
22    **A.  The -- first of all, I was -- I received a**
23 **copy of this, of this deck.**
24    Q.  Slide deck?  Okay.  From --
25    **A.  Draft animal.**

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles

April 3, 2014

6 (Pages 18 to 21)

---

**18**

1  Q. Oh, from yesterday. That's --
2  **A. This was the second one.**
3  Q. Okay.
4  **A. The first one looked at dairy, slaughter**
5  **animals, eggs, and didn't really go anywhere.**
6  **The second one, which was this one, which**
7  **was borne out of the meat and poultry issues team,**
8  **went mostly to slaughter, although you see some**
9  **eggs also there. But that was a later -- that was**
10 **the second shot at it.**
11 Q. Okay. And just for clarity for the
12 record, you're looking at a document there. Does
13 that say Manion 19 on the bottom?
14 **A. It does, indeed.**
15 Q. It looks like the record that was
16 Exhibit 19 from yesterday's deposition.
17 MS. CLAIR: Can we mark that as Amundson 1
18 since we've discussed it here?
19 MS. ANSARI: Yes.
20 MR. CAMPBELL: I think that's a good idea.
21 MS. CLAIR: Do you mind if I put a little
22 sticker on this one?
23 MS. ANSARI: Sure.
24
25

---

**19**

1  (Amundson Deposition Exhibit
2  No. 1 marked for
3  identification.)
4  MS. CLAIR: So, counsel, this is KRA19.
5  This was Exhibit 19 yesterday, a coincidence the
6  19s. Thank you.
7  BY MS. CLAIR:
8  Q. Let's talk about that earlier group or
9  task force. Did it have a name that you recall?
10 MS. CLAIR: Before we answer let's --
11 MR. CAMPBELL: Did somebody join?
12 MR. MONICA: John Monica.
13 MR. CAMPBELL: Hi, John. It's
14 Dick Campbell. Sharon joined a minute or two ago.
15 We started a trifle early. And Katie, you know,
16 did the preliminaries and that sort of thing while
17 waiting for you to join.
18 MR. MONICA: Okay.
19 MR. CAMPBELL: And she is just now getting
20 into the substance of the animal welfare. All
21 right?
22 MR. MONICA: Sounds good. Thank you.
23 MS. CLAIR: Okay, great. No problem. We
24 just marked one exhibit, which happened to be
25 Exhibit 19 from yesterday.

---

**20**

1  MR. MONICA: Okay. Thank you.
2  MS. CLAIR: Great.
3  BY MS. CLAIR:
4  Q. So do you recall the question?
5  **A. I don't recall the first one having a**
6  **name.**
7  Q. Okay. Do you know when it was formed?
8  **A. It had to be 2003 or 4.**
9  Q. Were you personally involved in it?
10 **A. Yes, I was.**
11 Q. You were. Okay. Who else was involved in
12 it?
13 **A. Boy, that was a long time ago on one that**
14 **didn't go anywhere.**
15 Q. Okay.
16 **A. There would have been someone from**
17 **Corporate Affairs, probably Claire Regan. There**
18 **was a representative from dairy, I don't remember**
19 **her name. I don't know the rest of the people**
20 **that were involved in that.**
21 Q. Do you know why that first initiative was
22 undertaken?
23 **A. Well, I think all of the -- the birth of**
24 **all of the initiatives was the growing concern**
25 **about animal welfare becoming an issue and us not**

---

**21**

1  **having a position on the issue that we could**
2  **communicate.**
3  Q. Did the idea to develop a position on
4  animal welfare come from management at Kraft?
5  MS. ANSARI: Objection.
6  Katie, can you clarify what type of animal
7  welfare, meat or eggs?
8  MS. CLAIR: Sure.
9  BY MS. CLAIR:
10 Q. And let me just ask a more precise
11 question, did the idea to start this early
12 initiative that you discussed come from
13 management at Kraft?
14 **A. It must have, but I don't know**
15 **specifically how it came about.**
16 Q. Okay. I'll ask that one a little...
17 (Amundson Deposition Exhibit
18 No. 2 marked for
19 identification.)
20 BY MS. CLAIR:
21 Q. Mr. Amundson, I'm going to hand you what
22 we've marked as Amundson 2. This is a document
23 Bates labeled KRA00014698. I'll let you take a
24 minute to look it over.
25 **A. I'm ready to go.**

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles

April 3, 2014

7 (Pages 22 to 25)

---

22

1    Q.  Okay.  Do you know what this document is?
2    A.  May I read it first?
3    Q.  Oh, yes, yes, yes.
4    A.  Thank you.  Okay.
5    Q.  Okay.  Do you know what the document is?
6    A.  Yeah.
7    Q.  Okay.  And what is this?
8    A.  It sounds like the start of that 2004
9    animal affairs task charter.
10   Q.  Okay.  So this was the companywide one?
11   A.  Correct.
12   Q.  Okay.  That's helpful.
13       And do you see the sponsor listed there,
14   Marcy Glenn?
15   A.  Uh-huh.
16   Q.  And there's a description of the
17   "Sponsor's Role" below that.  It says to
18   "Provide senior management support for the
19   exploration and potential development and
20   implementation of the KFT animal welfare policy."
21   A.  Uh-huh.
22   Q.  On the task force do you feel you received
23   that support?
24   A.  Can you explain further?
25   Q.  Did you on the task force receive senior

---

23

1    management support for your efforts?
2    A.  We met.  We were encouraged to meet,
3    encouraged development.  So yes, I think we did
4    receive that support.
5    Q.  Okay.  And a little below we see some of
6    "Objectives," one is to "Assess" currently --
7    "current generally-accepted animal welfare
8    guidelines and recommendations..."
9        And another is to "Recommend adoption
10   and implementation of appropriate KFT policies and
11   practices."  Do you see that page?
12   A.  Uh-huh.
13   Q.  To whom were you supposed to make those
14   recommendations?
15   A.  Those recommendations would have been
16   made back to Marcy, first of all, and then she or
17   we would have taken them to a larger group of
18   management.
19   Q.  Okay.  Marcie's role here is written as
20   SVP Global Procurement.  Is that an accurate
21   description of her role?
22   A.  Yes, Senior Vice President.
23   Q.  A little further down in the
24   document under "Rationale," it notes "The issue
25   has been championed by NGOs."

---

24

1        Do you know which NGOs were championing
2    this issue?
3    A.  Well, the issue is animal welfare in
4    general.  And the NGOs would be PETA, HSUS.  Those
5    are the key players.
6    Q.  Okay.  And was Kraft paying attention to
7    PETA and HSUS in the 2004 time frame?
8    A.  Define paying attention.
9    Q.  Paying attention enough to note PETA and
10   HSUS efforts as a rationale for beginning this
11   task force.
12   A.  Yes.
13   Q.  Okay.  A little below that we see that
14   "Major KFT suppliers are adopting generally-
15   accepted animal welfare guidelines and
16   KFT customers could expect that KFT have a
17   similar program in place."
18       Do you know which customers Kraft was
19   thinking about with respect to this?
20   A.  I do not know which specific customers.
21   I think this is more customers in general, we were
22   -- we could be expecting those.
23   Q.  And do you know which KFT major suppliers
24   were being referred to here?
25   A.  I don't know.  I could name a couple.

---

25

1    That would be the Tyson Foods and the folks that
2    were slaughtering birds and slaughtering the red
3    meat animals.
4    Q.  Okay.  I see below here we have
5    "Task Force Members."  You're listed --
6    A.  Uh-huh.
7    Q.   -- along with several others.
8        Who decided who would be on the task
9    force?
10   A.  Well, there's four major people on the
11   order, public affairs, scientific affairs and me.
12   Q.  Okay.
13   A.  And then the ad hoc or obviously,
14   excuse me, dairy, which makes sense, and
15   Newberry, which is Fran, because that's our
16   slaughter facility.
17   Q.  Okay.  Did this document precede a meeting
18   or was this document created after a meeting do
19   you know?
20   A.  I don't know what took place before this.
21   My guess is that there had been some discussion,
22   but that's probably unfair.  I don't know.
23   Q.  Okay.  That's fine.
24
25

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                         April 3, 2014

8 (Pages 26 to 29)

---

**26**

        (Amundson Deposition Exhibit
        No. 3 marked for
        identification.)
BY MS. CLAIR:
    Q.  I'm going to hand you what we'll mark as
Amundson 3.  This is Bates labeled KRA00025493.
I'll give you a moment to review it.  Just let me
know when you have.
    A.  Okay.
    Q.  Okay.  Do you know what this document is?
    A.  Other than it looks like a continuation of
the prior one.
    Q.  It looks like -- so the prior one is
dated January 2004.  This one is dated April 2005,
right?
    A.  Uh-huh.
    Q.  This looks like an update; is that fair?
    A.  Or possibly a restart.
    Q.  Or possibly a restart.  Okay.
        Were there meetings and animal welfare
efforts going on between January 2004 and
April 2005?
    A.  This team had met.  We -- I can't say for
sure what else went on at that time.
    Q.  Okay.  Do you know why this document was

---

**27**

created anew in April 2005?
    A.  Well, we have a -- we had a different
structure because, you see the Werner Bossard,
the structure within the company had changed.
That's the only thing that I could tell you for
sure had caused this.
    Q.  Okay.  Werner Bossard is listed as the
sponsor here?
    A.  Correct.
    Q.  The sponsor's role was to provide senior
support for your efforts?
    A.  Correct.
    Q.  So that change might have been the reason
for the re-up here.  Okay.
        (Amundson Deposition Exhibit
        No. 4 marked for
        identification.)
BY MS. CLAIR:
    Q.  I'll hand you what we'll mark as
Amundson 4.
    A.  Okay.
    Q.  This is KRA00014700.
    A.  Okay.
    Q.  Okay.  And what is this document?
    A.  It looks like a continuation of the one

---

**28**

before, but you see the change with the MPPCT as
the sponsor or as the -- as the overall of this
group.
    Q.  What is the MPPCT?
    A.  Meat and Poultry Policy Core Team at
Oscar Mayer.  This was specifically Oscar Mayer as
opposed to Kraftwide.
    Q.  Perfect.  So this document is dated May 2,
2005.  It's really just a few days later than the
April 28, 2005, exhibit that we just looked at.
    A.  It looks like it would be an upgrade or a
redraft of the one before it.
    Q.  And it looks like you've been
further developed a bit from this document as
compared to the last one, right?  Is that right?
I'm sorry.
    A.  Yes, it looks like it has changed.
    Q.  So whereas before the goal was to adopt
and follow generally accepted animal welfare
guidelines, here the document gets a bit more
specific noting that "Kraft business units
will ensure that Kraft and its suppliers and its
suppliers adopt and follow this policy."
        So there's a bit more specificity here --
    A.  Correct.

---

**29**

    Q.  -- in this later document.  And there's,
in fact, a mandate to suppliers, as contemplated
in this later document?
        MS. ANSARI:  Objection to form.
        MS. CLAIR:  You can still answer.
        MS. ANSARI:  You can answer.
    A.  Yes, there is a -- this looks more
specific with specific things to result from it.
BY MS. CLAIR:
    Q.  Do you know who created these documents,
these last three exhibits that we've been looking
at?
    A.  I'm assuming the sponsor did or someone
working with the sponsor.
    Q.  Would the person who created this
document have been knowledgeable about the facts
in the document at the time they created it?
        MS. ANSARI:  Objection, speculation.
        You can answer.
    A.  Well, do you mean the facts about welfare
behind this?
BY MS. CLAIR:
    Q.  No, just the statements written in the
document that --
    A.  I've got to assume that, once again,

---

Henderson Legal Services, Inc.

202-220-4158                         www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                          April 3, 2014

9 (Pages 30 to 33)

---

30

1  speculation, I have to assume that the person who
2  wrote this was a sponsor and knew about this.
3      Q.  Would you have any reason to believe they
4  wouldn't?
5      A.  No.
6      Q.  Does it look like -- is it the case that
7  this was -- scratch that. I'll skip that. Okay.
8          Was there a meeting between the April 28th
9  document and the May 2nd document to your -- to
10 the best of your memory?
11     A.  I don't know.
12     Q.  Okay. And under "Tactics" here under this
13 exhibit, the first bullet says "Assess current
14 animal welfare guidelines and recommendations."
15         Who was responsible for doing that?
16     A.  That would have been the task force
17 itself. I would have been involved with that.
18     Q.  Okay. And what did the task force do to
19 go about assessing those guidelines?
20     A.  Well, it was primarily reading the
21 AMI guidelines and the NTF guidelines and the
22 National Chicken Council's guidelines, presumably,
23 and it may have been me, but somebody read the
24 UEP guidelines. That was the assessment.
25     Q.  And while you were reading them, were you

---

31

1  making evaluations in any manner?
2          MS. ANSARI: Objection, vague.
3      A.  Can you be more specific on that one?
4  BY MS. CLAIR:
5      Q.  Sure. So this mentions assessing. And
6  you said assessing would have involved reading the
7  documents.
8          Would it have involved anything other than
9  simply reading those documents?
10     A.  When I would read these documents,
11 typically there would be -- I can't outguess the
12 people who were doing them, because they were the
13 experts in the field. I would be looking at the
14 scientific group that developed the guidelines to
15 see if they looked reasonable or if I knew them.
16     Q.  Uh-huh.
17     A.  You would be reading them to see if
18 there is anything that you -- that obviously stuck
19 out as a question mark, but, once again, it's
20 difficult to second guess people who live with
21 this and work in the industry more closely from
22 just reading something.
23     Q.  And when you say to see if they looked
24 reasonable, were you referring to the individuals
25 in the scientific group --

---

32

1      A.  No, the guidelines, see if the
2  guidelines --
3      Q.  See if the guidelines looked reasonable,
4  okay.
5      A.  I think I actually said that two different
6  times. One is on guidelines, one is what the
7  people were like.
8      Q.  That's what I wanted to clarify. Thank
9  you. Okay.
10         And the UEP guidelines were reviewed as
11 part of this process; is that what you -- is that
12 right?
13     A.  I read them. My main interest was
14 slaughter guidelines and animal handling.
15     Q.  Okay. Do you recall finding anything in
16 the UEP guidelines that you found not reasonable?
17     A.  At the time I didn't know enough about
18 egg production to know if something was reasonable
19 or not.
20     Q.  One way or the other. Okay.
21         (Amundson Deposition Exhibit
22          No. 5 marked for
23          identification.)
24 BY MS. CLAIR:
25     Q.  I'm going to hand you what we'll mark as

---

33

1  Amundson 5. This is KRA00049798. I'll give you
2  a moment to review. Just let me know when you
3  have.
4      A.  Okay.
5      Q.  Okay. Do you know what this document is?
6      A.  It's scheduling of a meeting.
7      Q.  Okay. Is this an email that you received?
8      A.  I don't remember specifically receiving
9  this, but it does say to me, so I must have
10 received it.
11     Q.  Okay. Okay. And this is dated May 23,
12 2005, right?
13     A.  Yup.
14     Q.  From Claire Regan. And this references an
15 initial meeting of the animal welfare task force
16 for June 1, 2005, right?
17     A.  Uh-huh.
18     Q.  Would this have been the -- that early
19 companywide task force that you talked about
20 before?
21     A.  I don't think so. I think it would have
22 been more related to this one from Exhibit 4.
23     Q.  As I understood it, Exhibit 4 did relate
24 to the early companywide task force, but maybe
25 I'm incorrect in saying that.

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

---

34

1      When you noted that this was part of
2   MPPCT --
3      **A. Right.**
4      Q. -- does that mean to you that this is part
5   of --
6      **A. The second one.**
7      Q. -- the second task force? Okay. Thank
8   you.
9      MS. CLAIR: Okay. I'll just note for the
10  record that no attachment was provided in the
11  files for this, although there's a mention of a
12  draft agenda attached. We would have included it
13  if we had it.
14  BY MS. CLAIR:
15     Q. So were there animal welfare task force
16  meetings before June 1, 2005, just of the earlier
17  initiative? It sounds like that's the case,
18  right?
19     **A. There would have been discussions earlier.**
20     Q. Okay.
21     **A. I don't know specifically what they were.**
22     Q. Okay. That's fine. I'm just trying to
23  get the lay of the land and time lines here.
24
25

---

35

1      (Amundson Deposition Exhibit
2      No. 6 marked for
3      identification.)
4   BY MS. CLAIR:
5      Q. I'll hand you what we'll mark as
6   Amundson 6. This is KRA00049819.
7      **A. Okay.**
8      Q. Okay. Do you know what this document is?
9      **A. Uh-huh.**
10     Q. And what is this?
11     **A. This is the -- it looks like the summary**
12  **of the meeting that was mentioned in the previous**
13  **message.**
14     Q. Okay. Was it a regular practice at Kraft
15  to summarize meetings, to send around notes like
16  this?
17     **A. Yes.**
18     Q. Would the people who made these notes have
19  been knowledgeable about the facts that they wrote
20  down in the notes?
21     MS. ANSARI: Objection, speculation.
22     **A. Probably. Yeah.**
23  BY MS. CLAIR:
24     Q. Okay. So this is the June 1, 2005,
25  meeting summary here, right?

---

36

1      **A. Uh-huh.**
2      Q. Let's go down to "Follow Ups." We see
3   your name. Next to that we see "Catalog
4   guidelines developed by," and it lists several
5   organizations. And one of them is United Egg
6   Producers, right?
7      **A. Uh-huh.**
8      Q. Okay. That was your task coming out of
9   this meeting, was to catalog those guidelines?
10     **A. Correct.**
11     Q. Did you do so?
12     **A. Correct, yes. Basically get copies of the**
13  **guidelines.**
14     Q. Okay. Makes sense.
15     And another followup, if we turn to the
16  next page, by your name is "Inventory current
17  suppliers for: animal welfare policies, training
18  and audits."
19     **A. Uh-huh.**
20     Q. Did you do that?
21     **A. I did that with the red meat suppliers**
22  **at that time, red and poultry slaughterers. I**
23  **probably contacted -- in fact, I'm sure I**
24  **contacted Rose Acre --**
25     Q. Okay.

---

37

1      **A. -- also.**
2      Q. And what did you do as part of this
3   inventory of suppliers, other than contact them?
4      **A. It depended. The inventory -- the**
5   **initial contact with the suppliers was do you**
6   **do animal welfare audits, well, do you follow**
7   **AMI guidelines, do you do animal welfare audits,**
8   **can you provide me with an example of those**
9   **audits? That would have been inventorying the**
10  **current suppliers.**
11     Q. Okay. And what was Kraft's relationship
12  with Tyson Foods at this time?
13     **A. They were a supplier of ours.**
14     Q. A supplier.
15     (Amundson Deposition Exhibit
16     No. 7 marked for
17     identification.)
18  BY MS. CLAIR:
19     Q. I hand you what we'll mark as Amundson 7.
20     **A. Thank you.**
21     Q. This is KRA00014673.
22     **A. Okay.**
23     Q. Okay. Do you know what this document is?
24     **A. Uh-huh.**
25     Q. And what is this?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

11 (Pages 38 to 41)

---

### 38

1    **A.  This is a summary of the next meeting of**
2    **an animal task force.**
3    Q.  This is another one of those summaries
4    that Kraft regularly prepared after it held
5    meetings, right?
6    **A.  Uh-huh.**
7    Q.  Okay.  And this is dated August 24, 2005,
8    right?
9    **A.  One correction on that one.  Every meeting**
10   **wouldn't have had a summary, but many of them**
11  **would have.**
12   Q.  Many of them would have.  That's
13  reasonable.  Thank you.
14     Okay.  Let's go down to where it says
15  "Animal Welfare Guidelines."
16   **A.  Uh-huh.**
17   Q.  Do you see that it says "For the US,
18  KFT will use the species-specific animal welfare
19  guidelines developed by the industry trade
20  associations as the standard for domestic
21  produce."
22     If we skip down, it says "The specific
23  guidelines we will follow in the US are," skip to
24  the second bullet, for "Egg laying hens - United
25  Egg Producers."  Right?

### 39

1    **A.  Uh-huh.**
2    Q.  So as of the last meeting in June, you
3  were tasked with reviewing guidelines.
4     And here at the end of August it looks
5  like the task force is recommending specific
6  industry guidelines?
7    **A.  Yes.**
8    Q.  Is that fair?
9     And if we turn to the next page, there's
10  a -- the top is called "Rationale."  Do you
11  understand this to be the rationale behind this
12  recommendation?
13   **A.  Correct.  When you look at this document,**
14  **it said USDA requirements.  There are humane**
15  **slaughter requirements by law for slaughter**
16  **facilities.**
17     **The individual industry trade associations**
18  **took that up a level.**
19   Q.  Uh-huh.
20   **A.  So by having an inspection stamp,**
21  **any meats were already following USDA.  The**
22  **recommendation was to take that up a level.**
23   Q.  Okay.  And was the recommendation to use
24  the United Egg Producers guidelines and other
25  industry guidelines as of August 2005, was that

### 40

1   Kraft policy or was that the recommendation of
2  this group?
3   **A.  That's the recommendation of the group.**
4   Q.  Okay.  Why did the group recommend
5  following these industry guidelines rather than
6  Kraft developing its own?
7   **A.  Kraft -- well, it's included in here,**
8  **the thinking behind that, but the primary thinking**
9  **was every company out there couldn't come up with**
10 **a separate set of requirements.  It would be**
11 **unmanageable for the suppliers and also for**
12 **people like Kraft, because we didn't have the**
13 **experts that these industry trade groups had**
14 **devising these.**
15    **So the opinion was we wouldn't be as good,**
16 **we would put an excess burden on the suppliers,**
17 **and the industry updated theirs on a regular**
18 **basis.  We'd get into that whole issue.**
19    **So the issue was upgrading requirements**
20 **while not putting a burden on the suppliers.**
21   Q.  Okay.  Makes sense.
22     (Amundson Deposition Exhibit
23     No. 8 marked for
24     identification.)
25

### 41

1   BY MS. CLAIR:
2   Q.  I hand you what we've marked as
3  Amundson 8.
4     Am I pronouncing your name correctly?
5   **A.  Close enough.**
6   Q.  I was saying "aim-mund-son" this
7  morning.
8   **A.  It's actually "am-mund-son."**
9   Q.  Amundson.  Okay.  Thank you.  I don't want
10  to get that wrong.
11    This is KRA00014916.
12   **A.  Okay.**
13   Q.  Do you know what this document is?
14   **A.  Uh-huh.**
15   Q.  What is this?
16   **A.  Summary and follow up of a later animal**
17 **task force meeting.**
18   Q.  Similar to the ones we looked at before --
19   **A.  Correct.**
20   Q.  -- with a later date, right?
21    The first line mentions a corporate
22  responsibility council.  What is the corporate
23  responsibility council?
24   **A.  I don't know what that is.**
25   Q.  Okay.  Do you know whether that's

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                  April 3, 2014

42

1  something within Kraft at all?
2      **A.  I'm sure it is, but I don't know.**
3      Q.  It's okay.  Okay.  A little further down
4  under number four, "Stakeholder Engagement," it
5  notes that "Regan and Beard updated the group on
6  their discussion with Applebee's."
7      Do you see where it says "Applebee's is
8  asking that all KFT have on record, annual animal
9  welfare audits for any supplier that provides
10 Kraft with meat that ends up in a product sold to
11 Applebee's."
12     Do you know why Applebee's made that
13 request?
14     **A.  I don't know the reason why they made that**
15 **request.**
16     Q.  And how did Kraft respond to that request?
17     **A.  I would -- I did not respond to that**
18 **request, so I don't know how Kraft -- I mean,**
19 **it indicates here that they would be unable to**
20 **meet Applebee's request at this point on the**
21 **second page.**
22             **(Discussion held off the**
23             **record.)**
24     **A.  If Applebee's was asking about**
25 **controlled-atmosphere killing, then we wouldn't**

43

1  **be able to answer that either, because we**
2  **weren't -- we hadn't positioned on that yet.**
3  BY MS. CLAIR:
4      Q.  Kraft didn't have a position one way or
5  the other on controlled-atmosphere killing at that
6  time?
7      **A.  That was one of the -- there was a set of**
8  **major issues under way, and that was one of them**
9  **for poultry.**
10     Q.  Okay.  Is Applebee's a customer of Kraft?
11     **A.  Yes, they were.**
12     Q.  They were at this time?  Okay.
13     A little further down you note that on
14 the second page "Regan and Beard then updated the
15 group on a recent request by PETA..."
16     **A.  I'm sorry, where is this?**
17     Q.  This is on the second page in the second
18 paragraph.
19     **A.  Uh-huh.**
20     Q.  Okay.  The recent request by PETA.
21     So this is a -- in 2005 there's a mention
22 of an approach by PETA.  Do you know if there were
23 earlier requests from PETA or approaches by
24 PETA to Kraft?
25     **A.  I don't know the approaches in the past.**

44

1      Q.  Let's look at the next paragraph.  It
2  quotes "The group then discussed how it was
3  important to have a recognized, independent,
4  external animal welfare expert review our proposed
5  policy and program."  Do you see that?
6      **A.  Uh-huh.**
7      Q.  Did Kraft ever engage such an expert?
8      **A.  We have -- we engaged a gentleman to**
9  **review processes at Newberry, and he followed up**
10 **by being an auditor in Newberry.**
11     **And then several years later we -- in**
12 **fact, this would have been in 2012 I think when**
13 **it became official -- we engaged a red meat and a**
14 **poultry animal welfare expert, two different**
15 **people, on a contingent -- on an as-needed basis.**
16     Q.  The idea was to advise Kraft on its policy
17 with regard to animal welfare?
18     **A.  Yeah, help, you know, first of all, teach**
19 **us more, teach us better, but also advise us on**
20 **where the industry is going and what things should**
21 **be done.**
22     Q.  Okay.
23             (Amundson Deposition Exhibit
24             No. 9 marked for
25             identification.)

45

1  BY MS. CLAIR:
2      Q.  I'll hand you what we'll mark as
3  Amundson 9.  This is KRA18.  It looks like the
4  same -- it's the same as Amundson 1, but there's
5  a cover, so just to include the cover email.  I'll
6  let you take a look at that cover document.
7      MS. ANSARI:  This is 9?
8      MS. CLAIR:  Nine.
9      MS. ANSARI:  Okay.  Thank you.
10     THE WITNESS:  Oh, I'm sorry.
11     **A.  Okay.**
12 BY MS. CLAIR:
13     Q.  Okay.  Do you know what this cover
14 document is?
15     **A.  I sent it so.**
16     Q.  You sent it, okay.
17     Is this a meeting request that you sent?
18     **A.  Yes.  This was a request to discuss with**
19 **Werner and Bill this deck.**
20     Q.  Okay.
21     **A.  Bill was my supervisor and Werner was his.**
22     Q.  Werner was his supervisor.
23     There's also a Paul Caruthers listed.  Who
24 is Paul Caruthers?
25     **A.  I don't remember what his role was at**

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

13 (Pages 46 to 49)

---

**46**

1   Kraft.
2       Q.  Okay.  And your cover note here references
3   an attached animal welfare proposal put together
4   by the team and offered by Chris Beard intended
5   for the 5/1 presentation to Warner, Paul and John,
6   right?
7       A.  Correct.
8       Q.  What was the purpose of the -- this
9   May 1st presentation?
10      A.  This would have been to get to -- this is
11  getting higher approval to proceed.  John Ruff was
12  the head of R&D at the time.  And so Werner was
13  obviously one of the leaders of procurement.  Like
14  I say, I don't know what Paul was.
15      Q.  Higher approval to proceed with what?
16      A.  Implementing a policy.
17      Q.  And there's a mention in the last sentence
18  of "We would like to review the document with you
19  prior to the 5/5 meeting in Glenview."
20          What was the 5/5 meeting in Glenview?
21      A.  5/5 meeting in Glenview?  That's a good
22  question.  I don't remember the 5/5 meeting.
23  I would have thought that the 5 -- I
24  don't -- I can't answer that.  I don't know.
25      Q.  Okay.  That's fine.  It was authored by

---

**47**

1   Chris Beard.  I apologize if we went over this
2   before.  I don't think we did.
3          What was Chris Beard's involvement in
4   animal welfare?
5       A.  Chris Beard was part of the responsibility
6   group.  He would work with Claire Regan.  And so
7   his responsibility in this, it was as much his
8   baby as mine.
9       Q.  Okay.  So Chris Beard was as knowledgeable
10  about the recommended animal welfare policy at
11  this time, right?
12      A.  Yeah.
13      Q.  Okay.  Let's look at the document,
14  specifically at the page ending in 22, which
15  is page 4 of the document.
16      A.  Oh, okay.
17      Q.  Sir, it notes one, two, three, four
18  bullets down that "Some customers are asking
19  Kraft to ensure that the meat products they
20  purchase from animals which were treated
21  humanely."  Do you know which customers those
22  were?
23      A.  I do not know which customers these were.
24  One example, however, would be Applebee's bringing
25  this up.  So there's one.

---

**48**

1       Q.  There's one.  Okay.  That's helpful.
2          Did it make business sense to Kraft to
3   develop an animal welfare policy so that it had
4   responses to this kind of customer inquiry?
5       A.  Absolutely.
6       Q.  And the second bullet notes that
7   "Animal welfare is a growing societal concern,
8   especially in the U.S. and the E.U."
9          Was that -- aside from particular
10  customers, was this general concern noted in the
11  document something that mattered to Kraft?
12      A.  Uh-huh.  Yes.  I'm sorry.
13      Q.  And why is that?
14      A.  Well, we serve our customers, and our
15  customers' concerns need to be our concerns within
16  reason -- the ability to do business.
17      Q.  Okay.  Makes sense.
18          And if we turn to two pages later, page 6
19  of the document, it ends in 24.  And the third and
20  fourth bullets down reference NGOs.  We've talked
21  a little bit about them.
22          Were -- did the -- it mentions
23  specifically "NGOs are well funded and effective
24  at communicating their animal welfare concerns to
25  consumers."

---

**49**

1          Is that a statement you agree with?
2       A.  Uh-huh.
3       Q.  Does it matter for Kraft to -- does it
4   make business sense for Kraft to respond to the
5   concerns of these NGOs because of the power these
6   NGOs have in communicating with consumers and
7   Kraft customers?
8       A.  At this time I don't recall Kraft having
9   had a lot of pressure from the NGOs, but you could
10  see it coming with what happened at McDonald's, as
11  mentioned here.  And it was a matter of time until
12  it passed to other areas.
13      Q.  It made sense to get out ahead of the
14  issue?
15      A.  I don't know that in 2006 we were ahead of
16  the issue really.
17      Q.  Yeah.  Fair enough.  Yeah.  Okay.
18          And let's look later in the document to
19  the page ending in 0039, that's page 20 -- it's
20  actually the very last page of this document.
21          Do you see under "The potential benefits
22  to Kraft," let's look at the second bullet.  Do
23  you see where it says "When customers request that
24  Kraft meat certain animal welfare requirements, we
25  will be able to communicate our policy and program

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles

April 3, 2014

14 (Pages 50 to 53)

50

1  which will be consistent for all of our customers.
2  This will allow us to avoid multiple and
3  potentially costly compliance programs."
4      What does it mean to say consistent
5  standards was a benefit to Kraft?
6      A. I obviously didn't write that line.
7      Q. Fair enough.
8      A. But if you -- you can't have one set of
9  standards for each different customer you serve,
10 because it's too difficult to manage.  And not
11 to mention the fact that somewhere along the line
12 you may not be telling everyone the right thing if
13 you have too many people with too many different
14 ideas running around.  So the idea was to have a
15 policy.
16     Now, obviously if we took the trade
17 recommendations, it's not going to make all of
18 the NGOs happy.  For instance, with eggs the
19 big issue there was cage free everybody was after
20 and we didn't go that far.  We went to the
21 industry-accepted practice.
22     Q. Uh-huh.
23     A. So while we were developing a consistent
24 set of principles that the, by and large, the
25 industry was already following.  But it gave us a

51

1  response that, again, would be consistent, maybe
2  not the best liked, but it's consistent to whoever
3  asked.
4      Q. Okay.
5          (Amundson Deposition Exhibit
6          No. 10 marked for
7          identification.)
8  BY MS. CLAIR:
9      Q. So I hand you what we've marked as
10 Amundson 10.  This is KRA00014791.
11     MS. ANSARI:  After this one, Katie, let's
12 take a little break, just a couple of minutes.
13     MS. CLAIR:  Yeah.
14     A. Okay.
15 BY MS. CLAIR:
16     Q. Do you know what this document is?
17     A. Yeah.  It's the -- I don't know if
18 this was a final draft, but it's certainly a
19 restatement primarily of what was the draft of the
20 deck.
21     Q. And this was -- this doesn't have a date
22 on the face.  I can represent that the electronic
23 date was 6/19/2006 on the document.
24     Was this Kraft's animal welfare policy?
25 Does this represent the substance of Kraft's

52

1  animal welfare policy?
2      A. Yes.
3      Q. Do you know exactly when Kraft formally
4  adopted the policy?
5      A. I do not know when the -- I do not
6  know when they formally adopted the policy.
7  Practically it would have been when contract
8  changes came into place.  So it wouldn't have been
9  tomorrow all of these things happened as they were
10 renewed.
11     Q. Okay.  And the policy was implemented
12 through contracts with suppliers, right?
13     A. Through contracts and POs, as mentioned in
14 here.
15     Q. Do you know why Kraft chose to implement
16 its policy through contractors with suppliers
17 rather than recommending its suppliers follow
18 certain practices?
19     A. Contracts are agreed-to terms that must be
20 met.  I can tell anybody that I'd like them to do
21 something.
22     Q. Okay.  And in the second page there's
23 some discussion -- in the second and third page,
24 actually, there's some discussion of audits.
25     A. Uh-huh.

53

1      Q. And it notes that "Suppliers will be
2  required to conduct a third-party animal welfare
3  audit on an annual basis."
4      Why was auditing a part of the Kraft
5  policy?
6      A. Well, in the -- first of all, I need
7  to talk about the slaughter, because I'm not sure
8  how the egg audits went.  I know that there was
9  something in UEP about that.
10     Q. Uh-huh.
11     A. But in slaughter proving that a third
12 party assesses the effectiveness of the stun and
13 kill were one of the keys to having a positive
14 animal welfare effect.
15     I mean, the idea is to make sure that the
16 animal is insensible before it's killed, and that
17 it's completely dead before disassembly takes
18 place.
19     And the way the industry approached that
20 was to have third-party auditors go in at least
21 once a year and measure X number of animals.  It
22 was a program started by Temple Grandin.  And that
23 was widely, widely accepted by the rest of the
24 slaughter industry.
25     Q. So was it important for Kraft not just

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                               April 3, 2014

---

**54**

1  that its suppliers have the appearance of having
2  animal welfare policies, but that they actually
3  practice what they preach?
4        **A.  The objective of -- and you can tell that**
5  **with our Newberry plant, that we did the same**
6  **thing to ourselves.**
7        Q.  Uh-huh.
8        **A.  The objective was to meet the industry**
9  **standards for animal welfare and handling.  It's**
10 **not -- I mean, that was obvious that something**
11 **had to be done that was -- that had numerical**
12 **data that was actually measured, that was actually**
13 **checked, otherwise what's the point?**
14       Q.  Yeah.  Okay.
15            A little further down under "Rationale,"
16 the third sentence there notes that "Animal
17 welfare experts were involved in the formulation
18 of most of the industry guidelines."  Is that
19 true?
20       **A.  Uh-huh.**
21       Q.  Is that true of UEP guidelines?
22       **A.  I believe UEP had the committee that put**
23 **those -- that supposedly put those guidelines**
24 **together.**
25       Q.  Are you referring to what's been called

---

**55**

1  the Scientific Advisory Committee?
2        **A.  Yeah.**
3        Q.  Did you review who the members were of
4  that Scientific Advisory Committee at that point?
5        **A.  I read the names.  It's included in the**
6  **UEP guidelines.**
7        Q.  Okay.  Was it your understanding when you
8  were working on these animal welfare issues that
9  that Scientific Advisory Committee had real input
10 into the development of the UEP guidelines?
11       **A.  That was my assumption.**
12       Q.  Uh-huh.  Okay.
13       **A.  Why else would you be saying that?**
14       Q.  Right.  Right.
15            And did you ever come across any evidence
16 that that wasn't the case?
17       **A.  Explain, please.**
18       Q.  Did you -- did anything ever undermine
19 that assumption?
20       **A.  No.**
21       Q.  No.  Okay.
22            MS. CLAIR:  I think that's it for this
23 document.  We can take our break.
24            MS. ANSARI:  Okay.  Let's take like a
25 5-minute break.

---

**56**

1            THE VIDEOGRAPHER:  Going off the record at
2  10:02 a.m.
3            (Recess taken.)
4            THE VIDEOGRAPHER:  We're back on the
5  record at 10:11 a.m.
6            MS. ANSARI:  Are they still on the line?
7            MS. CLAIR:  Are you guys still on the
8  line?  We're just back from a break.
9            MS. MARKOWITZ:  I am still on the line.
10           MR. MONICA:  Yup, still here.
11           MS. CLAIR:  Okay.  Great.
12               (Amundson Deposition Exhibit
13               No. 11 marked for
14               identification.)
15 BY MS. CLAIR:
16       Q.  Okay, Mr. Amundson.  I'm going to hand you
17 Exhibit 11.  This is KRA00014900.  I'll let you
18 review.
19       **A.  Okay.**
20       Q.  Do you know what this document is?
21       **A.  Yes.**
22       Q.  And what is this?
23       **A.  It's a list of potential third-party**
24 **auditors that were doing animal welfare audits.**
25       Q.  Okay.  And you say potential.  Was Kraft

---

**57**

1  considering approving the auditors that would do
2  its surprise animal welfare audits?
3        **A.  Nearly all beef and pork were using either**
4  **Silliker and Cook & Thurber.  So they -- we would**
5  **not direct somebody to use them as long as they**
6  **were a recognized third-party auditor.**
7        Q.  Okay.  Did Kraft undertake an assessment
8  of which auditors would be approved?
9        **A.  No.**
10       Q.  No?
11       **A.  Not that I'm aware of.**
12       Q.  No independent assessment at Kraft?  Okay.
13               (Amundson Deposition Exhibit
14               No. 12 marked for
15               identification.)
16 BY MS. CLAIR:
17       Q.  I'll hand you what we'll mark as
18 Exhibit 16 -- no, that's Exhibit 12.  This is
19 KRA00027934.
20       **A.  Okay.**
21       Q.  Is this an email that you wrote on
22 January 20, 2005?
23       **A.  Yes.  That's what it says.**
24       Q.  Okay.  And the subject is "Animal Welfare
25 Call List."  Is that right?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

16 (Pages 58 to 61)

---

**58**

1     A. Uh-huh.
2     Q. You note here that "My plan is to
3 contact most of the people on this list with the
4 objective of obtaining results from animal Welfare
5 audits that have been performed in their plants or
6 recommending audits if they have not been
7 performed." Is that right?
8     A. Yes.
9     Q. Do you recall reaching out to
10 Michael Foods around this time?
11     A. Yes. I think it was later, but yes, I did
12 reach out to them.
13     Q. Later to -- did you recommend an audit to
14 Michael Foods?
15     A. No. I asked them what their animal
16 welfare program was.
17     Q. Okay. And did they indicate to you that
18 they had an animal welfare program that included
19 auditing?
20     A. They explained to me that they followed
21 the Canadian required --
22     This is Michael Foods Canada.
23     Q. Oh, okay, okay.
24     A. -- the Canadian animal welfare
25 requirements.

**59**

1     Q. Did you ever reach out to Michael Foods'
2 US locations?
3     A. No.
4     Q. And you mentioned earlier on that you
5 reached out to Rose Acre.
6     A. Rose Acre.
7     Q. Did you do that around this 2005 time
8 frame?
9     A. I can't tell you the exact date. There's
10 a letter that was in the documents that had the
11 date of the reply, which was a couple of weeks
12 later.
13     Q. Okay. We'll just skip to that.
14     Did you reach out to any other egg
15 producers?
16     A. No.
17     Q. At any time?
18     A. No.
19     Q. Okay. Did -- you have a question here in
20 the email, question one. "Can I contact these
21 individuals cold concerning animal welfare or do
22 they need a heads-up?"
23     Did you receive a response to this
24 question from your team?
25     A. I believe cold was fine, but I'm not

**60**

1 completely sure. The list was of buyer contacts.
2 So typically it would have been a two level.
3     Q. And what does two level mean?
4     A. The buyer wouldn't necessarily know the
5 animal welfare, but he would know who was in
6 charge of it at the company.
7     Q. Would he make an introductory phone call
8 before yours generally?
9     A. Probably. Maybe not. They were used to
10 it.
11     Q. Okay. And the question I'm getting at
12 here is with respect to Rose Acre, do you know
13 whether this was the first time that anyone from
14 Kraft reached out to Rose Acre to inquire about
15 its animal welfare practices?
16     A. I don't know.
17     Q. You don't know. Okay. That's fine.
18     (Amundson Deposition Exhibit
19     No. 13 marked for
20     identification.)
21 BY MS. CLAIR:
22     Q. I'm going to hand you what was marked
23 Exhibit 13. This might be one of the ones you
24 were discussing. This is KRA00027999.
25     A. Okay.

**61**

1     Q. Do you recognize this document?
2     A. Uh-huh.
3     Q. What is this document?
4     A. It's a response to a -- to the phone call
5 that I made to Rose Acre.
6     Q. Okay. And it's an email chain with two
7 emails in it, right?
8     A. Yes. Actually --
9     Q. Oh, you're right. There's a -- are there
10 three emails in this?
11     A. No. I think there's only two. Two.
12     Q. Yeah, there's two. Okay.
13     Let's look at the bottom email here, which
14 looks like an email from you to Greg Hinton. Do
15 you see that?
16     A. Uh-huh.
17     Q. And this is May 20, 2005, right?
18     A. Correct.
19     Q. And you note, you say "Greg, enjoyed
20 discussion poultry animal welfare with you and
21 KY today."
22     Is KY someone else at Rose Acre?
23     A. I don't remember.
24     Q. You don't remember. Okay.
25     Is Greg employed by Rose Acre?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

17 (Pages 62 to 65)

---

62

1        A.  That would be Greg Hinton.
2        Q.  Greg Hinton.
3        A.  I thought he was.  It says "GoodEgg.com,"
4    though, so I'm not sure, up here.
5        Q.  Okay.  And your email goes on, "The
6    address information for the latest audit is as
7    follows," and it provides your address.
8            In that conversation had you asked
9    Rose Acre to send you their latest animal welfare
10   audit?
11       A.  If they communicated that they had done
12   the audits, I asked them to send me an example.
13       Q.  Okay.  And Greg replies here, if you look
14   at the email above, it says "We will be sending
15   you the audit information today."
16           And he goes on "Will you be including the
17   UEP animal welfare program as a requirement in the
18   upcoming egg bid?"  Do you see that?
19       A.  Uh-huh.
20       Q.  And he goes on to ask whether "Kraft has
21   an interest in putting the animal care certified
22   logo on its labels."  Do you see that?
23       A.  Yes.
24       Q.  Did you ever respond to those questions
25   from him?

---

63

1        A.  I did not, because I'm not involved in
2    the egg bids or egg contracts.
3        Q.  Okay.  Do you know whether anyone else at
4    Kraft responded?
5        A.  I don't know if anybody else responded.
6        Q.  Okay.  Do you know whether Kraft ever put
7    an animal care certified or UEP certified logo on
8    any products?
9        A.  To the best of my knowledge, we never did.
10       Q.  Okay.
11           (Amundson Deposition Exhibit
12           No. 14 marked for
13           identification.)
14   BY MS. CLAIR:
15       Q.  I'll hand you what we'll mark as
16   Exhibit 14, KRA00049855.
17       MR. CAMPBELL:  What number is this?
18       MS. ANSARI:  Fourteen.
19   BY MS. CLAIR:
20       Q.  Okay.  Do you know what this document is?
21       A.  Uh-huh.
22       Q.  What is this document?
23       A.  It's the response to the previous request
24   from -- to Rose Acre.
25       Q.  Okay.  This is Rose Acre's response to

---

64

1    your previous request?
2        A.  Uh-huh.
3        Q.  Okay.  Let's look to the bottom of this
4    first page here.  The third line up, do you see
5    where it notes "You will see a time period for
6    implementations of cage space allowances for
7    layers."
8        A.  Uh-huh.
9        Q.  "This part was staged to make sure that
10   we as an industry do not short the market,
11   therefore having less supply, which will cause
12   problems for our customers."
13           Did Kraft have any position on the time
14   period for implementing the UEP's space allowance
15   for layers?
16       A.  Explain.
17       Q.  So he notes that with respect to the
18   UEP policy, there's a certain time period for
19   implementing cage space, and that the
20   implementation of the UEP cage space policy was
21   staged, meaning rather than done all at once.
22   And it was done that way to ensure that the
23   industry didn't short the market.
24       A.  Uh-huh.
25       Q.  Did Kraft have a position on whether or

---

65

1    not it favored a staged approach as opposed to an
2    all-at-once approach or position?
3        A.  No, not that I'm aware of.
4        Q.  Did you or your work on the animal welfare
5    committee consider how the UEP animal welfare
6    guidelines might have affected the supply of eggs,
7    if at all?
8        A.  No.
9        Q.  Your concern was more with the other
10   aspects of animal welfare?
11       A.  I was much more in depth with slaughter
12   and the handling of animals for slaughter.
13       Q.  Okay.  And the next page at the very top
14   notes that "Below is a list of committee members
15   that served on the independent scientific advisory
16   committee."
17           Is that the committee that we talked about
18   earlier on?
19       A.  Uh-huh.
20       Q.  Okay.  He says "As you can see, we have
21   tried very hard to find the best people in their
22   field to help develop a program that will hold up
23   against pressure from groups that are opposed to
24   egg production."
25           Do you understand that to be the case?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                        April 3, 2014

18 (Pages 66 to 69)

---

**66**

A.  Do I know any of these people personally?
No.
Q.  No.  Fair enough.
(Amundson Deposition Exhibit
No. 15 marked for
identification.)
BY MS. CLAIR:
Q.  I'll hand you what we'll mark as
Exhibit 15.  This is KRA00004845.  I only have
questions about a few of the specifics on there.
You don't have to read the whole thing.
So I wanted to let you get a lay of the
land for what it is for a moment, but do you know
what this document is?
A.  I actually didn't attend this meeting.  I
wish I had because I was very interested in the
subject, but for some reason I wasn't there.
Q.  Okay.  And was this Power Point prepared
for a meeting?
A.  Yes.  It was a presentation.
Q.  Okay.  Was it common for Kraft to
periodically create Power Points ahead of meetings
like this one?
A.  Okay.  This is, I believe, one from the
presentation to us.

---

**67**

Q.  Okay.  And what makes you think that?
A.  Because I think -- I thought this was
Kellye Pfalzgraf.
Q.  Oh, I see.  On the very last page there's
someone named Kellye Pfalzgraf?
A.  Okay.  From Tyson.
Q.  From Tyson.
Okay.  This was a presentation from
Tyson Foods, which you noted was a Kraft supplier?
A.  Correct.
Q.  To Kraft?
A.  Correct.
Q.  On the vert front it says "Oscar Mayer
Animal Well-Being."  Oscar Mayer is a --
A.  Being the receiver.
Q.  And Oscar Mayer is a Kraft brand?
A.  I'm sorry, that's where I worked,
Oscar Mayer Kraft Foods.
Q.  Perfect.  Okay.  Was this a meeting that
Kraft asked for, was this a meeting that Tyson
called?
MS. ANSARI:  Objection, speculation.
THE WITNESS:  You're right, it is
speculation.

---

**68**

BY MS. CLAIR:
Q.  Do you know --
A.  My belief is this would be helping us get
introduced to animal welfare concept for the team
and MPPCT probably, but I don't know who was in
attendance at this meeting.
Q.  Okay.  Because you weren't at the meeting
itself?
A.  Because I wasn't at the meeting.
Q.  I can represent to you that this document
was in your files.
A.  Okay.
Q.  Is this something that you looked at at
the time?
A.  I must have got a copy then.
Q.  Fair then.  Let's just look at the
page ending in 4850.  It's, like, the fifth page
of this document.
Does this page recount some history about
how formal auditing started with respect to animal
welfare?
A.  I can only say that's what the author
thought it did.
Q.  Okay.  Okay.  It discusses McDonald's.
Are you familiar with McDonald's history with

---

**69**

respect to animal welfare?
A.  Explain.
Q.  Sure.  Well, specifically it discusses
some events.  The first bullet notes that "In
1997 McDonald's was found culpably responsible for
cruelty to animals in the British High Courts."
It goes on to note that "McDonald's
thereafter met with Temple Grandin and met with
PETA to discuss animal welfare."  Are you familiar
with those events?
A.  No, I'm not familiar with those events,
no.
Q.  Okay.  That's fine.  Let's look at
the page ending in 4851.  This is titled
"PETA Campaigns," right?
A.  Uh-huh.
Q.  And it notes campaigns with McDonald's,
Burger King, Wendy's and KFC, right?
A.  Uh-huh.
Q.  And next to each is a time period, first
11 months, 5 months, 2 months.
With the exception of KFC, these are
generally getting shorter, aren't they?
A.  That's what it says.
Q.  That's what it says.  Okay.  Fair enough.

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

19 (Pages 70 to 73)

---

**70**

1   Okay.
2       Do you know whether the end periods listed
3   here represent the company reaching some agreement
4   with PETA or something else?
5       A.  No, I don't know what the end result of
6   these would have been.
7       Q.  Okay.  Fair enough.
8       Let's turn two pages ahead to the page
9   ending 4853.  And this one is titled "PETA."  And
10  the first bullet says "Purchase common stock in
11  companies."  There's a list of companies that
12  includes Tyson and it includes Applebee's, right?
13      A.  Uh-huh.
14      Q.  Do you know what's the implication for
15  food companies when PETA purchases stock in those
16  companies?
17      MS. ANSARI:  Objection, speculation.
18      MS. CLAIR:  Oh, you can -- the lawyers
19  object for the record.
20      MS. ANSARI:  Sorry.  You can answer.
21      MS. CLAIR:  I should have gone over that
22  in the beginning.  It's for the record and for us
23  and the Judge.
24      A.  My understanding is typically it's to be
25  able to bring up issues at the stockholder's

---

**71**

1   meeting.
2   BY MS. CLAIR:
3       Q.  Okay.  And was that a concern to
4   companies in the food industry, that PETA might
5   do that?
6       A.  Well, they did it so.
7       Q.  Well, let me clarify.  When that happens,
8   is that a problem for those companies?
9       A.  I can't answer for the people who would be
10  dealing with those.
11      Q.  Uh-huh.
12      A.  But I'm -- I'm sure it must be, but I
13  can't answer why.
14      Q.  Okay.  Did you ever hear anything within
15  Kraft about concern that PETA might take that kind
16  of action with respect to Kraft?
17      A.  No.  Vaguely, but I don't remember
18  anything about it.
19      Q.  Okay.  Let's turn a little further to
20  the page ending in 4872.  This page is titled
21  "FMI/NCCR Animal Welfare Goals."  Are you familiar
22  with what FMI is?
23      A.  Food Manufacturing Institute or Food
24  Marketing.  It's a food group much like AMI would
25  be for the meats.

---

**72**

1       Q.  Do you know generally who are members of
2   FMI, what kind of companies?
3       A.  No, I don't know who would be members of
4   that.
5       Q.  Do you know what the NCCR is?
6       A.  Just the name.  I mean, these are one of
7   the first people to get involved in animal welfare
8   auditing.
9       Q.  And how are they first involved in animal
10  welfare auditing?
11      A.  They developed a program and auditors to
12  do third-party auditing, I believe.  I was never
13  involved in them because we did -- AMI was the
14  preferred audit program.
15      Q.  Okay.  Do you have any knowledge of
16  whether anyone at Kraft was a member of or
17  participated in FMI or NCCR?
18      A.  I don't have any knowledge that anyone
19  was.
20      Q.  Okay.  I'll do this anyway.
21          (Amundson Deposition Exhibit
22          No. 16 marked for
23          identification.)
24  BY MS. CLAIR:
25      Q.  I'm going to hand you Exhibit 16.  I'll

---

**73**

1   give you a chance to review.
2       Okay.  I can represent to you that this
3   document was produced in your files --
4       A.  Yup.
5       Q.  -- from hard copies, so there's no
6   electronic date.
7       Do you know what this document is?
8       A.  This would have been a comparison
9   between -- that I suspect FMI and the NCCR did
10  comparing -- determining whether they believed
11  in the -- or how much they accepted the animal
12  welfare guidelines produced by these trade groups.
13      Q.  And with respect to the United Egg
14  Producers in the second row down, this document
15  notes that "FMI and NCCR endorsed the production,
16  handling, transportation, processing and
17  euthanasia guidelines for layers of shell and
18  breaking eggs in 2002," right?
19      Do you have any knowledge apart from this
20  document of that endorsement happening?
21      A.  No.
22      Q.  Did anyone at Kraft involved in the
23  animal welfare task force discuss with you
24  whether it mattered to Kraft what FMI and NCCR
25  had to say about these guidelines?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

20 (Pages 74 to 77)

---

### 74

1  **A. I don't recall anybody mentioning that to**
2  **me.**
3  Q. Okay. Fair enough.
4  Do you know why you received this
5  document?
6  **A. I probably found it because it would have**
7  **been a -- it would have been something that would**
8  **have been interesting in the overall scheme of**
9  **whether these were really right or not. And they**
10 **basically accepted them so -- but we still were --**
11 **AMI had a nice program.**
12 Q. Uh-huh. Did the AMI -- AMI's program
13 didn't have provisions having to do with eggs,
14 did it?
15 **A. No.**
16 Q. Okay. And how would it have been
17 interesting to you that FMI and NCCR were
18 endorsing the UEP practices?
19 **A. Well, okay, FMI and NCCR were the, as**
20 **I recall, one of the first people to start putting**
21 **out third-party audits.**
22 **And so, you know, they took a run at it,**
23 **and I don't remember what any of their guidelines**
24 **or know what any of their guidelines are, but it**
25 **would have been interesting because they were the**

### 75

1  **first to take a run at it.**
2  Q. Uh-huh. So their --
3  **A. Third-party.**
4  Q. -- opinion would have been interesting
5  because of their early involvement?
6  **A. Well, especially if it came up with**
7  **something significantly different than what the**
8  **producer organization had indicated.**
9  Q. Okay. Before I give you this document,
10 let me see, are you familiar with the company
11 Cargill?
12 **A. Uh-huh.**
13 Q. What was Cargill's relationship with
14 Kraft, if any?
15 **A. They were a supplier.**
16 Q. They were a supplier, okay.
17 **A. Cargill Meat Solutions.**
18 Q. Okay.
19 (Amundson Deposition Exhibit
20 No. 17 marked for
21 identification.)
22 BY MS. CLAIR:
23 Q. Let me hand you Exhibit 17. This is
24 KRA00026000.
25 MS. CLAIR: For those on the phone I

### 76

1  skipped it. The last exhibit was KRA49658 was
2  Exhibit 16.
3  THE WITNESS: Okay.
4  BY MS. CLAIR:
5  Q. Okay. Do you know what this document is?
6  **A. I don't remember seeing this document**
7  **before. As I'm reading it, Cargill value added**
8  **meats were pizza topping manufacturers for us.**
9  **They weren't beef and pork suppliers like**
10 **Cargill beef and pork were.**
11 Q. Okay. Makes sense. I can represent it
12 was located in your files, but you might not
13 recall it.
14 **A. Okay.**
15 Q. Apart from the document, was Cargill value
16 meat suppliers one of the companies that you
17 reached out to beginning January of 2005 to
18 inquire about their animal welfare practices?
19 **A. I don't recall doing that. It's possible**
20 **that I did.**
21 **Once again, they were using meats to**
22 **further process meats. I would have talked to**
23 **Cargill beef and pork.**
24 Q. Beef and pork. Okay. Okay.

### 77

1  (Amundson Deposition Exhibit
2  No. 18 marked for
3  identification.)
4  BY MS. CLAIR:
5  Q. I hand you what we've marked as
6  Exhibit 18. This is KRA40. The question is
7  about a few pages, but I'll just let you get a
8  lay of the land of the document there. Okay?
9  **A. Should I be reading the whole thing?**
10 Q. No, no, no. I just want to make sure you
11 understand what this is.
12 Let's look at the cover email here.
13 **A. Okay.**
14 Q. Or the cover document. Do you know what
15 this is?
16 **A. I was organizing a meeting.**
17 Q. Okay. This is a meeting request that you
18 sent. And these required attendees include
19 yourself, Jose Rojo, Greg Hite and William Paulos.
20 We discussed Jose and William. Who is
21 Greg Hite?
22 **A. Greg Hite at that time was poultry**
23 **procurement.**
24 Q. And the subject of the meeting is
25 "Prep Meeting - Sustainable Agricultural -

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

---

**78**

Meat Animals," right?

A. Correct.

Q. You have a note here that "Francisco Pileggi will be visiting on Thursday..."

Who is Mr. Pileggi?

A. He was a part of Kraft buying meat from South America for the Italians canned meat production.

Q. Okay. What was the purpose of the upcoming meeting with him?

A. You've got me on that one. I don't remember what the point of that was.

My guess is I would have asked to organize something because other people were busy.

Q. Okay. Fair enough. I know this is awhile ago.

This document references an attachment, right, as attaching an analysis of dairy performed by an outside firm last year. Do you see that?

A. Uh-huh.

Q. Okay. Let's look at that attachment, the first page here.

The first page has a Kraft logo, right?

A. Uh-huh.

Q. Was this prepared for Kraft by the

---

**79**

Morgan & Myers firm referenced on the first page?

A. That's my assumption, yes.

Q. Was this something that Kraft commissioned this company to prepare?

A. I would not have knowledge of how this came about in the dairy area.

Q. Okay. This was something that you reviewed, but you might not have been as familiar with why it was created?

MS. ANSARI: Objection, form.

You can answer.

THE WITNESS: Okay.

A. I wouldn't have been reviewing this. I probably would have received it because it had to do with the sustainability.

BY MS. CLAIR:

Q. Okay. Let's look at the page ending in 45. Now, the first bullet here asks the question "How did dairy sustainability/CSR efforts pay off for Kraft? "

What is CSR?

A. I don't know.

Q. Might it be Corporate Social Responsibility?

A. It could well be.

---

**80**

Q. It could be, you just don't know. Okay. That's fine.

And if you look at this bottom chart here, it notes "Freedom from sticks" --

A. Uh-huh.

Q. -- "and carrots."

Is this document discussing the various benefits to Kraft of focusing on sustainability efforts?

A. As I read this, that's what it looks like to me.

Q. Okay. And just taking a look at the list under "freedom from sticks," the list under "carrots," do you agree that these reasons would apply to Kraft's animal welfare efforts specifically?

A. There's some of the carrots that I don't see an immediate to animal welfare, but, I mean, in general, yes.

Q. Uh-huh. And this looks like it's discussing sustainability as a general category, right?

So some of these might be not as specific to animal welfare.

But let's look under "Freedom from sticks,

---

**81**

not subject to NGO tax."

Is that a reason that it made business sense for Kraft to develop an animal welfare policy?

A. I don't think you're not subject to those taxes, but at least you have a policy in place.

The NGOs typically would be much more, much -- I would think would have much higher levels of requirements than our -- the industry position, than the industry position or industry welfare policies. So I don't know that it frees you from tax.

Q. There's a note at the bottom "Avert loss to competitors more in line with new consumer values."

Is that another reason that it made business sense for Kraft to develop an animal welfare policy?

A. At the end of the day, yes.

Q. Okay. Let's turn to the page ending in 48. It's just a few pages later.

The fourth bullet down, do you see where it notes that "Kraft likely to be 'called on' to influence change within supply chain."

Below that it notes "Big brand equals big

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                            April 3, 2014

---

82

1  target."
2       It goes on to discuss, it says "Kraft
3  equals supplier of big brands, such as Walmart,
4  McDonald's, which are likely to be a target or be
5  proactive."
6       Finally, it notes that "How well we work
7  with our supply chain can be a brand asset."
8       A.  Uh-huh.
9       Q.  Do you agree that these are some of the
10 reasons that it made sense for Kraft to adopt an
11 animal welfare policy?
12      A.  I would say that those were the -- that
13 was the assessment of Morgan & Myers.
14      Q.  Morgan & Myers.
15      Do you agree with those?
16      A.  Yeah, it makes sense.
17      Q.  Okay.  Let's turn farther back to the
18 page ending in 80.  Okay.  So this looks like a
19 cover page.  It's called "Competitive Dynamics.
20 Are we in step with our customers and peers?"
21 Right?
22      A.  That's what it says.
23      Q.  Okay.  Sorry.  Then the next three pages
24 have some charts, don't they?
25      Let's look, if we could, at the first

---

83

1  chart on the page ending in 81.
2       A.  Uh-huh.
3       Q.  So this chart is titled "Customer
4  Activity," and down the left we see a list of
5  organizations.
6       Are those organizations Kraft customers?
7       A.  The top would -- well, forgetting what
8  happened in the last year since I've been gone,
9  the top would have been customers, the bottom
10 would not be, at least our division within my
11 knowledge.
12      Q.  Okay.
13      A.  I don't know if there's egg suppliers or
14 anything there.
15      Q.  Okay.  So the bottom, meaning starting
16 with McDonald's?
17      A.  McDonald's.
18      Q.  Okay.  So those above, the companies
19 listed above, were in the time period that you
20 were at Kraft, customers of Kraft?
21      A.  I can't directly speak for Ahold or Tesco.
22      Q.  Okay.  Fair enough.
23      A.  I know Walmart was, I know Carter was,
24 Safeway obviously, yes.
25      Q.  Okay.  And across the top of this chart I

---

84

1  see a list of topics I guess we can call them,
2  organic, animal welfare, BST.
3       And under "animal welfare" there are Xs by
4  some of the companies.
5       A.  Uh-huh.
6       Q.  What do those Xs mean?
7       A.  Those Xs mean there's some activity going
8  on by those companies, something on the website
9  or -- well, first of all, Morgan & Myers did this.
10      Q.  Uh-huh.
11      A.  So I'm assuming that that's what these
12 things mean.
13      Q.  Okay.  That's your interpretation of this
14 document?
15      A.  That's my interpretation of it.
16      Q.  Okay.  This document -- so this document
17 is noting that one, two, three, four, five, six,
18 seven, eight, nine, nine of these companies here
19 that Morgan & Myers identified as customers or
20 maybe potential customers --
21      A.  Well --
22      Q.  -- had some activity on?
23      A.  -- five of them as customers or potential
24 customers.
25      Q.  Right.  Fair enough.  Let's look at those

---

85

1  five, okay, five of those at the top that had some
2  animal welfare activity going on?
3       MS. ANSARI:  Objection, form.
4       A.  Okay.
5  BY MS. CLAIR:
6       Q.  Let's look at the next page called
7  "Peer Activity."  This looks like a similar
8  chart except the organizations down the side are
9  different.
10      Are some of these organizations Kraft
11 competitors?
12      A.  Kraft peers, as indicated by
13 "Peer Activity."  Many of these are dairy, which
14 I didn't have any knowledge of, but yes.
15      Q.  Okay.  When you use the term peer,
16 Kraft or in your industry, would "peer" generally
17 mean the same thing as "competitor" or would it
18 mean something different?
19      A.  I look at it as companies similar to
20 ours --
21      Q.  Okay.
22      A.  -- in the food business.
23      Q.  Let's look at the -- and while we are
24 on this page under "animal welfare," we see that
25 several of these companies have an X by their

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                          April 3, 2014

23 (Pages 86 to 89)

---

86

1  name, right, indicating?
2      A.  Morgan & Myers felt they were doing
3  something, some activity in animal welfare.
4      Q.  With respect to animal welfare.
5      Let's look to the next page, which is a
6  list of NGOs.  This looks like a similar chart,
7  except the organizations down the side are NGOs.
8  Does that seem right to you?
9      A.  Yes.
10     Q.  Is it fair to say that animal welfare
11 activity was a trend in the food industry in
12 this -- in the, let's say, the period in the
13 mid 2000s?
14     A.  Explain, please.
15     Q.  Would you say that animal welfare activity
16 was something that Kraft's customers, Kraft's
17 peers and NGOs focused on the issue were paying
18 more attention to in these last several years?
19     A.  I think you would be safe in saying that,
20 yes.
21     Q.  Okay.  And a lot of Kraft's peers were
22 adopting animal welfare policies similar to the
23 one that Kraft did?
24         MS. ANSARI:  Objection, form.
25     A.  I can't guess what they would be doing,

---

87

1  other than the ones that put it on their website.
2  BY MS. CLAIR:
3      Q.  That put it on their website?  Okay.
4      When you were working on Kraft's animal
5  welfare task force, were you looking at what
6  Kraft's peers were doing with respect to animal
7  welfare?
8      A.  I did not.  We did look at McDonald's.
9      Q.  Okay.
10     A.  And the ones who were going -- undergoing
11 some of the challenges.
12     But our competitors would be, like,
13 the Nestles and things like this.  And during the
14 2004-2008 I did not look at those.
15     Q.  Okay.  Did anyone else on the task force
16 look at those policies?
17     A.  The task force was -- well, I don't know.
18 I don't know if anyone else did.
19     Q.  Okay.  Okay.  Did the fact that other
20 competitors of Kraft had animal welfare policies
21 have any influence on Kraft's decision to develop
22 one of its own?
23         MS. ANSARI:  Objection, form.
24     A.  Not that I recall.  We developed ours,
25 I believe, in case we would get questions or

---

88

1  concerns from our customers.
2  BY MS. CLAIR:
3      Q.  Perfect.  Okay.  Let's look at -- my
4  apologies.
5          (Amundson Deposition Exhibit
6          No. 19 marked for
7          identification.)
8  BY MS. CLAIR:
9      Q.  Okay.  I'll hand you what we'll mark as
10 Exhibit 19.  This is KRA0000949.  Once you've
11 reviewed, would you let me know what this document
12 is, if you know?
13     A.  It's one of those questions that comes up
14 from our salesforce based on what they're seeing
15 in the marketplace.
16     Q.  Okay.  So this email is raising a question
17 from some personnel involved in Kraft salesforce?
18     A.  Correct.
19     Q.  Okay.  And what was coming up in the
20 marketplace that's being discussed here in this
21 email?
22     A.  Well, as it says right here, Safeway
23 was coming under targeting based on controlled
24 atmosphere stunning of poultry.
25     Q.  So there's a --

---

89

1      A.  Down here it says "...also increase
2  quantity of cage-free eggs."
3      Q.  So was Safeway adopting policies with
4  respect to controlled-atmosphere killing and
5  increased quantity cage-free eggs?  Is that what's
6  going on here?
7      A.  I don't know what Safeway was doing.
8      Q.  Okay.  Is that what this document
9  indicates Safeway was doing?
10     A.  It looks by this document from
11 Brian Giroux that he anticipated questions from
12 Safeway regarding how they slaughter poultry.
13     Q.  As you mentioned before, is Safeway a
14 customer of Kraft?
15     A.  Yes.
16     Q.  Yes.
17     Okay.  And William Paulos forwarded this
18 email chain to you and some others on February 13,
19 2008, right?
20     A.  Uh-huh.
21     Q.  He notes "FYI more to come as the
22 questions come our way."
23     A.  Uh-huh.
24     Q.  Did you personally ever receive any
25 followup questions from Safeway?

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                    April 3, 2014

24 (Pages 90 to 93)

---

90

1    A.  I never received any questions from
2    Safeway.
3    Q.  Would that have been part of your job --
4    A.  No.
5    Q.  -- to respond to those questions?  Okay.
6        So if they came, they would have come
7    probably to somebody else?
8    A.  They would have come to somebody else in
9    the salesforce.
10   Q.  Okay.  By 2008 could the salesforce have
11   referred Safeway to Kraft's established animal
12   welfare policy rather than having to go to you
13   for a lot of details?
14   A.  By 2008 I would think so.  I know they
15   didn't come to me for details.
16   Q.  And Kraft had a formal animal welfare
17   policy by 2008, right?
18   A.  Yes.
19   Q.  Yes.  Okay.
20       MS. CLAIR:  That's all of my questions.
21       Does anyone on the phone have any followup
22   questions?
23       MS. MARKOWITZ:  None here.
24       MR. CAMPBELL:  Sharon, do you have any
25   questions?

---

91

1        MS. MARKOWITZ:  Nope.
2        MR. CAMPBELL:  Bill --
3        MS. ANSARI:  John.
4        MR. CAMPBELL:  John I mean.
5        MR. MONICA:  Yes, I have a couple of
6    questions.
7        MR. CAMPBELL:  All right.  Proceed.
8        MR. MONICA:  I'll keep them very brief.
9            EXAMINATION
10   BY MR. MONICA:
11   Q.  Mr. Amundson, my name is John Monica.  I'm
12   from the Porter Wright law firm in Washington DC.
13   I represent Rose Acre Farms, Inc.
14       I'll ask you a couple of questions over
15   the phone.  I'll try to make myself very clear.
16   If I'm not clear or you don't understand me,
17   please let me know.  Okay?
18   A.  Okay.
19   Q.  Do you know if Kraft still purchases
20   UEP certified egg products from my client,
21   Rose Acre Farms, Inc.?
22   A.  I do not know if -- where we purchase eggs
23   from now.
24   Q.  Okay.  Do you know if Kraft Foods --
25   Kraft currently purchases only UEP certified

---

92

1    egg products?
2    A.  Once again, since I don't work there
3    anymore, and since the eggs are a different
4    division, I have no idea.
5    Q.  Okay.  And as you sit here today, do you
6    have any understanding of why Kraft Foods has sued
7    my client, Rose Acre Farms, Inc.?
8        MS. ANSARI:  Objection.  To the extent
9    that the witness' understanding comes from
10   conversations with counsel, we instruct him not
11   to answer.  He can answer as to his understanding
12   of -- outside of what he's received from counsel.
13   BY MR. MONICA:
14   Q.  So with that instruction do you have any
15   understanding, sir?
16   A.  Not outside from what I've received from
17   counsel.
18       MR. MONICA:  Okay.  That's all that I
19   have.  Thank you.
20       MS. ANSARI:  So we are going to have a
21   couple of questions.  We just need a couple
22   minutes, a little bit of a break.
23       MS. CLAIR:  Sure.
24       MS. ANSARI:  Thank you.
25       THE VIDEOGRAPHER:  Going off the record at

---

93

1    11:06 a.m.
2            (Recess taken.)
3        THE VIDEOGRAPHER:  We are back on the
4    record at 11:16 a.m.
5            EXAMINATION
6    BY MS. ANSARI:
7    Q.  Mr. Amundson, I just have a couple of
8    questions for you.
9        Could you turn back to Exhibits 2, 3 and
10   4, Amundson 2, 3 and 4, that Ms. Clair asked you
11   about earlier today?
12       Sorry.  I know that it might -- they're
13   kind of --
14   A.  Sure.
15   Q.  They're in there.  We could look at
16   2 first, 2, then 3, then 4.  That's how we'll --
17   A.  I have 3 and 4.  I don't know where 2 is.
18       (Discussion held off the
19       record.)
20   BY MS. ANSARI:
21   Q.  Sorry to make you dig through everything.
22   A.  It's all right.
23   Q.  Is that 2?
24   A.  It's not here.
25   Q.  Here, I can help.  Here, I'll look through

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                           April 3, 2014

25 (Pages 94 to 97)

---

94

1   those.
2        Is it maybe under the -- maybe I will show
3   you a copy of mine.
4        **A. Oh, wait a minute. No, it's not there.**
5        MS. ANSARI: Katie, do you have a clean
6   copy of 2?
7        THE WITNESS: Sorry about that.
8        MS. ANSARI: I just wrote on mine, so I'd
9   rather show him a clean copy.
10       MS. CLAIR: Let's see if we have one,
11  414698, right?
12       MS. ANSARI: Oh, I found it.
13       THE WITNESS: Thank you. Sorry.
14       MS. ANSARI: No, it's fine.
15  BY MS. ANSARI:
16       Q. So Exhibit 2, as we established earlier,
17  is a January 2004 draft animal welfare task force
18  charter, correct?
19       **A. Uh-huh.**
20       Q. Do you see any mention of eggs in that
21  document?
22       **A. No, I don't.**
23       Q. You can take a look at Exhibit 3.
24       **A. Okay.**
25       Q. And this document, as we've established,

---

95

1   is an April 28, 2005, animal welfare task force
2   charter, correct?
3        **A. Uh-huh.**
4        Q. Is there any mention of eggs in that
5   document?
6        **A. I do not see one.**
7        Q. And if you could take a look at Exhibit 4,
8   a May 2, 2005, animal welfare task force charter,
9   are there -- is there a mention of eggs in that
10  document?
11       **A. Yes, there is.**
12       Q. Okay. So is it fair to say that Kraft
13  didn't begin to look into animal welfare for
14  eggs until around May 2, 2005?
15       MR. MONICA: Objection, calls for
16  speculation, contradicts the documents.
17       **A. It appears that way.**
18  BY MS. ANSARI:
19       Q. Okay. If you could take a look at
20  Exhibit 14.
21       **A. Okay.**
22       Q. Can you -- the first sentence --
23  Exhibit 14 is a letter from Rose Acre Farms
24  that they sent to you, correct?
25       **A. Uh-huh. Yes, it is.**

---

96

1        Q. And the first line in the second paragraph
2   states that "Rose Acre has been a big part of this
3   program since its inception in 2002," correct?
4        **A. Correct.**
5        Q. What did you understand this program to
6   be?
7        **A. I understood the program to be the**
8   **UEP animal welfare program.**
9        Q. Okay. Was it your understanding that
10  Rose Acre started implementing the UEP program
11  in 2002?
12       **A. Based on what they said here, yes.**
13       MR. MONICA: Asked and answered.
14       Go ahead.
15  BY MS. ANSARI:
16       Q. Sorry, can you repeat your answer?
17       **A. The second line says "We have been a big**
18  **part of this program since its inception in 2002,"**
19  **so I would say yes.**
20       Q. Okay. And this letter was written
21  sometime in May or June 2005, correct?
22       **A. There should have been a date on there**
23  **somewhere.**
24       MS. CLAIR: Objection to form.
25       **A. Yes. Well, okay.**

---

97

1   BY MS. ANSARI:
2        Q. In May 2005 had Kraft adopted an animal
3   welfare policy?
4        **A. No.**
5        Q. Okay. So based on this letter,
6   Exhibit 14, is it possible that Rose Acre
7   adopted the UEP guidelines at the request of
8   Kraft?
9        MS. MARKOWITZ: Objection.
10       **A. No, it would not be possible.**
11  BY MS. ANSARI:
12       Q. Go ahead. And based on this letter,
13  Exhibit 14, do you believe that Rose Acre adopted
14  the UEP guidelines in reliance on Kraft's request
15  that Rose Acre adopt those guidelines?
16       MS. CLAIR: Objection, foundation.
17       **A. We did not -- no. They could not have**
18  **adopted them based on Kraft's recommendation in**
19  **2002 to my knowledge.**
20       MS. ANSARI: Okay. I have no further
21  questions.
22       MR. MONICA: This is John. I have a
23  couple of followups, if no one else does.
24       MR. CAMPBELL: I think Katie has
25  questions.

---

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                        April 3, 2014

26 (Pages 98 to 101)

98

1    MS. CLAIR:  I have just one followup,
2  John.
3    MR. MONICA:  Go ahead.  You go first.
4         FURTHER EXAMINATION
5  BY MS. CLAIR:
6    Q.  Let's look back at Exhibit 2 that we were
7  just looking at.  Let me know when you have that
8  one in front of you.
9    A.  Yup.
10    Q.  Does Exhibit 2 specifically mention meat?
11    A.  Well, turkey handling and slaughter.
12    Q.  Turkey handling and slaughter.
13    A.  "Meat suppliers" on the next line.
14    Q.  Okay.  Okay.  In the 2004 and 2005 time
15  frame, was egg procurement under the Oscar Mayer
16  meat procurement umbrella?
17    A.  I don't believe so, but I -- that would be
18  a question for the ingredients buyer.
19    Q.  Okay.  Okay.
20    A.  I don't know the exact timing.
21    MS. CLAIR:  Okay.  That's fine.
22    MS. ANSARI:  John, do you have -- you have
23  a couple of questions?
24    MR. MONICA:  Sure.
25

99

1         FURTHER EXAMINATION
2  BY MR. MONICA:
3    Q.  Mr. Amundson, do you know when Kraft
4  first had UEP certification requirements in its
5  contracts with Rose Acre?
6    A.  I've seen the document.  I can't say I
7  know the time.
8    Q.  Do you know if it was as early as 2002?
9    A.  No, it would not have been then.  Well,
10  no, I don't believe so.  The proper person to
11  check with would be --
12    Q.  Do you know -- I'm sorry.  Go ahead.
13    A.  The proper people to check with are the
14  buyers.  I did not have knowledge or activity
15  related to contract formation.
16    Q.  So as you sit here today, you don't know
17  whether any of Kraft's contracts with Rose Acre
18  ever contained animal welfare requirements, do
19  you?
20    A.  I was informed secondhand that they had
21  finally gotten in there.
22    Q.  And by whom were you informed and when?
23    A.  Javier Maneses, and I don't know the date.
24    Q.  Do you know the approximate year?
25    A.  I'm going to guess 2007.

100

1    Q.  Do you have any reason to believe it
2  couldn't have been years earlier than that?
3    A.  When we started this, we had no -- there
4  was no idea that had been -- that anybody had been
5  looking into this ahead of time, this animal
6  welfare program.
7    Q.  So is it your testimony that prior to 2007
8  Kraft didn't have any interest in animal welfare
9  for egg-laying hens?
10    MS. ANSARI:  Objection, form.
11    You can answer.
12    A.  There's -- before 2007 there was interest
13  because it was being discussed.  We were trying to
14  figure out what our policies and what our policy
15  should be.
16    But was it in a contract?  I don't think
17  so.
18  BY MR. MONICA:
19    Q.  Do you know if prior to 2007 Kraft ever
20  agreed to renegotiate any of its contracts with
21  Rose Acre?
22    A.  I don't know that.
23    Q.  If -- I'm sorry.  Let me finish.  It was a
24  long question so I paused.  Let me ask it again.
25    Prior to 2007, do you know if Kraft ever

101

1  renegotiated any of its contracts with Rose Acre
2  to pay them more -- pay Rose Acre more due to
3  increased production costs related to animal
4  welfare?
5    A.  I don't know what would have gone on in
6  the contract development.
7    Q.  So you don't know if Kraft ever made that
8  offer?
9    A.  I do not.
10    Q.  Or if they followed through with that?
11    A.  I do not.
12    MR. MONICA:  Okay.  That's all I have.
13  Thank you.
14    MR. CAMPBELL:  Sharon, are we correct that
15  you have no questions?
16    MS. MARKOWITZ:  That's correct.  Thanks.
17    MR. CAMPBELL:  Okay.
18    MS. ANSARI:  We are -- we have no further
19  questions.
20    MS. CLAIR:  I think we're done.
21    THE VIDEOGRAPHER:  Going off the record at
22  11:28 a.m.  This concludes the videotaped
23  deposition of Mr. Amundson.
24
25

HIGHLY CONFIDENTIAL

Amundson, Curtis Miles                                April 3, 2014

27 (Pages 102 to 104)

102

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby
acknowledge that I have read and examined the
foregoing testimony, and the same is a true, correct
and complete transcription of the testimony given by
me, and any corrections appear on the attached Errata
Sheet signed by me.

_____     _____
(DATE)              (SIGNATURE)

103

STATE OF ILLINOIS  )
                   )   SS:
COUNTY OF C O O K  )
    I, Deralyn Gordon, a notary public within and
for the County of Cook and State of Illinois, do
hereby certify that heretofore, to-wit, on the
3rd of April, 2014, personally appeared before me
at 353 North Clark Street, Chicago, Illinois,
CURTIS MILES AMUNDSON, in a cause now pending and
undetermined in the United States District Court
for the Eastern District of Pennsylvania,
In Re:  Processed Egg Products Antitrust
Litigation.
        I further certify that the said witness
was first duly sworn to testify the truth, the
whole truth and nothing but the truth in the cause
aforesaid; that the testimony then given by said
witness was reported stenographically by me in the
presence of the said witness, and afterwards
reduced to typewriting by Computer-Aided
Transcription, and the foregoing is a true and
correct transcript of the testimony so given by
said witness as aforesaid.
    I further certify that the signature to the
foregoing deposition was not waived by counsel for

104

the respective parties.
    I further certify that the taking of this
deposition was pursuant to Notice, and that there
were present at the deposition the attorneys
hereinbefore mentioned.
    I further certify that I am not counsel for
nor in any way related to the parties to this
suit, nor am I in any way interested in the
outcome thereof.
    IN TESTIMONY WHEREOF:  I have hereunto set my
hand and affixed my notarial seal this 10th day of
April, 2014.


_____
Notary Public, Cook County, Illinois