# ATTACHMENT 3

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------)

IN RE:  PROCESSED EGG PRODUCTS  )

ANTITRUST LITIGATION            )

-------------------------------)  MDL NO. 2002

THIS DOCUMENT RELATES TO        )  08-md-02002

Kroger, Inc. v. United Egg      )

Producers, et al.,              )  HIGHLY

No. 2:10-cv-06705GP             )  CONFIDENTIAL

**************************************************

IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS

TWENTY-NINTH JUDICIAL DISTRICT

ASSOCIATED WHOLESALE           )

GROCERS, INC., et al.,         )

                Plaintiffs,    )

        -vs-                   )  CAUSE NO.

                               )  10-CV-2171

UNITED EGG PRODUCERS, et       )

al.,                           )

                Defendants.    )

DEPOSITION OF JEFFREY ARMSTRONG, PH.D.

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

2 (Pages 2 to 5)

---

**2**

1     The videotaped deposition upon oral
2  examination of JEFFREY ARMSTRONG, PH.D., a witness
3  produced and sworn before me, Tara Gandel Hudson,
4  RPR, CRR, CSR 93-R-1039, a Notary Public in and for
5  the County of Marion, State of Indiana, taken on
6  behalf of the defendants United Egg Producers and
7  United States Egg Marketers at the offices of
8  STUART & BRANIGIN, 300 Main Street, Lafayette,
9  Tippecanoe County, Indiana, on the 13th day of
10 March, 2014, commencing at the hour of 8:38 a.m.,
11 pursuant to the Federal Rules of Civil Procedure
12 and the Kansas Rules of Civil Procedure with
13 written notice as to the time and place thereof
14 having been given.
15
16
17
18
19
20
21
22

---

**3**

1
2
3  APPEARANCES:
4
5  On behalf of the direct purchaser Plaintiffs:
6     STEIG D. OLSON, ESQ.
7     Quinn Emanuel Urquhart & Sullivan
8     51 Madison Avenue
9     22nd Floor
10    New York, NY  10010
11    212/849-7152
12    steigolson@quinnemanuel.com
13
14 On behalf of the Plaintiffs (Kansas):
15    RACHEL M. SCHWARTZ, ESQ.
16    Stueve Siegel Hanson, LLP
17    460 Nichols Road
18    Suite 20
19    Kansas City, MO  64112
20    816/714-7125
21    schwartz@stuevesiegel.com
22

---

**4**

1
2  On behalf of the Kraft Plaintiffs:
3     RICHARD CAMPBELL, ESQ.
4     (Appearing telephonically)
5     STEPHEN R. BROWN, ESQ.
6     (Appearing telephonically)
7     Jenner & Block
8     353 N. Clark Street
9     Chicago, IL  60654
10    312/923-2818
11    312/840-7282
12    rcampbell@jenner.com
13    stephenbrown@jenner.com
14
15 On behalf of the Kroger Plaintiffs:
16    DOUGLAS H. PATTON, ESQ.
17    (Appearing telephonically)
18    Kenny Nachwalter
19    1100 Miami Center
20    201 South Biscayne Boulevard
21    Miami, FL  33131
22    305/737-1000
      dpatton@knpa.com

---

**5**

1
2  On behalf of the indirect purchaser Plaintiffs:
3     MARK J. SCHIRMER, ESQ.
4     Straus & Boles, LLP
5     4041 University Avenue
6     Fairfax, VA  22030
7     901/818-3146
8     mschirmer@straus-boies.com
9
10 On behalf of the Defendants United Egg Producers
11 and United States Egg Marketers:
12    ROBIN P. SUMNER, ESQ.
13    EVAN W. DAVIS, ESQ.
14    Pepper Hamilton, LLP
15    3000 Two Logan Square
16    Eighteenth & Arch Streets
17    Philadelphia, PA  19103
18    215/981-4652
19    215/981-4245
20    sumnerr@pepperlaw.com
21    davisw@pepperlaw.com
22

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

3 (Pages 6 to 9)

---

**6**

On behalf of the Defendant Sparboe Farms, Inc.:
MATTHEW HARTUNG, ESQ.
(Appearing telephonically)
Hutchinson, PA
1907 E. Wayzata Boulevard
Suite 330
Wayzata, MN 55391
952/215-0141
mhartung@hutchinsonlegal.com

On behalf of Defendant Midwest Poultry Services:

E. JASON BURKE, ESQ.

(Appearing telephonically)

Faegre Baker Daniels

311 S. Wacker Drive

Suite 4400

Chicago, IL 60606

312/212-2264

jasonburke@faegreBD.com

---

**8**

On behalf of the Defendant Rose Acre Farms:
DONALD M. BARNES, ESQ.
(Appearing telephonically)
KARRI ALLEN, ESQ.
(Appearing by text streaming)
Porter Wright
1900 K Street, NW
Suite 1110
Washington, D.C. 20006
202/778-3056
202/778-3059
dbarnes@porterwright.com
kallen@porterwright.com

On behalf of the Defendant Daybreak Foods:
ADRIAN FONTECILLA, ESQ.
(Appearing telephonically)
Crowell & Moring, LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
202/624-2803
afontecilla@crowell.com

---

**7**

On behalf of the Defendant NuCal Foods, Inc.:
MARGARET ZIEMIANEK, ESQ.
(Appearing telephonically)
Kasowitz Benson Torres & Friedman, LLP
101 California Street
Suite 2300
San Francisco, CA 94111
415/655-4335
mziemianek@kasowitz.com

On behalf of the Defendants Michael Foods, Inc.,
and Papetti's Hygrade Egg Products, Inc.:

CARRIE MAHAN ANDERSON, ESQ.

(Appearing telephonically)

Weil Gotshal & Manges

1300 Eye Street, NW

Suite 900

Washington, D.C. 20005

202/682-7231

carrie.anderson@weil.com

---

**9**

On behalf of the Defendants Moarck, LLC, and Norco
Ranch, Inc.:

ARIN ARAGONA, ESQ.

(Appearing telephonically)

Eimer Stahl

224 S. Michigan Avenue

Suite 1100

Chicago, IL 60604

312/660-7679

aaragona@eimerstahl.com

On behalf of the Witness:

WILLIAM P. KEALEY, ESQ.

Stuart & Branigin, LLP

300 Main Street

Suite 900

Lafayette, IN 47902

765/423-1561

wpk@stuartlaw.com

ALSO PRESENT:
Sara Williams, Videographer

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

4 (Pages 10 to 13)

---

10

INDEX OF EXAMINATION
PAGE
DIRECT EXAMINATION ...........................18
    Questions by Robin P. Sumner
CROSS-EXAMINATION ...........................169
    Questions by Steig D. Olson
FURTHER CROSS-EXAMINATION ....................321
    Questions by Rachel E. Schwartz
FURTHER CROSS-EXAMINATION ....................388
    Questions by Douglas H. Patton
REDIRECT EXAMINATION .........................391
    Questions by Evan W. Davis

INDEX OF EXHIBITS
PAGE
Armstrong Deposition Exhibit No.:
Exhibit 1  Curriculum Vitae of Armstrong, .... 20
    UE0857131-154
Exhibit 2  Recommendations for UEP Animal .....39
    Welfare Guidelines, UE0208684-703
Exhibit 3  Armstrong to United Egg ............47
    Producers, UE0813141

---

12

Exhibit 14  8-2-08 Scientific Advisory ........159
    Committee Publication,
    UE0557576-578
Exhibit 15  United Voices Newsletter, .........170
    UE0064537-539
Exhibit 16  United Voices Newsletter, .........181
    UE0064421-424
Exhibit 17  October 1999 UEP Annual Board .....182
    Meeting and Executive Conference
    Minutes, UE0297719-723
Exhibit 18  Recommendations for UEP Animal ....200
    Welfare Guidelines,
    DAY0000029-055
Exhibit 19  May 2000 UEP Producer Committee ...245
    for Animal Welfare Minutes,
    UE0153203-204
Exhibit 20  May 2000 UEP Animal Welfare .......248
    Committee Meeting, UE0215485-486
Exhibit 21  Animal Husbandry Guidelines for ...256
    U.S. Egg Laying Flocks,
    MFI0276310-328

---

11

Exhibit 4  1-16-06 Letter, Gregory to .........52
    Armstrong, UE0666613
Exhibit 5  3-7-05 Letter, Gregory to ..........50
    Armstrong, UE0662322
Exhibit 6  3-12-07 Email, Armstrong to.........53
    Gregory, UE0800562-563
Exhibit 7  Feedstuffs Article, ................69
    UE0206284-285
Exhibit 8  Recommendations for UEP Animal .....83
    Welfare Guidelines, UE0331895-919
Exhibit 9  United Egg Producers Animal ........87
    Husbandry Guidelines U.S. Egg
    Laying Flocks, UE0140563-595
Exhibit 10  1-15-08 UEP Animal Welfare and ....112
    Public Relations Committee
    Meeting Minutes, UE0297533-536
Exhibit 11  10-4-04 Letter, Armstrong to ......124
    Bahan, NUCAL-08md2002-0001116
Exhibit 12  United Voices Newsletter, .........146
    UE0213960-963
Exhibit 13  11-29-06 Letter, Armstrong to .....156
    Gregory, UE0366667-668

---

13

Exhibit 22  1-8-02 Letter, Pope to ............263
    Armstrong, UE0331187-190
Exhibit 23  (This number intentionally left ...272
    blank.)
Exhibit 24  3-17-02 Email, Armstrong to .......271
    Gregory, UE1074535-536
Exhibit 25  3-1-03 Minutes, UEP Welfare .......287
    Scientific Advisory Committee
    Minutes, UE0211387-390
Exhibit 26  3-3-04 Producer Committee for .....291
    Animal Welfare Minutes,
    UE0153284-285
Exhibit 27  4-23-04 Email, Hester to ..........298
    Armstrong, et al.,
    UC_E00052294-297
Exhibit 28  United Voices Newsletter, .........300
    MPS-00066253-256
Exhibit 29  United Voices Newsletter, .........303
    UE0072463-466
Exhibit 30  10-4-04 Email, Armstrong to .......309
    Bell, et al., UC_E00052448

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

5 (Pages 14 to 17)

---

14

1   Exhibit 31  8-4-08 Email, Armstrong to ........318
2       Gregory, UE0547338-341
3   Exhibit 32  8-14-03 Letter, Armstrong to ......330
4       Haley, NL002214-215
5   Exhibit 33  UEP Website Printout ..............333
6   Exhibit 34  The Egg Industry and Animal .......335
7       Welfare, RA0067419-438
8   Exhibit 35  3-13-03 Letter, Gregory to ........351
9       Armstrong, UE0660000-001
10  Exhibit 36  (Withdrawn) ......................357
11  Exhibit 37  2-22-01 Email, Gregory to .........383
12      Armstrong, UE0840917
13  Exhibit 38  2002 United Egg Producers .........396
14      Animal Husbandry Guidelines for
15      U.S. Egg Laying Flocks, beginning
16      with UE0295925
17  Exhibit 39  Feedstuffs article, ...............411
18      UE0605112-121
19
20
21
22

---

15

1       THE VIDEOGRAPHER:  This is the video
2   deposition of Dr. Jeffrey Armstrong in the matter
3   of "Associated Wholesale Grocers, Inc., et al.,
4   versus United Egg Producers, et al.," in the
5   District Court of Wyandotte County, Kansas,
6   Twenty-ninth Judicial District.
7       Case No. 10-cv-2171.
8       Also, In Re: Processed Egg Products
9   Antitrust Litigation.  This document relates to
10  "Kroger Inc., versus United Egg Producers, et
11  al." Number 2:10-CV-06705GP in the United States
12  District Court for the Eastern District of
13  Pennsylvania.  MDL No. 2002 08-md-02002.
14      This deposition is being held at Stuart
15  and Branigin, 300 Main Street, Suite 900,
16  Lafayette, Indiana, on Thursday, March 13, 2014.
17      My name is Sara Williams, I am the
18  video specialist.  The court reporter is Tara
19  Hudson.  We represent Henderson Legal Services.
20      The time is 8:38 a.m., and we're on the
21  record.
22      Counsel will now state their

---

16

1   appearances and who they represent for the
2   record.
3       MS. SUMNER:  Robin Sumner, Pepper
4   Hamilton, LLP, for defendants United Egg
5   Producers and United States Egg Marketers.
6       MR. DAVIS:  Evan Davis, Pepper
7   Hamilton, LLP, on behalf of the United Egg
8   Producers and United States Egg Marketers.
9       MR. OLSON:  Steig Olson from Quinn
10  Emanuel, Urquhart & Sullivan, for the direct
11  purchaser class plaintiffs in the federal action.
12      MS. SCHWARTZ:  Rachel Schwartz, here on
13  behalf of the plaintiffs in the Kansas action.
14      MR. KEALEY:  William Kealey, Stuart &
15  Branigin, here on behalf of the witness,
16  Dr. Armstrong.
17      THE REPORTER:  Counsel on the phone.
18      MR. CAMPBELL:  Richard Campbell, Jenner
19  & Block, on behalf of the Kraft plaintiffs in the
20  Pennsylvania action.
21      MR. HARTUNG:  Matthew Hartung on behalf
22  of Sparboe Farms.  I'm with Hutchinson, PA.

---

17

1       MR. BURKE:  Jason Burke with Faegre
2   Baker Daniels on behalf of Midwest Poultry
3   Services.
4       MS. ZIEMIANEK:  Margaret Ziemianek,
5   Kasowitz Benson Torres & Friedman, on behalf of
6   NuCal Foods.
7       MR. PATTON:  Douglas Patton with the
8   firm of Kenny Nachwalter, on behalf of the Kroger
9   plaintiffs.
10      MR. FONTECILLA:  Adrian Fontecilla with
11  Crowell & Moring, on behalf of Daybreak Foods.
12      MR. BROWN:  Stephen Brown from Jenner &
13  Block on behalf of the Kraft plaintiffs in the
14  federal action in Pennsylvania.
15      MR. BARNES:  Don Barnes on behalf of
16  Rose Acre Farms.  I'm with the Washington, D.C.,
17  office of Porter Wright.  And good morning to
18  Dr. Armstrong and good morning to everyone else.
19      MS. ANDERSON:  Carrie Mahan Anderson
20  with Weil Gotshal on behalf of Michael Foods and
21  Papetti's Hygrade Egg Products.
22      MR. ARAGONA:  Arin Aragona of Eimer

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

6 (Pages 18 to 21)

---

**18**

¹ Stahl on behalf of Moarck, LLC, and Norco Ranch,
² Inc.
³         THE VIDEOGRAPHER:  Court reporter,
⁴ please swear in the witnesses.
⁵         JEFFREY ARMSTRONG, PH.D.,
⁶ having been first duly sworn to tell the truth, the
⁷ whole truth and nothing but the truth relating to
⁸ said matter, was examined and testified as follows:
⁹         MR. OLSON:  I before we get started,
¹⁰ Robin, just to put on the record, I assume
¹¹ there's no objection that if I make an objection,
¹² it will be for all the other plaintiffs' counsel
¹³ here; we don't all have to make objections?
¹⁴         MS. SUMNER:  That's fine.
¹⁵ DIRECT EXAMINATION,
¹⁶     QUESTIONS BY ROBIN P. SUMNER:
¹⁷     Q   Good morning, Dr. Armstrong.  My name
¹⁸ is Robin Sumner.  I'm with the law firm of Pepper
¹⁹ Hamilton in Philadelphia, and I represent
²⁰ defendants United Egg Producers and United States
²¹ Egg Marketers in these antitrust actions that
²² have been field in the Eastern District of

---

**19**

¹ Pennsylvania and in Kansas state court.
²         Have you had your deposition taken
³ before?
⁴     A   No.
⁵     Q   Do you understand that you're here
⁶ today to testify under oath?
⁷     A   Yes.
⁸     Q   I'll be asking you a series of
⁹ questions today, and you'll be giving me a series
¹⁰ of answers to those questions.  If there's
¹¹ something that you don't understand in the
¹² question, I'd ask that you speak up and let me
¹³ know; otherwise, I'm going to assume that you
¹⁴ understand the question.  Is that okay with you?
¹⁵     Yes.
¹⁶     MR. OLSON:  And just for the record,
¹⁷ Mark Schirmer from the indirect purchaser
¹⁸ plaintiffs has just joined the proceedings.
¹⁹     Q   Dr. Armstrong, is there anything that
²⁰ will prevent you from testifying here today
²¹ truthfully and accurately?
²²     A   No.

---

**20**

¹     Q   And if you'd like to take a break at
² any time, just please let me know, and, so long
³ as there's not an active question pending, we can
⁴ stop and take a quick break.
⁵     A   Okay.
⁶     Q   Would you please state your full name
⁷ for the record.
⁸     A   **Jeffrey Dyer Armstrong.**
⁹     Q   I'd like to mark this as the first
¹⁰ exhibit.
¹¹         (Deposition Exhibit 1 was marked for
¹² identification.)
¹³         MS. SUMNER:  For the record, I've
¹⁴ marked as Armstrong Exhibit 1 a document --
¹⁵ confidential document bearing the Bates numbers
¹⁶ UE057131 through 7154.
¹⁷     Q   Dr. Armstrong, could you please take a
¹⁸ moment and look at this document and then let me
¹⁹ know if you recognize the document.
²⁰     A   **Yes.  I do.**
²¹     Q   What is this document?
²²     A   **It's my curriculum vitae.**

---

**21**

¹     Q   Did you prepare this document?
²     A   **Yes.  It looks to be dated around 2007.**
³     Q   I'd like to direct your attention to
⁴ the first page of the CV where you have a section
⁵ entitled Higher Education.
⁶     A   **Yes.**
⁷     Q   Is that an accurate summary of your
⁸ educational background?
⁹     A   **Yes.**
¹⁰     Q   So you have a Bachelor of Science with
¹¹ a major in Animal Science; is that correct?
¹²     A   **Yes.**
¹³     Q   What is animal science?
¹⁴     A   **It's the study of all aspects of**
¹⁵ **animal -- animals.  Typically it's farm animals,**
¹⁶ **domestic animals.  Also includes companion**
¹⁷ **animals, zoo animals, exotic animals.  But, by**
¹⁸ **and large, it's domestic -- domesticated food**
¹⁹ **animals, the study of their nutrition,**
²⁰ **reproduction, et cetera.**
²¹     Q   And then you also hold a Master's and a
²² Ph.D. in Physiology; is that correct?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

7 (Pages 22 to 25)

---

**22**

1  A   Yes.

2  Q   And, Dr. Armstrong, what is physiology?

3  A   It's the study of really how the

4  mammalian system, in this case, works.

5  Q   Prior to your attendance at Murray

6  State beginning in 1977, did you have a

7  background in animal agriculture?

8  A   Yes.

9  Q   Can you explain to me what that

10  background was?

11  A   I grew up on a small farm in western

12  Kentucky where we raised tobacco, different

13  crops, and different animals.

14  Q   Dr. Armstrong, are you currently

15  employed?

16  A   Yes.

17  Q   And what is your -- where are you

18  employed?

19  A   I'm president of California Polytechnic

20  State University in San Luis Obispo, California.

21  That's part of the California State University

22  system.

---

**23**

1  Q   And how long have you held that

2  position?

3  A   A little over three years.

4  Q   So beginning in approximately --

5  A   February 1 of 2011.

6  Q   Thank you.  And prior to becoming

7  president of Cal Poly, what was your employment

8  situation?

9  A   From July 1 of 2011 until the end of

10  January -- from July 1 of 2001 -- from the end of

11  January 2011 I was dean of the College of

12  Agriculture and Natural Resources at Michigan

13  State University, also held the title of

14  professor.

15  Q   And as a professor at Michigan State

16  did you have a specialty?

17  A   Continued as a reproductive

18  physiologist, and then I worked in social

19  responsibility in the food system.

20  Q   And what -- describe for me your work

21  with social responsibility in the food system

22  while you were at Michigan State University.

---

**24**

1  A   By and large it was local, state, and

2  national matters related to animal welfare and

3  looking at a holistic approach to sustainability

4  of food animal production.

5  Q   Were there specific animal populations

6  that you focused on in that work?

7  A   The majority was laying hen, laying hen

8  egg production.

9  Q   Any other specialties you had while you

10  were at Michigan State University?

11  A   Both as an individual but largely as a

12  professor and as dean, I worked on a broader

13  topics interactive with corporations on the whole

14  topic of social responsibility in food system.

15  Worked with different companies.

16  Q   What companies did you work with in

17  that regard?

18  A   McDonald's, Cargill, and, too, just

19  some visits to other companies.  But those two

20  would have been the major.  But not -- that's not

21  an inclusive list as I can't recall them all.

22  Q   Can you describe for me your work with

---

**25**

1  McDonald's during that time period?

2  A   I served on McDonald's animal welfare

3  advisory board, and I also served on -- a larger

4  group of people that I don't recall the title of

5  the group, but it had to do with their corporate

6  social responsibility.  We were a group of

7  advisers.

8  Q   What was McDonald's animal welfare

9  advisory board?

10  A   We provided advice on their different

11  policies and guidelines, which included egg

12  production and other areas.

13  Q   And when did you begin that work with

14  McDonald's?

15  A   I don't recall the exact date.  It may

16  be in this document but I don't recall the exact

17  date.  It would have been around 2001, 2002, or

18  maybe earlier.

19  Q   And at that time that you were serving

20  on McDonald's animal welfare advisory board, what

21  was McDonald's position on animal welfare?

22  A   At the -- when I first started working

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

8 (Pages 26 to 29)

---

26

1  with McDonald's, they had a track record of
2  working in animal welfare with Temple Grandin, so
3  it was established.
4      Q   And did you have an understanding as to
5  why animal welfare was something that McDonald's
6  had constituted an advisory committee on at that
7  point in time?
8      A   Most any group that was trying to be
9  progressive and look to the future had -- they
10  were embracing animal welfare much as companies
11  have embraced food safety. It's a fundamental
12  component at that time and I believe for the
13  future.
14      Q   And what about your work with Cargill
15  at that time; can you describe that for me,
16  please?
17      A   That was related later. It was -- it
18  was related to study that was initiated with
19  Cargill and linked with McDonald's.
20      Q   And what was that study?
21      A   It was a study that looked at different
22  types of egg production, and that study is

---

27

1  ongoing, and started just a few years ago. But
2  we started planning it, as I recall, in -- four,
3  five years ago.
4      Q   What was the purpose of that study, or
5  what is the purpose of that study?
6      A   To look at different -- three different
7  types of egg production from a holistic
8  perspective.
9      Q   What are the types of egg production?
10      A   Aviary, enriched cage, traditional
11  cage.
12      Q   And when you say to look at them from a
13  holistic perspective, can you explain to me what
14  that entails?
15      A   Animal welfare, food safety, production
16  parameters, feed efficiency, et cetera,
17  mortality. Included monitoring animal behavior,
18  and I don't recall the rest. I'm not as intimate
19  with the work in the last three years as I was
20  earlier.
21      Q   Do you recall when that study was
22  initiated by Cargill?

---

28

1      A   No, I don't recall the exact date, but
2  it's in the -- it's in the last four or five
3  years.
4      Q   And have there been any results or
5  papers published in connection with that study?
6      A   Yes. There's a website that anyone in
7  the general public can go to and review the
8  results. I'm not conversant with the latest
9  results.
10      Q   Do you know what the address of that
11  website is?
12      A   No. Not right off. Not off hand. I
13  can get it for you.
14      Q   And do you have an understanding as to
15  why Cargill initiated that study?
16      A   We recommended the study.
17      Q   And when you say "we" --
18      A   Michigan State university and UC-Davis.
19  We recommended. We suggested that the study be
20  conducted.
21      Q   And why -- why did you suggest that?
22      A   Because knowledge was lacking.

---

29

1      Q   Knowledge in what areas?
2      A   Understanding the -- understanding the
3  comparison, the head-to-head comparison of the
4  three systems. That information is lacking from
5  a perspective of U.S. hens, the varieties, the
6  strains that we have, and in today's hens, the
7  varieties that we have today.
8      Q   And who --
9      A   Or at that time.
10      Q   Who else was involved in the study at
11  the inception?
12      A   I don't recall the list, but there were
13  a group of scientists from other universities,
14  including USDA, and all of that is available on
15  the website.
16      Q   And what is your role in that study
17  today?
18      A   I don't have an official role now. I'm
19  not actively involved in the study, since I --
20  I'll just leave it at that.
21      Q   Were you actively involved in the study
22  at its inception?

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

9 (Pages 30 to 33)

---

30

1      A   Yes.
2      Q   And when did you transition?
3      A   When I became president of Cal Poly,
4  February 1 of 2011, my activity in that project
5  and many other projects related to animal science
6  or laying hens, my previous roles, diminished
7  significantly.
8      Q   Do you still have -- or do work related
9  to animal science or animal welfare today?
10     A   Limited.
11     Q   And did that change when you became
12 president of --
13     A   Yes.
14     Q   -- of Cal Poly?
15     A   Yes.
16     Q   And why did it change at that time?
17     A   I moved from a dean of a college of
18 agriculture and natural resources to president of
19 a comprehensive university that covers much, much
20 more than food and agriculture, although that is
21 a part of our university.  So my responsibilities
22 are much broader.

---

31

1      Q   Prior to taking on the role of dean and
2  professor at Michigan State University, what was
3  your employment situation?
4      A   I was head and professor of Animal
5  Sciences at Purdue University from 1997 until
6  2001.
7      Q   And did you have a specialty, an
8  academic specialty, while you were at Purdue?
9      A   Yes.  It was the same.  Reproductive
10 physiology and social responsibility in the food
11 system.  Although, in 1997, I'm not sure we
12 called it that phrase.
13     Q   And prior to coming to Purdue in 1997
14 what did you do?
15     A   From July 1 of 1986 until June of 1997
16 I held various positions at North Carolina State
17 University.
18     Q   Were those teaching positions?
19     A   I was involved in teaching and research
20 as well as administrative positions.
21     Q   What was your focus in teaching and
22 research?

---

32

1      A   Reproductive physiology, endocrinology.
2  I also taught an undergraduate course entitled
3  Reproduction, Lactation, and Behavior.
4      Q   And prior to your teaching and
5  research, and administrative responsibilities at
6  NC State, am I correct that you were in school?
7      A   Yes.  From 1981, the fall, until 1986 I
8  worked on my master's and Ph.D. at North Carolina
9  State.
10     Q   I'd like to direct your attention on
11 your CV to the third page where you have listed
12 honors, awards, and professional recognition.  Is
13 this an accurate list of your honors, awards, and
14 professional recognition at the time that this
15 résumé was created?
16     A   Yes.
17     Q   Is -- the fifth one down is McDonald's
18 Welfare Advisory Panel where you state that you
19 were a member from 2000 to the present; do you
20 see that?
21     A   Yes.
22     Q   Does that refresh your recollection as

---

33

1  to when you began service with McDonald's?
2      A   That does.
3      Q   And are you still part of that advisory
4  panel today?
5      A   No.
6      Q   When did you stop being a member of
7  that advisory panel?
8      A   I don't recall exactly, but certainly
9  before I became president or at the time I became
10 president of Cal Poly.
11     Q   And three entries below that you have a
12 listing for United Egg Producers Welfare Advisory
13 Committee, Chair.  Do you see that?
14     A   Yes.
15     Q   What is the United Egg Producers
16 Welfare Advisory Committee?
17     A   It's a group of scientists that I was
18 asked to pull together, that I pulled together,
19 to look at the scientific basis for animal
20 welfare guidelines for the egg industry.
21     Q   And is that, what's listed here as the
22 welfare advisory committee, sometimes referred to

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

---

34

1  as the UEP scientific advisory committee?
2      A   Right.  We typically would include
3  "scientific" in the title.  I think that's the
4  title UEP has used.
5      Q   Okay.  So it's the same --
6      A   It's the same.
7      Q   -- I just want to make sure it's the
8  same committee.
9          And you say here you were invited to
10 chair and select members of the committee.  Is
11 that accurate?
12     A   Yes.
13     Q   Who invited you to chair that
14 committee?
15     A   At that time, Al Pope as president of
16 UEP.
17     Q   When were you invited to chair and
18 select members of the scientific advisory
19 committee for UEP?
20     A   Sometime early 1998, could have been
21 late 1997.  I don't recall the exact date.
22     Q   Why did you agree to serve as chair of

---

35

1  this committee?
2      A   It was something that I felt was
3  needed.  It was something that was consistent
4  with the goals of the department of animal
5  sciences at Purdue University and something
6  consistent with my professional role and goals at
7  the time.
8      Q   Why did you feel it was needed?
9      A   Animal welfare has not received -- at
10 that time had not received the attention from the
11 scientific perspective, nor had it received the
12 attention that it deserved by the different
13 animal commodity groups.  So it was a very
14 interesting moment in time, and it was needed.
15     Q   And when you say it was consistent with
16 the goals of the university at that time, what do
17 you mean by that?  Consistent in what way?
18     A   When I arrived in Purdue University in
19 1997, the USDA ARS, Agriculture Research Service,
20 Livestock Behavior Unit, had been placed on the
21 campus, so that's a separate entity but they
22 collaborate with Purdue University, and we were

---

36

1  in the process of building an animal welfare -- I
2  don't recall the exact title -- but we were
3  building a center, and we wanted to be and did
4  establish ourselves as a location, a go-to place
5  for animal welfare and behavior.
6      Q   At the time you were asked by UEP to
7  chair this committee, was the egg industry the
8  first industry that had taken on this role of
9  developing animal welfare guidelines for their
10 industry?
11         MR. OLSON:  Objection.  Form.
12     Q   You can go ahead and answer.
13     A   No.
14     Q   What other industries had embarked on
15 that endeavor?
16     A   I'm not aware of all others, but I do
17 know that the National Pork Producers had an
18 effort that was ongoing.
19     Q   Any others you can think of?
20     A   There were other -- there were others,
21 but I can't recall the exact ones.
22     Q   How long did you serve as chair of

---

37

1  UEP's scientific advisory committee?
2      A   From 1998 until I became president of
3  Cal Poly.
4      Q   In 2011?
5      A   Early 2011.
6      Q   And why did you step down as chair of
7  the scientific advisory committee in 2011?
8      A   I did not have time to do the job in
9  the way that I would want to.  Time.
10     Q   And that was associated with your
11 becoming president of Cal Poly?
12     A   Absolutely.  It's a 24/7 job.
13     Q   Did you remain on the committee in any
14 capacity after you stepped down as chair?
15     A   No.
16     Q   At any time during your service on the
17 committee from 1998 through 2011 did you leave
18 the committee?
19     A   No.
20     Q   Do you still have a relationship with
21 United Egg Producers today?
22     A   Yes.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

11 (Pages 38 to 41)

---

**38**

1  Q   What is that relationship?
2  A   **Cordial but nothing -- nothing official**
3  **at this time.**
4  Q   Do you do any work for --
5  A   **No.**
6  Q   -- UEP today?
7  A   **No.**
8  Q   And are you compensated in any way by
9  UEP today?
10  A   **No.**
11  Q   Do you do any work with the egg
12  industry today?
13  A   **Not -- no.  I don't have anything**
14  **ongoing.**
15  Q   As chair of the UEP scientific advisory
16  committee, what was your understanding of the
17  committee's charter?
18  A   **To establish science-based animal**
19  **welfare guidelines first and foremost focused on**
20  **animal welfare.**
21  Q   And that's for egg-laying hens?
22  A   **For egg-laying hens.**

---

**39**

1      **(Deposition Exhibit 2 was marked for**
2  **identification.)**
3      MS. SUMNER:  For the record I've marked
4  as Armstrong 2 a confidential document bearing
5  the Bates numbers UE0208684 through 703.
6  Q   Dr. Armstrong, if you'd just take a
7  moment to familiarize yourself with this document
8  and let me know when you've done so.
9      Do you recognize this document,
10  Dr. Armstrong?
11  A   **Yes.**
12  Q   Can you tell me what it is?
13  A   **I believe this is the -- an early**
14  **version of the recommendations for UEP animal**
15  **welfare guidelines that was developed by the**
16  **committee, as you can see on page 3.**
17  Q   And is this a draft document, or was
18  this the final recommendations that were issued
19  in 2000 by the scientific advisory committee?
20  A   **These -- these are the recommendations**
21  **as of this date.**
22  Q   And did they evolve over time?

---

**40**

1  A   **Yes.**
2  Q   Do you know whether another document
3  that looks similar to this in that it has a title
4  Recommendations for UEP Animal Welfare Guidelines
5  and comprehensively, you know, runs through
6  several areas was ever issued after this date by
7  the scientific advisory committee?
8  A   **Oh, yes.**
9  Q   Do you recall when?
10  A   **No, I don't recall.  But there**
11  **were different versions as this evolved.**
12  Q   Do you recall how many versions?
13  A   **I do not.  At least --**
14  Q   I'd like to direct --
15  A   **At least three.**
16  Q   Subsequent to this?
17  A   **Total.  Total.**
18  Q   Total.  Okay.  I'd like to direct your
19  attention to the third page of the document that
20  is entitled Members, UEP Scientific Advisory
21  Committee on Animal Welfare.
22  A   **Yes.**

---

**41**

1  Q   Do you see that?
2      Does this list reflect accurately the
3  committee's members in 2000?
4  A   **Yes.**
5  Q   And are these the original members of
6  the scientific -- UEP Scientific Advisory
7  Committee on Animal Welfare?
8  A   **Yes.**
9  Q   And who selected these members for the
10  committee?
11  A   **I did.**
12  Q   And how did you select them?
13  A   **I consulted with Janice Swanson and Joy**
14  **Mench, and to a certain extent Scotti Hester, and**
15  **also I had conversations with Gene Gregory.**
16  Q   And why was this group selected by you
17  to serve on the committee?
18  A   **They were -- they were selected for**
19  **their individual contributions to the committee.**
20  **Each person has a different professional**
21  **background, a different professional set of**
22  **accomplishments, and these were the best at the**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

12 (Pages 42 to 45)

---

42

1  time that -- I called it our dream team, in fact,
2  at the time -- and everyone that we wanted said
3  yes.
4        And when I say we, really Janice
5  Swanson and Joy Mench were close -- were
6  advisers.  And I don't recall how much it was Joy
7  or Janice, but they're very well known in the
8  animal behavior area.
9     Q   So you consulted with them in coming up
10 with the committee's composition?
11    A   Correct.
12    Q   Did the composition of the committee
13 evolve over time?
14    A   It did.
15    Q   What was the role of the USDA,
16 Dr. Larry Stanker, on this committee?
17       MR. OLSON:  Objection to form.
18    A   His --
19       THE WITNESS:  Go ahead and answer?
20       MR. KEALEY:  Yes.
21    A   Larry Stanker's role, as I recall, he
22 was not on the committee for very long.  There

---

43

1  was multiple issues totally unrelated to the
2  committee, but it had to do with food safety, as
3  I recall.
4     Q   Do you recall whether he was replaced
5  by another USDA person?
6     A   I don't -- I don't recall.  I would
7  have to look at the list.  But he was replaced.
8     Q   And then under the members there are
9  two individuals listed under the word "support";
10 do you see that?
11    A   Yes.
12    Q   Okay.  And who are they?
13    A   Barrie Wilcox was the chair of the
14 producer animal welfare committee, a UEP standing
15 or ad hoc -- I'm not sure -- committee.  And then
16 Gene Gregory was vice president at the time, and
17 they were there for support.  They were
18 ex-officio nonvoting members of the committee.
19    Q   What kind of support did they provide
20 to the committee?
21    A   Well, our first meeting was a tour of
22 egg facilities in Iowa.  So they facilitated,

---

44

1  they went along with us and answered questions.
2  And then they were a resource as we -- as our
3  meetings progressed, if we wanted to understand
4  something more from a practical perspective,
5  these two individuals were very helpful, as was
6  Don Bell and Bill Chase, as they had more
7  practical experience in the day-to-day operation
8  of laying hens and egg production than the rest
9  of the members.
10    Q   Why was that important to have -- or
11 why did you place individuals on the committee
12 who had that background?
13       MR. OLSON:  Objection.  Form.
14    A   Because animal welfare guidelines that
15 are not practical nor feasible do no good to an
16 animal.  The animal welfare is not impacted if
17 guidelines are not adopted.
18    Q   Were the committee members compensated
19 for their work on the scientific advisory
20 committee?
21    A   Yes.  They received honorariums on an
22 individual basis.

---

45

1     Q   What's an honorarium?
2     A   An honorarium in academic terms is,
3  someone gives a presentation or they visit a
4  university, it's not a typical consulting
5  arrangement, but it's a five-, six-,
6  seven-hundred, eight-hundred-dollar amount that's
7  paid to thank them and recognize the effort.
8     Q   Do you recall on how many occasions
9  scientific advisory committee members received
10 honoraria for their work on the scientific
11 advisory committee?
12       MR. OLSON:  Objection.  Form.
13    A   I do not recall.  Not more than
14 annually, but I don't think it occurred every
15 year.
16    Q   And do you recall the amount that was
17 paid as an honorarium in any of those years?
18       MR. OLSON:  Objection.  Form.
19    A   I don't recall the exact amount, but I
20 never recall it being more than a thousand
21 dollars per committee member.
22    Q   Did you receive honoraria from UEP?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

13 (Pages 46 to 49)

---

46

1      A    Yes.
2      Q    And did those payments influence your
3   work on the scientific advisory committee?
4      A    Absolutely not.
5      Q    Do you recall when the honoraria were
6   paid?  What years?
7      A    I do not.
8      Q    Do you recall whether any were paid
9   prior to the publication of these guidelines in
10  September 2000 -- or these recommendations,
11  excuse me -- in September of 2000?
12     A    I do not recall.  I do not recall.  I
13  don't think so, but I cannot say for certain.
14     Q    Okay.  Did you -- aside from those
15  honoraria that we just talked about, did you ever
16  receive any other compensation from United Egg
17  Producers?
18     A    Yes, I did, as I had a separate role
19  advising UEP on broader aspects of
20  sustainability.  So I had -- I received a
21  consulting fee on several occasions.
22     Q    And was that consulting fee for your

---

47

1   work on the scientific advisory committee as
2   chair?
3      A    No.
4      Q    Describe for me, please, the consulting
5   work for which you did receive a fee from UEP.
6      A    I -- one example is I traveled to an
7   egg farm, toured with some lay individuals,
8   members of the public, asked questions, developed
9   videos, responded to other inquiries, worked to
10  look at the broader aspects of the egg industry,
11  and also looked at sort of a crystal ball
12  perspective, where might the industry be going
13  with regard to animal welfare, other aspects of
14  social responsibility in the food system.
15         (Deposition Exhibit 3 was marked for
16  identification.)
17         MS. SUMNER:  For the record, I've
18  marked as Armstrong 3 a confidential document
19  bearing the Bates No. UE0813143.
20     Q    Dr. Armstrong, do you recognize this
21  document?
22     A    Yes.

---

48

1      Q    Can you tell me what it is, please?
2      A    It's an invoice I sent to Gene Gregory
3   for consulting in 2004.
4      Q    And is this an invoice for the
5   consulting services -- type services that you
6   were just describing?
7      A    Yes.
8         MR. OLSON:  Objection.  Form.
9      A    Yes.  Anytime that I was involved in
10  consulting, there was an invoice associated with
11  it.
12     Q    What was the line item No. 1 here on
13  the description:  Consulting, Interview with CBS
14  Eye on America?
15     A    It involved traveling to a Pennsylvania
16  egg farm, spending the entire day with the
17  producers and personnel of CBS Eye on America
18  answering questions about the egg industry.
19     Q    Do you recall the subject matter of the
20  CBS Eye on America piece?
21     A    Laying hen animal welfare.
22     Q    And was that work done in connection

---

49

1   with your work on the scientific advisory
2   committee?
3      A    It was correlated with it, but it was
4   a -- this was a separate endeavor.  It wasn't a
5   committee activity.
6      Q    And the next line item, Consulting, UEP
7   Producer Committee on Hen Welfare, can you
8   describe that work for me, please?
9      A    Yeah.  That -- and I'm not sure how
10  much of that -- I don't recall whether that
11  included -- some of that included travel
12  reimbursement.  I'm not sure; it may or may not
13  have.  But I worked with the UEP producer
14  committee and I attended the meetings.
15     Q    And why did you -- what was your role
16  in working with the producer committee and
17  attending their meetings?
18     A    To advise them, to serve as a liaison
19  with the scientific advisory committee.
20     Q    And the item No. 3, 2004 Communication,
21  Advise, and Consulting from Michigan.  Can you
22  describe that work for me, please?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

14 (Pages 50 to 53)

---

50

1    A    That's basically a retainer, to be
2  available to answer questions about topics
3  related to sustainability of the egg industry.
4    Q    And was this invoice submitted by you
5  to UEP?
6    A    Yes.
7    Q    And was it -- was this amount paid by
8  UEP?
9    A    Yes.
10   Q    And do you recall to whom the payment
11  was made?
12   A    Either to me directly or JDA
13  Consulting.  I'm not -- I can't recall.
14   Q    And what is JDA Consulting?
15   A    It's just what I formed as a -- as a --
16  my consulting business.
17      (Deposition Exhibit 5 was marked for
18  identification.)
19      MS. SUMNER:  For the record, I've
20  marked as Armstrong 5 a confidential document
21  bearing the Bates No. UE066.
22      MR. OLSON:  Did we skip 4, Robin, on

---

51

1  purpose?
2      MS. SUMNER:  Oh.  Sorry.  Yes.  That
3  should be marked as Armstrong 4.
4      MR. OLSON:  We can do 4 next.
5  Whatever.
6      MS. SUMNER:  That's fine.  We'll just
7  keep this as 5.
8      UE0662322.
9    Q    Dr. Armstrong, do you recognize this
10  document?
11   A    Yes.
12   Q    Can you tell me what it is?
13   A    It's apparently the cover letter for a
14  check I received from Gene Gregory for an invoice
15  I submitted in 2005.
16   Q    And what was that invoice for?
17   A    Reimbursement of travel, and a retainer
18  for consulting and sustainability for 2005.
19   Q    And is that consulting work similar to
20  the consulting work that you've been describing?
21   A    Yes.
22   Q    And did you, indeed, receive these

---

52

1  checks from UEP in this year?
2    A    Yes.
3    Q    And do you recall to whom the checks
4  were made out?
5    A    Jeff Armstrong or my consulting
6  company.
7      (Deposition Exhibit 4 was marked for
8  identification.)
9      MS. SUMNER:  We marked as Armstrong 4 a
10  confidential document bearing the Bates No.
11  UE0666613.
12   Q    Dr. Armstrong, do you recognize this
13  document?
14   A    Yes.
15   Q    Can you tell me what it is, please?
16   A    This is the cover memo for a check, a
17  donation, from UEP to the College of Agriculture
18  and Natural Resources.  This was a gift from UEP.
19  This is a common practice for industry,
20  corporations to contribute to universities.
21   Q    And was this compensation for your work
22  on the scientific advisory committee?

---

53

1    A    No, I requested the discretionary
2  support from Gene to Michigan State University.
3  So yes, it was indirectly related.  But it was
4  for use -- discretionary use as dean.
5    Q    And did this payment influence in any
6  way the recommendations that you made or endorsed
7  as chair of the scientific advisory committee?
8    A    Oh, absolutely not.  The first set of
9  recommendations came out before any of this --
10  any of this started.  And it's typical for
11  university professors to be involved in
12  consulting.  It's also typical for scientific
13  advisory committee members to be involved and
14  have honoraria.
15      (Deposition Exhibit 6 was marked for
16  identification.)
17      MS. SUMNER:  I've marked as Exhibit 6 a
18  confidential document bearing the Bates numbers
19  UE0800562 through 63.
20   Q    Dr. Armstrong, do you recognize this
21  document?
22   A    Yes.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

---

**54**

1      Q    And can you tell me what it is, please?

2      A    **It's an invoice for -- in effect a**

3 **retainer for my advice and consulting dated**

4 **March 12th, 2007.**

5      Q    And is this the same consulting work --

6      A    **Yes.**

7      Q    -- that we've been discussing?

8      A    **Yes.**

9        MR. OLSON: Objection to form.

10      Q    And is this an invoice -- this is a

11 retainer?

12      A    **Yes.**

13      Q    Was this invoice submitted to UEP?

14      A    **Yes.**

15      Q    And was the invoice paid?

16      A    **Yes.**

17      Q    Do you recall to whom UEP made the

18 payment?

19      A    **To -- to me.**

20      Q    Other than the invoices that we have

21 just walked through, do you recall whether there

22 were other invoices for consulting services that

---

**55**

1 were submitted by you to UEP?

2      A    **I'm not -- I don't recall whether**

3 **that's all of them. It's very close because it**

4 **wasn't annually, and it didn't continue after a**

5 **certain period of time.**

6      Q    Do you recall when was the last invoice

7 that you submitted to UEP --

8      A    **I do not.**

9      Q    -- for consulting work.

10        Did you ever submit an invoice to UEP

11 for your work on the scientific advisory

12 committee?

13      A    **No. No.**

14      Q    Going back to what was marked as

15 Exhibit -- Armstrong Exhibit 2, the

16 September 2000 Recommendations for UEP Animal

17 Welfare Guidelines submitted by the Scientific

18 Advisory Committee on Animal Welfare, can you

19 describe for me, Dr. Armstrong, the committee's

20 process in coming up with these recommendations?

21      A    **So the first time the committee got**

22 **together we went on a tour of egg facilities in**

---

**56**

1 **Iowa. And we were -- "appalled" might have been**

2 **the word -- to see exactly the conditions. And**

3 **that really set the stage for us looking at what**

4 **was going -- what was going on in the industry.**

5      **The first committee meeting, I believe,**

6 **was held in Arizona. We spent quite a bit of**

7 **time discussing different types of egg**

8 **production. We discussed the pros and cons of**

9 **all of those different types of egg production.**

10 **By types I mean free range, aviary, we called it**

11 **modified cage at the time it's really referring**

12 **to enriched cage or cage production.**

13      **That discussion was led by Joy Mench,**

14 **UC-Davis, one of the world's experts in this**

15 **area. And at that committee at that time we**

16 **decided to focus our efforts first and foremost**

17 **on caged production, because at that time in**

18 **1998, 98 percent of the birds were housed in**

19 **cages.**

20      **That was preceded by a meeting in late**

21 **1997-98 before I was asked to form the committee**

22 **in which we met with Al Pope, Gene Gregory, I**

---

**57**

1 **don't recall who else was there, and we looked at**

2 **their guidelines at the time. And we said these**

3 **are not science-based guidelines, they are simply**

4 **a collection of your best practices. And at the**

5 **time they were being pushed very hard by one or**

6 **two animal rights activist groups. And we**

7 **basically said your guidelines are not**

8 **science-based. They are -- they are just simply**

9 **what you're doing.**

10      **One, two, or three months after that I**

11 **received a call and said, "Would you put together**

12 **a committee?" And we -- and that was what I**

13 **recommended on how to do it.**

14      **What I recommended not to do is what**

15 **I'd observed in other areas where you have a**

16 **group of scientists in the room and a group of**

17 **producers in the room, and you're always arguing**

18 **about the science among people that don't**

19 **understand the science.**

20      **So in our process, it was very clear**

21 **what I wanted to do up front is establish a group**

22 **of scientists that had knowledge, and then we**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

---

58

would provide recommendations. It would be up to the producers whether they would implement those recommendations or not. Because that's -- that wasn't our role to say "You must do this tomorrow, you must do this next year."

So in that first meeting after the tour we also established -- and I was very clear in establishing -- we're going to determine the minimum guidelines for humane production of eggs, housing hens. And we used very conservative measures of animal welfare. And that's where we started, and then those original recommendations were developed and published in 2000, so they were -- we started talking about them well before that. And the industry -- it was very difficult for the industry in the beginning to think about giving birds more space. Some members were very angry and did not understand why that should happen.

Q    Did you have an understanding as to why industry members were so angry about the idea that birds should be given more space?

---

59

A    Some members. Some members. Because -- let me put it this way.

(A discussion was held off the record.)

MR. OLSON: Should we take a break?

MS. SUMNER: Yeah. Why don't we take a quick break.

THE VIDEOGRAPHER: We're going off the record. The time is 9:26 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: This is the beginning of Tape 2. The time is 9:37 a.m., and we are back on the record.

Q    Dr. Armstrong, before we went off the record I had asked you the question as to whether you had an understanding as to why some industry members were so angry about the idea that birds should be given more space.

A    Yes. What had happened over time is the industry had adjusted the cage system to the maximum efficiency on a per-house basis. So what that means is the amount of money in feed and labor and in the amount of eggs coming out. So

---

60

it was more focused on the corporate -- the welfare of the building versus the welfare of the individual animal.

So the birds were typically housed at 48 square inches. Producers knew that if they gave the birds more space, it would cost more money. As birds would waste more food, they would move around more, and the total house efficiency would change.

So that's why they -- they didn't -- that's one of the reasons why they didn't want to give birds more space. Secondly -- and I think that was one of the main reasons.

Secondly, it was related to, well, the birds are producing. They're fine.

Third, human nature, people don't want to change.

Fourth, animal agriculture as a whole, they don't like to be told what to do by anybody, especially government regulations, retail, or a group of academics.

Q    You'd mentioned several times this

---

61

morning about science-based guidelines. Did you believe that it was important that animal welfare guidelines be science-based?

MR. SCHIRMER: Object to form.

A    Absolutely. Because if you look at perception, and you look at what some people would perceive as good animal welfare, then all of our birds would be outside in open fields, referred to as free-range. If you look at that from an animal welfare perspective, that's not the best from a science-based perspective. There are other reasons that people may want to have their birds raised in that manner.

For example, if you look at a confined system of aviaries versus cages. Which -- in which system to more birds die? In the aviary. In which system do birds have more broken bones? In the aviary. But many people would view that as a much higher level of animal welfare because the bird can perform many more behaviors.

So it gets -- it gets complicated, but it's important, then, to have measures of animal

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

17 (Pages 62 to 65)

---

**62**

welfare, and have science-based so that you have a baseline, a minimum level -- a minimum level -- of welfare. Then the market can look at, well, should there be a higher level, should there be the minimum.

We were looking at what is the minimum animal welfare. And as a result of our guidelines, what we have said -- and I've said on the record and the committee would say -- that individuals that are not using the guidelines and they're housing birds at 48 square inches or less than 67 square inches, that type of production is not humane. It's inhumane. And that's based on science.

Q   Dr. Armstrong, whose recommendations are the recommendations that are embodied in that document that's been marked as Exhibit No. 2?

A   These are the recommendations of the individuals, the one, two, three, four, five, six, seven, eight, nine individuals, that make up this UEP Scientific Advisory Committee on Animal Welfare.

---

**63**

Q   And those nine individuals are the individuals who are listed as the members?

MR. OLSON:  Object to form.

A   The membership as of 2000, that's correct. These people came up with the recommendations.

Q   Who drafted these recommendations?

A   The same people. I was the editor-in-chief.

Q   And was there a consensus among the committee members with respect to these recommendations?

A   Absolutely.

MR. SCHIRMER:  Object to form.

A   Absolutely there was a consensus. There was a lot of discussion, a lot of debate, push and pull, but there was a consensus at each and every point.

The other thing I can tell you from the long view of this, two points. The scientific advisory committee believes this is a model by which the rest of animal agriculture can use to

---

**64**

develop science-based guidelines.

Secondly, we view the industry's response to our guidelines at the macro level as being very progressive and positive. Every one of the major points that we put forward were accepted and eventually implemented.

That was -- that is viewed as a very significant professional accomplishment by any of the committee members. You could ask them, and they would tell you that.

Q   Were there any restrictions placed on the scientific advisory committee's recommendations?

A   Absolutely not. In fact, I told -- I've told people, and I've said in presentations, that it wasn't a given that this group of people would say that cages were humane at the beginning. It wasn't a -- it wasn't -- there wasn't a litmus test:  "Will you join this committee, and will you support cages?"

That was not asked. That's why those first couple of meetings were so important to

---

**65**

establish the fundamental aspects of where we were going and from where we were moving.

Q   Was the scientific advisory committee disbanded or dissolved after these recommendations were published in September of 2000?

A   No. We recognized from day one that science is dynamic, biology is dynamic, the birds change over time as they're being selected, and guidelines change. This committee continues. The chair now is Patricia Hester. Also known as Scotti Hester.

Q   And what was the committee's role after these recommendations were published in September of 2000?

A   Several --

MR. SCHIRMER:  Object to form.

A   -- roles. One to continue to refine because some of the recommendations were based on the best knowledge we had at the time. Some areas needed additional investigation. Some areas needed, you know, additional refinement.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

18 (Pages 66 to 69)

66

1          We also looked at different types of
2     production.  We started with cages, and I think
3     you'll see in subsequent guidelines, we added
4     non-cage and cage.  And we basically said here
5     are the guidelines that affect any bird, here are
6     the guidelines that affect non-cage, here are the
7     guidelines that affect cage.
8          So it's greatly -- it's evolving.  And
9     the committee is very active and should continue
10    on and on.
11        Q    You just mentioned additional areas
12    that at this time -- the time of publication in
13    September 2000 -- needed additional investigation
14    or refinement.
15        A    Yes.
16        Q    Do you have a recollection as to what
17    those areas were?
18        A    Yes.  Yes.  Major -- one of the major
19    ones was to continue to work with the producers
20    to help them to understand that 25 parts per
21    million ammonia is the level that the science
22    supported.  There were producers that were very

67

1     upset about that.  They were upset on the fact
2     that we didn't -- they didn't think we could ever
3     get below 50 let alone 25 parts per million.
4          So that was not really refining the
5     science and doing more studies, it was continuing
6     to help educate the producers, and that was part
7     of my role as chair, that was part of the
8     committee's role.
9          Second would be molting.  Molting was
10    recognized at our very first committee meeting as
11    being -- having positive and negative aspects.
12        Just a brief summary on molting.  It is
13    the process in which a bird loses a significant
14    amount of weight and the bird is rejuvenated.
15    That's positive.  The bird can then go into
16    another cycle of laying eggs, and you don't need
17    another whole batch of hens, you can use them.
18    So you get twice or three times the production
19    from one bird.  From a corporate welfare
20    perspective, that's positive; right?
21        The negative aspect of molting is how
22    it was induced.  It used to be water withdrawal.

68

1     That was stopped, and it was traditionally feed
2     withdrawal.  Feed removal for up to 14 days
3     causes a suppression of the immune system.  That
4     is a negative impact on animal welfare, the
5     welfare of the hen.
6          The industry was not prepared to stop
7     molting or using non-feed withdrawal method at
8     that time.  We needed to understand how could we
9     induce a molt without starving the birds.
10        There were also some fine tunings that
11    were needed in the areas of beak trimming,
12    understanding the way you might do it, helping
13    the producers understand that, yes, under ten
14    days is when you need to do it to avoid chronic
15    pain.
16        And then feeder space was another
17    example.
18        Q    We're going to talk about each of those
19    in a little bit but --
20        A    And I may not have hit them all, but
21    that's --
22        Q    I want to --

69

1          MS. SUMNER:  Can I have No. 7.
2          (Deposition Exhibit 7 was marked for
3     identification.)
4          Q    Dr. Armstrong, if you can just take a
5     moment and review the document that's been marked
6     as Armstrong 7.  This is a confidential document
7     that bears the Bates Nos. UE0206284 through 285.
8          A    Yes, I'm familiar with the document.
9          Q    Can you tell me what this document is?
10        A    This was an opinion piece that I
11    penned, shared, received feedback from the
12    committee, but I wanted to get a point across to
13    as many people that would read it.  In
14    particular, I wanted to influence the producers,
15    and I hoped the activist groups would read it as
16    well.  And then there are other secondary points
17    of why I did it.
18        Q    So this is an article that you
19    authored?
20        A    I did write this.
21        Q    And what was the point that you were
22    trying to make with this article?

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                March 13, 2014

19 (Pages 70 to 73)

---

**70**

A   It's really in the title.  Proactivity, development of industry guidelines shows concern for the future, not a caving to activists.  I learned when I was in North Carolina that, in that case, the pork producers had a very dim view of regulations, and they referred to it as a slippery slope.  If you give them an inch, they'll take a mile.  And we wanted the industry to understand, we wanted the activists to understand, that we've got to be proactive.  We've got to use science-based guidelines and make changes.  Don't wait until they're forced upon you.  That was the major point.

Q   And at the time you wrote this article, were the -- did you believe that the article was accurate?

A   Absolutely.

MR. SCHIRMER:  Object to form.

Q   I'd like to just ask you a couple of questions about some of the specific statements in this article.  So if you would just please turn with me to the second column on the first

---

**71**

page.

A   Yes.

Q   It's the third full paragraph down which starts "In 1999."

A   Yes.

Q   Do you see that?

A   Yes.

Q   Dr. Armstrong, could you just read that paragraph into the record, please.

A   "In 1999, UEP asked that a committee of specialists in animal behavior, poultry production, and food safety, along with veterinarians and other animal scientists, be established.  An egg producer and a UEP staff member served as ex-officio, nonvoting members (advisers).  While the primary objective of the committee was hen welfare, we also looked at economics, productivity, product safety and social concerns."

Q   Is that an accurate statement, Dr. Armstrong?

A   Yes.

---

**72**

Q   Can you explain to me what you meant by, "While the primary objective of the committee was hen welfare, we also looked at economics, productivity, product safety and social concerns"?

A   So very simply, we wanted to look at very conservative measures of animal welfare, measures that were irrefutable.  Because that's one of the issues with animal welfare, how do you measure whether an animal is in a good state or a bad state.

Two fundamental basic measures are mortality, how many birds die, and per-hen productivity.  Better the welfare, the more eggs they produce.  Those were our conservative measures, and our goal was to establish the minimum humane levels for cage production.

We were not going to ignore other factors such as the productivity from a house perspective.  Feed efficiency, which is not really animal welfare, but it is a cost.  Does a bird waste feed?  Do they use the feed more

---

**73**

effectively, efficiently?  Product safety -- you can't do something that causes the product to be unsafe at the expense of welfare.  And then social concerns.  Perception is there.  Some people will never accept a cage, regardless of science.

Q   Specifically when you said "we also looked at economics," what were you referring to there with your use of the term "economics"?

A   Totally within the confines of the production system.  It really -- it really is the cost -- you know, the parameters.  And I think a better way to phrase that would have been is it practical, is it feasible.  That's really what we were getting at.

Q   And why did the committee undertake that consideration, was it practical, was it feasible?

A   Because guidelines that are so impractical, they don't have any impact on animal welfare.  98 -- as an example, 98 percent of the birds are in cages.  We chose as a committee on

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

20 (Pages 74 to 77)

74

1 our own accord to look at can cages be humane.
2 We said yes, under these conditions.
3 But to say to the industry that, for
4 example, molting would be abolished tomorrow was
5 totally impractical. Not doable by the industry.
6 And that involved -- part of that involved the
7 system and the cost that was -- how they had
8 built their system.
9 So we said use these guidelines to make
10 it work for now. And -- but you got to change
11 it. And we didn't say when. We were very
12 careful. And we said from the very beginning
13 that it's not our role to say when. 25 parts per
14 million ammonia, get there as fast as you can,
15 but it's not our role as a group of scientists to
16 tell the industry when they should have 25 parts
17 per million. As soon as you can. That's as far
18 as we would go.
19     Q    If it had been practical to implement
20 all of the recommendations immediately, would the
21 committee have been in favor of that?
22     A    Yes. Absolutely. Because again, the

75

1 committee was concerned first and foremost about
2 the welfare of the laying hen. So if we could
3 have waived -- we would have said let's
4 immediately change the genetics of the birds such
5 that they're calm and they don't even peck each
6 other or kill each other, and you don't need to
7 beak trim. Let's immediately put them at 67
8 square inches and give them more space. Let's
9 immediately stop molting altogether, or use a
10 method that does not involve starvation. Those
11 are just examples. We would have said
12 immediately. Absolutely. But it's got to be
13 practical.
14     Q    I'd like to direct your attention now
15 to the third column on this page, the second full
16 paragraph down that starts, "The UEP board
17 unanimously."
18     A    Yes.
19     Q    Do you see that? Could you read that
20 paragraph into the record, please.
21     A    "The UEP board unanimously accepted the
22 guidelines for laying hens. The guidelines were

76

1 not changed and represented significant changes
2 in the husbandry of laying hens. There was no
3 question in the mind of the committee or the UEP
4 members that implementations of these guidelines
5 would increase the cost of production. Yet, the
6 guidelines prevailed. These recommendations
7 became the basis of a voluntary welfare program
8 under the auspices of UEP. It also became the
9 basis for McDonald's requirements for its egg
10 suppliers."
11     Q    And are those sentences in that
12 paragraph accurate statements, Dr. Armstrong?
13     A    Absolutely.
14     Q    I'd like you to turn now to page 2 of
15 this editorial. And at the very bottom of the
16 first column there on page 2 it starts, "It is
17 very important to base guidelines on science but
18 not be oblivious to the social" --
19     A    Mm-hmm.
20     Q    -- "economic" -- do you see that?
21     A    Yes.
22     Q    Could you read into the record just

77

1 from that sentence through the end of that
2 paragraph, please.
3     A    "It is very important to base
4 guidelines on science but not be oblivious of the
5 social, economic, ecological and environmental
6 issues. Producers and agricultural leaders need
7 to be at the table. While I do not believe
8 producers should be involved in establishing the
9 science behind the guidelines, I equally believe
10 that scientists should not be telling producers
11 when to implement these guidelines."
12     Q    Dr. Armstrong, is that an accurate
13 statement of your beliefs?
14     A    That was not only an accurate statement
15 of my beliefs but that would be the full belief
16 of the committee at that time.
17     Q    And what was the basis or bases for
18 that -- those believes?
19         MR. SCHIRMER: Object to form.
20     A    First of all, you cannot have a minimum
21 guideline for animal welfare, humane raising of
22 hens, any more than you can have the base

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                                                    March 13, 2014

21 (Pages 78 to 81)

---

**78**

guidelines for food safety and have people that
don't understand science come in and change it
because it doesn't work that way.  We don't do it
that way.  We've never done it that way.  That's
the fundamental aspect that we -- I want to make
sure that everyone understands.

We were establishing the minimum
guidelines for laying hen -- for laying hens.
And the point about not be oblivious means
practical.  It does birds no good if one percent
of the birds in the country are affected by it.
We were dealing with 98 percent of the birds in
the country.

And it's -- this is an analogy that
would put things in perspective.  If you want to
maximize bird welfare, then we each have our own
laying hen, and we take care of it and we have
our own eggs produced.  That's not very practical
for each of us to have our own hen.  So we'd like
for someone else to produce our eggs for us.  So
what's the minimum level of humaneness, animal
welfare that's acceptable.  That's what we

---

**79**

established with the best scientists at the time.

Q   In the third column on this page
starts, "Surveys and polls show that consumers
have clearly indicated"; do you see that?

A   Yes.

Q   Can you just read that into the record,
please.

A   "Surveys and poles indicate" --

Surveys and polls show that consumers
have clearly indicated that they retain
confidence in farmers and ranchers to make
responsible decisions concerning the welfare of
their animals.  They also show that consumers
regard the humane treatment of farm animals as
important, and that their ethical perspective on
animal treatment are continuing to evolve."

Q   Dr. Armstrong, was that an accurate
statement at the time you authored this article?

MR. SCHIRMER:  Object to form.

A   Yes.

Q   And what -- what was the basis for
those statements?

---

**80**

A   Well, first of all, we wanted the
producers and all the readers and activists to
understand that, you know, we're aware of the
changes in demographics.  And these were
science-based polls and surveys that were
conducted.

The second sentence is important
because we're separating humane treatment and
ethical perspectives.  I have an ethical view of
something; I may have a perception or values base
on how I want to see eggs produced.

What we established are science-based
guidelines.  Two of the most conservative
measures of animal welfare.  And that was
important because the producers did not -- some
of the producers just did not buy that.  Why do
we need to give them more space?  Here's why.
More will live and they'll produce more eggs on
an individual basis.  There's no better, more
conservative measure of welfare than those two.
And the science was clear.  Multiple studies
showed what would happen if you give more space.

---

**81**

And that's what happened.  It improved the
welfare of the hens.

Q   The paragraph that starts, "Maintaining
the present level of consumer confidence"; do you
see that, Dr. Armstrong?

A   Yes.

Q   Could you just finally read that
paragraph into the record, please.

A   "Maintaining the present level of
consumer confidence is critical to the egg
production industry.  Therefore, it is the
responsibility of industry to make carefully
researched and considered decisions regarding
animal welfare.  Producers who adopt sound
guidelines for the welfare of their hens and
incorporate these into their production
operations will have a solid base from which to
reassure the public that they are practicing good
management and care for their birds."

Q   And do you agree with those statements,
Dr. Armstrong?

MR. SCHIRMER:  Object to form.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

22 (Pages 82 to 85)

---

**82**

1    A   Yes.  Yes.
2    Q   And why do you agree with those
3  statements?
4    A   That comes from my view and my
5  experience in social responsibility in the food
6  system, in that producers cannot be in a vacuum.
7  They have to pay attention to what they're doing,
8  and they have to work to maintain the confidence
9  of consumers.
10      So this was -- this is part of, you
11  know, while the committee reviewed this whole
12  document, this is something that's broader than
13  the committee.  This is a very important point.
14  It's got to start with sound science-based
15  guidelines, though.  Without that, producers
16  cannot have a firm basis in order to build
17  consumer confidence.
18    Q   And did you understand the building of
19  consumer confidence to be important to UEP in the
20  undertaking of this project?
21      MR. SCHIRMER:  Object to form.
22    A   Absolutely.  Public perception was one

---

**83**

1  of those factors that was secondary level to
2  animal welfare, but one we considered.
3      (Deposition Exhibit 8 was marked for
4  identification.)
5    Q   Dr. Armstrong, could you take a moment
6  to look at the document that's been marked as
7  Armstrong 8.  It's a confidential document that
8  bears the Bates No. UE0331895 through 1919.
9    A   Yes, I'm familiar with this document.
10    Q   Okay.  What is this document?
11    A   This is the next -- apparently the
12  second, if I recall correctly, this is the second
13  iteration of the recommendations from the
14  scientific advisory committee that's listed in
15  this case.
16      Does it list the committee members?
17      I don't know if the page is missing or
18  we just didn't list them at this point.  It's the
19  next reiteration -- iteration of this document.
20    Q   Is this an earlier draft of the
21  document that was marked as Exhibit No. 2?
22    A   Oh, yes, it's the May -- it's the May

---

**84**

1  version.  Yeah.  Yeah.  Okay.
2    Q   So it's an earlier draft?
3    A   It's a earlier version, yeah.  I was
4  confusing my dates.  Sorry.
5    Q   You mentioned before, I think, this
6  morning, the UEP Producer Committee for Animal
7  Welfare; are you familiar with that committee?
8    A   Yes.
9    Q   Can you tell me what that committee is?
10    A   It's a -- I think it's a standing
11  committee as part of UEP; they have multiple
12  committees.  And this is a group of the members
13  of UEP, and they discuss topics related to animal
14  welfare.
15    Q   Did this committee have a role in the
16  scientific advisory committee's 2000
17  recommendations for animal welfare?
18    A   The chair --
19      MR. SCHIRMER:  Object to form.
20    A   -- the chair of the producer animal --
21  the producer committee, not to get tied up in a
22  name, was the adviser to the science advisory

---

**85**

1  committee.  So when you saw Barrie Wilcox when we
2  started in that September 2000 document, he was
3  the chair of the producer committee.  So he was a
4  liaison.  I in turn was the liaison to the
5  producer committee.
6    Q   And what role did Mr. Wilcox play in --
7  if any, in the recommendations that were
8  contained in that September 2000 document that's
9  been marked as Exhibit No. 2?
10    A   Advice and support.
11    Q   When you say advice and support, what
12  does that mean or entail to you?
13    A   They would answer questions.  They
14  would provide support, information, get us
15  places, answer questions.  But the committee
16  members debated, discussed the recommendations
17  and voted on the recommendations.
18    Q   Did the producer committee vote on the
19  recommendations?
20      MR. SCHIRMER:  Object to form.
21    A   They did not -- the producer committee
22  made a recommendation to the UEP board as to

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

23 (Pages 86 to 89)

---

86

1   whether to accept the recommendations or not. So
2   yes, they did. But they did not vote on
3   individual components. They had problems with
4   individual components and they would ask
5   questions, and there would be an iterative
6   process to go back and forth. Sometimes it was
7   quite involved.
8        Q   Did the producer committee suggest
9   changes to the recommendations before the
10  September 2000 version was published?
11       MR. SCHIRMER: Object to form.
12       A   I don't recall -- I think, as I recall,
13  they were involved more with -- worried about
14  implementing. So I don't recall if they
15  recommended changes during that interval or not.
16  The representatives on the committee, they could
17  voice their opinion, but they had no voting
18  status. So I don't recall.
19       Q   Did you attend meetings of the UEP
20  producer committee for animal welfare?
21       A   Yes.
22       Q   And why did you attend meetings?

---

87

1        A   To serve as liaison with the
2   scientists. It wasn't practical to have all the
3   scientists attend. At times, depending on the
4   topics, some of the other scientists would join
5   me.
6        Q   Did you attend every meeting of the
7   producer committee for animal welfare?
8        A   No.
9        Q   Do you have a sense as to how often you
10  attended those meetings or a recollection?
11       A   At the time we were in the throes of
12  the major development, it was -- I was a regular
13  attendee.
14       (Deposition Exhibit 9 was marked for
15  identification.)
16       Q   Dr. Armstrong, if you could just take a
17  moment and look at the document that's been
18  marked as Armstrong 9.
19       MS. SUMNER: For the record, this is a
20  confidential document bearing the Bates Nos.
21  UE0140563 through 595.
22       A   Yes, I'm familiar with this document.

---

88

1        Q   Okay. What is this document?
2        A   This is the UEP -- it's a UEP document
3   for the United Egg Producers certified program.
4   So it's the United Egg Producers Animal Husbandry
5   Guidelines for U.S. Egg Laying Flocks.
6        Q   Did the scientific advisory committee
7   have a role in drafting these guidelines?
8        A   As I recall, we reviewed them. And my
9   role and the committee's role was to make sure
10  that the main core of our recommendations were
11  maintained intact.
12       Q   Okay. If you could turn to page 2 of
13  this document, and I want to direct your
14  attention to the section that's entitled UEP's
15  Mission on page 2.
16       A   Yes.
17       Q   Do you see that?
18       A   Yes.
19       Q   In that paragraph, the second sentence
20  states, "UEP commissioned an independent
21  scientific advisory committee for animal welfare
22  in 1999."

---

89

1   Is that an accurate statement?
2        A   '99 or '98, but the rest of it's
3   accurate. I'm not quite sure about the date, but
4   the sentence is accurate.
5        Q   The next sentence says, "This committee
6   was asked to review the scientific literature on
7   topics relevant to the well-being of laying hens
8   and to identify areas where further research was
9   needed. Additionally, the committee was asked to
10  development recommendations based upon existing
11  science for presentation to the UEP Producer
12  Committee for Animal Welfare board of directors,
13  and ultimately to the industry."
14       Is that an accurate statement?
15       A   Yes.
16       MR. SCHIRMER: Object to form.
17       Q   It's an accurate description of what
18  you were asked to do as a scientific advisory
19  committee?
20       A   Yes.
21       Q   The next sentence says, "The Scientific
22  Advisory Committee took no responsibility for

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

24 (Pages 90 to 93)

90

1  mandating these recommendations recognizing that
2  the producers must voluntarily accept and
3  implement them."
4      Is that an accurate statement?
5      A   Yes.
6      Q   Why did the scientific advisory
7  committee believe that producers must voluntarily
8  accept and implement their recommendations?
9      MR. SCHIRMER:  Object to form.
10     A   Because UEP was -- UEP's a voluntary
11 organization.  And we just accepted that from the
12 beginning.  Our committee has no statutory,
13 federal or retail authority, so that's all we
14 could do.
15     Q   Next sentence says, "This historic step
16 led to the development of a responsible working
17 model for the development and implementation of
18 science-based guidelines to improve the welfare
19 of laying hens managed in caged and cage-free
20 production systems."
21     Do you agree with that statement?
22     A   Absolutely.  Our committee would -- our

91

1  committee feels strongly that we developed a
2  model that should be used by the rest of animal
3  agriculture.  Specifically that you don't put
4  producers or other industry members and
5  scientists in the same room and expect to develop
6  science-based guidelines.
7      Q   The next paragraph, the second sentence
8  reads, "The recommendations and guidelines found
9  within this document have been accepted and
10 presented by the UEP Producer Committee using the
11 recommendations from the Scientific Committee as
12 a blueprint."
13     Do you agree with that statement?
14     A   Absolutely.
15     MR. SCHIRMER:  Object to form.
16     A   Throughout my term as chair of the UEP
17 scientific advisory committee, there were no
18 substantial periods of time where there was --
19 where the UEP failed to accept the science-based
20 recommendations.
21     Implementation was a different story.
22 That was more of a practical matter.

92

1      Q   And what do you mean by that?
2      A   For example, the UEP board accepted the
3  guidelines in -- as Exhibit 2 unanimously.  They
4  accepted those.  That is -- they recognized that
5  we have to go beyond 48 square inches, 67 to 86.
6  They accepted those guidelines.
7      Q   If you can turn to page 3 of this
8  document.  And I want to direct your attention to
9  the section that's entitled Independent
10 Scientific Advisory Committee.  Do you see that?
11     A   Yes.
12     Q   The first paragraph there reads, "The
13 independent committee was comprised of government
14 officials, academicians, scientists, and humane
15 association members with all having been selected
16 by the Chairman of the Committee."
17     Is that an accurate statement?
18     A   Yes.
19     Q   "The Scientific Advisory Committee
20 meets on a regular basis to review the science
21 and make recommendations to the UEP Producer
22 Committee."

93

1      Was that true as of 2008?
2      A   Yes.  It was true throughout my
3  experience as chair.
4      Q   In the second paragraph there it says,
5  "The recommendations and guidelines within UEP's
6  first Animal Husbandry Guidelines published in
7  October 2000 were based upon those
8  recommendations made by the Scientific Advisory
9  Committee."
10     Is that an accurate statement?
11     A   Yes.
12     MR. SCHIRMER:  Object to form.
13     Q   And finally in the third paragraph
14 there it says, "The guidelines presented in this
15 publication represent the recommendations of the
16 Scientific Advisory Committee for best husbandry
17 practices to assure the welfare of hens managed
18 under cage and cage-free conditions."
19     Do you agree with that statement,
20 Dr. Armstrong?
21     A   Yes.
22     Q   Below that there is a list of current

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                        March 13, 2014

25 (Pages 94 to 97)

---

94

1   advisory -- current scientific advisory committee
2   members.  Do you see that?
3       A   Yes.
4       Q   And did those members consent to their
5   listing in this document?
6       A   As I recall, I believe they did.
7       Q   And I'd just note here that it
8   indicates that Don Bell is associated with
9   Cooperative Extension, University of
10  California-Riverside; do you see that?
11      A   Yes.
12      Q   Is cooperative extension something with
13  which you're familiar, Dr. Armstrong?
14      A   Yes.
15      Q   Can you explain to me what that is?
16      A   Cooperative extension was formed in the
17  early 1900s, and the goal of cooperative
18  extension is to transmit knowledge from the
19  scientific community to producers, farmers, and
20  increasingly to the community and consumers.
21          So every state has a land grant
22  university.  Every state contributes money to

---

95

1   extension.  There's a companion agricultural
2   research component.  In the state of California,
3   agriculture and natural resources extension and
4   research is operated through the University of
5   California system office.  So there are extension
6   faculty and educators all over the state, and
7   there are also different locations where they do
8   research.
9           Don Bell was a long-term member of the
10  University of California-Riverside faculty, but
11  he was also an employee through the cooperative
12  extension through the system level.
13      Q   And is cooperative extension a federal
14  program?
15      A   It's federal and it's state and local.
16  But its mandate comes from federal.
17      Q   And do you know which federal agency
18  has responsibility for administering that
19  program?
20      A   Yes.  I'm quite familiar with it.
21  USDA.
22      Q   All right.  I'd like to direct your

---

96

1   attention to pages 4 and 5 of these guidelines,
2   to the section that's entitled Beak Trimming.
3       A   Yes.
4       Q   Do you see that?
5       A   Yes.
6       Q   Dr. Armstrong, what is beak trimming?
7       A   Beak trimming is the removal of the end
8   of the beak, the horn part, such that it removes
9   the sharp point, and it greatly reduces the
10  chance of two types of pecking -- or the damage
11  due to two types of pecking.  It doesn't
12  necessarily eliminate it.  Birds engage in two
13  types of pecking behaviors: cannibalistic and
14  feather pecking.
15      Q   So why is beak trimming done?
16      A   Beak trimming is required in order to
17  maintain a low mortality of hens.  It's really
18  required in almost all systems.  Some small
19  free-range will not -- will not do that, but they
20  will have higher mortality.  It is within the
21  birds' behavior, regardless of the system, to
22  peck one another in those two manners.  And they

---

97

1   will -- cannibalistic pecking is fairly
2   self-explanatory.
3       Q   And have you heard the term "debeak" or
4   "debeaking" used?
5       A   Yes.  In fact, one of the first things
6   we said to the industry is "Stop using that term.
7   That is not what you're doing, and it is a very
8   bad public image, public perception.  You're beak
9   trimming.  You're not removing the beak."
10          And they said, "Oh.  That makes sense."
11      Q   If you'd take a moment to review the
12  guidelines for beak trimming that are listed in
13  this section of the 2008 UEP Animal Husbandry
14  Guidelines.
15      A   Would you like me to read them?  Would
16  you like me to talk about --
17      Q   My question to you, Dr. Armstrong, is
18  do these guidelines represent the recommendations
19  of the scientific committee?  And I'd like you to
20  review them to the extent necessary to answer
21  that question for me.
22      A   Yes.  A major point that was of

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

26 (Pages 98 to 101)

---

98

1  contention and of concern by the producers was
2  only trimming the beak at ten days or younger.
3  The producers were not used to doing that, and
4  they were concerned about two factors:
5  Mortality, but also feed efficiency.  If you trim
6  the beak early, the science is clear, you don't
7  get chronic pain.  If you trim the beak after ten
8  days, birds will exhibit signs of chronic pain
9  resulting from that beak trimming.  If you trim
10  early, the beak will grow back, and birds tend to
11  waste more feed.
12       So we had to be firm, but we also said
13  that if there's a problem when birds start
14  pecking one another, and the issue of mortality
15  comes to play, then the pain that would be caused
16  by a second trim is much less than the mortality
17  that would occur if you don't trim.  So that was
18  absolutely something that was back and forth that
19  was added that is very science- and
20  welfare-based.
21       So as you'll see in Point 8 on page 5,
22  if a trimmed beak grows back, a second trim may

---

99

1  be needed.  A preventive second trim is not
2  recommended after eight weeks old; however,
3  therapeutic beak trimming may be performed at any
4  age if an outbreak of cannibalism occurs.
5       And if you want to put that in
6  perspective, I know of examples where producers
7  were new with some of the non-cage systems, and
8  I've literally heard producers say, "I had a 30
9  to 40 percent mortality."  Because they were
10  learning to manage, the birds cannibalized each
11  other.  So that's a -- beak trimming is a good
12  example of the dynamic evolution aspect of the
13  guidelines.
14       Q    I want to ask you a question about a
15  specific paragraph in this beak trimming section
16  of these guidelines.  The second paragraph starts
17  with, "Scientific evidence suggests that primary
18  breeders of egg-laying birds can select a more
19  docile bird and minimize the need to beak trim
20  from a behavioral point of view."
21       Do you see that?
22       A    Yes.

---

100

1       Q    Then it says, "Whenever possible,
2  genetic stock should be used that require little
3  or no beak trimming.  UEP recommends beak
4  trimming only when necessary to prevent feather
5  pecking and cannibalism and only when carried out
6  by properly trained personnel monitored regularly
7  for quality and control."
8       Is that guidance consistent with the
9  scientific committee's recommendations?
10       MR. SCHIRMER:  Object to form.
11       A    It's completely consistent with the
12  science-based guidelines, and this is an example
13  of why a committee is needed long-term and why
14  things evolved.  The actual -- some of the
15  research that was done to prove that statement
16  was done at Purdue University by a professor.
17  And he selected birds strictly on behavior, and
18  they did not require beak trimming.  But the bird
19  was -- there were many other problems associated
20  with that, so it wasn't practical.
21       The companies that produced these birds
22  are including selection for behavior based on his

---

101

1  research, and progress is being made.  But as of
2  the time this document was printed, the
3  scientific committee was vehement in recommending
4  beak trimming because the genetic change had not
5  occurred significantly to permit birds to be left
6  alone and not beak trimmed.
7       Q    And was that true as of 2008?
8       A    Absolutely true as of 2008.  I suspect
9  it's true still today.  Changing bird behavior
10  takes time.
11       Q    Is beak trimming still required for
12  most birds in housing systems?
13       A    Yes.
14       Q    And why is that?
15       A    If birds -- if beaks are not trimmed, that is
16  mortality will be elevated.  And, again, that is
17  a very conservative measure of animal welfare.
18       Q    Mortality?
19       A    Mortality.  Death.  And then sometimes
20  near death from being pecked and -- near death.
21  Yes.
22       Q    I'd like to direct your attention now

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                     March 13, 2014

27 (Pages 102 to 105)

---

102

1  to pages 5 and 6 of the UEP guidelines, the
2  section that is entitled Molting --
3      A  Yes.
4      Q  -- which we spoke about a little
5  earlier.  But could you please explain for me
6  again, Dr. Armstrong, what is molting?
7      A  So if you look at page 5 in the first
8  paragraph, "Molting is a normal process of
9  chickens and other feathered species.  In the
10 wild state, birds usually shed and renew old,
11 worn plumage in preparation for cold weather and
12 their migratory flights.  Chickens kept for
13 commercial egg production have a different
14 molting pattern.  They have been bred for high
15 performance, and their environment, with respect
16 to temperature and light, is usually modified to
17 remove major seasonal influences."
18     So molting is a practice that allows
19 rejuvenation of the hen, rejuvenation of the
20 flock, and another cycle of laying.  So it has an
21 advantage from a corporate perspective, multiple
22 animal perspective, that you don't have to use

---

103

1  another set of hens -- another set of chicks.
2      Now, why is that important?  We can't
3  produce just females.  We produce males.  So
4  every -- for every female that's produced,
5  there's a male chick that's euthanized shortly
6  after hatching.  That's a welfare issue.  But
7  it's an acceptable welfare issue in the scheme of
8  providing eggs for human beings.
9      So, again, the molt is positive, but
10 starving the birds is negative.  And we had many
11 producers push back on this.  Molting is natural.
12 All -- all birds molt.  They don't eat when
13 they're molting.  That's different.
14 That's a natural situation.  When you remove feed
15 from a commercial laying hen, you suppress the
16 immune system.
17     You'll also -- you'll also note in our
18 guidelines we talk about a linkage to food safety
19 as well.  The immune system being suppressed.  So
20 there's a linkage to food safety.
21     Q  And explain that for me, please.
22     A  If you suppress the -- salmonella is an

---

104

1  issue that the industry has dealt with for years
2  and will continue to deal with.  The fluid egg
3  industry doesn't have to worry about it as the
4  eggs are -- it's pasteurized, fluid egg's
5  pasteurized.  So that's why there are safe
6  handling guidelines.  When you cook eggs, you
7  crack your eggs and you wash your hands because
8  one in 20- or 30,000 eggs is contaminated with
9  salmonella.  Salmonella has been shown to
10 increase during a food-withdrawal-induced molt.
11     Q  I'd like you to look on page 6, please,
12 at the Guidelines for Molt Program.
13     A  Yes.
14     Q  And, if you could just take a minute to
15 review those.  My question is, do these
16 guidelines represent the recommendations of the
17 scientific advisory committee?
18     A  Yes.
19     Q  The first guideline there reads only
20 non-feed-withdrawal molts will be permitted after
21 January 1st, 2006.  Do you see that?
22     A  Yes.

---

105

1      Q  Was that in the original scientific
2  advisory committee September 2000
3  recommendations?
4      A  No.
5      Q  What was the approach that was taken to
6  molting in the original 2000 -- September 2000
7  recommendations of the scientific advisory
8  committee?
9      A  Well, this is an example of practical,
10 because at that time feed withdrawal was the best
11 way to induce a molt, and they did not have a
12 practical alternative.  So the committee agreed
13 to continue that, but we put certain guidelines
14 in place to minimize the impact on the bird's
15 welfare.  Not -- not eliminate, but to minimize
16 the negative impact.
17     Subsequent to the 2000, research was
18 conducted -- not by any of the committee members,
19 as I recall, but by other scientists in the
20 U.S. -- that, plus existing research, led to the
21 confidence that feed withdrawal methods were
22 available and could be a substitute, in fact a

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

28 (Pages 106 to 109)

---

106

1  replacement.  Therefore, only non-feed-withdrawal
2  molt method -- molt methods will be permitted
3  after January 1, 2006.  That's a good example of
4  the evolution of the guidelines.
5      Q   So, based on the research, the research
6  showed that non-feed withdrawal molts could be
7  achieved; is that correct?
8      A   In a --
9          MR. SCHIRMER:  Object to form.
10     A   Yes.  The research demonstrated that a
11  non-feed withdrawal molt could be induced in a
12  practical manner.
13     Q   And then were the scientific advisory
14  committee's recommendations modified based on
15  that research?
16     A   Yes.
17         MR. SCHIRMER:  Object to form.
18     Q   And how were they modified?
19     A   I don't recall.  I think the original
20  guidelines that were published in Feedstuffs and
21  modified, it didn't require -- it didn't require
22  that we change the essence of our guidelines, it

---

107

1  was more the implementation.  We said at the
2  beginning what was good and bad about the molt.
3  We said at the beginning you should use a
4  non-feed withdrawal, or not molt at all.  But it
5  wasn't until 2006 that the producers were able to
6  implement it on a practical basis.
7          So our view of the science didn't
8  change over time.  It was the ability to
9  implement the science-based guidelines.  The
10  practical aspect of animal welfare.
11     Q   I'd like to turn your attention now in
12  these guidelines to pages 11 and 12, the Housing
13  and Space Guidelines.
14     A   Yes.
15     Q   If you could jump there.  And again, if
16  you could just take a moment to review the
17  guidelines for cage production systems on pages
18  11 and 12, and my question is, did these
19  guidelines represent the recommendations of the
20  scientific committee?
21     A   Yes.
22     Q   Specifically I want to direct your

---

108

1  attention first to one of the guidelines on page
2  11.  It's No. 2 which reads, "All hens should be
3  able to stand comfortably upright in their cage.
4  The slope of the cage floor should not exceed
5  8 degrees."  Do you see that?
6      A   Yes.
7      Q   Is that recommendation consistent with
8  the recommendations of the scientific advisory
9  committee?
10     A   Yes.
11         MR. SCHIRMER:  Object to form.
12     Q   Do you have an understanding as to why
13  these guidelines did not refer specifically to a
14  cage height of 16 to 17 inches?
15     A   Yes.
16     Q   And what is that understanding?
17     A   Originally we had a lot of discussion
18  about a more prescriptive standard, a more
19  prescriptive guideline, that is 16 to 17, you
20  know, the height of a bird.  We had debates and
21  discussions about how the EU was handling it and
22  everyone else.  But then we came to more of a

---

109

1  performance-based guideline.  Because we didn't
2  want producers taking advantage of a prescriptive
3  and, in essence, cheating.  We didn't really say
4  cheating, but it was basically what someone could
5  do.
6          So the performance guideline was
7  established, and the committee felt very
8  comfortable with that.  The welfare aspect of
9  this is all birds should be able to stand.  Not
10  with their head out of the top of the cage if
11  they happen to be on the top, but the birds
12  should be able to stand comfortably.
13         And I don't think -- and when we put it
14  that way, it's very difficult for anyone to say,
15  well, that's not a minimum guideline.  That is a
16  minimum guideline.  That's a good example of a
17  minimum guideline:  A bird should be able to
18  stand comfortably.
19     Q   I'd like you to take a look at the
20  fourth guideline on that same page which reads,
21  "Feeder space should be sufficient to allow all
22  birds to eat at the same time."  Do you see that?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

29 (Pages 110 to 113)

---

110

1    A    Yes.
2    Q    And is that recommendation consistent
3    with the recommendations of the scientific
4    advisory committee?
5    A    Yes.  At that time.
6         MR. SCHIRMER:  Object to form.
7    A    Yes, it is.  At that time.
8    Q    Do you have an understanding as to why
9    the guidelines did not refer specifically to a
10   minimum of four inches of feeder space per bird?
11   A    Yes.
12   Q    What is that understanding?
13   A    Again, this is -- at this time, 2008,
14   this document, as well as the scientific
15   recommendation, was more of a performance
16   standard.  This was a matter that was debated
17   back and forth and, frankly, the science
18   review -- a meta analysis of the science was not
19   clear.
20        We knew that the overriding factor
21   would be if you give birds from 48 and increase
22   them to 67, you're going to deal with that issue

---

111

1    somewhat.
2         We ended up conducting a set of studies
3    here at Purdue University looking at the strains
4    at the time, and different -- I don't recall the
5    actual amount of feeder space, but it was a very
6    carefully conducted study.  And we found that the
7    particular strain of bird used, which represented
8    a lot of the industry, the birds performed quite
9    well with a wide range of feeder space.  And it
10   did not add clarity at all.  And in fact it
11   validated a point some of the producers had been
12   saying.  Why worry about four inches?  These
13   birds are adapting; they're eating.  So we went
14   to a performance standard.
15        Feeder space should be sufficient to
16   allow all birds to eat at the same time.  Feeder
17   space is not that big of a issue is what we found
18   through our study.  Space per bird is the bigger
19   issue.
20   Q    And that was a conclusion that you came
21   to by the time these guidelines were published in
22   2008?

---

112

1    A    Exactly.  Yes.
2         (Deposition Exhibit 10 was marked for
3    identification.)
4    Q    Dr. Armstrong, if you could take a
5    moment to look at the document that's been marked
6    as Armstrong 10.  It's a confidential document
7    bearing the Bates Nos. UE0297533 through 7536.
8         I'm going to ask you a question really
9    just about the last paragraph on the first page,
10   the update on the feeder space project that's
11   mentioned in these minutes, but feel free to take
12   as much time as you need to look at the minutes
13   to refresh yourself about the meeting.
14   A    Okay.
15   Q    So these are minutes from a UEP Animal
16   Welfare and Public Relations Committee on
17   October 15th, 2008, that was held in Greensboro,
18   Georgia.  Did you attend this meeting,
19   Dr. Armstrong?
20   A    Yes.
21   Q    Why did you attend this meeting?
22   A    It was part of my role as liaison.

---

113

1    Q    Did you provide an update on feeder
2    space at this meeting?
3    A    Apparently so.
4    Q    And what did you tell the committee
5    regarding feeder space at this meeting?
6    A    I don't recall the details.  The
7    minutes indicate that I provided an update on the
8    feeder space project and noted that clearly no
9    additional feeder space is needed.  "In regards
10   to the epidemiological study, Dr. Armstrong noted
11   there were no updates at this time but the study
12   was coming along."
13        The first sentence has do with the
14   study I mentioned at Purdue University where we
15   provided a range in different amounts of feeder
16   space, and there were no changes in mortality, no
17   changes in per-egg -- per-hen egg production, our
18   two conservative measures of animal welfare.  I
19   don't recall whether we had behavior study --
20   videotapes of behavior in that study at all.
21        The epidemiological study was -- I
22   don't recall all the details, but it was looking

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

30 (Pages 114 to 117)

---

114

at a variety of data collected from industry much like you would look for disease. That's why they say epidemiological and look at correlations with feeder space, but I don't recall what -- the details.

Q   What did you mean when you advised the committee that clearly no additional feeder space is needed?

A   That the --

MR. SCHIRMER:  Object to form.

A   The state -- the first sentence when I said, "clearly no additional feeder space is needed," was in reference to the scientific committee's inability to say a specific linear inch of feeder space was needed because the scientific data would not support that. So all we could do, and we believe was the right thing, was to go to the performance standard and indicate birds should be able to eat.

Q   Thank you. I'd like you to turn back now to the 2008 edition of the guidelines --

A   Yes.

---

115

Q   -- which was the prior exhibit. And we were talking about the cage production systems guidelines.

A   Yes.

Q   And I'd like you now to move over to page 12. I want to ask you about a couple of the guidelines on that page.

A   Yes.

Q   Number 7 reads, "Poultry houses should be designed to provide a continuous flow of fresh air for every bird. Sufficient ventilation to minimize levels of carbon monoxide, ammonia, hydrogen sulfide and dust is critically important. The ammonia concentration to which the birds are exposed should ideally be less than 10 ppm and should not exceed 25 ppm, but temporary excesses should not adversely affect bird health."

Does that guideline represent the recommendations of the scientific advisory committee, Dr. Armstrong?

A   Yes.

---

116

MR. SCHIRMER:  Object to form.

Q   And I'd like to look at the one right below that about light. It reads, "Lights should be allowed" -- sorry.

"Lights should be provided to allow effective inspection of all birds. Inspection of the birds should be conducted daily. Light intensity should be 0.5 to 1-foot candle for all birds at feeding levels during production."

Can you explain to me what means?

A   The first part means you've got to have sufficient light to be able to see in a cage and look into the back of the cage and see if there is a bird that's dead or ill or not mobile. It's not a given that at that time that all birds were inspected daily. It was not -- it wasn't necessarily a common practice to look at every bird every day.

And then the light intensity was just a minimum level for all birds at feeding. So those are the components of Point 8.

Q   And does that guideline represent the

---

117

recommendations of the scientific advisory committee?

A   Yes.

MR. SCHIRMER:  Object to form.

Q   Let's just go back to the ammonia one for a minute. Can you explain to me what is the problem with ammonia in cage production systems?

MR. SCHIRMER:  Object to form.

A   From a -- from a practical perspective, I've been in houses with over 25 parts per million. And whether it's 50 or even higher, one of the first things that happens is to eyes; it's very serious burning.

From a scientific perspective, it's very clear from the research that birds should not be exposed chronically to 25 parts per million or above. They will have eye damage, they will have lung problems. It is a bad situation. There's no question from a scientific perspective that that impacts animal welfare.

As you recall, I talked about touring an egg-laying facility in Iowa. At the time the

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

31 (Pages 118 to 121)

---

**118**

guidelines were developed, there were many
facilities that were called A frame, where
sometimes manure would drop on other birds, and
the manure was stored in the house.

Ammonia levels -- in that type of
system it's very difficult to get ammonia below
25, let alone 50.  I even -- this was a
contentious point for some producers.  I recall
clearly sitting in my office at Purdue University
one evening talking to a producer arguing that in
the upper Midwest, "I don't see how it's ever
going to be practical to get ammonia below 50.
It's sometimes hard to get it below 100."

Here is an example where the scientific
committee stuck to our science from the very
beginning and said 25, ideally it should be less
than 10.  And we didn't say when, but the
industry accepted -- the board accepted those
guidelines, but there were minority numbers of
members that did not accept it, and there are
production facilities out there today that are
still at 48 square inches and still have ammonia

---

**119**

levels over 25 parts per million of ammonia.  And
I've been saying for years, that is inhumane
production, that's inhumane housing of laying
hens.

Q    Let's turn to page 13.  I'd like to
direct your attention to the section of the
guidelines that is entitled Backfilling.  Do you
see that?

A    Yes.

Q    Dr. Armstrong, what is backfilling?

A    Backfilling is a practice in which --
where birds die in a cage over a period of time,
then birds are replaced.  So you may have five
hens, you may have six hens, you may have ten
hens, that's what the guidelines would allow.
Two birds die, let's put two birds back in.

Q    When you say that's what the guidelines
would allow, what do you mean by that?

A    Depending on the cage configuration, if
they're so many square inches, if it were 670
square inches and you could put ten birds in
there, and that would get you 67 square inches

---

**120**

per bird.  And then if two birds die, then all of
a sudden those eight birds have more than 67
square inches per bird.

Q    What is the scientific advisory --
Well, does the scientific advisory
committee have a position on backfilling?

A    Absolutely we have a position on
backfilling.

Q    And what is the scientific advisory
committee's position on backfilling?

A    Very negative.

Q    Why?

A    If you have a group of animals, they
have been put in there at a certain week of age
when they are ready to start laying eggs, they
develop a hierarchy.  We call it pecking order.
And that same thing translates to all -- all
animals.  We talk about a pecking order.  That's
established.  Those birds have been in there for
some time, and then you throw a novel bird or two
novel birds novel to those birds, they will hurt
those birds.  They will fight those birds.  It is

---

**121**

a detriment to the welfare of the bird to put
them in that backfilling situation.

There was no equivocation by the
committee on this aspect of backfilling.  That's
where the practical aspect did not match up
with -- with the welfare.  Because the welfare
impact is so high, we couldn't get over that
hurdle.  If a bird had been traumatized a little
bit --

Anyway, you get my point.  Negative.

Q    Are there other -- any other welfare
problems with backfilling other than what you've
just described?

A    There are --

MR. SCHIRMER:  Object to form.

A    -- could -- there could be other
problems that could be chronic welfare.  There
could be -- you know, there could be disease or
other aspects.  But the committee focused on the
behavior aspects of how the existing birds in a
cage would react to the novel birds being placed
in the cage.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

32 (Pages 122 to 125)

---

122

1      Q   When you say there could be problems
2   like disease, what do you mean by that?
3      A   Well, it's just a general practice that
4   if you go to an egg -- if you go into an egg
5   house, I mean if they let you in, you are going
6   to take a shower and put on their coveralls,
7   et cetera, et cetera.  So moving birds from one
8   barn to the next even on the same farm is not
9   exactly the best thing to do.
10      But within a farm that may not be as
11   big an issue.  The main issue for the committee
12   was behavior.
13      Q   Did anyone on the scientific committee
14   think that backfilling was okay as an animal
15   welfare matter?
16      MR. SCHIRMER:  Object to form.
17      A   I can't recall specific discussions,
18   but there was a typical response from Don Bell to
19   support ongoing practices.  But I don't recall if
20   this was one.  But there was somewhat of a
21   attachment to continuing practices from Don's
22   perspective.

---

123

1      Q   Was backfilling addressed in the
2   September 2000 scientific advisory committee
3   recommendations?
4      A   I would have to look.  I don't recall.
5      Q   Could -- do you mind taking a look?  I
6   don't believe that it was, but --
7      A   No.  As I recall, this is an example of
8   something that was brought to our attention --
9   brought to my attention, and this is part of that
10   liaison with the producer committee.  And some
11   producers recognized it was a bad thing, some
12   producers wanted to be able to keep doing it.
13   "What's the problem?"
14      I took -- I didn't say on the spot
15   what's the problem; I went back to the scientific
16   committee and we discussed it.  I never -- I
17   would never speak for the scientific committee
18   unless we had discussions.  So we would hold
19   phone calls or meetings to discuss topics.  So
20   while I can't recall the details and the dates of
21   this, I can assure you there was more than one
22   discussion of backfilling.

---

124

1      I can also say this is an example of
2   one of the aspects that we did not foresee in the
3   original discussion.  We did not foresee the
4   issues related to backfilling.  We didn't think
5   through that.  But it's a real practical matter.
6   And from a practical perspective it makes common
7   sense.  I've got -- you know, ten birds can be in
8   there and three have died, and I've got eight
9   weeks left.  I've got three spots empty.
10      That makes sense.  But it doesn't if
11   you're looking first and foremost at the welfare
12   of the hen, and that's what we were doing.
13      (Deposition Exhibit 11 was marked for
14   identification.)
15      Q   Dr. Armstrong, I've marked as Armstrong
16   11 a document that bares the Bates No. NUCAL,
17   that's N-U-C-A-L-08md2002-0001116.
18      A   Mm-hmm.
19      Q   Do you recognize this document?
20      A   I do.
21      Q   Can you tell me what it is?
22      A   This is a memo from me representing the

---

125

1   Scientific Advisory Committee for Animal Welfare
2   and expressing our extreme opposition to
3   backfilling.
4      Q   Is it an accurate summary of the
5   scientific advisory committee's position on
6   backfilling?
7      A   Yes.  It is --
8      MR. SCHIRMER:  Object to form.
9      A   It is more accurate than my recent
10   recollection.
11      Q   And what do you mean by that?
12      A   Well, it clearly states the rationale
13   in the middle paragraph.
14      Q   Can you read that into the record,
15   please.
16      A   "Bird welfare is compromised when
17   backfilling is done every month to replace
18   mortality for the purpose of keeping houses full.
19   Science has shown that mixing birds from other
20   flocks and with different ages increases
21   susceptibility to disease.  Older hens may harbor
22   disease-causing pathogens that are easily

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

33 (Pages 126 to 129)

---

126

1  transmitted to younger pullets that may not have
2  been fully vaccinated or have had the opportunity
3  to develop full immunocompetency.  In addition,
4  the introduction of unfamiliar birds to resident
5  birds increases social competition and stress,
6  which can increase mortality and decrease
7  production."
8       Again, notice the words "increase
9  mortality and decrease production."
10       The other point that I would make is
11  the younger birds that are in there that are
12  being beaten up, that's likely going to suppress
13  their immune system and make them more
14  suppressed.  Make them more susceptible to what
15  normally they'd fend off.
16       Q    Did you write this letter,
17  Dr. Armstrong?
18       A    I did, after careful review by the
19  advisory committee.
20       Q    Do you recall why you wrote this
21  letter?
22            MR. SCHIRMER:  Object to form.

---

127

1       A    Because of the -- because the
2  iterations and interactions with the industry, we
3  learned that this was a problem occurring
4  realtime in the field with producers.
5       Q    I'd like to direct you back to the 2008
6  guidelines.
7       A    Yes.
8       Q    The paragraph on backfilling that we
9  were reviewing just a moment ago.
10       A    What page was that again?
11       Q    13, I believe.
12       A    Okay.
13       Q    Do you see that?
14       A    Yes.
15       Q    Okay.  And let's take a moment to
16  review that guideline on backfilling.
17       A    Okay.
18       Q    Do you see it reads, "Other than a
19  catastrophic event, backfilling of cages to
20  replace mortality is prohibited under the United
21  Egg Producers certified program."
22            Does that guideline reflect the

---

128

1  recommendation of the scientific advisory
2  committee?
3            MR. SCHIRMER:  Object to form.
4       A    Yes.  It's completely in line with the
5  scientific advice.
6            MS. SUMNER:  Why don't we take a short
7  break.
8            THE VIDEOGRAPHER:  We are going off the
9  record.  The time is 10:55 a.m.
10            (A recess was taken.)
11            THE VIDEOGRAPHER:  This is the
12  beginning of Tape 3.  The time is 11:14 a.m., and
13  we are back on the record.
14       Q    Dr. Armstrong, sticking with the 2008
15  guidelines that we've been discussing, I'd like
16  you to turn to page 14 and look at the section
17  entitled Time Period for Implementations.
18       A    Yes.
19       Q    Did the scientific advisory committee
20  make a recommendation regarding the time period
21  for implementation of the animal welfare
22  guidelines?

---

129

1       A    As I recall, we discussed it, but we
2  were not formally involved in establishing this
3  table.  We said as soon as possible.
4       Q    Do you know who devised this table for
5  implementation?
6       A    I would assume the producer committee.
7       Q    Do you have an understanding as to why
8  the guidelines were to be implemented over the --
9  this six-year period?
10            MR. SCHIRMER:  Object to form.
11       A    It was a practical matter with regard
12  to facility, facility turnover, just the
13  practical matter of laying hen management,
14  production, et cetera.  It was just practicality.
15       Q    Would the committee have preferred that
16  the guidelines be implemented more quickly?
17       A    I think the committee would have
18  preferred --
19            MR. SCHIRMER:  Object to form.
20       A    -- but the committee was pleased that
21  the timetable was accelerated.
22       Q    And by accelerated, what do you mean or

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                              March 13, 2014

34 (Pages 130 to 133)

130

1  what are you referring to?
2      A   I don't recall the initial timetable,
3  but it was much longer than what you see on page
4  14.  And in the committee's -- I think the
5  committee's opinion, individual opinion, not
6  necessarily discussed as a group, that was
7  because of the increased involvement of members
8  of the retail sector.  When McDonald's announced
9  their guidelines, when Burger King announced
10  their guidelines, when other groups started
11  paying a lot more attention to science-based
12  guidelines for laying hens, the producers had the
13  impetus and through other discussion points to
14  move it along.  That would have been -- that was
15  my opinion at the time, and I think it's an
16  opinion shared by the committee members.
17      Q   Are you familiar with the term "house
18  average" as used in the guidelines?
19      A   Yes.  But that's not -- that's not a
20  topic that I was -- that I recall with great
21  detail.
22      Q   What is your understanding of house

131

1  averaging as it's used in the guidelines?  And if
2  it helps, I'd direct your attention to the last
3  paragraph in this Time Period for Implementations
4  section where the term is used.
5      A   The way I understand it, it was allowed
6  for producers to use old facilities.  That was
7  my -- that was my understanding.
8      Q   Was the scientific --
9          Was house averaging a concept that was
10  recommended by the scientific advisory committee
11  in September of 2000?
12          MR. SCHIRMER:  Object to form.
13      A   I don't recall a great deal of
14  discussion about house average.  I don't recall
15  it being controversial, that's why I'm having
16  trouble going beyond what's written right here.
17  It was nowhere near the same level as
18  backfilling, for example.  But I think the
19  committee understood that we were dealing with
20  old facilities.  And old facilities that would
21  make it difficult to deal with ammonia, would
22  make it difficult to deal with other things, and

132

1  the fact that the industry was in the process of
2  phasing in going from -- going from 48 to 67.  So
3  there was -- there was quite a bit of tolerance
4  on the -- from the realm of the committee of
5  going through to get to the point.  We were more
6  worried about getting to the point.  What's it
7  going to look like when you get there.
8      Q   Did you understand house averaging to
9  be what you have referred to I think repeatedly
10  in your deposition as an implementation issue as
11  opposed to an animal welfare issue?
12      A   Absolutely.
13          MR. SCHIRMER:  Object to form.
14      A   Absolutely.  We -- if there had been
15  animal welfare issues that had been really --
16  that -- if there had been animal welfare issues
17  from some of the key committee members like Joy
18  Mench or Ruth Newberry or others, I would recall
19  those discussions.  That's why I don't -- the
20  reason I don't recall it is that it is an
21  implementation issue, and it's noise in getting
22  to full implementation of the guidelines.

133

1      Q   Have you used the term "level playing
2  field" in connection with the UEP guidelines or
3  your discussion of them?
4          MR. SCHIRMER:  Object to form.
5      A   I have used the term "level playing
6  field" in speeches and comments that I've made in
7  a variety of settings, primarily but not
8  exclusively outside the committee realm.  I'm
9  sure I discussed it with the committee, but I've
10  been saying that for years, that animal welfare
11  is akin to food safety.  Companies shouldn't
12  compete on food safety.  My food is safer than
13  yours.  My water is safer than your water.  My
14  animals are -- you treat yours inhumane and I
15  don't?  And again, that's what I'm talking about.
16  What's a humane level?
17          It's not whether they have perches,
18  whether they have 500 feet to wander around.
19  It's that minimum level of animal welfare should
20  be on an equivalent level as food safety, and
21  there should be a level playing field.
22      Q   And what's the basis for that belief?

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

35 (Pages 134 to 137)

---

134

MR. SCHIRMER: Object to form.

A   My basis for the belief there is the simple scientific basis for a minimum level of guidelines. It's very clear after the thorough review that was established very early on in 2000. The core guidelines did not change very much after 2000 when we first established them because there were years of literature and studies that had been done looking at different production systems and whether this was good for many, many reasons. But all those studies always measured mortality and they always measured per-hen productivity. So we had years of data, and it was really clear that giving birds space up around 67 would enhance animal welfare. In fact, it was even clear that giving them a hundred or more would be negative because more space, mortality actually goes up.

That's what multiple studies said. Not one study, not two studies, multiple studies.

So the committee felt very comfortable that we have established a minimum level of

---

135

animal welfare, a humane level. If you go below it, the birds are being treated inhumanely, and, in my opinion and I think the committee's opinion, they have an unfair economic advantage because they're skirting the guidelines.

Now, there are no federal laws, there's nothing to prevent them. The only thing that can drive those guidelines are a voluntary program, or companies like McDonald's saying you will put your birds at, their case, 72 square inches, you will not molt, and they could be very direct because they weren't dealing with 98 percent of the birds, they were dealing with just a few percentage points of the birds.

There's really no equivocation in the committee on those points.

Q   Could you turn to page 24 of the guidelines. And I'd like to direct your attention to the audit section.

Was the scientific advisory committee involved in developing the audit procedures for the UEP certified program?

---

136

MR. SCHIRMER: Object to form.

A   The UEP certified committee was developed by the producers, by UEP, working with USDA, AMS, Validus. I don't recall if any of the individual members -- I'm thinking that some may have been involved just to review an audit. I can't recall. But we -- our main role was to provide the science-based guidelines. We were given reports on what was going on and our role and my role was, as liaison, was to make sure that the producer document was consistent with what we were doing from the macro level; that are the guidelines being held true? Are they true? Are they following the guidelines?

So the details, I just don't recall. But we -- we did not spend a lot of time on the UEP program. We spent our time on the science-based guidelines.

Q   Did the scientific advisory committee have a view on the need for an audit?

MR. SCHIRMER: Object to form.

A   I don't know whether we ever took any

---

137

actual votes on that topic. But you have to realize that the dream team that we put together, and even with the replacements, these are folks that are on numerous advisory boards, and I couldn't begin to tell you whether Janice Swanson or Joy Mench or Ruth Newberry or any of those other folks, if they worked with USDA, AMS, or Validus. They worked with my other groups, they worked with Burger King, McDonald's.

There are not a tremendous number of ethologists in the United States. It's a growing science. It's much more -- it's younger science, if you will.

So these folks would say individually audits are absolutely required. That's what they would say individually. But as a committee we didn't vote, we didn't talk about that. We're very pleased. And we are -- we just -- I just don't recall the details of how much we, you know, spent time on it but it wasn't significant compared to the science.

Q   Did you believe that an audit was

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

36 (Pages 138 to 141)

---

138

needed?

MR. SCHIRMER:  Object to form.

A   Absolutely.  I personally believe an audit is needed.  Any -- any type of guidelines need an audit.

Q   Why is that?

A   Because people will cheat.  They will ignore them.  It's true, it's human behavior.  And here's the most important reason, is people that really care about animal welfare and they're buying eggs, like McDonald's and others, they're going to require it.  Now in this case McDonald's has their own system, but they audit everything.  It's good supply chain management.

I mean it's almost a given that the audit was required.  It's good supply chain practice.

Q   Do you have an understanding that the failure to meet the space allowance requirements of the guidelines would cause an audit failure?

A   Absolutely.

Q   And do you have an understanding as to

---

139

why the failure to meet the space allowance guidelines is a cause for audit failure?

MR. SCHIRMER:  Object to form.

A   Because the space allowance for the birds, that was one of the -- one of the fundamental aspects of establishing humane guidelines for laying hens, that 67 to 86 square inch per bird range was carefully thought out.  In fact, our first recommendation, which only lasted a meeting or so, was 72.  That's why you'll see McDonald's program at 72, because that was the number we produced first.

After interaction with the industry, additional consideration, we have a wide range of birds and sizes, so we went to a range of 67 to 86, which in effect made the minimum 67.  That's a fundamental aspect of what we're -- what we were about, the space allowance per bird.  That was -- without that and -- without meeting that, there's no basis for humane guidelines.

Q   Do you have an understanding that evidence of backfilling is a cause for audit

---

140

failure under the UEP-certified program?

A   Yes, as I understand it.  And it's -- in this document, I think on page 13, it's prohibited.  So if something's prohibited and you do it, you fail the audit.  That's my understanding.

Q   I'd like to turn your attention to page 8 and 9.  Actually 8 through 10 of the guidelines to the section that's entitled Euthanasia and On-Farm Depopulation of Entire Flocks.

Dr. Armstrong, are you familiar with this section of the guideline?

A   Yes.

Q   And is this -- does this section of the UEP-certified guidelines represent the recommendations of the scientific advisory committee?

A   Yes.

Q   And can you explain to me the scientific advisory committee's view on euthanasia and on-farm depopulation?

MR. SCHIRMER:  Object to form.

---

141

A   Like many topics, we had one person who was the sort of resident expert, and that was Ruth Newberry.  And we recognized as a committee that on-farm euthanasia is essential and required.  The practical nature of laying hen production, it's not economically feasible to even think about a veterinarian to visit your farm and euthanize a bird.  It's just not practical.  So the ability to do that in an approved manner is very important.  Doing it wrong is a very, very big welfare issue.

Q   And is it the committee's view that -- well, strike that.

Do you believe that the scientific advisory committee's recommendations on euthanasia and flock depopulation are consistent with animal welfare?

A   Yes.

Q   You've referred multiple times today to the idea that the scientific advisory committee's guidelines set the baseline for humane animal care; correct?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

37 (Pages 142 to 145)

142

1    A    Yes.
2    Q    Is any animal welfare program perfect?
3    A    No.
4    Q    Why not?
5    A    Because we only know what we know at
6    the time, and we build the recommendations based
7    on the existing science.  And we're constantly
8    learning, the birds are constantly changing, and
9    then the external influences are constantly
10   changing.
11   Q    Can any animal welfare program
12   completely eliminate mortality in a flock?
13   A    No.
14   Q    What about cannibalism?  Can any animal
15   welfare program completely eliminate cannibalism
16   among birds?
17   A    No.
18   Q    And is cannibalism specific to hens in
19   caged systems?
20   A    No.
21   Q    Is it incident -- is its incidence
22   higher or lower in caged systems as compared to

143

1    other production systems?
2    MR. SCHIRMER:  Object to form.
3    A    The scientific research and the
4    practical knowledge from Europe and the United
5    States would clearly indicate that mortality is
6    higher in non-caged systems than caged systems.
7    Q    What about vermin?
8    A    Non --
9    MR. SCHIRMER:  Object to form.
10   A    Unconfined systems are subject to
11   predation -- predation.
12   Q    And can any animal welfare program
13   eliminate vermin that are found on farms?
14   MR. SCHIRMER:  Object to form.
15   A    A well-managed, confined system can
16   eliminate vermin if -- if properly managed.
17   Q    What about a non-caged system?
18   MR. SCHIRMER:  Object to form.
19   A    It's nearly impossible.
20   Q    Are you familiar with the term "hundred
21   percent rule" as it relates to the animal well --
22   UEP --

144

1    A    Could you repeat that?
2    Q    Yeah.  Are you familiar with the term
3    "hundred percent rule" as it relates to the UEP
4    certified program?
5    MR. SCHIRMER:  Object to form.
6    A    I need additional information.
7    Q    Okay.  Why don't we turn to page 26 of
8    the guidelines.
9    A    Oh, yes, I am -- I am very conversant
10   with this -- this concept.
11   Q    Okay.  And what is your understanding
12   of this concept?
13   A    So, really originated with the
14   committee discussions and also having a knowledge
15   of what's -- what was going on in the industry.
16   And it's consistent again with the concept that
17   our guidelines are minimum guidelines for humane
18   production.
19   So based on that and our role as a
20   committee focused on animal welfare, we saw no
21   reason why a producer, let alone a producer in a
22   voluntary certified program, would have some

145

1    birds treated humanely and other birds treated
2    inhumanely.  That's not supported by the view
3    that we believe in a humane minimum level of
4    production -- or husbandry.
5    Q    So on page 26, I'd like to direct your
6    attention to -- this is the section entitled
7    Additional Requirements for United Egg Producer
8    Certified Companies.  And No. 1 under this
9    section reads "A UEP Certified company must
10   implement the animal husbandry guidelines on a
11   hundred percent of the company-owned contract or
12   affiliate (site or location) regardless of where
13   or how eggs may be marketed."
14   Do you see that?
15   A    Yes.
16   Q    And did the scientific advisory
17   committee have a position --
18   A    Yes.
19   Q    -- on that statement?
20   A    They had a position on that concept
21   and, in essence, that statement, yes.
22   Q    Okay.  And what was that position?

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

38 (Pages 146 to 149)

---

146

1      A    It would support that concept in that
2  the committee would never condone or support
3  birds being housed and treated in a manner below
4  the minimum guidelines that we set.  We don't
5  have control over that, but we would never accept
6  it, and we would never advise UEP to go anywhere
7  other than a hundred percent rule.
8      Q    Was that position unanimous among the
9  committee members?
10     MR. SCHIRMER:  Object to form.
11     A    I think -- I don't recall whether Don
12 Bell was -- I don't recall all the detailed
13 discussions of whether we -- whether we were
14 unanimous, and specifically I'm thinking of Don
15 Bell, but the committee was very much to
16 consensus.  That's a detail I can't pull out.
17     (Deposition Exhibit 12 was marked for
18 identification.)
19     MS. SUMNER:  Marked as Armstrong 12 a
20 document that bears the Bates No. UE0213960
21 through 63.  This is a copy of the United Voices
22 newsletter dated May 25th, 2005.

---

147

1      Q    Dr. Armstrong, I'd like to direct your
2  attention to pages 2 and 3 of this document,
3  specifically to the article entitled Egg Industry
4  Needs to Be United on Animal Welfare, Editorial
5  by Dr. Jeff Armstrong and Scientific Advisory
6  Committee.  Could you please just take a minute
7  to review --
8      A    I have.
9      Q    -- that article.  And do you recall
10 this editorial?
11     A    Yes.
12     Q    Did you write this?
13     A    Yes.
14     Q    And what's the subject of this?
15     A    I wrote this, and it --
16     MR. SCHIRMER:  Object to form.
17     A    I wrote this article and it was
18 reviewed by the scientific committee and endorsed
19 by the scientific committee.  The subject of this
20 article is, basically, if you look at the second
21 paragraph, middle of it, "How can you justify
22 keeping (owning) some hens under humane

---

148

1  conditions and others in less-than-ideal
2  conditions?  Animal welfare is a public issue
3  that is growing in importance each day.  In this
4  context, how is it possible to justify selling
5  eggs that are produced under less-than-optimal
6  conditions for hen welfare?  This is not about
7  niche markets.  This is about an industry
8  establishing a set of guidelines for the humane
9  treatment of hens.  Failure to follow scientific
10 guidelines that are designed to ensure animal
11 welfare will leave not only producers, but the
12 entire industry extremely vulnerable to
13 criticism.  This is a quick way to the end of
14 cage-produced eggs."
15     So this is -- my memory is more clear
16 from this.  Apparently the committee fully
17 endorsed this because they reviewed it.
18     Q    Is this an accurate reflection of your
19 views?
20     A    Yes.
21     Q    And also --
22     A    It's a great capture of several of the

---

149

1  things I've stated today.
2      Q    And also of the views of the scientific
3  advisory committee?
4      A    Yes.
5      MR. SCHIRMER:  Object to form.
6      A    They were involved in editing and
7  reviewing this document.  It was a regular
8  practice for me.  Anything that I produced that
9  had "and scientific advisory committee" or their
10 names with it, that they would review it.
11 Sometimes it took weeks.
12     Q    What was the problem, or issue I should
13 say, from an animal welfare perspective with a
14 program that lacks a hundred percent rule or
15 equivalent concept?
16     MR. SCHIRMER:  Object to form.
17     A    The problem with an individual producer
18 who is going to be in a voluntary program, is
19 that -- is that they are housing birds in
20 inhumane conditions.  It's very simple.
21     And that's not an ethical -- that is a
22 science-based set of guidelines that we produced

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

39 (Pages 150 to 153)

---

150

1     Q    I'd like to direct your attention to
2   the first paragraph of this editorial.  The last
3   sentence states, "An industry-wide set of
4   guidelines should be just that, industry-wide."
5     A    Mm-hmm.
6     Q    Do you see that sentence?
7     A    Mm-hmm.
8     Q    And did you write that sentence?
9     A    Yes.
10    Q    Okay.  And what did you mean when you
11  wrote that sentence?
12    A    At that time, I think you'll see in the
13  first sentence of the second paragraph, a group
14  of producers were considering the establishment
15  of a separate program that would allow it to be
16  consumer driven.  And we were voicing our opinion
17  on that topic as well as just the general rule
18  that a UEP program should be a hundred percent.
19    Q    And why were you of that opinion, that
20  it should be a hundred percent or should be
21  industry-wide?
22        MR. SCHIRMER:  Object to form.

---

151

1     A    It goes back to the core belief, the
2   core understanding of the committee, that we were
3   establishing the minimum guidelines for humane
4   treatment of laying hens in cages.  And if the
5   industry wanted to follow our advice, we're
6   giving it.  That's -- that was our view.  And it
7   really gets to the core point that we did not
8   want to see hens housed at less than 67 square
9   inches or in houses with high ammonia or many of
10  the other noncompliance points.
11    Q    Were practices that the scientific
12  advisory committee considered to be inhumane
13  unacceptable to the committee?
14        MR. SCHIRMER:  Object to form.
15    A    Absolutely.  We found the current --
16  when we toured the industry and reviewed the
17  current status of the industry in 1998, we found
18  it to be unacceptable based on a review of best
19  practices -- practices grounded on science.
20  Therefore, we developed a set of guidelines that
21  would allow them to move to a science-based set
22  of guidelines with a minimum level.  Not a niche

---

152

1   market, not mine are more welfare friendly than
2   yours, but a minimum level.  And it's a zero or a
3   1.  It's humane or it's inhumane in the
4   committee's perspective.
5     Q    I'd like to direct your attention to
6   the second-to-the-last paragraph of this
7   editorial which is on page 3.  It begins, "It is
8   not our intent to suggest that all producers
9   should be part of the ACC program.  However, we
10  do believe all eggs should be produced in a
11  humane manner consistent with our guidelines.
12  Currently the ACC provides a very effective and
13  efficient means to assure customers that the
14  guidelines are being followed."
15        Do you see that?
16    A    Mm-hmm.
17    Q    And is that an accurate representation
18  of the committee's position at the time this
19  editorial was written?
20    A    Yes.
21        MR. SCHIRMER:  Object to form.
22    A    Yes.  And I would accentuate the second

---

153

1   sentence.  "We do believe all eggs should be
2   produced in a humane manner consistent with our
3   guidelines."
4         Another entire area of egg production
5   that was under our concern but we had little
6   opportunity to affect is the entire fluid or
7   breaker market.  There are still millions of
8   birds that are housed in guidelines that are
9   below standard, but the industry still does that.
10  We don't control that.  All we can do is
11  recommend and hope that federal law or consumer
12  retail will change those practices in the future.
13        In this case, we're providing advice to
14  an entity that asked us to provide advice, UEP.
15  And that's what we did.
16    Q    Last sentence of this editorial reads,
17  "Developing a separate program that permits eggs
18  to be produced under conditions that do not meet
19  the humane standards found in the UEP guidelines
20  is a huge mistake for the egg industry and one
21  that could have repercussions for all of animal
22  agriculture."

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

40 (Pages 154 to 157)

---

154

1         Did you write that sentence?
2     **A   Yes.**
3         Q   Okay.  And what did you mean when you
4     wrote that sentence?
5     **A   Exactly what it says.  I cannot**
6     **accentuate it any better than -- than exactly**
7     **what that says.  Developing a separate program**
8     **that permits eggs to be produced under conditions**
9     **that do not meet the humane standards found in**
10    **the UEP guidelines is a huge mistake for the egg**
11    **industry and one that could have repercussions**
12    **for all of animal agriculture.**
13        Q   Why was it a huge mistake in your view?
14    **A   Because if you are --**
15        MR. SCHIRMER:  Object to form.
16    **A   -- if you are saying that you have**
17    **science-based guidelines, and you're not**
18    **following science, that's false.  That's a huge**
19    **mistake.  You will lose the trust of retailers**
20    **and consumers that value science-based**
21    **guidelines.  And, again, my parallel to food**
22    **safety, you know, is it humane or not?**

---

155

1         **And the egg industry, by and large the**
2     **UEP, they've accepted the science and moved to a**
3     **humane level.**
4         Q   What were the repercussions for animal
5     agriculture that you were concerned about?
6     **A   It's just a spreading of the same**
7     **concept that if one group doesn't trust one**
8     **section of animal agriculture, then that mistrust**
9     **spreads to all.  All get labeled.**
10        Q   Going back to your work as an adviser
11    for Cargill for a moment.
12    **A   Yes.**
13        Q   Did you have an understanding as to why
14    Cargill -- well, what is Cargill?
15    **A   Cargill is a -- is a very large company**
16    **that -- many, many facets.  The particular aspect**
17    **of Cargill that I worked with was at that time**
18    **called Cargill Sunny Fresh, and they were the --**
19    **they're connected but separate with McDonald's.**
20    **So it's Cargill/McDonald's.  It's hard to**
21    **separate.  It has to do with their -- their egg**
22    **production.**

---

156

1         Q   Okay.  And did you have an
2     understanding as to why Cargill was interested in
3     animal welfare?
4     **A   Cargill and McDonald's both had --**
5     **well, since I became familiar with McDonald's and**
6     **Cargill, it's hard to separate the two.  It's**
7     **part of their value system.  They believe in food**
8     **safety, they believe in humane treatment of**
9     **animals.  It's part of their corporate social**
10    **responsibility principles.  That's true for both**
11    **companies.**
12        (Deposition Exhibit 13 was marked for
13    identification.)
14        MS. SUMNER:  For the record, I've
15    marked as Armstrong 13 a confidential document
16    that bears the Bates Nos. UE0366667 through 668.
17        Q   Dr. Armstrong, do you recognize this
18    document?
19    **A   Yes, I do recognize the document.**
20        Q   And what is this document?
21    **A   This is a letter that we sent to Gene**
22    **Gregory, and we wanted to clearly send a message**

---

157

1     to the industry stressing the point in page 2.
2     And if you look at the first full paragraph, I'd
3     given the background, "Our group of scientists is
4     first and foremost concerned with the welfare of
5     laying hens.  We have consistently maintained our
6     role is to recommend science-based animal care
7     practices to the UEP and not attempt to dictate
8     timely -- timelines of adoption by the industry.
9         "It has come to our attention that
10    individuals within industry are attempting to
11    develop a program that would use the USDA Process
12    Verified seal but result in less than one hundred
13    percent of the hens subject to science-based
14    guidelines."
15        And you skip down and it says, "It is
16    our collective and firm belief that any program
17    approved by UEP or USDA should require
18    100 percent implementation.  While both seals
19    represent marketing programs, we believe failure
20    to ensure 100 percent implementation threatens
21    the welfare of laying hens and the overall
22    credibility of our science-based guidelines."

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

41 (Pages 158 to 161)

### 158

1          **So I could have gotten to that point**
2   **quicker, but the two points:  Failure to ensure a**
3   **hundred percent threatens the welfare of laying**
4   **hens, and the overall credibility of**
5   **science-based guidelines.**
6          Q    In that third-to-the-last paragraph,
7   you read the first sentence.  And then it goes on
8   to say, "In other words, a given producer or
9   company would not be required to maintain all
10  hens under science-based guidelines.  We are
11  adamantly opposed to this approach."
12         Do you see that?
13  **A    Yes.**
14         Q    And was that your view at the time you
15  sent this letter to Gene?
16  **A    That was not --**
17         MR. SCHIRMER:  Object to form.
18  **A    That sentence and the following**
19  **sentence, the entire note is not only my view but**
20  **the committee's view.**
21         Q    And why were you and the committee
22  adamantly opposed to this approach where a

### 159

1   producer or company would not be required to
2   maintain all hens under science-based guidelines?
3          MR. SCHIRMER:  Object to form.
4   **A    Because hens would be subject to**
5   **inhumane conditions.  Inhumane conditions.**
6          Q    And you then went on to write, "We view
7   the UEP guidelines as grounded in sound science
8   that represents the threshold for maintaining
9   caged layers humanely.  Housing hens at less than
10  UEP minimum standards is neither scientifically
11  justified nor humane."
12         Did I read that correctly?
13  **A    That's absolutely correct.**
14         Q    And was that your belief at the time
15  you wrote this letter?
16  **A    That was my belief and the full belief**
17  **of the committee.**
18         Q    And is that still your belief today?
19  **A    Yes.**
20         **(Deposition Exhibit 14 was marked for**
21  **identification.)**
22         MS. SUMNER:  I've marked as Armstrong

### 160

1   14 a document that bears the Bates numbers --
2   confidential document that bears the Bates Nos.
3   UE0557576 through 78.
4          Q    Dr. Armstrong, if you could take a
5   moment, please, to review this document and let
6   me know when you've done so.
7   **A    Yes.  I've reviewed it.**
8          Q    Do you recognize this document?
9   **A    Yes.**
10         Q    Can you tell me what it is?
11  **A    It is another one of our notes from the**
12  **committee, fully endorsed by the committee, to**
13  **the industry stressing the importance of**
14  **science-based guidelines, stressing the**
15  **importance to look at new systems, stressing the**
16  **importance of additional research.  And finally,**
17  **that we're unanimous in the support of the**
18  **implementation of science-based animal care**
19  **guidelines by the industry.**
20         Q    And if you look at pages 2 and 3, the
21  document has a date of August 2nd, 2008, at the
22  top.

### 161

1   **A    Yes.**
2          Q    Do you see that?  Is that at or around
3   the time that this document was written?
4   **A    Yes.**
5          Q    And did you write this document?
6   **A    Yes.**
7          Q    Did you consult with the committee in
8   writing the document?
9   **A    In great detail.**
10         MR. SCHIRMER:  Object to form.
11  **A    I consulted with the committee, they**
12  **were actively involved.**
13         Q    Did they approve this document?
14  **A    100 percent approval by the committee.**
15         Q    Does this document accurately -- excuse
16  me -- reflect your views and the views of the
17  committee on the topics that are addressed in the
18  document?
19  **A    Yes.**
20         MR. SCHIRMER:  Object to form.
21         Q    Sitting here today as you reviewed this
22  document, is there anything in this document that

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

42 (Pages 162 to 165)

---

162

1  you believe to be inaccurate?
2          MR. SCHIRMER:  Object to form.
3      A   No, not based on my quick renewal with
4  the document.  No.
5      Q   If you look at the top of page 3,
6  there's a discussion about enriched cages.
7      A   Yes.
8      Q   Do you see that?  What was the
9  committee's view on enriched cages at this time?
10     A   From the very beginning, when we
11 reviewed types of systems, and even in the
12 earliest writings from the committee, we stressed
13 to the industry that modified or enriched cages,
14 similar terms, are a system that should be
15 evaluated and carefully looked at, the industry.
16         As I learned more and more about
17 enriched cages, toured enriched-cage facilities,
18 I pushed even harder.  Because, again, if you
19 think about mortality and per-hen egg production
20 as being the minimum levels of hen welfare, it's
21 also clear that birds want to perch, they want to
22 dust bathe, and they like a dark area to lay

---

163

1  their eggs.  Three distinct behaviors.  And the
2  enriched cage provides that, but yet keeps
3  mortality low and per-hen productivity high.  So
4  it's something that the industry should look at,
5  I think, as soon as possible within the realm of
6  what's practical.
7      Q   The last sentence -- do you know if the
8  industry is looking at --
9      A   Yes.
10     Q   -- those systems today?
11         MR. SCHIRMER:  Object to form.
12     A   Yes.  In fact, in my state there's a
13 very -- very good example of enriched cages.  You
14 can go to a website and watch the birds online,
15 and it's doing very well.  And enriched cages
16 were mandated by the EU -- or I should say cages
17 were banned by the EU and enriched cages are
18 coming into play.
19     Q   The last sentence of this paragraph you
20 wrote, "Because of pressure from activists,
21 however, a solid science-based assessment may be
22 required before retailers and consumers will

---

164

1  accept this approach."
2      Q   Do you see that?
3      A   Yes.
4      Q   What did you mean?
5      A   At the time this was written,
6  August 2nd, 2008, some of the major groups --
7  I'll name one:  HSUS -- were vehemently opposed
8  to any type of cage.  Any type of cage.  So that
9  was a reality at the time.  Because there were
10 significant groups that would never accept any
11 modifier cage.
12         But if you look at the science of this
13 system, and you look at the holistic approach to
14 sustainability, it's very solid.
15         Since writing this in 2008, HSUS has
16 changed their view and they now accept enriched
17 cages as humane.
18         I personally think that's where the
19 industry will go and should go, and I've been
20 very open about that.  Not as representing the
21 committee's view, but as my own view.
22     Q   Dr. Armstrong, do you understand that

---

165

1  United Egg Producers and several of UEP's members
2  have been sued for alleged antitrust violations
3  that are in part based on allegations relating to
4  the UEP certified program?
5          MR. SCHIRMER:  Object to form.
6      A   I am aware.
7      Q   Are you familiar generally with the
8  allegations about the UEP certified program that
9  are being made in those lawsuits?
10     A   I am not --
11         MR. SCHIRMER:  Object to form.
12     A   I am not aware of the specific details,
13 just that -- just the overarching view.
14     Q   Okay.  And what is the -- what is the
15 overarching view that you are aware of?
16         MR. SCHIRMER:  Object to form.
17     A   My assumption is that the complaint is
18 that this welfare program was not a welfare
19 program but was used to alter the price or
20 supply.  And I really don't know much more than
21 that.
22     Q   Okay.  And what is your reaction to

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

43 (Pages 166 to 169)

166

1    those allegations?
2         MR. SCHIRMER:  Object to form.
3         A    My response is, from the beginning, our
4    scientific advisory board first and foremost
5    established minimum humane guidelines for caged
6    animal production.  Later we expanded that to
7    other forms.
8         Our committee would be -- if there were
9    any indication that our committee was involved in
10   something other than the science, they would be
11   profoundly upset and disappointed, because we
12   always focused on, first and foremost, the
13   welfare of laying hens.
14        Moreover, as you can see in the
15   writings that I have produced and the view of the
16   committee, we view the process that we went
17   through and the resulting guidelines as an
18   example for the rest of animal agriculture to
19   follow.
20        This is a -- we're all -- we all view
21   our role in this committee as something that is
22   quite profound and had monumental impact in not

167

1    only egg production, but in animal agriculture.
2    That's clearly the view of the committee.  We've
3    been that a long time.
4         We're quite proud of this
5    accomplishment from a professional perspective
6    because we put science-based guidelines into
7    play, and we're also -- I have also said
8    repeatedly to numerous audiences that I believe
9    the egg producers, the United Egg Producers, are
10   one of the, if not the, most proactive and
11   forward-thinking groups with regard to animal
12   welfare in the United States.
13        Q    Did you ever understand the development
14   of the UEP certified program to be part of a
15   supply restriction conspiracy among egg
16   producers?
17        A    No.
18        MR. SCHIRMER:  Object to form.
19        A    No.
20        Q    Do you ever hear anyone talk about the
21   program in those terms?
22        MR. SCHIRMER:  Object to form.

168

1         A    Never.
2         MS. SUMNER:  Can we take a short break.
3         THE VIDEOGRAPHER:  We are going off the
4    record.  The time is 12:01 p.m.
5         (A recess was taken.)
6         THE VIDEOGRAPHER:  We are back.  This
7    is the beginning of Tape 4.  The time is
8    12:45 p.m., and we are back on the record.
9         MS. SUMNER:  Dr. Armstrong, thank you
10   for your time this morning.
11        At this point I have no further
12   questions for Dr. Armstrong.  We do, however,
13   want to reserve adequate time to conduct a
14   redirect examination which will be dependent
15   obviously on, you know, the course of questioning
16   this afternoon.  We'd like to reserve up to an
17   hour to do that since we really did not use
18   nearly our time this morning.  But at this point
19   we're happy to turn -- turn over the deposition
20   to the plaintiffs.
21        MR. OLSON:  Okay.  Well, we can see how
22   the timing works out and address that later.

169

1    CROSS-EXAMINATION,
2         QUESTIONS BY STEIG D. OLSON:
3         Q    So, good afternoon, Dr. Armstrong.  I'm
4    Steig Olson.  I am an attorney for the direct
5    purchaser class plaintiffs in the federal case,
6    and I'm going to ask you a few questions today.
7    I'm going to do my best to ask clear questions,
8    but if at any time you find anything about the
9    question unclear, just ask me to stop and ask for
10   clarification.
11        A    Thank you.
12        Q    And if you answer a question, I'll
13   assume you understood it; is that fair?
14        A    Yes.
15        Q    At the very beginning of the day you
16   discussed your professional work in the area of
17   social responsibility with regard to food
18   systems.  Do you recall that?
19        A    Yes.
20        Q    With regard to the social
21   responsibility of food producers, is part of that
22   social responsibility being truthful and

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

---

170

1    forthright about production practices?
2        A    Yes.
3        Q    So I'd like to go back to the beginning
4    of your work for the UEP scientific advisory
5    committee.  And to do so, let me hand you a
6    document that we'll mark today Armstrong 15.
7    This was previously used as Gene Gregory 6,
8    Donald Bell 3.  It is UE0064537.  And it's a
9    United Voices from February 22nd, 1999.
10           (Deposition Exhibit 15 was marked for
11   identification.)
12       Q    Dr. Armstrong, are you generally
13   familiar with United Voices publications?
14       A    Yes.
15       Q    Are you aware who its editor was of --
16   as of 1999?
17       A    Yes.
18       Q    And is this a publication that you
19   would review as part of your efforts to stay up
20   to date on the egg industry?
21       A    Yes.  I was a regular recipient.
22       Q    And if you look at the first page of

---

171

1    this particular United Voices, does it discuss
2    the first meeting of the UEP scientific advisory
3    committee?
4        A    Yes.
5        Q    And I asked if you were aware who the
6    editor was.  Who was the editor as of this time?
7        A    As listed here, Gene Gregory.
8        Q    All right.  And this first meeting
9    occurred in February of 1999; correct?
10       A    Yes.
11       Q    And this is a meeting in Arizona, I
12   believe you referenced earlier.  Do you recall
13   the meeting?
14       A    I do, yes.
15       Q    Now, you testified earlier today about
16   how the members of the meeting were selected; do
17   you recall that?
18       A    Yes.
19       Q    And you testified that part of that
20   process involved conversations with Gene Gregory.
21   Do you recall that?
22       A    Yes.

---

172

1        Q    And what types of conversations did you
2    have with Gene Gregory?
3        A    I don't recall the details, but I
4    talked with Gene all along as I was constituting
5    the committee.
6        Q    And do you see that Gene Gregory --
7    sorry, that Armstrong Exhibit 15 that you're
8    looking at lists the members of the committee as
9    of the date of the first meeting?
10       A    Yes.  The only error I see on the
11   document is it says I'm head of the poultry
12   science department, and it's head of animal
13   science department.  Everything else looks
14   accurate.
15       Q    Okay.  And the listing of the members
16   of the committee looks accurate as well; correct?
17       A    That is correct.
18       Q    And there's a picture of these members,
19   and although the picture is fuzzy, the names are
20   there as well; right?
21       A    Yes.
22       Q    And in both the picture and the list of

---

173

1    the members of the committee, Barrie Wilcox,
2    Wilcox Farms, is listed as a member; correct?
3        A    He's shown with the members, yes.
4        Q    Mm-hmm.
5        A    And he's listed as a member on Gene's
6    document.  Yeah.
7        Q    And Donald Bell is also listed as a
8    member; correct?
9        A    Right.  Barrie was an ex-officio
10   member, Don was a full member.
11       Q    The -- now this document doesn't say
12   anything about ex-officio?
13       A    No, it does not, no.
14       Q    You have an understanding of what an
15   ex-officio member is; correct?
16       A    Yes.
17       Q    And I believe that's a Latin term; is
18   that right?
19       A    I'm not familiar with the Latin, but I
20   know an ex-officio can be virtue of title, or it
21   can be voting are nonvoting.
22       Q    Right.  But putting the voting issue

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

45 (Pages 174 to 177)

174

1  aside, ex-officio means you're a member of some
2  body by right of some office you hold in some
3  other body; is that right?
4  **A   In this case it was -- the member was**
5  **ex-officio as a result of being the chair of the**
6  **producer committee.  That's correct.**
7  Q   And that means essentially -- well,
8  strike that.
9        Now, when you constituted the
10  membership, who suggested that Donald Bell be a
11  member?
12  **A   I think Gene Gregory.**
13  Q   Now, when you --
14  **A   I'm pretty -- I'm pretty sure it**
15  **happened that way, and then I agree -- and I**
16  **agreed with that.**
17  Q   Now, when you agreed to be the chair of
18  the scientific advisory committee -- and to be
19  clear, this was a UEP committee; correct?
20  **A   Correct.**
21  Q   All right.  So we'll call it the UE --
22  we'll call it the scientific advisory committee

175

1  but its full name is UEP's Animal Welfare
2  Scientific Advisory Committee?
3  **A   Yes.**
4  Q   Now when you agreed to chair this
5  committee, were you given any formal set of rules
6  that would govern how the business of the
7  committee was conducted?
8  **A   No.**
9  Q   Did you sit down and create any such
10  set of formal rules?
11  **A   No.  We --**
12  Q   Were you --
13  **A   We discussed guide -- we discussed how**
14  **we were going to do things at the first meeting.**
15  Q   Just discussed those orally?
16  **A   Best of my recollection.**
17  Q   Do you recall at any time anyone
18  memorializing the formal rules that would govern
19  how business was conducted at the committee?
20  **A   I don't recall.**
21  Q   So there are no written formal rules
22  about such things as voting; correct?

176

1  **A   There are no written rules about it,**
2  **no -- I mean yes, that's correct.**
3  Q   And did you -- did the committee apply
4  the Robert's Rule of Order -- Rules of Order?
5  **A   No.  It was not a formal -- it wasn't**
6  **run in a formal manner, no, which is not unusual**
7  **for a group of academicians.**
8  Q   And this -- this exhibit we're looking
9  at references that among the issues discussed at
10  the first meeting were molting and the economics
11  of such.  Do you see that?
12  **A   Yes.**
13  Q   Do you recall what issues about
14  economics were discussed with regard to molting
15  at this meeting?
16  MS. SUMNER:  Object to the form of the
17  question.
18  MR. OLSON:  What's the objection?
19  MS. SUMNER:  You haven't established
20  that --
21  THE REPORTER:  I'm sorry?
22  MS. SUMNER:  Lack of foundation.

177

1  Q   You can answer.
2  **A   The topic that was discussed -- and**
3  **again, this is Gene's set of notes that I didn't**
4  **edit.  I didn't write this.  Very similar to what**
5  **I said earlier, we looked at molting from two**
6  **perspectives.  What's good about a molt from the**
7  **welfare prospective, and what's bad about the**
8  **molt.**
9  **We discussed it from a production**
10  **perspective in that it was clear that not molting**
11  **would increase the cost of production.  So it was**
12  **in that context.  Not molting would increase the**
13  **cost of production.  That was -- that was clear.**
14  Q   Okay.  Were there other economic issues
15  about molting that you recall being discussed at
16  around this time?
17  **A   We talked about -- Steig, we talked**
18  **about almost every aspect of the industry in that**
19  **first meeting.  So if it had to do with molting,**
20  **we probably discussed it.  I just don't recall**
21  **the details.**
22  Q   Fair enough.  And I'm just focusing on

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

46 (Pages 178 to 181)

---

**178**

1  the -- the economic issues related to molting for
2  now.
3      A   Mm-hmm.
4      Q   To you -- to your knowledge, are there
5  times when molting is more economically
6  attractive for producers than other times?
7      A   That's really not in my sphere of
8  expertise.
9      Q   And who on the committee was -- had
10 more expertise with regard to economic issues
11 than you did?
12     MS. SUMNER:  Object to the form of the
13 question.
14     Q   If you know?
15     A   If you look at the different members of
16 the committee, the person who understood
17 production better than anyone else would be Don
18 Bell.
19     Q   And Mr. Bell, would it be fair to say
20 also, studied the economic issues related to
21 production?
22     A   I don't know his formal background, but

---

**179**

1  he studied every aspect of laying hen production,
2  so I think that would be fair.
3      Q   Do you recall discussing with Mr. Bell
4  at any time the economic consequences of adopting
5  a uniform set of cage space allowance guidelines
6  in the egg industry?
7      MS. SUMNER:  Objection.
8      A   I go ahead and answer; correct?
9      Q   Yes.
10     A   Okay.  We talked about the impact of
11 various production systems on all aspects of
12 production.  So, the cost of production, feed
13 efficiency, all of those aspects were very clear.
14 Because it was very clear to the producers that
15 giving more space was going to be associated with
16 an increased cost of production.
17     Q   Did you ever discuss with Mr. Bell the
18 notion that adopting a uniform set of cage space
19 allowance guidelines could address surplus
20 production problems that had affected the egg
21 industry?
22     MS. SUMNER:  Objection.

---

**180**

1      MR. KEALEY:  Objection to form.
2      Q   You can answer.
3      A   I'm getting used to this.
4      I don't recall a specific conversation
5  in that context.  I can assure you we talked
6  about the cost of production, feed efficiency of
7  all the different production systems, as well as
8  molting and not molting, within the context of
9  the early discussions of systems.
10     Q   Now, I take it you were aware that
11 there were concerns in the egg industry about
12 times when there was too much supply in the
13 market?
14     MS. SUMNER:  Objection.
15     MR. KEALEY:  Objection to form.
16     A   We focused in our committee meetings --
17     Q   That's not the -- I'm just asking you
18 as someone who knows about the egg industry, were
19 you aware that this was something that concerned
20 egg producers?
21     MS. SUMNER:  Objection.
22     A   I have been in animal agriculture my

---

**181**

1  entire career, so I am not oblivious to the ups
2  and downs of all different types of production,
3  but that's a normal -- normal thing for a person
4  in my role.
5      Q   And so would it be fair to say you were
6  aware that egg producers paid attention to issues
7  about oversupply of eggs in the egg industry?
8      MR. KEALEY:  Objection to form.
9      MS. SUMNER:  Objection.
10     A   I was not in those conversations.  I --
11 all I know is what I read from Feedstuffs and
12 normal email that comes to a department head of
13 animal sciences.
14     (Deposition Exhibit 16 was marked for
15 identification.)
16     Q   Let me hand you what we've marked
17 Armstrong 16.  And this is a UEP United Voices
18 publication from September 27, 1999, Bates
19 stamped UE0064421 through 24.  And I'd like you
20 to look at the -- I believe the third page of the
21 publication.  There's an article that's titled
22 Animal Welfare Committee to Meet.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

---

182

1       A   Yes, I see it. I've scanned it.
2       Q   And it references an upcoming meeting
3   in September of 1999 in Iowa. Do you see that?
4       A   Yes.
5       Q   Do you generally recall that meeting?
6       A   Yes.
7       Q   And there's a listing of the members of
8   the scientific committee; do you see that?
9       A   Correct.
10      Q   And Mr. Wilcox is listed; correct?
11      A   Yes. And this is Gene's list, not my
12  list. Yes.
13      Q   But it's an accurate list?
14      A   That's an accurate list of members and
15  ex-officio members.
16      Q   Okay. You can put that aside.
17          (Deposition Exhibit 17 was marked for
18  identification.)
19      Q   I will hand you what we're marking
20  Armstrong 17. This is a document Bates stamped
21  UE0297719 through 23.
22          And can you identify this,

---

183

1   Dr. Armstrong, as minutes of an October 14 and
2   15, 1999, UEP meetings?
3       A   Yes, I recognize that these are minutes
4   from that -- that date.
5       Q   And one of the meetings was the UEP
6   annual board meeting and another was an executive
7   conference?
8       A   Correct.
9       Q   In Tucson, Arizona?
10      A   Correct.
11      Q   Okay. And you attended these meetings;
12  correct?
13      A   Yes. I was there.
14      Q   And, do you know who Ken Looper is?
15      A   Yes. I know Ken Looper.
16      Q   All right. And if you look at the
17  first substantive page, there's the chairman's
18  opening comments. Do you see those?
19      A   Yes, I do.
20      Q   And do you see where it says, referring
21  to Chairman Looper, "He stated that this meeting
22  was extremely important because of so many

---

184

1   pressing issues that needed to be addressed
2   including the current supply/demand problem."
3           Do you see that?
4       A   I sure do.
5       Q   Do you recall those remarks?
6       A   The thing I recall from Ken's
7   remarks -- and I don't know if it was exactly at
8   this meeting, but he was very helpful because he
9   said we need to be proactive and on the offensive
10  and look at science-based animal welfare
11  guidelines, much as we handled the cholesterol
12  issue in the past.
13          You asked about my attendance at these
14  meetings. I'm in, I'm out. When I'm there
15  sometimes I'm on my laptop. So I can only tell
16  you what I can recall.
17      Q   And do you --
18      A   But I was at these meetings, and I
19  recall -- you know, I recall hearing Ken Looper
20  speak on many occasions.
21      Q   And do you recall Mr. Looper at this
22  meeting saying that the meeting was extremely

---

185

1   important because of pressing issues that needed
2   to be addressed, including a supply/demand
3   problem?
4       A   I recall him talking about the meeting.
5   I do not recall him saying other than what I
6   said. And I just don't recall the details.
7           But I'm sure he did if it's written in
8   the minutes.
9       Q   If you look at the next page there's a
10  marketing committee report. Do you see that?
11      A   Yes.
12      Q   And you were in attendance for that as
13  well; correct?
14      A   For that specific committee report, I
15  cannot verify if I was in the room or not, but
16  chances are I was.
17      Q   You were at the meeting where the
18  report --
19      A   I was at the meeting. I just honestly
20  can't tell you and remember which parts I was in
21  there for.
22      Q   Fair enough. If you could just briefly

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

48 (Pages 186 to 189)

---

186

review what's right under that so I can ask one
or two questions.
    A   Yes.  I read it.
    Q   All right.  Do you see a reference to a
Joe Arias?
    A   Yes.  I see that.
    Q   And do you know who that is?
    A   Yes, I know Joe.
    Q   Who is Joe Arias?
    A   I know Joe as an egg producer who my --
I just remember him.  He's got a really big
personality, and you don't forget Joe.
    Q   Do you see where the
minutes say "Joe Arias pleaded with the industry
to only produce eggs for their markets and not be
tempted to expand with hopes of taking accounts
away from other producers"?  Do you see that?
    A   I see that.
    Q   Do you recall Mr. Arias making those
remarks?
    A   I don't recall those specific remarks.
    Q   That's the question.  If you don't

---

187

know --
    A   I don't recall the specific remarks.
    Q   I have to ask the question, if --
    A   Sure.  Sure.
    Q   -- the answer's "no," that's a fair
answer.
        Well, do you see that under the motion
to address the issues, there's a motion to
immediately molt 5 percent of your flock?
    A   Mm-hmm.
    Q   Do you know any way that immediately
molting 5 percent of a flock relates to supply
and demand issues in the egg industry?
        MR. KEALEY:  Objection to form.
    A   That's -- that's beyond my expertise,
and from my broad knowledge, I know that molting
was a practice that the producers used in a
variety of means.  Our focus on the committee was
the animal welfare aspect of molting, and nothing
really focused on that.
    Q   All right.  And if you look at the next
page there's a heading that says Animal Welfare

---

188

Committee Report that references a presentation
that you had given.  Do you see that?
    A   Yes.
    Q   And do you recall giving that
presentation generally?
    A   Yes.  I recall that -- I recall giving
that presentation, I think it was the first time.
And I let them know about the significant changes
we were recommending.
    Q   Okay.  So there's a reference to you
referencing some preliminary recommendations.  Is
that what you just referred to?
    A   Yes.  If this was -- let me double
check the date.  This was October, so by that
time, we would have had the February meeting, and
then we also had the September meeting.  And I
don't recall whether it was this meeting or a
later meeting, but it was when I talked about 72
square inches and other aspects of the
guidelines.
    Q   And you referenced a time you alerted
folks at UEP to some of the significant changes

---

189

that the scientific advisory committee was
recommending.  In addition to the 72 inches of
cage space, were there other significant changes
that the -- that you alerted the producers to?
        MS. SUMNER:  Objection.
    A   So I talked about molting, and I talked
about the good things of molting and the bad
things of molting.
    Q   Well, let's pause on that.  What were
the significant changes with regard to molting
that the scientific advisory committee was
recommending?
    A   We -- we at that time, we were
recommending that as soon as possible they find a
non-feed-withdrawal method to induce the molt
versus a feed-withdrawal method.
    Q   Were there any other significant
changes with regard to molting practices that the
committee was recommending?
    A   At that time, as I recall, we were
focused on not eliminating the molt but finding a
non-feed withdrawal.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

49 (Pages 190 to 193)

190

1    Q   I understand.  So -- so one thing is
2  you were saying there needed -- there should be
3  research into non-feed withdrawal?
4    A   And then we also talked about things a
5  producer could do to evaluate and mitigate the
6  negative welfare impacts of the current practice.
7  We did not talk about timing of when they would
8  implement, other than implement these practices
9  because it represented no change, it represented
10  modifying and looking -- modifying slightly and
11  looking at how they were handling normal practice
12  of a feed withdrawal molt.
13    Q   And do you see a reference that the
14  committee would meet again in February to
15  hopefully complete their work at that time?
16    A   I do.
17    Q   So was your understanding as of
18  October 1999 that the committee would complete at
19  least its initial work on the guidelines as of
20  February 2000?
21    A   That makes -- that makes logical sense.
22  I don't remember all the details.  But the

191

1  core -- I believe at this time some of the core
2  recommendations were there.  For example, I know
3  the first time I presented, if this was indeed, I
4  think, the first time I presented, I used 72.  We
5  went back at the next meeting and talked about a
6  range making more sense from a biological and a
7  strain perspective.
8    Q   At which next meeting did you go back
9  on the 72?
10    A   If this was indeed the meeting where I
11  talked about 72, then it would have been
12  reference to that next February meeting where we
13  would've talked about the range, I think.  Best
14  of my recollection.
15      I don't know if it spanned two meetings
16  or three meetings.  I don't remember how
17  frequently we met then.
18    Q   So in your first presentation to the
19  UEP members you talked about 72 inches per hen,
20  and then after that went back to the scientific
21  advisory committee and went to a range instead of
22  that number?

192

1    A   Mm-hmm.
2    Q   Is that what you're saying?
3    A   Mm-hmm.
4    Q   Now if we look back at this marketing
5  committee report on the prior page --
6    A   Correct.
7    Q   -- do you see Point 1, there's a
8  motion.  It says there was a motion for the
9  members to reduce each member's flock size by
10  5 percent as quickly as possible and to maintain
11  this through July 1, 2000.  Do you see that?
12    A   I do see that.
13    Q   Was the scientific advisory committee
14  ever asked to evaluate whether producers reducing
15  their flock size by 5 percent as quickly as
16  possible was a humane thing to do?
17    A   I don't recall.  I really don't recall.
18  I don't recall it being a topic of discussion,
19  but if it was, it wasn't something that makes me
20  remember it today.
21    Q   Okay.  And if the way that was to be
22  done was by slaughtering 5 percent of hens, would

193

1  that be a humane thing to do?
2      MR. KEALEY:  Objection to form.
3    A   The committee nor I -- as I attended
4  these meetings, I didn't focus on the details of
5  the other committees.
6    Q   You can put that aside.  I'm just
7  asking you a question.
8    A   No.  That's what I'm saying.  Whether
9  it's attending this meeting or others, I didn't
10  focus on the details, I focused on the details of
11  the animal welfare committee and the animal
12  welfare report.  I can tell you from a
13  perspective of the animal welfare committee that
14  we talked about on-farm euthanasia almost -- the
15  best of my recollection, that was with regard to
16  disease situations, cannibalistic outbreaks.  We
17  were more focused about how you do it, not when
18  you should do it or -- and again, I don't recall
19  being posed that specific question.
20    Q   Well, let me just ask the question, and
21  the question is, as the former long-time chairman
22  of the scientific advisory committee, if you have

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

50 (Pages 194 to 197)

---

194

1  an opinion on the following -- the question had
2  been presented to you:  Is it consistent with
3  animal welfare practices for the producer members
4  of the UEP to slaughter 5 percent of their flock,
5  not because of disease, not because of
6  cannibalistic outbreaks, but only to increase the
7  price of eggs?  Would that be something in your
8  view that's consistent with animal welfare?
9           MR. KEALEY:  Objection to form.
10          MS. SUMNER:  Objection.
11      A    That's not the context that we would
12  ever discuss anything.  If you look at --
13      Q    I'm just asking you now.
14      A    No, I know, and I'm giving you an
15  answer.
16          But if you look at what we just talked
17  about in the very first meeting, I was very
18  clear, and I said let's have a basic discussion
19  of animal welfare.  We're going to use these
20  animals, when their lifetime is up they're going
21  to be slaughtered.  That impinges on their animal
22  welfare but it's done in a humane way, humane

---

195

1  slaughter.
2          So the committee is not going to get
3  into deciding when a flock is -- is terminated.
4  It was a clear understanding from the committee
5  that when a flock quits lay, they go either to
6  spent hen, or another big discussion that
7  happened is the reason the on-farm euthanasia was
8  discussed by the committee is that the price of
9  spent hens became such that it was impractical to
10  transport hens off the farm.
11          And so we were more focused about how
12  they would euthanize a group of hens.  And we
13  didn't -- we didn't make a judgment as to whether
14  they were euthanized there or in the
15  slaughterhouse or et cetera.  We were focused on
16  the humane slaughter, or euthanasia.
17      Q    Just to be clear on my question, this
18  isn't -- I'm not asking about hens who have
19  finished laying eggs.  We're not asking about
20  hens that have disease.  We're not asking about
21  cannibalistic outbreak.  This question is about
22  hens in the prime of their production.

---

196

1          Do you have a view about whether
2  producers slaughtering 5 percent of those hens
3  for the purpose of increasing the price of eggs
4  is consistent with animal welfare or is
5  inconsistent with animal welfare?
6          MR. KEALEY:  Objection to form.
7          MS. SUMNER:  Objection to form.
8      A    The determination of when the useful
9  lifetime of a hen is over is extremely open for
10  debate.  Some would argue that a bird should
11  never be slaughtered and they should go to a
12  spent hen farm and live their life out fully.
13      Q    But I don't think we're in that debate.
14      A    The committee and I recognize that a
15  bird will be slaughtered at the end of its
16  usefulness on that -- on that farm, and there's a
17  lot of things that determine that, and that's my
18  answer.
19      Q    But this question is not about, you
20  know, the margins of, you know, whether a hen's
21  useful lifetime is over.  Let's assume for the
22  purpose of the question that we're right in the

---

197

1  prime of a hen's egg-laying capability.  Does
2  that affect your answer?
3      A    I've not been exposed to that in a real
4  life situation with the committee.
5      Q    So you don't have a view?
6      A    I don't have a view.
7      Q    All right.  Now --
8      A    I would -- I'm sure the committee would
9  be happy to take it up, and that's exactly what I
10  would do.  I would go back to them.
11      Q    But the committee was never asked to
12  look at a question like that?
13      A    Not that I recall.
14      Q    Okay.
15      A    And I think I would -- I think that
16  would stimulate quite a bit of debate.
17      Q    Okay.  If you could look at Exhibit 8
18  that you were shown this morning, that's what I'd
19  like to talk about next, because it's in the time
20  line of where we are.
21      A    This?  Okay.
22      Q    Yes.

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

51 (Pages 198 to 201)

---

**198**

1    A   Got it.
2    Q   Now, Exhibit 8 should be the May 2000
3  recommendations for the UEP animal welfare
4  guidelines submitted by the scientific advisory
5  committee; correct?
6    A   Yes.
7    Q   And you were the editor-in-chief of
8  this document; correct?
9    A   Yes.
10   Q   Okay.
11   A   Yes.
12   Q   Now if we look at the first page --
13   A   And it bounced all over -- these
14  documents bounced all over the place.  You know.
15  Word documents bounced all over the place.
16   Q   All right.  If you look at the first
17  page there's a mission statement from the
18  scientific advisory committee on animal welfare.
19  Do you see that?
20   A   Yes.
21   Q   And you wrote that; correct?
22   A   Yes.  Best of my recollection.

---

**199**

1    Q   If you -- if you look at the second
2  full paragraph towards the bottom, there's a
3  sentence that says, "UEP did provide one staff
4  member and a producer as ex-officio members of
5  the committee."  Do you see that?
6    A   Yes.
7    Q   And that was a true statement; correct?
8    A   That's correct.
9    Q   And if you look at the next page,
10  there's a listing of the UEP scientific advisory
11  committee members for animal welfare; correct?
12   A   Mine's missing on Exhibit 8.  I noticed
13  that earlier.  My page is missing.
14   Q   Okay.  Well, it looks like the version
15  is --
16   A   I'd noticed that earlier, but we talked
17  about the October version or whatever --
18  September version.
19   Q   Okay.  Let me then hand you something
20  I'll mark as -- but keep that one out for me,
21  please.
22   A   Okay.

---

**200**

1    Q   -- Exhibit 18.
2        (Deposition Exhibit 18 was marked for
3  identification.)
4    A   Okay.
5        MR. OLSON:  Did I not give you one?
6    A   Okay.
7    Q   All right.  Give me a moment so I don't
8  get confused.
9        So what I just handed you, Armstrong 18
10  was previously Gregory 19, Bates stamped DAY -- I
11  think five zeros, 29 through 55.
12       All right.  And this is also dated
13  May 2000, Recommendations for UEP Animal Welfare
14  Guidelines, Submitted by a Scientific Advisory
15  Committee on Animal Welfare; correct?
16   A   Yes.
17   Q   All right.  And if we look at the first
18  page there's that same mission statement;
19  correct?
20   A   Yes.
21   Q   And where it says UEP to provide one
22  staff member and a producer as ex-officio members

---

**201**

1  of the committee; right?
2    A   Yes.
3    Q   And the next page is a listing of the
4  committee members; right?
5    A   Yes.
6    Q   Has Barrie Wilcox there; right?
7    A   Yes.
8    Q   And it says UEP staff coordinator, Gene
9  Gregory; right?
10   A   That's correct.
11   Q   And then the next page is a preamble
12  which also, I believe, is in Armstrong Exhibit 8.
13  But --
14   A   I think so.
15   Q   Yeah.  But let's just choose one.
16  Let's look at 18.
17   A   Okay.
18   Q   Now is this something -- also something
19  that you authored?
20   A   I -- like I said, I was kind of the
21  editor-in-chief, so I didn't necessarily write
22  every section.

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

52 (Pages 202 to 205)

---

202

1    Q   Do you recall whether you offered this
2  preamble?
3    A   I don't recall.
4    Q   Do you recall who did?
5    A   I -- I don't know.  That might have
6  been -- Gene might have written first draft of
7  this.  I'm not sure.
8    Q   Okay.
9    A   Either Gene or -- I don't know.  Maybe
10  Janice.  I don't remember.
11    Q   Were there parts of this, the
12  scientific advisory committee's recommendations
13  for animal welfare guidelines that were first
14  drafted by Mr. Gregory?
15    A   There may have been from a logistical
16  perspective.  I don't recall.  But I can tell you
17  that every word was perused and supported and
18  tossed around by the committee members.
19    Q   Okay.  So if you look at the second
20  page of the preamble where it says, "Recognizing
21  the growing concern for animal welfare
22  world-wide, UEP commissioned a scientific

---

203

1  advisory committee for animal welfare in 1999."
2  Do you see that?
3    A   Yes.
4    Q   And this is part of those words that
5  would have been scrubbed by all the committee
6  members; right?
7    A   The committee would have reviewed the
8  entire thing, yeah.
9    Q   And then it says, "This committee was
10  comprised of" -- do you see that?
11    A   Yes.
12    Q   Six university representatives, two
13  USDA agriculture research service
14  representatives, one American Humane Association
15  executive, one veterinarian, one egg producer.
16  Do you see that?
17    A   I do.
18    Q   Now if you look at the bottom of this
19  page it says, "The committee takes no
20  responsibility for mandating these
21  recommendations, recognizing that the producers
22  must voluntarily accept and implement them."  Do

---

204

1  you see that?
2    A   Yes.
3    Q   Do you recall who drafted that
4  language?
5    A   I don't know who drafted that language,
6  but I can tell you I led the discussion early in
7  our meetings that we would not be involved with
8  implementation or mandating timing.
9    Q   Well, other than timing, were there
10  other aspects that the scientific advisory
11  committee would not be involved in implementing?
12    MR. KEALEY:  Objection to form.
13    MS. SUMNER:  Objection.
14    A   That -- that question is difficult to
15  understand.  The best way I can answer it is that
16  we focused on animal welfare first and foremost,
17  but we did not do that in a vacuum.
18    Q   You considered economic factors?
19    A   We considered the cost of production,
20  we considered feed efficiency, we considered
21  many, many aspects.  We also considered public --
22  public perception.

---

205

1    Q   Did you consider -- well, strike that.
2    All right.  So --
3    A   We considered those --
4    Q   -- let's look the next page that's
5  titled --
6    A   We considered those --
7    MR. KEALEY:  If you can wait until he's
8  finished with his response.
9    A   Go ahead.
10    Q   I'm trying to be as fast as possible.
11    A   Gotcha.  Keep going.
12    Q   The next -- the next page is titled
13  Public Perceptions and Attitudes; do you see
14  that?
15    A   Yes, I -- let me get to it.
16    Q   You went past it.
17    A   Okay.
18    Q   And then I'm going to look at the
19  recommendations at the end of it.
20    A   Yes.
21    Q   Point No. 2 says, "The recommendations
22  in the UEP Guidelines should be designed to

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

53 (Pages 206 to 209)

---

**206**

1  foster high standards of hen welfare while still
2  maintaining the economic vitally of the
3  industry."
4      Do you see that?
5      A   I do.
6      Q   In what way did the scientific advisory
7  committee consider how to maintain the economic
8  vitality of the industry?
9      A   It was --
10     MS. SUMNER:  Objection.
11     A   It was simply from the perspective --
12 and by the way, this section I recall very
13 clearly was written by Janice Swanson.  She was
14 the primary author.  We primarily looked at
15 practicality.  And a good example is, you know,
16 we didn't say go immediately to a non-feed
17 withdrawal molt because it was not practical.
18 The industry couldn't do it.
19     Q   Even though anyone supplying McDonald's
20 had to do that; right?
21     MR. KEALEY:  Objection to the form of
22 the question.  It's argumentative, lacks

---

**207**

1  foundation.  Who are you speaking about?
2      Q   Well, let me just ask a foundation.  Is
3  that true, McDonald's at this time --
4      THE REPORTER:  Could you repeat your
5  question, please?
6      MR. OLSON:  I'll just --
7      MR. KEALEY:  You're withdrawing the
8  question?
9      MR. OLSON:  -- ask it a different way.
10     MR. KEALEY:  Okay.  It's withdrawn.
11     Q   Is it true, Dr. Armstrong, that at this
12 time McDonald's required its suppliers to no
13 longer use a forced molt?
14     A   They did.
15     Q   So it was doable?
16     A   It was doable in the context of
17 McDonald's which had very few egg suppliers.
18     Q   McDonald's buys small amount of eggs or
19 a large amount of eggs?
20     A   Relative to the rest of the people that
21 buy eggs, it's a large amount.  Relative to the
22 98 percent of the eggs in cages, it was very

---

**208**

1  doable for them.
2      Q   And so --
3      A   They also banned the gestation --
4      Q   -- there were suppliers --
5      MR. KEALEY:  I don't think he finished
6  his answer.
7      A   They also banned gestation crates.  And
8  I was involved -- I was --
9      Q   We're off topic with this --
10     MR. KEALEY:  No, you need to let the
11 witness finish his answer.
12     MS. SUMNER:  But I didn't ask anything
13 about gestation crates.
14     MR. KEALEY:  You asked an open-ended
15 question --
16     MR. OLSON:  No, I didn't.
17     MR. KEALEY:  Yes, you did.
18     MR. OLSON:  No, I didn't.
19     MR. KEALEY:  Can we have the question
20 read back, please.
21     (The reporter read the requested
22 question.)

---

**209**

1      MR. OLSON:  That was the question.  And
2  then I think I asked -- was there a question
3  after that?
4      THE REPORTER:  I think you began but
5  you were speaking at the same time.
6      MR. OLSON:  Okay.  Okay.
7      Q   So you've answered that one.
8      So -- and egg suppliers were able,
9  after McDonald's made that change, to supply
10 McDonald's with eggs without using a forced molt;
11 correct?
12     A   No.  They were not.  Not all were able
13 to maintain as egg suppliers to McDonald's.  At
14 the beginning -- at about the time that
15 McDonald's did this, I think they had
16 approximately 26 shell egg providers.  I don't
17 know exactly the number that it dropped to, but
18 it dropped to probably three.
19     Q   Okay.  But --
20     A   Because producers were not able to
21 accommodate the guidelines or other reasons.  I
22 only know the facts of that change.  I can only

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

54 (Pages 210 to 213)

---

210

1    give you an estimate of the reasons.
2        Q   But McDonald's continued to sell
3    Egg McMuffins after they made the change; right?
4        A   Correct.
5        Q   Their needs, McDonald's needs for eggs
6    were satisfied by the industry; correct?
7        A   That is correct, but McDonald's is not
8    a mandatory organization.
9        Q   What is a mandatory organization?
10       A   Well, UEP is a voluntary organization.
11   McDonald's, if you're going to supply them eggs,
12   you agree to certain conditions.
13       Q   Right.  And --
14       A   You're comparing apples and oranges.
15       Q   Well, I'm trying to understand.  You
16   said it wasn't practical to, at this time, no
17   longer use the forced-starvation molt.  And why
18   was it -- why was it practical for McDonald's to
19   have its suppliers do it but it wasn't practical
20   for others to do it?
21       MR. KEALEY:  Objection to the form of
22   the question.

---

211

1        MS. SUMNER:  Objection.
2        A   It was because at the beginning
3    producers did not want changes.  A significant
4    number of producers did not want changes.  Some
5    still do not want changes.  So we were trying to
6    get and move as fast as possible -- McDonald's is
7    a leader in animal welfare, and they typically
8    move faster.
9        So the producers did not want to change
10   the starvation-induced molt.  Producers did not
11   want to give birds more space at the beginning of
12   our discussions.  Over time I believe they
13   listened and responded to the animal welfare
14   committee.  They did not want to make these
15   changes at the beginning.
16       Q   Now you've described the
17   recommendations layed out in this document as a
18   minimum baseline for animal welfare.
19       A   That's correct.
20       MS. SUMNER:  Object to the --
21       Q   And you said --
22       MS. SUMNER:  -- question.

---

212

1        Q   -- in fact these are --
2        THE REPORTER:  Wait.  Excuse me a
3    minute.
4        Okay.  Thank you.
5        Q   You said in fact these were
6    conservative recommendations?
7        A   No.  I said that our measures of animal
8    welfare, mortality and per-hen production are the
9    two most conservative measures of animal welfare.
10   Measuring animal welfare is not as easy as one
11   might think.  It is very complicated, and it is
12   controversial even among scientists, but those
13   two measures are not controversial.
14       Q   Okay.  I appreciate that clarification.
15       So, in any case, the -- the guidelines
16   here reflect a floor of sorts, the minimum
17   guidelines to produce eggs in a humane way.  Fair
18   statement?
19       A   In a caged system.
20       MS. SUMNER:  Objection.
21       A   Yes.
22       Q   In a caged system?

---

213

1        A   Humane.  The minimum for humane housing
2    of hens.
3        Q   All right.  Well, let's just -- we've
4    already gone through them, and I'll try not to
5    duplicate, but let's go through these a little
6    bit.  Let's start with beak trimming.
7        A   Which document are you referring to?
8        Q   Let's use Armstrong 18.
9        MS. SUMNER:  I'm going to object to
10   that.  I mean, this he had testified to is a
11   draft, and I don't know why -- I'm objecting to
12   the extent that these questions pretend like
13   these are the final recommendations of the
14   committee.
15       MR. OLSON:  Okay.  I don't really
16   consider that an appropriate objection, but it's
17   noted.
18       Q   So let's look at -- I mean, why don't
19   we use the one that --
20       A   Do you want to use --
21       Q   -- counsel used.  Is that 5?
22       A   -- Exhibit 2?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

55 (Pages 214 to 217)

---

214

1 Q   Was it 2?  The May one.
2        MS. SUMNER:  2.
3        MR. OLSON:  No, I want to use the
4 May one.
5        MS. SUMNER:  Well, the May one's a
6 draft.
7 Q   8.  Let's use 8, please.  I don't think
8 there's any difference, but -- a significant
9 difference.
10        All right.  So let's use Exhibit 8,
11 this is May 2000, the one you discussed this
12 morning with UEP counsel; right?
13 **A   I discussed Exhibit 2 with the counsel**
14 **this morning.**
15 Q   And we're going to --
16        MS. SUMNER:  Yeah, objection.
17 Misstates his testimony.
18 Q   We're going to object to Exhibit 2, but
19 I would like to start with Exhibit 8.
20 **A   Okay.**
21        MS. SUMNER:  Objection.  Misstates his
22 testimony.  We didn't really discuss Exhibit 8

---

215

1 other than for him to say it was a draft.
2        MR. OLSON:  All right.
3 Q   So let's start with beak trimming which
4 is on the one that ends in 901.
5 **A   Exhibit 8?**
6 Q   Exhibit 8, please.
7 **A   What page?**
8 Q   Well, the Bates number ends in 901.
9 **A   Okay.**
10 Q   Is that not correct?
11 **A   That is correct.**
12 Q   Okay.
13 **A   Beak trimming starts, and then --**
14 Q   All right.  And there's a Background
15 section; right?
16 **A   Yeah.  That's the way we typically put**
17 **this together.  Background, Literature Review,**
18 **Conclusions, and then Recommendations.**
19 Q   Okay.  So the -- in the literature
20 review it discusses that beak trimming has both
21 disadvantages and advantages from the welfare
22 standpoint; correct?

---

216

1 **A   Beak trimming, yes.**
2 Q   And the -- and the disadvantages are
3 short-term and perhaps long-term pain; correct?
4 **A   Correct.**
5 Q   And short-term stress following the
6 beak trimming; right?
7 **A   Which is what you just said, short-term**
8 **and long-term pain.**
9 Q   Well, this document breaks it out to
10 also referred to stress following the beak
11 trimming.
12 **A   Sure.**
13 Q   And part of that is because the baby
14 bird -- ability to eat after the trimming process
15 is impaired; right?
16 **A   I would -- I would assume so.  I don't**
17 **recall all the details of that, but --**
18 Q   Do you see in the middle of the
19 literature review, the sentence that says "the
20 bird's ability"?
21 **A   Yes.  Then that's -- then I would**
22 **agree.  Yes.**

---

217

1 Q   Okay.  And so -- and this is the
2 science at the time.  This reflects your -- the
3 committee's best effort to reflect the science at
4 the time; correct?
5        MS. SUMNER:  Objection.
6 **A   The best science at the time of this**
7 **document that was produced, which is a draft,**
8 **that's correct.**
9 Q   All right.  And, do you see the next
10 paragraph that starts, "Evidence suggests"?
11 **A   Yes.**
12 Q   It says, "Evidence suggests that
13 primary breeders of egg-laying strains can select
14 for a more docile bird and minimize the need to
15 beak trim from a behavioral point of view."  Do
16 you see that?
17 **A   Yes.**
18 Q   And that was what science at the time
19 said as well; right?
20 **A   That was science at the time**
21 **demonstrating that it's possible, but it required**
22 **implementation.**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

56 (Pages 218 to 221)

218

1    Q   Right.  And it would be a humane thing
2  to do to put that into effect; right?
3    A   Yes.
4      MR. KEALEY:  Objection.  Form.
5    A   But the committee realized that was
6  years away.
7    Q   And then there's the conclusions of the
8  committee.  Do you see that?
9    A   I do.
10   Q   It talks about weighing the evidence.
11 And then it says, "Using genetic stocks that
12 require little or no beak trimming is the most
13 desirable approach."  Do you see that?
14   A   That is correct.
15   Q   And that was the teaching of science at
16 the time; correct?
17   A   Right.  But the committee also had the
18 opinion that those stocks did not exist at the
19 time.
20   Q   Well, where does it say that?
21   A   I'm just telling you what we talked
22 about from a committee perspective.

219

1    Q   But actually the next sentence says,
2  "However, under certain management systems and
3  with some genetic stocks, beak trimming is
4  recommended."  Right?
5    A   Right.
6    Q   This document doesn't say, and the
7  others aren't going to say it either, that all
8  management systems or all genetic stocks require
9  beak trimming; does it?
10     MS. SUMNER:  Objection.
11     MR. KEALEY:  Objection to form.
12   A   What I can tell you is --
13   Q   No, no.  I'm asking what the document
14 says.
15     MR. KEALEY:  No.  You said and all
16 other documents aren't going to say it either.  I
17 have no idea what you're talking about.
18     MR. OLSON:  Well, let me withdraw.
19   Q   This document doesn't say --
20   A   And I could probably go back on my
21 computer --
22     MR. KEALEY:  Just wait until there's a

220

1  question and pause.
2    Q   This document doesn't say under all
3  management systems and with all genetic stocks
4  beak trimming is --
5      MR. KEALEY:  Document --
6    Q   -- recommended; does it?
7      MR. KEALEY:  -- speaks for itself.
8      THE REPORTER:  Excuse me a minute.
9  Could you repeat your question and your answer,
10 please?
11     MR. OLSON:  Will you let me get it out?
12     MR. KEALEY:  I did.  And the document
13 speaks for itself.  That's my objection.
14     MR. OLSON:  Why don't you wait until I
15 ask it, and then you're free to make that.
16   Q   Dr. Armstrong, this document doesn't
17 say under all management systems and with all
18 genetic stocks beak trimming is recommended; does
19 it?
20   A   The document speaks for itself.
21   Q   And it doesn't say that; does it?
22   A   The document speaks for itself.

221

1    Q   Right.  And what the document says is
2  under certain management systems and with some
3  genetic stocks beak trim is recommended; right?
4    A   That's what the document says, but the
5  discussion in the committee and the general
6  consensus then and today is that beak trimming is
7  required for almost -- required for all
8  confinement systems.  And if people choose not to
9  beak trim, they're going to have to deal with
10 mortality.
11   Q   And do you find it odd --
12   A   That's the consensus of the scientists.
13     MR. KEALEY:  You need to let the
14 witness finish.
15   A   And it also -- what's important, with
16 all the documents leading up, recommendations, if
17 you look at the recommendations at 331902 --
18   Q   Okay.  What's the first one?
19   A   The first one says where possible,
20 producers should select genetic stocks known to
21 require little or no beak trimming.
22   Q   And that --

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

57 (Pages 222 to 225)

222

1    A    That is -- that is our way of pushing
2    the industry to doing this.  Because at the time,
3    from a practical perspective, caged birds
4    required beak trimming from a welfare
5    perspective.  Hands down.  It was a mistake that
6    we didn't make that more clear in the document.
7    But I can tell you without equivocation that's
8    how the committee felt and, I would assume, still
9    feels today.
10   Q    The first recommendation of the
11   committee with regard to beak trimming was that,
12   where possible, producers should select genetic
13   stocks known to require little or no beak
14   trimming; right?
15   A    That's correct.  That and --
16   Q    That was the most important of the
17   recommendations?
18   A    No, it was the first recommendation
19   because we wanted to get the committee and -- we
20   wanted the producers and the companies that
21   produced the hens to understand that that is a
22   goal.

223

1        There's no equivocation among the
2    scientists on our committee that would say you
3    could have a caged system with the genetics at
4    the time this was written that you would not beak
5    trim.  It would be a welfare nightmare.
6    Q    But --
7    A    Would have been at that time.
8    Q    I'm trying not to interrupt you.  I
9    apologize.
10       But, Dr. Armstrong, in the document
11   that the committee actually generated, that was
12   vetted by all the members of the committee --
13   A    That's correct.
14   Q    -- it doesn't say anywhere that beak
15   trimming is required for all hens in cages; does
16   it?
17   A    No.  Because it was generally
18   understood and common knowledge that anyone that
19   understood production knew that in a caged system
20   you beak trimmed or you were foolish.
21   Q    But why does it say in this document,
22   sir --

224

1    A    Because --
2    Q    Hold on.  Let me ask the question --
3    A    Yes, okay.
4    Q    -- Dr. Armstrong, that beak trimming
5    was only recommended under certain management
6    systems and with some genetic stocks?
7    A    I cannot speak to the exact wording,
8    but I can tell you that the clear impetus for the
9    committee in this document was to send the
10   message to the breeding companies and the
11   industry that selection for behavior is important
12   and a goal for the future.
13   Q    And do you know whether --
14   A    No equivocation in my mind about that.
15   Q    Do you know whether UEP as part of the
16   UEP certified program ever in any way required a
17   single producer to do anything to select genetic
18   stocks that would not require beak trimming of
19   baby hens?
20       MS. SUMNER:  Objection.
21   A    I have never -- I have not known UEP to
22   influence breeding.  The UEP members would as

225

1    individual purchasers of strains.  I'm not aware
2    they -- and I'm really not an expert in the
3    supply -- supply chain of the -- of hens, other
4    than having visited Hy-Line and my work on the
5    committee.
6    Q    Let me try this again, but first just
7    nomenclature.  At one time this program was
8    called -- the UEP program was called the Animal
9    Care Certified program; is that right?
10   A    That's correct.
11   Q    And then at a certain point that was
12   changed to the UEP Certified program; correct?
13   A    That's correct.
14   Q    And do you know why?
15   A    I don't know all the details, but I
16   know there were -- there were complaints.  And it
17   was changed due to outside interference -- or
18   discussions.  Trade --
19   Q    Do you know whether --
20   A    -- trade commission or something of
21   that nature.
22   Q    The Federal Trade Commission, are you

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                     March 13, 2014

58 (Pages 226 to 229)

---

226

familiar with that body?

A   I'm familiar with that, and I know that happened, but I don't have the details.

Q   And what happened is the Federal Trade Commission was --

MR. KEALEY:  Questions, please, counsel.

Q   -- thought that calling the program an animal care program was deceptive; is that right?

MR. KEALEY:  That's not a question.

MS. SUMNER:  Objection.

MR. KEALEY:  That's an argument.  Ask a question, please.

Q   Do you know whether the Federal Trade Commission was concerned that calling the program an animal care program was deceptive?

MR. KEALEY:  Object to the question as argumentative.  Lacks foundation.  If you have evidence that you can establish this witness's knowledge of the Federal Trade Commission's state of mind, I'd ask --

A   I'm not knowledgable of the details --

---

227

THE REPORTER:  Wait a minute, wait a minute.  Please.  Please.  Federal Trade Commission's state of mind --

MR. KEALEY:  -- I'd ask you to please lay your foundation.

Q   I'm just asking if you know what the Federal Trade Commission's concern was.  Do you know?

A   I told you what I knew.  That's all I know.

Q   Okay.  So whatever -- let's just call it the UEP Certified program.  My question is at any time over the course of that program, do you know whether UEP required the certified members of the program to do anything, to take any step, to make any effort to develop genetic stocks that would not require the painful beak trimming of baby hens?

MS. SUMNER:  Objection.

A   There's a fundamental flaw in your question.  And it is a fundamental flaw that -- let me -- let me take a moment and explain it to

---

228

you, Steig.  And I don't mean that to sound like an instructor and I'm going to go into 50 minutes.  But changing behavior and changing strains of birds takes years and years.  The paper that is quoted by Craig and Muir took many years to conduct.  It was one study.  And the entire situation was not meant to be that industry would follow that.

So what the committee wanted to do was encourage the industry to implement that selection, and it would be years.  Once -- I can assure you that once strains were available that did not require beak trimming, the UEP scientific advisory committee would -- would consider and say use those strains.

So you're -- you're condensing something that takes years into something that is there, and the clear message that we were trying to send -- not well written I don't think at that time -- and the reason we put it first on the list is that we wanted to send a message to the breeders and the companies that this is a big

---

229

deal.

Q   Right.  From the standpoint of animal welfare, it would be a big deal not to have to beak trim.  Correct?

A   Only if the birds didn't kill each other.

Q   Right.

A   And that -- those strains in cage systems don't exist.

Q   But --

A   They will kill each other, and animal welfare will be very negative if you do not beak trim the birds today.

Q   But the reason why the first recommendation was develop genetic stocks that don't require beak trimming was because that would be a great advance from an animal welfare perspective?

A   And the committee agreed with that --

Q   Can you just answer the question, please?

MR. KEALEY:  He was answering the

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                     March 13, 2014

59 (Pages 230 to 233)

---

230

1  question, counsel.  And we're awfully close to a
2  boundary line here.  You are not in court.  You
3  are askings questions of the witness about his
4  personal knowledge.  Please settle down.  Please
5  slow down.  Please stop talking over the witness.
6  Are we understood on that?
7      MR. OLSON:  Well, I don't believe I'm
8  doing any of those things.  I just want to ask
9  him --
10      MR. KEALEY:  I do -- I do believe you
11  are.  You're on videotape while you're doing it.
12  So please dial it back.
13      MR. OLSON:  Can I ask the question
14  again?
15      Q   The question is this:  The reason why
16  the first recommendation with regard to beak
17  trimming was put in this document was because
18  developing and using genetic stocks that don't
19  require beak trimming would be a great advance
20  from an animal welfare perspective; correct?
21      A   That is correct.  But the committee
22  recognized that those strains did not exist at

---

231

1  the time, and it would take years for that to
2  happen.  That's why we pushed it in this manner.
3      Q   And this is what I'm trying to get
4  clarity on.  And even something that takes years
5  has to be started; right?
6      A   Which is what we did.
7      Q   Okay.  And my question is, do you know
8  whether under the UEP Certified program UEP ever
9  required of the producers who were certified
10  under the program to do anything to advance that
11  goal of using genetic stocks that did not require
12  beak trimming?
13      MS. SUMNER:  Objection to the form.
14      A   No, because it would be very
15  impractical.  The most UEP could do is -- I think
16  which is profound, they established a
17  science-based committee which told the industry
18  you need to go there.  It's like telling the
19  automotive industry that we want hydrogen cars
20  tomorrow.  That's equivalent to it, Steig.  And
21  why is GM not selling hydrogen cars today?
22  Because they're not practical.

---

232

1      Q   All right.  So let's move on to the
2  housing -- housing space allowances and
3  environment section.  There's a background, and
4  then I think I want to start in the literature
5  review section, particularly where it summarizes
6  the research on space allowances, with some
7  bullets.  Do you see that?
8      A   Yes, I do.
9      Q   And would it be fair to say those
10  bullets reflect the state of scientific teaching
11  on the space allowance issues as of this time,
12  May 2000?
13      MS. SUMNER:  Objection to the form.
14      A   This -- the review of this was very
15  lengthy.  These points would summarize the major
16  points at that time.
17      Q   All right.  And I'll try to be very
18  selective so we can move through this.  If you
19  look at the fourth bullet, the one that starts
20  "Measurement of white leghorn hens"; do you see
21  that?
22      A   Correct.

---

233

1      Q   Now the white leghorn are the smaller
2  size hens; right?
3      A   They're the most prevalent, yes.
4      Q   It says, "Measurements of white leghorn
5  hens show that they require about 65 to 83 square
6  inches, average 74, to perform even the most
7  basic behaviors, standing comfortably and
8  resting."  That was of the scientific teaching at
9  the time; right?
10      A   That was one point you're pulling out
11  of context, that's correct.
12      Q   And from an animal welfare perspective,
13  is it humane to permit a hen to perform the most
14  basic behaviors such as standing comfortably and
15  resting?
16      A   The committee would say yes.
17      Q   And would the committee also say that
18  from an animal welfare perspective it would be
19  a -- humane to permit a hen to perform other
20  behaviors like wing flapping?
21      A   When you get into the behaviors of wing
22  flapping, that's where there is debate.  And it

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

60 (Pages 234 to 237)

---

234

1    also gets into the realm of practicality and it
2    also gets into other factors besides wing
3    flapping.  So if you put birds in a system where
4    they can more freely express wing flapping,
5    perching, there are tradeoffs in other areas that
6    are related to welfare, such as mortality.
7    That's why studies are ongoing to try to better
8    understand that.
9        Q    If you look at the last bullet, the
10   last sentence says "four inches of feeder space
11   per hen is required for all hens to have free
12   access to the feeder."  Do you see that?
13       A    Yes, that was our thinking at that
14   time.
15       Q    All right, you can turn the page.
16           All right.  And now we're on the
17   committee conclusions; right?
18       A    Yes.
19       Q    And if you look at the second full
20   paragraph it says, "There is overwhelming
21   evidence that hen welfare in conventional cages
22   is impaired when hens are given space allowances

---

236

1    a preliminary stage" -- strike that.  I'll move
2    on from that one.
3            All right.  Now let's look at the next
4    page, the recommendations for caged hens; right?
5            These -- these were the scientific
6    advisory committee's recommendations for caged
7    hens per the UEP guidelines; correct?
8        A    Correct.
9        Q    Number one says "Cage configurations
10   should be such that manure from birds in upper
11   cage levels does not drop directly on birds in
12   lower level cages"; right?
13       A    Yes.
14       Q    And would it be fair to say this is one
15   of those baseline, minimum standards of animal
16   welfare?
17       A    Yes.  The committee felt strongly about
18   that.
19       Q    And if hens are sitting in a henhouse
20   and manure is dropping directly on them from
21   cages above them, that's not complying with even
22   basic standards of animal welfare?

---

235

1    of less than 67 to 86 square inches, average
2    about 72 square inches, per bird."  Was that a
3    true statement?
4        A    Yes.
5        Q    And it continues, "And also evidence
6    that hen welfare is impaired when feeder space
7    allowances are less than four inches per bird."
8        A    So --
9        Q    Was that also a true statement?
10       A    The 67 to 86 was a true statement then,
11   and it is a true statement now.  The four inches
12   per bird for feeder space was the committee's
13   statement at that time, but it's no longer our
14   statement.
15       Q    Right.  But at the time --
16       A    That's correct.
17       Q    Okay.  Now, the next paragraph talks
18   about -- can we call them enriched or modified
19   cages?
20       A    Yeah.  You can use those words
21   interchangeably as far as I'm concerned.
22       Q    All right.  And it says "Research is at

---

237

1        A    That's one of the many things we
2    discussed, we observed as a problem in our tours,
3    and thus it's listed as a recommendation.
4        Q    Right.  And you -- in fact you, on your
5    tours, you went to henhouses and saw cage systems
6    where manure from the higher level hens was
7    dropping directly on the lower level hens; right?
8        A    Correct.
9        Q    And earlier today you talked about how
10   the committee just thought it was intolerable for
11   there to be a system where some hens are being
12   treated humanely but others are not; do you
13   recall that?
14       A    Yes.  That was in the context of
15   different flocks owned by the same person.
16       Q    Right.
17       A    Person or entity.
18       Q    And does that apply here as well to
19   this principle?
20           MR. KEALEY:  Objection to form.  Lack
21   of foundation.
22       A    I've already stated that we don't want

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

61 (Pages 238 to 241)

---

238

1  manure to drop on any birds.
2      Q   Right.  And if -- okay.  I'll move on.
3      I think we've covered some of these
4  others.  Let's see.  All right.  Let's go to
5  molting.
6      Dr. Armstrong, did the UEP certified
7  program put an end to cage systems where manure
8  from the higher level hens could drop directly on
9  hens below them?
10     MS. SUMNER:  Objection.
11     **A   I have no basis to answer that program.**
12 **I can only tell you what our scientific**
13 **recommendations are.  I haven't surveyed the**
14 **industry.**
15     Q   All right.  So molting, there's
16 background, literature review.  I'd like to go to
17 sort of under the Induced Molting.  There's a
18 paragraph at the bottom that starts -- that says
19 "Extended feed withdrawal."
20     **A   Yes.**
21     Q   It says, "Extended feed withdrawal
22 causes an increase in mortality during the feed

---

239

1  withdrawal period."  Do you see that?
2      **A   Yes.**
3      Q   And there's some statistics.  It would
4  be fair to say this was the teaching of science
5  at the time?
6      **A   Yes.**
7      Q   All right.  And so for -- during the
8  first week -- and just to be clear, what we're
9  talking about is depriving the hen of food;
10 correct?
11     **A   Yes.  It's a -- it's a total feed**
12 **withdrawal.**
13     Q   Some call it starving the hen?
14     **A   Mm-hmm.**
15     Q   Now, and this says during the first
16 week there is a doubling of mortality that occurs
17 during the first week of food depravation.
18 Right?
19     **A   That's what the document indicates,**
20 **yes.**
21     Q   And then it says during the second week
22 of food deprivation mortality doubles again;

---

240

1  right?
2      **A   That's correct.**
3      Q   Right.  And those are not good things
4  from an animal welfare perspective?
5      **A   Mortality goes up, welfare goes down.**
6  **Exactly.**
7      Q   There's more here, but to cut to the
8  chase, the conclusion was that this practice does
9  raise some concerns?
10     **A   Yes.**
11     Q   And the industry should explore
12 alternatives?
13     **A   Yes.**
14     Q   And until -- and then it says "until
15 such time that these alternatives are available,
16 the shortest period of feed withdrawal possible
17 should be used for molting."  Right?
18     **A   Yes.**
19     Q   And that was the committee's view of
20 the baseline animal welfare standard at the time;
21 correct?
22     **A   That was the committee's view during a**

---

241

1  transition.  We established that -- what the
2  **baseline would be.  The baseline, getting to the**
3  **point of being humane, would be non-feed**
4  **withdrawal.**
5      Q   Right.
6      **A   This is an implementation point that**
7  **you're getting at, not a scientific**
8  **recommendation.**
9      Q   Okay.  And but -- but it would be fair
10 to say that the committee said to the extent this
11 is going to happen, it should -- the shortest
12 period of time possible should be used?
13     **A   Right.  Again, we -- whether it was**
14 **housing or others, we said we want you to**
15 **implement these recommendations as soon as**
16 **possible.  But we at the beginning, a priority,**
17 **said we're not going to get into discussions of**
18 **timing.  We'll respond, we'll advise you, we'll**
19 **help you, and we're going to constantly tell you**
20 **to move as fast as possible as reasonable.**
21     **Molting took a little while.  Beak**
22 **trimming is going to take a long time.  And**

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                        March 13, 2014

62 (Pages 242 to 245)

---

242

1  space, they built their own implementation time
2  lines.  We only said "keep going."
3      Q   I understand.  And just for a moment I
4  want to put aside the idea of moving to not using
5  forced molting at all and just talk about the
6  recommendations during this interim period when
7  the committee recognized that there would still
8  be some forced molting.
9      A   Correct.
10     Q   Fair enough?  Okay.
11     A   Right.
12     Q   And during this interim period the
13  recommendation was if you're going to do it, use
14  the shortest period of time possible; correct?
15     A   Correct.
16     Q   And do you know -- okay.  And then --
17     A   So we were trying to mitigate the
18  negative impacts, but we knew we couldn't
19  eliminate them.
20     Q   And there was -- there was scientific
21  evidence at this time that indicated a four- to
22  six-day feed withdrawal period would -- well,

---

243

1  strike that.
2      Let me ask you this question.
3      A   Mm-hmm.
4      Q   Do you -- do you know, Dr. Armstrong,
5  whether the UEP certified program, while it
6  permitted forced molting, placed any requirement
7  on producers to only molt for the shortest period
8  of time possible?
9      A   I don't recall the details of the audit
10  system.  I simply know that during this period of
11  time we had significant producer pushback against
12  eliminating feed withdrawal, and we were trying
13  to push the industry in hoping that they would
14  move as fast as possible.  See, there were many
15  producers that looked me in the eye and said
16  "There's nothing wrong with feed withdraw.  You
17  guys are nuts."  And --
18     Q   That's not --
19     A   -- and that's the environment we were
20  working in.
21     Q   But that's not what the science said.
22  The science said --

---

244

1      A   That's --
2      Q   -- there is a problem?
3      A   That's exactly right.  And that's why
4  we didn't get into timeline.  Because I can tell
5  an animal rights activist what the science means,
6  and I can tell a producer what the science means
7  and I've often said I'm an equal opportunity
8  offender because I frankly made both of those
9  parties mad because I didn't waver on what the
10  science would say.
11     Q   And -- and from the perspective of
12  science and animal welfare, was it compatible
13  with what the science said about animal welfare
14  at this time in 2000 to starve a hen for two
15  weeks?
16         MR. KEALEY:  Objection to the form of
17  the question.
18     A   It was incompatible with a change that
19  would result in significant animal welfare to
20  expect the industry to do that overnight.  That's
21  why we viewed practicality as -- as an issue.
22  And that's why we didn't get into trying to tell

---

245

1  the industry when they would do things.
2      Q   All right.  Now, let's just move
3  forward in the timeline --
4      A   But I will -- but I will also tell you
5  that I think the committee was pleased with their
6  action.  They immediately spent some money and
7  refined the feed withdrawal --
8  non-feed-withdrawal methods, because it wasn't
9  clear, or we would have said implement such a
10  program at the time.
11         (Deposition Exhibit 19 was marked for
12  identification.)
13     Q   All right.  I've handed you what we've
14  marked as Armstrong 19.  And this is Bates
15  stamped UE0153203 through 204.  And can you
16  identify this as minutes of the UEP Producer
17  Committee for Animal Welfare of May 15th, 2000?
18     A   Yes.
19     Q   And you attended this meeting; correct?
20     A   Yes.  I'm listed as an -- a guest.  A
21  consultant.  I'm listed as a consultant.
22     Q   And I believe you testified this

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

63 (Pages 246 to 249)

---

246

1  morning that you were essentially the liaison to
2  the producer committee --
3      A  Mm-hmm.
4      Q  -- and there were also producers that
5  were liaison to the scientific committee?
6      A  That's correct.  And I also mentioned
7  that others would go with me from time to time,
8  and Joy Mench, Janice Swanson, Don Bell were also
9  there, and Steve Reger.
10     MR. KEALEY:  Yeah.
11     A  Is that a Hy-Line guy?  I'm trying to
12 think.  I don't know.  Anyway.
13     Q  In any way -- in any case, there were
14 liaisons back and forth between the two
15 committees?
16     A  That's correct.  It was quite
17 iterative.
18     Q  Now, this refers to the committee
19 reviewing the draft of the Humane Guidelines for
20 U.S. Egg Laying Flocks.  Do you know whether
21 that's the draft that we just looked at?
22     A  I don't know for sure, but I would

---

247

1  assume so.  This was the -- it would have to be.
2  I think this is the earliest draft.
3      Q  Okay.  And then it says minor changes
4  were made to each component of the guidelines; do
5  you see that?
6      A  Yes.
7      Q  So this is the UEP producer committee
8  making changes to each component of the
9  scientific advisory committee guidelines; right?
10     MS. SUMNER:  Objection to the form.
11     A  I don't -- the producers, I don't know
12 what is exactly entailed here, but I can tell you
13 that producers did not change any scientific
14 guidelines on their own.  If a producer had a
15 question about a guideline -- case in point, four
16 inches of feeder space, because they said
17 practically that doesn't matter.  I took it back
18 to the committee, we would discuss it.  The
19 committee had full control on what was changed in
20 the scientific guidelines.
21     Q  Do you recall this meeting?
22     A  I -- I don't recall it in detail.  I

---

248

1  don't.
2      Q  Do you see the reference to minor
3  changes being made to each component?
4      A  I do.
5      Q  Do you know what that's referring to?
6      A  I do not.
7      Q  Okay.
8      A  I do not.  All I can repeat is what I
9  said earlier about how things happened.
10     Q  Okay.  You can put that aside.
11     Let me hand you what we'll mark
12 Armstrong 20.  This was previously Gregory 23 and
13 Pope 9.  And I actually can't read the Bates
14 stamp, but those are the exhibits for people to
15 find it.
16     (Deposition Exhibit 20 was marked for
17 identification.)
18     Q  And do you see, this is also titled UEP
19 Animal Welfare Committee Meeting, May 15th, 2000.
20 Do you see that?
21     A  I do.
22     Q  Same date as the last document?

---

249

1      A  Mm-hmm.
2      Q  Do you recall this meeting of the
3  animal welfare committee meeting?
4      A  I do not recall this specific document.
5      Q  Now, if the prior document, Armstrong
6  19, refers to the committee meeting three times
7  over the course of several days around
8  May 15th -- do you see that?
9      A  Yes.
10     Q  Do you know whether you attended all
11 three meetings?
12     A  That committee, animal welfare?
13     Q  Right.
14     A  I do not recall.  But I can almost
15 promise I wasn't there a hundred percent of the
16 time.  And then there were times when I was there
17 when I was, you know, doing emails sitting in the
18 back of the room waiting for my turn.
19     Q  Okay.  So this question -- this next
20 question might be pretty easy, but looking at
21 Armstrong 20 now --
22     A  This one didn't get a sticker.  Is this

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

64 (Pages 250 to 253)

---

250

1  **Armstrong 20?**
2      Q    Why don't you switch with your counsel.
3      **A    Oh.  Okay.  That says 20.  That says**
4  **19.  Okay, good.  Got it.  20.**
5      Q    All right.  Do you see there's a
6  heading that says Cage Space Allowance
7  Considerations?
8      **A    Yes, I do.**
9      Q    There's a number of points under that?
10     **A    Yes.**
11     Q    Do you see the one that says
12 "increasing space allowances would have two major
13 effects"?  At the bottom.
14     **A    Yes.**
15     Q    Point 5?
16     **A    I do see that.**
17     Q    One of them is a positioning of the
18 industry as a pro welfare step.  Do you see that?
19     **A    I do.**
20     Q    Do you recall discussions about that?
21     **A    A pro welfare step -- I don't recall**
22 **the specifics of this meeting, but absolutely.**

---

251

1  **It's in my writings everywhere.**
2      Q    All right.  And then sub-point B says
3  "an increase in space allowance would inevitably
4  reduce the layer population and thereby reduce
5  the surplus production problems affecting the
6  industry over the past twenty years"; do you see
7  that?
8      **A    I do.**
9      Q    Do you recall that discussion?
10     **A    I do not.**
11     Q    Do you recall at any time being privy
12 to discussions about that type of thing?
13     **A    No.  Our -- in our committee -- and**
14 **I -- and I may have and I don't recall, but I can**
15 **tell you that our committee -- our committee**
16 **would walk out on me if we started talking about**
17 **that from a -- from a scientific perspective.**
18     Q    All right.  Now, if you pull out
19 Exhibit 2, I think we're now up to
20 September 2000.  You might have even already
21 pulled it out.
22         And Exhibit 2 should be the

---

252

1  September 2000 recommendations for UEP animal
2  welfare guidelines --
3      **A    Got it.**
4      Q    -- submitted by the committee.  So now
5  there's been this May document that was
6  discussed.  There's a reference to some minor
7  changes being made, and now we're at
8  September 2000.  This is the document that you
9  discussed earlier as sort of the more formal
10 document at this time?
11     **A    For the -- at the time.**
12         MS. SUMNER:  Objection to the form.
13     Q    And I'm just --
14         MS. SUMNER:  Misstates testimony --
15 prior testimony.
16     Q    That was just only a table-setting
17 question, but we're on --
18     **A    Okay.**
19     Q    -- the same page; right?
20     **A    Yes.**
21     Q    Okay.
22         MS. SUMNER:  Objection.

---

253

1      Q    Now, let's just look to see the
2  differences between the May and September.
3      **A    That would -- that would be interesting**
4  **to revise my memory of that.**
5      Q    Yeah.  Okay.  So if you look at the --
6      **A    Revive, I should say.**
7      Q    -- Exhibit 8 was the May.
8      **A    I gotcha.**
9      Q    Okay.  There's your mission statement.
10     **A    Okay.**
11     Q    All right.  Generally looks the same.
12 And then -- then it looks like the list of
13 members was taken off.  Is that right?
14     **A    Yeah.  I noticed that this morning.**
15     Q    Yeah.  And do you know why it was that
16 the list of members of the scientific advisory
17 committee, including Barrie Wilcox, was taken
18 off?
19     **A    In May?**
20         MS. SUMNER:  Objection.
21     Q    In the September -- oh, sorry.  Sorry,
22 you're right.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

65 (Pages 254 to 257)

---

254

1      MS. SUMNER:  It's in the September one.
2  The gears switched.
3      MR. DAVIS:  It's in your May one.
4      MR. OLSON:  Right.  So, sorry.
5    Q   The September one -- I'm going to have
6  to have you compare now Armstrong 18 to --
7    A   Compare it to?
8    Q   -- Exhibit 2.
9    A   18 compared to 2.  Okay.
10    Q   Okay.  So 18 has your mission
11  statement, then the listing of the members.
12    A   Correct.
13    Q   Barrie Wilcox listed as a member;
14  right?
15    A   Correct.
16    Q   Now if you look at Exhibit 2, there's
17  the listing of the members, but now Barrie Wilcox
18  is not listed as a member, he's listed under a
19  heading that says Support.  True?
20    A   Correct.
21    Q   Who made that change; do you know?
22    A   I don't recall.

---

255

1    Q   All right.  And then if you look at
2  Exhibit 2, the September 2000 version, would it
3  be fair to say your preamble -- or the preamble
4  is also gone?
5    A   That's correct.
6    Q   So that language that says this
7  committee was comprised of 6, 2, 1, 1, 1 egg
8  producer, also cut; right?
9    A   Yeah.  And I -- I don't have a complete
10  recollection, but I remember -- I do remember
11  that the committee felt that the preamble really
12  didn't fit.  I don't recall discussions about the
13  composition, I don't recall discussions about
14  members.  I can tell you, I really wasn't worried
15  at the time whether a person was an ad hoc member
16  or ex-officio member.  I knew that the science --
17  the science group on the committee was driving
18  things.  That's all I can tell you.  We weren't
19  sticklers how it was listed, from my perspective.
20    Q   Do you recall, Dr. Armstrong,
21  discussing with anyone at UEP at any time that
22  the producer member of the scientific advisory

---

256

1  committee should no longer be listed as a member?
2    A   I -- I may have, but I don't recall.
3  I --
4    Q   Okay.
5    A   There were so many conversations back
6  and forth.
7    Q   All right.  You can put that aside.
8      Now let me hand you what we'll mark
9  Armstrong 21.
10      (Deposition Exhibit 21 was marked for
11  identification.)
12    Q   This was previously Gregory 21.  And
13  it's Bates stamped MFI0276310.  And can you,
14  Dr. Armstrong, identify what this document is?
15    A   Yes.  This is the -- must be pretty
16  close to the first draft of the producer -- well,
17  the document speaks for itself.  Animal Husbandry
18  Guidelines for U.S. Egg Laying Flocks.  I'm
19  trying to read it and get the context.
20    Q   Okay.  Give it a brief scan, and you
21  might want to read that cover letter that starts
22  it off.

---

257

1    A   Okay.
2    Q   All right.  And --
3    A   Can -- let me read it.
4    Q   Oh, sure.  Just let us know when you're
5  done.
6    A   Okay.
7    Q   Okay.  Now can you identify what this
8  document is?
9    A   I understand the document and the
10  contents, but I'm not -- I don't have a detailed
11  recollection of it from a contextual perspective.
12    Q   Well, let's look at the first page.
13  There's a cover letter from Gene Gregory.
14    A   Yes.
15    Q   Dated November 13, 2000.  Do you see
16  that?
17    A   Yes.
18    Q   And do you see where he says, "We are
19  now pleased to share with you the completed
20  document of husbandry guidelines for the egg
21  industry"?  Do you see that?
22    A   Yes.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                March 13, 2014

66 (Pages 258 to 261)

---

**258**

1     Q   Does that help identify this document?
2     A   **Yes.**
3     Q   Okay.
4     A   **Yes.**
5     Q   So this is the -- the scientific
6 advisory committee had issued recommendations
7 that we looked at before.
8     A   **Mm-hmm.**
9     Q   Now this is the first completed version
10 of the producers' guidelines; correct?
11     A   **Well, yeah, I mean I'm still -- I'm**
12 **still not clear. It looks to me that -- yeah, I**
13 **think this is the first presentation of the**
14 **producer, because it has some of our language and**
15 **it appears to be that.**
16     Q   Okay. So if you look at Mr. Gregory's
17 cover letter, at the bottom it says, "This road
18 map does not demand immediate changes but does
19 give producers an opportunity to be prepared when
20 their customer wants changes." Do you see that?
21     A   **I do.**
22     Q   Do you have an understanding of what

---

**259**

1 that means?
2     A   **I don't remember the exact context, but**
3 **this is at a period of time when, you know,**
4 **they're worried about people revolting because**
5 **some people did not want these guidelines. This**
6 **was -- this was -- this was a very touchy thing**
7 **for the industry to move forward with these**
8 **guidelines. And they were going day by day on**
9 **whether the members would accept adding space and**
10 **doing all these things. It was -- I think the**
11 **industry was being very proactive.**
12     Q   All right. Now if we turn a few pages
13 in, do you see there's a heading that says
14 Scientific Advisory Committee Members?
15     A   **Yes. I see it.**
16     Q   All right. And Barrie Wilcox is just
17 not listed here at all; right?
18     A   **I don't see him.**
19     Q   And do you know why that is?
20     A   **I -- I don't recall.**
21     Q   And at the top it says United Egg
22 Producers asked Dr. Jeffrey Armstrong to serve as

---

**260**

1 chairman of this committee, requesting that he
2 personally select the most qualified persons
3 available to assist him in this endeavor; do you
4 see that?
5     A   **I do.**
6     Q   Would it have been more accurate to say
7 that Donald Bell was selected by UEP as opposed
8 to you personally?
9       MS. SUMNER: Object to the form of the
10 question.
11     A   **I don't think that's an accurate**
12 **statement. Because they made the recommendation.**
13 **And I was talking with my advisers and I could**
14 **have said no. Donald Bell was a very qualified**
15 **and acceptable member. And in fact we knew that**
16 **he would be someone that would be very much**
17 **toward the status quo, and it's good to have a**
18 **diverse viewpoint on a committee.**
19      **There were no predetermined**
20 **qualifications on the committee. He was**
21 **recommended by UEP. I think Gene also**
22 **recommended Scotti Hester too.**

---

**261**

1     Q   And how about Mr. Wilcox? Who
2 recommended him?
3     A   **Barrie Wilcox was there because he was**
4 **chair of the producer committee, if I remember**
5 **correctly.**
6     Q   All right. So if you look a few
7 paragraphs in to the recommendations and
8 guidelines, there's the housing and space
9 allowance, the first one; do you see that?
10     A   **I do.**
11     Q   And then I want to look at the box that
12 says Recommendations.
13     A   **Yes.**
14     Q   There's an intro and two sentences, and
15 the second one says, "Variances due to
16 unalterable features of existing equipment will
17 be permitted for the useful life of that
18 equipment." Do you see that?
19     A   **I do.**
20     Q   Was that something that the scientific
21 advisory committee was responsible for?
22     A   **No, but we were aware of -- we were**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

67 (Pages 262 to 265)

---

**262**

1  aware of it, I assume. I don't recall the
2  specific discussions, but we reviewed this.
3      Q   Okay. But you don't recall the
4  discussions about that concept?
5      A   I recall the discussions in the broad
6  context about old equipment, and that barns, you
7  know, and facilities have a lifetime, and that it
8  would be very impractical to go (indicating)
9  replace the -- replace some of these cages.
10     Q   And would it be fair to say cages have
11 a lifetime that can span many years?
12     A   I'm not an expert on cage lifetime.
13 But yes, the longer the better.
14     Q   Right. Do you know, I mean 15, 20, 30,
15 50? Do you have any idea?
16     A   That's not in my expertise.
17     Q   Okay.
18         MR. OLSON: Okay. We can go ahead and
19 change tape. I might just have one or two more
20 questions on this.
21         THE VIDEOGRAPHER: We're going off the
22 record. The time is 2:13 p.m.

---

**263**

1          (A recess was taken.)
2          THE VIDEOGRAPHER: This is the
3  beginning of Tape 5. The time is 4:30 -- no,
4  2:30 p.m. and we're back on the record.
5          (Deposition Exhibit 22 was marked for
6  identification.)
7      Q   Dr. Armstrong, you can put that aside.
8  I'm handing you what we've marked Armstrong 22.
9          This is a document Bates stamped
10 UE0331187 through 1190. And it's a -- it's
11 actually two documents put together. And why
12 don't you just briefly review the document, and
13 then we will discuss it.
14         MS. SUMNER: Steig, I think it's three
15 documents together.
16     Q   We're just going to walk through the
17 whole thing.
18     A   I've scanned them.
19     Q   Okay. So let's start at the back with
20 the oldest --
21     A   Okay.
22     Q   -- document. That's -- can you

---

**264**

1  identify that as an email you sent to Gene
2  Gregory, copying others, on January 6, 2002?
3      A   Yes.
4      Q   And who are the folks that you copied?
5      A   Those are the members of the scientific
6  advisory committee.
7      Q   And one of those is Bob Krouse; who is
8  that?
9      A   Bob was the ex officio member. He was
10 chair of the animal welfare committee at that
11 time.
12     Q   And so was that Mr. Krouse who took
13 over from Mr. Wilcox?
14     A   I assume so. I don't remember if there
15 was someone in between; we've had several.
16     Q   Fair enough. And have you reviewed
17 this email that you wrote?
18     A   Yeah. I looked at it again.
19     Q   Okay. The Subject is "Concerns from
20 the committee." Do you see that?
21     A   I do see that.
22     Q   And do you recall these concerns from

---

**265**

1  the committee?
2      A   I don't recall a lot more than
3  what's -- than what's here. There were numerous
4  times when the committee had concerns, and in
5  addition to being the chair I was sort of the
6  chief navigator and the negotiator-in-chief.
7      Q   Okay. And even after reviewing the
8  email, you don't recall what the concern was?
9      A   No. I -- the document stands for
10 itself. I -- I don't have knowledge -- I don't
11 recall much beyond what's here.
12     Q   Okay.
13     A   But I do -- I do understand the email,
14 yes.
15     Q   Can you explain for the record the
16 concern that you were expressing?
17     A   So, as I had alluded earlier, Janice,
18 Joy, Adele and others are involved in many
19 other -- it's a small world. They were involved
20 with MPPC, the FMI committee -- it may have
21 been -- should have been NCCR. I'm not sure.
22 It's NCCR, FMI. That might have been a typo on

---

Armstrong, Jeffrey      March 13, 2014

**266**

1 my part.  They were upset to see a retailer
2 version of the producer standards, which must
3 have been this -- must have been Document 21.  I
4 don't know.
5  Q Let's not speculate.
6  A I don't know.  And --
7  Q Okay.
8  A -- which calls for space allowances
9 recommended by the scientific committee for
10 laying hens to be achieved by hen mortality.  So
11 they were upset.  And I transmitted that.
12  Q Okay.  And as part of what you
13 transmitted, did you transmit a request that the
14 scientific committee members' names should only
15 be used on the scientific document?
16  A I did.  I said that being the case, it
17 was requested that the scientific committee
18 members -- members to be used only on the
19 scientific document.
20  Q And by that did you mean the scientific
21 advisory committee's recommendations as opposed
22 to the UEP guidelines?

**267**

1  A That's exactly right.
2  Q And you said --
3  A And the -- go ahead.
4  Q You said, "Gene, I think this is only
5 fair."  Do you see that?
6  A Yes.  And, again, putting our name on
7 that document puts us in the perspective of
8 endorsing timelines and endorsing particular
9 actions that were not -- that are not in the
10 purview of the committee.  And it really broke
11 that longstanding view that we had from the
12 beginning.
13  Q And is that why you said having the
14 committee's names mentioned on any document other
15 than the scientific report implies that the
16 committee supports or endorses -- endorses those
17 guidelines when in fact they don't?
18  A That's correct.
19  Q All right.  Now, if we turn to the next
20 page, can you identify this as Gene Gregory
21 responding to you, copying -- strike that.
22   Can you identify the email on the next

**268**

1 page as an email you received from Gene Gregory
2 on January 7, 2002, the next day?
3  A Yes.
4  Q And the title is using member names,
5 so -- and it concerns this topic; correct?
6  A Yes.
7  Q And Mr. Gregory copied Bob Krouse; do
8 you see that?
9  A Yes.
10  Q Do you know why Bob Krouse was copied?
11  A I would assume because he was the chair
12 of the producer committee, and he -- he
13 referenced Bob in the first sentence.
14  Q Okay.
15  A But I can't speak for Gene.
16  Q All right.  And have you briefly
17 reviewed this email?
18  A I scanned it.
19  Q All right.  I just want to focus
20 towards the bottom.  Do you see where Mr. Gregory
21 says, "We cannot take the scientific committee
22 members out of the producer document because this

**269**

1 has been printed and distributed since
2 October 2000"?  Do you see that?
3  A That's correct.
4  Q And then he says, "If the committee
5 does not want us to use their names, then is it
6 fair to request that they not publish a report
7 for peer review since this project was initiated
8 by UEP?"  Do you see that?
9  A I do.
10  Q And what do you understand Mr. Gregory
11 to mean by that?
12  A I don't recall the -- knowing Gene,
13 Gene was upset.  And he was saying, well, if
14 you're going to do this, I'm going to do that.
15 And --
16  Q And the "that" --
17  A -- that doesn't -- no.  That was a
18 point in time that Gene was upset with me,
19 clearly.  Yeah.
20  Q And just for the sake of the record,
21 the "that" is suggesting that the members of the
22 committee couldn't publish anything about their

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

69 (Pages 270 to 273)

270

1  work on the committee in a peer-reviewed setting?
2      **A  He could request all day long, but he**
3  **has absolutely zero control over university**
4  **academicians on publishing papers.**
5      Q  But is that what you understand him to
6  be --
7      **A  That's what he requested.**
8      Q  -- requesting?
9      **A  The document speaks for itself.**
10     Q  And then he says, "We need to support
11 one another."  Do you see that?
12     **A  He did say that.**
13     Q  And what did you understand that to
14 mean?
15     **A  It's just out of the context he's mad**
16 **and -- and he's trying to get his way.  It's just**
17 **back and forth between two human beings.**
18     Q  Yeah.  All right.  And then if you look
19 to the cover letter, can you identify this as a
20 letter that was sent to you by Al Pope dated
21 January 8, 2002, that is the next day?
22     **A  Mm-hmm.  Yes.**

271

1      Q  And it's Mr. Pope now weighing in with
2  his thoughts on this -- this email that you had
3  written; correct?
4      **A  Yes.  That's correct.**
5      Q  I think that we can just put that aside
6  and move on.
7          And we are going to skip Exhibit 23 and
8  go to Exhibit 24.  So let me hand you what's been
9  marked Armstrong 24.
10         (Deposition Exhibit 24 was marked for
11 identification.)
12     Q  And this is -- was previously Gene
13 Gregory 33.  It's Bates stamped UE0174535
14 through --
15         MS. SUMNER:  Can you repeat that number
16 one more time, please?
17         MR. OLSON:  Yes.  UE0174535 through 36.
18     Q  And Mr. -- Dr. Gregory, please briefly
19 review it, and let us know when you're done.
20         MR. KEALEY:  I think you meant
21 Dr. Armstrong.
22         MR. OLSON:  Right.  Sorry.

272

1  Dr. Armstrong.  Sorry.
2          MS. SUMNER:  Did you intentionally skip
3  23?
4          MR. OLSON:  Yes.
5      **A  Okay.**
6      Q  All right.  And can you identify this
7  as an email you sent to Gene Gregory copying the
8  scientific advisory committee on March 17th,
9  2002?
10     **A  Yes.**
11     Q  And you copied Bob Krouse again;
12 correct?
13     **A  I did.**
14     Q  Because he was a member of the
15 committee?
16     **A  He was ex officio member by reason of**
17 **his position as the committee chair.  Sure.**
18     Q  Do you recall this email that you sent?
19     **A  I -- I do now.**
20     Q  This has refreshed your recollection?
21     **A  It has.**
22     Q  Okay.

273

1      **A  Yes.**
2      Q  And it's generally about this same --
3      **A  Yes.**
4      Q  -- topic?  Umm --
5      **A  I was -- I was wondering what happened**
6  **next.**
7      Q  So essentially you say on behalf of the
8  committee you want to continue the dialogue about
9  this issue; correct?
10     **A  Mm-hmm.**
11     Q  And again you raise the concern about
12 the committee members' names being on the
13 producer guidelines.
14     **A  Mm-hmm.**
15     Q  Right?
16     **A  Yeah.  Scientists, academicians, are**
17 **very careful about what they put their name on.**
18 **And they didn't want to be tied into the**
19 **implementation.  While we're reviewing it, this**
20 **is also evidence that if we see something that's**
21 **not what we think it should be, we point it out.**
22     Q  Right.  Because one of the points you

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

70 (Pages 274 to 277)

---

274

make is that there's -- there's a difference
between the scientific advisory committee
recommendations and the producer guidelines;
right?

A    That's accurate, yes.

Q    And you refer to this difference with
regard to space allowances; correct?

A    Umm --

Q    Well, just to be clear, what you write
is --

A    This language speaks for itself.  Yes.

Q    So just to be clear what language we're
talking about, it says "The scientific document
recommends a per-hen range of 67 to 86 square
inches, but makes it plain that the lowest limit
is to apply only to small leghorns in shallow
cages, and that generally 72 square inches per
hen should be provided."  Right?

A    That's correct.  And since you
mentioned that, from a -- from a broad
perspective, not, you know, necessarily with this
specific document, I can tell you that over time

---

275

the committee basically said, okay, we'll accept
67.

Q    But that was --

A    That was not the case at this time.

Q    And I take it that was sort of a
reluctant -- or a -- something the committee was
reluctant to accept?

A    I wouldn't say reluctant because I
don't recall at that exact time.  There was --
Steig, there was give and take back and forth
with this committee.  There were -- there were
times when one committee member might have been
upset at another, and it was a very long and
dynamic process.  And any time people are
involved you get this type of thing.

Q    All right.  There's also a reference --
and I don't think we need to get into it -- to
the using a per-house average as opposed to
per-hen; right?

A    Mm-hmm.

Q    That was another difference you
identified?

---

276

A    Yes.

Q    And then you also identified
differences with regard to lighting and ammonia
as of this time; correct?

A    That's correct.  There -- you know, in
one sense -- and that's probably what I said to
Gene on the phone, is there -- you know, is there
a tremendous difference?  Where are we going?
When do we -- when does the committee get upset
about a detail?  When do we let a detail go?  And
I tried to keep the committee focused on what
really is making a difference in animal welfare
versus what's an implementation step that in two
or three years is going to be not an issue
anymore.

Q    Because --

A    And that was a constant struggle.

Q    Because the scientific advisory
committee was not concerned with the
implementation steps.  Correct?

A    Not as concerned.

Q    Now, 67 square inches, would it be fair

---

277

to say that that is smaller than the piece of
paper that this email is written on?

A    I don't do the math in my head very
quickly, but 67 square inches is 67 square
inches.  So 8 by 11 would be 88.  So yes, it's
smaller.

Q    Smaller than this piece of paper?

A    That's correct.

Q    All right.  So would it be fair to say
that as of this time in 2002, under the producer
guidelines, hens could be certified under the UEP
program while they were kept in a cage smaller
than this piece of paper, that didn't give them
sufficient room to flap their wings?  True so
far?

MS. SUMNER:  Objection.

A    Cage systems in general do not permit
birds to freely flap their wings.

Q    And -- and even birds within the
certified program weren't necessarily given
enough space to perform basic hen behavior
comfortably; correct?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

71 (Pages 278 to 281)

---

278

1    MS. SUMNER:  Object to form.
2        A    You're pulling one document out of
3    context.  The overall view of the committee is
4    that where we settled was 67.  We went through a
5    transition of 72.  And what I got the committee
6    to -- you know, the committee, myself through
7    discussion, and I never got them to do anything they
8    wouldn't agree to, that we settled on 67.  And we
9    knew that through the transition birds would be
10   housed at less than 67.  And 67 is a remarkable
11   victory compared to 48 as far as hen welfare.
12       So we were looking at major changes,
13   not diving down to a specific, you know, would
14   this small bird be able to flap?  Would this
15   small bird have enough room to sit or a larger
16   bird have enough room to sit?
17       Some of my committee members at first
18   really wanted to look at that range and really
19   look at different birds, and that wasn't
20   practical to ever implement.  And that's why we
21   ended up where we ended up, which is after this.
22       Q    Right.  But the science -- the

---

279

1    scientific advisory committee's report had
2    concluded that white leghorn hens required an
3    average of 74 square inches to perform even the
4    most basic behaviors like standing comfortably
5    and resting; correct?
6        A    You're pulling -- you're pulling -- one
7    paper stated that, and the committee stated that
8    for white leghorn hens.  But our recommendation
9    ended up being 67 to 86.  There was give and
10   take, Steig.  Yes.  That's correct.
11       Q    All right.  So, if you could just stick
12   with me.  Now I want to talk about the
13   requirements under the producer program.
14       A    Mm-hmm.
15       Q    All right.  So under the producer
16   program, a hen would get -- could pass the
17   program while getting less than the space needed
18   to perform even the most basic behaviors like
19   standing comfortably and resting; correct?
20       MS. SUMNER:  Object to form of the
21   question.
22       A    The producers phased in -- the

---

280

1    producers phased in the space allowances and the
2    committee was fully aware that there was a
3    phase-in.  What the committee takes pride in and
4    what the committee now sees is that we are to a
5    67 and it's been implemented.
6        Q    All right.
7        A    So during the transition, were there
8    back and forth and were there subtle differences?
9    Yes.  And I cannot recall or track those for you,
10   but I would be glad to comment on specific points
11   or documents.
12       Q    Okay.  Well, let's then -- put the
13   phase-in aside.  Let's assume that -- jump right
14   to 67.  That's still seven inches less than what
15   the committee said birds needed on average to
16   perform basic behaviors; correct?
17       MS. SUMNER:  Object to the form of the
18   question.
19       A    The committee said in its final
20   recommendation that 67 to 86 is the -- is the
21   recommendation, and the committee recognized that
22   the industry went to 67 as the final.  And from a

---

281

1    practical perspective, we lived with it.
2        Q    All right.  And now --
3        A    But some members of the committee, if
4    they were writing the guidelines by themselves,
5    would have put everybody in enriched cages
6    tomorrow, including myself.  But that's not at
7    all practical, and would not -- have very little
8    impact -- it would have very little impact on
9    animal welfare because it would have -- wouldn't
10   have been implementable.
11       Q    And I just want to go back to mid 2002
12   during the time of this document just to have the
13   record --
14       A    Yes.
15       Q    -- give a landscape of what the
16   producer guidelines were requiring.  All right.
17   So we've talked about how much cage -- how much
18   space they get in a cage.
19       Now, would it -- to your knowledge, at
20   this time, mid 2002, could a producer be
21   certified even if -- because they were still
22   using older cages -- manure from the higher hens

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                March 13, 2014

72 (Pages 282 to 285)

---

**282**

1  was dropping directly on the lower hens?

2  **A   I believe there was a document earlier**

3  **today where there was grandfathering of -- that**

4  **was the phrase the industry used to facilities,**

5  **and the committee was aware of that.  But the**

6  **committee also knew there -- that we were headed**

7  **toward a goal.  So, yes, there were transitions.**

8  Q   All right.  And as of mid 2002, to your

9  knowledge, under the producer guidelines, could a

10 producer be certified even though it forcibly

11 starved its hens for two weeks or longer?

12           MS. SUMNER:  Object to the form.

13 **A   What I can tell you is that there were**

14 **transition points, various phases of**

15 **implementation.  And the committee was aware that**

16 **molting induced by feed withdrawal would occur,**

17 **and we told them certain conditions that should**

18 **go along with that to mitigate the negative**

19 **aspects.  So yes, the committee recognized during**

20 **implementation that it wasn't going to be**

21 **perfect, but we were moving away from an inhumane**

22 **system to a humane system.**

---

**283**

1           **Were there points where it wasn't**

2  **exactly like we wanted?  And that was my role to**

3  **try to keep the committee moving and thinking**

4  **about the big picture and not get tied up and**

5  **worried about specific details.**

6  Q   All right.  And again, speaking about

7  this time in mid 2002, a producer could be

8  certified under the producer program even if it

9  was beak trimming all of its --

10 **A   I --**

11 Q   -- baby hens?

12 **A   I was not -- I was not then, and I'm**

13 **not conversant now, on the details of the**

14 **certification program other than we worked to**

15 **make sure that the main points of the**

16 **science-based guidelines were included, and I**

17 **think there's evidence here that we complained**

18 **and said, hey, this isn't exactly right.**

19           **Gene had producers that were pushing,**

20 **pushing, pushing, because they did not want to do**

21 **this.  They didn't want to give them 67.  They**

22 **didn't want to give them 72.  They wanted to keep**

---

**284**

1  them at 48.

2  Q   All right.  I recognize that you're

3  saying you're not conversant in all the details

4  of the producer guidelines, but you are aware

5  based on this document that as of March 2002

6  producers could be certified under the

7  guidelines, even though --

8  **A   Was --**

9  Q   -- they weren't meeting the ammonia and

10 the lighting recommendations of the scientific

11 committee?

12           MS. SUMNER:  Object to the form --

13 Q   Correct?

14           MS. SUMNER:  -- of the question.

15 **A   I am -- I am recognizing at this point**

16 **I was much more -- at the date of this note,**

17 **March 17th, 2002, I was much more conversant with**

18 **the details.  And I am recognizing that there was**

19 **a transition in the implementation of the**

20 **guidelines, as I've stated several times.**

21 Q   All right.  Let me just try to pull all

22 this together.

---

**285**

1           So, Dr. Armstrong, from an animal

2  welfare perspective, was a program that allowed

3  producers to house their hens in cages too small

4  for the hens to comfortably perform basic

5  behaviors, that allowed for those hens to be in

6  cages where manure was dropping directly on their

7  heads from hens above them, that allowed for the

8  producer to forcibly starve those hens for two

9  weeks or longer, where all of the baby hens were

10 beak trimmed, and where the hens were not

11 receiving the minimum lighting or ammonia

12 standards recommended by the scientific advisory

13 committee, was that program truly providing a

14 humane way of treating those hens?

15           MS. SUMNER:  Object to the form of the

16 question.

17 **A   At all points from the formation of the**

18 **scientific committee through the life of the**

19 **committee, albeit back and forth like this**

20 **(indicating), the committee and the individual**

21 **members would tell you overarchingly the**

22 **producers implemented this to the best of their**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

286

1  ability. So was the committee aware of a
2  transition in implementation? Yes.
3          Did we believe -- did we believe that
4  the program was humane? Yes.
5      Q   So hens --
6      A   So the program was -- the program --
7  the industry was moving from no -- no guidelines
8  whatsoever to guidelines. And the committee as a
9  whole realized that there are practical measures
10 and aspects that go through this.
11         So to dive down to any one point in
12 time during the transition and say that a program
13 is not appropriate when it is heading in the
14 slope of the line in change that's quite
15 monumental, I don't agree with that foundation.
16     Q   But were those hens at that time, that
17 were in a cage smaller than a sheet of paper,
18 with manure dripping on them and forcibly starved
19 for two weeks or more being treated in a humane
20 way?
21         MS. SUMNER: Object --
22         MR. KEALEY: Object --

287

1      A   A higher percentage of hens --
2          THE REPORTER: Wait. Hold on.
3      A   -- were being --
4          THE REPORTER: Okay. Thank you.
5      A   A higher percentage of hens were being
6  treated in a humane manner than when we started
7  the program, and that percentage increased every
8  month of the program as UEP, the animal producer
9  committee, as deemed by me and interaction with
10 the committee, continued to make progress.
11         This note and the notes that you just
12 put forward of March -- of 17, of 24, indicates
13 and captures a moment in time where we had
14 disagreements.
15     Q   All right. I've handed you what we've
16 marked Armstrong 25. It's Bates stamped
17 UE0211387 through 90. And I'd like you to just
18 see if you can, after looking at the document,
19 identify it for us.
20         (Deposition Exhibit 25 was marked for
21 identification.)
22     A   All right. I scanned it in the spirit

288

1  of time and then I'll read -- if you go to
2  certain sections, I'll read in more detail.
3      Q   Fair enough. And if at any time you
4  need to read anything --
5      A   Sure.
6      Q   -- to answer a question, you always
7  can, of course. But --
8      A   Thank you.
9      Q   -- can you just identify the document
10 for us?
11     A   These are the March 1, 2003 minutes of
12 the UEP welfare scientific advisory committee.
13     Q   And did you take these notes?
14     A   Apparently Scotti and I took the
15 notes --
16     Q   Was it the --
17     A   -- together. I don't know who actually
18 typed them in. But we would have reviewed them
19 together before we submitted them to the
20 committee and UEP.
21     Q   Was there any typical practice of
22 taking notes of the scientific advisory committee

289

1  meetings?
2      A   As I recall, sometimes yes, sometimes
3  no.
4      Q   And when it was yes, what was the
5  practice?
6      A   I guess this. I assume this.
7      Q   All right. And do you know who took
8  them?
9      A   It -- I would take notes, sometimes
10 Scotti would take notes, and I think Gene always
11 took notes.
12     Q   And how did you take notes?
13     A   I -- never the same. Sometimes I'll
14 write on the computer, some -- type on a
15 computer, sometimes I'll write notes. But if I
16 can avoid taking notes, I avoid it, just as a
17 general practice.
18     Q   And with regard to the notes that you
19 took, how did you keep them?
20     A   Anything we did, we distributed
21 electronically via email typically.
22     Q   And how did you keep the notes that you

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

74 (Pages 290 to 293)

---

**290**

1  took yourself?

2  **A   On my computer.**

3  Q   Are they still in your computer today?

4  **A   I have no idea.  I've moved a couple**

5  **times since then.**

6  Q   Has anybody asked you to collect those?

7  **A   They have not.**

8  Q   Has anybody asked you to preserve

9  those?

10 **A   They have not.**

11 Q   All right.  Let's look at the second

12 page of this document.  There's a heading that

13 says Feeder Space.

14 **A   Okay.**

15 Q   And it references Joy Mench pointing

16 out some discrepancies between the guidelines and

17 audit forms on feeder space; do you see that?

18 **A   I do.**

19 Q   Do you recall those issues being

20 discussed?

21 **A   Not in detail, but they were.**

22 Q   Okay.  Then if you look at the next

---

**291**

1  page at the top, the third sentence, do you see

2  where it says "it was the general consensus of

3  the committee that feeder space was even more

4  important than the space allowance"?

5  **A   That was the feeling at the time.**

6  Q   Okay.  You can put that aside.

7  **A   But feeder space evolved.**

8  Q   Let me hand you what's been marked

9  Armstrong 26.

10     (Deposition Exhibit 26 was marked for

11 identification.)

12 Q   This is Bates stamped UE0153284 through

13 25.  And can you identify this as minutes of the

14 producer committee for animal welfare meeting in

15 Chicago dated March 3rd, 2004?

16 **A   Yes.**

17 Q   And you attended; correct?

18 **A   Yes.**

19 Q   All right.  Why don't you just review

20 the first page.  I'll have a couple questions

21 there.

22 **A   Yes.  I'm ready.**

---

**292**

1  Q   All right.  Do you recall this meeting?

2  **A   I do.**

3  Q   There was a discussion of the -- of

4  cage configuration and feed space issues;

5  correct?

6  **A   Mm-hmm.  Mm-hmm.**

7  Q   And you made some comments in that

8  regard; correct?

9  **A   I did.**

10 Q   All right.  And you reference -- you

11 referenced a visit to an egg farm where the

12 committee saw manure dropping on birds in lower

13 cages.  Do you see that?

14 **A   I do.**

15 Q   And when did that visit occur?  Do you

16 recall?

17 **A   It must have been the visit, I think**

18 **it's referenced in the second committee meeting**

19 **maybe.**

20 Q   Okay.  So back in 1999?

21 **A   I think so.**

22 Q   All right.

---

**293**

1  **A   Or whenever -- yeah.  I think that**

2  **would have been it.  That would've -- that was**

3  **the main one where the committee was together.**

4  **Yes.**

5  Q   All right.  So would it be fair to say

6  that nearly five years later, in 2004, the

7  scientific advisory committee was still concerned

8  that hens were being housed in systems where

9  manure from higher cages was dropping on birds in

10 lower cages?

11     MS. SUMNER:  Objection.

12 **A   I think that the document speaks for**

13 **itself as to what I transmitted to the -- to the**

14 **producer committee at that time.**

15 Q   That was still a concern?

16 **A   I don't -- I don't recall the details**

17 **of that.  I recall the -- for some reason I**

18 **recall the discussion of feeder space, because**

19 **that was quite lengthy and quite concerning.  I**

20 **don't recall whether -- where we were as far as**

21 **the manure drop-down.  Because the committee**

22 **never budged on that, I don't -- I don't recall**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

75 (Pages 294 to 297)

---

294

the exact details of what we were dealing with
here with regard to manure drop-down, other than
what it says.
Q   All right.  And do you see where you
reference some research that had -- had occurred
on feeder space?
A   I do.  I see that.
Q   So as of March of 2004, your view was
that the research that had been done on feeder
space confirmed that as additional feeder space
was provided, hens performed at higher levels;
correct?
A   That is correct.  We -- I presented
that information.  The committee was not really
clear, but it -- but at that point we -- the best
we knew was that it needed to be four inches.  I
took that to the committee, to this group, and
they pushed back and said that's not what we see
in the field.
I took that back to the -- to the
scientific committee, and the end result is we
designed a set of experiments that were conducted

---

295

at Purdue University, and it proved the producer
view correct, and it proved the old results
Dr. Joy Mench -- not necessarily incorrect for
that time, but for the majority of birds now, in
that one particular study, it wasn't clear.  The
study conducted at Purdue did not confirm that
cage -- that feeder space was related to hen
performance.
Q   All right.
A   So this is an example of the back and
forth.
Q   Okay.  So let's break that down a
little bit.  As of this time, the best scientific
teaching available taught that additional feeder
space was critically important to hen welfare;
correct?
MS. SUMNER:  Objection.
A   That's what we -- that's what we
thought.
Q   At the time?
A   But it was -- if you -- if you look at
our level of confidence on a scale of zero to 10

---

296

with regard to how we felt about the range of
space, it would have been about a 9.  This would
have been about a 5.
Q   Okay.
A   And as we subsequently changed the
documents, we said such that birds could consume
feed.  And we did that based on the results of
the study conducted at Purdue.
Q   Okay.  So the -- anything other than
this Purdue study led to the change in the
recommendation?
A   The Purdue study was very pivotal in
that wording change.
Q   Okay.  Were there other studies other
than the Purdue study that were relied upon?
A   I'm sure there -- I mean there were
numerous studies that the committee looked at,
not just one.  But that one confirmed with the --
with the strain of birds that's the majority
today, we don't know, and they would all say we
need additional research.
That's the other -- that's another

---

297

common thread here.  There's some things you know
and some things the best knowledge of the day is
what we have.
Q   And do you see here that there was a
motion made with regard to new cage equipment?
A   Mm-hmm.
Q   And it said new cage equipment ordered
after May 14, 2004, and installed after
December 31, 2004, must provide ten centimeters
of feeder space per hen and zero exposed area for
manure drop-through, and it continues; do you see
that?
A   I do.
Q   Do you see that motion was withdrawn?
A   I do.
Q   So is it consistent with your knowledge
at this time that there was no hard-and-fast
requirement under the UEP producer program that
cages could not allow manure to drop directly on
hens in lower cages?
A   No.  What was clear is what's stated in
the document that their motion to effect

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

76 (Pages 298 to 301)

---

**298**

1   equipment orders was discussed and withdrawn.
2   The conversation about manure drop-through and
3   the combination -- conversation about feeder
4   space was quite involved and complicated, as I
5   alluded to earlier.
6       Q   Do you know if there was any clear
7   prohibition on cages permitting manure
8   drop-through as of 2004?
9       A   Best of my recollection is that the
10  committee stated repeatedly that we wanted to get
11  to a space, we wanted to get our different
12  guidelines, and that the industry was getting
13  there as quickly as they could.  As I said
14  earlier, Steig, the committee understood that
15  during the transition we were increasing welfare
16  for birds, but it wasn't perfect as we were
17  transitioning.
18      Q   All right.  I've handed you what we've
19  marked Armstrong 27, Bates stamped UC_E00052294
20  through 97.  If you could just briefly review
21  this.
22          (Deposition Exhibit 27 was marked for

---

**299**

1   identification.)
2       A   Okay.
3       Q   All right.  Can you identify the email
4   at the back as one that you wrote on April 23rd,
5   2004?
6       A   Yes.
7       Q   And towards the end you make a point
8   about protecting hens in lower cages from manure
9   dropping from upper cages.
10      A   I did.  Yes.
11      Q   And you make a point about -- you say,
12  "We believe it would be a serious mistake for
13  producers to simply disregard this recommendation
14  by saying they would give up the points in the
15  audit."  Do you see that?
16      A   Yes, I did.
17      Q   Do you know what you're referring to
18  there?
19      A   Yeah, yeah.  That's -- that helps me
20  because I think that was probably discussed at
21  this -- at the other meeting, but I'm not sure.
22  Yes.

---

**300**

1       Q   And what's -- what is the point?
2       A   I think the document stands for itself.
3   That's what I -- what I wrote.
4       Q   That -- are you saying it's just
5   unacceptable to have cages that allow manure to
6   drop on lower hens and it shouldn't be a matter
7   of points coming off an audit?
8       A   Yeah, we -- yeah.  That's what we were
9   saying.
10      Q   All right.
11          All right.  You can put that aside.
12          (Deposition Exhibit 28 was marked for
13  identification.)
14      Q   Let me hand you what's been marked
15  Armstrong 28.  This is previously Gregory 68.
16  Can you identify this, Dr. Armstrong, as a United
17  Voices publication from May 20th, 2004?
18      A   Yes.
19      Q   And if you look at the second page,
20  there is a reference to an -- there's an
21  editorial by Gene Gregory called Are You
22  Committed?  I want you to briefly take a look at

---

**301**

1   that.
2       A   Okay.  I scanned it.  If you have
3   specific areas, I'll dive in again.
4       Q   Just a couple.  Do you recall reviewing
5   this editorial --
6       A   I do not recall --
7          MS. SUMNER:  Objection.
8       A   -- this --
9       Q   -- as you sit here today?
10      A   Pardon?
11      Q   Let me just ask the full question.
12  Sorry.
13          Do you recall ever reviewing this
14  editorial prior to just looking at it now?
15          MS. SUMNER:  Objection.
16      A   Not to my recollection.
17      Q   Then we'll just look at a couple
18  points.  Do you see where Mr. Gregory at the
19  bottom of the first page says, "While never
20  intended as supply adjustment program, the animal
21  care certified program is the only roadmap the
22  industry has ever had for future planning"?  Do

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

77 (Pages 302 to 305)

---

302

1  you see that?
2      A   I do.
3      Q   Do you recall ever discussing those
4  concepts with Gene Gregory?
5      A   No.
6      MS. SUMNER:  Objection.
7      Q   Where it says, "If you stay true to the
8  program and manage it to meet the market demand,
9  it can provide the industry with prolonged
10  profits"; do you see that?
11      A   I do.
12      Q   Do you recall discussing those concepts
13  with Gene Gregory?
14      MS. SUMNER:  Objection.
15      A   Not to my recollection.
16      Q   And then he says, "For many people
17  backfilling to replace mortality was a new
18  production practice and may be necessary to
19  maximize profits, but it's now time to rethink
20  this position.  Backfilling into unprofitable
21  periods certainly doesn't make good business
22  sense."  Do you see that?

---

303

1      A   I do.
2      Q   Do you recall discussing those concepts
3  with Gene Gregory?
4      MS. SUMNER:  Objection.
5      A   I do not recall.  But I had hundreds of
6  emails and hundreds of discussions.  Not to my
7  recollection.
8      (Deposition Exhibit 29 was marked for
9  identification.)
10      Q   Let me hand you what we've marked
11  Armstrong 29, which is the United Voices from
12  August 12th, 2004.  And it was previously Pope
13  Exhibit 35.
14      In here, Dr. Armstrong, if you look at
15  the second page, again, there's an editorial,
16  this one by Al Pope.  It's called Backfilling:
17  The Loophole of a Hangman's Noose.
18      A   Yes.  I've read it.
19      Q   All right.  Do you recall ever seeing
20  this editorial before?
21      A   I'm sure I scanned it, just like that
22  one, but I don't recall.  I mean they all came

---

304

1  through email or paper.  I don't remember when
2  that changed.
3      Q   All right.  Mr. -- Mr. Pope says,
4  "Whose program is it anyway, this UEP animal care
5  certified program?"  Do you see that?
6      A   I do.
7      Q   It eventually says, "program belongs to
8  those of you who are participating in the
9  program.  You decide how the program operates."
10  Do you see that?
11      A   Mm-hmm.
12      Q   Did you ever discuss those concepts
13  with Mr. Pope?
14      A   Not that I recall.  I did not have a
15  tremendous number of conversations with Al, nor
16  with Gene, nor with the animal welfare producer
17  committee chair.
18      Q   I think the court reporter wrote down
19  "nor with Gene, nor with the animal welfare
20  producer committee," but you said more --
21      A   More.
22      Q   More?

---

305

1      A   Yeah.
2      Q   All right.
3      A   I had more -- most of my contact would
4  be with those two individuals.
5      Q   All right.  So --
6      A   But I had contact with Al, so to best
7  of my recollection, I don't recall.
8      Q   All right.  So Mr. Pope said here, "In
9  this regard, the original intent of permitting
10  animal care certified companies to backfill was
11  to accommodate those few extra unexpected pullets
12  from grow-out facilities."  Do you see that?
13      A   Mm-hmm.
14      Q   "This option will avoid the destruction
15  and waste of what otherwise was a productive
16  bird."  Do you see that?
17      A   Mm-hmm.
18      Q   Do you know what Mr. Pope was referring
19  to there?
20      A   I think it's exactly what it says.
21      Q   Okay.  And is that consistent with your
22  knowledge?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

78 (Pages 306 to 309)

---

306

1    **A    Yes.  That's one argument for**
2    **backfilling.**
3        Q    To avoid --
4    **A    There are arguments against.**
5        Q    Right.  So one of the arguments for
6    backfilling is to avoid the destruction and waste
7    of a bird; correct?
8    **A    To avoid the -- the destruction of**
9    **unexpected pullets, excess pullets, yes.**
10        Q    And that is consistent with animal
11    welfare, avoiding the destruction of excess
12    pullets; correct?
13    **A    From a -- from a broad perspective, it**
14    **is.  Similar to avoiding euthanasia of male**
15    **chicks.**
16        Q    Now, is the concept that a producer has
17    to make an estimate of the livability of the
18    pullets they put in the pullet house, and that
19    sometimes they have better livability than they
20    expected, so there are extra pullets?
21    **A    What you're saying is sometimes the**
22    **producer cannot produce -- cannot predict the**

---

307

1    supply.
2        Q    And sometimes --
3    **A    I just -- I'm not an expert in that**
4    **area, but it is logical.**
5        Q    Okay.  And sometimes supply is less,
6    sometimes it's more, presumably?
7    **A    That's logical.**
8        Q    Okay.  And when it's more, that means
9    there are these extra pullets that either have to
10    go somewhere or be destroyed.  Is that true?
11    **A    Yes.**
12        Q    And backfilling is a way to put those
13    pullets somewhere as opposed to destroying them.
14    True?
15    **A    That's consistent with what's written**
16    **here.**
17        Q    But what Mr. Pope says is, "While that
18    may have been a good idea at one time, the
19    backfill provision, in my opinion, is
20    contributing or even causing some of the
21    disorderly marketing and poor egg prices that we
22    are currently experiencing."  Do you see that?

---

308

1    **A    I do see that.**
2        Q    Now, Dr. Gregory, is it your testimony
3    that you never discussed with Gene --
4        Did I call you Dr. Gregory?  I
5    apologize.
6        Dr. Armstrong, is it your testimony
7    that you never discussed with Gene Gregory or Al
8    Pope the idea that the problem with backfilling
9    was that it was hurting egg prices?
10    **A    I don't recall.**
11        Q    All right.  So you see this editorial's
12    dated August 12th, 2004; correct?  Just as a
13    table setting.
14    **A    (No response)**
15        Q    Okay.  And now you've pulled out your
16    letter, which I appreciate.  That's Exhibit 11, I
17    believe; correct?
18    **A    Yes.  I was trying to think about the**
19    **timing of --**
20        Q    Yeah.
21    **A    -- of these events.**
22        Q    So -- so but I've also handed you, and

---

309

1    just keep this one out too, what we've marked
2    Armstrong Exhibit 30.
3        (Deposition Exhibit 30 was marked for
4    identification.)
5    **A    Okay.  So I've got August 12th,**
6    **October 4th, and then I've got a October 4th.**
7        Q    Yeah.  So -- so Armstrong Exhibit 30 is
8    Bates stamped UC_E00052448.  Okay?
9    **A    Mm-hmm.**
10        Q    And can you identify that as a
11    letter -- as an email that you wrote on
12    August 4th, 2004?
13    **A    I believe so, and I think Exhibit 11**
14    **would have been the attachment.**
15        Q    The attached letter.  So a little over
16    a month after Al Pope's editorial about
17    backfilling being a loophole of a hangman's
18    noose; correct?
19    **A    That's correct.**
20        Q    And then your cover letter -- well, let
21    me ask first, who was your email addressed to?
22    **A    The email is addressed to the**

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

79 (Pages 310 to 313)

---

**310**

scientific committee.

Q   And you say -- you asked them to review the attached letter?

A   Mm-hmm.

Q   You say, "Scotti assisted in providing the first draft of a letter asking producers to cease the practice of backfilling." Do you see that?

A   I do.

Q   Then you say, "We need to support UEP in their quest to terminate this practice." Do you see that?

A   I do.

Q   And that was your view at the time; right?

A   That's correct.

Q   And what was of the basis for saying that UEP was on a quest to terminate this practice?

A   I don't -- I don't recall.

Q   It's these editorials from Gene Gregory and Al Pope; correct?

---

**311**

A   I don't recall.

Q   But it could have been at least partly that; correct?

MR. KEALEY:  Calls for speculation.

A   I don't recall.

MR. KEALEY:  The witness has answered the question.

Q   Okay.  You can put that aside.

Dr. Armstrong, if you could now pull out Exhibit 12.

A   Can you show it to me?  That might help expedite.

Q   It's a United Voices from May 2005 where you wrote the editorial on the egg industry needing to be united.

A   Got it.  Okay.

Q   Now, Dr. Armstrong, Gene Gregory came to you and asked you to speak out against this competing program to the UEP certified program; correct?

A   I don't recall.  He may have.  I don't recall the details.  I'm not -- I'm not

---

**312**

remembering the exact details.  I don't know how it originated.  But we could have had that conversation; I don't know.

Q   All right.  Do you recall what led up to you writing this editorial for United Voices?

A   I do not.

Q   Was that -- do you recall how many editorials you wrote?  In other words, is this the only one or were there others?  Do you know?

A   No, I was frequent -- I frequently voiced my opinion, both in Feedstuffs to the producers, trying -- with the goal of trying to move them along, to continue to be proactive and accept science-based guidelines.

Q   Do you know how many United Voices editorials you wrote while you were the chair of the scientific advisory committee?

A   No.

Q   And I'm going to leave more of these questions for another counsel, but was the writing of these editorials part of what you were -- your consulting work for UEP?

---

**313**

A   My consulting work for UEP was not tied to any one specific issue, but it wasn't the direct work with the committee.

Q   And it encompassed things like --

A   So I was --

Q   -- efficacy?

A   So I was providing a crystal ball and looking at the future for the industry as far as animal welfare and social responsibility in the food chain.  But not in areas of supply chain or others.

Q   And your consulting work encompassed using the media to advocate for animal welfare?

A   And science-based guidelines.

Q   And in the middle of your editorial that we've looked at -- I think I only want to look at this one sentence -- you say, "In this context, how is it possible to justify selling eggs that are produced under less-than-optimal conditions for hen welfare?"  Do you see that?

A   I do.

Q   Is that true statement?  I mean a --

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                      March 13, 2014

80 (Pages 314 to 317)

---

**314**

1    A    That was my --
2    Q    -- fair question?
3    A    That was my opinion that I penned at
4    that time.
5    Q    But, Dr. Armstrong, haven't you
6    repeatedly today told us that the committee
7    understood that during this very period there
8    were going to be hens, even under the UEP
9    guidelines, that weren't receiving optimal
10   conditions for hen welfare?
11        MS. SUMNER:  Objection.
12   A    That's correct.  But what you're --
13   you're comparing apples and oranges.  I'm talking
14   about establishing a program that condones
15   permanently, and doesn't transition.
16   Q    That --
17   A    So we had a committee -- we had a
18   industry that was transitioning and moving into
19   adopting these animal welfare guidelines.  That's
20   different.
21   Q    So if that --
22   A    And the committee agreed with me.  So

---

**315**

1    this was -- this was as my role as committee
2    chair, as it says.  Jeff Armstrong and scientific
3    advisory committee.
4    Q    So if that competing program didn't
5    have any permanent requirements, then you
6    wouldn't have had any problem with it?
7        MR. KEALEY:  Objection to form.  Lack
8    of foundation.  Contrary to fact.
9    Q    Was that -- I mean was that your
10   concern with the competing program, that it had
11   some permanent requirements?
12   A    My -- my concern, our concern with a
13   program, whatever program it may be, that did not
14   have the minimum humane standards is that hen
15   welfare would suffer.
16   Q    And didn't that same concern apply to
17   the UEP certified program at this time?
18        MS. SUMNER:  Objection.
19   A    It was in transition.  As I said
20   repeatedly, the committee understood there was a
21   transition.  And we were not going to be able to
22   move the industry immediately.  The timing was up

---

**316**

1    to the industry, not me.  And not the committee.
2    You're comparing apples and oranges again.
3    Q    Do you recall a time when Gene Gregory
4    asked you to reach out to a customer of one of
5    the egg suppliers who was planning to use this
6    competing program?
7    A    I don't recall, but that may have
8    happened.
9    Q    Do you recall Mr. Gregory asking you to
10   reach out to Walmart?
11   A    I recall going to Walmart for several
12   purposes.  And it -- it could very well, and it
13   wouldn't have been unlikely that I talked with
14   Gene before I went to Walmart.  But I went to
15   Walmart representing Michigan State, but I also
16   went to Walmart as chair of the advisory
17   committee and all that I am.
18   Q    Did you go to Walmart and -- to try to
19   convince Walmart not to leave the UEP program in
20   favor of this competing program?
21   A    I don't recall that precise detail.
22   But I can tell you that I talked with numerous

---

**317**

1    groups about the positive aspects of the UEP --
2    UEP program.  I did that publicly, I did that in
3    meetings, and I did it privately.
4    Q    And in addition to talking about the
5    positive aspects of the UEP program, did you talk
6    to Walmart about the negative aspects of this
7    competing program?
8    A    I don't recall.
9    Q    Do you recall Mr. Gregory asking you to
10   do that?
11   A    I really don't recall.
12   Q    Do you recall Mr. Gregory asking you to
13   contact the USDA about concerns about this
14   competing program?
15   A    Yes, I do recall that.
16   Q    And did you do that?
17   A    I did.
18   Q    And do you --
19   A    I -- I believe I did.  I -- I would
20   have.  Yes.
21   Q    Was that part of your consulting work
22   for UEP?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

81 (Pages 318 to 321)

---

318

1    A   It is difficult to determine what was
2 what.  But if you look at the committee's view on
3 that program, I would have been speaking on
4 behalf of the committee.  Because the committee
5 has a letter here that says they are not in favor
6 of a program that does not have a baseline of
7 humane production.
8    Q   So did you see part of your work on the
9 committee as being to advocate against other
10 programs that you didn't believe in?
11   A   My role on the committee, my role as a
12 person, my role as a consultant, was to advocate
13 for science.  And to advocate for the humane
14 treatment of hens.  If that felled against the
15 program, so be it.
16      MR. OLSON:  Well, just for the sake of
17 the record I'll put this document in, Armstrong
18 31.
19      (Deposition Exhibit 31 was marked for
20 identification.)
21      MR. OLSON:  And it's Bates stamped
22 UE0547338 through 341.

---

319

1    Q   And I'll just ask, Dr. Gregory, if
2 you -- Dr. Armstrong, I apologize -- if you can
3 identify this as an email that you wrote to Gene
4 Gregory on August 4, 2008?
5    A   Yes.  I recall this.
6    Q   All right.  Dr. Armstrong, what did you
7 do to prepare for today's deposition?
8    A   I read the three documents that Bill
9 provided, and I met with Bill yesterday.  That
10 was all.
11   Q   Did -- before today had you ever spoken
12 to counsel for UEP?
13   A   I met these two individuals today for
14 the first time.
15   Q   And did you speak to these individuals
16 today during the course of this deposition during
17 breaks?
18   A   Other than how was the drive to
19 Indianapolis, no.
20   Q   Do you know how your counsel selected
21 the documents you were shown?
22   A   I do not.

---

320

1      MR. OLSON:  All right.  At this time I
2 think that's all I have so I'll pass the witness
3 and hopefully won't need to circle back after UEP
4 counsel has anything, and thank you very much for
5 your time.
6      THE WITNESS:  You're welcome.
7      MR. KEALEY:  Sorry.  Counsel, you've
8 marked Exhibit 31.
9      MR. OLSON:  I just wanted him to
10 authenticate it, which he did.  He identified it
11 as an email he wrote.
12      MR. KEALEY:  This one has four emails
13 in it.
14   Q   Is that an email chain that you --
15   A   Absolutely.
16   Q   -- transmitted?
17   A   I remember -- I remember that because
18 we were getting our letterhead right, and that's
19 all strung together.
20      MR. OLSON:  Thank you.
21      Should we go off the record?
22      THE VIDEOGRAPHER:  We're going off the

---

321

1 record.  The time is 3:32 p.m.
2      (A recess was taken.)
3      THE VIDEOGRAPHER:  This is the
4 beginning of Tape 6.  The time is 3:43 p.m., and
5 we are back on the record.
6 FURTHER CROSS-EXAMINATION,
7   QUESTIONS BY RACHEL E. SCHWARTZ:
8    Q   Good afternoon, Dr. Armstrong.  My name
9 is Rachel Schwartz.  I'm the third person to
10 speak with you today.  I appreciate your patience
11 and still being here this afternoon.  I represent
12 the plaintiffs in the Kansas litigation.  Are you
13 aware that there is litigation currently pending
14 in the state of Kansas against UEP and others?
15   A   Before yesterday and today I wasn't
16 aware that there were two or even much detail
17 beyond that.
18   Q   Fair enough.
19      So it sounds like yesterday was the
20 earliest time you would have heard about the
21 Kansas litigation?
22   A   Yes.  But I've been aware of the

---

---

322

1  litigation in bigger terms for some time.
2      Q    And today we are videotaping you here
3  at your deposition; correct?
4      A    Yes.
5      Q    You now understand that this is a video
6  that could be played to a jury in the state of
7  Kansas?
8      A    Yes.
9      Q    And you understand that you're still
10 under oath at this time?
11     A    Yes.
12     Q    Very good.  Right before we took a
13 break, I wanted to follow up on one question.
14 You have counsel here today with you; correct?
15     A    Yes.
16     Q    And are you personally paying for that
17 counsel?
18     A    No.
19     Q    Who is paying for your counsel?
20     A    I believe Purdue University.
21     Q    And is that a situation that they would
22 be reimbursing you or would they pay that

---

323

1  directly?
2      A    I think they're paying it directly
3  because the work that we're discussing was
4  started when I was at Purdue University, so
5  Purdue University opted to do this.
6      Q    Do you have any understanding as to
7  whether any of the defendants in the litigation
8  will be paying for your counsel in any way?
9      A    I have no knowledge of -- other than
10 who's paying William Kealey, I don't -- I'm not
11 aware of others.
12     Q    Following up on discussion we had this
13 morning, you had mentioned that you were paid for
14 your work with UEP; correct?
15     A    Yes.  I talked about honoraria or
16 individual honorariums that were distributed to
17 committee members and myself.  And then what I
18 did at one point with the amount of work that I
19 was doing beyond my service as chair, I
20 approached Gene about a retainer consultantship.
21 I don't remember how I worded it.
22     Q    Other than the documents we looked at

---

324

1  this morning, do you recall a specific time when
2  that conversation would have occurred with
3  Mr. Gregory?
4      A    I don't recall if those were the only
5  ones.  I would assume you showed me all of them.
6  We only talked about it typically one time and
7  then I would send an email and say, "Gene, this
8  is what I propose."
9      Q    And in addition to the honoraria, there
10 were -- you received other benefits of your work
11 with UEP; correct?  Including travel to
12 conferences?
13     A    Well, one would -- it would be
14 determined on whether one would call it a benefit
15 or not.  There were times when you go into
16 Chicago at a meeting; I wouldn't call that a
17 benefit.  But there were times when we met in
18 Arizona and we met in Hawaii.  That was a nice
19 place to go.
20     Q    And UEP would pay all of the expenses
21 associated with that travel; correct?
22     A    Yes, that's common practice with

---

325

1  academics in that type of committee.
2      Q    So that would include flights; correct?
3      A    Correct.
4      Q    Hotels; correct?
5      A    Correct.
6      Q    Meals; correct?
7      A    Correct.
8      Q    Would it also include social
9  activities?
10     A    Yes, yes.  There were golf outings, I
11 think sometimes members took advantage of the
12 amenities at the resort.  I don't remember the
13 details, but that was something that the members
14 did.
15     Q    Do you ever recall submitting any
16 expenses that were not reimbursed related to that
17 travel?
18     A    I don't recall travel with UEP or
19 expenses with UEP that were not reimbursed.
20     Q    And did on occasion they also either
21 offer or did your wife actually accept to go on
22 these trips with you?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                                     March 13, 2014

83 (Pages 326 to 329)

---

326

1      A    On occasion, yes.  The spouse or
2   partner would go on the trips; that's correct.
3      Q    And that was, again, compensation that
4   was covered by UEP; they would pay to, for
5   instance, fly your wife out?
6      A    Yes.  I would definitely qualify that
7   as an added benefit.
8      Q    And you mentioned a couple of the
9   locations you went to.  To focus on some of the
10  nicer ones, Las Vegas was one of them; correct?
11     A    I assume so, if you say so.  I don't
12  recall every location.
13     Q    You remembered Hawaii?
14     A    Yes.
15     Q    Did you remember Tucson in Arizona?
16     A    Yes.
17     Q    Do you remember a trip actually to
18  Kansas City for a meeting?
19     A    Yes.  I've been to Kansas City a lot,
20  but I'm sure if it's in the record, it happened.
21     Q    And you also went to England; correct?
22     A    Yes.  Gene and I went on a tour of

---

327

1   egg -- different production facilities.  Yes.
2      Q    And it's fair to say you would consider
3   those types of benefits provided by UEP as a form
4   of compensation?
5         MR. DAVIS:  Objection.
6      A    I would -- I would consider them
7   reimbursement of expenses.  I was going based on
8   work.  Universities really encourage their
9   faculty and administrators, who are also faculty,
10  to interact with companies and committees of this
11  nature.  And it's also part of their work, and it
12  builds their reputation.  So traveling to a
13  location to tour egg facilities was part of my
14  work.  It was something -- I think Michigan State
15  was my employer at the time.  It's something that
16  Michigan State would have covered if UEP hadn't
17  covered it.
18     Q    But Michigan State did not; correct?
19  UEP covered it.
20     A    That's correct.  Right.  And Michigan
21  State would expect us to have that type of trip
22  covered by a partner or collaborator, so to

---

328

1   speak.
2      Q    But it is a form of payment to you;
3   correct?
4         MR. DAVIS:  Objection.
5      A    It clearly -- I was paid a
6   retainer/consulting fee separate of my committee
7   work.  I was paid an honorarium as a committee
8   member along with everyone else, the same amount.
9   The rest of this was reimbursement of expenses.
10  Was it a benefit for my wife to go along?  Yes.
11  So whether I call it compensation?  I would not
12  because I wouldn't report that as income.  So I'm
13  not understanding the point you're getting at.
14     Q    The honoraria would not be something
15  you would have reported at income?
16     A    No, no, no.  Reimbursement of travel
17  expenses.
18     Q    When we look at the honoraria, the
19  travel expenses, those were provided to all the
20  members of the scientific advisory committee;
21  correct?
22     A    Absolutely.  No one was treated

---

329

1   differently.
2      Q    And it is, therefore, not accurate to
3   say that the committee members were unpaid;
4   correct?
5         MR. DAVIS:  Objection.
6      A    The committee -- the committee -- the
7   committee members were not paid a consulting fee.
8   They were -- they were given an honorarium and
9   their expenses were paid, which is a common
10  practice in academic circles.
11     Q    And, sir, I'm not asking if it was a
12  common practice.  I'm asking whether you would
13  agree that a statement that the scientific
14  advisory committee was unpaid is not a true
15  statement.
16        MR. DAVIS:  Objection to form.
17     A    That's for someone else to determine.
18  All I can tell you is what happened.
19     Q    Did you ever claim that members of the
20  scientific advisory committee were unpaid?
21     A    I may have.  I'm not sure.  But I can
22  tell you that the committee members did this

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

84 (Pages 330 to 333)

330

1  because of their profession and their interest to
2  do it, not because they received an honorarium or
3  got to go to a certain place.  And there was no
4  mention of honorarium or honoraria at the
5  beginning.  All I told the committee members is
6  that your expenses will be reimbursed.
7     Q    Let me hand to you what we've justified
8  marked as Exhibit 32.
9        (Deposition Exhibit 32 was marked for
10 identification.)
11    Q    This is Bates NL002214.  And does this
12 letter look familiar to you?
13    A    It's from my office, so it is my
14 signature and it is from me, yes.
15    Q    And it shows a date at the top of
16 August 14th, 2003; correct?
17    A    That's correct.
18    Q    And if you -- do you see in the center
19 of that first page where it says "Response to
20 first statement"; do you see that?
21    A    I do.
22    Q    And if you look two paragraphs below

331

1  that, can you read the sentence that starts off
2  "None of the committee members."  That's the last
3  sentence in that second paragraph.
4     A    I would prefer to take a moment and
5  read the entire memo since I haven't seen this in
6  years.
7        Okay.  I'm finished.
8     Q    And let me read the sentence for you.
9  It says, "None of the committee members were paid
10 by UEP or anyone else in the ag industry for
11 their services."
12       Did I read that sentence correctly?
13    A    That is correct.
14    Q    This is, again, an August 14, 2003,
15 letter that you believe you wrote?
16    A    I did write -- I did write this.
17    Q    And are you aware -- you can put that
18 aside.
19       Are you aware as to whether UEP ever
20 publicly stated that members of the scientific
21 advisory committee were unpaid?
22    A    Oh, I think I recall Gene saying that

332

1  several times, and I think Gene was using the
2  definition of "paid" the same as I was; that the
3  committee's expenses were reimbursed.  I don't
4  know when the first honorarium was paid, whether
5  it was paid before August 14th of 2003 or not;
6  probably was.
7        But in general terms, if you're -- if
8  you're paid an honorarium, that is -- that is not
9  something that I consider as pay.  In fact, in
10 the guidelines for this California State
11 University system, and I have very strict
12 reportings of any gift over $40 or $50,
13 honorarium -- an honorarium to me is considered
14 an exception because it is a typical practice for
15 universities and university individuals to
16 participate in activities that are related to
17 their profession.
18    Q    But again, sir, to the best of your
19 knowledge, it's something you would have reported
20 on your taxes and paid taxes on?
21    A    To the best of my knowledge.
22    Q    And are you aware that to this day UEP

333

1  still has on their website that scientific
2  advisory committee members are unpaid?
3        MR. DAVIS:  Objection.
4     A    I'm not aware what's on the website,
5  but my definition of pay is consistent with
6  what's in this -- in Point 32.  So we can
7  continue to discuss our difference in description
8  of pay, if you want.
9     Q    Let me go ahead and mark as Exhibit
10 33 --
11       (Deposition Exhibit 33 was marked for
12 identification.)
13    Q    And, sir, let me represent to you that
14 I printed this off from the UEP website last week
15 before coming out here.
16    A    Mm-hmm.
17    Q    Have you looked at the animal welfare
18 part of the UEP website?
19    A    I couldn't tell you when.  I'm sure I
20 did at some point.
21    Q    Fair enough.  And on that first page
22 you see it's got United Egg Producers at the top

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

85 (Pages 334 to 337)

334

1  of it; do you see that?
2      A   I do.
3      Q   And then below that there's a section
4  entitled Animal Welfare; do you see that?
5      A   I do.
6      Q   And if you look at the fourth
7  paragraph, the one that starts with "The process
8  for this review"; do you see that?
9      A   Yes.
10     Q   And at the end of that sentence it says
11 that you were asked if "he would be interested in
12 forming his own scientific committee of which he
13 could select all of the members without pay." Do
14 you see that?
15     A   No. I've lost you. Where are you?
16     Q   Sorry. That first sentence of the --
17     A   Oh, yeah. I see it. "Asking if he
18 would be interested in forming his own scientific
19 committee of which he could select all the
20 members without pay."
21     Q   And would your consulting relationship,
22 with UEP for example, the invoices, would those

335

1  have been public?
2      A   I did not make them public, but I did
3  inform the committee members that I was
4  consulting on a one-on-one basis because I did
5  not want them to be surprised.
6      Q   And if you turn to the second page of
7  this document. You'll see on the right-hand side
8  there's a little tiny version of the egg industry
9  and animal welfare. Do you see that on the far
10 right-hand side?
11     A   Yes.
12     Q   And have you seen that document before?
13     A   Yes.
14     Q   It's hard to tell --
15     A   Not for some time, but I'm sure I've
16 seen -- I know I've seen it. I would have
17 received a copy of it.
18     Q   Let me go ahead and mark as Exhibit 34
19 this document. And a version of this has been
20 produced in the Kansas litigation.
21         (Deposition Exhibit 34 was marked for
22 identification.)

336

1      MS. SCHWARTZ: So Exhibit 34 is
2  RA0067419.
3      Q   And as you're looking through this, is
4  this the document that you've seen before?
5      MR. KEALEY: Counsel, this appears to
6  be several documents. Is this a unitary
7  document? Because it looks like you've got a
8  preprinted document and then later in the back
9  you've got a publication, or two or three.
10     A   What's the date on this document?
11     Q   I don't believe there is a date on the
12 document.
13     MR. KEALEY: At the back the
14 publications have dates on them. You've got
15 bundled documents here. You can't -- you've got
16 to be specific what you're asking the witness
17 about.
18     A   Was this compiled as a single UEP
19 document?
20     Q   It was. And this entire document is on
21 the website if you click on that.
22     A   So this very far right?

337

1      Q   Correct.
2      A   Right, right.
3      Q   This entire document is there.
4      A   I don't know the date of this. I am
5  familiar with some of the documents, more than
6  others, from a recognition perspective. I am
7  sure that -- I can't recall specifically, but I'm
8  sure I've seen this. But I'll be happy to answer
9  any questions.
10     Q   Fair enough. I'll give you -- I just
11 have a few questions about this document, so I'm
12 happy to give you the chance to read it when we
13 get to those specific sections.
14         If you turn to the second page. And I
15 believe you had testified this morning that it
16 was very important to be up front with the public
17 about the scientific advisory guidelines;
18 correct?
19     A   Yes.
20     Q   And if you look at the third bullet
21 point on that second page, and that's with 420 as
22 a Bates label at the bottom, do you see that

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                                    March 13, 2014

86 (Pages 338 to 341)

|  | 338 |
|---|---|

1    third bullet point?
2      **A**   Yes.
3      **Q**   And again that third bullet point says,
4   in part, that an independent unpaid scientific
5   advisory committee recommended industry-wide
6   guidelines; correct?
7      **A**   Correct.
8      **Q**   And if you turn to the second page --
9   to the next page of this document, I want to give
10   you a chance to read that last paragraph on that
11   page that ends with 421.
12      **A**   Yes.
13      **Q**   Let's take those sentences one by one.
14   The first sentence says, "Nevertheless, the UEP
15   board of directors approved a schedule for
16   implementing every one of the committee's
17   recommendations." Do you see that?
18      **A**   Yes.
19      **Q**   And the rest of that paragraph reads,
20   "As the years have gone by, the committee has
21   reviewed additional welfare issues as they arose.
22   UEP has never rejected a recommendation by the

|  | 339 |
|---|---|

1   committee, a remarkable track record that
2   reflects the industry's determination to follow
3   the best available science." Do you see that?
4      **A**   Yes.
5      **Q**   And do you believe that to be a true
6   statement?
7      **A**   From the macro view, yes.
8      **Q**   Before we took a break you had said
9   that the producer committee had, quote, pushed
10   back on recommendations; is that fair to say?
11      **A**   Yes.
12      **Q**   And sitting here today do you recall
13   any recommendations that did not make their way
14   into the producer guidelines?
15      **A**   That's a different question. When --
16   when I make -- when I look at the --
17      **My view of that sentence, which I did**
18   **not write, "has never rejected a recommendation**
19   **by its committee," the committee -- the UEP and**
20   **animal welfare committee, they've always accepted**
21   **our animal care science-based guidelines.**
22      **Now implementation, what went in there,**

|  | 340 |
|---|---|

1   **that gets back to the previous discussion. Lots**
2   **of ups and downs. That's why I said from a macro**
3   **perspective. And you'll have to ask the writer**
4   **of this what they meant, but I'm just telling you**
5   **what I think.**
6      **Q**   So --
7      **A**   **Was the molting recommendation**
8   **accepted? Yes.**
9      **Was the space recommendation accepted?**
10   **Yes.**
11      **Was the beak trimming recommendation**
12   **accepted? Yes.**
13      **You go down the line from a macro**
14   **perspective, they were accepted. And that in**
15   **itself is a huge accomplishment because there**
16   **were significant numbers of producers that did**
17   **not want to go in that direction.**
18      **Q**   But it's fair to say that UEP did not
19   implement all of the recommendations by the
20   scientific advisory committee; correct?
21      MR. DAVIS: Objection.
22      **A**   **It's fair to say that the UEP has had**

|  | 341 |
|---|---|

1   **an implementation plan that's had its transitions**
2   **and ups and downs, and the committee has been**
3   **watching it over and over.**
4      **Q**   And let me ask my question again. My
5   question was, it's fair to say that UEP did not
6   implement all of the recommendations by the
7   scientific advisory committee; correct?
8      MR. DAVIS: Objection.
9      **A**   **I gave you the previous answer.**
10      **Q**   And, sir, I'm just trying to be very
11   specific. I think you're trying to make a
12   distinction between a recommendation being
13   approved or rejected and actually implementing.
14   So let me ask again.
15      There have been times that the UEP
16   scientific advisory committee has made
17   recommendations that were not implemented by UEP
18   and the producer committee; correct?
19      MR. DAVIS: Objection.
20      MR. KEALEY: Asked and answered.
21      **A**   **By design there was a transition and a**
22   **phase-in in implementation. So did the UEP**

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

87 (Pages 342 to 345)

---

342

1    immediately implement the space allowance? No
2         Did the scientific advisory committee
3    accept that? Yes.
4         Q   So, again, when the recommendation was
5    made by the scientific advisory committee, that
6    was not immediately implemented by UEP; that's
7    fair to say?
8         MR. KEALEY: Counsel, you're arguing
9    with the witness. Please move on.
10        MR. DAVIS: Objection to form.
11        A   It's fair to say that there was a
12   transition, and the committee did not get
13   involved in the timing of implementation; I've
14   repeated that over and over again. And the
15   committee was very content to see the percentage
16   improvement in animal welfare as this tremendous
17   change was brought on this industry.
18        Q   If you turn to the next page which has
19   at the bottom Bates No. 422, you'll see on the
20   left-hand side a heading that says UEP Certified
21   Science in Action. Do you see that?
22        A   Mm-hmm.

---

343

1         Q   And if you look at the third paragraph
2    under that section, do you see that paragraph?
3         A   Yes.
4         Q   And it says, "To participate in the
5    program, each producer must apply UEP's animal
6    care standards to all his production. Consumers
7    who see the UEP certified seal on an egg carton
8    have assurance that the producer who packed those
9    eggs treats all hens under his control with the
10   level of care recommended by the scientific
11   experts." Is that a true statement?
12        A   I believe it is true. It goes back to
13   the point I made previously. The committee
14   recognized that there was a transition in
15   implementing the guidelines. You're asking the
16   same question in a different way.
17        Q   I'm just asking you to confirm that you
18   believe that's true to the best of your
19   knowledge.
20        A   Under the context that I provided.
21        Q   If you keep turning in this document
22   and you turn to page -- what has page 6 at the

---

344

1    bottom of it. It's Bates range RA0067425. Do
2    you see that document?
3         A   Yes.
4         Q   And if you look four paragraphs down on
5    that document, do you see that it says "The UEP
6    certified program for cage production provides
7    assurance that hens receive adequate space,
8    nutritious food, clean water, proper lighting,
9    and fresh air daily, as well as improves the
10   flocks' livability and egg production rates." Do
11   you see that?
12        A   Yes.
13        Q   Do you believe that that is a true
14   statement?
15        A   Within the context of the transition
16   and implementation of the guidelines, the
17   committee was satisfied with the program as it
18   was being implemented. Was it perfect from an
19   animal welfare perspective? No.
20        Q   And if you look at what appears to be
21   the footnote at the bottom of that document --
22   and I'll give you a chance to read that.

---

345

1         A   Yes.
2         Q   And I just want to ask in part, the
3    scientific advisory committee mandated that hens
4    have continuous access to fresh air and water;
5    correct?
6         A   Yes.
7         Q   And the way that UEP was able to ensure
8    that UEP members followed that was through the
9    audit; correct?
10        A   That's correct.
11        Q   And if you turn to page 8 of this
12   document. This appears to be a question and
13   answer page; do you see that?
14        A   Mm-hmm. Yes.
15        Q   One of the questions is: What does
16   United Egg Producers Certified mean? Do you see
17   that?
18        A   Yes.
19        Q   And do you see that part of the answer
20   to that is that a farm must commit to, quote,
21   meet 100 percent of the requirements; do you see
22   that?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

88 (Pages 346 to 349)

346

1     A   I do.
2     Q   And do you believe that's an accurate
3  statement?
4     A   Yes, I believe it is an accurate
5  statement within the context of a transitioning
6  program.
7     Q   And I understand that the program
8  changed over time, but is it accurate to say at
9  whatever the guidelines were at that point in
10  time, a producer had to meet 100 percent of the
11  requirements to be UEP certified?
12        MR. DAVIS:  Objection.  Lacks
13  foundation.
14     A   You'd have to look at the audit, and
15  there were some things where there were points
16  and there were some things where they were "yes"
17  or "no."  I don't know the details of the audit.
18  So you're asking a very complicated question that
19  I'm not equipped to answer.
20     Q   Sir, you would expect that a consumer
21  who had questions about the UEP certified program
22  might go to the UEP website to learn about it;

347

1  correct?
2        MR. DAVIS:  Objection.
3        MR. KEALEY:  Object to the form of the
4  question.  This witness is here to talk about his
5  personal experience, counsel.  Please limit your
6  questions to Dr. Armstrong's personal experience.
7     Q   You can answer the question, sir.
8        MR. DAVIS:  Objection.  Lacks
9  foundation.
10        MR. KEALEY:  Please establish a
11  foundation of personal knowledge for which
12  consumer who is, by definition, somebody other
13  than Dr. Armstrong, you're asking him to testify
14  about.  And explain to me, counsel, how this is
15  not calling for speculation about your
16  hypothetical consumer.
17     Q   Sir, do you have an understanding --
18        MR. KEALEY:  Are you withdrawing the
19  question?
20        MS. SCHWARTZ:  I am.  I'll ask another
21  one.
22        MR. KEALEY:  Thank you.

348

1     Q   Do you have an understanding as to why
2  UEP would make information about the UEP
3  certified program available on its website?
4     A   Anyone publishes their information on a
5  website these days; it's the best practice.
6     Q   So that people who might have questions
7  about it could go and learn about a program if
8  they wanted to; correct?
9        MR. DAVIS:  Objection.  Lacks
10  foundation.
11     A   Correct.
12     Q   So, sir, your testimony this morning
13  was that the scientific advisory committee had no
14  responsibility for creating the audit; correct?
15     A   Well, I think I said at the time that I
16  recall, and I think as we looked at some other
17  documents it was clear, and, as I said, there was
18  always a back and forth where the committee paid
19  attention to what the producer committee was
20  doing from a macro level to make sure there were
21  not issues.  We just discussed ammonia and other
22  issues where the committee -- you see evidence

349

1  that the committee was watching and paid
2  attention.  But the audit committee -- the
3  companies created the audit process, as far as I
4  know.
5     Q   Correct.  So when I'd asked whether the
6  UEP scientific committee had responsibility for
7  creating the audit, the answer is no; correct?
8        MR. DAVIS:  Objection.
9     A   The best of my recollection.
10     Q   And did the UEP scientific advisory
11  committee help create the point totals in the
12  audit?
13     A   I don't recall in detail.  You would
14  have to ask some of the other committee members.
15  But I vaguely recall that committee members were
16  asked to comment.  Obviously, previous counsel
17  presented evidence where the committee members
18  commented on audit.
19        We always had a discussion or an update
20  on what was going on at the audits at our animal
21  welfare committee because the committee was
22  concerned about animal welfare, thus our interest

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

89 (Pages 350 to 353)

350

1  in a program that, by its structure, would permit
2  inhumane practice.  So to say that the committee
3  was not connected to what was going on would not
4  be a correct statement.
5      To say that the committee did not
6  create the audit would be a correct statement.
7  Did the committee have faith and believe that our
8  science-based guidelines were being implemented
9  in a reasonable manner in a transition -- a huge
10  transition?  Yes.
11     Q    And, sir, do you recall being told by
12  Gene Gregory that the committee should have been
13  more respectful with regard to the audit
14  procedures UEP had put together?
15     MR. DAVIS:  Objection.
16     A    Would you repeat that?
17     Q    Sure.
18     (The reporter read the requested
19  question.)
20     A    I don't recall that.  But I wouldn't be
21  surprised if he had said that.
22     Q    And was it your understanding that

351

1  Mr. Gregory believed that decisions about the
2  audit were supposed to be made by UEP and the
3  auditing committees?
4      MR. DAVIS:  Objection.  Calls for
5  speculation.
6      A    I cannot answer that.  I cannot answer
7  what Mr. Gregory was thinking or how he handled
8  that.
9      Q    Go ahead and mark as Exhibit 35.
10     (Deposition Exhibit 35 was marked for
11  identification.)
12     Q    This is UE0660000.
13     Sir, do you recall if you ever received
14  this letter from Mr. Gregory?
15     A    One moment, please.
16     MR. KEALEY:  Counsel, this is an
17  unsigned letter not on stationery.  Are you
18  representing that this document was absolutely
19  sent?
20     MS. SCHWARTZ:  Sir, I've asked the
21  witness if he remembers receiving this.
22     MR. KEALEY:  No.  I don't think that

352

1  was exactly how you put it.
2      Q    My question was, sir, do you recall if
3  you ever received this letter from Mr. Gregory?
4      A    I do not.
5      MR. KEALEY:  You said -- so you're
6  saying this is a letter from Mr. Gregory?  That's
7  what you're saying?
8      MR. OLSON:  She's asking that.
9      MR. KEALEY:  No.  She's representing
10  this is a letter from Mr. Gregory and asking if
11  the witness received it.
12     Is this a letter from Mr. Gregory?
13     MS. SCHWARTZ:  Let me ask the
14  witness --
15     MR. KEALEY:  The witness isn't
16  Mr. Gregory, so he can't testify whether this
17  letter was signed or sent.
18     MS. SCHWARTZ:  He can if he received
19  it.
20     Q    So, sir, let me ask you.  On the front
21  page of this document, it is dated March 13th of
22  2003, and it appears to be a letter addressed to

353

1  your attention; correct?
2      A    I see that it's addressed to me.  I do
3  not recall receiving this letter.
4      Q    That was my question for you.
5      Do you recall having any discussions
6  with Mr. Gregory about his disappointment --
7      (A discussion was held off the record.)
8      Q    Let me start over with the question.
9      We had mentioned earlier that you had
10  come to Kansas City for a meeting; correct?
11     A    (Nodding affirmatively)
12     Q    Is that a "yes," sir?
13     A    Apparently.  As I answered before,
14  apparently I did.  I don't recall all the UEP
15  meetings, but I've been to Kansas City for many
16  meetings.
17     Q    Do you recall having any discussion
18  with Mr. Gregory about his disappointment with a
19  critique by the committee of the audit
20  procedures?
21     A    I do not recall the specific instance
22  that you're talking about, but I can tell you in

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

90 (Pages 354 to 357)

---

354

1  general it was not uncommon for there to be
2  tension and differences of opinion with Gene and
3  committee members back and forth.
4      Q    And specifically with regard to the
5  audit, do you have any specific recollection of
6  conversations with Mr. Gregory about the audit?
7      A    I don't have specific -- I don't recall
8  specific items related to that.  That doesn't
9  mean it didn't occur.
10     Q    Now, this morning when we looked at --
11 this morning and this afternoon when we looked at
12 the guidelines and the recommendations from the
13 scientific advisory committee, you had testified
14 that these were the minimum requirements for a
15 producer to be a humane producer; correct?
16     A    Mm-hmm.  Once implemented.
17     Q    And did you believe that with regard to
18 each one of the recommendations?
19     A    The committee believes that with regard
20 to all of the recommendations and some are
21 more -- the committee would be more stringent on
22 some than others, but that's in the context of

---

355

1  the full scientific guidelines.
2      Q    But it's fair to say a producer who is
3  not meeting one of those requirements in the view
4  of the committee is not a humane producer?
5      A    Again, within the context of a
6  transition, there were grandfathered facilities,
7  there were time line implementations.  So, again,
8  within the context, the committee is pleased
9  where we ended up, and it took a transition to
10 get there.
11     Q    And I understand that, but at any given
12 point in time there was a set of recommendations
13 by the scientific advisory committee; correct?
14     A    That's correct.
15     Q    And those may have changed over time
16 upon reflection by the committee; correct?
17     A    By and large they changed, the macro
18 aspect of them changed very little.
19     Q    But at any given time, it was the
20 scientific advisory committee's best scientific
21 recommendations --
22         (A discussion was held off the record.)

---

356

1      Q    Let me start over.  At any specific
2  time the scientific advisory committee had put
3  forth their best scientific recommendations for
4  being a humane producer; correct?
5      A    We put forward the minimum guidelines
6  for humane housing in egg production in caged
7  systems first, then we developed other
8  guidelines.
9      Q    And a producer who was not following
10 those guidelines at that time in the view of the
11 committee was not a humane producer; correct?
12         MR. DAVIS:  Objection.
13     A    That is not a correct statement.  The
14 way I would phrase it is that a producer that did
15 not pass the audit based on the guidelines as
16 they were at that point being implemented
17 because, again, you -- we didn't go immediately
18 to 67 square inches, we didn't go immediately to
19 a feed -- a non-feed-withdrawal molt.  So the
20 committee recognized that there was an
21 implementation period and a transition.
22     Q    Let me hand you what I've marked as

---

357

1  Exhibit 36.  This was previously marked in the
2  Kansas litigation as Exhibit 495.
3         (Deposition Exhibit 36 was marked for
4  identification.)
5      Q    Sir, let's just --
6         And, sir, I'll give you the chance to
7  look at this whole document, but if you'll turn
8  to page 3, this is where I want -- the third page
9  of this document, that's where I wanted to start
10 with questions.
11        MS. SUMNER:  I just want to note for
12 the record, Rachel, that this is a highly
13 confidential document that was produced by
14 Sparboe, and I'm not sure that under the terms of
15 the protective order that you are permitted to
16 show this to this witness.
17        MR. DAVIS:  The witness has signed the
18 protective order in this case giving him access
19 to the documents in this case.  This is relevant
20 to his testimony here today.
21        MR. KEALEY:  Are you going to contend
22 that this witness --

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

91 (Pages 358 to 361)

358

1      MS. SUMNER: It's your call. It's not
2  our document. But I'm just -- I have not gone
3  back and looked at the protective order, and it's
4  not clear to me if Sparboe -- even he falls
5  within the category of people who are permitted
6  to look at it even if he signed the order given
7  who he is and what this document is.
8      UNIDENTIFIED TELEPHONIC SPEAKER: Can
9  we get a Bates number on the phone, please?
10      MR. DAVIS: Sure. So this is
11  actually --
12      MS. SCHWARTZ: It's a compilation
13  document.
14      MR. DAVIS: -- multiple documents, but
15  I can read them off. It's SF124902 through 03.
16      SF124906 through 07.
17      SF124910 through 11.
18      UNIDENTIFIED TELEPHONIC SPEAKER: Are
19  all three documents being marked as the same
20  exhibit?
21      MR. DAVIS: They are all stapled
22  together. It's a six-page exhibit.

359

1      MR. KEALEY: Note a preliminary
2  objection for the record. I'll ask you to
3  establish a foundation of personal knowledge or
4  engagement of this witness with this document.
5  If you're not able to do that, and you're going
6  to ask this witness to opine on some aspect of a
7  particular farming operation, you're asking for
8  an expert opinion of this witness. And he's not
9  here as an expert witness for that purpose, he's
10  here to testify about his historical
11  participation in events. I would ask you to
12  confine the questioning to that.
13      Q   Sir, let me ask you a few questions
14  before we get to this document. This morning you
15  recall executing the protective order in the
16  Kansas litigation; correct?
17      A   Yes. I think I signed two different
18  protective orders.
19      Q   And you understand that with signing --
20  I'll represent to you the protective
21  orders are very similar. You understand that you
22  may be reviewing very sensitive confidential

360

1  information in this litigation; correct?
2      A   Yes. But I'm not a legal counsel, and
3  I can't answer the specific question at hand.
4      Q   And I'm not asking you to, sir. You
5  understand, though, that you have an obligation
6  not to disclose what we're talking about here
7  today outside of this room or with people outside
8  of this litigation; is that correct?
9      A   Yes. Other than the knowledge I walked
10  in with, I won't speak of it.
11      MR. KEALEY: Counsel, you need to
12  establish a reason to ask this witness to become
13  acquainted with this highly confidential
14  document. Are you --
15      MS. SCHWARTZ: Sir, I will get there.
16      MR. KEALEY: Make me an offer of proof,
17  please. What is the engagement with this
18  document?
19      MS. SCHWARTZ: Sir, I have no burden to
20  make an offer of proof.
21      MR. KEALEY: Well, I'm asking as a
22  courtesy to me in order to keep this deposition

361

1  on the track it should be on to tell me what your
2  reason is for asking this witness to look at this
3  document before he looks at it. I think that's
4  fair.
5      MS. SCHWARTZ: Sir, I'm not obligated
6  to give you a justification --
7      MR. KEALEY: I don't want to argue with
8  you about Kansas rules. I'm asking you for
9  professional courtesy, counsel.
10      MS. SCHWARTZ: If you'll allow me to
11  ask the witness a few preliminary questions --
12      MR. KEALEY: Without looking at the
13  document. Okay. Go ahead and turn it over and
14  ask your preliminary questions.
15      Q   Sir, as the chair of the scientific
16  advisory committee, have you seen an audit
17  checklist before?
18      A   I am sure that we were shown the audit
19  checklist along the line, and I, frankly, relied
20  on other committee members to deal with the
21  questions about audit.
22      Q   But it's fair to say you've seen an

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

92 (Pages 362 to 365)

---

362

1 audit checklist before; correct?
2    A   That's fair to say.
3    Q   And do you have an understanding that
4 any company who wants to be UEP certified must go
5 through an audit; correct?
6    A   That's correct.
7    Q   And as part of the audit, do you have
8 an understanding that an audit checklist is
9 filled out for that company or that facility?
10   A   I'm aware of some of the details, but I
11 couldn't tell you the details of an audit.
12 That's outside my expertise.
13   Q   Do you have an understanding that a
14 company to be UEP certified does not need to have
15 a perfect score on the audit?
16   A   That was my understanding, yes.
17   Q   And do you have an understanding
18 about -- today -- how many points total there are
19 in an audit?
20   A   No.  I would speculate a hundred, but I
21 don't know.  I don't recall.  I'm sure I knew at
22 some point.

---

363

1    Q   If you can take -- I'm sorry -- in the
2 stack in front of you what was previously marked
3 today at Exhibit 9.  This was the United Egg
4 Producers Animal Husbandry Guidelines for U.S.
5 Egg Laying Flocks, the 2008 edition.
6    A   Yes, I have that document.
7    Q   Great.  If you will turn to page 24.
8    A   Yes.
9    Q   And do you see the heading on the
10 left-hand side that says Audit?
11   A   I do.
12   Q   You recall that we looked at this
13 document earlier today; correct?
14   A   Yes, I scanned it.
15   Q   And do you see the second paragraph
16 under that, that it says "Audits require 170
17 points of a 200 total for a passing score."  Do
18 you see that?
19   A   I do.
20   Q   And do you have an understanding that
21 for an egg producer, all they need to get for the
22 audit is 170 points out of the 200 total for a

---

364

1 passing score?
2        MR. DAVIS:  Objection.  Lacks
3 foundation.
4    A   The document stands for itself.
5    Q   Is that consistent with your
6 understanding of the audit?
7        MR. DAVIS:  Objection.
8    A   My understanding of the audit is
9 that -- it that there were points, and so many
10 were required to pass.  Beyond that, I don't have
11 a detailed knowledge of -- I'll not an expert in
12 audits.  Some of the other committee members are
13 more versed in audits.
14   Q   And who would have been those committee
15 members who would have had more knowledge about
16 the audits?
17   A   If you look at -- I think Janice --
18 Janice Swanson and Joy Mench both served on
19 Adele's program and helped her develop her
20 program which had an audit system.  So I'm a
21 physiologist, and I was really the chair of the
22 committee.  I'm not an ethologist, I'm not a

---

365

1 behaviorist.
2    Q   Did you have an understanding that
3 companies that were UEP certified could fail
4 aspects of the audit but still remain UEP
5 certified?
6        MR. DAVIS:  Objection.
7    A   I was aware that there were some things
8 that were "yes" or "no" and some aspects were
9 given points, which is normal for audits.
10   Q   And you understood that because you
11 didn't have to get a perfect score, that there
12 were parts of the audits where you could miss
13 points and still pass; correct?
14   A   That's correct.  Then it's also in the
15 context of implementing guidelines and phasing in
16 guidelines.  So you're asking very precise
17 questions about something that was quite nuanced
18 and bumpy along the road.
19   Q   Sir, do you have an understanding as to
20 whether a company could get a -- could get a zero
21 out of the total possible points for the
22 question:  "Is feed and water kept so that it

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

93 (Pages 366 to 369)

366

1  remains in a fresh condition?" and still pass the
2  audit?
3       A  I don't recall.
4       Q  Do you recall whether a company could
5  get a zero on the category:  Seeking compliance
6  with the daily removal of those layers that are
7  dead or injured, euthanized and depopulated in a
8  humane manner, and still be UEP certified?
9       A  I do not recall.  As I said earlier, I
10 relied on other committee members to look at this
11 area, evaluate reports, and that was my mode of
12 operation.  I was not a detail person.  I was the
13 committee chair, so I cannot answer those
14 questions.  I do not recall the discussions.
15      Q  So sitting here today you do not know
16 whether any UEP certified company has provided
17 fresh water to all of its hens?
18      MR. KEALEY:  Object to the form of the
19 question.  That's an incoherent question,
20 counsel.
21      MR. DAVIS:  Objection to form.
22      MR. KEALEY:  Any company in the history

367

1  of companies has ever not -- any company in the
2  history of that set, whatever its population is,
3  has not done something or has done something?  I
4  just don't understand the question.
5       Q  Sitting here today, you do not know
6  whether any company that publicly said they're
7  UEP certified provided fresh water to their hens,
8  for instance?
9       MR. DAVIS:  Objection to form.
10      A  You're asking me about something that
11 happens on an individual farm during an
12 individual audit, and I am not aware of that.
13 What I can tell you is the intent and the spirit
14 and the content of our science-based guidelines
15 that have been implemented and are moving
16 forward.
17      Q  But sitting here today, sir, with
18 regard to the recommendations that the scientific
19 advisory committee made, you don't know whether
20 any of the UEP certified companies did or did not
21 follow any of those specific guidelines?
22      MR. DAVIS:  Objection to form.

368

1  Argumentative.  Asked and answered.
2       A  It was not my role then, nor is it
3  today my role to know that.
4       Q  And is there somewhere public that I
5  could go to find out whether a specific company
6  had passed all of the aspects of the UEP
7  certified audit checklist?
8       MR. DAVIS:  Objection.  Lacks
9  foundation.
10      A  I have no basis to answer that
11 question.
12      MR. DAVIS:  Counsel, are we leaving
13 Exhibit 36 as part of the record?
14      Q  Sir, I'll ask again.  Sitting here
15 talking to you today, I understand that you are
16 not the expert on an audit checklist; is that
17 fair to say?
18      A  That's correct.  I don't recall the
19 details of the audit checklist, nor have I ever
20 been a person that, from an expert or
21 professional perspective, was involved with
22 audits and audit development.

369

1       Q  Sir, you can put this document away.  I
2  will not show you this document.
3       THE REPORTER:  Do I get it?
4       MR. KEALEY:  I guess so, because she
5  marked it.
6       Q  Sir, I think you had testified earlier
7  today that you would have been disappointed to
8  hear that members who participated in the UEP
9  guidelines had ulterior motives that involved
10 supply and demand issues.
11      MR. DAVIS:  Objection.
12      MR. KEALEY:  I don't recall.
13      A  I don't recall saying that.
14      Q  Is it fair to say that you would be
15 disappointed to hear that UEP members who
16 participated in creating the guidelines --
17      A  I think what I said was that our
18 committee members would be disappointed if there
19 were any other reasons for the scientific
20 guidelines.  We worked very hard and based our
21 guidelines on science.  I can't remember my exact
22 comment, but it was something to that effect

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

94 (Pages 370 to 373)

---

370

1  because of the professional pride and
2  professional -- and the nature of the committee
3  members.
4      Q   And did that pride also extend to the
5  UEP producer committee as well?
6          MR. DAVIS:  Objection.  Lacks
7  foundation.
8      A   I don't understand what you're talking
9  about.
10     Q   You were a consultant for the UEP
11  produce producer committee as well; correct?
12     A   I was -- as my role as the chair of the
13  scientific advisory committee, I was the liaison
14  to the producer scientific committee.  They
15  sometimes called me a consultant, but it wasn't
16  in my consulting role that I interacted with that
17  committee.
18     Q   And was Paul Bahan the chair of the UEP
19  producer committee at a point in time?
20     A   I believe so.
21     Q   And do you recall whether he was the
22  chair in 2001?

---

371

1      A   I do not.  I could not give you the
2  chronological order.
3      Q   And would you be disappointed to hear
4  that he thought the animal welfare program and
5  the recommendations could be a justification for
6  flock reductions?
7          MR. KEALEY:  Wait a minute.  That's not
8  a proper form of the question.  If you're saying
9  that some person said that, you need to establish
10  a foundation before you ask the witness to
11  comment on something that may or may not have
12  occurred.  You haven't established those facts
13  for him to address.
14     Q   Dr. Armstrong, did you ever have a
15  conversation with Paul Bahan about the animal
16  welfare UEP guidelines being a possible
17  justification for a flock reduction without
18  raising legal issues?
19         MR. DAVIS:  Objection.
20     A   Not that I recall.
21     Q   Would you be disappointed to learn that
22  he had said that?

---

372

1          MR. KEALEY:  Counsel, I just asked you
2  not to pursue the question that way.  If you have
3  evidence that this person said something, then
4  you need to establish that before you pursue the
5  next question.
6      Q   You can answer my question, sir.
7          MR. DAVIS:  Objection to form.
8      A   I have no basis to comment on his
9  opinion.
10     Q   Would it surprise you that he would
11  have said that?
12         MR. KEALEY:  Same objection.
13         MR. DAVIS:  Same objection.
14     A   I cannot recall.  I have no opinion.
15     Q   A few last questions before we move on
16  to a new topic as it relates back to the
17  scientific advisory committee members.  We had
18  talked earlier today about Don Bell; correct?
19     A   Don was a member of the committee
20  before his retirement.  That is correct.
21     Q   And he was one of the original members
22  of the scientific advisory committee; correct?

---

373

1      A   Yes.
2      Q   And was he also a consultant for UEP?
3          MR. DAVIS:  Objection.  Lacks
4  foundation.
5      A   I -- I don't know.  I assume so.  I
6  have no direct knowledge of Don Bell's
7  consultantship or lack thereof.  But I'd always
8  assumed so.
9      Q   Did you have any understanding as to
10  whether Mr. Bell was paid by UEP?
11     A   I had no knowledge either way.
12     Q   Did you ask any of the members of the
13  scientific advisory committee as to whether they
14  were being compensated by UEP in any way?
15     A   I had no reason to.  I did not.
16     Q   Sir, you've published in peer-reviewed
17  academic journals; correct?
18     A   Yes.
19     Q   And if your research was in any way
20  funded by a company, is that something you would
21  normally disclose in a footnote, for example, in
22  a paper that's published?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

95 (Pages 374 to 377)

---

374

1    **A  That's common practice.**
2    Q  And why is that common practice?
3    **A  Just disclosure.**
4    Q  And --
5    **A  It's typically -- it's a common**
6  **practice because it's part of the specific**
7  **university guidelines.**
8    Q  And have those guidelines been at every
9  university you have been at?
10    **A  As far as I know.**
11    Q  And would part of the reason for
12  disclosing that -- let me start over.
13    Why would you, in addition to it being
14  a university guideline, disclose that in a
15  published article?
16    MR. DAVIS:  Objection.
17    **A  I've already answered that question.**
18  **Because it's part of the university guidelines.**
19    Q  And do you have an understanding as to
20  why that's part of university guidelines?
21    MR. DAVIS:  Objection.  Vague and
22  ambiguous.

---

375

1    **A  It is a normal process of publication.**
2    Q  And it would be to disclose any
3  potential bias that could be alleged against the
4  publication for example; correct?
5    **A  That's correct.**
6    Q  And again, that's something you would
7  routinely do if part of your research was funded,
8  would be to drop a footnote disclosing that there
9  had been funding provided for research?
10    **A  For research that is funded, that is**
11  **correct.  That does not -- that's not the same**
12  **for other categories.**
13    Q  But if you had been paid to help do
14  that research, that's something that you would
15  put into a footnote in a published article?
16    MR. KEALEY:  Asked and answered,
17  counsel.  You've asked this three times.
18    **A  You just -- you just talked about an**
19  **individual being paid; that's a consulting**
20  **agreement.  What you mentioned earlier, did the**
21  **company fund the research that was published in**
22  **an article, and that's what I answered.**

---

376

1    **If you have other questions, I'm happy**
2  **to answer them.**
3    Q  And your answer is that you would put a
4  foot note in that circumstance to disclose --
5    **A  If the research --**
6    MR. DAVIS:  Objection --
7    THE REPORTER:  Excuse me.  Hold on.
8  Please wait --
9    THE WITNESS:  You've asked me three
10  questions --
11    MR. DAVIS:  Let me just voice the
12  objection --
13    (Off the record discussion.)
14    Q  Just to be clear on your testimony, if
15  you received funding for research and you
16  published an article on that research, you would
17  typically drop a footnote disclosing that
18  funding; correct?
19    **A  That is correct.  And, if an individual**
20  **from a university receives a consulting fee,**
21  **there are appropriate documents that the**
22  **individual files internal to the university, and**

---

377

1  **that is not the same category.  I just wanted to**
2  **make that clear.**
3    Q  Would you -- have you personally
4  disclosed being a consultant in an article you
5  published?
6    MR. KEALEY:  Objection.  Lack of
7  foundation.
8    **A  No.  And that's not typical.  That's**
9  **not typical practice because I was publishing**
10  **those articles as Michigan State University and**
11  **as a -- as chair of the scientific committee.**
12    Q  Sir, at the time the scientific
13  advisory committee was formed, I think, was
14  McDonald's doing their own animal welfare
15  research?
16    **A  I don't recall the exact details, but**
17  **when you state the question:  "Was McDonald's**
18  **doing their own research?" I define that as**
19  **paying for studies, and the answer is no.**
20    Q  Were they in the process of developing
21  animal welfare guidelines for the eggs they
22  purchased?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                          March 13, 2014

96 (Pages 378 to 381)

---

378

1  A   Yes.  I and other committee members
2  were also members of the McDonald's welfare
3  committee, and McDonald's was discussing many
4  aspects of animal welfare and social
5  responsibility.
6  Q   And if you could help me understand
7  what the differences were between -- well, let me
8  start over.
9       Some of the differences between the UEP
10 certified program and the McDonald's
11 recommendations in the 2000-2001 time period, I
12 want to ask you a few questions about those.
13      If you could explain what some of those
14 differences were at that time frame?
15 A   The two main differences that I recall
16 off the top of my head --
17      First let me mention the context.  The
18 science by which both sets of guidelines were
19 developed was the same.  The implementation is
20 what differed.  So the big different -- two big
21 differences -- which is not inclusive because I
22 don't have documents in front of me -- but the

---

379

1  two big differences is McDonald's and in UEP --
2  because there was a lot of crosstalk going on
3  because of common members, and I also talked
4  with -- through my role as being on both,
5  members, as an example.
6       One, McDonald's did not look at
7  anything related to a molt.  They moved on a date
8  certain in the future that their birds would not
9  be molted.
10      Second, McDonald's did not use a range;
11 in effect, they used 72.  The reason that
12 McDonald's used 72 is that's because that's what
13 we stated at the time.  They took a snapshot of
14 the science-based guidelines.
15 Q   So at the time -- to simplify that, the
16 two main differences you remember related to
17 molting and to the cage space; correct?
18 A   That's correct.
19 Q   And is -- to the best of your
20 knowledge, is McDonald's -- let me strike that
21 and start over.
22      UEP could have adopted those guidelines

---

380

1  that McDonald's was requiring of their suppliers;
2  correct?
3       MR. DAVIS:  Objection.
4  A   UEP adopted their guidelines first
5  based on the scientific advice of our committee;
6  and there was significant overlap in the two
7  committees, so the same advice was given.  There
8  was a different implementation.  And our
9  scientific committee did not worry whether it was
10 67 or 72; we were happy to see progress.
11      It's a matter of a voluntary
12 organization that contains most of the industry,
13 versus McDonald's which at that time had about 26
14 shell egg providers.  I think if you ask the
15 committee members then and you ask them today,
16 they would say that both programs provided humane
17 treatment of laying hens.  But there were
18 certainly differences in implementation.
19 Q   And McDonald's did not have a house
20 average concept; correct?  To the best of your
21 knowledge.
22 A   I do not recall the details of

---

381

1  McDonald's' program at that level.
2  Q   Do you recall any conversations with
3  Mr. Gregory about trying to convince McDonald's
4  to change their recommendations?
5  A   I don't recall the details, but I do
6  recall conversations about that.  Again, I don't
7  recall the details, but I do believe we had that
8  discussion.
9  Q   And do you believe that Mr. Gregory
10 would have approached McDonald's about changing
11 their guidelines?
12      MR. DAVIS:  Objection.
13 A   I can't answer that question.  All I
14 know is that serving on both committees, in an
15 ideal world we would all love to have seen a
16 similar guideline as far as implementation, but
17 that didn't occur.  And then later, Burger King
18 came out with 78 square inches.
19      Were all three science-based
20 guidelines?  Yes.
21 Q   Sir, the final -- the September 2000
22 recommendations from the scientific advisory

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

97 (Pages 382 to 385)

---

**382**

1  committee, do you recall whether those were
2  publicly available back in that time period?
3  　　A　No one has presented today a document
4  that I haven't looked at at some time that was
5  a -- where the guidelines were published in
6  Feedstuffs. I don't recall the date of that.
7  And I cannot recall whether they were published
8  publicly before that.
9  　　　But the Feedstuffs article that
10  published the entire set of guidelines with the
11  literature review, recommendation, and guidelines
12  was something that I pushed because I wanted to
13  get it in the record to make sure that everyone
14  that read Feedstuffs understood it. And we also
15  wanted to try to influence the rest of animal
16  agriculture.
17  　　Q　Do you recall asking Mr. Gregory to
18  provide the scientific committee report to a
19  person outside of the committee and being told
20  no?
21  　　A　I -- I don't recall.
22  　　　(Deposition Exhibit was marked for

---

**383**

1  identification.)
2  　　Q　Marking as Exhibit 37 a document with
3  the Bates label UE0840917.
4  　　A　I see the email exchange.
5  　　Q　And who is Karen Davis?
6  　　A　Karen Davis is -- I don't recall the
7  exact name of her group, but she's an animal
8  activist, someone that does not want to see
9  laying hens used at all by humans. And her
10  organization had been bombarding the UEP for many
11  years.
12  　　　So the document stands for itself. I
13  cannot tell you. I don't recall what I said to
14  Gene after he made this comment. But I can tell
15  you from the longer perspective, I worked very
16  hard, and we had that published in Feedstuffs.
17  And I was successful in getting that done because
18  I believed in the long haul that was important to
19  do. I can't recall whether he ended up sending
20  this to her or not. I don't recall.
21  　　Q　Do you recall which version that we've
22  looked at today ultimately was published in

---

**384**

1  Feedstuffs?
2  　　A　We'd have to look at the dates, and I
3  could tell you. But I will tell you that the
4  major aspects of our recommendations did not
5  change drastically from a macro perspective as we
6  moved along.
7  　　Q　But in 2001, the date of your
8  February 21st, 2001, email, it appears that the
9  scientific report was not available; is that fair
10  to say based on this email?
11  　　A　No. It's fair to say that Gene didn't
12  want to give it to Karen Davis. That is --
13  extending that to the rest of the world is
14  something that I cannot answer.
15  　　Q　But if it had been -- did you have an
16  understanding that it was publicly available in
17  2001?
18  　　A　I don't recall having that discussion.
19  All I can tell you is that my goal was to make it
20  publicly available as soon as possible. I can't
21  tell you what went on beyond this. But this --
22  this, to link this individual with the rest of

---

**385**

1  the world is a stretch because there's some
2  serious emotion there.
3  　　MR. KEALEY: This is notice to all
4  counsel. We're a little bit past six and a half
5  hours on the record, so I'd ask you to update me
6  on your status and on your position about how
7  we're going to wrap up this deposition promptly.
8  　　MR. OLSON: Could I make a suggestion?
9  　　MR. KEALEY: Yes.
10  　　MR. OLSON: We break for two to five
11  minutes, and we can confer and figure out the
12  most efficient way to wrap up?
13  　　MR. KEALEY: Excellent idea.
14  　　THE WITNESS: Outstanding.
15  　　THE VIDEOGRAPHER: We're going off the
16  record. The time is 4:52 p.m.
17  　　(A recess was taken.)
18  　　THE VIDEOGRAPHER: This is the
19  beginning of Tape 7. The time is 5:03 p.m., and
20  we are back on the record.
21  　　MS. SCHWARTZ: We have one housekeeping
22  thing. Exhibit 36 is being withdrawn. Exhibit

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

98 (Pages 386 to 389)

---

386

36.
Q   Dr. Armstrong, I just have a few last questions for you today.  Did you ever request that UEP make a donation to your discretionary account at Michigan State?
A   Yes.
Q   And was that request in the nature of approximately $18,000 per year?
A   I don't recall the amount.  It wasn't the same, and I think it happened two or three times.  I don't recall the exact amounts.
Q   And did UEP make that donation to your discretionary account?
A   They did.
Q   And to the best of your knowledge sitting here today it was two or three times?
A   The best of my -- the best of my recollection.
Q   And sitting here today do you have -- for those two or three times do you remember the amounts?
A   I do not recall the individual amounts.

---

387

Q   Did you ever discuss with Mr. Gregory a way to be compensated without becoming an employee of UEP, for example?
MR. DAVIS:  Objection.
A   I only discussed the invoices that were presented earlier, and I never had a discussion about being an employee because I've been an employee at Purdue, I was an employee at Michigan State, and an employee now.  Consulting is a normal practice for university employees and is encouraged.
Q   Did you have a conversation with Mr. Gregory about how to be compensated without forming a contract with UEP?
A   I don't recall.
MS. SCHWARTZ:  I've got no further questions.
MR. OLSON:  So, I guess, Doug Patton, if you're going to ask questions, it's probably your turn.
MR. PATTON:  Sure.  Let me ask a few questions.

---

388

Thank you, Dr. Armstrong.  And I know it's late in the day, and I'll try to be brief.
FURTHER CROSS-EXAMINATION,
QUESTIONS BY DOUGLAS H. PATTON:
Q   Since your retirement or resignation from the UEP scientific committee, do you make an effort to keep abreast of developments in the industry regarding animal welfare?
A   Mr. Patton, would you remind me who you're with?
Q   Sure.  And who's that speaking?
A   That's Jeff Armstrong.
Q   Oh, okay.  I'm an attorney with the firm of Kenny Nachwalter, and I represent the Kroger plaintiffs in this case.
A   Okay.  Thank you.
And the question was?  I'm sorry.
Q   Since your resignation from the UEP scientific committee, do you make an effort or at least try to stay abreast of developments that occur with respect to animal welfare in the egg industry?

---

389

A   Only to the extent of what I can read in Feedstuffs, and also I still get United Voices on a regular basis, and I scan that document.
Q   What knowledge do you have of an ABC undercover investigation broadcast nationally in November of 2011 exposing Sparboe Farms for inhumanely treating hens?
MR. DAVIS:  Objection to form.
A   I -- there have been numerous undercover investigations, so I don't recall the specifics.
Q   Do you recall at all a broadcast on ABC where, I guess, Mercy for Animals folks went into a Sparboe Farms henhouse and videoed treatment of hens?
A   I remember -- I don't remember the details, but I remember hearing about -- I can't -- I can't pinpoint the details.
Q   Well, I'll be brief.  In your view, Doctor, would swinging a hen around on a rope be humane treatment of a hen?
MR. DAVIS:  Objection.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

99 (Pages 390 to 393)

---

**390**

1    A   I really would need to see the video
2    and I'm -- I'm not quite understanding the
3    context, but we have science-based guidelines.
4    And humane handling of a hen means grabbing the
5    bird's legs with one hand and cradling the bird
6    in your other hand.  So other than that, I would
7    ask our behavior experts to determine if that
8    instance was inhumane or not.
9        Q   Well, part of the broadcast showed a
10   hen with like what looked like a rope tied around
11   it and a handler swinging it around over his head
12   like a lasso.  Would that be humane in your mind?
13       MR. DAVIS:  Objection.  Argumentative,
14   lacks foundation.
15       A   I -- as far as what you're picturing --
16   and I don't recall the video -- you're picturing
17   a bird with -- it really wouldn't matter to me if
18   its legs were tied or it's tied around its neck
19   and it's being swung around by a person, I would
20   call that abuse.
21       Q   Now, if dead hens are left in a cage
22   for days, would you consider that humane?

---

**391**

1        MR. DAVIS:  Objection.
2        A   I would consider dead hens being left
3    in the cage as a very bad management practice
4    that needs to be dealt with.
5        MR. PATTON:  Okay.  I have no further
6    questions.  Thank you.
7        MR. DAVIS:  Anyone else on the phone?
8        Okay.  Seeing as though there are no
9    more questions, I will do what I anticipate to be
10   a very short redirect of hopefully ten to fifteen
11   minutes tops.
12   REDIRECT EXAMINATION,
13   QUESTIONS BY EVAN W. DAVIS:
14       Q   Dr. Armstrong, if you could refer back
15   to the document that's marked as Exhibit 19.
16       Exhibit 19 are a set of minutes from
17   the UEP Producer Committee for Animal Welfare
18   dated May 15th, 2000.
19       A   Okay.
20       Q   Do you recall being asked questions by
21   plaintiffs' counsel about this document?
22       A   Yes.

---

**392**

1        Q   If you could, on page 1 where it says
2    Review of Guidelines, the minutes read that the
3    committee reviewed the draft of a "Humane
4    Guidelines for U.S. Egg Laying Flocks."  Do you
5    see that?
6        A   Yes.
7        Q   Now, I believe that you were asked
8    whether or not this statement refers to the
9    document that's been marked as Exhibit 18.  If
10   you could refer to that document.
11       A   Yes, I see the document.  18.
12       Q   And Exhibit 18, you'll see this is
13   dated May of 2000.
14       A   Yes.
15       Q   And these are -- Exhibit 18, again, are
16   a draft of recommendations by UEP's scientific
17   advisory committee; is that right?
18       A   That's correct.
19       Q   Is this document entitled Humane
20   Guidelines for U.S. Egg Laying Flocks?
21       MR. SCHIRMER:  Object to form.
22       A   I think it is.

---

**393**

1        Q   Exhibit 18's title.  At the top --
2        A   What you're asking is -- they reviewed
3    a draft of the guidelines, and it was in May.  I
4    do not know exactly which document that's
5    referring to.  I'm confused now.
6        Q   So it may or may not be Exhibit 18, in
7    your view?
8        MS. SCHWARTZ:  Object to form.
9        A   Yes.
10       Q   If you could turn to Exhibit 21.
11       A   Okay.
12       Q   And Exhibit 21 is a document entitled
13   Animal Husbandry Guidelines for U.S. Egg Laying
14   Flocks; do you see that?
15       A   Yes.
16       Q   And it's dated sometime in 2000;
17   correct?
18       A   Yes.
19       Q   Do you know whether the reference in
20   Exhibit 19 to humane guidelines for U.S.
21   egg-laying flocks is referring to the document
22   that's been marked as Exhibit 21?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

100 (Pages 394 to 397)

---

394

1      MS. SCHWARTZ:  Objection.  Form, calls
2  for speculation.
3      **A    I do not know the timing, but if you**
4  **look at the letter of November 13th, this**
5  **document has a letter on the inside dated**
6  **November 13th, 2000, and these minutes were**
7  **May 15th, 2000.  So it doesn't seem likely that**
8  **this is the document being referenced here.**
9      Q    Might the minutes be referring to an
10  earlier draft of the document that's been labeled
11  as Exhibit 21?
12      MS. SCHWARTZ:  Objection.  Form.
13      **A    That's entirely possible.  It may have**
14  **been; I am not certain the document that is**
15  **referenced in Exhibit 19.**
16      Q    So just to clarify, the document that's
17  referenced in Exhibit 19, you're not sure whether
18  or not that refers to the scientific advisory
19  committee's recommendations, or a draft thereof,
20  or whether it refers to the UEP producer
21  committee's animal husbandry guidelines, or a
22  draft thereof?

---

395

1      MS. SCHWARTZ:  Objection.  Form.
2  Misstates previous testimony.
3      **A    I don't remember what I said earlier**
4  **this morning, but if you look at these minutes**
5  **and you look at the motion, it was moved and**
6  **seconded to accept the recommendations and goals**
7  **of the scientific committee with the**
8  **implementation plans of phasing in the cage space**
9  **allowance to be presented for approval at the**
10  **October board meeting, and that carried.**
11      **Based on that, regardless of the**
12  **document, they were voting on the scientific**
13  **guidelines.  That's my belief that the motion --**
14  **and I was at the meeting, and time line wise,**
15  **that would have been about the time when they --**
16  **when this committee recommended to accept the**
17  **science-based guidelines and would have sent it**
18  **to the UEP committee.**
19      Q    But do you know which document this
20  statement on page 1 is referring to?
21      **A    I don't know for sure, but I would say**
22  **it's more likely that one (indicating).  But I**

---

396

1  don't know for sure.
2      Q    You can put that aside.
3      (Deposition Exhibit 38 was marked for
4  identification.)
5      Q    Dr. Armstrong, I'll hand you what's
6  been marked as Exhibit 38.  Do you recognize
7  Exhibit 38?
8      **A    Yes.**
9      Q    What is Exhibit 38?
10      **A    It's another -- it's a 2002 edition of**
11  **the United Egg Producers Animal Husbandry**
12  **Guidelines for U.S. Egg Laying Flocks.  It's a**
13  **document that resulted from the producer**
14  **committee.**
15      Q    Exhibit 38 bears Bates label UE0295925.
16  If you will, turn to page 8 of the document.
17      **A    Yes.**
18      Q    Under Molting Recommendations.
19      **A    Yes.**
20      Q    The next-to-last paragraph says
21  "However, until such time that these alternatives
22  are available, the shortest period of feed

---

397

1  withdrawal possible should be used to accomplish
2  the goal of rejuvenating the hen's egg production
3  capabilities and overall welfare."  Do you see
4  that statement?
5      Yes.
6      Q    Is that component of the guidelines
7  consistent with the scientific advisory
8  committee's recommendation?
9      Yes.
10      MS. SCHWARTZ:  Objection.  Form.
11      A    Yes.
12      Q    Turn to page 12 of the document.
13      A    Yes.
14      Q    Page 12 refers to the space allowance
15  per hen; is that correct?
16      A    Yes.
17      Q    And the time period for implementing
18  that?
19      A    Yes.
20      Q    And by April 1st, 2008, these
21  guidelines call for 67 inches of space to be
22  provided for white leghorn hens; is that correct?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                March 13, 2014

101 (Pages 398 to 401)

---

**398**

1      MS. SCHWARTZ: Objection. Form.
2      A   Yes.
3      Q   And how much space is called for to be
4   provided to brown egg-laying hens?
5      A   76.
6      Q   And are those separate space
7   requirements consistent with the scientific
8   advisory committee's recommendations?
9      MS. SCHWARTZ: Objection. Form.
10     A   Yes. Yes.
11     Q   Put that document aside.
12     Turn to the 2008 guidelines. I'm not
13   sure which exhibit number they received.
14     MR. KEALEY: Exhibit 9.
15     Q   Exhibit 9.
16     A   Exhibit 9. Okay. I have it.
17     Q   Exhibit 9 are the 2008 version of the
18   guidelines; is that right?
19     A   Yes.
20     Q   Turn to page 11.
21     A   Yes.
22     Q   Under Guidelines per Cage Production

---

**399**

1   Systems. Would you mind reading Point No. 1 into
2   the record.
3      A   "Cage configuration and equipment
4   maintenance should be such that manure from birds
5   in upper cage levels does not drop directly on
6   birds in lower-level cages."
7      Q   Is that guideline consistent with the
8   scientific advisory committee's recommendation?
9      MS. SCHWARTZ: Objection. Form.
10     A   Yes.
11     Q   You can put that document aside.
12     Turn your attention to the document
13   that's been marked as Exhibit 30.
14     Do you have Exhibit 30 in front of you?
15     A   I do.
16     Q   You were asked about the sentence in
17   this document reading, "We need to support UEP in
18   their quest to terminate this practice." Do you
19   see that?
20     A   Yes.
21     Q   And "this practice" refers to
22   backfilling; is that right?

---

**400**

1      A   Correct.
2      MS. SCHWARTZ: Objection. Form.
3      Q   Does this practice refer to
4   backfilling?
5      A   Yes.
6      Q   Are the scientific advisory committee's
7   views on backfilling at all related to the effect
8   on supply that backfilling has?
9      MS. SCHWARTZ: Objection. Form.
10     A   No.
11     MS. SCHWARTZ: Calls for speculation.
12     A   No. The rationale is noted in another
13   exhibit in a letter based on welfare, behavior
14   issues, and disease problems.
15     Q   And aside from welfare and behavior
16   issues and disease problems, as you just said,
17   was the scientific advisory committee's
18   opposition to backfilling based on anything else?
19     MS. SCHWARTZ: Objection. Form.
20     A   The opposition is stated in the letter,
21   and it's those two items, as I recall the letter.
22   And it is -- it is Exhibit 11. "Welfare is

---

**401**

1   compromised for a couple of reasons, but the main
2   reason is welfare is compromised."
3      Q   Thank you. You can put Exhibit 30
4   aside.
5      If I could draw your attention to
6   Exhibit 31.
7      A   Okay.
8      Q   I'm not sure that you were actually
9   asked any questions about Exhibit 31 other than
10   whether or not you recalled this email chain.
11   But I will ask you a question about the third
12   email down from yourself to Gene Gregory. You
13   say in this email, "The advisory committee is
14   adamant about the need for proper welfare for all
15   birds." And the word "all" is in all capital
16   letters. Do you see that sentence?
17     A   Exhibit 31?
18     Q   I believe so.
19     A   Yes, I see it now. I'm with you.
20     Q   Take a minute to refresh yourself as to
21   this, but what did you mean when you wrote that
22   sentence?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                           March 13, 2014

102 (Pages 402 to 405)

---

402

1    A   As the committee -- what the committee
2  had learned was being proposed is that an
3  alternative program -- we're not talking about
4  transition, phasing, or anything -- but an
5  alternative program was being proposed that only
6  the base humane standards would be implemented if
7  a consumer demanded it.  And if the market didn't
8  demand it, a producer could produce eggs in
9  conditions lower than our standards, which we
10 deemed to be the minimum humane standards for
11 caged hens.
12      So in the context of UEP, we suggested
13 that that -- that we want proper welfare for all
14 birds.
15     Q   And is that a reason why you say that
16 you were happy to speak with Walmart?
17      MS. SCHWARTZ: Objection.  Form.
18     A   I was happy to speak with anyone
19 about -- in opposition of a program that would
20 condone long-term poor animal welfare clearly not
21 supported by science.  That program proposed --
22 flew in the face of our science-based guidelines.

---

403

1    Q   You were asked earlier a series of
2  questions about the feasibility of one or a small
3  number of producers producing according to a
4  standard for McDonald's that might be feasible
5  for that one producer or two or three producers
6  but may not be feasible industry-wide.
7      MS. SCHWARTZ: Objection.  Form.
8    Q   Do you recall that testimony?
9    A   Yes.
10   Q   So can it be -- might it be practical
11 for one customer's suppliers to adopt a certain
12 animal welfare standard, whereas it would not be
13 practical for that standard to be adopted
14 industry-wide?
15      MS. SCHWARTZ: Objection.
16   A   Absolutely.  And the committee -- the
17 committee recognized that, and the committee --
18 there were several committee members that were on
19 both advisory panels, and its apples and oranges.
20   Q   Why?
21   A   Especially -- again, I remind you that
22 during those early years, all the way into the

---

404

1  mid 2000s, there were -- significant number of
2  producers did not want to see the guidelines
3  fully implemented.  That's why an alternate
4  program was proposed, because people did not want
5  to comply with the base animal welfare
6  guidelines.
7    Q   What is the difference --
8      Go ahead.
9    Q   What is the difference, in your view,
10 for a standard implemented by one customer versus
11 a standard that's implemented industry-wide?
12      MS. SCHWARTZ: Objection.  Form.
13      MR. DAVIS:  What's your objection?
14      MS. SCHWARTZ:  It, I don't think,
15 properly states what he said earlier, or earlier
16 today, but he's welcome to answer that question
17 if he has personal knowledge.
18   A   There is a big difference -- having
19 served on both advisory boards, chairing one and
20 served on the other, there is a big difference
21 when you have an organization like McDonald's
22 that can say a date on out -- not tomorrow, but I

---

405

1  can't remember the time line -- but you have to
2  abide by that.
3      And, of course, I don't know the
4  details, but they do their due diligence and they
5  know their -- that the suppliers are going to be
6  able to comply or they would have given a longer
7  time line.
8      So where you have a B-to-B
9  relationship, I'm going to provide eggs to you,
10 here are the conditions under which I will sign a
11 contract and buy your eggs, that's different than
12 a voluntary -- an organization of which the
13 members are voluntary members.
14      On top of that, again, you have a group
15 of members that are not unanimous.  While the
16 board unanimously approved our science-based
17 guidelines, there were many members who did not
18 want to do this.  A lot of members that are in
19 the fluid egg business, in the breaker market,
20 they had no customer impetus to do this, and they
21 had no -- they wanted any way not to implement
22 the science-based guidelines.

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                    March 13, 2014

103 (Pages 406 to 409)

---

406

1    Q   You talked about when McDonald's
2 implemented its standards the number of producers
3 that could meet those guidelines dropped; is that
4 accurate?
5    A   Yes.  And that's not based on
6 information that I'm divulging that's
7 confidential to McDonald's.  It was what I had
8 heard and ascertained, so I'm not sure of the
9 validity.  But I believe at about the time -- I
10 think it's fairly common and understood knowledge
11 that regardless of whether it was 26 down to a
12 fewer number, the number of suppliers for
13 McDonald's dropped.  Now, was it directly related
14 to the animal welfare guidelines?  I don't know.
15 I would suggest that it contributed heavily.
16    Q   When a customer implements its own
17 guidelines, it only needs a certain number of
18 producers to be able to meet those guidelines;
19 fair?
20       MS. SCHWARTZ:  Objection.  Form.
21    A   When a retail -- when a grocery store,
22 a fast food chain, when they implement

---

407

1 guidelines, they have to know that they have the
2 supply, or the guidelines are false advertising.
3    Q   They need to be able to supply
4 themselves?
5    A   Exactly.
6    Q   And when an industry implements
7 guidelines, what are its concerns?
8    A   When an industry is implementing
9 guidelines, if industry decided to implement the
10 guidelines, what's going to influence how fast
11 you can implement?  Will people -- will people
12 pay for -- do they want that supply?
13    Q   So are an industry's concerns and a
14 single customer's concerns --
15       MS. SCHWARTZ:  Objection.  Form.
16    A   And the main thing is it's a voluntary
17 organization.
18    Q   Sorry.  Let me just ask the question.
19 Sure.
20    Q   Are an industry's concerns and one
21 customer's concerns necessarily the same?
22    A   That's correct.  You've got multiple,

---

408

1 multiple customers and one customer.
2    Q   So they might be very different?
3    A   They might be very different, and they
4 are very different.
5    Q   I believe that you were asked about
6 UEP's contributions to your discretionary
7 account.  Do you recall that line of questioning?
8    A   Yes.  I do recall a couple of instances
9 I was asked about that.
10    Q   What is your discretionary account --
11 or I should say what was your discretionary
12 account while you were at Michigan State?
13    A   All administrators in universities,
14 whether they're president on down, your goal is
15 to have a discretionary account.  These are funds
16 that are given by individuals where they don't
17 have a purpose.  Most gifts to a university have
18 a specific purpose:  For a scholarship, for a
19 building, for this or that.  To have
20 discretionary funds that you can use for any
21 program you want is very, very significant.  So
22 it's not atypical for a department head or a dean

---

409

1 to ask a company to make a contribution.  They
2 say yes or they say no.
3    Q   What are those funds ultimately used
4 for?
5    A   At the discretion of the department
6 chair.  Or, in this case, when I was dean.  They
7 can't tell you what I used them for.  They went
8 into a larger pool of discretionary dollars.
9    Q   Are they used for things related to the
10 school?
11    A   They are absolutely.  Regardless of --
12 if you look at university guidelines, they're
13 very similar.  Different pools of money have
14 different guidelines and restrictions.  The
15 discretionary funds, there's a certain range of
16 things that it can be used for within those
17 guidelines, and it is discretionary.  So it was
18 used for the college.
19    Q   I want to clear up one thing that may
20 have come out wrong.  Did you say that it is or
21 is not atypical for a department head or dean to
22 ask a company to make a contribution?

---

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey                                    March 13, 2014

104 (Pages 410 to 413)

---

410

1    A   It is typical and good practice for
2 administrators and university personnel to ask
3 companies, alumni, anyone for money.  I spend
4 about 50 percent of my time asking people for
5 money in my current job.
6    Q   You were also asked some questions by
7 Mr. Patton over the phone about a video, that
8 wasn't showed, which he says related to Sparboe
9 Farms.  Do you recall that line of questioning?
10   A   Yes.
11   Q   And do you know whether or not Sparboe
12 Farms was a UEP-certified company at various
13 points in time?
14   A   I knew, and I read lists, but I cannot
15 tell you with any precision when or when they
16 were not a UEP company.  My recollection is that
17 there were times when they were not, but I don't
18 recall the details.
19   Q   And do you know anything about the
20 video that Mr. Patton referenced and whether or
21 not Sparboe was UEP certified at the time that
22 video was made?

---

411

1       MS. SCHWARTZ:  Objection.  Form and
2 calls for speculation.
3    A   I recall vaguely that they were not at
4 the time, but I'm not certain.
5       (Deposition Exhibit 39 was marked for
6 identification.)
7    Q   I'll show you what's been marked as
8 Exhibit 39.  Exhibit 39 bears Bates label
9 UE0605112.
10      Dr. Armstrong, do you recognize Exhibit
11 39?
12   A   Yes, I do.
13   Q   I'm just going to ask you one or two
14 questions about it.
15      This is dated March 15th, 2004.  You
16 spoke earlier about publication in Feedstuffs
17 which promulgated the scientific advisory
18 committee's recommendations; do you recall that
19 testimony?
20   A   Yes.
21   Q   Is this that publication to which you
22 referred?

---

412

1    A   This is the publication which codifies
2 the science-based guidelines at the time of
3 printing.
4       MR. DAVIS:  Can we go off the record
5 for one minute.
6       THE VIDEOGRAPHER:  We are going off the
7 record.  The time is 5:36 p.m.
8       (A discussion was held off the record.)
9       THE VIDEOGRAPHER:  We're back on the
10 record.  The time is 5:37 p.m.
11      MR. DAVIS:  Dr. Armstrong, that is all
12 the questions that I have for you.  Thank you
13 very much for your time today.
14      MR. KEALEY:  Everybody on the phone
15 done?
16      THE VIDEOGRAPHER:  This concludes the
17 deposition of Dr. Jeffrey Armstrong.  The time is
18 5:38 p.m., and we are off the record.
19      THE REPORTER:  Signature?  Yes.
20      MR. KEALEY:  Yes, please.  Send it to
21 me, and I'll take care of the next steps.
22      (The deposition concluded at 5:38 p.m.)

---

413

1       AND FURTHER THE DEPONENT SAITH NOT.
2
3       ACKNOWLEDGMENT OF DEPONENT
4
5    I, _____, do hereby
6 acknowledge that I have read and examined the
7 foregoing testimony, and the same is a true, correct
8 and complete transcription of the testimony given by
9 me, and any corrections appear on the attached Errata
10 Sheet signed by me.
11
12
13 _____   _____
14 (DATE)           (SIGNATURE)
15
16
17
18
19
20
21
22

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Armstrong, Jeffrey

March 13, 2014

105 (Pages 414 to 415)

414

1  STATE OF INDIANA        )
2                          ) SS:
3  COUNTY OF MARION        )
4      I, Tara Gandel Hudson, RPR, CRR, CSR, a Notary
5  Public in and for the County of Marion, State of
6  Indiana at large, do hereby certify that the
7  deponent herein, JEFFREY ARMSTRONG, PH.D., was by
8  me first duly sworn to tell the truth, the whole
9  truth, and nothing but the truth in the
10 aforementioned matter;
11     That the foregoing deposition was taken on
12 behalf of the Defendants United Egg Producers and
13 United States Egg Marketers at the offices of
14 STUART & BRANIGIN, 300 Main Street, Suite 900,
15 Lafayette, Tippecanoe County, Indiana, on the 13th
16 day of March, 2014, commencing at the hour of 8:38
17 a.m., pursuant to the Federal Rules of Civil
18 Procedure and the Kansas Rules of Civil Procedure;
19     That said deposition was taken down in
20 stenograph notes and afterwards reduced to English
21 under my direction, and that transcript is a true
22 record of the testimony given by the said deponent;

415

1      and that the signature of said deponent to his
2  deposition was requested;
3      That the parties were represented by their
4  counsel as aforementioned.
5      I do further certify that I am a disinterested
6  person in this cause of action; that I am not a
7  relative or attorney of either party, or otherwise
8  interested in the event of this action, and am not
9  in the employ of the attorneys for either party.
10     IN WITNESS WHEREOF, I have hereunto set my
11 hand and affixed my notarial seal this _____ day
12 of _____, 2014.
13
14     _____
15             N O T A R Y   P U B L I C
16
17 My Commission Expires:
18 April 9, 2016
19
20 County of Residence:
21 Marion
22