# ATTACHMENT 5

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 6

 7                            - - - - -

 8

 9                         PHILADELPHIA, PA

10

                              MAY 9, 2018
11                            DAY SIX

12

13   BEFORE:       THE HONORABLE GENE E.K. PRATTER, J.

14

15                            - - - - -

16                         TRIAL TRANSCRIPT

17                            - - - - -

18

19

20

21             KATHLEEN FELDMAN, CSR, CRR, RPR, CM
               Official Court Reporter
22             Room 1234 - U.S. Courthouse
               601 Market Street
23             Philadelphia, PA  19106
               (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)
```

14

1        TERRY LEE BAKER, sworn.
2        THE DEPUTY CLERK:  Could you please have a seat.
3        Please state your full name and spell your last name
4    for the record.
5        THE WITNESS:  Terry Lee Baker, TERRY L-E-E,
6    B-A-K-E-R.
7        THE COURT:  Good morning, Mr. Baker.  How are you
8    today?
9        THE WITNESS:  Good.
10       THE COURT:  Good.  Make yourself comfortable.  Keep
11   speaking up nice and loudly so everybody can hear you.
12       Mr. Neuwirth, you may proceed.
13       MR. NEUWIRTH:  Thank you, Your Honor.  Good morning,
14   Your Honor.  Good morning, ladies and gentlemen.  Good
15   morning, Mr. Baker.
16            DIRECT EXAMINATION
17   BY MR. NEUWIRTH:
18   Q.   Mr. Baker, are you currently employed?
19   A.   Yes.
20   Q.   And, by whom are you employed?
21   A.   Michael Foods.
22   Q.   And how long have you been employed by Michael Foods?
23   A.   Forty years.
24   Q.   So that would be going back to roughly 1977?
25   A.   Yes, correct.

15

1    Q.   And what is Michael Foods' business?
2    A.   We're primarily an egg products company.  We have some
3    small percentage of our business that is some retail shell egg
4    business, but we're primarily a products business first and
5    foremost, the largest -- probably the largest processer in the
6    world.
7    Q.   So the largest egg processor?
8    A.   Processer, yes.
9    Q.   But you do have a business that includes shell eggs,
10   correct?
11   A.   Yes.
12   Q.   And although you said that it was a small percentage of
13   Michael Foods own overall business, it's still a business
14   producing many millions of shell eggs, correct?
15   A.   Yes.  We do have some of our own production, yes.
16   Q.   Of millions of eggs, correct?
17   A.   Yes.
18   Q.   And what is your current position at Michael Foods?
19   A.   I'm vice president of egg procurement.
20   Q.   Okay.  Now, do you recall that you were previously
21   questioned under oath in this case in what is known as a
22   deposition?
23   A.   Yes, I do.
24   Q.   Okay.  And that was when Michael Foods was a Defendant in
25   this case, correct?

16

1    A.   I believe so, yes.
2    Q.   And is Michael Foods still a Defendant in the case at
3    this time?
4    A.   I'm -- I don't believe so, but I'm not sure.  I'm not
5    part of that discussion or involved in that area.
6    Q.   Okay, you were never told that Michael Foods had resolved
7    its claims in this case?
8    A.   Maybe -- maybe off -- yeah, unofficially, and there were
9    some press releases that alluded to that, but --
10   Q.   Now, what did you do to prepare for your testimony today,
11   if anything?
12   A.   Did some review of my deposition documents and then a
13   couple of the affidavits we had filed.
14   Q.   Okay.  And when you talk about deposition documents, did
15   you review the transcript of the deposition?
16   A.   Yes, I did.
17   Q.   And without telling me what happened at the meetings, did
18   you meet with anyone to prepare today?
19   A.   Just my -- just our in-house or our attorneys.
20   Q.   And when you say your attorneys, you're talking about
21   Michael Foods' attorneys, correct?
22   A.   Yes.  I'm sorry.
23   Q.   And it's correct that you never met with me to prepare
24   for this testimony today?
25   A.   No.

17

1    Q.   In fact, do you recall that I was the lawyer who took
2    your deposition in this case?
3    A.   I do recall, yes.
4    Q.   And do you recall that that was roughly in the year 2013?
5    A.   I know it was a long time ago.
6    Q.   And between the time of that deposition and your coming
7    to court today, have we met at any time in between?
8    A.   No.
9    Q.   Have we spoken at any time in between?
10   A.   No.
11   Q.   And were you told that as part of its agreement to
12   resolve this case, Michael Foods agreed to make a witness
13   available to testify at trial?
14   A.   I think I was, yes, I did hear or was told something
15   about it, but I don't know the specifics or arrangements.
16   Q.   And do you have an understanding that in order to have
17   you appear today, Plaintiffs needed to serve a subpoena?
18   A.   Yes, I did receive a subpoena.
19   Q.   Okay.  Now, it's correct, isn't it, that you have a
20   working knowledge of egg production?
21   A.   Yes, it is.
22   Q.   And that you have a good knowledge of the entire process
23   of producing eggs?
24   A.   Yes, I think I do.
25   Q.   And that comes from your years of experience at Michael

18

```
 1   Foods, correct?
 2   A.   Correct.
 3   Q.   I'd like you to focus on the period roughly 2000 to 2008,
 4   that decade.  What were your responsibilities at that time --
 5   well, let me ask you, what was your position at that time?
 6   Was it still vice president for egg procurement?
 7   A.   Yes, it was.  I started in 1977 with that particular
 8   position, so --
 9   Q.   And what were your responsibilities as the vice president
10   of Michael Foods for egg procurement?
11   A.   Our role was to work on all of the external procurement
12   we do.  We have -- we have a percentage of our internal layers
13   in production located in Nebraska and Minnesota, but the
14   majority of our supplies, I mean, our customer demand comes
15   from external producers, and so that is the portion of the
16   supply side that my group works with.
17   Q.   So, Michael Foods has, as I think you indicated earlier,
18   several million layers or enough layers to produce millions of
19   its own eggs but also purchases eggs from other egg suppliers?
20   A.   Yes, that would be true.
21   Q.   And are some of those egg suppliers relatively small egg
22   production facilities compared to Michael Foods?
23   A.   We actually have quite a variety.  We have some down to
24   very, very small producers with a single layer house up to
25   some facilities that may be as much as 5 or 6 million layers
```

19

```
 1   on one site.  So --
 2   Q.   So you're buying from a range of egg producers?
 3   A.   Yes.
 4   Q.   Some small, some large?
 5   A.   Yes.
 6   Q.   Okay.  Now, in this period, 2000 to 2008, was Michael
 7   Foods a member of a trade association called the United Egg
 8   Producers?
 9   A.   Yes, we were.
10   Q.   And, in fact, Michael Foods had been a member of the
11   United Egg Producers from the time you became the vice
12   president for egg procurement in 1997, correct?
13   A.   Yes.
14   Q.   And during this period we're talking about, in the early
15   2000s, Michael Foods, in fact, had a seat on the United Egg
16   Producers Board of Directors, correct?
17   A.   Yes.  Not for the entire period, but for a majority of
18   that period.  I think it started in 2002 or 2004.  I don't
19   recall the date exactly.
20   Q.   Okay.  And, in fact, there was a point in time when you,
21   yourself, served as Michael Foods' representative on the
22   United Egg Producers Board of Directors, correct?
23   A.   Yes, I did.
24   Q.   Okay.  And it's also correct, isn't it, that in addition
25   to serving on the United Egg Producers Board of Directors,
```

20

```
 1   over those years you also served, at least at certain times,
 2   on a number of committees of the United Egg Producers,
 3   correct?
 4   A.   Yes, I did.
 5   Q.   Okay.  And it's correct, isn't it, that when you served
 6   on the United Egg Producers Board of Directors in 2004, the
 7   other members of the Board were other egg producers, correct?
 8   A.   Yes.
 9   Q.   And that included some companies -- were there companies
10   besides Michael Foods that in addition to producing eggs also
11   produced egg products?
12   A.   Yes, there was multiple companies that were participating
13   in both sides of the industry, so...
14   Q.   Okay.  Now, is it correct that one of the methods -- if
15   you have -- if you're an egg producers with a flock of hens
16   laying eggs, that one of the methods for reducing flock size
17   is to adjust the timing of molting of those flocks?
18   A.   Yeah.  Yes, I guess, you're really not changing the flock
19   size, you're changing the productivity or when the production
20   is occurring, maybe.
21   Q.   Okay, so let me ask it a different way.  Is it correct
22   that one of the methods to adjust the number of eggs your
23   flock is producing at a given point in time is to adjust the
24   timing of when those flocks molt, correct?
25   A.   Yes, that is true.
```

21

```
 1   Q.   And is it correct that one method of affecting the size
 2   of your flock is to adjust the timing of when an egg producer
 3   disposes of what are known as spent hens?
 4   A.   Yes, that would be true.  Although, sometimes that's
 5   really dictated by the pullet growing schedule.  So you maybe
 6   have some latitude, but you still have 20-week-old or
 7   16-week-old pullets sitting out there normally because you're
 8   scheduling those as much as two years out or longer.
 9   Q.   Okay.  Well, do you disagree at this point that one of
10   the methods that can be used to adjust flock size at a point
11   in time is to adjust the timing of when you dispose of spent
12   hens?  That is a method that can be used, isn't it?
13   A.   Yes, it could be removed early.  You just can't take them
14   out late because of scheduling from the other side.
15   Q.   Right.  But -- but -- but --
16   A.   It is possible.
17   Q.   -- disposing early is a way to adjust your flock size at
18   a given point of time, correct?
19   A.   Yes.  Yes, that's correct.
20   Q.   Now, let me hand you a document that is already in
21   evidence.  It's Plaintiffs' Exhibit 123.
22            MR. NEUWRITH:  I've already given this to the Court.
23   And because this is already in evidence, let me ask you to put
24   up Plaintiffs' Exhibit 123.
25   BY MR. NEUWRITH:
```

22

1   Q.   And do you recognize this document as the minutes of a
2   meeting of the United Egg Producers Board of Directors on
3   May 11 and 12, 2004, in Washington, D.C.?
4   A.   Yes, I do.
5   Q.   And do you see that on the list of members of the Board
6   who are said to be attending, one of the names listed in the
7   first line is your name, Terry Baker?
8   A.   Yes.
9   Q.   And let me also ask you, about four lines from the bottom
10  of the list of members, one of the names that's listed is
11  Mohamed Mousa.  Do you see that?
12  A.   Yes, I do.
13  Q.   Do you recall who Mr. Mousa was?
14  A.   Yes, I do.
15  Q.   Who was he?
16  A.   He is a -- a flock manager for -- I'm not sure -- I'm not
17  sure who he was working for in '04.  I know who he's with
18  today, but I don't know -- I think it was the same, but I'm
19  not sure.
20  Q.   Do you have a recollection that at that time he worked
21  for Ohio Fresh foods?
22  A.   Actually, I don't, no.
23  Q.   Okay.  And do you see that on the next line after that,
24  Paul Sauder is listed as one of the people who attended that
25  meeting?

23

1   A.   Yes.
2   Q.   And do you see that right next to Mr. Sauder's name is
3   the name Marcus Rust, was a member of the Board who attended
4   that meeting?
5   A.   Yes, I do.
6   Q.   Okay.  And all of these are listed as members who
7   attended, correct?
8   A.   Yes, that's how it is listed.  That's correct.
9   Q.   Right.  Now, I would appreciate if we could look at the
10  second page of the document.  And there is a section towards
11  the bottom which says Marketing Committee, and it says that
12  under that, there is a motion, and it says:  It was moved by
13  Baker and seconded by Fortin to recommend that the industry
14  molt all flocks at 62 weeks and dispose of spent hens by 108
15  weeks, and that this plan of action take place immediately and
16  carried through until August 1st, 2004.
17            And then it says, Carried.
18            Do you see that?
19  A.   Yes, I do.
20  Q.   And it says that it carried.
21            Do you recall how Michael Foods voted on this
22  motion?
23  A.   Well, this is the committee.  I don't know if this --
24  this was a Board motion.  I'm not sure.
25  Q.   I believe -- yes, I believe that it says right above

24

1   that:  Mr. Baker presented the report of the committee and
2   submitted this motion to the Board.
3   A.   Which was chairman Dolph Baker.
4   Q.   Right.
5   A.   Right, okay.  Just so I'm clear.  It was not me that
6   presented the motion.
7   Q.   Right.
8   A.   I don't recall whether I voted for this or not.  We
9   generally -- this was a function that we did not participate
10  in as Michael Foods.  It was just something that -- our
11  mission is to take care of our customers, and it doesn't
12  necessarily fit the agendas of these kind of activities.  So
13  we just didn't participate as a rule.  And if I would have
14  voted, it would have been probably a no, but it probably
15  didn't -- didn't officially abstain but just didn't vote on
16  it, period.
17  Q.   And when you talk about the agendas of these types of
18  activities, what are you referring to?
19  A.   Well, if they were -- if it was because of some reason to
20  change -- to kind of alter the -- just the timing of the
21  flocks, that's -- that would be the only thing I can think of,
22  so...
23  Q.   Well, you agree, don't you, that these types of steps
24  affect the production of eggs at a given point in time,
25  correct?

25

1            MR. CALLOW:  Your Honor, I'm just going to object to
2   the leading nature of these questions.
3            THE COURT:  Okay.  You can ask the question -- try
4   your question again.
5            MR. NEUWIRTH:  Okay, Your Honor.  I believe that
6   this is --
7            THE COURT:  Just try the question again.
8   BY MR. NEUWIRTH:
9   Q.   Well, you testified earlier, Mr. Baker, correct, that
10  these types of steps, such as timing of the molting of flocks
11  and early disposal of spent hens, can be a way to affect the
12  number of eggs, correct?
13  A.   Yes.
14  Q.   At a given point in time?
15            MR. CALLOW:  Same objection, Your Honor.
16            THE COURT:  Okay, overruled.
17  BY MR. NEUWIRTH:
18  Q.   And is that the type of agenda you were referring to when
19  you said that this was not the type of thing that Michael
20  Foods would have supported?
21  A.   Yeah.
22  Q.   Thank you.
23            Now, do you recall that in late 2004, after you had
24  already become a member of the United Egg Producers Board of
25  Directors that there was an egg industry economic summit that

26

1   the United Egg Producers convened?
2   A.   I remember a summit.  I don't remember the exact timing
3   but somewhere in that vicinity, yes.
4   Q.   Okay.  Let me hand you a document that's been marked for
5   identification as Plaintiffs' Exhibit 140.
6           And are you able to identify what this document is?
7   A.   Yes.
8   Q.   And what is it?
9   A.   Well, it was talking about the upcoming egg -- the
10  summit, to be held in November, or that was held, I guess, and
11  I missed it.  Yes, I was not there, so I did not attend that
12  meeting, so...
13  Q.   Right.  And is it correct that this is a letter addressed
14  to you, Mr. Terry Baker, at Michael Foods from the United Egg
15  Producers referencing this summit?
16  A.   Yes, it is.
17  Q.   And does it indicate a date when that summit took place
18  in Atlanta?
19  A.   I think the summit, it says -- yes.  On November 16 of
20  2004.
21  Q.   Okay.  And is it correct that this would have been
22  something you would have received in the ordinary course of
23  business?
24  A.   Yes, I believe so.  I was a Board member.
25  Q.   And it's something that you would have reviewed when you

27

1   received it?
2   A.   Yes.
3           MR. NEUWIRTH:  Your Honor, we would move for the
4   introduction of Plaintiffs' Exhibit 140 into evidence.
5           MR. KING:  Objection.  Hearsay and relevance.
6           THE COURT:  Sustained.
7   BY MR. NEUWIRTH:
8   Q.   Let me ask you if you can look at the first page of the
9   document.  And it's addressed to you, correct?
10          And it says:  If you don't read any other mail
11  today, please take the time to read this.
12          Correct?
13  A.   Yes, it does.
14  Q.   And is that something that would have mattered to you
15  when you received it?
16  A.   Yes, probably.
17  Q.   And do you see that on the last two pages of the
18  document, there are two pages that have the heading,
19  Intention --
20          MR. KING:  Objection, Your Honor.  This
21  exhibit's already -- it's hearsay.
22          THE COURT:  Well, why don't you -- the document is
23  not yet admitted, so reading from the document is probably not
24  appropriate.  Do you have another question for the witness?
25  BY MR. NEUWIRTH:

28

1   Q.   Can you look at the last two pages of the document?
2   A.   Yes.
3   Q.   And do you have an understanding of what it was that this
4   document was soliciting from you at Michael Foods?
5   A.   Yes.  It's pretty straightforward, I think.
6   Q.   And what was it soliciting from Michael Foods?  What was
7   it asking Michael Foods to do?
8           MR. KING:  Objection to the extent that the witness
9   is going to be reading from the document.
10          THE COURT:  Well, do you want to rephrase the
11  question to find out what the witness's understanding was?
12  BY MR. NEUWIRTH:
13  Q.   What is your understanding, without reading from the
14  document?  Can you just tell us what your understanding is of
15  what it was that the United Egg Producers was asking Michael
16  Foods to do at this point following this economic summit of
17  egg producers?
18  A.   They were suggesting that you dispose of flocks four
19  weeks earlier than whenever your schedule was, I think, is
20  what it sounds -- I think, if I'm reading it correctly.
21          MR. KING:  Objection.  Motion to strike.
22          THE COURT:  Sustained.
23          Ladies and gentlemen, to the extent that the witness
24  was saying what he thinks the document says, since the
25  document's not been admitted into evidence, I'm going to

29

1   strike that part of his testimony.
2           But you can go on.
3   BY MR. NEUWIRTH:
4   Q.   Is it correct that -- is it your recollection that from
5   time to time, the United Egg Producers would ask companies
6   like Michael Foods that were members of United Egg Producers
7   to participate in molting at particular times and disposal of
8   hens at particular times?
9   A.   I recall there was -- it did happen.  I don't know how
10  many times, but I know this was one.
11  Q.   And is it correct that at certain times, members of the
12  United Egg Producers, like Michael Foods, would be asked to
13  commit in writing to do that?
14  A.   My recollection is this was the first time they asked for
15  a written commitment.  I think before, previously, it might
16  have just been a verbal.
17  Q.   And this is a -- and is it your recollection that a point
18  came around November 2004 related to this economic summit when
19  Michael Foods, as a member of the United Egg Producers, was
20  asked to make a written commitment to molt flocks early and to
21  dispose of spent hens at a particular time?
22          MR. KING:  Objection.
23          MR. BIZAR:  Objection.  Leading.
24          THE COURT:  Overruled.
25          MR. NEUWIRTH:  This is -- I'm sorry, Your Honor.

30

1    THE COURT:  Overruled.
2  BY MR. NEUWIRTH:
3    Q.  You may answer the question.
4    A.  Oh, okay, yes, that's what they were requesting.
5    Q.  Okay.
6        MR. NEUWIRTH:  And, Your Honor, based on this
7  recollection of the witness and the testimony of the witness,
8  we would reapply for admission of this document into evidence.
9        MR. KING:  Objection.  Hearsay.  Foundation hasn't
10 been laid to admit the document.
11       THE COURT:  I'm overruling the objection.  Now the
12 document may be admitted.
13       MR. NEUWIRTH:  Thank you, Your Honor.
14       And if we could just put up the document, please.
15 It's Plaintiffs' Exhibit 140.
16 BY MR. NEUWIRTH:
17   Q.  And this is the letter to you that you were referring to
18 certainly from November 19th with the statement:  If you do
19 not read any other mail today, please take the time to read
20 this, correct?
21       And if we could turn to the last page -- or the
22 next-to-last page -- I'm sorry -- it has the heading,
23 Intention to Meet Market Needs Option One.
24       Do you see that?
25   A.  Yes, I do.

31

1    Q.  And it then says, it is -- there's a blank.  It says:  It
2  is my company's intention to dispose of hens that are
3  currently scheduled for disposal between January 1st and
4  April 30, 2005, four weeks earlier than previously scheduled.
5  Do you see that?
6    A.  Yes, I do.
7    Q.  And do you recall whether Michael Foods chose to exercise
8  this option one at this time?
9    A.  No, we did not.
10   Q.  And if you look at the last page of the document, it
11 says:  Intention to meet market demand, option two.  And,
12 again, there's an opportunity to check.  It is my company's
13 intention to reduce my own December 1st, 2004 flock size by
14 5 percent between the dates of January 1st through April 30,
15 2005.
16       Do you see that?
17   A.  Yes, I do.
18   Q.  And do you know whether Michael Foods at this time chose
19 to exercise that option number two?
20   A.  I believe we did not.
21   Q.  Now, when you received this letter, did you understand
22 that one of the objectives of at least the people who had sent
23 it to you was to have United Egg Producer members manage the
24 supply of shell eggs?
25       MR. CALLOW:  Objection.

32

1        THE COURT:  Sustained.
2        THE WITNESS:  I really don't know.
3        THE COURT:  Hold on, sir.  Mr. Neuwirth is going to
4  ask you another question.
5        THE WITNESS:  Okay.
6        MR. NEUWIRTH:  May we have a quick sidebar,
7  Your Honor?
8        THE COURT:  No.  You can ask another question.
9        MR. NEUWIRTH:  Can I just understand what the basis
10 for the ruling is?
11       THE COURT:  Yes.  You've asked this witness what
12 other people understood something to be.
13       MR. NEUWIRTH:  Okay.  Thank you.
14 BY MR. NEUWIRTH:
15   Q.  When you received this letter, what was your
16 understanding of the objective of seeking to have United Egg
17 Producer members agree either to have an early molt or an
18 early slaughter of hens?
19       MR. KING:  Objection.  Foundation and speculation.
20       THE COURT:  Overruled.
21       THE WITNESS:  You know, again, I don't know for sure
22 what their intent was, because I think I told you at my
23 deposition we had participated in a lot of these marketing
24 committee activities, so I really don't know for sure.
25 BY MR. NEUWIRTH:

33

1    Q.  Is that your recollection of what you said at your
2  deposition about this document?
3    A.  Well, that was a long time ago, but I believe it was
4  something like that, I believe, yes.
5    Q.  Okay.  Let me hand you your deposition, and I've put it
6  in a binder, the whole thing, so I only have to give it to you
7  once.
8    A.  Okay.
9    Q.  And let me ask you if you can turn to page 67 of the
10 deposition.  This is the transcript of your deposition from
11 August 22, 2013.  And --
12       THE COURT:  Mr. Neuwirth, what page was it again?
13       MR. NEUWIRTH:  I'm sorry.  Page 67.
14       THE COURT:  Yes.
15 BY MR. NEUWIRTH:
16   Q.  And you'll see that starting on line 3, there is a
17 question and it -- you can read the page and you can let me
18 know -- you don't have to -- please don't read what you said
19 at the deposition.  Just let me know, when you read it, if it
20 refreshes your recollection of what, at least as of 2013, you
21 understood to be the purpose of this request.
22   A.  Well, I said yes but, again, that's -- I'm guessing
23 that's what the answer was.  You know, I think that's what
24 they're doing.  I don't know that.  I wasn't at the meeting.
25 So I did say yes, but only because that was an assumption.  I

34

1  don't know.  I wasn't there, so --
2  Q.  And when you said "yes" at your deposition, you didn't
3  say you were making an assumption.  You just said "yes"?
4  A.  I said yes, I did.
5  Q.  And what you said yes to was that you understood that the
6  purpose of these requests related to managing the supply of
7  eggs, correct?
8  A.  I don't recall if I said exactly that.
9  Q.  Well, again, why don't you read --
10     THE COURT:  Mr. Neuwirth?
11     MR. NEUWIRTH:  Yes.
12     THE COURT:  Let the witness finish his answer.
13     MR. NEUWIRTH:  Oh, I'm sorry.  I didn't realize he
14  hadn't.  I apologize.
15     THE WITNESS:  All's I see is the "yes," but I
16  don't -- does it go on?
17  BY MR. NEUWIRTH:
18  Q.  I think if you read lines 14 to 24 on page 67.
19  A.  Coming out of the meeting, yes, that was quite clear,
20  yes, but, again, that's what it appeared to be.  I have to --
21  I have to say, but --
22  Q.  Okay.  And at your deposition, you didn't make that
23  caveat, right?
24  A.  I can't -- you're right.
25  Q.  Now, are you familiar with the UEP, United Egg Producers

35

1  Certified Program?
2  A.  Yes.
3  Q.  Now, do you recall that that program started going into
4  effect with a 100% rule in approximately 2002?
5  A.  I think that's -- that would be correct.
6  Q.  And when the program in that form first started at that
7  time, did Michael Foods join the program right away?
8  A.  No, we did not.
9  Q.  Is it correct that although you were not the ultimate
10  decision-maker as to whether Michael Foods would join the
11  program at that time, you were one of the people involved in
12  the decision-making process?
13  A.  Yes, that's -- that's the proper description, yes.
14  Q.  And what is your understanding of why when this Certified
15  Program was adopted with the 100% rule in 2002 Michael Foods
16  chose not to join the Certified Program?
17  A.  Our business model has been and continues to this day,
18  especially on the animal welfare front, we try to do what our
19  customers ask us to do.  In 2002 there was a lot of discussion
20  starting from some of the customer base and some of the large
21  customers, the national kind of accounts, but we didn't have
22  any customers at that point asking for this program.
23     So while we were exploring, investigating, trying to
24  learn about it, understand about it, we still had not --
25  didn't have a reason to recommend to our senior management

36

1  that we should pursue that at that stage.
2  Q.  Okay.  Now, at that time when the -- at that time when
3  this program was being adopted with a 100% rule, did Michael
4  Foods as a participant in the United Egg Producers support
5  having a 100% rule?
6  A.  We did disagree with the 100% rule.  At least in our
7  case, we didn't -- again, when we try to match what our
8  customers want, the 100% rule didn't always necessarily make
9  sense for us, but that was really just a disagreement with a
10  lot of the membership.
11  Q.  And, in fact, Michael Foods did not join the program in
12  2003, did it?
13  A.  No, we did not.
14  Q.  Or in 2004?
15  A.  No, we did not.
16  Q.  Or in 2005?
17  A.  We did not in 2005, but in 2002, '3, '4, '5, there was --
18  it was a period of time when a lot of lay people, a lot of the
19  end users, food service, retailers, everybody was learning.
20  So we did a lot of education in that time frame trying to make
21  our customers understand what animal welfare for laying hens
22  was about, and an interest was definitely growing.  I couldn't
23  deny that.  There was definitely interest growing.
24     But like I say, it wasn't there in 2002, but it was
25  starting to come on as -- and as you -- I don't know if most

37

1  people wouldn't know this, but McDonald's and Burger King were
2  probably two of the first major national users of eggs that
3  committed to proprietary programs.  And I can't remember if
4  that was in 2000, 2001, 2002, somewhere in that window.  And
5  they were actually ahead of the United Egg Producers program
6  in that period.  So...
7  Q.  Now, is it your position that during these years of 2003,
8  '4, and '5, there was some new customer demand --
9  A.  There was --
10  Q.  -- from your customers for a program with the 100% rule?
11  A.  Well, their demand and the 100% rule were really two
12  different things.
13  Q.  Okay.
14  A.  So we were having customers ask about it.  Nobody was
15  requiring it in '2, '3, '4, other than we were doing the --
16  like I said, the proprietary programs were being done for
17  McDonald's and Burger King.
18  Q.  So -- and you said a few minutes ago that -- or let me
19  ask, did Michael Foods eventually join the Certified Program?
20  A.  Ultimately in 2006.  The summer of '06, I think it was.
21  Q.  Okay.  And do you recall that in the lead up to that
22  decision to join the program in 2006, you had some discussions
23  about the program with Gene Gregory of the United Egg
24  Producers?
25  A.  Are you referring to discussions about a transition plan

38

```
1   into it or just discussions about the plan itself?
2   Q.   I'm asking whether -- just the most general question --
3   whether in connection --
4   A.   Okay.
5   Q.   -- with -- in connection with Michael Foods ultimately
6   joining the program, you had one or more discussions around
7   that time in 2006 with Gene Gregory of the United Egg
8   Producers?
9   A.   Yes.  Yes, I did.
10  Q.   And let me hand to you what -- let me hand to you what
11  for identification purposes -- and it's just for
12  identification purposes, we will call Plaintiffs' Exhibit 500.
13       I'm sorry.
14       And this document shows, doesn't it, that
15  Mr. Gregory, on April 13 of 2006, sent you an e-mail on the
16  subject of Michael Foods' interest expressed in UEP Certified,
17  correct?
18  A.   Yes.
19  Q.   And he said in this e-mail, correct, that he had sent you
20  what is a report that is attached that he says he has written
21  for himself only at this time?
22       MR. KING:  Objection.  Hearsay.
23       THE COURT:  Sustained.
24       MR. NEUWIRTH:  I'm just -- Your Honor.
25       THE COURT:  Sustained to the question.
```

39

```
1   BY MR. NEUWIRTH:
2   Q.   You received this from Mr. Gregory, correct?
3   A.   Yes.
4   Q.   And it's correct, isn't it, that after receiving this,
5   you never undertook to correct the contents of the attached
6   report, correct?
7   A.   I'm not sure when you say "correct."
8   Q.   You never told Mr. Gregory that anything in this report
9   he sent you was incorrect, correct?
10  A.   I don't recall that we did.  I don't know for sure.
11  Q.   Well, do you recall that at your deposition, you
12  testified that you had not asked Mr. Gregory to make any
13  changes to the attached report?
14  A.   I don't recall what I answered.  I honestly don't.
15  Q.   Okay.  Let me ask you if you can please -- if you can
16  please look at page 136 of your deposition.  Okay?  And do you
17  see on that page there is a reference to the introduction at
18  the bottom of the page to Baker Exhibit 16, which is the
19  document I've just handed to you?  Do you see that?
20  A.   Yes, I do.
21  Q.   And can I ask you now to turn to page 138.  And do you --
22  do you see that it says that -- does this refresh your
23  recollection on whether you read this report at the time?
24  A.   It -- yes.  That I read the report?
25  Q.   Yes.
```

40

```
1   A.   Yes, I did read the report.
2   Q.   Now, is it correct that at this meeting with Mr. Gregory,
3   you told him that Michael Foods currently had no customers
4   asking for Certified egg products and that Michael Foods
5   didn't think the volume would ever be big enough among
6   ingredient and buyers and export accounts to justify Michael
7   Foods complying with the 100% rule?
8        I'm just asking you without reference to the
9   document whether that's your recollection that you told that
10  to Mr. Gregory when you met with him.
11  A.   I don't -- I don't remember if I did or not.
12  Q.   Okay.  Let me ask you if you can look at the second page
13  of this document that I handed you.  And does -- if you look
14  at the fourth paragraph in this report Mr. Gregory sent you,
15  that begins with "the certainty," can you read that paragraph
16  and let me know if that refreshes your recollection of what
17  you told Mr. Gregory at that time about -- and that's 2006 --
18  about customer demand among Michael Foods' customers for
19  Certified egg products.
20  A.   Yes, I see it.  I just read it.
21  Q.   And does that refresh your recollection that you would
22  have told Mr. Gregory during this meeting that Michael Foods
23  currently has no customers asking for Certified egg products
24  and that Michael Foods doesn't think the volume will ever be
25  big among ingredient buyers and export accounts?
```

41

```
1   A.   I -- I honestly don't remember saying this.  This is Gene
2   Gregory's version of what transpired.  So I don't know for
3   sure.  Probably there was some conversation.  Whether it was
4   as he wrote it, I can't speak to that.  I don't know.
5        This goes back 12 years.  I, frankly, can't
6   remember, I have to say.
7   Q.   Right.  Do you have any reason, as you sit here today, to
8   believe that Mr. Gregory would have just made this up?
9   A.   No.  We may have been positioning --
10       MR. CALLOW:  Objection, Your Honor.
11       THE COURT:  Overruled.
12  BY MR. NEUWIRTH:
13  Q.   And, again, this meeting took place in 2006?
14  A.   '6.
15  Q.   Okay.  Now, do you recall that a point came in 2005 when
16  some changes were being made to the 100% rule that Michael
17  Foods opposed?
18  A.   There were some -- there were several of the aspect of
19  the 100% rule that we disagreed with, because, again, it
20  didn't match how we did business.  That's what our
21  disagreement was always about.
22  Q.   And, in fact, it's the case, isn't it, that in 2005,
23  Michael Foods, with your involvement, made an affirmative
24  effort to oppose and to try -- to oppose a change being made
25  to the 100% rule and then to try to get it reconsidered after
```

42

1  that change had been adopted, correct?
2  A.  I think we made more than one attempt to at least alter
3  it or do something to make it a little bit more usable for
4  some of the egg products people.  There were other companies
5  that had some similarity to us that were also looking for it.
6       So, yes, we did try to lobby to get a change done to
7  make it a little bit more -- find some other way around that a
8  little bit or change it.
9  Q.  And, in fact, when you say "lobby," you're talking about
10  trying to get the United Egg Producers --
11  A.  Yeah.
12  Q.  -- to change the rule?
13  A.  I'm sorry.  The lobby is the members, the Board and UEP,
14  right.
15  Q.  And you did that, I think you just said, with some other
16  companies that also shared the view that it would make sense
17  to do something different on the 100% rule at that time than
18  what the United Egg Producers had chosen to do, correct?
19  A.  Yes, that is true.
20  Q.  And is it correct that one of the companies that was
21  involved in that effort that you were involved in was Sparboe?
22  A.  Yes, Sparboe was part of that group.
23  Q.  Do you remember any of the other companies that were
24  involved?
25  A.  I think it might have been -- I don't know.  I'd be

43

1  speaking -- I'm not remembering for sure.
2  Q.  Do you recall that one was Midwest Poultry, Mr. Krouse?
3  A.  Yes, I think -- I think Midwest Poultry was one of them,
4  yes.
5  Q.  And do you recall that Mr. Krouse was one of the people
6  who was involved in that effort with you to try to address
7  what you perceived to be a problem with the 100% rule --
8  A.  Yes.
9  Q.  -- as it was being handled at that time?
10  A.  Yes.  Yes, that's correct.
11  Q.  Okay.  Let me hand you a document that is already in
12  evidence.  This is Plaintiffs' Exhibit 152.
13       MR. NEUWIRTH:  And if we can put that up, please.
14  It's already in evidence.
15  BY MR. NEUWIRTH:
16  Q.  And do you see that this is the minutes of the United Egg
17  Producers Board of Directors meeting on January 25, 2005, in
18  Atlanta, Georgia?
19  A.  Yes, I do.
20  Q.  And do you see that in the first -- towards the top under
21  the heading Minutes, there's a listing of Board members and
22  staff who attended the meeting?
23  A.  Yes.
24  Q.  And about four lines from the bottom, do you see that
25  your name appears?

44

1  A.  Yes, I do.
2  Q.  And do you see that a few lines up, the name of
3  Marcus Rust of Rose Acre appears as one of the Board members
4  who attended the meeting?
5  A.  Yes.
6  Q.  And can I ask you please if we can turn to what I believe
7  is the fourth page of the document, there's a section, again,
8  on the Animal Welfare Committee report, and do you see that
9  within that section, it says:  Oldenkamp presented the
10  following committee motions.
11       Do you see that?
12  A.  Yes, I do.
13  Q.  And do you see Motion Number 2, the motion says:  In
14  order to protect the integrity of the ACC program and logo,
15  and in view of the difficulty in preventing the commingling of
16  Certified eggs with non-Certified eggs and to treat all egg
17  producers equally, it is hereby moved that no new licenses to
18  market Animal Care Certified eggs will be issued or renewed to
19  producers who are not ACC Certified.
20       Do you see that?
21  A.  Yes, I do.
22  Q.  And do you see that it says:  The motion carried with a
23  vote of 19 yes, and eight nos?
24  A.  Yes.
25  Q.  Okay.  What was Michael Foods' vote on this motion?

45

1  A.  I'm pretty sure we voted no.  Or I voted no.
2  Q.  And what was the reason that you voted no?
3  A.  Well, this -- this was a vehicle that allowed us to -- or
4  was available to us to buy Certified egg products from other
5  Certified Producers -- or not egg products, but Certified eggs
6  from other Certified Producers so that if we did have some
7  customers that wanted that Certified Program, we could meet
8  their needs, without having to commit all of our birds into
9  the program.  And so we had some small customers that may have
10  been asking -- I don't remember exactly who -- but -- but --
11  so this kind of took away our ability to do that.
12  Q.  So, in other words, before this motion passed, Michael
13  Foods had the option to purchase Certified eggs from another
14  producer, and either sell those Certified eggs to your own
15  customer or use them in your egg products, correct?
16  A.  Correct.
17  Q.  And this motion was designed to take away your ability to
18  do that, correct?
19  A.  Yes.  Effectively -- effectively that's what it did.
20  Q.  Now, there's reference here to what's called:  The
21  Difficulty in Preventing the Commingling of Certified Eggs and
22  Non-Certified Eggs, correct?
23  A.  Yes.
24  Q.  Was commingling -- this commingling of Certified and
25  non-certified eggs something that Michael Foods felt it could

46

1  prevent at its own facilities?
2  A.   Yes, I -- we were confident in our abilities and our
3  systems and our documentation that we could accomplish that
4  with -- with no issues.  It doesn't come without a cost, but
5  it is very possible to do.
6  Q.   And so Michael Foods was absorbing the costs of
7  preventing that commingling, correct?
8  A.   Yes.  Yes.
9  Q.   Now, do you see that there's a Motion Number 3, which
10 says:  It was moved by Oldenkamp and seconded by -- I
11 apologize -- by Clanton, that a license to market ACC eggs may
12 be issued to shell egg processors and further egg processors
13 who do not own or operate egg production facilities.  And this
14 motion carried with a vote 26 yes, and two no votes.
15        This was also a motion that Michael Foods voted
16 against?
17 A.   Yes.
18 Q.   And what was the reason that you voted against this
19 motion?
20 A.   What this motion was really about was that we had two
21 nationally known competitors in -- direct competitors in our
22 business in the retail markets and food service markets that
23 did not own birds themselves.  They relied on externally
24 sourced supply.  So this motion allowed them to do a marketing
25 license, but it didn't allow us to do the same marketing

47

1  license because we had -- we owned birds of our own.  So it
2  was really something that was going to be an issue for us that
3  we needed -- you know, we had to do something at some point.
4  Q.   So is it correct, a combination of these two motions
5  meant that because Michael Foods had layers producing shell
6  eggs, Michael Foods had to comply 100 percent with the 100%
7  rule, but other egg products producers who did not have their
8  own shell eggs, it was fine for them to purchase eggs and sell
9  Certified egg products?
10 A.   Yes.  Effectively, that's what this was doing, yes.
11 Q.   And, again, Michael Foods was opposed to that, correct?
12 A.   Yes.
13 Q.   Now, after these motions passed, is it correct that you
14 undertook the efforts you referred to previously to try to get
15 these rules changed?
16 A.   Yes.  Yes, we did.
17 Q.   And is it correct that you created some documents where
18 you shared with your colleagues at Michael Foods your views
19 about these motions?
20 A.   Yeah.  I needed to report back to our group, our internal
21 group, to know -- let them know what was going on and what was
22 happening with the program on the animal welfare front.
23 Q.   And do you recall what you told your colleagues at
24 Michael Foods about these motions that you had voted against?
25 A.   No, not verbatim.  I assume they're in here somewhere,

48

1  but I don't remember.
2  Q.   Well, let me ask you, do you generally recall?
3  A.   Yeah, yeah.
4  Q.   Okay.  What do you generally recall about what you told
5  your colleagues?
6  A.   Well, it put us at a real disadvantage, assuming if we
7  had the same -- if we were working with the same customer and
8  the customer was going to require UEP Certified eggs, we would
9  be precluded from doing that as this rule was at that moment
10 in time.  So...
11 Q.   And, again, that was because you were covered by the
12 motion that related to companies that had hens --
13 A.   Yes.
14 Q.   -- that laid eggs?
15 A.   That's true.  Yes, that's correct.
16 Q.   Now, do you recall that a point came where Michael Foods
17 with your involvement undertook officially at the United Egg
18 Producers to challenge the policy of who could market Animal
19 Care Certified eggs that was embodied in those two motions
20 that we just looked at?
21 A.   Yes, there was some meetings, committee meetings or
22 meeting that we participated in to try to make our case.
23 Q.   Let me hand you a document which has been marked for
24 identification as Plaintiffs' Exhibit 158.  Thank you.
25        And when you've had a chance to look at this

49

1  document, are you able to identify what it is?
2  A.   Yes.  This was a special meeting of the Animal Welfare
3  Committee in Chicago on April 19 of 2005.
4  Q.   Okay.  And I apologize if I didn't hear you.  Did you say
5  that these are the minutes of that meeting?
6  A.   I believe that's what this is, yes.
7  Q.   And are these the types of meeting minutes that in your
8  experience were regularly produced after these types of
9  meetings?
10 A.   I was not on that committee.  One of our other -- one of
11 my other staff people from Michael Foods participated in the
12 committee.  So I don't know if they always did minutes.  I
13 presume they did, but we didn't necessarily see those minutes
14 until this version.  So...
15 Q.   Okay.  Let me ask you if you can turn to the fourth page
16 of the document.  And do you see that there's a section there
17 beginning with the word Challenge?
18 A.   Yes, I do.
19 Q.   Does this refresh your recollection of whether this was a
20 meeting that you personally attended?
21 A.   Yes.
22 Q.   And do you recall going to a meeting in April of 2005 of
23 the Producer Committee for animal welfare that you attended
24 and along with Mr. Krouse of Midwest Poultry, reported that
25 you were representing several producers that were concerned

50

1  about these motions that had been adopted in January?
2  A.   Yeah, I think -- I'm trying to recall -- well, you know,
3  partially it was about the commingling issue, which we were
4  wanting to discuss with the committee.  And I think as it
5  correctly says, it says:  The challenges presented a number of
6  problems that were being created by the motion.
7        And we were there to offer an alternative motion.
8  Q.   Right.  And the motion that was the problem was the one
9  that we had talked about earlier, those two motions --
10  A.   Yes.
11  Q.   -- that you referenced?
12        MR. NEUWIRTH:  And, Your Honor, we would move the
13  admission of Plaintiffs' Exhibit 158.
14        MR. BIZAR:  No objection, Your Honor.
15        THE COURT:  158 will be admitted.
16        MR. NEUWIRTH:  Okay.
17  BY MR. NEUWIRTH:
18  Q.   And so, again, as I think you've said, these -- this is
19  a -- I guess it's a memo from Gene Gregory attaching the
20  minutes of the Producer Committee for animal welfare on
21  April 19th, 2005, and if we could turn to the fourth page of
22  that document, and do you see -- you were just referring to
23  that section which says:  Challenge of policy regarding who
24  may market Animal Care Certified eggs.
25        And do you see that it says Bob Krouse -- that's Bob

51

1  Krouse of Midwest Poultry, correct?
2  A.   Yes.
3  Q.   Bob Krouse was joined by Toby Catherman?
4  A.   Toby Catherman was an employee of Michael Foods and part
5  of my procurement team of Michael Foods.
6  Q.   Mr. Krouse was joined by Toby Catherman and Mr. Baker --
7  that's you, right?
8  A.   Yes.
9  Q.   -- and reported that they represented several producers
10  that were extremely concerned with the motion adopted in
11  January that stated the following.
12        And is it correct that this motion here is the same
13  motion that we talked about earlier, in order -- is that
14  correct, the motion from that January Board meeting?
15  A.   Yes.  The January meeting, right.
16  Q.   And is it correct that it says:  The challengers
17  presented a number of problems that were being created by this
18  motion and offered a new motion that would correct the January
19  motion?
20        And is that what you were referring to when you said
21  that you came to propose an alternative approach from the one
22  that had been adopted in that January motion?
23  A.   Yes, that's what we were doing and -- because the other
24  aspect we were trying to make the point about was in order to
25  further the animal -- the UEP Certified Program, the best

52

1  thing they could do was allow us and other egg products people
2  to market -- excuse me -- to market the program.  So these
3  other motions from January wouldn't allow us to do that.
4  That's when we were trying to convince them that we could
5  market more of their eggs under that program if they were
6  available to us, and that's what this motion was attempting to
7  do.
8  Q.   Right.  But as you said earlier, under those resolutions
9  that had been passed, companies that were just making egg
10  products didn't need to comply with the 100% rule, right?
11  A.   Yes, that's correct.
12  Q.   It was only a company like Michael Foods that had hens
13  laying eggs?
14  A.   Um-hum, um-hum.
15  Q.   Now, it says here that the challengers presented a number
16  of problems, and then it says in parenthesis:  The complete
17  details of their challenge is attached, are included as part
18  of the meeting minutes.
19        Do you see that?  In parenthesis, it's in that
20  paragraph?
21  A.   Oh, yes, okay.
22  Q.   And do you recall that there was a written statement
23  prepared by the group you were working with, that included you
24  and Mr. Krouse, that laid out the reasons for the type of
25  change you were suggesting that the UEP make to the 100% rule?

53

1  A.   Yes.  That's accurate.
2  Q.   Okay.  And if we look at the last -- the
3  third-from-the-last page of the document, do you see that
4  there is a handwritten note on the top which says:  Presented
5  by Bob Krouse, Toby Catherman, Terry Baker?
6        Do you see that?
7  A.   Yes, I do.
8  Q.   And do you see that under heading UEP Animal Welfare
9  Committee, Tuesday, April 19, 2005, it says:  Discussion of
10  alternative to Atlanta motions on ACC marketing by
11  non-certified producers and marketers.
12        Okay, do you see that?
13  A.   Yes, I do.
14  Q.   And do you recall having a role yourself in the creation
15  of this document?
16  A.   Yes, I did.
17  Q.   Okay.  Now, it then lists Motion 2 and Motion 3.  Those
18  are the two motions we looked at earlier from that January
19  Board meeting that Michael Foods had voted against, correct?
20  A.   Yes.
21  Q.   And were you the person from Michael Foods who would have
22  made those negative votes, correct?
23  A.   Yes.
24  Q.   Now, do you see that at the bottom of the page, it
25  said -- on this document that you helped create, it says:

54

```
 1   Problems created, unanswered by motions.
 2           Right, so these are the problems created by those
 3   two motions, right, that you had voted against?
 4   A.   Yes.
 5   Q.   And the first thing listed, problem Number 1, it says:
 6   Limits free trade of eggs.
 7           Do you see that?
 8   A.   Yes.
 9   Q.   And as one of the people who created this document, what
10   did you understand that phrase "limits free trade of eggs" to
11   mean?
12   A.   Well, almost all of these numbered items or bullet
13   points, whatever you want to call them, I guess they're
14   numbered items, these were all things that we had heard from
15   rumors from other producers, not necessarily our direct
16   thoughts, but we just tried to accumulate kind of a brainstorm
17   of what was out there and what people were saying.  And so
18   that was just kind of a random list of some of the thoughts
19   and comments being shared amongst the industry people.
20   Q.   And do you see that Item Number 4 under that list of
21   problems with those motions that you had voted against in this
22   document you helped to write, Number 4 says:  Raises the
23   question about the original purpose of ACC.
24           And ACC is the Certified Program, correct?
25   A.   Oh.
```

55

```
 1   Q.   Right, ACC is the Certified Program?
 2   A.   Yes.  Yes.
 3   Q.   And it says:  A husbandry practice program now managing
 4   the marketing and economic restriction of movement of product.
 5           Right?  This was another one of the problems that,
 6   at least you had heard about --
 7   A.   Yes.
 8   Q.   -- that you chose to include in this document, correct?
 9   A.   Yes.
10           THE COURT:  Mr. Neuwirth?
11           MR. NEUWIRTH:  Yes.
12           THE COURT:  I believe there's an interest in having
13   a break.
14           MR. NEUWIRTH:  Thank you, Your Honor.
15           THE COURT:  So we will break for, oh, five, six,
16   seven minutes.  Ladies and gentlemen, please don't talk about
17   the case, but come straight back and we will resume.
18           THE DEPUTY CLERK:  All rise.
19           (Jury out.)
20           THE COURT:  Okay, all of you can enjoy the moment of
21   the break.
22           MR. NEUWIRTH:  Thank you, Your Honor.
23           (After recess.)
24           (Witness resumes the stand.)
25           THE DEPUTY CLERK:  All rise.
```

56

```
 1           (Jury in.)
 2           THE COURT:  All right, everybody, you may take your
 3   seats.
 4           Mr. Neuwirth, you may resume.
 5           MR. NEUWIRTH:  Thank you, Your Honor.
 6   BY MR. NEUWIRTH:
 7   Q.   Mr. Baker, if we could pick up, again, Plaintiffs'
 8   Exhibit 158 that we were looking at before the break, the
 9   minutes of the April 19, 2005 meeting of the United Egg
10   Producers Producer Committee for Animal Welfare.
11           If we can go back to the third page of the minutes
12   where there was the section on the challenge of policy
13   regarding who may market Animal Care Certified eggs.
14           Do you see there -- I think you mentioned earlier
15   that you and your group, that it at least included Mr. Krouse
16   and Mr. Catherman, made a motion that would be an alternative
17   way to deal with the 100% rule, correct?
18   A.   Yes, I believe so.
19   Q.   And do you see there it says -- it says, "motion," and it
20   says:  It was moved by Krouse and seconded by Bebee.
21           Who is Bebee?
22   A.   What page?
23   Q.   I'm sorry.  It's the third page of the minutes.
24   A.   I'm sorry.  Okay.
25   Q.   And it's in that section on:  Challenge of policy
```

57

```
 1   regarding who may market Animal Care Certified eggs.
 2           And in the middle of that section, do you see it
 3   says, "motion," and it says:  It was moved by Krouse and
 4   seconded by Bebee.
 5           Who is Bebee?
 6   A.   Bebee was Tim Bebee, and he was our vice president for
 7   our farm production group for Michael Foods.
 8   Q.   Okay, so Mr. Krouse and Mr. Bebee, who's from Michael
 9   Foods, made a motion that was an alternative way to approach
10   the issues that had been addressed in those motions that
11   passed over your objection in January of that year, correct?
12   A.   Yes.
13   Q.   And it says at the end of that section, it says:  After
14   numerous questions were posed to the challengers, chairman
15   Oldenkamp announced that the committee would go into executive
16   session.
17           And since you were not a member of the committee,
18   that meant you were not present when the vote took place,
19   correct?
20   A.   Yes.
21   Q.   And then it says:  In the executive session, the motion,
22   again, revisited and voted upon, the motion presented by the
23   challengers was defeated by a count of eight to three,
24   correct?
25   A.   Yes.
```

58

1   Q.   And so this motion that Michael Foods and Mr. Krouse had
2   discussed and proposed at this meeting was voted down, and the
3   motions that had been adopted over your objection at the Board
4   of Directors meeting a few months earlier remained in effect,
5   correct?
6   A.   Yes.
7   Q.   Now, do you recall that after this happened, Michael
8   Foods continued to interact with the United Egg Producers to
9   see if something could be worked out on the 100% rule?
10  A.   Yes.
11  Q.   And do you recall that a point came where you were
12  involved in discussions with the United Egg Producers about
13  what was being referred to at the time as a transitional
14  agreement?
15  A.   Yeah.  That was probably in early 2006 or sometime spring
16  of 2006, probably, almost a year later after this meeting we
17  were just talking about, I think.  So...
18  Q.   Okay.  And was this transitional agreement meant to be a
19  way to ease Michael Foods into the Certified Program to
20  encourage Michael Foods to join?
21  A.   Well, it was a pathway for us to become an ACC or UEP
22  Certified company.
23  Q.   Okay.  And let me hand you what's been marked as
24  Plaintiffs' Exhibit 165 for identification.
25           And let me ask you, even before you look at the

59

1   document, do you recall that in late 2005, there was a meeting
2   in Minneapolis that you attended that involved certain
3   producers and certain officers and executives of the United
4   Egg Producers?
5   A.   Yes.
6   Q.   And are you able to identify what is the document that I
7   just handed to you?
8   A.   Um, it was a document from -- it says at the bottom:
9   Recorded by Gene Gregory.
10           So this was his version of notes, I guess, or
11  discussion points in that meeting.
12  Q.   Do you recall receiving this document roughly around the
13  time of the meeting in Minneapolis?
14  A.   I don't remember when I saw the document.
15  Q.   Okay.
16  A.   I know I saw it.  I don't know if it was before, after,
17  or during.  I just don't recall.
18  Q.   Did you understand these to be minutes of that meeting
19  you attended?
20  A.   Yeah.  No, I don't -- I just don't recall what this was
21  exactly.  I don't -- I don't know.
22  Q.   Does this refresh your recollection on the timing of when
23  there was a discussion of a trans -- a transitional agreement
24  for the marketing of UEP Certified eggs?
25  A.   Yes, I mean, I knew it was sometime in late 2005, in

60

1   December '05 in this case would be when -- I think that's what
2   I was trying to think of too.
3   Q.   Okay.  And was this transitional agreement that was being
4   discussed at this meeting in Minneapolis something that you,
5   in your capacity as representing Michael Foods at the meeting,
6   supported?
7   A.   Well, it certainly -- as I recall, it was something that
8   we would be interested in.  I don't remember all of the
9   details, but it was certainly movement by staff to make some
10  changes, but, again, it was just a staff suggestion, as I
11  recall, so...
12  Q.   And, in fact, this transitional agreement was never
13  adopted by the United Egg Producers, was it?
14  A.   I -- no.  I think it was -- yeah, no, it was never -- it
15  never came to light, let's say.
16  Q.   Okay.  Now, around this time, 2005, 2006, did Michael
17  Foods undertake to evaluate what would be the impact on the
18  portion of Michael Foods business that involved the production
19  of shell eggs?  Did Michael Foods undertake to understand what
20  would be the impact on that part of the business producing
21  shell eggs if Michael Foods were, in fact, to join the UEP
22  Certified Program?
23  A.   Yes, we did, because as part of our planning, our
24  long-term planning, that would involve -- again, assuming our
25  demand stays the same, we have to account for -- you know, if

61

1   we have less -- less production, then we were already looking
2   at what our options to make that up, who to resource it with
3   or do we build internally, whatever we do, something like
4   that, so...
5   Q.   Right.  And you were one of the people at Michael Foods
6   who undertook to make that evaluation, correct?
7   A.   Yes.  We did the evaluation and probably listed options.
8   Q.   Right.  And, in fact, you were involved in creating some
9   written materials setting forth what that analysis determined,
10  correct?
11  A.   Are you referring to numbers that laid out -- is that the
12  document?
13  Q.   Well, did you create a document?
14  A.   Yes, I'm sure that we did.  Yes.
15  Q.   And as one of the people involved, you would have had a
16  role in creating that document?
17  A.   Yes.
18  Q.   Let me give you what's been marked for identification as
19  Plaintiffs' Exhibit 155.
20           And let me ask you first if you are familiar with
21  this document?
22  A.   Yes, I am.
23  Q.   And is it correct that this is an e-mail chain that
24  attaches the analysis that you were referring to a few minutes
25  ago evaluating what would be the impact on Michael Foods, the

62

```
1   part of Michael Foods that was involved with shell egg
2   production if Michael Foods were to join the Certified
3   Program?
4   A.   Yes, this was an attachment to the cover e-mail.
5   Q.   And I think you said earlier that you were personally
6   involved in the creation of materials that laid out this
7   analysis, correct?
8   A.   Yes.
9   Q.   And then there on the cover, you have e-mails, correct,
10  in which you expressly say that you're attaching a file that
11  you and Tim put together to project the impact of implementing
12  the UEP ACC program for Michael Foods, correct?
13  A.   Yes.
14  Q.   And this was on March 20th, 2005?
15  A.   Yes.
16  Q.   And this is -- these are -- you sent these e-mails and
17  created the attachments in the ordinary course of business,
18  correct?
19  A.   Yes.
20  Q.   And the Tim -- it says:  Tim and I put this together.
21  Who is that Tim?
22  A.   Again, that's Tim Bebee, who was our VP of farm
23  production for Michael Foods.
24  Q.   And he was the one who had gone with you to that meeting
25  we just looked at a few minutes ago, where Michael Foods had
```

63

```
1   presented an alternative approach to the 100% rule, correct?
2   Or to the motions on the 100% rule?
3   A.   Yeah, the motion on the marketing.
4   Q.   Yes.
5   A.   It was more the marketing committee, I think, is what --
6   I mean, they were both involved, but they were two really
7   separate issues kind of.
8   Q.   Yes.
9        MR. NEUWIRTH:  Your Honor, we would move for the
10  admission of Plaintiffs' Exhibit 155.
11       MR. KING:  Objection.  Hearsay and relevance.
12       THE COURT:  Well, there's -- portions of it is
13  hearsay but not all of it.
14       MR. KING:  Well, we will submit that all --
15  certainly the middle e-mail is hearsay, and the fact that the
16  witness is on the stand does not make it not hearsay.  It's
17  still an out-of-court statement.
18       THE COURT:  Do you wish to propose a modification of
19  the exhibit?
20       MR. NEUWIRTH:  Certainly.  We would -- we would
21  simply move the admission of the e-mail we referred to a few
22  minutes ago, where Mr. Baker transmits to his colleagues the
23  attachment that he says he put together and the attachment and
24  we would --
25       THE COURT:  That's the bottom portion?
```

64

```
1        MR. NEUWIRTH:  Yes.  And we would be prepared not to
2   publish the two e-mails above that and to redact them from the
3   version that will end up being used in court.
4        THE COURT:  Everybody understand that?
5        MR. KING:  I still object based on hearsay.
6        THE COURT:  Okay, well, I'm going to overrule the
7   objection, allow the document as edited that Mr. Neuwirth just
8   explained.
9        MR. NEUWIRTH:  Thank you.
10       And just to ensure that there is -- that there's no
11  issue, let me just ask that when we put up the document, that
12  we only actually put up the attachment.
13  BY MR. NEUWIRTH:
14  Q.   But just to be clear now that this has been admitted
15  before we put anything up, this is an e-mail that you,
16  Mr. Baker, sent on March 20th, 2005, correct?  And it says
17  that the recipients are Gregg Ostrander and JD Clarkson.
18       Who was Gregg Ostrander?
19  A.   Gregg Ostrander was the CEO for Michael Foods, and at the
20  time JD Clarkson was the president of the egg company or egg
21  division.
22  Q.   Okay.  And I think you mentioned earlier that it says
23  that as per Gregg's request, that would be the request of the
24  CEO of Michael Foods, the chief executive officer?
25  A.   Yes.
```

65

```
1   Q.   You were attaching a file that you and Mr. Bebee put
2   together to project the impact of implementing the UEP Animal
3   Care Certified Program for Michael Foods, correct?
4   A.   Yes.
5   Q.   Okay.  So if we can look at the attachment, if we can
6   look at the second page of the attachment, do you see that
7   there are a series of numbers and you have three columns?  One
8   is Layer Capacity, one is Dozens, and one is Liquid Equivalent
9   Pounds.
10       Do you see that, those three headings on that chart?
11  A.   Yes.  Yes.
12  Q.   And is it correct that layer capacity is the number of
13  laying hens that Michael Foods would have in its facilities?
14  A.   This included -- yes, our facilities, that's true, and it
15  also included some outside external facilities, but --
16  Q.   But they were outside external facilities that Michael
17  Foods considered --
18  A.   Yes.
19  Q.   -- under its purview, correct?
20  A.   Yes.
21  Q.   And just to be clear, layer capacity refers to the number
22  of hens laying eggs, correct?
23  A.   Yes.  Well, and let's be clear, the very top section,
24  when it gets to in the third column where it says Liquid
25  Equivalent Pounds, that first subtotal is a billion three
```

66

1  ninety.  That was all of our supply chain.  It wasn't just
2  internal or birds -- I mean, our own layers.  It was our
3  contracted layers, also.
4  Q.   Right.
5  A.   Okay.
6  Q.   So just focusing on the first column, that column is
7  talking about, as you said, the number of layers that Michael
8  Foods had either in its own facilities or within the purview
9  of its business, correct?
10 A.   Yes.  Yes.
11 Q.   And if we go to the bottom of that column, do you see it
12 says:  Total reduction in production fully phased?
13       Do you see that?
14 A.   Yes.
15 Q.   And so that was referring to once the -- once Michael
16 Foods had fully phased in to the Certified Program, what would
17 be the total reduction that would occur, correct?
18 A.   Yes, I believe so.  That's -- if we converted everything
19 that was not already UEP Certified, that's what the difference
20 on a conservative basis, I would have to admit, but that's
21 what that was representing.
22 Q.   Right.  And so then in the first column under Layer
23 Capacity, the number you have there is 14,861,904, correct?
24 A.   Yes.
25 Q.   And so this chart, this analysis you prepared, was

67

1  showing that if Michael Foods was fully phased in under the
2  Certified Program, its layer capacity, the number of hens in
3  its facilities or facilities within the Michael Foods' purview
4  would be reduced by 14,861,904.  That's what you were
5  projecting in this analysis, correct?
6  A.   Yes.  That would have been the fully phased over the
7  course of at least two to maybe even three-plus years.
8  Q.   Right.  And, in fact, right above this you say that the
9  full phase-in -- that you were talking about was April 1st,
10 2008, correct?
11 A.   Yes.  And this allowed us -- this was telling us, for my
12 group or whatever our recommendation was between Tim Bebee and
13 myself, what we either had to construct internally or look to
14 the outside to replace.  Because our -- you know, we had no
15 intentions that our demand was going to shrink, so we had to
16 cover that one way or -- you know, in one form or another,
17 so...
18 Q.   So just to be clear, putting aside what Michael Foods
19 would do about it, your analysis was basically saying if this
20 were fully phased in, the number of layers at Michael Foods'
21 facilities and the facilities within the business's purview
22 would be reduced by 14 -- more than 14.8 million, correct?
23       MR. CALLOW:  Objection.  Leading.  And wasn't his
24 testimony.
25       THE COURT:  Ask a nonleading question.

68

1  BY MR. NEUWIRTH:
2  Q.   You've testified, haven't you, that the column here says
3  Layer Capacity is the number of hens, correct?
4  A.   Correct.
5  Q.   And so putting aside what Michael Foods would choose to
6  do, what is the number of hens that your analysis shows would
7  be reduced if Michael Foods were to fully phase in the
8  Certified Program?
9        MR. CALLOW:  Objection.  Asked and answered.
10       THE COURT:  Overruled.
11 BY MR. NEUWIRTH:
12 Q.   What's the number of hens listed there?
13 A.   14 million.  And this was just strictly the result of the
14 change in density.  That's what that really resulted in.
15 Q.   Right.
16 A.   It was 14 million 861 or 862.
17 Q.   Now, if you look at the next page of the document,
18 there's a section which says:  Additional Notes and Comments.
19       Do you see that?
20 A.   Yes.
21 Q.   And if you look at Item Number 6, do you see that it
22 says:  If we were to pursue implementation of the UEP ACC
23 program, we would have to meet the current requirements for
24 cage space listed above of 61 square inches as of April 1st,
25 2005?

69

1        Do you see that?
2  A.   Yes.
3  Q.   And so although there was a longer period of phase-in,
4  this is saying what you'd have to do right away at this point
5  if you were to join the program, correct?
6  A.   Well, we would have to do it on a phase-in basis.  So
7  depending on the flock rotation schedule, because we didn't --
8  we didn't take birds out and euthanize birds to get to these
9  targets.  It was done as those birds reached the end of their
10 useful life on a rotational basis.  So that was why it was
11 over probably about a two-year window you had to get to that
12 61, I think.  At least 18 months or two years.  I don't
13 remember what the rotation was.
14 Q.   Well, you wrote this document.  This document was
15 transmitted on March 20, 2005, right?
16 A.   Right.
17 Q.   And you just wrote here in this note that you would have
18 to meet the current requirements for cage space of 61 square
19 inches as of April 1st, 2005, the very next month?
20 A.   Well, that was the start.  So any birds rotating after
21 April 1st would have to be at 61.
22 Q.   Right.  And that would be the very first phase of this
23 longer term phase-in, correct?
24 A.   Oh, yes.  Yes.
25 Q.   And you then write:  The short-term impact of

70

```
 1   implementing the program for our internal production would
 2   result in reduced capacity of 3.3 million layers in order to
 3   meet the 61 square inch requirement.
 4           It says that, right?
 5   A.   Yes.
 6   Q.   And so this was talking about what would be the impact of
 7   the very first phase of this longer term phased in process,
 8   correct?
 9   A.   Well, that's what we were attempting to demonstrate, yes.
10   Q.   Right.  And so there you were saying that in that first
11   phase, it would result in a reduced capacity of 3.3 million
12   layers, right?
13   A.   Yes.  But, again, it's phased in over a year-and-a-half
14   or two years.  So it doesn't happen in one day.
15   Q.   Right.
16   A.   Right.
17   Q.   You're not disagreeing that you wrote --
18   A.   No.
19   Q.   -- the --
20           THE COURT:  One at a time, gentlemen, please.
21           THE WITNESS:  Yeah.  I just want to make sure we're
22   clear.  We're not saying that we lost 3 million birds in one
23   day.  We lost them -- it would have been a reduction over a
24   period, so...
25   BY MR. NEUWIRTH:
```

71

```
 1   Q.   Right.  But that is just for the first phase of the
 2   phase-in.
 3   A.   Yes.
 4   Q.   Correct?
 5   A.   Yes, that's correct.
 6   Q.   Now, I believe that you said a few minutes ago that --
 7   that Michael Foods was going to continue to have demand even
 8   though if it joined the program, it might reduce the number of
 9   hens in its own facilities, correct?
10   A.   Yes.
11   Q.   And I think you said that because of that demand, Michael
12   Foods would have to determine whether to build additional
13   facilities to have additional hens to make up that lost supply
14   of eggs or to purchase the eggs from some other source,
15   correct?
16   A.   Yes.
17   Q.   And, in fact, Michael Foods did not add any new capacity
18   after joining the program, but instead chose to make up the
19   lost eggs from its own production by purchasing eggs from
20   other sources, correct?
21           And I'm talking now about this period after Michael
22   Foods joined the program.
23   A.   Um, not -- no.  I think -- in the affidavit that we
24   filed, I think dated April of '15, we laid that out.  Now, we
25   did add maybe 480,000 or 500,000 birds starting in '05, '06,
```

72

```
 1   and then we started outsourcing other birds.  So we did some
 2   replacement internally at that point.  It wasn't all outside,
 3   but, yes, we did go -- we did some of both.
 4   Q.   So your position today is that you had projected that
 5   there would be a reduction in the first phase of about
 6   3.3 million hens, that over the phase-in there would be a
 7   reduction of about 14.8 million hens, and what you did was add
 8   about 500,000?
 9   A.   Right.
10   Q.   And the rest you sourced from others.
11   A.   Yeah, I think that's what the -- the affidavit, I think
12   that's what that would suggest, is that in total we added 50-
13   or 60 million pounds from the end of '05 to the end of -- or I
14   think the end of '04 to the end of '06.
15   Q.   Right.  But that was just a tiny percentage of the
16   overall reduction, correct?
17   A.   Well, I think, again, if I had the numbers in front of
18   me, I think -- when we did this -- the exhibit back here that
19   we were just discussing, that was a really conservative
20   estimate.  And so because of some of the technicalities and
21   the implementation on our internal supply, we didn't -- it
22   didn't reduce our layer population by as much as we thought.
23   You know, we were talking 3 million birds at that point, three
24   point -- in that one paragraph, which would be like 75 to
25   80 million pounds of liquid equivalent egg, estimate in our --
```

73

```
 1   the rule of thumb.
 2           When -- and I think we actually replaced about 50 --
 3   you know, we brought back a total of 55 million to remain
 4   whole, because we didn't end up taking -- it didn't take as
 5   many birds to meet the guidelines because of some
 6   technicalities on age of facilities and a few other things.
 7           So that was an extremely conservative worse case
 8   kind of scenario that we laid out in this document.  And at
 9   the time we always tried to give worst-case scenario, I guess.
10   Q.   Do you disagree that any new layers that Michael Foods
11   added, several hundred thousand you mentioned, do you disagree
12   that that was far less than whatever turned out to be the
13   reduction in the number of layers at Michael Foods because of
14   the program?  Do you genuinely dispute that?
15   A.   It was -- no, it was the smaller piece.  It was probably
16   about -- we were probably maybe 25 to 35 percent internally,
17   and the balance was external.
18   Q.   So -- and when did you say you submitted -- you prepared
19   this affidavit?
20   A.   It was in -- it was in 2015.
21   Q.   And you recall that your deposition was in 2013, correct?
22   A.   Yes.
23   Q.   And do you recall acknowledging at your deposition that
24   Michael Foods, after joining the Certified Program, did not
25   build any new facilities?
```

74

1    A.    That was my recollection at that point.  As we reviewed
2    it again later on, there was some new construction and updates
3    that did increase our internal capacity.  So I was in error
4    when I made that comment or made the statement in the
5    deposition in '13.
6              Again, it was -- based on memory, that's what I
7    thought, but it was not quite the case.
8    Q.    Right.  And so taking what you're saying to be the case,
9    that your recollection got better with time --
10   A.    Got better.
11             MR. CALLOW:  Objection.
12             MR. NEUWIRTH:  I didn't --
13             THE WITNESS:  As a matter of fact --
14             THE COURT:  Start again.
15             MR. NEUWIRTH:  Yes.
16   BY MR. NEUWIRTH:
17   Q.    Accepting your premise --
18             THE COURT:  Accepting.
19             MR. NEUWIRTH:  Accepting.
20   BY MR. NEUWIRTH:
21   Q.    Accepting your premise that your recollection got better
22   with time, because I think you said you reviewed some
23   additional materials you had not reviewed at the time of your
24   deposition, your best recollection that you gave today was
25   that something in the range of 25 percent of the reduction in

75

1    hens, laying hens, at Michael Foods as a result of joining the
2    Certified Program was addressed with some sort of new
3    facilities --
4    A.    Yes.
5    Q.    -- and the remainder you obtained by purchasing eggs from
6    other producers, correct?
7    A.    Yes.  And I think that's -- that's why we submitted the
8    affidavit to try to clarify some of the information that we
9    were earlier quoting from memory from ten years prior.  So...
10   Q.    Okay.  Now, Michael Foods did join the program in 2006,
11   correct?
12   A.    Yes.
13   Q.    The Certified Program?
14   A.    Yes.
15   Q.    And it's correct, isn't it, that Michael Foods made some
16   arrangements with the United Egg Producers to address Michael
17   Foods' phase-in into the program, correct?
18   A.    Yes.
19   Q.    And Michael Foods determined that -- that those -- that
20   those steps were -- that those steps were acceptable to it to
21   have it make sense to join the program, correct?
22   A.    Yeah.  Through some negotiation with staff, UEP staff, we
23   finally got to a conclusion that, yes, we would agree to go
24   down that road and join the program.
25   Q.    And the program that you joined was a program that had

76

1    the 100% rule with the provisions that you had voted against,
2    but Michael Foods was given some period of time to phase-in
3    that was a little longer than the normal phase-in for other
4    companies, correct?
5    A.    No.  Actually, we didn't.  That was -- we -- we had
6    proposed like a four-year phase-in to give us some more
7    opportunity to kind of ease into it and smooth out the
8    transition.  That was rejected, I think, by -- by UEP, and so
9    we actually had to meet the phase-in schedule that was listed
10   in the exhibit.  I think it was listed in the back of this
11   exhibit that you just used.
12             So the final agreement was that we had to meet
13   whatever the dates were on this particular -- and that was the
14   UEP Certified original phase in schedule.  We just didn't
15   have -- we had to jump from 48 or 50 to, say, 61 inches, where
16   had we been in a program at the outset or at the beginning of
17   the program in 2002, or '3, we would have done it in five
18   steps.  We had to pass the first three hurdles to get caught
19   up, and that was the agreement and that's what we -- that's
20   what we ultimately agreed to.
21   Q.    Okay.  And do you recall -- do you recall what your role
22   was in the decision of Michael Foods to ultimately join the
23   Certified Program?
24   A.    Only a recommendation to senior management.
25   Q.    And what was your recommendation?

77

1    A.    I believe the recommendation was that based on the
2    customer demands, we were starting to see that we needed to
3    get into the program or begin the program, or else we had to
4    go look for an alternative which we had investigated earlier.
5    Q.    And what alternate was that?
6    A.    It was -- it was a program that we had looked at that was
7    similar to UEP, but it would have been administered by a
8    different organization, obviously, and so we did look into
9    that before we joined.
10   Q.    And so in 2006, after the discussion you had had with
11   Mr. Gregory that we spoke about earlier --
12   A.    Um-hum.
13   Q.    -- Michael Foods decided to join the program, correct?
14   A.    Yes.  And the other part of that driver was there were a
15   couple key customers who not only wanted the animal welfare
16   but they -- the logo, the UEP Certified logo was part of a
17   marketing program and we had a fairly significant customer
18   requesting that logo.  So that kind of ruled out doing an
19   alternate program.  And then the benefit of the marketing logo
20   would not be there.  So it kind of became a question of not a
21   lot of options left.
22             And so there was beginning -- like I mentioned
23   earlier, that demand was starting to build, start to go grow,
24   and so when forced to either give up the customer or go to the
25   program, that's when we made the decision that Gregg Ostrander

78

1  made the decision to move forward with the program.
2  Q.   Okay.  And, again, this all took place shortly after that
3  meeting with Mr. Gregory that we had looked at previously,
4  correct?
5  A.   Yes, yes.  I believe he came to Minneapolis and we had
6  that sit-down, and then in June of '06 is when we officially
7  filled out the forms and applied to be part of the program.
8  Q.   Okay.  And Michael Foods then stayed in the program going
9  forward, correct?
10 A.   Yes.  And we're still in the program today.
11       MR. NEUWIRTH:  We're ready to pass the witness,
12 Your Honor.
13       THE COURT:  Very well, cross-examination may start.
14            CROSS-EXAMINATION
15 BY MR. CALLOW:
16 Q.   Good morning, sir.  My name's Joe Callow.  I'm one of the
17 attorneys representing Ohio Fresh Eggs in this case.
18       We haven't met before either, have we?
19 A.   No, I don't think so.
20 Q.   So I didn't meet with you to prepare for your testimony
21 here today or discuss what you were going to testify about?
22 A.   No.
23 Q.   You mentioned at the beginning that Michael Foods deals
24 with liquid eggs.
25       Can you explain to the jury what that is?

79

1  A.   Um, the bulk of our production and our marketing program
2  is related on -- we're a food service producer or marketer
3  first and foremost.  That's the largest segment of our volume
4  and our business, and what that means is many, many
5  restaurants that you go to probably on a regular basis, other
6  than for sunny-side up or if you order breakfast, if you're
7  getting a liquid, anything like in scrambled eggs or anything
8  with egg products, you're probably -- it's pasteurized liquid
9  whole egg or whole egg blend maybe that has some other --
10 like, it could have milk, it could have other things in it,
11 but it's a refrigerated product, a fresh egg that has a shelf
12 life, and that's what we're referring to when we talk about
13 egg products.
14       Now, we also do frozen products, dried egg products,
15 and those could be whole egg solids or they could be separated
16 products where we have some people, like cake mix people or
17 whatever, that want dried albumen or frozen albumen for
18 certain recipes or products they make, or it could be yolk
19 products that go into dressings, and the big issue is probably
20 mayonnaise has a fair amount of yolk in it.
21       So that's the business we're in.  We also do hard
22 cooked, which requires shell eggs and pasteurized shell eggs
23 today, too, or pasteurized in the shell, but the liquid egg
24 product is probably our largest category.
25 Q.   So you're describing different products of a shell egg?

80

1  A.   Yes.
2  Q.   You start with a shell egg?
3  A.   Start with the shell, yeah.
4  Q.   It all starts with the egg?
5  A.   Yes.
6  Q.   But then you do different processing to it?
7  A.   Yes.
8  Q.   For different customers for different reasons?
9  A.   Yes.
10 Q.   I want to go back and talk about construction of your
11 affidavits.
12 A.   Okay.
13 Q.   Mr. Neuwirth asked you about a projection, if you only
14 looked at reduction of the flock size without looking at
15 construction, building or the purchasing.  Do you recall that?
16 A.   Yes.
17 Q.   What is IPRO?
18 A.   IPRO was a proposed project that we were -- had actually
19 signed a contract and a commitment to build a greenfield
20 project in the state of Ohio to service our East region.  We
21 have two -- we kind of have an East Coast processing
22 facilities, and then we have the Midwest.  And so IPRO was
23 originally conceived to really be that supply link to cover
24 our East Coast operations in Ohio.  So we had a signed
25 contract.  I can't recall if it was -- most of those kind of

81

1  supply contracts lasted 7 to 10 years once completed.
2  Q.   In May of 2005, did you make a recommendation to increase
3  the capabilities of IPRO farm?
4  A.   Well, yes, yes.
5  Q.   Explain how you did that.
6  A.   It was for 4 million layers, was the estimate or the
7  configuration that we agreed to in '05, I think.
8  Q.   And the reason for the increase was to take into account
9  the possible reduction in flock if Michael Foods joined the
10 Certified Program?
11 A.   Yes.  We had two things going.  We were either growing
12 volume and/or we were anticipating that at some point we would
13 be participating in some form of an animal welfare program which
14 would reduce some of our existing capabilities.  So we had
15 intended -- and then that was a lot of the IPRO, or any of our
16 other sourcing was always targeted to where are we in '07, '8,
17 '9, '10, so to speak.
18 Q.   And specifically, your recommendation to Mr. Ostrander to
19 increase the production capability at IPRO was designed in
20 part to offset any decrease in flock size in existing marts if
21 you joined the animal welfare program?
22 A.   Yes, that's correct.
23 Q.   What is Rembrandt?
24 A.   Rembrandt was another greenfield project that we did.  It
25 started in -- actually started in Missouri with a facility

82

1   that was built.  It was another greenfield project, and then
2   we did a second site with them in northwest Iowa.  That
3   ultimately was like 4 million-plus layers.
4   Q.   Between 2004 and 2008, did Michael Foods increase its
5   purchasing capabilities from Rembrandt?
6   A.   I think in my -- again, without -- my memory, I believe
7   we did.  I don't know -- I'd have to look in the affidavit or
8   look in our records, but I think Rembrandt was building and
9   growing in that period, yes.
10  Q.   What is Center Fresh Egg Farm?
11  A.   Um, that was another -- it originally was another one of
12  our long-term contractors in northwest Iowa.  They originally
13  had layers to the tune of about 600,000.  They came to us with
14  a proposal -- when we were looking for proposals for more
15  growth, they came to us with a proposal, and they had
16  permitting on the existing site to build -- to put up another
17  3.5 or something like that.  Three and a half million layers
18  is what they were permitted for.  So we did that contract
19  also.
20  Q.   And what was Michael Foods role in helping Center Fresh
21  make this adjustment and increase in productivity?
22  A.   We always had to support them for financing purposes
23  with, say, Farm Credit or somebody, whoever their lenders
24  were.  The only way they could be able to finance those kinds
25  of large projects was they needed to have had a long-term

83

1   marketing contract guaranteeing that they had a place for the
2   product to go.  So we underwrote several of these kinds of
3   projects in that period.
4   Q.   So Michael Foods was the underwriter for the financial
5   ability of Center Fresh to expand?
6   A.   Yes.
7   Q.   And from 2004 to 2007, Michael Foods actually allowed for
8   over 3.5 million layers to increase at that farm, correct?
9   A.   Yes.  Yes.
10  Q.   What is Fremont Farms of Iowa?
11  A.   Fremont Farms was another -- they were probably one of
12  the first greenfield projects we did in central Iowa.  We
13  originally did -- I think it was around 3.5 million, and then
14  it ultimately grew to 6 million on a secondary contract, an
15  extension of the initial, and that started -- I think that
16  even started in the late '90s, early 2000s but continued to
17  expand into the early 2000s, somewhere in there.
18  Q.   In 2003, did Michael Foods help Fremont Farms expand?
19  A.   The same process, again, with another long-term extension
20  of probably a 10-year contract or 7- to 10-year contract
21  usually.
22  Q.   Another 18 to 20,000 layers were placed at Fremont Farm
23  after 2003 following Michael Foods commitment, correct?
24  A.   Yes.
25  Q.   What is Golden Oval Eggs?

84

1   A.   Golden Oval was an existing project that had -- I don't
2   remember how many layers they had, but we did negotiate with
3   them and then completed an agreement for them to expand an
4   existing site, to add new construction to add another -- I
5   think it was probably about 2 million birds onto their farm.
6   They had permit capabilities.  So they did ultimately
7   construct and added another -- I think it was at least
8   2 million.
9   Q.   Do you recall that agreement was around the summer of
10  2004?
11  A.   Yes, I believe it was.
12  Q.   And Michael Foods helped underwrite the construction as
13  well?
14  A.   Yes.
15  Q.   And 2 million additional layers dedicated to Michael
16  Foods were added after 2004?
17  A.   I think that was the case.
18  Q.   In addition to this construction, in addition to these
19  contracts, did Michael Foods also increase its purchase of
20  eggs from existing suppliers?
21  A.   Yes, we did.  Because some of these suppliers did -- some
22  of them were sold suppliers to us or we were their only
23  customer.  Some of them had other customers or other egg
24  supply.  So in many cases we were buying spot purchases from
25  some of those same people as well.

85

1   Q.   So you also increased the purchases from existing
2   suppliers in the 2004 to 2008 time frame?
3   A.   Yes.  Yes.
4   Q.   So from 2004 to 2008, you're constructing your own
5   facilities, you are increasing your purchases from existing
6   facilities, and you are funding expansion on multiple
7   different sites to accommodate potential decreases in flock,
8   correct?
9   A.   Well, that was part of it, yes.  Yes.
10  Q.   And that was in part because your demand was expected to
11  be the same but you needed other sources in which to fulfill
12  that demand?
13  A.   Yes.
14       MR. CALLOW:  Should I keep going, Your Honor, or do
15  you want to take a break?
16       THE COURT:  You're asking me?
17       MR. CALLOW:  I'm asking you, yes, Your Honor.
18       THE COURT:  No.  We can go for a few more minutes.
19       MR. CALLOW:  Thank you.
20  BY MR. CALLOW:
21  Q.   Mr. Baker, you talked a little bit about the 100% rule
22  and the issues with respect to whether Michael Foods could be
23  100 percent compliant.
24       I believe the question was mostly in the 2004 to
25  2005 time frame, correct?

86

1   A.   Yes, I think that's when that was becoming an issue for
2   us.
3   Q.   At some point in 2006, you talked to the people at
4   Michael Foods about the 100% rule based upon some information
5   that you received from Dr. Jeff Armstrong.  Do you recall
6   that?
7   A.   Yes, we did.
8   Q.   Who is Dr. Jeff Armstrong?
9   A.   Dr. Jeff Armstrong was the Dean of, I think the Ag
10  College at Michigan State and he was a volunteer for the
11  UEP's Scientific -- Animal Welfare Scientific Advisory
12  Committee.  And so that committee was made up of -- of many
13  Ph.Ds and people from academia from schools, universities, and
14  colleges all over the US that actually provided scientific
15  advice to UEP on how to set the guidelines.
16       And so Dr. Armstrong was a very persuasive guy.
17  He -- so he had wrote some -- some different papers here and
18  there and spoke oftentimes.  But was very passionate about if
19  you're really going to do animal welfare you have to do
20  100 percent, you can't not do it all.
21       So he was very persuasive and probably he was maybe
22  one of the people that probably convinced people to do --
23  maybe that's where the 100% rule really stemmed from because
24  he was a very -- a very genuine and very persuasive guy.
25  There's no doubt about it.

87

1        MR. CALLOW:  May I approach the witness, Your Honor?
2        THE COURT:  Yes.
3   BY MR. CALLOW:
4   Q.   Sir, I've handed you a document that we have marked for
5   identification purposes as Defendants' Cross-Examination
6   Exhibit 219.  Are you familiar with that document?
7   A.   Yes, I wrote it, I guess, I --
8   Q.   You prepared it?
9   A.   I prepared it.
10  Q.   What is it?
11  A.   It was an update, an internal document from Michael
12  Foods, and I was trying to update most of our senior staff at
13  exactly where were we at on January 22nd.  I think that was
14  following the UEP meeting from January 19th of 2006.  And we
15  had had a Board meeting, I think -- yeah, probably in Atlanta.
16  Usually our January meeting was in Atlanta.  And so this was
17  just a lot of discussion and trying to update all of our
18  people internally, our corporate staff.
19  Q.   And this is a document that you prepared?
20  A.   Yes.
21  Q.   And you prepared it after reading the attachment that was
22  provided by Mr. -- Dr. Armstrong, correct?
23  A.   Yes, it is.
24        MR. CALLOW:  Your Honor, I'd move into admission
25  exhibit -- Cross-Examination Exhibit 219.

88

1        THE COURT:  Is there any objection?
2        MR. NEUWIRTH:  I'm just looking at the whole
3   document, Your Honor.
4        To the extent that there is an attachment, which, at
5   this point, is hearsay, we would want a limiting instruction
6   that the document is not being offered for the truth of the
7   matter asserted.
8        THE COURT:  Well, I've not yet perceived what the
9   document is being offered for.
10       MR. CALLOW:  It's being offered for his status
11  report up to management at Michael Foods regarding his
12  discussions and review of Dr. Armstrong's reports and
13  information.
14       THE COURT:  All right.  For that limited purpose,
15  Exhibit CX-219 will be admitted.
16       MR. CALLOW:  May I show it to the jury, Your Honor?
17       THE COURT:  Which part?
18       MR. CALLOW:  His e-mail first.
19       THE COURT:  Yes.
20       MR. CALLOW:  And then after the e-mail, I'd like to
21  ask permission to show the --
22       THE COURT:  Okay.  Go ahead.
23  BY MR. CALLOW:
24  Q.   Mr. Baker, do you have the document handy?
25  A.   Yes, I do.

89

1   Q.   And, again, this is a document that you prepared and sent
2   to senior management at Michael Foods?
3   A.   Yes.
4   Q.   Can you identify the recipients that are listed in the
5   top of Exhibit 219?
6   A.   It was to JD Clarkson, who was our president of our
7   division; Gregg Ostrander our CEO; Vince O'Brien, who was
8   our -- one of our general managers for our food ingredient
9   segment, which at that point in time we had three segments.
10  We were food service, food ingredient and retail.
11       Diane Sparish was our retail general manager.  And
12  Michael Elliott was our food service general manager.  And
13  then the copies of -- the cc's below were to my guy, Toby
14  Catherman, who was part of my team, and then some of our farm
15  people and a couple other staff people from our corporate
16  office.
17  Q.   Thank you.
18       I'd like to direct your attention to the first
19  paragraph, sir.
20       FYI, the attached document is primarily from
21  Dr. Jeff Armstrong, the Chairman of the UEP Scientific
22  Advisory Committee.  Based on many comments he has made at UEP
23  meetings and this document, I think that a great deal of the
24  push for the 100% rule stems from him and the Scientific
25  Advisory Committee.

90

```
 1            Did I read that correctly?
 2  A.   Yes.
 3  Q.   And is that what you wrote to your senior management?
 4  A.   Yes.
 5  Q.   What was that based upon, sir?
 6  A.   Well, it was based on this document.  And then I had also
 7  had some conversation with him, and -- personally, and so as I
 8  stated here, I mean, I think this explains a lot of -- where a
 9  lot of the membership was involved with the 100% rule.  We
10  didn't agree with it because it didn't fit initially because
11  it doesn't work for our model and our business to try to meet
12  our customer demand.  But nonetheless, we just disagreed with
13  the rule because it maybe didn't fit our model.  But it wasn't
14  that it wasn't right -- maybe the right thing to do as he
15  clearly -- if you read his document, you'll see that, so...
16  Q.   Let me refer you to that.
17            MR. CALLOW:  Your Honor, if I may?
18            THE COURT:  Yes.
19  BY MR. CALLOW:
20  Q.   Sir, the second page of the attachment, the first full
21  paragraph, I believe, is what you were referring to; is that
22  correct?
23  A.   I believe so, yes.
24  Q.   It is not the intent of the Scientific Committee to try
25  to tell UEP how to run its business or even its UEP Certified
```

91

```
 1  Program; however, our intent is to stress the importance of
 2  science-based guidelines.
 3            With this in mind, the intent of this communication
 4  is to place our advice in a clear context.  The science-based
 5  guidelines that we produced and you accepted should be viewed
 6  as minimums.  It is essential that egg production in cages
 7  follow science-based guidelines.  It is critical that all hens
 8  should be managed using science-based guidelines.  Simply
 9  stated, failure to adhere to these minimum guidelines is not
10  consistent with humane treatment of laying hens.
11            Did I read that correctly?
12  A.   Yes.
13  Q.   And is that, in part, what convinced you that the 100%
14  rule was science based?
15  A.   Yes.  Partially, yeah.  For the most part, I would say
16  that's true.  Earlier we had maybe had some other science that
17  said, maybe, maybe not.  But he was pretty convincing that
18  that was -- should be part of the guidelines.  So...
19  Q.   Okay.  There's a paragraph near the bottom as well.
20  Talking about "minimum level of welfare."  Do you see that,
21  sir?  It's the one, two, three -- fourth full paragraph.
22  A.   Oh, yes.
23  Q.   We are aware of the discussions that are ongoing within
24  UEP and believe you are at a critical point.  We understand
25  that some believe that the UEP Certified Program should be
```

92

```
 1  limited to a few of your members.  Our point is simple.  We
 2  have provided science-based guidelines that we believe ensure
 3  a minimum level of welfare for hens producing eggs in any
 4  manner, UEP Certified or not, that is not consistent with the
 5  science-based guidelines is not appropriate.
 6            Did I read that correctly?
 7  A.   Yes.
 8  Q.   Did you understand that to be the position of the
 9  Scientific Advisory Committee?
10  A.   Oh, yes.
11  Q.   And that position that Dr. Armstrong was advocating as
12  well?
13  A.   Correct.
14            THE COURT:  Is that the end of that particular
15  topic?
16            MR. CALLOW:  Yes, it is.
17            THE COURT:  Then we will take our lunch break at
18  this point.  And let's plan on resuming at a quarter to two
19  again.
20            Is this timing working out okay for you guys for
21  lunch, to have a decent but not overindulgent lunchtime?
22  Okay, great.  Then please plan on being back in the -- on the
23  10th floor here at a quarter of two, and we will resume
24  straightaway then.
25            Obviously, it's important that you continue to
```

93

```
 1  follow the instructions of not talking about the case.  See
 2  you in about an hour and ten minutes.
 3            THE DEPUTY CLERK:  All rise.
 4            (Jury out.)
 5            THE COURT:  Okay.  I am going to do my best
 6  rendition of being a vent recipient at the lunch hour,
 7  and then I'll report if there's anything really you guys ought
 8  to know, whether you want to or not.
 9            MR. NEUWIRTH:  Thank you.  Thank you.
10            MR. KING:  Your Honor, can I just address the one
11  issue I held off and didn't talk about?
12            THE COURT:  Sure.
13            MR. KING:  It has to do with --
14            (Discussion held off the record with the clerk.)
15            THE COURT:  Sure, why not.  No reason she should
16  start lunch before me.
17            MR. KING:  It has to do with three upcoming
18  witnesses that are going to be coming in Plaintiffs' case.
19  Two of them are third-party witnesses, Linda Reickard, who I
20  understand will be called this afternoon from USEM, and then
21  Chad Gregory from UEP, who's expected to testify tomorrow.
22  Both of those witnesses were on the Plaintiffs' witness list
23  and on the Defendants' witness list.
24            We were going to ask whether the Court would permit
25  the Defendants to conduct their examination, direct
```

94

1  examination of those two witnesses then rather than bringing
2  them back?
3          THE COURT:  You mean now, as opposed to --
4          MR. KING:  Now.  Excuse me, now.  When they were
5  called, one is coming out from Iowa, Linda Reickard's coming
6  out from Iowa.  My understanding is the other one's coming
7  from Atlanta.  I think it would make things quicker, easier --
8          THE COURT:  Is there problem -- I mean, just the
9  bottom line.  Is there a problem with this?
10         MR. NEUWIRTH:  The problem is that I don't think it
11  is a far-fetched supposition that the Defendants would be
12  doing a very lengthy examination of each of these witnesses to
13  try to put forth their case in the middle of ours.  And we
14  don't believe that either of these witnesses -- both, I
15  think -- I won't say anything about today's witness, but I
16  think these two witnesses are coming from -- who have
17  relationships --
18         THE COURT:  You can step down.  You can just begin
19  to enjoy yourself.
20         THE WITNESS:  Thank you.
21         MR. NEUWIRTH:  -- who have relationships -- one is
22  the current president, I believe, of United Egg Producers, and
23  the other is either a current -- is it current or former
24  employee -- former employee of the United States Egg
25  Marketers.

95

1          With respect to Chad Gregory, the current employee
2  of United Egg Producers, I think Your Honor will recall that
3  counsel for the United egg producers told Your Honor, when
4  asking for permission to talk about the case, how her client
5  was going to be all over what was going on here and she wanted
6  permission to be able to discuss the case.  The notion that it
7  would be a burden for the United Egg Producers to have
8  Mr. Gregory to come back to testify --
9          THE COURT:  I'll tell you what, at this point, folks
10  my -- almost -- my prime -- well, my primary concern is going
11  to be the way the jury's going to perceive our use of their
12  time.
13         What I would like to hear from -- when we resume, is
14  your best professional evaluation of how much time are we
15  talking about.  I'm perfectly prepared, as I said yesterday,
16  to be the one who takes the hit with the jury in terms of how
17  we are spending our time.  But I don't want, you know -- don't
18  kid a kidder here, okay?  If you're going to give me bad info
19  and bad Intel, I will realize it eventually, okay?  Just tell
20  me your best estimate and I'll make -- I'll really resolve it
21  then, because I just don't like wasting time on a generic
22  basis.
23         MR. KING:  And, Your Honor, there's a separate
24  witness, a third witness and that is Marcus Rust, who
25  Plaintiffs are calling in their case-in-chief.  He's the chief

96

1  executive officer.
2          THE COURT:  He's going to come back later.
3          MR. KING:  He'll come back, okay.
4          MR. NEUWIRTH:  Thank you.
5          Thank you, Your Honor.  The only thing --
6          THE COURT:  I don't even have to know a whole lot to
7  know --
8          MR. KING:  That's fine.  I just want to make sure
9  we're set for Plaintiffs' purposes.
10         MR. NEUWIRTH:  And the only point I want to make
11  about Mr. Gregory is that our concerns that we -- we have been
12  acting to streamline our presentation as much as we can to try
13  to finish within just a couple of -- within a few days.
14         THE COURT:  Of when?
15         MR. NEUWIRTH:  To finish our case --
16         MR. OLSON:  She said when?  A few days from now?
17         MR. NEUWIRTH:  A few days from today.  A few days
18  from today.
19         And obviously we are dependent, in part, on the
20  cross-examination --
21         THE COURT:  I know.  I said, I mean, I'm going to
22  provide your cover for all of you.
23         MR. NEUWIRTH:  Right.
24         THE COURT:  As long as you don't abuse that.
25         MR. NEUWIRTH:  Right.  And I just -- the thing that

97

1  we're concerned about is that we -- we believe that our
2  examinations of Mr. Gregory and Ms. Reickard are going to be a
3  far more limited scope than what the Defendants are going to
4  say they need to cover for their case.
5          And just to put this in perspective, Ms. Reickard --
6  even though all we were told is that she is coming from a
7  distant state, which is one plane ride away, Ms. Reickard is
8  being offered as a sponsor of one of the Defendants' summary
9  exhibits.  And so the notion that she is, you know, not fully
10  connected with the Defense side of this case, just like
11  Mr. Gregory's the head of the UEP is, we would submit that
12  they are all in certain ways similarly situated with respect
13  to whether it's genuinely a burden for them to have to come
14  back a second time for whatever Defendants want to address
15  with them beyond the scope of --
16         THE COURT:  Well, their burden is down my list of
17  concerns, not at the top.
18         MR. BARNES:  Your Honor --
19         THE COURT:  Yes, sir.  Nice to see you again.
20         MR. BARNES:  -- may I make a point in response to
21  comments from counsel?  I'm going to be handling
22  Ms. Reickard's examination this afternoon.  It's not going to
23  be lengthy.  Fortunately, we've reached an agreement with
24  opposing counsel this morning.  They have agreed not to oppose
25  our motion to admit the summary exhibits under Rule 1006.  So

98

```
 1    that, of course, will significantly shorten the background
 2    information and the support for those exhibits.  Ms. Reickard,
 3    at the request of the Plaintiffs, has been rescheduled.  She
 4    was originally scheduled for later in the week.
 5              THE COURT:  Mr. Barnes, you're engendering less eye
 6    rolling.
 7              MR. NEUWIRTH:  Because of the misrepresentations.
 8              THE COURT:  Ah, ah, ah, ah.  I think it's time for
 9    lunch for everybody.
10              MR. BARNES:  I think you're right.  The point is
11    Ms. Reickard is here at this time or will be here this
12    afternoon specifically at the request of the Plaintiffs.
13              THE COURT:  As I said, when we resume, I would like
14    your best professional estimates of how much time we're
15    talking about in bulk, in chunks, okay.  Plaintiffs, I mean,
16    you're the people going to call this lady initially.  So
17    you're telling me, oh, two questions for her, and then what's
18    going to happen?  And the Defense is going to keep her here
19    for a hour and a half.  If that's what you're going to tell
20    me, then tell me that.
21              MR. NEUWIRTH:  That's not what -- what we're saying
22    is that we believe that for each of these witnesses it is
23    appropriate for the cross to be limited to the scope of what
24    we cover on direct.
25              THE COURT:  That's the normal.
```

99

```
 1              MR. NEUWIRTH:  The reason Ms. Reickard is coming
 2    here today, we were told by her counsel that the day we
 3    originally wanted to call her, which was either tomorrow or
 4    Friday, was not convenient for her because of a personal
 5    matter --
 6              THE COURT:  Okay.
 7              MR. NEUWIRTH:  -- and that she could only come today
 8    or Monday.  Taking to heart Your Honor's request that we keep
 9    this moving, we're calling her today.  What Mr. Barnes said is
10    just factually untrue.  I'm sure he didn't mean it, but it is
11    factually untrue.
12              MR. BARNES:  Well, I prefer that counsel for UEP
13    participate in this discussion.
14              THE COURT:  Okay.  I'll tell you what.  Just give me
15    your best shot for how much time we're talking about.
16    Inclination is to explain to the jury that sometimes
17    witnesses, rather than coming back and taking more time to go
18    through all of the routine, sometimes they -- they are kept
19    here when they first arrive and we cover more material than we
20    otherwise would, and that that is a decision that I have made
21    on behalf of everybody's interest in moving along with some
22    efficiency.
23              But I'm only going to do that if we're not -- if
24    this is not kind of a tip of the iceberg kind of a thing,
25    where somebody is appearing for two questions and then
```

100

```
 1    suddenly five hours later, we're still talking to that
 2    witness.  That would not be something that you should get me
 3    into or use me to cover for that.
 4              MR. NEUWIRTH:  And I would just say that --
 5              THE COURT:  And I applaud the efforts to work with
 6    each other in terms of the scheduling of witnesses, but
 7    remember, that we also have to worry about our jury, and I'm
 8    going to go talk to them now.  I should have invited all of
 9    you who want to come and listen to her story.
10              (Luncheon recess taken.)
11              THE DEPUTY CLERK:  All rise.
12              THE COURT:  Hello, everybody.  Please take your
13    seats.
14              The good news is that I'm still with you.  She
15    didn't do me in.  But she is very unhappy.  I told her to
16    write her congressman, essentially.
17              Anything else from anybody?
18              MR. BARNES:  Yes, Your Honor.  I'd like to make a
19    brief statement for the Court, hopefully to clear the air over
20    some comments that were made before the break.  I want the
21    record to reflect that over the course of the -- this
22    decade-long litigation, I've developed a healthy respect for
23    the professionalism of Mr. Neuwirth, Mr. Aranoff, and the
24    entire Plaintiffs' team.  I made comments this morning that
25    were based on some misinformation, and I want to correct the
```

101

```
 1    record to reflect that they should not be taken as any comment
 2    or suggestion that anything Mr. Neuwirth said or did was
 3    improper.
 4              THE COURT:  Okay.  So we're all back to being
 5    friends?  No offense taken.  No notes made of it.  Nobody's
 6    gotten any demerits.  We're back in business.  Yes?
 7              Next.
 8              MS. LEVIN:  Your Honor, I also have a brief motion
 9    on behalf of R.W. Sauder.  For the record, I'm Christine Levin
10    on behalf of R.W. Sauder.  It has come to our attention in the
11    last day or two in some of the discussions that the Plaintiffs
12    are going to be taking the position and eliciting testimony
13    with respect to R.W. Sauder was a member of USEM, which is the
14    egg marketing arm of the case, and we believe they should not
15    be allowed to do that as a matter of judicial admission.
16              In response to our motion for summary judgment on
17    the state of undisputed facts where we stated R.W. Sauder was
18    not a member of USEM, the Plaintiffs didn't contest that, but
19    more importantly, when they were moving for summary judgment
20    on Capper-Volstead immunity, or the lack thereof with respect
21    to USEM, they premised that motion on the statement that
22    R.W. Sauder was not a member of USEM.
23              That was the -- one of the factual bases for that
24    motion.  And the Court denied the motion, didn't question
25    whether R.W. Sauder was a member of USEM, because neither of
```

102

1    us believed that R.W. Sauder was a member of USEM, but having
2    made that statement, we believe that they are not able at this
3    juncture in the litigation to shift gears just because they
4    lost the motion.
5            And we would offer up as authority the Lishner
6    versus Upper Darby case which talks about and defines judicial
7    admissions as a formal concession in a pleading or stipulation
8    by the party that is binding upon the party making them, and
9    once they're made, they're binding for the purpose of the
10   entire case.  So you can't go and change a statement that
11   you've made that's binding at a subsequent --
12           THE COURT:  Go back, though, and explain to me why
13   you think it was an unequivocal statement.
14           MS. LEVIN:  The Plaintiffs' statement of undisputed
15   material facts in conjunction with a motion for summary
16   judgment that they filed and the statement is R.W. Sauder was
17   not a USEM member.
18           THE COURT:  No timing issue with respect to the
19   statement?
20           MS. LEVIN:  Excuse me?
21           THE COURT:  There's no limitation as to the timing
22   or a focus of timing?
23           MS. LEVIN:  There is no timing whatsoever.  There is
24   that simple sentence, and when Your Honor ruled on the motion,
25   we didn't dispute that, obviously, but when Your Honor ruled

103

1    on the motion, you said, Well, Sauder was not a member of
2    USEM.  Plaintiffs contend that Sauder was involved in egg
3    exports.
4            They at that point wanted to argue we were not a
5    member of USEM, but that we conspired with USEM by exporting
6    through it.  And Your Honor concluded that USEM is, in fact,
7    entitled to export some portion of product by nonmembers.
8    Having lost that, they now want to argue that Sauder is a
9    member of USEM and for that reason, USEM doesn't have
10   Capper-Volstead immunity.  So it's just a complete and total
11   180-degree turn.
12           THE COURT:  Okay.  Is this on the same issue?
13           MR. LYONS:  Yes, it's on the same issue, Your Honor.
14   Duane Lyons on behalf of the Plaintiffs.
15           THE COURT:  Okay.
16           MR. LYONS:  Just -- I might address the factual
17   situation, Your Honor, that was raised by counsel, and I think
18   my colleague is going to address specifically the issue raised
19   in the summary judgment motion, but with regard to the factual
20   issue that's before the Court, our position is that we're
21   going to call Ms. Reickard.  Ms. Reickard is going to testify
22   about her understanding as to Mr. Sauder's relationship with
23   USEM.  There is going to be equivocal evidence --
24           THE COURT:  Which is going to be what?
25           MR. LYONS:  That there's going to be a membership

104

1    application, he's identified as being on a membership list,
2    and then he's also identified as not being a member, and there
3    are e-mails saying he's not a member and that he's a
4    supporter.  So the evidence is going to be equivocal as to his
5    status as a member of USEM and whether he was at any point in
6    time.
7            THE COURT:  Let's try for something basic.  Is the
8    Plaintiff taking -- are the Plaintiffs taking the position
9    that Sauder is or is not, was or was not a member of USEM?
10   Let's just go with something simple with this proposition.
11           MR. LYONS:  Okay.  As to --
12           THE COURT:  Or are you trying to make -- make a
13   point without saying it and, therefore, trying to evade the
14   problem of the admission?
15           MR. LYONS:  So first of all, Your Honor, I don't
16   believe we made a binding admission with regard to the
17   evidence for the entirety of the trial.  We filed a summary
18   judgment motion.  In the summary judgment motion, there was a
19   statement that R.W. Sauder was not a member of USEM.  We're
20   not taking a contrary position by asking the witness if he
21   presented himself as a member.  That is purely as a matter of
22   fact.  Mr. Bizar in his opening statement said --
23           THE COURT:  What's the point of asking that
24   question?
25           MR. LYONS:  Because the evidence will show that

105

1    Mr. Sauder intended to curry favor with the other members of
2    USEM by presenting himself as a member and assisting in the
3    exports.  Mr. Bizar testified -- excuse me -- in his opening
4    statement, he made a great big point of saying that Sauder was
5    never a member of USEM, and we should be able to address that
6    with the evidence coming from this witness.
7            Secondly, with regard to whether or not Mr. Sauder
8    communicated with people at USEM and tried to become a member,
9    that is certainly relevant.  And whether after trying to
10   become a member, he decided he did not want to be a member is
11   also relevant.
12           So I think that entire factual spectrum as to his
13   attempts to become a member, whether he actually was a member
14   for any particular point in time and whether he decided to
15   withdraw and decided not to be a member but to support the
16   efforts of the USEM are all relevant, and there's no issue
17   before the Court that the Court has to address at this time.
18   The summary judgment motion was denied.  There was no factual
19   finding made that because he was a member of USEM, he was not
20   entitled to immunity or what have you.  So the record should
21   come out from this witness and we will see what the testimony
22   is of the witness and then we can address it in an appropriate
23   time.
24           THE COURT:  Okay.  As I understand it, that's only
25   half of the argument from the Plaintiffs.

106

```
1          MR. LYONS:  Your Honor, I think we've exhausted our
2    time and would submit the matter.
3          I'm sorry.  You didn't hear me, Your Honor.  I said
4    I think we'll submit the matter.
5          THE COURT:  You're going to submit it?
6          MR. LYONS:  Yes.  My colleague is not going to argue
7    it.
8          MS. KENNEY:  Unless the Court has -- it sounds to me
9    like the issue, Your Honor, is really a question of whether
10   there's been some waiver.  If you have some questions about
11   the Capper-Volstead issues, I'm happy to address them.
12         THE COURT:  Well, no.  My focus is on precisely what
13   was teed up.  It seems to me that there's an issue about
14   whether or not the Plaintiffs have asserted that Sauder was or
15   was not a member of USEM.  That's one simple proposition.  I
16   think it is different, by the way, to say that so and so is
17   not a member but wanted to create the impression they were.
18   It's a slightly different issue and not necessarily precluded
19   by the assertion of the affirmative statement, at least
20   arguably.
21         I have in another setting taken the position that if
22   somebody wishes to subject themselves to exposure to the jury
23   of having taken different positions -- this goes both ways, by
24   the way here -- then that's fine, but both positions are going
25   to be made available to the jury to evaluate.
```

107

```
1          So, for example, if the Plaintiffs have taken the
2    position Sauder was not a member, and suddenly now are
3    advancing the position that they were, then the vehicle by
4    which they previously took a different position will be shared
5    with or can be shared with the jury.
6          MS. KENNEY:  From the Capper-Volstead -- the only
7    thing I would say -- and I hear what Your Honor is saying, and
8    I don't think we have anything to add on the factual issues.
9    The only point I would make on the Capper-Volstead front is
10   that the two positions aren't inconsistent.  So Mr. Sauder --
11         THE COURT:  Are what?
12         MS. KENNEY:  That the --
13         THE COURT:  Are not inconsistent?
14         MS. KENNEY:  Are not inconsistent.
15         THE COURT:  You mean are consistent?
16         MS. KENNEY:  There would be multiple bases to move
17   for summary judgment as to R.W. Sauder and as to
18   USEM's eligibility for Capper-Volstead.  One of those would be
19   that he wasn't a member and that he conspired, which would
20   vitiate the exemption.  Another would be that he was a member
21   and he was a nonproducer.  And so --
22         THE COURT:  That one issue, I have focused on.
23         MS. KENNEY:  Right.  The other one simply didn't
24   come up, but they're not precluded.  They're not inconsistent
25   positions.  So that's all I would have to add on the
```

108

```
1    Capper-Volstead.
2          THE COURT:  Well, I don't see the focus being the
3    Capper-Volstead feature of this argument, frankly.
4          MS. KENNEY:  Fair enough.  Thank you.
5          THE COURT:  That's just a reaction.
6          MS. LEVIN:  Your Honor, the only point I wanted to
7    make in response to that is that there's nothing relevant here
8    other than whether he was a member of USEM or not.  So the
9    notion that he's currying favor with people or saying he's a
10   member or whatever, I would submit, first of all, I don't
11   think there's any factual basis for that.  But setting that to
12   one side, that's not relevant.  What's relevant is whether
13   he's a member or not, and they have unequivocally stated that
14   he was not a member.
15         THE COURT:  Well, I don't know.  I can't say whether
16   that's --
17         MS. LEVIN:  Well, I understand.  But I understand
18   the Court's position correctly.  We will be able to advise the
19   jury of the positions taken.
20         THE COURT:  Absolutely.  This goes back to my -- one
21   of my favorite rules.
22         MR. BIZAR:  The Goosy Gander Rule.
23         THE COURT:  You've got it.  Okay.
24         Anything else?  Before you get into -- I mean, you
25   have to wait and see what the proposition is going to be.
```

109

```
1          MS. LEVIN:  I didn't -- I was speaking --
2          THE COURT:  Before you start waving around
3    anybody's prior summary judgment motion, we have to wait and
4    see what the proposition is.
5          MS. LEVIN:  Absolutely.
6          THE COURT:  Okay.  Thanks for the heads-up, though,
7    everybody.  Anything else?  Okay, where were we?
8          MR. CALLOW:  We're ready.
9          THE COURT:  How was lunch?
10         THE WITNESS:  Good.
11         THE COURT:  Good.
12         THE DEPUTY CLERK:  All rise.
13         (Jury in.)
14         THE COURT:  Okay, everybody, you may take your
15   seats.
16         And, Mr. Callow, you may resume.
17         MR. CALLOW:  Thank you.
18   BY MR. CALLOW:
19   Q.   Good afternoon, sir.  As your job as director of
20   procurement, you had many different responsibilities at
21   Michael Foods, correct?
22   A.   Correct.
23   Q.   One of those responsibilities was to be involved in
24   communications regarding pressures from animal rights
25   activists that may occur, correct?
```

110

1   A.   Yes.

2   Q.   Was that a concern at Michael Foods?

3   A.   Oh, yes.

4   Q.   Why?

5   A.   Well, we had numerous -- you know, we had some videos of

6   Michael Foods premises, lawful videos, I may add, like many in

7   this -- and UEP have had over the years.  And so there's

8   always a lot of pressure related to those, and then there's a

9   lot of blow back coming from the customer base and the

10   consumer base.  So it's always a concern to know what's going

11   on there.

12   Q.   Okay.  As your role as director of procurement, are you

13   monitoring that for Michael Foods or the industry or both?

14   A.   No, just for Michael Foods and just as a matter of maybe

15   the connection with UEP.

16   Q.   Fair enough.  Were you also involved in discussions

17   regarding the banning of conventional cages in Europe?

18   A.   No.  Just -- we were just a spectator watching, like

19   everybody else at that point.

20   Q.   What about discussions regarding animal welfare

21   requirements of either customers or other programs besides the

22   UEP Program?

23   A.   We do monitor those and we've also done a lot of

24   education.  We've been in a number of boardrooms over the last

25   ten years, probably meeting with customers, trying to educate,

111

1   explain the differences between the various programs.

2   Q.   What other programs are you familiar with that relate to

3   animal welfare other than the UEP Certified Program?

4   A.   Well, in today's world, you know, UEP Certified is maybe

5   a little bit more on the back burner because now we're into

6   cage-free.

7   Q.   Let's go back to 2000, 2008 time frame --

8   A.   Yeah, okay.

9   Q.   -- back in that time frame.

10   A.   Primarily it was UEP Certified.

11   Q.   Fair enough.  Do you remember the McDonald's situation

12   sort of starting the animal rights movement in the United

13   States?

14   A.   Yes, I do.

15   Q.   What do you remember about the McDonald's situation and

16   animal rights groups?

17   A.   I think -- I assume they were getting some pressure from

18   some of the animal rights groups, and I think -- I don't

19   remember the year, if it was 2000 or 2001 -- they announced

20   they were going to do a proprietary program, and that was

21   prior to UEP Certified.  UEP Certified, I think, started in

22   2002, is my kind of guesstimating there.  But McDonald's, I

23   think, came out before that, and they had a proprietary

24   program with their guidelines.  They were similar, but the

25   biggest differential was they were allowing a few more inches

112

1   of square -- square inches per bird.

2   Q.   And you recall that those were really the first

3   guidelines in the industry; is that correct?

4   A.   Yes, in the US.  I believe that would be true.

5         MR. CALLOW:  May I approach the witness, Your Honor?

6         THE COURT:  Yes.

7   BY MR CALLOW:

8   Q.   Sir, I've handed you what I've marked for trial purposes

9   as Defendants' Cross Exhibit 200.

10         Can you identify this document?

11   A.   It was a press release or a news article that was

12   forwarded to me from one of our -- well, Arthur Papetti from

13   within Michael Foods.  That was part of Michael Foods in 2000.

14   Q.   And who was Mr. Papetti?

15   A.   He was -- we acquired the Papetti organization in 1997,

16   and Arthur was one of the original owners of the Papetti

17   Hygrade Eggs.

18   Q.   Do you remember receiving this in the 2000 time frame?

19   A.   I do, now that I've seen this.  I had forgotten, but I

20   do.

21         MR. CALLOW:  Your Honor, I'd like to move it for

22   admission and show it to the jury.

23         MR. NEUWIRTH:  I think this news story is obvious

24   hearsay, Your Honor.  If it's being admitted for the limited

25   purpose of demonstrating something that Mr. Baker received, we

113

1   don't have an objection.

2         THE COURT:  Fine.

3         MR. CALLOW:  Fair enough, Your Honor.

4         THE COURT:  Then it will be admitted on that basis.

5         MR. CALLOW:  And may I display it for the jury?

6         THE COURT:  Yes.

7   BY MR CALLOW:

8   Q.   Sir, you recall receiving this in the 2000 time frame?

9   Why was this important to you?

10   A.   Well, again, as this article, I think, speaks to, it was

11   probably the first real announcement and a significant one at

12   that.  Of course McDonald's is one of the largest single users

13   of eggs in the US in the restaurant or food service industry.

14   So this was a fairly significant announcement and kind of an

15   earth-shattering announcement.  Not totally unexpected

16   necessarily, but certainly it was a big announcement at that

17   point.

18   Q.   Part of the reason for the announcement was a campaign by

19   PETA; is that correct?

20   A.   I'm not sure if it was PETA or US.  One of them.  I'm not

21   sure who it was.

22   Q.   If you look at a reference on page 2 of that document --

23   A.   I didn't get a chance.  I apologize.  Okay.

24   Q.   Do you see the reference to PETA on page 2 of that

25   document?

114

1  A.  Yes, I do.
2  Q.  We are very appreciative of what the company has done and
3  think they are doing the right thing.  It says:  Steven Gross,
4  he has served as a negotiator for People For the Ethical
5  Treatment of Animals, in its two-year discussions with
6  McDonald's.  Other companies in this field have been dragging
7  their feet and, frankly, we think this decision will have the
8  salutary effect of waking them up.
9         Did you see that?
10 A.  Yes.
11 Q.  Did that concern you?
12 A.  Yes.  I mean, everybody was watching this, and like I
13 said, this is -- this -- McDonald's has the ability to move
14 the needle.  So I think everybody was paying attention.
15 Q.  Did it generate discussions within Michael Foods?
16 A.  Yes, it did, because we had -- we had another customer
17 who followed suit not long after this.
18 Q.  What customer is that?
19 A.  That would have been Burger King.
20        MR. CALLOW:  Your Honor, may I approach the witness?
21        THE COURT:  Yes.
22 BY MR CALLOW:
23 Q.  Sir, I've handed you what I've marked for trial purposes
24 as Defendants' Cross Exhibit 201.
25        Can you identify this document for the record?

115

1  A.  Yes.
2  Q.  And what is that document?
3  A.  It's an e-mail from Tim Bebee, who was the vice president
4  of our farm group.
5  Q.  And there's an e-mail starting at the bottom of that
6  e-mail chain; is that correct?
7  A.  Yes.  It's from -- from the same Arthur Papetti that we
8  were talking about in the other McDonald's announcement.
9  Q.  Do you recall this e-mail chain?
10 A.  Yes.
11 Q.  Do you recall the discussions regarding this e-mail
12 chain?
13 A.  Yes.
14 Q.  And were you part of those discussions?
15 A.  Well, in this case, we were -- I was probably secondary
16 because we were contemplating doing this internally which
17 affected the farm group more so than my external
18 group, but, again, we were all part of the discussion.  So --
19        MR. CALLOW:  Your Honor, I'd like to move Cross
20 Exhibit 201 into evidence and show it to the jury.
21        MR. NEUWIRTH:  No objection, Your Honor.
22        THE COURT:  Defendants' Exhibit CX-201 is admitted.
23 BY MR. CALLOW:
24 Q.  Sir, Mr. Papetti's discussion talked about Michael Foods
25 trying to get out in front of this issue.  Do you recall that?

116

1  A.  Yes, somewhat, yes.
2  Q.  And what do you recall about that discussion?
3  A.  Well, I mean, pretty much what was in the e-mail.
4  Nothing -- nothing outside of that, as I can recall.
5  Q.  The concern was that McDonald's was going to start a
6  chain reaction in the fast food industry, correct?
7  A.  Yes.
8  Q.  And the question was whether a company like Michael Foods
9  would be the next subject of an animal rights campaign given
10 its size and purchasing power in the industry, correct?
11 A.  That would be our concern, yeah.
12 Q.  What were the Michael Food decision points at this time
13 regarding animal welfare and how to deal with this particular
14 issue?
15 A.  Well, I mean, the immediate concern here was I think
16 Burger King was ready to make the move after McDonald's
17 announced they were more than ready to make the move and we
18 were -- this e-mail really is talking more so -- I guess I'm
19 focused more on the second piece of the e-mail, where
20 Mr. Bebee was talking about what it would take for us and can
21 we do this, can we isolate these eggs, because in this case,
22 it's -- it's -- for this customer, it would be one item code
23 or one SKU or one item.
24        So we could -- it was fairly easy to isolate this
25 item on one farm, package it, sort it or segregate it, and so

117

1  that was really more of an operational thing almost at this
2  point, because I think the thought process was by the time we
3  got to here, we were already probably going.
4  Q.  Going?
5  A.  Going with this idea or the idea to accommodate Burger
6  King.
7  Q.  Thank you.
8         MR. CALLOW:  Your Honor, may I approach the witness?
9         THE COURT:  Yes.
10        MR. CALLOW:  Thank you.
11 BY MR CALLOW:
12 Q.  Sir, I've handed you what I've marked as Defendants'
13 Cross Exhibit 202.
14        Can you identify this document for the record?
15 A.  Yes.  This was an e-mail from -- it started with Mark
16 Whitmer, one of our corporate staff people, and then it went
17 to Bill Goucher.  It was a response from Bill Goucher, who was
18 the president of the egg division in this period of 2000.
19        And so the concern here was, which is what everybody
20 had at UEP, is that Burger King's guidelines that they
21 announced were slightly different than McDonald's.  So all of
22 a sudden we've got two different proprietary guidelines out
23 there, and the concern was if every major national account
24 comes with their own set of guidelines, the industry has a
25 nightmare on its hands.  And so that was the concern.  That's

118

```
1   what he's speaking to here in this e-mail, or Goucher is, is
2   that what's UEP going to do.
3   Q.   And you recall this e-mail on this September 2000 time
4   frame?
5   A.   Yes.
6        MR. CALLOW:  Your Honor, I'd like to move exhibit --
7   Cross Exhibit 202 into evidence.
8        THE COURT:  Any objection?
9        MR. NEUWIRTH:  No objection, Your Honor.
10       THE COURT:  It's admitted.
11  BY MR CALLOW:
12  Q.   Sir, do you recall the McDonald's campaign being called
13  McCruelty To Go?
14  A.   I forgot about it until you mentioned it, but I do now.
15  Q.   Catchy phrase, huh?
16  A.   Yes.  Yes.
17  Q.   Do you see that the concern is that PETA is now going to
18  start targeting other companies besides McDonald's in the 2000
19  time frame?
20  A.   Yes.
21  Q.   And did that raise concerns at Michael Foods as well?
22  A.   Yes, absolutely.
23  Q.   McDonald's was not a customer of Michael Foods, correct?
24  A.   That's correct.
25  Q.   But Burger King was?
```

119

```
1   A.   Yes.
2   Q.   How did Michael Foods accommodate Burger King's interest
3   in animal welfare in this 2001 time frame?
4   A.   You mean as far as how did we implement this?
5   Q.   Yes, sir.
6   A.   Yeah, we had one farm in Minnesota that was already -- it
7   was already in what we call an inline breaking farm where
8   those eggs were produced and broken the same day or within
9   hours, actually, of being laid, and so we converted that farm
10  by taking -- removing birds to get to their square inch
11  guidelines.
12       So the McDonald's was 72 square inches.  They came
13  out at 75 square inches.  And that was that one upsmanship, so
14  to speak, is what it appeared to be, was what was just sending
15  chills down a lot of producers, and mine, so -- but that's how
16  we accommodated them.  So that was kind of our BK farm, and
17  the volume just pretty well matched up with what our volume
18  was that we were selling or producing with BK.  So it matched
19  up fairly well for us.
20  Q.   I think in one of the documents you were shown earlier,
21  that's known as the Gaylord Farm; is that correct?
22  A.   Right.  Yes.
23  Q.   Is why the Gaylord Farm had a 75-inch, square inch
24  note in that column, correct?
25  A.   Yes, yes, yes.
```

120

```
1        MR. CALLOW:  Your Honor, may I approach?
2        THE COURT:  Yes.
3   BY MR CALLOW:
4   Q.   Mr. Baker, I've handed you what I've marked for trial
5   purposes as Defendants' Cross Exhibit 203, an e-mail talking
6   about Burger King.  Do you see that?
7   A.   Yes, I do.
8   Q.   Do you recall this e-mail?
9   A.   Yes, I do.
10  Q.   And you were copied on this e-mail?
11  A.   Um-hum.
12  Q.   And this relates to the Burger King issues that you
13  described earlier, correct?
14  A.   Yes.
15       MR. CALLOW:  Your Honor, I'd like to admit
16  Defendants' Cross Exhibit 203 into evidence and display it to
17  the jury.
18       THE COURT:  Any objection?
19       MR. NEUWIRTH:  No, Your Honor.
20       THE COURT:  203 then is admitted.
21  BY MR CALLOW:
22  Q.   First, sir, can you identify the people who are on this
23  e-mail chain?
24  A.   Yes.  Again, it was myself, Tim Bebee, and Ken Neishi was
25  our VP of operations at this time.  So he was in charge of the
```

121

```
1   plant side and the processing side of our operations that did
2   the Burger King product or any of the other processed egg
3   products.  And then the CC, it was our VP of quality, our R&D,
4   and then our sales management group along with JD Clarkson.
5   Q.   Had Michael Foods been doing business with Burger King
6   before 2001?
7   A.   Yes, we had.
8   Q.   So this was an opportunity to keep that business?
9   A.   Yes.
10  Q.   And in order to do so, you had to modify your facilities
11  to the new standards announced by Burger King, correct?
12  A.   Yes, we did.
13  Q.   Was there competition from another vendor for this same
14  business?
15  A.   You know, I don't recall.  You know, I don't know -- I
16  was thinking we were the sole supplier, but I don't remember.
17  I don't know that for sure.
18  Q.   Do you recall the discussion about trying to get out
19  faster than Sunny Fresh?
20  A.   Yes.  And they may have had a piece of it at that time,
21  and that's what he's alluding to, is if we can get this done,
22  but I don't -- I don't remember that.  I can't recollect for
23  sure how that went down.
24  Q.   Were you involved in the discussions with Burger King to
25  establish the facility at 75 inches?
```

122

```
 1   A.   Not directly.  Well, on the facility's side, not the
 2   75 inches, but...
 3   Q.   Who is Sysco?
 4   A.   Sysco is a broad line distributor, I believe.  That's the
 5   term we use.  And they distribute products, all sorts of food
 6   products for restaurants all over the country, so very large.
 7   Q.   Was there a time that Sysco wanted to have eggs that were
 8   Certified as well?
 9   A.   Yes, there was.  They -- I think they initially, I
10   believe, started with their shell egg producers, and then
11   eventually they asked if we -- we were their primary supplier,
12   I think, and they asked if we could provide them with ACC or
13   UEP Certified, as it became known later, for all of the egg
14   products.  And they did distribute a fairly large volume of
15   egg products.
16   Q.   So your discussions involved the certification on the egg
17   products side, not just on the shell eggs side?
18   A.   Right.
19   Q.   And how large a customer was Sysco of Michael Foods?
20   A.   At that point in time, I think the numbers I recall were
21   somewhere in the neighborhood of 140 million pounds of Sysco
22   egg products that we produced and distributed.
23   Q.   Can you give us an idea what that means in shell eggs?
24   A.   In shell eggs, that's probably about 100 million dozen,
25   110 million dozen.
```

123

```
 1   Q.   So 100 million dozen a year --
 2   A.   Um-hum.
 3   Q.   -- that you're using for liquid egg --
 4   A.   Um-hum.
 5   Q.   -- now had to be Certified under the UEP Program?
 6   A.   Well, yes, and -- but the issue that was different about
 7   Sysco compared to Burger King, where Burger King was one item
 8   or one -- one label, one item, Sysco was dozens and dozens of
 9   items, and we -- it's always possible, we could have done them
10   all individually and put the logo, if we had had a logo or
11   whatever.  In those days we didn't.  But we could have
12   addressed all of their individual items.
13        Their -- the solution we came to was they asked if
14   we could supply -- if we were buying 140 million pounds of
15   Certified products, which we were, many of our suppliers were
16   on both sides of that.  Even though we had required UEP
17   Certified in those days, many of our suppliers had other
18   accounts or shell egg accounts that required UEP Certified.
19        So we were already obtaining or procuring a number
20   of pounds of UEP Certified eggs, shell eggs, just by default,
21   I guess would be the way to say it.  So we had more than
22   140 million pounds or very close to the pounds.  So what we
23   agreed to do with them was we would -- we assured them and
24   guaranteed that we would always have more UEP Certified pounds
25   in our system than they were buying.
```

124

```
 1        Now, they wouldn't necessarily be those eggs in
 2   those cartons or their packages, but we had enough eggs in our
 3   system to account for them in those days.  So that was kind of
 4   the arrangement that we ended up making with Sysco.
 5   Q.   So in 2003, you're dealing with UEP Certified eggs for
 6   one of your largest customers?
 7   A.   Yes.
 8   Q.   It just happens to be on the liquid egg side?
 9   A.   Yes.
10   Q.   What about large food chains, did there come a time when
11   large food chains began requesting UEP Certified eggs?
12   A.   Yeah.  You know, all through that period, from 2002 on up
13   to the time we committed to the program in '06, there were
14   many, many customers that we were meeting with who were
15   asking, because they were getting -- they were having meetings
16   with some of the animal welfare groups, and so then they would
17   call us, we would try to educate them, give us -- to provide
18   the egg industry side of the story.  So we were talking to
19   many, many people at that time.
20        But in -- probably in '04, '05, in that range,
21   especially '06, people like Walmart, we also had retail liquid
22   egg called -- the product we had our label was Better Than
23   Eggs, that competed with Egg Beaters, which you've probably
24   seen on the shelf.  And so Walmart was starting to -- by '06
25   was starting to make waves and requiring us to -- they wanted
```

125

```
 1   that logo on their egg products, and that was coming up in
 2   '06.  So -- and the issue there was, for instance, either we
 3   did it or they would just go to Egg Beaters and take our
 4   product off the shelf.  So that was the direct pressure we
 5   were receiving from a large user, of course, of Walmart.
 6             MR. CALLOW:  Your Honor, may I approach?
 7             THE COURT:  Yes.
 8   BY MR CALLOW:
 9   Q.   Sir, I've handed you what I've marked for trial purposes
10   as Defendants' Cross Exhibit 207.  We're going to get to
11   Walmart in just a second.
12   A.   Oh, sorry.  I got ahead of you.
13   Q.   That's all right.  But other supermarkets were requesting
14   UEP Certified eggs as early as 2002; is that correct?
15   A.   Yes.  In some form.
16   Q.   Did you receive a copy of Cross Exhibit 2007 in the 2002
17   time frame?
18   A.   Yes, I believe so.
19   Q.   Can you identify this exhibit for the record?
20   A.   Yes.  This was an e-mail related to Kroger is the -- was
21   the supermarket chain or the retailer asking us about UEP
22   Certified egg products.  And, again, this was the retail
23   product which was our egg substitute product in the Better
24   Than Egg label or category.
25   Q.   Do you recall this e-mail in the 2002 time frame?
```

126

1  A.   Yes, I think I do.

2  Q.   And the discussion regarding these markets?

3  A.   Yes.  And this was becoming an increasing problem.  We

4  were -- and the pressure just continued to grow.  We were able

5  to, you know, keep it at bay for a while, for maybe a couple

6  of years there, but it just continued to grow.

7       MR. CALLOW:  Your Honor, I'd like to move Cross

8  Exhibit 207 into evidence and display it to the jury.

9       THE COURT:  Any objection?

10      MR. NEUWIRTH:  The only objection is that the bottom

11 e-mail chain appears to be complete hearsay without any

12 foundation, and so certainly the top two e-mails that

13 Mr. Baker received, we don't have an objection to, but that

14 very bottom e-mail does appear to be hearsay.

15      MR. CALLOW:  I will display it without the bottom

16 showing on the --

17      THE COURT:  Okay, just to be clear, this is the one

18 that starts out from Rob Simmons?

19      MR. NEUWIRTH:  Yes, Your Honor.

20      THE COURT:  Okay.  That bottom 25 percent of the

21 document will be excised?  Okay, on that basis, it's admitted.

22      MR. CALLOW:  And may I display it, Your Honor?

23      THE COURT:  Yes, you may.

24 BY MR. CALLOW:

25 Q.   You mentioned Kroger in 2002.  What are the other

127

1  supermarkets listed on this exhibit, sir, that were also

2  asking for animal Certified eggs at this time?

3  A.   Oh, yeah, there was Costco, Ahold or Ahold, however you

4  say it, Publix were some of the ones that were asking.

5  Q.   So Ahold, Costco, Publix, Kroger.  Are those all

6  customers of Michael Foods?

7  A.   Yeah, they were off -- you know, most times they were.

8       MR. CALLOW:  Your Honor, may I approach?

9       THE COURT:  Yes.

10 BY MR. CALLOW:

11 Q.   Sir, I've handed you what I've marked as Defendants'

12 Cross Exhibit 209.  It's an e-mail talking about Costco asking

13 about animal husbandry.  Do you see that, sir?

14 A.   Yes.

15 Q.   Are you familiar with this e-mail?

16 A.   Yes.

17 Q.   And do you recall a discussion about Costco in the

18 October 2002 time frame?

19 A.   Yes.

20 Q.   What do you remember about it?

21 A.   Well, I mean, again, they were -- just like the other

22 retailers, they were all being contacted by different animal

23 welfare groups.  So that's why they were wanting to know what

24 was possible, what was not possible, what was our

25 recommendation, et cetera, along those lines.

128

1       MR. CALLOW:  Your Honor, I'd like to move the Cross

2  Exhibit 208.

3       THE COURT:  Is it 8 or 9?  I mean, which --

4       MR. CALLOW:  It's an 8, Your Honor.

5       THE COURT:  8?

6       MR. CALLOW:  It's an 8, Your Honor.

7       THE COURT:  Okay.  That's an 8.

8       MR. NEUWIRTH:  So, Your Honor, this e-mail has the

9  same issue as the last one.  The original e-mail is not

10 something that was to or from Mr. Baker and, again, represents

11 hearsay for the same reason as the last document.

12      MR. CALLOW:  The whole e-mail chain was forwarded to

13 Mr. Baker and the topic is --

14      THE COURT:  This is all a question of

15 Mr. Baker's knowledge base with respect to Costco, right?

16      MR. CALLOW:  Yes, Your Honor.

17      THE COURT:  Oh, I think the bottom part comes -- is

18 really referred to in the top part.  So it's all going to come

19 in.  What's the second page -- just one page, right?

20      MR. CALLOW:  Just one page, Your Honor.

21      THE COURT:  Okay.  I'm going to admit it to the

22 jury.

23      MR. CALLOW:  May I display it to the jury,

24 Your Honor?

25      THE COURT:  Yes.

129

1  BY MR. CALLOW:

2  Q.   So Costco is willing to award business but needed to know

3  about Animal Husbandry Guidelines, correct?

4  A.   Yes.

5  Q.   And they wanted to know whether or not Michael Foods can

6  supply UEP Certified eggs to them, correct?

7  A.   Yes.

8  Q.   Were you able to do so at this time?

9  A.   At this point, we were not.  We were -- this goes back

10 into the issue of the marketing licenses that we talked about

11 earlier today.

12 Q.   That we talked about earlier.

13 A.   Um, with the help of marketing license, we could meet

14 this -- we could have met this.  It turned out we didn't, that

15 this just -- I don't remember the reasons why we didn't now,

16 but we did hit -- that was the ability we were looking for if

17 we had -- because, again, these volumes were all our retail

18 customers, and those volumes were very small volumes,

19 relatively speaking, compared to a Sysco or Burger King.

20      So it wasn't massive volumes of eggs, but it was

21 important volumes because it was retail business.  So very

22 important business to us.  So that's why we were still trying

23 to figure out how do we take care of this, how do we service

24 these accounts or these customers and meet their needs.

25      MR. CALLOW:  Your Honor, may I approach the witness?

130

1   BY MR. CALLOW:
2   Q.   Mr. Baker, I've handed you what I've marked for
3   cross-examination purposes as Exhibit 209, so we are, I think
4   clear.
5         Can you identify this document for the record?
6   A.   This was a letter that I sent to Publix in response to a
7   request that we received from them in July, the end of July in
8   2002.
9   Q.   You prepared this document?
10  A.   Yes.
11  Q.   And you sent it to Publix?
12  A.   Yes.
13        MR. CALLOW:  Your Honor, I'd like to admit Cross
14  Exhibit 209 and display it to the jury.
15        MR. NEUWIRTH:  No objection, Your Honor.
16        THE COURT:  Very well.
17  BY MR. CALLOW:
18  Q.   Sir, what was the purpose of this correspondence, Cross
19  Exhibit 209?
20  A.   You know, I -- um, I think they just wanted some
21  assurance and that's what we were trying to assure them, that
22  we could -- we could accommodate their requests.
23  Q.   Okay.
24  A.   But this was just really early, of course, in the first
25  phase of the implementation of the program.  So even though we

131

1   weren't in the program, there wasn't a lot of this egg even
2   available in 2002 yet.  But no doubt there was interest,
3   clearly.
4   Q.   And I want to direct your attention to the two paragraphs
5   that are talking about phasing and costs, which are some of
6   the issues that you've talked about here today.
7         You note that:  The guidelines developed by the
8   United Egg Producers are in the first phase of implementation
9   and consequently the costs associated with these programs are
10  not fully known at this time.  When the increased costs are
11  identified and verifiable, we may request the current pricing
12  formula be reviewed.
13        Did I read that correctly?
14  A.   Yes.
15  Q.   What was that referring to?
16  A.   Well, any time that you changed the density and then
17  there was -- there would be the processing -- some processing
18  costs just because of the segregation and the no commingling,
19  so that's -- but those were all unknowns to us at the point.
20  So that's what this was addressing was, we could do it but we
21  would need more time and more experience as we got into this
22  whole program to really be able to understand what those costs
23  were, if they were significant or -- or not.  So...
24  Q.   There were going to be certain added costs associated
25  with UEP compliance with the Certified Program, correct?

132

1   A.   Correct.
2   Q.   And how those costs were allocated or passed on or how
3   they were negotiated in a pricing formula was the subject of
4   negotiation?
5   A.   Yes.
6   Q.   You mentioned Walmart.
7   A.   Yes.
8   Q.   And you noted that Michael Foods joined the UEP Certified
9   Program in 2006, correct?
10  A.   Correct.
11  Q.   That was to accommodate Walmart, correct?
12  A.   Oh, yeah, among a couple others, but that was one of the
13  drivers, I think.
14  Q.   What were the others that you were accommodating?
15  A.   Well, I think some of these were these retail accounts
16  that we've just been discussing.  I'm trying to think who
17  else.  There probably was more, they're just not coming to
18  mind at the moment.  But there were some others who were in
19  the wings or waiting or looking into it, so...
20  Q.   Walmart required Michael Foods to become UEP Certified --
21  A.   Yes.
22  Q.   -- in order to sell eggs to Walmart; is that correct?
23  A.   Yes.
24  Q.   Were you involved in those discussions?
25  A.   Yeah.  I was in Bentonville, Arkansas in a meeting with,

133

1   I think the buyer was Gary Pickett, I think his name was, he
2   was the egg buyer for corporate Walmart in those days.  And so
3   one of our retail sales vice-presidents and I went down and
4   had a meeting with Gary just to try to understand exactly what
5   we needed to do and what he would accept or -- you know.  And
6   at the end of the day, it was, we needed to be UEP Certified
7   with a logo, which UEP Certified has a logo or had a logo, and
8   that logo had to be on their cartons.  And, again, this was
9   the liquid egg products, the better the egg product that was
10  on the -- that would be in the dairy case.
11  Q.   And was the logo important to Walmart?
12  A.   It was at that point, yes, it was.
13  Q.   And --
14  A.   It probably still is today.  I'm just not familiar with
15  it.
16  Q.   You understood that from your meetings with the Walmart
17  people?
18  A.   Yes.  Yes.
19  Q.   Were you talking with any other companies that were also
20  trying to get into Walmart at this time?
21  A.   Yeah.  There was -- our competitors were from ConAgra.
22  Q.   Okay.  Did you talk to Sparboe?
23  A.   Yes.  And there was some conversation, we had some
24  correspondence with Sparboe.
25  Q.   And did you talk --

134

1  A.   They're on the shell side of it.
2  Q.   Right.
3           Did you talk to Beth Schnell?
4  A.   I did.
5  Q.   Who is Beth Schnell?
6  A.   Beth Schnell was the -- I believe she -- she was the
7  president or vice-president of -- of Sparboe Farms based in
8  Minnesota.  And the reason I'm hesitating, she -- her father
9  was the founder, Robert -- Bob Sparboe was the founder, and
10 she was -- that was her dad.  And I can't remember when he --
11 he passed away suddenly and his daughter became the president
12 of the company.  I don't know if that was '06 or if that
13 was -- it was sometime right after, maybe.  That's my only
14 hesitancy.  I just don't remember the day.  But anyway, she
15 was very active in the Sparboe -- their business and their
16 customer base.
17 Q.   And do you recall whether Beth Schnell was trying to
18 convince Walmart to purchase non-certified eggs?
19 A.   Yes, she -- she went down -- she had meetings with them
20 and specifically tried to convince them that there was
21 proprietary programs of animal welfare that were comparable to
22 UEP's in most -- in almost every way.  But Walmart was really,
23 really locked into the UEP Certified at that point in time.
24 Q.   So you know that Beth Schnell was going down to Walmart
25 trying to negotiate an exception or a change from

135

1  Walmart's demand for Certified eggs and the logo you
2  described?
3  A.   Yes.
4  Q.   Were you part of those discussions?
5  A.   Not -- not with her.  We independently, when we were
6  there, we brought up the same issue, a similar kind of
7  question about a comparable program or proprietary program.
8  But they had already really locked and loaded onto the logo
9  and the UEP Certified Program.
10 Q.   Did Ms. Schnell tell you about her efforts?
11 A.   Yes, she did share some of the -- some -- some of the
12 pieces of her visit and her endeavors, so...
13          MR. CALLOW:  May I approach the witness, Your Honor?
14          THE COURT:  Yes.
15 BY MR. CALLOW:
16 Q.   Mr. Baker, I've handed you what I've marked as
17 Defendants' Cross Exhibit 210.
18          Can you identify this document?
19 A.   Yes, I can.
20 Q.   What is this document?
21 A.   It was an e-mail from our CEO in November of 2005.  The
22 CEO at that time was Gregg Ostrander, and it was sent to
23 Mr. Clarkson, myself, and our general managers for food ingredient
24 retail, Vince O'Brien, and our food service VP, Michael Elliot
25 and our retail VP, along with our CFO, Mark Westphal.

136

1  Q.   And he asked you to review Ms. Schnell's report; is that
2  correct?
3  A.   Yes.
4          MR. CALLOW:  Your Honor, I'd like to move
5  Exhibit 210 into evidence and show it to the jury.
6          MR. NEUWIRTH:  No objection, Your Honor.
7          THE COURT:  Very well, 210 is admitted.
8  BY MR. CALLOW:
9  Q.   So Ms. Schnell provided Michael Foods with the summary of
10 her meetings with individuals at Walmart, including Gary
11 Pickett, who you identified, and Betty Marshall.  Do you see
12 that, sir?
13 A.   Yes, I do.
14 Q.   And there were discussions regarding not only the
15 Certified Program, but Walmart's insistence on having the seal
16 as well, correct?
17 A.   Yes.
18 Q.   All right.  And the dilemma what you were facing at
19 Michael Foods is at this point in time, you're not part of the
20 Certified Program, correct?
21 A.   Not at this juncture we were not.
22 Q.   And your competitors, like Sunny Fresh and ConAgra, are
23 also trying to get the Walmart business?
24 A.   Yes.
25 Q.   And Michael Foods has to decide whether to join the

137

1  Certified Program in order to accommodate Walmart's demands at
2  this point, correct?
3  A.   Yes.
4  Q.   Ms. Schnell was agitated that she could not convince
5  Walmart to change its mind; is that correct?
6  A.   Yes, I think that's a good description.
7  Q.   She made all sorts of arguments, she tried different
8  things.  Walmart would not change its mind to be UEP
9  Certified; is that correct?
10 A.   Yes.  Right.
11 Q.   And eventually is that why Michael Foods chose to be part
12 of the Certified Program?
13 A.   That among other things, but this was a big piece of it,
14 yes.
15          MR. CALLOW:  Your Honor, may I approach?
16          THE COURT:  Yes.
17 BY MR. CALLOW:
18 Q.   Sir, I've handed you what, for trial purposes, I've
19 marked as Defendants' Cross Exhibit 213, February 2006 e-mail
20 chain.  Do you see that, sir?
21 A.   Yes.
22 Q.   Can you identify this for the record?
23 A.   Yes.  This was an e-mail from Jeff Thomas to myself
24 regarding the UEP Certified issue and a meeting with Sam's,
25 and then this was occurring in February of 2006.

138

```
1    Q.   So this helps give us a time frame for when you went down
2    to Bentonville to talk with the Walmart/Sam's people?
3    A.   Yes.
4    Q.   Do you recall more than one meeting with Walmart?
5    A.   I was only at one personally, but I think there might
6    have been -- I'm sure there were others with our sales team
7    and from retail, but I was only at one that I can recall.
8         MR. CALLOW:  Your Honor, I'd like to admit this
9    exhibit into evidence and display it to the jury.
10        MR. NEUWIRTH:  No objection, Your Honor.
11        THE COURT:  Okay.  213 is admitted.
12   BY MR. CALLOW:
13   Q.   Sir, I want you to focus on the bottom e-mail that's sort
14   of starts this chain --
15   A.   Okay.
16   Q.   -- which has some of the questions that they wanted to
17   ask about.  Do you see that?
18   A.   Yes.
19   Q.   And you'll see that there's a second paragraph that
20   starts:  We have had three go-arounds with the buyer at Sam's
21   as it pertains to UEP.  It was made very clear to us, without
22   exception, that the largest retailer in the world is going to
23   sell UEP eggs.  They don't care what kind of carton there are
24   in, with the shell on or not, this is coming down from
25   corporate and it is a final conversation.
```

139

```
1         Do you see that?
2    A.   Yes, I do.
3    Q.   And that was the pushback you were getting in your
4    discussions as well, correct?
5    A.   Yes.  Yes.
6    Q.   There's a reference here that:  Some UEP Certified
7    vendors are telling Walmart that they are getting more eggs
8    since they started following the guidelines which has lowered
9    their cost of eggs.
10        Do you see that?
11   A.   Yes.
12   Q.   Do you recall any discussions that you had with Walmart
13   in Bentonville in the March 2006 time frame on that particular
14   issue?
15   A.   I don't recall specifically, no.
16   Q.   There's another question that was asked:  Does Michael
17   Foods follow UEP Guidelines?  And if so, what has it done to
18   their cost of eggs?
19        Do you see that?
20   A.   Yes.
21   Q.   Was that one of the discussions that you had at your
22   Walmart meeting in March of 2006?
23   A.   Yeah, I believe there were those kinds of questions that
24   were asked.
25   Q.   Did you know what the cost was going to be at that time?
```

140

```
1    A.   No.  We were just estimating at that point.  We didn't
2    know for sure.  We knew that -- when you increased the density
3    or lowered -- how depending on the context, if you give the
4    birds more space, you do get a small increase in production or
5    productivity.  But it doesn't offset the overall costs.  But
6    there were people who -- who experienced higher levels of
7    production on a per-bird basis because of the additional
8    space.  But, again, it doesn't really equalize out with the
9    higher cost, the facility cost and the capital cost.  So at
10   the end of the day, there was still a cost increase to do UEP
11   Certified.
12        MR. CALLOW:  Your Honor, may I approach?
13        THE COURT:  Yes.
14   BY MR. CALLOW:
15   Q.   Sir, I've handed you what I've marked for trial purposes
16   as Defendants' Cross Exhibit 214.  Is that your name at the
17   top of this document?
18   A.   Yes, it is.
19   Q.   Can you identify this document for the record?
20        MR. NEUWIRTH:  Your Honor, before it's identified,
21   may we approach at a sidebar, please?  There's a significant
22   issue with this document.
23        THE COURT:  Yes.  Come on up.
24        (The following transpired at sidebar:)
25        THE COURT:  Oh, sure, well, I'll tell you what,
```

141

```
1    since we've got -- two, four, six -- a half a dozen, you go
2    sit down and we'll give the jury a break.
3         So don't talk about the case.  Come on back in five,
4    six minutes.
5         (End of sidebar.)
6         THE COURT:  Okay, what's up?
7         MR. NEUWIRTH:  Your Honor, during the testimony of
8    Mr. Airoso from -- oh, can we excuse the witness?
9         THE COURT:  Oh, sure.
10        Why don't you step down, Mr. Baker, and go enjoy the
11   hallway.
12        (Witness steps out of the courtroom.)
13        THE COURT:  You all can sit down.  I'm just standing
14   up because I'm tired.
15        MR. NEUWIRTH:  The issue, Your Honor, is this:
16   During the testimony of Mr. Airoso from Walmart, there were
17   documents handed to the witness by the Plaintiffs' counsel,
18   including a letter from Mr. Poole and -- of Walmart, and the
19   Defendants stood up and objected that because the letter was
20   unsigned and because of their concern that it was hearsay,
21   even though this was a witness from Walmart, that that letter
22   should not be introduced, it should not even be discussed by
23   Mr. Airoso, who wanted to address the authenticity of that
24   document that the UEP was -- this is counsel for -- this is
25   counsel for Michael Foods.
```

142

```
 1              THE COURT:  We've met before.
 2              MR. NEUWIRTH:  Yes.  And if Ms. Anderson is going to
 3    be here, I hope there will be an instruction that what we are
 4    discussing cannot be shared by --
 5              MS. MAHAN:  If you'd like me to leave, Your Honor,
 6    I'm happy to leave.
 7              THE COURT:  Well, I mean --
 8              MS. MAHAN:  Carrie Mahan.
 9              MR. NEUWIRTH:  I'm sorry.  I apologize.
10              MS. MAHAN:  I'll wait in the hall.  But I do have a
11    timing question before we come back.
12              MR. NEUWIRTH:  But you sustained that objection.
13    Now the Defendants in, I think, in overt violation of the
14    goose/gander rule, are seeking to show this witness an
15    unsigned letter, which does have a cover e-mail on it, but so
16    did the document that Mr. Olson tried to review with
17    Mr. Airoso, and you granted the Defendants' motion on hearsay
18    grounds, he could not even talk about that letter from his own
19    company.  And so we would object.  We believe that it's only
20    fair that the same treatment be given to this unsigned
21    letter --
22              MR. OLSON:  Can I make a clarification?  Your Honor,
23    I think what we request, this comes in with an explicit
24    limiting instruction --
25              THE COURT:  Well, I would have thought that the
```

143

```
 1    objection was going to be that this is really just redundant
 2    because we've already gone over the Walmart view and
 3    Mr. Baker's knowledge of Walmart having a particular approach.
 4    I mean, this is just cumulative.
 5              MR. OLSON:  But, Your Honor, it's actually much
 6    worse than that from our perspective.  This is -- the reality
 7    is, for what it's worth, Your Honor --
 8              THE COURT:  The last time I'm going to do
 9    anybody's work for them.
10              MR. OLSON:  We believe these letters were forged.
11              THE COURT:  Well, I'm not going there right now.
12              MR. OLSON:  I understand that.  That's what we would
13    have brought out --
14              THE COURT:  I have no basis on which to --
15              MR. OLSON:  I'm just letting you know where we're
16    going.  I'm letting you know where we're going.
17              THE COURT:  And if we're going to have a side
18    hearing on that issue, then we're going to do that either at
19    the end of the day after school is out or something else,
20    but --
21              MR. OLSON:  I'm not asking you to agree.  I'll just
22    let you know where we're going.
23              THE COURT:  I think it's cumulative.
24              MR. NEUWIRTH:  If that's a basis to keep it out,
25    fine.  But the concern -- just please, if I might just say
```

144

```
 1    this.
 2              THE COURT:  Okay.
 3              MR. NEUWIRTH:  The concern is that we were denied
 4    the opportunity to let the witness from Walmart explain the
 5    basis for --
 6              THE COURT:  And I recall that, I recall that.
 7              MR. NEUWIRTH:  -- saying that these were misleading.
 8    And so for the Defendants now to try to use these same types
 9    of letters seems totally prejudicial to the Plaintiffs, and
10    I'll just use the word goose/gander rather than a word with
11    the H.
12              MR. OLSON:  And if I may, if the Defendants are
13    doing this, which they're doing, they've already presented
14    Walmart things.  We had Chad Gregory on the stand.  All we'd
15    ask from the goose/gander perspective, because he was involved
16    in all of this, that we are allowed to establish with
17    Mr. Gregory the basis for why we believe these letters are
18    inauthentic.
19              MR. CALLOW:  I don't know anything about Chad
20    Gregory or this issue.
21              Terry Baker has an e-mail that was produced by
22    Michael Foods, that the attachment is associated with it.  I
23    intend to ask the witness if he received an e-mail and
24    attachment.  That's the sole basis.  If it's cumulative, I
25    understand, Your Honor.
```

145

```
 1              THE COURT:  How can it not be cumulative?  I've been
 2    sitting here for -- I don't know how long.
 3              MR. CALLOW:  I understand.
 4              THE COURT:  And we've talked a lot about Walmart and
 5    Walmart's views and whether they're a big customer or not big
 6    customer.
 7              MR. CALLOW:  I will move on.
 8              THE COURT:  Good.  Okay, so you're not going to be
 9    offering 214?
10              MR. CALLOW:  No, I will not.
11              THE COURT:  All right.  Now, if we do need to
12    revisit -- well, let me step back.
13              I've not heard that anybody is saying that any
14    counsel involved in this trial has any reason to believe or to
15    be offering or proposing or be proponents of documents known
16    to be false or fraudulent.  Is that correct?
17              MR. OLSON:  May I?  May I?
18              THE COURT:  I'm not hearing that.
19              MR. NEUWIRTH:  I was just going to say, the issue is
20    not an issue about any of the counsel here.  It's about what
21    happened factually at the time by the people at the UEP.
22              THE COURT:  Okay.  If that becomes important with
23    Chad, then let's talk about that separately.
24              MR. NEUWIRTH:  Okay.
25              MR. OLSON:  Okay, thank you, Your Honor.
```

146

```
1         MR. CALLOW:  I will move on from Walmart,
2    Your Honor.
3         THE COURT:  I think we covered Walmart.
4         MR. CALLOW:  I understand.
5         MR. DESTEFANO:  Can we have a break?
6         THE COURT:  Oh, yes, by all means bring the jury
7    back.  If you all need a break, I mean, very quickly.
8         (After recess.)
9         THE DEPUTY CLERK:  All rise.
10        (Jury in.)
11        THE COURT:  All right, everybody take their seats.
12        Mr. Callow, you may resume.
13        MR. CALLOW:  Thank you.
14   BY MR. CALLOW:
15   Q.   Mr. Baker, do you recall any discussions that you had
16   with Yum! Corporation, which owns Taco Bell, in the 2003 time
17   frame regarding Animal Welfare Guidelines?
18   A.   I don't recall, to be honest.
19   Q.   Do you recall discussions with Ben & Jerry's when Ben &
20   Jerry's wanted to have Animal Welfare Guideline eggs?
21   A.   Yes, I do Ben & Jerry's.  And then the Ben & Jerry's
22   relates to Unilever, since they're owned by Unilever, and they
23   still are today.  And so we were having conversations with Ben
24   & Jerry's and Unilever.
25   Q.   And what other products does Unilever manufacture for
```

147

```
1    which they needed liquid eggs from Michael Foods?
2    A.   All of Hellmann's mayonnaise, which is Unilever, was
3    being -- we were producing -- I think we were the sole
4    supplier.  So that was probably like a 40 to 50 million pound
5    customer just in -- just for Unilever proper.  And then Ben &
6    Jerry's is probably another 4 million pounds of yolk only for
7    their ice cream operation.  So...
8    Q.   And again, to help us out, how does that convert to shell
9    eggs?
10   A.   Because there was -- there was a heavy use of yolk in the
11   Unilever product.  It was kind of a combination of liquids,
12   just straight liquid whole egg, but it was also four or five
13   or the solids were much higher because it has the yolk in it.
14   So -- you're making me do --
15   Q.   I am.
16   A.   Trying to do the math in my head here.  That was
17   probably -- you know, that probably was equivalent of several
18   million birds, maybe 3 million, at least, in layer capability.
19   Because, of course, the whites then went elsewhere.  But to
20   support that business, you needed a lot of yolk, which means
21   you were breaking a lot of eggs, generating a lot of liquid
22   whites for some other customer.
23   Q.   3 million layers a year for the Michael Foods/Unilever
24   business?
25   A.   Yes.  Yes.
```

148

```
1    Q.   In this 2006, 2007 time frame?
2    A.   Yeah, yeah.
3    Q.   We talked before the lunch break about Michael Foods
4    expansion and the work that it did in the '04, '08 time frame.
5    Many of those contracts that you described were grain-based
6    contracts, weren't they?
7    A.   On the procurement side, you're referring to?
8    Q.   Yes, sir.
9    A.   Yes.  Yes.  Almost all of those were.
10   Q.   Why did Michael Foods use grain-based contracts on the
11   procurement side?
12   A.   We were -- our goal or our published objective is, we
13   tried to set and procure how we sell.  So in some cases, we
14   were trying to convert people from, say, the spot market
15   quotes and we were trying to get them to a grain-based
16   calculation, which is much less volatile.
17        Urner Barry is the commodity service in the US.
18   It's a private company that reports all of the egg pricing on
19   a spot market basis.  But it's extremely volatile.  And so to
20   give some maybe stability to a lot of customers, over the
21   long -- over the long haul in our analysis, the grain-based
22   accounts weren't necessarily lower costs overall, but they
23   were much less volatile.  Because even the grains, even with
24   some gyrations in the grain markets, they still weren't
25   anywhere close to the spot market volatility was.  So -- and
```

149

```
1    then the other ability that gave us and the end user, you
2    could hedge those on the Board of Trade, protect your pricing.
3         And so a lot of the restaurant and food service
4    groups loved that kind of pricing because if they put out a
5    menu price for an end user, many prices today, if they have to
6    change the menu very often, it's extremely expensive in this
7    day and age.  So there was a lot of attraction.  So this
8    helped us align to where we were selling as we were buying the
9    grain, and it was really a pass-through kind of operation.
10   Q.   You told us earlier that you've been director of
11   procurement for nearly 40 years, correct?
12   A.   Twenty years.
13   Q.   Twenty years?
14   A.   I did other things prior to '97.
15   Q.   You were director of procurement in this 2000 to 2008
16   time frame?
17   A.   Yes, yeah.
18   Q.   You made a number of decisions with respect to
19   construction, remodeling, purchasing, throughout that entire
20   time frame, correct?
21   A.   Yes.
22   Q.   Did you make those decisions in conjunction with some
23   other Defendant in this case?
24   A.   Um --
25   Q.   Did you talk with any other Defendants about supply?
```

150

1   A.   Well, yeah, I mean, in our industry, it's a small
2   industry and we deal in longs and shorts.  So even if we had
3   all these long-term contracts, we were still dealing with
4   several of the other Defendants in this case that we bought
5   and sold short-term week-to-week, because you're dealing with
6   a perishable commodity.  So you have to deal with it -- if
7   you're long, you're going to have to find a home pretty
8   quickly.  So -- and that's the nature of this business.  So we
9   do work with one day you're a competitor and the next day
10  they're a raw customer.  But usually when you're trading,
11  you're trading raw product.  In our case, raw liquid that's
12  unpasteurized, not finished goods.
13  Q.   When you joined the UEP Certified Program, did you stop
14  construction of any henhouses at Michael Foods?
15  A.   No.
16  Q.   Did you enter into any agreement not to replace the hens
17  that may or may not be lost by being compliant with UEP
18  Certified Program?
19  A.   No.  We only agreed to the density change.
20          MR. CALLOW:  Thank you.  I have no further
21  questions.
22          THE COURT:  Any further cross-examination from any
23  counsel?
24          MR. KING:  Nothing, Your Honor.
25          MR. BIZAR:  Nothing from us.

151

1          THE COURT:  Any redirect?
2          MR. NEUWIRTH:  Thank you, Your Honor.
3                  REDIRECT EXAMINATION
4   BY MR. NEUWIRTH:
5   Q.   Mr. Baker, you spoke at some length this afternoon in
6   response to questions from Defense counsel about some
7   materials you received related to a meeting that Sparboe had
8   with Walmart.  Do you recall that?
9   A.   Yes.
10  Q.   And do you recall, in fact, that you were shown Exhibit
11  CX-210, which I think you have in front of you --
12  A.   I think I do.
13  Q.   -- which forwarded to you an e-mail from Beth Schnell who
14  you described as one of the senior officers at that time at
15  Sparboe, correct?
16  A.   Yes.  Was it 210?
17  Q.   Yes, it says Defendants' Exhibit CX-210.
18  A.   Oh, that's a zero.  Okay, that was the zero we were
19  talking about earlier, I think.  All right.
20  Q.   Okay.  And do you see on the bottom of that page, there's
21  the e-mail from Beth Schnell dated Tuesday, November 8, 2005?
22  And then there is an e-mail that you talked about where
23  Mr. Ostrander, who I think you said was the CEO of your
24  company --
25  A.   Correct.

152

1   Q.   -- right?  CEO of Michael Foods, the chief executive
2   officer, forwarded to you and some of the other people at
3   Michael Foods, correct?
4   A.   Yes.
5   Q.   And I think that in response to a question from Defense
6   counsel, you agreed that Ms. Schnell was agitated about what
7   she had heard from Walmart, correct?
8   A.   I believe, yes.  I don't know if that was the word -- I
9   don't know, is that my word?
10  Q.   It appears in today's transcript at 14-hour, 2:48 from
11  seconds 40 to 45.
12  A.   I'll take your word for it.
13  Q.   We have it here.
14  A.   Okay.
15  Q.   The word was "agitated," okay?
16          Now, Mr. Ostrander was the CEO of your company,
17  meaning he was the chief executive officer.
18  A.   Yes.
19  Q.   Your ultimate boss, correct?
20  A.   Yes.
21  Q.   And he forwarded this e-mail to you.  Now, you -- are you
22  familiar with a gentleman at Walmart named Tony Airoso?
23  A.   I am not.
24  Q.   And obviously you have not been here to hear any
25  testimony that he might have given in this case already about

153

1   any interaction he may have had with the United Egg Producers
2   at a time when these discussions with Sparboe were taking
3   place, correct?
4   A.   No, I did not.
5   Q.   However, this e-mail that you received is dated
6   November 10, 2005, correct?
7   A.   Let's see.  Yes.
8   Q.   And isn't this what Mr. Ostrander wrote to you?  He's
9   forwarding you this summary of Beth's meeting, meaning Beth
10  Schnell with Sparboe's meeting with Walmart, correct?
11  A.   Yes, I believe this is --
12  Q.   And do you see in this e-mail he sent to you, about four
13  lines down, talking about Walmart, he says:  They, Walmart,
14  are clearly being schooled and cajoled by the UEP to strongly
15  support this initiative.
16          Meaning the Certified Program, right?  That's what
17  your CEO wrote to you when he forwarded this e-mail from
18  Ms. Schnell, correct?
19  A.   He sent the e-mail, yes.
20  Q.   Now, you also testified about another document, which was
21  marked as Defendants' Exhibit CX-219.  Do you have that?  It's
22  one of the ones with the blue sticker that you spent a lot of
23  time responding to questions about.  Do you have --
24  A.   214 is the -- am I missing --
25  Q.   No, this is 219.  CX-219.  It's your Sunday,

154

1  January 22nd, 2006 e-mail that you sent to certain of your
2  colleagues at Michael Foods, and it's the document you spoke
3  at length about regarding a meeting you had with Jeff
4  Armstrong.
5  A.  Oh.  Yeah.  Sorry.  I see it now, okay.
6  Q.  Have it?
7  A.  Got it.
8  Q.  And you recall you spoke at length about this today,
9  right?
10  A.  I think I did, yes.
11  Q.  And you went on at great length about how hearing from
12  Mr. Armstrong had a big impact on how you felt about the UEP
13  Certified Program and the 100% rule, correct?
14  A.  I was identifying what he was saying more or less, but
15  that was my intent, anyway.
16  Q.  Okay.  So it was not your intent to suggest that this
17  influenced you when you testified earlier?
18  A.  No, because we didn't convert for a while after this
19  necessarily.  But it is still a compelling argument he put out
20  there, I guess.  That's all I was suggesting.
21  Q.  Right.  And I think you answered multiple questions yes,
22  that were posed by Defense counsel about what this document
23  stood for, correct?
24  A.  Well, yeah.  As I've testified earlier, we just disagreed
25  with the 100% rule.  It didn't fit our model.  But it doesn't

155

1  change the fact of what he has here.  This is -- you know,
2  this is the science and this is the guy leading the charge
3  from science, so...
4  Q.  So let me raise my hand and tell you I have the place
5  where you said it.
6  A.  Okay.
7  Q.  But I believe that you referred to Mr. Armstrong as a
8  volunteer.  Your word was "volunteer" with the United Egg
9  Producers Scientific Advisory Committee?
10  A.  Yes, I think I did.
11          MR. CALLOW:  Your Honor --
12          THE COURT:  Yes?
13          MR. CALLOW:  It's Dr. Armstrong.
14  BY MR. NEUWIRTH:
15  Q.  Dr. Armstrong, I apologize.
16  A.  Yes, Dr. Armstrong.
17  Q.  Dr. Armstrong, a scientist?
18  A.  Yes.
19  Q.  And I think you describe him as, "a volunteer," right?
20  A.  I was under the impression he was a volunteer.
21  Q.  Now, you were a member of the United Egg Producers Board
22  of Directors, correct?
23  A.  Correct.
24  Q.  And weren't you aware that Mr. Armstrong actually had a
25  retainer agreement with the United Egg Producers --

156

1  A.  No.
2  Q.  -- where he was paid annually?
3  A.  I was not.
4  Q.  You were not aware?
5  A.  I was not aware.  That was an -- the executive committee
6  of UEP's Board does -- makes those kinds of decisions or that
7  kind of information.  So the Board largely is not privy to
8  those things.  And honestly, this is the first I've ever heard
9  of that.  So I learned something new today.  I didn't know
10  that.
11  Q.  And were you aware of other payments that the United Egg
12  Producers was making at this time to Dr. Armstrong or to
13  universities with which he was affiliated with at his request?
14  A.  I'm -- I'm assuming there was some research grants or if
15  we were looking for information or studies that needed to be
16  completed, I'm sure there were some of those.  But, again, I
17  don't know that I knew specifically who, what, and how much.
18  Q.  Were you aware that during this period, the United Egg
19  Producers paid for a trip for Dr. Armstrong and his wife to go
20  to Hawaii?
21  A.  No, I was not.
22  Q.  Right around the time when he was coming to tell you
23  about this program.
24  A.  Yes.
25  Q.  So you just didn't know any of that?

157

1  A.  No, I didn't know any of that.  I'm embarrassed to say I
2  didn't.  But, no, we did not know and we were never told these
3  things.
4  Q.  Now, again, you spent a lot of time answering questions
5  from Defense counsel about this document.
6  A.  Okay.
7  Q.  And I was here listening.  And it's correct, isn't it,
8  that you talked about, or at least said yes multiple times in
9  answers to questions that suggested that this document showed
10  how you were starting to feel and what you were considering
11  about the program with the 100% rule at this time when you
12  wrote this memo, January 22nd, 2006, right?
13          MR. BIZAR:  Eventually, Your Honor, we have to make
14  a leading objection.  It's his witness, so I object on the
15  grounds.
16          MR. NEUWIRTH:  This is obviously an adverse witness.
17          THE COURT:  No, we're not going to have this
18  discussion.  There's been no finding by the Court.  You
19  may cover the material covered on cross-examination.
20          MR. NEUWIRTH:  As I'm doing.
21  BY MR. NEUWIRTH:
22  Q.  Now, it's correct, isn't it, that you were asked these
23  questions about how this influenced how you felt and how
24  Michael Foods felt and you answered many of those questions
25  yes, correct?  We were all here --

158

1  A.  Yes, I believe so.  Yes.

2  Q.  Now, in fact, this memo that you were shown from

3  January 22, 2006, does not present, does it, everything about

4  what Michael Foods was considering at this time about this

5  program, correct?

6  A.  I'm not sure I understand the question.

7  Q.  Well, isn't it the case that within less than two months

8  of this memo, you were still telling the United Egg Producers,

9  and you were very clear that you were not making a legal

10  point, but didn't you tell the United Egg Producers within

11  less than two months of this e-mail that you believed that the

12  way that this 100% rule and the program were being addressed

13  was creating restraint of trade issues?  Isn't that true?

14  A.  I don't think it was the 100% rule was the issue.

15  Q.  Isn't it --

16  A.  The issue was the marketing license, where it was --

17  where the restraint of trade was when we were not allowed --

18  that was the point there.

19  Q.  And wasn't that marketing license one of the issues that

20  came up in those two motions that Michael Foods was opposed to

21  at that Board meeting where you voted no?

22  A.  Yes.

23  Q.  And you said they had to be considered together, the 100%

24  rule and the marketing license, you told us that earlier,

25  those two motions when Michael Foods --

159

1  A.  My recollection is the two motions that were talked about

2  were both related to the marketing license, not the 100% rule.

3  Q.  Okay.  They both related to the Certified Program.

4  A.  Well, they both had to do with the Certified Program, but

5  they're two separate issues.

6  Q.  So at this same time that you were writing this memo

7  about Dr. Armstrong, within less than two months you were

8  still telling the United Egg Producers that you had a concern

9  related to the program, related to a restraint of trade,

10  correct?

11        MR. CALLOW:  Objection.  Asked and answered,

12  Your Honor.  I think we've established --

13        THE WITNESS:  I don't recall.  I'd --

14        THE COURT:  Hold on for just a second.

15        Do you want to move on?

16        MR. NEUWIRTH:  Well --

17        THE COURT:  I thought the objection was going to be

18  leading, but -- so I was wrong.

19        MR. CALLOW:  Objection.

20        THE COURT:  But I do think you've covered that.

21        Do you want to finish your answer?  And then

22  Mr. Neuwirth can --

23        THE WITNESS:  Well, I don't -- I'd have to go back

24  and figure out the timeline here just to be sure, so...

25  BY MR. NEUWIRTH:

160

1  Q.  Let me give you something to refresh your recollection.

2  A.  Okay.

3  Q.  Let me give you what's been marked as Plaintiffs'

4  Exhibit 170.  And does this document refresh your recollection

5  as to whether, on March 13th, 2006, just a number of weeks

6  after your meeting with Dr. Armstrong, you wrote to your

7  colleagues, including Mr. Ostrander, the CEO of the company,

8  that you had spoken with Gene Gregory at the United Egg

9  Producers about what you considered not as a legal issue, but

10  just that you considered there to be aspects of the Certified

11  Program that were creating restraint of trade issues?  That's

12  true, isn't it?

13  A.  Yes, as it relates, again, to the marketing license.  I

14  think -- I haven't got through it all, but I think that's what

15  this e-mail I sent on the 13th, that's what I was referring to

16  is the marketing license, which we had talked about earlier

17  today with -- as it related to Cargill and Cargill/Sunny

18  Fresh, the same difference, whether or not they were producers

19  and they could have the marketing license.

20  Q.  Right.  But you, as the company, said this morning, you

21  as a company that was also producing eggs, could not, under

22  the UEP rules that were adopted that Michael Foods, voted

23  against, correct?

24  A.  Yes, for the marketing license.

25  Q.  Right.  Now, is it correct that when Michael Foods joined

161

1  the Certified Program in 2006, with the rules in place,

2  including those two motions that you had voted against in

3  place, is it correct that at that point under the 100% rule as

4  it existed and the marketing rules, that Michael Foods was

5  agreeing that it would only use Certified eggs to create its

6  egg products?

7  A.  No.

8  Q.  And what was it agreeing?

9  A.  It was agreeing that we would start down the conversion

10  trail with our farm sector, and, number two, the other

11  important piece of it was since we could not market any of --

12  even after our birds met the UEP Guidelines on a specific farm

13  or a different site, we were not allowed to market those as

14  UEP Certified until we had 100 percent of our flocks converted

15  to the program.

16        So in the interim, which was roughly assumed to be a

17  two-year period, we were allowed -- we were -- in spite of the

18  two motions that you're referring to, part of that negotiation

19  then, they did give us a marketing license so that we could

20  buy from other Certified producers to be able to service our

21  customer requirements for UEP Certified and the logo.

22  Q.  Now, you were asked during the examination by Defense

23  counsel about a series of egg production facilities of other

24  companies?

25  A.  Um-hum.

162

1   Q.   And you testified that during -- I think, mainly during
2   the years 2004, 2005 -- there may have been one exception
3   later -- but during those years, that Michael Foods was giving
4   some financial support to some of these suppliers of eggs to
5   help them build additional facilities.  Is that a correct
6   understanding of your testimony?
7   A.   No.
8   Q.   Okay.  So what were you trying to say?
9   A.   What we were trying to say was we didn't do any
10   financial -- like, we didn't help finance them, other than we
11   gave them a contract that was for a long-term extended period
12   in that seven, ten-year category to allow them to go to a bank
13   or a farm credit or one of those kinds of lenders that would
14   back up their request for credit and a loan or a construction
15   loan to build these facilities.  That's -- and so, I don't
16   know if "underwriting" is the proper term, but that was what
17   somebody -- the people referred to it as.
18   Q.   And if you had a company -- let's say one of those
19   companies that was doing that was Company X --
20   A.   Um-hum.
21   Q.   -- and you were purchasing their eggs to make your egg
22   products, when Michael Foods joined the Certified -- Certified
23   Program in 2006, subject to whatever phase-in you had
24   negotiated, would those suppliers of eggs to Michael Foods
25   also need to comply with the cage space requirements of the

163

1   UEP Certified Program?
2   A.   They did not.
3   Q.   Now, you --
4   A.   I'm sorry.  Let me correct that.  We had - depending on
5   where they were and the conditions, we could -- we may have
6   asked somebody to convert, I don't remember, but I think we
7   did some of them that might have been in the program for other
8   reasons, and if they were already a UEP Certified Producer
9   that was going to work with us, then they had to be UEP
10   Certified.
11         So it's just a -- but most of them, if they were a
12   separate corporation or an LLC or something, a new entity that
13   didn't control any other layers, then they probably were not.
14   They were outside of the program.
15   Q.   So it sounds like some of them would have been --
16   A.   Could have been.
17   Q.   -- in the program based on what you described.  In fact,
18   once Michael Foods joined the program, it sounds like you even
19   asked some of them?
20   A.   Yes, yes.
21   Q.   Now, it's correct -- I think you said this morning
22   Michael Foods is the largest producer of egg products in the
23   United States?
24   A.   Yes.
25   Q.   And so Michael Foods --

164

1   A.   No, I'm sorry.  Processor.
2   Q.   Egg processor?
3   A.   I don't know if you said producer or processor.
4   Q.   I'm sorry.  I meant to say processor.
5   A.   That's right, because Cal-Maine would come after me if I
6   said that.
7   Q.   So you were -- you were -- you are -- and during this
8   period, you were the largest producer in the United States of
9   processed egg products, correct?
10   A.   There we go.
11   Q.   And that means, and I think you described some of this,
12   you were using a lot of eggs to make your processed egg
13   products, correct?
14   A.   Yes, correct.
15   Q.   And that means from these suppliers, you were acquiring a
16   lot of eggs.  I think you spoke earlier about how many pounds
17   of eggs and how many dozens of eggs we were talking about.
18   It's a lot of eggs.
19   A.   Um-hum.  Yes.
20   Q.   And so even a portion of the eggs you used is a lot of
21   eggs, isn't it?
22   A.   Yes, that would be an accurate description.
23   Q.   You were shown some news articles relating to McDonald's
24   and Burger King.  Do you recall that?
25   A.   Yes, I do.

165

1   Q.   And with respect to Burger King, which you described as
2   one of your customers, you were shown some materials from
3   2002.  Do you recall that?
4   A.   Yes.
5   Q.   And Burger King, according to you, had some concerns
6   about animal welfare that McDonald's also raised.  Do you
7   recall talking about that today?
8   A.   Yes.
9   Q.   And is it correct that your testimony today was that in
10   response to these concerns expressed by Burger King, you were
11   able to be responsive to Burger King by isolating one of your
12   farms in Minnesota to provide eggs that would meet the
13   requirements for animal welfare that Burger King had set?
14   A.   That's correct.
15   Q.   Now, in 2002, did Burger King go to Michael Foods and
16   say, We don't want to buy your eggs anymore?
17   A.   That I'm not -- I'm not aware of the conversation.  I
18   wasn't part of the specific negotiations, so I don't know.
19   Q.   Well, you -- you said that Mike -- that Michael Foods is
20   able to create or dedicate this facility --
21   A.   Yes.
22   Q.   -- to producing eggs that met Burger King's requirements.
23   Once that facility was up and running, was Burger King buying
24   eggs from that facility from Michael Foods?
25   A.   Yes, they were, yes.

1   Q.   And after that facility was up and running, let's say in

2   2003 or 2004, did Burger King suddenly go to Michael Foods and

3   say, we don't want to buy your eggs anymore?

4   A.   Not that I'm aware of, no.

5   Q.   In fact, they remained a major customer, right?

6   A.   Yes.  Yes.

7   Q.   And that was true in 2005, isn't it?

8   A.   I believe so, yes.

9   Q.   And Michael Foods didn't join the Certified Program with

10  the 100% rule until 2006, correct?

11  A.   That's when we first joined, yes.  We weren't Certified

12  until 2008.

13          MR. NEUWIRTH:  No further questions, Your Honor.

14          THE COURT:  Any further cross-examination?

15          MR. CALLOW:  No, Your Honor.

16          THE COURT:  From anybody?

17          MR. BIZAR:  No, Your Honor.

18          THE COURT:  Mr. Baker, thanks.

19          THE WITNESS:  Thank you.

20          THE COURT:  You can step down.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Righto.  Travel safely.  You may call

23  your next witness.

24          MR. LYONS:  Your Honor, the Plaintiffs call Linda

25  Reickard.