# ATTACHMENT 10

1

1          IN THE UNITED STATES DISTRICT COURT

      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

   IN RE:  PROCESSED EGG PRODUCTS :  MDL No. 2002

3  ANTITRUST LITIGATION          :  No. 08-MD-02002

   ------------------------------:

4  THIS DOCUMENT APPLIES TO:      :

   ALL ACTIONS                    :

5  -------------------------------------------------

6  IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS

            TWENTY-NINTH JUDICIAL DISTRICT

7

   ASSOCIATED WHOLESALE GROCERS,  :  Case No.

8  INC., et al.,                  :  10-cv-2171

         Plaintiffs,              :

9          v.                     :

   UNITED EGG PRODUCERS, et al.,  :

10         Defendants.            :

11

12             ** HIGHLY CONFIDENTIAL **

13

14             Wednesday, April 23, 2014

15

16             Videotaped deposition of KAREN

17  BROWN, taken at the offices of Pepper

18  Hamilton LLP, 600 Fourteenth Street, N.W.,

19  Washington, D.C. 20005, beginning at 10:54

20  a.m., before LINDA ROSSI RIOS, a Federally

21  Approved RPR, CCR and Notary Public.

22

23

24

25

**2**

```
1   A P P E A R A N C E S :
2
3   KENNY NACHWALTER
    BY:  DOUGLAS H. PATTON, ESQUIRE
4        and
         SAMUEL J. RANDALL, ESQUIRE
5   1100 Miami Center
    201 South Biscayne Boulevard
6   Miami, FL  33131
    305-373-1000
7   dpatton@kennynachwalter.com
    srandall@kennynachwalter.com
8   On behalf of Kroger Plaintiffs
9
10  QUINN EMANUEL URQUHART & SULLIVAN
    BY:  LEE TURNER FRIEDMAN, ESQUIRE
11  51 Madison Avenue, 22nd Floor
    New York, NY  10010
12  212-849-7129
    leefriedman@quinnemanuel.com
13  On behalf of the Direct Purchaser
    Plaintiffs in the MDL Litigation
14
15  STRAUS BOISE
    BY:  MARK J. SCHIRMER, ESQUIRE
16  4041 University Drive
17  5th Floor
    Fairfax, VA  22030
18  703-764-8700
    mschirmer@straus-boise.com
19  On behalf of Indirect Purchaser Plaintiffs
    (Via teleconference)
20
21
22
23
24
25
```

**4**

```
1   A P P E A R A N C E S :
2
3   PORTER, WRIGHT, MORRIS & ARTHUR
    BY:  DONALD M. BARNES, ESQUIRE
4   1900 K Street, NW
    Suite 1110
5   Washington, D.C.  20006
    202-778-3056
6   dbarnes@porterwright.com
    On behalf of Rose Acre Farms
7
8
    FAEGRE BAKER DANIELS
9   BY:  E. JASON BURKE, ESQUIRE
    311 S. Wacker Drive
10  Suite 4400
    Chicago, IL  60606
11  317-212-2264
    jason.burke@faegrebd.com
12  On behalf of Midwest Poultry Services
    (Via teleconference)
13
14
    WEIL GOTSHAL & MANGES
15  BY:  CARRIE M. ANDERSON, ESQUIRE
    1300 Eye Street, NW
16  Suite 900
    Washington, D.C.  20005
17  202-682-7231
    carrie.anderson@weil.com
18  On behalf of Michael Foods
19
20  HUTCHINSON P.A.
    BY:  TROY J. HUTCHINSON, ESQUIRE
21  1907 Wayzata Boulevard E
    Suite 330
22  Wayzata, MN  55391
    952-215-0141
23  On behalf of Sparboe Farms
24
25
```

**3**

```
1   A P P E A R A N C E S :
2
3   STUEVE SIEGEL HANSON LLP
    BY:  BRADLEY T. WILDERS, ESQUIRE
4   460 Nichols Road
    Suite 200
5   Kansas City, MO  64112
    816-714-7126
6   wilders@stuevesiegel.com
    On behalf of the Plaintiffs in the Kansas
7   Associated Wholesale Grocers litigation
8
9   PEPPER HAMILTON, LLP
    BY:  EVAN W. DAVIS, ESQUIRE
10       and
         ROBIN P. SUMNER, ESQUIRE
11  3000 Two Logan Square
    18th & Arch Street
12  Philadelphia, PA  19103
    215-981-4245
13  215-981-4652
    davisew@pepperlaw.com
14  sumner@pepperlaw.com
    On behalf of United Egg Producers and the
15  United States Egg Marketers
16
17  CROWELL & MORING
    BY:  KATHLEEN CLAIR, ESQUIRE
18  1001 Pennsylvania Avenue NW
    Washington D.C.  20004-2595
19  202-624-2951
    kclair@crowell.com
20  On behalf of Daybreak Foods
21
22
23
24
25
```

**5**

```
1   A P P E A R A N C E S :
2
3   EIMER STAHL, LLP
    BY:  VANESSA G. JACOBSEN, ESQUIRE
4   224 South Michigan Avenue
    Suite 1100
5   Chicago, IL  60604
    312-660-7604
6   vjacobsen@eimerstahl.com
    On behalf of Moark, LLC
7   and Norco Ranch, Inc.
    (Via teleconference)
8
9
    GIBSON DUNN & CRUTCHER
10  BY:  JASON C. MCKENNEY, ESQUIRE
    2100 McKinney Avenue
11  Suite 1100
    Dallas, TX  75201-6912
12  214-698-3279
    jmckenney@gibsondunn.com
13  On behalf of the Defendant, Cal-Maine
14
15  GEORGE GREEN, ESQUIRE
    General Counsel Food Marketing Institute
16  2345 Crystal Drive
    Suite 800
17  Arlington VA  22202
    202-220-0613
18  On behalf of the Witness
19
20  A L S O  P R E S E N T :
21  KIMBERLY JOHNSON, Videographer
22
23
24
25
```

2  (Pages 2 to 5)

**6**

I N D E X
- - -
Testimony of: KAREN BROWN
By Ms. Sumner                    15, 333
By Mr. Hutchinson                236
By Mr. Wilders                   237, 361
By Mr. Randall                   301
By Mr. Barnes                    348, 370

- - -
E X X I B I T S
- - -
EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED

Brown-1      Subpoena              16

Brown-2      The Food Marketing
             Institute and the
             National Council of
             Chain restaurants:
             animal welfare and the
             retail food industry in
             the United States of
             America article,
             CM00731181 - 0731189    34

Brown-3      PowerPoint presentation,
             FMI-003053 - 003077     37
Brown-4      FMI Meeting Notes
             November 29, 2000 PETA,

             FMI-001209 & 001210     53

Brown-5      E-mail chain,
             FMI-001078 & 001079     74

**8**

E X H I B I T S (cont'd.)
- - -
EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED

Brown-16     Summary of Meeting with
             FMI - December 13, 2001,
             MPS-00047338            169

Brown-17     1/21/02 Letter,
             FMI-000899 - 000904     176
Brown-18     Interim Report FMI-NCCR
             Animal Welfare Program
             February 15, 2002,
             FMI-000245 - 000249     186

Brown-19     June 2002 Report
             FMI-NCCR Animal Welfare
             Program,
             FMI-000015 - 000022     186
Brown-20     January 2003 Report
             FMI-NCCR Animal Welfare
             Program,
             FMI-000001 - 000014     186

Brown-21     June 2003 Report,
             FMI-NCCR Animal Welfare
             Program,
             FMI-000105 - 000110     186

Brown-22     7/2/02 Letter,
             FMI-002277 - 002293     194

Brown-23     Status FMI-NCCR Animal
             Welfare Guidelines
             Updated October 2004,
             FMI-000077 & 000078     195

Brown-24     Status FMI-NCCR Animal
             Welfare Guidelines
             Updated February 2005,
             FMI-000075              195

**7**

E X H I B I T S (cont'd.)
- - -
EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED

Brown-6      8/31/01 Fax memo,
             FMI-001205 - 001208     83
Brown-7      7/2/01 Fax,
             FMI-001129 - 001142     108

Brown-8      8/13/01 Fax,
             FMI-001099 - 001117     124
Brown-9      12/11/01 Letter,
             UE0178561 & 0178562     147

Brown-10     8/16/02 Fax,
             FMI-001066 - 001077     158
Brown-11     Animal Welfare
             Conference Call
             Wednesday,
             June 6, 2001,
             FMI-000680 - 000683     165
Brown-12     Animal Welfare Meeting
             San Diego, CA
             February 10-12, 2003,
             FMI-000296 - 000305     165

Brown-13     FMI-NCCR Animal Welfare
             Advisors Meeting
             May 13-14, 2003,
             FMI-002809 - 002813     165
Brown-14     Animal Welfare Advisory
             Committee Meeting
             Arlington, VA
             May 22-24, 2007,
             FMI-003402 - 003407     165
Brown-15     Meeting Summary FMI-NCCR
             Animal Welfare Advisory
             Committee
             November 17-19, 2008,
             FMI-003389 - 003392     165

**9**

E X H I B I T S (cont'd.)
- - -
EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED

Brown-25     Status FMI-NCCR Animal
             Welfare Guidelines
             Updated March 2007,
             FMI-000076              195

Brown-26     Status FMI-NCCR Animal
             Welfare Guidelines
             Updated May 2008,
             FMI-004436              195
Brown-27     E-mail chain,
             FMI-001781 - 001783     207

Brown-28     E-mail chain,
             FMI-003090 & 003091     214
Brown-29     12/27/02 E-mail,
             FMI-001983              221

Brown-30     6/6/07 E-mail,
             FMI-003393 - 003395     226
Brown-31     United Egg Producers
             Animal Husbandry
             Guidelines for U.S.
             Egg Laying Flocks 2006
             Edition,
             FMI-000386 - 000408     232

Brown-32     1/9/03 Letter,
             FMI-001915 - 001917     247
Brown-33     12/20/02 E-mail,
             FMI-001984              253

Brown-34     E-mail chain,
             FMI-001778              260
Brown-35     E-mail chain,
             FMI-002537 & 002538     265

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430

10

E X H I B I T S (cont'd.)
- - -
EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED

Brown-36    10/18/04 E-mail,
            FMI-003137        270
Brown-37    E-mail chain,
            UE0762934         278

Brown-38    E-mail chain,
            FMI-001461        290
Brown-39    9/22/03 Letter,
            Bates UE295185    297

- - -

11

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
Page   Line          Page   Line
(None)


REQUEST FOR PRODUCTION OF DOCUMENTS
Page   Line
362


STIPULATIONS
Page   Line
(None)

QUESTIONS MARKED

Page   Line
(None)

12

- - -

VIDEOGRAPHER:  We are now on the record.  My name is Kim Johnson, representing Veritext.  The date today is April 23, 2014.  The time is 10:54.  This deposition is being held at Pepper Hamilton located at 600 Fourteenth Street, N.W., Washington, D.C., and is being taken by counsel for the plaintiffs.  The caption of this case is Processed Egg Products Antitrust Litigation, and it's filed in the U.S. District Court for the Eastern Pennsylvania, Case Number 08-MD-02002.  Also taken in the matter of Associated Wholesale Grocers, Inc., et al. versus United Egg Producers, et al. filed in the District Court of Kansas, Case Number 10-cv-2171.

The name of the witness is Karen Brown.

At this time the attorneys present in the room and attending remotely will identify themselves and

13

the parties they represent.

MR. GREEN:  George Green for the witness.

MR. RANDALL:  Sam Randall from Kenny Nachwalter on behalf of Kroger plaintiffs.

MR. PATTON:  Doug Patton with Kenny Nachwalter, also on behalf of the Kroger plaintiffs.

MR. WILDERS:  Brad Wilders from Stueve Siegel Hanson on behalf of the plaintiffs in the Kansas Associated Wholesale Grocers litigation.

MS. FRIEDMAN:  Lee Turner Friedman on behalf -- from Quinn Emanuel on behalf of Direct Purchaser Plaintiffs in the MDL litigation.

MS. SUMNER:  Robin Sumner, Pepper Hamilton on behalf of United Egg Producers and United States Egg Marketers.

MR. DAVIS:  Evan Davis from Pepper Hamilton on behalf of United Egg Producers and United States Egg

4 (Pages 10 to 13)

14

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  Marketers.
3         MS. ANDERSON:  Carrie Anderson,
4  Weil Gotshal on behalf of Michael
5  Foods.
6         MS. CLAIR:  Kathleen Clair with
7  Crowell & Moring on behalf of Daybreak
8  Foods.
9         MR. BARNES:  Don Barnes with
10  Porter Wright on behalf of Rose Acre
11  Farms.
12         MR. MCKENNEY:  Jason McKenney
13  from Gibson Dunn & Crutcher on behalf
14  of Cal-Maine Foods.
15         VIDEOGRAPHER:  On the phone?
16         MR. SCHIRMER:  Mark Schirmer,
17  Straus & Boies on behalf of the
18  indirect purchasers.
19         MS. JACOBSEN:  Vanessa Jacobsen
20  on Eimer Stahl for defendants, Moark,
21  LLC. and Norco Ranch, Inc.
22         MR. BURKE:  Jason Burke with
23  Faegre Baker Daniels on behalf of
24  Midwest Poultry Services.
25         VIDEOGRAPHER:  At this time our

15

1
2  court reporter, Linda Rossi,
3  representing Veritext will swear in
4  the witness and we can proceed.
5         - - -
6         KAREN BROWN, after having been
7  duly sworn, was examined and testified
8  as follows:
9         - - -
10         EXAMINATION
11         - - -
12  BY MS. SUMNER:
13     Q.    Good morning, Ms. Brown.  My
14  name is Robin Sumner.  I'm an attorney with
15  Pepper Hamilton, and I'll be taking your
16  deposition this morning.
17         Could you, please, state your
18  full name and current address for the record?
19     A.    Karen Huter Brown, 1445 McLean
20  Mews Court, McLean, Virginia 22101.
21     Q.    Ms. Brown, have you been
22  deposed before?
23     A.    Yes.
24     Q.    You're familiar with the
25  process, I'll just go over a couple of quick

16

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  reminders before we get started.  I'm going
3  to be asking you a series of questions this
4  morning.  If you don't understand my question
5  or need a clarification, please ask and I'd
6  be happy to do my best to provide that.  If
7  you don't ask, I'm going to assume that you
8  understand the question.  Is that okay with
9  you?
10     A.    Yes.
11     Q.    If you need a break, please ask
12  and we can take a break at any time.
13         Is there any reason or thing
14  that will prevent you from testifying
15  truthfully and accurately here today?
16     A.    No.
17         - - -
18         (Exhibit Brown-1, Subpoena, was
19         marked for identification.)
20         - - -
21  BY MS. SUMNER:
22     Q.    Ms. Brown, I'm showing you a
23  document that's been marked as Brown
24  Exhibit 1.  It's a subpoena issued from the
25  United States District Court for the Western

17

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  District of Virginia.
3         Do you recognize this document?
4     A.    No.
5     Q.    Have you ever seen this before?
6     A.    No.
7     Q.    Do you understand that it is a
8  subpoena for your testimony and for documents
9  served by defendants in this litigation?
10     A.    Yes.
11     Q.    And do you understand that you
12  are here to testify under oath pursuant to
13  this subpoena?
14     A.    Yes.
15     Q.    Do you understand that the
16  testimony you give today can be used for --
17  at trial in the litigation in Pennsylvania
18  and in Kansas?
19     A.    Yes.
20     Q.    Did you prepare for this
21  deposition?
22     A.    I talked with counsel.
23     Q.    Did you speak with anyone other
24  than counsel in preparation for your
25  deposition?

5 (Pages 14 to 17)

18

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2     A.    No.
3     Q.    When you refer to "counsel,"
4  are you referring to your counsel Mr. Green?
5     A.    I am.
6     Q.    Did you speak with any other
7  counsel in preparation for this deposition?
8     A.    No.
9     Q.    Have you at any time spoken
10 with any counsel in this room other than Mr.
11 Green?
12    A.    Two years ago Mr. Patton.
13    Q.    And what did you speak with
14 Mr. Patton about when you talked with him two
15 years ago?
16    A.    He just called to inform me
17 that this case -- about the case, that it
18 involved -- that I may be called as a
19 witness.
20    Q.    Did he provide any substance
21 about the case during your conversation?
22    A.    Only in general.
23    Q.    What do you recall about what
24 he said to you?
25    A.    I don't really recall what he

19

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  said exactly.
3     Q.    Do you recall anything at all?
4     A.    It's about eggs.
5     Q.    Did he explain to you the
6  allegations in the case?
7     A.    Yes.
8     Q.    And what did he explain to you
9  about those allegations?
10    A.    That the -- there was a
11 question, an allegation of potential price
12 fixing on the part of egg producers.
13    Q.    Do you recall anything else?
14    A.    Nope.
15    Q.    What was your reaction to
16 Mr. Patton's description of the allegations
17 in the case?
18    A.    I hope the case settles was my
19 reaction.
20    Q.    Why is that?
21    A.    I would not have to be here
22 today.
23    Q.    Any other reaction?
24    A.    No.
25    Q.    Anything else you recall about

20

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  your conversation with Mr. Patton?
3     A.    No.
4     Q.    Did you ever speak to
5  Mr. Patton again after that --
6     A.    No.
7     Q.    -- initial conversation?
8     A.    Not that I recall.
9     Q.    The court reporter is going to
10 be working probably harder than any of us
11 today.  She needs to get down on the record
12 everything that's said.  So it's helpful for
13 her if you and I just let each other finish
14 before we talk.  So give me a minute to
15 finish my questions before you answer just so
16 she can catch up.
17    A.    Okay.
18    Q.    I think we're both going to
19 need to slow down or she's going to be the
20 one asking for a break very quickly.
21          Other than Mr. Patton, have you
22 spoken with any other lawyers about this
23 case?
24    A.    No.
25    Q.    Did you talk to anyone at FMI?

21

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2     A.    No.
3     Q.    Are you currently employed, Ms.
4  Brown?
5     A.    No.
6     Q.    What was your last employment?
7     A.    Food Marketing Institute.  I
8  retired on January 30, 2009.
9     Q.    How long were you employed by
10 the Food Marketing Institute?
11    A.    40 years.
12    Q.    And what was your position at
13 FMI when you retired?
14    A.    I was a senior vice president.
15    Q.    What were your responsibilities
16 in that role as senior vice president?
17    A.    I had an eclectic portfolio
18 that included marketing and communications,
19 food safety membership, issues management,
20 crisis management.
21    Q.    Did it include animal welfare?
22    A.    As an issue, yes.
23    Q.    How long had you been in -- did
24 you hold the role of senior vice president at
25 FMI?

6 (Pages 18 to 21)

22

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    A.    I don't recall.  Mid '90s.
3    Q.    And what did you do for FMI
4 prior to becoming senior vice president?
5    A.    I was vice president.
6    Q.    Were your responsibilities
7 substantially similar to those you held as
8 senior vice president?
9    A.    No.
10    Q.    What did you do as vice
11 president?
12    A.    I was vice president of
13 communications.  Prior to that, I was vice
14 president of consumer affairs.
15    Q.    And those roles ended in the
16 early 1990s?
17    A.    No.  I was vice president of
18 consumer affairs until '81, and I was vice
19 president of communications until I became a
20 senior VP.
21    Q.    And that was in the early '90s?
22    A.    I think.
23    Q.    In your -- over the course of
24 your 40-year employment with FMI, did you
25 have regular contact with FMI's members?

23

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2        MR. WILDERS:  Objection.  Vague.
3        THE WITNESS:  Yes.
4 BY MS. SUMNER:
5    Q.    Did you come to know them well
6 during that time?
7        MR. WILDERS:  Objection.  Vague.
8        THE WITNESS:  Can you define
9    what you mean by "know them well"?
10 BY MS. SUMNER:
11    Q.    Well, did you attend meetings
12 with them?
13    A.    Yes.
14    Q.    And did you attend industry
15 functions with them?
16    A.    Yes.
17    Q.    Did you talk to them on the
18 phone?
19    A.    Yes.
20    Q.    Did you acquire a working
21 knowledge of the retail food business through
22 that contact and during the course of your
23 employment with FMI?
24        MR. WILDERS:  Objection.
25    Compound and vague.

24

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2        THE WITNESS:  My knowledge about
3    the retail food industry came from
4    many sources.
5 BY MS. SUMNER:
6    Q.    What were --
7    A.    Research, education, colleagues
8 in -- within FMI, visiting stores, talking
9 with members about issues that they were
10 concerned about, that FMI could help them
11 with.
12    Q.    Through all of those things and
13 your contact with FMI's members, did you gain
14 an understanding as to how their businesses
15 operated?
16    A.    Individually, no.  In general,
17 yes.
18    Q.    Through the course of your
19 employment at FMI and the contact with the
20 members, did you gain an understanding of the
21 concerns that they had about what was going
22 on in the industry at various points in time?
23        MR. RANDALL:  Objection to form.
24        MR. WILDERS:  And also vague.
25 BY MS. SUMNER:

25

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    You can go ahead and answer the
3 question.  They're going to make objections
4 to preserve them for the record, but unless
5 your counsel instructs you not to answer, you
6 need to answer the question.
7    A.    Can you repeat the question?
8    Q.    Sure.  Through the course of
9 your employment at FMI and the contact that
10 you had with the members that you just
11 described during that employment, did you
12 gain an understanding of the concerns they
13 had about what was going on in the industry?
14        MR. RANDALL:  Objection to form.
15        MR. WILDERS:  Same objection.
16        THE WITNESS:  Mainly the
17    concerns that they shared with me were
18    concerns that related to their
19    customers.
20 BY MS. SUMNER:
21    Q.    Did you gain an understanding
22 of their concerns about animal welfare?
23        MR. RANDALL:  Objection to form.
24        MR. WILDERS:  Objection.  Vague.
25        THE WITNESS:  From the

7 (Pages 22 to 25)

26

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2        standpoint as an issue that was
3        affecting their customers, yes.
4   BY MS. SUMNER:
5        Q.    What about as an issue that was
6   affecting their businesses?
7              MR. WILDERS:  Same objection.
8              THE WITNESS:  They were most
9        concerned about how it was affecting
10       their customers.
11  BY MS. SUMNER:
12       Q.    Why?
13       A.    They were not -- they were not
14  experiencing -- they had some letters from
15  PETA that they had received, and that
16  concerned them as to how to answer it, and
17  how it would affect what PETA's actions may
18  have contributed to their own public image.
19       Q.    And when you say "to their own
20  public image," you mean the public image of
21  your members?
22             MR. WILDERS:  Objection.
23       Leading.
24             THE WITNESS:  Repeat the
25       question?

27

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2   BY MS. SUMNER:
3        Q.    You used the phrase --
4        A.    I'm trying to understand your
5   context.
6        Q.    You said -- testified that they
7   were concerned -- that your members were
8   concerned about how PETA's actions may have
9   contributed to their own public image.
10       A.    I didn't say contribute.
11       Q.    You did say contribute.
12       A.    I said affected.  Might affect.
13             MR. RANDALL:  Objection to form.
14             MR. WILDERS:  Badgering.  And
15       argumentative.
16             MS. SUMNER:  If we could just
17       have one objection for all, it would
18       be helpful just to speed this along
19       because we have limited time with this
20       witness today and I don't think we
21       want to keep her here unnecessarily.
22  BY MS. SUMNER:
23       Q.    I'm just going to read back one
24  of your answers that the court reporter took
25  down, and if you want to modify it or change

28

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2   it, let me know, I'm just trying to
3   understand it.
4        I asked you the question -- you
5   said they were most concerned about how it
6   was affecting their customers.  I asked you
7   the question why and your response was, they
8   had received some letters from PETA that they
9   had received and that concerned them as to
10  how to answer it and how it would affect what
11  PETA's actions may have contributed to their
12  own public image.
13       My question to you is, when you
14  say "their own public image," you're talking
15  about the public image of your members?
16             MR. WILDERS:  Objection.
17       Leading.
18             THE WITNESS:  Correct.  The
19       industry as a whole.
20  BY MS. SUMNER:
21       Q.    When you say "the industry,"
22  what industry are you referring to?
23       A.    I'm talking about the
24  supermarket industry.
25       Q.    Let me finish the question or

29

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2   she's not going to be able to get it down.
3        Who were FMI's members?
4        A.    FMI's members were large
5   chains, regional chains, small companies,
6   independent operators, cooperative
7   wholesalers and voluntary wholesalers.
8        Q.    In what industry?
9        A.    The supermarket industry.
10       Q.    Now, through your contact with
11  FMI's members over the 40 years that you were
12  employed by FMI, did you gain an
13  understanding of those member's views on
14  animal welfare?
15             MR. WILDERS:  Objection.  Vague.
16             THE WITNESS:  Animal welfare was
17       a fairly new issue.  It did not span
18       40 years.  The issue became a public
19       issue for food retail in general in
20       the late '90s, beginning of 2000.
21  BY MS. SUMNER:
22       Q.    And once it became an issue for
23  FMI's members, in the course of your
24  employment at FMI, did you gain an
25  understanding of those members' views on

8 (Pages 26 to 29)

30

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    animal welfare?
3         MR. WILDERS: Objection.
4         Assumes facts not in evidence, and
5         vague as to members.
6    BY MS. SUMNER:
7         A.   They didn't really express
8    their views. They were looking to FMI to
9    help them approach the issue in a way that
10   would enhance or improve the humane handling
11   of farm animals.
12        Q.   And what was your understanding
13   as to why those members were looking to FMI
14   to help them approach the animal welfare
15   issue?
16        MR. WILDERS: Vague. Assumes
17        facts not in evidence.
18        THE WITNESS: They had an
19        example from the quick serve industry
20        where the animal rights organizations
21        were attacking them publicly and
22        asking them to take specific actions.
23        The response of some of the members of
24        the quick serve industry was to come
25        up with specific guidelines that they

31

1         KAREN BROWN - HIGHLY CONFIDENTIAL
2         as an individual company, I'm not
3         talking about the supermarket industry
4         now, I'm talking about the quick serve
5         restaurant industry, to come up with
6         specific actions that would enhance
7         the humane handling of farm animals,
8         particularly in the area of space
9         allocation. Because there were many
10        different proposals or requirements by
11        individual companies in the quick
12        serve industry, the supermarket
13        industry at that time was under the
14        radar, and they felt that it would be
15        a better approach to try to get ahead
16        of the issue in a way that would
17        improve humane handling and also give
18        them a story they could tell their
19        customers about what they were doing
20        in the area of humane handling.
21   BY MS. SUMNER:
22        Q.   Why did FMI's members want to
23   get ahead of the issue?
24        MR. WILDERS: Objection. Calls
25        for the witness to speculate.

32

1         KAREN BROWN - HIGHLY CONFIDENTIAL
2         THE WITNESS: I think it's good
3         business to get ahead of an issue.
4    BY MS. SUMNER:
5         Q.   Do you have an understanding of
6    why they wanted to get ahead of the issue?
7         A.   They certainly wanted to be
8    able to have an approach that was going to
9    enhance the humane handling of animals and to
10   be able to publicize what their approach was
11   going to be so that their customers would
12   know what their involvement was. There were
13   public campaigns being undertaken, executed
14   against the members of the quick serve
15   industry by PETA and other animal rights
16   organizations, and that's a very
17   uncomfortable position for a company to be
18   in, and it makes it difficult for them to
19   tell their own story and play catch up.
20        Q.   And was that what was happening
21   to your members?
22        MR. WILDERS: Objection.
23        THE WITNESS: Our members were
24        not at that point on the -- being
25        attacked.

33

1         KAREN BROWN - HIGHLY CONFIDENTIAL
2    BY MS. SUMNER:
3         Q.   But they wanted to avoid that?
4         MR. WILDERS: Objection. Calls
5         for speculation.
6         THE WITNESS: Yes.
7    BY MS. SUMNER:
8         Q.   You mentioned before, you said
9    "particularly in the area of space
10   allocation."
11        A.   Correct.
12        Q.   What was it about space
13   allocation that made that a focus for your
14   members?
15        A.   It wasn't that it was the
16   focus. But it was the -- one
17   of the issues that was front and center from
18   the standpoint of the animal rights
19   organizations. They were concerned about
20   gestation stalls with pregnant sows. They
21   were concerned about space in the egg laying
22   industry from the standpoint of the cages
23   that the chickens were being raised in.
24        Q.   Does FMI have an animal welfare
25   program, Ms. Brown?

9  (Pages 30 to 33)

34

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2      A.    Does it currently have an
 3   animal welfare program?
 4      Q.    Yes.
 5      A.    I wouldn't know that.
 6      Q.    Did it have an animal welfare
 7   program as of the time you departed in 2009?
 8      A.    It had established a program,
 9   yes.
10      Q.    When did FMI first become
11   involved in animal welfare?
12      A.    In my recollection, the end of
13   2000.
14              -  -  -
15        (Exhibit Brown-2, The Food
16        Marketing Institute and the National
17        Council of Chain restaurants:  animal
18        welfare and the retail food industry
19        in the United States of America
20        article, Bates CM00731181 -
21        CM00731189, was marked for
22        identification.)
23              -  -  -
24   BY MS. SUMNER:
25      Q.    I'd like to show you a document
```

35

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2   that has been marked as Brown Exhibit 2.  If
 3   you could just take a moment to look at this
 4   document.
 5        My first question is, do you
 6   recognize this document, Ms. Brown?
 7      A.    I wrote it.
 8      Q.    What is it?
 9      A.    It is a summary of a
10   presentation that was made to the OIE in
11   Paris, which is an international organization
12   that the United States belongs to.
13      Q.    Why did you write this article?
14      A.    Because that was their format.
15   You made a presentation, but they needed an
16   article that would be in more detail and
17   would be published in the report of the
18   conference.
19      Q.    And what is OIE?
20      A.    It's French.
21      Q.    Can you describe for me
22   generally what your understanding is as to
23   the purpose or charter of that organization?
24      A.    Well, from -- no.  But from the
25   standpoint of the presentation that I made,
```

36

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2   OIE was -- had representatives from countries
 3   all over the world, and the focus of this
 4   particular conference was animal welfare.
 5      Q.    And OIE invited you to make a
 6   presentation at that conference?
 7      A.    Correct.
 8      Q.    When was that presentation?
 9      A.    Good question.  Let's see
10   what's the date on here.  It was in 2005.
11   Probably March, April, May.
12      Q.    Was this article published?
13      A.    Yes, in their report.
14      Q.    I'm sorry?
15      A.    In their report of the
16   conference.
17      Q.    In OIE's report?
18      A.    Correct.
19      Q.    And do you know when it was
20   published?
21      A.    I don't recall.
22      Q.    If you look at the top of
23   what's been marked as Brown-2, there's a 2005
24   date.  Does that refresh your memory as to
25   when it was published?
```

37

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2      A.    Yes.  I would assume that it
 3   was published in 2005, yes.
 4              -  -  -
 5        (Exhibit Brown-3, PowerPoint
 6        presentation, Bates FMI-003053 -
 7        FMI-003077, was marked for
 8        identification.)
 9              -  -  -
10   BY MS. SUMNER:
11      Q.    I'm going to show you a
12   document that's been marked as Brown-3.
13      A.    Oh, 2004.
14      Q.    Do you recognize this document,
15   Ms. Brown?
16      A.    I do.
17      Q.    Can you tell me what this is?
18      A.    This is the PowerPoint that I
19   used with my presentation.
20      Q.    So this is the PowerPoint from
21   the presentation that we were talking about
22   in connection with the article that has --
23      A.    Correct.
24      Q.    -- been marked as Brown-2.
25        Let's go back to Brown-2 for a
```

10  (Pages 34 to 37)

38

1 KAREN BROWN - HIGHLY CONFIDENTIAL
2 moment. When you wrote this article, did you
3 attempt to be truthful and accurate?
4         A.    Yes.
5         Q.    And before the article was
6 published, did you review it to ensure its
7 accuracy?
8         A.    I don't understand the
9 question.
10        Q.    Before this article was
11 published, did you review it?
12        A.    I wrote it. Oh, I did not see
13 it before it was published by the OIE.
14        Q.    But you provided it at some
15 point to the OIE?
16        A.    I did. Without the British
17 spellings.
18        Q.    Other than the British
19 spellings, did OIE make any changes to your
20 article before publication?
21        A.    I don't know that.
22        Q.    Sitting here today, do you
23 believe that this article is accurate?
24        MR. WILDERS: Objection.
25        THE WITNESS: It was accurate at

39

1 KAREN BROWN - HIGHLY CONFIDENTIAL
2 the time I wrote it.
3 BY MS. SUMNER:
4         Q.    And are the statements that you
5 made in this article based on your own
6 personal knowledge?
7         A.    I don't understand the
8 question.
9         Q.    Well, what was the -- you make
10 many statements throughout the course of this
11 article. Correct?
12        A.    Yes.
13        Q.    What is the basis for those
14 statements?
15        A.    Could you give me something
16 more specific as a question?
17        Q.    Where did you gain the
18 knowledge that you set forth in this article?
19        A.    With my work on the issue with
20 animal welfare.
21        Q.    So did you acquire it in the
22 course of your employment at FMI?
23        A.    Excuse me?
24        Q.    Did you gain that knowledge
25 during the course of your employment at FMI?

40

1 KAREN BROWN - HIGHLY CONFIDENTIAL
2         A.    Yes.
3         Q.    From what sources did you gain
4 that knowledge?
5         A.    Many sources.
6         Q.    Can you name them for me?
7         MR. GREEN: Wait for her to
8 finish. Wait for her to finish the
9 question.
10 BY MS. SUMNER:
11        Q.    Can you name those sources for
12 me, please?
13        A.    Reading, meetings,
14 conversations with our animal welfare
15 experts, conversations with producer groups.
16        Q.    What about conversations with
17 your members?
18        MR. WILDERS: Objection.
19 Leading.
20        THE WITNESS: Conversations
21 with -- I don't -- whose members?
22 BY MS. SUMNER:
23        Q.    Your members, FMI's members.
24        A.    Yes.
25        Q.    What was the impetus for FMI's

41

1 KAREN BROWN - HIGHLY CONFIDENTIAL
2 animal welfare program?
3         MR. GREEN: Asked and answered.
4         MR. WILDERS: Same objection.
5         THE WITNESS: You want me to
6 answer it again? I don't want -- I
7 would -- the impetus for our program?
8 BY MS. SUMNER:
9         Q.    Yeah. Why did FMI create an
10 animal welfare program?
11        A.    FMI created an animal welfare
12 program because it wanted to enhance the
13 humane handling of farm animals.
14        Q.    I'd like to direct your
15 attention to a -- to the first page of this
16 document that's been marked as Brown-2. If
17 you could look at the third paragraph. It
18 reads, "In 2000, animal rights organizations
19 began to demand that individual restaurant
20 chain companies force their suppliers to
21 follow specific animal welfare guidelines
22 developed by activist organizations."
23        Is that an accurate statement,
24 Ms. Brown?
25        A.    Yes.

11 (Pages 38 to 41)

42

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       Q.    And then I'd like you to turn
3   now to the next page, page 656.  I'd like to
4   direct your attention to the last sentence of
5   the partial paragraph that begins that page.
6   The sentence reads, "Believing their tactics
7   were achieving success, the activists began
8   to approach supermarket chains in the USA,
9   making similar demands."
10      A.    Yes.
11      Q.    Is that an accurate statement?
12      A.    Yes.
13      Q.    Were FMI's members among the
14  recipients of the demands that you referred
15  to in that sentence?
16      A.    Yes.
17          MR. WILDERS:  Objection.  Calls
18      for speculation.
19  BY MS. SUMNER:
20      Q.    Which members?
21      A.    They got a list from
22  Supermarket News and wrote to everybody.
23      Q.    And what were the demands that
24  the animal activists were making of FMI's
25  members?

43

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       A.    I don't recall specifically.
3       Q.    Again, just try to let me
4   finish the question so that she can get it
5   all down.
6       A.    I'm sorry.
7       Q.    So the question was, what was
8   the demands that FMI's animal activists were
9   making of FMI's members?
10      A.    I don't recall specifically.
11      Q.    Do you recall generally?
12      A.    No.
13      Q.    Were they animal welfare
14  related demands?
15      A.    Yes.
16      Q.    Were they asking the members to
17  provide more space, to require their
18  suppliers to provide adequate space for
19  animals, for example?
20          MR. WILDERS:  Objection.
21          THE WITNESS:  I don't recall
22      specifically.
23  BY MS. SUMNER:
24      Q.    I'd like you to turn to the
25  exhibit that has been marked as Brown-3.

44

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       A.    Anyplace in particular?
3       Q.    You had said before this was
4   the presentation, the PowerPoint presentation
5   that you gave at the OIE conference.  Is that
6   correct?
7       A.    Correct.
8       Q.    Did you draft this document?
9       A.    Yes.
10      Q.    And did you draft it in your
11  role as senior vice president of FMI?
12      A.    Yes.
13      Q.    Were you invited to make this
14  presentation?
15      A.    I already answered that.  Yes.
16      Q.    And who invited you?
17      A.    The OIE.
18      Q.    Was there a person in
19  particular --
20      A.    No.
21      Q.    -- that you recall?
22      A.    Not that I recall.
23      Q.    When you drafted this
24  presentation, did you attempt to be truthful
25  and accurate?

45

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. PATTON:  Objection.  Asked
3      and answered.
4          THE WITNESS:  I already answered
5      that also.
6   BY MS. SUMNER:
7       Q.    Well, I asked you that question
8   about the article, Ms. Brown, not about your
9   presentation.
10      A.    Yes.
11      Q.    And just for the sake of the
12  record, I know this is a trying process, but
13  we just need to get down your testimony and
14  your best answer on all of the questions
15  today.  So I'll ask the question again.
16          When you drafted this
17  presentation, did you attempt to be truthful
18  and accurate?
19      A.    Yes.
20      Q.    Is what has been marked as
21  Brown Exhibit 3 an accurate copy of the
22  presentation that you gave at the OIE
23  conference in 2004?
24      A.    Yes.
25          MR. WILDERS:  Objection.  She

12  (Pages 42 to 45)

**46**

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2    hasn't even had time to look at it.
 3    BY MS. SUMNER:
 4        Q.    And are the statements that are
 5    expressed in the presentation truthful and
 6    accurate?
 7            MR. WILDERS:  Asked and
 8    answered.
 9            THE WITNESS:  I've already
10    answered that.
11    BY MS. SUMNER:
12        Q.    I asked you actually if you
13    attempted to be truthful and accurate.  Now
14    I'm asking you take a moment and look at the
15    presentation and, please, answer the question
16    as to whether the statements that are
17    expressed in the presentation are truthful
18    and accurate?
19            MR. WILDERS:  Argumentative.
20            MS. SUMNER:  We need to lay the
21    foundation for admissibility at trial.
22    So these aren't objectionable
23    questions and I would appreciate your
24    not wasting a lot of time on this and
25    let us move along with the witness.
```

**47**

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2            MR. WILDERS:  It's not a waste
 3    of time.  I'm going to make
 4    appropriate objections.
 5            MS. ANDERSON:  You have form and
 6    foundation, Counsel, that's it.
 7            MS. SUMNER:  We need to lay
 8    foundation and if you insist, we're
 9    going to take your objection time out
10    of your time at the end.  I'm sorry,
11    but we have limited time with this
12    witness today who has been nice enough
13    to come help us out.
14            MR. WILDERS:  You guys objected
15    all day last week so we're going to
16    have a right to make our objections on
17    the record and do it concisely.
18            THE WITNESS:  What is the
19    question?
20    BY MS. SUMNER:
21        Q.    The question is whether the
22    statements that are expressed in your
23    presentation that's been marked as Brown-3
24    are indeed truthful and accurate?
25        A.    They were at the time.
```

**48**

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2        Q.    And do you have any reason to
 3    think that they're not still today?
 4        A.    I wouldn't have a clue.
 5        Q.    I'd like to direct your
 6    attention on Brown-3 to the second page which
 7    bears the Bates number at the bottom
 8    FMI-003054.  It reads, "SUPERMARKETS AND
 9    ANIMAL WELFARE, How We Arrived At Where We
10    Are."
11            Is that an accurate description
12    of what this presentation was about?
13        A.    To the extent it's a
14    description of where -- of what we had done
15    to that point in time.
16        Q.    And that's what the
17    presentation was about?
18        A.    Correct.
19        Q.    So it outlines the steps that
20    were taken in connection with the development
21    and implementation of FMI's animal welfare
22    policy and program?
23        A.    Yes.
24        Q.    If you turn to the next page
25    which bears the Bates number 3055 at the
```

**49**

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2    bottom.
 3        A.    Yes.
 4        Q.    The first bullet point on that
 5    page reads, "Five of FMI's largest members
 6    ask FMI to develop a policy and program to
 7    address animal welfare."  This is on a slide
 8    that is -- bears the legend December 2000.
 9    Do you see that?
10        A.    Yes.
11        Q.    Is that an accurate statement?
12        A.    Yes.
13        Q.    Who were those five members,
14    Ms. Brown?
15        A.    Kroger, Albertsons, Safeway,
16    Ahold, and I don't remember the fifth.
17        Q.    Was the fifth one Wal-Mart?
18        A.    It could have been.  Wal-Mart
19    was definitely involved in our program.
20        Q.    Why don't you turn back to what
21    was marked as Brown-2, the article.  I'll
22    direct your attention to page 656.  The first
23    full paragraph on that page.  The second
24    sentence in that paragraph reads, "To this
25    end, late in 2000, the Food Marketing
```

13 (Pages 46 to 49)

50

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  Institute...was asked by five member
3  companies (Ahold...; Albertsons...;
4  Kroger...; Safeway...; and Wal-Mart
5  Stores...) to develop a voluntary policy and
6  programme to address animal welfare that the
7  entire supermarket industry could embrace."
8      Does that refresh your
9  recollection as to whether Wal-Mart was the
10 fifth?
11     A.    Yes.
12     Q.    And these were five of FMI's
13 largest members?
14     A.    Yes.
15     Q.    Largest in terms of what?
16     A.    Volume.
17     Q.    Sales volume?
18     A.    Yes.
19     Q.    The bullet point says the
20 members asked FMI to develop a policy.  Did
21 they come to you with that request?
22     A.    Yes.
23     Q.    What do you recall about that
24 initial approach?
25     A.    Not much.  It was more than ten

51

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  years ago.
3      Q.    But what do you recall sitting
4  here today?
5      A.    There was a meeting of members
6  which is not uncommon, and I was at the
7  meeting, and three of the companies'
8  representatives asked me if I would look into
9  developing a policy and a program to address
10 animal welfare.
11     Q.    Who were those three?
12     A.    Kroger, Safeway and Albertsons.
13     Q.    Did they make that request to
14 you privately or in the company of other FMI
15 members?
16     A.    We were having lunch, the four
17 of us.
18     Q.    Do you recall who the
19 representatives were specifically from those
20 three companies who you had lunch with, who
21 were the individual people?
22     A.    Yes.
23     Q.    Who were they?
24     A.    Jonathan Mayes, Lynn Marmer,
25 and Ertharin Cousin.

52

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Jonathan Mayes is with which
3  company?
4      A.    Safeway.
5      Q.    Ms. Marmer?
6      A.    Kroger.
7      Q.    And is it Ms. Cousin?
8      A.    Ertharin Cousin, Albertsons.
9      Q.    What do you recall about that
10 conversation?
11     A.    That they asked me if I would
12 look into FMI developing a program on animal
13 welfare that would include a program and a
14 policy.
15     Q.    Did they tell you why they were
16 interested in having FMI look into developing
17 a policy and program about animal welfare at
18 that time?
19     A.    They were very -- sorry.
20 Sorry.
21     They were very concerned about
22 the public media attention and the manner in
23 which it was being used against individual
24 companies in the quick serve industry.
25     Q.    Were they concerned that it

53

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  would be used against supermarkets like
3  themselves?
4      A.    Yes.
5           - - -
6      (Exhibit Brown-4, FMI Meeting
7      Notes November 29, 2000 PETA, Bates
8      FMI-001209 & FMI-001210, was marked
9      for identification.)
10          - - -
11 BY MS. SUMNER:
12     Q.    Ms. Brown, I'd like to show you
13 a document that bears the Bates numbers
14 FMI-001209 through 1210.  It's been marked as
15 Brown-4.  It's entitled, "FMI Meeting Notes
16 November 29, 2000 PETA."
17     Do you recognize this document,
18 Ms. Brown?
19     A.    Not specifically, but I
20 produced a lot of documents at my time at FMI
21 so I'm sure this is mine.
22     Q.    Does this appear to you to be
23 meeting notes from a meeting among Kroger,
24 Albertsons, Safeway, and FMI?
25     A.    Well, it doesn't say that

14 (Pages 50 to 53)

54

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2    Kroger was there, so...
3           Oh, no, this is not my
4    document.  This is a document someone else
5    wrote.  Sorry.
6       Q.    Did you participate in the
7    meeting that's referenced in these notes?
8       A.    Yes.
9       Q.    And is that the lunch meeting
10   that you just described to me?
11      A.    Yes.
12      Q.    So this is the meeting among
13   Kroger, Albertsons, Safeway and yourself?
14      A.    Yes.
15      Q.    And did that meeting take place
16   on or about November 29, 2000?
17      A.    I don't recall the exact date,
18   but I would assume that this is accurate.
19      Q.    Did you receive these meeting
20   notes in the course of your employment at
21   FMI?
22      A.    I don't recall that.  I'm
23   copied on it, but I don't recall receiving
24   it.  I must have.
25      Q.    Could you take a moment to

55

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2    review these notes, and my question is, are
3    these notes an accurate description of what
4    was discussed at this meeting?
5       A.    I don't recall the specifics of
6    our conversation, but I think that this is a
7    representation of a very good approach.
8       Q.    The first sentence reads, "Our
9    hope is that no individual company will deal
10   with PETA, but instead we will all work with
11   FMI to develop an industry position that we
12   can all adopt."
13           Is that a topic that was
14   discussed at this meeting?
15      A.    Yes.
16      Q.    What was your understanding as
17   to why the retailers at this meeting did not
18   want to deal with PETA themselves?
19           MR. RANDALL:  Objection.  Vague.
20           THE WITNESS:  It was not
21      uncommon for the members to use the
22      trade association's expertise and help
23      in developing a response to an issue
24      that they all had to deal with.  So
25      you could have an industry position

56

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2    and then -- so that was a very common
3    practice within the association,
4    within all associations.  It's one of
5    the reasons why associations are so
6    valuable to their individual members.
7    Their members are spending their time
8    running their businesses, and the
9    association expertise in the areas of
10   public affairs and issues management
11   were very helpful in
12   developing a position that all of the
13   members can then use as opposed to
14   having to go about that work
15   themselves and take that time away
16   from their business.
17   BY MS. SUMNER:
18      Q.    So is it fair to say that these
19   members were looking to FMI to develop a
20   single industry approach to the animal
21   welfare issues they were concerned about?
22           MR. WILDERS:  Objection.
23           MR. RANDALL:  Objection.
24      Leading.
25   BY MS. SUMNER:

57

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       Q.    You can go ahead and answer the
3    question.
4       A.    Repeat the question.
5       Q.    I said so is it fair to say
6    that these members were looking to FMI to
7    develop a single industry approach to the
8    animal welfare issues they were concerned
9    about?
10           MR. RANDALL:  Same objection.
11           THE WITNESS:  They wanted FMI to
12      work with them on developing an
13      industry position.
14   BY MS. SUMNER:
15      Q.    That they could all adopt?
16           MR. WILDERS:  Objection.
17           THE WITNESS:  That they could
18      use as they needed.
19           MR. WILDERS:  Misstates the
20      testimony.
21           COURT REPORTER:  That they could
22      use --
23           THE WITNESS:  -- as they needed.
24   BY MS. SUMNER:
25      Q.    Was there a benefit to these

15  (Pages 54 to 57)

**58**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2 members of having a single industry approach
3 as opposed to varied individual
4 approaches?
5          MR. RANDALL:  Objection to form.
6          MR. WILDERS:  Vague and calls
7     for speculation.
8          THE WITNESS:  Repeat the
9     question.
10 BY MS. SUMNER:
11     Q.    Did you have an understanding
12 as to whether these members perceived a
13 benefit to having a single industry approach
14 as opposed -- a single industry approach to
15 animal welfare as opposed to multiple
16 approaches by individual companies?
17          MR. RANDALL:  Same objection.
18          THE WITNESS:  The whole industry
19     benefits from that approach.
20     Certainly suppliers and producers
21     would benefit if there is a common
22     industry position on an issue that
23     affects them so directly, and,
24     therefore, they do not have to deal
25     with different requests, different

**59**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     specifications on the same issue.
3 BY MS. SUMNER:
4     Q.    Would it also benefit the
5 individual retailers who were FMI's members
6 to have a single industry approach?
7          MR. RANDALL:  Objection to form.
8          MR. WILDERS:  Calls for
9     speculation.
10          THE WITNESS:  They could have a
11     common position on the issue, yes.
12 BY MS. SUMNER:
13     Q.    And what would the benefit of a
14 common position to them be?
15          MR. WILDERS:  Calls for
16     speculation.
17          THE WITNESS:  It would be
18     something that they could point to
19     from the standpoint of their customers
20     and anyone else who was asking them
21     questions about where they are on the
22     issue of animal welfare.
23 BY MS. SUMNER:
24     Q.    Was there a -- strike that.
25          Further down in the notes, if

**60**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2 you turn to page 2, it says, "Once we have a
3 shared information base...," I'm looking at
4 number 5, it says, "Based on our meeting, FMI
5 will do the following," and then point 5 is,
6 "Once we have a shared information base, set
7 up a conference call or meeting with the
8 producer trade associations and their leading
9 members."
10          Was that discussed at the
11 meeting?
12     A.    I don't recall that
13 specifically.
14     Q.    Do you have an understanding as
15 to why -- well, as to whether the produce --
16 whether the FMI's members asked FMI to reach
17 out to the producer trade associations?
18          MR. WILDERS:  Objection.  Vague.
19          THE WITNESS:  Part of the policy
20     was to collaborate with the producer
21     industry.  This was an issue which
22     affected the producers directly.  And
23     if FMI was going to develop a position
24     on the issue, we felt it important to
25     let our producers know what we were

**61**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     developing.  So there was a meeting
3     that was held.  It was hosted by the
4     American Meat Institute.  And all of
5     the producer organizations were
6     invited to attend.  And at the
7     meeting, we told them that we would be
8     developing a position, a board
9     position, that we would be developing
10     a group of animal welfare experts, and
11     that we would be collaborating with
12     them on an approach to the issue of
13     animal welfare.
14 BY MS. SUMNER:
15     Q.    When was that meeting held?
16     A.    I don't recall specifically.
17     Q.    And was that something that
18 your members asked you to do?
19          MR. WILDERS:  Objection.  Vague.
20          THE WITNESS:  I don't recall
21     specifically whether it was something
22     they asked us to do or it was
23     something that we said we thought
24     would be a good idea to let in a
25     producer organizations know in a

16 (Pages 58 to 61)

**62**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     meeting as opposed to individual
3     one-on-one meetings.
4  BY MS. SUMNER:
5     Q.     Before you held that meeting,
6  would you have gotten the consent of your
7  members to do that?
8     A.     There is very little that a
9  trade association executive does on their own
10 without the consent and knowledge of their
11 members, particularly with an issue that was
12 so highly controversial at the time.
13    Q.     So in this particular instance,
14 you would have had the consent and knowledge
15 of the members before you went and held that
16 meeting?
17        MR. RANDALL:  Objection.
18    Leading.
19        MR. WILDERS:  Leading and
20    assumes facts not in evidence, and
21    misstates the testimony.
22 BY MS. SUMNER:
23    Q.     Let me rephrase the question.
24        In this particular instance,
25 did you have the consent and knowledge of

**63**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  your members before the meeting was held?
3     A.     I'm not sure I understand the
4  question.  And I'll tell you why I don't
5  understand it.  I feel as if that question
6  has a hidden agenda in it, and I sure would
7  like to know what it is.
8     Q.     I'm just picking up on -- you
9  said to me, your answer, I'm just trying to
10 understand your answer.  You said -- I asked
11 you a question, was -- was that something
12 that your members asked you to do.  Your
13 answer was, it was something that we said we
14 thought would be a good idea to let the
15 producer organizations know in a meeting as
16 opposed to individual one-on-one meetings.
17 And I asked whether you would have gotten the
18 consent of your members before you did that.
19 Your answer was there's very little that a
20 trade association executive does without the
21 consent and knowledge of your members.
22        My question is in this
23 particular instance, did you have the consent
24 and knowledge of the members before that
25 meeting was held?

**64**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2        MR. WILDERS:  Objection.  Vague.
3        THE WITNESS:  We had a policy
4  and a program outline that we were
5  following.  And our members certainly
6  knew about that.  Did we call them up
7  and ask them if it was okay that we
8  have a specific meeting on a specific
9  day?  I doubt that.  I don't recall.
10 BY MS. SUMNER:
11    Q.     Was the concept of coordinating
12 with producer organizations part of that
13 policy and program that you just referred to?
14    A.     Yes.  Yes.
15    Q.     And was that policy and program
16 approved by FMI's Board of Directors?
17    A.     Yes.
18    Q.     And who makes up FMI's Board of
19 Directors?
20    A.     It's representative of all of
21 the aspects of our membership.
22    Q.     So it's FMI members --
23    A.     FMI members.
24    Q.     -- who sit on the board?
25    A.     That's correct.

**65**

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.     Let's go back to the five
3  members who approached you, approached FMI to
4  develop an animal welfare program.  Did FMI's
5  other members, aside from those five, support
6  that animal welfare effort that was initiated
7  by those five members?
8     A.     Yes.
9        MR. WILDERS:  Objection.  Vague.
10    Compound.  I object to you using the
11    term "members."
12        MS. SUMNER:  Your objections are
13    noted.  You can object to the form of
14    the question and let's move on.
15        MR. WILDERS:  There are 1,500
16    members.  You're asking her every
17    single one --
18        MS. SUMNER:  Please refrain from
19    the speaking objection.
20        MR. MCKENNEY:  Objection to the
21    sidebar.
22        MS. SUMNER:  We understand your
23    objections.  I'm not going to change
24    my terminology.  It's duly noted for
25    the record, save it for trial.

17  (Pages 62 to 65)

**66**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2         MR. WILDERS:  You're trying to
3    trick this witness.
4         THE WITNESS:  Let me clarify
5    something.  FMI used several means of
6    informing its large member base of
7    what it was doing.  And that was done
8    through our weekly mailings.  So
9    anything that we would have been doing
10   in the area of a board policy, in the
11   area of program development,
12   educational programs, research
13   programs, issues management, all of
14   that was shared with our members on a
15   weekly basis through a weekly mailing.
16   It was also made a part of our Web
17   site, and in certain circumstances
18   there were members only sections
19   primarily because there was government
20   relations information, et cetera, that
21   each association likes to keep to
22   themselves from the standpoint of
23   strategy.  But our members were fully
24   informed all the time.  Did they read
25   every single word that we sent them,

**67**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    probably not.  But we definitely
3    informed our members on a regular
4    basis through a communication system
5    that we had developed that reached all
6    1,500 of them.
7    BY MS. SUMNER:
8         Q.    That's helpful.  Thank you for
9    that clarification.
10        I'd like to direct your
11   attention back to your presentation which was
12   marked as Brown-3.  Specifically I'd like to
13   direct your attention to the page with the
14   Bates number 3056.  Bears the heading
15   "PURPOSE" at the top.
16        A.    Uh-huh.
17        Q.    First bullet there reads, "Take
18   a page from the experience of the quick serve
19   chain restaurants - get in front of the issue
20   to develop an industry approach."
21        What did you mean when you
22   wrote that bullet point?
23        A.    Exactly what it says.
24        Q.    What did FMI mean by -- or what
25   did you mean by an industry approach?

**68**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2         A.    A common approach.
3         Q.    A common approach among whom?
4         A.    The supermarket industry, but
5    in collaboration with our producer partners.
6         Q.    And why was it important for
7    FMI's members to have an industry approach?
8         MR. GREEN:  Asked and answered.
9         THE WITNESS:  I have already
10        answered that question.
11   BY MS. SUMNER:
12        Q.    I'm not sure that I have had
13   that exact question, so I'd appreciate it if
14   you'd answer it again.  Why was it important
15   for FMI's members to have an industry
16   approach?
17        MR. WILDERS:  Assumes facts not
18        in evidence.
19        THE WITNESS:  The association's
20        purpose was to help the -- one of the
21        association's purposes was to help the
22        industry develop an industry approach
23        to a numerous -- numerous issues,
24        government relations issues,
25        communications issues, specific issues

**69**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    of labeling, food safety, animal
3    welfare, GMOs.  It was part of our --
4    part of our day-to-day mission.
5    BY MS. SUMNER:
6         Q.    I understand that the trade
7    association's mission was to develop industry
8    positions on various things.  And that's not
9    my question.  My question really is, with
10   respect to this particular issue, did you
11   have an understanding as to why FMI's members
12   wanted an industry approach on this issue,
13   the animal welfare issue?
14        MR. WILDERS:  Assumes facts not
15        in evidence.  Misstates the testimony
16        and the document.
17        THE WITNESS:  FMI wanted to
18        develop an industry approach for its
19        members because we had the expertise,
20        the resources and the time to be able
21        to do that.  And our individual
22        members, rightfully so, were more
23        focused on maintaining successful
24        businesses.
25   BY MS. SUMNER:

18 (Pages 66 to 69)

70

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.    Maybe I just need to ask the
3  question a little bit differently.  I'm not
4  asking why they turned to FMI to do it or why
5  they didn't want to do it themselves.  What
6  I'm asking is, did you have an understanding
7  as to why the members wanted one industry
8  approach to this issue?
9           MR. RANDALL:  Objection.
10          MR. WILDERS:  Objection.  Asked
11      and answered.  Argumentative.
12      Misstates the document and the
13      testimony, and assumes facts not in
14      evidence.
15          MR. RANDALL:  Objection to form.
16          THE WITNESS:  Excuse me, but
17      pardon what I'm going to say.  It's
18      very irritating to be constantly asked
19      the same question over and over and
20      over again.
21  BY MS. SUMNER:
22      Q.    And I apologize for that, but I
23  need an answer to the specific question.  I'm
24  not asking you -- I'm trying to clarify the
25  question in case we're having a

71

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  miscommunication.
3      A.    I don't understand what your
4  question is.  I don't understand what --
5      Q.    Let me try to ask it again.
6      A.    I don't understand why this
7  question is any different from any other
8  question in which you asked me about an
9  industry approach.  And I do not understand
10  why any of my previous answers cannot be
11  applied to this question.
12      Q.    Because I'm not asking you why
13  they wanted FMI to develop the approach.  I
14  have asked you that question and you've
15  covered that, why they turned to FMI as
16  opposed to doing it themselves.  My question
17  is one step before that.
18      A.    One step before that.
19      Q.    And it's, did you have an
20  understanding as to why your members wanted a
21  single industry approach on this particular
22  issue?
23      A.    Yes.
24          MR. WILDERS:  Asked and
25      answered.

72

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  BY MS. SUMNER:
3      Q.    What is your understanding?
4          MR. RANDALL:  Objection to form.
5          MR. WILDERS:  Asked and
6      answered.  Assumes facts.
7          THE WITNESS:  They outlined what
8      is in this document that you've handed
9      to me.
10  BY MS. SUMNER:
11      Q.    And what was that?
12      A.    You want me to read it to you?
13      Q.    If there's something in that
14  specific document that you think answers that
15  question, it would be helpful for you to
16  point that out.
17      A.    You're asking -- no.  You're
18  asking me to recall specific data that's more
19  than ten years ago.  And I have been away
20  from the industry for five.
21      Q.    Ms. Brown, I'm just asking you
22  if you have an understanding sitting here
23  today as to why they wanted a single industry
24  approach?
25      A.    Yes.

73

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    And what is that understanding?
3          MR. WILDERS:  Asked and
4      answered.
5          MR. RANDALL:  Objection to form.
6          MR. WILDERS:  Assumes facts not
7      in evidence.  And argumentative.
8          THE WITNESS:  That they could
9      avoid having any company singled out
10      specifically by activist groups,
11      individual companies don't have to
12      duplicate efforts.  And that would
13      also apply to the producer community.
14      And individual companies are not
15      leveraged by the actions of one.
16  BY MS. SUMNER:
17      Q.    What do you mean by that, that
18  individual companies are not leveraged by the
19  actions of one?
20      A.    Company A did, if PETA comes
21  to -- which they did with the quick serve
22  industry, company A did X, you know, what are
23  you going to do about it, are you going to do
24  better, are you going to do less.  Trying to
25  up the game.  That is a common tactic on the

19 (Pages 70 to 73)

74

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2 part of activist organizations. That is what
3 they were trying -- that was one of the
4 things they were trying to avoid.
5       Instead, FMI dealt with the
6 activist organizations, and FMI on behalf of
7 its members, described what our position was,
8 what our policy was, and the efforts that we
9 had under way to increase the humane handling
10 for farm animals.
11    Q.   At the time you had that
12 meeting in late November of 2000 with
13 Safeway, Albertsons and Kroger, prior to that
14 meeting, had FMI been approached by any
15 producer organization regarding its animal
16 welfare program?
17    A.   I don't recall.
18          - - -
19       (Exhibit Brown-5, E-mail chain,
20 Bates FMI-001078 & FMI-001079, was
21 marked for identification.)
22          - - -
23 BY MS. SUMNER:
24    Q.   Ms. Brown, I'm going to show
25 you a document that's been marked as Brown-5.

75

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2 It's an e-mail chain bearing the Bates number
3 FMI-001078 to 79. My question to you is
4 whether you recognize this document?
5    A.   I don't recall the document
6 specifically. I mean, I recognize it, it has
7 my name on it, but I don't recall the
8 correspondence.
9    Q.   Is this an e-mail chain between
10 you and Lynn Marmer?
11    A.   Uh-huh.
12    Q.   Is Ms. Marmer one of the
13 individuals who attended the meeting in late
14 2000?
15    A.   Yes, I already answered that.
16    Q.   And she's from Kroger?
17    A.   Yes, I already answered that.
18    Q.   Did you receive the first
19 e-mail in the chain from Ms. Marmer on or
20 about March 20, 2002?
21    A.   I have no idea. It is -- I
22 don't know. I mean, there's a date on here,
23 so I'm assuming the date is correct.
24    Q.   Do you have any reason to
25 believe that you did not receive that e-mail

76

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2 from Ms. Marmer on or about March 20, 2002?
3    A.   No.
4    Q.   And did you respond to
5 Ms. Marmer as indicated in the second e-mail
6 in the chain?
7    A.   That's what it says.
8    Q.   Did you have this conversation
9 with Ms. Marmer in your role as senior vice
10 president for FMI?
11    A.   Any conversation I would have
12 had with Lynn using FMI's e-mail system would
13 have been in my role as a senior vice
14 president with FMI.
15    Q.   Does this appear to be an
16 accurate copy of the e-mail conversation you
17 had with Ms. Marmer?
18    A.   I wouldn't have something to
19 compare it to, so I'm assuming it's accurate.
20    Q.   Do you have any reason to
21 believe it's not an accurate copy?
22    A.   No.
23    Q.   Just to under -- so you
24 understand this, Ms. Brown, and it will make
25 it go faster, for purposes of trial, we need

77

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2 to lay a foundation for each document. The
3 questions I just asked you are necessary to
4 lay that foundation. So for every document
5 we go through today I'm going to have to ask
6 you the same questions and you're just going
7 to have to bear with me through the process,
8 it's something we have to do to do what's
9 called authenticate this document.
10    A.   Maybe you can have a poster
11 that says question A, question B, question C,
12 question D, you could just point to it and I
13 could point to the answer on the other side.
14    Q.   Well, unfortunately we can't do
15 it that way, because this will be played to a
16 jury someday.
17    A.   I hope I'm somewhere else in
18 the world.
19    Q.   In this e-mail to you, the
20 bottom one, Ms. Marmer wrote that there are
21 two purposes for having an industry-wide
22 group develop an animal welfare policy. Do
23 you see that? About halfway down her e-mail
24 she says, Karen, I explained that there are
25 two purposes to having an industry-wide

78

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   group.
3          Do you see that?  I'm in the
4   middle of her e-mail.
5          MR. GREEN:  Read the whole
6   document.
7          THE WITNESS:  Okay.  Okay.
8   Okay.  Okay.  Which is the paragraph
9   you're focusing on now?
10  BY MS. SUMNER:
11     Q.    About halfway down her e-mail
12  she writes, I explained that there are two
13  purposes for having an industry-wide group.
14  Do you see that?
15     A.    Yes.
16     Q.    One of the purposes she says
17  is, "...to not allow advocacy groups to pit
18  one retailer against another..."
19         Do you see that?
20     A.    Okay.
21     Q.    Is that -- did you understand
22  that to be the concept that you just
23  explained to me about the concern about the
24  animal activists leveraging one company
25  against another I think are the words you

79

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   used?
3      A.    I suppose you could use all of
4   those terms.
5      Q.    Did you have a different
6   understanding as to what she meant here by
7   not allowing advocacy groups to pit one
8   retailer against another?
9      A.    No.
10         MR. RANDALL:  Objection.
11  Speculation.
12         THE WITNESS:  One of the things
13     that was happening with PETA is they
14     would write to company A and say
15     company B is doing blah, blah, blah,
16     blah.  And company B had no clue their
17     name was being used by PETA, because
18     PETA does not have been to responsible
19     for its accuracy or honesty.  So then
20     that was the kind of shenanigan that
21     was going on.  That's part of it.  So
22     if a company can say, when they get
23     these kinds of letters, we're working
24     with the Food Marketing Institute on
25     this issue, please contact them on our

80

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     behalf, then it nullifies to some
3     extent those kinds of shenanigans that
4     go on among the activist
5     organizations.
6   BY MS. SUMNER:
7      Q.    The second purpose she lists
8   there is to move the industry standards so
9   that if there are costs, they are shared
10  across the industry.  Do you see that?
11     A.    I see that.
12     Q.    What did you understand her to
13  mean when she wrote that one of the purposes
14  of having an industry-wide group was to move
15  the industry standards so that if there are
16  costs, they are shared across the industry?
17     A.    I probably didn't understand
18  what she was talking about.
19     Q.    Sitting here today, do you have
20  an understanding of what she meant?
21     A.    No.  I mean, I know in general
22  what she may be trying to imply, but
23  specifically I don't know.
24     Q.    And what is it in general that
25  you know that she may be trying to imply?

81

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. RANDALL:  Objection.
3   Speculation.
4          MR. WILDERS:  Misstates the
5   testimony.
6          THE WITNESS:  I don't know.  I
7     can't speculate.  I'm here to speak
8     truthfully and honestly and
9     accurately, and I would prefer not to
10     speculate on something that is
11     contained in an e-mail message that
12     occurred 12 years ago.
13  BY MS. SUMNER:
14     Q.    So your testimony sitting here
15  today is that you don't know what Ms. Marmer
16  meant when she said --
17     A.    Specifically, no, I don't.
18     Q.    If you could turn to the end of
19  her e-mail which is on the second page of
20  this document.  She wrote to you, "If the
21  animal welfare group does its work right, it
22  is reasonable to assume that most of the
23  major purchasers of eggs (whether retailers
24  or fast food) will support the FMI work group
25  guidelines and the egg industry will have to

21  (Pages 78 to 81)

82

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  get on board, or be left behind by the major
3  players."
4          Do you see that?
5      A.    I see it.
6      Q.    What did you understand her to
7  mean?
8      A.    That maybe that was an unwise
9  train of thought on her part.  I can't
10  imagine --
11      Q.    What do you mean by that?
12      A.    In other words, I don't know
13  what she was talking about.  She is
14  basically -- I could only speculate what
15  she's talking about.  One of the things that
16  FMI did not get into discussion with our
17  members on, no matter what our members wrote
18  in e-mails, were costs or their relationship
19  with their suppliers.
20      Q.    So you don't have an
21  understanding as to what she meant?
22      A.    No.
23          MR. WILDERS:  Objection.
24  Misstates the testimony.
25                - - -

83

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          (Exhibit Brown-6, 8/31/01 Fax
3          memo, Bates FMI-001205 - FMI-001208,
4          was marked for identification.)
5                - - -
6  BY MS. SUMNER:
7      Q.    I'm going to show you a
8  document that's been marked as Brown
9  Exhibit 6.
10      A.    My God, I got an awful lot of
11  stuff, didn't I?
12      Q.    This is a document bearing the
13  Bates numbers FMI-001205 through 1208.  And
14  my first question, Ms. Brown, is whether you
15  recognize this document?
16      A.    No, but I'm sure I must have
17  received it.
18      Q.    Is this a fax memo from Steve
19  Hilton at Albertsons addressed to you?
20      A.    That's what it says.
21      Q.    Did you receive this fax from
22  Mr. Hilton on or about August 31, 2001, in
23  your role as senior vice president at FMI?
24      A.    That is the date on the memo.
25      Q.    Do you have any reason to

84

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  believe that you did not receive it?
3      A.    I have no reason to believe
4  that I did not receive it.
5      Q.    What was Mr. Hilton asking you
6  to do?
7      A.    I don't know.  I would have to
8  read this to find out what Mr. Hilton was
9  asking me to do.
10      Q.    Could you take a moment to
11  review the fax, please?
12      A.    Yes.  [Reviewing document.]
13  Okay.
14      Q.    When you received this
15  document, what did you understand Mr. Hilton
16  to be asking you to do?
17      A.    What he says in the document.
18      Q.    Which is what?
19      A.    He is giving me some ideas
20  about what he thinks I might, emphasize
21  might, share with Sean Gifford of PETA.
22      Q.    Had Albertsons received a
23  letter from PETA?
24      A.    There is one attached.
25      Q.    Was he asking you to respond to

85

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  PETA on Albertsons' behalf?
3      A.    That was part of our role, but
4  we did not necessarily respond to PETA on
5  behalf of individual companies.  What we did
6  was we talked with PETA about what the
7  industry was doing, which was a policy and a
8  program that our members supported.  We did
9  not get into conversations with PETA about
10  individual actions that individual companies
11  were taking, might take, thought about
12  taking, did take.
13      Q.    If you look at the --
14      A.    Even if we were asked as is one
15  of the suggestions in this letter.
16      Q.    So here if you just look at the
17  first paragraph --
18      A.    I've seen that.
19      Q.    -- in this letter, he says, "So
20  we would like you to call Sean Gifford PETA
21  Campaign Coordinator and respond to him on
22  our behalf."
23      A.    Right.
24      Q.    So did you understand him to be
25  asking you to call PETA --

22  (Pages 82 to 85)

86

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       A.    Right, yes.
3       Q.    -- and respond to PETA on
4   Albertsons' behalf?
5       A.    Yes.
6       Q.    And then he further on down in
7   the third bullet point there, he writes to
8   you, "We will continue to ask FMI to
9   represent us on this important matter."
10      A.    Right.
11      Q.    Do you see that?
12      A.    Uh-huh.
13      Q.    What was he referring to, or
14  what did you understand him to be --
15      A.    He was referring to the general
16  issue of animal welfare.
17      Q.    You understood him to be asking
18  you to represent Albertsons on the animal
19  welfare issue?
20      A.    As part of the industry.  Not
21  as an individual company.  In other words, we
22  were representing the industry.  We were
23  not -- and our members as a part of that --
24  as a part of our membership collectively, we
25  were representing our members.

87

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       Q.    Did other FMI members look to
3   FMI to represent them on matters related to
4   animal welfare?
5       A.    Yes.
6       Q.    I'd like you to look back to
7   Brown-3.  This is your presentation again.
8   If you just want to keep that out, we're
9   going to use that throughout the course of
10  the deposition kind of to walk us through the
11  time sequence.
12      A.    Okay.
13      Q.    If you look at the page that
14  ends with the Bates number 3055.  Again, this
15  is the December 2000 slide.  It notes, "FMI
16  forms a member committee."
17          Do you see that?
18      A.    Yes.
19      Q.    Did FMI form a member committee
20  related to animal welfare?
21      A.    Yes.
22      Q.    And when was that committee
23  formed?
24      A.    I don't recall.
25      Q.    Was it formed by December 2000?

88

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       A.    We were probably in the -- no,
3   I don't -- I think we were in the process of
4   beginning to form a member committee because
5   the member committee had more representation
6   than just the original companies that raised
7   the issue with FMI.
8       Q.    Who was on that member
9   committee?
10      A.    I don't recall.
11      Q.    Why was the member committee
12  formed?
13      A.    Any issue that FMI was involved
14  in which affected our members, we had a
15  member committee as advice of counsel and to
16  give us direction and guidance.
17      Q.    So the role of the member
18  committee was to give FMI direction and
19  guidance on animal welfare issues?
20      A.    React to or advise us on
21  whether we -- what we were developing was
22  going in the right direction.
23      Q.    Did you have a role vis-á-vis
24  the member committee?
25      A.    Yes.

89

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       Q.    What was that role?
3       A.    I managed the committee.
4       Q.    Did the committee hold
5   meetings?
6       A.    They held one or two meetings,
7   but the rest of their involvement was by
8   memos and phone calls, conference calls.
9       Q.    Were minutes of the meetings
10  and conference calls kept?
11      A.    Minutes of meetings would have
12  been kept.  They may have been -- the result
13  of them may have been not minutes, per se,
14  but actions coming out of it that needed to
15  be taken.  Conference calls, notes were
16  probably made, but I have no idea --
17      Q.    Did you keep --
18      A.    -- specifically.
19      Q.    Did you keep those minutes and
20  notes in your role as senior vice president
21  of FMI?
22      A.    I had files, voluminous files,
23  yes.
24      Q.    Did you keep, though, like a
25  set of official minutes of these meetings?

23 (Pages 86 to 89)

90

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      A.    No, not that I recall.
3      Q.    Was a list of member committee
4  members maintained by FMI?
5      A.    Yes.
6      Q.    And who maintained that list of
7  committee members?
8      A.    There were changes in the
9  committee.  There were companies that got
10  involved later on in the process.  There were
11  changes of staff within the member companies.
12  The list would have been kept within my
13  office.
14      Q.    Do you recall what those lists
15  looked like or what form they were in?
16      A.    No.
17      Q.    If I wanted to understand over
18  time who sat on this member committee at any
19  given point in time, would those lists be the
20  best thing to look to?
21      A.    If they exist, yes.
22      Q.    Do you know if they exist?
23      A.    I don't know anything that has
24  happened at FMI after January 30, 2009.
25      Q.    You did create them at some

91

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  point in time?
3      A.    Yeah, we had -- yes, we had a
4  list of people that we corresponded with
5  regularly on this issue.
6      Q.    The next bullet point on this
7  December 2000 slide says, "FMI begins
8  meetings with producer community."
9      A.    Correct.
10      Q.    Did that -- those meetings
11  begin in or around December of 2000?
12      A.    Probably not because -- I don't
13  recall specifically.
14      Q.    What was the purpose of these
15  meetings?
16      A.    To -- the first initial meeting
17  was to let the producer community know what
18  our approach was going to be.  And there were
19  individual meetings with producer
20  organizations to talk with them specifically
21  about recommendations that were being made by
22  our expert panel.  And the expert panel
23  consisted of veterinarians, animal scientists
24  and an animal welfare advocate who was not
25  part of any of the activist organizations.

92

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      Q.    Was United Egg Producers one of
3  the producer organizations with whom FMI
4  met --
5      A.    Yes.
6      Q.    -- in this effort?
7      A.    Yes.
8      Q.    Do you recall who -- did you
9  attend those meetings with United Egg
10  Producers?
11      A.    Yes.
12      Q.    And who did you meet with at
13  United Egg Producers?
14      A.    Al Pope.  Gene what's his face,
15  I can't remember his last name.
16      Q.    Gregory?
17      A.    Gregory.  Ken Klippen.  There
18  may have been other people, but I don't
19  recall.
20      Q.    Were individual egg producers
21  included in those meetings?
22      A.    Sometimes.
23      Q.    Do you recall any specific egg
24  producers?
25      A.    No.

93

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      Q.    When was the first meeting with
3  United Egg Producers?
4      A.    I don't recall.
5      Q.    Was that a meeting that FMI
6  requested?
7      A.    I'm not sure about that either.
8  Once when we had the general meeting with all
9  of the producer organizations, it was hosted
10  by AMI, some of the producer organizations
11  had been working on the animal welfare issue
12  for some time, the egg producers was one.
13  They were way ahead of this issue than many
14  of the producer organizations.  The other one
15  was the American Meat Institute which had
16  worked with Temple Grandin on slaughter
17  guidelines.  It is possible, but I don't
18  know, so I don't want to speculate, that UEP
19  approached us before -- when they -- after
20  that initial meeting that we had with the
21  larger group, but I don't recall that.
22      Q.    Turn to page 3057 in Exhibit 3,
23  Brown-3.  This is slide entitled "January 2001."
24      A.    Uh-huh.
25      Q.    Second bullet point there says,

24  (Pages 90 to 93)

94

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    "FMI Board approves an animal welfare policy
3    and program on January 14, 2001."
4        A.    Correct.
5        Q.    Do you see that?
6        A.    Uh-huh.
7        Q.    If you turn to the next page,
8    3058, my question is, is this the policy that
9    was approved by FMI's board?
10       A.    These are bullet points taken
11   out of the policy.
12       Q.    And is it an accurate summary
13   of the policy?
14       A.    Well, it's accurate, but it's
15   not exactly the policy language.
16       Q.    And page 305 --
17       A.    It wouldn't all fit on the
18   slide.
19       Q.    Page 3059, the next bullet, the
20   next page in the slide presentation that's
21   entitled, "The Program," is this the program
22   that was approved by FMI's board?
23       A.    Basically, yes. But this is --
24   again, this is -- these are bullet points
25   taken to be used as an aid to a presentation.

95

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2        Q.    Did the board approve the
3    policy and program unanimously?
4        A.    Yes. All 81 of them.
5        Q.    Look at the program. The first
6    component of the program or the first bullet
7    point is "Develop retailer expectations for
8    use with suppliers."
9        A.    Correct.
10       Q.    Do you see that?
11       A.    Yes.
12       Q.    Why did FMI's board want to
13   develop retailer expectations for use with
14   suppliers?
15       A.    The expectations were that the
16   animals would be raised, transported and
17   processed, i.e. slaughtered, in an
18   environment that was safe and secure and free
19   from abuse and neglect. Those were the
20   expectations.
21       Q.    My question is, why were
22   expectations or what did it mean to develop
23   expectations for use with suppliers? How
24   were they to be used with suppliers? What
25   was intended there?

96

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    We explained to our suppliers
3    that we hope that they would develop animal
4    handling guidelines that would provide
5    through the process of raising, transporting
6    and processing animals for food in an
7    environment that was safe and free from abuse
8    and neglect.
9        Q.    The second component of this
10   board approved program reads, worked with
11   respected animal -- "Work with respected
12   animal welfare experts and organizations."
13           Do you see that?
14       A.    Yes.
15       Q.    Did FMI form a panel of animal
16   welfare experts?
17       A.    Yes.
18       Q.    What was the role of that
19   expert panel?
20       A.    That panel, since retailers and
21   certainly not the FMI staff have any
22   scientific standing to develop any specific
23   ideas about how to humanely handle farm
24   animals, part of our program was to put
25   together a panel of people who did know, and

97

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2    they were animal scientists and veterinarians
3    primarily.
4        Q.    Did FMI and its members rely on
5    the expertise of that panel in developing
6    FMI's animal welfare program?
7        A.    FMI's program was as it's
8    stated in these components, and the part of
9    that was for the experts to review the --
10   what the producer organizations had at the
11   time as far as humane handling of animals.
12   So their role was to review it, to lay that
13   against the scientific consensus at the time.
14   They were all well known, some world
15   renowned, specific expertise for each species
16   and they would review what the procedures
17   were that each producer group was using as
18   far as handling your animals, and they would
19   make recommendations in some cases for ways
20   to enhance or improve that.
21       Q.    Did FMI and its members rely on
22   that review by the animal welfare expert
23   panel?
24       A.    I'm not sure I understand your
25   use of the word "rely."

25 (Pages 94 to 97)

98

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    Well, am I correct that at some
3  point FMI made a decision as to whether or
4  not to endorse specific producer guidelines?
5          MR. RANDALL:    Objection to form.
6          THE WITNESS:    There's a
7    semantical issue here, and all of our
8    documents that we would send to our
9    members, the "we" is a royal we, and
10   FMI did not endorse anything
11   specifically.    Our experts endorsed.
12   And if our experts endorsed it, then
13   we would say our experts have endorsed
14   it.    And then the individual companies
15   could decide themselves whether or not
16   that was something that they would use
17   with their individual producers or
18   suppliers or not.    But we didn't
19   develop guidelines, we didn't endorse
20   anything.    Our experts endorsed.    So I
21   think that's really important to
22   clarify.
23 BY MS. SUMNER:
24   Q.    So is it your testimony,
25 Ms. Brown, sitting here today, that FMI did

99

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  not endorse individual producer guidelines?
3          MR. WILDERS:    Objection.    Asked
4    and answered.    Argumentative.
5          THE WITNESS:    What we did was we
6    informed our members and the public
7    that our experts endorsed.
8 BY MS. SUMNER:
9    Q.    And I just want to be clear.    I
10 understand that you -- your experts -- your
11 testimony is that your experts endorsed
12 individual producer guidelines.    My question
13 to you is, is your testimony that FMI as an
14 organization did not endorse individual
15 producer guidelines?
16         MR. WILDERS:    Asked and
17   answered.
18         THE WITNESS:    I have just
19   answered it.    The terminology is
20   important.    We hired a group of
21   experts to review and either endorse
22   or not specific guidelines developed
23   by producers, not by FMI, or to make
24   suggestions or recommendations for how
25   whatever the current state of those

100

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    guidelines were, how they could be
3    improved or enhanced on behalf of the
4    animals.    So in -- so what we did was
5    we communicated that our experts --
6    those things that our experts had
7    endorsed.    Does that help?
8 BY MS. SUMNER:
9    Q.    I understand that.    And my
10 question is much simpler than that.    I think
11 it's just a yes or no answer.
12         Is it your testimony that FMI
13 itself did not endorse any individual
14 producer guidelines?
15   A.    Yes.
16         MR. WILDERS:    Objection.    Asked
17   and answered.    Vague.
18 BY MS. SUMNER:
19   Q.    The third component of the
20 program listed on the slide is, "Review
21 expectations with producer community."
22         Do you see that?    I'm going
23 back to your presentation.
24   A.    Yes.
25   Q.    Did FMI begin a series of

101

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  meetings with the producer community to share
3  FMI's policy and program?
4    A.    As I stated before, yes.
5    Q.    The fourth component of the
6  program is, "Distribute expectations as
7  voluntary recommendations for retailers to
8  adopt."    What did that refer to?
9    A.    Our experts, if they endorsed
10 specific guidelines, and in some cases they
11 wouldn't endorse all of the guidelines.    They
12 would endorse maybe some of them and say some
13 of them needed to be changed before they
14 would say, yes, that is a best practice for
15 the humane handling of farm animals.    That
16 information was given to our members,
17 published widely, the news media, supermarket
18 news, et cetera, and companies could use it
19 as they wanted.    They could either -- as they
20 would do.    They have their own individual
21 expectations or -- of what they want of all
22 of our suppliers, be it the baker, the fish
23 guy, the meat guy.    Those are their
24 individual programs.    And FMI doesn't have
25 anything to do with that.    There may be best

26  (Pages 98 to 101)

102

KAREN BROWN - HIGHLY CONFIDENTIAL
1   KAREN BROWN - HIGHLY CONFIDENTIAL
2   practices and food safety, sustainability,
3   environmental control, animal welfare. We
4   certainly, to the extent that we could, would
5   share all of that with them in all of those
6   areas, and they could use it as they felt it
7   fit their company.
8       Q.    So the idea was to make these
9   voluntary expert panel endorsed guidelines
10  available for retailers to use in their
11  discussions with their suppliers if those
12  retailers chose?
13      A.    Correct.
14      Q.    And the fifth component of the
15  program is "Support an ongoing advisory
16  council." What does that refer to?
17      A.    That would be the ongoing, you
18  know, having the advisory committee, the
19  expert committee maintained because it's an
20  area, a scientific area where there are many
21  changes underway. So what works today may
22  not work tomorrow, there may be a better way
23  to approach it. There was also concern about
24  regulation that was going on in some of the
25  states and feeling that if regulation does

103

1   KAREN BROWN - HIGHLY CONFIDENTIAL
2   not result in continuos improvement. And so,
3   therefore, to keep the advisory panel in
4   place would be a good idea over time.
5       Q.    Was the advisory panel that
6   you're referring to there, is that the expert
7   panel --
8       A.    Correct.
9       Q.    -- or is that the member
10  committee?
11      A.    No, it's the expert committee.
12      Q.    The expert panel. Okay.
13          Flip to the next page in your
14  presentation, this is the slide entitled,
15  "January to June 2001."
16      A.    Uh-huh.
17      Q.    I'm just going to run through
18  these bullet points to make sure that I
19  understand. The first one is, "Met with
20  producer community and restaurant industry to
21  share policy and program." Are those the
22  meetings that we've been talking about?
23      A.    Yes.
24      Q.    And that formed the panel of
25  animal welfare experts, that's the same

104

1   KAREN BROWN - HIGHLY CONFIDENTIAL
2   expert advisory panel that we just discussed?
3       A.    Yes.
4       Q.    The fourth bullet point says,
5   "Experts identify gaps in existing industry
6   guidelines." What does that refer to?
7       A.    We asked all the producer
8   organizations to share with us what their
9   guidelines were at that time. And that was
10  given to the experts. They were also asked
11  to provide research that supported their
12  guidelines. These are scientists looking at
13  this. And they then reviewed them and they
14  identify areas where they thought
15  improvements should or could be made. Those
16  are the gaps.
17      Q.    Then the next bullet point
18  says, FMI member committee prioritizes gaps.
19  What does that refer to?
20      A.    I think as they were looking at
21  what the experts were recommending as far as
22  things that needed to be changed, in their
23  mind some of that may have been more
24  important than others.
25      Q.    When you say "their," who are

105

1   KAREN BROWN - HIGHLY CONFIDENTIAL
2   you referring to?
3       A.    Members in general. In other
4   words --
5       Q.    So members on the member
6   committee?
7       A.    Yes, or other members.
8       Q.    FMI's members?
9       A.    Yes.
10      Q.    And why was that function
11  delegated to the member committee?
12      A.    It was --
13          - - -
14          (Interruption.)
15          - - -
16  BY MS. SUMNER:
17      Q.    The question was, why was that
18  function delegated to the member committee?
19      A.    It wasn't a function delegated
20  to the member committee. They had one
21  meeting where we came back with the initial
22  results from the first review of the experts,
23  and they took a look at that and they said to
24  us, we're not scientists, we're only
25  merchants. Some of these things seem more

27 (Pages 102 to 105)

106

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  important than others.  So that's -- that was
3  it.  It was not an ongoing thing.  They
4  didn't continue.  They could have -- after
5  that they just wanted to -- I think from
6  their perspective, they wanted to make sure
7  that the experts knew what they were doing.
8  And other than that, they felt very
9  confident.  That was -- they never continued
10  that function.
11    Q.    Were the UEP guidelines for egg
12  laying hens one of the sets of industry
13  guidelines that were reviewed by FMI's expert
14  advisory panel?
15    A.    Yes.  And I'll tell you,
16  everyone was very impressed at how far along
17  UEP was.  They were way ahead of the game.
18  They had very specific guidelines.  They had
19  been working on it for some time.  They had
20  their own expert panel.  As a matter of fact,
21  Joy Mench who is the world renowned poultry
22  expert at UC Davis was one of our advisors
23  because we thought that she would be
24  extremely helpful to us.  So, yeah, UEP had
25  very specific guidelines.  They had guidance

107

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  to their members on how to use them.
3    Q.    Do you recall whether FMI's
4  expert advisory panel identified any gaps --
5    A.    Yes.
6    Q.    -- in the UEP guidelines?
7    A.    Yes.
8    Q.    And what were those gaps that
9  were identified?
10    A.    Forced molting, not feeding the
11  chickens in order to execute a forced molt.
12  Ammonia levels higher than what was required
13  by EPA for workers.  Those are two that stand
14  out.
15    Q.    What about the schedule for
16  phasing in cage space requirements?
17    A.    There was an interest on the
18  part of the experts in speeding that up if
19  they could.  You have to understand that when
20  you get 12 chickens in a space this big,
21  space allocation becomes an issue.  And it
22  becomes an issue particularly if the cages
23  are stacked one on top of the other.  The
24  people on the top -- or chickens on the top
25  are okay, but as the excrement goes down, you

108

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  don't want it on the bottom.  So the issue of
3  space allocation in all species is an
4  important one.
5    Q.    And that was important to FMI's
6  members?
7    A.    It was important to FMI's
8  members from the perspective that this was an
9  issue that the animal rights organizations
10  were most specifically focusing on.
11    Q.    Do you recall how FMI's member
12  committee prioritized the gaps that were
13  identified by the expert panel in the UEP
14  program in particular?
15    A.    No.
16        - - -
17        (Exhibit Brown-7, 7/2/01 Fax,
18    Bates FMI-001129 - FMI-001142, was
19    marked for identification.)
20        - - -
21  BY MS. SUMNER:
22    Q.    Ms. Brown, I'm showing you a
23  document that has been marked as Brown-7.
24  This is a fax from the Food Marketing
25  Institute.  It bears the Bates labels

109

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  FMI-001129 through 1142.
3        Do you recognize this document
4  as a document that you created in your role
5  as senior vice president at FMI?
6    A.    I do.
7    Q.    Is this a fax that you sent in
8  that role?
9    A.    Yes.
10    Q.    Who are the -- and was the
11  document faxed to the individuals who are in
12  the fax to and cc lines on the first page of
13  this document?
14    A.    Yes.
15    Q.    Who are those individuals, and
16  I mean generally?
17    A.    Executives with member
18  companies.  They're comprised of public
19  affairs executives and operations executives.
20    Q.    These are of your FMI members?
21  Yes?
22    A.    Yes.
23    Q.    Is this the member advisory
24  committee we've been talking about?
25    A.    The committee -- well, this

28  (Pages 106 to 109)

110

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2   committee had additional people.  As you are
 3   all familiar with trade associations, when
 4   you have a committee meeting, often other
 5   people come to the meeting, but they're not
 6   necessarily one big committee or the
 7   committee will change over time.
 8       Q.    So this was the committee plus?
 9       A.    I would say this was the
10   committee plus.
11       Q.    The title of the document here
12   is Background For July 9th Meeting in
13   Chicago.  Do you see that?
14       A.    Yes.
15       Q.    The document is dated July 2,
16   2001?
17       A.    Yes.
18       Q.    What was the meeting that you
19   were providing background materials for here?
20       A.    It was a meeting of these
21   people.
22       Q.    On the first line of the second
23   paragraph it says, "The purpose of our
24   meeting is to review and comment on the gaps
25   in current producer industry guidelines that
```

111

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2   have been identified by our third party
 3   animal welfare experts."
 4        Do you see that?
 5       A.    I do.
 6       Q.    Is that the meeting that you
 7   just referred to where the members took the
 8   gaps that had been identified and prioritized
 9   with them?
10       A.    Yes.
11       Q.    And the next sentence says,
12   "You will help us develop a process to
13   determine the feasibility and potential
14   economic impact at retail of changes to
15   current guidelines."
16        Do you see that?
17       A.    I see that.
18       Q.    What did you mean?
19       A.    I'm not sure.
20       Q.    Do you want to take a moment to
21   review this document to see if it refreshes
22   your recollection in that regard?
23       A.    I can skip the cattle part.
24   Right?
25       Q.    Yes.
```

112

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2       A.    Okay.
 3       Q.    Just focusing back on that
 4   first page where you're addressing this group
 5   and talking about the purpose of the meeting,
 6   do you have an understanding as to whether
 7   the feasibility of changes to current
 8   guidelines was important to FMI's members?
 9       A.    Certainly FMI's members did not
10   want to end up with an expert panel that
11   recommended to the producer community
12   guidelines that were not practicable in the
13   true sense of the word or that would try to
14   move the industry if there were parts of the
15   producer community that were at square one,
16   would try to move them from A to Z in a short
17   period of time.
18       Q.    What was the concern about
19   doing that?
20       A.    Logic.
21       Q.    What do you mean by that?
22       A.    Well, basically you want to
23   make sure that you're not through guidelines
24   to address an issue that animal activists are
25   beating you on the head about cause
```

113

```
 1        KAREN BROWN - HIGHLY CONFIDENTIAL
 2   disruption in the marketplace.
 3       Q.    So it was important that
 4   whatever was recommended was something that
 5   the producer community could actually do and
 6   implement.  Is that fair to say?
 7        MR. RANDALL:  Objection.
 8   Leading.
 9        MR. WILDERS:  Objection.
10        THE WITNESS:  They wanted to
11    make sure that there wasn't anything
12    that the experts would recommend that
13    would be impossible to execute or
14    would be ridiculous to execute.  In
15    Europe there was a recommendation that
16    pigs be given balls to play with.  We
17    don't necessarily think that pregnant
18    sows should be in a gestation crate
19    that is too small for them so they
20    can't move during their pregnancy, but
21    giving the pigs a ball maybe is going
22    too far.
23   BY MS. SUMNER:
24       Q.    You also talked about, in your
25   earlier answer, you referred to disruption in
```

114

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  the marketplace, that the members didn't want
3  changes to the guidelines to cause disruption
4  in the marketplace. What did you mean by
5  that?
6        A.    Nothing specific.
7        Q.    Well, what disruption in the
8  marketplace? I'm not sure I understand what
9  that refers to.
10       A.    Well, if you have a guideline
11 that's impossible to implement, and people
12 try to implement it, you're going to be
13 disrupting the marketplace.
14       Q.    So was there a concern about
15 not having an undue impact on things like
16 supply and price in the market?
17             MR. WILDERS: Objection.
18       Leading. Misstates the witness'
19       testimony.
20             THE WITNESS: There was no
21       discussion that I was ever a part of
22       that talked about supply and price.
23 BY MS. SUMNER:
24       Q.    You also wrote here to the
25 members that they were going to help develop

115

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  a process to determine the potential economic
3  impact at retail of changes to the current
4  guidelines?
5        A.    Where are you reading?
6        Q.    Second sentence here, second
7  paragraph on the first page of this fax that
8  you wrote.
9        A.    Right.
10       Q.    You are talking about the
11 purpose of the meeting is to review and
12 comment. "You will help us to develop a
13 process to determine the...potential economic
14 impact at retail of changes to the current
15 guidelines." What did you mean by that?
16       A.    I'm not quite sure.
17       Q.    Did you have an -- do you have
18 an understanding as to whether the potential
19 economic impact at retail of changes to the
20 current guidelines was important to FMI's
21 members?
22             MR. WILDERS: Objection. Vague.
23             THE WITNESS: I think that would
24       be something -- our members would not
25       have had that information. That would

116

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        be information that would come from
3        producers.
4  BY MS. SUMNER:
5        Q.    Well, wouldn't the members have
6  been concerned about the impact that adopting
7  guidelines could have had on the price of the
8  products that they would be purchasing?
9             MR. WILDERS: Leading and
10       speculation.
11             THE WITNESS: There was never
12       any discussions like that in any
13       meetings that I attended. We never
14       had any discussions talking about
15       price of the product.
16 BY MS. SUMNER:
17       Q.    We'll look at some documents
18 later, maybe that will help refresh your
19 recollection.
20             MR. WILDERS: Objection.
21       Argumentative.
22             MS. SUMNER: Move forward.
23 BY MS. SUMNER:
24       Q.    Let's go back to the
25 presentation. Actually I want to ask you one

117

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  quick question about this document. If you
3  turn to 1131 in this document that's been
4  marked as Brown-7, the document entitled,
5  "BOARD APPROVED POLICY," and then it has
6  policy and program components.
7        A.    Uh-huh.
8        Q.    Is this the actual board
9  approved policy and program that we discussed
10 earlier?
11       A.    As it says on top, it was
12 adopted January 14, 2001.
13       Q.    And this is the official board
14 approved copy?
15       A.    Yes, it is.
16       Q.    Let's go back to Brown-3. This
17 is the global OIE conference presentation.
18 And turn to the slide that bears the Bates
19 number 3061, it's entitled, "FMI-NCCR
20 Collaboration."
21       A.    When is your time up, by the
22 way?
23             MR. GREEN: Do you need a break?
24             THE WITNESS: How much time have
25       we gone by now?

118

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2         MS. SUMNER:  We've been going
3    probably about an hour and a half so
4    if you'd like to take a break now --
5         THE WITNESS:  Only an hour and a
6    half?  Are you sure?
7         MR. GREEN:  I think it's closer
8    to two hours.
9         THE WITNESS:  That's what I'm
10   wondering, because it's almost 1:00.
11        MS. ANDERSON:  Go off the
12   record.
13        THE WITNESS:  It's almost 1:00.
14        MS. SUMNER:  Go off the record,
15   we're not to going to waste time.
16        VIDEOGRAPHER:  This is the end
17   of videotape one in the deposition of
18   Karen Brown.  We're off the record at
19   12:39.
20             - - -
21        (A recess was taken.)
22             - - -
23        VIDEOGRAPHER:  Here begins tape
24   two in the videotape deposition of
25   Karen Brown.  We're back on the record

119

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    at 1:01.
3    BY MS. SUMNER:
4         Q.   Ms. Brown, I'd like to direct
5    your attention back to Brown Exhibit 2.  This
6    is the article that you authored with
7    Ms. Hollingsworth.  I want to direct your
8    attention to page 657 of the article.  And
9    under the heading "Joint programme," I want
10   to direct you to about two-thirds of the way
11   down that first paragraph, it says,
12   "Therefore, in June 2001..."  Do you see
13   where I am?
14        A.   I do.
15        Q.   "Therefore, in June 2001, the
16   FMI and the NCCR joined their parallel
17   efforts."
18             Is that an accurate statement?
19        A.   Yes.
20        Q.   "In making this decision, the
21   two organizations considered the advantages
22   of a single industry approach."
23             Is that an accurate statement?
24        A.   Yes.
25        COURT REPORTER:  Excuse me.  The

120

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    witness wrote on the exhibit, just for
3    the record.
4    BY MS. SUMNER:
5         Q.   In this article that you
6    drafted, you list four advantages of the
7    single industry approach.  Do you see that?
8         A.   Yes.
9         Q.   I want to talk for a moment
10   about those advantages.  The third one reads,
11   "avoidance of market-driven competition on an
12   issue that affected all the food animal
13   industries."
14             Do you see that?
15        A.   Yes.
16        Q.   What did you mean by "avoidance
17   of market-driven competition on an issue that
18   affected all the food animal industries"?
19        A.   As I stated earlier, if you
20   have individual companies asking for
21   different approaches to a single issue that
22   such as animal welfare where the companies
23   are interested in the producers improving,
24   enhancing, advancing their animal handling
25   for humane purposes, it makes it very

121

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    difficult, it's inefficient.  It makes it
3    very difficult from the standpoint of the
4    producers.  They have to do things
5    differently for individual organizations.
6    They have to subject themselves to multiple
7    inspections if there's an inspection program
8    involved, et cetera.
9         Q.   Let's turn back to your
10   presentation, and we're up to the slide
11   entitled, "FMI-NCCR Collaboration" which is
12   on Bates number 3061.
13        A.   Correct.
14        Q.   Do you see that?
15        A.   Yes.
16        Q.   The last bullet point there
17   says, "FMI and NCCR undertake one-on-one
18   meetings with producer community to give
19   feedback on how enhance current industry
20   guidelines."
21        A.   Yes.
22        Q.   Did those meetings occur?
23        A.   Yes.
24        Q.   And during what time period
25   approximately were those meetings conducted?

31  (Pages 118 to 121)

122

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          A.    I do not remember.
3          Q.    Did FMI reach out to UEP as one
4    of the producer organizations to discuss
5    UEP's Animal Welfare Guidelines?
6          A.    Yes.
7                MR. WILDERS:  Asked and
8          answered.  Misstates the testimony.
9    BY MS. SUMNER:
10         Q.    And when did FMI meet with
11   UEP --
12         A.    I don't remember.
13         Q.    -- to discuss the feedback on
14   how to enhance UEP's guidelines?
15         A.    I don't remember specifically.
16         Q.    Do you remember generally that
17   meeting?
18         A.    I remember the meeting, yes.
19         Q.    Was there one meeting or
20   multiple meetings to talk specifically about
21   how to enhance the UEP guidelines?
22         A.    There was more than one
23   meeting.
24         Q.    Who from FMI attended those
25   meetings?

123

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          A.    It depended.  Sometimes we
3    would bring in Joy Mench because these
4    were -- this was feedback from the experts.
5    Our CEO sat in on some of the meetings.  Jill
6    sat in on all the meetings.  Terrie Dort of
7    NCCR sat in on the meetings.
8          Q.    Were you present for all of the
9    meetings?
10         A.    I was present for all of the
11   meetings, yes.
12         Q.    When you say your CEO, are you
13   referring to Tim Hammonds?
14         A.    Correct.
15         Q.    Who from UEP attended those
16   meetings?
17         A.    I don't remember.  It could
18   have been Gene Gregory, Gene and Al.  It
19   could have been Ken.  It could have been some
20   of their members.  If they wanted to bring
21   their members, we would generally try to have
22   Joy there, if we could.
23         Q.    Do you have a recollection
24   today as to approximately how many meetings
25   there were on this particular issue with UEP?

124

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          A.    Haven't a clue.
3          Q.    Were there fewer than ten?
4          A.    I don't remember.
5          Q.    Were there more than five?
6          A.    I don't remember.  Trade
7    associations have a lot of meetings, lots and
8    lots of meetings.
9                     - - -
10         (Exhibit Brown-8, 8/13/01 Fax,
11   Bates FMI-001099 - FMI-001117, was
12   marked for identification.)
13                    - - -
14   BY MS. SUMNER:
15         Q.    I'm going to show you a
16   document that's been marked as Brown
17   Exhibit 8.
18         A.    Do you need to mark a new
19   document since I circled that?
20         Q.    No.  We'll just leave that.
21         A.    Oh, best regards from me.
22         Q.    Ms. Brown, do you recognize the
23   document that has been marked as Brown-8?
24         A.    In the context of I see it's an
25   FMI document sent by me, yes, I recognize it.

125

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          Q.    And did you create this
3    document in your role as senior vice
4    president at FMI?
5          A.    Yes.
6          Q.    And is this a document that you
7    faxed to the individuals who are listed in
8    the fax to and cc columns on the front page
9    of the document?
10         A.    Yes.
11         Q.    Who are the individuals to whom
12   this document was faxed?
13         A.    Executives with our member
14   companies.
15         Q.    And was this document created
16   by you on or about August 13, 2001?
17         A.    That's what it says.
18         Q.    And was that when,
19   approximately when it was sent?
20         A.    It would have been sent on that
21   day.
22         Q.    If you can turn to the second
23   and third pages of this document which bear
24   the Bates numbers FMI-001100 through 01.
25   They're entitled FLIP CHART NOTES July 9,

32 (Pages 122 to 125)

126

KAREN BROWN - HIGHLY CONFIDENTIAL
1      2001 - Chicago, Illinois.  Do you see that?
2      A.    Yes.
3      Q.    Are these notes from the
4  meeting of the member -- I'm sorry.
5           Are these notes from the member
6  meeting that took place on July 9, 2001, in
7  Chicago that we discussed earlier?
8      A.    I would assume so.
9      Q.    Did you attend that meeting?
10     A.    I did.
11     Q.    Did you take these notes?
12     A.    I wrote on the flip charts,
13  yes.
14     Q.    And did you take these notes at
15  or near the time of the meeting?
16     A.    I would have taken them at the
17  meeting.
18     Q.    And do they accurately depict
19  the discussion at the meeting?
20     A.    I assume so.
21     Q.    And were these notes made by
22  you in your role as senior vice president for
23  FMI?
24     A.    Yes.

127

KAREN BROWN - HIGHLY CONFIDENTIAL
1      Q.    And were these notes kept by
2  FMI in the regular course of its business?
3      A.    Yes.
4      Q.    I want to direct your attention
5  to the egg laying hens portion of this
6  document.  It says, "EGG LAYING HEN ISSUES."
7      A.    Yes.
8      Q.    And it lists multiple issues.
9      A.    Yes.
10     Q.    Are these the gaps that were
11  identified by the expert advisory panel that
12  FMI put together?
13     A.    These would have been issues
14  that the experts thought should be improved
15  or changed.
16     Q.    And I think you referred to
17  those as gaps.  Is that right?
18     A.    Yes.  Just -- yes.
19     Q.    And are these --
20     A.    Gaps between their practices
21  which the experts thought were best practices
22  and those which they didn't, the experts
23  didn't feel were the best practices at the
24  time.

128

KAREN BROWN - HIGHLY CONFIDENTIAL
1      Q.    So these were the experts'
2  recommendations for improvements that could
3  be made in the UEP program or issues that had
4  to be addressed in the UEP program?
5      MR. WILDERS:  Objection.
6  Leading.
7      THE WITNESS:  These were the
8  issues that the experts raised from
9  the standpoint of all laying hen
10  operations.  And the only document
11  that they had to review was the UEP
12  document.  So it was based on the UEP
13  guideline document that existed at the
14  time.
15  BY MS. SUMNER:
16     Q.    And do you recall that one of
17  the things that was listed as an action item
18  or an activity to be done at the meeting was
19  for the member advisory committee to rank,
20  order the gaps or to prioritize the gaps?
21     MR. RANDALL:  Objection to form.
22     THE WITNESS:  I don't recall,
23  but -- I mean, I don't recall that as
24  a specific.

129

KAREN BROWN - HIGHLY CONFIDENTIAL
1  BY MS. SUMNER:
2      Q.    Let's look back, I just want to
3  make sure that I get these right.
4      A.    I could be confused because of
5  the questions being asked in a different
6  manner.
7      Q.    Well, I certainly don't want to
8  confuse you.  So let's look back, just
9  keep -- you can keep this document out, but
10  if you can turn to Exhibit 3, and let's look
11  back at the page that's Bates numbered 3060.
12     A.    3060.
13     Q.    This is the "January to
14  June 2001" slide.
15     A.    I hope all this was done by
16  some machine, all these numbers.
17     Q.    So you see the last bullet
18  point there are "Experts identify gaps in
19  existing industry guidelines."
20     A.    Yes.
21     Q.    So the gaps identified in the
22  UEP industry guidelines are the ones that are
23  listed on this flip chart notes document
24  under egg laying hen issues.  Is that

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

130

KAREN BROWN - HIGHLY CONFIDENTIAL

1  correct?
2      A.    These are the gaps.  Whether
3  they were specific to UEP's guidelines,
4  I'm --
5      Q.    Was there any other document or
6  set of guidelines with respect to egg laying
7  hens that your expert advisory panel was
8  reviewing?
9          MR. WILDERS:  Objection.
10         Assumes facts.
11         THE WITNESS:  No.  But they also
12         were aware of guidelines from other
13         places, Canada, Europe, et cetera.
14  BY MS. SUMNER:
15      Q.    Were there other guidelines for
16  egg laying hens that the advisory committee
17  consulted in its work?
18      A.    Specifically for us?
19      Q.    Yes.
20      A.    No, but it was all within the
21  context of the consensus, scientific animal
22  science consensus at the time of what were
23  the issues that were most important.  And it
24  was looking at any guidelines that they had

131

KAREN BROWN - HIGHLY CONFIDENTIAL

1  before then depending upon the species, they
2  knew what the scientific consensus was on the
3  issues that were most important and were they
4  addressed in the guidelines that the
5  producers shared with them.
6      Q.    The last bullet point then
7  says, "FMI member committee prioritizes
8  gaps."
9      A.    Yes.
10      Q.    We had a discussion about that,
11  remember?
12      A.    Yes.
13      Q.    My question simply was, are the
14  egg laying hen issues that you recorded on
15  the flip chart notes document that's been
16  marked in Brown-8 in the order in which the
17  member committee prioritized them?
18      A.    I don't recall.  But the
19  members, from their perspective, what they
20  would be worrying most about were the issues
21  that would be before their customers.  And
22  definitely from the standpoint of media and,
23  you know, animal activist campaigns, and the
24  responses from the quick serve industry,

132

KAREN BROWN - HIGHLY CONFIDENTIAL

1  space allocation was the number one issue.
2      Q.    Looking at this document, let's
3  turn back to Brown-8, the egg laying hen
4  issues identified in the flip chart notes
5  portion of the document.
6      A.    Yes.
7      Q.    The first one is Space - a
8  range or 72 inch minimum.
9      A.    Right.
10      Q.    Do you recall what was
11  discussed at the July 9th meeting about that
12  issue?
13      A.    I haven't a clue.
14      Q.    What was the concern or gap
15  identified by the expert advisory panel with
16  respect to space for egg laying hens?
17      A.    They were concerned that the
18  timing needed to be pushed forward.  In other
19  words, they thought that the time that the
20  industry was proposing for getting to the 72
21  minimum, I presume, needed to be enhanced.
22      Q.    When you say "enhanced," you
23  mean shortened?
24      A.    Sooner.

133

KAREN BROWN - HIGHLY CONFIDENTIAL

1      Q.    Do you recall what UEP's
2  original proposal was on cage space phase-in?
3      A.    No.
4      Q.    Let me direct your attention to
5  some pages later in Brown Exhibit 8.  So
6  turn, please, to the pages that are marked
7  FMI-1102 through 1105.
8      A.    Okay.  You want me to read all
9  these or you only want me to read the egg
10  part?
11      Q.    Let me ask you just about the
12  document first so we can get through this
13  authentication part.
14      A.    Okay.
15      Q.    Do you recognize these as
16  minutes from a meeting of the FMI expert
17  review panel?
18      A.    It was a conference call, yes.
19      Q.    And were minutes kept for all
20  meetings or conference calls of the animal
21  welfare expert review panel?
22      A.    Summaries of the meetings.
23  Summaries.
24      Q.    Is this one of those summaries?

134

KAREN BROWN - HIGHLY CONFIDENTIAL

1
2    A.    Yes.
3    Q.    And who created this summary?
4    A.    I did.
5    Q.    And was this summary created at
6  or around the time of this conference call?
7    A.    It was created -- yes.  Well,
8  it would have been created after.  It would
9  have been created as a record of the notes
10  that I kept of the conference call.
11    Q.    And you kept the -- you drafted
12  these notes on June 6th or close in time?
13    A.    I would presume so.  It would
14  be kind of hard to -- I mean, this was very
15  detailed stuff.  I would have kept the notes
16  at the time of the call.
17    Q.    And you participated in this
18  call.  Correct?
19    A.    Yes.  No, I kept the notes from
20  my home through some sort of system of mind
21  reading and osmosis.
22    Q.    And were those minutes
23  maintained as part of the regular business of
24  FMI?
25    A.    Yes.

135

KAREN BROWN - HIGHLY CONFIDENTIAL

1
2    Q.    On the bottom of page 2 it
3  says --
4    A.    1002, 102?
5    Q.    1003.  It's page 2 of the
6  document, the Bates number for litigation
7  purposes of 1003.  Do you see where it says,
8  "CHICKENS:  EGG-LAYERS"?
9    A.    Yes.
10    Q.    First bullet point says, "Three
11  gaps:  space; forced molting; and disposal."
12    A.    Yes, putting the chickens when
13  they're spent in a plastic bag and tying the
14  top is not a good method.
15    Q.    So those were the gaps -- those
16  were gaps identified by the expert advisory
17  panel.  Correct?
18    A.    Yes.
19    Q.    And gaps in the existing UEP
20  guidelines?
21    A.    Yes.  Although I don't think
22  their guidelines actually said put them in a
23  plastic bag and tie them up.
24    Q.    I'm sure they did not.
25    The second point says, "Cage

136

KAREN BROWN - HIGHLY CONFIDENTIAL

1
2  size of egg layers is big issue."
3    Do you see that?
4    A.    Yes.  Yes.
5    Q.    How so?
6    A.    That was the primary issue that
7  everyone was focusing on.  If you go back to
8  the -- I don't know how many chickens can fit
9  on an 8-and-a-half-by-11 sheet of paper, and
10  some of the exposés that had been done by the
11  animal activists which were shown on the
12  news, the Internet campaigns that were
13  underway, the allegations that were being
14  made by PETA about the practices within the
15  egg industry, and, you know, some of it was
16  probably not all true.  But it painted a very
17  graphic picture and that made it a very big
18  issue.
19    MR. PATTON:  The record should
20    reflect for the transcript that the
21    witness has been holding up a piece of
22    paper that's 8 and a half by 11.
23    MS. SUMNER:  Okay.  Doug, we
24    don't need the speaking objections.
25    MR. PATTON:  I'm entitled to

137

KAREN BROWN - HIGHLY CONFIDENTIAL

1
2  make a note for the record.
3    MS. SUMNER:  Doug, there's a
4    video and this is our time.  You can
5    take it out of your time.  Okay?
6    MR. PATTON:  We have a video,
7    but also have a transcript.
8  BY MS. SUMNER:
9    Q.    If you could flip to page 3.
10    A.    Well, I did say 12, you know,
11  whatever the number of chickens was, about a
12  dozen chickens inside an 8-and-a-half-by-11
13  size footprint of a cage.  That's a lot of
14  chickens.
15    Q.    It is a lot of chickens in a
16  very small space.
17    A.    Even if it was only six
18  chickens, it's still a lot of chickens.
19    Q.    That's a lot of chickens.
20    If you'd flip to page 3, the
21  top bullet point reads, Recommendations is
22  for minimum 72 square inches floor space.
23  UEP said it would meet this standard (67 to
24  72 square inches) in ten years -- not
25  acceptable to expert panel.

35  (Pages 134 to 137)

138

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2         Does that refresh your
3  recollection as to what UEP's original
4  proposal was for the time in which it was
5  going to phase in the cage space requirement?
6         A.    I still don't recall it, but
7  I'm sure it's true.
8         Q.    So it was ten years?
9         A.    If that's what this says, yes.
10        Q.    It says, "not acceptable to
11 expert panel."
12        Do you see that?
13        A.    Correct.
14        Q.    What was not acceptable to the
15 expert panel?
16        A.    That they take ten years.
17        Q.    What did the expert panel want
18 or recommend?
19        A.    That they speed it up.
20        Q.    Did FMI's members encourage UEP
21 to implement the cage space requirements as
22 quickly as possible?
23        A.    FMI's members looked to the
24 expert panel to make recommendations.  And if
25 the experts were making recommendations,

139

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  those were being made through FMI to UEP and
3  our members individually were not, to my
4  knowledge, involved in those discussions
5  directly with UEP.  They may have had
6  discussions with their own suppliers, but I
7  have no knowledge of that.  So I have no
8  knowledge of that.  I do not know.
9         Q.    Were your members apprised of
10 the recommendations that, or the gaps that
11 were identified by the expert --
12        A.    Yes.
13        Q.    -- panel?
14        A.    Yes.  As I said before, we have
15 a system of communication.  And this document
16 actually is sent to the members, so they
17 certainly were apprised of it through this.
18 Did they read UEP's guidelines?  I doubt it.
19        Q.    But they did understand the
20 gaps that were identified by the expert
21 panel.  Correct?
22        A.    They understood there were
23 gaps.  If they understood exactly what the
24 gaps were, I don't know.  But they understood
25 that there were gaps and they understood the

140

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  gaps as described, technically or
3  specifically, they're running their business.
4         Q.    And they also ranked those gaps
5  in order of priority.  Correct?
6         A.    They thought that the most
7  important gap from their perspective was the
8  one that was the most visible to the
9  consumer, their customers.  And that was the
10 space allocation.  And that was because it
11 was being focused on in the news media, by
12 the activists, letters they were getting from
13 PETA.  That's why it became the most
14 important issue to them.
15        Q.    I understand that.  I just want
16 to make sure that I'm understanding your
17 testimony correctly, though, that you
18 recently just said I don't know if they
19 understood exactly what the gaps were.  My
20 question to you was, in fact, on July 9,
21 2001, you held a meeting where the members
22 were not only apprised of the gaps, but they,
23 in fact, ranked them in order of priority.
24 Correct?
25        A.    Space allocation.

141

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2         MR. RANDALL:  Objection to form.
3         MR. WILDERS:  Also misstates the
4  document.
5  BY MS. SUMNER:
6         Q.    You can answer the question.
7         A.    What is the question, again?
8         Q.    The question --
9         A.    And what document -- what are
10 you referring to?  You know how -- I'm sorry,
11 but I want to make sure I know exactly what
12 meeting are you talking about.  What
13 document --
14        Q.    I'm talking about the July 9th
15 meeting.  And if it helps you, you sent an
16 agenda of sorts for that meeting to the
17 members, it was marked as Brown-7.
18        A.    Okay.
19        Q.    And my question is, at this
20 meeting --
21        A.    Yes.
22        Q.    -- the gaps --
23        A.    Under item 4, "a summary of the
24 June conference call"?
25        Q.    No.  I'm sorry.  I'm just --

142

KAREN BROWN - HIGHLY CONFIDENTIAL

1  the July 9th -- I'm sorry, it's July 2, 2001.
2  At the July 2, 2001, meeting, I think we
3  talked about this multiple times and I don't
4  mean to belabor this point, but I just want
5  to make sure that the record --
6      A.    You're doing a good job of
7  that.
8      Q.    -- is clear, that at that
9  meeting, the members who attended that
10  meeting were apprised of the gaps that were
11  identified by the FMI expert advisory panel.
12  Correct?
13         MR. RANDALL:  Objection to form.
14         THE WITNESS:  As background to
15      the meeting, they had a copy of the
16      summary of the flip charts from the
17      experts' meeting which identified the
18      four items you see on there, space
19      allocation being number one.
20  BY MS. SUMNER:
21      Q.    And as reflected in your
22  presentation to OIE --
23      A.    Okay.
24      Q.    -- one thing that that member

143

KAREN BROWN - HIGHLY CONFIDENTIAL

1  committee did at that meeting, and this is on
2  page 3060, was prioritize those gaps?
3      A.    Yes.  Yes.  Our members had two
4  basic concerns.  One, they knew from the
5  quick and dirty non-publishable research that
6  we did of focus groups that consumers wanted
7  to make sure that farm animals for food were
8  handled humanely.  They didn't want to know
9  anything about what happened to the little
10  baby chick until it ended up in the
11  supermarket case as a -- in the meat case.
12  They didn't want to know about anything that
13  happened in between.  But they did think that
14  the supermarket as the buying agent for the
15  customer had a responsibility to make sure
16  that its suppliers were treating those
17  animals humanely if they were producers
18  raised in the growing, transportation and
19  processing.  So if it is an issue that is
20  important to consumers, it is an issue that
21  is important to retailers.  They are not
22  product or process specific.  They will sell
23  what consumers want to buy, and they will
24  sell the kinds of products that consumers

144

KAREN BROWN - HIGHLY CONFIDENTIAL

1  want to buy.  And humane handling is an
2  important issue to consumers today.  And,
3  therefore, retailers are thereby concerned
4  about it.
5         So from the standpoint of them
6  prioritizing, they weren't getting involved
7  in the scientific, technical or the reading
8  the guidelines off all these producer groups
9  because you've got all five or six species
10  here, they wanted to know what the experts
11  thought were the most important areas that
12  needed to be improved.  And they looked at it
13  from their perspective of what is it that my
14  consumers are hearing about right now, what
15  is it my customers are concerned about, what
16  are they asking questions about.  That's the
17  most important gap to me.
18      Q.    And the experts identified the
19  ten-year phase-in requirement for the cage
20  space requirement as unacceptable.  Correct?
21         MR. WILDERS:  Asked and
22      answered.
23         THE WITNESS:  They thought it
24      had -- it should be shortened.

145

KAREN BROWN - HIGHLY CONFIDENTIAL

1  BY MS. SUMNER:
2      Q.    And indeed on the notes that
3  you took of the meeting, you wrote, "not
4  acceptable to expert panel."
5      A.    That's their language.
6      Q.    And that's an accurate
7  reflection of what they said.  Correct?
8      A.    Yes.
9         MR. RANDALL:  Objection to form.
10  BY MS. SUMNER:
11      Q.    Because you took these notes.
12  Right?
13         MR. WILDERS:  Asked and
14      answered.
15         THE WITNESS:  Well, I'm not sure
16      I remember whether -- yes, I did.
17  BY MS. SUMNER:
18      Q.    Was the phase-in period a topic
19  of discussion between FMI and UEP?
20      A.    It would have been something
21  that we would have given feedback.  And,
22  again, we were giving feedback to the
23  producers of what our experts said.  And we
24  had one-on-one meetings because we thought

37 (Pages 142 to 145)

146

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  that was the best way to go about it.  We
3  didn't think that it was fair to sit in a
4  meeting with all the producer organizations
5  and tell them the areas where the experts
6  thought they should do a better job.  So
7  that's why we had individual meetings.
8          In some cases, as before you
9  ask the question, you know, they would have
10 some of their members there to explain from
11 the producer standpoint what the challenges
12 were in egg laying as far as that particular
13 part of farming.  And if possible, we would
14 have Joy Mench there if we could, so that she
15 could explain from the scientist, the animal
16 science perspective, why this was so
17 important and what the negative ramifications
18 were to the animal.  All this was focused on
19 how the animals were being treated before
20 they were processed for food.  That's the
21 main focus of all of this.  That was really
22 FMI's interest and the expert's focus.
23     Q.    In FMI's meeting with UEP --
24     A.    Which I don't remember the
25 details of.

147

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.    -- did FMI communicate to UEP
3  that the ten-year proposed phase-in was not
4  acceptable to FMI's expert advisory panel?
5     A.    Yes.  We told them that the
6  experts thought it should be shortened.
7     Q.    Did UEP shorten the timetable?
8     A.    I don't recall that.
9              -  -  -
10         (Exhibit Brown-9, 12/11/01
11      Letter, Bates UE0178561 & UE0178562,
12      was marked for identification.)
13              -  -  -
14 BY MS. SUMNER:
15     Q.    I'd like to show you what's
16 been marked as Brown Exhibit 9.
17     A.    I'm sorry, I just don't
18 remember all the details of what happened 12
19 years ago.
20     Q.    Ms. Brown, is this a letter
21 that you received?
22     A.    I assume so.  I don't know who
23 the others are, though.  I don't know.
24         MR. GREEN:  This is not an FMI
25 document.

148

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  BY MS. SUMNER:
3     Q.    This is a document that is --
4  it's a letter that's addressed to you, senior
5  vice president of the FMI Food Marketing
6  Institute.  Is that correct?
7     A.    Right here in this building.
8     Q.    Did you receive this letter
9  from UEP in your role as SVP of FMI?
10    A.    I don't recall.  But I would --
11 if it came to me, I received it.
12    Q.    Do you have any reason to
13 believe that you did not receive this
14 letter --
15    A.    No.
16    Q.    -- from UEP on or about
17 December 11, 2001?
18    A.    No.  I would like to read it,
19 though, if you're going to ask me questions
20 about it.
21    Q.    I am going to ask you a
22 question just about the first two sentences,
23 but feel free to look at the whole thing if
24 you'd like.
25         I want to focus on, it says,

149

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  "Dear Karen & Others: ...("UEP) Animal
3  Welfare Committee and Board have addressed
4  FMI's Discussion Points, as identified at our
5  last meeting in a proactive, responsible and
6  aggressive way?"
7         Do you see that?
8     A.    I do.
9     Q.    Do you have an understanding as
10 to what FMI's discussion points the authors
11 of this letter were refers to?
12    A.    Not exactly.
13    Q.    Do you generally?
14    A.    Not exactly, I don't.
15    Q.    Were those gaps that were
16 identified by FMI in the UEP guidelines in a
17 meeting between FMI and UEP, one of these
18 meetings we've been talking about?
19    A.    I am sure we shared them.  I'm
20 sure that we shared have been.  But I do not
21 specifically know, I can't give you the
22 specifics of what the last meeting was that's
23 referred to here or what was discussed in
24 that last meeting because I do not recall.
25    Q.    Do you recall -- you do recall,

38 (Pages 146 to 149)

150

KAREN BROWN - HIGHLY CONFIDENTIAL
1  though, discussing the ten-year phase-in in
2  your meetings with UEP. Correct?
3      A.   Discussing to the point of
4  saying this is what they said.
5      Q.   And the next sentence in this
6  letter reads, "Phase-in: a 'Fast Track'
7  revised implementation program reduces the
8  originally Proposed Phase-in by approximately
9  50%."
10     A.   Okay.
11     Q.   Do you see that?
12     A.   I do.
13     Q.   And does that refresh your
14 recollection as to whether UEP agreed to
15 speed up the phase-in in response to FMI's
16 comments?
17     A.   That's what it says.
18     Q.   Going back to what was marked
19 as Brown-8, and this is -- we were looking at
20 the minutes from June 6, 2001, expert panel
21 conference call.
22     A.   Yes.
23     Q.   It says this bullet point I
24 want to go back to, "Recommendation is for

151

KAREN BROWN - HIGHLY CONFIDENTIAL
1  minimum 72 square inches of floor space." On
2  page 3. The Bates number at the bottom is
3  1104. This is page 3 of the minutes you took
4  of the June 2nd conference call.
5      A.   The summary, yeah.
6      Q.   June 6th.
7      A.   There's a difference between a
8  summary and minutes.
9      Q.   The summary of the June
10 conference call. You see the first bullet
11 point says, "Recommendation is for minimum
12 72 inches of floor space"?
13     A.   Right. We've already talked
14 about this.
15     Q.   Well, we talked about the
16 phase-in. What I want to ask you
17 specifically is whether it was the
18 recommendation of the FMI advisory panel that
19 a minimum 72 inches of floor space be
20 allotted for egg laying hens?
21     A.   I don't recall that, that they
22 specifically recommended that. I think what
23 they were looking at is the fact that UEP
24 said this was going to be their minimum in

152

KAREN BROWN - HIGHLY CONFIDENTIAL
1  their guidelines and it would take ten years.
2  The experts said we think that should be
3  shortened.
4      Q.   Do you have a recollection of a
5  discussion about whether there should be a
6  range 67 to 72 square inches versus a minimum
7  of 72?
8      A.   I don't recall a discussion.
9      Q.   And looking back just at your
10 flip chart notes on July 9, 2001, which are
11 also contained in Exhibit 8, they're the
12 second page of the document, FMI-1100.
13     A.   Okay.
14     Q.   Under "EGG LAYING HEN ISSUES,"
15 the first one, Space - a range or 72 inches
16 minimum.
17     A.   Yes.
18     Q.   Does that refresh your
19 recollection?
20     A.   If I wrote it down, they said
21 it.
22     Q.   So the expert advisory panel
23 recommended the 72 inch minimum?
24     A.   No, I think maybe they could

153

KAREN BROWN - HIGHLY CONFIDENTIAL
1  have been parroting what was in the guideline
2  document. I don't know. I don't have the
3  document. I don't know. I have no clue.
4      Q.   Do you recall what was PETA's
5  position on cage space?
6      A.   Specifically, no. Keep in
7  mind, PETA was broccoli in the meat case.
8      Q.   Let's turn -- stay with
9  Exhibit 8 there. And following the
10 conference call summary, I'd like to focus
11 your attention on the remainder of this
12 document which appears to be a letter from
13 PETA to you bearing Bates numbers 1106
14 through 1110. Do you see that?
15     A.   Yes.
16     Q.   Do you recognize this document
17 as a letter that you received from Sean
18 Gifford of PETA on or about August 2, 2001,
19 in your role as senior vice president at FMI?
20     A.   In my role as senior vice
21 president at FMI I received numerous
22 communications from PETA written and from
23 different people within PETA. So in that
24 context I recognize it. But do I recall or

154

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   remember what's in this, no.
3       Q.   I'm just asking you, this is a
4   letter that you received from Sean Gifford of
5   PETA.  Correct?
6       A.   Probably.
7       Q.   On the first page of this
8   letter --
9       A.   Yes.
10      Q.   -- Mr. Gifford wrote to you in
11  the one, two, three, fourth paragraph.
12      A.   You skipped over where he
13  thanks us for clarifying our plans.
14      Q.   The last sentence of that
15  fourth paragraph, I just want to focus there,
16  he says, "For the FMI to offer its members
17  meaningful advice on animal welfare, it must
18  leave the current industry standards behind
19  and meet or exceed McDonald's and Burger
20  King's new standards, which include the
21  following."
22      A.   And herein lies the problem for
23  the producer.  We have two companies listed
24  in this letter, if indeed it's accurate, who
25  have new standards that are completely

155

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   different and telling the producer that if
3   they don't follow these standards, they're
4   not going to buy the product anymore.  This
5   is Burger King and McDonald's.
6       Q.   Right.
7       A.   So therein lies the problem
8   that the supermarket industry didn't want to
9   have anything to do with.
10      Q.   That's the competitive issue
11  they were concerned about?
12      A.   They didn't want to have
13  anything to do with that kind of an issue.
14      Q.   So then flip to -- so then he
15  includes a list of standards that he is
16  requiring or saying that FMI must meet or
17  exceed?
18      A.   Right.  Quite a list.
19      Q.   I just want to focus you on
20  number 2, which is on the next page of this
21  letter.  It reads, "Cease buying eggs from
22  suppliers that give hens less than 75 square
23  inches of space per bird with the ultimate
24  goal of phasing out battery cages
25  altogether."

156

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2       Do you see that?
3       A.   I see that.
4       Q.   Was that indeed PETA's position
5   on cage space requirement at this time?
6       MR. RANDALL:  Objection to form.
7       THE WITNESS:  It certainly is in
8       their letter.  I can't -- you know --
9   BY MS. SUMNER:
10      Q.   Let me rephrase the question.
11      A.   -- I can't document that that
12  was their position because their position was
13  a moving target.
14      Q.   Fair enough.  Let me just
15  rephrase the question to make it easier.
16      Was that the position that was
17  communicated by PETA to you at this time as
18  to PETA's --
19      A.   Within this letter.
20      Q.   Yes.
21      A.   It's in this letter.
22      Q.   So that was the 75 --
23      A.   Yes, it is in this letter.
24      Q.   And my -- yes, my question is,
25  that was the position that PETA communicated

157

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   to you at this time?
3       MR. WILDERS:  Asked and
4       answered.
5       THE WITNESS:  PETA -- in this
6       letter, PETA says that they want
7       everybody to cease buying eggs from
8       suppliers that give hens less than 75 square
9       less than 75 square inches of space.
10      At the time they wrote this letter,
11      that was the position that whoever
12      signed it, because it was always
13      somebody different, Sean Gifford
14      signed it --
15  BY MS. SUMNER:
16      Q.   And that's more space than was
17  required by the UEP guidelines at this time.
18  Correct?
19      A.   I don't know that.  But if you
20  say so, yes.
21      Q.   Well, we had just seen a
22  document that talked about 72 square inches.
23      A.   I don't see -- I don't have a
24  copy of the UEP guidelines of 2001, so I
25  can't speak to that.

40  (Pages 154 to 157)

158

KAREN BROWN - HIGHLY CONFIDENTIAL

1    Q.    What was the position -- what
2  was PETA's position on how quickly egg
3  producers should phase in the cage space
4  guidelines?
5    A.    I haven't a clue unless I read
6  it and it's in this letter.
7              - - -
8         (Exhibit Brown-10, 8/16/02 Fax,
9    Bates FMI-001066 - FMI-001077, was
10   marked for identification.)
11             - - -
12 BY MS. SUMNER:
13   Q.    I'm going to show you a
14 document that's been marked as Brown
15 Exhibit 10.
16   A.    It's another letter from PETA.
17 Have you noticed that the executives in the
18 member companies are changing all the time as
19 to who gets to read it?
20   Q.    This is a document that bears
21 the Bates numbers FMI-1066 through 1077.
22   A.    Yes.
23   Q.    It's dated August 16, 2002?
24   A.    Yes.

159

KAREN BROWN - HIGHLY CONFIDENTIAL

1    Q.    It appears to be from you, a
2  fax from you to a series of people regarding
3  animal welfare update.
4         Do you recognize this document,
5  Ms. Brown?
6    A.    I don't remember the document,
7  but I see that it's a document from me to --
8  faxed to member companies on FMI letterhead.
9    Q.    Is this a fax that you sent on
10 or about August 16, 2002, to the individuals
11 listed in the fax to column?
12   A.    I presume so.
13   Q.    And who are those individuals?
14   A.    Executives in FMI member
15 companies.
16   Q.    I'd like to direct your
17 attention --
18   A.    Let me point something out,
19 because I want to make sure it's clear. I
20 don't want to have a misunderstanding.
21         These larger companies were the
22 ones that had staff to focus on issues
23 management. It wasn't that these were the
24 only companies in our membership that were

160

KAREN BROWN - HIGHLY CONFIDENTIAL

1  interested in this issue or who were involved
2  or who were happy that we were doing what we
3  were doing. But our smaller companies and
4  our one store operators, they had no one to
5  devote to this kind of activity. So thank
6  heavens that we have companies within trade
7  associations who have members within their
8  companies, executives within their companies
9  who can devote time to these kinds of issues
10 and work with the trade association on it.
11 Otherwise, who knows what trade associations
12 will be doing. So I just wanted to point
13 that out. It does not mean that these were
14 the only companies that were involved in this
15 issue or cared about it.
16   Q.    That clarification is helpful,
17 thank you.
18         I'd like to direct you to the
19 PETA letter contained in this fax that you
20 sent. It begins on FMI-1070 and runs through
21 1077.
22   A.    1070. They wrote really long
23 letters.
24   Q.    They sure did.

161

KAREN BROWN - HIGHLY CONFIDENTIAL

1         Was this a letter that you
2  received in your role as senior vice
3  president at FMI on or about August 7, 2002,
4  from Bruce Friedrich at PETA?
5    A.    I presume so.
6    Q.    I'd like to direct your
7  attention to page 3 of the letter, under the
8  "Laying Hens" section.
9    A.    72?
10   Q.    72. It says, "Laying Hens,"
11 about two-thirds of the way down the page.
12 Do you see that?
13   A.    Yes.
14   Q.    And about two-thirds of the way
15 down that paragraph, there's a bold phased
16 sentence that reads, "For these guidelines,
17 PETA expects a phase-in period for FMI/NCCR
18 members of a maximum 18 months."
19         Did I read that correctly?
20   A.    I think so. Good job.
21   Q.    Was this the position on
22 phase-in that PETA communicated to FMI in
23 August of 2002?
24   A.    It's in this letter.

41  (Pages 158 to 161)

162

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    Was this the position on
3  phase-in that PETA communicated to FMI in
4  August of 2002?
5    A.    It's in this letter.
6    Q.    And that is a faster phase-in
7  than what was proposed by UEP. Correct?
8    A.    They were reducing it by
9  50 percent which would have taken the ten
10 years to five, so 18 months would be --
11   Q.    Even quicker. Right?
12   A.    But, again, keep in mind,
13 PETA's objective is not having any chickens,
14 any cows, any pigs, any ducks ever processed
15 for food to be eaten by any human on the
16 planet. So anything that they proposed,
17 which was always a moving target, was going
18 to be almost impossible to achieve because
19 that's their agenda.
20   Q.    So they wanted it to be done
21 tomorrow?
22   A.    They're all vegans. Very
23 irritable all the time, too.
24   Q.    Let's go back to your
25 presentation again that you gave to OIE.

163

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    A.    I'm not lecturing you, I'm just
3  trying to help you understand the context of
4  what we're talking about from a retail
5  perspective.
6    Q.    I want to direct your attention
7  now to page 3065. It's a slide entitled,
8  "Experts' Meetings To-Date."
9    A.    Okay.
10   Q.    Is this a list of all of the
11 meetings of the animal welfare expert panel
12 as of the date of this presentation?
13   A.    Yes.
14   Q.    I believe you testified before
15 that you kept summaries of these meetings?
16   A.    Flip chart notes.
17   Q.    Well, do you recall the --
18   A.    I did not keep word-by-word
19 summaries of meetings. I mean, there were
20 conversations all over the place by the
21 scientists. And the important thing coming
22 out of the meetings were what were the
23 actions that they were recommending or what
24 were their recommendation. So they were
25 meeting summaries kept on flip chart notes,

164

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  not descriptive minutes in the traditional
3  context.
4    Q.    But you kept meeting summaries?
5    A.    Yes. Mostly. Maybe not
6  always, but I would assume mostly.
7    Q.    Ms. Brown, I'm going to go show
8  you -- mark five documents right now.
9    A.    I'm sorry, what did you say?
10   Q.    I'm going to mark five
11 documents right now and just ask you a
12 question about all of them together, just
13 general question to hopefully identify them
14 quickly.
15   A.    Speed reading.
16   Q.    The first one is -- give those
17 back to me, they're not in order.
18         So first one is -- bears the
19 Bates numbers FMI-680 through 83.
20         MS. ANDERSON: You want to wait
21 until counsel has all of them,
22 otherwise we'll ask you to repeat the
23 Bates number.
24         MS. SUMNER: That's been marked
25 as Brown Exhibit 7 (sic, Exhibit 11).

165

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2  I want to mark as Brown Exhibit 12 --
3         THE WITNESS: This is a
4  duplicate document right here.
5         MS. SUMNER: I want to mark as
6  Exhibit 12 a document that bears the
7  Bates numbers FMI-296 through 305.
8         We'll mark as Brown-13, a
9  document that bears the Bates numbers
10 FMI-2809 through 13.
11         MR. RANDALL: When you said 7
12 there, did you mean 11?
13         THE WITNESS: I've got 11, 12
14 and 13. That's the stickies I'm
15 looking at.
16         MS. SUMNER: I'm going to mark
17 as Brown-14, a document that bears the
18 Bates numbers FMI-3402 through 07.
19 And as Brown-15, a document that bears
20 the Bates numbers FMI-3389 through 92.
21         THE WITNESS: Okay.
22              - - -
23         (Exhibits Brown-11, Animal
24 Welfare Conference Call Wednesday,
25 June 6, 2001, Bates FMI-000680 -

42 (Pages 162 to 165)

166

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      FMI-000683; Brown-12, Animal Welfare
3      Meeting San Diego, CA February 10-12,
4      2003, Bates FMI-000296 - FMI-000305;
5      Brown-13, FMI-NCCR Animal Welfare
6      Advisors Meeting May 13-14, 2003,
7      Bates FMI-002809 - FMI-002813;
8      Brown-14, Animal Welfare Advisory
9      Committee Meeting Arlington, VA May
10     22-24, 2007, Bates FMI-003402 -
11     FMI-003407; and Brown-15, Meeting
12     Summary FMI-NCCR Animal Welfare
13     Advisory Committee November 17-19,
14     2008, Bates FMI-003389 - FMI-003392,
15     were marked for identification.)
16              - - -
17     BY MS. SUMNER:
18     Q.     Ms. Brown, my first question to
19 you is, is each of the documents that have
20 just been marked as exhibits, Brown Exhibits
21 11 through 15, a summary, flip chart notes
22 summary of an animal welfare expert review
23 panel meeting that was prepared by you?
24     A.     That's what they look like.
25     Q.     And were these summaries

167

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2 created at or around the time of the meeting
3 identified at the top of the summary?
4     A.     Yes.
5     Q.     Did you attend each of these
6 meetings for which you created summaries?
7     A.     Yes, as is stated on here.
8     Q.     And was it your practice to
9 record accurately in these summaries what
10 occurred at the meetings?
11     A.     I recorded conclusions,
12 accurate conclusions, accurate
13 recommendations, on flip charts.
14     Q.     And did you attend these
15 meetings as a senior vice president of FMI?
16     A.     Yes.
17     Q.     And were these meetings
18 maintained as part of the regular business of
19 FMI?
20     A.     Yes.
21     Q.     Let's turn back to your
22 presentation which we're moving through here.
23 This is Brown-3.
24     A.     Never thought I would get so
25 much attention.

168

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.     I'd like to direct your
3 attention to --
4     A.     Which page?
5     Q.     -- 3061, we're back on the
6 FMI-NCCR Collaboration.
7     A.     Okay.
8     Q.     And we talked before about the
9 last bullet point, "FMI and NCCR undertake
10 one-on-one meetings with producer community
11 to give feedback on how to enhance current
12 industry guidelines."
13          Do you see that?
14     A.     Yes.
15     Q.     And I believe you testified
16 before that you had such a series of meetings
17 with UEP.  Is that correct?
18     A.     Yes.  How many, I don't
19 remember.
20     Q.     Do you recall a meeting in
21 mid-December 2001 with the UEP to discuss
22 these gaps?
23     A.     Not specifically.
24     Q.     I'm going to show you a
25 document that I'm going to mark as Brown-16.

169

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2              - - -
3          (Exhibit Brown-16, Summary of
4     Meeting with FMI - December 13, 2001,
5     Bates MPS-00047338, was marked for
6     identification.)
7              - - -
8 BY MS. SUMNER:
9     Q.     This is a document bearing the
10 Bates numbers MPS-00047338.
11          MR. WILDERS:  Counsel, are you
12     going to lay a foundation for the
13     protective order?
14 BY MS. SUMNER:
15     Q.     My question for you, Ms. Brown,
16 is, if you could take a moment to look at the
17 document which is entitled, "Summary of
18 Meeting with FMI - December 13, 2001," it
19 identifies you as one of the attendees.
20          My question is, does reviewing
21 this document refresh your recollection as to
22 a meeting that occurred on December 13, 2001,
23 between FMI and various representatives of
24 UEP?
25          MR. WILDERS:  I object that this

43  (Pages 166 to 169)

170

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     document is marked confidential.
3          MS. SUMNER:  Your objection is
4     duly noted for the record.  Midwest
5     has --
6          MR. PATTON:  Don't interrupt.
7          MS. SUMNER:  Midwest has waived
8     their confidentiality over it.
9          MR. PATTON:  Let him make his
10    objection.
11         MS. SUMNER:  We covered this --
12         MR. WILDERS:  They did not waive
13    this.
14         MR. DAVIS:  They waived it in
15    writing.
16         MS. SUMNER:  They waived it in
17    writing.
18         MR. DAVIS:  Your objection is
19    noted.
20         MS. SUMNER:  And we're entitled
21    to use it.  It's our risk of
22    violating.  So, again, I don't think
23    we need to take up time on this.  They
24    waived their -- the confidentiality.
25         MR. BURKE:  This is Jason Burke

171

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     on behalf of Midwest.  We have indeed
3     waived our confidentiality right as to
4     this document with this particular
5     witness.
6          THE WITNESS:  Aren't I lucky.
7     BY MS. SUMNER:
8          Q.    So, again, Ms. Brown, the
9     question is, after reviewing the document,
10    does it refresh your recollection as to a
11    meeting with UEP on December 13, 2001?
12         A.    The specifics of the meeting,
13    no.
14         Q.    Does it refresh your
15    recollection generally about the meeting?
16         A.    No.  This is -- I don't think I
17    made this document.
18         Q.    You did not create this
19    document.
20         A.    Okay.  Because I have no --
21         Q.    So I don't want there to be any
22    confusion about that.
23         A.    I wouldn't want a document that
24    was not really identifiable.
25         Q.    I want to direct your attention

172

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     to the second item that's listed here.
3          A.    Yes.
4          Q.    Which reads, "Terrie Dort
5     recommended UEP develop a space phase-in
6     program for brown laying hens."
7          Do you recall a discussion with
8     UEP at or around December 13, 2001, where
9     Terrie Dort recommended that UEP develop a
10    phase-in program for brown laying hens?
11         A.    Not specifically, no.
12         Q.    Do you recall it generally?
13         A.    No.
14         Q.    Do you recall anything about
15    that conversation?
16         A.    No.  Sorry.
17         Q.    That's okay.
18         A.    I can't even get a picture of
19    what room it would have been in, so...
20         Q.    Let's look at item number 3
21    which says, "Karen Brown - an audit form
22    needs to be quantifiable."
23         A.    That would be a general
24    statement I would make in any meeting that
25    was held where somebody would have been, I

173

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     don't know whether they were talking about --
3     I mean, I don't recall the meeting, but if
4     there was a conversation about an audit form,
5     one of the things that our experts said is
6     they have to be quantifiable.  So I could
7     have made that statement.  But I don't recall
8     specifically.
9          Q.    What do you mean by
10    "quantifiable"?
11         A.    You have to have metrics.
12    Measurable metrics in any kind of audit, be
13    it an environmental audit, food safety audit,
14    animal welfare audit, you have to have
15    measurable metrics, things you can count or
16    easily identify.
17         Q.    What's the purpose of an audit?
18         A.    The purpose of an audit, as far
19    as I understand it, is to make sure people
20    are doing what they said they were doing to
21    do.
22         Q.    Did FMI believe that an audit
23    component should be part of its animal
24    welfare program?
25         MR. WILDERS:  Objection.  Vague.

44  (Pages 170 to 173)

174

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          THE WITNESS:  There was
3      discussion about an audit being part
4      of any animal welfare program, and
5      certainly from the standpoint of being
6      able to confirm that people were doing
7      what they said they were doing, an
8      audit is definitely a good way to do
9      that.  There was some conversation
10     about, I'm sure you'll get to the
11     whole list, maybe you won't, but, yes,
12     we did believe that an audit would be
13     helpful in the process of confirming.
14     But we were talking about third-party
15     audits, independent third-party audits
16     that would be done by some third party
17     that would confirm that companies were
18     following the guidelines they said
19     they were following.
20  BY MS. SUMNER:
21     Q.    That was something that FMI
22  included as part of its animal welfare
23  program?
24         MR. WILDERS:  Objection.
25     Misstates the testimony.

175

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          MS. SUMNER:  It's a question.
3      It's not intended to be a statement of
4      testimony.
5          THE WITNESS:  That was
6      something that --
7          MR. WILDERS:  Object to leading.
8          THE WITNESS:  -- was discussed
9      down the road, but never got off the
10     ground.
11  BY MS. SUMNER:
12     Q.    What do you mean by "never got
13  off the ground"?
14     A.    It never got implemented.
15     Q.    Why is that?
16     A.    There was an attempt to
17  implement.  Because -- there were a couple of
18  reasons.  Producers refused to have a
19  third-party audit.  They wanted to audit
20  themselves.  We didn't believe that was a
21  credible approach.  That was one problem.  We
22  didn't have the resources, FMI didn't put any
23  resources, very few resources into an audit
24  program.  That was not what we saw was our
25  primary role in this process.

176

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2               - - -
3          (Exhibit Brown-17, 1/21/02
4      Letter, Bates FMI-000899 - FMI-000904,
5      was marked for identification.)
6               - - -
7  BY MS. SUMNER:
8     Q.    I'd like to show you what's
9  being marked as Brown Exhibit 17.  This is a
10  document that bears the Bates numbers FMI-899
11  through 904.
12         Ms. Brown, is this a letter
13  that you received from Al Pope on or about
14  January 21, 2002, in your capacity as senior
15  vice president of FMI?
16     A.    I assume so.
17     Q.    What did you understand -- why
18  did you understand Al to be writing to you at
19  this time?
20     A.    As it states in the letter, he
21  was sharing results of their board meeting.
22     Q.    Results pertaining to what?
23     A.    I'll read it and tell you.
24     Q.    Is this relating to the Animal
25  Welfare Guidelines?

177

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2     A.    Yes.
3     Q.    I want to focus your attention
4  on the page that bears the Bates number 903
5  of this document.
6     A.    Okay.  Can I look at the page
7  before it so I have an idea what the document
8  is?
9     Q.    Sure.
10     A.    This is all still Al's stuff.
11  Right?  Okay.
12     Q.    Actually you can just focus on
13  the first page.
14     A.    Which page?
15     Q.    You said you wanted to look at
16  the first page of the document, 902.
17     A.    I'd like to back up on the
18  document because you -- the page looked like
19  it was in the middle of something.
20     Q.    We can focus on the first page.
21  I just want to focus your attention --
22     A.    Is that 902?
23     Q.    902.  On the boldface sentence
24  there.
25     A.    Yes.

45  (Pages 174 to 177)

178

KAREN BROWN - HIGHLY CONFIDENTIAL

1      Q.    Where UEP wrote, "Based upon
2  existing equipment and existing density,
3  meeting the Scientific Committee's target
4  could reduce house capacity and the U.S. Egg
5  Supply by a minimum of 12 to as much as 44%."
6           Do you see that?
7      A.    Yes.
8      Q.    So as of this time, UEP
9  informed FMI that meeting the guidelines
10 could have a significant impact on U.S. egg
11 supply.  Correct?
12     A.    It says what it means, it means
13 what it says, I suppose.
14     Q.    And is that something that FMI
15 shared with its members?
16     A.    I don't know the answer to that
17 question.  FMI was always very careful about
18 sharing anything that would imply -- that
19 would even have a hint of any kind of
20 involvement in directing the marketplace.
21 We -- FMI's staff, we were always very highly
22 skeptical of numbers like that.
23     Q.    And why is that?
24     A.    We just had a healthy degree of

179

KAREN BROWN - HIGHLY CONFIDENTIAL

1  skepticism about some of the things that the
2  industry's, you know, suppliers were saying
3  because they didn't always prove out to be
4  actual fact.
5      Q.    In your normal practice --
6      A.    So we had skepticism.
7      Q.    In your normal practice at FMI,
8  is this the sort of information that you
9  would have passed on to your members?
10     A.    Probably not.
11     Q.    Why not?
12           MR. WILDERS:  Asked and
13     answered.
14           THE WITNESS:  I don't have any
15     idea, I don't have any knowledge that
16     it was passed on.  And it's not
17     something that I would have passed on
18     myself.  We might have said that there
19     was a concern within the producer
20     industry that there could be some
21     impact, negative impact on supply, but
22     we never would have said anything
23     about specific numbers that I am aware
24     of.  Now, if somebody else shared it,

180

KAREN BROWN - HIGHLY CONFIDENTIAL

1      I don't know.  I don't recall anything
2      like that.
3  BY MS. SUMNER:
4      Q.    Did you tell your members that
5  UEP had raised with you that there could be a
6  negative impact of supply --
7      A.    I do not --
8      Q.    -- on implementing these
9  guidelines?
10           MR. PATTON:  Object to the form.
11           MR. WILDERS:  Asked and
12     answered.
13           THE WITNESS:  I do not recall.
14  BY MS. SUMNER:
15     Q.    You don't recall?
16     A.    I do not recall.
17     Q.    You did testify before that
18 avoiding market disruption was something that
19 was important to your members as your members
20 considered animal welfare programs.  Correct?
21     A.    They certainly don't want to
22 end up with not having products that our
23 customers want.  But in other words,
24 consumers want eggs.  So they certainly

181

KAREN BROWN - HIGHLY CONFIDENTIAL

1  wouldn't want -- they would be concerned
2  about any marketplace disruption.  A disease
3  wipes out all the laying hens.  A tornado
4  that takes out the largest supplier's egg
5  laying operation.  A salmonella recall, of
6  which there had been several.  So, yeah, we
7  would be concerned about any kind of
8  marketplace disruption that is going to
9  impact the ability of our consumers to buy
10 the products that they want to buy.
11     Q.    And a 12 to 44 percent decrease
12 in the U.S. supply of eggs would be a
13 significant market disruption, wouldn't it?
14           MR. WILDERS:  Objection.  Call
15     for speculation of testimony.
16           MR. RANDALL:  Objection.
17           THE WITNESS:  I am not an
18     antitrust attorney.  You are.  So I'm
19     not -- you know, I don't recall any
20     conversation that was shared with our
21     members about that.  I am not aware of
22     it.  If it happened and you can flip
23     something out and show me that, you
24     know, it was, but I do not recall it.

46  (Pages 178 to 181)

182

KAREN BROWN - HIGHLY CONFIDENTIAL

1  These are very tricky issues and they
2  are the kinds of issues that we stayed
3  away from very carefully. We didn't
4  talk about supplies. We didn't talk
5  about prices. We didn't allow our
6  members to have any of those
7  conversations when they were together.
8  People like our counsel would jump up
9  and start waiving, you know, flags at
10  the back of the room. So I don't
11  know. I don't know. I'm not sure
12  where you're going with this. I'm
13  very uncomfortable with it. So I
14  would like you to be a little bit more
15  transparent.
16  BY MS. SUMNER:
17      Q.   I do not mean to be
18  nontransparent. I'm just asking you a simple
19  question, which is --
20      A.   And the answer is I don't
21  recall, if you're going to repeat the
22  question.
23      Q.   Well, I don't think that's
24  responsive to the question. The question

183

KAREN BROWN - HIGHLY CONFIDENTIAL

1  was --
2          MR. WILDERS: Don't argue with
3  the witness.
4          MR. MCKENNEY: Objection to the
5  sidebar.
6          MR. WILDERS: It is improper to
7  argue and badger this --
8          MS. SUMNER: The question --
9          MS. ANDERSON: Wait for your
10  time.
11  BY MS. SUMNER:
12      Q.   The question was, a 12 to
13  44 percent decrease in the U.S. supply of
14  eggs would be a significant market
15  disruption?
16      A.   I have no clue if that's true
17  or not. I have no clue, I wouldn't have had
18  then, have no clue now whether, number one,
19  that was an accurate statement; or number
20  two, whether that would actually bear out. I
21  have no clue.
22      Q.   Turn to page 904 in this
23  document that's been marked as Brown-17.
24      A.   I have a daughter who is about

184

KAREN BROWN - HIGHLY CONFIDENTIAL

1  to get married, not today, but I just want to
2  check and see if there's something I have --
3          MS. SUMNER: Can we go off the
4  record, please?
5          VIDEOGRAPHER: Off the record at
6  2:06.
7                    - - -
8          (A recess was taken.)
9                    - - -
10         VIDEOGRAPHER: Back on the
11  record at 2:07.
12  BY MS. SUMNER:
13      Q.   Ms. Brown, if you could just
14  reorient yourself to Brown Exhibit 17, this
15  is the letter from Al Pope to you,
16  January 21, 2002.
17      A.   Yes.
18      Q.   I want to direct your attention
19  to the last page of that document. In this
20  letter, Mr. Brown sent you a chart outlining
21  the capacity changes that could be associated
22  with a phase in of the cage space requirement
23  of the UEP guidelines. Correct?
24      A.   That's what is here.

185

KAREN BROWN - HIGHLY CONFIDENTIAL

1      Q.   Did you pass this information
2  along to your members?
3      A.   I have no idea. It would have
4  been more likely that we may have shared it
5  with the experts, but I have no idea.
6      Q.   And is this information that
7  your members would have been interested in?
8          MR. WILDERS: Objection. Calls
9  for speculation.
10         THE WITNESS: I have no idea. I
11  have no idea.
12         MS. SUMNER: Let's take a lunch
13  break.
14         VIDEOGRAPHER: Off the record at
15  2:08.
16                   - - -
17         (A recess was taken.)
18                   - - -
19         VIDEOGRAPHER: Here begins tape
20  three in the videotape deposition of
21  Karen Brown. Back on the record at
22  2:59.
23  BY MS. SUMNER:
24      Q.   Good afternoon, Ms. Brown,

47  (Pages 182 to 185)

186

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2   could you pull back out what we've marked as
3   Brown Exhibit 3, your presentation from 2004.
4       A.    Okay.
5       Q.    And please turn to the page
6   3066 that's headed "FMI-NCCR Reports."
7       A.    Okay.
8       Q.    What were FMI-NCCR reports?
9       A.    They were reports summarizing
10  where we were.  Our progress.  And they were
11  sent to both of our memberships.  They were
12  released to the media.  They were put on our,
13  each of our Web sites.
14      Q.    When you say where we are, you
15  mean where you were with your animal welfare
16  program efforts?
17      A.    Yes.
18      Q.    I'm going to mark -- well,
19  there's four reports listed on the slide.
20  Correct?
21      A.    Yes.
22              - - -
23          (Exhibits Brown-18, Interim
24      Report FMI-NCCR Animal Welfare Program
25      February 15, 2002, Bates FMI-000245 -

187

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       FMI-000249, Brown-19, June 2002 Report
3       FMI-NCCR Animal Welfare Program, Bates
4       FMI-000015 - FMI-000022, Brown-20,
5       January 2003 Report FMI-NCCR Animal
6       Welfare Program, Bates FMI-000001 -
7       FMI-000014, and Brown-21, June 2003
8       Report, FMI-NCCR Animal Welfare
9       Program, Bates FMI-000105 -
10      FMI-000110, were marked for
11      identification.)
12              - - -
13  BY MS. SUMNER:
14      Q.    I'm going to mark a set of
15  exhibits right now.  The first one I'm going
16  to show you is Brown-18.  It's a document
17  bearing the Bates numbers FMI-245 through
18  249.  I'll mark as Brown-19, FMI-15 through
19  22.  As Brown-20, FMI-1 through 14.  And as
20  Brown-21, FMI-105 through 110.
21      Ms. Brown, are the documents
22  that I just handed you that have been marked
23  as Exhibits 18 through 21 the reports that
24  are referred to on your slide entitled
25  "FMI-NCCR Reports"?

188

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2       A.    I'm just checking the dates to
3   see if there -- because there were -- you
4   know, I want to make sure they're consistent
5   with the slides.  Yes.
6       Q.    Did you draft these reports?
7       A.    I wrote them.
8       Q.    In drafting them, was it your
9   intent that they be truthful and accurate?
10      A.    Yes.
11      Q.    Do the reports reflect your
12  personal knowledge of FMI's progress on the
13  animal welfare program?
14      A.    If you mean my professional
15  knowledge, yes.
16      Q.    And were the reports drafted by
17  you on or about the dates identified on the
18  front page of each of the reports?
19      A.    Probably before that date.
20      Q.    Were they published on the date
21  that's listed on the report?
22      A.    They would have been sent to
23  the members initially and then maybe a day or
24  two later sent out publicly.
25      Q.    Were they sent to all of your

189

1       KAREN BROWN - HIGHLY CONFIDENTIAL
2   members?
3       A.    Through the communications
4   system that I described, yes.  Our weekly
5   mailings.
6       Q.    Did you draft these reports as
7   part of your regular business as senior vice
8   president of FMI?
9       A.    Yes.
10      Q.    And were these reports kept in
11  the ordinary course of FMI's business?
12      A.    I'm sorry, what did you say?
13      Q.    Were these reports kept in the
14  normal course of FMI's business?
15      A.    Yes.
16      Q.    I'd like to direct your
17  attention to the one that has been marked as
18  Brown-19.  This is the June 2002 report.  Do
19  you see that?
20      A.    Yes.
21      Q.    On the first page it reads,
22  second paragraph, "Some recommendations
23  contained within this report have economic
24  implications.  Some require an implementation
25  timetable because they cannot be accomplished

48 (Pages 186 to 189)

190

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  immediately."
3          What economic implications were
4  you referring to there?
5      A.   Some of the recommendations of
6  the scientific experts would have required
7  changes in housing or other structural
8  changes as far as the producers were
9  concerned and it would have had an economic
10 impact from the standpoint of cost of
11 changes.
12     Q.   So they would have increased
13 the cost?
14     A.   I don't know about that.
15 Increased the cost of what?
16     Q.   I'm sorry, you said "from the
17 standpoint of cost of changes." You mean
18 they would have had a cost associated with
19 making those changes?
20     A.   Certainly if they had to get
21 new cages, you know, new -- or housing,
22 change housing. Those kinds of things would
23 have incurred some cost on the part of the
24 producer.
25     Q.   What did you mean when you

191

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  wrote, "Some require an implementation
3  timetable because they cannot be accomplished
4  immediately"?
5      A.   Well, you certainly couldn't
6  follow the instructions of PETA who thought
7  everything could be done within a couple of
8  weeks. So some of these were complicated;
9  for example, changing anything that has to do
10 with housing requirements would take some
11 time.
12     Q.   Were these two issues that you
13 identified on the first page of this report
14 unique to the guidelines for egg laying hens?
15     A.   No.
16     Q.   Did they also apply to other
17 industry guidelines that FMI was reviewing?
18     A.   As far as animal welfare for
19 other species?
20     Q.   Yes.
21     A.   Yes. This report is about all
22 of the species. It's not just about the egg
23 laying hens.
24     Q.   Can you turn to the page that
25 is marked FMI-17. At the top it's entitled,

192

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  "THE GUIDELINES," and towards the bottom
3  there's a heading for "Laying Hens."
4      A.   Yes.
5      Q.   I want to focus on the laying
6  hens section. The first sentence reads, "FMI
7  and NCCR recommended to their members the
8  2002 guidelines of the United Egg
9  Producers...for use with their suppliers of
10 eggs and egg products."
11     A.   Yes.
12     Q.   Is that an accurate statement?
13     A.   We recommended them as best
14 practices, and if they wanted to voluntarily
15 use that individually with their suppliers,
16 that was the intent of that sentence.
17     Q.   And at this point in time when
18 this recommendation was made, that was
19 following the meetings that FMI had had with
20 UEP to identify and address the gaps that had
21 been identified by FMI's animal welfare
22 experts. Correct?
23     A.   Yes. But not all of the gaps
24 had been dealt with.
25     Q.   Let's look at page 18. The

193

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  third bullet point down that page reads, "The
3  UEP phase-in timetable for increasing the
4  space allocation per bird (67 inches for
5  White Leghorn hens; 76 inches for Brown Egg
6  Layers) has been significantly shortened and
7  a minimum standard has been added for all new
8  and remodeled laying houses."
9          Do you see that?
10     A.   Yes.
11     Q.   And is that an example of a gap
12 that had been identified and addressed by UEP
13 to the animal -- well, and addressed by UEP?
14     MR. WILDERS: Objection. Vague.
15     THE WITNESS: Yes.
16 BY MS. SUMNER:
17     Q.   Look at the bullet right above
18 that, it notes that "UEP has undertaken three
19 research projects looking at the molting of
20 laying hens without withdrawing feed."
21         Do you see that?
22     A.   Yes.
23     Q.   Is that accurate?
24     A.   I presume so. That's what UEP
25 told us.

49  (Pages 190 to 193)

194

KAREN BROWN - HIGHLY CONFIDENTIAL

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.   Is that another action that was
3  taken by UEP in response to a gap identified
4  by FMI's experts?
5     A.   I don't know the answer to that
6  question. I don't know when that research
7  was undertaken or whether it related at all
8  to what we had identified, what the experts
9  had identified. So not knowing the
10 timetable, I have no idea. I don't know when
11 the research began. I don't know when it was
12 concluded or what the results were.
13    Q.   Am I correct that one of the
14 gaps that FMI's experts have identified did
15 relate to feed withdrawal molting?
16    A.   Yes, that is starving the
17 chickens, true.
18          - - -
19      (Exhibit Brown-22, 7/2/02
20 Letter, Bates FMI-002277 - FMI-002293,
21 was marked for identification.)
22          - - -
23 BY MS. SUMNER:
24    Q.   Ms. Brown, I'd like to show you
25 a document that's been marked as Brown-22.

195

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2  It bears the Bates FMI-2277 through 93. I'd
3  like to focus your attention on the second
4  page of this document.
5     A.   Okay.
6     Q.   And my question is, is this a
7  copy of the 2002 UEP guidelines that FMI and
8  NCCR recommended for their members as of
9  June 2002?
10    A.   Yes, I presume so. They made a
11 lot of changes. They didn't always change
12 the covers, which is understandable.
13          - - -
14      (Exhibits Brown-23, Status
15 FMI-NCCR Animal Welfare Guidelines
16 Updated October 2004, Bates FMI-000077
17 & FMI-000078; Brown-24, Status
18 FMI-NCCR Animal Welfare Guidelines
19 Updated February 2005, Bates
20 FMI-000075; Brown-25, Status FMI-NCCR
21 Animal Welfare Guidelines Updated
22 March 2007, Bates FMI-000076; and
23 Brown-26, Status FMI-NCCR Animal
24 Welfare Guidelines Updated May 2008,
25 Bates FMI-004436, were marked for

196

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2     identification.)
3           - - -
4  BY MS. SUMNER:
5     Q.   Ms. Brown, I want to show you
6  the next four exhibits. The first one marked
7  as Brown-23 is FMI-77 through 78. Brown-24
8  is FMI-75. Brown-25 is FMI-76. And Brown-26
9  is FMI-4436.
10    A.   Yes.
11    Q.   Do you recognize these
12 documents, Ms. Brown?
13    A.   I do.
14    Q.   What are they?
15    A.   They are status charts on where
16 the experts were on the guidelines that they
17 were reviewing.
18    Q.   And did you draft these
19 documents?
20    A.   I did.
21    Q.   And in drafting them, was it
22 your intent that they be truthful and
23 accurate?
24    A.   Yes.
25    Q.   And do the reports reflect your

197

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2  personal knowledge of the work on FMI's
3  animal welfare program and review of the
4  producer guidelines as of the dates they were
5  drafted?
6     A.   My professional knowledge, yes.
7     Q.   And did you draft these reports
8  as part of your regular business as senior
9  vice president of FMI?
10    A.   I did.
11    Q.   And were these kept in the
12 regular course of FMI's business?
13    A.   Yes.
14    Q.   I'd like to direct your
15 attention to the one that has been marked as
16 exhibit, it's got the Bates number 76 at the
17 bottom. I believe it's 25.
18    A.   Yes.
19    Q.   And the second row down is
20 entitled UEP or "United Egg Producers." Do
21 you see that?
22    A.   Yes.
23    Q.   And under "FMI-NCCR Endorsement."
24    A.   Yes.
25    Q.   Can you read to me what it says

50  (Pages 194 to 197)

198

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    next to "United Egg Producers"?
3        A.    "Endorsed production, handling,
4    transportation, processing and euthanasia
5    guidelines for layers of shell and breaking
6    eggs..."
7        Q.    So at this point in time as of
8    March 2007 FMI and NCCR endorsed the UEP
9    guidelines.  Correct?
10        MR. WILDERS:  Objection.
11    Misstates the testimony.
12        MR. RANDALL:  Objection.
13        THE WITNESS:  Yes, our advisors
14    endorsed it.  We went through this
15    before.  The FMI specifically we --
16    our advisors endorsed the guidelines.
17    BY MS. SUMNER:
18        Q.    This document doesn't say --
19        A.    I understand that.
20        Q.    -- FMI expert advisory panel
21    endorsement, does it?
22        MR. RANDALL:  Objection to form.
23        MR. PATTON:  Leading.
24    BY MS. SUMNER:
25        Q.    You can answer the question.

199

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    There wasn't enough room.
3        Q.    That's not my question.
4        A.    It had to fit on one sheet of
5    paper.  I understand, I'm just --
6        Q.    Answer my question, Ms. Brown.
7        A.    I did answer the question.  I
8    answered it accurately.  This -- FMI advisors
9    endorsed these guidelines.  We were not in a
10    position to know whether the guidelines were
11    any good or not when we began this process.
12    So that's what the expert advisory panel's
13    process was.  I can assure you that had I
14    known I was going to be sitting in this chair
15    today, I would have had, you know, it clearly
16    spelled out.  But from the perspective of
17    trying to fit everything on one page and get
18    it onto a Web site, FMI-NCCR endorsement.
19        Q.    And that's what it says, FMI
20    and NCCR endorsement?
21        A.    That's what it says.
22        MR. WILDERS:  Asked and
23    answered.  Badgering.
24    BY MS. SUMNER:
25        Q.    At this point --

200

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    That's not what it means, but
3    that's what it says.
4        Q.    At this point in time, were
5    there any points of difference or any
6    remaining gaps that had not been addressed by
7    UEP?
8        A.    I assume none that were
9    considered critical.
10        Q.    You drafted this document.
11    Correct?
12        A.    I did.
13        Q.    If there had been a gap that
14    remained unaddressed, would you have included
15    it under points of difference?
16        A.    If it had been identified by
17    our advisors, yes.
18        Q.    So at this point in time, there
19    were no remaining unaddressed gaps that had
20    been identified by your animal expert
21    advisory panel.  Correct?
22        A.    Correct.  But the 2002 number
23    means that's when they're first -- first time
24    they were -- you know, that's what we were
25    looking at initially.  So we didn't

201

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    endorse -- the advisors did not endorse this
3    complete document because there were parts of
4    this document that they did not agree with
5    for the best practices for humane handling.
6        MR. RANDALL:  Could you just
7    clarify for the record what document?
8        THE WITNESS:  The document is
9    United Egg Producers Animal Husbandry
10    Guidelines for U.S. Egg Laying Flocks
11    2002 Edition.  This is the early
12    edition.  They had later editions that
13    included the changes that were made
14    and additional points that we had
15    suggested would be more helpful to
16    explain to their producers how to
17    actually implement what they were
18    recommending.  So this is the
19    original -- this is the 2002
20    guidelines that you've given me.
21    BY MS. SUMNER:
22        Q.    And those 2002 guidelines, in
23    your June 2002 report, that was provided to
24    all of your members as well as I believe you
25    testified provided to the public on your Web

51 (Pages 198 to 201)

202

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2    site and to the press.
3        A.   We didn't provide these
4    guidelines to our members.
5            MR. PATTON:  Identify the
6        exhibit please.
7            THE WITNESS:  What are you
8        talking about?
9    BY MS. SUMNER:
10       Q.    Let me rephrase the question.
11   I'm asking you a question.  Let me just start
12   over.
13           MR. PATTON:  Let's have the
14       exhibit identified she's talking
15       about.
16           MS. SUMNER:  I'm not talking
17       about an exhibit.
18           MR. PATTON:  The witness is.
19       She's talking about an exhibit, and we
20       should know what it is.
21           MS. SUMNER:  Let me ask a
22       question, Mr. Patton.
23           MR. PATTON:  You don't want her
24       to identify the exhibit then?
25           MR. MCKENNEY:  I don't think

203

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2        that's what Ms. Sumner said.
3    BY MS. SUMNER:
4        Q.    Let me start over with the
5    question.
6            In your 2002 -- in your
7    June 2002 interim report, if you pull that
8    out again, that was marked -- do you have
9    that exhibit?
10       A.    19.
11       Q.    Yes, that was marked as
12   Brown-19.  In that report, the -- I want to
13   just direct your attention to the third page,
14   FMI-17, and this report was provided to all
15   of your members as well as to the public.
16   Correct?
17       A.    Correct.
18       Q.    In this report you wrote, "FMI
19   and NCCR recommend to their members the 2002
20   guidelines of the United Egg Producers...for
21   use with their suppliers for eggs and egg
22   products."
23           Do you see that?
24       A.    I do.
25       Q.    And that is an accurate

204

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2    statement.  Correct?
3        A.    Yes.
4            MR. WILDERS:  Asked and
5        answered.
6    BY MS. SUMNER:
7        Q.    I just want to confirm that the
8    guidelines --
9        A.    But there's exceptions to that.
10   We did not think that all the guidelines were
11   as good as they could be.  The whole basis of
12   this scientific process from the standpoint
13   of our animal scientist was continuous
14   improvement.  It's a very important term when
15   it comes to best practices.  Continuous
16   improvement.  Not everything can be done
17   today, but here's where you need to get to
18   tomorrow.  So UEP, having been one of the
19   first organizations who began this process
20   before we even got involved, was very far
21   along.  The only organization that was
22   further along was the American Meat
23   Institute.  So I mean, they had done great
24   work, and so we were saying to our members,
25   if you're looking for something to share with

205

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2    your producers at this point in time, the
3    best document out there is the UEP
4    guidelines.
5        Q.    And those guidelines that you
6    were referring to here are the guidelines
7    that have been marked as Brown Exhibit --
8        A.    22.
9        Q.    -- 22.
10       A.    22?
11       Q.    Yes.
12       A.    You're talking about this
13   pamphlet?
14       Q.    Yes, Brown Exhibit 22.  Is that
15   correct?
16       A.    Correct.
17       Q.    And when you say there were
18   exceptions, what you mean is that there were
19   still some points of difference that had been
20   identified by your animal welfare experts
21   that remained to be addressed at this point
22   in time?
23       A.    Yes.
24       Q.    Correct?
25       A.    Yes, pretty specific, pretty

52  (Pages 202 to 205)

206

KAREN BROWN - HIGHLY CONFIDENTIAL

1   significant points. This was a collaborative
2   process. We were not in the business of
3   telling our producers what to do. We were
4   trying to work with our producers, and our
5   main goal was to improve the handling, the
6   humane handling of farm animals. So that was
7   the main goal of our collaboration with the
8   producers. We weren't going to tell them
9   what to do. We were going to set up an
10  advisory panel of experts who could make
11  recommendations to them about ways they could
12  improve their practices so they could
13  progress towards best practices.
14       Q.    Are you familiar, Ms. Brown,
15  with the term "100 percent rule"?
16       A.    The term what?
17       Q.    The term "100 percent rule,"
18  have you heard that term before?
19       A.    Not that I recall. I am a
20  compendium of trivia that I put on erase as
21  of January 30, 2009. There just wasn't
22  enough room in there for all that stuff.
23       Q.    Do you understand that to be a
24  UEP certified company, a company must

207

KAREN BROWN - HIGHLY CONFIDENTIAL

1   implement the UEP guidelines across all of
2   its egg laying hens?
3       A.    In that context, I know what
4   according to UEP that 100 percent meant.
5       Q.    What is your understanding of
6   that?
7       A.    That all of the houses had to
8   be inspected, I think.
9       Q.    And what was FMI's position on
10  that concept?
11       A.    I was not involved in technical
12  discussions that had to do with housing and
13  inspections and all of that. So I don't --
14  I'm not --
15                - - -
16            (Exhibit Brown-27, E-mail chain,
17       Bates FMI-001781 - FMI-001783, was
18       marked for identification.)
19                - - -
20  BY MS. SUMNER:
21       Q.    Let me show you a document
22  that's been marked as Brown-27. This is a
23  document bearing the Bates numbers FMI-1781
24  through 83.

208

KAREN BROWN - HIGHLY CONFIDENTIAL

1       Ms. Brown, can you just take a
2   moment and review this e-mail chain and let
3   me know when you've done so.
4       A.    Where does it start, on the
5   last page?
6       Q.    Yes. It's in reverse
7   chronological order like most e-mail chains
8   unfortunately are. It's confusing.
9       A.    Oh, 100 percent products.
10  That's different than the concept I was
11  talking about. This is breaking eggs versus
12  shell eggs. Correct?
13           MR. GREEN: Wait for the
14       question.
15           THE WITNESS: I'm just trying to
16       get clarification on the -- because it
17       doesn't say. Okay.
18  BY MS. SUMNER:
19       Q.    Is this a series of e-mails
20  that were exchanged between you and Brian
21  Joyer on -- between July 21 and 24, 2003, in
22  the course of your work as FMI's senior vice
23  president?
24       A.    I think the original e-mail

209

KAREN BROWN - HIGHLY CONFIDENTIAL

1   went to Tim Hammonds and I was cc'd.
2       Q.    But you were copied on all of
3   these e-mails --
4       A.    Yes.
5       Q.    -- you either sent or received
6   them in the course of your work at FMI?
7       A.    Yes.
8       Q.    Who is Brian Joyer?
9       A.    I have no idea at this point in
10  time. He says he's director of quality
11  assurance for Sparboe Farms.
12       Q.    What's Sparboe Farms?
13       A.    It's a UEP member, or was at
14  the time.
15       Q.    Is it an egg producer?
16       A.    I presume so.
17       Q.    I'd like to direct your
18  attention to the last page of this document.
19  It ends in 1783 is the Bates number. The
20  e-mail starts on the prior page so just to
21  get the context, this is Mr. Joyer writing to
22  Tim Hammonds, and cc to you. And he asks the
23  question, this is on 1783, "What is
24  FMI/NCCR's position on implementing the

53 (Pages 206 to 209)

210

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  guidelines?  Should a company allow the
3  marketplace to influence the amount of
4  product produced under the guidelines or
5  should the company commit 100% of their
6  products to the guidelines regardless of the
7  interest from customers and consumers?  Is
8  your position the same across all producer
9  organizations?"
10        What did you understand
11  Mr. Joyer to be asking?
12     A.   I wasn't 100 percent sure what
13  all the questions meant.  The answer to that
14  is point number two.  Well, one and two.  It
15  was a several part question.
16     Q.   So did Mr. Hammonds ask you to
17  respond to Mr. Joyer?
18     A.   Yes, he did.
19     Q.   And was your response reflected
20  on the e-mail you -- or in the e-mail you
21  sent on Thursday, July 24th at 1:57?
22     A.   Yes.
23     Q.   And what was your response?
24     A.   Do you want me to read it?
25     Q.   Yes.

211

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2     A.   "Regarding the questions you
3  raise about the FMI-NCCR June 2003 report on
4  our animal welfare program:
5        "FMI and NCCR developed" --
6     Q.   Let me just -- I'm sorry, I
7  didn't mean to interrupt you, but let me just
8  clarify my question.  My question is, what
9  was your response not to all of Mr. Joyer's
10  questions, but in response to the specific
11  question that I had read to you about should
12  the company commit 100 percent of their
13  products to the guidelines regardless of the
14  interest of consumers?
15     A.   Okay.  So you only care about
16  that one part.  He's got several questions in
17  that asterisk.
18     Q.   Yes.
19     A.   We are working with UEP and
20  USDA-ARPAS to reconcile the two audit
21  programs so that they are interchangeable.
22  We have not yet achieved 100% parity..., but
23  that is the goal.  At this point we hope to
24  endorse the UEP audit.  We are not (sic)
25  involved in a cooperative auditor training

212

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  program with UEP.
3     Q.   That was your response to his
4  first question about the audit.  Correct?
5        MR. WILDERS:  Objection.
6  Leading.
7        THE WITNESS:  The first question
8  is, what is our position on
9  implementing the guidelines.
10  BY MS. SUMNER:
11     Q.   I'm sorry.  Let's back up and
12  look at the Joyer e-mail more carefully.  I
13  do agree that this is confusing, but I think
14  if we go through it carefully, we can
15  clarify.
16        His e-mail to you, it starts on
17  1782.
18     A.   Correct.
19     Q.   Says, "There are three points I
20  wanted to clarify."  And he's got three
21  asterisks -- three bullet points, asterisks,
22  whatever you want to call them.  The first
23  one relates to audit issues.  Correct?
24     A.   Yes.
25     Q.   I'm not asking you about the

213

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  audit.
3     A.   Okay.
4     Q.   His second question says, "What
5  is FMI/NCCR's position on implementing the
6  guidelines?  Should a company allow the
7  marketplace to influence the amount of
8  products produced...or should the company
9  commit 100% of their products to the
10  guidelines regardless of the interest..."
11        Then the third question he asks
12  is, "Does FMI/NCCR require a seal..."  And
13  when you responded, you laid out your answer
14  1, 2, 3.  Do you see that?
15     A.   Yes.
16     Q.   And does 1, 2 and 3, do those
17  correspond to Mr. Joyer's bullets?
18     A.   I don't think we answered all
19  of his bullets, I mean, all parts of his
20  bullets.
21     Q.   What did -- you answered number
22  2.  "Our goal is enhanced animal welfare for
23  all animals in food production - not animals
24  used only for certain products or product
25  categories.  This is our position for all

214

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    producer groups."
3        A.    That's true.
4        Q.    That was indeed your position?
5        A.    Yes.
6        Q.    Why was that FMI's position?
7        A.    Because all animals, what
8    difference does it make what product they're
9    going to be.  They're all animals who are in
10   a system which needed to be improved
11   significantly.  So if I'm a chicken whose
12   eggs are going into this product versus a
13   chicken whose eggs are going into that
14   product, why should that make any difference
15   as to how I'm handled as an animal.  Why
16   should I be less humanely handled because of
17   what product I end up in, if I understand the
18   question.  So if you come back as an animal,
19   you better make sure what kind you come back
20   as.
21              - - -
22        (Exhibit Brown-28, E-mail chain,
23    Bates FMI-003090 & FMI-003091, was
24    marked for identification.)
25              - - -

215

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    BY MS. SUMNER:
3        Q.    I'm going to show you another
4    document that's been marked as Brown-28.
5        A.    I haven't gotten it yet.  Thank
6    you.
7        Q.    I've marked as Brown-28 a
8    document bearing the Bates FMI-3090 through
9    91.
10        Ms. Brown, do you recognize
11   this as an e-mail conversation between you
12   and Gene Gregory that you sent and received
13   on or about May 20 -- May 2, 2003, May 2 to
14   3, 2003, in the course of your work at FMI?
15        A.    That's what it looks like.
16        Q.    Let's focus on the first e-mail
17   in the chain which is from Gene to you and
18   Terrie Dort.  Do you see that?
19        A.    Yes.
20        Q.    Gene wrote to you that there
21   was a program that would implement a rule
22   that instead -- I'm at the very bottom of
23   page 1 where he says, Instead of implementing
24   animal welfare guidelines on 100% of their
25   egg-production houses, they would simply

216

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    implement the guidelines on only the number
3    of hens it needed to fill a customer needs.
4        Do you see that?
5        A.    Yes.
6        Q.    And then he says, "Should this
7    group seek to receive the endorsement of
8    either FMI or NCCR, we would hope that you
9    would respond by only endorsing UEP's
10   guidelines for egg-laying hens."
11        Do you see that?
12        A.    Yes.
13        Q.    And then your response, you
14   wrote, "On the second issue -- we have no
15   intention to endorse a second set of
16   guidelines for laying hens that are weaker
17   than the UEP guidelines."
18        Do you see that?
19        A.    Yes.
20        Q.    What do you mean by that?
21        A.    We were involved in a process
22   of making progressive changes to a system
23   that needed some significant changes.  And we
24   were not interested in anything that would be
25   regressive.  So if the guidelines were going

217

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    to be weaker than UEP, which was the floor,
3    then that would be regressive.
4        Q.    And did FMI consider guidelines
5    that were required to be implemented on less
6    than 100 percent of production houses to be
7    weaker than the UEP guidelines?
8        MR. RANDALL:  Objection to form.
9        MR. WILDERS:  Also misstates the
10   evidence.  Assumes facts.
11        THE WITNESS:  We did not get
12   into the issue of whether or not it
13   should be -- there's a difference
14   between -- if you mean 100 percent of
15   the houses for egg laying hens whose
16   products, whose eggs were going to be
17   divided into two different channels,
18   for example, shell eggs going in
19   cartons for consumers in the
20   supermarket or breaking eggs that were
21   going to be sold to Kraft and General
22   Foods and the people who use eggs in
23   their manufacturing product, and the
24   animals whose eggs were going into
25   shell eggs and those were the animals

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

218

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      whose handling was going to follow the
3      UEP guidelines, and the other animals
4      whose eggs were going into
5      manufactured product, those animals'
6      handling was not going to be following
7      the UEP guidelines, that was a concept
8      that we would not agree with.  That
9      gets back to the point of how we
10     handle the animal, how humanely we
11     handle the animal depends upon where
12     the end product ends up.  That we did
13     not think was humane.  So if that's
14     the context in which you're talking,
15     then that would be my response.  It
16     doesn't seem fair to the animals.
17  BY MS. SUMNER:
18     Q.    Let's go back to your
19  presentation which we are nearing the end of.
20  Exhibit 3.  I'd like to focus you on the page
21  that talks about verification program.
22     A.    Could you give me a number?
23     Q.    This is 3067.  It starts on
24  3067.  It spans a couple of pages.
25     A.    You understand the verification

219

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  program died?
3     Q.    Yes.
4     A.    So...
5     Q.    What was the verification
6  program being referred to here?
7     A.    This was the SES program.  It
8  was a third-party independent audit that was
9  originally developed to be used voluntarily
10  by producers at the request of the retailers.
11  So that the retailers could be assured that
12  the producers were actually following the
13  guidelines that had been endorsed by FMI's
14  experts.  The one common audit format if
15  you're asking what that is -- I'm not sure
16  what your question is.
17     Q.    No, I just generally wanted to
18  understand the verification program was some
19  kind of audit program.  Correct?
20     A.    Correct.
21     Q.    Was the rationale for the audit
22  to give the program credibility?
23     A.    The rationale for the audit was
24  to make sure that the producers who said they
25  were following the guidelines were actually

220

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  following the guidelines.
3     Q.    Initially who did FMI believe
4  should develop and run the audit program?
5     A.    A third-party independent
6  organization.  And we put out bids to
7  several.
8     Q.    What was the basis for that
9  belief?
10     A.    Because the industry can't
11  audit itself and be credible.  A self audit
12  is fine as an informational tool or an
13  educational tool for a company, but if you
14  want true credibility that you're doing
15  something the way you say you're doing it,
16  then a third-party independent -- an
17  independent third party is the best way to go
18  about that.
19     Q.    Was that a position that was
20  shared by PETA?
21     A.    I don't know.  Probably.  But
22  they didn't -- again, they want broccoli in
23  the -- that isn't the reason why FMI would
24  have gone with that kind of program.  But
25  I'll tell you something, I don't think

221

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  consumers, I don't think our customers would
3  have had a high degree of trust in a program
4  where industry is auditing itself.  So a
5  third-party -- independent third-party audit
6  programs are the best from the standpoint of
7  consumer credibility.  PETA was not our
8  focus.  They were an irritant.  There was no
9  question about that.  But our focus was doing
10  what we could for our member companies so
11  that they could go to their customers and
12  they could in an open, transparent, honest
13  way tell them what they were doing to enhance
14  and move animal welfare forward by working
15  collaboratively with their suppliers because
16  we weren't going to tell our suppliers what
17  to do.
18                  - - -
19          (Exhibit Brown-29, 12/27/02
20     E-mail, Bates FMI-001983, was marked
21     for identification.)
22                  - - -
23  BY MS. SUMNER:
24     Q.    I'd like to show you a document
25  I've marked as Brown-29.  It's an e-mail

56 (Pages 218 to 221)

222

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  bearing the Bates number FMI-1983.
3      A.    I don't know when I had time to
4  do anything else.  Oh, my favorite -- my
5  least favorite person, Steve Gross.  Well,
6  this isn't my document.  This is -- I'm
7  copied on this document, yes.
8          MR. GREEN:  Wait for the
9      question.
10 BY MS. SUMNER:
11     Q.    Ms. Brown, is this an e-mail
12 that you received on or about December 27,
13 2002, in the course of your work as an FMI
14 senior vice president?
15     A.    Yes.
16     Q.    It's an e-mail that was sent
17 from Steve Gross to Brian Dowling.  Is that
18 correct?
19     A.    That's what it says.
20     Q.    Who is Steve Gross?
21     A.    He's with PETA.
22     Q.    And Brian Dowling is one of
23 your members with Safeway?
24     A.    He was at Safeway.
25     Q.    Mr. Gross wrote, "PETA would

223

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  like to clarify that audits done by producer
3  groups such as UEP or by private groups such
4  as FACTA will not be considered by PETA as
5  legitimate audits."
6          Is that correct?
7      A.    That's what it says.
8      Q.    And was that a factor in the
9  insistence of FMI, that FMI or a third-party
10 administer the audit component and not the
11 producers?
12     A.    No.
13     Q.    And that was because you
14 disregarded PETA?
15         MR. WILDERS:  Objection.
16         THE WITNESS:  We were not doing
17     anything within our program to
18     acquiesce to PETA.  Definitely PETA
19     was a factor and concern on the part
20     of the industry because of the
21     campaigns they were running, the
22     allegations they were making which
23     were not clear, but PETA had -- you
24     know, this is a communication between
25     PETA and Safeway, and -- so I'm not

224

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     privy to the background or the reason
3     why that went forward.
4  BY MS. SUMNER:
5      Q.    At some point in time, did the
6  audit component of FMI's animal welfare
7  program change?
8      A.    It went away.
9      Q.    Why did that happen?
10     A.    There were producers who were
11 refusing to undertake a third-party, an
12 independent third-party audit.  They felt
13 that they could audit themselves.  And if
14 there was no benefit to SES to recover the
15 cost that they had put into the -- resources
16 that they had put into developing the audit
17 and the training materials and certifying
18 auditors, then the business model wasn't
19 going to work.
20     Q.    So was it FMI's decision to do
21 away with the audit program?
22     A.    It was SES' decision that the
23 audit wasn't going to work.  I mean, it was
24 not a sustainable business model.
25     Q.    So SES refused to do the audit?

225

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2      A.    They undertook the audit, but
3  they didn't have any customers.  They didn't
4  have enough customers to get a return on
5  their investment.  So with no ROI, you would
6  have to be a crazy person to continue doing
7  that when you're not getting any kind of
8  return on what you put into it.
9      Q.    How did FMI -- well, strike
10 that.
11         FMI had identified the audit or
12 an audit procedure as an important part of
13 any animal welfare program.  Correct?
14     A.    Yes.
15     Q.    So how did FMI's program meet
16 that need once SES was no longer running the
17 third-party audit program?
18     A.    Well, now you're getting into a
19 time period very close to when I left, so I
20 really can't answer that question.  In other
21 words, FMI did not have the resources to
22 develop an audit on its own in this area.
23 There was some conversation about whether
24 other third-party, independent third-party
25 audit companies would be interested in

57 (Pages 222 to 225)

226

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   picking up the animal welfare audit based on
3   the guidelines that the experts had
4   developed. But those conversations did not
5   come to a conclusion before I retired.
6                  - - -
7          (Exhibit Brown-30, 6/6/07
8     E-mail, Bates FMI-003393 - FMI-003395,
9     was marked for identification.)
10                 - - -
11  BY MS. SUMNER:
12      Q.    Let me show you a document
13  that's been marked as Brown-30. This is a
14  document that bears the Bates numbers
15  FMI-3393 through 95.
16         Do you recognize this contract
17  Ms. Brown?
18      A.    I see it's my document, yes.
19      Q.    What is this document?
20      A.    It's an update on the program.
21      Q.    This is another animal welfare
22  program update that you authored?
23      A.    It's a memo to the member
24  committee on -- yeah, on an update of our
25  animal welfare expert advisory panel meeting.

227

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Did you send this document to
3   the individuals listed in the "To" column on
4   or about June 6, 2007?
5      A.    Yes.
6      Q.    I'd like to turn your attention
7   to the second page of the document under the
8   heading "Animal Welfare...Program."
9      A.    You mean "Animal Welfare Audit
10  Program"?
11     Q.    Yeah, "Animal Welfare Audit
12  Program." Excuse me.
13     A.    Yes.
14     Q.    Do you see that?
15     A.    Yes.
16     Q.    The first sentence reads, "On
17  July 2, 2007, the contract between FMI, NCCR
18  and SES...regarding the FMI-NCCR independent,
19  third party animal welfare audit
20  program...will expire."
21     A.    Correct.
22     Q.    It goes on to say, "We have
23  notified SES that we do not intend to renew
24  the contract."
25     A.    That's correct.

228

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Is that accurate?
3      A.    That's correct.
4      Q.    It goes on then to say, "When
5   FMI and NCCR joined efforts in 2001 to
6   motivate food producers to develop animal
7   welfare guideline programs, only the American
8   Meat Institute had developed an audit
9   component to verify conformance with their
10  slaughter guidelines."
11         Is that accurate?
12     A.    Yes.
13     Q.    Then it goes on to say,
14  "Currently, all of the producer organizations
15  which have guidelines endorsed by our
16  Advisors, also have their own audit component
17  or an audit checklist for the guidelines."
18         Is that accurate?
19     A.    Yes.
20     Q.    And then it goes on to say,
21  Therefore, based on the discussions with our
22  advisors about animal welfare audits, we
23  propose that FMI and NCCR proceed in the
24  following manner -- that FMI and NCCR request
25  for review a summary statement outlining

229

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   existing animal welfare audit programs from
3   each individual producer organization whose
4   guidelines our Advisors have endorsed.
5          Is that accurate?
6      A.    Yes.
7      Q.    And is that -- was that indeed
8   done?
9      A.    I don't recall if we received
10  any of that. Perhaps you have it in your
11  pile of papers, but I don't recall it.
12     Q.    Today, does the FMI-NCCR Animal
13  Welfare Program rely on the producer audits?
14     A.    I have no clue as to what FMI
15  is doing or NCCR is doing today.
16     Q.    Do you know if that ever became
17  a part of the FMI-NCCR program?
18     A.    I have no idea.
19     Q.    I believe you testified
20  earlier, Ms. Brown, that the expert advisory
21  panel that FMI had constituted remained in
22  place after its initial review of the
23  producer guidelines. Is that correct?
24     A.    Correct.
25     Q.    Is it correct that that

58  (Pages 226 to 229)

230

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  advisory panel did an annual review of the
3  producer guidelines to keep the program
4  current?
5    A.    I'm not sure -- not exactly.
6  They reviewed changes or there were producer
7  organizations that had not gotten very far
8  along yet, and those were reviewed more
9  often.
10    Q.    Can you pull back out
11 Exhibit 13 that we had marked earlier.  This
12 is a summary of a welfare advisors meeting
13 that occurred on May 13 and 14, 2003.
14    A.    Well, we're not looking at them
15 in order so they're all mixed up.
16    Q.    Do you have that?
17    A.    I do.
18    Q.    This is a document that you
19 wrote.  Correct?
20    A.    Correct.
21    Q.    The section that describes the
22 advisory committee's role, do you see that?
23    A.    Do you want to point it out to
24 me?
25    Q.    It's on the first page here,

231

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  and there's a heading, "Advisory Committee's
3  Role."
4          Do you see that?
5    A.    I see it.
6    Q.    The last sentence in the first
7  paragraph says, "Additionally, the Committee
8  will come together on an annual basis to
9  review existing guidelines, new science and
10 information, needed revisions, etc. to keep
11 the program current."
12          Is that accurate?
13    A.    That's what it says.
14    Q.    Did that happen?
15    A.    Not always.
16    Q.    Did it happen -- do you know
17 when the last time they reviewed the
18 guidelines was?
19    A.    The last guidelines they
20 reviewed were the Turkey Federation's
21 guidelines.  That was very close to when I
22 left.
23    Q.    Do you know whether on an
24 ongoing basis, so we talked about how in the
25 initial endorsement was of the 2002 UEP

232

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  guidelines, do you remember that?
3    A.    With exceptions.
4    Q.    Yeah, right.  With the
5  exceptions noted.  And eventually the
6  endorsement status on that chart got to the
7  point where there were no exceptions.
8  Correct?
9    A.    For UEP.
10    Q.    For UEP, yes.  Is that correct?
11    A.    Correct.
12    Q.    So in getting there, I assume
13 that the expert advisory panel was reviewing
14 subsequent versions of the guidelines.
15 Correct?
16    A.    UEP was very good and
17 enthusiastic about communicating with FMI
18 about all of their work in this area.
19    MS. SUMNER:  Let's mark this as
20 Brown-31.
21          -  -  -
22    (Exhibit Brown-31, United Egg
23 Producers Animal Husbandry Guidelines
24 for U.S. Egg Laying Flocks 2006
25 Edition, Bates FMI-000386 -

233

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  FMI-000408, was marked for
3  identification.)
4          -  -  -
5    THE WITNESS:  Is there a reason
6  why this page was dog eared just so
7  that I should go to --
8  BY MS. SUMNER:
9    Q.    I am going to ask you to go to
10 that page.
11    A.    Is that the one you want me to
12 look at?
13    Q.    Let me first ask you,
14 Ms. Brown --
15    A.    392, is that the one you want
16 me to look at?
17    Q.    Yeah.  I have marked a document
18 as Brown-31 that bears the Bates numbers 386,
19 FMI-386 to FMI-408.
20    A.    Okay.
21    Q.    And this is the 2006 edition of
22 the UEP Animal Husbandry Guidelines that was
23 produced from FMI's files.
24          Did the FMI expert advisory
25 panel review this version of the UEP

59 (Pages 230 to 233)

234

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    guidelines?
3        A.    I would imagine so.  You know
4    there was some crossover between our experts
5    and their experts, so I would imagine that
6    some of our experts were very familiar with
7    what their experts, because they were one and
8    the same, so...
9        Q.    I'd like to direct your
10   attention to the page that was turned down.
11   Can you remind me what the number was, I
12   think was 392?
13       A.    It was, yes, 392.
14       Q.    I just want to ask you a
15   question about this page.  What did -- do you
16   know what FMI's animal welfare expert
17   advisory panel's views were on the provision
18   of the guidelines which appears on this page
19   that prohibits backfilling?
20       A.    No.
21       Q.    Did any member of FMI's expert
22   advisory panel ever raise a concern with you
23   about this provision of the UEP --
24       A.    I'm not sure I understand what
25   backfilling is, so I need a technical

235

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    explanation of the term.  It's not
3    transparent in the paragraph.
4        Q.    Let me ask you a simpler
5    question.  At any point in time, did any
6    member of FMI's expert advisory panel
7    communicate to you an issue or concern about
8    the UEP provision on backfilling by referring
9    to it specifically as backfilling?
10            MR. WILDERS:  Objection.
11       Foundation.
12            THE WITNESS:  Not that I recall.
13       Because I don't know what the term
14       means.  And they knew that I didn't
15       know a lot of the technical terms, so
16       they may not have used that term.
17   BY MS. SUMNER:
18       Q.    Did at any time any member of
19   FMI's expert advisory panel communicate to
20   you an issue or a concern about a practice of
21   restocking or refilling existing henhouses
22   with new birds or younger birds or birds that
23   were not raised with the original flock
24   housed in that house?
25       A.    Not that I recall.

236

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2            MS. SUMNER:  At this point in
3    time, I think we'd like to reserve the
4    remaining time that we have for
5    anything at the end.
6            Go off the record for a minute.
7            VIDEOGRAPHER:  Off the record at
8    3:54.
9                - - -
10           (A recess was taken.)
11               - - -
12           VIDEOGRAPHER:  Back on the
13   record at 4:12.
14               - - -
15           EXAMINATION
16               - - -
17   BY MR. HUTCHINSON:
18       Q.    Ms. Brown, my name is Troy
19   Hutchinson.  I represent an egg farmer up in
20   Minnesota called Sparboe Farms.  I know it's
21   been a long time since you were involved in
22   these issues.
23            Do you ever remember meeting
24   with anyone from Sparboe Farms?
25       A.    Not specifically.  There were

237

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    times when we had meetings with UEP when they
3    had members of theirs in the room, more than
4    one member in the room.
5        Q.    You don't remember someone from
6    Sparboe Farms ever being at any of those
7    meetings.  Right?
8        A.    Not specifically.
9            MR. HUTCHINSON:  I have no
10       further questions.
11           We can go off the record.
12           VIDEOGRAPHER:  Off the record at
13   4:13.
14               - - -
15           (A recess was taken.)
16               - - -
17           VIDEOGRAPHER:  Back on the
18   record at 4:15.
19               - - -
20           EXAMINATION
21               - - -
22   BY MR. WILDERS:
23       Q.    Good morning -- good afternoon,
24   Ms. Brown.  Thank you for your time today.
25   I'm Brad Wilders, and I represent Associated

60  (Pages 234 to 237)

238

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  Wholesale Grocers, Ball Foods, Four B
3  Corporation and Consentino's.  And it's my
4  turn to sort of ask you a few questions in
5  follow up to what the defendant's counsel
6  asked you.  Okay?
7      A.    Yes.
8      Q.    I'll try not to repeat things
9  as much as possible.  In some instances I may
10 have to repeat just a little bit to kind of
11 set the record as to what other prior
12 testimony I'm going to be asking you about.
13 Okay?
14     A.    Okay.
15     Q.    Of course, if you don't
16 understand my question, feel free to tell me
17 and I'll try to fix it.
18           At the beginning of today's
19 deposition, you had testified to a question
20 that you believed you had an understanding of
21 FMI's members' views on animal welfare.  Do
22 you recall that?
23     A.    Yes.
24     Q.    And when you were answering
25 questions with respect to the term "members,"

239

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  who were you, in your mind, thinking about?
3      A.    Our membership collectively.
4      Q.    And am I right that FMI has
5  approximately 1,500 members?
6      A.    They did at the time that I was
7  there.
8      Q.    Is it fair to say, then, that
9  there generally isn't a unified view on any
10 particular issue among all 1,500 members?
11     A.    I would say that is an accurate
12 statement.
13     Q.    So when you're testifying
14 generally about the members of FMI, is it
15 fair to say you're testifying what you
16 believe the members might -- the majority of
17 members' position might be?
18           MS. SUMNER:  Objection.
19           MR. BARNES:  Objection.
20     Leading.
21           MR. MCKENNEY:  Objection.  Form.
22           THE WITNESS:  Certainly it would
23     be represented by what our board
24     approves or recommends FMI do.
25 BY MR. WILDERS:

240

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    In the specific instance with
3  respect to the animal welfare program and the
4  best practices that were generated about the
5  egg industry, did you ever have any
6  discussions with anyone about that at AWG,
7  Associated Wholesale Grocers?
8      A.    Not that I --
9           MR. HUTCHINSON:  Objection to
10     form.
11           THE WITNESS:  Not that I recall
12     specifically.
13 BY MR. WILDERS:
14     Q.    Did you ever have any
15 discussions with anyone at Consentino's about
16 animal welfare generally?
17           MR. HUTCHINSON:  Objection to
18     form.
19           THE WITNESS:  Not that I recall.
20 BY MR. WILDERS:
21     Q.    Did you ever have any
22 discussions with anyone at Four B about
23 animal welfare?
24     A.    How do you spell that?
25     Q.    It's F-O-U-R, B, and I think

241

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  you would know it as Ball's Food Group.
3      A.    Okay.  David Ball was on the
4  board of FMI, but I do not recall any
5  specific direct discussion with David about
6  the issue.
7      Q.    Do you ever recall any direct
8  discussion with David Ball or anyone else at
9  Ball Foods about the UEP guidelines?
10     A.    Not specifically.
11     Q.    Do you recall any specific
12 discussions about the FMI egg producing best
13 practices with anyone at Ball's Food Group?
14     A.    Not specifically.
15     Q.    And we looked at several
16 documents that referenced Animal Welfare
17 Committee members.  Do you recall those?
18     A.    Yes.
19     Q.    And was anyone from AWG or
20 Consentino's or Four B/Ball's Food Group
21 involved in any of those animal welfare
22 committees?
23           MR. BARNES:  Objection.  Form.
24     Compound.
25           THE WITNESS:  Not that I saw in

242

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     any of the documents.
3 BY MR. WILDERS:
4     Q.    Sitting here today, do you have
5 a recollection of anyone from those companies
6 being involved in the Animal Welfare
7 Committee?
8     A.    No.
9     Q.    Do you even know whether anyone
10 at Associated Wholesale Grocers was aware of
11 what the ultimate result of the -- let me
12 back up.
13        Do you know whether anyone at
14 Associated Wholesale Grocers was aware of
15 the -- what guidelines FMI adopted with
16 respect to egg laying hens?
17        MR. BARNES:  You mean other than
18     the AWG member on her board of
19     directors?  Is that your question?
20        MR. HUTCHINSON:  I'll object to
21     the question.  It calls for
22     speculation.
23        THE WITNESS:  You want to ask
24     the question again?
25 BY MR. WILDERS:

243

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.    Do you know whether anyone at
3 Associated Wholesale Grocers was aware of the
4 best practices that FMI adopted with respect
5 to egg laying hens?
6        MR. HUTCHINSON:  Objection.
7     Calls for speculation on behalf of
8     this witness.
9        MR. BARNES:  I'm going to object
10     also.  You're trying to mislead the
11     witness.  Everybody in this room knows
12     that AWG had a member on the Board of
13     Directors of FMI going back at least
14     to 1999.  And you're asking your
15     question as if that didn't happen.  So
16     please don't try to mislead the
17     witness, Mr. Wilders.
18        MR. WILDERS:  I'm not misleading
19     the witness.
20 BY MR. WILDERS:
21     Q.    I'm just simply asking whether
22 anyone at AWG, to your knowledge, whether
23 they were aware about the specific best
24 practices that FMI adopted regarding egg
25 laying hens?

244

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2        MS. SUMNER:  Objection.
3        MR. HUTCHINSON:  Objection.
4     Calls for speculation.
5        MS. SUMNER:  Foundation.
6 BY MR. WILDERS:
7     Q.    You can answer.
8     A.    I don't know specifically.
9     Q.    Thank you.
10        You had testified about some
11 exhibits that were generally distributed to
12 the membership.  Do you recall those
13 documents?
14     A.    The reports, the progress reports?
15     Q.    Yes.
16     A.    Yes.
17        MS. SUMNER:  Objection.  Let's
18     identify them by number, please.
19 BY MR. WILDERS:
20     Q.    You had testified about the
21 communication mechanism that FMI had with its
22 membership?
23     A.    Yes.
24     Q.    You may have said it, maybe I
25 missed it, but what was the mechanism for

245

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2 communicating updates to membership?
3        MR. BARNES:  Objection.  Asked
4     and answered.
5        THE WITNESS:  We had a
6     communication system where we weekly
7     sent to all of our members information
8     about all of the issues and programs
9     that we were working on.  That would
10     have included government relations,
11     issues management, education programs,
12     convention, et cetera.  We also made
13     all of the information about issues
14     such as animal welfare available on
15     our member Web site.  So those were
16     the primary methods of communication
17     that we used to update our members on
18     any of the programs, policies or
19     procedures that we had underway.
20 BY MR. WILDERS:
21     Q.    And when those interim reports
22 were disseminated in that manner, was it part
23 of a larger newsletter or communication or
24 were they sent separately?
25     A.    If it was -- if it was -- they

62  (Pages 242 to 245)

246

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2    were part of a mailing, so several pieces
3    went into one mailing.  There was a summary
4    sheet on the front which identified the topic
5    and a couple of sentence description of what
6    each piece was.  The Board of Directors
7    received separate pieces, but we didn't
8    duplicate what was in the mailing in most
9    cases.
10       Q.    Would you have any way as part
11   of this communications mechanisms which
12   members read which portions of the mailing?
13       A.    No, we always wondered about
14   that mystery.
15       Q.    If you could pull out
16   Exhibit 22, please?
17       A.    Could you tell me the title,
18   might be easier?
19       Q.    July 2, 2002, letter on UEP
20   letterhead.
21            Now, Exhibit 22 is a letter
22   from Al Pope.  Correct?
23       A.    Correct.  That's what it says.
24       Q.    Was this something that UEP
25   asked FMI to send to its members?

247

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    I do not recall specifically.
3        Q.    So do you know whether this
4    communication, Exhibit 22, was ever sent to
5    the individual UEP members?
6        A.    It's addressed to the FMI
7    members and the NCCR members.  I don't recall
8    its dissemination.
9             - - -
10            (Exhibit Brown-32, 1/9/03
11   Letter, Bates FMI-001915 - FMI-001917,
12   was marked for identification.)
13            - - -
14   BY MR. WILDERS:
15       Q.    I'm going to hand you a copy of
16   what I'm marking as Exhibit 32.
17       A.    Brown-32.
18       Q.    Is this a January 9, 2003,
19   letter that you received from UEP?
20       A.    I see that it is.
21       Q.    And is this a document you
22   would have kept in the ordinary course of
23   business at FMI?
24       A.    Yes.
25       Q.    Does it appear to be a true and

248

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2    accurate copy of the letter that UEP sent
3    you?
4            MR. BARNES:  Object to the form
5        of the question.
6            THE WITNESS:  I can't really
7        testify to that, but...
8    BY MR. WILDERS:
9        Q.    Take a moment to read the
10   letter, please.
11       A.    [Reviewing document.]
12            MR. BURKE:  Is there a Bates
13       number on the document?
14            MR. WILDERS:  Yeah.  It's
15       FMI-1915.
16            THE WITNESS:  Okay.
17   BY MR. WILDERS:
18       Q.    Ms. Brown, do you recall there
19   being some debate between FMI and UEP about
20   FMI's decision to use an independent audit
21   firm?
22            MS. SUMNER:  Objection.
23            THE WITNESS:  Do you mean SES?
24   BY MR. WILDERS:
25       Q.    Yes.

249

1        KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    Because he mentions other firms
3    in here.  There was some discussion of that.
4        Q.    And during this January 9,
5    2003, time frame, did UEP threaten FMI about
6    potential legal action with respect to its
7    use of the UEP Animal Welfare Guidelines if
8    it didn't agree to drop its audit program?
9            MS. SUMNER:  Object to the form
10       of the question.
11            THE WITNESS:  Not that I recall,
12       but it's certainly implied in this
13       letter.
14   BY MR. WILDERS:
15       Q.    Did you, when you read this
16   letter -- let's just specifically direct you
17   to page 1916, and the third paragraph there
18   where Mr. Pope, the president of UEP writes,
19   "UEP and the egg industry have made very
20   heavy capital investments in developing its
21   Animal Welfare Guidelines, the audit system
22   and Dispute Resolution process necessary for
23   their implementation.  The Guidelines and its
24   adjuncts are the exclusive property of UEP
25   just as its logo and seal.  We would view

63  (Pages 246 to 249)

250

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  very seriously any attempt to make use of the
3  Guidelines, or any of the materials
4  associated with the Guidelines, for any
5  purpose without our consent."
6      What did you understand that to
7  mean when you received this letter?
8      A.    I probably walked it down to
9  house counsel.
10     Q.    And if you return to the very
11 last page, 1917, Mr. Pope copied someone
12 named James Coleman at the law firm
13 Constangy, Brooks & Smith.  Do you know who
14 that was?
15     A.    No.  I know who Eric Hess was.
16     Q.    Who was Eric Hess?
17     A.    He was at SES.
18     Q.    Did you perceive UEP as putting
19 pressure on FMI with respect to FMI's audit
20 program?
21         MR. BARNES:  Objection.
22     Leading.
23         THE WITNESS:  We knew that the
24     producer community was unhappy with
25     the development of an independent

251

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      third-party audit that was not
3      connected to any of the producer
4      organizations.  We knew that they were
5      unhappy.  UEP was not the only person
6      who expressed that they were unhappy
7      with it.
8  BY MR. WILDERS:
9      Q.    But this letter specifically
10 relates to UEP.  Correct?
11     A.    I know that.  Thank you.
12     Q.    Was UEP ever -- did UEP ever
13 communicate to you that it would prefer to
14 maintain control of any audits using their
15 Animal Welfare Guidelines?
16     A.    They definitely felt strongly
17 about doing their own audit.
18     Q.    Did they ever tell you that the
19 reason for that was so they could enforce
20 compliance with the UEP Certified Program?
21         MS. SUMNER:  Objection.
22         THE WITNESS:  They may have.
23 BY MR. WILDERS:
24     Q.    And did UEP ever tell you that
25 they were using the Animal Welfare Guidelines

252

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  as a supply and management tool among their
3  members?
4          MS. SUMNER:  Object to the form
5      of the question.
6          THE WITNESS:  I never heard
7      anything like that.
8  BY MR. WILDERS:
9      Q.    Did UEP ever disclose to you
10 that their goal with the Animal Welfare
11 Program was to develop a certified program
12 that would increase egg prices in the U.S.
13 market?
14         MS. SUMNER:  Objection to the
15     form.
16         THE WITNESS:  I personally did
17     not have any conversations like that.
18 BY MR. WILDERS:
19     Q.    If UEP had told you that they
20 were using the Animal Welfare Guidelines to
21 reduce supply or increase price, would that
22 have impacted FMI's review of the UEP
23 guidelines?
24         MS. SUMNER:  Objection.
25         THE WITNESS:  It certainly would

253

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      have impacted our relationship and
3      conversations with UEP.
4  BY MR. WILDERS:
5      Q.    Why?
6      A.    That would be unethical at
7      best.
8      Q.    What would it be at worst?
9      A.    Well, my personal and
10 professional opinion is that it could walk a
11 fine line regarding legality.
12         MR. MCKENNEY:  Move to strike
13     that as lay opinion.
14             - - -
15         (Exhibit Brown-33, 12/20/02
16     E-mail, Bates FMI-001984, was marked
17     for identification.)
18             - - -
19 BY MR. WILDERS:
20     Q.    I've handed you a copy,
21 Ms. Brown, of Exhibit 33.  Is that an e-mail
22 that you drafted on or about December 20,
23 2002?
24     A.    It seems so.
25     Q.    Who are you sending the e-mail

254

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   here to generally?
3         A.    These are executives within
4   member companies.
5         Q.    Were these companies -- strike
6   that.
7             You write here about partway
8   through, "We understand that yesterday a
9   number of "the producer groups held a
10  conference call to express their concern that
11  FMI and NCCR are implementing a third party
12  audit and to solicit funds to counter (?) the
13  process. Part of this 'plan' includes
14  contacting FMI members directly to express
15  their displeasure with the animal welfare
16  program FMI and NCCR have developed."
17            Do you see that?
18        A.    Yes.
19        Q.    Was UEP one of the producer
20  groups you were referencing here?
21        A.    I don't recall that.
22        Q.    But it would have been
23  consistent with UEP's displeasure with FMI's
24  decision --
25            MR. MCKENNEY:  Objection to

255

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   form. Objection. Leading.
3             MR. WILDERS:  Please let me
4   finish my question before you make
5   objections.
6             MR. BARNES:  It was
7   objectionable even before you finished
8   it.
9             MR. WILDERS:  I would appreciate
10  the courtesy of letting you object to
11  the question as a whole and not just a
12  part of it.
13            MR. BARNES:  Put a question mark
14  after that.
15            MR. BURKE:  Counsel, could we
16  get a Bates number on the document,
17  please?
18            MR. WILDERS:  I apologize.
19  FMI-1984.
20            THE WITNESS:  That's an
21  appropriate number.
22  BY MR. WILDERS:
23        Q.    Ms. Brown, is this -- is it
24  consistent with the fact that UEP was unhappy
25  with FMI's decision to use an audit program?

256

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2             MR. MCKENNEY:  Objection. Form.
3   Objection. Leading.
4             MS. SUMNER:  Objection. Form.
5             THE WITNESS:  Many of the
6   producer groups were unhappy with the
7   idea that FMI would undertake an
8   independent third-party audit of their
9   guidelines that our experts had
10  recommended. It is -- you know, but I
11  don't recall how we became aware of
12  the call that was made or who was on
13  it.
14  BY MR. WILDERS:
15        Q.    If you look at the part of the
16  e-mail that shows what documents were
17  attached, do you see that?
18        A.    Yes. But I don't recall what
19  they were.
20        Q.    One of them is labeled "Egg
21  Production Audit Form.pdf."
22            MR. MCKENNEY:  Objection.
23  Leading.
24            THE WITNESS:  I don't see it,
25  though.  I can't --

257

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2             MR. GREEN:  It's not attached,
3   it's just listed.
4   BY MR. WILDERS:
5         Q.    I'm just referring to the
6   listing of what was attached.  The
7   attachments are here.
8         A.    So one of them was what?
9         Q.    If you look three lines up from
10  the top, do you see where it says, Egg
11  Production --
12        A.    Oh, I see. I see. I see. I
13  see. A description of what's attached.
14  Sorry, I went right over that.
15        Q.    Did you attach an egg
16  production audit form to the e-mail?
17        A.    I'm just reading all the things
18  that are on here. It looks as if there is a
19  production audit form, a swine audit form and
20  livestock slaughter audit form attached.
21        Q.    Do you think that indicates or
22  refreshes your recollection that UEP was one
23  of the producers who was participating in a
24  conference call to solicit funds to counter
25  FMI's audit process?

65  (Pages 254 to 257)

258

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          MS. SUMNER:  Objection to the
3     form.
4          MR. MCKENNEY:  Objection to
5     form.
6          THE WITNESS:  I do not recall
7     specifically any of the -- because I
8     wasn't party to the call and do not
9     know the content of the call except
10    what is here, and I don't even recall
11    how we became aware of this
12    information.
13    BY MR. WILDERS:
14         Q.    Thank you.  You can set that
15    one aside now.
16              Ms. Brown, do you -- was there
17    any part of FMI's Animal Welfare Guidelines
18    that were mandatory with respect to FMI's
19    members?
20         A.    No.
21         Q.    And --
22         A.    We not only couldn't tell the
23    producers what to do, we really couldn't tell
24    our members what to do either.
25         Q.    Can you explain why you didn't

259

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     create mandatory guidelines for the members?
3          A.    Well, we didn't create the
4     guidelines.  The producers created the
5     guidelines and the experts reviewed them and
6     either said they were good guidelines or they
7     needed to be improved.  It's not an
8     appropriate role for a trade association to
9     mandate its members follow certain things.
10         Q.    So if a member wanted to buy --
11         A.    We did mandate they had to pay
12    their dues or they couldn't be a member.
13         Q.    Fair enough.  If a member
14    wanted to buy, and just so the record is
15    clear, the amount of the dues that members
16    paid to FMI had nothing to do with Animal
17    Welfare Guidelines, did they?
18         A.    No.
19              MS. SUMNER:  Objection.
20    BY MR. WILDERS:
21         Q.    If a member wanted to -- if a
22    member decided not to include any animal
23    welfare guidelines in the bids to their
24    suppliers, was that something that FMI got
25    involved with?

260

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          A.    No.  We would have no idea
3     about that at all.  It was a voluntary
4     program.  They could either use it or not.
5                      - - -
6              (Exhibit Brown-34, E-mail chain,
7          Bates FMI-001778, was marked for
8          identification.)
9                      - - -
10    BY MR. WILDERS:
11         Q.    Let me hand you Exhibit 34.
12    Can you identify this as a document -- an
13    e-mail you wrote on August 22, 2003, to Gene
14    Gregory?
15         A.    Yes.
16         Q.    Is this a true and accurate
17    copy of the e-mail you wrote on that date?
18         A.    It seems to be.
19         Q.    Is this something you kept in
20    the ordinary course of business at FMI?
21         A.    Yes.
22         Q.    Let's move down to the first
23    e-mail in that train, that e-mail chain from
24    Gene Gregory.  It says, Karen, Just to keep
25    you informed:  Albertsons is now bidding

261

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     their egg business out all across the
3     country.  This will likely result in a
4     competitive situation that lowers our
5     producers' prices.  Albertsons has also
6     required the Animal Care Certified Program up
7     to this point but refused to pay the
8     additional costs for the program.  They are
9     now saying to some bidders that they don't
10    have to be on the Animal Care program.  I
11    believe Albertsons was one of your leaders
12    and a member of your committee that called
13    for the establishment of guidelines.
14              "If other retailers follow this
15    direction, it could have a major negative
16    impact upon our guidelines."
17              Do you see that?
18         A.    I do.
19         Q.    What did you understand Mr.
20    Gregory to be communicating to you here?
21         A.    Something he shouldn't have.
22    My response was, "Gene -- these are terms of
23    trade between retailers and their suppliers.
24    It is not appropriate information to be
25    shared or discussed with trade associations.

262

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    Please do not send me this type of
3    information.  Thank you, Karen."
4        Q.    Did you receive a response from
5    Mr. Gregory?
6        A.    Not that I'm aware of.
7        Q.    And did -- is that true, that
8    FMI members were free to negotiate prices
9    with their suppliers?
10       A.    We didn't get involved in any
11   of that.  That's their business and that's
12   not our business.  Those are as stated,
13   individual terms of trade between retailers
14   and suppliers and not an area that's
15   appropriate at all for a trade association to
16   be involved.
17       Q.    And when you talk about terms
18   of the trade, what types of things does terms
19   of trade encompass?
20       A.    Well, if you're a retailer,
21   you're going to be buying products from the
22   supplier and you have certain terms that you
23   would require and the supplier has certain
24   terms that they require in order to make a
25   sale.

263

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2        Q.    And if a retailer was
3    negotiating the purchase of eggs from a
4    supplier, and they decided that they wanted
5    eggs that were consistent with the animal
6    welfare best practices, but the supplier
7    produced other eggs that were not consistent
8    with the animal welfare best practices, was
9    the retailer free to buy eggs from that
10   supplier?
11       A.    FMI would have nothing to do
12   with that.  We wouldn't have that kind of
13   conversation and we would not be involved in
14   anything that goes on between the buyer and
15   seller.
16       Q.    And was there anything in FMI's
17   animal welfare program that would have made
18   it more difficult for a retailer to engage in
19   such a purchase?
20             MR. MCKENNEY:  Objection.  Form.
21             THE WITNESS:  Can you ask that
22        one more time?
23   BY MR. WILDERS:
24       Q.    Was there anything in FMI's
25   animal welfare program that would have made

264

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2    it difficult for a retailer and a supplier to
3    engage in that type of a contract?
4             MR. MCKENNEY:  Same objection.
5             THE WITNESS:  I have no idea.
6    BY MR. WILDERS:
7        Q.    When you received this e-mail
8    from Mr. Gregory, did you take it as an
9    attempt to get FMI to help enforce compliance
10   with UEP's certified program among its --
11            MR. MCKENNEY:  Objection to
12        form.
13   BY MR. WILDERS:
14       Q.    -- among its own producers?
15            MR. WILDERS:  Again, please just
16        wait.
17            MS. SUMNER:  Object to the form
18        of the question.
19            THE WITNESS:  I took it as a
20        very inappropriate communication from
21        a supplier organization to me.
22   BY MR. WILDERS:
23       Q.    Do you recall whether Mr.
24   Gregory heeded your instruction not to send
25   you this type of information again?

265

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    I have no idea what is in that
3    pile.  I don't know.  I don't know.
4             - - -
5             (Exhibit Brown-35, E-mail chain,
6        Bates FMI-002537 & FMI-002538, was
7        marked for identification.)
8             - - -
9    BY MR. WILDERS:
10       Q.    Let me hand you another e-mail
11   that's been marked Brown Exhibit 35.  Is this
12   an e-mail from, at least the first e-mail
13   from Tim Hammonds to you on May 20, 2004?
14       A.    Yes, that's what it looks like.
15       Q.    Does this appear to be a true
16   and correct copy of e-mail correspondence
17   that he sent to you on that date?
18       A.    I presume so.
19       Q.    Is this an e-mail that you
20   would have kept in your file as an ordinary
21   business record?
22       A.    Yes.
23       Q.    And kept in the ordinary course
24   of business?
25       A.    Right.  Yes.

67  (Pages 262 to 265)

266

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      MS. ANDERSON:  Counsel, this is
3   Exhibit 35, right?
4      MR. WILDERS:  It is.  And it's
5   FMI-2537.
6      MS. ANDERSON:  Sorry, I thought
7   you said 25.
8      MR. WILDERS:  If I did, I
9   apologize.
10  BY MR. WILDERS:
11     Q.    So if we look at the very first
12  e-mail on May 20, 2004, from
13  karenconrad@unitedegg.com to Tim Hammonds.
14  Do you see that?
15     A.    I see that.
16     Q.    Do you know who Karen Conrad
17  was?
18     A.    I don't remember.
19     Q.    It reads, "Hi Tim, Thanks for
20  meeting with Gene and I last week."
21         It says, "UEP produces a
22  newsletter for its members called 'United
23  Voices'.  It is a bi-monthly publication that
24  is mailed out, put out on our website and
25  sent via email to our members.

267

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2          "Would you be willing to write
3   a short (1/2 page) article for us relating to
4   why producers should 'stay the course' and
5   continue to provide leadership and support
6   for UEP's Animal Care Certified program?
7   Also something regarding the continued use of
8   the seal on our egg cartons for informing
9   customers."
10         Did I read that correctly?
11     A.    Yes.
12     Q.    What did you understand -- let
13  me back up.
14         Mr. Hammonds then forwarded the
15  e-mail to you on the same day, May 20, 2004,
16  didn't he?
17     A.    Yes, I see that.
18     Q.    What did you understand United
19  Egg to be asking here?
20     A.    Well, my response was "We can
21  draft something saying we appreciate their
22  efforts and support of their customers...,"
23  meaning retailers, "...but we can't tell them
24  to 'stay the course' [implied pressure] or
25  'endorse' their labeling program.  I am happy

268

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2   to draft something.  It would be best if it
3   was signed by you and Terrie."
4      Q.    What did you -- what did you
5   mean when you wrote "implied pressure"?
6      A.    Well, pressuring them to go in
7   a certain direction.
8      Q.    What do you mean pressure --
9   when you say "them," do you mean the egg
10  producers, the members of UEP?
11     A.    Yes.
12     Q.    So you understood United Egg
13  Producers to be asking FMI to write something
14  to pressure the producers to stay on or join
15  the Animal Care Certified Program of UEP?
16     A.    Correct.
17         MR. MCKENNEY:  Objection to
18     form.  Mischaracterizes the testimony,
19     the document.
20         THE WITNESS:  Correct.
21  BY MR. WILDERS:
22     Q.    That was something that you
23  were not -- is that something you were
24  comfortable with?
25     A.    No.

269

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      Q.    And, again, why not?
3      A.    I think it skirts the edge of
4   what's legal.
5          MS. SUMNER:  Objection.  Move to
6     strike that as a lay opinion.  She's
7     not a lawyer.
8          THE WITNESS:  So if I change it
9     and say it skirts the edge of
10    legality?  I revise my response.  It
11    skirts the edge of legality --
12         MR. MCKENNEY:  Same objection.
13         THE WITNESS:  -- at a minimum.
14         MS. SUMNER:  Same objection.
15    Moves to strike as a lay opinion.
16         MR. WILDERS:  We'll let the
17    judge decide if the jury gets to hear
18    it.  Okay?
19  BY MR. WILDERS:
20     Q.    Did UE -- do you understand
21  whether there's a difference between UEP's
22  Animal Welfare Guidelines and the UEP
23  Certified Program?
24     A.    I couldn't tell you in detail.
25  I know the program had different components,

68 (Pages 266 to 269)

270

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  and one component was a certified label.  I
3  don't know if that's what you're referring
4  to.
5       Q.    Did FMI ever endorse the UEP
6  certified label?
7       A.    No.
8       Q.    So the testimony you've been
9  giving about, you know, FMI Scientific
10 Committee reviewing, potentially endorsing
11 some of the Animal Welfare Guidelines, did
12 that relate to the guidelines themselves or
13 the guidelines and the UEP certified label?
14       MR. MCKENNEY:  Objection to
15 form.
16       THE WITNESS:  That related only
17       to the guidelines.  It was our belief
18       that industry devising its own label
19       for a program that it developed and
20       then audited itself had a lot of
21       issues regarding credibility.
22            - - -
23       (Exhibit Brown-36, 10/18/04
24 E-mail, Bates FMI-003137, was marked
25 for identification.)

271

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2            - - -
3  BY MR. WILDERS:
4       Q.    Let me hand you another e-mail
5  from Mr. Gregory to you that I'm marking
6  Brown-36.  Is this an e-mail that you
7  received from Mr. Gregory on October 18,
8  2004?
9       A.    It appears so.
10      Q.    And does it appear to be a true
11 and accurate copy of the communication he
12 sent to you on that date?
13      A.    Yes.
14      Q.    And is this an e-mail that you
15 would have kept in the ordinary course of
16 business while at FMI?
17      A.    Yes.
18      Q.    Mr. Gregory -- and this e-mail
19 on October 18, 2004, Mr. Gregory writes,
20 "Karen, The egg industry is now experiencing
21 severe low egg prices.  Prices far below the
22 costs of production."  Let's just stop right
23 there for a second.
24            Do you think that was an
25 appropriate message for Mr. Gregory to be

272

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  sending to you at FMI?
3       A.    No --
4            MS. SUMNER:  Objection to form.
5            THE WITNESS:  -- I do not.
6  BY MR. WILDERS:
7       Q.    Why not?
8       A.    It's not information that
9  should be discussed or shared with the trade
10 association.
11      Q.    And this e-mail -- you're
12 holding another exhibit there.  Could you
13 identify it by number for the record and the
14 jury, please?
15      A.    Okay.  We've got -- I'm holding
16 two things.  I'm holding Brown-34 001778 and
17 Brown-36 003137.  I just want to check the
18 date.
19      Q.    What did that -- what did that
20 reveal to you?
21      A.    That he didn't listen to my --
22 didn't understand my first e-mail which said
23 don't send me this type of information again.
24      Q.    Or perhaps he understood it and
25 he willfully ignored it?

273

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2            MS. SUMNER:  Objection to form.
3            MS. ANDERSON:  Objection.
4            MR. MCKENNEY:  Objection.
5            THE WITNESS:  I don't know the
6       answer to that question.
7  BY MR. WILDERS:
8       Q.    He goes on to write in the
9  second paragraph, "Egg producers made money
10 in 2003 and the first half of 2004.  Like
11 farmers do - they expanded their flock size
12 and are now producing too many eggs for the
13 market."
14            Did I read that correctly?
15      A.    Uh-huh.  Yes, you did.
16      Q.    In your experience, in the
17 retail sector if there are too many eggs for
18 the market, what kind of impact does that
19 have on price?
20            MS. SUMNER:  Objection.
21            THE WITNESS:  Paul Samuelson in
22       Econ 101 says if there's a large
23       supply, prices go down; and if there
24       is a short supply, prices go up.
25 BY MR. WILDERS:

274

KAREN BROWN - HIGHLY CONFIDENTIAL
1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     Q.    And then in the fourth
3   paragraph Mr. Gregory writes, "We need to
4   tell you that we are having difficulty
5   keeping producers committed to the Animal
6   Care Certified program unless their retail
7   customer requires that their eggs be produced
8   by Animal Care Certified companies."
9        Did I read that correctly?
10    A.    Yes.
11    Q.    Did you have an understanding
12  as to why Mr. Gregory was writing you an
13  e-mail that first talked about severe low egg
14  prices, too many eggs for the market and then
15  directly going into -- going into the fact
16  that he was having difficulty keeping people
17  on the Animal Care Certified Program?
18        MS. SUMNER:  Object to the form.
19        THE WITNESS:  I have no idea,
20        but I think maybe it would have been
21        valuable to have some of these
22        communications reviewed by counsel
23        before sending.
24        MS. SUMNER:  Move to strike the
25        testimony.

275

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   BY MR. WILDERS:
3     Q.    He also goes on to write in the
4   sixth paragraph, sixth paragraph, "We are
5   also hearing from some of your members that
6   they are no longer requiring Animal Care
7   Certified eggs so you may be losing some of
8   your member support for the program that we
9   all worked on for so long and hard."
10        What did you understand him to
11  be communicating to you there?
12    A.    Make their problem our problem.
13    Q.    What do you mean by "their
14  problem"?
15    A.    FMI had no role in what was
16  going on within UEP's membership as regard to
17  these issues mentioned in this e-mail.
18    Q.    And did you, after receiving
19  this letter, do anything to, as he puts it,
20  provide in keeping your members committed to
21  the program?
22    A.    Probably not.
23    Q.    And while you were at FMI, did
24  you take any action to try to force members
25  into only buying eggs consistent with the UEP

276

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   Certified Program?
3     A.    Never.
4     Q.    Do you know if you responded to
5   Mr. Gregory?
6     A.    I don't recall.
7     Q.    Would this have been the kind
8   of letter that you would typically send to
9   legal counsel to deal with?
10    A.    I would definitely send it to
11  legal counsel.
12    Q.    The last paragraph, third to
13  the last paragraph here says, second
14  sentence, "I think it is critically important
15  that we work together to keep this good
16  program going.  Any message from you that we
17  could convey to our members would certainly
18  help."
19        Did you -- did I read that
20  correctly?
21    A.    I'm sorry.  Did I --
22    Q.    I'll let the record reflect
23  itself.
24        It says, "Any help you can
25  provide in keeping your members committed to

277

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2   the program would help us.  I think it is
3   critically important that we work together to
4   keep this good program going.  Any message
5   from you that we could convey to our members
6   would certainly help."
7        Did I read that right?
8     A.    Yes.
9     Q.    And when you -- reading this
10  e-mail as a whole, did you take this as
11  pressure from Gene Gregory to force FMI
12  members to buy eggs on the animal welfare
13  certified program?
14        MS. SUMNER:  Objection.
15        Leading.
16        THE WITNESS:  This e-mail is
17        asking FMI to do something in an area
18        that was inappropriate and FMI was not
19        going to do.
20        MR. WILDERS:  Could I get some
21        stickers from you?  Off the record.
22            - - -
23        VIDEOGRAPHER:  Off the record at
24        4:58.
25            - - -

70  (Pages 274 to 277)

278

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        (A recess was taken.)
3            - - -
4        VIDEOGRAPHER:  Back on the
5    record at 4:59.
6            - - -
7        (Exhibit Brown-37, E-mail chain,
8    Bates UE0762934, was marked for
9    identification.)
10           - - -
11   BY MR. WILDERS:
12       Q.    Ms. Brown, I handed you a copy
13   of Exhibit 37 to your deposition.  You were
14   asked some questions --
15       MS. SUMNER:  I'm going to object
16   to the fact that this is a
17   confidential document and --
18       MR. WILDERS:  She's a recipient
19   of the e-mail.
20       MS. SUMNER:  But under the
21   protective order you have to have her
22   sign it before you can show it to her.
23       MR. WILDERS:  I don't think so.
24       MR. RANDALL:  You showed her
25   documents that were confidential.  You

279

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    can't pick and choose.
3    BY MR. WILDERS:
4        Q.    Ms. Brown --
5        MS. SUMNER:  They're our
6    documents and under the protective
7    order --
8        MR. WILDERS:  The protective
9    order does not require you to sign a
10   confidentiality if you're a recipient.
11       MS. SUMNER:  That's actually not
12   true.
13       MR. WILDERS:  You can take it up
14   with the judge.
15       MS. SUMNER:  No.  You're
16   violating the protective order.  This
17   is my client's document.  This is an
18   instance, unlike the one you brought
19   up before, where we are not waiving it
20   and we do have the right to object.
21       MR. PATTON:  You're keeping out
22   evidence is what you're doing.
23       MR. WILDERS:  Your objection is
24   noted.  Let the record reflect --
25       MS. ANDERSON:  I'm sorry, has

280

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    the witness not signed the protective
3    order?  Is that an issue?  Because if
4    she hasn't, we're not talking about
5    this anymore.
6        MR. WILDERS:  We're talking
7    about it in this deposition.  Do
8    whatever you need to do.
9        MR. BURKE:  Is there a Bates
10   number?
11       MR. WILDERS:  It's UE 762934.
12       MS. SUMNER:  You know what,
13   before you read this, Ms. Brown, could
14   you put it down?  My client produced
15   this document.  And, Mr. Green, it is
16   under protective order.  And until I
17   have a chance to review it, I suggest
18   we go off the record.  We're not
19   agreeing to waive the confidentiality
20   right now.
21       THE WITNESS:  I'm cc'd on the
22   document.
23       MS. SUMNER:  We'll take a moment
24   to review that.
25       MS. ANDERSON:  There is a court

281

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    order in place.
3        MR. WILDERS:  She received it.
4        MS. SUMNER:  Unfortunately
5    that's not how the protective order
6    reads and I'm sure --
7        MR. GREEN:  Is there a copy of
8    the protective order around?
9        MS. SUMNER:  I do have a copy of
10   the protective order in the other
11   room.
12       MR. WILDERS:  Off the record.
13       VIDEOGRAPHER:  Off the record.
14           - - -
15       (A recess was taken.)
16           - - -
17       VIDEOGRAPHER:  Here begins tape
18   four in the videotape deposition of
19   Karen Brown.  We're back on the record
20   at 5:07.
21       MS. SUMNER:  We understand that
22   counsel has not had this witness sign
23   Exhibit A to the confidentiality
24   agreement in either the MDL or the
25   Kansas litigation, and this is a

71 (Pages 278 to 281)

**282**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    document that was marked by UEP as
3    confidential and as such falls within
4    the disclosure limitations in the
5    protective order.  However, for
6    purposes of this witness, we are
7    prepared under paragraph 6, paragraph
8    6(B)(12) which refers to, treatment of
9    confidential information, to agree
10   that this witness can be shown this
11   confidential document without
12   violating the protective order.
13        MR. WILDERS:  Thank you.
14   BY MR. WILDERS:
15   Q.    Ms. Brown, I apologize for the
16   interruption.
17        Before you take a look at the
18   document again, do you recall your testimony
19   on direct examination that -- about a 100
20   percent rule that UEP was enacting as part of
21   its UEP Certified Program?
22   A.    I recall that discussion here.
23   Q.    And was it your testimony, I
24   believe, that you weren't quite certain what
25   was meant by the 100 percent rule?

**283**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        MS. SUMNER:  Objection.
3    Misstates her testimony.
4        THE WITNESS:  That was my
5    statement, that I didn't understand at
6    the time it was asked.
7    BY MR. WILDERS:
8    Q.    Thank you.  I didn't mean to
9    interrupt you.  I'm sorry.
10        Could you look now at
11   Exhibit 37.  You can turn it over now.  If
12   you would look, is this an e-mail that Mr.
13   Hammonds sent to Gene Gregory and copying you
14   on October 28, 2005?
15   A.    I see that.
16   Q.    And it includes an e-mail from
17   Mr. Gregory to Tim Hammonds and Al Pope on
18   the same date.  Correct?
19   A.    Yes.
20   Q.    Let me just read the first part
21   and part of the second paragraph here.  "Tim,
22   There is a sector within the egg industry
23   (those primarily in egg breaking/egg
24   products) that would either like for UEP to
25   water down or completely eliminate the

**284**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    'United Egg Producers Certified' (formerly
3    Animal Care Certified) program.  This group
4    represents approximately 20% of all layers in
5    the industry and these people are UEP
6    members.
7        "Two opportunities will be
8    provided to this group over the next couple
9    of months for them to convince UEP's Board
10   that we should get out of the management of
11   an animal husbandry program or do away with
12   the 100% rule.  To remind you, the 100% rule
13   requires a company to implement our
14   guidelines on 100% of their production
15   facilities regardless of where or how they
16   market...eggs."
17        Did I read that correctly?
18   A.    Yes.
19   Q.    And does that refresh your
20   recollection as to what you understood the
21   100 percent rule to mean while you were at
22   FMI?
23        MR. MCKENNEY:  Objection to
24   form.
25        THE WITNESS:  I understood that

**285**

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    there was a sector or -- of the UEP
3    membership or there were some
4    companies within the UEP membership
5    that wanted to determine which of
6    their animals were humanely treated
7    according to the guidelines based on
8    what were the egg ended up.  And the
9    way I understood it was that shell
10   eggs which go in cartons for consumers
11   to buy were the eggs that some
12   companies that were in the business of
13   two kinds of egg laying operations
14   wanted those eggs to be under the UEP
15   program.  Those animals.  Animals who
16   were laying eggs for breaking
17   operation which were basically going
18   to end up in products manufactured by
19   other companies such as cereal
20   companies or cookie companies, et
21   cetera, that those animals did not --
22   they did not want them to be under the
23   UEP guidelines.  They did not want
24   them to be handled as humanely under
25   the UEP guidelines.  That's what I

72  (Pages 282 to 285)

286

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        understand the 100 percent rule to be.
3        I just didn't understand it as a
4        separate term.
5    BY MR. WILDERS:
6        Q.    So when you testified earlier
7    about what FMI's position would be on that
8    issue, that was the understanding that -- the
9    definition that you were applying to the 100
10   percent rule?
11       A.    That's what I understood it to
12   be after reading further into the document.
13       Q.    And did you know that, in fact,
14   UEP was using the 100 percent rule as a means
15   to prohibit their -- some of their members
16   from selling certified eggs if they sold
17   non-certified eggs to a customer?
18       MS. SUMNER:  Object to the form
19       of the question.
20       MR. MCKENNEY:  Objection to
21       form.  Misstates the record.
22       MS. SUMNER:  Lack of foundation.
23       THE WITNESS:  I don't know about
24       that part.  Our focus was really on
25       how the animals were being handled.

287

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        From our perspective, we believed that
3        regardless of where the product ends
4        up, the animals should all be treated
5        as humanely as possible.  So that was
6        our position.
7    BY MR. WILDERS:
8        Q.    If a producer had customers who
9    wanted to buy eggs that were produced under
10   the guidelines and they had a customer that
11   wanted to buy eggs that were not produced
12   under the guidelines, that wasn't something
13   that FMI got involved with, was it?
14       A.    That's correct.  FMI had no
15   business getting involved in that kind of a
16   discussion.  Those are terms of trade between
17   producers and -- I mean between retailers and
18   suppliers and not an area that FMI got
19   involved in.
20       Q.    And from an animal welfare
21   perspective, if you have a producer that has
22   this split customer base, is it better or
23   worse from an animal welfare perspective to
24   allow them to at least sell some of their
25   eggs under the guidelines or to kick them out

288

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    of the program altogether?
3        MS. SUMNER:  Objection to the
4        form of the question.  Calls for
5        impermissible opinion testimony.
6        She's a fact witness.
7        THE WITNESS:  We were not in the
8        business of saying who should be
9        kicked out of any program.  Our focus
10       was on having animals being raised for
11       food being treated humanely and
12       improving that system for all animals.
13   BY MR. WILDERS:
14       Q.    Fair enough.  If you were to
15   look at Exhibit 37 again, the e-mail from Mr.
16   Gregory to Mr. Hammonds, Mr. Gregory at UEP
17   to Mr. Hammonds at FMI, one of the latter
18   sentences, third from the bottom says, "My
19   reason for writing you at this time is to ask
20   if you would be willing to write me a letter
21   stating, among any ideas you may have, the
22   importance of UEP maintaining and managing
23   the 'United Egg Producers certified'
24   program."
25       Did I read that right?

289

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2        A.    Yes.
3        Q.    And did FMI provide UEP with
4    that letter?
5        A.    Not to my knowledge.  And Mr.
6    Hammonds specifically states that, implies
7    that he's not going to do anything else.
8        Q.    Where do you see that?
9        A.    I see that in his response
10   which says, "Gene, I think we have gone as
11   far as associations should at this point.  I
12   believe our support for your program is clear
13   and our key members who have the real
14   standing here have given you specific letters
15   of support.  I'm reluctant to insert us any
16   further into your own governance issues.
17   This is in no way a lack of strong and
18   continuing support on our part, it's just a
19   reflection of our view of governance for
20   associations working with their own
21   membership."
22       Q.    Now, did you have an
23   understanding of how UEP's governance
24   differed from FMI's governance?
25       MS. SUMNER:  Object to the form

290

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     of the question.
3           THE WITNESS:  Only to the extent
4     that they are a cooperative and we are
5     a trade association, so different
6     structure.
7     BY MR. WILDERS:
8     Q.    Is Mr. Hammonds -- is this a
9     true and accurate reflection of the e-mail
10    that you received in October 28 of 2005?
11    A.    I assume so.
12    Q.    You had no reason to disagree
13    that it is not.  Correct?
14    A.    I have no reason to disagree
15    that it is not.
16              - - -
17          (Exhibit Brown-38, E-mail chain,
18    Bates FMI-001461, was marked for
19    identification.)
20              - - -
21    BY MR. WILDERS:
22    Q.    Let me hand you Exhibit 38.
23    Will you confirm for me that this is an
24    e-mail you received on November 12, 2004?
25    For the record this is Bates FMI-1461.

291

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     A.    [Reviewing document.]
3     Q.    I'm sorry, did you have a
4     chance to look at it or are you still
5     reading?
6     A.    I have.
7     Q.    Is this an e-mail you received
8     from a Terrie Dort on November 12, 2004?
9     A.    It appears to be.
10    Q.    Does it appear to be a true and
11    accurate copy of that communication?
12    A.    Yes.
13    Q.    Is this an e-mail that you
14    would have kept in the ordinary course of
15    business while at FMI?
16    A.    Yes.
17    Q.    At the bottom of the e-mail
18    there is an earlier e-mail from the same date
19    from Eric Hess, and I think you said earlier,
20    but who was Mr. Hess?
21    A.    He was with SES, which was the
22    program that -- the auditing firm that was
23    developing an audit program to coordinate the
24    audits of the guidelines, the animal welfare
25    guidelines, producer guidelines that our

292

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     animal welfare experts had endorsed.
3     Q.    Would this have been during the
4     period when there was sort of a lack of
5     participation in the Animal Welfare Audit
6     Program by egg producers?
7           MS. SUMNER:  Object to the form
8     of the question.
9           THE WITNESS:  There was a
10    declining interest in using the SES
11    audit program at this time, yes.
12    BY MR. WILDERS:
13    Q.    And Mr. Hess writes here to you
14    and to Ms. Dort and also to
15    Dr. Hollingsworth, "I have attached a
16    brochure I stumbled across yesterday while I
17    was working on the national Ag Homeland
18    Security program we are involved with.  The
19    hyperlink to the website I pulled the
20    brochure off of is below.  Please pay
21    particular attention to the final paragraph
22    on page 2.  It may explain why the egg
23    producers are not interested in AWAP.  Take
24    care."
25          What was AWAP, first of all?

293

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     A.    Animal Welfare Auditing
3     Program, I think.
4     Q.    What do you -- do you recall
5     generally what this was about?
6     A.    No.
7     Q.    Well, in the next e-mail Terrie
8     writes to you, "Karen - how many times did we
9     tell Gene that we could not endorse their
10    program."
11          Who do you think she was
12    referring to there?
13    A.    She was referring to
14    Mr. Gregory at UEP.
15    Q.    And she says, "This is really
16    outrageous."
17          What did you understand her to
18    mean when she wrote that?
19    A.    Well, I don't know what was in
20    the brochure, so I don't know specifically
21    what she was referring to.
22    Q.    Do you think that this is --
23    A.    I don't recall what was in the
24    brochure.
25    Q.    Is it consistent with the other

74  (Pages 290 to 293)

294

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  communications that we looked at that, that
3  UEP was attempting to push its own
4  certification program?
5          MR. MCKENNEY:  Objection to
6      form.
7          MS. SUMNER:  Objection to the
8      form of the question.
9          MR. WILDERS:  Let me withdraw
10      that question.  That really was a bad
11      question.
12  BY MR. WILDERS:
13      Q.    Was there ever a period of time
14  while you were at FMI when UEP was
15  misrepresenting that FMI -- let me back up.
16          Was there ever a time when you
17  were at FMI, that you can recall, where UEP
18  was representing that FMI had endorsed their
19  certified program?
20      A.    I don't recall specifically.
21      Q.    If you could pull out
22  Exhibit 31, please.  Do you recall being
23  asked some questions about Exhibit 31 when
24  Ms. Sumner was questioning you?
25      A.    Yes, but I don't remember what

295

1  they were.
2      Q.    She had asked you some
3  questions about something called backfilling.
4      A.    Oh.
5      Q.    Do you recall that?
6      A.    Yes, I recall the question.
7      Q.    Do you know whether the FMI
8  Scientific Advisory Committee ever took an
9  opinion on the concept of backfilling?
10      A.    I don't recall.  As I stated
11  before, I am not familiar with the term.  I
12  don't remember it being discussed in our
13  meetings by that term.  I didn't see it on
14  any documents today that were shown to me as
15  summaries of those meetings.
16          MR. WILDERS:  Let's go off the
17      record for a second.  I think I might
18      be finished.  Let me just take a quick
19      look.
20          VIDEOGRAPHER:  Off the record at
21      5:24.
22          - - -
23          (A recess was taken.)
24          - - -

296

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          VIDEOGRAPHER:  We're back on the
3      record at 5:38.
4  BY MR. WILDERS:
5      Q.    Ms. Brown, I just have a small
6  set of questions left for you and I'll turn
7  it over to someone else.
8          Let me hand you Exhibit 41.  I
9  think Ms. Sumner wants to make a record
10  before I ask you a couple of questions.
11          MR. BARNES:  Would you speak up,
12      Counsel?
13          MR. WILDERS:  I'm sorry.  Yes.
14      I handed the Exhibit 41 to the
15      witness.  It's UE295185.
16          MS. SUMNER:  This is a document
17      that has been produced as -- by UEP
18      with a confidential designation.
19      There has been a request that UEP
20      waive with respect to this witness.
21      UEP is prepared to do that under
22      paragraph 12 of the protective order
23      which limits the waiver to this
24      witness and this witness only.
25  BY MR. WILDERS:

297

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Exhibit 38, is this a letter
3  from Frank Bryant at SES to Gene Gregory?
4          MS. SUMNER:  Is this 38 or 41?
5          THE WITNESS:  41.
6          MR. WILDERS:  I'm sorry, I
7      skipped some exhibits.  It's 38.
8          MR. BARNES:  We have a 38.
9          MR. WILDERS:  It's Exhibit 39.
10          MR. BARNES:  Not 41?
11          MR. WILDERS:  39.  Thank you.
12      Sorry for the confusion.  Just hand
13      that back to me.
14          - - -
15          (Exhibit Brown-39, 9/22/03
16      Letter, Bates UE295185, was marked for
17      identification.
18          - - -
19  BY MR. WILDERS:
20      Q.    It's getting late for all of
21  us.
22          Ms. Brown, my question was, is
23  this a September 22, 2003, letter from Frank
24  Bryant at SES to Gene Gregory at UEP?
25      A.    It appears to be.

298

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2     Q.    You note at the bottom, is this
3  a letter that you were cc'd on as senior vice
4  president at FMI?
5     A.    Yes.
6     Q.    Take a moment, do you recall
7  receiving this letter?
8     A.    No.
9     Q.    If you were to look there at
10 the very last paragraph.
11    A.    Yes.
12    Q.    Let's start with the first
13 paragraph, it says, "Dear Mr. Gregory, I
14 would like to clarify several issues relative
15 to the Animal Welfare Audit Program (AWAP)
16 developed by the National Council of Chain
17 Restaurants (NCCR) and the Food Marketing
18 Institute (FMI)."
19          Did I read that correctly?
20    A.    Yes.
21    Q.    And then the last paragraph
22 states, "The second issue deals with the
23 relationship between the AWAP audit and the
24 United Egg Producers (UEP) Animal Care
25 Certified audit."  It goes down, in the last

299

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2  sentence there it says, "Neither NCCR nor FMI
3  have determined that an Animal Care Certified
4  audit is equivalent to or should replace an
5  AWAP audit, suggesting equivalency is
6  misleading and incorrect."
7          Did I read that correctly?
8     A.    Yes.
9     Q.    Was there a period of time when
10 UEP was misrepresenting the equivalency
11 between an AWAP audit and a UEP certified
12 audit?
13          MS. SUMNER:  Object to the form.
14          THE WITNESS:  That is stated in
15    this letter.
16 BY MR. WILDERS:
17    Q.    Do you have a recollection of
18 that fact?
19    A.    I know that there were
20 differences between the two audits, and there
21 was discussion on how to remove the
22 differences.
23    Q.    Was there ever any -- was UEP
24 ever misrepresenting that there were not
25 differences between the two audits?

300

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. MCKENNEY:  Objection to
3    form.
4          THE WITNESS:  I don't recall.
5  BY MR. WILDERS:
6     Q.    Was one of the differences the
7  fact that the UEP Certified Program was a
8  pass/fail test and the AWAP audit did not
9  attempt to determine whether a producer
10 passed or failed any particular criteria?
11          MR. MCKENNEY:  Objection to
12    form.
13          MS. SUMNER:  Objection to form.
14          MR. MCKENNEY:  Leading.
15          THE WITNESS:  Now I recall that
16    AWAP was a pass/fail and ours was
17    specifically and purposely not a
18    pass/fail.
19 BY MR. WILDERS:
20    Q.    Why was it not purposely a
21 pass/fail, the FMI audit?
22    A.    From a standpoint of a trade
23 association to say that certain suppliers
24 pass or fail was an implication that we
25 didn't want to make.  We characterized it

301

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2  differently as excellent, good, acceptable
3  and needs improvement or nonconformity.  I
4  think the last term was nonconformity.
5     Q.    So you left it to your members
6  to decide --
7     A.    Correct.
8     Q.    -- what to do with the results
9  of an audit?
10    A.    Correct.
11          MR. WILDERS:  I thank you for
12    your time.  That's all the questions I
13    have right now.  I'm going to pass it
14    off to the next person here.  Okay?
15          THE WITNESS:  Okay.  Thank you.
16          MR. WILDERS:  Off the record.
17          VIDEOGRAPHER:  Off the record at
18    5:44.
19          - - -
20          (A recess was taken.)
21          - - -
22          VIDEOGRAPHER:  We're back on the
23    record at 5:46.
24          - - -
25          EXAMINATION

76  (Pages 298 to 301)

302

```
 1      KAREN BROWN - HIGHLY CONFIDENTIAL
 2                - - -
 3  BY MR. RANDALL:
 4      Q.    Good evening, Ms. Brown.  My
 5  name is Sam Randall, and I represent the
 6  Kroger plaintiffs in this case.  That's
 7  Kroger, Safeway, Albertsons and some other
 8  FMI members.
 9           I just wanted to start off by
10  reviewing some of -- I had some follow-up
11  questions on some of the documents that you
12  were shown previously.
13      A.    Okay.
14      Q.    So we can do these in order to
15  make it go more easily.  Can we start off
16  with Exhibit 2?  Would it be easier to go in
17  reverse order?
18      A.    No, it's okay.  Are you going
19  to do this one, too?
20      Q.    No.
21           Could you review the second
22  paragraph of this article that you wrote
23  starting with "Retailers are far removed..."?
24      A.    Would you like me to read it
25  out loud or look at it?
```

303

```
 1      KAREN BROWN - HIGHLY CONFIDENTIAL
 2      Q.    Just read it to yourself.
 3      A.    [Reviewing document.]
 4           Thank you.  I read it.
 5      Q.    Would you continue to agree
 6  today that retailers are far removed from
 7  live animal processes?
 8      A.    Yes.
 9      Q.    Would you continue to agree
10  that retailers have limited ways of knowing
11  or monitoring the conditions under which
12  animals are raised or produced?
13      A.    At the time that I was involved
14  in the industry, yes.
15      Q.    From your time in the industry,
16  would it be fair to -- would it be a fair
17  characterization of the retailers to say that
18  they don't have much knowledge about the
19  specific nitty-gritty of egg farming?
20           MS. SUMNER:  Objection.
21  Leading.
22           THE WITNESS:  Yes, because
23      they're merchants, but not farmers or
24      producers.  And they're not product
25      process specific.
```

304

```
 1      KAREN BROWN - HIGHLY CONFIDENTIAL
 2  BY MR. RANDALL:
 3      Q.    There have been some terms
 4  thrown out today that you don't have
 5  knowledge about, backfilling, for instance.
 6  Would that also be true of FMI members?
 7           MS. SUMNER:  Object to the form.
 8           MR. MCKENNEY:  Objection.
 9      Leading.
10           MS. SUMNER:  Lacks foundation.
11           THE WITNESS:  I'm not sure I
12      understand the question.
13  BY MR. RANDALL:
14      Q.    Do you believe that the term,
15  for instance, "backfilling" is widely known
16  as to its meaning within FMI's membership?
17           MS. SUMNER:  Object to the form.
18           THE WITNESS:  I have no idea of
19      knowing, but I don't recall any
20      conversation I had with an FMI member
21      using that term.
22  BY MR. RANDALL:
23      Q.    That's all I have about that
24  document.
25           The next one is Exhibit 5.
```

305

```
 1      KAREN BROWN - HIGHLY CONFIDENTIAL
 2      A.    I have it.
 3      Q.    Were members of the egg
 4  industry including UEP placing pressure on
 5  FMI members to support the UEP standards?
 6           MR. MCKENNEY:  Objection to
 7      form.
 8           THE WITNESS:  They definitely
 9      were communicating their enthusiastic
10      interest in having FMI members
11      participate or require participation
12      in the program.
13  BY MR. RANDALL:
14      Q.    Why do you think that was?
15           MS. SUMNER:  Objection.
16           THE WITNESS:  I think it was
17      important to them and they felt it was
18      important to the success of their
19      program.
20  BY MR. RANDALL:
21      Q.    Did it go the other way around,
22  can you think of specific FMI members placing
23  pressure on the UEP to implement specific
24  guidelines?
25      A.    No.  Those would have been
```

77  (Pages 302 to 305)

306

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   conversations that they would have had
3   individually with their own suppliers if they
4   decided to do that.
5      Q.   In general terms, what was --
6      A.   To my knowledge anyway.  As far
7   as I know.
8      Q.   In general terms, what was the
9   goal of FMI's membership in initiating this
10  process with respect to animal welfare?
11     A.   The primary goal, because they
12  knew that consumers were looking to them --
13  the retailer is very visible and very
14  accessible to the general public.  There is
15  no way that really they can run and hide.
16  People are in their stores every day and they
17  hear from their customers on a daily basis
18  about what it is they like and what they
19  don't like.  When issues become priority
20  issues because of media and other public
21  attention to it, the retailer hears about it,
22  and within that context, the retailer's goal
23  with animal welfare was to assure that
24  animals in the agriculture system used as
25  food would be raised, transported and

307

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   processed in a safe manner that was free from
3   abuse and neglect.
4      Q.   And in these meetings that you
5   had with UEP and UEP membership, did you ever
6   represent that you were communicating
7   specific messages from specific UEP
8   members -- I'm sorry, from specific FMI
9   members?
10     A.   No.  We talked about it from
11  the standpoint of the royal we.  We as the
12  retailer of the association representing the
13  retail industry, here is our policy and
14  program developed and approved by our Board.
15  This was the basis of our conversations with
16  everybody on the issue.
17     Q.   And let's use Kroger as an
18  example.  Did you ever say anything in these
19  meetings that would have given the impression
20  that you were speaking for Kroger?
21     A.   We always spoke on behalf of
22  the industry in general and our members as a
23  group.  If an individual member for some
24  reason wanted to come to a meeting, I don't
25  recall Kroger ever doing that, then that was

308

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   their prerogative and they could attend the
3   meeting.  But I mean, a meeting without --
4   with stakeholders.
5      Q.   And did you ever give the
6   indication that Kroger agreed with positions
7   that you were taking or would take?
8      A.   Kroger was a long-time member
9   of FMI and was on our board and their
10  executives participated in our member
11  committee, so within that context, yes.
12     Q.   Did Kroger -- did you get the
13  impression that Kroger's acceptance of the
14  UEP program was up to Kroger?
15     A.   Absolutely.
16     Q.   Was it -- was that the case for
17  all FMI members?
18     A.   Absolutely.
19     Q.   Would that have been clear to
20  anybody attending these meetings with FMI and
21  UEP?
22     A.   Yes.
23     MR. BARNES:  Object to the form.
24  BY MR. RANDALL:
25     Q.   That's all for that document.

309

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      We're going to skip ahead to
3   Exhibit 16.  Just by way of background, I'll
4   represent to you that this was produced by
5   Midwest Poultry in this case.
6      A.   Okay.
7      Q.   Do you have any idea who wrote
8   this document?
9      A.   No.
10     Q.   Was it anybody from FMI?
11     A.   No.
12     Q.   I'd like you to refer to point
13  8 on this document where it says, "Tim
14  Hammond - FMI will work with UEP to push the
15  FMI members to accept and implement
16  guidelines."
17      Is that how Tim Hammonds
18  characterized this meeting with members of
19  UEP?
20     A.   Not in my presence.  Not to my
21  knowledge.
22     Q.   Is that how you would have
23  characterized --
24     A.   No.
25     Q.   -- this -- sorry.  Is that how

78  (Pages 306 to 309)

310

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2  you would have characterized this meeting?
3          MR. MCKENNEY:  Objection to
4      form.
5          THE WITNESS:  No.  The term
6      "push" implies we were going to tell
7      our members what to do, and that was
8      not a part of FMI's mission.
9  BY MR. RANDALL:
10     Q.    Do you recall Tim Hammonds ever
11 saying that he was going to push FMI members
12 to do anything?
13     A.    No.
14     Q.    Other than pay their dues
15 maybe?
16     A.    Right.  No.
17     Q.    Do you recall specifically Tim
18 Hammonds pushing FMI members to accept and
19 implement the UEP guidelines?
20     A.    No.
21     Q.    Did you get the impression from
22 these meetings that UEP felt the need to push
23 for acceptance of these guidelines?
24         MS. SUMNER:  Object to the form
25     of the question.

311

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          THE WITNESS:  As I stated
3      before, UEP was very enthusiastic
4      about communicating their desire that
5      everybody involved in egg laying on
6      all sides support their program.
7  BY MR. RANDALL:
8      Q.    Now let's go to Exhibit 17.  In
9  particular, I want to start at page 902 of
10 this document.
11     A.    Okay.
12     Q.    Do you know what UEP's
13 Scientific Committee was?
14     A.    Yes.
15     Q.    Do you recall generally what
16 their recommendations were with respect to
17 animal welfare?
18         MS. SUMNER:  Objection.
19         THE WITNESS:  I know what their
20     recommendations were as they are
21     contained in these printed documents
22     such as Brown-31, FMI-000386 which is
23     the 2006 edition of the UEP guidelines
24     for U.S. egg laying flocks.
25 BY MR. RANDALL:

312

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Do you know whether the UEP's
3  Scientific Committee's recommendations
4  necessarily became part of the UEP
5  guidelines?
6          MR. MCKENNEY:  Objection to
7      form.
8          THE WITNESS:  I wasn't a party
9      to their discussions so I don't know
10     what would have been accepted and what
11     would have been not accepted on the
12     part of what the advisory committee
13     was recommending.
14 BY MR. RANDALL:
15     Q.    Did you know that the UEP
16 Scientific Committee did not provide for a
17 phase-in period for the cage space
18 guidelines?
19         MS. SUMNER:  Objection.  Lacks
20     foundation.
21         THE WITNESS:  I did not know
22     that.
23         MR. MCKENNEY:  Objection to
24     form.  Mischaracterizes the record.
25 BY MR. RANDALL:

313

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Now, based on my representation
3  to you that the UEP Scientific Committee did
4  not provide for a phase-in period, does that
5  provide any context for this paragraph, the
6  second full paragraph on page 902?
7          MR. BARNES:  Object to the form.
8          THE WITNESS:  Is this the
9      paragraph that starts with "The
10     current program..."?
11 BY MR. RANDALL:
12     Q.    Yes, that paragraph.
13     A.    Okay.  Would you repeat the
14 question again?  I'm sorry.  It's getting
15 late for me, too.
16     Q.    I'll read the paragraph.  It
17 says, "The current program as proposed meets
18 current Industry Equipment needs and does not
19 create Guidelines that are either 'impossible
20 or unattainable'.  Based upon existing
21 equipment and existing density, meeting the
22 Scientific Committee's target could reduce
23 house capacity and the U.S. Egg Supply by a
24 minimum of 12 to as much as 44%."
25         Did I read that paragraph

314

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  accurately?
3  A.  Yes.  So I don't know about
4  this.  I mean, this is from the UEP
5  Scientific Committee recommending something.
6  And UEP, as I read this, is saying that's
7  difficult.
8  Q.  As a matter of flock
9  disruption, does it make sense that there
10  would be a substantially greater flock
11  disruption if the egg industry were to go
12  from its then existing cage space guidelines
13  to 67 square inches immediately?
14  A.  I don't know the answer to that
15  question.  I just don't -- I don't have the
16  background or the knowledge to answer that
17  question.
18  Q.  In context, do you know whether
19  the document is referring to the flock
20  disruption by the actual UEP guidelines or by
21  the recommendations from the Scientific
22  Committee?
23  MS. SUMNER:  Objection to form.
24  THE WITNESS:  I'm sorry, can you
25  repeat that one more time?  I'm sorry.

315

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  BY MR. RANDALL:
3  Q.  Do you know whether the
4  document is referring to the disruption in
5  the nation's flock based on the UEP
6  guidelines as they were proposed or based on
7  the Scientific Committee's recommendations to
8  UEP?
9  MS. SUMNER:  Object to the form
10  of the question.
11  THE WITNESS:  I don't have any
12  specific knowledge about this
13  discussion or this issue as is laid
14  out here.  I only know what I read.
15  So this, as I read it, is a
16  recommendation from their Scientific
17  Committee, and UEP is stating they
18  have problems with it.
19  BY MR. RANDALL:
20  Q.  Going to the next page of the
21  document, do you see where it says, "Based
22  upon existing equipment and existing density,
23  meeting the Scientific Committee's target
24  could reduce house capacity and the U.S. Egg
25  Supply by a minimum of 12 to as much as 44%"?

316

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  A.  I see that paragraph.
3  Q.  And then below that it says,
4  "New construction will be required to avoid
5  this market disruption."
6  A.  I see that sentence.
7  Q.  Would it have changed your
8  perceptions about the UEP program if you knew
9  that UEP would encourage members not to build
10  new houses to replace the displaced hens?
11  MS. SUMNER:  Objection to form.
12  Lacks foundation.
13  THE WITNESS:  Again, our focus
14  was on the humane handling of animals.
15  Space allocation was a significant
16  issue when it came to egg laying hens.
17  The system needed to be improved and
18  it was the feeling of our scientific
19  committee, some of whom sat on the UEP
20  Scientific Committee, although we
21  didn't have discussions back and forth
22  about the committee meetings, that
23  they needed to shorten their time
24  frame.  That's basically it.
25  BY MR. RANDALL:

317

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  Q.  Keep that document there for a
3  second and also bring out Exhibit 22.
4  A.  I have it.
5  Q.  Do you see in the middle of the
6  second paragraph it says, "We intend to
7  deliver on our commitment to provide you with
8  a program that will prove meaningful and
9  orderly with little or no market
10  disruptions."
11  A.  I see that paragraph.
12  Q.  And then compare that to the
13  Exhibit 17 where it says, "New construction
14  will be required to avoid this market
15  disruption."
16  A.  Okay.
17  Q.  Do you believe that UEP was
18  making a commitment to minimize any market
19  effects that the implementation of the UEP
20  program would have?
21  A.  I really don't know the answer
22  to that question.  I would have to take it at
23  face value.  As I said before, we always had
24  a healthy skepticism when suppliers would
25  list reasons why something couldn't be

318

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2    achieved.  But I'm not an economist, I'm not
3    an animal -- I'm not an agriculture expert.
4    I'm not an expert on egg laying.  I really
5    can't answer that question.
6          Q.    Was it important to FMI's
7    membership that there not be market
8    disruptions?
9          A.    Of course FMI's membership
10   wanted to be sure that they had all the
11   products available in their stores that
12   consumers wanted to buy.
13         Q.    So would that promise to
14   provide FMI with a program that will prove
15   meaningful and orderly with little or no
16   market disruptions, would that have been
17   important to FMI's members?
18         MR. MCKENNEY:  Objection to
19   form.
20         THE WITNESS:  The way this is
21   stated is pretty general, and it
22   doesn't have a lot of specifics in it.
23   It's certainly the one -- you know,
24   it's the kind of statement that
25   anybody would think would be a good

319

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2    statement.
3    BY MR. RANDALL:
4          Q.    Is discouraging members from
5    building new henhouses consistent with that
6    promise?
7          MS. SUMNER:  Object to the form.
8          THE WITNESS:  I don't know the
9    answer to that question from the
10   context of what was going on
11   internally within UEP.  I really don't
12   know the answer to that question.
13   There is no -- there is certainly --
14   there were a number of things that
15   related to space allocation across a
16   number of species that would require
17   new construction.  The question was,
18   when that time would normally occur,
19   were you going to keep the animals in
20   a less humane situation than they
21   might be if you did something
22   differently.
23   BY MR. RANDALL:
24         Q.    That's all for that document.
25         Skip ahead to Exhibit 28.

320

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2          A.    Gene Gregory was very prolific.
3    Okay.
4          Q.    Now, when you responded to Mr.
5    Gregory's e-mail on or about May 3, 2005, you
6    were referring to a second set of Animal
7    Welfare Guidelines.  Right?
8          A.    Yes.
9          Q.    Had you seen --
10         A.    Well, a separate set.  Right.
11         Q.    Had you seen any alternate,
12   alternative animal welfare guidelines when
13   you responded to that?
14         A.    That were weaker than UEP, no.
15         Q.    Approximately how long after
16   Mr. Gregory sent that e-mail did you respond?
17         A.    It says a day later.
18         Q.    That's all for that document.
19         A.    By the way, the good news was
20   on the molting issue, not his whole
21   communication.
22         Q.    One more question about market
23   disruption.  With the five-year phase-in for
24   cage space guidelines, did you believe that
25   the egg producers could avoid any disruption

321

1          KAREN BROWN - HIGHLY CONFIDENTIAL
2    to the market?
3          A.    Again, we didn't get into those
4    kinds of specific conversations.  We just --
5    we didn't.  They either said they could do it
6    or they said they couldn't do it.
7          Q.    You've spoken generally with
8    Mr. Patton what was it, a few years ago?
9          A.    Uh-huh.  At least a year ago.
10   Maybe more.
11         Q.    Do you understand generally the
12   allegations that are being made by the
13   plaintiffs in this case?
14         A.    I understand a lot more today
15   than I did before I spoke to Mr. Patton.
16         Q.    Do you also understand that
17   certain defendants are also claiming that
18   some of FMI's members have committed fraud by
19   supporting the Animal Welfare Guidelines
20   between 2000 and today?
21         MR. BARNES:  Object to the form.
22         THE WITNESS:  I don't know about
23   that.
24         MR. BARNES:  Object to the form.
25   BY MR. RANDALL:

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

322

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    Do you believe there is
3    anything inconsistent between the -- FMI's
4    position as to animal welfare and FMI's
5    members' positions as to animal welfare and
6    their representations of price fixing that
7    you're familiar with that you've heard today?
8         MR. MCKENNEY: Object to the
9         form. Objection to the form. Calls
10        for speculation.
11        THE WITNESS: Okay. Let's take
12        the members and FMI's position on
13        animal welfare. FMI's members and our
14        position have a common goal. How that
15        is implemented between retailer and
16        supplier falls into this area of terms
17        of trade which FMI has no knowledge or
18        appropriate interest in. So that
19        is -- you know, our goals are common.
20        How the goals get implemented
21        individually by individual companies
22        for a voluntary program is exactly
23        that, individual companies will make
24        individual decisions on how they're
25        going to use a voluntary program and

323

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2         which components of that program
3         they're going to buy into. But the
4         common goal of improving and enhancing
5         animal welfare was definitely across
6         the board with FMI members.
7    BY MR. RANDALL:
8    Q.    Did you ever inform UEP that
9    you were supporting efforts to reduce the
10   domestic flock size for egg laying hens?
11   A.    We would never have made that
12   kind of a statement. I'd be fired.
13   Q.    Are you aware of whether any
14   FMI members ever made any statements to that
15   effect?
16        MS. SUMNER: Objection.
17        THE WITNESS: I'm not aware of
18        any such statements.
19   BY MR. RANDALL:
20   Q.    Did you ever inform FMI's
21   membership that the UEP guidelines would lead
22   to a reduction in the domestic flock of egg
23   laying hens?
24   A.    I don't recall ever doing that
25   myself. I don't recall. I mean, I -- it

324

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    would be highly unusual for me to do that.
3    Q.    If you had known so, would you
4    have done that in writing?
5    A.    I hope not.
6         MR. GREEN: You might want to
7         clarify that.
8         THE WITNESS: I meant that as a
9         joke. Only within the context of all
10        the pieces of paper I see here where I
11        wouldn't have written those things.
12        No, I would not have done that. I
13        would not have made that statement to
14        our members directly and I would not
15        have put it in writing.
16   BY MR. RANDALL:
17   Q.    Did you intend to encourage the
18   egg producers to reduce the domestic flock of
19   egg laying hens?
20   A.    No.
21   Q.    Do you believe anything that
22   you said or that FMI said to UEP could be
23   construed as encouraging that?
24        MR. BARNES: Objection to form.
25        Speculation.

325

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2         MR. MCKENNEY: Objection.
3         THE WITNESS: No. All we were
4         talking to UEP about was their
5         guidelines as analyzed by our expert
6         advisory committee and what the expert
7         advisory committee's recommendations
8         were to the UEP in the areas where
9         they needed to improve them and the
10        areas where they had done a good job.
11   BY MR. RANDALL:
12   Q.    Speaking generally, can an
13   animal welfare program actually increase
14   productivity of animals?
15   A.    I'm not -- I don't have the
16   standing to make a statement on that.
17   Q.    Now, you've heard a little bit
18   about what's been called the 100 percent rule
19   today. Do you have an understanding now and
20   a memory of what that rule is?
21   A.    I do.
22        MR. BARNES: Objection.
23        Repetitive. This witness has been
24        asked that question repeatedly. She
25        previously testified she gets

326

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      irritated when asked repetitive
3      questions.  So do it at your own risk.
4      I object.
5          MR. RANDALL:  Thank you.  I
6      appreciate the warning.
7   BY MR. RANDALL:
8      Q.    With that in mind, did you
9   ever -- did you or FMI ever endorse the
10  100 percent rule?
11     A.    Not to my knowledge.  We
12  endorsed their -- our experts endorsed their
13  guidelines.  We did not get into endorsing
14  the execution of their program.
15     Q.    Was the 100 percent rule ever
16  part of the UEP guidelines as distinct from
17  the UEP program?
18         MS. SUMNER:  Objection.
19         MR. BARNES:  Objection to form.
20         THE WITNESS:  I have to admit
21     that I haven't read every single word
22     in every single document of UEP's, of
23     their guidelines.  I don't remember
24     seeing it in there.
25  BY MR. RANDALL:

327

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      Q.    Are you aware of any of FMI's
3   members ever endorsing the 100 percent rule?
4      A.    Not that I'm aware of.
5      Q.    Did FMI ever endorse the band
6   on what's known as backfilling?
7          MR. BARNES:  Objection.  The
8      witness testified she doesn't know
9      what backfilling is.
10         THE WITNESS:  I'm not sure what
11     backfilling is.  I could speculate and
12     I'm not.  But I can only speculate
13     after reading it here today.  I don't
14     know if -- I don't know the term.  We
15     didn't endorse specific parts -- our
16     experts didn't endorse specific parts
17     of the guidelines.  They basically
18     pointed out those areas in the
19     guidelines that needed improvement.
20  BY MR. RANDALL:
21     Q.    If FMI had endorsed something,
22  do you believe you would have understood what
23  it meant to make that endorsement?
24     A.    Yes.
25     Q.    So do you think the fact that

328

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2      you don't sitting here today know what
3      backfilling means --
4      A.    I don't understand the term.
5      Q.    Okay.
6      A.    You know, it's like the news
7   media doesn't understand the term slotting
8   allowances or whatever, you know.  I mean,
9   there are call kinds of terms within the
10  industry that mean something to the industry
11  participants but may not mean anything to
12  somebody outside of the industry.  Even
13  though I know a lot about the food industry
14  in general, backfilling is not a term I'm
15  familiar with.  I can only speculate, and I
16  will not.
17     Q.    But as you understand what the
18  FMI did or did not endorse, backfilling is
19  not a part of it?
20     A.    Not specifically.
21         MR. BARNES:  Objection to form.
22         THE WITNESS:  I don't see it on
23     any of those pieces of paper except
24     for in this UEP document.  That's the
25     only place I see it.

329

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   BY MR. RANDALL:
3      Q.    Was FMI's overarching purpose
4   in promoting best practices to assure the
5   humane treatment of farm animals?
6      A.    Yes.
7      Q.    Do you know what a flock
8   reduction is?
9      A.    Fewer chickens in the flock.
10     Q.    What does it mean to you, a 5
11  percent flock reduction?
12     A.    If you got 100 chickens, you
13  end up with 95.
14     Q.    Now, were you aware that UEP
15  and UEP members coordinated at various times
16  joint efforts to reduce their flock sizes by
17  5 percent?
18     A.    Absolutely not.
19         MS. SUMNER:  Object to the form.
20  BY MR. RANDALL:
21     Q.    Did you ever endorse that
22  practice?
23     A.    No.
24         MS. SUMNER:  Objection.
25  BY MR. RANDALL:

83  (Pages 326 to 329)

330

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    Q.    Based on your understanding of
3  a flock reduction, how do you believe that
4  would be implemented?
5         MS. SUMNER:  Objection.
6         THE WITNESS:  I haven't a clue.
7  BY MR. RANDALL:
8    Q.    How would you go from 100 hens
9  to 95?
10         MS. SUMNER:  Objection.
11         THE WITNESS:  You can have some
12      die because they're all stuffed
13      together in the same cage.
14  BY MR. RANDALL:
15    Q.    Would that be consistent with
16  animal welfare in your opinion?
17         MR. MCKENNEY:  Objection to
18      form.
19         THE WITNESS:  That is one of the
20      concerns when it comes to space
21      allocation for egg laying hens.
22  BY MR. RANDALL:
23    Q.    Were you ever told that the UEP
24  was encouraging its members to pass on the
25  costs of implementing the UEP program to egg

331

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  purchasers?
3         MS. SUMNER:  Object to the form
4      of the question.
5         THE WITNESS:  No, I never had
6      any conversations like that.
7  BY MR. RANDALL:
8    Q.    Would you have supported those
9  efforts if you knew about them?
10    A.    No.
11    Q.    Do you know what forced molting
12  is?
13    A.    Yes.
14    Q.    What is forced molting?
15    A.    You starve the chicken so that
16  it will lay eggs faster.
17    Q.    Do you believe that forced
18  molting is consistent with animal welfare?
19    A.    No.
20    Q.    What was the UEP -- sorry, what
21  was the FMI's position on forced molting?
22    A.    Our expert said it should be
23  eliminated.
24    Q.    Were you aware that the UEP at
25  various times was encouraging molts of

332

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2  flocks?
3         MS. SUMNER:  Object to the form
4      of the question.
5         THE WITNESS:  Forced molting as
6      we learned from our experts was a
7      common practice across the industry,
8      and it was one of the practices that
9      they highlighted as inhumane to
10      animals.
11  BY MR. RANDALL:
12    Q.    So would FMI's endorsement have
13  extended to an early molt or a forced molt of
14  a flock?
15    A.    We identify that as one of our
16  significant exceptions to their guidelines
17  early on.
18         MR. RANDALL:  We can go off the
19      record.
20         VIDEOGRAPHER:  Off the record at
21      6:22.
22            -  -  -
23         (A recess was taken.)
24            -  -  -
25         VIDEOGRAPHER:  Back on the

333

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2      record at 6:23.
3            -  -  -
4         FURTHER EXAMINATION
5            -  -  -
6  BY MS. SUMNER:
7    Q.    Ms. Brown, you were shown a
8  couple of e-mails from -- that you received
9  from Gene Gregory at various points in time
10  by Mr. Wilders.  Do you recall those?
11    A.    Yes.
12    Q.    Did Mr. Gregory's e-mail change
13  FMI's conduct in any way?
14         MR. WILDERS:  The e-mail that
15      she was shown?
16         THE WITNESS:  Can you be more
17      specific?  All of his e-mails
18      together, one of his e-mails in
19      particular or, you know, a particular
20      statement?  His e-mails covered a lot
21      of different topics and subjects.
22  BY MS. SUMNER:
23    Q.    Let me just show you the ones
24  we're referring to specifically.  Mr. Wilders
25  marked for you e-mails at Exhibits 34,

84  (Pages 330 to 333)

334

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   Brown-34, Brown-35, and Brown-36, and
3   Brown-37.
4        A.    Okay.
5        Q.    My question is simply, did FMI
6   do what Gene was asking them to do in
7   response to any of these e-mails?
8        A.    No.  Well, I mean, I would have
9   to go through each individual e-mail.  When
10  he was asking us to share with our members
11  specific information about, you know, what
12  was going on within their own membership that
13  they didn't like, no.  To share information
14  about pricing or flock reduction, or that
15  kind of stuff, no.  In Tim's e-mail, his
16  response on the 100 percent rule was, you
17  know, we support your guideline program and
18  we're not going to insert ourself any further
19  in your own association governance.
20       Q.    You were asked a couple of
21  questions about phase-in issues and market
22  disruption issues, how consideration was
23  given to whether or on what schedule animal
24  welfare guidelines could be implemented and
25  the effect that implementing those guidelines

335

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   might have on the market.  Do you recall that
3   questioning?
4        A.    Yes.
5        Q.    My question is, are those
6   issues that were faced by all species
7   considering animal welfare initiatives?
8             MR. PATTON:  Objection.  Vague.
9             THE WITNESS:  You know, I don't
10       know how to answer that question.
11       Each species is different.  Each issue
12       that they had to deal with was
13       different.  We did not have market
14       disruption pricing discussions, flock
15       or herd reduction conversations with
16       other organizations.  Those were not
17       the kinds of things that other
18       organizations brought up frankly.
19  BY MS. SUMNER:
20       Q.    I think you had mentioned
21  specifically or referenced specifically
22  building new facilities and that that might
23  be required to address space for various
24  species.  Correct?
25       A.    Yes, but I didn't put it in the

336

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   context of market disruption.  You asked if
3   it would affect cost, and the question is --
4        Q.    Let me just reask the question.
5        A.    -- how does that fit into their
6   business plan.
7        Q.    You referenced specifically
8   building new facilities.  Correct?
9        A.    Correct.
10       Q.    And that was an issue that was
11  faced by all of the species considering
12  animal welfare?
13       A.    Not necessarily.  If you were a
14  cattle rancher, it wouldn't necessarily apply
15  to you.  If you were a pig farmer, yes, that
16  could be an issue for you.  As far as
17  pregnant sows, it depends upon what kind of
18  housing you had.  Broiler chickens are not in
19  cages.  They're running free inside of huge
20  houses, they're out in the field.  So, you
21  know, each species is completely different.
22       Q.    Fair to say it was an issue
23  that was faced by species other than egg
24  laying hens?
25       A.    There is -- was an issue with

337

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2   pregnant sows, yes.
3        Q.    And are you aware that FMI's
4   members conduct their own animal welfare
5   audits?
6        A.    I'm not aware specifically, but
7   I'm not surprised.
8        Q.    Was the structure of the FMI
9   animal welfare program audit component that a
10  retailer had to request an audit of a
11  supplier?
12       A.    Our hope was that the producers
13  would go through the audits, the information
14  would be made -- they would have an
15  opportunity to correct any non-conformances,
16  the information would be made available on a
17  confidential Web site that you had to have a
18  password to get into and that through that
19  method FMI members could go on that Web site
20  and determine what the result of the audit
21  was.  And the reason for that particular way
22  of laying it out was to reduce multiple
23  audits multiple times by multiple companies
24  on the same producer.
25       Q.    Let me ask the question maybe

338

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  more clearly. Under the FMI program, an
3  audit was done when a retailer requested that
4  the audit be done. Correct?
5     MR. PATTON: Object to the form.
6     THE WITNESS: Pardon me?
7     MR. PATTON: I objected to the
8  form. It's leading.
9     THE WITNESS: Ask the question
10  again.
11 BY MS. SUMNER:
12    Q.    Under the FMI audit program, am
13 I correct that an audit was done at the
14 request of a retailer?
15    A.    It could have been. But that
16 was not required.
17    Q.    Do you know whether any
18 retailers requested audits --
19    A.    I don't.
20    Q.    -- be done under the FMI audit
21 program?
22    A.    I don't recall. I know that
23 some producers undertook audits.
24    Q.    Can you pull out Brown-39,
25 please. This is the letter that was marked

339

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  from SES to Gene Gregory.
3     A.    Okay. Brown-39. It's not the
4  official one. Okay. I know it's been 12
5  years since I've seen these documents so you
6  have to bear with me. I don't remember every
7  word on all of them or even recall getting
8  any of them. I have it.
9     Q.    I want to direct your attention
10 to the second paragraph, last two sentences,
11 Mr. Bryant from SES wrote "AWAP...," and
12 that's the FMI-NCCR animal welfare program.
13 Correct?
14    A.    That's the audit.
15    Q.    "...is an NCCR and FMI program,
16 not an SES program." Is that accurate?
17    A.    He was speaking to the
18 guidelines themselves. SES had nothing to do
19 with developing the guidelines. Their job
20 was to take the guidelines, develop training
21 materials around them, develop checklists and
22 certify auditors based on specific criteria
23 and experience in animal welfare and animal
24 husbandry and help execute the audits.
25    Q.    What he wrote there was the

340

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  Animal Welfare Audit Program is an NCCR and
3  FMI program, not an SES program. Is that
4  accurate?
5     MR. WILDERS: Asked and
6  answered.
7     THE WITNESS: We're talking
8  about semantics here, and I'll tell
9  you quite frankly, I'm not sure of the
10  context in which Frank Bryant was
11  responding to Mr. Gregory. It sounds
12  as if he's concerned about something
13  that Mr. Gregory has implied or said.
14  So I really can't answer your
15  question.
16 BY MS. SUMNER:
17    Q.    FMI and UEP worked together on
18 FMI's animal welfare program. Correct?
19    MR. PATTON: Objection. Leading
20  and vague.
21    THE WITNESS: Not exactly. We
22  collaborated on the program from the
23  context of we shared with -- UEP
24  shared with us their guidelines. We
25  shared with them the results of the

341

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2  review and recommendations of our
3  animal welfare experts. If they had
4  questions about certain things or
5  wanted to explain certain procedures
6  to us, we gave them that opportunity.
7  In some cases they were technical
8  issues. We would make sure that there
9  was one of our expert advisors there
10  who was knowledgeable about their
11  industry. So that is the process by
12  which we collaborated.
13 BY MS. SUMNER:
14    Q.    And that collaboration was the
15 basis of the industry-wide approach that FMI
16 advocated and that we talked about earlier
17 this morning. Correct?
18    MR. WILDERS: Objection.
19  Leading. Vague.
20    THE WITNESS: We were not going
21  to tell our suppliers what to do, just
22  as we were not going to tell our
23  members what to do. Our role was
24  simply to put together the policy and
25  program that would enhance animal

86 (Pages 338 to 341)

342

KAREN BROWN - HIGHLY CONFIDENTIAL
1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    welfare for animals in agriculture
3    used for food.
4         MS. SUMNER:  I'm going to move
5    to strike that answer as
6    non-responsive and I'm going to ask
7    the question again.
8    BY MS. SUMNER:
9         Q.    Ms. Brown, I know we're -- it's
10   been a long day and we're really close to the
11   end, but if I can ask you to just listen to
12   the question and respond to the question, it
13   will speed us along and get us all out of
14   here.
15        MR. WILDERS:  Disagree that it
16   was not responsive.
17   BY MS. SUMNER:
18        Q.    The question was the
19   collaboration, and I'm using your word from
20   the prior answer which I would be happy to
21   read back to you, that you described between
22   FMI and UEP was the industry-wide approach
23   that we discussed earlier this morning.
24   Correct?
25        MR. WILDERS:  Asked and

343

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    answered.
3         THE WITNESS:  We used similar
4    communication tools with all of the
5    producer groups.
6    BY MS. SUMNER:
7         Q.    Again, that's not my question.
8    My question is the collaboration --
9         A.    You're talking about -- excuse
10   me.  Go ahead, finish your question.
11        Q.    I'm not talking about UEP
12   specifically.  The collaboration between UEP
13   and FMI is part of the industry-wide approach
14   that FMI embraced and that we talked about
15   earlier this morning.  Correct?
16        MR. WILDERS:  Objection.  Vague,
17   and asked and answered.
18        THE WITNESS:  You're going to
19   have to be more specific.  I'd like to
20   know what in -- what you're referring
21   to specifically that we talked about
22   this morning because this was a very
23   broad topic and there were many
24   questions that you asked about it.  So
25   I would like to know that.  And I

344

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    would also like to know specifically
3    when you talk about collaboration,
4    what elements of collaboration you are
5    asking about.
6    BY MS. SUMNER:
7         Q.    I'm using your words, Ms.
8    Brown.
9         A.    I understand that.
10        MR. PATTON:  Let her finish her
11   answer.
12        THE WITNESS:  My words were
13   related to UEP.  You're now taking it
14   in a broader context and I don't
15   understand how you're trying to ask
16   the question.  So I would like to have
17   some more specific -- more specificity
18   in your question because to me it
19   seems rather general and vague and I'm
20   not sure as to what you're asking
21   specifically.
22   BY MS. SUMNER:
23        Q.    As of June 2002, FMI
24   recommended the UEP guidelines to its
25   members.  Correct?

345

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2         A.    We did not -- what we did was
3    we informed our members that our experts
4    endorsed their guidelines.  If that is the
5    context in which we recommended it, we
6    informed our members that our experts
7    endorsed their guidelines with exceptions.
8         Q.    Do you recall that in your
9    June 2002 interim report which was made
10   publicly available and distributed to all of
11   your members you wrote that FMI recommends
12   the UEP guidelines?
13        MR. WILDERS:  Objection.
14   Misstates the testimony.
15        THE WITNESS:  Written into it,
16   yes.
17   BY MS. SUMNER:
18        Q.    I'd like you to turn to Exhibit
19   2, please.
20        MR. WILDERS:  Can we get a time
21   from the defense?  I was cut off
22   yesterday, so...
23        MR. GREEN:  Off the record.
24   Where are we timewise?
25        VIDEOGRAPHER:  Off the record at

87  (Pages 342 to 345)

346

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    6:36.
3              - - -
4        (A recess was taken.)
5              - - -
6        VIDEOGRAPHER:  Back on the
7    record at 6:38.
8    BY MS. SUMNER:
9        Q.    Ms. Brown, if you could pull
10   out Exhibit 2 which is the article that you
11   authored.  I'd like to direct your attention
12   to page 658 of that article.
13       A.    658, is that correct?
14       Q.    Yes, 658.  Are you there?
15       A.    I'm there.
16       Q.    The second full paragraph
17   begins, "As each commodity group submits its
18   own guidelines, the experts convene to review
19   the documents and supporting science and
20   references."
21            Is that an accurate statement?
22       A.    Correct.
23       Q.    Then you wrote the last
24   sentence in that paragraph, "When the experts
25   are satisfied with the content of the

347

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    guidelines, the FMI and the NCCR provide
3    public endorsement of the guideline..."
4            Is that an accurate statement?
5        MR. WILDERS:  Asked and
6    answered.
7        THE WITNESS:  As I, you know,
8    have mentioned several times, when we
9    speak of endorsement, we speak that we
10   have a group of experts who have
11   endorsed those guidelines and we are
12   endorsing their endorsement.
13   BY MS. SUMNER:
14       Q.    But that's not what your
15   article says, is it?
16       MR. WILDERS:  Objection.
17   Argumentative.
18       THE WITNESS:  It may not be what
19   the article says, but I wasn't writing
20   it for a legal treatise.
21   BY MS. SUMNER:
22       Q.    And then it says the FMI-NCCR
23   notified their respective members of the
24   availability of the guidance document and its
25   endorsed status.  Is that an accurate

348

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    statement?
3        A.    What we have -- what we did was
4    we notified our members of the availability
5    of the guidance document and also notified
6    them that those guidelines with exceptions
7    have been endorsed by our experts.
8        MS. SUMNER:  I have no further
9    questions, but I believe Mr. Barnes
10   has just a few cross-examination
11   questions.
12             - - -
13            EXAMINATION
14             - - -
15   BY MR. BARNES:
16       Q.    Mrs. Brown -- Ms. Brown, I'm
17   sorry.  I know it's been a long day.  I'll
18   try to be very brief.  I'm sorry I'm a little
19   disorganized, I was back there in the nickel
20   seats and I didn't have anything really to
21   write on, so I apologize if I stumble around
22   a little bit.
23       A.    That's okay.  I had a member
24   from the south who told me that when anybody
25   opens with that kind of friendly country boy

349

1    KAREN BROWN - HIGHLY CONFIDENTIAL
2    statement, to grab your wallet.
3        Q.    Well, talking about country
4    boys, you're fortunate today because you have
5    not only one, but two lawyers for one of
6    FMI's largest members, Kroger, participating
7    in this deposition.  You're aware of that,
8    are you not?
9        A.    I have heard that stated.
10       Q.    Are you also aware that in
11   addition to Kroger, I believe Mr. Randall
12   mentioned this, they represent Safeway,
13   another member.  Correct?
14       A.    Yes.
15       Q.    Albertsons.  Correct?
16       A.    He did mention that.
17       Q.    How about Hy-Vee, were they
18   mentioned, they represent Hy-Vee?
19       A.    I don't recall them mentioning
20   that.
21       Q.    Hy-Vee is an FMI member?
22       A.    They were when I left.
23       Q.    How about A&P, FMI member when
24   you left?
25       A.    Yes.

88  (Pages 346 to 349)

350

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    They -- you're aware that --
3    A.    They are regional chains, you
4    know.
5    Q.    Pardon me?
6    A.    They're regional chains now.
7    Q.    A&P, I know.  When I was a boy,
8    a country boy, growing up in Northeastern
9    Pennsylvania, we -- that was one of our
10   stores, an A&P.
11         How about H.E. Butt, former
12   member -- pardon me, a member when you were
13   associated with FMI?
14   A.    Part of the time I was
15   associated with FMI, when I worked on this
16   issue, H.E. Butt was not a member.
17   Q.    You're aware that the two
18   Kroger lawyers also represent H.E. Butt?
19   A.    I'm not aware of that.
20   Q.    I will make that representation
21   to you.  Now --
22   A.    Whose on the phone?
23   Q.    I have -- whose on the -- I
24   have no idea who is on the phone.
25         We've already heard testimony

351

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    that your dues are based on your member
3    sales.  Do you recall, as you sit here today,
4    and I realize you haven't been with the
5    organization for four years, but you had --
6    five years, pardon me, thank you for the
7    correction, but you had been with them for 40
8    years which is remarkable.  Do you recall as
9    you sit here today whether Kroger and Safeway
10   were two of FMI's largest dues paying
11   members?
12   A.    It would depend upon at what
13   point in time you were speaking.  The
14   original dues schedule that was developed had
15   a cap on it so that a company could not -- so
16   that there was a limit at which a company,
17   their volume even if it went above that, it
18   was a cap.  And then the dues were then
19   scaled down exponentially based on volume.
20   Q.    What was the cap?
21   A.    I don't recall specifically.
22   Q.    Generally?
23   A.    160,000 maybe.
24   Q.    When was the cap removed?
25   A.    I don't recall that

352

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    specifically.  As a matter of fact, I think
3    Ron Pearson of Hy-Vee was the chairman of FMI
4    at the time.
5    Q.    Do you recall an approximate
6    time period?
7    A.    I don't.
8    Q.    I'm just testing.
9    A.    When I retired, I walked away,
10   turned out the light and closed the door.  I
11   don't know the answer to that question.
12   Q.    I understand.  But am I correct
13   that when the cap, the dues cap was removed,
14   then members, very large members such as
15   Kroger would end up paying significantly more
16   dues than other members.  There was no cap on
17   Kroger's dues.  Right?
18   A.    The entire schedule was
19   adjusted.
20   Q.    Okay.
21   A.    So it was adjusted so that the
22   companies in the middle and the bottom, when
23   there was a cap, as their business grew,
24   their dues went up, but as the companies at
25   the cap, their business grew, their dues did

353

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    not.  So it was considered an issue of
3    fairness.
4    Q.    I understand, but the records
5    of FMI would tell us, I assume, exactly what
6    the cap was, how long it was in existence,
7    when it was taken off and what these very
8    large organizations actually paid in dues.  I
9    assume that's correct.
10        MR. WILDERS:  Objection.  Vague.
11        THE WITNESS:  I don't know.
12   BY MR. BARNES:
13   Q.    You don't know if the records
14   would show that?
15   A.    Well, I don't know -- I mean,
16   I -- member records of that nature were not
17   shared a lot internally, so I don't know the
18   answer to that question.
19   Q.    But when you were there,
20   records of that nature were kept, I assume?
21   A.    Oh, yes.
22   Q.    Do you recall that Kroger and
23   Safeway were members of FMI from let's take
24   the time period 1999 up to and including the
25   time you left the organization?

89 (Pages 350 to 353)

354

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      A.    Yes.
3      Q.    Would that be true for Safeway
4  as well?
5      A.    As I recall.
6      Q.    Albertsons?
7      A.    That would depend upon who
8  owned Albertsons at the time.  When they were
9  owned by American Stores, they were not
10 members of FMI.
11     Q.    How about SuperValu, were they
12 members from the period approximately 1999 up
13 until the time you left?
14     A.    Yes.
15     Q.    How about Associated Wholesale
16 Grocers, I almost forgot them, were they
17 members during that entire time period?
18     A.    Yes.
19     Q.    And you mentioned, I believe,
20 in response to a question, I think, that
21 there was a gentleman named Mr. Ball who was
22 a member.
23     A.    He was on our board.
24           MR. WILDERS:  Objection.  You
25     asked for extra time and now you're

355

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      replowing ground that we had in the
3      30(b)(6).
4  BY MR. BARNES:
5      Q.    We can ignore him, just answer
6  my question.
7           MR. GREEN:  Actually, I make the
8      same objection.
9  BY MR. BARNES:
10     Q.    I'm sorry, I don't want to be
11 repetitive.  Was --
12     A.    Do a better job then.
13     Q.    I'll try.  I'll try.  You keep
14 me on my toes.
15           Was Associated Wholesale
16 Grocers a member of the Board of Directors
17 during the entire time -- pardon me, from
18 approximately 1999 until the time you left?
19           MR. WILDERS:  Same objection.
20           THE WITNESS:  We had a system
21     where there was a three-year limit on
22     a member being on the board.  So you
23     came on and went off.  There was no
24     such thing as a company seat.
25  BY MR. BARNES:

356

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2      Q.    Do you know a Douglas Carolan?
3      A.    No.
4      Q.    How about a --
5      A.    That sounds familiar.  But no.
6      Q.    If I told you he was on your
7  Board of Directors as a representative of
8  Associated Wholesale Grocers, would that
9  refresh your recollection?
10     A.    You would have to tell --
11           MR. RANDALL:  Objection.  This
12     is really not responsive to anything
13     that we've asked on direct examination.
14 BY MR. BARNES:
15     Q.    How about Gary Phillips, do you
16 know Gary Phillips?
17           MR. RANDALL:  I'm making an
18     objection.
19           MR. BARNES:  You made it.
20           MR. PATTON:  You interrupted his
21     objection every time.
22           MR. BARNES:  What's your
23     objection?
24           MR. WILDERS:  I also think
25     you're out of time.

357

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2           MR. RANDALL:  That if -- you
3      know, if you're going to start a new
4      line of questioning right now, we'd
5      like to go back on the record and have
6      a chance to respond.  And given the
7      amount of time, I just don't think
8      it's appropriate.
9           MR. BARNES:  Your objection is
10     noted.
11 BY MR. BARNES:
12     Q.    Do you know a Gary Phillips?
13           MR. GREEN:  Two more questions
14     and we're done.
15           MR. BARNES:  Two more, okay.
16     I'll be quick.  I'll withdraw the
17     question about Gary Phillips.
18 BY MR. BARNES:
19     Q.    You testified initially, and I
20 wrote it down because I thought it was very
21 incisive and really applied to, universally
22 to senior association executives.
23     A.    This is where I grab my wallet?
24     Q.    No, no.
25     A.    Are you sure?

358

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    Q.    I'm sure.  I am sure.
3          I believe you said, I may
4    misquote this a little bit, so please bear
5    with me, I believe you testified that there's
6    very little a trade associate -- a trade
7    association executive would do without the
8    knowledge and consent of the members.  Do you
9    recall that testimony?
10   A.    Yes.
11   Q.    Would that be true regarding
12   the knowledge and consent of the Board of
13   Directors?
14   A.    Yes.
15   Q.    Did you keep the FMI Board of
16   Directors fully informed while you were there
17   regarding the animal welfare activities and
18   recommendations of FMI?
19         MR. WILDERS:  Objection.  Vague.
20   Three questions.
21         THE WITNESS:  Through -- as I
22   answered before, through the
23   communications system that we had
24   which included a weekly mailing which
25   was a compendium of information about

359

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    all of the programs that we had
3    underway, public affairs, research,
4    education, convention, et cetera, the
5    board had communications it related to
6    their meetings primarily.  If a policy
7    was passed by the board, we made sure
8    that it was -- went out to them as
9    they approved it.
10   BY MR. BARNES:
11   Q.    Did anyone from Associated
12   Wholesale Grocers, to your knowledge and
13   recollection, ever voice an objection to any
14   board policy regarding any animal welfare
15   activities of FMI and your Expert Scientific
16   Committee?
17   A.    Not that I'm aware.
18         MR. WILDERS:  Objection.
19   Assumes facts not in evidence, and
20   vague.
21         MR. GREEN:  Off the record.
22         MR. MCKENNEY:  I want to make a
23   couple of objections on the record.
24         MR. BARNES:  You're going to
25   make a couple?

360

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2          MR. MCKENNEY:  Yeah.  Standing
3    objections, Mr. Green, about the
4    30(b)(6).
5          MR. GREEN:  We're off the
6    record.
7                - - -
8          (A discussion off the record
9    occurred.)
10               - - -
11         VIDEOGRAPHER:  Off the record at
12   6:52.
13               - - -
14         (A recess was taken.)
15               - - -
16         VIDEOGRAPHER:  We're back on the
17   record at 6:53.
18         MR. BARNES:  Based on statement
19   from FMI's counsel, I won't ask any
20   questions, any further questions at
21   this time, although I do have further
22   questions, and may have even more if
23   plaintiffs' lawyer is permitted to
24   reexamine the witness.
25         Thank you, Ms. Brown, for your

361

KAREN BROWN - HIGHLY CONFIDENTIAL
1
2    time.
3          THE WITNESS:  Sure.  I'm not
4    going to agree to that necessarily.
5    And I have a cat at home that's been
6    alone since early this morning, so I'm
7    not treating it very humanely if I'm
8    here much longer.
9                - - -
10         EXAMINATION
11               - - -
12   BY MR. WILDERS:
13   Q.    Ms. Brown, Brad Wilders --
14         MR. MCKENNEY:  Just a couple of
15   objections.  Again, I'd like to object
16   to the insufficiency of Dr.
17   Hollingsworth's preparation on the
18   2000 Animal Welfare Guidelines review
19   that was raised in our direct
20   examination of her last week and she
21   replied that she did not have
22   knowledge of that and that was within
23   the scope of the 30(b)(6) topic.
24         MR. GREEN:  Could I ask you to
25   restate is that?

91  (Pages 358 to 361)

362

KAREN BROWN - HIGHLY CONFIDENTIAL

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2      MR. MCKENNEY:  Yes.  We asked
3  questions concerning FMI's 2013 review
4  of Producer Animal Welfare Guidelines
5  such as and including the UEP Animal
6  Welfare Guidelines.  She responded
7  that she did not have knowledge of
8  that topic.  And so we objected, that
9  was in the scope of the deposition
10  notice served.  And we reserve our
11  rights to recall Dr. Hollingsworth or
12  another 30(b)(6) designee to examine
13  FMI as to its corporate position about
14  that 2013 effort.
15      We also would like to note that
16  testimony today and Dr.
17  Hollingsworth's deposition there was
18  previously unknown communications
19  system that on a weekly basis
20  transmitted reports to the FMI
21  membership.  Based on our review of
22  the documents produced in this
23  litigation, FMI has not collected and
24  produced those materials, so we ask
25  that FMI represent that it has engaged

363

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  in a search for and production of such
3  responsive materials.  And if it has
4  not, to produce those materials.  And
5  we, again, reserve our right to call
6  witnesses to discuss those
7  communications.
8      We also note that there was --
9  at Dr. Hollingsworth's deposition that
10  she testified that the communications
11  group conducted analyses regarding Web
12  site hits and other media or analyses
13  of media reports on animal welfare
14  issues in the 2000 and 2002 time
15  frame.
16      Again, we have based, on our
17  review of FMI's production, those have
18  not been produced in this litigation
19  and we ask that you represent that you
20  searched for and produced those
21  materials.  And if you have not done
22  so, to do so, and then we, again,
23  reserve our rights to depose a witness
24  on those topics.
25      MR. GREEN:  I will represent

364

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  right here and now that FMI conducted
3  a search pursuant to the subpoena and
4  pursuant to negotiations with defense
5  counsel as to what exactly we would
6  search for.  We conducted that process
7  and search thoroughly and produced
8  every single document that mentioned
9  any of the search terms that we
10  searched for, every single document.
11      MR. MCKENNEY:  Including the
12  communications department at FMI?
13      MR. GREEN:  Correct.  Within the
14  time scope of the discovery.
15      MR. MCKENNEY:  The witnesses
16  have testified that there are these
17  documents.
18      MR. GREEN:  No, they testified
19  that there was the systems.  They
20  didn't testify that there were
21  documents.
22      MR. MCKENNEY:  Well, it sounded
23  like in Dr. Hollingsworth's deposition
24  that there were communications sent
25  regarding animal welfare in these

365

1  KAREN BROWN - HIGHLY CONFIDENTIAL
2  weekly reports that we did not have.
3  They conducted analyses --
4      MR. GREEN:  Again, I want to
5  remind you we're talking about 15
6  years ago.
7      MR. MCKENNEY:  If the answer is
8  they don't exist, then that's the
9  answer.
10      MR. GREEN:  I just represented
11  that we provided everything we have.
12  We provided 4,500 pages of documents
13  as a nonparty to this proceeding.
14      MR. PATTON:  We should do
15  this --
16      MR. GREEN:  I glad to do it.  We
17  provided three witnesses, provided
18  4,500 pages of documents.  We are not
19  parties and if we get harassed further
20  by the defendants or the plaintiffs in
21  this case, we will seek sanctions.
22      MR. WILDERS:  Can I ask my two
23  questions now?
24      MR. BARNES:  This deposition is
25  over.

92  (Pages 362 to 365)

366

KAREN BROWN - HIGHLY CONFIDENTIAL
1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. WILDERS:  Wait.  I had two
3     questions.
4          MR. HUTCHINSON:  I have an
5     objection if Mr. Wilders is going to
6     be permitted to ask additional
7     questions.  I haven't had the
8     opportunity to ask the witness any
9     cross-examination on any of Mr.
10    Wilders' questions today.  So I object
11    to him --
12         MR. WILDERS:  You had an
13    opportunity.
14         MR. HUTCHINSON:  Let me ask my
15    cross then.
16         MR. WILDERS:  You already did.
17         MR. HUTCHINSON:  I haven't asked
18    any questions on cross.  I haven't
19    asked a single question on
20    cross-examination.
21         MR. GREEN:  What is the total
22    amount of time that we've now spent
23    today?
24         MR. HUTCHINSON:  I had
25    30 seconds.

367

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. GREEN:  I'm not asking about
3     what you had.
4          MR. HUTCHINSON:  Well, I'm
5     objecting to -- if I'm going to be
6     denied the opportunity to ask
7     questions, we -- this deposition
8     should be concluded.
9          MS. ANDERSON:  How much time is
10    on the record?
11         MR. PATTON:  Let me just note
12    for the record --
13         MR. WILDERS:  We just spent like
14    half an hour on --
15         MR. PATTON:  I just want to note
16    for the record that Mr. Evans and I --
17    I'm sorry, Mr. Davis and I had reached
18    an agreement as to the division of
19    time.  And it was that the defendants
20    would have four hours today and the
21    plaintiffs would have three and they
22    got to go first.  And Ms.
23    Hollingsworth's deposition -- Dr.
24    Hollingsworth's deposition, we got
25    four hours and they got three.  And we

368

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2     abided by those time limits in both
3     Hollingsworth's deposition and this
4     deposition today.
5          MR. DAVIS:  I'll just clarify,
6     that agreement was subject to a
7     unilateral representation by FMI's
8     counsel that he did not intend to put
9     his witness up for the collective
10    14 hours that we would otherwise be
11    entitled to since we each noticed it.
12    And at no point did we affirmatively
13    accept that, but rather came to terms
14    on how we would deal with it should we
15    try to accommodate his request.
16         MR. PATTON:  So what's good for
17    the goose is good for the gander as
18    the judge says.  We've played fair.
19    And you guys apparently are not happy,
20    so what's new?  What's new?
21         MS. ANDERSON:  That is -- is he
22    asking the questions?
23         MR. PATTON:  The witness wants
24    to go home.  You got ten extra minutes
25    and now you want more.

369

1     KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. GREEN:  Proceed with your
3     questions.
4          MR. HUTCHINSON:  For the record,
5     I object to this examination and I
6     move to strike.
7          MR. WILDERS:  Your objection is
8     noted.
9     BY MR. WILDERS:
10    Q.     Ms. Brown, you testified
11    earlier about an FMI or SES audit program.
12    If a producer agreed to go through one of
13    these audits, were the results of those
14    audits available to FMI?
15    A.     No.
16    Q.     Were the results of any UEP
17    audits available to FMI?
18    A.     FMI as an entity?
19    Q.     Yes.
20    A.     No.
21         MR. WILDERS:  I have no further
22    questions.
23         MR. BARNES:  I have one
24    question.
25         MR. GREEN:  Is it redirect?

93 (Pages 366 to 369)

370

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          MR. BARNES:  It's redirect.  One
3  question.
4          THE WITNESS:  Is it on the
5  topic?
6          MR. BARNES:  Yes, ma'am.
7              - - -
8      FURTHER EXAMINATION
9              - - -
10  BY MR. BARNES:
11     Q.    Did FMI ever ask UEP for the
12  results of any particular audits of its
13  members?
14     A.    No.
15         MR. HUTCHINSON:  Mr. Green, can
16  I ask some questions now?
17         MR. GREEN:  Is it a new topic?
18         MR. HUTCHINSON:  It's cross of
19  Mr. Wilders' examination.
20         MR. WILDERS:  I didn't ask any
21  questions about Sparboe, your client.
22         MR. GREEN:  I think this -- you
23  know, the problem is it will continue
24  after that.  So let's draw the line
25  here.  Thank you.

371

1      KAREN BROWN - HIGHLY CONFIDENTIAL
2          VIDEOGRAPHER:  This is the end
3  of tape four in the videotape
4  deposition of Karen Brown.  This
5  deposition concludes at 7:01.
6              - - -
7      (Witness excused.)
8              - - -
9          (Deposition concluded at 7:01
10  p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

372

1
2          C E R T I F I C A T E
3
4      I do hereby certify that I am a Notary
5  Public in good standing, that the aforesaid
   testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
   said deponent was by me duly sworn to tell
7  the truth, the whole truth, and nothing but
   the truth; that the testimony of said
8  deponent was correctly recorded in machine
   shorthand by me and thereafter transcribed
9  under my supervision with computer-aided
   transcription; that the deposition is a true
10 and correct record of the testimony given by
   the witness; and that I am neither of counsel
11 nor kin to any party in said action, nor
   interested in the outcome thereof.
12
       WITNESS my hand and official seal this
13 27th day of April, 2014.
14
15
16  _____
           Notary Public
17
18
19
20
21
22
23
24
25

373

INSTRUCTIONS TO WITNESS

1
2      INSTRUCTIONS TO WITNESS
3
4      Please read your deposition over
5  carefully and make any necessary corrections.
6  You should state the reason in the
7  appropriate space on the errata sheet for any
8  corrections that are made.
9      After doing so, please sign the errata
10 sheet and date it.
11     You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14     It is imperative that you return the
15 original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24
25

94  (Pages 370 to 373)

**VERITEXT REPORTING COMPANY**
**www.veritext.com**
(212) 279-9424                              (212) 490-3430

**374**

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3         I have read the foregoing transcript of
 4   my deposition and except for any corrections or
 5   changes noted on the errata sheet, I hereby
 6   subscribe to the transcript as an accurate record
 7   of the statements made by me.
 8
 9         _____
10
11
12         SUBSCRIBED AND SWORN before and to me
13   this ____ day of _____, 20___.
14
15
16         _____
17              NOTARY PUBLIC
18
19
20   My Commission expires:
21
22
23
24
25
```

**375**

```
 1         E R R A T A   S H E E T
 2   IN RE:  PROCESSED EGG PRODUCTS ANTITRUST LITIGATION
 3   DATE:  4/23/14
 4   PAGE   LINE        CORRECTION AND REASON
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23
24   _____ _____
25   (DATE)          KAREN BROWN
```

95  (Pages 374 to 375)

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430