# ATTACHMENT 13

HIGHLY CONFIDENTIAL

1       IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    IN RE:  PROCESSED EGG PRODUCTS :

     ANTITRUST LITIGATION           :

4    -------------------------------:  MDL No. 2002

     THIS DOCUMENT RELATES TO:       :  08-MD-02002

5    ALL DIRECT PURCHASER ACTIONS    :

6

7              ** HIGHLY CONFIDENTIAL **

8

9              Tuesday, March 18, 2014

10

11              Videotaped 30(b)(6) deposition

12    of Michael Foods, through TOBY LEE CATHERMAN,

13    and deposition of TOBY LEE CATHERMAN, taken

14    at the offices of Weil Gotshal & Manges LLP,

15    1300 I Street NW, Suite 900, Washington, D.C.

16    20005, beginning at 9:06 a.m., before LINDA

17    ROSSI RIOS, a Federally Approved RPR, CCR and

18    Notary Public.

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

```
1  A P P E A R A N C E S :
2
3  BERNSTEIN LIEBHARD LLP
     BY:  RONALD J. ARANOFF, ESQUIRE
4       and
        DANA STATSKY SMITH, ESQUIRE
5  10 East 40th Street
     22nd Floor
6  New York, NY  10016
     212-779-1414
7  aranoff@bernlieb.com
     dsmith@bernlieb.com
8  On behalf of the Direct Purchaser Plaintiff
     Class
9
10 JENNER & BLOCK, LLP
     BY:  STEPHEN BROWN, ESQUIRE
11 353 North Clark Street
     Chicago, IL  60654
12 312-840-7282
     stephenbrown@jenner.com
13 312-840-7282
     On behalf of the Direct Action Plaintiffs,
14 Kraft, Kellogg, General Mills and Nestle
15
   WEIL, GOTSHAL & MANGES LLP
16 BY:  CARRIE M. ANDERSON, ESQUIRE
     1300 Eye Street, N.W.
17 Suite 900
     Washington, D.C.  20005
18 202-682-7231
     carrie.anderson@weil.com
19 On behalf of Defendant, Michael Foods,
     Papetti's Hygrade Egg Products and Toby Lee
20 Catherman
21
22
23
24
25
```

Page 4

```
1  A P P E A R A N C E S :
2
   FAEGRE BAKER DANIELS
3  BY:  KATHY L. OSBORN, ESQUIRE
     300 N. Meridian Street
4  Suite 2700
     Indianapolis, IL  46204
5  317-237-8261
     kathy.osborn@faegrebd.com
6  On behalf of Midwest Poultry Services
     (Via teleconference)
7
8
9
10
11 A L S O   P R E S E N T :
12 TJ O'TOOLE, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  A P P E A R A N C E S :
2
   PORTER, WRIGHT, MORRIS & ARTHUR LLP
3  BY:  DONALD M. BARNES, ESQUIRE
     1900 K Street
4  Suite 1100
     Washington, D.C.  20006
5  202-778-3056
     dbarnes@porterwright.com
6  On behalf of Rose Acre Farms
7
   STINSON LEONARD STREET
8  BY:  WILLIAM L. GREENE, ESQUIRE
     150 South Fifth Street
9  Suite 2300
     Minneapolis, MN  55402
10 612-335-1568
     william.greene@stinsonleonard.com
11 On behalf of Defendant, Michael Foods
     (Via teleconference)
12
13 PEPPER HAMILTON LLP
     BY:  EVAN W. DAVIS, ESQUIRE
14 3000 Two Logan square
     18th and Arch Streets
15 Philadelphia, PA  19103
     215-981-4245
16 davisew@pepperlaw.com
     On behalf of United Egg Producers and
17 United States Egg Marketers
     (Via teleconference)
18
19 LOVELL STEWART HALEBIAN & JACOBSON LLP
     BY:  KEITH D. ESSENMACHER, ESQUIRE
20 61 Broadway, Suite 501
     New York, NY  10006
21 212-608-1900
     kessenmacher@lshllp.com
22 On behalf the Indirect Purchaser Plaintiffs
     (Via teleconference)
23
24
25
```

Page 5

```
1         I N D E X
2         -  -  -
3  Testimony of:  TOBY LEE CATHERMAN
4  By Ms. Smith            11
5  By Mr. Brown            138
6  By Mr. Essenmacher      200
7  By Mr. Barnes           202
8  By Ms. Anderson         210
9
10        -  -  -
11        E X H I B I T S
12        -  -  -
13 EXHIBIT NUMBER   DESCRIPTION    PAGE MARKED
14
   Catherman-1  3/14/14 Letter     28
15
   Catherman-2  Agenda,
16     MFI0007203          36
17 Catherman-3  11/15/04 E-mail with
     attachment,
18     MFI0330628 - 0330630   37
19 Catherman-4  11/19/04 Letter,
       MFI0615604 - 0615609  43
20
   Catherman-5  E-mail chain,
21     MFI0117419 & 0117420  53
22 Catherman-6  Michael Foods Animal
       Welfare document,
23     MFI0322587 & 0322588  60
24 Catherman-7  12/16/08 E-mail with
       attachment,
25     MFI0068418 - 0068446  73
```

2 (Pages 2 - 5)

Page 6

```
1        E X H I B I T S (cont'd.)
2              - - -
3 EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
4
   Catherman-8  E-mail chain,
5       MFI0006564         85
6 Catherman-9  5/24/04 E-mail,
       MFI0330846         92
7
   Catherman-10  Agenda and Minutes,
8       MFI0007263 - 0007266  98
9 Catherman-11  E-mail chain,
       MFI0322904 - 0322907  103
10
   Catherman-12  1/3/07 Fax with
11      attachment,
       MFI0322666 - 0322675  112
12
   Catherman-13  12/22/06 E-mail with
13      attachment,
       MFI0104583 - 0104585  117
14
   Catherman-14  1/4/07 E-mail with
15      attachment,
       MFI0037476 - 0037478  125
16
   Catherman-15  10/11/07 E-mail,
17      MFI0005090         132
18 Catherman-16  5/12/05 E-mail,
       MFI0039578 - 0039581  141
19
   Catherman-17  4/13/04 E-mail,
20      MFI0330137         145
21 Catherman-18  6/8/04 E-mail,
       MFI0330857         156
22
   Catherman-19  7/16/04 E-mail,
23      MFI0631434         162
24 Catherman-20  12/23/05 E-mail with
       attachment,
25      MFI0031571 - 0031576  169
```

Page 7

```
1        E X H I B I T S (cont'd.)
2              - - -
3 EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
4
   Catherman-21  E-mail chain,
5       MFI0617596 & 0617597  173
6 Catherman-22  10/5/06 E-mail with
       attachment,
7       MFI0616647 - 0616653  176
8 Catherman-23  1/29/03 E-mail,
       MFI0118191 - 0118193  192
9
   Catherman-24  4/13/04 E-mail,
10      MFI0330138         194
11 Catherman-25  4/13/07 E-mail,
       MFI0097273         196
12
   Catherman-26  E-mail chain,
13      MFI0033487 & 0033488  207
14
              - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1        DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4 Page  Line        Page  Line
5 (None)
6
7
8
9 REQUEST FOR PRODUCTION OF DOCUMENTS
10 Page  Line
11 (None)
12
13
14 STIPULATIONS
15 Page  Line
16
   (None)
17
18
19 QUESTIONS MARKED
20 Page  Line
21 (None)
22
23
24
25
```

Page 9

```
1
2              - - -
3        VIDEOGRAPHER:  On the record
4 with disc number one of the video
5 deposition of Toby Catherman taken in
6 the matter of Processed Egg Products
7 Antitrust Litigation being heard
8 before the United States District
9 Court for the Eastern District of
10 Pennsylvania, MDL Number 2002.
11     This deposition is being held at
12 the offices of Weil Gotshall located
13 at 1300 I Street, Northwest in
14 Washington, D.C. on March 18, 2014, at
15 approximately 9:06 a.m.
16     My name is TJ O'Toole.  I am a
17 certified legal video specialist.  The
18 court reporter is Linda Rossi Rios.
19 We are both here representing Veritext
20 New York.
21     Will counsel, please, introduce
22 themselves and indicate which parties
23 they represent?
24     MS. SMITH:  Dana Statsky Smith,
25 Bernstein Liebhard, New York, New York
```

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1
2  for the Direct Purchaser Plaintiffs.
3      MR. ARANOFF:  Ronald Aranoff,
4  Bernstein Liebhard, LLP, 10 East 40th
5  Street, New York, New York for the
6  Direct Purchaser Class Plaintiffs.
7      MR. BROWN:  Stephen Brown,
8  Jenner and Block Chicago for Direct
9  Action Plaintiffs, Kraft, Kellogg,
10  General Mills and Nestle.
11      MS. ANDERSON:  Carrie Anderson
12  with Weil Gotshall on behalf of
13  Michael Foods, Papetti's Hygrade Egg
14  Products and Mr. Catherman.
15      VIDEOGRAPHER:  Thank you.  I am
16  getting interference from someone's
17  cell phone.
18      Will the court reporter, please,
19  swear in the witness?
20          -  -  -
21      TOBY LEE CATHERMAN, after having
22  been first duly sworn, was examined
23  and testified as follows:
24          -  -  -
25      COURT REPORTER:  Counsel on the

Page 11

1
2  phone, would you like to make an
3  appearance on the record?
4      MR. ESSENMACHER:  Yes, I would.
5  Thank you.
6      Keith Essenmacher from Lovell
7  Stewart Halebian & Jacobson on behalf
8  of the Indirect Purchasers.
9      MR. DAVIS:  Evan Davis from
10  Pepper Hamilton on behalf of United
11  Egg Producers, United States Egg
12  Marketers.
13      MR. GREENE:  William Greene,
14  Stinson Leonard Street on behalf of
15  Michael Foods.
16      MS. OSBORN:  Kathy Osborn,
17  Faegre Baker Daniels on behalf of
18  Midwest Poultry Services.
19          -  -  -
20      EXAMINATION
21          -  -  -
22  BY MS. SMITH:
23      Q.    Good morning, Mr. Catherman.
24  My name is Dana Smith, and I represent the
25  Direct Purchaser Plaintiffs in this lawsuit.

Page 12

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2      Can you give your name and
3  address for the record, please?
4      A.    It's Toby Catherman, 10
5  Chesterfield Drive, Palmyra, Pennsylvania
6  10708.
7      Q.    Do you understand that you're
8  under oath today?
9      A.    Yes.
10      Q.    Have you ever been deposed
11  before?
12      A.    Yes.
13      Q.    When?
14      A.    In the 1980s.
15      Q.    What were the circumstances?
16      A.    It was an accounts receivable
17  claim on some property and various other
18  funds for a company that I was president of
19  at the time.
20      Q.    Was that a deposition?
21      A.    Yes.
22      Q.    And did you give any testimony
23  at trial?
24      A.    No.
25      Q.    Did that case have anything to

Page 13

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  do with the egg industry?
3      A.    Yes, it did.  Well, it had to
4  do with accounts receivable of an egg
5  customer at that time that was based in Long
6  Island.  And I was president of the company
7  which is now part of Michael Foods.  At that
8  time it was called Quaker State Farms,
9  Incorporated.
10      Q.    Is there anything that would
11  prevent you from speaking clearly and
12  testifying truthfully today?
13      A.    No.
14      Q.    When I say Michael Foods today,
15  I'm referring to Michael Foods, Incorporated
16  including any and all affiliated Michael
17  Foods companies and all the products
18  manufactured by the overall company unless I
19  otherwise specify.
20      A.    Okay.
21      Q.    Are you still employed at
22  Michael Foods?
23      A.    Yes.
24      Q.    What is that position?
25      A.    I am just a part-time employee.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 I retired from my full-time position in
3 January of 2013.
4     Q.   What's that position?
5     A.   Today?
6     Q.   Uh-huh.
7     A.   I am working, assisting on
8 counseling and training some of the people we
9 brought in as my replacements. And I'm also
10 representing the company with Urner Barry on
11 a daily basis.
12     Q.   Let's go through some of the
13 positions. Well, let's go back.
14     What is the highest level of
15 education you've attained?
16     A.   I have a -- just a BA in
17 business administration with a second major
18 in accounting.
19     Q.   From where?
20     A.   Kutztown State College.
21     Q.   And what was your first
22 position in the food service industry?
23     A.   It was as controller of the
24 company I mentioned, which was Quaker State
25 Farms.

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     Q.   How long were you there?
3     A.   From '79, '78 until 1987 when
4 it was acquired by Papetti's Hygrade Egg.
5     Q.   So you were -- I'm sorry, you
6 said you were the controller?
7     A.   Yes.
8     Q.   What did you do in that
9 position?
10     A.   All the financial records and
11 accounting and eventually then became
12 president of the company.
13     Q.   And then you -- the company was
14 acquired by Papetti's?
15     A.   Yes.
16     Q.   What did you do when the
17 company was taken over?
18     A.   At Papetti's, I became vice
19 president of Pennsylvania operations which
20 entailed managing all the Pennsylvania
21 operations but I also then went into other
22 positions, then inside Papetti's as we
23 started growing some other ancillary
24 operations.
25     Q.   What were those other

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 positions?
3     A.   Concept trucking I was
4 treasurer of. Egg specialties, I think I was
5 vice president of that, which was a precooked
6 operation based in Pennsylvania. Papetti
7 Farms, which is a layer operation, and I was
8 treasurer of that. And Sunbest-Papetti
9 Farms, which is a joint company of Papetti
10 Farms with another company, and I was vice
11 president of that. I think I have them all.
12     Q.   It's a lot of positions.
13     A.   All at the same time.
14     Q.   Impressive.
15     In your role at Papetti's, did
16 you have responsibility for shell eggs as
17 well as egg products?
18     A.   The purchase of shell eggs.
19 When they first purchased Quaker State Farms
20 we were a shell egg processor, we had spun
21 that off to -- we maintained the facility,
22 but we leased the facility to RW Sauder,
23 along with the equipment as part of the
24 lease. And that occurred within the first
25 year that Papetti's owned Quaker State.

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     Q.   And so Papetti's never sold
3 shell eggs?
4     A.   Except for that very small
5 transitional period, correct.
6     Q.   And then Papetti'S was an egg
7 processor, so it purchased all of its eggs
8 from another source?
9     A.   Yes.
10     Q.   Who was that?
11     A.   Various producers.
12     Q.   Can you name some?
13     A.   Probably Wenger Feed Mills,
14 Esbenshade Farms, RW Sauder.
15     Q.   So you sold them and then
16 bought them back?
17     A.   Yes.
18     Q.   And then how long were you at
19 Papetti's?
20     A.   From '90 -- '89 when it was
21 acquired -- when I -- when they acquired
22 Quaker State, until '97 when it was -- when
23 Papetti's was acquired by Michael Foods. So
24 it's a continuous employment.
25     Q.   Now, when Papetti's was

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 acquired, what position did you take on at
3 that point?
4     A.    Vice president of procurement.
5     Q.    Can you tell me a little bit
6 about that position?
7     A.    As part of Michael Foods, it
8 sources eggs from various regions in the
9 country, most of it third party.  It does
10 have a production avenue itself, but the rest
11 of the eggs are sourced from third parties,
12 so I, along with Terry Baker, were
13 responsible for sourcing all the eggs that
14 were required based on the strategic plan and
15 the sales plan.  Part of that responsibility
16 then would include negotiations of those
17 agreements, spot purchasing and managing the
18 quality and logistics systems that are a part
19 of that.
20     Q.    That's a lot.  So you sourced
21 eggs from various regions, but you said it
22 does have a production avenue itself.  So
23 there were internal shell eggs that you would
24 pull from Michael Foods?
25     A.    Michael Foods has its -- and

Page 19

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 today still has several million birds which
3 are located on company owned facilities, the
4 majority of them.  There are a few contract
5 layers.  Those birds, from the time that I
6 became part of Michael Foods, have been
7 in-line broken, the entire process.  So that
8 liquid is then transferred to different
9 processing facilities.  The contract layers
10 that Michael Foods has are primarily based in
11 Nebraska, in that immediate area, and we use
12 those shell eggs primarily for our hard
13 cooking operation in the Midwest.  And then
14 we do have one farm in Minnesota which did a
15 small amount of grading for the Crystal Label
16 Program that was mostly basically selling in
17 the Upper Midwest.  It's probably less than
18 half of a percent of our sales or something
19 like that.  It's very minor.
20     Q.    So when you say they do some
21 grading, that means that they were selling
22 the actual shell eggs?
23     A.    Yes.
24     Q.    Now, you said that you worked
25 along with Terry Baker.  Did you work as

Page 20

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 partners?  Were one of you superior to the
3 other?  How was your working relationship?
4     A.    Formally I reported to Terry
5 Baker the entire time.
6     Q.    What was that entire time, that
7 was from 1997 until?
8     A.    Until 2013.
9     Q.    And then -- so that brings us
10 back to 2013.  And now you're a part-time
11 employee.  What is your position now?  What
12 would you consider your title to be?
13     A.    I am just basically assisting
14 in some ongoing training with some of the
15 procurement staff.  I'm the go-to if they
16 have a call about, oh, agreements or various
17 other things, more historical base questions,
18 they'll pick up and call me.  But I
19 also get and monitor some of the current
20 buy/sell of Michael Foods when it comes to
21 the bulk liquid of tankers and that type of
22 stuff or shell eggs for breaking today so I
23 can report those activities with Urner Barry.
24     Q.    Explain to me exactly what that
25 means by monitoring the current buy/sell of

Page 21

1     TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 Michael Foods.
3     A.    Michael Foods has strategic
4 plan which it has always had.  It is -- there
5 is established a certain percentage of our
6 supply which we call spot.  Spot in our
7 definition is less than one year, so they
8 could be three month agreements, they could
9 be no agreement at all and we're just buying
10 them off of ECI.  Those -- that supply is
11 purchased ongoing, sometimes weekly,
12 sometimes daily to meet the longs and shorts
13 as our sales fluctuate and/or seasonal demand
14 fluctuates and/or availability of product.
15     Q.    What's ECI?
16     A.    Egg Clearinghouse, Incorporated.
17     Q.    Now, I'm going to go back to
18 your position before you became a consultant
19 when you were VP of procurement.  So you
20 reported to Terry Baker?
21     A.    Yes.
22     Q.    Did you report to anybody else?
23     A.    Through Terry Baker, yes.
24     Q.    Who is that?
25     A.    It would have been dependent on

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 who the president of the egg company was at
3 the time, so it could have been William
4 Gaucher, JD Carlson. So it was various
5 others, you know, depending upon how the
6 senior management changed or progressed over
7 the years.
8      Q.    And did anybody report to you?
9      A.    Yes.
10     Q.    And who was that?
11     A.    Her name is Joanne Raybuck.
12     Q.    Anybody else?
13     A.    Indirectly the Wakefield staff
14 of Lowell Ostrand is a dotted line to Terry
15 Baker and myself.
16     Q.    The Wakefield staff of -- I'm
17 sorry, what was the place?
18     A.    In Wakefield, that's the
19 Wakefield office where Terry is based, Lowell
20 Ostrand.
21     Q.    That's who reported to Terry?
22     A.    And myself, yes.
23     Q.    Do you have an understanding of
24 what this case is about?
25     A.    Vague.

Page 23

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2      Q.    What is that vague
3 understanding?
4      A.    That it's alleged that the
5 shell egg processors primarily try to create
6 a means of which to raise margins or whatever
7 in the marketplace by having the Animal
8 Welfare Program and also various other
9 activities that they might have done before
10 that or by a result of their Marketing
11 Committee of the UEP.
12     Q.    What's the basis of that
13 understanding?
14     A.    Primarily just reading press
15 releases from UEP and the press.
16     Q.    What source in the press?
17     A.    Feedstuffs I think would
18 probably be one. Watts Publishing I think is
19 what they call themselves. I think Urner
20 Barry at times has reported on some of the
21 activities.
22     Q.    Now, when you -- you spoke
23 about Urner Barry before, that you have a
24 position where you're reporting on Michael
25 Foods to Urner Barry. Do you work for Urner

Page 24

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 Barry?
3      A.    No.
4      Q.    So how does that relationship
5 work?
6      A.    Urner Barry is a market
7 reporting system which I'm sure you're fully
8 aware of. So their objective is to report
9 valuations of egg products. One of those egg
10 products obviously is breaking stock and raw
11 liquids. As we trade or purchase breaking
12 stock and/or raw liquids with other suppliers
13 that are not contractual, those values we
14 report to Urner Barry on a daily basis. I
15 also report to Urner Barry spot trades or
16 short term contracts we may do on finish
17 products. That they quote on. They don't
18 quote on precooked or various other products,
19 but they would quote on frozen containers or
20 tankers or dry products or some of those
21 products. So it's rather limited, the
22 information that we exchange.
23     Q.    Before you came today, did you
24 discuss the fact that you were coming to be
25 deposed with Terry Baker?

Page 25

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2      A.    No.
3      Q.    What about Gregg Ostrander?
4      A.    No.
5      Q.    Or Tim Bebee?
6      A.    No.
7      Q.    Did you discuss -- did you have
8 any discussions with them at all prior to
9 coming in today?
10     A.    That's a vague question. I'm
11 not sure what you mean by that.
12     Q.    In the last six months, have
13 you spoken to Terry Baker?
14     A.    Yes, spoke to Terry Baker last
15 week. I still technically report to him, so
16 we speak probably once a week about my
17 activities for -- on his behalf.
18     Q.    And did you speak in any way,
19 shape or form about the fact that you were
20 testifying today?
21     A.    No.
22     Q.    Did you speak about his
23 testimony?
24     A.    No.
25     Q.    What about Mr. Ostrander, have

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1  you spoken with him in the last six months?
2  A. Probably in the last five
3  years.
4  Q. Have you spoken to Tim Bebee in
5  the last six months?
6  A. No.
7  Q. Did you review any of their
8  transcripts prior to your deposition today?
9  A. No.
10  Q. Did you do anything to prepare
11  for this deposition today?
12  A. Yes. Only I've met with Carrie
13  Anderson in January for part of the day to go
14  through the logistics of this, and also with
15  Carrie and William Greene.
16  Q. Was there -- did you have a
17  face-to-face meeting with them?
18  A. Yes.
19  Q. When you met with Carrie and
20  William Greene, was that more recently than
21  January?
22  A. Just yesterday.
23  Q. Did you -- was there anybody on
24  the phone when you had that meeting?

Page 27

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1  A. No.
2  Q. Was there anybody else in the
3  room?
4  A. No.
5  Q. Did you review any documents in
6  preparation for your deposition?
7  MS. ANDERSON: Mr. Catherman,
8  you can answer that question yes or
9  no.
10  THE WITNESS: Yes.
11  BY MS. SMITH:
12  Q. Did you review any documents
13  independently outside the presence of
14  counsel?
15  A. No.
16  Q. Approximately how many?
17  A. Probably 15 yesterday.
18  Q. During the course of your work
19  at Michael Foods, if you had a question about
20  legal issues, who would you ask them of?
21  A. I would call Cary Wolski who is
22  the general counsel.
23  Q. Do you understand that you've
24  been designated to speak as a corporate

Page 28

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1  designee today?
2  A. Yes.
3  Q. And do you know what you've
4  been designated to speak about?
5  A. I forgot the subject, but yes.
6  Q. If I showed you a letter, do
7  you believe your recollection could be
8  refreshed?
9  A. I'm sure. I enjoyed my
10  retirement away from the egg industry.
11  MS. SMITH: I'm going to mark
12  this document.
13  - - -
14  (Exhibit Catherman-1, 3/14/14
15  Letter, was marked for identification.)
16  - - -
17  MS. ANDERSON: The record can
18  reflect that Mr. Barnes has joined us.
19  THE WITNESS: Yes, I recall now.
20  BY MS. SMITH:
21  Q. So, Mr. Catherman, do you know
22  what topic you're here to discuss today as a
23  corporate designee?
24  A. Yes. It's listed here as my

Page 29

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1  membership and participation in UEP.
2  Q. Including elected and appointed
3  positions you held, committees that you
4  served on, your meeting attendance, motions
5  made and votes taken at all UEP meetings?
6  MS. ANDERSON: With the caveat,
7  Dana, including the second sentence.
8  BY MS. SMITH:
9  Q. Including, with the caveat that
10  it's limited to your own personal
11  participation in UEP related activities.
12  A. Correct.
13  Q. What is the United Egg
14  Producers?
15  A. It's a Capper-Volstead co-op.
16  Q. What is a Capper-Volstead
17  co-op?
18  A. I've never had this explained
19  to me by legal counsel, so my opinion is that
20  it is a co-op of producers that acts beyond
21  their trade association into the point that
22  they can also discuss pricing and indexes
23  that are used to arrive at pricing. Thus
24  some of the Market Committee activities that

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 we're involved inside UEP.
2
3 Q. What's the basis for that
4 understanding?
5 A. I think it's just -- I really
6 couldn't define it. It's just really just
7 general knowledge or my perceived -- my
8 perception.
9 Q. How did you come to that
10 perception?
11 A. Sitting at a UEP meeting, any
12 of the UEP meetings, you constantly heard
13 about the Capper-Volstead exceptions and et
14 cetera.
15 Q. Who explained those to you?
16 A. Counsel.
17 Q. Do you know who that was?
18 A. Various times, I think it could
19 have already been Ike, Irving Isaacson I
20 think his name was, and then various other
21 counsel that UEP had along with Mike McLeod.
22 Q. Who is Mike McLeod?
23 A. He was their counsel for UEP.
24 He was also part of their lobbying effort.
25 Q. Who is Mr. -- I think you said

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 Irvingson?
2
3 A. He was their general counsel
4 early on. Probably 15 years ago.
5 Q. Let's go back to your -- so you
6 said that a Capper-Volstead co-op can discuss
7 some of the Market Committee activities that
8 were involved inside UEP. What do you mean
9 by that?
10 A. I'm not sure exactly what I did
11 say, but I do recall that UEP had a Marketing
12 Committee. In that Marketing Committee they
13 would talk about various indexes and various
14 carton surveys they would do so they could
15 gather information about cost structures,
16 grade yields and that type of stuff and
17 provide it to Urner Barry as a way of
18 improving the reporting values on various
19 Urner Barry quoted products like cartoned
20 eggs versus loose. All on the shell egg side
21 of which I was never involved in, but...
22 Q. Why was the fact that UEP was a
23 Capper-Volstead co-op important when they
24 were discussing those topics?
25 MS. ANDERSON: Objection.

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 Foundation.
3 MR. DAVIS: Objection. Lacks
4 foundation. Calls for speculation.
5 This is Evan Davis.
6 BY MS. SMITH:
7 Q. You can answer if you know.
8 A. I don't know.
9 MS. ANDERSON: Just so you know,
10 Mr. Catherman, Mr. Davis is UEP's
11 counsel, so you may hear voices coming
12 over the phone, but you can still
13 answer the question.
14 BY MS. SMITH:
15 Q. Michael Foods is a member of
16 the United Egg Producers?
17 A. Yes.
18 Q. If I use UEP, do you have an
19 understanding that I mean United Egg
20 Producers?
21 A. Yes. You'll have me saying
22 UEP. I don't say United Egg Producers.
23 Q. Okay. Do you know when Michael
24 Foods became a member of UEP?
25 A. No, I do not.

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 Q. Was it a member when you became
3 employed by Michael Foods?
4 A. Best of my recall, yes.
5 Q. And now as an employee of
6 Michael Foods, you were representative at
7 UEP?
8 MS. ANDERSON: Objection.
9 THE WITNESS: I was not the
10 formal representative of Michael Foods
11 at UEP at any given time.
12 BY MS. SMITH:
13 Q. Did you sit on any committees
14 as a member -- as a Michael Foods
15 representative at UEP?
16 A. No.
17 MS. ANDERSON: Same --
18 BY MS. SMITH:
19 Q. Were you an independent member
20 of UEP?
21 A. No.
22 Q. Did you attend UEP meetings?
23 A. A few.
24 Q. Did you attend out of your own
25 interest?

HIGHLY CONFIDENTIAL

Page 34

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2    A.    Most cases I would attend the
3  legislative meetings they would have annually
4  in Washington in May.  That was an
5  opportunity because most of our suppliers
6  would be in town and so we use that as an
7  opportunity to meet with them also to go over
8  ongoing contractual discussions, projects
9  that we had under way.  So as a means of
10 convenience of location of having many people
11 in the industry in the same place.
12     Q.    Were you on any committees of
13 the UEP?
14     A.    Not that I recall.
15     Q.    Were you a member of the board
16 of the UEP?
17     A.    No.
18     Q.    Who is Larry Seger?
19     A.    Larry Seger was the -- I
20 believe his title was president of Wabash
21 Valley, and they have ancillary companies
22 also.
23     Q.    What does Wabash Valley do?
24     A.    It is an egg producer.  And
25 they also do egg products.

Page 35

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2     Q.    Do you know any of the Wabash
3  Valley ancillary companies?
4     A.    Yes.  It would be Ballas Egg
5  Products and Brown Produce.  And they have
6  their layers in a separate company, I don't
7  remember the name of that.
8     Q.    In 2004, did you give a
9  presentation at the UEP Economic Summit?
10     A.    Yes.
11     Q.    What was the topic of that
12 presentation?
13     A.    I've been invited to come in
14 and speak to the UEP members that were
15 present about the egg products industry.
16     Q.    And did you give that
17 presentation by yourself?
18     A.    I gave my presentation by
19 myself, but there were other presentations
20 made.
21     Q.    Who made the other
22 presentations?
23     A.    I know Larry Seger gave a
24 presentation.  And I believe there were
25 others, but I don't recall who or their

Page 36

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2  subjects.
3          - - -
4          (Exhibit Catherman-2, Agenda,
5      Bates MFI0007203, was marked for
6      identification.)
7          - - -
8  BY MS. SMITH:
9     Q.    Mr. Catherman, I'm showing you
10 a document Bates stamped MFI0007203.  It's
11 titled "Egg Industry Economic Summit, Demand
12 - Supply Trends Today & The Future" from
13 November 16, 2004, and it's an agenda?
14     A.    Yes.
15     Q.    Now, if you look at number 5,
16 it's titled "Egg Product Trends."  And it
17 says, "Larry Seger & Toby Catherman."  Is
18 this the presentation that we were just
19 discussing?
20     A.    Yes.
21     Q.    Now, in this agenda it
22 indicates that you and Mr. Seger were giving
23 the presentation together.  Is that
24 incorrect?
25          MS. ANDERSON:  Objection.

Page 37

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2  That's not what it says.
3          THE WITNESS:  I agree with
4  counsel, that's not what it's saying.
5  It's saying that two individuals are
6  giving presentations.
7          MS. SMITH:  Okay.
8          MR. BARNES:  Was this marked, by
9  the way?
10          MS. ANDERSON:  It was marked as
11 Exhibit 2.
12          - - -
13          (Exhibit Catherman-3, 11/15/04
14      E-mail with attachment, Bates
15      MFI0330628 - MFI0330630, was marked
16      for identification.)
17          - - -
18          MS. ANDERSON:  I'm assuming you
19 would like the witness to read the
20 document?
21          MS. SMITH:  Right.  Correct.
22 BY MS. SMITH:
23     Q.    This is Catherman Exhibit
24 Number 3, Bates number MFI0330628 through 30.
25 It's an e-mail and attachment from

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  November 15, 2004, from Toby Catherman to
3  Larry Seger with a copy to Richard Brown with
4  the subject, "UEP Economic Summit 11-16-04."
5       A.    [Reviewing document.] Okay.
6       Q.    Mr. Catherman, is this an
7  outline of the presentation that you gave?
8       A.    It's an outline of my thoughts
9  that I was going to be giving at that
10 presentation, yes. I'm not sure it's even
11 the final draft at this point.
12      Q.    Did this in any way cover any
13 of Mr. Seger's presentation?
14      A.    No.
15      Q.    So let's go through some of the
16 points in the document. If you move down
17 towards the middle of the page, it says
18 there's a "Trend toward continued growth of
19 in-line breaking." Correct?
20      A.    Yes.
21      Q.    And "Followed a movement in
22 shell processing started around 1970 with
23 small in-line operations of less than 200,000
24 layers when house size was only 30-40,000."
25           MS. ANDERSON: Is there a

Page 39

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2      question?
3           MS. SMITH: There is.
4  BY MS. SMITH:
5       Q.    Is that what it says?
6       A.    Yes.
7       Q.    And then later in the document,
8  if you move -- continue to move down, the
9  document continues to discuss the growth of
10 in-line breaking?
11           MS. ANDERSON: Objection. The
12           document speaks for itself.
13 BY MS. SMITH:
14      Q.    Is that what it says?
15      A.    That would be -- it speaks to
16 various points of reasons of why in-line
17 breaking was expanding.
18      Q.    Why was in-line breaking
19 expanding?
20      A.    I can read the document here, I
21 can cite it.
22      Q.    Please do.
23      A.    At that time, processors were
24 having various economic pressures and food
25 safety pressures from our customer base to

Page 40

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  provide a steady high quality egg supply.
3  The historical base of egg products has been
4  to use under grades and/or the surplus eggs
5  from the shell egg industry. That supply
6  varies in availability and quality. So to
7  meet customer demand and especially inside
8  Michael Foods, we started and the egg
9  industry started to do in-line production
10 that allowed for total control by the egg
11 products company of all aspects of cost,
12 quality and availability. That was started
13 by Michael Foods and other companies early on
14 in the '80s and continued to, but really
15 expanded in the 1990s, really driven as a
16 requirement inside for Michael Foods to
17 supply our ESL category.
18      Q.    What is ESL category?
19      A.    Extended shelf life.
20      Q.    Tell me what in-line production
21 is.
22      A.    Instead of having independent
23 layer facilities, and, again, I call them
24 layer houses, in the Midwest they'll call
25 them barns, so depending upon who you're

Page 41

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  speaking to, you'll get different references.
3  All I know is on an individual facility you
4  have a single house and then historically
5  those eggs would have to be packed onto some
6  kind of bulk packing, plastic flats or
7  whatever, and then transported to a central
8  processing center. An in-line processing
9  facility allows for you to put multiple of
10 those houses together with a common belt
11 which would then convey those eggs into a
12 central processing room which in the early
13 part of in-lines were all shell eggs led by
14 Rose Acre and other companies, and Waldbaum.
15 And then it evolved into the point that then
16 Michael Foods started to, under Waldbaum at
17 that time, to actually break those eggs on
18 the farm and then transport the liquid to a
19 processing center to be pasteurized and
20 packaged.
21      Q.    Now, on the second page of the
22 document, you wrote, Today we have
23 approximately 40 million layers being broken
24 in-line which is equivalent to 38 percent of
25 all cases broken. This means we have

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2   approximately 800,000 cases weekly being
3   transported to off-line sites. Correct?
4        A.   That's what is cited here, yes.
5        Q.   Now, at the bottom of the page,
6   it says, "50% by 2008 (10 million layers by
7   construction and conversion), move toward 60%
8   before slowing pace."
9        What did you mean by that?
10       A.   My point being there is that as
11  my point up above, 40 million birds roughly
12  in-line. I saw it by moving to roughly 50
13  million birds or 50 percent being in-line
14  availability for the egg products industry
15  and then that would expand eventually to
16  60 percent of all eggs be broken in-line,
17  which it is today.
18       Q.   So that was true?
19       A.   Yeah, I'm a pretty good
20  forecaster. Ten years ago.
21       Q.   Is it still at 60 percent in
22  2014?
23       A.   I think a couple weeks ago it
24  was 62 percent. So it varies weekly.
25       Q.   Impressive.

Page 43

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Did you receive letters from
3   the UEP?
4        A.   I wouldn't say they were
5   letters. I received newsletters and blanket
6   invitations to meetings and various other
7   things, blanket e-mailings that they sent to
8   their membership.
9        Q.   Do you recall receiving a
10  letter subsequent to this presentation
11  relaying information about the presentation
12  you gave?
13       A.   No.
14            - - -
15       (Exhibit Catherman-4, 11/19/04
16       Letter, Bates MFI0615604 - MFI0615609,
17       was marked for identification.)
18            - - -
19  BY MS. SMITH:
20       Q.   I'm showing you what is -- has
21  been marked as Catherman-4. It's Bates
22  stamped MFI0615604 through MFI0615609. It's
23  titled, "United Egg Producers." Appears to
24  be a letter from the United Egg Producers
25  along with the agenda and to -- "Intention to

Page 44

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2   Meet Market Needs" option statements.
3        A.   I'll read it first, depending
4   upon what you want to ask me, because this
5   letter obviously is not addressed to me.
6        Q.   Have you ever seen this letter
7   of before?
8        MS. ANDERSON: Have you read the
9        letter, Mr. Catherman?
10       THE WITNESS: No, I've not. Let
11       me read it.
12       [Reviewing document.]
13  BY MS. SMITH:
14       Q.   Have you ever seen this letter
15  before?
16       A.   I'm going to use the word
17  "assume" which I hate to use, but I believe I
18  probably have. I don't recall actually it.
19  But it was addressed to Terry. And often
20  these types of industry updates or summaries
21  would then be copied to me.
22       Q.   Now that you're looking at this
23  letter, do you recall seeing the subject
24  matter of this letter before?
25       MS. ANDERSON: Objection. Form.

Page 45

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        THE WITNESS: Not really.
3   BY MS. SMITH:
4        Q.   I just want to move to the page
5   Bates stamped ending in 07. It's the agenda
6   from the Egg Industry Economic Summit. You
7   gave a presentation, as we discussed before.
8   Did you attend the entire day of the summit?
9        A.   I believe I did.
10       Q.   And so attending the summit,
11  did you attend all of these presentations on
12  the agenda?
13       A.   I don't exactly recall if I did
14  or not.
15       Q.   Do you recall attending many of
16  these presentations?
17       MS. ANDERSON: Objection.
18       THE WITNESS: Not really.
19  BY MS. SMITH:
20       Q.   Let's go back to the first page
21  of the document ending in 604. The first
22  page, in the middle of the page, the
23  statement starts with "Shocking..." Do you
24  see where I'm indicating?
25       A.   Yes.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2       Q.    So the statement reads,
3    shocking eye opening information that had
4    never been candidly expressed about the
5    trends of the egg breaking products industry
6    and the retail business caught the attention
7    of all the attendees.
8          MS. ANDERSON:  I think you
9       missed a couple of words, but...
10   BY MS. SMITH:
11      Q.    Okay.  I'll reread it again to
12   be clear.  "'Shocking' - 'Eye Opening'
13   information that had never before been
14   candidly expressed about the trends of the
15   egg breaking/products industry and the retail
16   business caught the attention of all the
17   attendees."
18          The presentation or the
19   information candidly expressed about the
20   trends of the egg breaking products industry,
21   was that your presentation?
22      A.    I would assume that's what he's
23   referencing to.
24      Q.    Now, let's move to the next
25   page ending in 605.  And if you go to the

Page 47

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    second bullet point, it states, "Probably the
3    most shocking news came from Larry Seger and
4    Toby Catherman when they presented a report
5    on the current conditions of the egg
6    breaking/products business and the trends of
7    that industry."
8          Is that correct?
9       A.    That's what it says here, yes.
10      Q.    On November 16, 2004, did
11   members of the UEP express shock to you about
12   the current conditions of the egg breaking
13   products business?
14      A.    I don't recall.
15      Q.    Did you have a discussion with
16   Gene Gregory about his surprise over the
17   current conditions of the egg breaking
18   products business?
19          MS. ANDERSON:  Objection.
20   Foundation.
21          THE WITNESS:  I don't recall
22      having a conversation with Gene
23      Gregory about the presentation.
24   BY MS. SMITH:
25      Q.    After you gave your

Page 48

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    presentation, did anybody ask any questions?
3       A.    Again, I don't recall.  It's
4    ten years ago.
5       Q.    After your presentation, did
6    the UEP present "a bleak over-view of the
7    supply side of the business and the pending
8    problems with an ever-increasing flock size
9    at a time when demand appears to be
10   diminishing."
11          MS. ANDERSON:  Are you reading
12      from the document?
13          MS. SMITH:  I am.
14          MS. ANDERSON:  Can you tell me
15      where?
16          THE WITNESS:  The next bullet
17      point.
18          MS. SMITH:  Thank you.
19          THE WITNESS:  That is what's
20      cited here in the document.  Again, I
21      don't remember the -- who said what
22      sequence of presentation, that type of
23      stuff.
24   BY MS. SMITH:
25      Q.    Do you recall we -- and based

Page 49

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    on the document, I'm guessing that the UEP
3    then asked the attendees if they wanted to be
4    part of the solution in managing the supply
5    to meet an expected demand as stated in the
6    letter on the bottom of the page?
7          MR. DAVIS:  Objection to form.
8          THE WITNESS:  I do recall that
9      UEP did try to solicit participation
10     in early molts.  And that's all I
11     recall at this point.
12   BY MS. SMITH:
13      Q.    Moving to the second to the
14   last page ending in 608, it's titled,
15   "Intention to Meet Market Needs."  It's
16   titled, "Option #1."
17          "It is my company's intention
18   to dispose of hens that are currently
19   scheduled for disposal between January 1 and
20   April 30, 2005 - four...weeks earlier than
21   previously scheduled."
22          Now, earlier you stated I do
23   recall that UEP did try to solicit
24   participation in early molts, and that's all
25   I recall at this point.  Is this Option

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 Number 1 representative of that UEP -- strike
2 that.
3
4        Is Option Number 1
5 representative of what the UEP was trying to
6 solicit participation of?
7        MS. ANDERSON: Object to the
8 form of the question.
9        THE WITNESS: It's not my
10 recall. I don't recall them
11 discussing this option about disposal
12 of birds. My recall is discussion
13 about moving molts earlier.
14 BY MS. SMITH:
15    Q.   What did they state about
16 moving molts earlier?
17        MS. ANDERSON: Object to the
18 form of the question.
19        THE WITNESS: I don't recall the
20 exact verbiage. There were often --
21 there were at times discussions about
22 moving molts in the way that it could
23 shift, it would not change the total
24 supply or output of a flock, but you
25 could shift the timing of when those

Page 51

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 eggs were produced to shift maybe away
3 from lower production, lower demand
4 periods such as the summer.
5 BY MS. SMITH:
6    Q.   Let's move to "Option #2" on
7 the next page ending in 609. This option
8 states, "It is my company's intention to
9 reduce my own December 1, 2004 flock size by
10 5% between the dates of January 1 through
11 April 30, 2005."
12        Do you remember that option
13 being discussed by UEP at the Economic
14 Summit?
15    A.   No, I do not.
16    Q.   Do you remember Michael Foods
17 participating in either of those options?
18        MS. ANDERSON: Object to the
19 form.
20        THE WITNESS: Michael Foods, the
21 best of my knowledge, has never
22 participated in any of these types of
23 programs with United Egg Producers.
24 And, in fact, that timeline, we would
25 have been expanding our supply.

Page 52

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 BY MS. SMITH:
3    Q.   When was the last time you
4 spoke with Gene Gregory?
5    A.   I think it was early December
6 of 2012 at a point that I called him. I knew
7 he was retiring basically about the same time
8 I did and I called to wish him best of life
9 to come.
10    Q.   During your tenure at Michael
11 Foods, how often did you speak with Gene
12 Gregory?
13    A.   Possibly twice a year.
14    Q.   Who is Connie Bish?
15    A.   Connie Bish was my assistant in
16 my Pennsylvania office in the early 2000, I
17 would guess it was.
18    Q.   Did there come a point where
19 she was no longer your assistant?
20    A.   Yes.
21    Q.   When was that?
22    A.   I don't recall. Again, it was
23 early 2000s.
24    Q.   Do you know where she went?
25    A.   Yeah, she went to Atlanta to

Page 53

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 work for the CDC and to work on her Ph.D.
3        - - -
4        (Exhibit Catherman-5, E-mail
5        chain, Bates MFI0117419 & MFI0117420,
6        was marked for identification.)
7        - - -
8 BY MS. SMITH:
9    Q.   Mr. Catherman, I'm showing you
10 an e-mail marked Exhibit Catherman-5, Bates
11 stamped MFI0117419 through 420. It's an
12 e-mail chain from November 8, 2004, between
13 you, Mr. Catherman and Connie Bish, subject
14 "Dinner Date."
15    A.   Okay. Let me read it.
16        [Reviewing document.] Okay.
17    Q.   Mr. Catherman, in this e-mail
18 which it starts on the bottom of the chain
19 and then moves its way up --
20    A.   Yes.
21    Q.   -- it appears that you were
22 discussing your attendance at the Egg
23 Economic Summit in Atlanta on November 15th.
24 Is that correct?
25    A.   Yes, that's what's reflected

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    here.
3        Q.    And then if you move to the
4    first page and you move to -- it's not the
5    very, very bottom e-mail, but the second from
6    the bottom, you stated, "I can't, the shell
7    egg guys are having an 'Egg Industry Economic
8    Summit' on Tuesday and I can't miss it!!!!!
9    They are losing money again and they think
10   this will help.  Kill 8 million layers
11   overnight and you can fix it!!!!
12       "What do you think the animal
13   welfare folks would suggest???  Maybe we just
14   need to let some out onto the streets."
15       Is that correct?
16       A.    That's what's cited here, yes.
17       Q.    Did you believe that the Egg
18   Industry Economic Summit and the shell egg
19   guys were advocating killing 8 million layers
20   overnight and you can fix their losing money?
21       MS. ANDERSON:  Object to the
22   form of the question.
23       THE WITNESS:  No.  This is my --
24   Connie and I had a constant exchange
25   of humor, if you can call it that.  In

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    the point that in her responsibilities
3    with me, she did our interfacing with
4    suppliers if they called and they had
5    material issues or something else, and
6    she would call them crybabies.  So
7    this is sort of a takeoff on that
8    pleading to our exchanges back and
9    forth with poor attempts at humor, but
10   still very effective between she and
11   I.
12   BY MS. SMITH:
13       Q.    So this is -- you believe that
14   you were joking when you discussed that the
15   shell egg guys believed that killing 8
16   million layers would fix their losing money?
17       MS. ANDERSON:  Object to the
18   form of the question.
19       THE WITNESS:  Yes.
20   BY MS. SMITH:
21       Q.    But a moment ago, in Catherman,
22   I believe we were at 4, one option, Option 2,
23   which is the last page of the document,
24   indicated that the UEP asked their members to
25   reduce their flock size by 5 percent between

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    the dates of January 1 and April 30,
3    January 1 through April 30, 2005.  Do you
4    believe that they were joking when they said
5    they wanted you to reduce your flock size?
6        MS. ANDERSON:  Object to the
7    form of the question.
8        MR. DAVIS:  Object.
9        THE WITNESS:  I don't see the
10   relationship --
11       MR. DAVIS:  Same objection.
12       THE WITNESS:  -- to the two
13   points at all.  My e-mail to her is
14   before the Economic Summit.  I already
15   stated that I did not participate in
16   this and was not aware of this option.
17   And so there's no correlation between
18   the two, from my perspective.
19   BY MS. SMITH:
20       Q.    So you joked that they would
21   suggest that they would kill layers and then
22   they actually asked you to do it?
23       MS. ANDERSON:  Objection.
24   Foundation.  Form.
25       THE WITNESS:  I already cited

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    that I had -- I joked about it, the
3    egg number, I don't recall where I got
4    that, it could have been one, it could
5    have been 300.  But, again, I already
6    cited that I had no idea what UEP was
7    going to talk about at this Economic
8    Summit other than my presentation.
9        MS. SMITH:  Okay, we can take a
10   break.
11       VIDEOGRAPHER:  This ends disc
12   number one of the Catherman
13   deposition.  The time is 10:06:22.
14   Off the record.
15           - - -
16       (A recess was taken.)
17           - - -
18       VIDEOGRAPHER:  On the record
19   with disc number two of the testimony
20   of Toby Catherman in the matter of
21   Processed Egg Products.  The date is
22   March 18, 2014.  The time is 10:22:14.
23   BY MS. SMITH:
24       Q.    Mr. Catherman, I'm going to
25   remind you that you're still under oath.

HIGHLY CONFIDENTIAL

Page 58

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    A.    Yes.
3    Q.    In 2005, Michael Foods was not
4 signed on to the Animal Care Certified
5 Program. Correct?
6    A.    Correct.
7    Q.    Do you recall in April 2005
8 Michael Foods taking any proactive steps to
9 convince their customers that they were
10 following a set of requirements that were
11 scientific and animal welfare friendly?
12    MS. ANDERSON: Object to the
13    form of the question. Lacks
14    foundation.
15    THE WITNESS: I don't really
16    even understand the question, so could
17    you elaborate or restate it?
18 BY MS. SMITH:
19    Q.    Sure. In -- before Michael
20 Foods was a member of the Animal Care
21 Certified Program, did Michael Foods take any
22 steps to convince their customers that they
23 were animal welfare certified, not on a
24 program, but just animal welfare, I'm going
25 to use the term "friendly"?

Page 59

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    MS. ANDERSON: Object to the
3    form of the question.
4    Dana, can I clarify, when you're
5    talking about the Animal Welfare
6    Certified Program, are you talking
7    about the UEP Certified Program?
8    MS. SMITH: Correct.
9    THE WITNESS: At that time,
10    Michael Foods was not part of the UEP
11    Certified Program. Obviously you
12    stated that. But prior to that,
13    already back in 2000, 2001 I think it
14    was, we had our own special
15    proprietary program that we used for
16    one particular customer. And a lot of
17    those standards that were used in that
18    program then were adopted throughout
19    the Michael Foods company owned
20    facilities.
21 BY MS. SMITH:
22    Q.    And what was that proprietary
23 program? Who was that for?
24    A.    Burger King.
25    Q.    And how did that proprietary

Page 60

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 program differ from the Animal Welfare
3 Program of the UEP?
4    MS. ANDERSON: Object to the
5    form of the question.
6    THE WITNESS: The most
7    significant was the square inch
8    capacity level. UEP's was on a
9    graduated scale at that point yet to
10    67, I think if you're still talking
11    2005. This program, if my memory is
12    right, was at 72, it might have been
13    75 square. One or the other.
14 BY MS. SMITH:
15    Q.    So Michael Foods had larger
16 cage space?
17    MS. ANDERSON: Object to the
18    form of the question.
19    THE WITNESS: In that one
20    facility, in one facility for one
21    customer, yes.
22    - - -
23    (Exhibit Catherman-6, Michael
24    Foods Animal Welfare document, Bates
25    MFI0322587 & MFI0322588, was marked

Page 61

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    for identification.)
3    - - -
4 BY MS. SMITH:
5    Q.    I'm marking a document
6 Catherman-6, Bates labeled MFI0322587 through
7 88. It has the Michael Foods' logo on it and
8 it says, "Animal Welfare" at the top.
9    A.    Okay.
10    Q.    First, did you, as an employee
11 of Michael Foods, not in your consulting
12 position, but during your tenure as an
13 employee, have any responsibility for the
14 marketing and sales of Michael Foods
15 products?
16    A.    Yes, there was a period in the
17 early 2000s, I think it was 2000 to 2002, to
18 2003, of which I was also vice president of
19 industrial sales with a primary focus on the
20 East Coast, reporting to Terry Baker at the
21 time.
22    Q.    And what was your role in
23 industrial sales?
24    A.    It's really primarily a
25 supervisory in a point that I did not really

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 make direct sales calls, but did not say I
3 would not call on a customer with one of the
4 sales staff, but my role really was to help
5 reorganize the Papetti Industrial Sales
6 Program on the East Coast into the existing
7 program that Michael Foods already had, and
8 to supervise or -- yeah, supervise that sales
9 group that was involved in that activity and
10 also the customer service group that was
11 involved in that activity.
12     Q.    So you were reorganizing
13 Papetti's Industrial Sales Program.  What are
14 industrial sales?
15     A.    Industrial sales is what we
16 called it at that time, is direct sales to
17 primarily food manufacturers, it could be a
18 bakery, it could be a candy manufacturer,
19 that type of end user, nonfood services,
20 non-retail would basically put everything
21 else into that bucket.
22     Q.    I'm sorry, you said that was
23 2000 to 2002 approximately?
24     A.    Yeah, I believe it was right in
25 that time frame.

Page 63

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     Q.    So, Mr. Catherman, have you
3 ever seen the document Bates stamped
4 Catherman -- not Bates stamped, excuse me,
5 marked Catherman-6?
6     A.    I believe I have.
7     Q.    And how was this document
8 utilized by Michael Foods?
9         MS. ANDERSON:  Object to the
10 form of the question.  Foundation.
11         THE WITNESS:  Based on Michael
12 Foods' sales program and our approach
13 to the market whereas we're satisfying
14 what the marketplace really requires,
15 we will get various inquiries from
16 customers at all kinds of levels
17 about, in this case, different welfare
18 programs and egg supplies that could
19 meet certain welfare programs that the
20 customer thought that they wanted to
21 review.  To assist in that, we created
22 more or less a talking point, white
23 paper if you want to call it this.
24 Sort of highlight the current position
25 of Michael Foods at that time, that we

Page 64

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 were sort of an open catalog and that
3 we had uncertified product,
4 conventional product as one would say.
5 We would also have our proprietary
6 program or create a proprietary
7 program for somebody or that we could
8 develop different standards.  Did the
9 exact same thing on food safety.
10 BY MS. SMITH:
11     Q.    Do you know who wrote this
12 document?
13     A.    I do not recall.
14     Q.    Do you know if you wrote this
15 document?
16     A.    I would doubt it.  But I do
17 believe that I was probably -- did have an
18 edit of it.
19     Q.    This document states, "We
20 believe issues exist surrounding the audit
21 and compliance process and we have
22 reservations with the use of the 'Animal
23 Care' logo."  It's the second bold paragraph
24 on page 1.  Is that correct?
25     A.    Yes, that's what's cited.

Page 65

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     Q.    Do you have an understanding of
3 what those issues were that surrounded the
4 audit and compliance process and why Michael
5 Foods had reservations for the use of the
6 animal care logo?
7         MS. ANDERSON:  Objection.
8 Compound.
9         THE WITNESS:  It's here a
10 reference to the UEP Certified
11 Program.  And, yes, our problem with
12 the audit and compliance process was
13 that the UEP program was established,
14 an audit only went through technically
15 the packing of the egg, in most cases
16 really only went through what occurred
17 in the layer facility itself, not in
18 really what happened in the cartoning
19 area or the egg processing area, and
20 had no guidance, no audit procedures
21 and no guidance from UEP on what would
22 happen to that egg once it left a
23 grading machine or a breaking machine.
24 As part of our internal audit
25 processes, we were always on the

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    forefront, unlike most companies, at a
3    point that we had a full audit program
4    to make sure that we were meeting
5    exactly any labeling or
6    representations we were doing with any
7    of our customers to make sure that we
8    established no commingling, quality
9    standards, all the other factors.  Our
10   concern with the UEP program was that,
11   again, they only audited and monitored
12   until the egg was actually put onto a
13   grading machine.  Once those eggs left
14   that facility, whether they were under
15   grades going to a competitor of mine,
16   and they would potentially label that
17   as UEP certified liquid product, there
18   was no audit process of that.  UEP
19   never established any guidelines on
20   how to monitor that.  There was no
21   establishment of UEP guidelines on
22   representation in the marketplace of
23   products.  So we obviously had huge
24   challenges on that before we put our
25   name on the product or our name next

Page 67

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    to a UEP logo on how that
3    representation could be in the
4    marketplace.
5 BY MS. SMITH:
6    Q.    You stated UEP never
7    established any guidelines on how to monitor
8    that, and what you're referring to is UEP
9    certified liquid product.  Did UEP ever
10   change their guidelines?
11        MS. ANDERSON:  Object to the
12   form.  Foundation.  I think you're
13   misstating his testimony, but you can
14   answer, Mr. Catherman.
15        THE WITNESS:  I, again, don't
16   recall exactly what I said.
17 BY MS. SMITH:
18   Q.    Why don't we read it back.
19 I'll read.  "Our concern with the UEP program
20 was that, again, they only audited and
21 monitored until the egg was actually put onto
22 a grading machine.  Once those eggs left that
23 facility, whether they were under grades
24 going to a competitor of mine, and they would
25 potentially label that as UEP certified

Page 68

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 liquid product, there was no audit process of
3 that.  UEP never established any guidelines
4 on how to monitor that."
5        Did UEP ever establish
6 guidelines on how to monitor that?
7    A.    No.
8        MS. ANDERSON:  Object to the
9    form of the question.
10 BY MS. SMITH:
11   Q.    Did UEP ever establish
12 guidelines on representation in the
13 marketplace of products?
14        MS. ANDERSON:  Object to the
15    form of the question.
16        THE WITNESS:  I don't really
17    know.
18 BY MS. SMITH:
19   Q.    During your tenure at Michael
20 Foods, did UEP ever establish guidelines on
21 the representation in the marketplace of
22 products?
23        MS. ANDERSON:  Object to the
24    form of the question.  Asked and
25    answered.  You just asked him that

Page 69

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    question.
3        THE WITNESS:  I don't recall.  I
4    don't believe they did.
5 BY MS. SMITH:
6    Q.    Let's go back to the document
7 and the third full paragraph.  "Michael Foods
8 has not signed up for certification under the
9 new UEP guidelines.  Since the program
10 requires 100% compliance of all company
11 production facilities, we decided it would be
12 unfair to pass the increased costs of the
13 program to customers who do not require
14 compliance with the new UEP guidelines."
15        Why was it unfair that the
16 program required 100 percent compliance of
17 all company production facilities?
18        MS. ANDERSON:  Objection.
19    Foundation.  You're misstating the
20    document.  Mr. Catherman, if you
21    understand what she's asking you, you
22    can answer.
23        THE WITNESS:  Could you ask the
24    question again?
25 BY MS. SMITH:

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2    Q.   Let's go back. The UEP program

3 required 100 percent compliance of all

4 company production facilities. Correct?

5    A.   Yes.

6    Q.   And what does that -- what was

7 that 100 percent compliance? What were the

8 requirements of 100 percent compliance?

9        MS. ANDERSON: Object to the

10    form of the question. Vague and

11    ambiguous.

12        THE WITNESS: The standard, as

13    my understanding, is that 100 percent

14    of your layer ownership must meet and

15    pass annual audits of the UEP

16    standard. In that standard meant that

17    100 percent of your layers had to pass

18    that audit. As part of that standard,

19    there are various criteria in there

20    including density.

21 BY MS. SMITH:

22    Q.   Back to the document, in that

23 same paragraph, the document states,

24 "Instead, we have chosen to honor individual

25 customer requests to supply eggs that meet

Page 71

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 the new UEP guidelines."

3        Is it your understanding that

4 Michael Foods honored individual requests for

5 meeting the UEP guidelines by its specific

6 customers?

7        MS. ANDERSON: Object to the

8    form.

9        THE WITNESS: I believe that's

10    correct.

11 BY MS. SMITH:

12    Q.   And then it states, "We

13 currently supply eggs that meet or exceed the

14 new UEP guidelines to several customers."

15        Do you know who those customers

16 were?

17    A.   I don't know all of them. One

18 in particular we obviously already cited was

19 Burger King.

20    Q.   The second page of the

21 document, the second to last full paragraph,

22 it states, "We would like to stress to our

23 customers that the eggs are identical whether

24 they are produced under the current

25 guidelines or under the new UEP guidelines.

Page 72

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 However, the implementation of the new UEP

3 guidelines does bring additional costs, which

4 must be reflected, in the final price of

5 eggs."

6        Do you understand that Michael

7 Foods' eggs were identical to those produced

8 under the current guidelines in 2005?

9        MS. ANDERSON: Object to the

10    form of the question. Lacks

11    foundation.

12        THE WITNESS: That's not the

13    point here. The point was that eggs

14    produced under different animal

15    husbandry, densities are nutritionally

16    equivalent.

17 BY MS. SMITH:

18    Q.   Where does it say nutritionally

19 equivalent?

20    A.   That's the point of this.

21 Means you give me an egg that is cage free,

22 organic, conventional caging, the proprietary

23 system under -- we had for UEP, nutritionally

24 you can't tell the difference of any of them,

25 because the difference is in animal welfare

Page 73

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 which has to do with air conditions, density

3 of housing, feeding programs. So those are

4 -- if they're given the same feeding

5 programs, they would all be equivalent. The

6 point here being is that once you went to

7 UEP, you changed that equivalence by a cost

8 factor based on the husbandry standard you're

9 now asking for primarily around the density

10 which would increase cost structures because

11 of the density of which you're housing that

12 bird.

13    Q.   Who is Rich Products?

14    A.   Rich Products is a food

15 manufacturer. They make premixes and whip

16 creams and that type of stuff, based in

17 Buffalo, New York.

18    Q.   And they were a client of

19 Michael Foods?

20    A.   Customer, yes.

21    Q.   Customer.

22        - - -

23        (Exhibit Catherman-7, 12/16/08

24    E-mail with attachment, Bates

25    MFI0068418 - MFI0068446, was marked

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        for identification.)
3             - - -
4    BY MS. SMITH:
5        Q.    Mr. Catherman, I'm showing you
6    a document Exhibit Catherman-7.  It's Bates
7    stamp MFI0068418 through 446.  It's an e-mail
8    and attachment from you to Jason Taylor with
9    a copy to Terry Baker and Bruce Waddell.  The
10   subject, "08-12-18 Rich Products - Egg
11   Industry and Markets."
12           Mr. Catherman, you can review
13   the entire document.
14       A.    Go ahead.
15       Q.    But I'm mostly going to direct
16   your attention --
17       A.    Go ahead.
18       Q.    -- to the documents ending in
19   439 and 440.
20       A.    [Reviewing document.]
21       Q.    Mr. Catherman, have you had a
22   chance to review the document?
23       A.    Partially, yes.
24           MS. ANDERSON:  The pages you
25   directed him to or the entire

Page 75

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        document?
3    BY MS. SMITH:
4        Q.    The pages I directed you to,
5    but do you want to go back and review the
6    entire document?
7        A.    I will if I need to based on
8    your questioning, but I'm fine with these
9    two pages.
10       Q.    Directing your attention to the
11   page Bates stamp MFI0068439, the slide is
12   "Egg Markets."  First, did you create this
13   presentation?
14       A.    I believe I did.
15       Q.    And just for clarity, who is
16   Jason Taylor?
17       A.    He was then and is still vice
18   president of sales for the -- what we call
19   the ingredient division today.
20       Q.    We discussed Terry Baker
21   before, but who is Bruce Waddell?
22       A.    At this time he was a
23   salesperson, I think, and director of
24   customer development or something like that.
25   Reporting to Jason Taylor.

Page 76

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Q.    Now, would Mr. Taylor be the
3    person presenting this presentation to Rich
4    Products?
5        A.    I was -- I would assume.  I
6    don't recall, but I believe that would be the
7    case.
8        Q.    Now would you assist in that
9    presentation beyond preparing the slides?
10           MS. ANDERSON:  Object to the
11   form of the question.  Lacks
12   foundation.
13           THE WITNESS:  No.
14   BY MS. SMITH:
15       Q.    So back to Bates 439, the
16   document states, "What's Causing The
17   Pressure...." - Low Layer -- Lower Layer
18   Inventories:  • 279.6 million today,
19   January 2009 expected to exceed prior year
20   monthly level - first time since
21   December 2006.
22           It then goes on, UEP Certified
23   Guidelines have removed approximately 39
24   million cage spaces, 56 million by 2007 --
25   '10.  Excuse me.

Page 77

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        "- Record Grain prices and
3    higher pullet replacement costs.
4        "- Record Low Dried product
5    inventories in 2007 have now reached 5 year
6    average levels."
7           Is that correct?
8        A.    That's what's cited here, yes.
9        Q.    What are you referring to by
10   "What's Causing The Pressure...."?
11           MS. ANDERSON:  Object to the
12   form.
13           THE WITNESS:  This is all part
14   of an industry trend or industry
15   occurrence update for that customer.
16   So that point would probably be around
17   what is affecting price points.
18   BY MS. SMITH:
19       Q.    And you told your customer that
20   UEP Certified Guidelines have removed
21   approximately 39 million cage spaces, 56
22   million by 2010, and that was affecting the
23   price point?
24           MS. ANDERSON:  Object to the
25   form of the question.  Lacks

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 foundation.
3         THE WITNESS: I didn't tell the
4 customer anything. I presented a
5 document that I cited that UEP
6 guidelines at that point, based on my
7 projections, had removed approximately
8 39 cage spaces. It did not reference
9 and it would have been part of the
10 conversation. That is a market factor
11 but not a sole factor, because just
12 doing during that period of time
13 Michael Foods itself would have added
14 quite a few million birds during the
15 implementation of UEP and would have
16 continued to. So that's an abstract
17 number of what cage changes would have
18 been under a theoretical calculation,
19 which I don't remember what the basis
20 of that was at that time.
21 BY MS. SMITH:
22    Q.   But you wrote that a factor
23 that was causing pressure on the egg market
24 and increasing price was the UEP Certified
25 Guidelines?

Page 79

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2         MS. ANDERSON: Object to the
3 form of the question. That's not what
4 he wrote.
5         THE WITNESS: I wrote exactly
6 what's there, which is UEP guidelines
7 have removed approximately 39 million
8 cage spaces --
9 BY MS. SMITH:
10    Q.   Right.
11    A.   -- as a market factor.
12    Q.   But a moment ago you testified
13 that the point of this presentation is what
14 is affecting price points.
15         MS. ANDERSON: Object to the
16 form of the question. He has not
17 testified as to the point of this
18 presentation.
19 BY MS. SMITH:
20    Q.   So I'm going to read back.
21 This is all part --
22         MS. ANDERSON: Are you rereading
23 his testimony, Counsel, because we
24 have a court reporter to do that.
25         MS. SMITH: Okay. Can the court

Page 80

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 reporter read back his testimony?
3         MS. ANDERSON: Which part would
4 you like?
5         MS. SMITH: 71-06 to 71-10.
6         - - -
7         (The court reporter read the
8 pertinent part of the record.)
9         - - -
10         MS. ANDERSON: You're asking him
11 to confirm his prior testimony?
12         MS. SMITH: I'm asking him that
13 this portion of the presentation was
14 what was affecting price points.
15 BY MS. SMITH:
16    Q.   Is that correct?
17    A.   The presentation has an agenda,
18 and part of that agenda says current events
19 and activities influence Urner Barry markets.
20 So this was a section under that point that
21 was going to be part of the entire agenda.
22    Q.   And so under the heading,
23 "Current Events and Activities influencing
24 the Urner Barry Markets," you wrote one of
25 the points affecting Urner Barry markets is

Page 81

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 UEP Certified Guidelines.
3         MS. ANDERSON: Objection. Where
4 are you quoting in the document,
5 Counsel? The two slides you directed
6 him to say, "Egg Markets."
7         MS. SMITH: Mr. Catherman
8 referred back to page MFI0068420 which
9 is an agenda. And he indicated that
10 this section would fall under "Current
11 Events and Activities influencing the
12 Urner Barry Markets."
13         MS. ANDERSON: What is "this
14 section," Counsel?
15         MS. SMITH: This slide.
16         MS. ANDERSON: What's "this
17 slide"?
18         MS. SMITH: Egg markets.
19         MS. ANDERSON: What's the Bates
20 number?
21         MS. SMITH: MFI0068439.
22         MS. ANDERSON: So you're asking
23 Mr. Catherman to confirm that
24 MFI0068439 falls under the heading
25 "Current Events and Activities

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 influencing the Urner Barry Markets"
3 on MFI0068420?
4     MS. SMITH:  No.  Mr. Catherman
5 said that that would be the heading
6 that this slide would fall under.
7     MS. ANDERSON:  So you're asking
8 him to confirm that this slide, being
9 slide 21, falls under that heading?  I
10 just want to understand the question.
11     MS. SMITH:  Right.  So he
12 confirmed that this slide falls under
13 that heading.
14     MS. ANDERSON:  Are you asking
15 him or not?
16 BY MS. SMITH:
17     Q.    Did this slide fall under that
18 heading?
19     MS. ANDERSON:  And by "this
20 slide," you mean slide 21.  Correct?
21     MS. SMITH:  Correct.
22     THE WITNESS:  Yes.
23     MS. ANDERSON:  And by "that
24 heading," you mean current events and
25 activities influencing the Urner Barry

Page 83

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 markets?
3     MS. SMITH:  Correct.
4     MS. ANDERSON:  Do you understand
5 the question, Mr. Catherman?
6     THE WITNESS:  Yes.  It would be
7 part of the discussion around that
8 agenda point.
9 BY MS. SMITH:
10     Q.    And part of that discussion
11 was -- and part of the discussion as
12 indicated on the agenda of the current events
13 and activities influencing the Urner Barry
14 markets was the UEP Certified Guidelines?
15     A.   It is one of many points that I
16 put on this document that's underneath that.
17 How it was presented and discussed, I was not
18 there.
19     Q.    But you put it there because
20 you believed it was affecting the Urner Barry
21 market?
22     MS. ANDERSON:  Object to the
23 form of the question.  Vague.
24 Ambiguous as to "it," "there," "it"
25 and "affecting."  Do you understand

Page 84

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 the question, Mr. Catherman?
3     THE WITNESS:  Yes, she's
4 referring did I -- is the bullet point
5 citing that UEP guidelines removed
6 approximately 39 million cage spaces.
7 Yes, I wrote that.
8 BY MS. SMITH:
9     Q.    Did you write that the UEP
10 guidelines have removed approximately 39
11 million cage spaces, 56 million by 2010 as a
12 point of what's causing the pressure?
13     MS. ANDERSON:  Object to the
14 form of the question.
15     THE WITNESS:  I already said
16 that I did write it and it was part of
17 what should have been a discussion
18 around market factors. The discussion
19 was to update our customer as their
20 request, which every customer requests
21 when you go in, what's affecting Urner
22 Barry.
23 BY MS. SMITH:
24     Q.    Did there ever come a time when
25 you believed that Michael Foods would cancel

Page 85

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1
2 their membership with UEP?
3     A.   I don't really recall that.
4     Q.    Did Michael Foods ever consider
5 suing UEP?
6     A.   Not that I recall.
7         - - -
8         (Exhibit Catherman-8, E-mail
9 chain, Bates MFI0006564, was marked
10 for identification.)
11         - - -
12 BY MS. SMITH:
13     Q.    I've handed you what's been
14 marked Catherman-8, Bates stamped MFI0006564.
15 It's a one-page e-mail chain actually.  The
16 first chain is from Gene Gregory to you, Toby
17 Catherman, and with a cc to Roger Deffner and
18 the second in the chain is the forward of
19 that e-mail from you to Terry Baker from
20 March 2005.
21     A.   Yes.
22     Q.    Have you had a chance to review
23 the document?
24     A.   Yes.
25     Q.    Does this refresh your

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  recollection as to whether Michael Foods ever
3  considered canceling its membership with
4  Michael -- with UEP?
5         MR. BARNES: Objection. That's
6  not the question you asked earlier.
7  You asked him if he -- if they ever
8  considered suing. Now you're changing
9  it.
10        MS. SMITH: I also asked if they
11 considered cancelling their membership.
12 BY MS. SMITH:
13    Q.   Did Michael Foods ever consider
14 cancelling the membership?
15    A.   I don't recall.
16    Q.   Did Michael Foods ever consider
17 suing UEP?
18        MS. ANDERSON: Objection. Asked
19 and answered.
20        THE WITNESS: I don't recall.
21 BY MS. SMITH:
22    Q.   Do you recall meeting with the
23 UEP's Animal Welfare Committee in March 2005?
24        MS. ANDERSON: Object to the
25 form of the question. Lacks

Page 87

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  foundation.
3         THE WITNESS: I have no idea.
4  BY MS. SMITH:
5     Q.   Did you ever -- Mr. Gregory
6  wrote to you, "The offer for you to meet with
7  UEP's Animal welfare committee still stands."
8         Did you ever take him up on
9  that offer?
10    A.   I don't know in particular
11 reference to this letter because I don't
12 remember this letter. There were multiple
13 occasions where I attended Animal Welfare
14 Committee meetings. I don't know of any
15 occasion where they had a meeting to meet
16 with me.
17    Q.   You forwarded this e-mail to
18 Mr. Baker on March 22, 2005, with the subject
19 "Let's Meet." That was the original subject.
20 Did you discuss this e-mail with Mr. Baker?
21        MS. ANDERSON: Object to the
22 form of the question. He just told
23 you he doesn't remember the e-mail.
24        THE WITNESS: I don't remember
25 the e-mail, so I did forward it to him

Page 88

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  as I would have any documents coming
3  from UEP since he was on the UEP
4  board.
5  BY MS. SMITH:
6     Q.   And you have no recollection of
7  why -- strike that.
8         Do you know why Mr. Gregory
9  would suggest that you were considering --
10 you being Michael Foods, was considering
11 suing UEP?
12        MS. ANDERSON: Object to the
13 form of the question.
14        THE WITNESS: I think I answered
15 it differently before, but I don't
16 recall this subject at all.
17 BY MS. SMITH:
18    Q.   What is United Egg Association?
19    A.   It's a trade association
20 representing egg processors.
21    Q.   Was Michael Foods a member of
22 United Egg Association?
23    A.   Yes.
24    Q.   If I recall it UEA, do we have
25 an understanding?

Page 89

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     A.   That's fine. Yes.
3     Q.   Who are members of the UEA?
4     A.   Only egg processors. It can be
5  companies that break product and/or companies
6  that only process egg product, but they have
7  to be either a breaker or a processor of
8  products.
9     Q.   Were you on the board of the
10 UEA?
11        MS. ANDERSON: Object to the
12 form of the question as to time.
13 BY MS. SMITH:
14    Q.   During the time period 2000
15 through 2008, were you on the board of UEA?
16    A.   At various points of that, yes.
17    Q.   So at some points you were not
18 on the board?
19    A.   I'm not exactly sure throughout
20 that entire thing. I believe I was, but I
21 wouldn't be exactly sure. I know I
22 definitely was in 2003 through '08.
23    Q.   Were you on any committees of
24 the UEA?
25    A.   UEA basically did not really

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 have that many functioning committees. So I
2 would say no. We had ad hoc committees that
3 the chairman would ask to work on certain
4 products, but there were no really standing
5 committees.
6 Q. You mentioned a chairman. Who
7 is the chairman of the UEA?
8 MS. ANDERSON: Object to the
9 form of the question. Vague and
10 ambiguous as to time.
11 THE WITNESS: When?
12 BY MS. SMITH:
13 Q. Between 2003 and 2008.
14 A. I was chairman, I think, from
15 2004 through 2006. After myself, I believe
16 it was Dan Meagher representing Moark. I
17 think after him and probably in 2008, I think
18 it -- I'm not even sure after that. Before
19 I, I think it was Elliot Gibber from Deb-El
20 Egg.
21 Q. As a result of your membership
22 in the UEA, were you placed on any UEP
23 committees?
24 MS. ANDERSON: Object to the

Page 91

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 form. Foundation. Forgive me, Dana.
2 Strike my objection. I don't think
3 you asked him that.
4 THE WITNESS: I believe that it
5 wasn't a formal committee, there was a
6 group put together under UEP to
7 investigate whether or not we could
8 look at Chicago Board of Trade
9 potentially creating an index as a
10 market index for liquid products.
11 Members of that group had to be UEP
12 members and even though they were,
13 quote, sitting or discussing things
14 that were of interest also to UEA.
15 BY MS. SMITH:
16 Q. Did this committee have a name?
17 MS. ANDERSON: Object to the
18 form of the question.
19 THE WITNESS: I don't recall.
20 BY MS. SMITH:
21 Q. Do you know what the UEP
22 Sub-Committee on Egg Products Price Discovery
23 is?
24 A. Not exactly.

Page 92

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 Q. Do you have any understanding
2 of what it is?
3 A. It may be the name that UEP
4 used for this group. I don't recall.
5 Q. I'm going to show you another
6 document.
7 - - -
8 (Exhibit Catherman-9, 5/24/04
9 E-mail, Bates MFI0330846, was marked
10 for identification.)
11 - - -
12 BY MS. SMITH:
13 Q. Mr. Catherman, I've shown you a
14 document marked Catherman-9, Bates stamped
15 MFI0330846, it's an e-mail from you to Gene
16 Gregory and Dan Meagher with a cc to Al Pope
17 and Ken Klippen from Monday, May 24, 2004.
18 The subject is "UEP Sub-Committee on Egg
19 Products Price Discovery."
20 A. I see it.
21 Q. The first statement you made is
22 "I believe it is important that we are
23 consistent what we call our new sub-committee."
24 Were you a member of the UEP

Page 93

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 Sub-Committee on Egg Products Price
2 Discovery?
3 MS. ANDERSON: Object to the
4 form of the question.
5 THE WITNESS: My statement was
6 earlier that we formed a small group
7 to investigate this. I, in fact,
8 didn't recall that we called it a
9 subcommittee.
10 BY MS. SMITH:
11 Q. You further stated, "I just
12 received my room confirmation from Linda..."
13 Who is Linda?
14 A. I don't remember Linda's last
15 name. She's a staff person at UEP. Redner
16 or something like that. I can't remember.
17 Q. And the meeting is referred --
18 and you further stated, "...and the meeting
19 is referred to as 'UEA'. We all know this is
20 an error, but I believe we need to be sure
21 'ALL STAFF' inside UEP and our committee
22 members' offices use a reference to 'UEP'."
23 Why is that?
24 MS. ANDERSON: Object to the

25 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    form of the question.
3         THE WITNESS: The UEA is a trade
4    association so it cannot at any time
5    be involved or even consider
6    discussions or get-togethers or
7    anything to do with pricing. And so,
8    therefore, even if it entailed
9    meetings that were members of both, it
10   could not be addressed or referenced
11   as a UEA effort.
12   BY MS. SMITH:
13   Q.    Who is Ike in the next
14   sentence, "I like Ike..."?
15   A.    Ike is Irving Isaacson that I
16   referenced to before who was at one time, I
17   don't know if it was at this time, was
18   counsel -- or general counsel for UEP.
19   Q.    You further stated, "...but I
20   don't want to provide more work for him this
21   way!!!"
22         Why would you provide more work
23   for him this way?
24         MS. ANDERSON: Object to the
25   form of the question.

Page 95

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2         MR. DAVIS: Objection to the
3    extent that it calls for any UEP
4    privileged information.
5         MS. ANDERSON: You can answer
6    the question without revealing any
7    legal information -- I'm sorry, legal
8    advice that UEP's counsel may have
9    given you.
10        THE WITNESS: My understanding
11   was, as I cited before, UEA could
12   never be involved in any price
13   discovery or any other pricing
14   discussions so, therefore, I wanted to
15   make sure that any references that I
16   was involved in, and at this time I
17   believe I might have still been chair,
18   that I was not going to expose UEA to
19   inaccuracies that could create legal
20   challenge.
21   BY MS. SMITH:
22   Q.    Why can't UEA be involved in
23   any price discussions?
24         MS. ANDERSON: I'm going to
25   object to the form of the question.

Page 96

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    You're asking a fact witness for his
3    lay opinion, you're not seeking legal
4    advice?
5         MS. SMITH: Correct.
6         MR. DAVIS: I also object to the
7    extent that this calls for any advice
8    that came from counsel for UEP.
9         MS. ANDERSON: My instruction is
10   the same as before, Mr. Catherman.
11   You can answer the question if you can
12   do so without revealing any legal
13   advice from counsel for Michael Foods
14   or UEP.
15        THE WITNESS: Then I can't.
16   BY MS. SMITH:
17   Q.    Who is Dan Meagher?
18   A.    I don't know that name, you may
19   be mispronouncing the last name.
20   Q.    I'm going to spell the name.
21   A.    Okay.
22   Q.    M-E-A-G-H-E-R.
23   A.    Dan Meagher.
24   Q.    Meagher.
25   A.    He was, I believe, the

Page 97

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    president of Moark's egg products division.
3    Q.    Who is Dana Persson?
4    A.    He was a CEO of Golden Oval Egg
5    Products.
6    Q.    Who is Brian Hayward?
7    A.    Brian is vice president of
8    sales for Crystal Farms, Creighton Brothers.
9    Q.    Were you correcting yourself or
10   is that --
11   A.    Creighton Brothers, Crystal
12   Farms are the same entity. So I'm not sure
13   if one is just a trade member, the other one
14   is a corporate name. I've seen him use both.
15   Q.    Who is Norm Stocker?
16   A.    Norm Stocker back at this time
17   was probably director of procurement for
18   Cargill. I believe that was his title.
19   Q.    Were all of these people
20   members of the Sub-Committee for Egg Products
21   Price Discovery?
22         MS. ANDERSON: Object to the
23   form of the question. Vague and
24   ambiguous.
25         THE WITNESS: I don't recall.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2          - - -
3          (Exhibit Catherman-10, Agenda
4      and Minutes, Bates MFI0007263 -
5      MFI0007266, was marked for
6      identification.)
7          - - -
8  BY MS. SMITH:
9      Q.   Mr. Catherman, I'm showing you
10  a document Bates stamped MFI0007263 through
11  7266. The first page titles it "UEP
12  Sub-Committee for Egg Product Market
13  Discovery Washington DC October 10, 2005."
14      You can review the document.
15      A.   Yes, I'm reading it.
16  [Reviewing document.]
17      Okay.
18      Q.   On the first page marked
19  "Agenda," the second point says, "Review
20  Minutes from previous meeting."  Correct?
21      A.   Yes.
22      Q.   And then if you turn to the
23  third page of the document, Bates stamp
24  MFI0007265, are those the minutes from the
25  previous meeting?

Page 99

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2      A.   It would appear so.
3      Q.   The committee chairman -- it
4  states on the top, "Committee Chairman Dan
5  Meagher called the meeting to order at 9:30
6  AM with the following being present."  And
7  then it lists "Dan Meagher - Dana Persson -
8  Larry Seger - Toby Catherman - Brian
9  Hayward."
10      Were all these people members
11  of the committee -- Sub-Committee for Egg
12  Products Price Discovery?
13      MS. ANDERSON:  Object to the
14      form of the question.  Vague and
15      ambiguous.
16      THE WITNESS:  I believe all the
17      people were part of the working group
18      that was put together.  I still
19      challenge the idea of a price
20      discovery or a subcommittee.
21  BY MS. SMITH:
22      Q.   Larry Seger was part of that
23  working group?
24      A.   It would reflect so, yes.
25      Q.   I know you stated this earlier,

Page 100

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  but who did Larry Seger work for?
3      A.   Wabash Valley.
4      Q.   Now, if you look further down
5  on the document, it lists under point 4,
6  "Norm Stocker of Sunny Fresh Foods was to
7  investigate the possible trading through
8  Cargill."
9      Was Norm Stocker part of the
10  working group?
11      A.   I don't recall.
12      Q.   But the working group,
13  according to these minutes, asked Mr. Stocker
14  to investigate the possible trading through
15  Cargill?
16      A.   It would be implied here that
17  that was going to -- to occur.
18      Q.   Do you know Norm Stocker
19  personally?
20      A.   Yes.
21      Q.   Do you recall him ever
22  attending subcommittee -- meetings of the
23  Sub-Committee for Egg Products Price
24  Discovery?
25      A.   I don't recall him attending

Page 101

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  any of the working group meetings.
3      Q.   But the working group asked him
4  to do work for them?
5      A.   That's what's reflected here.
6      Q.   Was Sunny Fresh a member of the
7  UEA?
8      A.   Yes.
9      Q.   Was Sunny Fresh a member of
10  UEP?
11      A.   No.
12      Q.   Why not?
13      MS. ANDERSON:  Object to the
14      form of the question.
15      THE WITNESS:  The best question
16      is to ask UEP.
17  BY MS. SMITH:
18      Q.   What does Sunny Fresh do?  What
19  is their business model?
20      A.   Sunny Fresh is a food service,
21  primary food service egg processor and
22  marketer.
23      MS. SMITH:  Take a break.
24      VIDEOGRAPHER:  This ends disc
25      number two of the Catherman

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        deposition.  The time is 11:21:43.
3        Off the record.
4            - - -
5        (A recess was taken.)
6            - - -
7            VIDEOGRAPHER:  On the record
8        with disc number three of the
9        testimony of Toby Catherman in the
10       matter of Processed Egg Products.  The
11       date is March 18, 2014.  The time is
12       11:35:23.
13   BY MS. SMITH:
14       Q.   Hi, Mr. Catherman.
15           Who is John Brommer?
16       A.   John Brommer is a sales
17   representative for Michael Foods.
18       Q.   Did you work with Mr. Brommer
19   at Michael Foods?
20       A.   Yes.  Actually I had hired him
21   way back in the Quaker State days, so he --
22   worked with him on and off since early '80s.
23       Q.   Did he report to you?
24       A.   He did during that Quaker State
25   period and also during the short period where

Page 103

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    I was the industrial VP, that two- or
3    three-year period.
4        Q.   When did you say that was?
5        A.   I think it was 2000 to 2003,
6    somewhere in that window, give or take a
7    year.
8        Q.   Do you know who Laura Lyon is?
9        A.   I don't recall.
10           - - -
11           (Exhibit Catherman-11, E-mail
12       chain, Bates MFI0322904 - MFI0322907,
13       was marked for identification.)
14           - - -
15   BY MS. SMITH:
16       Q.   I'm just going to read it into
17   the record.  This has been marked Catherman
18   Exhibit 10 -- 11 with Bates range MFI0322904
19   through 907.  It's an e-mail chain from
20   March 2007 with the subject, "Sacramento dry
21   whole."  The initial e-mails are between
22   Laura Lyon and John Brommer.  And the final
23   e-mail is between Mr. Brommer and you, Mr.
24   Catherman.  Why don't you take a moment to
25   review through.

Page 104

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        A.   [Reviewing document.]  Okay.
3        Q.   I'll just ask you a few
4    questions first.
5            Michael Foods signed onto the
6    Animal Care Certified Program or the UEP
7    Certified Program in 2006.  Correct?
8            MS. ANDERSON:  Object to the
9        form of the question.
10           THE WITNESS:  Yes, I believe it
11       was sometime in 2006.
12   BY MS. SMITH:
13       Q.   And who is the United States
14   Egg Marketers?
15       A.   It was a separate group of
16   producers that were organized into this group
17   to export shell eggs.
18       Q.   And if I use the term "USEM,"
19   is that the United States Egg Marketers?
20       A.   Yes.
21       Q.   Is Michael Foods a member of
22   USEM?
23       A.   Never.
24       Q.   So back to the document.  The
25   top of the document starts, "Laura," and then

Page 105

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    it goes, "Toby..."  Looking at this document,
3    do you believe the initial e-mail was
4    addressed to you?
5        A.   That the initial e-mail?
6        Q.   Right, the very top e-mail.
7            MS. ANDERSON:  The last e-mail.
8    BY MS. SMITH:
9        Q.   The last e-mail, but the top
10   e-mail in this chain.
11       A.   Yes, the last e-mail is
12   addressed to me, it's -- apparently John
13   didn't incorporate some of the format I do.
14   When I refer to somebody I've created an
15   e-mail, and on top that has placed an inquiry
16   to somebody else for review.  Although in
17   poor shape, you should have put lines or some
18   other way to make sure you distinguish the
19   formatting.
20       Q.   Mr. Brommer wrote, "Toby, I
21   want to use this to reply to Laura Lyon at
22   Campbell.  See her note below."  Correct?
23       A.   That's what's cited here.
24       Q.   "Please review this, correcting
25   any stated errors.  I did not know feed/egg

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 costs so they will most likely be incorrect.
3 I don't like parts of it but on average it
4 works." Correct?
5        A.    That's what is cited.
6        Q.    Did you review this letter from
7 Mr. Brommer?
8        A.    I do not recall if I did or
9 not.
10       Q.    Would it be your normal
11 business practice to review letters addressed
12 to you with -- requesting help?
13           MS. ANDERSON:  Object to the
14           form of the question.  Lacks
15           foundation.
16           THE WITNESS:  Yes, it would.
17 BY MS. SMITH:
18       Q.    I'm going to go to the second
19 page of the document MFI0322905.  And I'm
20 going to go to the bottom of the page which
21 is an e-mail from John Brommer to Laura Lyon.
22       Mr. Brommer stated, "The market
23 is right at the $2.30 we quoted.  Easter
24 inventories are starting to be built and
25 another export to Europe has been completed

Page 107

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 with yet another one pending.  The egg
3 producers have kept the market tight trying
4 to hold on to their gains through Easter.
5 They are being pressured by this $4.00 corn
6 to keep the market up."
7       Is that correct?
8        A.    That is what's cited.
9        Q.    In your experience in
10 procurement in March 2007, and based on Mr.
11 Brommer's question, was that correct as Mr.
12 Brommer stated?
13           MS. ANDERSON:  Object to the
14           form of the question.
15           THE WITNESS:  I truly don't
16           remember those market conditions, if
17           those numbers were correct at the
18           time.  $4 corn would put cost
19           pressures on historical levels of
20           pricing.
21 BY MS. SMITH:
22       Q.    Do you recall an export to
23 Europe in March 2007 with another export
24 pending?
25       A.    No.

Page 108

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Q.    Ms. Lyon wrote to Mr. Brommer,
3 "I don't believe a bit of it.  Who's the big
4 exporter?  My understanding is that they're
5 selling at a loss to what they can make here
6 so why would they want to do that?  Inventory
7 levels are well above last year and the feed
8 isn't yet making that big of an impact.  It
9 would be nice if someday they figured it out
10 and rather than manipulate prices and UB
11 folks, they'd work on a fair market basis.
12 (I'm not saying this about any one
13 manufacturer in particular but the industry
14 as a whole).  There's no rhyme or reason to
15 any of it."
16       Is that correct?
17        A.    That is what's written here.
18        Q.    Do you know who the big
19 exporter Ms. Lyon is referring to?
20           MS. ANDERSON:  Object to the
21           form of the question.  Ms. Lyon is not
22           referring to one.  She's asking who it
23           is.
24           MS. SMITH:  Correct.  Strike
25           that.

Page 109

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 BY MS. SMITH:
3        Q.    Do you know who the big
4 exporter Ms. Lyon is questioning about is?
5        A.    Based on the latter part of the
6 e-mail where it's speaking about exports
7 going to Europe, and another one pending, I
8 would -- it would be inferred in my memory
9 that, yes, it would be U.S. Egg Marketers.
10 They were the agency exporting at that time
11 over those multiple periods of time.
12        Q.    I'm going to move up to the
13 next e-mail which is the e-mail that Mr.
14 Brommer wrote and asked you to review.  He
15 wrote, The Exporter is a group called UEP
16 (United Egg Producers) whose membership is
17 the layer hen owners in America today.  They
18 are selling at a loss to support the domestic
19 markets prices.  There was an export that
20 concluded in early March and they tentatively
21 have another scheduled for mid April.  Each
22 of these exports included approximately 300
23 containers of 800 - 30 dozen cases.
24       Is that what it says?
25        A.    That's what's cited here.

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Q.    Did you disagree with any of
3    the statements Mr. Brommer made in this
4    e-mail?
5        A.    I don't recall my reaction to
6    it, but I would cite right away that
7    obviously the first statement there
8    referencing UEP was an error. The second
9    clarifications that selling at a loss is a
10   poor domestic market is not a phrase that I
11   would support being advanced to a customer.
12       Q.    You wouldn't support it being
13   advanced to a customer, but was the statement
14   itself true?
15       A.    I don't know. I don't know
16   what their costs are.
17       Q.    In the last paragraph starting
18   with "Fair pricing...," Mr. Brommer wrote,
19   "Fair pricing: The egg market was too low
20   too long and this type of market reaction is
21   what keeps the growers profitable."
22       Do you know what he meant by
23   "this type of market reaction"?
24       MS. ANDERSON: Object to the
25   form of the question. Calls for

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    speculation.
3        THE WITNESS: I would assume
4    you'd have to ask Mr. Brommer.
5    BY MS. SMITH:
6        Q.    Did you ask Mr. Brommer what he
7    meant when he sent this to you?
8        A.    I don't recall if I did or not.
9    I probably would have stricken that.
10   Obviously this is not my response, so I'm not
11   sure how I responded to this.
12       Q.    Do you recall if as an employee
13   of Michael Foods you were ever asked by USEM
14   to export eggs?
15       A.    No. Because you had to be a
16   member of U.S. Egg Marketers to do the
17   exporting.
18       Q.    Were you kept informed by USEM
19   of when they were sending -- when they were
20   exporting eggs?
21       MS. ANDERSON: Object to the
22   form of the question.
23       THE WITNESS: Absolutely not.
24   Never had any direct conversations
25   with U.S. Egg Marketers about their

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    activities. My information would come
3    from friends of the industry that
4    maybe some of the members or not, but
5    that would talk about maybe what they
6    were doing and/or conversations I had
7    with Urner Barry on what they were
8    hearing.
9        -  -  -
10       (Exhibit Catherman-12, 1/3/07
11   Fax with attachment, Bates MFI0322666
12   - MFI0322675, was marked for
13   identification.)
14       -  -  -
15   BY MS. SMITH:
16       Q.    Mr. Catherman, I'm showing you
17   a document Bates stamped MFI0322666 through
18   675. Indicates --
19       MS. ANDERSON: Are you marking
20   it Exhibit 12?
21       MS. SMITH: It's being marked as
22   Exhibit 12.
23   BY MS. SMITH:
24       Q.    I'm unclear if this is a fax or
25   an e-mail, but I'll inquire of that when you

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    review it. The document is from January 3,
3    2007.
4        First, is this a fax or an
5    e-mail?
6        A.    This looks like it was an
7    electronic fax.
8        Q.    Did you sometimes receive faxes
9    to your e-mail account?
10       A.    Yes, I had an electronic fax
11   number that went into my e-mail account,
12   correct.
13       Q.    Now, it indicates it's from
14   RightFax E-mail Gateway. Do you know who
15   RightFax E-mail Gateway is?
16       A.    No idea.
17       Q.    Do you recall receiving this
18   fax?
19       A.    No, I don't. But after looking
20   at it, I do remember look at specifications
21   for the exports as a way of gaining knowledge
22   of what the industry was doing with their
23   exports. Again, part of my job to understand
24   what somebody -- what activities are going on
25   there, what would be the quality of the egg

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    they were exporting, what are their
3    requirements and all those factors would be
4    of interest of me, to me I should say.
5        Q.   If you look at the top of the
6    second page Bates stamped MFI0322667, and
7    then you look at the fax kind of line at the
8    very, very top, it's dated 1/3/2007, and it
9    says 11:26. And it indicates UEP. Would
10   this fax have come to you by way of UEP?
11       A.   I don't recall.
12       Q.   Do you recall if the UEP kept
13   you apprised of USEM's activities?
14       A.   No, they did not.
15       Q.   Do you recall if an employee of
16   UEP would keep you apprised of USEM's
17   activities?
18       A.   They would not.
19       Q.   It says on it "APPROVED," and
20   then I can't really make out what is
21   underneath that.
22       MS. ANDERSON:  Are you on 2667?
23       MS. SMITH:  Correct.
24   BY MS. SMITH:
25       Q.   Do you see who stamped it

Page 115

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    approved, and I believe it says, "Poultry
3    Division, Grading Branch"?
4        A.   Yes. It was Roger Glassoff who
5    was the undersecretary, I believe, at the
6    time at USDA.
7        Q.   Now, do you have an
8    understanding of what he approved?
9        MR. DAVIS:  Objection. Calls
10   for speculation.
11       THE WITNESS:  I really -- I have
12   no idea.
13   BY MS. SMITH:
14       Q.   Did he approve this U.S. Egg
15   Markets European Export Class 1 Net Run?
16       MR. DAVIS:  Same objection.
17   Calls for speculation. Lacks
18   foundation.
19       MS. ANDERSON:  You can answer
20   the question.
21       THE WITNESS:  Well, I mean,
22   Roger Glassoff's responsibility at the
23   time, if I'm correct, was he was a
24   senior over all the USDA egg
25   inspectors and shell egg processing

Page 116

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    facilities. So I'm assuming, which
3    would be the case, that any product
4    that was labeled USDA had to be
5    approved by Washington for its
6    labeling. The labeling mechanism
7    and/or what they were inspecting for
8    had to be approved by Washington. So
9    the assumption I have, by looking at
10   this, from my experience, is that
11   Roger approved the inspection -- the
12   guidelines for the quality and the
13   criteria for eggs being exported that
14   his inspectors, USDA being that, would
15   follow when they were approving and
16   preparing and inspecting product prior
17   to shipment for export.
18   BY MS. SMITH:
19       Q.   Do you know what the egg
20   procurement update is?
21       A.   It's too general of a question.
22       Q.   Did the UEP ever send out
23   something called the egg procurement update?
24       A.   Not that I recall. Using
25   that -- they had a newsletter, but other than

Page 117

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    that. A newsletter, a calendar, that type of
3    thing.
4        Q.   I'm going to show you another
5    document.
6        -  -  -
7        (Exhibit Catherman-13, 12/22/06
8    E-mail with attachment, Bates
9    MFI0104583 - MFI0104585, was marked
10   for identification.)
11       -  -  -
12   BY MS. SMITH:
13       Q.   I'm showing you what has been
14   marked Catherman Exhibit-13, Bates stamped
15   MFI0104583 through 585.
16       It's an e-mail from Lowell
17   Ostrand to you, Mr. Catherman, and Terry
18   Baker with the subject, Egg Procurement
19   Update for the week of December 24 through
20   December 30, from December 22, 2006.
21       MS. ANDERSON:  The e-mail is
22   from December 22, 2006. Right?
23       MS. SMITH:  Correct.
24       THE WITNESS:  Yes, I'm familiar
25   with these. Do you have a question?

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  BY MS. SMITH:
3      Q.   Now, what is the egg
4  procurement update?
5      A.   This is an internal highly
6  confidential update which is given to various
7  key managers inside Michael Foods about our
8  current sourcing level.
9      Q.   I'm going to direct your
10 attention to, on the first page, it's not a
11 second bullet point, but it's the second
12 paragraph under the first bullet point, and
13 it says on the document, U.S. Egg Marketers,
14 bracket, a UEP exporting producer's
15 organization, close paren -- sorry, not
16 bracket, "...apparently has agreed to a shell
17 egg export of 300 loads with shipments from
18 1/8 through 2/2/07 at delivered port pricing
19 of $.40. This will immediately stop the free
20 fall of the egg markets. We expect the large
21 markets will now hold at current levels and
22 move upward before late January. We did
23 expect this export but it is occurring about
24 3 weeks earlier than originally thought."
25           Is that correct?

Page 119

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2      A.   That's what is cited there.
3      Q.   Did you write that?
4      A.   I don't recall writing it, but
5  it would appear as I did.
6      Q.   What did you mean by, "This
7  will immediately stop the free fall of the
8  egg markets"?
9      A.   Any time historically there was
10 an export or any kind of event, animal
11 disease or something like that, becoming
12 aware in the marketplace, the marketplace
13 would stop. Any spot trades would stop and
14 everybody would start reevaluating their
15 inventory positions and that type of stuff
16 before any activity would continue. Whether
17 they were surplus or not, it was all about
18 stopping, freezing for a period of time to
19 understand really what is the cause and
20 effect of what's the latest buzz.
21     Q.   What did you mean by "the free
22 fall of the egg markets"?
23          MS. ANDERSON: Objection. You
24 just asked him that question and he
25 just answered you.

Page 120

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2          MS. SMITH: Well, he answered
3  that he would stop.
4          MS. ANDERSON: You didn't like
5  his answer, you can ask it again. You
6  can repeat your answer if you'd like,
7  but you've already answered the
8  question.
9  BY MS. SMITH:
10     Q.   I just want to understand what
11 "free fall" means in this statement?
12     A.   My reference would be as
13 apparently the markets were on a declining
14 period as historically would be the norm
15 considering the time of the year, being
16 immediately at the holiday, at post Christmas
17 market. History would recite that I think
18 probably out of -- 19 out of 20 years the
19 markets go down somewhere within a week or
20 two of Christmas.
21     Q.   Within a week or two of
22 Christmas would you typically categorize the
23 egg market as being in a free-fall?
24          MS. ANDERSON: Object to the
25 form of the question.

Page 121

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2          THE WITNESS: That would be my
3  reference for it. Often during that
4  period of time you have a -- the
5  highest percentage correction in the
6  graded large markets that occurs
7  during a period of the year. So if
8  the most dynamic and highest
9  percentage of market adjustment is
10 occurring, I would call it a
11 free-fall. Or it could be a skyrocket
12 if it was going the other way.
13 BY MS. SMITH:
14     Q.   It says -- did the export stop
15 the free-fall of the egg markets in 2007?
16          MS. ANDERSON: Object to the
17 form of the question. Lacks
18 foundation.
19          THE WITNESS: I don't really
20 recall.
21 BY MS. SMITH:
22     Q.   Who is Ken Klippen? You can
23 put that document away.
24     A.   Ken Klippen at one time was the
25 -- a lobbyist for UEP. He was also a --

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 during that function, he was working as our
3 direct contact as the UEP staff person for
4 UEA.
5        Q.    You said "our." What do you
6 mean "our"?
7        A.    UEA's -- UEA always had a
8 person on the UEP staff since they were a
9 hired agency to run our sort of back room, if
10 you want to call it that, as part of the UEA.
11 So he was the staff representative, our only
12 staff representative for UEA at one time.
13       Q.    Did Mr. Klippen work for
14 Michael Foods?
15       A.    I don't believe he ever worked
16 for Michael Foods as an employee.
17       Q.    Did he work for Michael Foods
18 as a consultant?
19       A.    He worked for Michael Foods on
20 a project that we had which was under an
21 alternative Animal Welfare Food Safety
22 Certification Program, but as an independent
23 contractor.
24       Q.    Michael Foods had a program for
25 an alternative Animal Welfare Food Safety

Page 123

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 Program?
3        A.    There was a time that Michael
4 Foods and other companies worked on a --
5 working with Ken Klippen, he did it under his
6 agency, to develop a verified process. I'm
7 not sure of the exact formal name of it. But
8 it was modeled after a USDA quality program
9 which the industry could adapt. And it was
10 very comprehensive to the point that it was
11 working towards an Animal Welfare Husbandry
12 Audit Program, but also then had -- took
13 additional steps on controlling and
14 addressing how product would be processed and
15 packed and marketed and labeled to make sure
16 that the integrity of the program was solid.
17       Q.    Have you ever heard of the
18 Processed Verified Program?
19       A.    That's the program I was just
20 referencing to. Thank you.
21       Q.    Did that Processed Verified
22 Program ever become a program that Michael
23 Foods joined?
24       MS. ANDERSON: Object to the
25 form of the question.

Page 124

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        THE WITNESS: I guess I need you
3 to restate that because the program
4 never really -- it was being
5 developed. It never was executed.
6 BY MS. SMITH:
7        Q.    That's probably a better
8 question. Was the Processed Verified Program
9 ever executed by Mr. Klippen or the --
10       A.    It was developed by Mr.
11 Klippen. It was never adapted or executed by
12 Michael Foods. I don't have firsthand
13 knowledge of any of the other working group
14 actually executed any part of it. To the
15 best of my knowledge, they did not.
16       Q.    Who is Jeff Henning?
17       A.    Jeff Henning is a -- CEO of
18 the company that is a major supplier to
19 Michael Foods.
20       Q.    What company is that?
21       A.    Fremont Farms of Iowa. Sorry.
22 He's not the CEO formally of that, but he is
23 the lead or the largest stockholder or
24 participated because the LLC, so he's
25 probably the largest unit owner, if I can be

Page 125

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 corrected.
3        Q.    Who is -- do you know who Jim
4 Adams is?
5        A.    Jim Adams is currently the CEO
6 of Wenger's Feed Mill Incorporated.
7        Q.    And who is Wayne Carlson?
8        A.    Wayne Carlson was, I believe
9 he's now retired, VP of sales for Sparboe
10 Companies, I think is their formal name.
11       Q.    Do you know who Dave Rettig is?
12       A.    Dave Rettig is CEO president of
13 Rembrandt Enterprises.
14       - - -
15       (Exhibit Catherman-14, 1/4/07
16 E-mail with attachment, Bates
17 MFI0037476 - MFI0037478, was marked
18 for identification.)
19       - - -
20 BY MS. SMITH:
21       Q.    We're showing you an exhibit
22 marked Catherman-14, Bates stamped
23 MFI003746 -- I'm sorry, I read that wrong.
24 37476 through 478. It's an e-mail from you
25 to a host of people that -- including O'Brien

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 S. -- S. Vince O'Brien, Gregg Ostrander,
3 Terry Baker, Michael Elliott, Diane Sparish,
4 Mark Anderson, Charles Bailey, Jim Mohr, Mark
5 Westphal, Ronn Seim and Tim Bebee with the
6 subject "Klippen Animal Welfare Program" from
7 January 4, 2007.
8        Would you take a moment to read
9 through.
10   A.   [Reviewing document.] Okay.
11   Q.   Mr. Catherman, this is an
12 e-mail, I believe, that indicates it's a --
13 the attachment is a summary of activities for
14 the alternative Animal Welfare Program. Is
15 that correct?
16   A.   Yes.
17   Q.   These are your notes?
18   A.   I believe they are.
19   Q.   This summary indicates you were
20 a member of the committee for the Klippen
21 Animal Welfare Guidelines Processed Verified
22 Program?
23        MS. ANDERSON: Object to the
24 form of the question. Foundation.
25        THE WITNESS: Yes, it is there.

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 BY MS. SMITH:
3    Q.   Now, its title -- it lists
4 "Committee Expectations." Do you see where
5 I'm reading?
6    A.   Yes.
7    Q.   It states that this is a
8 "Scientific committee for husbandry program."
9 What does that mean?
10   A.   The listing there, what are the
11 committee's expectations of the program. So
12 the expectation was that there would be a
13 scientific committee established for the
14 husbandry program of this.
15   Q.   The committee -- the next point
16 it states, "Mirror UEP program." What does
17 that mean?
18   A.   It means that the committee
19 expected that whatever program was advanced
20 would mirror UEP's existing certified
21 program.
22   Q.   And then if you go to the next
23 page, at the top of the page it lists
24 "Comparison Klippen to UEP Certified."
25 Correct?

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    A.   Yes.
3    Q.   Then the first point is,
4 "Participation: Layer House not 100%
5 ownership requirement." What does that mean?
6        MS. ANDERSON: Object to the
7 form of the question.
8        THE WITNESS: The significant
9 deviation that we had and always had
10 with the UEP Certified Program early
11 on was the 100 percent rule. This
12 program was advancing without the 100
13 percent rule as one would know it from
14 the UEP Certified Program.
15 BY MS. SMITH:
16   Q.   And the next point it states,
17 "No logo, USDA shield available for tier 1
18 individual company participants." What does
19 that mean?
20   A.   Part of the program is, is
21 unlike the UEP program which had a logo, we
22 would use a USDA shield. USDA had a verified
23 process shield that you could put on your
24 product. And we obviously thought that that
25 meant significantly more to our customer base

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 than a UEP logo.
3    Q.   And the third point is that
4 "Audits on all grading/breaking programs, UEP
5 only required for non-certified companies."
6 Is that correct?
7    A.   That's what's cited here.
8    Q.   What does that mean?
9    A.   The program was going to
10 require that -- obviously that's cited --
11 that there were going to be audits on all
12 grading and breaking programs. The UEP
13 program, as we've spoken about before, did
14 not. It basically stopped at the layer house
15 or in an upgrading machine or packing room or
16 something like that.
17   Q.   The bottom point states,
18 "Documentation intense." Correct?
19   A.   Yes.
20   Q.   What does that mean?
21   A.   This program is going to be an
22 ISO-based program. So if you're familiar
23 with ISO in any way, you'll recall that
24 unlike the UEP program or other programs, it
25 requires documentation and training. It

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  requires how often documents are reviewed,
3  how often things are checked.  So it was
4  extremely an intense program.  If I remember
5  right, this was unlike the certified program
6  which I think was about eight pages.  If I
7  recall, this was over 80 pages.
8      Q.    Does ISO stand for something?
9  ISO?
10     A.    Yeah, ISO.
11     Q.    Is that an acronym for
12 something?
13     A.    I don't know what it actually
14 stands for.  It's an international standards,
15 it's -- you've never heard of ISO 900 and ISO
16 301 and that type of stuff?  Okay.  It's an
17 international standard adapted for high
18 quality verifications and audits.
19     Q.    In the next section, it says,
20 "Next Steps," and if you go to number 4, it
21 says, "Possible UEP negotiation."  What did
22 you mean by that?
23     A.    I believe, my intent was to
24 make sure that as we advanced this, that our
25 program was at minimum mirrored, as it cited

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  before, the UEP program except for the 100
3  percent rule.  So we wanted to make sure that
4  as our program went forward, once it was
5  complete, we would make it obvious to, and
6  show it to UEP so they knew exactly what our
7  program was so there were no mysteries
8  out there or misinformation.  And as part of
9  that, we would make sure that ongoing as UEP
10 scientific committee made any changes, we
11 would want to be aware of them, so make sure
12 that we could file suit if we felt it was
13 appropriate.
14     Q.    And on the bottom you wrote,
15 "Michael's minimum requirements to advance."
16 Do you see where I am?
17     A.    Yes.
18     Q.    The first is "UEP Certified
19 product must be interchangeable into
20 program."  And the second point is, "Program
21 startup by July 2007 or sooner."  Is that
22 correct?
23     A.    That's what's cited.
24     Q.    Did the program start up by
25 July 2007 or sooner?

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2      MS. ANDERSON:  Object to the
3  form of the question.
4      THE WITNESS:  No, it did not.
5  Not -- Michael Foods did not start up
6  this program.
7  BY MS. SMITH:
8      Q.    Do you know why?
9      A.    I would be speculating, so I
10 don't remember actually.
11     Q.    Do you recall in 2007 the UEP
12 being opposed to the Klippen Processed
13 Verified Program?
14     MS. ANDERSON:  Object to the
15 form of the question.  Lacks
16 foundation.
17     THE WITNESS:  I do recall that
18 UEP was going to various lengths of
19 trying to get an understanding of what
20 the program was, who the participants
21 were and what the strategy and/or
22 purpose of the program would be.
23     - - -
24     (Exhibit Catherman-15, 10/11/07
25 E-mail, Bates MFI0005090, was marked

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  for identification.)
3      - - -
4  BY MS. SMITH:
5      Q.    Mr. Catherman, I'm showing you
6  Exhibit Catherman-15, Bates stamped
7  MFI0005090.  This is an e-mail from Ken
8  Klippen to you, Terry Baker, Tim Bebee with a
9  cc to Chris Klippen, from October 11, 2007,
10 and the subject is "UEP's action may be
11 legally actionable."  Why don't you review
12 it?
13     A.    Thank you.
14     [Reviewing document.]  Okay.
15     Q.    First, who is Chris Klippen?
16     A.    The brother of Ken Klippen, and
17 he was an attorney who -- I believe who Ken
18 had -- was using to represent his interest.
19     Q.    At this point in October of
20 2007, was Mr. Klippen still working as a
21 consultant for Michael Foods?
22     A.    I do not recall.  I think we
23 had terminated that arrangement right around
24 that same time.
25     Q.    Mr. Klippen wrote, "Because you

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  asked me 'to rise above the fray' concerning
3  UEP and their demeaning comments concerning
4  what I am doing on behalf of my clients, I
5  have followed your directions and limited any
6  mentioning of them in my newsletters. UEP
7  took exception recently with the invitation
8  to me by a State University to discuss the
9  Processed Verified Program in front of a
10  group of egg producers. No doubt, you will
11  hear more at UEP's meeting next week."
12      Do you see where it says that?
13  A.   Yes.
14  Q.   Did I read that correctly?
15  A.   Go ahead.
16  Q.   Do you recall hearing about Mr.
17  Klippen at a UEP meeting in October of 2007?
18  A.   I don't believe I recall having
19  a public conversation. I do believe that I
20  probably had a private one with Gene Gregory,
21  as I did with Ken Klippen, both of them, sort
22  of like cool their tools if I can say it just
23  in slang. Both of them were -- a lot of
24  animosity between the two of them that was
25  getting to be extremely unprofessional, if I

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  could say it that way. So I think our
3  caution, obviously it's noted here to both
4  parties that, you know, we're in business.
5  This isn't a play yard.
6  Q.   A little bit later in the
7  paragraph Mr. Klippen wrote, "I called USDA
8  to inform them also that UEP was objecting to
9  my talking about their PVP approach to
10  dealing with animal welfare. They are not
11  happy with UEP."
12      Do you recall a time when USDA
13  was not happy with the UEP?
14      MS. ANDERSON: Object to the
15  form of the question. Lacks
16  foundation.
17      THE WITNESS: I don't have
18  firsthand knowledge of that. I do
19  remember Ken Klippen complaining about
20  that and actually accusing Gene
21  Gregory of visiting UEP -- USDA about
22  this issue.
23  BY MS. SMITH:
24  Q.    On the last paragraph Mr.
25  Klippen writes, "Although the UEP

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  Certification program is a profit center, the
3  Board Member wondered if it is time for them
4  to turn over the animal welfare issue to an
5  independent organization like Klippen &
6  Associates, LLC? What is your reaction to
7  this suggestion? As always, I value your
8  thoughts on this matter."
9      Do you recall agreeing that
10  maybe it was time for the UEP -- strike that.
11      What was your reaction to the
12  idea of the UEP turning over the animal
13  welfare issue to an independent organization
14  like Klippen & Associates?
15      MR. DAVIS: Objection to form.
16      THE WITNESS: I think it was
17  pretty consistent with my opinion and
18  the point that I did not believe UEP
19  had the staff nor the expertise to
20  manage a verification -- the certified
21  program and that it should have been
22  taken out to a third source from day
23  one. That had been expressed with
24  Gene Gregory in prior discussions from
25  my viewpoint.

1  TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  BY MS. SMITH:
3  Q.   But that never happened?
4      MS. ANDERSON: Object to the
5  form of the question. What never
6  happened?
7  BY MS. SMITH:
8  Q.   Do you understand?
9  A.   What's the question?
10  Q.   UEP never outsourced to a third
11  party for animal welfare issues, did they?
12  A.   No.
13      MS. ANDERSON: Object to the
14  form of the question. Remains vague.
15      THE WITNESS: Not to my
16  knowledge.
17  BY MS. SMITH:
18  Q.   The subject of the e-mail is
19  "UEP's action may be legally actionable."
20  Correct?
21  A.   That's what's listed.
22  Q.   Do you know if Mr. Klippen took
23  legal action against the UEP?
24  A.   No knowledge of that at all.
25  Q.   At this point -- strike that.

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Do you know where Mr. Klippen
3 is now?
4    A.    No, I do not.
5    Q.    When was the last time you
6 spoke with Mr. Klippen?
7    A.    Probably six years ago or more.
8        MS. SMITH:  I'm going to go off
9 the record.
10        VIDEOGRAPHER:  This ends disc
11 number three of the Catherman
12 deposition.  The time is 12:29:23.
13 Off the record.
14        - - -
15        (A recess was taken.)
16        - - -
17        VIDEOGRAPHER:  On the record
18 with disc number four of the testimony
19 of Toby Catherman in the matter of
20 processed egg products.  The date is
21 March 18, 2014.  The time is 1:05:53.
22        - - -
23        EXAMINATION
24        - - -
25 BY MR. BROWN:

Page 139

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    Q.    Good afternoon, Mr. Catherman.
3 My name is Stephen Brown.  I represent the
4 Direct Action Plaintiffs, Kraft, Kellogg,
5 General Mills and Nestle.
6        I'm going to be asking you some
7 additional questions this afternoon.
8        MS. ANDERSON:  Mr. Brown, if I
9 could just, the Direct Purchaser
10 Plaintiffs, has your questioning
11 concluded?
12        MS. SMITH:  Yes.
13 BY MR. BROWN:
14    Q.    If we could briefly, can you go
15 back to what's marked as Catherman-6, this is
16 MFI0322587.
17    A.    Okay.
18    Q.    If you take a look at the third
19 paragraph, right about in the middle it says,
20 "Instead, we have chosen to honor individual
21 customer requests to supply eggs that meet
22 the new UEP guidelines."
23        Did I read that correctly?
24    A.    Yes.
25    Q.    At this time, were you selling

Page 140

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 any UEP certified eggs?
3        MS. ANDERSON:  At what time,
4 Counsel?
5        MR. BROWN:  The time of this
6 document.
7 BY MR. BROWN:
8    Q.    If you go to the second page of
9 this document, there's a note at the bottom
10 that says, "April 2005."  Do you see that?
11    A.    Yes.
12    Q.    So at the time of this
13 document?
14    A.    At the time of this revision,
15 which is April 2005, we weren't a certified
16 producer.  I don't recall, I don't believe we
17 had our marketing license either at that
18 point, so we would not have been selling any
19 UEP certified product.
20    Q.    Did you have customer requests
21 to supply UEP certified eggs?
22    A.    Yes.
23    Q.    But you were not honoring those
24 requests?
25    A.    We were marketing product that

Page 141

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 was equivalent to a UEP certified product but
3 was not formally certified.
4    Q.    Customers that -- those
5 customers that demanded or that requested UEP
6 certified product, did those customers accept
7 what you referred to as the equivalent?
8        MS. ANDERSON:  Object to the
9 form of the question.  Slightly
10 misstates the document.
11        THE WITNESS:  I wouldn't have
12 firsthand knowledge.  I would assume
13 that because I didn't run sales or
14 have those direct conversations with
15 those customers, but if our operations
16 and sales would require us to have UEP
17 equivalent product, that we would have
18 it available and that we would have
19 our internal control systems to make
20 sure that that was the case.
21 BY MR. BROWN:
22    Q.    I'm handing to you a document
23 that will be marked as Catherman-16.
24        - - -
25        (Exhibit Catherman-16, 5/12/05

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    E-mail, Bates MFI0039578 - MFI0039581,
3    was marked for identification.)
4              - - -
5  BY MR. BROWN:
6    Q.    This is MFI0039578, and this is
7  a May 12, 2005, e-mail that you sent.  Is
8  that correct?
9    A.    That's what's cited here.
10   Q.    I would like to direct you
11 to --
12           MS. ANDERSON:  Just give the
13   witness a minute to read the document.
14           THE WITNESS:  Yes, I'd like to
15   read it.  Thank you.
16           [Reviewing document.]  Okay.
17 BY MR. BROWN:
18   Q.    If you take a look at the page
19 ending 579, on the top it says, "UEP Animal
20 Welfare Committee Tuesday April 19, 2005."
21 Then it says, "Discussion of alternative to
22 Atlanta motions on ACC marketing by
23 Non-Certified Producers/Marketers."
24           Did I read that correctly?
25   A.    Correct.

Page 143

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    Q.    Do you understand what the
3  reference to the Atlanta motions is?
4    A.    The Atlanta motions were, my
5  understanding are cited directly below.
6    Q.    Okay.  Do you recall when those
7  motions were passed?
8           MS. ANDERSON:  Object to the
9    form of the question.  Lacks
10   foundation.
11           THE WITNESS:  Being in April of
12   this letter, I'm assuming, again, it
13   would be in January of 2005 since
14   that's when the UEP meetings held
15   during the poultry conference which
16   occurred every January in Atlanta.
17 BY MR. BROWN:
18   Q.    Do you have any reason to think
19 that that assumption is incorrect?
20   A.    No.
21   Q.    Okay.  So -- let's see.  This
22 document is dated April 19, 2005.  Correct?
23   A.    Yes.  Correct.
24   Q.    Now, let me direct your
25 attention back to what was previously marked

Page 144

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  as Catherman-8.  And this is MFI0006564.
3           MS. ANDERSON:  By "this," you
4    mean Exhibit 8, Counsel?
5           MR. BROWN:  That is correct.
6  BY MR. BROWN:
7    Q.    And, again, this says, Before
8  you decide to sue UEP or cancel membership I
9  would formally like -- excuse me, I would
10 like to formally meet with Michael's senior
11 management.  And that is an e-mail from Gene
12 Gregory to you on March 21, 2005.  Is that
13 correct?
14   A.    Yes.
15   Q.    Does reviewing Catherman-16
16 refresh your recollection as to whether or
17 not you had discussed with Gene Gregory suing
18 UEP?
19   A.    No.
20   Q.    You can put that one aside.
21 Thank you.
22           I'd like to direct your
23 attention to Exhibit Catherman-9.  This is
24 MFI0330846.
25   A.    Okay.

Page 145

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    Q.    Do you recall where the idea
3  for the UEP Sub-Committee on Egg Products
4  Price Discovery came from?
5    A.    No, I do not.
6              - - -
7           (Exhibit Catherman-17, 4/13/04
8    E-mail, Bates MFI0330137, was marked
9    for identification.)
10             - - -
11 BY MR. BROWN:
12   Q.    I am handing you what is being
13 marked Catherman-17.  Please take a minute to
14 review.  And this is MFI0330137.
15   A.    Okay.
16   Q.    So the earliest e-mail on the
17 chain is an e-mail from you April 13, 2004,
18 to dbaker@cmfoods.com.  Is that Dolph Baker?
19   A.    Yes.
20   Q.    And you copy Ken Klippen and Al
21 Pope.  Is that correct?
22   A.    Correct.
23   Q.    In the first paragraph of that
24 e-mail you write, At past UEA meeting and in
25 our Executive Committee calls, it was agreed

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2   that we need to have a price discovery group
3   focused only on the products markets.
4        Did I read that correctly?
5        A.    Almost.
6        Q.    I'll try it one more time.  "At
7   the past UEA meeting and in our Executive
8   Committee calls, it was agreed that we need
9   to have a price discovery group focused only
10  on the products markets."
11       Did I read that correctly?
12       A.    Yes.
13       Q.    Does that refresh your
14  recollection as to where the idea for the UEP
15  subcommittee came from?
16       MS. ANDERSON:  Object to the
17       form of the question.
18       THE WITNESS:  It partially does
19       in the point that it's saying here
20       that it was obviously, as is cited
21       here, came through discussions at UEA.
22       Who, what, when is not -- I don't
23       recall.  It's not cited.
24  BY MR. BROWN:
25       Q.    Did you have a position at UEA

Page 147

1   at this time?
2        A.    2004, I believe I was chairman
3   at that time.
4        Q.    As chairman --  well, withdrawn.
5        Do you know what position Dolph
6   Baker held at the time?
7        A.    No, I don't recall.
8        Q.    Was he involved in UEP?
9        A.    Yes.
10       Q.    At this time?
11       A.    Yes.
12       Q.    Why was the subcommittee to be
13  focused only on the products markets?
14       MS. ANDERSON:  Object to the
15       form of the question.
16       THE WITNESS:  It appears as if
17       the interest of a price discovery on
18       egg products came from UEA, that it is
19       obvious that it would only be on egg
20       products because the membership of UEA
21       would only have interest in products.
22  BY MR. BROWN:
23       Q.    And this committee that's being
24  proposed here would facilitate that interest?

Page 148

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        MS. ANDERSON:  Object to the
3        form of the question.  Are you
4        referring back to a document when you
5        say "here"?
6   BY MR. BROWN:
7        Q.    I'll try that again.  In
8   Catherman-17, there is a discussion of the
9   Egg Products Price Discovery subcommittee.
10  Would this committee that's being proposed
11  here facilitate the interest that you refer
12  to?
13       MS. ANDERSON:  Object to the
14       form of the question.  I have no idea
15       what you're asking him.
16       THE WITNESS:  I'm not sure what
17       you're asking.
18  BY MR. BROWN:
19       Q.    Was there an interest on price
20  discovery on egg products from UEA?
21       MS. ANDERSON:  Object to the
22       form of the question.  If you
23       understand it, you can answer, Mr.
24       Catherman.
25       THE WITNESS:  I believe that

Page 149

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        there were members of UEA that had
3        interest in price discovery on egg
4        products.  As cited before, UEA could
5        not.
6   BY MR. BROWN:
7        Q.    And the interest that you just
8   referred to, would this committee that's
9   being proposed in Catherman-17 facilitate
10  that interest?
11       MS. ANDERSON:  Object to the
12       form of the question.
13       THE WITNESS:  I think the
14       working group that was being thought
15       of could potentially approach those
16       subjects.
17  BY MR. BROWN:
18       Q.    How could it approach those
19  subjects?
20       MS. ANDERSON:  Object to the
21       form of the question.
22       THE WITNESS:  You want to define
23       "subjects" or you want me to?
24  BY MR. BROWN:
25       Q.    Well, I'm referring to what you

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    said. You said that the working group could
3    potentially approach those subjects. What
4    did you mean when you said "subjects"?
5        A.    I'm mentally referring to a
6    document you showed me earlier which was, I
7    believe, the purpose or various other issues
8    around this committee citing that it would
9    look at transparency of markets, look at
10   potential -- the Chicago Board of Trade
11   references and various other things. So,
12   yes, the concept was to have a working group
13   that would approach that idea. Apparently it
14   did meet and did come up with a strategy or a
15   mission statement to at least start
16   discussion.
17       Q.    And in doing those things that
18   you just referred to, would this committee be
19   facilitating an interest of UEA members?
20            MS. ANDERSON: Object to the
21   form of the question. Vague and
22   ambiguous.
23            THE WITNESS: Can you repeat the
24   question again?
25            MR. BROWN: Would you read it

Page 151

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    back?
3            - - -
4            (The court reporter read the
5    pertinent part of the record.)
6            - - -
7            MS. ANDERSON: Same objection.
8            THE WITNESS: It's actually
9    advancing the interest of UEP members
10   that also happen to be a member of
11   UEA.
12   BY MR. BROWN:
13       Q.    Would it also be advancing the
14   interest of UEA members?
15            MS. ANDERSON: Object to the
16   form of the question. Asked and
17   answered.
18            THE WITNESS: Not all members.
19   BY MR. BROWN:
20       Q.    Which members would it be
21   advancing the interests of?
22            MS. ANDERSON: Object to the
23   form of the question. Vague and
24   ambiguous.
25            THE WITNESS: I'm not quite sure

Page 152

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    how one would define that. It
3    depends. Again, it's an undefined
4    question because there was -- nothing
5    ever came out of the committee. So
6    you could only surmise who would have
7    any advantage or benefit from a result
8    that did not occur.
9    BY MR. BROWN:
10       Q.    Did you have particular members
11   in mind when you said "Not all members"?
12            MS. ANDERSON: Object to the
13   form of the question. Vague and
14   ambiguous.
15            THE WITNESS: I don't recall.
16   BY MR. BROWN:
17       Q.    If you'll refer to Catherman-9,
18   and this is MFI0330846, do you recall
19   answering questions about this document
20   earlier today?
21       A.    Yes.
22       Q.    Do you recall saying that you
23   could not answer those questions without
24   revealing the advise of counsel?
25            MS. ANDERSON: I'm going to

Page 153

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    object to the form of the question.
3    The transcript will reflect what his
4    testimony was. If you have a new
5    question, please ask it.
6    BY MR. BROWN:
7        Q.    Without getting into the
8    substance of anything that your attorneys
9    said to you or any attorney said to you, does
10   your understanding of this UEP
11   subcommittee -- withdrawn.
12            You state here in this
13   document, "minor but of HUGE importance," and
14   huge is in all caps.
15            Did I read that correctly?
16       A.    Yes.
17       Q.    What is your understanding of
18   why that is "minor but of HUGE importance"?
19            MR. DAVIS: I object to the
20   extent that the question calls for
21   privileged communications with UEP
22   counsel.
23            MS. ANDERSON: I'm going to
24   instruct you not to answer to the
25   extent you would have to reveal legal

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    advice provided to you by a lawyer.
3    Otherwise, if you can answer the
4    question without doing so, you may
5    answer the question.
6        THE WITNESS: No.
7    BY MR. BROWN:
8        Q.    Was the legal advice provided
9    by UEP counsel?
10        MS. ANDERSON: Object to the
11    form of the question. Lacks
12    foundation. That's not what he said.
13    He said he could not answer the
14    question.
15    BY MR. BROWN:
16        Q.    Did you -- concerning this
17    subject, "minor but of HUGE importance," did
18    you receive advice from UEP counsel?
19        MS. ANDERSON: I'm sorry, "minor
20    but of HUGE importance" is the
21    subject? Object to the form of the
22    question. I don't understand your
23    question.
24    BY MR. BROWN:
25        Q.    Do you understand, sir?

Page 155

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        A.    I'm going to respond to it this
3    way --
4        MR. DAVIS: I'm going to object
5    to the extent that this calls for the
6    witness to reveal any such
7    communication from UEP counsel.
8    BY MR. BROWN:
9        Q.    Were there any other
10    communications from UEP counsel?
11        MS. ANDERSON: Object to the
12    form of the question.
13        THE WITNESS: About a phrase
14    that says "minor but of HUGE
15    importance," the answer is no. What's
16    the question?
17    BY MR. BROWN:
18        Q.    Concerning this UEP
19    Sub-Committee on Egg Products Price
20    Discovery, did you receive any communications
21    from UEP counsel?
22        MS. ANDERSON: You may answer
23    that question yes or no, Mr.
24    Catherman.
25        THE WITNESS: No.

Page 156

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    BY MR. BROWN:
3        Q.    Concerning this UEP
4    Sub-Committee on Egg Products Price
5    Discovery, did you receive any communications
6    from Michael Foods' counsel?
7        MS. ANDERSON: Same instruction,
8    Mr. Catherman. You may answer it yes
9    or no.
10        THE WITNESS: No.
11    BY MR. BROWN:
12        Q.    I'm handing you what's being
13    marked as Catherman-18.
14            - - -
15        (Exhibit Catherman-18, 6/8/04
16    E-mail, Bates MFI0330857, was marked
17    for identification.)
18            - - -
19    BY MR. BROWN:
20        Q.    Did you have a chance to
21    review?
22        A.    Yes.
23        Q.    This is MFI0330857. This is an
24    e-mail from you to Mr. Ken Klippen on June 8,
25    2004. Is that correct?

Page 157

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        A.    Yes.
3        Q.    This is a forward of an earlier
4    e-mail from Gene Gregory to you, and that
5    earlier e-mail is dated also June 8, 2004.
6    Is that correct?
7        A.    Correct.
8        Q.    And Mr. Gregory writes to you,
9    "While the meeting held in Chicago was a UEP
10    Market Discovery Committee meeting, it was
11    done so to benefit UEA members more so that
12    the majority of UEP members."
13        Did I read that correctly?
14        A.    I believe so.
15        Q.    Mr. Gregory continues, "Based
16    upon this, do you think it is fair to charge
17    the expenses of the meeting to UEA?"
18        Did I read that correctly?
19        A.    I believe so.
20        Q.    Do you understand this to be a
21    reference -- withdrawn.
22        If you'll keep that in hand and
23    go back to Catherman-9, please.
24        MS. ANDERSON: You'd like him to
25    keep Exhibit 18 in hand?

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    MR. BROWN: Yes, please.
3    THE WITNESS: Okay.
4 BY MR. BROWN:
5    Q.   Do you understand Mr. Gregory,
6 in Exhibit 18, to be referring to the meeting
7 that is the subject of Exhibit Catherman-9?
8    MR. DAVIS: Object to the form.
9    THE WITNESS: It would appear
10 so.
11 BY MR. BROWN:
12    Q.   And you, after receiving that
13 e-mail, you forwarded it to Mr. Klippen. Is
14 that correct?
15    A.   I forwarded a question to Mr.
16 Klippen, yes.
17    Q.   Including --
18    A.   Sorry.
19    Q.   You forwarded both Gene
20 Gregory's message to you and then an
21 additional question. Is that correct?
22    A.   I forwarded an additional
23 question to Ken Klippen, yes.
24    Q.   Along with what Gene Gregory
25 had sent. Correct?

Page 159

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    A.   Yes.
3    Q.   And your question is, "What are
4 your thoughts," and then three question
5 marks. Is that correct?
6    A.   Yes.
7    Q.   Do you recall discussing this
8 with Mr. Klippen?
9    A.   I really don't. But it's ten
10 years ago.
11    Q.   Mr. Gregory wrote to you, "It
12 was done so to benefit UEA members more so
13 that the majority of UEP members."
14    Did you agree -- excuse me. Do
15 you agree with that statement?
16    A.   Those are his words. It just
17 so happened that this is a -- was a UEP
18 function and that the discussion would
19 benefit processors potentially which were UEP
20 members. There are lots of different
21 functions that UEP would do that would
22 benefit one or two members and not all
23 members. So this would not be an uncommon
24 practice. I would hope not, at least.
25    Q.   So when you say, "not an

Page 160

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 uncommon practice," what practice are you
3 referring to?
4    A.   I was referring to UEP having
5 expenditure that had benefit, yielding
6 benefit to 100 percent of its members.
7    Q.   Was this an expenditure that
8 yielded benefit to 100 percent of its
9 members?
10    MS. ANDERSON: Object to the
11 form of the question. Vague and
12 ambiguous.
13    THE WITNESS: As we already
14 mentioned, to the best of my
15 knowledge, there was no benefit and no
16 actual steps taken out of any of these
17 discussions that were subject to this
18 pricing discovery.
19 BY MR. BROWN:
20    Q.   Did UEP's holding -- excuse me.
21    Did UEP's holding meetings
22 provide any benefits to its members?
23    MS. ANDERSON: Object to the
24 form of the question. It's totally
25 vague and ambiguous.

Page 161

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    THE WITNESS: I don't really
3 know what you mean by that. I mean
4 every -- if a meeting is held without
5 a benefit to somebody, fire that
6 executive, please.
7 BY MR. BROWN:
8    Q.   So do you think this meeting
9 was held without a benefit to somebody?
10    MS. ANDERSON: Object to the
11 form of the question.
12    THE WITNESS: I think it
13 potentially could respond to some of
14 the members' inquiries.
15 BY MR. BROWN:
16    Q.   Which members are you referring
17 to?
18    MS. ANDERSON: Same objection.
19    THE WITNESS: The members that
20 asked and would participate in the
21 discussion.
22 BY MR. BROWN:
23    Q.   Do you have any in mind?
24    MS. ANDERSON: Object to the
25 form of the question.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2         THE WITNESS:  No, I do not.
3 BY MR. BROWN:
4    Q.    I'm going to hand you what's
5 being marked as Catherman-19.
6         - - -
7         (Exhibit Catherman-19, 7/16/04
8 E-mail, Bates MFI0631434, was marked
9 for identification.)
10        - - -
11 BY MR. BROWN:
12   Q.    This is MFI0631434.  Please
13 take a minute to review.
14   A.    I've read it.
15   Q.    The earliest e-mail on the
16 chain is from Gene Gregory to Ken Klippen on
17 July 16, 2004.  Is that correct?
18   A.    Yes.
19   Q.    Mr. Gregory writes to Mr.
20 Klippen, "Brann & Isaacson has invoiced UEP
21 $5,237.64 for research on preparation and
22 attending the meeting in Chicago for the
23 purpose of market discovery for egg
24 products."
25        Did I read that correctly?

Page 163

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    A.    Not perfectly, close.
3    Q.    What did I miss?
4    A.    You said Mr. Klippen.  It was
5 addressed to only Catherman.
6    Q.    Sure.  Thank you.  Other than
7 that, did I read it correctly?
8    A.    I believe.
9    Q.    Thank you.  Mr. Gregory
10 continues "While this was a UEP committee, it
11 was for the purpose of the egg products
12 industry.  Therefore, should this not be a
13 cost charged from UEP to UEA Further
14 Processors."
15        Did I read that correctly?
16   A.    I believe, yes.
17   Q.    Do you understand Mr. Gregory
18 when he writes, "...the meeting in
19 Chicago...," do you understand that to be a
20 reference to the meeting that is discussed in
21 Catherman-9?
22        MS. ANDERSON:  Object to the
23 form of the question.  Do you have
24 Catherman-9 out, Mr. Catherman?
25        THE WITNESS:  Yes.

Page 164

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    I believe it's the same.
3 BY MR. BROWN:
4    Q.    Does this refresh your
5 recollection as to whether or not you
6 received any communication from UEP counsel
7 regarding the UEP Sub-Committee on Egg
8 Products Price Discovery?
9    A.    No.
10   Q.    Do you recall receiving this
11 e-mail?
12   A.    No.
13   Q.    Do you recall Brann & Isaacson
14 having any involvement with the Chicago
15 meeting that's referred to in Catherman-19?
16        MS. ANDERSON:  You can answer
17 that yes or no, Mr. Catherman.
18        THE WITNESS:  I can't say yes or
19 no.
20        MS. ANDERSON:  Can you answer
21 the question without revealing the
22 advice of counsel?
23        THE WITNESS:  Are you asking
24 me -- ask the question again.
25        MS. ANDERSON:  His question was

Page 165

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    whether you recall Brann & Isaacson
3    having any involvement with the
4    meeting referred to in Catherman-19.
5         THE WITNESS:  Can my response
6    be?
7         MS. ANDERSON:  You can answer
8    the question if doing so will not
9    reveal any advice from Brann &
10   Isaacson.
11        THE WITNESS:  Every UEA or UEP
12   meeting I've ever attended had a
13   counsel.  If I attended this meeting,
14   which the record would show that I
15   did, I don't remember who counsel was
16   at that meeting.
17 BY MR. BROWN:
18   Q.    When counsel attended UEA or
19 UEP meetings, was that counsel Brann &
20 Isaacson?
21        MS. ANDERSON:  Object to the
22   form of the question.  Vague and
23   ambiguous.  When?
24 BY MR. BROWN:
25   Q.    Let me just clarify.  You

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 recall that counsel attended every UEA
3 meeting. Is that correct?
4         MS. ANDERSON: I'm going to
5    object to the form of the question
6    because he's testified about six times
7    that he doesn't recall this counsel
8    being at this meeting. Which counsel?
9         MR. BROWN: He just said every
10   UEA or UEP meeting I attended had a
11   counsel.
12        MS. ANDERSON: What is the
13   question?
14 BY MR. BROWN:
15   Q.   I just wanted to confirm you
16 recall that --
17        MS. ANDERSON: You're asking him
18   to repeat his testimony?
19        MR. BROWN: I'm clarifying.
20        MS. ANDERSON: Are you confused?
21 BY MR. BROWN:
22   Q.   Do you have a specific
23 recollection of that or are you just
24 generally stating?
25        MS. ANDERSON: Object to the

Page 167

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    form of the question.
3        MR. BARNES: Object to the form.
4        THE WITNESS: I've already made
5    a statement that I do not remember,
6    from my recall, that I've never
7    attended a UEA or UEP meeting that did
8    not have counsel representation.
9 BY MR. BROWN:
10   Q.   Thank you.
11        Now, in Exhibit Catherman-19
12 Mr. Gregory writes, "While this was a UEP
13 committee, it was for the purpose of the egg
14 products industry."
15        Did I read that correctly?
16   A.   Yes.
17   Q.   Do you agree with that
18 statement?
19   A.   I would not.
20   Q.   Why not?
21   A.   Because it was for the benefit
22 of some of his members. If those members
23 happened to be UEA members or they happen to
24 be members of PIDA, so be it.
25   Q.   The members that benefited from

Page 168

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 this meeting -- well, withdrawn.
3        Were there members that
4 benefited from this meeting?
5        MS. ANDERSON: Object to the
6    form of the question. Vague and
7    ambiguous.
8        THE WITNESS: I already cited
9    that no actionable steps were ever
10   taken from any of these discussions so
11   I believe there was no benefit.
12 BY MR. BROWN:
13   Q.   Were there any UEP members that
14 were members of PIDA?
15   A.   I have no idea.
16   Q.   Do you recall when Mr. Klippen
17 began working as a consultant for Michael
18 Foods?
19   A.   Not exactly. You're asking me
20 about the date?
21   Q.   I was referring to the date,
22 yes.
23   A.   No, I do not.
24   Q.   I'm handing you what's being
25 marked Exhibit Catherman-20.

Page 169

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2         - - -
3        (Exhibit Catherman-20, 12/23/05
4    E-mail with attachment, Bates
5    MFI0031571 - MFI0031576, was marked
6    for identification.)
7         - - -
8 BY MR. BROWN:
9    Q.   This is MFI0031571. And feel
10 free to review in its entirety, but I am just
11 going to direct you to the first couple of
12 sentences in an e-mail from Mr. Klippen.
13 Please let me know when you are ready.
14   A.   [Reviewing document.] Okay.
15   Q.   The earliest e-mail in the
16 chain is an e-mail from Mr. Klippen to Mr.
17 Terry Baker. Is that correct?
18        MS. ANDERSON: What page are you
19   on, Counsel?
20 BY MR. BROWN:
21   Q.   31571. The first page.
22   A.   Yes.
23   Q.   On December -- excuse me.
24        That e-mail from Mr. Klippen to
25 Mr. Baker is dated December 22, 2005.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    A.    Yes.
3    Q.    And there is the heading in
4 that e-mail that says, "Klippen Representing
5 Sparboe Summit Farms and Michael Foods, Inc."
6 And it continues, "UEP's and UEA's former
7 Vice President and Executive Director for
8 Government Relations Ken Klippen is now
9 officially representing Sparboe Summit Farms
10 and Michael Foods, Inc. as a consultant
11 working in Washington, DC."
12        Did I read that correctly?
13   A.    I believe so.
14   Q.    Is this December 2005 around
15 the time when Mr. Klippen began working as a
16 consultant for Michael Foods?
17   A.    I don't recall.
18   Q.    Do you have any reason to think
19 that this is incorrect?
20   A.    No, I do not.
21       MS. ANDERSON:  Object to the
22       form of the question.
23 BY MR. BROWN:
24   Q.    Do you recall when -- well,
25 withdrawn.

Page 171

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2        Do you know whether Mr. Klippen
3 ever worked for UEP?
4    A.    I've already stated to that
5 earlier today, yes, he did.
6    Q.    Do you know when he stopped
7 working for -- well, withdrawn.
8        Do you when Mr. Klippen stopped
9 working for UEP?
10   A.    No, I do not.
11   Q.    Do you know that he did stop
12 working for UEP?
13   A.    Yes, I do.
14   Q.    Do you have an understanding of
15 the circumstances in which Mr. Klippen
16 stopped working for UEP?
17       MR. DAVIS:  Objection.  Vague
18       and ambiguous.  Calls for speculation.
19       Lack of foundation.
20       THE WITNESS:  It would be a
21       vague memory.
22 BY MR. BROWN:
23   Q.    What is your vague memory of
24 that?
25   A.    That he and Gene Gregory had

Page 172

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 some issues and decided to part.
3    Q.    As a consultant for Michael
4 Foods, what type of work did Mr. Klippen do?
5    A.    We asked him to -- I believe he
6 was directed to work with our effort on
7 government relations in Washington, D.C.
8    Q.    Was that the full scope of the
9 work that he did?
10       MS. ANDERSON:  Object to the
11       form of the question.
12       THE WITNESS:  When?
13 BY MR. BROWN:
14   Q.    Well, let's say from 2005
15 approximately any time up to 2008.
16       MS. ANDERSON:  Object to the
17       form of the question.  Lacks
18       foundation.
19       THE WITNESS:  He also worked
20       with us developing an Animal Welfare
21       Program which eventually he took on to
22       his own corporate entity working with
23       several other companies in the
24       industry.
25 BY MR. BROWN:

Page 173

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2    Q.    Did he provide any other
3 services to Michael Foods as a consultant?
4    A.    I wouldn't be aware of all of
5 his functions with us.  I do not know.
6    Q.    I'm going to hand you what will
7 be marked as Exhibit Catherman-21.
8        - - -
9        (Exhibit Catherman-21, E-mail
10       chain, Bates MFI0617596 & MFI0617597,
11       was marked for identification.)
12       - - -
13 BY MR. BROWN:
14   Q.    Please take a minute to review.
15 This is MFI0617596.
16   A.    [Reviewing document.]  Okay.
17   Q.    The latest e-mail in the chain
18 on Exhibit 21 is an e-mail from you to Vince
19 O'Brien, Tim Bebee, Terry Baker and Lowell
20 Ostrand.  Is that correct?
21   A.    Yes.
22   Q.    And this is -- that e-mail
23 is -- excuse me, the latest e-mail in the
24 chain dated October 6, 2006.  Is that
25 correct?

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        A.    Correct.
3        Q.    And in that latest e-mail you
4    are forwarding a communication from Ken
5    Klippen. Is that correct?
6        A.    Correct.
7        Q.    Will you identify for me the
8    recipients of the Klippen e-mail?
9            MS. ANDERSON: The e-mail he is
10    forwarding, Counsel?
11            MR. BROWN: Yes.
12            THE WITNESS: He is forwarding
13    the e-mail, or he is sending an e-mail
14    to Dana Persson who was Golden Oval.
15    J. Dean is at -- Jim Dean at Center
16    Fresh. Blair Van Zetten at Oskaloosa
17    Foods. Jerry Warntjes at Echo Lake
18    Foods. Myself. Terry Baker. Elliot
19    Gibber, E. Gibber at Deb-El Foods. J.
20    Luikart, I can't remember J's first
21    name at Primera. Norm Stocker at
22    Cargill. And I'm not sure who the
23    intent would be at Sonstegard for the
24    eggs@Sonstegard. K. Brodhagen would
25    be Kathy Brodhagen at Abbotsford Egg.

Page 175

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    Dean Hughson I believe at the time was
3    at Rembrandt. Dave Rettig, Rembrandt.
4    And the William would have been
5    William Rehm at Daybreak Foods.
6    BY MR. BROWN:
7        Q.    Mr. Klippen writes, "All:
8    Before the vote is cast on changes to the
9    UEP-certified program this week, please
10    consider the thoughts in this white paper
11    analysis."
12            Did I read that correctly?
13        A.    I believe so.
14        Q.    Do you have an understanding of
15    what vote Mr. Klippen was referring to?
16        A.    Not exactly.
17        Q.    Well, if you take a look down
18    to the bottom of this page, there is a
19    bolded, the word "Phase-in."
20        A.    Okay.
21        Q.    This says, "The concept of
22    phasing in a purchase requirement for
23    non-certified producers/breakers over the
24    next six years will be placed on the table in
25    San Antonio, Texas on October 10th."

Page 176

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2            Did I read that correctly?
3        A.    I believe so.
4        Q.    Does that refresh your
5    recollection as to what vote Mr. Klippen is
6    referring to?
7        A.    Not really.
8        Q.    If you'll do me a favor and
9    keep that in hand.
10            MS. ANDERSON: "That" being
11    Exhibit 21?
12            MR. BROWN: Correct.
13    BY MR. BROWN:
14        Q.    I'm going to hand to you what
15    is going to be marked as Exhibit
16    Catherman-22.
17                - - -
18            (Exhibit Catherman-22, 10/5/06
19    E-mail with attachment, Bates
20    MFI0616647 - MFI0616653, was marked
21    for identification.)
22                - - -
23    BY MR. BROWN:
24        Q.    This is MFI0616647. Feel free
25    to --

Page 177

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2            MS. ANDERSON: Counsel, is this
3    one document?
4            MR. BROWN: It is an e-mail with
5    an attachment.
6            MS. ANDERSON: But is this all
7    one document?
8            MR. BROWN: It was produced all
9    as --
10            MS. ANDERSON: It was produced
11    as one?
12            MR. BROWN: Yes.
13            MS. ANDERSON: The Bates range
14    for those on the phone is MFI0616653.
15    BY MR. BROWN:
16        Q.    Now, feel free to review it to
17    the extent that you would like, although I'm
18    really just showing it to you to try to
19    refresh your recollection about a particular
20    motion.
21        A.    I would like to read it all,
22    but I do recall now that there was pending
23    discussion to limit, if not prohibit the
24    marketing of cage -- excuse me, of certified
25    product.

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        Q.    Okay.  Now, will you refer to
3    Exhibit Catherman-21?  Do you understand that
4    to be the vote that Mr. Klippen is
5    discussing?
6            MS. ANDERSON:  I'm sorry, can
7        you rephrase that?
8    BY MR. BROWN:
9        Q.    Your recollection was refreshed
10   about -- well, why don't we just go through
11   the document.
12       A.    Then I'll need to read it.
13       Q.    Well, okay.  You have an
14   understanding that there was a motion being
15   talked about at this time.  Correct?
16           MS. ANDERSON:  Objection.  Vague
17       and ambiguous.  Are you talking about
18       this time being October 6, 2006, in
19       Exhibit 21?
20           MR. BROWN:  Yes.
21           THE WITNESS:  By looking at the
22       Exhibit Number 22, being October 5th,
23       I would surmise that if we're talking
24       about a forthcoming meeting and a
25       potential motion, and a letter dated a

Page 179

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        day later that addresses a potential
3        vote, yes, I would assume that they're
4        one and the same.
5    BY MR. BROWN:
6        Q.    If we go -- if you'll go back
7    to Exhibit 21, please.  Mr. Klippen in the
8    e-mail -- excuse me.  At the very top of his
9    e-mail he writes, "Before the vote is cast on
10   changes to the UEP-certified program this
11   week..."
12           Did I read that correctly?
13       A.    Yes.
14       Q.    And the changes, what is your
15   understanding of the changes that he was
16   referring to?
17       A.    I don't recall.
18       Q.    In this paragraph with the
19   heading "Phase-in" at the bottom of the
20   e-mail, he talks about "The concept of
21   phasing in a purchase requirement for
22   non-certified producers/breakers over the
23   next six years..."  Would that have been a
24   change to the UEP program?
25           MS. ANDERSON:  Object to the

Page 180

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        form of the question.
3            THE WITNESS:  Potentially, but I
4        don't recall a discussion of requiring
5        a phase in of purchases by
6        non-certified producers.
7    BY MR. BROWN:
8        Q.    I think maybe we should go back
9    to Exhibit 22, please.  And, please, take
10   your time reviewing it.
11       A.    [Reviewing document.]  Okay.
12       Q.    Okay.  The first page of that
13   document -- well, backing up.  That's an
14   e-mail from you to Mr. Terry Baker, Mr. Vince
15   O'Brien, copying Mr. Tim Bebee, dated
16   October 5, 2006.  Is that correct?
17       A.    Correct.
18       Q.    You write, "In advance of next
19   week's UEP annual meetings, I spoke to Gene
20   Gregory about the possible motion being
21   advanced in the Welfare Committee to prohibit
22   marketing of non-certified eggs."
23           MR. BARNES:  What are you
24       reading from, Counsel, 22?
25           MR. BROWN:  22, that's correct,

Page 181

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        the first page of the document.  It's
3        the first sentence under the word
4        "Attachment" which is in bold.
5            MR. BARNES:  Okay.  Thank you.
6    BY MR. BROWN:
7        Q.    Are you with me, sir?
8        A.    Yes.
9            MS. ANDERSON:  Is there a
10       question about what you just read?
11   BY MR. BROWN:
12       Q.    Did I read that correctly?
13       A.    I believe so.
14       Q.    I will direct your attention to
15   the page that ends 6650.
16       A.    Okay.
17       Q.    And there's a heading on this
18   page that says, "MOTION."  Is it your
19   understanding that this motion that is
20   referred to on the page ending 6650 is the
21   motion that you were referring to on the
22   first page of this document in your e-mail?
23           MS. ANDERSON:  Object to the
24       form of the question.
25           THE WITNESS:  I would say yes.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  BY MR. BROWN:
3      Q.    Were you in favor of that
4  motion?
5      A.    You're asking my personal
6  opinion, no, I was not.
7      Q.    In your e-mail, still on
8  Exhibit 22, the first page, there's a
9  statement from you, "He...," I believe this
10 refers to Gene Gregory, "stated that in his
11 opinion, this is a direct attack towards
12 Michael Foods by Rose Acres and thus a
13 competitive issue and activity, not an
14 improvement to the welfare guidelines."
15     Did I read that correctly?
16     A.    Yes, you did.
17     Q.    Do you agree with that
18 statement?
19         MR. BARNES:  Object to the form.
20         THE WITNESS:  Well, the
21 statement I'm making there is a recap
22 of my thought of what I had heard from
23 a he, he being most likely Gene
24 Gregory.  So it's not whether I agree
25 or not, it's whether or not what he

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  was referring to or stating.
3  BY MR. BROWN:
4      Q.    In your personal opinion, you
5  were not in favor of this motion.  Correct?
6      A.    Correct.  Already stated.
7      Q.    Thank you.
8      We can move just quickly to
9  Exhibit 21 again.
10     A.    Okay.
11     Q.    Is it your understanding that
12 in this e-mail Mr. Klippen is discussing the
13 motion that we just looked at that is in
14 Exhibit 22?
15         MS. ANDERSON:  Object to the
16 form of the question.  Are you
17 referring to the e-mail from
18 Mr. Klippen?
19         THE WITNESS:  I don't recall.
20         MS. ANDERSON:  Hold on one
21 second, Mr. Catherman.  Are you
22 referring to the e-mail from Mr.
23 Klippen to the long series of
24 individuals which is the second e-mail
25 in Exhibit 21?

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2          MR. BROWN:  That's correct.
3          THE WITNESS:  I don't recall.
4  In fact, when I started looking at
5  them, under his phase-in process, he
6  doesn't even mention about the
7  purchase requirement being a condition
8  of certified membership.  So that's my
9  response before where I didn't
10 remember that discussion about a
11 purchase requirement as part of
12 membership into the certified program,
13 whereas, the motion and discussion in
14 the other documents, it was
15 potentially a requirement for
16 participation in the program.  A
17 slight clarification.
18 BY MR. BROWN:
19     Q.    Do you understand that a
20 purchase requirement was being proposed as a
21 change to the UEP Certified Program at this
22 time?
23         MS. ANDERSON:  Object to the
24 form of the question.  Lacks
25 foundation.

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2          THE WITNESS:  I recall by
3  looking at this document that there
4  was a UEP member who was promoting
5  that concept.
6          MS. ANDERSON:  And the record
7  should reflect that Mr. Catherman is
8  looking at Exhibit 22.
9  BY MR. BROWN:
10     Q.    Exhibit 21, sir.  Now, you
11 write "...we had Ken send it..." -- well,
12 let me back up.
13     In the latest e-mail to the
14 chain from you dated October 6, 2006, you
15 write, "...we had Ken send it to the
16 following."
17     Did I read that correctly?
18     A.    Yes.
19     Q.    When you say, "...send it to
20 the following," were you referring to the
21 addressees on Mr. Klippen's e-mail that is
22 the e-mail that you forwarded?
23     A.    I believe so.
24     Q.    What did you mean when you
25 said, "...we had Ken send it to the

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  following"?
3        A.    We as a representative of the
4  working group that was a verified process of
5  which he was working for us, I believe, at
6  this time. So as he created the document, it
7  was obviously working to the Guidance
8  Committee, and that group made sure that any
9  art of work that he was creating was sent to
10 all of its memberships.
11       Q.    Did you request that
12 Mr. Klippen send it to the addressees?
13       A.    Did I request? I do not recall
14 that I requested it.
15       Q.    Okay. You then write in the
16 latest e-mail in the chain, "I did ok him to
17 send it to Sparboe group under a separate
18 cover to keep them in the loop."
19             Did I read that correctly?
20       A.    I believe so.
21       Q.    Did you request that
22 Mr. Klippen send this to -- withdrawn.
23             Did you request that
24 Mr. Klippen send this white paper analysis to
25 the Sparboe group?

Page 187

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2        A.    I don't recall. And this does
3  not say that I requested it.
4        Q.    Did you okay him to send it to
5  the Sparboe group?
6        A.    That's what it's citing in the
7  e-mail.
8        Q.    What does okay mean in this
9  context?
10       A.    Looking at the e-mail and the
11 context of the document, my assumption would
12 be that Mr. Sparboe, Mr. Klippen asked me
13 whether or not he could forward it to
14 Sparboe, and that I thought it was not an
15 issue.
16       Q.    So you believe that you
17 approved -- do you believe that you approved
18 Mr. Klippen sending this, forwarding this to
19 Sparboe?
20       MS. ANDERSON: Object to the
21 form of the question.
22       THE WITNESS: No, I wouldn't use
23       those words.
24 BY MR. BROWN:
25       Q.    But you did okay him to send it

Page 188

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  to Sparboe?
3        MS. ANDERSON: Same objection.
4        THE WITNESS: As I cited before,
5        the e-mail says -- I don't recall the
6        direct conversations, that I did okay
7        him to send it, in quotes.
8  MR. BROWN:
9        Q.    Would you have okayed
10 Mr. Klippen to send this to the Sparboe group
11 if you thought it was inaccurate?
12       MS. ANDERSON: Object to the
13       form of the question. Calls for
14       speculation testimony about a document
15       that he's already told you he doesn't
16       recall.
17       THE WITNESS: Most likely not.
18       At the same point, I do not recall
19       ever editing any document Mr. Klippen
20       ever produced except for the detail of
21       the PVP process documents.
22       MS. ANDERSON: Can we take a
23       break when convenient, Mr. Brown?
24       MR. BROWN: Just ten minutes,
25       sir, if that's okay with everyone.

Page 189

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2  BY MR. BROWN:
3        Q.    Would you have reviewed this
4  prior to okaying Mr. Klippen -- when I say
5  "this," I'm referring to the white paper
6  analysis in Exhibit 21. Would you have
7  reviewed this prior to okaying Mr. Klippen
8  sending it to the Sparboe group?
9        MS. ANDERSON: Object to the
10       form of the question.
11       THE WITNESS: I don't recall.
12 BY MR. BROWN:
13       Q.    Okay. If we take a look at the
14 body of the e-mail.
15       MS. ANDERSON: Exhibit 21?
16       MR. BROWN: That's correct,
17       still Exhibit 21.
18 BY MR. BROWN:
19       Q.    Do you see the heading "What
20 has evolved" which is in bold?
21       A.    Yes.
22       Q.    The second sentence, "The UEP
23 Animal Welfare Committee sought 100%
24 compliance by any participants under the
25 pretense this would signal a higher degree of

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 'welfare' and it was...," quote -- excuse me,
2 '"...and it was the 'right thing to do.'"
3 Did I read that correctly?
4 MS. ANDERSON: I think you
5 inserted some words there, but the
6 document can speak for itself.
7 THE WITNESS: Yes. I guess I'll
8 make a comment, I'm not quite sure why
9 I'm having to verify every time you
10 read something.
11 MR. BARNES: It's a reading
12 test.
13 THE WITNESS: It's a reading
14 test for you, it's a little bit
15 insulting of my intelligence at times.
16 BY MR. BROWN:
17 Q. Thank you.
18 Sir, I apologize if it comes
19 across that way. It's really not my intent.
20 A. I've had it all day, so...
21 Q. Very quickly, the last sentence
22 in that paragraph, "The Certified Program
23 evolved into a marketing structure dictating
24 how and to whom UEP members marketed their

Page 191

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 product."
2 Did I read that correctly?
3 A. I believe so.
4 Q. Thank you.
5 MR. BROWN: Can we go off the
6 record and take a break, please?
7 VIDEOGRAPHER: This ends disc
8 number four of the Catherman
9 deposition. The time is 2:27:47. Off
10 the record.
11 - - -
12 (A recess was taken.)
13 - - -
14 VIDEOGRAPHER: On the record
15 with disc number five of the testimony
16 of Toby Catherman in the matter of
17 Processed Egg Products. The date is
18 March 18, 2014. The time is 2:39:59.
19 BY MR. BROWN:
20 Q. Good afternoon, Mr. Catherman.
21 A. Yes.
22 Q. I'm going to hand you what will
23 be marked as Catherman-23.
24 - - -

Page 192

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 (Exhibit Catherman-23, 1/29/03
2 E-mail, Bates MFI0118191 - MFI0118193,
3 was marked for identification.)
4 - - -
5 BY MR. BROWN:
6 Q. Please take a minute to review.
7 This is MFI0118191.
8 A. Okay.
9 Q. This is an e-mail from Don Bell
10 to you, January 29, 2003. Is that correct?
11 A. Yes.
12 Q. Subject, "Urner Barry market
13 reaction to new layer house construction."
14 Correct?
15 A. Correct.
16 Q. Mr. Bell writes, "Toby, Your
17 questions, as stated, are a little
18 confusing."
19 Do you understand Mr. Bell to
20 be referring to the text that's on the next
21 page of this document ending 8192?
22 A. Yes.
23 Q. And that text that's on --
24 well, let me just -- if you'll bear with me,

Page 193

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

1 I'm going to read it for you. Quote, what
2 would be the --
3 MS. ANDERSON: Where are you,
4 Counsel?
5 MR. BROWN: On page 8192. It's
6 about three-fourths down the page.
7 BY MR. BROWN:
8 Q. "What would be the 'market rule
9 of thumb' of market impact if starting in
10 late 2003, an additional 5 to 10 million
11 layer house construction would begin for
12 in-line breaking in an even housing pattern
13 over two to three years."
14 Did I read that correctly?
15 A. I believe so.
16 Q. And it's your understanding
17 that that -- the passage I just read is
18 what Mr. Bell is referring to on the previous
19 page, 8191, when he discusses your questions?
20 A. Yes.
21 MS. ANDERSON: Object to the
22 form of the question.
23 BY MR. BROWN:
24 Q. And if you'll go, the third

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 paragraph from the bottom on 8191, the last
3 sentence. Do you see that, it starts with
4 "Question"?
5     A.    Okay.
6     Q.    "Question: wouldn't it make
7 more sense to buy your needs from existing
8 production than to add to the nation's
9 surplus production?"
10          Did I read that correctly?
11    A.    I believe so.
12    Q.    You can set that one aside.
13          I'm handing you what will be
14 marked Catherman-24.
15          - - -
16          (Exhibit Catherman-24, 4/13/04
17 E-mail, Bates MFI0330138, was marked
18 for identification.)
19          - - -
20 BY MR. BROWN:
21    Q.    Please take a minute to review.
22    A.    [Reviewing document.] Okay.
23    Q.    This is MFI0330138. This is an
24 e-mail from you April 13, 2004, to several
25 individuals. Will you identify who those

Page 195

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 individuals are, please?
3     A.    I believe the first one is
4 Roger Deffner at National Food. The second
5 one is, I think his first name is Mike Bynum
6 at Tampa Farms. Dolph Baker Cal-Maine. Mr.
7 West, I can't remember his first name, of JS
8 West. Bob at Midwest Poultry. Joe Fortin.
9 Jim Dean at Center Fresh. The next one I
10 don't know who that is, don't remember. The
11 last one would be Wayne Mooney at Pilgrim's
12 Pride.
13    Q.    Do you recall why you wrote
14 this to those individuals in particular?
15    A.    Reading the letter, it
16 apparently is my invitation as chair of UEA
17 inviting them to attend a UEA meeting with
18 the intent to strengthen their understanding
19 of UEA.
20    Q.    And is it correct that you
21 wrote that the UEA Executive Committee and
22 you intend to greatly increase the exchange
23 of information between the UEA membership and
24 UEP?
25    A.    That's what's cited here, yes.

Page 196

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2     Q.    You can set that one aside.
3          I'm handing you what's being
4 marked as Catherman-25.
5          - - -
6          (Exhibit Catherman-25, 4/13/07
7 E-mail, Bates MFI0097273, was marked
8 for identification.)
9          - - -
10 BY MR. BROWN:
11    Q.    This is MFI0097273. Please
12 take a minute to review.
13    A.    Okay.
14    Q.    The latest e-mail in the chain
15 is an e-mail from you April 13, 2007, to Mr.
16 Baker, Mr. Lowell Ostrand and Mr. Tim Bebee.
17 Is that correct?
18    A.    Correct.
19    Q.    You're forwarding an e-mail
20 with the subject line "CONFIDENTIAL" that you
21 received from Mr. Ken Klippen. Correct?
22    A.    Correct.
23    Q.    And Mr. Klippen writes, "The
24 official letter..." -- excuse me, Mr. Klippen
25 writes, "UEP's efforts to stop USDA from

Page 197

TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
1
2 accepting the Verified Program were turned
3 down by USDA. The official letter is being
4 sent today. The meeting that took place was
5 termed 'ugly' followed by the message that
6 the egg guys would do what they have to do
7 (which means Capitol Hill)."
8          Did I read that correctly?
9     A.    I believe so.
10    Q.    Do you recall discussions with
11 Mr. Klippen about the meeting that he's
12 referring to?
13          MS. ANDERSON: Object to the
14    form of the question.
15          THE WITNESS: Vaguely after
16    reading this.
17 BY MR. BROWN:
18    Q.    And what is your vague
19 recollection of it?
20    A.    That there was a meeting and
21 that UEP was speaking to USDA about the
22 potential verified program that we were
23 working on.
24    Q.    Was UEP making efforts to stop
25 USDA from accepting the verified program?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2       A.   I wasn't in the meeting.
3          MR. DAVIS:  Objection.  Lacks
4    foundation.
5          THE WITNESS:  I wasn't in the
6    meeting, I don't know.
7    BY MR. BROWN:
8       Q.   Do you have an understanding of
9    what Mr. Klippen meant when he used the term
10   "ugly" to refer to that meeting?
11         MS. ANDERSON:  Object to the
12   form of the question.  Calls for
13   speculation.
14         THE WITNESS:  Not really because
15   I wasn't there.
16   BY MR. BROWN:
17      Q.   Did you subsequently discuss
18   the meeting with Mr. Klippen?
19      A.   The meeting that UEP had with
20   USDA?
21      Q.   Yes.
22      A.   I believe I did.
23      Q.   What is your recollection of
24   that discussion with Mr. Klippen regarding
25   this meeting that's referred to in Exhibit

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    Catherman-25?
3       A.   That he had informed myself and
4    others that the meeting occurred and that
5    USDA was supportive of the verified program
6    and that they had, during their session,
7    explained to the participants in the meeting
8    some information about our verified program.
9       Q.   Do you recall anything else
10   about your discussion with Mr. Klippen
11   regarding this meeting?
12      A.   No.
13         MR. BROWN:  If we could go off
14   the record and take a quick break,
15   please.
16         VIDEOGRAPHER:  The time is
17   2:53:44.  Off the record.
18             - - -
19         (A recess was taken.)
20             - - -
21         VIDEOGRAPHER:  On the record.
22   The time is 3:04:03.
23         MR. BROWN:  This is Stephen
24   Brown, I have no further questions.
25   We're going to pass now to the IPPs.

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2             - - -
3           EXAMINATION
4             - - -
5    BY MR. ESSENMACHER:
6       Q.   Okay.  Keith Essenmacher.  I
7    represent the Indirect Purchaser Plaintiffs.
8          Good afternoon, Mr. Catherman.
9       A.   Good afternoon.
10      Q.   I know it's been a long day, so
11   I'm going to kind of keep this brief and get
12   right to the point.
13         Did you or did you direct
14   anyone to the conduct a survey or study on
15   street pricing, also known as retailing
16   pricing, of shell eggs?
17         MS. SMITH:  Objection.
18         MS. ANDERSON:  Object to the
19   form of the question.
20         THE WITNESS:  Answer?
21         MS. ANDERSON:  Yes, I'm sorry.
22   You can answer.  I'm sorry.
23         THE WITNESS:  I have no recall
24   of ever asking anybody to look at
25   retail pricing.

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    BY MR. ESSENMACHER:
3       Q.   My next question, did you or
4    did you direct anyone to conduct a study on
5    retail sales of shell eggs based on consumer
6    demographics?
7          MS. SMITH:  Objection on the
8    basis of downstream.
9          MS. ANDERSON:  And I object to
10   the form of the question, because I
11   don't understand it, but you can
12   answer the question if you do.
13         THE WITNESS:  I've never
14   directed anybody to do retail surveys,
15   so no matter what the subject is, a
16   retail survey, I don't think I've ever
17   been involved in that.
18         MR. ESSENMACHER:  That was my
19   final question.  Thank you, Mr.
20   Catherman, for your time and energy in
21   this effort.
22         THE WITNESS:  Thank you.
23         MS. ANDERSON:  Is that all from
24   the plaintiff's side?
25         MR. ARANOFF:  Unless there's a

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 redirect, that's it.
3     MS. ANDERSON: Mr. Barnes I
4 think has some questions for Rose
5 Acre.
6     MR. BARNES: Yes, I do.
7     MS. ANDERSON: You didn't
8 realize that everyone was going to get
9 to talk to you today.
10     THE WITNESS: I'm fine with
11 that. I'm here until you run out of
12 time.
13     MS. ANDERSON: No, you're not
14 actually. You're only here for seven
15 hours.
16     THE WITNESS: When you run out
17 of time I meant to say.
18         - - -
19     EXAMINATION
20         - - -
21 BY MR. BARNES:
22     Q.  Mr. Catherman, good afternoon.
23 My name is Don Barnes. I represent Rose Acre
24 Farms. We are also a defendant in this
25 litigation.

Page 203

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2     Have we met before today?
3     A.  No.
4     Q.  In your prior testimony in
5 response to a question by Mr. Brown, one of
6 your answers referred to a marketing license,
7 and this was in the time period April 2005,
8 you testified that Michael Foods was not yet
9 a certified producer nor did you have a
10 marketing license. Do you recall generally
11 that testimony?
12     MR. BROWN: Objection.
13     THE WITNESS: I recall that,
14 yes, there was a question about
15 marketing license.
16 BY MR. BARNES:
17     Q.  Yes.
18     A.  And, yes, there was a period
19 where Michael Foods operated with a marketing
20 license and a period when we did not before
21 we were a certified producer which was in --
22 sometime in 2006.
23     Q.  You're clairvoyant because you
24 anticipated my next question. So there did
25 come a point in time when you operated with a

Page 204

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 marketing license to sell certified eggs. Is
3 that correct?
4     A.  Yes.
5     Q.  Do you recall what period of
6 time that was?
7     A.  If I recall, it was during the
8 transitional period while we had already
9 signed up to the program until we were
10 100 percent through the transitional period
11 that we had agreed with UEP for changing the
12 density of our company facilities.
13     Q.  Now, I realize you're no longer
14 employed by Michael Foods, but during the
15 time of your employment, did Michael Foods
16 market certified, UEP certified eggs and
17 non-UEP certified eggs?
18     MS. ANDERSON: Let me just
19 quickly object. He is employed by
20 Michael Foods.
21     MS. SMITH: Objection.
22     THE WITNESS: A correct --
23 correct actually a prior reference
24 earlier today I was referenced as a
25 consultant. Now I'm just a part-time

Page 205

1 TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2 employee working at the pleasure of
3 Terry Baker and his demand with some
4 very finite, detailed intricacies.
5     Yes, Michael Foods has and
6 continues today to sell non-certified
7 egg products.
8 BY MR. BARNES:
9     Q.  Together with certified egg
10 products?
11     MS. SMITH: Objection.
12     THE WITNESS: Yes.
13 BY MR. BARNES:
14     Q.  You previously testified
15 Michael Foods ultimately became a member or a
16 participant in the UEP Certified Program.
17 Correct?
18     A.  Correct.
19     Q.  Do you recall that in order to
20 become a participant in the UEP Certified
21 Program, Michael Foods complied with a
22 phase-in schedule to become certified? Do
23 you recall that?
24     A.  Yes. The phase-in schedule was
25 around the density of the layers. All other

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    parts of the program were immediately
3    effective.
4       Q.    So at least as to the density
5    of the layers -- you mean cage space. Is
6    that correct?
7       A.    Correct.
8       Q.    So as to the cage space
9    requirements of the program, Michael Foods
10   ultimately complied with a phase-in schedule
11   to become fully certified. Is that correct?
12      A.    Correct.
13      Q.    At another point in your
14   testimony, Mr. Catherman, and at this point
15   in time you were talking about Exhibit 4, and
16   you don't have to look at it, I'm just trying
17   to set the scene for my question. In the
18   period of time around November 2004, that's a
19   period of time that I'm going to ask you
20   about. In response to a question from
21   plaintiff's counsel, you said that around
22   that period of time Michael Foods would have
23   been expanding its egg supply. Do you recall
24   generally that testimony?
25      A.    I remember mentioning earlier

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    today that, yes, Michael Foods has
3    continually increased its supply network.
4       Q.    Do you recall other UEP members
5    who were acting like Michael Foods and
6    continually increasing their supply?
7       MS. SMITH: Objection.
8       THE WITNESS: Yes, I believe
9    there were other companies that were
10   growing by additional capacity by
11   adding additional layers.
12   BY MR. BARNES:
13      Q.    Can you recall any companies in
14   particular?
15      A.    One in particular would be Rose
16   Acres.
17      Q.    Mr. Catherman, I'm going to
18   show you a document which we will mark as --
19   what's our next number?
20      MS. ANDERSON: 25.
21      THE WITNESS: 26.
22      MS. ANDERSON: 26.
23          - - -
24      (Exhibit Catherman-26, E-mail
25   chain, Bates MFI0033487 & MFI0033488,

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    was marked for identification.)
3          - - -
4    BY MR. BARNES:
5       Q.    Mr. Catherman, the court
6    reporter has marked a document, a multi-page
7    document as Exhibit 26. It bears two
8    document identification numbers. I'll only
9    refer to the Michael Foods number which is
10   MFI0033487 up to and including 488. And I do
11   have another --
12      MR. BARNES: Mr. Brown, I'm
13   sorry, I do have a copy for you. I
14   apologize. It was stuck to my
15   reference copy.
16      MR. BROWN: Thank you, sir.
17   BY MR. BARNES:
18      Q.    Exhibit 26 appears to be an
19   e-mail chain. The e-mail at the very top
20   appears to be from Terry Baker, dated
21   June 12, 2006, to a number of recipients
22   including you. Do you recall receiving this
23   e-mail chain from Mr. Baker?
24      A.    Not exactly.
25      Q.    Now, in the first, the very

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL
2    first e-mail at the top, Mr. Baker's e-mail
3    to you and others dated June 12, 2006, Mr.
4    Baker says, "We know Rose Acre is moving
5    forward with the N. Carolina facility." Do
6    you see that?
7       A.    Yes.
8       Q.    What's your understanding of
9    the N. Carolina facility of Rose Acre Farms?
10      A.    They were going to construct, I
11   believe, a -- it was either a 4 -- a 2 or a 4
12   million layer in-line shell egg layer
13   facility in North Carolina.
14      Q.    And is that referred to in the
15   third e-mail from the top from Mr. Mike
16   Vanderpol dated June 11, 2006, to Mr. Baker
17   with a copy to you?
18      A.    Yes.
19      Q.    That's the Rose Acre North
20   Carolina expansion that you just testified
21   to. Is that correct?
22      A.    Yes.
23      Q.    Do you know if that actually
24   took place?
25      A.    Yes, it did. I don't know

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2 exactly the timing of the construction or

3 housing.

4        MR. BARNES:  Mr. Catherman,

5    thank you very much for your patience.

6    I have no further questions.

7        MS. ANDERSON:  Does anyone on

8    the phone have any further questions?

9            - - -

10            EXAMINATION

11            - - -

12 BY MS. ANDERSON:

13    Q.    I just have one general

14 question, Mr. Catherman, to follow up on some

15 of the questions that Mr. Brown asked you

16 earlier today regarding documents that

17 Mr. Klippen -- or excuse me, e-mails that

18 Mr. Klippen would send to you that you

19 forwarded on.

20        In Mr. Klippen's role as an

21 outside consultant, he had opportunity -- did

22 he have opportunity to send you documents

23 relating to his efforts on behalf of Michael

24 Foods?

25    A.    Yes.

Page 211

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2    Q.    Did you -- you stated earlier,

3 did you not, that you did not edit

4 Mr. Klippen'S work.  Is that correct?

5    A.    Correct.  I am a strong

6 believer that if you have a consultant,

7 you're paying them for a reason.

8    Q.    So you would forward on Mr.

9 Klippen's documents to other members of the

10 working group regardless of whether you

11 agreed with his opinions?

12    A.    Yes.

13        MS. ANDERSON:  I have no further

14    questions.

15        MR. ARANOFF:  We'll take five

16    just to see if we want to redirect.

17        VIDEOGRAPHER:  The time is

18    3:15:54.  Off the record.

19            - - -

20        (A recess was taken.)

21            - - -

22        VIDEOGRAPHER:  On the record.

23    The time is 3:20:59.

24        MS. SMITH:  Plaintiffs have no

25    further questions.

Page 212

1    TOBY LEE CATHERMAN - HIGHLY CONFIDENTIAL

2        MS. ANDERSON:  I think we are

3    done, Mr. Catherman.  Thank you.

4    Thank you, Linda and Tim.

5        THE WITNESS:  Thank you.

6        VIDEOGRAPHER:  This ends disc

7    number five and concludes the

8    testimony of Toby Catherman in the

9    matter of Processed Egg Products.  The

10    date is March 18, 2014.  The time is

11    3:21:26.  Off the record.

12            - - -

13    (Witness excused.)

14            - - -

15    (Deposition concluded at 3:21

16    p.m.)

Page 213

1

2    C E R T I F I C A T E

3

4

        I do hereby certify that I am a Notary

5 Public in good standing, that the aforesaid

   testimony was taken before me, pursuant to

6 notice, at the time and place indicated; that

   said deponent was by me duly sworn to tell

7 the truth, the whole truth, and nothing but

   the truth; that the testimony of said

8 deponent was correctly recorded in machine

   shorthand by me and thereafter transcribed

9 under my supervision with computer-aided

   transcription; that the deposition is a true

10 and correct record of the testimony given by

   the witness; and that I am neither of counsel

11 nor kin to any party in said action, nor

   interested in the outcome thereof.

12

        WITNESS my hand and official seal this

13 26th day of March, 2014.

14

15

16    _____

        Notary Public

17

18

19

20

21

22

23

24

25

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1
2      INSTRUCTIONS TO WITNESS
3
4    Please read your deposition over
5 carefully and make any necessary corrections.
6 You should state the reason in the
7 appropriate space on the errata sheet for any
8 corrections that are made.
9    After doing so, please sign the errata
10 sheet and date it.
11    You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14    It is imperative that you return the
15 original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you. If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24
25

Page 216

1    E R R A T A  S H E E T
2 IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION
3 DATE: 3/18/14
4 PAGE   LINE       CORRECTION AND REASON
5 ___ ___ _____
6 ___ ___ _____
7 ___ ___ _____
8 ___ ___ _____
9 ___ ___ _____
10 ___ ___ _____
11 ___ ___ _____
12 ___ ___ _____
13 ___ ___ _____
14 ___ ___ _____
15 ___ ___ _____
16 ___ ___ _____
17 ___ ___ _____
18 ___ ___ _____
19 ___ ___ _____
20 ___ ___ _____
21 ___ ___ _____
22 ___ ___ _____
23
24 _____ _____
25 (DATE)      TOBY LEE CATHERMAN

Page 215

1
2    ACKNOWLEDGMENT OF DEPONENT
3    I have read the foregoing transcript of
4 my deposition and except for any corrections or
5 changes noted on the errata sheet, I hereby
6 subscribe to the transcript as an accurate record
7 of the statements made by me.
8
9    _____
10    TOBY LEE CATHERMAN
11
12    SUBSCRIBED AND SWORN before and to me
13 this ____ day of _____, 20___.
14
15
16    _____
17    NOTARY PUBLIC
18
19
20 My Commission expires:
21
22
23
24
25

55 (Pages 214 - 216)