# ATTACHMENT 22

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE: PROCESSED EGG PRODUCTS      |

ANTITRUST LITIGATION               |    MDL NO. 2002

_____    08-md-02002

THIS DOCUMENT RELATES TO           |

Kraft Foods Global, Inc., et al. |

v. United Egg Producers, Inc.,     |    HIGHLY

et al., No. 2:12-cv-00088-GP       |    CONFIDENTIAL

_____

                         Monday, August 26, 2013

                         10:00 a.m.


        Videotaped deposition of JEFFRY L. HENNING,

convened at the law offices of Bradshaw, Fowler, Proctor

& Fairgrave, P.C., 801 Grand Avenue, Des Moines, Iowa

50309, pursuant to subpoena, the proceedings being

recorded stenographically by Jonathan Wonnell, a

Registered Professional Court Reporter (NCRA #835577),

and transcribed under his direction.

HIGHLY CONFIDENTIAL

Henning, Jeffry L.

August 26, 2013

2 (Pages 2 to 5)

---

**2**

APPEARANCES OF COUNSEL

On behalf of the Direct Purchaser Plaintiffs:
JOHN R. MALKINSON, ESQ.
Malkinson & Halpern, P.C.
208 S. La Salle Street, Suite 1750
Chicago, Illinois 60604
(312) 427-9600
jmalkinson@mhtriallaw.com

On behalf of the Indirect Plaintiffs:
MERRICK S. RAYLE, ESQ.
Lovell Stewart Halebian Jacobson
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

---

**4**

CONTENTS

WITNESS NAME                    PAGE
JEFFRY LYNN HENNING
By Mr. Greene:                  8
By Mr. Malkinson:               82
By Mr. Rayle:                   157
By Mr. Malkinson:               189
By Mr. Greene:                  193
By Mr. Malkinson                194

          Afternoon Session    81

EXHIBITS

NO.        DESCRIPTION                       PAGE
Exhibit 1  Case Management Order No. 10          11
Exhibit 2  Supply Agreement dated December 22, 2003  23
           (MFI0300390 to MFI0300413)

Exhibit 3  Assignment of Supply Agreement for    39
           Security Purposes dated March 1, 2004
           (MFI0300424-MFI0300428)

Exhibit 4  Supply Agreement dated 9/3/04         41
           (MFI0028926-MFI0028956)

Exhibit 5  Letter dated June 23, 2005 with attached  55
           Supply Agreement (MFI0298827-MFI0298851)

---

**3**

APPEARANCES (Cont'd)

On behalf of the Defendant Rose Acre Farms:
KARRI ALLEN, ESQ. (via phone)
Porter, Wright, Morris & Arthur LLP
1919 Pennsylvania, N.W., Suite 500
Washington, D.C. 20006-3434
(202) 778-3050
kallen@porterwright.com

On behalf of the Defendant Michael Foods:
WILLIAM L. GREENE, ESQ.
PETER J. SCHWINGLER, ESQ.
Leonard, Street and Deinard
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
(612) 335-7023
william.greene@leonard.com
peter.schwingler@leonard.com

ALSO PRESENT:
ART HOWARD, Videographer

---

**5**

EXHIBITS (Cont'd)

NO.        DESCRIPTION                       PAGE
Exhibit 6  E-mail dated 9/5/07                   67
           (MFI0045216-MFI0045217)

Exhibit 7  United Voices dated 11/30/07 (MFI0056110  72
           - MFI0056118)
Exhibit 8  Subpoena to Jeff Henning              83
Exhibit 9  E-mail dated 1/708 with attached minutes  91
           dated 12/28/07 (MFI0297922 - MFI0297925)

Exhibit 10 Letter dated 2/5/03 from Bob Sparboe  107
           (DAY0014411 - DAY0014414)
Exhibit 11 E-mail chain (EGOE00529017 -          110
           EGOE00529019)

Exhibit 12 Attendee List Chicago Mariott O'Hare  111
           Hotel 10/30/06 (UE0218113)
Exhibit 13 Klippen Animal Welfare Guidelines     126
           Summary of Status 1/4/07 (MFI0037477 -
           MFI0037478)
Exhibit 14 United Egg Producers Annual Board     128
           Meeting and Executive Conference Minutes
           dated October 12 & 13, 2000 (UE0296624 -
           UE0296627)
Exhibit 15 E-mail dated 2/12/07 from Ken Klipped  136
           (MFI0064431, MFI0064432, MFI0064484)
Exhibit 16 Egg Industry Center biography of Jeff  162
           Henning
Exhibit 17 E-mail string Subject: Misrepresented  164
           and Misguided (MOARK0029479 -
           MOARK0029481)

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                        August 26, 2013

3 (Pages 6 to 9)

---

**6**

E X H I B I T S (Cont'd)

NO.          DESCRIPTION                    PAGE
Exhibit 18 United Voices dated June 2, 2004      167
    (MOARK0006344 - MOARK0006353)

Exhibit 19 Henning News March 2013              170

Exhibit 20 E-mail string dated 4/12/07 Subject:   171
    Update VPC (MFI0035084 - MFI0035085)
Exhibit 21 E-mail string Subject: USDA comments on  172
    Verified VPC (MFI0064621 - MFI0064662)

Exhibit 22 UEP Marketing Committee Meeting Minutes  177
    dated 1/27/09 (MFI009964 - MFI0010002)

Exhibit 23 Unresolved Animal Welfare Issues        179
    (BELL-D-0028597 - BELL-D-0028599)
Exhibit 24 E-mail chain Subject: Chicago meeting   184
    (MFI0008369 - MFI0008371)

Exhibit 25 UEP Annual Membership Meeting 10/16/08,  186
    MFI0021325 - MFI0021333)
Exhibit 26 Memorandum dated January 11, 2003       191
    (MFI0052348 - MFI0052350)

---

**7**

P R O C E E D I N G S

(9:03 a.m.)

THE VIDEOGRAPHER:  On the record.  At this time, I'd please ask everyone to identify themselves starting from my left.

MR. GREENE:  All right.  William L. Greene from the law firm of Leonard, Street & Deinard representing Michael Foods.

MR. SCHWINGLER:  Peter Schwingler from Leonard, Street & Deinard on behalf of Michael Foods.

MR. RAYLE:  Merrick Rayle, Lovell Stewart Halebian Jacobson, on behalf of the Indirect Plaintiffs.

MR. MALKINSON:  John Malkinson, Malkinson Halpern, for the Direct Purchaser Plaintiffs.

MR. HENNING:  Jeff Henning, Henning Holdings.

MR. GREENE:  And the people on the phone, could you please make -- counsel on the phone, please make appearances.

---

**8**

MS. ALLEN:  This is Karri Allen from Porter, Wright, Morris & Arthur for Rose Acre Farms.

MR. GREENE:  Is there anyone else on the phone other than Ms. Allen?

* * * * *

Whereupon,

JEFFRY LYNN HENNING,

called as a Witness, having been duly sworn, was examined and testified as follows.

* * * * *

EXAMINATION BY COUNSEL FOR THE DEFENDANT MICHAEL FOODS

BY MR. GREENE:

Q.   Will you please state your name.

A.   Jeffry Lynn Henning.

Q.   What is your address?

A.   Business or personal?

Q.   Do both.  Let's start with residential address.

A.   794 West Elkham Circle, Unit Number

---

**9**

2001, Marco Island, Florida 34145.

Q.   And your business address?

A.   Henning Construction Company, Passport, Henning Holdings, at 5800 Merle Hay Road, Johnston, Iowa 50131.

Q.   Mr. Henning, is it correct that you're not represented by counsel here today?

A.   That is correct.

Q.   Okay.  You understand you have the opportunity to be represented by counsel?

A.   Yes.

Q.   And it's your choice to go forward without counsel; is that correct?

A.   Yes.

Q.   Well, let me start by explaining the process a bit.  This is a deposition in the case of In Re: Processed Egg Products Antitrust Litigation.  You have been sworn.  I want to make sure the order --

MR. GREENE:  The witness was sworn, correct?

THE REPORTER:  Yes.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

4 (Pages 10 to 13)

---

10

BY MR. GREENE:
1 Q.   Okay.  You've taken an oath today to
2 testify -- to tell the truth.  Do you understand
3 that?
4    A.   Yes.
5    Q.   And this oath is the same oath you would
6 be taking if you were testifying in court.  Do you
7 understand that?
8    A.   Yes.
9    Q.   So it's important that you testify
10 truthfully and accurately.  Do you understand that?
11    A.   Yes.
12    Q.   I'm going to be asking you questions and
13 the court reporter is going to be taking down the
14 questions.  You're going to be providing answers
15 and the court reporter will be taking those down.
16 So it's important that you give your answers out
17 loud rather than a nod of the head.  Do you
18 understand that?
19    A.   Yes.
20    Q.   And it's also important that we don't
21 talk over each other.  I'll try and avoid

---

11

1 interrupting you, and if you can wait for the end
2 of my question before you start speaking.  Is that
3 okay?
4    A.   Yes.
5    Q.   Is there any reason that you can't give
6 accurate and complete testimony this morning?
7    A.   Not to the best of my knowledge.
8    Q.   There is a protective order in this case
9 that governs the confidentiality of information
10 that has been produced in discovery and also
11 deposition testimony.  I'm going to have a copy of
12 the protective order marked as Henning Exhibit 1.
13 It's also referred to on the face of the document
14 as Case Management Order No. 10.
15         (Henning Exhibit 1 was marked for
16          identification.)
17 BY MR. GREENE:
18    Q.   I'll ask you to review Henning
19 Exhibit 1.
20    A.   (Reading).  Okay.
21    Q.   Are you willing to comply with the terms
22 of the protective order?

---

12

1    A.   I am.
2    Q.   All right.  Are you willing to sign the
3 acknowledgment and consent that appears on the
4 final page of Exhibit 1?
5    A.   I am.
6    Q.   Okay.  Would's you do so at this time,
7 please.
8    A.   (Complies).  Okay.
9    Q.   Thank you.  So for the record, Henning
10 Exhibit 1 is the protective order in the case, Case
11 Management Order No. 10, with the signed
12 acknowledgment and consent form on page 18 signed
13 by Mr. Henning.
14         Mr. Henning, I'd like to get some
15 background information from you.  Can you give us
16 an overview of your educational background?
17    A.   I graduated from Iowa State University
18 circa 1971 with an engineering operations degree.
19 Prior to that, I was in Cal Community High School
20 in north central Iowa in grade school.  And I've
21 had various continuing education courses of various
22 natures in the various industries we're involved in

---

13

1 since then.
2    Q.   What type of continuing education have
3 you been involved with?
4    A.   I'm a member of the International Egg
5 Commission, the United Egg Producers, et cetera.
6 Also licensing requirements for various states for
7 building construction licenses, et cetera.
8    Q.   And your degree from Iowa State, what
9 exactly is the degree?
10    A.   Engineering operations.
11    Q.   Now let's talk about your work history.
12 Can you give us an overview of your business or
13 work history, maybe starting from the time you
14 graduated college going forward?
15    A.   I was in Chicago for a short period of
16 time.  Then returned to Latimer, Iowa, where I went
17 to work for Henning Construction Company, a family
18 construction firm, in 1973.  I purchased the assets
19 of the company, Henning Construction Company, and
20 Henning Sales Company.
21         From there -- we mainly did construction
22 in north central Iowa.  Eventually in the rest of

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

5 (Pages 14 to 17)

---

**14**

1  Iowa, eventually the states around Iowa and, as
2  time went by, 37 of the 50 states and 13, 14,
3  foreign countries.
4      Q.   What is Henning Construction?
5      A.   Henning Construction Company is a
6  general contractor involved in several segments and
7  industries, being hospitality, agriculture,
8  assisted living, commercial buildings, apartment
9  projects, several others.
10     Q.   Okay.  Well, as you know, this case
11  involves eggs and egg production.  Does Henning
12  Construction have any involvement in egg
13  production-related businesses?
14     A.   Henning Construction builds facilities
15  for various customers in the industry in both the
16  pullet-raising side, the production side and the
17  processing side.
18     Q.   When you say you build facilities, is
19  Henning Construction essentially hired by a company
20  to build their facilities?
21     A.   Yes.  Sometimes design and build.
22     Q.   How long has Henning Construction been

---

**15**

1  building egg production facilities?
2      A.   I believe since 1964.
3      Q.   And you said you started working with
4  the company in what year?
5      A.   Underneath the table saws as a youngster
6  in probably '65 or '66 and ran some crews in the
7  various actual construction side of the business
8  and then post college and then back in the
9  management side of the business.
10     Q.   What's your position at Henning
11  Construction today?
12     A.   I am chairman of the board.
13     Q.   How long have you had that position?
14     A.   Since about 1975.
15     Q.   Have you held any other positions since
16  1975 other than chairman of the board?
17     A.   Yes.  I was CEO and president.
18     Q.   When were you CEO and president?
19     A.   President probably since 1978 or so, and
20  CEO in the '80s and later turned the CEO job over
21  in 2002 to another individual.
22     Q.   So when was the last time you were

---

**16**

1  either president or CEO?
2      A.   I would say 2002.
3      Q.   And since that time, chairman of the
4  board?
5      A.   Yes.
6      Q.   Now, apart from Henning Construction, do
7  you have an interest in any other businesses that
8  relate to egg production?
9      A.   Yes.
10     Q.   What kind of interest do you have?
11     A.   I am a partner in -- founding partner in
12  Fremont Farms of Iowa, which is an egg production
13  business.  Likewise, a partner in Center Fresh and
14  Hawkeye Pride Egg Farms, Sioux County Eggs.  I'm
15  also a partner in Cedar Valley Egg Farm.  I'm also
16  a partner in Zeilinger Egg Farm.  Also a partner in
17  Meek's Egg Farm.  Also a partner in Iowa Cage-free,
18  and also a partner in Trillium Farms.  I believe
19  that's it.
20     Q.   In each of these instances -- as to each
21  of these companies you just mentioned, do you have
22  an ownership interest?

---

**17**

1      A.   Yes.
2      Q.   What is your ownership interest in
3  Fremont Farms of Iowa?
4      A.   I am a founding partner and a 10 percent
5  owner.  I served on the admin committee there for
6  oversight and management until about three years
7  ago when we disbanded that committee and the entire
8  partnership oversees the administrative functions.
9      Q.   What is your ownership interest in
10  Center Fresh?
11     A.   I am a -- again, an owner and I am
12  active in the negotiations relative to markets and
13  construction.
14     Q.   What about Iowa Cage-free?
15     A.   I am the founding partner.  I'm the
16  largest stockholder by percentage in that
17  particular operation and, again, work with the
18  markets and the production.
19     Q.   And what is your interest in Sioux
20  County Eggs?
21     A.   As a partner in Center Fresh Group, we
22  purchased a significant interest in Sioux County

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.

August 26, 2013

6 (Pages 18 to 21)

### 18

1 Egg, and we market the products out of Sioux County
2 Egg.
3     Q.  What is your interest in -- is it
4 Trillium?
5     A.  Trillium.  I am one of the four managing
6 members of Trillium and an owner of Trillium in the
7 Class A stock and, again, work with the marketplace
8 in that particular organization.
9     Q.  My client is Michael Foods in this case.
10 Does Henning Construction have any history of
11 business relationship with Michael Foods?
12     A.  Yes.
13     Q.  What is that -- the history of that
14 business relationship?
15     A.  In 1984, we were contacted to help a
16 contractor who was having some difficulty in a
17 project that they had in Colorado, and we became a
18 builder for them in the Colorado projects and
19 later, post 1984, we took over most entirely all of
20 their production, construction, and a lot of their
21 processing construction under Dan Gardner's
22 tutelage, when it was my -- Milton G. Waldbaum

### 19

1 Company.  Post that, it was Michael's Foods.  And
2 so we build many buildings for MFI/Waldbaums.
3     Q.  Do you recall any -- withdrawn.
4     Did you build any egg production
5 facilities for Michael Foods?
6     A.  Yes.  We did.
7     Q.  Do you recall any of the facilities that
8 Henning Construction built for Michael Foods?
9     A.  Well, originally we built the Colorado
10 complex.  And I'm sorry I can't give you that name
11 right now.  Originally it was a Gates farm.  I
12 don't know what it's called at this point in time.
13 Post that, we went to Wakefield and continued to
14 build out of Big Red Farms.
15     We also built all the pullet-growing
16 facilities, Gardner Growers and all the various
17 pullet-growing facilities to raise baby chickens to
18 go into there.
19     Post that, we went to northern Nebraska
20 and built Blooming Egg Farm.  And while we were
21 building Blooming Egg Farm, we also built Husker
22 Pride back in the Wakefield area.

### 20

1     And then we did some work for their
2 Minnesota facilities.  Whenever they would have
3 disasters of some kind, we would go in and clean
4 them up and get them back in production.
5     Q.  During what period was Henning
6 Construction doing this construction for Michael
7 Foods?
8     A.  From 1984 to today.  We still do that
9 work.
10     Q.  I want to talk to you about Fremont
11 Farms of Iowa.  You indicated that you were a
12 founding partner of Fremont Farms of Iowa; is that
13 correct?
14     A.  Yes.
15     Q.  When was Fremont Farms of Iowa formed?
16     A.  Formative legal stages were probably 4Q
17 '96 and '97.
18     Q.  Who were the original owners?
19     A.  I -- to the best of my recollection, the
20 original partners in the formative stages were Bill
21 Reed, Paul Garnett, Jim Dean, myself, and two other
22 partners from Nebraska.

### 21

1     Q.  And what were the circumstances that led
2 to the formation of Fremont Farms of Iowa?
3     A.  As Michael Foods took over the Waldbaum
4 companies, I had spent a lot of time with Michael's
5 Foods in the design, construction and delivery of
6 the buildings we built for them.  And as the --
7 Dr. Waldbaum was bought out and eventually Dan
8 Gardner was bought out, there was a transition from
9 wanting to build additional facilities in-house to
10 wanting to expand production outside and use their
11 in-house money, I assume, for markets and product
12 development.
13     We were approached -- I was approached,
14 and said since you've built all these buildings and
15 you understand who we are and what we are, would
16 you have an interest in putting a group together to
17 do production for us on a contract basis.
18     Q.  And who was it that approached you with
19 that proposal?
20     A.  I would have to go around the room that
21 was in the table that day, but I would think it was
22 Dan Gardner and Don Paulson, primarily, which then

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                                August 26, 2013

22

1   when it got to shipping from the management people
2   that I had worked with and the construction people
3   I had worked with, sliding over to the procurement
4   side, it would have been Terry Baker.
5       Q.   When this original proposal was made,
6   was there a particular project or projects that
7   Michael Foods identified as wanting Fremont Farms
8   of Iowa to build?
9       A.   Yes.  The initial discussion was a 1.3
10  to 2.7 million bird facility.  The initial
11  contract, as I recall, was for the 1.3 and let's
12  crawl, walk, run.  We didn't even get that done and
13  we added the second piece of it, which were the
14  second 1.35, which got us to 2.7.  And post that,
15  we added additional buildings in the third quadrant
16  to eventually end up with about 5.2 million birds
17  there -- for there.
18      Q.   I'm sorry.  5.2 million birds for --
19      A.   For Michael's.
20      Q.   Over what period of time?
21      A.   I would -- we, of course, began
22  construction in '97, '98.  I think it was about two

23

1   years to build phase one and phase two, which would
2   have been the 1.35 times two, 2.7.  And then --
3   I'll get fuzzy with you right now on buildings.  21
4   through 25.  But my recollection would be that that
5   was in the 2003 to '5 range.
6       Q.   Let me show you what I'm going to mark
7   as Henning Exhibit 2.  This is a supply agreement
8   stamped -- or identified as confidential between
9   M.G. Waldbaum Company, a Nebraska corporation,
10  doing business as the Michael Foods Egg Products
11  Company and Fremont Farms of Iowa, LLP.  The date
12  on the front page is December 22, 2003 and the
13  Bates numbers are MFI0300390 to -413.
14          (Henning Exhibit 2 was marked for
15          identification.)
16      BY MR. GREENE:
17      Q.   Take a moment to look at Exhibit 2, if
18  you would, Mr. Henning.
19      A.   Yes, sir.
20      Q.   Do you recognize Exhibit 2?
21      A.   Yes.
22      Q.   What is Exhibit 2?

24

1       A.   It is our -- the contract with my
2   initials on it for the Fremont Farms of Iowa
3   facility.
4       Q.   And -- when you say your initials on it,
5   on the first page, I see three sets of initials.
6   There's one that is kind of moving from upper left
7   to lower right.  Which of the initials are yours?
8       A.   The top left is JLH.  The second one is
9   Terry Baker and the third one is Steve George.
10      Q.   So the top left is your initials?
11      A.   Yes.
12      Q.   Okay.  And if we can go to the signature
13  page on page 7.
14      A.   Yes.
15      Q.   Under Fremont Farms of Iowa, do you
16  recognize the signature there?
17      A.   Yes.
18      Q.   Whose signature is that?
19      A.   JLH, partner, 12/22/03 and Steve George,
20  president and CEO, same date.
21      Q.   Is the JLH your signature?
22      A.   Yes.

25

1       Q.   Now, can you explain what the -- what
2   this supply agreement, Exhibit 2, provides for?
3       MR. MALKINSON:  Objection, the document
4   speaks for itself.
5       BY MR. GREENE:
6       Q.   Can you provide a summary of the terms
7   of the document?
8       MR. MALKINSON:  Same objection.
9       A.   It is the agreement between those -- MFI
10  and ourselves regarding the terms, the payments,
11  deliveries, the requirements under which we need to
12  produce, insurance coverage, right of first refusal
13  for expansion, risk of loss, confidentiality,
14  biosecurity, force majeures, termination, notices,
15  miscellaneous regarding other legal requirements
16  between the two of us, a discussion about a
17  look-back on total costs of ownership regarding
18  transparency between the two companies to some
19  extent relative to the costs of production.
20          And do you want to go into the exhibits
21  also?
22      BY MR. GREENE:

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

8 (Pages 26 to 29)

---

26

1   Q.   That's fine.  I think that's sufficient
2   for an overview.  Is the format of this contract --
3   leaving aside the particulars, is the format
4   similar to other contracts between Freemont Farms
5   and Michael Foods?
6         MR. MALKINSON:  Objection, lack of
7   foundation.
8         BY MR. GREENE:
9   Q.   Are you familiar with the other
10  contracts between Fremont Farms of Iowa and Michael
11  Foods?
12  A.   Yes.
13  Q.   Is the format of this contract similar
14  to other contracts between Fremont Farms of Iowa
15  and Michael Foods?
16  A.   Substantially, yes.
17  Q.   Now, underneath the first paragraph that
18  refers to the agreement between M.G. Waldbaum
19  Company doing business as Michael Foods Egg
20  Products Company and Freemont Farms, there are two
21  "whereas" clauses.  Do you see that?
22  A.   Yes.

---

27

1   Q.   And the contract reads "Whereas Michael
2   requires a reliable supply of shell eggs and raw
3   liquid whole eggs, white and yolks, and whereas
4   producer is willing to produce and sell shell eggs
5   and/or liquid eggs on the terms and conditions set
6   forth herein."  Do you see that?
7   A.   Yes.
8   Q.   Okay.  Specifically what is it that
9   Fremont Farms of Iowa was to be selling Michael
10  Foods?
11  A.   At this particular time, whole eggs.
12  Whole liquid eggs.
13  Q.   When you say liquid eggs, what is it
14  that Fremont Farms of Iowa would actually deliver
15  to Michael Foods?
16  A.   Tankers of whole liquid egg.
17  Q.   Would those be pasteurized or
18  unpasteurized?
19  A.   Unpasteurized.
20  Q.   Was that the case for all of the Fremont
21  Farms contracts with Michael Foods?
22  A.   I believe that there may be an addendum

---

28

1   now that Fremont Farms of Iowa has separation
2   capabilities that, at Michael's option, they could
3   ask for separated products.  It would have been not
4   in this document.
5   Q.   That would still be unpasteurized
6   liquid; is that correct?
7   A.   Correct.
8   Q.   And the -- term is set forth in
9   paragraph 1 on page 1; is that correct?
10  A.   Yes.
11  Q.   Okay.  And this is a term, if I'm
12  reading it correctly, March 30th 2003 and continue
13  until December 31, 2010; is that right?
14  A.   Yes.
15  Q.   That's the initial term?  So that's a --
16  is that a term of seven years and nine months?
17  A.   Yes.
18  Q.   Let's take a look at the exhibit --
19  page 8 of the document, which is -- the Bates
20  number ends with 397.  Do you see that?
21  A.   Yes.
22  Q.   There's a quantity provision here, Roman

---

29

1   numeral III, approximate pounds per year.  Do you
2   see that?
3   A.   Yes.
4   Q.   Okay.  And that goes from 92,500,000
5   pounds in 2003 to 142 million pounds in 2010.  Do
6   you see that table?
7   A.   Yes.
8   Q.   Okay.  Where were the layers that were
9   to produce that quantity of liquid egg for Michael
10  Foods?  Where were they located?
11  A.   At the Fremont Farms of Iowa complex in
12  Malcolm, Iowa.
13  Q.   Now, when Fremont Farms of Iowa was
14  formed, did it have any facilities?
15  A.   No.
16  Q.   No egg-production facilities?
17  A.   Correct.
18  Q.   You can see underneath the table it
19  says, "It is agreed the existing producer layer
20  houses of number 1 through number 25 (approximately
21  4,380,000 layers) comprised the base volume through
22  2004."

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

9 (Pages 30 to 33)

---

30

1    Can you explain what that means?  What
2  are producer layer houses 1 through 25?
3        A.   Envision, if you will, an H.  Okay?  The
4  so center of the H, the cross leg that would be in
5  the middle of the H is the breaking plant and
6  cooling, refrigeration and delivery.
7        The right-hand upper leg of the H would
8  be ten buildings compromising 1,350,000 layers.
9  The upper left-hand leg of the H would be
10 identically opposite of that, so another 1,350,000
11 birds, or 2.7.
12       The balance buildings, 21 through 25,
13 are of a different configuration.  Instead of
14 highrise buildings, they are battery cage
15 buildings, and so they're wider and they have more
16 hens in them.  And that comprises the balance
17 between the 2.7 and the 4.380.
18       Q.   As of December 2003, had Fremont Farms
19 of Iowa already built housing for 4,380,000 layers?
20       A.   Yes.
21       Q.   And this was all built between the time
22 Fremont Farms of Iowa --

---

31

1        A.   Excuse me, sir.
2        Q.   Yeah.
3        A.   I apologize.  We were under
4  construction.  We weren't fully populated.
5        Q.   Okay.
6        A.   That's why you will read that it says
7  compromises [sic] the base volume through 2004, but
8  not 2003.
9        Q.   So construction -- withdrawn.
10       Once the construction that was then
11 underway was completed, you would be at 4,380,000
12 layers; is that correct?
13       A.   Correct.
14       Q.   And all of that construction occurred
15 after Fremont Farms of Iowa was formed; is that
16 correct?
17       A.   Correct.
18       Q.   All construction between the late '90s
19 and December of 2003; is that right?
20       MR. MALKINSON:  Objection, leading.
21       BY MR. GREENE:
22       Q.   When did all of that construction occur?

---

32

1        A.   From 1997 through 2004.
2        Q.   Now, the next sentence reads "The
3  additional output (approximately 820,000 layers)
4  included in the 2005 and forward volume is subject
5  to the construction of those facilities."
6        This is now discussing another 820,000
7  layers; is that correct?
8        A.   Correct.
9        Q.   And is this 820,000 layers then in
10 addition to the 4,380,000 layers that are already
11 under construction at this point?
12       A.   Correct.
13       Q.   And is that additional 820,000 layers
14 the subject of this supply agreement, Exhibit 2?
15       MR. MALKINSON:  Objection.  The document
16 speaks for itself.
17       A.   Yes.  This Exhibit A outlines our
18 obligation through that process.
19       Q.   Now, were you involved in decisions
20 by -- withdrawn.
21       Were facilities for those additional
22 820,000 layers ultimately constructed?

---

33

1        A.   Yes.
2        Q.   At the same location as the rest of the
3  layers?
4        A.   Yes.  Quad 3 of Fremont Farms of Iowa.
5        Q.   And where physically is this site
6  located?
7        A.   Malcolm, Iowa.
8        Q.   Were you involved in decisions by
9  Fremont Farms of Iowa about whether to build new
10 facilities to house layers?
11       A.   Yes.
12       Q.   You personally?
13       A.   Yes.
14       Q.   How did Fremont Farms of Iowa decide
15 when to build facilities and how much capacity to
16 build?
17       A.   Through our dialogues with the
18 marketplace, in this case, Michael Foods --
19 Waldbaums and Michael Foods -- there would be a
20 discussion as to their future needs on a regular
21 basis so that we would have time to produce and
22 build facilities for them to meet their future

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                     August 26, 2013

10 (Pages 34 to 37)

34

1    needs.  And they would let us know what they were.
2         We would require a contract in order to
3    obtain investors and the appropriate Farm Credit
4    Services of America financing to build them.  And
5    if we couldn't get that, we wouldn't.  So it took a
6    contract, then it took the financing and investors,
7    and then the project would move forward.
8         Q.   You say it took a contract -- am I
9    understanding correctly, you required a contract in
10   order to go forward with building facilities?
11        A.   Yes.
12        Q.   What kind of contract?
13        A.   A grain-based -- confidentially, of
14   course, a grain-based, market-based -- I'm sorry, a
15   grain-based cost-plus contract of an adequate
16   length to satisfy both the investors' needs and the
17   Farm Credit Services of America's to fund our
18   project so we could build them and deliver the
19   product.
20        Q.   And when you say a term of sufficient
21   length, how long a contract were you looking for?
22        A.   At this point in time, seven years.  In

35

1    today's world, 12 to 14.
2         Q.   And under the seven-year contract -- a
3    contract, let's say, for example, seven years --
4    what would Michael Foods' obligations be under that
5    contract?
6         MR. MALKINSON:  Object to form.
7         BY MR. GREENE
8         Q.   When one of the counsel makes an
9    objection, that's for the record, but you can go
10   ahead and answer the question.
11        A.   If I understand the question --
12        Q.   Well, let me withdraw it.
13        A.   Thank you.  Sorry.
14        Q.   If he's objected to it and you've
15   indicated you're not clear on the understanding,
16   it's probably one I should withdraw.
17        What kind of a commitment were you
18   looking for from Michael Foods as a prerequisite to
19   building new facilities?
20        MR. MALKINSON:  Objection, vague.  No
21   time frame.
22        A.   We looked for a contract that met our

36

1    pro forma needs, which generally required a
2    percentage return to the investors and a financing
3    term such that we weren't having a lot of exposure
4    at the end of the contract period.
5         BY MR. GREENE
6         Q.   And during this period of time -- let's
7    say it's seven years -- would Michael Foods then be
8    obligated to purchase the output from the
9    facilities you'd be building?
10        MR. MALKINSON:  Objection, the contract
11   speaks for itself.  I don't know what -- you've
12   said there's several contracts.  I don't know
13   whether you're talking about the one you've just
14   gone through or some other one.
15        BY MR. GREENE:
16        Q.   Under Henning Exhibit 2 -- take a look
17   at Henning Exhibit 2.
18        A.   Yes, sir.
19        Q.   This is the contract, as I understand
20   it, where Fremont Farms agreed to construct
21   facilities for an additional 820,000 layers; is
22   that correct?

37

1         A.   Yes.
2         Q.   Okay.  Was it your understanding, then,
3    that Michael Foods was obligated to purchase the
4    output from those 820,000 layers for the term of
5    the contract?
6         A.   Yes.
7         MR. MALKINSON:  Objection, the contract
8    speaks for itself.
9         BY MR. GREENE:
10        Q.   Why was that important to Fremont Farms
11   of Iowa that Michael Foods make that commitment?
12        A.   Because Farm Credit Services of America
13   would not extend us the credit to be able to
14   finance these facilities and build them without
15   that commitment.
16        Q.   And by "that commitment," you mean the
17   long-term purchase commitment?
18        A.   That's correct.
19        Q.   From the time Fremont Farms of Iowa was
20   formed until the end of 2008, did Fremont Farms of
21   Iowa ever build new facilities without first having
22   a long-term commitment from Michael Foods to

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                            August 26, 2013

11 (Pages 38 to 41)

---

**38**

1    purchase production from the new facilities?
2        A.    No.
3        Q.    Who was the buyer of the output --
4    again, withdrawn.
5              From the formation of Fremont Farms of
6    Iowa until the end of 2008, who was the buyer of
7    the liquid eggs produced by Fremont Farms of Iowa?
8        A.    Michael's Foods.
9        Q.    Were there any other buyers during that
10   period?
11       A.    No.
12       Q.    In total, between the time of Fremont
13   Farms of Iowa's formation in 2008, how much
14   capacity did Freemont Farms of Iowa build as a
15   result of long-term contracts with Michael Foods?
16       A.    5.2 million birds.
17       Q.    I'll ask the court reporter to mark
18   Henning Exhibit 3.  This is a Assignment of Supply
19   Agreement for Security Purposes.  It reads on the
20   top "This assignment is made effective the first
21   day of March 2004 by Freemont Farms of Iowa, LLP,
22   an Iowa limited liability partnership (Borrower) to

---

**40**

1    and the Farm Credit financing for total, yes.
2        Q.    The debt financing?
3        A.    Yes.
4        Q.    And on page 2, there's a line that says,
5    "Freemont Farms of Iowa, LLP by Jeff Henning,
6    manager."  Do you see that line?
7        A.    Yes.
8        Q.    And is that your signature?
9        A.    Yes.
10       Q.    What was your understanding of the --
11   oh.  Let's just turn the page a couple pages to the
12   page that ends Bates number 427.  This is an
13   acceptance of notice of assignment.  It appears to
14   be signed by Terry Baker.  Do you see that?
15       A.    Yes.
16       Q.    And then the final page is the first
17   page of the supply agreement that we previously
18   marked as Exhibit 2; is that correct?
19       A.    Yes.
20       Q.    All right.  What was your understanding
21   of the purposes of this assignment document?
22       A.    It was further collateral assurance to

---

**39**

1    and for the benefit of Farm Credit Services of
2    America, FLCA, and Farm Credit Services of America
3    PCA (Lender) Bates numbers MFI0300424 through -28.
4              (Henning Exhibit 3 was marked for
5              identification.)
6         BY MR. GREENE:
7        Q.    Do you recognize Henning Exhibit 3?
8        A.    Yes.
9        Q.    What is it?
10       A.    That is an assignment required by Farm
11   Credit Services of America of our supply agreement
12   with Michael Foods so that it would help secure the
13   financing that we needed to expand the projects.
14       Q.    And was Farm Credit Services of
15   America -- I'm sorry, Farm Credit Services of
16   America, were they the lender for Freemont Farms of
17   Iowa?
18       A.    Yes.
19       Q.    Farm Credit Service of America provided
20   the financing for the construction of the
21   facilities you've been testifying about?
22       A.    Yes, subject to the investor financing

---

**41**

1    the lender that should something happen to the
2    operators, i.e., Freemont Farms of Iowa, that they
3    would have the ability to come in, produce the egg
4    and execute on getting paid off on their financing.
5        Q.    When you say to get paid off, you mean
6    under the supply agreement with Michael Foods?
7        A.    Correct.  They would continue to supply
8    product and hopefully produce profits to pay off
9    their loan.
10       Q.    Do you believe that Fremont Farms of
11   Iowa could have obtained financing for these
12   construction projects without the Michael Foods
13   supply agreements?
14       A.    No.  We could not have.
15       Q.    Let me ask you now about Center Fresh.
16   When did you first become a part owner of Center
17   Fresh?
18       A.    Oh, my goodness. I believe 2005.
19       Q.    Let me show you some documents.  Maybe
20   it will help.
21             (Henning Exhibit 4 was marked for
22             identification.)

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                        August 26, 2013

12 (Pages 42 to 45)

---

**42**

BY MR. GREENE:

Q.   I'm going to mark as Henning Exhibit 4 a supply agreement. "Confidential. This agreement made and entered into as of this 3rd day of September 2004 by and between M.G. Waldbaum Company, a Nebraska corporation, d/b/a the Michael Foods Eggs Products Company, and Center Fresh Egg Farm, LLP, an Iowa limited liability partnership." The Bates numbers on this document are MFI0028926 through -956.

Do you see that -- do you see Henning Exhibit 4?

A.   Yes.

Q.   Do you recognize the document?

A.   Yes.

Q.   What is Henning Exhibit 4?

A.   **It is the marketing supply agreement between Michael Foods and Center Fresh Egg Farm, LLP.**

Q.   All right. And I want to direct your attention to the third to the last page of the exhibit, the one that ends with Bates number 954.

---

**43**

A.   **Yes, sir.**

Q.   And you see some quantity tables and the second half of the page says "Phase 1, Existing Houses, New Facilities. Phase 2, New Facilities." Do you see that?

A.   **Yes.**

Q.   Okay. Does this, Henning Exhibit 4, refresh your recollection about when you became a part owner of Center Fresh?

A.   **Yes.**

Q.   When did you become a part owner of Center Fresh?

A.   **In probably mid-2004.**

Q.   And what were the circumstances under which you became a part owner of Center Fresh?

A.   **Jim Dean wished to expand Center Fresh Farms. The existing owner group -- part of the existing owner group decided to exit at that point in time. And Jim asked me if I would become an investor, work with him with Michael Foods on the expansion contract and participate in some of the construction activities.**

---

**44**

Q.   So before -- you said probably mid-2004. Before mid-2004, you were not a part owner of Center Fresh?

A.   **That is correct.**

Q.   And what's your understanding of what Center Fresh's business was before you became a part owner?

A.   **With my Henning Construction Company hat on, there were two sets of facilities there. There were two buildings called the Dooyema & Sons buildings on this document.**

Q.   And "this document" you're referring to what?

A.   **This exhibit that you showed me. Henning 4.**

Q.   Okay. Henning 4. And are you pointing to a part of --

A.   **Dooyema -- yes, on page 954.**

Q.   Okay.

A.   **The bottom half. It says Dooyema & Sons, layers, 160,000. We had built one of those buildings. The Dooyemas had built one of those**

---

**45**

about 15 years before themselves. So we, as a builder, had built for the Dooyema family who owned the ground where Center Fresh eventually expanded. And the Dooyema family is about a 20 percent partner in that business. So that's what they had, and those were sold as shell eggs into the market.

Jim came in and expanded and the first investor group came in and expanded the additional 780,000 layers that were there, but there were only four buildings. So there were two buildings that were added, and we built those last two buildings for them as a contractor and they were built for Michael's Foods. The upstream market at that point in time was Michael Foods.

Q.   When you say Jim, you refer to --

A.   Jim Dean, the CEO.

Q.   Okay. Jim Dean was the CEO of Center Fresh?

A.   Yes.

Q.   So by the time that you became a part owner of Center Fresh, the 940,000 layers that are indicated in the existing houses line on the

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

13 (Pages 46 to 49)

---

**46**

1  document that ends 954, those already existed; is
2  that correct?
3      A.   Correct.
4      Q.   The rest of the facilities, the ones
5  that are indicated under new facilities, did those
6  exist at the time you became a part owner?
7      A.   They did not.
8      Q.   Let's talk about the -- first the
9  existing houses.  I think you mentioned that two of
10  the buildings were built for Michael Foods.  What
11  do you mean by that?
12      A.   Jim recognized via his participation in
13  the original Fremont Farms of Iowa model that the
14  future of the business at that point in time was to
15  find grain-based markets of which Michael's was a
16  major one.  And they -- he entered into a
17  discussion with them to add two more buildings'
18  production to that -- what was there at that point
19  in time.  And the original investor group
20  participated in that process.
21          And so those two buildings were new, as
22  well as the conversion of the others to Michael's

---

**47**

1  at that point in time.
2      Q.   The new buildings that were built for
3  Michael's, how many layers were in those buildings?
4      A.   380,000.
5      Q.   No.  I'm sorry.  Withdraw the question.
6          I'm referring now to the line that says
7  existing houses, 780,000 layers.  Okay?
8      A.   There were two 135,000 bird houses added
9  for Waldbaum's --
10      Q.   Okay.
11      A.   -- as new construction.
12      Q.   Two 135,000 buildings?
13      A.   Yes.
14      Q.   For a total of --
15      A.   270.
16      Q.   -- 270,000 in new construction for
17  Michael Foods?
18      A.   Correct.
19      MR. MALKINSON:  Just so I'm clear,
20  that's the existing?  That's part of the existing?
21      BY MR. GREENE:
22      Q.   Mr. Malkinson is asking, your testimony

---

**48**

1  in here about the 270,000, that's referring to the
2  line that says existing houses, layers, 780,000?
3      A.   Correct.
4      Q.   All right.  Now, with those 940,000
5  layers already on the ground, you then become a
6  part owner of Center Fresh; is that right?
7      A.   Correct.
8      Q.   All right.  And, by the way, where again
9  geographically is this site located?
10      A.   Northwest Iowa, Sioux Center, Iowa.
11      Q.   And were you involved in the negotiation
12  of Henning Exhibit 4, the September 2004 contract
13  between Michael Foods and Center Fresh?
14      A.   Yes.  Because as a partner, that was one
15  of the things I brought to the table was
16  participation in that process.
17      Q.   That was one of your responsibilities?
18      A.   Correct.
19      Q.   Were you also involved in Center Fresh's
20  decision to build new facilities?
21      A.   Yes.
22      Q.   And looking at Exhibit 4 under the term,

---

**49**

1  the term of this contract, it's actually got two
2  phases, correct?
3      A.   Yes.
4      Q.   And phase one had a term of January 1,
5  2005 until December 31, 2010; is that correct?
6      A.   Yes.
7      Q.   That's a six-year term?
8      A.   Yes.
9      Q.   Okay.  And then there's a phase two that
10  goes from January 1, 2006 until December 31, 2011,
11  correct?
12      A.   Yes.
13      Q.   And that's also a six-year term?
14      A.   Yes.  If I might add, with an evergreen
15  provision.
16      Q.   And what does an evergreen provision
17  mean?
18      A.   It means that this agreement will
19  continue unless one party or the other notifies the
20  other party at a date certain before the
21  termination of the contract.
22      Q.   So it's at least six years?

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

14 (Pages 50 to 53)

---

**50**

1      **A.  Correct.**

2      Q.  Now, let's go back to that third to last

3  page of Exhibit 4, the one that ends 954.

4      **A.  Yes.**

5      Q.  Did Center Fresh agree to build

6  additional facilities under Exhibit 4?

7      **A.  Yes.**

8      Q.  How much additional housing did Center

9  Fresh agree to build under Exhibit 4?

10      **A.  Approximately 2.8-plus million birds.**

11      Q.  And how did Center Fresh make the

12  decision on whether to go ahead and build the

13  housing for the additional 2.8 million birds?

14      **A.  Upon Michael's request for X amount of**

15  **product back into the number of hens it takes, back**

16  **into the length of the contract you need, back into**

17  **the investors' amount of money to put in, back into**

18  **the Farm Credit Service financing, and assignments,**

19  **et cetera, it all ties together, and away we go.**

20      Q.  What was the significance of Michael

21  Foods' willingness to enter into this supply

22  contract, Exhibit 4, in Center Fresh's decision to

---

**51**

1  build these facilities?

2      **A.  It would not have happened without it.**

3      Q.  And do you believe you would have been

4  able to -- withdrawn.

5      Do you believe that Center Fresh would

6  have been able to obtain financing to build housing

7  for an additional 2.8 million birds without the

8  Michael Foods supply contract?

9      **A.  I do not believe they would have.**

10      Q.  Were the facilities for these additional

11  2.8 million layers, in fact, built?

12      **A.  Yes.**

13      Q.  And they currently exist today in -- is

14  it Sioux Center, Iowa?

15      **A.  Yes.**

16      Q.  What form -- withdrawn.

17      What was the specific product that

18  Center Fresh delivered to Michael Foods?

19      **A.  Liquid eggs. However, the initial**

20  **phases were -- let me restate this.**

21      **Liquid egg products, liquid whole egg**

22  **products and eventually separated products.**

---

**52**

1      Q.  And, again, would that be pasteurized or

2  unpasteurized?

3      **A.  Unpasteurized.**

4      Q.  And how were those delivered to Michael

5  Foods?

6      **A.  In tankers.**

7      Q.  You mentioned the 270,000 birds that

8  were -- withdrawn.

9      You mentioned the housing for 270,000

10  birds that was part of the existing houses at the

11  time you became a part owner.  Do you recall that?

12      **A.  Yes.**

13      Q.  And you've just testified about the

14  2.8 million -- you just testified about the housing

15  for the additional 2.8 million layers, correct?

16      **A.  Yes.**

17      Q.  In total, how much capacity -- how much

18  additional housing did Center Fresh build as a

19  result of long-term contracts with Michael Foods?

20      **A.  To my knowledge, approximately**

21  **3.1 million.**

22      Q.  Without Michael Foods' long-term

---

**53**

1  commitment to purchase, would that capacity have

2  been built?

3      MR. MALKINSON:  Objection, calls for

4  speculation.

5      **A.  No.**

6      BY MR. GREENE:

7      Q.  Were you in a position to know whether

8  Center Fresh would have built without the Michael

9  Foods commitment to purchase?

10      **A.  Yes.**

11      Q.  And, in fact, you were one of the

12  decision makers, weren't you?

13      **A.  Yes.**

14      MR. GREENE:  Why don't we take a break.

15      THE VIDEOGRAPHER:  Off the record.

16      (Whereupon, a recess was taken from

17  11:20 a.m to 11:30 a.m.)

18      THE VIDEOGRAPHER:  On the record.

19      BY MR. GREENE:

20      Q.  Mr. Henning, do you recognize an entity

21  known as IPRO, I-P-R-O?

22      **A.  Yes.**

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

15 (Pages 54 to 57)

---

54

1    Q.    What is IPRO?
2    A.    It is a company that was set up to
3    locate a facility site and construct a green field
4    production operation for Michael's Foods. I'm
5    sorry. For its investors to be contracted to
6    Michael's Foods.
7    Q.    And what was your involvement with IPRO?
8    A.    I was the founder.
9    Q.    And who were the owners of IPRO?
10   A.    Myself and Steve George originally.
11   Q.    You used the term "green field." Can
12   you explain who you mean when you say "green
13   field"?
14   A.    As opposed to a taking over an existing
15   facility and expanding it, it would be to locate,
16   like we did at Freemont Farms of Iowa, a green
17   field and start from scratch, permitting and
18   construction of a new facility.
19   Q.    At the time -- let me ask you this.
20   When was IPRO formed?
21   A.    199- -- I'm sorry. 2004-ish.
22   Q.    And at the time that IPRO was formed,

---

55

1    did IPRO have any egg production facilities?
2    A.    No.
3    Q.    Now, you said that it was -- that it was
4    created for its investors, but to be contracted to
5    Michael Foods. Can you explain what you mean by
6    that?
7    A.    Not unlike Center Fresh or Fremont Farms
8    of Iowa, we were under an agreement with Michael's
9    Foods to take the output production of liquid eggs
10   from this facility as and once it was constructed.
11   Q.    I'm going to show you what we'll mark as
12   Henning Exhibit Number 5.
13        (Henning Exhibit 5 was marked for
14         identification.)
15        BY MR. GREENE:
16   Q.    Henning Exhibit Number 5 begins with a
17   letter from IPRO II, LLC from Steve George to Terry
18   Baker dated June 23, 2005 on the first page, and
19   then after that, the second page and thereafter is
20   a document that reads "Supply Agreement." The
21   Bates numbers are MFI0298827 through -851.
22        Mr. Henning, would you please look at

---

56

1    Henning Exhibit 5.
2    A.    Yes.
3    Q.    And do you recognize Henning Exhibit 5?
4    A.    Yes.
5    Q.    What is it?
6    A.    It is a letter from Steve George to
7    Terry Baker regarding the transmittal of an
8    executed supply agreement for IPRO II.
9    Q.    Okay. Now, I want to focus our
10   attention on the supply agreement itself. So from
11   this point on, if I refer to Henning Exhibit 5,
12   will you understand that to be a reference to the
13   supply agreement?
14   A.    Yes.
15   Q.    Okay. And as I understand it, the
16   supply agreement is this entire Henning Exhibit 5
17   except for the cover letter; is that correct?
18   A.    Yes.
19   Q.    This is dated, according to the first
20   page of the supply agreement with Bates number
21   82 -- ends 828, June 1st of 2005. Do you see that?
22   A.    Yes.

---

57

1    Q.    And the term of this agreement is from
2    the date of the agreement until December 31, 2017;
3    is that correct?
4    A.    That's correct.
5    Q.    So this is a twelve-and-a-half-year
6    term?
7    A.    Yes.
8    Q.    Do you recall any discussion as to why
9    the term for this contract was twelve and a half
10   years?
11   A.    Yes. It was a two-piecer. Number one
12   is that we had to locate the facility, and that was
13   going to take some permitting time. Number two was
14   that the cost of these facilities was -- had
15   increased greatly from the previous agreements and,
16   therefore, we needed a longer-term commitment in
17   order to have the Farm Credit financing work into
18   the proforma.
19   Q.    When you say a longer-term commitment,
20   do you mean a longer-term purchase commitment from
21   the buyer?
22   A.    Correct.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                      August 26, 2013

16 (Pages 58 to 61)

---

58

Q.   Okay.  And the buyer in this case is Michael Foods; is that correct?

A.   Correct.

Q.   As of June 2005, what was your understanding as to where these facilities would be located?

A.   I would have to give you background to get to that point.

Q.   Why don't you go ahead and give me the background as far as location for IPRO.

A.   IPRO originally was to be located in the midwest, not unlike the rest of the facilities we've previously discussed here.  And as Michael's strategy and customer demands progressed, they decided that they would like to move this farther east towards their eastern marketplace.

And so we went through the vetting of Illinois, Indiana and eventually Ohio.  And so at this point in time -- I don't know where exactly that falls in that time frame, but eventually it was Ohio was the target.

Q.   I want to direct your attention to the

---

59

quantity page.  Let's first look at page 7.  Page 7 of the supply agreement, which is Henning Exhibit 5, ending with a Bates number 834.  Do you see that?

A.   Yes.

Q.   And there is a signature underneath IPRO II, LLC.  Do you see that?

A.   Yes.

Q.   Whose signature is that?

A.   That's my signature.

Q.   And were you involved in negotiating this contract?

A.   Yes.

Q.   Were you involved in IPRO's decision to go forward with this contract?

A.   Yes.

Q.   Let's take a look at the next page of the supply agreement, Henning Exhibit 5.  It says Exhibit A.

A.   Yes.

Q.   There is a table there that reads "Quantity, approximate pounds per year."  Do you

---

60

see that?

A.   Yes.

Q.   Okay.  And it shows a quantity going from 2007 at 241,000 -- is that liquid pounds?

A.   Yes.

Q.   -- annual volume until 2011 for 111 million liquid pounds.  Do you see that?

A.   Yes.

Q.   Okay.  And then there is a paragraph that starts "It is agreed."  I'm just going to read for the record.

"It is agreed the producer shall undertake on a commercially reasonable basis efforts to secure financing and commence construction as soon as is practical.  Producer will provide a volume forecast by month to Michael for the following twelve months on a quarterly basis.

"During the term of this agreement and following completion of the production facilities, Michael agrees to purchase, and producer agrees to supply, quantities for approximately 4 million

---

61

layer hens." Did I read that correctly?

A.   Yes.

Q.   And the 4 million layer hens, was that the size of the additional housing that was to be built under this project?

A.   Yes.  We permitted for 6 million birds, but only had contracted for four, allowing for expansion, should they request it.

Q.   Why did you allow for expansion?

A.   Because all of our previous projects grew, and we wanted to make sure in Ohio that we located, publicized and permitted for some expansion.

Q.   When you say all the previous projects grew, what do you mean?

A.   Well, when we did Fremont Farms of Iowa, it was originally going to be 1.350 and then 2.7 and then 4 and eventually 5.2.

Q.   And why did they grow?

A.   Because they requested --

MR. MALKINSON:  Objection, calls for speculation, lack of foundation.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

17 (Pages 62 to 65)

---

**62**

1    A.   They asked us to expand to meet need.
2         BY MR. GREENE:
3    Q.   And who is "they"?
4    A.   Michael Foods.
5    Q.   So at the time -- this line says,
6  "Michael agrees to purchase, and producer agrees to
7  supply, quantities produced from approximately 4
8  million layer hens."
9         At the time this was signed, did you
10 already have permitting started?
11   A.   I don't know the exact date.
12   Q.   And you said you were one of the owners
13 of IPRO, correct?
14   A.   Correct.
15   Q.   And one of the decision makers?
16   A.   Yes.
17   Q.   Why did IPRO agree to build housing for
18 4 million additional hens?
19        MR. MALKINSON:  Objection, calls for
20 speculation, lack of foundation.
21   A.   Michael's asked us to expand -- locate a
22 facility and expand to meet their needs on the East

---

**63**

1  Coast.
2         BY MR. GREENE:
3    Q.   And from a business standpoint, from
4  IPRO's standpoint, why did you think that was a
5  good business proposition?
6    A.   Because we were able to get a longer
7  contract commitment and we were able to expand a
8  business that -- and take care of our customer.
9    Q.   Without Michael Foods' commitment to
10 purchase the output from these 4 million layers,
11 would IPRO have agreed to build the facilities?
12   A.   No.
13   Q.   Do you believe that you would have been
14 able to obtain financing to build housing for
15 4 million birds without Michael Foods' commitment
16 to purchase the output?
17        MR. MALKINSON:  Object to form, calls
18 for speculation.
19   A.   My experience would have said no.
20        BY MR. GREENE:
21   Q.   I want to direct your attention to
22 Section 12(d) of the termination -- I'm sorry.

---

**64**

1  12(d) of the supply agreement marked as Henning
2  Exhibit 5.  This is page 4 of the supply agreement.
3  It's the Bates number that ends 831.  Do you see
4  that?
5    A.   Yes, sir.
6    Q.   Focusing your attention -- and whenever
7  I show you a document, you're free, of course, to
8  read as much as you want or any other portions of
9  the document.  But directing your attention to
10 Section 12(d), it says, "The agreement shall
11 terminate automatically in the event Producer has
12 not commenced a supply of shell eggs and/or liquid
13 eggs to Michael hereunder by December 31, 2007,
14 unless an event of force majeure causes a delay, in
15 which case the date shall be extended accordingly."
16        Do you see that?
17   A.   Yes, sir.
18   Q.   After you signed the IPRO contract in
19 2005, what happened with respect to your efforts to
20 construct these facilities?
21   A.   We ran into a difficult time locating
22 facility locations in Ohio.  We spent a great deal

---

**65**

1  of time vetting three or four ultimate candidates.
2  We entered into agreements to purchase those pieces
3  of property subject to, and then we went through
4  the ODA, Ohio Department of Agriculture, permitting
5  process which requires public meetings, et cetera.
6         And in two cases, we ended up with a
7  fair amount of local resistence to the NIMBY
8  livestock process that's going on in the country
9  nowadays.  And so that caused us an extended period
10 to try and get the permits.
11   Q.   You used a term I'm not sure I
12 recognize.  Did you say NIMBY livestock?
13   A.   Yes.
14   Q.   Okay.  Can you spell that and then tell
15 us what it means?
16   A.   NIMBY.  "Not in my backyard."
17   Q.   Okay.  So that's a reference to
18 community or local opposition?
19   A.   Community activism, yes.  Mm-hmm.
20   Q.   Were facilities completed -- withdrawn.
21        Were you able to supply eggs to Michael
22 Foods under the IPRO contract by December 31, 2007?

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                          August 26, 2013

18 (Pages 66 to 69)

---

66

1     A.   We were not.
2     Q.   And what did Michael Foods do in
3   response to that?
4     A.   We were in constant contact with them
5   through the entire site-vetting process, the
6   permitting process, and it became evident that that
7   time frame was not going to be met.  And we
8   contacted them, and they agreed that we should
9   continue to pursue it.
10     Q.   And from your perspective, did they
11   remain committed to purchase the output from IPRO?
12     A.   Absolutely, on a continuing basis.
13     Q.   And you continued -- did you continue at
14   that point to invest time and money in getting the
15   IPRO project sited?
16     A.   We did.
17     Q.   And in doing that, did you rely on
18   Michael Foods' commitment to continue to be willing
19   to purchase the output from the additional
20   construction?
21         MR. MALKINSON:  Object to form.
22     A.   Yes, we did.

---

67

1         BY MR. GREENE:
2     Q.   During the period from the inception of
3   IPRO through, let's say, the end of 2008, did
4   Michael Foods ever withdraw its commitment to
5   purchase the output from 4 million layers under the
6   IPRO contract?
7     A.   No, they did not.  And they actually
8   encouraged us to vigorously pursue it.
9         MR. MALKINSON:  Move to strike the last
10   part of his answer as nonresponsive.
11         BY MR. MALKINSON:
12     Q.   I'm going to ask the court reporter to
13   mark as Henning Exhibit 6 --
14         (Henning Exhibit 6 was marked for
15         identification.)
16         BY MR. MALKINSON:
17     Q.   This is an e-mail from Steve George to
18   Terry Baker, copied to persons including Jeff
19   Henning, subject "IPRO Schedule - Confidential."
20   Bates number MFI0045216.  And there is no Bates
21   number on the second page.  I'll represent to
22   counsel and to the witness it's my understanding

---

68

1   the second page is the attachment to the item that
2   ends Bates number 5216.  That's why it doesn't
3   print with a Bates number, but it's my
4   understanding that it is the attachment to the item
5   that has the Bates number.
6         MR. MALKINSON:  Did it come out of the
7   repository?
8         MR. GREENE:  It did come out of the
9   repository.  And I may have a -- it's my
10   understanding that there just is an issue with
11   printing a native attachment.  I do not pretend to
12   be the expert on such things.
13         MR. RAYLE:  For the record, we have had
14   similar problems.
15         MR. GREENE:  I believe -- and this is,
16   again -- I am getting this from somebody in my
17   office.  I believe the attachment is numbered
18   MFI0045217, but it doesn't print that way.  And so
19   I've now represented just about everything I can
20   represent about the Bates number of this document.
21         BY MR. GREENE:
22     Q.   I'm showing you Henning Exhibit 6.  And

---

69

1   this is a document dated September 5th 2007 from
2   Steve George to Terry Baker.  You see you're copied
3   on that, correct?
4     A.   Yes.
5     Q.   Is this an e-mail you, in fact,
6   received?
7     A.   Yes.
8     Q.   And this is a -- the document begins,
9   "Dear Terry, good to hear from you.  Below is the
10   latest IPRO schedule based on current assumptions."
11   Do you see that?
12     A.   Yes.
13     Q.   And can you explain, then, reading the
14   document what the -- what the IPRO schedule is that
15   was -- that was being communicated?
16     A.   Yes.  This indicated that should the
17   permitting process soon go from August '07 through
18   March of '08, we would commence construction on the
19   pullet facilities in April of '08, commence
20   concrete pad pour on the layer houses in April of
21   '08, continuing on through 2008.  And house layer
22   flock one December 7th of '08, flock 2, February

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

19 (Pages 70 to 73)

---

70

1   **8th of '09, flock 3, April 12th of '09 and turn on**
2   **the breaking plant approximately April 15th of**
3   **2009, so that they had the ability to forecast this**
4   **into their supply chain.**
5       Q.    And if you can look at the attachment,
6   and you can see this flock schedule and it goes
7   from one to ten, although 1 and 2, there's a 1A,
8   1B, 2A and 2B.  What do those numbers from 1 to 10
9   represent?
10      **A.    These are the buildings.  And so you**
11  **have two sides to the building.  We don't house**
12  **them all at once.  We house them in two stages, so**
13  **you have an A and B to each building.**
14      Q.    And how many layers are there per
15  building?
16      **A.    400,000.**
17      Q.    So this flock schedule on the attachment
18  to Henning Exhibit 6, the ten flock -- the
19  ten-flock buildings represent 4 million layers; is
20  that correct?
21      **A.    Yes.**
22      Q.    So this is now September of 2007.  This

---

71

1   is two years after the IPRO contract was signed,
2   correct?  A little bit more than two years after?
3       **A.    Yes.  Two and a half, I think.**
4       Q.    And just to refresh your recollection,
5   Henning Exhibit 5 is dated June of 2005.  So a
6   little bit more than two years?
7       **A.    Correct.**
8       Q.    At this point, was it still your
9   expectation that you would be proceeding forward
10  with building housing for an additional 4 million
11  layers under the IPRO contract?
12      **A.    Yes.**
13      Q.    And based on your discussions with
14  personnel at Michael Foods, did you understand that
15  Michael Foods' personnel continued to expect the
16  construction of housing for an additional 4 million
17  hens?
18      MR. MALKINSON:  Objection, calls for
19  hearsay.
20      **A.    They requested the information that we**
21  **produced, and their explanation to us was they**
22  **needed it to forecast it into their supply chain.**

---

72

1       BY MR. GREENE:
2       Q.    Did they indicate to you during this
3   time frame in 2007 that they had given up on IPRO?
4       MR. MALKINSON:  Objection, calls for --
5   strike that.
6           Objection, hearsay.  Calls for hearsay.
7       **A.    They did not tell me that.**
8       BY MR. GREENE:
9       Q.    I'm going to ask to mark as Henning
10  Exhibit 7 a copy of the United Voices dated
11  November 30th 2007, Bates numbers FMI0056110
12  through -118.
13          (Henning Exhibit 7 was marked for
14          identification.)
15      BY MR. GREENE:
16      Q.    Mr. Henning, you can certainly read as
17  much of the document as you would like.  I'm going
18  to direct your attention to the bottom of the first
19  page, an item marked with the title "Plans
20  Announced to Build Six (6) Million Bird Complex."
21  Do you see that particular section of United
22  Voices?

---

73

1       **A.    Yes.**
2       Q.    All right.  Are you familiar with the
3   publication United Voices?
4       **A.    Yes.  I'm a member of United Egg**
5   **Producers.**
6       Q.    Okay.  And toward the bottom of the
7   first page, there is a story in United Voices that
8   reads "An application has been filed with the Ohio
9   Department of Agriculture for the construction of a
10  complex with housing for 6 million laying hens.
11      "The company, Hi-Q Egg Products, will
12  reportedly build a new farm near West Mansfield,
13  Ohio, and produce an estimated 375,000 pounds of
14  liquid egg product daily for use by bakeries and
15  others in the food processing industry.  The
16  company hopes to break ground in April 2008 and
17  complete the first phase of construction by October
18  2010."  Do you see that?
19      **A.    Yes.**
20      MR. MALKINSON:  Objection, move to
21  strike, lack of foundation.
22      BY MR. GREENE:

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

20 (Pages 74 to 77)

---

74

1    Q.    Did I read it correctly?
2    A.    Yes.
3    Q.    My only question here is there's a
4  reference in this United Voices to a company called
5  Hi-Q Egg Products.  Do you recognize that name?
6    A.    Yes.
7    Q.    What is Hi-Q Egg Products?
8    A.    It is the name under which IPRO made
9  application to ODA for the permit at this site.
10    Q.    And this site -- there is a reference to
11  West Mansfield, Ohio.  What happened in West
12  Mansfield, Ohio?
13    A.    That was the particular piece of
14  property that we successfully optioned and
15  engineered and submitted for approval to ODA for
16  the permit for 6 million hens.
17    Q.    So would it be fair to say that IPRO
18  then became Hi-Q?
19    A.    Or d/b/a.
20    Q.    Or d/b/a?  Okay.  So IPRO was doing
21  business as Hi-Q?
22    A.    Yes.

---

75

1    Q.    That's still -- when we talk about Hi-Q,
2  we are talking about a company that you were still
3  part owner of, correct?
4    A.    Correct.
5    Q.    One of the principals, correct?
6    A.    Correct.
7    Q.    Okay.  What happened to -- withdrawn.
8         Did you, in fact -- did Hi-Q, in fact,
9  file an application to start the permitting process
10  in West Mansfield, Ohio?
11    A.    Yes.  I'm sure the public notice is what
12  triggered this particular article.
13    Q.    There was a public notice?
14    A.    Yes.
15    Q.    And that would have indicated the
16  location and the number of hens?
17    A.    Correct.
18    Q.    What happened regarding your efforts to
19  get housing for 6 million hens permitted in West
20  Mansfield, Ohio?
21    A.    We successfully completed all the due
22  diligence.  We submitted the package.  We went

---

76

1  through the public hearings.  And the -- under Ohio
2  law, the commissioner of egg has a couple of months
3  to vet politically this process.  There was an
4  election.  There was a change in the department
5  director.  And ultimately the permit was not
6  granted.
7    Q.    How long did that process take?
8    A.    I believe that it was well into 2009 or
9  '10.
10    Q.    And ultimately did Hi-Q get government
11  approval?
12    A.    No.  The -- no.
13    Q.    It was denied?
14    A.    That's correct.  The permit was denied.
15    Q.    Was Michael Foods responsible in any way
16  for the problems that you encountered in getting
17  the construction of the housing for these 4 million
18  birds built?
19         MR. MALKINSON:  Objection, lack of
20  foundation.
21    A.    No.  Quite frankly, the issues were
22  focused -- under ODA law, the issues were focused

---

77

1  on the operator, not the market.
2         BY MR. GREENE:
3    Q.    Throughout the period from the time that
4  IPRO was formed until the permit was ultimately
5  denied for Hi-Q, was Michael Foods supportive of
6  the IPRO project?
7    A.    Yes.
8         MR. MALKINSON:  Objection, calls -- go
9  ahead.
10         BY MR. GREENE:
11    Q.    From your perspective and your
12  understanding, was Michael's Foods supportive of
13  the project?
14    A.    Yes, they were.  The operator got
15  approved, but the permit got denied.
16    Q.    From your perspective, it wasn't in any
17  way Michael Foods' fault?
18         MR. MALKINSON:  Object to form.
19    A.    No, sir.
20         MR. GREENE:  Okay.  Why don't we take
21  another break.
22         THE VIDEOGRAPHER:  Off the record.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                         August 26, 2013

21 (Pages 78 to 81)

---

**78**

1      (Whereupon, a recess was taken from
2  12:02 p.m to 12:08 p.m.)
3      THE VIDEOGRAPHER:  On the record.
4      BY MR. GREENE:
5      Q.  Just one or two additional questions at
6  this time, Mr. Henning.  You talked earlier about
7  the specific product that was called for under the
8  Fremont Farms of Iowa contracts.  You testified
9  about the specific product that was called for
10 under the Center Fresh contract.  I want to ask you
11 the same question under the IPRO contract.
12     Under the IPRO contract, what was the
13 specific product that IPRO was to be providing
14 Michael Foods?
15     MR. MALKINSON:  Objection.  The contract
16 speaks for itself.
17     BY MR. GREENE:
18     Q.  And just for the record, you're looking
19 at Henning Exhibit --
20     **A.  Five.**
21     Q.  Five.
22     **A.  Separated eggs --**

---

**79**

1      Q.  You're looking at --
2      **A.  -- either whole -- I'm sorry.  On page 8**
3  **of that supply agreement.**
4      Q.  And that's Henning Exhibit 5, right?
5      **A.  Yes, sir.**
6      Q.  Okay.  Page 8.
7      **A.  They have the option to have either**
8  **whole eggs or separated.**
9      Q.  And are these all liquid eggs?
10     **A.  All liquid eggs.**
11     Q.  Are they pasteurized or unpasteurized?
12     **A.  Unpasteurized.**
13     Q.  And they would be delivered in what
14 form?
15     **A.  FOBR docks and tanker loads.**
16     MR. GREENE:  No further questions at
17 this time.
18     MR. MALKINSON:  Okay.  We'll take a
19 lunch break.
20     MR. GREENE:  Okay.  We're going to take
21 a lunch break.  I've got 12:10.  Do you want to set
22 a time?  Why don't we go off the record.

---

**80**

1      THE VIDEOGRAPHER:  Off the record.
2      (Whereupon, at 12:10 p.m. a lunch recess
3  was taken.)

---

**81**

1      A F T E R N O O N   S E S S I O N
2      (1:06 p.m.)
3      * * * * *
4  Whereupon,
5      JEFFRY LYNN HENNING,
6  the witness testifying at the time of
7  recess, having been previously duly
8  sworn, was further examined and testified
9  as follows.
10     * * * * *
11     THE VIDEOGRAPHER:  On the record.
12     MR. MALKINSON:  Okay.  Just to clarify,
13 we had a discussion a moment ago before we
14 commenced about whether or not defense counsel was
15 indicating that there is a standard stipulation in
16 these depositions that all objections are reserved
17 other than as to form.  That's not the information
18 that I have, and so I'm not in a position to agree
19 to that and I'm not agreeing to that for today's
20 deposition.
21     MR. GREENE:  Okay.  The other
22 stipulation I mentioned was an objection of one is

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

22 (Pages 82 to 85)

---

82

1    an objection of all. In this case, there is only
2    one other defense counsel, I think, on the phone.
3    But are you agreeable to that stipulation so that
4    not every lawyer has to make the same objection?
5        MR. MALKINSON: I can only say that I'm
6    sticking with my instructions and that I'm not
7    agreeing.
8        MR. GREENE: Okay. Well, then if
9    there's a need for objections, everyone needs to
10   know they've got to raise their own voice.
11       MR. MALKINSON: Counsel for Rose Acre,
12   do you have any questions for the deponent?
13       MS. ALLEN: No, not at this time. Thank
14   you.
15       EXAMINATION BY COUNSEL FOR THE DIRECT
16            PURCHASERS PLAINTIFFS
17       BY MR. MALKINSON:
18   Q.   Mr. Henning, my name is John Malkinson.
19   We met this morning. I'm one of the attorneys that
20   represents the Direct Purchaser Plaintiffs in this
21   lawsuit. I know that you are not represented here
22   by counsel at today's deposition, but am I correct

---

83

1    that this is kind of home turf for you? Is this a
2    law firm that you have done business with before,
3    where we are situated presently?
4    A.   One of our affiliates has, yes.
5    Q.   That's the Bradshaw Fowler firm that's
6    hosting this deposition today?
7    A.   Yes.
8    Q.   And you know some of the lawyers here at
9    Bradshaw, Bradshaw's office?
10   A.   Two.
11   Q.   You were not served with a subpoena in
12   this case, true?
13   A.   False.
14   Q.   You were served with a subpoena?
15   A.   Yes.
16   Q.   Did you bring that with you?
17       MR. GREENE: I have it, if you want it.
18       MR. RAYLE: I'd like it marked.
19   A.   Is this what you're looking for, sir?
20       (Henning Exhibit 8 was marked for
21        identification.)
22       BY MR. MALKINSON:

---

84

1    Q.   Okay. Based on your testimony, you do a
2    lot of business with Michael Foods; you have for
3    over 25 years, true?
4    A.   Yes.
5    Q.   I'm gathering that based on the
6    contracts that we've seen today that you've had
7    with Michael Foods that you know several of the
8    people, the principals in that company, true?
9    A.   Yes.
10   Q.   And some of them, Terry Baker, perhaps,
11   and others are people that you consider friends of
12   yours?
13   A.   Business friends, yes.
14   Q.   Have you ever done anything socially
15   with some of the folks, executives from Michael
16   Foods?
17   A.   No.
18   Q.   Have you ever entertained them at a -- I
19   forget what it's called, a Henning Poultry
20   Conference?
21   A.   No.
22   Q.   The contracts that we saw today, those

---

85

1    alone have generated millions of dollars in revenue
2    for businesses that you have an ownership interest
3    in, true?
4    A.   Yes.
5    Q.   You have a personal interest in
6    continuing to do business with Michael Foods going
7    forward, true?
8    A.   A business interest?
9    Q.   Yes. You have a business interest in
10   continuing to do business with them?
11   A.   That would be nice.
12   Q.   When were you first contacted about
13   giving a deposition in this case?
14   A.   Two months ago possibly.
15   Q.   Were you contacted by someone from
16   Michael Foods or one of their lawyers?
17   A.   It was at the direction of Mr. Greene.
18   Q.   How many times have you met with
19   Mr. Greene before today's testimony?
20   A.   Two. Once on the phone and once in
21   person.
22   Q.   The time on the phone was approximately

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

23 (Pages 86 to 89)

---

**86**

1  when?
2  **A.   45 days ago, 60 days ago.**
3  Q.   And for how long did you speak with him?
4  **A.   35 minutes.**
5  Q.   When you met with him in person, when
6  was that?
7  **A.   30 days ago.**
8  Q.   And how long was that meeting?
9  **A.   An hour and a quarter maybe.**
10  Q.   Did he fly or -- strike that.
11       Did he travel out to Iowa to meet with
12  you?
13  **A.   Yes.**
14  Q.   And you understood that he came from
15  where?
16  **A.   Minneapolis.**
17  Q.   Were you shown documents at that
18  meeting?
19  **A.   Yes.**
20  Q.   Did you ever resist the notion of
21  providing testimony for Michael Foods in this case?
22       MR. GREENE:  Objection, vague and

---

**87**

1  argumentative.
2  **A.   No.**
3       BY MR. MALKINSON:
4  Q.   If you could help them in some way, you
5  would?
6       MR. GREENE:  Objection, argumentative.
7  **A.   I would say to you that certainly it was**
8  **appropriate to do that.**
9       BY MR. MALKINSON:
10  Q.   If they had asked you to appear here and
11  schedule a time to appear and testify in the
12  absence of a subpoena, you would have been
13  agreeable to that?
14  **A.   Not necessarily.**
15  Q.   Showing you what has been marked as
16  Henning Exhibit No. 8, is that the subpoena that
17  you were issued?
18  **A.   Yes.**
19  Q.   It doesn't call for you producing any
20  documents for your testimony, true?
21  **A.   True.**
22  Q.   And I would guess that there are at

---

**88**

1  least hundreds of pages of documents related to
2  business that you and your -- and businesses that
3  you're involved with have had with Michael Foods?
4  **A.   I couldn't conjecture on how many there**
5  **are.**
6  Q.   Were the three supply contracts that you
7  were presented with earlier today the only supply
8  contracts you've entered into with Michael Foods on
9  behalf of any of the businesses you're affiliated
10  with?
11  **A.   No.**
12  Q.   There are others?
13  **A.   One possibly.  Or two.**
14  Q.   Did any of those contracts, to your
15  knowledge, address layer hen density as any
16  requirement or goal of the contract?
17  **A.   Yes.**
18  Q.   Did the contracts we looked at today
19  address that?
20  **A.   Yes.**
21  Q.   What's your understanding of what those
22  contracts provide in terms of layer hen density?

---

**89**

1  We'll go one by one.  With the Fremont.
2       MR. GREENE:  I'm just going to say,
3  objection, vague, and the contract speaks for
4  itself.
5  **A.   Fremont calls for a density of 48 square**
6  **inches.  It allows a density of 48 square inches.**
7       BY MR. MALKINSON:
8  Q.   In fulfilling that contract, is that the
9  density that was provided throughout?
10  **A.   Yes.**
11  Q.   That density can be modified by the user
12  by removing some layer hens, true?
13  **A.   Yes.**
14  Q.   Was that ever done, to your knowledge?
15  **A.   No, it was not.**
16  Q.   Was Freemont Farms ever a --
17  **A.   May I reanswer the last question?**
18  Q.   Sure.
19  **A.   I need to expand on that.  When I say**
20  **yes, you said the user, which is us --**
21  Q.   True.
22  **A.   -- the operator, could reduce the**

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                          August 26, 2013

24 (Pages 90 to 93)

---

90

density, but we would have to expand the buildings
because we have a contractual liability for X
amount of production.

Q.  I take it you never did that?

A.  We never did that.

Q.  In the contracts that you identified
this morning, one of the provisions is that Michael
Foods pays for the feed for the birds?

A.  Yes.

Q.  Even though --

A.  Excuse me.  No.  That's wrong.  The
operator pays for the feed.

Q.  At some point, am I correct that with, I
believe, Fremont Farms an issue came up as to the
increased cost of feed in conjunction with your
supply agreement with Michael Foods?

A.  It is a grain-based cost-adjustment
contract.

Q.  What does that mean?

A.  It means that confidentially, the cost
of the feed is adjusted monthly based on the
Chicago Board of Trade, plus or minus a basis

---

91

issue.

MR. GREENE:  Can we stop for a moment
and ask the law firm to make a copy?  Are there
going to be other similar exhibits where --

MR. MALKINSON:  There might be.  I don't
know how many of these I'm actually going to use.
I don't want to deprive you from the --

MR. RAYLE:  I'd like to have a copy in
front of me.

MR. GREENE:  I think it's the ordinary
process to have copies available.  So let me
suggest this.  Why don't we take a break.  Why
don't you look through and see if there are some
other things you may want to use and have copied.
If you don't use them, you don't use them.  But --

MR. MALKINSON:  Okay.

MR. GREENE:  All right.

THE VIDEOGRAPHER:  Off the record.

(Whereupon, a recess was taken from 1:17
p.m to 1:44 p.m.)

THE VIDEOGRAPHER:  On the record.

(Henning Exhibit 9 was marked for

---

92

identification.)

BY MR. MALKINSON:

Q.  Mr. Henning, I'm showing you a
three-page exhibit that's marked as Henning Exhibit
Number 9.  It's -- the first page is an e-mail.
You're one of the recipients.  It's from Steve
George.  And it has to do with an FFI supply
contract adjustment.  Could you take a moment to
look at that and let me know when you're done?

A.  The memo or the entire thing, sir?

Q.  Excuse me?

A.  The memo or the entire document?

Q.  Yeah.  Just look at the three pages just
to familiarize yourself with what it is, please.  I
guess it's a four-page document, not three.

A.  (Reading).  Yes, sir.

Q.  So you mentioned a moment ago that
Michael -- strike that.

You mentioned a moment ago that the
operator, which would be your company, was
responsible for the feed costs in the Michael Foods

---

93

Fremont project, true?

A.  Yes, sir.

Q.  And could you explain for me what this
document is, which to my reading is asking for
Michael Foods to make adjustments because of your
increased food cost -- feed cost.

A.  No.  The truth of the matter here is
that Michael's has a CBOT adjusting portion for
grains and beans.

Q.  What is a CB --

A.  Chicago Board of Trade.

In the month prior, they set the price
for the next month, and we buy and sell against
that process, plus or minus a basis that's in the
contract.  And there were things outside of the
normal cost of feed that needed to be adjusted
because they weren't allowed for appropriately in
the original contract.

And this was the opening discussions on
adding a pullet feed cost adjustment factor to the
contract.  It was a tweak to the contract language.

Q.  And the original contract did not

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

25 (Pages 94 to 97)

94

1   provide for Michael Foods having to be responsible
2   for those additional costs, true?
3       **A.   Correct.**
4       Q.   Did they ultimately agree?
5       **A.   Yes.**
6       Q.   And so they accommodated your request at
7   that time?
8       **A.   Yes.**
9       Q.   And according to this Exhibit Number 9,
10  the cost increase in those other items that you're
11  referring to on page 2, which is MFI0297924, it
12  says on the top line actually beginning from the
13  previous page, "Jeff Henning and Steve George
14  stressed that the financial impact to FFI was well
15  over $1 million annually and that this needed to be
16  addressed as soon as possible."  That's a true
17  statement?
18      **A.   Yes.**
19      Q.   So that your colleagues at Michael Foods
20  came through for you and helped you abate that type
21  of ongoing loss under the contract, true?
22      MR. GREENE:  Objection to the

95

1   characterization and argumentative.
2       **A.   Michael's Foods partnered with us to**
3   **meet in the middle on both these issues so that**
4   **both parties could continue to give and receive.**
5       BY MR. MALKINSON:
6       Q.   When you met with Mr. Greene today, who
7   did you meet with besides him?
8       **A.   I'm sorry.  I was concentrating on 9.  I**
9   **apologize.  Say it again.**
10      Q.   When you met with Mr. Greene today, who
11  else did you meet with?
12      **A.   Pete.  For part of the meeting with his**
13  **accomplice.**
14      Q.   Have you ever spoken to anyone at
15  Michael Foods about the fact that you were giving a
16  deposition?
17      **A.   Yes.**
18      Q.   With whom did you speak?
19      **A.   Terry Baker.**
20      Q.   And when was that, roughly?
21      **A.   In the last month, I told him that I had**
22  **been contacted and was going to be giving a**

96

1   deposition.
2       Q.   How long did you talk to him for?
3       **A.   About this subject matter, the length of**
4   **me to say that to you.**
5       Q.   Did you speak with anyone else in the
6   egg industry about the fact of your deposition?
7       **A.   Yes.**
8       Q.   Who?
9       **A.   Bill Rehm.  Daybreak Foods.**
10      Q.   What did you tell him?
11      **A.   That I was going to be giving a**
12  **deposition.**
13      Q.   Did you ask him anything about whether
14  he had given a deposition?
15      **A.   No.**
16      Q.   Did you have any substantive discussion
17  about the deposition at all?
18      **A.   No.**
19      Q.   And did he call you to ask you, or how
20  did that conversation come about?
21      **A.   He's a regular customer of ours in the**
22  **construction business and I do a lot of**

97

1   construction and design-build work for him relative
2   to various complexes for Michael's and other
3   customers.
4       Q.   Is Daybreak Foods a supplier to Michael
5   Foods?
6       MR. GREENE:  Objection.
7       BY MR. MALKINSON
8       Q.   Strike that.
9       Is Daybreak, to your knowledge, a
10  supplier to Michael Foods?
11      **A.   Yes.**
12      Q.   Does Michael Foods have its own laying
13  facilities?
14      **A.   Yes.**
15      Q.   You mentioned earlier that you were a
16  member of the UEP.  When did you first become a
17  member?
18      **A.   I have no idea.  I've been an allied**
19  **member for as long as I've been in the construction**
20  **business and in chickens.  So I would guess 20**
21  **years.**
22      Q.   Is there a difference between an allied

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

26 (Pages 98 to 101)

98

1  member and just a regular member?
2      **A.    There are several categories.  An allied**
3  **member would be a supplier or vendor, like the**
4  **construction company.**
5      Q.    Have you ever been a member in any
6  capacity other than an allied member?
7      **A.    Yes.**
8      Q.    Have you been a member as a producer?
9      **A.    Lately in the cage-free business.**
10     Q.    When did that begin, roughly?
11     **A.    Three years ago.**
12     Q.    Prior to three years ago, was your only
13 membership an allied membership?
14     **A.    Yes.**
15     Q.    Were any of the various, for lack of a
16 better phrase, laying companies and other egg
17 companies that you listed earlier today that you
18 have a partnership or other ownership interest in
19 ever members of the UEP?
20         (Whereupon, the requested portion of
21 testimony was read back by the reporter.)
22         BY MR. MALKINSON:

99

1      Q.    Earlier today you identified a variety
2  of egg companies that you have an ownership or
3  partnership interest in.  Do you recall that?
4      **A.    Yes.**
5      Q.    At any time, have any of those companies
6  been members of the UEP or any executives of those
7  companies been members of the UEP?
8      **A.    Yes.**
9      Q.    And were they members as producing
10 members, producer members?
11     **A.    Yes.**
12     Q.    Which ones?
13     **A.    Center Fresh, Hawkeye, Fremont Farms of**
14 **Iowa, Trillium.**
15     Q.    How do you spell that?
16     **A.    T-r-i-l-l-i-u-m.**
17     Q.    If we were to pick the company whose
18 membership as a producer of the UEP goes back to
19 the earliest date, which of those four would it be?
20     **A.    Fremont Farms of Iowa.**
21     Q.    And they became a member approximately
22 when?

100

1      **A.    1997.**
2      Q.    So when you would attend UEP meetings as
3  a member, as an allied member, were there also
4  other people that would sometimes be present from
5  one or more of these four companies that you listed
6  at the same meetings?
7      **A.    Yes.**
8      Q.    Was Fremont Farms ever a member of the
9  UEP's animal welfare committee?
10     **A.    The representative from Fremont Farms, I**
11 **do believe, was on the animal welfare committee,**
12 **yes.**
13     Q.    Were the representatives of any of the
14 other three companies that you mentioned which you
15 have an ownership interest in members of that
16 committee at any time?
17     **A.    I cannot say exactly.  Sorry.**
18         MR. MALKINSON:  Can I please see the
19 exhibits from this morning?
20         BY MR. MALKINSON:
21     Q.    Mr. Henning, I'm showing you Henning
22 Exhibit Number 2, the supply agreement with Fremont

101

1  Farms that you testified to earlier.  Can you
2  please point out to me where the laying hen density
3  is set forth in that document?
4      **A.    Page 6, (i).  It would be section 14(i)**
5  **on page 6.**
6          BY MR. MALKINSON:
7      Q.    Okay.  Could I have that back, please?
8  And that section simply refers to Animal Welfare
9  Bird specifications, certifications and guidelines.
10 It doesn't state 48 square inches, correct?
11     **A.    It does state as in the past.**
12     Q.    And so it's your testimony that at the
13 time this was executed, they were using a minimum
14 48-inch -- 48-square-inch density?
15     **A.    Yes.**
16     Q.    Did the fact of the UEP animal
17 certification density requirements ever factor into
18 discussions with Michael Foods in connection with
19 the Fremont Farms arrangements?
20         MR. GREENE:  Objection, confusing.
21     **A.    "Factor in," what does that mean?**
22

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

27 (Pages 102 to 105)

---

102

BY MR. MALKINSON:
Q.   Were you ever told that you had to comply, they had to change the density, anything like that?
A.   No.  As you can see in the contract language, it is as-is.
Q.   I understand what the contract says. I'm asking you if at any time after this contract was entered anyone from Michael Foods told you that needed to have an arrangement that was different?
A.   No.  No, sir.
Q.   What does the phrase "UEP compliant" mean to you in terms of hen density?
MR. GREENE:  Objection, lack of foundation.
A.   "UEP compliant" in terms of hen density, which isn't what it means in that contract, means 67 square inches per hen.
BY MR. MALKINSON:
Q.   And that became true approximately when?
A.   I don't know.  Three, four, five years ago.

---

103

Q.   You are familiar with the requirements of an egg producer in order to be able to get a UEP certification on their egg production?
A.   Yes, sir.
Q.   And what are those requirements?
A.   Oh, it's 14 pages, and I'm not going to be able to read them all to you out of my head.
Q.   In terms of hen density, what are the requirements?
A.   As I said a few minutes ago, 67 square inches per hen, at this point in time.
Q.   Is it your understanding that certification required a producer to have all laying facilities under its control compliant with that density requirement?
MR. GREENE:  Objection, lack of foundation, confusing and argumentative.
A.   I would say to you that I am not an attorney, but my understanding is there are about five different requirements that go with that.
BY MR. MALKINSON:
Q.   Is the one I stated one of them?

---

104

MR. GREENE:  Objection, same objection.
A.   I am not an attorney.
BY MR. MALKINSON:
Q.   Well, you're an egg producer, aren't you, sir?
A.   I am, sir.
Q.   Okay.  And you're a member of the UEP?
A.   I am.
Q.   And Fremont Farms was a member of the UEP, true?
A.   Yes.
Q.   I presume you had to analyze whether or not it was an appropriate business decision for you, for Fremont Farms to be -- to try to seek UEP certification at some point, true?
A.   No.  We didn't need to do that.
Q.   Why not?
A.   Because our contract doesn't request that.
Q.   Your testimony is that Michael Foods never approached or discussed with you having any of the facilities you were involved with that

---

105

provided supply of eggs to Michael Foods become UEP compliant?
A.   Egg products, that's absolutely true.
Q.   You attended animal welfare committee meetings of the UEP, true?
A.   Yes.
Q.   And you did that regularly when they held them?
MR. GREENE:  Objection, vague.
A.   I wouldn't say that, but I did attend numerous of them, yes.
BY MR. MALKINSON:
Q.   You were present during many of the discussions about the UEP certification program and its inception?
A.   Sure.
Q.   So you were present when the 100 percent compliant aspect of that certification was discussed there?
A.   Yes.  Correct.  I'm not sure I was present, but I am aware of that conversation, yes.
Q.   And what's your understanding of that

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                            August 26, 2013

28 (Pages 106 to 109)

| | |
|---|---|
| **106** | **108** |

**106**

1  requirement?
2      A.   That would be left to an attorney. I'm
3  not going to answer that.
4      Q.   Well, as a member of the committee, you
5  understood what they were talking about, true?
6      A.   I was never a member of the committee.
7      Q.   As a person in the egg industry who's
8  also a producer, you were present during that
9  committee meeting?
10     A.   Not always.
11     Q.   You know Ken Klippen, true?
12     A.   I do.
13     Q.   Am I correct that you were one of the
14  principal members of a group that he was involved
15  with that came up with an alternative proposed
16  program to the UEP certification?
17     A.   I was a member of the PVP program, yes.
18     Q.   And that was Ken Klippen's program?
19     A.   Yes.
20     Q.   Am I correct that the 100 percent
21  compliance requirement of a producer's facilities
22  was a key element of opposition that the Ken

**107**

1  Klippen group was trying to address?
2          MR. GREENE:  Objection, confusing.
3      A.   During the discussion regarding animal
4  welfare programs, there was not universal agreement
5  necessarily in the industry as to what was
6  happening, and one of the alternatives that was
7  discussed was the Klippen program.
8          BY MR. MALKINSON:
9      Q.   What was your understanding of the
10  difference between the two programs?
11     A.   I would have to go back and read it
12  again to find out. I dropped out of that program
13  at one period of time.
14     Q.   Do you know Bob Sparboe?
15     A.   I did, yes.
16          (Henning Exhibit 10 was marked for
17          identification.)
18          BY MR. MALKINSON:
19     Q.   So this is a letter from Bob Sparboe to
20  what he calls the Animal Welfare Concerned Group.
21  Were you ever a member of that group?
22     A.   I don't recall it being named that.

**108**

1      Q.   Were you a member of the group that is
2  described in this memo, regardless of whether you
3  recognize the name at the top?
4      A.   I never received this memo.
5      Q.   Okay. That was going to be my next
6  question.
7          To your knowledge, are you a member of
8  that group?
9          MR. GREENE:  Objection, lack of
10  foundation.
11     A.   I'm sorry. I never received that.
12  So --
13          BY MR. MALKINSON:
14     Q.   I'm not asking if you received that
15  particular memo. I'm asking if you were a member
16  of Bob Sparboe's Animal Welfare Concerned Group.
17          MR. GREENE:  Same objection.
18     A.   We would have to define what we're
19  talking about. I've never been to an Animal
20  Welfare Concerned Group, called as such. I will
21  stipulate that I was early on in the Klippen
22  committee, if that makes it easier.

**109**

1          BY MR. MALKINSON:
2      Q.   Did you or any of the companies that you
3  were -- you had ownership interest in ever
4  contribute money to the Klippen group or pay dues?
5      A.   Henning Family Farms made a contribution
6  to the original exploratory group because at that
7  point in time, understand Henning Construction
8  Company has a myriad of customers involved in
9  production, there was turmoil in the industry and
10  nonagreement. And Henning Construction Company
11  made an investment into the exploratory committee
12  to see if there would be alternatives that would be
13  helpful to our customers, et al.
14     Q.   Did the UEP certification program impact
15  Henning Construction in any way?
16     A.   Certainly when it impacted our
17  customers, it impacted us.
18     Q.   In your estimation, did the UEP
19  certification program have a negative impact on
20  Henning Construction?
21     A.   Certainly it put our customers in a
22  turmoil as to what direction the industry was going

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

29 (Pages 110 to 113)

---

**110**

1  to take and whether to invest in X kind of systems.
2      Q.    What about in terms of revenue to the
3  company?
4      A.    I can't speak specifically to that.  It
5  varies year to year in the construction business.
6      Q.    Were you ever involved in conference
7  calls as part of the Ken Klippen effort in which
8  gaining support from the USDA to the Klippen
9  program was discussed?
10      A.    At any time?  Probably yes.  Specific
11  times, I cannot answer.
12          May I add to that?
13      Q.    I think you've answered the question.
14      MR. GREENE:  Objection.  I think if the
15  witness feels the need to add to an answer, I think
16  the witness should be permitted to respond.  But
17  I'll --
18      MR. MALKINSON:  You can ask to follow
19  up.
20          (Henning Exhibit 11 was marked for
21          identification.)
22      BY MR. MALKINSON:

---

**111**

1      Q.    You know what?  I'm not going to ask you
2  about it.  I'll leave it marked.  We'll just go on
3  from there.  It's not addressed to you.  Have you
4  ever seen that document, sir?
5      A.    No.
6      Q.    Okay.
7          (Henning Exhibit 12 was marked for
8          identification.)
9      MR. MALKINSON:  Exhibit 11 is
10  EGOE00529017.  That was Exhibit 11.  Exhibit 12 is
11  UEO218113.
12      BY MR. MALKINSON:
13      Q.    Mr. Henning, Exhibit 12 is a list of
14  attendees at a meeting in Chicago in October of
15  2006, and you're listed number 9, Henning
16  Construction, Jeff Henning.  Do you see that?
17      A.    Yes.
18      Q.    Do you recall being in Chicago for a Ken
19  Klippen-related meeting at that time?
20      A.    Not specifically, but it's certainly
21  possible.
22      Q.    Do you have any recollection of a one-

---

**112**

1  or two-day meeting with Ken Klippen taking place in
2  Chicago?
3      A.    Not specifically, but it's probable.
4  It's fine.
5      Q.    Did you meet in Chicago frequently on
6  egg-related business?
7      A.    On many businesses.
8      Q.    With Ken Klippen?
9      A.    No.
10      Q.    Do you recall being at a meeting in
11  Chicago in which he was trying to get consensus to
12  form an association --
13      A.    Yes.
14      Q.    -- of producers?
15      A.    Yes.  Yes.  Not necessarily just
16  producers, but the answer is yes.
17      Q.    Were there producers present at the
18  meeting that you recall being a -- participating
19  in?
20      A.    Yes.
21      Q.    And were some of those producers
22  expressing any displeasure over the UEP's 100

---

**113**

1  percent rule?
2      A.    I attended a lot of meetings about this
3  deal.  I will only tell you that there was no
4  consensus, in my opinion.  And that's why there was
5  other meetings, for people to figure out if there
6  were alternatives.  I must tell you the reason that
7  I invested in this, I previously stated to you.
8          Number two, I will tell you that my
9  reason to staying interested in it was the PVP
10  program was of great interest to me and some of our
11  other processing businesses where we still today
12  have implemented the PVP program in businesses that
13  are not egg related.  So the Klippen manual was a
14  guideline for that particular -- those particular
15  processes.
16      Q.    I may have asked you this earlier, but
17  have any of the egg businesses that you have been
18  involved in over the years, were any of them ever
19  UEP-certified programs?
20      A.    At what point in time?
21      Q.    At any time.
22      A.    Yes.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                          August 26, 2013

30 (Pages 114 to 117)

---

114

1      Q.   Which ones and when?
2      A.   **Trillium is now UEP certified.**
3      Q.   What is the reason why you've had
4  Trillium UEP certified?
5      A.   **Customer requests.**
6      Q.   What customer does Trillium provide egg
7  products for?
8      A.   **Understand Trillium provides egg**
9  **products for the Waldbaum Company.  MFI.**
10     Q.   That's part of Michael Foods?
11     A.   **The driver, however, was the shell egg**
12 **portion of the business.**
13     Q.   The driver of Trillium?
14     A.   **Of UEP certification.**
15     Q.   Does Trillium have laying hens?
16     A.   **Yes.**
17     Q.   Is Michael Foods the exclusive customer
18 of all of your egg production businesses that
19 you're affiliated with?
20     A.   **No.  Minor.**
21     Q.   Have you ever read the Complaint in this
22 case?

---

115

1      A.   **No.**
2      Q.   Henning Construction has done work for
3  Cal-Maine, true?
4      A.   **Yes.**
5      Q.   Can you describe what it's done for
6  them?
7      A.   **Primarily processing, egg processing**
8  **facilities.**
9      Q.   And when you say "processing," do you
10 mean developing an outside contractor to provide
11 Cal-Maine with eggs or egg products?
12     A.   **No.  Construction.  You asked about**
13 **Henning Construction Company.**
14     Q.   Yes.
15     A.   **And I'm answering Henning Construction**
16 **Company.**
17     Q.   So what you're saying is that you've
18 constructed egg agricultural facilities for
19 Cal-Maine?
20     A.   **For the breaking and grading the side of**
21 **their business.**
22     Q.   Where were those done?

---

116

1      A.   **Texas.**
2      Q.   How big a facility?
3      A.   **I have no earthly idea.**
4      Q.   Do you know where in Texas?
5      A.   **No earthly idea.**
6      Q.   If I were to tell you that your Henning
7  Construction website lists a Cal-Maine breaking
8  plant in Gonzalez, Texas --
9      A.   **That would probably be it.  I want to**
10 **tell you I have not been in the CEO's chair since**
11 **2002 in that business.**
12     Q.   What would be the capacity, in your
13 estimation, of a 31,000-square-foot frame building?
14     A.   **It is a breaking facility.  It's the**
15 **processing building from which eggs are either**
16 **delivered from the outside or produced on site**
17 **through that building.**
18     Q.   Do you know what revenue was generated
19 by that project?
20     A.   **No idea.**
21     Q.   Did you ever hear any representatives of
22 egg producers expressing displeasure with the UEP's

---

117

1  100 percent rule?
2      A.   **I believe that that's bantered and**
3  **discussed then and now.**
4      Q.   Is that a yes?
5      A.   **Yes.**
6      Q.   Did you ever hear any UEP producer
7  representatives discussing bird reduction as a
8  result of laying hen density requirements?
9      A.   **Never.**
10     Q.   At any of the UEP animal welfare
11 committee meetings that you attended, did anyone
12 ever discuss bird reduction?
13     MR. GREENE:  Objection, vague.
14     A.   **My answer would be that the concern that**
15 **would come out of the discussions that involved any**
16 **construction company would be if there's a cage**
17 **density change, there's going to be a reduction in**
18 **throughput in birds in buildings, and people are**
19 **going to have to invest capital in it, and is that**
20 **going to effect me down the road if they don't have**
21 **enough capital to keep building.**
22     BY MR. MALKINSON:

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

31 (Pages 118 to 121)

---

**118**

Q.   Okay.  But the question I asked you was whether you heard any UEP producer representatives at UEP meetings discussing bird reduction as -- in the context of laying hen density in the egg industry.

MR. GREENE:  Objection, confusing.

A.   Without getting thrown out of the room, I'd say asked and answered.  I already told you what I told you in the time before.

BY MR. MALKINSON:

Q.   Well, tell me again, because I --

A.   Read it, please, then.

Q.   Sir, I'm going to have the question read back to you, and I'd just look for an answer.

A.   Read the answer, please, from the previous question.  That's my answer.

Q.   Are you going to refuse to answer the question?

A.   I have answered it as best I can.

Q.   You have not answered the question.

MR. GREENE:  Objection, argumentative.

A.   I have no answer for that question, sir.

---

**119**

BY MR. MALKINSON:

Q.   Is it your testimony that you never heard bird reduction discussed in the context of laying hen density at any UEP meetings?

MR. GREENE:  Objection.

A.   I was not on the executive committee.  The executive committee made the decisions they made regarding the subject matter after many meetings of all sorts of discussions, none of which I heard were doing this to change bird numbers.  It was about animal welfare.

BY MR. MALKINSON:

Q.   Okay.  So it's your testimony that you never heard any of them talking about bird reduction in the context of laying hen density in the egg industry?

A.   I would go on to tell you that when you --

Q.   Sir, it's a yes or no question.  Did you hear them --

A.   No, it's not.

Q.   Did you hear them say it or did you not?

---

**120**

That's all I'm asking.

A.   It's not a yes or no question.  So if that's how I have to answer it, I have no answer.

Q.   Did you hear anyone talk about bird reduction in the context of laying hen density at any of the UEP meetings you went to?  You either did hear it or you didn't, sir.  That's all I'm asking.

A.   I never --

MR. GREENE:  Objection, argumentative.

A.   I have no answer, sir.

BY MR. MALKINSON:

Q.   You have no answer?  You don't know?  Or you're declining to answer?

A.   I don't know.  That will be my answer.

Q.   Did you ever hear that discussed at any Ken Klippen group meeting, conference or discussion?

MR. GREENE:  Objection, vague.

A.   No, I did not.  That was never an objective of that committee in any meeting where I was there.

---

**121**

Q.   What wasn't an objective?

A.   A reduction in -- I heard the reduction in density discussion, but I didn't hear about a reduction in numbers.  That was never the objective.  The question was what alternatives are there and can there be an alternative program put together.

Q.   Did you ever agree after the -- at or after the October 2006 meeting in Chicago to be a member of a committee for Ken Klippen with someone from Sparboe and Ron Krieder and Toby Catherman?

A.   I may have.

Q.   You don't recall one way or the other?

A.   No, I really don't definitively.

Q.   Do you know what the capacity of Michael Foods' own laying facilities were in the 2000s, approximately?

A.   Well, they were changing because of construction.  But I would have guessed in the 14 million bird range.  13-something to 14.

Q.   And then on top of that, they would have had, for example, whatever was being produced from

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

32 (Pages 122 to 125)

---

122

1    the companies you described earlier?
2         MR. GREENE:  Objection to the
3    characterization of "on top of that."
4         A.   It would have been contract reduction
5    owned by other people.
6         BY MR. MALKINSON:
7         Q.   Was it your understanding that Michael
8    Foods used contract egg producers such as the
9    companies that you testified to this morning that
10   you have ownership interest in, companies other
11   than yours, over the years?
12        A.   Yes.
13        Q.   Was Daybreak one of them?
14        A.   I'm not sure I'm at liberty to discuss
15   that process.
16        Q.   Well, you've signed a protective order
17   in the case.  I'm just asking a straightforward --
18        A.   Yes.
19        Q.   Okay.  Did you ever hear any discussion
20   at UEP meetings about the egg industry making a
21   good effort in meeting the price and discovery
22   committee meetings' recommendation of reducing the

---

123

1    chick hatch?
2         MR. GREENE:  Objection, confusing.  Lack
3    of foundation.
4         A.   My answer would still be no, though.
5         BY MR. MALKINSON:
6         Q.   In the early 2000s when you would go to
7    a UEP meeting, I want to just ask you a little bit
8    about how they were organized.  Was it initially a
9    board meeting and then separate side meetings of
10   different committees or how was it?
11        A.   There would be -- my recollection is
12   there was a pre-board meeting for the executive
13   committee.  There's an executive meeting, there's
14   a board and then there's the constituents, whether
15   they are allied or producers.  And you are allowed
16   in or out of various meetings, whether you were a
17   producer or an allied, et cetera.
18        But my general sense is that -- and
19   understanding is that there's an executive meeting
20   and -- possibly the day before, and a board meeting
21   possibly early the first day, and then lots of
22   breakout sessions the second day and third day for

---

124

1    committees and other things, allieds, et cetera,
2    and then the final day, there's a master board
3    meeting to wrap up the meeting.
4         And I've never been on the board, so
5    I've not been in those meetings.
6         Q.   So it's your testimony that you've not
7    gone to the board meetings, the board aspect of the
8    meeting?
9         A.   I may have gone to the closing board
10   meeting a third of the time.
11        Q.   You would have been welcomed if you
12   wanted to go in?  Those were free to be -- people
13   could sit in them --
14        MR. GREENE:  Objection.
15        BY MR. MALKINSON:
16        Q.   -- who were there?
17        A.   There was -- are you talk- -- what
18   period of time?
19        Q.   Early -- like 2000.
20        A.   Probably.
21        Q.   The various committees would give a
22   report as part of the meeting?

---

125

1         A.   Yes.
2         Q.   And was that something that was
3    typically rendered when other guests or
4    participants in the conference were present?  In
5    other words, it wasn't just within that committee?
6         MR. GREENE:  Objection, confusing.
7         A.   The committee meetings would battle out
8    whatever objectives they were supposed to have
9    been, if they could, and then present a report to
10   the board with motions for action if they got that
11   far.
12        BY MR. MALKINSON:
13        Q.   And if you were -- and you have, from
14   time to time, sat in on board meetings and heard
15   the various committee reports being rendered at
16   that time?
17        A.   Yes.
18        Q.   The fact that you were present at an
19   annual board meeting, does that indicate to you
20   that you would have heard the reports of the
21   committees at that meeting?
22        A.   Not necessarily.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

33 (Pages 126 to 129)

---

126

1    Q.   Did you ever participate in Ken
2  Klippen's discussions with the USDA about the USDA
3  potentially endorsing his program?
4    **A.   I believe I sat in on a presentation**
5  **when the USDA was in a meeting to explain what the**
6  **PVP program was.**
7    Q.   Were you a -- strike that.
8       Were you the chairman of Ken Klippen's
9  committee on the Processed Verified Program?
10   **A.   I may have been.  I was very active in**
11 **that.  As I say, I had numerous interests there.**
12      **(Henning Exhibit 13 was marked for**
13      **identification.)**
14   BY MR. MALKINSON:
15   Q.   Mr. Henning, I've shown you what's been
16 marked as Henning Exhibit 13.  It starts with Bates
17 Number FMI0037477.  Let me know when you're
18 finished looking at it, sir.
19   **A.   Yes, sir.  I've gone through it.**
20   Q.   This is a summary of a Ken
21 Klippen -- strike that.
22      This document is titled at the top

---

127

1  "Klippen Animal Welfare Guidelines (Processed
2  Verified Program)" with a date of January 4th 2007.
3  And in the middle, it lists you as chair of the
4  committee.  Do you see that?
5    **A.   Yes, sir.**
6    Q.   Have you seen this document before?
7    **A.   I'm sure I have.**
8    Q.   And the companies listed at the top,
9  those are companies that were, at the time this was
10 rendered, interested in Ken Klippen's program, the
11 alternative to the UEP?
12   **A.   I wouldn't say that, sir.  I would say**
13 **that they were interested in the -- hearing more**
14 **about learning about the PVP program.**
15   Q.   Did any of those companies contribute
16 money to finance Ken Klippen's efforts in this
17 regard?
18   **A.   Henning Construction did, I can tell you**
19 **that.**
20   Q.   Do you know if any of the others paid
21 money?
22   **A.   Not specifically, no, I don't.**

---

128

1    **(Henning Exhibit 14 was marked for**
2    **identification.)**
3    BY MR. MALKINSON:
4    Q.   Mr. Henning, I'm showing you what's been
5  marked as Henning Exhibit 14.  Bates Number
6  UE0296624.
7    **A.   Yes.  I see it.**
8    Q.   This is a set of minutes from a UEP
9  annual board meeting in October of 2000.  I will
10 state for the record that the -- there was a little
11 highlighting that's different from the original.
12 It's generated by me.  I've got your name -- you
13 see that? -- highlighted on the first page.
14   **A.   Yes, sir.**
15      MR. GREENE:  So the highlighting is not
16 part of the document as it was produced; is that
17 correct?
18      MR. MALKINSON:  Correct.  That's
19 correct.
20      BY MR. MALKINSON:
21   Q.   As even an -- I don't want to interrupt
22 you while you're reading it, sir.  Let me know when

---

129

1  you're finished.
2    **A.   I'm okay.  Go ahead.**
3    Q.   As an allied member of the UEP, you
4  would receive minutes after their meetings?
5    **A.   No, sir.**
6    Q.   Did you ever review minutes of their
7  meetings?
8    **A.   No, sir.**
9    Q.   On the third page of this exhibit that
10 has Bates Number UE0296626, there's a highlighted
11 sentence that says, and I'll read it, "In regard to
12 supply demand, Baker reported that the industry had
13 made a good effort in meeting the committee's
14 recommendation of reducing the chick hatch."  Do
15 you recall that report being made?
16   **A.   No, I do not.**
17   Q.   The next sentence says, and I quote,
18 "Layer numbers still exceed last year's inventory
19 by 5 million hens and that further hen reduction
20 was needed to return to profitable prices."  Do you
21 see that sentence?
22   **A.   Yes, sir.**

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                                August 26, 2013

34 (Pages 130 to 133)

130

Q.   Do you recall that report being made?

A.   No, I do not.

Q.   Did you ever hear anyone at that committee meeting discussing anything along the lines of the content of those two sentences that we just went over?

A.   No, I can't recall.  It's not uncommon since the beginning of time for everyone to understand the chick hatch reports and understand what that's going to do to the industry when we have more supply than we do demand.  And so ever since I've been in the business, you know, people needed to figure out if they needed to store some nuts away because the times could get difficult for a while when the hatch was high.  And so I personally don't see -- wouldn't pay much attention to that fodder because it goes on forever.

Q.   Are you saying that among producers, over the years, there has been discussion about reducing -- about -- strike that.

Are you saying that over the years, there has been discussion among producers, to your

131

knowledge, about hen reduction being needed to improve pricing?

A.   No, I won't say that.  No, I would not say that.  I would only say to you that the government has produced statistic on chick hatch, and you watch the chick numbers and chick prices, and I think everybody can put two and two together on that subject matter.

Q.   And by that, you mean that if the supply is lower, the price goes up?

MR. GREENE:  Object to the characterization.

A.   My point was if the chick hatch is too high, then we're likely to have lower prices and people are going to have to be able to suffer through that to see another day.

BY MR. MALKINSON:

Q.   Is that the type of discussion that would sometimes take place at UEP meetings that you were at?

A.   No.  Not to my knowledge.

Q.   Did you ever hear any producers having

132

discussions along those lines?

A.   No.

Q.   I take it you don't have any reason to believe you were not in attendance at the UEP meeting in the year 2000 that's reflected on Exhibit 14?

A.   No.  I was in Ponte Vedra.  But you must understand that hundreds of my customers were there, and there are many, many side meetings that take place.  So I probably listened to the animal welfare committee.  I probably listened to this and that and the next thing.  But I'm in and out of those meetings and side meetings all the time.  But I don't dispute that I was there.

Q.   During your involvement with the Klippen program, were you -- did you ever become aware of the UEP making any efforts to defeat or counter the Klippen effort?

MR. GREENE:  Objection, lack of foundation.

A.   I believe that UEP would like to have had unanimity, as any organization, within all of

133

their members.  So certainly I was aware that it wasn't the most popular discussion on earth.  But also believe that it's important that you hear all sides of a discussion and see what alternatives could be there.

I would give you an example that the industry thought about banding together and building a new hatchery because we only had one genetics company in the entire industry.  So some people thought that would be smart.  I went to a meeting and listened.  So I go to lots of meetings to listen.

BY MR. MALKINSON:

Q.   Based on your involvement in the Klippen program, what is your understanding of the main difference between that program and the UEP-certified program?

A.   A point of contention at that point in time, one of the points, was an absolute 67 square inches versus a range.

Q.   Excuse me.  67 square inches in terms of hen density?

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

35 (Pages 134 to 137)

---

134

1    A.   Per hen, yes.  So one of the
2  alternatives was some range there as opposed to an
3  absolute.  The other discussion was a hundred
4  percent versus an alternative to that.
5    Q.   And the hundred percent meaning what?
6    A.   Of participation.  If you did one farm,
7  you did all farms under that same ownership.
8    Q.   Was it your understanding that the 100
9  percent participation excluded any egg products
10 that come from contract suppliers?
11   MR. GREENE:  Objection, confusing.
12   A.   My answer would be it was my
13 understanding it was a hundred percent of the
14 ownership group.
15   BY MR. MALKINSON:
16   Q.   So just to extrapolate, to use an
17 example, for Michael Foods, if one were to assess
18 with it whether they were or were not 100 percent
19 compliant, assuming that the density all fit the
20 program for purposes of my question, if Michael
21 Foods was receiving egg products from a company
22 such as one of the ones you had ownership in, which

---

135

1  was not within the UEP density guidelines, it's
2  your understanding that that would not impact
3  Michael Foods' own UEP certification because your
4  company wasn't owned by Michael Foods; is that what
5  you're saying?
6    MR. GREENE:  Objection, confusing.
7    A.   I will only say to you that I am not an
8  attorney, so I can't answer that legally.  I will
9  tell you that --
10   BY MR. MALKINSON:
11   Q.   I understand you are not a lawyer.  I'm
12 just asking you what your impression was at that
13 point.
14   A.   My impression was that if we needed to
15 fall underneath that program, that contractually we
16 would sit down and figure that out in terms of an
17 impact to the organizations I was in.
18   Q.   So you don't know?
19   A.   That's a good answer, sir.
20   Q.   Were there any other key differences in
21 the two programs that you recall?
22   A.   There were -- yeah, there were

---

136

1  differences between the programs.  Like I say, they
2  were many pages long.  And so there were nuances
3  that some of the constituents were interested, and
4  that's it.
5        (Henning Exhibit 15 was marked for
6        identification.)
7    BY MR. MALKINSON:
8    Q.   Mr. Henning, I'm showing you an e-mail
9  we've marked -- a series of e-mails marked
10 Exhibit 15, and it begins with Bates Number
11 MFI0064431.  This is an e-mail from Ken Klippen
12 addressed to you and some other folks back in
13 February 2000 [sic], true?
14   A.   Yes.
15   Q.   For how long were you involved in the
16 Klippen program in terms of working with him on his
17 committees?
18   A.   Sir, I don't know.  I think until it
19 lost interest and didn't move forward with enough
20 constituency to give it legs.
21   Q.   Page 2 of this exhibit has a line called
22 "Budget."  Do you see that?

---

137

1    A.   Yes, sir.
2    Q.   And it says, "Here is a list of
3  companies that are currently funding my efforts."
4  And it lists several companies.
5        Does that refresh your recollection as
6  to whether or not any of those companies were
7  funding Mr. Klippen's alternative program efforts
8  at that time?
9    MR. GREENE:  Objection, lack of
10 foundation.
11   A.   All I can say is what I read.  I know
12 what we paid.  I don't know whether all the rest of
13 them paid all the time or not.
14   BY MR. MALKINSON:
15   Q.   Do you have any reason to doubt the
16 statement here that these companies listed are
17 currently funding his efforts?
18   A.   No.  I probably don't doubt that.
19   Q.   What is the Henning Poultry Conference,
20 if you know?
21   A.   I have no idea.
22   Q.   To your knowledge, did Henning

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

36 (Pages 138 to 141)

---

**138**

1  Construction or any of its affiliated companies
2  traditionally invite people to dinner following
3  some of the UEP meetings?
4  **A.  We always take customers out.**
5  Q.  That would include some of the
6  producers?
7  **A.  They are our customers.**
8  Q.  So that would include Michael Foods?
9  **A.  Sure.**
10  Q.  At any of those -- did you participate
11  in some of those?
12  **A.  Yes.**
13  Q.  And was hen density ever discussed
14  during those get-togethers?
15  **A.  Oh, boy.  I can't answer that, sir.**
16  **We've had a lot of different meetings, and I have**
17  **no idea.  In the context of our contracts, if they**
18  **were going to change hen density, there could have**
19  **been a discussion at one point in time, but it**
20  **never occurred.**
21  Q.  Did any producer ever ask you in your
22  capacity with Henning Construction to create

---

**139**

1  facilities that were UEP compliant in terms of
2  density?
3  **A.  Yes.**
4  Q.  Which producers did that?
5  **A.  I would have to go through a list, and**
6  **that would require some research.**
7  Q.  What would you be looking at to research
8  it?  Contracts?
9  **A.  The list of customers and facilities.**
10  Q.  Are there any that come to mind right
11  now that you know you created UEP-qualified density
12  laying facilities for?
13  **A.  Daybreak.  I'm guessing Rose Acres**
14  **possibly.  I can't -- that would be a guess.  It's**
15  **been a while since we built production facilities**
16  **for them.  Minor producers.  I can't put names on**
17  **those for you at this point in time.**
18  Q.  Are you familiar at all with the laying
19  hen densities at Michael Foods' own facilities?
20  **A.  Yes.**
21  Q.  Are any of them UEP compliant?
22  **A.  To my knowledge, they all are.**

---

**140**

1  Q.  Were you involved in the construction of
2  some of those?
3  **A.  Yes.**
4  Q.  Are you familiar at all with Michael
5  Foods' laying hen business practices in terms of
6  whether or not they undertake to reduce the size of
7  their flock at any time?
8  MR. GREENE:  Objection, confusing.
9  **A.  I know that they switched to the**
10  **UEP-compliant density.**
11  BY MR. MALKINSON:
12  Q.  And in terms of any reduction in
13  their -- in the number of laying hens, is that the
14  only item of business practice of theirs that you
15  know that would fit that category?
16  MR. GREENE:  Objection.
17  BY MR. MALKINSON:
18  Q.  In other words, you're not aware of them
19  killing off parts of their flock purposely or
20  anything like that; all you know about is the
21  density?
22  **A.  Well, in answer to the first question, I**

---

**141**

1  **know they made the density reduction.  I know that**
2  **they had ordered additional buildings from us**
3  **because of the lack of throughput that happened in**
4  **certain of their facilities when that happened.  As**
5  **far as --**
6  Q.  What do you mean by that, just so I -- I
7  don't know what you mean by "throughput."
8  **A.  Well, you have a breaking plant that's**
9  **built for 4 million birds.  So you take out X**
10  **number of birds, and you're inefficient inside that**
11  **plant, so you have to add production facilities, so**
12  **they keep the efficiency of that plant up.**
13  Q.  Is it your testimony that Michael's
14  added onto their laying facilities to accommodate
15  the increased -- the decrease in density from the
16  UEP certification?
17  **A.  Well, I would say to you they don't have**
18  **the density they had before, but certainly they had**
19  **to add back and replace certain facilities in order**
20  **to -- and when they did that, they increased the**
21  **bird throughput so that the fixed-cost breaking**
22  **facilities and processing facilities were better**

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                             August 26, 2013

---

### 142

1    utilized.
2        Q.   Did they add back facilities so that
3    they had the same number of laying hens?
4            MR. GREENE:  Objection, lack of
5    foundation.
6            BY MR. MALKINSON:
7        Q.   If you know.
8        A.   I know they do not have the same number
9    of hens at each location that they had pre -- to my
10   knowledge, pre their change in density.
11       Q.   Okay.  And just so that we're clear, so
12   once they became UEP compliant and had the UEP
13   certification, from that point on, they did not
14   have the same -- they had a lesser number of laying
15   hens than they did previously?
16           MR. GREENE:  Objection, lack of
17   foundation.
18           BY MR. MALKINSON:
19       Q.   To your knowledge.
20       A.   To my knowledge, that is true.
21   Mathematically, it would have to be.
22       Q.   Is Cindy Henning your wife?

---

### 143

1        A.   Yes.
2        Q.   You and your wife would sometimes go on
3    UEP golf events, golf outings, true?
4        A.   UEP -- as a part of a UEP function, yes.
5        Q.   To your knowledge, did the UEP encourage
6    a limitation on backfilling?
7        A.   That's a part of their program, as I
8    understand it, yes.
9        Q.   Did you ever hear any producers discuss
10   displeasure with that?
11       A.   There's controversy on every rule that's
12   made.
13       Q.   So that means yes?
14       A.   Yes.
15       Q.   And what was the displeasure on that
16   that you recall?
17       A.   The animal welfare issues, socialization
18   of older birds put back in with birds that weren't
19   raised with them.
20       Q.   So that -- you recall that being the
21   reason for limiting the backfilling?
22       A.   I believe so, yes.

---

### 144

1        Q.   And what were the reasons being fostered
2    for those who wanted to backfill?
3        A.   I will give you an example.  There is a
4    waiver allowed in the program for natural
5    disasters.  Trillium had a natural disaster last
6    August and lost a million birds, and they got a
7    waiver to be able to backfill for an economic
8    hardship.
9        Q.   To your knowledge, during the years
10   after the UEP certification program came into
11   effect, did the national inventory of laying hens
12   go down?
13           MR. GREENE:  Objection, lack of
14   foundation.
15       A.   Certainly it has varied up and down.
16   Now it's the highest it has ever been in history.
17           BY MR. MALKINSON:
18       Q.   That's as of when?
19       A.   Today.
20       Q.   What about in the years 2003 through
21   2008?
22       A.   I can't answer that, sir.  Sorry.

---

### 145

1        Q.   Do you have Henning Exhibit Number 6 in
2    front of you?
3            MR. GREENE:  Which one is Number 6?
4            MR. MALKINSON:  United Voices.  Maybe I
5    have it.  Let's see.
6            THE WITNESS:  I think you have it.
7    Yeah.
8            MR. GREENE:  I have it marked as 7.  Do
9    I have it incorrectly marked?
10           MR. MALKINSON:  No.  Actually, you're
11   correct.  I have it at 6.  You're showing 7?
12           BY MR. MALKINSON:
13       Q.   Sir, you were previously showed the
14   United Voices issue in reference to the project in
15   Ohio that was reported there on the first page.
16       A.   Yes, sir.
17       Q.   Did that -- to this day, has that
18   project ever come to fruition in any form?
19       A.   No, it has not.  I relinquished the
20   permits in exchange for the operating permit for
21   Trillium.
22       Q.   And so was there a separate supply

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

38 (Pages 146 to 149)

---

146

1  agreement with Michael Foods then entered into with
2  Trillium?
3      A.   Yes.
4      Q.   And was Trillium formulated for the
5  purpose of engaging in that supply agreement?
6      A.   No.
7      Q.   It existed before that?
8      A.   As a shell egg producer, it did, yes.
9      Q.   And as part of the supply agreement, did
10 it also become a liquid egg producer?
11     A.   Four and a half million birds did.
12     Q.   I take it, then, that that became the
13 substitute for -- well -- strike that.
14          Where is that facility located?
15     A.   In Ohio.
16     Q.   Did that become the substitute for
17 the -- I'm going to use the wrong -- the acronym,
18 the IPRO II project that took its place when that
19 one didn't come to fruition?
20     A.   That -- well, I don't know if you use
21 the word "substitute." We entered into a contract
22 with Michael's and naturally negated the IPRO

---

147

1  contract.
2      Q.   Okay. So when it became evident that
3  the IPRO project wasn't going to work out, the
4  Trillium project was entered into at that point?
5      A.   A series of economic events to a
6  producer in the industry caused the Trillium
7  project to become available. I had the only
8  authorized operating permit in Ohio, and we were
9  asked to come in and take over that operation.
10     Q.   Okay. And you had that permit because
11 you had applied for it under IPRO?
12     A.   IPRO, correct.
13     Q.   Is there an IPRO I? What's the Roman
14 numeral II?
15     A.   We were originally looking in Iowa, and
16 incorporated in Iowa, and we reincorporated IPRO II
17 when the objective changed.
18     Q.   Okay. But it was all essentially the
19 same project?
20     A.   Yes, sir.
21     Q.   The same issue on page 2 under "Hen
22 Inventory and Hatch" says, and I quote, "USDA

---

148

1  reported the layer flock inventory of 283.7 million
2  hens on November 1st, down 4.8 million hens from
3  the same date a year ago." Do you have any reason
4  to disagree with that?
5      A.   No, sir.
6      Q.   In your meetings with Mr. Greene, did
7  you review any documents?
8      A.   Only the exhibits that he produced.
9      Q.   The ones he produced during your
10 testimony?
11     A.   Yes, sir.
12     Q.   And so during your meetings, he advised
13 you as to the nature of what he was going to be
14 asking you about?
15     A.   Generally, yes, sir.
16     Q.   And he told you about what a deposition
17 involved and that sort of thing?
18     A.   Yes.
19     Q.   The formality of it?
20     A.   Yes.
21     Q.   So that his description at the beginning
22 of today, you had heard all that from him before,

---

149

1  listen to the questions, answer yes or no, that
2  sort of thing?
3      A.   No, not necessarily. I've been in a
4  deposition before, so --
5      Q.   Okay.
6          MR. GREENE: Are you just about done?
7          MR. MALKINSON: I'm getting close. I'm
8  looking for one document.
9          BY MR. MALKINSON:
10     Q.   When you would attend --
11     A.   Excuse me, sir. Is it all right if I
12 just --
13     Q.   Do you need those?
14     A.   I was just to trying to put the
15 originals back for him. Sorry.
16     Q.   We'll arrange them when we're done.
17          When you would attend animal welfare
18 committee meetings at the UEP from time to time --
19     A.   Mm-hmm.
20     Q.   -- would there be other allied members
21 present sometimes sitting in on those meetings?
22     A.   Yes.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                              August 26, 2013

39 (Pages 150 to 153)

---

150

1    Q.   In the early years, in particular 2000,
2 2001, 2002, 2003, would allied members from time to
3 time be asked their view or would sometimes speak
4 up and participate in the discussions going on
5 during the committee meeting?
6    **A.   Yes.**
7    Q.   And did you from time to time -- strike
8 that.
9         When you sat in on those meetings, you
10 were doing it as a representative of Henning
11 Construction?
12    **A.   Yes.**
13    Q.   Would I be correct in stating that you,
14 from time to time, spoke up when you were in some
15 of those meetings?
16    **A.   Yes.**
17    Q.   In your estimation, is there a segment
18 of the UEP board membership that has respect for
19 your knowledge in the industry?
20    MR. GREENE:  Objection, vague.
21    **A.   I would hope so.**
22    BY MR. MALKINSON:

---

151

1    Q.   So that those committee meetings were,
2 for lack of a better phrase, free discussions among
3 the people present?
4    **A.   Yes.**
5    Q.   How many laying hens are within the
6 ambit of all of the companies that you have an
7 ownership interest in right now, the producing
8 companies?
9    **A.   24 million, 25 million.**
10    Q.   And as of 2008, can you estimate what
11 that number would be, approximately?
12    **A.   Half.**
13    Q.   Half that -- around 12 million?
14    **A.   That's a guess.**
15    Q.   But that's your best estimate?
16    **A.   Yes.  Yeah.**
17    Q.   The Fremont contract that was seven
18 years and nine months in duration, was it
19 ultimately extended?  Has that been a continuing
20 relationship with Michael Foods?
21    **A.   Renegotiated.**
22    Q.   But it's an ongoing business

---

152

1 relationship?
2    **A.   Yes.**
3    Q.   If you could look at Henning Exhibit 2.
4    **A.   Yes, sir.**
5    Q.   On page 8, the quantity, you were asked
6 about this before, that the quantities of the
7 contract, I think the question was phrased along
8 the lines of ranged from 92,500,000 pounds in 2003
9 to 142 million in 2010.  Do you recall that?
10    **A.   Yes.**
11    Q.   The contract actually provides that it
12 reached the 142 million dollar pound level in 2006,
13 true?
14    **A.   Yes.**
15    Q.   So that for the five years starting 2006
16 through 2010, it was the exact same number of
17 pounds that were being contracted for by Michael
18 Foods, true?
19    **A.   Yes.**
20    Q.   Hawkeye Pride does what?
21    **A.   It's in the 3 million bird laying**
22 **facility that was built for Primera Foods, is the**

---

153

1 **upstream market and transition to Michael's Foods**
2 **post that.**
3    Q.   Center Fresh, I think you told us who
4 they produced for, but remind me.
5    **A.   Michael's.**
6    Q.   Okay.  Cedar Valley?
7    **A.   Sparboe and Michael's.**
8    Q.   Is that an ongoing business relationship
9 with each?
10    **A.   Yes.  And it's only 375,000 birds.**
11    Q.   Meek's?
12    **A.   Meek's is Michael's.**
13    Q.   What does that produce?
14    **A.   Nest-run breaking stock.**
15    Q.   Sioux County Eggs?
16    **A.   Sioux County Eggs produces nest-run**
17 **breaking stock that is then broken at Center Fresh**
18 **and marketed to Michael's.**
19    Q.   Iowa Cage-Free?
20    **A.   Iowa Cage-Free is a 600,000 bird aviary**
21 **system that produces nest-run breaking stock for**
22 **Michael's.**

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                                August 26, 2013

---

154

```
 1        Q.   You described your ownership when
 2   Mr. Greene was asking you questions earlier.  Was
 3   your ownership interest in any of these companies
 4   that you listed, the egg-producing companies you
 5   have an ownership interest in, ever greater than it
 6   is today?
 7        A.   No.
 8        Q.   Was Dan Gardner an employee of Michael
 9   Foods at any time?
10        A.   That's a technical question.  I do know
11   that he owned 50 percent of the company.
12        Q.   And he then became your partner in
13   Fremont Farms; is that true?
14        A.   No.  No, that's not true.
15        Q.   Did he work for Fremont Farms?
16        A.   No.
17             MR. GREENE:  John, are we wrapping up?
18             MR. MALKINSON:  I've just got to look at
19   my notes.
20             BY MR. MALKINSON:
21        Q.   Were you aware that Bob Sparboe
22   expressed an opinion that the animal welfare
```

---

155

```
 1   process had been, for lack of a better phrase,
 2   contaminated by a secondary goal of national bird
 3   reduction?
 4             MR. GREENE:  Objection, lack of
 5   foundation.
 6        A.   No, I really wasn't, sir.
 7             BY MR. MALKINSON:
 8        Q.   Other than the animal welfare committee,
 9   what other committees -- well -- strike that.
10             Were you ever a member of -- strike
11   that.
12             Other than the animal welfare committee
13   at the UEP, did you ever attend other committee
14   meetings of that organization?
15        A.   Certainly.
16        Q.   The -- did Fremont participate actively
17   in the animal welfare committee?
18        A.   Steve was a member of that committee.  I
19   certainly attended it.
20        Q.   Do you know how he voted on the UEP
21   certification?
22        A.   No.  No -- no idea, sir.
```

---

156

```
 1        Q.   You never asked him how he voted on
 2   that?
 3        A.   I'm sure he voted no.  But as a
 4   committee member, it didn't make any difference.
 5        Q.   Do you still go to committee meetings?
 6        A.   Not very often.
 7        Q.   As a member now, are you a member of any
 8   committees?
 9        A.   Just the allied.
10        Q.   In connection with the UEP certification
11   or the Klippen program, did you ever consult with
12   legal counsel?  And I'm excluding anything
13   pertaining to today's deposition.
14        A.   No.
15        Q.   You've never heard that national bird
16   reduction was an ultimate goal of the UEP
17   certification?
18             MR. GREENE:  Objection, argumentative.
19             BY MR. MALKINSON:
20        Q.   You've never heard that?
21        A.   Whatever I answered before, sir.
22        Q.   I don't think I asked it that way
```

---

157

```
 1   before.  So if you could just answer it, I'll move
 2   on.
 3        A.   No.  I never heard that that was a goal.
 4   No, I did not.
 5             MR. MALKINSON:  Okay.  I'm going to just
 6   continue looking for the one -- I'm looking for one
 7   document.  If you want, I'd just as soon let
 8   Merrick go ahead, and if I find it, I find it.
 9             MR. RAYLE:  Five minutes?
10             MR. GREENE:  Yeah.  Why don't we take a
11   short break.  Are you going to be ready to go?
12             THE VIDEOGRAPHER:  Off the record.
13             (Whereupon, a recess was taken from 3:21
14   p.m to 3:26 p.m.)
15             THE VIDEOGRAPHER:  On the record.
16        EXAMINATION BY COUNSEL FOR THE INDIRECT PLAINTIFFS
17             BY MR. RAYLE:
18        Q.   Good afternoon, sir.  My name is Merrick
19   Rayle, and I am one of the lawyers that represents
20   the indirect plaintiffs.  I'll do my best to be
21   brief.
22             When you spoke with Mr. Greene, did he
```

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                        August 26, 2013

41 (Pages 158 to 161)

158

1  explain to you why he wanted to take your
2  deposition?
3      A.   To get a better -- yes.
4      Q.   And what was that reason?
5      A.   To get a better understanding of the
6  construction that had taken place in the industry
7  during the period that he was interested in looking
8  at it.
9      Q.   And I believe you testified this morning
10 that you have a property in Florida.  Did I hear
11 that correctly?
12     A.   Yes.
13     Q.   Marco Island?
14     A.   Yes.
15     Q.   Is that where you currently reside?
16     A.   Yes.
17     Q.   And when were you last there?
18     A.   Last Wednesday.
19     Q.   And you flew from that location to
20 Des Moines Wednesday last?
21     A.   Yes.  Actually, I flew from Des Moines
22 to that location and back Wednesday.

159

1      Q.   Did you receive any money to cover your
2  transportation costs?
3      A.   For?
4      Q.   From anybody for this deposition.
5      A.   $43.86.
6      Q.   A pretty cheap flight.  And that was
7  from Michael Foods?
8      A.   I don't know who it was from.  It came
9  with the subpoena.
10     Q.   Okay.  And that's the only remuneration
11 you received?
12     A.   Mm-hmm.  Yes.
13     Q.   Would you look again at Exhibit 11,
14 please.
15     A.   Yes, sir.
16     Q.   Let's go down to the bottom of page one.
17 Paul Osborne, is he with Golden Oval?
18     A.   Moark.
19     Q.   Moark?
20     A.   And then -- he may have moved to Golden
21 Oval when Golden Oval bought Moark.  Go ahead.
22     Q.   All right.  I believe that is -- I think

160

1  that's true.  Now, he sends an e-mail dated
2  October 31, 2006 to Dana P-e-r-s-s-o-n.  Do you see
3  that?
4      A.   Persson, yes.
5      Q.   And who is Dana --
6      A.   The CEO of Golden Oval Eggs.
7      Q.   And throughout that e-mail, he
8  describes, Mr. Osborne -- let me draw your
9  attention to the second paragraph, "the major
10 reason for the interest in meeting."  Do you see
11 all that?
12     A.   Yes.
13     Q.   Does that inaccurately characterize the
14 situation as of that date, as far as you know?
15         MR. GREENE:  Objection, vague.
16         BY MR. RAYLE:
17     Q.   I'm looking on page 2 specifically --
18     A.   Sir, I can only speak to what I read.  I
19 mean, everybody was there for a different reason,
20 I'm sure.  Different reasons.
21     Q.   I'm looking at the -- on page 2, the
22 first full sentence.  "The only one I regarded as

161

1  truly hostile to UEP and the ACC program is
2  Sparboe."  Do you see that, sir?
3      A.   Yes.
4      Q.   Based on your experience with this
5  matter, is that a fair statement, that Sparboe was
6  truly hostile to the program?
7      A.   Sparboe is a customer of mine.  They
8  have the rights to their own opinions.
9      Q.   I don't dispute that.  I'm just trying
10 to get a sense from you as to what you thought
11 Mr. Sparboe's opinion was, whether this was an
12 accurate statement or not accurate statement.
13     A.   They were not a fan of the UEP program.
14     Q.   On the penultimate paragraph of that
15 page, it starts out "After much discussion, a
16 committee was formed to consider options for going
17 forward with Ken and to make recommendations back
18 to the group.  There was not unanimous consensus
19 regarding this."  Do you recall who was opposed to
20 that?
21     A.   There was not a unanimous consensus to
22 form a committee and move forward.  That is a true

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

42 (Pages 162 to 165)

162

1    statement. It wasn't unanimous.
2        Q. Do you recall who was opposed to it?
3        A. No. There was -- it was not just one
4    person. There were several people who weren't sure
5    how to go forward. And it was decided that we
6    needed more information, so a committee was formed
7    to try and get more information.
8        Q. And that committee included someone from
9    Sparboe; is that right?
10       A. Yes.
11       Q. Mr. Krieder, yourself and Mr. Catherman;
12   is that right?
13       A. Yes.
14          (Henning Exhibit 16 was marked for
15          identification.)
16       BY MR. RAYLE:
17       Q. Exhibit 16 for identification in the
18   upper left-hand corner is titled "Egg Industry
19   Center" and then there's a picture of you
20   underneath that; is that correct?
21       A. Yes, sir.
22       Q. The biographical data that sits to the

163

1    right of your picture, will you just read that and
2    tell me whether it's accurate.
3        A. "Mr. Henning is chairman of Henning
4    Construction" --
5        Q. You don't have to read it aloud. Just
6    read through it and tell me whether it's accurate,
7    as best you can tell.
8        A. It is accurate.
9        Q. And can you tell me what the Egg
10   Industry Center is?
11       A. The Egg Industry Center is a center that
12   was formed in conjunction with Iowa State
13   University and 13 other land grant institutions to
14   research and provide guidance to matters of
15   importance topically to the industry at any given
16   time.
17       Q. And who formed it?
18       A. It was formed by Iowa State University
19   in conjunction with these other universities, but
20   the founding committee -- or formational committee,
21   was a group of twelve of us.
22       Q. All right. Can you tell us who was part

164

1    of that particular group?
2        A. Oh, not off my head totally.
3        Q. You were one such person?
4        A. I was one person. Sparboe was one
5    person. Dr. Dennis Casey, an ex-chairman of
6    Hy-Line, was on there. One gentleman from
7    Michael's Foods was on there from the egg products
8    beside a doctor or somebody. I'm sorry. It will
9    come to me after a bit.
10          Pete Block from Hy-Line International.
11   Two or three other producers. Dr. Wendy
12   Wintersteen from Iowa State University.
13   Dr. Hongwei Shin, who is now the director, and a
14   number of other people were on the foundational
15   committee to try and set up the rules on how to
16   accomplish the goals for the Egg Industry Center.
17       Q. Are you still active in that --
18       A. I am.
19       Q. -- activity?
20          (Henning Exhibit 17 was marked for
21          identification.)
22       BY MR. RAYLE:

165

1        Q. My first question -- well, let me for
2    the record say this is -- at the top it's an e-mail
3    to Mr. Fortin, F-o-r-t-i-n from Jerry Kil, K-i-l.
4    And it's Moark 0029479 through -29481.
5          My question, sir, is first off, do you
6    know Mr. Jerry Kil, K-i-l?
7        A. Yes.
8        Q. And who is he?
9        A. He is retired from Moark, but currently
10   sells their over/unders. And Joe Fortin was what I
11   would call the managing director of Moark at that
12   point in time.
13       Q. And below that is what purports to be a
14   copy of an e-mail from Mr. Klippen to Mr. Gene
15   Gregory dated October 17, 2006. Do you see that,
16   sir?
17       A. Yes, sir.
18       Q. Okay. Do you know who Mr. Gene Gregory
19   was as of October of 2006?
20       A. CEO of -- or president, whichever, of
21   United Egg Producers.
22       Q. And what was Mr. Ken Klippen's position

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                      August 26, 2013

43 (Pages 166 to 169)

---

**166**

at that time?

A.   Agitator.  Ken Klippen and Gene Gregory never got along on many subjects.  And this certainly -- the Klippen committee was a real agitation between those two folks and those two organizations.

Q.   And the subject of Mr. Klippen's October 17 e-mail reads "misrepresented and misguided, does it not?

A.   Yes, it does.

Q.   Now, it's true, is it not, that at one point in time, Mr. Klippen was employed by the UEP?

A.   I'm not positive of that.  That sounds right.

Q.   In Mr. Klippen's e-mail, he speaks about going to a meeting in Iowa recently.  Do you see that?

A.   Yes, sir.

Q.   Do you know anything about that meeting?

A.   No.

Q.   Okay.  Is it fair, then, to say that you don't believe you attended this meeting?

---

**167**

A.   I don't remember it.

Q.   Now, on the next page we have a copy of an e-mail from Mr. Gene Gregory, Tuesday, October 17, to Mr. Klippen, subject "Disappointed."  And Mr. Gregory refers to a meeting of several producers that Mr. Klippen is holding in Chicago, do you see that, on October 30th?

A.   Yes, sir.

Q.   Do you recall if you attended the October 30th meeting?

A.   Yes, I did.

Q.   And what was discussed at that meeting, to the best of your memory today, sir?  I realize it was seven years ago.

A.   It would be outlined in the previous exhibit that was shown.

Q.   All right.  Thank you.

     (Henning Exhibit 18 was marked for
      identification.)

BY MR. RAYLE:

Q.   Exhibit 18 is a United Voices document dated June 2nd 2004.  And you're free to read the

---

**168**

whole thing if you want.  But I'm only interested in page 2.  For the record, this is MOARK0006344 through -6353.  And at the bottom of page 2, there's a paragraph titled "Feeder Space Research." Do you see that, sir?

A.   Yes, sir.

Q.   Will you read through that.

A.   Yes, sir.

Q.   You don't have to read it --

A.   Done.

Q.   Good.  The very last sentence of that item reads, "The new deeper cage would, in fact, provide less feeder space per hen than existing equipment once the 67 inches were reached."  Do you see that, sir?

A.   Yes.

Q.   Is that a true statement?

A.   Yes.

Q.   Do you know why that apparent miscalculation occurred?

A.   Well, if you have a 24-by-20 cage and you have ten birds in it, that's 48 square inches.

---

**169**

If you have a 24-by-23-and-one-third-inch-deep cage with eleven birds in it, you've had less front space for feeders, mathematically.  Now, this is 67 square inches.  I offered 48 for discussion purposes.

Q.   Is that still true today with regard to the 67-square-inch cage, floor space?

     MR. GREENE:  Objection, vague.

     BY MR. RAYLE:

Q.   Well, let me -- that's a fair objection.  To your knowledge, has anything been done in the industry to rectify the problem outlined in the last sentence that we just -- that we're focused on here?

A.   The feeder space requirement was revisited.

Q.   And can you tell us to what -- with what result?

A.   I believe that the result was 24 inches in the front of the cage that size was acceptable.

Q.   Do you know when that was implemented?

A.   Not exactly, sir.  But this -- the

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                      August 26, 2013

44 (Pages 170 to 173)

---

170

1  scientific committee relooked at that, as I recall
2  the sequence of events.
3      Q.   All right.  So to summarize and repeat,
4  it's a true statement and the problem has been
5  rectified, as best as you know?
6      A.   Yes, sir.
7      Q.   Okay.
8           (Henning Exhibit 19 was marked for
9           identification.)
10      BY MR. RAYLE:
11      Q.   Exhibit 19 is a copy of a document
12  titled "Henning News."  Can you tell us what
13  Henning News is?
14      A.   That would be the newsletter that my
15  daughter puts out to the industry and customers.
16      Q.   And for how many years has this document
17  or a document like it been disseminated?
18      A.   She is 34 years old, so subtract about
19  21 from that, and that would be my guess.
20      Q.   Okay.  And how frequently does it come
21  out?
22      A.   Monthly.

---

171

1      Q.   Put that aside.
2           (Henning Exhibit 20 was marked for
3           identification.)
4      BY MR. RAYLE:
5      Q.   20 is a series of e-mails with the
6  last -- on the first page starts out from Mr. Baker
7  to Mr. Bebee and it reads on down.  You're
8  mentioned in the e-mail from Mr. Catherman dated
9  Thursday, April 12th 2007, are you not?
10      A.   Yes.
11      Q.   Do you recall receiving these e-mails?
12      A.   Probably, yes.
13      Q.   And on the second page, Mr. Klippen says
14  he's enclosing the VPC, LLC financial plan.  Do you
15  see that?
16      A.   Yes.
17      Q.   Did you assist Mr. Klippen in any way in
18  formulating that plan?
19      A.   I believe he and his brother did that.
20      Q.   Is his brother a lawyer?
21      A.   Yes.
22      Q.   There's a reference in Mr. Catherman's

---

172

1  e-mail at the top to Mr. Lowell D. Ostrand.  Do you
2  see that?
3      A.   Yes.
4      Q.   Who is Mr. Ostrand?
5      A.   He is the assistant buyer.  Works with
6  Terry Baker.
7      Q.   With Michael Foods?
8      A.   Correct.
9           (Henning Exhibit 21 was marked for
10           identification.)
11      BY MR. RAYLE:
12      Q.   Exhibit 21 is a multipage document,
13  MFI0064621 through -64662.  And at the very top of
14  the first page, it looks like it's an e-mail
15  e-mail -- transmittal e-mail from yourself to
16  Mr. Klippen, Mr. Catherman, Mr. Rettig, Mr. Adams
17  and Mr. Carlson.  Do you see that, sir?
18      A.   Yes.
19      Q.   And the subject is "USDA comments on
20  verified VPC."  Do you recall sending this e-mail,
21  sir?
22      A.   Yes.

---

173

1      Q.   And then below that is an e-mail from
2  Mr. Klippen to, among others, yourself which speaks
3  for itself.  In general, just looking through this,
4  was this a final draft of the purported verified
5  VPC program?
6      A.   I believe that this was the USDA's
7  comments on our draft that was submitted.  And this
8  was the comments back, and this was Ken's comments
9  back to them.  So this was close to what would have
10  been the final program.
11      Q.   To what extent, if at all, did you have
12  input into any part of the Verified VPC program?
13      A.   I would have been responsible for
14  calling the people together to keep this moving
15  forward.  I'm more of a 30,000-foot whip guy than I
16  am a nuts-and-bolts guy.
17           So the various people that were involved
18  in the whole thing went back and saw drafts along
19  the way, and we kept putting drafts out to people
20  to get their comments to incorporate what we could,
21  and then get USDA's thoughts and processes back on
22  that to produce a program.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                          August 26, 2013

45 (Pages 174 to 177)

---

174

My interest in this again, quite frankly, was to offer an alternative for our customers and producers and, quite frankly, the reason I continued to participate in the financing of this process to some extent was to have the use of this in some of our other businesses.

Q.   Did Mr. -- was it -- Mr. Gene Gregory was at the top of the UEP in 2007, was he not?

A.   Yes.

Q.   He was head -- I don't know what they call him.  Chairman or president or something.  Was he aware of your interaction with Mr. Klippen?

A.   Yes.

MR. GREENE:  Objection, calls for speculation.

BY MR. RAYLE:

Q.   To your knowledge, was he aware of your interaction with Mr. Klippen?

A.   Yes.

Q.   Did he ever have any conversations with you about your interaction with Mr. Klippen and the VPC program?

---

175

A.   Only constructive in nature and do you think this was the right thing to do, and do you think this was, da, da, da, da, da.  And my answer was the same as I would give to you right now, is I have an interest in this program for other things.  I also believe that, you know, your constituency will ultimately make their decisions as to what we're going to do.  And as a member of this industry, then we'll have to decide individually, each producer, what they're going to do.

Q.   Did Mr. Gregory express any displeasure with you over your interactions with this program?

A.   I didn't have many lunches and dinners with him.  It was professional.

Q.   So whatever dissatisfaction, if any, he had, he acted professionally at all times?  He didn't try to pressure you to back down or anything like that?  Mr. Gregory.

A.   Well, he certainly wanted to express his views.  But I wasn't barred from being a UEP member or anything else along those lines.

Q.   He didn't make any threats to you --

---

176

A.   No.

Q.   -- about your business or customers or anything?

A.   No.

Q.   So as far as you can recall today, when did Mr. Klippen's verified VPC program, when was that put into final form?

A.   I can't recall memory-wise.

Q.   Did it reach an end at some point?

A.   It did.

Q.   And when it was in its final form, was that then redistributed to various people?

A.   Yes, it was.

Q.   And I believe you testified in response to my colleague here questioning a few minutes ago that you were financially -- one of the financial contributors to what he referred to as the Klippen group.  Do you recall that?

A.   Yes.

Q.   Do you recall how much of your company's money you contributed to Mr. Klippen?

A.   Actually, I need to again remind you

---

177

that this was done through the Henning family.

Q.   Okay.  Fair.

A.   And, no, I do not know the entire amount of money.  It wouldn't surprise me if it was 30- or 40,000 bucks.

Q.   Okay.

MR. RAYLE:  Mark that as the exhibit next in order, please.

(Henning Exhibit 22 was marked for identification.)

BY MR. RAYLE:

Q.   Exhibit 22 are the minutes -- the title is UEP Marketing Committee Tuesday, January 27, 2009, MFI0009964 through MFI0010002.  On the date, as I said, January 27th, 2009.  Is this a meeting that you attended, sir?

A.   No, sir.

Q.   And on the third page in are minutes of a meeting held -- a UEP Marketing Committee meeting held in Greensboro, Georgia on October 15, 2008.  And there's an entry on that page that suggests that you were present at that particular marketing

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

46 (Pages 178 to 181)

---

178

1  committee meeting.  Do you see that, "The meeting
2  attendees included," and then go down to the second
3  line, Jeff Henning.
4      A.   Okay.  I see what it says, but I do not
5  recall being at the meeting.
6      Q.   Do you have any reason to believe that
7  your name would be there if you weren't?
8          MR. GREENE:  Objection, argumentative.
9          MR. RAYLE:  I'm not trying to be.
10     A.   No, I don't remember.  So --
11         BY MR. RAYLE:
12     Q.   Now, as of October 15, 2008, were you a
13  member of the UEP Marketing Committee, you or your
14  company?
15     A.   I was not, no.
16     Q.   Was your company?
17     A.   No.  Well, which company?  No.  We were
18  not.
19     Q.   In other words, you could attend that
20  meeting without being a member?
21     A.   That's why you're an additional
22  attendee, sir.

---

179

1      Q.   Yeah.  Put that aside.
2          (Henning Exhibit 23 was marked for
3          identification.)
4          BY MR. RAYLE:
5      Q.   Exhibit 23 is entitled "Unresolved
6  Animal Welfare Issues" at BELL-D-00028597 through
7  -28599.  Do you know who Mr. Don Bell is, sir?
8      A.   Yes, sir.
9      Q.   Who is he?
10     A.   A retired California professor who was a
11  longtime adviser to the industry on monthly
12  statistics, pricing, housing and price projections,
13  among other things.
14     Q.   In the course of your dealings with the
15  UEP, did you have occasion to have interactions
16  with Mr. Bell?
17     A.   Yes.  And he also was a member of the
18  Egg Industry Center board.
19     Q.   Now, this document does not bear a date,
20  but it does list as unresolved animal welfare
21  issues feeder space, cage configuration, usable
22  floor space and cage height and so on.

---

180

1      Do you recall whether you ever had any
2  conversations with Mr. Bell about any one or more
3  or all of those three subjects, feeder space, cage
4  configuration, or --
5      A.   No, I had not.
6      Q.   Now, I gather that your company is not
7  in the business of designing cages.
8      A.   No.  We were not.  We work with the cage
9  companies to design facilities with them using
10  their equipment.  So the cage boys would have had
11  more to do with all this than we would have.
12     Q.   With regard to the various construction
13  activities you undertook in connection with Michael
14  Foods, was there one particular cage manufacturer,
15  or as you put it, cage guy, that handled that on
16  your projects?
17     A.   I was the primary project manager for
18  the majority of the early part of the construction
19  that happened there, and there were two or three
20  different cage manufacturers involved.
21     Q.   Can you tell us who they were?
22     A.   M-u-e-l-l-e-r, Mueller, which was a

---

181

1  German company.
2      Q.   Okay.
3      A.   Facco, F-a-c-c-o, which is an Italian
4  company.  Big Dutchman, which is an American
5  company -- well, actually, it's a German company,
6  manufactured in America.  And that would have been
7  the preponderance of them.
8      Q.   Are those entities, as far as you know,
9  still in business today?
10     A.   I don't believe Mueller is.
11     Q.   Now, are you acquainted in a general way
12  with the September 2000 recommendations of the UEP
13  scientific committee?
14         MR. GREENE:  Are you asking him about
15  Exhibit 23?  Because he's looking --
16         MR. RAYLE:  Yes.
17     A.   In general, yes, sir.
18         BY MR. RAYLE:
19     Q.   Did you from time to time have
20  interactions with the members of the UEP scientific
21  advisory committee?
22     A.   Occasionally.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

47 (Pages 182 to 185)

---

182

1    Q.   Did you have any suggestions from time
2  to time that you would give to the committee with
3  respect to, for example, cage configuration?
4    A.   On occasion.
5    Q.   Did you have any consultations -- strike
6  that.
7        Did you have any interactions with the
8  members of the scientific advisory committee on the
9  issue of feeder space?
10   A.   I believe that is one where I might have
11 had an input to them.
12   Q.   Can you tell us what you -- as best you
13 can tell today, what your input was?
14   A.   Well, the other countries and scientific
15 committees had not necessarily stipulated a
16 four-inch feeder space and that from an economics
17 standpoint for the producers, it would be much
18 better off if they could go to the slightly deeper
19 cage and get to the eight birds times the 67 square
20 inches, because you can't have a half a bird or a
21 third of a bird in a cage.
22        And so something had to give.  Either it

---

183

1  was going to be seven birds or it was going to be
2  four inches.  Which was it?  They needed to figure
3  it out and see if they really had scientific proof
4  that it needed to be four inches.
5    Q.   And did you have a judgment one way or
6  the other as to whether the scientific proof
7  supported four inches?
8    A.   I would only tell you that we had
9  customers in Europe that had been very successful
10 in feed conversion without a lot of animal pecking
11 or, you know, aggressiveness issues using less than
12 four inches.  And that was what I indicated to
13 them.
14   Q.   If you were asked this already and I
15 didn't hear your answer, I beg your indulgence.
16 But did you have occasion to attend UEP Scientific
17 Advisory Committee meetings at any time?
18   A.   Yes.
19   Q.   Could you tell us approximately how many
20 such meetings you believe you might have -- was it
21 more or less than ten?
22   A.   It was less than ten.

---

184

1    Q.   I'm trying to figure out a way to do
2  this very quickly, because this is my last line of
3  questioning.
4        MR. RAYLE:  Make this the exhibit next
5  in order.
6        (Henning Exhibit 24 was marked for
7        identification.)
8        BY MR. RAYLE:
9    Q.   Exhibit 24 is a series of e-mails
10 involving -- somewhat involving, concerning a
11 Chicago meeting.  The first one is dated March 26th
12 2008 from Mr. Catherman to Mr. Baker and others.
13        Looking through that, do you recall
14 whether you attended the Chicago meeting that's
15 outlined in this document?
16   A.   Quite frankly, without the calendar in
17 front of me, I cannot.  I apologize.
18   Q.   Okay.  And at the bottom of the second
19 page, there's an e-mail there from Mr. Klippen to
20 yourself and others dated March 24, 2008, and he
21 outlines five bullet points on the next to the last
22 page there, three of which concern the VPC.  Do you

---

185

1  see that, sir?
2    A.   Yes.
3    Q.   And there's a reference to the Midwest
4  Poultry Federation convention in St. Paul on the
5  first line of that e-mail.  Do you recall if you
6  attended that event?
7    A.   2008.  I probably did not.  I spend my
8  winters in Florida normally.  I don't -- the last
9  six, seven, eight years, I don't believe I've been
10 there.
11   Q.   Do you recall when Mr. Klippen was able
12 to circulate or disseminate the very first draft of
13 the VPC program?
14   A.   I'm sorry.  Not without those docs, I do
15 not.  I'd just refer back to the Exhibit 21 that
16 you gave.  That's the best time frame I could give
17 you, quite frankly.
18   Q.   What I'm trying to figure out here is
19 the VPC program had a beginning date and then it
20 had a date where it got no legs and didn't go
21 anywhere.  And I'm trying to get an idea of what
22 that span of time was, whether it was a year, a

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                  August 26, 2013

48 (Pages 186 to 189)

---

186

1    year and a half, more or less.
2        A.  I would guess 14, 15 months.
3        Q.  Okay.
4            (Henning Exhibit 25 was marked for
5            identification.)
6        BY MR. RAYLE:
7        Q.  I've put before you the exhibit next in
8    order, which is entitled UEP Annual Membership
9    Meeting, Reynolds Plantation, Georgia.  And if
10   you -- MFI00021325 through -333.
11           And on page 328, your name is listed
12   under staff, State executives and associate
13   members.  Can you tell me whether you were in
14   attendance at the UEP annual membership meeting
15   October 18th 2007 in Chicago?
16       A.  I thought you were going to ask me about
17   the Reynolds Plantation.  I know I was there
18   because I have the shirt in my closet.  I don't
19   remember the Chicago meeting.  If it says I was
20   there, I probably was there.  I have no reason to
21   dispute that.
22       Q.  On page MFI00021333, there's some

---

187

1    handwritten notes there.  Do you recognize in whose
2    hand those notes were made?
3        A.  No, sir.
4        Q.  Has your company done business with
5    Mr. Bob Krouse's company?
6        A.  We interviewed to do business with them
7    years ago.
8        Q.  Did you do any business with them?
9        A.  No.
10       Q.  Do you recall whether in 2006 you
11   attended a UEP annual membership meeting in
12   San Antonio, Texas?
13       A.  I think I have that shirt, too.  Yes.
14       Q.  Do you recall whether you attended an
15   UEP annual membership meeting held October 6th 2005
16   in Seattle, Washington?
17       A.  I did not.  I was in Seattle.  That was
18   the International Egg Commission.  I do not believe
19   I was there.  I thought that was an International
20   Egg Commission meeting.
21       Q.  Do you recall whether you attended a UEP
22   annual membership meeting October 21, 2004 in

---

188

1    New Orleans?
2        A.  Yes.
3        Q.  Do you recall if you attended a UEP
4    annual membership meeting October 23, 2003 in
5    Albuquerque?
6        A.  Yes.
7        Q.  Yes, you recall and, yes, you did?
8        A.  Yes.  I would probably stipulate to you
9    that I recall being at most UEP annual meetings, if
10   that would make this easier for you.
11       Q.  All right.  That's good.  So you are a
12   regular attendee at the annual meeting?
13       A.  I am.
14       Q.  And that is because you had many
15   customers who were also there?
16       A.  That is correct.  It's the easiest sales
17   call in the world.
18       Q.  Okay.  And that was part of your
19   business, was to do business, and to do business,
20   you had to interact with those folks in your
21   industry when you could, correct?
22       A.  That is correct.

---

189

1        MR. RAYLE:  I have no further questions
2    at this time.  Thank you very much, sir.
3        THE WITNESS:  Thank you.
4        MR. GREENE:  Mr. Malkinson, did you find
5    your exhibit?
6        MR. MALKINSON:  I did.
7        FURTHER EXAMINATION BY COUNSEL FOR THE
8            DIRECT PURCHASER PLAINTIFFS
9            BY MR. MALKINSON:
10       Q.  Just so I don't have to -- would it be
11   fair, sir, to you if a UEP committee meeting
12   minutes, set of minutes, lists you in attendance,
13   do you have any reason to dispute whether you were
14   actually there?
15       A.  I would have been in the committee
16   meeting if it said I was.  I may have left the
17   committee meeting.  But I certainly wouldn't argue
18   that I was probably there for some period of time.
19       Q.  Are you familiar with an audit process
20   that exists for determining compliance with UEP
21   certification?
22       A.  Yes.

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                    August 26, 2013

49 (Pages 190 to 193)

---

190

1    Q.   Please tell me if you agree with the
2  following remark about that audit process.  This is
3  as of January of 2003.  "A producer can fail the
4  significant portions of the beak trimming, handling
5  transportation, slaughter and molting portions of
6  the audit and still receive a passing score.  Thus,
7  the audit program could be construed to be
8  unconcerned whether a producer is humanely handling
9  molting and beak trimming layers."
10       "Layers layers" is the way it's printed.
11       "This is not true of density.  Here
12  there is a total knockout factor on space.  This,
13  in our opinion, materially impacts those producers
14  unable to deliver the UEP space requirement on all
15  flocks."
16       Do you agree with that criticism?
17       MR. GREENE:  Object to the form of the
18  question.
19     A.   I really have no foundation to agree or
20  disagree with it.  I mean, if somebody said that,
21  that was their opinion.
22       BY MR. MALKINSON:

---

191

1    Q.   Do you recall a memorandum being
2  presented to the UEP about its animal husbandry
3  guidelines, seeking some changes in the guidelines
4  by a bunch of undersigned individuals and
5  companies?
6     A.   No, I don't.  But it doesn't surprise
7  me.  I mean, they've tweaked the program since its
8  inception.
9       MR. MALKINSON:  I don't have copies of
10  it, but it's the last thing I've got here.  This
11  will be Exhibit 26.
12       (Henning Exhibit 26 was marked for
13       identification.)
14       BY MR. MALKINSON:
15     Q.   Sir, showing you what's been marked as
16  Exhibit -- Henning Exhibit Number 26.  This is a
17  three-page document that goes from MFI0052348
18  through -52350.  At the very top, it's entitled
19  "Memorandum" and it's dated January 11th, 2003.  If
20  you could just take a look at it, sir.  The main
21  thing I want to ask you is whether or not you were
22  one of the people that signed off on this

---

192

1  memorandum.
2     A.   I am sure that I did not.
3     Q.   And when you say that, why are you so
4  sure?
5     A.   Because it was our intention and policy
6  to not try and get out in the front of this
7  process.  It wasn't -- we really didn't have a dog
8  in the hunt.
9     Q.   You previously told us that you -- if
10  you attended committee meetings, you and other
11  guests who were present would typically participate
12  in discussions that were going on.  Was that true
13  at board meetings as well when you would attend
14  those?
15     A.   Board functions were normally board
16  discussion, and you were, as a member, listening
17  and watching what was going on.
18     Q.   Did they ever entertain opinions or
19  thoughts from people who were observing?
20     A.   Not that I recall.
21     EXAMINATION BY COUNSEL FOR THE DEFENDANT
22       MICHAEL FOODS

---

193

1       BY MR. GREENE:
2     Q.   I have one follow-up question, Mr.
3  Henning, about Exhibit 14.  Could you put Exhibit
4  14 in front of yourself?  It's some minutes.  They
5  look like this.  October 12 and 13, 2000.
6     A.   Yes, sir.
7     Q.   Mr. Malkinson asked you about these
8  minutes earlier.  You're indicated here under a
9  section that's entitled "UEA Members."  Do you see
10  that?
11     A.   Yes.
12     Q.   And what's your understanding of what
13  UEA means?
14     A.   That's United Egg Allied.  So we're
15  allied members.  We're vendors.  We're chemical
16  salesmen, cage salesmen, builders, et cetera.
17  We're not voting UEP members.
18     Q.   So when you referred to yourself at
19  various times today as an allied member, were you
20  meaning to indicate that you were a UEA member?
21     MR. MALKINSON:  Objection, form.
22     BY MR. GREENE:

---

HIGHLY CONFIDENTIAL

Henning, Jeffry L.                                      August 26, 2013

50 (Pages 194 to 197)

194

1    Q.   Withdrawn.
2         Do you use -- in your various references
3    to allied member, do you use "allied member"
4    interchangeably with "UEA member"?
5    A.   Yes.
6         MR. GREENE:  No further questions.
7    FURTHER EXAMINATION BY COUNSEL FOR THE DIRECT
8              PURCHASER PLAINTIFFS
9         BY MR. MALKINSON
10   Q.   Just -- the UEA stands for?
11   A.   You're asking me a question I don't know
12   except for the "allied" portion.
13   Q.   United Allied Associates or Association?
14   --
15   A.   I think it's "Allied."
16   Q.   Do you know the address of that
17   organization?
18   A.   No, I don't.
19   Q.   Do you know whether it works out of the
20   same address as the UEP?
21   A.   Well, I know that you have ex-officio
22   members from the United Egg Producers staff.  But

195

1    the Allied has its own officers and operates
2    independently of UEP relative to the administrative
3    functions of it.
4    Q.   I understand what you're saying.  But
5    you're saying that the staff at the UEP facilitates
6    the functions of the UEA, but that the members are
7    not members of the -- the members of the UEA are
8    not members of --
9    A.   The primary function of the UEA is to
10   raise money and help support United Egg Producers,
11   who are all our customers --
12   Q.   Okay.
13   A.   -- in a nutshell.
14   Q.   The dues you paid to the UEA, do you
15   know what they were?
16   A.   It varies.  I can't be specific on that.
17   Q.   Did you go to meetings of the UEA?
18   A.   Yes.  I might even have been president
19   at one point in time.
20   Q.   Were they held at different times and
21   locations from the UEP meetings?
22   A.   Primarily the major membership meeting

196

1    was held at the UEP membership meetings.
2    Q.   They were held at the same time?
3    A.   Yes.  The same location.
4    Q.   Were the executives the same for both
5    groups?
6    A.   No.
7    Q.   The officers are different?
8    A.   Right.
9    Q.   Do they each have a board?
10   A.   Yes.
11   Q.   And are the boards -- is there any
12   overlap on the board, to your knowledge?
13   A.   No.  I don't believe there's any allied
14   members that are on the UEP board.
15        THE VIDEOGRAPHER:  Off the record.
16        (Reading and signing reserved).
17        (Whereupon, at 4:21 p.m. the videotaped
18   deposition was adjourned.)
19              *  *  *  *  *
20
21
22

197

1         ACKNOWLEDGMENT OF DEPONENT
2
3         I, _____, do hereby
4    acknowledge that I have read and examined the
5    foregoing testimony, and the same is a true, correct
6    and complete transcription of the testimony given by
7    me, and any corrections appear on the attached Errata
8    Sheet signed by me.
9
10
11
     _____     _____
12   (DATE)          (SIGNATURE)
13
14
15
16
17
18
19
20
21
22

HIGHLY CONFIDENTIAL

Henning, Jeffry L.

August 26, 2013

51 (Page 198)

198

REPORTER'S CERTIFICATE

STATE OF IOWA          )
                       ) ss.
COUNTY OF POLK         )

I hereby certify that I reported the deposition of JEFFRY LYNN HENNING on August 26, 2013, in Des Moines, Iowa;

That the testimony was transcribed by me and that this transcript is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality.

WITNESS MY HAND AND SEAL THIS 29th day of August, 2013.

_____
Jonathan Wonnell
Registered Professional Reporter (NCRA #835577)