# ATTACHMENT 23

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

1

IN THE DISTRICT COURT OF WAYNDOTTE COUNTY,

KANSAS

TWENTY-NINTH JUDICIAL DISTRICT

_____

ASSOCIATED WHOLESALE GROCERS,

INC., et al.,

        Plaintiffs,      Case No.

   V.                10CV2171

UNITED EGG PRODUCERS, et al.,   HIGHLY

        Defendants.     CONFIDENTIAL

_____

               Volume I

               Washington, D.C.

               March 17, 2014

      The deposition of GREGORY EUGENE

HINTON was convened on Monday, March 17, 2014,

Commencing at 9:05 a.m., at the offices of

Porter Wright, 1900 K Street, Northwest

Washington, D.C., before Paula G. Satkin,

Registered Professional Reporter and Notary

Public.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

2 (Pages 2 to 5)

---

**2**

APPEARANCES:

On behalf of the Plaintiffs:
 PATRICK J. STUEVE, ESQ.
 DAVID A. HICKEY, ESQ.
 Stueve Siegel Hanson LLP
 460 Nichols Road, Suite 200
 Kansas City, Missouri 64112
 (816) 714-7100

On behalf of Rose Acre Farms:
 JOHN C. MONICA, JR., ESQ.
 MOLLY CRABTREE, ESQ.
 Porter, Wright, Morris & Arthur LLP
 1900 K Street, NW
 Suite 1110
 Washington, DC 20006
 (202) 778-3000

---

**4**

A P P E A R A N C E S  (Cont'd)

On behalf of Midwest Poultry:
 RYAN HURLEY, ESQ.
 Faegre Baker Daniels
 300 N. Meridian Street
 Suite 2700
 Indianapolis, IN 46204-1750
 (317) 237-0300

---

**3**

A P P E A R A N C E S  (Cont'd)

On behalf of United Egg Producers and US
Egg Marketers:
 WHITNEY REDDING, ESQ. (Via phone)
 Pepper Hamilton LLP
 3000 Two Logan Square
 Eighteenth and Arch Streets
 Philadelphia, Pennsylvania 19103-2799
 (215) 981-4000

On behalf of the Sparboe:
 MATTHEW HARTUNG, ESQ.
 Hutchison, P.A.
 1907 East Wayzata Blvd
 Suite 330
 Wayzata, Minnesota 55391
 (952) 215-0141

---

**5**

ALSO PRESENT:
 JOSEPH A. MILLER
 General Counsel, Rose Acre Farms, Inc.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

3 (Pages 6 to 9)

---

**6**

1        E X A M I N A T I O N

2  By Mr. Stueve                    8

3

4

5            E X H I B I T S

6  Exhibit No.            Page No.

7  517 (Previously Marked)      82

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

**8**

1  Stueve Siegel Hanson.  We're here on behalf of

2  the Plaintiffs.  Along with me is my associate,

3  David Hickey.

4        MR. MONICA:  John Monica from

5  Porter Wright Morris & Arthur, representing Rose

6  Acre Farms, Inc.  Here with my partner, Molly

7  Crabtree, and Rose Acre's general counsel,

8  Joe Miller.

9        MR. STUEVE:  The folks on the

10  phone have already made their appearance on the

11  record.

12  Whereupon --

13        GREGORY EUGENE HINTON

14  a witness, called for examination, having been

15  first duly sworn, was examined and testified as

16  follows:

17        EXAMINATION BY COUNSEL FOR PLAINTIFFS

18  BY MR. STUEVE:

19        Q.   Good morning, Mr. Hinton.

20        A.   **Good morning.**

21        Q.   My name is Pat Stueve.  I

22  introduced myself just before your deposition

---

**7**

1        P R O C E E D I N G S

2        THE VIDEOGRAPHER:  This is media

3  unit number one of the videotaped deposition of

4  Greg Hinton, in the matter of Associated

5  Wholesale Grocers, Inc., et al., Plaintiffs

6  versus United Egg Producers, et al., Defendants,

7  in the District Court of Wyandotte County,

8  Kansas, 29th Judicial District.  Case Number

9  10CV2171.

10        This deposition is being held at

11  Porter Wright Morris & Arthur, LLP, 1900 K

12  Street, Northwest, Washington, D.C. 20006, on

13  March 17, 2014, at approximately 9:05 a.m.

14        My name is Steve Decanio, from the

15  firm of Henderson Legal Services, Incorporated,

16  and I am the legal video specialist.  The court

17  reporter is Paula Satkin, in association with

18  Henderson Legal Services, Incorporated, located

19  at 1015 Fifteenth Street, N.W. Washington, D.C.

20        For the record, will counsel

21  please introduce themselves.

22        MR. STUEVE:  Patrick Stueve with

---

**9**

1  today; is that correct?

2        A.   **Yes.**

3        Q.   You have not met be before today;

4  is that right?

5        A.   **No.**

6        Q.   You understand that I represent

7  Associated Wholesale Grocers and other

8  Plaintiffs who brought a lawsuit against Rose

9  Acre and other Defendants in Wyandotte County,

10  Kansas?

11        A.   **Yes.**

12        Q.   All right.  And you've been

13  designated on behalf of Rose Acre to respond to

14  certain topics that are contained in a corporate

15  rep notice that was served on Rose Acre.  Do you

16  understand that?

17        A.   **Yes.**

18        Q.   Can you state your full name for

19  the record.

20        A.   **Gregory Eugene Hinton.**

21        Q.   And where do you reside?

22        A.   **Seymour, Indiana.**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

10

1     Q.   Is that the headquarters of Rose
2  Acre?
3     A.   Yes.  It is.
4     Q.   And what is your title at Rose
5  Acre?
6     A.   Vice-president of sales.
7     Q.   And how long have you held that
8  position?
9     A.   Since 1992.
10    Q.   Okay.  Have you had your
11 deposition taken before?
12    A.   No.  I haven't.
13    Q.   All right.  So this is the first
14 time?
15    A.   Yes.
16    Q.   All right.  Let me go through a
17 few things.  One, we have a court reporter here
18 who is going to transcribe everything that I say
19 and that you say.  So it is important you give
20 me verbal responses.
21    A.   All right.
22    Q.   It is important you allow me to

---

11

1  get my question out before you answer.  She can
2  only record one person at a time speaking; okay?
3     A.   Yes.
4     Q.   And if that becomes an issue I'll
5  remind you.
6          In addition, your counsel here, is
7  that Mr. Monica?
8     A.   Yes.
9     Q.   All right.  And you understand
10 he's representing you today in your capacity as
11 witness on behalf of Rose Acre?
12    A.   Yes.
13    Q.   All right.  He also has an
14 opportunity to object to my question.  Once his
15 objection has been stated for the record I'll
16 ask you to go ahead and answer the question.
17 Okay?
18    A.   Okay.
19    Q.   If you don't understand a question
20 that I've asked, please let me know and I'll
21 rephrase it.  All right?
22    A.   Yes.

---

12

1     Q.   If you answer my question I'm
2  going to assume that you understood it; fair
3  enough?
4     A.   Yes.
5     Q.   You understand that your testimony
6  is under oath here, just as if you were
7  testifying in a Court of law?
8     A.   Yes.
9     Q.   All right.  And one of the
10 important aspects of that is that if you testify
11 differently at the trial in this matter then I
12 can use this testimony today to discredit your
13 testimony at trial.  Do you understand that?
14    A.   Yes.
15    Q.   All right.  You are also being
16 videotaped and this videotape can be played at
17 trial, again, just as if you were a live witness
18 at trial; do you understand that?
19    A.   Yes.
20    Q.   All right.  If you need to take a
21 break just let me know and we'll take a break.
22          Where I would like to start is, if

---

13

1  you could, describe for me what your
2  responsibilities currently are as vice-president
3  of sales for Rose Acre?
4     A.   Well, I oversee all the sale of
5  shell eggs and egg products for Rose Acre, so
6  I've got responsibility for all of our
7  customers, shell egg and egg products.  I've got
8  a staff of about 11 people that work for me,
9  directly under my supervision, that range from
10 customer service reps that take care of the
11 ordering for the customers, to sales people that
12 are on the road, contacting and visiting
13 customers.  I'm responsible for setting pricing
14 for the customers and basically all aspects.
15 Whatever involves the egg and egg product
16 customers it falls under my responsibility.
17    Q.   Okay.  And let's first, if you
18 could, you mentioned that you're responsible
19 overall for the sale of shell eggs; is that
20 right?
21    A.   Yes.
22    Q.   If you could tell me what products

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

14

```
 1    fall under shell eggs?
 2         A.  Okay.  Basically shell eggs, it's
 3    you have different sizes.  You have jumbos,
 4    extra large, large, medium, smalls.
 5         We have specialty eggs, which
 6    under specialty shell eggs would encompass
 7    cage-free eggs, Omega-3, vitamin enhanced eggs,
 8    organic eggs.
 9         And then there's -- within those
10    categories there's different pack sizes.  So you
11    would have loose eggs, which are flats, which
12    are mainly used for food service for
13    restaurants, and then carton eggs, which are
14    primarily for retailers.  And within that you
15    would have single dozen, 18 pack, two-and-a-half
16    pack, six-pack.  So you have a multiple of
17    different pack sizes that would go along with
18    shell eggs.
19         Q.  Okay.
20         MR. MONICA:  Pat, did you want him
21    to tell you about egg products or are you still
22    on eggs?
```

15

```
 1         MR. STUEVE:  I'm just talking
 2    about shell eggs right now.
 3         MR. MONICA:  Okay.
 4    BY MR. STUEVE:
 5         Q.  With respect to your specialty
 6    eggs, the Omega-3 and organic eggs?
 7         A.  Yes.
 8         Q.  Where are those produced?
 9         A.  The Omega-3 is produced in
10    Frankfort, Indiana, at County Line Egg Farm.
11    And the organics, we purchase all our organics
12    from Herbrucks, H-E-R-B-R-U-C-K-S, in Michigan.
13         Q.  How long have you purchased your
14    organic eggs from Herbrucks?
15         A.  Approximately five years now, I
16    think.
17         Q.  Okay.  And prior to that time
18    where did you purchase your organic?
19         A.  We didn't.
20         Q.  You didn't.  Okay.  So you just
21    started the last five years selling organic
22    eggs?
```

16

```
 1         A.  Yes.  Approximately the last five.
 2    I don't remember the exact year, but it's more
 3    recently, though.
 4         Q.  What about Omega-3s?  How long
 5    have you been selling Omega-3s?
 6         A.  It's over ten years now.  Ten to
 7    12 years.
 8         Q.  And have those always been
 9    produced at the County Line facility?
10         A.  No.  We first produced them at our
11    North Vernon facility, Jen-Acres, in North
12    Vernon, Indiana.
13         Q.  Okay.  But you've been selling
14    those for the pass ten years, at least?
15         A.  Yes.  At least ten.
16         Q.  And what about cage-free?
17         A.  Our cage-free, we have a farm in
18    Donovan, Illinois.  And then we have a farm in
19    North Vernon, Indiana, called Jen-Acre Plus.
20    The Donovan is called Donovan Egg Farm.
21         Q.  And how long have you been selling
22    cage-free?
```

17

```
 1         A.  Well, we first sold cage-free back
 2    in the '60s from our Pentagon locations,
 3    Pentagon 1 and 2.  And then as time went by the
 4    industry changed and went from cage-free
 5    production and moved into cage production.  So
 6    those farms, the Pentagon farms, the cage-free
 7    were phased out sometime in the '70s late, early
 8    '80s.  And then we went back.  Donovan, we
 9    purchased that farm sometime in the '90s, I
10    don't know the exact year, off the top of my
11    head.  We've been back producing cage-free for
12    the last -- probably close to 20 years now.
13         Q.  Have you been promoting them as a
14    specialty egg for the last 20 years?
15         A.  Yes.
16         Q.  Under what brand?
17         A.  Multiple brands.  We have our own
18    house brand, which is called Golden Premium,
19    that's a cage-free.  We have -- we've sold them
20    under Rose Acre Farms brand.  We currently have
21    one that is our own house brand called White
22    River Valley Farms.
```

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

**18**

1  Q.  White River?
2  A.  Yes.
3  Q.  Okay.
4  **A.  And then we also pack private**
5  **label brands for supermarkets.**
6  Q.  What about the branding for your
7  organic eggs?
8  **A.  The organics are all -- we don't**
9  **package -- we don't sell any organics under our**
10  **brand, under Rose Acres, any of our own house**
11  **brands.  They are private label supermarket**
12  **brands for each individual customer.**
13  Q.  What about Omega-3?
14  **A.  The Omega-3 we pack -- it's also**
15  **private -- at one time we did sell a Christopher**
16  **brand, that was our own house brand, but we**
17  **don't pack that anymore.  Today we pack under**
18  **customer, private label brands.**
19  Q.  And just so the record is clear
20  what you mean by that, let's say it's a grocery
21  store chain, they'll say, look, we want the
22  Omega-3.  And then they'll tell you the brand

---

**19**

1  that they want you to package it under?
2  A.  Yes.
3  Q.  Okay.  And that's basically what
4  you're doing then for the Omega-3 and the
5  organic?
6  A.  Yes.
7  Q.  But the cage-free you do have a
8  brand that you market under, a Rose Acre Brand?
9  A.  Yes.
10  Q.  And, I'm sorry, what is that
11  currently?
12  A.  White River Valley.
13  Q.  And how long have you been selling
14  it?
15  **A.  The White River Valley, it's been**
16  **about four years now.**
17  Q.  And then prior to that?
18  **A.  Rose Acre.  And then -- and**
19  then -- we still have our Golden Premium, also.
20  Q.  Is that a Rose Acre brand, Golden
21  Premium?
22  **A.  Yes.  Yes.  It is.**

---

**20**

1  Q.  Let's talk about your -- the shell
2  eggs, the commodity eggs, the jumbo, extra
3  large, large, medium, small.  How do you refer
4  to those?  Do you refer to them as commodity
5  eggs, internally?
6  **A.  Yes.  Commodity is one of the**
7  **terms that we would use.**
8  Q.  Okay.  And are those eggs
9  generally then priced off of the Urner Barry
10  market price?
11  **A.  Some are.  They can be, yes.**
12  Q.  Let's talk about -- so I'll get
13  back.  We'll talk about the commodity and then
14  the specialty eggs, but I want to talk about the
15  egg products, which is the other area of
16  responsibility; is that correct, you have for
17  sales?
18  **A.  Yes.**
19  Q.  And what are those products?
20  **A.  Under egg products I would**
21  **categorize we have liquid eggs.  We have frozen**
22  **eggs.  And we have dried eggs, pretty much.**

---

**21**

1  **And -- then there are subcategories under each**
2  **one of those.**
3  Q.  Let's start with liquid eggs.
4  First of all, where are those produced?
5  **A.  We have three farms we produce**
6  **liquid at.  One is Seymour, Indiana, Cort Acres**
7  **at in Seymour, Indiana.  Guthrie Center Egg**
8  **Farm.**
9  **In Guthrie Center, Iowa and**
10  **Pulaski Egg Farm in Francesville, Indiana.**
11  Q.  And is there a brand name that you
12  sell your liquid eggs?
13  **A.  We sell the majority under our**
14  **Rose Acre brand.**
15  Q.  And are these primarily to -- who
16  are your primary customers for your liquid eggs?
17  **A.  We have -- I guess if you want to**
18  **categorize it and break it down, we have**
19  **industrial and we also have food service.**
20  **On the industrial side, which a**
21  **lot of it falls into bulk tankers for**
22  **ingredients.  We would have Kraft Foods.  We**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

22

1  would have Rich Products. They are the current
2  ones that buy tankers.
3          Then we also pack in totes, the
4  liquid egg in 2000-pound totes for bakeries.
5  And that would go to Kroger's bakery, Country
6  Oven. Sister Schubert's, who is a bakery. Ohio
7  Farmers, who is a distributor that sells to
8  other bakeries like Main Street Muffins in Ohio.
9          And then on the, more the package
10 size we do bag-in-a-box liquid. Customers would
11 be like Cracker Barrel for the breakfast. We
12 sell them liquid packaged eggs.
13     Q.   Would that be primarily for the
14 food service then the bag-in-a-box?
15     A.   Yes.
16     Q.   Okay.
17     A.   And we would sell -- we've got
18 different distributors in different markets that
19 would buy truckloads of liquid bag-in-a-box, and
20 distribute to restaurants, which I'm not aware
21 of all the customers of those.
22     Q.   What are the names of the

23

1  distributors?
2     A.   Prime Foods in Booneville,
3  Indiana; Dutch Farms in Chicago, Illinois;
4  Demand Badger in Chicago, Illinois. Dutt and
5  Wagner in Abingdon, Virginia; Happy Chicken in
6  Columbus, Ohio. That's some of them. I'm
7  not -- there's others.
8     Q.   As I understand it you would, at
9  one of your three facilities you would take
10 shell eggs that are produced by Rose Acre Farms,
11 they would be broken, and a liquid egg product
12 is then produced and it's packaged in a
13 bag-in-a-box package and then sold to these
14 distributors who then turn around and sell them
15 to various restaurants in their regions; is that
16 correct?
17     A.   Yes.
18     Q.   Now, let's talk about frozen --
19 frozen egg products. First of all, where are
20 those produced?
21     A.   Well, a year-and-a-half ago we
22 quit producing frozen eggs.

24

1     Q.   Okay.
2     A.   It was produced in Seymour,
3  Indiana.
4     Q.   Okay. At the Cort Acres?
5     A.   Yes.
6     Q.   All right. And how long did you
7  sell frozen eggs?
8     A.   More than 15 years. Fifteen,
9  20 years.
10    Q.   And were the frozen eggs in liquid
11 form?
12    A.   Well, they start out in a liquid
13 form and then they're packed in pails, like
14 mainly two pack sizes, a 30-pound pail or a
15 5-pound gable top. The gable tops -- 5-pound
16 and 2-pound gable top. 5 and 2-pound gable top
17 would be used for small bakeries or even
18 restaurants would buy them. The frozen,
19 30-pound pails, would go to big larger scale
20 bakeries, mainly. So you put the liquid into
21 the pail and put it in the blast freezer and
22 freeze it.

25

1     Q.   And why did you stop selling
2  those?
3     A.   The market for frozen has been
4  shrinking dramatically over the last five to ten
5  years because of the restaurants are switching
6  to the fresh liquid egg, because we can offer
7  liquid egg with extended shelf life, and so it
8  is just more practical to buy liquid instead of
9  buying frozen and that thawing it out. So it is
10 kind of the transition. We saw our business was
11 changing dramatically from frozen into liquid,
12 so it got to the point it was economic to shut
13 the freezer down.
14    Q.   What about dried? Where are your
15 dried eggs produced?
16    A.   Okay. We have three dryers. We
17 have a what we call a yellow dryer in Guthrie
18 Center, Iowa, that we produce dried whole egg
19 and yolk. We have a whites dryer in Marshall,
20 Missouri, that we produce dried egg whites. And
21 we have an inedible dryer in Francesville,
22 Indiana, that we produce inedible egg, dry

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

8 (Pages 26 to 29)

---

**26**

inedible egg which is sold mainly to pet manufacturers.

Q. So yellow, whites, and inedible eggs; is that correct?

A. Yes.

Q. And let's go with the yellow. Who are the customers for that?

A. It's mainly bakeries. Again, it's customers would be like Flowers Bakery in Georgia. McKee in Crossville, Tennessee. CSM, which is a -- another bakery company. We used to sell Krispy Kreme donuts, but we don't sell them today. Really, the customers, it's all mainly baked goods.

Q. And then what about the whites?

A. The whites is a little more of a variety. Whites go into, we sell like M&M Mars, confectionary companies use dried egg whites. We sold Ceremi companies in the past, imitation crab meet. It's a binder. The Kraft Foods and then -- so, let's see. Gilster Mary Lee, who is a manufacturer of angel food cakes. So it's

---

**27**

used a little different, it's baked goods, like it's the cakes and then also like the confectionary industry, so those are major users of egg whites.

Q. And then the edible eggs, you mentioned, are these primarily for animal consumption?

A. The inedible?

Q. Yes.

A. The inedible is mainly pet food. We would sell Nestle, Purina, Pet Care is a major.

Q. Where is that produced again?

A. In Francesville, Indiana.

Q. What eggs are utilized for that for the inedible?

A. Basically -- it's what USDA deems inedible. So it would be eggs coming out of our -- there's two sources, really. One is from the egg grading plants. It would be the inedible egg that comes from egg grading. And also from our egg breaking plants it's the

---

**28**

spinoff of the egg in the shells that we centrifuge and then put it into inedible. So USDA would deem it inedible as eggs not fit for human consumption.

Q. What would be the basis for these eggs not being fit for human consumption?

A. It's eggs from a grading plant, if you have eggs that are broken before you get to the packing machine, so it comes out through the egg washer, and they come out of the chicken house they're already cracked and broke. So any broken, checked eggs from the processing plant. And then it's the spin-off from the shells from the breaking operations. So once it's come in contact like with the shell in the breaking operation USDA won't allow you to use it for edible, it has to be deemed inedible, and then you have to denature that product.

Q. What do you mean by that?

A. You add a coloring, a caramel food coloring to the product, so USDA -- it's all regulated by AMS USDA, so they know that product

---

**29**

shouldn't be put into edible products, so you have to discolor it.

Q. Now, with respect to the various egg products, the liquid, the frozen, and the dried, how are those generally then distributed once they're made at your various production facilities?

A. Could you repeat that again? I'm sorry.

Q. Yes. What is the -- is the primary distribution channel to sell them to distributors who then sell them to various locations?

A. Are we talking egg products?

Q. I'm talking egg products.

A. Okay. Egg products. No. We do both. That's one channel, you know, through the distributor. That's one opportunity for distribution. The other is direct sales to the customers.

Q. And on those direct sales, how are the products delivered? Do the customers come

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

9 (Pages 30 to 33)

---

30

1    and pick it up or do you actually deliver it?
2        A.   Both.
3        Q.   Okay.
4        A.   So we have some customers who want
5    to pick up their own product as a back haul
6    saving for freight reasons.  Others, they ask
7    for delivery.
8        Q.   What about -- what is the
9    breakdown, currently, between your egg product
10   sales and your shell egg sales?
11       A.   It's about 70 percent shell eggs
12   and 30 percent egg products.
13       Q.   And has that -- how long has that
14   been the breakdown, approximately?
15       A.   For quite a few years.  Probably
16   more than ten years it's been pretty similar.
17            The pass year it may have went a
18   little heavier in the shell eggs.  It's possibly
19   at 72/28 this past year.
20       Q.   But that 70/30 ratio has been
21   pretty consistent for the last decade?
22       A.   Yes.  Yes, it has.

---

31

1        Q.   Okay.
2            MR. MONICA:  Mr. Hinton, just let
3    him finish the whole question.
4            THE WITNESS:  Oh.
5    BY MR. STUEVE:
6        Q.   Now, if you would, you mentioned
7    that you have approximately 11 folks that you
8    supervise; is that right?
9        A.   Yes.
10       Q.   And, if you could, can you just
11   kind of breakdown how -- do you call it the
12   sales department?
13       A.   Yes.  Sales department.
14       Q.   How does the sales department
15   break down?
16       A.   Okay.  Well, I'm the head of the
17   sales department as vice-president of sales.
18            Directly under me is Amanda
19   Jackson.  She's our director of sales.
20       Q.   How long has she held that
21   position?
22       A.   Approximately two years.

---

32

1        Q.   And who held that position before
2    Amanda?
3        A.   No one.
4        Q.   Okay.  So that was a newly created
5    position?
6        A.   Yes.
7        Q.   And what are her responsibilities
8    as director of sales?
9        A.   She oversees -- for myself she
10   would oversee all of our -- all of our
11   customers.  She has direct responsibility for
12   contacting new customers, working on new
13   business, as well as taking care of existing
14   business.
15       Q.   And would that include both shell
16   egg and egg products?
17       A.   Yes.
18       Q.   Okay.  And who else?
19       A.   Okay.  Aaron Heironimus.  I knew
20   she was going to give me the eye on that,
21   H-e-i-r-o-n-i-m-u-s.
22            THE REPORTER:  Aaron with an E or

---

33

1    an A?
2            THE WITNESS:  A-a.  He's our
3    national sales manager for liquid products.
4    BY MR. STUEVE:
5        Q.   Okay.  How long has he had that
6    position?
7        A.   More than ten years.
8        Q.   Does he report directly to you?
9        A.   Yes.  And -- he reports to myself.
10   Obviously, I'm over everyone in the department,
11   but he would report directly to Amanda.
12       Q.   Okay.  And you said she just
13   joined two years ago, so who did he report to
14   prior to that time?
15       A.   He reported to me.
16       Q.   Prior to --
17       A.   Prior to Amanda, but --
18       Q.   Okay.
19       A.   But Amanda -- that was a newly
20   created position, but Amanda has been with the
21   company for more than 15 years.
22       Q.   I'll get back to that.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

34

1    **A.   Prior to that he reported to me.**
2        Q.   All right.  So for several years
3    as the national sales manger for liquid products
4    he would have reported directly to you.  That
5    changed two years ago.  He still reports to you,
6    but he also is now reporting to Amanda Jackson?
7        **A.   Correct.**
8        Q.   Okay.  And I'll come back to his
9    specific responsibilities.  Who else is part of
10   the team?
11       **A.   Brad Ginnane, G-i-n-n-a-n-e.  He's**
12   **national sales manager for dried products.**
13       Q.   How long has Brad Ginnane had that
14   position?
15       **A.   Close to 20 years.**
16       Q.   And who does he report to,
17   currently?
18       **A.   Currently, to Jeff Cutler.**
19       Q.   Okay.  How long has he reported to
20   Jeff Cutler?
21       **A.   About a year now.**
22       Q.   And prior to a year ago who did he

---

35

1    report to?
2        **A.   To myself.**
3        Q.   Who else?
4        **A.   Lindsey Schepman, S-c-h-e-p-m-a-n.**
5        Q.   Is that a he or a she?
6        **A.   She.**
7        Q.   Okay.  And what is her title?
8        **A.   Customer service manager.**
9        Q.   All right.  Does she have -- is
10   that for all customers or is it broken out,
11   shell versus egg products?
12       **A.   For shell eggs.**
13       Q.   Shell eggs.  Okay.  And how long
14   has she had this position?
15       **A.   Two years.**
16       Q.   And who held that position prior
17   to her?
18       **A.   Newly created position.**
19       Q.   All right.  Who else?
20       **A.   Matt Nieble.**
21       Q.   How do you spell his last name?
22       **A.   N-i-e-b-l-e.**

---

36

1        Q.   Nieble?
2        **A.   Nieble.**
3        Q.   Okay.  What's his title?
4        **A.   He doesn't actually have a title,**
5    **but he's sales.**
6        Q.   For what products?
7        **A.   For shell eggs.**
8        Q.   Is that national?
9        **A.   Yes.**
10       Q.   Or region?
11       **A.   National.**
12       Q.   And who does -- who does Matt
13   report to?
14       **A.   Amanda Jackson.**
15       Q.   Who does Lindsey Schepman report
16   to?
17       **A.   Amanda Jackson.**
18       Q.   How long has Mat Nieble been
19   responsible for shell egg sales on a national
20   level?
21       **A.   For about a year.**
22       Q.   And did he replace someone?

---

37

1        **A.   Lindsey Schepman.**
2        Q.   Who else is on the team?
3        **A.   Catherine Horton, H-o-r-t-o-n.**
4        Q.   Horton?
5        **A.   Yes.**
6        Q.   Sorry.
7        **A.   Sorry.**
8        Q.   Catherine Horton.  What is her
9    title?
10       **A.   Customer service rep.**
11       Q.   For what products?
12       **A.   Shell eggs.**
13       Q.   How long has she held that
14   position?
15       **A.   Just about a year.**
16       Q.   Who does she report to?
17       **A.   Lindsey Schepman.**
18       Q.   Who else is in the department?
19       **A.   Cindy Hackney, H-a-c-k-n-e-y.**
20       Q.   Okay.  What's her title?
21       **A.   Customer service rep.**
22       Q.   And what products?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

38

1      A.   Shell eggs.
2      Q.   How long has she held that
3  position?
4      A.   I think it's close to ten years,
5  approximately.
6      Q.   Okay.  And who does Cindy report
7  to?
8      A.   Lindsey Schepman.
9      Q.   Okay.  Who else is in there?
10     A.   Brittany Cornett -- I didn't know
11  I was going to have a spelling test.  I'm going
12  to get one wrong.  It's C-o-r-n-e-t-t, Cornett.
13     Q.   Unfortunately for you, if you get
14  it wrong you don't get to sit down.  You have to
15  stay up here and answer questions.
16     MR. MONICA:  I object to that.
17  BY MR. STUEVE:
18     Q.   What is Brittany's title?
19     A.   Customer service rep.
20     MR. MONICA:  They'll never see the
21  transcript so you don't have to worry that you
22  misspelled their name.

---

39

1  BY MR. STUEVE:
2      Q.   Who does Brittany report to?
3      A.   Lindsey Schepman.
4      Q.   And what products?
5      A.   Shell eggs.
6      Q.   Who else is in the department?
7      A.   Drew Royalty.
8      Q.   And what's his position?
9      A.   He's got a dual role.  He's
10  customer service rep, newly customer service
11  rep.  And he's also field staff for quality
12  inspections at supermarkets.
13     Q.   How long has he held this
14  position?
15     A.   Nine months.
16     Q.   Who does he report to?
17     A.   Because of his dual role he
18  reports to Lindsey Schepman and Amanda Jackson.
19     Q.   And how long has Brittany Cornett
20  had her position?
21     A.   Two years now.
22     Q.   And who does she report to?

---

40

1      A.   Lindsey Schepman.
2      Q.   Who else is in the department?
3      A.   Bob Niewedde.
4      Q.   How do you spell his last name?
5      A.   N-i-e-w-e-d-d-e.
6      Q.   It's pronounced Niewedde?
7      A.   Niewedde.  Correct.
8      Q.   What's his title?
9      A.   He doesn't necessarily have one.
10  He's just -- he's sales.  Outside sales.
11     Q.   For what products?
12     A.   For shell eggs.
13     Q.   Okay.  How long has he held this
14  position?
15     A.   Probably close to 20 years.
16     Q.   Okay.  Who does he report to?
17     A.   Amanda Jackson.
18     Q.   Who else is in the department?
19     A.   Mark Anchorage.
20     Q.   Okay.  What's his title?
21     A.   He's field staff, quality
22  inspections for shell eggs.

---

41

1      Q.   How long has he held that
2  position?
3      A.   About -- a little over more than
4  five years.
5      Q.   Who does he report to?
6      A.   Amanda Jackson.
7      Q.   Anyone else?
8      A.   Travis Kuntz, K-u-n-t-z.
9      Q.   Kuntz?
10     A.   Yes.
11     Q.   What's Travis' position?
12     A.   Outside rep for quality shell egg
13  inspections.
14     Q.   How long has he held this
15  position?
16     A.   About two years now.
17     Q.   Who does he report to?
18     A.   Amanda Jackson.
19     Q.   Anyone else?
20     A.   Ralph Kimsey, K-i-m-s-e-y.
21     Q.   What's his title?
22     A.   Account rep for Ingles

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

12 (Pages 42 to 45)

---

**42**

Supermarkets.

Q. What supermarket?

A. Ingles, I-n-g-l-e-s, Ingles.

Q. Where are they located?

A. They're based in Black Mountain, North Carolina.

Q. Are they a large grocery chain there?

A. Yes. They're a regional supermarket chain.

Q. Do you know how many stores?

A. Approximately 100 stores.

Q. How long has he held that position?

A. For a little over five years now.

Q. Would that have occurred at the time you acquired the North Carolina facility?

A. No.

Q. All right. Has -- how long has Ingles Supermarket been a customer of Rose Acre?

A. For about five years now.

Q. And how did you acquire that

---

**43**

client?

A. Through the acquisition of Crystal Farms in Georgia.

Q. Was that approximately five years ago?

A. Yes.

Q. Who does Ralph report to?

A. To myself.

Q. Who else in the sales department? Anyone else?

A. That's everybody, today.

Q. Okay.

MR. MONICA: Please don't take him back to 1992.

MR. STUEVE: What's that?

MR. MONICA: Don't take him back to 1992.

BY MR. STUEVE:

Q. What I'm trying to figure out is there appears to be a number of folks who took up their new positions about two years ago?

A. Yes.

---

**44**

Q. What was the reason for that?

A. We decided to restructure the sales department. And we basically -- I gave Amanda a promotion. She was a salesperson on the road and so making her director of sales. And our company we restructured some regional areas, so we put a customer service person -- put Lindsey, brought her off the road, put -- Matt took over her position on the road on outside sales and we -- at that point -- we always had customer service but never had it structured that way. We just did a restructuring of the department.

Q. Was this about the time that Marcus Rust became CEO?

A. It would have been after that. Correct.

Q. Was that restructuring at the direction of Marcus Rust?

A. No.

Q. Whose idea was it?

A. It was a joint idea between myself

---

**45**

and Tony Wesner.

Q. And after Marcus Rust became the CEO, he took on the chief operating officer position; is that right?

A. He took on the CEO position.

Q. What position did Marcus Rust take on?

A. Oh. I just said Marcus took on the CEO position.

Q. I know. But what was Tony Wesner's position at that time?

A. His new position?

Q. Yeah.

A. COO.

Q. Chief operating officer?

A. Yes.

Q. Okay. My bad -- I was talking about Tony, you thought I was talking about Marcus. At that time under the restructuring Tony would have been the chief operating officer?

A. Correct.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I       March 17, 2014

13 (Pages 46 to 49)

---

**46**

1      Q.   And you would have consulted with
2 them about the restructure of the sales
3 department?
4      **A.   Yes.**
5      Q.   So before the restructuring how
6 was the sales department structured?
7      **A.   Everyone answered to me, directly.**
8      Q.   Okay. So what was Amanda
9 Jackson's position before the restructuring?
10      **A.   She was a sales rep.**
11      Q.   For?
12      **A.   For shell eggs. For shell eggs.**
13      Q.   And was that nationally?
14      **A.   Yes.**
15      Q.   And she reported to you; is that
16 right?
17      **A.   Correct.**
18      Q.   How long did she hold that
19 position?
20      **A.   More than 15 years.**
21      Q.   And where is she located?
22      **A.   Seymour, Indiana.**

---

**47**

1      Q.   All right. And then what about
2 Aaron? Did he report to you?
3      **A.   Yes.**
4      Q.   And was he the national sales
5 manager for liquid?
6      **A.   Correct. It was liquid and**
7 **frozen.**
8      Q.   And then what about Brad, is it
9 Ginnane?
10      **A.   Correct.**
11      Q.   Who would have been national sales
12 manager for dry products?
13      **A.   Yes.**
14      Q.   Reporting directly to you?
15      **A.   Yes.**
16      Q.   And what about Lindsey Schepman at
17 that time?
18      **A.   She was a sales rep.**
19      Q.   Also nationwide?
20      **A.   Yes.**
21      Q.   For egg shells?
22      **A.   Yes.**

---

**48**

1      Q.   Excuse me. Shell eggs?
2      **A.   Shell eggs.**
3      Q.   How long did she have that
4 position?
5      **A.   More than 15 years.**
6      Q.   What about Matt Nieble?
7      **A.   He was customer service rep.**
8      Q.   For how many years?
9      **A.   About approximately a**
10 **year-and-a-half, two years.**
11      Q.   Is that when he joined the
12 company?
13      **A.   Yes.**
14      Q.   Okay. Did he replace someone?
15      **A.   No.**
16      Q.   What about Catherine Horton?
17      **A.   What --**
18      Q.   What was her position prior to the
19 restructuring?
20      **A.   Oh. Customer service rep.**
21      Q.   For how many years?
22      **A.   For one year.**

---

**49**

1      Q.   Prior to the restructuring?
2      **A.   No. She came after the**
3 **restructuring.**
4      Q.   Okay. So she was not with -- by
5 the way, was the restructuring sometime in 2011
6 or was it 2012?
7      MR. MONICA: If you know. Do your
8 best.
9      THE WITNESS: I believe it was
10 2012.
11 BY MR. STUEVE:
12      Q.   To the best of your recollection?
13      **A.   Yes.**
14      Q.   So her position as a customer
15 service rep was created then after the
16 restructuring?
17      **A.   Well, no. Her position wasn't**
18 **created then, but she hired in new. She was a**
19 **new hire.**
20      Q.   Who did she replace?
21      MR. MONICA: Again, if you recall.
22      THE WITNESS: I don't -- I don't

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

50

1  think she necessarily replaced. We added an
2  additional customer service rep.
3  BY MR. STUEVE:
4      Q.   During this restructuring were
5  there certain folks that were in the sales
6  department that were let go or no longer with
7  the company?
8      A.   No.
9      Q.   So everyone you just added a
10  position or restructured their responsibilities?
11      A.   Yes.
12      Q.   So Catherine Horton would be
13  someone who came on after restructuring and it
14  was a newly created position?
15      A.   Correct.
16      Q.   And then what about Sidney
17  Hackney? Prior to the restructuring was her
18  responsibility for customer service shell egg?
19      A.   Yes.
20      Q.   And she reported to you?
21      A.   Yes.
22      Q.   And then what about Brittany

---

51

1  Cornett?
2      A.   She started about the time of the
3  restructuring as a new hire.
4      Q.   And did she replace anyone?
5      A.   No.
6      Q.   So this was another newly created
7  position?
8      A.   Yes.
9      Q.   And then what about Drew? Is that
10  a newly created position, Drew?
11      A.   His -- for the outside quality
12  inspections, yes.
13      Q.   So let me ask you this. Prior to
14  the restructuring -- sorry is it Drew Royalty?
15      A.   Yes.
16      Q.   Okay. What was his
17  responsibility?
18      A.   He was a new hire, last May.
19      Q.   Okay. Did he replace anybody?
20      A.   No -- sorry. Yes. He did.
21      Q.   All right.
22      A.   I'm sorry. He replaced -- I'll

---

52

1  think of it.
2      Q.   Was it someone that was let go or
3  were they just repositioned in the company?
4      A.   No. Somebody that left the
5  company. Took another job.
6      Q.   Okay. How long had this other
7  person been with the company?
8      A.   About two years. Tyler Lewis.
9      Q.   What was Tyler Lewis' position?
10      A.   Field staff quality inspection,
11  shell eggs.
12      Q.   So when Drew was brought on he had
13  that responsibility, as well as some customer
14  service rep responsibilities?
15      A.   He's recently taken on the
16  customer service responsibilities.
17      Q.   All right. And then what about
18  Bob Niewedde, was he shell egg sales prior to
19  the restructuring?
20      A.   Yes.
21      Q.   And reported directly to you?
22      A.   Yes.

---

53

1      Q.   And then Mark Anchorage, what was
2  his responsibility prior to restructuring?
3      A.   Same. Outside sales. Quality
4  inspections.
5      Q.   And he kept that same
6  responsibility, but now reports to Amanda
7  Jackson?
8      A.   Correct.
9      Q.   Okay. What about Travis?
10      A.   Same as Mark. Had the same
11  responsibility and kept it and reports to
12  Amanda.
13      Q.   And -- but he -- you had him down
14  as approximately two years; is that right, he's
15  been with the company?
16      A.   Yes.
17      Q.   Okay. Did he replace someone?
18      A.   No.
19      Q.   So he was an added position?
20      A.   Correct.
21      Q.   And then we've already talked
22  about Ralph Kimsey. Did he have the same

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

54

1  responsibility prior to the restructuring?
2       **A.  Yes.**
3       Q.   All right.  So let's talk a little
4  bit about the -- both, Travis and Mark and Drew
5  have responsibilities for quality inspection of
6  shell eggs; is that right?
7       **A.  Correct.**
8       Q.   And let's start with Travis.
9  First of all, where is he located?
10      **A.  In Iowa.**
11      Q.   Does he office out of his house?
12      **A.  Out of the -- he -- the three**
13 **farms in Iowa would be his -- but he travels the**
14 **majority of the time.**
15      Q.   And where does -- what
16 specifically does he inspect?
17      **A.  Shell eggs.  He goes -- he visits**
18 **supermarkets and he inspects the quality of the**
19 **shell eggs at the supermarkets.  He works with**
20 **dairy managers if there's any issues with the**
21 **shell eggs that they're seeing, you know, coming**
22 **in, and then reports back to the quality**

55

1  **department at all the farms, as well as myself**
2  **and Amanda.  There's several people on an e-mail**
3  **list.  Every day that he reports back daily on**
4  **what he's finding on the shell egg quality at**
5  **the supermarkets.**
6       Q.   Does he also track pricing?
7       **A.  Pricing?  No.**
8       Q.   So he collects no data with
9  respect to the pricing of the products that he's
10 inspecting?
11      MR. MONICA:  If you know.
12      THE WITNESS:  I'm trying to think.
13 Does Travis report.  On his reports he does put
14 down what the retail price is he's seen at the
15 store on his quality inspections.
16 BY MR. STUEVE:
17      Q.   He does?
18      **A.  Yes.**
19      Q.   And those are prepared each day he
20 does his inspections; is that correct?
21      **A.  Yes.**
22      Q.   And is that primarily what he does

56

1  on a weekly basis, travel to supermarkets?
2       **A.  Travels to supermarkets and does**
3  **quality inspections.  Correct.**
4       Q.   Is there a form that he fills out?
5       **A.  Yes.**
6       Q.   Okay.  And what's the name of
7  that?
8       **A.  Shell egg quality inspection form.**
9  **It doesn't necessarily have a name.**
10      Q.   Is it an Excel spreadsheet?  Is it
11 a Word document?  What is it?
12      **A.  Excel.  I believe it's an Excel**
13 **spreadsheet.**
14      Q.   And what is the information that
15 is contained on this Excel spreadsheet that he
16 prepares daily?
17      **A.  Some of the things that are on it**
18 **would include the temperature of the cooler at**
19 **the store, and then the quality inspections.  I**
20 **mean, it will have -- there's different columns**
21 **for checks, dirties, loss.  And then there's a**
22 **remarks column where he can enter in any special**

57

1  **remarks he wants to make about what he found.**
2  **There's -- it will have the store information,**
3  **the name and address of the store.  The dairy**
4  **manager, and the brands that he inspected.  The**
5  **size and brand.**
6       Q.   Okay.  And does he then include
7  with respect to those brands and sizes their
8  retail price?
9       **A.  Not always, but he can put the**
10 **retail price down.  But I don't think he always**
11 **puts it down, but he has.**
12      Q.   Who uses that information?
13      MR. MONICA:  Objection.
14 Objection.  Foundation.
15      THE WITNESS:  Which information?
16 BY MR. STUEVE:
17      Q.   The retail price information?
18      **A.  Nobody.**
19      Q.   You're the person that's
20 responsible for pricing of eggs; right?
21      **A.  Yes.**
22      Q.   And you don't use it?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

58

1  **A.  No.**
2  Q.  Why is he collecting it?
3  MR. MONICA:  Objection.  If you
4  know.
5  THE WITNESS:  We -- as far as the
6  pricing that he collects, it's there, but I
7  don't use it for anything.
8  BY MR. STUEVE:
9  Q.  It's not important for you to know
10  what the retail price of your Rose Acre products
11  are being sold at?
12  **A.  No.**
13  Q.  How do you determine the price of
14  your specialty eggs?
15  MR. MONICA:  Object to the form.
16  THE WITNESS:  How do I determine
17  the price?
18  BY MR. STUEVE:
19  Q.  Yeah.
20  **A.  Specifically to what specialty**
21  **egg?**
22  Q.  Does it differ?

---

59

1  **A.  The components of the price would**
2  **differ.  Yes.**
3  Q.  Why don't we take Omega-3?
4  **A.  Okay.**
5  MR. MONICA:  I'm just going to
6  lodge an objection to -- I've let you have some
7  latitude on specialty eggs, but my understanding
8  is your position that specialty eggs are not
9  part of this lawsuit.  If that's the case I'm
10  going to continue to lodge objections to any
11  questions about specialty eggs, but you can go
12  ahead and answer his question.
13  BY MR. STUEVE:
14  Q.  Omega-3.  How do you set the
15  specialty egg price?
16  **A.  We would work with our CFO on our**
17  **cost.  All the cost components going into**
18  **producing a specialty egg, including the feed**
19  **cost, the special feed to produce the Omega-3**
20  **egg.  And then we take into consideration what**
21  **the packaging cost, depending on what carton,**
22  **what case it would be packed in.  And then we**

---

60

1  would look at -- the freight would be a
2  component, depending on what customer it is and,
3  you know, how much freight is involved in that
4  pricing.  We add in any fees that we have to pay
5  on the Omega-3, and determine all of our costs,
6  and then we would add a margin to that price.
7  Q.  Is there a typical target margin?
8  MR. MONICA:  I continue my
9  objection to questioning on specialty eggs when
10  it is not part of this suit.  You can answer.
11  THE WITNESS:  No.  There's no
12  specific.  It varies.  And then it depends on,
13  you know, the marketplace and what we can get
14  for the eggs.
15  BY MR. STUEVE:
16  Q.  What are the factors that impact
17  the margin that you're going to ask for?
18  MR. MONICA:  Same objection.  You
19  can answer.
20  THE WITNESS:  The factors that
21  impact the margin?  It would be -- it's really
22  what we determine.  It's our call on what margin

---

61

1  we set, and then whether we see that margin or
2  not depends on the marketplace.
3  BY MR. STUEVE:
4  Q.  That's what I'm saying.  When
5  you're exercising your analysis as to what
6  margin you're going to try to seek, what factors
7  do you rely on?
8  MR. MONICA:  Same objection.  You
9  can answer.
10  THE WITNESS:  It would be -- if
11  we're bidding on a new account it's past
12  experience, knowing if we priced and weren't
13  competitive and didn't get the business, in our
14  mind, you know, we'll go through a scenario to
15  think about what to price it the next time.
16  There's no really -- we don't have a set margin.
17  BY MR. STUEVE:
18  Q.  I'm not asking whether you have a
19  set margin, but you keep saying depends on the
20  marketplace.  Are you -- how do you determine
21  what the marketplace is willing to pay in a
22  particular market?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

62

1      MR. MONICA:  We're still on
2  specialty eggs, counsel?
3  BY MR. STUEVE:
4      Q.    Go ahead and answer my question.
5      MR. MONICA:  Before you answer I
6  object.  I want to know if we're on specialty
7  eggs.  If you do I'm going to ask for a
8  continuing objection so I don't have to keep
9  objecting.
10  BY MR. STUEVE:
11     Q.    You understand I'm talking about
12  specialty eggs?
13     A.    Which eggs are we talking about?
14     Q.    Omega-3.  The ones we've been
15  talking about.
16     MR. MONICA:  Same objection.  You
17  can answer.
18     THE WITNESS:  The -- what I mean
19  by the marketplace is, like I already said, if
20  we have past experience with bidding on
21  accounts, and depending on whether we were
22  successful or not, it gives us guidance on what

---

63

1  to bid the next time.
2  BY MR. STUEVE:
3      Q.    How often are you bidding your
4  Omega-3 specialty eggs?
5      MR. MONICA:  Object to continuing
6  questions about specialty eggs when you claim
7  they are not relevant to the lawsuit.  You can
8  answer the question.
9      THE WITNESS:  It varies.  Just
10  whenever customer bids come up.
11  BY MR. STUEVE:
12     Q.    Is that on a -- so who's your
13  largest customer for Omega-3 eggs?
14     MR. MONICA:  Same objection.  You
15  can answer.
16     THE WITNESS:  Kroger.
17  BY MR. STUEVE:
18     Q.    And what stores do you sell your
19  specialty eggs -- your Omega-3 eggs to?
20     MR. MONICA:  Same objection.
21  Counsel, will you give me a continuing objection
22  so I don't have to keep doing this?

---

64

1      MR. STUEVE:  Yeah.
2      THE WITNESS:  Could you ask it
3  again, please.
4  BY MR. STUEVE:
5      Q.    Yeah.  Kroger?
6      A.    Yes.
7      Q.    Where are the stores that you sell
8  Omega-3s?
9      A.    Throughout the Midwest and, also,
10  Phoenix, Arizona.
11     Q.    Okay.  And where are the stores
12  throughout the Midwest?
13     A.    Indiana, Kentucky, Tennessee,
14  Georgia, North Carolina, Ohio, Michigan,
15  Illinois, Virginia, West Virginia.  That's some.
16  There could be others.
17     Q.    And with respect to the Kroger
18  specialty egg, Omega-3, do you negotiate one
19  price for all of those locations?
20     A.    For the Midwest there's a price.
21  It's a different price for Phoenix.
22     Q.    Okay.  And what is your Midwest

---

65

1  price?
2      MR. MONICA:  Objection.
3      THE WITNESS:  I don't know off the
4  top of my head.
5  BY MR. STUEVE:
6      Q.    You understand that one of the
7  topics today was -- that I was going to ask you
8  about was the pricing of your specialty eggs?
9      MR. MONICA:  No.  Objection.  It
10  was not stated.
11     THE WITNESS:  No.  I understand it
12  to be shell eggs and egg products.
13  BY MR. STUEVE:
14     Q.    You're responsible for pricing
15  specialty eggs; is that correct, sir?
16     A.    Yes.
17     Q.    And do you know when the last time
18  you priced the specialty eggs for Kroger?
19     A.    Maybe two years ago.
20     Q.    All right.  What do you understand
21  the margin is on that?
22     MR. MONICA:  Objection.  Assumes

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**66**

1  facts not in evidence.
2         THE WITNESS:  I don't know.  Off
3  the top of my head, I don't know.
4  BY MR. STUEVE:
5     Q.   What document would that be
6  reflected in?
7     A.   I'm not positive.  There may be a
8  document in my office that would show that.
9     Q.   Well, I mean, you obviously would
10 have negotiated a price; right, for the shell
11 egg?
12    A.   For which shell egg?
13    Q.   For Kroger, Omega-3 shell egg?
14    A.   Yes.
15    Q.   It's a specialty egg.  You would
16 have negotiated a price specifically for that;
17 is that correct?
18    A.   Correct.
19    Q.   And that negotiated price, is it a
20 formula then that's been in place for the last
21 two years?
22         MR. MONICA:  Objection to the term

---

**67**

1  "formula."
2         THE WITNESS:  The price has been
3  in effect for the last two years.  Correct.
4  BY MR. STUEVE:
5     Q.   And what are the components of the
6  price that you quoted Kroger?
7     A.   Like I stated before, it would be
8  our -- we would look at our cost and our feed
9  formulas, the packaging, which is the cartons,
10 the cases, and the freight, and a margin.
11    Q.   Is that margin indicated somewhere
12 in the agreement that you have with -- with
13 Kroger?
14    A.   No.
15    Q.   Do they know what your margin is?
16    A.   No.
17    Q.   But you do; right?
18    A.   We could look that up.  Off the
19 top of my head, I don't have it.
20    Q.   Right.  So where would you go to
21 determine what the margin is that you negotiated
22 for the Kroger Omega-3 shell egg?

---

**68**

1     A.   I would have to go to our CFO and
2  review it.
3     Q.   The document you're talking about?
4     A.   Yes.
5     Q.   And is there a central document
6  that would have that information for all of your
7  Omega-3 customers?
8     A.   Today, no, but we would have to
9  create it.
10    Q.   How would you do that?
11         MR. MONICA:  Objection.  You don't
12 have to create any documents for counsel.
13 BY MR. STUEVE:
14    Q.   How would you do that?
15    A.   It would have to be with our CFO,
16 and review our costs and add the fact of other
17 components.
18    Q.   But at the time, though, that you
19 bid, two years ago, the Kroger Omega-3 specialty
20 egg, you had included in there a margin; is that
21 correct?
22    A.   Yes.

---

**69**

1     Q.   And if you wanted to know what
2  that margin was, what document would you go to
3  to refresh your recollection?
4         MR. MONICA:  Objection.  Asked and
5  answered.  You can answer.
6         THE WITNESS:  I don't know if
7  there is a document, today.
8  BY MR. STUEVE:
9     Q.   Okay.  But was there one at the
10 time that you came up with the bid that would
11 indicate what margin you used to bid the
12 Omega-3?
13    A.   No.  Not necessarily a document.
14 Just information we put together and then put
15 the price down.
16    Q.   The documents that you utilize to
17 come up with a price, would it reflect what
18 margin you utilized?
19         MR. MONICA:  If you can recall.
20         THE WITNESS:  I don't recall.  I
21 don't think there's a document that would show
22 that.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**70**

BY MR. STUEVE:

Q.   Do you believe that there was a document at the time that you did the pricing for Kroger?

A.   As far as a document, not necessarily a document.  No.

Q.   How did you come up -- how did you do the calculations in which you used the factors that you identified and then you added a margin?  Was that written down on an Excel spreadsheet or some other document that would in fact indicate how you came up with the price?

MR. MONICA:  Object to the form. You can answer.

THE WITNESS:  We would have had the cost, the initial cost from the CFO, and then from that we would add our other costs to packaging and freight and then determine the price.

BY MR. STUEVE:

Q.   And how did you determine the margin?

---

**71**

MR. MONICA:  Object to the form of the question.

THE WITNESS:  There's no -- there's no set formula.

BY MR. STUEVE:

Q.   Well, that's what I'm saying though.  You did come up with a margin, though, right, for the Kroger Omega-3 specialty egg price; right?

A.   Yes.

Q.   And did you -- what factors did you look at to come up with that margin?

MR. MONICA:  Object to the form.

THE WITNESS:  There's -- it's just what we decide we want to add to it.

BY MR. STUEVE:

Q.   Was it 2 percent?

MR. MONICA:  Objection.

THE WITNESS:  We don't -- we don't price anything by percent.

BY MR. STUEVE:

Q.   So what?

---

**72**

A.   Like that, with the Omega-3 eggs.

Q.   How would the margin have been calculated?  As a percentage of what?

MR. MONICA:  Objection.

THE WITNESS:  It would be a cost per dozen.

BY MR. STUEVE:

Q.   Okay.  There would have been a percentage of the cost per dozen would have made up the margin?

MR. BARNES:  Objection. Mischaracterizes what he just testified to.

THE WITNESS:  Right.  We don't use a percentage.  We use a per dozen price for margin.

BY MR. STUEVE:

Q.   Right.  So you figure out the cost.  Then do you have a set margin, as far as cents, that's added onto that cost to come up with the price?

A.   No.

Q.   So how do you calculate the

---

**73**

margin?

A.   It's -- on the Kroger Omega-3?

Q.   Uh-huh.

A.   It's whatever we decide we want to add.

Q.   When you say add, what are you adding?

A.   A margin.

Q.   Is it in terms of cents per dozen?

A.   Yes.  That's what I said.  Cents per dozen.

Q.   Okay.  And that cents per dozen that you're adding would be on top of the cost you've already been provided by your CFO; is that right?

A.   Correct.

Q.   Now, do you look at -- do you know what Omega-3 eggs are being sold in the marketplace?

MR. MONICA:  Objection.

THE WITNESS:  No.

BY MR. STUEVE:

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

74

1      Q.   Do you evaluate that at all?
2          MR. MONICA:  Objection.
3          THE WITNESS:  To what they're
4  sold, meaning what?
5  BY MR. STUEVE:
6      Q.   Well, so, for example, Kroger's
7  competitors, or do you look at what the Omega-3
8  is being sold by their competitors?
9          MR. MONICA:  Objection.
10         THE WITNESS:  No.  It's not
11 relevant to us.
12 BY MR. STUEVE:
13     Q.   Do you do any market analysis at
14 all in determining the Omega-3 price that you're
15 quoting to Kroger?
16         MR. MONICA:  Mr. Hinton, give him
17 time to finish his question before you answer.
18 Give me time to object.
19         Could you read the question back,
20 please.
21         (The record was read as
22 requested.)

---

75

1          MR. MONICA:  Objection as to
2  timeframe.  Go ahead and answer.
3          THE WITNESS:  No.
4  BY MR. STUEVE:
5      Q.   Okay.  When's the last time you
6  bid on an Omega-3 specialty egg sale?
7          MR. MONICA:  Objection.  As to
8  Kroger?
9          MR. STUEVE:  No.
10 BY MR. STUEVE:
11     Q.   In general.  When's the last time
12 you bid on?
13     A.   To any customer?
14     Q.   Yeah.  Uh-huh.
15     A.   I'm not sure.
16     Q.   Would it have been the last
17 two months?
18         MR. MONICA:  Objection.  Asked and
19 answered.  You can answer it.
20         THE WITNESS:  It's possible.
21 BY MR. STUEVE:
22     Q.   And you would have been the one

---

76

1  that would have been responsible for coming up
2  with the price; correct, sir?
3      A.   Myself or Amanda Jackson.
4      Q.   Okay.  And in preparation for your
5  deposition today did you review any of your
6  pricing documents to prepare yourself for this
7  deposition?
8      A.   Yes.
9      Q.   Did you review the -- your
10 specialty egg pricing documents?
11         MR. MONICA:  Objection.  Wasn't
12 designated.
13         THE WITNESS:  No.  Not
14 specifically.
15 BY MR. STUEVE:
16     Q.   Well, I mean did you review any
17 specialty egg pricing documents in preparation
18 of your deposition today?
19         MR. MONICA:  It wasn't one of your
20 topics, Pat.
21         MR. STUEVE:  Keep saying that
22 counsel, because we're going to go back to the

---

77

1  Court and you're going to pay for me to come
2  back.
3          MR. MONICA:  It's not going to
4  happen.
5          MR. STUEVE:  Yeah.  It will.  You
6  were put on clear notice.
7          MR. MONICA:  Show me which topic
8  suggests that.
9  BY MR. STUEVE:
10     Q.   Sir, did you review any shell --
11     A.   If it would have been on a pricing
12 letter.
13     Q.   A pricing letter.  What would have
14 been in the pricing letter?
15     A.   For which customer?
16     Q.   I don't know what you're talking
17 about when you say a pricing letter, sir, so I'm
18 asking you what do you mean by a pricing letter?
19     A.   It would be a pricing letter or a
20 bid form for a customer.
21     Q.   Okay.  And the bid form, what
22 would be contained on the bid form?

---

**Page 78**

1    A.   It would be the items that the
2  customer is wishing to buy, along with our price
3  for those items.
4    Q.   And do you have a bid form for all
5  of your specialty egg bids?
6    A.   No.
7    Q.   Why would you not have one for the
8  specialty eggs that you bid?
9         MR. MONICA:  Objection.  Calls for
10 speculation.
11        THE WITNESS:  There would be --
12 not all customers send outbid forms.
13 BY MR. STUEVE:
14   Q.   Okay.  So this would be a form
15 that you would get from the customer?
16   A.   Yes.
17   Q.   But internally what document would
18 you prepare in order for you to submit that bid?
19   A.   We would prepare a pricing letter.
20   Q.   Okay.  And is that -- that pricing
21 letter, is that an internal document or is that
22 a document shared with the customer?

**Page 79**

1    A.   It would be both.  Some are just
2  internal.  Some could be shared.
3    Q.   Do those pricing letters, the
4  internal ones, do they indicate what margin
5  you've built into the price?
6    A.   No.
7    Q.   What document would indicate what
8  margin you built into the price?
9         MR. MONICA:  Objection.  Asked and
10 answered about three times now.  You can go
11 ahead and answer.
12        THE WITNESS:  On the price of
13 what?
14 BY MR. STUEVE:
15   Q.   On the price you indicated you
16 believe in the last couple of months you may
17 have submitted a bid on specialty eggs Omega-3.
18 Do you recall that?
19   A.   There would be no document on
20 those for the last few months.  We would --
21   Q.   Go ahead.
22   A.   I said we would have the cost and

**Page 80**

1  then we would calculate the price from there.
2    Q.   And what -- within the last couple
3  of months what margin did you use?
4    A.   There was no set margin.
5    Q.   Give me a range of the margin that
6  you used?
7         MR. MONICA:  Objection.  If you
8  know.
9         THE WITNESS:  On which eggs?
10 BY MR. STUEVE:
11   Q.   The Omega specialty eggs.
12   A.   On Omega specialty eggs the margin
13 could range from approximately 10 to $0.30 a
14 dozen.
15   Q.   What pricing documents did you
16 review in preparation for your deposition today?
17   A.   What specific pricing documents?
18   Q.   Yeah.  Uh-huh.
19        MR. MONICA:  Just tell him to the
20 best of your recollection what you reviewed.
21        THE WITNESS:  I reviewed some
22 pricing letters.

**Page 81**

1  BY MR. STUEVE:
2    Q.   Relating to what type of product?
3    A.   Well, some shell eggs, as well as
4  egg products.
5    Q.   In what timeframe were these
6  pricing letters prepared?
7    A.   The one -- as far as?
8         MR. MONICA:  Mr. Hinton, just tell
9  him what you recall.  He's asking for the dates
10 the documents were prepared.
11        MR. STUEVE:  Counsel, the witness
12 knows he's supposed to testify about what he
13 recalls.  I request you stop instructing the
14 witness how to answer.  Just answer my question,
15 sir.
16        MR. MONICA:  Object.  Object to
17 the form of the question.
18        THE WITNESS:  On pricing letters I
19 have a file of all the pricing letters in my
20 office.  Most of them.  Not all the new ones,
21 but -- and I look at pricing letters on pretty
22 much a regular basis as involves customers.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                          March 17, 2014

---

82

1    To say specifically the ones that
2  I've looked at recently, I can't say exactly
3  which ones.
4  BY MR. STUEVE:
5    Q.   When did you prepare for your
6  deposition today?
7    A.   For today?
8    Q.   Yeah.
9    A.   Over the last, I don't know how
10  many months.
11    Q.   How many times -- when's the first
12  time you met with counsel concerning your
13  deposition today?
14    A.   It's been several years ago when I
15  first met counsel.  Specifically -- what's it
16  called.
17    Q.   The topics?
18    A.   The document?
19    Q.   Uh-huh.
20    (Exhibit Number 517 was previously
21  marked for identification.)
22  BY MR. STUEVE:

---

83

1    Q.   I'm going to show you what's
2  previously been marked -- I'll write the number
3  on there, it's 517.  When did you meet with
4  counsel as to the topics you were going to
5  testify to?
6    MR. MONICA:  I caution the witness
7  you can certainly tell him when you met with
8  counsel, but don't disclose the testimony --
9  sorry -- the substance of the discussions.
10    THE WITNESS:  A couple months ago.
11  BY MR. STUEVE:
12    Q.   Where was that?
13    A.   Rose Acre office in Seymour,
14  Indiana.
15    Q.   How long did that meeting last?
16    A.   For a day.
17    Q.   Who did you meet with there?
18    A.   I met with Molly.
19    Q.   Ms. Crabtree, who is here today?
20    A.   Yes.
21    Q.   Anyone else?
22    A.   You were briefly, I believe, at

---

84

1  the first meeting.
2    In regards to this document?
3    Q.   Yes.  Uh-huh.
4    A.   Really, Molly.
5    Q.   And that was a day long meeting;
6  is that correct, sir?
7    A.   The first meeting.
8    Q.   Did you review any documents
9  during that meeting?
10    A.   Documents, what kind of documents?
11    Q.   Any documents?
12    A.   I don't recall the specific
13  documents.  We did review some documents.  I
14  don't remember exactly what they were.
15    Q.   All right.  When's the next
16  meeting you had with counsel concerning the
17  topics that are set fort in Exhibit 517?
18    A.   Last week.
19    Q.   Where was that meeting?
20    A.   Rose Acre office.
21    Q.   Who was present for that meeting?
22    A.   Molly.

---

85

1    Q.   Anyone else?
2    A.   Joe Miller.
3    Q.   Okay.  And did you review
4  documents at that meeting last week?
5    A.   Yes.
6    Q.   All right.  And what documents did
7  you review at that meeting?
8    A.   I reviewed this document.
9    Q.   Okay.  Did you review any
10  documents other than Exhibit 517?
11    A.   I think there were some other
12  documents.  I don't remember exactly what they
13  were.
14    Q.   I'm asking you about the meeting
15  last week?
16    A.   Right.
17    Q.   And do you recall whether or not
18  you reviewed any pricing letters?
19    A.   No.
20    Q.   You did not?
21    A.   No.  Not in the meeting with
22  Molly.  No.

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                     March 17, 2014

23 (Pages 86 to 89)

---

86

1    Q.   Okay.  And do you remember -- do
2  you remember any type of documents you reviewed
3  last week?
4    A.   I remember this document.
5    Q.   Anything else other than
6  Exhibit 517 that you recall reviewing?
7    A.   Like I said, there, could have
8  been some other documents, but I remember this
9  one specifically.
10   Q.   Did you do any preparation after
11 that meeting?
12   A.   Yes.
13   Q.   When did you do that?
14   A.   When?
15   Q.   Yeah.
16   A.   I did that basically every day
17 since that meeting.
18   Q.   What did you do every day since
19 that meeting to prepare for your deposition?
20   A.   I discussed topics that were in
21 this Exhibit 517 with different people in Rose
22 Acre to get myself -- if I didn't know some of

---

87

1  the topics I wanted to make sure I was educated
2  on them.
3    Q.   Okay.  And who did you meet with?
4    A.   Any certain topic or everyone I
5  met with?
6    Q.   Who did you meet with?
7    A.   At Rose Acres?
8    Q.   Yeah.
9    A.   I met with Amanda Jackson, Matt
10 Nieble, David Hurd, and Mark Whittington.
11   Q.   Anyone else?
12   A.   No.
13   Q.   Would this have been the latter
14 part of last week then?
15   A.   Yes.  The latter part of last
16 week.
17   Q.   So today's Monday?
18   A.   It would have been -- it would
19 have been Thursday through today.
20   Q.   And who -- when did you meet with
21 Amanda Jackson?
22   A.   I spoke with Amanda -- well,

---

88

1  actually, it probably would have been Wednesday.
2  I'm sorry.  Wednesday through today.  I spoke
3  with Amanda on Wednesday and Matt -- Matt on
4  Thursday and Friday I spoke with him.
5        I spoke with David Hurd on Friday.
6        And I spoke with Mark Whittington
7  today.
8    Q.   And what did you speak with Mark
9  Whittington about?
10   A.   About the -- just reviewed our
11 list of top ten customers and over time and how
12 it changed.
13   Q.   And what is his position with Rose
14 Acre?
15   A.   Today he's VP of risk management.
16   Q.   And why did you ask him for that
17 information?
18   A.   Because Mark, his role over the
19 years, he's been responsible for accounts
20 receivable.  And every year he puts together a
21 list of our top ten customers.
22   Q.   Is that disseminated within the

---

89

1  company?
2    A.   Yes.
3    Q.   Okay.  Is that broken out by shell
4  egg and egg products?
5    A.   The actual list he puts out, it
6  includes all customers, which includes shell
7  eggs, egg products, soybean oil, and soybean
8  meal.
9    Q.   What else did you talk to Mark
10 Whittington about?
11   A.   That's all.
12   Q.   Okay.  And what about David Hurd?
13   A.   I talked to him about flock
14 management.
15   Q.   And what specifically?
16   A.   Our backfilling practices.
17   Q.   And what did he tell you?
18   A.   In regards to?
19   Q.   Backfilling?
20   A.   Backfilling?
21   Q.   Uh-huh.
22   A.   What specifically do you want to

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

24 (Pages 90 to 93)

---

90

1    know?
2         Q.   What did he tell you?
3         A.   Is there a specific question?
4         Q.   No.  The specific question is you
5    spoke to David Hurd about backfilling practices.
6    I'm asking you, what did he tell you?
7         A.   All right.  He told me that -- I
8    asked him specifically about backfilling and how
9    it related to the UEP Certified Animal Welfare
10   Program.  And he told me that prior to us being
11   part of UEP Certified we had a general practice
12   that we backfilled houses.
13          And he told me that under the UEP
14   Certified Program that the scientific committee
15   determined that backfilling wasn't the best
16   animal husbandry practice for the birds, and
17   that they -- and because that they felt like by
18   combining ages of birds into a house, and even
19   in the same cage, was that it was not the best
20   animal welfare practice.  And so that under the
21   UEP guidelines that we had to change our
22   backfilling practices and the backfilling would

---

91

1    only be allowed under a catastrophic event.
2         Q.   When you spoke with David Hurd on
3    Friday was there anyone else present when you
4    spoke with him?
5         A.   No.
6         Q.   Did he tell you whether or not
7    Rose Acre stopped the backfilling when they
8    joined the UEP Certified Program?
9         A.   He told me that part of the
10   certified program, once we started on the
11   program that we had to adhere to the guidelines
12   of the UEP Certified Program; correct.
13        Q.   And so it was your understanding
14   Rose Acre stopped backfilling at that time?
15        A.   I didn't specifically ask David,
16   but he told me that that was part of the
17   program.
18        Q.   But he did not tell you whether or
19   not Rose Acre stopped backfilling; is that
20   correct?
21        A.   I didn't --
22          MR. MONICA:  You can answer.

---

92

1           THE WITNESS:  I didn't ask him
2    that specific direct question.  No.
3    BY MR. STUEVE:
4         Q.   Just so the record is clear, he
5    did not tell you that Rose Acre stopped
6    backfilling when they joined the UEP Certified
7    Program; correct?
8         A.   No.  But he told me it was part of
9    the program.
10        Q.   And you did not ask him whether or
11   not Rose Acre stopped backfilling; is that
12   correct?
13        A.   Well, he told me the only way that
14   we could backfill is if it's a catastrophic
15   event.  So by him telling me that, he was
16   telling me we don't backfill unless there is a
17   catastrophic event.  And I asked him what that
18   definition was.
19        Q.   So I just want to make sure I
20   understand what your testimony is.  Is it your
21   testimony that Mr. Hurd told you that they
22   stopped backfilling when they joined the UEP

---

93

1    Certified Program?
2           MR. MONICA:  Objection.  Asked and
3    answered about three times.  You can answer.
4           THE WITNESS:  I'll say it again.
5           He told me that under the program,
6    the only way we can backfill is a catastrophic
7    event.
8    BY MR. STUEVE:
9         Q.   Right.  I understand that's what
10   he told you the guidelines required.  What I'm
11   asking you, did you ask him -- let me ask you
12   this way.
13          Did you ask him whether or not
14   Rose Acre stopped backfilling after joining the
15   UEP Certified Program?
16          MR. MONICA:  Objection.  Asked and
17   answered.  You can answer.
18          THE WITNESS:  No.  I did not ask
19   him that specific question.
20   BY MR. STUEVE:
21        Q.   All right.  Now, were you aware
22   that there were certain requirements of the UEP

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                  March 17, 2014

---

94

1  Certified Program that Rose Acre did not comply
2  with?
3           MR. MONICA:  Objection.  Assumes
4  facts not in evidence.
5           THE WITNESS:  Ask that again,
6  please.
7           MR. STUEVE:  Read it back to him.
8           (The record was read as
9  requested.)
10          MR. MONICA:  Same objection.
11          THE WITNESS:  No.  I was not aware
12  of that.
13 BY MR. STUEVE:
14     Q.   Okay.  Were you aware, prior to
15  your conversation with Mr. Hurd, that there was
16  a prohibition against backfilling under the UEP
17  Certified Program?
18     A.   I don't understand what the
19  question is.
20     Q.   Prior to your conversation with
21  Mr. Hurd, when you were asking him about
22  backfilling, prior to that conversation were you

---

96

1  you ask Mr. Hurd this past Friday about molting
2  practices?
3     A.   About the molting practices as it
4  pertained to the UEP Guidelines.
5     Q.   And what did you ask him?
6     A.   Just what the guidelines were and
7  how it affected what we did.
8     Q.   Okay.  What did he tell you about
9  the guidelines as it relates to molting?
10     A.   He told me that part of the UEP
11  Guidelines it requires a -- the molt, you have
12  to continue to feed the birds a diet during the
13  molting.
14     Q.   Okay.  Anything else that he told
15  you?
16     A.   He told me that the reason they
17  required the diet was that the scientific
18  committee felt that it would be too much of a
19  strain on the birds not to totally restrict feed
20  during the molt.
21     Q.   Did he tell you anything else?
22     A.   No.

---

95

1  aware that the UEP Certified Guidelines
2  prohibited backfilling?
3           MR. MONICA:  Objection.  Misstates
4  the guidelines.  You can answer the question.
5           THE WITNESS:  It was my general
6  knowledge that there was a backfilling provision
7  in the UEP Guidelines.
8  BY MR. STUEVE:
9     Q.   But you didn't know what it was?
10     A.   It's not my area.  I didn't deal
11  with that.
12     Q.   Okay.  Did you talk to him about
13  anything else other than the backfilling issue?
14     A.   Yes.  Molting.
15     Q.   Okay.  Prior to your conversation
16  with Mr. Hurd did you have any responsibility
17  for the molting practices of Rose Acre?
18     A.   No.  I did not.
19     Q.   Did you have any supervisory role,
20  at all, in the molting practices?
21     A.   I didn't -- I never have.
22     Q.   Okay.  And what specifically did

---

97

1     Q.   Did he tell you whether or not --
2  whether or not Rose Acre complied with that
3  guideline requirement?
4     A.   Yes.
5     Q.   Did you ask him that question?
6     A.   He told me.
7     Q.   What did he tell you?
8     A.   He told me that when we molt now
9  that we feed a reduced ration to the birds.
10     Q.   But did he ask you -- did you ask
11  him whether or not during the team Rose Acre has
12  been UEP Certified, whether or not it's complied
13  with that requirement?
14          MR. MONICA:  Objection.  Asked and
15  answered.  You can answer it.
16          THE WITNESS:  He told me that we
17  changed our practices because of the UEP
18  Guidelines.
19  BY MR. STUEVE:
20     Q.   What I'm asking you, though, is,
21  did he tell you whether or not, while they've
22  been UEP Certified, whether or not they have

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

98

1   complied with that requirement?
2       A.   Yes.
3       Q.   And what did he tell you?
4       A.   That we have.
5       Q.   All right.  Were you aware of the
6   fact Rose Acre's own internal documents indicate
7   there have been periods where they have not
8   complied with that requirement?
9           MR. MONICA:  Objection it is not
10  true.  Assumes facts not in evidence.
11          THE WITNESS:  I don't know what
12  you'd be referring to.
13  BY MR. STUEVE:
14      Q.   You wouldn't know one way or the
15  other, personally, because you didn't have any
16  involvement with the molting practices of Rose
17  Acre; correct, sir?
18      A.   That is correct.  I am not
19  involved in molting practices of Rose Acres.
20      Q.   What else did you talk to Mr. Hurd
21  about?
22      A.   That was all.

99

1       Q.   Okay.  What about Mr. Nieble?
2       A.   I talked to him at our specific
3   relationship with AWG.
4       Q.   Have you had any contact with AWG?
5       A.   Yes.
6       Q.   Okay.  And what did you ask him
7   specifically about AWG?
8       A.   I asked him -- there's several
9   things I asked him about.
10          I asked him as -- he's an account
11  manager with AWG, so I asked him about
12  everything he could tell me with regards to AWG
13  that he could remember, from the time he had
14  first contact with AWG.
15      Q.   Was that his account he was
16  responsible for?
17      A.   Yes.
18      Q.   Did anyone else have
19  responsibility for AWG besides him?
20      A.   Amanda Jackson.
21      Q.   Okay.  And how long was your
22  meeting with Mr. Nieble about contact with AWG?

100

1       A.   We met for a couple hours.
2       Q.   And was there anyone else present?
3       A.   Not in that meeting, no.  I had
4   another discussion, also, with Lindsey Schepman
5   about AWG.
6       Q.   And was Mr. Nieble present in that
7   one?
8       A.   No.  That was just Lindsey and I.
9       Q.   Okay.  So let's focus on
10  Mr. Nieble, your meeting with him last Thursday.
11  Was there anybody else present in that meeting?
12      A.   It was on Friday.
13      Q.   I'm sorry.  I had Thursday and
14  Friday?
15      A.   I think I had a brief phone
16  conversation on Thursday, but Friday's when I
17  met.
18      Q.   All right.  And you met with him
19  in person?
20      A.   Yes.
21      Q.   And what did he tell you about
22  AWG?

101

1       A.   All right.  I discussed his
2   visit -- his first visit to AWG, along with
3   Amanda Jackson, and what all took place on that
4   visit.
5           They met with Linda at the AWG
6   headquarters and was discussing the -- basically
7   the setup of the business that we were awarded,
8   which was the warehouses in Kansas City and
9   Nashville, Tennessee.  And that evolved around
10  specifications.  And they got into -- they
11  reviewed the specs that were required for AWG
12  and -- I asked him about the different -- what
13  all was involved in the specifications.  And
14  basically it was that they met the shell egg
15  quality standards of USDA.  And there's
16  different things that go into the spec on color
17  of shell and appearance and grade quality.  UEP
18  certification was part of it.  And then they
19  discussed the packaging and how that would work.
20          The packaging for AWG -- AWG, so
21  they control the packaging, and that they
22  would -- we would have to buy the egg cartons

102

1  from AWG from their designated supplier, which
2  is FPI, Foam Packaging, in Mississippi.  And
3  Linda gave Matt a contact person within AWG that
4  he was to contact to help work out the packaging
5  details, because they were going to -- the
6  cartons had the prior -- the current supplier's
7  legal line information on it, and they need to
8  change that to our legal line.  So Linda gave
9  Matt the contact person and who he was supposed
10 to contact to work the details of that so they
11 could get the packaging set up with our name.
12          They discussed the -- AWG has a --
13 had requested that we do some ceiling pricing
14 forecasts for them that we would sell them off
15 of.  And they discussed how that program would
16 work.
17          And then I'm -- he said there was
18 just general discussion about transportation and
19 that AWG wanted to pick up the eggs at the farm
20 and just, you know, kind of some general
21 information on how that would, you know, how to
22 set that up and at the farm locations.

103

1          And then Linda took Amanda and
2  Matt, they left the office and went out to a --
3  she said she was taking one of their members to
4  a Price Chopper store.  So they went into the
5  Price Chopper with Linda, and they went to the
6  dairy case, and she was showing them the
7  different packaging, the cartons, you know, just
8  so they could see what the all the cartons
9  looked like and what we would be packing.
10         Let's see.  That was -- that's
11 most of the conversation.
12         MR. STUEVE:  Okay.  We got to
13 change the tape.
14         MR. MONICA:  Can we take a break?
15         MR. STUEVE:  Yeah.
16         THE VIDEOGRAPHER:  The time is
17 approximately 10:55 a.m., and we're going off
18 the record.
19         (A brief recess was taken.)
20         THE VIDEOGRAPHER:  This is the
21 start of media unit number two.  The time is
22 11:12 a.m., and we are back on the record.

104

1  BY MR. STUEVE:
2      Q.   We broke to change the videotape
3  here.  You were telling me about your
4  conversation with Mr. Nieble; is that correct,
5  last Friday.  Do you recall that testimony?
6      A.   Yes.
7      Q.   All right.  You appear to be
8  describing a visit that would have happened
9  recently concerning the 2013 bid process; is
10 that correct?
11     A.   Yes.  Yes.
12     Q.   All right.  And so this visit,
13 would this have been after -- that Mr. Nieble
14 was sharing with you, would that have been after
15 Rose Acre had been selected to supply commodity
16 eggs to the Kansas City location?
17     A.   To the Kansas City and the
18 Nashville location.
19     Q.   Okay.  But this would have been --
20 this visit would have been after the selection
21 process?
22     A.   Yes.

105

1      Q.   Okay.  Did he tell you about any
2  other contact, other than this visit, that he
3  would have had with AWG?
4      A.   Him, personally -- no.  This would
5  have been his first contact.
6      Q.   Okay.  So he described -- to the
7  best of your recollection, what he told you,
8  you've described that; is that correct?
9      A.   Yes.
10     Q.   All right.  Now, you also said
11 that -- let me ask you this.  Did you talk to
12 Mr. Nieble about anything else, other than his
13 visit to AWG after the selection process was
14 completed, that you can recall?
15     A.   Pertaining to AWG, no.  The
16 conversation, I mean, I talk to Mr. Nieble on a
17 lot of things but.
18     Q.   Okay.  So let's move to the next
19 topic.  What else did you talk to him about last
20 Friday, in addition to the discussion about his
21 visit to AWG?
22     A.   The fact that the Hoosiers lost in

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

106

the big ten tournament.

Q. Okay. I'm sure that came up first?

A. It might have, because I was probably harassing him about it.

Q. Yeah. Okay. You support?

A. Pardon?

Q. You're a fan of?

A. Purdue.

Q. Purdue. Okay. You guys don't have a lot to talk about.

A. No. We lost, too, but our game was closer.

Q. Okay. So, but as it pertains to preparation for your deposition today, was there any other -- any other topics you talked to Mr. Nieble about last Friday?

A. No. For preparation of today that was the main topic.

Q. You said you also spoke with Amanda Jackson; is that right?

A. Yes.

---

107

Q. And what did you speak to her about?

A. Similar topic to what I spoke to Mr. Nieble about. She was at the meeting, as well, and I spoke to her about the visit and just anything relating to AWG that she could remember, you know, and wanted to talk about to help me prepare.

Q. What else did she remember concerning her contact with AWG, other than the visit after the selection process?

A. The first visit. Amanda and I, prior to being selected to be a supplier to AWG, Amanda and I visited AWG during the bid process.

Q. Okay. What did she share with you about her recollection of that?

A. Nothing. I guess nothing I didn't already know, because I was at the meeting, as well, with her, and it was just kind of how our meeting went the different topics we discussed at the meeting with Linda and Scott.

Q. Scott Ritchie; is that right?

---

108

A. Yes.

Q. Do you remember anything specific that she recalled?

A. We talked about the packaging and how that would work. We talked about the way the promotion -- not promotion. The way we would guarantee AWG a ceiling price during different periods of the year and how that was going to work.

The transportation and just, you know, who's going to be doing the transportation piece. Just general data just from the meeting. That's the main things.

Q. Do you recall anything else about your discussion with Amanda?

A. No. No. Not off the top of my head.

Q. Okay. So you talked to her about a visit that you and Amanda had with AWG before you submitted your bid; is that correct?

A. Yes.

Q. All right. Was there anyone else

---

109

at that meeting from Rose Acre besides the two of you?

A. No.

Q. All right. And had you met either Linda Whiteside or Scott Ritchie prior to that meeting?

A. No. On our prior visits with AWG we met with other individuals.

Q. Okay. Had you had prior visits to AWG?

A. Yes.

Q. All right. Do you recall when your first visit was to AWG?

A. 2006.

Q. All right. And was that prior to submitting a bid concerning commodity eggs?

A. Yes.

Q. All right. And what do you recall about that visit?

A. The -- Lindsey Schepman and myself.

Q. Okay.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**110**

1  A.  Were on the visit.  And it was to
2  do with all their -- AWG was putting out a bid
3  for all their shell eggs, commodity and
4  specialty eggs.
5      Q.  Okay.
6      A.  And that visit I don't remember
7  everyone that was in the meeting, but I remember
8  Joyce Owens, I believe is her name, Owens, was
9  the main contact then that was -- that had asked
10 us, you know, to come out for a visit to talk
11 about their egg program.
12     Q.  And did you go to their
13 headquarters there in Kansas City, Kansas?
14     A.  I went to their headquarters in
15 Kansas City.  I get confused about Kansas and
16 Missouri and which -- since there's two Kansas
17 Cities.
18     Q.  You remember it was Kansas City?
19     A.  I remember it was Kansas City.
20     Q.  Okay.  And you remember meeting
21 with Joyce Owens; is that right?
22     A.  To my recollection that was her

---

**111**

1  name.  I'm almost positive Owens was her last
2  name, Joyce Owens.
3      Q.  In preparation for your deposition
4  today did you review any documents to refresh
5  your recollection about that 2006 visit?
6      A.  Yes.
7      Q.  What did you review?
8      A.  I reviewed e-mails, documents
9  that -- with Lindsey Schepman, concerning
10 information about the visit.  There were just --
11 the visit in general.  That's how I recall
12 Joyce's name.  Because I didn't -- until I
13 reviewed it I didn't remember her name.
14     Q.  So was Lindsey Schepman someone
15 who you also met with in prep for your
16 deposition?
17     A.  Yes.
18     Q.  And when did you meet with her?
19     A.  On Friday.
20     Q.  Okay.  And what e-mails did you
21 review with her concerning the 2006 visit?
22     A.  Any e-mails -- I reviewed any

---

**112**

1  e-mails that she had in her file on AWG.
2      Q.  All right.  And what did those
3  e-mails -- did she have some e-mails?
4      A.  Yes.
5      Q.  And what did they pertain to?
6      A.  The first one was -- she had a
7  document where we submitted a bid to AWG in 2004
8  for their Nashville division.
9      Q.  Okay.
10     A.  And then she had a subsequent
11 meeting.  We were not awarded -- we didn't
12 receive any business on Nashville at that time.
13     And then the next contact with AWG
14 was in 2006 when Joyce reached out to Lindsey
15 and asked us to come in for a visit to discuss
16 their egg program.  She had -- she received an
17 e-mail after -- so we submitted a bid for the
18 AWG business at that time, and we had -- there
19 was an e-mail from Joyce telling us that they
20 appreciated us bidding and that they were going
21 to keep all the business with their current
22 supplier, Moark.

---

**113**

1      And then the next contact, Lindsey
2  reached out in 2009 to Joyce and asked her if
3  they were going -- if there was an opportunity
4  for us to review their business again, because
5  it had been several years, and she had an e-mail
6  back from Joyce telling her that she was no
7  longer in charge of eggs and that Linda was now
8  responsible for eggs and that at this time they
9  were happy with their current supplier and that
10 they would not be bidding out the business.
11     Q.  And was that an e-mail?
12     A.  Yes.
13     Q.  Okay.  And so is it safe to say
14 that from 2006 up until the 2013 bid process AWG
15 had purchased exclusively its eggs and specialty
16 eggs from Moark; is that correct?
17     A.  I don't know that for a fact.
18     Q.  Do you have any information that
19 would indicate otherwise?
20     A.  The only information I have is an
21 e-mail in 2009 -- I think it's 2009 -- 2008 --
22 2009 from -- a response from Joyce that Linda

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**114**

1    was the new buyer and that they were not going
2    to bid the business.
3            The only prior e-mail to that
4    would have been in 2006 when they told us that
5    they were keeping all their business with Moark.
6    And that was in 2006.  And that was in an
7    e-mail.
8        Q.    So as far as you knew nothing had
9    changed since 2006; is that fair to say?
10            MR. MONICA:  Object to the form of
11    the question.  You can answer.
12            THE WITNESS:  Nothing happened
13    between 2006 until the 2013 bid that would
14    have -- that I wouldn't have known, but I don't
15    know -- I guess -- ask me the question again,
16    please.  I just.
17    BY MR. STUEVE:
18        Q.    As far as you knew, up to the
19    point you were bidding in 2013, AWG was
20    purchasing its commodity eggs and specialty eggs
21    from Moark; fair enough?
22            MR. MONICA:  Same objection.

---

**115**

1            THE WITNESS:  I wouldn't have any
2    knowledge different than that, if they were
3    purchasing them from Moark.  I know for a fact
4    that Moark did not produce all the eggs that AWG
5    purchased.
6    BY MR. STUEVE:
7        Q.    Well, let me ask you this way.
8            As far as you knew, AWG was
9    purchasing all of its eggs, commodity and
10    specialty eggs, from Moark; is that correct?
11            MR. MONICA:  Same objection.
12    BY MR. STUEVE:
13        Q.    From 2006 up to 2013?
14            MR. MONICA:  Same objection.
15            THE WITNESS:  I wouldn't know
16    that.
17    BY MR. STUEVE:
18        Q.    You knew in '06 they had secured
19    the business; right?
20        A.    Yes.  I did.
21        Q.    Then you made inquiry in '09 and
22    you were told that they were happy with their

---

**116**

1    current supplier; right?
2        A.    Yes, I was.
3        Q.    And then you would have known, as
4    far as the bid process in 2013, that the current
5    supplier was Moark; right?
6        A.    No.  Not for 100 percent of their
7    eggs, no.
8        Q.    What was your understanding when
9    you submitted the bid in 2013 as to who was
10    their supplier of their eggs?
11        A.    I knew Moark supplied them eggs.
12        Q.    Were you aware of any other
13    supplier?
14        A.    No.
15        Q.    And you understood at that time
16    that Moark would have been UEP Certified; right?
17        A.    At what time?
18        Q.    2013?
19        A.    That?
20        Q.    Moark was UEP Certified?
21        A.    Yes.
22        Q.    And they would have been UEP

---

**117**

1    Certified from 2006 up until 2013, as far as you
2    knew; correct?
3        A.    Yes.
4        Q.    Do you know who else submitted
5    bids in 2013?
6        A.    No.  I don't.
7        Q.    Okay.  Now, the -- do you know who
8    your principal competitors are with respect to
9    the AWG business, as far as egg producers?
10        A.    In what divisions?
11        Q.    In their Midwest division?
12        A.    Which Midwest division?
13        Q.    Kansas City, Oklahoma, Iowa?
14        A.    Those states?
15        Q.    Yeah.
16        A.    Okay.  I'm not aware of one in
17    Iowa, but with regards to Kansas City --
18        Q.    You bid on all the business;
19    right?
20        A.    Yes.
21        Q.    Both specialty and commodity?
22        A.    Yes.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

---

118

1    Q.   Okay.  Who did you understand your
2   principal competitors were going to be?
3        A.   Back.  Same question.  Are we
4   talking all their divisions?
5        Q.   In any of their divisions.  Yeah.
6        A.   I just want to be clear.
7        Okay.  In all divisions -- and
8   this is only because I know who the producers
9   are in the division, so I don't know who bid,
10  but if you're asking me who were my competitors
11  that are in the geographic locations for the bid
12  that I put in, that's all I can refer to,
13  because I have no knowledge of who all -- other
14  than Moark.  I don't know who else bid.  So.
15       Q.   You understood, though, that the
16  bid requirement, they wanted you to bid on all
17  the business; right?
18       A.   No.  I think we could have bid --
19  we could have bid or just certain divisions.
20       Q.   You bid on all their business?
21       MR. MONICA:  Objection.  Asked and
22  answered.

---

119

1        THE WITNESS:  Let me think.
2        My recollection is we bid on all
3   the business, to the best of my recollection.
4   BY MR. STUEVE:
5        Q.   And who would your competition
6   have been in the areas in which AWG's
7   distribution centers are located?
8        A.   Okay.  They would be Moark,
9   Sparboe, Centrum Farms, Cal-Maine, Midwest
10  Poultry, Creighton Brothers, Hillandale, Weaver,
11  Dutt and Wagner, Mahard, Feather Crest.  That's
12  the ones off the top of my head.  There could be
13  a few others.
14       Q.   Feather Crest, where are their
15  production facilities?
16       A.   In Texas.
17       Q.   Do you know how many hens they
18  own?
19       A.   More than a million.
20       Q.   They wouldn't have been able to
21  supply all of the eggs for all of Moark's
22  facilities; correct?

---

120

1        A.   Yeah.  I believe they would.  They
2   would have enough birds.
3        Q.   A million hens would do it?
4        A.   Uh-huh.
5        MR. MONICA:  Mr. Hinton, you have
6   to answer audibly.
7        THE WITNESS:  I'm sorry.  Yes.
8   BY MR. STUEVE:
9        Q.   What about Mahard?
10       A.   Yes.
11       Q.   Where are their facilities?
12       A.   Texas.
13       Q.   How many hens?
14       A.   Three to four million.
15       Q.   Is that where they're only located
16  is in Texas, to the best of your knowledge?
17       A.   They may have a farm over the line
18  in Oklahoma.
19       Q.   Okay.  What about Dutt and Wagner.
20  Where are their hens?
21       A.   Virginia.
22       Q.   And it's your testimony that they

---

121

1   would be able to submit a competitive bid on
2   AWG's business?
3        A.   They would have focused -- my
4   thought would be they would focus primarily on
5   Nashville.
6        Q.   Do you know how many hens they
7   have?
8        A.   Over a million,
9   a million-and-a-half.
10       Q.   What about Weaver?  Where are
11  theirs located?
12       A.   In Ohio.
13       Q.   And approximately how many birds?
14       A.   Seven million.
15       Q.   And would it be your assumption
16  that they would bid on the entire business?
17       A.   I think they would focus on
18  Nashville, as well.
19       Q.   And then what about Midwest
20  Poultry for their --
21       A.   Eight million.
22       Q.   Where are they located?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

122

1    A.   Indiana.
2        Q.   Is it your understanding that they
3    would have been in a position to bid on all the
4    business?
5            MR. HURLEY:  This is Ryan Hurley.
6    Object.  Lack of foundation.  Calls for
7    speculation.
8    BY MR. STUEVE:
9        Q.   Go ahead.
10       A.   They have enough birds -- I mean,
11   my -- you're asking my thinking.  I would think,
12   you know, logic would be Nashville.
13       Q.   Just because of the geographic
14   location; right?
15       A.   Yes.  Yes.
16       Q.   Because the transportation costs
17   could be prohibitive as far as submitting a bid
18   in all the distribution centers AWG business;
19   correct?
20           MR. MONICA:  Objection.  Calls for
21   speculation.
22           THE WITNESS:  Transportation is

123

1    one factor that goes into the price.  I can't
2    say what somebody is going to bid at.
3    BY MR. STUEVE:
4        Q.   What about Cal-Maine?  Where are
5    their birds?
6        A.   They -- I believe Cal-Maine has
7    birds in approximately 15 states.  I can --
8        Q.   And Central Farms?
9        A.   Iowa and -- well, they have a
10   sister company, Trillium, in Ohio.
11       Q.   But, again, where would you
12   anticipate they were going to submit a bid?
13       A.   Everything.
14       Q.   Everything for Centrum?
15       A.   Centrum and Trillium, together.
16   They're joint companies.  They just have
17   different names.
18       Q.   Okay.  How many birds do they
19   have?
20       A.   Over 20 million.
21       Q.   Okay.  In Indiana?
22       A.   No.  They're in Iowa and Ohio.

124

1        Q.   Okay.  Now, with respect to your
2    recollection with respect to the 2006 visit, you
3    recall going there prior to submitting the bid.
4    Do you recall any discussion with respect to any
5    specification requirements for that bid?
6        A.   I don't recall.
7        Q.   Did any of the e-mails that you
8    found have any specifications listed in them?
9        A.   I -- I don't recall.  I didn't
10   specifically look for the -- we may very likely
11   have them, but I didn't -- I didn't look for
12   that.
13       Q.   The 2006 bid, did you bid on all
14   their distribution centers?
15       A.   Yes.
16       Q.   Okay.  Do you know who else
17   submitted bids?
18       A.   Well, the only thing I know is
19   Moark, because we were told Moark kept the
20   business, so I know for a fact Moark did.
21       Q.   In 2006 were you aware that
22   Sparboe bid on that business?

125

1        A.   No.
2        Q.   In 2006 Sparboe was not UEP
3    Certified; correct?
4        A.   I don't recall the exact year that
5    Sparboe -- I can't say for sure exactly in 2006,
6    no, not off the top of my head.
7        Q.   But you know they left the UEP
8    Certified Program; correct, sir?
9        A.   Yes.  I know that.
10       Q.   Would it have been around
11   2005/2006 timeframe?
12       A.   I don't remember the time.
13       Q.   Okay.  Anything else that you
14   discussed with Amanda Jackson, besides the 2006
15   visit?
16       A.   I didn't discuss the 2006 visit
17   with Amanda Jackson.
18       Q.   I'm sorry.  Lindsey Sherman?
19       A.   Schepman.
20       Q.   Schepman?
21       A.   No.  That was mainly focused on
22   just what she recalled and looked at the e-mails

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

33 (Pages 126 to 129)

---

126

1   with her.  She reviewed the e-mails.
2        Q.   And so -- I just want to make sure
3   I understand everything that you both recall
4   after looking at the e-mails.  You did go out
5   and visit the AWG headquarters in Kansas City
6   and met with Joyce Owens; correct?
7        A.   Yes.
8        Q.   You recall that you submitted a
9   bid for all the business; correct?
10       A.   Yes.
11       Q.   And that Moark -- you recall being
12  advised Moark kept the business; is that
13  correct?
14       A.   Yes.
15       Q.   All right.  And you were not aware
16  of anyone else supplying eggs to AWG up to the
17  2013 bid; fair enough?
18       A.   Like I said, supplying but not
19  producing.
20       Q.   My question was supplying, sir?
21       A.   I don't have personal knowledge of
22  anyone else that was their vendor.

---

127

1        Q.   Okay.  And when -- you did not
2   come out and visit prior to submitting the bid
3   in 2013; is that correct?
4        A.   No.  That's not correct.
5        Q.   Okay.  I'm sorry.  You did come
6   out and visit prior to, in 2013?
7        A.   Yes.
8        Q.   Okay.  And who participated in
9   that meeting again?
10       A.   Myself and Amanda Jackson.
11       Q.   Okay.  Now I've got my dates
12  realigned here.
13            Okay.  And we -- let me drill down
14  on that meeting, because I don't think I've
15  asked you specifics about that.
16            How long were you at the AWG
17  headquarters?
18       A.   No more than a couple hours.
19       Q.   Okay.  And you met with Linda
20  Whiteside; is that correct?
21       A.   And Scott.
22       Q.   And Scott.

---

128

1        A.   I mentioned already.
2        Q.   And prior to that meeting did you
3   all request what the specifications would be for
4   the bid?
5        A.   They submitted an RFP to us,
6   asking us for information about our company and
7   what -- that they were -- and they requested
8   that we would come out for a meeting to discuss
9   their bid process.
10       Q.   That RFP, though, did not have
11  product specifications; is that correct?
12            MR. MONICA:  Objection.
13            THE WITNESS:  The -- I don't
14  remember if the RFP initially had it or not.
15  BY MR. STUEVE:
16       Q.   Okay.  But you do recall receiving
17  an RFP; is that right?
18       A.   Yes.
19       Q.   And a part of the RFP requested
20  that you come to visit before submitting a bid;
21  is that correct?
22       A.   Correct.

---

129

1        Q.   All right.  And when did you get
2   that RFP?
3        A.   It was last spring.
4        Q.   Okay.
5        A.   Last spring.  Yeah.
6        Q.   Spring of 2013?
7        A.   Yes.
8        Q.   All right.  And did you review
9   that in preparation for your deposition today?
10       A.   Yes.
11       Q.   Okay.  Do you recall who sent you
12  the RFP?
13       A.   I believe it was Linda.
14       Q.   Who did it go to at Rose Acre?
15       A.   To Lindsey Schepman.
16       Q.   And then what did she do with it
17  when she got it?
18       A.   She sent it to Amanda Jackson and
19  myself.
20       Q.   Okay.  And how long afterwards,
21  after getting the RFP did you set up a meeting
22  with AWG?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

34 (Pages 130 to 133)

---

130

1          A.   We met in -- I think the request
2   date was -- I believe it was June.
3          Q.   Okay.
4          A.   Yeah.  June.  They had some dates.
5   They said they were going to meet with
6   suppliers.
7          Q.   Okay.
8          A.   And there was like a two-day --
9   there was a two-day window that they wanted to
10  meet.  And I can't remember exactly those
11  two days, but it may have been even prior to
12  June.  It was last spring.  They had two dates.
13  Linda said there were two dates, wanted to know
14  if we could make one of those two dates.
15         Q.   Okay.
16         A.   And so we -- Amanda then
17  responded -- since Lindsey was no longer the one
18  that would have been the account rep, it was
19  Amanda's job, you know, Amanda contacted Linda
20  and set up the meeting.
21         Q.   Okay.  And do you recall what
22  specific information they wanted from you in the

---

131

1   RFP?
2          A.   Yeah.  There was -- there was
3   different questions about our company, our size,
4   our capabilities.  They asked -- there was a
5   question they asked us if we were UEP Certified.
6   There was -- I'm trying to remember if there was
7   financial -- our farm locations.  I'm trying to
8   think.  Our capabilities.  There was ten or 12
9   different things.  I can't remember every one.
10  We have a document.  I could --
11         Q.   Okay.  You remember looking at it,
12  though?
13         A.   Yes.
14         Q.   Okay.  And the question with
15  respect to UEP Certified, do you recall what
16  that question was, specifically?
17         A.   Yes.
18         Q.   What was it?
19         A.   It said, are you UEP Certified?
20  Yes or no.
21         Q.   Okay.  And did they ask about any
22  other standards that you may be in compliance

---

132

1   with?
2          A.   Yes.  They asked us if we were
3   SQF, which is our safe food quality standards.
4          Q.   Anything else they asked you
5   about?
6          A.   I think it was just our production
7   capabilities.
8          Q.   And why were they asking you about
9   the production capabilities?  What was your
10  understanding as to why they were asking that?
11         A.   I think just to know what our size
12  was as a company, because we had never really
13  had any contact with Linda before.
14         Q.   Also, they not only wanted size,
15  but they wanted locations; right?
16         A.   I -- I -- to the best of my
17  knowledge, yeah, they wanted to know where the
18  farms were located.
19         Q.   Okay.  And did you collect all
20  that information before going out there?
21         A.   We submitted information to them
22  before, prior to the meeting.

---

133

1          Q.   Okay.  And who did you submit it
2   to?
3          A.   To Linda.
4          Q.   Okay.  And then when you met with
5   Linda did you go over those questions?
6          A.   Yeah.  We had lengthy discussions
7   with Linda and Scott.  Amanda and I did.
8          Q.   Specifically, did you walk through
9   the questions that were in the RFP?
10         A.   I think the topics of it were
11  discussed.  I don't think we went down the list
12  of them, but, I mean, it was a pretty in-depth
13  meeting.
14         Q.   What was the primary focus of the
15  meeting, the in-person meeting?
16         A.   They wanted to get to know us
17  better.
18         Q.   Okay.  And specifically what were
19  they inquiring about, as far as getting to know
20  you better?
21         A.   I think as a company and what our
22  capabilities are and what we had to offer to AWG

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**134**

if we were chosen as a supplier. Just, you
know, general, what our -- so our approach to
the meeting was that we would give them a
history of Rose Acres. We would tell them all
about our company, the fact that, you know,
we're vertically integrated and just what all of
our capabilities were, about our food safety
program, about our animal welfare program. The
fact that we have a veterinarian on staff. The
fact that we have our quality control department
and we have microbiologists on staff. And, like
I said, discuss our farms, what farms we had and
which farms we had availability to supply them
from, our capabilities. Those kind of things.

    Q.  Did you talk to them about some of
your other customers that may be similar to
them?

    A.  No.

    Q.  Did you talk at all about any
capabilities as far as assisting the independent
retail grocers in promotions and those types of
things?

---

**135**

    MR. MONICA: Objection. Vague.
Ambiguous.

    THE WITNESS: No. Not -- not
specifically on promotions. No.

BY MR. STUEVE:

    Q.  Okay. Did you submit a bid, both
as to the specialty eggs and the commodity eggs?

    MR. MONICA: Objection. Vague.
Ambiguous.

    THE WITNESS: There -- yes. We
supply AWG commodity eggs and some specialty
eggs.

BY MR. STUEVE:

    Q.  The bid that you submitted,
though, included both; is that correct?

    A.  Yes.

    Q.  Okay. And with respect to the
specialty eggs, what specialty eggs did you bid
on?

    A.  I can't remember off the top of my
head the different specialty eggs. I know that
we -- we're currently supplying an organic egg

---

**136**

and a -- we supply two specialty eggs. I'm
trying to remember what the other one is. There
are two specialty eggs we are supplying to AWG
right now.

    Q.  Did your bid include all of your
specialty products?

    MR. MONICA: Objection. You can
answer.

    THE WITNESS: I don't remember
everyone that was on there. I would have to
review the bid again.

BY MR. STUEVE:

    Q.  Okay. And with respect to the
specialty eggs, would you have been the one that
would have been responsible for setting the
price?

    MR. MONICA: Objection.

    THE WITNESS: I would have worked
on setting a price.

BY MR. STUEVE:

    Q.  All right. And who else would
have assisted in that?

---

**137**

    A.  Amanda Jackson and Greg Marshall.

    Q.  And with respect to the specialty
eggs that you bid on, what was the margin that
you built in?

    MR. MONICA: Objection as to the
term "margin."

    THE WITNESS: Yeah. As I stated
before, there's no -- actually, you referred to
margin. I would refer to it as profit, really,
when we're looking at specialty eggs. We call
it profit, not margin, as a company, but the --
I can't sit there and tell you what that would
have been. And it changes. And one thing, our
profit, it can change, just, you know, basically
monthly, because it all evolves around our feed
costs. So it's not set. When we look at it we
put a -- we establish a profit in the beginning,
but it constantly changes.

BY MR. STUEVE:

    Q.  Right. And what I want to know is
what was the profit margin that you built in in
the beginning in your bid process?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

138

1       MR. MONICA:  Objection.
2       THE WITNESS:  Without reviewing
3   the prior, I don't recall.
4   BY MR. STUEVE:
5       Q.   What documents would you look to
6   to refresh your recollection?
7       A.   I would have to go back and look
8   at production costs at that time, and then what
9   our ultimate bid price was.
10      Q.   Is there -- you would have been
11  provided that information; is that correct, by
12  Mr. Marshall?
13      MR. MONICA:  Objection.
14      THE WITNESS:  In regards to the
15  specialty eggs?
16  BY MR. STUEVE:
17      Q.   On your costs?
18      A.   On the specialty eggs?
19      Q.   Yes.
20      A.   Okay.  Yes.
21      Q.   All right.  And in what form would
22  he have provided that to you?

---

139

1       A.   Okay.  Not all the specialty eggs.
2   On the organic eggs, we purchase those.  As I
3   stated before, all our organic eggs are
4   purchased from Herbrucks.
5       On the specialty eggs that we
6   produce, Greg Marshall provides a document to us
7   with those costs.
8       Q.   And --
9       A.   On Omega-3 or a cage-free egg.
10      Q.   And did it have a title on the
11  document?
12      MR. MONICA:  Objection.
13      THE WITNESS:  I don't -- I don't
14  remember what the title would be.
15  BY MR. STUEVE:
16      Q.   But it's a bid document?
17      A.   No.  It's not a bid document.
18      Q.   So he generates this from the
19  computer?
20      MR. MONICA:  Objection.
21      THE WITNESS:  Greg Marshall would
22  put together a cost document for us.

---

140

1   BY MR. STUEVE:
2       Q.   Specifically for the bid process;
3   correct?
4       MR. MONICA:  Objection.  Vague.
5       THE WITNESS:  Not specifically for
6   the bid process.  It's just they -- a document
7   that he generates based on what our, you know,
8   our costs are.
9   BY MR. STUEVE:
10      Q.   But he understands you're going to
11  use that in order to formulate a bid; is that
12  fair to say?
13      MR. MONICA:  Objection.  Calls for
14  speculation.
15      THE WITNESS:  Yes.
16  BY MR. STUEVE:
17      Q.   Okay.  And you take that document
18  that he prepares for you, that has the cost, and
19  then from there you add a profit margin onto
20  that and then submit the bid; correct, sir?
21      MR. MONICA:  Object to the
22  terminology, "profit margin."  You can answer.

---

141

1       THE WITNESS:  Yeah.  We would take
2   the document he provides us.  We would ramp up
3   other costs like packaging and freight and
4   whatever it may be, and then decide at that
5   point in time a profit what we wanted to add and
6   submit a bid, yes.
7   BY MR. STUEVE:
8       Q.   All right.  And those calculations
9   that you do where you add in the freight and
10  packaging and then add in the profit margin, is
11  that contained in a document?
12      MR. MONICA:  Object to the term,
13  "profit margin."  You can answer.
14      THE WITNESS:  The -- no.
15  BY MR. STUEVE:
16      Q.   So is it written down somewhere?
17      A.   On the pricing in the bid -- the
18  final price is submitted to the customer.
19      Q.   Right.  But the internal
20  calculation that has the margin added to the
21  cost, is that noted anywhere?
22      MR. MONICA:  Objection to the

---

142

1  term, "margin." Mischaracterizing.
2        THE WITNESS: The profit that we
3  add, I don't -- I don't have -- for the AWG --
4  we're talking about the bid for AWG. I don't
5  recall that I have a document that's stating
6  that. No.
7  BY MR. STUEVE:
8        Q. And sitting here today you don't
9  recall what that profit margin was?
10       MR. MONICA: Objection to the
11 term, "profit margin."
12       THE WITNESS: The profit that we
13 added in -- no. I don't recall today what that
14 profit is that we added at that time to the bid.
15 BY MR. STUEVE:
16       Q. Do you track whether or not you're
17 meeting or exceeding that margin?
18       MR. MONICA: Objection to the
19 term, "margin." You're mischaracterizing what
20 he's testified to. You can answer.
21       THE WITNESS: As far as the profit
22 on individual sales, we do not track that. No.

143

1  BY MR. STUEVE:
2        Q. Do you do any tracking with
3  respect to the sales to AWG as to the profit
4  that you're generating and whether or not that
5  exceeds or is below the margin that you had
6  utilized in submitting the bid?
7        MR. MONICA: Objection.
8  Mischaracterizes prior testimony. Counsel, you
9  keep twisting his words. You can answer.
10       THE WITNESS: Okay. Repeat,
11 please.
12       (The record was read as
13 requested.)
14       MR. MONICA: Same objection. You
15 can answer.
16       THE WITNESS: Yeah. The question
17 is kind of vague. If you're -- my answer --
18 BY MR. STUEVE:
19       Q. Let me back up.
20       MR. MONICA: Let him answer the
21 question.
22       THE WITNESS: My answer would be

144

1  we do not track profit -- I already said I don't
2  track profit on any --
3  BY MR. STUEVE:
4        Q. You said my question is vague. I
5  told you earlier, I do not want you to answer a
6  question that you don't understand. So if I
7  could?
8        MR. MONICA: Counsel, you're
9  interrupting his answer. You cut him off twice.
10       MR. STUEVE: The witness told me
11 the question is vague. I want to make sure the
12 record is clear.
13       MR. MONICA: If you want to
14 withdraw the question and ask a new one, you
15 can. But if you want him to answer that
16 question, he was answering it, you cut him off
17 twice.
18       Could you read it back, please.
19       MR. STUEVE: Again, I'm going to
20 caution the witness, if you answer my question
21 I'm going to assume you understood it.
22       MR. MONICA: Please read it back.

145

1  Thank you.
2        (The record was read as
3  requested.)
4        MR. MONICA: I want to lodge the
5  same objection. If you understand it, answer
6  it. If you don't, tell Mr. Stueve.
7        THE WITNESS: Yeah. I don't fully
8  understand the question.
9  BY MR. STUEVE:
10       Q. Okay. So you've described to me a
11 process that would have been utilized to submit
12 the bid to AWG in 2013 and in 2006 concerning
13 specialty eggs; correct?
14       A. Concerning speciality eggs;
15 correct.
16       Q. And what you've told me is you get
17 costs from Mr. Marshall, that's the chief
18 financial officer of the company. You then add
19 certain transportation, packaging and other
20 costs, and then you add a margin to that and you
21 then submit the bid; is that correct?
22       MR. MONICA: Objection.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

38 (Pages 146 to 149)

---

146

1   Mischaracterizes his prior testimony.  You can
2   answer.
3           THE WITNESS:  We get the cost.  We
4   add a profit to that.  At that time, that point
5   in time on what our costs were, then we add a
6   profit at that point in time and submit the bid.
7   BY MR. STUEVE:
8       Q.   And that profit, you testified
9   earlier, was a margin -- it could be anywhere
10  between 10 and $0.30 per dozen; is that right?
11          MR. MONICA:  Objection.  You're
12  asking him about Kroger.  You're twisting what
13  he said, counsel.  You can answer it.
14          THE WITNESS:  Yeah.  I guess -- do
15  you want to ask the question specifically to
16  AWG?
17  BY MR. STUEVE:
18      Q.   I just want to know, because your
19  counsel keeps accusing me of twisting, and I'm
20  not trying to twist anything, I'm trying to
21  track your testimony.
22          You used the term margin earlier

---

147

1   in your testimony.  You've also used the term
2   profit; right?
3           MR. MONICA:  Objection.  His
4   testimony speaks for itself.  You can answer the
5   question.
6           THE WITNESS:  Yes.  I testified
7   that we use -- internally we refer to it as
8   profit.
9   BY MR. STUEVE:
10      Q.   And that profit you understand is
11  the margin between the bid that you submit, the
12  difference -- let me back up.
13          The margin for profit is the
14  difference between the bid that you submit and
15  the costs, whether it's including the cost you
16  get from Mr. Marshall, packaging and
17  transportation.  That difference is the profit;
18  correct, sir?
19          MR. MONICA:  Object to the form of
20  the question.
21          THE WITNESS:  The -- the
22  difference between our costs, all of our costs

---

148

1   and our selling price on the specialty eggs
2   would be what we would consider a profit.
3   BY MR. STUEVE:
4       Q.   And you understood earlier, my
5   earlier questions, that's what I was referring
6   to when I was referring to a margin; correct,
7   sir?
8           MR. MONICA:  Objection.
9           THE WITNESS:  If you're referring
10  to the difference between all of our costs and
11  what we sell, if you refer to it as a margin and
12  I refer to it as a profit.  Yes.
13  BY MR. STUEVE:
14      Q.   Same thing; correct?
15          MR. MONICA:  Objection.
16          THE WITNESS:  I -- like I said, we
17  consider it to be a profit, is what we look at.
18  BY MR. STUEVE:
19      Q.   But if what we're talking about is
20  the difference between the sales price that you
21  bid and your costs, that difference, if I'm
22  using that -- if I'm describing that as a

---

149

1   margin, that's the same as your reference to
2   profit; fair enough?
3           MR. MONICA:  Objection.
4           THE WITNESS:  I guess it's
5   whatever your termination definition of margin
6   that you're going to use, but.
7   BY MR. STUEVE:
8       Q.   If I'm using my definition of
9   margin is the difference between the sales price
10  and Rose Acre's costs, if that's my definition
11  of margin that would be the same as your
12  reference of using profit; fair enough, sir?
13          MR. MONICA:  Object to the form of
14  the question.
15          THE WITNESS:  If you're saying
16  it's the same as what I'm saying is profit, then
17  yes.
18  BY MR. STUEVE:
19      Q.   I'm defining margin to mean the
20  difference between the sales price that you
21  submitted to AWG and your costs.  That would be
22  the same as your term "profit;" fair enough?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

150

1    MR. MONICA: Objection. You can
2  answer.
3    THE WITNESS: We're talking about
4  specialty eggs; correct?
5  BY MR. STUEVE:
6    Q.  Yes.
7    **A.  In reference to specialty eggs our**
8  **profit is the difference between what our costs**
9  **and what our bid price would be at that point in**
10 **time.**
11   Q.   Right. And so if I define
12 "margin" as the difference between your bid
13 price at the time and your costs, that would be
14 the same as your term, "profit;" fair enough?
15   MR. MONICA: Object to the form of
16 the question.
17   THE WITNESS: If that's what you
18 are saying.
19 BY MR. STUEVE:
20   Q.   Read back my question. If you
21 would just answer it for me, sir.
22   (The record was read as

---

151

1  requested.)
2    MR. MONICA: I'm going to assert
3  the same objection. Plus, now you've asked this
4  about ten times now. You can answer the
5  question.
6    THE WITNESS: I just go back to,
7  like I said, our definition of what we look at,
8  when we're looking at our costs and into our
9  bid, is what we deem as our profit.
10 BY MR. STUEVE:
11   Q.   The difference between the bid
12 price and your cost is what you're deeming
13 profit; correct?
14   **A.  At that point in time, yes.**
15   Q.   And if I'm defining margin as the
16 difference between your bid price and your cost
17 at the time you submit your bid, that would be
18 the same as profit; fair enough?
19   MR. MONICA: Same objection that I
20 just asserted.
21   Counsel, you're trying to force
22 him to use your word. He's already told you

---

152

1  about ten times, that it's called profit.
2    You can answer the question.
3    THE WITNESS: Yeah. I -- like I
4  said, you can call it what you want to call it.
5  We call profit on the difference between what
6  our costs are and what we sell for.
7  BY MR. STUEVE:
8    Q.   You've never used the term
9  "margin" to describe the difference between your
10 bid price and your cost at the time you
11 submitted the bid; is that your testimony, sir?
12   **A.  To AWG. Correct.**
13   Q.   Or internally?
14   **A.  On the AWG bid?**
15   Q.   No. I'm talking about the
16 specialty eggs. When you're referring to the
17 difference between your bid cost and the cost
18 you never used the term margin to describe the
19 difference. Is that your testimony?
20   MR. MONICA: Objection as to vague
21 and time period.
22   THE WITNESS: I don't recall.

---

153

1  Like I said, we always talk about profit.
2    MR. STUEVE: Why don't we take a
3  break.
4    THE VIDEOGRAPHER: The time is
5  12:05 p.m., and we are going off the record.
6    (Whereupon, at 12:05 p.m., a lunch
7  recess was taken.)

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**154**

1      AFTERNOON SESSION
2           (1:03 p.m.)
3           THE VIDEOGRAPHER:  This is the
4    start of media unit number three.  The time is
5    1:03 p.m. and we are back on the record.
6    BY MR. STUEVE:
7           Q.   I wanted to make sure I wrap up a
8    few things.  We were talking about your
9    preparation and the various people that you met
10   with on Wednesday, Thursday, Friday, and then
11   this morning.  I think I've walked through all
12   of the folks.  Is there anyone that I've missed
13   that you recall?
14          A.   Not specifically since Wednesday.
15   No.
16          Q.   Okay.  Is there any other
17   preparation that you did other than the two in
18   person meetings with your counsel, the meetings
19   with the various folks that we've talked about?
20   Anything else you did to prepare for your
21   deposition today?
22          A.   Yeah.  When I first received --

---

**155**

1           Q.   Exhibit 517?
2           A.   Yes.  I reviewed some -- I kind of
3    talked through some of the specific questions
4    with Amanda Jackson.
5           Q.   Okay.
6           A.   Just kind of going over the
7    information kind of in my mind, you know,
8    what -- what was going -- just kind of went
9    through the topics and we kind of discussed, I
10   can't say exactly in general everything, it was
11   just different customers.  A lot of it
12   pertaining to AWG even at that time because it
13   focused a lot with AWG and since she had a lot
14   of the contact with AWG I wanted to make sure
15   there wasn't something -- you know, if there was
16   anything I could gather that would be helpful I
17   would get that.
18               Prior to that, over -- basically
19   over the course of the last several years, I
20   mean you could say -- I didn't have the
21   knowledge of the 517, though, until, you know,
22   recently, but prior to that I was aware of the

---

**156**

1    lawsuit and, you know, I've been preserving
2    documents ever since, you know, I was told to by
3    counsel to preserve documents.  So I'm aware and
4    basically just my own knowledge of dealings I
5    guess I would say that I have, you know, working
6    knowledge of the different information, pricing
7    with customers and just in general, but.
8           Q.   My question, though, was focused
9    specifically with respect to the topics that
10   have been identified in Exhibit 517.  When you
11   got that it's your testimony that you met with
12   Amanda Jackson; is that right, and reviewed the
13   topics with her?
14          A.   Yes.
15          Q.   Did you review it with anyone else
16   the first time you got it?
17          A.   Not other than counsel.  No.
18          Q.   Okay.  And then we talked about
19   the two in person meetings with counsel;
20   correct?
21          A.   Yes.
22          Q.   And then we talked about your

---

**157**

1    discussions with the various folks at Rose Acre
2    last week up until this morning; right?
3           A.   Correct.
4           Q.   Is there anything else that you
5    did in preparation specifically for the topics
6    in Exhibit 517?
7           A.   No.  The rest of the information
8    is pretty much my knowledge of -- for all the
9    years I've done the business.  I felt I had
10   pretty good knowledge of the questions that were
11   asked.  So the ones that I didn't I went to the
12   people and talked with others just to make sure.
13          Q.   Right.  That's what I'm just
14   trying to make sure I've identified all the
15   specific preparation.  Have I identified, to the
16   best of your recollection, the specific
17   preparation that you did to testify with respect
18   to the topics in 517?
19          A.   Yes.
20          Q.   All right.  Now, I want to make
21   sure I understood and I understand your duties
22   as vice-president of sales.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

41 (Pages 158 to 161)

---

158

1    A.   Okay.
2    Q.   As I -- what I would like to do is
3 focus on the timeframe from '99 up until the
4 restructuring that you testified occurred in
5 2012?
6    A.   Okay.
7    Q.   During that little over a decade
8 period of time you would have been -- your title
9 would have been VP of sales; is that right?
10   A.   Yes.
11   Q.   And who would you have reported to
12 during that time?
13   A.   Marcus Rust.
14   Q.   Okay.  And if you would, could you
15 identify for me your specific responsibilities
16 during that time as VP of sales?
17   A.   I think I already did, but the
18 specific duties was I'm responsible for all
19 customer shell egg and egg product sales,
20 including basically whatever it needs to take
21 care of those customers in regards to setting
22 pricing, hiring staff to help support the

---

159

1 support of the customers, working with
2 transportation department and, you know, any
3 issues regarding the customers.  Overseeing,
4 talking with, you know, quality departments for
5 the different quality programs like SQF, the --
6 with the plants with all the farms, basically
7 the cooler managers who's responsible for
8 ultimately making sure that the customers orders
9 are produced and shipped.  You know, I had
10 contact with them over time, various times,
11 just, you know, specific customer issues.  If
12 customers have certain specs which have to abide
13 by, communicating that, either to people in my
14 department or directly with some of the farm
15 personnel, keeping an eye on packaging -- during
16 the period of time I was responsible to oversee
17 the purchasing of packaging, egg cartons, egg
18 cases, and then really anything encompassing the
19 sell of the shell egg and egg products, I was
20 directly responsible for.
21   Q.   Now, these responsibilities you
22 would have had up through the restructuring; is

---

160

1 that fair to say?
2    A.   Yes.  And I continue on today with
3 many of the same responsibilities.
4    Q.   That was going to be my next
5 question.
6         Were there any additional
7 responsibilities or changes in your
8 responsibilities after the restructuring?
9    A.   No.
10   Q.   Okay.  Now, prior to you -- as I
11 understand it, you joined Rose Acre in 1992; is
12 that right?
13   A.   No.
14   Q.   Okay.  I'm sorry.  When did you
15 join Rose Acre?
16   A.   1980?
17   Q.   1980.  Okay.  And then you took on
18 the responsibility of VP of sales in 1992?
19   A.   Approximately 1992.  Yes.
20   Q.   Okay.  And have your
21 responsibilities then been basically the same
22 since then, 1992?

---

161

1    A.   Yes.
2    Q.   Okay.  Prior to 1992 what were
3 your job responsibilities at Rose Acre?
4    A.   From -- okay.  You want to talk
5 about 1980?
6    Q.   What I want to focus on is 1980 to
7 1992.  What were your job responsibilities?  Did
8 you have various positions?  If so, just give me
9 a summary of those?
10   A.   In 1980 I hired in and my job
11 responsibilities was unloading carton trucks.
12   Q.   Okay.
13   A.   I did that -- I had that
14 responsibility for about four or five months.
15 And then I moved into -- when I graduated high
16 school I moved into the cooler and my
17 responsibilities were stacking egg cases on
18 palettes, getting ready for shipment.  During
19 that time of working in the cooler I had
20 different responsibilities, helped cooler, line
21 puller, pulling palettes away, putting them in
22 the warehouse.  And then started helping loading

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

42 (Pages 162 to 165)

---

162

1  egg trucks.
2          In approximately '90 -- I'm sorry.
3  In approximately '82 -- '81/'82 -- late '81
4  early '82 I was transferred to Jen-Acres -- that
5  first responsibility was all at Court Acres egg
6  farm.  In '81/'82 I transferred over to
7  Jen-Acres in North Vernon, Indiana.  At that
8  time I was put in charge of -- I was cooler
9  manager and also kind of overseen the egg
10 grading operations and did some house checks in
11 the chicken houses and I was there for about a
12 year -- a little over a year.  And at that time
13 I was transferred back to Court Acres in Seymour
14 and was put in charge of the egg cooler, cooler
15 manager in Seymour, and I basically held that
16 position of cooler manager up until late '88/'89
17 and at that time from '89 to '92 I was put in
18 charge of egg sales.
19     Q.   Both shell egg and egg products?
20     A.   Yes.
21     Q.   And who -- whose responsibility
22 did you take over?

---

163

1      A.   Donna Disque.
2      Q.   How do you spell her name?
3      A.   D-I-S-Q-U-E.
4      Q.   Is she still with the company?
5      A.   No.
6      Q.   When did she leave?
7      A.   Early '90s.
8      Q.   And then you took on the title of
9  VP of sales in '92 sometime; is that correct?
10     A.   Yes.
11     Q.   Okay.  Any other job
12 responsibilities you haven't identified between
13 '80 and 1992?
14     A.   I took on the responsibility, as I
15 mentioned, of egg packaging.  I was doing
16 some -- and that would have happened probably --
17 I think in and around '86, '85/'86 I was
18 responsible for buying our egg cartons and egg
19 cases.
20     Q.   Okay.  Any other responsibilities
21 we haven't talked about?
22     A.   No.

---

164

1      Q.   Now, do you have a college degree?
2      A.   No.
3      Q.   Okay.  When did you graduate from
4  high school?
5      A.   1980.
6      Q.   Okay.  So you directly -- had you
7  been working part-time at Rose Acre at that
8  time?
9      A.   When I hired in 1980 I was
10 part-time.
11     Q.   You were?
12     A.   Yes.
13     Q.   Starting in 1980?
14     A.   Yes.
15     Q.   Okay.
16     A.   February.
17     Q.   How old were you at that time?
18     A.   17.
19     Q.   Okay.  And how old are you now?
20     A.   52.
21         MR. MONICA:  It gets hard when
22 you're about 50.

---

165

1          MR. STUEVE:  Easy.  I'm 52, as
2  well.
3  BY MR. STUEVE:
4      Q.   Okay.  All right.  Again, I want
5  to focus on the 2000 to 2012 timeframe there
6  before the restructuring when you would have
7  been VP of sales.
8          As I understand it, during that
9  time period Amanda Jackson would have been
10 working for you; is that right?
11     A.   Yes.
12     Q.   And at that time she would have
13 been a shell egg sales rep; is that right?
14     A.   Correct.
15     Q.   And did she have a specific region
16 that she was assigned to?
17     A.   No.
18     Q.   Okay.  And what did she do as a
19 shell egg sales rep during this timeframe?  And,
20 again, we're talking about 2000 to 2012.
21     A.   2000 to 2012.  She called on
22 customers -- worked on -- took care of existing

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

166

1   customers, making visits, reviewing -- reviewing
2   just with customers -- a visit and talk to them
3   about the business.  Anything we can do better,
4   anything else that they want from us.
5          She would make sales calls on new
6   accounts and -- that's kind of anything
7   involving that.  Anything involving customers.
8   If you get a new account, following through,
9   submitting, you know, price letters to
10  customers.  Communicating that with the accounts
11  receivable department.  Just a lot of general
12  sales functions.
13      Q.   With respect to existing
14  customers, was she assigned to existing
15  customers?
16      A.   Nothing specific.  She worked with
17  all customers -- except for -- mainly shell
18  eggs.
19      Q.   Right.  And on the shell eggs side
20  was she assigned any specific account that she
21  was responsible for maintaining the customer
22  relations and maintaining contact?

---

167

1          A.   Between -- at the time from
2   2000 -- Lindsey and her worked with basically
3   all the customers.  They were seeing all the
4   shell egg customers between Lindsey and Amanda.
5       Q.   Lindsey Schepman?
6       A.   Schepman.
7       Q.   Schepman.  Okay.  So between the
8   two of them they were responsible during this
9   timeframe of maintaining existing customer
10  relations; is that right?
11      A.   Yes.  Along with myself.
12      Q.   Okay.  And would you -- would you
13  actually go out in the field and visit them?
14      A.   Yes.
15      Q.   Okay.  And did you have any
16  specific accounts, for example, larger customers
17  that you paid particular attention to?
18      A.   Yes.
19      Q.   And who were those?
20      A.   Dutch Farms, Save-A-Lot, CCF
21  Brands, B-R, Brands, and Aldie.
22      Q.   Those would have been your

---

168

1   accounts that you would have had particular
2   responsibility for?
3       A.   I would have had more direct
4   communication with them, but I had communication
5   with all customers.
6       Q.   Right.  And when you would go --
7   so first of all, Dutch Farms.  Can you tell us a
8   little bit more about Dutch Farms?
9       A.   Sure.
10          MR. MONICA:  Objection.  Vague.
11  Go ahead.  Go ahead.
12          THE WITNESS:  Dutch Farms is a --
13  they're a distributor.  They're located in
14  Chicago, Illinois and they sell shell eggs for
15  us.  They distribute for us -- I say us.  They
16  also sell for other producers, but they're an
17  egg distributor.
18  BY MR. STUEVE:
19      Q.   Is that also known as Boomsma, as
20  well, the same related entity?
21      A.   Well, I don't know about -- Brian
22  Boomsma is the owner, B-O-O-M-S-M-A.

---

169

1       Q.   All right.  And with respect --
2   then did they turn around and then sell your
3   eggs to independent retail grocers?
4       A.   They sold our eggs to a variety of
5   customers.
6       Q.   And what's that variety?
7       A.   Well, they sold eggs -- during
8   that period?
9       Q.   Yeah.
10      A.   They sold eggs to Wal-Mart.  They
11  sold eggs -- well, prior to 2000 they sold eggs
12  to AWG.  They sold eggs to Super Value.  They
13  sold eggs to Safeway.  And then various
14  independents in -- retail independents in the
15  Chicago market area.
16          They sold eggs to Piggly Wiggly in
17  Alabama.
18      Q.   Okay.  Now, when you met with
19  Dutch Farms what are the types of things that
20  you would do in order to try and increase the
21  volume of sales that they would be making of
22  your eggs?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

44 (Pages 170 to 173)

---

170

1      A.   They really worked on their own.
2  They -- Bruce Boomsma, who has passed away, he
3  was in charge of their sales during that time
4  and Bruce would work on new business and
5  accounts and then he would contact me to say he
6  had a customer he was working on and we would
7  discuss the customer and he would talk about
8  what their needs are and what eggs they were
9  looking for.  We would work out and I would give
10 him pricing and he had total direct with his
11 customers.  It was his accounts, not mine.
12     Q.   All right.  Would he approach you
13 about providing certain allowances or certain
14 promotions that would try to drive volume?
15     A.   He -- on existing accounts, if he
16 had an existing account and, yes, he would
17 ask -- from time to time if he wanted to run an
18 ad or promotion and he would come to me and say
19 can we, you know, can we do a deal on a
20 customer.
21     Q.   And when you say do a deal, would
22 he ask for a price concession?

---

171

1      A.   He would ask for a discount, a per
2  dozen discount on the eggs that he was buying.
3      Q.   Okay.  And would these be
4  commodity eggs or specialty eggs or both?
5      A.   Both.
6      Q.   Okay.  And when he would ask for a
7  discount that would be a discount off of the
8  negotiated price that you had in place with
9  Dutch Farms at the time?
10     A.   Yes.
11     Q.   Okay.  And let's take Dutch Farms.
12          We talked about -- we talked
13 about -- with respect to specialty eggs then,
14 would you have had an agreement in place that
15 would have included a price that when you
16 initially entered into it with him would have
17 included your cost plus profit for the specialty
18 eggs?
19     A.   For the specialty eggs he would
20 have had a set price.
21     Q.   Okay.  And that would have been
22 bid pursuant to your practice that you

---

172

1  identified earlier where you at the time of
2  bidding would identify all your costs and then
3  add profit and then give him the bid price; is
4  that fair to say?
5      A.   Yes.
6      Q.   All right.  And do you know during
7  this time period how often you would have
8  renegotiated this specialty egg price that you
9  had in place with Dutch Farms?
10     A.   I don't recall how often the price
11 would have been renegotiated.
12     Q.   Would it have been --
13     A.   We didn't sell Dutch Farms very
14 few specialty eggs.
15     Q.   But with respect to specialty
16 eggs, would it have been renegotiated every year
17 or would it have been a longer period of time?
18     A.   Annual is -- at least annually we
19 would look at it internally.  And if we needed
20 to go back to the customer or to Dutch Farms on
21 it then we would.
22     Q.   All right.  And then with respect

---

173

1  to Dutch Farms' commodity eggs, was that a
2  contract that would be based off of Urner Barry?
3      A.   Not only on I guess if you want to
4  talk about Urner Barry for the different
5  regions.
6      Q.   Did you have different prices
7  based off of different Urner Barry markets for
8  Dutch Farms?
9      A.   Yes.
10     Q.   Which Urner Barry region did you
11 use?
12     A.   The mid -- for Urner Barry we used
13 Midwest and the -- I think we used the South
14 Central in the past.
15     Q.   I'm focusing on this timeframe
16 between 2000 and roughly 2012?
17     A.   Yeah.  The Southeast market.
18     Q.   Okay.
19     A.   And the Rose Acre market.
20     Q.   With respect to the Midwest Urner
21 Barry, what portion of the business for Dutch
22 Farms would have fallen under that pricing

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**174**

structure?
  A.   During the whole period?  From 2000 to 2012?
  Q.   Uh-huh.
  A.   I don't know exactly when things changed -- early in 2000 and first part of 2000 we would have had -- it could have been as much as 50/50 between Urner Barry Midwest and Rose Acre market and then sometime in that period, I don't know exactly what year without looking it up, it would have transitioned more to the Midwest and today it's the majority.  The Midwest Urner Barry market.
  Q.   When you say 50/50 Midwedst Urner Barry then you said Rose Acre, what are you referring to?
  A.   We set a Rose Acre market.
  Q.   And was that -- was that published?  Was that publicly available?
  A.   Sure.  To my customers.
  Q.   Okay.  And how was the Rose Acre market priced different from the Urner Barry

---

**175**

Midwest market price?
  A.   The Rose Acre market is something that we've been setting for years.  And we base the Rose Acre market off of our own internal egg supply and so we determine for our customers what price it is.  So we move the market -- we only set it on Thursday once a week.  And so every Thursday we publish the Rose Acre market and sell customers off of that market.
  Q.   Why would a customer choose the Rose Acre as opposed to the Urner Barry Midwest?
       MR. MONICA:  Objection.  You can answer.
       THE WITNESS:  Yeah.  I guess the customer has to make their own determination.  I don't -- I can't be in the minds of what my customer are, but they look at our market.  They would see a history of what our market, how the Rose Acre market fell and made their decision to use that as what they bought from.
BY MR. STUEVE:
  Q.   So it was left up to the customer,

---

**176**

like Dutch Farms would decide whether they wanted to use the Urner Barry Midwest versus Rose Acre?
  A.   Yes.
  Q.   All right.  And would you provide the customer a history of the Rose Acre market as compared to Urner Barry?
  A.   Yes.
  Q.   And how would you provide that to them?
  A.   In a document.
  Q.   And what would it be called?
  A.   It really wasn't a heading.  It would have -- the document would have all four -- well, four of the Urner Barry regional markets and the Rose Acre market and it would give it every week a breakdown with a summary of the average at the bottom.
  Q.   Okay.  And would the Rose Acre typically fall below the Urner Barry?
       MR. MONICA:  Objection.  Vague.  You can go ahead.

---

**177**

       THE WITNESS:  Depending on the week.  Some weeks were above, some weeks were below.
BY MR. STUEVE:
  Q.   But on overall basis over a period of years, would it typically trend below or above?
  A.   Below.
  Q.   Okay.  And you indicated that there had has been a shift from Dutch Farms from that being kind of evenly split for their commodity purchases to almost all Midwest Urner Barry; is that correct?
  A.   Yes.
  Q.   Have they ever told you why?
  A.   Yeah.  I think their customers -- from what Bruce back when the change happened, Bruce had said that his customers preferred to follow the Midwest market.  They wanted to know -- they understood the Midwest market and knew it and they wanted to use the Urner Barry.
  Q.   Okay.  Now, what about Save-A-Lot?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

178

1  Can you describe what kind of a business they
2  had?
3      A.  Yeah.  Save-A-Lot is a subsidiary
4  of Super Value and they're located in Earth
5  City, Missouri.  They're made up -- they have
6  approximately 1,200 stores, I believe, which
7  about 75 percent are franchisees and the
8  remainder are company owned stores.
9      Q.  Okay.  So about 75 percent
10 franchisees and 25 percent company owned; is
11 that right?
12     A.  Yes.
13     Q.  And the franchisees would use the
14 Super Value brand name; is that right, on their
15 stores?
16     A.  Well, today what we pack for
17 Save-A-Lot is a brand called Coburn Farms, which
18 is a Save-A-Lot brand.
19     Q.  As far as the franchisees on the
20 stores, the name of the stores?
21     A.  They would be Save-A-Lot.  The
22 name would be Save-A-Lot.

---

179

1      Q.  And those franchisees, would they
2  purchase then a broad array of grocery products
3  from the Save-A-Lot company?
4      MR. MONICA:  Objection to the term
5  franchisee.  Calls for a legal conclusion.  You
6  can answer.
7      THE WITNESS:  Could you repeat the
8  question, just make sure I'm clear.
9      (The record was read as
10 requested.)
11     THE WITNESS:  Yes.
12 BY MR. STUEVE:
13     Q.  Okay.  And you would deal with the
14 company headquarters in bidding on both
15 commodity and specialty eggs; is that right?
16     A.  They buy no specialty eggs, but
17 commodity, yes.
18     Q.  Okay.  And in 2000 were they
19 buying commodity eggs from Rose Acre?
20     A.  Yes.
21     Q.  And have you had them as a
22 customer throughout?

---

180

1      A.  Yes.
2      Q.  The 2000 time period?
3      A.  Yes.
4      Q.  Are they a customer today?
5      A.  Yes.
6      Q.  And what market do they use with
7  respect to your commodity egg sales?
8      A.  They use the Midwest Urner Barry,
9  the Northeast Urner Barry, the Southeast Urner
10 Barry and the South Central Urner Barry and the
11 California Urner Barry markets.
12     Q.  Okay.  And you have separate bids
13 with respect to each of those markets that would
14 use those Urner Barry market prices?
15     A.  It's -- I don't have a separate
16 bid.  I've got -- they have warehouses in each
17 one of the different regions.
18     Q.  Right.
19     A.  The region the warehouse falls in
20 determines the market they purchase of of.
21     Q.  Right.  But the bid that you put
22 in when you're negotiating, would there then be

---

181

1  a separate bid price for each of those
2  distribution centers depending on which Urner
3  Barry market they're using?
4      MR. MONICA:  Objection.  Vague.
5  You can answer.
6      THE WITNESS:  The -- the bid price
7  is the same.  The difference is the regional
8  markets.
9  BY MR. STUEVE:
10     Q.  So the bid price, when you say the
11 bid price is the same, what do you mean?
12     A.  The discount to the Urner Barry
13 market.
14     Q.  Okay.  Would be the same?
15     A.  Yes.
16     Q.  Okay.  And what is that discount?
17     MR. MONICA:  Objection as to time.
18     THE WITNESS:  Yeah.  For what time
19 period?
20 BY MR. STUEVE:
21     Q.  Well, let's just take currently?
22     A.  Okay.  Currently the -- it's

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

182

1    **different for different products.**
2          Q.   Talking about shell eggs?
3          **A.   Yeah.  For the different items**
4    **that they purchase.  They -- it's not a one**
5    **price.**
6          Q.   Okay.  So let's break it up.
7          **A.   Okay.**
8          Q.   Why don't you walk me through it?
9          **A.   Okay.  The base price for large**
10   **eggs is -- let me think, 27 back.**
11         Q.   And that would be 27 back from the
12   Urner Barry market and which Urner Barry market
13   would be used would depend on where their
14   distribution center was located; fair enough?
15         **A.   Yes.**
16         Q.   All right.  And how does that
17   break out?
18         **A.   Medium's are 25 back.**
19         Q.   Okay.  So you've just identified
20   the base was the large egg.  Would that be
21   white?
22         **A.   White large.  Correct.**

183

1          Q.   White large at 27 back, which
2    means $0.27 back from the applicable Urner Barry
3    market?
4          **A.   Correct.**
5          Q.   And then the next break out would
6    be medium white?
7          **A.   Yes.**
8          Q.   And what is that discount?
9          **A.   25 back.**
10         Q.   All right.  And in-house is the
11   break out?
12         **A.   The only other item, they buy a**
13   **few brown eggs for one division in New York and**
14   **I'm not off the top of my head exactly what that**
15   **back is.  I would -- I don't remember exactly**
16   **what that is.**
17         Q.   Okay.  And how long have you had
18   this bid structure in place with Save-A-Lot?
19         MR. MONICA:  Objection as to form.
20   You can answer.
21         THE WITNESS:  This particular bid
22   has been a little over two years.

184

1    BY MR. STUEVE:
2          Q.   Okay.  And the prior bid that you
3    had in place with Save-A-Lot, how long had that
4    been in place?
5          MR. MONICA:  Object as to form.
6          THE WITNESS:  Prior to this
7    current bid, I don't recall exactly.  It's --
8    there could have been pricing changes over the
9    years.  We've had the account so long that I
10   can't remember each time we change.  I really --
11   I recall the last one, but, you know, prior to
12   that.
13   BY MR. STUEVE:
14         Q.   Would you go to your price sheet
15   folder to refresh your recollection?
16         **A.   Yes.**
17         Q.   All right.  And do you know if
18   that's been provided to counsel?
19         **A.   Yes.**
20         Q.   Do you remember when you provided
21   it to him?
22         **A.   When they scanned all my file**

185

1    **documents.**
2          Q.   When was that?
3          **A.   I think it's been a couple years**
4    **ago.**
5          Q.   Okay.  You had indicated earlier
6    that you had been told to preserve your
7    documents.  Do you remember that?
8          **A.   Yes.**
9          Q.   Do you remember when you were
10   told?
11         **A.   First time was maybe five years**
12   **ago.**
13         Q.   Anything more specific than that?
14         **A.   Well, I don't remember the exact**
15   **time.  It was when I was notified by counsel to**
16   **start preserving.**
17         Q.   Was that communication orally or
18   in writing?
19         **A.   Both.**
20         Q.   And do you remember what the
21   specific instructions were?
22         **A.   Not everything in the document,**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

186

but it was basically anything -- any e-mails or letters or communications with customers in regard to pricing and production that I was supposed to hold on to.

Q. Do you have -- sitting here today, do you have a specific recollection of all the things that were detailed in there?

A. Like I said, they -- they preserved all my e-mails and I have a filing cabinet in my office and they scanned it, to my knowledge, they scanned every document in the filing cabinet.

Q. Do you remember specifically what was in the instruction to you, in the written instruction as far as the scope of preservation?

A. Yes. All of what I just said.

Q. Well, on a going forward basis, is it your testimony that you have kept every e-mail that you have related to any of your customers?

A. Related to my customers in regard to pricing. Yes.

---

187

Q. Right. But if it doesn't relate to pricing have you deleted e-mails?

A. The pricing production, I don't think I've kept every art work e-mail I've had.

Q. Art work meaning ad, advertisement?

A. No.

Q. What do you mean?

A. Meaning cartons if someone changed an art work. I have some. I don't have every one.

Q. What about communications you've had back and forth about issues related to your eggs? Have you kept all those?

A. Yeah. I've got quality documents. I've got store check records. I keep every one of those. I've got tens of thousands of e-mails saved. I try to keep everything.

Q. Is that your practice, to do that?

A. After I was told to keep them. Yes.

Q. All right. What I'm asking you,

---

188

though, is there -- are there any e-mails that you get on a daily basis from customers that you don't keep?

A. Specifically what -- I mean?

Q. Just any. Is your testimony that you keep all communications with all your customers?

A. No. I said I didn't -- I don't think I kept all the art work and things like that.

Q. What else didn't you keep?

A. I don't know. I get so many e-mails. Specific to customers. We're talking about -- I don't recall which ones -- what I didn't keep, I mean, I get so many e-mails. I don't -- I don't know anything specific.

Q. Okay. Now, with respect to the Save-A-Lot, is it your testimony then you would have the pricing information going back to 2000?

A. Yes.

Q. Okay. And that would have been -- you would have kept that in hard copy or?

---

189

A. Hard copy and on my computer.

Q. Okay.

A. Not -- probably -- sometimes when I update the computer if I get a new one I print a hard copy and it's in my filing cabinet.

Q. And who's been your primary contact with Save-A-Lot?

A. Me.

Q. No. I mean at Save-A-Lot?

A. Oh, sorry. In that period it was Kim Fromme, F-R-O-M-M-E.

Q. Is she still with Save-A-Lot?

A. Yes.

Q. Okay. And would she approach you about certain promotions that they would like to run and ask if you would give certain discount off of the negotiated bid price?

MR. MONICA: Objection. Vague.

THE WITNESS: No.

BY MR. STUEVE:

Q. Did they ever run -- did they ever come to you with ideas on how to increase their

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

49 (Pages 190 to 193)

---

190

1　volume of purchases from Rose Acre?
2　　　　MR. MONICA: Objection. Vague.
3　You can answer.
4　　　　THE WITNESS: No. Not
5　necessarily.
6　BY MR. STUEVE:
7　　　Q. Did they ever run any promotions
8　involving Rose Acre's eggs?
9　　　A. Yes.
10　　　Q. Okay. And how would you be aware
11　of that?
12　　　A. The broker would ask me.
13　　　Q. And who was the broker?
14　　　A. During that period we had two
15　different brokers.
16　　　Q. Okay.
17　　　A. Early in 2000 that would have been
18　Peter Kroner from Marketing Concepts, KRONER.
19　And sometime during that period, I don't
20　remember the exact year, but we switched brokers
21　to Steve Dieso was the broker, but his company
22　name was -- I can't think of it off the top of

---

191

1　my head. Steve Dieso, he was a broker in
2　St. Louis. Peter Kroner was a broker in
3　Chicago.
4　　　Q. Who is the current broker?
5　　　A. Marketing Concepts. They took
6　over the role back from Steve Dieso about two
7　years ago. A little over two years. Maybe
8　three now.
9　　　Q. During the 2000 to 2012 time
10　period who was the broker?
11　　　A. During different times of that
12　year it was Marketing Concepts would have been
13　in 2000, but sometime during that timeframe
14　Steve Dieso was for a couple years.
15　　　Q. And how do you spell his last
16　name?
17　　　A. D-I-E-S-O. Dieso.
18　　　Q. And you said he's out of
19　St. Louis?
20　　　A. Yes.
21　　　Q. And why did you -- why are you no
22　longer using him?

---

192

1　　　　MR. MONICA: Objection.
2　　　　THE WITNESS: It was my choice to
3　go back to Marketing Concepts.
4　BY MR. STUEVE:
5　　　Q. Okay. Whose choice was it to use
6　Steve Dieso?
7　　　A. It was my choice. He was our
8　broker of record for that period of time.
9　　　Q. Why did you decide to go back to
10　Marketing Concepts?
11　　　A. Honest, I like working with Peter
12　Kroner, Marketing Concepts better. I think he
13　did a better job representing Rose Acre at
14　Save-A-Lot.
15　　　Q. Now, were there any other brokers
16　as head of sales that you used besides these two
17　companies during the 2000 to 2012 timeframe?
18　　　　MR. MONICA: Objection.
19　　　　THE WITNESS: For which products?
20　BY MR. STUEVE:
21　　　Q. Shell eggs?
22　　　A. 2000 to 2012. Yes.

---

193

1　　　Q. Okay. Who were they?
2　　　A. Oh. Daymond & Associates.
3　　　Q. Can you spell that for me, please?
4　　　A. I believe it's D-A-Y-M-O-N-D.
5　　　Q. And where are they located?
6　　　A. I don't actually know their
7　headquarters.
8　　　Q. Okay. Where was the person --
9　　　A. They're a national broker.
10　　　Q. Where was the person you worked
11　with out of at Daymond Associates?
12　　　A. Cincinnati.
13　　　Q. Okay. And for what time period
14　did you use Daymond Associates?
15　　　A. I think the first -- I don't know
16　the exact years. It's been for at least
17　six years or so.
18　　　Q. During that 2000 to 2012
19　timeframe?
20　　　A. Yes.
21　　　Q. All right. And are they still
22　working with Rose Acre?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

194

1    A.   Yes.
2    Q.   And who are you working with at
3  Daymond Associates?
4    A.   The person?
5    Q.   Yeah.
6    A.   I don't know.  I don't directly
7  work with them.
8    Q.   Who does?
9    A.   Amanda.
10    Q.   Any other brokers?
11    MR. MONICA:  Before you answer,
12  I'm going to object and request for a
13  clarification.  I'm not sure if we're still on
14  Save-A-Lot brokers or more generally.  I think
15  that might help.
16    THE WITNESS:  Are we talking about
17  all brokers?
18  BY MR. STUEVE:
19    Q.   Yeah.  That's what you understood;
20  didn't you?
21    A.   Yes.
22    Q.   Okay.

---

195

1    A.   I remember -- if you want I
2  remember Steve's company.
3    Q.   Okay.
4    A.   Alliance.
5    Q.   All right.
6    A.   I think that's all the brokers we
7  worked with.
8    Q.   Okay.  With respect to Daymond
9  Associates, what types of services do they
10  provide?
11    A.   They work in the supermarkets and
12  provide retail -- they work within the retail in
13  the supermarkets and they would do like
14  checking, stocking the shelves.  They review the
15  products on the shelves and if -- so I guess
16  manage the retail egg case would be the best way
17  to describe it.
18    Q.   For Rose Acre?
19    A.   Yes.
20    Q.   How are they compensated?
21    A.   They get paid a price per dozen
22  for their work.

---

196

1    Q.   So the more they sell the more
2  they make?
3    A.   The more eggs we sell to a
4  customer that they would be representing us on,
5  yes, the more they would make.
6    Q.   And which customers are assigned
7  to Daymond & Associates?
8    A.   Kroger and they do Topco,
9  T-O-P-C-O.
10    Q.   And what is Topco?
11    A.   Topco is a buying group that's
12  made up of a lot of -- they represent a lot of
13  regional grocery chains.
14    Q.   Where are they located?
15    A.   Chicago.
16    Q.   And how long has Topco been a
17  customer?
18    A.   Oh.
19    Q.   At least 2000?
20    A.   No.  Probably somewhere in that
21  period, but it would have been early 2000s,
22  maybe 2004, somewhere in that range.

---

197

1    Q.   Have they always had the name
2  Topco?
3    A.   That's the only way I've known
4  them.  I can't speak prior to when we did
5  business with them.
6    Q.   Who's your principal contact
7  there?
8    A.   It is -- I can see her face -- I
9  can't think of her name at this time.
10    Q.   Does anyone else work with Topco?
11    A.   Amanda.
12    Q.   And when you say buying group, are
13  they similar to Associated Wholesale Grocers?
14    MR. MONICA:  Objection.  You can
15  answer.
16    THE WITNESS:  Yeah.  I actually
17  don't know.
18  BY MR. STUEVE:
19    Q.   Okay.  You do know that they buy
20  grocery products on behalf of or they buy
21  grocery products and then resell them to
22  independent retail grocers; is that correct?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

51 (Pages 198 to 201)

---

**198**

1    A.   I know they represent several
2 supermarket chains.  The way I would think -- I
3 honestly don't know their exact structure, but
4 the way I would view it different is they
5 represent chain supermarkets, where I don't know
6 with AWG as their members, I don't know if
7 they're the same or not.  I don't know if it's
8 more of smaller chains or big chains.  I know
9 there's big chains in Topco.
10    Q.   Let me ask you this.  With respect
11 to Topco, though, are the sales that Rose Acre
12 makes, are they invoiced and shipped to Topco's
13 distribution centers?
14        MR. MONICA:  Objection.
15        THE WITNESS:  I -- one, I don't
16 know -- I'm not -- I have no knowledge of the
17 Topco distribution centers as far as that
18 product.  They -- we have a couple different
19 structures with Topco.
20 BY MR. STUEVE:
21    Q.   Okay.  What are they?
22    A.   There's accounts within Topco that

**199**

1 we invoice direct to Topco and there's accounts
2 in Topco that we direct -- we invoice direct to
3 the supermarket.
4    Q.   Okay.  When is the -- with respect
5 to Topco, do you sell both commodity and
6 specialty eggs?
7    A.   Yes.
8    Q.   Okay.  And are they one of the
9 larger customers of Rose Acres?
10    A.   Today, yes.
11    Q.   And approximately how much volume
12 do you do on an annual basis?
13    A.   Volume as in?
14    Q.   When you -- how do you -- how do
15 you internally define a larger customer?
16    A.   On how many truckloads they buy
17 per week.
18    Q.   All right.  How many truckloads
19 per week are you selling to them?
20    A.   On the ones we invoice them direct
21 and the ones we invoice the retailer?
22    Q.   Yeah.  Uh-huh.

**200**

1    A.   Approximately 30 loads.  And it
2 could go higher.  30 plus.
3    Q.   All right.  Each load, how many
4 cases are there?
5    A.   Approximately 840.
6    Q.   Now, when you deliver those loads
7 do you know where those loads go?
8        MR. MONICA:  Objection.
9 BY MR. STUEVE:
10    Q.   Do they pick up or both?
11    A.   Both.
12    Q.   Okay.  So let's break it up.
13 Approximately what percentage of the Topco
14 business does Topco pick it up?
15    A.   Topco don't pick up any direct, as
16 far as -- that I know of.  That's actually
17 Topco.  But their supermarkets that they
18 represent, about 70 -- a little -- maybe
19 80 percent is picked up and 20 percent we
20 deliver.
21    Q.   And the 20 percent that you
22 deliver, where are you delivering them?

**201**

1    A.   To Laredo, Texas.
2    Q.   And what is in Laredo, Texas?
3    A.   Their customer, Topco's.
4    Q.   What customer is it?
5    A.   Larroc.
6    Q.   Can you spell it for me, sir?
7    A.   L-A-R-R-O-C.
8    Q.   Is it their distribution center
9 there?
10    A.   They have a cross dock center
11 there.
12    Q.   So you're not actually delivering
13 any of your eggs directly to any retail grocery
14 store; is that correct?
15        MR. MONICA:  Objection.
16        THE WITNESS:  No.
17        MR. MONICA:  Go ahead.
18        THE WITNESS:  I guess -- for
19 Topco?
20 BY MR. STUEVE:
21    Q.   Yeah.
22    A.   No.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

---

**202**

Q. Is that correct, you're not?

A. I'm not. Not for Topco.

Q. Okay. Now, of the 80 percent that are being picked up by Topco's retail grocers, are they picking them up from what facilities?

A. For all their customers the pickup?

Q. The 80 percent?

A. The different farms?

Q. Uh-huh.

A. They pick up in our three farms in Iowa, Winterset, Iowa, Guthrie Center, Iowa, and Stuart Iowa, and they pick up at Lincoln County egg farm in Missouri.

Q. Now, with respect to Topco, do you know -- do you know anything about whether or not the customers, whether or not they get the rebates or patronage from Topco if they buy their eggs through Topco?

A. I have no knowledge of that.

Q. One way or the other?

A. I have no knowledge of that.

---

**203**

Q. Okay. When they are -- do you deal directly with any -- and make any direct sales to any of Topco's customers?

A. What do you mean by direct sales?

Q. Well, so you've got the -- you said 80 percent -- let me ask you this. When you're dealing with Topco, who's the primary person at Rose Acre that's dealing with Topco?

A. Amanda.

Q. And she's assisted with the broker; is that right?

A. In regards to what?

Q. There's a broker involved with that account; right?

A. For the retail -- for the display cases.

Q. Okay. And what does the broker do for Topco's customers?

A. They work at the store level and take care of the display cases.

Q. Okay. Do they assist in the

---

**204**

promotion of Rose Acre's eggs at the store level?

MR. MONICA: Objection.

THE WITNESS: Not directly from me. Not from Rose Acres.

BY MR. STUEVE:

Q. So, for example, if one of the large grocery chains that purchased through Topco wanted to run a promotion on Rose Acre's eggs, would they reach out to the broker or they would reach out directly to Rose Acre to discuss that?

MR. MONICA: Object to the form. You can answer.

THE WITNESS: They would reach out to Topco corporate and Topco corporate would reach out to Amanda.

BY MR. STUEVE:

Q. Okay. And when Topco would reach out to Amanda what types of things would Topco typically ask Rose Acre to do with respect to the promotion?

---

**205**

MR. MONICA: Objection. You can answer.

THE WITNESS: Topco's came to Rose Acres and asked that could we provide a discount on eggs for a particular promotion or for a time period to one of their customers.

BY MR. STUEVE:

Q. Okay. And how would that be communicated from Topco to Rose Acre?

A. The girl is Kathy. I'll think of her last name. Kathy would contact Amanda or Amanda and Matt now because Matt assists Amanda with that. So and Kathy would communicate that back to them to say -- is there something we could do for a promotion.

Q. All right. And then would they consult you about that?

A. Yes.

Q. And you would then authorize a certain discount off of the existing bid price?

A. Yes.

Q. All right. And what else -- what

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

53 (Pages 206 to 209)

---

206

1  other information -- would that then be
2  communicated back to Topco?
3       A.   Yes.
4       Q.   So you would be aware of the
5  timeframe in which the promotion would be
6  running; is that correct?
7       A.   Correct.
8       Q.   You would be aware of the discount
9  that was being provided to the customer; right?
10      A.   I would be aware of the discount
11  per dozen that we offer.  Correct.
12      Q.   And your understanding is that
13  that discount would be offered to Topco's
14  customer; correct?
15      A.   Yes.
16          MR. MONICA:  Object.
17  BY MR. STUEVE:
18      Q.   All right.  And then would that
19  also give you an indication of perhaps the
20  volume that may be being generated from that
21  promotion?
22      A.   No.

---

207

1       Q.   It was your hope, though; right,
2  that by providing the discount off of the bid
3  price that that would drive volume to those
4  stores; correct?
5          MR. MONICA:  Objection.
6          THE WITNESS:  Not always.  No.
7  BY MR. STUEVE:
8       Q.   I'm not asking actually.  I asking
9  you, you're in the business to make a profit;
10  right, Mr. Hinton?
11      A.   I'm in the business to sell eggs.
12      Q.   At a profit; right?
13      A.   Hopefully then they would make a
14  profit.  Yes.
15      Q.   So one of the reasons why you
16  would participate in a promotion in which you
17  were discounting your eggs is that would
18  drive volume and increase the volume of
19  purchases of your eggs so hopefully you could
20  make a profit; correct?
21          MR. MONICA:  Objection.
22          THE WITNESS:  We don't always make

---

208

1  a profit.
2  BY MR. STUEVE:
3       Q.   I'm not asking what you always do.
4  I'm asking your hope and intent is that by
5  offering this discount to Topco's customers that
6  will drive volume and hopefully ultimately
7  result in a profit to Rose Acres; fair enough?
8          MR. MONICA:  Objection.
9          THE WITNESS:  No.
10  BY MR. STUEVE:
11      Q.   So you're out of the goodness of
12  your heart providing this discounted to Topco's
13  customers; is that your testimony?
14          MR. MONICA:  Objection.
15  Argumentative.
16          THE WITNESS:  What's the question?
17          MR. STUEVE:  Read him back the
18  question.
19          MR. MONICA:  Same objection.  You
20  can answer.
21          THE WITNESS:  I offer the discount
22  because of my relationship with Topco.

---

209

1  BY MR. STUEVE:
2       Q.   And you're hoping that that
3  relationship will grow; correct?
4       A.   Correct.
5       Q.   And if that relationship grows it
6  means greater volume; correct?
7          MR. MONICA:  Objection.
8          THE WITNESS:  If the relationship
9  grows it hopefully will result in greater
10  volume.
11  BY MR. STUEVE:
12      Q.   And what you're hoping is that
13  will result in greater profits to Rose Acre;
14  fair enough?
15      A.   On -- are we talking back to a
16  specific discount or are we talking about the
17  program overall?
18      Q.   I'm going to ask you to read back
19  the question and I'll give you one more chance
20  to answer it and I'll move on.
21          (The record was read as
22  requested.)

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

54 (Pages 210 to 213)

---

210

1      MR. MONICA: Objection. Vague.
2  Please answer.
3      THE WITNESS: We're -- I'm not
4  guaranteed any profits.
5  BY MR. STUEVE:
6      Q.   That's not my question.
7      My question is real simple.
8      You testified that you would offer
9  the discount with the hope of growing the
10  relationship with Topco; correct?
11      **A.   I offer the discount to work with**
12  **the customer, specifically we're talking about**
13  **Topco and what they ask for. I offer them a**
14  **discount because they asked for it.**
15      Q.   And you -- you're hoping, though,
16  by meeting their request and providing the
17  discount that that will grow the relationship.
18  You've already admitted that would be one of the
19  reasons why you did it; is that correct?
20      **A.   I feel strongly that that would**
21  **help with growing the relationship by working**
22  **with my customers. Yes.**

---

211

1      Q.   And what you're hoping is by
2  growing the relationship that that is going to
3  grow the volume of sales to that customer; fair
4  enough?
5      **A.   If they indeed expand, yes. We'll**
6  **grow sales.**
7      Q.   And then what you're hoping is
8  when you grow those sales that that will
9  increase the profits for Rose Acre; fair enough?
10      **A.   I'll say it -- it has potential to**
11  **increase the profits.**
12      MR. STUEVE: I need to take a
13  restroom break.
14      MR. MONICA: Okay.
15      MR. STUEVE: Do you want to start
16  back up in 10 minutes?
17      MR. MONICA: Yeah.
18      THE VIDEOGRAPHER: The time is
19  2:09 p.m. and we're going off the record.
20      (A brief recess was taken.)
21      THE VIDEOGRAPHER: This is the
22  start of media unit number four. The time is

---

212

1  approximately 2:19 p.m. and we are back on the
2  record.
3  BY MR. STUEVE:
4      Q.   I want to be clear. Topco has
5  been a customer of Rose Acre for several years
6  now; is that correct?
7      **A.   Yes.**
8      Q.   And you, along with Amanda
9  Jackson, have been the primary contact; is that
10  right?
11      **A.   Yes.**
12      Q.   Have you ever been to their
13  headquarters?
14      **A.   I have not -- no. I'm sorry. I**
15  **was at their old headquarters years ago, like**
16  **prior -- probably prior to 2000.**
17      Q.   Okay.
18      **A.   One time.**
19      Q.   And have they been a customer of
20  Rose Acre since 2000?
21      **A.   No. It was, as I think I stated**
22  **earlier, it was in that '04/'05 area, I believe**

---

213

1  it was.
2      Q.   You were soliciting their business
3  prior to that time; is that correct?
4      **A.   Yes.**
5      Q.   Who was their principal shell egg
6  supplier?
7      **A.   When?**
8      Q.   When you were trying to solicit
9  their business?
10      **A.   Back in the '90s?**
11      Q.   Uh-huh.
12      **A.   I don't really know. I think -- I**
13  **think they -- I know today they have multiple**
14  **suppliers, so.**
15      Q.   Who else supplies them besides
16  Rose Acre?
17      **A.   I know Hillandale supplies them.**
18  **I guess -- I would be speculating. I honestly**
19  **don't know all their suppliers, but I've got**
20  **some ideas who may supply them, but I don't know**
21  **for a fact.**
22      Q.   Who are the ones you think may be

---

214

1  supplying them?
2      A.  I think on the East Coast Sauder.
3  Krieder.  I think Krieder may supply them,
4  possibly Weavers.  Moark may be a supplier to
5  them.  Cal-maine, possibly.  And those would be
6  the ones that come to mind that I would think
7  just, you know, because of where there members
8  geographic areas may be their suppliers.
9      Q.  When you talk about members,
10 you're talking about Topco; right?
11     A.  Yes.
12     Q.  You understand Hy-Vee is one of
13 those members; right?
14     A.  Yes.
15     Q.  There are several large grocery
16 chains that are member owners of Topco; correct?
17     A.  That are members --
18         MR. MONICA:  Objection.
19         THE WITNESS:  They get eggs --
20 Topco puts out bids on eggs on several, like I
21 said, several big regional supermarket chains.
22 BY MR. STUEVE:

215

1      Q.  Now, when they're running a
2  promotion -- when Topco is running a promotion
3  they come to you, they ask you for a discount,
4  and when I say you, Rose Acre, you would be
5  involved in making that decision whether or not
6  to provide the discount; is that correct?
7      A.  Yes.
8      Q.  And have you -- when they have
9  approached Rose Acre, have you always agreed to
10 do the discount for the promotion?
11     A.  No.
12     Q.  Okay.  How often have you said no?
13     A.  I don't recall.
14     Q.  Several times?
15     A.  Yes.
16     Q.  And why did you say no?
17     A.  My -- it could be for various
18 reasons.  It depends on the time of the year for
19 promotion.  It depends on what our supply, if
20 it's something that -- if it's a promotion that
21 whether I think it's something we can meet.
22 Depends on what they're asking for.  What kind

216

1  of a discount they would like to see for
2  promotion.  To say no -- it depends on the
3  supply of eggs at the time whether I, you know,
4  agree to a promotion or not.
5      Q.  Okay.  Obviously whether or not
6  that's economically beneficial to Rose Acre is
7  one of the factors you consider; right?
8      A.  What's your definition of
9  economically beneficial?
10     Q.  Whether or not from a business
11 standpoint it makes sense to you to give the
12 discount that Topco is asking for?
13     A.  Like I said, we determine it based
14 on what's our availability of eggs at the time.
15 If it's something -- if I think I can meet what
16 they're asking for and if the discount they're
17 asking for would make economic sense for Rose
18 Acres, yes.
19     Q.  And when you use economic sense,
20 what do you mean by that?
21     A.  The -- the amount, the promotion
22 they're asking for, if I think it's too much of

217

1  a discounted or not.
2      Q.  If it's too much of a discount
3  meaning you could lose money on the deal you're
4  not going to do it; fair enough?
5          MR. MONICA:  Objection.  Form.
6          THE WITNESS:  The amount of
7  discount doesn't determine whether I make or
8  lose money.
9  BY MR. STUEVE:
10     Q.  It's certainly a factor; right?
11     A.  Depending on what the egg market
12 is at the time and what the selling price of the
13 eggs are.
14     Q.  Right.  So it could only be a
15 $0.03 discount, but depending on the egg market
16 at the time that small discount may be too much;
17 right?
18     A.  Yes.
19     Q.  All right.  Now, when you do agree
20 to the promotion how is that documented within
21 Rose Acre?
22     A.  Matt or Amanda or Lindsey would

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

218

1  send an e-mail to our accounts receivable
2  department, notifying them of the discount to be
3  given so they could invoice the product
4  correctly.
5      Q.    And I assume they would give them
6  the start date of the discount and the end date?
7      A.    Yes.
8      Q.    All right.  And also the specific
9  locations that are at issue?
10     A.    The specific customer that would
11 be -- and specific product that's being
12 discounted.
13     Q.    All right.  Now.  Is it your
14 understanding that Topco assists their members
15 with respect to that promotion, for example, if
16 there's advertising that's done that they assist
17 their members in the advertising?
18         MR. MONICA:  Objection.  Vague.
19         THE WITNESS:  I don't know.  It
20 doesn't involve us.
21 BY MR. STUEVE:
22     Q.    Okay.  What I'm asking you, you

---

219

1  have no knowledge of whether Topco assists their
2  members with respect to the advertising of the
3  promotion that you're agreeing to give a
4  discount?
5      A.    No.  Like I said, that just
6  doesn't involve us.  We only discuss what we
7  sell to Topco.
8      Q.    Do you ever go to any of Topco's
9  customers and determine what the retail price
10 that they're selling your eggs at?
11     A.    No.
12     Q.    You've never been into any of
13 their stores to determine their -- the egg
14 prices that Rose Acre eggs are being sold?
15     A.    I've been in stores and I have
16 seen prices they sell eggs at.
17     Q.    Topco member stores?
18     A.    Yes.
19     Q.    Okay.  And do you have a specific
20 employee that's assigned to inspecting and going
21 to Topco customers' stores?
22     A.    I have an employee that does store

---

220

1  checks and does quality store inspections at
2  stores that would include Topco member stores.
3      Q.    And which employee is that?
4      A.    Well, it's today, Travis Kuntz.
5      Q.    And consist with your testimony
6  earlier, he does put on his report what the
7  prices that those stores are selling Rose Acre
8  eggs on his daily reports; correct?
9      A.    He does sometimes.
10     Q.    Okay.  Now, does Rose Acre do any
11 other tracking of prices, retail prices, for any
12 of its customers?
13         MR. MONICA:  Objection.
14 Mischaracterizes prior testimony.  Also, vague
15 as to the term tracking.
16         THE WITNESS:  Could you repeat the
17 question.
18         (The record was read as
19 requested.)
20         THE WITNESS:  We don't track
21 retail pricing for our customers.
22 BY MR. STUEVE:

---

221

1      Q.    Well, sir, you've testified that
2  Mr. Kuntz includes in his reports what the
3  retail prices are at the facilities that he is
4  inspecting; correct?
5          MR. MONICA:  Objection.
6  Mischaracterizes this witness' prior testimony.
7          THE WITNESS:  I said that
8  Mr. Kuntz sometimes puts down the retail price
9  of the eggs when he does his quality
10 inspections.
11 BY MR. STUEVE:
12     Q.    Okay.  Other than that information
13 that -- well, let me ask you this.
14         Do your other folks who do the,
15 for example, Drew Royalty, does he include the
16 retail prices of the facilities, the
17 supermarkets that he inspects?
18     A.    He has on occasion.
19     Q.    Okay.  And who else does the
20 actual supermarket inspections besides Drew and
21 Mr. Kuntz?
22     A.    Mark Anchorage.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

57 (Pages 222 to 225)

---

222

1    Q.   And when he does that does he also
2  include retail pricing in his reports?
3       **A.   Yes.  He occasionally includes**
4  **retail pricing.**
5       Q.   Now, but it's your testimony that
6  you do nothing with that information in those
7  reports; right?
8       **A.   Yes.**
9       Q.   Okay.  Now, is there any other
10 documentation of retail prices of eggs, shell
11 eggs, specialty eggs, that Rose Acre has in its
12 possession besides those daily reports that on
13 occasion will have that information?
14      MR. MONICA:  Objection.
15      THE WITNESS:  Can you repeat that.
16      (The record was read as
17 requested.)
18      MR. MONICA:  Same objection.
19      THE WITNESS:  I don't know for
20 sure.
21 BY MR. STUEVE:
22      Q.   Okay.  And it's your testimony

---

223

1  that when you're setting pricing on commodity
2  eggs for your customers that you do not rely on
3  any publicly available information concerning
4  the retail sales price of shell eggs?
5       **A.   Can you repeat that, make sure I'm**
6  **clear.**
7           **(The record was read as**
8  **requested.)**
9       THE WITNESS:  Correct.
10 BY MR. STUEVE:
11      Q.   Okay.  Now, are there any other
12 employees employed by Rose Acre that track or
13 note on any report retail sales price of shell
14 eggs?
15      MR. MONICA:  Object to the term
16 track.  Vague and ambiguous.
17      THE WITNESS:  I don't recall any
18 reports today that we would have that we were
19 tracking the retail prices.
20 BY MR. STUEVE:
21      Q.   Whether -- any reports that have
22 any reference to retail prices?

---

224

1       **A.   That would -- to retail prices.**
2           **That we would have that we would**
3  **have today that we're doing?  Is that what the**
4  **question?**
5       MR. STUEVE:  Read back my
6  question.
7       (The record was read as
8  requested.)
9       MR. MONICA:  Object to the form.
10 You can answer, please.
11      THE WITNESS:  Reports.  I don't
12 know for sure.
13 BY MR. STUEVE:
14      Q.   Who would know?
15      **A.   I would have to -- it would be in**
16 **my files.**
17      Q.   What files would you look to?
18      **A.   Our computer files in the sales**
19 **department.**
20      Q.   Okay.  Do your brokers provide you
21 information with respect to retail pricing?
22      **A.   No.**

---

225

1       Q.   Okay.  Now, you testified that
2  with respect to Save-A-Lot that the broker has
3  been Marketing Concepts and Alliance; is that
4  correct?
5       **A.   Correct.**
6       Q.   And it's currently Marketing
7  Concepts; is that correct?
8       **A.   Yes.**
9       Q.   The broker would also come to you
10 to ask for discounts for promotions for
11 Save-A-Lot; is that right?
12      **A.   Yes.**
13      Q.   And how frequently would you grant
14 discounts for promotions for Save-A-Lot?
15      **A.   Approximately twice a year.**
16      Q.   How frequently would you do that
17 for Topco?
18      MR. MONICA:  Objection.  Asked and
19 answered.  You can answer.
20      THE WITNESS:  For -- I don't know
21 exactly how many for Topco.  It's been more
22 often than two.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

58 (Pages 226 to 229)

---

226

BY MR. STUEVE:
Q.   More than four times a year?
**A.   Are we -- for all Topco members?**
Q.   For any Topco members?
**A.   Well, individually?**
Q.   Yeah.
**A.   Yes.**
Q.   Okay.  It would be several times a year?
**A.   Yes.**
Q.   Okay.  Now, back to Save-A-Lot.  Would the broker assist the franchisees of Save-A-Lot with respect to the promotions being run on Rose Acre eggs?
MR. MONICA:  Objection as to the term franchisee.  Calls for a legal conclusion.  You can answer.
THE WITNESS:  Not to my knowledge.
BY MR. STUEVE:
Q.   Okay.  Do you know whether or not Save-A-Lot would assist the franchisees with respect to the promotion and advertising of the

---

227

egg discounts?
MR. MONICA:  Same objection.  Please answer.
THE WITNESS:  It's -- that they would -- I don't get involved in that.
BY MR. STUEVE:
Q.   Would anyone at Rose Acre be involved in that?
**A.   No.**
Q.   Okay.  Would you be aware of, though, the advertising that was being run?
MR. MONICA:  Objection.  Vague.
THE WITNESS:  The advertising as to a price?
BY MR. STUEVE:
Q.   Yeah.
**A.   I have been -- not all the time.**
Q.   But you have been privy to that information on occasion; is that correct?
**A.   I have been told before what price they were running in the newspaper ad.**
Q.   All right.  And who would have

---

228

told you that from Save-A-Lot?
**A.   No one from Save-A-Lot.**
Q.   The broker?
**A.   Yes.**
Q.   Okay.  Would you on occasion be provided copies of the advertisements?
**A.   I did once.**
Q.   Okay.  And with respect to Topco, would you also be advised as to what the discount price was going to be in the advertisement?
**A.   No.**
Q.   Okay.  And that's never happened?
**A.   No.  Not that I can recall.**
Q.   Are you ever provided a copy of the advertisements for the Topco promotions?
**A.   Not that I recall.**
Q.   Have you ever had anyone at Rose Acre collect those?
**A.   No.**
Q.   Okay.  But you do recall that happening with respect to the broker for

---

229

Save-A-Lot?
MR. MONICA:  Objection.  Mischaracterizes his prior testimony.
THE WITNESS:  I have been provided recently with a newspaper ad that Save-A-Lot ran an ad on promotion of eggs.
BY MR. STUEVE:
Q.   And who provided that to you?
**A.   The broker.**
Q.   Okay.  But I thought your earlier testimony was you were made aware of that advertising price prior to the promotion; is that correct?
MR. MONICA:  Objection.  Mischaracterizes his prior testimony.  You can answer it.
THE WITNESS:  Yes.  I was made aware, but I was provided after the ad.
BY MR. STUEVE:
Q.   Okay.  And what broker made you aware before the promotion what the ad price was going to be?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

59 (Pages 230 to 233)

---

230

1          MR. MONICA:  Objection.  Vague.
2          THE WITNESS:  Market Peter Kroner.
3    BY MR. STUEVE:
4      Q.    Peter Kroner.  And he's with
5    Marketing Concepts; is that correct?
6      A.    Yes.
7      Q.    Okay.  Now, you also mentioned one
8    of your principal customers that you had
9    responsibility for was CCF Brands?
10     A.    Correct.
11     Q.    And that's the distributor for
12   Wal-Mart; is that correct?
13     A.    Yes.  They work with Wal-Mart.
14     Q.    Okay.  They're not an egg
15   producer; right?
16         MR. MONICA:  Objection.
17         THE WITNESS:  Well, they -- no.
18   They have production.
19   BY MR. STUEVE:
20     Q.    It's fair to say, though, that the
21   majority of the eggs that they sell to Wal-Mart
22   they're not producing; correct?

---

231

1          MR. MONICA:  Objection.  Calls for
2    speculation.
3          THE WITNESS:  I don't know
4    exactly, you know, what are the relationships
5    with all the producers, but they -- to my
6    knowledge, the only birds I was aware they owned
7    they own birds in Green Forest, Arkansas.
8    BY MR. STUEVE:
9      Q.    And approximately how many birds
10   do they own that you're aware of?
11     A.    At that location less than
12   a million.
13
14     Q.    Now, what type of contracts did
15   you enter into with CCF Brands, both commodity
16   and specialty?
17     A.    I have sold CCF Brands commodity
18   and specialty eggs.  Yes.
19     Q.    Okay.  And let me back up for a
20   minute.  Topco, currently what percentage of
21   your shell eggs, your commodity shell eggs do
22   you sell to Topco?

---

232

1      A.    What percentage of commodity shell
2    eggs do I sell to Topco?
3      Q.    Yeah.
4      A.    As compared to what?
5      Q.    Your other customers, your other
6    egg shell customers?
7          MR. MONICA:  Objection.
8          THE WITNESS:  So you want to know
9    what percentage of my sales are of commodity
10   eggs to Topco compared -- how they rank with my
11   other customers?
12   BY MR. STUEVE:
13     Q.    Uh-huh.
14     A.    All shell egg customers?
15     Q.    Uh-huh.
16     A.    Less than 10 percent.
17     Q.    Where would AWG fall?
18         MR. MONICA:  Objection.  Vague.
19   BY MR. STUEVE:
20     Q.    Below that or above it?
21         MR. MONICA:  Same objection.
22         THE WITNESS:  Below that.

---

233

1    BY MR. STUEVE:
2      Q.    Okay.  Now, have you ever -- has
3    Rose Acre ever asserted an antitrust claim
4    against Topco or any of its members?
5      A.    Antitrust.  I'm not aware exactly
6    about the antitrust claim.
7      Q.    Are you personally aware of an
8    antitrust claim or a claim that Topco is engaged
9    in anticompetitive conduct being asserted by
10   Rose Acre against Topco?
11     A.    I'm aware of the fact that there's
12   been a lawsuit filed against a Topco member, but
13   I don't know the details of the suit.
14     Q.    I'm talking about on behalf of
15   Rose Acre.  Is it your understanding -- has Rose
16   Acre asserted a claim against Topco for engaging
17   in anticompetitive conduct?
18     A.    I don't know the basis.  I know a
19   lawsuit has been filed against a member of
20   Topco, but I don't know the details.
21     Q.    What lawsuit are you referring to?
22     A.    There's been a lawsuit filed, to

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

60 (Pages 234 to 237)

---

234

1  my knowledge, against Hy-Vee, but I don't know
2  the details.
3       Q.  Do you know where that's pending?
4       A.  No.  I don't.
5       Q.  And is that -- do you believe
6  that's asserted by Rose Acre?
7       A.  Yes.
8       Q.  Okay.  And have you had any
9  involvement in that litigation?
10      A.  No.
11      Q.  Have you been asked to provide any
12 information in that litigation?
13      A.  No.
14      Q.  Okay.  Has -- putting aside
15 Hy-Vee, are you aware of any claim being
16 asserted by Rose Acre against Topco for buying
17 eggs on behalf of its members from Rose Acre?
18      MR. MONICA:  Objection.  Vague.
19      THE WITNESS:  I don't know the
20 exact details -- honestly, I don't know the
21 details.
22 BY MR. STUEVE:

---

235

1       Q.  You are aware of a lawsuit against
2  Hy-Vee; is that correct?
3       A.  Yes.
4       Q.  Do you know whether or not Topco
5  is named as a Defendant in that case?
6       A.  I don't recall.  No.
7       Q.  Okay.  Other than that lawsuit,
8  are you aware of any lawsuit that you're aware
9  that's been asserted by Rose Acre against Topco,
10 directly, for its group purchasing on behalf of
11 its members?
12      A.  I think I just answered that.  No.
13 I'm not aware of it.
14      Q.  Okay.  Are you aware of any claim
15 brought by Rose Acre against Save-A-Lot and --
16 for its group purchasing on behalf of its
17 franchisees?
18      MR. MONICA:  Objection.  Calls for
19 legal conclusion.  Please, go ahead and answer.
20      THE WITNESS:  I'm not aware of any
21 lawsuit brought by Rose Acre against Save-A-Lot.
22 BY MR. STUEVE:

---

236

1       Q.  Okay.  And are there any other
2  customers of Rose Acre that are like Topco where
3  it's a group buying customer -- customer buying
4  on behalf of its members?
5       A.  Well, Topco -- I don't know to say
6  Topco group buys.  When Topco comes to us with a
7  bid for a member, it's only pertaining to that
8  member only.  So, no, I don't have anyone else
9  that I deal with that's like Topco.
10      Q.  Do you -- my question is, do you
11 have anyone, and we're going to get into Topco
12 more here, but do you have anyone that -- any
13 customer that buys on behalf of a group or
14 members, other than Topco?
15      MR. MONICA:  Objection.
16      THE WITNESS:  Topco don't come to
17 us with multiple members when they bid.  They
18 come to us with a specific chain and they say
19 here's the bid for this customer.  They've never
20 have ever discussed multiple customers during
21 any single bid.
22 BY MR. STUEVE:

---

237

1       Q.  Let me ask you this.
2       Are there any customers -- you're
3  not understanding my question.
4       What I'm asking you is, are there
5  any other customers that you have that represent
6  a group or individual buyers?
7       A.  My understanding that that would
8  be the structure of AWG.
9       Q.  Okay.
10      A.  Which is different than Topco, the
11 way I would view it, but I don't know the
12 legalities.
13      Q.  We'll see what Topco says about
14 how they conduct their business, that's publicly
15 available.
16      MR. MONICA:  Objection.
17 Argumentative.
18 BY MR. STUEVE:
19      Q.  What I'm asking you is, you've
20 already identified that Save-A-Lot has
21 75 percent of its franchisees and they purchased
22 from Rose Acre; correct?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

61 (Pages 238 to 241)

---

238

1          MR. MONICA:  Objection.
2   Mischaracterizes his prior testimony.
3          THE WITNESS:  Save-A-Lot, as I
4   stated, was a subsidiary of Super Value, and we
5   sell eggs to Save-A-Lot.  They happen to have
6   some franchisees, but I don't know how -- my
7   understanding that would be a different
8   structure than what I -- in my opinion, what I
9   sell to Topco or what I sell to AWG, they're
10  different.
11  BY MR. STUEVE:
12         Q.   I'm not asking you to make any
13  legal conclusions about their similarity.  I'm
14  asking you, you testified about the fact that
15  you are aware that Save-A-Lot corporate
16  headquarters purchases eggs from Rose Acre and
17  they resell those eggs to their franchisees;
18  correct?
19         MR. MONICA:  Objection to the term
20  franchisee, but go ahead and answer.
21         THE WITNESS:  The relationship
22  between Save-A-Lot and their franchise -- I have

---

239

1   no knowledge of other than I've been told that
2   they have franchise stores and corporate stores.
3   BY MR. STUEVE:
4          Q.   And with respect to the franchise
5   stores, you understand that those franchise
6   stores buy eggs from Save-A-Lot; correct?
7          A.   They receive eggs from Save-A-Lot
8   warehouses.
9          Q.   All right.  Now, with respect
10  to -- are there any other customers that you're
11  aware of in which -- and I'm not asking you
12  whether they're similar or not to AWG, so just
13  put that out of your mind, because we're going
14  to get into your customers.  I'm trying to
15  shortcut this.
16         Are there any other customers in
17  which you're negotiating with a headquarter -- a
18  headquarters and then they are reselling those
19  eggs to members or affiliated grocery stores?
20  Any other customers?
21         A.   Super Value is a wholesaler that
22  we sell direct and indirect to that does turn

---

240

1   around and sell to independents.
2          Q.   So this is not their Save-A-Lot?
3          A.   Correct.
4          Q.   This is the same corporate
5   company, Super Value, and they do have a
6   wholesale grocer group; is that right?
7          A.   Yes.
8          Q.   All right.  And where is that
9   located, sir?
10         A.   Well, they have multiple
11  warehouses.  They're in Anniston, Alabama,
12  they're in Champagne, Illinois, Minneapolis,
13  Minnesota, they have a division in North Dakota,
14  St. Louis, Missouri.  I know there's others,
15  too.  There's a few more than that.
16         Q.   Is there -- does Super Value have
17  a name for its wholesale?
18         A.   Super Value wholesale.
19         Q.   Super Value wholesale.  And are
20  the members independently owned stores?
21         A.   I don't know that they have
22  members.  They have customers, as far as I know.

---

241

1          Q.   Are the customers independently
2   owned?
3          A.   Yes.
4          Q.   They're not owned by Super Value?
5          A.   They own some.  Super Value is
6   structured in two ways.  They have a wholesale
7   division that they sell independents and then
8   they have some of their own corporate own
9   stores, as well.
10         Q.   But with respect to -- there are
11  folks who purchase from the wholesaler that are
12  not owned by Super Value; is that correct?
13         A.   Yes.
14         Q.   What percentage of their wholesale
15  business comes from stores that are not owned by
16  Super Value?
17         A.   I don't know that.
18         Q.   What distribution centers do you
19  supply for Super Value's wholesale business?
20         A.   Anniston, Alabama, Champagne,
21  Illinois.  Them are the two today.
22         Q.   How long has the wholesale

---

Henderson Legal Services, Inc.

**242**

1 business been a customer of Rose Acre?
2          MR. MONICA:  Objection.  You may
3 answer.
4          THE WITNESS:  For Super Value?
5 BY MR. STUEVE:
6     Q.   Super Value's wholesale business,
7 how long has it been a customer of Rose Acre?
8     A.   **Well, indirectly more than**
9 **15 years.**
10     Q.   When you say indirectly, what do
11 you mean?
12     A.   **We sell eggs to Dutch Farms in**
13 **Chicago, who in turn sells to Super Value in**
14 **Champagne, Illinois, and we sell to Lakeside**
15 **Foods in Alabama that in turn sells to the**
16 **Anniston warehouse.**
17     Q.   And then do you also have direct
18 sales now?
19     A.   **We have sold some eggs direct to**
20 **the Champagne warehouse.**
21     Q.   How long have you done that?
22     A.   **For about eight years.**

**243**

1     Q.   And how much business on a weekly
2 basis?
3     A.   **Of -- that we sell direct to the**
4 **Champagne warehouse?**
5     Q.   Uh-huh.
6     A.   **A few palettes a week.**
7     Q.   And where are those from?
8     A.   **Germantown, Illinois.**
9     Q.   Now, when you say indirect, with
10 respect to the Super Value wholesale operations,
11 do you invoice Super Value or do you invoice
12 Dutch Farms?
13     A.   **Invoice Dutch Farms.**
14     Q.   Okay.  But you know that those
15 eggs are then going to be shipped to the Super
16 Value warehouse?
17     A.   **In Champagne; correct.**
18     Q.   All right.  And why don't you just
19 deal directly with Super Value?
20     A.   **Because Dutch Farms came to me**
21 **with the account.**
22     Q.   Okay.  Do they have a markup

**244**

1 between -- from what you're selling to Dutch
2 Farms and then what they're selling to Super
3 Value?
4     A.   **I don't have any direct knowledge**
5 **of how they sell.**
6     Q.   Is that your assumption?
7          MR. MONICA:  Objection.  Calls for
8 speculation.
9          THE WITNESS:  I said I don't get
10 involved in their business and what they sell.
11 BY MR. STUEVE:
12     Q.   Sir, I just want to make sure I
13 understand.  You have no understanding whether
14 or not Dutch Farms marks up the eggs you sell to
15 them before they sell it to Super Value's
16 wholesale distribution center?
17     A.   **I have never been told they markup**
18 **the eggs.**
19     Q.   Well, why would they be engaged in
20 a sale to Super Value wholesale distribution
21 center if they didn't markup the price that they
22 paid you for the eggs?

**245**

1          MR. MONICA:  Objection.  Calls for
2 speculation.  You can answer.
3          THE WITNESS:  I said I have no
4 knowledge of what they do with the eggs they
5 purchase from us or how they sell any of their
6 customers.
7 BY MR. STUEVE:
8     Q.   I'm not asking you personally, but
9 is it fair your assumption is in order for that
10 transaction to make sense, and what I'm
11 referring to is for it to make sense for Dutch
12 Farms to buy the eggs from Rose Acre and then
13 sell them and distribute them and transport them
14 to Super Value's warehouse there would have to
15 be a markup?
16     A.   **I have no knowledge what they sell**
17 **at.**
18     Q.   I'm going to read back my question
19 one more time, give you one more chance to
20 answer and then we'll ask the judge to get
21 involved.
22     A.   **Okay.**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

246

1   **(The record was read as**
2   **requested.)**
3         MR. MONICA:  Let me put my
4   objection.  I object.  It's compound.  You're
5   asking this witness to speculate about things he
6   has no firsthand knowledge about.  You can
7   answer the question if you know.
8         THE WITNESS:  Okay.  I'll state
9   again I have no knowledge of what Dutch Farms
10  sells the eggs -- the eggs I sell them what they
11  sell them for.
12  BY MR. STUEVE:
13        Q.   They never told you that there's a
14  markup?
15        **A.   No.**
16        Q.   Okay.  And do they pick those eggs
17  up from your production facilities, Dutch Farms?
18        **A.   For Champagne?**
19        Q.   Yes.
20        **A.   I believe today that Champagne is**
21  **picking their own eggs up.**
22        Q.   So Super Value's warehouse is

---

247

1   actually picking the eggs up from your Rose
2   Acre's production facility?
3         **A.   Yes.**
4         Q.   So Dutch Farms is really just
5   serving as a broker there; right?
6         MR. MONICA:  Objection.
7         THE WITNESS:  No.
8   BY MR. STUEVE:
9         Q.   What else are they doing other
10  than consummating the transaction between Super
11  Value's wholesaler and Rose Acre?
12        **A.   Super Value is Dutch Farms**
13  **customer.  I sell to Dutch Farms.**
14        Q.   I understand that, but other than
15  Dutch Farms being the middleman, are they doing
16  anything else?
17        MR. MONICA:  Objection.
18        THE WITNESS:  I don't know.
19  BY MR. STUEVE:
20        Q.   They're not packaging the eggs;
21  right?
22        **A.   No.  They're not packaging them.**

---

248

1         Q.   Who's packaging them?
2         **A.   We package them.**
3         Q.   Is it under the Super Value brand?
4         **A.   No.**
5         Q.   What brand is it under?
6         **A.   Dutch Farms.**
7         Q.   Okay.  So it's the Dutch Farms
8   brand that's being sold at the -- at the
9   customers of Super Value's warehouse?
10        **A.   Yes.**
11        Q.   Okay.  So -- and do you know which
12  independent retail grocers are purchasing the
13  Dutch Farms eggs at the Champagne, Illinois
14  warehouse?
15        **A.   I'm aware of two of them.**
16        Q.   Okay.
17        **A.   That I can think of.  Dierberg's**
18  **and Neiman's.**
19        Q.   Okay.  Do you know what production
20  facility they're picking that -- Super Value's
21  picking the eggs up at?
22        **A.   We pack the majority of the eggs**

---

249

1   at our Newton County in Brook, Indiana.
2         Q.   How far is that from Champagne,
3   Illinois?
4         **A.   I don't know.  Maybe approximately**
5   **three hours, roughly.**
6         Q.   How many miles?
7         **A.   Three hours would be somewhere**
8   **around 150 to 180 miles approximately.**
9         Q.   Does your price that you quote
10  Dutch Farms include any transportation costs
11  from your production facility to Champagne,
12  Illinois?
13        **A.   If we deliver.**
14        Q.   I thought your testimony was that
15  they pick up?
16        **A.   I said I thought that they were**
17  **picking up right now.**
18        Q.   Okay.
19        **A.   We have delivered them in the**
20  **past.  We may deliver today.  I would have to**
21  **check.**
22        Q.   But if they pick up does your

---

## HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

250

1  price to Dutch Farms include any transportation
2  costs?
3      **A.   Not if they pick up.**
4      Q.   Okay.  When you say they, the --
5  are they Super Value wholesale trucks?
6      **A.   Super Value or Dutch Farms.**
7      Q.   Okay.  Do you know if Dutch Farms
8  has any ownership interest in Super Value?
9      **A.   Not that I'm aware of.**
10     Q.   Okay.  Are they a member of the
11  wholesaler?
12     **A.   Not that I'm aware of.**
13     Q.   Okay.  Now, with respect to the
14  price for the direct shipments that you make to
15  Champagne, the Super Value warehouse?
16     **A.   Uh-huh.**
17         MR. MONICA:  Objection.
18  BY MR. STUEVE:
19     Q.   Who do you invoice for those
20  sales?
21     **A.   Can you repeat the question.**
22     **(The record was read as**

---

251

1  **requested.)**
2         MR. MONICA:  Same objection.
3  BY MR. STUEVE:
4     Q.   Let me walk you -- let me -- the
5  record is not very clear.  Let me ask it again
6  so the record is clear.
7         You testified earlier that there
8  were direct sales made between Rose Acre and
9  Super Value's wholesale distribution center in
10  Champagne, Illinois; is that correct?
11     **A.   Yes.**
12     Q.   Who do you invoice for those
13  direct sales?
14     **A.   Super Value.**
15     Q.   Okay.  And are those both
16  commodity and specialty eggs?
17     **A.   No.**
18     Q.   What are they?
19     **A.   Specialty eggs.**
20     Q.   Specialty eggs.  And what type of
21  specialty eggs?
22     **A.   Eggland's Best.**

---

252

1     Q.   Eggland's Best.  And has that
2  always been direct sales to them, Eggland's
3  Best?
4     **A.   Yes.**
5     Q.   Now, are you familiar with a
6  customer called Centrella?
7     **A.   Yes.  Well, I'm familiar with the**
8  **company Centrella.**
9     Q.   Have they been a customer of Rose
10  Acre?
11     **A.   No.**
12     Q.   Never been?
13     **A.   No.**
14     Q.   Okay.  Have you solicited their
15  business before?
16     **A.   Centrella, no.**
17     Q.   Any related entities of Centrella?
18     **A.   Centrella purchased a company I**
19  **used to sell eggs to.**
20     Q.   Who was that?
21     **A.   Certified Grocers.**
22     Q.   When was Certified Grocers a

---

253

1  customer?
2     **A.   From prior 2000 up until mid**
3  **2000s.  They were a customer through the '90s**
4  **and up until mid 2000.  I don't remember the**
5  **exact date.**
6     Q.   Okay.  And whose responsibility
7  was Certified Grocers account?  Whose
8  responsibility?
9     **A.   Prior to myself it would have been**
10  **Donna Disque.**
11     Q.   And then from --
12     **A.   From --**
13     Q.   '92 to 2000?
14     **A.   Myself.**
15     Q.   Okay.  And when you say Centrella
16  purchased them, when did Centrella purchase
17  them?
18     **A.   Somewhere in the mid 2000s about**
19  **six months to a year after I lost the business.**
20     Q.   Okay.  Now, did you understand
21  that Certified Grocers was a wholesale grocer?
22     **A.   Yes.**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

65 (Pages 254 to 257)

---

254

1    Q.   And did it have members?
2    A.   They had independents.  I knew one
3    of their independents they worked with was
4    Butera Foods.
5    Q.   Okay.  And where were their
6    distribution centers?
7    A.   It was in Chicago, Illinois they
8    had one, that I know of.
9    Q.   And do you know what volume of
10   eggs you sold them?
11   A.   Approximately average five to six
12   loads a week, roughly.  Maybe more sometimes.
13   Q.   At that time was that one of your
14   larger customers?
15   A.   Yes.
16   Q.   And did you have a broker that
17   assisted you with that account?
18   A.   No.
19   Q.   Okay.  And do you know whether or
20   not they had ad groups within Certified Grocers?
21   A.   I don't -- I don't know.  I don't
22   know what groups they had.  I mean --

---

255

1    Q.   Are you familiar with the concept
2    ad groups?
3    A.   Advertising departments maybe.  I
4    don't know about group.  I would call something
5    an advertising department.
6    Q.   Did you understand there were
7    advertising groups that Certified had that
8    assisted the independent retail grocers in
9    promoting their products?
10            MR. MONICA:  Objection to the
11   question.
12            THE WITNESS:  No.
13   BY MR. STUEVE:
14   Q.   You had no --
15   A.   No direct knowledge.
16   Q.   No direct knowledge of that?
17   A.   No.
18   Q.   Okay.  Who was your contact at
19   Certified Grocers?
20   A.   Kathy.
21   Q.   Kathy?
22   A.   I would have to look in the files.

---

256

1    I can't recall her last name.
2    Q.   What was the reason why you lost
3    that business?
4    A.   Somebody offered them lower prices
5    than I was willing to do.
6    Q.   Who was that?
7    A.   I can't remember exactly.  I'm
8    thinking of a couple people came to mind, but I
9    can't remember.
10   Q.   Who are the people that are coming
11   to mind?
12   A.   Sparboe or Moark.
13   Q.   Any other wholesale grocers that
14   were customers of Rose Acre from '99 to the
15   present?
16   A.   Wholesale?  Well, yeah, Flemming
17   Foods.
18   Q.   Okay.
19   A.   I think it was after 2000.  I
20   can't remember when they filed bankruptcy, but.
21   Q.   They would have been a customer of
22   Rose Acre's up until the time they filed for

---

257

1    bankruptcy?
2    A.   Yes.
3    Q.   Any others?
4    A.   Wholesale.  I'm trying to remember
5    if we ever sold Nash Finch.  They would be a
6    wholesaler, but I would have to -- we bid on
7    Nash Finch several times.  I don't recall for
8    sure if we ever sold them.
9    Q.   Any others?
10   A.   None I can think of off the top of
11   my head.
12   Q.   Any other entity that was a group
13   buyer?
14   A.   A group buyer meaning?
15   Q.   A buyer on behalf of a group of
16   customers?
17   A.   Indirect, I mentioned Piggly
18   Wiggly in Alabama.
19   Q.   Any others?
20   A.   I can't of any more off the top of
21   my head other than the ones we already
22   discussed.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

258

1  Q.   When you say Piggly Wiggly, what
2  do you understand their structure is?
3      A.   I don't exactly know.  I know
4  there's Piggly Wiggly stores throughout the
5  Southeast and the warehouse.  We supply -- we
6  deliver eggs at the warehouse for Dutch Farms,
7  our distributor.
8      Q.   Are there some Piggly Wiggly
9  stores that are independently owned separate and
10 apart from Piggly Wiggly?
11     A.   I honestly don't know owners of
12 stores.  It's just not my business.
13     Q.   What about Aldie?  Does Aldie own
14 all its grocery stores?
15     A.   To my knowledge, they own
16 100 percent of their stores.
17     Q.   Are there any of your customers in
18 which some of the stores are not 100 percent
19 owned by the customer, they're using a brand
20 name, either a franchisee or some other loose
21 affiliation with the customer, but the customer
22 does not corporately own all of the grocery

---

259

1  stores?
2      A.   I've already mentioned Save-A-Lot.
3      Q.   Right.
4      A.   Are you asking me if there's any
5  besides Save-A-Lot?
6      Q.   Yes.  Uh-huh.
7      A.   To my knowledge, like an AWG and
8  then -- other than the ones I already talked
9  about like Super Value, any of the wholesalers
10 they sell to independents, but beyond those that
11 we've already discussed?
12     Q.   Right.
13     A.   None that comes to mind.
14     Q.   Okay.
15     A.   Or I guess -- I've got quite a few
16 distributors, but they don't own supermarkets
17 like Dutch Farms, and then they sell.  So I've
18 got several distributors like that and I've had
19 them over the years.
20     Q.   Can you tell me the names of those
21 distributors?
22     A.   Sure.

---

260

1      Q.   I'm talking about shell eggs now,
2  too?
3      A.   Shell eggs.  Sorry.
4          The -- McCauley.
5      Q.   How do you spell that?
6      A.   M-C-C-A-U-L-E-Y.
7      Q.   Okay.  And where is this
8  distributor located?
9      A.   He's in Mount Vernon, Kentucky.
10     Q.   And do you know who he distributes
11 to?
12     A.   Independent grocery stores.
13     Q.   Okay.
14     A.   Throughout -- I think -- they live
15 in Tennessee.  He's been to Nashville before.
16     Q.   And do they purchase grocery
17 products other than eggs and distribute them to
18 these independent grocers?
19     A.   I only have knowledge of the eggs
20 that I sell him.
21     Q.   All right.  Who else?
22     A.   Dalton Poultry.

---

261

1      Q.   Okay.
2      A.   He's in Johnson City -- no.  He's
3  in Tennessee -- he's in western Tennessee.
4  What's the name of the town?  I can't think of
5  the town, but it's in western Tennessee outside
6  of Memphis, D-A-L-T-O-N, Poultry.
7          Now, I've been in his warehouse
8  and he sold other products.
9      Q.   Okay.  Any others?
10     A.   Oh, yeah.  Prime Foods.
11     Q.   Are they currently a customer?
12     A.   Yes.
13     Q.   Okay.  Where are they located?
14     A.   Booneville, Indiana.
15     Q.   And do they buy other grocery
16 products other than eggs?
17     A.   Not that I'm aware of.
18     Q.   Okay.  And do they resell to
19 independent retail grocers?
20     A.   They sell to independent
21 supermarkets; correct.
22     Q.   Okay.  Any others?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

262

1     A.    Dutt & Wagner, D-U-T-T &
2  W-A-G-N-E-R.
3     Q.    Any others?
4     A.    Yes.  Jersey Lynn Farms, L-Y-N-N.
5     Q.    Do you know if they purchase other
6  grocery products?
7     A.    Yes.
8     Q.    Same thing with Dutt & Wagner, do
9  they purchase other grocery products?
10    A.    Yes.
11    Q.    Any others?
12    A.    Egg Depot.
13    Q.    Where are they located?
14    A.    Bronx, New York.
15    Q.    Do you know if they purchase other
16 grocery products?
17    A.    Yes.
18    Q.    Any others?
19    A.    Hillcrest Food Service.
20    Q.    And do they resell to independent
21 retail grocers?
22    A.    Yes.

---

263

1     Q.    Where are they located?
2     A.    Cleveland, Ohio.
3     Q.    All right.  Any others?
4     A.    During -- are we discussing still
5  the period from 2004?
6     Q.    Uh-huh.
7     A.    Linwood.
8     Q.    Located where?
9     A.    Detroit.
10    Q.    Do they purchase other grocery
11 products?
12    A.    Yes.  I believe they did.
13    Q.    Do they resell them to independent
14 retail grocers?
15    A.    Yes.
16    Q.    Any others?
17    A.    Rexing.
18    Q.    How do you spell that?
19    A.    R-E-X-I-N-G.
20    Q.    Where are they located?
21    A.    Evansville, Indiana.
22    Q.    Okay.  And do they purchase other

---

264

1  grocery products other than eggs?
2     A.    Not that I was aware of.
3     Q.    Okay.  Do they resell their eggs
4  to independent grocers?
5     A.    Yes.
6     Q.    Okay.  Any others?
7     A.    Collins Brothers.
8     Q.    Located where?
9     A.    Atlanta, Georgia.
10    Q.    Do they purchase other grocery
11 products?
12    A.    I believe they do, but I'm not
13 totally familiar with their business.
14    Q.    Do they resell their eggs to
15 independent grocers?
16    A.    Yes.
17    Q.    Okay.  Any others?
18    A.    There's more.  I'm trying to
19 remember in my mind who I've given you.
20          Terry Volz.
21    Q.    How do you spell that?
22    A.    V-O-L-Z.

---

265

1     Q.    It's Terry?
2     A.    Terry.
3     Q.    And do they purchase other grocery
4  products?
5     A.    Not that I'm aware of.
6     Q.    Where are they located?
7     A.    Sunman, Indiana, S-U-N-M-A-N.
8     Q.    Any others?
9     A.    Happy Chicken.
10    Q.    Located where?
11    A.    Columbus, Ohio.
12    Q.    Do you know if they purchase other
13 grocery products?
14    A.    I believe they do dairy, as well.
15    Q.    And do they resell to independent
16 retail grocers?
17    A.    Yes.
18    Q.    Is that the same for Terry Volz,
19 does he resell to independent retail grocers?
20    A.    Yes.
21    Q.    Okay.  Any others?
22    A.    Quality Foods in Chicago,

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

266

1    Illinois.
2        Q.   Okay.  Do they purchase other
3    grocery products?
4        A.   Actually, he bought -- I believe
5    he only bought loose eggs.  So since he was
6    buying loose I think it went mainly to
7    restaurants.
8        Q.   Okay.  Any others?
9        A.   We're talking about --
10   distributors.  Let's see.  Oh.  Poss, P-O-S-S.
11   Well, do you want restaurants?  If someone just
12   sells restaurants do you want that, too?
13       Q.   I want to focus on independent
14   retail grocers.
15       A.   Poss, they sell to restaurants.
16       Q.   Okay.  Any other distributors that
17   resell to independent retail grocers?
18       A.   I'm sure I've left some out.  Off
19   the top of my head that's -- those are the ones
20   that come to mind right now.
21       Q.   Now, any other entity that you
22   haven't identified that purchases eggs from Rose

267

1    Acre and then resells them to independent retail
2    grocers?
3        A.   Independent retail grocers or just
4    supermarkets?
5        Q.   Supermarkets?
6        A.   Okay.  So it can be a chain,
7    whether it's a chain that I have knowledge of?
8        Q.   Uh-huh.
9        A.   Yes.
10       Q.   Who is that?
11       A.   Cal-Maine Foods, C-A-L-M-A-I-N-E.
12       Q.   And Cal-Maine purchases eggs from
13   Rose Acre and then resells them to supermarkets?
14       A.   Yes.
15       Q.   All right.  Any others?
16       A.   Eggs-R-Us.
17       Q.   Where are they located?
18       A.   In Missouri.
19       Q.   Okay.  And it's your understanding
20   that they purchase eggs from Rose Acre and then
21   resell them to supermarkets?
22       A.   Oh.  No.

268

1        Q.   What do they do when they purchase
2    the eggs?
3        A.   They purchased -- we sold them
4    eggs and they'll sell them to other egg
5    producers.
6        Q.   Okay.  All right.  Any other
7    entity that purchases eggs from Rose Acre and
8    then resells them to independent retail grocers
9    or supermarkets?  Any other retail outlet?
10       A.   Dixie Egg.
11       Q.   Sorry.  Can you spell that?
12       A.   D-I-X-I-E.
13       Q.   Okay.  Located where?
14       A.   Blackshear -- one of his locations
15   is Blackshear, Georgia.
16       Q.   Okay.  And what does Dixie do when
17   they purchase the eggs?
18       A.   We've sold him -- he's an egg
19   producer and we've sold him eggs to help
20   supplement his own production.
21       Q.   Okay.  Any entity that's not an
22   egg producer that you would be selling eggs and

269

1    then they turn around and sell them to retail
2    grocers or supermarkets that we haven't
3    identified?
4        A.   I'm sure there's some that we
5    didn't discuss.  Over that period of time we've
6    had customers -- we may have had them and lost
7    them.  Off the top of my head I think we covered
8    the majority of them, but I know there would be
9    more.  Our records would show that.
10       Q.   I wouldn't know looking at your
11   records know what those customers do with those
12   eggs; right?
13           MR. MONICA:  Objection.  Calls for
14   speculation.
15   BY MR. STUEVE:
16       Q.   Your customer list, for example, I
17   wouldn't know if they have -- if those eggs are
18   distributed to corporate owned stores or whether
19   or not they're resold to independent retail
20   grocers or markets?
21           MR. MONICA:  Objection.  Calls for
22   speculation.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

69 (Pages 270 to 273)

---

270

1    THE WITNESS:  My customer list
2  would not specify that exactly.  No.
3  BY MR. STUEVE:
4    Q.  Okay.  But sitting here today,
5  you've given me the best of your recollection;
6  fair enough?
7    A.  I can think about some more if you
8  want me to.
9    Q.  Why don't we take a break?
10    MR. MONICA:  Yeah.
11    THE VIDEOGRAPHER:  The time is
12  3:27 p.m.  We are going off the record.
13    (A brief recess was taken.)
14    THE VIDEOGRAPHER:  This is the
15  start of medial unit number five.  The time is
16  approximately 3:43 p.m.  We are back on the
17  record.
18  BY MR. STUEVE:
19    Q.  Mr. Hinton, you've mentioned
20  Lindsey Schepman and Amanda Jackson as the ones
21  principally responsible for shell egg sales
22  prior to the restructuring in 2012, basically

---

271

1  from timeframe we were talking about was 2000 to
2  2012; is that right?
3    A.  Right, Lindsey Schepman.
4    Q.  I have it down S-H-E-P-M-A-N?
5    A.  S-C-H-E-P-M-A-N.
6    Q.  All right.  Pronounced Schepman?
7    A.  Yes.
8    Q.  So Lindsey Schepman and Amanda
9  Jackson from 2000 to the 2012 timeframe had
10  principal responsibility for shell egg sales; is
11  that correct?
12    A.  Along with myself.  Yes.
13    Q.  All right.  And then what about
14  Bob Niewedde?  I had him down as shell egg sales
15  20 years?
16    A.  Yes.
17    Q.  What about him?  What was his
18  role?
19    A.  Bob is -- I speak of it as he
20  manages our longs and shorts.
21    Q.  Could you explain that?
22    A.  Yes.  When -- Bob works with --

---

272

1  directly with the customer service and with the
2  farms on -- if we have a need -- if we're short
3  on eggs or long on eggs Bob helps procure
4  additional supply for us or he helps sell eggs
5  outside of our -- we would say our day-to-day
6  customers.
7    Q.  So let's take when you say long on
8  eggs, you mean Rose Acre's supply is exceeding
9  its sales volume?
10    A.  On a particular -- in a particular
11  week.  Yes.
12    Q.  And in those circumstances what
13  would Bob Niewedde do?
14    A.  Bob works with Lindsey directly to
15  help identify, you know, what's the best avenue
16  to go with the eggs we are long on.  If that's
17  the case, we have more eggs that particular week
18  than what our regular customers are ordering, so
19  he will look on the outside to see what we can
20  market the eggs for.  The different channels
21  that he would sell those eggs or look to market
22  those eggs to would be, for example, it would be

---

273

1  through -- he would post eggs on ECI for sale.
2    He would talk to shell egg brokers
3  like Eggs-R-Us or -- and also he works with our
4  customers that export eggs.  So his process
5  would be that he would talk to all his different
6  outlets that he would have to market the eggs to
7  someone that's not our weekly, daily customer,
8  and then get the pricing that he thought we
9  could get for those eggs and then consult with
10  Lindsey as far as, you know, what's out there
11  available and also Aaron Heironimus comes into
12  play with this because Aaron who is over the
13  liquid eggs and then Jeff Cutler who is
14  vice-president of processing for liquid and dry
15  eggs, they would all discuss what the best
16  market to go with those eggs, whether it would
17  be to sell them into the shell egg market or to
18  break those eggs and sell them into the liquid
19  or dried markets.
20    Q.  ECI?
21    A.  Yes.
22    Q.  What is that?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

---

274

1    A.   Stands for egg clearinghouse.
2    Q.   So that would be one channel for
3  them; right?
4    A.   Yes.
5    Q.   Other shell egg brokers; correct?
6    A.   Correct.
7    Q.   Potential customers who export
8  eggs; right?
9    A.   Yes.
10    Q.   And then possibly for the breaking
11  market?
12    A.   Correct.
13    Q.   And then what about your existing
14  shell egg customers?  What about the possibility
15  of reaching out to them to run promotions that
16  would increase the demand?
17    A.   That's part of the discussion with
18  Lindsey.
19    Q.   Okay.  And what would Lindsey do?
20  Would she reach out then to existing customers
21  and see if they would be interested in running a
22  special, if you will, or promotion, with respect

---

275

1  to Rose Acre eggs?
2    A.   Yes.
3    Q.   Okay.  And how frequently are you
4  dealing with short or long situations?
5    A.   Every week.
6    Q.   Okay.  And is this -- this
7  process, is dealing with short and long
8  situations, does this keep Bob Niewedde busy
9  full-time?
10    A.   It keeps Bob very busy.  Bob has
11  some other responsibilities, as well.
12    Q.   What are those other
13  responsibilities?
14    A.   He works with the -- help customer
15  service with the liquid and dried products.
16    Q.   Now, in the short situation, as I
17  understand it, that would be a situation where
18  the sales to existing customers is exceeding the
19  current supply that Rose Acre has; is that
20  right?
21    A.   Correct.
22    Q.   In those circumstances what are

---

276

1  the various options that Rose Acre would
2  consider?
3    A.   Okay.  What we would do, after
4  consulting with Lindsey and Aaron and Jeff,
5  they -- we have three breaking plants where we
6  break eggs.  We've got liquid customers --
7  liquid and dried customers that we supply from
8  those plants.  So we look -- we have basically
9  two options.  We can -- we can look at what we
10  do with the liquid eggs and either go out and
11  source additional liquid eggs to meet customers
12  demand or we go out and source shell eggs to
13  meet customers demand.  So they evaluate which
14  direction they want to go, what's the best
15  option for the company.
16    Q.   And so there are occasions then
17  that Rose Acre will purchase eggs that they did
18  not produce?
19    A.   Yes.
20    Q.   And how frequently does that
21  occur?
22    A.   Quite often.

---

277

1    Q.   Okay.  And who are the producers
2  that Rose Acre purchases from, the producers?
3    A.   We would -- well, sometimes we
4  purchase through ECI.  So when you purchase
5  through ECI it's a blind trading.  So you don't
6  know when you make the trade exactly who the
7  producer you're buying from, but -- then as
8  far as direct, we purchase eggs on a weekly
9  basis from Trillium -- Trillium Farms and also
10  from Eggs-R-Us.  In the past we've purchased
11  eggs from Hillandale.  I believe we've purchased
12  eggs from Cal-Maine, to name a few.  Up in
13  Michigan we've purchased eggs from Vandebunte,
14  Hamilton co-op, Vande Bunte, you need that one?
15  V-A-N-D-E, B-U-N-T-E.
16    Let's see.  Other purchases.
17    We purchase eggs from Herbrucks,
18  which I stated earlier.
19    Q.   Omega-3?
20    A.   Organics and some cage-free.
21    We purchase eggs from Glenwood
22  Farms.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

278

1    Q.   Located where?
2    A.   In Nashville, North Carolina.  And
3  I'm sure there are others that would be in our
4  records.
5    Q.   What records?  Did you keep a list
6  of perspective producers that you could buy
7  from?
8    A.   Yeah.  Bob has track -- he tracks
9  our egg purchases.
10   Q.   Okay.  How is that tracked?
11   A.   Bob has files with that.
12   Q.   All right.  And do you know how he
13 tracks them?
14   A.   He tracks each purchase.
15   Q.   Okay.  Is there a summary sheet
16 that he prepares?
17   A.   I know he -- I -- I'm not sure
18 what he's got for a summary sheet.
19   Q.   Do you know on average what
20 percentage of the eggs that Rose Acre uses in
21 its business are purchased from other egg
22 producers?

---

279

1    A.   Off the top much my head, I don't
2  know the exact percentage, but it's probably
3  less than 10 percent.
4    Q.   Who at Hillandale do you deal
5  with?
6    A.   Gary Bethel.
7    Q.   Okay.  And do you source eggs from
8  their various locations?
9    A.   Not on a regular basis.  No.  I've
10 gotten eggs before from him.  It's been a long
11 time since we've bought anything from Gary.  I
12 recall buying some medium eggs several years
13 ago.
14        Do you want liquid suppliers that
15 we bought eggs from, too?
16   Q.   Sure.
17   A.   We buy -- we bought eggs from
18 Michael Foods, Creighton Brothers, Daybreak
19 Foods, Sonstegard, S-O-N-S-T-E-G-A-R-D, Texas
20 Egg, Rembrandt.  That's the ones I can think of
21 right now.
22   Q.   Of the eggs that you purchase,

---

280

1  what portion of them do you source through ECI?
2    A.   I don't know off the top of my
3  head.
4    Q.   Is it one of the channels that you
5  do use?
6    A.   Yes.
7    Q.   Okay.  And you had indicated
8  earlier it's a blind trade so you don't know who
9  the producer is; is that right?
10   A.   Correct.
11   Q.   Are there any brokers that you buy
12 eggs from?
13   A.   Eggs-R-Us I would consider to
14 be -- in that world we call it egg traders.
15   Q.   Okay.
16   A.   I may have said broker, but egg
17 trader.
18   Q.   Do your brokers that you utilize,
19 you've identified them, do they represent other
20 egg producers?
21   A.   Which brokers?
22   Q.   I'm talking about, you know, the

---

281

1  folks that you are -- for example, Marketing
2  Concepts.  Do they represent other egg
3  producers?
4    A.   No.
5    Q.   Just Rose Acre?
6    A.   Yes.
7    Q.   I assume they also provide
8  brokerage services for other grocery products?
9    A.   Yes.
10   Q.   Okay.  Is that the same thing with
11 Alliance?
12   A.   At the time we dealt.  Yes.
13   Q.   And also it would be true of
14 Daymond Associates?
15   A.   No.
16   Q.   So they also represent other egg
17 producers?
18   A.   Yes.
19   Q.   Okay.  Who else do they represent?
20   A.   Well, I don't -- I know within
21 regards to Kroger, Kroger has multiple
22 suppliers, but I guess I don't have direct

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

72 (Pages 282 to 285)

---

**282**

knowledge that they represent those other
suppliers, but I know of other suppliers to
Kroger. I'm aware of other suppliers, but I
guess I don't actually have direct knowledge of
them representing them.

Q. Okay. So we've identified --
again, I'm focusing on 2000 to 2012 your role
with respect to shell egg sales, Amanda Jackson,
Lindsey Schepman -- I keep putting an R in
there. Lindsey Schepman and then we have talked
about --

MR. MONICA: Bob.

BY MR. STUEVE:

Q. Bob, is it Niewedde?

A. Bob Niewedde; correct.

Q. And then what about are there any
other folks during that time that we haven't
mentioned that were involved in shell egg sales
or purchases?

A. I don't remember when Joan
retired. Joan Schlehuser, but I can't remember
what year she retired exactly.

---

**283**

Q. What office was she out of?

A. Seymour.

Q. How do you spell her last name?

A. S-C-H-L-E-U -- that's not right.
S-C-H-L-E-H-U-S-E-R.

Q. Sounds like a good German name?

A. Yes. It is.

Q. Is she retired or is she working
for somebody else now?

A. No. She retired.

Q. Anyone else?

A. I don't believe so. Not since
2000.

MR. MONICA: Anyone on the phone?

MS. REDDING: Whitney Redding is
on the phone.

MS. CRABTREE: Sorry, Whitney.

MR. MONICA: We had it muted in
the beginning when we came back.

BY MR. STUEVE:

Q. Are we done talking about UEP,
USEM -- just teasing.

---

**284**

MR. MONICA: He's teasing the
person on the phone.

MR. STUEVE: We didn't ask any
questions about UEP, USEM, just so you know.

BY MR. STUEVE:

Q. Okay. If you would, Exhibit 517
there, if you could turn to topic number 8?

A. Okay.

Q. And you understand you've been
designated to testify with respect to this topic
on behalf of Rose Acre?

A. Yes.

Q. As I understand it, you spoke with
the person who actually tracks this in
preparation for your deposition; is that right?

A. Yes. I did.

Q. Let's talk about 2013. What
information did he tell you with respect to the
top 10 customers by volume of eggs sold?

A. He didn't give me anything exact
on 2013 because I don't think he's compiled 2013
yet.

---

**285**

Q. Okay.

A. But I can speak to our current top
customers.

Q. Sure. And this would be basically
then based off of 2012 data?

A. It would be based off my knowledge
and what we sell the customers.

Q. Okay. But what I'm saying is this
would be current customers?

A. Current customers.

Q. Okay. Go ahead.

A. Our top customers currently for
2013 would be Save-A-Lot, Aldie, Kroger, Kraft
Foods, Topco, Wal-Mart, Cal-Maine Foods, US
Foods, AWG, and Flowers.

Q. Okay. So we talked about
Save-A-Lot; right?

A. Yes.

Q. And is that currently your largest
shell egg customer?

A. Yes.

Q. And approximately what percentage

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

286

1    of shell eggs are purchased by Save-A-Lot?
2         A.   Total eggs or shell eggs?
3         Q.   Shell eggs?
4         A.   Shell eggs only?
5         Q.   Uh-huh.
6         A.   They would be -- top of my head,
7    it's around 10 percent.
8         Q.   And just to make sure, on
9    Save-A-Lot, what portion of the shell eggs are
10   picked up?
11        A.   Today, 97 percent.
12        Q.   With respect to Aldie, what
13   percentage of your shell eggs are sold to Aldie?
14        A.   Probably say less than 8 percent.
15        Q.   And what percentage of their shell
16   egg purchases are picked up?
17        A.   10 percent.
18        Q.   And with respect to the other
19   90 percent, who handles transportation?
20        A.   We do.
21        Q.   And --
22        A.   Rose Acres.

---

287

1         Q.   And are those transported to their
2    warehouses?
3         A.   Yes.
4         Q.   And where are their warehouses
5    located?
6         A.   Denton, Texas, Kansas City -- I'm
7    sorry.  It's not Kansas City, it's Olathe,
8    Kansas.  Sorry.
9         Q.   There is a difference?
10        A.   There is a difference.  It's
11   outside, so it's Olathe.  Faribault, Minnesota,
12   it's F-A-R-I-B-U-A-L-T.
13        MR. MONICA:  We'll let you off of
14   that one.
15        THE WITNESS:  I think I got it
16   right.
17        And then you're wanted to know all
18   the delivery locations; right?
19   BY MR. STUEVE:
20        Q.   Yes.
21        A.   The delivery locations.  Okay.
22        Q.   Are there several?

---

288

1         A.   Locations?
2         Q.   For Aldie distribution centers?
3         A.   That we deliver?
4         Q.   Yeah?
5         A.   Yeah.  Like ten.
6         Q.   Okay.  And are all those -- are
7    these Aldie warehouses that you drop the eggs
8    off at and then Aldie is then responsible for
9    delivering them to the stores directly?
10        A.   Yes.
11        Q.   That's what I needed to know.
12        With respect to Aldie, do they
13   purchase both commodity and specialty eggs?
14        A.   Only commodity eggs.
15        Q.   Okay.  And when is the last time
16   that you negotiated the contract price for
17   commodity eggs?
18        A.   Last -- it was late summer 2012.
19   Between summer and fall of 2012.
20        Q.   And were there several Urner Barry
21   markets that were utilized for that bid?
22        A.   No.

---

289

1         Q.   What was the market that was
2    utilized?
3         A.   The Midwest Urner Barry.
4         Q.   Okay.  Do you remember, were there
5    several different bids within that Urner Barry
6    Midwest market?
7         A.   Yes.
8         Q.   And how did that break out?
9         A.   I don't know exactly each
10   division, but it ranged from 21 back to 30 back.
11        Q.   And do you -- was that part of a
12   competitive bidding process?
13        A.   Yes.
14        Q.   Do you know who else bid on that?
15        A.   I don't know every one that bid,
16   but I know some of the bidders.
17        Q.   Who were they?
18        A.   Weaver in Ohio.  Sauder in
19   Pennsylvania, S-A-U-D-E-R.  Country Charm in
20   Georgia.  Cal-Maine Foods out of Mississippi.
21   Those are the ones I can think of just off the
22   top of my head.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

74 (Pages 290 to 293)

---

290

1    Q.   Do you know what portion of their
2  shell eggs, commodity shell eggs you supply?
3    A.   **Approximately 50 percent.**
4    Q.   Who has the other 50?
5    A.   **All the producers -- I can go**
6  **back.  To my knowledge, between Sauder,**
7  **Cal-Maine, Country Charm, and Weaver are all**
8  **suppliers.  I don't recall if there's another**
9  **supplier.  There may be one more, but I'm not**
10  **sure right off.**
11    Q.   Okay.  Do you use a broker to
12  assist you with that customer?
13    A.   **No.**
14    Q.   What is the analysis for you in
15  determining whether or not you need a broker for
16  a particular customer?
17    A.   **If a customer that I'm going to**
18  **deal with is already involved with a broker and**
19  **they tell me that there's a broker that they**
20  **work with and -- but other than that, as I**
21  **discussed our brokers, with all the customers we**
22  **have our normal practice is not to use brokers.**

---

291

1    Q.   So is it fair to say unless it's a
2  customer that has a broker that they utilize,
3  you don't use brokers?
4    A.   **I don't go out and look for**
5  **brokers for new business.  No.  We've got a few**
6  **that's established for years like Marketing**
7  **Concepts, and then the other broker that we've**
8  **discussed, Daymond, they're an in-house broker**
9  **with Kroger.**
10    Q.   So if you want to do business with
11  Kroger you've got to deal with their broker?
12    A.   **We work with -- I don't know if I**
13  **can say you have to work with them.  I would**
14  **have to check and probably talk with Amanda for**
15  **sure on that.  I know we utilize them and I know**
16  **they're an in-house broker, which is not**
17  **uncommon for supermarkets.**
18    Q.   Is that the only broker -- do you
19  use any other broker for that relationship other
20  than Kroger's in-house broker?
21    A.   **No.**
22    Q.   What are all the clients that you

---

292

1  use or customers that you use Marketing Concepts
2  for?
3    A.   **Today, just Save-A-Lot.**
4    Q.   Okay.  And why do you use it with
5  Save-A-Lot?  The size?
6    A.   **The relationship started -- well,**
7  **our relationship with Marketing Concepts started**
8  **15 years ago or more.  They came -- they**
9  **contacted us and said they had -- they had a**
10  **relationship with Save-A-Lot and wanted to know**
11  **if we would be interested in working with them**
12  **on an egg program.**
13    Q.   But you dropped Marketing Concepts
14  for a period of time; right?
15    A.   **Yes.  And went with Alliance for**
16  **about a two-year period.**
17    Q.   Okay.  Was that at the request of
18  Save-A-Lot or was it your decision?
19    A.   **It was our decision to go with**
20  **Alliance.**
21    Q.   Okay.  But other than Save-A-Lot
22  then and the in-house broker for Kroger, you

---

293

1  don't use a broker for any other customers?
2    A.   **No.  That's not true.**
3        **We have some brokers for dried**
4  **products.**
5    Q.   I'm sorry.  I'm just focusing
6  specifically for shell egg?
7    A.   **Okay.  Trying to think if there's**
8  **a broker.  No -- that I can recall those are the**
9  **brokers that we use.**
10    Q.   Okay.  For those customers?
11    A.   **For?**
12    Q.   We've identified Kroger and
13  Save-A-Lot.  I just want to make sure that for
14  shell egg customers?
15    A.   **Topco.**
16    Q.   And Topco?
17    A.   **Yeah.**
18    Q.   And you use -- any other customers
19  that you use a broker for?  Again, I'm focusing
20  on shell egg customers.
21    A.   **Right.  Not that I can think of**
22  **right now.**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

75 (Pages 294 to 297)

---

294

1      Q.  All right.  Now, with respect to
2   Kroger, what percentage of your shell egg sales
3   are attributable to Kroger?
4      A.  I'm going to get real fuzzy on
5   calculating percentages, but I know loads that
6   they buy, so I'll just do my best.  I'm more
7   familiar with the number of loads customers
8   purchase that I think of by percentage of sales.
9   I'm in my mind trying to process that off the
10  top of my head.  I know how much people buy.
11     Q.  On a weekly basis?
12     A.  Yes.  Loads per week.  That's how
13  we think of -- the size of a customer is based
14  how many loads of eggs per week they purchase
15  from us.  Internally that's our thought process.
16     Q.  You're taking that as a percentage
17  of your --
18     A.  Total sales and trying to do it in
19  my head and calculate it for you.
20     Q.  What is your total loads per week
21  that you sell on average?
22     A.  Okay.  We sell -- on just shell

---

295

1   eggs?
2      Q.  Yeah.
3      A.  Okay.  We do --
4      Q.  I'm just trying to figure out what
5   you're using to come up with your percentage
6   like the 10 percent what your total loads?
7      A.  I'm using shell about
8   300 truckloads per week.
9      Q.  Okay.  And approximately how many
10  do you do for a week for Kroger?
11     A.  Loads?
12     Q.  Yeah.
13     A.  Oh, that's better.  We do
14  approximately about 16.
15     Q.  So we could take that as a factor
16  of 300 and get our percentage?
17     A.  Yes.
18     Q.  Okay.  And is that all commodity?
19     A.  No.
20     Q.  Okay.  What specialty eggs do you
21  sell?
22     A.  We sell Kroger an Omega-3 and a

---

296

1   cage-free.
2      Q.  Do you purchase those or do those
3   come from your own facilities?
4      A.  We purchase.
5      Q.  Who did you purchase from?
6      A.  From Eggs-R-Us and Trillium farms.
7      Q.  And how do you price the Omega-3
8   and the cage-free for Kroger?
9      A.  I think we discussed that this
10  morning, but we can review it.  We discussed the
11  Omega-3 and the cage-free would be priced -- we
12  go through the same process with cage-free as we
13  would with Omega-3.
14     Q.  Well, as I understand it, we
15  talked about the specialty egg pricing where you
16  take your costs and then you add a profit to get
17  to the bid price.  Remember that whole line of
18  questions; right?
19     A.  Yes.
20     Q.  Okay.  What about in a situation
21  here where you're actually purchasing the eggs?
22     A.  We look at the -- we take what we

---

297

1   purchased the eggs for and we add a profit to
2   arrive at a price.
3      Q.  All right.  And so when would you
4   have bid on the Kroger specialty egg business
5   last?
6      A.  About three months ago.
7      Q.  Okay.  And were you involved in
8   that?
9      A.  Yes.
10     Q.  What profit did you build into the
11  specialty egg bid?
12     A.  On which eggs?
13     Q.  On the Omega-3?
14     A.  Okay.  The Omega-3 has not been
15  bid for about a year and a half.
16     Q.  Okay.  What profit margin did you
17  build in?
18         MR. MONICA:  Objection.  The term
19  profit margin.
20         THE WITNESS:  As I described this
21  morning, the profit we added to our cost on the
22  Omega-3 that we sell Kroger, I don't recall

---

## 298

1  exactly what that profit was.
2  BY MR. STUEVE:
3       Q.  What did you bid in the past
4  three months?
5       **A.  Some cage-free eggs.**
6       Q.  All right.  What margin or profit
7  did you build into that?
8       MR. MONICA:  Objection to the term
9  margin.  You can answer.
10       THE WITNESS:  On the eggs that we
11  purchased?
12  BY MR. STUEVE:
13       Q.  On the bid to Kroger for the
14  cage-free?
15       **A.  Okay.  The recent sale to Kroger**
16  **on cage-free eggs are on loads we were**
17  **purchasing from other producers.**
18       Q.  Right.
19       **A.  And we took the price that we had**
20  **to pay and added a profit to that price to offer**
21  **Kroger a price for those eggs.**
22       Q.  And what was the profit that you

## 299

1  added?
2       **A.  Without looking at the exact**
3  **document I -- it would have been somewhere less**
4  **than $0.20.  I don't know the exact price.**
5       Q.  In the -- how long will this
6  contract then be in place with that profit built
7  in?
8       **A.  We have -- on some of the eggs it**
9  **will be through Thanksgiving this year, on an**
10  **approximate one load a week.**
11       **On the other load it would -- I**
12  **need to double-check, but I believe it's the --**
13  **the price was set through July and then it could**
14  **be reevaluated for a longer period of time.**
15       Q.  And how many loads a week?
16       **A.  That was a second load.**
17       Q.  Okay.  And is -- does the price
18  fluctuate at all based on what you have to pay
19  Egg Co. or Trillium?
20       **A.  The price?**
21       Q.  The price that you charge Kroger,
22  does it fluctuate based on the what you charge?

## 300

1       **A.  I'm selling Kroger at one price**
2  **for their cage-free eggs I'm selling them.**
3       Q.  Regardless what you have to pay
4  Egg Co. or Trillium?
5       **A.  Yes.**
6       Q.  Does that price you have to pay
7  Egg Co. or Trillium vary at all during this
8  period?
9       **A.  Well, as we discussed, the**
10  **Trillium is locked in until Thanksgiving next**
11  **year.  The Eggs-R-Us is something we would**
12  **review this summer and then see where that goes.**
13       Q.  And I think you're one step ahead
14  of me.
15       What I was asking you is, your
16  contract with Kroger for the price on the
17  cage-free we're talking about that you just bid
18  within the past three months; right?  Let me
19  back up.
20       It's my understanding you put a
21  bid into Kroger that was accepted by Kroger for
22  cage-free; is that correct, in the past

## 301

1  three months?
2       **A.  Yes.**
3       Q.  And the source for those eggs is
4  Egg Co. and Trillium; is that right?
5       **A.  Eggs-R-Us and Trillium.**
6       Q.  I'm sorry.  Eggs-R-Us and
7  Trillium.  So the bid that you submitted to
8  Kroger, does it fluctuate depending on the price
9  that you have to pay to Eggs-R-Us or Trillium?
10       **A.  No.  Like I said, I've got one**
11  **price to Kroger for their cage-free.**
12       Q.  I just didn't know -- I understand
13  that, but I didn't know if that price was a
14  formula that would fluctuate based on what you
15  have to pay to Trillium or Eggs-R-Us?
16       **A.  The price I sell to Kroger is a**
17  **fixed price.**
18       Q.  Okay.  And that fixed price has a
19  profit built in of somewhere in the $0.20 range;
20  is that correct?
21       **A.  Yes.  Less than $0.20, but, yes.**
22       Q.  Okay.  And then as I understand

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

302

1  your testimony, you also said that you lock in a
2  purchase price with Eggs-R-Us and Trillium for a
3  period of time; is that right?
4     **A.  Yes.**
5     Q.  All right.  And with respect to
6  Eggs-R-Us, how long have you locked in the
7  purchase price?
8     **A.  Like I already stated, it's like**
9  **July or midsummer.**
10    Q.  And then with respect to Trillium
11 how long did you lock that price in?
12    **A.  Until next Thanksgiving.**
13    Q.  All right.  And is that typically
14 how you bid your specialty eggs that you have to
15 purchase from a third-party, you give the
16 customer a set price that has a margin in it or
17 a profit in it and then you attempt to secure a
18 long-term contract with the supplier?
19       MR. MONICA:  Object to the term
20 margin.
21       THE WITNESS:  It's hard to lock in
22 at a long-term price in our business because of

303

1  the fluctuation in feed costs.  So you negotiate
2  what you can, but some of the customers you can
3  negotiate they would just state up front that
4  based on what feed is doing, so if there's a
5  movement in feed.  Typically it would be like a
6  quarterly adjustment to go back and review feed
7  cost.  They may want to increase or possibly
8  decrease the price based on what grain has done.
9  BY MR. STUEVE:
10    Q.  If you would, would you just
11 answer my question, though.
12       Is what you did here with Kroger,
13 is that your typical approach, which is you did
14 negotiate both with Trillium and Eggs-R-Us a
15 contract over a period of time for a set price;
16 right?
17       MR. MONICA:  Objection.  Vague as
18 to typical.  You can answer.
19       THE WITNESS:  I negotiated a set
20 price with Trillium and Eggs-R-Us for cage-free
21 eggs for Kroger.
22 BY MR. STUEVE:

304

1     Q.  And that covered a period of time;
2  right?
3     **A.  Yes.**
4     Q.  Okay.  And what I'm asking you is,
5  when you -- with your other customers on the
6  specialty eggs that you purchase, do you try to
7  do the same approach where you get a contract
8  with a supplier over a period of time and then
9  you bid the specialty egg based on your
10 knowledge that you can get the specialty egg at
11 that price for that period of time?
12    **A.  With a supplier that I would buy**
13 **eggs from for specialty eggs I would try and**
14 **negotiate a price for a period of time, which I**
15 **stated for in most cases would be a quarterly**
16 **and then with feed adjustment is how it**
17 **typically works.**
18    Q.  You keep saying you stated before.
19 If you just answer my question, because you
20 haven't answered some of these questions.  I'm
21 asking you because I'm trying to get
22 clarification.

305

1     So, with respect to Trillium, for
2  example, when did you negotiate the price
3  through the next Thanksgiving?
4     **A.  With Trillium?**
5     Q.  Yeah.
6     **A.  I negotiated it -- it was a**
7  **one-year price.**
8     Q.  Okay.  And do they get to adjust
9  that price at any time during that one year?
10    **A.  No.**
11    Q.  Okay.  And then you submitted a
12 bid to Kroger based on that one year price;
13 right?
14    **A.  Yes.**
15    Q.  And you built in a margin of
16 approximately $0.20 for that one-year period; is
17 that correct?
18       MR. MONICA:  Object to the term
19 margin.
20       THE WITNESS:  We built in a profit
21 for that period on the eggs we purchased from
22 Trillium and sold to Kroger.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

306

BY MR. STUEVE:

1  BY MR. STUEVE:
2      Q.    And that profit is approximately
3  20 percent; right -- $0.20; right?
4      A.    I said it was less than $0.20.  I
5  didn't know exactly what it was.
6      Q.    Somewhere in that range?
7      A.    Yes.  I said less than 20.
8      Q.    So, now, you also -- when did you
9  lock in your contract through July with
10 Eggs-R-Us?
11     A.    It was right around the first of
12 this year.
13     Q.    So that was approximately a six
14 month contract then?
15     A.    Yeah.  I guess I want to clarify.
16 I don't have written contracts.
17 So when you say contracts, I think of
18 agreements.  So I guess I want to clarify that.
19 There's no contract I can produce that's an
20 actual contract.  So it depends on what you want
21 to use, but it's an agreement.
22     Q.    You have an agreement for

---

307

1  six months at a set price from Eggs-R-Us?
2      A.    Yes.
3      Q.    And you bid the Kroger specialty
4  egg bid based on that set price from Eggs-R-Us
5  for six months; is that correct?
6      A.    I had a price established with
7  Kroger, already, from the bid with Trillium.
8      Q.    Okay.
9      A.    I secured an additional load and
10 offered it to Kroger for the same price that I
11 was selling them to Trillium at.  So I have one
12 price, as I stated before, with Kroger.
13     Q.    And so I just want to be clear
14 then.  So you don't have -- you don't -- as I
15 understand it now, you had a contract price with
16 Kroger that was based on the contract that you
17 had in place from your supplier, Trillium?
18     A.    Okay.  I do not have a contract
19 with Kroger and I do not have a contract with
20 Trillium.  I have agreements with both of them.
21     Q.    If you would, when I'm referring
22 to contract I'm talking about agreement?

---

308

1      A.    Okay.
2      Q.    A contract doesn't have to be in
3  writing, it can be oral, it can be whatever you
4  want.  So just so you know, when I'm referring
5  to contract I'm talking about an agreement;
6  okay?
7      A.    All right.
8      Q.    So you have a contract with
9  Kroger, initially, with respect to their
10 specialty egg that you bid based on the contract
11 you had with Trillium for one year; is that
12 right?
13     A.    Yes.
14     Q.    Okay.  And that contract that you
15 had with Kroger you built into that a profit of
16 somewhere just under $0.20 a dozen; is that
17 correct?
18     A.    Well, I said it's less than -- I
19 don't know the exact without looking at it.
20     Q.    Sir, I'm just trying to confirm
21 your testimony.  You have no idea -- I thought
22 you said earlier that it was just under $0.20?

---

309

1      A.    Well, that's not what I said.
2          MR. MONICA:  Hold on.  Objection.
3  You're badgering the witness.  You're being
4  argumentative.  You've asked the question five
5  times.
6          MR. STUEVE:  I just want to make a
7  record of this.  I repeatedly asked this witness
8  questions.  He won't answer them.  Then he
9  changes his testimony.  We're going back to the
10 Court if we can't get this depo done tomorrow
11 and ask for more time.
12         MR. MONICA:  Move to strike the
13 comments by counsel.  They are inaccurate.
14 You're harassing this witness.  You've asked him
15 20 times over and over and he keeps telling you
16 the same thing.  You don't like it so you keep
17 asking.
18         MR. STUEVE:  I don't even care.
19 It's not a question of whether I like it or not.
20 I want to make sure I understand.
21         MR. MONICA:  Are you asking him
22 questions you don't care about?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

310

1    MR. STUEVE:  You keep saying I
2  don't like his answer.  I want to understand his
3  answer.  That's what I want.
4    You start -- you use the term
5  contract.  I used the term contract then you
6  complained that I used the term contract, that
7  we don't have any contracts.  And so I'm just
8  trying to use your terminology.  You're the one
9  that started using margin, I started using
10 margin, then your lawyer started quibbling.  The
11 record's going to reflect that.  That the margin
12 -- so I had to go through this entire
13 questioning that profit and margin mean the same
14 thing.  So here's the preface to my following
15 question.
16    MR. MONICA:  First of all, I want
17 you to ask him a question, but I want to put on
18 the record.
19    MR. STUEVE:  Make your record.
20    MR. MONICA:  If you tell me to do
21 it and you talk over me I can't do it.  So
22 please don't talk over me.

311

1    You're asking him questions, you
2  clearly don't understand your own terminology.
3  You're asking him and trying to confuse him.
4  You're asking him over and over the same thing.
5  You don't like his answer so you keep asking him
6  again.  The record is going to reflect that.
7  Please ask your question again.  Mr. Hinton,
8  please do your best to answer the question he
9  asks you and make sure you understand what he's
10 asking you.
11    THE WITNESS:  I will.
12 BY MR. STUEVE:
13    Q.    I want to preface this by contract
14 means agreement, so when I say contract I mean
15 agreement?
16    A.    Okay.
17    Q.    Margin means the difference
18 between the sales price and your cost; okay?
19 And I want to take this in steps.  I'm going to
20 start with -- and I want to just understand the
21 chronology.
22    As I understand it, when you

312

1  submitted within the past three months a bid to
2  Kroger concerning their specialty eggs, you had
3  a contract in place with Trillium; is that
4  correct?
5    MR. MONICA:  I object to your term
6  contract, but please answer.
7    THE WITNESS:  I had an offer from
8  Trillium when I submitted it to Kroger.  I
9  didn't make the final agreement with Trillium
10 until Kroger accepted it.
11 BY MR. STUEVE:
12    Q.    Okay.  That's what I wanted to get
13 clarification.  So you had an offer in place
14 from Trillium for a set price for a cage-free
15 egg for one year; is that right?
16    A.    Yes.
17    Q.    Okay.  And based on that
18 information you added a margin or a profit of
19 some number below $0.20; correct?
20    MR. MONICA:  Object to the term
21 margin.
22    THE WITNESS:  I said I believe it

313

1  was less than $0.20 is what I said.
2  BY MR. STUEVE:
3    Q.    And you added that on to the offer
4  that you got from Trillium and submitted the bid
5  to Kroger; is that correct?
6    A.    Yes.
7    Q.    All right.  Kroger accepted your
8  bid?
9    A.    Yes.
10    Q.    You then accepted the offer from
11 Trillium?
12    A.    Correct.
13    Q.    Which locked in your price from
14 Trillium for one year?
15    A.    Yes.
16    Q.    Therefore, locked in your profit
17 for that one year period; correct?
18    A.    Not exactly.
19    Q.    Okay.  What is it about that that
20 is not exactly right?
21    A.    Okay.  The eggs I'm purchasing
22 from Trillium are nest runs, N-E-S-T, R-U-N.  So

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**314**

1    nest runs are ungraded, unwashed eggs.
2        Q.   I know what a nest run is.
3        A.   Okay.  So we purchased a nest run
4    from Trillium.  We pick them up and bring them
5    to our plant in North Vernon, Indiana.  Then we
6    turn around and wash and grade the eggs and pack
7    them into Kroger's carton.  So the reason I said
8    we don't know -- we didn't lock in a profit for
9    that whole year is because my freight costs
10   could change.  I pick up the eggs at Trillium's
11   dock and I bring them back to North Vernon, then
12   I deliver the material back to them.  So I don't
13   have a guaranteed freight rate for one year, so
14   that could fluctuate.  I don't have a guaranteed
15   processing cost in my plant for an entire year.
16   I don't have a guaranteed grade yield size loss
17   on those nest runs for that year.  So I don't
18   have a guarantee -- I can't sit there and tell
19   you that's a guaranteed locked in profit, but
20   the -- there will be runs, so it will fluctuate
21   some during that year on that load from
22   Trillium.

---

**315**

1        Q.   So you may make a little bit more
2    than $0.20, you may make a little bit less
3    depending on those factors; is that right?
4        A.   I may make a little bit more/less
5    than the profit that we started with, which is
6    somewhere as I recall, somewhere less than
7    $0.20.
8        Q.   Then, as I understand it, you then
9    submitted an additional bid to Kroger for
10   additional sales of cage-free eggs; correct?
11       A.   For a second load; correct.
12       Q.   And the source for that additional
13   load was Eggs-R-Us?
14       A.   Correct.
15       Q.   And what was the price that you
16   were paying to Eggs-R-Us compared to Trillium?
17       A.   It's a much different price
18   because we are buying graded packed -- the eggs
19   from Eggs-R-Us are already packed in the Kroger
20   carton.  So we're not doing the processing.  So
21   we're not buys nest runs.  We're buying finished
22   product.

---

**316**

1        Q.   Okay.  Was your profit, did it
2    come out to about the same, your projected
3    profit?
4        A.   I -- it was -- the initial
5    compared to where the Trillium started at, the
6    initial profit on Eggs-R-Us, I believe, is less
7    than what the Trillium is.
8        Q.   What cents per dozen range are we
9    talking about?
10       A.   Somewhere in the $0.05 to $0.10
11   range.
12       Q.   Where would you go to refresh your
13   recollection as to that margin or profit?
14       A.   To records in my office.
15       Q.   And specifically what records?
16       A.   A document I have from -- I would
17   have to -- two documents.  One, the purchase
18   price from Eggs-R-Us and, two, would be the
19   sales price to Kroger.
20       Q.   And would those be in the same
21   file?
22       A.   Which file?

---

**317**

1        Q.   I'm asking you, would they be in
2    the same file?
3        A.   I don't understand what you mean
4    by same file.
5        Q.   I thought you told me earlier that
6    you kept your documents related to the bidding
7    on -- in a file?
8        A.   For what bidding?
9        Q.   Let me ask it this way.
10           Are there multiple files that you
11   have that relate to your bidding?
12       A.   Our bid -- I guess I'm not -- to
13   our -- I guess explain the bidding.  I just want
14   to make sure I'm clear.
15       Q.   You just testified that there
16   would be a document that would reflect your bid
17   price to Kroger?
18       A.   Okay.  The price.  The pricing to
19   Kroger.
20       Q.   Hold on.  Let me finish.  You
21   testified there would be a document that would
22   reflect your bid price to Kroger and there would

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

81 (Pages 318 to 321)

---

318

1  be a document that would reflect your purchase
2  price from Eggs-R-Us; right?
3      A.  Yes.
4      Q.  Would those be kept in the same
5  file or would they be kept separately?
6      A.  I still want to know what file
7  we're talking about.  It's in the sales office.
8      Q.  Okay.  Do you keep them in files?
9      A.  They're either in a filing cabinet
10 or on the computer and in most cases in an
11 e-mail on our computers.
12     Q.  And what would be contained in the
13 e-mail?
14     A.  It would have a price to Kroger
15 that we're selling them for and then we also,
16 every week we get a price -- every Thursday
17 Kroger, we get a price sheet from Kroger stating
18 what that price is so we have all those saved.
19 They're in my computer, as well as Amanda's and
20 Cindy's and AR gets a copy of that.
21         Then the price from Eggs-R-Us
22 would be an on e-mail file in either Amanda --

---

319

1  probably Amanda and Cindy's computer.
2      Q.  Would there be an e-mail that
3  would have both the sales price to Kroger and
4  the purchase price from Eggs-R-Us?
5      A.  No.
6      Q.  Okay.  So in order for me -- this
7  is why I'm drilling down because I want to make
8  sure the Court understand why we're going to
9  have to come back here.  There is no way for me
10 to piece together what your purchase price was
11 with Kroger and what your -- excuse me.  Your
12 sales price to Kroger and your purchase price
13 to -- from Eggs-R-Us, they're not in one
14 document anywhere; is that correct?
15         MR. MONICA:  Objection.  Counsel.
16 You're talking about a transaction from
17 three months ago.  I don't know why you have to
18 come back here and get the Court involved over
19 that, but answer the question if you can.
20 BY MR. STUEVE:
21     Q.  Do you understand my question?
22     A.  Yes.

---

320

1      Q.  Okay.
2      A.  I don't believe there's a
3  document that would have -- in the same document
4  because it's two different issues.
5      Q.  Right.  And so the only way we
6  could piece together what on your pricing of
7  this sale, for example, of the specialty egg, is
8  if you were to review your records and piece
9  that together and then I could ask you that
10 question and you would be able to tell me,
11 sitting here today, what at least your profit
12 was anticipated on that transaction; correct?
13     A.  If I was to look at the price we
14 paid Eggs-R-Us and the price I sold to Kroger at
15 I could tell you what profit was added in.  Yes.
16     Q.  Okay.  And let's flip over to the
17 commodity sales that you made to -- that you're
18 making to Kroger; okay?
19     A.  Okay.
20     Q.  As I understand it, the last --
21 when was the last commodity bid that you made to
22 Kroger?

---

321

1      A.  It would have been last February.
2      Q.  Okay.  And what documents would
3  you look at in order to recreate that bidding
4  process to determine what profit you had built
5  into that bid?
6      A.  There's no profitability into that
7  bid.
8      Q.  Okay.  So how did you prepare that
9  bid?
10     A.  Well, it was -- on that particular
11 bid, which was for the Fry's, F-R-Y-'-S
12 Supermarkets in Phoenix, which Kroger owns, I
13 was the incoming supplier.  I supplied the Fry's
14 business for multiple years.  So when I -- when
15 it came up for bid we looked at what we were
16 selling at at the time.  We looked at our
17 current freight rates to deliver the eggs to
18 Phoenix and we sent in our price.
19     Q.  Okay.  And was that a competitive
20 bidding process?
21     A.  Yeah.  There were -- I was not the
22 only bidder for that business.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

82 (Pages 322 to 325)

---

322

1    Q.   And was it your business strategy
2 there that you were willing to bid that at your
3 costs with the hopes of maintaining the
4 relationship and making your margins on the
5 specialty egg side?
6         MR. MONICA:  Objection to the term
7 margin.  You can answer the question.
8         THE WITNESS:  We don't -- any time
9 we bid commodity eggs there's no guarantee on
10 any kind of profit on commodity.  So you're
11 selling off the market, off the Urner Barry
12 market and so our -- because it's based off the
13 market, the market changes daily, so there's no
14 set.  You set a discount to that market, but
15 that's all you can do.
16 BY MR. STUEVE:
17    Q.   And how long is your bid in place
18 for the commodity eggs for Kroger?
19    A.   **For the Fry's business,**
20 **three years.**
21    Q.   Okay.  So you're basically the --
22 price you're going to get is going to be subject

---

324

1 whether or not you're making a profit off of
2 that commodity contract?
3    A.   **No.**
4    Q.   Okay.  So how many different
5 contracts do you have with Kroger with respect
6 to commodity eggs?
7    A.   **Okay.  I'm going back to**
8 **contracts.  The contract on the Fry's business**
9 **in Phoenix.**
10    Q.   That's a written contract; right?
11    A.   **Yeah.  The only other eggs --**
12 **commodity eggs I'm currently selling Kroger is**
13 **some extra large eggs, about two and a half**
14 **loads a week to Shelbyville, Indiana.**
15    Q.   Okay.  When did you enter into
16 that contract?
17    A.   **That agreement was about -- maybe**
18 **a year, year and a half ago.**
19    Q.   And at the time did you build a
20 profit into that bid?
21    A.   **No.**
22    Q.   Okay.  Would that be true for all

---

323

1 to the fluctuation of the Urner Barry market;
2 right?
3    A.   **Correct.**
4    Q.   Your only alternative is I assume
5 you could terminate the contract when you wanted
6 to; right?
7    A.   **No.  It's a three year contract.**
8 **There's clauses.**
9    Q.   Are you obligated to supply for
10 three years?
11    A.   **Yes.**
12    Q.   Okay.  So you don't even have an
13 out?
14    A.   **Well, we would have to review the**
15 **language.  There is a contract on --**
16    Q.   A written contract?
17    A.   **Yes.**
18    Q.   Okay.
19    A.   **But I don't recall that I have a**
20 **specific out clause in it for myself.  No.**
21    Q.   Okay.  Do you track at all in any
22 way, let's take that contract with Kroger,

---

325

1 your commodity contracts?
2    A.   **For commodity -- on our commodity**
3 **shell eggs, because any market based commodity**
4 **shell egg bid there is no guarantee of any**
5 **profit.  In fact, a lot of times we sell at a**
6 **loss, depending on the market.**
7    Q.   How do you make money on your
8 shell egg business?
9    A.   **We hope that the egg market's high**
10 **enough over time that between the losses and the**
11 **gains that we come out ahead.**
12    Q.   But unlike your specialty egg,
13 you're not building in some profit at the time
14 you make the bid for the commodity eggs; is that
15 correct?
16    A.   **That's correct.**
17    Q.   Let's -- on Kraft how many loads a
18 week?
19    A.   **Kraft goes more in pounds because**
20 **they buy liquid eggs.**
21    Q.   Let's skip that because I want to
22 focus on shell eggs.  Let's just skip them.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                     March 17, 2014

83 (Pages 326 to 329)

---

**326**

1         Topco, how many loads?

2       **A.  All the Topco group members?**

3       Q.  Yeah.

4       **A.  Approximately 28 loads a week.**

5       Q.  And how do those loads break down

6 as far as types of shell eggs?

7       **A.  You mean the difference between**

8 **the commodity and specialty eggs?**

9       Q.  Yeah.

10      **A.  I believe it's about two loads of**

11 **specialty eggs.  So maybe a little over two, two**

12 **and a half.  So maybe 10 percent and 90 percent**

13 **commodity, roughly.**

14      Q.  And then Wal-Mart?  And by the

15 way, you had mentioned CCF.  Is this one in the

16 same when we are referencing Wal-Mart?

17      **A.  Yes, but what time period do we**

18 **want to talk about on the Wal-Mart?  Actually,**

19 **the numbers you're looking at are 2013; right?**

20      Q.  I'm just giving you the top

21 customers you identified earlier.

22      **A.  The ones you asked me for 2013?**

---

**327**

1       Q.  Yeah.

2       **A.  Okay.  All right.**

3       Q.  I'm just going down the list you

4 gave me earlier.

5       **A.  For 2013?**

6       Q.  I think it was based on the data

7 that you believed was the most current?

8       **A.  You asked me 2013.**

9       Q.  So --

10      **A.  I want to make sure that's the**

11 **ones we're talking about.**

12      Q.  I'm not trying to put words in

13 your mouth.  You felt like the gentleman that

14 puts together the list did not have 2013 done,

15 but you felt like you had enough information

16 that you could give me the list you gave me; is

17 that correct, sir?

18      **A.  2013.  I just want to make sure**

19 **we've got the right year because I don't sell**

20 **CCF shell eggs today.**

21      Q.  I'm just trying to tell you what

22 you told me.  So I don't know what data you're

---

**328**

1 relying on, whether it was 2012 or 2013.  You

2 had testified and as I understood, that I had

3 current customer, but I don't know what year

4 you're talking about.  So are you telling me

5 it's 2013?

6       **A.  Yes.**

7       Q.  Okay.  Fair enough.  So why is

8 that important to you?

9       **A.  Because you asked me if that was**

10 **CCF and it's not in 2013.**

11      Q.  Okay.

12      **A.  If we than want to go to 2002 we**

13 **can talk about CCF.  You asked me in 2013 how**

14 **many I sold to Wal-Mart.**

15      Q.  I didn't ask you that question.

16      **A.  Yes.  You did.**

17      Q.  My question was, when I was

18 referring to CCF was it Wal-Mart or CCF?

19      **A.  I was referring to the question**

20 **before that.**

21      Q.  Let me just get clarification on

22 that; okay.

---

**329**

1       So as I understand it for 2013,

2 when we're talking about Wal-Mart you're dealing

3 directly with Wal-Mart?

4       **A.  Yes.**

5       Q.  Okay.  When did you stop dealing

6 with CCF?

7       **A.  2011.**

8       Q.  Okay.  And why did you stop in

9 2011 dealing with CCF?

10      **A.  Because Wal-Mart for the first**

11 **time I recall went out with a national egg bid**

12 **for all their divisions and we made a decision**

13 **as a company that we would bid on Wal-Mart**

14 **direct instead of working with Country Creek.**

15      Q.  Okay.  So when -- so did you get

16 the Wal-Mart bid in 2011 directly from them?

17      **A.  Yes.**

18      Q.  For calendar year 2011?

19      **A.  It was -- the bids came out**

20 **sometime in the summer of 2011 was due in the**

21 **fall and the business was awarded approximately**

22 **around September 2011 for a three year contract.**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

84 (Pages 330 to 333)

---

330

1    Q.   Okay.  And so now -- so let's talk
2 about 2013 Wal-Mart.  How many loads?
3    A.   About ten loads direct with
4 Wal-Mart.
5    Q.   And how does that break down?
6    A.   It's 100 percent commodity.
7    Q.   And is that pursuant to the bid
8 you submitted in the summer of 2011?
9    A.   Yes.
10    Q.   And what was that bid?
11    A.   For -- we bid approximately -- I
12 think we put in -- we put in a bid price for
13 approximately 12 Wal-Mart warehouses at that
14 time, and we were awarded one.
15    Q.   Okay.  And what was the bid price?
16    A.   I don't remember the exact bid
17 price.
18    Q.   If we were trying to determine
19 that what document or documents would that
20 information be contained in?
21    A.   It's in my filing cabinet that was
22 copied for --

---

331

1    Q.   Would it be in one document or
2 would it be in multiple documents?
3    A.   Because it was 12 divisions they
4 would have been -- there are documents for each
5 division we bid on.
6    Q.   And would there be a date or
7 indication on there if we were looking at those
8 documents that would allow us to determine
9 whether or not this was a bid document for the
10 summer of 2011?
11    A.   Yes.  I believe so.
12    Q.   Who would have been assisting you
13 with that bid?
14    A.   Amanda Jackson and Greg
15 Marshall -- I don't know if Lindsey worked on
16 that bid or not.  I can't remember if it was
17 it was Lindsey.  Mainly it would have been
18 Amanda, myself and Greg Marshall.
19    Q.   And then Cal-Maine how many loads?
20    A.   About 17.
21    Q.   And how would that break down?
22    A.   It would be 98 -- 98, 99 percent

---

332

1 commodity.
2    Q.   And where -- would Cal-Maine pick
3 the eggs up?
4    A.   Yes.
5    Q.   And do you know what they were
6 doing with those eggs?
7    A.   Some of them.
8    Q.   What were they doing with them?
9    A.   Selling to Wal-Mart and to Food
10 Lion.
11    Q.   What about US Foods?  How many
12 loads?
13    A.   It's all food service, so it's not
14 retail, it's shell eggs.  US Foods would be
15 about 15.
16    Q.   And do you have a -- when's the
17 last time you bid that business?
18    A.   It's been about two years.
19    THE REPORTER:  I'm sorry, counsel.
20 I got a note that the real time stopped.  Do we
21 need to go off the record for a minute?
22    THE VIDEOGRAPHER:  The time is

---

333

1 5:01 p.m.  We are going off the record.
2    (A brief recess was taken.)
3    THE VIDEOGRAPHER:  The time is
4 5:15 p.m. and we are back on the record.
5 BY MR. STUEVE:
6    Q.   The next customer you identified
7 as far as top customers for 2013 is AWG.
8 Approximately how many loads do you ship to AWG?
9    A.   Approximately a little over ten
10 loads a week.
11    Q.   And how does that break down?
12    A.   It would be 95 percent plus
13 commodity eggs and a couple -- less than
14 5 percent specialty eggs.
15    Q.   And do you deliver all those to
16 AWG's warehouse?
17    MR. MONICA:  Objection.
18    THE WITNESS:  No.  AWG for Kansas
19 City?
20 BY MR. STUEVE:
21    Q.   Yeah.
22    A.   AWG picks up the majority.  We

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

85 (Pages 334 to 337)

---

334

1  deliver one or two loads a month.  The rest they
2  pick up at our farm.
3        Q.  Okay.  So it's a percentage, is it
4  98 percent pick up?
5        A.  Yes.  Approximately.
6        Q.  And those that you are delivering,
7  where are you delivering those?
8        A.  To the Kansas City warehouse of
9  AWG.
10       Q.  And you would have -- it's your
11 testimony with respect to the bidding for the
12 commodity eggs that when you submitted that bid
13 in -- that would have been the spring of 2013,
14 that you did not build in any margin at the time
15 you submitted that bid; is that correct?
16       A.  For the -- on commodity eggs?
17       Q.  Yeah.
18       A.  Yes.  That's correct.
19       Q.  And then with respect to the
20 specialty eggs, you did build in a margin; is
21 that correct?
22            MR. MONICA:  Object to the term

---

335

1  margin.  You may answer.
2            THE WITNESS:  We would have -- at
3  the time of the bid we would have looked at our
4  cost and then added on the extra such as
5  packaging and added a profit to that.
6  BY MR. STUEVE:
7        Q.  Now, your counsel has repeatedly
8  objected to my use of the term "margin"
9  throughout the day.  You've heard those
10 objections; correct?
11       A.  Yes.
12       Q.  I just want to make sure I
13 understand your testimony, that prior to today
14 you did not use the term "margin" to reflect
15 that amount that you would add on above your
16 cost in the submitting a bid for specialty eggs;
17 is that your testimony?
18            MR. MONICA:  Object to the form of
19 the question.  You can answer.
20            THE WITNESS:  Correct.  On the
21 specialty eggs that we sold AWG internally we
22 refer to it as profit.

---

336

1  BY MR. STUEVE:
2        Q.  And you've never used the term
3  margin to describe that profit; correct?
4        A.  In regards to the specialty eggs
5  that we're talking about?
6        Q.  Uh-huh.
7        A.  Correct.
8        Q.  With respect to Flowers, how many
9  loads per week?
10       A.  It's all dried product, so it
11 would be -- I'm not sure exactly.  I would have
12 to review to look up the loads per week, but the
13 pounds for the Flowers bid would have been
14 approximately five million pounds.
15       Q.  This would have been liquid?
16       A.  It's all dried.
17       Q.  Dried.  Excuse me.
18            Let's focus on 2012, and
19 specifically the folks that you've identified
20 here, would they, for 2012 would they have
21 approximately -- excluding AWG because obviously
22 they were not a customer?

---

337

1        A.  Correct.
2        Q.  We'll go down the list here.  Was
3  Save-A-Lot approximately the same number of
4  loads in 2012?
5        A.  Yes.
6        Q.  For how long -- how many years had
7  you doing approximately 10 percent of your
8  business?
9        A.  With Save-A-Lot?
10       Q.  Yeah.
11       A.  It would have ranged from 7 to
12 10 percent, going back to 2000.
13       Q.  And, again, so is it -- when you
14 said 10 percent, is that approximately 30 loads
15 in 2013?  Is that how you came up with the
16 10 percent?
17       A.  2013 they were approximately 40
18 loads.
19       Q.  Okay.  So it would have been
20 slightly above 10 percent?
21       A.  Yes.
22       Q.  And then so what has been the

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

338

1  range as far as loads per week over the last
2  several years?
3       **A.   Over the last several years it's**
4  **been pretty similar.  It could have probably**
5  **increased a couple loads over the last two years**
6  **because they opened up a new warehouse.**
7       Q.   What about Aldie's?  Would it have
8  been approximately the same number of loads?
9       **A.   No.**
10      Q.   You used approximately 8 percent,
11 what was the load per week you were using for
12 2013?
13      **A.   For Aldie it would have been --**
14 **2013 just under 30 loads.**
15      Q.   Okay.  And how has that fluctuated
16 in the past several years?
17      **A.   Prior to this past year we were**
18 **selling Aldie about 40 loads.**
19      Q.   Okay.  For how many years?
20      **A.   The 40 loads would have been for**
21 **probably at least five years.**
22      Q.   Okay.

---

339

1       **A.   Four to five, but going back to**
2  **2000 they've been over 20 loads.**
3       Q.   And then what about Kroger?  You
4  indicated 16 loads for 2013.  Where have they
5  fallen in the last several years?  What's the
6  range been as far as the number of loads per
7  week?
8       **A.   It's been the same there since**
9  **2012.  Prior to that we sold them approximately**
10 **35 loads.**
11      Q.   For how many years?
12      **A.   Probably more than five.**
13      Q.   Okay.  And then what about Topco?
14 You indicated 28 loads in 2013.  Approximately
15 how many loads have you been doing for the past
16 several years?
17      **A.   Prior to -- prior to 2012 only**
18 **about five loads.**
19      Q.   For how many years?
20      **A.   For since we've been dealing**
21 **with -- at least eight years -- seven -- eight.**
22      Q.   So in 2012 and 2013 that increased

---

340

1  dramatically?
2       **A.   Yes.**
3       Q.   And what caused that increase?
4       **A.   We picked up Hy-Vee as an account**
5  **and Larroc.**
6       Q.   And which -- all the Hy-Vee
7  stores?
8       **A.   Yes.**
9       Q.   What percentage of their shell
10 eggs do you provide?
11      **A.   I don't know their exact sales of**
12 **some of their specialty eggs, but I would**
13 **estimate at least 98 percent.**
14      Q.   Now, are there any significant
15 customers that you've had in the past as far as
16 loads per week that you haven't -- that we did
17 not identify?  Obviously you gave me 2013.  Were
18 there some significant customers that you had
19 that you no longer sell to or that has dropped
20 off dramatically?
21      **A.   Yes.**
22      Q.   And who would those customers be?

---

341

1       **A.   CCF Brands.**
2       Q.   Okay.  We've talked about that.
3       **A.   Okay.**
4       Q.   Who else?
5       **A.   Dutt & Wagner -- sorry.  Not Dutt**
6  **& Wagner.  Sorry.  Well, okay.  I still sold**
7  **Dutt & Wagner, but their volumes dropped off.**
8  **Back in 2000 they would have been in my top ten**
9       Q.   They're a distributor; is that
10 right?
11      **A.   Yes.**
12      Q.   Any others?
13      **A.   Certified Grocers, that we**
14 **discussed earlier.**
15      Q.   And are you familiar with the
16 company that purchased them?
17      **A.   I'm aware of who they are.  Yes.**
18      Q.   Is their business model similar to
19 Certified Foods, as far as you know?
20      **A.   As far as I know.  Yes.**
21      Q.   Any others?
22      **A.   Well, we discussed our Kroger**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

342

1  volume because you asked me prior.  Our Kroger
2  volume dropped off.  We still sell to Kroger,
3  but the volume changed.  Prime Foods we
4  discussed before, he's a distributor.  At one
5  time he would have made my top ten.
6      Q.  Any others?
7      A.  No.  Not offhand.  We've had most
8  of our customers for a long time.
9      Q.  Okay.  Now, with respect to topic
10  14 it says, "your principal competitors and
11  whether you compete with these companies in
12  selling eggs and egg products to AWG and AWG
13  members."  Do you see that topic?
14      A.  Yes.
15      Q.  Now, I had asked you earlier who
16  you believed would have been in a position to
17  bid on the AWG business.  Do you remember that?
18      A.  Yes.  I do.
19      Q.  And would those -- would those
20  companies that you identified certainly be your
21  principal competitors certainly in the region
22  AWG sells -- AWG's distribution centers are

343

1  located?
2      A.  Yes.  The ones I mentioned.
3      Q.  So you mentioned Moark; right?
4      A.  Correct.
5      Q.  And would that be one of your
6  principal competitors?
7      A.  Yes.
8      Q.  They're UEP certified; is that
9  correct?
10      A.  Yes.
11      Q.  Is Sparboe one of your principal
12  competitors?
13      A.  Yes.
14      Q.  They're currently UEP certified;
15  correct?
16      A.  Yes.
17      Q.  Centrum Farms, one of your
18  principal competitors?
19      A.  Yes.
20      Q.  They're UEP certified; correct?
21      A.  Yes.
22      Q.  Cal-Maine, one of your principal

344

1  competitors?
2      A.  Yes.
3      Q.  They're UEP certified; correct?
4      A.  Correct.
5      Q.  Midwest Poultry, one of your
6  principal competitors?
7      A.  Yes.
8      Q.  They're UEP certified; correct?
9      A.  Correct.
10      Q.  Creighton Brothers, one of your
11  principal competitors?
12      A.  Yes.
13      Q.  They're UEP certified; correct?
14      A.  Correct.
15      Q.  Weavers, one of your principal
16  competitors?
17      A.  Yes.
18      Q.  They're UEP certified; correct?
19      A.  Correct.
20      Q.  Mylar, they're one of your
21  principal competitors?
22      A.  Correct.

345

1      Q.  They're UEP certified?
2      A.  Yes.
3      Q.  Feather Crest, they're one of your
4  principal competitors?
5      A.  I consider them more minor
6  competitor than competitor yes.
7      Q.  They're UEP certified?
8      A.  Yes.
9      Q.  Where would UEP go if you're in
10  the Midwest to purchase eggs, shell eggs, other
11  than UEP certified?
12      MR. MONICA:  Objection.  You said
13  UEP.
14  BY MR. STUEVE:
15      Q.  Excuse me.  Let me rephrase that.
16  Where would AWG go to buy eggs from an egg
17  producer in the Midwest that is not UEP
18  certified?
19      A.  If they wanted to buy nonUEP
20  certified eggs?
21      Q.  Yeah.  Who would that be?
22      A.  Sonstegard Foods.

## HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

88 (Pages 346 to 349)

---

346

1    Q.   Where are they located?
2    A.   In Iowa.
3    Q.   Okay.  And how many birds do they
4  have?
5    A.   About 8 million.
6    Q.   And have they always been nonUEP
7  certified?
8    A.   Yes.
9    Q.   Do they have their own animal
10 welfare program; do you know?
11   A.   I'm not aware of what they have.
12   Q.   Do you know who they sell their
13 eggs primarily to?
14   A.   I believe a lot -- I think --
15 well, I believe a lot of them go to California.
16   Q.   And to who?  Who are they selling
17 in California?
18   A.   I know they've sold Hidden Villa
19 Ranch is one person, but I don't know who else
20 they sell to.
21   Q.   Are they cage-free eggs?
22   A.   No.

---

347

1    Q.   They're caged eggs?
2    A.   Yes.
3    Q.   Okay.  And you're saying that you
4  believe they sell to customers in California; is
5  that right?
6    A.   Yes.
7    Q.   Where else do they sell?
8    A.   I would think they sell through
9  the Midwest, but I don't know their customers.
10 I mean, I don't know their exact customers.
11   Q.   But the principal competitors you
12 identified earlier that you compete against, all
13 of them are UEP certified; correct?
14   A.   The ones that you asked me about
15 for the AWG bid.
16   Q.   Yes.
17   A.   Yes.
18   Q.   Now, when you -- when you spoke
19 with UEP when you came out here before, the 2013
20 bid?
21   A.   You mean --
22   MR. MONICA:  AWG.

---

348

1    MR. STUEVE:  Excuse me.  AWG.
2  When you came out before AWG -- it's a long day.
3  I apologize.
4    When you came out for the 2013 bid
5  for AWG you mentioned the topic of UEP certified
6  came up; is that correct.
7    THE WITNESS:  No.  I don't think I
8  mentioned that.
9  BY MR. STUEVE:
10   Q.   Okay.  You don't recall that
11 coming up; is that correct, in your discussions?
12   A.   Before I came out for the bid.
13   Q.   No.  When you came out for the
14 bid?
15   A.   During the bid.  Okay.
16   Q.   Let me -- let me be clear about
17 what I'm asking you.
18    As I understand it, you got an
19 RFP?
20   A.   Yes.
21   Q.   It had some questions in it?
22   A.   Yes.

---

349

1    Q.   You then came out to visit AWG?
2    A.   Correct.
3    Q.   During that visit did the topic of
4  UEP certified come up?
5    A.   I believe it did.
6    Q.   Who do you believe asked about
7  that?
8    A.   Linda did most of the talking on
9  that.
10   Q.   Now, did you ask if there were
11 some other animal welfare program that would be
12 sufficient for AWG?
13   A.   No.  There's no reason to.
14   Q.   Because you were UEP certified;
15 right?
16   A.   Yes.  They asked us on the RFP if
17 we were and we said yes.  There would have been
18 no reason to bring up anything else.
19   Q.   Now, what I'm asking you, you
20 didn't ask to modify any of the specifications
21 that you are aware of; is that correct?
22   A.   No.  Because I can meet the

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

350

1  **specifications as they asked for them.**
2      Q.   You understood, though, you could
3  modify them -- you could ask for them to be
4  modified; right?
5          MR. MONICA:  Objection.  Assumes
6  facts not in evidence.
7          THE WITNESS:  I would have had no
8  reason to ask to modify.
9  BY MR. STUEVE:
10     Q.   Okay.  But you didn't have an
11  understanding you would be prohibited from
12  modifying any specification; correct?
13     **A.   It's not common practice for me to**
14  **ask a customer to change his specs that I could**
15  **already meet.  Why would I ask him to change it?**
16     Q.   And do you know whether the other
17  companies that submitted a bid, whether or not
18  they sought to modify any of the specifications?
19     **A.   I don't know.**
20         MR. MONICA:  Objection.  Assumes
21  facts not in evidence.  Calls for speculation.
22         THE WITNESS:  I would have no

---

351

1  knowledge of what any other competitor asked.
2  BY MR. STUEVE:
3      Q.   All right.  Did you provide any
4  documentation to AWG concerning your compliance
5  with the UEP certified program?
6          MR. MONICA:  Objection as to
7  timeframe.
8          THE WITNESS:  When we met with
9  them?
10  BY MR. STUEVE:
11     Q.   Yeah.
12     **A.   When Amanda and I went out?**
13     Q.   Yeah.
14     **A.   Yes.  I believe we did.**
15     Q.   What did you provide them?
16     **A.   A booklet with our animal -- UEP**
17  **animal welfare certificate along with our SQF**
18  **certifications and the brochure with our -- just**
19  **a Rose Acre brochure.  It has pictures of our**
20  **farms in it and talks about some of our**
21  **capabilities.  And then -- what other**
22  **documents -- I would have to refer back to the**

---

352

1  **booklet to get the rest of the information that**
2  **was in it.**
3      Q.   Did you provide them any copies of
4  the audits that you had?
5      **A.   Not at that visit.  No.**
6      Q.   Have you ever provided them any
7  copies of your audits that you're aware of?
8      **A.   I'm not aware for sure.**
9          MR. STUEVE:  It's 5:35.  Do you
10  want to take a break.
11         MR. MONICA:  Keep going.
12         MR. STUEVE:  Okay.
13  BY MR. STUEVE:
14     Q.   Do you -- we talked -- one of the
15  topics is your -- let's -- why don't we move to
16  that.  It talks about your communications with
17  number 12, topic number 12.  Do you see that?
18     **A.   Yes.**
19     Q.   Your relationship with any AWG
20  member, including the other Plaintiffs -- hold
21  on.  I'm sorry.  I skipped.
22         It's number 11.  I'll get to 12,

---

353

1  but number 11.  Your relationship with AWG?
2      **A.   Okay.**
3      Q.   We talked about the -- you believe
4  that you submitted a bid in '06, but did not get
5  any part of that bid; is that correct?
6      **A.   Correct.**
7      Q.   And then we talked about the 2013
8  bid process; right?
9      **A.   Yes.**
10     Q.   And you also talked about
11  inquiries about submitting a bid between '06 and
12  2013.  Do you recall that?
13     **A.   Yes.**
14     Q.   And approximately what timeframe
15  was that?
16     **A.   End of '08, end of '09.**
17     Q.   Okay.  And did you submit a bid
18  during that time?
19     **A.   No.**
20     Q.   Okay.  And why not?
21     **A.   We were instructed that they were**
22  **not accepting bids.  They were happy with their**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

354

1  current supplier and were not bidding out the
2  business.
3      Q.   Okay.  So the only time you
4  actually submitted bids, as far as you know, to
5  AWG would have been '06 and then spring of 2013?
6      A.   No.
7      Q.   Any other time?
8      A.   Yeah.  I told you earlier, '04.
9      Q.   Okay.  I'm sorry.  Between '06 and
10 2013 you submitted no other bids?
11     A.   Not that I recall.
12     Q.   All right.  Then in '04, you
13 testified about that?
14     A.   Yes.
15     Q.   All right.  Any other contact Rose
16 Acre would have had with AWG other than the ones
17 you just testified to?
18     A.   Not that I recall.
19     Q.   Okay.  Who else -- would Amanda
20 Jackson have information related to that?
21     A.   Lindsey Schepman, I discussed it
22 with her, about AWG.

355

1      Q.   All right.  What about -- have you
2  participated in any of AWG's food shows?
3      A.   No.
4      Q.   Have you -- you are aware they do
5  have food shows?
6      A.   Actually, not until I read this.
7      Q.   Okay.  All right.  The -- as I
8  understand it, you were not involved in any of
9  the advertising of any of Rose Acre's eggs that
10 are being sold at member stores?
11     A.   Correct.
12     Q.   All right.  And no one at Rose
13 Acre would be involved in that; is that correct?
14     A.   Correct.
15     Q.   All right.  And then your egg and
16 egg product sales to AWG, we talked about the
17 current contract you have in place.  Anything
18 else you have to offer on that?
19     A.   Well, prior -- sometime in the
20 '90s we sold eggs to Dutch Farms, who in turn
21 sold them to AWG as their customer.
22     Q.   All right.  And do you remember

356

1  for how long?
2      A.   I think it was several years.
3      Q.   Into the 2000s?
4      A.   I don't know if it came into 2000
5  or not.  It may have just been in the '90s.
6      Q.   Okay.  Any other contact with AWG
7  concerning egg or egg product sales?
8      A.   Not that I recall.  No.
9      Q.   Okay.  The bidding for AWG's
10 bidding, have we identified everything you're
11 aware of?
12     A.   For?
13     Q.   AWG's -- the bidding?
14     A.   From any time?
15     Q.   Yeah.
16     A.   That I recall.  Yes.
17     Q.   Okay.  And then we -- topic, part
18 G, your employees agents, including but not
19 limited grocery brokers who sell to or
20 correspond with AWG regarding eggs and egg
21 products?
22          MR. MONICA:  Counsel, would you

357

1  tell him which topic?
2  BY MR. STUEVE:
3      Q.   Topic 11G.  I believe I did.  Why
4  don't you review that topic first and I'll break
5  it up.
6      A.   I guess what specifically do you
7  want to know?
8      Q.   Well, I just want to break it up.
9  First of all, the employees.  You've already
10 identified Linda Schepman.
11     A.   Lindsey Schepman.
12     Q.   Lindsey Schepman?
13     A.   Amanda Jackson.
14     Q.   Amanda Jackson, you?
15     A.   And Matt Nieble.
16     Q.   And Matt Nieble.  Matt Nieble
17 would have had contact with AWG as part of the
18 2013 bid?
19     A.   He followed up with them.  As I
20 stated earlier, he visited AWG with Amanda once
21 we were awarded the business.
22     Q.   Okay.  And any other contact of

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

91 (Pages 358 to 361)

---

358

1  Matt Nieble with AWG other than that?
2      A.  **Not prior to that visit.  No.**
3      Q.  And then afterwards?
4      A.  **Yes.**
5      Q.  Does he have the principal contact
6  with them?
7      A.  **Yes.**
8      Q.  And who does he principally deal
9  with?
10     A.  **With Linda.**
11     Q.  Okay.  Any other employees that --
12 of Rose Acre that would have had contact with
13 AWG that we haven't identified?
14     A.  **No.**
15     Q.  Okay.  And then as far as brokers?
16     A.  **No.**
17     Q.  Okay.  Any other representative of
18 Rose Acre, whether they're an employee or not,
19 that would have contact with AWG on behalf of
20 AWG?
21     A.  **It's possible that Phyllis Roberts**
22 **has had contact with someone at AWG regarding**

---

359

1  **egg taxes and Amy Sheldon.  She's our accounts**
2  **receivable manager.  So on invoices Amy or**
3  **someone in Amy's department I'm sure has had**
4  **contact with AWG on invoicing.**
5      Q.  Okay.  And then with respect to
6  topic 12, "your relationship with any AWG
7  member, including other Plaintiffs or
8  third-party Defendants."  Do you see that?
9      A.  **Yes.**
10     Q.  Have you had any -- you, I'm
11 starting with you, had any direct contact with
12 any of AWG's members over the years?
13     A.  **Yes.**
14     Q.  Which ones?
15     A.  **Houchens Industries,**
16 **H-O-U-C-H-E-N-S.**
17     Q.  And what contact have you had with
18 Houchens?
19     A.  **They're a customer of ours and**
20 **they want to sell us insurance.**
21     Q.  With respect to their egg
22 purchases, how long have they been a customer of

---

360

1  Rose Acre?
2      A.  **Probably at least -- more than**
3  **five years.**
4      Q.  Okay.  And both commodity and
5  specialty?
6      A.  **I believe we only sell them**
7  **commodity.**
8      Q.  And who has principal
9  responsibility for that account?
10     A.  **Amanda Jackson.**
11     Q.  Do you know what the weekly loads
12 are?
13     A.  **About -- a little over a load a**
14 **week.**
15     Q.  And do you know whether Houchens
16 buys eggs from anyone else other than Rose Acre?
17     A.  **I don't know for sure.**
18     Q.  And AWG did not --
19     A.  **Oh.  I'm sorry.  I do know that**
20 **Houchens Industries does buy eggs from**
21 **Save-A-Lot.**
22     Q.  The wholesaler?

---

361

1      A.  **Yes.**
2      Q.  And do you know how much?
3      A.  **Volume, no.**
4      Q.  Okay.  How do you know that?
5      A.  **Because when I was on Houchens' --**
6  **well, I've been -- I've known it a couple of**
7  **ways.**
8          **I've known for several years that**
9  **Houchens was a franchisee holder in Save-A-Lot**
10 **and recently when I've been on their website**
11 **they list their -- that they own Save-A-Lot**
12 **stores and locations where those stores are**
13 **located.**
14     Q.  Now, the fact that you sold eggs
15 directly to Houchens did not in any way
16 disqualify you from submitting a bid for AWG's
17 bid in 2013; is that correct?
18     A.  **Correct.**
19     Q.  Other than Houchens, do you have
20 any direct contact with any other AWG member?
21     A.  **Not that I'm aware of.**
22     Q.  With respect to the approximately

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

362

1  load per week, does Houchens pick it up from one
2  of your facilities?
3      A.  Yes.
4      Q.  Okay.
5      A.  Majority of the time.  There could
6  have been a time they asked to have something
7  delivered, but their practice is to pick up.
8      Q.  Okay.  Now, have you attempted to
9  solicit business from any of AWG's members,
10 other than -- other than the sales to Houchens,
11 have you attempted to solicit business from
12 any --
13     A.  Not that I'm aware of.
14     Q.  Okay.  All right.  I think we've
15 got to change the tape; is that right?
16         MR. MONICA:  Let's not take a
17 break if that's okay.
18         THE VIDEOGRAPHER:  The time is
19 5:45 p.m.  We are going off the record.
20         (Videotape change.)
21         THE VIDEOGRAPHER:  This is the
22 start of media unit number six.  The time is

363

1  5:52 p.m. and we are back on the record.
2  BY MR. STUEVE:
3      Q.  So we were -- I want to turn you
4  back to 11H.  "It's why you do business with
5  AWG."  Do you see that?
6      A.  Yes.
7      Q.  What -- who made the decision at
8  Rose Acre to submit the bid in 2013?
9      A.  The decision to submit the bid.
10 Amanda and myself.
11     Q.  Okay.  And what were the business
12 reasons why you felt it made good business sense
13 for Rose Acre to submit the bid?
14     A.  Because they buy eggs and we're in
15 the business of selling eggs.
16     Q.  Okay.  And was it attractive to
17 you that they were a large buyer of eggs?
18     A.  Yes.
19     Q.  Okay.  And I think we've seen that
20 certainly many of your customers are large
21 volume purchasers; correct?
22     A.  Yes.  They are.

364

1      Q.  And these folks, because they're
2  large volume purchasers, are able to pick up the
3  eggs on their own or Rose Acre drops them off at
4  a distribution center; correct?
5      A.  Yes.
6         MR. MONICA:  Give me time to
7  object.  Objection.  Go ahead and answer,
8  please.
9         THE WITNESS:  Oh.  Which customers
10 are we talking about?  I'm sorry.  Are we
11 talking about AWG?  I want to make sure.
12         MR. STUEVE:  Why don't you read
13 back my question.  If you don't understand I'll
14 rephrase it.
15         (The record was read as
16 requested.)
17         THE WITNESS:  I guess.
18         MR. MONICA:  He answered it.  Are
19 you going to ask him again?
20         MR. STUEVE:  No.  I wanted to read
21 the question and the answer.
22         MR. MONICA:  I have a belated

365

1  objection to this being vague.  You're talking
2  about the question, but he already answered it.
3         THE WITNESS:  That last question?
4         MR. MONICA:  Yeah.
5  BY MR. STUEVE:
6      Q.  You answered it yes.  Do you want
7  to qualify it?  Because I want to make sure, it
8  sounds like --
9      A.  I would like to qualify it.
10     Q.  Okay.  Go ahead?
11     A.  We have customers, large and some
12 very small, that have the ability to pick up
13 eggs and we deliver.  So it's not only large
14 customers, but even our smaller customers have
15 the ability to pick up their eggs.  You don't
16 have to be a large customer to go pick up your
17 own eggs.  I just wanted to make that clear.
18     Q.  Their willingness to pick up their
19 eggs is because they've got a large volume that
20 they're going to be picking up; right?
21         MR. BARNES:  Objection.
22 Speculation.

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

93 (Pages 366 to 369)

366

1      THE WITNESS:  No.  I think they
2  pick up because they have trucks in the areas of
3  our farms where they may be delivering groceries
4  to their stores and it is advantageous to come
5  back and pick up eggs because for them to have a
6  back haul it helps with your freight costs.
7  BY MR. STUEVE:
8      Q.    And those trucks they come by with
9  they are very large trucks; right?
10     A.    Yes.  They are semi tractor
11 trailers.
12     Q.    And do you have any large volume
13 purchaser that you ship directly to their
14 stores?
15     A.    Define a large volume purchaser.
16     Q.    The customers that we identified,
17 your top ten customers.  Do you have any that
18 you deliver directly to their stores?
19     MR. MONICA:  Object.  Part of it's
20 been asked and answered, but go ahead.
21     THE WITNESS:  I have directly
22 delivered before to a store.  It's very

367

1  uncommon.
2  BY MR. STUEVE:
3      Q.    The large customers that you've
4  identified when we went through your top ten
5  customers, they either come and pick up the eggs
6  in large semis from Rose Acre egg production
7  facilities or Rose Acre delivers the eggs in
8  large semis to distribution centers for those
9  customers; correct?
10     A.    Well, we have route trucks that we
11 will deliver.  Not just large semis, but smaller
12 straight trucks.
13     Q.    But those deliveries go to
14 distribution centers for those large customers;
15 correct?
16     A.    Yes.  For the most part, they go
17 to a warehouse.  Yeah.  Warehouse or
18 distribution center for the customer.
19     Q.    As you said, it is very rare for
20 those customers that you would make a delivery
21 of eggs to a particular retail outlet; is that
22 fair to say?

368

1      A.    For my customers that I have
2  today.  Yes.
3      Q.    And the top ten customers that we
4  identified, that would be true, as well;
5  correct, sir?
6      A.    Yes.
7      Q.    All right.  Now, with respect to
8  why you do business with AWG, you testified
9  because they buy eggs; right?
10     A.    Yes.
11     Q.    All right.  And is it fair to say
12 you're hoping to make a profit from the sale of
13 those eggs; correct, sir?
14     A.    Yes.
15     Q.    And you're hoping over time to
16 grow the business with AWG; correct?
17     A.    I would like to grow with AWG;
18 correct.
19     Q.    You, in fact, submitted a bid for
20 all of their distribution centers; correct?
21     A.    I believe we submitted a bid for
22 all of them.

369

1      Q.    All right.  Now, with respect to
2  the AWG business, if you look at topic 13.  Do
3  you see that topic?
4      A.    Yes.
5      Q.    You've been designated; right, to
6  testify on behalf of Rose Acre with respect to
7  that topic; right?
8      A.    Yes.
9      Q.    Since you have secured the AWG
10 business that you've already identified, have
11 you participated in any promotions, credits,
12 coupons, advertising, allowances of support,
13 services or remuneration with AWG?
14     A.    You know, credits I guess that
15 could refer to credit memo.  I would have to
16 talk to accounts receivable to see whether
17 there's been an adjustment on any invoice for
18 whatever reason, that could be construed as a
19 credit memo.  If there's an invoice discrepancy
20 we would issue.
21     Q.    What about has AWG approached you
22 about a promotional discount?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

370

1      A.   No promotional discount as such.
2      Q.   Okay.  Have they talked to you
3  about any type of a promotion of your eggs
4  during a period of time?
5      A.   Not a promotion, but they have
6  asked for us to give them a cap on the Urner
7  Barry market for a ceiling price, no higher
8  than, so for a period of time.  So if the
9  market, whatever the market is at the time of
10  the period they've asked for, if the Urner Barry
11  market exceeds that I've given them a ceiling
12  price holding that no higher than market price
13  for them.
14      Q.   Is that for just a certain period
15  of time during the year?
16      A.   Yes.  We just did our first one a
17  couple weeks ago.
18      Q.   And what did you -- what
19  timeframes did AWG pick?
20      A.   It was -- it was the end of
21  February and there was a three week window they
22  asked for and we told them that we couldn't

---

371

1  hold -- I couldn't give them a three week
2  window, so they asked us -- because the market
3  was a little volatile, so they asked if we would
4  give them the first week and at the end of the
5  first week when we saw -- had more market
6  knowledge and what was going on in the
7  marketplace, at that point would we give them
8  the additional two weeks at that time, which we
9  did.
10      Q.   So in the bid that you submitted,
11  were you obligated to offer them the ceiling?
12      A.   They discussed that when we
13  visited with them.  Yes.
14      Q.   But was that part of the bid
15  process?
16      A.   Yes.
17      Q.   Okay.  So were the time
18  periods outlined in the bid process?
19      A.   No.
20      Q.   Okay.  Just certain times during
21  the year?
22      A.   Yes.

---

372

1      Q.   You would have to be open to at
2  least entertaining such a request from AWG?
3      A.   Yes.
4      Q.   Okay.  And so one of those -- is
5  the concept there they would pass on any savings
6  then to the members so they would promote your
7  eggs?
8          MR. MONICA:  Objection.  Calls for
9  speculation.  You can answer.
10          THE WITNESS:  Yeah.  I don't know
11  what their intent is, but to say -- I mean, the
12  market -- because I'm not -- all I'm doing is
13  giving them a ceiling price on the market.  So I
14  don't know how they work that.  I have no idea
15  what the communication is with their members on
16  how they use that.
17  BY MR. STUEVE:
18      Q.   Did they explain to you why they
19  were asking for that?
20      A.   They wanted to have a known cost
21  during that time.
22      Q.   Did they explain to you why they

---

373

1  picked that period of time?
2      A.   No.
3      Q.   Okay.  And you had no --
4      A.   Because it could be -- they'll
5  come to us when -- the timing when they're going
6  to do it they're going to ask and we're supposed
7  to be open to, and they specifically told us
8  that whatever the ceiling -- because we told
9  them it could be difficult at times not knowing
10  what the market -- what's happening in the
11  market conditions.  They told us we had no
12  obligation to what that price had to be.  I can
13  set that ceiling whatever we're comfortable
14  setting it at.
15      Q.   They didn't explain to you why
16  they wanted that?
17      A.   Once I set a ceiling then they
18  know their price would be no higher than a
19  certain amount.  So that's why they would have
20  it.  So they would know the top price they would
21  pay during that time.
22      Q.   What I'm asking is why would they

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I

March 17, 2014

374

1  ask for that for a short period of time?
2           MR. MONICA: Objection. Calls for
3  speculation.
4           THE WITNESS: That's so they would
5  have a known cost. No higher than during that
6  period of time.
7  BY MR. STUEVE:
8      Q.  But did they explain to you like
9  this time, why they were picking the particular
10 time they were picking?
11     A.  **Why they picked February?**
12     Q.  Yeah.
13     A.  **Not -- no reason why they would**
14 **pick February. I mean, I thought they would**
15 **have done it sooner, but they just now did the**
16 **first one.**
17     Q.  Okay. And you have no
18 understanding as to why they picked this
19 particular timeframe; is that fair to say?
20     A.  **Yes.**
21     Q.  Okay. Have you -- any other
22 allowances or any other thing that they've asked

375

1  for?
2      A.  **A swell allowance.**
3      Q.  And that was part of the bid;
4  right?
5      A.  **Yes.**
6      Q.  Anything else?
7      A.  **No.**
8      Q.  Okay. Now?
9      A.  **Not that I can think of.**
10     Q.  We talked about AWG. You've
11 mentioned Topco and Save-A-Lot have come to you
12 during the year and asked for discounts on the
13 set price; is that correct?
14     A.  **Discounts against the market**
15 **price; correct.**
16     Q.  Right. And so we talked --
17 anything more to add with respect to Save-A-Lot
18 and Topco that would be responsive to topic
19 number 13?
20           MR. MONICA: Objection. Vague and
21 compound. You can answer.
22           THE WITNESS: No. Not really. I

376

1  have nothing to add.
2  BY MR. STUEVE:
3      Q.  Okay. Any other customers that
4  would come to you during the year and ask for
5  discounts off the market price or the
6  specialty egg price to promote the product?
7      A.  **Yes.**
8      Q.  Okay. And who would those be?
9      A.  **That came to me and asked for a**
10 **discount?**
11     Q.  To Rose Acre, whether it was you
12 or somebody else?
13     A.  **Hillcrest Food Service.**
14     Q.  And what kind of deal would they
15 ask for?
16     A.  **They would ask for a discount per**
17 **dozen off their price.**
18     Q.  And what would be the basis for
19 that request?
20     A.  **They wanted to give a price to**
21 **their customer. They have wanted to give them a**
22 **discount.**

377

1      Q.  And how often does Hillcrest Food
2  Service do that on an annual basis?
3      A.  **Several times a year.**
4      Q.  Okay. And do you agree to those?
5      A.  **Sometimes.**
6      Q.  Okay. Is it typically several
7  times a year you'll agree to those?
8      A.  **I don't always agree with it, but**
9  **several times a year I give them a discount.**
10 **Yes.**
11     Q.  Is that typically for a set period
12 of time?
13     A.  **Yes. A set period or a set --**
14 **maybe a set load of eggs or something.**
15     Q.  All right. Any other customers?
16     A.  **Dutch Farms.**
17     Q.  Okay. And they're the distributor
18 we've been talking about earlier?
19     A.  **Yes.**
20     Q.  And how often do they ask?
21     A.  **Several times a year also.**
22     Q.  And is the concept then that they

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

96 (Pages 378 to 381)

---

378

1  would pass that savings on to their customer and
2  hopefully drive volume?
3       MR. MONICA: Objection. You can
4  answer.
5       THE WITNESS: Either drive volume
6  or keep business because they compete with other
7  distributors.
8  BY MR. STUEVE:
9       Q. Okay. Any others?
10      **A. Egg Depot.**
11      Q. And how often?
12      **A. Several -- many times a year.**
13      Q. And who are they passing those
14 savings on to?
15      **A. Honestly, I don't know what they**
16 **sell their price for, but I mean, they ask for**
17 **discounts on eggs, but I don't know**
18 **their customers. They sell inner-city in the**
19 **Bronx.**
20      Q. Okay. Is this one of the
21 strategies that you would implement with respect
22 to situations in which you're long on eggs?

---

379

1       MR. MONICA: Objection. Vague.
2  You can answer.
3       THE WITNESS: Is?
4  BY MR. STUEVE:
5       Q. Where you would agree to a
6  discount would be during a time period in which
7  you're long on eggs?
8       **A. Yes. That happens.**
9       Q. Okay. Other customers?
10      **A. That?**
11      Q. Ask for discounts?
12      **A. Yes.**
13      Q. Who else?
14      **A. Hidden Villa.**
15      Q. What is Hidden Villa?
16      **A. They're a distributor in**
17 **California, but they also own some production of**
18 **their own. Similar to a Dutt & Wagner.**
19      Q. Okay. Would they ask for
20 discounts various times during the year?
21      **A. Yes.**
22      Q. What's the volume you sell to

---

380

1  Hidden Villa?
2       **A. Today we have no regular sales to**
3  **them. We sold them in the past.**
4       Q. In the past how high have they
5  gotten?
6       **A. From 2000 to 2012, that period.**
7  **The peak would have been an average of about 9**
8  **to ten loads a week.**
9       Q. Any of your more significant
10 customers that routinely ask for discounts that
11 we haven't talked about?
12      **A. I can recall once or twice in the**
13 **last four or five years with Kroger, but it's**
14 **pretty rare.**
15      Q. Now, with respect to -- are there
16 any other -- besides discounts off of the Urner
17 Barry price, are there any other types of
18 allowances or promotions that you would
19 participate in with your customers?
20      **A. I participate in some food shows.**
21      Q. Okay. And for which customer?
22      **A. For Dutch Farms.**

---

381

1       Q. And would those food shows, would
2  the purpose of those be to promote your
3  specialty eggs and commodity or one or the other
4  or both?
5       **A. Both.**
6       Q. Okay.
7       **A. With Dutch Farms.**
8       Q. Okay. And at those food shows
9  would you offer certain promotions?
10      **A. Yes.**
11      Q. And what would those be?
12      **A. Oh, I -- I don't know the**
13 **specific. We just recently did a show with**
14 **Dutch Farms in the last two months and it was**
15 **a -- it was a price for -- there was a discount**
16 **on two loads of medium eggs. I can't remember**
17 **the exact -- we gave them a deal on two loads of**
18 **medium for the show.**
19      Q. Okay. So did they actually sell
20 them at the show?
21      **A. Yes.**
22      Q. Any others come to mind?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

97 (Pages 382 to 385)

---

382

1    A.   Ohio Farmers, but their shows we
2 only participate with liquid eggs.  So we didn't
3 do the shell eggs.
4       Going back to 2000 we probably did
5 a Certified show.  Certified used to have a
6 couple shows a year and I don't recall what all
7 our participation was, but I remember we used to
8 do those -- we used to attend their shows.
9    Q.   Okay.
10    A.   Let me think.  Them are the ones
11 that come to mind.
12    Q.   Okay.  Any other allowances,
13 advertising, coupons that -- programs that you
14 would participate in that we haven't identified
15 with some of your customers?
16    A.   There is -- with Hillcrest and
17 Houchens we have a -- Houchens gets a monthly
18 credit on purchases up to -- it's up to a
19 certain dollar amount based on their -- on what
20 they purchase each month.
21    Q.   Okay.
22    A.   And Hillcrest gets a -- I believe

---

383

1 it's $250 marketing allowance for a customer of
2 theirs called Dave's Supermarkets in Cleveland.
3       And then we have an annual
4 promotion budget that for some customers that
5 purchase Eggland's Best eggs.
6       And there are -- Eggland's Best
7 does -- puts out coupons and we notify
8 customers, let them know there's going to be
9 coupons, FSIs, flyers in like the weekly
10 newspaper and those are all redeemed by
11 Eggland's Best, Incorporated.  We don't redeem
12 the coupons, but we notify our customers that
13 the coupons are going to be in the flyers.
14    Q.   And what are the -- what's the
15 nature of the coupons?  Are they a certain
16 amount off retail price?
17    A.   Yes.  Cents per dozen off, yes, a
18 discount.
19    Q.   Do they indicate what its cents
20 per off of the retail price, does it tell the
21 customer what the retail price is?
22    A.   It tells the consumer when they

---

384

1 buy the eggs at a store -- if the consumer
2 brings in a coupon when they check out they will
3 get the discount off the dozen they purchase at
4 that store.
5    Q.   Does the consumer know from the
6 coupon what that retail price is?
7    A.   Not from the coupon.  No.
8    Q.   They have to go into the store to
9 learn that?
10    A.   To learn the price of the dozen
11 eggs they would find out, yeah, from the store
12 they would take the coupon like they had for any
13 product and redeem it at check out.
14    Q.   Any other coupons or allowances?
15    A.   No coupons.  No coupons.
16 Allowances.  Nothing that comes to mind right
17 now.
18    Q.   Let's back up a little bit with
19 Houchens.  So based on their volume purchases
20 from Rose Acre, you give them a credit; is that
21 correct?
22    A.   They get a monthly credit;

---

385

1 correct.
2    Q.   And what's it based of off, number
3 of loads or dollar amount?
4    A.   Number of dozens purchased.
5    Q.   Okay.  And what is that credit?
6    A.   The -- the amount of the credit?
7    Q.   Uh-huh.
8    A.   I need to -- I would need to
9 double-check, but it's -- I think there's a cap
10 on it of -- I would have to check.  It's
11 somewhere around $1,500, possibly.
12    Q.   Okay.  Is there any requirement
13 that they pass that credit on to their
14 customers?
15    A.   Oh, I don't know what they do with
16 the credit.
17    Q.   So the answer is there is no
18 requirement what they do with the credit?
19    A.   No.
20    Q.   Now, you indicated with respect to
21 Hillcrest that there's a $250 marketing
22 allowance; is that right?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

**386**

1    A.   Yes.
2         Q.   And is the -- does that have to be
3    sent on print advertising?
4         A.   I -- I don't know what they -- I
5    just know it's for Dave's Supermarkets, but I
6    don't know how it's used.
7         Q.   And what type of Rose Acre eggs
8    does Dave's Supermarkets sell?
9         A.   Our Country Day Break brand.
10   Jumbos -- I believe he buys all sizes, jumbos,
11   extra large, large, medium, 18 pack large.
12        Q.   And how many Dave's Supermarkets
13   are there?
14        A.   I don't know.  I would guess ten,
15   maybe.  I'm not sure exactly how many there are.
16   I really don't.  Maybe less than ten.
17        Q.   Okay.  Then you indicated that
18   there's an annual promotion budget for Eggland's
19   Best; is that right?
20        A.   Yes.
21        Q.   And how is that administered?
22        A.   We would sit down with the

---

**387**

1    customer and discuss the number of times a
2    year -- beginning -- it's not necessarily a
3    calendar year, but say a 12 month period.  We
4    would work with them on how many times a year
5    they would promote the different products of
6    Eggland's Best.  And then from us if say, for
7    example, if it was a cage-free egg or a red,
8    white, and blue as they call it, and we said
9    we're going to give you this week 35 -- we're
10   going to give you $0.10 a dozen off on all those
11   eggs you purchased that week.  And then it's up
12   to them what they -- how they go out and promote
13   that or market that.  So it's set -- we discuss
14   it so it's all put in place for an entire 12
15   month period, promotion calendar for the year.
16        Q.   Okay.  Which customers do you deal
17   with?
18        A.   On that particular type of
19   scenario for the annual budget we work with
20   Schnucks, with Hy-Vee, with -- then we work with
21   Hautley Cheese in St. Louis, who in turn sells
22   those to, I believe Neiman's and Dierberg's.

---

**388**

1         Q.   Where are those stores?
2         A.   Illinois -- St. Louis market area.
3         Q.   Okay.  And where are the Schnucks
4    located?
5         A.   Through -- their headquarters is
6    in St. Louis, so their stores are throughout
7    Missouri and Illinois.
8         Q.   Approximately how many participate
9    in the Eggland's Best promotional?
10        A.   For who?  Approximately?
11        Q.   How many of the Schnucks
12   participate in the annual promotion for
13   Eggland's Best, which you administer?
14        A.   It would be all the Schnucks
15   stores.
16        Q.   How many?
17        A.   They've got a little over 100.
18        Q.   Okay.  And what about Hy-Vee
19   stores?
20        A.   I believe they have a little over
21   200.
22        Q.   And all participate?

---

**389**

1         A.   Well, I -- any of the stores that
2    they have that carry the Eggland's Best.
3         Q.   Okay.  And so would you -- who at
4    Rose Acre would sit down with Schnucks, for
5    example, and figure out the promotional budget
6    or the Eggland's Best promotional budget for the
7    year?
8         A.   The budgets -- for Rose Acres the
9    person that works on the budgets is Lindsey
10   Schepman.
11        Q.   Okay.  And does she sit down with
12   somebody at Schnucks and maps it out?
13        A.   She works with Schnucks, along
14   with a sales rep from Eggland's Best.
15        Q.   Okay.  And who is that?
16        A.   John Mahalic, M-A-H-A-L-I-C.
17        Q.   And do you know if there is print
18   advertising that's utilized to promote these
19   promotions throughout the year?
20        A.   Yes, there are.
21        Q.   And who works with Schnucks with
22   respect to the Eggland's Best print advertising?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

99 (Pages 390 to 393)

---

390

1      A.    Well, Eggland's Best handles print
2  advertising direct with newspapers.
3      Q.    Who determines the advertising
4  price?
5           MR. MONICA:  Objection.  Assumes
6  facts not in evidence.
7           THE WITNESS:  Okay.  The -- make
8  sure we're talking about the same thing.
9           The advertising price for the
10 promotional calendar we give them, not coupons?
11 BY MR. STUEVE:
12     Q.    Yeah.  For the promotional
13 calendar?
14     A.    The -- that is between Rose Acres
15 and Eggland's Best to determine it.
16     Q.    And who at Rose Acre would be
17 involved in that?
18     A.    Lindsey Schepman.
19     Q.    And who at Eggland's Best?
20     A.    John Mahalic.
21     Q.    And is that information then
22 provided to Schnucks?

---

391

1      A.    Yes.
2      Q.    Then who actually implements the
3  advertising?  Is it Eggland's Best?
4      A.    Well, Eggland's Best pays for
5  advertising in magazines and newspapers to
6  promote Eggland's Best product.
7      Q.    That's what I'm saying.  So
8  they're the ones who actually purchase the
9  advertising?
10     A.    Yes.
11     Q.    But it's promoting Eggland's Best
12 at the Schnucks store, we're using Schnucks as
13 the example; is that correct?
14     A.    Well, when they purchase
15 advertising it's not specifically to one
16 retailer.  It's in the market area.  So they'll
17 send it out to whole St. Louis and like
18 Champagne, so whatever retail.  So not only
19 Schnucks, but any supermarket selling Eggland's
20 Best eggs could redeem coupons.  So advertising
21 is geared towards all Eggland's Best.  It's not
22 geared specifically to a retailer in that case.

---

392

1      Q.    But Schnucks has to agree to
2  participate; right?
3      A.    Redeeming coupons?  Yeah.  I guess
4  Schnucks could refuse to redeem coupons.  I
5  don't know.  I don't know any retailers that
6  would do that but it's their business to honor
7  coupons or not.
8      Q.    The -- who notifies, though, the
9  Schnucks stores when these promotions are going
10 to be run, promoting the Rose Acre Eggland's
11 Best eggs?
12     A.    Okay.  I think we're talking about
13 two different things.
14     Q.    So what you said, there's a
15 calendar at the beginning of the year that's
16 worked out between Eggland's Best and Rose
17 Acres?
18     A.    A promotion calendar.
19     Q.    Who tells the Schnucks stores when
20 these promotions are going to be run about the
21 calendar?
22     A.    We don't -- the Schnucks stores

---

393

1  they would do internally.  The Schnucks buyer,
2  Lindsey would work with the Schnucks buyer on
3  the promotions.
4      Q.    Okay.  So the Schnucks buyer would
5  be aware of the promotional calendar that had
6  been worked out between Rose Acre and Eggland's
7  Best; is that correct?
8      A.    Yes.
9      Q.    Okay.  And that would be -- that
10 would be done at the beginning of the year; is
11 that right?
12     A.    It's a 12 month period.  I'm not
13 saying it's exactly the beginning of the year.
14 I don't know, you know, exactly the timing, but
15 it's a 12 month calendar year.
16     Q.    All right.  Is there actually a
17 document that evidences the promotions?
18     A.    Yes.
19     Q.    And what is in the document?
20     A.    It would have the timing of the
21 different promotions and the different products
22 we're going to promote during the year.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

---

394

1          Q.    Okay.  And the timeframe for those
2    promotions?
3          A.    Yes.
4          Q.    Okay.  And then how else -- and
5    then is that actually given then to the Schnucks
6    store?
7          A.    I don't know.  Given to the
8    Schnucks buyer.
9          Q.    Okay.
10         A.    And Schnucks owns their stores, so
11   however they communicate that.  I don't know how
12   they communicate it, but.
13         Q.    Okay.  And does Eggland's Best
14   give Rose Acre a copy of the print advertising?
15         A.    I get copies -- it's -- so we're
16   back to the advertising.  We're not talking
17   about the promotion calendar.  The print
18   advertising -- Eggland's Best does they do send
19   me pretty much on an every other week basis
20   copies of magazines they have ran ads in to
21   promote Eggland's Best eggs.
22         Q.    And in those advertisements do

---

395

1    they notify the customer what their -- the price
2    of the eggs will be that they're going to be
3    purchasing the Eggland's Best eggs?
4          A.    No.  It's just an advertisement
5    promoting --
6          Q.    The brand?
7          A.    The brand.  It's an advertisement
8    promoting the brand.
9          Q.    Is there also a promotion of the
10   discount or the coupon?
11         A.    No.  That's something separate.
12   That's FSIs I was talking about.  If they send
13   out coupons that's usually done in the -- a lot
14   of times it's done in the Sunday circulars where
15   there's a lot of coupons for a lot of products
16   in the stores.  Eggland's Best happens to be one
17   of them.  That's couponing that Eggland's Best
18   supports and takes care of.
19         Q.    Just so I understand, the process
20   you were just talking about, though, with
21   respect to this monthly promotional campaign
22   that Schnucks would -- that Rose Acre would work

---

396

1    with Eggland's Best?
2          A.    It's not month, but on a yearly
3    basis -- there's not a promotion every month.
4    It's a yearly calendar that gives them the times
5    of the year for the different products and the
6    different discounts they're going to receive,
7    Schnucks is going to receive on those products.
8          Q.    Okay.  That's separate from a
9    coupon program; is that correct?
10         A.    Yes.  It is.
11         Q.    All right.  And then how does
12   Eggland's Best promote those discounts that
13   they're providing to Schnucks?
14         A.    To my knowledge -- I don't -- I'm
15   not aware of what they would do to promote them.
16   I mean, we give them to Schnucks, but I don't
17   know -- I'm not aware of what -- if Eggland's
18   does anything for those particular on their
19   promotion calendar.  I mean --
20         Q.    Do you have a price sheet that's
21   given to Schnucks that reflects those discounts?
22         A.    Yes.  The promotion that I

---

397

1    discussed, the promotional calendar we give them
2    would have their promotions for that year.
3          Q.    And that would contain the -- the
4    purchase price plus the discount price?
5          A.    No.
6          Q.    What is on that pricing document?
7          A.    It would only be the period of
8    time and the discount given.
9          Q.    Okay.  But is there any other
10   retail pricing information -- suggested retail
11   pricing information on that document?
12         A.    No.
13         Q.    What -- what -- but is the bid
14   pricing reflected in the price sheet that shows
15   the promotion?
16         A.    The document that we give them on
17   the calendar year, the promotional calendar
18   year, would only reflect the time period and the
19   discount given for the particular product.
20         Q.    How is the discount given
21   reflected?
22         A.    Price per dozen.

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

101 (Pages 398 to 401)

---

398

1    Q.   Price per dozen?
2    A.   Yes.
3    Q.   So hypothetically $0.03 or $0.04
4 per dozen?
5    A.   Correct.
6    Q.   And they would know, though, once
7 you send out the price sheets -- I assume you
8 give them weekly price sheets; is that right?
9        MR. MONICA: Objection. Vague.
10       THE WITNESS: On which product?
11 BY MR. STUEVE:
12   Q.   On the commodity eggs?
13   A.   On commodity --
14   Q.   Let me back up.
15       So on the Eggland's Best?
16   A.   Yes.
17   Q.   You're selling the -- they're
18 going to know what the -- what their purchase
19 price is already; right?
20       MR. MONICA: Objection.
21 BY MR. STUEVE:
22   Q.   Because that's a fixed -- that's a

---

399

1 fixed price; right?
2        MR. MONICA: Objection. Vague as
3 to "they".
4        THE WITNESS: Okay. Who is going
5 to know the pricing for Eggland's Best?
6 BY MR. STUEVE:
7    Q.   Let me back up a little bit. With
8 respect to Schnucks.
9    A.   Okay.
10   Q.   This is a -- do you have a
11 contract with Schnucks to purchase your
12 Eggland's Best products?
13   A.   I've got an agreement with
14 Schnucks to purchase Eggland's Best -- well,
15 yes. I have an agreement for Schnucks to
16 purchase Eggland's Best products.
17   Q.   All right. And how long has that
18 agreement been in place?
19   A.   Over five years, I believe.
20   Q.   All right. And that's for a -- at
21 the time you bid it it was based on your cost
22 plus a profit number; correct, that was added to

---

400

1 it; right?
2    A.   Yes.
3    Q.   And that -- so they have known for
4 the last five years what their purchase price is
5 going to be for Eggland's Best eggs from Rose
6 Acre; correct?
7    A.   They have always known what their
8 purchase price is going to be. It's changed
9 over time, but they know what that price is.
10 Yes.
11   Q.   Well, but I thought you said you
12 bid it five years ago; right?
13   A.   When I first started selling
14 Eggland's, but it's changed over time.
15   Q.   When's the last time it changed?
16   A.   It was changed about a year ago.
17   Q.   And was -- a year ago was it --
18 again, did you follow your normal protocol where
19 you take your cost, all of your cost, add a
20 profit margin and give them the bid price?
21       MR. MONICA: Object to the term
22 margin. You can answer.

---

401

1        THE WITNESS: At the time we
2 reviewed our cost, reviewed all our costs and
3 packaging cost and whatever goes into that
4 component, added up profit and gave Schnucks a
5 price. Yes.
6 BY MR. STUEVE:
7    Q.   Okay. And so for 2013 they would
8 know on a weekly basis what their purchase price
9 was for Eggland's Best eggs; correct?
10   A.   That Schnucks would know?
11   Q.   Yeah.
12   A.   What their price is. Yes.
13   Q.   And would that be reflected in a
14 price sheet that you would give to Schnucks?
15   A.   Yes.
16   Q.   And did that price sheet also,
17 when there was a promotion for Eggland's Best,
18 reflect the discount?
19   A.   No. That's a separate document.
20   Q.   All right. What document would
21 they get that would notify them that they're in
22 the period for a discount?

---

402

1    A.   The promotion calendar reflects
2    that.
3    Q.   Okay.  So the price sheets do not
4    also include that information?
5    A.   The pricing letter would not.
6    That would have been when the price was
7    established.  Our weekly -- I would have -- I'm
8    not exactly sure what Schnucks gets every week,
9    if we're giving them a weekly sheet showing them
10   the price.  They know the markets and the prices
11   are based off the market on their commodity eggs
12   and Eggland's Best is a fixed price.  So
13   Schnucks knows their prices.  Now, I'm not sure
14   what all from my office goes to Schnucks on a
15   weekly basis.
16   Q.   Who would know that?
17   A.   For Schnucks -- well, several
18   people.  Amanda Jackson would know what Schnucks
19   gets.
20         MR. STUEVE:  Okay.  We've gone
21   over a half hour, so we'll stop here.  We
22   appreciate you staying late.

403

1         MR. MONICA:  Before you go off the
2    record, I just want to put on the record,
3    understand the court reporter has to take a
4    break.  We're all human, but we're prepared to
5    keep going.  And we're also prepared to produce
6    him at 8:00 tomorrow if that's acceptable.
7         MR. STUEVE:  We'll take you up on
8    the offer at 8:00.  Just for the record, the
9    court reporter has indicated that it's a long
10   day, she's working off of little sleep and she's
11   gone longer than what she thought she could do
12   at the last break.
13        MR. MONICA:  I agree.
14        THE VIDEOGRAPHER:  This concludes
15   volume number I of testimony of Mr. Greg Hinton
16   of March 17th, 2014, volume I.  It consists of
17   six media records.  The time is 6:40 p.m. and we
18   are going off the record.
19        (Reading and signature not
20   waived.)
21        (Whereupon, at 6:40 p.m., the
22   deposition was concluded.)

404

1         ACKNOWLEDGMENT OF DEPONENT
2
3    I do hereby acknowledge that I have read
4    and examined the foregoing of the transcript of
5    my deposition and that:
6
7    (Check appropriate box):
8
9    ( ) the same is a true, correct and
10   complete transcription of the answers given by
11   me to the questions therein recorded.
12
13   ( ) except for the changes noted in the
14   attached errata sheet, the same is a true,
15   correct and complete transcription of the
16   answers given by me to the questions therein
17   recorded.
18
19
20
21   _____    _____
22   DATE              SIGNATURE

405

1         CERTIFICATE OF NOTARY PUBLIC
2    I, Paula G. Satkin, the officer before whom the
3    foregoing proceedings were taken, do hereby
4    certify that the witness whose testimony appears
5    in the foregoing proceeding was duly sworn by
6    me; that the testimony of said witness was taken
7    by me in stenotype and thereafter reduced to
8    typewriting under my direction; that said
9    proceedings is a true record of the testimony
10   given by said witness; that I am neither counsel
11   for, related to, nor employed by any of the
12   parties to the action in which these proceedings
13   were taken; and, further, that I am not a
14   relative or employee of any attorney or counsel
15   employed by the parties hereto, nor financially
16   or otherwise interested in the outcome of the
17   action.
18   My commission expires November 14, 2015.
19
20        _____
21        PAULA G. SATKIN
22        Notary Public in and for the
             District of Columbia

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                 March 17, 2014

1

**A**

**$0.03** 217:15
398:3
**$0.04** 398:3
**$0.05** 316:10
**$0.10** 316:10
387:10
**$0.20** 299:4
301:19,21
305:16 306:3,4
308:16,22
312:19 313:1
315:2,7
**$0.27** 183:2
**$0.30** 80:13
146:10
**$1,500** 385:11
**$250** 383:1
385:21
**A-a** 33:2
**a.m** 1:17 7:13
103:17,22
**Aaron** 32:19,22
47:2 273:11,12
276:4
**abide** 159:12
**ability** 365:12
365:15
**Abingdon** 23:5
**able** 119:20
121:1 320:10
364:2
**acceptable**
403:6
**accepted** 300:21
312:10 313:7
313:10
**accepting**
353:22
**account** 41:22
61:11 99:10,15
130:18 166:8

166:20 170:16
184:9 203:15
243:21 253:7
254:17 340:4
360:9
**accounts** 62:21
88:19 166:6,10
167:16 168:1
170:5,11,15
198:22 199:1
218:1 359:1
369:16
**accusing** 146:19
**acknowledge**
404:3
**ACKNOWLE...**
404:1
**acquire** 42:22
**acquired** 42:17
**acquisition** 43:2
**Acre** 2:11 5:3
8:6 9:9,13,15
10:2,5 11:11
13:3,5 17:20
19:8,18,20
21:14 23:10
42:20 58:10
83:13 84:20
86:22 88:14
91:7,14,19
92:5,11 93:14
94:1 95:17
97:2,11 98:17
104:15 109:1
129:14 157:1
160:11,15
161:3 164:7
173:19 174:9
174:15,17,21
175:2,4,8,11
175:19 176:3,6
176:16,19

179:19 190:1
192:13 193:22
195:18 198:11
203:8 204:11
204:21 205:9
209:13 211:9
212:5,20
213:16 215:4,9
216:6 217:21
219:14 220:7
220:10 222:11
223:12 226:14
227:7 228:19
233:3,10,15,16
234:6,16,17
235:9,15,21
236:2 237:22
238:16 242:1,7
245:12 247:11
251:8 252:10
256:14 267:1
267:13,20
268:7 275:1,19
276:1,17 277:2
278:20 281:5
284:11 351:19
354:16 355:13
358:12,18
360:1,16 363:8
363:13 364:3
367:6,7 369:6
376:11 384:20
386:7 389:4
390:16 392:10
393:6 394:14
395:22 400:6
**Acre's** 8:7 98:6
149:10 190:8
204:1,9 247:2
256:22 272:8
355:9
**Acres** 18:10

21:6 24:4 87:7
98:19 134:4
162:5,13 199:9
204:5 205:4
208:7 216:18
286:22 389:8
390:14 392:17
**action** 405:12,17
**actual** 89:5
221:20 306:20
**ad** 170:18 187:5
227:21 229:5,6
229:18,21
254:20 255:2
**add** 28:20 60:4
60:6 68:16
70:17 71:15
73:5,6 140:19
141:5,9,10
142:3 145:18
145:20 146:4,5
172:3 296:16
297:1 335:15
375:17 376:1
400:19
**added** 50:1,9
53:19 70:9
72:19 141:20
142:13,14
297:21 298:20
299:1 312:18
313:3 320:15
335:4,5 399:22
401:4
**adding** 73:7,13
**addition** 11:6
105:20
**additional** 50:2
160:6 272:4
276:11 307:9
315:9,10,12
371:8

**address** 57:3
**adhere** 91:11
**adjust** 305:8
**adjustment**
303:6 304:16
369:17
**administer**
388:13
**administered**
386:21
**admitted** 210:18
**ads** 394:20
**advantageous**
366:4
**advertisement**
187:6 228:11
395:4,7
**advertisements**
228:6,16
394:22
**advertising**
218:16,17
219:2 226:22
227:11,13
229:12 255:3,5
255:7 355:9
369:12 382:13
386:3 389:18
389:22 390:2,3
390:9 391:3,5
391:9,15,20
394:14,16,18
**advised** 126:12
228:9
**affiliated** 239:19
**affiliation**
258:21
**AFTERNOON**
154:1
**agents** 356:18
**ages** 90:18
**ago** 23:21 33:13

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

2

34:5,22 43:5
43:21 65:19
68:19 82:14
83:10 185:4,12
191:7 212:15
279:13 292:8
297:6 319:17
324:18 370:17
400:12,16,17
**agree** 216:4
217:19 377:4,7
377:8 379:5
392:1 403:13
**agreed** 215:9
**agreeing** 219:3
**agreement**
67:12 171:14
306:21,22
307:22 308:5
311:14,15
312:9 324:17
399:13,15,18
**agreements**
306:18 307:20
**ahead** 11:16
59:12 62:4
75:2 79:11,21
122:9 168:11
168:11 176:22
201:17 235:19
238:20 285:11
300:13 325:11
364:7 365:10
366:20
**al** 1:6,9 7:5,6
**Alabama** 169:17
240:11 241:20
242:15 257:18
**Aldie** 167:21
258:13,13
285:13 286:12
286:13 288:2,7

288:8,12
338:13,18
**Aldie's** 338:7
**Alliance** 195:4
225:3 281:11
292:15,20
**allow** 10:22
28:16 331:8
**allowance** 375:2
383:1 385:22
**allowances**
170:13 369:12
374:22 380:18
382:12 384:14
384:16
**allowed** 91:1
**alternative**
323:4
**Amanda** 31:18
32:2 33:11,17
33:19,20 34:6
36:14,17 39:18
40:17 41:6,18
44:4 46:8 53:6
53:12 55:2
76:3 87:9,21
87:22 88:3
99:20 101:3
103:1 106:21
107:12,14
108:15,19
125:14,17
127:10 129:18
130:16,19
133:7 137:1
155:4 156:12
165:9 167:4
194:9 197:11
203:10 204:17
204:20 205:11
205:12,12
212:8 217:22

270:20 271:8
282:8 291:14
318:22 319:1
331:14,18
351:12 354:19
357:13,14,20
360:10 363:10
402:18
**Amanda's**
130:19 318:19
**ambiguous**
135:2,9 223:16
**amount** 216:21
217:6 335:15
373:19 382:19
383:16 385:3,6
**AMS** 28:22
**Amy** 359:1,2
**Amy's** 359:3
**analysis** 61:5
74:13 290:14
**Anchorage**
40:19 53:1
221:22
**angel** 26:22
**animal** 27:6
90:9,16,20
134:8 346:9
349:11 351:16
351:17
**Anniston**
240:11 241:20
242:16
**annual** 172:18
199:12 377:2
383:3 386:18
387:19 388:12
**annually** 172:18
**answer** 11:1,16
12:1 38:15
59:12 60:10,19
61:9 62:4,5,17

63:8,15 69:5
70:14 74:17
75:2,19 79:11
81:14,14 91:22
93:3,17 95:4
97:15 114:11
120:6 136:8
140:22 141:13
142:20 143:9
143:15,17,20
143:22 144:5,9
144:15,20
145:5 146:2,13
147:4 150:2,21
151:4 152:2
175:13 179:6
181:5 183:20
190:3 194:11
197:15 204:14
205:2 208:20
209:20 210:2
224:10 225:19
226:17 227:3
229:16 235:19
238:20 242:3
245:2,20 246:7
298:9 303:11
303:18 304:19
309:8 310:2,3
311:5,8 312:6
319:19 322:7
335:1,19 364:7
364:21 372:9
375:21 378:4
379:2 385:17
400:22
**answered** 46:7
69:5 75:19
79:10 93:3,17
97:15 118:22
225:19 235:12
304:20 364:18

365:2,6 366:20
**answering**
144:16
**answers** 404:10
404:16
**anticipate**
123:12
**anticipated**
320:12
**anticompetitive**
233:9,17
**antitrust** 233:3
233:5,6,8
**anybody** 51:19
100:11
**anymore** 18:17
**apart** 258:10
**apologize** 348:3
**appear** 104:7
**appearance**
8:10 101:17
**APPEARAN...**
2:1
**appears** 43:20
405:4
**applicable**
183:2
**appreciate**
402:22
**appreciated**
112:20
**approach** 134:2
170:12 189:14
303:13 304:7
**approached**
215:9 369:21
**appropriate**
404:7
**approximate**
299:10
**approximately**
7:13 15:15

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

3

16:1 30:14
31:7,22 38:5
42:12 43:4
48:9 53:14
80:13 103:17
121:13 123:7
160:19 162:2,3
178:6 199:11
200:1,5,13
212:1 225:15
231:9 249:4,8
254:11 270:16
285:22 290:3
295:9,14
305:16 306:2
306:13 326:4
329:21 330:11
330:13 333:8,9
334:5 336:14
336:21 337:3,7
337:14,17
338:8,10 339:9
339:14 353:14
361:22 388:8
388:10
**AR** 318:20
**Arch** 3:8
**area** 20:15
95:10 169:15
212:22 388:2
391:16
**areas** 44:7 119:6
214:8 366:2
**argumentative**
208:15 237:17
309:4
**Arizona** 64:10
**Arkansas** 231:7
**array** 179:2
**arrive** 297:2
**art** 187:4,5,10
188:9

**Arthur** 2:14
7:11 8:5
**aside** 234:14
**asked** 11:20
69:4 75:18
79:9 90:8
92:17 93:2,16
97:14 99:8,9
99:10,11
101:12 110:9
112:15 113:2
118:21 127:15
131:4,5 132:2
132:4 151:3
157:11 205:4
210:14 225:18
234:11 309:4,7
309:14 326:22
327:8 328:9,13
342:1,15
347:14 349:6
349:16 350:1
351:1 362:6
366:20 370:6
370:10,22
371:2,3 374:22
375:12 376:9
**asking** 61:18
77:18 81:9
85:14 90:6
93:11 94:21
97:20 118:10
122:11 128:6
132:8,10
146:12 187:22
207:8,8 208:3
208:4 215:22
216:12,16,17
216:22 218:22
237:4,19
238:12,14
239:11 245:8

246:5 259:4
300:15 304:4
304:21 309:17
309:21 311:1,3
311:4,5,10
317:1 348:17
349:19 372:19
373:22
**asks** 311:9
**aspects** 12:10
13:14
**assert** 151:2
**asserted** 151:20
233:3,9,16
234:6,16 235:9
**assigned** 165:16
166:14,20
196:6 219:20
**assist** 203:22
218:16 226:12
226:21 290:12
**assisted** 136:22
203:11 254:17
255:8
**assisting** 134:20
331:12
**assists** 205:12
218:14 219:1
**associate** 8:2
**Associated** 1:5
7:4 9:7 197:13
**Associates** 193:2
193:11,14
194:3 195:9
196:7 281:14
**association** 7:17
**assume** 12:2
144:21 218:5
281:7 323:4
398:7
**Assumes** 65:22
94:3 98:10

350:5,20 390:5
**assumption**
121:15 244:6
245:9
**Atlanta** 264:9
**attached** 404:14
**attempt** 302:17
**attempted** 362:8
362:11
**attend** 382:8
**attention** 167:17
13:14
**attorney** 405:14
**attractive**
363:16
**attributable**
294:3
**audibly** 120:6
**audits** 352:4,7
**authorize**
205:19
**availability**
134:13 216:14
**available** 174:19
223:3 237:15
273:11
**avenue** 272:15
**average** 176:18
254:11 278:19
294:21 380:7
**awarded** 101:7
112:11 329:21
330:14 357:21
**aware** 22:20
93:21 94:11,14
95:1 98:5
116:12 117:16
124:21 126:15
155:22 156:3
190:10 206:4,8
206:10 227:10
229:11,18,21
231:6,10 233:5

233:7,11
234:15 235:1,8
235:8,13,14,20
238:15 239:11
248:15 250:9
250:12 261:17
264:2 265:5
282:3 341:17
346:11 349:21
352:7,8 355:4
356:11 361:21
362:13 393:5
396:15,17
**AWG** 99:3,4,7
99:11,12,14,19
99:22 100:5,22
101:2,5,11,20
101:20 102:1,3
102:12,19
105:3,13,15,21
107:6,10,13,14
108:7,19 109:7
109:10,13
110:2 112:1,7
112:13,18
113:14 114:19
115:4,8 117:9
122:18 126:5
126:16 127:16
129:22 133:22
135:11 136:3
142:3,4 143:3
145:12 146:16
149:21 152:12
152:14 155:12
155:13,14
169:12 198:6
232:17 237:8
238:9 239:12
259:7 285:15
333:7,8,18,22
334:9 335:21

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

4

| | | | | |
|---|---|---|---|---|
| 336:21 342:12 | 144:18,22 | **bag-in-a-box** | 382:19 384:19 | 123:6 129:13 |
| 342:12,17,22 | 147:12 150:20 | 22:10,14,19 | 385:2 399:21 | 130:2 178:6 |
| 345:16 347:15 | 151:6 154:5 | 23:13 | 402:11 | 193:4 212:22 |
| 347:22 348:1,2 | 162:13 172:20 | **baked** 26:14 | **basically** 13:14 | 234:5 246:20 |
| 348:5 349:1,12 | 177:17 182:10 | 27:1 | 14:2 19:3 | 263:12 264:12 |
| 351:4 352:19 | 182:11,18 | **Baker** 4:5 | 27:17 44:3 | 265:14 266:4 |
| 353:1 354:5,16 | 183:1,2,9,15 | **bakeries** 22:4,8 | 86:16 101:6,14 | 277:11 283:12 |
| 354:22 355:16 | 187:13 188:19 | 24:17,20 26:8 | 137:14 155:18 | 299:12 312:22 |
| 355:21 356:6 | 191:6 192:3,9 | **bakery** 22:5,6 | 156:4 158:20 | 316:6 320:2 |
| 356:20 357:17 | 205:14 206:2 | 26:9,11 | 159:6 160:21 | 326:10 331:11 |
| 357:20 358:1 | 208:17 209:15 | **bankruptcy** | 162:15 167:2 | 346:14,15 |
| 358:13,19,20 | 209:18 211:16 | 256:20 257:1 | 186:1 270:22 | 347:4 349:5,6 |
| 358:22 359:4,6 | 212:1 213:10 | **BARNES** 72:11 | 276:8 285:4 | 351:14 353:3 |
| 360:18 361:20 | 224:5 226:11 | 365:21 | 322:21 | 357:3 360:6 |
| 363:5 364:11 | 231:19 245:18 | **Barrel** 22:11 | **basis** 28:5 56:1 | 368:21 382:22 |
| 368:8,16,17 | 270:16 283:19 | **Barry** 20:9 | 81:22 177:5 | 386:10 387:22 |
| 369:2,9,13,21 | 289:10,10 | 173:2,4,7,10 | 186:17 188:2 | 388:20 399:19 |
| 370:19 372:2 | 290:6 300:19 | 173:12,21 | 199:12 233:18 | **believed** 327:7 |
| 375:10 | 303:6 309:9 | 174:8,13,15,22 | 243:2 277:9 | 342:16 |
| **AWG's** 119:6 | 314:11,12 | 175:11 176:2,7 | 279:9 294:11 | **beneficial** 216:6 |
| 121:2 333:16 | 319:9,18 324:7 | 176:15,20 | 376:18 377:2 | 216:9 |
| 342:22 355:2 | 333:4 337:12 | 177:13,21 | 394:19 396:3 | **best** 49:8,12 |
| 356:9,13 | 339:1 341:8 | 180:8,9,10,10 | 401:8 402:15 | 80:20 90:15,19 |
| 359:12 361:16 | 351:22 363:1,4 | 180:11,14 | **beginning** | 105:7 119:3 |
| 362:9 | 364:13 366:5,6 | 181:3,12 | 137:17,22 | 120:16 132:16 |
| | 382:4 384:18 | 182:12,12 | 283:19 387:2 | 157:16 195:16 |
| | 394:16 398:14 | 183:2 288:20 | 392:15 393:10 | 251:22 252:1,3 |
| **B** | 399:7 | 289:3,5 322:11 | 393:13 | 270:5 272:15 |
| **B** 6:5 | **backfill** 92:14 | 323:1 370:7,10 | **behalf** 2:3,11 | 273:15 276:14 |
| **B-O-O-M-S-...** | 92:16 93:6 | 380:17 | 3:3,12 4:3 8:1 | 294:6 311:8 |
| 168:22 | **backfilled** 90:12 | **base** 175:3 | 9:13 11:11 | 383:5,6,11 |
| **B-R** 167:21 | **backfilling** | 182:9,20 | 197:20 233:14 | 386:19 387:6 |
| **B-U-N-T-E** | 89:16,19,20 | **based** 42:5 | 234:17 235:10 | 388:9,13 389:2 |
| 277:15 | 90:5,8,15,22 | 140:7 173:2,7 | 235:16 236:4 | 389:6,14,22 |
| **back** 17:1,8,11 | 90:22 91:7,14 | 216:13 285:5,6 | 236:13 257:15 | 390:1,15,19 |
| 20:13 30:5 | 91:19 92:6,11 | 294:13 299:18 | 284:11 358:19 | 391:3,4,6,11 |
| 33:22 34:8 | 92:22 93:14 | 299:22 301:14 | 369:6 | 391:20,21 |
| 43:14,16 54:22 | 94:16,22 95:2 | 303:4,8 304:9 | **belated** 364:22 | 392:11,16 |
| 55:3 74:19 | 95:6,13 | 305:12 307:4 | **believe** 49:9 | 393:7 394:13 |
| 76:22 77:2 | **bad** 45:17 | 307:16 308:10 | 56:12 70:2 | 394:18,21 |
| 94:7 103:22 | **Badger** 23:4 | 312:17 322:12 | 79:16 83:22 | 395:3,16,17 |
| 113:6 118:3 | **badgering** 309:3 | 325:3 327:6 | 110:8 120:1 | 396:1,12 |
| 138:7 143:19 | | | | |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

5

398:15 399:5
399:12,14,16
400:5 401:9,17
402:12
**Bethel** 279:6
**better** 133:17,20
166:3 192:12
192:13 295:13
**beyond** 259:10
**bid** 63:1 68:19
69:10,11 75:6
75:12 77:20,21
77:22 78:4,8
78:18 79:17
104:9 107:14
108:20 109:16
110:2 112:7,17
113:14 114:2
114:13 116:4,9
117:18 118:9
118:11,14,16
118:16,18,19
118:20 119:2
121:1,16 122:3
122:17 123:2
123:12 124:3,5
124:13,13,22
126:9,17 127:2
128:4,9,20
135:6,14,18
136:5,11 137:3
137:22 138:9
139:16,17
140:2,6,11,20
141:6,17 142:4
142:14 143:6
145:12,21
146:6 147:11
147:14 148:21
150:9,12 151:9
151:11,16,17
152:10,11,14

152:17 171:22
172:3 180:16
180:21 181:1,6
181:10,11
183:18,21
184:2,7 189:17
205:20 207:2
236:7,17,19,21
257:6 288:21
289:14,15
296:17 297:4
297:11,15
298:3,13
300:17,21
301:7 302:14
304:9 305:12
307:3,4,7
308:10 312:1
313:4,8 315:9
317:12,16,22
320:21 321:5,7
321:9,11,15
322:2,9,17
324:20 325:4
325:14 329:11
329:13,16
330:7,10,11,12
330:15,16
331:5,9,13,16
332:17 334:12
334:15 335:3
335:16 336:13
342:17 347:15
347:20 348:4
348:12,14,15
350:17 353:4,5
353:8,11,17
357:18 361:16
361:17 363:8,9
363:13 368:19
368:21 371:10
371:14,18

375:3 397:13
399:21 400:12
400:20
**bidder** 321:22
**bidders** 289:16
**bidding** 61:11
62:20 63:3
112:20 113:10
114:19 172:2
179:14 289:12
317:6,8,11,13
321:3,20
334:11 354:1
356:9,10,13
**bids** 63:10 78:5
117:5 124:17
180:12 214:20
289:5 329:19
353:22 354:4
354:10
**big** 24:19 106:1
198:8,9 214:21
**binder** 26:20
**birds** 90:16,18
96:12,19 97:9
120:2 121:13
122:10 123:5,7
123:18 231:6,7
231:9 346:3
**bit** 54:4 168:8
315:1,2,4
384:18 399:7
**Black** 42:5
**Blackshear**
268:14,15
**blast** 24:21
**blind** 277:5
280:8
**blue** 387:8
**Blvd** 3:15
**Bob** 40:3 52:18
271:14,19,22

272:3,13,14
275:8,10,10
278:8,11
282:12,14,15
**booklet** 351:16
352:1
**Boomsma**
168:19,22
170:2
**Booneville** 23:2
261:14
**bottom** 176:18
**bought** 175:20
266:4,5 279:11
279:15,17
**box** 404:7
**Brad** 34:11,13
47:8
**brand** 17:16,18
17:20,21 18:10
18:16,16,22
19:8,8,20
21:11,14 57:5
178:14,17,18
248:3,5,8
258:19 386:9
395:6,7,8
**branding** 18:6
**brands** 17:17
18:5,11,12,18
57:4,7 167:21
167:21 230:9
231:15,17
341:1
**break** 12:21,21
21:18 31:15
103:14 153:3
182:6,17 183:5
183:11 200:12
211:13 270:9
273:18 276:6
289:8 326:5

330:5 331:21
333:11 352:10
357:4,8 362:17
386:9 403:4,12
**breakdown** 30:9
30:14 31:11
176:17
**breakfast** 22:11
**breaking** 27:22
28:14,15
274:10 276:5
**Brian** 168:21
**brief** 100:15
103:19 211:20
270:13 333:2
**briefly** 83:22
**bring** 314:4,11
349:18
**brings** 384:2
**Brittany** 38:10
39:2,19 50:22
**Brittany's** 38:18
**broad** 179:2
**brochure**
351:18,19
**broke** 28:11
104:2
**broken** 23:11
28:8,12 35:10
89:3
**broker** 190:12
190:13,21
191:1,2,4,10
192:8 193:9
203:12,14,18
204:10 225:2,9
226:12 228:3
228:22 229:9
229:20 247:5
254:16 280:16
290:11,15,18
290:19 291:2,7

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

6

291:8,11,16,18
291:19,20
292:22 293:1,8
293:19
**brokerage** 281:8
**brokers** 190:15
190:20 192:15
194:10,14,17
195:6 224:20
273:2 274:5
280:11,18,21
290:21,22
291:3,5 293:3
293:9 356:19
358:15
**Bronx** 262:14
378:19
**Brook** 249:1
**Brothers** 119:10
264:7 279:18
344:10
**brought** 9:8
44:8 52:12
235:15,21
**brown** 183:13
**Bruce** 170:2,4
177:17,18
**budget** 383:4
386:18 387:19
389:5,6
**budgets** 389:8,9
**build** 297:10,17
298:7 324:19
334:14,20
**building** 325:13
**built** 79:5,8
137:4,21 299:6
301:19 305:15
305:20 308:15
321:4
**bulk** 21:21
**Bunte** 277:14

**business** 25:10
32:13,14 61:13
101:7 112:12
112:18,21
113:4,10 114:2
114:5 115:19
117:9,18
118:17,20
119:3 121:2,16
122:4,18
124:20,22
126:9,12 157:9
166:3 170:4
173:21 178:1
197:5 200:14
207:9,11 213:2
213:9 216:10
237:14 241:15
241:19 242:1,6
243:1 244:10
252:15 253:19
256:3 258:12
264:13 278:21
291:5,10 297:4
302:22 321:14
321:22 322:1
322:19 324:8
325:8 329:21
332:17 337:8
341:18 342:17
354:2 357:21
362:9,11 363:4
363:11,12,15
368:8,16 369:2
369:10 378:6
392:6
**busy** 275:8,10
**Butera** 254:4
**buy** 22:2,19
24:18 25:8
78:2 101:22
179:16 183:12

197:19,20
199:16 202:18
239:6 245:12
261:15 278:6
279:17 280:11
294:6,10
304:12 325:20
345:16,19
360:20 363:14
368:9 384:1
**buyer** 114:1
257:13,14,15
363:17 393:1,2
393:4 394:8
**buyers** 237:6
**buying** 25:9
163:18 171:2
179:19 196:11
197:12 234:16
236:3,3 266:6
277:7 279:12
315:18,21
**buys** 236:6,13
315:21 360:16
386:10

**— C —**

**C** 2:12 3:1 4:1
7:1
**C-A-L-M-A-I...**
267:11
**C-o-r-n-e-t-t**
38:12
**cabinet** 186:10
186:12 189:5
318:9 330:21
**cage** 17:5 90:19
**cage-free** 14:7
16:16,17,22
17:1,4,6,11,19
19:7 139:9
277:20 296:1,8

296:11,12
298:5,14,16
300:2,17,22
301:11 303:20
312:14 315:10
346:21 387:7
**caged** 347:1
**cakes** 26:22 27:2
**Cal-Maine**
119:9 123:4,6
214:5 267:11
267:12 277:12
285:14 289:20
290:7 331:19
332:2 343:22
**calculate** 72:22
80:1 294:19
**calculated** 72:3
**calculating**
294:5
**calculation**
141:20
**calculations**
70:8 141:8
**calendar** 329:18
387:3,15
390:10,13
392:15,18,21
393:5,15
394:17 396:4
396:19 397:1
397:17,17
402:1
**California**
180:11 346:15
346:17 347:4
379:17
**call** 25:17 31:11
60:22 137:10
152:4,4,5
255:4 280:14
387:8

**called** 8:14
16:19,20 17:18
17:21 82:16
152:1 165:21
176:12 178:17
252:6 383:2
**calls** 78:9 122:6
122:20 140:13
166:5 179:5
226:16 231:1
235:18 244:7
245:1 269:13
269:21 350:21
372:8 374:2
**campaign**
395:21
**cap** 370:6 385:9
**capabilities**
131:4,8 132:7
132:9 133:22
134:7,14,20
351:21
**capacity** 11:10
**caramel** 28:20
**care** 13:10 27:11
32:13 158:21
165:22 203:21
309:18,22
395:18
**Carolina** 42:6
42:17 64:14
278:2
**carry** 389:2
**carton** 14:13
59:21 161:11
314:7 315:20
**cartons** 67:9
101:22 102:6
103:7,8 159:17
163:18 187:9
**case** 1:7 7:8 59:9
59:22 103:6

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

7

195:16 235:5
272:17 391:22
**cases** 67:10
159:18 161:17
163:19 200:4
203:17,21
304:15 318:10
**catastrophic**
91:1 92:14,17
93:6
**categories** 14:10
**categorize** 20:21
21:18
**Catherine** 37:3
37:8 48:16
50:12
**caused** 340:3
**caution** 83:6
144:20
**CCF** 167:20
230:9 231:15
231:17 326:15
327:20 328:10
328:13,18,18
329:6,9 341:1
**ceiling** 102:13
108:7 370:7,11
371:11 372:13
373:8,13,17
**center** 21:7,9
25:18 182:14
201:8,10
202:12 244:16
244:21 251:9
364:4 367:18
**centers** 119:7
122:18 124:14
181:2 198:13
198:17 241:18
254:6 288:2
342:22 367:8
367:14 368:20

**central** 68:5
123:8 173:14
180:10
**Centrella** 252:6
252:8,16,17,18
253:15,16
**centrifuge** 28:2
**Centrum** 119:9
123:14,15
343:17
**cents** 72:19 73:9
73:10,12 316:8
383:17,19
**CEO** 44:15 45:3
45:5,9
**Ceremi** 26:19
**certain** 9:14
50:5 87:4
93:22 118:19
145:19 159:12
170:13,13
189:15,16
205:20 370:14
371:20 373:19
381:9 382:19
383:15
**certainly** 83:7
217:10 342:20
342:21 363:20
**certificate**
351:17 405:1
**certification**
101:18
**certifications**
351:18
**certified** 90:9,11
90:14 91:8,10
91:12 92:6
93:1,15 94:1
94:17 95:1
97:12,22
116:16,20

117:1 125:3,8
131:5,15,19
252:21,22
253:7,21
254:20 255:7
255:19 341:13
341:19 343:8
343:14,20
344:3,8,13,18
345:1,7,11,18
345:20 346:7
347:13 348:5
349:4,14 351:5
382:5,5
**certify** 405:4
**CFO** 59:16 68:1
68:15 70:16
73:14
**chain** 18:21 42:7
42:10 198:5
236:18 267:6,7
**chains** 196:13
198:2,8,8,9
204:8 214:16
214:21
**Champagne**
240:12 241:20
242:14,20
243:4,17
246:18,20
248:13 249:2
249:11 250:15
251:10 391:18
**chance** 209:19
245:19
**change** 90:21
102:8 103:13
104:2 137:14
177:17 184:10
314:10 350:14
350:15 362:15
362:20

**changed** 17:4
34:5 88:12
97:17 114:9
174:6 187:9
342:3 400:8,14
400:15,16
**changes** 137:13
137:18 160:7
184:8 309:9
322:13 404:13
**changing** 25:11
**channel** 29:11
29:17 274:2
**channels** 272:20
280:4
**charge** 113:7
162:8,14,18
170:3 299:21
299:22
**Charm** 289:19
290:7
**check** 187:16
249:21 291:14
384:2,13
385:10 404:7
**checked** 28:12
**checking** 195:14
**checks** 56:21
162:10 220:1
**Cheese** 387:21
**Chicago** 23:3,4
168:14 169:15
191:3 196:15
242:13 254:7
265:22
**chicken** 23:5
28:10 162:11
265:9
**chief** 45:3,15,20
145:17
**choice** 192:2,5,7
**choose** 175:10

**Chopper** 103:4
103:5
**chosen** 134:1
**Christopher**
18:15
**chronology**
311:21
**Cincinnati**
193:12
**Cindy** 37:19
38:6
**Cindy's** 318:20
319:1
**circulars** 395:14
**circumstances**
272:12 275:22
**Cities** 110:17
**City** 2:8 101:8
104:16,17
110:13,15,18
110:19 117:13
117:17 126:5
178:5 261:2
287:6,7 333:19
334:8
**claim** 63:6 233:3
233:6,8,8,16
234:15 235:14
**clarification**
194:13 304:22
312:13 328:21
**clarify** 306:15
306:18
**clause** 323:20
**clauses** 323:8
**clear** 18:19 77:6
92:4 118:6
144:12 179:8
212:4 223:6
251:5,6 307:13
317:14 348:16
365:17

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

8

clearinghouse 274:1
clearly 311:2
Cleveland 263:2 383:2
client 43:1
clients 291:12
close 17:12 34:15 38:4 40:15
closer 106:13
co-op 277:14
Coast 214:2
Coburn 178:17
collect 132:19 228:19
collecting 58:2
collects 55:8 58:6
college 164:1
Collins 264:7
color 101:16
coloring 28:20 28:21
Columbia 405:22
Columbus 23:6 265:11
column 56:22
columns 56:20
combining 90:18
come 28:10,14 29:22 34:8 63:10 69:17 70:7 71:7,12 72:19 77:1 110:10 112:15 127:2,5 128:8 128:20 170:18 189:22 214:6 215:3 225:9

236:16,18
266:20 295:5
296:3 316:2
319:9,18
325:11 349:4
366:4,8 367:5
373:5 375:11
376:4 381:22
382:11
comes 27:21 28:9 236:6 241:15 259:13 273:11 384:16
comfortable 373:13
coming 27:18 54:21 76:1 256:10 348:11
Commencing 1:17
comments 309:13
commission 405:18
committee 90:14 96:18
commodity 20:2 20:4,6,13 104:15 109:16 110:3 114:20 115:9 117:21 135:7,11 171:4 173:1 177:12 179:15,17,19 180:7 199:5 223:1 231:15 231:17,21 232:1,9 251:16 288:13,14,17 290:2 295:18 320:17,21 322:9,10,18

324:2,6,12
325:1,2,2,3,14
326:8,13 330:6
332:1 333:13
334:12,16
360:4,7 381:3
398:12,13
402:11
common 350:13
communicate 205:13 394:11 394:12
communicated 205:9 206:2
communicating 159:13 166:10
communication 168:4,4 185:17 372:15
communicatio... 186:2 187:12 188:6 352:16
companies 26:18,19 123:16 192:17 342:11,20 350:17
company 26:11 33:21 44:6 48:12 50:7 52:3,5,7 53:15 89:1 123:10 128:6 131:3 132:12 133:21 134:5 137:11 145:18 163:4 178:8,10 179:3 179:14 190:21 195:2 240:5 252:8,18 276:15 329:13 341:16

compared 176:7 232:4,10 315:16 316:5
compensated 195:20
compete 342:11 347:12 378:6
competition 119:5
competitive 61:13 121:1 289:12 321:19
competitor 345:6,6 351:1
competitors 74:7,8 117:8 118:2,10 342:10,21 343:6,12,18 344:1,6,11,16 344:21 345:4 347:11
compiled 284:21
complained 310:6
complete 404:10 404:15
completed 105:14
compliance 131:22 351:4
complied 97:2 97:12 98:1,8
comply 94:1
component 60:2 401:4
components 59:1,17 67:5 68:17
compound 246:4 375:21
computer

139:19 189:1,4 224:18 318:10 318:19 319:1
computers 318:11
concept 255:1 372:5 377:22
Concepts 190:18 191:5 191:12 192:3 192:10,12 225:3,7 230:5 281:2 291:7 292:1,7,13
concerning 82:12 84:14 104:9 107:10 109:16 111:9 111:21 145:12 145:14 223:3 312:2 351:4 356:7
concession 170:22
concluded 403:22
concludes 403:14
conclusion 179:5 226:16 235:19
conclusions 238:13
conditions 373:11
conduct 233:9 233:17 237:14
confectionary 26:18 27:3
CONFIDENT... 1:10
confirm 308:20

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

9

**confuse** 311:3
**confused** 110:15
**consider** 148:2
148:17 216:7
276:2 280:13
345:5
**consideration**
59:20
**consist** 220:5
**consistent** 30:21
**consists** 403:16
**constantly**
137:18
**construed**
369:18
**consult** 205:17
273:9
**consulted** 46:1
**consulting**
276:4
**consumer**
383:22 384:1,5
**consummating**
247:10
**consumption**
27:7 28:4,6
**Cont'd** 3:1 4:1
**contact** 28:15
99:4,14,22
102:3,4,9,10
105:2,5 107:10
110:9 112:13
113:1 132:13
155:14 159:10
166:22 170:5
189:7 197:6
205:11 212:9
255:18 354:15
356:6 357:17
357:22 358:5
358:12,19,22
359:4,11,17

361:20
**contacted**
130:19 292:9
**contacting**
13:12 32:12
**contain** 397:3
**contained** 9:14
56:15 77:22
141:11 318:12
330:20
**continue** 59:10
60:8 96:12
160:2
**continuing** 62:8
63:5,21
**contract** 173:2
288:16 299:6
300:16 302:18
303:15 304:7
306:9,14,19,20
307:15,16,18
307:19,22
308:2,5,8,10
308:14 310:5,5
310:6 311:13
311:14 312:3,6
323:5,7,15,16
323:22 324:2,8
324:10,16
329:22 355:17
399:11
**contracts**
231:14 306:16
306:17 310:7
324:5,8 325:1
**control** 101:21
134:10
**convened** 1:16
**conversation**
94:15,20,22
95:15 100:16
103:11 104:4

105:16
**COO** 45:14
**cooler** 56:18
159:7 161:16
161:19,20
162:8,14,14,16
**copied** 330:22
**copies** 228:6
352:3,7 394:15
394:20
**copy** 188:22
189:1,5 228:15
318:20 394:14
**Cornett** 38:10
38:12 39:19
51:1
**corporate** 9:14
204:16,16
238:15 239:2
240:4 241:8
269:18
**corporately**
258:22
**correct** 9:1
20:16 23:16
26:4 34:7 40:7
44:17 45:22
46:17 47:6,10
50:15 53:8,20
54:7 55:20
56:3 65:15
66:17,18 67:3
68:21 73:16
76:2 84:6
91:12,20 92:7
92:12 98:17,18
104:4,10 105:8
108:20 113:16
115:10 117:2
119:22 122:19
125:3,8 126:6
126:9,13 127:3

127:4,20
128:11,21,22
135:15 138:11
140:3,20
145:13,15,21
147:18 148:6
148:14 150:4
151:13 152:12
156:20 157:3
163:9 165:14
177:13 182:22
183:4 197:22
201:14 202:1
206:6,7,11,14
207:4,20 209:3
209:4,6 210:10
210:19 212:6
213:3 214:16
215:6 220:8
221:4 223:9
225:4,5,7
227:19 229:13
230:5,10,12,22
235:2 237:22
238:18 239:6
240:3 241:12
243:17 251:10
261:21 271:11
274:5,6,12
275:21 280:10
282:15 300:22
301:20 305:17
307:5 308:17
312:4,19 313:5
313:12,17
315:10,11,14
319:14 320:12
323:3 325:15
325:16 327:17
334:15,18,21
335:10,20
336:3,7 337:1

343:4,9,15,20
344:3,4,8,9,13
344:14,18,19
344:22 347:13
348:6,11 349:2
349:21 350:12
353:5,6 355:11
355:13,14
361:17,18
363:21 364:4
367:9,15 368:5
368:13,16,18
368:20 375:13
375:15 384:21
385:1 391:13
393:7 396:9
398:5 399:22
400:6 401:9
404:9,15
**correctly** 218:4
**correspond**
356:20
**Cort** 21:6 24:4
**cost** 59:17,17,19
59:21 67:8
70:16,16 72:5
72:9,18,19
73:13 79:22
139:22 140:18
141:21 146:3
147:15 151:12
151:16 152:10
152:17,17
171:17 297:21
303:7 311:18
314:15 335:4
335:16 372:20
374:5 399:21
400:19,19
401:2,3
**costs** 60:5 68:16
70:17 122:16

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

10

137:16 138:8
138:17 139:7
140:8 141:3
145:17,20
146:5 147:15
147:22,22
148:10,21
149:10,21
150:8,13 151:8
152:6 172:2
249:10 250:2
296:16 303:1
314:9 322:3
366:6 401:2
**counsel** 5:3 7:20
8:7,17 11:6
62:2 63:21
68:12 76:22
81:11 82:12,15
83:4,8 84:16
143:8 144:8
146:13,19
151:21 154:18
156:3,17,19
184:18 185:15
309:13 319:15
332:19 335:7
356:22 405:10
405:14
**Country** 22:5
289:19 290:7
329:14 386:9
**County** 1:1 7:7
9:9 15:10 16:9
202:13 249:1
**couple** 79:16
80:2 83:10
100:1 127:18
185:3 191:14
198:18 256:8
333:13 338:5
361:6 370:17

382:6
**coupon** 384:2,6
384:7,12
395:10 396:9
**couponing**
395:17
**coupons** 369:12
382:13 383:7,9
383:12,13,15
384:14,15,15
390:10 391:20
392:3,4,7
395:13,15
**course** 155:19
**court** 1:1 7:7,16
10:17 12:7
77:1 162:5,13
309:10 319:8
319:18 403:3,9
**covered** 269:7
304:1
**crab** 26:20
**Crabtree** 2:13
8:7 83:19
283:17
**cracked** 28:11
**Cracker** 22:11
**create** 68:9,12
**created** 32:4
33:20 35:18
49:15,18 50:14
51:6,10
**credit** 369:15,19
382:18 384:20
384:22 385:5,6
385:13,16,18
**credits** 369:11
369:14
**Creek** 329:14
**Creighton**
119:10 279:18
344:10

**Crest** 119:11,14
345:3
**cross** 201:10
**Crossville** 26:10
**Crystal** 43:2
**CSM** 26:10
**current** 22:1
102:6 112:21
113:9 116:1,4
184:7 191:4
275:19 285:2,9
285:10 321:17
327:7 328:3
354:1 355:17
**currently** 13:2
17:20 19:11
30:9 34:17,18
135:22 181:21
181:22 225:6
231:20 261:11
285:12,19
324:12 343:14
**customer** 13:10
18:12,18 35:8
37:10,21 38:19
39:10,10 42:20
44:7,11 48:7
48:20 49:14
50:2,18 52:13
52:16 60:2
63:10,13 75:13
77:15,20 78:2
78:15,22
141:18 158:19
159:11 166:21
167:9 170:6,7
170:20 172:20
175:10,15,17
175:22 176:6
179:22 180:4
196:4,17
199:15 201:3,4

206:9,14
210:12 211:3
212:5,19
218:10 236:3,3
236:13,19
242:1,7 247:13
252:6,9 253:1
253:3 256:21
258:19,21,21
261:11 269:16
270:1 272:1
273:7 275:14
285:20 290:12
290:16,17
291:2 294:13
302:16 328:3
333:6 336:22
350:14 355:21
359:19,22
365:16 367:18
376:21 378:1
380:21 383:1
383:21 387:1
395:1
**customers** 13:7
13:11,13,14,16
21:16 22:10,21
26:7,9,13
29:20,22 30:4
32:11,12 35:10
68:7 78:12
81:22 88:11,21
89:6 134:16
155:11 156:7
158:21 159:1,3
159:8,12
165:22 166:1,2
166:7,10,14,15
166:17 167:3,4
167:16 168:5
169:5 170:11
174:20 175:5,9

177:16,18
186:2,20,21
188:2,7,13
196:6 199:9
202:6,17 203:3
203:19 205:6
208:5,13
210:22 219:9
219:21 220:12
220:21 223:2
230:8 232:5,6
232:11,14
236:2,20 237:2
237:5 239:10
239:14,16,20
240:22 241:1
245:6 248:9
254:14 256:14
257:16 258:17
269:6,11 272:6
272:18 273:4
274:7,14,20
275:18 276:6,7
276:11,13
284:19 285:3,7
285:9,10,12
290:21 292:1
293:1,10,14,18
293:20 294:7
303:2 304:5
326:21 333:7
340:15,18,22
342:8 347:4,9
347:10 363:20
364:9 365:11
365:14,14
366:16,17
367:3,5,9,14
367:20 368:1,3
376:3 377:15
378:18 379:9
380:10,19

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

11

382:15 383:4,8
383:12 385:14
387:16
**cut** 144:9,16
**Cutler** 34:18,20
273:13

**D**

**D** 7:1
**D-A-L-T-O-N**
261:6
**D-A-Y-M-O-...**
193:4
**D-I-E-S-O**
191:17
**D-I-S-Q-U-E**
163:3
**D-I-X-I-E**
268:12
**D-U-T-T** 262:1
**D.C** 1:13,19
7:12,19
**daily** 55:3 56:16
188:2 220:8
222:12 273:7
322:13
**dairy** 54:20 57:3
103:6 265:14
**Dakota** 240:13
**Dalton** 260:22
**Daniels** 4:5
**data** 55:8
108:12 285:5
327:6,22
**date** 130:2 218:6
218:6 253:5
331:6 404:22
**dates** 81:9
127:11 130:4
130:12,13,14
**Dave's** 383:2
386:5,8,12

**David** 2:5 8:3
87:10 88:5
89:12 90:5
91:2,15
**day** 55:3,19
83:16 84:5
86:16,18 335:9
348:2 386:9
403:10
**day-to-day**
272:5
**Daybreak**
279:18
**Daymond** 193:2
193:11,14
194:3 195:8
196:7 281:14
291:8
**days** 130:11
**DC** 2:17
**deal** 95:10
170:19,21
179:13 203:2
217:3 236:9
243:19 279:4
290:18 291:11
358:8 376:14
381:17 387:16
**dealing** 203:7,9
275:4,7 329:2
329:5,9 339:20
**dealings** 156:4
**dealt** 281:12
**decade** 30:21
158:7
**Decanio** 7:14
**decide** 71:15
73:4 141:4
176:1 192:9
**decided** 44:2
**decision** 175:19
215:5 292:18

292:19 329:12
363:7,9
**decrease** 303:8
**deem** 28:3 151:9
**deemed** 28:17
**deeming** 151:12
**deems** 27:17
**Defendant**
235:5
**Defendants** 1:10
7:6 9:9 359:8
**define** 150:11
199:15 366:15
**defining** 149:19
151:15
**definition** 92:18
149:5,8,10
151:7 216:8
**degree** 164:1
**deleted** 187:2
**deliver** 30:1
200:6,20,22
249:13,20
258:6 288:3
314:12 321:17
333:15 334:1
365:13 366:18
367:11
**delivered** 29:22
249:19 362:7
366:22
**deliveries**
367:13
**delivering**
200:22 201:12
288:9 334:6,7
366:3
**delivers** 367:7
**delivery** 30:7
287:18,21
367:20
**demand** 23:4

274:16 276:12
276:13
**denature** 28:18
**Denton** 287:6
**department**
31:12,13,14,17
33:10 37:18
39:6 40:2,18
43:9 44:3,13
46:3,6 50:6
55:1 134:10
159:2,14
166:11 218:2
224:19 255:5
359:3
**departments**
159:4 255:3
**depend** 182:13
**depending**
59:21 60:2
62:21 177:1
181:2 217:11
217:15 301:8
315:3 325:6
**depends** 60:12
61:2,19 215:18
215:19,22
216:2 306:20
**depo** 309:10
**DEPONENT**
404:1
**deposition** 1:15
7:3,10 8:22
10:11 76:5,7
76:18 80:16
82:6,13 86:19
106:15 111:3
111:16 129:9
154:21 284:15
403:22 404:5
**Depot** 262:12
378:10

**describe** 13:1
152:9,18 178:1
195:17 336:3
**described** 105:6
105:8 145:10
297:20
**describing**
104:8 148:22
**designated** 9:13
76:12 102:1
284:10 369:5
**detailed** 186:7
**details** 102:5,10
233:13,20
234:2,20,21
**determination**
175:15
**determine** 58:13
58:16 60:5,22
61:20 67:21
70:18,21 175:5
216:13 217:7
219:9,13 321:4
330:18 331:8
390:15
**determined**
90:15
**determines**
180:20 390:3
**determining**
74:14 290:15
**Detroit** 263:9
**Dierberg's**
248:17 387:22
**Dieso** 190:21
191:1,6,14,17
192:6
**diet** 96:12,17
**differ** 58:22
59:2
**difference**
147:12,14,17

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

12

147:22 148:10
148:20,21
149:9,20 150:8
150:12 151:11
151:16 152:5,9
152:17,19
181:7 287:9,10
311:17 326:7
**different** 14:3
14:10,17 22:18
22:18 27:1
56:20 64:21
86:21 101:12
101:16 103:7
107:20 108:8
115:2 123:17
131:3,9 135:21
155:11 156:6
159:5 161:20
173:4,6,7
174:22 180:17
182:1,1,3
190:15 191:11
198:4,18 202:9
237:10 238:7
238:10 272:20
273:5 289:5
315:17 320:4
324:4 387:5
392:13 393:21
393:21 396:5,6
**differently**
12:11
**difficult** 373:9
**direct** 29:19,21
32:11 92:2
168:3 170:10
199:1,2,2,20
200:15 203:2,4
239:22 242:17
242:19 243:3
244:4 250:14

251:8,13 252:2
255:15,16
277:8 281:22
282:4 329:14
330:3 359:11
361:20 390:2
**direction** 44:19
276:14 405:8
**directly** 13:9
31:18 33:8,11
34:4 46:7
47:14 52:21
159:14,20
164:6 194:6
201:13 203:2
204:4,11
235:10 243:19
272:1,14 288:9
329:3,16
361:15 366:13
366:18,21
**director** 31:19
32:8 44:5
**dirties** 56:21
**disclose** 83:8
**discolor** 29:2
**discount** 171:1,2
171:7,7 181:12
181:16 183:8
189:16 205:4
205:20 206:8
206:10,13
207:2 208:5,21
209:16 210:9
210:11,14,17
215:3,6,10
216:1,12,16
217:2,7,15,16
218:2,6 219:4
228:10 322:14
369:22 370:1
376:10,16,22

377:9 379:6
381:15 383:18
384:3 395:10
397:4,8,19,20
401:18,22
**discounted**
208:12 217:1
218:12
**discounting**
207:17
**discounts**
225:10,14
227:1 375:12
375:14 376:5
378:17 379:11
379:20 380:10
380:16 396:6
396:12,21
**discredit** 12:12
**discrepancy**
369:19
**discuss** 112:15
125:16 128:8
134:12 170:7
204:11 219:6
269:5 273:15
387:1,13
**discussed** 86:20
101:1,19
102:12,15
107:20 125:14
133:11 155:9
236:20 257:22
259:11 290:21
291:8 296:9,10
300:9 341:14
341:22 342:4
354:21 371:12
397:1
**discussing** 101:6
263:4
**discussion** 100:4

102:18 105:20
108:15 124:4
274:17
**discussions** 83:9
133:6 157:1
348:11
**display** 203:16
203:21
**disqualify**
361:16
**Disque** 163:1
253:10
**disseminated**
88:22
**distribute** 22:20
168:15 245:13
260:17
**distributed** 29:5
269:18
**distributes**
260:10
**distribution**
29:11,19 119:7
122:18 124:14
181:2 182:14
198:13,17
201:8 241:18
244:16,20
251:9 254:6
288:2 342:22
364:4 367:8,14
367:18 368:20
**distributor** 22:7
29:18 168:13
168:17 230:11
258:7 260:8
341:9 342:4
377:17 379:16
**distributors**
22:18 23:1,14
29:12 259:16
259:18,21

266:10,16
378:7
**District** 1:1,3
7:7,8 405:22
**division** 112:8
117:11,12
118:9 183:13
240:13 241:7
289:10 331:5
**divisions** 117:10
118:4,5,7,19
329:12 331:3
**Dixie** 268:10,16
**dock** 201:10
314:11
**document** 56:11
66:5,8 68:3,5
69:2,7,13,21
70:3,5,6,11
78:17,21,22
79:7,19 82:18
84:2 85:8 86:4
112:7 131:10
139:6,11,16,17
139:22 140:6
140:17 141:2
141:11 142:5
176:11,14
185:22 186:11
299:3 316:16
317:16,21
318:1 319:14
320:3,3 330:19
331:1,9 393:17
393:19 397:6
397:11,16
401:19,20
**documentation**
222:10 351:4
**documented**
217:20
**documents**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

13

| | | | | |
|---|---|---|---|---|
| 68:12 69:16 | 25:4,11 340:1 | 247:12,13,15 | 377:18 | 101:14,22 |
| 76:6,10,17 | 340:20 | 248:6,7,13 | **early** 17:7 162:4 | 110:11 112:16 |
| 80:15,17 81:10 | **Drew** 39:7 51:9 | 249:10 250:1,6 | 163:7 174:6 | 117:9 135:22 |
| 84:8,10,10,11 | 51:10,14 52:12 | 250:7 258:6 | 190:17 196:21 | 139:9 158:19 |
| 84:13,13 85:4 | 54:4 221:15,20 | 259:17 355:20 | **Earth** 178:4 | 158:19 159:17 |
| 85:6,10,12 | **dried** 20:22 | 377:16 380:22 | **East** 3:15 214:2 | 159:17,19,19 |
| 86:2,8 98:6 | 25:14,15,18,20 | 381:7,14 | **Easy** 165:1 | 161:17 162:1,5 |
| 111:4,8 138:5 | 26:18 29:5 | **duties** 157:21 | **ECI** 273:1,20 | 162:9,14,18,19 |
| 156:2,3 185:1 | 34:12 273:19 | 158:18 | 277:4,5 280:1 | 162:19 163:15 |
| 185:7 187:15 | 275:15 276:7 | **Dutt** 23:4 | **economic** 25:12 | 163:18,18 |
| 316:17 317:6 | 293:3 336:10 | 119:11 120:19 | 216:17,19 | 165:13,19 |
| 321:2 330:19 | 336:16,17 | 262:1,8 341:5 | **economically** | 167:4 168:17 |
| 331:2,4,8 | **drill** 127:13 | 341:5,7 379:18 | 216:6,9 | 172:8 175:4 |
| 351:22 | **drilling** 319:7 | | **edible** 27:5 | 180:7 182:20 |
| **doing** 19:4 | **drive** 170:14 | **E** | 28:17 29:1 | 195:16 202:14 |
| 63:22 108:11 | 207:3,18 208:6 | **E** 3:1,1 4:1,1 6:1 | **educated** 87:1 | 213:5 217:11 |
| 163:15 224:3 | 378:2,5 | 6:5 7:1,1 32:22 | **effect** 67:3 | 217:15 219:13 |
| 247:9,15 303:4 | **drop** 288:7 | **e-mail** 55:2 | **egg** 1:9 3:3,4 7:6 | 227:1 230:14 |
| 315:20 332:6,8 | **dropped** 292:13 | 112:17,19 | 13:5,7,7,15,15 | 232:6,14 |
| 337:7 339:15 | 340:19 341:7 | 113:5,11,21 | 14:21 15:10 | 262:12 268:4 |
| 372:12 | 342:2 | 114:3,7 186:19 | 16:20 17:14 | 268:10,18,22 |
| **dollar** 382:19 | **drops** 364:3 | 187:4 218:1 | 20:15,20 21:7 | 270:21 271:10 |
| 385:3 | **dry** 25:22 47:12 | 318:11,13,22 | 21:10 22:4 | 271:14 273:2 |
| **Donna** 163:1 | 273:14 | 319:2 | 23:11,19 25:6 | 273:17 274:1,5 |
| 253:10 | **dryer** 25:17,19 | **e-mails** 111:8,20 | 25:7,18,20,22 | 274:14 278:9 |
| **Donovan** 16:18 | 25:21 | 111:22 112:1,3 | 26:1,18 27:4 | 278:21 279:20 |
| 16:20,20 17:8 | **dryers** 25:16 | 112:3 124:7 | 27:20,21,21,22 | 280:14,16,20 |
| **donuts** 26:12 | **dual** 39:9,17 | 125:22 126:1,4 | 28:1,10 29:4 | 281:2,16 282:8 |
| **double-check** | **due** 329:20 | 186:1,9 187:2 | 29:14,15,16 | 282:18 285:20 |
| 299:12 385:9 | **duly** 8:15 405:5 | 187:17 188:1 | 30:9,10,12 | 286:16 292:12 |
| **dozen** 14:15 | **Dutch** 23:3 | 188:13,15 | 32:16,16 35:11 | 293:6,14,20 |
| 72:6,9,14 73:9 | 167:20 168:7,8 | **earlier** 144:5 | 36:19 41:12 | 294:2 296:15 |
| 73:11,12 80:14 | 168:12 169:19 | 146:9,22 148:4 | 47:21 50:18 | 297:4,11 |
| 146:10 171:2 | 171:9,11 172:9 | 148:5 172:1 | 52:18 55:4 | 299:19 300:4,7 |
| 195:21 206:11 | 172:13,20 | 185:5 212:22 | 56:8 58:21 | 301:4 304:9,10 |
| 308:16 316:8 | 173:1,8,21 | 220:6 229:10 | 59:15,18,20 | 307:4 308:10 |
| 376:17 383:17 | 176:1 177:10 | 251:7 277:18 | 64:18 65:12 | 312:15 320:7 |
| 384:3,10 | 242:12 243:12 | 280:8 308:22 | 66:11,12,13,15 | 322:5 325:4,8 |
| 387:10 397:22 | 243:13,20 | 317:5 326:21 | 67:22 68:20 | 325:9,12 |
| 398:1,4 | 244:1,14 | 327:4 341:14 | 71:8 75:6 | 329:11 342:12 |
| **dozens** 385:4 | 245:11 246:9 | 342:15 347:12 | 76:10,17 78:5 | 345:16 355:15 |
| **dramatically** | 246:17 247:4 | 354:8 357:20 | 81:4 89:4,4,7 | 355:16 356:7,7 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

14

359:21 367:6
376:6 378:10
387:7
**Eggland's**
251:22 252:1,2
383:5,6,11
386:18 387:6
388:9,13 389:2
389:6,14,22
390:1,15,19
391:3,4,6,11
391:19,21
392:10,16
393:6 394:13
394:18,21
395:3,16,17
396:1,12,17
398:15 399:5
399:12,14,16
400:5,14 401:9
401:17 402:12
**eggs** 13:5,19
14:1,2,5,6,7,7
14:8,11,13,18
14:22 15:2,6,6
15:14,22 18:7
20:2,2,5,8,14
20:21,22,22
21:3,12,16
22:12 23:10,22
24:7,10 25:15
26:4 27:5,15
27:18 28:3,6,7
28:8,12 30:11
30:18 35:12,13
36:7 37:12
38:1 39:5
40:12,22 46:12
46:12 48:1,2
52:11 54:6,17
54:19,21 57:20
58:14 59:7,8

59:11 60:9,14
62:2,7,12,13
63:4,6,13,19
63:19 65:8,12
65:15,18 72:1
73:18 78:8
79:17 80:9,11
80:12 81:3
89:7 102:19
104:16 109:16
110:3,4 113:7
113:8,15,16
114:20,20
115:4,9,10
116:7,10,11
119:21 126:16
135:7,7,11,12
135:18,18,21
136:1,3,14
137:3,10
138:15,18
139:1,2,3,5
145:13,14
148:1 150:4,7
152:16 166:18
166:19 168:14
169:3,4,7,10
169:11,11,12
169:13,16,22
170:8 171:2,4
171:4,13,18,19
172:14,16
173:1 179:15
179:16,19
182:2,10
183:13 187:14
190:8 192:21
196:3 199:6
201:13 202:19
204:1,10 205:5
207:11,17,19
214:19,20

216:3,14
217:13 219:10
219:14,16
220:8 221:9
222:10,11,11
223:2,4,14
226:14 229:6
230:21 231:18
231:21,21
232:2,10
234:17 238:5
238:16,17
239:6,7,19
242:12,19
243:15 244:14
244:18,22
245:4,12
246:10,10,16
246:21 247:1
247:20 248:13
248:21,22
251:16,19,20
251:21 252:19
254:10 258:6
260:1,3,17,19
261:16 264:1,3
264:14 266:5
266:22 267:12
267:20 268:2,4
268:7,17,19,22
269:12,17
272:3,3,4,8,16
272:17,20,21
272:22 273:1,4
273:6,9,13,15
273:16,18
274:8 275:1
276:6,10,11,12
276:17 277:8
277:11,12,13
277:17,21
278:20 279:7

279:10,12,15
279:17,22
280:12 284:19
286:1,2,2,3,4,9
286:13 288:7
288:13,14,17
290:2,2 294:14
295:1,20
296:21 297:1
297:12 298:5
298:10,16,21
299:8 300:2
301:3 302:14
303:21 304:6
304:13,13
305:21 312:2
313:21 314:1,6
314:10 315:10
315:18 321:17
322:9,18 324:6
324:11,12,13
325:3,14,20,22
326:6,8,11
327:20 332:3,6
332:14 333:13
333:14 334:12
334:16,20
335:16,21
336:4 340:10
340:12 342:12
345:10,10,16
345:20 346:13
346:21 347:1
355:9,20
356:20 360:16
360:20 361:14
363:14,15,17
364:3 365:13
365:15,17,19
366:5 367:5,7
367:21 368:9
368:13 370:3

372:7 377:14
378:17,22
379:7 381:3,16
382:2,3 383:5
384:1,11 386:7
387:11 391:20
392:11 394:21
395:2,3 398:12
400:5 401:9
402:11
**Eggs-R-Us**
267:16 273:3
277:10 280:13
296:6 300:11
301:5,6,9,15
302:2,6 303:14
303:20 306:10
307:1,4 315:13
315:16,19
316:6,18 318:2
318:21 319:4
319:13 320:14
**eight** 121:21
242:22 339:21
339:21
**Eighteenth** 3:8
**either** 109:4
159:13 258:20
276:10 318:9
318:22 367:5
378:5
**employed**
223:12 405:11
405:15
**employee**
219:20,22
220:3 358:18
405:14
**employees**
223:12 356:18
357:9 358:11
**encompass** 14:6

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

15

encompassing
159:18
engaged 233:8
244:19
engaging 233:16
enhanced 14:7
enter 56:2
231:15 324:15
entered 171:16
entertaining
372:2
entire 121:16
310:12 314:15
387:14
entities 252:17
entity 168:20
257:12 266:21
268:7,21
errata 404:14
ESQ 2:4,5,12,13
3:5,13 4:4
establish 137:17
established
291:6 307:6
402:7
estimate 340:13
et 1:6,9 7:5,6
Eugene 1:15
8:13 9:20
evaluate 74:1
276:13
Evansville
263:21
evenly 177:11
event 91:1 92:15
92:17 93:7
everybody
43:11
evidence 66:1
94:4 98:10
350:6,21 390:6
evidences

393:17
evolved 101:9
evolves 137:15
exact 16:2 17:10
125:4 185:14
190:20 193:16
198:3 234:20
253:5 279:2
284:20 299:2,4
308:19 330:16
340:11 347:10
381:17
exactly 82:2
84:14 85:12
125:5 130:10
155:10 174:5
174:10 183:14
183:15 184:7
225:21 231:4
233:5 256:7
258:3 270:2
277:6 282:22
289:9 298:1
306:5 313:18
313:20 336:11
386:15 393:13
393:14 402:8
examination
8:14,17
examined 8:15
404:4
example 74:6
167:16 204:7
218:15 221:15
269:16 272:22
281:1 305:2
320:7 387:7
389:5 391:13
exceeding
142:17 272:8
275:18
exceeds 143:5

370:11
Excel 56:10,12
56:12,15 70:10
excluding
336:21
exclusively
113:15
excuse 48:1
319:11 336:17
345:15 348:1
exercising 61:5
Exhibit 6:6
82:20 84:17
85:10 86:6,21
155:1 156:10
157:6 284:6
existing 32:13
165:22 166:13
166:14 167:9
170:15,16
205:20 274:13
274:20 275:18
expand 211:5
experience
61:12 62:20
expires 405:18
explain 271:21
317:13 372:18
372:22 373:15
374:8
export 273:4
274:7
extended 25:7
extra 14:4 20:2
324:13 335:4
386:11
eye 32:20
159:15

————————
F
F-A-R-I-B-U-...
287:12

F-R-O-M-M-E
189:11
F-R-Y 321:11
face 197:8
facilities 23:9
29:7 119:15,22
120:11 202:5
221:3,16
246:17 296:3
362:2 367:7
facility 16:9,11
42:17 247:2
248:20 249:11
fact 68:16 70:12
98:6 105:22
113:17 115:3
124:20 134:5,9
134:10 213:21
233:11 238:14
325:5 361:14
368:19
factor 123:1
217:10 295:15
factors 60:16,20
61:6 70:9
71:11 216:7
315:3
facts 66:1 94:4
98:10 350:6,21
390:6
Faegre 4:5
fair 12:2 114:9
114:21 126:17
140:12 149:2
149:12,22
150:14 151:18
160:1 172:4
182:14 208:7
209:14 211:3,9
217:4 230:20
245:9 270:6
291:1 328:7

367:22 368:11
374:19
fall 14:1 176:20
232:17 288:19
329:21
fallen 173:22
339:5
falls 13:16 21:21
180:19
familiar 252:5,7
255:1 264:13
294:7 341:15
fan 106:8
far 58:5 70:5
72:18 81:7
114:8,18 115:8
116:4 117:1,9
122:17 133:19
134:20 142:21
178:19 186:15
198:17 200:16
240:22 249:2
273:10 277:8
326:6 333:7
338:1 339:6
340:15 341:19
341:20 354:4
358:15
Faribault
287:11
farm 15:10
16:17,18,20
17:9 21:8,10
102:19,22
120:17 131:7
159:14 162:6
202:14 334:2
Farmers 22:7
382:1
farms 2:11 5:3
8:6 17:6,6,20
17:22 21:5

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

16

| | | | | |
|---|---|---|---|---|
| 23:3,10 43:3 | **fell** 175:19 | 13:17 16:10 | 301:14 314:14 | **Foods** 21:22 |
| 54:13 55:1 | **felt** 90:17 96:18 | 17:1 21:4 | 314:20 | 23:2 26:20 |
| 119:9 123:8 | 157:9 327:13 | 23:19 54:9 | **fluctuated** | 242:15 254:4 |
| 132:18 134:12 | 327:15 363:12 | 82:11,15 84:1 | 338:15 | 256:17 261:10 |
| 134:12,13 | **field** 39:11 | 84:7 99:14 | **fluctuation** | 265:22 267:11 |
| 159:6 167:20 | 40:21 52:10 | 101:2 105:5 | 303:1 323:1 | 279:18,19 |
| 168:7,8,12 | 167:13 | 106:3 107:12 | **flyers** 383:9,13 | 285:14,14,15 |
| 169:19 171:9 | **Fifteen** 24:8 | 109:13 112:6 | **Foam** 102:2 | 289:20 332:11 |
| 171:11 172:9 | **Fifteenth** 7:19 | 154:22 156:16 | **focus** 100:9 | 332:14 341:19 |
| 172:13,20 | **figure** 43:19 | 162:5 168:7 | 121:4,17 | 342:3 345:22 |
| 173:1,8,22 | 72:17 295:4 | 174:6 185:11 | 133:14 158:3 | **force** 151:21 |
| 176:1 177:10 | 389:5 | 193:15 306:11 | 161:6 165:5 | **forecasts** 102:14 |
| 178:17 202:9 | **file** 81:19 112:1 | 310:16 329:10 | 266:13 325:22 | **foregoing** 404:4 |
| 202:11 242:12 | 184:22 316:21 | 357:4,9 370:16 | 336:18 | 405:3,5 |
| 243:12,13,20 | 316:22 317:2,4 | 371:4,5 374:16 | **focused** 121:3 | **Forest** 231:7 |
| 244:2,14 | 317:7 318:5,6 | 400:13 | 125:21 155:13 | **form** 24:11,13 |
| 245:12 246:9 | 318:22 | **firsthand** 246:6 | 156:8 | 56:4,8 58:15 |
| 246:17 247:4 | **filed** 233:12,19 | **fit** 28:3,6 | **focusing** 173:15 | 70:13 71:1,13 |
| 247:12,13,15 | 233:22 256:20 | **five** 15:15,21 | 282:7 293:5,19 | 77:20,21,22 |
| 248:6,7,13 | 256:22 | 16:1 25:4 41:4 | **folder** 184:15 | 78:4,14 81:17 |
| 249:10 250:1,6 | **files** 224:16,17 | 42:15,21 43:4 | **folks** 8:9 31:7 | 114:10 138:21 |
| 250:7 258:6 | 224:18 255:22 | 161:14 185:11 | 43:20 50:5 | 147:19 149:13 |
| 259:17 262:4 | 278:11 317:10 | 254:11 270:15 | 154:12,19 | 150:15 183:19 |
| 272:2 277:9,22 | 318:8 | 309:4 336:14 | 157:1 221:14 | 184:5 204:13 |
| 296:6 343:17 | **filing** 186:9,12 | 338:21 339:1 | 241:11 281:1 | 217:5 224:9 |
| 351:20 355:20 | 189:5 318:9 | 339:12,18 | 282:17 336:19 | 335:18 |
| 366:3 377:16 | 330:21 | 360:3 380:13 | 364:1 | **forms** 78:12 |
| 380:22 381:7 | **fills** 56:4 | 399:19 400:4 | **follow** 177:19 | **formula** 66:20 |
| 381:14 | **final** 141:18 | 400:12 | 400:18 | 67:1 71:4 |
| **Feather** 119:11 | 312:9 | **fixed** 301:17,18 | **followed** 357:19 | 301:14 |
| 119:14 345:3 | **financial** 131:7 | 398:22 399:1 | **following** 166:8 | **formulas** 67:9 |
| **February** | 145:18 | 402:12 | 310:14 | **formulate** |
| 164:16 321:1 | **financially** | **flats** 14:11 | **follows** 8:16 | 140:11 |
| 370:21 374:11 | 405:15 | **Flemming** | **food** 14:12 | **fort** 84:17 |
| 374:14 | **Finch** 257:5,7 | 256:16 | 21:19 22:14 | **forth** 187:13 |
| **feed** 59:18,19 | **find** 384:11 | **flip** 320:16 | 26:22 27:10 | **forward** 186:17 |
| 67:8 96:12,19 | **finding** 55:4 | **flock** 89:13 | 28:20 132:3 | **found** 57:1 |
| 97:9 137:15 | **finish** 31:3 | **Flowers** 26:9 | 134:7 262:19 | 124:8 |
| 303:1,4,5,6 | 74:17 317:20 | 285:15 336:8 | 332:9,13 355:2 | **foundation** |
| 304:16 | **finished** 315:21 | 336:13 | 355:5 376:13 | 57:14 122:6 |
| **feel** 210:20 | **firm** 7:15 | **fluctuate** 299:18 | 377:1 380:20 | **four** 19:16 |
| **fees** 60:4 | **first** 8:15 10:13 | 299:22 301:8 | 381:1,8 | 120:14 161:14 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

17

176:15,15
211:22 226:2
339:1 380:13
**FPI** 102:2
**Francesville**
21:10 25:21
27:14
**franchise**
238:22 239:2,4
239:5
**franchisee** 179:5
226:16 238:20
258:20 361:9
**franchisees**
178:7,10,13,19
179:1 226:12
226:21 235:17
237:21 238:6
238:17
**Frankfort** 15:10
**freeze** 24:22
**freezer** 24:21
25:13
**freight** 30:6
60:1,3 67:10
70:18 141:3,9
314:9,13
321:17 366:6
**frequently**
225:13,16
275:3 276:20
**fresh** 25:6
**Friday** 88:4,5
91:3 96:1
100:12,14
104:5 105:20
106:17 111:19
154:10
**Friday's** 100:16
**Fromme** 189:11
**front** 303:3
**frozen** 20:21

23:18,19,22
24:7,10,18
25:3,9,11 29:4
47:7
**Fry's** 321:11,13
322:19 324:8
**FSIs** 383:9
395:12
**full** 9:18
**full-time** 275:9
**fully** 145:7
**functions**
166:12
**further** 405:13
**fuzzy** 294:4

_____
**G**

**G** 1:19 7:1
356:18 405:2
405:20
**G-i-n-n-a-n-e**
34:11
**gable** 24:15,15
24:16,16
**gains** 325:11
**game** 106:12
**Gary** 279:6,11
**gather** 155:16
**geared** 391:21
391:22
**general** 5:3 8:7
75:11 90:11
95:5 102:18,20
108:12 111:11
134:2 155:10
156:7 166:11
**generally** 20:9
29:5 194:14
**generated**
206:20
**generates**
139:18 140:7

**generating**
143:4
**gentleman**
327:13
**geographic**
118:11 122:13
214:8
**Georgia** 26:10
43:3 64:14
264:9 268:15
289:20
**German** 283:6
**Germantown**
243:8
**getting** 129:21
133:19 161:18
**Gilster** 26:21
**Ginnane** 34:11
34:13 47:9
**girl** 205:10
**give** 10:19 32:20
63:21 74:16,18
80:5 134:3
161:8 170:9
172:3 176:17
189:16 206:19
209:19 216:11
218:5 219:3
245:19 284:20
302:15 327:16
364:6 370:6
371:1,4,7
376:20,21
377:9 384:20
387:9,10
390:10 394:14
396:16 397:1
397:16 398:8
400:20 401:14
**given** 218:3
264:19 270:5
370:11 394:5,7

396:21 397:8
397:19,20
404:10,16
405:10
**gives** 62:22
396:4
**giving** 326:20
372:13 402:9
**Glenwood**
277:21
**go** 10:16 11:16
14:17 22:5
24:19 26:6,17
50:6 52:2
59:11 61:14
62:4 67:20
68:1 69:2 75:2
76:22 79:10,21
101:16 110:12
122:9 126:4
129:14 133:5
138:7 151:6
167:13 168:6
168:11,11
172:20 176:22
184:14 192:3,9
200:2,7 201:17
219:8 235:19
238:20 272:16
273:16 276:10
276:12,14
285:11 290:5
291:4 292:19
296:12 303:6
310:12 316:12
328:12 332:21
337:2 345:9,16
346:15 364:7
365:10,16
366:20 367:13
367:16 384:8
387:12 403:1

**goes** 54:17 123:1
300:12 325:19
401:3 402:14
**going** 10:18 12:2
32:20 38:11,11
59:5,10,17
60:17 61:6
62:7 65:7
76:22 77:1,3
83:1,4 102:5
103:17 108:9
108:11 112:20
113:3 114:1
118:2 123:2,12
124:3 130:5
132:20 140:10
144:19,21
149:6 151:2
153:5 155:6,8
160:4 186:17
188:19 194:12
209:18 211:2
211:19 217:4
219:20 228:10
229:22 236:11
239:13 243:15
245:18 270:12
290:17 294:4
309:9 310:11
311:6,19 319:8
322:22,22
324:7 327:3
333:1 337:12
339:1 352:11
362:19 364:19
365:20 371:6
373:5,6 382:4
383:8,13 387:9
387:10 392:9
392:20 393:22
395:2 396:6,7
398:18 399:4

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

18

400:5,8 403:5 403:18
**Golden** 17:18 19:19,20
**good** 8:19,20 157:10 283:6 363:12
**goodness** 208:11
**goods** 26:14 27:1
**gotten** 279:10 380:5
**grade** 101:17 314:6,16
**graded** 315:18
**grading** 27:20 27:21 28:7 162:10
**graduate** 164:3
**graduated** 161:15
**grain** 303:8
**grant** 225:13
**greater** 209:6,9 209:13
**Green** 231:7
**Greg** 7:4 137:1 139:6,21 331:14,18 403:15
**Gregory** 1:15 8:13 9:20
**grocer** 240:6 253:21
**groceries** 366:3
**grocers** 1:5 7:5 9:7 134:21 169:3 197:13 197:22 202:4 248:12 252:21 252:22 253:7 253:21 254:20

255:8,19
256:13 260:18
261:19 262:21
263:14 264:4
264:15 265:16
265:19 266:14
266:17 267:2,3
268:8 269:2,20
341:13
**grocery** 18:20 42:7 179:2 196:13 197:20 197:21 201:13 204:8 214:15 239:19 258:14 258:22 260:12 260:16 261:15 262:6,9,16 263:10 264:1 264:10 265:3 265:13 266:3 281:8 356:19
**group** 196:11 197:12 235:10 235:16 236:3,6 236:13 237:6 240:6 255:4 257:12,14,15 326:2
**groups** 254:20 254:22 255:2,7
**grow** 209:3 210:17 211:3,6 211:8 368:16 368:17
**growing** 210:9 210:21 211:2
**grows** 209:5,9
**guarantee** 108:7 314:18 322:9 325:4
**guaranteed**

210:4 314:13 314:14,16,19
**guess** 21:17 107:17 114:15 146:14 149:4 156:5 173:3 175:14 195:15 201:18 213:18 259:15 281:22 282:4 306:15 306:18 317:12 317:13 357:6 364:17 369:14 386:14 392:3
**guidance** 62:22
**guideline** 97:3
**guidelines** 90:21 91:11 93:10 95:1,4,7 96:4,6 96:9,11 97:18
**Guthrie** 21:7,9 25:17 202:12
**guys** 106:10

**H**

**H** 6:5
**H-a-c-k-n-e-y** 37:19
**H-e-i-r-o-n-i-...** 32:21
**H-E-R-B-R-U-...** 15:12
**H-o-r-t-o-n** 37:3
**H-O-U-C-H-E-...** 359:16
**Hackney** 37:19 50:17
**half** 297:15 324:13,18 326:12 402:21
**Hamilton** 3:6 277:14

**handles** 286:19 390:1
**Hanson** 2:6 8:1
**happen** 77:4 238:5
**happened** 104:8 114:12 163:16 177:17 228:13
**happening** 228:22 373:10
**happens** 379:8 395:16
**happy** 23:5 113:9 115:22 265:9 353:22
**harassing** 106:5 309:14
**hard** 164:21 188:22 189:1,5 302:21
**HARTUNG** 3:13
**haul** 30:5 366:6
**Hautley** 387:21
**head** 17:11 31:16 65:4 66:3 67:19 108:17 119:12 125:6 135:21 183:14 191:1 192:16 257:11 257:21 266:19 269:7 279:1 280:3 286:6 289:22 294:10 294:19
**heading** 176:13
**headquarter** 239:17
**headquarters** 10:1 101:6 110:13,14

126:5 127:17 179:14 193:7 212:13,15 238:16 239:18 388:5
**heard** 335:9
**heart** 208:12
**heavier** 30:18
**Heironimus** 32:19 273:11
**held** 7:10 10:7 31:20 32:1 35:16 37:13 38:2 39:13 40:13 41:1,14 42:13 162:15
**help** 102:4 107:8 158:22 194:15 210:21 268:19 272:15 275:14
**helped** 161:20
**helpful** 155:16
**helping** 161:22
**helps** 272:3,4 366:6
**Henderson** 7:15 7:18
**hens** 119:17 120:3,13,20 121:6
**Herbrucks** 15:12,14 139:4 277:17
**hereto** 405:15
**Hickey** 2:5 8:3
**Hidden** 346:18 379:14,15 380:1
**high** 161:15 164:4 325:9 380:4
**higher** 200:2

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

19

| | | | | |
|---|---|---|---|---|
| 370:7,12 | hopes 322:3 | I-n-g-l-e-s 42:3 | in-house 183:10 | 266:17 267:1,3 |
| 373:18 374:5 | hoping 209:2,12 | idea 44:21,22 | 291:8,16,20 | 268:8 269:19 |
| **HIGHLY** 1:9 | 210:15 211:1,7 | 308:21 372:14 | 292:22 | **independently** |
| **Hillandale** | 368:12,15 | **ideas** 189:22 | **in-person** | 240:20 241:1 |
| 119:10 213:17 | **Horton** 37:3,4,8 | 213:20 | 133:15 | 258:9 |
| 277:11 279:4 | 48:16 50:12 | **identification** | **inaccurate** | **independents** |
| **Hillcrest** 262:19 | **Houchens** | 82:21 | 309:13 | 169:14,14 |
| 376:13 377:1 | 359:15,18 | **identified** 70:9 | **include** 32:15 | 240:1 241:7 |
| 382:16,22 | 360:15,20 | 156:10 157:14 | 56:18 57:6 | 254:2,3 259:10 |
| 385:21 | 361:5,9,15,19 | 157:15 163:12 | 136:5 220:2 | **Indiana** 9:22 |
| **Hinton** 1:16 7:4 | 362:1,10 | 172:1 182:19 | 221:15 222:2 | 15:10 16:12,19 |
| 8:13,19 9:20 | 382:17,17 | 237:20 266:22 | 249:10 250:1 | 21:6,7,10 23:3 |
| 31:2 74:16 | 384:19 | 269:3 280:19 | 402:4 | 24:3 25:22 |
| 81:8 120:5 | **hour** 402:21 | 282:6 293:12 | **included** 68:20 | 27:14 46:22 |
| 207:10 270:19 | **hours** 100:1 | 326:21 333:8 | 135:15 171:15 | 64:13 83:14 |
| 311:7 403:15 | 127:18 249:5,7 | 336:19 342:20 | 171:17 | 122:1 123:21 |
| **hire** 49:19 51:3 | **house** 17:18,21 | 347:12 356:10 | **includes** 89:6,6 | 162:7 249:1 |
| 51:18 | 18:10,16 28:11 | 357:10 358:13 | 221:2 222:3 | 261:14 263:21 |
| **hired** 49:18 | 54:11 90:18 | 366:16 367:4 | **including** 59:18 | 265:7 314:5 |
| 161:10 164:9 | 162:10 | 368:4 369:10 | 147:15 158:20 | 324:14 |
| **hiring** 158:22 | **houses** 90:12 | 382:14 | 352:20 356:18 | **Indianapolis** 4:8 |
| **history** 134:4 | 162:11 | **identify** 158:15 | 359:7 | **indicate** 69:11 |
| 175:18 176:6 | **human** 28:4,6 | 172:2 272:15 | **incoming** | 70:12 79:4,7 |
| **hold** 46:18 | 403:4 | 340:17 | 321:13 | 98:6 113:19 |
| 186:4 309:2 | **Hurd** 87:10 88:5 | **Illinois** 16:18 | **Incorporated** | 383:19 |
| 317:20 352:20 | 89:12 90:5 | 23:3,4 64:15 | 7:15,18 383:11 | **indicated** 67:11 |
| 371:1 | 91:2 92:21 | 168:14 240:12 | **increase** 169:20 | 79:15 177:9 |
| **holder** 361:9 | 94:15,21 95:16 | 241:21 242:14 | 189:22 207:18 | 185:5 280:7 |
| **holding** 370:12 | 96:1 98:20 | 243:8 248:13 | 211:9,11 | 339:4,14 |
| **Honest** 192:11 | **Hurley** 4:4 | 249:3,12 | 274:16 303:7 | 385:20 386:17 |
| **honestly** 198:3 | 122:5,5 | 251:10 254:7 | 340:3 | 403:9 |
| 213:18 234:20 | **husbandry** | 266:1 388:2,7 | **increased** 338:5 | **indication** |
| 258:11 378:15 | 90:16 | **imitation** 26:19 | 339:22 | 206:19 331:7 |
| **honor** 392:6 | **Hutchison** 3:14 | **impact** 60:16,21 | **independent** | **indirect** 239:22 |
| **Hoosiers** 105:22 | **Hy-Vee** 214:12 | **implement** | 134:20 169:3 | 243:9 257:17 |
| **hope** 207:1 | 234:1,15 235:2 | 378:21 | 197:22 248:12 | **indirectly** 242:8 |
| 208:4 210:9 | 340:4,6 387:20 | **implements** | 255:8 260:12 | 242:10 |
| 325:9 | 388:18 | 391:2 | 260:18 261:19 | **individual** 18:12 |
| **hopefully** | **hypothetically** | **important** 10:19 | 261:20 262:20 | 142:22 237:6 |
| 207:13,19 | 398:3 | 10:22 12:10 | 263:13 264:4 | **individually** |
| 208:6 209:9 | | 58:9 328:8 | 264:15 265:15 | 226:5 |
| 378:2 | _____ **I** _____ | **in-depth** 133:12 | 265:19 266:13 | **individuals** |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

20

109:8
**industrial** 21:19
21:20
**Industries**
359:15 360:20
**industry** 17:4
27:3
**inedible** 25:21
25:22 26:1,3
27:8,10,16,18
27:21 28:2,3
28:17
**information**
56:14 57:2,12
57:15,17 68:6
69:14 88:17
102:7,21
111:10 113:18
113:20 128:6
130:22 132:20
132:21 138:11
155:7 156:6
157:7 188:19
206:1 221:12
222:6,13 223:3
224:21 227:19
234:12 284:18
312:18 327:15
330:20 352:1
354:20 390:21
397:10,11
402:4
**Ingles** 41:22
42:3,3,20
**ingredients**
21:22
**initial** 70:16
316:4,6
**initially** 128:14
171:16 308:9
**inner-city**
378:18

**inquiries** 353:11
**inquiring**
133:19
**inquiry** 115:21
**inspect** 54:16
**inspected** 57:4
**inspecting** 55:10
219:20 221:4
**inspection** 52:10
54:5 56:8
**inspections**
39:12 40:22
41:13 51:12
53:4 55:15,20
56:3,19 220:1
221:10,20
**inspects** 54:18
221:17
**instructed**
353:21
**instructing**
81:13
**instruction**
186:14,15
**instructions**
185:21
**insurance**
359:20
**integrated** 134:6
**intent** 208:4
372:11
**interest** 250:8
**interested**
274:21 292:11
405:16
**internal** 78:21
79:2,4 98:6
141:19 175:4
**internally** 20:5
78:17 147:7
152:13 172:19
199:15 294:15

335:21 393:1
**interrupting**
144:9
**introduce** 7:21
**introduced** 8:22
**invoice** 199:1,2
199:20,21
218:3 243:11
243:11,13
250:19 251:12
369:17,19
**invoiced** 198:12
**invoices** 359:2
**invoicing** 359:4
**involve** 218:20
219:6
**involved** 60:3
98:19 101:13
203:14 215:5
227:5,8 244:10
245:21 282:18
290:18 297:7
319:18 355:8
355:13 390:17
**involvement**
98:16 234:9
**involves** 13:15
81:22
**involving** 166:7
166:7 190:8
**Iowa** 21:9 25:18
54:10,13
117:13,17
123:9,22
202:12,12,12
202:13 346:2
**issue** 11:4 95:13
218:9 369:20
**issues** 54:20
159:3,11
187:13 320:4
**item** 183:12

**items** 78:1,3
182:3

_____
**J**
**J** 2:4
**Jackson** 31:19
34:6 36:14,17
39:18 40:17
41:6,18 53:7
76:3 87:9,21
99:20 101:3
106:21 125:14
125:17 127:10
129:18 137:1
155:4 156:12
165:9 212:9
270:20 271:9
282:8 331:14
354:20 357:13
357:14 360:10
402:18
**Jackson's** 46:9
**Jeff** 34:18,20
273:13 276:4
**Jen-Acre** 16:19
**Jen-Acres** 16:11
162:4,7
**Jersey** 262:4
**Joan** 282:20,21
**job** 52:5 130:19
161:3,7,10
163:11 192:13
**Joe** 8:8 85:2
**John** 2:12 8:4
389:16 390:20
**Johnson** 261:2
**join** 160:15
**joined** 33:13
48:11 91:8
92:6,22 160:11
**joining** 93:14
**joint** 44:22

123:16
**JOSEPH** 5:2
**Joyce** 110:8,21
111:2 112:14
112:19 113:2,6
113:22 126:6
**Joyce's** 111:12
**JR** 2:12
**judge** 245:20
**Judicial** 1:3 7:8
**July** 299:13
302:9 306:9
**jumbo** 20:2
**jumbos** 14:3
386:10,10
**June** 130:2,4,12

_____
**K**
**K** 1:18 2:15 7:11
**K-i-m-s-e-y**
41:20
**K-u-n-t-z** 41:8
**Kansas** 1:2 2:8
7:8 9:10 101:8
104:16,17
110:13,13,15
110:15,16,18
110:19 117:13
117:17 126:5
287:6,7,8
333:18 334:8
**Kathy** 205:10
205:11,13
255:20,21
**keep** 61:19 62:8
63:22 76:21
112:21 143:9
187:16,18,20
188:3,6,11,15
275:8 278:5
282:9 304:18
309:16 310:1

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I        March 17, 2014

21

352:11 378:6
403:5
**keeping** 114:5
159:15
**keeps** 146:19
275:10 309:15
**Kentucky** 64:13
260:9
**kept** 53:5,11
124:19 126:12
186:18 187:4
187:14 188:9
188:22 317:6
318:4,5
**Kim** 189:11
**Kimsey** 41:20
53:22
**kind** 25:10
31:11 84:10
102:20 107:19
134:14 143:17
155:2,6,7,8,9
162:9 166:6
177:11 178:1
215:22 322:10
376:14
**knew** 32:19
114:8,18 115:8
115:18 116:11
117:2 177:21
254:2
**know** 11:20
12:21 17:10
28:22 29:17
38:10 42:11
45:10 49:7
54:21 55:11
58:4,9 60:3,13
61:14 62:6
65:3,17 66:2,3
67:15 69:1,6
73:17 77:16

80:8 82:9
86:22 90:1
95:9 98:11,14
102:20,21
103:7 107:7,18
108:11 110:10
113:17 114:15
115:3,15 117:4
117:7 118:8,9
118:14 119:17
121:6 122:12
124:16,18,20
125:7,9 130:13
130:19 132:11
132:17 133:16
133:19 134:2,5
135:21 137:14
137:20 140:7
146:18 155:7
155:15,21
156:1,2,5
159:2,4,9,11
166:9 168:21
170:19 172:6
174:5,10
177:20 184:11
184:17 188:12
188:16 193:6
193:15 194:6
197:17,19
198:1,3,5,6,7,8
198:16 200:7
200:16 202:16
202:16 213:12
213:13,17,19
213:20 214:7
216:3 218:19
222:19 224:12
224:14 225:20
226:20 231:3,4
232:8 233:13
233:18,18,20

234:1,3,19,20
235:4 236:5
237:11 238:6
240:14,21,22
241:17 243:14
246:7 247:18
248:11,19
249:4 250:7
254:8,9,19,21
254:22 255:4
258:3,3,11
260:10 262:5
262:15 265:12
269:8,10,11,17
272:15 273:10
277:6 278:12
278:17,19
279:2 280:2,8
280:22 281:20
282:2 284:4
287:17 288:11
289:9,14,15,16
290:1 291:12
291:15,15
292:10 294:5
294:10 299:4
301:12,13
306:5 308:4,19
314:2,8 318:6
319:17 327:22
328:3 331:15
332:5 340:11
341:19,20
346:10,12,18
346:19 347:9
347:10 350:16
350:19 354:4
356:4 357:7
360:11,15,17
360:19 361:2,4
369:14 372:10
372:14 373:18

373:20 378:15
378:17 381:12
383:8 384:5
385:15 386:4,5
386:6,14
389:17 392:5,5
393:14,14
394:7,11
396:17 398:6
398:18 399:5
400:9 401:8,10
402:10,16,18
**knowing** 61:12
373:9
**knowledge** 95:6
115:2 118:13
120:16 126:21
132:17 155:21
156:4,6 157:8
157:10 186:11
198:16 202:20
202:22 219:1
226:18 231:6
234:1 239:1
244:4 245:4,16
246:6,9 255:15
255:16 258:15
259:7 260:19
267:7 282:1,4
285:6 290:6
304:10 351:1
371:6 396:14
**known** 114:14
116:3 168:19
197:3 361:6,8
372:20 374:5
400:3,7
**knows** 81:12
402:13
**Kraft** 21:22
26:20 285:13
325:17,19

**Kreme** 26:12
**Krieder** 214:3,3
**Krispy** 26:12
**Kroger** 63:16
64:5,17 65:18
66:13 67:6,13
67:22 68:19
70:4 71:8 73:2
74:15 75:8
146:12 196:8
281:21,21
282:3 285:13
291:9,11
292:22 293:12
294:2,3 295:10
295:22 296:8
297:4,22
298:13,15,21
299:21 300:1
300:16,21,21
301:8,11,16
303:12,21
305:12,22
307:3,7,10,12
307:16,19
308:9,15 312:2
312:8,10 313:5
313:7 315:9,19
316:19 317:17
317:19,22
318:14,17,17
319:3,11,12
320:14,18,22
321:12 322:18
323:22 324:5
324:12 339:3
341:22 342:1,2
380:13
**Kroger's** 22:5
74:6 291:20
314:7
**Kroner** 190:18

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

190:18 191:2
192:12 230:2,4
**Kuntz** 41:8,9
220:4 221:2,8
221:21

---

**L**

**L-A-R-R-O-C**
201:7
**L-Y-N-N** 262:4
**label** 18:5,11,18
**Lack** 122:6
**Lakeside** 242:14
**language** 323:15
**Laredo** 201:1,2
**large** 14:4,4
20:3,3 42:7
182:9,20,22
183:1 204:8
214:15 324:13
363:17,20
364:2 365:11
365:13,16,19
366:9,12,15
367:3,6,8,11
367:14 386:11
386:11,11
**larger** 24:19
167:16 199:9
199:15 254:14
**largest** 63:13
285:19
**Larroc** 201:5
340:5
**late** 17:7 162:3
162:16 288:18
402:22
**latitude** 59:7
**law** 12:7
**lawsuit** 9:8 59:9
63:7 156:1
233:12,19,21

**Linda** 101:5
102:3,8 103:1
103:5 107:21
109:5 113:7,22
127:19 129:13
130:13,19
132:13 133:3,5
133:7 349:8
357:10 358:10
**Lindsey** 35:4
36:15 37:1,17
38:8 39:3,18
40:1 44:8
47:16 100:4,8
109:20 111:9
111:14 112:14
113:1 125:18
129:15 130:17
167:2,4,5
217:22 270:20
271:3,8 272:14
273:10 274:18
274:19 276:4
282:9,10
331:15,17
354:21 357:11
357:12 389:9
390:18 393:2
**line** 15:10 16:9
102:7,8 120:17
161:20 296:17
**Linwood** 263:7
**Lion** 332:10
**liquid** 20:21
21:3,6,12,16
22:4,10,12,19
23:11 24:10,12
24:20 25:6,7,8
25:11 29:4
33:3 34:3 47:5
47:6 273:13,14
273:18 275:15

276:6,7,10,11
279:14 325:20
336:15 382:2
**list** 55:3 88:11
88:21 89:5
133:11 269:16
270:1 278:5
327:3,14,16
337:2 361:11
**listed** 124:8
**litigation** 234:9
234:12
**little** 26:16 27:1
30:18 41:3
42:15 54:3
158:7 162:12
168:8 183:22
191:7 200:18
315:1,2,4
326:11 333:9
360:13 371:3
384:18 388:17
388:20 399:7
403:10
**live** 12:17
260:14
**LLP** 2:6,14 3:6
7:11
**load** 200:3
299:10,11,16
307:9 314:21
315:11,13
338:11 360:13
362:1 377:14
**loading** 161:22
**loads** 200:1,6,7
254:12 294:5,7
294:12,14,20
295:6,11
298:16 299:15
324:14 325:17
326:1,4,5,10

330:2,3 331:19
332:12 333:8
333:10 334:1
336:9,12 337:4
337:14,18
338:1,5,8,14
338:18,20
339:2,4,6,10
339:14,15,18
340:16 360:11
380:8 381:16
381:17 385:3
**located** 7:18
42:4 46:21
54:9 119:7
120:15 121:11
121:22 132:18
168:13 178:4
182:14 193:5
196:14 240:9
260:8 261:13
262:13 263:1,8
263:20 264:8
265:6,10
267:17 268:13
278:1 287:5
343:1 346:1
361:13 388:4
**location** 104:16
104:18 122:14
231:11
**locations** 17:2
29:13 64:19
102:22 118:11
131:7 132:15
218:9 268:14
279:8 287:18
287:21 288:1
361:12
**lock** 302:1,11,21
306:9 314:8
**locked** 300:10

**Lee** 26:21
**left** 52:4 103:2
125:7 175:22
266:18
**legal** 7:15,16,18
102:7,8 179:5
226:16 235:19
238:13
**legalities** 237:12
**lengthy** 133:6
**let's** 13:17 18:20
20:1,12 21:3
23:18 26:6,21
54:3,8 100:9
103:10 105:18
171:11 181:21
182:6 200:12
266:10 272:7
277:16 284:17
320:16 323:22
325:17,21,22
330:1 336:18
352:15 362:16
384:18
**letter** 77:12,13
77:14,17,18,19
78:19,21 402:5
**letters** 79:3
80:22 81:6,18
81:19,21 85:18
166:9 186:2
**level** 36:20
203:20 204:2
**Lewis** 52:8,9
**life** 25:7
**limited** 356:19
**Lincoln** 202:13

233:22 235:1,7
235:8,21
**lawyer** 310:10
**learn** 384:9,10
**leave** 163:6

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

23

302:6 313:13
313:16 314:19
**lodge** 59:6,10
145:4
**Logan** 3:7
**logic** 122:12
**long** 10:7 15:13
16:4,21 19:13
24:6 30:13
31:20 33:5
34:13,19 35:13
36:18 37:13
38:2 39:13,19
40:13 41:1,14
42:13,19 46:18
48:3 52:6
83:15 84:5
99:21 127:16
129:20 183:17
184:3,9 196:16
241:22 242:7
242:21 272:3,7
272:16 275:4,7
279:10 299:5
302:6,11
322:17 337:6
342:8 348:2
356:1 359:22
378:22 379:7
399:17 403:9
**long-term**
302:18,22
**longer** 50:6
113:7 130:17
172:17 191:22
299:14 340:19
403:11
**longs** 271:20
**look** 18:21 60:1
67:8,18 71:12
73:17 74:7
81:21 124:10

124:11 137:16
138:5,7 148:17
151:7 172:19
175:17 224:17
255:22 272:19
272:21 276:8,9
291:4 296:22
320:13 321:3
336:12 369:2
**looked** 82:2
103:9 125:22
321:15,16
335:3
**looking** 126:4
131:11 137:10
151:8 170:9
174:10 269:10
299:2 308:19
326:19 331:7
**loose** 14:11
258:20 266:5,6
**lose** 217:3,8
**loss** 56:21
314:16 325:6
**losses** 325:10
**lost** 105:22
106:12 253:19
256:2 269:6
**lot** 21:21 105:17
106:11 155:11
155:13,13
166:11 196:12
196:12 325:5
346:14,15
395:13,15,15
**Louis** 191:2,19
240:14 387:21
388:2,6 391:17
**lower** 256:4
**lunch** 153:6
**Lynn** 262:4

### M

**M** 6:1
**M-A-H-A-L-I-...**
389:16
**M-C-C-A-U-...**
260:6
**M&M** 26:17
**machine** 28:9
**magazines**
391:5 394:20
**Mahalic** 389:16
390:20
**Mahard** 119:11
120:9
**main** 22:8
106:19 108:13
110:9
**maintaining**
166:21,22
167:9 322:3
**major** 27:3,12
**majority** 21:13
54:14 174:12
230:21 248:22
269:8 333:22
362:5
**making** 44:5
159:8 166:1
169:21 215:5
320:18 322:4
324:1
**manage** 195:16
**management**
88:15 89:14
**manager** 33:3
34:12 35:8
47:5,12 57:4
99:11 162:9,15
162:16 359:2
**managers** 54:20
159:7
**manages** 271:20

**manger** 34:3
**manufacturer**
26:22
**manufacturers**
26:2
**maps** 389:12
**March** 1:14,16
7:13 403:16
**Marcus** 44:15
44:19 45:2,6,8
45:19 158:13
**margin** 60:6,7
60:17,21,22
61:1,6,16,19
65:21 67:10,11
67:15,21 68:20
69:2,11,18
70:10,22 71:7
71:12 72:2,10
72:15,18 73:1
73:8 79:4,8
80:3,4,5,12
137:3,6,9,11
137:21 140:19
140:22 141:10
141:13,20
142:1,9,11,17
142:19 143:5
145:20 146:9
146:22 147:11
147:13 148:6
148:11 149:1,5
149:9,11,19
150:12 151:15
152:9,18
297:16,19
298:6,9 302:16
302:20 305:15
305:19 310:9
310:10,11,13
311:17 312:18
312:21 316:13

322:7 334:14
334:20 335:1,8
335:14 336:3
400:20,22
**margins** 322:4
**Mark** 40:19
53:1,10 54:4
87:10 88:6,8
88:18 89:9
221:22
**marked** 6:7
82:21 83:2
**market** 19:8
20:10 25:3
61:22 74:13
169:15 173:17
173:19 174:9
174:13,17,22
175:1,2,4,6,8,9
175:17,18,19
176:6,16
177:19,20
180:6,14,20
181:3,13
182:12,12
183:3 217:11
217:15 230:2
272:20,21
273:6,16,17
274:11 289:1,6
322:11,12,13
322:13,14
323:1 325:3,6
370:7,9,9,11
370:12 371:2,5
372:12,13
373:10,11
375:14 376:5
387:13 388:2
391:16 402:11
**market's** 325:9
**Marketers** 3:4

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

24

**marketing**
  190:18 191:5
  191:12 192:3
  192:10,12
  225:3,6 230:5
  281:1 291:6
  292:1,7,13
  383:1 385:21
**marketplace**
  60:13 61:2,20
  61:21 62:19
  73:19 371:7
**markets** 22:18
  173:7 176:16
  180:11,13
  181:8 269:20
  273:19 288:21
  402:10
**marks** 244:14
**markup** 243:22
  244:17,21
  245:15 246:14
**Mars** 26:17
**Marshall** 25:19
  137:1 138:12
  139:6,21
  145:17 147:16
  331:15,18
**Mary** 26:21
**Mat** 36:18
**material** 314:12
**Matt** 35:20
  36:12 44:9
  48:6 87:9 88:3
  88:3 102:3,9
  103:2 205:12
  205:12 217:22
  357:15,16,16
  358:1
**matter** 7:4 12:11
**MATTHEW**
  3:13

**McCauley** 260:4
**McKee** 26:10
**meal** 89:8
**mean** 18:20
  28:19 56:20
  62:18 66:9
  76:16 77:18
  105:16 122:10
  133:12 149:19
  155:20 181:11
  187:8 188:4,15
  189:9 203:4
  216:20 242:11
  254:22 272:8
  310:13 311:14
  317:3 326:7
  347:10,21
  372:11 374:14
  378:16 396:16
  396:19
**meaning** 74:4
  187:5,9 217:3
  257:14
**means** 183:2
  209:6 311:14
  311:17
**media** 7:2
  103:21 154:4
  211:22 362:22
  403:17
**medial** 270:15
**medium** 14:4
  20:3 183:6
  279:12 381:16
  381:18 386:11
**Medium's**
  182:18
**meet** 26:20 83:3
  83:17 87:3,6
  87:20 111:18
  130:5,10
  215:21 216:15

  276:11,13
  349:22 350:15
**meeting** 83:15
  84:1,5,7,9,16
  84:19,21 85:4
  85:7,14,21
  86:11,17,19
  99:22 100:3,10
  100:11 107:4
  107:18,20,21
  108:12 109:1,6
  110:7,20
  112:11 127:9
  127:14 128:2,8
  129:21 130:20
  132:22 133:13
  133:15,15
  134:3 142:17
  210:16
**meetings** 154:18
  154:18 156:19
**member** 214:16
  219:17 220:2
  233:12,19
  236:7,8 250:10
  352:20 355:10
  359:7 361:20
**members** 103:3
  198:6 214:7,9
  214:13,17
  218:14,17
  219:2 226:3,4
  233:4 234:17
  235:11 236:4
  236:14,17
  239:19 240:20
  240:22 254:1
  326:2 342:13
  359:12 362:9
  372:6,15
**memo** 369:15,19
**Memphis** 261:6

**mentioned**
  13:18 27:6
  31:6 128:1
  163:15 230:7
  257:17 259:2
  270:19 282:18
  326:15 343:2,3
  348:5,8 375:11
**Meridian** 4:6
**met** 9:3 82:12,15
  83:7,18 87:5,9
  100:1,17,18
  101:5,14 109:4
  109:8 111:15
  126:6 127:19
  130:1 133:4
  154:9 156:11
  169:18 351:8
**Michael** 279:18
**Michigan** 15:12
  64:14 277:13
**microbiologists**
  134:11
**mid** 173:12
  253:2,4,18
**middleman**
  247:15
**midsummer**
  302:9
**Midwedst**
  174:14
**Midwest** 4:3
  64:9,12,20,22
  117:11,12
  119:9 121:19
  173:13,20
  174:8,12,13
  175:1,11 176:2
  177:12,19,20
  180:8 289:3,6
  344:5 345:10
  345:17 347:9

**miles** 249:6,8
**Miller** 5:2 8:8
  85:2
**million** 119:19
  120:3,14 121:8
  121:14,21
  123:20 231:12
  336:14 346:5
**million-and-a...**
  121:9
**mind** 61:14
  155:7 214:6
  239:13 256:8
  256:11 259:13
  264:19 266:20
  294:9 381:22
  382:11 384:16
**minds** 175:16
**mine** 170:11
**Minneapolis**
  240:12
**Minnesota** 3:17
  240:13 287:11
**minor** 345:5
**minute** 231:20
  332:21
**minutes** 211:16
**Mischaracteri...**
  72:12 143:8
  146:1 220:14
  221:6 229:3,15
  238:2
**mischaracteri...**
  142:1,19
**missed** 154:12
**Mississippi**
  102:2 289:20
**Missouri** 2:8
  25:20 110:16
  178:5 202:14
  240:14 267:18
  388:7

**misspelled**
38:22
**Misstates** 95:3
**Moark** 112:22
113:16 114:5
114:21 115:3,4
115:10 116:5
116:11,16,20
118:14 119:8
124:19,19,20
126:11,12
214:4 256:12
343:3
**Moark's** 119:21
**model** 341:18
**modified** 350:4
**modify** 349:20
350:3,8,18
**modifying**
350:12
**Molly** 2:13 8:6
83:18 84:4,22
85:22
**molt** 96:11,20
97:8
**molting** 95:14
95:17,20 96:1
96:3,9,13
98:16,19
**Monday** 1:16
87:17
**money** 217:3,8
325:7
**Monica** 2:12 8:4
8:4 11:7 14:20
15:3 31:2
38:16,20 43:13
43:16 49:7,21
55:11 57:13
58:3,15 59:5
60:8,18 61:8
62:1,5,16 63:5

63:14,20 65:2
65:9,22 66:22
68:11 69:4,19
70:13 71:1,13
71:18 72:4
73:20 74:2,9
74:16 75:1,7
75:18 76:11,19
77:3,7 78:9
79:9 80:7,19
81:8,16 83:6
91:22 93:2,16
94:3,10 95:3
97:14 98:9
103:14 114:10
114:22 115:11
115:14 118:21
120:5 122:20
128:12 135:1,8
136:7,17 137:5
138:1,13
139:12,20
140:4,13,21
141:12,22
142:10,18
143:7,14,20
144:8,13,22
145:4,22
146:11 147:3
147:19 148:8
148:15 149:3
149:13 150:1
150:15 151:2
151:19 152:20
164:21 168:10
175:12 176:21
179:4 181:4,17
183:19 184:5
189:18 190:2
192:1,18
194:11 197:14
198:14 200:8

201:15,17
204:3,13 205:1
206:16 207:5
207:21 208:8
208:14,19
209:7 210:1
211:14,17
214:18 217:5
218:18 220:13
221:5 222:14
222:18 223:15
224:9 225:18
226:15 227:2
227:12 229:2
229:14 230:1
230:16 231:1
232:7,18,21
234:18 235:18
236:15 237:16
238:1,19 242:2
244:7 245:1
246:3 247:6,17
250:17 251:2
255:10 269:13
269:21 270:10
282:12 283:14
283:18 284:1
287:13 297:18
298:8 302:19
303:17 305:18
309:2,12,21
310:16,20
312:5,20
319:15 322:6
333:17 334:22
335:18 345:12
347:22 350:5
350:20 351:6
352:11 356:22
362:16 364:6
364:18,22
365:4 366:19

372:8 374:2
375:20 378:3
379:1 390:5
398:9,20 399:2
400:21 403:1
403:13
**month** 306:14
334:1 382:20
387:3,15
393:12,15
396:2,3
**monthly** 137:15
382:17 384:22
395:21
**months** 39:15
75:17 79:16,20
80:3 82:10
83:10 161:14
253:19 297:6
298:4 300:18
301:1 307:1,5
312:1 319:17
381:14
**more/less** 315:4
**morning** 8:19
8:20 154:11
157:2 296:10
297:21
**Morris** 2:14
7:11 8:5
**Mount** 260:9
**Mountain** 42:5
**mouth** 327:13
**move** 105:18
175:6 209:20
309:12 352:15
**moved** 17:5
161:15,16
**movement**
303:5
**Muffins** 22:8
**multiple** 14:16

17:17 213:13
236:17,20
240:10 281:21
317:10 321:14
331:2
**muted** 283:18
**Mylar** 344:20

**N**

**N** 3:1 4:1,6 6:1,1
7:1
**N-E-S-T** 313:22
**N-i-e-b-l-e** 35:22
**N-i-e-w-e-d-d-e**
40:5
**N.W** 7:19
**name** 7:14 8:21
9:18 21:11
35:21 38:22
40:4 56:6,9
57:3 102:11
110:8 111:1,2
111:12,13
163:2 178:14
178:20,22
190:22 191:16
197:1,9 205:11
240:17 256:1
258:20 261:4
277:12 283:3,6
**named** 235:5
**names** 22:22
123:17 259:20
**Nash** 257:5,7
**Nashville** 101:9
104:18 112:8
112:12 121:5
121:18 122:12
260:15 278:2
**national** 33:3
34:3,12 36:8
36:11,19 47:4

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I　　　　　　　March 17, 2014

26

| | | | | |
|---|---|---|---|---|
| 47:11 193:9 | 252:12 336:2 | 64:14 162:7 | 70:13 71:1,13 | 145:22 146:11 |
| 329:11 | **new** 32:12,12 | 240:13 278:2 | 74:18 81:16,16 | 147:3 148:8,15 |
| **nationally** 46:13 | 43:21 45:12 | 314:5,11 | 114:10 122:6 | 149:3 150:1 |
| **nationwide** | 49:18,19 51:3 | **Northeast** 180:9 | 140:21 141:12 | 151:3,19 |
| 47:19 | 51:18 61:11 | **Northwest** 1:18 | 147:19 149:13 | 152:20 168:10 |
| **nature** 383:15 | 81:20 114:1 | 7:12 | 150:15 184:5 | 175:12 176:21 |
| **necessarily** 40:9 | 144:14 166:5,8 | **Notary** 1:20 | 194:12 204:13 | 179:4 181:4,17 |
| 50:1 56:9 | 170:4 183:13 | 405:1,21 | 206:16 223:15 | 183:19 189:18 |
| 69:13 70:6 | 189:4 262:14 | **note** 223:13 | 224:9 246:4 | 190:2 192:1,18 |
| 190:5 387:2 | 291:5 338:6 | 332:20 | 302:19 305:18 | 197:14 198:14 |
| **need** 12:20 | **newly** 32:4 | **noted** 141:21 | 312:5,20 | 200:8 201:15 |
| 102:7 211:12 | 33:19 35:18 | 404:13 | 334:22 335:18 | 204:3 205:1 |
| 272:2 277:14 | 39:10 50:14 | **notice** 9:15 77:6 | 364:7 366:19 | 207:5,21 208:8 |
| 290:15 299:12 | 51:6,10 | **notified** 185:15 | 400:21 | 208:14,19 |
| 332:21 385:8,8 | **newspaper** | **notifies** 392:8 | **objected** 335:8 | 209:7 210:1 |
| **needed** 172:19 | 227:21 229:5 | **notify** 383:7,12 | **objecting** 62:9 | 214:18 217:5 |
| 288:11 | 383:10 | 395:1 401:21 | **objection** 11:15 | 218:18 220:13 |
| **needs** 158:20 | **newspapers** | **notifying** 218:2 | 57:13,14 58:3 | 221:5 222:14 |
| 170:8 | 390:2 391:5 | **November** | 59:6 60:9,18 | 222:18 225:18 |
| **negotiate** 64:18 | **Newton** 249:1 | 405:18 | 61:8 62:8,16 | 226:15 227:2 |
| 303:1,3,14 | **Nichols** 2:7 | **number** 7:3,8 | 63:14,20,21 | 227:12 229:2 |
| 304:14 305:2 | **Nieble** 35:20 | 43:20 82:20 | 65:2,9,22 | 229:14 230:1 |
| **negotiated** | 36:1,2,18 48:6 | 83:2 103:21 | 66:22 68:11 | 230:16 231:1 |
| 66:10,16,19 | 87:10 99:1,22 | 154:4 211:22 | 69:4 71:18 | 232:7,18,21 |
| 67:21 171:8 | 100:6,10 104:4 | 270:15 284:7 | 72:4,11 73:20 | 234:18 235:18 |
| 189:17 288:16 | 104:13 105:12 | 294:7 312:19 | 74:2,9 75:1,7 | 236:15 237:16 |
| 303:19 305:6 | 105:16 106:17 | 337:3 338:8 | 75:18 76:11 | 238:1,19 242:2 |
| **negotiating** | 107:4 357:15 | 339:6 352:17 | 78:9 79:9 80:7 | 244:7 245:1 |
| 180:22 239:17 | 357:16,16 | 352:17,22 | 93:2,16 94:3 | 246:4 247:6,17 |
| **Neiman's** | 358:1 | 353:1 362:22 | 94:10 95:3 | 250:17 251:2 |
| 248:18 387:22 | **Niewedde** 40:3 | 375:19 385:2,4 | 97:14 98:9 | 255:10 269:13 |
| **neither** 405:10 | 40:6,7 52:18 | 387:1 399:22 | 114:22 115:11 | 269:21 297:18 |
| **nest** 313:22 | 271:14 272:13 | 403:15 | 115:14 118:21 | 298:8 303:17 |
| 314:1,2,3,17 | 275:8 282:14 | **numbers** 326:19 | 122:20 128:12 | 309:2 319:15 |
| 315:21 | 282:15 | **NW** 2:15 | 135:1,8 136:7 | 322:6 333:17 |
| **Nestle** 27:11 | **Nine** 39:15 | | 136:17 137:5 | 345:12 350:5 |
| **never** 38:20 | **nonUEP** 345:19 | _____ | 138:1,13 | 350:20 351:6 |
| 44:11 95:21 | 346:6 | **O** | 139:12,20 | 364:7 365:1,21 |
| 132:12 152:8 | **normal** 290:22 | **O** 6:1 7:1 | 140:4,13 | 372:8 374:2 |
| 152:18 219:12 | 400:18 | **oath** 12:6 | 141:22 142:10 | 375:20 378:3 |
| 228:13 236:19 | **North** 16:11,11 | **object** 11:14 | 142:18 143:7 | 379:1 390:5 |
| 244:17 246:13 | 16:19 42:6,17 | 38:16 58:15 | 143:14 145:5 | 398:9,20 399:2 |
| | | 62:6 63:5 | | |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

27

| | | | | |
|---|---|---|---|---|
| **objections** 59:10 | **Oh** 31:4 45:8 | 100:9 103:12 | 182:6,7,9,19 | 266:2,8,16 |
| 335:10 | 48:20 189:10 | 104:19 105:1,6 | 183:17 184:2 | 267:6,19 268:6 |
| **obligated** 323:9 | 193:2 196:18 | 105:18 106:2,6 | 185:5 188:17 | 268:13,16,21 |
| 371:11 | 261:10 266:10 | 106:10,14 | 188:21 189:2 | 270:4 274:19 |
| **obligation** | 267:22 295:13 | 107:15 108:18 | 189:14 190:10 | 275:3,6 276:3 |
| 373:12 | 360:19 364:9 | 109:9,22 110:5 | 190:16 192:5 | 277:1 278:10 |
| **obviously** 33:10 | 381:12 385:15 | 110:20 111:20 | 193:1,8,13 | 278:15 279:7 |
| 66:9 216:5 | **Ohio** 22:6,8 | 112:9 113:13 | 194:22 195:3,8 | 280:7,15 |
| 336:21 340:17 | 23:6 64:14 | 117:7,16 118:1 | 197:19 198:21 | 281:10,19 |
| **occasion** 221:18 | 121:12 123:10 | 118:7 119:8 | 199:4,8 200:12 | 282:6 284:6,8 |
| 222:13 227:19 | 123:22 263:2 | 120:19 123:18 | 202:3 203:1,18 | 285:1,8,11,16 |
| 228:5 | 265:11 289:18 | 123:21 124:1 | 203:22 204:19 | 287:21 288:6 |
| **occasionally** | 382:1 | 124:16 125:13 | 205:8 211:14 | 288:15 289:4 |
| 222:3 | **oil** 89:7 | 127:1,5,8,11 | 212:17 215:12 | 290:11 292:4 |
| **occasions** | **okay** 10:10 11:2 | 127:13,19 | 216:5 218:22 | 292:17,21 |
| 276:16 | 11:17,18 13:17 | 128:16 129:4 | 219:19 220:10 | 293:7,10 |
| **occur** 276:21 | 14:2,19 15:3 | 129:11,20 | 221:12,19 | 294:22 295:3,9 |
| **occurred** 42:16 | 15:17,20 16:13 | 130:3,7,15,21 | 222:9,22 | 295:18,20 |
| 158:4 | 18:3 19:3 20:8 | 131:11,14,21 | 223:11 224:20 | 296:20 297:7 |
| **offer** 25:6 | 22:16 24:1,4 | 132:19 133:1,4 | 225:1 226:8,11 | 297:14,16 |
| 133:22 206:11 | 25:16 29:16 | 133:18 135:6 | 226:20 227:10 | 298:15 299:17 |
| 208:21 210:8 | 30:3 31:1,16 | 135:17 136:13 | 228:5,8,13,21 | 301:18,22 |
| 210:11,13 | 32:4,18,19 | 138:20 139:1 | 229:10,20 | 304:4 305:8,11 |
| 298:20 312:7 | 33:5,12,18 | 140:17 143:10 | 230:7,14 | 307:8,18 308:1 |
| 312:13 313:3 | 34:8,19 35:7 | 145:10 154:16 | 231:19 233:2 | 308:6,14 |
| 313:10 355:18 | 35:13 36:3 | 155:5 156:18 | 234:8,14 235:7 | 311:16,18 |
| 371:11 381:9 | 37:20 38:6,9 | 158:1,6,14 | 235:14 236:1 | 312:12,17 |
| 403:8 | 40:13,16,20 | 160:10,14,17 | 237:9 243:14 | 313:19,21 |
| **offered** 206:13 | 43:12 45:17 | 160:20 161:2,4 | 243:22 245:22 | 314:3 316:1 |
| 256:4 307:10 | 46:8 48:14 | 161:12 163:11 | 246:8,16 248:7 | 317:18 318:8 |
| **offering** 208:5 | 49:4 51:16,19 | 163:20 164:3,6 | 248:11,16,19 | 319:6 320:1,16 |
| **offhand** 342:7 | 52:6 53:9,17 | 164:15,19 | 249:18 250:4,7 | 320:18,19 |
| **office** 54:11 66:8 | 56:6 57:6 59:4 | 165:4,18 167:7 | 250:10,13 | 321:2,8,19 |
| 81:20 83:13 | 64:11,22 69:9 | 167:12,15 | 251:15 252:14 | 322:21 323:12 |
| 84:20 103:2 | 72:8 73:12 | 169:18 171:3,6 | 253:6,15,20 | 323:18,21 |
| 186:10 283:1 | 75:5 76:4 | 171:11,21 | 254:5,19 | 324:4,7,15,22 |
| 316:14 318:7 | 77:21 78:14,20 | 173:18 174:21 | 255:18 256:18 | 327:2 328:7,11 |
| 402:14 | 85:3,9 86:1 | 176:19 177:9 | 259:14 260:7 | 328:22 329:5,8 |
| **officer** 45:3,15 | 87:3 89:3,12 | 177:22 178:9 | 260:13 261:1,9 | 329:15 330:1 |
| 45:21 145:18 | 94:14 95:12,15 | 179:13,18 | 261:13,18,22 | 330:15 334:3 |
| 405:2 | 95:22 96:8,14 | 180:12 181:14 | 263:22 264:3,6 | 337:19 338:15 |
| **offices** 1:17 | 99:1,6,21 | 181:16,22 | 264:17 265:21 | 338:19,22 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

28

339:13 341:2,3
341:6 342:9
346:3 347:3
348:10,15
350:10 352:12
353:2,17,20
354:3,9,19
355:7 356:6,9
356:17 357:22
358:11,15,17
359:5 360:4
361:4 362:4,8
362:14,17
363:11,16,19
365:10 370:2
371:17,20
372:4 373:3
374:17,21
375:8 376:3,8
377:4,6,17
378:9,20 379:9
379:19 380:21
381:6,8,19
382:9,12,21
385:5,12
386:17 387:16
388:3,18 389:3
389:11,15
390:7 392:12
393:4,9 394:1
394:4,9,13
396:8 397:9
399:4,9 401:7
402:3,20
**Oklahoma**
117:13 120:18
**Olathe** 287:7,11
**old** 164:17,19
212:15
**Omega** 80:11,12
**Omega-3** 14:7
15:6,9 18:13

18:14,22 19:4
59:3,14,19
60:5 62:14
63:4,13,19
64:18 66:13
67:22 68:7,19
69:12 71:8
72:1 73:2,18
74:7,14 75:6
79:17 139:9
277:19 295:22
296:7,11,13
297:13,14,22
**Omega-3s** 16:4
16:5 64:8
**once** 11:14
28:14 29:6
91:10 175:7
228:7 357:20
373:17 380:12
398:6
**one-year** 305:7
305:16
**ones** 22:2 62:14
79:4 81:20
82:1,3 119:12
157:11 188:14
199:20,21
213:22 214:6
257:21 259:8
266:19 270:20
279:20 289:21
326:22 327:11
343:2 347:14
354:16 359:14
382:10 391:8
**open** 372:1
373:7
**opened** 338:6
**operating** 45:3
45:15,20
**operation** 28:16

**operations**
28:14 162:10
243:10
**opinion** 238:8
**opportunity**
11:14 29:18
113:3
**opposed** 175:11
**option** 276:15
**options** 276:1,9
**oral** 308:3
**orally** 185:17
**order** 78:18
140:11 169:20
245:9 319:6
321:3
**ordering** 13:11
272:18
**orders** 159:8
**organic** 14:8
15:6,14,18,21
18:7 19:5
135:22 139:2,3
**organics** 15:11
15:11 18:8,9
277:20
**outbid** 78:12
**outcome** 405:16
**outlet** 268:9
367:21
**outlets** 273:6
**outlined** 371:18
**outside** 40:10
41:12 44:10
51:11 53:3
261:5 272:5,19
287:11
**Oven** 22:6
**overall** 13:19
177:5 209:17
**oversee** 13:4
32:10 159:16

**Overseeing**
159:3
**overseen** 162:9
**oversees** 32:9
**Owens** 110:8,8
110:21 111:1,2
126:6
**owned** 178:8,10
231:6 240:20
241:2,4,12,15
258:9,19
269:18
**owner** 168:22
**owners** 214:16
258:11
**ownership**
250:8
**owns** 321:12
394:10

**P**

**P** 3:1,1 4:1,1 7:1
**P-O-S-S** 266:10
**P.A** 3:14
**p.m** 153:5,6
154:2,5 211:19
212:1 270:12
270:16 333:1,4
362:19 363:1
403:17,21
**pack** 14:10,15
14:16,17 18:4
18:14,17,17
22:3 24:14
178:16 248:22
314:6 386:11
**package** 18:9
19:1 22:9
23:13 248:2
**packaged** 22:12
23:12
**packaging**

59:21 67:9
70:18 101:19
101:20,21
102:2,4,11
103:7 108:4
141:3,10
145:19 147:16
159:15,17
163:15 247:20
247:22 248:1
335:5 401:3
**packed** 24:13
59:22 315:18
315:19
**packing** 28:9
103:9
**Page** 6:6
**paid** 167:17
195:21 244:22
320:14
**pail** 24:14,21
**pails** 24:13,19
**palettes** 161:18
161:21 243:6
**Pardon** 106:7
**part** 34:9 59:9
60:10 87:14,15
90:11 91:9,16
92:8 96:10
101:18 128:19
174:6 274:17
289:11 353:5
356:17 357:17
366:19 367:16
371:14 375:3
**part-time** 164:7
164:10
**participate**
207:16 380:19
380:20 382:2
382:14 388:8
388:12,22

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                March 17, 2014

29

392:2
participated
  127:8 355:2
  369:11
participation
  382:7
particular 61:22
  167:17 168:1
  183:21 205:5
  272:10,10,17
  290:16 321:10
  367:21 374:9
  374:19 387:18
  396:18 397:19
parties 405:12
  405:15
partner 8:6
pass 16:14 30:17
  372:5 378:1
  385:13
passed 170:2
passing 378:13
Pat 8:21 14:20
  76:20
Patrick 2:4 7:22
patronage
  202:18
Paula 1:19 7:17
  405:2,20
pay 60:4 61:21
  77:1 298:20
  299:18 300:3,6
  301:9,15
  373:21
paying 315:16
pays 391:4
peak 380:7
pending 234:3
Pennsylvania
  3:9 289:19
Pentagon 17:2,3
  17:6

people 13:8,11
  55:2 86:21
  154:9 157:12
  159:13 256:8
  256:10 294:10
  402:18
Pepper 3:6
percent 30:11
  30:12 71:17,20
  116:6 178:7,9
  178:10 200:19
  200:19,21
  202:3,8 203:6
  232:16 237:21
  258:16,18
  279:3 286:7,11
  286:14,17,19
  290:3 295:6
  306:3 326:12
  326:12 330:6
  331:22 333:12
  333:14 334:4
  337:7,12,14,16
  337:20 338:10
  340:13
percentage 72:3
  72:9,14 200:13
  231:20 232:1,9
  241:14 278:20
  279:2 285:22
  286:13,15
  294:2,8,16
  295:5,16 334:3
  340:9
percentages
  294:5
period 152:21
  158:8 159:16
  165:9 169:8
  172:7,17 174:2
  174:9 177:5
  180:2 181:19

189:10 190:14
  190:19 191:10
  192:8 193:13
  196:21 205:6
  263:5 269:5
  292:14,16
  299:14 300:8
  302:3 303:15
  304:1,8,11,14
  305:16,21
  313:17 326:17
  370:4,8,10,14
  373:1 374:1,6
  377:11,13
  379:6 380:6
  387:3,15
  393:12 397:7
  397:18 401:22
periods 98:7
  108:8 371:18
person 11:2
  44:7 52:7
  57:19 100:19
  102:3,9 154:18
  156:19 193:8
  193:10 194:4
  203:8 284:2,14
  346:19 389:9
personal 126:21
personally
  98:15 105:4
  233:7 245:8
personnel
  159:15
perspective
  278:6
pertain 112:5
pertained 96:4
pertaining
  105:15 155:12
  236:7
pertains 106:14

pet 26:1 27:10
  27:11
Peter 190:18
  191:2 192:11
  230:2,4
phased 17:7
Philadelphia
  3:9
Phoenix 64:10
  64:21 321:12
  321:18 324:9
phone 3:5 8:10
  100:15 283:14
  283:16 284:2
Phyllis 358:21
pick 30:1,5
  102:19 200:10
  200:14,15
  202:11,13
  246:16 249:15
  249:22 250:3
  314:4,10 332:2
  334:2,4 362:1
  362:7 364:2
  365:12,15,16
  365:18 366:2,5
  367:5 370:19
  374:14
picked 200:19
  202:4 286:10
  286:16 340:4
  373:1 374:11
  374:18
picking 202:5
  246:21 247:1
  248:20,21
  249:17 365:20
  374:9,10
picks 333:22
pickup 202:7
pictures 351:19
piece 108:12

319:10 320:6,8
Piggly 169:16
  257:17 258:1,4
  258:8,10
place 66:20
  101:3 171:8,14
  172:9 183:18
  184:3,4 299:6
  307:17 312:3
  312:13 322:17
  355:17 387:14
  399:18
Plaintiffs 1:7
  2:3 7:5 8:2,17
  9:8 352:20
  359:7
plant 28:7,12
  314:5,15
plants 27:20,22
  159:6 276:5,8
play 273:12
played 12:16
please 7:21
  11:20 43:13
  64:3 74:20
  94:6 114:16
  143:11 144:18
  144:22 193:3
  210:2 224:10
  227:3 235:19
  310:22 311:7,8
  312:6 364:8
plus 16:19 151:3
  171:17 200:2
  333:12 397:4
  399:22
point 25:12
  44:10 114:19
  141:5 146:4,6
  150:9 151:14
  371:7
Porter 1:18 2:14

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

30

| | | | | |
|---|---|---|---|---|
| 7:11 8:5 | pounds 325:19 | 185:6 | 227:14,20 | 397:14,22 |
| portion 173:21 | 336:13,14 | preserved 186:9 | 228:10 229:12 | 398:1,7,8,19 |
| 280:1 286:9 | practical 25:8 | preserving | 229:21 244:21 | 399:1 400:4,8 |
| 290:1 | practice 90:11 | 156:1 185:16 | 249:9 250:1,14 | 400:9,20 401:5 |
| position 10:8 | 90:16,20 | pretty 20:22 | 288:16 296:7 | 401:8,12,14,16 |
| 31:21 32:1,5 | 171:22 187:19 | 30:16,21 81:21 | 296:17 297:2 | 402:3,6,10,12 |
| 33:6,20 34:14 | 290:22 350:13 | 133:12 157:8 | 298:19,20,21 | priced 20:9 |
| 35:14,16,18 | 362:7 | 157:10 338:4 | 299:4,13,17,20 | 61:12 65:18 |
| 37:14 38:3 | practices 89:16 | 380:14 394:19 | 299:21 300:1,6 | 174:22 296:11 |
| 39:8,14,20 | 90:5,22 95:17 | previously 6:7 | 300:16 301:8 | prices 173:6 |
| 40:14 41:2,11 | 95:20 96:2,3 | 82:20 83:2 | 301:11,13,16 | 180:14 219:14 |
| 41:15 42:14 | 97:17 98:16,19 | price 20:10 | 301:17,18 | 219:16 220:7 |
| 44:9 45:4,5,6,9 | preface 310:14 | 55:14 57:8,10 | 302:2,7,11,16 | 220:11,11 |
| 45:11,12 46:9 | 311:13 | 57:17 58:10,13 | 302:22 303:8 | 221:3,16 |
| 46:19 48:4,18 | preferred | 58:17 59:1,15 | 303:15,20 | 222:10 223:19 |
| 49:14,17 50:10 | 177:18 | 60:6 61:15 | 304:11,14 | 223:22 224:1 |
| 50:14 51:7,10 | Premium 17:18 | 64:19,20,21 | 305:2,7,9,12 | 256:4 402:10 |
| 52:9 53:19 | 19:19,21 | 65:1 66:10,16 | 307:1,4,6,10 | 402:13 |
| 59:8 88:13 | prep 111:15 | 66:19 67:2,6 | 307:12,15 | pricing 13:13 |
| 122:3 162:16 | preparation | 69:15,17 70:12 | 311:18 312:14 | 55:6,7,9 57:20 |
| 342:16 | 76:4,17 80:16 | 70:19 71:9,20 | 313:13 315:15 | 58:6 60:4 65:8 |
| positions 43:21 | 86:10 106:15 | 72:14,20 74:14 | 315:17 316:18 | 65:14 70:3 |
| 161:8 | 106:18 111:3 | 76:2 78:2 79:5 | 316:19 317:17 | 76:6,10,17 |
| positive 66:7 | 129:9 154:9,17 | 79:8,12,15 | 317:18,22 | 77:11,13,14,17 |
| 111:1 | 157:5,15,17 | 80:1 103:4,5 | 318:2,14,16,17 | 77:18,19 78:19 |
| Poss 266:10,15 | 284:15 | 108:7 123:1 | 318:18,21 | 78:20 79:3 |
| possession | prepare 76:6 | 136:16,19 | 319:3,4,10,12 | 80:15,17,22 |
| 222:12 | 78:18,19 82:5 | 138:9 141:18 | 319:12 320:13 | 81:6,18,19,21 |
| possibility | 86:19 107:8 | 148:1,20 149:9 | 320:14 321:18 | 85:18 102:13 |
| 274:14 | 154:20 321:8 | 149:20 150:9 | 322:22 330:12 | 141:17 156:6 |
| possible 75:20 | prepared 55:19 | 150:13 151:12 | 330:15,17 | 158:22 170:10 |
| 358:21 | 81:6,10 403:4 | 151:16 152:10 | 370:7,12,12 | 173:22 184:8 |
| possibly 30:18 | 403:5 | 166:9 170:22 | 372:13 373:12 | 186:3,22 187:2 |
| 214:4,5 274:10 | prepares 56:16 | 171:8,15,20 | 373:18,20 | 187:3 188:19 |
| 303:7 385:11 | 140:18 278:16 | 172:3,8,10 | 375:13,15 | 220:21 222:2,4 |
| post 273:1 | present 5:1 | 175:1,6 181:1 | 376:5,6,17,20 | 223:1 224:21 |
| potential 211:10 | 84:21 91:3 | 181:6,10,11 | 378:16 380:17 | 273:8 296:15 |
| 274:7 | 100:2,6,11 | 182:5,9 184:14 | 381:15 383:16 | 317:18 320:6 |
| Poultry 4:3 | 256:15 | 189:17 195:21 | 383:20,21 | 397:6,10,11,14 |
| 119:10 121:20 | preservation | 205:20 207:3 | 384:6,10 390:4 | 399:5 402:5 |
| 260:22 261:6 | 186:15 | 217:12 219:9 | 390:9 395:1 | primarily 14:14 |
| 344:5 | preserve 156:3 | 221:8 223:4,13 | 396:20 397:4,4 | 21:15 22:13 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

31

27:6 55:22
121:4 346:13
**primary** 21:16
29:11 133:14
189:6 203:8
212:9
**Prime** 23:2
261:10 342:3
**principal** 117:8
118:2 197:6
213:5 230:8
271:10 342:10
342:21 343:6
343:11,18,22
344:6,11,15,21
345:4 347:11
358:5 360:8
**principally**
270:21 358:8
**print** 189:4
386:3 389:17
389:22 390:1
394:14,17
**prior** 15:17
19:17 33:14,16
33:17 34:1,22
35:16 48:18
49:1 50:17
51:13 52:18
53:2 54:1
90:10 94:14,20
94:22 95:15
102:6 107:13
109:5,7,9,15
114:3 124:3
127:2,6 128:2
130:11 132:22
138:3 143:8
146:1 155:18
155:22 160:10
161:2 169:11
184:2,6,11

197:4 212:16
212:16 213:3
220:14 221:6
229:3,12,15
238:2 253:2,9
270:22 335:13
338:17 339:9
339:17,17
342:1 355:19
358:2
**private** 18:4,11
18:15,18
**privy** 227:18
**probably** 17:12
30:15 40:15
88:1 106:5
163:16 189:3
196:20 212:16
279:2 286:14
291:14 319:1
338:4,21
339:12 360:2
382:4
**proceeding**
405:5
**proceedings**
405:3,9,12
**process** 104:9
104:21 105:13
107:11,14
113:14 116:4
128:9 137:22
140:2,6 145:11
273:4 275:7
289:12 294:9
294:15 296:12
321:4,20 353:8
371:15,18
395:19
**processing**
28:12 273:14
314:15 315:20

**procure** 272:3
**produce** 21:5
25:18,20,22
59:19 115:4
139:6 276:18
306:19 403:5
**produced** 15:8,9
16:9,10 21:4
23:10,12,20
24:2 25:15
27:13 159:9
**producer**
230:15 268:19
268:22 277:7
280:9 345:17
**producers** 1:9
3:3 7:6 117:9
118:8 168:16
231:5 268:5
277:1,2 278:6
278:22 280:20
281:3,17 290:5
298:17
**producing**
17:11 23:22
59:18 126:19
230:22
**product** 13:15
23:11 28:18,21
28:22 30:5,9
81:2 128:11
158:19 198:18
218:3,11
315:22 336:10
355:16 356:7
376:6 384:13
391:6 397:19
398:10
**production** 17:5
17:5 29:6
119:15 132:6,9
138:8 186:3

187:3 230:18
246:17 247:2
248:19 249:11
268:20 367:6
379:17
**products** 13:5,7
13:22 14:21
20:15,19,20
22:1 23:19
29:1,4,14,15
29:16,22 30:12
32:16 33:3
34:3,12 35:11
36:6 37:11,22
39:4 40:11
47:12 55:9
58:10 65:12
81:4 89:4,7
136:6 159:19
162:19 179:2
182:1 192:19
195:15 197:20
197:21 255:9
260:17 261:8
261:16 262:6,9
262:16 263:11
264:1,11 265:4
265:13 266:3
275:15 281:8
293:4 342:12
356:21 387:5
393:21 395:15
396:5,7 399:12
399:16
**Professional**
1:20
**profit** 137:9,11
137:14,17,21
140:19,22
141:5,10,13
142:2,9,11,12
142:14,21

143:3 144:1,2
146:4,6,8
147:2,8,10,13
147:17 148:2
148:12,17
149:2,12,16,22
150:8,14 151:9
151:13,18
152:1,5 153:1
171:17 172:3
207:9,12,14,20
208:1,7 296:16
297:1,10,16,19
297:21 298:1,6
298:20,22
299:6 301:19
302:17 305:20
306:2 308:15
310:13 312:18
313:16 314:8
314:19 315:5
316:1,3,6,13
320:11,15
321:4 322:10
324:1,20 325:5
325:13 335:5
335:22 336:3
368:12 399:22
400:20 401:4
**profitability**
321:6
**profits** 209:13
210:4 211:9,11
**program** 90:10
90:14 91:8,10
91:11,12,17
92:7,9 93:1,5
93:15 94:1,17
102:15 110:11
112:16 125:8
134:8,8 209:17
292:12 346:10

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

32

| | | | | |
|---|---|---|---|---|
| 349:11 351:5 | 390:10,12 | 174:19 | 366:13,15 | 282:9 |
| 396:9 | 393:5 395:21 | **Pulaski** 21:10 | **purchasers** | **Q** |
| **programs** 159:5 | 397:1,17 | **puller** 161:21 | 363:21 364:2 | **qualify** 365:7,9 |
| 382:13 | **promotions** | **pulling** 161:21 | **purchases** | **quality** 39:11 |
| **prohibited** 95:2 | 134:21 135:4 | **purchase** 15:11 | 177:12 190:1 | 40:21 41:12 |
| 350:11 | 170:14 189:15 | 15:18 139:2 | 207:19 238:16 | 51:11 52:10 |
| **prohibition** | 190:7 225:10 | 179:2 180:20 | 266:22 267:12 | 53:3 54:5,18 |
| 94:16 | 225:14 226:13 | 182:4 241:11 | 268:7 277:2,16 | 54:22 55:4,15 |
| **prohibitive** | 228:16 274:15 | 245:5 253:16 | 278:9 282:19 | 56:3,8,19 |
| 122:17 | 369:11 380:18 | 260:16 262:5,9 | 286:16 359:22 | 101:15,17 |
| **projected** 316:2 | 381:9 389:19 | 262:15 263:10 | 382:18 384:19 | 132:3 134:10 |
| **promote** 372:6 | 392:9,20 393:3 | 263:22 264:10 | **purchasing** | 159:4,5 187:15 |
| 376:6 381:2 | 393:17,21 | 265:3,12 266:2 | 114:20 115:3,9 | 220:1 221:9 |
| 387:5,12 | 394:2 397:2 | 267:20 268:1 | 159:17 235:10 | 265:22 |
| 389:18 391:6 | **pronounced** | 268:17 276:17 | 235:16 248:12 | **quarterly** 303:6 |
| 393:22 394:21 | 40:6 271:6 | 277:4,4,8,17 | 296:21 298:17 | 304:15 |
| 396:12,15 | **protocol** 400:18 | 277:21 278:14 | 313:21 395:3 | **question** 11:1,14 |
| **promoting** | **provide** 176:5,9 | 279:22 288:13 | **Purdue** 106:9 | 11:16,19 12:1 |
| 17:13 255:9 | 195:10,12 | 294:8,14 296:2 | 106:10 | 31:3 59:12 |
| 391:11 392:10 | 205:4 215:6 | 296:4,5 302:2 | **Purina** 27:11 | 62:4 63:8 71:2 |
| 395:5,8 | 224:20 234:11 | 302:7,15 304:6 | **purpose** 381:2 | 74:17,19 81:14 |
| **promotion** 44:4 | 281:7 340:10 | 316:17 318:1 | **pursuant** | 81:17 90:3,4 |
| 108:6,6 170:18 | 351:3,15 352:3 | 319:4,10,12 | 171:22 330:7 | 92:2 93:19 |
| 204:1,9,22 | **provided** 73:14 | 345:10 382:20 | **put** 24:20,21 | 94:19 95:4 |
| 205:5,15 206:5 | 138:11,22 | 383:5 384:3 | 28:2 29:1 44:7 | 97:5 114:11,15 |
| 206:21 207:16 | 184:18,20 | 391:8,14 397:4 | 44:8,8 55:13 | 118:3 126:20 |
| 215:2,2,10,19 | 206:9 228:6,15 | 398:18 399:11 | 57:9 69:14,14 | 131:5,14,16 |
| 215:20 216:2,4 | 229:4,8,18 | 399:14,16 | 77:6 118:12 | 143:16,21 |
| 216:21 217:20 | 352:6 390:22 | 400:4,8 401:8 | 137:17 139:22 | 144:4,6,11,14 |
| 218:15 219:3 | **provides** 139:6 | **purchased** | 162:8,14,17 | 144:16,20 |
| 226:22 229:6 | 141:2 | 15:13 17:9 | 180:21 220:6 | 145:8 146:15 |
| 229:12,21 | **providing** | 113:15 115:5 | 239:13 246:3 | 147:5,20 |
| 274:22 370:3,5 | 170:13 207:2 | 139:4 204:8 | 300:20 310:17 | 149:14 150:16 |
| 383:4 386:18 | 208:12 210:16 | 237:21 252:18 | 327:12 330:12 | 150:20 151:5 |
| 387:15 388:12 | 396:13 | 253:16 268:3 | 330:12 387:14 | 152:2 156:8 |
| 392:18 394:17 | **provision** 95:6 | 277:10,11,13 | 403:2 | 160:5 179:8 |
| 395:9 396:3,19 | **Public** 1:21 | 278:21 286:1 | **puts** 57:11 88:20 | 208:16,18 |
| 396:22 397:15 | 405:1,21 | 297:1 298:11 | 89:5 214:20 | 209:19 210:6,7 |
| 401:17 402:1 | **publicly** 174:19 | 305:21 314:3 | 221:8 327:14 | 220:17 224:4,6 |
| **promotional** | 223:3 237:14 | 341:16 385:4 | 383:7 | 236:10 237:3 |
| 369:22 370:1 | **publish** 175:8 | 387:11 | **putting** 110:2 | 245:18 246:7 |
| 388:9 389:5,6 | **published** | **purchaser** | 161:21 234:14 | |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

33

| | | | | |
|---|---|---|---|---|
| 250:21 255:11 | **range** 13:9 80:5 | 132:12 137:9 | 125:22 | 403:8,18 405:9 |
| 303:11 304:19 | 80:13 196:22 | 159:18 170:1 | **recalls** 81:13 | **record's** 310:11 |
| 309:4,19 | 301:19 306:6 | 176:13 184:10 | **receivable** 88:20 | **recorded** 404:11 |
| 310:15,17 | 316:8,11 338:1 | 213:12 247:4 | 166:11 218:1 | 404:17 |
| 311:7,8 319:19 | 339:6 | 375:22 386:16 | 359:2 369:16 | **records** 187:16 |
| 319:21 320:10 | **ranged** 289:10 | **reason** 44:1 | **receive** 112:12 | 269:9,11 278:4 |
| 322:7 328:15 | 337:11 | 96:16 256:2 | 239:7 396:6,7 | 278:5 316:14 |
| 328:17,19 | **rank** 232:10 | 314:7 349:13 | **received** 112:16 | 316:15 320:8 |
| 335:19 364:13 | **rare** 367:19 | 349:18 350:8 | 154:22 | 403:17 |
| 364:21 365:2,3 | 380:14 | 369:18 374:13 | **receiving** 128:16 | **recreate** 321:3 |
| **questioning** | **rate** 314:13 | **reasons** 30:6 | **recess** 103:19 | **red** 387:7 |
| 60:9 310:13 | **rates** 321:17 | 207:15 210:19 | 153:7 211:20 | **Redding** 3:5 |
| **questions** 38:15 | **ratio** 30:20 | 215:18 363:12 | 270:13 333:2 | 283:15,15 |
| 59:11 63:6 | **ration** 97:9 | **rebates** 202:18 | **recollection** | **redeem** 383:11 |
| 131:3 133:5,9 | **reach** 204:10,11 | **recall** 49:21 | 49:12 69:3 | 384:13 391:20 |
| 148:5 155:3 | 204:15,17,19 | 69:19,20 79:18 | 80:20 105:7 | 392:4 |
| 157:10 284:4 | 274:20 | 81:9 84:12 | 107:16 110:22 | **redeemed** |
| 296:18 304:20 | **reached** 112:14 | 85:17 86:6 | 111:5 119:2,3 | 383:10 |
| 309:8,22 311:1 | 113:2 | 104:5 105:14 | 124:2 138:6 | **Redeeming** |
| 348:21 404:11 | **reaching** 274:15 | 108:14 109:12 | 157:16 184:15 | 392:3 |
| 404:16 | **read** 74:19,21 | 109:18 111:11 | 186:6 270:5 | **reduced** 97:9 |
| **quibbling** | 94:7,8 143:12 | 124:3,4,6,9 | 316:13 | 405:7 |
| 310:10 | 144:18,22 | 125:4 126:3,8 | **record** 7:20 8:11 | **reevaluated** |
| **quit** 23:22 | 145:2 150:20 | 126:11 128:16 | 9:19 11:2,15 | 299:14 |
| **quite** 30:15 | 150:22 179:9 | 129:11 130:21 | 18:19 74:21 | **refer** 20:3,4 |
| 259:15 276:22 | 208:17 209:18 | 131:15 138:3 | 92:4 94:8 | 118:12 137:9 |
| **quote** 249:9 | 209:21 220:18 | 142:5,9,13 | 103:18,22 | 147:7 148:11 |
| **quoted** 67:6 | 222:16 223:7 | 152:22 154:13 | 143:12 144:12 | 148:12 335:22 |
| **quoting** 74:15 | 224:5,7 245:18 | 172:10 184:7 | 145:2 150:22 | 351:22 369:15 |
| | 246:1 250:22 | 184:11 188:14 | 153:5 154:5 | **reference** 149:1 |
| **R** | 355:6 364:12 | 215:13 223:17 | 179:9 192:8 | 149:12 150:7 |
| **R** 3:1 4:1 7:1 | 364:15,20 | 228:14,17,21 | 209:21 211:19 | 223:22 |
| 282:9 | 404:3 | 235:6 256:1 | 212:2 220:18 | **referencing** |
| **R-E-X-I-N-G** | **Reading** 403:19 | 257:7 279:12 | 222:16 223:7 | 326:16 |
| 263:19 | **ready** 161:18 | 290:8 293:8 | 224:7 246:1 | **referred** 137:8 |
| **R-U-N** 313:22 | **real** 210:7 294:4 | 297:22 315:6 | 250:22 251:5,6 | **referring** 98:12 |
| **Ralph** 41:20 | 332:20 | 323:19 329:11 | 270:12,17 | 148:5,6,9 |
| 43:7 53:22 | **realigned** | 348:10 353:12 | 309:7 310:18 | 152:16 174:16 |
| **ramp** 141:2 | 127:12 | 354:11,18 | 310:19 311:6 | 233:21 245:11 |
| **ran** 229:5 | **really** 26:13 | 356:8,16 | 332:21 333:1,4 | 307:21 308:4 |
| 394:20 | 27:19 60:21 | 380:12 382:6 | 362:19 363:1 | 328:18,19 |
| **Ranch** 346:19 | 61:16 84:4 | **recalled** 108:3 | 364:15 403:2,2 | **reflect** 69:17 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

34

310:11 311:6 317:16,22 318:1 335:14 397:18 401:18
**reflected** 66:6 397:14,21 401:13
**reflects** 396:21 402:1
**refresh** 69:3 111:4 138:6 184:15 316:12
**refuse** 392:4
**regard** 186:3,21
**regarding** 159:3 356:20 358:22
**Regardless** 300:3
**regards** 84:2 89:18 99:12 117:17 138:14 158:21 203:13 281:21 336:4
**region** 36:10 165:15 173:10 180:19 342:21
**regional** 42:9 44:6 176:15 181:7 196:13 214:21
**regions** 23:15 173:5 180:17
**Registered** 1:20
**regular** 81:22 272:18 279:9 380:2
**regulated** 28:22
**relate** 187:1 317:11
**related** 90:9 168:20 186:19 186:21 187:13

252:17 317:6 354:20 405:11
**relates** 96:9
**relating** 81:2 107:6
**relations** 166:22 167:10
**relationship** 99:3 208:22 209:3,5,8 210:10,17,21 211:2 238:21 291:19 292:6,7 292:10 322:4 352:19 353:1 359:6
**relationships** 231:4
**relative** 405:14
**relevant** 63:7 74:11
**rely** 61:7 223:2
**relying** 328:1
**remainder** 178:8
**remarks** 56:22 57:1
**Rembrandt** 279:20
**remember** 16:2 84:14 85:12 86:1,2,4,8 99:13 107:7,9 108:2 110:6,7 110:18,19,20 111:13 125:12 128:14 130:10 131:6,9,11 135:20 136:2,9 139:14 183:15 184:10,20 185:7,9,14,20

186:13 190:20 195:1,2 253:4 256:7,9,20 257:4 264:19 282:20,21 289:4 296:17 330:16 331:16 342:17 355:22 381:16 382:7
**remind** 11:5
**remuneration** 369:13
**renegotiated** 172:8,11,16
**rep** 9:15 37:10 37:21 38:19 39:10,11 41:12 41:22 46:10 47:18 48:7,20 49:15 50:2 52:14 130:18 165:13,19 389:14
**repeat** 29:8 143:10 179:7 220:16 222:15 223:5 250:21
**repeatedly** 309:7 335:7
**rephrase** 11:21 345:15 364:14
**replace** 36:22 48:14 49:20 51:4,19 53:17
**replaced** 50:1 51:22
**report** 33:8,11 33:13 34:16 35:1 36:13,15 37:16 38:6 39:2,16,22 40:16 41:5,17

43:7 47:2 55:13 220:6 223:13
**reported** 33:15 34:1,4,19 46:15 50:20 52:21 158:11
**reporter** 1:20 7:17 10:17 32:22 332:19 403:3,9
**reporting** 34:6 47:14
**reports** 33:9 34:5 39:18 53:6,11 54:22 55:3,13 220:8 221:2 222:2,7 222:12 223:18 223:21 224:11
**repositioned** 52:3
**represent** 9:6 196:12 198:1,5 200:18 237:5 280:19 281:2 281:16,19 282:1
**representative** 358:17
**representing** 8:5 11:10 192:13 196:4 282:5
**reps** 13:10
**request** 81:13 128:3 130:1 194:12 210:16 292:17 372:2 376:19
**requested** 74:22 94:9 102:13 128:7,19

143:13 145:3 151:1 179:10 209:22 220:19 222:17 223:8 224:8 246:2 251:1 364:16
**required** 93:10 96:17 101:11
**requirement** 97:3,13 98:1,8 118:16 385:12 385:18
**requirements** 93:22 124:5
**requires** 96:11
**resell** 197:21 238:17 261:18 262:20 263:13 264:3,14 265:15,19 266:17 267:21
**reselling** 239:18
**resells** 267:1,13 268:8
**reside** 9:21
**resold** 269:19
**respect** 15:5 29:3 55:9 57:7 64:17 117:8 124:1,2,4 131:15 135:17 136:13 137:2 143:3 156:9 157:17 166:13 169:1 171:13 172:15,22 173:20 180:7 180:13 188:17 195:8 198:10 199:4 202:15 204:21 218:15 219:2 224:21

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

35

225:2 226:13
226:22 228:8
228:22 239:4,9
241:10 243:10
250:13 274:22
282:8 284:10
284:18 286:12
286:18 288:12
294:1 302:5,10
305:1 308:9
324:5 334:11
334:19 336:8
342:9 359:5,21
361:22 368:7
369:1,6 375:17
378:21 380:15
385:20 389:22
395:21 399:8
**respond** 9:13
**responded**
    130:17
**response** 113:22
**responses** 10:20
**responsibilities**
    13:2 32:7 34:9
    50:10 52:14,16
    54:5 158:15
    159:21 160:3,7
    160:8,21 161:3
    161:7,11,17,20
    163:12,20
    275:11,13
**responsibility**
    13:6,16 20:16
    32:11 50:18
    51:17 52:13
    53:2,6,11 54:1
    95:16 99:19
    160:18 161:14
    162:5,21
    163:14 168:2
    230:9 253:6,8

271:10 360:9
**responsible**
    13:13,18 36:19
    57:20 65:14
    76:1 88:19
    99:16 113:8
    136:15 158:18
    159:7,16,20
    163:18 166:21
    167:8 270:21
    288:8
**responsive**
    375:18
**rest** 157:7 334:1
    352:1
**restaurants**
    14:13 22:20
    23:15 24:18
    25:5 266:7,11
    266:12,15
**restrict** 96:19
**restroom** 211:13
**restructure** 44:2
    46:2
**restructured**
    44:6 50:10
**restructuring**
    44:13,18 45:19
    46:5,9 48:19
    49:1,3,5,16
    50:4,13,17
    51:3,14 52:19
    53:2 54:1
    158:4 159:22
    160:8 165:6
    270:22
**result** 208:7
    209:9,13
**retail** 55:14 57:8
    57:10,17 58:10
    134:21 169:3
    169:14 195:12

195:12,16
197:22 201:13
202:4 203:16
219:9 220:11
220:21 221:3,8
221:16 222:2,4
222:10 223:4
223:13,19,22
224:1,21
248:12 255:8
261:19 262:21
263:14 265:16
265:19 266:14
266:17 267:1,3
268:8,9 269:1
269:19 332:14
367:21 383:16
383:20,21
384:6 391:18
397:10,10
**retailer** 199:21
391:16,22
**retailers** 14:14
392:5
**retired** 282:21
282:22 283:8
283:10
**review** 68:2,16
76:5,9,16
77:10 80:16
84:8,13 85:3,7
85:9 111:4,7
111:21 113:4
129:8 136:11
156:15 195:14
296:10 300:12
303:6 320:8
323:14 336:12
357:4
**reviewed** 80:20
80:21 85:8,18
86:2 88:10

101:11 111:8
111:13,22
126:1 155:2
156:12 401:2,2
**reviewing** 86:6
138:2 166:1,1
**Rexing** 263:17
**RFP** 128:5,10
128:14,17,19
129:2,12,21
131:1 133:9
348:19 349:16
**Rich** 22:1
**right** 9:4,12
10:13,16,21
11:9,13,21
12:9,15,20
13:20 15:2
24:6 31:8 34:2
35:9,19 42:19
45:4 46:16
47:1 51:21
52:17 53:14
54:3,6 57:20
65:20 66:10
67:17,20 71:8
71:9 72:13,17
73:15 84:15
85:6,16 90:7
93:9,21 98:5
100:18 101:1
104:7,12
105:10 106:21
107:22 108:22
109:4,12,15,18
110:21 112:2
115:19 116:1,5
116:16 117:19
118:17 122:14
126:15 128:17
129:1,8 132:15
136:4,21

137:20 138:21
141:8,19
146:10 147:2
150:11 156:12
157:2,13,20
158:9 160:12
165:4,10,13
166:19 167:10
168:6 169:1
170:12 172:6
172:22 176:5
178:11,14
179:15 180:18
180:21 182:16
183:10 184:17
187:1,22
193:21 195:5
199:18 200:3
203:12,15
205:16,22
206:9,18 207:1
207:10,12
212:10 214:10
214:13 216:7
217:10,14,17
217:19 218:8
218:13 222:7
225:11 227:22
230:15 239:9
240:6,8 243:18
247:5,21
249:17 259:3
259:12 260:21
263:3 266:20
267:15 268:6
269:12 271:2,3
271:6,13 274:3
274:8 275:20
278:12 279:21
280:9 283:4
284:15 285:17
287:16,18

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I　　　　　　March 17, 2014

36

290:10 292:14
293:21,22
294:1 296:18
297:3 298:6,18
300:18 301:4
302:3,5,13
303:16 304:2
305:13 306:3,3
306:11 308:7
308:12 312:15
313:7,20 315:3
318:2 320:5
323:2,6 324:10
326:19 327:2
327:19 341:10
343:3 347:5
349:15 350:4
351:3 353:8
354:12,15
355:1,7,12,15
355:22 362:14
362:15 365:20
366:9 368:7,9
368:11 369:1,5
369:7 375:4,16
377:15 384:16
385:22 386:19
392:2 393:11
393:16 396:11
398:8,19 399:1
399:17,20
400:1,12
401:20
**risk** 88:15
**Ritchie** 107:22
　109:5
**River** 17:22
　18:1 19:12,15
**road** 2:7 13:12
　44:5,8,9
**Roberts** 358:21
**role** 39:9,17

88:18 95:19
191:6 271:18
282:7
**Rose** 2:11 5:3
8:5,7 9:8,13,15
10:1,4 11:11
13:3,5 17:20
18:10 19:8,18
19:20 21:14
23:10 42:20
58:10 83:13
84:20 86:21
87:7 88:13
91:7,14,19
92:5,11 93:14
94:1 95:17
97:2,11 98:6
98:16,19
104:15 109:1
129:14 134:4
149:10 157:1
160:11,15
161:3 164:7
173:19 174:8
174:15,17,21
175:2,4,8,11
175:19 176:3,6
176:16,19
179:19 190:1,8
192:13 193:22
195:18 198:11
199:9 203:8
204:1,5,9,11
204:21 205:3,9
208:7 209:13
211:9 212:5,20
213:16 215:4,9
216:6,17
217:21 219:14
220:7,10
222:11 223:12
226:14 227:7

228:18 233:3
233:10,15,15
234:6,16,17
235:9,15,21
236:2 237:22
238:16 242:1,7
245:12 247:1
247:11 251:8
252:9 256:14
256:22 266:22
267:13,20
268:7 272:8
275:1,19 276:1
276:17 277:2
278:20 281:5
284:11 286:22
351:19 354:15
355:9,12
358:12,18
360:1,16 363:8
363:13 364:3
367:6,7 369:6
376:11 384:20
386:7 389:4,8
390:14,16
392:10,16
393:6 394:14
395:22 400:5
**roughly** 173:16
249:5 254:12
326:13
**route** 367:10
**routinely** 380:10
**Royalty** 39:7
51:14 221:15
**run** 170:17
189:16,21
190:7 204:9
226:14 227:11
274:15 314:2,3
392:10,20
**running** 206:6

215:1,2 227:21
274:21
**runs** 313:22
314:1,17,20
315:21
**Rust** 44:15,19
45:2,6 158:13
**Ryan** 4:4 122:5

_____
**S**
_____

**S** 3:1 4:1 6:5 7:1
321:11
**S-A-U-D-E-R**
289:19
**S-c-h-e-p-m-a-n**
35:4 271:5
**S-C-H-L-E-H...**
283:5
**S-C-H-L-E-U**
283:4
**S-H-E-P-M-A...**
271:4
**S-O-N-S-T-E-...**
279:19
**S-U-N-M-A-N**
265:7
**safe** 113:13
132:3
**safety** 134:7
**Safeway** 169:13
**sale** 13:4,19 75:6
244:20 273:1
298:15 320:7
368:12
**sales** 10:6 13:3
13:11 20:17
29:19,21 30:10
30:10 31:12,13
31:14,17,17,19
32:8 33:3 34:3
34:12 36:5,19
40:10,10 43:9

44:3,5,10 46:2
46:6,10 47:4
47:11,18 50:5
52:18 53:3
142:22 143:3
148:20 149:9
149:20 157:22
158:9,16,19
160:18 162:18
163:9 165:7,13
165:19 166:5
166:12 169:21
170:3 180:7
192:16 198:11
203:3,4 211:3
211:6,8 223:4
223:13 224:18
232:9 242:18
250:20 251:8
251:13 252:2
270:21 271:10
271:14 272:9
275:18 282:8
282:18 294:2,8
294:18 311:18
315:10 316:19
318:7 319:3,12
320:17 340:11
355:16 356:7
362:10 380:2
389:14
**salesperson** 44:4
**Satkin** 1:19 7:17
405:2,20
**Sauder** 214:2
289:18 290:6
Save-A-Lot
167:20 177:22
178:3,17,18,21
178:22 179:3
183:18 184:3
188:18 189:7,9

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I          March 17, 2014

37

| | | | | |
|---|---|---|---|---|
| 189:12 192:14 | 125:19,20 | 216:1 237:13 | 273:17,18 | **separate** 180:12 |
| 194:14 225:2 | 129:15 167:5,6 | 266:10 272:19 | 285:7 294:21 | 180:15 181:1 |
| 225:11,14 | 167:7 270:20 | 274:21 277:16 | 294:22 295:21 | 258:9 395:11 |
| 226:11,13,21 | 271:3,6,8 | 300:12 342:13 | 295:22 297:22 | 396:8 401:19 |
| 228:1,2 229:1 | 282:9,10 | 352:17 359:8 | 301:16 325:5 | **separately** 318:5 |
| 229:5 235:15 | 354:21 357:10 | 363:5 369:3,16 | 327:19 340:19 | **September** |
| 235:21 237:20 | 357:11,12 | **seeing** 54:21 | 342:2 346:12 | 329:22 |
| 238:3,5,15,22 | 389:10 390:18 | 167:3 | 346:20 347:4,7 | **served** 9:15 |
| 239:6,7 240:2 | **Schlehuser** | **seek** 61:6 | 347:8 356:19 | **service** 13:10 |
| 259:2,5 285:13 | 282:21 | **seen** 55:14 | 359:20 360:6 | 14:12 21:19 |
| 285:17 286:1,9 | **Schnucks** | 219:16 363:19 | 378:16,17,18 | 22:14 35:8 |
| 292:3,5,10,18 | 387:20 388:3 | **selected** 104:15 | 379:22 381:19 | 37:10,21 38:19 |
| 292:21 293:13 | 388:11,14 | 107:13 | 386:8 | 39:10,10 44:7 |
| 337:3,9 360:21 | 389:4,12,13,21 | **selection** 104:20 | **selling** 15:21 | 44:11 48:7,20 |
| 361:9,11 | 390:22 391:12 | 105:13 107:11 | 16:5,13,21 | 49:15 50:2,18 |
| 375:11,17 | 391:12,19 | **sell** 18:9,15 | 19:13 25:1 | 52:14,16 |
| **saved** 187:18 | 392:1,4,9,19 | 21:12,13 22:12 | 148:1 199:19 | 262:19 272:1 |
| 318:18 | 392:22 393:1,2 | 22:17 23:14 | 217:12 219:10 | 275:15 332:13 |
| **saving** 30:6 | 393:4 394:5,8 | 24:7 26:12,12 | 220:7 244:1,2 | 376:13 377:2 |
| **savings** 372:5 | 394:10 395:22 | 26:17 27:11 | 268:22 300:1,2 | **services** 7:15,18 |
| 378:1,14 | 396:7,13,16,21 | 29:11,12 63:18 | 307:11 318:15 | 195:9 281:8 |
| **saw** 25:10 371:5 | 399:8,11,14,15 | 64:7 102:14 | 321:16 322:11 | 369:13 |
| **saying** 61:4,19 | 401:4,10,14 | 148:11 152:6 | 324:12 332:9 | **serving** 247:5 |
| 71:6 76:21 | 402:8,13,14,17 | 159:19 168:14 | 338:18 342:12 | **SESSION** 154:1 |
| 149:15,16 | 402:18 | 168:16 169:2 | 346:16 363:15 | **set** 59:14 61:1 |
| 150:18 285:8 | **school** 161:16 | 172:13 175:9 | 391:19 398:17 | 61:16,19 71:4 |
| 304:18 310:1 | 164:4 | 196:1,3 199:5 | 400:13 | 72:18 80:4 |
| 347:3 391:7 | **Schubert's** 22:6 | 207:11 219:7 | **sells** 22:7 242:13 | 84:17 102:11 |
| 393:13 | **scientific** 90:14 | 219:16 230:21 | 242:15 246:10 | 102:22 129:21 |
| **says** 237:13 | 96:17 | 231:22 232:2 | 266:12 342:22 | 130:20 137:16 |
| 342:10 | **scope** 186:15 | 238:5,9,9 | 387:21 | 171:20 174:17 |
| **scale** 24:19 | **Scott** 107:21,22 | 239:22 240:1 | **semi** 366:10 | 175:7 299:13 |
| **scanned** 184:22 | 109:5 127:21 | 241:7 242:12 | **semis** 367:6,8,11 | 302:16 303:15 |
| 186:10,11 | 127:22 133:7 | 242:14 243:3 | **send** 78:12 | 303:19 307:1,4 |
| **scenario** 61:14 | **second** 299:16 | 244:5,10,14,15 | 218:1 391:17 | 312:14 322:14 |
| 387:19 | 315:11 | 245:5,13,16 | 394:18 395:12 | 322:14 373:13 |
| **Schepman** 35:4 | **secure** 302:17 | 246:10,11 | 398:7 | 373:17 375:13 |
| 36:15 37:1,17 | **secured** 115:18 | 247:13 252:19 | **sense** 216:11,17 | 377:11,13,13 |
| 38:8 39:3,18 | 307:9 369:9 | 259:10,17 | 216:19 245:10 | 377:14 387:13 |
| 40:1 47:16 | **see** 26:21 38:20 | 260:20 261:20 | 245:11 363:12 | **setting** 13:13 |
| 100:4 109:20 | 61:1 103:8,10 | 266:15 268:4 | **sent** 129:11,18 | 136:15,19 |
| 111:9,14 | 175:18 197:8 | 269:1 272:4,21 | 321:18 386:3 | 158:21 175:3 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

38

223:1 373:14
**setup** 101:7
**seven** 121:14
  339:21
**Seymour** 9:22
  21:6,7 24:2
  46:22 83:13
  162:13,15
  283:2
**share** 107:15
**shared** 78:22
  79:2
**sharing** 104:14
**sheet** 184:14
  278:15,18
  318:17 396:20
  397:14 401:14
  401:16 402:9
  404:14
**sheets** 398:7,8
  402:3
**Shelbyville**
  324:14
**Sheldon** 359:1
**shelf** 25:7
**shell** 13:5,7,19
  14:1,2,6,18
  15:2 20:1
  23:10 28:15
  30:10,11,18
  32:15 35:11,12
  35:13 36:7,19
  37:12 38:1
  39:5 40:12,22
  41:12 46:12,12
  48:1,2 50:18
  52:11,18 54:6
  54:17,19,21
  55:4 56:8
  65:12 66:10,12
  66:13 67:22
  77:10 81:3

89:3,6 101:14
  101:17 110:3
  158:19 159:19
  162:19 165:13
  165:19 166:17
  166:19 167:4
  168:14 182:2
  192:21 213:5
  222:10 223:4
  223:13 231:21
  231:21 232:1,6
  232:14 260:1,3
  270:21 271:10
  271:14 273:2
  273:17 274:5
  274:14 276:12
  282:8,18
  285:20 286:1,2
  286:3,4,9,13
  286:15 290:2,2
  293:6,14,20
  294:2,22 295:7
  325:3,4,8,22
  326:6 327:20
  332:14 340:9
  345:10 382:3
**shells** 28:1,13
  47:21
**shelves** 195:14
  195:15
**Sherman** 125:18
**shift** 177:10
**ship** 333:8
  366:13
**shipment**
  161:18
**shipments**
  250:14
**shipped** 159:9
  198:12 243:15
**short** 272:2
  275:4,7,16

374:1
**shortcut** 239:15
**shorts** 271:20
**show** 66:8 69:21
  77:7 83:1
  269:9 381:13
  381:18,20
  382:5
**showing** 103:6
  402:9
**shows** 355:2,5
  380:20 381:1,8
  382:1,6,8
  397:14
**shrinking** 25:4
**shut** 25:12
**side** 21:20
  166:19 322:5
**Sidney** 50:16
**Siegel** 2:6 8:1
**signature**
  403:19 404:22
**significant**
  340:14,18
  380:9
**similar** 30:16
  107:3 134:16
  197:13 239:12
  338:4 341:18
  379:18
**similarity**
  238:13
**simple** 210:7
**single** 14:15
  236:21
**sir** 65:15 76:2
  77:10,17 81:15
  84:6 98:17
  125:8 126:20
  140:20 147:18
  148:7 149:12
  150:21 152:11

201:6 221:1
  240:9 244:12
  308:20 327:17
  368:5,13
**sister** 22:6
  123:10
**sit** 38:14 137:12
  314:18 386:22
  389:4,11
**sitting** 142:8
  186:5 270:4
  320:11
**situation** 275:16
  275:17 296:20
**situations** 275:4
  275:8 378:22
**six** 193:17
  253:19 254:11
  306:13 307:1,5
  362:22 403:17
**six-pack** 14:16
**size** 22:10 57:5
  131:3 132:11
  132:14 292:5
  294:13 314:16
**sizes** 14:3,10,17
  24:14 57:7
  386:10
**skip** 325:21,22
**skipped** 352:21
**sleep** 403:10
**slightly** 337:20
**small** 20:3 24:17
  217:16 365:12
**smaller** 198:8
  365:14 367:11
**smalls** 14:4
**sold** 17:1,19
  23:13 26:1,19
  58:11 73:18
  74:4,8 169:4,7
  169:10,11,11

169:12,13,16
  219:14 231:17
  242:19 248:8
  254:10 257:5,8
  261:8 268:3,18
  268:19 284:19
  286:13 305:22
  320:14 328:14
  335:21 339:9
  341:6 346:18
  355:10,20,21
  361:14 380:3
**solicit** 213:8
  362:9,11
**solicited** 252:14
**soliciting** 213:2
**somebody** 52:4
  123:2 256:4
  283:9 376:12
  389:12
**Sonstegard**
  279:19 345:22
**sooner** 374:15
**sorry** 19:10 29:9
  37:6,7 51:14
  51:20,22 83:9
  88:2 100:13
  120:7 125:18
  127:5 160:14
  162:2 189:10
  212:14 260:3
  268:11 283:17
  287:7,8 293:5
  301:6 332:19
  341:5,6 352:21
  354:9 360:19
  364:10
**sought** 350:18
**sounds** 283:6
  365:8
**source** 276:11
  276:12 279:7

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

39

| | | | | |
|---|---|---|---|---|
| 280:1 301:3 | 137:10 138:15 | 54:16 58:20 | 283:3 | 161:22 292:6,7 |
| 315:12 | 138:18 139:1,5 | 66:16 76:14 | **spelling** 38:11 | 310:9,9,10 |
| **sources** 27:19 | 145:13 148:1 | 82:1,15 86:9 | **spin-off** 28:13 | 315:5 316:5 |
| **South** 173:13 | 150:4,7 152:16 | 89:15,22 90:8 | **spinoff** 28:1 | 400:13 |
| 180:10 | 171:4,13,17,19 | 91:15 95:22 | **split** 177:11 | **starting** 164:13 |
| **Southeast** | 172:8,14,15 | 99:7 124:10 | **spoke** 87:22 | 359:11 |
| 173:17 180:9 | 179:15,16 | 131:16 133:8 | 88:2,4,5,6 90:5 | **state** 9:18 246:8 |
| 258:5 | 199:6 222:11 | 133:18 135:4 | 91:2,4 106:20 | 303:3 |
| **soybean** 89:7,7 | 231:16,18 | 140:2,5 146:15 | 107:3,5 284:13 | **stated** 11:15 |
| **Sparboe** 3:12 | 251:16,19,20 | 154:14 156:9 | 347:18 | 65:10 67:7 |
| 119:9 124:22 | 251:21 288:13 | 157:5 186:13 | **spreadsheet** | 137:7 139:3 |
| 125:2,5 256:12 | 295:20 296:15 | 188:4 210:12 | 56:10,13,15 | 212:21 238:4 |
| 343:11 | 297:4,11 | 293:6 316:15 | 70:11 | 277:18 302:8 |
| **speak** 88:8 | 302:14 304:6,9 | 336:19 357:6 | **spring** 129:3,5,6 | 304:15,18 |
| 107:1 197:4 | 304:10,13 | 373:7 391:15 | 130:12 334:13 | 307:12 357:20 |
| 271:19 285:2 | 307:3 308:10 | 391:22 | 354:5 | **states** 117:14 |
| **speaking** 11:2 | 312:2 320:7 | **specification** | **SQF** 132:3 | 123:7 |
| **speaks** 147:4 | 322:5 325:12 | 124:5 350:12 | 159:5 351:17 | **stating** 142:5 |
| **spec** 101:16 | 326:8,11 | **specifications** | **Square** 3:7 | 318:17 |
| **special** 56:22 | 333:14 334:20 | 101:10,13 | **St** 191:2,19 | **stay** 38:15 |
| 59:19 274:22 | 335:16,21 | 124:8 128:3,11 | 240:14 387:21 | **staying** 402:22 |
| **specialist** 7:16 | 336:4 340:12 | 349:20 350:1 | 388:2,6 391:17 | **stenotype** 405:7 |
| **speciality** | 360:5 376:6 | 350:18 | **stacking** 161:17 | **step** 300:13 |
| 145:14 | 381:3 | **specifics** 127:15 | **staff** 13:8 39:11 | **steps** 311:19 |
| **specialty** 14:5,6 | **specific** 34:9 | **specify** 270:2 | 40:21 52:10 | **Steve** 7:14 |
| 15:5 17:14 | 60:12 80:17 | **specs** 101:11 | 134:9,11 | 190:21 191:1,6 |
| 20:14 58:14,20 | 84:12 90:3,4 | 159:12 350:14 | 158:22 | 191:14 192:6 |
| 59:7,8,11,15 | 92:2 93:19 | **speculate** 246:5 | **standards** | **Steve's** 195:2 |
| 59:18 60:9 | 99:2 108:2 | **speculating** | 101:15 131:22 | **stocking** 195:14 |
| 62:2,6,12 63:4 | 130:22 155:3 | 213:18 | 132:3 | **stop** 25:1 81:13 |
| 63:6,19 64:18 | 157:15,16 | **speculation** | **standpoint** | 329:5,8 402:21 |
| 65:8,15,18 | 158:15,18 | 78:10 122:7,21 | 216:11 | **stopped** 91:7,14 |
| 66:15 68:19 | 159:11 165:15 | 140:14 231:2 | **Stands** 274:1 | 91:19 92:5,11 |
| 71:8 75:6 | 166:16,20 | 244:8 245:2 | **start** 12:22 21:3 | 92:22 93:14 |
| 76:10,17 78:5 | 167:16 185:13 | 269:14,22 | 24:12 54:8 | 332:20 |
| 78:8 79:17 | 185:21 186:6 | 350:21 365:22 | 103:21 154:4 | **store** 18:21 |
| 80:11,12 110:4 | 188:13,16 | 372:9 374:3 | 185:16 211:15 | 55:15 56:19 |
| 113:15 114:20 | 209:16 218:8 | **spell** 35:21 40:4 | 211:22 218:6 | 57:2,3 103:4 |
| 115:10 117:21 | 218:10,11 | 163:2 191:15 | 270:15 310:4 | 187:16 201:14 |
| 135:7,11,18,18 | 219:19 236:18 | 193:3 201:6 | 311:20 362:22 | 203:20 204:1 |
| 135:21 136:1,3 | 323:20 381:13 | 260:5 263:18 | **started** 15:21 | 219:22 220:1 |
| 136:6,14 137:2 | **specifically** | 264:21 268:11 | 51:2 91:10 | 366:22 384:1,4 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

40

| | | | | |
|---|---|---|---|---|
| 384:8,11 | 198:19 | 144:10,19 | 283:20 284:3,5 | 152:11 301:7 |
| 391:12 394:6 | **Stuart** 202:13 | 145:6,9 146:7 | 287:19 298:2 | 305:11 312:1,8 |
| **stores** 42:11,12 | **Stueve** 2:4,6 6:2 | 146:17 147:9 | 298:12 303:9 | 313:4 315:9 |
| 63:18 64:7,11 | 7:22,22 8:1,9 | 148:3,13,18 | 303:22 306:1 | 330:8 334:12 |
| 178:6,8,15,20 | 8:18,21 15:1,4 | 149:7,18 150:5 | 309:6,18 310:1 | 334:15 350:17 |
| 178:20 207:4 | 31:5 33:4 | 150:19 151:10 | 310:19 311:12 | 353:4 354:4,10 |
| 219:13,15,17 | 38:17 39:1 | 152:7 153:2 | 312:11 313:2 | 368:19,21 |
| 219:21 220:2,2 | 43:15,18 49:11 | 154:6 165:1,3 | 319:20 322:16 | 371:10 |
| 220:7 239:2,2 | 50:3 55:16 | 168:18 175:21 | 333:5,20 335:6 | **submitting** |
| 239:5,6,19 | 57:16 58:8,18 | 177:4 179:12 | 336:1 345:14 | 109:16 122:17 |
| 240:20 241:9 | 59:13 60:15 | 181:9,20 184:1 | 348:1,9 350:9 | 124:3 127:2 |
| 241:15 258:4,9 | 61:3,17 62:3 | 184:13 189:20 | 351:2,10 352:9 | 128:20 143:6 |
| 258:12,14,16 | 62:10 63:2,11 | 190:6 192:4,20 | 352:12,13 | 166:9 335:16 |
| 258:18 259:1 | 63:17 64:1,4 | 194:18 197:18 | 357:2 363:2 | 353:11 361:16 |
| 260:12 269:18 | 65:5,13 66:4 | 198:20 200:9 | 364:12,20 | **subsequent** |
| 288:9 340:7 | 67:4 68:13 | 201:20 204:6 | 365:5 366:7 | 112:10 |
| 355:10 361:12 | 69:8 70:1,20 | 204:18 205:7 | 367:2 372:17 | **subsidiary** |
| 361:12 366:4 | 71:5,16,21 | 206:17 207:7 | 374:7 376:2 | 178:3 238:4 |
| 366:14,18 | 72:7,16 73:22 | 208:2,10,17 | 378:8 379:4 | **substance** 83:9 |
| 388:1,6,15,19 | 74:5,12 75:4,9 | 209:1,11 210:5 | 390:11 398:11 | **successful** 62:22 |
| 389:1 392:9,19 | 75:10,21 76:15 | 211:12,15 | 398:21 399:6 | **sufficient** |
| 392:22 394:10 | 76:21 77:5,9 | 212:3 214:22 | 401:6 402:20 | 349:12 |
| 395:16 | 78:13 79:14 | 217:9 218:21 | 403:7 | **suggested** |
| **straight** 367:12 | 80:10 81:1,11 | 220:22 221:11 | **subcategories** | 397:10 |
| **strain** 96:19 | 82:4,22 83:11 | 222:21 223:10 | 21:1 | **suggests** 77:8 |
| **strategies** | 92:3 93:8,20 | 223:20 224:5 | **subject** 322:22 | **suit** 60:10 |
| 378:21 | 94:7,13 95:8 | 224:13 226:1 | **submit** 78:18 | 233:13 |
| **strategy** 322:1 | 97:19 98:13 | 226:19 227:6 | 121:1 123:12 | **Suite** 2:7,16 |
| **Street** 1:18 2:15 | 103:12,15 | 227:15 229:7 | 133:1 135:6 | 3:16 4:7 |
| 4:6 7:12,19 | 104:1 114:17 | 229:19 230:3 | 140:20 141:6 | **summary** 161:9 |
| 22:8 | 115:6,12,17 | 230:19 231:8 | 145:11,21 | 176:17 278:15 |
| **Streets** 3:8 | 119:4 120:8 | 232:12,19 | 146:6 147:11 | 278:18 |
| **strike** 309:12 | 122:8 123:3 | 233:1 234:22 | 147:14 151:17 | **summer** 288:18 |
| **strongly** 210:20 | 128:15 135:5 | 235:22 236:22 | 353:17 363:8,9 | 288:19 300:12 |
| **structure** 174:1 | 135:13 136:12 | 237:18 238:11 | 363:13 | 329:20 330:8 |
| 183:18 198:3 | 136:20 137:19 | 239:3 242:5 | **submitted** 79:17 | 331:10 |
| 237:8 238:8 | 138:4,16 | 244:11 245:7 | 108:20 112:7 | **Sunday** 395:14 |
| 258:2 | 139:15 140:1,9 | 246:12 247:8 | 112:17 116:9 | **Sunman** 265:7 |
| **structured** | 140:16 141:7 | 247:19 250:18 | 117:4 124:17 | **Super** 169:12 |
| 44:12 46:6 | 141:15 142:7 | 251:3 255:13 | 126:8 128:5 | 178:4,14 238:4 |
| 241:6 | 142:15 143:1 | 269:15 270:3 | 132:21 135:14 | 239:21 240:5 |
| **structures** | 143:18 144:3 | 270:18 282:13 | 141:18 149:21 | 240:16,18,19 |

HIGHLY CONFIDENTIAL
Hinton, Gregory Eugene - Vol. I                    March 17, 2014

41

241:4,5,12,16
241:19 242:4,6
242:13 243:10
243:11,15,19
244:2,15,20
245:14 246:22
247:10,12
248:3,9,20
250:5,6,8,15
251:9,14 259:9
**supermarket**
18:11 42:2,10
42:20 198:2
199:3 214:21
221:20 391:19
**supermarkets**
18:5 39:12
42:1 54:18,19
55:5 56:1,2
195:11,13
198:5 200:17
221:17 259:16
261:21 267:4,5
267:13,21
268:9 269:2
291:17 321:12
383:2 386:5,8
386:12
**supervise** 31:8
**supervision**
13:9
**supervisory**
95:19
**supplement**
268:20
**supplied** 116:11
321:13
**supplier** 102:1
107:13 112:22
113:9 116:1,5
116:10,13
134:1 213:6

214:4 290:9
302:18 304:8
304:12 307:17
321:13 354:1
**supplier's** 102:6
**suppliers** 130:6
213:14,19
214:8 279:14
281:22 282:2,2
282:3 290:8
**supplies** 213:15
213:17
**supply** 104:15
119:21 134:13
135:11 136:1
175:5 213:20
214:3 215:19
216:3 241:19
258:5 272:4,8
275:19 276:7
290:2 323:9
**supplying**
126:16,18,20
135:22 136:3
214:1
**support** 106:6
158:22 159:1
369:12
**supports** 395:18
**supposed** 81:12
102:9 186:4
373:6
**sure** 75:15 87:1
92:19 106:2
125:5 126:2
144:11 154:7
155:14 157:12
157:14,21
159:8 168:9
174:20 179:8
194:13 222:20
223:5 224:12

244:12 257:8
259:22 266:18
269:4 278:3,17
279:16 285:4
286:8 290:10
291:15 293:13
309:20 311:9
317:14 319:8
327:10,18
331:16 335:12
336:11 352:8
359:3 360:17
364:11 365:7
386:15 390:8
402:8,13
**swell** 375:2
**switched** 190:20
**switching** 25:5
**sworn** 8:15
405:5

**T**

**T** 6:1,5
**T-O-P-C-O**
196:9
**take** 12:20,21
13:10 23:9
43:13,16 45:6
59:3,20 103:14
140:17 141:1
153:2 158:20
162:22 171:11
181:21 203:21
211:12 270:9
272:7 295:15
296:16,22
311:19 323:22
352:10 362:16
384:12 400:19
403:3,7
**taken** 10:11
52:15 103:19

153:7 211:20
270:13 333:2
405:3,6,13
**takes** 395:18
**talk** 20:1,12,13
20:14 23:18
54:3 89:9
95:12 98:20
105:11,16,19
106:11 107:7
110:10 134:15
134:19 153:1
161:4 166:2
170:7 173:4
214:9 273:2,5
284:17 291:14
310:21,22
326:18 328:13
330:1 369:16
**talked** 53:21
89:13 99:2
106:16 108:4,5
108:18 154:19
155:3 156:18
156:22 157:12
163:21 171:12
171:12 259:8
282:10 285:16
296:15 341:2
352:14 353:3,7
353:10 355:16
370:2 375:10
375:16 380:11
**talking** 15:1
29:14,15 45:17
45:18 62:11,13
62:15 68:3
77:16 118:4
142:4 148:19
150:3 152:15
154:8 159:4
165:20 182:2

188:13 194:16
209:15,16
210:12 214:10
233:14 260:1
266:9 271:1
280:22 283:21
300:17 307:22
308:5 316:9
318:7 319:16
327:11 328:4
329:2 336:5
349:8 364:10
364:11 365:1
377:18 390:8
392:12 394:16
395:12,20
**talks** 351:20
352:16
**tankers** 21:21
22:2
**tape** 103:13
362:15
**target** 60:7
**taxes** 359:1
**team** 34:10 37:2
97:11
**teasing** 283:22
284:1
**tell** 13:22 14:21
18:22 80:19
81:8 83:7
89:17 90:2,6
91:6,18 92:5
96:8,21 97:1,7
97:21 98:3
99:12 100:21
105:1 134:4
137:12 145:6
168:7 259:20
284:18 290:19
310:20 314:18
320:10,15

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

42

327:21 357:1
383:20
**telling** 92:15,16
104:3 112:19
113:6 309:15
328:4
**tells** 383:22
392:19
**temperature**
56:18
**ten** 16:6,6,14,15
25:4 30:16
33:7 38:4
88:11,21 106:1
131:8 151:4
152:1 288:5
330:3 333:9
341:8 342:5
366:17 367:4
368:3 380:8
386:14,16
**Tennessee** 26:10
64:13 101:9
260:15 261:3,3
261:5
**tens** 187:17
**term** 66:22
137:6 141:12
142:1,11,19
146:22 147:1
149:22 150:14
152:8,18 179:4
220:15 223:15
226:16 238:19
297:18 298:8
302:19 305:18
310:4,5,6
312:5,20 322:6
334:22 335:8
335:14 336:2
400:21
**terminate** 323:5

**termination**
149:5
**terminology**
140:22 310:8
311:2
**terms** 20:7 73:9
**Terry** 264:20
265:1,2,18
**test** 38:11
**testified** 8:15
72:12 142:20
146:8 147:6
158:4 210:8
221:1 225:1
238:14 251:7
317:15,21
328:2 354:13
354:17 368:8
**testify** 12:10
81:12 83:5
157:17 284:10
369:6
**testifying** 12:7
**testimony** 12:5
12:12,13 83:8
92:20,21 104:5
120:22 143:8
146:1,21 147:1
147:4 152:11
152:19 156:11
186:18 188:5
188:18 208:13
220:5,14 221:6
222:5,22 229:3
229:11,15
238:2 249:14
302:1 308:21
309:9 334:11
335:13,17
403:15 405:4,6
405:9
**Texas** 119:16

120:12,16
201:1,2 279:19
287:6
**Thank** 145:1
**Thanksgiving**
299:9 300:10
302:12 305:3
**thawing** 25:9
**theirs** 121:11
383:2
**thing** 124:18
137:13 148:14
262:8 281:10
309:16 310:14
311:4 374:22
390:8
**things** 10:17
56:17 99:9
101:16 105:17
108:13 131:9
134:14,22
154:8 169:19
174:5 186:7
188:9 204:20
246:5 392:13
**think** 15:16 38:4
50:1 52:1
55:12 57:10
61:15 69:21
85:11 100:15
113:21 118:18
119:1 121:17
122:11 127:14
130:1 131:8
132:6,11
133:10,11,21
154:11 158:17
163:17 173:13
177:16 182:10
185:3 187:4
188:9 190:22
192:12 193:15

194:14 195:6
197:9 198:2
205:10 212:21
213:12,13,22
214:2,3,6
215:21 216:15
216:22 235:12
248:17 256:19
257:10 260:14
261:4 266:6
269:7 270:7
279:20 284:21
287:15 289:21
293:7,21 294:8
294:13 296:9
300:13 306:17
327:6 330:12
346:14 347:8
348:7 356:2
362:14 363:19
366:1 375:9
382:10 385:9
392:12
**thinking** 122:11
256:8
**third-party**
302:15 359:5
**thought** 45:18
121:4 229:10
249:14,16
273:8 294:15
308:21 317:5
374:14 400:11
403:11
**thousands**
187:17
**three** 21:5 23:9
25:16 54:12
79:10 93:3
120:14 154:4
191:8 202:11
249:5,7 276:5

297:6 298:4
300:18 301:1
312:1 319:17
322:20 323:7
323:10 329:22
370:21 371:1
**Thursday** 87:19
88:4 100:10,13
100:16 154:10
175:7,8 318:16
**time** 10:14 11:2
15:17 17:3
18:15 33:14
42:17 44:14
45:11,19 47:17
51:2 54:14
61:15 63:1
65:17 68:18
69:10 70:3
74:17,18 75:5
75:11 82:12
88:11 91:14
99:13 103:16
103:21 112:12
112:18 113:8
116:15,17
125:12 138:8
141:5 142:14
146:4,5,6
150:10,13
151:14,17
152:10,21
153:4 154:4
155:12 156:16
158:8,12,16
159:10,16
161:19 162:8
162:12,17
164:8,17 165:9
165:12 167:1
170:3,17,17
171:9 172:1,7

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

43

| | | | | |
|---|---|---|---|---|
| 172:17 180:2 | 81:5 125:11 | 154:21 160:2 | 266:19 269:7 | 375:11,18 |
| 181:17,18 | 158:3 165:5,19 | 174:12 178:16 | 279:1 280:2 | **Topco's** 198:12 |
| 184:10 185:11 | 167:9 173:15 | 180:4 186:5 | 284:19 285:2 | 201:3 202:4 |
| 185:15 191:9 | 191:13 192:17 | 199:10 213:13 | 285:12 286:6 | 203:3,19 205:3 |
| 192:8 193:13 | 193:19 206:5 | 220:4 223:18 | 289:22 294:10 | 206:13 208:5 |
| 197:9 205:5 | 271:1,9 351:7 | 224:3 241:21 | 326:20 333:7 | 208:12 219:8 |
| 211:18,22 | 353:14 374:19 | 246:20 249:20 | 341:8 342:5 | **topic** 77:7 87:4 |
| 212:18 213:3 | 394:1 | 270:4 286:11 | 366:17 367:4 | 105:19 106:19 |
| 215:18 216:3 | **timeframes** | 292:3 320:11 | 368:3 373:20 | 107:3 284:7,10 |
| 216:14 217:12 | 370:19 | 327:20 335:13 | **Topco** 196:8,10 | 342:9,13 348:5 |
| 217:16 227:17 | **times** 79:10 | 368:2 380:2 | 196:11,16 | 349:3 352:17 |
| 245:19 254:13 | 82:11 93:3 | **today's** 87:17 | 197:2,10 198:9 | 356:17 357:1,3 |
| 256:22 269:5 | 151:4 152:1 | **told** 90:7,10,13 | 198:11,17,19 | 357:4 359:6 |
| 270:11,15 | 159:10 191:11 | 91:9,16 92:8 | 198:22 199:1,2 | 369:2,3,7 |
| 279:11 281:12 | 215:14 226:2,8 | 92:13,21 93:5 | 199:5 200:13 | 375:18 |
| 282:17 288:15 | 257:7 309:5,15 | 93:10 96:10,14 | 200:14,15,17 | **topics** 9:14 65:7 |
| 292:14 299:14 | 325:5 371:20 | 96:16 97:6,8 | 201:19 202:2 | 76:20 82:17 |
| 302:3 303:15 | 373:9 377:3,7 | 97:16 105:7 | 202:15,18,19 | 83:4 84:17 |
| 304:1,8,11,14 | 377:9,21 | 114:4 115:22 | 203:7,9 204:9 | 86:20 87:1 |
| 305:9 309:11 | 378:12 379:20 | 124:19 144:5 | 204:16,16,19 | 106:16 107:20 |
| 321:16 322:8 | 387:1,4 395:14 | 144:10 145:16 | 204:20 205:9 | 133:10 155:9 |
| 324:19 325:10 | 396:4 | 151:22 156:2 | 206:2 208:22 | 156:9,13 157:5 |
| 325:13 326:17 | **timing** 373:5 | 177:15 185:6 | 210:10,13 | 157:18 352:15 |
| 329:11 330:14 | 393:14,20 | 185:10 187:20 | 212:4 214:10 | **tops** 24:15 |
| 332:17,20,22 | **title** 10:4 35:7 | 227:20 228:1 | 214:16,20 | **total** 170:10 |
| 333:3 334:14 | 36:3,4 37:9,20 | 239:1 244:17 | 215:2 216:12 | 286:2 294:18 |
| 335:3 342:5,8 | 38:18 40:8,20 | 246:13 317:5 | 218:14 219:1,7 | 294:20 295:6 |
| 353:18 354:3,7 | 41:21 139:10 | 327:22 354:8 | 219:17,21 | **totally** 96:19 |
| 356:14 362:5,6 | 139:14 158:8 | 370:22 373:7,8 | 220:2 225:17 | 264:13 |
| 362:18,22 | 163:8 | 373:11 | 225:21 226:3,4 | **totes** 22:3,4 |
| 364:6 368:15 | **today** 9:1,3 | **tomorrow** | 228:8,16 | **tournament** |
| 370:4,8,9,15 | 11:10 12:12 | 309:10 403:6 | 231:20,22 | 106:1 |
| 371:8,17 | 18:17 26:13 | **Tony** 45:1,10,18 | 232:2,10 233:4 | **town** 261:4,5 |
| 372:21 373:1 | 43:11 65:7 | 45:20 | 233:8,10,12,16 | **track** 55:6 |
| 373:21 374:1,6 | 68:8 69:7 76:5 | **top** 17:10 24:15 | 233:20 234:16 | 142:16,22 |
| 374:9,10 | 76:18 80:16 | 24:16,16 65:4 | 235:4,9 236:2 | 144:1,2 146:21 |
| 377:12 379:6 | 82:6,7,13 | 66:3 67:19 | 236:5,6,6,9,11 | 220:20 223:12 |
| 397:8,18 | 83:19 87:19 | 73:13 88:11,21 | 236:14,16 | 223:16 278:8 |
| 399:21 400:9 | 88:2,7,15 | 108:16 119:12 | 237:10,13 | 323:21 |
| 400:14,15 | 106:15,18 | 125:6 135:20 | 238:9 285:14 | **tracked** 278:10 |
| 401:1 403:17 | 111:4 129:9 | 183:14 190:22 | 293:15,16 | **tracking** 143:2 |
| **timeframe** 75:2 | 142:8,13 | 257:10,20 | 326:1,2 339:13 | 220:11,15 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

44

| | | | | |
|---|---|---|---|---|
| 223:19 | 12:18 | 330:18 | **two-day** 130:8,9 | 82:19 84:3 |
| **tracks** 278:8,13 | **Trillium** 123:10 | **turn** 23:14 | **two-year** 292:16 | 89:21 120:4 |
| 278:14 284:14 | 123:15 277:9,9 | 169:2 239:22 | **Tyler** 52:8,9 | 174:4 199:22 |
| **tractor** 366:10 | 296:6 299:19 | 242:13,15 | **type** 81:2 86:2 | 202:10 213:11 |
| **trade** 277:6 | 300:4,7,10 | 269:1 284:7 | 231:14 251:20 | 232:13,15 |
| 280:8 | 301:4,5,7,9,15 | 314:6 355:20 | 370:3 386:7 | 243:5 250:16 |
| **trader** 280:17 | 302:2,10 | 363:3 387:21 | 387:18 | 259:6 263:6 |
| **traders** 280:14 | 303:14,20 | **TWENTY-NI...** | **types** 134:21 | 267:8 286:5 |
| **trading** 277:5 | 305:1,4,22 | 1:3 | 169:19 195:9 | 336:6 385:7 |
| **trailers** 366:11 | 307:7,11,17,20 | **twice** 144:9,17 | 204:20 326:6 | **ultimate** 138:9 |
| **transaction** | 308:11 312:3,8 | 225:15 380:12 | 380:17 | **ultimately** 159:8 |
| 245:10 247:10 | 312:9,14 313:4 | **twist** 146:20 | **typewriting** | 208:6 |
| 319:16 320:12 | 313:11,14,22 | **twisting** 143:9 | 405:8 | **uncommon** |
| **transcribe** 10:18 | 314:4,22 | 146:12,19 | **typical** 60:7 | 291:17 367:1 |
| **transcript** 38:21 | 315:16 316:5,7 | **two** 3:7 24:14 | 303:13,18 | **understand** 9:6 |
| 404:4 | **Trillium's** | 27:19 31:22 | **typically** 176:20 | 9:16 11:9,19 |
| **transcription** | 314:10 | 33:13 34:5 | 177:6 204:21 | 12:5,13,18 |
| 404:10,15 | **truckloads** | 35:15 39:21 | 302:13 303:5 | 23:8 62:11 |
| **transferred** | 22:19 199:16 | 41:16 43:21 | 304:17 377:6 | 65:6,11,20 |
| 162:4,6,13 | 199:18 295:8 | 48:10 52:8 | 377:11 | 92:20 93:9 |
| **transition** 25:10 | **trucks** 161:11 | 53:14 65:19 | | 94:18 118:1 |
| **transitioned** | 162:1 250:5 | 66:21 67:3 | _____ | 126:3 144:6 |
| 174:11 | 366:2,8,9 | 68:19 75:17 | **U** | 145:5,8 147:10 |
| **transport** | 367:10,12 | 103:21 109:1 | **UEP** 90:9,11,13 | 157:21 160:11 |
| 245:13 | **true** 98:10 | 110:16 130:11 | 90:21 91:8,12 | 165:8 214:12 |
| **transportation** | 281:13 293:2 | 130:12,13,14 | 92:6,22 93:15 | 239:5 244:13 |
| 102:18 108:10 | 324:22 368:4 | 136:1,3 154:17 | 93:22 94:16 | 247:14 253:20 |
| 108:11 122:16 | 404:9,14 405:9 | 156:19 167:8 | 95:1,7 96:4,10 | 255:6 258:2 |
| 122:22 145:19 | **try** 61:6 169:20 | 183:22 190:14 | 97:12,17,22 | 275:17 284:9 |
| 147:17 159:2 | 170:14 187:18 | 191:6,7 192:16 | 101:17 116:16 | 284:13 296:14 |
| 249:10 250:1 | 304:6,13 | 225:22 241:6 | 116:20,22 | 301:12,22 |
| 286:19 | **trying** 43:19 | 241:21 248:15 | 125:2,7 131:5 | 307:15 309:20 |
| **transported** | 55:12 131:6,7 | 276:9 316:17 | 131:15,19 | 310:2 311:2,9 |
| 287:1 | 136:2 146:20 | 316:18 320:4 | 283:21 284:4 | 311:20,22 |
| **travel** 56:1 | 146:20 151:21 | 324:13 326:10 | 343:8,14,20 | 315:8 317:3 |
| **travels** 54:13 | 157:14 213:8 | 326:11,11 | 344:3,8,13,18 | 319:8,21 |
| 56:2 | 239:14 257:4 | 332:18 334:1 | 345:1,7,9,11 | 320:20 329:1 |
| **Travis** 41:8,11 | 264:18 293:7 | 338:5 371:8 | 345:13,17 | 335:13 348:18 |
| 53:9 54:4,8 | 294:9,18 295:4 | 381:14,16,17 | 347:13,19 | 355:8 364:13 |
| 55:13 220:4 | 304:21 308:20 | 392:13 | 348:5 349:4,14 | 395:19 403:3 |
| **trend** 177:6 | 310:8 311:3 | **two-and-a-half** | 351:5,16 | **understanding** |
| **trial** 12:11,13,17 | 327:12,21 | 14:15 | **Uh-huh** 73:3 | 59:7 91:13 |
| | | | 75:14 80:18 | |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I    March 17, 2014

45

116:8 122:2
132:10 206:12
218:14 233:15
237:3,7 238:7
244:13 267:19
300:20 350:11
374:18
**understands**
140:10
**understood** 12:2
116:15 118:15
144:21 148:4
157:21 177:20
194:19 328:2
350:2
**Unfortunately**
38:13
**ungraded** 314:1
**unit** 7:3 103:21
154:4 211:22
270:15 362:22
**United** 1:9 3:3
7:6
**unloading**
161:11
**unwashed** 314:1
**update** 189:4
**Urner** 20:9
173:2,4,7,10
173:12,20
174:8,13,14,22
175:11 176:2,7
176:15,20
177:12,21
180:8,9,9,10
180:11,14
181:2,12
182:12,12
183:2 288:20
289:3,5 322:11
323:1 370:6,10
380:16

**USDA** 27:17
28:3,16,21,22
101:15
**use** 12:12 20:7
26:18 28:16
57:22 58:7
72:13,14 80:3
140:11 147:7
149:6 151:22
173:11 175:20
176:2 177:21
178:13 180:6,8
180:14 192:5
193:14 216:19
280:5 290:11
290:22 291:3
291:19 292:1,1
292:4 293:1,9
293:18,19
306:21 310:4,8
335:8,14
372:16
**USEM** 283:22
284:4
**users** 27:3
**uses** 57:12
278:20
**usually** 395:13
**utilize** 69:16
280:18 291:2
291:15
**utilized** 27:15
69:18 143:6
145:11 288:21
289:2 389:18

———————
**V**
**V** 1:8
**V-A-N-D-E**
277:15
**V-O-L-Z** 264:22
**vague** 135:1,8

140:4 143:17
144:4,11
152:20 168:10
176:21 181:4
189:18 190:2
210:1 218:18
220:14 223:16
227:12 230:1
232:18 234:18
303:17 365:1
375:20 379:1
398:9 399:2
**Valley** 17:22
19:12,15
**Value** 169:12
178:4,14 238:4
239:21 240:5
240:16,18,19
241:4,5,12,16
242:4,13
243:10,11,16
243:19 244:3
244:20 247:12
248:3 250:5,6
250:8,15
251:14 259:9
**Value's** 241:19
242:6 244:15
245:14 246:22
247:11 248:9
248:20 251:9
**Vande** 277:14
**Vandebunte**
277:13
**varies** 60:12
63:9
**variety** 26:17
169:4,6
**various** 23:15
29:3,6,12
154:9,19 157:1
159:10 161:8

169:13 215:17
276:1 279:8
379:20
**vary** 300:7
**vendor** 126:22
**verbal** 10:20
**Vernon** 16:11
16:12,19 162:7
260:9 314:5,11
**versus** 7:6 35:11
176:2
**vertically** 134:6
**veterinarian**
134:9
**vice-president**
10:6 13:2
31:17 157:22
273:14
**video** 7:16
**VIDEOGRAP...**
7:2 103:16,20
153:4 154:3
211:18,21
270:11,14
332:22 333:3
362:18,21
403:14
**videotape** 12:16
104:2 362:20
**videotaped** 7:3
12:16
**view** 198:4
237:11
**Villa** 346:18
379:14,15
380:1
**Virginia** 23:5
64:15,15
120:21
**visit** 101:2,2,4
104:8,12,20
105:2,13,21

107:5,11,12
108:19 109:13
109:19 110:1,6
110:10 111:5
111:10,11,21
112:15 124:2
125:15,16
126:5 127:2,6
128:20 166:2
167:13 349:1,3
352:5 358:2
**visited** 107:14
357:20 371:13
**visiting** 13:12
**visits** 54:17
109:7,9 166:1
**vitamin** 14:7
**volatile** 371:3
**volume** 1:12
169:21 170:14
190:1 199:11
199:13 206:20
207:3,18,18
208:6 209:6,10
211:3 254:9
272:9 284:19
342:1,2,3
361:3 363:21
364:2 365:19
366:12,15
378:2,5 379:22
384:19 403:15
403:16
**volumes** 341:7
**Volz** 264:20
265:18
**VP** 88:15 158:9
158:16 160:18
163:9 165:7

———————
**W**
**W-A-G-N-E-R**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I    March 17, 2014

46

262:2
**Wagner** 23:5
119:11 120:19
262:1,8 341:5
341:6,7 379:18
**waived** 403:20
**Wal-Mart**
169:10 230:12
230:13,21
285:14 326:14
326:16,18
328:14,18
329:2,3,10,13
329:16 330:2,4
330:13 332:9
**walk** 133:8
182:8 251:4
**walked** 154:11
**want** 14:20
18:21 19:1
20:14 21:17
30:4 62:6
71:15 73:4
89:22 92:19
118:6 126:2
137:20 144:5
144:11,13,15
145:4 146:15
146:18 152:4
157:20 161:4,6
165:4 166:4
173:3 195:1
211:15 212:4
232:8 244:12
266:11,12,13
270:8 276:14
279:14 291:10
293:13 303:7
306:15,18,20
307:13 308:4
309:6,20 310:2
310:3,16,17

311:13,19,20
317:13 318:6
319:7 325:21
326:18 327:10
327:18 328:12
335:12 352:10
357:7,8 359:20
363:3 364:11
365:6,7 403:2
**wanted** 69:1
87:1 102:19
107:7 118:16
130:9,13,22
132:14,15,17
133:16 141:5
154:7 155:14
170:17 176:2
177:19,21
204:9 287:17
292:10 312:12
323:5 345:19
364:20 365:17
372:20 373:16
376:20,21
**wants** 57:1
**warehouse**
161:22 180:19
242:16,20
243:4,16
245:14 246:22
248:9,14
250:15 258:5,6
261:7 333:16
334:8 338:6
367:17,17
**warehouses**
101:8 180:16
239:8 240:11
287:2,4 288:7
330:13
**wash** 314:6
**washer** 28:10

**Washington**
1:13,19 2:17
7:12,19
**wasn't** 49:17
76:11,19 90:15
155:15 176:13
**way** 44:12 49:5
92:13 93:6,12
98:14 108:5,6
115:7 195:16
197:3 198:2,4
202:21 237:11
317:9 319:9
320:5 323:22
326:15 361:15
**WAYNDOTTE**
1:1
**ways** 241:6
361:7
**Wayzata** 3:15
3:17
**we'll** 12:21
20:13 61:14
211:5 237:13
245:20 287:13
337:2 402:21
403:7
**we're** 8:1 61:11
62:1,6 76:22
103:17 134:6
135:22 137:10
142:4 148:19
150:3 151:8
165:20 188:13
194:13 210:3
210:12 211:19
224:3 236:11
239:13 266:9
272:2 300:17
309:9 315:20
315:21,21
318:7,15 319:8

327:11 329:2
336:5 363:14
373:6,13 387:9
387:9 390:8
391:12 392:12
393:22 394:15
394:16 402:9
403:4,4,5
**we've** 17:11,19
22:17 53:21
62:14 154:19
175:3 184:9
259:11 268:18
268:19 269:5
276:6 277:10
277:11,13
279:11 282:6
291:5,7 293:12
327:19 339:20
341:2 342:7
362:14 363:19
377:18 402:20
**Weaver** 119:10
121:10 289:18
290:7
**Weavers** 214:4
344:15
**website** 361:10
**Wednesday**
88:1,2,3
154:10,14
**week** 84:18 85:4
85:15 86:3
87:14,16 157:2
175:7 176:17
177:2 199:17
199:19 243:6
254:12 272:11
272:17 275:5
294:12,14,20
295:8,10
299:10,15

318:16 324:14
325:18 326:4
333:10 336:9
336:12 338:1
338:11 339:7
340:16 360:14
362:1 370:21
371:1,4,5
380:8 387:9,11
394:19 402:8
**weekly** 56:1
243:1 273:7
277:8 294:11
360:11 383:9
398:8 401:8
402:7,9,15
**weeks** 177:2,2
370:17 371:8
**welfare** 90:9,20
134:8 346:10
349:11 351:17
**went** 17:3,4,8
30:17 103:2,4
103:5 107:20
110:14 133:11
155:8 157:11
266:6 292:15
329:11 351:12
367:4
**weren't** 61:12
**Wesner** 45:1
**Wesner's** 45:11
**West** 64:15
**western** 261:3,5
**when's** 75:5,11
82:11 84:15
332:16 400:15
**white** 17:21 18:1
19:12,15
182:21,22
183:1,6 387:8
**whites** 25:19,20

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

47

26:3,15,16,17
26:18 27:4
**Whiteside** 109:5
127:20
**Whitney** 3:5
283:15,17
**Whittington**
87:10 88:6,9
89:10
**wholesale** 1:5
7:5 9:7 197:13
240:6,17,18,19
241:6,14,19,22
242:6 243:10
244:16,20
250:5 251:9
253:21 256:13
256:16 257:4
**wholesaler**
239:21 241:11
247:11 250:11
257:6 360:22
**wholesalers**
259:9
**Wiggly** 169:16
257:18 258:1,4
258:8,10
**willing** 61:21
256:5 322:2
**willingness**
365:18
**window** 130:9
370:21 371:2
**Winterset**
202:12
**wishing** 78:2
**withdraw**
144:14
**witness** 8:14
11:11 12:17
31:4 33:2 49:9
49:22 55:12

57:15 58:5,16
60:11,20 61:10
62:18 63:9,16
64:2 65:3,11
66:2 67:2 69:6
69:20 70:15
71:3,14,19
72:5,13 73:21
74:3,10 75:3
75:20 76:13
78:11 79:12
80:9,21 81:11
81:14,18 83:6
83:10 92:1
93:4,18 94:5
94:11 95:5
97:16 98:11
114:12 115:1
115:15 119:1
120:7 122:22
128:13 135:3
135:10 136:9
136:18 137:7
138:2,14
139:13,21
140:5,15 141:1
141:14 142:2
142:12,21
143:10,16,22
144:10,20
145:7 146:3,14
147:6,21 148:9
148:16 149:4
149:15 150:3
150:17 151:6
152:3,22
168:12 175:14
177:1 179:7,11
181:6,18
183:21 184:6
189:19 190:4
192:2,19

194:16 197:16
198:15 201:16
201:18 204:4
204:15 205:3
207:6,22 208:9
208:16,21
209:8 210:3
214:19 217:6
218:19 220:16
220:20 221:6,7
222:15,19
223:9,17
224:11 225:20
226:18 227:4
227:13 229:4
229:17 230:2
230:17 231:3
232:8,22
234:19 235:20
236:16 238:3
238:21 242:4
244:9 245:3
246:5,8 247:7
247:18 255:12
270:1 287:15
297:20 298:10
302:21 303:19
305:20 309:3,7
309:14 311:11
312:7,22 322:8
333:18 335:2
335:20 348:7
350:7,22 351:8
364:9,17 365:3
366:1,21
372:10 374:4
375:22 378:5
379:3 390:7
398:10 399:4
401:1 405:4,6
405:10
**word** 56:11

151:22
**words** 143:9
327:12
**work** 13:8 59:16
101:19 102:4
102:10,16
108:5,9 170:4
170:9 187:4,5
187:10 188:9
194:7 195:11
195:12,22
197:10 203:20
210:11 230:13
290:20 291:12
291:13 372:14
387:4,19,20
393:2 395:22
**worked** 136:18
165:22 166:16
167:2 170:1
193:10 195:7
254:3 331:15
392:16 393:6
**working** 32:12
156:5 159:1
161:19 164:7
165:10 170:6
192:11 193:22
194:2 210:21
283:8 292:11
329:14 403:10
**works** 54:19
271:22 272:14
273:3 275:14
304:17 389:9
389:13,21
**world** 280:14
**worry** 38:21
**wouldn't** 98:14
114:14 115:1
115:15 119:20
269:10,17

**wrap** 154:7
**Wright** 1:18
2:14 7:11 8:5
**write** 83:2
**writing** 185:18
308:3
**written** 70:10
141:16 186:14
306:16 323:16
324:10
**wrong** 38:12,14
**Wyandotte** 7:7
9:9

———— **X** ————
**X** 6:1,5

———— **Y** ————
**yeah** 45:13
58:19 64:1,5
75:14 77:5
80:18 82:8
86:15 87:8
103:15 106:6
117:15 118:5
120:1 129:5
130:4 131:2
132:17 133:6
137:7 141:1
143:16 145:7
146:14 152:3
154:22 169:9
173:17 175:14
177:16 178:3
181:18 182:3
187:15 194:5
194:19 197:16
199:22 201:21
211:17 226:6
227:16 232:3
256:16 261:10
270:10 278:8
288:4,5 293:17

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I                    March 17, 2014

48

| | | | | |
|---|---|---|---|---|
| 295:2,12 305:5 | 393:22 396:5 | 400:12 | **11H** 363:4 | 200:21 271:15 |
| 306:15 321:21 | 397:2,17,18 | **yellow** 25:17 | **12** 16:7 131:8 | 306:3,7 309:15 |
| 324:11 326:3,9 | 400:16,17 | 26:3,6 | 330:13 331:3 | 339:2 |
| 326:17 327:1 | **year-and-a-half** | **yield** 314:16 | 352:17,17,22 | **200** 2:7 388:21 |
| 333:21 334:17 | 23:21 48:10 | **yolk** 25:19 | 359:6 387:3,14 | **2000** 165:5,20 |
| 337:10 345:21 | **yearly** 396:2,4 | **York** 183:13 | 393:12,15 | 165:21 167:2 |
| 351:11,13 | **years** 15:15,21 | 262:14 | **12:05** 153:5,6 | 169:11 173:16 |
| 354:8 356:15 | 16:6,7,14 | | **13** 369:2 375:19 | 174:3,6,6 |
| 365:4 367:17 | 17:12,14 19:16 | **Z** | **14** 342:10 | 179:18 180:2 |
| 372:10 374:12 | 24:8,9 25:5 | | 405:18 | 188:19 190:17 |
| 384:11 390:12 | 30:15,16 31:22 | **0** | **15** 24:8 33:21 | 191:9,13 |
| 392:3 401:11 | 33:7,13,21 | **04** 212:22 354:8 | 46:20 48:5 | 192:17,22 |
| **year** 16:2 17:10 | 34:2,5,15 | 354:12 | 123:7 242:9 | 193:18 196:19 |
| 30:17,19 34:21 | 35:15 38:4 | **05** 212:22 | 292:8 332:15 | 212:16,20 |
| 34:22 36:21 | 39:21 40:15 | **06** 115:18 353:4 | **150** 249:8 | 253:2,4,13 |
| 37:15 48:22 | 41:4,16 42:15 | 353:11 354:5,9 | **16** 295:14 339:4 | 256:19 271:1,9 |
| 88:20 108:8 | 42:21 43:4,21 | **08** 353:16 | **17** 1:14,16 7:13 | 282:7 283:13 |
| 125:4 162:12 | 46:20 48:5,8 | **09** 115:21 | 164:18 331:20 | 337:12 339:2 |
| 162:12 172:16 | 48:10,21 52:8 | 353:16 | **17th** 403:16 | 341:8 356:4 |
| 174:10 190:20 | 53:14 65:19 | | **18** 14:15 386:11 | 380:6 382:4 |
| 191:12 215:18 | 66:21 67:3 | **1** | **180** 249:8 | **2000-pound** |
| 225:15 226:2,9 | 68:19 82:14 | **1** 17:3 | **1900** 1:18 2:15 | 22:4 |
| 253:19 282:22 | 88:19 113:5 | **1,200** 178:6 | 7:11 | **2000** 6 2:17 7:12 |
| 297:15 299:9 | 155:19 157:9 | **1:03** 154:2,5 | **1907** 3:15 | **2000s** 196:21 |
| 300:11 305:9 | 175:3 177:6 | **10** 80:13 146:10 | **19103-2799** 3:9 | 253:3,18 356:3 |
| 305:12 306:12 | 183:22 184:9 | 211:16 232:16 | **1980** 160:16,17 | **2002** 328:12 |
| 308:11 312:15 | 185:3,11 191:7 | 279:3 284:19 | 161:5,6,10 | **2004** 112:7 |
| 313:14,17 | 191:7,14 | 286:7,17 295:6 | 164:5,9,13 | 196:22 263:5 |
| 314:9,13,15,17 | 193:16,17 | 326:12 337:7 | **1992** 10:9 43:14 | **2005/2006** |
| 314:21 323:7 | 212:5,15 242:9 | 337:12,14,16 | 43:17 160:11 | 125:11 |
| 324:18,18 | 242:22 259:19 | 337:20 | 160:18,19,22 | **2006** 109:14 |
| 327:19 328:3 | 271:15 279:12 | **10:55** 103:17 | 161:2,7 163:13 | 111:5,21 |
| 329:18,22 | 291:6 292:8 | **100** 42:12 116:6 | | 112:14 113:14 |
| 338:17 370:15 | 321:14 322:20 | 258:16,18 | **2** | 114:4,6,9,13 |
| 371:21 375:12 | 323:10 332:18 | 330:6 388:17 | **2** 17:3 71:17 | 115:13 117:1 |
| 376:4 377:3,7 | 337:6 338:2,3 | **1015** 7:19 | **2-pound** 24:16 | 124:2,13,21 |
| 377:9,21 | 338:5,16,19,21 | **10CV2171** 1:8 | 24:16 | 125:2,5,14,16 |
| 378:12 379:20 | 339:5,11,16,19 | 7:9 | **2:09** 211:19 | 145:12 |
| 382:6 387:2,3 | 339:21 356:2 | **11** 13:8 31:7 | **2:19** 212:1 | **2008** 113:21 |
| 387:4,15 389:7 | 359:12 360:3 | 352:22 353:1 | **20** 17:12,14 24:9 | **2009** 113:2,21 |
| 389:19 392:15 | 361:8 380:13 | **11:12** 103:22 | 34:15 40:15 | 113:21,22 |
| 393:10,13,15 | 399:19 400:4 | **1110** 2:16 | 123:20 200:19 | **2011** 49:5 329:7 |
| | | **11G** 357:3 | | |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. I  March 17, 2014

49

329:9,16,18,20
329:22 330:8
331:10
**2012** 49:6,10
158:5 165:5,20
165:21 173:16
174:3 191:9
192:17,22
193:18 270:22
271:2,9 282:7
285:5 288:18
288:19 328:1
336:18,20
337:4 339:9,17
339:22 380:6
**2013** 104:9
113:14 114:13
114:19 115:13
116:4,9,18
117:1,5 126:17
127:3,6 129:6
145:12 284:17
284:21,21
285:13 326:19
326:22 327:5,8
327:14,18
328:1,5,10,13
329:1 330:2
333:7 334:13
337:15,17
338:12,14
339:4,14,22
340:17 347:19
348:4 353:7,12
354:5,10
357:18 361:17
363:8 401:7
**2014** 1:14,16
7:13 403:16
**2015** 405:18
**202** 2:18
**21** 289:10

**215** 3:10
**215-0141** 3:18
**237-0300** 4:9
**25** 178:10
182:18 183:9
**27** 182:10,11
183:1
**2700** 4:7
**28** 326:4 339:14
**29th** 7:8

———

**3**

**3:27** 270:12
**3:43** 270:16
**30** 30:12 200:1,2
289:10 337:14
338:14
**30-pound** 24:14
24:19
**300** 4:6 295:8,16
**3000** 3:7
**317** 4:9
**330** 3:16
**35** 339:10 387:9

———

**4**

**40** 337:17
338:18,20
**460** 2:7
**46204-1750** 4:8

———

**5**

**5** 24:16 333:14
**5-pound** 24:15
24:15
**5:01** 333:1
**5:15** 333:4
**5:35** 352:9
**5:45** 362:19
**5:52** 363:1
**50** 164:22 290:3
290:4
**50/50** 174:8,14

**517** 6:7 82:20
83:3 84:17
85:10 86:6,21
155:1,21
156:10 157:6
157:18 284:6
**52** 164:20 165:1
**55391** 3:17

———

**6**

**6:40** 403:17,21
**60s** 17:2
**64112** 2:8

———

**7**

**7** 337:11
**70** 30:11 200:18
**70/30** 30:20
**70s** 17:7
**714-7100** 2:9
**72/28** 30:19
**75** 178:7,9
237:21
**778-3000** 2:18

———

**8**

**8** 6:2 284:7
286:14 338:10
346:5
**8:00** 403:6,8
**80** 163:13
200:19 202:3,8
203:6
**80s** 17:8
**81** 162:3,3,6
**816** 2:9
**82** 6:7 162:3,3,4
162:6
**840** 200:5
**85** 163:17
**86** 163:17,17
**88** 162:16
**89** 162:16,17

———

**9**

**9** 380:7
**9:05** 1:17 7:13
**90** 162:2 286:19
326:12
**90s** 17:9 163:7
213:10 253:3
355:20 356:5
**92** 162:17 163:9
253:13
**95** 333:12
**952** 3:18
**97** 286:11
**98** 331:22,22
334:4 340:13
**981-4000** 3:10
**99** 158:3 256:14
331:22

Henderson Legal Services, Inc.