# ATTACHMENT 24

406

IN THE DISTRICT COURT OF WAYNDOTTE COUNTY,

KANSAS

TWENTY-NINTH JUDICIAL DISTRICT

_____

ASSOCIATED WHOLESALE GROCERS,

INC., et al.,

          Plaintiffs,          Case No.

   V.                    10CV2171

UNITED EGG PRODUCERS, et al.,   HIGHLY

          Defendants.         CONFIDENTIAL

_____

                  Volume II

                  Washington, D.C.

                  March 18, 2014

      The deposition of GREGORY EUGENE

HINTON was convened on Tuesday, March 18, 2014,

Commencing at 8:02 a.m., at the offices of

Porter Wright, 1900 K Street, Northwest

Washington, D.C., before Paula G. Satkin,

Registered Professional Reporter and Notary

Public.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

2 (Pages 407 to 410)

---

407

1    APPEARANCES:

3        On behalf of the Plaintiffs:
4            PATRICK J. STUEVE, ESQ.
5            DAVID A. HICKEY, ESQ.
6            Stueve Siegel Hanson LLP
7            460 Nichols Road, Suite 200
8            Kansas City, Missouri 64112
9            (816) 714-7100

11       On behalf of Rose Acre Farms:
12           JOHN C. MONICA, JR., ESQ.
13           MOLLY CRABTREE, ESQ.
14           Porter, Wright, Morris & Arthur LLP
15           1900 K Street, NW
16           Suite 1110
17           Washington, DC 20006
18           (202) 778-3000

---

409

1    A P P E A R A N C E S  (Cont'd)

3        On behalf of Midwest Poultry:
4            RYAN HURLEY, ESQ.
5            JASON BURKE, ESQ.
6            Faegre Baker Daniels
7            300 N. Meridian Street
8            Suite 2700
9            Indianapolis, IN 46204-1750
10           (317) 237-0300

---

408

1    A P P E A R A N C E S  (Cont'd)

3        On behalf of United Egg Producers and US
4    Egg Marketers:
5            WHITNEY REDDING, ESQ.
6            Pepper Hamilton LLP
7            3000 Two Logan Square
8            Eighteenth and Arch Streets
9            Philadelphia, Pennsylvania 19103-2799
10           (215) 981-4000

12       On behalf of the Sparboe:
13           MATTHEW HARTUNG, ESQ.
14           Hutchison, P.A.
15           1907 East Wayzata Blvd
16           Suite 330
17           Wayzata, Minnesota 55391
18           (952) 215-0141

---

410

1    ALSO PRESENT:
2            JOSEPH A. MILLER
3            General Counsel, Rose Acre Farms, Inc.

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

411

EXAMINATION

By Mr. Stueve          414
By Mr. Monica          717
By Mr. Stueve          722

EXHIBITS

Exhibit No.                    Page No.
Exhibit 573  Document Bates stamped       451
      RAFKS 0010568
Exhibit 574  Document Bates stamped       455
      RAFKS 0000603
Exhibit 575  Document Bates stamped       578
      RA 0071932 to 33
Exhibit 576  Super Value website printout   601
Exhibit 577  Topco website printout       601
Exhibit 578  Centrella website printout    602
Exhibit 579  August 2010 membership agreement  614
      Entered into between Rose Acre
      And USEM
Exhibit 580  Document Bates stamped       625
      RAUPDATE 0067579 through 93

412

EXHIBITS

Exhibit No.                    Page No.
Exhibit 581  Document Bates stamped RA 1359   645
      Through RA 1368
Exhibit 582  Document Bates stamped UE 0317733 664
Exhibit 583  Document Bates stamped       662
      RA 0002299 through 06
Exhibit 584  Urner Barry egg quote for     669
      Thursday, August 9, 2007
Exhibit 585  Urner Barry egg quote        675
Exhibit 586  Document Bates stamped       678
      UE 0095810 through 5811
Exhibit 587  Document Bates stamped       681
      RA 0042370
Exhibit 588  Document Bates stamped       684
      UE 0457968 through 71
Exhibit 589  Document Bates stamped       685
      UE 0316921 to 22
Exhibit 590  Document Bates stamped       686
      UE 0526344 through 46
Exhibit 591  Document Bates stamped       688
      RAFKS 0011622

413

EXHIBITS

Exhibit No.                    Page No.
Exhibit 592  Document Bates stamped       690
      UE 1028004 through 15
Exhibit 593  Document Bates stamped       703
      RAUPDATE 0013665 through 66
Exhibit 594  Document Bates stamped       706
      RAFKS 0013293
Exhibit 595  Document Bates stamped       708
      RAUPDATE 0040047
Exhibit 596  Document Bates stamped       713
      RAUPDATE 0071391 through 30

414

PROCEEDINGS

THE VIDEOGRAPHER:  The time is
8:02 a.m. on March 18, 2014.  This begins media
unit number one, volume II, of the continued
deposition of Mr. Greg Hinton.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. STUEVE:
Q.   Mr. Hinton, you understand you are
still under oath?
A.   Yes.
Q.   All right.  If you could, turn
back to topic number 7.  You'll see that there's
how you determine the price of the eggs and egg
products, you market and sell to any grocery
cooperative or grocery wholesaler.  Do you see
that?
A.   Yes.
Q.   We spent quite a bit of time
yesterday talking about how Rose Acre prices
both its commodity eggs and its specialty eggs;
correct?
A.   We talked a lot about specialty

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

415

eggs, not much about commodity eggs.

Q.   I asked you about your commodity eggs and you testified repeatedly what you would do is you would negotiate based off of an Urner Barry?

A.   Urner Barry, correct.

Q.   And cents back on Urner Barry; is that correct?

MR. BARNES:  Let him finish. You're talking over each other.  But you can go ahead.

BY MR. STUEVE:

Q.   Is that correct, sir?

A.   We talked -- yes.  That's one of the pricing mechanisms is the price off the Urner Barry market.

Q.   So let's walk through your largest customers, your top ten customers we talked about yesterday?

A.   Okay.

Q.   With respect to Save-A-Lot, I'm focusing on the commodity eggs, are those

---

416

commodity eggs priced off the Urner Barry markets?

A.   Yes, they are.

Q.   And Aldie?

A.   Yes, they are.

Q.   And Kroger?

A.   Yes.  They are.

Q.   And Topco?

A.   Yes.  They are.

Q.   Wal-Mart?

A.   No.  They're not.

Q.   What is Wal-Mart's commodity eggs priced off of?

A.   They're a cost plus formula.

Q.   How long has that been the case?

A.   Since 2012.

Q.   Okay.  And from prior to that time, what was the pricing based off of?

A.   Urner Barry market formula.

Q.   Would that be true from '99 through 2012?

A.   Yes.

---

417

Q.   Cal-Maine?

A.   Market.  Urner Barry market.

Q.   AWG?

A.   Urner Barry market.

Q.   Now, focusing on that 2000 to 2012 timeframe, what percentage of your commodity eggs were based off of -- priced off of Urner Barry?

A.   It changed over the years because we used the Rose Acre market we discussed before, also.  So I think yesterday I talked about that in 2000 -- early in 2000s, we had as many of 50 percent of our eggs priced off the Rose Acre market, combination of Rose Acre and Urner Barry.  And so during the time from 2000 to 2012, it was always a combination of either the Rose Acre or the Urner Barry and it just kept increasing more and more Urner Barry and less Rose Acre during that time.

Q.   By 2003 would it have been majority Urner Barry?

A.   I don't remember what year -- I

---

418

don't remember exactly what year everything transitioned.

Q.   What documents would you look to to refresh your recollection?

A.   The pricing documents.

Q.   And when you were referring to pricing documents, what do you mean?

A.   It would be pricing letters that would be in my files.

Q.   Okay.  Was there any summary document that you kept that distinguished bids from Urner Barry versus Rose Acre?

A.   Yes.  Our sales -- there's sales records that show -- it's like a summary of what loads per week the customers bought and it distinguished who was buying off Rose Acre and who was buying off Urner Barry.

Q.   Okay.  And what document was that?

A.   I don't believe it would have been a title on the document.  It's just a -- just a customer sales report.  It had the last ten weeks that everyone -- the eggs that the

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

5 (Pages 419 to 422)

---

419

1  customers purchased, average loads which they
2  purchased and which market they bought off of.
3      Q.   How would the markets be
4  delineated in this sales report?
5      A.   The top -- it's -- it just said
6  Rose Acre market listed customers and it said
7  Urner Barry market listed customers.  So there
8  was no --
9      Q.   And those were kept --
10     A.   In my office in the sales office
11 at Rose Acre.
12     Q.   Did you provide those to counsel?
13     A.   They scanned my documents, so --
14        MR. MONICA:  They've been
15 produced.
16 BY MR. STUEVE:
17     Q.   Who maintained those records?
18     A.   I maintain them in my office.
19 Brenda Tormoehlen, she compiled them and gave me
20 the records.
21     Q.   Is she still at Rose Acre?
22     A.   No.

---

420

1      Q.   When did she leave?
2      A.   This month.
3      Q.   Okay.  Did she retire?
4      A.   She took another position.
5      Q.   Where at?
6      A.   Stepwish Trucking.
7      Q.   Where at?
8      A.   In Brownstown, Indiana.  I think
9  it's Brownstown.  I think it's Brownstown, maybe
10 Bologna, but it's a small town.
11     Q.   Where does she live?
12     A.   She built a new house, somewhere
13 either Brownstown or Bologna in that area.
14     Q.   How do you spell her last name?
15        MR. BARNES:  I think he already
16 spelled it.
17        THE WITNESS:  T-O-R-M-O-E-H-L-E-N.
18 BY MR. STUEVE:
19     Q.   Do you believe by 2007, let's move
20 several more years, by 2007 was it substantially
21 all Urner Barry by that timeframe?
22     A.   The majority would be Urner Barry.

---

421

1      Yes.
2      Q.   And then are there any summary
3  documents that tracked your Rose Acre market
4  price?
5      A.   Yes.
6      Q.   And what was that document?
7      A.   There's -- there was the document
8  that I discussed yesterday where we would
9  provide the customers the history -- show them
10 the Rose Acre market all the different regional
11 markets and show them the average.
12     Q.   Was that maintained internally so
13 you could use that for any of your customers?
14     A.   Yes.
15     Q.   Do you remember the title of that
16 document?
17     A.   Just -- it was not necessarily a
18 title.
19     Q.   Okay.  But would you generate that
20 on a monthly basis?  How frequently would that
21 be generated?
22     A.   It was -- it was Aaron Heironimus

---

422

1  puts it together.  He would track it, you know,
2  update it -- it could be updated weekly, but he
3  didn't necessarily do it every week.  We more
4  used it for the annual, so it was more important
5  for an annual market.
6      Q.   When you say annual, what do you
7  mean by that?
8      A.   At the end of the year, so we saw
9  the averages.
10     Q.   You would generate kind of a year
11 end report?
12     A.   Yes.
13     Q.   What would that be called?
14     A.   There really was no title on it.
15     Q.   Did you keep those?
16     A.   Yes.
17     Q.   Would those have been provided to
18 your counsel?
19     A.   Yes.
20     Q.   Okay.  Now, of the top customers,
21 you identified Kraft.  Was that one of your
22 customers that would purchase your egg products?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II          March 18, 2014

---

423

1    A.   Yes.
2    Q.   Okay.  Which egg products would
3  Kraft purchase?
4    A.   They would purchase salt yolk and
5  salted whole mix, Feme.
6    Q.   How do you spell that?
7    A.   F-E-M-E.
8    Q.   What is that?
9    A.   Am I allowed to discuss?
10       MR. MILLER:  It's all
11  confidential.
12       THE WITNESS:  It's a proprietary
13  product.
14       MR. BARNES:  Sorry.
15       MR. MILLER:  We have to mark this
16  highly confidential.
17       THE WITNESS:  We have confidential
18  agreements with Kraft.  Is it okay?
19       MS. CRABTREE:  Yeah.  I've got it.
20       THE WITNESS:  It's an enzyme
21  modified product to enhance the flavor of egg.
22  BY MR. STUEVE:

---

424

1    Q.   Okay.
2    A.   Dried egg whites.
3    Q.   Okay.
4    A.   Frozen salt yolk and NEF, N-E-F.
5    Q.   What is that?
6    A.   It's another highly confidential
7  product, it's an enzyme modified yolk.
8    Q.   What does Kraft use NEF for?
9    A.   In the process of making salad
10  dressings.
11   Q.   Okay.  What does it use the frozen
12  salt yolk for?
13   A.   I don't know for sure.
14   Q.   What about the dried egg whites?
15   A.   Marshmallow fluff.
16   Q.   What about the FEME?
17   A.   Making the salad dressings.
18   Q.   Salted, is it white mix?
19   A.   Whole mix.
20   Q.   Whole mix?
21   A.   Salad dressings.
22   Q.   What about the salt yolk?

---

425

1    A.   Salad dressings.
2    Q.   Any other egg products you sell to
3  Kraft?
4    A.   Not that I can think of right now.
5  No.
6    Q.   Okay.  And how do you -- let's
7  take the frozen salt yolk.  How do you price
8  that to Kraft?
9    A.   Off the Urner Barry frozen salt
10  yolk market.
11   Q.   What about the dried egg whites?
12   A.   Off the Urner Barry dried egg
13  white market.
14   Q.   What about the salted whole mix?
15   A.   It's priced off the Urner Barry
16  liquid whole egg and yolk market.
17   Q.   What about the salt yolk?
18   A.   It's priced off the Urner Barry
19  yolk market.
20   Q.   Now, you listed -- some of these
21  products you didn't list yesterday, correct,
22  like FEME?

---

426

1    A.   Correct.
2    Q.   I want to make sure you're giving
3  me your best recollection at the time.  I want
4  to make sure.  Are there any other egg products
5  we didn't talk about yesterday that we've now
6  identified this morning?  Are there any other,
7  whether they're proprietary or not?
8    A.   We would need to go back to the
9  list we went through yesterday.  I'm not --
10       MR. MONICA:  We're talking about
11  that Rose Acre sold from 2000 to present?
12       MR. STUEVE:  Yes.
13       MR. MONICA:  Okay.
14       THE WITNESS:  Because I mean, we
15  talked about -- if I recall right, we talked
16  about in general terms, we did dried egg whites.
17  Those products would have fell into that
18  category we didn't go into subcategories on some
19  of them.  Like dried yolk, we have a free flow
20  dried yolk and standard dried yolk.  I didn't go
21  into subcategories.
22  BY MR. STUEVE:

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

427

1    Q.   Let me ask you this.  With respect
2 to your egg products that you sell to your
3 customers, is the pricing based off of Urner
4 Barry?
5    A.   Not all egg products.
6    Q.   Roughly what percentage of your
7 egg product sales are based off the
8 corresponding Urner Barry markets?
9    A.   Probably 95 percent.
10    Q.   And then let's focus on the
11 5 percent.  What types of products are we
12 talking about that are not based off of Urner
13 Barry markets?
14    A.   Retail liquid.
15    Q.   Okay.  What else?
16    A.   I have some whole egg bag in a box
17 for Cracker Barrel.
18    Q.   Any others?
19    A.   Dried -- a lot of dried egg -- the
20 dried eggs.  So, actually -- that 95 percent is
21 probably more like 80 percent.  Because the
22 majority of dried products are sold off of fixed

428

1 price.
2    Q.   Retail liquid, who do you sell
3 those to?
4    A.   Grocery stores.
5    Q.   Okay.  And did you have a
6 particular set of clients, grocery stores that
7 buy a large portion of that?
8    A.   Yes.  We do.
9    Q.   Who is that?
10    A.   Aldie, Save-A-Lot, CCF Brands for
11 Sam's, Meyer, Big Y, Hy-Vee, Giant Eagle, Dutch
12 Farms, Eggland's Best.  There's others.  Off the
13 top of my head, I can't put a name on them.
14    Q.   On the retail liquid, is this the
15 packaging you can get in certain ounce size like
16 Eggland's Best, where they may low cholesterol,
17 those types of --
18    A.   We produce two products.
19    Q.   Okay.  What are those?
20    A.   Some that's all whites and the
21 others the no cholesterol, similar to an Egg
22 Beaters type product.

429

1    Q.   What size packages?
2    A.   1-pound and 2-pound.
3    Q.   And then you sell them in 1-pound,
4 2-pound and then they package themselves?
5    A.   No.  We pack it in gable top,
6 quart and pint, gable top carton, packed in a
7 case and ship it to their warehouse.
8    Q.   So you do all the packaging?
9    A.   Yes.
10    Q.   Do you price the retail liquid the
11 same way for all these customers?
12    A.   We use a similar process goes into
13 the pricing those.  Yes.
14    Q.   What is that process?
15    A.   We establish a white price that we
16 want to receive and add the ingredients and
17 packaging cost and freight, if necessary, and
18 then that's how we establish a price.
19    Q.   Do you add in your profit then?
20    A.   There's not a set profit on the
21 product because the egg white market fluctuates
22 often and it's highly influenced by the yolk

430

1 prices.
2    Q.   When you talk about that, are you
3 talking about the Urner Barry yolk market?
4    A.   Yes.
5    Q.   Okay.  And so whether or not you
6 make a profit again is going to be impacted by
7 the Urner Barry market?
8    A.   Yes.  That would definitely -- the
9 Urner Barry market would have an impact on us,
10 yes.
11    Q.   That process you just described,
12 do you use that same process for all the
13 customers that you identified with respect to
14 the retail liquid?
15    A.   Yes.  That's the thought process
16 that goes into that.
17    Q.   Okay.  With respect to the little
18 egg bag in a box?
19    A.   Yes.
20    Q.   Is that also a similar pricing
21 method that you just described?
22    A.   Yes.  For the Cracker Barrel, it's

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                   March 18, 2014

431

1  a similar process.
2      Q.  I'm sorry.  Go ahead.
3      A.  On the fixed price Cracker Barrel.
4  It would be a similar process.  Yes.
5      Q.  What market impacts your
6  profitability there?
7      A.  On that product, the market is not
8  going to impact it.  Our cost to produce will
9  impact it.
10     Q.  Do you have a cost plus then
11  pricing for that?
12     A.  No.
13     Q.  Okay.
14     A.  It's just a fixed price.
15     Q.  Okay.  What -- what is -- what
16  makes up this product?  Is it a dried, liquid?
17     A.  It's a liquid whole egg.
18     Q.  Okay.  How is it different than
19  the retail liquid product you make?
20     A.  Because it's a whole egg, they're
21  getting the entire egg.
22     Q.  Okay.

432

1      A.  It would be like taking an egg,
2  breaking it open and selling everything.
3      Q.  Okay.
4      A.  The difference in the retail
5  liquid is you're only selling the egg whites to
6  those retail customers.  So the egg whites make
7  up about 60 percent of the egg.  The other
8  remainder part is 30 percent yolk and 10 percent
9  soup, which is incidental whole egg that comes
10  off of it.  Soup, it's a term we use in the
11  industry.  So that product because you're only
12  selling 60 percent, what happens to that the
13  other 40 percent influences your bottom line on
14  the other 60 percent because you don't control
15  you don't have that at a price, so you're only
16  fixing the whites price.
17     Q.  Got it.  Why wouldn't the Urner
18  Barry market impact your pricing of the bag in a
19  box product?
20     A.  Because we take the market out of
21  it when I issue a fixed price.
22     Q.  Okay.  What about dried eggs?

433

1      A.  Dried eggs, the majority of dried
2  eggs are contract bids.
3      Q.  And are they -- does your
4  profitability, is it impacted by Urner Barry?
5      A.  No.  Not when we -- not once --
6  well, I'll take that back.  On some products,
7  they are.  The whites -- example -- the yolks
8  and whites would be.
9      Q.  Okay.
10     A.  For the same reason the whites on
11  the retail.
12     Q.  Okay.
13     A.  But whole egg would not.
14     Q.  Okay.  Any -- any other -- so on
15  the egg product side, any other egg products
16  that -- we're talking about the approximately
17  20 percent that either have some impact or no
18  impact by Urner Barry.  Any other egg products?
19     A.  We didn't go into all the
20  subcategories of frozen if you want to.  I think
21  yesterday we just said we did frozen, I believe.
22     Q.  I'm just talking about now the big

434

1  picture, your approximation of 80 percent Urner
2  Barry, 20 percent have some or no impact by
3  Urner Barry.  On that 20 percent, any other egg
4  product we haven't talked about?
5      A.  There was a one year period back
6  approximately 2010 that we did a fixed price for
7  some Kraft's liquid products.
8      Q.  And were those whole eggs?
9      A.  It was the -- yes.  The whole mix
10  and the salt yolk.
11     Q.  Any others?
12     A.  On some of the whole egg, we've
13  got -- like the Cracker Barrel there was some
14  whole egg totes for Main Street Muffins in
15  Columbus, Ohio, that we sold to a distributor,
16  Ohio Farmers that would ask for fixed pricing.
17     Q.  And what type of -- what type of
18  egg product made up that?
19     A.  They purchased whole egg and egg
20  whites.
21     Q.  So the egg whites would be subject
22  to Urner Barry, the whole egg would not; is that

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

9 (Pages 435 to 438)

---

435

```
1   correct?
2        A.   Correct.
3        Q.   Any others?
4        A.   Skinner Baking in Omaha, Nebraska.
5   Let's see.  We've done a fixed price for them in
6   the past on whole egg in totes and a few in bag
7   in a box.
8        Q.   Okay.
9        A.   Sometime between 2000 to 2012, we
10  were selling to Oleksky in Chicago, and some of
11  his customers before we had gave fixed pricing
12  on whole egg bag in a box.  He's from Poland.
13       We also trade liquid tankers with
14  other egg breakers and those would be sold --
15  they can be sold both ways.  They can be sold at
16  a fixed price or a price off of Urner Barry.
17       Q.   Okay.
18       A.   I can keep thinking of others.
19  There could be others we sold fixed, but most
20  common is Urner Barry.
21       Q.   Okay.  With respect to your egg
22  products and how those would break out on an
```

---

436

```
1   annual basis, the different types of egg
2   products, where would that summary be reflected?
3        A.   It would be in a -- in a document.
4        Q.   And what document would that be
5   in?
6        A.   It's a document that's compiled --
7   it gives a break out of all of our shell eggs,
8   dried products, frozen products and inedible
9   products.  It's a yearly summary.
10       Q.   Prepared at the end of the year?
11       A.   Yes.
12       Q.   Did you keep those?
13       A.   Yes.
14       Q.   Would those have been produced to
15  counsel?
16       A.   Yes.
17            MR. MONICA:  They have been
18  produced.
19  BY MR. STUEVE:
20       Q.   You had indicated earlier that
21  there was a document that would track the
22  difference between the Rose Acre market and the
```

---

437

```
1   Urner Barry market.  Do you remember that
2   testimony?
3        A.   It would have the customers that
4   bought off the respective markets; correct.
5        Q.   Did you also prepare a summary for
6   them that would compare what they were paying
7   for their specialty eggs to their commodity
8   eggs?
9        A.   No.
10       Q.   Did you all track that internally,
11  what that spread was between the specialty egg
12  price and the -- the eggs priced off of Urner
13  Barry?
14            MR. MONICA:  Objection.  Vague.
15            THE WITNESS:  It wasn't tracked
16  priced off of Urner Barry, but the document we
17  just discussed that had the summary with all the
18  products' percentages, not only had the volume
19  percentages, it shows the pricing received, and
20  specialty eggs are one of those categories, so
21  it would have that broke out in that document.
22  BY MR. STUEVE:
```

---

438

```
1        Q.   You could compare the pricing you
2   were getting for specialty eggs to the pricing
3   you were getting for commodity eggs from that
4   document?
5            MR. MONICA:  Objection.  Vague.
6   You can answer.
7            THE WITNESS:  The document -- like
8   I said, the document does show for dried
9   product, the average price for the year.
10       Liquid product, it has -- the
11  specialties aren't subcategory broke out just in
12  general.
13  BY MR. STUEVE:
14       Q.   Specialty egg -- is it specialty
15  egg product?
16       A.   No.
17       Q.   Okay.  So if you would, the
18  price -- so in there, how was -- how was the
19  average pricing determined for the specialty egg
20  that's on that document?
21       A.   It's a -- from all of our sales
22  files that's been produced, it would just be a
```

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

439

1  summary of the price the customers pay.
2      Q.   Is it an average?
3      A.   Yes.
4      Q.   For all customers?
5      A.   Yes.
6      Q.   Then from customer to customer in
7  a particular year for the same specialty egg
8  product, was there any material difference in
9  the prices they were getting?
10     MR. MONICA:  Objection.  Vague.
11     THE WITNESS:  On -- I guess --
12 BY MR. STUEVE:
13     Q.   On specialty eggs?
14     A.   You're asking me if there's a
15 different price that customers pay for specialty
16 eggs?
17     Q.   Materially different?  Was there a
18 significant gap between what customer A would
19 pay for the same specialty product and customer
20 B in any particular year?
21     A.   There would be on Eggland's Best.
22     Q.   Okay.

---

440

1      A.   Because we sell Eggland's Best
2  internally between franchisees, so if I sell to
3  another franchisee, it's a different cost
4  compared to if I'm selling it to a retailer,
5  because on Eggland's Best, you pay either
6  royalty or you pay MSF.  You pay to Eggland's
7  for promotion and advertising, and if I just
8  sell the product the other franchisee would be
9  obligated to support the product, not me.  So
10 those kind of sales would show a difference if
11 you're looking at a sales report because those
12 costs aren't added in.  The producer who buys it
13 from me then would in turn be responsible for
14 those costs.
15     Q.   If you put that example out, the
16 specialty egg prices you would sell to your
17 specialty egg customers in any particular year,
18 would the pricing be similar?
19     MR. MONICA:  Objection.  Vague and
20 ambiguous.  You can answer.
21     THE WITNESS:  Like products of
22 specialty eggs sold to different customers are

---

441

1  going to be in a similar range price.
2  BY MR. STUEVE:
3      Q.   Okay.  In the summary document
4  would it also have then your -- the average
5  commodity egg price that you got?
6      A.   Yes.
7      Q.   Okay.  And in looking at that, is
8  it fair to say that the average specialty egg
9  price was typically higher than the commodity
10 egg price?
11     A.   On a yearly average, the specialty
12 egg price would be higher.
13     Q.   Is there a typical range that that
14 is higher?
15     A.   No.  Because it's going to vary
16 year to year, depending on the markets.
17     Q.   Okay.  All right.
18         With respect to your commodity egg
19 pricing, what would you -- let me ask you this.
20 How did you account for your input cost, for
21 example, increases, would you go back to a
22 customer that you had an existing contract in

---

442

1  and lay out, look here, our costs have gone
2  up -- I'm specifically talking about the
3  specialty egg side, would you go back to them
4  and say, look, our costs have gone up we need to
5  adjust price?
6      MR. MONICA:  Objection.  Vague.
7      THE WITNESS:  You said two things.
8  You started out talking about commodity and you
9  switched to specialty.
10 BY MR. STUEVE:
11     Q.   Let me back up.  I appreciate
12 that.
13         Let me focus on -- let me just ask
14 you the general question.
15     A.   Okay.
16     Q.   What were your practice if there
17 were a significant change in your input costs
18 and I'm talking about an increase, what was your
19 practice?
20     A.   On which product?
21     Q.   Specialty eggs.
22     A.   Okay.  On specialty eggs the

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

443

1  biggest change in cost is going to be feed.  So
2  if we had a significant increase in feed, yes,
3  we have went back to customers and explained to
4  them what our cost change on feed was and asked
5  for a price increase.  That's typical practice.
6       Q.   Any other change that would
7  precipitate you going back to your customers
8  with respect to specialty eggs?
9       A.   We've had customers change
10  packaging, asked to go from, for example, a pulp
11  carton to either maybe a pulp label carton or to
12  a clear carton.  And there's a significant
13  difference in packaging costs, so if that's a
14  customer request we would go to the customer and
15  explain the difference in the pricing for the
16  packaging and ask for that cost to be passed
17  through.
18       Q.   Okay.  Any other circumstances
19  that would precipitate you going to your
20  customers concerning your specialty egg pricing?
21       A.   If we go to organics, because we
22  purchase organics, if our supplier comes to us

444

1  but their increase would be basically for the
2  same reason.  If they have an increase on
3  organic feed they come to us ask for an
4  increase, so we go to our customers.  So it's a
5  different feed but it's just coming from a
6  different source versus us buying the feed, it's
7  from our supplier.
8       Q.   Any other circumstances?
9       A.   Not during the time selling, only
10  if a new bid came up then it's all start over
11  with the bid.
12       Q.   Now, were the circumstances in
13  which a customer would come to you and ask for a
14  price change with respect to specialty eggs?
15       A.   What's the question?
16       Q.   So let's say, for example, there
17  is a declining Urner Barry market and a customer
18  has a fixed contract with respect to specialty
19  egg pricing, and there's greater and greater gap
20  between their specialty egg price and their
21  commodity egg price.  Would a customer approach
22  you, and I'm talking about Rose Acre and say,

445

1  look, we want to renegotiate our specialty egg
2  price?
3       MR. MONICA:  Objection.
4  Hypothetical and compound.  You may answer.
5       THE WITNESS:  I don't recall that
6  customer coming to me and asking for to us lower
7  a specialty egg fixed price because of the Urner
8  Barry market, no.
9  BY MR. STUEVE:
10       Q.   Do you recall them ever coming to
11  you and ask for you to lower your price?
12       MR. MONICA:  Objection.  Vague.
13       THE WITNESS:  I don't recall a
14  specific instance of that.  No.
15  BY MR. STUEVE:
16       Q.   So sitting here today, you don't
17  ever remember lowering your specialty egg price
18  upon a customer's request?
19       A.   Not during the time we're selling
20  them.  You know, if it's a bid period then
21  you're -- everything's opened up to competition
22  and prices may change at that time, but not

446

1  during the time we're selling them.  No.  I
2  don't recall.
3       Q.   Let's talk about that.  Is
4  there -- have you had customers during that bid
5  process discuss with you the price variance
6  between what they're paying for the specialty
7  eggs and the commodity eggs?
8       MR. MONICA:  Objection.  Vague.
9  You can answer.
10       THE WITNESS:  No.  Not that I
11  recall.  No.
12  BY MR. STUEVE:
13       Q.   Okay.  Let's focus on commodity
14  eggs now.  Are there circumstances in which your
15  input costs changed that you would go to the
16  customer and ask to change the commodity egg
17  price, that you can think of?
18       A.   Yes.
19       Q.   Okay.  Does it happen very often?
20       A.   No.
21       Q.   Okay.  How frequently does it
22  happen?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

447

1      A.   Maybe two or three times over the
2  last ten years.
3      Q.   Okay.  So we're talking about a
4  very infrequent circumstance; is that right?
5      A.   Yes.
6      Q.   All right.  You were sitting there
7  thinking about it.  What's the example you
8  thought about?
9      A.   Well, the carton packaging costs.
10  Recently we've had some surcharging on
11  packaging.  There was a fire at one of the
12  manufacturers, we went to the customers asked
13  them -- a lot of it the customers control their
14  packaging, so since our price went up, we asked
15  for price increases on those.
16      Q.   Now, Mr. Rust, we took his
17  deposition, said that you would track the spread
18  between the Urner Barry quote and the
19  noncertified Urner Barry quote?
20          MR. MONICA:  Objection.
21  Mischaracterizes testimony.
22          THE WITNESS:  There's -- on liquid

448

1  products, only on liquid, there is a certified
2  Urner Barry quote.  There's -- today.  There's
3  no -- there's a noncertified and certified for
4  liquid yolk, whole egg and whites only.
5  Pasteurized and unpasteurized.  There's no Urner
6  Barry -- Urner Barry only quotes one market
7  today for shell eggs.  One market for each
8  region.  Urner Barry puts a brown shell market,
9  as well.
10  BY MR. STUEVE:
11      Q.   The Urner Barry shell egg quote,
12  you're saying there is no distinction between
13  certified and noncertified; is that correct?
14      A.   No.  Today there's only one
15  market.
16      Q.   Has there ever been since 2009 a
17  Urner Barry certified quote and non-Urner Barry
18  certified quote for shell eggs?
19      A.   I -- I don't remember for sure.  I
20  would have to look at the markets.
21      Q.   Where -- what document would you
22  look at to refresh your recollection?

449

1      A.   The Urner Barry markets.
2      Q.   And do you keep that historical
3  data?
4      A.   Yes.
5      Q.   In your files?
6      A.   Yes.
7      Q.   Was that provided to your counsel?
8      A.   Yes.
9      Q.   The -- today, what percentage of
10  the shell egg market is produced by companies
11  that are certified?
12          MR. MONICA:  Objection.  Vague.
13  You can answer.
14          THE WITNESS:  Just shell egg
15  producers?
16  BY MR. STUEVE:
17      Q.   Uh-huh.
18      A.   I don't -- if we're only talking
19  shell eggs, to my knowledge, there's -- it's a
20  large percentage.  I know that -- the only
21  number I know is there's 80, I think roughly
22  85 percent of all producers are participants in

450

1  UEP animal welfare program.
2          Now, the breakdown exactly how
3  many is liquid, how many is shell, I don't know
4  for sure.  I don't know the exact amount, but it
5  would be a large percentage.
6      Q.   Okay.  You mentioned yesterday
7  Sonstegard?
8      A.   Yes.
9      Q.   They sell liquid eggs; right?  The
10  vast majority of their eggs are sold to folks
11  who are egg product companies; right?
12          MR. MONICA:  Objection.  Vague.
13  Compound.  You can answer.
14          THE WITNESS:  They sell liquid
15  products.  They sell dried products and they
16  sell shell eggs.
17  BY MR. STUEVE:
18      Q.   What percentage of their business
19  are they selling shell eggs?
20      A.   I don't know.
21      Q.   It's a pretty small percentage; is
22  it not?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

13 (Pages 451 to 454)

---

451

1      A.   I don't know.  They tend to sell a
2  lot more shell eggs when the markets are
3  favorable to them to sell shell eggs.
4      Q.   Do you know who they sell those
5  shell eggs to?
6      A.   Yesterday I said they sell in
7  California and I didn't know the rest of their
8  customers.
9      Q.   Do you know the name of the
10 company in California?
11     A.   Hidden Valley Ranch.
12     Q.   Okay.
13         (Exhibit Number 573 was marked for
14 identification.)
15 BY MR. STUEVE:
16     Q.   Show you what's been marked as
17 Exhibit 573.
18         MS. REDDING:  Can I get the Bates
19 number?
20         MR. STUEVE:  RAFKS 0010568.
21         MS. REDDING:  Thank you.
22 BY MR. STUEVE:

---

452

1      Q.   Did you review this document in
2  preparation for your deposition today?
3      A.   No.
4      Q.   This is from markets, Rust, and it
5  says to the family.  Do you know who falls
6  within that list?
7      A.   Yes.
8      Q.   Who falls within that list?
9      A.   It would be Lois Rust, Anthony
10 Rust, James Rust, John Rust, Robert Rust, Ruth
11 Ann Hendrix, Karen McQuarry, and I believe some
12 of the grandkids are on the list.  I -- they're
13 either on the family list or the Board list.  I
14 can -- there's some of the previous, the six --
15 besides Lois the other ones I mentioned, some of
16 their kids are on this list, too, but I don't
17 know all of them who's on it.
18     Q.   The Board, who's on that list?
19     A.   On the Board list would be Tony
20 Wesner, David Hurd, Victor Rigterink, myself,
21 then some of the family members we've already
22 mentioned.  Do you want me to go back through

---

453

1  those names?
2      Q.   No.
3      A.   Okay.  And I -- that's the members
4  of the Board.  There are some advisors that I'm
5  not positive if they're on this e-mail.  There's
6  some advisors to the Board.
7      Q.   And do you remember receiving this
8  e-mail in February 2012?
9          MR. MONICA:  If you're on the
10 phone, could you put your outgoing line on mute?
11 We can hear typing.  Thank you.
12         THE WITNESS:  I don't remember it.
13 No.
14 BY MR. STUEVE:
15     Q.   Okay.  You can confirm for me,
16 though, that the certified large price is $0.78
17 compared to the noncertified at 56 and a half
18 which is 21 and a half cent spread; correct --
19 21 and a half cent spread; correct?
20         MR. MONICA:  Objection.  Calls for
21 speculation.
22         THE WITNESS:  I can't confirm that

---

454

1  these numbers are accurate, sitting here, no,
2  without looking them up myself, but --
3  BY MR. STUEVE:
4      Q.   But you can confirm those are the
5  numbers in the e-mail; correct?
6      A.   Those are the numbers written
7  here, correct.
8      Q.   The numbers that are contained in
9  this e-mail from Marcus Rust shows the
10 difference between $0.78 and 56 and a half cents
11 for the noncertified is 21.5 cent difference;
12 correct?
13     A.   Those are numbers that are written
14 here for that particular day in sales trading.
15     Q.   And can you tell what the source
16 was he was relying on?
17     A.   In the e-mail -- if this is
18 correct, it states Egg Clearinghouse, Inc.
19     Q.   And was that a website that you
20 utilized?
21     A.   That me personally?
22     Q.   Yeah.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

---

**455**

1    **A.  Yes.  I use Egg Clearinghouse.**
2    Q.  And what -- what are the reasons
3 you use it?
4    **A.  To trade surplus and -- to trade**
5 **eggs and to buy eggs on.**
6    Q.  Okay.  And do you trade and buy
7 eggs for Rose Acre?
8    **A.  I'm responsible to oversee the**
9 **person that works with the Egg Clearinghouse.**
10    Q.  And who is that person?
11    **A.  Bob Niewedde.**
12    Q.  He is?
13    **A.  And -- for shell eggs, and Aaron**
14 **Heironimus for liquid eggs.**
15    **(Exhibit Number 574 was marked for**
16 **identification.)**
17 BY MR. STUEVE:
18    Q.  Show you what's been marked as
19 Exhibit 574, and I'm just going to ask you about
20 the top e-mail there in 574.  Bates range is
21 RAFKS 0000603.
22    In the spring of 2012, Sparboe was

---

**456**

1 not UEP certified; correct, sir?
2    **A.  I don't remember for sure.  I know**
3 **they rejoined.  I don't know exactly when.**
4    Q.  The difference between what they
5 were selling their eggs for in the spring of
6 2012 compared to Rose Acre's certified eggs
7 shows a $0.24 gap; correct?
8    MR. MONICA:  Objection.  Calls for
9 speculation.  Misstates what this document says.
10 You can answer.
11    THE WITNESS:  Can you repeat the
12 question?
13 BY MR. STUEVE:
14    Q.  Yeah.  The -- what's reflected in
15 here by Marcus Rust is a $0.24 gap between Rose
16 Acre's price, DF, I assume Dutch Farms, right,
17 and Sparboe's; correct?
18    MR. MONICA:  Objection.  You can
19 answer.
20    THE WITNESS:  I mean, I don't know
21 if these are real numbers, but in this e-mail
22 that you're showing me, it shows that there's a

---

**457**

1 difference of $0.24; correct.
2 BY MR. STUEVE:
3    Q.  Then what Marcus Rust is saying is
4 we need the ability to do both if we want to
5 keep our business in certain areas.  He's
6 referring to the ability to sell both certified
7 and noncertified; correct, sir?
8    MR. MONICA:  Objection.  Calls for
9 speculation.  You can answer.
10    THE WITNESS:  I can't tell you
11 what Marcus was thinking here.
12 BY MR. STUEVE:
13    Q.  Well, let's read it.
14    Our price to DF, would be Dutch
15 Farms, right, would have been $1.08.  One and a
16 half of Dutch Farms' buyers do not care about
17 UEP certification.  Did I read that correctly?
18    **A.  Yes.**
19    Q.  We need the ability to do both if
20 we want to keep our business in certain areas.
21 Did I read that correctly?
22    **A.  Yes.**

---

**458**

1    Q.  What he's referring to there is
2 the ability to sell both UEP certified and
3 noncertified; correct, sir?
4    MR. MONICA:  Objection.  Calls for
5 speculation.  You can answer.
6    THE WITNESS:  I can't tell you
7 what Marcus is thinking here.
8 BY MR. STUEVE:
9    Q.  Because Rose Acre has agreed that
10 it will only market certified eggs, it's
11 precluded from selling noncertified eggs to
12 Dutch Farms; correct, sir?
13    **A.  No.**
14    MR. MONICA:  Objection.
15 BY MR. STUEVE:
16    Q.  It's not?
17    **A.  No.**
18    Q.  Okay.  It's your testimony that
19 Rose Acre has not agreed to the 100 percent
20 rule?
21    MR. MONICA:  Objection.
22    THE WITNESS:  I didn't say that.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

15 (Pages 459 to 462)

---

459

BY MR. STUEVE:

Q.   Okay.  What do you understand the 100 percent rule to be, sir?

**A.   That under the 100 percent rule, all eggs that Rose Acre produces will be UEP certified.**

Q.   Right, so all of the eggs it does produce is UEP certified; right?

**A.   Correct.  Except for the cage-free.**

Q.   And so Rose Acre is unable to sell the eggs it produces to Dutch Farms -- let me back up.

Rose Acre has no noncertified eggs that it produces that it could sell to Dutch Farms; correct?

**A.   That we produce, but I can sell noncertified eggs.**

Q.   I'm not asking about -- you would have to go out and buy those; right?

**A.   Yes.**

Q.   Who would you buy those from?

---

460

**A.   From a noncertified producer.**

Q.   Like who?

**A.   Like Sparboe or Kryder come to mind.**

Q.   As far as the eggs you produce from your 22 million hens, you could not sell a single one of those to a Dutch Farms if they're looking for noncertified; correct, sir?

MR. MONICA:  Objection.

THE WITNESS:  On my own production of eggs that are non cage-free, they would all be UEP certified on my production.

BY MR. STUEVE:

Q.   Your cage-free are not certified; is that correct?

**A.   Today there's no certified rules today, certification on -- they would meet -- our cage-free meet all the guidelines for UEP certified, so you can put UEP certified, but there is no written standard today.  They're working on standards for -- currently working on standards for cage-free and organics.**

---

461

Q.   Your cage-free eggs are not certified UEP; correct, sir?

**A.   They do meet the UEP guidelines.**

Q.   There is no certification process, correct?

**A.   But you can use the certification -- they exceed the current guidelines.**

Q.   If you can answer my question, there is no certification program currently being utilized by UEP with respect to cage-free; is that correct, sir?

MR. MONICA:  Object.  Give me a chance to object, you changed the question on him but you can go ahead and answer.

THE WITNESS:  Our cage-free eggs exceed the UEP certified guidelines so we can use the UEP certified on the cage-free eggs today.  What I stated was the UEP is in the process currently to write guidelines specifically for cage-free eggs, but you do because we already meet the UEP guidelines with certified because there's no cages and one of the guidelines is

---

462

67 square inches for the birds, and since there's no cages, we meet the guidelines along with the other animal humane standards for those birds, we treat them all the same so we can use the UEP certified shield on cage-free eggs today.

BY MR. STUEVE:

Q.   Mr. Hinton, are you changing your testimony you just gave five minutes ago that your cage-free eggs are not certified?

MR. MONICA:  Objection mischaracterizes his prior testimony.  Asked and answered.  You can answer.

THE WITNESS:  Okay.  I explained to you what -- how we can use the UEP certified shield.  And that I also stated that the UEP is in the process of writing guidelines specifically for cage-free eggs.  So we can use the certified shield on cage-free eggs and we do.

BY MR. STUEVE:

Q.   Sir, there's no 100 percent rule

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II       March 18, 2014

16 (Pages 463 to 466)

---

463

that applies to cage-free eggs; correct?

MR. MONICA: Objection.
Foundation. You can answer.

THE WITNESS: By definition,
cage-free meets the rule.

BY MR. STUEVE:

Q. Sir, you're not obligated -- you
can sell cage-free eggs that do not meet the UEP
animal welfare guidelines; correct?

A. I can -- you said I can sell
cage-free eggs that don't meet it?

Q. Yeah.

A. Yes.

Q. That's not true with respect to
your caged eggs -- caged hen; right?

MR. MONICA: Objection. Asked and
answered.

THE WITNESS: No. I can sell
caged eggs, too, that don't meet it.

BY MR. STUEVE:

Q. You cannot sell caged eggs that
you produce that do not meet the certified?

---

464

A. That's a different question. That
I produce? No.

Q. Now, if you could, could you turn
to topic 28. This is your contacts with the
State of Kansas including purchase, sale,
marketing, offer for sale, attempted sale, or
manufacture of any goods or services in Kansas,
along with any business relationships you have
with entities in Kansas. Do you see that?

A. Yes.

Q. What did you do to prepare for
this topic?

A. I have personal knowledge of this
topic.

Q. Okay. Tell me what your personal
knowledge is?

A. We have a couple shell egg
customers in the State of Kansas, Aldie in
Olathe, Kansas, and AWG in Kansas City. And
then our -- in reference to contacts -- then we
have Menu Foods, it's inedible, that buys
inedible egg powder for pet food in Kansas. In

---

465

relation to the contact with the State of Kansas
we pay egg taxes so that's our only contact that
I know of with the State of Kansas is the fact
that we pay taxes to the State of Kansas.

Q. With respect to doing business in
Kansas, you do business with Aldie's that are
located in Olathe, Kansas?

A. Yes.

Q. How long has that been the case?

A. Ever since they've been there,
probably more than 15 years.

Q. With respect to Menu Foods?

A. Yes.

Q. How long have you been doing
business with Menu Foods?

A. Probably more than ten years.

Q. And how long have you been paying
egg taxes?

A. Since we've been selling eggs in
Kansas since Aldie's.

Q. What about Hy-Vee? Aren't your
eggs sold at Hy-Vee stores in Kansas?

---

466

A. If -- if there's Hy-Vee stores in
Kansas, yes.

Q. And, again, how long have you been
selling Rose Acre eggs at Hy-Vee stores?

A. We've been supplying the Hy-Vee
warehousing in Atheny, Iowa since approximately
May of 2012.

Q. And is it your testimony you
didn't do business with any Hy-Vee stores prior
to that?

A. No.

Q. Is that correct?

A. No.

Q. That's not correct?

A. No.

Q. Okay. With respect to Hy-Vee
stores, how long have you been doing business
with Hy-Vee stores?

A. Most recently was 2012 when we
started supplying all the Hy-Vee stores.

Q. Okay.

A. Prior to that, we've sold eggs to

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

467

1  Hy-Vee, and I don't know what stores they went
2  to.  We was -- we was one of their suppliers
3  back -- I'm not sure of the exact year.  It
4  was -- I can't remember if it was prior to 2000
5  or after 2000, but we were supplying some eggs
6  to Hy-Vee.
7      Q.  Starting in either late 1999 or
8  early 2000; is that correct?
9      A.  I don't remember the exact year,
10 sir.
11     Q.  Would that be true up through
12 2012?
13     A.  No.
14     Q.  So you stopped at some point and
15 then started back up?
16     A.  Yes.
17     Q.  Okay.  Any other business in the
18 State of Kansas?
19     A.  Not that I can think of.
20     Q.  You talked about your efforts to
21 solicit business from AWG in 2004, 2006 and 2009
22 and then in early 2013; is that correct, sir?

468

1      A.  Well, they came to us in 2006 and
2  2013 and asked us for -- but, yes, we've talked
3  with AWG about doing business.
4      Q.  You testified about those various
5  times in your testimony yesterday; right?
6      A.  Yes.
7      Q.  Those would have been contacts
8  with AWG's headquarters in Kansas City, Kansas;
9  correct?
10     A.  If it's Kansas.  Like I said, I
11 get confused with Kansas City.
12     Q.  Have you solicited business from
13 anyone else, any other customers in Kansas?  And
14 I'm focusing on '99 up through today?
15     A.  Yes.
16     Q.  Can you identify those instances?
17     A.  Kroger and I believe Wal-Mart has
18 a warehouse in Kansas that we bid on.  Kansas or
19 Oklahoma.
20     Q.  There's a Wal-Mart warehouse right
21 next to AWG's.  Would that have been the one?
22     A.  If that's the case, it may have

469

1  been.  Yes.  It would be in my files.
2      Q.  Okay.  When did you solicit that
3  business?
4      A.  It would have been in when
5  Wal-Mart did their bid in 2012.
6      Q.  And what about Kroger?
7      A.  It was in 2011.
8      Q.  And what stores in Kansas?
9      A.  The Dillons.
10     Q.  Do you know, are the Dillons
11 stores are they owned by Kroger?
12     A.  They're owned by Kroger.
13     Q.  And approximately how many Dillon
14 stores are there in Kansas?
15     A.  I don't know.
16     Q.  Okay.  Now, what about your
17 distributors?  Have they distributed Rose Acre
18 eggs in the State of Kansas from 1999 to the
19 present?
20         MR. MONICA:  Objection.  Calls for
21 speculation.
22         THE WITNESS:  I --

470

1  BY MR. STUEVE:
2      Q.  Let's take Dutch Farms.
3      A.  Okay.  They sold to AWG in the
4  past.
5      Q.  And would those have been Rose
6  Acre eggs?
7      A.  They would have been my eggs, but
8  it would have been AWG's cartons.
9      Q.  They would have been Rose Acre
10 eggs?
11     A.  Yes.
12     Q.  And do you remember what time
13 period?
14     A.  No.  Like I testified yesterday, I
15 couldn't remember if that was prior to '99 or
16 not.
17     Q.  What about any other customers of
18 Dutch Farms in Kansas?
19     A.  I don't know where all Dutch
20 Farms -- I don't know all their customers.
21     Q.  What about other distributors here
22 that are in the Midwest?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II　　　　　March 18, 2014

18 (Pages 471 to 474)

---

471

1　　　　MR. MONICA:  Objection.  Vague.
2　　　　THE WITNESS:  Distributors of mine
3　that may sell eggs into Kansas?
4　BY MR. STUEVE:
5　　　Q.   Yeah.
6　　　**A.   I'm not aware of any of them.**
7　**It's possible.  I don't know where they all sell**
8　**their eggs.**
9　　　Q.   Okay.
10　　　MR. STUEVE:  I need to take a
11　quick restroom break here.
12　　　MR. MONICA:  Sounds good.
13　　　THE VIDEOGRAPHER:  The time is
14　9:15 a.m. and we're going off the record.
15　　　(A brief recess was taken.)
16　　　THE VIDEOGRAPHER:  This is the
17　start of media unit number two.  The time is
18　9:27 a.m. and we are back on the record.
19　BY MR. STUEVE:
20　　　Q.   In the last five years, has Rose
21　Acre purchased non-certified shell eggs and sold
22　them to one of its shell egg customers?

---

472

1　　　**A.   No.  Not that I can think of.**
2　　　Q.   If you could turn to topic 20.
3　It's my understanding starting with topic 20,
4　subpart F through J, you have been designated to
5　testify on behalf of Rose Acre; is that correct,
6　counsel?
7　　　MR. MONICA:  That's correct.
8　BY MR. STUEVE:
9　　　Q.   Are you aware of that?
10　　　**A.   Yes.**
11　　　Q.   I'm going to jump around here a
12　little bit.  Let's talk about 20 G, which
13　states, your knowledge of and participation in
14　any industry or collective efforts to decrease
15　the egg supply or raise the price of eggs and
16　egg products including through early or
17　coordinated molts, changes in flock disposal or
18　flock kills, changes to chick placement or
19　hatch, hen house vacancies, reduction or
20　elimination of backfilling and/or other layer
21　hen reductions.  Do you see that?
22　　　**A.   Yes.**

---

473

1　　　Q.   What did you do to prepare
2　yourself for that topic?
3　　　**A.   I reviewed our molts and**
4　**backfilling practices with David Hurd.**
5　　　Q.   And you testified about your
6　discussion with Dave Hurd; is that right?
7　　　**A.   Yes.  I did.**
8　　　Q.   Anything else?
9　　　**A.   No.  Just my knowledge of the**
10　**subject.**
11　　　Q.   Now, did you have any contact with
12　United Egg Producers or United States Egg
13　Marketers prior to Rose Acre joining UEP in
14　early 2002?
15　　　**A.   Contact with a specific person or**
16　**you mean -- I guess I don't -- I mean, you're**
17　**talking about an organization, so that's not a**
18　**person.**
19　　　Q.   Do you not understand my question?
20　　　**A.   I guess not.**
21　　　Q.   Okay.  It's my understanding based
22　on Marcus Rust's testimony that Rose Acre joined

---

474

1　United Egg Producers in early 2002; is that
2　correct?
3　　　**A.   Yes.**
4　　　Q.   Prior to that time, did you have
5　any contact with United Egg Producers?
6　　　**A.   I guess who do you mean by United**
7　**Egg Producers?**
8　　　Q.   Anyone that was involved with the
9　management or direction of United Egg Producers?
10　　　**A.   Yes.**
11　　　Q.   Who?
12　　　**A.   Al Pope.  Gene Gregory.  Prior to**
13　**'02.  Those two for sure.  I had contact with.**
14　　　Q.   Okay.  Describe to me the nature
15　of that contact?
16　　　**A.   I would see them at industry**
17　**meetings.**
18　　　Q.   And what industry meetings are you
19　referring to, sir?
20　　　**A.   The -- the Urner Barry marketing**
21　**conference.**
22　　　Q.   Any others?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

475

1       A.   Yeah.  The International Egg
2   Commission Conference.
3       Q.   Any others?
4       A.   Not that I can recall.  Well, I
5   saw them at the -- back then it was called
6   Southeastern it's a trade show in Atlanta.
7       Q.   Who sponsored that?
8       A.   The US Poultry and Egg
9   Association.
10      Q.   And where are they located?
11      A.   Atlanta, Georgia.
12      Q.   And who ran the US Egg and Poultry
13  Association?
14      A.   During when?
15      Q.   This is prior to 2002 when you had
16  had contact with Al Pope and Gene Gregory?
17      A.   I believe Don Balton was the
18  president then.
19           MR. MONICA:  Mr. Hinton, please
20  let him finish his questions.
21  BY MR. STUEVE:
22      Q.   What was -- was Rose Acre a member

---

476

1   of the US Egg and Poultry Association?
2       A.   Yes.
3       Q.   From what timeframe?
4       A.   I don't know exactly when we
5   joined.  It could have been in the '80s possibly
6   I don't remember exactly when.
7       Q.   Certainly in the '90s, you would
8   have been members?
9       A.   Yes.
10      Q.   Are you members today?
11      A.   Yes.
12      Q.   Approximately what percentage of
13  the egg producers are members of the US Egg and
14  Poultry Association?
15      A.   I -- I don't know.
16      Q.   Is there a fair number?
17      A.   I believe so.
18      Q.   And do they host a -- do they host
19  an annual meeting?
20      A.   No -- well, they host an annual
21  trade show.
22      Q.   And where is that held?

---

477

1       A.   In the Georgia Conference Center
2   in Atlanta, Georgia.
3       Q.   Has that been true --
4       A.   Ever since I've been in the egg
5   business.
6       Q.   When did you start going to the US
7   Egg and Poultry Association's trade show?
8       A.   It could have been the early '80s.
9   I can't remember which year.
10      Q.   All right.  Who else would
11  accompany you?
12      A.   Do you want specific names?
13      Q.   Yes.
14      A.   Over the last 30 years?
15      Q.   Uh-huh.
16      A.   Okay.  Start back at the
17  beginning.  Bill Knott.  Fred Lewis.  John
18  Solidine.  David Hurd.  David Rust.  Randy
19  Lawson.  Gary Johns.  Peggy Johns.  Ralph
20  Miller.  Ty Harweger.  Ralph Miller.  Marcus
21  Rust.  Victor Rigterink.  KY Hendrix.  Robert
22  Rust.  Josh Marcott.

---

478

1       Q.   Can you spell that, please?
2       A.   M-A-R-C-O-T-T.
3       Q.   Okay.
4       A.   Kent Ford.  Amanda Jackson.  Ralph
5   Long.  Joe Easton, Ron Swafford,
6   S-W-A-F-F-O-R-D.  There's many, many others.
7   More can't come to mind right now.
8       Q.   Why don't we just focus on the
9   last ten years, so since 2000?
10      A.   Okay.
11      Q.   Folks that are still employed at
12  Rose Acre?
13      A.   Okay.
14      Q.   Would that include then David
15  Hurd, Amanda Jackson?
16      A.   Yes.
17      Q.   And who else?
18      A.   The ones, if I can recall -- since
19  I don't have them in front of me, I'll try to
20  recall the ones no longer with us that I
21  mentioned.
22      Q.   Bill Knott?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

20 (Pages 479 to 482)

---

479

1    **A.  No longer with us.**
2    Q.  When did he leave?
3    **A.  Sometime in the '80s probably.**
4    Q.  Fred Lewis?  No longer with Rose
5  Acre?
6    **A.  No longer with us.  Sorry.**
7    Q.  Has he been gone for some time?
8    **A.  Long time.**
9    Q.  John Solidine?
10    **A.  Long time gone.**
11    Q.  David Rust?
12    **A.  He passed away.**
13    Q.  Is that Lois' husband?
14    **A.  Her first -- her ex-husband.**
15    Q.  Okay.  Randy Lawson?
16    **A.  Still with us.**
17    Q.  Has he been going for the last
18  several years?
19    **A.  He didn't go this past year with**
20  **us.**
21    Q.  What's his role at Rose Acre?
22    **A.  Maintenance, egg graders.**

---

480

1    Q.  Gary Johns?
2    **A.  Still with us.**
3    Q.  What's his role?
4    **A.  Maintenance on egg graders.**
5    Q.  Peggy Johns?
6    **A.  She's still with us.**
7    Q.  What's her role?
8    **A.  She works with our SQF with our**
9  **egg safety.**
10    Q.  Ralph Miller?
11    **A.  He's still with us.**
12    Q.  What's his role?
13    **A.  He's pullet manager.**
14    Q.  And Ty Harweger is still; right?
15    **A.  Yes.**
16    Q.  Joe Easton?
17    **A.  He's feed department.**
18    Q.  Ron Swafford?
19    **A.  He's our quality manager for shell**
20  **egg quality.**
21    Q.  Okay.  Then Ralph Miller?
22    **A.  He's still with us.  He's a**

---

481

1  regional complex manager.
2    Q.  Okay.  Marcus Rust we know about.
3  Victor Rigterink, we know about.  KY Hendrix?
4    **A.  He's retired.**
5    Q.  When did he stop going?
6    **A.  It would have been a few years**
7  **ago.**
8    Q.  Robert Rust?
9    **A.  He's our -- in the IT department.**
10    Q.  John Marcott?
11    **A.  He's in the IT department.**
12    Q.  Kent Ford?
13    **A.  He's our purchasing manager.**
14    Q.  And what is he -- what's his
15  general responsibility?
16    **A.  He's purchasing.  He purchases --**
17  **he's over all of our, basically supplies.  He's**
18  **just our purchasing agent that purchases for the**
19  **company.**
20    Q.  Whatever supplies are necessary to
21  run the various production facilities he's
22  responsible for buying all that, all those

---

482

1  materials?
2    **A.  Yes.  He's responsible for all the**
3  **POs.  His department writes all the POs.**
4    Q.  POs means purchase orders?
5    **A.  Purchase orders.  So he don't**
6  **necessarily negotiate all the things -- the**
7  **regional managers for each farm that they would,**
8  **you know, decide some of the big major items,**
9  **but just general day to day things, you know,**
10  **soap for the washers, things like that, I mean**
11  **he would oversee tape for tape machines.  He**
12  **works with the packaging suppliers.**
13    Q.  And then we talked about Amanda
14  Jackson.  Is it Ralph Long?
15    **A.  Yes.  He's pullet manager.**
16    Q.  So currently is there a fairly
17  large contingency that goes to the trade show?
18    **A.  I believe there was maybe eight of**
19  **us this past year.**
20    Q.  Okay.  And then approximately how
21  many folks typically go to the United Egg
22  Producers annual meeting?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

21 (Pages 483 to 486)

---

483

1     A.   The annual meeting?
2     Q.   Yeah.
3     A.   Maybe five or six.
4     Q.   I want to move back to prior to
5   2002, we're talking about your contact with Al
6   Pope and Gene Gregory, so at these annual
7   Southeastern trade shows they would be there on
8   behalf of United Egg Producers; is that correct?
9     A.   Yes.
10    Q.   You would have contact with them
11   during that time?
12    A.   Yes.  They had a booth.  They
13   always had a booth at the show.  I can't recall
14   any time.  But I mean, they had a booth and I
15   would go past their booth.
16    Q.   Okay.  You also indicated that you
17   would see them at the International Egg
18   Commission Conference?
19    A.   Yes.
20    Q.   Was that an annual conference?
21    A.   Yes.  There's a spring and a fall.
22    Q.   Would you go to both, typically?

---

484

1     A.   Early on, I went to a few of the
2   falls.  In recent years, I've been going to
3   both.
4     Q.   Prior to 2002?
5     A.   Prior to 2002, I think I may have
6   just went to the fall.
7     Q.   Would they have a booth there, Al
8   Pope and Gene Gregory?
9     A.   No.
10    Q.   You would just see them there?
11    A.   Al, no.  Gene, after Al retired,
12   Gene came to a few, I remember.
13    Q.   But Al Pope would have been prior
14   to 2002 would have been the head?
15    A.   It would have been Al then, yes.
16    Q.   Gene Gregory was kind of his right
17   hand man at that time?
18    A.   Yes.
19    Q.   All right.  Then you also
20   mentioned the Urner Barry marketing conference.
21   How often was that?
22    A.   It's annual.

---

485

1     Q.   Where is that at?
2     A.   It -- '02.  Years ago it was in
3   Atlantic City.  Then it moved to Las Vegas.  It
4   was in Orlando one year and then went back to
5   Vegas.  It's been in Vegas ever since.
6     Q.   Would UEP have a booth there?
7     A.   No.  There's no booths.
8     Q.   You would run into them there; is
9   that correct?
10    A.   Yes.
11    Q.   Did you ever, prior to 2002,
12   attend any of the United Egg Producers meetings?
13    A.   Not that I recall.
14    Q.   Anyone else from Rose Acre attend
15   any of the United Egg Producers meetings prior
16   to 2002?
17    A.   I don't remember for sure.  I
18   don't -- I don't know.
19    Q.   Did you participate in any of
20   their committees prior to 2002, either you or
21   anybody at Rose Acre?
22    A.   Not that I recall.

---

486

1     Q.   Okay.  So other than these
2   contacts at the conferences, you had no other
3   contact with Al Pope or Gene Gregory; is that
4   correct?
5         MR. MONICA:  Objection.  Vague.
6   Ambiguous.
7         THE WITNESS:  It's too long ago
8   for me to remember.  I remember seeing them at
9   the conferences, but I don't recall.
10   BY MR. STUEVE:
11    Q.   Okay.  So you knew who they were?
12    A.   Yes.
13    Q.   You knew what United Egg Producers
14   was about?
15    A.   Yes.
16    Q.   Did you receive any of their --
17   they have this United Voices.  Would you receive
18   their newsletter prior to 2002?
19    A.   Not that I know of.
20    Q.   Anyone else at Rose Acre?
21    A.   Not that I recall.
22    Q.   Do you ever remember being

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

487

1  solicited to join United Egg Producers prior to
2  2002?
3           MR. MONICA:  By you, you mean Rose
4  Acre; right?
5           MR. STUEVE:  Uh-huh.
6           THE WITNESS:  For Rose Acre to be
7  solicited?
8  BY MR. STUEVE:
9     Q.    Yeah.
10    A.    Yeah.  I think so.  I think that
11 in conversations that -- don't know exactly
12 when, and if it was one of the conferences.  I
13 mean, I solicited a meeting -- you know, you
14 guys ought to be thinking about joining United
15 Egg Producers.  There could have conversations.
16 I'm sure there was.
17    Q.    Did you attempt to encourage
18 management to join United Egg Producers?
19    A.    Did I personally?
20    Q.    Yes.
21    A.    No.
22    Q.    Did you have a view one way or the

488

1  other?
2     A.    No.  Before 2002?  No.
3     Q.    Were you involved in the decision
4  to join in 2002?
5     A.    Yes.
6     Q.    You were involved?
7     A.    Yes.
8     Q.    How were you involved?
9     A.    Because in 2002 with the animal
10 welfare program, I had customers that were going
11 to require the UEP certified program and so I
12 was asked by Marcus about, you know, customers
13 and what it would mean if we, you know, weren't
14 a member.  I said we would lose customers over
15 it if we didn't join.  So ultimately, it wasn't
16 my decision, but I was asked questions about it.
17    Q.    And when did you have this
18 conversation with Marcus?
19    A.    I don't remember for sure.  It
20 would have been prior to joining.
21    Q.    All right.  And we believe we've
22 looked at the documents it was in February 2002

489

1  that they joined.  Do you know how much earlier
2  prior to February 2002 you would have had this
3  conversation?
4     A.    No.  I don't.
5           MR. MONICA:  Let him finish.
6  BY MR. STUEVE:
7     Q.    Do you recall documenting at that
8  time the communication with any customer that --
9  about the UEP certified program?
10    A.    I don't remember.
11    Q.    Do you remember the specific
12 customer that you believe had indicated to you
13 that if Rose Acre did not join the UEP certified
14 program, they would drop your business?
15    A.    Wal-Mart.
16    Q.    Who at Wal-Mart told you that?
17    A.    CCF Brands.
18    Q.    So this was the egg broker for
19 Wal-Mart told you that?
20    A.    It was -- CCF Brands was a company
21 I sold eggs to that supplied Wal-Mart.
22    Q.    Any other customers?

490

1           MR. MONICA:  Objection.  Vague.
2           THE WITNESS:  Kroger is one of my
3  customers who wanted UEP certified also.
4  BY MR. STUEVE:
5     Q.    I'm asking you prior to joining,
6  do you recall anyone else other than CCF Brands
7  telling you that if you did not join the UEP
8  certified program, you would lose business?
9           MR. MONICA:  Objection.  You can
10 answer.
11          THE WITNESS:  Kroger.
12 BY MR. STUEVE:
13    Q.    Who at Kroger?
14    A.    Gary Stull.
15    Q.    Is he still with Kroger?
16    A.    No.
17    Q.    What was his position at Kroger at
18 the time?
19    A.    Egg buyer.
20    Q.    And when did you have this
21 conversation with Gary Stull?
22    A.    I don't remember exactly.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II
March 18, 2014

---

491

1  Q.   Was it prior to Rose Acre joining
2  UEP?
3  A.   I had a lot of conversations with
4  Gary.  I can't recall exactly the timeframe.
5  Q.   It could have been afterwards?
6  A.   Like I said, I don't exactly
7  recall when.
8  Q.   Okay.  Do you have any specific
9  recollection of any customer other than Wal-Mart
10  that you're sure that you had a communication
11  with prior to joining UEP?
12  A.   I had conversations with customers
13  every day.  If you're asking me prior to 2000 --
14  I just can't remember.
15  Q.   But you do have a specific
16  recollection that CCF Brands told you prior to
17  Rose Acre joining UEP that if they didn't join
18  the UEP certified program, that they would lose
19  business?
20  MR. MONICA:  Objection.  Asked and
21  answered.  You can answer again.
22  THE WITNESS:  I was told

---

492

1  specifically by CCF Brands that Wal-Mart was
2  going to require us to be part of the UEP
3  certified egg program.
4  BY MR. STUEVE:
5  Q.   And you were told that prior to
6  Rose Acre joining UEP.  Is that your testimony?
7  A.   To the best I can recall.
8  Q.   Now, at that time, did Rose Acre
9  have an animal welfare program in place?
10  A.   We've always had -- taken care of
11  our birds, because they're our livelihood.
12  Without our birds, we're out of business.  So
13  yes, we have an animal welfare program.  It
14  wouldn't have been spelled out specifically like
15  the scientific guidelines like the UEP program,
16  but we've always taken care of our birds.
17  Q.   Did Rose Acre explore the
18  possibility of adopting standards that Wal-Mart
19  had been supporting at that time, non-UEP
20  standards?
21  MR. MONICA:  Objection.  Calls for
22  speculation.

---

493

1  THE WITNESS:  I'm not sure.  Which
2  standards are you referring to for Wal-Mart?
3  BY MR. STUEVE:
4  Q.   Were you aware of other standards
5  that were being implemented, for example, by FMI
6  at that time?
7  A.   In regards to FMI, back then it
8  was my understanding that FMI, at the direction
9  of their member supermarkets, were wanting --
10  because of pressure from the animal rights
11  groups, that there was pressure onto the
12  supermarkets that they needed to adopt some
13  animal welfare program guidelines.  And that's
14  when the contact from what I remember was made
15  with -- UEP made contact or FMI jointly along
16  with NCCR, National Council of Chain Restaurants
17  had meetings with UEP to discussed formulation
18  of a scientific based animal welfare guideline
19  that could be standard through the industry so
20  we didn't end up with multiple animal welfare
21  programs for every customer.
22  And for us as a company, for Rose

---

494

1  Acre, it was very important to have a standard
2  base because we sold to so many different
3  supermarkets it would have been hard to operate
4  our farms if we was operating under different
5  guidelines for many different customers.
6  Q.   When did you -- you testified
7  about this contact between UEP and FMI.  You
8  just testified about that?
9  A.   Yes.
10  Q.   Was that during the time -- did
11  that occur prior to Rose Acre joining UEP or
12  afterwards?
13  A.   I don't recall.
14  Q.   What's the basis of that
15  understanding you just testified to?
16  A.   Basis?
17  Q.   Were you involved on behalf of UEP
18  with those discussions with FMI?
19  A.   No.
20  Q.   What is the source of the
21  information that you just testified to under
22  oath?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

24 (Pages 495 to 498)

---

**495**

1      A.   It would have been either
2    discussions or information coming from UEP.  And
3    I believe there was letters that provided --
4    that was communications between FMI and NCCR and
5    UEP that was back and forth to the heads of the
6    organizations discussing it.
7      Q.   Is it your testimony as a non-UEP
8    member, you would have been receiving these
9    communications?
10         MR. MONICA:  Objection as to
11   timeframe.
12         THE WITNESS:  No.  It depends -- I
13   don't know when I would have received the
14   documentations.
15   BY MR. STUEVE:
16     Q.   Sir, when do you believe -- first
17   of all, you've already testified you weren't
18   involved in the communications that supposedly
19   took place between UEP and FMI; correct?
20     A.   Correct.
21     Q.   You can't tell me sitting here
22   when those communications supposedly took place;

---

**496**

1    is that correct, sir?
2      A.   Not sitting here today.  No.
3      Q.   Okay.  And who told you about
4    these supposed communications that took place
5    between UEP and FMI?
6      A.   I don't remember exactly.
7      Q.   Were you aware of an animal
8    welfare audit that FMI had in place in 2002?
9          MR. MONICA:  Objection.
10   Mischaracterizes, in place.
11         THE WITNESS:  I don't remember.
12   BY MR. STUEVE:
13     Q.   Did you attempt to investigate,
14   prior to 2002, the standards that were being
15   required by McDonald's?
16     A.   I was aware that McDonald's was
17   formulating standards.  Yes.
18     Q.   Did you evaluate those before
19   making the decision to join UEP certified
20   program?
21     A.   I don't recall when McDonald's
22   issued their standards.

---

**497**

1      Q.   I'm asking you, do you recall
2    evaluating McDonald's standards before making
3    the decision to join?
4      A.   I don't remember.
5      Q.   Did you investigate whether there
6    were other scientific based standards out there
7    that UEP -- excuse me, that Rose Acre could
8    adopt?
9          MR. MONICA:  You can answer, but
10   I'm going to lodge an objection, he's not been
11   designated on these topics.  You used the term
12   you.  You can give him your personal knowledge.
13   Go ahead and answer the question.
14         THE WITNESS:  I'm not personally
15   aware -- I wouldn't be personally aware of it.
16   No.
17   BY MR. STUEVE:
18     Q.   Okay.  Now, you were aware that
19   Rose Acre had concerns about the fact that UEP,
20   before they joined it, was engaged in management
21   supply programs.  Were you aware of that?
22         MR. MONICA:  Objection.

---

**498**

1    Mischaracterizes the truth.
2          THE WITNESS:  No.  I wasn't.
3    BY MR. STUEVE:
4      Q.   Were you aware that Lois Rust
5    believed that UEP would engage in shady deals?
6          MR. MONICA:  Objection.
7    Mischaracterizes the truth and also vague and
8    ambiguous, calls for speculation.
9          THE WITNESS:  No.  I'm not aware
10   of that.
11   BY MR. STUEVE:
12     Q.   Were you aware of Marcus Rust's
13   intense distrust of UEP and in particular Al
14   Pope and Gene Gregory?
15     A.   No.  I'm not aware of that.
16     Q.   Were you aware of Marcus Rust's
17   intense distrust of Brann & Isaacson, the law
18   firm that provided compliance advice to UEP?
19     A.   No.  I'm not aware of that.
20     Q.   Were you aware that before Rose
21   Acre joined the certified program that Rose Acre
22   was concerned about the underlying purpose of

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

25 (Pages 499 to 502)

---

499

the certified program, that their concern was
that it was being used to restrict the supply of
eggs and boost prices under the false pretense
of an animal welfare program?

MR. MONICA: Objection.

MS. REDDING: Objection.

MR. MONICA: Mischaracterizes
facts.

THE WITNESS: You have to read
that back. That was a lot.

(The record was read as
requested.)

MR. MONICA: Assert the same
objection. Add compound to my objection. You
can go ahead and answer if you understand.

THE WITNESS: No. I'm not aware
of that.

BY MR. STUEVE:

Q. No one at Rose Acre shared with
you that they were concerned that the certified
program and specifically its restriction on cage
space was being used to boost prices under the

---

500

alleged agenda of animal rights; is that
correct?

MR. MONICA: Objection. Assumes
facts not in evidence. Compound. You can
answer.

THE WITNESS: No. I'm not aware
of that.

BY MR. STUEVE:

Q. When you joined UEP -- I'm talking
about Rose Acre, you in particular were involved
in several of the committees; is that correct,
sir?

Let me rephrase that. Let me
rephrase that.

A. Okay.

Q. I got my yous mixed-up here. When
UEP joined -- and excuse me. Back up.

When Rose Acre joined UEP in early
2002, there were several members of Rose Acre
that became involved in the UEP; correct?

A. I don't know what you mean by
several, but I know I personally served on at

---

501

**least one committee, and I believe Marcus Rust**
**served on the Board.**

Q. KY Hendrix joined the producers
committee for animal welfare; correct?

**A. Yes. I don't know what year he**
**joined, but yes, he was on that committee.**

Q. Let me show you what's been marked
as Exhibit 525. We walked through these with
Marcus Rust. Use these as a point of reference
here.

In 2002, it indicates that Marcus
Rust was a Board member. Do you see that?

**A. Yes.**

Q. Mr. Rust has confirmed the
information on 525, but is that consistent with
your recollection? And I'm specifically
referring to 2002 here?

MR. MONICA: I'm going to object
to the document. You should explain to him what
it is before he answers any questions about it.

You've handed him a document
you've prepared. He doesn't know what it is.

---

502

I'm sure he's never seen it because you prepared
it. I object to lack of foundation on this
document.

You can answer if you know.

THE WITNESS: It's too long ago.
I can't -- I don't remember who served on all
the committees.

BY MR. STUEVE:

Q. You remember, though, when you
served on the Marketing Discovery Committee;
right?

**A. I remember serving on it. But**
**going back, I can't tell you what years.**

Q. You served on it for several
years; right, sir?

**A. Yes.**

Q. You also knew Marcus Rust served
on the Board of Directors?

**A. Yes.**

Q. And he still serves on the Board
of Directors?

**A. Yes.**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

503

1    Q.   Exhibit 525 is a document that we
2  prepared that summarized the information that
3  was provided to us by Rose Acre in its
4  interrogatory answers as well as UEP in their
5  annual listing of folks who participated in the
6  committees; okay?
7    A.   Okay.
8    Q.   And it reflects here with respect
9  to your participation, you served on the
10 Marketing and Price Discovery Committee from --
11 in 2002, 2003, 2004, 2005, and 2006; correct?
12   A.   That's what this document says. I
13 can't recall the years I served on the committee
14 off the top of my head.
15   Q.   Okay. But you do recall serving
16 on the committee for several years; right?
17   A.   Yes. I do.
18   Q.   That was the committee that would
19 vote on the coordinated early kills, early
20 molts, and hatch reductions; correct?
21      MR. MONICA: Objection. Assumes
22 facts not in evidence. Mischaracterizes the

505

1  BY MR. STUEVE:
2    Q.   Okay. Show you what's been marked
3  as Exhibit 532. It's an e-mail communication
4  between Gene Gregory and Marcus Rust and then
5  Marcus Rust -- excuse me. The lower hand, it's
6  from Marcus to Gene Gregory and on top it's Gene
7  Gregory to Marcus.
8       Did you review this document in
9  preparation to responding to topic 20G?
10   A.   No.
11   Q.   Concerning Rose Acre's knowledge
12 of and participation in any industry or
13 collective efforts to decrease the egg supply?
14   A.   No.
15   Q.   And, sir, if you would, up at the
16 top it says, Marcus, yes. And to think that
17 when egg farmers try to manage supply to have
18 profitable business. Do you see that?
19   A.   Yes.
20   Q.   And not ask for Government hand
21 outs, we find ourselves in a lawsuit. Do you
22 see that?

504

1  factual record. You can answer if you know.
2       THE WITNESS: I don't recall a
3  committee vote. No.
4  BY MR. STUEVE:
5    Q.   On early molts. You don't
6  remember a committee vote?
7    A.   No. I don't.
8    Q.   On early kills?
9    A.   No.
10   Q.   Don't recall a committee vote?
11   A.   No. I don't.
12   Q.   On hatch reductions?
13   A.   No.
14   Q.   Don't recall a committee vote?
15   A.   No.
16   Q.   Do you recall a committee vote
17 recommending that UEP certified companies only
18 buy certified eggs?
19      MR. MONICA: Objection.
20 Mischaracterizes the factual record. You may
21 answer.
22      THE WITNESS: No. I don't.

506

1    A.   Yes. I see that.
2    Q.   Now, Gene Gregory, who was one of
3  the leaders of UEP, certainly understood that
4  what the Marketing Committee was voting on was
5  an attempt to manage supply to have profitable
6  business; right, sir?
7       MR. MONICA: Objection.
8       MS. REDDING: Objection.
9       MR. MONICA: Objection. Calls for
10 speculation and misinterprets this document.
11 You can answer if you know.
12      THE WITNESS: Could you repeat the
13 question?
14      (The record was read as
15 requested.)
16      MR. MONICA: Same objections.
17      THE WITNESS: No. I had no idea
18 what Gene Gregory was thinking.
19 BY MR. STUEVE:
20   Q.   Did you talk to Marcus Rust about
21 this e-mail in preparation to your testimony on
22 behalf of Rose Acre with respect to 20G, sir?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

507

1    A.  No.
2    Q.  Show you what's been marked as
3  536.  Did you review this document in
4  preparation for your deposition today?
5    A.  No.
6    Q.  If you could turn to the second
7  page of this e-mail from KY Hendrix to Lois
8  Rust, dated March 14, 2002.  About halfway down,
9  it says, I don't really know what this whole
10  motive is, but I think there is more to it than
11  animal welfare.  I think some people think it
12  will make them rich or something.  I've never
13  been and never will be for quotas.  It seems to
14  me that is somewhat the path they are taking.
15  Do you see that?
16    A.  I see that.  Yes.
17    Q.  You did not speak with KY Hendrix,
18  Lois Rust, Anthony Rust, Marcus Rust, Victor
19  Rigterink or David Hurd about this document in
20  preparation for your testimony on behalf of Rose
21  Acre; is that correct, sir?
22    A.  That's correct.

508

1    Q.  Show you what's been marked as
2  Exhibit 537.
3    MR. BURKE:  This is Jason Burke.
4  Sorry to interrupt.  Would it be possible to get
5  Bates numbers on these documents?
6    MR. STUEVE:  On the exhibits I'm
7  not doing Bates numbers, the previously marked
8  ones.  It's 537.
9  BY MR. STUEVE:
10    Q.  Did you review Exhibit 537 in
11  preparation for your deposition today?
12    A.  No.
13    Q.  All right.  This is an e-mail at
14  the bottom here from John Rust, he's a member of
15  the Board; correct?
16    A.  Correct.
17    Q.  To Marcus Rust and this is dated
18  February 13, 2008; is that correct, the bottom
19  there?
20    A.  That's what it says.  Yes.
21    Q.  All right.  And if you would, in
22  that first paragraph there, second sentence, it

509

1  says, I don't think we have anything to be
2  ashamed of by putting as many hens per cage as
3  conditions permit, as that is doing what is
4  economically right for consumers.  Do you see
5  that?
6    A.  I see that.  Yes.
7    Q.  Then he states, rather than trying
8  to restrict cage space to boost prices under the
9  alleged agenda of animal rights.  Do you see
10  that?
11    A.  I see that.
12    Q.  And it's my understanding that you
13  were not aware of that concern?
14    MR. MONICA:  Objection.
15  BY MR. STUEVE:
16    Q.  By John Rust, a Board member of
17  Rose Acre?
18    MR. MONICA:  Objection.  Vague and
19  ambiguous.
20    THE WITNESS:  I'm not aware of
21  this document.  No.
22  BY MR. STUEVE:

510

1    Q.  Or the concern that was voiced by
2  a Board member of Rose Acre in February of 2008?
3    MR. MONICA:  Objection.
4    THE WITNESS:  I'm not going to
5  speculate on what John Rust meant by this.  No.
6  BY MR. STUEVE:
7    Q.  I want to be clear, though, you
8  were not aware as the head of sales at Rose
9  Acre, in February of 2008, of the concern that
10  rather than trying to restrict cage space to
11  boost prices under the alleged agenda of animal
12  rights.  Were you aware of that concern?
13    MR. MONICA:  Objection.  Vague.
14  Objection.  Vague, mischaracterizes this
15  document.  Mischaracterizes the facts.  You can
16  answer.
17    THE WITNESS:  As I stated, I'm not
18  aware what John Rust means by this.
19  BY MR. STUEVE:
20    Q.  Okay.  In preparation for your
21  deposition today, counsel for Rose Acre did not
22  give you this document; correct, sir?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

28 (Pages 511 to 514)

---

511

1    A.   Correct.
2    Q.   You did not in preparation, in
3  response to 20G, speak with Marcus Rust or John
4  Rust about Exhibit 537; correct, sir?
5    A.   Correct.
6    Q.   He goes on to state, we lose the
7  moral right to argue for the continued right of
8  low cost production cost when we ourselves are
9  manipulating the system under false pretenses.
10 Do you see that?
11   A.   I see that.
12   Q.   All right.  And that concern was
13 not shared with you by either Marcus Rust or
14 John Rust in February of 2008; is that correct,
15 sir?
16   A.   I'm not aware of what John means
17 by this.
18   Q.   In preparation for your testimony
19 today, you did not ask John or Marcus Rust about
20 what he meant when he says we lose the moral
21 right to argue for continued right of low cost
22 production cost when we ourselves are

---

512

1  manipulating the system under false pretenses;
2  correct?
3    A.   I'm not aware of this document
4  before today.
5    Q.   Show you what's been marked as
6  Exhibit 236.  Were you shown this document in
7  preparation for your deposition today?
8    A.   No.
9    Q.   It's -- the title of it is Supply
10 Program for April/July period.  Do you see that?
11   A.   Yes.
12   Q.   And it's to all UEP members up at
13 the top; right?
14   A.   Yes.
15   Q.   In March of 2002, Rose Acre was
16 now a member of UEP; correct?
17   A.   I don't recall the exact date we
18 joined.  No.
19   Q.   We established with Mr. Rust it
20 was February 2002.  Do you have any reason to
21 doubt that?
22   A.   If -- if Marcus Rust said that, I

---

513

1  would not doubt Marcus Rust on that.
2    Q.   Okay.  And it says under UEP
3  Marketing Committee recommendation.  It says
4  UEP's Marketing Committee met on March 11th, is
5  now recommending the industry follow the plan
6  identified below.  And do you see down below
7  it's all flocks, 62 weeks or older be placed
8  into a molt starting April 1st and continue
9  through July 1st.  Do you see that?
10   A.   Yes.  I do.
11   Q.   Dispose of spent hens four weeks
12 earlier than the normal schedule starting
13 April 1st and continuing through July 1st.  Do
14 you see that?
15   A.   Yes.  I do.
16   Q.   The Marketing Committee was the
17 committee you belonged to when UEP joined;
18 correct, sir?  Excuse me.  Let me rephrase that.
19       When Rose Acre joined UEP, the
20 Marketing Committee is the committee that you
21 participated in; right?
22   A.   I participated in the Marketing

---

514

1  Committee.  I don't recall the dates.
2    Q.   Now, sir, if you would, let me
3  show you what's been marked as Exhibit 527?
4       MS. CRABTREE:   Did you say 537?
5       MR. STUEVE:   527.
6  BY MR. STUEVE:
7    Q.   This is United Voices dated
8  May 2002.  See that up at the top.  May 6th?
9    A.   Yes.
10   Q.   It's been identified as
11 Exhibit 527.  Did counsel for Rose Acre show you
12 this document in preparation for your deposition
13 today?
14   A.   No.
15   Q.   If you would, the title right up
16 at the top says prices should improve, but
17 supply action plan must be followed now.  Do you
18 see that?
19   A.   Yes.
20   Q.   And down at the bottom here it has
21 in all bold there, molt all flocks 62 weeks or
22 older and continue through July 1st.  Do you see

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

29 (Pages 515 to 518)

---

515

1 that?

2 **A. Yes. I do.**

3 Q. It says here right above that, it

4 says, it is in the best interest of everyone to

5 follow the recommendation made by UEP's

6 Marketing Committee. It is as such, and then

7 the recommendation again is stated in bold;

8 right, sir?

9 **A. Yes. It is.**

10 Q. You would have been a member of

11 the Marketing Committee in May of 2002; correct?

12 **A. I don't remember.**

13 Q. You did not review this document

14 in preparation for Rose Acre's -- in preparation

15 for your testimony on behalf of Rose Acre in

16 response to 20G; is that correct?

17 **A. Correct.**

18 MR. MONICA: I'm just going to

19 assert an ongoing objection. You could have

20 clearly identified any documents you wanted him

21 to look at prior to this deposition. You did

22 not do it. You are not asking questions about

---

516

1 the topic.

2 Q. Showing you what's been marked as

3 Exhibit 528. These are the minutes of the Board

4 of Director meetings dated May 11th and May 12,

5 2004. It's marked as Exhibit 528.

6 Were you shown this document by

7 Rose Acre's counsel in preparation for your

8 testimony in response to 20G?

9 **A. No.**

10 Q. You note under the minutes about

11 four rows down to the right, KY Hendrix is

12 listed there. Do you see that?

13 **A. Yes.**

14 Q. And then about four more rows down

15 in the middle Marcus Rust is listed there. Do

16 you see that?

17 **A. Yes.**

18 Q. All right. And then if you would,

19 over on the second page, under Marketing

20 Committee, it says, Committee Chairman Dolph

21 Baker presented the committee report and

22 identified pending problems for the financial

---

517

1 stability of the industry if some minor supply

2 adjustments were not made very quickly. He

3 submitted the following motion. Motion it was

4 moved by Baker and seconded by Fortin to

5 recommend the industry molt all flocks at

6 62 weeks and dispose of spent lens by 108 weeks

7 and that this plan of action take place

8 immediately and carry through until August 1,

9 2004. Carried. Do you see that?

10 **A. Yes.**

11 Q. Sir, is this the first time you

12 were aware that the Board of Directors of UEP,

13 in which Mr. Rust sat on, approved a supply

14 adjustment program, as I just read?

15 MR. MONICA: Objection.

16 MS. REDDING: Objection.

17 THE WITNESS: One, there's nothing

18 that I'm looking at here that would tell me that

19 Marcus Rust approved anything.

20 BY MR. STUEVE:

21 Q. Sir, what I'm asking you, if you

22 would just read back my question.

---

518

1 (The record was read as

2 requested.)

3 BY MR. STUEVE:

4 Q. Answer my question, please.

5 MR. MONICA: Same objection.

6 THE WITNESS: I'm not aware of

7 this.

8 BY MR. STUEVE:

9 Q. Show you what's been marked as

10 Exhibit 215. These are the minutes of the

11 October 20, 2004 shell egg Marketing Committee.

12 Were you shown this document in preparation for

13 your deposition today?

14 **A. No.**

15 Q. If you would under committee and

16 staff about three rows down, it lists you as

17 participating; is that correct, sir?

18 **A. My name's there. Yes.**

19 Q. And over on the second page, it

20 says, recommendation to the Board, down at the

21 bottom there. Motion. It was moved by Wicker

22 and seconded by Schimpf to recommend to the

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

30 (Pages 519 to 522)

---

519

Board a plan for hens currently scheduled
disposal between December 1, 2004, and July 1,
2005, be disposed of four weeks earlier or
reduce your flock size by 5 percent.  Do you see
that?

    A.  Yes.

    Q.  You understand that to be a supply
and management recommendation; correct, sir?

        MR. MONICA:  Objection.
Mischaracterizes the document.

        THE WITNESS:  Would you repeat the
question?

        (The record was read as
requested.)

        MR. MONICA:  Same objection.

        THE WITNESS:  You have to
rephrase.  I don't understand what you're
asking.

BY MR. STUEVE:

    Q.  Sir, you understand what is being
recommended here by the Marketing Committee,
which you sat on, is a recommendation for egg

---

520

producers to reduce the flock size; correct,
sir?

    A.  I see what's written here is what
I see.  I'm not going to interpret it.

    Q.  Sir, actually this was, in fact,
discussed at a committee meeting which you
participated in; correct?

    A.  That's what this says, but I don't
remember it.

    Q.  You don't remember it?

    A.  No.

    Q.  Counsel for Rose Acre did not show
you Exhibit 215 in your preparation to testify
in response to topic 20G on behalf of Rose Acre;
correct, sir?

    A.  Could you repeat that?

        (The record was read as
requested.)

        THE WITNESS:  Correct.

        MR. MONICA:  Counsel, do you think
us showing him a document would have changed his
recollection?  I guess not.  Can we take a

---

521

break?

        THE WITNESS:  Restroom.

        MR. STUEVE:  Sure.  You need to
take a break?

        THE WITNESS:  Restroom, sure.

        MR. STUEVE:  Can we reconvene in
about five?

        MR. MONICA:  Five or ten.

        THE VIDEOGRAPHER:  The time is
10:29 and we are going off the record.

        (A brief recess was taken.)

        THE VIDEOGRAPHER:  The time is
approximately 10:38 a.m. and we are back on the
record.

BY MR. STUEVE:

    Q.  Show you what's been marked as
Exhibit 119.  Did you review this document in
preparation for your deposition today?

    A.  No.  I didn't.

    Q.  You were designated under 20F to
testify on behalf of Rose Acre concerning your
attendance at or participation in any economic

---

522

summit; is that correct?

    A.  Yes.

    Q.  And do you recall attending this
summit?

    A.  No.  I don't.

    Q.  Okay.  And Marcus Rust indicated
that, in fact, you did attend.  Do you have
any reason to doubt that?

    A.  I don't recall attending it.

    Q.  Okay.  In preparation for response
to 20F, counsel did not provide you this
document; is that correct, sir?

    A.  That's correct.

    Q.  Now, is it your testimony that you
believe you did not attend this conference?

    A.  No.  I said I don't remember.

    Q.  One way or the other?

    A.  Yes.

    Q.  Okay.  Let me show you -- do you
remember the discussion -- it's over on -- so
we're looking at Exhibit 119, which is the
November 16, 2004 egg economic summit

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

31 (Pages 523 to 526)

---

523

1    presentation by Gene Gregory, and the numbers --
2    the specific page I want you to look at the
3    numbers are right up here in the middle so it's
4    -- the last two digits is 47.
5        **A.   Okay.**
6        Q.   And do you remember this
7    presentation here at all?
8        **A.   I don't remember attending the**
9    **summit.  I can't remember this presentation,**
10   **either.**
11       Q.   I'm asking if you would review it
12   and see if that refreshes your recollection,
13   sir?
14       **A.   No.  It doesn't.**
15       Q.   Now, this economic summit was
16   conducted in November of 2004 because there was
17   a significant concern by egg producers that the
18   egg supply was growing too fast and it was
19   impacting prices.  Do you recall that?
20       MR. MONICA:  Objection.
21       MS. REDDING:  Objection.
22       THE WITNESS:  No.  I don't recall

---

524

1    it.
2    BY MR. STUEVE:
3        Q.   And, if you would, over on 44?
4        **A.   Okay.**
5        Q.   It says just the facts.  If you
6    would, if you could review that, and confirm
7    that the problem -- do you think we have a
8    problem?  See that at the bottom, that that
9    problem is the growth in the supply of hens?
10       MR. MONICA:  Objection.  Calls for
11   speculation.  Please review the page and answer
12   counsel.
13       THE WITNESS:  Can you repeat the
14   question?
15   BY MR. STUEVE:
16       Q.   Yeah.  First of all, does this
17   refresh your recollection that the problem that
18   was identified by Gene Gregory of UEP to all of
19   the egg producers who attended the economic
20   summit was the growth in the supply of hens?
21       **A.   I don't understand your question.**
22       MR. STUEVE:  Why don't you read it

---

525

1    back and tell me what you don't understand about
2    it.
3        (The record was read as
4    requested.)
5        THE WITNESS:  I can't speak to
6    that because, quite honestly, I don't recall
7    being at the summit.
8    BY MR. STUEVE:
9        Q.   Sir, if you would underneath, in
10   that analysis about four rows down, it compares
11   the hen inventory year end '03 to 2004, it shows
12   11.6 million increase.  Do you see that?
13       **A.   Yes.  I see that.**
14       Q.   And then at the bottom, there's a
15   comparison of the average October Midwest large
16   quote in '03 to '04 and there's a drop in price
17   of 42.29 cents; correct?
18       **A.   That's what's written here.**
19       Q.   And then right underneath there,
20   he says, do you think we have a problem?  Do you
21   see that?
22       **A.   Yes.  I do.**

---

526

1        Q.   That doesn't refresh your
2    recollection about the problem that was defined
3    at that economic summit?
4        **A.   As I stated before, I don't recall**
5    **at all being at the summit.**
6        Q.   This doesn't refresh your
7    recollection?
8        MR. MONICA:  Objection.  Asked and
9    answered.
10       THE WITNESS:  I don't recall being
11   at the summit.
12   BY MR. STUEVE:
13       Q.   Marcus Rust was just mistaken when
14   he said you were there?
15       MR. MONICA:  Objection.
16   Mischaracterizes Marcus Rust's testimony.
17       THE WITNESS:  I don't know what
18   Marcus Rust said, but I don't recall being at
19   this summit.
20   BY MR. STUEVE:
21       Q.   Let me show you what's over on --
22   over on 48.  If you could review the columns

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

527

1    here, first supply result on price during high
2    demand period, the middle column is a million
3    hens over -- or under same period last year, and
4    then supply result on price during low demand.
5    Do you see that?
6        A.   Yes.
7        Q.   And does that refresh your
8    recollection as to, again, the problem that was
9    being presented at the economic summit in
10   November 2004, which is the negative impact on
11   prices as a result of the growth in the hen
12   population?
13       MR. MONICA: Objection. Compound.
14   Convoluted. Calls for speculation. You can
15   answer.
16       THE WITNESS: As I've stated
17   several times before, I don't recall being at
18   this summit.
19   BY MR. STUEVE:
20       Q.   Over on -- over on impact of
21   supply/demand price relationship on 51. Do you
22   see that?

---

528

1        A.   Yes.
2        Q.   At the bottom, it states, to meet
3    the demand for 2005 at profitable prices, the
4    industry may need to reduce the projected flock
5    size by 10 million hens. Do you see that?
6        A.   Yes.
7        Q.   Do you remember that being
8    discussed at the November 2004 economic summit?
9        A.   As I've stated several times
10   before, I don't recall being at the 2004
11   economic summit.
12       Q.   Do you remember this problem that
13   was being identified here at the summit being
14   discussed at the Marketing Committee of UEP,
15   which you were a member of in November 2004?
16       MR. MONICA: Object to form.
17       THE WITNESS: What meeting?
18   BY MR. STUEVE:
19       Q.   Marketing Committee?
20       A.   What meeting?
21       MR. STUEVE: If you would read
22   back my question.

---

529

1        (The record was read as
2    requested.)
3        MR. MONICA: Object to the form.
4    You can answer.
5        THE WITNESS: I don't know which
6    Marketing Committee meeting you're referring to.
7    Are you referring to the economic summit?
8    BY MR. STUEVE:
9        Q.   No. I'm asking you in this
10   timeframe of the fall of 2004, do you recall
11   this problem with the oversupply of hens being
12   discussed at the Marketing Committee of UEP?
13       MR. MONICA: Object to the form of
14   the question.
15       THE WITNESS: No. I don't recall.
16   BY MR. STUEVE:
17       Q.   Now, if you would, over on 52,
18   it's the benefit of producing at 95 percent of
19   capacity. Do you see that?
20       A.   Yes.
21       Q.   It says, what would be the
22   benefits of reducing the flock size by

---

530

1    10 million hens? A 5 percent flock reduction
2    would achieve the 10 million goal. Do you see
3    that statement?
4        A.   Yes. I do.
5        Q.   And then there is the economic
6    benefit of reducing flock size by 5 percent.
7    That is depicted here on page 52 of Exhibit 115;
8    right, sir?
9        MR. MONICA: Object to the form of
10   the question.
11       THE WITNESS: Could you repeat
12   that, please?
13       (The record was read as
14   requested.)
15       MR. MONICA: Object to the form.
16       THE WITNESS: I still don't
17   understand. Can you read that again, please?
18       (The record was read as
19   requested.)
20       MR. MONICA: Object to the form.
21       THE WITNESS: Since I don't have
22   any recollection of this, I don't have an answer

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

33 (Pages 531 to 534)

---

531

1  either way on that.
2  BY MR. STUEVE:
3       Q.   Sir, it says right above the
4  economic benefit analysis, it says, if all
5  producers made this adjustment, the 5 percent
6  flock reduction, what would be their individual
7  benefit; right?
8            MR. MONICA:  Object to the term
9  economic benefit analysis.
10           THE WITNESS:  Can you state that
11  again?
12           (The record was read as
13  requested.)
14           MR. MONICA:  Objection.  Misstates
15  the document.  You can answer.
16           THE WITNESS:  What it states, it
17  says if all producers made this adjustment, what
18  would be their individual benefit?  That's what
19  it states right there.
20  BY MR. STUEVE:
21       Q.   The adjustment he's referring to
22  is the 5 percent flock reduction; is that

---

532

1  correct, sir?
2            MR. MONICA:  Object to the form.
3            THE WITNESS:  If that's what
4  this -- if that's what that was referring to.  I
5  don't have knowledge of it.
6  BY MR. STUEVE:
7       Q.   Sir, if you could, over on 53, it
8  says management recommendations.  Stay committed
9  to animal care certified space phase-in plan.
10  Do you see that?
11       A.   Yes.
12       Q.   You understand that to be the
13  reduction in cage space under the certified
14  program; right?
15           MR. MONICA:  Objection.  Give me a
16  chance to object.  Object to the form of the
17  question.
18           THE WITNESS:  No.  I don't.
19  BY MR. STUEVE:
20       Q.   You don't know what that means,
21  sir?
22           MR. MONICA:  Same objection.

---

533

1            THE WITNESS:  No.  I'm not -- I
2  was not part of this -- that I'm aware of part
3  of this meeting, so anything that's here, I
4  don't recall.
5  BY MR. STUEVE:
6       Q.   I'm just asking you, sir, you
7  understand what's being referenced there under
8  stay committed to animal care certified space
9  phase-in plan is the cage space reduction
10  component of the certified program; correct?
11           MR. MONICA:  Objection.  You may
12  answer what your understanding is.
13           THE WITNESS:  No.  As far as
14  the -- what was intended or discussed at this
15  meeting, I do not recall.
16  BY MR. STUEVE:
17       Q.   Sir, do not backfill cages.  Do
18  you see that?
19       A.   I see that.
20       Q.   That's referencing the certified
21  program's prohibition on backfilling of cages;
22  correct, sir?

---

534

1            MR. MONICA:  Objection.  You can
2  answer.
3            THE WITNESS:  It just says do not
4  backfill cages.  It doesn't reference anything
5  else.
6  BY MR. STUEVE:
7       Q.   Of course, both bullet point 1 and
8  bullet point 2, if followed, would reduce the
9  supply of hens; correct, sir?
10           MR. MONICA:  Objection.
11           THE WITNESS:  No.  Not
12  necessarily.
13  BY MR. STUEVE:
14       Q.   Bullet point number 3, dispose of
15  spent hens at younger ages.  That also would
16  reduce the flock size; correct, sir?
17           MR. MONICA:  Object to the form of
18  the question.  You can answers.
19           THE WITNESS:  No.  There's too
20  many other factors.  If you're putting in new
21  cages and adding birds, not necessarily.
22  BY MR. STUEVE:

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

34 (Pages 535 to 538)

---

535

1    Q.   Did you talk to Marcus Rust about
2  Exhibit 115 in preparation for your deposition
3  today in response to topics 20F and 20G?
4    **A.   I don't believe I have an**
5  **Exhibit 115.**
6    Q.   Excuse me, 119.  Let me rephrase
7  that.
8         Did you speak with Marcus Rust
9  with respect to Exhibit 119 in preparation for
10 your deposition on behalf of Rose Acre in
11 response to topics 20F and 20G?
12   **A.   No.  I did not.**
13   Q.   Sir, let me show you what's been
14 marked as Exhibit 251.  Did you review this
15 document in preparation for your testimony in
16 response to topics 20F and 20G?
17   **A.   No.  I did not.**
18   Q.   If you would, it's dated
19 November 18, 2004, it says, dear -- and then it
20 says if you do not read any other mail today
21 please take the time to read this.  Did I read
22 that correctly?

---

536

1    **A.   Yes.**
2    Q.   It says, UEP hosted an egg
3  industry economic summit in Atlanta on
4  November 16th, and you missed it.  Do you see
5  that?
6    **A.   Yes.**
7    Q.   Then it goes on to -- I'm
8  overwhelmed with the best UEP meeting ever.  I
9  wish we would have put this one on DVD.  Every
10 producer should have been there.  Every one of
11 us should hear it all again and again.  Do you
12 see that?
13   **A.   Yes.**
14   Q.   And then it -- it has, let us
15 share just a few bullet point, highlights of the
16 agenda and speakers.  Do you see that?
17   **A.   Yes.**
18   Q.   And it states -- bullet point 2,
19 Marty Eisenstein from the firm of Brann &
20 Isaacson advised the attendees on the
21 protections and limitations of the
22 Capper-Volstead cooperatives such as UEP.  Do

---

537

1  you see that?
2    **A.   Yes.**
3    Q.   Does that refresh your
4  recollection that you attended that summit?
5    **A.   No.**
6    Q.   Okay.  Do you know who Marty
7  Eisenstein is?
8    **A.   Yes.**
9    Q.   Who is he?
10   **A.   He's an attorney.**
11   Q.   For who?
12   **A.   For Brann Isaacson.**
13   Q.   Have you met him before?
14   **A.   Yes.**
15   Q.   When did you meet him?
16   **A.   At some UEP meeting.**
17   Q.   Okay.  Did the Marketing Committee
18 ever meet in person?
19   **A.   Yes.**
20   Q.   And when would it meet in person?
21   **A.   I don't know exactly when.**
22   Q.   Would it meet in person at the

---

538

1  annual meeting?
2    **A.   It's possible.**
3    Q.   And the other meetings during the
4  year were by phone; is that correct?
5    **A.   Not always, I don't believe.**
6    Q.   So there were other meetings that
7  would have been in person other than the annual
8  meeting?
9    **A.   I believe so.  Yes.**
10   Q.   Okay.  And when would those occur,
11 those other in person meetings during the year?
12   **A.   I don't remember when.**
13   Q.   Okay.  Now, let me ask you.
14 It's -- on the bullet point summary of what was
15 discussed at the economic summit, November 2004,
16 over on -- over on the second page there under
17 the last bullet point, it says, UEP presented a
18 bleak overview of the supply side of the
19 business and the pending problems with an ever
20 increasing flock size at a time when demand
21 appears to be diminishing.  Did I read that
22 correctly?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

35 (Pages 539 to 542)

539

1    A.    Yes.
2    Q.    Then it goes on, the next
3  paragraph says, we then asked the attendees if
4  they wanted to be a part of the solution, all in
5  bold and in quotes; is that correct?
6    A.    Yes.
7    Q.    It says, we then asked the
8  attendees if they wanted to be part of the
9  solution in managing the supply to meet an
10 expected demand.  Do you see that?
11   A.    Yes.
12   Q.    It says, we offered the two
13 options that are now enclosed with this letter.
14 Do you see that?
15   A.    Yes.
16   Q.    Now, does that refresh your
17 recollection that you attended that meeting?
18   A.    No.  It doesn't.
19   Q.    And then attached, again to
20 Exhibit 251, is -- on the -- on pages 42 and 43
21 are two intention forms.  Intention to meet
22 market needs.  It's my company's intention to

540

1  dispose of hens that are currently scheduled for
2  disposal between January 1st and April 30, 2005,
3  four weeks earlier than previously scheduled.
4  Do you see that?
5    A.    Yes.  I do.
6    Q.    It says as a member of UEP and an
7  egg producer, I fully understand by making my
8  intention known, that UEP will rely upon my
9  statement of intention.  Do you see that?
10   A.    Yes.  I do.
11   Q.    Do you recall receiving this
12 document?
13   A.    No.  I don't recall receiving this
14 document.
15   Q.    Then on the second page, it says,
16 intention to meet market demand.  Option 2.  Do
17 you see that?
18   A.    Yes.
19   Q.    It's my company's intention to
20 reduce my own December 1st, 2004, flock size by
21 5 percent between the dates of January 1st
22 through April 30, 2005.  Do you see that?

541

1    A.    Yes.
2    Q.    As a member of UEP and an egg
3  producer, I fully understand that by making my
4  intention known, that UEP will rely on my
5  statement.  Do you see that?
6    A.    Yes.
7    Q.    Do you recall receiving that, sir?
8    A.    No.  I do not recall receiving
9  that.
10   Q.    Of course, if the flock reduction
11 was reduced by 5 percent, as discussed at the
12 November economic summit, that would project to
13 approximately 10 million reduction in hens;
14 correct?
15        MR. MONICA:  Objection.
16        THE WITNESS:  I don't know that.
17 BY MR. STUEVE:
18   Q.    That's what was reflected in the
19 economic summit presentation we looked at;
20 correct, sir?
21        MR. MONICA:  Objection.
22        THE WITNESS:  I don't know that to

542

1  be accurate.
2  BY MR. STUEVE:
3    Q.    But that was what was reflected in
4  the presentation; correct, sir?
5        MR. MONICA:  Objection.
6        THE WITNESS:  If we can go back
7  and reread it, if you like?
8  BY MR. STUEVE:
9    Q.    Sure.  Over on 52?
10   A.    Yes.
11   Q.    It says, a 5 percent flock
12 reduction would achieve the 10 million goal?
13   A.    That's correct.  That's what that
14 says.
15   Q.    That's in the November 2004
16 economic summit presentation marked as
17 Exhibit 119; correct, sir?
18   A.    Correct.
19   Q.    All right.  Show you what's been
20 marked as Exhibit 139.  This is the UEP Board of
21 Director minute meetings for January 25th, 2005;
22 is that correct?

543

1       A.   Yes.  That's what's stated.
2       Q.   So this is approximately
3   two months after the November 2004 economic
4   summit; is that correct, sir?
5       A.   That's what's stated here.  Yes.
6       Q.   Now, it indicates about three
7   lines down under Board members and staff, Marcus
8   Rust was in attendance; is that correct, sir?
9       A.   That's what's stated here.  Yes.
10      Q.   And then under members and guests
11  about six lines down, KY Hendrix and you are
12  listed, as well; correct?
13      A.   That's correct.
14      Q.   Were you shown Exhibit 139 by Rose
15  Acre's counsel in preparation for your testimony
16  today in response to topics 20F and 20G?
17      A.   No.
18      Q.   It states under the chairman's
19  comments, you see down there?
20      A.   Yes.
21      Q.   There's -- it says, among the
22  comments made by Chairman Deffner were the

544

1   following and then there's a summary there; is
2   that correct, sir?
3       A.   Yes.
4       Q.   Do you remember Chairman Deffner
5   making those statements to you and the other
6   participants on the UEP Board of Directors
7   meeting of January 25, 2005?
8           MR. MONICA:  Objection as to
9   participant.  You can answer the question.
10          THE WITNESS:  Well, no.  I don't
11  remember that.
12  BY MR. STUEVE:
13      Q.   It says -- he says about halfway
14  down, we don't have to accept low prices and we
15  can have a good 2005 if we just make a few
16  changes and work together.  Did I read that
17  correctly?
18      A.   Yes.  You did.
19      Q.   Do you remember him making that
20  statement to you in January 2005?
21      A.   No.  I don't.
22      Q.   And then he references two lines

545

1   down the economic summit.  The economic summit
2   highlighted some of the problems and some of you
3   have already reacted in a positive manner.  We
4   need more of you to participate in a positive
5   change.  Thanks to those that have prepaid for
6   your 2005 dues and assessments.  Do you see
7   that?
8       A.   Yes.  I do.
9       Q.   The positive change he's referring
10  to was the intention forms that requested UEP
11  members to commit to reducing their flock size
12  by 5 percent; correct?
13          MR. MONICA:  Objection.  Calls for
14  speculation.
15          THE WITNESS:  I don't know that.
16  BY MR. STUEVE:
17      Q.   You don't recall being at that
18  January 25, 2005, meeting; is that correct, sir?
19      A.   That's correct.
20      Q.   Now, under the Marketing Committee
21  report.  It's over on the next page, it says,
22  Wayne Mooney -- first of all, the Marketing

546

1   Committee, this is in January 2005.  You would
2   have been a member of the Marketing Committee;
3   correct, sir?
4       A.   As I stated before, I don't
5   remember what years I was a member of the
6   committee.
7       Q.   If the documents indicate, in
8   fact, you were, do you have any reason to doubt
9   the documents?
10      A.   If there's documents that states
11  that I was there, then I don't have reason to
12  doubt the document.  No.
13      Q.   Sir, the sworn interrogatory
14  answer of Rose Acre indicates that you were a
15  member of the Marketing and Price Discovery
16  Committee from 2002 to approximately 2006.  Do
17  you have any reason to doubt that sworn answer
18  by Rose Acre?
19      A.   By who from Rose Acre?
20      Q.   It was verified by Joseph A.
21  Miller, who is the in-house counsel sitting here
22  today?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

547

1      A.   I would have no reason to doubt
2  that then if Joe verified it.
3      Q.   This is dated January 2005, which
4  would have been in that timeframe identified by
5  Rose Acre that you were a member of the
6  Marketing Committee; correct, sir?
7      A.   Yes.
8      Q.   And, in fact, looking at 139, you
9  are listed as a participant in this meeting
10 dated January 25, 2005; right?  We just looked
11 at that?
12     A.   I was a guest.
13     Q.   It says members and guests; right?
14     A.   Oh, I'm an UEP member; correct.
15     Q.   So Marketing Committee report over
16 on -- that 103 the last three digits, we've
17 established according to Rose Acre's records you
18 were a member; correct?
19     A.   Of the Marketing Committee;
20 correct.
21     Q.   Now I'm going to direct you to
22 your committee's report, see that at the bottom

548

1  of 103?
2      A.   Yes.  I do.
3      Q.   Who was Wayne Mooney?
4      A.   Wayne was -- I don't know if he
5  was general manager, but I know he took care of
6  sales for Pilgrim's Pride in Texas.
7      Q.   He says Wayne Mooney presented the
8  committee report and then called upon Gene
9  Gregory to review a number of industry
10 statistics.  Mooney reported on the number of
11 companies that have made their intentions known
12 to either sell flocks early or reduce their
13 flock size by 5 percent.  Do you see that?
14     A.   Yes.  I do.
15     Q.   Those were the two intention form
16 plans that we saw earlier; correct?
17     MS. REDDING:  Objection.
18 BY MR. STUEVE:
19     Q.   Remember, you could either option
20 1 --
21     A.   By reading just this, it's not --
22 I'm not exactly sure which forms he's referring

549

1  to.
2      Q.   Well, let's pull out the exhibit.
3  It's Exhibit 251.  And keep that document in
4  front of you there, sir.  Do you see that?  Do
5  you have 251 there?
6      A.   Yes.
7      Q.   And if you would, option 1.  Can
8  you find option 1 that was attached there?
9      A.   Yes.
10     Q.   And then if you could refer then
11 back to 139 under the Marketing Committee
12 report, it says, Mooney reported on the number
13 of companies that have made their intentions
14 known to either sell flocks early, that would be
15 option 1; correct, sir?
16     MR. MONICA:  Objection.
17 Mischaracterizes the document.
18     THE WITNESS:  But what I'm saying
19 from this, just this paragraph here in the
20 Marketing Committee report, it does not
21 reference when.  It does reference companies --
22 it does say intentions known to either sell

550

1  flocks early or reduce their flocks by
2  5 percent.  But just reading this it doesn't --
3  it's not referencing this exact -- it's
4  referencing reducing the flocks by 5 percent,
5  but what I'm just stating, it's not saying
6  that -- it's not referencing a date or time of
7  when.
8  BY MR. STUEVE:
9      Q.   But you can confirm January 25th
10 would be approximately two months after the
11 November economic summit; right, sir?
12     A.   Yes.  I can.
13     Q.   If you could, just confirm that
14 Mooney reported on the number of companies that
15 have made their intentions known to either sell
16 flocks early, that is what option 1 was
17 identified; right?
18     MR. MONICA:  Objection.  It's not
19 what it says.
20     THE WITNESS:  I'm just saying
21 this -- this paragraph is not referencing any
22 certain document, just the intentions of the

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II
March 18, 2014

38 (Pages 551 to 554)

---

551

1  known to either sell flocks, reduce flocks by
2  5 percent.
3  BY MR. STUEVE:
4  Q.  Can you confirm for me, sir, that
5  option 1 is an intention to sell flocks early?
6  **A.  We're going back to the other**
7  **document?**
8  Q.  Yeah.
9  **A.  In Exhibit 251?**
10  Q.  Uh-huh.
11  **A.  In that exhibit from November 18,**
12  **2004, intention to meet market needs.  Option 1.**
13  Q.  And that is an option to sell
14  flocks early; correct, sir?
15  MR. MONICA:  Objection.
16  MS. REDDING:  Objection.
17  THE WITNESS:  That option states
18  that -- it references just four weeks earlier
19  than previously scheduled.  Yes.
20  BY MR. STUEVE:
21  Q.  So that's a recommendation to sell
22  flocks early; correct, sir?

---

552

1  MR. MONICA:  Objection.
2  THE WITNESS:  We can all read it.
3  Like I said, I don't have a recollection of
4  being at that meeting so I'm not going to
5  discuss a document.
6  BY MR. STUEVE:
7  Q.  Sir, I'm just asking you to
8  confirm what is reflected in intention number
9  1 --
10  **A.  I can read it if you like.**
11  Q.  And what it is asking for UEP
12  members to commit to is to sell their flocks
13  early, as outlined in option number 1; correct,
14  sir?
15  MR. MONICA:  Same objection.
16  THE WITNESS:  I can read it if you
17  like, but I'm not going to draw any conclusions
18  from it.
19  BY MR. STUEVE:
20  Q.  Sir, I'm going to give you one
21  more chance to answer my question, and then
22  we'll ask the Court to ask you -- to order you

---

553

1  to answer it.
2  MR. MONICA:  Counsel, you keep
3  threatening the witnesses.  It is inappropriate,
4  please don't do it.  Let him answer the
5  question.
6  THE WITNESS:  I'm not going to
7  draw any conclusions of something that I don't
8  have any knowledge about.
9  MR. STUEVE:  If you could go ahead
10  and ask my question.
11  (The record was read as
12  requested.)
13  THE WITNESS:  As I stated before,
14  I'm not going to draw a conclusion to something
15  I'm not aware of.
16  BY MR. STUEVE:
17  Q.  And then, sir, option number 2
18  that is attached to the November 18th, 2004,
19  Exhibit 251, did you find option number 2?
20  **A.  Yes.**
21  Q.  That is requesting that UEP
22  members sign their intention to reduce their

---

554

1  December 1, 2004, flock size by 5 percent;
2  right?
3  **A.  I'll state the same as I did**
4  **before.  Since I'm not aware of this document,**
5  **then I'm not going to draw conclusions to it.**
6  Q.  And then if you would, if you can
7  turn to Exhibit 139 under the Marketing
8  Committee report, which you were a member of, it
9  says, Mooney reported on the number of companies
10  that have made their intentions known to either
11  sell flocks early or reduce their flock size by
12  5 percent.  That's option number 2; correct,
13  sir?
14  MS. REDDING:  Objection.  Calls
15  for speculation.
16  THE WITNESS:  As I stated, there's
17  nothing that I'm reading here in Exhibit 139
18  under the marketing report refers to what
19  Mr. Mooney is referring to.  No other documents.
20  BY MR. STUEVE:
21  Q.  But you can confirm that this
22  Marketing Committee report was presented on

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

---

555

1 January 25, 2005, approximately two months after
2 the intention forms were sent out; correct, sir?
3     MS. REDDING: Objection.
4     THE WITNESS: No, because I'm not
5 aware of the other forms, so I'm not going to
6 speculate that they were sent out.
7 BY MR. STUEVE:
8     Q. Sir, if you would, if you look at
9 251. The date of that is November 18, 2004;
10 right?
11     **A. Yes.**
12     Q. And attached to it is option 1 and
13 option 2; right?
14     **A. Yes.**
15     Q. And then Exhibit 159 -- 139 and
16 the committee report that we're referring to is
17 dated approximately two months later,
18 January 25, 2005; correct, sir?
19     **A. Correct.**
20     Q. All right. And we are reading
21 from the Marketing Committee report on 103. Now
22 I want to direct you to 104. It says this was

---

556

1 the motion pursuant to the Marketing Committee
2 report. It was moved by Mooney and seconded by
3 Dean to recommend that the current intentions
4 program for flocks to be disposed of four weeks
5 earlier than previously scheduled, and/or flock
6 size reduction by 5 percent be extended through
7 Labor Day. And it was carried. Do you see
8 that?
9     **A. Yes. I see that.**
10     Q. This is reflected in the meetings
11 minutes in which Marcus Rust, KY Hendrix and you
12 of Rose Acre were present; correct, sir?
13     **A. That's what this states, yes.**
14     Q. Does that refresh your
15 recollection at all, looking at this document?
16     MR. MONICA: Objection.
17     THE WITNESS: Refresh my
18 recollection of what?
19 BY MR. STUEVE:
20     Q. That you were there and all these
21 things being discussed that we've been
22 reviewing?

---

557

1     **A. No. I don't remember.**
2     Q. Now, again, if you turn back to
3 option number 1, under 251, November 2004,
4 option number 1. It is my company's intention
5 to dispose of hens that are currently scheduled
6 disposal between January 1st and April 30, 2005,
7 four weeks earlier than previously scheduled.
8 Did I read that correctly?
9     **A. Yes.**
10     Q. And then, if you look at the
11 motion, it's your committee is recommending that
12 that intentions program for flocks to be
13 disposed of four weeks earlier than previously
14 scheduled be extended through Labor Day.
15 They're referring to option number 1 in 251;
16 correct, sir?
17     MS. REDDING: Objection. Calls
18 for speculation.
19     MR. MONICA: I think it
20 mischaracterizes what happened, too, who was
21 voting.
22     THE WITNESS: Yeah. No. I

---

558

1 don't -- it doesn't state that there. No.
2 BY MR. STUEVE:
3     Q. Then it says, or flock size
4 reduction of 5 percent be extended through Labor
5 Day. That would be option number 2, attached to
6 Exhibit 251 being extended through Labor Day;
7 right, sir?
8     MS. REDDING: Objection.
9     THE WITNESS: No. It doesn't
10 state that here.
11 BY MR. STUEVE:
12     Q. What it states is the current
13 intention program for stocks to be disposed of
14 four weeks earlier than previously scheduled,
15 which is reflected in option number 1 be
16 extended through Labor Day, or flock size
17 reduction by 5 percent, which is option number 2
18 be extended through Labor Day, that's what it
19 says; right, sir?
20     MR. MONICA: Objection. That's
21 not what it says.
22     MS. REDDING: Objection.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

559

1    THE WITNESS:  No.  You said we,
2  and I never said it, and you said it.  And you
3  just said in your thing that we said it.  And I
4  did not.  I stated before that there is nothing
5  in this motion that references that exact
6  document from what I'm reading here.
7  BY MR. STUEVE:
8    Q.   This does not refresh your
9  recollection about your attendance at this
10  meeting; is that correct, sir?
11    A.   No.  It doesn't.
12    Q.   Did counsel for Rose Acre give you
13  Exhibit 139 and ask you to discuss it with
14  Marcus Rust and KY Hendrix in preparation for
15  your testimony on behalf of the company in
16  response to 20G or 20F?
17    A.   No, sir.
18    Q.   Show you what's been previously
19  marked as Exhibit 111 -- actually, I think it's
20  two pages?
21    MR. MONICA:  Keep those together.
22  Here's a clip.

---

560

1  BY MR. STUEVE:
2    Q.   These are the UEP shell egg
3  Marketing Committee conference call minutes of
4  June 1, 2005; is that correct, sir?
5    A.   That's what it states.  Yes.
6    Q.   And you're identified as
7  participating; is that correct?
8    A.   Yes.  My name's there.
9    Q.   As well as Marcus Rust; right?
10    A.   Yes.  His name's there.
11    Q.   Now, did Marcus Rust ultimately
12  take over your responsibilities on the Marketing
13  Committee?
14    A.   Not that I'm aware of.
15    Q.   How long -- did you continue to
16  serve on the Marketing Committee in '07 and '08
17  and '09 and 2010?
18    A.   I don't remember.  If there was --
19  from what you stated before, that counsel
20  provided -- said I attended from '02 to '06, if
21  Joe stated that in a document from Rose Acre
22  that's all I would know for sure if that's what

---

561

1  he said.
2    Q.   Starting in '07, according to Rose
3  Acre's records, Marcus Rust began participating
4  in the Marketing Committee.  Do you recall that?
5    A.   Do you have records from Rose Acre
6  stating that?
7    Q.   Yes.  Do you recall that, though?
8    A.   I don't remember, no.
9    Q.   You don't?
10    A.   No.
11    Q.   You don't know one way or the
12  other whether or not Marcus Rust participated in
13  the Marketing Committee starting in 2007 and
14  into '08, '09.
15    A.   No.  I don't remember that.
16    Q.   You don't ever recall having
17  discussion with him about him replacing you on
18  the Marketing Committee?
19    A.   No.  I don't.
20    Q.   Why did you stop participating in
21  the Marketing Committee?
22    A.   I don't know.

---

562

1    Q.   Did -- in June of 2005, you still
2  would have been a member of the Marketing
3  Committee; right?
4    A.   Yes.
5    Q.   Was this document, Exhibit 111,
6  shown to you by Rose Acre's counsel in
7  preparation for your testimony on behalf of Rose
8  Acre in response to 20G?
9    A.   No.
10    Q.   If you would, over on the second
11  page -- actually, before I get there, over on
12  the first page, at the bottom, it says, Paul
13  Osborn suggested that UEP issue an industry egg
14  economic alert in which information on price
15  forecasts, along with possible solutions to the
16  economic problem could be communicated.  Do you
17  see that?
18    A.   Yes.  I do.
19    Q.   Do you remember that being
20  discussed at that June 2005 meeting, sir?
21    A.   No.  I don't.
22    Q.   Over on the next page, it says,

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

**563**

1  under motion, it was moved by Osborn and
2  seconded by Schimpf that UEP distribute an
3  economic alert to the members and that the alert
4  include a price forecast and a list of possible
5  options to correct the oversupply problem.
6  Carried.  Do you see that?
7      **A.  Yes.  I do.**
8      Q.  Do you remember participating in
9  that meeting and the recommendation being
10 approved that UEP distribute an economic alert
11 to the members, and that it would include a
12 price forecast and a list of possible options to
13 correct the oversupply problem?
14     **A.  No.  I don't remember that.**
15     Q.  And this doesn't refresh your
16 recollection?
17     **A.  No.  It doesn't.**
18     Q.  You did not discuss Exhibit 111
19 with Marcus Rust in preparation for your
20 testimony today in response to topic 20G on
21 behalf of Rose Acre; is that correct, sir?
22     **A.  That's correct.**

---

**564**

1      MR. MONICA:  I'm just going to put
2  a continuing objection on the record.  If you
3  look at the Notice, counsel, it says that Marcus
4  Rust was designated for topics 20D and E, which
5  are participation and attendance at meetings.
6  You've had him for two days.  You asked him
7  questions about these.  This witness is not
8  designated on these topics.  You know that.
9  BY MR. STUEVE:
10     Q.  Show you what's been marked as
11 Exhibit 170.  This is the Marketing Committee
12 minutes, March 31st, 2006, and identifies Marcus
13 Rust.  Do you see that?
14     **A.  Yes.**
15     Q.  Was this document, Exhibit 170,
16 provided to you by counsel in preparation for
17 your testimony today in response to 20G?
18     **A.  No.**
19     Q.  Did you meet with Marcus Rust and
20 discuss Exhibit 170 in preparation for your
21 response to 20G?
22     **A.  No.**

---

**565**

1      Q.  Under the Marketing Committee
2  minutes of March 31, 2006, about two-thirds
3  down, it says motion.  It was moved by Baker and
4  seconded by Schimpf to recommend to the members
5  a program calling for the flocks to be molted
6  six weeks earlier than previously scheduled and
7  dispose of spent hens six weeks earlier than
8  previously scheduled.  Did I read the motion
9  correctly?
10     **A.  Yes.  You did.**
11     Q.  It indicates the motion passed
12 unanimously; is that right, sir?
13     **A.  That's what's stated here.**
14     Q.  You understand that the purpose of
15 that motion was to reduce the supply of hens in
16 order to reduce the supply of eggs and boost egg
17 prices; correct, sir?
18     MR. MONICA:  Objection.  Calls for
19 speculation.  You can answer.
20     THE WITNESS:  I'm not going to
21 draw conclusions on something I wasn't a part
22 of.

---

**566**

1  BY MR. STUEVE:
2      Q.  Do you remember ever discussing
3  the contents of this motion with Marcus Rust?
4      **A.  Not this specific motion, but the**
5  **topic, Rose Acre has a firm policy that we do**
6  **not molt flocks early and restrict flocks**
7  **because we can't because our birds, we have our**
8  **own hatcheries and breeder farms.  In our**
9  **production system, we couldn't adhere to**
10 **changing our schedules because we have to plan**
11 **everything 18 months in advance on our flock**
12 **placements.  So if we were to try to -- if we**
13 **actually participated or did something like**
14 **this, it would throw off our entire flock**
15 **program schedule.  We are different than a lot**
16 **of producers, since we have our own breeder**
17 **farms.  It's not very common at all in the**
18 **industry to have your own birds.  So it would**
19 **never work for our company.**
20     MR. STUEVE:  I move to strike the
21 answer as nonresponsive, and ask if you could
22 read back my question.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

567

1     MR. MONICA: I object to your
2  motion to strike. Please read the answer back
3  as well as the question.
4     MR. STUEVE: I don't want the
5  answer read back. I want my question asked
6  again.
7     MR. MONICA: Well, I want to hear
8  the answer to your question. If you want to ask
9  your question, go ahead.
10  BY MR. STUEVE:
11     Q.   I'll ask it again.
12       Sir, did you discuss the contents
13  of this motion that is reflected in March 31st,
14  2006, with Marcus Rust?
15     **A.   As I stated before, not this**
16  **specific motion, but this topic of moulting and**
17  **selling out hens early, as I stated, would not**
18  **work for our company because we have a strict**
19  **company policy, we can't do that because of our**
20  **system. We have our own breeder farms, our own**
21  **hatcheries, so with us producing our own birds,**
22  **we could not do something like this. As a**

568

1  **company, we don't.**
2     Q.   Sir, the motion indicates it was
3  passed unanimously; is that correct, sir?
4     **A.   That's what's stated here.**
5     Q.   Marcus Rust is identified as a
6  participant in the meeting?
7     **A.   His name is on this paper. Yes.**
8     Q.   And if egg producers -- let me
9  back up. Even if Rose Acre did not participate
10  in this, if there were enough egg producers that
11  did, this would reduce the supply of hens;
12  correct, sir?
13     MR. MONICA: Objection.
14     THE WITNESS: No. Not
15  necessarily. You don't know how many people
16  adding houses, it happens all the time, we're
17  building chicken houses.
18  BY MR. STUEVE:
19     Q.   So this was just passed for grins
20  by the Marketing Committee?
21     MR. MONICA: Objection. You're
22  taunting the witness. Please don't do it.

569

1     THE WITNESS: I cannot speak to
2  this. I was not part of this.
3  BY MR. STUEVE:
4     Q.   Would you have an understanding as
5  to why the Marketing Committee would have
6  recommended that the members, the UEP members
7  molt six weeks earlier their flocks than
8  previously scheduled, and dispose of spent hens
9  six weeks earlier than previously scheduled?
10     **A.   No. I'm not going to speculate on**
11  **what this was.**
12     Q.   And then in the -- also what's
13  reflected in Exhibit 170 is Gregory announced
14  that he would send out a supply demand alert to
15  the industry as quickly as possible?
16     MR. MONICA: On the second page.
17     THE WITNESS: That's what's stated
18  there.
19  BY MR. STUEVE:
20     Q.   Do you remember that economic --
21  the supply demand alert being sent out by UEP,
22  sir?

570

1     **A.   No. I don't recall that.**
2     Q.   Let me show you what's been marked
3  as Exhibit 531. This is a document that is --
4  if you look at the bottom produced by Rose Acre.
5  See here it says RAFKS 0004654. Do you see
6  that?
7     **A.   Yes.**
8     Q.   And it says right at the top, from
9  Chad Gregory, UEP, it should come as no surprise
10  to any of you that UEP will not have a Marketing
11  Committee in 2010, nor the foreseeable future.
12  Do you see that?
13     **A.   Yes. I do.**
14     Q.   Were you aware that after UEP and
15  Rose Acre and other members of UEP were sued
16  that UEP disbanded the Marketing Committee?
17     **A.   No. I don't remember when that**
18  **happened.**
19     Q.   You were aware, though, it was
20  disbanded, sir?
21     **A.   I'm aware today that there is not**
22  **a Marketing Committee.**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

43 (Pages 571 to 574)

---

571

1  Q.  When did you learn that, sir?
2  A.  I don't remember.
3  Q.  Sir, if you could, turn to 24 in
4  517.  It's the -- it's my understanding you've
5  been designated on behalf of Rose Acre to
6  testify about topics L and M.  Can you find L
7  and M there?
8  A.  Yes.
9  Q.  Is that your understanding?
10  A.  Yes.
11  Q.  So 24L states, the impact of the
12  animal care certified program and the UEP
13  certified program on the supply of eggs and egg
14  products.  Do you see that?
15  A.  Yes.  I do.
16  Q.  What did you do in preparation to
17  testify on behalf of Rose Acre in response to
18  24L?
19  A.  On L, I -- from Rose Acres I
20  really can't draw a conclusion to what the
21  impact is.  I think you would require an
22  economist to tell you that.

---

572

1  Q.  Did you attempt to determine the
2  impact of the animal care certified program on
3  the -- Rose Acre's flock size?
4  MR. MONICA:  Objection.  That's
5  not what that asks.
6  THE WITNESS:  Could you repeat
7  that?
8  (The record was read as
9  requested.)
10  MR. MONICA:  Same objection.  You
11  can answer.
12  THE WITNESS:  For Rose Acres, on
13  our flock size, it really had no impact because
14  we -- during -- since the program's -- even
15  prior to the program's inception, and through
16  today, I can't remember no time in our history
17  that we haven't been building chicken houses.
18  MR. STUEVE:  Move to strike the
19  answer as nonresponsive.  I would ask you to
20  read back the question and ask you to answer it
21  for me, sir.
22  MR. MONICA:  I object to the

---

573

1  motion to strike.  Please read back the answer,
2  as well.
3  (The record was read as
4  requested.)
5  BY MR. STUEVE:
6  Q.  Let me make sure you understand my
7  question.
8  Did you, in preparation for 24L,
9  attempt to go back through the records of and
10  documents of Rose Acre to determine what impact,
11  if any, the animal care certified program had on
12  the flock size of Rose Acre?
13  MR. MONICA:  Counsel, he just told
14  you he knows the answer to that.  Why don't you
15  ask him.
16  THE WITNESS:  Yeah.  Like I --
17  MR. STUEVE:  Hold on just a
18  second.  I'm going to ask that Mr. Monica not
19  instruct the witness how to answer.  Read back
20  my question and I would ask for you to answer
21  it, sir.
22  MR. MONICA:  You're trying to

---

574

1  trick him.  You've harassed him, belittled him.
2  Now you're trying to trick him.  I ask you to
3  stop doing it.  Just ask the question.
4  MR. STUEVE:  We'll let the jury
5  decide whether we're trying to trick him.
6  MR. MONICA:  I'm sure they will.
7  MR. STUEVE:  A rude awakening
8  here.
9  MR. MONICA:  For your side.
10  MR. STUEVE:  We'll see.
11  MR. MONICA:  You will.
12  MR. STUEVE:  Looking forward to
13  it.
14  (The record was read as
15  requested.)
16  MR. MONICA:  Object to the form.
17  You can answer.
18  THE WITNESS:  As I previously
19  stated, that Rose Acres, prior to, during, and
20  even through today, Rose Acres I can't remember
21  any time in the history since 1980 since I've
22  been a part of Rose Acres that we have not been

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

44 (Pages 575 to 578)

---

575

building chicken houses.  So our flock size was
not impacted by this program.  That's my answer.
BY MR. STUEVE:
    Q.    I'm going to give you one more
chance to answer it, then we'll bring it back to
the Court.  Read it back and ask you to answer
it?
    **A.    I've answered it twice.**
    Q.    I'll give you one more chance.
    **A.    Why? I've answered it twice.**
    Q.    You have to answer it one more
time.
            Okay.  I'll give you my same
answer.
            MR. MONICA:  We object.  You're
harassing -- you continue to harass the witness.
Repeat the same question.
            THE WITNESS:  You'll get my same
answer, you can ask me a hundred times.  I'll
give you the same answer.
            MR. STUEVE:  I'm going to ask you
one more time.

---

576

            THE WITNESS:  Okay.  Just one
more?
BY MR. STUEVE:
    Q.    Yeah.  Then we'll get the judge
involved and have him review the transcript.
    **A.    All right.  Good.**
            MR. MONICA:  Counsel, you are
continuing to harass the witness.  The video is
going to show it, the transcript is going to
show it.  I ask you for the fifth time to stop
doing it.  You are agitating the witness on
purpose.  Please go ahead read it back.  Greg,
answer it again.
            THE WITNESS:  I will.
            (The record was read as
requested.)
            MR. MONICA:  Same objection.
Please answer.
            THE WITNESS:  As I've stated twice
previously, Rose Acre Farms, before the
certified program and as early as my
recollection, 1980 when I began with the

---

577

company, we have continued -- no time during
that period have we not been building chicken
houses, so the program did not have an impact on
our flock size.
            MR. STUEVE:  I'm going to certify
that question as not responsive.
            MR. MONICA:  We would like to take
a break for a couple minutes.
            MR. STUEVE:  No.  It's not -- I'm
not done with my line of questioning.
            MR. MONICA:  Counsel, you said at
the beginning, he can take a break --
            THE WITNESS:  I have to go to the
restroom.
            MR. MONICA:  We want a break.
Thank you.
            MR. STUEVE:  I want the record to
reflect, counsel is the one broke off, not the
witness.  I did tell the witness he could let me
know when he wanted to take a break.
            MR. MONICA:  Sir, do you want to
take a break?

---

578

            THE WITNESS:  I need to go to the
restroom.
            THE VIDEOGRAPHER:  The time is
11:42 a.m.  We are going off the record.
            (A brief recess was taken.)
            THE VIDEOGRAPHER:  This is the
start of media unit number four.  We're back on
the record at 11:50 a.m.
BY MR. STUEVE:
    Q.    Sir, did you discuss your
testimony with Molly Crabtree, counsel for Rose
Acre during this break?
    **A.    No.**
    Q.    Okay.  Let me show you what's been
marked as Exhibit 575?
            (Exhibit Number 575 was marked for
identification.)
BY MR. STUEVE:
    Q.    And this is Bates range RA 0071932
to 33.  Did you review this, the document, in
preparation for your deposition today?
    **A.    No.**

---

### 579

1    Q.   If you could, you could look down
2  on the bottom of the first page of 575, it's
3  from James Rust to Marcus Rust dated June 15,
4  2008.  Do you see that?
5    A.   Yes.
6    Q.   That would be approximately six
7  years after Rose Acre would have been a part of
8  the UEP certified program; is that right, sir?
9    A.   Correct.
10   Q.   And it says, I disagree adding to
11 existing farms only makes them more efficient.
12 Do you see that line?
13   A.   Yes.
14   Q.   Then the next one down.  Since we
15 lost so much capacity due to animal care,
16 building houses at those farms -- excuse me, let
17 me reread that.
18      Since we lost so much capacity due
19 to animal care.  Do you see that?
20   A.   Yes.
21   Q.   Building houses at those farms is
22 a must, just to hold our own.  Do you see that?

### 580

1    A.   Yes.
2    Q.   This document which is between
3  James Rust -- he's a Board member; right, sir?
4    A.   Yes.  He is.
5    Q.   To Marcus Rust, who is a Board
6  member and also running the company with his
7  mother at this time; is that right?
8      MR. MONICA:  Objection.
9      THE WITNESS:  I'm fine with
10 running the company, but Marcus Rust was
11 vice-president of -- he was executive
12 vice-president of sales and construction.
13 BY MR. STUEVE:
14   Q.   Was there anybody above him,
15 besides his mother?
16      MR. MONICA:  Objection.
17 BY MR. STUEVE:
18   Q.   At this time?
19      MR. MONICA:  Objection.
20      THE WITNESS:  As far as -- at that
21 time we had several executive vice presidents.
22 Marcus was one of several executive vice

### 581

1  presidents under our old structure.  And then
2  Lois Rust was president and chairman of the
3  Board.
4  BY MR. STUEVE:
5    Q.   My question is again, was there
6  anybody above Marcus Rust before Lois Rust?
7    A.   Not above.  No, sir.
8    Q.   Okay.  Now, James Rust's statement
9  that since we lost so much capacity due to
10 animal care.  Do you see that?
11   A.   Yes.
12   Q.   This document was not provided to
13 you by counsel for Rose Acre; is that correct,
14 sir?
15   A.   That's correct.
16   Q.   And you did not review it in
17 preparation for your testimony on behalf of Rose
18 Acre in response to 24L; is that correct, sir?
19   A.   That's correct.
20   Q.   All right.  Show you what's been
21 marked as Exhibit 554.  If you look at the
22 bottom, this is a document produced by Rose

### 582

1  Acre.  It's previously been marked.
2      If you look -- first of all, was
3  this document shown to you by Rose Acre's
4  counsel in preparation for your deposition
5  today?
6    A.   No, sir.
7    Q.   If you go on down to the bottom
8  half.  It -- starting with the line that says,
9  on Tuesday, June 21, 2011.  Do you see that?
10   A.   Yes.
11   Q.   And this is at 9:50 a.m. in the
12 morning, Marcus Rust.  Do you see that reference
13 there?
14   A.   Yes.
15   Q.   All right.  And this is an e-mail
16 from Marcus Rust to Ruth Ann Hendrix, if you
17 look over on the next page, you'll see her
18 initial e-mail; is that correct?
19   A.   From Ruth Ann to Marcus.
20   Q.   Right.  Right above that which is
21 the portion I'm going to be reviewing with you
22 is Marcus's e-mail back to Ruth Ann.  Is that

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

583

1  correct, sir?
2          MR. MONICA:  Objection.
3          THE WITNESS:  I'll have to read it
4  because it doesn't -- in the document, it
5  doesn't state who Marcus wrote it to, unless
6  it's mentioned in here.  I can read it and see.
7  BY MR. STUEVE:
8      Q.   If you look at the e-mail string,
9  the string starts with -- this is the form it
10  was produced to us.  It starts with an e-mail
11  from Ruth Ann to Marcus; right?
12      A.   Yes.  It does.
13      Q.   Dated June 21, 2011, at 8:22?
14      A.   That's what's stated here.  Yes.
15      Q.   On June 21, 2011, same day,
16  approximately a little over an hour later, it
17  appears that Marcus Rust is responding to that
18  e-mail; is that fair to say?
19      A.   If I can read it, I can see.
20      Q.   Sure.
21      A.   Sorry.
22      Q.   Actually, I can shortcut this.  If

584

1  you look right above on the first page?
2      A.   Okay.
3      Q.   It says, dear Marcus, thanks for
4  taking time to respond.  That's from Ruth Ann
5  back to Marcus?
6      A.   Okay.  Let me see.  I just want to
7  make sure that I understand it, if I'm going to
8  agree to what you're saying.  It appears that
9  that is Marcus's response, based on -- they
10  reference the Ohio Farm Bureau.
11      Q.   About halfway down in that
12  response prepared by Marcus Rust on June 21,
13  2011, it states, starting with, did you know.
14  Do you see that, it's right after the HUS
15  question mark.  Do you see that?
16      A.   Yes.
17      Q.   Marcus Rust states, did you know
18  we reduced the output potential of our farms by
19  25 to 30 percent with the cage space increase to
20  try and make a viable program.  Do you see that?
21      A.   Yes.  I do.
22      Q.   The cage space increase he's

585

1  referring to there, sir, is the animal care
2  certified program's cage space requirements;
3  correct?
4          MR. MONICA:  Object to form.
5          THE WITNESS:  I can't draw a
6  conclusion what Marcus is referring to.
7  BY MR. STUEVE:
8      Q.   You did not discuss this statement
9  in Exhibit 554 with Marcus Rust in preparation
10  for your testimony in response to 24L; is that
11  correct, sir?
12      A.   That is correct.
13      Q.   Are you aware of any other cage
14  space increase program that Rose Acre was
15  involved in other than the UEP certified
16  program?
17          MS. REDDING:  Objection.
18          MR. MONICA:  I join the objection.
19  You can answer.
20          THE WITNESS:  Repeat the question,
21  please.
22  BY MR. STUEVE:

586

1      Q.   Let me restate it.  Are you
2  aware -- we've been looking at Marcus Rust's
3  statement on June 21, 2011, that we reduced the
4  output potential of our farms by 25 to
5  30 percent with the cage space increase.  We've
6  been looking at that statement; correct?
7      A.   Yes.
8      Q.   Are you aware of any other
9  program, other than the animal care certified
10  program that Rose Acre was participating in that
11  had a cage space increase requirement?
12          MR. MONICA:  Object to the form of
13  the question.  You can answer.
14          THE WITNESS:  Not that I recall.
15  No.
16  BY MR. STUEVE:
17      Q.   Show you what's been marked as
18  Exhibit 567.  Did Rose Acre's counsel give you
19  this document in preparation for your deposition
20  today?
21      A.   No, sir.
22      Q.   If you would, on the first page of

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

587

1  567, it's an e-mail from Joe Miller, who is the
2  general counsel for Rose Acre; correct?
3        A.   Correct.
4        Q.   Who's present at your deposition
5  today; right?
6        A.   Correct.
7        Q.   It's to Gene Gregory of United
8  Egg, which would be UEP; correct?
9        A.   Well, United Egg and UEP are
10  separate.
11        Q.   Okay.  But Gene Gregory is the
12  person who in 2007 would have had a leadership
13  role with United Egg Producers; correct?
14        A.   That is correct.
15        Q.   And Joe copies Marcus Rust and you
16  on this; right?
17        A.   Yes.
18        Q.   And do you recall getting a copy
19  of this letter to the USDA concerning shield?
20        MR. MONICA:  Sorry.  I lost track.
21  Is there a question pending?
22        THE WITNESS:  Can you repeat the

---

588

1  question?
2        (The record was read as
3  requested.)
4  BY MR. STUEVE:
5        Q.   If you look up at the subject line
6  of the e-mail that you're copied on, it says
7  letter to USDA concerning shield; is that
8  correct?
9        A.   Yes.
10        Q.   All right.  Do you recall
11  receiving this letter to the USDA that was
12  attached?
13        A.   I vaguely -- I have a vague
14  recollection of this e-mail, but I would never
15  have remembered it without looking at it.
16        Q.   Okay.
17        A.   Once I looked at it, I kind of
18  remember it.  Yes.
19        Q.   Okay.  So you do remember
20  reviewing this at the time you would have
21  received it in August of 2007; is that correct?
22        A.   Like I said, looking it over, and

---

589

1  I would have to read more of the contents but I
2  have a vague recollection of receiving this
3  e-mail.  Yes.
4        Q.   And not only were you copied but
5  Marcus Rust was copied, as well; correct?
6        A.   Yes.
7        Q.   And this was actually sent by --
8  the e-mail was sent by Joe Miller, who is the
9  author of the letter; right?
10        A.   That's what's stated here.  Yes.
11        Q.   All right.  And it lists
12  Mr. Miller as the general counsel of Rose Acre
13  Farms; right?
14        A.   Yes.  It does.
15        Q.   You would expect a letter that was
16  prepared by the general counsel of Rose Acre to
17  be accurate; correct, sir?
18        A.   I guess -- repeat the question,
19  please.
20        (The record was read as
21  requested.)
22        THE WITNESS:  I guess I don't

---

590

1  understand what you mean by accurate.  What -- I
2  guess I'm not sure what you're referring to.
3  BY MR. STUEVE:
4        Q.   That the statements that would be
5  made in the letter on behalf of Rose Acre by
6  their general counsel, that those statements
7  would be accurate; correct?  That's what you
8  would expect?
9        A.   Our legal counsel -- as general
10  counsel for Rose Acres, Joe Miller is -- does
11  give opinions to management of Rose Acres, is
12  what he does.  Now, to state whether what Joe
13  states is accurate, I guess I'm just -- I'm a
14  little vague on what you're asking.
15        Q.   I'll ask it one more time.
16        You would expect that the
17  statements in a letter prepared by the general
18  counsel of Rose Acre to the USDA would be
19  accurate statements; correct, sir?
20        A.   Without talking about specific
21  statements that are accurate, I guess -- I just
22  don't want to in general agree to that.  No.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II
March 18, 2014

591

1  Q.   Well, you consider him a
2  trustworthy person; is that right?
3      A.   Yes.  I do.
4  Q.   And he speaks publicly on occasion
5  on behalf of Rose Acre; correct?
6      A.   Yes.
7  Q.   For example, when the Humane
8  Society issued a videotape of Rose Acre's
9  facilities, he was the person who spoke on
10 behalf of Rose Acre to the press; correct, sir?
11     A.   I don't recall that for sure.  No.
12 I remember Victor Rigterink was involved in
13 that.
14 Q.   You don't recall Mr. Miller
15 issuing a statement on behalf of Rose Acre?
16     A.   No.  I don't recall that.
17 Q.   Sir, the letter that's attached
18 that you were copied on, it states in the second
19 paragraph there, Rose Acre Farms is one of the
20 largest egg producers in the US.  See that
21 statement.  Second paragraph?
22     A.   Yes.

592

1  Q.   That's an accurate statement;
2  right?
3      A.   Yes, it is.
4  Q.   We have also been very committed
5  to the UEP certified program.  That's an
6  accurate statement; correct, sir?
7      A.   Yes.
8  Q.   This commitment has come at a
9  great deal of expense and work on our part.  Is
10 that an accurate statement, sir?
11     A.   Yes.
12 Q.   And then if you would, he states
13 in the next sentence how the program was
14 developed.  Is that consistent with your
15 understanding, sir?
16     MR. MONICA:  Objection.  Vague.
17     THE WITNESS:  Yes.  The -- it's my
18 understanding -- yes.  The Scientific Committee
19 developed the guidelines; correct.
20 BY MR. STUEVE:
21 Q.   In the next statement, he states,
22 in order to comply with these requirements, he's

593

1  referring to the UEP certified egg program;
2  correct, sir?
3      MR. MONICA:  Objection.
4      THE WITNESS:  Yes.
5  BY MR. STUEVE:
6  Q.   He states, in order to comply with
7  these requirements, Rose Acre Farms reduced the
8  number of birds per cage, which has amounted to
9  a reduction of literally millions of birds from
10 our operation.  Did I read that accurately, sir?
11     A.   Yes.
12 Q.   We did this because it was the
13 right thing to do.  Did I read that correctly?
14     A.   Yes.
15 Q.   Now, at the time you received and
16 reviewed this letter, did you contact Mr. Miller
17 and indicate to him that there are any
18 inaccurate statements in this letter?
19     A.   I don't remember my discussions
20 with Mr. Miller in regards to this statement.
21 Q.   All right.  Now, did counsel for
22 Rose Acre show you this document in preparation

594

1  for your testimony in response to topics 20G and
2  24L?
3      A.   No, sir.
4  Q.   Show you what's been marked as
5  Exhibit 108.
6      MR. MONICA:  Don't look at it
7  until I've seen it, please.  Go ahead and look
8  at it.
9  BY MR. STUEVE:
10 Q.   Sir, did counsel for Rose Acre
11 provide you this document in response to -- in
12 preparation for your testimony on behalf of Rose
13 Acre in response to 20G?
14     A.   No, sir.
15 Q.   And if you would, on the second
16 page of Exhibit 108 -- well, first of all, on
17 the first page, it's dated March 29, 2002.  That
18 would have been right at the beginning of when
19 UEP joined -- excuse me.  When Rose Acre joined
20 UEP; is that correct, sir?
21     A.   Yes.
22 Q.   And over on the second page, it

595

1    discusses a Producer Committee for animal
2    welfare and it has both you and Marcus Rust
3    listed as participating; is that right, sir?
4        A.   Yes.
5        Q.   And in reviewing this document,
6    does that refresh your recollection that you
7    attended that meeting?
8        A.   No.  It doesn't.
9        Q.   If you would, over on 912, it
10   says -- right at the top, it says, motion was
11   moved by Thompson and seconded by Arias to
12   recommend to the Board a requirement for a grade
13   of 85 percent would be required to past the
14   audit.  Motion carried by vote 8 to 3.  Do you
15   see that?
16       A.   Yes.  I do.
17       Q.   Do you recall that vote being
18   taken?
19       A.   No.  I don't.
20       Q.   All right.  About the fifth one
21   down, it says, it was moved by Arias and
22   seconded by Behan to recommend that 50 points of

596

1    the 110 in the housing and space allowance be
2    assigned to the space allowance and all other
3    line items be assigned 5 points.  Do you see
4    that?
5        A.   Yes.  I do.
6        Q.   Do you recall that motion being
7    voted on?
8        A.   No.  I don't.
9        Q.   Do you recall that the only
10   requirement of the animal care certified program
11   that would result in a failure of the audit is
12   the cage space allowance requirement?
13           MR. MONICA:  Object to the form.
14           THE WITNESS:  No.  I'm not.
15   BY MR. STUEVE:
16       Q.   Is this the first time you heard
17   of that today, sir?
18       A.   I don't remember.  I read the
19   requirements.  I just can't recall them.
20       Q.   Now, also attached to Exhibit 108,
21   and just to go back to the first page of 108,
22   this is from Gene, and then it's to several

597

1    folks, including yourself; right?
2        A.   Yes.
3        Q.   KY Hendrix also of Rose Acre?
4        A.   Correct.
5        Q.   And it says, please find attached
6    minutes from both the Producer Committee for
7    animal welfare and price discovery for certified
8    egg meetings.  Please review these and let me
9    know if any corrections are needed.  Do you
10   remember receiving Exhibit 108, sir?
11       A.   No.  I don't.
12       Q.   And reviewing it now doesn't
13   refresh your recollection at all; is that
14   correct?
15       A.   That's correct.
16       Q.   Now, if you would, if you look
17   over on the Bates 915 at the bottom there of
18   Exhibit 108, this is the minutes of the price
19   discovery meeting that you were provided a copy
20   of; is that right?
21       A.   You mean --
22       Q.   On 915, the price discovery for

598

1    certified egg minutes.  Do you see that?
2        A.   Yes.  I do.
3        Q.   This was attached to the
4    communication you would have received from Gene
5    Gregory of United Egg Producers; right?
6        A.   That's what it says.  Yes.
7        Q.   Okay.  Under the motion for the
8    price discovery, it says, it was moved by Fortin
9    and seconded by Deffner to recommend to the
10   Board that no more eggs may be marketed as
11   certified than those produced by the certified
12   company or purchased from other certified
13   companies.  Do you see that?
14       A.   Yes.
15       Q.   Do you remember that motion being
16   approved by the Price Discovery Committee?
17       A.   No.  I don't.
18       Q.   Do you remember that motion
19   ultimately being approved by the Board of
20   Directors of UEP?
21       A.   I don't remember.
22       Q.   Is this the first time that you

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

599

1    became aware that this action was taken by UEP?
2              MR. MONICA:  Objection.
3              THE WITNESS:  Which action?
4    BY MR. STUEVE:
5         Q.   The action that's identified in
6    the motion of the Price Discovery Committee?
7              MR. MONICA:  Object to the form of
8    the question.
9              THE WITNESS:  Repeat your
10   question, please.
11             MR. STUEVE:  Read it back for him,
12   please.
13             (The record was read as
14   requested.)
15             MR. MONICA:  Object to the form of
16   the question.
17             THE WITNESS:  I don't remember
18   this motion and this meeting, but that's not the
19   way the program works today.
20   BY MR. STUEVE:
21        Q.   Do you, though, have any
22   recollection of the discussion of this motion

600

1    for the subsequent approval by UEP?
2              MR. MONICA:  Objection.
3    BY MR. STUEVE:
4         Q.   Forward of the motion?
5         A.   I don't remember that.  No.
6              MR. STUEVE:  Why don't we take our
7    lunch break here.
8              MR. MONICA:  Let's go off the
9    record and talk about it.
10             THE VIDEOGRAPHER:  The time is
11   12:18 p.m. and we're going off the record.
12             (Whereupon, at 12:18 p.m., a lunch
13   recess was taken.)
14
15
16
17
18
19
20
21
22

601

1              AFTERNOON SESSION
2                 (1:03 p.m.)
3              THE VIDEOGRAPHER:  The time is
4    approximately 1:03 p.m. and we are back on the
5    record.
6    BY MR. STUEVE:
7         Q.   Let me show you what's been marked
8    as Exhibit 576?
9              (Exhibit Number 576 was marked for
10   identification.)
11   BY MR. STUEVE:
12        Q.   You testified yesterday that Super
13   Value, the wholesaler, was one of your
14   customers; is that correct?
15        A.   Yes.
16        Q.   Okay.  And can you confirm that
17   this is the entity that you're referring to?  We
18   printed off their website.
19        A.   Yes.  This is Super Value that I
20   was referring to.
21        Q.   Okay.
22             (Exhibit Number 577 was marked for

602

1    identification.)
2    BY MR. STUEVE:
3         Q.   I'll show you what's been marked
4    as Exhibit 577 and ask if you can confirm this
5    is the website of Topco, also one of Rose Acre's
6    customers that you testified about yesterday?
7              MR. MONICA:  Counsel, mine is
8    highlighted.  Is it supposed to be?  I want to
9    make sure it doesn't matter.
10             MR. STUEVE:  No.  It doesn't
11   matter.
12             THE WITNESS:  Yes.  This is the
13   Topco I was referring to.
14   BY MR. STUEVE:
15        Q.   Okay.
16             (Exhibit Number 578 was marked for
17   identification.)
18   BY MR. STUEVE:
19        Q.   Let me show you the first page of
20   Centrella's website, it's been marked as
21   Exhibit 578.
22             Can you confirm for me this is the

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

603

1  Centrella you were testifying about yesterday
2  that purchased Certified?
3      A.  I don't recall anything talking
4  about Centrella purchasing Certified.
5      Q.  Okay.  If you remember yesterday,
6  I asked you about whether Certified had been
7  purchased.  Do you remember that?
8      A.  Oh.  I'm sorry.  Certified
9  Grocers.
10     Q.  Yeah.  Certified Grocers.  I'm
11 sorry.  Do you remember that?
12     A.  They purchased Certified Grocers
13 Midwest.  I remember that.
14     Q.  Centrella did?
15     A.  Yes.
16     Q.  Centrella did?
17     A.  Yes.
18     Q.  I asked you if they had a similar
19 business model as Certified.  Do you recall
20 that?
21     A.  I remember they purchased
22 Certified.  Yes.

---

604

1      Q.  Is this the Centrella you were
2  referring to?  I want to confirm that that's
3  referenced on this website, 578?
4      A.  That purchased Certified Grocers?
5      Q.  Yes.
6      A.  Yes.
7      Q.  Okay.  If you could turn to topic
8  22 and confirm that you have been designated to
9  testify on behalf of Rose Acre with respect to
10 22G through L?
11     A.  Yes.
12     Q.  And what did you do to prepare
13 yourself to testify concerning 22G through L?
14     A.  Just my general knowledge of being
15 involved with US Egg Marketers on this topic.
16     Q.  Now, you're not on the Board of
17 USEM; is that correct?
18     A.  That is correct.
19     Q.  Did you talk to Marcus Rust in
20 preparation for your testimony today in response
21 to 22G through L?
22     A.  No.  I did not.

---

605

1      Q.  All right.  And he is the one that
2  actually serves on the USEM Board of Directors
3  and would actually vote on the exports; is that
4  correct, sir?
5      A.  That is correct.
6      Q.  Now, what involvement did you
7  have -- this is the big picture -- with respect
8  to the USEM exports that Rose Acre participated
9  in?
10     A.  My involvement would be working
11 with Bob Niewedde and our customer service
12 people and Lindsey Schepman on the supply of the
13 eggs for the exports to make sure to execute the
14 production and distribution of those.
15     Q.  And would you have had that role
16 each and every time that Rose Acre participated
17 in the USEM exports?
18     A.  Yes.  I did.
19     Q.  Did you have any involvement in
20 the decision for Rose Acre to join USEM in 2006?
21     A.  No.  I did not.
22     Q.  Whose decision was that?

---

606

1      A.  Marcus Rust.
2      Q.  Who else -- let me ask this.
3  Anyone other than you, Bob Niewedde, and Lindsey
4  Schepman that would actually be involved in the
5  execution of the various exports that Rose Acre
6  participated with USEM in?
7      A.  Yes.  Our -- our -- many people
8  got involved.
9      Q.  Okay.
10     A.  Because when you -- when we
11 produce eggs, Bob would get the orders and then
12 they would be assigned to a farm.  If you go --
13 to the cooler manager at that particular
14 location that would have been producing the
15 eggs.
16         The cooler manager, his
17 responsibility is to fill out the daily
18 production schedules for the egg graders for the
19 egg -- processing manager for the egg graders.
20 They would in turn, there's approximately 12
21 people -- 12 to 15 people per egg grader.  Their
22 responsibility then would be to process and

---

607

package through their machine the eggs would be
washed and sanitized, graded, and packaged into
loose flats and then put into cases which then
would be sent to the line men and the line men
they go through a tape machine, be taped. So
the line men would then stack the cases
transport them into our egg cooler. From there
the shipping department would load them onto
trucks to be transported to the ultimate
destination for delivery so our transportation
department would become involved.

        Our accounts receivable department
would be involved in invoicing for the eggs and
collecting money.

        Our customer service people would
be involved with the plants, verifying to make
sure the eggs were shipped and went out and were
invoiced correctly.

        I guess you could go back to the
flock managers that run the chicken houses and
the feed people that are responsible for feeding
the birds.

608

        I mean, you could ultimately say
through the whole process all the way back to
our, you know, from the flock side on, once the
eggs are produced and into the processing. So
to make this happen there's a lot of people
involved.

Q. Because the -- these exports were
very large exports that needed to be filled in a
very short period of time; correct, sir?

A. Which -- no. Not always.

Q. When you say accounts receivable
invoicing, who would be invoiced?

A. It would be -- I don't exactly
know whose name -- it would be within USEM and
UEP, but I don't know exactly what the heading
of the invoice said.

Q. But it would have been someone at
USEM that would have been invoiced?

A. Yes.

Q. Now, were there exports in which
Rose Acre would have to purchase eggs in order
to fulfill its commitment?

609

A. That has happened. Yes.

Q. Who would be obligated to do that
at Rose Acre?

A. Bob Niewedde.

Q. Would you assist him in that
process?

A. Yes.

Q. Anyone else?

A. In the actual going out to procure
them. No. In some of the decisions to -- if we
had to procure eggs that could have involved
Lindsey and Aaron, as well.

Q. Okay. And --

A. And Jeff Cutler.

Q. And then, Rose Acre participated
in several USDA exports since 2006; is that
correct, sir?

A. I don't know how many for sure.

Q. Which egg production facilities
would have contributed eggs over that time to
fulfill those orders?

A. Our farms in North Carolina and

610

Georgia, as well as Indiana, I recall.

Q. Which ones in Indiana?

A. Cort Acres in Seymour, Indiana.

Q. And then which ones in Georgia?

A. Oconee Egg Farm and Cannon Egg
Farm.

Q. And then which ones in North
Carolina?

A. Hyde County Egg Farm, H-Y-D-E.

Q. How long has Rose Acre had the
Cort Acres production facility?

A. It was -- started construction in
1978.

Q. Okay. And what about Cannon in
Indiana?

A. Cannon is in Ohio -- Georgia.

Q. Excuse me. Cannon in Georgia?

A. Cannon has been about five years
now.

Q. Okay. So that would have been
approximately 2008?

A. Approximately, yes.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

53 (Pages 611 to 614)

---

611

1    Q.    And when what about Oconee Egg?
2    A.    **Oconee was -- it was prior to**
3    **2005, early 2000s. I don't know the exact year.**
4    Q.    Okay. What about Hyde County?
5    A.    **We -- construction I believe**
6    **started in 2005.**
7    Q.    Okay. Sir, let me show you what's
8    previously been marked as Exhibit 518. You had
9    mentioned earlier in your testimony about a
10   brochure. Is this the type of brochure, for
11   example, you would have provided AWG?
12   A.    **No, sir.**
13   Q.    What is this?
14   A.    **This was a previous brochure that**
15   **was put together by a salesperson that used to**
16   **work for us, but we don't use this anymore.**
17   Q.    Was it used at one point in time
18   when you solicited customers?
19   A.    **Yes, sir.**
20   Q.    Is the new one in a similar
21   format?
22   A.    **No. It's not.**

---

612

1    Q.    Okay. If you look at on the
2    second page, down at the bottom there?
3    A.    **Okay.**
4    Q.    Is Oconee listed there?
5    A.    **Yes.**
6    Q.    Where?
7    A.    **Under the history and growth of**
8    **Rose Acre.**
9    Q.    Yeah. Which year?
10   A.    **1999.**
11   Q.    Okay. I see Oconee. Does that
12   refresh your recollection when that would have
13   been built?
14   A.    **Yes.**
15   Q.    So Cort Acres broke ground in '78.
16   Oconee would have been '99. Hyde County would
17   have been in '05 and Cannon Egg in '08; is that
18   correct, sir?
19   A.    **Yes. Approximately '08. Yes.**
20   Q.    All right. Did you participate in
21   any of the USEM export meetings?
22   A.    **I know I attended one -- I**

---

613

1    remember attending at least one meeting.
2    Q.    Okay. Who else would have
3    attended those meetings?
4    A.    **Marcus Rust.**
5    Q.    Anyone else?
6    A.    **Not that I can recall. No.**
7    Q.    Okay. Show you what's been marked
8    as 321. Would you have -- can you confirm for
9    me that this is the USEM, the initial membership
10   agreement that was entered into by Rose Acre?
11   A.    **Yes. It appears to be.**
12   Q.    Okay. Would you have participated
13   in filling this out?
14   A.    **No, sir.**
15   Q.    Okay. And whose signature is on
16   there?
17   A.    **That's Marcus'.**
18   Q.    Now, we've -- we've confirmed
19   through other testimony that actually when Rose
20   Acre joined USEM was actually in 2006; is that
21   correct?
22   A.    **I don't know. This says 2007.**

---

614

1    Q.    You don't know one way or the
2    other?
3    A.    **No. I don't.**
4          **(Exhibit Number 579 was marked for**
5    **identification.)**
6    BY MR. STUEVE:
7    Q.    Let me show you what's been marked
8    as Exhibit 585?
9          THE REPORTER:  585?
10         MR. HICKEY:  Sorry. We should
11   switch that out.
12         MR. MONICA:  Yeah. If you could
13   change it. Still 585?
14         MR. HICKEY:  It will be 579.
15   BY MR. STUEVE:
16   Q.    Show you what's been marked as
17   Exhibit 579. Does this appear to be the
18   August 2010 membership agreement entered into
19   between Rose Acre and USEM?
20         MR. MONICA:  Objection.
21         MS. REDDING:  Can we get the Bates
22   number, please?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

54 (Pages 615 to 618)

---

615

1         MR. STUEVE:  Yeah, UE 1028216
2    through 21.
3    BY MR. STUEVE:
4         Q.    Have you seen this document
5    before?
6         A.    I don't recall.
7         Q.    Did you participate in providing
8    the information that's contained in this
9    document?
10        A.    No.  I didn't.
11        Q.    Is that Marcus Rust's signature?
12        A.    Yes.  It is.
13        Q.    On 217 there at the bottom?
14        A.    Yes.
15        Q.    Okay.  Now, do you know who Larry
16   Seger is?
17        A.    Yes.  I do.
18        Q.    Who is Larry Seger?
19        A.    He's passed away.
20        Q.    Okay.  When he was alive did
21   you -- what organization did he work for?
22        A.    Well, he was Wabash Valley Produce

---

617

1         Q.    What is UEA?
2         A.    United Egg Association.
3         Q.    Has Rose Acre been a member of
4    that association?
5         A.    Yes.
6         Q.    And for how long?
7         A.    For many years.  I don't recall.
8    I don't remember when we joined, but for a long
9    time.
10        Q.    And who from Rose Acre
11   participated in the United Egg Association?
12        A.    Over the years, myself, Victor
13   Rigterink, currently Jeff Cutler.  We -- Todd
14   Vogle, our quality manager, may have attended a
15   meeting.  I can vaguely recall he might have
16   attended sometime, but never -- I don't think he
17   was ever a member -- well, we're a member
18   because we're a company member.  I'm sorry.
19   But -- Larry McVee.  Possibly Yves Crepelay.
20   I'm not -- oh, don't ask me to --
21        Q.    As far as current employees?
22        A.    Jeff Cutler.

---

616

1    in DuBois, Indiana.
2         Q.    When did he pass away?
3         A.    Several years ago.
4         Q.    While he was alive, did you
5    understand he was involved in the USEM export
6    program?
7         A.    Yes.  I did.
8         Q.    What was his role?
9         A.    I believe -- I don't know the
10   title, it was either president or chairman,
11   whichever that title was.
12        Q.    Okay.  Let me show you what's been
13   marked as Exhibit 173.  In this communication
14   down at the bottom it has Larry Seger USEM
15   chairman?
16        A.    Okay.
17        Q.    Is that consistent with your
18   recollection?
19        A.    Yes.
20        Q.    This is to all UEP, UEA and USEM
21   members.  Do you see that?
22        A.    Yes.  I do.

---

618

1         Q.    So Marcus, Victor, Jeff Cutler and
2    you would have been involved in it?
3         A.    The most active; correct.
4         Q.    And that is also a trade
5    association that Al Pope and Gene Gregory led;
6    correct?
7         MR. MONICA:  Object to the form.
8         THE WITNESS:  No.  It was --
9    UEA -- United Egg Association -- when I say, no,
10   UEA was a -- separate from UEP, but UEP -- my
11   understanding, I think I understand that there
12   is a fee for management services to UEP for UEA
13   but most of our -- it's either Howard McGuire
14   was kind of the -- when I was active that I
15   recall -- I've not been to the meetings for many
16   years, but when I was there, I remember Howard
17   McGuire was kind of like our main go to guy that
18   helped us on issues that we had for the egg
19   breaking industry.
20   BY MR. STUEVE:
21        Q.    And you indicated though that UEA
22   would pay a management fee to UEP; is that

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

619

1  correct?
2      A.   That's what I remember.
3      Q.   And UEP would have been run by Al
4  Pope and then Gene Gregory during that time
5  period; correct, sir?
6      A.   UEP.  Yes.
7      Q.   Did they attend the UEA meetings?
8      A.   I don't remember particularly
9  how -- I know -- I can -- I recall Gene possibly
10 being in meetings.
11     Q.   Was Rose Acre a member of United
12 Egg Association prior to 2002?
13     A.   I don't remember.
14     Q.   What documents would you look at
15 to refresh your recollection on that?
16     A.   I would look at -- I would
17 probably have to go back and look in accounts
18 payable to see if we paid dues.  That's probably
19 what I would have to look at, see if we ever
20 paid any dues into UEA prior to that.
21     Q.   In the second paragraph there of
22 the letter that was written by Larry Seger of

---

620

1  USEM to all UEP, UEA and USEM members, it says
2  the main purpose of exports is to strengthen the
3  current market, unquestionably, that always
4  happens.  Do you see that?
5      A.   Yes.  I do.
6      Q.   Strengthening a weak market or
7  raising a steady market is what exports are
8  meant to accomplish in the short run.  Do you
9  see that?
10     A.   That's what's written there.
11     Q.   And that was your understanding
12 and when I'm referring to your, I'm referring to
13 Rose Acre that was your understanding of the
14 purpose of the USEM exports; correct, sir?
15     A.   No.
16          MR. MONICA:  Objection to form.
17 You can answer.
18          THE WITNESS:  No.  That's not my
19 understanding.
20 BY MR. STUEVE:
21     Q.   Show you what's been marked as
22 Exhibit 243.  And this is a May 1, 2003 United

---

621

1  Voices that would have been sent out to UEP
2  members, dated May 1st, 2003; is that correct?
3      A.   Yes.
4      Q.   And at this time, Rose Acre would
5  have been a member; right?
6      A.   Correct.
7      Q.   And under the -- in fact, Rose
8  Acre is the one that produced this document; is
9  that right, Exhibit 243?
10     A.   It has RA at the bottom.
11     Q.   And it says -- it's talking about
12 the industry's economic recovery up at the top.
13 Do you see that?
14     A.   Yes.
15     Q.   And it says there are possibly
16 many theories for this recovery.  However, we
17 believe there are at least four major reasons.
18 They are:  First is the reduced chick hatch.  Do
19 you see that?
20     A.   Yes.
21     Q.   And that would be related to the
22 certified program; correct?

---

622

1          MS. REDDING:  Objection.
2          MR. MONICA:  Objection.
3          THE WITNESS:  No.  I can't say
4  that.
5  BY MR. STUEVE:
6      Q.   And number 2 would be UEP's animal
7  care certification program.  Do you see that?
8      A.   Yes.
9      Q.   That would be referring to the
10 cage space reduction requirements of that
11 program; correct, sir?
12          MR. MONICA:  Object to the form.
13          THE WITNESS:  No.  I don't agree
14 with that.
15 BY MR. STUEVE:
16     Q.   And number 4, it lists -- the
17 fourth one is exports taken by United States Egg
18 Marketers.  Do you see that?
19     A.   Yes.
20     Q.   That would be consistent with
21 Mr. Seger, the chairman of USEM's statement that
22 the purpose of the exports is to boost egg

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

56 (Pages 623 to 626)

---

623

prices in the domestic market in the short run;
correct, sir?
      A.  I don't agree with that.  No.
      Q.   Okay.  Now, if you look down here
at the second to last paragraph here, it says,
we believe the major reason for the industry's
economic recovery must be attributed to the USEM
export of 550 trailer loads of shell eggs
through the period late October through mid
March.  Do you see that?
      A.  Yes.
      Q.   550 trailer loads, that would be
almost two years of shell egg sales for Rose
Acre; correct?
      A.  No.
      Q.   I thought you said that you, on an
annual basis, were using 300 trailer loads.  Do
you see that?
            MR. MONICA:  Objection.
            THE WITNESS:  No.
BY MR. STUEVE:
      Q.   Okay.  So let me -- let me go

---

624

on --
      A.  I --
      Q.   Go ahead.
      A.  I sell 45 trailer loads a day,
sir, per day.
      Q.   What were you referring to the 300
trailer loads?
      A.  Per week.
      Q.   Per week.  Excuse me.  So the 550
number would be close to two weeks of your shell
egg sale; is that correct, sir, from all your
facilities?
      A.  Approximately, yes.
      Q.   Let me ask you this.  It says, we
believe these exports have contributed nearly
300 million to the industry recovery.  Do you
see that?
      A.  Yes.
      Q.   Again, that would be consistent
with the chairman of USEM, Larry Seger's
statement that the purpose of the exports was my
boost domestic prices; correct, sir?

---

625

            MR. MONICA:  Objection.
            THE WITNESS:  No.  I don't agree
with that.  I can't tell you what Larry Seger
was thinking.
            (Exhibit Number 580 was marked for
identification.)
BY MR. STUEVE:
      Q.   Let me show you what's been marked
as Exhibit 580, that's Bates range RAUPDATE
0067579 through 93.
            Did you review this document in
preparation for your deposition today?
      A.  No.  I didn't.
      Q.   If you would, topic 22K asks for
you to testify on behalf of Rose Acre concerning
the impact or effect of USEM exports on the
supply of eggs or egg products.  Do you see
that?  That's in 517.  That's number 22K?
      A.  Yes.
      Q.   Did counsel for Rose Acre show you
Exhibit 580 in preparation for your testimony
today?

---

626

      A.  No.
      Q.   You can confirm this is a Rose
Acre document; is it not, sir?
      A.  It's not a Rose Acre document but
it's got Rose Acre at the bottom so it may have
been produced by Rose Acre, but it is not a Rose
Acre document.
      Q.   It was produced by Rose Acre; is
that correct, sir?
      A.  What do you mean by produced?
      Q.   Exhibit 580 has the Bates range RA
which would stand for Rose Acre.  Do you
understand that?
      A.  Yes.
      Q.   Okay.  Do you know whose files
this would have come from, from Rose Acre?
      A.  Probably mine.
      Q.   And, if you would, sir, over on
the -- it's the last two digits are 86?
      A.  Okay.
      Q.   Under USEM.  Do you see that at
the bottom?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

57 (Pages 627 to 630)

627

1    A.    Yes.
2    Q.    It says, UEP assumed the
3  management of United States Egg Marketers, USEM,
4  in 2000.  Do you see that?
5    A.    Yes.
6    Q.    Is that consistent with your
7  recollection?
8    **A.    I don't know about way back in**
9  **2000.**
10    Q.    At the time Rose Acre joined in
11  2006, was UEP managing United States Egg
12  Marketers?
13    **A.    The document that you show me that**
14  **Marcus signed was 2007, but, yes, at that time,**
15  **I would probably recall UEP assisted in the**
16  **management of US Egg Marketers.**
17    Q.    Since then USEM activities have
18  been limited to a conference call three times
19  per week and an export program.  Do you see
20  that?
21    A.    Yes.
22    Q.    When Rose Acre joined USEM in 2006

628

1  did it participate in the conference calls?
2    **A.    I don't recall.**
3    Q.    Has it -- from 2006 up to the
4  present, has it participated in those conference
5  calls?
6    **A.    I know that Bob Niewedde**
7  **participates in some conference calls, I just**
8  **can't tell you exactly when he was on them.**
9    Q.    We're talking about USEM
10  conference calls?
11    **A.    Yes.  We are.**
12    Q.    It says, these timely exports have
13  been a major benefit to the egg industry in
14  total, not just to USEM members.  Do you see
15  that?
16    **A.    Yes.  I do.**
17    Q.    You understood again what was
18  being indicated there that by executing these
19  large exports into foreign markets, it reduced
20  the supply of eggs and boosted domestic prices;
21  correct, sir?
22    MR. MONICA:  Object to the form of

629

1  the question.
2    THE WITNESS:  No.  I don't
3  necessarily agree with that.
4  BY MR. STUEVE:
5    Q.    If you would, over on 587 under
6  exports, it -- you see that category there,
7  it's on RA the last two digits are 87.  Do you
8  see that?
9    A.    Yes.
10    Q.    Under exports, it says, many UEP
11  members participate in exports through their
12  USEM membership.  Do you see that?
13    A.    Yes.
14    Q.    And that would be true of Rose
15  Acre; right?
16    MR. MONICA:  Objection.
17    THE WITNESS:  If we're talking
18  about the date range that we have been a USEM
19  member; correct.
20  BY MR. STUEVE:
21    Q.    Then it says these exports --
22  excuse me -- it says, second sentence there, it

630

1  says, these exports are only taken in large
2  volume shipments over a very short delivery
3  period for the purpose of having the greatest
4  impact upon surplus supply reduction.  Do you
5  see that?
6    A.    Yes.
7    Q.    And you understood that that was
8  the purpose of the USEM exports; correct?
9    A.    No.
10    MR. MONICA:  Object to the form.
11    THE WITNESS:  No.  I don't agree
12  with that.
13    Q.    I'll show you what's been marked
14  as Exhibit 48.  Have you seen this document
15  before?
16    **A.    No.  I don't recall ever seeing**
17  **this.**
18    Q.    If you would, turn back to the
19  last page.  This is a -- according to the
20  testimony of UEP, this is a summary under
21  exports 2000 the summary of the exports that
22  USEM executed in the year 2000.  Do you see

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                                    March 18, 2014

631

1   that, where that is on that page?
2           MR. MONICA:  Objection.
3           THE WITNESS:  I don't know that
4   this is the summary.  I see it lists exports and
5   dates and people's names, but I don't.
6   BY MR. STUEVE:
7       Q.   Are you familiar with Worldwide
8   Egg?
9       A.   No.  I'm not.
10      Q.   What about Dolphin Fuchs?
11      A.   Yes.
12      Q.   What is that?
13      A.   Fuchs -- Jürgen Fuchs is an egg
14  producer in Germany.  Dolphin is a shipping and
15  trading company located in Georgia.
16      Q.   Okay.  What about Worldwide Egg?
17      A.   No idea.
18      Q.   And then Dolphin Fuchs again and
19  Dolphin Fuchs again is listed there; is that
20  right?
21      A.   Yes.
22      Q.   Do you know what is meant by

632

1   Class 1?
2       A.   Class 1 would be a Class 1 nest
3   run product, ungraded.
4       Q.   And are those types of eggs
5   typically used for breaking?
6       A.   They can be.
7       Q.   If they're ungraded -- let me ask
8   you this.
9           Have you sold Class 1 shell eggs
10  to any of your shell egg customers that sell
11  them to -- that are then sold to customers
12  shopping at grocery stores?
13          MR. MONICA:  Objection.  Compound.
14          THE WITNESS:  Wow.  That question
15  is really -- you asked like three questions in
16  there, I believe.
17  BY MR. STUEVE:
18      Q.   Do I understand you don't
19  understand my question, sir?
20      A.   Yes.
21      Q.   Okay.  So have you sold Class 1
22  eggs, for example, to Kroger for it to be -- for

633

1   them to be sold in Kroger stores?
2       A.   No, sir.
3       Q.   Have you sold Class 1 eggs to
4   Topco?
5       A.   No.
6       Q.   Save-A-Lot?
7       A.   No.
8       Q.   Wal-Mart?
9       A.   It's illegal, sir, by USDA
10  standards, you can't.  So I've never sold them
11  to any supermarket.
12      Q.   Okay.  What is legal for you to
13  sell Class 1 for?
14          MR. MONICA:  Objection.  Vague.
15  You can go ahead and answer it.
16          THE WITNESS:  Okay.  A Class 1 --
17  when you refer -- what I would refer to as a
18  Class 1 is a Class 1 nest run, which means the
19  product came from a chicken house that's been
20  put onto flats.  In this case, if they've -- if
21  they've -- okay.  Class 1 nest runs -- a Class 1
22  nest run would have to go to a grading plant.

634

1   To be sold to a supermarket in the United
2   States, under USDA Egg Products Inspection Act,
3   you have to wash and grade the eggs under the
4   USDA guidelines, which is you have -- there's --
5   there's -- you have to -- first you've got
6   temperature requirements for the wash water.
7   You've got sanitation requirements that you have
8   to go through.
9           And then packing and grading
10  requirements.  And then under most state laws,
11  and under USDA, if you put a shield on the
12  carton, you have to follow the weight standards
13  that's established by USDA that has to be
14  clearly marked and some states have certain
15  regulations about what size those things are.
16  So you have to pass those laws before I could
17  sell it to a supermarket that in turn would sell
18  it to a consumer.
19  BY MR. STUEVE:
20      Q.   What market does Rose Acre have
21  for nest run ungraded eggs?
22      A.   I'm sorry.  What market -- what do

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

59 (Pages 635 to 638)

635

1   you mean by what market do we have?

2      Q.  Who does Rose Acre sell Class 1,

3   ungraded eggs to?

4      A.  I don't.

5      Q.  Okay.  Do you use them in your

6   breaking facilities?

7      A.  I don't today.  I don't recall in

8   the past if I used Class 1's.  It's not a term

9   that's used much anymore.

10      Q.  What does Rose Acre do with its

11   Class 1 or nest run ungraded eggs?

12      A.  Our birds -- our birds, other than

13   our cage-free at Donovan -- today, other than

14   Donovan and Jen Acre Plus, which are our

15   cage-free farms, 100 percent of Rose Acre's

16   production is in line with our processing

17   plants.  So we do not produce that grade of egg.

18   Ours are in line so we're vertically integrated.

19   Our processing plants and breaking plants are

20   connected directly with the chicken houses, so

21   we don't produce that product.

22      Q.  Would that be true since 2006,

636

1   sir?

2      A.  No.  When we purchased Crystal

3   Farms in Georgia, it came with a little over

4   a million birds that were on contract.  When we

5   assumed those contracts in the purchase, those

6   were -- those houses were producing -- would

7   have been producing nest run eggs we had to

8   bring to our locations to our processing

9   locations.  We've -- since then, we've ceased to

10   operate those contracts and no longer have those

11   nest run eggs.

12      Q.  Do those nest run eggs ultimately,

13   were they graded then?

14      A.  They could have been graded or

15   broken.

16      Q.  And for what period of time would

17   the nest run eggs have been broken?

18      A.  I don't recall the exact dates

19   that we owned those contracts.  I would have to

20   look that up.  But any time during that period

21   that we owned those contracts.

22      Q.  When do you recall acquiring

637

1   Crystal Farms?

2      A.  Can I go back and look through the

3   notes you handed me?

4      Q.  Sure.

5      A.  It was after 2005.

6      Q.  I believe it was in '07, but in

7   any event, it was after 2005?

8      A.  Yes.

9      Q.  Was that for approximately a one

10   year period?  Do you recall?

11      A.  It was more than a year.

12      Q.  It was?

13      A.  Yes.

14      Q.  Okay.  Other than that exception

15   from 2006 to the present, Rose Acre simply does

16   not produce Class 1 nest run ungraded eggs; is

17   that correct, sir?

18      A.  We don't pack Class 1 nest run

19   because our eggs -- every egg we produce in line

20   with our farms have to go through the egg

21   washer.  We have no means to package the eggs

22   other than -- the only time we would have would

638

1   have been if we were putting in a new egg grader

2   in the processing plant and if we hooked up a

3   farm packer temporarily for less than a week

4   while we had to put a new egg grading machine

5   in, we would have nest run those eggs off onto

6   loose and then have to rehandle them because we

7   didn't have a machine in place to break them at

8   the time.  So other than that exception, when we

9   replaced equipment, no.

10      Q.  We're talking about nearly

11   100 percent of the eggs that were produced

12   during that time period would have been in your

13   in line production?

14      A.  Which time period?

15      Q.  From '06 to the present?

16      A.  No, because we had over a million

17   birds on contract.

18      Q.  Excluding Crystal Farms, that

19   exception?

20      A.  Excluding the contract birds.

21      Q.  Right, Crystal Farm birds you

22   identified?

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

639

1  A.  Yes.
2      Q.  Other than those, nearly
3  100 percent from 2006 to the present would have
4  been in line and, therefore, not been nest run
5  ungraded eggs; is that correct?
6      A.  Correct.
7      Q.  Now, if you jump over to 2006 over
8  on 35, you'll see the Class 1 reference again;
9  is that right?
10     A.  Yes.
11     Q.  And --
12     A.  I guess the 11/1 to 11/15.
13     Q.  11/1 to 11/7 and then 11/1 to
14  11/15.
15     A.  Okay, yes.
16     Q.  Did Rose Acre participate in those
17  exports?
18     A.  I don't remember.
19     Q.  What did you do to prepare
20  yourself to testify with respect to the 22G,
21  which is your participation in any USEM exports
22  after becoming a USEM member including financial

---

640

1  obligations of an exporter?
2      A.  I don't think I was designated on
3  G.  Was I?
4      MR. MONICA:  Yes.  You are.
5      THE WITNESS:  On G?
6  BY MR. STUEVE:
7      Q.  Yeah.
8      A.  I couldn't remember which ones
9  here.  Okay.
10     Q.  Did you review any documents in
11  preparation for your testimony today concerning
12  Rose Acre's participation in USEM exports?
13     A.  I didn't review any other
14  documents.  Just my own knowledge.
15     Q.  Do you have documents concerning
16  USEM's exports in -- excuse me.  Rose Acre's
17  participation, if any, in USEM's exports for
18  2006?
19     A.  If we participated, the documents
20  would be in my office.
21     Q.  Where would you keep those, sir?
22     A.  They would be in a filing cabinet.

---

641

1      Q.  You did not review those in
2  preparation for your testimony in response to
3  22G; is that correct?
4      A.  That is correct.
5      Q.  All right.  Now, there's a
6  reference under the exports for 2007, just right
7  above where we were just looking.  It has graded
8  XLG/large.  What do you understand that to mean?
9      A.  That would be graded extra large
10  and large combination, a mixed load blended
11  between extra large and large eggs.
12     Q.  Do you understand what that $0.39
13  reference is?
14     A.  I'm sorry.  I was looking up
15  there.  Since I haven't seen this document, I
16  didn't prepare it.  There's not a heading on it.
17  I mean, it would only be speculation what that
18  may be.
19     Q.  What is your guess as to what that
20  is?
21     A.  In looking at the document, my
22  guess would be is that's what the eggs were sold

---

642

1  for.
2      Q.  To, for example, Jürgen Fuchs; is
3  that right?
4      A.  Jürgen Fuchs.
5      Q.  Jürgen Fuchs?
6      A.  Yes.
7      Q.  Have you heard the term breaking
8  stock?
9      A.  Yes.
10     Q.  What do you understand breaking
11  stock to mean?
12     A.  Breaking stock would be eggs that
13  are broken for liquid eggs.
14     Q.  And what -- is there -- what types
15  of eggs are typically used by Rose Acre for
16  breaking stock?
17     A.  What types of eggs to break?
18     Q.  Yeah.
19     A.  All types.  Peewee, small, medium,
20  large, extra large, jumbos, super jumbos.
21     Q.  When someone uses the term Class
22  1, do you typically consider those the type of

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

61 (Pages 643 to 646)

---

643

1  eggs that would typically be used for breaking
2  or breaking stock?
3      A.   It could be.
4      Q.   Now, if you would, there is a
5  reference up on 234 to X large and large.  Do
6  you see that?  White or brown?
7      A.   Yes.
8      Q.   What do you understand designation
9  to mean?
10     A.   It would be large and extra large
11 eggs, white eggs or brown eggs.
12     Q.   Okay.  And then over on the -- up
13 on the first page, it has large whites stamped.
14 See that classification there?
15     A.   First page.  Yes.
16     Q.   What do you understand that to
17 mean?
18     A.   That means that the eggs have to
19 have a US stamp on it because Iraq requires it.
20     Q.   Okay.  Is there an Urner Barry
21 market for large white stamped?
22     A.   Not specific to the stamp, no.

---

644

1      Q.   What market would be most
2  attributable to large white stamp, large white
3  Urner Barry?
4          MR. MONICA:  Objection.  Vague.
5  You may answer.
6          THE WITNESS:  Well, there's no
7  market for stamped eggs.  It's -- it's
8  because -- well, there's no market for those.
9  BY MR. STUEVE:
10     Q.   Okay.  Did Rose Acre participate
11 in this August 13th through September 25, 2008
12 USEM export?
13     A.   We were members then, yes, we
14 would have participated.
15     Q.   And the reason why you know that
16 is that once you joined and signed the agreement
17 with USEM, you were required to participate in
18 the export; correct?
19     A.   Correct.
20     Q.   And how was your allocation of the
21 export determined?
22     A.   By the percentage of birds that we

---

645

1  owned in relationship to the other members in
2  USEM.
3      Q.   And under that formula, Rose Acre
4  had the second largest fulfillment requirement;
5  correct, sir?
6      A.   I'm not -- it's possible.
7      Q.   Cal-Maine would have also been a
8  member of USEM?
9      A.   Yes.  They were.
10     Q.   And their fulfillment requirement
11 would have been higher than Rose Acre's during
12 that time period?
13     A.   Yes.  It would have.
14          (Exhibit Number 581 was marked for
15 identification.)
16 BY MR. STUEVE:
17     Q.   Show you what's been marked as
18 Exhibit 581.  And this is Bates range RA 1359
19 through RA 1368.  This is a January 4, 2007,
20 United Voices; is that correct, sir?
21     A.   Yes.
22     Q.   This would have been produced by

---

646

1  Rose Acre?
2      A.   I guess.  I'm -- produced, I would
3  have -- you received it from Rose Acre.  We
4  didn't produce the document.  I mean --
5      Q.   Do you believe this document came
6  from your files, sir?
7      A.   Yes.
8      Q.   Okay.  And, if you would, on
9  Exhibit 581, it actually references the fact
10 that Rose Acre joined USEM; is that right?
11     A.   Yes.
12     Q.   And it says, USEM now has the
13 membership support from producers owning
14 approximately 139 million layers; is that right?
15     A.   Yes.
16     Q.   And then it goes on to state that
17 UEP's production planning calendar just recently
18 published and distributed.  Do you see that?
19     A.   Yes.
20     Q.   Did Rose Acre receive that?
21     A.   I don't recall this specific year,
22 but I have received a production planning

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

62 (Pages 647 to 650)

647

calendar in the past.

Q.   It's no longer being disseminated by UEP; correct, sir?

A.   I don't remember seeing them lately.

Q.   Okay.  That stopped after the lawsuit initiated in 2008; correct?

A.   I don't know that for sure.

Q.   It says, UEP's production planning calendar just recently published and distributed forecast January and February carton large prices in the Midwest to average about $0.84 per dozen.  Do you see that?

A.   Yes.

Q.   With the delivery of such a large volume export, it is expected that prices will exceed UEP's forecast.  Do you see that?

A.   Yes.

Q.   It is also believed that the announcement of USEM working on a sizable export may have helped hold prices at a higher level the last week of December.  Do you see that?

648

A.   Yes.

Q.   All right.  Now, if, in fact, the USEM exports that's being referred here increased the domestic Urner Barry market, Rose Acre would directly benefit from that; correct, sir?

MR. MONICA:  Objection.  Calls for speculation and expert testimony.  You may answer.

THE WITNESS:  I don't agree with what's written here.

BY MR. STUEVE:

Q.   If you could read my question, I ask you to answer my question, sir.

(The record was read as requested.)

MR. MONICA:  Same objection.  You can answer.

THE WITNESS:  I don't agree. There are too many factors that affect the egg market, so I can't agree with this.

BY MR. STUEVE:

649

Q.   I'm asking you to assume that statement is correct, that, in fact, the export boosted the Urner Barry market domestically. Rose Acre, if that occurred, would directly benefit from that; correct, sir?

MR. MONICA:  Same objection.

THE WITNESS:  I don't want to assume, sir.

BY MR. STUEVE:

Q.   Show you what's been previously marked as Exhibit 23.  Did you review this document in preparation for your deposition today?

A.   No, sir.

Q.   Look at the Marketing Committee meeting minutes of January 23, 2007; is that correct, sir?

A.   Yes.  That's what it states.

Q.   It lists Marcus Rust as participating; is that right?

A.   Yes.  It does.

Q.   If you would, if you turn over

650

under USEM exports, Larry Seger is referenced there; is that right?

A.   Yes.

Q.   And, again, he was an egg producer; is that right?

A.   Correct.

Q.   And the chair of USEM export?

A.   Yes.  He was.

Q.   It states, Larry Seger and Phyllis Blizzard, she would have been working for UEP; is that correct?

A.   Yes.

Q.   Provided a report and assessment of the November export and the one currently being filled in January.  Do you see that?

A.   Yes.

Q.   A graph was presented showing the November export had increased egg prices by about $0.15 during November and December.  Do you see that?

A.   Yes.

Q.   Now, if, in fact, that occurred,

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

63 (Pages 651 to 654)

651

1 Rose Acre would directly benefit from that;
2 right, sir?
3 MR. MONICA: Objection. Posed a
4 hypothetical question. Calls for speculation.
5 You can answer.
6 THE WITNESS: Yeah. The -- I
7 wasn't -- I wasn't even a part of this meeting
8 and that statement I don't necessarily agree
9 with.
10 BY MR. STUEVE:
11 Q. Now, sir, Rose Acre would not have
12 been participating in these exports unless they
13 believed it was going to directly benefit them;
14 right?
15 MR. MONICA: Objection. Vague.
16 THE WITNESS: No. I don't agree
17 with that.
18 BY MR. STUEVE:
19 Q. In fact, each of the exports that
20 Rose Acre participated in, the actual eggs that
21 it utilized, it incurred a loss as a result of
22 that; right, sir?

652

1 MR. MONICA: Objection.
2 THE WITNESS: No. I don't agree
3 with that.
4 BY MR. STUEVE:
5 Q. And the reason why it was willing
6 to take a loss with respect to the eggs it
7 committed to the USEM export is that the boost
8 in overall egg prices would far outweigh the
9 cost of participating in the transaction for
10 Rose Acre; is that correct?
11 MR. MONICA: Object to the form of
12 the question. You can answer.
13 THE WITNESS: No. I don't agree
14 with that.
15 BY MR. STUEVE:
16 Q. As the second largest egg producer
17 in the country during this time period, if the
18 Urner Barry market prices go up, Rose Acre is
19 directly benefiting from that because, as you
20 testified yesterday, many of your contracts are
21 based on the Urner Barry market; right, sir?
22 MR. MONICA: Object to the form.

653

1 You can answer.
2 THE WITNESS: I sell a lot of eggs
3 off the Urner Barry market; correct. I sell a
4 lot of shell eggs off the Urner Barry market.
5 BY MR. STUEVE:
6 Q. Show you what's been marked as
7 Exhibit 181. Did you review this document in
8 preparation of your testimony in response to
9 22G?
10 A. No. I didn't.
11 Q. If you would, on the first page,
12 it has Rose Acre and it has the list of its
13 layers; is that right?
14 A. Yes.
15 Q. And did that number 20 million
16 586, did that include all of the layers from the
17 15 or so Rose Acre production facilities in
18 February 2007?
19 A. Well, in 2007, I don't think -- we
20 didn't have 15. I would have to look at our
21 list of farms by years. But it relatively looks
22 like it includes all of our birds.

654

1 Q. And that would have been
2 information that Rose Acre would have provided
3 USEM; correct, sir?
4 A. Yes.
5 Q. And the percentage total, the next
6 column is the allocation of the export; correct?
7 A. It appears to be. I've never seen
8 this document before, but, yes, that's what it
9 appears to be.
10 Q. And if you look from the top to
11 the bottom here, and over to the next page,
12 you'll note that Cal-Maine Foods, four down, was
13 allocated 16.28 percent. Do you see that?
14 A. Yes.
15 Q. And, number two was Rose Acre at
16 14.685 percent; is that right?
17 A. Yes.
18 Q. And then there's a significant
19 drop off after that; is that right, sir?
20 A. The next one appears to be 4.8.
21 Q. Getting Rose Acre to join USEM was
22 a significant boost to the export program;

---

655

```
 1   wasn't it, sir?
 2              MR. MONICA:  Object to the form of
 3   the question.
 4              THE WITNESS:  I can't speculate on
 5   that.
 6   BY MR. STUEVE:
 7       Q.   Looking at the numbers, it's
 8   pretty self-evident; isn't it?
 9              MR. MONICA:  Object to the form of
10   the question.
11              THE WITNESS:  I'm not going to
12   speculate on that.
13   BY MR. STUEVE:
14       Q.   If you look at the totals there,
15   you'll see that they calculated -- you'll see
16   the notations, the total loss was 946,389 or
17   $0.59 a dozen.  Do you see that?
18              MS. REDDING:  Objection.
19   Mischaracterizing the document.
20              MR. MONICA:  I'll join in the
21   objection.
22              THE WITNESS:  I don't -- I've
```

---

656

```
 1   never seen this document, so I can't -- I'm not
 2   going to confirm unless I have a better
 3   understanding of it.
 4   BY MR. STUEVE:
 5       Q.   If you look up here, percentage of
 6   loss.  Do you see that?
 7       A.   Yes.
 8       Q.   And it has the -- it has the
 9   percentage, and then over on the -- it has the
10   total loss is 946,389.  Do you see that?
11       A.   Yes.
12       Q.   Now, if you go back to Rose Acre,
13   it's not in -- it doesn't have a percentage of
14   loss, because it would have filled its order
15   through its own eggs; correct?
16       A.   According to this document, we did
17   not purchase any eggs.
18       Q.   Right.  But those who did, the
19   difference between what they were going to get
20   paid by USEM and what they had to buy on the
21   open market, they all incurred losses; correct,
22   sir?
```

---

657

```
 1              MR. MONICA:  Object to the form of
 2   the question.
 3              THE WITNESS:  I can't confirm
 4   that.
 5   BY MR. STUEVE:
 6       Q.   Why don't you look at -- if you
 7   look at active feed company 854, that is the
 8   cases purchased and then it has percentage of
 9   loss.  Do you see that?
10       A.   It says percent of loss.
11       Q.   But for everyone that purchased
12   that's listed in the second to last column on
13   the right side, they all have losses allocated
14   to them; correct, sir?
15              MR. MONICA:  Objection.
16              MS. REDDING:  Objection.
17   Foundation.
18              THE WITNESS:  I said I don't know
19   what the percent of loss.  I don't understand
20   that.
21   BY MR. STUEVE:
22       Q.   But there is a number that's
```

---

658

```
 1   under -- under that column and that -- there's a
 2   number for each of the egg producers who
 3   purchased cases; correct?
 4              MR. MONICA:  Objection.  Vague.
 5              THE WITNESS:  There is a number in
 6   the percent of loss column, next to the cases
 7   purchased.  Yes.
 8   BY MR. STUEVE:
 9       Q.   Now, Rose Acre packed
10   35,729 cases; is that right?
11       A.   That's what it says here.
12       Q.   And there are 30 dozen eggs; is
13   that correct, in a case?
14       A.   Not always.  No.  We pack a lot of
15   15 dozen cases.
16       Q.   Do you recall whether your cases
17   that you packed here were the 30 dozen?
18       A.   No.  I don't recall, without
19   looking at the records.  I don't see anywhere
20   that states for sure if it's full cases or half
21   cases.
22       Q.   If they were full cases, would
```

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

659

1  that be 30 dozen, sir?
2      A.  A full case is 30 dozen, yes.
3      Q.  If you took 35,729 cases and you
4  multiply that times 30 dozen and you multiply
5  that by $0.59 a dozen, that would be a loss
6  attributable to Rose Acre of 631,415; is that
7  correct, sir?
8          MR. MONICA:  Object to the form of
9  the question.  Mischaracterizes this document.
10 BY MR. STUEVE:
11     Q.  Go ahead and answer the question,
12 sir.
13     A.  No.  It's not.
14         MR. STUEVE:  We need to change the
15 videotape.
16         MR. MONICA:  Take a five minute --
17         THE VIDEOGRAPHER:  The time is
18 approximately 2:18 p.m.  We're going off the
19 record.
20         (A brief recess was taken.)
21         THE VIDEOGRAPHER:  Standby.  This
22 is the start of media unit number five.  The

660

1  time is 2:25 p.m.  We are back on the record.
2  BY MR. STUEVE:
3      Q.  So, Mr. Hinton, we are back on the
4  record.  I'm going to give you a calculator,
5  it's an iPhone.  Could you grab that for me.
6          Could you type in 35,729 for the
7  number of cases?
8          MR. MONICA:  I'm just going to put
9  on the record, I generally object to having the
10 witness do math.  I'm going to let him go ahead
11 and do it if he wants to do it.  So go ahead.
12 BY MR. STUEVE:
13     Q.  Type that in?
14     A.  35,000.
15     Q.  729 cases.  Do you have that
16 number?  Okay.  Can you multiply that times 30?
17     A.  Okay.
18     Q.  And then multiply that times
19 $0.59.  And what does that give you, sir?
20     A.  That number is 632,403.03.
21     Q.  632,402?
22     A.  03 and $0.30.

661

1          MR. MONICA:  Can I see the
2  calculator, please?
3  BY MR. STUEVE:
4      Q.  If Rose Acre incurred a loss of
5  630,000 to participate in that export, it
6  obviously was convinced that the overall benefit
7  resulting from that export would outweigh that
8  cost; correct, sir?
9          MR. MONICA:  Objection.
10 Misconstrues the document.  Misstates the nature
11 of their involvement in USEM.  Vague.  Compound.
12 Calls for speculation.  Hypothetical.  You can
13 answer it.
14         THE WITNESS:  I don't agree with
15 your statement.
16 BY MR. STUEVE:
17     Q.  Let me show you --
18         MR. MONICA:  I'm sorry.  Can we
19 give the phone back to you?
20         MR. STUEVE:  Yes.  Thank you.
21 Actually, David thanks you.
22         MR. MONICA:  Nice phone, by the

662

1  way.
2          (Exhibit Number 583 was marked for
3  identification.)
4  BY MR. STUEVE:
5      Q.  Show you what's been marked as
6  Exhibit 583.  If you could keep that other
7  exhibit in front of you for a moment, 581.  583
8  is RA 0002299 through 06.  That is the United
9  Voices newsletter from UEP dated April 27, 2007;
10 is that correct, sir?
11     A.  Yes.
12     Q.  And this would have come from your
13 file, you believe?
14     A.  Rose Acre's produced it.  I
15 believe so.
16     Q.  And if you look here, April 27,
17 2007 is a couple months after Exhibit 181, the
18 reference to the February 2007 export; is that
19 correct?
20     A.  April -- that would be two months
21 after February 2007; correct.
22     Q.  That February 2007 is Exhibit 181

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

66 (Pages 663 to 666)

---

663

1    the export we were looking at; is that correct,
2    sir?
3         **A.   Yes.  181 is February 2007.**
4         Q.   And that is the export we were
5    just talking about; correct?
6         **A.   Yes.**
7         Q.   And if you now look at 583, the
8    United Egg Voices two months later states, in
9    that last paragraph, the last sentence, within a
10   few days of the latest export announcement, the
11   market moved up a dollar 8, a $0.17 increase and
12   higher prices are expected as we attempt to find
13   eggs to fill the market.  Do you see that?
14        **A.   Yes.**
15        Q.   And that's why Rose Acre would
16   participate in that export and incur that loss,
17   because a $0.17 increase would result in a
18   benefit far outweighing a 632,000 loss; correct,
19   sir?
20             MR. MONICA:  Object to the form of
21   the question.
22             THE WITNESS:  No.  I don't agree

---

664

1    with that statement.
2    BY MR. STUEVE:
3         Q.   In fact, this UEP communication
4    further confirms what the purpose of the USEM
5    exports were, which is to reduce the domestic
6    egg supply and boost domestic egg prices;
7    correct, sir?
8             MR. MONICA:  Object.  Object to
9    the form of the question.
10            THE WITNESS:  No.  I do not agree
11   with that.
12            THE REPORTER:  Did we mark 582?
13            MR. MONICA:  I don't believe we
14   did.
15            MR. STUEVE:  We're going to get to
16   582 next.
17            (Exhibit Number 582 was marked for
18   identification.)
19            MR. STUEVE:  Let me show you
20   what's been marked as Exhibit 582.  This is
21   Bates range UE 0317733.  This is the minutes of
22   the United States Egg Marketers of August 9,

---

665

1    2007.  Marcus Rust participated in that; is that
2    correct, sir?
3             THE WITNESS:  Yes.  His name's
4    here.
5    BY MR. STUEVE:
6         Q.   And under the motion, do you see
7    that in bold?
8         **A.   Yes.**
9         Q.   It says, it was moved by Elste and
10   seconded by Rust to offer Shevi 63 loads at 60
11   cents and Fuchs 100 loads at $0.60.  Do you see
12   that?
13        **A.   Yes.**
14        Q.   So that's referring to the export
15   committee's vote on the motion seconded by Rust
16   to execute on two exports; is that correct?
17            MR. MONICA:  Objection.
18            THE WITNESS:  Could you repeat the
19   question, please?
20            (The record was read as
21   requested.)
22            THE WITNESS:  Read that one more

---

666

1    time, please.
2             (The record was read as
3    requested.)
4             THE WITNESS:  Can you define
5    execute?
6    BY MR. STUEVE:
7         Q.   After this motion was carried
8    unanimously, the Export Committee agreed that
9    USEM should execute on two exports.  One, to
10   Shevi of 63 loads at $0.60 and the second to
11   Fuchs of 100 loads at $0.60; is that correct?
12        **A.   I don't agree with your definition**
13   **of execute.**
14        Q.   Okay.  What did you understand --
15   let me ask it this way.
16        The motion was moved by Elste
17   seconded by Marcus Rust; right?
18        **A.   Correct.**
19        Q.   What did you understand the motion
20   to approve?
21        **A.   Okay.  My understanding, reading**
22   **the motion, is that the motion made by Elste and**

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

67 (Pages 667 to 670)

---

667

1  seconded by Rust was directing the USEM staff to
2  make an offer by Shevi and Fuchs for these eggs.
3       Q.   And --
4       A.   Looking at this, I can't tell you
5  the export -- I would use execute that it
6  happened.  Offer means they were directing the
7  staff to make an offer to them, is how I would
8  interpret it.
9       Q.   Let's look up above here.  Maybe
10 that will clarify.
11      Staff reported that only two
12 buyers had made bids at $0.60 or better and
13 provided the following details?
14      A.   Okay.
15      Q.   Michael Shevi had bid $0.60 per
16 dozen for 63 container loads.  Do you see that?
17      A.   Yes.
18      Q.   And then Jürgen Fuchs had amended
19 his bid to $0.61 per dozen for 100 container
20 loads; right?
21      A.   Yes.
22      Q.   It says, after a period of

---

668

1  discussion, it was determined that since Michael
2  Shevi was the first to meet our price
3  requirement, we should give him the first
4  opportunity to purchase the 63 loads.  It was
5  also suggested that we also offer Fuchs up to
6  100 loads at the same price.  Do you see that?
7       A.   Yes.
8       Q.   So they then move on that there's
9  a motion seconded by Rust to actually execute
10 the transaction; correct?
11      MR. MONICA:  Objection.
12      THE WITNESS:  It was to make the
13 offer, but this document doesn't state that the
14 offer was accepted.
15 BY MR. STUEVE:
16      Q.   But it would indicate, though,
17 from this document that that was a foregone
18 conclusion based on the bids by Shevi and Fuchs;
19 correct?
20      MR. MONICA:  Objection.
21      THE WITNESS:  Not until the offer
22 was accepted.  This was to make an offer, is

---

669

1  what I'm stating.
2       (Exhibit Number 584 was marked for
3  identification.)
4  BY MR. STUEVE:
5       Q.   Let me show you 584.  And if you
6  would, this is the Urner Barry egg quote for
7  Thursday, August 9, 2007.  And if you could
8  compare that to the August 9, 2007, United
9  States Egg Marketers Committee conference call
10 minutes?
11      MS. REDDING:  Can we get the Bates
12 number, please?
13      MR. STUEVE:  There is no Bates --
14 actually, there is a Bates range, I'm sorry.
15 It's MFI 0136751.
16 BY MR. STUEVE:
17      Q.   So this -- if -- we'll get to it,
18 but assuming this offer were accepted by Shevi
19 and Fuchs, as outlined in the motion, all --
20 using the Urner Barry quote of August 9, 2007,
21 which is the same date, it was understood that
22 this export would result in a loss to the egg

---

670

1  producers who would participate; correct, sir?
2       MR. MONICA:  Object to the form of
3  the question.
4       THE WITNESS:  I don't know that.
5  I don't know the producers you're referring to,
6  I don't know their cost.
7  BY MR. STUEVE:
8       Q.   Well, if we look at the Urner
9  Barry quote, let's look at the 30 loads for
10 graded large eggs.  Do you see that?  It says,
11 the reference for Jürgen Fuchs, 30 loads of
12 graded large/extra large?  Do you see that in
13 the bullet point there?
14      A.   I'm sorry.  Where?
15      Q.   On Exhibit 582, do you see that,
16 under second bullet point, graded large/extra
17 large, do you see that reference, 30 loads?
18      A.   Yes.
19      Q.   If you look over on Urner Barry
20 quote for that day, the various Urner Barry
21 markets had the large from $1.09, $1.06, $1.09,
22 and $1.11; is that correct, sir?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

68 (Pages 671 to 674)

---

671

1        MR. MONICA:  Objection.  Misreads
2  the document.
3        THE WITNESS:  Repeat the question,
4  please.
5        (The record was read as
6  requested.)
7        MR. MONICA:  Objection.
8        THE WITNESS:  The -- looking at
9  this Urner Barry market report, the large Urner
10  Barry market has been reported as a $1.09,
11  $1.06, $1.09, and $1.11 for their respective
12  markets on that day; correct.
13  BY MR. STUEVE:
14        Q.    Then if you look at the extra
15  large, it is $1.15, $1.12, $1.15, and $1.17; is
16  that correct?
17        **A.    The Urner Barry market reports on**
18  **August 9th for extra large $1,15, Northeast,**
19  **$1.12, Midwest, $1,15 in the Southeast, $1.17 in**
20  **the South Central.**
21        Q.    And then if you look at the
22  reference to the 70 loads of nest run.  Do you

---

672

1  see that in the second bullet point there?
2        **A.    Yes.**
3        Q.    You look over on Urner Barry,
4  the -- do you see the standard 48 to 50 pounds?
5        **A.    Yes.**
6        Q.    That price is from 70, 72, 70 and
7  72; is that correct?
8        **A.    On this report, the standard 48 to**
9  **50 nest run breaking stock is reported as a low**
10  **of 72 and 72, the high in the East, and 70 and**
11  **72 -- 72 low, 75 high in the South -- in the**
12  **Central; correct.**
13        Q.    Now, the 42 pound and the 50
14  pound; is that correct, that are listed there?
15        **A.    Yes.  42 to 44 and then 50 and up.**
16        Q.    Did Rose Acre have access to the
17  Urner Barry daily quotes?
18        **A.    Yes.  We do.**
19        Q.    And who would have access to that
20  at Rose Acre?
21        **A.    Today -- in 2007?**
22        Q.    Yeah.  August of 2007?

---

673

1        **A.    I believe it was -- in 2007, my --**
2  **the sales department has access to it and then**
3  **Marcus would also have access to it.**
4        Q.    Marcus Rust?
5        **A.    Yes.**
6        Q.    The representative of Rose Acre
7  that seconded the motion for this August 9, 2007
8  export; is that correct?
9        **A.    For that offer; correct.**
10        Q.    Now, keep Exhibit 582 in front of
11  you.
12        **A.    Okay.**
13        Q.    If you would, keep that document,
14  keep 582 out in front of you.  Then I also need
15  you to get back out Exhibit 48.  That's this
16  document here, remember the USEM export summary?
17        **A.    Okay.**
18        Q.    And if you would, under the export
19  for 2007 reference there in Exhibit 48, do you
20  see that, on Bates number, the last three is 34?
21  Do you see that there?
22        **A.    Yes.**

---

674

1        Q.    And this is the export 8/22 to
2  9/13 of 2007; is that correct?
3        **A.    Sorry.  What was the question?**
4        Q.    This is an export that has the
5  date 8/22 to September 13th, '07; is that
6  correct?
7        **A.    Yes.**
8        Q.    That would immediately follow the
9  Export Committee's conference call; is that
10  right, of August 9th?
11        **A.    Yes.**
12        MS. REDDING:  Objection.  Calls
13  for speculation.
14  BY MR. STUEVE:
15        Q.    Now, if you would -- if you would,
16  the last -- on that same indication, there's
17  week 9/10.  Do you see that, on the bottom line
18  there?  It has week 9/10, 34 loads.  Do you see
19  that?
20        **A.    No.**
21        Q.    Okay.  I'm sorry.  Under export
22  2007, August to September 13th, '07, that

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II          March 18, 2014

69 (Pages 675 to 678)

---

675

1 section there, the bottom line there lists the
2 amount of the loads and the week. Do you see
3 that?
4     **A.   Okay.  Yes.**
5     Q.   And if you look at the last week,
6 September 10th of 2007, 34 loads; right?
7     **A.   Yes.**
8     Q.   Now, let me show you what's been
9 marked as Exhibit 585?
10         (Exhibit Number 585 was marked for
11 identification.)
12         MR. MONICA:  He's got three in
13 front of him already.  Do you want four in front
14 of him?
15         MR. STUEVE:  Yep.  Just 585.  He
16 doesn't need that other Urner Barry.  You can
17 place that -- so Exhibit 585, do you have that
18 in front of you now?
19         THE WITNESS:  Yes.
20 BY MR. STUEVE:
21     Q.   If you looked for the week -- it's
22 Monday, September 10th; right?

---

676

1     **A.   Yes.**
2     Q.   It has -- you'll see for extra
3 large and large white.  Do you see that?  It has
4 for extra large, $1.45, $1.42, $1.45, and $1.46;
5 right?
6     **A.   For extra large, correct.**
7     Q.   Large is $1.37, $1.34, $1.37 and
8 $1.38; correct?
9     **A.   Correct.**
10     Q.   If you look at the UEP summary of
11 the export in August through September of '07,
12 the bid price is $0.60 for extra large and
13 large; correct, sir?
14     **A.   I'm sorry.  Can you repeat that?**
15     Q.   Yeah.  The price that USEM was
16 being paid by Jürgen Fuchs was $0.60; right, for
17 extra large and large?
18     **A.   Like I said, I haven't seen this
19 document.  That's what this appears to be.**
20     Q.   All right.  And then if you look
21 at the extra large, the 23 loads there, it's
22 also $0.60 being paid by Jürgen Fuchs; correct?

---

677

1     **A.   That's what's stated here.**
2     Q.   And then with respect to the Class
3 1, it's $0.60; right?
4     **A.   For which one?**
5     Q.   The 14 loads, Class 1, $0.60?
6     **A.   That's what's stated there;
7 correct.**
8     Q.   On September 10th, what was the
9 Class 1, if you use breaking stock, nest run off
10 the Urner Barry, the standard 48 to 50 pounds
11 it's 80, 82, 80 and 82; is that correct?
12         MR. MONICA:  Objection.
13         THE WITNESS:  You're referring to
14 the Urner Barry market quote for Monday,
15 September 10th.
16 BY MR. STUEVE:
17     Q.   Yes.
18     **A.   Nest run breaking stock.**
19     Q.   Right.
20     **A.   Standard 48 to 50 pound is
21 reported as $0.80 low, $0.82 high for eastern,
22 and $0.80 low and $0.82 high for Central.**

---

678

1     Q.   Now, if you could, keep 48 in
2 front of you, and keep it turned to the August
3 to September '07 export that we were looking at?
4     **A.   Okay.**
5     Q.   I'll show you what's been marked
6 as 586.
7         (Exhibit Number 586 was marked for
8 identification.)
9         MS. REDDING:  Can we get the Bates
10 number, please?
11         MR. STUEVE:  UE 0095810 through
12 5811.  Up at the top, it has export case volume
13 August through September 2007; right?
14         THE WITNESS:  Oh.  Yes.
15 BY MR. STUEVE:
16     Q.   And that's the same timeframe
17 that's referenced in Exhibit 48, summary of the
18 export of August 22nd through September 13,
19 2007; correct?
20         MR. MONICA:  Objection.
21         THE WITNESS:  I've never seen this
22 document before, but it -- has the same date

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

70 (Pages 679 to 682)

---

679

1    as far as months.
2    BY MR. STUEVE:
3        Q.   And the allocation of the
4    commitment to Rose Acre is the largest of any
5    egg producer; correct?
6        A.   As stated in this document, yes.
7        Q.   The second largest is Cal-Maine;
8    right?
9        A.   On this document.  Yes.
10       Q.   Then there's a significant drop
11   off after Rose Acre and Cal-Maine with respect
12   to the commitments of the other egg producers;
13   correct, sir?
14       A.   Rose Acre at 13.9394 and Cal-Maine
15   at 12.5366 and the next one is 4.6045.
16       Q.   And if you would, under Rose Acre
17   it indicates that Rose Acre's commitment is
18   15,069; is that right?
19       A.   That's what's stated here.
20       Q.   Do you understand that to be
21   cases?
22       A.   It's not labeled cases, but

---

680

1    it's --
2        Q.   Would that be your assumption,
3    sir?
4        A.   Yes.
5        Q.   And then, again, if it's a full
6    case that would be 30 dozen a case; right?
7        A.   If it's a full case; correct.
8        Q.   If you would, on the second page
9    over under the loss column, there's a
10   handwritten notation of $0.60 a dozen; right?
11       A.   I -- there's a notation
12   handwritten, it says $0.60 a dozen; correct.
13       Q.   And, again, ask you to do some
14   math here.
15       MR. MONICA:  Well, why don't you
16   tell us what the number is.
17   BY MR. STUEVE:
18       Q.   I just want him to confirm it.
19   This is my last one.
20       MR. MONICA:  If it's your last
21   one, go ahead.
22   BY MR. STUEVE:

---

681

1        Q.   It's my last one.
2        A.   Do I get to keep the phone?
3        MR. HICKEY:  No.
4        THE WITNESS:  Okay.  What would
5    you like me to do?
6    BY MR. STUEVE:
7        Q.   If you typed in the commitment
8    number of 15,069?
9        A.   15,000.
10       Q.   69, representing the number of
11   cases, times 30, representing 30 dozen per case,
12   times $0.60, representing the loss per dozen,
13   what number does that give you?
14       MR. MONICA:  Objection.
15       THE WITNESS:  The numbers you
16   asked me to type in?
17   BY MR. STUEVE:
18       Q.   Yeah.
19       A.   Come to 271,242.
20       MR. MONICA:  May I see the
21   calculator, please?
22       (Exhibit Number 587 was marked for

---

682

1    identification.)
2    BY MR. STUEVE:
3        Q.   I'll show you what's been marked
4    as Exhibit 587.
5        This is an e-mail by Phyllis
6    Blizzard of UEP to several folks, including
7    Marcus Rust; is that right?
8        MS. REDDING:  Can I get the Bates
9    number, please?
10       MR. STUEVE:  Bates range RA
11   0042370.
12       THE WITNESS:  I'm looking.  Yes.
13   I see it.  Yes.
14   BY MR. STUEVE:
15       Q.   Okay.  And do you know whose files
16   at Rose Acre this document came from?
17       A.   It would have been in the sales --
18   in my office.
19       Q.   And this August 24, 2007, again,
20   is the timeframe of the export that we have been
21   discussing that was referenced in Exhibit 48, as
22   well as Exhibit 586; correct, sir?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

683

1     A.   It would have been the same
2  timeframe; correct.
3     Q.   It says, will you please forward
4  this message on to the USEM members.  We have
5  two export customers for which we are committed
6  to deliver all eggs by a certain date.  Our
7  first deadline is September 6th and the next is
8  September 12th.  Do you see that?
9     A.   Yes.
10     Q.   It is my understanding that we are
11  still in need of as many as 30 container loads,
12  which I have no commitments for and we must
13  purchase.  It is also my understanding that we
14  are offering premiums as high as $0.15 for nest
15  run and $0.20 or more for graded eggs and still
16  getting no one to sell us eggs.  Do you see
17  that?
18     A.   Yes.
19     Q.   If you go on down there it says,
20  the market has already risen by nearly $0.20 per
21  dozen since the export was announced.  Maybe the
22  export has contributed to some of this gain.  Do

---

684

1  you see that?
2     A.   Yes.
3     Q.   Okay.  Do you remember reviewing
4  this document at the time?
5     A.   No.  I don't remember it.
6          (Exhibit Number 588 was marked for
7  identification.)
8  BY MR. STUEVE:
9     Q.   Show you what's been marked
10  Exhibit 588, and the Bates range is UE 0457968
11  through 71.  If you look up in the upper
12  right-hand corner, it's June '08 sale.  Do you
13  see that?
14     A.   Yes.
15     Q.   And if you look on Exhibit 48, the
16  first page?
17     A.   Okay.
18     Q.   On the first page?
19     A.   Oh.  Okay.
20     Q.   Is there a reference there to a
21  May 21st through June 24th, '08 export?
22     A.   Yes.

---

685

1     Q.   And under Rose Acre, Rose Acre was
2  allocated the highest amount, its commitment
3  with respect to this export; is that correct,
4  15.89?
5     A.   I wasn't familiar with this
6  document, but on this document, it does state we
7  had a 15.8959 percent.
8     Q.   That would be the highest
9  percentage allocation; correct, sir?
10     A.   On this document.  Yes.
11     Q.   And the next closest would be
12  Cal-Maine Foods at 11.5 percent; is that right?
13     A.   Yes.  11.5575; correct.
14     Q.   Then there's a significant drop
15  off after that; is that correct?
16     A.   The next one on this document is
17  4.3444 percent.
18          (Exhibit Number 589 was marked for
19  identification.)
20  BY MR. STUEVE:
21     Q.   Show you what's been marked as
22  Exhibit 589, and the Bates range here is UE

---

686

1  0316921 to 22.  Do you see that?
2     A.   Yes.
3     Q.   And under this export total of 120
4  containers, Rose Acre's allocation is
5  15.73 percent; is that right?
6     A.   Yeah.  I haven't seen this before,
7  but on this document, it says Rose Acre is
8  15.7359 percent.
9     Q.   And then the next highest
10  percentage is Cal-Maine Foods at 11.4; is that
11  right?
12     A.   Yes.  11.4411.
13     Q.   And then there's a significant
14  drop off after that; is that correct, sir?
15     A.   The next one was 4.3007.
16          (Exhibit Number 590 was marked for
17  identification.)
18  BY MR. STUEVE:
19     Q.   Show you what's been marked as
20  Exhibit 590.  It's Bates range UE 0526344
21  through 46.  And this is to Marcus Rust at Rose
22  Acre from Gene Gregory; is that right?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II          March 18, 2014

72 (Pages 687 to 690)

---

687

1    A.  Yes.  Appears to be.
2    Q.  And if you turn to the second page
3  of the document, there's a date up at the top of
4  August 1, 2008, and there's a confirmation of
5  export, delivery or purchase.  So you have to
6  indicate whether your company will deliver or
7  purchase for delivery a pro rata share of this
8  export order.  Our company requests UEP traders
9  purchase our pro rata share.  Do you see that?
10    A.  Yes.
11    Q.  And do you recall filling a
12  document like this out in relation to USEM
13  exports?
14    A.  To -- to this export?
15    Q.  Just in general, do you remember
16  getting a document like this asking you to
17  indicate whether you're going to fill your pro
18  rata share through delivery of your own eggs or
19  purchasing eggs?
20    A.  I've seen a document like this
21  before.  Yes.
22    Q.  Okay.

---

688

1        (Exhibit Number 591 was marked for
2  identification.)
3  BY MR. STUEVE:
4    Q.  Show you what's been marked as
5  Exhibit 591, it's Bates range RAFKS 0011622.
6  Would this have come from your files, sir?
7    A.  Yes.  From the sales office.
8    Q.  And it's dated up here, August 29,
9  2012; is that right?
10    A.  Yes.
11    Q.  And it lists in the second
12  paragraph there that your percentage share of
13  the second export order is 18,034 cases based on
14  information from your most recent membership
15  agreement, this makes your total for 200 load
16  export to be 36,068 cases.  Did I read that
17  correctly?
18    A.  Yes.
19    Q.  Then at the bottom, it says, for
20  those requesting UEP to purchase their
21  commitment in the open market, you will be
22  invoiced the difference between sale price of

---

689

1  $1.18 and the average price we have to pay to
2  purchase all the eggs in the pool.  Do you see
3  that?
4    A.  Yes.
5    Q.  So we were looking at earlier, if
6  UEP has to pay, for example, $1.25 a dozen to
7  meet the USEM member's export requirement, that
8  USEM member would have to pay the difference
9  between those two numbers; is that correct?
10        MR. MONICA:  Object to the form of
11  the question.
12        THE WITNESS:  My understanding
13  it's not directed towards each member, it's a
14  pool based on how many eggs UEP has to purchase
15  for all the members.
16  BY MR. STUEVE:
17    Q.  Purchase for those members who are
18  requiring them to purchase; is that right?
19        MR. MONICA:  Objection.
20        THE WITNESS:  For members that
21  required to be purchased.
22  BY MR. STUEVE:

---

690

1    Q.  Right.  And so if it's having you
2  purchase -- if it's having to pay a higher
3  purchase price for those members than the sales
4  price to the foreign customer, there's going to
5  be a loss incurred by all USEM members who are
6  asking USEM to make their purchases; correct?
7        MR. MONICA:  Object to the term
8  loss, counsel.
9        THE WITNESS:  Yeah.  I don't agree
10  with that.
11  BY MR. STUEVE:
12    Q.  Okay.
13        (Exhibit Number 592 was marked for
14  identification.)
15  BY MR. STUEVE:
16    Q.  Show you what's been marked as 592
17  and the Bates range for 592 is UE 1028004
18  through 15.  The first page is redacted; is that
19  correct, up at the top it says redacted?
20    A.  Yes.
21    Q.  Okay.  I want you to turn to the
22  page that has the last two digits 10.

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II        March 18, 2014

73 (Pages 691 to 694)

---

691

1        Actually, if you could turn to 14,
2  you'll see a reference to the August 12th sale,
3  200 containers. It says Rose Acre 23716014.
4  Its allocation of that export is
5  22.5427 percent; is that correct?
6      **A. Yes, I'll state again I haven't**
7  **seen it, but on this document it says 22.5427**
8  **for Rose Acre.**
9      Q. Up at the second -- the highest
10  percentage is Cal-Maine at 27.311; is that
11  right?
12      **A. Yes. On this document, 27.3111.**
13      Q. Then after Cal-Maine and Rose
14  Acre, there's a substantial drop off; correct,
15  sir?
16      **A. The next one on this document is**
17  **6.2643.**
18      Q. In fact, between Cal-Maine and
19  Rose Acre, almost 50 percent of the export is
20  being allocated to Rose Acre and Cal-Maine;
21  correct?
22      **A. Yes. 49.8 percent.**

---

692

1      Q. And on this one, it indicates that
2  you all requested that USEM purchase 14,198; is
3  that correct?
4      MR. MONICA: Object to the form of
5  the question. Mischaracterizes the document.
6      THE WITNESS: Could you repeat it,
7  please?
8  BY MR. STUEVE:
9      Q. Do you see the -- let me ask you
10  this.
11      Do you see the 192,628 under that
12  percentage of loss for Rose Acre?
13      **A. Yes. I see that number.**
14      Q. Do you recall incurring a loss of
15  192,628 in August of 2012 to participate in an
16  export for USEM?
17      MR. MONICA: Objection.
18      THE WITNESS: No. I don't.
19  BY MR. STUEVE:
20      Q. You don't -- do you remember
21  having to purchase eggs to fulfill that
22  requirement?

---

693

1      **A. Yes. I do.**
2      Q. Who would have purchased those
3  eggs?
4      **A. Those eggs would have been**
5  **purchased by USEM.**
6      Q. Okay. But sitting here today, you
7  just don't recall having a percentage of the
8  loss number of 192,628 being allocated to Rose
9  Acre?
10      MR. MONICA: Object to the form of
11  the question.
12      THE WITNESS: No. You asked me if
13  I lost -- no. We did not.
14  BY MR. STUEVE:
15      Q. Do you remember being allocated a
16  percentage of the loss of 192,628 by USEM?
17      MR. MONICA: Objection.
18      THE WITNESS: Can you repeat the
19  question, please?
20  BY MR. STUEVE:
21      Q. Sir, let me ask it this way.
22      Do you see on this document that

---

694

1  was produced to us by UEP USEM, it says that the
2  percentage of the loss allocated to Rose Acre is
3  192,628. Do you see that?
4      MR. MONICA: Objection.
5      THE WITNESS: I see under the
6  column percentage of loss, under Rose Acre it
7  shows 192,628.09.
8  BY MR. STUEVE:
9      Q. Do you have any reason to doubt
10  the accuracy of this document, sir?
11      **A. The accuracy -- I've never seen it**
12  **before. I don't even know who put it together.**
13      Q. Okay. Do you recall USEM
14  notifying you with respect to the percentage of
15  the loss being allocated to Rose Acre of 192,628
16  for its purchases?
17      MR. MONICA: Objection.
18      THE WITNESS: I don't agree with
19  the statement, percentage of loss.
20  BY MR. STUEVE:
21      Q. Do you know what that number
22  reflects, sir, the 192,628?

---

695

1    A.   Do I know what the number
2    reflects?
3         Q.   Uh-huh.
4         A.   I think it reflects -- without
5    talking to whoever prepared the document, my
6    thought would be it reflects a dollar amount
7    that they had to go out and buy eggs.
8         Q.   You don't believe it's the
9    difference between the amount they had to buy
10   the eggs for on the open market and what they
11   got paid by the customer who was purchasing the
12   export?
13        A.   Yes.  It could be that.
14             MR. MONICA:  Can we go off the
15   record for one second?
16             MR. STUEVE:  Sure.
17             THE VIDEOGRAPHER:  The time is
18   3:20 p.m.  We are going off the record.
19             (A brief recess was taken.)
20             THE VIDEOGRAPHER:  The time is
21   3:30 p.m.  We are back on the record.
22   BY MR. STUEVE:

696

1         Q.   If you could look at 517, topic
2    22H.  You were designated on behalf of Rose Acre
3    to testify about your profits or losses from
4    each USEM export sale?
5         A.   Yes.
6         Q.   Is it fair to say based on your
7    prior testimony, you did not review your USEM
8    export file or any other file to prepare you to
9    respond to 22H?
10             MR. MONICA:  Objection.
11             THE WITNESS:  No, because I don't
12   have any USEM file that I could review that is
13   going to tell me exactly the proper loss.  We
14   don't track that on USEM export sales.  I
15   wouldn't have any documents that would show
16   that.
17   BY MR. STUEVE:
18        Q.   Did you talk to Mr. Rust in
19   preparation for 22H?
20        A.   No.  I did not.
21        Q.   And your counsel did not show you,
22   for example, the document that listed the

697

1    percentage loss to Rose Acre that we just looked
2    at?
3         A.   Which one?
4         Q.   The one we just looked at.
5             MR. MONICA:  The one produced by
6    United Egg.
7             THE WITNESS:  By?
8    BY MR. STUEVE:
9         Q.   It would be Exhibit 592.
10        A.   No.  They did not.
11        Q.   I'll show you what's been marked
12   as Exhibit 563.  This has previously been
13   marked.
14             Do you recall reviewing this
15   document in preparation for your deposition
16   today?
17        A.   No.  I did not.
18        Q.   And with respect to 563, if you
19   could, it is dated November 25, 2002?
20        A.   Yes.
21        Q.   And it says, it was the opinion of
22   the Marketing Committee that with 213 million

698

1    layers now enrolled in the program, and this
2    representing nearly 100 percent of the shell
3    eggs needed to supply the shell egg markets,
4    that the quote should now be considered as an
5    animal care certified quote.  Do you see that?
6         A.   Yes.  I do.
7         Q.   Do you remember that being
8    discussed at the Marketing Committee in
9    November 2002?
10        A.   I don't specifically remember.
11   No.
12        Q.   And, if you would, on the last
13   page of Exhibit 563 -- excuse me, second to last
14   page, it lists you as a committee member
15   participating in the call on November 22nd?
16        A.   Yes.  It does.
17        Q.   And then it also says in the next
18   paragraph down, that the committee further
19   recommended to UEP members and certified
20   companies that all animal husbandry certified
21   companies only purchase eggs from other
22   certified companies for their marketing of shell

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

75 (Pages 699 to 702)

---

699

1  eggs.  Do you see that?
2       A.   Yes.  I see that.
3       Q.   Do you remember that being
4  discussed at the November 22nd Marketing
5  Committee meeting that you participated in?
6       A.   No.  I don't.
7       Q.   And this does not refresh your
8  recollection?
9       A.   No, sir.
10       Q.   Show you what's been marked as
11  Exhibit 185.  This is a December 2nd, 2002,
12  United Voices, so this would have been shortly
13  after the November 22nd Marketing Committee
14  meeting that you participated in; is that
15  correct, sir?
16       A.   Yes.
17       Q.   And if you would, if you could
18  turn to the Bates range 21, the last two digits,
19  it's the third page?
20       A.   Which page?
21       Q.   The bottom two digits are 21.
22       A.   Okay.

---

700

1       Q.   It states, the UEP's Marketing
2  Committee met via conference call on
3  November 22nd and made the following
4  recommendation to all UEP members and animal
5  care certified companies.  It is recommended
6  that all animal husbandry certified companies
7  only purchase eggs from other certified
8  companies for their marketing of shell eggs.  Do
9  you see that?
10       A.   Yes.
11       Q.   And that would be consistent with
12  what was reflected in Exhibit 563 that we just
13  read; is that correct, sir?
14       MR. MONICA:  Objection.
15       THE WITNESS:  It's stating the
16  same thing, yes.
17  BY MR. STUEVE:
18       Q.   This would have been disseminated,
19  United Voices, to all UEP members?
20       MR. MONICA:  Objection.
21       THE WITNESS:  I don't know that
22  for a fact.  I mean, I received it.

---

701

1  BY MR. STUEVE:
2       Q.   Okay.  Now, if you would, on 517,
3  Exhibit 517, that's the Notice?
4       A.   Oh.
5       Q.   If you would, if you could turn to
6  topic 32.  It says, any communications between
7  you and any attorney regarding the legality of
8  your activities under Federal or State antitrust
9  laws.  Do you see that?
10       A.   Yes.
11       Q.   I believe Mr. Hinton has been
12  designated for that topic; is that correct?
13       MR. MONICA:  He's been designated,
14  but he's going to be instructed not to divulge
15  any discussions with counsel.  You've been
16  designated, but don't divulge the content of any
17  conversations when counsel for Rose Acre was
18  present, but you've been designated to say that.
19  BY MR. STUEVE:
20       Q.   Let me ask you this.  You got an
21  instruction from counsel.  Let me ask you a
22  question.  What did you do to prepare yourself

---

702

1  for topic 32?
2       A.   It would just be my knowledge.
3       Q.   And do you have any knowledge
4  concerning the legality of any of the activities
5  we've been talking about today?
6       MR. MONICA:  Caution the witness,
7  you can answer that, but if your only knowledge
8  comes from conversations with counsel, instruct
9  you not to provide that information.
10       THE WITNESS:  Okay.  Then I --
11       MS. REDDING:  Also, what time
12  period are you talking about?
13  BY MR. STUEVE:
14       Q.   Go ahead and answer my question.
15       A.   Could you repeat that, please?
16       (The record was read as
17  requested.)
18       MR. MONICA:  You can answer that,
19  subject to my prior instruction.
20       THE WITNESS:  I --
21  BY MR. STUEVE:
22       Q.   You look confused.  Let me ask it

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                                March 18, 2014

---

703

1  this way.
2          Do you have any information
3  concerning the legality of the conduct that I've
4  been asking you about the last two days,
5  separate and apart from advice that you've
6  gotten from Mr. Monica's firm or any other firm
7  representing Rose Acre?
8          MR. MONICA:  Or any attorney
9  representing Rose Acre.
10 BY MR. STUEVE:
11     Q.   Yeah.
12     A.   No.
13     Q.   And did you talk to anyone else at
14 Rose Acre concerning topic 32 to prepare
15 yourself for topic 32?
16     A.   No.
17          (Exhibit Number 593 was marked for
18 identification.)
19 BY MR. STUEVE:
20     Q.   Show you what's been marked 593,
21 and this is Bates range RAUPDATE 0013665 through
22 66.  Did you review this document in preparation

---

704

1  for your testimony in response to topic number
2  32?
3      A.   No.
4      Q.   If you would, at the top, it's
5  August 6, 2007 communication from Larry Seger to
6  you and Aaron -- how do you pronounce his name
7  again?
8      A.   Heironimus.
9      Q.   Heironimus.  Both of you were from
10 Rose Acre; right?
11     A.   Correct.
12     Q.   And then copied on there are
13 several other folks, including Marcus Rust; is
14 that right?
15     A.   Yes.
16     Q.   And do you recall receiving this
17 communication?
18     A.   I vaguely remember it.  Yes.
19     Q.   And what do you recall about it?
20     A.   Just -- I remember receiving it.
21     Q.   Okay.  Now, in the second
22 paragraph, it says, our three egg breaking

---

705

1  plants are Wabash Valley Produce, Brown Produce
2  Company and Ballas Egg Products, all separate
3  corporations, none of these entities own
4  production.  Do you see that?
5      A.   Yes.
6      Q.   Do you remember reading that at
7  the time, sir?
8      A.   I don't remember reading this.
9  No.
10     Q.   But you don't -- sitting here
11 today, you don't -- you can't confirm you would
12 have received it?
13     A.   No.  I told you earlier, I recall
14 the document.  I just don't remember exactly
15 reading that.
16     Q.   I'm sorry.  I said received it.
17 You can't confirm you received this
18 communication?
19     A.   Yes.
20     Q.   Okay.  This does not refresh your
21 recollection after reviewing it, as far as
22 whether or not you had any communications with

---

706

1  anyone else about it after receiving it?
2      A.   No.
3          (Exhibit Number 594 was marked for
4  identification.)
5  BY MR. STUEVE:
6      Q.   Show you what's been marked as
7  Exhibit 594, and it's RAFKS 0013293 and up at
8  the top it's an e-mail from Phyllis Blizzard to
9  you; is that correct?
10     A.   Yes.
11     Q.   Dated September 17, 2012?
12     A.   Yes.
13     Q.   It's an e-mail chain starting with
14 Phyllis Blizzard down below; right?  At the
15 bottom half of the page is an e-mail from
16 Phyllis Blizzard?
17     A.   Yes.
18     Q.   And then there's an e-mail from
19 you saying, Phyllis, what can you buy for us and
20 at what price; is that right?
21     A.   Yes.
22     Q.   And then it says, Greg, I was

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

707

1  wrong on the amount of purchase loads outside of
2  USEM, I was figuring that on 100 loads instead
3  of 200 loads.  You could probably buy all of
4  yours if we could find someone to pack them.  Do
5  you see that?
6      A.   Yes.
7      Q.   And then it says, USEM is required
8  to have a minimum of 50 percent packed by USEM
9  members.  Do you see that?
10     A.   Yes.
11     Q.   Did you have any understanding as
12 to why that was a requirement?
13     A.   Not an understanding why it was a
14 requirement.  No.
15     Q.   Did USEM purchase eggs for Rose
16 Acre in September of 2012 to fulfill their
17 export commitment?
18     A.   I'm sorry, can you repeat that?
19          MR. STUEVE:  Why don't you read it
20 back.
21          (The record was read as
22 requested.)

---

708

1          MR. MONICA:  Objection.  You can
2  answer.
3          THE WITNESS:  I'm sorry.  Could
4  you read it one more time?  I apologize.
5          (The record was read as
6  requested.)
7          MR. MONICA:  Objection.
8          THE WITNESS:  Yes.
9  BY MR. STUEVE:
10         (Exhibit Number 595 was marked for
11 identification.)
12     Q.   Show you what's been marked as
13 Exhibit 595, and the Bates range is RAUPDATE
14 0040047.  Do you know from whose files this Rose
15 Acre document -- the document Bates stamped Rose
16 Acre came from.
17     A.   No.  I don't.
18     Q.   It's an e-mail from Gene Gregory
19 to Marcus Rust in January of 2007; is that
20 right?
21     A.   No.
22     Q.   I'm sorry.

---

709

1      A.   No.  That's not correct.
2      Q.   Let me rephrase it.  This is an
3  e-mail that's dated January 31, 2007; is that
4  correct?
5      A.   Yes.
6      Q.   Okay.  And it's from Marcus Rust
7  to Gene Gregory?
8      A.   Correct.
9      Q.   Okay.  I'm getting tired, too.
10          It's subject, USDA Program?
11     A.   Correct.
12     Q.   Now, were you aware at this time
13 that Sparboe had left the UEP certified program
14 and was attempting to develop its own verified
15 animal welfare program?
16     A.   I was aware that Sparboe had left
17 the program.  Yes.  The exact timing, I can't
18 remember the exact timing, but, yes, I remember
19 that.
20     Q.   And it says, Gene, after hearing
21 Vic's comments?  Who is Vic referring to?
22          MR. MONICA:  Objection.

---

710

1          THE WITNESS:  If this, in fact,
2  is -- like I said, I've never seen this e-mail
3  before.  If Marcus Rust would be referring to
4  Vic, I would think it was Victor Rigterink.
5  BY MR. STUEVE:
6      Q.   It says, Gene, after hearing Vic's
7  comments after talking to USDA, the verified
8  process is a done deal.  Our only chance in
9  stopping is to going to be through FMI or
10 Wal-Mart/Kroger approach.  Do you see that?
11     A.   Yes.
12     Q.   Were you involved in an effort to
13 reach out to FMI or Wal-Mart to get them not to
14 use or to purchase Sparboe eggs that would be
15 verified under the USDA process?
16          MR. MONICA:  Objection.  Compound.
17 Calls for speculation.  Assumes facts not in
18 evidence.  You can answer.
19          THE WITNESS:  No.  I did not.
20 BY MR. STUEVE:
21     Q.   Were you aware of the discussion
22 by Marcus Rust at this timeframe that the only

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

711

1  chance of stopping is going to be through FMI or
2  Wal-Mart Kroger?
3          MR. MONICA:  Same objection.
4          THE WITNESS:  No.  I'm not.
5  BY MR. STUEVE:
6      Q.   Then it says, we lost business in
7  Chicago last week for $0.80 a dozen pricing to
8  Sparboe.  In January of 2007, who would that
9  have been?
10         MR. MONICA:  Objection.
11         THE WITNESS:  I don't know.
12  BY MR. STUEVE:
13     Q.   Was this document reviewed with
14  you in preparation for today's deposition?
15     A.   No.  It was not.
16     Q.   If you could turn to topic 34.  It
17  says the -- you understand you have been
18  designated to testify on behalf of Rose Acre in
19  response to topic 34?
20     A.   Yes.
21     Q.   And what did you do to prepare
22  yourself to respond to topic 34?

712

1          MR. MONICA:  I'm going -- well, go
2  ahead.
3          THE WITNESS:  There was nothing I
4  knew that I could do to prepare.  I have no
5  knowledge of what that is referring to.
6  BY MR. STUEVE:
7      Q.   Are you aware, sir, that Rose Acre
8  has alleged that AWG and its members violate the
9  Kansas Restraint of Trade Act?
10     A.   No.  I'm not.
11     Q.   Under topic 25, it's the principal
12  material facts which you allege support each
13  defense set forth in your answer.  Do you see
14  that topic?
15     A.   Yes.
16     Q.   Were you designated on behalf of
17  Rose Acre to respond to that topic?
18     A.   Yes.
19     Q.   What did you do in preparation to
20  testify about that topic prior to today?
21         MR. MONICA:  Mr. Hinton, before
22  you answer that, you can answer it, but to the

713

1  extent that any of your knowledge comes from
2  conversations with counsel, do not disclose
3  that, but go ahead and answer the question,
4  please.
5          THE WITNESS:  I have -- I've not
6  done anything to prepare.  I didn't know what --
7  I didn't quite understand it and don't know what
8  it means.
9  BY MR. STUEVE:
10     Q.   It's fair to say you did not meet
11  with anyone at Rose Acre in preparation of
12  testimony with respect to topic 25; is that
13  correct?
14     A.   Correct.
15         (Exhibit Number 596 was marked for
16  identification.)
17  BY MR. STUEVE:
18     Q.   Let me show you what's been marked
19  as 596, it's RAUPDATE 0071391 through 30.
20         All right.  First of all, can you
21  tell me -- this is a Rose Acre, Inc. layer farm
22  budget summary, fiscal 2001 to fiscal 2006.  Do

714

1  you see that?
2      A.   Yes.
3      Q.   Do you know why this was prepared?
4      A.   No.
5      Q.   Did you get a copy of it?
6      A.   No.  Not that I recall.
7      Q.   Okay.  Was there a time period in
8  the 2000s in which Rose Acre was considering
9  making an initial public offering?
10     A.   Not that I know of.
11     Q.   You weren't consulted about that?
12     A.   No.
13     Q.   Okay.  Do you recall from '99 up
14  to the present, Rose Acre contemplating the sale
15  of its business?
16     A.   No.
17     Q.   Have you seen this document
18  before?
19         MR. MONICA:  Objection.  Asked and
20  answered.
21         THE WITNESS:  No.
22  BY MR. STUEVE:

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

715

1    Q.  Okay.  If you would, over on 93,
2  it has fiscal year '98 up through fiscal year --
3  excuse me -- '98 and then it goes to '93 -- so
4  '93 through '98, it has the average per dozen,
5  if you go down about halfway down.  Do you see
6  that?
7    A.  Yes.
8    Q.  Does it appear to be the average
9  price per dozen?
10    MR. MONICA:  Objection.
11    THE WITNESS:  I don't know exactly
12  what that is without talking to somebody.
13  BY MR. STUEVE:
14    Q.  Okay.  We are done with our
15  questions, obviously reserving the right to come
16  back with respect to those topics that the
17  witness was not prepared to testify about.
18    MR. MONICA:  Well, we encourage
19  you to ask any questions you have because he was
20  prepared for all of your topics.  I will take a
21  five minute break and come back with my topics
22  for you.  For those on the phone if you have

716

1  questions after that, feel free to ask.  I need
2  a five minute break.
3    MR. STUEVE:  Do you still believe
4  there's just going to be a couple, so I can get
5  to Marshall.
6    MR. MONICA:  Let's go off the
7  record.
8    THE VIDEOGRAPHER:  The time is
9  3:58 p.m.  We are going off the record.
10    (A brief recess was taken.)
11    MR. STUEVE:  I want to go back on
12  the record.  I don't need it videotaped.
13    MR. MONICA:  Are we going back on
14  right now?
15    MR. STUEVE:  Yes.  We don't need
16  the videotape.
17    MR. MONICA:  No.  We want him on.
18    MR. STUEVE:  That's fine.
19    THE VIDEOGRAPHER:  This is the
20  start of media unit number six.  The time is
21  approximately 4:05 p.m.  We are back on the
22  record.

717

1    EXAMINATION BY COUNSEL FOR ROSE ACRE FARMS
2  BY MR. MONICA:
3    Q.  Mr. Hinton, I want to ask you a
4  few follow-up questions.  I'll try to be brief.
5  I know you've been here two long days.  We
6  appreciate your work and opposing counsel may
7  have some follow-up questions after that.
8    If you will take Exhibit 517,
9  which is the Deposition Notice and look at topic
10  22I, please.
11    A.  Okay.
12    Q.  You see topic 22I is the purpose
13  of USEM exports.  Do you see that?
14    A.  Yes.
15    Q.  What is the purpose of USEM
16  exports from Rose Acre's perspective?
17    A.  From Rose Acre's perspective, it's
18  twofold.  One, it's a way of when there's
19  surplus eggs, we don't have a market for in our
20  regular channels in the US without the
21  possibility of losing money in the breaking
22  market or drying without knowing the known costs

718

1  when those eggs are sold, it's a way to remove
2  the surplus we don't have another home for.
3    And the second would be at times
4  to help when countries are in need they have a
5  natural disaster or disease problem that it
6  helps other countries out to get them products
7  when they need it.
8    Q.  Does Rose Acre make money off its
9  USEM exports?
10    MR. STUEVE:  I object.  The
11  witness testified he did no investigation,
12  didn't know one way or the other.  So I object.
13  Lack of foundation.
14    MR. MONICA:  Move to strike.  You
15  can answer the question, though.
16    THE WITNESS:  We have made money
17  off USEM exports, but I can't tell you -- we
18  don't track the exact numbers for any profit or
19  loss off an individual account like USEM or
20  customers that I would have record of.
21  BY MR. MONICA:
22    Q.  Next I would like you to turn to

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

---

719

1   topic 20G in the Notice.  Take a moment to read
2   that, 20G.  I'm going to ask you a couple
3   questions about it.
4       A.   Okay.
5       Q.    Was Rose Acre aware and did it
6   ever participate in any industry or collective
7   effort to decrease supply or raise the price of
8   eggs and egg products?
9       MR. STUEVE:  Hold on.  I object.
10  Lacks foundation on the part of this witness.
11      THE WITNESS:  Okay.  Speaking for
12  Rose Acres, as I stated earlier today, we -- our
13  company policy is not to participate in flock
14  reductions or molt, early sell outs as it says
15  here, because of what I stated earlier that we
16  have our own breeder farms and hatcheries and
17  our pullet facilities, our layer facilities.
18  And we have to plan our schedules out on flocks
19  more than 18 months in advance so it would
20  disrupt our schedule too much.
21      As far as the second part asking,
22  am I aware of anyone else, I don't have any

---

720

1   direct knowledge of anyone doing that.
2   BY MR. MONICA:
3       Q.    Did Rose Acre ever take part in
4   any early or coordinated molt, to Rose Acre's
5   knowledge?
6       A.   No.
7       Q.    Did Rose Acre ever make any
8   changes to its flock disposal or flock kill
9   programs as a result of any coordination with
10  anyone else in the industry?
11      A.   No.
12      Q.    Did Rose Acre ever make a change
13  to its chick placement or chick hatch program as
14  a result of any collective effort with any other
15  entity in the industry?
16      A.   No.
17      Q.    Did Rose Acre ever reduce its
18  layers or hens in conjunction with any other
19  entity in the egg industry?
20      A.   No.
21      Q.    And from 2000 to present -- let's
22  step back.

---

721

1       What was Rose Acre's approximate
2   number of layer hens in 2000, if you can recall?
3       A.   I don't recall off the top of my
4   head.
5       Q.    What was it when you started
6   working in your current position at Rose Acre?
7       MR. STUEVE:  Objection.  Vague as
8   to time.
9       THE WITNESS:  My current position
10  as we established earlier was around 1992.  The
11  number of birds in '92, I -- I don't recall the
12  exact number of birds in '92 off the top of my
13  head.
14  BY MR. MONICA:
15      Q.    When you started to work for Rose
16  Acre in the 1980s, do you remember how many hens
17  they had?
18      A.   Yes.  I do.
19      Q.   How many?
20      A.   Three and a half million.
21      Q.   What do they have now?
22      A.   We have capacity for 24 million,

---

722

1   just over 24.
2       Q.    Has it always been Rose Acre's
3   stated and followed plan to increase the number
4   of layer hens whenever possible?
5       A.   Yes.
6       Q.    Is that, in fact, what's occurred
7   for your tenure at Rose Acres?
8       A.   Yes.  It has.
9       MR. MONICA:  That's all I have.
10      MR. STUEVE:  A few follow-up
11  questions, Mr. Hinton.
12      EXAMINATION BY COUNSEL FOR PLAINTIFF
13  BY MR. STUEVE:
14      Q.    You testified to two purposes that
15  you claim that Rose Acre joined USEM.  Do you
16  remember that testimony?
17      A.   Yes.
18      Q.    And we walked through document
19  after document that confirmed the purpose that
20  Larry Seger understood, as chairman of the USEM,
21  understood the purpose of the exports were.  Do
22  you remember those documents?

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

81 (Pages 723 to 726)

---

723

1  MR. MONICA: Objection.
2  Mischaracterizes the documents. Calls for
3  speculation.
4  THE WITNESS: I guess can you
5  repeat the question?
6  BY MR. STUEVE:
7  Q. Do you remember the document I
8  showed you that indicated Larry Seger, who is
9  the chairman of USEM, as well as UEP USEM United
10  Voices documents that indicated that the purpose
11  of USEM export was to reduce supply and boost
12  prices. Do you remember seeing those documents?
13  MR. MONICA: Object to the form of
14  the question. You can answer.
15  THE WITNESS: I remember you
16  showing me documents, and I remember me firmly
17  stating I didn't agree with them.
18  BY MR. STUEVE:
19  Q. Yeah. And the -- you identified
20  -- you testified that you believe that Rose Acre
21  may have made money, quote, unquote, from USEM
22  exports. Do you remember that?

---

724

1  A. Yes.
2  Q. I asked you specifically whether
3  or not you knew whether Rose Acre had profits or
4  losses from USEM exports and you told me you had
5  no way of telling that. Do you remember that
6  testimony?
7  MR. MONICA: Objection.
8  THE WITNESS: I remember you
9  asking me if we had losses.
10  BY MR. STUEVE:
11  Q. You told me you had no way of
12  telling me that; right?
13  A. Without looking at the
14  documentation; right.
15  Q. I also asked you whether or not
16  you had gains. Do you remember that?
17  A. No. I don't.
18  Q. What document would you look at to
19  determine whether or not Rose Acre ever made
20  money off of a USEM export?
21  A. What document?
22  Q. Yeah.

---

725

1  A. I know from my knowledge on --
2  Q. That's not my question. My
3  question is what document would you look at?
4  MR. MONICA: Objection.
5  THE WITNESS: It would be a couple
6  documents. We would look at the invoice price
7  we sold at and we would go back and look at our
8  cost to produce at the time that they were sold.
9  BY MR. STUEVE:
10  Q. Why wouldn't you look at what the
11  market price would be if you could sell those
12  eggs on the market?
13  A. That has nothing to do with it.
14  Q. Now, sir, you also said that one
15  of the purposes was to help countries in need,
16  is that your testimony for USEM exports?
17  A. Yes. I did.
18  Q. Which export are you referring to?
19  A. The Mexico export.
20  Q. When was that?
21  A. 2012. And there was -- there was
22  another one that you didn't show me.

---

726

1  Q. The Mexico export, though, in 2012
2  was six years after you had joined USEM; is that
3  correct, sir?
4  A. Five or six. Yes.
5  Q. Now, you testified that Rose Acre
6  does not participate in early molts; is that
7  correct?
8  A. That's not what I testified to.
9  No.
10  Q. What did you testify to?
11  A. Do you want to read back the
12  question?
13  MR. MONICA: Read it back.
14  THE WITNESS: What did I
15  testify -- I testified to what he asked.
16  BY MR. STUEVE:
17  Q. Does Rose Acre participate in
18  early molts?
19  A. That's not a clear question.
20  Q. Sir, does -- did -- it's also your
21  testimony that Rose Acre did not participate in
22  flock disposal or flock kill programs; is that

---

Case: 1:11-cv-08808 Document #: 392-24 Filed: 10/23/23 Page 83 of 131 PageID #:15036

---

727

1  correct?
2       MR. MONICA:  Objection.  That is
3  not his testimony.
4       THE WITNESS:  That's not what I
5  testified to.
6  BY MR. STUEVE:
7       Q.  You remember me walking through
8  document after document concerning
9  recommendations by the Marketing Committee at
10 the time you sat on it concerning early molts
11 and early kills.  Do you recall that?
12      MR. MONICA:  Objection.
13      THE WITNESS:  I recall documents
14 that you showed me.  Yes.
15 BY MR. STUEVE:
16      Q.  All right.  And you couldn't
17 recall those discussions.  Do you remember that?
18      MR. MONICA:  Objection.  Misstates
19 his testimony.
20 BY MR. STUEVE:
21      Q.  Do you remember that testimony?
22      **A.  Repeat the question.**

---

728

1       Q.  I showed you the documents and
2  asked you if you recalled the discussions
3  concerning the recommended the early molts and
4  early kills and you testified you had no
5  recollection.  Do you remember that?
6       MR. MONICA:  Objection.
7       THE WITNESS:  You asked me if I
8  remembered being at these meetings and I said
9  no.
10 BY MR. STUEVE:
11      Q.  I asked you if the documents
12 themselves refreshed your recollection and you
13 said no, as well; correct?
14      **A.  Correct.**
15      Q.  Now, whether or not Rose Acre
16 participated in those organized early kills or
17 early molts, Rose Acre benefited from those
18 organized early molts and early kills, did they
19 not, sir?
20      MR. MONICA:  Objection calls for
21 speculation.  Assumes facts not in evidence.
22      THE WITNESS:  I can't agree with

---

729

1  that.
2  BY MR. STUEVE:
3       Q.  You also testified that Rose Acre
4  did not reduce its layers in conjunction with
5  any other egg producer.  Do you recall that
6  testimony?
7       **A.  Yes.**
8       Q.  In fact, Rose Acre has been a
9  participant in the certified program since 2002;
10 right?
11      **A.  Correct.**
12      Q.  And according -- nearly 90 percent
13 of the egg producers are participants in that
14 certified program; correct, sir?
15      **A.  It's 80 -- I think I testified I**
16 **thought around 85 percent.**
17      Q.  And all of those certified
18 producers, they're audited to make sure that
19 they increase the cage spaces required by the
20 certified program; correct?
21      MR. MONICA:  Objection.
22      THE WITNESS:  They're audited to

---

730

1  make sure they follow the program; correct.
2  BY MR. STUEVE:
3       Q.  And according to Rose Acre's
4  general counsel, as well as Marcus Rust, during
5  the time that Rose Acres participated in the
6  certified program, it's reduced its flock
7  population literally by the millions.  Do you
8  recall that, sir?
9       MR. MONICA:  Objection.
10 Mischaracterizes the document -- let me
11 finish -- objection mischaracterizes the
12 documents you've shown the witness as well as
13 Mr. Rust's testimony.  You can answer the
14 question.
15 BY MR. STUEVE:
16      Q.  Do you recall that?
17      **A.  I recall testifying earlier that**
18 **ever since I've worked as Rose Acres since 1980**
19 **that we have continued to increase our flock**
20 **size every year since I've been there.**
21      Q.  I asked Mr. Rust without the cage
22 space reduction, what would Rose Acre's flock

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

83 (Pages 731 to 734)

---

731

1  size be.  And he testified it could be as high
2  as 30 to 40 million.  Do you have any reason to
3  doubt that testimony, sir?
4        MR. MONICA:  Counsel, I object.
5  You haven't shown him the transcript of what
6  Mr. Rust was saying.  You're just making the
7  representation that was false.  So you can
8  answer the question as to whether you know from
9  he's telling you what Mr. Rust said.
10        THE WITNESS:  I don't know what
11  Mr. Rust said.  I had no discussion with him on
12  that topic.
13  BY MR. STUEVE:
14        Q.   He's currently the chief executive
15  officer of Rose Acre; correct, sir?
16        A.   Yes.  He is.
17        MR. STUEVE:  I have no further
18  questions.
19        MR. MONICA:  Anyone on the phone
20  have any questions?
21        MS. REDDING:  No questions.
22        MR. BURKE:  No questions.

---

732

1        MR. MONICA:  We're going to break
2  real quick to try to get Greg Marshall in here,
3  so Pat can finish his depo and get on the road.
4        MR. STUEVE:  Mr. Hinton, I know
5  it's tough being in your chair.  I'm just doing
6  my job, and I appreciate your time.
7        THE VIDEOGRAPHER:  This concludes
8  the video deposition of Mr. Greg Hinton on
9  behalf of Rose Acre Farms, Incorporated.
10  There's a total of two volumes, consisting of 12
11  media units.  The time is 4:21 p.m. and we're
12  going off the record.
13        (Reading and signature not
14  waived.)
15        (Whereupon, at 4:21 p.m., the
16  deposition was concluded.)
17        - - - - -
18
19
20
21
22

---

733

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I do hereby acknowledge that I have read
4  and examined the foregoing of the transcript of
5  my deposition and that:
6
7        (Check appropriate box):
8
9        (  ) the same is a true, correct and
10  complete transcription of the answers given by
11  me to the questions therein recorded.
12
13        (  ) except for the changes noted in the
14  attached errata sheet, the same is a true,
15  correct and complete transcription of the
16  answers given by me to the questions therein
17  recorded.
18
19
20
21  _____   _____
22  DATE          SIGNATURE

---

734

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Paula G. Satkin, the officer before whom the
3  foregoing proceedings were taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing proceeding was duly sworn by
6  me; that the testimony of said witness was taken
7  by me in stenotype and thereafter reduced to
8  typewriting under my direction; that said
9  proceedings is a true record of the testimony
10  given by said witness; that I am neither counsel
11  for, related to, nor employed by any of the
12  parties to the action in which these proceedings
13  were taken; and, further, that I am not a
14  relative or employee of any attorney or counsel
15  employed by the parties hereto, nor financially
16  or otherwise interested in the outcome of the
17  action.
18  My commission expires November 14, 2015.
19  _____
20        PAULA G. SATKIN
21        Notary Public in and for the
22        District of Columbia

---

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

1

**A**

**$0.15** 650:19 683:14
**$0.17** 663:11,17
**$0.20** 683:15,20
**$0.24** 456:7,15 457:1
**$0.30** 660:22
**$0.39** 641:12
**$0.59** 655:17 659:5 660:19
**$0.60** 665:11 666:10,11 667:12,15 676:12,16,22 677:3,5 680:10 680:12 681:12
**$0.61** 667:19
**$0.78** 453:16 454:10
**$0.80** 677:21,22 711:7
**$0.82** 677:21,22
**$0.84** 647:12
**$1,15** 671:18,19
**$1.06** 670:21 671:11
**$1.08** 457:15
**$1.09** 670:21,21 671:10,11
**$1.11** 670:22 671:11
**$1.12** 671:15,19
**$1.15** 671:15,15
**$1.17** 671:15,19
**$1.18** 689:1
**$1.25** 689:6
**$1.34** 676:7
**$1.37** 676:7,7
**$1.38** 676:8
**$1.42** 676:4
**$1.45** 676:4,4

**$1.46** 676:4
**a.m** 406:17 414:3 471:14 471:18 521:13 578:4,8 582:11
**Aaron** 421:22 455:13 609:12 704:6
**ability** 457:4,6 457:19 458:2
**accept** 544:14
**accepted** 668:14 668:22 669:18
**access** 672:16,19 673:2,3
**accompany** 477:11
**accomplish** 620:8
**account** 441:20 718:19
**accounts** 607:12 608:11 619:17
**accuracy** 694:10 694:11
**accurate** 454:1 542:1 589:17 590:1,7,13,19 590:21 592:1,6 592:10
**accurately** 593:10
**achieve** 530:2 542:12
**acknowledge** 733:3
**ACKNOWLE...** 733:1
**acquiring** 636:22
**Acre** 407:11 410:3 411:19

414:19 417:10 417:14,14,17 417:19 418:12 418:16 419:6 419:11,21 421:3,10 426:11 436:22 444:22 455:7 458:9,19 459:5 459:11,14 466:4 469:17 470:6,9 471:21 472:5 473:13 473:22 475:22 478:12 479:5 479:21 485:14 485:21 486:20 487:4,6 489:13 491:1,17 492:6 492:8,17 494:1 494:11 497:7 497:19 498:21 498:21 499:19 500:10,18,19 503:3 506:22 507:21 509:17 510:2,9,21 512:15 513:19 514:11 515:15 520:12,14 521:21 535:10 546:14,18,19 547:5 556:12 559:12 560:21 561:5 562:8 563:21 566:5 568:9 570:4,15 571:5,17 573:10,12 576:20 578:12 579:7 581:13 581:18 582:1

585:14 586:10 587:2 589:12 589:16 590:5 590:18 591:5 591:10,15,19 593:7,22 594:10,13,19 597:3 604:9 605:8,16,20 606:5 608:21 609:3,15 610:10 612:8 613:10,20 614:19 617:3 617:10 619:11 620:13 621:4,8 623:14 625:15 625:20 626:3,4 626:5,6,7,8,12 626:16 627:10 627:22 629:15 634:20 635:2 635:10,14 637:15 639:16 642:15 644:10 645:3 646:1,3 646:10,20 648:5 649:4 651:1,11,20 652:10,18 653:12,17 654:2,15,21 656:12 658:9 659:6 661:4 663:15 672:16 672:20 673:6 679:4,11,14,16 682:16 685:1,1 686:7,22 691:3 691:8,14,19,20 692:12 693:9 694:2,6,15

696:2 697:1 701:17 703:7,9 703:14 704:10 707:16 708:15 708:16 711:18 712:7,17 713:11,21 714:8,14 717:1 718:8 719:5 720:3,7,12,17 721:6,16 722:15 723:20 724:3,19 726:5 726:17,21 728:15,17 729:3,8 731:15 732:9
**Acre's** 456:6,16 505:11 515:14 516:7 543:15 547:17 561:3 562:6 572:3 582:3 586:18 591:8 602:5 635:15 640:12 640:16 645:11 662:14 679:17 686:4 717:16 717:17 720:4 721:1 722:2 730:3,22
**Acres** 571:19 572:12 574:19 574:20,22 590:10,11 612:15 719:12 722:7 730:5,18
**Act** 634:2 712:9
**action** 514:17 517:7 599:1,3 599:5 734:12

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II      March 18, 2014

2

734:17
**active** 618:3,14
657:7
**activities** 627:17
701:8 702:4
**actual** 609:9
651:20
**add** 429:16,19
499:14
**added** 440:12
**adding** 534:21
568:16 579:10
**adhere** 566:9
**adjust** 442:5
**adjustment**
517:14 531:5
531:17,21
**adjustments**
517:2
**adopt** 493:12
497:8
**adopting** 492:18
**advance** 566:11
719:19
**advertising**
440:7
**advice** 498:18
703:5
**advised** 536:20
**advisors** 453:4,6
**affect** 648:20
**AFTERNOON**
601:1
**agenda** 500:1
509:9 510:11
536:16
**agent** 481:18
**ages** 534:15
**agitating** 576:11
**ago** 462:9 481:7
485:2 486:7
502:5 616:3

**agree** 584:8
590:22 622:13
623:3 625:2
629:3 630:11
648:10,19,21
651:8,16 652:2
652:13 661:14
663:22 664:10
666:12 690:9
694:18 723:17
728:22
**agreed** 458:9,19
666:8
**agreement**
411:18 613:10
614:18 644:16
688:15
**agreements**
423:18
**ahead** 415:11
431:2 461:14
497:13 499:15
553:9 567:9
576:12 594:7
624:3 633:15
659:11 660:10
660:11 680:21
702:14 712:2
713:3
**al** 406:6,9
474:12 475:16
483:5 484:7,11
484:11,13,15
486:3 498:13
618:5 619:3
**Aldie** 416:4
428:10 464:18
**Aldie's** 465:6,20
**alert** 562:14
563:3,3,10
569:14,21
**alive** 615:20

616:4
**allege** 712:12
**alleged** 500:1
509:9 510:11
712:8
**allocated** 654:13
657:13 685:2
691:20 693:8
693:15 694:2
694:15
**allocation**
644:20 654:6
679:3 685:9
686:4 691:4
**allowance** 596:1
596:2,12
**allowed** 423:9
**Amanda** 478:4
478:15 482:13
**ambiguous**
440:20 486:6
498:8 509:19
**amended** 667:18
**amount** 450:4
675:2 685:2
695:6,9 707:1
**amounted** 593:8
**analysis** 525:10
531:4,9
**and/or** 472:20
556:5
**animal** 450:1
462:3 463:9
488:9 492:9,13
493:10,13,18
493:20 496:7
499:4 500:1
501:4 507:11
509:9 510:11
532:9 533:8
571:12 572:2
573:11 579:15

579:19 581:10
585:1 586:9
595:1 596:10
597:7 622:6
698:5,20 700:4
700:6 709:15
**Ann** 452:11
582:16,19,22
583:11 584:4
**announced**
569:13 683:21
**announcement**
647:20 663:10
**annual** 422:4,5
422:6 436:1
476:19,20
482:22 483:1,6
483:20 484:22
503:5 538:1,7
623:17
**answer** 438:6
440:20 445:4
446:9 449:13
450:13 456:10
456:19 457:9
458:5 461:8,14
462:13 463:3
490:10 491:21
497:9,13
499:15 500:5
502:4 504:1,21
506:11 510:16
518:4 524:11
527:15 529:4
530:22 531:15
533:12 534:2
544:9 546:14
546:17 552:21
553:1,4 565:19
566:21 567:2,5
567:8 572:11
572:19,20

573:1,14,19,20
574:17 575:2,5
575:6,11,14,19
575:20 576:13
576:18 585:19
586:13 620:17
633:15 644:5
648:9,14,18
651:5 652:12
653:1 659:11
661:13 702:7
702:14,18
708:2 710:18
712:13,22,22
713:3 718:15
723:14 730:13
731:8
**answered**
462:13 463:17
491:21 526:9
575:8,10
714:20
**answers** 501:20
503:4 534:18
733:10,16
**Anthony** 452:9
507:18
**antitrust** 701:8
**anybody** 485:21
580:14 581:6
**anymore** 611:16
635:9
**apart** 703:5
**apologize** 708:4
**appear** 614:17
715:8
**APPEARAN...**
407:1
**appears** 538:21
583:17 584:8
613:11 654:7,9
654:20 676:19

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

3

687:1 734:4
**applies** 463:1
**appreciate**
  442:11 717:6
  732:6
**approach**
  444:21 710:10
**appropriate**
  733:7
**approval** 600:1
**approve** 666:20
**approved**
  517:13,19
  563:10 598:16
  598:19
**approximate**
  721:1
**approximately**
  433:16 434:6
  466:6 469:13
  476:12 482:20
  521:13 541:13
  543:2 546:16
  550:10 555:1
  555:17 579:6
  583:16 601:4
  606:20 610:21
  610:22 612:19
  624:13 637:9
  646:14 659:18
  716:21
**approximation**
  434:1
**April** 513:8,13
  540:2,22 557:6
  662:9,16,20
**April/July**
  512:10
**Arch** 408:8
**area** 420:13
**areas** 457:5,20
**argue** 511:7,21

**Arias** 595:11,21
**Arthur** 407:14
**ashamed** 509:2
**asked** 415:2
  443:4,10
  447:12,14
  462:12 463:16
  468:2 488:12
  488:16 491:20
  526:8 539:3,7
  564:6 567:5
  603:6,18
  632:15 681:16
  693:12 714:19
  724:2,15
  726:15 728:2,7
  728:11 730:21
**asking** 439:14
  445:6 459:19
  490:5 491:13
  497:1 515:22
  517:21 519:18
  523:11 529:9
  533:6 552:7,11
  590:14 649:1
  687:16 690:6
  703:4 719:21
  724:9
**asks** 572:5
  625:14
**assert** 499:13
  515:19
**assessment**
  650:13
**assessments**
  545:6
**assigned** 596:2,3
  606:12
**assist** 609:5
**assisted** 627:15
**ASSOCIATED**
  406:5

**association**
  475:9,13 476:1
  476:14 617:2,4
  617:11 618:5,9
  619:12
**Association's**
  477:7
**assume** 456:16
  649:1,8
**assumed** 627:2
  636:5
**Assumes** 500:3
  503:21 710:17
  728:21
**assuming**
  669:18
**assumption**
  680:2
**Atheny** 466:6
**Atlanta** 475:6
  475:11 477:2
  536:3
**Atlantic** 485:3
**attached** 539:19
  549:8 553:18
  555:12 558:5
  588:12 591:17
  596:20 597:5
  598:3 733:14
**attempt** 487:17
  496:13 506:5
  572:1 573:9
  663:12
**attempted** 464:6
**attempting**
  709:14
**attend** 485:12
  485:14 522:7
  522:15 619:7
**attendance**
  521:22 543:8
  559:9 564:5

**attended** 524:19
  537:4 539:17
  560:20 595:7
  612:22 613:3
  617:14,16
**attendees**
  536:20 539:3,8
**attending** 522:3
  522:9 523:8
  613:1
**attorney** 537:10
  701:7 703:8
  734:14
**attributable**
  644:2 659:6
**attributed** 623:7
**audit** 496:8
  595:14 596:11
**audited** 729:18
  729:22
**August** 411:18
  412:9 517:8
  588:21 614:18
  644:11 664:22
  669:7,8,20
  671:18 672:22
  673:7 674:10
  674:22 676:11
  678:2,13,18
  682:19 687:4
  688:8 691:2
  692:15 704:5
**author** 589:9
**average** 419:1
  421:11 438:9
  438:19 439:2
  441:4,8,11
  525:15 647:12
  689:1 715:4,8
**averages** 422:9
**awakening**
  574:7

**aware** 471:6
  472:9 493:4
  496:7,16
  497:15,15,18
  497:21 498:4,9
  498:12,15,16
  498:19,20
  499:16 500:6
  509:13,20
  510:8,12,18
  511:16 512:3
  517:12 518:6
  533:2 553:15
  554:4 555:5
  560:14 570:14
  570:19,21
  585:13 586:2,8
  599:1 709:12
  709:16 710:21
  712:7 719:5,22
**AWG** 417:3
  464:19 467:21
  468:3 470:3
  611:11 712:8
**AWG's** 468:8
  468:21 470:8

———————
**B**
———————
**B** 411:7 412:1
  413:1 439:20
**back** 414:12
  415:7 426:8
  433:6 434:5
  441:21 442:3
  442:11 443:3,7
  452:22 459:13
  467:3,15
  471:18 475:5
  477:16 483:4
  485:4 493:7
  495:5 499:10
  500:17 502:13

| | | | | |
|---|---|---|---|---|
| 517:22 521:13 | 416:1,19 417:2 | 494:16 623:17 | 711:18 712:16 | **bid** 444:10,11 |
| 525:1 528:22 | 417:4,8,15,17 | **Bates** 411:9,11 | 732:9 | 445:20 446:4 |
| 542:6 549:11 | 417:18,21 | 411:13,21 | **Behan** 595:22 | 468:18 469:5 |
| 551:6 557:2 | 418:12,17 | 412:3,5,6,11 | **believe** 418:19 | 667:15,19 |
| 566:22 567:2,5 | 419:7 420:21 | 412:13,15,17 | 420:19 433:21 | 676:12 |
| 568:9 572:20 | 420:22 425:9 | 412:19,21 | 452:11 468:17 | **bids** 418:11 |
| 573:1,9,19 | 425:12,15,18 | 413:3,5,7,9,11 | 475:17 476:17 | 433:2 667:12 |
| 575:5,6 576:12 | 427:4,8,13 | 451:18 455:20 | 482:18 488:21 | 668:18 |
| 578:7 582:22 | 430:3,7,9 | 508:5,7 578:19 | 489:12 495:3 | **big** 428:11 |
| 584:5 596:21 | 432:18 433:4 | 597:17 614:21 | 495:16 501:1 | 433:22 482:8 |
| 599:11 601:4 | 433:18 434:2,3 | 625:9 626:11 | 522:15 535:4 | 605:7 |
| 607:19 608:2 | 434:22 435:16 | 645:18 664:21 | 538:5,9 611:5 | **biggest** 443:1 |
| 619:17 627:8 | 435:20 437:1 | 669:11,13,14 | 616:9 621:17 | **Bill** 477:17 |
| 630:18 637:2 | 437:13,16 | 673:20 678:9 | 623:6 624:15 | 478:22 |
| 656:12 660:1,3 | 444:17 445:8 | 682:8,10 | 632:16 637:6 | **birds** 462:1,4 |
| 661:19 673:15 | 447:18,19 | 684:10 685:22 | 646:5 662:13 | 492:11,12,16 |
| 695:21 707:20 | 448:2,6,6,8,11 | 686:20 688:5 | 662:15 664:13 | 534:21 566:7 |
| 715:16,21 | 448:17,17 | 690:17 699:18 | 673:1 695:8 | 566:18 567:21 |
| 716:11,13,21 | 449:1 474:20 | 703:21 708:13 | 701:11 716:3 | 593:8,9 607:22 |
| 720:22 725:7 | 484:20 643:20 | 708:15 | 723:20 | 635:12,12 |
| 726:11,13 | 644:3 648:4 | **Beaters** 428:22 | **believed** 498:5 | 636:4 638:17 |
| **backfill** 533:17 | 649:3 652:18 | **becoming** | 647:19 651:13 | 638:20,21 |
| 534:4 | 652:21 653:3,4 | 639:22 | **belittled** 574:1 | 644:22 653:22 |
| **backfilling** | 669:6,20 670:9 | **began** 561:3 | **belonged** 513:17 | 721:11,12 |
| 472:20 473:4 | 670:19,20 | 576:22 | **benefit** 529:18 | **bit** 414:18 |
| 533:21 | 671:9,10,17 | **beginning** | 530:6 531:4,7 | 472:12 |
| **bag** 427:16 | 672:3,17 | 477:17 577:12 | 531:9,18 | **bleak** 538:18 |
| 430:18 432:18 | 675:16 677:10 | 594:18 | 628:13 648:5 | **blended** 641:10 |
| 435:6,12 | 677:14 | **begins** 414:3 | 649:5 651:1,13 | **Blizzard** 650:10 |
| **Baker** 409:6 | **base** 494:2 | **behalf** 407:3,11 | 661:6 663:18 | 682:6 706:8,14 |
| 516:21 517:4 | **based** 415:4 | 408:3,12 409:3 | **benefited** | 706:16 |
| 565:3 | 416:18 417:7 | 472:5 483:8 | 728:17 | **Blvd** 408:15 |
| **Baking** 435:4 | 427:3,7,12 | 494:17 506:22 | **benefiting** | **Board** 452:13 |
| **Ballas** 705:2 | 473:21 493:18 | 507:20 515:15 | 652:19 | 452:18,19 |
| **Balton** 475:17 | 497:6 584:9 | 520:14 521:21 | **benefits** 529:22 | 453:4,6 501:2 |
| **BARNES** 415:9 | 652:21 668:18 | 535:10 559:15 | **best** 426:3 | 501:12 502:18 |
| 420:15 423:14 | 688:13 689:14 | 562:7 563:21 | 428:12,16 | 502:20 508:15 |
| **Barrel** 427:17 | 696:6 | 571:5,17 | 439:21 440:1,5 | 509:16 510:2 |
| 430:22 431:3 | **basically** 444:1 | 581:17 590:5 | 492:7 515:4 | 516:3 517:12 |
| 434:13 | 481:17 | 591:5,10,15 | 536:8 | 518:20 519:1 |
| **Barry** 412:8,10 | **basis** 421:20 | 594:12 604:9 | **better** 656:2 | 542:20 543:7 |
| 415:5,6,7,16 | 436:1 494:14 | 625:15 696:2 | 667:12 | 544:6 580:3,5 |

HIGHLY CONFIDENTIAL
Hinton, Gregory Eugene - Vol. II                    March 18, 2014

5

581:3 595:12
598:10,19
604:16 605:2
**Bob** 455:11
605:11 606:3
606:11 609:4
628:6
**bold** 514:21
515:7 539:5
665:7
**Bologna** 420:10
420:13
**boost** 499:3,22
509:8 510:11
565:16 622:22
624:22 652:7
723:11
**boosted** 628:20
649:3
**booth** 483:12,13
483:14,15
484:7 485:6
**booths** 485:7
**bottom** 432:13
508:14,18
514:20 518:21
524:8 525:14
528:2 547:22
562:12 570:4
579:2 581:22
582:7 597:17
612:2 615:13
616:14 621:10
626:5,22
654:11 674:17
675:1 688:19
699:21 706:15
**bought** 418:15
419:2 437:4
**box** 427:16
430:18 432:19

435:7,12 733:7
**Brands** 428:10
489:17,20
490:6 491:16
492:1
**Brann** 498:17
536:19 537:12
**break** 435:22
436:7 471:11
521:1,4 577:8
577:12,15,20
577:22 578:12
600:7 638:7
642:17 715:21
716:2 732:1
**breakdown**
450:2
**breakers** 435:14
**breaking** 432:2
618:19 632:5
635:6,19 642:7
642:10,12,16
643:1,2 672:9
677:9,18
704:22 717:21
**breeder** 566:8
566:16 567:20
719:16
**Brenda** 419:19
**brief** 471:15
521:11 578:5
659:20 695:19
716:10 717:4
**bring** 575:5
636:8
**brochure**
611:10,10,14
**broke** 437:21
438:11 577:18
612:15
**broken** 636:15
636:17 642:13

**broker** 489:18
**brown** 448:8
643:6,11 705:1
**Brownstown**
420:8,9,9,13
**budget** 713:22
**building** 568:17
572:17 575:1
577:2 579:16
579:21
**built** 420:12
612:13
**bullet** 534:7,8
534:14 536:15
536:18 538:14
538:17 670:13
670:16 672:1
**Bureau** 584:10
**Burke** 409:5
508:3,3 731:22
**business** 450:18
457:5,20 464:8
465:5,6,15
466:9,17
467:17,21
468:3,12 469:3
477:5 489:14
490:8 491:19
492:12 505:18
506:6 538:19
603:19 711:6
714:15
**buy** 428:7 455:5
455:6 459:20
459:22 504:18
656:20 695:7,9
706:19 707:3
**buyer** 490:19
**buyers** 457:16
667:12
**buying** 418:16
418:17 444:6

481:22
**buys** 440:12
464:21

_____
**C**
_____

**C** 407:12 408:1
409:1 414:1
**cabinet** 640:22
**cage** 499:21
509:2,8 510:10
532:13 533:9
584:19,22
585:2,13 586:5
586:11 593:8
596:12 622:10
729:19 730:21
**cage-free** 459:10
460:11,14,18
460:22 461:1
461:10,15,17
461:20 462:5
462:10,18,19
463:1,5,8,11
635:13,15
**caged** 463:15,15
463:19,21
**cages** 461:22
462:2 533:17
533:21 534:4
534:21
**Cal-Maine**
417:1 645:7
654:12 679:7
679:11,14
685:12 686:10
691:10,13,18
691:20
**calculated**
655:15
**calculator** 660:4
661:2 681:21
**calendar** 646:17

647:1,10
**California**
451:7,10
**call** 560:3
627:18 669:9
674:9 698:15
700:2
**called** 422:13
475:5 548:8
**calling** 565:5
**calls** 453:20
456:8 457:8
458:4 469:20
492:21 498:8
506:9 524:10
527:14 545:13
554:14 557:17
565:18 628:1,5
628:7,10 648:7
651:4 661:12
674:12 710:17
723:2 728:20
**Cannon** 610:5
610:14,16,17
610:18 612:17
**capacity** 529:19
579:15,18
581:9 721:22
**Capper-Volst...**
536:22
**care** 457:16
492:10,16
532:9 533:8
548:5 571:12
572:2 573:11
579:15,19
581:10 585:1
586:9 596:10
622:7 698:5
700:5
**Carolina** 609:22
610:8

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

6

**carried** 517:9
556:7 563:6
595:14 666:7
**carry** 517:8
**carton** 429:6
443:11,11,12
447:9 634:12
647:11
**cartons** 470:8
**case** 406:7
416:15 429:7
465:9 468:22
633:20 658:13
659:2 678:12
680:6,6,7
681:11
**cases** 607:3,6
657:8 658:3,6
658:10,15,16
658:20,21,22
659:3 660:7,15
679:21,22
681:11 688:13
688:16
**categories**
437:20
**category** 426:18
629:6
**Caution** 702:6
**CCF** 428:10
489:17,20
490:6 491:16
492:1
**ceased** 636:9
**cent** 453:18,19
454:11
**Center** 477:1
**Central** 671:20
672:12 677:22
**Centrella**
411:17 603:1,4
603:14,16

604:1
**Centrella's**
602:20
**cents** 415:7
454:10 525:17
665:11
**certain** 428:15
457:5,20
550:22 634:14
683:6
**certainly** 476:7
506:3
**CERTIFICA...**
734:1
**certification**
457:17 460:17
461:4,6,9
622:7
**certified** 448:1,3
448:13,17,18
449:11 453:16
456:1,6 457:6
458:2,10 459:6
459:8 460:12
460:14,16,19
460:19 461:2
461:16,17,21
462:5,10,15,19
463:22 488:11
489:9,13 490:3
490:8 491:18
492:3 496:19
498:21 499:1
499:20 504:17
504:18 532:9
532:13 533:8
533:10,20
571:12,13
572:2 573:11
576:21 579:8
585:2,15 586:9
592:5 593:1

596:10 597:7
598:1,11,11,12
603:2,4,6,8,10
603:12,19,22
604:4 621:22
698:5,19,20,22
700:5,6,7
709:13 729:9
729:14,17,20
730:6
**certify** 577:5
734:4
**Chad** 570:9
**chain** 493:16
706:13
**chair** 650:7
732:5
**chairman**
516:20 543:22
544:4 581:2
616:10,15
622:21 624:20
722:20 723:9
**chairman's**
543:18
**chance** 461:13
532:16 552:21
575:5,9 710:8
711:1
**change** 442:17
443:1,4,6,9
444:14 445:22
446:16 545:5,9
614:13 659:14
720:12
**changed** 417:9
446:15 461:13
520:21
**changes** 472:17
472:18 544:16
720:8 733:13
**changing** 462:8

566:10
**channels** 717:20
**Check** 733:7
**Chicago** 435:10
711:7
**chick** 472:18
621:18 720:13
720:13
**chicken** 568:17
572:17 575:1
577:2 607:20
633:19 635:20
**chief** 731:14
**cholesterol**
428:16,21
**circumstance**
447:4
**circumstances**
443:18 444:8
444:12 446:14
**City** 407:8
464:19 468:8
468:11 485:3
**claim** 722:15
**clarify** 667:10
**Class** 632:1,2,2
632:9,21 633:3
633:13,16,18
633:18,21,21
635:2,8,11
637:16,18
639:8 642:21
677:2,5,9
**classification**
643:14
**clear** 443:12
510:7 726:19
**Clearinghouse**
454:18 455:1,9
**clearly** 515:20
634:14
**clients** 428:6

**clip** 559:22
**close** 624:10
**closest** 685:11
**collecting**
607:14
**collective**
472:14 505:13
719:6 720:14
**Columbia**
734:22
**Columbus**
434:15
**column** 527:2
654:6 657:12
658:1,6 680:9
694:6
**columns** 526:22
**combination**
417:14,16
641:10
**come** 444:3,13
460:3 478:7
570:9 592:8
626:16 662:12
681:19 688:6
715:15,21
**comes** 432:9
443:22 702:8
713:1
**coming** 444:5
445:6,10 495:2
**Commencing**
406:17
**comments**
543:19,22
709:21 710:7
**commission**
475:2 483:18
734:18
**commit** 545:11
552:12
**commitment**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

7

592:8 608:22
679:4,17 681:7
685:2 688:21
707:17
**commitments**
679:12 683:12
**committed**
532:8 533:8
592:4 652:7
683:5
**committee**
501:1,4,6
502:10 503:10
503:13,16,18
504:3,6,10,14
504:16 506:4
513:3,4,16,17
513:20,20
514:1 515:6,11
516:20,20,21
518:11,15
519:21 520:6
528:14,19
529:6,12
537:17 545:20
546:1,2,6,16
547:6,15,19
548:8 549:11
549:20 554:8
554:22 555:16
555:21 556:1
557:11 560:3
560:13,16
561:4,13,18,21
562:3 564:11
565:1 568:20
569:5 570:11
570:16,22
592:18 595:1
597:6 598:16
599:6 649:15
666:8 669:9

697:22 698:8
698:14,18
699:5,13 700:2
727:9
**committee's**
547:22 665:15
674:9
**committees**
485:20 500:11
502:7 503:6
**commodity**
414:20 415:1,2
415:22 416:1
416:12 417:6
437:7 438:3
441:5,9,18
442:8 444:21
446:7,13,16
**common** 435:20
566:17
**communicated**
562:16
**communication**
489:8 491:10
505:3 598:4
616:13 664:3
704:5,17
705:18
**communicatio...**
495:4,9,18,22
496:4 701:6
705:22
**companies**
449:10 450:11
504:17 548:11
549:13,21
550:14 554:9
598:13 698:20
698:21,22
700:5,6,8
**company** 451:10
481:19 489:20

493:22 559:15
566:19 567:18
567:19 568:1
577:1 580:6,10
598:12 617:18
631:15 657:7
687:6,8 705:2
719:13
**company's**
539:22 540:19
557:4
**compare** 437:6
438:1 669:8
**compared** 440:4
453:17 456:6
**compares**
525:10
**comparison**
525:15
**competition**
445:21
**compiled** 419:19
436:6
**complete** 733:10
733:15
**complex** 481:1
**compliance**
498:18
**comply** 592:22
593:6
**component**
533:10
**compound**
445:4 450:13
499:14 500:4
527:13 632:13
661:11 710:16
**concern** 499:1
509:13 510:1,9
510:12 511:12
523:17
**concerned**

498:22 499:20
**concerning**
443:20 505:11
521:21 587:19
588:7 604:13
625:15 640:11
640:15 702:4
703:3,14 727:8
727:10 728:3
**concerns** 497:19
**concluded**
732:16
**concludes** 732:7
**conclusion**
553:14 571:20
585:6 668:18
**conclusions**
552:17 553:7
554:5 565:21
**conditions**
509:3
**conduct** 703:3
**conducted**
523:16
**conference**
474:21 475:2
477:1 483:18
483:20 484:20
522:15 560:3
627:18 628:1,4
628:7,10 669:9
674:9 700:2
**conferences**
486:2,9 487:12
**confidential**
406:10 423:11
423:16,17
424:6
**confirm** 453:15
453:22 454:4
524:6 550:9,13
551:4 552:8

554:21 601:16
602:4,22 604:2
604:8 613:8
626:2 656:2
657:3 680:18
705:11,17
**confirmation**
687:4
**confirmed**
501:14 613:18
722:19
**confirms** 664:4
**confused** 468:11
702:22
**conjunction**
720:18 729:4
**connected**
635:20
**consider** 591:1
642:22
**considered**
698:4
**considering**
714:8
**consistent**
501:15 592:14
616:17 622:20
624:19 627:6
700:11
**consisting**
732:10
**construction**
580:12 610:12
611:5
**consulted**
714:11
**consumer**
634:18
**consumers**
509:4
**Cont'd** 408:1
409:1

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

8

| | | | | |
|---|---|---|---|---|
| 473:11,15 | **control** 432:14 | 456:1,7,17 | 563:5,13,21,22 | 664:7 665:2,16 |
| 474:5,13,15 | 447:13 | 457:1,7 458:3 | 565:17 568:3 | 666:11,18 |
| 475:16 483:5 | **convened** | 458:12 459:9 | 568:12 579:9 | 668:10,19 |
| 483:10 486:3 | 406:16 | 459:16 460:8 | 581:13,15,18 | 670:1,22 |
| 493:14,15 | **conversation** | 460:15 461:2,5 | 581:19 582:18 | 671:12,16 |
| 494:7 593:16 | 488:18 489:3 | 461:11 463:1,9 | 583:1 585:3,11 | 672:7,12,14 |
| **contacts** 464:4 | 490:21 | 466:12,14 | 585:12 586:6 | 673:8,9 674:2 |
| 464:20 468:7 | **conversations** | 467:8,22 468:9 | 587:2,3,6,8,13 | 674:6 676:6,8 |
| 486:2 | 487:11,15 | 472:5,7 474:2 | 587:14 588:8 | 676:9,13,22 |
| **contained** 454:8 | 491:3,12 | 483:8 485:9 | 588:21 589:5 | 677:7,11 |
| 615:8 | 701:17 702:8 | 486:4 495:19 | 589:17 590:7 | 678:19 679:5 |
| **container** | 713:2 | 495:20 496:1 | 590:19 591:5 | 679:13 680:7 |
| 667:16,19 | **convinced** 661:6 | 500:2,11,20 | 591:10 592:6 | 680:12 682:22 |
| 683:11 | **Convoluted** | 501:4 503:11 | 592:19 593:2 | 683:2 685:3,9 |
| **containers** | 527:14 | 503:20 507:21 | 594:20 597:4 | 685:13,15 |
| 686:4 691:3 | **cooler** 606:13,16 | 507:22 508:15 | 597:14,15 | 686:14 689:9 |
| **contemplating** | 607:7 | 508:16,18 | 601:14 604:17 | 690:6,19 691:5 |
| 714:14 | **cooperative** | 510:22 511:1,4 | 604:18 605:4,5 | 691:14,21 |
| **content** 701:16 | 414:15 | 511:5,14 512:2 | 608:9 609:17 | 692:3 699:15 |
| **contents** 566:3 | **cooperatives** | 512:16 513:18 | 612:18 613:21 | 700:13 701:12 |
| 567:12 589:1 | 536:22 | 515:11,16,17 | 618:3,6 619:1 | 704:11 706:9 |
| **contingency** | **coordinated** | 518:17 519:8 | 619:5 620:14 | 709:1,4,8,11 |
| 482:17 | 472:17 503:19 | 520:1,7,15,19 | 621:2,6,22 | 713:13,14 |
| **continue** 513:8 | 720:4 | 522:1,12,13 | 622:11 623:2 | 726:3,7 727:1 |
| 514:22 560:15 | **coordination** | 525:17 532:1 | 623:14 624:11 | 728:13,14 |
| 575:16 | 720:9 | 533:10,22 | 624:22 626:9 | 729:11,14,20 |
| **continued** 414:4 | **copied** 588:6 | 534:9,16 538:4 | 628:21 629:19 | 730:1 731:15 |
| 511:7,21 577:1 | 589:4,5 591:18 | 539:5 541:14 | 630:8 637:17 | 733:9,15 |
| 730:19 | 704:12 | 541:20 542:4 | 639:5,6 641:3 | **corrections** |
| **continuing** | **copies** 587:15 | 542:13,17,18 | 641:4 644:18 | 597:9 |
| 513:13 564:2 | **copy** 587:18 | 542:22 543:4,8 | 644:19 645:5 | **correctly** 457:17 |
| 576:8 | 597:19 714:5 | 543:12,13 | 645:20 647:3,7 | 457:21 535:22 |
| **contract** 433:2 | **corner** 684:12 | 544:2 545:12 | 648:5 649:2,5 | 538:22 544:17 |
| 441:22 444:18 | **corporations** | 545:18,19 | 649:17 650:6 | 557:8 565:9 |
| 636:4 638:17 | 705:3 | 546:3 547:6,14 | 650:11 652:10 | 593:13 607:18 |
| 638:20 | **correct** 414:21 | 547:18,20 | 653:3 654:3,6 | 688:17 |
| **contracts** 636:5 | 415:6,8,13 | 548:16 549:15 | 656:15,21 | **corresponding** |
| 636:10,19,21 | 425:21 426:1 | 551:14,22 | 657:14 658:3 | 427:8 |
| 652:20 | 435:1,2 437:4 | 552:13 554:12 | 658:13 659:7 | **Cort** 610:3,11 |
| **contributed** | 448:13 453:18 | 555:2,18,19 | 661:8 662:10 | 612:15 |
| 609:20 624:15 | 453:19 454:5,7 | 556:12 557:16 | 662:19,21 | **cost** 416:14 |
| 683:22 | 454:12,18 | 559:10 560:4,7 | 663:1,5,18 | 429:17 431:8 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

9

431:10 440:3
441:20 443:1,4
443:16 511:8,8
511:21,22
652:9 661:8
670:6 725:8
**costs** 440:12,14
442:1,4,17
443:13 446:15
447:9 717:22
**Council** 493:16
**counsel** 410:3
414:6 419:12
422:18 436:15
449:7 472:6
510:21 514:11
516:7 520:12
520:20 522:11
524:12 543:15
546:21 553:2
559:12 560:19
562:6 564:3,16
573:13 576:7
577:11,18
578:11 581:13
582:4 586:18
587:2 589:12
589:16 590:6,9
590:10,18
593:21 594:10
602:7 625:20
690:8 696:21
701:15,17,21
702:8 713:2
717:1,6 722:12
730:4 731:4
734:10,14
**countries** 718:4
718:6 725:15
**country** 652:17
**County** 406:1
610:9 611:4

612:16
**couple** 464:17
577:8 662:17
716:4 719:2
725:5
**course** 534:7
541:10
**Court** 406:1
552:22 575:6
**Crabtree** 407:13
423:19 514:4
578:11
**Cracker** 427:17
430:22 431:3
434:13
**Crepelay** 617:19
**Crystal** 636:2
637:1 638:18
638:21
**current** 461:7
556:3 558:12
617:21 620:3
721:6,9
**currently**
460:21 461:9
461:19 482:16
519:1 540:1
557:5 617:13
650:14 731:14
**customer**
418:21 439:6,6
439:18,19
441:22 443:14
443:14 444:13
444:17,21
445:6 446:16
489:8,12 491:9
493:21 605:11
607:15 690:4
695:11
**customer's**
445:18

**customers**
415:18,18
418:15 419:1,6
419:7 421:9,13
422:20,22
427:3 429:11
430:13 432:6
435:11 437:3
439:1,4,15
440:17,22
443:3,7,9,20
444:4 446:4
447:12,13
451:8 464:18
468:13 470:17
470:20 471:22
488:10,12,14
489:22 490:3
491:12 494:5
601:14 602:6
611:18 632:10
632:11 683:5
718:20
**Cutler** 609:14
617:13,22
618:1

**D**

**D** 414:1
**D.C** 406:13,19
**daily** 606:17
672:17
**Daniels** 409:6
**data** 449:3
**date** 512:17
550:6 555:9
629:18 669:21
674:5 678:22
683:6 687:3
733:22
**dated** 507:8
508:17 514:7

516:4 535:18
547:3,10
555:17 579:3
583:13 594:17
621:2 662:9
688:8 697:19
706:11 709:3
**dates** 514:1
540:21 631:5
636:18
**Dave** 473:6
**David** 407:5
452:20 473:4
477:18,18
478:14 479:11
507:19 661:21
**day** 454:14
482:9,9 491:13
556:7 557:14
558:5,6,16,18
583:15 624:4,5
670:20 671:12
**days** 564:6
663:10 703:4
717:5
**DC** 407:17
**deadline** 683:7
**deal** 592:9 710:8
**deals** 498:5
**Dean** 556:3
**dear** 535:19
584:3
**December** 519:2
540:20 554:1
647:22 650:19
699:11
**decide** 482:8
574:5
**decision** 488:3
488:16 496:19
497:3 605:20
605:22

**decisions** 609:10
**declining**
444:17
**decrease** 472:14
505:13 719:7
**Defendants**
406:10
**defense** 712:13
**Deffner** 543:22
544:4 598:9
**define** 666:4
**defined** 526:2
**definitely** 430:8
**definition** 463:4
666:12
**delineated** 419:4
**deliver** 683:6
687:6
**delivery** 607:10
630:2 647:15
687:5,7,18
**demand** 527:2,4
528:3 538:20
539:10 540:16
569:14,21
**department**
480:17 481:9
481:11 482:3
607:8,11,12
673:2
**depending**
441:16
**depends** 495:12
**depicted** 530:7
**depo** 732:3
**DEPONENT**
733:1
**deposition**
406:15 414:5
447:17 452:2
507:4 508:11
510:21 512:7

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

10

514:12 515:21
518:13 521:18
535:2,10
578:21 582:4
586:19 587:4
625:12 649:12
697:15 711:14
717:9 732:8,16
733:5
**Describe** 474:14
**described**
430:11,21
**designated**
472:4 497:11
521:20 564:4,8
571:5 604:8
640:2 696:2
701:12,13,16
701:18 711:18
712:16
**designation**
643:8
**destination**
607:10
**details** 667:13
**determine**
414:13 572:1
573:10 724:19
**determined**
438:19 644:21
668:1
**develop** 709:14
**developed**
592:14,19
**DF** 456:16
457:14
**difference** 432:4
436:22 439:8
440:10 443:13
443:15 454:10
454:11 456:4
457:1 656:19

688:22 689:8
695:9
**different** 421:10
431:18 436:1
439:15,17
440:3,22 444:5
444:6 464:1
494:2,4,5
566:15
**digits** 523:4
547:16 626:19
629:7 690:22
699:18,21
**Dillon** 469:13
**Dillons** 469:9,10
**diminishing**
538:21
**direct** 547:21
555:22 720:1
**directed** 689:13
**directing** 667:1
667:6
**direction** 474:9
493:8 734:8
**directly** 635:20
648:5 649:4
651:1,13
652:19
**Director** 516:4
542:21
**Directors**
502:18,21
517:12 544:6
598:20 605:2
**disagree** 579:10
**disaster** 718:5
**disbanded**
570:16,20
**disclose** 713:2
**discovery**
502:10 503:10
546:15 597:7

597:19,22
598:8,16 599:6
**discuss** 423:9
446:5 552:5
559:13 563:18
564:20 567:12
578:10 585:8
**discussed**
417:10 421:8
437:17 493:17
520:6 528:8,14
529:12 533:14
538:15 541:11
556:21 562:20
698:8 699:4
**discusses** 595:1
**discussing** 495:6
566:2 682:21
**discussion** 473:6
522:20 561:17
599:22 668:1
710:21 731:11
**discussions**
494:18 495:2
593:19 701:15
727:17 728:2
**disease** 718:5
**disposal** 472:17
519:2 540:2
557:6 720:8
726:22
**dispose** 513:11
517:6 534:14
540:1 557:5
565:7 569:8
**disposed** 519:3
556:4 557:13
558:13
**disrupt** 719:20
**disseminated**
647:2 700:18
**distinction**

448:12
**distinguished**
418:11,16
**distribute** 563:2
563:10
**distributed**
469:17 646:18
647:10
**distribution**
605:14
**distributor**
434:15
**distributors**
469:17 470:21
471:2
**District** 406:1,3
734:22
**distrust** 498:13
498:17
**divulge** 701:14
701:16
**document** 411:9
411:11,13,21
412:3,5,6,11
412:13,15,17
412:19,21
413:3,5,7,9,11
418:11,18,20
421:6,7,16
436:3,4,6,21
437:16,21
438:4,7,8,20
441:3 448:21
452:1 456:9
501:19,21
502:3 503:1,12
505:8 506:10
507:3,19
509:21 510:15
510:22 512:3,6
514:12 515:13
516:6 518:12

519:10 520:21
521:17 522:12
531:15 535:15
540:12,14
546:12 549:3
549:17 550:22
551:7 552:5
554:4 556:15
559:6 560:21
562:5 564:15
570:3 578:20
580:2 581:12
581:22 582:3
583:4 586:19
593:22 594:11
595:5 615:4,9
621:8 625:11
626:3,4,7
627:13 630:14
641:15,21
646:4,5 649:12
653:7 654:8
655:19 656:1
656:16 659:9
661:10 668:13
668:17 671:2
673:13,16
676:19 678:22
679:6,9 682:16
684:4 685:6,6
685:10,16
686:7 687:3,12
687:16,20
691:7,12,16
692:5 693:22
694:10 695:5
696:22 697:15
703:22 705:14
708:15,15
711:13 714:17
722:18,19
723:7 724:18

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

11

724:21 725:3
727:8,8 730:10
**documentation**
724:14
**documentations**
495:14
**documenting**
489:7
**documents**
418:3,5,7
419:13 421:3
488:22 508:5
515:20 546:7,9
546:10 554:19
573:10 619:14
640:10,14,15
640:19 696:15
722:22 723:2
723:10,12,16
725:6 727:13
728:1,11
730:12
**doing** 465:5,14
466:17 468:3
508:7 509:3
574:3 576:11
720:1 732:5
**dollar** 663:11
695:6
**Dolph** 516:20
**Dolphin** 631:10
631:14,18,19
**domestic** 623:1
624:22 628:20
648:4 664:5,6
**domestically**
649:3
**Don** 475:17
**Donovan** 635:13
635:14
**doubt** 512:21
513:1 522:8

546:8,12,17
547:1 694:9
731:3
**dozen** 647:13
655:17 658:12
658:15,17
659:1,2,4,5
667:16,19
680:6,10,12
681:11,12
683:21 689:6
711:7 715:4,9
**draw** 552:17
553:7,14 554:5
565:21 571:20
585:5
**dressings**
424:10,17,21
425:1
**dried** 424:2,14
425:11,12
426:16,19,20
426:20 427:19
427:19,20,22
431:16 432:22
433:1,1 436:8
438:8 450:15
**drop** 489:14
525:16 654:19
679:10 685:14
686:14 691:14
**drying** 717:22
**DuBois** 616:1
**due** 579:15,18
581:9
**dues** 545:6
619:18,20
**duly** 734:5
**Dutch** 428:11
456:16 457:14
457:16 458:12
459:12,15

460:7 470:2,18
470:19
**DVD** 536:9

---

**E**

**E** 408:1,1 409:1
409:1 411:1,7
412:1 413:1
414:1,1 564:4
**e-mail** 453:5,8
454:5,9,17
455:20 456:21
505:3 506:21
507:7 508:13
582:15,18,22
583:8,10,18
587:1 588:6,14
589:3,8 682:5
706:8,13,15,18
708:18 709:3
710:2
**Eagle** 428:11
**earlier** 436:20
489:1 513:12
519:3 540:3
548:16 551:18
556:5 557:7,13
558:14 565:6,7
569:7,9 611:9
689:5 705:13
719:12,15
721:10 730:17
**early** 417:12
467:8,22
472:16 473:14
474:1 477:8
484:1 500:18
503:19,19
504:5,8 548:12
549:14 550:1
550:16 551:5
551:14,22

552:13 554:11
566:6 567:17
576:21 611:3
719:14 720:4
726:6,18
727:10,11
728:3,4,16,17
728:18,18
**East** 408:15
672:10
**eastern** 677:21
**Easton** 478:5
480:16
**economic**
521:22 522:22
523:15 524:19
526:3 527:9
528:8,11 529:7
530:5 531:4,9
536:3 538:15
541:12,19
542:16 543:3
545:1,1 550:11
562:14,16
563:3,10
569:20 621:12
623:7
**economically**
509:4
**economist**
571:22
**effect** 625:16
**efficient** 579:11
**effort** 710:12
719:7 720:14
**efforts** 467:20
472:14 505:13
**egg** 406:9 408:3
408:4 412:8,10
414:13 422:22
423:2,21 424:2
424:14 425:2

425:11,12,16
426:4,16 427:2
427:5,7,16,19
428:21 429:21
430:18 431:17
431:20,21
432:1,5,6,7,9
433:13,15,15
433:18 434:3
434:12,14,18
434:19,19,21
434:22 435:6
435:12,14,21
436:1 437:11
438:14,15,19
439:7 440:16
440:17 441:5,8
441:10,12,18
442:3 443:20
444:19,20,21
445:1,7,17
446:16 448:4
448:11 449:10
449:14 450:11
454:18 455:1,9
464:17,22
465:2,18
471:22 472:15
472:16 473:12
473:12 474:1,5
474:7,9 475:1
475:8,12 476:1
476:13,13
477:4,7 479:22
480:4,9,20
482:21 483:8
483:17 485:12
485:15 486:13
487:1,15,18
489:18 490:19
492:3 505:13
505:17 518:11

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

12

| | | | | |
|---|---|---|---|---|
| 519:22 522:22 | 414:20 415:1,1 | 632:22 633:3 | **elimination** | **evaluate** 496:18 |
| 523:17,18 | 415:3,22 416:1 | 634:3,21 635:3 | 472:20 | **evaluating** |
| 524:19 536:2 | 416:12 417:7 | 635:11 636:7 | **Elste** 665:9 | 497:2 |
| 540:7 541:2 | 417:13 418:22 | 636:11,12,17 | 666:16,22 | **event** 637:7 |
| 560:2 562:13 | 427:20 432:22 | 637:16,19,21 | **employed** | **everything's** |
| 565:16 568:8 | 433:1,2 434:8 | 638:5,11 639:5 | 478:11 734:11 | 445:21 |
| 568:10 571:13 | 436:7 437:7,8 | 641:11,22 | 734:15 | **evidence** 500:4 |
| 587:8,9,13 | 437:12,20 | 642:12,13,15 | **employee** | 503:22 710:18 |
| 591:20 593:1 | 438:2,3 439:13 | 642:17 643:1 | 734:14 | 728:21 |
| 597:8 598:1,5 | 439:16 440:22 | 643:11,11,11 | **employees** | **ex-husband** |
| 604:15 606:18 | 442:21,22 | 643:18 644:7 | 617:21 | 479:14 |
| 606:19,19,21 | 443:8 444:14 | 651:20 652:6 | **enclosed** 539:13 | **exact** 450:4 |
| 607:7 609:19 | 446:7,7,14 | 653:2,4 656:15 | **encourage** | 467:3,9 512:17 |
| 610:5,5,9 | 448:7,18 | 656:17 658:12 | 487:17 715:18 | 550:3 559:5 |
| 611:1 612:17 | 449:19 450:9 | 663:13 667:2 | **engage** 498:5 | 611:3 636:18 |
| 617:2,11 618:9 | 450:10,16,19 | 670:10 683:6 | **engaged** 497:20 | 709:17,18 |
| 618:18 619:12 | 451:2,3,5 | 683:15,16 | **enhance** 423:21 | 718:18 721:12 |
| 622:17,22 | 455:5,5,7,13 | 687:18,19 | **enrolled** 698:1 | **exactly** 418:1 |
| 623:13 624:11 | 455:14 456:5,6 | 689:2,14 | **entered** 411:19 | 450:2 456:3 |
| 625:17 627:3 | 458:10,11 | 692:21 693:3,4 | 613:10 614:18 | 476:4,6 487:11 |
| 627:11,16 | 459:5,7,12,14 | 695:7,10 698:3 | **entire** 431:21 | 490:22 491:4,6 |
| 628:13 631:8 | 459:18 460:5 | 698:21 699:1 | 566:14 | 496:6 537:21 |
| 631:13,16 | 460:11 461:1 | 700:7,8 707:15 | **entities** 464:9 | 548:22 608:13 |
| 632:10 634:2 | 461:15,17,20 | 710:14 717:19 | 705:3 | 608:15 628:8 |
| 635:17 637:19 | 462:5,10,18,19 | 718:1 719:8 | **entity** 601:17 | 696:13 705:14 |
| 637:20 638:1,4 | 463:1,8,11,15 | 725:12 | 720:15,19 | 715:11 |
| 648:20 650:4 | 463:19,21 | **eight** 482:18 | **enzyme** 423:20 | **EXAMINATI...** |
| 650:18 652:8 | 465:19,22 | **Eighteenth** | 424:7 | 414:6 717:1 |
| 652:16 658:2 | 466:4,22 467:5 | 408:8 | **equipment** | 722:12 |
| 663:8 664:6,6 | 469:18 470:6,7 | **Eisenstein** | 638:9 | **examined** 733:4 |
| 664:22 669:6,9 | 470:10 471:3,8 | 536:19 537:7 | **errata** 733:14 | **example** 433:7 |
| 669:22 679:5 | 471:21 472:15 | **either** 417:16 | **ESQ** 407:4,5,12 | 440:15 441:21 |
| 679:12 697:6 | 489:21 499:3 | 420:13 433:17 | 407:13 408:5 | 443:10 444:16 |
| 698:3 704:22 | 504:18 565:16 | 440:5 443:11 | 408:13 409:4,5 | 447:7 493:5 |
| 705:2 719:8 | 571:13 598:10 | 452:13 467:7 | **establish** 429:15 | 591:7 611:11 |
| 720:19 729:5 | 605:13 606:11 | 485:20 495:1 | 429:18 | 632:22 642:2 |
| 729:13 | 606:15 607:1 | 511:13 523:10 | **established** | 689:6 696:22 |
| **Eggland's** | 607:13,17 | 531:1 548:12 | 512:19 547:17 | **exceed** 461:7,16 |
| 428:12,16 | 608:4,21 | 548:19 549:14 | 634:13 721:10 | 647:17 |
| 439:21 440:1,5 | 609:11,20 | 549:22 550:15 | **et** 406:6,9 | **exception** |
| 440:6 | 623:8 625:17 | 551:1 554:10 | **EUGENE** | 637:14 638:8 |
| **eggs** 414:13,20 | 628:20 632:4,9 | 616:10 618:13 | 406:15 | 638:19 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

13

**Excluding**
638:18,20
**excuse** 497:7
500:17 505:5
513:18 535:6
579:16 594:19
610:17 624:9
629:22 640:16
698:13 715:3
**execute** 605:13
665:16 666:5,9
666:13 667:5
668:9
**executed** 630:22
**executing**
628:18
**execution** 606:5
**executive**
580:11,21,22
731:14
**exhibit** 411:8,9
411:11,13,15
411:16,17,18
411:21 412:2,3
412:5,6,8,10
412:11,13,15
412:17,19,21
413:2,3,5,7,9
413:11 451:13
451:17 455:15
455:19 501:8
503:1 505:3
508:2,10 511:4
512:6 514:3,11
516:3,5 518:10
520:13 521:17
522:21 530:7
535:2,5,9,14
539:20 542:17
542:20 543:14
549:2,3 551:9
551:11 553:19

554:7,17
555:15 558:6
559:13,19
562:5 563:18
564:11,15,20
569:13 570:3
578:15,16
581:21 585:9
586:18 594:5
594:16 596:20
597:10,18
601:8,9,22
602:4,16,21
611:8 614:4,8
614:17 616:13
620:22 621:9
625:5,9,21
626:11 630:14
645:14,18
646:9 649:11
653:7 662:2,6
662:7,17,22
664:17,20
669:2 670:15
673:10,15,19
675:9,10,17
678:7,17
681:22 682:4
682:21,22
684:6,10,15
685:18,22
686:16,20
688:1,5 690:13
697:9,12
698:13 699:11
700:12 701:3
703:17 706:3,7
708:10,13
713:15 717:8
**exhibits** 508:6
**existing** 441:22
579:11

**expect** 589:15
590:8,16
**expected** 539:10
647:16 663:12
**expense** 592:9
**expert** 648:8
**expires** 734:18
**explain** 443:15
501:19
**explained** 443:3
462:14
**explore** 492:17
**export** 612:21
616:5 623:8
627:19 644:12
644:18,21
647:16,20
649:2 650:7,14
650:18 652:7
654:6,22 661:5
661:7 662:18
663:1,4,10,16
665:14 666:8
667:5 669:22
673:8,16,18
674:1,4,9,21
676:11 678:3
678:12,18
682:20 683:5
683:21,22
684:21 685:3
686:3 687:5,8
687:14 688:13
688:16 689:7
691:4,19
692:16 695:12
696:4,8,14
707:17 723:11
724:20 725:18
725:19 726:1
**exporter** 640:1
**exports** 605:3,8

605:13,17
606:5 608:7,8
608:20 609:16
620:2,7,14
622:17,22
624:15,21
625:16 628:12
628:19 629:6
629:10,11,21
630:1,8,21,21
631:4 639:17
639:21 640:12
640:16,17
641:6 648:3
650:1 651:12
651:19 664:5
665:16 666:9
687:13 717:13
717:16 718:9
718:17 722:21
723:22 724:4
725:16
**extended** 556:6
557:14 558:4,6
558:16,18
**extent** 713:1
**extra** 641:9,11
642:20 643:10
671:14,18
676:2,4,6,12
676:17,21

**F**
**F** 472:4
**F-E-M-E** 423:7
**facilities** 481:21
591:9 609:19
624:12 635:6
653:17 719:17
719:17
**facility** 610:11
**fact** 465:3

497:19 520:5
522:7 546:8
547:8 621:7
646:9 648:2
649:2 650:22
651:19 664:3
691:18 700:22
710:1 722:6
729:8
**factors** 534:20
648:20
**facts** 499:8
500:4 503:22
510:15 524:5
710:17 712:12
728:21
**factual** 504:1,20
**Faegre** 409:6
**failure** 596:11
**fair** 441:8
476:16 583:18
696:6 713:10
**fairly** 482:16
**fall** 483:21
484:6 529:10
**falls** 452:5,8
484:2
**false** 499:3
511:9 512:1
731:7
**familiar** 631:7
685:5
**family** 452:5,13
452:21
**far** 460:5 533:13
580:20 617:21
652:8 663:18
679:1 705:21
719:21
**farm** 482:7
584:10 606:12
610:5,6,9

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II          March 18, 2014

14

638:3,21
713:21
**farmers** 434:16
505:17
**farms** 407:11
410:3 428:12
456:16 457:15
457:16 458:12
459:12,16
460:7 470:2,18
470:20 494:4
566:8,17
567:20 576:20
579:11,16,21
584:18 586:4
589:13 591:19
593:7 609:22
635:15 636:3
637:1,20
638:18 653:21
717:1 719:16
732:9
**fast** 523:18
**favorable** 451:3
**February** 453:8
488:22 489:2
508:18 510:2,9
511:14 512:20
647:11 653:18
662:18,21,22
663:3
**Federal** 701:8
**fee** 618:12,22
**feed** 443:1,2,4
444:3,5,6
480:17 607:21
657:7
**feeding** 607:21
**feel** 716:1
**fell** 426:17
**Feme** 423:5
424:16 425:22

**fifth** 576:10
595:20
**figuring** 707:2
**file** 662:13 696:8
696:8,12
**files** 418:9
438:22 449:5
469:1 626:15
646:6 682:15
688:6 708:14
**filing** 640:22
**fill** 606:17
663:13 687:17
**filled** 608:8
650:15 656:14
**filling** 613:13
687:11
**financial** 516:22
639:22
**financially**
734:15
**find** 505:21
549:8 553:19
571:6 597:5
663:12 707:4
**fine** 580:9
716:18
**finish** 415:9
475:20 489:5
730:11 732:3
**fire** 447:11
**firm** 498:18
536:19 566:5
703:6,6
**firmly** 723:16
**first** 479:14
495:16 508:22
517:11 524:16
527:1 545:22
562:12 579:2
582:2 584:1
586:22 594:16

594:17 596:16
596:21 598:22
602:19 621:18
634:5 643:13
643:15 653:11
668:2,3 683:7
684:16,18
690:18 713:20
**fiscal** 713:22,22
715:2,2
**five** 462:9
471:20 483:3
521:7,8 610:18
659:16,22
715:21 716:2
726:4
**fixed** 427:22
431:3,14
432:21 434:6
434:16 435:5
435:11,16,19
444:18 445:7
**fixing** 432:16
**flats** 607:3
633:20
**flavor** 423:21
**flock** 472:17,18
519:4 520:1
528:4 529:22
530:1,6 531:6
531:22 534:16
538:20 540:20
541:10 542:11
545:11 548:13
554:1,11 556:5
558:3,16
566:11,14
572:3,13
573:12 575:1
577:4 607:20
608:3 719:13
720:8,8 726:22

726:22 730:6
730:19,22
**flocks** 513:7
514:21 517:5
548:12 549:14
550:1,1,4,16
551:1,1,5,14
551:22 552:12
554:11 556:4
557:12 565:5
566:6,6 569:7
719:18
**flow** 426:19
**fluctuates**
429:21
**fluff** 424:15
**FMI** 493:5,7,8
493:15 494:7
494:18 495:4
495:19 496:5,8
710:9,13 711:1
**focus** 427:10
442:13 446:13
478:8
**focusing** 415:22
417:5 468:14
**folks** 450:10
478:11 482:21
503:5 597:1
682:6 704:13
**follow** 513:5
515:5 634:12
674:8 730:1
**follow-up** 717:4
717:7 722:10
**followed** 514:17
534:8 722:3
**following** 517:3
544:1 667:13
700:3
**food** 464:22
**Foods** 464:21

465:12,15
654:12 685:12
686:10
**Ford** 478:4
481:12
**forecast** 563:4
563:12 647:11
647:17
**forecasts** 562:15
**foregoing** 733:4
734:3,5
**foregone** 668:17
**foreign** 628:19
690:4
**foreseeable**
570:11
**form** 528:16
529:3,13 530:9
530:15,20
532:2,16
534:17 548:15
574:16 583:9
585:4 586:12
596:13 599:7
599:15 618:7
620:16 622:12
628:22 630:10
652:11,22
655:2,9 657:1
659:8 663:20
664:9 670:2
689:10 692:4
693:10 723:13
**format** 611:21
**forms** 539:21
545:10 548:22
555:2,5
**formula** 416:14
416:19 645:3
**formulating**
496:17
**formulation**

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

15

493:17
**forth** 495:5
712:13
**Fortin** 517:4
598:8
**forward** 574:12
600:4 683:3
**foundation**
463:3 502:2
657:17 718:13
719:10
**four** 513:11
516:11,14
519:3 525:10
540:3 551:18
556:4 557:7,13
558:14 578:7
621:17 654:12
675:13
**fourth** 622:17
**franchisee** 440:3
440:8
**franchisees**
440:2
**Fred** 477:17
479:4
**free** 426:19
716:1
**freight** 429:17
**frequently**
421:20 446:21
**front** 478:19
549:4 662:7
673:10,14
675:13,13,18
678:2
**frozen** 424:4,11
425:7,9 433:20
433:21 436:8
**Fuchs** 631:10,13
631:13,18,19
642:2,4,5

665:11 666:11
667:2,18 668:5
668:18 669:19
670:11 676:16
676:22
**fulfill** 608:22
609:21 692:21
707:16
**fulfillment**
645:4,10
**full** 658:20,22
659:2 680:5,7
**fully** 540:7
541:3
**further** 664:4
698:18 731:17
734:13
**future** 570:11

─────── G ───────
**G** 406:19 414:1
472:12 640:3,5
734:2,20
**gable** 429:5,6
**gain** 683:22
**gains** 724:16
**gap** 439:18
444:19 456:7
456:15
**Gary** 477:19
480:1 490:14
490:21 491:4
**Gene** 474:17
475:16 483:6
484:8,11,12,16
486:3 498:14
505:4,6,6
506:2,18 523:1
524:18 548:8
587:7,11
596:22 598:4
618:5 619:4,9

686:22 708:18
709:7,20 710:6
**general** 410:3
426:16 438:12
442:14 481:15
482:9 548:5
587:2 589:12
589:16 590:6,9
590:17,22
604:14 687:15
730:4
**generally** 660:9
**generate** 421:19
422:10
**generated**
421:21
**Georgia** 475:11
477:1,2 610:1
610:4,16,17
631:15 636:3
**Germany**
631:14
**getting** 431:21
438:2,3 439:9
587:18 654:21
683:16 687:16
709:9
**Giant** 428:11
**give** 461:12
497:12 510:22
532:15 552:20
559:12 575:4,9
575:13,20
586:18 590:11
660:4,19
661:19 668:3
681:13
**given** 733:10,16
734:10
**gives** 436:7
**giving** 426:2
**go** 415:10 426:8

426:18,20
431:2 433:19
441:21 442:3
443:10,14,21
444:4 446:15
452:22 459:20
461:14 479:19
482:21 483:15
483:22 497:13
499:15 542:6
553:9 567:9
573:9 576:12
577:13 578:1
582:7 594:7
596:21 600:8
606:12 607:5
607:19 618:17
619:17 623:22
624:3 633:15
633:22 634:8
637:2,20
652:18 656:12
659:11 660:10
660:11 680:21
683:19 695:7
695:14 702:14
712:1 713:3
715:5 716:6,11
725:7
**goal** 530:2
542:12
**goes** 429:12
430:16 482:17
511:6 536:7
539:2 646:16
715:3
**going** 430:6
431:8 441:1,15
443:1,7,19
455:19 471:14
472:11 477:6
479:17 481:5

484:2 488:10
492:2 497:10
501:18 502:13
510:4 515:18
520:4 521:10
547:21 551:6
552:4,17,20
553:6,14 554:5
555:5 564:1
565:20 569:10
573:18 575:4
575:21 576:9,9
577:5 578:4
582:21 584:7
600:11 609:9
651:13 655:11
656:2,19
659:18 660:4,8
660:10 664:15
687:17 690:4
695:18 696:13
701:14 710:9
711:1 712:1
716:4,9,13
719:2 732:1,12
**good** 471:12
544:15 576:6
**goods** 464:7
**gotten** 703:6
**Government**
505:20
**grab** 660:5
**grade** 595:12
634:3 635:17
**graded** 607:2
636:13,14
641:7,9 670:10
670:12,16
683:15
**grader** 606:21
638:1
**graders** 479:22

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

606:19
**grading** 633:22
    634:9 638:4
**grandkids**
    452:12
**graph** 650:17
**great** 592:9
**greater** 444:19
    444:19
**greatest** 630:3
**Greg** 414:5
    576:12 706:22
    732:2,8
**Gregory** 406:15
    474:12 475:16
    483:6 484:8,16
    486:3 498:14
    505:4,6,7
    506:2,18 523:1
    524:18 548:9
    569:13 570:9
    587:7,11 598:5
    618:5 619:4
    686:22 708:18
    709:7
**grins** 568:19
**Grocers** 406:5
    603:9,10,12
    604:4
**grocery** 414:14
    414:15 428:4,6
    632:12
**ground** 612:15
**groups** 493:11
**growing** 523:18
**growth** 524:9,20
    527:11 612:7
**guess** 439:11
    473:16,20
    474:6 520:22
    589:18,22
    590:2,13,21

607:19 639:12
    641:19,22
    646:2 723:4
**guest** 547:12
**guests** 543:10
    547:13
**guideline**
    493:18
**guidelines**
    460:18 461:3,7
    461:16,19,21
    461:22 462:2
    462:17 463:9
    492:15 493:13
    494:5 592:19
    634:4
**guy** 618:17
**guys** 487:14

**H**

**H** 411:7 412:1
    413:1
**H-Y-D-E** 610:9
**half** 453:17,18
    453:19 454:10
    457:16 582:8
    658:20 706:15
    721:20
**halfway** 507:8
    544:13 584:11
    715:5
**Hamilton** 408:6
**hand** 484:17
    505:5,20
**handed** 501:21
    637:3
**handwritten**
    680:10,12
**Hanson** 407:6
**happen** 446:19
    446:22 608:5
**happened**

557:20 570:18
    609:1 667:6
**happens** 432:12
    568:16 620:4
**harass** 575:16
    576:8
**harassed** 574:1
**harassing**
    575:16
**hard** 494:3
**HARTUNG**
    408:13
**Harweger**
    477:20 480:14
**hatch** 472:19
    503:20 504:12
    621:18 720:13
**hatcheries** 566:8
    567:21 719:16
**head** 428:13
    484:14 503:14
    510:8 721:4,13
**heading** 608:15
    641:16
**headquarters**
    468:8
**heads** 495:5
**hear** 453:11
    536:11 567:7
**heard** 596:16
    642:7
**hearing** 709:20
    710:6
**Heironimus**
    421:22 455:14
    704:8,9
**held** 476:22
**help** 718:4
    725:15
**helped** 618:18
    647:21
**helps** 718:6

**hen** 463:15
    472:19,21
    525:11 527:11
**Hendrix** 452:11
    477:21 481:3
    501:3 507:7,17
    516:11 543:11
    556:11 559:14
    582:16 597:3
**hens** 460:6
    509:2 513:11
    519:1 524:9,20
    527:3 528:5
    529:11 530:1
    534:9,15 540:1
    541:13 557:5
    565:7,15
    567:17 568:11
    569:8 720:18
    721:2,16 722:4
**hereto** 734:15
**HICKEY** 407:5
    614:10,14
    681:3
**Hidden** 451:11
**high** 527:1
    672:10,11
    677:21,22
    683:14 731:1
**higher** 441:9,12
    441:14 645:11
    647:21 663:12
    690:2
**highest** 685:2,8
    686:9 691:9
**highlighted**
    545:2 602:8
**highlights**
    536:15
**highly** 406:9
    423:16 424:6
    429:22

**Hinton** 406:16
    414:5,8 462:8
    475:19 660:3
    701:11 712:21
    717:3 722:11
    732:4,8
**historical** 449:2
**history** 421:9
    572:16 574:21
    612:7
**hold** 573:17
    579:22 647:21
    719:9
**home** 718:2
**honestly** 525:6
**hooked** 638:2
**host** 476:18,18
    476:20
**hosted** 536:2
**hour** 583:16
**house** 420:12
    472:19 633:19
**houses** 568:16
    568:17 572:17
    575:1 577:3
    579:16,21
    607:20 635:20
    636:6
**housing** 596:1
**Howard** 618:13
    618:16
**humane** 462:3
    591:7
**hundred** 575:19
**Hurd** 452:20
    473:4,6 477:18
    478:15 507:19
**HURLEY** 409:4
**HUS** 584:14
**husband** 479:13
**husbandry**
    698:20 700:6

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                March 18, 2014

17

**Hutchison**
  408:14
**Hy-Vee** 428:11
  465:21,22
  466:1,4,5,9,16
  466:18,20
  467:1,6
**Hyde** 610:9
  611:4 612:16
**hypothetical**
  445:4 651:4
  661:12

_____ **I** _____
**idea** 506:17
  631:17
**identification**
  451:14 455:16
  578:17 601:10
  602:1,17 614:5
  625:6 645:15
  662:3 664:18
  669:3 675:11
  678:8 682:1
  684:7 685:19
  686:17 688:2
  690:14 703:18
  706:4 708:11
  713:16
**identified**
  422:21 426:6
  430:13 513:6
  514:10 515:20
  516:22 524:18
  528:13 547:4
  550:17 560:6
  568:5 599:5
  638:22 723:19
**identifies**
  564:12
**identify** 468:16
**II** 406:12 414:4

**illegal** 633:9
**immediately**
  517:8 674:8
**impact** 430:9
  431:8,9 432:18
  433:17,18
  434:2 527:10
  527:20 571:11
  571:21 572:2
  572:13 573:10
  577:3 625:16
  630:4
**impacted** 430:6
  433:4 575:2
**impacting**
  523:19
**impacts** 431:5
**implemented**
  493:5
**important** 422:4
  494:1
**improve** 514:16
**in-house** 546:21
**inaccurate**
  593:18
**inappropriate**
  553:3
**inception**
  572:15
**inches** 462:1
**incidental** 432:9
**include** 478:14
  563:4,11
  653:16
**includes** 653:22
**including** 464:5
  472:16 597:1
  639:22 682:6
  704:13
**Incorporated**
  732:9
**increase** 442:18

443:2,5 444:1
444:2,4 525:12
584:19,22
585:14 586:5
586:11 663:11
663:17 722:3
729:19 730:19
**increased** 648:4
  650:18
**increases** 441:21
  447:15
**increasing**
  417:18 538:20
**incur** 663:16
**incurred** 651:21
  656:21 661:4
  690:5
**incurring**
  692:14
**Indiana** 420:8
  610:1,2,3,15
  616:1
**Indianapolis**
  409:9
**indicate** 546:7
  593:17 668:16
  687:6,17
**indicated**
  436:20 483:16
  489:12 522:6
  618:21 628:18
  723:8,10
**indicates** 501:11
  543:6 546:14
  565:11 568:2
  679:17 692:1
**indication**
  674:16
**individual** 531:6
  531:18 718:19
**industry** 432:11
  472:14 474:16

474:18 493:19
505:12 513:5
517:1,5 528:4
536:3 548:9
562:13 566:18
569:15 618:19
624:16 628:13
719:6 720:10
720:15,19
**industry's**
  621:12 623:6
**inedible** 436:8
  464:21,22
**influenced**
  429:22
**influences**
  432:13
**information**
  494:21 495:2
  501:15 503:2
  562:14 615:8
  654:2 688:14
  702:9 703:2
**infrequent**
  447:4
**ingredients**
  429:16
**initial** 582:18
  613:9 714:9
**initiated** 647:7
**input** 441:20
  442:17 446:15
**Inspection**
  634:2
**instance** 445:14
**instances** 468:16
**instruct** 573:19
  702:8
**instructed**
  701:14
**instruction**
  701:21 702:19

**integrated**
  635:18
**intended** 533:14
**intense** 498:13
  498:17
**intention** 539:21
  539:21,22
  540:8,9,16,19
  541:4 545:10
  548:15 551:5
  551:12 552:8
  553:22 555:2
  557:4 558:13
**intentions**
  548:11 549:13
  549:22 550:15
  550:22 554:10
  556:3 557:12
**interest** 515:4
**interested**
  734:16
**internally**
  421:12 437:10
  440:2
**International**
  475:1 483:17
**interpret** 520:4
  667:8
**interrogatory**
  503:4 546:13
**interrupt** 508:4
**inventory**
  525:11
**investigate**
  496:13 497:5
**investigation**
  718:11
**invoice** 608:16
  725:6
**invoiced** 607:18
  608:12,18
  688:22

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

18

| | | | | |
|---|---|---|---|---|
| **invoicing** | 547:3,10 550:9 | 644:16 646:10 | 468:10,11,13 | 469:15 470:19 |
| 607:13 608:12 | 555:1,18 557:6 | 722:15 726:2 | 468:18,18 | 470:20 471:7 |
| **involved** 474:8 | 645:19 647:11 | **joining** 473:13 | 469:8,14,18 | 476:4,15 481:2 |
| 488:3,6,8 | 649:16 650:15 | 487:14 488:20 | 470:18 471:3 | 481:3 482:8,9 |
| 494:17 495:18 | 708:19 709:3 | 490:5 491:1,11 | 712:9 | 485:18 486:19 |
| 500:10,20 | 711:8 | 491:17 492:6 | **Karen** 452:11 | 487:11,13 |
| 576:5 585:15 | **Jason** 409:5 | 494:11 | **keep** 422:15 | 488:12,13 |
| 591:12 604:15 | 508:3 | **jointly** 493:15 | 435:18 436:12 | 489:1 495:13 |
| 606:4,8 607:11 | **Jeff** 609:14 | **Joseph** 410:2 | 449:2 457:5,20 | 500:21,22 |
| 607:13,16 | 617:13,22 | 546:20 | 549:3 553:2 | 501:5,22 502:4 |
| 608:6 609:11 | 618:1 | **Josh** 477:22 | 559:21 640:21 | 504:1 506:11 |
| 616:5 618:2 | **Jen** 635:14 | **JR** 407:12 | 662:6 673:10 | 507:9 526:17 |
| 710:12 | **job** 732:6 | **judge** 576:4 | 673:13,14 | 529:5 532:20 |
| **involvement** | **Joe** 478:5 | **JUDICIAL** | 678:1,2 681:2 | 537:6,21 |
| 605:6,10,19 | 480:16 547:2 | 406:3 | **Kent** 478:4 | 541:16,22 |
| 661:11 | 560:21 587:1 | **July** 513:9,13 | 481:12 | 545:15 548:4,5 |
| **Iowa** 466:6 | 587:15 589:8 | 514:22 519:2 | **kept** 417:18 | 560:22 561:11 |
| **iPhone** 660:5 | 590:10,12 | **jumbos** 642:20 | 418:11 419:9 | 561:22 564:8 |
| **Iraq** 643:19 | **John** 407:12 | 642:20 | **kids** 452:16 | 568:15 577:20 |
| **Isaacson** 498:17 | 452:10 477:17 | **jump** 472:11 | **kill** 720:8 | 584:13,17 |
| 536:20 537:12 | 479:9 481:10 | 639:7 | 726:22 | 597:9 608:3,14 |
| **issue** 432:21 | 508:14 509:16 | **June** 560:4 | **kills** 472:18 | 608:15 609:18 |
| 562:13 | 510:5,18 511:3 | 562:1,20 579:3 | 503:19 504:8 | 611:3 612:22 |
| **issued** 496:22 | 511:14,16,19 | 582:9 583:13 | 727:11 728:4 | 613:22 614:1 |
| 591:8 | **Johns** 477:19,19 | 583:15 584:12 | 728:16,18 | 615:15 616:9 |
| **issues** 618:18 | 480:1,5 | 586:3 684:12 | **kind** 422:10 | 619:9 626:15 |
| **issuing** 591:15 | **join** 487:1,18 | 684:21 | 440:10 484:16 | 627:8 628:6 |
| **items** 482:8 | 488:4,15 | **Jürgen** 631:13 | 588:17 618:14 | 631:3,22 |
| 596:3 | 489:13 490:7 | 642:2,4,5 | 618:17 | 644:15 647:8 |
| **its's** 629:7 | 491:17 496:19 | 667:18 670:11 | **knew** 486:11,13 | 657:18 670:4,5 |
| | 497:3 585:18 | 676:16,22 | 502:17 712:4 | 670:6 682:15 |
| ——————— | 605:20 654:21 | **jury** 574:4 | 724:3 | 694:12,21 |
| **J** | 655:20 | | **Knott** 477:17 | 695:1 700:21 |
| **J** 407:4 472:4 | **joined** 473:22 | ——————— | 478:22 | 708:14 711:11 |
| **Jackson** 478:4 | 476:5 489:1 | **K** | **know** 422:1 | 713:6,7 714:3 |
| 478:15 482:14 | 497:20 498:21 | **K** 406:18 407:15 | 424:13 445:20 | 714:10 715:11 |
| **James** 452:10 | 500:9,17,18 | **Kansas** 406:2 | 449:20,21 | 717:5 718:12 |
| 579:3 580:3 | 501:3,6 512:18 | 407:8 464:5,7 | 450:3,4,20 | 725:1 731:8,10 |
| 581:8 | 513:17,19 | 464:9,18,19,19 | 451:1,4,7,9 | 732:4 |
| **January** 540:2 | 594:19,19 | 464:22 465:1,3 | 452:5,17 456:2 | **knowing** 717:22 |
| 540:21 542:21 | 613:20 617:8 | 465:4,6,7,20 | 456:3,20 465:3 | **knowledge** |
| 544:7,20 | 627:10,22 | 465:22 466:2 | 467:1 469:10 | 449:19 464:13 |
| 545:18 546:1 | | 467:18 468:8,8 | | |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

19

| | | | | |
|---|---|---|---|---|
| 464:16 472:13 | **Lacks** 719:10 | 721:2 722:4 | **Lindsey** 605:12 | literally 593:9 |
| 473:9 497:12 | **large** 428:7 | **layers** 646:14 | 606:3 609:12 | 730:7 |
| 505:11 532:5 | 449:20 450:5 | 653:13,16 | **line** 432:13 | **little** 430:17 |
| 553:8 604:14 | 453:16 482:17 | 698:1 720:18 | 453:10 577:10 | 472:12 583:16 |
| 640:14 702:2,3 | 525:15 608:8 | 729:4 | 579:12 582:8 | 590:14 636:3 |
| 702:7 712:5 | 628:19 630:1 | **leaders** 506:3 | 588:5 596:3 | **live** 420:11 |
| 713:1 720:1,5 | 641:9,10,11,11 | **leadership** | 607:4,4,6 | **livelihood** |
| 725:1 | 642:20,20 | 587:12 | 635:16,18 | 492:11 |
| **known** 540:8 | 643:5,5,10,10 | **learn** 571:1 | 637:19 638:13 | **LLP** 407:6,14 |
| 541:4 548:11 | 643:13,21 | **leave** 420:1 | 639:4 674:17 | 408:6 |
| 549:14,22 | 644:2,2 647:11 | 479:2 | 675:1 | **load** 607:8 |
| 550:15 551:1 | 647:15 670:10 | **led** 618:5 | **lines** 543:7,11 | 641:10 688:15 |
| 554:10 717:22 | 670:12,17,21 | **left** 709:13,16 | 544:22 | **loads** 418:15 |
| **knows** 573:14 | 671:9,15,18 | **legal** 590:9 | **liquid** 425:16 | 419:1 623:8,12 |
| **Kraft** 422:21 | 676:3,3,4,6,7 | 633:12 | 427:14 428:2 | 623:17 624:4,7 |
| 423:3,18 424:8 | 676:12,13,17 | **legality** 701:7 | 428:14 429:10 | 665:10,11 |
| 425:3,8 | 676:17,21 | 702:4 703:3 | 430:14 431:16 | 666:10,11 |
| **Kraft's** 434:7 | **large/extra** | **lens** 517:6 | 431:17,19 | 667:16,20 |
| **Kroger** 416:6 | 670:12,16 | **let's** 415:17 | 432:5 434:7 | 668:4,6 670:9 |
| 468:17 469:6 | **largest** 415:17 | 420:19 425:6 | 435:13 438:10 | 670:11,17 |
| 469:11,12 | 591:20 645:4 | 427:10 435:5 | 447:22 448:1,4 | 671:22 674:18 |
| 490:2,11,13,15 | 652:16 679:4,7 | 444:16 446:3 | 450:3,9,14 | 675:2,6 676:21 |
| 490:17 632:22 | **Larry** 615:15,18 | 446:13 457:13 | 455:14 642:13 | 677:5 683:11 |
| 633:1 711:2 | 616:14 617:19 | 470:2 472:12 | **list** 425:21 426:9 | 707:1,2,3 |
| **Kryder** 460:3 | 619:22 624:20 | 549:2 600:8 | 452:6,8,12,13 | **located** 465:7 |
| **KY** 477:21 | 625:3 650:1,9 | 667:9 670:9 | 452:13,16,18 | 475:10 631:15 |
| 481:3 501:3 | 704:5 722:20 | 716:6 720:21 | 452:19 563:4 | **location** 606:14 |
| 507:7,17 | 723:8 | **letter** 539:13 | 563:12 653:12 | **locations** 636:8 |
| 516:11 543:11 | **Las** 485:3 | 587:19 588:7 | 653:21 | 636:9 |
| 556:11 559:14 | **late** 467:7 623:9 | 588:11 589:9 | **listed** 419:6,7 | **lodge** 497:10 |
| 597:3 | **lately** 647:5 | 589:15 590:5 | 425:20 516:12 | **Logan** 408:7 |
| | **latest** 663:10 | 590:17 591:17 | 516:15 543:12 | **Lois** 452:9,15 |
| ——————— | **law** 498:17 | 593:16,18 | 547:9 595:3 | 479:13 498:4 |
| **L** | **laws** 634:10,16 | 619:22 | 612:4 631:19 | 507:7,18 581:2 |
| **L** 571:6,6,19 | 701:9 | **letters** 418:8 | 657:12 672:14 | 581:6 |
| 604:10,13,21 | **Lawson** 477:19 | 495:3 | 696:22 | **long** 416:15 |
| **label** 443:11 | 479:15 | **level** 647:21 | **listing** 503:5 | 465:9,14,17 |
| **labeled** 679:22 | **lawsuit** 505:21 | **Lewis** 477:17 | **lists** 518:16 | 466:3,17 478:5 |
| **Labor** 556:7 | 647:7 | 479:4 | 589:11 622:16 | 479:8,10 |
| 557:14 558:4,6 | **lay** 442:1 | **limitations** | 631:4 649:19 | 482:14 486:7 |
| 558:16,18 | **layer** 472:20 | 536:21 | 675:1 688:11 | 502:5 560:15 |
| **lack** 502:2 | 713:21 719:17 | **limited** 627:18 | 698:14 | 610:10 617:6,8 |
| 718:13 | | | | |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

20

717:5
**longer** 478:20
479:1,4,6
636:10 647:2
**look** 418:3 442:1
442:4 445:1
448:20,22
515:21 523:2
555:8 557:10
564:3 570:4
579:1 581:21
582:2,17 583:8
584:1 588:5
594:6,7 597:16
612:1 619:14
619:16,17,19
623:4 636:20
637:2 649:15
653:20 654:10
655:14 656:5
657:6,7 662:16
663:7 667:9
670:8,9,19
671:14,21
672:3 675:5
676:10,20
684:11,15
696:1 702:22
717:9 724:18
725:3,6,7,10
**looked** 488:22
541:19 547:10
588:17 675:21
697:1,4
**looking** 440:11
441:7 454:2
460:8 517:18
522:21 547:8
556:15 574:12
586:2,6 588:15
588:22 641:7
641:14,21

655:7 658:19
663:1 667:4
671:8 678:3
682:12 689:5
724:13
**looks** 653:21
**loose** 667:3
638:6
**lose** 488:14
490:8 491:18
511:6,20
**losing** 717:21
**loss** 651:21
652:6 655:16
656:6,10,14
657:9,10,19
658:6 659:5
661:4 663:16
663:18 669:22
680:9 681:12
690:5,8 692:12
692:14 693:8
693:16 694:2,6
694:15,19
696:13 697:1
718:19
**losses** 656:21
657:13 696:3
724:4,9
**lost** 579:15,18
581:9 587:20
693:13 711:6
**lot** 414:22
427:19 447:13
451:2 491:3
499:10 566:15
608:5 653:2,4
658:14
**low** 428:16
511:8,21 527:4
544:14 672:9
672:11 677:21

677:22
**lower** 445:6,11
505:5
**lowering** 445:17
**lunch** 600:7,12

_____

**M**

**M** 411:1 571:6,7
**M-A-R-C-O-...**
478:2
**machine** 607:1,5
638:4,7
**machines**
482:11
**mail** 535:20
**main** 434:14
618:17 620:2
**maintain** 419:18
**maintained**
419:17 421:12
**Maintenance**
479:22 480:4
**major** 482:8
621:17 623:6
628:13
**majority** 417:21
420:22 427:22
433:1 450:10
**making** 424:9
424:17 496:19
497:2 540:7
541:3 544:5,19
714:9 731:6
**man** 484:17
**manage** 505:17
506:5
**management**
474:9 487:18
497:20 519:8
532:8 590:11
618:12,22
627:3,16

**manager** 480:13
480:19 481:1
481:13 482:15
548:5 606:13
606:16,19
617:14
**managers** 482:7
607:20
**managing** 539:9
627:11
**manipulating**
511:9 512:1
**manner** 545:3
**manufacture**
464:7
**manufacturers**
447:12
**March** 406:14
406:16 414:3
507:8 512:15
513:4 564:12
565:2 567:13
594:17 623:10
**Marcott** 477:22
481:10
**Marcus** 454:9
456:15 457:3
457:11 458:7
473:22 477:20
481:2 488:12
488:18 498:12
498:16 501:1,9
501:11 502:17
505:4,5,6,7,16
506:20 507:18
508:17 511:3
511:13,19
512:22 513:1
516:15 517:19
522:6 526:13
526:16,18
535:1,8 543:7

556:11 559:14
560:9,11 561:3
561:12 563:19
564:3,12,19
566:3 567:14
568:5 579:3
580:5,10,22
581:6 582:12
582:16,19
583:5,11,17
584:3,5,12,17
585:6,9 586:2
587:15 589:5
595:2 604:19
606:1 613:4,17
615:11 618:1
627:14 649:19
665:1 666:17
673:3,4 682:7
686:21 704:13
708:19 709:6
710:3,22 730:4
**Marcus's**
582:22 584:9
**mark** 423:15
584:15 664:12
**marked** 451:13
451:16 455:15
455:18 501:7
505:2 507:2
508:1,7 512:5
513:3 516:2,5
518:9 521:16
535:14 542:16
542:20 559:19
564:10 570:2
578:15,16
581:21 582:1
586:17 594:4
601:7,9,22
602:3,16,20
611:8 613:7

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

21

614:4,7,16
616:13 620:21
625:5,8 630:13
634:14 645:14
645:17 649:11
653:6 662:2,5
664:17,20
669:2 675:9,10
678:5,7 681:22
682:3 684:6,9
685:18,21
686:16,19
688:1,4 690:13
690:16 697:11
697:13 699:10
703:17,20
706:3,6 708:10
708:12 713:15
713:18
**market** 414:14
415:16 416:19
417:2,2,4,10
417:14 419:2,6
419:7 421:3,10
422:5 425:10
425:13,16,19
429:21 430:3,7
430:9 431:5,7
432:18,20
436:22 437:1
444:17 445:8
448:6,7,8,15
449:10 458:10
539:22 540:16
551:12 620:3,6
620:7 623:1
634:20,22
635:1 643:21
644:1,7,8
648:4,21 649:3
652:18,21
653:3,4 656:21

663:11,13
671:9,10,17
677:14 683:20
688:21 695:10
717:19,22
725:11,12
**marketed**
598:10
**Marketers**
408:4 473:13
604:15 622:18
627:3,12,16
664:22 669:9
**marketing**
464:6 474:20
484:20 502:10
503:10 506:4
513:3,4,16,20
513:22 515:6
515:11 516:19
518:11 519:21
528:14,19
529:6,12
537:17 545:20
545:22 546:2
546:15 547:6
547:15,19
549:11,20
554:7,18,22
555:21 556:1
560:3,12,16
561:4,13,18,21
562:2 564:11
565:1 568:20
569:5 570:10
570:16,22
649:15 697:22
698:8,22 699:4
699:13 700:1,8
727:9
**markets** 416:2
419:3 421:11

427:8,13 437:4
441:16 448:20
449:1 451:2
452:4 628:19
670:21 671:12
698:3
**Marshall** 716:5
732:2
**Marshmallow**
424:15
**Marty** 536:19
537:6
**material** 439:8
712:12
**Materially**
439:17
**materials** 482:1
**math** 660:10
680:14
**matter** 602:9,11
**MATTHEW**
408:13
**McDonald's**
496:15,16,21
497:2
**McGuire** 618:13
618:17
**McQuarry**
452:11
**McVee** 617:19
**mean** 418:7
422:7 426:14
456:20 473:16
473:16 474:6
482:10 483:14
487:3,13
488:13 500:21
590:1 597:21
608:1 626:10
635:1 641:8,17
642:11 643:9
643:17 646:4

700:22
**means** 482:4
510:18 511:16
532:20 633:18
637:21 643:18
667:6 713:8
**meant** 510:5
511:20 620:8
631:22
**mechanisms**
415:15
**media** 414:3
471:17 578:7
659:22 716:20
732:11
**medium** 642:19
**meet** 460:17,18
461:3,21 462:2
463:8,11,19,22
528:2 537:15
537:18,20,22
539:9,21
540:16 551:12
564:19 668:2
689:7 713:10
**meeting** 476:19
482:22 483:1
487:13 520:6
528:17,20
529:6 533:3,15
536:8 537:16
538:1,8 539:17
544:7 545:18
547:9 552:4
559:10 562:20
563:9 568:6
595:7 597:19
599:18 613:1
617:15 649:16
651:7 699:5,14
**meetings** 474:17
474:18 485:12

485:15 493:17
516:4 538:3,6
538:11 542:21
556:10 564:5
597:8 612:21
613:3 618:15
619:7,10 728:8
**meets** 463:5
**member** 475:22
488:14 493:9
495:8 501:12
508:14 509:16
510:2 512:16
515:10 528:15
540:5 541:2
546:2,5,15
547:5,14,18
554:8 562:2
580:3,6 617:3
617:17,17,18
619:11 621:5
629:19 639:22
645:8 689:8,13
698:14
**member's** 689:7
**members**
452:21 453:3
476:8,10,13
500:19 512:12
543:7,10
545:11 547:13
552:12 553:22
563:3,11 565:4
569:6,6 570:15
616:21 620:1
621:2 628:14
629:11 644:13
645:1 683:4
689:15,17,20
690:3,5 698:19
700:4,19 707:9
712:8

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

22

**membership**
411:18 613:9
614:18 629:12
646:13 688:14
**men** 607:4,4,6
**mentioned**
450:6 452:15
452:22 478:21
484:20 583:6
611:9
**Menu** 464:21
465:12,15
**Meridian** 409:7
**message** 683:4
**met** 513:4
537:13 700:2
**method** 430:21
**Mexico** 725:19
726:1
**Meyer** 428:11
**MFI** 669:15
**Michael** 667:15
668:1
**mid** 623:9
**middle** 516:15
523:3 527:2
**Midwest** 409:3
470:22 525:15
603:13 647:12
671:19
**Miller** 410:2
423:10,15
477:20,20
480:10,21
546:21 587:1
589:8,12
590:10 591:14
593:16,20
**million** 460:6
525:12 527:2
528:5 530:1,2
541:13 542:12

624:16 636:4
638:16 646:14
653:15 697:22
721:20,22
731:2
**millions** 593:9
730:7
**mind** 460:4
478:7
**mine** 471:2
602:7 626:17
**minimum** 707:8
**Minnesota**
408:17
**minor** 517:1
**minute** 542:21
659:16 715:21
716:2
**minutes** 462:9
516:3,10
518:10 556:11
560:3 564:12
565:2 577:8
597:6,18 598:1
649:16 664:21
669:10
**mischaracteri...**
447:21 462:12
496:10 498:1,7
499:7 503:22
504:20 510:14
510:15 519:10
526:16 549:17
557:20 659:9
692:5 723:2
730:10,11
**Mischaracteri...**
655:19
**Misconstrues**
661:10
**misinterprets**
506:10

**Misreads** 671:1
**missed** 536:4
**Missouri** 407:8
**Misstates** 456:9
531:14 661:10
727:18
**mistaken** 526:13
**mix** 423:5
424:18,19,20
425:14 434:9
**mixed** 641:10
**mixed-up**
500:16
**model** 603:19
**modified** 423:21
424:7
**Molly** 407:13
578:11
**molt** 513:8
514:21 517:5
566:6 569:7
719:14 720:4
**molted** 565:5
**molts** 472:17
473:3 503:20
504:5 726:6,18
727:10 728:3
728:17,18
**moment** 662:7
719:1
**Monday** 675:22
677:14
**money** 607:14
717:21 718:8
718:16 723:21
724:20
**Monica** 407:12
411:3 419:14
426:10,13
436:17 437:14
438:5 439:10
440:19 442:6

445:3,12 446:8
447:20 449:12
450:12 453:9
453:20 456:8
456:18 457:8
458:4,14,21
460:9 461:12
462:11 463:2
463:16 469:20
471:1,12 472:7
475:19 486:5
487:3 489:5
490:1,9 491:20
492:21 495:10
496:9 497:9,22
498:6 499:5,7
499:13 500:3
501:18 503:21
504:19 506:7,9
506:16 509:14
509:18 510:3
510:13 515:18
517:15 518:5
519:9,15
520:20 521:8
523:20 524:10
526:8,15
527:13 528:16
529:3,13 530:9
530:15,20
531:8,14 532:2
532:15,22
533:11 534:1
534:10,17
541:15,21
542:5 544:8
545:13 549:16
550:18 551:15
552:1,15 553:2
556:16 557:19
558:20 559:21
564:1 565:18

567:1,7 568:13
568:21 569:16
572:4,10,22
573:13,18,22
574:6,9,11,16
575:15 576:7
576:17 577:7
577:11,15,21
580:8,16,19
583:2 585:4,18
586:12 587:20
592:16 593:3
594:6 596:13
599:2,7,15
600:2,8 602:7
614:12,20
618:7 620:16
622:2,12
623:19 625:1
628:22 629:16
630:10 631:2
632:13 633:14
640:4 644:4
648:7,17 649:6
651:3,15 652:1
652:11,22
655:2,9,20
657:1,15 658:4
659:8,16 660:8
661:1,9,18,22
663:20 664:8
664:13 665:17
668:11,20
670:2 671:1,7
675:12 677:12
678:20 680:15
680:20 681:14
681:20 689:10
689:19 690:7
692:4,17
693:10,17
694:4,17

695:14 696:10
697:5 700:14
700:20 701:13
702:6,18 703:8
708:1,7 709:22
710:16 711:3
711:10 712:1
712:21 714:19
715:10,18
716:6,13,17
717:2 718:14
718:21 720:2
721:14 722:9
723:1,13 724:7
725:4 726:13
727:2,12,18
728:6,20
729:21 730:9
731:4,19 732:1
**Monica's** 703:6
**month** 420:2
**monthly** 421:20
**months** 543:3
550:10 555:1
555:17 566:11
662:17,20
663:8 679:1
719:19
**Mooney** 545:22
548:3,7,10
549:12 550:14
554:9,19 556:2
**moral** 511:7,20
**morning** 426:6
582:12
**Morris** 407:14
**mother** 580:7,15
**motion** 517:3,3
518:21 556:1
557:11 559:5
563:1 565:3,8
565:11,15

566:3,4 567:2
567:13,16
568:2 573:1
595:10,14
596:6 598:7,15
598:18 599:6
599:18,22
600:4 665:6,15
666:7,16,19,22
666:22 668:9
669:19 673:7
**motive** 507:10
**moulting** 567:16
**move** 420:19
483:4 566:20
572:18 668:8
718:14
**moved** 485:3
517:4 518:21
556:2 563:1
565:3 595:11
595:21 598:8
663:11 665:9
666:16
**MSF** 440:6
**Muffins** 434:14
**multiple** 493:20
**multiply** 659:4,4
660:16,18
**mute** 453:10

---

**N**

**N** 408:1 409:1,7
411:1,1 414:1
**N-E-F** 424:4
**name** 420:14
428:13 451:9
568:7 608:14
704:6
**name's** 518:18
560:8,10 665:3
**names** 453:1

477:12 631:5
**National** 493:16
**natural** 718:5
**nature** 474:14
661:10
**NCCR** 493:16
495:4
**nearly** 624:15
638:10 639:2
683:20 698:2
729:12
**Nebraska** 435:4
**necessarily**
421:17 422:3
482:6 534:12
534:21 568:15
629:3 651:8
**necessary**
429:17 481:20
**need** 426:8
442:4 457:4,19
471:10 521:3
528:4 545:4
578:1 659:14
673:14 675:16
683:11 716:1
716:12,15
718:4,7 725:15
**needed** 493:12
597:9 608:8
698:3
**needs** 539:22
551:12
**NEF** 424:4,8
**negative** 527:10
**negotiate** 415:4
482:6
**neither** 734:10
**nest** 632:2
633:18,21,22
634:21 635:11
636:7,11,12,17

637:16,18
638:5 639:4
671:22 672:9
677:9,18
683:14
**never** 502:1
507:12,13
559:2 566:19
588:14 617:16
633:10 654:7
656:1 678:21
694:11 710:2
**new** 420:12
444:10 534:20
611:20 638:1,4
**newsletter**
486:18 662:9
**Nice** 661:22
**Nichols** 407:7
**Niewedde**
455:11 605:11
606:3 609:4
628:6
**non** 460:11
**non-certified**
471:21
**non-UEP**
492:19 495:7
**non-Urner**
448:17
**noncertified**
447:19 448:3
448:13 453:17
454:11 457:7
458:3,11
459:14,18
460:1,8
**nonresponsive**
566:21 572:19
**normal** 513:12
**North** 609:22
610:7

**Northeast**
671:18
**Northwest**
406:18
**Notary** 406:20
734:1,21
**notation** 680:10
680:11
**notations**
655:16
**note** 516:10
654:12
**noted** 733:13
**notes** 637:3
**Notice** 564:3
701:3 717:9
719:1
**notifying** 694:14
**November**
522:22 523:16
527:10 528:8
528:15 535:19
536:4 538:15
541:12 542:15
543:3 550:11
551:11 553:18
555:9 557:3
650:14,18,19
697:19 698:9
698:15 699:4
699:13 700:3
734:18
**number** 414:4
414:12 449:21
451:13,19
455:15 471:17
476:16 534:14
548:9,10
549:12 550:14
552:8,13
553:17,19
554:9,12 557:3

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

24

| | | | | |
|---|---|---|---|---|
| 557:4,15 558:5 | 528:16 529:3 | 509:18 510:3 | 681:14 689:19 | 682:18 688:7 |
| 558:15,17 | 529:13 530:9 | 510:13,14 | 692:17 693:17 | **officer** 731:15 |
| 578:7,16 593:8 | 530:15,20 | 515:19 517:15 | 694:4,17 | 734:2 |
| 601:9,22 | 531:8 532:2,16 | 517:16 518:5 | 696:10 700:14 | **offices** 406:17 |
| 602:16 614:4 | 532:16 534:17 | 519:9,15 | 700:20 708:1,7 | **oh** 547:14 603:8 |
| 614:22 622:6 | 567:1 572:22 | 523:20,21 | 709:22 710:16 | 617:20 678:14 |
| 622:16 624:10 | 574:16 575:15 | 524:10 526:8 | 711:3,10 | 684:19 701:4 |
| 625:5,18 | 585:4 586:12 | 526:15 527:13 | 714:19 715:10 | **Ohio** 434:15,16 |
| 645:14 653:15 | 596:13 599:7 | 531:14 532:15 | 721:7 723:1 | 584:10 610:16 |
| 654:15 657:22 | 599:15 618:7 | 532:22 533:11 | 724:7 725:4 | **okay** 415:20 |
| 658:2,5 659:22 | 622:12 628:22 | 534:1,10 | 727:2,12,18 | 416:17 418:10 |
| 660:7,16,20 | 630:10 652:11 | 541:15,21 | 728:6,20 | 418:18 420:3 |
| 662:2 664:17 | 652:22 655:2,9 | 542:5 544:8 | 729:21 730:9 | 421:19 422:20 |
| 669:2,12 | 657:1 659:8 | 545:13 548:17 | 730:11 | 423:2,18 424:1 |
| 673:20 675:10 | 660:9 663:20 | 549:16 550:18 | **objections** | 424:3,11 425:6 |
| 678:7,10 | 664:8,8 670:2 | 551:15,16 | 506:16 | 426:13 427:15 |
| 680:16 681:8 | 689:10 690:7 | 552:1,15 | **obligated** 440:9 | 428:5,19 430:5 |
| 681:10,13,22 | 692:4 693:10 | 554:14 555:3 | 463:7 609:2 | 430:17 431:13 |
| 682:9 684:6 | 718:10,12 | 556:16 557:17 | **obligations** | 431:15,18,22 |
| 685:18 686:16 | 719:9 723:13 | 558:8,20,22 | 640:1 | 432:3,22 433:9 |
| 688:1 690:13 | 731:4 | 564:2 565:18 | **obviously** 661:6 | 433:12,14 |
| 692:13 693:8 | **objection** | 568:13,21 | 715:15 | 435:8,17,21 |
| 694:21 695:1 | 437:14 438:5 | 572:4,10 | **occasion** 591:4 | 438:17 439:22 |
| 703:17 704:1 | 439:10 440:19 | 576:17 580:8 | **occur** 494:11 | 441:3,7,17 |
| 706:3 708:10 | 442:6 445:3,12 | 580:16,19 | 538:10 | 442:15,22 |
| 713:15 716:20 | 446:8 447:20 | 583:2 585:17 | **occurred** 649:4 | 443:18 446:13 |
| 721:2,11,12 | 449:12 450:12 | 585:18 592:16 | 650:22 722:6 | 446:19,21 |
| 722:3 | 453:20 456:8 | 593:3 599:2 | **Oconee** 610:5 | 447:3 450:6 |
| **numbers** 454:1 | 456:18 457:8 | 600:2 614:20 | 611:1,2 612:4 | 451:12 453:3 |
| 454:5,6,8,13 | 458:4,14,21 | 620:16 622:1,2 | 612:11,16 | 453:15 455:6 |
| 456:21 508:5,7 | 460:9 462:11 | 623:19 625:1 | **October** 518:11 | 458:18 459:2 |
| 523:1,3 655:7 | 463:2,16 | 629:16 631:2 | 525:15 623:9 | 462:14 464:15 |
| 681:15 689:9 | 469:20 471:1 | 632:13 633:14 | **offer** 464:6 | 466:16,21 |
| 718:18 | 486:5 490:1,9 | 644:4 648:7,17 | 665:10 667:2,6 | 467:17 469:2 |
| **NW** 407:15 | 491:20 492:21 | 649:6 651:3,15 | 667:7 668:5,13 | 469:16 470:3 |
| | 495:10 496:9 | 652:1 655:18 | 668:14,21,22 | 471:9 473:21 |
| **O** | 497:10,22 | 655:21 657:15 | 669:18 673:9 | 474:14 477:16 |
| **O** 411:1 414:1 | 498:6 499:5,6 | 657:16 658:4 | **offered** 539:12 | 478:3,10,13 |
| **oath** 414:9 | 499:14,14 | 661:9 665:17 | **offering** 683:14 | 479:15 480:21 |
| 494:22 | 500:3 503:21 | 668:11,20 | 714:9 | 481:2 482:20 |
| **object** 461:12,13 | 504:19 506:7,8 | 671:1,7 674:12 | **office** 419:10,10 | 483:16 486:1 |
| 501:18 502:2 | 506:9 509:14 | 677:12 678:20 | 419:18 640:20 | 486:11 491:8 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

25

| | | | | |
|---|---|---|---|---|
| 496:3 497:18 | 704:21 705:20 | 555:12,13 | 482:11 | 518:19 523:2 |
| 500:15 503:6,7 | 709:6,9 714:7 | 557:3,4,15 | **oversupply** | 524:11 530:7 |
| 503:15 505:2 | 714:13 715:1 | 558:5,15,17 | 529:11 563:5 | 538:16 540:15 |
| 510:20 513:2 | 715:14 717:11 | **options** 539:13 | 563:13 | 545:21 562:11 |
| 522:6,10,19 | 719:4,11 | 563:5,12 | **overview** 538:18 | 562:12,22 |
| 523:5 524:4 | **Oklahoma** | **order** 552:22 | **overwhelmed** | 569:16 579:2 |
| 537:6,17 | 468:19 | 565:16 592:22 | 536:8 | 582:17 584:1 |
| 538:10,13 | **Olathe** 464:19 | 593:6 608:21 | **owned** 469:11 | 586:22 594:16 |
| 575:13 576:1 | 465:7 | 656:14 687:8 | 469:12 636:19 | 594:17,22 |
| 578:14 581:8 | **old** 581:1 | 688:13 | 636:21 645:1 | 596:21 602:19 |
| 584:2,6 587:11 | **older** 513:7 | **orders** 482:4,5 | **owning** 646:13 | 612:2 630:19 |
| 588:16,19 | 514:22 | 606:11 609:21 | ——————— | 631:1 643:13 |
| 598:7 601:16 | **Oleksky** 435:10 | **organic** 444:3 | **P** | 643:15 653:11 |
| 601:21 602:15 | **Omaha** 435:4 | **organics** 443:21 | **P** 408:1,1 409:1 | 654:11 680:8 |
| 603:5 604:7 | **once** 433:5 | 443:22 460:22 | 409:1 414:1 | 684:16,18 |
| 606:9 609:13 | 588:17 608:3 | **organization** | **P.A** 408:14 | 687:2 690:18 |
| 610:14,20 | 644:16 | 473:17 615:21 | **p.m** 600:11,12 | 690:22 698:13 |
| 611:4,7 612:1 | **ones** 452:15 | **organizations** | 601:2,4 659:18 | 698:14 699:19 |
| 612:3,11 613:2 | 478:18,20 | 495:6 | 660:1 695:18 | 699:20 706:15 |
| 613:7,12,15 | 508:8 610:2,4 | **organized** | 695:21 716:9 | **pages** 539:20 |
| 615:15,20 | 610:7 640:8 | 728:16,18 | 716:21 732:11 | 559:20 |
| 616:12,16 | **ongoing** 515:19 | **Orlando** 485:4 | 732:15 | **paid** 619:18,20 |
| 623:4,22 | **open** 432:2 | **Osborn** 562:13 | **pack** 429:5 | 656:20 676:16 |
| 626:15,20 | 656:21 688:21 | 563:1 | 637:18 658:14 | 676:22 695:11 |
| 631:16 632:21 | 695:10 | **ought** 487:14 | 707:4 | **paper** 568:7 |
| 633:12,16,21 | **opened** 445:21 | **ounce** 428:15 | **package** 429:4 | **paragraph** |
| 635:5 637:14 | **operate** 494:3 | **outcome** 734:16 | 607:1 637:21 | 508:22 539:3 |
| 639:15 640:9 | 636:10 | **outgoing** 453:10 | **packaged** 607:2 | 549:19 550:21 |
| 643:12,20 | **operating** 494:4 | **outlined** 552:13 | **packages** 429:1 | 591:19,21 |
| 644:10 646:8 | **operation** | 669:19 | **packaging** | 619:21 623:5 |
| 647:6 660:16 | 593:10 | **output** 584:18 | 428:15 429:8 | 663:9 688:12 |
| 660:17 666:14 | **opinion** 697:21 | 586:4 | 429:17 443:10 | 698:18 704:22 |
| 666:21 667:14 | **opinions** 590:11 | **outs** 505:21 | 443:13,16 | **part** 432:8 492:2 |
| 673:12,17 | **opportunity** | 719:14 | 447:9,11,14 | 533:2,2 539:4 |
| 674:21 675:4 | 668:4 | **outside** 707:1 | 482:12 | 539:8 565:21 |
| 678:4 681:1 | **opposing** 717:6 | **outweigh** 652:8 | **packed** 429:6 | 569:2 574:22 |
| 682:15 684:3 | **option** 540:16 | 661:7 | 658:9,17 707:8 | 579:7 592:9 |
| 684:17,19 | 548:19 549:7,8 | **outweighing** | **packer** 638:3 | 651:7 719:10 |
| 687:22 690:12 | 549:15 550:16 | 663:18 | **packing** 634:9 | 719:21 720:3 |
| 690:21 693:6 | 551:5,12,13,17 | **overall** 652:8 | **page** 411:8 | **participant** |
| 694:13 699:22 | 552:13 553:17 | 661:6 | 412:2 413:2 | 544:9 547:9 |
| 701:2 702:10 | 553:19 554:12 | **oversee** 455:8 | 507:7 516:19 | 568:6 729:9 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

26

| | | | | |
|---|---|---|---|---|
| **participants** | **particularly** | 427:9,11,20,21 | 577:2 608:9 | 675:17 |
| 449:22 544:6 | 619:8 | 432:7,8,8,12 | 619:5 623:9 | **placed** 513:7 |
| 729:13 | **parties** 734:12 | 432:13,14 | 630:3 636:16 | **placement** |
| **participate** | 734:15 | 433:17 434:1,2 | 636:20 637:10 | 472:18 720:13 |
| 485:19 545:4 | **pass** 616:2 | 434:3 449:22 | 638:12,14 | **placements** |
| 568:9 612:20 | 634:16 | 458:19 459:3,4 | 645:12 652:17 | 566:12 |
| 615:7 628:1 | **passed** 443:16 | 462:22 519:4 | 667:22 702:12 | **PLAINTIFF** |
| 629:11 639:16 | 479:12 565:11 | 529:18 530:1,6 | 714:7 | 414:6 722:12 |
| 644:10,17 | 568:3,19 | 531:5,22 | **permit** 509:3 | **Plaintiffs** 406:7 |
| 661:5 663:16 | 615:19 | 540:21 541:11 | **person** 455:9,10 | 407:3 |
| 670:1 692:15 | **Pasteurized** | 542:11 545:12 | 473:15,18 | **plan** 513:5 |
| 719:6,13 726:6 | 448:5 | 548:13 550:2,4 | 537:18,20,22 | 514:17 517:7 |
| 726:17,21 | **Pat** 732:3 | 551:2 554:1,12 | 538:7,11 | 519:1 532:9 |
| **participated** | **path** 507:14 | 556:6 558:4,17 | 587:12 591:2,9 | 533:9 566:10 |
| 503:5 513:21 | **PATRICK** | 584:19 586:5 | **personal** 464:13 | 719:18 722:3 |
| 513:22 520:7 | 407:4 | 595:13 635:15 | 464:15 497:12 | **planning** 646:17 |
| 561:12 566:13 | **Paul** 562:12 | 638:11 639:3 | **personally** | 646:22 647:9 |
| 605:8,16 606:6 | **Paula** 406:19 | 654:13,16 | 454:21 487:19 | **plans** 548:16 |
| 609:15 613:12 | 734:2,20 | 657:10,19 | 497:14,15 | **plant** 633:22 |
| 617:11 628:4 | **pay** 439:1,15,19 | 658:6 685:7,12 | 500:22 | 638:2 |
| 640:19 644:14 | 440:5,6,6 | 685:17 686:5,8 | **perspective** | **plants** 607:16 |
| 651:20 665:1 | 465:2,4 618:22 | 691:5,19,22 | 717:16,17 | 635:17,19,19 |
| 699:5,14 | 689:1,6,8 | 698:2 707:8 | **pet** 464:22 | 705:1 |
| 728:16 730:5 | 690:2 | 729:12,16 | **phase-in** 532:9 | **please** 475:19 |
| **participates** | **payable** 619:18 | **percentage** | 533:9 | 478:1 518:4 |
| 628:7 | **paying** 437:6 | 417:6 427:6 | **Philadelphia** | 524:11 530:12 |
| **participating** | 446:6 465:17 | 449:9,20 450:5 | 408:9 | 530:17 535:21 |
| 518:17 560:7 | **Peewee** 642:19 | 450:18,21 | **phone** 453:10 | 553:4 567:2 |
| 561:3,20 563:8 | **Peggy** 477:19 | 476:12 644:22 | 538:4 661:19 | 568:22 573:1 |
| 586:10 595:3 | 480:5 | 654:5 656:5,9 | 661:22 681:2 | 576:12,18 |
| 649:20 651:12 | **pending** 516:22 | 656:13 657:8 | 715:22 731:19 | 585:21 589:19 |
| 652:9 698:15 | 538:19 587:21 | 685:9 686:10 | **Phyllis** 650:9 | 594:7 597:5,8 |
| **participation** | **Pennsylvania** | 688:12 691:10 | 682:5 706:8,14 | 599:10,12 |
| 472:13 503:9 | 408:9 | 692:12 693:7 | 706:16,19 | 614:22 661:2 |
| 505:12 521:22 | **people** 507:11 | 693:16 694:2,6 | **picture** 434:1 | 665:19 666:1 |
| 564:5 639:21 | 568:15 605:12 | 694:14,19 | 605:7 | 669:12 671:4 |
| 640:12,17 | 606:7,21,21 | 697:1 | **Pilgrim's** 548:6 | 678:10 681:21 |
| **particular** 428:6 | 607:15,21 | **percentages** | **pint** 429:6 | 682:9 683:3 |
| 439:7,20 | 608:5 | 437:18,19 | **place** 492:9 | 692:7 693:19 |
| 440:17 454:14 | **people's** 631:5 | **period** 434:5 | 495:19,22 | 702:15 713:4 |
| 498:13 500:10 | **Pepper** 408:6 | 445:20 470:13 | 496:4,8,10 | 717:10 |
| 606:13 | **percent** 417:13 | 512:10 527:2,3 | 517:7 638:7 | **plus** 416:14 |

431:10 635:14
**point** 467:14
  501:9 534:7,8
  534:14 536:15
  536:18 538:14
  538:17 611:17
  670:13,16
  672:1
**points** 595:22
  596:3
**Poland** 435:12
**policy** 566:5
  567:19 719:13
**pool** 689:2,14
**Pope** 474:12
  475:16 483:6
  484:8,13 486:3
  498:14 618:5
  619:4
**population**
  527:12 730:7
**Porter** 406:18
  407:14
**portion** 428:7
  582:21
**POs** 482:3,3,4
**Posed** 651:3
**position** 420:4
  490:17 721:6,9
**positive** 453:5
  545:3,4,9
**possibility**
  492:18 717:21
**possible** 471:7
  508:4 538:2
  562:15 563:4
  563:12 569:15
  645:6 722:4
**possibly** 476:5
  617:19 619:9
  621:15
**potential** 584:18

586:4
**Poultry** 409:3
  475:8,12 476:1
  476:14 477:7
**pound** 672:13
  672:14 677:20
**pounds** 672:4
  677:10
**powder** 464:22
**practice** 442:16
  442:19 443:5
**practices** 473:4
**precipitate**
  443:7,19
**precluded**
  458:11
**premiums**
  683:14
**prepaid** 545:5
**preparation**
  452:2 505:9
  506:21 507:4
  507:20 508:11
  510:20 511:2
  511:18 512:7
  514:12 515:14
  515:14 516:7
  518:12 520:13
  521:18 522:10
  535:2,9,15
  543:15 559:14
  562:7 563:19
  564:16,20
  571:16 573:8
  578:21 581:17
  582:4 585:9
  586:19 593:22
  594:12 604:20
  625:12,21
  640:11 641:2
  649:12 653:8
  696:19 697:15

703:22 711:14
  712:19 713:11
**prepare** 437:5
  464:11 473:1
  604:12 639:19
  641:16 696:8
  701:22 703:14
  711:21 712:4
  713:6
**prepared**
  436:10 501:22
  502:1 503:2
  584:12 589:16
  590:17 695:5
  714:3 715:17
  715:20
**present** 410:1
  426:11 469:19
  556:12 587:4
  628:4 637:15
  638:15 639:3
  701:18 714:14
  720:21
**presentation**
  523:1,7,9
  541:19 542:4
  542:16
**presented**
  516:21 527:9
  538:17 548:7
  554:22 650:17
**president**
  475:18 581:2
  616:10
**presidents**
  580:21 581:1
**press** 591:10
**pressure** 493:10
  493:11
**pretense** 499:3
**pretenses** 511:9
  512:1

**pretty** 450:21
  655:8
**previous** 452:14
  611:14
**previously**
  508:7 540:3
  551:19 556:5
  557:7,13
  558:14 559:18
  565:6,8 569:8
  569:9 574:18
  576:20 582:1
  611:8 649:10
  697:12
**price** 414:13
  415:15 421:4
  425:7 428:1
  429:10,15,18
  431:3,14
  432:15,16,21
  434:6 435:5,16
  435:16 437:12
  438:9,18 439:1
  439:15 441:1,5
  441:9,10,12
  442:5 443:5
  444:14,20,21
  445:2,7,11,17
  446:5,17
  447:14,15
  453:16 456:16
  457:14 472:15
  503:10 525:16
  527:1,4,21
  546:15 562:14
  563:4,12 597:7
  597:18,22
  598:8,16 599:6
  668:2,6 672:6
  676:12,15
  688:22 689:1
  690:3,4 706:20

715:9 719:7
  725:6,11
**priced** 416:1,13
  417:7,13
  425:15,18
  437:12,16
**prices** 414:19
  430:1 439:9
  440:16 445:22
  499:3,22 509:8
  510:11 514:16
  523:19 527:11
  528:3 544:14
  565:17 623:1
  624:22 628:20
  647:12,16,21
  650:18 652:8
  652:18 663:12
  664:6 723:12
**pricing** 415:15
  416:18 418:5,7
  418:8 427:3
  429:13 430:20
  431:11 432:18
  434:16 435:11
  437:19 438:1,2
  438:19 440:18
  441:19 443:15
  443:20 444:19
  711:7
**Pride** 548:6
**principal**
  712:11
**printed** 601:18
**printout** 411:15
  411:16,17
**prior** 416:17
  462:12 466:9
  466:22 467:4
  470:15 473:13
  474:4,12
  475:15 483:4

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

28

| | | | | |
|---|---|---|---|---|
| 484:4,5,13 | 635:16,19 | 568:10 587:13 | 437:18 440:21 | 698:1 709:10 |
| 485:11,15,20 | 636:8 638:2 | 591:20 598:5 | 448:1 450:15 | 709:13,15,17 |
| 486:18 487:1 | **procure** 609:9 | 646:13 658:2 | 450:15 472:16 | 720:13 729:9 |
| 488:20 489:2 | 609:11 | 670:1,5 679:12 | 571:14 625:17 | 729:14,20 |
| 490:5 491:1,11 | **produce** 428:18 | 729:13,18 | 634:2 705:2 | 730:1,6 |
| 491:13,16 | 431:8 459:8,17 | **produces** 459:5 | 718:6 719:8 | **program's** |
| 492:5 494:11 | 460:5 463:22 | 459:12,15 | **Professional** | 533:21 572:14 |
| 496:14 515:21 | 464:2 606:11 | **producing** | 406:20 | 572:15 585:2 |
| 572:15 574:19 | 615:22 635:17 | 529:18 567:21 | **profit** 429:19,20 | **programs** |
| 611:2 619:12 | 635:21 637:16 | 606:14 636:6,7 | 430:6 718:18 | 493:21 497:21 |
| 619:20 696:7 | 637:19 646:4 | **product** 423:13 | **profitability** | 720:9 726:22 |
| 702:19 712:20 | 705:1,1 725:8 | 423:21 424:7 | 431:6 433:4 | **prohibition** |
| **pro** 687:7,9,17 | **produced** | 427:7 428:22 | **profitable** | 533:21 |
| **probably** 427:9 | 419:15 436:14 | 429:21 431:7 | 505:18 506:5 | **project** 541:12 |
| 427:21 465:11 | 436:18 438:22 | 431:16,19 | 528:3 | **projected** 528:4 |
| 465:16 479:3 | 449:10 570:4 | 432:11,19 | **profits** 696:3 | **promotion** |
| 619:17,18 | 581:22 583:10 | 433:15 434:4 | 724:3 | 440:7 |
| 626:17 627:15 | 598:11 608:4 | 434:18 438:9 | **program** 450:1 | **pronounce** |
| 707:3 | 621:8 626:6,8 | 438:10,15 | 461:9 488:10 | 704:6 |
| **problem** 524:7,8 | 626:10 638:11 | 439:8,19 440:8 | 488:11 489:9 | **proper** 696:13 |
| 524:9,17 | 645:22 646:2 | 440:9 442:20 | 489:14 490:8 | **proprietary** |
| 525:20 526:2 | 662:14 694:1 | 450:11 632:3 | 491:18 492:3,9 | 423:12 426:7 |
| 527:8 528:12 | 697:5 | 633:19 635:21 | 492:13,15 | **protections** |
| 529:11 562:16 | **producer** | **production** | 493:13 496:20 | 536:21 |
| 563:5,13 718:5 | 440:12 460:1 | 460:10,12 | 498:21 499:1,4 | **provide** 419:12 |
| **problems** | 536:10 540:7 | 481:21 511:8 | 499:21 512:10 | 421:9 522:11 |
| 516:22 538:19 | 541:3 595:1 | 511:22 566:9 | 517:14 532:14 | 594:11 702:9 |
| 545:2 | 597:6 631:14 | 605:14 606:18 | 533:10 556:4 | **provided** 422:17 |
| **proceeding** | 650:5 652:16 | 609:19 610:11 | 557:12 558:13 | 449:7 495:3 |
| 734:5 | 679:5 729:5 | 635:16 638:13 | 565:5 566:15 | 498:18 503:3 |
| **proceedings** | **producers** 406:9 | 646:17,22 | 571:12,13 | 560:20 564:16 |
| 734:3,9,12 | 408:3 449:15 | 647:9 653:17 | 572:2 573:11 | 581:12 597:19 |
| **process** 424:9 | 449:22 473:12 | 705:4 | 575:2 576:21 | 611:11 650:13 |
| 429:12,14 | 474:1,5,7,9 | **products** 414:14 | 577:3 579:8 | 654:2 667:13 |
| 430:11,12,15 | 476:13 482:22 | 422:22 423:2 | 584:20 585:14 | **providing** 615:7 |
| 431:1,4 446:5 | 483:8 485:12 | 425:2,21 426:4 | 585:16 586:9 | **public** 406:21 |
| 461:4,18 | 485:15 486:13 | 426:17 427:2,5 | 586:10 592:5 | 714:9 734:1,21 |
| 462:17 606:22 | 487:1,15,18 | 427:11,22 | 592:13 593:1 | **publicly** 591:4 |
| 608:2 609:6 | 501:3 520:1 | 428:18 433:6 | 596:10 599:19 | **published** |
| 710:8,15 | 523:17 524:19 | 433:15,18 | 616:6 621:22 | 646:18 647:10 |
| **processing** | 531:5,17 | 434:7 435:22 | 622:7,11 | **pull** 549:2 |
| 606:19 608:4 | 566:16 568:8 | 436:2,8,8,9 | 627:19 654:22 | **pullet** 480:13 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

29

482:15 719:17
**pulp** 443:10,11
**purchase** 422:22
423:3,4 443:22
464:5 482:4,5
608:21 636:5
656:17 668:4
683:13 687:5,7
687:9 688:20
689:2,14,17,18
690:2,3 692:2
692:21 698:21
700:7 707:1,15
710:14
**purchased**
419:1,2 434:19
471:21 598:12
603:2,7,12,21
604:4 636:2
657:8,11 658:3
658:7 689:21
693:2,5
**purchases**
481:16,18
690:6 694:16
**purchasing**
481:13,16,18
603:4 687:19
695:11
**purpose** 498:22
565:14 576:12
620:2,14
622:22 624:21
630:3,8 664:4
717:12,15
722:19,21
723:10
**purposes** 722:14
725:15
**pursuant** 556:1
**put** 428:13
440:15 453:10

460:19 536:9
564:1 607:3
611:15 633:20
634:11 638:4
660:8 694:12
**puts** 422:1 448:8
**putting** 509:2
534:20 638:1

_____
**Q**
**quality** 480:19
480:20 617:14
**quart** 429:6
**question** 442:14
444:15 456:12
461:8,13 464:1
473:19 497:13
506:13 517:22
518:4 519:12
524:14,21
528:22 529:14
530:10 532:17
534:18 544:9
552:21 553:5
553:10 566:22
567:3,5,8,9
572:20 573:7
573:20 574:3
575:17 577:6
581:5 584:15
585:20 586:13
587:21 588:1
589:18 599:8
599:10,16
629:1 632:14
632:19 648:13
648:14 651:4
652:12 655:3
655:10 657:2
659:9,11
663:21 664:9
665:19 670:3

671:3 674:3
689:11 692:5
693:11,19
701:22 702:14
713:3 718:15
723:5,14 725:2
725:3 726:12
726:19 727:22
730:14 731:8
**questioning**
577:10
**questions**
475:20 488:16
501:20 515:22
564:7 632:15
715:15,19
716:1 717:4,7
719:3 722:11
731:18,20,21
731:22 733:11
733:16
**quick** 471:11
732:2
**quickly** 517:2
569:15
**quite** 414:18
525:6 713:7
**quotas** 507:13
**quote** 412:8,10
447:18,19
448:2,11,17,18
525:16 669:6
669:20 670:9
670:20 677:14
698:4,5 723:21
**quotes** 448:6
539:5 672:17

_____
**R**
**R** 408:1 409:1
414:1
**RA** 411:14

412:3,4,7,14
578:19 621:10
626:11 629:7
645:18,19
662:8 682:10
**RAFKS** 411:10
411:12 412:22
413:8 451:20
455:21 570:5
688:5 706:7
**raise** 472:15
719:7
**raising** 620:7
**Ralph** 477:19,20
478:4 480:10
480:21 482:14
**ran** 475:12
**Ranch** 451:11
**Randy** 477:18
479:15
**range** 441:1,13
455:20 578:19
625:9 626:11
629:18 645:18
664:21 669:14
682:10 684:10
685:22 686:20
688:5 690:17
699:18 703:21
708:13
**rata** 687:7,9,18
**RAUPDATE**
411:22 413:6
413:10,12
625:9 703:21
708:13 713:19
**reach** 710:13
**reacted** 545:3
**read** 457:13,17
457:21 499:9
499:11 506:14
517:14,22

518:1 519:13
520:17 524:22
525:3 528:21
529:1 530:13
530:17,18
531:12 535:20
535:21,21
538:21 544:16
552:2,10,16
553:11 557:8
565:8 566:22
567:2,5 572:8
572:20 573:1,3
573:19 574:14
575:6 576:12
576:15 583:3,6
583:19 588:2
589:1,20
593:10,13
596:18 599:11
599:13 648:13
648:15 665:20
665:22 666:2
671:5 688:16
700:13 702:16
707:19,21
708:4,5 719:1
726:11,13
733:3
**reading** 548:21
550:2 554:17
555:20 559:6
666:21 705:6,8
705:15 732:13
**real** 456:21
732:2
**really** 422:14
507:9 571:20
572:13 632:15
**reason** 433:10
444:2 512:20
522:8 546:8,11

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

30

546:17 547:1
623:6 644:15
652:5 694:9
731:2
**reasons** 455:2
621:17
**recall** 426:15
445:5,10,13
446:2,11 475:4
478:18,20
483:13 485:13
485:22 486:9
486:21 489:7
490:6 491:4,7
492:7 494:13
496:21 497:1
503:13,15
504:2,10,14,16
512:17 514:1
522:3,9 523:19
523:22 525:6
526:4,10,18
527:17 528:10
529:10,15
533:4,15
540:11,13
541:7,8 545:17
561:4,7,16
570:1 586:14
587:18 588:10
591:11,14,16
595:17 596:6,9
596:19 603:3
603:19 610:1
613:6 615:6
617:7,15
618:15 619:9
627:15 628:2
630:16 635:7
636:18,22
637:10 646:21
658:16,18

687:11 692:14
693:7 694:13
697:14 704:16
704:19 705:13
714:6,13 721:2
721:3,11
727:11,13,17
729:5 730:8,16
730:17
**recalled** 728:2
**receivable**
607:12 608:11
**receive** 429:16
486:16,17
646:20
**received** 437:19
495:13 588:21
593:15 598:4
646:3,22
700:22 705:12
705:16,17
**receiving** 453:7
495:8 540:11
540:13 541:7,8
588:11 589:2
597:10 704:16
704:20 706:1
**recess** 471:15
521:11 578:5
600:13 659:20
695:19 716:10
**recollection**
418:4 426:3
448:22 491:9
491:16 501:16
520:22 523:12
524:17 526:2,7
527:8 530:22
537:4 539:17
552:3 556:15
556:18 559:9
563:16 576:22

588:14 589:2
595:6 597:13
599:22 612:12
616:18 619:15
627:7 699:8
705:21 728:5
728:12
**recommend**
517:5 518:22
556:3 565:4
595:12,22
598:9
**recommendat...**
513:3 515:5,7
518:20 519:8
519:22 551:21
563:9 700:4
**recommendat...**
532:8 727:9
**recommended**
519:21 569:6
698:19 700:5
728:3
**recommending**
504:17 513:5
557:11
**reconvene** 521:6
**record** 471:14
471:18 499:11
504:1,20
506:14 518:1
519:13 520:17
521:10,14
525:3 529:1
530:13,18
531:12 553:11
564:2 572:8
573:3 574:14
576:15 577:17
578:4,8 588:2
589:20 599:13
600:9,11 601:5

648:15 659:19
660:1,4,9
665:20 666:2
671:5 695:15
695:18,21
702:16 707:21
708:5 716:7,9
716:12,22
718:20 732:12
734:9
**recorded** 733:11
733:17
**records** 418:14
419:17,20
547:17 561:3,5
573:9 658:19
**recovery** 621:12
621:16 623:7
624:16
**redacted** 690:18
690:19
**REDDING**
408:5 451:18
451:21 499:6
506:8 517:16
523:21 548:17
551:16 554:14
555:3 557:17
558:8,22
585:17 614:21
622:1 655:18
657:16 669:11
674:12 678:9
682:8 702:11
731:21
**reduce** 519:4
520:1 528:4
534:8,16
540:20 548:12
550:1 551:1
553:22 554:11
565:15,16

568:11 664:5
720:17 723:11
729:4
**reduced** 541:11
584:18 586:3
593:7 621:18
628:19 730:6
734:7
**reducing** 529:22
530:6 545:11
550:4
**reduction**
472:19 530:1
531:6,22
532:13 533:9
541:10,13
542:12 556:6
558:4,17 593:9
622:10 630:4
730:22
**reductions**
472:21 503:20
504:12 719:14
**refer** 549:10
633:17,17
**reference**
464:20 501:9
534:4 549:21
549:21 582:12
584:10 639:8
641:6,13 643:5
662:18 670:11
670:17 671:22
673:19 684:20
691:2
**referenced**
533:7 604:3
650:1 678:17
682:21
**references**
544:22 551:18
559:5 646:9

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

31

referencing
  533:20 550:3,4
  550:6,21
referred 648:3
referring 418:6
  457:6 458:1
  474:19 493:2
  501:17 529:6,7
  531:21 532:4
  545:9 548:22
  554:19 555:16
  557:15 585:1,6
  590:2 593:1
  601:17,20
  602:13 604:2
  620:12,12
  622:9 624:6
  665:14 670:5
  677:13 709:21
  710:3 712:5
  725:18
refers 554:18
reflect 577:18
reflected 436:2
  456:14 541:18
  542:3 552:8
  556:10 558:15
  567:13 569:13
  700:12
reflects 503:8
  694:22 695:2,4
  695:6
refresh 418:4
  448:22 524:17
  526:1,6 527:7
  537:3 539:16
  556:14,17
  559:8 563:15
  595:6 597:13
  612:12 619:15
  699:7 705:20
refreshed

728:12
refreshes 523:12
regarding 701:7
regards 493:7
  593:20
region 448:8
regional 456:3
  481:1 482:7
Registered
  406:20
regular 717:20
regulations
  634:15
rehandle 638:6
rejoined 456:3
related 621:21
  734:11
relation 465:1
  687:12
relationship
  527:21 645:1
relationships
  464:8
relative 734:14
relatively
  653:21
rely 540:8 541:4
relying 454:16
remainder
  432:8
remember
  417:22 418:1
  421:15 437:1
  445:17 448:19
  453:7,12 456:2
  467:4,9 470:21
  470:15 476:6
  477:9 484:12
  485:17 486:8,8
  486:22 488:19
  489:10,11
  490:22 491:14

493:14 496:6
  496:11 497:4
  502:6,9,12
  504:6 515:12
  520:9,10
  522:16,20
  523:6,8,9
  528:7,12
  538:12 544:4
  544:11,19
  546:5 548:19
  557:1 560:18
  561:8,15
  562:19 563:8
  563:14 566:2
  569:20 570:17
  571:2 572:16
  574:20 588:18
  588:19 591:12
  593:19 596:18
  597:10 598:15
  598:18,21
  599:17 600:5
  603:5,7,11,13
  603:21 613:1
  617:8 618:16
  619:2,8,13
  639:18 640:8
  647:4 673:16
  684:3,5 687:15
  692:20 693:15
  698:7,10 699:3
  704:18,20
  705:6,8,14
  709:18,18
  721:16 722:16
  722:22 723:7
  723:12,15,16
  723:22 724:5,8
  724:16 727:7
  727:17,21
  728:5

remembered
  588:15 728:8
remove 718:1
renegotiate
  445:1
repeat 456:11
  506:12 519:11
  520:16 524:13
  530:11 572:6
  575:17 585:20
  587:22 589:18
  599:9 665:18
  671:3 676:14
  692:6 693:18
  702:15 707:18
  723:5 727:22
repeatedly
  415:3
rephrase 500:13
  500:14 513:18
  519:17 535:6
  709:2
replaced 638:9
replacing
  561:17
report 418:21
  419:4 422:11
  440:11 516:21
  545:21 547:15
  547:22 548:8
  549:12,20
  554:8,18,22
  555:16,21
  556:2 650:13
  671:9 672:8
reported 548:10
  549:12 550:14
  554:9 667:11
  671:10 672:9
  677:21
Reporter 406:20
  614:9 664:12

reports 671:17
representation
  731:7
representative
  673:6
representing
  681:10,11,12
  698:2 703:7,9
request 443:14
  445:18
requested
  499:12 506:15
  518:2 519:14
  520:18 525:4
  529:2 530:14
  530:19 531:13
  545:10 553:12
  572:9 573:4
  574:15 576:16
  588:3 589:21
  599:14 648:16
  665:21 666:3
  671:6 692:2
  702:17 707:22
  708:6
requesting
  553:21 688:20
requests 687:8
require 488:11
  492:2 571:21
required 496:15
  595:13 644:17
  689:21 707:7
  729:19
requirement
  586:11 595:12
  596:10,12
  645:4,10 668:3
  689:7 692:22
  707:12,14
requirements
  585:2 592:22

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II      March 18, 2014

32

593:7 596:19
622:10 634:6,7
634:10
**requires** 643:19
**requiring**
  689:18
**reread** 542:7
  579:17
**reserving**
  715:15
**respect** 415:21
  427:1 430:13
  430:17 435:21
  441:18 443:8
  444:14,18
  461:10 463:14
  465:5,12
  466:16 503:8
  506:22 535:9
  604:9 605:7
  639:20 652:6
  677:2 679:11
  685:3 694:14
  697:18 713:12
  715:16
**respective** 437:4
  671:11
**respond** 584:4
  696:9 711:22
  712:17
**responding**
  505:9 583:17
**response** 511:3
  515:16 516:8
  520:14 522:10
  535:3,11,16
  543:16 559:16
  562:8 563:20
  564:17,21
  571:17 581:18
  584:9,12
  585:10 594:1

594:11,13
604:20 641:2
653:8 704:1
711:19
**responsibilities**
  560:12
**responsibility**
  481:15 606:17
  606:22
**responsible**
  440:13 455:8
  481:22 482:2
  607:21
**responsive**
  577:6
**rest** 451:7
**restate** 586:1
**Restaurants**
  493:16
**Restraint** 712:9
**restrict** 499:2
  509:8 510:10
  566:6
**restriction**
  499:21
**restroom** 471:11
  521:2,5 577:14
  578:2
**result** 527:1,4
  527:11 596:11
  651:21 663:17
  669:22 720:9
  720:14
**resulting** 661:7
**retail** 427:14
  428:2,14
  429:10 430:14
  431:19 432:4,6
  433:11
**retailer** 440:4
**retire** 420:3
**retired** 481:4

484:11
**review** 452:1
  505:8 507:3
  508:10 515:13
  521:17 523:11
  524:6,11
  526:22 535:14
  548:9 576:5
  578:20 581:16
  597:8 625:11
  640:10,13
  641:1 649:11
  653:7 696:7,12
  703:22
**reviewed** 473:3
  593:16 711:13
**reviewing**
  556:22 582:21
  588:20 595:5
  597:12 684:3
  697:14 705:21
**rich** 507:12
**right** 414:11
  425:4 426:15
  441:17 447:4,6
  450:9,11
  456:16 457:15
  459:7,8,20
  463:15 468:5
  468:20 473:6
  477:10 478:7
  480:14 484:16
  484:19 487:4
  488:21 502:11
  502:15 503:16
  506:6 508:13
  508:21 509:4
  511:7,7,12,21
  511:21 512:13
  513:21 514:15
  515:3,8 516:11
  516:18 523:3

525:19 530:8
531:3,7,19
532:14 542:19
547:10,13
550:11,17
554:2 555:10
555:13,20
558:7,19 560:9
562:3 565:12
570:8 576:6
579:8 580:3,7
581:20 582:15
582:20,20
583:11 584:1
584:14 587:5
587:16 588:10
589:9,11,13
591:2 592:2
593:13,21
594:18 595:3
595:10,20
597:1,20 598:5
605:1 612:20
621:5,9 629:15
631:20 638:21
639:9 641:5,6
642:3 646:10
646:14 648:2
649:20 650:2,5
651:2,14,22
652:21 653:13
654:16,19
656:18 657:13
658:10 666:17
667:20 674:10
675:6,22 676:5
676:16,20
677:3,19
678:13 679:8
679:18 680:6
680:10 682:7
685:12 686:5

686:11,22
688:9 689:18
690:1 691:11
704:10,14
706:14,20
708:20 713:20
715:15 716:14
724:12,14
727:16 729:10
**right-hand**
  684:12
**rights** 493:10
  500:1 509:9
  510:12
**Rigterink**
  452:20 477:21
  481:3 507:19
  591:12 617:13
  710:4
**risen** 683:20
**road** 407:7
  732:3
**Robert** 452:10
  477:21 481:8
**role** 479:21
  480:3,7,12
  587:13 605:15
  616:8
**Ron** 478:5
  480:18
**Rose** 407:11
  410:3 411:19
  414:19 417:10
  417:14,14,17
  417:19 418:12
  418:16 419:6
  419:11,21
  421:3,10
  426:11 436:22
  444:22 455:7
  456:6,15 458:9
  458:19 459:5

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II          March 18, 2014

33

| | | | | |
|---|---|---|---|---|
| 459:11,14 | 589:16 590:5 | 693:8 694:2,6 | 677:9,18 | 665:10,15 |
| 466:4 469:17 | 590:10,11,18 | 694:15 696:2 | 683:15 | 666:17 667:1 |
| 470:5,9 471:20 | 591:5,8,10,15 | 697:1 701:17 | **running** 580:6 | 668:9 673:4 |
| 472:5 473:13 | 591:19 593:7 | 703:7,9,14 | 580:10 | 682:7 686:21 |
| 473:22 475:22 | 593:22 594:10 | 704:10 707:15 | **runs** 633:21 | 696:18 704:13 |
| 478:12 479:4 | 594:12,19 | 708:14,15 | **Rust** 447:16 | 708:19 709:6 |
| 479:21 485:14 | 597:3 602:5 | 711:18 712:7 | 452:4,9,10,10 | 710:3,22 730:4 |
| 485:21 486:20 | 604:9 605:8,16 | 712:17 713:11 | 452:10,10 | 730:21 731:6,9 |
| 487:3,6 489:13 | 605:20 606:5 | 713:21 714:8 | 454:9 456:15 | 731:11 |
| 491:1,17 492:6 | 608:21 609:3 | 714:14 717:1 | 457:3 477:18 | **Rust's** 473:22 |
| 492:8,17 | 609:15 610:10 | 717:16,17 | 477:21,22 | 498:12,16 |
| 493:22 494:11 | 612:8 613:10 | 718:8 719:5,12 | 479:11 481:2,8 | 526:16 581:8 |
| 497:7,19 | 613:19 614:19 | 720:3,4,7,12 | 498:4 501:1,9 | 586:2 615:11 |
| 498:20,21 | 617:3,10 | 720:17 721:1,6 | 501:12,14 | 730:13 |
| 499:19 500:10 | 619:11 620:13 | 721:15 722:2,7 | 502:17 505:4,5 | **Ruth** 452:10 |
| 500:18,19 | 621:4,7 623:13 | 722:15 723:20 | 506:20 507:8 | 582:16,19,22 |
| 503:3 505:11 | 625:15,20 | 724:3,19 726:5 | 507:18,18,18 | 583:11 584:4 |
| 506:22 507:20 | 626:2,4,5,6,6,8 | 726:17,21 | 508:14,17 | **RYAN** 409:4 |
| 509:17 510:2,8 | 626:12,16 | 728:15,17 | 509:16 510:5 | |
| 510:21 512:15 | 627:10,22 | 729:3,8 730:3 | 510:18 511:3,4 | **S** |
| 513:19 514:11 | 629:14 634:20 | 730:5,18,22 | 511:13,14,19 | **S** 408:1 409:1 |
| 515:14,15 | 635:2,10,15 | 731:15 732:9 | 512:19,22 | 411:7 412:1 |
| 516:7 520:12 | 637:15 639:16 | **roughly** 427:6 | 513:1 516:15 | 413:1 414:1 |
| 520:14 521:21 | 640:12,16 | 449:21 | 517:13,19 | **S-W-A-F-F-O...** |
| 535:10 543:14 | 642:15 644:10 | **rows** 516:11,14 | 522:6 526:13 | 478:6 |
| 546:14,18,19 | 645:3,11 646:1 | 518:16 525:10 | 526:18 535:1,8 | **safety** 480:9 |
| 547:5,17 | 646:3,10,20 | **royalty** 440:6 | 543:8 556:11 | **salad** 424:9,17 |
| 556:12 559:12 | 648:4 649:4 | **rude** 574:7 | 559:14 560:9 | 424:21 425:1 |
| 560:21 561:2,5 | 651:1,11,20 | **rule** 458:20 | 560:11 561:3 | **sale** 464:5,6,6 |
| 562:6,7 563:21 | 652:10,18 | 459:3,4 462:22 | 561:12 563:19 | 624:11 684:12 |
| 566:5 568:9 | 653:12,17 | 463:5 | 564:4,13,19 | 688:22 691:2 |
| 570:4,15 571:5 | 654:2,15,21 | **rules** 460:16 | 566:3 567:14 | 696:4 714:14 |
| 571:17,19 | 656:12 658:9 | **run** 481:21 | 568:5 579:3,3 | **sales** 418:13,13 |
| 572:3,12 | 659:6 661:4 | 485:8 607:20 | 580:3,5,10 | 418:21 419:4 |
| 573:10,12 | 662:14 663:15 | 619:3 620:8 | 581:2,6,6 | 419:10 427:7 |
| 574:19,20,22 | 672:16,20 | 623:1 632:3 | 582:12,16 | 438:21 440:10 |
| 576:20 578:11 | 673:6 679:4,11 | 633:18,22 | 583:17 584:12 | 440:11 454:14 |
| 579:7 581:13 | 679:14,16,17 | 634:21 635:11 | 584:17 585:9 | 510:8 548:6 |
| 581:17,22 | 682:16 685:1,1 | 636:7,11,12,17 | 587:15 589:5 | 580:12 623:13 |
| 582:3 585:14 | 686:4,7,21 | 637:16,18 | 595:2 604:19 | 673:2 682:17 |
| 586:10,18 | 691:3,8,13,19 | 638:5 639:4 | 606:1 613:4 | 688:7 690:3 |
| 587:2 589:12 | 691:20 692:12 | 671:22 672:9 | 649:19 665:1 | 696:14 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

34

salesperson
611:15
salt 423:4 424:4
424:12,22
425:7,9,17
434:10
salted 423:5
424:18 425:14
Sam's 428:11
sanitation 634:7
sanitized 607:2
sat 517:13
519:22 727:10
Satkin 406:19
734:2,20
Save-A-Lot
415:21 428:10
633:6
saw 422:8 475:5
548:16
saying 448:12
457:3 549:18
550:5,20 584:8
706:19 731:6
says 452:5 456:9
503:12 505:16
507:9 508:20
509:1 511:20
513:2,3 514:16
515:3,4 516:20
518:20 520:8
524:5 525:20
529:21 531:3,4
531:17 532:8
534:3 535:19
535:20 536:2
538:17 539:3,7
539:12 540:6
540:15 542:11
542:14 543:21
544:13,13
545:21 547:13

548:7 549:12
550:19 554:9
555:22 558:3
558:19,21
562:12,22
564:3 565:3
570:5,8 579:10
582:8 584:3
588:6 595:10
595:10,21
597:5 598:6,8
613:22 620:1
621:11,15
623:5 624:14
627:2 628:12
629:10,21,22
630:1 646:12
647:9 657:10
658:11 665:9
667:22 670:10
680:12 683:3
683:19 686:7
688:19 690:19
691:3,7 694:1
697:21 698:17
701:6 704:22
706:22 707:7
709:20 710:6
711:6,17
719:14
scanned 419:13
schedule 513:12
566:15 719:20
scheduled 519:1
540:1,3 551:19
556:5 557:5,7
557:14 558:14
565:6,8 569:8
569:9
schedules
566:10 606:18
719:18

Schepman
605:12 606:4
Schimpf 518:22
563:2 565:4
scientific 492:15
493:18 497:6
592:18
second 507:6
508:22 516:19
518:19 538:16
540:15 562:10
569:16 573:18
591:18,21
594:15,22
612:2 619:21
623:5 629:22
645:4 652:16
657:12 666:10
670:16 672:1
679:7 680:8
687:2 688:11
688:13 691:9
695:15 698:13
704:21 718:3
719:21
seconded 517:4
518:22 556:2
563:2 565:4
595:11,22
598:9 665:10
665:15 666:17
667:1 668:9
673:7
section 675:1
see 414:12,15
435:5 464:9
472:21 474:16
483:17 484:10
501:12 505:18
505:22 506:1
507:15,16
509:4,6,9,11

511:10,11
512:10 513:6,9
513:14 514:8
514:18,22
516:12,16
517:9 519:4
520:3,4 523:12
524:8 525:12
525:13,21
527:5,22 528:5
529:19 530:2
532:10 533:18
533:19 536:4
536:12,16
537:1 539:10
539:14 540:4,9
540:17,22
541:5 543:19
545:6 547:22
548:13 549:4
556:7,9 562:17
563:6 564:13
570:5,5,12
571:14 574:10
579:4,12,19,22
581:10 582:9
582:12,17
583:6,19 584:6
584:14,15,20
591:20 595:15
596:3 598:1,13
612:11 616:21
619:18,19
620:4,9 621:13
621:19 622:7
622:18 623:10
623:18 624:17
625:17 626:21
627:4,19
628:14 629:6,8
629:12 630:5
630:22 631:4

639:8 643:6,14
646:18 647:13
647:17,22
650:15,20
654:13 655:15
655:15,17
656:6,10 657:9
658:19 661:1
663:13 665:6
665:11 667:16
668:6 670:10
670:12,15,17
672:1,4 673:20
673:21 674:17
674:18 675:2
676:2,3 681:20
682:13 683:8
683:16 684:1
684:13 686:1
687:9 689:2
691:2 692:9,11
692:13 693:22
694:3,5 698:5
699:1,2 700:9
701:9 705:4
707:5,9 710:10
712:13 714:1
715:5 717:12
717:13
seeing 486:8
630:16 647:4
723:12
seen 502:1 594:7
615:4 630:14
641:15 654:7
656:1 676:18
678:21 686:6
687:20 691:7
694:11 710:2
714:17
Seger 615:16,18
616:14 619:22

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

35

622:21 625:3
650:1,9 704:5
722:20 723:8
**Seger's** 624:20
**self-evident**
655:8
**sell** 414:14
425:2 427:2
428:2 429:3
440:1,2,8,16
450:9,14,15,16
451:1,3,4,6
457:6 458:2
459:11,15,17
460:6 463:8,10
463:18,21
471:3,7 548:12
549:14,22
550:15 551:1,5
551:13,21
552:12 554:11
624:4 632:10
633:13 634:17
634:17 635:2
653:2,3 683:16
719:14 725:11
**selling** 432:2,5
432:12 435:10
440:4 444:9
445:19 446:1
450:19 456:5
458:11 465:19
466:4 567:17
**send** 569:14
**sent** 555:2,6
569:21 589:7,8
607:4 621:1
**sentence** 508:22
592:13 629:22
663:9
**separate** 587:10
618:10 703:5

705:2
**September**
644:11 674:5
674:22 675:6
675:22 676:11
677:8,15 678:3
678:13,18
683:7,8 706:11
707:16
**serve** 560:16
**served** 500:22
501:2 502:6,10
502:14,17
503:9,13
**serves** 502:20
605:2
**service** 605:11
607:15
**services** 464:7
618:12
**serving** 502:12
503:15
**SESSION** 601:1
**set** 428:6 429:20
712:13
**Seymour** 610:3
**shady** 498:5
**share** 536:15
687:7,9,18
688:12
**shared** 499:19
511:13
**sheet** 733:14
**shell** 436:7
448:7,8,11,18
449:10,14,19
450:3,16,19
451:2,3,5
455:13 464:17
471:21,22
480:19 518:11
560:2 623:8,13

624:10 632:9
632:10 653:4
698:2,3,22
700:8
**Shevi** 665:10
666:10 667:2
667:15 668:2
668:18 669:18
**shield** 462:5,16
462:19 587:19
588:7 634:11
**ship** 429:7
**shipments** 630:2
**shipped** 607:17
**shipping** 607:8
631:14
**shopping**
632:12
**short** 608:9
620:8 623:1
630:2
**shortcut** 583:22
**shortly** 699:12
**show** 418:14
421:9,11 438:8
440:10 451:16
455:18 475:6
476:21 477:7
482:17 483:13
501:7 505:2
507:2 508:1
512:5 514:3,11
518:9 520:12
521:16 522:19
526:21 535:13
542:19 559:18
564:10 570:2
576:9,10
578:14 581:20
586:17 593:22
594:4 601:7
602:3,19 611:7

613:7 614:7,16
616:12 620:21
625:8,20
627:13 630:13
645:17 649:10
653:6 661:17
662:5 664:19
669:5 675:8
678:5 682:3
684:9 685:21
686:19 688:4
690:16 696:15
696:21 697:11
699:10 703:20
706:6 708:12
713:18 725:22
**showed** 723:8
727:14 728:1
**showing** 456:22
516:2 520:21
650:17 723:16
**shown** 512:6
516:6 518:12
543:14 562:6
582:3 730:12
731:5
**shows** 437:19
454:9 456:7,22
483:7 525:11
694:7
**side** 433:15
442:3 538:18
574:9 608:3
657:13
**Siegel** 407:6
**sign** 553:22
**signature**
613:15 615:11
732:13 733:22
**signed** 627:14
644:16
**significant**

439:18 442:17
443:2,12
523:17 654:18
654:22 679:10
685:14 686:13
**similar** 428:21
429:12 430:20
431:1,4 440:18
441:1 603:18
611:20
**simply** 637:15
**single** 460:7
**sir** 415:13 456:1
457:7 458:3,12
459:3 460:8
461:2,11
462:22 463:7
467:10,22
474:19 495:16
496:1 500:12
502:15 505:15
506:6,22
507:21 510:22
511:4,15
513:18 514:2
515:8 517:11
517:21 518:17
519:8,20 520:2
520:5,15
522:12 523:13
525:9 530:8
531:3 532:1,7
532:21 533:6
533:17,22
534:9,16
535:13 541:7
541:20 542:4
542:17 543:4,8
544:2 545:18
546:3,13 547:6
549:4,15
550:11 551:4

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

36

| | | | | |
|---|---|---|---|---|
| 551:14,22 | 656:22 657:14 | **small** 420:10 | 708:22 | 441:8,11 442:3 |
| 552:7,14,20 | 659:1,7,12 | 450:21 642:19 | **Sounds** 471:12 | 442:9,21,22 |
| 553:17 554:13 | 660:19 661:8 | **soap** 482:10 | **soup** 432:9,10 | 443:8,20 |
| 555:2,8,18 | 662:10 663:2 | **Society** 591:8 | **source** 444:6 | 444:14,18,20 |
| 556:12 557:16 | 663:19 664:7 | **sold** 426:11 | 454:15 494:20 | 445:1,7,17 |
| 558:7,19 | 665:2 670:1,22 | 427:22 434:15 | **South** 671:20 | 446:6 |
| 559:10,17 | 676:13 679:13 | 435:14,15,15 | 672:11 | **specific** 445:14 |
| 560:4 562:20 | 680:3 682:22 | 435:19 440:22 | **Southeast** | 473:15 477:12 |
| 563:21 565:12 | 685:9 686:14 | 450:10 465:22 | 671:19 | 489:11 491:8 |
| 565:17 567:12 | 688:6 691:15 | 466:22 470:3 | **Southeastern** | 491:15 523:2 |
| 568:2,3,12 | 693:21 694:10 | 471:21 489:21 | 475:6 483:7 | 566:4 567:16 |
| 569:22 570:20 | 694:22 699:9 | 494:2 632:9,11 | **space** 499:22 | 590:20 643:22 |
| 571:1,3 572:21 | 699:15 700:13 | 632:21 633:1,3 | 509:8 510:10 | 646:21 |
| 573:21 577:21 | 705:7 712:7 | 633:10 634:1 | 532:9,13 533:8 | **specifically** |
| 578:10 579:8 | 725:14 726:3 | 641:22 718:1 | 533:9 584:19 | 442:2 461:19 |
| 580:3 581:7,14 | 726:20 728:19 | 725:7,8 | 584:22 585:2 | 462:18 492:1 |
| 581:18 582:6 | 729:14 730:8 | **solicit** 467:21 | 585:14 586:5 | 492:14 499:21 |
| 583:1 585:1,11 | 731:3,15 | 469:2 | 586:11 596:1,2 | 501:16 698:10 |
| 586:21 589:17 | **sitting** 445:16 | **solicited** 468:12 | 596:12 622:10 | 724:2 |
| 590:19 591:10 | 447:6 454:1 | 487:1,7,13 | 730:22 | **speculate** 510:5 |
| 591:17 592:6 | 495:21 496:2 | 611:18 | **spaces** 729:19 | 555:6 569:10 |
| 592:10,15 | 546:21 693:6 | **Solidine** 477:18 | **Sparboe** 408:12 | 655:4,12 |
| 593:2,10 594:3 | 705:10 | 479:9 | 455:22 460:3 | **speculation** |
| 594:10,14,20 | **six** 452:14 483:3 | **solution** 539:4,9 | 709:13,16 | 453:21 456:9 |
| 595:3 596:17 | 543:11 565:6,7 | **solutions** 562:15 | 710:14 711:8 | 457:9 458:5 |
| 597:10 605:4 | 569:7,9 579:6 | **somebody** | **Sparboe's** | 469:21 492:22 |
| 608:9 609:17 | 716:20 726:2,4 | 715:12 | 456:17 | 498:8 506:10 |
| 611:7,12,19 | **sizable** 647:20 | **somewhat** | **speak** 507:17 | 524:11 527:14 |
| 612:18 613:14 | **size** 428:15 | 507:14 | 511:3 525:5 | 545:14 554:15 |
| 619:5 620:14 | 429:1 519:4 | **Sonstegard** | 535:8 569:1 | 557:18 565:19 |
| 622:11 623:2 | 520:1 528:5 | 450:7 | **speakers** 536:16 | 641:17 648:8 |
| 624:5,11,22 | 529:22 530:6 | **sorry** 423:14 | **Speaking** | 651:4 661:12 |
| 626:3,9,18 | 534:16 538:20 | 431:2 479:6 | 719:11 | 674:13 710:17 |
| 628:21 632:19 | 540:20 545:11 | 508:4 583:21 | **speaks** 591:4 | 723:3 728:21 |
| 633:2,9 636:1 | 548:13 554:1 | 587:20 603:8 | **specialties** | **spell** 420:14 |
| 637:17 640:21 | 554:11 556:6 | 603:11 614:10 | 438:11 | 423:6 478:1 |
| 645:5,20 646:6 | 558:3,16 572:3 | 617:18 634:22 | **specialty** 414:20 | **spelled** 420:16 |
| 647:3 648:6,14 | 572:13 573:12 | 641:14 661:18 | 414:22 437:7 | 492:14 |
| 649:5,8,14,17 | 575:1 577:4 | 669:14 670:14 | 437:11,20 | **spent** 414:18 |
| 651:2,11,20 | 634:15 730:20 | 674:3,21 | 438:2,14,14,19 | 513:11 517:6 |
| 652:21 654:3 | 731:1 | 676:14 705:16 | 439:7,13,15,19 | 534:15 565:7 |
| 654:19 655:1 | **Skinner** 435:4 | 707:18 708:3 | 440:16,17,22 | 569:8 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

37

| | | | | |
|---|---|---|---|---|
| **spoke** 591:9 | **started** 442:8 | 651:8 661:15 | **stopping** 710:9 | 472:8 475:21 |
| **sponsored** 475:7 | 466:20 467:15 | 664:1 694:19 | 711:1 | 486:10 487:5,8 |
| **spread** 437:11 | 610:12 611:6 | **statements** | **stores** 428:4,6 | 489:6 490:4,12 |
| 447:17 453:18 | 721:5,15 | 544:5 590:4,6 | 465:22 466:1,4 | 492:4 493:3 |
| 453:19 | **starting** 467:7 | 590:17,19,21 | 466:9,17,18,20 | 495:15 496:12 |
| **spring** 455:22 | 472:3 513:8,12 | 593:18 | 467:1 469:8,11 | 497:17 498:3 |
| 456:5 483:21 | 561:2,13 582:8 | **states** 454:18 | 469:14 632:12 | 498:11 499:18 |
| **SQF** 480:8 | 584:13 706:13 | 472:13 473:12 | 633:1 | 500:8 502:8 |
| **square** 408:7 | **starts** 583:9,10 | 509:7 528:2 | **Street** 406:18 | 504:4 505:1 |
| 462:1 | **state** 464:5,18 | 531:16,19 | 407:15 409:7 | 506:19 508:6,9 |
| **stability** 517:1 | 465:1,3,4 | 536:18 543:18 | 434:14 | 509:15,22 |
| **stack** 607:6 | 467:18 469:18 | 546:10 551:17 | **Streets** 408:8 | 510:6,19 514:5 |
| **staff** 518:16 | 511:6 531:10 | 556:13 558:12 | **strengthen** | 514:6 517:20 |
| 543:7 667:1,7 | 554:3 558:1,10 | 560:5 571:11 | 620:2 | 518:3,8 519:19 |
| 667:11 | 583:5 590:12 | 584:13,17 | **Strengthening** | 521:3,6,15 |
| **stamp** 643:19,22 | 634:10 646:16 | 590:13 591:18 | 620:6 | 524:2,15,22 |
| 644:2 | 668:13 685:6 | 592:12,21 | **strict** 567:18 | 525:8 526:12 |
| **stamped** 411:9 | 691:6 701:8 | 593:6 622:17 | **strike** 566:20 | 526:20 527:19 |
| 411:11,13,21 | **stated** 461:18 | 627:3,11 634:2 | 567:2 572:18 | 528:18,21 |
| 412:3,5,6,11 | 462:16 510:17 | 634:14 649:18 | 573:1 718:14 | 529:8,16 531:2 |
| 412:13,15,17 | 515:7 526:4 | 650:9 658:20 | **string** 583:8,9 | 531:20 532:6 |
| 412:19,21 | 527:16 528:9 | 663:8 664:22 | **structure** 581:1 | 532:19 533:5 |
| 413:3,5,7,9,11 | 543:1,5,9 | 669:9 700:1 | **Stueve** 407:4,6 | 533:16 534:6 |
| 643:13,21 | 546:4 553:13 | **stating** 550:5 | 411:2,4 414:7 | 541:17 542:2,8 |
| 644:7 708:15 | 554:16 559:4 | 561:6 669:1 | 415:12 419:16 | 544:12 545:16 |
| **stand** 626:12 | 560:19,21 | 700:15 723:17 | 420:18 423:22 | 548:18 550:8 |
| **standard** 426:20 | 565:13 567:15 | **statistics** 548:10 | 426:12,22 | 551:3,20 552:6 |
| 460:20 493:19 | 567:17 568:4 | **stay** 532:8 533:8 | 436:19 437:22 | 552:19 553:9 |
| 494:1 672:4,8 | 569:17 574:19 | **steady** 620:7 | 438:13 439:12 | 553:16 554:20 |
| 677:10,20 | 576:19 583:14 | **stenotype** 734:7 | 441:2 442:10 | 555:7 556:19 |
| **standards** | 589:10 677:1,6 | **step** 720:22 | 445:9,15 | 558:2,11 559:7 |
| 460:21,22 | 679:6,19 | **Stepwish** 420:6 | 446:12 448:10 | 560:1 564:9 |
| 462:3 492:18 | 719:12,15 | **stock** 642:8,11 | 449:16 450:17 | 566:1,20 567:4 |
| 492:20 493:2,4 | 722:3 | 642:12,16 | 451:15,20,22 | 567:10 568:18 |
| 496:14,17,22 | **statement** 530:3 | 643:2 672:9 | 453:14 454:3 | 569:3,19 |
| 497:2,6 633:10 | 540:9 541:5 | 677:9,18 | 455:17 456:13 | 572:18 573:5 |
| 634:12 | 544:20 581:8 | **stocks** 558:13 | 457:2,12 458:8 | 573:17 574:4,7 |
| **Standby** 659:21 | 585:8 586:3,6 | **stop** 481:5 | 458:15 459:1 | 574:10,12 |
| **start** 444:10 | 591:15,21 | 561:20 574:3 | 460:13 462:7 | 575:3,21 576:3 |
| 471:17 477:6 | 592:1,6,10,21 | 576:10 | 462:21 463:6 | 577:5,9,17 |
| 477:16 578:7 | 593:20 622:21 | **stopped** 467:14 | 463:20 470:1 | 578:9,18 |
| 659:22 716:20 | 624:21 649:2 | 647:6 | 471:4,10,19 | |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

| | | | | |
|---|---|---|---|---|
| 580:13,17 | 689:16,22 | **substantially** | 482:12 | 548:22 560:22 |
| 581:4 583:7 | 690:11,15 | 420:20 | **supplies** 481:17 | 573:6 574:6 |
| 585:7,22 | 692:8,19 | **sued** 570:15 | 481:20 | 583:20 584:7 |
| 586:16 588:4 | 693:14,20 | **suggested** | **supply** 472:15 | 590:2 591:11 |
| 590:3 592:20 | 694:8,20 | 562:13 668:5 | 497:21 499:2 | 602:9 605:13 |
| 593:5 594:9 | 695:16,22 | **Suite** 407:7,16 | 505:13,17 | 607:17 609:18 |
| 596:15 599:4 | 696:17 697:8 | 408:16 409:8 | 506:5 512:9 | 637:4 647:8 |
| 599:11,20 | 700:17 701:1 | **summarized** | 514:17 517:1 | 658:20 695:16 |
| 600:3,6 601:6 | 701:19 702:13 | 503:2 | 517:13 519:7 | 729:18 730:1 |
| 601:11 602:2 | 702:21 703:10 | **summary** | 523:18 524:9 | **surplus** 455:4 |
| 602:10,14,18 | 703:19 706:5 | 418:10,14 | 524:20 527:1,4 | 630:4 717:19 |
| 614:6,15 615:1 | 707:19 708:9 | 421:2 436:2,9 | 534:9 538:18 | 718:2 |
| 615:3 618:20 | 710:5,20 711:5 | 437:5,17 439:1 | 539:9 565:15 | **surprise** 570:9 |
| 620:20 622:5 | 711:12 712:6 | 441:3 538:14 | 565:16 568:11 | **Swafford** 478:5 |
| 622:15 623:21 | 713:9,17 | 544:1 630:20 | 569:14,21 | 480:18 |
| 625:7 629:4,20 | 714:22 715:13 | 630:21 631:4 | 571:13 605:12 | **switch** 614:11 |
| 631:6 632:17 | 716:3,11,15,18 | 673:16 676:10 | 625:17 628:20 | **switched** 442:9 |
| 634:19 640:6 | 718:10 719:9 | 678:17 713:22 | 630:4 664:6 | **sworn** 546:13,17 |
| 644:9 645:16 | 721:7 722:10 | **summit** 522:1,4 | 698:3 719:7 | 734:5 |
| 648:12,22 | 722:13 723:6 | 522:22 523:9 | 723:11 | **system** 511:9 |
| 649:9 651:10 | 723:18 724:10 | 523:15 524:20 | **supply/demand** | 512:1 566:9 |
| 651:18 652:4 | 725:9 726:16 | 525:7 526:3,5 | 527:21 | 567:20 |
| 652:15 653:5 | 727:6,15,20 | 526:11,19 | **supplying** 466:5 | |
| 655:6,13 656:4 | 728:10 729:2 | 527:9,18 528:8 | 466:20 467:5 | **T** |
| 657:5,21 658:8 | 730:2,15 | 528:11,13 | **support** 440:9 | **T** 411:1,7 412:1 |
| 659:10,14 | 731:13,17 | 529:7 536:3 | 646:13 712:12 | 413:1 |
| 660:2,12 661:3 | 732:4 | 537:4 538:15 | **supporting** | **T-O-R-M-O-...** |
| 661:16,20 | **Stull** 490:14,21 | 541:12,19 | 492:19 | 420:17 |
| 662:4 664:2,15 | **subcategories** | 542:16 543:4 | **supposed** 496:4 | **take** 425:7 |
| 664:19 665:5 | 426:18,21 | 545:1,1 550:11 | 602:8 | 432:20 433:6 |
| 666:6 668:15 | 433:20 | **super** 411:15 | **supposedly** | 470:2 471:10 |
| 669:4,13,16 | **subcategory** | 601:12,19 | 495:18,22 | 517:7 520:22 |
| 670:7 671:13 | 438:11 | 642:20 | **surcharging** | 521:4 535:21 |
| 674:14 675:15 | **subject** 434:21 | **supermarket** | 447:10 | 560:12 577:7 |
| 675:20 677:16 | 473:10 588:5 | 633:11 634:1 | **sure** 424:13 | 577:12,20,22 |
| 678:11,15 | 702:19 709:10 | 634:17 | 426:2,4 448:19 | 600:6 652:6 |
| 679:2 680:17 | **submitted** 517:3 | **supermarkets** | 450:4 456:2 | 659:16 715:20 |
| 680:22 681:6 | **subpart** 472:4 | 493:9,12 494:3 | 467:3 474:13 | 717:8 719:1 |
| 681:17 682:2 | **subsequent** | **supplied** 489:21 | 485:17 487:16 | 720:3 |
| 682:10,14 | 600:1 | **supplier** 443:22 | 488:19 491:10 | **taken** 471:15 |
| 684:8 685:20 | **substantial** | 444:7 | 493:1 502:1 | 492:10,16 |
| 686:18 688:3 | 691:14 | **suppliers** 467:2 | 521:3,5 542:9 | 521:11 578:5 |

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

595:18 599:1
600:13 622:17
630:1 659:20
695:19 716:10
734:3,6,13
**talk** 426:5 430:2
446:3 472:12
506:20 535:1
600:9 604:19
696:18 703:13
**talked** 414:22
415:14,18
417:11 426:15
426:15 434:4
467:20 468:2
482:13
**talking** 414:19
415:10 426:10
427:12 430:3
433:16,22
442:2,8,18
444:22 447:3
449:18 473:17
483:5 500:9
590:20 603:3
621:11 628:9
629:17 638:10
663:5 695:5
702:5,12 710:7
715:12
**tankers** 435:13
**tape** 482:11,11
607:5
**taped** 607:5
**taunting** 568:22
**taxes** 465:2,4,18
**tell** 454:15
457:10 458:6
464:15 495:21
502:13 517:18
525:1 571:22
577:19 625:3

628:8 667:4
680:16 696:13
713:21 718:17
**telling** 490:7
724:5,12 731:9
**temperature**
634:6
**temporarily**
638:3
**ten** 415:18
418:22 447:2
465:16 478:9
521:8
**tend** 451:1
**tenure** 722:7
**term** 432:10
497:11 531:8
635:8 642:7,21
690:7
**terms** 426:16
**testified** 415:3
468:4 470:14
473:5 494:6,8
494:15,21
495:17 601:12
602:6 652:20
718:11 722:14
723:20 726:5,8
726:15 727:5
728:4 729:3,15
731:1
**testify** 472:5
520:13 521:21
571:6,17 604:9
604:13 625:15
639:20 696:3
711:18 712:20
715:17 726:10
726:15
**testifying** 603:1
730:17
**testimony** 437:2

447:21 458:18
462:9,12 466:8
468:5 473:22
492:6 495:7
506:21 507:20
511:18 515:15
516:8 522:14
526:16 535:15
543:15 559:15
562:7 563:20
564:17 578:11
581:17 585:10
594:1,12
604:20 611:9
613:19 625:21
630:20 640:11
641:2 648:8
653:8 696:7
704:1 713:12
722:16 724:6
725:16 726:21
727:3,19,21
729:6 730:13
731:3 734:4,6
734:9
**Texas** 548:6
**Thank** 451:21
453:11 577:16
661:20
**thanks** 545:5
584:3 661:21
**theories** 621:16
**thing** 559:3
593:13 700:16
**things** 442:7
482:6,9,10
556:21 634:15
**think** 417:11
420:8,9,15
425:4 433:20
446:17 449:21
467:19 472:1

484:5 487:10
487:10 505:16
507:10,11,11
509:1 520:20
524:7 525:20
557:19 559:19
571:21 617:16
618:11 640:2
653:19 695:4
710:4 729:15
**thinking** 435:18
447:7 457:11
458:7 487:14
506:18 625:4
**third** 699:19
**Thompson**
595:11
**thought** 430:15
447:8 623:16
695:6 729:16
**threatening**
553:3
**three** 447:1
518:16 543:6
547:16 627:18
632:15 673:20
675:12 704:22
721:20
**throw** 566:14
**Thursday** 412:9
669:7
**time** 414:2,18
416:18 417:15
417:19 426:3
444:9 445:19
445:22 446:1
470:12 471:13
471:17 474:4
479:7,8,10
483:11,14
484:17 489:8
490:18 492:8

492:19 493:6
494:10 517:11
521:9,12
535:21 538:20
550:6 568:16
572:16 574:21
575:12,22
576:10 577:1
578:3 580:7,18
580:21 584:4
588:20 590:15
593:15 596:16
598:22 600:10
601:3 605:16
608:9 609:20
611:17 617:9
619:4 621:4
627:10,14
636:16,20
637:22 638:8
638:12,14
645:12 652:17
659:17 660:1
666:1 684:4
695:17,20
702:11 705:7
708:4 709:12
714:7 716:8,20
721:8 725:8
727:10 730:5
732:6,11
**timeframe**
417:6 420:21
476:3 491:4
495:11 529:10
547:4 678:16
682:20 683:2
710:22
**timely** 628:12
**times** 447:1
468:5 527:17
528:9 575:19

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

40

627:18 659:4
660:16,18
681:11,12
718:3
**timing** 709:17
709:18
**tired** 709:9
**title** 418:20
421:15,18
422:14 512:9
514:15 616:10
616:11
**today** 445:16
448:2,7,14
449:9 452:2
460:16,17,20
461:17 462:6
468:14 476:10
496:2 507:4
508:11 510:21
511:19 512:4,7
514:13 518:13
521:18 535:3
535:20 543:16
546:22 563:20
564:17 570:21
572:16 574:20
578:21 582:5
586:20 587:5
596:17 599:19
604:20 625:12
625:22 635:7
635:13 640:11
649:13 672:21
693:6 697:16
702:5 705:11
712:20 719:12
**today's** 711:14
**Todd** 617:13
**told** 489:16,19
491:16,22
492:5 496:3

573:13 705:13
724:4,11
**Tony** 452:19
**top** 415:18
419:5 422:20
428:13 429:5,6
455:20 503:14
505:6,16
512:13 514:8
514:16 570:8
595:10 621:12
654:10 678:12
687:3 690:19
704:4 706:8
721:3,12
**Topco** 411:16
416:8 602:5,13
633:4
**topic** 414:12
464:4,12,14
472:2,3 473:2
505:9 516:1
520:14 563:20
566:5 567:16
604:7,15
625:14 696:1
701:6,12 702:1
703:14,15
704:1 711:16
711:19,22
712:11,14,17
712:20 713:12
717:9,12 719:1
731:12
**topics** 497:11
535:3,11,16
543:16 564:4,8
571:6 594:1
715:16,20,21
**Tormoehlen**
419:19
**total** 628:14

654:5 655:16
656:10 686:3
688:15 732:10
**totals** 655:14
**totes** 434:14
435:6
**tough** 732:5
**town** 420:10
**track** 422:1
436:21 437:10
447:17 587:20
696:14 718:18
**tracked** 421:3
437:15
**trade** 435:13
455:4,4,6
475:6 476:21
477:7 482:17
483:7 618:4
712:9
**traders** 687:8
**trading** 454:14
631:15
**trailer** 623:8,12
623:17 624:4,7
**transaction**
652:9 668:10
**transcript** 576:5
576:9 731:5
733:4
**transcription**
733:10,15
**transitioned**
418:2
**transport** 607:7
**transportation**
607:10
**transported**
607:9
**treat** 462:4
**trick** 574:1,2,5
**Trucking** 420:6

**trucks** 607:9
**true** 416:20
463:14 467:11
477:3 629:14
635:22 733:9
733:14 734:9
**trustworthy**
591:2
**truth** 498:1,7
**try** 478:19
505:17 566:12
584:20 717:4
732:2
**trying** 509:7
510:10 573:22
574:2,5
**Tuesday** 406:16
582:9
**turn** 414:11
440:13 464:3
472:2 507:6
554:7 557:2
571:3 604:7
606:20 630:18
634:17 649:22
687:2 690:21
691:1 699:18
701:5 711:16
718:22
**turned** 678:2
**TWENTY-NI...**
406:3
**twice** 575:8,10
576:19
**two** 408:7
428:18 442:7
447:1 471:17
474:13 523:4
539:12,21
543:3 544:22
548:15 550:10
555:1,17

559:20 564:6
623:13 624:10
626:19 629:7
654:15 662:20
663:8 665:16
666:9 667:11
683:5 689:9
690:22 699:18
699:21 703:4
717:5 722:14
732:10
**two-thirds**
565:2
**twofold** 717:18
**Ty** 477:20
480:14
**type** 428:22
434:17,17
611:10 642:22
660:6,13
681:16
**typed** 681:7
**types** 427:11
428:17 436:1
632:4 642:14
642:17,19
**typewriting**
734:8
**typical** 441:13
443:5
**typically** 441:9
482:21 483:22
632:5 642:15
642:22 643:1
**typing** 453:11

——— U ———

**UE** 412:5,12,16
412:18,20
413:4 615:1
664:21 678:11
684:10 685:22

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

41

686:20 690:17
**UEA** 616:20
617:1 618:9,10
618:12,21
619:7,20 620:1
**UEP** 450:1
456:1 457:17
458:2 459:5,8
460:12,18,19
461:2,3,10,16
461:17,18,21
462:5,15,16
463:8 473:13
485:6 488:11
489:9,13 490:3
490:7 491:2,11
491:17,18
492:2,6,15
493:15,17
494:7,11,17
495:2,5,19
496:5,19 497:7
497:19 498:5
498:13,18
500:9,17,18,20
503:4 504:17
506:3 512:12
512:16 513:2
513:17,19
517:12 524:18
528:14 529:12
536:2,8,22
537:16 538:17
540:6,8 541:2
541:4 542:20
544:6 545:10
547:14 552:11
553:21 560:2
562:13 563:2
563:10 569:6
569:21 570:9
570:10,14,15

570:16 571:12
579:8 585:15
587:8,9 592:5
593:1 594:19
594:20 598:20
599:1 600:1
608:15 616:20
618:10,10,12
618:22 619:3,6
620:1 621:1
627:2,11,15
629:10 630:20
647:3 650:10
662:9 664:3
676:10 682:6
687:8 688:20
689:6,14 694:1
698:19 700:4
700:19 709:13
723:9
**UEP's** 513:4
515:5 622:6
646:17 647:9
647:17 700:1
**Uh-huh** 449:17
477:15 487:5
551:10 695:3
**ultimate** 607:9
**ultimately**
488:15 560:11
598:19 608:1
636:12
**unable** 459:11
**unanimously**
565:12 568:3
666:8
**underlying**
498:22
**underneath**
525:9,19
**understand**
414:8 459:2

473:19 499:15
519:7,17,20
524:21 525:1
530:17 532:12
533:7 540:7
541:3 565:14
573:6 584:7
590:1 616:5
618:11 626:13
632:18,19
641:8,12
642:10 643:8
643:16 657:19
666:14,19
679:20 711:17
713:7
**understanding**
472:3 473:21
493:8 494:15
509:12 533:12
569:4 571:4,9
592:15,18
618:11 620:11
620:13,19
656:3 666:21
683:10,13
689:12 707:11
707:13
**understood**
506:3 628:17
630:7 669:21
722:20,21
**ungraded** 632:3
632:7 634:21
635:3,11
637:16 639:5
**unit** 414:4
471:17 578:7
659:22 716:20
**United** 406:9
408:3 473:12
473:12 474:1,5

474:6,9 482:21
483:8 485:12
485:15 486:13
486:17 487:1
487:14,18
514:7 587:7,9
587:13 598:5
617:2,11 618:9
619:11 620:22
622:17 627:3
627:11 634:1
645:20 662:8
663:8 664:22
669:8 697:6
699:12 700:19
723:9
**units** 732:11
**unpasteurized**
448:5
**unquestionably**
620:3
**unquote** 723:21
**update** 422:2
**updated** 422:2
**upper** 684:11
**Urner** 412:8,10
415:4,6,7,16
416:1,19 417:2
417:4,7,15,17
417:18,21
418:12,17
419:7 420:21
420:22 425:9
425:12,15,18
427:3,8,12
430:3,7,9
432:17 433:4
433:18 434:1,3
434:22 435:16
435:20 437:1
437:12,16
444:17 445:7

447:18,19
448:2,5,6,8,11
448:17 449:1
474:20 484:20
643:20 644:3
648:4 649:3
652:18,21
653:3,4 669:6
669:20 670:8
670:19,20
671:9,9,17
672:3,17
675:16 677:10
677:14
**USDA** 587:19
588:7,11
590:18 609:16
633:9 634:2,4
634:11,13
709:10 710:7
710:15
**use** 421:13
424:8,11
429:12 430:12
432:10 455:1,3
461:6,17 462:4
462:15,18
501:9 611:16
635:5 667:5
677:9 710:14
**USEM** 411:20
604:17 605:2,8
605:17,20
606:6 608:14
608:18 612:21
613:9,20
614:19 616:5
616:14,20
620:1,1,14
623:7 624:20
625:16 626:21
627:3,17,22

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II
March 18, 2014

42

628:9,14
629:12,18
630:8,22
639:21,22
640:12 644:12
644:17 645:2,8
646:10,12
647:20 648:3
650:1,7 652:7
654:3,21
656:20 661:11
664:4 666:9
667:1 673:16
676:15 683:4
687:12 689:7,8
690:5,6 692:2
692:16 693:5
693:16 694:1
694:13 696:4,7
696:12,14
707:2,7,8,15
717:13,15
718:9,17,19
722:15,20
723:9,9,11,21
724:4,20
725:16 726:2
**USEM's** 622:21
640:16,17
**uses** 642:21
**utilized** 454:20
461:10 651:21

**V**

**V** 406:8
**vacancies**
472:19
**vague** 437:14
438:5 439:10
440:19 442:6
445:12 446:8
449:12 450:12

471:1 486:5
490:1 498:7
509:18 510:13
510:14 588:13
589:2 590:14
592:16 633:14
644:4 651:15
658:4 661:11
721:7
**vaguely** 588:13
617:15 704:18
**Valley** 451:11
615:22 705:1
**Value** 411:15
601:13,19
**variance** 446:5
**various** 468:4
481:21 606:5
670:20
**vary** 441:15
**vast** 450:10
**Vegas** 485:3,5,5
**verified** 546:20
547:2 709:14
710:7,15
**verifying** 607:16
**versus** 418:12
444:6
**vertically**
635:18
**viable** 584:20
**Vic** 709:21
710:4
**Vic's** 709:21
710:6
**vice** 580:21,22
**vice-president**
580:11,12
**Victor** 452:20
477:21 481:3
507:18 591:12
617:12 618:1

710:4
**video** 576:8
732:8
**VIDEOGRAP...**
414:2 471:13
471:16 521:9
521:12 578:3,6
600:10 601:3
659:17,21
695:17,20
716:8,19 732:7
**videotape** 591:8
659:15 716:16
**videotaped**
716:12
**view** 487:22
**violate** 712:8
**Vogle** 617:14
**voiced** 510:1
**Voices** 486:17
514:7 621:1
645:20 662:9
663:8 699:12
700:19 723:10
**volume** 406:12
414:4 437:18
630:2 647:16
678:12
**volumes** 732:10
**vote** 503:19
504:3,6,10,14
504:16 595:14
595:17 605:3
665:15
**voted** 596:7
**voting** 506:4
557:21

**W**

**Wabash** 615:22
705:1
**waived** 732:14

**Wal-Mart**
416:10 468:17
468:20 469:5
489:15,16,19
489:21 491:9
492:1,18 493:2
633:8 710:13
711:2
**Wal-Mart's**
416:12
**Wal-Mart/Kr...**
710:10
**walk** 415:17
**walked** 501:8
722:18
**walking** 727:7
**want** 426:2,3
429:16 433:20
445:1 452:22
457:4,20
477:12 483:4
510:7 523:2
555:22 567:4,5
567:7,8 577:15
577:17,21
584:6 590:22
602:8 604:2
649:7 675:13
680:18 690:21
716:11,17
717:3 726:11
**wanted** 490:3
515:20 539:4,8
577:20
**wanting** 493:9
**wants** 660:11
**warehouse**
429:7 468:18
468:20
**warehousing**
466:6
**wash** 634:3,6

**washed** 607:2
**washer** 637:21
**washers** 482:10
**Washington**
406:13,19
407:17
**wasn't** 437:15
488:15 498:2
565:21 651:7,7
655:1 685:5
**water** 634:6
**way** 429:11
487:22 522:17
531:1 561:11
599:19 608:2
614:1 627:8
662:1 666:15
693:21 703:1
717:18 718:1
718:12 724:5
724:11
**WAYNDOTTE**
406:1
**Wayne** 545:22
548:3,4,7
**ways** 435:15
**Wayzata** 408:15
408:17
**we'll** 552:22
574:4,10 575:5
576:4 669:17
**we're** 426:10
433:16 445:19
446:1 447:3
449:18 471:14
483:5 492:12
522:21 551:6
555:16 568:16
574:5 578:7
600:11 617:17
617:18 628:9
629:17 635:18

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II                    March 18, 2014

43

638:10 659:18
664:15 732:1
732:11
**we've** 426:5
434:12 435:5
443:9 447:10
452:21 465:19
466:5,22 468:2
488:21 492:10
492:16 547:16
556:21 586:2,5
613:18,18
636:9,9 702:5
**weak** 620:6
**website** 411:15
411:16,17
454:19 601:18
602:5,20 604:3
**week** 418:15
422:3 624:8,9
627:19 638:3
647:22 674:17
674:18 675:2,5
675:21 711:7
**weekly** 422:2
**weeks** 418:22
513:7,11
514:21 517:6,6
519:3 540:3
551:18 556:4
557:7,13
558:14 565:6,7
569:7,9 624:10
**weight** 634:12
**welfare** 450:1
463:9 488:10
492:9,13
493:13,18,20
496:8 499:4
501:4 507:11
595:2 597:7
709:15

**went** 426:9
443:3 447:12
447:14 467:1
484:1,6 485:4
607:17
**weren't** 488:13
495:17 714:11
**Wesner** 452:20
**whichever**
616:11
**white** 424:18
425:13 429:15
429:21 643:6
643:11,21
644:2,2 676:3
**whites** 424:2,14
425:11 426:16
428:20 432:5,6
432:16 433:7,8
433:10 434:20
434:21 448:4
643:13
**WHITNEY**
408:5
**WHOLESALE**
406:5
**wholesaler**
414:15 601:13
**Wicker** 518:21
**willing** 652:5
**wish** 536:9
**witness** 420:17
423:12,17,20
426:14 437:15
438:7 439:11
440:21 442:7
445:5,13
446:10 447:22
449:14 450:14
453:12,22
456:11,20
457:10 458:6

458:22 460:10
461:15 462:14
463:4,18
469:22 471:2
486:7 487:6
490:2,11
491:22 493:1
495:12 496:11
497:14 498:2,9
499:9,16 500:6
502:5 504:2,22
506:12,17
509:20 510:4
510:17 517:17
518:6 519:11
519:16 520:19
521:2,5 523:22
524:13 525:5
526:10,17
527:16 528:17
529:5,15
530:11,16,21
531:10,16
532:3,18 533:1
533:13 534:3
534:11,19
541:16,22
542:6 544:10
545:15 549:18
550:20 551:17
552:2,16 553:6
553:13 554:16
555:4 556:17
557:22 558:9
559:1 564:7
565:20 568:14
568:22 569:1
569:17 572:6
572:12 573:16
573:19 574:18
575:16,18
576:1,8,11,14

576:19 577:13
577:19,19
578:1 580:9,20
583:3 585:5,20
586:14 587:22
589:22 592:17
593:4 596:14
599:3,9,17
602:12 618:8
620:18 622:3
622:13 623:20
625:2 629:2,17
630:11 631:3
632:14 633:16
640:5 644:6
648:10,19
649:7 651:6,16
652:2,13 653:2
655:4,11,22
657:3,18 658:5
660:10 661:14
663:22 664:10
665:3,18,22
666:4 668:12
668:21 670:4
671:3,8 675:19
677:13 678:14
678:21 681:4
681:15 682:12
689:12,20
690:9 692:6,18
693:12,18
694:5,18
696:11 697:7
700:15,21
702:6,10,20
708:3,8 710:1
710:19 711:4
711:11 712:3
713:5 714:21
715:11,17
718:11,16

719:10,11
721:9 723:4,15
724:8 725:5
726:14 727:4
727:13 728:7
728:22 729:22
730:12 731:10
734:4,6,10
**witnesses** 553:3
**work** 544:16
566:19 567:18
592:9 611:16
615:21 717:6
721:15
**worked** 730:18
**working** 460:21
460:21 605:10
647:20 650:10
721:6
**works** 455:9
480:8 482:12
599:19
**Worldwide**
631:7,16
**wouldn't** 432:17
492:14 497:15
696:15 725:10
**Wow** 632:14
**Wright** 406:18
407:14
**write** 461:19
**writes** 482:3
**writing** 462:17
**written** 454:6,13
460:20 520:3
525:18 619:22
620:10 648:11
**wrong** 707:1
**wrote** 583:5

---
**X**
**X** 411:1,7 412:1

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

44

413:1 643:5
**XLG/large**
641:8

**Y**

**Y** 428:11
**Yeah** 423:19
454:22 456:14
463:12 471:5
475:1 483:2
487:9,10
524:16 551:8
557:22 573:16
576:4 603:10
612:9 614:12
615:1 640:7
642:18 651:6
672:22 676:15
681:18 686:6
690:9 703:11
723:19 724:22
**year** 417:22
418:1 422:8,10
434:5 436:10
438:9 439:7,20
440:17 441:16
441:16 467:3,9
477:9 479:19
482:19 485:4
501:5 525:11
527:3 538:4,11
611:3 612:9
630:22 637:10
637:11 646:21
715:2,2 730:20
**yearly** 436:9
441:11
**years** 417:9
420:20 447:2
465:11,16
471:20 477:14
478:9 479:18

481:6 484:2
485:2 502:13
502:15 503:13
503:16 546:5
579:7 610:18
616:3 617:7,12
618:16 623:13
653:21 726:2
**Yep** 675:15
**yesterday**
414:19 415:19
417:11 421:8
425:21 426:5,9
433:21 450:6
451:6 468:5
470:14 601:12
602:6 603:1,5
652:20
**yo** 561:7
**yolk** 423:4 424:4
424:7,12,22
425:7,10,16,17
425:19 426:19
426:20,20
429:22 430:3
432:8 434:10
448:4
**yolks** 433:7
**younger** 534:15
**yous** 500:16
**Yves** 617:19

**Z**

**0**

**0000603** 411:12
455:21
**0002299** 412:7
662:8
**0004654** 570:5
**0010568** 411:10
451:20
**0011622** 412:22

688:5
**0013293** 413:8
706:7
**0013665** 413:6
703:21
**0040047** 413:10
708:14
**0042370** 412:14
682:11
**0067579** 411:22
625:10
**0071391** 413:12
713:19
**0071932** 411:14
578:19
**0095810** 412:10
678:11
**0136751** 669:15
**02** 474:13 485:2
560:20
**03** 525:11,16
660:22
**0316921** 412:18
686:1
**0317733** 412:5
664:21
**04** 525:16
**0457968** 412:16
684:10
**05** 612:17
**0526344** 412:20
686:20
**06** 412:7 560:20
638:15 662:8
**07** 560:16 561:2
637:6 674:5,22
676:11 678:3
**08** 560:16
561:14 612:17
612:19 684:12
684:21
**09** 560:17

561:14

**1**

**1** 517:8 519:2,2
534:7 548:20
549:7,8,15
550:16 551:5
551:12 552:9
552:13 554:1
555:12 557:3,4
557:15 558:15
560:4 620:22
632:1,2,2,9,21
633:3,13,16,18
633:18,21,21
635:2,11
637:16,18
639:8 642:22
677:3,5,9
687:4
**1's** 635:8
**1-pound** 429:2,3
**1:03** 601:2,4
**10** 432:8 528:5
530:1,2 541:13
542:12 690:22
**10:29** 521:10
**10:38** 521:13
**100** 458:19
459:3,4 462:22
635:15 638:11
639:3 665:11
666:11 667:19
668:6 698:2
707:2
**1028004** 413:4
690:17
**1028216** 615:1
**103** 547:16
548:1 555:21
**104** 555:22
**108** 517:6 594:5

594:16 596:20
596:21 597:10
597:18
**10CV2171**
406:8
**10th** 675:6,22
677:8,15
**11.4** 686:10
**11.4411** 686:12
**11.5** 685:12
**11.5575** 685:13
**11.6** 525:12
**11/1** 639:12,13
639:13
**11/15** 639:12,14
**11/7** 639:13
**11:42** 578:4
**11:50** 578:8
**110** 596:1
**111** 559:19
562:5 563:18
**1110** 407:16
**115** 530:7 535:2
535:5
**119** 521:17
522:21 535:6,9
542:17
**11th** 513:4
516:4
**12** 516:4 606:20
606:21 732:10
**12.5366** 679:15
**12:18** 600:11,12
**120** 686:3
**12th** 683:8
691:2
**13** 508:18
678:18
**13.9394** 679:14
**1359** 412:3
645:18
**1368** 412:4

HIGHLY CONFIDENTIAL
Hinton, Gregory Eugene - Vol. II                    March 18, 2014

45

645:19
**139** 542:20
543:14 547:8
549:11 554:7
554:17 555:15
559:13 646:14
**13th** 644:11
674:5,22
**14** 507:8 677:5
691:1 734:18
**14,198** 692:2
**14.685** 654:16
**15** 413:4 465:11
579:3 606:21
653:17,20
658:15 690:18
**15,000** 681:9
**15,069** 679:18
681:8
**15.73** 686:5
**15.7359** 686:8
**15.89** 685:4
**15.8959** 685:7
**159** 555:15
**16** 522:22
**16.28** 654:13
**16th** 536:4
**17** 706:11
**170** 564:11,15
564:20 569:13
**173** 616:13
**18** 406:14,16
414:3 535:19
551:11 555:9
566:11 719:19
**18,034** 688:13
**181** 653:7
662:17,22
663:3
**185** 699:11
**18th** 553:18
**1900** 406:18

407:15
**1907** 408:15
**19103-2799**
408:9
**192,628** 692:11
692:15 693:8
693:16 694:3
694:15,22
**192,628.09**
694:7
**1978** 610:13
**1980** 574:21
576:22 730:18
**1980s** 721:16
**1992** 721:10
**1999** 467:7
469:18 612:10
**1st** 513:8,9,13
513:13 514:22
540:2,20,21
557:6 621:2

——— **2** ———
**2** 534:8 536:18
540:16 553:17
553:19 554:12
555:13 558:5
558:17 622:6
**2-pound** 429:2,4
**2:18** 659:18
**2:25** 660:1
**20** 433:17 434:2
434:3 472:2,3
472:12 518:11
653:15
**200** 407:7
688:15 691:3
707:3
**2000** 417:5,12
417:15 426:11
435:9 467:4,5
467:8 478:9

491:13 627:4,9
630:21,22
720:21 721:2
**20006** 407:17
**2000s** 417:12
611:3 714:8
**2001** 713:22
**2002** 473:14
474:1 475:15
483:5 484:4,5
484:14 485:11
485:16,20
486:18 487:2
488:2,4,9,22
489:2 496:8,14
500:19 501:11
501:17 503:11
507:8 512:15
512:20 514:8
515:11 546:16
594:17 619:12
697:19 698:9
699:11 729:9
**2003** 417:20
503:11 620:22
621:2
**2004** 467:21
503:11 516:5
517:9 518:11
519:2 522:22
523:16 525:11
527:10 528:8
528:10,15
529:10 535:19
538:15 540:20
542:15 543:3
551:12 553:18
554:1 555:9
557:3
**2005** 503:11
519:3 528:3
540:2,22

542:21 544:7
544:15,20
545:6,18 546:1
547:3,10 555:1
555:18 557:6
560:4 562:1,20
611:3,6 637:5
637:7
**2006** 467:21
468:1 503:11
546:16 564:12
565:2 567:14
605:20 609:16
613:20 627:11
627:22 628:3
635:22 637:15
639:3,7 640:18
713:22
**2007** 412:9
420:19,20
561:13 587:12
588:21 613:22
627:14 641:6
645:19 649:16
653:18,19
662:9,17,18,21
662:22 663:3
665:1 669:7,8
669:20 672:21
672:22 673:1,7
673:19 674:2
674:22 675:6
678:13,19
682:19 704:5
708:19 709:3
711:8
**2008** 508:18
510:2,9 511:14
579:4 610:21
644:11 647:7
687:4
**2009** 448:16

467:21
**2010** 411:18
434:6 560:17
570:11 614:18
**2011** 469:7
582:9 583:13
583:15 584:13
586:3
**2012** 416:16,21
417:5,16 435:9
453:8 455:22
456:6 466:7,19
467:12 469:5
688:9 692:15
706:11 707:16
725:21 726:1
**2013** 467:22
468:2
**2014** 406:14,16
414:3
**2015** 734:18
**202** 407:18
**20D** 564:4
**20F** 521:20
522:11 535:3
535:11,16
543:16 559:16
**20G** 505:9
506:22 511:3
515:16 516:8
520:14 535:3
535:11,16
543:16 559:16
562:8 563:20
564:17,21
594:1,13 719:1
719:2
**21** 453:18,19
582:9 583:13
583:15 584:12
586:3 615:2
699:18,21

HIGHLY CONFIDENTIAL

Hinton, Gregory Eugene - Vol. II

March 18, 2014

46

**21.5** 454:11
**213** 697:22
**215** 408:10
  518:10 520:13
**215-0141** 408:18
**217** 615:13
**21st** 684:21
**22** 412:18 460:6
  604:8 686:1
**22.5427** 691:5,7
**22G** 604:10,13
  604:21 639:20
  641:3 653:9
**22H** 696:2,9,19
**22I** 717:10,12
**22K** 625:14,18
**22nd** 678:18
  698:15 699:4
  699:13 700:3
**23** 649:11,16
  676:21
**234** 643:5
**236** 512:6
**237-0300** 409:10
**23716014** 691:3
**24** 571:3 682:19
  721:22 722:1
**243** 620:22
  621:9
**24L** 571:11,18
  573:8 581:18
  585:10 594:2
**24th** 684:21
**25** 544:7 545:18
  547:10 555:1
  555:18 584:19
  586:4 644:11
  697:19 712:11
  713:12
**251** 535:14
  539:20 549:3,5
  551:9 553:19

**555:**9 557:3,15
  558:6
**25th** 542:21
  550:9
**27** 662:9,16
**27.311** 691:10
**27.3111** 691:12
**2700** 409:8
**271,242** 681:19
**28** 464:4
**29** 594:17 688:8
**2nd** 699:11

     **3**

**3** 534:14 595:14
**3:20** 695:18
**3:30** 695:21
**3:58** 716:9
**30** 413:12 432:8
  477:14 540:2
  540:22 557:6
  584:19 586:5
  658:12,17
  659:1,2,4
  660:16 670:9
  670:11,17
  680:6 681:11
  681:11 683:11
  713:19 731:2
**300** 409:7
  623:17 624:6
  624:16
**3000** 408:7
**31** 565:2 709:3
**317** 409:10
**31st** 564:12
  567:13
**32** 701:6 702:1
  703:14,15
  704:2
**321** 613:8
**33** 411:14

**578:**20
**330** 408:16
**34** 673:20
  674:18 675:6
  711:16,19,22
**35** 639:8
**35,000** 660:14
**35,729** 658:10
  659:3 660:6
**36,068** 688:16

     **4**

**4** 622:16 645:19
**4.3007** 686:15
**4.3444** 685:17
**4.6045** 679:15
**4.8** 654:20
**4:05** 716:21
**4:21** 732:11,15
**40** 432:13 731:2
**414** 411:2
**42** 539:20
  672:13,15
**42.29** 525:17
**43** 539:20
**44** 524:3 672:15
**45** 624:4
**451** 411:9
**455** 411:11
**46** 412:20
  686:21
**460** 407:7
**46204-1750**
  409:9
**47** 523:4
**48** 526:22
  630:14 672:4,8
  673:15,19
  677:10,20
  678:1,17
  682:21 684:15
**49.8** 691:22

     **5**

**5** 427:11 519:4
  530:1,6 531:5
  531:22 540:21
  541:11 542:11
  545:12 548:13
  550:2,4 551:2
  554:1,12 556:6
  558:4,17 596:3
**50** 417:13
  595:22 672:4,9
  672:13,15
  677:10,20
  691:19 707:8
**51** 527:21
**517** 571:4
  625:18 696:1
  701:2,3 717:8
**518** 611:8
**52** 529:17 530:7
  542:9
**525** 501:8,15
  503:1
**527** 514:3,5,11
**528** 516:3,5
**53** 532:7
**531** 570:3
**532** 505:3
**536** 507:3
**537** 508:2,8,10
  511:4 514:4
**550** 623:8,12
  624:9
**55391** 408:17
**554** 581:21
  585:9
**56** 453:17
  454:10
**563** 697:12,18
  698:13 700:12
**567** 586:18
  587:1

**573** 411:9
  451:13,17
**574** 411:11
  455:15,19,20
**575** 411:13
  578:15,16
  579:2
**576** 411:15
  601:8,9
**577** 411:16
  601:22 602:4
**578** 411:13,17
  602:16,21
  604:3
**579** 411:18
  614:4,14,17
**580** 411:21
  625:5,9,21
  626:11
**581** 412:3
  645:14,18
  646:9 662:7
**5811** 412:12
  678:12
**582** 412:5
  664:12,16,17
  664:20 670:15
  673:10,14
**583** 412:6 662:2
  662:6,7 663:7
**584** 412:8 669:2
  669:5
**585** 412:10
  614:8,9,13
  675:9,10,15,17
**586** 412:11
  653:16 678:6,7
  682:22
**587** 412:13
  629:5 681:22
  682:4
**588** 412:15

HIGHLY CONFIDENTIAL
Hinton, Gregory Eugene - Vol. II            March 18, 2014

47

| | | |
|---|---|---|
| 684:6,10 | **662** 412:6 | 677:11 729:15 |
| **589** 412:17 | **664** 412:5 | **80s** 476:5 477:8 |
| 685:18,22 | **669** 412:8 | 479:3 |
| **590** 412:19 | **67** 462:1 | **816** 407:9 |
| 686:16,20 | **675** 412:10 | **82** 677:11,11 |
| **591** 412:21 | **678** 412:11 | **85** 449:22 |
| 688:1,5 | **681** 412:13 | 595:13 729:16 |
| **592** 413:3 | **684** 412:15 | **854** 657:7 |
| 690:13,16,17 | **685** 412:17 | **86** 626:19 |
| 697:9 | **686** 412:19 | **87** 629:7 |
| **593** 413:5 | **688** 412:21 | |
| 703:17,20 | **69** 681:10 | **9** |
| **594** 413:7 706:3 | **690** 413:3 | **9** 412:9 664:22 |
| 706:7 | **6th** 514:8 683:7 | 669:7,8,20 |
| **595** 413:9 | | 673:7 |
| 708:10,13 | **7** | **9/10** 674:17,18 |
| **596** 413:11 | **7** 414:12 | **9/13** 674:2 |
| 713:15,19 | **70** 671:22 672:6 | **9:15** 471:14 |
| | 672:6,10 | **9:27** 471:18 |
| **6** | **703** 413:5 | **9:50** 582:11 |
| **6** 704:5 | **706** 413:7 | **90** 729:12 |
| **6.2643** 691:17 | **708** 413:9 | **90s** 476:7 |
| **60** 432:7,12,14 | **71** 412:16 | **912** 595:9 |
| 665:10 | 684:11 | **915** 597:17,22 |
| **601** 411:15,16 | **713** 413:11 | **92** 721:11,12 |
| **602** 411:17 | **714-7100** 407:9 | **93** 411:22 |
| **614** 411:18 | **717** 411:3 | 625:10 715:1,3 |
| **62** 513:7 514:21 | **72** 672:6,7,10,10 | 715:4 |
| 517:6 | 672:11,11 | **946,389** 655:16 |
| **625** 411:21 | **722** 411:4 | 656:10 |
| **63** 665:10 | **729** 660:15 | **95** 427:9,20 |
| 666:10 667:16 | **75** 672:11 | 529:18 |
| 668:4 | **778-3000** 407:18 | **952** 408:18 |
| **630,000** 661:5 | **78** 612:15 | **98** 715:2,3,4 |
| **631,415** 659:6 | | **981-4000** 408:10 |
| **632,000** 663:18 | **8** | **99** 416:20 |
| **632,402** 660:21 | **8** 595:14 663:11 | 468:14 470:15 |
| **632,403.03** | **8/22** 674:1,5 | 612:16 714:13 |
| 660:20 | **8:02** 406:17 | **9th** 671:18 |
| **64112** 407:8 | 414:3 | 674:10 |
| **645** 412:3 | **8:22** 583:13 | |
| **66** 413:6 703:22 | **80** 427:21 434:1 | |
| | 449:21 677:11 | |

Henderson Legal Services, Inc.