# ATTACHMENT 27

HIGHLY CONFIDENTIAL

Horner, Sage                                April 29, 2014

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS          )
ANTITRUST LITIGATION                   )
                                       )
                                       ) MDL No. 2002
                                       ) 08-md-02002
                                       ) HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF SAGE HORNER

Phoenix, Arizona
April 29, 2014
9:04 a.m.

REPORTED BY:
Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

2 (Pages 2 to 5)

---

**2**

VIDEOTAPED DEPOSITION OF SAGE HORNER
commenced at 9:04 a.m., on April 29, 2014, at Driver
and Nix Court Reporters, 3131 East Clarendon Avenue,
Suite 108, Phoenix, Arizona, before Kristy A. Ceton,
RPR, Arizona Certified Court Reporter No. 50200.

* * *

APPEARANCES:
For the Plaintiff:
KENNY NACHWALTER
By:  Kevin J. Murray, Esq.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
305-373-1000

For Rose Acre Farms:

PORTER WRIGHT
By:  Molly S. Crabtree
41 South High Street
Suites 2800-3200
Columbus, Ohio 43215
(614) 227-2015
Also Present:
Edward Kishel, the videographer

---

**3**

I N D E X

EXAMINATION BY                         PAGE

Ms. Crabtree................................  6

EXHIBITS          DESCRIPTION        PAGE
Exhibit 1  November 20, 2003, e-mail from   19
           Gary Angell to Tom McIntyre

Exhibit 2  October 18, 2003, e-mail from    23
           Sage Horner re Eggs- Recap &
           Butter

Exhibit 3  October 18, 2003, e-mail from    42
           Sage Horner to Gary Angell and
           Tom McIntyre

Exhibit 4  October 23, 2003, e-mail from    45
           Patrician Albrecht to Tom
           McIntyre

Exhibit 5  October 25, 2003, e-mail from    49
           Tom McIntyre to Dwight Stanley
Exhibit 6  November 3, 2003, e-mail from    55
           Dwight Stanley to Tom McIntyre

Exhibit 7  November 6, 2003, e-mail from    57
           Tom McIntyre to Dwight Stanley
Exhibit 8  November 14, 2003, e-mail from   58
           Tom McIntyre to Dwight Stanley

Exhibit 9  November 17, 2003, e-mail from   60
           Gary Angell to Tom McIntyre and
           Sage Horner

---

**4**

EXHIBIT          DESCRIPTION         PAGE
Exhibit 10  December 2, 2003, e-mail from     61
            Brian Joyer to Gary Angell; Tom
            McIntyre; Beth Sparboe Schnell;
            Terry Culhane; Wendy Hamm

Exhibit 11  December 4, 2003, e-mail from     64
            Tom McIntyre to Gary Angell
Exhibit 12  Our Own Brands Supply Agreement   67

---

**5**

Phoenix, Arizona
April 29, 2014
9:04 a.m.
TRANSCRIPT OF PROCEEDINGS
THE VIDEOGRAPHER:  Good morning,
Everyone.  We are on the record.  This the beginning
of media No. 1 of the videotaped deposition of Sage
Horner taken on behalf of the defendants in the
matter of in regarding Processed Eggs Product
Antitrust Litigation, Case No. MDL No.
200208-MD-02002 filed in the United States District
Court for the Eastern District of Pennsylvania.
Today is April 29th, 2014, at
approximately 9:04 a.m.  This deposition is taking
place at the offices of Driver and Nix Court
Reporters located in Phoenix, Arizona.  Your
certified reporter is Kristy Ceton and Ed Kishel is
your certified legal videographer, both appearing on
behalf of Henderson Legal Services located in
Washington, D.C.
Would counsel please identify yourselves
and state which party you represent.
MS. CRABTREE:  Molly Crabtree of Porter
Wright for Rose Acre Farms.
MR. MURRAY:  Kevin Murray from Kenny
Nachwalter on behalf of Plaintiff Albertsons, LLC,

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

3 (Pages 6 to 9)

---

6

1 and also on behalf of the witness, Mr. Horner.
2          THE VIDEOGRAPHER:  Thank you.
3          Will the court reporter please swear in
4 the witness.
5
6          SAGE HORNER,
7 called as a witness herein, having been first duly
8 sworn, was examined and testified as follows:
9
10          EXAMINATION
11 BY MS. CRABTREE:
12     Q.   Good morning.
13     A.   Morning.
14     Q.   Could you please state your full name for
15 the record?
16     A.   Sure.  It's Sage Horner.
17     Q.   And, Mr. Horner, with whom are you
18 currently employed?
19     A.   Fresh Thyme Farmers Market.  Thyme is
20 spelled like the herb.
21     Q.   And what do you do with Fresh Thyme?
22     A.   I'm the senior vice president of
23 merchandising and marketing.
24     Q.   What is Fresh Thyme?
25     A.   It's a retail grocery company that's in

---

7

1 the natural and organic space.
2     Q.   So the whole foods-type space?
3     A.   With a --  Yes.  With more of a focus on
4 kind of value, so quite frankly, a lower price point
5 approach.  But, yeah, healthier retail grocery.
6     Q.   And what is the geographic scope of the
7 Fresh Thyme Markets?
8     A.   We actually just started the company
9 about 18 months ago and opened our first store in the
10 Chicago suburbs last week.
11     Q.   Congratulations.
12     A.   Thanks.
13     Q.   I take it you are one of the founding
14 members?
15     A.   Yeah.
16     Q.   What are your responsibilities as senior
17 vice president of merchandise and marketing for Fresh
18 Thyme?
19     A.   I have the IT function, the purchasing
20 function, the marketing function, and all of retail
21 operations reporting to me.
22     Q.   Do you have any responsibility for eggs
23 or egg products in your current position?
24     A.   I mean indirectly I'm over all
25 purchasing, in essence, functions for the company.

---

8

1 So all categories, all vendors.
2     Q.   But no direct contact with eggs?
3     A.   No.  We have a category management
4 purchasing team that handles that.
5     Q.   What was your position prior to being a
6 senior vice president with Fresh Thyme?
7     A.   I was group vice president of client
8 relations for a company called Park City Group, which
9 is a supply chain software company that serves the
10 grocery industry, retail industry.
11     Q.   And how long were you in that position?
12     A.   About a year.
13     Q.   And who were price city -- or Park City
14 Group's clients?
15     A.   A myriad of large and small grocery,
16 drug, and mass retailers across the U.S. and
17 manufacturers.
18     Q.   And what about prior to Park City Group?
19     A.   I was with a company called Sunflower
20 Farmers Markets.  I was vice president of
21 merchandising, marketing, and supply chain for them.
22     Q.   Did you have any responsibility for eggs
23 or egg products in that position?
24     A.   Similar to my answer about Fresh Thyme.
25 Ultimately, all purchasing fell under my authority, I

---

9

1 guess, but I didn't at any granular level.  I had
2 other people that handled at that level.
3     Q.   And how long were you with Sunflower?
4     A.   Four years.
5     Q.   What about before Sunflower?
6     A.   I had a small -- I think I had a small
7 consulting thing I did after I left SuperValu
8 Albertsons.  I mean, that's a good four companies
9 ago.  I had a small consulting thing that I did for
10 about nine months that was post a longtime career I
11 had with Albertsons, Inc., and SuperValu.
12     Q.   Can you tell me about your positions
13 within Albertsons and SuperValu?
14     A.   Sure.
15     Q.   We can go backwards or forwards.  Your
16 choice.
17     A.   Why don't we go backwards from where I
18 was --
19     Q.   Okay.
20     A.   -- when I left the company.
21          So I was --  My recollection was my title
22 was corporate director of strategic sourcing and
23 procurement.  And I --  Honestly, it's been long
24 enough ago where I'm not sure if that's exactly
25 right.

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

4 (Pages 10 to 13)

---

**10**

1      Q.   That's pretty specific.
2      A.   And at the time I left the company, I had
3 responsibility for the nonfoods part of the business,
4 so health and beauty care, general merchandise, and
5 import sourcing. Not -- not food items.
6          Prior to that, I had different director
7 level roles over merchandising and procurement
8 activities that, quite frankly, through the years
9 spanned most all departments, most all categories.
10          And then going backwards in time, I had,
11 quite frankly, a very typical succession through the
12 company that really started at retail level in
13 stores, moved through buying roles, moved through
14 merchandising roles, and ultimately was kind of that
15 director level after 20, 23 years, 24 years with the
16 combined Albertsons SuperValu company.
17      Q.   When you say the combined company, were
18 you working for one entity as opposed to the other?
19      A.   Which companies are you referring to?
20      Q.   Albertsons, Inc., and SuperValu.
21      A.   So my recollection of how to, I guess,
22 state that is that both were public companies.
23 SuperValu acquired Albertsons, Inc., and there was no
24 -- there was no way to work for both. You know, you
25 either went forward and became a SuperValu employee

---

**11**

1 or you went with one of the other pieces of the
2 business that was sold off or you didn't have a job.
3          I was offered a position to continue on
4 with SuperValu at the time they acquired Albertsons,
5 Inc., and that's when I moved from being an
6 Albertsons employee to a SuperValu employee.
7      Q.   So you were with Albertsons before the
8 two companies combined?
9      A.   Correct.
10          MR. MURRAY: And he was not with
11 Albertsons, LLC, as the deposition notice indicates.
12          THE WITNESS: Yeah. Never was.
13          MR. MURRAY: He never was with them.
14          THE WITNESS: Never have. Never was.
15          MR. MURRAY: You're free to inquire, but
16 I wanted to correct that in the notice.
17          MS. CRABTREE: Okay. Appreciate it.
18      Q.   BY MS. CRABTREE: When did you start with
19 Albertsons, Inc.?
20      A.   I believe 1986 as a box boy at a grocery
21 store in Mission Viejo, California.
22      Q.   And when did you leave SuperValu?
23      A.   To the best of my recollection, it was in
24 the summer of 2008.
25      Q.   At any point in your positions with

---

**12**

1 Albertsons and SuperValu, were you involved with eggs
2 and egg products?
3      A.   Yes.
4      Q.   And approximately when was that?
5      A.   Well, what -- what I recall is that there
6 were earlier time frames in my career when I was at a
7 division level that I had responsibility from a
8 buying perspective to transactionally just cut orders
9 and order eggs through our distribution environment
10 and out to our stores.
11          I have no recollection of how far back or
12 what year or which divisions or whatever. But I
13 certainly had a tactical piece way back when.
14          And then as part of my responsibilities
15 at a director level, eggs, like other categories,
16 were reviewed and the business was sourced out to
17 different suppliers based on their participation in
18 category reviews.
19          And that would have been the latter part
20 of my career. I don't recall specifically when or
21 ...
22      Q.   Well, we'll look at some documents that
23 may help with that --
24      A.   Okay.
25      Q.   -- but I just wanted to get a general

---

**13**

1 sense.
2      A.   Sure.
3      Q.   And I want to make sure we're also
4 talking about the same thing. When I say "eggs," I'm
5 referring to white shell table eggs. Is that fair?
6 So when you hear me say that, that's what I'm
7 referring to; is that fair?
8      A.   Understood.
9      Q.   Have you heard the term "commodity eggs"?
10      A.   Sure. Yes.
11      Q.   What does that mean to you today?
12      A.   Likely, in a private label environment,
13 lower cost from a consumer's perspective. Not
14 organic, not any kind of cage free, not value added.
15 It just means, you know, a standard spec where likely
16 cost and quality have a very specific place to
17 intersect and -- with somebody's strategy,
18 retailerwise.
19      Q.   Have you heard of specialty eggs?
20      A.   I've heard of eggs referred to as
21 specialty, sure.
22      Q.   What would -- what would a specialty egg
23 be?
24      A.   My interpretation of what a specialty egg
25 would be would be something where it's omega 3, it's

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

5 (Pages 14 to 17)

---

**14**

1  organic, maybe a sizing dynamic to it, things like
2  that.
3      Q.  So, basically, specialty eggs are
4  noncommodity eggs?
5      A.  I guess in my mind.  But I truly have
6  never thought about that level of differentiation,
7  so ...
8      Q.  When you were helping to do category
9  review, were you dealing with both commodity and
10  specialty eggs?
11      A.  I don't have a specific recollection.
12      Q.  What about egg products?  What egg
13  products did you deal with?
14      A.  I'll have to ask you to be more specific
15  because eggs are in probably 1,000 items in a grocery
16  store, so ...
17      Q.  I want to say as part of a category
18  review, did you ever look at the egg products that
19  Albertsons, SuperValu was selling and help with the
20  procurement of those?
21      A.  I really don't know what you mean by egg
22  product.  Do you just mean different types of eggs?
23      Q.  Like an Egg Beaters or liquid egg.
24      A.  I don't specifically recall.
25      Q.  Okay.  How often would you do -- Were

---

**15**

1  eggs part of the dairy category?
2      A.  Yes.
3      Q.  How often would you do a category review
4  for dairy?
5      A.  I don't specifically recall a time frame.
6      Q.  Would it be every year?
7      A.  The only thing that comes to mind is that
8  these were agreement-based relationships and that the
9  expiration of an agreement would likely define when
10  we would review the category.
11      Q.  So when you say agreement relationships,
12  do you mean you had set periods set forth in
13  contracts?
14      A.  That's my recollection.
15      Q.  And what would you do during the category
16  review?
17      A.  So that I understand your question, what
18  would I do?
19      Q.  You personally.  And, understand,
20  anything today I'm asking for your personal
21  recollection.  You're not speaking on behalf of any
22  other entity.  So if you ever need clarification, I'm
23  happy to give it.
24      A.  Sure.
25          So what I would do, no different than any

---

**16**

1  other category review, was to make sure that the
2  sourcing manager or category manager who was actually
3  directly interacting with the vendors was following
4  our set procedures, appropriate templates, conducting
5  the process consistent with what our expectations
6  were as a company, and providing assistance along the
7  way.  Sometimes participating in meetings; many times
8  not.
9          Playing more of a manager over the
10  process and the people more so than being a direct
11  participant in the sourcing process itself.
12      Q.  Was the goal of a category review to
13  reduce Albertsons' or SuperValu's costs?
14      A.  My recollection was our goal had
15  multifronts to it and that would have been one of the
16  hopeful things we would have accomplished through
17  sourcing a category out.
18      Q.  What were the other goals?
19      A.  Making sure that the suppliers were
20  qualified for us to do business with from a food
21  handling, food safety, financial strength, service
22  provider context.  You know, making sure that they
23  could handle the geography of the company at the time
24  and volume.
25          And at the time, Albertsons was a -- as I

---

**17**

1  recall, $45 billion-a-yearish kind of volume company.
2  So there was a -- In essence, there was a myriad of
3  things that qualified a company to be able to do
4  business with us.  We wanted to make sure that we
5  were aligned with the right folks from that context,
6  as well as understand what the volume that we
7  represented meant in terms of an opportunity of
8  improving cost.
9      Q.  I'd like to talk specifically about a
10  2003 egg bidding process.  Do you remember --
11          Well, first, would -- in 2003, would you
12  be with Albertsons, Inc.?
13      A.  Correct.
14      Q.  Do you remember the 2003 egg bidding
15  process?
16      A.  Not with any specificity, but, yes.  I
17  mean ...
18      Q.  Do you remember there being anything
19  unusual about it?
20      A.  I don't know what you mean by "unusual."
21      Q.  Anything stick out in your mind about it
22  that would be -- that you specifically remember?
23      A.  The only thing that comes to mind is that
24  it was an important large category for the company,
25  geographically complex.  I mean, that's about all

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

6 (Pages 18 to 21)

---

18

that comes to mind.
Q.   At that time, what was the geographic
scope of Albertsons, Inc.?
A.   Specifically, I don't recall.  I mean,
coast to coast 2,500 stores.  I don't remember
specific states, or -- I could probably recall all
the different banners, but I don't really remember
specifically much more than that at that stage of the
game.
Q.   What banners was Albertsons operating
under to the best of your recollection at that time?
A.   Shaw's, ACME, Jewel, Albertsons, and
likely Savon and Osco from a drugstore perspective,
although things changed through acquisition and
divestiture through that time frame, and I don't know
if 2003 if what I just said is accurate or not.
Q.   Fair enough.
Typically, over what period of time would
a category review last?
A.   Three months.
Q.   And how did you initiate a category
review?
A.   An RFI, or request for information, would
be sent to a group of incumbent and potential
suppliers.

---

19

Q.   How did you identify potential suppliers?
A.   I didn't.
Q.   Was that the responsibility of someone
else on that team?
A.   Correct.
Q.   Who would be in charge of identifying the
potential suppliers?
A.   The title, as I recall, was sourcing
manager.  It may have been buyer or category manager,
but sourcing manager is what comes to mind.
Q.   And in 2003, do you know who the sourcing
manager for eggs was?
A.   I don't recall specifically, no.
Q.   I think I'm going to remind you.
A.   Okay.
MS. CRABTREE:  Let's go ahead and mark --
let's start with 1.  We'll mark Horner 1.
(Exhibit 1 was marked for identification.)
Q.   BY MS. CRABTREE:  And if you could take a
moment -- if you could take a moment to review that
and let me know when you've had a chance to review.
And for the record, this is SVL_EGGS_101036.
A.   Okay.
Q.   I actually gave you the wrong document,
so I'm going to switch tracks for just a minute.

---

20

A.   Okay.  No problem.
Q.   I'll catch up.  I have my documents out
of order.
Do you recognize this document?
A.   I do not.
Q.   You'll see that this is a series of
e-mails originating with someone named Gene Gregory
at unitedegg.com, and that e-mail gets forwarded to
your -- to Mr. Tom McIntyre.
A.   Uh-huh.
Q.   Who is Tom McIntyre?
A.   At that time, he was a member of our
sourcing team and I believe reported to me in 2003.
I mean -- but I don't -- I don't specifically
remember that.  I assume he did.
Q.   And were you at a director level in 2003?
A.   I don't know.
Q.   Okay.
A.   I don't know.
Q.   And Mr. McIntyre sends this to you and
cc's Mr. Gary Angell.  Do you remember who Gary
Angell was or is, I suppose?
A.   Yes.  Not by title, but he was our -- he
was Albertsons, Inc.'s, corporate dairy merchant,
I'll say.  I don't know titlewise.  I don't recall

---

21

specific title, but ...
Q.   Have you ever heard of United Egg
Producers?
A.   Uh-huh.
MR. MURRAY:  You have to say yes or no.
THE WITNESS:  Yes.  I'm sorry.
Q.   BY MS. CRABTREE:  And who -- who is --
What is your understanding of what United Egg
Producers is?
A.   Just an association of a voluntarily, you
know, participant association for companies that
produce eggs.
Q.   Have you heard them referred to as UEP?
A.   I have.
Q.   Have you ever heard the term "UEP
certified"?
A.   I don't specifically recall hearing that.
Q.   What about animal care certified?
A.   No.
Q.   Do you remember there being any animal
welfare issues surrounding the 2003 egg bid?
A.   What do you mean by "issues"?
Q.   Was animal welfare a consideration during
this egg bid?
A.   Yes.

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

---

**22**

Q. In what way?

A. My recollection is that Albertsons as a company had decided that we wanted to do business with egg producers that met animal welfare guidelines, and that was a -- that was communicated as an expectation to be considered for gaining business with the company.

Q. And do you remember any of the companies who bid for the egg business in 2003?

A. I recall company names, but I don't specifically recall if they actually did bid for the business or not.

Q. What company names do you recall?

A. Cal-Maine, Rose Acres, Sparboe. I want to say NuCal, or something like that. Nothing else specifically comes to mind.

Q. And in Mr. Gregory's e-mail towards the bottom of page 1 and the top of page 2, he writes, "We have since heard that Albertsons may have asked for bids from suppliers for both animal care certified eggs and noncertified eggs." And it goes to the top of the next page. "We would like to know if Albertsons is still committed to only purchasing animal care certified eggs from animal care certified companies."

---

**23**

Do you see where I'm at?

A. Uh-huh. Yes.

Q. And then -- You caught yourself there.

A. I learn fast.

Q. And you'll see that on the first page, Mr. McIntyre replies, "We are committed to animal care certified eggs." And then Mr. Gregory thanks him, and Mr. McIntyre forwards that message to you with the message, "Interesting. I wonder if this is in regards to Sparboe."

Do you know what Mr. McIntyre was referring to there?

A. I do not.

Q. Okay. And then the top e-mail it looks like you drop off, so I will not ask you about that. You can set this one aside.

A. Okay.

MS. CRABTREE: Now we'll get to the one I meant. We'll mark Horner Exhibit 2.

MR. MURRAY: Thank you, Molly.

(Exhibit 2 was marked for identification.)

Q. BY MS. CRABTREE: If you could take a moment to review and let me know when you've had a chance. And for the record, this is SVL_EGGS_101051.

A. Okay.

---

**24**

Q. Okay. Can you identify Exhibit 2 for me?

A. I'm sorry?

Q. Can you tell me what the document is?

A. It looks like an update that I'm giving to a group of people about an entire category review and then making a brief comment about a different category, butter, that's either getting ready to be reviewed or is under review as well.

Q. So did you prepare Exhibit 2?

A. I don't recall. I mean, I see my name, so ... But I don't recall -- I don't recall writing this.

Q. It is an e-mail from you to a group of people, correct?

A. Yes.

Q. Do you have any reason to doubt that you prepared this e-mail?

A. I don't.

Q. Would you ever have someone prepare something like this on your behalf?

A. In 2003, no.

Q. Okay. So you are sending an e-mail to a group of people. Who is Tom Lofland?

A. My recollection is that Tom was one step senior to Gary Angell, and so I was providing an

---

**25**

update to a group, but primarily, the corporate merchandising staff regarding what was going on in a couple of reviews.

Q. At this point, who were you reporting to?

A. I don't specifically recall.

Q. And we talked about Mr. Angell, Mr. McIntyre. Who is Patricia Albrecht?

A. My recollection is she was an analyst supporting category review processes.

Q. And you cc a couple of people. Who is Dwight Stanley?

A. Dwight was the director of procurement for Albertsons. To the best of my recollection, that was his title. I did report to him for a time frame. I have no idea if I did here or not.

Q. So he was the director of all procurement?

A. Uh-huh.

Q. Okay. And how about Butch Amyx?

A. Amyx, yeah. He was a sourcing manager. He was part of the procurement team, category review team.

Q. But he wasn't specific to a particular category?

A. I mean, the answer to your question is,

---

HIGHLY CONFIDENTIAL

Horner, Sage                                    April 29, 2014

8 (Pages 26 to 29)

---

26

yes, he was, but I have no idea what categories.
Q.   Okay.  Fair.
And John Sugihara?
A.   Exactly the same.  Sourcing manager.
Certainly had categories he owned, but I have no
recollection of which ones he did or didn't.
Q.   And it looks like this document is an
assessment of bids that you have received from egg
producers; is that fair?
A.   I would agree.
Q.   Let's start with No. 1.  You have the
eastern division DC.  Do you know what geographic
area this covers, other than the obvious East?
A.   The distribution center is in
Pennsylvania, but, no, I don't know from a retail
store perspective what specific geography did it
service.
Q.   But this would be a procurement for that
Pennsylvania distribution center?
A.   Correct.
Q.   Okay.  And after that, it says, ISE Mark
Lewis.  What does ISE mean?
A.   I have no idea.
Q.   And then it reads, "Has agreed to hold
his current underage, 155 back the northeast index."

---

27

Is that northeast index the Urner Barry index?
A.   That's my recollection.
Q.   Okay.  Were all of your commodity egg
purchases based off of the Urner Barry index?
A.   I don't know if all were, but it's my
recollection that that was the standard that we, in
essence, tried to negotiate from.
Q.   Okay.  And it then says, "And charge no
animal welfare logo expense to ABS."  Is ABS
Albertsons?
A.   Yes.
Q.   Okay.  Was it your understanding that
when Albertsons decided to purchase animal welfare --
Let me back up.
Was it your understanding that when
Albertsons decided to purchase animal welfare
certified eggs, that it understood that there would
be a cost involved in doing so?
A.   No, that's not my -- my recollection.
Q.   Could it be the case and you're not
remembering that, or it's your recollection that they
did not believe there would be a cost associated?
A.   It's -- I don't have any specific
recollection as to whether it did or didn't or I had
anybody say it did or didn't.  I don't -- I don't

---

28

recall that.
Q.   At this point in 2003, where were you
physically working for Albertsons?
A.   In Boise, Idaho.
Q.   Okay.  So you were working from the main
corporate offices?
A.   Correct.  Uh-huh.
Q.   Okay.  And you see it goes through other
pricing issues, and then I'm looking down under the
underlined part of No. 1.  And it says, "Either" --
the second sentence of that, "Either way, the
combined COG reduction."  Do you know what COG means?
A.   Cost of goods.
Q.   Okay.  "And cost avoidance benefit comes
to $400,000, approximately."  Do you know what the
cost avoidance benefit is that's referred to here?
A.   Not specifically here.
Q.   Okay.  What about generally, what would a
cost avoidance benefit be?
A.   Generally speaking, if an incumbent
supplier had positioned a cost increase to us, and we
had the opportunity to either renegotiate with them
to get a lower cost or to switch the business to
somebody else who was qualified, and we avoided that
price increase, we would reference it as a -- a

---

29

benefit of the exercise.  No financial benefit for
the company.  We just avoided a cost increase
situation.
Q.   Okay.  Let's look at No. 2, which says
"Florida DC."  Is "DC" distribution center?
A.   Yes.
Q.   Do you know where the Florida
distribution center was?
A.   Plant City, Florida.
Q.   And after that, it references Zephyr
Danny Linville.  Do you recall this being one of your
egg bidders?
A.   Seeing the name, it rings a bell.  I
don't remember the person's name.
Q.   Okay.  And after that, it reads, "Has
agreed to maintain bid cost, reduction of" -- and
that's cost of goods?
A.   Sold.
Q.   "Cost of goods sold of $250,000."  What's
the difference between cost of goods --
A.   Nothing.
Q.   Okay.
A.   Nothing.  Me being inconsistent in an
e-mail.  That's all.
Q.   It's e-mail.  We're all inconsistent.

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

9 (Pages 30 to 33)

---

30

1  "Agreed to reduce animal welfare
2  compliance costs to one penny per dozen versus two
3  penny per dozen."
4         Would that be an example of a cost
5  avoidance benefit?
6      A.  I don't know because I don't specifically
7  recall if we were -- if Zephyr was an incumbent.  So
8  if they were a new party wanting to be considered for
9  business, the fact that this represents a potential
10 improvement in a bid doesn't necessarily have any
11 implications on our spend or what we were spending,
12 would have spent, anything.
13     Q.  The difference being if an incumbent is
14 willing to reduce a proposed price increase, that
15 would be cost avoidance to get out of that, but just
16 negotiating a bid would not necessarily fall into
17 that category?
18     A.  Correct.
19     Q.  Okay.  Does this refresh your
20 recollection of whether Albertsons was expecting
21 there to be a compliance cost associated with the
22 animal welfare program?
23     A.  It does not.
24     Q.  And you see at the bottom, it says,
25 "Combined COG reduction and avoidance equals 318,700,

---

31

1  approximately."
2         Did I read that correctly?
3      A.  At the bottom of No. 2?
4      Q.  Yes.  The underlined part.
5      A.  I do see it.
6      Q.  Okay.  Let's go to No. 3, the Dallas,
7  Fort Worth distribution center.  Where was that
8  distribution center?
9      A.  In Fort Worth.
10     Q.  And there it says Cal-Maine.  This --
11 this is one of the companies that you recall being a
12 bidder, correct?
13     A.  Yes.
14     Q.  Do you remember if they were an incumbent
15 at this time?
16     A.  Not specifically.
17     Q.  Okay.  "Has agreed to rebid at current
18 cents off.  Eliminates a $400,000 increase."
19        Does that refresh your recollection of
20 whether they would be an incumbent?
21     A.  It doesn't.
22     Q.  Okay.  Then it reads, "And has agreed to
23 reduce his animal welfare logo charge to one cent per
24 dozen versus two cents per dozen."
25        Do you know if there was a difference

---

32

1  between an animal welfare compliance cost, that was
2  referred to in No. 2, and an animal welfare logo
3  charge referred to in No. 3?
4      A.  I don't.
5      Q.  And then under the to do in this one, the
6  first sentence says, "Confirm that we have no
7  credible threat for Dallas (contact Sparboe)."
8         Do you have an understanding of what you
9  meant by that?
10     A.  I would deduct that that means Cal-Maine
11 is the incumbent, but I don't specifically recall
12 that.
13     Q.  When you were going through a category
14 review, would you make an effort to make sure there
15 was more than one bidder per geographic region?
16     A.  Well, if there isn't more than one,
17 there's not much to review, so I guess yes would be
18 the answer.
19     Q.  Okay.  Let's look at No. 4.  Phoenix
20 distribution center I'm going to assume is in
21 Phoenix; is that correct?
22     A.  It's actually in Tolleson, Arizona.
23     Q.  There you go.
24        And after this one, it says, "Hickman's
25 (Clint Hickman.)"  Do you recall Hickman's being an

---

33

1  egg bidder in this time period?
2      A.  I don't specifically.
3      Q.  And this reads, "Was unable to reach
4  Clint on Friday.  Tried repeatedly.  He did respond
5  Friday evening and left a message."
6         Would you be having direct contact with
7  the bidders during a category review like this?
8      A.  I truly don't recall that.
9      Q.  Would it be unusual for you to have that
10 kind of contact?
11     A.  I don't recall.  I don't remember.  I
12 don't recall.
13     Q.  The next sentence says, "We need to push
14 him down on his animal welfare cost.  Hickman's is
15 the only supplier of 38 in this process to call out
16 the animal welfare logo at 3 cents per dozen."
17        Did I read that correctly?
18     A.  Yes.
19     Q.  Do you recall that Hickman's had a much
20 higher animal welfare compliance cost?
21     A.  I have no -- no recollection at all.
22     Q.  Okay.  And you'll see the last sentence
23 of the to do underlined portion.  "If we can get them
24 to maintain lower bid and reduce FMI compliance to
25 one cent per dozen, they would be $150,000 good guy,

---

HIGHLY CONFIDENTIAL

Horner, Sage                                             April 29, 2014

10 (Pages 34 to 37)

### 34

approximately."

What did you mean by "$150,000 good guy"?

A. A financial benefit to the company. But I don't -- I don't really know what that means.

Q. And it references "only supplier of 38 in this process." Do you recall there being 38 bidders during this bid?

A. I do not.

Q. Would that surprise you if there were?

A. Nationally, no.

Q. And when egg producers would respond to the RFI that Albertsons put out, would they submit a paper bid or was there an electronic system that they would submit a bid on?

A. As I recall, it was an e-mail process filling out forms and sending them back.

Q. Do you know where the bids -- who the bids were submitted to?

A. The individual sourcing managers that were responsible for the categories.

Q. And that would be corporate sourcing managers, not in each division, correct?

A. That's my recollection.

Q. Do you know if they maintained those bids in one centralized place?

### 35

A. I recall that that was the -- that was the process.

Q. So for you to be writing a summary e-mail like this, would the sourcing managers be giving you this information?

A. Logically, but I don't recall specifically that that's what happened here.

Q. And this would -- this type of summary would be prepared after everyone had bid and those bids had been evaluated?

A. I can only deduce by reading this that we were in the middle of that process and this was an update. It wasn't saying we're done. It's a strategy conversation to me where it's saying to do, to do, to do, to do. So it's more giving direction and making sure it's aligned with the folks on the e-mail that everyone agrees this is what we need to do.

Q. Okay. And let's look at No. 5. SLC DC and North Nevada DSD. What's the SLC DC?

A. Salt Lake City.

Q. And where is that distribution center?

A. In North Salt Lake.

Q. And the northern Nevada DSD?

A. I believe that's referring to a dynamic

### 36

where these stores were serviced by a direct store delivery program versus getting their eggs from a company-owned distribution center.

Q. And why would Albertsons be using a direct store delivery system as opposed to a distribution center in a particular area?

A. All I can speculate is that the cost was lower to have them delivered directly to the store by a local provider. Theoretically, that's the only reason we would do that.

Q. And after that, it says, "Rocky Mountain Shirley Jorgensen." Do you remember Rocky Mountain being an egg supplier to Albertsons, Inc.?

A. I remember the name, but I don't recall if they were an actual supplier or just a participant. I don't know in the process.

Q. And it refers to "Tom M. and I had a firm conversation with them and told them to go back to drawing board or they risk losing the DC business in Salt Lake."

Is the Tom M. referred to there Tom McIntyre?

A. I have to assume.

Q. There's no other Tom M. that was involved in this process that you recall?

### 37

A. I don't specifically remember, but ...

Q. Okay. They should respond to the following direction I gave them. "One, eliminate the cost increase for Reno DSD." That would be the direct store delivery again; is that correct?

A. My assumption, yes.

Q. "2, sharpen the pencil on the cents off bid for the SLC DC, and, 3, slit the FMI compliance charge of one and a half cents to three quarters of a cent per dozen."

Did I read that correctly?

A. Yeah. Obviously, I left a "p" out of a word in slit, because I think it means to say "split." But yes.

Q. You get to the same place.

Is it your understanding that the FMI compliance charge is the same thing as the animal welfare compliance?

A. I don't specifically recall. I mean, based on this document, deduct -- I could deduce that that's what it means, but I don't remember.

Q. Okay. Was Albertsons a member of FMI at this time?

A. I don't specifically remember.

Q. Did you ever have any involvement with

HIGHLY CONFIDENTIAL

Horner, Sage                                                    April 29, 2014

11 (Pages 38 to 41)

38

1  FMI on behalf of Albertsons, Inc.?
2      **A.  Not to my recollection, no.**
3      Q.  What about on behalf of SuperValu?
4      **A.  Not to my recollection, no.**
5      Q.  Okay.  And then under to do on this one,
6  it says, "If they agree and change all of the above,
7  it would represent 125,000 in COG
8  reduction/avoidance."
9          Then the next sentence says, "I made them
10 very aware that we had a credible threat for the DC
11 business and they clearly did not want to" -- I think
12 it should be "lose it."
13         Do you know who the credible threat for
14 this particular DC was?
15     **A.  No recollection at all.**
16     Q.  Okay.  And we've seen from several
17 different ones of these that -- that there appear to
18 be different animal welfare compliance costs in
19 different regions.  Do you know why that is?
20     **A.  I have no idea.**
21     Q.  Okay.  Let's look at No. 6.  And this
22 refers to eastern Idaho DSD, eastern Washington DSD
23 and Portland DC.  I assume the eastern Washington is
24 the state, correct?
25     **A.  Correct.**

39

1      Q.  And where is the Portland DC?
2      **A.  It is in Portland.**
3      Q.  And after that, it refers to Oakdale
4  Farms.  Do you remember Oakdale Farms being a
5  supplier to Albertsons, Inc.?
6      **A.  I remember the name, seeing it, but I**
7  **don't specifically remember them being a supplier.**
8      Q.  And it refers to "Great situation.  They
9  want all of our business out of the Portland DC, and
10 retain their DSD business with" -- again, that's
11 Albertsons?
12     **A.  Yes.**
13     Q.  And then they refer to -- the last
14 sentence before the to do.  "Also, John has agreed to
15 one cent per dozen for animal welfare."
16         Did I read that correctly?
17     **A.  Yes.**
18     Q.  And then under to do, you refer to, "The
19 combined COG savings and one cent per dozen cost
20 avoidance equals $325,000 in benefits annually,
21 approximately.  This one is a winner because we
22 consolidate the supplier base (national gets fired)
23 and we get benefits."
24         Do you know who national is who is
25 referred to here?

40

1      **A.  No idea.**
2      Q.  And the fact that it refers to "national
3  gets fired," does that indicate to you that you were
4  eliminating an egg supplier as part of this process?
5      **A.  I have no recollection.  I don't know.**
6  **For all I know, that's the name of the company.**
7      Q.  Okay.
8      **A.  I don't even know who that is.**
9      Q.  And then underneath that, the second
10 sentence of your last paragraph before butter -- or
11 no, excuse me.
12         Third sentence of that paragraph.  "Block
13 out as many of the other issues going on as you can
14 and focus on eggs."  Do you know what "other issues"
15 you're referring to there?
16     **A.  Let me read the paragraph.**
17     Q.  Sure.  Sure.
18     **A.  I don't have any idea what the other**
19 **issues would have been.**
20     Q.  And the next sentence is, "This category
21 is still trending to be about a $1.75 million win.
22 Short of target but still a great accomplishment."
23         What was the target?
24     **A.  No recollection.**
25     Q.  Do you have a standard target when you go

41

1  through the category review that you recall?
2      **A.  I don't recall having a standard target,**
3  **no.**
4      Q.  So Albertsons during the course of this
5  category review was expecting to benefit by
6  approximately $1.7 million?
7          MR. MURRAY:  Objection.  Mischaracterizes
8  his testimony.
9          You can answer, if you know.
10         THE WITNESS:  Say that one more time,
11 please.
12     Q.  BY MS. CRABTREE:  I'll say it a different
13 way.
14         What did you mean by "This category is
15 still trending to be about a $1.75 million win"?
16     **A.  I can only deduce that if we added up**
17 **each of the estimates or approximate numbers that I**
18 **referenced in all of the six things prior, that they**
19 **roll up to something around 1.75 million.**
20     Q.  And that's a benefit to Albertsons?
21     **A.  Yes.**
22     Q.  Okay.  You can set this one aside.
23         Did Albertsons actually pay the animal
24 welfare compliance costs?
25     **A.  I have no -- I have no specific**

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

12 (Pages 42 to 45)

---

**42**

1 recollection.
2     MS. CRABTREE: Okay. Let's mark Horner
3 3.
4     (Exhibit 3 was marked for identification.)
5     MR. MURRAY: Thank you.
6     Q. BY MS. CRABTREE: If you could take a
7 moment to review.
8     A. Sure.
9     Q. And for the record, this is
10 SVL_EGGS_100550.
11     A. Okay.
12     Q. And Exhibit 3 appears to be a fax from
13 ISE America sent to Ms. Albrecht and that she
14 forwards to you that you forward to Mr. Angell and
15 Mr. McIntyre; is that correct?
16     A. It appears to be that, yep.
17     Q. Let's first look at the second page,
18 which is the fax. And it references, "ISE America is
19 willing to continue on a current pricing formula that
20 is now in effect with ACME/Albertsons without adding
21 an additional cost for the use of the AHC logo that
22 is now on the carton."
23     Did I read that correctly?
24     A. Yes.
25     Q. Does the ACME/Albertsons indicate to you

---

**43**

1 what area geographically ISE America was supplying
2 Albertsons?
3     A. It does.
4     Q. And what area would that be?
5     A. Well, it would be in the Northeast.
6 Specific to the ACME-bannered stores.
7     Q. And do you recall ISE America being an
8 egg supplier for Albertsons?
9     A. Only from seeing this document, but no
10 recollection otherwise.
11     Q. Do you know the -- what the AHC logo
12 refers to?
13     A. Had we not been talking about the animal
14 welfare, it wouldn't even have rung a bell at all.
15     Q. Okay. But is it your assumption that
16 that means the animal welfare logo?
17     MR. MURRAY: Objection. Calls for
18 speculation.
19     You can answer, if you know.
20     THE WITNESS: Based on this discussion, I
21 would deduce that, but I don't know it for sure.
22     Q. BY MS. CRABTREE: The next sentence says,
23 "As we both know, the costs throughout our industry
24 for this AHC program at the present requirements of
25 59 square inches is approximately two cents per

---

**44**

1 dozen."
2     Do you have any reason to doubt the
3 veracity of that statement from this supplier?
4     MR. MURRAY: Objection. Lack of
5 foundation.
6     You can answer, if you know.
7     THE WITNESS: I have no recollection of
8 what I thought then, so, you know, I would have no
9 way of knowing if that's true or not. I have no
10 idea.
11     Q. BY MS. CRABTREE: Do you recall whether
12 ISE was able to retain Albertsons' business by
13 agreeing not to increase?
14     A. I have no recollection at all.
15     Q. If we look back at Exhibit 2, and note
16 that this is dated Saturday, October 18th, 5 p.m.,
17 and your Exhibit 2 e-mail is dated Saturday,
18 October 18th, at 7 p.m., which division would this
19 supplier relate to in Exhibit 2?
20     A. No. 1.
21     Q. Okay. And there it says ISE?
22     A. Uh-huh.
23     Q. And, again, it looks like from the last
24 sentence of your to do on that, it says, "Get a
25 letter of agreement and execute cost change and get

---

**45**

1 contract process started."
2     Does that indicate to you that ISE, in
3 fact, was able to retain Albertsons' business with
4 this bid?
5     A. It does not.
6     Q. Okay. Do you have any reason to doubt
7 that ISE retained the business in 2003 in this area?
8     MR. MURRAY: Objection. Lack of
9 foundation.
10     You can answer, if you know.
11     THE WITNESS: I have no idea. It's just
12 saying that the to do is to get that process started.
13 I have no idea if we had signed an agreement or if
14 they got through that process and everybody agreed.
15 I have no idea.
16     Q. BY MS. CRABTREE: Okay.
17     A. No idea.
18     MS. CRABTREE: You can set this one
19 aside.
20     Next will be Horner 4.
21     (Exhibit 4 was marked for identification.)
22     MR. MURRAY: Thank you.
23     THE WITNESS: I want to know why I was
24 working at 7:20 on a Saturday night.
25     MS. CRABTREE: Hey. I'm not judging.

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

13 (Pages 46 to 49)

---

**46**

1  THE WITNESS: Get a life. All right.
2  Q. BY MS. CRABTREE: SVL_EGGS_100117.
3  A. Okay.
4  Q. Okay. And Exhibit 4 appears to be an
5  e-mail from Jeff Hardin at CMfoods.com to yourself
6  and Ms. Albrecht, Dolph Baker, and Tim Thompson that
7  Ms. Albrecht forwards on to McIntyre.
8  Do you remember who Jeff Hardin was?
9  A. I do not.
10 Q. Does the CM Foods indicate to you that
11 he's with Cal-Maine?
12 A. I don't know.
13 Q. And who was Dolph Baker?
14 A. No idea.
15 Q. And Tim Thompson?
16 A. No idea.
17 Q. And Jeff writes, "Sage, Enjoyed our visit
18 and I am hopeful that we have our ongoing
19 relationship firmly solidified."
20 Did Cal-Maine Foods visit Albertsons'
21 headquarters during this bidding process?
22 A. I don't recall.
23 Q. Do you recall any egg producer visiting
24 Albertsons' offices during this process?
25 A. I recall that, but I have no idea who or

---

**47**

1  when or anything.
2  Q. Do you know if it was more than one?
3  A. I don't specifically remember, no.
4  Q. As part of the category review, did you
5  ask all of your bidders to come to make a pitch?
6  A. Nope.
7  Q. The next sentence reads, "As we
8  discussed, Cal-Maine appreciates Albertsons' position
9  on the animal welfare program and we agree that
10 Cal-Maine should participate with Albertsons in
11 sharing these costs."
12 MR. MURRAY: Those costs.
13 MS. CRABTREE: Those costs. Thank you.
14 Q. BY MS. CRABTREE: "Consequently,
15 Cal-Maine will share one cost per dozen of the cost
16 in the bid related to animal welfare."
17 Do you recall this negotiation?
18 A. Huh-uh. No, I do not.
19 Q. Do you have any reason to believe that
20 this is an inaccurate portrayal of the negotiation?
21 MR. MURRAY: Objection. Lack of
22 foundation.
23 You can answer, if you know.
24 THE WITNESS: I don't have any reason to
25 think this is inaccurate.

---

**48**

1  Q. BY MS. CRABTREE: And the last paragraph
2  of this e-mail references, "I look forward to working
3  through the vendor-managed system with the objective
4  of reducing your inventories and eliminating store
5  phone orders."
6  What was the vendor-managed system?
7  A. I don't specifically recall.
8  Q. Was that something you had involvement
9  with at this point with Albertsons?
10 A. I can only speculate it's about
11 vendor-managed inventory versus system. And there
12 were initiatives in place where vendors were able to
13 basically facilitate the ordering of their products
14 through our systems. But I have no idea if that was
15 in eggs, if that was what this meant, I don't know.
16 Q. And this document is dated several days
17 after the review that you sent out on Saturday. So
18 does this indicate to you that negotiations were
19 still going on during this time?
20 A. Yeah. Consistent with what you just
21 referred to on Saturday, that was an update document,
22 and I think this confirms that the process just
23 continued on.
24 MS. CRABTREE: Okay. You can set that
25 one aside. Let's mark Horner 5.

---

**49**

1  (Exhibit 5 was marked for identification.)
2  Q. BY MS. CRABTREE: Go ahead and take a
3  look and let me know when you're ready.
4  A. Sure.
5  Q. This is SVL_EGGS_10056.
6  A. Okay.
7  Q. All right. And this -- I lost the
8  number. Is it 5?
9  A. Yeah. It is?
10 Q. 5 is a series of e-mails culminating in
11 an e-mail that you are cc'd on from Tom McIntyre.
12 Let's go back to the beginning of the chain where a
13 Sean McKinless refers -- sends an e-mail to Dwight
14 Stanley. Who is Sean McKinless?
15 A. Sean was group vice president of
16 procurement for the company, for Albertsons.
17 Q. So he would have been reporting to Dwight
18 Stanley who was the director of procurement?
19 A. Other way around.
20 Q. Oh, so Dwight Stanley would be reporting
21 to Mr. McKinless?
22 A. To Sean.
23 Q. Okay.
24 And the subject is "Eggs. How we doing?"
25 And in Mr. McKinless's e-mail, he refers to the

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

14 (Pages 50 to 53)

---

**50**

"baseline for logo cost avoidance should be 3 cents."
Do you know what he's referring to there?

A. I do not.

Q. And then Mr. Stanley forwards this to
Mr. Angell and Mr. McIntyre, which prompts McIntyre's
e-mail. And the other questions I have are for this
last e-mail that you were actually cc'd on.

A. Okay.

Q. And this is McIntyre to Mr. Stanley, cc'd
to you and Mr. Angell. It says, "Dwight, The average
for the vendors Albertsons has historically used was
2 cents. But I would agree that across the industry,
it could be as high as five cents, so three cents
would be a fair assumption."

Do you know what he's referring to here?

A. I don't specifically. I mean, I could
deduce from the comment here, but I don't
specifically know.

Q. Would the baseline be you go through a
category review, you -- I assume that you would need
to account for where you're getting savings and cost
avoidance; is that fair?

A. Yes.

Q. And in order to calculate cost avoidance,
would you have to set a baseline of, hey, if we

---

**51**

hadn't negotiated, it would be X?

MR. MURRAY: Object to the form of the
question. It's vague.

And you can answer, if you know.

THE WITNESS: Well, I mean, I don't know
how to answer your question because if I heard you
correctly, you're assuming there would be a cost
avoidance dynamic in each category review, and that's
not necessarily the case.

Q. BY MS. CRABTREE: Okay. If there was a
cost avoidance dynamic, would you have to set a
baseline from which you were negotiating from for
that avoidance?

MR. MURRAY: Objection. Calls for
speculation.

You can answer, if you know.

THE WITNESS: The only response that
comes to mind is, we either have a formal price
increase with a specific amount, so therefore it's
just a pure number. You're not establishing a range.
It just becomes, here's the specific scenario. I'm
not familiar with this dynamic, I guess, that's
being, you know, spoken to in this e-mail string.

Q. BY MS. CRABTREE: Okay. And it appears
that he set forth a chart and across the top in the

---

**52**

columns, are these the different divisions that
Albertsons had at this time, to the best of your
recollection?

A. To the best of my recollection, these are
divisions of the former Albertsons, but I don't know
that that's all divisions --

Q. Okay.

A. -- i.e., drugstore world. I don't see
anything that necessarily represents that 800 stores
worth of what the company was then.

Q. And what banner were the drug stores
being operated under?

A. Savon and Osco is my recollection.

Q. How do you spell Osco?

A. O-s-c-o.

Q. And look several paragraphs down where it
says, "These divisions/areas continue to be a
challenge."

Do you see where I'm at?

A. I do.

Q. It then says, "A bit of positive came on
Friday when Sparboe agreed they could provide the
animal welfare logo that we required."

Do you remember there being a problem
with Sparboe providing the logo required?

---

**53**

A. I do not.

Q. And then it says, "Apparently, there are
two different logos. Sparboe explained that one is
from FMI and one is from UEP. Sparboe can do the FMI
but not the UEP. I'm currently investigating exactly
what Ertharin announced that we would supply with."

Who is Ertharin?

A. Ertharin Cousins, I believe was her last
name, was an executive with Albertsons, I assume, at
that time, based on this e-mail.

Q. And do you remember her making some
statement about Albertsons' commitment to animal
welfare?

A. I have a very vague recollection of her,
the topic, and being in meetings about it. But I
don't specifically recall anything.

Q. Was it important to make sure that your
egg suppliers were complying with the standards that
Albertsons announced that it supported?

MR. MURRAY: Object to the form of the
question. It's vague.

THE WITNESS: I can only deduce from
reading these, but honestly I don't recall that. I
don't recall it outside of this dialogue.

Q. BY MS. CRABTREE: I wasn't talking

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

15 (Pages 54 to 57)

---

**54**

specifically about this. In a more general sense, was it important that Albertsons' suppliers were complying with the statements that Albertsons was making to the public?

A. I just don't know what important means. I don't know what your question is asking.

Q. Would it be problematic in your opinion if Albertsons said it was complying with animal welfare standards and its suppliers did not?

MR. MURRAY: Objection. Speculative.

THE WITNESS: Yes.

MR. MURRAY: Did you get my objection in? Okay.

Q. BY MS. CRABTREE: The next paragraph says, "Sparboe gives us a bit of leverage with incumbents that are claiming to be at the bottom and justify their cost increases with Albertsons' decrease in sales volume."

What do you remember about a decrease in sales volume of eggs around this time?

A. No recollection.

Q. Higher cost of business, what's your recollection of that?

A. None.

Q. And new animal welfare specifications. I

---

**55**

think we've covered that thoroughly.

A. Sure.

Q. I think that's all I have on that one.

A. Okay.

Q. We've been going for about an hour. Do you want to take a quick break?

A. I'm fine.

Q. Okay.

MR. MURRAY: He's actually got a board meeting to get to, so -- with his new company.

MS. CRABTREE: Well, then we will keep going.

What time is your board meeting?

THE WITNESS: It's middle of the afternoon, but I've got a bunch of prep work to do with other folks, so anything we can do to expedite is appreciated.

MS. CRABTREE: Okay.

Let's mark Exhibit 6.

(Exhibit 6 was marked for identification.)

Q. BY MS. CRABTREE: I'm about halfway through my documents if that gives you a sense.

A. Okay. Okay. Okay.

Q. Exhibit 6 is SVL_EGGS_100530. And the first e-mail, this is October -- late October, early

---

**56**

November e-mail string from Tom McIntyre to yourself, Mr. Angell, Mr. Stanley, and a cc to Ms. Albrecht.

And it reads, "If we changed new vendors in Rocky, Southern California and Southwest, the total savings would be," and then it lists, animal welfare at three cents saving -- animal welfare at three cents, then it looks like a little arrow, $4.4 million. Animal welfare at two cents, $3.2 million.

Would these be cost avoidance numbers calculated as part of this process?

A. I have no idea.

Q. And then, Mr. Stanley, do you have any idea what these numbers refer to?

A. Mr. Stanley? Can you repeat what you just said?

Q. Do you have any idea what these numbers refer to?

A. Only from seeing the line above it that says "total savings would be." But I have no recollection, no thought beyond that.

Q. Okay. And then you see Mr. Stanley replies, "Tom, do you have anything 'in writing' that states the egg producers (not the suppliers) will incur a 3 cent cost increase as a result of the animal welfare changes?"

---

**57**

Did I read that correctly?

A. You did.

Q. Did you ever receive anything in writing in response to Mr. Stanley's request? Did you ever see?

A. I have no recollection if I did or didn't.

Q. Okay. You can set that aside.

Why were animal welfare compliance costs separated out as a separate line item during this process in 2003?

A. I don't -- I don't recall.

Q. Was it a new cost for eggs that hadn't been there before?

A. I don't recall.

MS. CRABTREE: Let's mark No. 7.

(Exhibit 7 was marked for identification.)

THE WITNESS: Okay.

Q. BY MS. CRABTREE: And this is a chart. It appears to have been sent from McIntyre to Mr. Stanley with a cc to you. Is this chart familiar to you?

A. It's not.

Q. Do you know what this chart indicates?

A. Only by reading the subject line and

---

HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

16 (Pages 58 to 61)

---

**58**

1  viewing it.
2       Q.  And it appears --
3       In viewing it, what does this chart mean
4  to you?
5       A.  Exactly what the subject line says:
6  Animal welfare cost per dozen.
7       And then it references an initial bid, a
8  final bid, and the difference by vendor.
9       Q.  And I notice that it does not list 38
10 vendors here.  Would this be just the vendors that
11 ended up being awarded some business?
12      A.  I have no specific recollection.
13      Q.  And the difference between initial bid
14 and final bid, would that be the difference that
15 Albertsons was able to negotiate with these vendors?
16      A.  I can only deduce that that's what it is.
17 But ...
18      Q.  Okay.
19      Okay.
20      MS. CRABTREE:  Let's mark ...
21      MR. MURRAY:  8.
22      MS. CRABTREE:  Thank you.
23      (Exhibit 8 was marked for identification.)
24      MS. CRABTREE:  You would be amazed how
25 hard it is to count to 10 in this context.

---

**59**

1       MR. MURRAY:  It is.
2       MS. CRABTREE:  If I don't write the
3  number down, I never catch it.
4       Q.  BY MS. CRABTREE:  And this is
5  SVL_EGGS_099914.
6       A.  Okay.
7       Q.  Okay.  This is an e-mail from McIntyre to
8  Mr. Stanley with the cc to yourself and Mr. Angell
9  dated November 14th, 2003, at 9:56 p.m.  Boy, you
10 guys are hard workers.
11      A.  Those were some tough years, yeah.
12      Q.  And it indicates, "Dwight, The loose ends
13 with eggs have been tied up.  We have made decisions
14 for vendors."  References - "Southern California -
15 Norco (incumbent stays)."  Then it says "Rocky."
16 What area would that -- is that an area?
17      A.  I would assume Rocky Mountain, but I
18 don't know for sure.
19      Q.  "Vendor switch from FMG to Sparboe,
20 vendors notified."  Do you recall FMG being a
21 supplier?
22      A.  I do not.
23      Q.  Do you know what FMG stands for?
24      A.  I do not.
25      Q.  And then Phoenix, vendor switch from

---

**60**

1  Hickman to Dutch Farms.  Do you recall that vendor
2  switch occurring?
3       A.  I do not.
4       Q.  Does this indicate to you that the egg
5  bid wrapped up in November of 2003?
6       A.  It indicates that, yes.
7       Q.  Okay.  Had you ever used Sparboe Farms as
8  a vendor before this process?
9       A.  No recollection.
10      Q.  How about Dutch Farms?
11      A.  No recollection.
12      Q.  Do you know who -- do you know --  Was it
13 your understanding that Dutch Farms would be
14 procuring the eggs from a producer or that it was a
15 producer itself?
16      A.  I have no recollection at all.
17      MS. CRABTREE:  And then let's now look at
18 9 which is an e-mail a couple days later.
19      (Exhibit 9 was marked for identification.)
20      MR. MURRAY:  Thank you.
21      THE WITNESS:  Thanks.
22      Q.  BY MS. CRABTREE:  And this is
23 SVL_EGGS_100122.
24      A.  Okay.
25      Q.  And this is an e-mail dated November 15th

---

**61**

1  from Pat Graves at gerps.com.  Do you know who
2  gerps.com is?
3       A.  I don't.
4       Q.  And it reads -- it's an e-mail to
5  Mr. Angell.  "I would strongly look at one cent if
6  you would consider a two-year contract.  Then no
7  additional AC charges for you."
8       And then Mr. Angell forwards this to you
9  and McIntyre, "FYI, due to this change, the
10 completion of Sparboe transition."
11      Do you change your decision on Sparboe in
12 response to this bid?
13      A.  I have no idea.
14      Q.  Okay.
15      A.  No recollection.
16      MS. CRABTREE:  Let's mark 10.
17      (Exhibit 10 was marked for identification.)
18      MR. MURRAY:  Thanks.
19      Q.  BY MS. CRABTREE:  And this is
20 SVL_EGGS_101193.
21      A.  Okay.
22      Q.  Okay.  And this document appears to be a
23 -- an e-mail from Sparboe to yourself, Mr. Angell,
24 and McIntyre with some cc's.  Who is Beth Sparboe
25 Schnell?

---

HIGHLY CONFIDENTIAL

Horner, Sage                                             April 29, 2014

17 (Pages 62 to 65)

---

**62**

1    A.  I don't recall.
2    Q.  Terry Cullhane?
3    A.  Name's familiar, but don't recall.
4    Q.  Familiar in --
5    A.  I just recognize the name, but no --
6  that's it.
7    Q.  You recognize him as maybe an Albertsons
8  employee or outside?
9    A.  I don't know.
10   Q.  Wendy Hamm?
11   A.  No recollection.
12   Q.  Okay.  This is dated December 2nd, 2003,
13 and says, "Please read the documents attached," and
14 it's signed, Brian Joyer, quality assurance
15 supervisor, Sparboe Farms.
16       And then my questions are actually for
17 the attachment.  And the second paragraph of this
18 letter, says, "Because of action taken by an animal
19 activist group on July 25th, 2003, Trader Joe's made
20 the following statement, 'Trader Joe's will continue
21 to sell ACC (animal care certified) eggs.  However,
22 we have decided to remove the ACC logo from our
23 private label eggs."
24       Do you remember the animal activist group
25 action taken in July of 2003?

---

**63**

1    A.  I do not.
2    Q.  Is Trader --  At this time, was Trader
3  Joe's a competitor of Albertsons?
4    A.  Yes.
5    Q.  Would that be in all of the markets in --
6  all of the geographic areas in which Albertsons was
7  operating?
8    A.  No.
9    Q.  Okay.  And then the third paragraph,
10 middle of the page, in your press release,
11 "Albertsons applauds and supports animal welfare
12 guidelines developed by the Food Marketing Institute
13 on 5/31/2002.  The UEP program and seal is not
14 mentioned."
15       Do you recall the press release
16 referenced here?
17   A.  I do not.
18   Q.  And then the next paragraph down reads,
19 "Our recommendation would be to use the FMI program,
20 which follows your public relation efforts and
21 discontinue using UEP's animal certified seal --
22 animal care certified seal."
23       Did I read that correctly?
24   A.  I'm actually looking for where you just
25 read.  Where is it again?

---

**64**

1    Q.  I'm sorry.  The paragraph that starts "To
2  clear up any confusion."
3    A.  Okay.
4    Q.  And it's the second --
5    A.  Oh, I see.
6    Q.  Yeah.
7    A.  Okay.
8    Q.  What did you do in response to this
9  letter?
10   A.  No recollection.
11   Q.  Did Albertsons stop placing the animal
12 care certified seal on its eggs?
13   A.  I don't recall.
14   Q.  Do you --  At any point before you left
15 Albertsons, SuperValu, did the company cease to have
16 the animal care or UEP-certified logo on its eggs?
17   A.  I have no idea.
18       MS. CRABTREE:  Let's look at 11.
19   (Exhibit 11 was marked for identification.)
20       MR. MURRAY:  Thank you.
21   BY MS. CRABTREE:  This is
22 SVL_EGGS_101311.
23   A.  Okay.
24   Q.  And this Exhibit 11 appears to be a
25 series of e-mails between yourself, Mr. Angell, and

---

**65**

1  McIntyre following the e-mail we just looked at.  And
2  if you look at the bottom of page 1, Mr. Angell
3  responds to Mr. Joyer's letter and cc's you and
4  McIntyre and says, "Brian, All corporate brand egg
5  packaging currently authorized for use/sale at
6  Albertsons, Jewel, ACME and drug stores uses the UEP
7  logo.  This clearly aligns us with our traditional
8  competitors in all markets."
9        Who were your traditional competitors in
10 those markets?
11   A.  I don't specifically know what Gary meant
12 by using that word in this paragraph.
13   Q.  The next sentence, "If Sparboe Farms
14 cannot supply corporate brand shell eggs to
15 Albertsons in compliance with the use of this logo,
16 please inform us immediately."
17       Did I read that correctly?
18   A.  You did.
19   Q.  So it appears that Albertsons was not
20 going to remove the logo from its eggs, correct?
21       MR. MURRAY:  Object to the form of the
22 question.
23       THE WITNESS:  I have no idea.
24   Q.  BY MS. CRABTREE:  But is that what
25 Mr. Angel's e-mail seems to indicate?

---

HIGHLY CONFIDENTIAL

Horner, Sage                                                        April 29, 2014

18 (Pages 66 to 69)

---

66

1    MR. MURRAY: Objection. Mischaracterizes
2  the document.
3    THE WITNESS: I mean, I could only deduce
4  that from what's said here, but he's just saying
5  inform me immediately if you can't.
6    Q. BY MS. CRABTREE: Okay. And Mr. Joyer
7  replies to all and cc's some of the people from the
8  previous e-mail and indicates that Sparboe Farms is
9  able to accommodate your requirement for animal
10 welfare certified eggs. And then Mr. McIntyre
11 forwards that to you and Mr. Horner -- you are
12 Mr. Horner -- you and Mr. Angell and says, "Still
13 seems like they're very nervous about using words
14 like we are compliant with the United Egg Producers
15 guideline and will be putting the checkmark logo on
16 all your corporate brand eggs in the future."
17    And Mr. Angell says, "You are right, sir.
18 You going to be on the call at 2:30 tomorrow?"
19    Do you know what call he's referring to?
20    A. I do not.
21    Q. Did Sparboe Farms, in fact, supply
22 Albertsons with corporate brand eggs with the UEP
23 certified logo?
24    A. I have no recollection. I don't know.
25    MS. CRABTREE: Let's mark No. 12.

---

67

1    (Exhibit 12 was marked for identification.)
2    Q. BY MS. CRABTREE: You are certainly
3  welcome to read the whole thing, but I will tell you
4  that I am only going to ask you about paragraph 3D,
5  and the second to last page.
6    A. And the second to last page?
7    Q. The second to last page where the
8  "approvals" are.
9    A. Okay.
10    Q. Okay. Do you recognize this -- this
11 document generally?
12    A. I do.
13    Q. And what is it?
14    A. It appears to be our boilerplate private
15 label supply agreement.
16    Q. And when you say your "boilerplate
17 private label," it wouldn't necessarily be specific
18 to eggs, but to your own -- your corporate brands?
19    A. Right. You asked me generally what I --
20 that's what I generally remember this to be.
21    Q. And if you look on the second page under
22 paragraph D, there's an indication, "Supplier shall
23 provide Albertsons with its designated animal care
24 certification number upon execution of this
25 agreement. Such certification shall be kept current

---

68

1  and in good standing throughout the term of this
2  agreement. Failure to maintain a current
3  certification number shall result in a breach and
4  termination of this agreement.
5    "Supplier's animal care certification
6  number is," and then there's a handwritten 198.
7    Did I read that correctly?
8    A. You did.
9    Q. Would this be a contract term specific to
10 eggs, to your knowledge?
11    A. I don't specifically know.
12    Q. Were there other animal welfare programs
13 that Albertsons required of its suppliers that you're
14 aware of?
15    A. I don't specifically recall.
16    Q. And if you look at the second to last
17 page, it appears to be -- it's -- it says, "Elizabeth
18 Clark, Albertsons, Inc., business law department" at
19 the top. Do you know who Ms. Clark is?
20    A. I recall -- I recall the name. Yes, I do
21 recall Liz.
22    Q. And then there's a list underneath that
23 says "tracking," and then it has a column for
24 recipient and response. And I just want to run over
25 the names in this to see if you recognize them.

---

69

1    The first is Duncan MacNaughton?
2    A. Uh-huh.
3    Q. Who is he?
4    A. He was a senior merchandising executive
5  for the company at that time as I recall.
6    Q. And Ed McCormick?
7    A. He was a counterpart of mine.
8    Q. In what way?
9    A. Title and responsibility.
10    Q. Do you know why Mr. MacNaughton would
11 need to approve this contract?
12    A. We had signing protocols at the company
13 that triggered different levels of approval based on
14 the duration or the annual spend of the agreement.
15 So I could only assume that the time frame or the
16 annual spend of this required Duncan's authorization.
17    Q. Would that be the same answer for
18 Mr. McCormick?
19    A. Can you make that a question? I mean,
20 I'm not sure --
21    Q. Why would Mr. McCormick be one of the
22 individuals approving this contract?
23    A. I don't specifically recall what the
24 signing protocol was, so I just have to assume, like
25 requiring my approval, there was something about this

---

## HIGHLY CONFIDENTIAL

Horner, Sage

April 29, 2014

19 (Pages 70 to 73)

---

**70**

1   agreement that required at our level a review of and
2   approval of.
3       Q.   Do you remember why you needed to review
4   and approve it?  You're the next name here.
5       A.   I recall that like many other categories,
6   eggs were under my area of responsibility, and so,
7   therefore, it rolled up to me for review and
8   approval.
9       Q.   Who was Mr. Dennis Clark?
10      A.   At the time, I believe Dennis was the
11  director of procurement for private label for the
12  company.
13      Q.   And Jason Burnett?
14      A.   He was vice president of inventory
15  management.
16      Q.   Steve Mesia?
17      A.   Very vague recollection of something to
18  do with quality control, something like that.
19      Q.   Do you know why there's a number after
20  his name?
21      A.   I don't recognize the specific number,
22  but some e-mail addresses ultimately tied out to a
23  business unit.  So I wouldn't be surprised to find
24  out that number means something to do with private
25  label or quality assurance or something like that.

---

**71**

1       Q.   Jim Stringfellow?
2       A.   He was a director of finance.
3       Q.   And Jason Maupin?
4       A.   I believe, as well, in the finance world,
5   but beneath Jim.
6       Q.   We discussed Mr. Angell?
7       A.   Uh-huh.
8       Q.   And there's a handwritten note underneath
9   the approvals.  Do you know whose handwriting that
10  is?
11      A.   I do not.
12      Q.   Can you read it?
13      A.   I believe the first line says, "See page
14  2." Miss something.  The number icon ... question
15  mark, and then I have no idea what the -- scar or
16  maybe that's somebody's name.  I don't know what that
17  is on the bottom.
18      Q.   Okay.  I didn't either.
19           You can set this one aside.
20      A.   Okay.
21      Q.   Mr. Horner, what did you do to prepare
22  for your deposition today?
23      A.   Very little.  We met for approximately 30
24  to 45 minutes yesterday.  I had the complaint kind of
25  shared with me, a couple of e-mails of which I think

---

**72**

1   we've looked at one or two here.  And just a general
2   discussion about what's gone on.  That's it.
3       Q.   And when you say "we," you're indicating
4   Mr. Murray?
5       A.   Correct.
6       Q.   Have you met with anyone else regarding
7   this case?
8       A.   I received a phone call, I'll guess
9   fourish months ago from Brian Bethke who is -- I
10  don't actually know if he works for Albertsons, LLC.
11           MR. MURRAY:  Don't reveal the contents of
12  your discussion.
13           MS. CRABTREE:  Yeah.  I don't want to
14  know what you talked about.
15           THE WITNESS:  That's the only other
16  conversation.
17           MR. MURRAY:  He -- he works inhouse at
18  Albertsons.
19           MS. CRABTREE:  Okay.
20           MR. MURRAY:  But the relationship may be
21  on a contract basis rather than a full-time basis.
22  It's evolving because of all the corporate changes
23  that are going on now.  I know he did at one point
24  while he was working for Albertsons, LLC, still
25  maintain some practice on the side.

---

**73**

1           MS. CRABTREE:  And as long as he's an
2   attorney, I don't want to know what you talked about.
3           MR. MURRAY:  But he represents
4   Albertsons, LLC.
5       Q.   BY MS. CRABTREE:  When did you first
6   become aware of this litigation?
7       A.   That initial phone call from Brian.
8       Q.   And you said that was about four months
9   ago?
10      A.   My recollection, it was Januaryish.
11      Q.   Have you -- have you ever seen any press
12  releases or press coverage of this -- about this
13  case?
14      A.   Not that I recall, no.
15      Q.   Other than what you learned from counsel,
16  what do you know about the allegations in the case?
17      A.   Nothing.
18      Q.   Okay.  Do you have any ongoing business
19  relationship with SuperValu or with Albertsons, LLC?
20      A.   No.
21      Q.   And when you left SuperValu in -- when
22  did we say that was, approximately 2008 --
23      A.   That's my recollection.
24      Q.   -- have you had any business relationship
25  with Albertsons or SuperValu since then?

---

HIGHLY CONFIDENTIAL

Horner, Sage                                                April 29, 2014

20 (Pages 74 to 76)

74

1      **A.  No.**
2      Q.  Are you being compensated for the time
3  that you're spending here with us today?
4      **A.  Other than by my own company?**
5      Q.  Yeah.
6      **A.  No.  No.**
7      MS. CRABTREE:  Well, Mr. Horner, I think
8  that's all the questions I have for you today.  And I
9  thank you very much for taking time with us.
10     THE WITNESS:  Sure.  Thank you very much.
11     MR. MURRAY:  I have no questions.  We
12 designate the entire deposition highly confidential
13 under the protective order and do not waive
14 signature.
15     Thank you for doing that.
16     THE VIDEOGRAPHER:  This concludes today's
17 recording of the deposition of Sage Horner.  This is
18 the end of media unit No. 1, and there are a total of
19 one media units in this recording.  We are now off
20 the record.  The time is 10:42 a.m.
21     (The proceedings concluded at 10:42 a.m.)
22
23
24
25

76

1                    CERTIFICATE
2
3      I, Kristy A. Ceton, Certified Court
4  Reporter for the State of Arizona, certify:
5      That the foregoing proceedings were taken
6  by me; that I am authorized to administer an oath;
7  that the witness, before testifying, was duly sworn
8  by me to testify to the whole truth; that the
9  questions propounded by counsel and the answers of
10 the witness were taken down by me in shorthand and
11 thereafter reduced to print by computer-aided
12 transcription under my direction; that review and
13 signature was requested; that the foregoing pages are
14 a full, true, and accurate transcript of all
15 proceedings and testimony had upon the taking of said
16 proceedings, all to the best of my skill and ability.
17     I FURTHER CERTIFY that I am in no way
18 related to nor employed by any of the parties hereto
19 nor am I in any way interested in the outcome hereof.
20     DATED this 9th day of May, 2014.
21
22     _____
23     Kristy A. Ceton
24     Certified Court Reporter No. 50200
25     For the State of Arizona

75

1      I, SAGE HORNER, do hereby declare under
2  penalty of perjury that I have read the foregoing
3  transcript; that I have made any corrections as
4  appear noted, in ink, initialed by me, or attached
5  hereto; that my testimony as contained herein, as
6  corrected, is true and correct,
7      EXECUTED this _____ day of _____,
8  20___, at _____, _____,
9         (City)              (State)
10
11 _____  I have made changes to my deposition.
12 _____  I have NOT made changes to my deposition.
13
14
15     _____
       SAGE HORNER
16
17
18
19
20
21
22
23
24
25