# ATTACHMENT 32

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 5

 6
                              - - - - -
 7
                         PHILADELPHIA, PA
 8
                              - - - - -
 9
                         NOVEMBER 19, 2019
10
                              - - - - -
11

12
     BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14                            - - - - -

15               TRANSCRIPT OF TRIAL PROCEEDINGS

16                           DAY 12

17                            - - - - -

18

19

20

21               KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                 Official Court Reporter
22               Room 1234 - U.S. Courthouse
                 601 Market Street
23               Philadelphia, PA  19106
                 (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)
```

94

1   Q.   And it says -- and do you understand that PETA was
2   representing in this letter that assuming there is a guarantee
3   of usable space, they are acceptable since these guidelines
4   are based on the science of Dr. Joy Mench's paper that
5   discusses this issue and are in line with the fast food
6   standards.  Do you see that?
7   A.   Yes, sir.
8   Q.   And do you understand that that was, at least in this
9   letter, that was the position PETA represented to Publix?
10  A.   Yes, sir.
11       MR. LEVINE:  I have nothing further, Your Honor.
12       MS. SUMNER:  Nothing, Your Honor.
13       MR. HARRIS:  Nothing from USEM, Your Honor.
14       THE COURT:  Anything further?
15       MR. VANEK:  Nothing.
16       THE COURT:  Okay, Mr. Wilson, you can step down.
17       THE WITNESS:  Thank you.
18       THE COURT:  Thanks very much.
19       Would you like to start the next witness, please?
20       MS. CAIN-MANNIX:  Yes, Your Honor.  Plaintiffs call
21  Ken Klippen.  I'll go get him.
22       THE DEPUTY CLERK:  Will you please remain standing
23  and raise your right hand.
24       (Sworn.)
25       THE WITNESS:  I do.

95

1        THE DEPUTY CLERK:  Would you please have a seat.
2   Please state your full name and spell your last name for the
3   record.
4        THE WITNESS:  My name is Kenneth L. Klippen.
5        THE COURT:  K-L-I-P-P-E-N?
6        THE WITNESS:  Excuse me, Your Honor, it's
7   K-L-I-P-P-E-N.
8        THE COURT:  Okay, Mr. Klippen with a K, how are you
9   today?
10       THE WITNESS:  I'm doing fine, Your Honor.
11       THE COURT:  Good.  Are you comfortable?
12       THE WITNESS:  I am.
13       THE COURT:  Excellent.  Thank you very much.
14       Go ahead.
15              KEN KLIPPEN,
16  Called as a witness herein by the Plaintiffs, having been
17   first duly sworn, was examined and testified as follows:
18              DIRECT EXAMINATION
19  BY MS. CAIN-MANNIX:
20  Q.   Mr. Klippen, are you currently employed?
21  A.   Yes, I am.
22  Q.   Where are you employed?
23  A.   I am a consultant, I'm self-employed and have my office
24  here in -- just outside of Philadelphia.
25  Q.   And what's the name of that office or business?

96

1   A.   Klippen and Associates, LLC.
2   Q.   Did you previously work for the UEP?
3   A.   I did work for United Egg Producers on two separate
4   occasions from 1982 to 1992 in Atlanta, Georgia; and then I
5   went overseas to work for the International Egg Commission and
6   then I came back to the United States and they asked me to
7   come back to the office in Washington, D.C.
8   Q.   And when you came back the second time, during what time
9   period did you work for the UEP?
10  A.   From 1999 to 2004.
11  Q.   Okay.  Have you also worked at other jobs in the egg
12  industry?
13  A.   I have.
14  Q.   Can you briefly describe those?
15  A.   Yes.  As I mentioned, when I left United Egg Producers in
16  1992, I went to work for the International Egg Commission in
17  London, England.  I was the director general.  I was there for
18  several years, just over two years.  I developed allergic
19  asthma from the pollution so I had to come back to the United
20  States.  I worked for Eggland's Best in King of Prussia,
21  Pennsylvania.  I worked for a American Dehydrated Foods.  I
22  was the egg buyer in Springfield, Missouri.  And then I went
23  back to United Egg Producers in 1994.
24  Q.   And after you left United Egg Producers in 2004, I
25  believe you said, did you work for another egg company or --

97

1   A.   Not immediately.  I did -- I did some private consulting
2   for a time, and then I did offer to work with a number of egg
3   companies.  Actually, they approached me and asked for help in
4   consulting, so there were a number of egg companies that I did
5   some work with.  And then eventually Sparboe Farms hired me in
6   2008.
7   Q.   Okay.  Mr. Klippen, what is your educational background?
8   A.   I have two degrees in poultry science.  I received my
9   Bachelor's of Science from Michigan State University in 1972
10  and then I received a Bachelor -- or excuse me, a Master of
11  Science in poultry science.
12       THE COURT:  Are you saying poultry?
13       THE WITNESS:  Yes, Your Honor, P-O-U-L-T-R-Y,
14  poultry science.
15       THE COURT:  Thank you.
16       THE WITNESS:  I usually pause there because people
17  usually laugh when they hear what kind of degrees I have, but
18  I have a very specific education in how to raise and produce
19  poultry and eggs.  I have an understanding of poultry
20  production extensively.
21  BY MS. CAIN-MANNIX:
22  Q.   Okay.  Could you -- I think you've just described to the
23  jury what poultry science encompasses.  Do you want to expand
24  on that at all?
25  A.   I'd be happy to.  The course work was in management of

98

1    how to deal with the actual production and to understand the
2    science behind producing eggs or producing poultry meat for
3    human consumption.  When I was working on my Master's degree,
4    I taught pre-veterinary students poultry science so they have
5    a comprehension of what's involved in the production of eggs
6    and how the chicken actually lives or operates.  I actually
7    started a PhD program before I was offered a job in the
8    Washington, D.C. area in 1975, and I opted to take the job.
9    Q.   Did -- while you are at UEP, did anyone else on staff
10   have that kind of educational background in poultry farming?
11   A.   No, they did not.
12   Q.   Could you briefly describe your employment with UEP,
13   starting with your first stint at UEP?
14   A.   Starting in 1982, I was hired to work in Atlanta,
15   Georgia, in membership, to recruit new members.  I was soon
16   after promoted to vice president, and then I was promoted to
17   senior vice president.  And my responsibilities were basically
18   administrative.  I used to write for the -- we have a
19   newsletter that we would send out to the membership.  I was
20   involved in writing that, so there was some research involved.
21   I dealt with insurance for the property casualty insurance for
22   the egg industry.  So there were a number of different facets.
23   It was thoroughly enjoyable job.
24   Q.   And who hired you to work at UEP?
25   A.   Albert Pope.  P-O-P-E.  He was the president.

99

1    Q.   Were Gene and Chad Gregory working at UEP during that
2    first period of time that you worked there?
3    A.   No, they were not.
4    Q.   Can you briefly describe how you came to work for UEP the
5    second time around?
6    A.   Well, I was -- at the time I was buying eggs for America
7    Dehydrated Foods, and that was where they would use those eggs
8    and convert them into a dry product and they would sell it to
9    pet food companies to increase the protein content of
10   different cats and dogs.  And then United Egg Producers, Al
11   Pope, had contacted me while I was working there and asked me
12   if I would consider coming back to the east coast, Washington,
13   D.C., and head up the office there; and while I thought about
14   it, I was still making calls on egg farmers, and there was one
15   in particular that happened to be a former chairman of United
16   Egg Producers, Doug Hoffer with Creighton Brothers, and he
17   thought it would be a good fit for me to go back to UEP
18   because of my personality and work experience that I had.
19   Q.   What was your job when you returned to the UEP?
20   A.   I was vice president of Government relations, and the
21   executive director, as well.  So I dealt with members of
22   Congress, I also had to deal with the federal regulatory
23   agencies on matters involving egg production or egg
24   processing.
25   Q.   Could you describe why you left UEP the second time?

100

1    A.   Starting in 2002, we noticed -- I noticed that the egg
2    industry was in the form -- or in the process of developing
3    these -- or had developed these production guidelines.  They
4    were strictly voluntary at that time.  They started to move
5    toward where they were pushing the farmers to actually
6    implement those.  They had to, basically, is what they were
7    saying to the farmers.  They talked about it being a voluntary
8    program but they said they must adhere to the voluntary
9    program, so -- and I had objections to that.
10           MS. LEVINE:  Objection, Your Honor.
11           THE COURT:  Sustained.  Do you want to ask another
12   question?
13           MS. CAIN-MANNIX:  Yes.
14           THE COURT:  The question was describing -- was
15   leading.
16           MS. CAIN-MANNIX:  Right.
17   BY MS. CAIN-MANNIX:
18   Q.   Were you unhappy with certain of the rules that were
19   being implemented by the UEP and to the UEP -- what became the
20   UEP Certified Program?
21   A.   That was it, yes.  Philosophical differences.
22   Q.   As a UEP staff member, did you serve on any committees?
23   A.   I served on the Government Relations Committee.  I was
24   involved in the committee on food safety.  But those are --
25   and also the committee on environment, but that was a very

101

1    short-lived.
2    Q.   Okay.
3           MS. CAIN-MANNIX:  Your Honor, may I approach the
4    witness?
5           I need PX-742 and PX-743, please.
6           THE COURT:  Yes.
7    BY MS. CAIN-MANNIX:
8    Q.   Could you please look at PX-742.
9    A.   Yes.
10   Q.   Can you identify this document?
11   A.   This provides the list of the names and addresses of the
12   farmers that served on the various committees and it starts
13   off with the Executive Committee but then would also provide
14   the staff coordinator for each one of those committees, and
15   for the 2000 committee appointments at page 4, it shows my
16   name as the staff coordinator for the Government Relations
17   Committee, and then a list of the farmers on that, and then
18   you have to go through several pages.
19   Q.   Okay, hold on a second.
20   A.   I'm sorry.
21   Q.   Wait for another question.
22           Is this a document which UEP produced and maintained
23   in the regular course of its business?
24   A.   Yes, they did.
25   Q.   And what year is it from, please?

102

```
1   A.    2000.
2         MS. CAIN-MANNIX:  Plaintiffs move to admit PX-742.
3         MS. LEVINE:  No objection, Your Honor.
4         MR. KING:  No objection.
5         MS. CAIN-MANNIX:  Could we please publish it to the
6   jury?
7         THE COURT:  Yes.  Well, first of all, yes, it's
8   admitted; and yes, you may publish it.
9         (Exhibit received in evidence.)
10  BY MS. CAIN-MANNIX:
11  Q.    Okay, you mentioned that list, that you're the staff
12  coordinator for the Government Relations Committee?
13  A.    Yes.
14  Q.    What was the role of staff coordinator?
15  A.    That I was the person that would actually have
16  face-to-face meetings with members of Congress or with the
17  federal regulatory agency, principally the U.S. Department of
18  Agriculture, the Food and Drug Administration, and then I
19  would bring back to the industry the proposed regulations or
20  decisions that Congress was making that might have an impact
21  on their production systems.
22  Q.    Okay.  Do you see the section at the top labeled
23  Objective?
24  A.    Yes, I do.
25  Q.    And do you see the last sentence of that paragraph, Other
```

103

```
1   Areas?
2   A.    I do.
3   Q.    And it states:  Other areas of responsibility include
4   food safety environment, animal welfare labor and egg PAC.
5         Was animal welfare one of your duties at that time?
6   A.    The animal welfare duties that I had was to respond to
7   the media as it relates to animal welfare, or if there was a
8   concern by a member of Congress or one of the agencies
9   concerning the welfare, I was not involved in producing the
10  guidelines.
11  Q.    Okay.  Can you look through this document and tell me, is
12  there a Producer Committee for Animal Welfare noted in this
13  document?
14  A.    Yes, there is.
15  Q.    Is that a Producer Committee or a Scientific Advisory
16  Committee for Animal Welfare?
17  A.    I'm looking at the UEP Producer Committee for Animal
18  Welfare.
19  Q.    Okay, are you in the 2000 document?
20  A.    I beg your pardon.  I was in 2001.
21  Q.    Okay.
22  A.    So I'll go back to 2000.
23  Q.    Page 17.
24  A.    In the 2000 document, I am looking at the Scientific
25  Advisory Committee for Animal Welfare.
```

104

```
1   Q.    Okay.  And who's the staff coordinator on that?
2   A.    Gene Gregory.
3   Q.    Is there in the 2000 document a Producer Committee for
4   Animal Welfare?
5   A.    There is not.
6   Q.    Okay.  And do you see that there is a committee on shell
7   eggs marketing?
8   A.    I do.
9   Q.    Okay.  And do you see -- well, first of all, who's the
10  staff coordinator on that committee?
11  A.    Gene Gregory.
12  Q.    Okay.  And when you read the -- let's see.  The objective
13  there, could you read that, the objective?
14  A.    Yes.  To monitor the egg pricing systems and make
15  recommendations for assuring the most accurate pricing system
16  possible, consider and recommend marketing proposals in view
17  of current and future supply/demand.
18  Q.    Okay, stop right there.
19        Do you recall this being one of the objectives of
20  the Marketing Committee at that time?
21  A.    I do.
22  Q.    Okay.  You can set that aside.  Could you look at the
23  2001 document?
24  A.    Yes.
25  Q.    I believe it's PX-743.
```

105

```
1   A.    Correct.
2   Q.    And can you identify this document for the jury?
3   A.    These are the committee appointments for United Egg
4   Producers for the year 2001.
5         MS. CAIN-MANNIX:  Your Honor, I move to admit
6   PX-743.
7         MS. LEVINE:  No objection.
8         MR. KING:  No objection.
9         THE COURT:  743 is admitted.
10        (Exhibit received in evidence.)
11        MS. CAIN-MANNIX:  May it be published to the jury,
12  Your Honor?
13        THE COURT:  Yes.
14  BY MS. CAIN-MANNIX:
15  Q.    Okay.  Could you look at 743, page 4?
16  A.    Yes.
17  Q.    Do you see that you are listed again as the staff
18  coordinator for the Government Relations Committee?
19  A.    That's correct.
20  Q.    Do you see the line about animal welfare and the
21  objective anymore?
22  A.    No.  Under Government Relations Committee?  Did you mean
23  that?
24  Q.    Yes.  Yes.
25  A.    There's nothing mentioned there about animal welfare.
```

106

1   Q.   And now, in 2001, is there a UEP Producer Committee for
2   Animal Welfare?
3         MS. LEVINE:  Could you direct us to the page?
4         MS. CAIN-MANNIX:  It may be page 18.
5         THE WITNESS:  Yes, there is.
6   BY MS. CAIN-MANNIX:
7   Q.   Okay.  And what is their objective?
8   A.   To develop guidelines and make recommendations to the
9   industry for the welfare of laying hens and growing pullets.
10   Q.   And who is the staff coordinator?
11   A.   Gene Gregory.
12   Q.   You can put that aside.
13         When you worked at UEP, did the UEP develop what
14   came to be known as the UEP Animal Care or UEP Certified
15   Program?
16   A.   Yes.
17   Q.   And are you familiar with the guidelines?
18   A.   Yes, I am.
19   Q.   Do you recall when these were originally produced?
20   A.   Approximately the year 2000.
21   Q.   Okay.
22         MS. CAIN-MANNIX:  Can you please cull up PX-57?
23   Your Honor, may I approach the witness?
24         THE COURT:  Yes.
25         MS. CAIN-MANNIX:  This document's been, according to

107

1   my notes, previously admitted, Your Honor.
2         THE COURT:  Mine, too.
3         MS. CAIN-MANNIX:  Okay.  May it be published to the
4   jury again in light of that?
5         THE COURT:  Yes.
6         MS. CAIN-MANNIX:  Okay.
7   BY MS. CAIN-MANNIX:
8   Q.   Mr. Klippen, have you reviewed these guidelines before?
9   A.   Yes, I have.
10   Q.   Okay.  Were these 2000 guidelines just -- just that,
11   guidelines for the industry?
12   A.   Yes, they were.
13   Q.   Were these guidelines preceded by Scientific Advisory
14   Committee recommendations?
15   A.   Yes, they were.
16   Q.   Did you ever see those Scientific Advisory Committee
17   recommendations?
18   A.   No, I did not.
19   Q.   Were you asked for your input on the guidelines given
20   your poultry science background?
21   A.   No, I was not.
22   Q.   After the 2000 guidelines were introduced, did UEP later
23   come up with what came to be known as the Certified Program?
24   A.   Yes.
25   Q.   And this program involved a producer audit and a seal

108

1   which the producer could use on the carton?
2   A.   That's correct.
3   Q.   And when was that?  Do you recall?
4   A.   Approximately 2002, I believe.
5         MS. CAIN-MANNIX:  May I approach the witness,
6   Your Honor?
7         THE COURT:  Yes.
8         MS. CAIN-MANNIX:  Okay.  It's actually D-175.
9   BY MS. CAIN-MANNIX:
10   Q.   Mr. Klippen, can you please identify D-175?
11   A.   These are the United Egg Producers Animal Husbandry
12   Guidelines for U.S. egg-laying flocks.  This is the 2002
13   edition.
14   Q.   Okay.
15         MS. CAIN-MANNIX:  And, Your Honor, my notes indicate
16   again this was previously admitted.  May it be published to
17   the jury?
18         THE COURT:  Yes.
19         MS. CAIN-MANNIX:  Thank you.
20   BY MS. CAIN-MANNIX:
21   Q.   Mr. Klippen, are you familiar with the 100% rule?
22   A.   Yes, I am.
23   Q.   Did this 2002 version of the guidelines contain the
24   100% rule?
25   A.   It did not.

109

1   Q.   Did this version of the guidelines mark the start,
2   though, of the UEP Certified Program?
3   A.   Yes, it did.
4   Q.   How is compliance with the guidelines enforced?
5   A.   The individual farmers that were participating in the
6   program on a voluntary basis would actually report their
7   production or their number of hens that they owned to Linda
8   Reickard who was in our office in Iowa.
9         So she maintained records on the number of hens, and
10   if they were out of compliance with the cage space allowance,
11   well, then they were deemed not in compliance.  UEP also
12   developed an audit program where they would actually have
13   independent auditors go out and see firsthand whether the
14   farmers were following the guidelines.
15   Q.   Who created the audit system including the scoring
16   system?
17   A.   United Egg Producers.
18   Q.   Did they have an audit subcommittee?
19   A.   Yes, they did.
20   Q.   Was that a subcommittee of the UEP's Producer Committee
21   for Animal Welfare?
22   A.   Yes, it was.
23   Q.   And was it this audit subcommittee that created the point
24   system?
25   A.   They did.

110

1  Q.   Did you have any role in developing either the audit or
2  the point system?
3  A.   No, I did not.
4  Q.   After the 2002 guidelines were introduced, did you work
5  with the FMI and NCCR to try to get their support for the
6  Certified Program?
7  A.   Yes, I did.
8  Q.   Did these --
9            THE COURT:  Are you moving into another area?
10           MS. CAIN-MANNIX:  Um...
11           THE COURT:  Or are you still on Exhibit 175?
12           MS. CAIN-MANNIX:  I'm moving on.
13           THE COURT:  Okay, if you wouldn't mind my
14  interrupting --
15           MS. CAIN-MANNIX:  That's fine.
16           THE COURT:  -- so we can take the lunch break.
17           And, folks, I'd like to resume at, oh, let's say,
18  1:40.  So we'll be in here working by 1:45.  Okay.  Same
19  rules, everybody.  I know you know them.  So have a nice
20  lunchtime.
21           THE DEPUTY CLERK:  All rise.
22           (Jury out.)
23           THE COURT:  Counsel, I'll see you-all at the same
24  time.
25           MR. BLECHMAN:  Thank you, Your Honor.

111

1            THE WITNESS:  Thank you, Your Honor.
2            (Luncheon recess taken.)
3            (After luncheon recess:)
4            THE DEPUTY CLERK:  All rise.
5            THE COURT:  Okay, back in business?
6            MS. CAIN-MANNIX:  Yes.  Can Mr. Klippen retake the
7  stand?
8            THE COURT:  I think that would be a good idea.
9            (Witness resumes the stand.)
10           THE COURT:  Is it cold in here?  Okay.
11           MS. CAIN-MANNIX:  I'm comfortable.
12           THE DEPUTY CLERK:  All rise.
13           (Jury in.)
14           THE COURT:  Okay, the rest of you may take your
15  seats.
16           And you may proceed.
17           MS. CAIN-MANNIX:  Thank you, Your Honor.
18  BY MS. CAIN-MANNIX:
19  Q.   Mr. Klippen, before lunch, I started to ask you whether
20  after the 2002 guidelines were introduced, did you work with
21  the FMI and NCCR to try to get those groups to comport for the
22  Certified Program?
23  A.   I did.
24  Q.   Did these groups also want the industry to have
25  guidelines?

112

1  A.   They did.
2  Q.   What was their position regarding audits?
3  A.   Since they had developed or they wanted to have several
4  different national associations devote guidelines for their
5  members, they did not take a stand on how that would actually
6  proceed as far as an audit.  They initially had -- at one time
7  they did propose helping to develop audits, but they -- they
8  backed away from that, so they left it up to the industries.
9  Q.   Did the UEP ask the FMI to endorse the UEP Certified
10  Program?
11  A.   They did.
12  Q.   And what was the FMI's response?
13  A.   They did not endorse it.  They did recognize it, but
14  they -- their purpose was simply to have a set of guidelines
15  that would provide a measure of welfare standards for egg
16  farmers, just as they did for other national associations as
17  well.  Whether it's the pork industry or the turkey or the
18  chicken, they did the same.
19  Q.   Did the FMI ask for what became known as the 100% rule?
20  A.   They did not.
21  Q.   Did the NCCR ask for the 100% rule?
22  A.   Not to my knowledge.
23  Q.   Throughout your time at the UEP until you left in 2004,
24  were you aware of any retailers or customers requesting that
25  the guidelines be applied to 100 percent of the flocks?

113

1  A.   No.
2  Q.   Why did UEP enact a 100% rule if there was no demand?
3  A.   In my opinion, they wanted to have a stronger program for
4  controlling production.
5  Q.   Did you raise concerns within the UEP about the
6  100% rule?
7  A.   I did.
8  Q.   And why did you do that?
9  A.   My whole career has been principally working with
10  national associations or state associations or international
11  associations, and I was always of the mind that you develop
12  programs that would be voluntary for the industry that you're
13  representing to implement if they so choose.  It was left up
14  to them.  So I did have a conversation; I voiced my concerns
15  to Gene Gregory.
16  Q.   Did your job responsibilities include promoting the UEP
17  Certified Program to the public as well as FMI and NCCR?
18  A.   I was the media spokesperson for the industry.  The
19  public relations firm that was representing the United Egg
20  Producers out of New York had recommended that I be the
21  spokesperson because of my background and my -- my experience
22  as well as my education.  So I would respond to questions
23  about the guidelines and try to encourage an acceptance,
24  overall acceptance for these set of guidelines.
25  Q.   Mr. Klippen, did you support the guidelines initially?

114

1    A.   I did.
2    Q.   Okay.  Why did you support them?
3    A.   Well, I believed that it was important to have some sort
4    of written documentation that they could point to show a
5    united front so that consumers can see that basically egg
6    farmers were following a set of guidelines.  But I was always
7    in support of a voluntary set of guidelines for the farmers to
8    support.  So if somebody opted not to be a participant, that
9    was fully within their allowance.
10   Q.   Did you also support the notion that a farmer could have
11   some of its flock on the program and some not on the program?
12   A.   I did.
13   Q.   Okay.  When did your support for the guidelines begin to
14   change?
15   A.   Approximately 2002, there were a number of egg farmers
16   that would express their concerns to me privately.  I would
17   have meetings in Washington, D.C. and they would actually come
18   up and approach me privately, perhaps between, when we had
19   breaks during a committee meeting, and they -- some of them
20   were saying that they did not like --
21          MR. KING:  Objection, Your Honor.  Hearsay.
22          MS. LEVINE:  Objection.
23          THE COURT:  Sustained.
24   BY MS. CAIN-MANNIX:
25   Q.   What's your understanding of the concerns raised by

115

1    farmers regarding the 100% rule?
2    A.   It was my understanding that they did not support a
3    hundred percent.
4          MS. CAIN-MANNIX:  Could I have... (indicating to
5    Mr. Hill).
6          May I approach the witness, Your Honor?
7          THE COURT:  Yes.
8    BY MS. CAIN-MANNIX:
9    Q.   Mr. Klippen, can you identify this document?
10   A.   This is a newsletter called United Voices.
11          THE COURT:  Excuse me.  We're just going --
12   we're having a meeting of the tech club.
13          MS. CAIN-MANNIX:  Okay.
14          THE COURT:  Excuse us.  Sorry.  Go ahead.
15   BY MS. CAIN-MANNIX:
16   Q.   Okay, you were -- you stated you can identify this,
17   correct?
18   A.   Yes, I can.  This is a newsletter called United Voices.
19   As you can see, the editor is Gene Gregory, and it was written
20   May 20, 2004.
21          MS. CAIN-MANNIX:  I believe this was previously
22   admitted, Your Honor.  May I publish it to the jury?
23          THE COURT:  Yes.
24   BY MS. CAIN-MANNIX:
25   Q.   Mr. Klippen, if you turn to pages 2 and 3, do you see an

116

1    editorial by Gene Gregory under the title:  Are You Committed?
2    A.   Yes, I do.
3    Q.   Do you recall reading this editorial?
4    A.   I do.
5    Q.   Do you see that he says on the bottom of page 2:  While
6    never intended as a supply adjustment program, the Animal Care
7    Certified program is the only road map the industry has ever
8    had for future planning.  If you stay true to the program and
9    manage it to meet the market demand, it can provide the
10   industry with prolonged profits.
11          Do you recall reading this?
12   A.   I do.
13   Q.   And what did you understand Gene to mean?
14   A.   That it was a mechanism for which they could control
15   supply and thereby control prices.
16   Q.   Do you see below that where Mr. Gregory says that the
17   industry needs to make a few minor adjustments?
18   Second-to-last paragraph on page 3.
19   A.   I do.
20   Q.   Okay.  And he relays a Marketing Committee recommendation
21   that all UEP members molt flocks at 62 weeks and dispose of
22   spent hens by 108 weeks and that this plan of action take
23   place immediately and carry through until August 1 of 2004.
24   A.   Yes, I do.
25   Q.   What did you understand to be the purpose of this

117

1    recommendation?
2    A.   To control supply and influence price.
3    Q.   Does this editorial give you pause?
4    A.   It did.
5    Q.   Okay.  And can you elaborate, please?
6    A.   There were a number of little incidences leading up to
7    this particular newsletter in 2000 -- excuse me -- from 2002
8    until 2004 where I had pause.  It troubled me that he was
9    using this program to try to influence the supply with the
10   understanding that it would influence price.  So I had pause
11   to reflect on this and thinking that perhaps I need not
12   continue working at that association anymore.
13   Q.   Okay.  And what -- do you recall the date that you
14   resigned from the UEP?
15   A.   It was the very first part of August 2004, so this was
16   just a few months before.
17   Q.   Okay.  And did you have a job when you resigned?
18   A.   I did not.  I just simply had to leave.
19   Q.   After you left the UEP, did you eventually begin work on
20   an alternative Animal Welfare Program?
21   A.   I did.
22   Q.   Did producers ask you to do that?
23   A.   They did.
24   Q.   Did you organize a meeting of producers who were
25   interested in an alternative?

118

1    A.   I did.
2    Q.   And was that meeting in Chicago?
3    A.   It was.
4         MS. CAIN-MANNIX:  May I approach the witness,
5    Your Honor?
6         THE COURT:  Yes.
7    BY MS. CAIN-MANNIX:
8    Q.   Mr. Klippen, can you identify this document, please?
9    A.   The typed copy says:  34 attendees in Chicago at Marriott
10   O'Hare Hotel, October 30, 2006, and there are 27 different
11   organizations that are listed there, so all of the typed --
12        MS. LEVINE:  Object on hearsay.  So if we can go one
13   by one for the witness.
14   BY MS. CAIN-MANNIX:
15   Q.   Okay, did you type this document?
16   A.   I typed it, yes.
17   Q.   And what was the purpose of preparing this document?
18   A.   It was to give an understanding to the people that were
19   attending who all was in attendance at this meeting.
20   Q.   Did you create this document at or about the time of the
21   meeting?
22   A.   Before the meeting I prepared this.
23        MS. CAIN-MANNIX:  Your Honor, I move to admit
24   Exhibit 647, Plaintiffs' 647.
25        MS. LEVINE:  We object to 802 hearsay and also 901

119

1    authentication of whose handwriting this is.
2         THE COURT:  Well, there is at least that issue.
3         MR. KING:  I object also based on hearsay.
4         MR. HARRIS:  Hearsay as well.
5         MS. CAIN-MANNIX:  I think he's the creator of the
6    document.
7         THE COURT:  Well, this document has a lot of -- I
8    understand the typing part and it's a document that he
9    prepared --
10        MS. CAIN-MANNIX:  Okay.
11        THE COURT:  -- as to the typing, but we don't know
12   about the other part.
13        MS. CAIN-MANNIX:  Okay.
14        THE COURT:  That's the nature of part of the
15   objection --
16        MS. CAIN-MANNIX:  Right.
17        THE COURT:  -- that I will sustain at this point.
18   BY MS. CAIN-MANNIX:
19   Q.   Okay.  Do you know whose handwriting is on this
20   particular copy of this document?
21   A.   It is my understanding that the person who actually
22   handwrote these notes was Ron Truex.  He's item Number 3 with
23   Creighton Brothers.  And you can see at the top of the page
24   that it has his company on the top showing that it was a fax
25   that he had sent to Gene Gregory.

120

1    Q.   Okay.  Without moving to admit the document, does this
2    document help refresh your recollection about who attended the
3    Chicago meeting on October 30 of 2006?
4    A.   Yes, it does.
5    Q.   Okay.  And can you tell the jury who attended the
6    meeting?  We don't have to go through all of them, but maybe
7    by category of producer, if you will.
8    A.   Okay.  A number of these names are companies that are
9    known as further processing companies.  In other words, they
10   would either produce shell egg or they would buy shell egg and
11   then they would make it into a liquid product and sell it to
12   bakeries or to companies that needed large supplies and not
13   having to crack open the eggs.  But there were also a number
14   of companies that also were shell egg producers, and Ron
15   Truex, to my understanding, when he wrote this, he identified
16   the UEP members who were also in attendance.
17   Q.   So certain of these attendees were also shell egg
18   producers.  Can you identify those?
19   A.   Yes, I can.  Just shell egg producers or combination?
20   Q.   Predominantly.
21   A.   Predominantly, okay.  Okay, well, Creighton Brothers is
22   predominantly shell egg producers but they do some processing.
23   Creekwood Farms is a shell egg producer.  Golden Oval, in
24   Renville, Minnesota, was a shell egg producer.  Hidden Villa,
25   out of California, was a shell egg producer; they're also a

121

1    marketer, they would buy eggs from around the country.
2    Henning Construction, out of Iowa, owned chickens, so they
3    were a shell producer.  Humpty Dumpty Eggs, out of Wisconsin,
4    was a shell egg producer.  Kreider's, which is Kreider's Farms
5    out of Manheim, Pennsylvania, just outside of Lancaster; he is
6    a shell egg producer.  Midwest Poultry Services is a shell egg
7    producer.  Sparboe Companies, shell egg producer.  Stoller
8    Farms, out of Ohio, was a shell egg producer.  Southwest Iowa
9    Egg, out of Massena, Iowa, is a cooperative; he represents a
10   number, over 100, shell egg producers.  And Wenger's Feed in
11   Rheems, Pennsylvania is also a shell egg producer, as is We 3
12   Egg out of Sibley, Iowa.
13   Q.   Okay.  Thank you.
14        Do you also have certain members of the Federal
15   Government in attendance at this meeting?
16   A.   Yes.  We invited Greg Morrison, who is the deputy
17   administrator of the poultry program for the Agricultural
18   Marketing Service; and we also invited his associate, and I
19   just drew a blank on his name.
20   Q.   Jeff Wade?
21   A.   Jeff Wade.  Thank you very much.  Jeff Wade, who headed
22   out the Process Verified Program and also had supervision over
23   the auditors.  They did process verified as well as other
24   types of auditing systems for USDA.
25   Q.   And what occurred at this meeting?

122

1  A.   The purpose of the meeting, as I stated to the people
2  that I invited to come, is that I was hearing individually
3  from different egg farmers and even some processors --
4        MS. LEVINE:   Objection, Your Honor.   Hearsay.
5        THE COURT:   Do you want to rephrase your question?
6  BY MS. CAIN-MANNIX:
7  Q.   Did you have an understanding that producers had concerns
8  with the UEP Certified Program?
9        MS. LEVINE:   Objection.  Leading, Your Honor.  This
10 is her witness.
11       THE COURT:   Well, technically, it's not a leading
12 question.
13       So you can answer it, but I would urge counsel to
14 rephrase the question.
15 BY MS. CAIN-MANNIX:
16 Q.   Did you make a presentation at this meeting?
17 A.   I did make a presentation, yes.
18 Q.   What kind of a presentation did you make?
19 A.   It was my understanding from these farmers that they had
20 objections to the Certified Program.  I compiled their
21 comments so that they could actually see all the comments at
22 once together, in a unified format, and then I asked USDA, the
23 representatives there, to talk about their Process
24 Verification Program so we could possibly develop an
25 alternative Animal Welfare Program.

123

1  Q.   Can you describe to the jury what a Process Verified
2  Program is?
3  A.   Yes.  The Federal Government has -- offers to its
4  Agricultural Marketing Service various auditing services and
5  the way the Government presented -- as I understand it, they
6  had like a triangle, and they would show at the bottom of the
7  triangle where they had a process format for just following
8  through and reviewing production standards at various farms
9  for United Egg Producers, but as they went up to the prime,
10 the very peak of it, they had the most sophisticated form of
11 auditing, which was the process verified.   This was their
12 program and it used their auditors with their own auditing
13 format and the Process Verified Program was an ISO -- that
14 stands for International Standards Organization -- 9000 and
15 9001 standards for quality management systems, which means it
16 was such a comprehensive auditing program, a comprehensive
17 program, that it was recognized in 164 different countries.
18 So these farmers at this meeting asked me to develop a Process
19 Verified Program, alternative program for the egg industry.
20 Q.   Can you describe, Mr. Klippen, how the process verified
21 is -- the auditing done under the Process Verified Program is
22 different from the audits the USDA does for the UEP Certified
23 Program?
24 A.   They have basically three types of auditing programs, and
25 as I mentioned, USDA, when they presented the triangle, it's

124

1  my understanding at the base of the triangle was the least
2  cumbersome as it relates to verifying a program.  That was
3  just a process audit is what they called that.  It had no
4  management systems in place, such as a process verified.  And
5  as you move up that ladder, there's an intermediate level
6  where they had the quality management system, but it wasn't an
7  ISO 9001.  The process verified at the very top was an ISO
8  9001 and that was the most comprehensive and intense form of
9  auditing that the Federal Government would do on any
10 verification process, and they would review not only the
11 production guidelines that we had established, but also the
12 quality manual we had developed for the industry to follow.
13 The comprehensiveness of it makes it a very intense program
14 for farmers to operate.
15 Q.   Who approved the -- is it okay if I use the acronym PVP
16 for Process Verified Program?
17 A.   Yes, that's fine.
18 Q.   Who approves the PVP program?
19 A.   The USDA.
20 Q.   How frequent are the audits under a PVP program?
21 A.   The USDA would audit every six months the individual
22 farms.  They would go to every single building on that farm
23 and they would make sure that every step of the way the farmer
24 was following that process.  If he had any infraction, he had
25 to correct that infraction, demonstrate that he had corrected

125

1  that infraction, show the documentation to show that that
2  would continue -- that the correction would remain in force
3  before he would even be considered to be considered a Process
4  Verified Program.
5  Q.   Who designs the audit forms under PVP program?
6  A.   USDA does that completely.  I had no input on their
7  audits and to this day I have no input on their audits.
8  Q.   Do the companies have any input into the audit?
9  A.   They do not.
10 Q.   Okay.  Is there a marketing shield associated with the
11 PVP program?
12 A.   The USDA is so proud of its Process Verified Program that
13 they offered the USDA grading shield with the words "processed
14 verified."  Initially they had -- they had that USDA shield
15 and then they had the words "animal welfare," but that became
16 so much of concern to the animal activists that were out there
17 so they changed that to process verified; but USDA has
18 provided a document, a letter indicating that farmers who had
19 achieved that USDA process verified can use the USDA shield on
20 their cartons or on whatever products they were selling, as
21 long as they were process verified.
22 Q.   Could you please distinguish for the jury the UEP Program
23 audit from the PVP audit?
24 A.   The UEP audits were developed by the Audit Committee with
25 the help of Gene Gregory as the staff director.  If a farmer

126

```
 1   failed a provision of one of the audits, he still could
 2   possibly pass the audit and continue to operate with that
 3   infraction until the next year when that audit came up again,
 4   which is untrue with the Process Verified Program.
 5   Q.   Is the USDA essentially a vendor for the UEP?
 6   A.   It's one of the vendors that could audit the program but
 7   they had other vendors as well.
 8   Q.   Is the UEP permitted to use a USDA marketing shield with
 9   its program?
10   A.   They are not.
11   Q.   Did you eventually come to create a Process Verified
12   Program?
13   A.   I did.
14   Q.   And did you consult with scientists in the process?
15   A.   I did.
16   Q.   Who were the scientists?
17   A.   It was Dr. Kenneth Anderson.  He's the extension
18   professor at North Carolina State.  Dr. Tony Pescatore, he's
19   an extension professor at the University of Kentucky.  And
20   Dr. Ken Koelkebeck, who is a professor at the University of
21   Illinois.
22   Q.   Okay.  Are these all animal scientists?
23   A.   These are poultry and animal scientists, correct.
24   Q.   Okay.  What was their role in the development of the PVP
25   program?
```

127

```
 1   A.   All guidelines need scientific verification.  They
 2   reviewed the guidelines that -- the production guidelines that
 3   I had written, and then they helped me to find -- and helped
 4   me to actually craft it by providing the scientific references
 5   that I could actually cite when I actually developed the
 6   Process Verified Program.
 7        So when I wrote the actual production guidelines, I
 8   used a superscript on each one of the sentences that
 9   referenced a particular research article and then they could
10   actually turn to the back of those production guidelines and
11   see where that research can be found.  So it actually provided
12   42 different scientific references.  That's what the extension
13   professors helped me to develop so that I can present that as
14   a science-based program to the U.S. Department of Agriculture.
15   Q.   Did you compensate the scientists?
16   A.   I did not send them individually any money, but I did
17   offer to send money to the university from which they came
18   because they're extension agents and they're using their time
19   to develop, so I did send a modest amount to the university
20   but not to the individual.
21   Q.   Okay.  What was the USDA's role in the creation of your
22   PVP program?
23   A.   The USDA helped me to understand all of the provisions in
24   the template for the quality management system, which is
25   something that I was not familiar with.  I'm very familiar
```

128

```
 1   with production standards so that was relatively easy for me
 2   to do on my own with the assistance of these three scientists,
 3   but the template for the quality management system, which is
 4   that ISO 9001 standard certification, they had to provide me
 5   with some details of each one of those provisions.  By the
 6   time I finished developing the Process Verified Program, I had
 7   180 pages of documents that the farmer had to follow.
 8   Q.   Mr. Klippen, were any producers approved by the USDA to
 9   have a Process Verified Program --
10   A.   Yes.
11   Q.   -- in production?
12   A.   Yes.
13   Q.   And what producer was approved?
14   A.   It was Sparboe Farms.
15        MS. CAIN-MANNIX:  Your Honor, may I approach?
16        THE COURT:  Yes.
17        MS. CAIN-MANNIX:  Okay.
18   BY MS. CAIN-MANNIX:
19   Q.   Mr. Klippen, can you please identify this document for
20   the jury?
21   A.   This is the Process Verified Animal Care Program that was
22   developed for Sparboe Companies; and as I mentioned, there's
23   180 pages here.
24   Q.   Are you the author of this document?
25   A.   I am.
```

129

```
 1   Q.   Approximately when did you create it?
 2   A.   2008.
 3   Q.   Were you employed by Sparboe around the time that you
 4   wrote this document?
 5   A.   As I was writing the document, I was not employed
 6   directly by Sparboe.  They were one of about 14 different
 7   companies that were paying me to develop a template for the
 8   process verified -- Process Verified Program, but to get into
 9   the specific details of the quality management system for
10   Sparboe Farms, they hired me to help them finish the program.
11        MS. CAIN-MANNIX:  Your Honor, Plaintiff moves to
12   admit PX-652.
13        MS. LEVINE:  Your Honor, we have an objection that
14   we don't think the jury should hear and would request a
15   sidebar.
16        THE COURT:  Well, I'm going to ask -- is the sidebar
17   going to be sufficient?
18        MS. LEVINE:  Yes, absolutely.
19        THE COURT:  Okay.  Excuse us for a moment, ladies
20   and gentlemen.
21        (The following transpired at sidebar:)
22        MS. LEVINE:  Jan Levine for UEP.  The problem with
23   the document, it was not produced in discovery and at
24   Mr. Klippen's deposition, he was asked about it and he said --
25   they asked about this program and he said as of today, it's
```

130

```
 1   impossible to get a completely unredacted set of your
 2   guidelines if you were a member of the public.  I don't
 3   believe it's available anywhere on the website or anywhere
 4   because nobody is process verified.  The UEP then filed a FOIA
 5   request which was objected to and everything was redacted
 6   other than the appendix page, so this is the first time
 7   honestly counsel is seeing this document.
 8            THE COURT:  Really?
 9            MS. CAIN-MANNIX:  Well, no.
10            THE COURT:  You didn't get it from Sparboe?
11            MS. LEVINE:  No, it was put on --
12            THE COURT:  I mean, presumably it was within the
13   scope of some request, I would guess.
14            MS. LEVINE:  It has not been produced in this case.
15   There's no Bates stamp number.
16            MS. CAIN-MANNIX:  It came into our possession,
17   Your Honor, in the summer, approximately August, and we
18   produced it immediately.
19            THE COURT:  To whom?
20            MS. CAIN-MANNIX:  To defense counsel and it's been
21   on our exhibit list for some time.
22            MS. LEVINE:  My understanding --
23            MR. KING:  This first appeared on the filings in
24   October.
25            MS. LEVINE:  Before the pretrial.
```

131

```
 1            MS. CAIN-MANNIX:  It was produced before that.
 2            MR. KING:  Not to our knowledge.
 3            THE COURT:  Well, I'll tell you what, you're asking
 4   him about what he designed.  You can ask him about what he
 5   designed.  I'd like to see the back and forth of the
 6   production so that I can really have a better appreciation.
 7            MR. BLECHMAN:  Yes.
 8            THE COURT:  Of who's on first and who's on second
 9   here.  I mean, if it turns out that it was produced in some
10   sensible timely fashion, then you can bring the guy back.  I
11   mean, he certainly is not shy about describing what it is he
12   did.
13            So you probably memorized this, you can ask him
14   questions, but let's not do the document until I get some
15   clarification because the discovery was very, very clear who
16   should be doing what.  I understand, you know, that things
17   slip up, but this is a pretty big thing to slip through the
18   cracks.
19            MS. CAIN-MANNIX:  Well, we --
20            THE COURT:  Particularly Sparboe has been a major
21   player.
22            MS. CAIN-MANNIX:  Go ahead.
23            MR. BLECHMAN:  Let us --
24            THE COURT:  Yes.  Look for the passage, look for the
25   material.
```

132

```
 1            MS. CAIN-MANNIX:  Okay.
 2            MR. BLECHMAN:  A transmission.
 3            THE COURT:  Where and when and how it got there.
 4   Okay.
 5            MS. CAIN-MANNIX:  Okay.
 6            THE COURT:  You can ask him questions.  I mean, the
 7   guy is not shy.
 8            MS. CAIN-MANNIX:  Right.
 9            (End of sidebar.)
10   BY MS. CAIN-MANNIX:
11   Q.   Mr. Klippen, have you also reviewed the 2008
12   UEP Guidelines for the egg-laying flocks.
13   A.   I have.
14   Q.   Okay.  And that's PX --
15            MS. CAIN-MANNIX:  Can we put up PX-434, please?
16            May I approach the witness, Your Honor?
17            THE COURT:  Yes.
18   BY MS. CAIN-MANNIX:
19   Q.   Mr. Klippen, can you identify PX-434?
20   A.   This is the 2008 edition of UEP's Animal Husbandry
21   Guidelines for the egg-laying flocks.
22   Q.   Were these in effect at approximately the same time as
23   the Sparboe PVP program --
24   A.   Yes.
25   Q.   -- it came into effect?
```

133

```
 1            MS. CAIN-MANNIX:  Plaintiffs moves to admit PX-434.
 2            MS. LEVINE:  No objection.
 3            MR. KING:  No objection.
 4            THE COURT:  434 is admitted.
 5            (Exhibit received in evidence.)
 6   BY MS. CAIN-MANNIX:
 7   Q.   Mr. Klippen, I'd like to go over some of the key animal
 8   welfare requirements of your program, and occasionally we may
 9   refer to 434 as well.
10   A.   Okay.
11   Q.   Does the PVP program require daily inspection of feeders
12   and drinkers, a maintenance plant -- well, it's three things
13   here:  feeders and drinkers, a maintenance plan and
14   recordkeeping concerning the provision of food and water?
15   A.   It does.
16   Q.   Okay.  And we're not going to put the document up, but
17   it's on multiple pages of your PVP program; is that correct?
18   A.   That is correct.
19   Q.   Did UEP's 2008 Guidelines require daily inspections of
20   food and water?
21   A.   They didn't audit for daily inspections, but they did
22   indicate that they expected that feed and water would be
23   available to the chickens at all times.
24   Q.   So is that the same as your program?
25   A.   It is not.
```

134

1   Q.   Did the PVP program require daily inspection of houses?
2   A.   It did.
3   Q.   In general?
4   A.   Yes.
5   Q.   Did it also require the producer to check daily for
6   equipment and temperature?
7   A.   It did.
8   Q.   What are the ammonia requirements under the PVP?
9   A.   Very specifically, it said that the level of ammonia was
10  not to exceed 25 parts per million, and if it ever exceeded
11  that temperature, which could sometimes happen during the
12  wintertime, that they were to provide immediate remediation.
13       Now, since they were maintaining a daily record of
14  temperature, that the auditors would come and notice when
15  there was a spike or when the temperature dropped and there
16  would be an explanation, that they had to refresh the air
17  because the ammonia levels had exceeded 25 parts per million.
18       So they had to produce documentation that they were
19  following the Process Verified Program to ensure that those
20  levels remained lower than 25 parts per million at all times
21  except for when they refreshed the air because it had spiked.
22  Q.   And so corrective action was required under your program?
23  A.   Corrective action was more than required.  It was
24  mandated that if they didn't demonstrate that they had
25  followed through with corrective action and produce the

135

1   documents to verify that they had followed through, they would
2   not receive process verification status from the USDA.
3   Q.   Okay.  Could you please explain to the jury how the
4   Process Verified Program addresses manure droppings?
5   A.   The manure is -- is a constant concern in any animal
6   agriculture industry, how to dispose of the manure in an
7   effective way.  The Process Verified Program made sure that
8   the manure was either removed out of the house or that it was
9   dried sufficiently in some of the deep pit houses.  A deep pit
10  would be where the chickens are higher up off the ground and
11  the manure would collect down below in the lower basement, if
12  you will, of the farm.
13       And they'd had fans blowing that would try to remove
14  as much moisture as possible because that's what contributes
15  to the odors and to the ammonia levels.  So this was a process
16  to make sure that the farmers were effectively dealing with
17  ammonia in a responsible way.
18  Q.   Can you briefly explain why ammonia is bad for hens?
19  A.   When ammonia level exceeds 25 parts per million, it
20  actually destroys the hairline of the cilia.  It's much like
21  the hair in your nostrils that filters out dust.  Well, they
22  have it also in they're esoph-- -- their trachea -- excuse
23  me -- their trachea which is where the air goes into their
24  lungs.
25       Well, the ammonia, if it exceeds 25 parts per

136

1   million, it starts to destroy those.  So it makes the chicken
2   prone to picking up illness, becoming sick.  So that's why
3   ammonia is such an important variable in making sure that
4   you're providing welfare for the chickens by keeping it low.
5   Q.   Can you explain the difference between the
6   PVP's provision on ammonia and the UEP's ammonia provision in
7   the 2008 guidelines in terms of enforcement?
8   A.   Under the UEP Guidelines for 2008, a farmer could exceed
9   25 parts per million and at the audit, it would be noted.  And
10  at the audit, since the producers were involved in writing the
11  audit, he had a few points deducted from his score.  He could
12  fail on the ammonia levels and still pass the audit.
13       Under the Process Verified Program, if he didn't
14  demonstrate that he was mediating the ammonia levels, he will
15  not receive process verified certification.  So the chickens
16  could continue to suffer with higher levels of ammonia for a
17  full year or thereafter without failing the audit.  Under the
18  Process Verified Program, that would not have been allowed.
19  Q.   Under the PVP program, were you required to check for
20  temperature and lighting on a daily basis?
21  A.   Yes, you were.
22  Q.   Were you also required to check for and remediate aerial
23  contaminants?
24  A.   Yes, definitely.
25  Q.   How about unhealthy birds?

137

1   A.   Definitely.  That was part of it, the daily inspection.
2   Q.   Unusual bird behavior?
3   A.   They were to notice unusual bird behavior and if it was
4   significant, meaning that it was a number of birds, not just
5   one bird, they were to report that to medical authorities and
6   in the case of Sparboe Farms, they had a certified
7   veterinarian who was an expert in poultry welfare on staff to
8   make sure he would go out and inspect to find out what was
9   wrong.
10  Q.   What are the cage space requirements under the PVP
11  program?
12  A.   67 square inches per bird, which is what the UEP
13  certification science -- is the science and that's what
14  scientists kind of came together and said that's the minimum
15  that they want to see, 67 square inches.
16  Q.   And that's for the White Leghorns, correct?
17  A.   For the White Leghorns which is the white shell eggs.  If
18  you buy brown shell eggs, that's a bigger bird.  And so they
19  allow 76 square inches.  Both -- both guidelines are the same.
20  Q.   How important is cage space compared to other animal
21  welfare provisions such as ammonia levels, fresh food and
22  water, proper euthanasia and veterinary attention and
23  monitoring?
24  A.   All of those provisions are important.  There isn't any
25  one that should dominate over all the others.  So under the

138

```
 1   Process Verified Program, if you failed at any one of those,
 2   you had to demonstrate that you had taken corrective action
 3   and then produced the document that you had followed through.
 4   Otherwise, you would not get the UEP -- excuse me -- PVP
 5   certification.
 6          Under UEP Guidelines, their focus was cage space.
 7   So if the cages did not allow for 67 square inches, that was
 8   considered an immediate failure.  And yet as I've already
 9   demonstrated or already stated, ammonia levels is an important
10   welfare aspect, but somebody that's under the UEP Certified
11   can fail that year after year after year, which is endangering
12   the health of the bird which is a welfare consideration, but
13   not under the Sparboe's -- or under any Process Verified
14   Program.
15   Q.   Was there an automatic fail under the PVP program for
16   cage space or any other provision?
17   A.   No.  It was -- the process verification was that if you
18   had something that needed to be corrected, you corrected it
19   immediately or you demonstrate how you were going to correct
20   that in order for USDA to grant PVP status.
21          So there wasn't any automatic fail.  You had to
22   correct all of the failures, all of the things that you were
23   deficient in under the Process Verified Program so that it was
24   a complete program, and as I mentioned before, it's a very
25   comprehensive program.
```

139

```
 1   Q.   Did the UEP have auto fail provisions in its 2008
 2   guidelines?
 3   A.   Automatic failure?
 4   Q.   Right.
 5   A.   Yes, they did.
 6   Q.   And what -- for what issues were those?
 7   A.   Well, cage space was one.  And if you just give me one
 8   moment, let me just double-check.
 9   Q.   Yes.
10          Would it help you to look at an audit form?
11   A.   It would.
12   Q.   Okay.  Let me find that.
13          MS. CAIN-MANNIX:  Your Honor, may I approach the
14   witness?
15          THE COURT:  Yes, you may.
16          MS. CAIN-MANNIX:  Okay.  Your Honor, this is PX-459,
17   which I believe has previously been admitted.
18          MR. KING:  Your Honor, before this is shown to the
19   jury, we have an objection.
20          THE COURT:  Let me just check here.  It was
21   admitted -- pages 1 through 3 were admitted and not as to
22   USEM, from my notes.
23          MR. KING:  And I have two objections.  One, lack of
24   foundation.  This audit form is from 2008, after Mr. Klippen
25   was with the UEP.
```

140

```
 1          Second, we would object under 403.  At a minimum,
 2   it's cumulative because it's already been introduced and
 3   there's no need for a witness who has no knowledge about this
 4   particular audit to be talking about it.
 5          MS. CAIN-MANNIX:  Your Honor, it was -- according to
 6   my notes, it was also admitted, all four pages, in connection
 7   with the Hendrix -- Ky Hendrix deposition, in unredacted form.
 8   And the witness has already testified that he's familiar with
 9   the auditing process under the --
10          THE COURT:  Actually the testimony was to be
11   familiar with the Exhibit 434.
12          MS. CAIN-MANNIX:  Right.  Okay.  Well, without
13   admitting it again.
14          THE COURT:  Well, it's already been admitted.  It's
15   a question of --
16          MS. CAIN-MANNIX:  I mean publishing it again, how
17   about that?
18          THE COURT:  Well, it's a question of the objection
19   to using this document with -- which is a 2008 -- June of 2008
20   document, it appears.
21          MS. CAIN-MANNIX:  Well, Your Honor, I'd like to use
22   it to refresh his recollection about --
23          THE COURT:  As to what?
24          MS. CAIN-MANNIX:  As to how the UEP Program
25   addressed provisions such as ammonia and the point system and
```

141

```
 1   the like.
 2          THE COURT:  He didn't say that he didn't know, did
 3   he?  I thought he just testified.
 4          MS. CAIN-MANNIX:  I asked him about the auto fail
 5   provisions and he said it would help him to review an audit.
 6          MR. KING:  Your Honor, not this particular audit for
 7   which he has no personal knowledge.
 8          THE COURT:  Do you have one from 2004 or earlier?
 9          MS. CAIN-MANNIX:  Not with me right now, but may I
10   allow him to review the document, not to testify about the
11   document itself to the jury, but to refresh his recollection
12   about what measures constituted automatic failures under the
13   UEP Program?
14          THE COURT:  About ammonia?
15          MS. CAIN-MANNIX:  No.  Did UEP have any auto fail
16   provisions was the question.  I'm not going to get into the
17   other items on the audit.
18          THE COURT:  Okay, the objection is to using the
19   document.
20          MS. CAIN-MANNIX:  I'm not going to use it with the
21   jury or publish it in front of the jury.  I'm using it only to
22   refresh this witness's recollection as to the point system
23   and --
24          THE COURT:  Well, he doesn't need it to refresh his
25   recollection.  You may use it without referring to a reading
```

142

```
1   from the document to see if somehow this does refresh his
2   recollection.
3   BY MS. CAIN-MANNIX:
4   Q.   Mr. Klippen, does reviewing the audit refresh your
5   recollection about whether UEP had any auto fail provisions in
6   the 2008 time period?
7   A.   It does.
8   Q.   Okay.  And what measures would trigger an automatic
9   failure?
10  A.   If they were less than 67 square inches, so it was space
11  was one of the automatic failures.  Backfilling was an
12  automatic failure.  Molting was an automatic failure.
13  Q.   Thank you.  Okay.  Returning to PVP, what are the PVP
14  protocols for catching and handling birds?
15  A.   They were very specific that -- and USDA would actually
16  observe the individual employees as to proper handling of
17  chicken.  In other words, when they would take a chicken out
18  of a cage, they were to support the chicken with one hand and
19  its breast, and the other hand would go over top to stop it
20  from flapping its wings, and then they were to pull the
21  chicken out, or if they were to put the chicken into a cage
22  they would just repeat that same sort of step process.  They
23  were not to just grab a leg or grab a wing or grab the neck
24  and just pull it out because the wings flapping or the legs
25  could be broken as a result of that.  So the way we devised
```

143

```
1   the handling was very, very specific and USDA would ask
2   employees to demonstrate how they were removing or putting
3   chickens into the cage.
4   Q.   Does the UEP 2008 Certified Program have guidelines on
5   how to handle birds?
6   A.   It does indicate that they should be handled properly.
7   Q.   What would happen if a producer failed to follow that
8   particular guideline?
9   A.   He would have some points taken off his score.
10  Q.   Would those points be sufficient to fail the audit?
11  A.   No.
12  Q.   What are the PVP requirements for birds held in
13  veterinary care?  Do you want to look at pages 10 and 12?
14       THE COURT:  What was the question, PVP or was it
15  UEP?
16       MS. CAIN-MANNIX:  PVP, Your Honor.
17       THE COURT:  Okay.
18       THE WITNESS:  It's very important.  It's at the very
19  beginning of the production guidelines or near the very
20  beginning of the production guidelines.  Right after feed and
21  water you would have health and veterinary care; and the
22  objective was to implement science-based animal health
23  programs to include the use of health products and provide
24  appropriate veterinary care.
25
```

144

```
1   BY MS. CAIN-MANNIX:
2   Q.   Is health and veterinary care addressed in the 2008 UEP
3   Guidelines?
4   A.   No, it is not.
5   Q.   Did the PVP address euthanasia?
6   A.   They did.
7   Q.   Okay.  Does the -- and what were the procedures,
8   generally speaking, on euthanasia?
9   A.   Euthanasia -- if they have to destroy birds, because
10  sometimes they may pick up a disease that cannot be helped --
11  or there's been a power failure and there has been -- the
12  birds have been traumatized, they stop laying eggs, they go
13  into what they say is a molt.  So they would euthanize those
14  birds and bring in a fresh flock.  So mass euthanization is
15  usually the use of carbon dioxide -- carbon -- CO₂, carbon
16  dioxide, so that you can actually cause them to go into an
17  unconscious state and then they would destroy the birds so
18  that they would minimize the pain and suffering.  We followed
19  similar procedures in the process verified, if you have to
20  mass euthanize a flock of birds.
21  Q.   Does the PVP address the cleaning out of dead birds?
22  A.   It does.
23  Q.   And what are the requirements?
24  A.   They were to inspect the cages daily and if they found a
25  bird had died in the course of the evening or before they came
```

145

```
1   back for their inspection, they were to remove that bird from
2   the cage -- that dead bird from the cage.
3   Q.   Does the PVP contain a Corrective Action Policy?
4   A.   Yes, it does.  There's a whole provision on corrective
5   action.  Again, it goes back to, in the quality management
6   system, if the farmer is not following all of the steps that
7   are required and then demonstrating that he's following those
8   steps with a verification, which means that he had
9   documentation to support that, he would fail the Process
10  Verified Certification.  He had to demonstrate that he was
11  taking corrective action.  So there's a specific part of the
12  program that says, not only does the farmer know that, but all
13  of his employees understand the corrective action that needs
14  to take place.
15  Q.   I'm going to backtrack a little bit.  Why did you leave
16  Sparboe Farms?
17  A.   Sparboe Farms fired me.
18  Q.   Can you explain what happened?
19  A.   Back in 2011, some animal activists had gained access to
20  the barns at Sparboe Farms and they were disguising themselves
21  as employees, they wanted to go into the farms and work on the
22  farm.  What they were doing is taking video pictures of some
23  of the employees who were abusing the chickens.  There was one
24  in particular that the chicken was on a rope and the employee
25  was swinging the chicken around saying, Let's see if you can
```

146

1   fly.
2           I had written a code of conduct that was to be
3   posted in every single barn.  A farm may have a number of
4   barns and these barns could be the length of a football field.
5   They might have several of those barns but every single barn
6   had to have a code of conduct where the employee who works
7   there signed it that says that he will not do something
8   abusive to the chicken and if he sees anybody doing something
9   abusive he was to report that.
10          So this video was released to ABC News, and ABC News
11  put it on their program called 20/20.  Brian Ross was the
12  reporter.  He called up Sparboe Farms and said he would
13  like --
14  Q.   Okay --
15  A.   I'm sorry.
16  Q.   -- let's not say what Brian Ross said.
17  A.   Okay.
18  Q.   But you may continue with that caution.
19  A.   Okay.  So the -- ABC came out and I was asked to be the
20  representative to respond to the questions.  The farm in
21  particular that was being analyzed was the farm that was
22  producing eggs for McDonald's, all the McDonald's stores west
23  of the Mississippi River, so it was a very important client
24  for Sparboe Farms.  And I took the reporter through the barns
25  and I showed him the conditions as well as the code of conduct

147

1   and explained the Process Verified Program to the reporter.
2   Nonetheless, the viral nature of that video, with some of the
3   video footage showing chickens being abused, was too much for
4   McDonald's to stomach and they basically terminated their
5   contract with Sparboe Farms.  Sparboe Farms released me from
6   employment as well as other employees at that time.
7   Q.   Was the conduct shown on the 20/20 video a violation of
8   PVP policy?
9   A.   Absolutely it was.  If a farm, farmer, or employee were
10  to see another employee, he was to report that.  If an
11  employee was to do that, he would be terminated.  All of those
12  employees were identified that were on that video and they
13  were immediately terminated from employment.
14  Q.   Do you know what would have happened if Sparboe had been
15  under the UEP Certified Program for this misconduct by these
16  employees?
17          MR. KING:  Objection.  Speculation.
18          THE COURT:  Sustained.  Well, you're asking does he
19  know?
20  BY MS. CAIN-MANNIX:
21  Q.   Do you know based on your review of the audit form, the
22  UEP's audit form?
23          THE COURT:  No.  Is the question does he know?
24  Right?  And what was the date of the --
25          MS. LEVINE:  2011.

148

1           THE COURT:  2011?
2           MS. CAIN-MANNIX:  2011.
3           Okay, we'll move on, Your Honor.  May I speak to
4   counsel for a minute?
5           THE COURT:  Yes.
6           MS. CAIN-MANNIX:  Okay.
7   BY MS. CAIN-MANNIX:
8   Q.   Mr. Klippen, with respect to the incident at Sparboe, did
9   that happen because of the PVP program or in spite of the PVP
10  program?
11  A.   In spite of the PVP program.
12  Q.   And was the cause of that conduct employee misconduct?
13  A.   Rogue employee misconduct.
14  Q.   And it was dealt with by the company -- was it dealt with
15  by the company in accordance with the PVP policy?
16  A.   Yes, it was.
17  Q.   Mr. Klippen, does the UEP Program require corrective
18  action for deficiencies?
19  A.   They simply subtract points from the audit.
20  Q.   What happens if a deficiency is not corrected under the
21  PVP program?
22  A.   A farmer does not remediate or does not correct the
23  action and demonstrates that he has corrected that and
24  produced documentation to verify that he's corrected that,
25  unless he does that, he will not receive process verification

149

1   certification.
2   Q.   Mr. Klippen, was backfilling permitted on the Sparboe PVP
3   program?
4   A.   Yes, it was.
5   Q.   Okay.  Was there a 100% rule in Sparboe PVP program?
6   A.   There was not.
7   Q.   Were all -- despite the fact that there was no actual
8   rule, were all of Sparboe-owned company farms on the PVP
9   program?
10  A.   All of the company-owned facilities of Sparboe did seek
11  PVP status.  So all of the company-owned facilities were
12  process verified.
13  Q.   Did the USDA require a 100% rule under the PVP program?
14  A.   No, they did not.  Can I elaborate on that?
15  Q.   Yes, please.
16  A.   Okay.  The USDA also has a program called Organic Program
17  and they actually provide a seal that says "organic," but when
18  they verify that a particular farm has some organic
19  production, they only verify that part of the production.
20  They don't mandate that that farmer have all of his production
21  as organic because he only has so many clients or so many
22  customers that are looking for organic whatever he's
23  producing.
24          So they do make that provision where it's only that
25  part of their production that is verified for, say, organic or

150

1    in the case of the Process Verified Program, only that portion
2    that follows these standards receive that certification.  So
3    it's the same.  USDA recognizes that organic is identical to
4    the process verification.
5         We did not mandate 100 percent.  And that was one of
6    the reasons why many farmers, egg farmers wanted a Process
7    Verified Program, because they didn't have customers that were
8    demanding welfare enhanced certification.  Only those that had
9    welfare enhanced certification required could actually use
10   that Process Verified Program and get that certification so
11   that they could provide what their customers want.
12        There are some customers that want, when they go
13   grocery shopping, to buy the least cost food they can find as
14   long as it's healthy and wholesome.  And, in fact, the
15   majority of people today prefer that.  So that's why we
16   developed an alternative Animal Welfare Program that did not
17   mandate you had to produce 100 percent of your production
18   under those guidelines.
19   Q.   If all the producers' flocks were not subject to the PVP
20   Guidelines, is there a risk that non-PVP eggs will be
21   commingled with PVP eggs?
22   A.   No.  And the reason for that is USDA has strict
23   requirements in the management system that they helped make,
24   Kraft, that says that they have to have that certification
25   that there is no commingling.  So there was no concern by

151

1    customers that were following or looking at the Process
2    Verified Program that some nonconforming eggs snuck into the
3    program.  That was not the case.  So the answer is no.
4    Q.   If there's no 100% rule, does that mean that the producer
5    can be treating some of its flocks in an inhumane manner
6    cramming them into 48-inch cages and the like?
7    A.   Even in UEP Certified Program, it's my understanding from
8    reading the 2000, the 2002 and 2008, they acknowledged that
9    farmers were producing in accordance with standards that would
10   provide for the health and welfare of their chickens even
11   before they developed the guidelines.
12        THE COURT:  What was the question?
13        MS. CAIN-MANNIX:  The question was:  If there is no
14   100% rule, does that mean --
15        THE COURT:  Is this in the PVP program or the UEP
16   Program?
17        MS. CAIN-MANNIX:  This is saying if you don't have a
18   100% rule --
19        THE COURT:  I'm sorry.  I just wasn't hearing the
20   question fully.
21        MS. CAIN-MANNIX:  Yes.
22        THE COURT:  Do you want to repeat the question?
23        MS. CAIN-MANNIX:  Yes.
24   BY MS. CAIN-MANNIX:
25   Q.   If there's no 100% rule, does that mean that the producer

152

1    can be treating some of its flocks in an inhumane manner?
2    A.   No.  Can I elaborate?
3    Q.   Well, let me ask the follow-up question, okay?  Do you
4    consider PVP to be an enhanced welfare program?
5    A.   That's what I was just going to say.
6    Q.   Okay.
7    A.   This is an enhanced welfare program for a special type of
8    clientele that demands an enhanced welfare certification or
9    enhanced guidelines to follow.  The farmers have evolved over
10   the last 50 years to produce in a condition that allows the
11   chicken to produce eggs.  If the chicken is being harmed or
12   treated -- mistreated, it's not going to be producing eggs.
13        And so he's trying to produce as many eggs as he can
14   from those chickens.  So the standards that we had even before
15   we developed the guidelines or the PVP were welfare standards
16   because the farmer was doing things right.  He was trying to
17   provide for his chickens to make sure that they had conditions
18   that were springlike year around, the amount of light was --
19   like it would be in the springtime because the birds are
20   photosensitive.  They're going to produce according to how
21   much light they receive in the course of the day.
22        And so the chickens believe it's springlike and
23   they're going to produce.  If the farmer is abusing his
24   chickens, they are not going to produce eggs.  So the answer
25   is, farmers will not abuse their chickens.

153

1    Q.   And did the UEP acknowledge that in its guidelines from
2    2008?
3    A.   They did.
4    Q.   And was that on -- I think it was on page 2.
5         MS. CAIN-MANNIX:  Can we show that exhibit, please?
6    I think it's 434.
7         MR. KING:  Your Honor, I would object to any further
8    kind of testimony under the 2008.  There's no foundation.  He
9    wasn't working for UEP.
10        THE COURT:  Indeed.
11        MS. CAIN-MANNIX:  Okay.
12        THE WITNESS:  2002?
13        MS. CAIN-MANNIX:  2002 then.  He was working for --
14        THE COURT:  How about if we let counsel ask the
15   question.
16        THE WITNESS:  I'm sorry, Your Honor.
17        THE COURT:  Do you want to ask the question?
18        MS. CAIN-MANNIX:  Yes.
19   BY MS. CAIN-MANNIX:
20   Q.   Under the 2002 guidelines enacted when you were at the
21   UEP, was there a provision in there concerning whether or not
22   production practices were humane?
23   A.   There is.
24        MS. CAIN-MANNIX:  Okay.  And can that be displayed,
25   please, Your Honor --

154

```
 1            THE COURT:  Sure.
 2       MS. CAIN-MANNIX:  -- what was previously admitted?
 3  It's 470.  I'm sorry, 740.  Did I misread it?
 4            MR. HILL:  93.
 5       MS. CAIN-MANNIX:  Oh, PX-93.  Oh, no, but the one we
 6  just used today was --
 7            MR. KING:  I believe it's D-175.
 8            MR. HILL:  D-175.
 9       MS. CAIN-MANNIX:  Thank you.  Exhibit malfunction.
10  BY MS. CAIN-MANNIX:
11  Q.   Do you see it?  Is there a reference on page 2 to what --
12  to the humanity, if you will, of the existing program?
13  Different page.
14  A.   It's the previous page, page 1 that we just had up.
15  Q.   Page 1.
16  A.   Fourth paragraph, may I read it?
17  Q.   Yes.
18  A.   To meet a growing demand, farmers needed to upgrade their
19  production facilities while keeping in mind the health and
20  welfare of their birds.  They also recognized the need to
21  deliver eggs to the market in the most economical manner
22  possible.  The modern-day cage system was found to be the one
23  system that could meet both requirements.
24  Q.   Thank you.
25            Mr. Klippen, let move on to a new subject.  What was
```

155

```
 1  the UEP's reaction to the development of the PVP program?
 2  A.   They tried to stop it.
 3  Q.   And in what ways did they try to stop it?
 4  A.   There were numerous and many.  They repeatedly met with
 5  officials at the USDA, poultry programs, agriculture marketing
 6  service, first the deputy administrator who supported the PVP.
 7  Then they met with the administrator himself, and then they
 8  went to an under secretary.  And in all occasions, it's my
 9  understanding that they were fully supportive of the PVP.  It
10  was their program.
11            So they tried through USDA.  I was a speaker at a
12  conference in Iowa, University of Iowa -- excuse me -- Iowa
13  State.  They had a conference in 2006, I believe, and I was
14  one of the speakers to explain this alternative Animal Welfare
15  Program because there were farmers in Iowa that wanted to know
16  more about that.
17            They wrote to the organizers and to the organizer,
18  specifically Dr. Gerald Trampel, and criticized him for
19  allowing me to be on the program to talk about an alternative
20  program.  There were two Freedom of Information Act requests
21  filed trying to obtain the documentation that took me a year
22  to write.
23  Q.   And was that while you were still developing it?
24  A.   While I was developing it.  Even before it was completed.
25  Q.   Okay.
```

156

```
 1  A.   I had three scientists that I refused to share their
 2  names because I knew that they would be intimidated and they
 3  were when they found -- as soon as United Egg Producers found
 4  out, it was my understanding, because they told me, that they
 5  were called upon by Gene Gregory and they were abused because
 6  they were actually supporting the program that I had
 7  developed.
 8            There was letters that were sent to the Food
 9  Marketing Institute not to cooperate with me in developing a
10  Process Verified Program.  It just -- those are the ones I can
11  remember off the top of my head right now, but there were many
12  attempts to try to stop the development of a Process Verified
13  Program, the alternative program for the egg industry.
14  Q.   How did you become aware of UEP's effort to convince the
15  USDA to reject the PVP program?
16  A.   The USDA officials, after they dealt with the UEP
17  employees, specifically Gene Gregory, but there were others
18  with him on occasion, they would contact me and they would ask
19  me to help.
20  Q.   Okay.  Don't say what they said, but what your
21  understanding --
22  A.   Thank you.
23  Q.   -- was of the situation.
24  A.   My understanding was that UEP was trying to stop the
25  development of the Process Verified Program.
```

157

```
 1  Q.   Okay.  Did the USDA reject the PVP program after hearing
 2  the UEP's --
 3  A.   They did not.
 4  Q.   -- protest?
 5            What's your understanding of their response to
 6  Gene Gregory and the UEP's communications concerning the PVP
 7  program?
 8  A.   My understanding is that because I was not seeking
 9  100 percent of all the production under the Process Verified
10  Program, that it was going to undermine all the auditing
11  programs.  USDA did not agree with that, and they specified
12  that they did not agree with that.  That was my understanding
13  because they would actually tell me when I went --
14  Q.   Don't say what they said.  Please.
15            Did you learn about a request by UEP to require some
16  kind of a disclaimer on cartons produced by the PVP program?
17  A.   Yes, I did.
18  Q.   And did they want a disclaimer that -- well, strike that.
19            Did USDA require that companies participating in PVP
20  use any kind of a disclaimer on their cartons?
21  A.   No, they did not.
22  Q.   Did you receive a letter from UEP's attorneys?
23  A.   Yes, I did.
24  Q.   What was the nature of that letter?
25  A.   Kevin Haley worked for Brann & Isaacson.  I've known of
```

158

1    that law firm because I worked also with them for a number of
2    years prior to Kevin Haley coming on board.  He wrote me a
3    letter where he was highly critical of --
4              MS. LEVINE:  Objection, Your Honor.  Hearsay.
5              MS. CAIN-MANNIX:  I think he's -- he received a
6    letter, Your Honor.
7              THE COURT:  What's the relevance of this?
8              MS. CAIN-MANNIX:  The relevance is that the UEP --
9              THE COURT:  I don't even have a date.
10             MS. CAIN-MANNIX:  Okay.
11   BY MS. CAIN-MANNIX:
12   Q.   Did you respond to the letter from Kevin Haley?
13   A.   Yes, I did.
14   Q.   Okay.  I'm going to show you what has been previously
15   marked as PX-431.
16        Can you identify this document, please, Mr. Klippen?
17   A.   It's an e-mail from me -- excuse me.  The top of the
18   e-mail is from Gerry Wigren, he was writing to me.  I
19   responded to Gerry below that.
20   Q.   Isn't it the -- flip it.  You wrote to him?  And he wrote
21   back to you?
22   A.   At the very top of the page you'll see where he's
23   addressing me, Ken, and he talks about the divisions within
24   the industry.
25   Q.   Let's focus on -- does this e-mail exchange with Gerry

159

1    Wigren contain in it your response letter to Kevin Haley?
2    A.   It does.
3    Q.   Okay.  And what is the date of your response letter?
4    A.   December 26, 2007.
5    Q.   Is this the letter that you wrote and sent to Kevin
6    Haley?
7    A.   It is.
8    Q.   Does this refresh your recollection about when Mr. Haley
9    wrote to you?
10   A.   Yes, it does.
11   Q.   And approximately when did he write to you?
12   A.   On December 22nd.
13   Q.   Okay.
14   A.   Excuse me, he sent it the day before.  He sent it by
15   special courier.  So I received it on December 22nd.  So it
16   must have been the day before.
17   Q.   And what's your understanding of the concerns that UEP
18   raised in Mr. Haley's letter?
19   A.   He had been misled and so I --
20   Q.   What concerns did he identify in the letter?
21   A.   He used words like so-called animal welfare --
22             MS. LEVINE:  Objection, Your Honor.  This is
23   completely hearsay.
24             THE COURT:  I'm still befuddled by the purpose of
25   this line of questioning.  So while I try and work on my being

160

1    befuddled, I'll give the jury a ten-minute break.
2              MS. CAIN-MANNIX:  Thank you, Your Honor.
3              THE COURT:  Same rules, folks, okay.
4              THE COURT:  I'll be back.
5              (After recess:)
6              THE COURT:  How much more do we have, by the way,
7    with -- oh, we've lost -- I hope I didn't chase her away.
8              MR. HILL:  If I could have just a moment, Your
9    Honor.
10             (Witness resumes the stand.)
11             THE COURT:  Roughly, what's our timing?
12             MS. CAIN-MANNIX:  I have about 15 more minutes.
13             THE COURT:  Okay.
14             MR. BLECHMAN:  Your Honor, would it be worth
15   concluding the sidebar that you held to answer the question.
16             THE COURT:  Oh, do we know more?
17             MR. BLECHMAN:  I believe we do.
18             THE COURT:  Have you been speaking with each other?
19             MR. BLECHMAN:  No, but I'll be happy to.
20             THE COURT:  I think maybe that would be the place to
21   start.
22             MR. BLECHMAN:  Of course.
23             (Discussion held off the record.)
24             MR. SLATER:  Your Honor -- sorry.  Would you like a
25   copy of the exhibit?

161

1              THE COURT:  I sure would.
2              MS. CAIN-MANNIX:  Can I have a copy?  I haven't seen
3    it.
4              THE COURT:  I'm just waiting for the net result.
5              MR. KING:  I'll withdraw.  Technically I didn't
6    object, so I'll defer to Ms. Levine.
7              MS. LEVINE:  I don't know this, but I have no
8    reason --
9              THE COURT:  Are you throwing her under the bus?
10             MS. CAIN-MANNIX:  Yes, thank you, Your Honor.
11             MS. LEVINE:  I'm going to make my objection.  It
12   does appear, I don't know what these numbers are, that over
13   the summer we got this document.
14             THE COURT:  No, Mike, I'm sorry, excuse us, we're
15   still doing some housekeeping.
16             MS. LEVINE:  But my point is that during discovery,
17   it was not produced, the witness said it was not available.
18   They filed objections to the FOIA request and there was no
19   opportunity to learn about it.  Getting this in the summer a
20   new document that's outside the confines of discovery, and
21   it's not very helpful to examining and it's not
22   cross-examination, it's for affirmative evidence.  So my
23   objection stands.  I think the witness testified from the
24   document.
25             THE COURT:  You think?

162

```
 1          MS. LEVINE:  I should have asked you to take it
 2    away.  So my objection stands about sending it back on the
 3    grounds that it's outside of discovery and it's not
 4    cross-examination.
 5          THE COURT:  Okay, well, other than the fact that
 6    it's now cumulative, I do appreciate the fact that we've
 7    documented the movement of these various pieces of
 8    information, and if there is a resumption of a request to
 9    admit the document on the understanding that you're not now
10    going to go over the document --
11          MS. CAIN-MANNIX:  No, no, Your Honor.  No, no,
12    Your Honor.
13          MR. SLATER:  Correct.
14          THE COURT:  Because it is cumulative.
15          MR. SLATER:  We agree.
16          THE COURT:  Because this would not be the first
17    exhibit that is cumulative.
18          MS. CAIN-MANNIX:  By me.
19          MR. BLECHMAN:  We would just offer it into evidence
20    and nothing more.
21          THE COURT:  Okay.  Fair enough.  We've got a
22    multi-faceted deal on this particular point.
23          MS. CAIN-MANNIX:  So do we want to do this now?  I
24    move, Your Honor, to admit.
25          THE COURT:  No.  What you want to do is, you want to
```

163

```
 1    admit it when the jury is here.
 2          MS. CAIN-MANNIX:  Okay.
 3          THE COURT:  Now you can bring them back.
 4          I don't mean to intrude on your decision-making, but
 5    I think that's what you want.
 6          MS. CAIN-MANNIX:  No, that's a good point.  Thank
 7    you.
 8          MR. SLATER:  Thank you, Your Honor.
 9          THE COURT:  You're welcome.
10          THE DEPUTY CLERK:  All rise.
11          (Jury in.)
12          THE COURT:  Okay, welcome back.  Sorry for the false
13    start.  The rest of you may take your seats.
14          And, Ms. Cain-Mannix, I believe you wanted to
15    re-offer Exhibit 52 --
16          MS. CAIN-MANNIX:  Yes.
17          THE COURT:  -- the Sparboe company's process
18    verified Animal Care Program from -- that you were talking
19    about.  And the objections have been withdrawn or overruled
20    and it is admitted.
21          You may now move on.
22          (Exhibit received in evidence.)
23          MS. CAIN-MANNIX:  Thank you, Your Honor.
24    BY MS. CAIN-MANNIX:
25    Q.   Before the break, we were talking about a letter exchange
```

164

```
 1    you had with UEP's counsel, correct?
 2    A.   That's correct.
 3    Q.   And first, did you feel threatened when you got a letter
 4    from UEP's counsel?
 5    A.   I did.
 6    Q.   Okay.  And how did you respond?
 7    A.   I responded as professionally as I could and responded to
 8    each one of the criticisms he had about the Process Verified
 9    Program, but I also put him on notice that I had been
10    consulting with another law firm out of Minneapolis that
11    specialized in business tort claims and antitrust, and I asked
12    him for verification that was not the case in his letter
13    in trying to threaten me.
14    Q.   Okay.  Do you have your e-mail -- excuse me -- your
15    letter in front of you, PX-431?
16    A.   I do.
17    Q.   Okay.
18          MS. CAIN-MANNIX:  Your Honor, I move to admit
19    PX-431.
20          MR. KING:  I would object based on relevance.
21          MS. CAIN-MANNIX:  Your Honor, the relevance is this
22    is a competing -- less restrictive program, and UEP is
23    trying --
24          THE COURT:  It has nothing to do with a problem
25    between him and a lawyer.
```

165

```
 1          MS. CAIN-MANNIX:  I think it does.
 2          THE COURT:  How so?
 3          MS. CAIN-MANNIX:  It's showing -- it's a response to
 4    the UEP's attempt to try to stop a less restrictive
 5    alternative.
 6          MS. LEVINE:  Your Honor, I object to
 7    counsel's characterization of the program.  That's really for
 8    the jury.
 9          THE COURT:  Well --
10          MS. LEVINE:  I also object that it's unsigned.
11          THE COURT:  I don't even know which part it is
12    you're offering.  There's -- the front page is an e-mail
13    exchange.
14          MS. CAIN-MANNIX:  We are not offering the e-mail
15    exchange.
16          THE COURT:  Then it's part of the exhibit I was
17    given to look at.
18          MS. CAIN-MANNIX:  I do apologize, Your Honor.
19          THE COURT:  No problem.  You don't have to
20    apologize.  I'm just pointing it out.
21          MS. CAIN-MANNIX:  Okay.  So we will redact the
22    e-mail correspondence at the top and move to admit a redacted
23    version of Exhibit PX-431 which contains the letter.
24          MR. KING:  I would renew my objection on relevance.
25    It's also cumulative.  He's already testified about what he
```

166

1   said.  We don't need the letter.
2           MS. LEVINE:  I would object on the basis of hearsay
3   and an unsigned letter.
4           THE COURT:  Does the only point of the letter have
5   to do with the PVP or VPC program?  You have not covered that
6   with -- and has the witness not covered it extensively?
7           MS. CAIN-MANNIX:  I think it's been covered,
8   Your Honor.
9           THE COURT:  Okay.
10          MS. CAIN-MANNIX:  That's fine.
11          THE COURT:  So are you withdrawing the exhibit?
12          MS. CAIN-MANNIX:  I'll -- that's fine, Your Honor.
13  I'll withdraw.
14  BY MS. CAIN-MANNIX:
15  Q.   Mr. Klippen, did you ever try to sit down with UEP to
16  discuss these kinds of issues that were arising regarding the
17  PVP program?
18  A.   Yes, I did.
19  Q.   And do you remember -- well, first of all, who did you
20  meet with?
21  A.   I met with Gene Gregory and his counsel, Mike McCloud.
22  That was his Washington counsel.  And I brought my counsel as
23  well.  We met in Washington, D.C.
24  Q.   And what was the approximate date of that meeting?
25  A.   Spring of 2006, I believe.

167

1   Q.   Okay.  Why did you decide to take that meeting?
2   A.   The U.S. Department of Agriculture had indicated to me --
3   it was my understanding that the USDA animal agriculture --
4   the agriculture marketing service -- I'll get it straight
5   here -- was receiving a lot of heat, a lot of tension from
6   Gene Gregory in trying to stop the Process Verified Program.
7   They specifically -- it's my understanding they specifically
8   wanted me to meet to see if I can reconcile.
9   Q.   Were you able to reconcile your differences with UEP?
10  A.   It was my hope that we could reconcile, but the answer is
11  no, we did not.
12  Q.   How did the meeting end?
13  A.   It started off cordial.  We exchanged pleasantries.  We
14  got into why we were meeting.  During the course of the
15  meeting, on several occasions Gene Gregory called me disloyal.
16          MS. LEVINE:  Objection, Your Honor.
17  BY MS. CAIN-MANNIX:
18  Q.   If you could please avoid --
19          THE COURT:  Sustained.
20  BY MS. CAIN-MANNIX:
21  Q.   -- explaining what others said.
22  A.   I felt intimidated.  And the intimidation was more than I
23  could bear.  So I finally stood up and said, This meeting has
24  ended.  And I left.
25  Q.   Okay.  Did you have -- after that incident, did you have

168

1   any other interactions with either Gene or Chad Gregory about
2   the PVP program?
3   A.   Chad Gregory approached me at another conference.  It was
4   The Center for Food Integrity, as I recall.  It was a meeting.
5   I was participating.  I had signed up to participate in this
6   conference.  Even before the conference began, he approached
7   me.  He too was intimidating.
8   Q.   Okay.
9   A.   So I ended the conversation and it did not end well.
10  Q.   Okay.  Did UEP ever attempt to contact while Sparboe
11  was on the PVP program one of Sparboe's customers?
12  A.   Yes.
13  Q.   And which customer was that?
14  A.   Walmart.
15  Q.   Could you please explain what happened?  And, again, try
16  to refrain from saying anything that others said.
17  A.   The second day of the job working for Sparboe, I was
18  flown down to Bentonville, Arkansas to meet with the buyer for
19  Walmart.  I was to present the Process Verified Program so
20  that Walmart can see the comprehensiveness of that program.
21  During the course of the conversation, it's my understanding
22  that Gene Gregory had contacted Tony Airoso who was the buyer.
23  Q.   Did this happen the same day you were at Sparboe?
24  A.   It did.
25  Q.   Okay.  Let's see.  Do you have an understanding of what

169

1   UEP's position was to Walmart regarding the PVP program?
2   A.   It's my understanding that they were trying to stop
3   Walmart from purchasing any processed verified eggs from
4   Sparboe.
5   Q.   Okay.  Did Walmart listen to the UEP and not go with the
6   PVP program?
7   A.   No, it did not.
8   Q.   Did Walmart eventually contract with Sparboe for the
9   purchase of PVP produced eggs?
10  A.   It did.
11  Q.   Mr. Klippen, did anyone -- did any other egg producer
12  besides Sparboe ever utilize the PVP program?
13  A.   Not for process verified of eggs, but there was one other
14  producer that used it for a process verification of spent
15  hens.
16  Q.   Okay.  And who was that?
17  A.   That was Henning, Jeff Henning.  And he -- it was
18  Henning Construction, and he had a facility where they were
19  processing the birds into pet food.  And he wanted to use the
20  process verification to demonstrate to the pet food companies
21  that the process had an arbiter order that was very rigorous
22  in making sure that they followed all of the procedures.
23  Q.   Did he consult with you about the PVP, developing a PVP
24  program in that regard?
25  A.   Yes, he did.

170

1  Q.   Okay.  Do you have an understanding of why other
2  producers -- I mean, you met with a number of producers,
3  correct?
4  A.   That's correct.
5  Q.   Do you have an understanding of why other producers did
6  not adopt a PVP program?
7  A.   I do.
8  Q.   Okay.  And what is your understanding?
9  A.   They also felt threatened.  That was my understanding.
10 There was a word that was coined as a result of what
11 happened --
12       MR. KING:  Objection.  Hearsay.
13       THE COURT:  Sustained.
14 BY MS. CAIN-MANNIX:
15 Q.   What is your understanding of who they felt threatened
16 by?
17 A.   The Humane Society of the United States and other animal
18 activists because they saw what happened to Sparboe.
19 Q.   Okay.  Before I turn you over to cross, could you comment
20 on whether the PVP program or the UEP Certified Program better
21 police's animal welfare issues?
22 A.   Because the auditing system utilized in USDA, it's my
23 understanding that it is a much more intensive tier of
24 auditing.  It's the top tier of auditing by USDA as it relates
25 to any kind of process verification.  The fact that it's an

171

1  Animal Care Program was demonstrating that we're following
2  provisions of science in trying to develop and enhance a
3  welfare program for those farmers, Sparboe, in particular,
4  that wanted to offer their customers a welfare enhanced
5  program that did not mandate 100 percent participation of all
6  their hens on the program.
7  Q.   And did you have a belief or understanding as to whether
8  one was better than another at catching deficiencies and
9  remedying animal welfare issues?
10 A.   I do.
11 Q.   And which program is that?
12 A.   The Process Verified Program is much more tuned to
13 catching deficiencies and requiring remediation instead of
14 allowing a deficiency to go on from year to year.
15       MS. CAIN-MANNIX:  At this time, Your Honor, I have
16 no further questions.
17       THE COURT:  Any cross-examination?
18       MS. LEVINE:  Yes, Your Honor.
19           CROSS-EXAMINATION
20 BY MS. LEVINE:
21 Q.   Good afternoon, Mr. Klippen.  My name is Jan Levine.  I
22 represent the United Egg Producers.  I don't know if you
23 remember me.
24 A.   I do.
25 Q.   But I met you back at your deposition, which I have right

172

1  here.
2  A.   I do remember.
3  Q.   I just want to go over just to clarify a little bit about
4  your background.  Now, I understand that you do not hold a PhD
5  in poultry science or any other form of animal welfare; is
6  that correct, sir?
7  A.   That's correct.
8  Q.   Okay.  And you are not -- you were not asked by anyone to
9  sit on UEP's Scientific Advisory Committee, were you, sir?
10 A.   That's correct.
11 Q.   And you were not asked by FMI to sit on its Scientific
12 Advisory Committee, were you, sir?
13 A.   That's correct.
14 Q.   And, in fact, the president of UEP, Al Pope, did not
15 assign you as a staff member to UEP's Producer Committee for
16 Animal Welfare, did he?
17 A.   He did not.
18 Q.   And I think your counsel -- I think Plaintiffs'
19 counsel -- I think Plaintiffs' counsel showed you what has
20 been marked as PX-0742, which is the United Egg Producers'
21 committee appointments for 2000, and also PX-0743, United Egg
22 Producers' committee appointments for 2001.  Do you remember
23 those two, sir?
24 A.   Yes, I do.
25 Q.   And I think in 2000, you were the staff member -- staff

173

1  coordinator for the Government Relations Committee; is that
2  correct?
3  A.   That's correct.
4  Q.   And at that time animal welfare was under the
5  jurisdiction of the Government Relations Committee; is that
6  right?
7  A.   Can you explain what you mean by "animal welfare"?
8  Q.   I'm just -- sorry.  That it's listed.  Plaintiffs'
9  counsel showed you that animal welfare was listed under one of the
10 duties of Government Relations Committee; is that correct?
11 A.   Can I explain why?
12 Q.   No.  Just can you tell me if animal welfare --
13 A.   It does say "animal welfare," correct.
14 Q.   Okay.  And you were the staff coordinator, correct?
15 A.   Of the Government Relations Committee.
16 Q.   Yeah.  And the next year, it was pointed out on your
17 direct examination, that the Government Relations Committee no
18 longer had the animal welfare as one of its duties, but it was
19 moved over to the United Producer Committee for Animal
20 Welfare; is that correct?
21 A.   That's correct.
22 Q.   And Gene Gregory was the staff coordinator for that
23 committee, correct, in 2001?
24 A.   That's correct.
25 Q.   Okay.  So it's no longer part of your duties, it was now

174

```
1   part of the UEP Producer Committee for Animal Welfare, and
2   Gene Gregory was the staff coordinator, correct?
3   A.   Correct.
4   Q.   Okay.  Now, there's been a lot of discussion about this
5   100% rule and the difference with the PVP program, your
6   program, Sparboe's prior program, and the UEP Program and I
7   just want to get it straight because I always think there's a
8   lot of confusion about that.
9        Under the PVP program, if I had an egg farm, let's
10  call it the Levine Company Egg Farm, I could get PVP verified
11  if I followed all of the requirements, correct?
12  A.   That's correct.
13  Q.   Okay.  So over here, it would be the Levine Family Farm
14  with 67 inches for chickens; is that right?
15  A.   That's correct.
16  Q.   Audited carefully, ammonia standards because you
17  explained how terrible ammonia could be?
18  A.   Correct.
19  Q.   Is that correct?  Okay.
20  A.   Yes.
21  Q.   I could also walk across the street and also have a
22  henhouse, right, and I could still keep my PVP certification,
23  Levine Family Farm, but over here, I could choose to put
24  chickens in less than 67 inches, correct, and I would not lose
25  my PVP verification on my PVP houses; is that correct?
```

175

```
1   A.   You would not receive PVP certification for any house
2   other than what's PVP certified.
3   Q.   Correct.  But I would not lose my PVP certification if I
4   had hens at 48 inches; is that correct?
5   A.   That's correct.
6   Q.   And I could have the wrong ammonia standards, I could be
7   really hurting those birds and the Levine Family Farm would
8   still be PVP certified, correct?
9   A.   You would not be in business for long.
10  Q.   Correct.  Thank you, Mr. Klippen.
11       And the PVP verified process was not in business for
12  long, was it, either?
13  A.   The PVP Certified Program ended when Sparboe dropped it.
14  Q.   Right.  Because nobody wanted to be on the program; is
15  that correct?
16  A.   No.
17  Q.   Do any of the grocery stores in this lawsuit, are they on
18  the PVP program?
19  A.   No.
20  Q.   Okay.  And Sparboe's no longer on the PVP program, right?
21  A.   That's correct.
22  Q.   In fact, the second that those cameras came rolling in
23  and the deplorable conditions on that farm was known, when you
24  were the head of the Animal Welfare Program at Sparboe, you
25  got fired -- you got terminated, and they terminated the PVP
```

176

```
1   program; is that right?
2   A.   Incorrect.
3   Q.   What was incorrect about my statement?
4   A.   It was not deplorable conditions.  That was a
5   state-of-the-art farm.  It was one -- I had been to six
6   continents where I visited with farm facilities.  That
7   particular farm was state-of-the-art.  So it was not
8   deplorable conditions.  It was a few rogue employees that were
9   terminated right afterwards.  So it was not because of the
10  conditions on that farm, it was because of those rogue
11  employees and the viral nature of that video.
12  Q.   And what was on the video?
13  A.   They showed chickens that were being abused.  There was
14  one employee that was swinging a chicken by a rope.  Obviously
15  a violation of the welfare standards that we had employed.
16  They had other farmer -- other employees that were abusing
17  chickens by the way they were pulling them out of the cages or
18  they were beak trimming them.  So there were some standards,
19  or, rather, there were some practices that were beyond the
20  standards that we had developed for the PVP program.
21  Q.   And you had said that those were deplorable, right, sir?
22  A.   Those were deplorable employees, not the condition of the
23  farm.
24  Q.   Right.  And, in fact, although you just testified and
25  stated back then that this was staged, Sparboe disagreed with
```

177

```
1   you, right?
2   A.   Sparboe did disagree with me; but to this day, it is my
3   opinion that those were staged acts by rogue employees.
4   Q.   But Sparboe disagreed with you and actually went to the
5   press that they disagreed with you, right, sir?
6   A.   That's correct.
7            THE COURT:  Don't worry, I'm just getting a pad of
8   paper here.
9            THE WITNESS:  Thank you, Your Honor.
10           THE COURT:  If anybody's counting, it's going to be
11  four.
12           MS. CAIN-MANNIX:  May I have a copy?
13           MS. LEVINE:  Oh, sure.
14  BY MS. LEVINE:
15  Q.   Mr. Klippen, do you recognize this document?
16  A.   I do.
17  Q.   This is the article where the terrible conditions were
18  explained, correct?
19           MS. CAIN-MANNIX:  Objection to the use of the
20  document.  Hearsay.
21           MS. LEVINE:  It's impeachment.
22           THE COURT:  Overruled.
23  BY MS. LEVINE:
24  Q.   And in this document, Sparboe disagrees with you when you
25  said it was staged, correct?
```

178

```
1  A.   They did right after.
2  Q.   Correct.  They never changed their opinion, have they?
3  A.   I don't know.  I didn't ask them.
4  Q.   Um-hum.  And this article explains that McDonald's and
5  Target dropped Sparboe Farms as an egg supplier, right?
6  A.   It does.
7          MS. CAIN-MANNIX:  Objection.
8  BY MS. LEVINE:
9  Q.   And they did, in fact, do that, right?
10         MS. CAIN-MANNIX:  Hearsay.
11         THE COURT:  Well, I think this material has been
12  covered at least once.  So I'm going to overrule the
13  objection.
14         But ask Ms. Levine for you to move through your
15  cross-examination, please.
16         MS. LEVINE:  Okay.
17  BY MS. LEVINE:
18  Q.   Mr. Klippen, you never got the endorsement from FMI for
19  the PVP program, right?
20  A.   We didn't ask for the endorsement by FMI.
21  Q.   Right.  And you never got the endorsement, correct?
22  A.   We didn't ask for it.
23  Q.   And you didn't ask for it because you knew that FMI
24  wanted all houses with all chickens to be treated the same and
25  humanely, correct?
```

179

```
1  A.   Incorrect.
2  Q.   Mr. Klippen, can you take a look at that letter and --
3  I'm sorry, the e-mails and make sure you're familiar with
4  them.
5  A.   I recognize it.
6  Q.   Now I need a copy.
7          I'm handing you what has been marked as -- you have
8  it as DX-92.  Do you recognize the e-mail chain?
9  A.   I do.
10  Q.   Okay.  And who is Brian Joyner?
11  A.   Brian Joyner was an employee of Sparboe Farms at that
12  time.
13  Q.   Do you know his position?
14  A.   I do not remember his title, no.
15  Q.   Okay.  And who is Karen Brown?
16  A.   Karen Brown was the --
17         MS. CAIN-MANNIX:  Your Honor -- okay.
18  BY MS. LEVINE:
19  Q.   And who is Karen Brown?
20  A.   The senior vice president for the Food Marketing
21  Institute.
22  Q.   And were you copied on the e-mail from Karen Brown to
23  Brian Joyner?
24  A.   I was.
25  Q.   Okay.
```

180

```
1          MS. LEVINE:  I'd like to move this document into
2  evidence for notice purposes only, that he was notified about
3  FMI's position about the 100% rule.
4          MS. CAIN-MANNIX:  Well, the document itself is
5  hearsay.  We would object on that basis, but it sounds like
6  they are offering it for the truth of the matter asserted, to
7  me.
8          MS. LEVINE:  We're offering it for notice that this
9  witness was aware that FMI thought all animals should be
10  treated equally.
11         THE COURT:  Is there or is there not an objection?
12         MS. CAIN-MANNIX:  Relevance.
13         THE COURT:  So that's a yes?
14         MS. CAIN-MANNIX:  Yes, please.
15         THE COURT:  Overruled.
16         Does it have a number?
17         MR. KING:  Actually, Your Honor, there is an exhibit
18  number you could use, it's D-267.
19         MS. LEVINE:  Oh.
20         THE COURT:  I heard DCX-92.  I'm looking at Klippen
21  69.  Just pick one.
22         MR. KING:  D-267.
23         MS. LEVINE:  D-267.
24         THE COURT:  Okay.  We've got a winner.
25         MS. LEVINE:  Numbers are not my thing.
```

181

```
1          THE COURT:  It's D-267.  Thank you.
2          MS. LEVINE:  May I publish it to the jury, Your
3  Honor?
4          THE COURT:  Yes.
5          (Exhibit received in evidence.)
6  BY MS. LEVINE:
7  Q.   Okay.  Let's read this e-mail chain together.  We can
8  start on Mr. Joyner's e-mail dated July 9.  Do you see that?
9  A.   I do.
10  Q.   Okay.  And his second bullet reads:  What is FMI and
11  NCCR's position on implementing the guidelines?  Should a
12  company allow the marketplace to influence the amount of
13  product produced under the guidelines or should the company
14  commit 100 percent of their product to the guidelines
15  regardless of the interest from consumers -- sorry --
16  customers and consumers?  Is your position the same across all
17  producer organizations?
18         Did I read that right, sir?
19  A.   You did.
20  Q.   Now, let's turn over and look at Karen Brown, senior vice
21  president of Food Marketing Institute, respond to that
22  question.  She writes:  Our goal is enhanced animal welfare
23  for all animals in food production, not animals used only for
24  certain products or product categories.  This is our position
25  for all producer groups.  Is that correct?
```

182

```
 1   A.   I see that, yes.
 2   Q.   All right.  Whether for shell eggs, for egg products, for
 3   whatever you could use the egg for, she is saying
 4   FMI's position?
 5   A.   She is saying that is their goal.
 6   Q.   That is their goal.  Right.  That is their wish list.
 7   Okay.
 8        And then you respond:  Sparboe is looking for the
 9   weaknesses in our relationship with FMI --
10        (Discussion held off the record.)
11        MS. LEVINE:  I can't read there.  What does this
12   say?
13        (Discussion off the record.)
14        MS. LEVINE:  One minute.  I think I have a different
15   document from what I handed to the witness.
16        MR. KING:  May I?
17        THE COURT:  Yes.
18   BY MS. LEVINE:
19   Q.   Okay.  Sorry.  And --
20        THE COURT:  Are we still with D-267?
21        MS. LEVINE:  Yes.
22        MS. CAIN-MANNIX:  And this is Klippen 69.  I just
23   want to make sure I have the right document, too.
24        MR. KING:  I will distribute my copy.
25        MS. CAIN-MANNIX:  Okay.  On the screen it's
```

183

```
 1   different.
 2        MS. LEVINE:  We'll get it right.
 3        MS. CAIN-MANNIX:  Okay.
 4        MS. LEVINE:  I apologize.
 5        MS. CAIN-MANNIX:  Can it be blown up enough so I --
 6   all right.
 7        MR. HILL:  Does the witness have a correct copy of
 8   the document?
 9        THE WITNESS:  No.
10        MS. LEVINE:  Can you give him one more copy?
11        MR. KING:  I don't have one.
12   BY MS. LEVINE:
13   Q.   I apologize, Mr. Klippen.
14   A.   Do you want that back?
15   Q.   Okay.  All right.  The question from Brian Joyner is the
16   same that I just read:  Does FMI and NCCR require a seal on
17   the products?
18        The second bullet.  And then Karen
19   Brown's response --
20   A.   Yes.
21   Q.   -- is the same, right?
22   A.   Yes.
23   Q.   And then your response is:  Thank you, Karen.  There
24   remain those who are looking for the weaknesses in our
25   relationship with your organization.  You set them straight.
```

184

```
 1   Is that correct?
 2   A.   That's correct.
 3   Q.   Okay.  So you agreed with Karen Brown that she set
 4   Sparboe straight, correct?
 5   A.   She answered their questions.
 6   Q.   Correctly; am I right?
 7   A.   Well, she stated what her goal was, and she's entitled to
 8   her goal, so that's how I took that.
 9   Q.   Okay, thank you.
10        So you knew, considering that that was FMI's goal,
11   that FMI would not endorse the PVP program because the PVP
12   program would allow a farm that had their PVP verification to
13   also have henhouses.  Now, I understand you would be PVP
14   verified, but it would still be the Jan Levine Farm that had
15   different conditions or was allowed to have different
16   conditions, and still remain the Jan Levine Farm being PVP
17   certified, correct?
18        MS. CAIN-MANNIX:  Objection.  Calls for speculation.
19        THE COURT:  Overruled.
20        THE WITNESS:  Karen Brown specified what her goal
21   was.  A goal is something in the future, what they're hoping
22   to attain.  It was just a matter of time before FMI actually
23   saw the comprehensiveness of the process verified program just
24   like Walmart wanted the see the comprehensiveness --
25   BY MS. LEVINE:
```

185

```
 1   Q.   Mr. Klippen, you didn't show it to her.  You didn't seek
 2   to get her endorsement; isn't that correct?  That's what you
 3   just testified to just now?
 4   A.   I was working for UEP at the time.  So no, I did not.  It
 5   wasn't until 2006 when I started to write the PVP program.
 6   Q.   Mr. Klippen, you never, from when you started on the PVP
 7   system, ever asked FMI to endorse your PVP program; isn't that
 8   correct?
 9   A.   That's correct.
10   Q.   And, in fact, your program was never endorsed by FMI;
11   isn't that correct?
12   A.   I never asked.
13   Q.   Can you answer my question?
14   A.   Yes.
15   Q.   And the Humane Society of the United States never
16   endorsed your program; isn't that correct?
17   A.   That's correct.
18   Q.   Now, Mr. Klippen, you just testified that your PVP
19   program had a really rigorous audit program, correct?
20   A.   Correct.
21   Q.   In fact, you thought it was more rigorous than UEP
22   Certified Program, right?
23   A.   That was my understanding how USDA viewed it.
24   Q.   And you thought so too, right?
25   A.   I did.
```

186

1    Q.   Right.  You audited it daily, right?  Isn't that what you
2    testified to?
3    A.   Could you repeat that?
4    Q.   Didn't you testify that your audit was really daily or
5    weekly?
6    A.   Incorrect.
7    Q.   What did you testify to?  What was the time frame?
8    A.   Every six months --
9    Q.   Every six months.
10   A.   -- USDA would audit.  UEP would be once a year.
11   Q.   Okay.  So you claim yours was more rigorous?
12   A.   USDA indicated it was more rigorous.
13   Q.   And you agree with that, right?
14   A.   And I agree with that.
15   Q.   Because you agree for a really fine Animal Welfare
16   Program, you ought to be audited, right?
17   A.   Correct.
18   Q.   And, in fact, on your program, if there were one extra
19   bird in your 67 inches, you would have to remove that bird,
20   right?
21   A.   Yes.
22   Q.   And you don't think that's a problem with the PVP
23   program, do you?
24   A.   It wouldn't be in there if it was a problem.
25   Q.   Right.  That's really good auditing, right?

---

187

1    A.   Yes.
2    Q.   Right.  You don't think that's an antitrust conspiracy,
3    do you?
4         MS. CAIN-MANNIX:  Objection.  Calls for a legal
5    conclusion.  This is a lay witness.
6         THE COURT:  Well, if I recall correctly, there was a
7    discussion about the witness seeking -- having antitrust
8    discussion with somebody.  So it's within the scope of direct.
9    BY MS. LEVINE:
10   Q.   You don't think that an audit is a supply control, do
11   you?
12   A.   I do not.
13   Q.   And you are aware that the UEP Certified Program is
14   listed on the Animal Welfare Information Center portion of the
15   USDA website, right?
16   A.   I cannot recall that.
17   Q.   Have you ever checked the USDA website?
18   A.   I have.
19   Q.   Have you ever seen UEP Certified Program on it?
20   A.   I have not.
21   Q.   Would it surprise you that the UEP Certified Program is
22   on the USDA website?
23   A.   No.
24   Q.   And that's because you know that the USDA is fine with
25   the UEP Certified Program, correct?

---

188

1    A.   For a process audit, it is not a quality management
2    system and it does not have ISO 9001 certification.
3    Q.   But grocery store chains and others are allowed to use it
4    with the USDA's approval, right?  Because it's on their
5    website; is that correct?
6    A.   Correct.
7    Q.   Now, did you meet with Plaintiffs' counsel before you
8    testified, Mr. Klippen?
9    A.   Could you repeat that?
10   Q.   Did you meet with any of the lawyers or the Plaintiffs'
11   counsel before you testified today?
12   A.   I did.
13   Q.   And for about how long?
14   A.   I had four meetings with Moira.
15   Q.   And about how many hours all together?
16   A.   Oh, I don't recall, but more than ten hours.
17   Q.   More than ten hours, okay.
18        MS. LEVINE:  Can we bring up PX-0232.
19   BY MS. LEVINE:
20   Q.   Do you remember that document, sir?
21   A.   I do.
22   Q.   All right.  And you testified on direct that you thought
23   Mr. Gregory's comment alluded to some kind of supply control,
24   correct?
25   A.   Mr. Gregory stated that.

---

189

1    Q.   I'm just asking you, you testified on direct that you
2    thought this document by Mr. Gregory, what he writes, could be
3    interpreted as some type of supply control; is that correct?
4    A.   That's correct.
5    Q.   Okay.  And when you testified back under oath, you
6    testified that the 100% rule was not an unfair trade practice,
7    right, sir?
8    A.   I don't remember saying that.
9    Q.   I apologize.  It doesn't have a clip on it.  A rubber
10   band will have to do.
11        It's a deposition, sir.
12        THE COURT:  I'll wait until I need it.  Thank you,
13   though, for offering it.
14   BY MS. LEVINE:
15   Q.   I direct your attention, sir, to page 54, line 14.
16        Question:  Do you have any concerns about the
17   100% rule being an unfair trade practice?
18        Answer:  I did not express that.
19        But you have those concerns internally?
20        My concerns focused more on the role that we were
21   trying to provide a service to the industry as opposed to
22   mandating compliance.  I didn't classify it as unfair trade
23   practice.  I classified it as something that I found
24   objectionable that an association or a group would demand of
25   its members.

190

```
1              Did I read that correctly?
2     A.   You did.
3     Q.   And, in fact, in your direct testimony, you said you had
4  a philosophical difference with UEP, correct?
5     A.   Incorrect.  I had a philosophical difference with
6  Gene Gregory.
7     Q.   Okay.  And that philosophical difference was that you
8  didn't think that a trade organization, such as UEP, should
9  advocate the way Gene Gregory did, right?
10    A.   I objected to the 100% rule to Gene Gregory, and that's
11 how I was objecting and that was my philosophical difference.
12    Q.   Right.
13    A.   He wanted 100 percent.  I thought that was unfair.
14    Q.   Right.  But it was a philosophical difference.  You
15 didn't think it was an antitrust violation, did you, sir?
16    A.   I'm not a lawyer.  It wasn't until later that I realized
17 that that was antitrust.
18    Q.   Until after you talked to your lawyers, right?
19    A.   Incorrect.
20         MS. CAIN-MANNIX:  Objection.
21         MS. LEVINE:  Plaintiffs' lawyers.  I'm sorry, I'm
22 sorry.
23         MR. BLECHMAN:  Excuse me, Your Honor.  The reference
24 by defense counsel to Plaintiffs' lawyers is misleading.
25         THE COURT:  But I think he corrected it and
```

191

```
1  apologized.
2         THE WITNESS:  I thought I was --
3         MS. LEVINE:  Right.  You're not a Defendant in this
4  so you don't need a lawyer.
5  BY MS. LEVINE:
6     Q.   So you testified at your deposition many times, and just
7  this morning, that you had a philosophical difference about
8  the 100% rule, right?
9     A.   That's right.
10    Q.   And, in fact, one of the issues that you have testified
11 to, and you have noted in some of your writings, is that there
12 was a problem with who was going to pay for the cost of the
13 increased costs for a certified egg if there was 100% rule,
14 correct?
15    A.   Can you rephrase that?
16    Q.   I will.
17    A.   That's kind of convoluted.
18    Q.   I will rephrase it.  It was a bad question.
19    A.   Thank you.
20    Q.   One of the concerns that you had was that if there was
21 100% rule, then the certified egg, the higher quality
22 certified egg would become commoditized.  It would be expected
23 because 100 percent would be produced.  And if it became
24 commoditized, no longer like a specialty egg, then that cost
25 would be borne by the producer rather than the consumer,
```

192

```
1  right?
2     A.   That's correct.
3     Q.   Right.  And if you didn't have the 100% rule, some eggs
4  were uncertified and some were certified, then when the
5  consumer chose, the consumer could pay for that increased
6  quality; is that correct?
7     A.   That's correct.
8     Q.   Okay.  So it was a cost-shifting issue that you also were
9  concerned about, correct?
10    A.   That was part of it, yes.
11    Q.   Now, you were not only employed by Sparboe from 2008 to
12 2011, you were also a paid lobbyist for Sparboe for the year
13 2006; is that correct?
14    A.   That's correct.  But not just Sparboe, but for a number
15 of companies.
16    Q.   A number of companies.  You were paid to go be a
17 mouthpiece in D.C. to get whatever legislation or issues they
18 needed solved?
19    A.   It's a requirement by law that if you spend more than
20 20 percent of your time talking to members of Congress, you
21 had to register as a lobbyist; and there were certain filing
22 requirements as a registered lobbyist that I had to comply
23 with since I was spending more than 20 percent of my time.  I
24 am a paid consultant.  I do not spend 20 percent of my time
25 currently so I'm no longer a registered lobbyist.
```

193

```
1     Q.   Now, you testified that Gene Gregory went to the USDA,
2  correct, to talk about the PVP program?
3     A.   That's correct.
4     Q.   And Gene Gregory and the United Egg Producers had asked
5  you time and time again for a copy of the PVP program; isn't
6  that true, sir?
7     A.   That's correct.
8     Q.   And this was a copy of the PVP program, right, this big
9  thick document you were testifying to?
10    A.   180 pages, yes.
11    Q.   Right.  Right.  But you refused to give this to the UEP
12 or to Mr. Gregory, correct?
13    A.   I spent a year writing that and the people that paid me
14 wanted to keep it proprietary, so the answer is yes.
15    Q.   Right.  You refused to have a dialogue with UEP and
16 Mr. Gregory about the PVP program; isn't that correct?  To the
17 point where they had to file a FOIA request, a Freedom of
18 Information Request, to even see what you were talking about;
19 isn't that true?  Yes or no, sir?
20    A.   Well, I want to give you an honest answer because that's
21 all my -- that's all the attorneys asked me to do, is give an
22 honest answer.
23    Q.   First, then why don't you answer my question.
24    A.   Can you break it into several questions --
25    Q.   Yes.
```

194

1  A.  -- instead of one long question because some parts of

2  that are not true.

3  Q.  Okay.  You did not give to UEP or Gene Gregory an

4  unredacted copy of the PVP program, true or false?

5  A.  True.

6  Q.  UEP and Gene Gregory asked you for a copy of the PVP

7  program, true or false?

8  A.  False.

9  Q.  UEP and Gene Gregory had to go -- or UEP -- had to go to

10  the trouble of filing a FOIA request to get a copy of the PVP

11  program, correct?

12        MS. CAIN-MANNIX:  Objection.  Foundation.

13        THE COURT:  If he knows.

14  BY MS. LEVINE:

15  Q.  Do you know, sir?

16  A.  Yes.

17  Q.  And you had your brother, Chris Klippen, file objections

18  with the United States Government to keep anyone from looking

19  at your PVP program, correct?  Correct?

20  A.  A FOIA, a Freedom of Information Act request, allows

21  somebody who has proprietary information to restrict its

22  release --

23  Q.  Mr. --

24  A.  -- and that's all we did, was restrict the release.

25  Q.  You filed objections, right?

195

1  A.  We filed legally -- objections -- legally recognized

2  objections, and USDA acknowledged that, so yes.

3  Q.  You filed objections.  And the only thing that you said

4  in your objections that you would not redact was the table of

5  contents; is that correct?

6  A.  They received some 29 percent of the documents so it had

7  to be more than just a table of contents.

8  Q.  29 pages of this 180-page document?

9  A.  Correct.  I'm not sure if it's 29 pages.  That would

10  be -- it would be more than 29 pages.  It's 180 pages, so

11  29 percent of 180 pages.  So it would be more than 29 pages.

12  I'm not a mathematician.

13  Q.  Now, UEP's program sees the light of day, right?  It's on

14  the website, it's on UEP's website, right?

15  A.  They did publish on the website.

16  Q.  Right.  And you could see UEP's Certified Program

17  whenever you wanted to, right?

18  A.  As if anyone else.

19  Q.  Right.  But people could not see the Process Verified

20  Program, correct?

21  A.  Because it had proprietary information.

22  Q.  And that really frustrated UEP, correct?

23        MS. CAIN-MANNIX:  Objection.  Foundation.

24        THE COURT:  If he knows.

25

196

1  BY MS. LEVINE:

2  Q.  Do you know, sir?

3  A.  I'm sure it did.

4  Q.  Okay.  And UEP -- and you understand that UEP felt it

5  very important that the public and the Government understand

6  that the PVP program did not have a 100% rule, correct?

7  A.  Could you --

8        MS. CAIN-MANNIX:  Objection.  Foundation.

9        MS. LEVINE:  Do you want to read the question back,

10  please?

11        THE COURT:  Once again, if he knows.  Is there a

12  time period in this question?

13        MS. LEVINE:  I don't have a time period.

14        THE COURT:  So the question is if he knows.

15        MS. LEVINE:  Could you read it back.

16        (The court reporter read back the previous

17  question.)

18        THE WITNESS:  Correct.

19  BY MS. LEVINE:

20  Q.  Okay.  Thank you.

21      And today, you can't get a completely unredacted

22  copy of the PVP program, can you?

23  A.  The public cannot, correct.

24  Q.  It is not available anywhere on a website, correct?

25  A.  Correct.

197

1  Q.  And that is because nobody is process verified within the

2  egg industry; isn't that correct?

3  A.  At the current time.

4  Q.  Mr. Klippen, are you aware that the UEP welfare

5  guidelines have a code of conduct?

6  A.  No.

7        MS. CAIN-MANNIX:  Counsel, this appears to be an

8  incomplete document.

9        THE COURT:  Would you address the Court, please.

10        MS. CAIN-MANNIX:  Yes.  I apologize, Your Honor.

11        THE COURT:  No problem.

12        MS. CAIN-MANNIX:  This document appears to be

13  incomplete, Your Honor.  It's the 2010 -- the cover page

14  states it's a 2010 UEP Animal Husbandry Guidelines, and after

15  the first page, it skips to page 13 and 14.

16        MS. LEVINE:  We're trying to get a complete copy

17  since this just came up.  The witness has a complete copy,

18  so -- it's a prior-marked exhibit.  What exhibit number is it?

19  We can pull it up.

20        MS. SUMNER:  D-184.

21        MS. LEVINE:  D-184, in evidence.

22        MS. SUMNER:  It's not in evidence yet, no.

23        MS. LEVINE:  Oh.

24        THE COURT:  Meanwhile, why don't you, first, show

25  the copy you gave to the witness to counsel so she can satisfy

198

1   herself what the exhibit is and maybe find it in the material.
2           MS. LEVINE:  That is a very good idea.
3           MS. CAIN-MANNIX:  May I return it to the witness,
4   Your Honor?
5           THE COURT:  Give it to Ms. Levine and then she
6   can --
7           MS. CAIN-MANNIX:  Okay.
8           THE COURT:  -- return it to the witness.
9           MS. LEVINE:  Thank you for bearing with me.
10          THE COURT:  Who was that a thanks to?
11          MS. LEVINE:  Everybody, really.
12          THE COURT:  No, no, I'm sorry.  I didn't mean that.
13  I take that back.
14          MS. LEVINE:  Sense of humor is everything.
15  BY MS. LEVINE:
16  Q.   Okay.  You can see under the Public Trust section, sir?
17  A.   Do you have a page number?
18  Q.   It should be marked 017 -- DO184-017.
19  A.   I see it.
20  Q.   And you can see that the guidelines require all pullet --
21  all caretakers to sign a code of conduct, right?
22  A.   I see that on the next page with the code of conduct for
23  caretakers where they ask for the employee's signature, yes.
24  Q.   And you can see that there's a procedure for responding
25  to animal abuse allegations?

199

1   A.   Yes, I do.
2   Q.   Which include a farm investigation?
3   A.   I do not see the part where it says, farm investigation.
4   Is that on -- is that 184-10 -- 017?
5   Q.   Yes.  It says:  Upon completion of an animal farm
6   investigation, the farm investigation team may do the
7   following.
8           Do you see that?
9   A.   I do see that.
10  Q.   Okay.  And they publish a timely report?
11  A.   I see that.
12  Q.   And make recommendations to UEP's investigative committee
13  for future actions including the possible termination of the
14  company's UEP Certified status?
15  A.   Yes.
16  Q.   And calls for a third-party audit by a different firm
17  than did the previous audit; is that correct?
18  A.   I see that.
19  Q.   Right.  Thank you, sir.
20          So, in fact, when you said that UEP did not have
21  such a policy, you were incorrect, correct?
22  A.   This is the first time I've seen this document.
23  Q.   Right.  So you stand corrected; is that true, sir?
24  A.   I stand corrected.
25  Q.   I think you testified a little bit about Walmart on

200

1   direct?
2   A.   Correct.
3   Q.   It's true, sir, that Sparboe never experienced any kind
4   of retaliation when it picked up the Walmart stores, correct?
5   A.   Can you describe for me what you mean by "retaliation"?
6   Q.   No retaliation from UEP or Gene Gregory or anyone else
7   regarding Sparboe being able to supply eggs to Walmart?
8   A.   Other than the fact that Gene asked them not to buy
9   Sparboe eggs.
10  Q.   You are not aware of any disruption of Sparboe's ability
11  to supply eggs to Walmart regardless of what you think Gene
12  said or not; isn't that true, sir?
13  A.   Walmart disregarded his comments and it did buy from
14  Sparboe, correct.
15  Q.   Right.  Because Walmart's a really big company and can
16  decide what it wants to do on its own; isn't that true?
17  A.   They had concerns because they also received a note from
18  Chad Gregory saying that they would be sued by the Federal
19  Trade Commission --
20  Q.   Ah, ah, ah, ah.
21  A.   Isn't that intimidation?
22          MS. CAIN-MANNIX:  Objection.
23  BY MS. LEVINE:
24  Q.   You've got to answer my question, sir.  We can't go into
25  hearsay.

201

1   A.   Your question's incomplete.  There' more information.
2           THE COURT:  Okay.
3           MS. LEVINE:  I will take away the question.
4           THE COURT:  And the ah, ah, ah, ah.
5           MS. LEVINE:  And strike the answer.
6           THE COURT:  Now, was there an objection to anything
7   more?
8           MS. CAIN-MANNIX:  I -- I'm objecting because she was
9   not allowing the witness to complete his answer.
10          THE COURT:  Okay, well, why don't we start with the
11  question again.
12          And I'll tell you what, maybe the witness can listen
13  to the question.
14          THE WITNESS:  Yes, Your Honor.
15  BY MS. LEVINE:
16  Q.   You testified under oath that you were not aware of any
17  disruption to Sparboe's ability to supply eggs to Walmart;
18  isn't that correct, sir?
19  A.   That's correct.
20          MS. LEVINE:  No further questions.  Thank you.
21          THE COURT:  Will there be additional
22  cross-examination?  Because if there is, we're going to pick
23  it up tomorrow morning unless it's like two questions.
24          MR. KING:  It's more than two.
25          THE COURT:  Bigger than a bread box?

202

```
1    MR. KING:  Probably five, six minutes.  Whatever the
2  Court --
3        THE COURT:  Well, I know, that's the right answer.
4  And then there's going to be some redirect.
5        MS. CAIN-MANNIX:  It's super brief like two
6  questions.
7        THE COURT:  Yes, okay.
8        MS. CAIN-MANNIX:  If we could finish this up today,
9  Your Honor, obviously, it's whatever the Court decides, but
10 I'm sure the witness would like to return home.
11       THE COURT:  Everybody gets brownie points for that
12 one.  Well, let's see if that works.
13       MR. KING:  Famous last words.
14       THE COURT:  Yes.  Exactly right.
15       Mr. Coyle, would you do me a favor?  Tell the
16 marshals I'll be with them in a minute.  Thank you.  Ten
17 minutes.
18                  CROSS-EXAMINATION
19 BY MR. KING:
20 Q.   Mr. Klippen, I just have a few questions.  I want to be
21 clear.  This Sparboe company's Process Verified Program,
22 PX-652, that you spent a great deal of time discussing, I just
23 want to be clear, when it says process verified, the USDA
24 verifies the process, right?
25 A.   Correct.
```

203

```
1  Q.   They don't actually write the requirements that are being
2  verified, correct?
3  A.   That's correct.
4  Q.   They're just making sure that whatever requirements
5  Sparboe comes up with, that the process that's delineated in
6  this document is being followed, correct?
7  A.   With the exception -- with the exception that the quality
8  management system was -- the specific sections of the quality
9  management system was provided to me by USDA.  So I had to
10 include that with the documentation to prove that they were
11 following that process.
12 Q.   But the specific animal welfare requirements, those were
13 written by you?
14 A.   With the assistance of those three poultry science
15 extension professors.
16 Q.   And the benefit of this is that if you follow your
17 process that you write and give to the USDA and that USDA says
18 you are following that process, the Agricultural Marketing
19 Service of the USDA allows you to put their little logo on
20 there, right?
21 A.   The USDA shield, correct.
22 Q.   Right.  It's something that's used in other types of
23 marketing for agricultural products, right?
24 A.   That's correct.
25 Q.   Like if an apple producer says that they're
```

204

```
1  pesticide-free, they have a process for that, it's known that
2  USDA Process Verified Program could apply to that, too, right?
3  A.   For that, for antibiotic-free, any number of reasons, but
4  they have to show the process and provide the documentation to
5  prove that they followed that process.
6  Q.   Now, you were asked -- and I don't want to bring it up
7  again, but I will if you need to see it.
8        You were asked some questions about a United Voices
9  publication, and this jury has seen many of these.  And you
10 were asked questions about a statement that Gene Gregory made
11 in a United Voices from May 20, 2004, and the specific
12 statement, if you recall, you were asked about is that counsel
13 asked you about the statement he made in this May 20, 2004
14 United Voices.
15       The statement is:  If you stay true to the
16 program -- meaning the Certified Program -- and manage it to
17 meet the market demand, it can prove -- excuse me -- it can
18 provide the industry with prolonged profits.
19       Do you remember being asked about that?
20 A.   I do.
21 Q.   And your answer -- and I'm quoting from the transcript.
22 Your answer was -- when you were asked what you thought this
23 meant, you said that:  It was a mechanism for which they could
24 control supply and thereby control prices.
25       That was your answer, right?
```

205

```
1  A.   Correct.
2  Q.   And -- and with respect to his statement that it can
3  provide the industry with prolonged profits,
4  Mr. Gregory's statements -- I'm sorry -- his statement that if
5  you stay true to the program and manage it to meet the market,
6  by May 20, 2004, the market for certified eggs was being
7  reflected in demand by the grocery chains, right?  Grocery
8  chains were demanding certified eggs at that time, right?
9  A.   That's correct.
10 Q.   And, in fact, in other United Voices, Mr. Gregory
11 identified all the various grocery supermarket chains that
12 were asking for certified eggs, right?
13 A.   I'm not aware of that, but I suspect that's the case.
14 Q.   Well, let me show you.  We can put up D-0844 and I'll
15 hand you a copy.
16       MR. KING:  Your Honor, may I approach?
17       THE COURT:  Yes.
18 BY MR. KING:
19 Q.   Mr. Klippen -- and, Mr. Klippen, now you've been handed
20 what the been marked as D-844.  This is United Voices from
21 December 2 of 2002.
22       You were working for UEP at this time, correct?
23 A.   That's correct.
24 Q.   And United Voices was a newsletter of UEP?
25 A.   That's correct.
```

206

```
 1   Q.   So you would have seen this on or about the time
 2   December 2002, when it came out, correct?
 3   A.   That's correct.
 4           MR. KING:  Your Honor, we would now ask to
 5   introduce -- we'd ask to introduce in evidence Exhibit D-844.
 6           THE COURT:  Any objection?
 7           MS. CAIN-MANNIX:  No, Your Honor.
 8           THE COURT:  844 is admitted.
 9           (Exhibit received in evidence.)
10           MR. KING:  May we publish, Your Honor?
11           THE COURT:  Yes.
12   BY MR. KING:
13   Q.   If you look at the first page of the document, the very
14   bottom, it says:  Retail grocery chains accept welfare
15   guidelines.
16           Do you see that?
17   A.   I do.
18   Q.   And it identifies a number of supermarket chains that
19   have adopted the UEP Certified Program, right?
20   A.   Correct.
21   Q.   These are early adopters because it's December of 2002,
22   right?
23   A.   That's what it says.
24   Q.   The program hasn't been in existence very long by that
25   time, correct?
```

207

```
 1   A.   Correct.
 2   Q.   And it lists a number of supermarket chains.  The first
 3   page has got Albertsons right there in the middle.  Do you see
 4   that?
 5   A.   I do.
 6   Q.   If you go to the second page, you'll see even more
 7   grocery chains.  You'll see Kroger.  Do you see that?
 8   Right-hand column.
 9   A.   I see Kroger.
10   Q.   Right above Kroger, you see H-E-B, H.E. Butt.  Do you see
11   that?
12   A.   H-E-B, correct.
13   Q.   H-E-B, all right.
14           And in the middle column, four lines down, you see
15   Publix, correct?
16   A.   Correct.
17   Q.   And over on the left-hand column, about six, seven lines
18   down, you see Safeway?
19   A.   I do.
20   Q.   And you see Walmart, correct?
21   A.   Correct.
22   Q.   And then I just hand you one more here, Mr. Klippen.
23           MR. KING:  May I approach, Your Honor?
24           THE COURT:  Yes.
25   BY MR. KING:
```

208

```
 1   Q.   And you've been handed what's been marked as
 2   Exhibit D-856.
 3           MR. KING:  Your Honor, this is actually a redacted
 4   version.  There's some statements -- I'm happy to show
 5   counsel -- that were redacted.  They were redacted to comport
 6   with one of your prior orders.
 7   BY MR. KING:
 8   Q.   And, Mr. Klippen, there is, again, another United Voices
 9   from June 18 of 2003, right?
10   A.   Correct.
11   Q.   And you, again, were working for UEP at the time?
12   A.   I was.
13   Q.   And this is a document you would have seen at the time on
14   or about June of 2003 when this came out, correct?
15   A.   Correct.
16           MR. KING:  Your Honor, we now ask to admit
17   Exhibit D-856.
18           THE COURT:  Any objection?
19           MS. CAIN-MANNIX:  No objection.
20           THE COURT:  D-856 is admitted.
21           (Exhibit received in evidence.)
22   BY MR. KING:
23   Q.   So this is a few months later, Mr. Klippen, and if you
24   look on page --
25           MR. KING:  May I publish?  Thank you.  May I
```

209

```
 1   publish?
 2           THE COURT:  Yes.
 3           MR. KING:  Thank you.  I'm getting a little quick
 4   here.
 5   BY MR. KING:
 6   Q.   If you look on page 4, so by June 2000 -- June 18, 2003,
 7   we have a listing here of more retailers which are supporting
 8   UEP's Animal Welfare Guidelines, right?
 9   A.   Correct.
10   Q.   And it includes the same one we mentioned:  Kroger,
11   Publix, Walmart, Safeway, Albertsons, H-E-B.  It also includes
12   on this -- maybe the second to the left-hand column, in the
13   middle there at the very bottom, do you see Winn-Dixie?
14   They're on there now?
15   A.   Which column is that?
16   Q.   The one that's second from the right?
17   A.   Second from the right.
18   Q.   At the very bottom?
19   A.   I see Winn-Dixie, correct.
20   Q.   So you have a number of supermarket chains that --
21   additional supermarket chains requiring certified eggs,
22   correct?
23   A.   The UEP Certified was the only animal enhanced program at
24   the time, so yes.
25   Q.   We'll get to that in a minute.  So you can put that down.
```

210

1   You talked a lot about the 2008 edition of the Certified
2   Program?
3   A.   Yes.
4   Q.   Right.  And the program's requirements were available on
5   the website, correct?
6   A.   Yes, they were.
7   Q.   It was actually --
8        MR. KING:  If we could pull up PX-0434, which is the
9   2008 iteration of the guidelines.
10  BY MR. KING:
11  Q.   You were asked questions about it.  It's on the screen.
12  It might be easier.
13  A.   Okay.
14  Q.   You see the certified logo right there at the top?
15       MR. KING:  This is already admitted into evidence so
16  we can show it to the jury.
17       THE WITNESS:  I do.
18  BY MR. KING:
19  Q.   And right below that logo, right below the logo, we can
20  pull that up.  You can see the website, right?
21  www.uepcertified.com, do you see that?
22  A.   I do.
23  Q.   You've been on that website before, haven't you?
24  A.   I have.
25  Q.   On there you can actually see the requirements, right?

211

1   A.   Correct.
2   Q.   Do you see the audit requirements?  If you remember.
3   A.   I don't remember seeing the audit requirements.
4   Q.   Okay.  All right.  Now, we can put that down.  Just a few
5   more questions.  I apologize.  I'm going longer than I
6   anticipated.
7        On the PVP program, you already said that Sparboe
8   was the only producer who adopted the animal welfare portions
9   of the PVP program that you developed, correct?
10  A.   That's correct.
11  Q.   All right.  And they're no longer a part of the PVP
12  program, right?
13  A.   That's correct.
14  Q.   But at least at the time that Sparboe was a PVP producer,
15  they were a big egg company, right?
16  A.   That's correct.
17  Q.   They served McDonald's?
18  A.   McDonald's was one of their customers.
19  Q.   They served Target?
20  A.   That's correct.
21  Q.   And they eventually served Walmart?
22  A.   That's also correct.
23  Q.   So they were able to meet their demands, right?
24  A.   Correct.
25  Q.   To your knowledge, Mr. Klippen -- how many years were you

212

1   at Sparboe, by the way?
2   A.   Three.
3   Q.   During the three years that you were at Sparboe, did the
4   Kroger company ever approach Sparboe and ask to buy
5   Sparboe's eggs?
6   A.   I was not aware.
7   Q.   Did Giant Eagle ever approach Sparboe and say, Hey, we'd
8   like to buy your eggs as a producer under the PVP?
9        MS. CAIN-MANNIX:  Objection.  I think there's a lack
10  of foundation for this line of questioning.  I don't think he
11  was in sales --
12       THE COURT:  It's still within the three years --
13  BY MR. KING:
14  Q.   I'm asking within the three years.  All my questions are
15  within the three years you were there.  Did Giant Eagle, to
16  your knowledge, ever approach Sparboe and ask for eggs
17  produced by Sparboe in accordance with the PVP program?
18       MS. CAIN-MANNIX:  If he knows, Your Honor, the
19  objection is --
20       MR. KING:  That is the question, if you know.
21       THE WITNESS:  Since I was director of Government
22  relations and animal welfare I was not involved in sales so I
23  do not know.
24  BY MR. KING:
25  Q.   My question, sir, is:  Do you know whether Giant Eagle

213

1   ever once asked for any eggs from Sparboe produced in
2   accordance with the PVP program, yes or no?
3   A.   I do not know.
4   Q.   And did Publix ever once during the period 2008 to 2011,
5   the three years you were there, did Publix ever approach
6   Sparboe and ask to purchase eggs produced in accordance with
7   the PVP program?
8        MR. BLECHMAN:  Object to the form -- objection.
9   Foundation.  All these questions should be "do you know if."
10       MR. KING:  Can we hear from one lawyer, Your Honor?
11       THE COURT:  Yes.  But I think all of the questions
12  were with that umbrella prelude.
13  BY MR. KING:
14  Q.   Please answer my question.
15       THE COURT:  I'm sure the witness understood that as
16  well.
17  BY MR. KING:
18  Q.   Please answer my question, Mr. Klippen.
19  A.   I was not aware.
20  Q.   And final question:  Were you aware of any instance
21  between 2008-2011, during your tenure at Sparboe, when the
22  H.E. Butt Company, H.E.B., ever approached Sparboe and asked
23  to buy shell -- commodity shell eggs produced in accordance
24  with the PVP program?
25  A.   I'm not aware.

214

1       MR. KING:  No further questions.

2       THE COURT:  Is there any more cross-examination?

3       MR. HARRIS:  No, Your Honor.

4       THE COURT:  Any redirect?

5       MS. CAIN-MANNIX:  I just have three.

6       THE COURT:  Three what?

7       MS. CAIN-MANNIX:  Three questions.

8       THE COURT:  Okay.

9       MS. CAIN-MANNIX:  Maybe four.

10              REDIRECT EXAMINATION

11  BY MS. CAIN-MANNIX:

12  Q.   Mr. Klippen, was having customers such as Walmart and

13  McDonald's all the endorsement Sparboe needed for its PVP

14  program?

15  A.   Correct.

16  Q.   I would like to -- do you have your deposition in front

17  of you?

18  A.   I do.

19  Q.   Ms. Levine asked you about a question and answer on

20  page 54.  Can you look at the very next page, the very next

21  question and answer.  Do you see the question --

22  A.   I do.

23  Q.   -- right there?

24          MS. LEVINE:  Objection.  She can't impeach her own

25  witness.

---

215

1       MS. CAIN-MANNIX:  I'm not impeaching him.  I just --

2       THE COURT:  Well, I'm quite sure you know that.  I'm

3  really wondering why you're going to the deposition.  If it's

4  part of the same question --

5       MS. CAIN-MANNIX:  I think it's incomplete.

6       THE COURT:  Excuse me?

7       MS. CAIN-MANNIX:  Go ahead, Your Honor.

8       THE COURT:  Thank you.  If it's part of the same

9  question and same answer, that's one thing, in which case I

10  guess I'd better take a look at the big fat deposition.  Thank

11  you.

12      MS. LEVINE:  Your Honor, it's hearsay.  She can ask

13  the witness.  He can testify.

14      THE COURT:  What page are we on, 54?

15      MS. CAIN-MANNIX:  55, Your Honor, first question.

16  The very next question after the one Ms. Levine directed

17  Mr. Klippen --

18      THE COURT:  I know.

19      And what's your justification?

20      MS. CAIN-MANNIX:  I just think it completes the

21  record on this topic, Your Honor.

22      THE COURT:  The reference to the deposition was for

23  impeaching the witness with respect to testimony he gave here

24  by focusing on the deposition testimony that he gave on

25  April 29, 2014.

---

216

1       MS. CAIN-MANNIX:  Okay.  I won't refer to the

2  deposition.

3  BY MS. CAIN-MANNIX:

4  Q.   Would you know, Mr. Klippen, if others at the time of --

5  that you were with UEP, found the UEP Program objectionable on

6  unfair trade practice or antitrust grounds?

7  A.   Yes.

8  Q.   You would know?

9  A.   I would.  There was one --

10      THE COURT:  There's no other question.

11      THE WITNESS:  Yes, yes.  Bob Sparboe.

12  BY MS. CAIN-MANNIX:

13  Q.   Thank you.  You were asked about Defense Exhibit 184,

14  that's the 2010 UEP Certified Program and you were referred to

15  a code of conduct on page 16.  Do you know, Mr. Klippen, if

16  this policy was violated, then, what would happen under the

17  2010 UEP Guidelines?

18  A.   I have not read the 2010 guidelines.  This is the first

19  I've seen this.  The code looks very similar to the code I

20  wrote for Sparboe.

21      MS. LEVINE:  Objection.  Lack of foundation.

22      THE COURT:  Well, I think he answered the question

23  that he hasn't read it.  So I guess he can't answer the

24  question as it was posed.

25      MS. CAIN-MANNIX:  Okay.

---

217

1       THE COURT:  What are we up to --

2       MS. CAIN-MANNIX:  I'll withdraw the question.

3       THE COURT:  Okay.

4       MS. CAIN-MANNIX:  That's all I have.  Thank you.

5       THE COURT:  There's more.

6       MS. LEVINE:  One very quick question that just came

7  up.

8       Mr. Klippen, you can hold on to that deposition.

9              RECROSS-EXAMINATION

10  BY MS. LEVINE:

11  Q.   When you were deposed under oath, you testified that you

12  couldn't name anyone, that you didn't know anyone that thought

13  that the program was objectionable, an unfair trade practice,

14  or an antitrust violation; isn't that true, sir?

15  A.   That's true.

16      MS. LEVINE:  Thank you.

17      MS. CAIN-MANNIX:  No further questions.

18      MR. KING:  Nothing further, Your Honor.

19      MR. HARRIS:  Nothing further, Your Honor.

20      THE COURT:  Then, Mr. Klippen, your deposition --

21  your testimony is complete.  Thank you very much.

22      THE WITNESS:  Thank you, Your Honor.

23      THE COURT:  As is our day.  Let's see.  Mr. Coyle,

24  what does tomorrow morning look like?

25          (Discussion held off the record.)