# ATTACHMENT 37

HIGHLY CONFIDENTIAL

Lynch, Gerald                                                      March 5, 2014

1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                   |
IN RE: PROCESSED EGG PRODUCTS      |
                                   |
ANTITRUST LITIGATION               |    MDL NO. 2002
                                   |
_____|    08-md-02002
                                   |
THIS DOCUMENT RELATES TO           |    HIGHLY CONFIDENTIAL
                                   |
Kraft Foods Global, Inc., et al.   |
                                   |
v. United Egg Producers, Inc.,     |
                                   |
et al., No. 2:12-cv-00088-GP       |
                                   |
_____|

                        Wednesday, March 5, 2014

                        10:22 a.m.


     Videotaped deposition of GERALD LYNCH, convened at the law offices of Robins, Kaplan, Miller & Ciresi LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota 55402, pursuant to notice, the proceedings being recorded stenographically by Jonathan Wonnell, a Registered Professional Court Reporter (NCRA #835577), and transcribed under his direction.

### Page 2

```
 1        APPEARANCES OF COUNSEL
 2
 3    On behalf of the Plaintiff General Mills and
 4      the Deponent:
 5      RICHARD P. CAMPBELL, ESQ.
 6      SARAH S. ANSARI, ESQ.
 7      Jenner & Block LLP
 8      330 North Clark Street
 9      Chicago, Illinois 60654-3456
10      (312) 840-9530
11      rcampbell@jenner.com
12      sansari@jenner.com
13      -- and --
14      MARY E. KIEDROWSKI, ESQ.
15      RACHEL A. PORTER, ESQ.
16      General Mills
17      Number One General Mills Boulevard
18      Minneapolis, Minnesota 55426
19      (763) 764-6698
20      mary.kiedrowski@genmills.com
21      rachel.porter@genmills.com
22
```

### Page 3

```
 1        A P P E A R A N C E S (Cont'd)
 2
 3    On behalf of the Defendant United Egg
 4      Producers and United States Egg
 5      Marketers:
 6      EVAN W. DAVIS, ESQ.
 7      Pepper Hamilton LLP
 8      3000 Two Logan Square
 9      Eighteenth and Arch Streets
10      Philadelphia, Pennsylvania 19103-2799
11      (215) 981-4000
12      davisw@pepperlaw.com
13
14    On behalf of the Defendant Michael Foods:
15      PETER J. SCHWINGLER, ESQ.
16      Leonard, Street and Deinard
17      150 South Fifth Street, Suite 2300
18      Minneapolis, Minnesota 55402
19      (612) 335-7023
20      peter.schwingler@leonard.com
21
22    ALSO PRESENT: STEVE KNUTSON, Videographer
```

### Page 4

```
 1              C O N T E N T S
 2   WITNESS                          PAGE
 3   GERALD LYNCH
 4     By Mr. Davis:                    6
 5     By Mr. Schwingler:              58
 6
 7           EXHIBITS MARKED
 8   LABEL/DESCRIPTION                 PAGE
 9   Exhibit Lynch 1 - News release from the    29
        generalmills.com website (3 pgs., No Bates)
10
     Exhibit Lynch 2 - Animal Welfare statement from  32
11      generalmills.com website (2 pgs., No Bates)
12   Exhibit Lynch 3 - Document re: General Mills one  43
        million cage-free egg buy (GMI 00032288
13      through 00032293)
14   Exhibit Lynch 4 - Handwritten notes by Gerald   48
        Lynch (GMI 00030754)
15
16
17
18
19
20
21
22
```

### Page 5

```
 1              P R O C E E D I N G S
 2                 (10:22 a.m.)
 3          THE VIDEOGRAPHER: We are on the record.
 4   This is the videotaped deposition of Gerald Lynch
 5   taken on March 5th 2014. The time now is
 6   approximately 10:22 a.m. The deposition is being
 7   taken in the matter In Reference Processed Egg
 8   Products Antitrust Litigation. It's filed in the
 9   U.S. District Court for the Eastern District of
10   Pennsylvania. File number is 08-MD-02002. The
11   deposition is taking place in Minneapolis,
12   Minnesota.
13          My name is Steve Knutsen. I'm a
14   videographer representing Henderson Legal Services.
15   Will counsel please identify themselves for the
16   record.
17          MS. ANSARI: On behalf of General Mills
18   and the deponent, Sarah Ansari of Jenner & Block.
19          MR. CAMPBELL: Richard Campbell of
20   Jenner & Block on behalf of General Mills.
21          MS. KIEDROWSKI: Mary Kiedrowski from
22   General Mills.
```

**Page 6**

1   MS. PORTER: Rachel Porter, General
2 Mills.
3       MR. DAVIS: Evan Davis from Pepper
4 Hamilton on behalf of the United Egg Producers and
5 United States Egg Marketers.
6       MR. SCHWINGLER: Peter Schwingler from
7 Stinson, Leonard, Street on behalf of defendant
8 Michael Foods, Inc.
9       THE VIDEOGRAPHER: Could the court
10 reporter please swear in the witness.
11         * * * * *
12   Whereupon,
13         GERALD LYNCH,
14   called as a Witness, was duly sworn by
15   Jonathan Wonnell, a Notary Public in and
16   for the Minnesota, and was examined and
17   testified as follows.
18         * * * * *
19 EXAMINATION BY COUNSEL FOR UNITED EGG PRODUCERS AND
20       UNITED STATES EGG MARKETERS
21   BY MR. DAVIS:
22   Q.   Good morning, Mr. Lynch.

**Page 7**

1   A.   Good morning.
2   Q.   My name is Evan Davis. I'm counsel to
3 United Egg Producers and United States Egg
4 Marketers in this litigation. Thank you for coming
5 today.
6   A.   You bet.
7   Q    Have you ever had your deposition taken
8 before?
9   A.   Never.
10   Q.   Your counsel may have done this
11 previously, but I will go over of a few guidelines
12 or ground rules.
13   A.   Okay.
14   Q    As you can see, there is a court
15 reporter here as well as a videographer. They'll
16 be taking down all of your testimony today. And
17 you understand that this testimony could be used at
18 trial, should the case get to that point?
19   A.   Mm-hmm. Yes.
20   Q    You understand that you're under oath
21 today?
22   A.   Yes.

**Page 8**

1   Q.   And it's also important that we get oral
2 responses to your questions because nods can't be
3 taken down as testimony.
4   A.   Sure.
5   Q.   And "uh-huh" can't be taken down
6 clearly.
7   A.   Okay.
8   Q.   So it's important to get yes or no
9 responses.
10   A.   Okay.
11   Q.   We can take a break whenever you would
12 like one. Simply let me know. I'd be happy to
13 accommodate you.
14   A.   Okay.
15   Q.   I only ask that we don't take a break
16 while a question is pending. If I've asked a
17 question, I'd like you to answer it and then I'd be
18 happy to take a break.
19   A.   Sure.
20   Q.   If you at all don't understand any of my
21 questions, please just ask me to clarify them, and
22 I'd be happy to do so.

**Page 9**

1   A.   Okay.
2   Q.   It's also important that you answer all
3 of my questions fully and to the best of your
4 knowledge. Is there any reason why you can't give
5 full and accurate and truthfully testimony here
6 today?
7   A.   Not that I'm aware of.
8   Q    Okay. Great. Could you please tell me
9 your job title at General Mills.
10   A.   So I am vice president and chief
11 sustainability officer for General Mills.
12   Q.   How long have you had that title?
13   A.   Four and a half years.
14   Q.   What was your title previously?
15   A.   I was the vice president of the
16 Progresso business unit.
17   Q.   For how long did you have that title?
18   A.   Two years.
19   Q.   When did you become chief of
20 sustainability officer?
21   A.   So I worked as vice president of applied
22 sustainability from July of 2009 until August of

## Page 10

1  2010 and the chief sustainability officer in August
2  of 2010.
3     Q.  What was your title prior to your work
4  in the Progresso business unit?
5     A.  I was director of marketing for Europe,
6  Middle East, North Africa region for General Mills.
7     Q.  When was that?
8     A.  2003 to 2007.
9     Q.  What were you prior to that?
10    A.  I was director of marketing for
11 international or international based in
12 Minneapolis.
13    Q.  When was that?
14    A.  That would have been 2001 to 2003.
15    Q.  Did you have a title prior to that?
16    A.  Yup.  I was marketing manager in the
17 Cheerios business unit handling some of the
18 Cheerios brands.
19    Q   When was that?
20    A.  It would have been 2000, 2001, to the
21 best of my recollection.
22    Q.  Prior to that?

## Page 11

1     A.  I was -- for a very short amount of
2  time, six months, I work in our corporate
3  development acquisition group as a manager.
4     Q   Prior to that?
5     A.  A marketing manager for trade marketing
6  in the Betty Crocker division.
7     Q.  When was that?
8     A.  That would have been -- now you're
9  testing my memory here -- like '99 to 2000.
10    Q.  Before that?
11    A.  Marketing manager on Betty Crocker
12 potatoes for a year.  So it would have been like
13 '98, '99.
14    Q   Before that?
15    A.  An assistant marketing manager -- no.
16 Sorry.  Marketing manager on category management
17 within the Betty Crocker division.
18    Q   How about before that?
19    A.  And assistant marketing manager on Betty
20 Crocker potatoes.
21    Q.  Was that your first title?
22    A.  No.

## Page 12

1     Q   Let's keep going backwards.
2     A.  And assistant marketing manager on sweet
3  rolls, snack bars in the snacks division.  And then
4  my first role was assistant marketing manager on
5  the WIC program within the cereal division.
6     Q   Women, Infants and Children?
7     A.  Correct.
8     Q.  And before that, you were not at General
9  Mills?
10    A.  I was not at General Mills.
11    Q.  Were you employed somewhere else?
12    A.  I was.  I worked for Wilton Enterprises
13 in Chicago.
14    Q.  What type of company is that?
15    A.  It's a housewares company.
16    Q.  What's your educational background?
17    A.  So I have a bachelor of music education
18 from Wheaton College in 1983 and then an MBA in
19 marketing and finance from the Kellogg School,
20 1994.  So I did that part time.
21    Q.  Do you have any responsibility for what
22 General Mills refers to as responsible sourcing?

## Page 13

1     A.  Mm-hmm.
2     Q.  Yes?
3     A.  Yes, I do.
4     Q.  So what is responsible sourcing?
5     A.  So responsible sourcing, the way it's
6  used internally, the way it's talked about
7  internally is looking at human rights and animal
8  welfare rights within our supply chain.
9     Q.  When was responsible sourcing
10 established?
11    A.  I don't honestly know.  It was
12 transferred over from our legal group to the
13 sustainable sourcing group in -- twelve months ago
14 basically.
15    Q.  So prior to twelve months ago, it
16 existed within the legal group?
17    A.  Correct.
18    Q.  Were you a part of it at that time?
19    A.  We were a consultant to it because of
20 the work that we're doing on sustainability.
21    Q.  What do you mean "we"?
22    A.  My team.

**Page 14**

1  Q. Your team being whom?
2  A. So in our team, I've got a director of
3  corporate social responsibility, a finance manager,
4  a applied sustainability manager, and then
5  reporting dotted line to me is our director of
6  sourcing sustainability.
7  Q. Who is that?
8  A. Steve Peterson. And then he has one
9  manager, same title, manager of sourcing
10 sustainability.
11 Q. Who is that?
12 A. Her name is Amy Owen.
13 Q. Okay. Who is the director of corporate
14 social responsibility?
15 A. Catherine Gunsbury.
16 Q. And the director of finance?
17 A. It's a manager of finance. Her name is
18 a Rena Pal.
19 Q. Powell?
20 A. P-a-l, like buddy pal.
21 Q. Got it. And I didn't hear the title,
22 but within applied sustainability?

**Page 15**

1  A. Yeah, so applied sustainability manager.
2  Her name is Ellen Silva.
3  Q. And all of these people together form
4  your team?
5  A. Correct.
6  Q. And that team is known as what?
7  A. The sustainability team.
8  Q. Okay. So how is that -- or is that
9  distinguishable from responsible sourcing?
10 A. Today responsible sourcing fits
11 underneath that umbrella.
12 Q. And who is affiliated with responsible
13 sourcing? All of these people?
14 A. No. Mostly Steve and Amy, who have
15 specific sourcing responsibility, and they report
16 up -- straight line up through the sourcing
17 organization. And then Catherine Gunsbury and
18 Sarena Wood from a reporting point of view, from an
19 external reporting point of view.
20 Q. What do you mean by that?
21 A. Meaning they publish our global
22 responsibility reports, so they collect and

**Page 16**

1  aggregate and coordinate the publication of that
2  information.
3  Q. So Steve Peterson, Amy Owen --
4  A. Uh-huh.
5  Q. -- and yourself are three individuals
6  who are probably most involved with responsible
7  sourcing?
8  A. Correct.
9  Q. Are any one or two of the three of you
10 more involved in the animal welfare component of it
11 than others?
12 A. Steve is probably the most involved.
13 Q. And are you involved to some degree?
14 A. Yes. As a manager of the total team.
15 Q. How about Amy?
16 A. She may be from an ancillary point of
17 view, a development point of view, but she doesn't
18 have point responsibility within sourcing for that.
19 Q. So that's been within the last twelve
20 months that it's been under the sustainability
21 umbrella?
22 A. Correct.

**Page 17**

1  Q. And before that, it was under the legal
2  umbrella?
3  A. Correct.
4  Q. But you were still part of it at that
5  time?
6  A. Yeah, we would consult on it, obviously.
7  Q. The same individuals, you and Steve and
8  Amy primarily?
9  A. Correct.
10 Q. Who else was involved with it over a
11 year ago?
12 A. So the only other person -- well, two
13 people would be Maury Murphy, who is a legal
14 counsel in the organization and Jill Bollettieri,
15 who's a legal counsel within the supply chain.
16 Q. Can you spell her last name, Jill? Was
17 it a V or a B?
18 A. B. Bollettieri. I would butcher it if
19 I tried. I can't remember. Sorry.
20 Q. That's fine. And what was their
21 responsibility within responsible sourcing?
22 A. So it was to oversee -- my

**18**

1  understanding, based on my interaction with them,
2  was it was to oversee things like signature for --
3  we're a signatory to the UN Global Compact. They
4  oversaw our responsible sourcing, which is a human
5  rights program within our facilities and our
6  co-packers.
7      Q.   Anything related to animal welfare on
8  their end?
9      A.   No. It wouldn't have been.
10     Q    That would have still stayed with you
11 and Steve and Amy?
12     A.   Right.
13     Q.   For how long have you been involved,
14 then, with responsible sourcing?
15     A.   So since the beginning of my work, my
16 boss -- for the first year that I was in the
17 sustainability -- so let me clarify. The entire
18 time I've been involved with our sustainability
19 work.
20     Q.   2009?
21     A.   Right.
22     Q.   Okay.

**19**

1      A.   My boss would have been much more
2  involved in the sourcing end of it the first year.
3  I was much more focused on employee programs and
4  operational programs.
5      Q.   Who is your boss?
6      A.   Gene Kahn was his name.
7      Q.   K or C?
8      A.   K-A-H-N. Yeah.
9      Q.   And how about prior to 2009?
10     A.   Clarify what you're asking.
11     Q.   Who was involved in responsible sourcing
12 prior to 2009?
13     A.   I really don't know.
14     Q.   Do you know if it existed prior to 2009?
15     A.   I don't honestly know. I'd have to
16 speculate if it did.
17     Q.   I'll ask it this way. When you became
18 involved in 2009 --
19     A.   Yeah.
20     Q.   -- was it a preexisting thing, or were
21 you starting from day one?
22     A.   No. What existed within the legal

**20**

1  function was -- certainly existed.
2      Q.   Okay.
3      A.   And discussions about how we do this
4  within sourcing operations were active discussions
5  when I joined.
6      Q.   So responsible sourcing existed sometime
7  prior to 2009?
8      A.   Correct.
9      Q.   But you're not sure when?
10     A.   Correct.
11     Q.   So if somebody said it started in 2010,
12 that wouldn't be true?
13     A.   Correct.
14     Q.   Okay. Do you have regular meetings or
15 anything like that for responsible sourcing?
16     A.   We have -- not specifically responsible
17 sourcing at this point. We don't -- it falls under
18 the -- it's a subject of discussion within other
19 sustainability -- regular sustainability meetings
20 that we have.
21     Q.   Did you ever have meetings that were
22 limited to responsible sourcing?

**21**

1      A.   Again, the way we characterize the
2  definition, no. Within the full picture of
3  sustainability, yes.
4      Q.   For meetings that discuss responsible
5  sourcing issues, would you invite others from
6  within General Mills? For example, if you were
7  discussing an animal welfare-related issue, might
8  you invite someone from the sourcing or buying side
9  for certain animal products?
10     A.   Certainly.
11     Q.   And you have, in fact, had those types
12 of discussions, right?
13     A.   Sure, yeah.
14     Q.   And you have invited individuals from
15 sourcing or buying?
16     A.   Correct.
17     Q.   Okay. Now, are you aware that General
18 Mills has filed a lawsuit against a number of
19 entities, including United Egg Producers and United
20 States Egg Marketers and a number of egg producers?
21     A.   Just based on what we have discussed in
22 preparation for this.

Page 22

1  Q.   And that would be in preparation for
2  your deposition?
3  A.   Correct.
4  Q.   What did you do to prepare for your
5  deposition?
6  A.   Just to understand what would happen
7  today.
8  Q.   You met with your attorneys?
9  A.   Correct.
10 Q.   And did you meet with all four of your
11 attorneys present in this room?
12 A.   Correct.
13 Q.   When did you meet with them?
14 A.   Last week.
15 Q.   For about how long?
16 A.   Was it an hour?
17 Q.   About an hour last week?
18 A.   Right.
19 Q.   Here in Minneapolis?
20 A.   Correct.
21 Q.   Had you ever met with your attorneys to
22 discuss this litigation prior to last week?

Page 23

1  A.   Only to pass off documents when the --
2  when we were first put on litigation hold, whenever
3  that was.
4  Q.   And between then and a week ago, you've
5  had no discussions with counsel about this case?
6  A.   Correct.
7  Q.   Did you go over documents with counsel
8  last week?
9  A.   No.
10 Q.   None?
11 A.   No.
12 Q.   What do you understand General Mills'
13 allegations in this lawsuit to be?
14     MS. ANSARI:  Objection to the extent
15 they ask for communications with counsel.
16     BY MR. DAVIS:
17 Q.   I specifically did not ask that.  I
18 asked what you understand General Mills'
19 allegations to be.
20 A.   The -- that we've filed suit for
21 collusion to fix prices.
22 Q.   Anything else?

Page 24

1  A.   That's the extent of my understanding.
2  Q.   And do you have any belief as to whether
3  those allegations are meritorious?
4  A.   I don't.
5  Q.   Have you talked to others at General
6  Mills, not counsel, but others at General Mills
7  about this case?
8  A.   No.
9  Q.   About the allegations in this case.
10 A.   Not that I can recall.
11 Q.   Did you talk to anyone at General Mills
12 about the deposition that you're giving here today,
13 again, excluding counsel?
14 A.   Just administrative, just to let them
15 know I would be out of the building, but not the
16 specifics of what the topic was.
17 Q    Do you know a gentleman at General Mills
18 by the name of Binh Tran?
19 A.   I do.
20 Q    Have you ever discussed this case with
21 him?
22 A.   No.

Page 25

1  Q.   Have you ever discussed the allegations
2  in this case with him?
3  A.   No.
4  Q.   Have you had any discussions with him at
5  all?
6  A.   Oh, on lots of different topics, sure.
7  Q.   But nothing that pertains to this case?
8  A.   We would have discussed our animal
9  welfare policy and its development in our animal
10 welfare programs.
11 Q.   And he would have been part of those
12 discussions?
13 A.   I can't honestly remember if it was him
14 or somebody who had his role at the time when those
15 were in development.
16 Q.   But that's it?
17 A.   Right.
18 Q.   Okay.
19 A.   Yeah.
20 Q.   So animal welfare issues are obviously
21 discussed at General Mills?
22 A.   Sure.  Yup.

Page 26

1  Q. And a lot of those discussions occur
2  within your group?
3  A. Correct.
4  Q. Have you had discussions or been a part
5  of discussions that are specific to eggs or the
6  hens that lay them?
7  A. Yes.
8  Q. What's the earliest that you can recall
9  having been part of those discussions?
10 A. So within this current role?
11 Q. No. At all.
12 A. So there were discussions when I was
13 marketing director in Europe. Haagen Daz uses a
14 lot of eggs. There was a small NGO who -- that was
15 focused on animal welfare that had approached us
16 about moving to cage-free eggs. And so there were
17 discussions when I was marketing director at the
18 time about doing that and what the cost would be
19 and et cetera.
20 Q. Did those discussions involve the U.S.
21 business at all?
22 A. It did not.

Page 27

1  Q. How about in your current role? What
2  discussions -- what's the earliest that you recall
3  having discussions?
4  A. So I'm guessing it was probably early
5  2010. One of the animal welfare NGOs had
6  approached us about eggs, specifically eggs, and
7  the raising of eggs.
8  Q. Is that the Humane Society of the United
9  States?
10 A. Correct.
11 Q. How about after that? What other animal
12 welfare-related discussions pertaining to eggs or
13 hens do you recall being a part of?
14 A. So that's been part of our regular
15 review of our sustainability programs that we do.
16 So there would have been touch point conversations.
17     We had made a commitment at that point
18 to purchase initially one million cage-free eggs as
19 part of our supply. And there would have been a
20 review of progress against that in regular reviews.
21 Q. Who else from General Mills were
22 involved in these discussions outside of the

Page 28

1  individuals that you've already named who were part
2  of your sustainability group?
3  A. Yeah. So there would have been our
4  corporate communications team, Tom Forsythe would
5  have been -- who's our vice president of corporate
6  communications. Because he was handling the direct
7  discussions with HSUS. And then whoever was
8  handling the purchase of eggs at the time. I can't
9  honestly remember who that was. Those are the ones
10 that come to mind that would have been part of that
11 discussion.
12 Q. Were there any discussions that you were
13 a part of with people from the egg production
14 industry?
15 A. I was never in any of those discussions,
16 no.
17 Q. Are you aware of any of those
18 discussions taking place between individuals from
19 the industry and people from General Mills?
20 A. It would had to have happened because of
21 the nature of the commitment and being able to
22 execute against that commitment. And so those were

Page 29

1  discussed in these reviews and decision-making
2  meetings.
3  Q. Do you know who from the industry was
4  involved?
5  A. I don't.
6  Q. I'll show you what's been marked as
7  Exhibit 1.
8      (Exhibit Lynch 1 was marked for
9      identification.)
10     BY MR. DAVIS:
11 Q. Mr. Lynch, do you recognize Exhibit 1?
12 A. I do.
13 Q. What is this document?
14 A. This is a news release that looks like
15 it came from our company website about our
16 sustainable sourcing commitment that we made last
17 September.
18 Q. Do you see the -- one, two, three,
19 four -- fifth paragraph is a quote from you?
20 A. Correct.
21 Q. Did you review this document at all
22 before it was published?

### 30

1  A. I did.
2  Q. If you would turn to page 2 of this
3  document, right after the numbered list ends, it
4  reads, "In addition to its sustainable commitment,
5  General Mills will continue to support the humane
6  treatment of animals in agriculture. The company
7  will enforce its animal welfare policy, which
8  covers pork, milk and egg production, antibiotic
9  use and animal testing."
10     Do you see that?
11  A. Correct.
12  Q. And is that an accurate statement?
13  A. Yes.
14  Q. What is General Mills' animal welfare
15  policy as it pertains to egg production?
16  A. So it would be the commitment that we've
17  made to purchase two million cage-free eggs. And
18  there may be other language surrounding that, but I
19  don't remember off the top of my head.
20  Q. So General Mills' animal welfare policy
21  as it pertains to egg production is to purchase a
22  certain number of cage-free eggs?

### 31

1  A. Correct.
2  Q. And that's it?
3  A. Correct.
4  Q. Okay. So does General Mills have any
5  animal welfare standards, then, that pertain to
6  egg-laying hens?
7  A. Not beyond that commitment unless
8  there's -- there's a -- unless there's a separate
9  document or language that talks to that that I
10  can't remember. But that's the driving piece of
11  our commitment.
12  Q. Okay. Does General Mills have any
13  requirements related to animal welfare that pertain
14  to its egg product suppliers?
15  A. So ask that question again. Sorry.
16     MR. DAVIS: Could you read it back?
17     (Whereupon, the requested portion of
18  testimony was read back by the reporter.)
19  A. Not that I can recall beyond the two
20  million commitment as well as the -- in Europe,
21  there is the commitment to purchase cage-free eggs
22  for Haagen Daz.

### 32

1  BY MR. DAVIS:
2  Q. I'll show you what's been marked as
3  Exhibit 2.
4  A. Okay.
5     (Exhibit Lynch 2 was marked for
6     identification.)
7  BY MR. DAVIS:
8  Q. Mr. Lynch, do you recognize Exhibit 2?
9  A. Yes. It looks like the additional
10  language about our animal welfare policy that comes
11  off of our website.
12  Q. Under "Egg Production," this reads, "To
13  encourage the development of alternative production
14  methods in the U.S., General Mills purchased
15  one million eggs from cage-free hens for our U.S.
16  retail operations in 2012." Do you see that?
17  A. Correct.
18  Q. Is that an accurate statement?
19  A. Yes.
20  Q General Mills did, in fact, purchase
21  one million cage-free eggs for U.S. retail
22  operations in 2012?

### 33

1  A. Correct.
2  Q. And has General Mills purchased more
3  since then?
4  A. I believe we have against the two
5  million egg commitment. I'm not clear on where
6  we're at.
7  Q. So two million -- the commitment for two
8  million eggs is for what period of time?
9  A. It's for a year.
10  Q. Which year?
11  A. I'd have to look. I believe it's a
12  commitment for 2014.
13  Q. 2014?
14  A. Right.
15  Q. Okay. Now, above that, this document
16  references what you already mentioned, which is a
17  commitment to source -- or 100 percent free-range
18  eggs for all Haagen Daz products produced in Europe
19  in 2013.
20  A. Correct.
21  Q. Does General Mills have any such
22  commitment for any of its brands in the United

                                                                    34

1     States?
2         A.   No.
3         Q.   Why not?
4         A.   Because this is a broad commitment for
5     our total buy, not specific to any one brand.
6         Q.   What is a broad commitment?
7         A.   It applies to how we buy things, which
8     is we buy things -- not necessarily for specific
9     brands.  Not in all cases do we buy things
10    specifically for specific brands.
11        Q.   In the U.S.?
12        A.   Correct.
13        Q.   Okay.  Back to the statement about the
14    United States.
15        A.   Yup.
16        Q.   It says, "To encourage the development
17    of alternative production methods in the U.S."  Do
18    you see that?
19        A.   Yup.
20        Q.   What does that mean?
21        A.   I think just what it says.  To encourage
22    the development of methods that are not

                                                                    35

1     traditional, limited cage size, also known as
2     battery cage, for hens.
3         Q.   So General Mills wants to encourage the
4     development of production methods other than
5     battery cages for hens?
6         A.   To have an alternative, yeah.
7         Q.   That's why they want to encourage --
8         A.   Correct.
9         Q.   -- the development of that production
10    method?
11        A.   Correct.
12        Q.   Why?
13        A.   To make sure that animals are taken --
14    treated well.  And because the science on the
15    existing cages and alternative methods is unclear.
16    So having more -- having another alternative out
17    there that can be studied and observed is in the
18    benefit -- is, you know, to the benefit of making
19    sure that animals are treated well in the supply
20    chain.
21        Q.   Okay.  And so that includes the amount
22    of space that's given to hens?

                                                                    36

1         A.   Correct.
2         Q.   And General Mills has an interest in
3     making sure that hens receive an amount of space
4     that scientific standards consider to be
5     sufficient?
6         A.   That would result in humane treatment of
7     the hens.
8         Q.   So I'll rephrase that --
9         A.   Sure.
10        Q    -- because you did a better job than I
11    did.
12             General Mills has an interest in making
13    sure that hens have an amount of space that
14    scientific standards consider to allow for the
15    humane treatment of hens?
16        A.   Correct.
17        Q.   Why does General Mills have an interest
18    in that?
19        A.   Well, first of all, it's the right thing
20    to do and, secondly, because our consumers care
21    about it as well.
22        Q.   How do they care about it, your

                                                                    37

1     consumers?
2         A.   In what we understand of consumers is
3     that they want to make sure that animals are
4     just -- are treated well, no matter what situation
5     they're in.
6         Q.   And that they reflect those views in
7     their purchasing decisions?
8         A.   Sometimes.  Sometimes just in their
9     values.
10        Q    But would General Mills care if they
11    don't reflect those views in their purchasing
12    decisions?
13        A.   Yeah.  Because if it's the right thing
14    to do for that treatment, the humane treatment of
15    animals, then we would definitely care.
16        Q    So General Mills cares for two reasons.
17        A.   Correct.
18        Q.   One is because General Mills wants to do
19    what's right for animals?
20        A.   Correct.
21        Q.   And another is because of the way that
22    that is going to be perceived by consumers?

**38**

1   A.   Correct.
2   Q.   And so specific to the latter half of
3 that --
4   A.   Yup.
5   Q.   -- General Mills' interest in consumer
6 perceptions about the company's animal welfare --
7 the company's procurement decisions --
8   A.   Uh-huh.
9   Q.   -- is because those consumers may
10 reflect their views on animal welfare issues in
11 deciding what products to purchase?
12   A.   Yeah. Let's rerun that one, because
13 that was a lot to remember.
14   Q.   I'm just trying to parse this out.
15   A.   Yeah.
16   Q.   And I'm not doing a particularly good
17 job of it. But specific to the consumer
18 preferences part of this --
19   A.   Right.
20   Q.   -- interest, it's that consumers care
21 about animal welfare issues?
22   A.   Correct.

**39**

1   Q.   And to some extent, they reflect that in
2 their decision on what products to purchase, right?
3   A.   Sometimes.
4   Q.   Sometimes. And that they may decide to
5 purchase or not purchase a General Mills product
6 versus a competitor's product based on, among other
7 reasons, animal welfare issues, right?
8   A.   Sometimes. Correct.
9   Q.   And so that -- to the extent that
10 General Mills cares about animal welfare for
11 consumer preference reasons, it's because those
12 consumer preferences can be reflected in consumers'
13 purchasing decisions?
14   A.   Correct.
15   Q.   Okay. Thank you. Have there been any
16 discussions that you're aware of regarding the UEP
17 Certified program?
18   A.   Not that I'm aware of.
19   Q.   Any discussions pertaining to the amount
20 of cage space that hens are given?
21   A.   That's part of the animal welfare
22 discussion around eggs as we look at this.

**40**

1   Q.   Making sure that hens whose eggs wind up
2 in General Mills' products are given --
3   A.   Adequate space. Absolutely.
4   Q.   Okay.
5   A.   Yup.
6   Q.   So let's talk about this commitment to
7 purchase -- well, let's start it at a million, and
8 it's since increased, to purchase a certain amount
9 of cage-free eggs. How did that come about?
10   A.   So we were approached by HSUS, had
11 discussions to understand what they thought the
12 issues were. Had conversations with -- my
13 understanding was that we had conversations with
14 suppliers about their understanding of the issues,
15 what alternatives were in development.
16      You know, we're not the first company
17 that HSUS has talked to, so this is not an unknown
18 issue in the egg industry. And in discussions with
19 HSUS, we agreed to make that first initial million
20 commitment.
21   Q.   So you say you're not the first company?
22   A.   Yeah.

**41**

1   Q.   You're aware of them going out to other
2 food companies?
3   A.   Correct.
4   Q.   Retailers?
5   A.   Could be. Not as familiar with that.
6   Q.   But food companies at least?
7   A.   Food companies.
8   Q.   And what is it that they do? They come
9 up to you and they say, would you please consider
10 sourcing cage-free eggs?
11   A.   So they educate us on what -- on their
12 concerns about animal welfare; in this case,
13 specifically about eggs and hens that lay eggs, and
14 alternatives that they believe are better, and ask
15 us to make a commitment to move some of our
16 sourcing to some of these alternatives.
17   Q.   Do they pressure the company at all?
18   A.   What's your definition of "pressure"?
19   Q.   Do you think that they exert any -- do
20 they do anything beyond just ask?
21   A.   I wouldn't characterize it as anything
22 beyond the discussions that we've had. But

**Page 42**

certainly I'm sure others would characterize it as pressure. It depends on your definition of "pressure."

Q. Have you heard anyone characterize it as pressure?

A. Oh, sure. You see it in the media all the time.

Q. Anyone at General Mills?

A. I'm sure the language has been used, yeah.

Q. So what did you understand that to mean?

A. That HSUS would like us to change our sourcing and procurement practices around eggs.

Q. And if you don't, then they will -- fill in the blank. Then they will do what?

A. I don't know.

Q. That never came up?

A. No.

Q. Okay. So are you aware of any -- well -- threats by HSUS to bring a shareholder resolution against General Mills?

A. I don't recall a shareholder resolution

**Page 43**

being threatened on eggs.

Q. Okay. I'll show you what's been marked as Exhibit 3.

A. Okay.

(Exhibit Lynch 3 was marked for identification.)

BY MR. DAVIS:

Q. Do you recognize this document at all?

A. I don't off the top of my head. That's not to say that I didn't -- that I haven't seen it before, but I don't recognize it off the top of my head.

Q. So on the first page --

A. Yeah.

Q. -- this references a recommendation that General Mills buy one million cage-free eggs in 2012.

A. Okay.

Q. And you recall that recommendation coming up in one of the meetings that you were in?

A. I don't recall this specific recommendation. It would have been part of the

**Page 44**

ongoing commitment to buy one million eggs, I'm guessing, at that point.

Q. Well, you said earlier that General Mills purchased a million cage-free eggs in 2012, correct?

A. Correct.

Q. So presumably somebody recommended that General Mills do that before it occurred, right?

A. Correct.

Q. So fair to say that that recommendation, that's what this is referencing here?

A. Correct.

Q. Okay. And then the next paragraph down where it says, "Why? The Humane Society of the United States, HSUS, has threatened to bring a shareholder resolution against General Mills, repeating the threat it made in 2010."

Do you see that?

A. Yup.

Q Does that refresh your recollection at all of that actually occurring?

A. It doesn't. But I'm not surprised that

**Page 45**

that's there.

Q. It goes on to talk about shareholder resolutions that HSUS has brought against other companies.

A. Uh-huh.

Q. Do you recall any discussion of that ever occurring?

A. I don't recall the discussion, but I'm sure there was discussion of it. We keep track of shareholder resolutions in all the areas that we work in, publicly as they become known in the news.

Q. Why?

A. Because we operate the company fundamentally.

Q But what is it about shareholder resolutions that is worth tracking?

A. I'm not quite sure what you mean.

Q What's the significance of shareholder resolutions?

A. Well, it's a measure perhaps of activities by NGOs or other interested parties on any number of issues.

**Page 46**

1  Q. Has there been an interest expressed to
2  stave off shareholder resolutions?
3  A. Certainly in given situations, yeah.
4  Q. Why?
5  A. Simply because they can complicate the
6  decision-making process.
7  Q. How?
8  A. By having multiple voices, external
9  voices, involved in what is essentially an
10 operating decision.
11 Q. So General Mills has an interest in
12 excluding external voices from things like its
13 procurement decisions?
14 A. It has an interest in making the best
15 possible decisions.
16 Q. That's not the what I asked, though. I
17 asked if General Mills has an interest in excluding
18 external voices --
19 A. In some cases, yes.
20 Q -- from its procurement decisions.
21 A. In some cases, yes.
22 Q. And would this be one of those

**Page 47**

1  instances, the decision to purchase cage-free eggs?
2  A. It could very well be. I mean, I don't
3  recall that discussion, again, about the
4  shareholder resolution, but it could very well be.
5  Q. Who would be involved in discussions
6  about shareholder resolutions pertaining to animal
7  welfare issues?
8  A. So the people we've discussed before.
9  Tom Forsythe, Trevor Gunderson, who's in our
10 corporate secretary's office.
11 Q. How about Naamua Sullivan?
12 A. Potentially, yeah. As a -- she manages
13 and tracks all the issues that we manage externally
14 reputationally.
15 Q. Wendy Tai?
16 A. Perhaps. Wendy's responsibility has
17 been more international than U.S.-based, at least
18 while -- the time I've been in this role. Kim
19 Nelson, our head of external relations, would be
20 involved in decisions like that.
21 Q. I'll show you what's been marked as
22 Exhibit 4.

**Page 48**

1      (Exhibit Lynch 4 was marked for
2      identification.)
3  BY MR. DAVIS:
4  Q. Do you recognize this document?
5  A. It looks like my scrawls.
6  Q You believe this is your handwriting?
7  A. It looks like it, yeah.
8  Q. And at the top, it says "HSUS" and then
9  "September 7th 2010"?
10 A. Correct.
11 Q. Do you have any reason to think that
12 wasn't the date that you met with them?
13 A. No. That looks like the date. These
14 look like my notes from a discussion we had with
15 them.
16 Q. So who is Sarah Shields?
17 A. I don't recall. I'm guessing she was
18 part of HSUS at the time.
19 Q. And it looks like Josh Balk, factory
20 farming campaign. Was he at this meeting?
21 A. I certainly recall meeting with Josh as
22 part of a meeting in 2010. Yes.

**Page 49**

1  Q. What is the factory farming campaign?
2  A. I honestly don't remember specifics. It
3  might have just been my notes about the fact that
4  they were pushing a factory farming campaign. I
5  don't remember the specifics about whether that's
6  something more specific or special or --
7  Q. If you go down the page, it says, "25
8  percent more expensive" -- it looks like "barn
9  system versus cage system to produce." Is that
10 right?
11 A. Correct.
12 Q. What does that refer to?
13 A. To my recollection, it refers to the
14 difference between hens being raised in cages and
15 hens being raised in a barn but outside of cages.
16 So on roosts.
17 Q. And are those the types of eggs that
18 General Mills sources for its cage-free commitment?
19 A. I don't recall off the top of my head if
20 that's the specific way that we're sourcing those.
21 Q. Are the eggs that General Mills sources
22 for its cage-free commitment more expensive than

Page 50

1  the eggs that it otherwise sources?
2      A.  My understanding is that they are, yes.
3      Q   So General Mills pays a premium for
4  cage-free eggs?
5      A.  Correct.
6      Q.  And that affects the company's bottom
7  line?
8      A.  Correct.  It affects our costs.
9      Q.  It affects your costs?
10     A.  Correct.
11     Q.  Why does General Mills pay that premium
12 that affects its costs?  Why does it choose to do
13 that?
14     A.  So for the reasons we've discussed, we
15 want to make sure we're doing the right thing for
16 animals.  We believe an alternative supply is
17 important to understand.
18     Q.  Mm-hmm.
19     A.  And reputationally, we think there's
20 value in doing that.
21     Q.  Why does General Mills not source more
22 of its eggs than it currently does from cage-free

Page 51

1  sources?
2      A.  Because it's not clear that that's
3  necessarily better for the hen.
4      Q.  So then why does General Mills source
5  any of its eggs from cage-free sources?
6      A.  Because the science isn't clear, so we
7  think an alternative -- having an alternative
8  supply and understanding that is valuable.
9      Q.  Understanding that -- you mean just for
10 the world at large?
11     A.  Understanding of -- and for us as well.
12 Both.
13     Q.  But is the company's understanding of
14 that enhanced at all by sourcing a percentage of
15 its eggs from cage-free sources?
16     A.  Sure.
17     Q   How?
18     A.  By understanding what that looks like
19 from a supply point of view.
20     Q.  What do you mean by that?
21     A.  Well, understanding what the welfare of
22 those animals is in being able to observe that

Page 52

1  supply.
2      Q.  You mean like going to the farms and
3  looking at the animals?
4      A.  Right.
5      Q.  And do people in General Mills do that?
6      A.  Our animal welfare team would visit
7  those.
8      Q.  Who does that include?
9      A.  So that would be -- Steve leads that
10 team, and there would be -- there would be other
11 members.  I can't remember off the top of my head
12 is part of that team, but there would be other
13 members of that team probably from direct sourcing,
14 probably from our quality group, potentially
15 somebody from our legal group.
16     Q.  And you need to actually source
17 cage-free eggs in order to be able to do those
18 inspections?
19     A.  We wouldn't have to.  I'm sure there are
20 other ways you could get at it.  But we choose to.
21     Q.  Why do you choose to?  That's what I'm
22 trying to understand.

Page 53

1      A.  Well -- to -- because we believe it's
2  important to invest in an alternative supplier,
3  have an alternative supply available for the world
4  at large, doing our part.
5      Q.  Okay.  Doing your part.
6      A.  Right.
7      Q.  So it's like a charitable donation or
8  something like that?
9      A.  That's one way of thinking of it.
10     Q.  Okay.  You obviously track what your
11 competitors are doing as well, right?
12     A.  Yes.  What we can see publicly.
13     Q.  And why is that something that the
14 company does?
15     A.  We're a consumer products company, so
16 we're interested in what other companies are doing
17 publicly because that affects consumer perceptions.
18 We're interested in understanding if they have a
19 different understanding of animal welfare that we
20 can learn from.
21     Q.  So you said it affects consumer
22 perceptions.  You want to see if one of your

54

1  competitors is marketing themselves as having
2  cage-free eggs, for example, or eggs that meet
3  certain animal welfare standards, how that plays in
4  the marketplace?
5     A.  Correct.
6     Q.  If it plays well, maybe that's something
7  we'll latch onto as well?
8     A.  Correct.
9     Q.  If it doesn't play well, then maybe
10  we'll steer clear of that?
11     A.  Correct.
12     Q.  Any concern that a competitor might
13  market their products as superior to yours based on
14  animal welfare standards?
15     A.  Always.  We're a consumer products
16  company.
17     Q.  And so that actually happens?
18     A.  What happens?  What are you --
19     Q.  That competitor -- well, competitors
20  market their products as being superior to your
21  products.
22     A.  Sure.

55

1     Q.  All the time?
2     A.  All the time.
3     Q.  And one, among other reasons, that they
4  might market their products that way would be
5  animal welfare-related issues?
6     A.  Correct.
7     Q.  Okay.  So we talked about HSUS and their
8  discussions with General Mills --
9     A.  Mm-hmm.
10     Q.  -- that resulted in General Mills
11  changing its egg procurement practices, right?
12     A.  Correct.
13     Q.  How about other NGOs or advocacy groups
14  or animal activists or anything like that?  Have
15  there been other discussions at General Mills has
16  had?
17     A.  On lots of issues.
18     Q.  Specific to eggs or hens, egg-laying
19  hens?
20     A.  I'm not aware of any.
21     Q.  Anything involving a group called United
22  Poultry Concerns?

56

1     A.  I'm not aware of them at all.
2     Q.  A group called Compassion Over Killing?
3     A.  I'm not aware of them.
4     Q.  PETA?
5     A.  I'm not aware of discussion on eggs with
6  PETA.
7     Q.  Other animal products?
8     A.  Correct.
9     Q.  Are you aware of any organizations other
10  than HSUS contacting any of your competitors
11  pertaining to egg, animal welfare or egg-laying hen
12  animal welfare?
13     A.  No.  Huh-uh.
14     Q.  Are you aware of any discussions between
15  NGOs or advocacy groups and retailers regarding the
16  animal welfare for eggs or egg-laying hens?
17     A.  I'm not.  Huh-uh.
18     Q.  So you've never had a customer of
19  General Mills, like a retail customer, come to you
20  or the company that you're aware of and say, you
21  know, we're getting pressure from this group about
22  egg issues or hen issues?

57

1     A.  I'm not aware of any customer asking for
2  that.
3     Q.  Are you familiar with the UEP Certified
4  program?
5     A.  I am not.
6     Q.  Have you ever heard of it?
7     A.  No.
8     Q.  Okay.  Are you aware of any discussions
9  regarding a licensing agreement for Betty Crocker
10  eggs?
11     A.  I'm not aware of that.  I know we have
12  lots of licensing agreements.
13     Q   Discussions about a licensing agreement
14  for Betty Crocker eggs?
15     A.  No.
16        MR. DAVIS:  Can we go off the record?
17        THE VIDEOGRAPHER:  Going off the record
18  about 11:18 a.m.
19        (Whereupon, a recess was taken from
20  11:17 a.m to 11:28 a.m.)
21        THE VIDEOGRAPHER:  We're back on the
22  record about 11:29 a.m.

## Page 58

1    MR. DAVIS: Mr. Lynch, that's all the
2  questions that I have for you today.
3  Mr. Schwingler is going to have a few for you, I
4  believe.
5      THE WITNESS: Okay.
6    EXAMINATION BY COUNSEL FOR MICHAEL FOODS
7         BY MR. SCHWINGLER:
8    Q.  Mr. Lynch, my name is Peter Schwingler.
9  I represent Michael Foods, which is a defendant in
10 this case. If I could just have you turn your
11 attention back to Exhibit 4 for a second.
12   A.  Sure.
13   Q.  And am I correct this is a document that
14 you authored?
15   A.  That's what it looks like. It looks
16 like my notes.
17   Q.  And you believe this document consists
18 of your notes from a meeting in 2010 with the
19 Humane Society?
20   A.  It looks like it. I can't say for sure,
21 but it looks like it, given that I've written Sarah
22 and Josh's name at the top.

## Page 59

1    Q.  If you go roughly three-fourths of the
2  way down the page, there's a line that appears to
3  say, "where is Unilever getting first mover
4  advantage?"
5    A.  Uh-huh.
6    Q.  Can you tell me what you mean by the
7  words "first mover advantage"?
8    A.  It would be a marketing claim in market.
9  Unilever is -- has a very strong reputation and a
10 very strong program in sustainability. And this is
11 probably a note to myself to try and understand
12 where they're getting first mover advantage for
13 making a claim on one of their products. You can
14 see here I've written @the Hellman's cage-free
15 eggs.
16   Q.  By the first mover advantage, do you
17 mean that they're the first competitor to make a
18 certain claim?
19   A.  Correct.
20   Q.  But, for example, here, then, Hellman's
21 is mayonnaise, correct?
22   A.  Correct.

## Page 60

1    Q.  So are you suggesting here that Unilever
2  could gain a first mover advantage by using
3  cage-free eggs to produce its Hellman's mayonnaise?
4    A.  I think at this point, they had already
5  done that. And my guess is that this is an example
6  that Josh and Sarah gave to us.
7    Q.  And you would consider Unilever to be a
8  competitor of General Mills, correct?
9    A.  Correct.
10   Q.  Do you know in what form General Mills
11 purchases its cage-free eggs, as shell eggs or
12 dried eggs or some other type of egg product?
13   A.  I don't. I don't. Not with any
14 certainty. I know there's been discussions around
15 both dried and liquid, I think, from my
16 recollection, but I don't know for sure.
17   Q.  Do you know what General Mills makes
18 using the cage-free eggs that it buys?
19   A.  I don't know specifically where they go
20 in our supply chain.
21       MR. SCHWINGLER: I have no other
22 questions.

## Page 61

1        MS. ANSARI: We don't have any
2  questions.
3        MR. CAMPBELL: That's it.
4        MR. DAVIS: Great. Thank you very much.
5        THE WITNESS: You're welcome.
6     (Reading and signing reserved).
7     (Whereupon, at 11:32 a.m. the deposition
8  was adjourned.)
9          * * * * *

**62**

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me, and any corrections appear on the attached Errata
8  Sheet signed by me.
9
10
11  _____   _____
12    (DATE)         (SIGNATURE)

**63**

1           REPORTER'S CERTIFICATE
2
3  STATE OF MINNESOTA        )
4                            ss.
5  COUNTY OF HENNEPIN        )
6        I hereby certify that I reported the
   deposition of GERALD LYNCH on March 5, 2014, in
7  Minneapolis, Minnesota, and that the witness was by
   me first duly sworn to tell the whole truth;
8        That the testimony was transcribed by me
   and that this transcript is a true record of the
9  testimony of the witness;
         That the cost of the original has been
10 charged to the party who noticed the deposition,
   and that all parties who ordered copies have been
11 charged at the same rate for such copies;
         That I am not a relative or employee or
12 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
13       That I am not financially interested in
   the action and have no contract with the parties,
14 attorneys, or persons with an interest in the
   action that affects or has a substantial tendency
15 to affect my impartiality.
         WITNESS MY HAND AND SEAL THIS 7th day of
16 March, 2014.
17
18 _____
19 Jonathan Wonnell
20 Notary Public, Hennepin County, Minnesota
21 My Commission expires January 31, 2017
22