# ATTACHMENT 41

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    IN RE:  PROCESSED EGG PRODUCTS:      MDL NO. 2002
      ANTITRUST LITIGATION                 08-MDL-02002
 5

 6
                             - - - - -
 7
                           PHILADELPHIA, PA
 8
                             - - - - -
 9
                          DECEMBER 3, 2019
10
                             - - - - -
11

12
      BEFORE:    THE HONORABLE GENE E.K. PRATTER, J.
13

14                           - - - - -

15                 TRANSCRIPT OF TRIAL PROCEEDINGS

16                             DAY 19

17                           - - - - -

18

19

20

21           KATHLEEN FELDMAN, CSR, CRR, RPR, CM
             Official Court Reporter
22           Room 1234 - U.S. Courthouse
             601 Market Street
23           Philadelphia, PA  19106
             (215) 779-5578
24

25
         (Transcript Produced By Mechanical Shorthand Via C.A.T.)
```

139

1  M-A-R-S-H-A-L-L.
2         THE COURT:  So, welcome back, Mr. Marshall.
3         THE WITNESS:  Thank you.
4              GREGORY D. MARSHALL,
5  called as a witness herein by the plaintiffs, having been
6  first duly sworn, was examined and testified as follows:
7         THE COURT:  Okay, you may resume.
8              CROSS-EXAMINATION (continuation)
9  BY MR. BJORK:
10 Q.   Mr. Marshall, welcome back.
11        MR. BJORK:  Members of the jury, again, John Bjork
12 on behalf of Publix and SuperValu.
13 BY MR. BJORK:
14 Q.   Mr. Marshall, during your direct exam, I guess it was a
15 week ago now, you talked at some length about Rose
16 Acre's expansion, correct?
17 A.   Correct.
18 Q.   And when you did so, your testimony was limited to Rose
19 Acre's expansion, correct?
20 A.   Correct.
21 Q.   Okay.  And you don't have any ability to testify to the
22 expansion or the lack thereof of anyone else in the industry,
23 right?
24 A.   No.
25 Q.   Okay.  And you also can't testify to Rose

140

1  Acre's expansion, the impact of that on overall market supply,
2  right?
3  A.   Sure.  I can testify to the production that Rose Acre
4  added to the overall egg -- or hen numbers in the country.
5  Q.   Okay, but you can't testify, for example, sir, whether
6  that production was sufficient to offsetting a decline in
7  production market-wide that resulted from the Certified
8  Program, correct?
9  A.   Correct.
10 Q.   And to be clear, then, sir, your testimony was specific
11 to Rose Acre and no one else, right?
12 A.   Yes.
13 Q.   And you've done no analysis of whether market output
14 would have been higher or lower if not for the Certified
15 Program, right?
16 A.   No.
17 Q.   Now, with respect to Rose Acre in particular, isn't it
18 true that your company had a long history of expanding before
19 the Certified Program?
20 A.   Yes, that's correct.
21 Q.   And Rose Acre had expanded through acquisition and other
22 means in the 1990s and well before that, right?
23 A.   Correct.
24 Q.   And isn't it true, sir, that due to the Certified
25 Program, Rose Acre, at least initially, had to reduce some of

141

1  its capacity, right?
2  A.   Yes.
3  Q.   And with each phased increase of the guidelines, the cage
4  space guidelines, you had to reduce your capacity a little bit
5  more, right?
6  A.   Yes.
7  Q.   And if, sir, Rose Acre had expanded in the manner you
8  testified to last week, without the restrictions of the
9  Certified Program, its output overall would have been greater,
10 right?
11 A.   Um, I don't -- I don't think I can answer that because I
12 don't know -- I don't know that our expansion would have been
13 the same had we not joined the Certified Program.
14 Q.   Okay.
15 A.   We may not have had customers to sell eggs to.
16 Q.   Well, whatever expansion you did engage in was confined
17 by the requirements of the Certified Program, correct?
18 A.   Correct.
19 Q.   Now, turning back just briefly to the overall market, you
20 would agree, sir, that any expansion Rose Acre engaged in
21 was -- was trivial compared to overall market output, right?
22 A.   No, I wouldn't agree with that.
23 Q.   Why not?
24 A.   We see the market move -- the market can move -- if a
25 producer has a fire, for example, and -- or a tornado hits and

142

1  takes out a million birds, it can impact the market and will
2  impact the market.  So I would argue that any addition or
3  subtraction of birds will -- will impact the market.
4  Q.   Will impact the market at some level but not
5  significantly, correct?
6  A.   I -- I don't agree or disagree with that.  I guess --
7  Q.   You've done no analysis of that, correct?
8  A.   Correct.
9  Q.   I believe last week you testified to some expansion that
10 occurred through acquisitions of existing facilities, correct?
11 A.   Yes.
12 Q.   And you acknowledged, sir, that acquisition of existing
13 facilities isn't going to increase overall market output,
14 right?
15 A.   Not acquisitions themselves.  No.  But I also testified
16 last week that in two or three of our acquisitions, we did go
17 ahead and expand those facilities.
18 Q.   You're talking about after the acquisition?
19 A.   Correct.
20 Q.   I'm talking about the simple acquisition, where you take
21 a production from one producer and shift it to another, in
22 this case, Rose Acre, that acquisition isn't going to move the
23 needle on overall market output, right?
24 A.   That's correct.
25 Q.   Now, moving to a couple of the specific Rose Acre

143

1  facilities that you identified, I believe one of them was a
2  facility in Donovan, Illinois, right?
3  A.   Yes.
4  Q.   Okay.  And that facility, sir, has always been, at least
5  as long as Rose Acre's owned it, a cage-free facility,
6  correct?
7  A.   It was a caged facility when it was purchased and we
8  converted it over, correct.
9  Q.   Okay.  So immediately upon purchase, you converted it to
10 a cage-free facility?
11 A.   Started that process, yes.
12 Q.   And you're aware, sir, that the Plaintiffs' claim in this
13 case concerns commodity shell eggs, not cage-free eggs,
14 correct?
15 A.   Yes.
16 Q.   Another facility you testified about, I believe, was Rose
17 Acre's Jen Acre facility?
18 A.   Yes.
19 Q.   Okay.  And that too is a cage-free facility, correct?
20 A.   It was originally a cage facility that was remodeled and
21 converted into a cage-free facility.
22 Q.   Okay.  So that remodel transferred it into or transformed
23 it into a cage-free operation?
24 A.   Correct.
25 Q.   Okay.  And, again, cage-free eggs are not at issue in

144

1  this case, correct?
2  A.   Yes.
3  Q.   Another one of the facilities, I believe you identified,
4  was your facility in County Line, Indiana, correct?
5  A.   Correct.
6  Q.   And I believe you said that facility added roughly
7  1.1 million layers; is that correct?
8  A.   The acquisition did, yes.
9  Q.   Okay.  And you would agree that, again, the acquisition
10 of the facility didn't result in an overall increase in market
11 supply, right?
12 A.   Yes.
13 Q.   And you didn't ever expand County Line, correct?
14 A.   Um, we had a small expansion at County Line, that was the
15 facility I mentioned last week that had the tornado go
16 through, and we built back cage-free housing there.  It made a
17 slight increase in the capacity at County Line.
18 Q.   But the increase, again, with that expansion was
19 cage-free eggs, right?
20 A.   Correct.
21 Q.   Germantown, Indiana, I believe was another facility you
22 identified, right?
23 A.   Germantown, Illinois.
24 Q.   Illinois, I'm sorry.  Again, that's another acquisition,
25 correct?

145

1  A.   Correct.
2  Q.   Crystal Farms, Georgia, was another facility I believe
3  you identified, correct?
4  A.   Correct.
5  Q.   Again, another acquisition, correct?
6  A.   Yes, but both at Crystal Farms and the Germantown
7  facility, at Germantown, there was 400,000 caged birds added
8  to that facility after the acquisition and about 200,000 were
9  added at the Crystal Farms facility in Canon, Georgia.
10 Q.   Okay.  But the initial, I believe it was 600,000 that you
11 acquired from the acquisition of Germantown was a simple
12 transfer of production from one producer to another, right?
13 A.   That's correct.
14 Q.   Okay.  But you still counted that -- those numbers in
15 your -- your overall numbers of Rose Acre's total expansion,
16 correct?
17 A.   Yes.
18 Q.   Okay.  And Crystal Farms, you said there was an expansion
19 of 200,000 layers; is that right?
20 A.   Correct.
21 Q.   But the acquisition, I believe you attributed 1.2 million
22 layers to that, correct?
23 A.   1.3, actually.
24 Q.   1.3?
25 A.   Yes.

146

1  Q.   And again, acquisition simply is a transfer of production
2  from one producer to another producer, right?
3  A.   Correct.
4  Q.   Crystal Farms, one more question on that.  That
5  acquisition took place in 2009, right?
6  A.   Correct.
7  Q.   And you're aware that Rose Acre was involved in
8  litigation concerning the conduct at issue in this case by
9  2009, right?
10 A.   Yes.
11 Q.   Okay.  So that acquisition was after suits had been
12 filed, right?
13 A.   Yes.
14 Q.   You also discussed at some length the Hyde County
15 facility in North Carolina, correct?
16 A.   Yes.
17 Q.   Now, Hyde County, according to your testimony, accounts
18 for a significant proportion of Rose Acre's expansion
19 throughout the 2000s, yes?
20 A.   It was three and a half million birds.
21 Q.   And isn't it true Hyde County wasn't complete until 2009,
22 right?
23 A.   Yes.
24 Q.   Okay.  Again, 2009 is after litigation involving the
25 program that already started, right?

147

1  A.   Correct.
2  Q.   And as of March 2007, when I believe you became CFO of
3  Rose Acre, only about a third of Hyde County's capacity was
4  being utilized, right?
5  A.   I believe there was about 1.1 million birds in place in
6  March of 2007.
7  Q.   Okay, so approximately a third, right?
8  A.   Um-hum.
9  Q.   And you would agree, then -- well, strike that.
10       As of March 2007, that was nearly five years after
11 Rose Acre had joined the Certified Program, right?
12 A.   Correct.
13 Q.   So any capacity that Rose Acre lost by joining the
14 Certified Program wasn't made up for -- through Hyde County
15 expansions until years later, right?
16 A.   I'm not sure I understand your question.
17 Q.   So if Rose Acre lost capacity through the Certified
18 Program --
19 A.   Um-hum.
20 Q.   -- it didn't make up any of that lost capacity through
21 Hyde County until several years after Rose Acre had first
22 joined the program, right?
23 A.   Well, we were making up the capacity from 2002 on, as I
24 testified --
25 Q.   But I'm talking about Hyde County specifically.

148

1  A.   I'm not sure I understand what specifically you're asking
2  about the Hyde County capacity.
3  Q.   That you didn't -- there were no eggs being produced out
4  of Hyde County until 2006, right?
5  A.   Correct.
6  Q.   And that was four years after Rose Acre had joined the
7  Certified Program in 2002, correct?
8  A.   Yes.
9  Q.   Okay.  Now, in addition to acquisitions and new builds
10 that we went through, you also discussed some remodeling that
11 Rose Acre engaged in, right?
12 A.   Yes.
13 Q.   And one of the facilities you identified was Cort Acres,
14 correct?
15 A.   Correct.
16 Q.   And Cort Acres was -- the remodeling there started in
17 1997, I believe you testified to?
18 A.   That's correct.
19 Q.   Okay.  So the planning and construction at Cort Acres
20 started before Rose Acre had ever joined the Certified
21 Program, yes?
22 A.   Yes, the planning would have started before then,
23 obviously.
24 Q.   Okay.
25 A.   But, you know, the completion of the project did continue

149

1  through and after us joining UEP.
2  Q.   Okay.  But quite a few years after you had agreed to join
3  the Certified Program in 2002, the planning had started, yes?
4  A.   Well, actually, the remodeling started in 1997, yes, but
5  it wasn't completed until 2005.
6  Q.   Okay.
7  A.   So --
8  Q.   It started --
9  A.   -- it was after we completed the project, the expansion.
10 Q.   Understood.  Understood.
11      And then a couple of other remodels you identified
12 were -- you identified were Lincoln County, Missouri, and
13 Pulaski County, Indiana; is that right?
14 A.   Correct.
15 Q.   And isn't it true, sir, that the planning and
16 construction for some of the expanded houses at those
17 facilities, like Cort Acres, started before Rose Acre joined
18 the Certified Program in 2002?
19 A.   Yes.  Similar to what I just said, obviously the planning
20 would have started before that, but construction did continue
21 and was completed after we joined the UEP Program.
22 Q.   But it was in the works before you joined the UEP
23 Program, right?
24 A.   Yes.
25 Q.   Sir, if you would, can you -- do you still have the

150

1  binder I gave you last week?  I have another one.
2  A.   I don't have one.
3  Q.   Okay.  It was such interesting reading, I thought you'd
4  keep it.
5       If you could look, sir, at the 2008 financial
6  statement which was marked as PX-624.
7  A.   Okay.
8  Q.   If you turn to the sixth page of the report, please.
9  A.   Okay.
10 Q.   You're faster than I am.
11      At the top, you'll see there's a date, June of 2008.
12 A.   Correct.
13 Q.   And then below that there is an entry for YTD dozens
14 produced.  Do you see that?
15 A.   Um, yes.  Sorry, I'm on the wrong page.
16 Q.   The same page.
17 A.   Yes.
18 Q.   And that, sir, refers to the number of dozens of eggs
19 Rose Acre produced for this particular fiscal year, 2008,
20 right?
21 A.   That's correct.
22 Q.   The number there is roughly 457 million, correct?
23 A.   Correct.
24 Q.   And that line item is going to exist in all of Rose
25 Acre's financial statements, yes?

151

1  A.   The line item --
2  Q.   Not the number but the line item for year-to-date dozens
3  produced?
4  A.   Year-to-date dozens produced, correct.
5  Q.   Okay.  And isn't it true, sir, that this total that's
6  identified there includes the production of all types of eggs?
7  A.   Yes, that's correct.
8  Q.   So it's going to include things like specialty eggs,
9  correct?
10 A.   Correct.
11 Q.   It's going to include things like cage-free eggs, right?
12 A.   Correct.
13 Q.   It's going to include things like nutritionally enhanced
14 eggs, right?
15 A.   It would be any shell egg produced.
16 Q.   Okay.  And would you also agree, sir, if one was
17 attempting to show Rose Acre's total production of commodity
18 shell eggs, that this number would -- would be misleading or
19 inaccurate?
20 A.   I wouldn't find it misleading, no, because at this point
21 in time in 2008 the only cage-free production that we had was
22 at Donovan.
23 Q.   Okay.  But there's some in later reports that include
24 numbers of dozens produced, those numbers are going to include
25 things other than commodity shell eggs, correct?

152

1  A.   A very small percentage, correct.
2  Q.   But a percentage is going to be imbedded in those
3  numbers, yes?
4  A.   Correct.
5  Q.   And that number also is going to include production from
6  acquired farms, yes?
7  A.   Yes.
8  Q.   And when you testified, I believe, last week, that Rose
9  Acre's production currently is, I think you said 520 million
10 dozen, that would include some of the non-commodity shell eggs
11 that we talked about just now, right?
12 A.   Yes.
13 Q.   Okay.  Now, another item you talked about last week was
14 funds that Rose Acre expended on expansion, right?
15 A.   Correct.
16 Q.   And isn't it true that like the production numbers we
17 just looked at, in Rose Acre's financial reports, the dollar
18 numbers you provided include expenditures for facilities that
19 produce things other than commodity shell eggs?
20 A.   Again, the only thing that -- in the time frame of the --
21 of the expansions that were discussed, Donovan would have been
22 the only one that was a cage-free facility that was converted
23 over.
24 Q.   But you were asked, I believe, funds expended through
25 2012.  Is it your testimony that Rose Acre wasn't producing

153

1  anything but commodity shell eggs?
2  A.   Through 2012, that's correct.  Donovan would have been
3  the only facility that was producing cage-free.
4  Q.   What about nutritionally enhanced eggs?
5  A.   I don't know that total off the top of my head.
6  Q.   But it would have been included in the total number of
7  dollars spent on expansion that you provided last week, right?
8  A.   Um, again, those make up such a small percentage of any
9  production, it would be a very miniscule number.
10 Q.   Okay.  But you didn't carve them out, I guess is my
11 question?
12 A.   No, that's correct.
13 Q.   So I believe the number you provided last week was
14 $215 million that Rose Acre spent on expansion; is that right?
15 A.   Correct.
16 Q.   And you would agree, sir, that obtaining financing for
17 that level of expansion can be challenging, yes?
18 A.   In a cyclical egg market, it can be very challenging.
19 Q.   Okay.  And that's especially true when you're talking
20 about tens of hundreds of millions of dollars like Rose Acre
21 was able to obtain, correct?
22 A.   Correct.
23 Q.   And it's really difficult if you're not a mega producer
24 like Rose Acre is, right?
25 A.   I think it's equally difficult for any producer.

154

1  Q.   Big or small, it's hard to get financing?
2  A.   Hard to get financing.
3  Q.   Okay.  And you agree most other egg producers are
4  significantly smaller than Rose Acre, right?
5  A.   Most, yes.
6  Q.   In fact, other than Cal-Maine, there isn't an egg
7  producer in America that's as big as your company, correct?
8  A.   That's correct.
9  Q.   And when you testified about obtaining financing for
10 expansion, you weren't speaking to the ability of other
11 producers to similarly obtain financing for expansion, right?
12 A.   No.  I was speaking about us obtaining financing.
13 Q.   Okay.  And that's because you can't speak to what anyone
14 else could do in terms of financing the type of expansion you
15 talked about last week, right?
16 A.   Oh, that's correct.
17 Q.   Okay.  Last week you briefly made reference to Rose Acre
18 participating in exports; is that right?
19 A.   Yes.  Well, I think the reference I made was that the
20 Hyde County facility, one of the things that made it
21 attractive was that it set close to one of the ports, so it
22 would be a possibility for an export market.
23 Q.   Okay.  And Rose Acre became a member of USEM in late
24 2006, right?
25 A.   I'm not sure on the exact date.

155

1   Q.   Does that sound like it's in the ballpark?
2   A.   I'm not sure.
3   Q.   Isn't it true, sir, that on occasion, USEM would engage
4   in exports around the holidays?
5   A.   I'm not -- I can't answer to that, no.
6   Q.   Okay.  Who would -- who would have that kind of
7   information?
8   A.   I'm not sure, but not me.
9   Q.   Okay.  Sir --
10          MR. BJORK:  May I approach, Your Honor?
11          THE COURT:  Yes.
12  BY MR. BJORK:
13  Q.   Sir, I've handed you what's been marked as Plaintiffs'
14  Exhibit 621.  Am I correct that what that document is is an
15  e-mail you sent to Marcus Rust on November 6, 2007, attaching
16  a set of PowerPoint slides referred to as bank meeting slides?
17  A.   Yes, that's correct.
18          MR. BJORK:  Your Honor, we would move for the
19  admission of PX-621 into evidence.
20          THE COURT:  Any objection?
21          MR. CARTER:  Your Honor, this appears to be a draft
22  document.
23          THE WITNESS:  Yes, it is a draft document.
24          THE COURT:  Hold on.  And therefore?
25          MR. CARTER:  Therefore, we object to authenticity

156

1   and relevance.
2           THE COURT:  Do you want to get some more background?
3           MR. BJORK:  I can.
4   BY MR. BJORK:
5   Q.   Mr. Marshall, this is an e-mail that you sent to
6   Mr. Rust, right?
7   A.   Correct.
8   Q.   Okay.  And this presentation was in part created by you,
9   correct?
10  A.   Correct.
11          MR. BJORK:  Your Honor, we would move to admit
12  PX-621 into evidence.
13          MR. CARTER:  No objection, Your Honor.
14          MR. HARRIS:  Your Honor, USEM would object based
15  on -- based on hearsay and ask for a limiting instruction with
16  respect to USEM.
17          MS. LEVINE:  And UEP would have the same objection
18  and ask for a limiting instruction as to UEP.
19          MR. BJORK:  That's fine for us, Your Honor.
20          THE COURT:  Okay.  So the document which is -- what
21  number are we dealing with here? -- 621 is admitted as to Rose
22  Acre only.
23          (Exhibit received in evidence.)
24  BY MR. BJORK:
25  Q.   Sir, this presentation was originally created in December

157

1   of 2006 in connection with the meeting Rose Acre had with its
2   lenders concerning financing of Hyde County, correct?
3   A.   That's correct.
4   Q.   Okay.  And what's -- what you're e-mailing Mr. Rust is a
5   modified set of these December 2006 slides for use in a second
6   meeting with your lenders in November 2007 concerning
7   Hyde County, right?
8   A.   Yes, that's correct.
9   Q.   Okay.  And as you said, you were involved in the creation
10  of this presentation, right?
11  A.   Yes.
12  Q.   And more specifically, you were involved in reviewing and
13  editing the presentation, right?
14  A.   Yes.
15  Q.   And the objective of this meeting with your lenders in
16  November 2007 is to get those lenders to release funds so that
17  you could complete Hyde County, correct?
18  A.   That was one of the topics, yes.
19  Q.   Okay.  And Rose Acre was truthful with its lenders during
20  this process, yes?
21  A.   Yes.
22  Q.   If you could, sir, please go to the seventh slide in the
23  deck which is on the second page of the presentation.  Do you
24  see that?  It's titled Rose Acre Investments In Plant and
25  Equipment.

158

1   A.   Yes.
2   Q.   This slide was created by you, correct?
3   A.   Yes.
4   Q.   Okay.  And the first bullet point for discussion in the
5   slide reads:  Capacity of Rose Acre facilities at the
6   beginning of the UEP cage space reductions versus capacity of
7   Rose Acre facilities at the end of the UEP cage space
8   reductions.  Correct?
9   A.   Yes.
10  Q.   Further down in that same slide, there's a section titled
11  Rose Acre Capacity Comparisons.
12          Do you see that?
13  A.   Yes.
14  Q.   And there are three bullet points within that subsection
15  that read:  RAF after the final UEP cage space reduction,
16  67 square inches; RAF before UEP cage space reductions began,
17  53.3 square inches; and finally, RAF capacity at non-UEP
18  Certified breaker standards, 45 square inches, right?
19  A.   Yes.
20  Q.   And the next slide in this presentation, moving to your
21  right -- wait until we get it pulled up -- is a corresponding
22  bar graph for Rose Acre capacities at these different floor
23  space levels, right?
24  A.   Yes.
25  Q.   And the slide, in fact, is titled RAF Capacity

159

1  Comparison, 67 Inches Versus 53.3 Inches Versus 45 Inches.
2  Right?
3  A.   Correct.
4  Q.   And what this is showing, sir, is on the far right is the
5  maximum layer capacity Rose Acre would have if it were
6  stocking its hens 45 square inches like other breaking stock
7  producers, right?
8  A.   Like breaking stock producers, correct.
9  Q.   Okay.  And that number is roughly 32.5 million hens,
10 right?
11 A.   Yes.
12 Q.   And roughly a third of Rose Acre's production goes into
13 breaking stock or somewhere in that neighborhood?
14 A.   20 to 30 percent of our revenues are egg products.
15 Q.   Okay.  But Rose Acre couldn't stock its hens at this
16 level because of the Certified Program, right?
17 A.   That's correct.
18 Q.   More specifically, because of the 100% rule, right?
19 A.   That's correct.
20 Q.   And the middle bar is the capacity Rose Acre would have
21 if it could stock its hens at 53.3 square inches, right?
22 A.   Yes.
23 Q.   And that was Rose Acre's average floor space prior to
24 joining the Certified Program, right?
25 A.   Yes.

160

1  Q.   And the number corresponding to 53.3 inches is roughly
2  26 million hens, right?
3  A.   Correct.
4  Q.   Finally, the last bar on the far left, that's Rose
5  Acre's capacity after the final phase-in of the Certified
6  Program, right?
7  A.   Yes.
8  Q.   And that's by far the shortest bar, right?
9  A.   Yes.
10 Q.   And it shows capacity in the ballpark of 21 million hens,
11 correct?
12 A.   That's correct.
13 Q.   Okay.  So what this reflects, sir, is due to compliance
14 with the Certified Program, Rose Acre, at this point in time,
15 had lost capacity of at least 4 million hens, right?
16 A.   Yes.
17 Q.   And for perspective, you testified last week that the
18 total capacity for all of Hyde County was roughly 3.5 million
19 hens, right?
20 A.   Yes.
21 Q.   Okay.  So Rose Acre lost more in capacity, per your
22 analysis here, due to the Certified Program than it had gained
23 through all of Hyde County, correct?
24 A.   Just Hyde County, yes, but not the other -- or
25 expenditures.

161

1  Q.   And Hyde County cost Rose Acre over $75 million to
2  construct; is that right?
3  A.   That's correct.
4  Q.   Okay.  And this loss in capacity takes into account
5  expansion, right?
6  A.   It would have been a snapshot of our capacity at the time
7  of the meeting.
8  Q.   Okay.  But a snapshot of your capacity inclusive of
9  expansion at this time, correct?
10 A.   Correct.
11 Q.   And you were down 4 million hens as of November 6, 2007,
12 correct?
13 A.   Yes.
14      MR. BJORK:  I have no further questions, Your Honor.
15      THE COURT:  Any redirect?
16      MR. CARTER:  Yes, Your Honor.
17              REDIRECT EXAMINATION
18 BY MR. CARTER:
19 Q.   Mr. Marshall, I'm going to start where we left off.
20 A.   Okay.
21 Q.   Keep PX-621 in front of you.  What was the point of this
22 bank meeting?
23 A.   As I testified last week, the point of the bank meeting
24 was to convince our bankers at that point to -- if you'll
25 recall, we had seven houses complete, that the ask at the bank

162

1  meeting was to allow us to build three more and do the
2  concrete foundations for the remaining four to meet our
3  building permits at that time.  Obviously there were some
4  other things discussed as well, but that was the main reason
5  for the meeting.
6  Q.   So the point of the meeting was to get money to expand
7  your production?
8  A.   That's correct.
9  Q.   Could Rose Acre have sold eggs to Kroger if it used the
10 stocking densities on the two right-hand columns?
11 A.   No.
12 Q.   Did Rose Acre have 26 million hens in 2002?
13 A.   In 2002, no.
14 Q.   And as of the date of this bank meeting, Rose Acre had
15 already engaged in some expansion, correct?
16 A.   Lots of expansion.
17 Q.   You can set that aside.
18      Now, you testified a little bit about the condition
19 of several of the farms that you acquired at the time that you
20 acquired them.  Can you remind the jury what the condition of
21 Donovan Egg Farm was at the time of the acquisition?
22 A.   Donovan at the time of the acquisition was a -- was a --
23 it was empty, it was sitting idle, it had been mothballed by
24 the previous owner, so no production, no chickens at all.
25 Q.   And what kind of farm did Rose Acre turn that into?

163

1  A.   It turned it into a cage-free facility.
2  Q.   And Mr. Bjork talked a lot about Rose Acre's expansion
3  into specialty eggs and especially cage-free eggs.  If Rose
4  Acre can't sell a cage-free egg as a cage-free egg, what does
5  Rose Acre do with that egg?
6  A.   If -- specialty eggs of any kind, cage-free, organic,
7  included, those go directly into the commodity market, just
8  because there's not an outlet for them in the specialty market
9  at given times of the year or certain customer demands.  So
10 those excess surplus eggs go right back into the commodity
11 market.
12 Q.   Now, we spoke about this on Tuesday.  It's been a week
13 since then, but how many hens did Rose Acre add to its flock
14 between 2002 and 2012?
15 A.   I believe 7.5 million.
16 Q.   Now, on Tuesday, last Tuesday, Mr. Bjork also showed you
17 a number of financial statements.  Do you recall that?
18 A.   Yes.
19 Q.   Do you recall him showing you the 2002 Rose Acre
20 financial statement?
21 A.   Yes.
22 Q.   Do you recall that the financial statement showed a loss
23 by Rose Acre Farms in 2002?
24 A.   Yes.
25 Q.   And I believe Mr. Bjork also showed you the financial

164

1  statements of Rose Acre Farms for 2008?
2  A.   Correct.
3  Q.   And Rose Acre had a profit that year?
4  A.   Correct.
5  Q.   2009, profit?
6  A.   Correct.
7  Q.   2010, a profit?
8  A.   Correct.
9  Q.   Did he show you 2005?
10 A.   No.
11 Q.   All right.
12      MR. CARTER:  Approach the witness, Your Honor?
13      THE COURT:  Yes, you may.
14 BY MR. CARTER:
15 Q.   Mr. Marshall, could you tell the jury what D-501 is.
16 A.   D-501 would be our monthly consolidated financial
17 statement package for June of 2005.
18      MR. CARTER:  Your Honor, we'd move for the admission
19 of D-501.
20      THE COURT:  Any objection?
21      MR. BJORK:  No.
22      THE COURT:  501 is admitted.
23      (Exhibit received in evidence.)
24      MR. CARTER:  May we publish it to the jury?
25      THE COURT:  Yes, you may.

165

1  BY MR. CARTER:
2  Q.   Now, before you get started, how, if at all, does Rose
3  Acre account for inflation in its financial statements?
4  A.   Not at all.  The financial statements are snapshots in
5  time, so no inflation factor applied at all.
6  Q.   If you could turn to -- I believe it's the second page of
7  this exhibit -- third page of this exhibit.  What was the net
8  income of Rose Acre Farms in 2005?
9  A.   It was a net loss of 17.7 million.
10 Q.   What was the Urner Barry average in Rose Acre's fiscal
11 year 2005?
12 A.   The Urner Barry average was 67 and a half cents a dozen.
13 Q.   And if you know, what is the average discount that Rose
14 Acre sells its eggs to Kroger -- customers like Kroger?
15 A.   Today that discount is somewhere around $0.30 a dozen.
16 Q.   $0.30 off of the Urner Barry?
17 A.   Correct.
18 Q.   How does an Urner Barry market of $0.67 a dozen impact
19 Rose Acre's cash flow?
20 A.   Pretty significantly.  As I testified last week, 2005,
21 2006, we were -- we were pretty much maxed out on all of our
22 lines of credit at the time and had taken on lots of leverage
23 on other facilities as well, so it's -- it's -- it's not good
24 for cash flow.
25 Q.   Is it positive, is the cash flow positive?

166

1  A.   No, cash flow is not positive.
2  Q.   And how long did the negative cash flow in 2005 last?
3  A.   2005 and 2006, pretty much 24 months there was solid of
4  negative cash flows.
5  Q.   If you could turn to the next page, D-501-004.  Do you
6  see the top line there?
7  A.   Yes.
8  Q.   YTD dozens produced.
9  A.   Yes.
10 Q.   I think you explained to the jury what that was when you
11 were speaking to Mr. Bjork.  What is the number there?
12 A.   398.7 million.
13 Q.   You can put that one aside.
14      You mentioned 2006.
15      MR. CARTER:  May I approach the witness, Your Honor?
16      THE COURT:  Yes.
17 BY MR. CARTER:
18 Q.   Did Mr. Bjork show you 2006?
19 A.   No.
20 Q.   Can you tell the jury what D-0507 is?
21 A.   Yes.  D-0507 is our consolidated financial statement
22 package for June of 2006.
23      MR. CARTER:  Your Honor, I move for the admission of
24 D-0507.
25      THE COURT:  Any objection to D-507?

167

1   MR. BJORK: No objection.
2   MR. CARTER: May we publish, Your Honor?
3   THE COURT: Yes, you may.
4   (Exhibit received in evidence.)
5   BY MR. CARTER:
6   Q. Do you know when the backfilling ban was implemented?
7   A. No, I don't know exactly that date.
8   Q. If you could go to the third page in. What was Rose
9   Acre's net income in 2006?
10  A. 2006 was a net loss of $10.3 million.
11  Q. If you turn to the next page, do you see that top line
12  again, dozens produced?
13  A. Yes.
14  Q. How many dozens did Rose Acre produce in 2006?
15  A. 411 million dozen.
16  Q. If my math is right, that's about 23 million more than
17  the year before?
18  A. Correct.
19  Q. You can set that aside.
20     Now in 2007, Rose Acre turned a profit, right?
21  A. Yes.
22  Q. We mentioned 2008, '9, and '10 already.
23     I believe Mr. Bjork showed you 2011 but didn't show
24  you the net income for 2011. Do you recall what the 2011
25  income was?

168

1   A. Um, I don't, but I have it right here.
2   Q. Can you use that to refresh your recollection, please?
3   A. Yes. 2011 was a net loss of $5.2 million.
4   Q. How many eggs did Rose Acre produce in 2011?
5   A. 517 million dozen.
6   Q. Do you know what Rose Acre's net income was in 2012?
7   A. If you'll allow me to look. 2012 we had a net loss of
8   $14.6 million.
9   Q. So in 2002, Rose Acre experienced a loss, correct?
10  A. Correct.
11  Q. 2003, profit?
12  A. Um, a small loss.
13  Q. Small loss in 2003?
14  A. Um-hum.
15  Q. Are you sure about that?
16  A. I'm not positive. Let me look.
17     I stand corrected. $6.2 million profit.
18  Q. 2004?
19  A. 2004 was a $55.2 million profit.
20  Q. So we have a loss in 2002, a profit in 2003, a profit in
21  2004, a loss in 2005, a loss in 2006, profit in 2007 through
22  2010, and then losses in 2011 and 2012, correct?
23  A. Correct.
24  Q. Why didn't Rose Acre shut down its expansion efforts
25  after it joined the UEP Certified Program?

169

1   A. Well, we didn't shut down our expansion efforts because,
2   number one, it was the company's goal to grow; number two, we
3   had to supply our customers. We had customers and we knew we
4   were going to lose capacity, as the cage -- UEP cage space was
5   implemented. So we had customers to supply. And, again, the
6   other reason was just the company is meant to grow and that's
7   what we've always done. As I testified to earlier, that's why
8   we didn't shut down any expansion opportunities.
9       MR. CARTER: Nothing further, Your Honor.
10      THE COURT: Anything further?
11      MR. BJORK: Just a couple of brief questions.
12      THE COURT: Go ahead.
13           RECROSS-EXAMINATION
14  BY MR. BJORK:
15  Q. Mr. Marshall, Mr. Carter said that, you know, we didn't
16  show you the 2005 and 2006 financial statements. But you
17  recall we discussed the losses in 2005 and 2006 last week,
18  right?
19  A. Briefly.
20  Q. Okay. And according to my review, while you had losses
21  in '5, '6, '11, and '12, those combined losses were roughly 48
22  million?
23  A. Correct.
24  Q. And as we discussed last week, in 2007, 2008, 2009, and
25  2010, the company made approximately $190 million in profits,

170

1   right?
2   A. I didn't add them up, but that sounds close.
3   Q. Okay. So any losses, just as a matter of arithmetic,
4   were far outweighed by your profits in those string of years,
5   right?
6   A. Profits were larger.
7   Q. Okay. And just going back to '11 and '12 briefly -- let
8   me go back to 2010. You said 2010 was a profitable year,
9   right?
10  A. Correct.
11  Q. Okay. And are you aware, sir, that the company, Rose
12  Acre, was generating more in revenue per dozen eggs produced
13  in 2011 and 2012 when you lost money than it was in 2010 when
14  it was profitable?
15  A. We had this discussion last week, I think, and, you know,
16  at the end of the day, the revenue stream still wasn't
17  supporting the cost structure.
18  Q. But as a factual matter -- please answer my question yes
19  or no first.
20  A. Comparatively, yes.
21  Q. Okay. So this indicates that the 2011 and 2012 losses
22  had more to do with costs than it did with egg prices, right?
23  A. Well, you can't look at them independently.
24  Q. Okay. And you would agree, sir, that the UEP Certified
25  Program had nothing to do with your feed costs, right?

```
 1  A.   Correct.
 2           MR. BJORK:  Okay, no further questions.
 3           THE COURT:  Anything more from anybody?
 4           Mr. Carter?
 5           MR. CARTER:  Nothing.
 6           MR. HARRIS:  No, Your Honor.
 7           THE COURT:  Okay, Mr. Marshall, I think you are
 8  done.
 9           THE WITNESS:  Thank you.
10           THE COURT:  All right.  Why don't we take a very
11  short break because I believe there's another witness to be
12  called.
13           MR. KING:  Yes, Your Honor.
14           THE COURT:  All righty.  Then ten minutes, folks, so
15  we'll resume at 3 o'clock.
16           THE DEPUTY CLERK:  All rise.
17           (Jury out.)
18           THE COURT:  Okay.  Ten minutes.
19           (Recess taken.)
20           THE DEPUTY CLERK:  All rise.
21           THE COURT:  Okay, everybody, take your seats.
22           THE DEPUTY CLERK:  All rise.
23           (Jury in.)
24           THE COURT:  Okay, you-all may take your seats and
25  Rose Acre may call its next witness.
```