# ATTACHMENT 43

HIGHLY CONFIDENTIAL

Moran, Paul                                           May 20, 2014

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE:  PROCESSED EGG PRODUCTS   )
ANTITRUST LITIGATION             )
                                 )
_____  ) MDL NO. 2002
                                 ) 08-md-02002
THIS DOCUMENT RELATES TO         )
Giant Eagle, Inc. v United Egg   ) HIGHLY CONFIDENTIAL
Producers, et al.,               )
No. 2:11-cv-00820                 )

- - -

Deposition of PAUL MORAN

Tuesday, May 20, 2014

- - -

The video deposition of PAUL MORAN, called
as a witness by the Defendants, pursuant to Notice and
the Federal Rules of Civil Procedure pertaining to the
taking of depositions, taken before me, the
undersigned, Melissa L. Fenster, a Notary Public in
and for the Commonwealth of Pennsylvania, at the
Offices of Marcus & Shapira, LLP, One Oxford Centre,
35th Floor, Pittsburgh, Pennsylvania, 15219,
commencing at 8:47 o'clock a.m., the day and date
above set forth.

- - -

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

2 (Pages 2 to 5)

---

**2**

APPEARANCES:

On behalf of the Direct Purchaser Plaintiff:

Marcus & Shapira, LLP:
Moira Cain-Mannix, Esquire
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
cain-mannix@marcus-shapira.com

On behalf of the Defendants, Michael Foods, Inc.
and Papetti's Hygrade Egg Products, Inc.:

Weil, Gotshal & Manges, LLP:
Carrie Mahan Anderson, Esquire
1300 Eye Street NW, Suite 900
Washington, DC 20005-3314
carrie.anderson@weil.com

On behalf of the Defendant, Rose Acre Farms,
Inc.:

Porter, Wright, Morris & Arthur, LLP:
Karrie Allen, Esquire
1919 Pennsylvania Avenue, NW, Suite 500
Washington, DC 20006-3434
kallen@porterwright.com

ALSO PRESENT:
Brandon Wilczek, Videographer
- - -

---

**4**

EXHIBITS (CONT.)

Exhibit 7 Product Supplier Letter of Agreement 84
Exhibit 8 Email, 4-30-02 85
Exhibit 9 UEP Certified Program Overview 112
Exhibit 10 UEP Background 113
Exhibit 11 Letter, 12-16-02 115
Exhibit 12 American Egg Board Retail Workshop, 118
December 1-2, 2004,Chicago
Exhibit 13 Email, with attachment, 8-27-07 125
Exhibit 14 Fax, 8-19-02 127
Exhibit 15 Giant Eagle's Egg Program Quote Due 135
to Topco by Monday, July 14, 2003
Exhibit 16 Fax, 7-18-03 140
Exhibit 17 Fax, 8-19-03 140
Exhibit 18 Email, 9-5-03 144
Exhibit 19 Letter, 9-30-03 150
Exhibit 20 Product Supplier Agreement 150
Exhibit 21 Product Supplier Agreement 152
Exhibit 22 Email chain, 2-1-05 159
Exhibit 23 Email, with attachment, 4-15-05 160
Exhibit 24 Giant Eagle Egg Quote Due to Topco 163
Monday, April 25, 2005
Exhibit 25 Fax, 4-18-05 164
Exhibit 26 Giant Eagle Egg Quote Due to Topco 164
by Monday April 25, 2005

---

**3**

INDEX
- - -

EXAMINATION: PAGE:

BY MS. ANDERSON 8
BY MS. ALLEN 266
BY MS. CAIN-MANNIX 269
BY MS. ANDERSON 274
BY MS. CAIN-MANNIX 289
BY MS. ANDERSON 289

EXHIBIT INDEX
PAGE:
Exhibit 1 Defendants' Amended Notice of 10
Deposition of Plaintiff Giant Eagle,
Inc. Pursuant to Fed. R. CIV.
P 30(b)(6)
Exhibit 2 Second Amended Complaint and Demand 22
for Jury Trial
Exhibit 3 Letter, 11-15-10 23
Exhibit 4 Agreement for Assignment of Antitrust 24
Claims
Exhibit 5 Agreement for Assignment of Antitrust 27
Claims
Exhibit 6 Letter, 7-6-99 56

---

**5**

EXHIBITS (CONT.)

Exhibit 27 Giant Eagle Egg Quote Due to Topco 165
by Monday April 25, 2005
Exhibit 28 Giant Eagle Egg Quote Due to Topco 165
by Monday April 11, 2005
Exhibit 29 Email chain, 5-13-05 165
Exhibit 30 Email chain, 6-2-05 166
Exhibit 31 Letter, 6-13-005 167
Exhibit 32 Letter, 6-13-005 168
Exhibit 33 Email chain, 6-10-05 169
Exhibit 34 Summary of Supplier Buying 172
Arrangement Form 60
Exhibit 35 Plaintiff Giant Eagle, Inc.'s 203
Supplemental Objections and Answers to
Defendants' First Set of Interrogatories
Exhibit 36 GE000010 205
Exhibit 37 GE000010 205
Exhibit 38 Egg Program Review 217
Exhibit 39 Email chain, 2-19-02 222
Exhibit 40 Letter, 2-22-02 224
Exhibit 41 Email, with attachment, 2-22-02 225
Exhibit 42 Email chain, 10-24-08 231
Exhibit 43 Dairy Business Plan FY08-FY10 234
Exhibit 44 Business Plan Presentation, 6-24-04 243
Exhibit 45 GE00011463, Giant Eagle Coupon 250

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

3 (Pages 6 to 9)

---

**6**

EXHIBITS (CONT.)
Exhibit 46 Ad Plan                              252
Exhibit 47 Ad Plan                              253
Exhibit 48 Feedstuffs article                   256
- - -

---

**7**

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER:  My name is Carrie Molitierno, certified video legal specialist on behalf of Henderson Legal Services.

The date today is May 20, 2014, and the time is approximately 8:47 a.m.  This deposition is being held in the offices of Marcus & Shapira located at One Oxford Centre, 35th Floor, Pittsburgh, Pennsylvania 15219, in the Processed Eggs Products Antitrust Litigation.  The name of the witness is Paul Moran.

At this time, the attorneys may identify themselves and the parties they represent.  After which our court reporter, Missy Fenster of Henderson Legal Services, will swear in the witness, and we can then proceed.

MS. ANDERSON:  Carrie Anderson with Weil Gotshal on behalf of Michael Foods.

MS. CAIN-MANNIX:  Moira Cain-Mannix on behalf of Giant Eagle, Inc. and the witness, Paul Moran.

MS. ALLEN:  Karrie Allen with Porter, Wright Morris & Arthur on behalf of Defendant Rose Acre Farms.

PAUL MORAN

---

**8**

called as a witness by the Defendant, having been first duly sworn, as hereinafter certified, was deposed and said as follows:

EXAMINATION

BY MS. ANDERSON:

Q    Good morning, Mr. Moran.

A    Good morning.

Q    As you heard and we met earlier, I'm Carrie Anderson.  I'm a lawyer, and I represent Michael Foods in the Eggs Litigation.

Can you just state your full name for the record and tell us where you currently reside?

A    My name is Paul Moran, and I reside in Peters Town -- McMurray, Pa.

Q    And your home address?

A    122 East Edgewood Drive, McMurray, Pa., 15317.

Q    Have you ever been deposed before, Mr. Moran?

A    I have not.

Q    Okay.  Let me just quickly run through some guidelines so that the day goes smoothly.  Your counsel present has already told you this, but we have a court reporter here who is writing down everything that we say, and so to the best of our ability, we

---

**9**

need to not speak over each other, and if we can answer and speak audibly rather than nodding at each other and saying uh-huh, I'm sure she is going to appreciate it.

A    Sure.

Q    If you don't understand a question or if I'm going too quickly at any point, please tell me. If you do answer, I'm going to assume that you understood my question.  Is that fair?

A    Yes.

Q    Okay.  If you need a break at any point, just give me a signal and let me know, and I'm happy to take a break at any point.  I'll try to take a break every hour, hour and a half so that we can --

A    Okay.

Q    -- grab some more coffee, use the restroom, et cetera. The only this is if there's a pending question, I will ask you to answer the question before we take the break.

Your lawyer may or Ms. Allen on the phone may interpose objections at some point.  Those are for the record and for the Judge to rule on if she ever has to somewhere down the line.  So if there's an objection, unless your lawyer instructs you not to answer, I would ask that you answer the question.

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

4 (Pages 10 to 13)

**10**

1    A    Okay.

2    Q    Okay.  Are you -- excuse me -- on any

3  medications or anything that would prevent you from

4  answering my questions truthfully today?

5    A    No.

6    Q    And you're represented by Ms. Cain-Mannix

7  today, correct?

8    A    Yes.

9    Q    I'm going to mark as -- I'll be handing you

10  a series of documents throughout the day.  Many of

11  them will have a number down on the bottom corner

12  called the Bates number just for the record, and

13  counsel on the phone, I'll refer to that as the Bates

14  number and call the number out, but you don't need to

15  really worry about that.

16    A    Okay.

17    Q    If we can mark as --

18    (Thereupon, Deposition Exhibit No. 1 was

19  marked for identification.)

20    Q    Mr. Moran, you've been handed what has been

21  marked as Exhibit 1.  Do you recognize this document?

22    A    Yes, ma'am.

23    Q    And can you identify the document for the

24  record?

25    A    The document is the Notice of Deposition

**11**

1  that I was able to review.

2    Q    Okay.  And when did you first see this

3  document?

4    A    A few weeks ago in preparation for this

5  case.

6    Q    Okay.  And you understand pursuant to this

7  notice that Giant Eagle has designated you to be a

8  corporate representative and provide corporate

9  testimony; is that correct?

10    A    I do.

11    Q    And if you turn in this document to get

12  past the legal beginnings and you get to it's marked

13  on the bottom as Page 4.  There's a list of deposition

14  topics.

15    A    Okay.

16    Q    I apologize.  All of the exhibits are

17  double-sided as I had to carry them on the plane, and

18  beginning on Topic 4 and continuing through the rest

19  of the document is a list of deposition topics.

20    Now, these have been modified somewhat by

21  your counsel in negotiations with another defense

22  attorney, but do you understand that these are the

23  topics on which you've been designated to provide

24  testimony?

25    A    I do.

**12**

1    Q    What did you do to prepare for your

2  deposition?

3    A    I was able to review information that was

4  provided to me by counsel.  We have spent two sessions

5  together reviewing it.  I was able to go back and talk

6  to some people internally to get some questions

7  clarified around some of the things that were

8  contained in those documents.

9    Q    Can you tell me specifically when you met

10  with your counsel?

11    A    We met for one session down here in April,

12  and we met last Thursday for a few hours at my office.

13    Q    Okay.  And how long did you meet when you

14  met in April?

15    A    We met for about five hours in April and

16  about another three hours last week.

17    Q    And with whom did you meet when you met in

18  April?

19    A    I met -- we met with Mr. Marcus or

20  Mr. Bernie Marcus.  I'm not going to remember

21  everybody that was there.

22    Q    Was there anybody there who was not one of

23  your lawyers?

24    A    No.

25    Q    And yesterday or Thursday?

**13**

1    A    With Ms. Cain-Mannix.

2    Q    And was there anybody there for that

3  meeting other than Ms. Cain-Mannix?

4    A    No.  It was the two of us.

5    Q    Okay.  And you said you had an opportunity

6  to review some information.  Can you tell me

7  specifically what you're referring to?

8    MS. CAIN-MANNIX:  And I'll just interpose

9  an objection.  To the extent it was provided by

10  counsel, he's not to discuss what documents I

11  gave him to review.

12    Q    Were the documents provided to you,

13  Mr. Moran, to educate you on the topics about which

14  you are providing corporate testimony?

15    A    Not so much education as just review and

16  maybe with help on recollection on certain things.

17    Q    And did any of the documents you reviewed

18  refresh your recollection of events?

19    A    Yes.

20    Q    Okay.  Can you tell me which documents

21  refreshed your recollection?

22    A    I'm not sure if I can speak to specific

23  documents, but there was a few things in there in

24  terms of time line especially that helped me to recall

25  as many of these things are very old, and frankly, I

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

5 (Pages 14 to 17)

---

14

1  don't recall very many specifics on a lot of them, but
2  it just sort of helped me with the time line on some
3  of the things.
4      Q    Do you have personal knowledge of all the
5  topics in which you've been designated to give
6  corporate testimony?
7      A    I had personal knowledge on some of them,
8  and some of them I had to go and get some input from
9  co-workers.
10      Q    Okay.  Well, can we talk about the topics
11  that you had to get input on?  Can you describe them
12  for me?
13      A    So there was a question around I believe
14  some questions on -- consumer questions on particular
15  things with UEP that I had to go and I have a
16  conversation with an internal -- our senior director
17  of communications from the marketing department.
18      Q    And who was that?
19      A    Mr. Borella.
20      Q    I'm sorry?
21      A    Rob Borella.
22      Q    Borella?
23      A    Yes.
24      Q    And what does Mr. Borella do?
25      A    Rob is our senior director in our marketing

---

15

1  department, and he -- his group sort of oversees our
2  communications, media relations, those types of
3  things.
4      Q    And what was the nature of your
5  conversation with Mr. Borella?
6      A    I was -- one of the questions that came up
7  was around inquiries into the building around -- from
8  consumers or media concerning some of the topics that
9  were -- that were in the documentation.
10      Q    Which topics?
11      A    Particularly, questions around UEP
12  certification or anything -- maybe some of the things
13  related to that.
14      Q    Did your conversations with Mr. Borella
15  educate you as to any animal welfare issues that arose
16  from the public?
17      A    He had no recollection of any specific
18  animal welfare questions that came up.
19      Q    But he had information about the UEP animal
20  welfare program?
21      A    Rob was -- there was a question around an
22  attendance at a particular event that occurred I
23  believe it was in 2006 that Mr. Borella attended, but
24  he attended.  He was at the session, but he was there
25  for credit card fees.  He was not there and did not

---

16

1  attend anything that had anything to do with the UEP
2  at that particular session.
3      Q    And what session was this or what meeting?
4      A    It was a meeting that I believe occurred in
5  Hershey.  Is that the one I'm thinking of?  I may be
6  confusing these.  I believe that was the meeting that
7  occurred in Hershey around that time.
8      Q    And can you tell me what entity sponsored
9  the meeting?
10      A    I don't remember.  I don't recall.
11      Q    Was it an industry meeting?
12      A    I believe it was some type of an industry
13  meeting.  I don't recall exactly what the sponsorship
14  of it was.
15      Q    And roughly what year are we talking
16  about now?
17      A    I believe that was 2006.
18      Q    Other than Mr. Borella, did you speak with
19  anybody else to prepare for your deposition?
20      A    I spoke with several people.  I spoke with
21  our corporate controller around a question that came
22  up around Topco and the way rebates flowed from them
23  in terms of --
24      Q    The way -- I'm sorry.
25      A    Well, in terms of internal money that flows

---

17

1  back from them as a result of that program.
2      Q    And who is the controller?
3      A    His name is Rick Lichtenfels.
4      Q    Can you spell that one for the court
5  reporter?
6      A    I believe it's L-I-C-H-T-E-N-F-E-L-S.
7      Q    And anybody else that you spoke with?
8      A    We spoke with Ms. Laura Karet, Mr. John
9  Lucot, Mr. Ray Burgo, who all three of them at one
10  time were sitting on the FMI Board.  And we asked them
11  if they had any particular recollection, any specific
12  recollections of animal welfare discussions when they
13  were on that board, and all three of them said that
14  they had no recollection of that.
15      Q    And what was Laura's last name?
16      A    Her last name is Karet, K-A-R-E-T.
17      Q    And when was she on the FMI Board?
18      A    I'm not sure if I'm going to be able to
19  give you the specific timeframes.  I know that all
20  three of them at one time were on it.  I'm not sure of
21  the exact timeframes that the three of them were on
22  it.
23      Q    Would the three of them encompass Giant
24  Eagle's representation on the FMI Board from, say,
25  1999 to the present?

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

6 (Pages 18 to 21)

---

**18**

1      A   I believe so. I'm not sure if anybody else
2 may have been, but I know the three of them were at
3 one point.
4      Q   Okay. And John's last name, can you spell
5 it?
6      A   Lucot, L-U-C-O-T.
7      Q   And Ray?
8      A   Burgo, B-U-R-G-O. Ray is retired. He is a
9 former executive for the company.
10      Q   What was -- I'm not going to get the last
11 names right. What is Laura's -- what is Laura's
12 position today, do you know?
13      A   Laura is CEO of the company.
14      Q   All right. And was she the CEO when she
15 was on --
16      A   No, she wasn't. I believe -- I may not
17 have this exactly right. I believe she was the senior
18 VP of marketing at the time.
19      Q   And John, what is his current position?
20      A   John is the president of the company.
21      Q   And when he was on the board, do you know?
22      A   I'm not sure what his title was at the
23 time.
24      Q   Okay. And Ray?
25      A   Ray was an executive of the company. I'm

---

**19**

1 not sure if I can give you his exact title at the
2 time.
3      Q   And roughly, how long did you spend
4 speaking with Laura, John and Ray?
5      A   Just a few minutes.
6      Q   And did you -- did Laura John or Ray
7 provide you with any documents?
8      A   No.
9      Q   And how long did you spend speaking with
10 the controller?
11      A   Just a few minutes.
12      Q   And did he provide any --
13      A   No.
14      Q   -- documents?
15      And how long did you spend speaking with
16 Mr. Borella.
17      A   Again, just a few minutes.
18      Q   And did Mr. Borella provide you any
19 documents?
20      A   He did not.
21      Q   Was there anyone else that you spoke with
22 to prepare for the deposition?
23      A   I did speak with Mr. Rohr, who is our
24 current category manager, concerning a question with
25 Kreider Farms eggs.

---

**20**

1      Q   And Mr. Rohr's first name?
2      A   Jim, James.
3      Q   How do you spell Rohr, do you know?
4      A   Rohr, it's R-O-H-R.
5      Q   And he is -- I'm sorry. His position?
6      A   He is our current category manager for
7 dairy.
8      Q   And how long has he been in that position?
9      A   Three years approximately.
10      Q   Anybody else that you spoke with to prepare
11 for today?
12      A   I don't believe so. I think that's
13 everyone.
14      And you are aware that Giant Eagle is a
15 Plaintiff in a lawsuit bringing antitrust claims
16 against a new number of shell eggs and egg product
17 manufacturers, correct?
18      A   I am.
19      Q   Can you tell me your understanding of the
20 claims in that lawsuit?
21      MS. CAIN-MANNIX: And I'm going to object
22 to the extent you're not to testify about things
23 you have learned in conversations with me or
24 other members of the law firm or Giant Eagle's
25 own counsel.

---

**21**

1      Q   To be very clear, Mr. Moran, at no point
2 today am I asking you to divulge any privileged
3 communications that you have received from Ms. Cain-
4 Mannix or any of her colleagues or any other lawyer
5 that has been representing Giant Eagle. I would just
6 like your understanding of the lawsuit.
7      A   Well, I wasn't aware of the lawsuit at all
8 until we had the conversation with counsel.
9      Q   When was that?
10      A   It was -- when did this whole thing start?
11 A couple years ago at this point, right? I don't know
12 if I can give you the exact date of when it started.
13 It was several years ago at this point I think when I
14 first became aware of the lawsuit.
15      Q   Had the lawsuit already been filed when you
16 became aware of it?
17      MS. CAIN-MANNIX: The lawsuit filed by
18 Giant Eagle?
19      MS. ANDERSON: Yes.
20      MS. CAIN-MANNIX: -- or filed by --
21      MS. ANDERSON: The lawsuit filed by Giant
22 Eagle.
23      A   I don't know. I'm not sure if I had been
24 or not.
25      Q   Okay. Were you involved in the decision to

---

HIGHLY CONFIDENTIAL

Moran, Paul                                            May 20, 2014

7 (Pages 22 to 25)

---

**22**

1  file the lawsuit?
2      A    No, ma'am.
3      Q    I am going to mark as Exhibit 2 --
4          (Thereupon, Deposition Exhibit No. 2 was
5      marked for identification.)
6      Q    Do you recognize this document, Mr. Moran?
7      A    I believe this was a document that I was
8  able to review.
9      Q    And this is the lawsuit, the Complaint that
10 Giant Eagle has filed against Michael Foods and a
11 number of other Defendants; is that correct?
12     A    I believe so, yes.
13     Q    Okay.  And I'm sorry.  I don't actually
14 think you were able to answer my question.  I think I
15 diverted us.
16          What is your understanding of the lawsuit
17 that Giant Eagle has filed against Michael Foods and
18 other Defendants?
19     A    My understanding of the lawsuit is that
20 there was a conspiracy across a broad group of
21 industry participants that unnaturally inflated the
22 cost of eggs through collusion I suppose between those
23 entities.
24     Q    And who at Giant Eagle made the decision to
25 file this lawsuit?

---

**23**

1      A    I don't know the answer to that question.
2      Q    Does Giant Eagle have an in-house counsel?
3      A    We do.
4      Q    Okay.  Who is the in-house counsel?
5      A    Well, Rick Russell I guess is the -- is the
6  main in-house counsel, Rick Russell.
7      Q    Do you know how long he has been in-house
8  counsel?
9      A    Many years.  I don't know exactly how many
10 years though.
11     Q    Back to 1999?
12     A    I don't know.  I don't know if he
13 officially the counsel back in 1999 or not to be
14 honest with you.  It has been a while though.
15     Q    And you don't know who at Giant Eagle made
16 the decision to file the lawsuit?
17     A    I do not.
18     Q    Do you have an understanding of who was
19 involved in considering whether to file the lawsuit?
20     A    I do not.
21          (Thereupon, Deposition Exhibit No. 3 was
22     marked for identification.)
23     Q    Let me mark what has been -- hand you what
24 has been marked as Exhibit 3.
25          And you understand that prior to Giant

---

**24**

1  Eagle filing its lawsuit there were a number of other
2  lawsuits that were settled by some Defendants.  Are
3  you aware of that?
4      A    I became aware of that through this
5  process, yes.
6      Q    And Giant Eagle opted out of those
7  lawsuits.  Is that your understanding?
8      A    Again, I became aware of that through this
9  process, yes.
10     Q    Okay.  Can you identify Exhibit 3 for me?
11 Do you recognize this document?
12     A    I'm not sure if I specifically saw this
13 document to be honest with you but --
14     Q    And this is a letter from Ms. Cain-Mannix
15 dated November 15, 2010 addressed to claims
16 administrator; is that correct?
17     A    Yes.
18     Q    And Ms. Cain-Mannix states that she is
19 counsel for Giant Eagle?
20     A    Yes.
21     Q    And that Giant Eagle wishes to be excluded
22 from both the Moark settlement and the Sparboe
23 settlement; is that correct?
24     A    Yes.
25          (Thereupon, Deposition Exhibit No. 4 was

---

**25**

1  marked for identification.)
2      Q    I'm going to hand you what has been marked
3  as Exhibit No. 4, which has the Bates range GE00010753
4  to 54.  Do you recognize this document?
5      A    I reviewed a lot of documents.  I won't
6  swear that -- I won't -- I don't recall this specific
7  document in that group.  They may have been there in
8  there.
9      Q    Okay.  And this is -- the document is
10 entitled Agreement for Assignment of Antitrust Claims
11 entered into on the 28th day of July 2010 by and
12 between Giant Eagle and Topco Associates; is that
13 right?
14     A    Yes.
15     Q    Do you understand what this document is?
16     A    That Topco has agreed to assign to us the
17 ability to go after the claims.
18     Q    Why did Giant Eagle enter into this
19 agreement with Topco?
20          MS. CAIN-MANNIX:  Objection to the
21     extent -- I'm just going to caution the witness
22     not to disclose anything you learned from
23     counsel.  If you can answer the question without
24     divulging attorney-client confidences, you may.
25     Q    Again, I'm not asking you for any legal

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

8 (Pages 26 to 29)

26

1  advice that you've been given from your client.  I'm
2  just asking you why Giant Eagle obtained an Agreement
3  for Assignment of Antitrust Claims from Topco?
4      A   I don't know that I would have personal
5  knowledge of exactly why we went through some of these
6  processes from a legal standpoint.
7      Q   Did you speak with anyone at the company
8  about these assignments to prepare for your deposition
9  today -- excuse me -- this assignment?
10      A   I did not speak with anybody in the company
11  specific to this that I can recall.
12      Q   And just for clarity, you have no personal
13  knowledge of the assignment of claims to Giant Eagle?
14      A   I do not have any personal knowledge of it
15  other than the conversations we have had with counsel.
16  That's completely what I know about this.
17      MS. ANDERSON:  And just for clarity,
18  counsel, is it your position that those
19  conversations are privileged?
20      MS. CAIN-MANNIX:  Yes.
21      MS. ANDERSON:  So he can -- you're
22  instructing him not to answer questions regarding
23  the rationale for the Assignment of Antitrust
24  Claims from Topco?
25      MS. CAIN-MANNIX:  To the extent he can

27

1  answer it without discussing legal advice, yes,
2  I'm instructing him not to answer.
3      (Thereupon, Deposition Exhibit No. 5 was
4  marked for identification.)
5      Q   Let me hand you what has been marked as
6  Exhibit 5, and Exhibit 5, Mr. Moran, is an Agreement
7  for Assignment of Antitrust Claims between Giant Eagle
8  and ConAgra Foods dated August 5, 2011; is that
9  correct?
10      A   Yes, ma'am.
11      Q   And can you explain to me or do you have an
12  understanding of what this document is?
13      A   I believe so, yes.
14      Q   Can you explain it to me?
15      A   It's our claim that -- our claim that
16  ConAgra was part of the conspiracy or the collusion.
17      MS. CAIN-MANNIX:  Take a look at it again.
18      THE WITNESS:  Sorry.
19      MS. CAIN-MANNIX:  Just take your time and
20  read it.
21      A   Okay.
22      I'm sorry.  Okay.
23      Q   Would you like to change your answer,
24  Mr. Moran?
25      A   Yes.  I apologize.

28

1      Q   That's okay.
2      A   I apologize.  It's the agreement between
3  Giant Eagle and ConAgra that they have agreed not to
4  pursue these claims.  I apologize.
5      Q   And they have agreed to assign those claims
6  to Giant Eagle?
7      A   Correct.
8      Q   Is that correct?
9      A   That's correct.
10      Q   Were you involved in the discussions,
11  internal discussions at Giant Eagle regarding the
12  Assignment of Claims from Topco or ConAgra?
13      A   The only conversations I ever had with that
14  were with counsel.
15      Q   So were you involved in the decision to
16  seek these assignments prior to them being executed?
17      A   I was not involved in the decision.
18      Q   Do you know who made that decision?
19      A   I do not.
20      Q   And do you know who was involved in
21  negotiating these assignments with Topco or ConAgra?
22      A   I do not.
23      Q   Do you have an understanding of why Giant
24  Eagle opted out of the prior multi-district litigation
25  and filed their own lawsuit?

29

1      MS. CAIN-MANNIX:  The same instruction as
2  before, not to divulge attorney-client
3  confidences.
4      A   Yeah.  Again, all the information I had on
5  that was what I had learned through conversations with
6  counsel whenever I became involved in the case.
7      Q   And how did you first become involved in
8  the case?
9      A   I believe I received either a call or an
10  email -- I don't remember exactly what the first
11  communication was -- just sort of explaining it to me
12  and asking that we start to gather some information
13  and then it sort of went on from there.  We weren't
14  aware of it at all until counsel reached out to us.
15      Q   Were you involved in drafting the
16  Complaint?
17      A   No, ma'am.
18      Q   Who at Giant Eagle was involved in drafting
19  the Complaint?
20      A   I don't know.
21      MS. CAIN-MANNIX:  Are you asking did he
22  provide information or physically drafted the
23  Complaint?
24      MS. ANDERSON:  I'm asking whether he was
25  involved in any way, shape or form in drafting

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

9 (Pages 30 to 33)

### Page 30

1     the Complaint.
2     **A   No, I was not.**
3     Q   Did you provide information to support the
4     Complaint?
5     **A   I don't believe so.**
6     **MS. CAIN-MANNIX:   Are you referring --**
7     **Carrie, are you referring to --**
8     MS. ANDERSON:   I'm referring to the Giant
9     Eagle Complaint.
10     MS. CAIN-MANNIX:   Or the one that has been
11     marked as an exhibit?
12     MS. ANDERSON:   I'm referring to the
13     Complaint, Giant Eagle filed, which is Exhibit --
14     MS. CAIN-MANNIX:   2.
15     MS. ANDERSON:   -- 2.
16     BY MS. ANDERSON:
17     Q   What type of damages is Giant Eagle seeking
18     in this litigation?
19     **A   I'm not sure if I'm aware of the specific**
20     **damages that they're seeking.**
21     Q   Have you reviewed the Complaint, Mr. Moran?
22     MS. CAIN-MANNIX:   It's Exhibit 2.
23     **A   Yeah.   If it was in the documentation that**
24     **I was given, then yes.**
25     Q   Was it in the documentation you were given?

### Page 31

1     **A   I don't remember specifically if it was to**
2     **be honest with you, if there was an exact number in**
3     **there.   I read through a lot of documentation that I**
4     **won't swear to remembering exactly everything that was**
5     **in the documentation.**
6     Q   Prior to preparing for your deposition, the
7     two sessions you have previously described, one in
8     April and one last Thursday, had you been provided
9     with a copy of reviewed the Complaint filed by Giant
10     Eagle in this lawsuit?
11     **A   Yes.**
12     Q   When?
13     **A   I believe the first time I got it was in**
14     **April whenever I came for the meeting then.**
15     Q   Okay.   I meant prior to preparing for your
16     deposition today in the ordinary course of your job at
17     Giant Eagle?
18     **A   Did I see it before I met with counsel?**
19     Q   Yes.
20     **A   Is that what the question is?   No, ma'am.**
21     **I never saw it.**
22     Q   So you had no input into the factual
23     allegations --
24     MS. CAIN-MANNIX:   Objection.
25     Q   -- in the Complaint?

### Page 32

1     MS. CAIN-MANNIX:   Objection to the form.
2     Go ahead.
3     **A   I did not have any input into any -- into**
4     **the drafting or any input into what was in the**
5     **documentation.**
6     Q   What is your current position?
7     **A   I am senior director of edible grocery at**
8     **this point.   At the time, I was the category manager**
9     **for dairy.**
10     Q   How long -- we'll walk through this and
11     I'll try to make it painless.   How long have you been
12     the senior director of edible grocery, and I'm
13     assuming the senior director of edible grocery for
14     Giant Eagle?
15     **A   Yes, ma'am. I'm sorry.**
16     Q   That's okay.
17     **A   For Giant Eagle.   Since August of 2011, so**
18     **it has been about three years.**
19     Q   And what are your responsibilities as the
20     senior director for edible grocery?
21     **A   They're varied.   Our group is responsible**
22     **for purchasing, for merchandising, for bottom line**
23     **responsibilities for that department within the**
24     **company.**
25     And by bottom line responsibilities, do you

### Page 33

1     mean profitability?
2     **A   Yes.**
3     Q   What is non-edible grocery?
4     **A   Well, it's actually inedible in our**
5     **terminology.   Basically, everything you can't eat**
6     **except pet and baby, which you can eat, but you're not**
7     **an adult, so they're considering it an animal.   It's**
8     **sort of an -- it's a way for us break up and easily**
9     **divide the responsibilities across teams more than**
10     **anything.**
11     Q   And to whom do you report today?
12     **A   I report to Ian Prisuta.**
13     Q   And can you spell Ann's last name?
14     **A   Yes.   It's P-R-I-S-U-T-A.**
15     Q   And what is her position?
16     **A   It's a gentleman, Ian.**
17     Q   Ian?
18     **A   Yeah. I'm sorry. I-A-N.**
19     Q   Okay.
20     **A   He is the senior vice president of**
21     **merchandising at Giant Eagle.**
22     Q   And does the purchase of eggs and egg
23     products fall into your purview as the senior director
24     of edible grocery?
25     **A   It does not, but it fell under my purview**

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

10 (Pages 34 to 37)

---

34

1  when I was the category manager of dairy previous to
2  that.
3      Q    Let's just stick with your current position
4  for a minute.
5      A    Okay.
6      Q    You said you were responsible for the
7  purchasing, merchandising, et cetera, of edible
8  grocery?
9      A    Yes.
10      Q    Does dairy fall into edible grocery?
11      A    The way we're structured right now,
12  actually, no.  The dairy category manager actually
13  reports to, as strange as this may sound, the inedible
14  senior director.  Again, it's just a way of us sort of
15  splitting the responsibilities as evenly as possible.
16      Q    Prior to August of 2011, what was your
17  position?
18      A    I was the category manager for dairy.
19      Q    And how long were you the category manager
20  for dairy?
21      A    Since probably 1999 approximately.
22      Q    And what were your responsibilities as the
23  category manager for dairy?
24      A    Similar to edible grocery, responsible for
25  all of the procurement and responsible for marketing,

---

35

1  merchandising and bottom line profitability within the
2  dairy department.
3      Q    And do you shell eggs fall within the dairy
4  department?
5      A    They do.
6      Q    And are there any other products made of
7  eggs that fall within the dairy department?
8      A    Well, I mean, there's a lot of things.  I'm
9  sure if I checked all the ingredient statements on the
10  all product, I mean, I'm sure the answer to that
11  question would be yes, but I'm not sure if I can list
12  them for you.
13      Q    Do you have an understanding of the term
14  "egg products" as used in this litigation?
15      A    I believe I do.
16      Q    And how would you define it?
17      A    So the fresh shelled eggs and any processed
18  eggs, liquid eggs, specialty eggs.
19      Q    What types of processed eggs does Giant
20  Eagle purchase?
21      A    Well, if you're referring to liquid eggs,
22  you know, like, Egg Beaters and those kinds of things,
23  that would be all within that section of the store.
24      Q    Is that what you were referring to when you
25  said processed eggs?

---

36

1      A    Yes.
2      Q    Are those called egg substitutes?
3      A    Egg substitutes is one terminology.
4      Q    I just want to find a word we can use.
5      A    That's fine.  That works.
6      Q    Are there any other liquid egg products
7  that Giant Eagle purchases?
8      A    I think that covers it pretty well.  I
9  think that covers it pretty well.
10      Q    Does Giant Eagle purchase any dried
11  products?
12      A    Can you give me an example of what?
13      Q    Dried eggs?
14      A    I don't -- I'm sure we do, but I don't
15  know.  Again, I'm not sure if I know specifics on
16  exactly what it is.  I would -- my focus within dairy
17  was on fresh eggs and egg substitutes for the most
18  part.
19      Q    Do other portions of Giant Eagle other than
20  the dairy department purchase shelled eggs or egg
21  products?
22      A    They could.  Our -- yes.
23      Q    What other areas?
24      A    Well, you would think the prepared foods.
25  I don't have a lot of information on what they buy,

---

37

1  but prepared foods probably would have to buy some
2  eggs.
3      Q    And what do you mean when you say "prepared
4  foods"?
5      A    So we have an area.  It's like a cafe area
6  that produces food that there are items in there that
7  I'm sure have ingredients in them that contain eggs.
8      Q    And you have no personal knowledge of any
9  shell egg or egg product purchased --
10      A    I don't have personal.
11      Q    Let me just finish the question.
12      A    I'm sorry.
13      Q    It's okay.  We're going to drive the court
14  reporter crazy.
15      A    I'm sorry.
16      Q    You have no personal knowledge of purchases
17  of shell egg or egg products by the prepared food
18  sections of Giant Eagle?
19      A    I don't have personal knowledge of that.
20      Q    And did you take any steps to educate
21  yourself as to those purchases in preparation for this
22  deposition?
23      A    I did not.
24      Q    So you're unable to provide any information
25  regarding purchases of shell eggs or egg products by

---

HIGHLY CONFIDENTIAL

Moran, Paul                                              May 20, 2014

---

**38**

1  the prepared foods section of Giant Eagle?
2      A    Today, yes.
3      Q    Are there any other areas of Giant Eagle
4  that purchase shell eggs or egg products?
5      A    I don't believe so.
6      Q    So then today when we're talking about
7  purchases of shell eggs or egg products, we're
8  limiting your testimony to purchases by the dairy
9  department?  Is it a department?
10     A    Yes.
11     Q    And will your testimony be limited to
12  purchases of shell eggs or egg products by the dairy
13  department?
14     A    That's where my knowledge really resides,
15  yeah, in that area.
16     Q    Prior to 1999, were you employed by Giant
17  Eagle?
18     A    Yes.
19     Q    Can you tell me what your position was?
20     A    I was varied.  I was in the stores for
21  about 14 years, and then I came out and did a series
22  of jobs within merchandising.
23     Q    Did any of those positions involve the
24  purchase or sale of shell eggs or egg products?
25     A    Not prior to dairy.  Although, I did buy --

---

**39**

1  well, let me restate that.  I bought dairy before I
2  was a category manager for dairy, so the answer to
3  that question is, yes, for a period of time I bought
4  dairy in the early nineties.
5      Q    In the early nineties, you were a buyer?
6      A    Yes.
7      Q    For roughly how long?
8      A    Two years.
9      Q    And what were your responsibilities as a
10  buyer of eggs?
11     A    To purchase, work with the vendors and
12  purchase eggs on a consistent basis to keep our
13  warehouse in stock, to keep the stores in stock.
14     Q    Did you deal directly with vendors?
15     A    I did.
16     Q    And were you -- other than shell eggs and
17  egg products -- I'm sorry.  Strike that.  Let me start
18  again.
19          When you were a buyer, what types of eggs
20  or egg products did you purchase for Giant Eagle?
21     A    The same types, fresh eggs, egg
22  substitutes.
23     Q    Can you tell me your educational background
24  since high school?
25     A    Yeah.  I graduated in 1980 from Duquesne

---

**40**

1  University with a degree in business administration.
2      Q    Do you have any post graduate education?
3      A    I do not.
4      Q    Who is -- I'm sorry.  In 1999, who was the
5  buyer responsible for purchasing shell eggs and egg
6  products for Giant Eagle?
7      A    Well, we had -- the actual buyer or the
8  category manager?  Do you mean the person --
9      Q    You were the category manager, correct?
10     A    I became the category manager about that
11  time.  Yes, ma'am.
12     Q    I shouldn't make assumptions.  As the
13  category manager, did you have a buyer --
14     A    Yes.
15     Q    -- for eggs and egg products?
16     A    Yes.
17     Q    Who was the buyer in 1999?
18     A    A gentleman by the name of Mike Hinnebusch.
19     Q    And how long was he the buyer?
20     A    Mike was the buyer for a very long time.
21  I'm not sure.  Mike's retired now.  Mike's been
22  retired since probably 2004 or so.
23     Q    Who was the --
24     A    I'm sorry.  Go ahead.
25     Q    No, no.  I'm sorry.  You finish your --

---

**41**

1      A    Mike was the buyer for eggs for a long time
2  though.
3      Q    Who was the buyer after Mike Hinnebusch?
4      A    We had a series of people that went through
5  that role.  Jim Rohr bought for a period of time.
6  He's now the category manager for eggs.  I may miss
7  somebody here because we had a series of people go
8  through this.  Brian Frey bought for a period of time.
9  Roy King is the current buyer.  He has been doing it
10  for a few years.
11          Honestly, there may be a person or two in
12  the middle there that I'm not thinking about that may
13  have done it for a period of time.  That job has a
14  tendency to turn over on a reasonably frequent basis.
15     Q    Can you explain to me during the time
16  period where you were the category manager for dairy
17  your interactions on a typical day with the buyer for
18  eggs or egg products?
19     A    Yeah.  So and we have an assistant buyer
20  who also assists in buying eggs.  They have really a
21  very defined process where we will receive every
22  morning the shipments that went out to the stores the
23  previous day.  We have systems to help us determine
24  what we're -- looking forward what we would need to
25  have in order to continue to satisfy customer needs,

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

12 (Pages 42 to 45)

---

**42**

store needs.  We would purchase that product and have it delivered in time hopefully to have that product there when the store ordered it.  That was really sort of the typical day-to-day process in terms of purchasing.

Q    How were responsibilities for the selection of your shell egg or egg product supplier divided between you as the category manager and your egg buyer?

A    In terms of determining -- I just want to make sure I'm clarifying your question.  You're asking we're determining -- how we determine vendor and who is supplying us?

Q    Yes.

A    It generally would fall under the category manager more than the buyer to determine that.

Q    Would the terms of your purchase -- and by "terms", I mean price, delivery, rebates, et cetera.  Would those also be handled by you as the category manager?

A    Well, it's sort of a collaborative process.  We went through Topco, and Topco is the collaborative that we use, that a lot of retailers use.  They had people that were experts in that particular area also, and when it came to bidding eggs, it became sort of

---

**43**

about collaborative process between us and Topco and the vendor obviously.

Q    Well, let me back up a little bit.  Between 1999 and 2008, from whom did Giant Eagle purchase shell eggs?

A    So in 1999 and I believe through 2000 -- sometime in 2003, we purchased eggs from Buckeye Eggs who is our supplier through that period of time.  They're located in Ohio.

Q    And did you purchase shell eggs only from Buckeye Farms from 1999 to 2003?

A    I believe so, yes.

Q    And did you purchase those shell eggs from Buckeye Farms directly?

A    We did.  Well, through Topco, so the process was is that Topco was involved.  We purchased them.  The PO, the purchase order actually went to Topco, and Topco actually billed them.  They paid Topco, and that's sort of the process that we have set up through.

Q    What is Topco?

A    Topco is a collaborative -- cooperative -- excuse me -- that a lot of retailers use to help them negotiate, particularly, in a corporate brand, owned brand types of product, programs across so that

---

**44**

there's an aggregate across, and the members potentially could talk to the vendors and work through potentially a better cost or whatever as a result of that aggregation.

Q    Can you explain to me what you mean by "cooperative"?

A    Well, I mean, maybe cooperative is the wrong word.  I mean, they are a group that historically has represented the retailers that are part of the group and gone out and at times negotiated.  It depends on the product line you're talking about.  At times they sort of totally negotiate it for the members, and the members just kind of get in line and partake with the program.

There are other times -- eggs is a good example of this -- where the demand is much more regionalized, and therefore, the vendor -- or the retailer -- excuse me -- is probably a lot more involved than it would be in some of the other disciplines, some of the other categories.

Q    What do you mean by "regionalized"?

A    Well, eggs can become challenging, right, because first of all they're-- you sell a lot of them.  And because of that, there are a lot of trucks involved, and because of that, transportation becomes

---

**45**

a significant component of cost.  And so therefore, generally speaking, your best cost is going to come from somebody probably within your general region.

Q    Turning back to Topco, is it fair to describe Topco as a group buying organization?

MS. CAIN-MANNIX:  Objection to the form.

Q    Do you understand my question?

A    They don't buy for the group.  They may help the group negotiate or they may represent the group to a particular vendor.  They don't buy for the group though.  The individual members are purchasing themselves.

Q    Does Topco collectively negotiate on behalf of its members?

A    They can.

Q    And do they do that for --

A    They do.

Q    -- shell eggs?

A    The way we work -- I can't speak for how they do it with other members.  I can speak for how they have done it historically with us, and that is it was sort of a triangle.  It was sort of a collaborative conversation where we would go to Topco or they would come to us and basically say, hey, we think the market is in a position now where we may

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

13 (Pages 46 to 49)

---

**46**

want to think about going out and taking the business out for bid or we may go to them and say, hey, are we in this position. And then if we came to the conclusion that this was a good time to do it, we may take it out to bid and invite potential vendors to come and basically bid on our business.

Q    Why do you -- why did you -- I'm sorry. Let me start again.

Why does Giant Eagle use Topco for its shell egg purchasing?

A    That's something -- that has been -- we've been doing that forever. All right. And honestly, I can't tell you what the origin of it was. It has been in a place for a very, very long time. The thought is is that they would be able to have more of a national scope and view of the category and be able to give us significant insight into some of the dynamics that were going on and help us sort of direct us towards vendors that may be the best ones to supply our business.

MS. CAIN-MANNIX:  At this time, I just want to note that I'm going to designate the transcript as highly confidential, and then we'll at the appropriate time make specific designations, but for now we'll designate the

---

**47**

whole transcript as highly confidential. Go ahead.

Q    Is Giant Eagle able to negotiate a more beneficial price through Topco than it would individually?

A    I think there's probably occasions where that's true. I'm not sure if that's just true with eggs just because of the regional nature of it but --

Q    In 2003 -- or excuse me. You stated that Giant Eagle purchased shell eggs exclusively from Buckeye Farms until 2003; is that correct?

A    Approximately, yeah.

Q    Approximately. From whom did Giant Eagle purchase shell eggs after 2003?

A    So at the time, we put it out for bid, and we decided to award the business at that time to both Hillandale and to Weaver Brothers. I believe at the time the reasoning was that neither of them could have adequately supplied all of our stores, so we decided to split the business between the two of them.

Hillandale supplied our warehouse that supplied our Pittsburgh stores or basically our Pennsylvania stores, and Weaver Brothers supplied the warehouse in Cleveland that supplied basically our Cleveland stores, or our Ohio stores.

---

**48**

Q    From 1999 to 2008, did Giant Eagle have retail locations outside of Pennsylvania or Ohio?

A    Yeah, yes.

Q    Where?

A    West Virginia.

Q    And which distribution center serviced those stores?

A    The distribution center to West Virginia was the Pittsburgh distribution center. We also have two stores in Maryland.

Q    Where?

A    In Frederick, that get supplied out of Pittsburgh also. That was before 2008, so yes, that would fall into that also.

Q    And which Hillandale Farms entity sold eggs to Giant Eagle?

A    Well, they have -- they have several farms. I believe that the majority of our eggs came from their farm in Croton down in Ohio, but there were times I'm sure where they got eggs -- they didn't necessarily clear it with us. I mean, they moved eggs around, so I'm not sure that we knew exactly which farm they were coming from all the time, but I believe we got the majority of them from the Croton farm.

MS. CAIN-MANNIX:  Did that answer your

---

**49**

question or were you -- I think the question call was what --

A    I'm sorry.

Q    Well, that's all right. I'll ask it again.

A    Okay. I'm sorry.

Q    That's okay. That's okay.

Do you know which corporate entity Giant Eagle contracted with at Hillandale?

A    Within Hillandale?

Q    Yes.

A    I'm not sure if I'm specific -- if I specifically know that.

Q    Okay. Was it Hillandale Farms of Pennsylvania?

A    I'm not sure.

Q    Okay. Do you know who the primary contact person at Hillandale Farms was with whom Giant Eagle dealt?

A    The primary contact person that I always dealt with was Gary Bethel.

Q    During what years did Giant Eagle purchase shell eggs from Hillandale Farms?

A    So it began whatever the timeframe was, late 2002/early 2003 through the present.

Q    What types of shell eggs did Giant Eagle

---

HIGHLY CONFIDENTIAL

Moran, Paul                                              May 20, 2014

14 (Pages 50 to 53)

---

**50**

1  purchase from Hillandale Farms in that time period?
2      **A    Well, all of our owned brand eggs.**
3      Q    I'm sorry?
4      **A    All of our Giant Eagle eggs, Giant Eagle**
5  **brand eggs, and Gary also did some -- Hillandale I**
6  **think was also the supplier of some of the specialty**
7  **eggs that we had.**
8      Q    Let's talk about the Giant Eagle branded
9  eggs. What types of shell eggs did Giant Eagle
10  purchase from Hillandale that it sold under the Giant
11  Eagle brand?
12      **A    Commodity eggs. Are you looking for sizes?**
13  **I mean --**
14      Q    Yes. Like, medium eggs, large eggs?
15      **A    All of those, like, jumbos, extra large,**
16  **large, medium, small, 18-pack, 12-pack, 6-pack, the**
17  **whole case basically.**
18      Q    And did Giant Eagle purchase -- forgive me.
19  Strike that.
20          Were all of the eggs you just described
21  white eggs?
22      **A    Yes. Well, we may have gotten some brown**
23  **eggs from them, but the vast majority of them were**
24  **white eggs, yes.**
25      Q    When would you purchase brown eggs from

---

**51**

1  Hillandale?
2      **A    I won't swear that we did or didn't. To be**
3  **honest with you, I don't recall purchasing brown eggs**
4  **specifically, but I won't sit here and say we never**
5  **did.**
6      Q    Are brown eggs sold during -- by the
7  timeframe that I'm talking about is 1999 to 2008.
8  During that timeframe, did Giant Eagle sell brown eggs
9  in its stores?
10      **A    I don't believe so.**
11      Q    You referred earlier to specialty eggs.
12  What did you mean by that?
13      **A    So there's brands out there like Eggland's**
14  **Best, Organic Valley, some of those types of brands**
15  **that are -- the nutrient level of the chickens is a**
16  **little different, and they market some of them. It's**
17  **just marketing, you know, but the eggs are of a higher**
18  **quality, and Hillandale is involved in those also.**
19      Q    What is your understanding of an organic
20  egg?
21      **A    An organic egg meets the organic standards,**
22  **and I'm not an expert at organic standards, but that**
23  **is a type of egg that is in demand by consumers, so**
24  **therefore, we go out and we try to source it and bring**
25  **it and have it available in the case.**

---

**52**

1      Q    Do you have any understanding of what you
2  mean when you say organic standards?
3      **A    Again, I'm not an organic expert, but there**
4  **are certain ways that the product has to be grown,**
5  **feed, all of these things that the vendor has to meet**
6  **in order for the organic claim to be put onto the**
7  **packaging.**
8      Q    And do you know who determines what the
9  standards that that vendor has to meet are?
10      **A    I think that has been a moving target over**
11  **time, and I'm not -- again, I don't know exactly where**
12  **that is right now. The government is involved pretty**
13  **heavily in defining organic standards.**
14      Q    And as the category manager for dairy, how
15  did you decide which organic eggs to purchase?
16      **A    Well, you look at -- you get information**
17  **just like you do with anything else that you put in**
18  **the case, and you want to try to understand what your**
19  **consumer wants and what is in demand. So there are a**
20  **number of ways you can do that, and we have all kinds**
21  **of data that you can get from Neilsen and IRI and**
22  **those types of places that help you to understand the**
23  **types of products that your consumer wants you to**
24  **carry, and we generally try to meet that demand.**
25      Q    And that demand showed a demand for organic

---

**53**

1  eggs?
2      **A    Yes.**
3      Q    Is your it your understanding that organic
4  eggs are produced from hens? Excuse me. Let me
5  strike that and start again.
6          Do you have an understanding as to how the
7  hens that produce organic eggs are raised?
8      **A    I don't have a clear understanding of it.**
9      Q    Do you have a general understanding?
10      **A    I know the process is different, but I**
11  **would be guessing if I tried to get into specifics.**
12      Q    Is one part of the process that's different
13  how much space each hen has?
14          MS. CAIN-MANNIX: Objection, lack of
15  foundation.
16          Go ahead. If you can, go ahead.
17      **A    I don't know.**
18      Q    You don't know?
19      **A    I don't know if that's a specific**
20  **requirement of organic eggs or not.**
21      Q    Okay. What is your understanding of cage
22  free eggs?
23      **A    Similar. Basically, I'll give you the same**
24  **answer I gave in organic. It's a product that**
25  **consumers are looking for. Again, I believe the**

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

15 (Pages 54 to 57)

---

**54**

1  definition of cage free historically has been a bit of
2  a moving target, and over time I think there are
3  people that have been trying to define exactly what
4  that means.  I don't know where it is right now, but I
5  know that there are claims out there for cage free.  I
6  know we had consumers looking for cage free, and
7  therefore, we went out and tried to source that
8  product from our vendors.
9      Q    Did Giant Eagle purchase organic eggs from
10  Hillandale?
11     A    I don't recall to be honest with you
12  specifically if there was organic that came from
13  Hillandale directly.  I know we bought organic eggs
14  from Organic Valley, for example.  I don't
15  specifically recall if Hillandale gave us organic eggs
16  or not.
17     Q    Okay.  Do you recall did Giant Eagle
18  purchase cage free eggs from Hillandale?
19     A    If cage free was part -- again, I'm not
20  going to recall exactly.  I don't recall exactly.  If
21  cage free was part of the program that we had with
22  them through Eggland's Best, then yes.
23     Q    What is Eggland's Best?
24     A    Eggland's Best is the largest specialty egg
25  in the country that is -- again, I'm not going to get

---

**55**

1  into specifics because I don't know all the specifics,
2  but it's the best marketed and best-selling specialty
3  egg brand in the case.  The nutrient value in the egg
4  is supposed to be higher due to the way they feed the
5  chickens and those kinds of things.
6      Q    Is Eggland's Best a brand or --
7      A    Eggland's Best is a brand, yes.
8      Q    Do multiple producers produce eggs under
9  the Eggland's Best brand?
10     A    I believe yes.
11     Q    And did Hillandale produce --
12     A    Yes.
13         MS. CAIN-MANNIX:  Wait until she's done --
14     A    I'm sorry.
15         MS. CAIN-MANNIX:  -- asking the question.
16     Q    You know where I'm going.
17     A    I'm sorry.
18     Q    Did Hillandale produce eggs that it sold to
19  Giant Eagle under the Eggland's Best brand?
20     A    It did.
21     Q    Throughout the entire time period that you
22  purchased eggs?
23     A    I don't know if it was the entire
24  timeframe.
25     Q    Are there any other eggs that you purchased

---

**56**

1  from Hillandale from late 2002-2003 to the present?
2      A    Not to my -- not to my recollection.
3      Q    What types of eggs did Giant Eagle purchase
4  from Weaver Brothers?
5      A    The same with the exception that I don't
6  believe they were doing the Eggland's Best at the
7  time.
8      Q    So is it accurate that Weaver Brothers
9  purchased small, medium, large, extra large and jumbo
10  white eggs from Weaver Brothers?
11     A    Yes.
12     Q    Were those eggs purchased in 6, 12 and
13  18-packs?
14     A    Yes.
15     Q    Did Giant Eagle purchase any brown eggs
16  from Weaver Brothers?
17     A    I don't recall, but I don't believe so.
18     Q    And did Giant Eagle purchase any specialty
19  eggs from Weaver Brothers?
20     A    I don't recall specific specialty eggs from
21  Weaver Brothers.
22         (Thereupon, Deposition Exhibit No. 6 was
23  marked for identification.)
24     Q    I'm going to handle you what has been
25  marked as Exhibit 6; and this is a letter from

---

**57**

1  Hillandale Farms, from Gary Bethel to you dated
2  July 6, 1999; is that correct?
3      A    Yes.
4      Q    Do you recognize this letter?
5      A    I don't recall if I saw this specific
6  letter or not, but I'm sure I saw it at one point if
7  it's directed to me.
8      Q    Okay.  And in the first paragraph,
9  Mr. Bethel states, "In response to the questions you
10  had about specialty eggs at our meeting, I have
11  compiled some broad definitions."  Do you see that?
12     A    Uh-huh, I do.
13     Q    And do you recall asking Mr. Bethel
14  questions about specialty eggs?
15     A    I don't specifically recall, but as part of
16  our natural relationship with vendors, it certainly
17  wouldn't surprise me if we had those conversations.
18     Q    And was Hillandale a vendor in 1999?
19     A    They were not a vendor specific to our
20  corporate program in 1999 I don't believe.
21     Q    Were they a different type of vendor?
22     A    Well, they were in the market, and they may
23  have been supplying some of our independent stores at
24  that time.
25     Q    Can you explain to me what you mean by your

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

16 (Pages 58 to 61)

---

**58**

1  independent stores?
2      A   We have a group of -- we have -- the way
3  we're structured we have corporate stores that
4  generally speaking are going to follow the Giant Eagle
5  corporate program.  We also have a group of stores
6  that carry the Giant Eagle banner that can and
7  sometimes do go out and source products outside the
8  sort of prescribed programs for the corporate stores.
9      Q   Does Giant Eagle own or operate the
10  independent stores?
11      A   They're independently operated.
12      Q   Turning back to be Exhibit 6, you'll see at
13  the bottom of the page Mr. Bethel just has several
14  paragraphs relating to organic eggs.  Do you see that?
15      A   I do.
16      Q   And you'll see the third paragraph under
17  organic eggs the statement, "The chicken must have at
18  least two square feet per bird floor space in the hen
19  house."  Do you see that?
20      A   Yes.
21      Q   And cage free eggs on the top of the next
22  page, Mr. Bethel states, "Eggs produced in an
23  environment where the hen has at least two square feet
24  per bird space in a nesting area."  Do you see that?
25      A   I do.

---

**59**

1      Q   Under free range eggs, three paragraphs
2  further down, "To range birds means to allow them to
3  graze or roam out doors," do you see that?
4      A   I do.
5      Q   So is it accurate to say that organic eggs,
6  cage free eggs and free range eggs to use those
7  labels, there are specific requirements with respect
8  to how much space or where the space a hen has is?
9      MS. CAIN-MANNIX:  Objection to form.
10      Q   Do you understand my question, sir?
11      A   I do.  I don't know.  I don't know if this
12  was Gary's interpretation or if these were formally
13  the requirements.
14      Q   Do you think that Mr. Moran would have
15  given you incorrect information?
16      MS. CAIN-MANNIX:  Objection.  You said
17  Mr. Moran.  Do you mean Mr. Bethel?
18      Q   I do mean Mr. Bethel.  I'm assuming you
19  would not lie to yourself, right?
20      A   I do not believe that Mr. Bethel would have
21  ever intentionally given me incorrect information.
22      Q   Do you believe that this reflects
23  Mr. Bethel's understanding as of the time?
24      A   I believe it does.
25      Q   Okay.  And would you have relied on these

---

**60**

1  statements?
2      A   Yes.
3      Q   This is where I wish I had the stream
4  because I may ask you a question more than once.  I
5  apologize if I do.
6      A   No.  That's fine.  That's okay.
7      Q   Did Weaver Brothers sell Giant Eagle
8  organic eggs?
9      A   This is -- I'm starting to think about this
10  brown egg and organic egg question now and I'm -- it's
11  been a while since I've been in dairy, so I believe
12  actually as I circle back the brown egg question you
13  asked before, I think actually we did carry them now
14  that I'm thinking about it.
15      Q   Okay.
16      A   Okay.  And the organic egg, I know we
17  carried organic eggs.  I honestly don't recall at this
18  point whether Hillandale and Weaver were supplying
19  them to us or whether we were getting them from
20  somebody else right now.  I just don't recall.
21      Q   Okay.  The brown -- is a brown egg a
22  specialty egg?
23      A   A brown egg is exactly the same.  Brown
24  eggs come from different kinds of chickens basically,
25  and the demand for brown eggs in New England -- if you

---

**61**

1  go to New England, up there 90 percent I think of the
2  eggs you sell, it's just the opposite of what it is
3  down here, and brown eggs are purchased by people that
4  believe that those are eggs that are sort of normal.
5  This area it's just white chicken eggs.  It's the same
6  egg.  It's just one is white and one is brown.
7      Q   Do you remember the commercial, "Brown eggs
8  are local eggs and local eggs are fresh"?
9      A   Yes.
10      Q   I grew up with that in New England.
11      A   I'm sorry.  I was thinking about that as
12  you were talking.  I apologize.  What I stated before
13  was not accurate.  We did carry brown eggs from both
14  of them.  It was one skew in both lines that both of
15  them provided to us as part of the program.
16      Q   Okay.  And were those large eggs?  What
17  size would they be?
18      A   They were large brown.
19      Q   Large brown?
20      A   Yes.  Yes, ma'am.
21      Q   So a consumer could go to the dairy case
22  and select various sizes of white eggs or large brown
23  eggs; is that correct?
24      A   Correct, that's right.
25      Q   If I were to walk into the Giant Eagle down

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

17 (Pages 62 to 65)

---

**62**

1  the street and purchase shell eggs, would I be able to
2  tell from the package whether those were purchased
3  from Weaver Brothers or Hillandale?
4       A    Only if you knew the plant number.  So the
5  package is the same, but they're required to put the
6  plant number on there, so if you had a list of the
7  plant numbers, you would be able to tell.  Other than
8  that, no.
9       Q    Okay.  So the only brand name on the egg
10 package is Giant Eagle?
11      A    Yes.
12      Q    Does Giant Eagle sell any of the eggs it
13 purchases from Hillandale or Weaver Brothers under any
14 brand other than Giant Eagle?
15      A    We sell Nature's -- I'm thinking about this
16 now.  This would be in this time frame.  We do sell
17 Nature's Basket eggs.
18      Q    What are those?
19      A    Sort of an -- again, it's sort of a -- it's
20 a brand of eggs that they're natural.  Let me go back
21 to the organic thing again.  I'm not sure if these
22 eggs are totally organic, but they're sort of a
23 natural organic egg similar to what's out there, some
24 of the brands.
25           We have a Nature's Basket brand across the

---

**63**

1  store.  It's an umbrella across the store that we have
2  in our Nature's Basket section in some stores, and
3  broadly, across the store it represents our offering
4  on natural and organic products.
5       Q    So this is a private labeled Giant Eagle
6  brand?
7       A    Correct, that's right.
8       Q    And from whom do you purchase the eggs that
9  you then brand as Nature's brand eggs?
10      A    This is the one I was -- at the time, I
11 believe we were purchase -- this is one I don't recall
12 exactly.  I don't recall if we were buying them from
13 them or if we were getting them from somebody else at
14 the time.  I just don't recall.  I would have to go
15 back and look at that.
16      Q    Were all of the Nature's brand eggs
17 specialty eggs?
18           MS. CAIN-MANNIX:  Nature's Basket.
19      A    Nature's Basket.
20           Nature's Basket.  Forgive me.
21      A    Well, again, specialty is a broad term
22 depending on how you want to define it, so I suppose
23 so.  They were natural/organic eggs in our offering in
24 that area.
25      Q    You used the term earlier "commodity eggs"?

---

**64**

1       A    Right.
2       Q    What is your understanding of that term?
3       A    So a commodity egg is really the white egg,
4  right, I mean, at least in our terminology.  Those are
5  the ones that you are most likely going to get the
6  best cost on.  Those are what you are by far and
7  away -- excuse me -- sell the most of and so -- and
8  those are the ones that generally speaking the cost
9  moves with the market on a weekly basis.
10      Q    Were any commodity eggs sold under the
11 Nature's Basket brand?
12      A    No, ma'am.
13      Q    Okay.  Why would you get the best cost on
14 the commodity eggs?
15      A    Well, those are the eggs that are the most
16 readily available and those are the eggs that are the
17 most competitive in the marketplace, and that's -- by
18 definition, that's sort of a commodity.
19      Q    I'm sorry.  How do you define commodity?
20      A    Well, commodity is something that is
21 readily available in the market and is somewhat
22 homogenius across different brands, right, so sugar,
23 flour, coffee, eggs, readily available.  There's not a
24 lot of distinction between brands necessarily.  It's
25 basically the same product.

---

**65**

1       Q    And do consumers differentiate between
2  commodity products based on brand?
3           MS. CAIN-MANNIX:  Object to the form.
4       A    I don't know.
5       Q    Do you understand the question?
6       A    I don't know.  I don't know if a consumer
7  does or not.
8       Q    Well, as the product manager responsible
9  for purchasing, did you view consumers as
10 distinguishing between, for instance, Weaver Brothers
11 eggs or Hillandale eggs which you have defined as a
12 commodity?
13           MS. CAIN-MANNIX:  Objection to form.
14           Go ahead.
15      A    I mean, my opinion is strictly opinion is
16 that they don't distinguish between those two.
17      Q    And that's your opinion based on 15-plus
18 years experience purchasing eggs, correct?
19      A    Correct.
20      Q    And what percentage of Giant Eagle's egg,
21 shell egg purchases -- and I'm talking about the
22 commodity eggs, not the specialty eggs that we have
23 walked through.
24           What percentage of Giant Eagle's commodity
25 egg purchases from 1999 to 2008 were from Hillandale

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

18 (Pages 66 to 69)

---

66

1  and Weaver Brothers collectively?
2      A    About 71 percent.  Well, just the commodity
3  eggs you're talking about, right?
4      Q    Yes.
5      A    About 71 percent.
6      Q    And the other 29 percent, from where did
7  you purchase those?
8      A    So combined, it was -- it was about -- the
9  rest of that 29 percent I believe were the combination
10  of the specialty eggs, like, the Eggland's Best,
11  natural and organic-type eggs and the egg substitutes,
12  which would have been the liquid eggs.
13      Q    And I want to limit this part of our
14  conversation just to shell eggs.  Did Giant Eagle
15  satisfy 100 percent of its commodity shell egg
16  purchases from Weaver Brothers and Hillandale?
17      A    Well, anything that went through the
18  warehouse, yes.  Again, you had situations where you
19  may have had independently-owned stores going out and
20  sourcing product independently.  Most of the time that
21  was from Hillandale, but it wasn't necessarily
22  exclusively Hillandale.  There were -- again, eggs
23  being a commodity, there are lots of suppliers, and
24  sometimes you will have individual stores going out
25  and purchasing eggs on their own.

---

67

1      Q    And these will be stores that Giant Eagle
2  does not own or operate, correct?
3      A    No.  These would be stores -- well, yes, so
4  these would be stores that have a Giant Eagle banner
5  potentially, but they're independently owned and they
6  would be able to go out and source eggs on their own
7  if they would like.
8      Q    Was this lawsuit filed on behalf of Giant
9  Eagle's independent locations?
10      A    I don't know.
11      Q    Can you describe for me very generally the
12  economic relationship between Giant Eagle and the
13  independent stores?
14      A    I'm not an expert on that at all.  There is
15  an agreement that they have between the independents
16  and the company that they are allowed to carry our
17  banner.  In terms of specifics of that agreement, you
18  would -- you would have to talk to somebody else about
19  that.
20          MS. CAIN-MANNIX:  Is this a good time for a
21  break and could we go off the record?
22          MS. ANDERSON:  Can I ask -- let me just
23  ask --
24          MS. CAIN-MANNIX:  Yeah, sure.
25          MS. ANDERSON:  -- one more follow-up

---

68

1  question.
2  BY MS. ANDERSON:
3      Q    If an independent location wanted to
4  purchase shell eggs from Hillandale, could they do
5  that through the Topco agreement with Giant Eagle?
6      A    No.  That would be outside.
7      Q    Okay.  So the independent stores are not
8  included in the Topco agreement with Giant Eagle?
9      A    What's included is anything that goes
10  through the warehouse.  So actually, they can be, and
11  in most cases are because they're buying product
12  through the warehouses.
13          MS. ANDERSON:  Okay.  Great.  Why don't we
14  go off the record and we can take a quick break?
15          THE VIDEOGRAPHER:  We are off the record.
16  The time is 9:57 a.m.
17          (Recess taken.)
18          THE VIDEOGRAPHER:  We are on the record.
19  The time is 10:08 a.m.
20  BY MS. ANDERSON:
21      Q    Mr. Moran, I just want to return briefly to
22  the specialty eggs that you described being sold in
23  the Giant Eagle stores.
24      A    Yes.
25      Q    Why does Giant Eagle sell specialty eggs?

---

69

1      A    Consumer demand.  It's why we sell
2  virtually anything we sell.
3      Q    And are the specialty eggs viewed by
4  consumers to be more animal friendly?
5      A    I can't speak to how the consumers perceive
6  them.  I think the consumers believe -- again,
7  opinion, I think consumers obviously believe that
8  there's some benefit to buying specialty eggs.  What
9  the benefit is I think may be individual.  I don't
10  know.
11      Q    As the category manager for dairy during
12  the time you were category manager for dairy, did you
13  ever personally or anyone on your staff analyze or
14  evaluate consumer demand for specialty eggs?
15      A    Yes.
16      Q    Okay.  In what way?
17          MS. CAIN-MANNIX:  I just want to lodge an
18  objection to the nature of this question being
19  downstream, and I think we have made that
20  objection in our notice, and I'll allow him to
21  testify.  I just want to make it for the record.
22      Q    Dually noted.
23          You can answer my question.
24      A    Yes, but define analyze.
25      Q    You testified that Giant Eagle purchased

---

HIGHLY CONFIDENTIAL

Moran, Paul                                          May 20, 2014

---

**70**

1  and sold specialty eggs because of consumer demand,
2  correct?
3      A    Yes.
4      Q    How did you know the consumers were
5  demanding specialty eggs?
6      A    You can do that a number of ways.  When you
7  get direct consumer requests.  You see information in
8  trade journals.  You get information from Neilsen.
9  You get information from IRI.  You put all of those
10  things together and you try to build an egg case that
11  is going to meet the demand of the most consumers that
12  you possibly can meet.
13      Q    So consumer -- is it fair to say that
14  consumer demand drove Giant Eagle's purchases of
15  organic eggs?
16      A    Yes.
17      Q    And free range eggs?
18      A    Yes.
19      Q    And Eggland's Best?
20      A    Yes.
21      Q    And brown eggs?
22      A    Yes.
23      Q    Are there any other specialty eggs that
24  Giant Eagle sold in response or purchased to sell in
25  response to consumer demand?

---

**71**

1      A    I'm sure there were.  I'm not going to
2  recall all of them sitting here.  I know we sold a
3  fertile egg for a period of time because we thought
4  that there was consumer demand, that actually could
5  have a chicken in it, but so the answer to that
6  question is yes.
7          And then what you do is you evaluate those
8  things over time, and if not enough -- you have a
9  finite amount of space in that case obviously, and
10  there comes a time when you have to make a decision on
11  eliminating some of those items and bringing in new
12  items, and that's just sort of an ongoing process that
13  you're always evaluating.
14      Q    And did Giant Eagle pay more for the
15  specialty eggs that you have listed?
16      A    Yes.
17      Q    And did Giant Eagle consequently charge
18  more for those eggs?
19      A    Yes.
20      Q    Why did specialty eggs cost more than
21  commodity eggs?
22      A    I'm not sure if I could list all the
23  reasons why.
24      Q    Can you list some reasons why?
25      A    From what I understand, there was different

---

**72**

1  feed that was needed to generate those eggs.  I have
2  always assumed that the producers, because they really
3  like that business, were making more money and
4  probably they had higher margins internally on those
5  eggs also.  The cost to produce them for various
6  reasons I'm sure was higher.  I don't know all the
7  specifics of it.
8      Q    If we can turn to the egg products side of
9  Giant Eagle's purchases, were egg product -- well,,
10  let me back up.
11          You previously testified that the egg
12  products that Giant Eagle purchased included only
13  liquid substitutes; is that correct?
14      A    Liquid substitutes was the main one in the
15  case that I recall, yes.
16      Q    Do you recall any other egg products in the
17  case?
18      A    I'm sure there were.  I know we carried a
19  hard boiled two-pack for a period of time, but I'm
20  having a hard time recalling specifics of what those
21  items might have been.
22      Q    Did you purchase -- from 1999 to the
23  present, did Giant Eagle purchase liquid egg
24  substitutes or hard boiled eggs through Topco?
25      A    So we had an -- we had an owned brand, a

---

**73**

1  Giant Eagle brand liquid egg that I believe that
2  program went through Topco, yes, through whatever
3  vendor we were getting it from at the time.  Other
4  than that, we dealt directly -- for example, on
5  Egg Beaters, we would have dealt directly with
6  ConAgra.
7      Q    When you say Giant Eagle brand liquid
8  egg, are you referring literally to liquid egg or
9  are you referring to an egg substitute product, like,
10  Egg Beaters?
11      A    Well I'm not an expert on all the
12  ingredients there.  A liquid egg and an egg substitute
13  is a similar product.  I mean, it's not -- what I'm
14  referring -- when I'm saying egg substitute, liquid
15  eggs, those are the Egg Beaters.  Those are the
16  Papetti brand we carried for a period of time.  It's
17  the eggs that are -- I believe that whole category is
18  referred to as egg substitutes.  That's really what
19  I'm referring to.  That's the vast majority of those
20  sales.
21      Q    From whom did Giant Eagle purchase the
22  liquid eggs that it sold under the Giant Eagle brand?
23      A    So I'm not sure if I'm going to remember
24  all the way back to 1999.  I know that for a period of
25  time we got that product from ConAgra, and I'm not

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

20 (Pages 74 to 77)

74

1 totally recalling who the vendor was prior to that to
2 be honest with you.
3     Q    Do you have a sense of how long you
4 purchased it from ConAgra?
5     A    A number of years.  I would have to go back
6 and get that information.  Probably from Topco, but I
7 don't -- I know we did for a period of time buy it
8 from ConAgra.
9     Q    And those purchases came through the Topco
10 program?
11        MS. CAIN-MANNIX:  Objection.
12     Q    Is that correct?
13        MS. CAIN-MANNIX:  No.  I think you're
14 misstating what he said.
15        Go ahead.
16     A    Well, the owned brand program, if it was a
17 Giant Eagle brand probably went through Topco.
18     Q    Okay.  That's what I asked you.
19     A    Right.  Similar to the way the egg -- the
20 commodity eggs go through Topco in a similar kind of
21 manner.
22     Q    Do you know what the label of those
23 products said when they were sold in the stores?
24     A    I don't recall.
25     Q    So you don't know?  You don't recall if it

75

1 said egg substitute?
2     A    Honestly, I do not recall exactly what the
3 labeling was.
4     Q    Was ConAgra's name anywhere on the label?
5     A    I don't know.
6     Q    And just to clarify, you don't know when
7 from 1999 to the present you purchased those from
8 ConAgra?
9     A    I do not have the specific date.  I know we
10 used ConAgra.  I don't have the dates though.
11     Q    Are you aware of any other supplier from
12 whom you purchased liquid substitute that was sold
13 under the Giant Eagle brand?
14     A    There was other supplier or suppliers.  I
15 don't recall them.  I don't recall who they were right
16 now.
17     Q    Egg products that were sold not under the
18 Giant Eagle brand from 1999 to the present, from whom
19 did Giant Eagle purchase those?
20     A    Are you talking about specialty eggs now or
21 are you talking about branded egg substitutes?
22     Q    I'm talking about any egg product that's
23 not in a shell.
24     A    So Egg Beaters, Papetti, those kinds of --
25     Q    Yes.

76

1     A    Those kinds of things?
2     Q    Can you list for me the egg products that
3 Giant Eagle sold?
4     A    The egg substitutes was by far the main
5 one.
6     Q    And which branded egg substitutes did Giant
7 Eagle sell?
8     A    Egg Beaters is by far the biggest brand
9 there.
10     Q    And from whom was that purchased?
11     A    ConAgra.
12     Q    Did you have other branded egg substitutes
13 in the case?
14     A    We carried Papetti for a period of time,
15 which I believe over time became Crystal Farms.
16     Q    And what was that brand?
17     A    That was an egg substitute also.
18     Q    What was the brand?
19     A    I believe it went from -- again, this was
20 around the time I was transitioning, but I believe it
21 went from Papetti to Crystal Farms.  Those are the two
22 main brands we had.  Egg Beaters is by far the biggest
23 name brand though in that area though.
24     Q    Why did you offer two brands of the same
25 product?

77

1     A    Perceived consumer demand.  That
2 admittedly, you know, can be debated.
3     Q    So some consumers wanted to purchase
4 Egg Beaters and other consumers wanted to purchase the
5 Papetti egg substitutes?
6     A    Yeah.  I mean, those types of decisions are
7 always made in the interest of trying to satisfy
8 consumer demand.
9     Q    Did Giant Eagle pay an equivalent price for
10 the egg substitute branded product it purchased from
11 ConAgra and Papetti?
12     A    I don't remember exactly what their cost
13 structures were.
14     Q    Do you recall if they were the same?
15     A    I doubt they were exactly the same.  I
16 would imagine they would be close, but I don't know
17 exactly what they were.
18     Q    Did Giant Eagle sell those two brands at
19 the same price?
20     A    I don't recall.
21     Q    Were there any other egg products in the
22 dairy case at Giant Eagle?
23     A    I don't recall anything specific jumping
24 out at me, other than the commodity eggs, the
25 specialty eggs and the egg substitutes, and again, you

HIGHLY CONFIDENTIAL

Moran, Paul                                                          May 20, 2014

21 (Pages 78 to 81)

---

**78**

1  know, we had a two-pack hard boiled egg for a period
2  of time that we were testing.  Those kinds of things
3  may have gone in and out, and I'm not going to sit
4  here and remember all of them, but those were the
5  three main areas.
6      Q    Did Giant Eagle pay more for Egg Beaters
7  from ConAgra than it did for the liquid egg that it
8  private labeled?
9      A    Yes.
10     Q    Why?
11     A    Well, any time you're purchasing a brand,
12 they are -- and again, this is -- you know, I believe
13 this is factual.  You're going to find that the brands
14 are going to have a higher cost because they are
15 including in their cost all of their marketing and all
16 of the commercials that they run and all of those
17 kinds of things, and it's just a different model.
18 Where you do not have those kinds of things in an
19 owned brand program, and therefore, you're able to get
20 those generally speaking for a lower cost.
21     Q    Did Giant Eagle ever purchase liquid egg
22 product -- or I'm sorry -- egg substitutes from
23 Papetti to private label?
24     A    I don't remember.  We may have.  I just
25 don't recall specifically if we did.

---

**80**

1  mean, those are -- that's the group that I'm most
2  familiar with because I've been in some meetings with
3  them, but it's -- I think there are 50 to 55 members
4  or something like that, and I don't have that list.  I
5  don't know who they are.
6      Q    Is it fair to say it's predominantly
7  smaller or regional grocery chains that are members of
8  Topco?
9      A    A Meijer is another one, so it can be --
10     Q    So no?
11     A    It can be larger people.  It can be larger
12 companies also.
13     Q    Do you know if Win Dixie is a member of
14 Topco?
15     A    I don't know.
16     Q    Do you know if Publix is a member of Topco?
17     A    I don't.  I don't recall seeing them at the
18 meetings.  I'm just going to say I don't know to those
19 questions.  I don't want to say no or yes.
20     Q    If you don't know, that's fine.
21         MS. CAIN-MANNIX:  Don't guess.
22     Q    I'm not asking you to guess.  I'm just
23 asking you if you know.  If you don't know the
24 answers, I don't know --
25     A    I don't know.

---

**79**

1      Q    And I'm remembering correctly from this
2  morning that you can't testify about any egg products
3  that were purchased other than those in the dairy
4  case?
5      A    Correct.
6      Q    Were frozen egg patties ever purchased and
7  sold in the dairy case?
8      A    No.
9      Q    Any other precooked egg?
10     A    Not to the best of my knowledge.
11     Q    Okay.  And no dried egg product?
12     A    Not to the best of my knowledge.
13     Q    Okay.  Returning for a moment to Topco, are
14 you -- do you know what other grocery stores are
15 members of Topco?
16     A    I know some of them.  I do not know the
17 entire list.
18     Q    Okay.  Can you tell me the ones you know?
19     A    Well, in some of the meetings that I've
20 been at Schnucks is there from St. Louis, Mastar
21 Brothers from California.  I think until recently
22 Harris Peter was I think but now that they're
23 purchased by Kroger, I'm not sure that they still
24 there.  There's --
25         I'm not going to remember all of them.  I

---

**81**

1      Q    Okay.  SuperValue?
2      A    I don't know.
3      Q    Hy-Vee.
4      A    I'm going to say I don't know, but I
5  think -- actually, I think they may be.  I think that
6  sounds familiar, but I'm going to say I don't know.
7      Q    Okay.  Kroger?
8      A    No.
9      Q    Safe way?
10     A    I don't know.
11     Q    Roundies?
12     A    I don't know.
13     Q    HE Butt?
14     A    I don't know.
15     Q    And Giant Eagle is still a member of Topco
16 today, correct?
17     A    Yes.
18     Q    What types of meetings would you go to with
19 Topco?
20         MS. CAIN-MANNIX:  Objection to form.
21     Q    You did testify that you attended some
22 meetings with Topco, correct?
23     A    Yeah.
24     Q    Can you describe those meetings to me?
25         MS. CAIN-MANNIX:  Objection relevance to

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                May 20, 2014

82

the extent it's beyond eggs, but go ahead.
        A    Yeah.  I mean, generally, it just had to do
with pulling members together and looking for
direct -- Topco looking for direction on some of the
things that they're doing and looking for suggestions
from us on maybe improving certain programs, improving
systems, improving technology.  It could be a number
of things.
        Q    Okay.  And did any of the meetings you
attended with Topco address the dairy case, the
products that you sold in the dairy case?
        A    I don't recall a specific meeting, but back
in the day, I'm sure that there were meetings I was at
that was specific to dairy that Topco was at.
        Q    And do you recall any meetings addressing
specifically the Egg Program?
        A    Again, I'll say the same thing.  I don't
recall a specific meeting, but I'm not saying that
there wasn't a meeting that I attended during that
timeframe.
        Q    And am I correct that this morning you
testified that you were unaware of why Giant Eagle
purchased through Topco?  I don't want to put words in
your mouth.  I just don't have something to check.
        A    Well, not unaware.  I mean, maybe the

83

question was around the origin of it.  I mean, we've
been with Topco I believe for forever.  I mean, many,
many, many years, so I don't know the original reason.
        Q    That's what I meant.
        A    The reason that we're with them is we
believe there is a benefit having them do aggregation
for us across the members.
        Q    What is that benefit?
        A    That you potentially could get a lower cost
if you aggregate and you potentially have those guys
help with the negotiation of some of the programming.
        Q    Is Topco a non-profit, do you know?
        A    I'm not -- I don't know.
        Q    How does Topco get compensated for the
services it provides to Giant Eagle?
        A    Again, I'm not an expert on this, but there
is a -- there is a service charge that's applied to
the individual programs.
        Q    Do you know if there's a membership fee?
        A    I don't know.
        Q    As a co-op, did Topco distribute dividends
of some sort to its members?
        A    So there is -- there is an annual rebate
that is received.  That's what I referred to earlier
when I talked to you when I was talking to

84

        Mr. Lichtenfels.  That is they're rolled up across all
of the programs, and it is not specific to any one
program.
        Q    On what is that rebate based?
        A    I believe it's based on total purchases.
        MS. CAIN-MANNIX:  Could we go off the
record for a second?
        MS. ANDERSON:  Sure.
        THE VIDEOGRAPHER:  We are off the record.
The time is 10:26 a.m.
        (Recess taken.)
        (Thereupon, Deposition Exhibit No. 7 was
marked for identification.)
        THE VIDEOGRAPHER:  We are on the record.
The time is 10:27 a.m.
BY MS. ANDERSON:
        Q    Mr. Moran, I'm going to hand you what has
been marked Exhibit 7, which is entitled Product
Supplier Letter of Agreement between Topco and Weaver
Brothers, which is dated on the bottom September 27,
1999.  Do you have that document in front of you?
        A    I do.
        Q    Did this agreement between Topco and Weaver
Brothers encompass Giant Eagle's egg purchases?
        A    I do not believe so in 1999.

85

        Q    Just one more follow-up question on the --
did dividends that were paid -- I'm sorry.  I keep
saying dividends.
        You stated the annual rebate from Topco was
based on all of Giant Eagle's purchases from Topco,
correct?
        A    Yes.
        Q    Was that broken down in any way to
distinguish between purchases of Product X or
Product Y?
        A    No.
        (Thereupon, Deposition Exhibit No. 8 was
marked for identification.)
        Q    I'm going to handed you a document that has
been marked Exhibit 8.  Before we actually get to
that -- or actually, let me jump straight to the
exhibit.  This is marked with a Bates No. GE00014131.
        It's a one-page email from a series
of people dated April 30, 2002; is that correct?
        A    Yes.
        Q    And it's addressed to John Tedesco, Laura
Karet, Dave Daniel, Ray Smaltz and Kevin Srigley.
        A    Srigley, right.
        Q    Is that correct?
        A    That is correct.

HIGHLY CONFIDENTIAL

Moran, Paul                                    May 20, 2014

23 (Pages 86 to 89)

**86**

1    Q   Who are these people?
2    A   So at the time, John was our VP in
3  merchandising.  Laura was I believe at the time the VP
4  in marketing.  I don't recall Dave's exact title at
5  the time.  Ray was VP in merchandising, and Kevin was
6  also in marketing, and I don't recall his exact title
7  either.  Mike, Linda and Pat were all on my dairy team
8  at the time, and Craig was the egg representative that
9  was running eggs at the time at Topco.
10   Q   And the subject line is "Update on egg
11  vendor change".  Do you see that?
12   A   I do.
13   Q   Have you had a moment -- I'm sorry -- to
14  read this?
15   A   I have seen this.  Yes, ma'am.
16   Q   Okay.  So you recognize this document?
17   A   I do.
18   Q   And you received this -- or you sent this
19  document in the ordinary course of your job at Giant
20  Eagle?
21   A   I did.
22   Q   You state in the first paragraph, "This is
23  to bring everyone up to date on the changing of our
24  egg vendor from Buckeye (Hartford Farm)."  Do you see
25  that?

**87**

1    A   I do.
2    Q   Is this the point in time, April 2002, that
3  Giant Eagle stopped purchasing from Buckeye Farm?
4    A   Yes.
5    Q   Who made the decision to move from Buckeye
6  Farm to the Hillandale/Weaver combination?
7    A   So I'm sure at the time I don't recall
8  exactly the process, but it was a collaborative
9  decision I'm sure between that group and me.
10   Q   And who would have been the ultimate
11  decision-maker?
12   A   Ultimately, I think Ray and John would have
13  probably been the decision-makers, but we as a group,
14  I was in charge of that category, so they went by the
15  recommendation that I gave them.
16   Q   So you made the recommendation to move
17  purchases from Buckeye to Hillandale and Weaver
18  Brothers?
19   A   Yes.
20   Q   And on what did you base that
21  recommendation?
22   A   So I'm not going to recall everything.  I'm
23  going to give you sort of the general landscape of
24  what was going on at the time.  There was -- Buckeye
25  at the time was having some issues with some negative

**88**

1  media as a result of some of the challenges that they
2  were having on their farm.  It had to do with runoff
3  water.
4    Q   I'm sorry.  You said --
5    A   It had to do with I think run off water.
6    Q   Run off?
7    A   I don't remember all of the details, right,
8  but there were media challenges as a result.  This had
9  been going on for a period of time.  I don't remember
10  exactly how long, and we as a company just got to the
11  point where again from a consumer standpoint, trying
12  to understand what the situation was, and we decided
13  to under the circumstances go ahead and take the
14  business out for bid which is what we did, and I
15  believe that was at the time when Hillandale and
16  Weaver both came aboard when we split the business
17  between Pittsburgh and Cleveland.
18       What drove that decision was I'm sure a
19  combination that I do not have listed in here and I do
20  not recall between costs that we were being offered
21  and just the ability to move the business away from
22  what we believed to be a vendor at the time that had
23  the potential for creating consumer issues for us.
24   Q   What do you mean by "consumer issues"?
25   A   Having dealing with a vendor that maybe

**89**

1  wasn't perceived in the best light in the community as
2  a result of some of the -- some of the public -- the
3  publicity that they were getting based on some of the
4  issues they were having on their farm.
5    Q   So Buckeye was having negative publicity
6  about farm conditions?
7    A   It was -- I don't remember all the
8  specifics, but they were having some negative
9  publicity, yes.
10   Q   Did any of that negative publicity get
11  connected to Giant Eagle?
12   A   I don't recall that it did.
13   Q   So this was more of a pre-emptive measure
14  to prevent the negative publicity from impacting Giant
15  Eagle?
16   A   Yes.
17   Q   And who at Giant Eagle was responsible for
18  the --
19       Was it an RFP the bidding process?  If I
20  used the term "RFP", is that accurate?  How do you
21  refer to it?
22   A   That's more of a recent, so at the time, I
23  don't know that we had quite the formalized process
24  that we have today.
25   Q   Who at Giant Eagle was responsible for I

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

24 (Pages 90 to 93)

---

90

1  think you used the phrase putting it out to bid?
2      A    Well, that's where the collaborative
3  communication went with Topco, which is one of the
4  reasons why Craig is on here, right.  We're sure
5  reached out --
6          Again, I don't recall specifically, but the
7  process would have been that we would have reached out
8  to Topco looking for their input in terms of
9  alternatives with vendors, and I'm sure that's how we
10  came upon both Hillandale and Weaver, and we probably
11  went in and evaluated all of our options and decided
12  that moving the business the way we did was the best
13  option for us at the time.
14      Q    Did Topco have a list of approved egg
15  vendors or something similar to that?
16      A    I don't ever -- I do not recall that.
17      Q    Okay.  Did Giant Eagle have one?
18      A    No.
19      Q    How did Giant Eagle decide which
20  competitors they would consider when you put the egg
21  business out to bid?
22      A    Well, we evaluate -- I mean, some of it's
23  listed here.  We evaluate all of those things.  We try
24  to understand regardless of when we put a bid out and
25  regardless of whether it's eggs or anything else, we

---

91

1  try to understand what the consumer is looking for
2  both in terms of product quality, any kind of
3  regulatory issues or anything like that that we
4  believe is in the marketplace that we need to be aware
5  of, and we try to take all of those things into
6  consideration when looking at vendors.
7          And then, of course, on top of that, you're
8  looking at the cost and the value that they can
9  provide it for you at.  And when you roll all of those
10  things together, you're going to make a decision.
11      Q    You say in your second paragraph, "We have
12  laid out requirements to any vendor looking to be our
13  egg supplier that detailed the cost, quality,
14  regulatory compliance, UEP and USDA standard
15  compliance, including non-forced molted birds and
16  several changes that we have made to the program over
17  the last several years to help ensure minimal damage
18  at the store level."  Do you see that?
19      A    I do.
20      Q    What did you mean when you said you had
21  laid out the requirements to vendors?
22      A    Well, again, I'm not going to recall
23  specifically.  I can tell you that it goes -- it all
24  circles back to what we believe or believed at the
25  time to be what consumers were looking for based on

---

92

1  all of the information that we had at the time.
2      Q    And what did you think consumers were
3  looking for in terms of cost?
4      A    Well, that part's probably more on us than
5  the consumer, right, but in order for us to provide
6  the best overall experience we can, we're obviously
7  going to look to try to get maybe not the best cost,
8  but the best value.  You're not going to necessarily
9  take the best cost if it doesn't provide all of the
10  other things that you're looking for, but within that
11  parameter of all the things that you're looking for,
12  you're probably going to take the best cost.
13      Q    And did the other things you were looking
14  for include quality, regulatory compliance, UEP and
15  USDA standard compliance, including non-forced molted
16  birds?
17      A    Clearly, at the time, we were.
18      Q    What did you mean by "regulatory
19  compliance"?
20      A    Well, anything that would any -- Topco, for
21  example, would send people to do plant inspections, so
22  there was a series of regulations that had to be met
23  to pass those plant inspections.  I am not an expert
24  on that, and I was not on those plant inspections, but
25  Topco did send people in there, and that was really

---

93

1  referring to those types of things that those people
2  would be looking for.
3      Q    So have you ever toured an egg plant?
4      A    I have.  I have toured them, yes.
5      Q    Okay.  Which egg farms did you tour?
6      A    I've been at Hillandale and Weaver at
7  different times.
8      Q    Which Hillandale facility?
9      A    I believe the one in Croton, the one right
10  outside of Columbus there.
11      Q    And which Weaver facility?
12      A    The one, it's like on the Indiana/Ohio
13  border.  What's the name of it?  I can't remember the
14  town now?  Western Ohio.
15      Q    And could you describe for me the
16  circumstances of your tour of Hillandale?
17      A    I don't recall the exact circumstances.
18  You know, at the time, I was responsible for eggs and
19  probably more than anything, I just wanted to become
20  more aware and better educated in terms of the whole
21  category, and I don't even recall exactly what we did
22  down there to be honest with you, but I can recall
23  making the trip.
24      Q    Did you make that trip before you selected
25  Hillandale as the supplier?

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

25 (Pages 94 to 97)

---

94

1    A    I don't remember.
2    Q    Do you recall the circumstances of your
3    trip to Weaver Brothers?
4    A    Similar.  I don't recall exactly, no.  I
5    remember going there.  I remember getting a tour of
6    the plant.  I don't remember any specific conversation
7    or any specific reason for being there to be honest
8    with you.  I think it was more informational than
9    anything in both of those cases.
10   Q    And you're not sure whether you did that
11   before or after you selected them to be a supplier?
12   A    I don't recall.
13   Q    When Topco conducted plant inspections, did
14   they provide Giant Eagle with any documents regarding
15   regulatory compliance of those vendors?
16   A    I don't recall that they gave us specific
17   documents.
18   Q    Would they have given you documents that
19   generally discussed the topic?
20   A    I don't recall that.  I think if we asked
21   for it specifically, we probably could have gotten it,
22   but I don't know that on a regular basis they
23   necessarily gave those things to us.
24   Q    You state in here next, "UEP and USDA
25   standard compliance, including non-forced molted

---

95

1    birds".  Do you see that?
2    A    I do.
3    Q    Is UEP United Egg Producers?
4    A    Yes.
5    Q    And what did you mean by UEP standard
6    compliance?
7    A    And I don't recall at the time.  I know
8    that generally speaking these types of things are
9    going to be very consumer based, and what this tells
10   me is that at that time we believed that those
11   were the standards that we needed to meet in order to
12   have a program that was going to be competitive in the
13   marketplace.
14   Q    And is the UEP standard to which you are
15   referring the Animal Care Certified Program or the UEP
16   Certified Program?
17   A    I don't recall exactly what I was referring
18   to there to be honest.  I don't recall exactly.  It's
19   saying UEP, so I would imagine that the -- it was --
20   that was a general reference to those things, but I
21   don't know that it was a reference to anything in
22   particular within that program.
23   Q    And the UEP standard compliance was
24   compliance with an animal welfare program, right?
25   A    I believe that that was a component of it.

---

96

1    I don't know that it was only that.
2    Q    Are you aware of any other UEP standards?
3    A    The one UEP standard that I can recall was
4    around cage sizes.  I do not really have a good
5    recollection of what else was contained in UEP
6    standards.
7    Q    And these were the standards for animal
8    welfare, correct?
9        MS. CAIN-MANNIX:  Objection to form.
10   A    I don't know.
11   Q    So explain to me then, Mr. Moran, what is
12   your understanding of compliance with UEP standards as
13   you use it in this document in 2002?
14   A    It's very -- well, again I don't know that
15   I have a good understanding of it or I may have had a
16   better understanding of it at the time.  I certainly
17   do not now.  The reference I'm sure was to make sure
18   that within the marketplace that we were meeting
19   standards that were being met by our competitors and
20   that we were aware of.
21       You know, the thought is always around you
22   don't want to the only retailer in the market that is
23   not meeting standards when customers are looking at
24   any kind of regulatory issues.  All right.  And so
25   we're going to ask those questions to try to meet

---

97

1    those demands.
2    Q    So consumers were demanding a UEP --
3    compliance with the UEP standard?
4    A    I don't know that we had specific requests.
5    I know that I believe at the time that there was just
6    industry information around those things and that
7    obviously we believed at the time that that was
8    something that we needed to do to meet the standard in
9    the marketplace.
10   Q    What did you mean by "non-forced molted
11   birds"?
12   A    I believe that's another issue that popped
13   up periodically that consumers would ask about, and
14   when you molt a bird, you basically starve it for a
15   couple of weeks and you try to regenerate its ability
16   to lay eggs.  And I guess at the time there were some
17   push back on that.  I don't recall the specifics of
18   it, but it must have been -- it must have risen to the
19   level where we became aware of it and decided to put
20   it into the documentation.
21       The other thing I don't know that I don't
22   recall is whether we did that or that was something
23   that maybe Topco put in place that we were just
24   following.  I don't recall the specific origin of
25   where that came from.  If that was me saying we need

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

26 (Pages 98 to 101)

98

this or if that was Topco basically giving me
information saying this is what we're asking them for,
I don't recall.

Q    If Topco was asking vendors submitting bids
with respect to Giant Eagle business for requirements
that you didn't think could be sustained by customer
demand, would those have gone out in the bid?

A    I'm sorry.  Say that again.

Q    The requirements that Topco put on
submissions from vendors for your business, if you
disagreed with those requirements or you wanted
different requirements, you would have told Topco
that, correct?

A    I don't recall reviewing those.  I don't
know the answer to that question.  We I don't
believe -- I don't believe that we would have allowed
requirements to go out that we didn't agree with, but
at the time, the origin of those requirements I don't
know that were ours or theirs.  I know that they were
based on what the perception around consumer demand
and industry standards were or were going.

Q    And that was your perception, correct, as
Giant Eagle?

A    Well, it probably was our perception.  It
may have also been Topco's perception at the time,

99

which were people that we were working collaboratively
with to get information on the industry.

Q    And one of the reasons that you used Topco
was for their perception and their intelligence into
the --

A    Yes.

Q    -- industry, correct?

A    Yes.

Q    You referenced cage sizes with respect to
the UEP standard.  What is your understanding on that?

A    My recollection on that is that there was a
requirement that if I'm remembering this correctly
would have been phased in over time that would have
gradually increased the cage sizes for the chickens.
That's really the only thing I remember about that
program.

Q    So it would have gradually increased the
number of hens per cage or the size of the cage?

A    No.  It would have gradually increased the
amount of the space that the chickens had to live in
basically.

Q    And if you have a set number of hens in a
cage and then you give them more space without
increasing the size of the cage, necessarily, there
are fewer hens in that cage, correct?

100

A    I guess if you do the math, that would
probably be accurate.

Q    In the sixth paragraph of Exhibit 8, you
state, "The other difference is a three-quarter of a
cent per dozen cost difference we will be paying to
Hillandale."  Do you see that?

A    Yes.

Q    What is your recollection of that cost
difference?

A    So my recollection is that when we bid --
this is strictly a cost issue.  When we bid it, we
would always bid based on a back from market, so the
Urner Barry market is what is used historically as the
cost mechanism weekly on commodity eggs.

And you bid based on what they call a back
from market.  So a very simple example is if your
market is 80 cents and you're back from market is 15,
you are going to pay 65 cents a dozen for eggs that
week.  So by speculation on that -- I don't recall it
exactly, but it appears that to me that Hillandale had
a cost that was slightly higher than Weaver, so we
decided to accept it at the time.

Q    You referred to Urner Barry.  What is
Urner Barry?

A    Urner Barry is the mechanism that the egg

101

market is set on a weekly basis.  We used historically
the Midwest Urner Barry market which is set every
Thursday.

Q    Is that a price index?

A    It's a price index, yeah.  I don't know a
lot about the detail behind it.  What I know about it
is that was the mechanism that we used and that I
believe was a standard across the industry in terms of
setting costs on eggs on a weekly basis.

Q    And by eggs, you mean shell eggs?

A    Shell eggs, shell commodity eggs, yes,
ma'am.

Q    And by cost, you mean the price that you
paid?

A    The price -- eventually, the price that we
paid, yes, but I mean, it wasn't -- so yeah, the price
that we were -- the price that we would negotiate.  It
wasn't setting the price.

So if the market was 80 cents, that wasn't
the price you were paying.  You were paying the
market, plus whatever you negotiated with whatever
vendor that -- or minus usually whatever the number
was that you negotiated with the vendor, which could
vary.

Q    I'm sorry?

HIGHLY CONFIDENTIAL

Moran, Paul                                                          May 20, 2014

27 (Pages 102 to 105)

---

102

1    A    Which could vary by vendor or by retailer,
2  right.
3    Q    And does Urner Barry published different
4  market prices for different geographic regions?
5    A    It does, but we -- I don't know how many
6  there are.  I know there's -- I believe there's at
7  least two, I know the Midwest and there was an Eastern
8  one.  I know historically we've always used the
9  Midwest.
10   Q    And does it publish different market prices
11 for different types of shell eggs?
12   A    It does.
13   Q    Is it by size?
14   A    It is.
15   Q    Do you know what the Urner Barry market
16 price was based on?
17       MS. CAIN-MANNIX:  Objection, foundation.
18       Go ahead.
19   A    Yeah.  I don't -- I mean, it was based on
20 all of the -- all of the components that go into a
21 market, right.  I mean, it's feed costs.  It's true
22 cost.  At times, it might -- it's basically supply and
23 demand, so wherever they were projecting the supply of
24 eggs to be in a particular week versus the demand
25 would drive that market.

---

103

1    Q    So it's your understanding that the Urner
2  Barry price is not actually just a compilation of
3  actual sale prices during that week?
4        MS. CAIN-MANNIX:  Can you repeat that?
5    Q    Can you read back?  I can't.
6        (Last question read back.)
7    A    I'm not sure if I totally understand that
8  question.  I mean, Urner Barry is generated based on
9  supply and demand.  That's what all know about it.
10 It's a number that we get every week that we used to
11 base the egg price on on a weekly basis that we were
12 purchasing eggs for.
13   Q    And you think that the index is based on
14 supply and demand?
15   A    Well, it's certainly a big component of it.
16 So for example, if it was Easter and the demand was
17 going to spike dramatically and there was suddenly a
18 shortage of eggs, that market would go through the
19 roof, so there is a big supply and demand component to
20 it.
21   Q    Did you receive reports from Urner Barry?
22   A    Not specific reports.  We would -- the
23 market would be published nationally every week at
24 noon on Thursday.
25   Q    What do you mean "the market"?

---

104

1    A    Whatever the Urner Barry was going to that
2  particular week, and it would do it on a Thursday at
3  noon and it would set the price that you were going to
4  pay for eggs for the following Sunday through
5  Saturday.
6        So if you were paying -- let's just say for
7  sake of argument that market is at 80 cents this week
8  and you were paying actually 65 because your back of
9  market was 15 cents and that market went to 85 cents,
10 then starting with purchase orders that Sunday, you
11 are now paying 70 cents instead of 65.
12   Q    And this is how Giant Eagle purchased eggs?
13   A    This is how Giant Eagle purchased, but it
14 was also from what I understand very standard across
15 the country, that many, many people used that standard
16 kind of as their mechanism to price eggs.
17   Q    On what is that understanding based?
18   A    Feedback from Topco.  You're right.  I
19 mean, I can't give you a specific answer to that
20 question, but just general feedback, that's my
21 understanding.
22   Q    What type of feedback did Topco give you on
23 how your competitors purchase eggs?
24   A    I don't recall any feedback specifically on
25 competitors purchasing eggs.

---

105

1    Q    Well, then on what are you forming your
2  understanding from Topco that how you purchase eggs is
3  how most other companies purchase eggs?
4    A    Well, I don't know -- I'm not sure if I'm
5  completely following.  The market based on everything
6  I know and the feedback I have gotten just
7  generally -- I mean, I think the vendors will give you
8  the same feedback -- is that that is a very standard
9  way that retailers price their eggs.  That's really
10 all I know about it.
11   Q    Okay.  And do you read the Urner Barry
12 reports?
13   A    Not on a typical basis, no.
14   Q    Do you receive them?
15   A    I don't believe so.
16   Q    Then how do you know how much your eggs are
17 going to cost in a given week?
18   A    Well, we receive a market price through
19 Topco every week.
20   Q    Does the Urner Barry price include delivery
21 charges?
22   A    It does.
23   Q    Delivery anywhere?
24   A    Well, so you're back -- it's not going to
25 include that because that gets factored into

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

28 (Pages 106 to 109)

---

**106**

1  negotiation on back of market, right.
2      Q    So the Urner Barry market price does not
3  include delivery?
4      A    No.
5      Q    And does it include tax?
6      MS. CAIN-MANNIX:  Objection, foundation.
7      A    I don't know.  I don't know what it
8  includes.
9      Q    So you don't know what it's based on?
10     A    I don't know specifically what it's based
11  on other than there is -- there appears to be based on
12  history a large supply and demand component to it.
13     Q    Did the back of market -- did you say back
14  of market or back from market?
15     A    Either one.
16     Q    Does the back of market -- is that what BOM
17  stands for?
18     A    Yes.
19     Q    Does the back of market discount vary by
20  type of egg?
21     A    Yes, it can.
22     Q    And by type of egg, I mean, type of
23  commodity egg, jumbo versus large --
24     A    Yes.
25     Q    -- versus small?

---

**107**

1      A    It does.
2      Q    So did you negotiate those separately?
3      A    Yeah.  It's usually part of one
4  negotiation, but yeah, there's some variances between
5  those.
6      Q    Why are there variances?
7      A    That gets -- you would have to talk to each
8  individual vendor.  It doesn't -- it's not consistent
9  vendor to vendor.  I mean, it's just the way that they
10  price theirs in a manner, you know, that's different
11  maybe from vendor to vendor.
12     Q    And from Giant Eagle's perspective, why
13  would you be willing to agree to variances or a
14  discount based on the size of the egg?
15     A    We never really looked at it based on one
16  specific egg type.  We really when we rolled it up and
17  did the cost evaluation on it, we looked at it as a
18  program across all of the eggs and weren't
19  necessarily -- we were looking at it by egg, but if it
20  all rolled up to a particular projected cost for us
21  based on the way we sold eggs, that's sort of how we
22  evaluated it.
23     Q    So it didn't particularly matter to Giant
24  Eagle if you got a larger discount off of small eggs,
25  for instance, than you do off of jumbo eggs provided

---

**108**

1  at the end of the day your total discount off of all
2  of market for all of your eggs met the threshold you
3  were seeking?
4      A    Yeah.  If the total -- and it wasn't large
5  variances there.  I mean, you weren't talking, you
6  know, five or ten cents a dozen.  I mean, you're
7  talking probably -- in some cases, you were talking
8  quarter pennies and half pennies.
9      Q    Did Giant Eagle receive any discounts on
10  its shell egg purchases from Buckeye, so in 1999 to
11  April 2002?
12     A    I don't recall the specifics of those
13  programs, but the back from market I'm sure was there.
14  I just don't remember the specifics of it.
15     Q    Do you recall any other discounts?
16     A    I don't recall.
17     Q    And what about discounts on your commodity
18  egg purchases from Hillandale other than the back of
19  market discount?
20     A    You know, I don't recall exactly.  I know
21  we have -- we negotiate cash discounts with a number
22  of vendors.  I don't recall specifically if Hillandale
23  and Weaver had a cash discount applied to theirs or
24  not.
25     Q    What do you mean by "cash discount"?

---

**109**

1      A    So you might get -- if you pay within
2  terms, so if you paid it by a certain date, you might
3  get two percent off.  That's pretty -- that's fairly
4  common.  I don't recall honestly if that was
5  specifically part of the Hillandale and Weaver program
6  or not.
7      Q    What is a --
8      Well, why don't we go ahead and change the
9  tape?
10     THE VIDEOGRAPHER:  We are off the record.
11  The time is 10:57 a.m.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  We are on the record.
14  The time is 11:07 a.m.
15  BY MR. ANDERSON:
16     Q    Mr. Moran, you have testified earlier that
17  the location -- let me rephrase it.  I don't want to
18  put words in your mouth.
19     The location of the farms that Hillandale
20  and Weaver had, did those play a role in you selecting
21  Hillandale and Weaver in 2002 as your new egg vendors?
22     A    I think they likely played a role because
23  of the proximity to us and the impact that that would
24  have on transportation costs.
25     Q    Okay.  Would the ability of an egg vendor,

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

29 (Pages 110 to 113)

---

110

1  an egg farmer to sell you all of the different types
2  of commodity eggs that you wanted, would that play a
3  role in your vendor selection?
4      A    All the things I talked about earlier would
5  play a role.  It would be all of the criteria that we
6  laid out, plus costs.
7      Q    And I'm sorry.  I don't have perfect
8  recall.  Was the ability to sell the spectrum of
9  commodity eggs, small to jumbo, is that considered?
10     A    Yes, yes.
11     Q    Did Giant Eagle have a written agreement
12  with Buckeye?
13     A    Not that I'm aware of.
14     Q    Did Giant Eagle agree to purchase a
15  minimum --
16     A    No, not that I'm aware of.
17     Q    A minimum number or type of egg from
18  Buckeye?
19     A    Not that I'm aware of.
20     Q    Okay.  What is a bill back?
21     A    A bill back in our terminology is an amount
22  of money that a vendor agrees to pay you back based on
23  your purchases.  So if a bill back, for example, is $2
24  per case and you buy 200 cases, you have the ability
25  to bill them back for $400.

---

111

1      Q    So it's a discount of sorts?
2      A    Or it could be some sort of an allowance
3  that they're giving you to run a promotion.  There
4  could be several different reasons for it but --
5      Q    Would your agreement with your egg vendor
6  specify what the bill back had to be used for?
7      A    I'm -- so I'm not tell totally clear on
8  what the --
9      Q    Sorry.  Let me rephrase.
10     A    -- what your understanding of the
11  terminology of bill back here is.
12     Q    Do you have -- I'm just asking for your
13  understanding of what a bill back is?
14     A    Well, that's what our terminology is what a
15  bill back is.
16     Q    Okay.  Do you have bill backs in your
17  agreements regarding the purchase of eggs?
18     A    Our negotiation that I have been involved
19  with generally is what we call something is a dead
20  net.  So in other words, the amount of money that
21  we're paying is really the lowest possible price and
22  there's really nothing else associated with it.
23     Q    Did you say dead net?
24     A    Yeah, dead net.  So in other words, it's
25  the lowest price and you're pulling of all those types

---

112

1  of things out and you're just getting to one bottom
2  cost.  That's what we ask for generally when we're
3  bidding programs so that everybody is on the same
4  page, so it's easier to compare that way.  You know,
5  it doesn't get muddled.  There's no gray area.  It's
6  sort of black and white.
7      Q    So speaking specifically of your agreement
8  with Buckeye prior to April of 2002, the price that
9  you negotiated with Buckeye was not subject to some
10  subsequent bill back; is that correct?
11     A    I don't recall.  I don't recall that.  I
12  don't believe that I negotiated the original program
13  with Buckeye.
14         (Thereupon, Deposition Exhibit No. 9 was
15     marked for identification.)
16     Q    I'm going to hand you a document, sir, that
17  I have marked as Exhibit 9.  Do you recognize this
18  document?
19     A    I have seen this document, yes.
20     Q    And can you describe this document for me?
21     A    The document is a UEP program overview.  It
22  kind of lays out their approach.
23     Q    And did you see this document in the
24  ordinary course of your job at Giant Eagle?
25     A    This document, I believe that the first

---

113

1  time I saw this document was I believe during the
2  course of preparing for this deposition.
3      Q    So this is not a document that you received
4  as --
5      A    I do not recall seeing this document prior
6  to this process.
7          MS. CAIN-MANNIX:  Wait for her to finish
8      her question.
9      A    Okay.  I'm sorry.
10     Q    That's okay.  That's okay.
11         So to be clear, was this document produced
12  from your files do you know?
13         MS. CAIN-MANNIX:  Your meaning Paul
14     Moran's.
15     Q    Your being Paul Moran's?
16     A    I don't know.
17     Q    But it was -- I can tell you it was
18  produced from Giant Eagle from the Bates number on the
19  front.
20     A    Okay.
21         (Thereupon, Deposition Exhibit No. 10 was
22     marked for identification.)
23     Q    Let me hand you what I'm marking as
24  Exhibit 10.  Do you recognize this document?
25     A    I don't recall specifically seeing this

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

30 (Pages 114 to 117)

---

**114**

document.  It may have been in the pile that I had, but I don't recall -- I don't specifically recall it.

Q    Did you -- you testified earlier about your understanding of the UEP Certified Program.  Did you ever speak with anybody from UEP about the certified program?

A    I don't recall that.

Q    Do you recall ever speaking with anybody from UEP?

A    No, I do not recall that.

Q    Do you recall ever receiving any communications from UEP?

A    I don't recall specific communications directly from the UEP.

Q    Do you ever recall -- do you recall any written materials regarding the certified program that you have received from UEP directly or through Topco?

A    I don't recall any specific material.

Q    Do you recall any general information?

A    I recall an awareness that I talked about earlier that had to do with cage sizes.  That's pretty much my entire recollection of that program.

Q    Okay.  And that awareness, on what was that based?

A    I don't recall how that awareness came to

---

**115**

be.

Q    Who is Larry Rife?

A    Larry was also a gentleman that was involved with eggs at Topco.  I don't recall if he succeeded Craig Eadon or -- they've gone through a series of people up there also.

Q    Was he your contact at Topco for egg purchases?

A    He was for a period of time.

Q    Do you know for what period of time?

A    I don't know exactly.

(Thereupon, Deposition Exhibit No. 11 was marked for identification.)

Q    I'm going to hand you what I have marked as Exhibit 11.  And Exhibit 11 is a letter from Weaver, Tim Weaver at Weaver Brothers to Larry Rife dated December 16, 2002; is that correct?

A    Yes.

Q    And Mr. Weaver states, "I am writing to confirm our conversation concerning the Giant Eagle Egg Program as related to Animal Care Certified eggs."  Do you see that?

A    I do.

Q    It further states, "It is agreed that effective January 6, 2003 the cost will be increased

---

**116**

one cent per dozen on all sizes."  Do you see that?

A    I do.

Q    Did Giant Eagle require the eggs that Weaver Brothers was producing to be compliant with the Animal Care Certified Program?

A    I don't recall that.

Q    Is the cost increase to which Mr. Weaver refers related to the first sentence of this letter?

MS. CAIN-MANNIX:  Can you repeat that question for me?

(Last question read back.)

MS. CAIN-MANNIX:  Objection to the form.

Q    Do you understand?

A    It appears to be.

Q    Do you recall this letter?

A    I do not.

Q    Do you recall that Weaver Brothers sold to Giant Eagle eggs that were Animal Care Certified?

A    I do not specifically recall that.

Q    Do you recall the price increase he's referring to here?

A    I do not specifically recall that.

Q    In December 2002, did Giant Eagle require its suppliers to provide UEP Certified eggs?

A    Based on what we talked about earlier, it

---

**117**

was part of a general requirement that was developed in collaboration between us and Topco.  I do not recall the origin of that requirement.

Q    Understood.  I'm not asking about the origin.  I just want to confirm that in December of 2002 the eggs that Giant Eagle purchased were UEP Certified eggs and UEP Certified eggs only?

A    I don't recall --

MS. CAIN-MANNIX:  If you know?

A    I don't recall the specific timing of it.

Q    Do you recall the general timing of it?

A    I do not recall specifically.  It was around this timeframe and that's --

Q    And this timeframe being December 2002?

A    Around the -- the only thing that I'm going on are the communications that I have seen in this documentation which makes me see that.  I do not have any specific recollection of that occurring.

Q    I'm sorry.  Are you done?

A    Yes.  I'm sorry.

Q    In preparing for this deposition today, did you ask anyone at Giant Eagle at what point Giant Eagle may have required that all of its egg purchases be UEP Certified?

A    I did not because that would have probably

---

---

**118**

1  been me, and I just don't recall the specifics of it.
2      Q    What is the American Egg Board?
3      A    I remember the term. I don't remember
4  specifically what it was.
5      Q    Do you recall presenting on a panel at an
6  American Egg Board retail workshop in December 2004?
7      A    I saw documentation on that. I generally
8  recall going to that meeting. I do not remember any
9  specifics of that meeting.
10      Q    Did you regularly attend any industry
11  meetings relating to eggs?
12      A    Not on a regular basis.
13          (Thereupon, Deposition Exhibit No. 12 was
14      marked for identification.)
15      Q    Let me hand you what I have marked as
16  Exhibit 12, and Exhibit 12 is a document describing
17  or entitled American Egg Board Retail Workshop,
18  December 1 through 2, 2004 Chicago; is that correct?
19      A    Yes.
20      Q    And you attended this workshop; is that
21  correct?
22      A    Based on the information in here, it
23  appears to be so, yes.
24      Q    Do you recall why you attended this
25  workshop?

---

**119**

1      A    I do not.
2      Q    And the first page -- I want to give you a
3  minute to review this if you need it. Why don't you
4  let me know if you're ready?
5      A    No. I think -- I have seen this.
6      Q    Okay. The first page of the document
7  refers to the Animal Care Certified Program and
8  comments that were made there; is that correct?
9      A    It does.
10      Q    And it states, "The Animal Care Certified
11  Program was highly regarded by the retailers that
12  participated on the retail panel during the workshop."
13  Do you see that?
14      A    I do.
15      Q    And you were on the retailer panel; is that
16  correct?
17      A    I was.
18      Q    Okay. And the document further states,
19  "All members of the panel agreed that ACC was an
20  important program and having a logo on the cartons was
21  a proactive tool in avoiding negative animal welfare
22  issues." Do you see that?
23      A    I'm sorry. Where is that?
24      Q    The same paragraph, next sentence.
25      A    I'm sorry. Okay. Yeah. I'm sorry. Yeah.

---

**120**

1  Go ahead.
2      Q    And "The ACC program information helped the
3  retailers counter calls from animal welfare conscious
4  consumers," do you see that?
5      A    I do.
6      Q    And do you agree with that, that being that
7  paragraph?
8      A    I do not recall agreeing or disagreeing
9  with that at the time. I don't recall that. I recall
10  very little of this particular workshop other than
11  going. I mean, I recall going. I don't recall any
12  specifics within the workshop.
13      Q    Do you have any reason to believe that the
14  summary is inaccurate?
15          MS. CAIN-MANNIX: Objection to the form.
16      A    I don't have any reason to believe that
17  it's accurate or inaccurate.
18      Q    Okay. Was the ACC an important program in
19  your view as the buyer of eggs for Giant Eagle?
20      A    I don't recall specifically back then. You
21  know, I'll circle back to what I was talking about
22  earlier around us trying to make sure that we
23  understood from a consumer perspective what was
24  expected of these programs and trying to gather
25  information that we would need in order to make

---

**121**

1  rational intelligent decisions to make sure that our
2  program was competitive in the marketplace.
3          I'm sure going to think at the time was in
4  that spirit. I don't believe or recall a specific
5  position that we took on this at the time. I don't
6  believe we actually took a position on this, but I
7  don't recall one that we specifically took.
8      Q    And in 2004, Giant Eagle's required its
9  vendors to sell ACC eggs, correct?
10          MS. CAIN-MANNIX: Objection to the form.
11      A    Well, again, I'll go back to we -- clearly,
12  at some point, that was in the requirement that we saw
13  earlier. Whether we drove that or whether that was
14  driven by Topco, I'm not exactly sure. I don't
15  recall.
16          So the basic answer to the question was it
17  was apparently a requirement based on things we have
18  seen. It was not something though that we took a -- I
19  recall taking a particular position on.
20      Q    Do you place significance on whether Topco
21  came up with the idea of requiring your eggs to be ACC
22  or you coming up with the idea? You have mentioned
23  that several times.
24      A    No. I just think that overall it just
25  points to us trying to understand what the requirement

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

32 (Pages 122 to 125)

---

122

1 in the marketplace was going to be from a consumer
2 standpoint and what was sort of the standard in the
3 industry.
4 Q So whether Topco suggested that you
5 purchase only certified eggs or that was a requirement
6 that you personally came up with, does that have an
7 impact on you in some way?
8 A At the end of the day, probably not.
9 Q So Topco, if Topco had placed a requirement
10 in your egg purchase contracts that ended up costing
11 you more money that you disagreed with, would you have
12 signed the contract?
13 A We probably would have been asking
14 questions around the validity of those requirements.
15 I don't recall a specific conversation around this
16 stuff.
17 Q Do you recall a general conversation?
18 A I do not recall any specific conversation
19 around this particular thing as of right now, no.
20 Q What is this particular thing?
21 A Around the requirement for the
22 certification.
23 Q Do you require any general -- I mean, do
24 you recall any general discussions about the
25 requirement of certification?

---

123

1 A I do not. What I recall -- what I know is
2 a lot of the things that I have seen that have been
3 presented to me recently that clearly at the time
4 there was some awareness there. And again, I believe
5 that we were trying to understand from a consumer
6 standpoint what was needed and from an industry
7 standard what was needed, and we were trying to meet
8 those requirements.
9 Q And was a certified care logo on the carton
10 of eggs something that consumers demanded?
11 A I don't recall.
12 Q Page 5 of the document, which has the Bates
13 UE 0331179 in the bottom right-hand corner, describes
14 the retailer panel on which you were a member,
15 correct?
16 A It does.
17 Q Does reviewing this page and a half summary
18 refresh your recollection of whether having the ACC
19 logo on the packs was very important?
20 A It does not.
21 Q On Page 6 at the top, it states, "The
22 retailers all agreed that having the ACC logo on the
23 packs was very important." Do you see that?
24 A I do.
25 Q And the retailers refers to four retailer

---

124

1 representatives, one of which was you, correct?
2 A Based on that, that's what it appears to
3 be, yes.
4 Q Did you agree?
5 A I don't recall.
6 Q Do you have any reason to believe that you
7 did not agree?
8 MS. CAIN-MANNIX: Objection to form.
9 A I do not recall. I do not recall this
10 conversation or that particular panel to be honest
11 with you.
12 Q So you're unable to testify as to whether
13 in December 2004 the ACC logo on the packs was
14 important to Giant Eagle or its customers?
15 A I do not recall the level of importance
16 that the company placed on that at that time.
17 Q Well, my question was whether --
18 Can you read my question back?
19 (Last question read back.)
20 A I don't recall.
21 Q It's a yes or no question. I'm not asking
22 you what you recall.
23 A So yes, I am --
24 Q I'm asking can you testify or not.
25 A Yes -- no.

---

125

1 Q And can you testify as to your opinion or
2 Giant Eagle's opinion that the ACC logo gives
3 retailers a positive story to tell to customers that
4 call up complaining about animal welfare issues?
5 A No.
6 Q And are you able to testify in any way
7 about the statement or the belief that the ACC logo on
8 packs takes animal welfare issues off the table for
9 retailers?
10 A No.
11 (Thereupon, Deposition Exhibit No. 13 was
12 marked for identification.)
13 Q Let me hand you what has been marked as
14 Exhibit 13. Exhibit 13 is an email dated August 27,
15 2007 from Kathryn Smith at Giant Eagle to
16 dlaukus@hillandalefarms. Do you see that?
17 A I do.
18 Q Did Kathy Smith work for you?
19 A She was in our quality assurance team,
20 yeah.
21 Q Did she work for you?
22 A She did not work for me, no. Not
23 specifically for me.
24 Q She was communicating or sending to
25 Hillandale Farms a Giant Eagle Q/A request; is that

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

33 (Pages 126 to 129)

126

1   correct?
2        A    Yes.  That's what it appears to be.
3        Q    And on the attached letter to dear valued
4   supplier it outlines the requirements for purchases by
5   Giant Eagle; is that correct?
6        A    Yes.  It appears to.
7        Q    And No. 7 under certifications states, "All
8   U.S. egg suppliers are expected to comply with the
9   United Egg Producers, EUP, Animal Husbandry
10  guidelines for U.S. Egg Laying Flocks.  A copy of
11  third-party certification should be posted."  Do you
12  see that?
13       A    I do.
14       Q    So in August of 2007, Giant Eagle required
15  all of its U.S. egg suppliers to be compliant with the
16  UEP guidelines, correct?
17       A    That's what's on here.  I believe that
18  that -- I don't -- I don't know the origin of that
19  but --
20       Q    Why are you referring to origin of it, sir?
21       A    Well, I mean, in terms of this all kind of
22  goes back to what I was talking about earlier with --
23  this comes from I believe what our belief was an
24  industry standard or a consumer need would have been,
25  but I can't speak specifically to these because I

127

1   didn't develop them.
2        Q    What I am ask you is in August of 2007,
3   isn't it true that Giant Eagle required all of its
4   U.S. egg suppliers to comply with the UEP animal
5   welfare guidelines?
6        A    Yes.
7             (Thereupon, Deposition Exhibit No. 14 was
8        marked for identification.)
9        Q    I'm handling you what has been marked as
10  exhibit 14.  You can take a moment to review the
11  document.
12            Do you recognize this document, Mr. Moran?
13       A    I have seen it because it -- I have seen it
14  before, but it wasn't a document that I am familiar
15  with because I don't put it together.  Topco does.
16       Q    Is this -- I'm sorry.  Let me start again.
17            This is a letter from Topco?
18       A    Right.
19       Q    On behalf of Giant Eagle, is it not?
20       A    Yes.
21       Q    Would Topco have sent out -- is this an
22  RFP?
23       A    Yeah.  It looks like it's an informal one,
24  yes.
25       Q    Okay.  Would Topco have sent out an

128

1   informal RFP on behalf of Giant Eagle without your
2   knowledge?
3        A    No.
4        Q    So you would have reviewed this RFP before
5   Topco sent it out, correct?
6        A    I don't know if we would have reviewed this
7   specific letter, but we would have understood what
8   they were asking for I'm sure.
9        Q    So Topco wouldn't have sent an RFP out
10  asking for information that Giant Eagle didn't want or
11  need, right?
12       A    That probably is true.
13       Q    You switched -- Giant Eagle switched its
14  egg purchases from Buckeye to Hillandale and Weaver
15  Brothers around roughly July of 2002, correct?
16       A    Yeah.  I think it was May -- the earlier
17  one I think the date was actually May 6th.
18       Q    If we look at Exhibit 8, it was an email
19  from you on April 30th stating that you had made the
20  change, correct?
21       A    Yes.  Underneath there, it says it's
22  effective May 6th.
23       Q    The transition will be complete by Monday,
24  May 6th --
25       A    Yes.

129

1        Q    -- is that what you're referring to --
2        A    Yes.
3        Q    -- in Exhibit 8?
4        A    Yes.
5        Q    So as of May 6, 2002, Giant Eagle has moved
6   its purchases from Buckeye to a combination of Weaver
7   and Hillandale, correct?
8        A    Yes.
9        Q    How long had you been purchasing from
10  Buckeye prior to that?
11       A    I don't know.
12       Q    At least back to 1999?
13       A    Prior to when I was there, I know that.  I
14  don't know what the beginning time was on it.
15       Q    So at least -- I'm sorry.  When did you get
16  there again?
17       A    '99.
18       Q    So from 1999 until May 6, 2002, Giant Eagle
19  was purchasing from Buckeye?
20       A    Yes.
21       Q    Why in July of 2003 did you send out
22  another RFP?
23       A    I don't recall the specifics of it.
24  Typically, we would go and periodically review when we
25  thought that there was opportunity in the market to

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

34 (Pages 130 to 133)

---

130

1   potentially get a better cost.  I don't recall exactly
2   when that one went out.
3       Q    Do you recall generally why this one went
4   out?
5       A    For the same reason.  If we thought or if
6   Topco thought that there was an opportunity to improve
7   our program or our costs, we would go out -- we might
8   take something out for bid to see if that was the case
9   or not.
10      Q    And your cost being the price you paid?
11      A    It could be --
12      Q    Is that what you mean by cost?
13      A    Yes, yes.
14      Q    So because Topco sent this out in July of
15  2003, something must have occurred to make Giant Eagle
16  believe it could improve its cost.  Is that what
17  you're saying?
18      MS. CAIN-MANNIX:  Objection to form.
19      A    I don't recall the specifics of exactly why
20  it went out.  It could have been part of a normal
21  process that Topco was doing any way.  I don't recall.
22      Q    So you can't testify as to the reason for
23  the 2002 RFP?
24      A    No.
25      Q    Who at Giant Eagle was responsible for

---

131

1   working with Topco on this RFP in 2003?
2       A    That would have been me.
3       Q    And you worked with Mr. Rife at Topco?
4       A    Typically, that process was that Larry and
5   I would talk or whoever was their representative, we
6   would just talk on the phone and we would -- you know,
7   if we thought it was time to do it, they would put out
8   an RFP.  I didn't -- I don't recall reviewing this
9   specific -- or any something RFP that went out
10  line-by-line.
11      Q    Would you have been sent a copy of the RFP
12  before Topco sent it out to your vendors?
13      A    I don't recall if we were or not.
14      Q    You have no knowledge as to whether Topco
15  would have provided you with a copy of your RFP before
16  he sent it out?
17      A    I do not recall again.  I don't recall if
18  we got it or not.  I don't recall.
19      Q    Would it be abnormal for Topco not to
20  provide you with a copy of it?
21      A    I don't -- I don't believe I -- I don't know
22  if there was a formal process in place for them to
23  provide us with copies of that or not.
24      Q    How many RFPs did you do with Topco for any
25  product category in your 20-plus years of buying

---

132

1   groceries?
2       A    I don't know.  I don't know.
3       Q    And does Topco typically provide you with a
4   copy of your RFP before they send it out?
5       A    The process in those days was a little more
6   informal than it is today, so it would not necessarily
7   have been unusual I don't think to do that.
8       Q    So is it your testimony they didn't show
9   you this?
10      A    It's not -- I don't --
11      MS. CAIN-MANNIX:  Objection.
12      A    I don't know.
13      MS. CAIN-MANNIX:  It's not his testimony.
14      Q    I don't understand your testimony then.
15  Can you please elaborate?
16      A    I don't know if they sent us a copy of it
17  or not.  I do not recall getting a copy of it.
18      Q    Does Exhibit 14 accurately reflect the RFP
19  that Topco sent out on Giant Eagle's behalf in July of
20  2003?
21      A    You know, if this is -- if this is what
22  they gave you, I can't -- I can't independently
23  definitely verify that it does, but I have no reason
24  to say that it doesn't.
25      Q    So you can't confirm the terms or you can't

---

133

1   offer any testimony on whether this is the actual RFP?
2       A    I cannot.
3       Q    Can you offer any testimony on responses
4   you received to this RFP?
5       A    Not specific responses, no, not that I can
6   recall.
7       Q    And this RFP asks vendors to indicate
8   whether they have signed up with the UEP Animal
9   Husbandry Guidelines, correct?  I mean, is that
10  correct?
11      MS. CAIN-MANNIX:  What Bates page?
12      Q    The Bates is 1483.
13      A    Are you looking at 4(c)?
14      Q    4(a).
15      A    4(a), it does say that.
16      Q    Okay.  And it specifically asks, "If yes,
17  what, if any, costs are included in this proposal"; is
18  that correct?
19      A    It does.
20      Q    And that would be the costs of
21  participating in the Animal Husbandry Guidelines?
22      MS. CAIN-MANNIX:  Objection to form.
23      Q    Do you understand my question?
24      A    You're asking if that line refers to -- the
25  4(b) refers to 4(a)?

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

35 (Pages 134 to 137)

---

134

1  Q   Correct.
2  A   Right.  It appears to.
3  Q   And the price codes were to be off the
4  Thursday, July 3, 2003 Midwest Urner Barry market; is
5  that right?
6  A   Where are you seeing that?
7  MS. CAIN-MANNIX:  Three.
8  A   Yeah.  That's what it says, yes.
9  Q   Can you testify in any way as to who at
10 Giant Eagle selected this type of price quote?
11 A   No.
12 Q   Can you offer any testimony on which
13 potential bidders the RFP was sent to?
14 A   No, I don't recall.
15 Q   Could you offer any testimony on which
16 entities submitted bids?
17 A   No.
18 Q   But you were the individual at Giant
19 Eagle --
20 A   I would have been the --
21 Q   -- responsible for this RFP, correct?
22 A   Yes, ma'am.
23 Q   And you've been designated to provide
24 corporate testimony with respect to your egg
25 purchases, correct?

---

136

1  Q   I'm sorry.  Can you say that again?
2  A   It appears that they are saying that that
3  is included in the cost.  Whatever they're bidding,
4  it's included in there.
5  Q   If you look at Exhibit 14, it is the Weaver
6  Brothers response dated July 14th, wherein 4(b) it
7  states, "Current cost increases included".  Do you see
8  that?
9  A   I do.
10 Q   And this is Weaver Brothers's submission,
11 correct?
12 A   Yes.
13 Q   So Exhibit 15 is Hillandale's submission,
14 correct?
15 A   Correct.
16 Q   Which indicates a one cent per dozen cost
17 on 4(b), correct?
18 A   It does.
19 Q   And there is no statement on Hillandale's
20 submission about costs being included, is there?
21 MS. CAIN-MANNIX:  Objection to form to the
22 extent they were included is in 4(b).
23 Q   Are you confusing the two submissions, sir?
24 I understood your question to --
25 A   No, I don't think I am.  I mean, reading

---

135

1  A   Yes, ma'am.
2  (Thereupon, Deposition Exhibit No. 15 was
3  marked for identification.)
4  Q   I'm handing you what has been marked as
5  Exhibit 15.  Exhibit 15 is Hillandale Farms's July 18,
6  2003 response to your July 2003 RFP, correct?
7  A   Yes.
8  Q   And in 4(a), Hillandale indicated yes to
9  the question of whether the company has signed up with
10 United Egg Producers Animal Husbandry Guidelines,
11 correct?
12 A   Yes.
13 Q   And in 4(b), they state that the costs
14 included in this proposal are one cent per dozen,
15 correct?
16 A   Correct.
17 Q   Hillandale, so Hillandale's submission
18 had -- is that a one cent per dozen surcharge of sorts
19 for the UEP program?
20 MS. CAIN-MANNIX:  Objection to form.
21 Q   What is your understanding of that one cent
22 per dozen?
23 A   I don't know for sure.  It appears that
24 it's the same as the previous one where we're saying
25 that that's included in the cost of the bid.

---

137

1  these, it seems to me that it's just an interpretation
2  issue of how they're answering the question.  That's
3  what it appears to me to be, but I don't know that for
4  sure.  I wasn't involved with this process, but that's
5  what it appears to me to be.
6  Q   I'm sorry.  What do you mean you weren't
7  involved in this process?
8  A   I wasn't involved.  I wasn't involved in
9  sending this thing out from Larry.
10 Q   You weren't involved in sending out the
11 RFP?
12 A   I think I said earlier that Larry sent that
13 on our behalf from Topco.  I don't recall specifically
14 reviewing these papers and having this particular
15 question come up previously.  I'm just -- maybe I
16 shouldn't be interpreting, but it looks to me like
17 he's including it on this side and he's saying that
18 that cent per dozen is in that number.
19 Q   When you're pointing out he's including it
20 on this side, which exhibit are you looking at?
21 A   I'm sorry.  The Weaver side seems to be
22 that they're including whatever cost they're referring
23 to in the number, and the Hillandale side, they're
24 just pulling it out, but it's included in the number.
25 That's how I'm interpreting it.

---

HIGHLY CONFIDENTIAL

Moran, Paul                                            May 20, 2014

36 (Pages 138 to 141)

---

**138**

1  Q    So your interpretation of these two
2  documents is they both have some cost in 4(b) related
3  to their participation in the UEP Certified Program;
4  is that correct?
5  A    Based on these sheets, that's what it
6  appears to be.
7  Q    Is it your understanding that there was an
8  increased cost --
9  A    I don't recall that.
10 Q    -- to egg producers to participate in the
11 UEP Certified Program?
12 A    I do not recall it specifically.
13 Q    Do you recall it generally?
14 A    I don't recall a specific conversation
15 around that impact.
16 Q    Do you recall any general conversations
17 around the impact of the UEP Certified Program on the
18 price you paid for eggs?
19 A    So I think that -- I don't recall a
20 specific conversation.  I can -- as I said earlier, I
21 can remember -- the only thing I remember specifically
22 about the UEP program was around the cage sizes and
23 the fact that if there was going to be a cost impact
24 related to it, it could be because there are less hens
25 in the house, right, and therefore, less supply, and

---

**139**

1  therefore, the cost might change.  That's my
2  recollection of it.
3  Q    You stated if there was going to be a cost
4  impact.  Was your recollection that there was a cost
5  impact?
6  A    I don't have any recollection of that at
7  all.
8  Q    So you can offer no testimony on behalf of
9  Giant Eagle with respect to the impact of the UEP
10 Certified Program on the price you paid for eggs; is
11 that right?
12       MS. CAIN-MANNIX:  Wait a minute.  Objection
13 to form to the extent he's not an economist, but
14 he may offer testimony to the extent --
15 Q    I'm not asking for expert testimony from
16 you, sir.  I'm asking as the gentleman whose
17 responsibility included the purchase of eggs at Giant
18 Eagle for more than a decade, can you offer any
19 testimony about the impact of the UEP Certified
20 Program on the price Giant Eagle paid for eggs?
21 A    No.
22 Q    Who evaluated the responses received to the
23 July 2003 RFP?
24 A    I don't recall specifically.  The process
25 would have been that Larry or somebody at Topco would

---

**140**

1  have received them back, and at some point, we would
2  have had a call probably to review them.
3       (Thereupon, Deposition Exhibit Nos. 16 and
4  17 were marked for identification.)
5  Q    I'm going to hand you two documents,
6  Mr. Moran, that have been marked Exhibits 16 and 17.
7  I just wrote 16 on the top so you would know.
8       Exhibit 16 is a fax to Larry Rife from Gary
9  Bethel, July 18, 2003 stating, "Following is my new
10 Giant Eagle pricing."  Do you see that?
11 A    I do.
12 Q    Do you recognize the pages behind it, which
13 are entitled Giant Eagle Egg Quote?
14 A    I have seen these.
15 Q    And is this Hillandale Farms's submission
16 to Topco in response to the 7-18-2003 RFP?
17 A    It appears to be.
18 Q    And further into this document is a letter.
19 It's Bates number that ends in 1486.  It is an
20 August 15, 2003 -- I'm not sure if you would call this
21 a letter or a memo, but it's to Larry Rife from Tim
22 Weaver.  Do you see that?
23 A    I do.
24 Q    It states, "I'm writing to confirm that the
25 Topco volume incentive agreement and the corresponding

---

**141**

1  incentive payments are applicable in our company's bid
2  for Giant Eagle."  Do you see that?
3  A    I do.
4  Q    What is Topco's volume incentive agreement?
5  A    I don't know.
6  Q    Do you have any knowledge of a volume
7  incentive agreement or corresponding incentive
8  payments?
9  A    I don't.  I do not.
10 Q    Who at Giant Eagle would know that?
11 A    I don't know.  I'm not sure if anybody
12 would.
13 Q    Did Weaver Brothers have an agreement with
14 Topco outside of its written agreement with Giant
15 Eagle?
16 A    I don't know.
17 Q    If they did, would you be likely to know
18 that?
19 A    I don't know.
20 Q    If Mr. Rife had a volume incentive
21 agreement with your suppliers, would that have been
22 part of your agreement with your suppliers?
23 A    I don't know enough about it to have a
24 response to it.  I just don't know the answer.
25 Q    Who at Giant Eagle would know about your

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

37 (Pages 142 to 145)

### 142

1  agreement with Topco?
2      A   Well, I got the information that I received
3  that I gave you earlier from Rick Lichtenfels.
4      Q   And that was the statement that you had an
5  annual dividend.  Is that the information to which
6  your referring?
7      A   Yes, ma'am.
8      Q   Did you speak to any other --
9      A   It wasn't really a dividend.  It was more
10 of a rebate but --
11     Q   Did ask Mr. Lichtenfels anything else about
12 the Topco agreement?
13     A   I did not.
14     Q   And the next page of this fax appears to be
15 another copy of the Weaver Brothers July 14th
16 submission to the RFP.  Is that correct?
17     A   It does.
18     Q   And Exhibit 17 is a fax dated August 19,
19 2003, again, from Mr. Bethel to Larry Fife, correct?
20     A   Correct.
21     MS. CAIN-MANNIX:  Larry Rife.
22     Q   Larry.
23     A   Rife.
24     Q   Rife.  What did I say?
25     A   Fife.

### 143

1      Q   Forgive me.  I have a partner named Fife.
2          And this is a two-page document with a
3  cover sheet that appears to be a revised Giant Eagle
4  Egg Quote from Hillandale Farms.  Is that correct?
5      A   It does.
6      Q   And the handwriting I guess it would be on
7  the bottom right states, "Additional promotional
8  allowance of one cent per dozen, two to three times
9  per year."  Do you have any understanding of what that
10 means?
11     A   I don't recall that specifically.  It could
12 be something that they were talking about to help in
13 the running of promotions.  Obviously, since it's a
14 promotional allowance, I don't specifically recall it.
15 I don't specifically remember ever using it.
16     Q   What is a promotional allowance?
17     A   So if you have potentially a 15-cent back
18 of market, maybe they gave you 16 cents for one week
19 to help you get to a cost that you can run a retail
20 end promotion.
21     Q   It's just another form of discount?
22     A   It's like an OI, a roll back.  You know, it
23 helps you get to a lower cost for a specified period
24 of time so that you could potentially do some
25 promotional activity.

### 144

1      Q   Is there a requirement that you use that
2  extra one cents on advertising?
3      A   I don't -- I do not specifically recall
4  this program.  It can vary by vendor.  If you're
5  talking generally, that's negotiated really
6  vendor-by-vendor and week-to-week really.
7          (Thereupon, Deposition Exhibit No. 18 was
8  marked for identification.)
9      Q   I'm handing you what has been marked
10 Exhibit 18, which is an email from Larry Rife to you
11 dated September 5, 2003, correct?
12     A   Correct.
13     Q   The subject line is Giant Eagle Egg Review;
14 is that correct?
15     A   It does -- that's what it says.
16     Q   In the first line, Mr. Rife refers to a
17 meeting in August.  Do you see that?
18     A   I do.
19     Q   Do you recall a meeting with Mr. Rife on
20 August 20, 2003?
21     A   I do not recall that meeting.
22     Q   Would that have been a meeting to review
23 the responses to the July 2003 RFP?
24     A   Total speculation, it certainly is
25 reasonable to think that, but I can't recall that

### 145

1  specific meeting.
2      Q   Did you sit down with Mr. Rife at any point
3  to review the responses to the RFP?
4      A   I don't recall specifically doing it.
5      Q   Did Giant Eagle review the responses to the
6  RFP?
7      A   I am sure that those responses were
8  reviewed probably by me at some point, yes.
9      Q   The first paragraph numbered one, Mr. Rife
10 refers to Moark.  Do you see that?
11     A   I do.
12     Q   Who is Moark?
13     A   Moark was another vendor that was bidding
14 on the business I believe at the time.
15     Q   Did Moark submit a written response to your
16 RFP?
17     A   I don't know.
18     Q   Do you have an understanding of the
19 reference to a USDA Shielded Program on the bottom
20 under -- next to Paragraph letter A?
21     A   Yeah.  We didn't partake in that to the
22 best of my recollection.  I think they were just --
23 that was just an option that they threw out there for
24 us.
25     Q   Do you know what it is?

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

38 (Pages 146 to 149)

---

146

A    I'm not an expert at it.  You get USDA
Shield on your cart, and then theoretically I guess
that the USDA would like to believe that that means
something to the customer, but it costs X amount of
money to get it.  I don't remember.  I don't recall
the exact cost of it, and I don't remember specific
conversations, but I don't believe we ever did it.
Q    Do you recall what you would have to do to
get that shield or does anybody that paid the cost get
it?
A    I think anybody that -- well, I think they
had to pass certain requirements from a quality
standpoint at the plants.
Q    Food safety requirements?
A    I don't remember specifically the
requirements.
Q    And who at Giant Eagle would have decided
whether or not to place a USDA Shield on the cart?
A    Well, it would have come through me.
Q    But you have no recollection of it?
A    I don't have a specific recollection of
that conversation, but that came up periodically where
we knew that was available, and I think we just as we
went down the road we decided not to partake in it
because we didn't necessarily think that consumers

---

147

were looking for it.
Q    If you go in two pages, there is a
three-page table entitled GE Egg Program Vendor
Quote Comparisons.  Do you see that?
A    I do.
Q    What are these tables?
A    Well, it appears that they are comparing
different methods that we could potentially be
bringing eggs in.  So one of them is where we pick --
two on the bottom is where we would in theory
back haul it, so we would pay the transportation
costs.  The two on top is where they're delivering
it.  I don't recall the difference to be honest with
you between the bulk load and the pallet rate and what
the distinction there was.  I don't remember.
Q    You'll note at the top it's highlighted,
the first page says Pactiv cartons.  The second page
says Hartmann cartons.  The third page say Dolco
cartons.  What is that referring to?
A    So there were different companies that
potentially could do the egg cartons basically, and
part of Topco's role was to negotiate with those
companies to try to get the best cost on egg cartons.
And so when they did these bids, they not
only did the bid across the egg suppliers, they also

---

148

the bid at the same of looking at the egg carton
suppliers and then matched the programs up.
Q    So this is an analysis -- is it fair to say
that this is a comparison of the various RFP responses
that Larry Rife sent to you?
A    That's what it appears to be.
Q    Who selected which vendors would win that
RFP?
A    At the end of the day, I was heavily
involved.  I suspect at the time I was also talking to
people that I reported to just to make sure that there
was alignment around the decision.
Q    Who would have had the ability to say yes
or no?
A    All of us.  I mean, John Tedesco at the
time was the senior VP in merchandising.  Ray Smaltz
was the VP who I reported to, and myself.  I don't
recall a specific process that we went through there.
Typically, on something this big, I would
gather the information, make the recommendations based
on what Topco fed me back and we would meet with them
at some point and say here's what we're thinking.  Yes
or no?  Do you have any questions?  We might go back
to Topco and say, hey, did your guys ever think about
ABC?  They might go back and throw some things back or

---

149

they might say, great, go with it, right.
And in this particular case, I believe for
whatever reason -- I don't remember the specifics of
it -- we decided to just keep the business with
Hillandale and Weaver.
Q    And can you offer any testimony on any
discussions that you would have had with John and --
A    Ray.
Q    -- Ray around the July 2003 RFP?
A    I do not recall specific conversations on
that, no.
Q    Can you offer any testimony in general
about those conversations?
A    I just don't recall any specific
conversations.
Q    And at the conclusion of the July 2003 RFP
process, Giant Eagle did not move its egg purchases;
is that correct?
A    Yes, that is correct.
Q    Did you enter into new written agreements
with Hillandale and Weaver?
A    I don't know that we had a formal contract
with them.  I don't recall that we did or didn't.  I
think we just move -- we just let the business
continue as it was.

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

39 (Pages 150 to 153)

---

150

1     (Thereupon, Deposition Exhibit No. 19 was
2   marked for identification.)
3     Q   I'm going to hand you what has been marked
4 Exhibit 19, which is a letter from Topco to Tim Weaver
5 at Weaver Brothers, correct, dated September 30, 2003?
6     A   It is.
7     Q   And this letter confirms that Giant Eagle
8 and Topco have awarded the Giant Eagle Egg Program for
9 the Cleveland warehouse to Weaver Brothers; is that
10 correct?
11     A   Correct.
12     Q   And the life of the agreement will be for
13 one year beginning October 2, 2003; is that correct?
14     A   That's what it says.
15     Q   Okay. In the third bullet underneath the
16 details of the program and pricing are as follows: It
17 states, "This program is a non-USDA Shielded Program,
18 as well as a UEP Certified Animal Husbandry Program";
19 is that correct?
20     A   That is correct.
21     Q   And does this letter reflect the terms
22 Of your purchases from Weaver Brothers as of
23 September 30, 2003?
24     A   It appears to.
25     (Thereupon, Deposition Exhibit No. 20 was

---

151

1     marked for identification.)
2     Q   I'm going to hand you what I'm marking as
3 Exhibit 20, which is a Product Supplier Agreement.
4 The date -- excuse me. Between Topco and Weaver
5 Brothers, the date which is kind of in tiny little
6 letters on the bottom left is July 28, 2003. Do you
7 see that?
8     A   I do.
9     Q   Is this the agreement for the purchase of
10 shell eggs from Weaver Brothers for Giant Eagle?
11     A   It appears to be.
12     Q   And let me correct because -- I'm sorry --
13 I misstated. The date, the signed date on the last
14 page is actually two dates, in February and March of
15 2004?
16     A   I'm sorry. What page is that on?
17     Q   The very last page.
18     MS. CAIN-MANNIX: On the back.
19     Q   On back on the signature blocks.
20     A   Okay. I got it. I'm sorry. I got it.
21 Yeah, I see it.
22     Q   Those are actually dated in 2004 despite
23 the fact that the very first page of the document --
24     A   Yeah.
25     Q   -- refers to the agreement being made and

---

152

1 entered into as of October 16, 2003.
2     A   It speaks more to the efficiency of our
3 process than anything.
4     (Thereupon, Deposition Exhibit No. 21 was
5   marked for identification.)
6     Q   Let me hand you now what I'm marking as
7 Exhibit 21. And is this the product supplier
8 agreement for your purchase of shell eggs from
9 Hillandale?
10     A   Again, it appears to be.
11     MS. CAIN-MANNIX: Take your time if you
12 want to look.
13     Q   Yes, please. I just really wanted to make
14 sure that these were the written agreements that were
15 in place.
16     A   This one is not signed.
17     MS. CAIN-MANNIX: Carrie, do you have one
18 that's signed?
19     Q   I do not know.
20     Do you know whether one was -- whether one
21 was actually ever executed, Mr. Moran?
22     A   I don't. I don't recall that.
23     Q   And if you compare Exhibits 20 and 21,
24 these appear to the same supplier agreement, the form
25 of agreement?

---

153

1     MS. CAIN-MANNIX: Take your time.
2     A   I would probably have to sit down and lay
3 these side-by-side for a while to really give you a
4 definitive answer on that but --
5     MS. CAIN-MANNIX: I just want to note for
6 the record that this appears to apply to several
7 chains, the Hillandale one, K-VA-T, Penn Traffic,
8 PDI/Hy-Vee, Albrecht, Giant Eagle, GNC Foods and
9 Palmer Foods.
10     Q   I believe the documents can speak for
11 themselves, but if you look at the first Exhibit 20,
12 it also refers to multiple --
13     A   Yeah.
14     Q   Topco appears to have supplier
15 agreements --
16     A   Yeah. These are --
17     Q   -- on behalf of numerous co-op members?
18     A   Correct. These are -- because it doesn't
19 appear to me that we signed these at all. It appears
20 both of these -- at least this one appears to be an
21 agreement between Topco and Weaver on our behalf.
22     Q   Right. That's because your purchases go
23 through Topco, correct?
24     A   Correct.
25     Q   So the Topco supplier agreement with Weaver

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

40 (Pages 154 to 157)

---

154

1  Brothers applies not just to Giant Eagle, but also to
2  Meijer?
3          MS. CAIN-MANNIX: Objection to the form.
4      Q   Is that correct.
5          MS. CAIN-MANNIX: He's not a representative
6  from Meijer.
7      A   I have no idea.
8      Q   Meijer is listed on Page 2 of the --
9          MS. CAIN-MANNIX: He can --
10     Q   -- Weaver Brothers agreement; is that
11 right?
12         MS. CAIN-MANNIX: Let me just interpose an
13 objection. He's here as a 30(b)(6) for Giant
14 Eagle. If he has personal knowledge about this
15 Meijer/Topco relationship, he can offer it.
16     A   I mean, I think that's what --
17     Q   I'm asking you what the document says.
18 It's right in front of you, so I think if you don't
19 have personal knowledge, you can quickly look at it
20 and ascertain.
21     A   Well, I mean, it's a new document. It's
22 accurate. That's what it appears to say, yes.
23     Q   That's what it appears to say --
24     A   That's what it says.
25     Q   -- or that's what it says, right?

---

155

1      A   That's what it says. It says it's for
2  Meijer and Giant Eagle, yes.
3      Q   Is it in your experience with Topco
4  traditional for them or normal for them to enter into
5  product supplier agreements on behalf of multiple
6  co-op members?
7      A   I don't know. Those are the question -- I
8  have not been overly involved with Topco's Product
9  Supplier Agreements in my career at all. I wouldn't
10 be able to be comfortable answer questions on what --
11     Q   Would Topco send you copies of their
12 supplier agreements entered into on your behalf?
13     A   I don't recall getting them.
14     Q   Ever?
15     A   I don't recall. I'm not saying we didn't
16 and I'm not saying some people didn't. I don't recall
17 getting these documents specifically.
18     Q   Okay. So can you offer any testimony as to
19 the written agreement entered into on behalf of Giant
20 Eagle by Topco with your egg suppliers in 2003 or
21 2004?
22         MS. CAIN-MANNIX: Objection to the form of
23 the question.
24     Q   Do you understand my question or were you
25 confused by it?

---

156

1      A   Well, no, I'm not confused. I'm just
2  trying to understand it I guess more than anything.
3  In terms of the specific agreement that Topco may have
4  had from an umbrella perspective across multiple
5  retailers, I'm not familiar with it at all. What I'm
6  familiar with is the conversations and the
7  communication that I had specific to Topco, specific
8  to the programs that we documented earlier that lay
9  out the specifics of the Giant Eagle program.
10     Q   I don't want to keep asking you questions
11 you can't answer, so what I'm trying to ascertain is
12 whether you can offer testimony on behalf of Giant
13 Eagle with respect to the actual terms of the
14 agreement and the written agreement that was entered
15 into for Giant Eagle's egg purchases in 2003 or 2004,
16 and if the answer is no, I will move on. I just want
17 to ask the question.
18         MS. CAIN-MANNIX: Objection to the extent
19 it assumes there was a written agreement other
20 than the supplier agreement.
21     A   To the best of my knowledge, there was no
22 written agreement directly between us that we signed
23 as a contract.
24     Q   When you purchase products through Topco,
25 sir, do you typically enter into written agreements or

---

157

1  does Topco do it on your behalf?
2      A   I think that -- I think it's a conversation
3  we need to have with Topco. I am not familiar with
4  signed contracts that we have had even with Topco
5  agreements. If Topco has contracts signed, it's
6  typically between Topco and the supplier. We
7  historically have not signed formal contracts with
8  these guys.
9      Q   So you cannot testify on behalf of Giant
10 Eagle today whether there was or was not a written
11 agreement for the purchase of eggs in 2003; is that
12 right?
13         MS. CAIN-MANNIX: Objection to the form.
14     A   What I'm saying is that I do not recall
15 any written agreement. I don't believe one existed,
16 but I guess without going back and doing research, I'm
17 not aware. I don't believe one existed, so I don't
18 think that exists, but I do not recall any specific
19 contracts that we had related to these agreements.
20     Q   I understand. But to be very clear, what I
21 am seeking from you is testimony as Giant Eagle's
22 corporate representative and the question is --
23         MS. CAIN-MANNIX: Asked and answered.
24     Q   -- was there an agreement or not?
25         MS. CAIN-MANNIX: Objection. Asked and

---

HIGHLY CONFIDENTIAL

Moran, Paul                                      May 20, 2014

41 (Pages 158 to 161)

---

158

answered.
Q     You have form and foundation.  That's it.
Can you answer the question?  It's a yes or
no.
      MS. CAIN-MANNIX:  Objection to the form.
A     I guess I'm struggling to answer that
question.  I think I -- I thought I did.
Q     What you told me is you don't recall it, so
I am confirming that you cannot testify --
A     That's true.  I can --
      MS. CAIN-MANNIX:  I'm objecting.
Q     Let me finish my question.
A     Okay.  I'm sorry.
Q     I'm confirming that you cannot testify as a
corporate representative of Giant Eagle as to whether
or not Giant Eagle had a written agreement for the
purchase of eggs in 2003?
      MS. CAIN-MANNIX:  And I'm objecting to the
form of that question.  I think it's a misleading
question.
Q     You can ask -- you have objected.  We don't
need the speaking objections.
      Do you understand my question or should I
read it back?
A     Read it back one more time.

---

159

Q     I will read it back.
A     Okay.
Q     I'm confirming that you cannot testify as a
corporate representative of Giant Eagle as to whether
or not Giant Eagle had a written agreement for the
purchase of eggs in 2003?  That's it.
A     I'll say no, but you have already heard my
qualifier on that.
Q     There is no qualifier, sir.  What is the
qualifier?  Can you or can you not --
      MS. CAIN-MANNIX:  Let him testify.  He's
able to finish his answer.
A     The answer is that I can't -- I'll say no
because I don't recall a specific contract that we
signed.  That's why I'm saying no.  I'm not
definitively saying that one didn't exist.
Q     I understand that.  I'm not asking you to
definitively say.  What I'm asking you is can you
definitively say and I believe that you cannot?
A     So no.
      (Thereupon, Deposition Exhibit No. 22 was
marked for identification.)
Q     I'm handing you a document that has been
marked as Exhibit 22.  This is an email chain between
you and Larry Rife which begins on the end -- of

---

160

course, in the emails, we're starting at the bottom of
the page.  It begins on February 1, 2005 and goes up
to February 2, 2005 at which point Larry Rife forwards
it to Tim Weaver, TweaverWBI@earthlink.net.  Do you
see that?
A     I do.
Q     Do you recall this email exchange?
A     I don't specifically recall this email
exchange.  After reading it, I think I understand what
it is.
Q     What is it?
A     They are trying to get a penny -- it looks
like Weaver was trying to get a penny a dozen
adjustment to the back from market based on packaging
costs, and we were basically saying we didn't want to
do that.
Q     Do you recall if you did?
A     I do not.
      (Thereupon, Deposition Exhibit No. 23 was
marked for identification.)
Q     I'm going to hand you what has been marked
as 23, and Exhibit 23 is an email with a letter from
Joseph Zabat, dairy department, Topco Associates, LLC
dated April 15, 2005.  Do you see that?
A     I do.

---

161

Q     The subject line is Giant Eagle Egg Program
Bid Information.  Do you see that?
A     Yes.
Q     Did Giant Eagle put the egg purchases back
out for bid in April of 2005?
A     Again, I don't recall the specifics of it;
but apparently, based on things I have seen, we did.
Q     And can you offer any testimony on why
Giant Eagle decided to issue another RFP in 2005?
A     I don't recall.
Q     Can you offer any testimony on to whom this
RFP was sent?
A     I do not recall.
Q     And so you cannot offer any testimony on
it, correct?
A     I cannot.
      MS. CAIN-MANNIX:  Object to the form of the
question.
Q     Can you offer any testimony onto whom --
I'm sorry.  Maybe I just asked you this -- this 2005
RFP was sent?
A     You're asking me who?
Q     Who it went to?
A     What vendors we sent it to --
Q     Yes.

---

---

**162**

A -- is the question, correct?

Q Yes.

MS. CAIN-MANNIX: You can take a look at the document to help you refresh your recollection.

Q Actually, my question is general. It doesn't refer specifically to the document.

A I do not specifically remember who it was sent to. It would have been the same process as we did in 2003 where Topco probably would have sent that to vendors.

Q And did you discuss which vendors they should send it to in 2005?

A I don't recall -- again, I'm going to say the same thing I said earlier. I don't recall a specific conversation, but I'm sure we did at some point.

Q And Exhibit 23 is addressed to Greg Hinton at Rose Acre Farms. Do you see that?

A I do.

Q And on the fourth page entitled Giant Eagle Egg Quote Due to Topco by Monday, April 25, 2005, do you see that?

A I'm sorry. What?

Q The Bates is 5335.

---

**163**

A Okay.

Q This is the blank bid form, correct?

A I got it. Yes, it looks like it.

Q So this is what all of the vendors were asked to complete; is that correct?

A I guess so. This is again what Topco sent out, so I'm not personally involved in this particular part of the process, but it appears to be.

Q And this is -- and I'm sorry. I didn't mean to interrupt you.

A No. That's okay.

Q And Item 4 on here again includes the questions, the same questions about the UEP Certified --

A Yes.

Q --- Program that you have used with respect to the 2003 RFP?

A Yes.

(Thereupon, Deposition Exhibit No. 24 was marked for identification.)

Q I'm going to hand you Exhibit 24. Is Exhibit 24 Rose Acre's submission in response to the 2005 RFP?

A I don't recall specifically. It appears to be.

---

**164**

Q And on the third page of Rose Acre's submission, in response to 4(a), Rose Acre states that, yes, their company has signed up with the UEP Animal Husbandry Guidelines; is that correct?

A It does.

Q In 4(c), it states, "The current Giant Eagle program is a UEP Certified Program. When submitting your bids, please make sure your quote is based on a UEP program"; is that correct?

A That is correct.

(Thereupon, Deposition Exhibit No. 25 was marked for identification.)

Q I'm handing you what has been marked Exhibit 25, and is Exhibit 25 Weaver Brothers's submission in response to the July 2005 RFP?

A Yes.

Q And on the second page, Weaver Brothers checks yes next to the answer -- excuse me -- Question 4(a) as well, correct?

A Yes.

(Thereupon, Deposition Exhibit No. 26 was marked for identification.)

Q I'm handing you what's been marked Exhibit 26.

MS. CAIN-MANNIX: Can you put this one

---

**165**

aside?

Q Yes. And Exhibit 26 appears to the submission I believe it is Vande Bunte Eggs at the top. Do you see that?

A I do.

Q Have you heard of this?

A I have no idea who they are.

Q And this is in response -- again, this is the submission in response to the 2005 RFP that Topco sent on your behalf, correct?

A Yes.

(Thereupon, Deposition Exhibit No. 27 was marked for identification.)

Q Exhibit 27, this is Midwest Poultry's RFP response dated May 2, 2005; is that correct?

It's on the second line at the top.

A I'm sorry. Yeah. Yes.

(Thereupon, Deposition Exhibit No. 28 was marked for identification.)

Q And Exhibit 28, I'll hand it to you. This is Hillandale Farms's response to the 2005 RFP, correct?

A Yes.

(Thereupon, Deposition Exhibit No. 29 was marked for identification.)

HIGHLY CONFIDENTIAL

Moran, Paul                                May 20, 2014

43 (Pages 166 to 169)

---

166

1      Q    I'm handing you what I have marked as 29.
2   You know what, hand that back.  No.  You can keep it.
3         This is an email chain between Gary Bethel
4   at Hillandale Farms and Larry Rife on the bottom,
5   which then Larry Rife forwards to Joseph Zabat on the
6   top email on May 13, 2005.
7         Can you remind me who Joseph Zabat is?
8      A    Joseph I think was just an assistant -- was
9   an assistant for Larry, with Larry I believe.
10     Q    So this is a revision to the Hillandale
11  bid, which we just looked at --
12     A    Yeah.
13     Q    -- as Exhibit 28, correct?
14     A    Uh-huh.
15        MS. CAIN-MANNIX:  Did we mark that 29?
16        MS. ANDERSON:  Yes, that 29.
17        (Thereupon, Deposition Exhibit No. 30 was
18     marked for identification.)
19     Q    I'm handing you a sideways Exhibit 30.
20  Exhibit 30 is an email exchange between you and Larry
21  Rife in June of 2005, correct?
22     A    Yes.
23     Q    And in the original email at the bottom,
24  you said, "Hi, Larry.  I want to finalize eggs this
25  week.  I would also like to talk to both Gary and

---

167

1   Tim."  Do you see that?
2      A    I do.
3      Q    And does that refer to Gary Bethel at
4   Hillandale and Tim Weaver at Weaver Brothers?
5      A    I'm sure it does.
6      Q    And Mr. Rife's response refers to an
7   attached spreadsheet outlining annual savings under
8   different scenarios; is that correct?
9      A    It is.
10     Q    Do you recall this email exchange?
11     A    I do not specifically recall this email
12  exchange.
13     Q    But from this email exchange, Larry Rife
14  and you reviewed at a minimum the Weaver and
15  Hillandale responses to the 2005 RFP?
16     A    Yes.
17     Q    Correct?
18     A    Yes.
19     Q    Is it likely you reviewed other responses
20  as well?
21     A    I don't know.
22        (Thereupon, Deposition Exhibit No. 31 was
23     marked for identification.)
24     Q    And I am handing you what has been marked
25  as Exhibit 31, which is a letter to Mr. Weaver from

---

168

1   Larry Rife, you are CC'd, dated June 13, 2005.
2         And this is the confirming letter that
3   Giant Eagle and Topco have awarded the Giant Eagle Egg
4   Program for the Cleveland warehouse to Weaver
5   Brothers; is that correct?
6      A    Correct.
7      Q    There are five bullets that describe the
8   details of the program and pricing; is that right?
9      A    Yes.
10     Q    And the third bullet states that the UEP --
11  this program is a non-USDA Shielded program, as well
12  as a UEP Certified Animal Husbandry Program; is that
13  correct?
14     A    That is correct.
15     Q    And then on the back of your page is the
16  pricing that will apply to this agreement; is that
17  correct?
18     A    It appears to be, yes.
19        (Thereupon, Deposition Exhibit No. 32 was
20     marked for identification.)
21     Q    I'm handing you what I have marked as
22  Exhibit 32, which appears to be the same letter as
23  Exhibit 31 except this one is to Gary Bethel of
24  Hillandale Farms dated June 13th.  You are again CC'd.
25  Is that correct?

---

169

1      A    Yes.
2      Q    And this letter confirms that Giant Eagle
3   and Topco awarded the Giant Eagle Egg Program for the
4   Pittsburgh warehouse to Hillandale Farms; is that
5   right?
6      A    Yes.
7      Q    And it has the same five details of the
8   program and pricing that were included in the Weaver
9   Brothers letter, which was the prior exhibit; is that
10  correct?  Please feel free to put them next to each
11  other.
12     A    Yeah.  They appear to be exactly the same
13  except for the names.
14     Q    Exhibit 32 does not have the pricing matrix
15  on the back; is that correct?
16     A    It does not.
17        (Thereupon, Deposition Exhibit No. 33 was
18     marked for identification.)
19     Q    I'm handing you what has been marked as
20  Exhibit 33, which is an email exchange again between
21  you and Larry Rife on the same date as the letters
22  where Mr. Rife writes to you, "There was one
23  calculation on your spreadsheet that was incorrect.
24  Gary's current BOM for jumbo is" -- I don't know how
25  to read that out loud -- "$.0765"?

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                          May 20, 2014

44 (Pages 170 to 173)

---

170

1       A    Yeah.  7/10 of a cent instead of -- I had
2  7/10 of a cent and it should have been 7.6 cents.
3       Q    Okay.  And it states, "Revised annual
4  savings are $276,583".  Do you see that?
5       A    I do.
6       Q    And attached to it is an Excel
7  spreadsheet --
8       A    Right.
9       Q    -- that appears to delineate the pricing
10 effective for Weaver and for Hillandale; is that
11 correct?
12      A    Yes.
13      Q    What is the column that states current BOM
14 total, which is?
15      A    The one you're look.
16      Q    -- fifth over and then proposed BOM total?
17      A    That's calculating the total back of market
18 when you back factor in the volume.  This is the
19 calculation of Column A under volume and the back of
20 market current, so if you do the math on it, you get
21 the 62,000.  If you do the math on the same volume
22 with the new bid, you get the math and any difference
23 is the savings.
24      Q    Okay.  So when you put the Egg Program out
25 for RFP in 2005, you did not change vendors?

---

171

1       A    Correct.
2       Q    But you did get a lower price?
3       A    Correct.
4       Q    Is the $276,583.22 total cost of saving
5  that Mr. Rife points out, is that for what time
6  period?
7       A    It's annualized.
8       Q    Annualized, and how long were these
9  agreements?
10      A    Again, I think these agreements -- we have
11 no contract to the best of my recollection, so they
12 were kind of open ended, and it was really as long as
13 we decided until we wanted to bid it again basically,
14 which typically was in the two to three-year range.
15      Q    Why was the price that Giant Eagle was able
16 to obtain in 2005 less than it was able to obtain in
17 2003?
18      A    I don't recall.
19      Q    Do you have any recollection of those
20 negotiations?
21      A    They all kind of melt into each other.
22 I mean, they're typical of -- you know, typically,
23 when you negotiate, you go back and forth a little
24 bit.  I don't -- I don't specifically remember what
25 conversations were with Gary and Tim or Topco in that

---

172

1  particular negotiation.
2       Q    Do you have any general recollections of
3  those negotiations?
4       A    Over time, I mean, you go back and forth.
5  They'll give you an initial bid, and you may look at
6  it, and, you know, you're going to -- typically, as
7  you're negotiating, you're going to try to get
8  something a little better and you wind up kind of
9  meeting in the middle at some point.  I don't remember
10 specifically exactly how that went in that particular
11 case.
12      Q    So what you just described is how you would
13 conduct really any negotiation, right?
14      A    Yeah.  It's relatively --
15      Q    So you don't have a general recollection of
16 this --
17      A    I do not.
18      Q    -- negotiation in 2005?
19      A    I do not.
20           (Thereupon, Deposition Exhibit No. 34 was
21           marked for identification.)
22      Q    I'm handing you what has been marked as
23 Exhibit 34.  Do you know what this is?
24      A    I don't think I -- I don't believe I have
25 ever seen this before.

---

173

1       Q    And this is a Summary of Supplier Buying
2  Arrangement Form 60 with Hillandale Farms listed as
3  the supplier and Topco listed as the Topco.
4           Do you see that at the top of the page?
5       A    I do.  I do.
6       Q    And if you go beneath the address block,
7  there's a line that says check one and volume
8  incentive is checked.  Do you see that?
9       A    Yes.
10      Q    And the next row states the arrangements,
11 "This arrangement covers the following products and
12 their brands recorded under the above refund account.
13 All Topco and Topco member label fresh shelled eggs
14 and value added eggs for Giant Eagle only."  Do you
15 see that?
16      A    I do.
17      Q    And under example of payment down at the
18 bottom, it says 8 million dozen times 7.5 cents -- or
19 .75 cents equals $60,000.  Do you see that?
20      A    I do.
21      Q    And then the shaded block at the bottom,
22 "Topco and supplier agree to the terms of this volume
23 incentive arrangement shall be treated by both parties
24 as confidential."  Do you see that?
25      A    I do.

---

HIGHLY CONFIDENTIAL

Moran, Paul                                        May 20, 2014

45 (Pages 174 to 177)

---

174

1  Q   Were you aware or does this appear that
2  Hillandale is receiving a volume incentive from Topco
3  based on its sales to Giant Eagle?  Do you see that?
4       MS. CAIN-MANNIX:  Objection to the extent
5  it's not signed.
6  A   I don't know.  I don't know.
7  Q   So do you have any knowledge of Topco --
8  A   No.
9  Q   -- providing --
10      MS. CAIN-MANNIX:  Wait.
11  Q   -- incentives or rebates back to your
12 vendors based on their sales to you?
13 A   I am not aware of the specific agreement.
14 Q   Are you aware of that happening generally?
15 A   I don't recall any awareness of that.  I
16 don't recall any awareness of that.  I know that there
17 are programs in place where the rebates back to us are
18 generated at the end of the year.  I don't know -- I
19 don't know specific details of exactly how that
20 occurs.
21 Q   Right.  I'm sorry.  Let me be clear.  I'm
22 not asking about the rebates back to you.  I'm asking
23 about rebates from Topco to your vendors --
24 A   I don't know.
25 Q   -- based on the vendor's sales to you?

---

175

1  A   I don't know.
2  Q   So does Giant Eagle pay in any way money to
3  Topco to fund rebates or volume incentives back to
4  vendors?
5  A   I'm not aware of that, no.  I'm not aware
6  of anything.
7       MS. CAIN-MANNIX:  I just want to lodge an
8  objection because it says vendor will pay Topco
9  .0075 cents a dozen.
10 A   That's how I read it too.  I'm sorry.  Did
11 you say it the other way?
12      MS. CAIN-MANNIX:  Yes, so I'm confused by
13 your question frankly.
14 Q   Well, you know what, then so am I.
15 A   Yeah.  I'm reading it that they would --
16 Q   So this is a volume incentive -- well, let
17 me -- I think the answers will probably be the same
18 because I don't think you know anything about this.
19 A   Right.
20 Q   Are you aware of your vendors and Topco
21 entering into any agreements where they pay each other
22 money based on your purchases?
23 A   I'm not aware of those agreements.
24 Q   And are you aware or does Topco other than
25 the annual rebate pay Giant Eagle back any sort of

---

176

1  refunds or rebates based on its purchases?
2  A   Well, I think that all rolls up into that
3  rebate number we get that we talked about earlier.
4  Q   Do you know that?
5  A   The rebate that we get back is the only
6  thing I am aware of that we get back.
7  Q   And I don't want to characterize what you
8  told me earlier this morning, so let me just very
9  quickly ask you --
10 A   Sure.
11 Q   -- do you have an understanding of what
12 that rebate is based on?
13 A   I believe it's based on total purchases
14 that get rolled up across all of the programs, not
15 just specific to one program.
16 Q   Okay.  Has Giant Eagle issued any RFPs,
17 formal or informal, through Topco or directly since
18 this 2005 RFP?
19 A   Yes.
20 Q   When?
21 A   I believe we did it in 2008, a similar kind
22 of a process, and I could be a little wrong on the
23 dates there, but that's my recollection of it.
24     And I believe that Mr. Rohr did another
25 one.  Was it last year?  It might have been the year

---

177

1  before.  It was either '11 or '12 I believe we did the
2  same process again.
3  Q   And for the RFP in 2008, was it conducted
4  in the same way that the 2003 and 2005 RFPs were
5  conducted?
6  A   Yes.
7  Q   And do you recall were you personally
8  involved in the 2008 RFP?
9       MS. CAIN-MANNIX:  I just want to object to
10 calling it the 2008 RFP because I don't know if
11 he's certain it was in 2008.
12 Q   What would you like to call it, sir?
13 A   I mean, it's -- it's around there.  I mean,
14 I know --
15      MS. CAIN-MANNIX:  We can call it that so
16 long as the record is clear that he's not certain
17 that it's --
18 Q   Well, I think he's already clearly
19 testified to that effect, so.
20 A   We need to -- yeah.  We just need to
21 clarify the specifics of it.
22 Q   I will call it whatever you would like.
23 A   Fine.
24 Q   I'm asking you about the RFP.  The next RFP
25 chronologically you believe may have happened in 2008.

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                                  May 20, 2014

46 (Pages 178 to 181)

---

**178**

1  Were you personally involved in that?
2      A   In the same manner that I was involved in
3  '05 and '03.
4      Q   And do you recall the results of that?
5      A   The results were that Hillandale and Weaver
6  kept the business again.
7      Q   And did you get another price decrease?
8      A   I believe that we did. I don't recall the
9  details though.
10     Q   And do you recall any written documents
11 that were generated, emails, letters from you, from
12 Topco, any written material related to that RFP
13 process?
14     A   I don't recall. I mean, I don't -- I don't
15 have -- I think we gave over everything that we had.
16 I don't know. I don't know. I'm not sure what is --
17 what exists on that. I'm sure it was a very similar
18 process.
19         MS. ANDERSON: Why don't we go off the
20 record?
21         THE VIDEOGRAPHER: We are off the record.
22 The time is 12:39 p.m.
23         (Recess taken.)
24         THE VIDEOGRAPHER: We are on the record.
25 The time is 1:29 p.m.

---

**179**

1  BY MS. ANDERSON:
2      Q   Mr. Moran, earlier this morning you
3  mentioned FMI. What is FMI?
4      A   FMI is the Food Marketing Institute.
5      Q   And what is it?
6      A   It's an industry group that pulls retailers
7  together to talk about industry issues and --
8      Q   Retailers being grocery stores; is that
9  right?
10     A   I honestly don't -- I'm not -- I haven't
11 been personally overly involved with FMI, so I'm not
12 totally familiar with who all attended those meetings,
13 but I know in the course of retailers, and many of
14 them do.
15     Q   Have you ever attended an FMI meeting?
16     A   No, I have not.
17     Q   And you listed this morning three
18 executives from Giant Eagle that over the course of
19 from 1999 to 2008 you stated were on the board of FMI;
20 is that correct?
21     A   I believe they were in some manner on the
22 board. I don't know what their exact titles were, but
23 yeah.
24     Q   So Giant Eagle has been a member of FMI
25 since '99 to at least 2008; is that correct?

---

**180**

1          MS. CAIN-MANNIX: Objection.
2          Go ahead.
3      A   I don't know if I know the answer to that
4  question.
5      Q   Do you know why Giant Eagle joined FMI?
6      A   I don't.
7      Q   And do you know whether any Giant Eagle
8  employees were involved in any FMI groups or
9  committees relating to animal welfare?
10     A   They were not to the best of my knowledge.
11     Q   And how do you know that?
12     A   I had a conversation with Laura Karet, John
13 Lucot and Ray Burgo who are our three -- the three
14 people in our building that have represented us on
15 those committees, and none of them had a recollection
16 of having anything with animal welfare come up in any
17 of the sessions that they were at.
18     Q   What did they recall about Giant Eagle's
19 involvement with FMI?
20     A   We didn't get into a lot -- we asked them a
21 question about the animal welfare issue and didn't get
22 into a lot of other conversation around it, so we
23 didn't get into a lot of detail, so I don't know.
24     Q   Who is "we"?
25     A   Counsel and myself.

---

**181**

1      Q   Are you aware of any of FMI's efforts
2  relating to animal welfare?
3      A   No.
4      Q   Are you aware of any statements FMI may
5  have made about the UEP Animal Welfare Program?
6      A   I am not.
7      Q   I want to flip back to egg products, which
8  we started talking about this morning before we
9  launched into our shell egg diversion.
10         I believe you testified earlier that the
11 only egg products that Giant Eagle purchases were
12 from -- were liquid egg substitutes, branded liquid
13 egg substitutes and unbranded liquid egg substitutes
14 that you private label sold as Giant Eagle brand. Is
15 that right?
16     A   And egg whites is mixed in there too is egg
17 whites that are part of that program.
18     Q   What program?
19     A   Egg substitutes.
20     Q   Can we --
21     A   I was going to say they're in a similar
22 carton as the Egg Beaters, but they're just egg
23 whites.
24     Q   Okay. So you have branded -- I just want
25 to make sure I have all the products. You have

---

HIGHLY CONFIDENTIAL

Moran, Paul                                     May 20, 2014

47 (Pages 182 to 185)

182

branded liquid egg substitutes, which you testified you purchased from ConAgra?

A    ConAgra supplies Egg Beaters, which is really the main brand there.

Q    Okay.  And the other branded liquid egg substitute?

A    Well, we had Papetti for a while over this period of time, and which I -- which at some point I believe the brand -- this was I think after I left -- transitioned to Crystal Farms, which was a Michael-owned company.

Q    So from '99 to the present, you've had in the dairy case Egg Beaters and the Papetti/Crystal Farms brand; is that correct?

A    Different variations of the items, but generally, yes.

Q    And why do you have two of them again?

A    It's one of those things where you try to determine what consumers want.  When I was doing it, I think we felt there was enough point of difference and enough demand on the second brand to warrant carrying the second brand.

Q    Do you have a written -- does Giant Eagle have a written contract with ConAgra for the purchase of Egg Beaters --

183

A    No.

Q    -- at any point from '99 to the present?

A    No.

Q    How are the --

A    Well, let me define it.  So when you say "written contracts", not a formal purchasing agreement.  We do cut purchase orders, which effectively is a contract.

Q    Okay.  Can you walk me through the process under which the terms on which you buy Egg Beaters from ConAgra are negotiated?

A    Well, you don't really negotiate the costs.  The costs are really set on a national basis.  They determine internally what they want to sell their product at.

We then can decide whether or not we want to carry that brand, you know, based on consumer demand for the product, what they're trying to charge for it, is it -- you know, and then the difference that you may see over time is in money that is spent by the vendors on promotional activity, on different things that they might want to do to help promote that product.

In terms of what you're paying cost-wise, you're not really negotiating the cost.  That's set,

184

and it's level across the market on the national brands.

Q    So is it accurate to say they have a list price?

A    Yes.

Q    Okay.  And from '99 to the present, has Giant Eagle ever obtained a discount off the list price from ConAgra?

A    Promotional discounts, yes.

Q    Okay.  What is a promotional discount?

A    It can take a variety of forms.  You can potentially -- and I don't recall the specific nature of the ConAgra going all the way back from '99, but the various forms it can take are things like we talked about earlier.  It can be a bill back, which is you what you bill them back based on everything you purchased.

Q    Is that based on volume?  I don't mean to interrupt you.

A    It is.  It's set for every case, so if I buy one case at $10 and the bill back is 2, I buy that case at $10.  I send them a bill for $2, and they send me a check for $2.

Q    So it's rebate of sorts?

A    It's generally a promotional allowance.

185

Those are fairly uncommon.  The bill backs are fairly uncommon.

You can do it via something called account recount, which is our terminology, and that's basically you buy it and then you just bill them back on cases that you actually ship to the stores, which is a little different than what you buy.

You can do it -- and the most common by far today with technology now is something called a scan back, so those are -- that's where they pay us the money based on what we sell through our front registers.  So we'll pay the $10 case price and we will sell X number of units, and their agreement is they're going to pay us 10 cents a unit back for every one that we scan through the front register.  Generally speaking, these things are set up to support promotional activity.

Q    What do you mean they're set up to support --

A    So if we're running an ad, so let's just say the everyday price is 2.99 and we're running an ad for say 2 for $5 on a particular weekend or circular, they may give us a scan back for 50 cents a unit to run that 2 for $5 retail, so we'll set it up on our system.  It will be in the system from this date to

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

48 (Pages 186 to 189)

---

**186**

1  this date at a particular retail.  It will be in our
2  circular at the same time, and then we'll bill them
3  back for every unit that we sell in that timeframe the
4  agreed upon scan back amount.
5      Q    Is there a requirement that you have to use
6  the promotional allowance for a promotion?
7      A    Different companies are different.
8      Q    With ConAgra?
9      A    The most common -- most commonly, yeah.
10  Most commonly, yes.  You can do different -- you can
11  maybe take that money and spend it against, say,
12  demos, so maybe you want to go and do -- maybe they
13  have a brand new product that they want to get in
14  people's mouth's, right.  Maybe they decide to take
15  $5,000 and instead of spending it against an ad or
16  against a scan back, they may go spend and go to our
17  demo company and ask them to go to 100 stores and demo
18  the product.
19      So generally, that's done in collaboration
20  with category managers, and they'll kind of determine
21  collaboratively between the client or rep and our
22  category manager exactly how they want to spend that
23  money.  It's usually in the form of a trade rate.
24  They'll get back --
25      Everybody is a little different.  We never

---

**187**

1  know exactly what they have to spend, but let's just
2  say for the sake of argument that they have 20 percent
3  to spend and it gets back to our conversation earlier
4  around why is the cost of the branded ConAgra product
5  higher than a known brand.  That's where the money is,
6  so that's the money that they're now spending back to
7  help promote the brand.
8      Q    Is there a -- well, strike that.  Let me
9  back up a little bit.
10      There's no written underlying agreement
11  with ConAgra, right, master purchase agreement or
12  anything --
13      A    No.
14      Q    -- like that?
15      A    There's not.
16      Q    Explain to me the process of creating and
17  exchanging a purchase order?
18      A    Well, it's very systematized at this point.
19  We have systems, and every company I think does it a
20  little differently, but we have a system called
21  BICEPS.  It's our buying system that is -- we will go
22  and we'll just -- it's automated.  We'll go in and
23  we'll go through a process and we say, okay, here's a
24  truck load of Egg Beaters.  Here's the agreed upon
25  cost, go, and it electronically goes over to the

---

**188**

1  vendor.  They pick it up on their end.  They ship us
2  that product, and then they bill us for the product
3  based on the agreed upon timeframe and then we have to
4  pay it in the agreed upon timeframe.
5      Q    And for ConAgra for the branded Egg Beaters
6  product, the agreed upon cost to which you referred
7  would be the list price?
8      A    It could be.  It could be that.  For the
9  sake of this conversation, yes.  You know, you might
10  decide that you want to spend some of that your trade
11  rate against an everyday price, so maybe you have a
12  list cost of $20 like everybody does, but you decide
13  you want to get a dollar of that a case back every
14  day, so now you have less money to spend against
15  promotions, but maybe you can reduce your everyday
16  price.  That's what the category managers do.  That's
17  how they try to manage those categories.
18      Q    How do you know how much you have in
19  promotional allowances?
20      A    It varies vendor to vendor.
21      Q    Let's talk just about ConAgra.
22      A    Well, ConAgra I haven't personally been
23  that close to recently, but the general rule of thumb
24  is that you work with their rep.  In this particular
25  case, they are -- or they have -- I'm sorry.  They

---

**189**

1  have a representative that calls on us directly.  All
2  right.  And we'll work with that person.
3      Usually, it's more than one person.
4  Because they represent so many different lines, we'll
5  have a couple of people calling on different category
6  managers, and those people will work directly with the
7  category managers to determine how to spend that
8  money.
9      Q    How often do you think you negotiate with
10  ConAgra for a promotional allowance or any of these
11  forms of discounting that you have described?
12      A    It's an ongoing process.  I mean,
13  generally, they come to us.  We're not -- a more
14  typical process is that you'll get together, you know,
15  two, three, maybe four times a year depending on the
16  size of the vendor and what you want to do, and you'll
17  very purposely plan out how you want to spend it.  You
18  know, you want to do a particular --
19      Say you want to do a back-to-school ad in
20  the second week of August, so you're going to plan in
21  April that you're going to spend X amount of that
22  money in August against the back-to-school ad and
23  you're going to spend X amount of that money in
24  November against the Thanksgiving ad and so on,
25  Christmas, and you try to plan for across the year.

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                        May 20, 2014

49 (Pages 190 to 193)

190

1    You have to monitor it though because the
2  projections aren't necessarily what exactly happens
3  all the time, so you're constantly sort of
4  re-evaluating that and going back and seeing, okay,
5  where do we stand, how did we do on the last one, are
6  we over spent, are we under spent, do we need to make
7  adjustments down the road.
8         And you know, what the goal is to try to
9  drive the business forward as much as possible, but do
10 it within the parameters of what they're allowed to
11 spend.
12    Q    Are the agreements that you reached with
13 the ConAgra sales rep on how much Giant Eagle will get
14 in promotional allowances for a given time period, are
15 those ever reduced to writing?
16    A    Yeah. They're on deal sheets.
17    Q    What is a deal sheet?
18    A    Well, we're actually in the process of
19 transitioning this also. It used to be a very manual
20 process where people would actually have to physically
21 write down on a sheet of paper, and we had to
22 formalize them. You know, there was a spreadsheet
23 basically.
24         And now we're in the process of
25 transitioning that over to a system we call Deal

191

1  Central where now they can go in from their computer
2  in their offices or on their home or wherever they're
3  logging on for them and they can input this data right
4  into our system, and we consider -- and they
5  electronically sign it, and we consider that their
6  contract to us.
7         So now they've given us a contract and we
8  can choose to accept it or reject it. If we accept
9  it, we are then under an obligation to abide by
10 whatever is on there, so what's on there might be
11 we're going to run an ad from this date to this date
12 and we're going to run -- well, no. We're not talking
13 about --
14         You know, they can make suggestions on
15 retails. We'll determine the retail that it's going
16 to run at. We're going to take that information and
17 we're going to put it into the ad and then we're going
18 to go then potentially back for either the scan back,
19 we might bill them an add fee. That's part of it
20 also. All that money rolls up into income, their
21 revenue.
22    Q    So when you were the category manager for
23 dairy, would you have had the deal sheets related to
24 Egg Beaters?
25    A    Yes. That would have been manual at that

192

1  point when I was doing it.
2    Q    Right. From '99 to 2008?
3    A    Well, I'm not sure about how far back our
4  system would go. We would have received them at some
5  point. Whether they're still available or whether
6  they were in the documentation provided, I really
7  don't know.
8    Q    Do you have with ConAgra some sort of
9  invoicing true-up for lack of a better word on, like,
10 an annual basis or a periodic basis?
11    A    Define what you mean by true-up.
12    Q    Where you sit and you basically say this is
13 what you committed to us over the course of, say, a
14 year and this is what we spent?
15    A    Yeah. It's not really that simple because
16 a lot of these vendors are on sort of what they call a
17 live accrual, which means that you can spend based on
18 what you are currently buying. So you can plan, but
19 what you're planning on spending in January may or may
20 not be what you actually spend at end of December
21 depending on how much product you buy from them,
22 right.
23         So yes, there's an ongoing process where
24 the representative will meet with category managers to
25 try to make sure that that number is as close as

193

1  possible. It's never perfect. Nobody ever comes in
2  exactly at zero, but they are held accountable for
3  keeping it within some reasonable range of that
4  number.
5    Q    The second brand, putting Egg Beaters to
6  the side, that you testified Giant Eagle purchased and
7  sold was an egg substitute product from Papetti and
8  then subsequently Crystal Farms. It's all owned by
9  Michael Foods. What was that brand?
10    A    It was Papetti, and then I think the
11 brand -- and again, I'm a little hazy on the exact
12 dates here, but I think at some point they
13 transitioned into Crystal Farms, and that was the
14 brand.
15    Q    Did you have a written agreement with
16 Papetti?
17    A    The process would be exactly the same
18 with -- really with any national brand.
19    Q    So again, it was a list price, they give
20 you a list price --
21    A    Correct.
22    Q    -- which you paid, but promotional
23 allowances or bill backs or recounts or scan backs
24 could be negotiated --
25    A    Absolutely.

HIGHLY CONFIDENTIAL

Moran, Paul                                          May 20, 2014

50 (Pages 194 to 197)

---

**194**

Q   -- during periodic meetings with the sales rep?

A   Correct.

Q   Were there any other liquid substitute products that Giant Eagle purchased?

A   I'm sure there were.  There's not any specifics coming to my mind right now.  I mean, we had -- I think we tested an organic egg substitute for a period of time I think maybe from Horizon.  It didn't do all that well and we wound up discontinuing it.

And that kind of gets back to what I was talking about earlier about us bringing items in and discontinuing them sort of on an ongoing basis, so you try things and if they don't work, you get out of them.  So I'm sure there are brands that aren't popping into my head that were in the case at some point or another.

Q   At any point from 1999 to the present, did Giant Eagle purchase any egg products or shell eggs from Rose Acre Farms?

MS. CAIN-MANNIX:  What was the time period?

Q   '99 to the present.

A   To the present, yes.  Our liquid egg program now is with Rose Acre since November of 2011.

---

**195**

That was a program that replaced the ConAgra program that was in place prior to that.  ConAgra decided to stop making the product.

Q   If you can turn to the Complaint which is Exhibit No. 2 I believe?

A   Yeah, I have it.

Q   Can you look on Page 7?  I'm sorry.  Actually, Page 6, Paragraph 15.  It states, "During the relevant period Giant Eagle used Topco as its agent for purchasing shell eggs."

A   I'm sorry.  I'm on the wrong page.  I'm sorry.

MS. CAIN-MANNIX:  What page, Carrie?

Q   6, Paragraph 15.

A   Okay.  Got it.

Q   "Giant Eagle used Topco as its agent for purchasing shell eggs," correct?

A   Uh-huh.

Q   And if you turn the page on Paragraph 17, "Giant Eagle purchased egg products both directly from Defendant Michael Foods and through ConAgra Foods," do you see that?

A   Yes.

Q   Where did the -- I think you testified earlier today that you bought the ConAgra -- a ConAgra

---

**196**

liquid product through Topco.  Is that correct?

A   An owned brand product, an owned brand product.  Giant Eagle brand.

Q   But it is a liquid egg product purchased through Topco?

A   Yes, through the owned brand through the Giant Eagle program.  To Topco, that was one of the -- that was one of the categories that Topco was helping to coordinate.

Q   And what exactly is that product?

A   It's Egg Beaters.

Q   So it's an egg, it's liquid egg substitute?

A   Uh-huh, yes.

Q   Was there a written agreement with ConAgra for this product?

A   I don't -- I am not aware of any written agreement that we have with them specific.

Q   Would ConAgra have had a written agreement with Topco for sales to Giant Eagle?

A   I don't know that for sure.

Q   Can you offer any testimony about the negotiation of the agreement for the purchase of liquid egg substitute from ConAgra through Topco?

MS. CAIN-MANNIX:  Objection to the form of the question.

---

**197**

Q   Do you understand?

A   I'll say no.

Q   And do you know how that was priced?  I'm assuming the answer to that is already no but --

A   No, not specifically.

Q   Do you know generally?

A   Well, I'm sure when -- and similar to the way they go -- I'm sure the process was when we went through with those guys as we went through with regular eggs where at some point we decided we need to be in that business, and at some point, Topco came to us and said here are your options, here are the costs.  We recommend that you do A or B, and we looked at the cost and we may have gone so far as to sample the product and, you know, go through that whole process and going back to them and said, okay, go, and we're going to bring this in as our own brand.

Q   Do you know when you entered into this agreement with -- when you started selling this product?

A   I don't recall.

Q   Was it after 1999?

A   I don't recall.

Q   So you don't know when -- how long this product has been in the dairy case?

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

51 (Pages 198 to 201)

---

**198**

1  A    Well, the ConAgra product no longer is in
2  the dairy case.  That's the one we moved to Rose Acre,
3  but I do not recall how long it was in there.
4  Q    Was it there for your duration as the
5  category manager?
6  A    I don't -- I'm going to have to say I don't
7  recall because there was some changes there that I
8  know I'm not going to remember completely.
9  Q    Do you remember some of them partially?
10  A    There may have been another vendor
11  involved.  I honestly don't -- I don't recall the
12  specifics of the path that the egg substitutes took in
13  terms of vendor over that timeframe.
14  Q    Do you know whether the egg substitutes --
15  I'm sorry.  Maybe I have asked you this already.
16        Do you have any knowledge of how the egg
17  substitutes were priced to you?
18        MS. CAIN-MANNIX:  The owned brand?
19        A    Yes.  What you're buying -- we know you
20  bought it from ConAgra at some point through Topco.
21  That liquid substitute product that's being private
22  labeled for you --
23        A    Right.
24        Q    -- do you have any idea how that was
25  priced?

---

**199**

1  A    No.
2        MS. CAIN-MANNIX:  Do you mean visa-via
3  price list, Urner Barry, that kind of thing?
4  Q    How you -- what was your price?
5  A    I don't recall the price.  It had to have
6  been reasonably significantly better than the branded
7  price or we wouldn't have done it.
8  Q    By better, you mean a much lower price?
9  A    But I don't -- exactly.  I mean, you're not
10  going to do an owned brand program where that you
11  can't, No. 1, ideally make a better margin on, and in
12  addition to that, you need to have a retail that
13  people are going to be willing to purchase it at.
14  Q    Right.  I'm sorry.  I'm talking about the
15  price Giant Eagle paid to ConAgra?
16        MS. CAIN-MANNIX:  And I think he was
17  testifying to that.
18        A    Right.
19        MS. CAIN-MANNIX:  Yeah.
20        A    Yeah.  I said, no, I'm not aware of exactly
21  how that was priced.
22  Q    Okay.  Other than the owned brand product
23  purchased through Topco from ConAgra and maybe other
24  vendors which we can't identify, you have the two
25  branded liquid egg substitutes, and then I believe you

---

**200**

1  referenced one other egg product which was an egg
2  white?
3  A    Well, the egg whites are generally part of
4  the -- part of the Egg Beaters line or part of the
5  Crystal Farms line.  It wouldn't necessarily have been
6  a separate brand.
7  Q    So in addition to an egg substitute product
8  from ConAgra and from Papetti, you also purchased and
9  sold -- purchased from them a liquid egg white
10  product?
11  A    Well, it's still an egg substitute.  It's
12  just an egg white as opposed to --
13  Q    But they're different products, correct?
14  A    They're different products, they are.
15  Q    Did you have a -- was the purchasing of the
16  egg whites under the same arrangement?
17  A    Yeah, the same basic agreement.  The cost,
18  the individual cost of the item may have been a little
19  different.  I don't recall, but it was the same basic
20  agreement.
21  Q    And so the pricing was the same.  It was a
22  list price offered from either ConAgra or for Papetti?
23  A    Correct.
24  Q    And various discounts in the form of
25  allowances, bill backs, recounts --

---

**201**

1  A    Not only -- not only -- I'm sorry.
2  Q    -- could be negotiated with the buyer
3  during these periodic meetings.  Is that --
4  A    On the branded.
5  Q    Right.
6  A    If you're talking branded, the answer to
7  that question is yes.
8  Q    Do you have any unbranded egg whites?
9  A    I'm distinguishing between branded and
10  Giant Eagle brand, so when I say branded, I'm talking
11  national brand, like, the Egg Beaters and the Crystal
12  Farms.  When I'm saying owned brand, Giant Eagle
13  brand, those are the ones that those types of things
14  likely did not occur because we were negotiating a
15  dead net cost.
16  Q    Understood.
17  A    Okay.
18  Q    Did Giant Eagle have an owned brand of egg
19  whites?
20  A    I don't believe we ever did that.
21  Q    Did the list prices for the branded egg
22  substitutes and egg whites change with time?
23  A    The brands?
24  Q    Yes.
25  A    I don't recall specifics.  I would have to

---

HIGHLY CONFIDENTIAL

Moran, Paul                                          May 20, 2014

52 (Pages 202 to 205)

---

**202**

1   go back and look at detail on that, and it may have
2   been provided to you guys already.  I'm not sure.
3   Typically, over time, those things will change, but
4   they're not changing -- they're not changing with the
5   market if that's what you mean.
6       Q   Right.  I'm trying --
7       A   They're much more stable, and they will
8   change periodically whenever there is significant
9   difference in cost for them as opposed to the weekly
10  up and down of the market with the Urner Barry.  That
11  was not tied to the Urner Barry if that's your
12  question.
13      Q   Right.  I was trying to understand how
14  those two were different, so the shell eggs would be
15  tied to Urner Barry --
16      A   Correct.
17      Q   -- and change weekly and the egg
18  substitutes are not tied to Urner Barry and --
19      A   Correct.
20      Q   -- they are consistent for some period of
21  time?
22      A   They're reasonably stable, exactly.  Not
23  totally stable, but reasonably stable.
24      Q   And again, those were list prices that were
25  simply told to you.  You didn't negotiate them?

---

**203**

1       A   I believe that's true in that case.  I do
2   not recall negotiating those.
3       Q   Do you have any understanding of what the
4   price of, for instance, Egg Beaters is based on?
5       A   No.
6       Q   I don't want to know the substance of any
7   of your conversations with counsel.  I simply want to
8   ask you whether you had conversations with counsel at
9   the end of 2012 or the beginning of 2013 relating to
10  interrogatory responses?
11      A   We had -- I had various communication back
12  and forth on different communications.  I'm not sure
13  that I can honestly tell you that I can answer your
14  question yes or no clearly as far as timeframe and the
15  specifics of what you're asking.
16      Q   Do you know what an interrogatory response
17  is?
18      A   That's the question.  Explain it to me.
19      Q   No.  I'm asking you if you know what an
20  interrogatory response is?
21      A   I think I have seen them, but I'm not sure
22  if I can distinguish it from other things I have seen,
23  so explanation might be helpful.
24          (Thereupon, Deposition Exhibit No. 35 was
25      marked for identification.)

---

**204**

1       Q   Let me hand you what I'm marking as
2   Exhibit 35.  Again, I want to be very careful here.  I
3   don't want to inadvertently solicit privileged
4   information.  I'm not --
5       A   I understand.
6       Q   I don't want you to tell me anything you
7   have told to Ms. Cain-Mannix or anybody else.  I'm
8   just trying to understand the fact or non-fact of your
9   involvement in preparing the Answers to
10  Interrogatories.
11          Specifically, have you ever seen these
12  interrogatories before?
13          MS. CAIN-MANNIX:  I think part of your
14      question is answered in three.
15          MS. ANDERSON:  Actually, I just want -- I
16      want to hear it from him.
17      A   I'm not positive I saw a lot of -- okay.
18  So I mean, this is saying that I must have had some
19  response that was in here.
20      Q   And do you recall discussing these
21  interrogatories and the answers with anyone at Giant
22  Eagle or your counsel?
23          MS. CAIN-MANNIX:  Don't get into specifics
24      but if you --
25      Q   Yes or no, that's all I want.

---

**205**

1          MS. CAIN-MANNIX:  Right
2       A   I'll say yes.  I'll say yes.
3       Q   If you can look on page -- actually, let me
4   ask you one more question.  I'll ask your counsel that
5   off the record.
6          On Page 5, it states, Topco's records of
7   egg purchases made by Giant Eagle through Topco to the
8   extent reasonably obtainable are available at Topco
9   00001, and Giant Eagle's own records of its egg
10  purchases to the extent reasonably obtainable are
11  available in GE, a series of zeros, 9 through GE, a
12  series of zeros, 10.  Do you see that?
13      A   I do.
14          (Thereupon, Deposition Exhibit Nos. 36 and
15      37 were marked for identification.)
16          MS. ANDERSON:  I'm going to hand you two
17      exhibits.  The first one which is Exhibit 36, and
18      I am sorry, but it is so very, very --
19          MS. CAIN-MANNIX:  Do you have your glasses?
20          MS. ANDERSON:  I have my glasses.  I'm
21      going to put them on.
22          MS. CAIN-MANNIX:  I don't have mine.  Are
23      we going to go over a lot of these?
24          MS. ANDERSON:  No.
25          MS. CAIN-MANNIX:  If it's just this one --

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

53 (Pages 206 to 209)

---

**206**

1  MS. ANDERSON: That's it.
2  MS. CAIN-MANNIX: -- I'm not going to get
3  my glasses.
4  MS. ANDERSON: That's it. And this is
5  Exhibit 37, and you will see at the bottom --
6  it's so little. I'm sorry. The bottom of 36,
7  GE000010.
8  THE WITNESS: I'm sorry. What are you
9  looking at?
10  MS. CAIN-MANNIX: The front page.
11  MS. ANDERSON: The front page down on the
12  bottom, you'll see GE000010 and GE0010.
13  THE WITNESS: Got it. Okay.
14  MS. ANDERSON: These were documents that
15  were produced natively as Excel files. If I
16  printed the entire thing out, it would be like
17  180 pages. I just want to ask you questions
18  about the headers, so I printed out a couple of
19  pages.
20  THE WITNESS: Okay.
21  MS. CAIN-MANNIX: Is this --
22  MS. ANDERSON: I'm not suggesting that this
23  is the whole document.
24  MS. CAIN-MANNIX: Okay. And is this
25  information at the bottom information you put in

---

**207**

1  there or --
2  MS. ANDERSON: This is -- yeah. I believe
3  that that GE00010 is the Bates number that we
4  have printed on it so you know because it's a
5  native file.
6  MS. CAIN-MANNIX: Okay. That's what --
7  MS. ANDERSON: Yes, and then beneath that
8  will show you what part of the --
9  MS. CAIN-MANNIX: What part you have
10  reproduced here today?
11  MS. ANDERSON: Yes, so there would be no
12  confusion as to what this is. So for instance,
13  Exhibit 36 is the worksheet, the tab that is
14  entitled Substitutes, and it is all data within
15  the tab, and it's the first two pages and the
16  last two pages of this massive Excel workbook.
17  MS. CAIN-MANNIX: Okay.
18  MS. ANDERSON: Exhibit 37 is the
19  substitutes tabs, but it is only selected columns
20  so that I could make them bigger, so we could
21  read them.
22  THE WITNESS: Okay. Got it.
23  MS. CAIN-MANNIX: I just want to -- I don't
24  have a problem with this at all other than I just
25  want to preserve an objection for the record to

---

**208**

1  the extent that, you know, I'm just seeing this
2  excerpt for the first time today.
3  MS. ANDERSON: Right, and this is just an
4  excerpt from your data.
5  MS. CAIN-MANNIX: Right.
6  BY MS. ANDERSON:
7  Q  Okay. Looking at Exhibit 36, is this, the
8  form of this data familiar to you?
9  A  Well, I recognize what it is. I'm not sure
10  if this particular report is familiar to me, but I can
11  identify what the columns are. I mean, it's familiar
12  to me.
13  Q  I'm sorry. I didn't mean to interrupt you.
14  A  That's okay. Go ahead. I'm sorry.
15  Q  This is the data this Giant Eagle's own --
16  this is Giant Eagle's records of its egg purchases to
17  the extent reasonably obtainable, correct?
18  A  Okay.
19  Q  So that this is the data to which you refer
20  in the interrogatory response that we just reviewed at
21  Exhibit 35?
22  A  Okay.
23  Q  No. I'm asking you?
24  A  Yes. I mean, it's -- yes.
25  Q  Can we just quickly run through the columns

---

**209**

1  across the top?
2  A  Sure.
3  Q  Buyer, the first column is buyer, is that a
4  buyer number?
5  A  That's a buyer number.
6  Q  And that's just assigned to a specific
7  employee?
8  A  That's our BICEPS, that's so our buying
9  system related to the system can get the right
10  information for the right buyer.
11  Q  Okay. And MJ Hinnebusch is the name of the
12  individual employee?
13  A  That's Mike Hinnebusch, yes.
14  Q  Okay. PO, is that a purchase order number?
15  A  It is.
16  Q  And facility is what?
17  A  That's the warehouse number.
18  Q  To which it's delivered?
19  A  Facility 44 is Pittsburgh. Facility 61 is
20  Cleveland.
21  Q  And is that where the product is being
22  delivered?
23  A  Correct.
24  Q  And is vendor, that's a number?
25  A  Again, that's the way we identify the

---

---

**210**

1  vendor that we're purchasing it from in our system.
2      Q    And the name column, is that the name of
3  vendor?
4      A    It is.
5      Q    I'm assuming the next column, DTE ORD, is
6  date ordered?
7      A    It is.
8      Q    And that's the date that the purchase order
9  is submitted?
10      A    The date the purchase order was written,
11  correct.
12      Q    And date received is the date the product
13  was received; is that correct?
14      A    Yeah.  Back this far, it could have been
15  the date that we asked for it, and I'm not sure if
16  that's the date actually that we asked for it
17  originally or the date that it was actually received
18  but --
19      Q    The date that you --
20      A    Most of the time it will be the same, but
21  sometimes the truck is later or whatever and you might
22  get a little variation there.
23      Q    What do you mean the date that you asked
24  for it?
25      A    So when we cut a purchase order, it has

---

**211**

1  let's just say theoretically a seven-day lee time, so
2  we cut a purchase order on Monday and the expectation
3  is it's going to be there the following Monday, but
4  the truck breaks down so it doesn't get there until
5  Tuesday.
6      Q    Okay.  So when you it's the date you asked
7  for, it's the date you asked for it to be delivered?
8      A    I believe that's what this is, but based
9  on -- because it looks to me like those dates are all
10  seven.  It's pretty consistent all the way down there
11  how many days in between.
12      Q    City and state in the next two columns,
13  city and state of what?
14      A    That looks to me like the city and state of
15  the distribution center where it's coming from.
16      Q    Okay.  And then item and UPC are specific
17  to the product at issue, right?
18      A    That is correct.
19      Q    The UPC I know comes on the package.  Is
20  the item number, is that one that's a Giant Eagle item
21  number?
22      A    Yes.  That's the system assigned item
23  number.  If you go look at our shelf tags, that's the
24  item number that would be on the shelf tag in the
25  store.

---

**212**

1      Q    Pack is the number of units per pack I'm
2  assuming?
3      A    Correct.
4      Q    Size is the size of the individual
5  container?
6      A    Correct.
7      Q    Description is self-explanatory.  Quantity
8  order, quantity received is also self-explanatory.
9          List cost, this is the price that you paid,
10  correct?
11      A    Correct.
12      Q    Does this price include any of the rebates
13  or discounts we discussed earlier?
14      A    I don't know that for sure, so if I'm
15  looking at this with one cost there, it's hard to tell
16  if that's a net cost after allowance or if that's just
17  the list cost they're pulling from the system
18  somewhere.  I think until -- unless you had a little
19  bit more information, it may be hard to tell that.
20      Q    Well, this is the data set in its entirety.
21  How would I ascertain --
22      A    So it says list cost --
23      Q    Right.
24      A    -- which makes me believe that that is the
25  cost before any allowances that might be out there.

---

**213**

1      Q    So how would I, for instance, taking that
2  top line of Item 10479, a 12-pack of 8-ounce Egg
3  Beaters refrigerated.  What is FF?
4      A    Fat free.
5      Q    Fat free.  I ordered 128 packs.  I got
6  128 packs and it says 28.076, or is that 28,000?
7      A    That's $28.07.  I believe that's what it
8  is.  It must have been what we had in the system at
9  the time.
10      Q    $20 and --
11      A    $28.07 is what I believe it is.
12      Q    If I had to find out how much -- what my
13  net cost for that product was, where would I get that?
14          MS. CAIN-MANNIX:  Objection to the form.
15      Q    Do you understand?  You just distinguished
16  between list cost and net cost.
17      A    I don't know if I can answer that question
18  to be honest with you.  Again, I would probably need a
19  little bit more information to determine if that's
20  list or net to begin with.
21      Q    What information would you need?
22      A    See, this goes back to 1999 and 2000.  I
23  know we ran this, but I'm not sure what exactly is
24  available to go back and grab, right.  I mean, it
25  looks like it's Egg Beaters, which means that there

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

55 (Pages 214 to 217)

---

214

1  could have been an allowance out there at times on
2  that item.
3      Q    Is the net cost information in the same
4  system as the list price information -- or the list
5  cost?  Excuse me.
6      A    It's in the same system.  It just depends
7  on what it's grabbing.  I mean, if it's saying list
8  cost, there's a list cost there, and then potentially
9  there's an allowance there that might reduce that list
10 cost.
11     Q    The way you access this data in the
12 ordinary course, do you have the option of seeing for
13 each item list cost and net cost?
14     A    Depending on the report that we run, I
15 think we can get that information, but again, this
16 is -- this system that we're looking at here is old
17 and there's been some updates in the system since
18 then, so I don't know what the system capabilities
19 would have been back then.
20     Q    Okay.  Why don't you turn to the last page
21 because it has data from 2012?  The same report was
22 generated and produced for the entire time period, the
23 same columns.
24     MS. CAIN-MANNIX:  The very last page?
25     Q    Uh-huh.  So if we're talking about 2012

---

215

1  data, we have somewhat mooted the qualification that
2  we are looking back in 1999.
3      A    Absolutely.  That's fair, yeah.
4      Q    So in your system from which this data was
5  derived, you can see list cost and net cost; is that
6  correct?
7      A    I'm not totally sure what system they
8  pulled this from.
9      Q    What system exists?
10     A    Well, we have a number of systems.  This
11 looks to me like this information probably got pulled
12 out of our BICEPS system somehow, but I don't know
13 what that queried.
14     Q    But there is a query that they could do
15 that would give us list cost and net cost?
16     A    We probably would have to ask that
17 question.
18     Q    I'm asking you.
19     A    I don't know.  I don't know.  That's a
20 technical question that I would probably have -- we
21 would probably have to go back and --
22     Q    When you were the category manager and you
23 wanted to see the list cost and the net cost for a
24 particular item, what system did you go to?
25     A    BICEPS.

---

216

1      Q    And you could do it then?
2      A    Uh-huh.
3      MS. ANDERSON:  I'll just ask on the record,
4  Miora, that you update your data?
5      MS. CAIN-MANNIX:  We will inquire into
6  that.
7      Q    And actually, I'm not going to have any
8  questions for Exhibit 37 because I think those are
9  The same.  It's just a subset, but you can see on
10 Exhibit 37 just so we can ask one question about it
11 and not have to withdraw it --
12     A    Sure.
13     Q    It lists a variety of Egg Beaters products
14 and then Papetti's Better'N Eggs, Papetti's All White,
15 Crystal Farms All White.  Do you see those?
16     A    I do.
17     Q    These are all these branded egg substitutes
18 and egg white products we have been discussing,
19 correct?
20     A    They are.
21     Q    I'm going to hop back to a conversation
22 from this morning, and I believe you testified but I
23 don't want to try -- and I don't have a stream, so I
24 don't want to characterize what you said, but I'll
25 just ask you the question again.

---

217

1      A    Okay.
2      Q    Did Giant Eagle from 1999 to 2008, say,
3  face any pressure from consumers with respect to the
4  animal welfare practices of its suppliers?
5      A    So I talked to Rob Borella about it, his
6  recollection on any consumer queries specific to that,
7  and he said he had no recollection of that
8  specifically.
9      Q    Did Giant Eagle discuss animal welfare
10 issues with its suppliers?
11     A    I don't recall having a specific
12 conversation about that.
13     Q    Do you recall animal welfare being an issue
14 that was part of the vendor selection?
15     A    Well, it was part -- as we reviewed
16 earlier, it was clearly part of the -- UEP was
17 clearly part of that, but it was never something that
18 was specific to vendor selection as far as being a
19 focus I guess.  It was all a requirement that was on
20 there based on overall -- I have said this earlier,
21 what we believed consumers were looking for or what we
22 believed was sort of an industry standard that we
23 needed to meet.
24     (Thereupon, Deposition Exhibit No. 38 was
25 marked for identification.)

---

HIGHLY CONFIDENTIAL

Moran, Paul                                                    May 20, 2014

56 (Pages 218 to 221)

---

218

1    Q    Let me hand you what has been marked as
2  Exhibit 38.  Did you create this document?
3    A    I don't recall personally creating this
4  document.
5    Q    Do you recognize the document?
6    A    This was -- I have read this document.
7  This was part of the information that I had to prepare
8  for this.
9    Q    Other than your meetings with counsel, do
10  you recognize this document entitled Giant Eagle Egg
11  Program Review as being one that you would have
12  reviewed during the ordinary course of your job as the
13  category manager for dairy?
14    A    I do not recall this specific document
15  before seeing it to prepare for this.
16    Q    Okay.  And it lists at the top, "The
17  following are key advantages to utilizing Buckeye Egg
18  Farm as Giant Eagle's egg supplier."  Do you see that?
19    A    I do.
20    Q    Is this a document that was created at
21  Giant Eagle in the ordinary course of business?
22    A    I don't know.
23    Q    Well, the document is not dated, and if you
24  turn to the second page, there is a bullet.  I'm
25  sorry.

---

219

1        The top of the second page states, "The
2  following are key hurdles to overcome in the pursuit
3  of alternative suppliers for the Giant Eagle Egg
4  Program."  Do you see that?
5    A    Uh-huh.
6    Q    And you were evaluating alternative
7  suppliers to Buckeye in 2002, correct?
8    A    That was around the timeframe when they
9  were having their issues, yes.
10    Q    And you were evaluating alternative
11  suppliers, correct?
12    A    I believe we were.
13    Q    And the second bullet is forced molting
14  issue.  Do you see that?
15    A    I do.
16    Q    It states, "Giant Eagle's recent
17  announcement of a policy not to purchase eggs from
18  processors who implement forced molting eliminate
19  several of the country's largest egg producers from
20  the list of potential alternative suppliers."  Do you
21  see that?
22    A    I do.
23    Q    Do you have a recollection of this
24  announcement of a policy change?
25    A    I don't remember that specific.  I remember

---

220

1  the issue, which we talked about this earlier where
2  that's the issue where they force chickens not to eat
3  food and drink for a period of time and it rejuvenates
4  apparently their ability to lay more higher quality
5  eggs.
6        The issue came up as part I believe of an
7  overall industry issue.  This wasn't specific to Giant
8  Eagle that we were reacting to in the same manner I
9  described earlier believing that this was something
10  that if it wasn't already an industry standard was
11  soon to become an industry standard and the consumers
12  were looking for it.
13    Q    So consumers objected to the idea of forced
14  molting?
15        MS. CAIN-MANNIX:  Objection to the form.
16    Q    Do you understand?
17    A    I don't remember a specific consumer
18  complaint or a question about it.  I remember some
19  industry information on it, and there was some things
20  that were -- I don't remember the specifics any one of
21  them, but I remember that being an issue that was sort
22  of brought to the top because of some other major
23  players in the country going down that path.
24    Q    Was Buckeye receiving negative publicity
25  about forced molting?

---

221

1    A    I don't recall if that was part of the
2  negative publicity or not.
3    Q    If you go back to the first page, one of
4  the bullets of the animal welfare shortly below the
5  midpoint of the page?
6    A    Right.
7    Q    It says "Buckeye Farm is ahead of the
8  industry in this area."  Do you see that?
9    A    I do.
10    Q    So one of the -- is it fair to say that one
11  of the factors on which you evaluated Buckeye was its
12  animal welfare program?
13    A    We evaluated all vendors in the same way,
14  and that was all the industry standards, plus what
15  they could provide to us in terms of value on the
16  program, which included cost, quality and all of those
17  other things.
18    Q    And animal welfare?
19    A    It was -- that was part of it.  It's listed
20  on here, and it was one of the considerations that we
21  were clearly looking at the time.
22    Q    And animal welfare is listed as one of the
23  key advantages to utilizing Buckeye Egg Farms as Giant
24  Eagle's egg supplier, right?
25    A    That's what it says.

---

HIGHLY CONFIDENTIAL

Moran, Paul                                           May 20, 2014

57 (Pages 222 to 225)

---

**222**

1    (Thereupon, Deposition Exhibit No. 39 was
2    marked for identification.)
3    Q    I'm handing you what has been marked as
4    Exhibit 39.  Exhibit 39 is an email to you dated
5    February 19, 2002 from Rob Giornichec --
6    A    Bob Giornichec.
7    Q    Bob Giornichec?
8    A    Yeah.
9    Q    At Buckeye Egg, correct?
10   A    Correct.
11   Q    Who is Mr. Giornichec?
12   A    Bob was our main contact with Buckeye when
13   we were dealing with Buckeye.
14   Q    And the subject of this email to you was
15   "Channel 10 News Report".  Do you see that?
16   A    I do.
17   Q    And at the beginning of the chain, which in
18   the most frustrating fashion is at the bottom of the
19   page, Mr. Giornichec states, "Good morning, Paul.
20   Channel 10 News in Columbus reported the animal rights
21   break-in last night.  It did not name us or the other
22   egg farm involved.  The piece focused on forced
23   molting of laying hens, which Buckeye does not do, and
24   the effect that the practice has on Salmonella
25   Enteritidis," E-N-T-E-R-I-T-I-D-I-S, "in eggs."  Do

---

**223**

1    you see that?
2    A    I do.
3    Q    Do you recall this news report in Columbus
4    regarding a break-in at Buckeye Egg?
5    A    I don't recall this specifically, but I
6    recall the general -- you know, the general --
7    generally what was going on with Buckeye at that
8    point, and it was these -- it was several of these
9    kinds of things that was occurring, which is what were
10   some of the things that made us start to question
11   whether we wanted to continue to maintain a
12   business -- a relationship with them.
13   Q    So it was a break-in at Buckeye.  This
14   particular report was a break-in at Buckeye by animal
15   rights activists; is that correct?
16        MS. CAIN-MANNIX:  Objection to the form.
17   Q    Do you understand?
18   A    This particular break-in --
19   Q    This particular report states that it
20   reported the animal rights break-in last night.  It
21   did not name us or the other egg farm involved.  Do
22   you see that?
23   A    I do, yes.
24   Q    And you asked Mr. Giornichec to define
25   molting, correct?

---

**224**

1    A    Yeah.  I think we were probably gathering
2    information at that point to decide what, if anything,
3    we wanted to do.
4    Q    So is it fair to say that negative
5    publicity from animal rights activists at your
6    supplier made you question continuing to use them as a
7    supplier?
8        MS. CAIN-MANNIX:  Objection to form.
9    A    I mean, that's always one of the
10   considerations.  You want to understand what's going
11   on with your suppliers.  In the event that you would
12   get consumer questions, you want to be able to answer
13   them intelligently.
14       (Thereupon, Deposition Exhibit No. 40 was
15   marked for identification.)
16   Q    I'm going to handed you Exhibit 40.
17   Exhibit 40, it's a letter dated February 22, 2002, to
18   Craig Eadon to Topco from Mr. Giornichec at Buckeye,
19   and you are CC'd; is that correct?
20   A    Yes.
21   Q    And the letter states, "Per your request,
22   this letter will serve as an official policy
23   statement.  Buckeye Egg Farm and Hartford Farms, LLC
24   does not, nor ever has followed the practice of forced
25   molting on any of its chicken.  Buckeye Egg Farm and

---

**225**

1    Hartford Farms, LLC as members of United Egg Producers
2    currently follow scientific accepted Animal Husbandry
3    past practices on all of the birds under its care."
4    Do you see that?
5    A    I do.
6    Q    Did you request this official policy
7    statement?
8    A    I don't recall that.
9    Q    Do you recall whether Topco requested it?
10   A    I don't recall.
11   Q    Do you recall anything about this policy
12   statement?
13   A    I do not.
14       (Thereupon, Deposition Exhibit No. 41 was
15   marked for identification.)
16   Q    I'm going to hand you what has been marked
17   as Exhibit 41.  Exhibit 41 is an email chain starting
18   at the beginning, so going to the last page.  You are
19   getting an email from Lisa Hinson on February 21,
20   2002.  Do you see that?
21   A    I do.
22   Q    It's subject, "Channel 10 Follow-Up Story"?
23   A    Yes.
24   Q    Who is Lisa Hinson?
25   A    I don't know who Lisa was or is.

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

58 (Pages 226 to 229)

---

226

1  Q   Do you know what Hinson, LTD is?
2  **A   I do not.**
3  Q   Did Giant Eagle have a PR firm of any sort?
4  **A   It could have been, but I don't know that**
5  **for sure for a fact.  Considering that she sent it to**
6  **Dave and Laura, that would make sense because Laura**
7  **was head of our marketing.**
8  Q   And to you, correct?
9  **A   Right, yes.**
10 Q   And this is referring to the Channel 10
11 follow-up story, and she states, Kevin Landers is the
12 reporter for WBMS-CBS affiliate who did the egg story
13 on Monday.  Called GE in Pitt today to ask for the
14 phone of our egg distributor.  Roberta called me after
15 speaking with Laura to let me know."  Do you see that?
16 **A   I do.**
17 Q   Do you know who Roberta is?
18 **A   Roberta I think was her administrative**
19 **assistant at the time.**
20 Q   Further in, she is -- Ms. Hinson is
21 describing the reporter as saying, "He also told me
22 they have received significant consumer response from
23 the story and are running a follow-up story next
24 Tuesday.  They're contacting all local grocers in an
25 effort to find out which Ohio egg farms are suppliers

---

227

1  to them, particularly, the ones that used forced
2  molting."  Do you see that?
3  **A   I do.**
4  Q   And further down, she states, "I know Dave
5  suggested perhaps we consider writing into our policy
6  that we would not buy from a farm using this
7  practice."  Do you see that?
8  **A   I do.**
9  Q   Does this refresh your recollection as
10 to whether Giant Eagle may have sought a written
11 affirmation from Buckeye that they do not engage in
12 forced molting?
13 **A   I think that that's -- I think it's very**
14 **likely that that's where that came from.  The**
15 **beginning of this with the -- this sort of circles**
16 **back to what I was talking about before a little bit**
17 **where it talks about how McDonald's is moving towards**
18 **that, and those are the kinds of things that are**
19 **naturally going to get our attention in terms of**
20 **potential industry issues and potential responses to**
21 **them.**
22     **So we would be naturally reaching out to**
23 **vendors to try to gatherer more information on those**
24 **types of things before we would be making any kind of**
25 **a decision on policy, and it sounds to me that's like**

---

228

1  what we were doing here.
2  Q   Craig Eadon at Topco, if you go back a
3  page -- or forward a page.
4  **A   I got it.**
5  Q   You forwarded this email message to Craig
6  Eadon at Topco and you stated, "FYI".  Do you see
7  that?
8  **A   I do.**
9  Q   Flip -- yeah.
10 **A   Yeah, I do.**
11 Q   And Mr. Eadon responds, "He knows that
12 Topco does not currently have a written policy
13 regarding the purchase of eggs from processors that
14 molt."  Do you see that?
15 **A   Where?**
16     **MS. CAIN-MANNIX:  What paragraph?**
17 Q   The first paragraph of his email, the first
18 line, "he knows that" --
19 **A   Craig's email.  Okay.**
20 Q   Yes.  Do you see it?
21 **A   The one that starts, "I have asked Andrew"?**
22 Q   Yes.
23 **A   Okay.  Yes.**
24 Q   So Topco did not currently have a written
25 policy regarding the purchase of eggs from processors

---

229

1  that molt.  Do you see that?
2  **A   Yes.**
3  Q   Two paragraphs down, he says, "In addition,
4  I have asked Bob to update you on where Hartford is
5  regarding the implementation of and level of
6  compliance to the phase-in schedule for per bird space
7  allowance as presented to and accepted by FMI, Food
8  Marking Institute, and NCCR, National Council of Chain
9  Restaurants, last December."  Do you see that?
10 **A   I do.**
11 Q   Who is Bob?
12 **A   That's probably Bob Giornichec.  He's the**
13 **guy that called on us from Buckeye Egg.**
14 Q   And did Bob update you?
15 **A   I don't recall.**
16 Q   From this email, does it appear that you
17 had a conversation with either Mr. Eadon or with
18 Buckeye about their level of compliance to the
19 phase-in schedule for per bird space allowance as
20 presented to and accepted by FMI and NCCR?
21     **MS. CAIN-MANNIX:  Objection to the form.**
22 **A   I don't know.**
23 Q   Does that seem like a conversation you
24 likely would have had after this email chain?
25 **A   So I think with all of the people that were**

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Moran, Paul                                                          May 20, 2014

59 (Pages 230 to 233)

---

230

1  involved on here, so Laura and Dave, these are people
2  that are vice president, you know, they're directors
3  of the company, vice presidents in the company. And
4  from a media standpoint, we're getting asked these
5  questions, so we are trying to gather information to
6  determine I think what we want to do about these and
7  do we need to make a policy. If I read all this, that
8  sounds like where this is.
9      Q    And does the fact that in Exhibit 40
10 Buckeye sent you an official policy statement? Is it
11 something that Giant Eagle likely asked for?
12     A    I don't know.
13     Q    Looking at the first paragraph, who is Bob
14 Lewandowski? I'm sorry. I'm at the first page of
15 Exhibit 41.
16     A    I got it.
17     Q    Okay.
18     A    Yeah. I don't recall exactly what Bob did.
19 He was in -- he said he was from Topco. I don't
20 recall exactly what Bob did though.
21     Q    Were you familiar with the animal welfare's
22 standards implemented by McDonald's in or around 2002?
23     A    I'm sorry. Can you repeat that?
24         MS. CAIN-MANNIX: Can you repeat that?
25     Q    Were you familiar with the animal welfare

---

231

1  guidelines implemented by McDonald's that's --
2      A    No, I don't --
3      Q    -- described in this email?
4      A    I don't recall. I don't recall.
5         (Thereupon, Deposition Exhibit No. 42 was
6      marked for identification.)
7      Q    I'm going to hand you what has been marked
8  as Exhibit 42. At the beginning of this email chain,
9  you ask Gary Bethel on October 24, 2008 the subject
10 line is "Humane Certification"?
11     A    Right.
12     Q    You state, "Hi, Gary. We have the human
13 certification on our egg packaging already, don't we?"
14 Do you see that?
15     A    I do, yes.
16     Q    And Gary Bethel responds that same day half
17 an hour later, "Paul, we do not have a human
18 certification on the carton." Do you see that?
19     A    I do.
20     Q    You then ask somebody named Delia Lamore to
21 call you?
22     A    Delia was the young lady that was running
23 eggs at the time at Topco.
24     Q    She was running eggs at the time what?
25     A    At Topco. She was at Topco.

---

232

1      Q    Okay. And Delia -- do you recall this
2  email chain? I'm sorry. I should have asked you that
3  at the outset.
4      A    Not really, no.
5      Q    Do you recall the question of a humane
6  certification on egg packaging at any point?
7      A    I don't recall the specific question. You
8  know, like I said earlier, I sort of this sort of
9  generally as a subject that came up periodically that
10 we would inquire and get information on and then make
11 a decision on whether or not we wanted to do
12 something. That's really my recollection generally
13 around this subject.
14     Q    Do you recall generally ever going through
15 that process you just described and then deciding
16 that, yes, you wanted the certification on the
17 package?
18     A    I do not recall making that decision.
19     Q    I'm sorry. You don't recall?
20     A    I do not recall making the decision. I
21 don't know that -- I don't think it says in here that
22 we said to them go get the humane certification if
23 that's what you're asking me.
24     Q    I'm asking actually generally putting this
25 document aside. We have described this issue of a

---

233

1  certification on a package, and you recall generally
2  having a discussion, gathering information and making
3  a decision as to what you wanted to do?
4      A    I'm not sure if I recall making a decision.
5         MS. CAIN-MANNIX: On forced molting, right?
6      A    No. We're talking --
7      A    He's talking about this humane --
8      Q    We're talking about a logo on a package.
9      A    I do not recall making a decision.
10     Q    Does that mean a decision was not made or
11 you simply don't recall what it was?
12     A    I don't recall. I don't know the answer to
13 that question. I don't know if it was made. I don't
14 recall if it was made or not.
15     Q    Okay. Delia Lamore, you asked Delia to
16 call you on Friday at 1:00, and two hours later, she
17 responded with information on certified humane in the
18 first kind of paragraph of this email and explained
19 this relates to cage free and organic.
20         And then the second paragraph that states,
21 "The standard or commodity eggs is UEP. What UEP has
22 done since 2002 is set guidelines based on a committee
23 of people from the USDA, scientists and academia to
24 develop standards that make the top priority the
25 comfort, health and safety of the chickens." Do you

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

60 (Pages 234 to 237)

234

1  see that?
2      A   I do.
3      Q   And this is referring UEP animal welfare
4  guidelines?
5      A   Yes.
6      Q   Which we're in 2008, so at this point,
7  Giant Eagle is already requiring the UEP Certified
8  guidelines?
9      A   Yes.
10         (Thereupon, Deposition Exhibit No. 43 was
11  marked for identification.)
12      Q   I'm handing you what has been marked
13  Exhibit 43.  When you were the category manager for
14  dairy, did you prepare a business plan?
15      A   Yes.  In collaboration with some others,
16  but yes.
17      Q   Do you recognize Exhibit 43?
18      A   I recognize it as a template that's in our
19  building.
20      Q   I'm sorry?
21      A   I recognize it as a template that we may
22  have used at one time.
23      Q   And if you go onto the fourth page of the
24  document entitled Major Business Factors, is this an
25  actual business plan that was prepared or a draft of

235

1  one?
2      A   This looks like a draft to me because if
3  you look at some of the pages, there's no information
4  filled in on them?
5      Q   And the X's?
6      A   Yeah.  So this looks to me like some
7  version of one that was not complete.  I don't know if
8  it was ever completed, so I'm not sure.
9      Q   So this a document that you had to prepare
10  on kind of a periodic basis as part of your ordinary
11  job responsibilities or --
12      A   Yes.  Well, we went through, and depending
13  on the year and depending on what was being required,
14  this had a tendency to change pretty much every year,
15  so it kind of varied.  I don't specifically recall
16  when I put this together or why I put this together.
17      Q   If you could look at the second bullet on
18  Page 4, "It says Calendar Year 2006 averaged about
19  two percent in deflation."  Do you see that?
20      A   I do.
21      Q   "Orange juice and egg retails however have
22  turned that around," do you see that?
23      A   I do.
24      Q   What does that mean?
25      A   It sounds like orange juice and egg retails

236

1  must have been inflationary.
2      Q   The second bullet states, "Egg pricing
3  is also up significantly, varies between 20 and
4  40 percent over last year due to a combination of
5  escalation of feed costs, plus several egg exports
6  that have impacted supply more than in past years."
7  Do you see that?
8      A   I do.
9      Q   Can you explain that statement for me?
10      A   Well, I don't recall exactly where I got
11  the information; but generally, when I'm putting this
12  stuff together, I may reach out to the vendors
13  particularly if you have a commodity that is
14  particularly increasing or declining to kind of
15  explain why, so I may have gotten information like
16  that from vendors.  I may have gotten it from Topco.
17  I may have read it in industry -- you know, some
18  industry things that I have seen.  I may have just --
19  Somebody may have just provided me a report.
20         I don't remember exactly how I got that
21  information, but typically, what we would do is we
22  would try to project into the future a little bit
23  where we can expect sales to go.  And in dairy, in
24  particular, when you get into milk and egg and butter
25  inflation/deflation, it can have a significant impact

237

1  on what you project for your annual sales.
2         And so you try to stay on Topco of those
3  trends and you try to understand them proactively so
4  that you can budget and hopefully be reasonably close
5  in trying to understand, so you're looking at the
6  things that are driving it either positively or
7  negatively and trying to understand it, and they're
8  projecting based on that.
9      Q   I think you said trade publications.  What
10  trade publications or industry magazines or anything
11  would you regularly review that would include eggs?
12      A   Well, I don't remember anything specific to
13  eggs.  It was, you know, we would get things like
14  Progressive Grocer and, you know, Grocer Headquarters,
15  and I don't remember all of them, but they would --
16  especially, if it there was a category that was, you
17  know, particularly impacted by something, there may be
18  articles in there.  I would say more than likely I got
19  that information either from Topco or from the vendors
20  probably.
21      Q   Do you recall any specific discussions with
22  your egg vendors from '99 to 2008?
23      A   I don't recall specific discussions.  I can
24  tell you that there was always ongoing discussions
25  around the markets and what we could expect.  And you

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

61 (Pages 238 to 241)

---

**238**

1 know, one of the things that we would try to do is try
2 to understand when an optimum time might be to run an
3 egg ad, for example. You know, you want to try to do
4 that when the market is low to try to maximize both
5 your retail and your cost or minimize your cost and
6 maximize your retail, so you always have -- that was
7 just basic business. You were always having those
8 conversations with the vendors.
9     Q   Do you recall specific instances of
10 reaching out to your egg vendors about the cost to you
11 of eggs?
12     A   Well, when -- so when the Urner Barry
13 market was either increasing dramatically or
14 decreasing dramatically and it wasn't apparent to us
15 why, so you would reach out and you might ask, you
16 know, what's the reason for this, just, you know,
17 either out of curiosity or maybe because you're
18 getting questions from your customers or maybe you're
19 getting questions internally about what's going on, so
20 you try to be as knowledgeable as you can about the
21 category that you're responsible for.
22     Some of them are very predictable. You
23 know the market is going to go up dramatically right
24 before Easter because of the supply surge or the
25 demand surge. Excuse me. And you know the market is

---

**239**

1 going to go down pretty significantly right after
2 Easter because it just falls off a cliff.
3     So some of those things you know. When you
4 get them at times where they're not sort of
5 historically predictable, you might start asking
6 questions about what's driving it.
7     Q   Did egg prices go up when grain prices went
8 up?
9     MS. CAIN-MANNIX: Objection, foundation.
10     A   I don't recall specific reasons driving
11 specific increases or declines. It generally was
12 never one reason. It was generally a combination of a
13 number of reasons that would drive it one way or the
14 other.
15     Q   If feed costs went up, would it make sense
16 to you that egg prices would go up?
17     A   It could.
18     MS. CAIN-MANNIX: Objection because he's
19 not an expert, but go ahead.
20     Q   Well, I'm asking based on your expertise as
21 a purchaser of eggs for, you know, however many years
22 it's been, far more than ten?
23     A   What I have learned by purchasing eggs for
24 as long as I have is that they are extraordinarily
25 unpredictable and that there are lots of things that

---

**240**

1 can drive the market.
2     Q   Can you give me an example of some things
3 that can drive the market?
4     A   Well, based on feedback that I've heard --
5 and how much of this is fact and how much of this is
6 stuff that I have gathered over time that isn't fact,
7 I don't know.
8     Q   Well, what I'm interested in is the facts
9 that you have gathered based on your experience as an
10 egg buyer. I don't want you to segway into any
11 conversations with your counsel. I really am just
12 looking --
13     A   No. I understand. My perception of what
14 drives it though and the reality of what drives it may
15 be two different things. I mean, the market is going
16 to do what the market does. You know, why the stocks
17 go up and down like they do. You know, it's a very
18 similar dynamic. Sometimes it's speculation.
19 Sometimes it's people think it's going to go up, so it
20 goes up.
21     I mean, I don't know. I'm not involved
22 heavily enough in the market to really have a good
23 understanding of what drives it up and down.
24     Q   How do you forecast what your egg needs
25 will be over a given period of time?

---

**241**

1     A   So you look at history, so if you're going
2 into Easter this year and you had Easter last year and
3 it's about the same time and the market is about the
4 same, so you think the retails are going to be about
5 the same and repetitive activity has been historically
6 about the same recently, you're probably going to
7 project about what you did last year. If the market
8 is a dollar a dozen higher this year than it was last
9 year, then you're probably going to project a lot
10 less, right.
11     And so you try to go in and you try to look
12 at all of the variables and you try to back that up
13 against your best guess and that's how you forecast.
14 It's not a perfect science by any --
15     Q   Why would you project less if the market
16 goes up?
17     A   Because you're going to sell less if the
18 retail is higher.
19     Q   So if the retail price of eggs goes higher,
20 people will buy fewer of them?
21     A   Yes.
22     Q   Are there other factors that affect
23 consumer demand for eggs that would impact your demand
24 for eggs?
25     A   I'm not sure if I'm following that

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

62 (Pages 242 to 245)

---

242

1 question.
2     Q    Are there other factors other than the ones
3 you have just listed that would impact how many eggs
4 you're going to buy, say, next year?
5     A    Consumer demand is what drives how many
6 eggs we buy. I mean, they have 30-day shelf life on
7 them, so we're bringing in what we need. You know,
8 the ideal is that you want to have exactly enough for
9 consumer demand. If you have too much, you're going
10 to wind up throwing some of it away because they're
11 going to go out of code. If you have too few, too
12 little you're make people -- you're going to upset
13 people because they're not going to be able to get
14 what they want when they want to buy it.
15     Q    So when there's a surge in consumer
16 demand -- there's a surge in consumer demand around
17 Easter?
18     A    Correct.
19     Q    Is that correct?
20     A    That's correct.
21     Q    We buy more eggs around Easter?
22     A    Correct.
23     Q    Was there a surge in consumer demand in
24 2003-2004 when the Atkins Diet was very popular?
25     A    I don't recall the exact impact of the

---

243

1 Atkins Diet on eggs. I remember the Atkins Diet
2 having impacts, but I don't remember specifically what
3 it was on eggs.
4     Q    What impact do you recall?
5     A    There were changes in different demands on
6 different items. I know there was an influx of
7 Atkins-related items, but I don't remember at this
8 point specifically what items were positively impacted
9 and what items were negatively impacted to be honest.
10         (Thereupon, Deposition Exhibit No. 44 was
11 marked for identification.)
12     Q    I'm going to hand you a document marked
13 as Exhibit 44. This is entitled Business Plan
14 Presentation, June 24, 2004. Do you see that?
15     A    I do.
16     Q    Do you recognize this document?
17     A    Not really. I mean, it looks like
18 something I would have done.
19     Q    So is this a presentation you gave?
20     A    I believe this was a store meeting where we
21 were -- I don't recall specifically. It appears to be
22 a store meeting because it's Regions 103, 105 and 102
23 that --
24         MS. CAIN-MANNIX: Take your --
25     A    I'm sorry.

---

244

1         MS. CAIN-MANNIX: Take your time and look
2 at it if that's going to help you answer.
3     Q    You'll note at the top --
4     A    I see where it says Atkin, yeah.
5     Q    At the top of the document, it states,
6 Overall Drivers, Atkins, cheese and eggs positive,
7 juice and refrigerated bread negative?
8     A    I see that.
9     Q    Does that fresh your recollection of the
10 impact the Atkins Diet had?
11     A    That must have been what I believed at the
12 time, yeah.
13     Q    So what you believed at the time was that
14 consumer demand was increased; is that right? Is that
15 what you mean by positive?
16     A    That must --
17         MS. CAIN-MANNIX: Objection to form.
18     Q    Do you understand my question?
19     A    Yes. That must have -- that must have
20 been -- that must have been what I was thinking at the
21 time.
22     Q    Are there other significant events or
23 movements that have happened from '99 to 2008 that
24 dramatically impacted the supply of eggs in either
25 direction? I'm sorry. I said the supply of eggs. I

---

245

1 meant demand of eggs?
2         MS. CAIN-MANNIX: Can you read that back,
3 please?
4         MS. ANDERSON: I can rephrase it if
5 There's --
6         MS. CAIN-MANNIX: I just don't know if I
7 heard it all.
8     Q    We talked about the temporary impact on
9 demand of Easter. We talked about the change in
10 demand for eggs based on the Atkins Diet.
11         Can you think of any other events from 1999
12 to 2008 that have impacted demand for eggs?
13     A    I can't think of anything specific. Eggs
14 themselves are generally reasonably stable in terms of
15 demand unless you're running -- unless you're running
16 a promotion. If you're running a promotion, then all
17 of a sudden you're selling eggs for 79 cents when the
18 everyday price is $1.69, you're going to sell a lot
19 more eggs. But on a day-to-day basis, there's not a
20 lot of significant volatility there.
21     Q    Is that on average over the course of a
22 year?
23     A    Yes.
24     Q    Because within the course of a year, there
25 are periods of high demand and very low demand,

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

63 (Pages 246 to 249)

246

1  correct?
2      A   So yeah.  Let me restate that.  So
3  certainly, around the holidays when you get into the
4  Christmas season, you get into Thanksgiving, you
5  absolutely get spikes.  It's like Easter.  I mean, the
6  Easter spike is by far the biggest spike, but you get
7  significant spikes at Christmas.  There's a lot of
8  baking going on, right.  You get significant spikes at
9  Thanksgiving.  There's a lot of cooking going on.
10      So yeah, I mean, you get your spikes that
11  you would think would naturally occur as a result of
12  holidays occurs in eggs.  It occurs in other
13  categories also.
14      Q   And you mentioned that how you price your
15  eggs could impact the demand for eggs.  Is there a
16  correlation between the price that you retail eggs for
17  to the amount of eggs that you buy?
18      A   It's a little bit more complicated than
19  that.  I mean, if the retail drops significantly -- we
20  have a short enough lee time though where we can
21  respond.  We can react to that, so I would say there's
22  probably some minor correlation there, but the retail
23  would have to be significantly different on a day-to-
24  day basis to really drive that much difference.
25      You know, it's much more around holidays.

247

1  That's when you really see the spikes, one of the
2  things we just talked about, not so much about retails
3  being, you know, $1.19 versus $1.29.  I mean, at that
4  point, it's pretty stable.  It doesn't really matter
5  that much.
6      Q   Does your competition with other grocers
7  for the sale of eggs impact your egg purchases?
8      A   Well, it certainly could.  I mean, if we're
9  running a promotional activity, it's getting impacted
10  because we're going to buy more.  If they're running a
11  promotional activity, it could.  I mean, I would have
12  to go back and look at the specifics there.
13      I'm sure there's just probably some impact
14  there, but it's not -- it's relatively negligible.
15  It's not a major impact that we can't -- that we have
16  to do any significant planning for.
17      Q   Do you monitor your competitor's retail egg
18  prices on a regular basis?
19      A   We have pricing strategies in place, so we
20  would monitor not only egg prices but we monitor
21  prices across the store.
22      Q   There are --
23      A   Yeah.  I mean, there are retail -- there
24  are retail pricing strategies in place, so there's
25  monitoring of retails and competitors, absolutely, but

248

1  it's not egg specific.  It's really across the store,
2  particularly, on what we consider to be key items.
3      Q   Are eggs a key item?
4      A   Yes.
5      Q   And in that when we say -- excuse me.  Eggs
6  being a key item, do you mean shell eggs or do you
7  mean Egg Beaters?
8      A   Commodity eggs --
9      Q   Commodity eggs?
10      A   -- would generally fall into that category,
11  yes.
12      Q   Does demand for Egg Beaters, for instance,
13  the liquid egg products, does that fluctuate as
14  dramatically as the demand that you have described for
15  commodity eggs?
16      A   No.
17      Q   Is demand for that relatively stable?
18      A   It is relatively stable.  Again, you'll get
19  promotional spikes again, but it's relatively stable.
20      Q   Is it common for Giant Eagle to use eggs as
21  a loss leader?
22      A   We have a promotional strategy where we
23  have key items that we will use periodically on the
24  front page of our circular that are loss leaders, and
25  eggs can fall into that category at times.

249

1      Q   I'm sorry.  Shell eggs?  Commodity eggs?
2      A   Shell eggs, yes.
3      Q   When would you do that with shell eggs?
4      A   Well, we try to be in the market when we
5  believe that we are going to be able to get a
6  competitive advantage in the market by running eggs,
7  and that's always very iffy because you never
8  necessarily know what everybody else is doing, so you
9  are going to try to plan and get it out there at a
10  time when you believe the market is first of all going
11  to be optimal.
12      So historically, what we've always done is
13  run them when we believed that the market was kind of
14  going to be at its slowest to try to take advantage of
15  that as quickly as we could, and it's reasonably
16  simple.  You try to run them.
17      Q   Does your --
18      MS. CAIN-MANNIX:  Could I interpose sort of
19  a standing objection to this downstream line of
20  questions?
21      MS. ANDERSON:  I'm asking about how
22  anything that's downstream impacts his purchasing
23  decisions, so I think it's outside of your
24  objection, but your objection is noted.
25      MS. CAIN-MANNIX:  Okay.

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

64 (Pages 250 to 253)

---

250

1    Q    Does your decision to use eggs as a loss
2  leader impact your purchasing patterns of eggs?
3    A    If it's on the front page of the circular,
4  it certainly will, yes.
5    Q    Which comes first?
6    A    The chicken or the egg?
7    Q    Loss leader ad or the supply?  I'm just
8  trying to understand if these are related.
9    A    Well, we have to be --
10   Q    Do you do a loss leader ad because you have
11 excess eggs?
12   A    No, no.  I mean, I won't say that's
13 never happened, but that is not the normal course of
14 business, and you're very planful with your vendors
15 and you have to be or else -- I mean, you can't just
16 surprise them and say, hey, I'm running an ad next
17 week because they're not going to be able to supply
18 you.  You have to be very planful when they
19 have to know the timing so that they could be prepared
20 to supply the spike that you're going to have.
21      (Thereupon, Deposition Exhibit No. 45 was
22      marked for identification.)
23   Q    I'm going to hand you what I have marked as
24 Exhibit 45.  Is this an example of the kind of front
25 page loss leader ad you were describing?

---

251

1    A    This isn't really a -- I don't think this
2  is a front page.  This likes like a coupon to me that
3  we probably mailed to X number of customers or it may
4  have been in a booklet that we sent out.  I'm not
5  exactly sure.  This probably wasn't a front page of an
6  ad.  This was probably a coupon that was mailed out.
7    Q    And if this coupon is valid from July 28,
8  2002 to August 24, 2002, when would the eggs that
9  you're selling during this period have been ordered?
10   A    Throughout the timeframe.  I mean, it
11 greatly depends.  I mean, don't forget, when you do
12 these types of things, this is -- we sell millions of
13 dozens of eggs a year, so we are shipping a lot of
14 eggs every day anyway.  So if we get a spike because
15 200 people come in and redeem them, we're not going to
16 even see it.  It doesn't really impact the purchasing
17 for something like this.
18   Q    In the top right-hand corner of this ad, it
19 says "Use your," and then is that a loyalty card?
20   A    That's an Advantage Card.  That's a loyalty
21 card that we have.
22   Q    How long have you had that program?
23   A    A long time.  I don't know if I even know
24 the answer to that anymore.
25   Q    Back to '99?

---

252

1    A    I would say yes, but I won't swear to the
2  beginning of date that, but that sounds -- mid to late
3  nineties sounds right.
4    Q    Is this one of those coupons that you have
5  to have the card in your wallet to get the discount
6  price?
7    A    You will get -- it doesn't look like it to
8  me.  It looks like there's a scannable bar there.  I
9  think probably you only had to scan the eggs and scan
10 the coupon, and it would take it off.
11   Q    Do you guys do that where you have to
12 have --
13   A    Yes.
14   Q    -- the card in your wallet?
15   A    Yeah.  Most of our promotions are like
16 that.
17   Q    I never have the card in my wallet.
18      MS. CAIN-MANNIX:  You have to get the key
19 FOB, Carrie.
20      MS. ANDERSON:  I keep losing my keys.
21      (Thereupon, Deposition Exhibit No. 46 was
22 marked for identification.)
23   Q    I'm going to hand you what's been marked as
24 Exhibit 46, which again is a -- I apologize, but this
25 one was a little printout to get it to fit on one

---

253

1  page, and I just have a question about the --
2      Do you recognize what this is?
3    A    Yeah.  It's our ad plan.
4    Q    I'm sorry.  It's your?
5    A    It's our ad plan.  I'm sorry.
6    Q    And so at the very top, for instance, the
7  top one says Giant Eagle Eggs?
8    A    Giant Eagle large is the egg that we
9  typically will put on the front page when we run it on
10 the front page.
11   Q    And it says case cost $17.76, retail
12 58 cents, GP.  What is GP?
13   A    Gross profit.
14   Q    So for this particular promotion, you
15 were losing 30 percent.  Your profit was negative
16 30 percent; is that correct?
17   A    That is correct.
18      (Thereupon, Deposition Exhibit No. 47 was
19      marked for identification.)
20   Q    I'm going to hand you Exhibit 47, which
21 again is a native produced document.  Is this the same
22 type of report?
23   A    It is.
24   Q    What does GEX in the top left-hand corner
25 mean, do you know?

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

65 (Pages 254 to 257)

---

**254**

1  A  So we have two stores, three now. Well,
2  two stores and an MDX. That is our Giant Eagle
3  Express, which is one store out of Harmarville right
4  by the turnpike there that they run at times separate
5  promotions, so this would have -- I'm guessing this
6  was part of -- that's what it looks like, part of that
7  because it's a GEX plan from '07 and they decided to
8  run eggs for whatever timeframe this is.
9  Q  So in the middle of the page there under
10  dairy where it says Giant Eagle Eggs, this is a
11  promotion for Giant Eagle large eggs it says with
12  19 cents credit on card usage per unit. What does
13  that mean?
14  A  That's a scan back. Remember, we talked
15  about scan backs earlier. The store gets that
16  19 cents for every dozen eggs they sell, so they pay
17  the 24.48, but would give them 19 cents a unit, so the
18  margin at the end of the day is actually 2 percent.
19  Q  So if I looked at these reports over time,
20  could I calculate the scan back total?
21  A  Well, the costs change. They're all pretty
22  self contained because they don't really -- you can't
23  really add them because their costs are different
24  every week pretty much because of the market changing.
25  Q  Would the decision to use eggs as a loss

---

**255**

1  leader be made on a store-by-store basis or across the
2  region or -- 
3  A  It can be either. There will be times
4  where we'll run specific ads for specific areas for
5  specific reasons that we might want eggs that we're
6  not going to run everywhere. We have different
7  markets that we're in. We're in Columbus. We're in
8  Cleveland. We're in Pittsburgh. We're not
9  necessarily running the same ads all the over the
10  place, but we can and do. We do both.
11  Q  How often are eggs run at a promotional
12  price?
13  A  It's very variable depending on the market
14  conditions. Generally, when the markets get a little
15  lower, you're going to run them a little bit more
16  frequently; and generally, when they're higher, you're
17  going to run them a little less. Four or five times a
18  year probably.
19  Q  So the amount that you paid for the eggs
20  obviously will impact how often and how steeply you're
21  going to discount them?
22  A  Yes.
23  Q  Did you ever receive or review on a regular
24  basis a magazine called Feedstuffs?
25  A  No.

---

**256**

1  Q  Have you ever heard of it?
2  A  No.
3  Q  What about Egg Industry Magazine?
4  A  I don't recall. I don't recall ever having
5  any kind of long-term exposure to any of those. I
6  don't recall reading them.
7  (Thereupon, Deposition Exhibit No. 48 was
8  marked for identification.)
9  Q  I'm going to hand you one more document.
10  MS. CAIN-MANNIX: Is that it? One more?
11  Q  I think so. I can't figure out where to
12  put the sticker without covering something up.
13  Do you recognize this document?
14  A  No.
15  Q  You can take a minute to take a look at it.
16  Does it make sense to you that this
17  document would have been in your files?
18  A  I don't recall this document. I'm not
19  saying it wasn't, but I don't recall it.
20  Q  You can flip back to Exhibit 2, which is
21  the Complaint.
22  A  Okay.
23  Q  Page 57. Before you get there, this
24  morning you testified that you were not involved in
25  the drafting of this Complaint; is that correct?

---

**257**

1  A  I was -- I had conversations with people.
2  I was -- my interpretation of that question was was I
3  involved in the actual drafting of it. I think I
4  answered no. Did I talk to people about information
5  that may have been used in the draft, I think the
6  answer to that question is probably yes.
7  Q  Okay. So this morning I believe you
8  testified that you didn't see the Complaint until
9  after it was filed?
10  A  I think that's true. I don't think I saw
11  the full Complaint until after it was filed, but I
12  think I may have had conversations that helped to give
13  information to people that they used in the Complaint.
14  Q  So you provided information to support the
15  Complaint?
16  A  Based on -- well, I had conversations. I'm
17  not sure exactly how to answer that question. I had
18  conversations with counsel that --
19  Q  Don't tell me what you told her.
20  A  I understand.
21  MS. CAIN-MANNIX: Right.
22  A  Okay. So I may --
23  Q  I'm just looking at the fact of the
24  discussion.
25  A  I guess what I wasn't totally clear on what

---

258

1    may have been used out of those conversations as part
2    of the Complaint.
3        Q    So when did you -- again, I'm not asking --
4    please don't tell me.  Your lawyer will kill me.
5        A    No.
6        Q    I'm not asking you what you told.
7        A    I understand.
8        Q    What I'm asking is when and for how long
9    did you --
10           MS. CAIN-MANNIX:  If it helps you --
11       Q    -- did you talk to --
12           That won't actually help him with what I'm
13   going to ask him.  I want to know when and for how
14   long you spoke with anyone at Giant Eagle or counsel
15   for Giant Eagle, just when and for how long regarding
16   the decision to file this lawsuit and what the lawsuit
17   would allege because I understood this morning you to
18   say you had no involvement in either of those things.
19           MS. CAIN-MANNIX:  I just want to object
20   because you showed him Exhibit No. 2, which is
21   dated from --
22           MS. ANDERSON:  I actually haven't gotten to
23   the question yet.  Exhibit 2 --
24           MS. CAIN-MANNIX:  You just asked one, but
25   this is from March 2013.

259

1           MS. ANDERSON:  No, no.  I'm sorry, Moira.
2    My question has nothing to do with Exhibit 2.  I
3    asked him to pull it out, and I said before we
4    get to the document, I want to clarify your
5    involvement --
6           THE WITNESS:  No.  I --
7           MS. CAIN-MANNIX:  And I want --
8           MS. ANDERSON:  -- in this Complaint.
9           MS. CAIN-MANNIX:  And I want to lodge an
10   objection or ask for a clarification rather.  Are
11   you talking about the initial Complaint filed in
12   December 2010?
13          MS. ANDERSON:  Yes, I am talking about the
14   original Complaint that Giant Eagle filed.
15       A    So I'm probably not remembering the
16   timeline exactly right.  I mean, I remember --
17   BY MS. ANDERSON:
18       Q    Well, your counsel just coached you a
19   little bit by telling you 2010.
20       A    No.  I understand.  I understand.  So this
21   is now going on, you know, a while, 3-1/2 years or
22   whatever since we started to talk about this, so maybe
23   some of the timeline I'm not totally clear on
24   remembering exactly at this point.  I remember
25   becoming aware that this was a possibility, right, and

260

1    I remember answering some questions.
2           What I'm not totally clear on is were those
3    questions after the fact this thing being done or
4    before.  I'm not totally clear.  So it could be I
5    suppose that if it was done after those questions were
6    answered, then it would be part of this.  If it was
7    done -- if those questions were asked of me after it
8    was already filed, then not, and that's -- I'm not
9    totally sure.
10       Q    So you don't actually know whether those
11   questions predated --
12       A    I'm not sure.
13       Q    -- or post dated the filing of the original
14   Complaint?
15       A    I'm not totally sure about that.
16       Q    And who addressed the questions to you?
17       A    I think I had -- I think I had several
18   conversations with counsel.
19       Q    With what counsel?  Inside counsel?
20   Outside counsel?
21       A    Inside counsel.
22       Q    Who specifically?
23       A    I'm not sure if I'm going to recall that
24   exactly right now.  I don't know if I recall exactly
25   how the whole time line of how it got started, who I

261

1    talked to.  I just don't recall the specifics of it.
2        Q    Did you have any written communications
3    with anybody regarding this Complaint, this Complaint
4    being the original Complaint filed that was
5    subsequently amended?
6        A    I don't recall any specific written
7    communications.
8        Q    In Paragraph 237 of the Complaint, Giant
9    Eagle alleges that you recall verbal conversations
10   with Gary Bethel of Hillandale and Tim Weaver of
11   Weaver about what was going on with market prices for
12   eggs on various occasions ranging between 2003 or 2004
13   and 2008 or 2009.  Do you see that?
14       A    I do.
15       Q    Can you please describe in detail for me
16   exactly what verbal conversations you recall?
17       A    Well, I think I talked about this a little
18   bit earlier.  Whenever the markets would change
19   dramatically for whatever reason, it was not unusual
20   for me in the course of normal conversation in a
21   normal business day, because we talked a lot anyway,
22   to say what's going on with the market?  What is it
23   up?  Why is it down?  What can I expect in another
24   month?  What can I expect in two months?  When's a
25   good time to run an ad?

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

67 (Pages 262 to 265)

---

262

1     Those were very common conversations within
2 just planning business. And what I meant by that was
3 that I was aware of some of those things that were
4 going on through those conversations with Tim and Gary
5 at the time.
6     I don't remember specific conversations. I
7 remember just sort of a general awareness around some
8 of those issues as a result of those conversations.
9     Q  When you said some of the things that were
10 going on, what does that mean? What things that were
11 going on?
12     A  Where is that specifically?
13     MS. CAIN-MANNIX: We were looking at 237.
14     Q  The first sentence is what I had asked you
15 about, the specific conversations.
16     A  Yeah. It says what's going on with market
17 prices on various occasions from 2003 and '04 and then
18 '08 and '09, right?
19     Q  Right.
20     A  All right. I think I just -- I think I
21 just explained that and I think --
22     Q  Well, you gave me some very general
23 guidelines of when you may or may not talk to Gary
24 Bethel and Tim Weaver. I'm asking you specifically
25 what conversations form the basis of this sentence?

---

263

1 You recall verbal conversations about what was going
2 on with market prices for eggs on various occasions
3 ranging between 2003 or 2004 and 2008 or 2009.
4     Do you recall any specifics about the
5 conversations that you're alleging in this Complaint?
6     A  I don't think -- I don't think I'm going to
7 remember specific conversations other than just a
8 general awareness of some of the things based on what
9 they told me was driving some of the markets.
10     Q  Okay. In 2003, what was going on with the
11 market prices for eggs that you recall discussing with
12 Mr. Bethel and Mr. Weaver?
13     A  I don't recall specific in 2003-2004. I
14 don't think I recall specifics in either of those
15 timeframes specifically other than the general items
16 that I referred to earlier around feed. I remember
17 feed. I remember exports, cage sizes. Those things
18 all came up in various times in conversation, but I
19 don't remember a specific conversation at a specific
20 time about a specific thing.
21     Q  So you don't recall verbal conversations
22 during the timeframes that are included in this
23 sentence?
24     A  We had an ongoing relationship from 2002
25 until when I left, so we were always having those

---

264

1 conversations.
2     Q  So why did you call out here between 2003
3 or 2004 and 2008 or 2009 if what you really meant
4 was --
5     A  Well, I don't --
6     MS. CAIN-MANNIX: Objection to the --
7     Q  Let me finish my statement first.
8     Why did you call out those specific years
9 if you recall having these conversations generally
10 throughout your entire career?
11     A  I don't know.
12     MS. CAIN-MANNIX: Objection to the form of
13 the question.
14     Q  Did you have more specifics when you
15 provided this information to somebody at Giant Eagle
16 or to your counsel and they signed the Complaint?
17     A  No, ma'am.
18     Q  So all you told them was you generally
19 recalled discussing the market with your suppliers?
20     A  I believe that's what I said to that, yes.
21     MS. CAIN-MANNIX: And move to strike that
22 answer. We were not discussing specifics of what
23 you told counsel. Okay.
24     MR. ANDERSON: What did she just say?
25     (Last colloquy was read back.)

---

265

1     MS. ANDERSON: I did not ask you what
2 specifically you told counsel. I asked whether
3 you had anymore information at that point in
4 time, whether you had any recollections at that
5 point in time that are different than the absence
6 of recollections now, and he said no.
7     MS. CAIN-MANNIX: Well, he's not to testify
8 that --
9     MS. ANDERSON: The Judge will ultimately
10 rule on your motion to strike.
11     Why don't we take a short break, so I can
12 see if I have anything further?
13     THE VIDEOGRAPHER: We are off the record.
14 The time is 3:14 p.m.
15     (Recess taken.)
16     THE VIDEOGRAPHER: We are on the record.
17 The time is 3:25 p.m.
18     MS. ANDERSON: I will hold any additional
19 questions or I have no additional questions
20 pending redirect, and as I have discussed with
21 Ms. Cain-Mannix, we will be holding open the
22 30(b)(6) until such time as counsel is able to
23 confer.
24     So Karrie Allen, on the phone, I think you
25 have some questions?

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

68 (Pages 266 to 269)

---

266

1    MS. ALLEN:  I do just a few.  All right.
2  Thank you.
3         EXAMINATION
4  BY MS. ALLEN:
5    Q   Well, I'm Karrie Allen.  I represent Rose
6  Acre Farms, a Defendant in this case, and just a few
7  questions for the end of the day.
8         Have you ever received instructions not to
9  destroy any documents related to this case?
10   A   Yes.
11   Q   When did you receive those instructions?
12   A   Very early on.  The day we found out about
13  it.
14   Q   Do you have an idea of when that was?
15   A   I don't recall the specific date.  It was
16  2010.  I don't have the specific date.
17   Q   Okay.  So just 2010, but no idea on the
18  month?
19   A   I don't recall the month that we were
20  officially notified.
21   Q   And the notification that you're referring
22  to, who were you notified by?
23   A   We were notified by our counsel.
24   Q   Have you ever been asked to gather
25  information related to this case?

---

267

1    A   Yes.
2    Q   What did you do to gather that information?
3    A   Well, we went back and just looked in our
4  files and our records, and we handed anything we had
5  that was egg related over to counsel.
6    Q   Including your personal files?
7    A   Yes.
8    Q   Okay.  Do you have a non-Giant Eagle email
9  address?
10   A   I have a home address, a home email
11  address.
12   Q   Have you ever used your home email address
13  for business purposes or forwarded Giant email --
14   A   No.
15   Q   -- or Giant Eagle information to that
16  account?
17   A   Well, I have -- I have a -- not Giant Eagle
18  information.  I mean, I get information from my home
19  computer from my wife, but I don't use it for
20  business.
21   Q   Okay.  Has anyone ever asked you for your
22  password or to search that account for information
23  related to this case?
24   A   No.
25   Q   Okay.  Let's see, what facts do you have

---

268

1  that Rose Acre conspired to increase egg prices?
2    MS. CAIN-MANNIX:  Objection to the
3  question.  And I want to counsel the witness not
4  to reveal anything provided -- information
5  provided by counsel.
6    A   Yeah, so all that information was provided
7  to me by counsel, so.
8    Q   Okay.  So apart from what was provided by
9  counsel, is it correct that you do not have any
10  additional facts regarding Rose Acre's involvement
11  with egg prices?
12   A   That is correct.
13   Q   Okay.  Let's see, I believe you stated
14  previously that Rose Acre started selling eggs around
15  2011 to Giant Eagle.  Is that correct?
16   A   Liquid eggs, yes, ma'am.
17   Q   Liquids eggs.  Okay.  And were these liquid
18  eggs UEP Certified?
19   A   I don't know the answer to that question.
20  I don't know.
21   Q   And are you aware of a contract between or
22  with Rose Acre for those sales of liquid eggs?
23   A   I am not aware of a contract within our
24  building.
25   Q   So when you say within your building, does

---

269

1  that mean there's a contract somewhere?
2    A   I don't know.  I don't know.  I don't know
3  if there's a contract, a formal contract or not.
4    Q   Okay.  And just a couple more questions.
5  Is Giant Eagle seeking the discontinuation of the UEP
6  Certified Program?
7    A   No
8    MS. CAIN-MANNIX:  Object to the form to the
9  question.  To the extent you know if there's such
10  a policy, go ahead.
11   A   To the best of my knowledge, no.
12   Q   Okay.  And does Giant Eagle support --
13  strike that.
14        Does Giant Eagle support the
15  discontinuation of the UEP Certified Program?
16   MS. ALLEN:  The same objection.
17   A   I don't think that Giant Eagle has taken
18  any formal position on that.
19   MS. ALLEN:  Okay.  I have no further
20  questions.
21   MS. CAIN-MANNIX:  I have a few.
22        EXAMINATION
23  BY MS. CAIN-MANNIX:
24   Q   Mr. Moran, as between Giant Eagle and
25  Topco, which company handled the nuts and bolts of

---

HIGHLY CONFIDENTIAL

Moran, Paul                                              May 20, 2014

69 (Pages 270 to 273)

---

270

1    what we called earlier today the RFPs --
2        A    Topco.
3        Q    -- with the egg vendors?
4        A    I'm sorry.  Topco generally handled the
5    RFP.
6        Q    And when did you become involved?
7        A    Generally, they would do the work, the work
8    ahead and gather the information, and then when they
9    felt that they had the right vendor mix and proposals,
10   they would come back and we would have conversations
11   around the best potential offerings that were there.
12       We might have a conversation around vendors
13   first and then sort of pair it down, and then they
14   would go out and formally ask for costs and then we
15   would have another conversation.  It was sort of an
16   informal process.
17       Q    Who drew up the written documentation that
18   was sent to vendors when you did an RFP --
19       A    Those came --
20       Q    -- for a bid?
21       A    Those came from -- those came from Topco
22   previously.  The more recent processes are a little
23   different that internally.
24       Q    Is that for eggs or everything?
25       A    For everything.

---

271

1        Q    During this period, is it your best -- what
2    is your best recollection as to whether there were
3    formal written contracts between Giant Eagle and its
4    shell egg vendors?
5        A    There is no written, formal written
6    contract that Giant Eagle has with the egg vendors
7    that I am aware of.
8        Q    There were purchase orders and you had
9    pricing that had been negotiated; is that correct?
10       A    Those contracts -- exactly, so the POs were
11   a form of a contract and then obviously honored all of
12   those, but in terms of a formal contract on the
13   program itself, I'm not aware of -- I'm not aware of
14   any one that exists.
15       Q    If there were a formal written contract
16   during this 1998 to 2008 time period, are you the
17   person at Giant Eagle -- or who would be the person at
18   Giant Eagle who's the most knowledgeable about that
19   subject?
20       A    I would probably be the most aware.  I
21   would have been the one at the time anyway that would
22   have been the most aware of that.
23       Q    And if you had formal written contracts
24   with your shell egg vendors, would you have produced
25   them to counsel in the litigation?

---

272

1        A    Yes.
2        Q    Okay.  With respect to that series of
3    questions, would the answers be the same with respect
4    to processed egg products?
5        A    Yes.
6        Q    You were asked about products that Giant
7    Eagle -- egg products that were purchased by Giant
8    Eagle during the relevant time period.
9        Would the best source of information about
10   the panoply of products purchased by Giant Eagle be in
11   the data?
12       A    Yes.
13       Q    With respect to shell eggs, the commodity
14   eggs that Giant Eagle purchased from Weaver and from
15   Hillandale, were there -- was there a rebate program
16   with respect to those shell eggs?
17       A    There's no rebate program that I'm aware
18   of.
19       Q    Okay.  Were those -- when we looked at the
20   data, we saw called for a list price.  Was that the
21   price, the net price you paid for shell eggs?
22       A    Yes.  There was no -- there was no
23   promotional activity, at least no vendor funded
24   promotional activity went on in the shell eggs, the
25   commodity shell eggs, Giant Eagle eggs, so that would

---

273

1    representative of those items.
2        Q    Okay.  Are you aware of a company by the
3    name of Kreider Farms?
4        A    Yes.
5        Q    And where are they located?
6        A    Kreider is in Central Pa., Eastern Central
7    Pa. I believe, the Harrisburg area.
8        Q    Did Giant Eagle consider using Kreider
9    Farms as a supplier in recent years?
10       A    So this is past my time, but in the last
11   bid that we did last year, Kreider was I know a
12   finalist in the bidding that at the end of the day did
13   not get awarded the business.
14       Q    And is Kreider Farms to your knowledge UEP
15   Certified?
16       A    To the best of my knowledge Kreider Farms
17   is not UEP Certified, but they have standards that are
18   UEP plus according to what I understand.
19       Q    And was the fact that they didn't have that
20   particular certification an obstacle to them receiving
21   the Giant Eagle business?
22       A    It was not.
23       Q    Was it a factor other than UEP
24   certification that determined who got the business?
25       A    Yes.

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

70 (Pages 274 to 277)

---

**274**

1     Q   Buckeye Farm, we talked about them earlier,
2 you did. Did Buckeye Farm to your knowledge have
3 environmental issues?
4     A   **Environmental issues were one of the things**
5 **that Buckeye was going through at the time. I think**
6 **they had a water runoff issue that was creating some**
7 **issues in the neighborhood that they -- where they**
8 **existed.**
9     Q   And to your knowledge, was there negative
10 publicity surrounding that issue as well?
11     A   **Part of the negative press was surrounding**
12 **that issue, yes.**
13     Q   Was that one of the factors that was
14 involved in Giant Eagle's decision-making process with
15 respect to moving its business away from Buckeye Farm?
16     A   **It was all part of it.**
17     MS. CAIN-MANNIX: That's all I have.
18     MS. ANDERSON: I have a few questions in
19 follow-up. How much time do we have?
20     THE VIDEOGRAPHER: You have about
21 11 minutes.
22     EXAMINATION
23 BY MS. ANDERSON:
24     Q   You just stated in response to questioning
25 from your own lawyer that there was no formal written

---

**275**

1 contract with Giant Eagle; is that -- I'm sorry. With
2 Hillandale or with Weaver Brothers; is that correct?
3     A   **I said what I said to you before, I'm not**
4 **aware of one. I'm not aware of a formal written**
5 **contract that we have with them.**
6     Q   Are you suggesting that there is no written
7 agreement between Topco and Hillandale covering the
8 sales to Giant Eagle?
9     A   **That's not what I suggested. I think we**
10 **saw earlier that there is apparently an agreement**
11 **between Topco and Hillandale that I don't think we**
12 **signed.**
13     Q   And it encompasses the Giant Eagle Egg
14 Program, correct?
15     A   **It does.**
16     Q   And that is what Topco is hired to do for
17 you, correct?
18     A   **That is what Topco -- it is one of the**
19 **things Topco does for us, yes.**
20     Q   Your counsel asked whether the best source
21 of the panoply of products that you sold is the data
22 and you responded yes. Do you recall that?
23     A   **Yes.**
24     Q   What data are you referring to? The data
25 that you --

---

**276**

1     A   **I'm sorry.**
2     Q   Are you referring to the data you couldn't
3 identify a half an hour ago?
4     MS. CAIN-MANNIX: Objection to the form of
5 that question. I don't think he couldn't
6 identify it.
7     MS. ANDERSON: Form or foundation is all
8 you have.
9     MS. CAIN-MANNIX: Okay.
10     A   **I actually think I -- actually, I think I**
11 **did identify it. I identified a potential issue on**
12 **the branded costs that were there. What I said was**
13 **that on the information that's there on the owned**
14 **brand because you don't have the added complication of**
15 **potential vendor allowances that that data would be**
16 **one in the same on the commodity fresh eggs. Whereas,**
17 **on the branded eggs that potentially have an OI**
18 **associated with them, it may not be the same.**
19     Q   Okay. Let's pull out that exhibit if you
20 don't mind.
21     MS. CAIN-MANNIX: What is the number,
22 Carrie?
23     Q   I don't know because I gave you all my
24 copies. All I have is my unmarked one. It's the
25 tiny, tiny print.

---

**277**

1     A   **It should be close to the top here**
2 **somewhere.**
3     Q   I can pull it out of your stack if you want
4 me to. Right there. Stop. Go back, Mr. Moran. Go
5 back. Right there.
6     A   **Okay. I got it.**
7     MS. CAIN-MANNIX: And then you can tell me
8 what number it is.
9     A   **Okay. It's 36.**
10     Q   Exhibit 36, I believe you previously
11 testified that you did not know where this data came
12 from?
13     MS. CAIN-MANNIX: Objection.
14     Q   Do you know --
15     MS. CAIN-MANNIX: Mischaracterizing what he
16 testified to.
17     Q   Do you know exactly where this data came
18 from, Mr. Moran?
19     A   **The data came -- well, the data came from**
20 **our systems, I don't -- I won't -- I believe they**
21 **would have had to have come from our BICEPS system.**
22 **What I said I am not totally clear on was which cost**
23 **this was looking at.**
24     Q   Which? I understand that you weren't sure
25 whether list cost meant list cost or net cost. I

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

71 (Pages 278 to 281)

---

278

1  understand that.
2      A    Correct.
3      Q    My question was can you tell me
4  definitively which system this report was run out of?
5      A    I didn't run them, so I can't tell you
6  definitively which system it was run out of.
7      Q    Then why are you so confident that every
8  single product that Giant Eagle purchased from 1999 to
9  2008 -- excuse me -- this would be to 2012 is
10 reflected in this chart?
11         MS. CAIN-MANNIX:  Objection to the form of
12 the question.
13     Q    Do you understand my question?
14     A    Did I personally go back and review the
15 information that was pulled, I did not.  The request
16 was to give counsel all of that information.
17     Q    And did you personally?
18     A    I did not personally give it to them, no.
19     Q    Is this chart what was given to counsel?
20         MS. CAIN-MANNIX:  Objection to the extent
21 I'm just going to caution you again -- I made
22 this caution several times -- don't discuss
23 things you discussed with counsel.
24     Q    I mean, I'm trying to understand the basis
25 for your certainty, sir, that the best source for the

---

279

1  panoply of eggs that are purchased over a ten-plus
2  year period is the data.  I'm trying to understand
3  what data you're talking about and why you're so sure
4  when you seemed to have a lot of questions about the
5  data --
6          MS. CAIN-MANNIX:  Objection.
7      Q    -- when I questioned you.
8          MS. CAIN-MANNIX:  Objection to the --
9          MS. ANDERSON:  Form or foundation?
10         MS. CAIN-MANNIX:  To the foundation of the
11 question.
12     Q    Fine.  Move on.  You can answer the
13 question.
14     A    Well, I'm as confident as I can be based on
15 the data that's in our system, and that's proven in
16 the past with other things we pulled to be accurate.
17 What I was questioning was whether that number is
18 actually a net number or a gross number, that was
19 really my -- that was the basis of my question.
20     Q    So we're looking not at the price.  Ignore
21 that last column, and what we are looking for is to
22 identify all products purchased over the relevant time
23 period by Giant Eagle, and your counsel asked you
24 whether the data was the best source.
25         Do you mean the data in your systems or are

---

280

1  you referring to a specific report that I -- that was
2  produced to the Defendants in this ligation?
3          MS. CAIN-MANNIX:  Objection to form.
4      Q    Do you understand what I have said?
5      A    I'm not totally sure I'm following you,
6  following the difference there.  I'm not -- I mean,
7  can you say that again?  I'm not totally sure that I'm
8  getting to what you want.
9      Q    Do you believe that all of the information,
10 all of the data in your systems was produced to the
11 Defendants in this litigation?
12         MS. CAIN-MANNIX:  Objection to form.
13     Q    I'm asking for your belief.  Do you
14 believe --
15     A    I believe it was.  I believe that based on
16 what I know of what went on with this there was a good
17 faith effort made to get every piece of data that was
18 necessary for this case.
19     Q    Okay.  And if the data that was produced is
20 the chart that is Exhibit 36, are you willing to
21 concede that perhaps not all of the data in your
22 systems were produced since we have a list cost here?
23 At a minimum, we have perhaps not the net cost, or we
24 don't have list and net separated out, which you have
25 told me is available in your systems?

---

281

1      A    I don't know if it's available on a report
2  like this.
3      Q    Right.  But if all of the data that was
4  produced is this report, are you comfortable
5  testifying under oath that all of the data available
6  in your systems was produced?
7          MS. CAIN-MANNIX:  Objection to the form of
8  the question.
9      A    I don't know how to answer that question.
10     Q    It's a yes or no question.  Are you
11 comfortable testifying under oath that Exhibit 36 is
12 all of the data available in your systems?
13         MS. CAIN-MANNIX:  With the caveat that he's
14 already made.
15     Q    There is no caveat for this question.  My
16 question is very simple.  Can you sit here today and
17 testify under oath that Exhibit 36 is all of the data
18 available in your systems?
19         MS. CAIN-MANNIX:  I think you're harassing
20 the witness, but go ahead.
21     Q    He hasn't answered the question yet.
22     A    No, I haven't.  I mean, I guess I would
23 have to say no to that, but I am not the person
24 that -- I am not necessarily the people that pulled
25 the data, so I wouldn't be the person that would be

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

72 (Pages 282 to 285)

---

282

1  the one that would be --
2      Q   I understand that you're not, which is why
3  I questioned your confidence in the data.
4          THE VIDEOGRAPHER:  I have four minutes left
5  on this.
6      Q   Understood.
7          Your counsel elicited some testimony about
8  Kreider Farms in the 2011 RFP.  Did you produce
9  documents to the Defendants about your Kreider -- the
10 RFP in 2011?
11         MS. CAIN-MANNIX:  Objection.  It wasn't
12 requested post 2008 I don't believe, so.
13     Q   Can you answer the question?
14     A   No.
15     Q   And what vendors were considered in 2011?
16     A   I don't know what all the vendors were.
17     Q   Who would know?
18     A   Topco would know.  It's part of their
19 process, and I'm sure Jim Rohr would know at least
20 whatever information that they -- that Topco gave him
21 after their process.
22     Q   You testified earlier today I believe that
23 you had frequent conversations with Gary Bethel and
24 Tim Weaver about egg markets.  Is that right?
25     A   Yeah.  On an ongoing business related

---

283

1  basis, yeah.
2      Q   When those companies were submitting bids
3  in response to your 2003, 2005 and 2008 RFPs, did you
4  stop those conversations?
5          MS. CAIN-MANNIX:  Objection to the 2008
6  characterization but --
7      Q   Go ahead.
8      A   I don't recall stopping those conversations
9  during that time, no.
10     Q   So is it safe to assume that during your
11 frequent conversations with them about the egg market,
12 the RFP and their submissions would have been
13 included?
14     A   Say that again.  I'm sorry.
15     Q   Is it safe to assume that during the time
16 you had RFPs outstanding that when you were speaking
17 with Mr. Bethel and Mr. Weaver, the subject of the
18 RFPs and their responses to your bid and the price
19 negotiations would have been included in your
20 conversions?
21     A   No, it's not safe to say that.
22     Q   Okay.  Would you not have discussed the RFP
23 process with them if you were on the phone with them?
24     A   I think we would have if it got to the
25 point where we kind of knew where everybody stood.  We

---

284

1  may have.  So if it got to the point where we were
2  ready to give vendors feedback, it certainly could
3  have been part of the conversation, but it wasn't
4  necessarily a day-to-day conversation that we were
5  having with vendors.
6      Q   But you would have been aware of their
7  involvement in the bid process?
8      A   Yes.
9      Q   Before we broke or during our break, did
10 you review how you were going to testify with your
11 counsel in the hallway, the substance of your
12 testimony?
13         MS. CAIN-MANNIX:  Objection.  You're not to
14 discuss conversations with counsel.
15     Q   Did your counsel tell you what questions
16 she was going to ask you?
17         MS. CAIN-MANNIX:  Objection.
18         MS. ANDERSON:  Are you instructing him not
19 to answer?
20         MS. CAIN-MANNIX:  Yes.
21     Q   Are you taking your counsel's advice?
22     A   Yes.
23     Q   Did you have any discussions with your
24 counsel during break before that was immediately
25 preceding the break that did not involve legal advice

---

285

1  on your testimony today?
2          MS. CAIN-MANNIX:  Legal advise?
3      Q   Do you understand my question?
4      A   Did we talk about things other than --
5      Q   Was the entirety of your conversation with
6  your counsel prior to her questioning of you, was it
7  strictly legal advice relating to your testimony or
8  did you have any other conversation?  You can answer
9  me.
10         MS. CAIN-MANNIX:  I'm going to object to
11 the form.
12         MS. ANDERSON:  You can objection or you can
13 instruct him not to answer.
14         MS. CAIN-MANNIX:  I'm going to object to
15 the form.
16     Q   Fine.
17         Can you answer the question?
18     A   Did conversations that we have -- I'm not
19 sure if I'm totally following.
20     Q   You had a conversation with you counsel,
21 after which you returned to the room and she proceeded
22 to ask you questions and you answered them?
23     A   Yes.
24     Q   During that conversation on your break, was
25 the entirety of that conversation legal advice from

---

HIGHLY CONFIDENTIAL

Moran, Paul                                      May 20, 2014

73 (Pages 286 to 289)

---

**286**

1  her on how to testify --
2          MS. CAIN-MANNIX:  Objection.
3      Q   -- or did you have any parts of the
4  conversation that were not legal advice?
5      **A   I'm not sure if I'm recalling the whole**
6  **conversation.  I'm sure there were parts of it that**
7  **weren't legally related.**
8      Q   And you can't recall anything that you had
9  discussed with her that wasn't legal advice, the
10 conversation a half an hour ago?
11     **A   How do you want me to answer that?**
12     Q   I have actually asked the question, so you
13 need to answer me.
14         MS. CAIN-MANNIX:  Let me say this --
15         MS. ANDERSON:  You can object to the form,
16 the foundation or instruct him not to answer.
17         MS. CAIN-MANNIX:  I can provide him an
18 instruction not to answer, which I may do.
19         MS. ANDERSON:  That's fine.  If you want to
20 do that, do that.
21         MS. CAIN-MANNIX:  Just give me a second and
22 quit interrupting.  If you can, just give me a
23 second.
24         Do you want to change the tape?
25         THE VIDEOGRAPHER:  Yeah.  We are off the

---

**287**

1  record.
2          MS. ANDERSON:  We are going to go off the
3  record.  I want the conversation to stop until
4  we're back on.
5          MS. CAIN-MANNIX:  Yeah.  I'm thinking
6  about --
7          THE VIDEOGRAPHER:  Are you okay with it?
8          MS. CAIN-MANNIX:  -- the instruction I want
9  to give.
10         MS. ANDERSON:  We're off the record.
11         THE VIDEOGRAPHER:  We're both agreed?
12         MS. ANDERSON:  Yes.
13         THE VIDEOGRAPHER:  We are off the record.
14 The time is 3:49 p.m.
15         (Recess taken.)
16         THE VIDEOGRAPHER:  We are on the record.
17 The time is 3:50 p.m.
18 BY MS. ANDERSON:
19     Q   Now, I'll just repeat my question, so we
20 can be on the same page.  I asked you if your counsel
21 had previewed her questions, if you had rehearsed your
22 testimony.  She instructed you not to answer on the
23 basis of legal advice.
24         I am now asking you if there was any part
25 of your conversations with counsel during the break

---

**288**

1  that was not her providing legal advice to you as to
2  your testimony?  That's my question.
3          MS. CAIN-MANNIX:  And I would like to
4  provide guidance to the witness.  To the extent
5  we discussed topics and anticipated questions,
6  you may answer her question.  To the extent you
7  believe any of it's legal advice that I provided
8  to you, you can refrain from answering, but to
9  the extent it was factual, go ahead and answer.
10     **A   I don't know that it was legal advice**
11 **necessarily.  We reviewed what we thought a couple of**
12 **the questions might be that she might ask me as**
13 **follow-ups.**
14     Q   And you reviewed what your answers would
15 be?
16     **A   We didn't specifically review answers.  It**
17 **was more questions and to think about what the**
18 **questions might be.  We didn't sit down and walk**
19 **through answers, no.**
20     Q   But did you sit down and walk through the
21 questions?
22     **A   Not specific questions.  More subject**
23 **matter.**
24         MS. ANDERSON:  I have no further questions
25 at this time.

---

**289**

1          MS. CAIN-MANNIX:  I have a question.
2          EXAMINATION
3  BY MS. CAIN-MANNIX:
4      Q   Did I tell you how to answer any of the
5  questions you have answered today?
6      **A   No.**
7          **MS. CAIN-MANNIX:  Okay.**
8          **EXAMINATION**
9  BY MS. ANDERSON:
10     Q   Are you referring -- now that you have
11 opened the door, did she tell you or offer advise to
12 you on how you should answer questions generally as to
13 topics and prior discussions?
14         MS. CAIN-MANNIX:  And you are not to
15 answer.
16         MS. ANDERSON:  You have just opened the
17 question.
18         MS. CAIN-MANNIX:  No.
19         MS. ANDERSON:  If you're instructing him
20 not to answer, then I move to strike your last
21 gratuitous question and his answer.
22         MS. CAIN-MANNIX:  That's fine.
23         MS. ANDERSON:  And we can get to the
24 subject of whether you have just waived privilege
25 at a different time, but thank you very much.

---

HIGHLY CONFIDENTIAL

Moran, Paul

May 20, 2014

74 (Pages 290 to 292)

290

1    THE VIDEOGRAPHER:  We are off the record.
2    The time is 3:52 p.m.
3         - - -
4         (Thereupon, at 3:52 o'clock p.m., the
5    deposition was concluded and signature was not
6    waived.)
7         - - -

291

SIGNATURE PAGE

_____

PAUL MORAN

Subscribed and sworn to before me this

_____ day of _____, 2014

_____

Notary Public

         - - -

292

CERTIFICATE
COMMONWEALTH OF PENNSYLVANIA, )
                              )
COUNTY OF ALLEGHENY.          )
    I, Melissa L. Fenster, do hereby certify that
before me, a Notary Public in and for the Commonwealth
aforesaid, personally appeared PAUL MORAN, who then
was by me first duly cautioned and sworn to testify
the truth, the whole truth, and nothing but the truth
in the taking of his oral deposition in the cause
aforesaid; that the testimony then given by him as
above set forth was by me reduced to stenotypy in the
presence of said witness, and afterwards transcribed
by means of computer-aided transcription.
    I do further certify that this deposition was
taken at the time and place in the foregoing caption
specified, and was completed without adjournment.
    I do further certify that I am not a relative,
counsel or attorney of either party, or otherwise
interested in the event of this action.
    IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office at Pittsburgh,
Pennsylvania, on this _____ day of _____,
2014.

_____
Melissa L. Fenster, Notary Public
My commission expires:  November 24, 2014

         - - -