# ATTACHMENT 44

1                    IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   IN RE:  PROCESSED EGG PRODUCTS:          MDL NO. 2002
    ANTITRUST LITIGATION                     08-MDL-02002
5

6

7                              - - - - -

8                          PHILADELPHIA, PA

9                              - - - - -

10                        NOVEMBER 6, 2019

11                             - - - - -

12

13  BEFORE:         THE HONORABLE GENE E.K. PRATTER, J.

14                             - - - - -

15                 TRANSCRIPT OF TRIAL PROCEEDINGS

16                              DAY 5

17                             - - - - -

18

19

20

21              KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                Official Court Reporter
22              Room 1234 - U.S. Courthouse
                601 Market Street
23              Philadelphia, PA  19106
                (215) 779-5578
24

25
           (Transcript produced by mechanical shorthand via C.A.T.)

1          MR. KING:  Rose Acre doesn't have anything.
2          THE COURT:  Okay.  I mean, if you really did need
3     me, there would be some time, but I'm talking about like a
4     huge chunk.
5          It looks like we can schedule it.  Thank you very
6     much, folks.
7          MR. BLECHMAN:  Your Honor, are we adjourned for
8     lunch?
9          THE COURT:  Pardon?
10          MR. BLECHMAN:  Are we adjourned for lunch?
11          THE COURT:  Oh, yes, absolutely.
12          (After luncheon recess:)
13          THE COURT:  Oh, your numbers are dwindling.  Please
14     take your seats.
15          Anything we need to address before bringing the jury
16     back in?
17          MR. AHERN:  No, Your Honor.
18          THE COURT:  Great.
19          THE DEPUTY CLERK:  All rise.
20          (Jury in.)
21          THE COURT:  Okay.  You all may take your seats.  We
22     are ready to resume, ladies and gentlemen.  I hope you had a
23     nice lunchtime, and Plaintiffs may call the next witness.
24          MR. AHERN:  Plaintiffs call John Mueller to the
25     stand, please.

1          THE DEPUTY CLERK:  Please remain standing and raise
2     your right hand.
3          (Witness affirms.)
4          THE DEPUTY CLERK:  Could you please have a seat.
5     Please state your full name and spell your last name for the
6     record.
7          THE WITNESS:  John Mueller, M-U-E-L-L-E-R.
8          THE COURT:  Good afternoon, Mr. Mueller.  How are
9     you today?
10          THE WITNESS:  Doing fine, thank you.
11          THE COURT:  Good.  Are you comfortable?
12          THE WITNESS:  I am.
13          THE COURT:  Be sure to keep your voice up so
14     everybody can hear you.
15          You may proceed.
16          MR. AHERN:  Thank you, Your Honor.
17                    JOHN MUELLER,
18     called as a witness herein by the Plaintiffs, having duly
19     affirmed to an oath, was examined and testified as follows:
20                    DIRECT EXAMINATION
21     BY MR. AHERN:
22     Q.   Good afternoon, Mr. Mueller.  Have you ever been employed
23     by a company named Sparboe?
24     A.   Yes.
25     Q.   And from what time?

1     A.   From 1997 until 2006.
2     Q.   Now, are you appearing here voluntarily today?
3     A.   I am.
4     Q.   And is it your intention to tell the truth today in
5     answering the questions you are asked?
6     A.   Absolutely.
7     Q.   Now, from -- from 1997 through March of 2006, when you
8     were employed by Sparboe, what position did you hold at the
9     company?
10     A.   I was the human resources director and the general
11     counsel.
12     Q.   And in that capacity, did your job involve any work
13     related to trade organizations or associations?
14     A.   It did.
15     Q.   And what role did you play during those years related to
16     trade associations?
17     A.   Well, various roles.  I was involved with the United Egg
18     Producers Environmental Committee.  I sat on that committee as
19     a representative of Sparboe companies.  I also interacted with
20     them frequently when UEP would ask us to sign any type of
21     agreements, or they would ask anybody from our company to sign
22     any type of agreements.  Those came across my desk for review
23     and consult with my fellow employees.
24     Q.   And did you have an understanding at that time as to what
25     the United Egg Producers was?

1     A.   It's a -- yes, I did.  It's a trade association for egg
2     producers across the country.
3     Q.   And if I refer to the United Egg Producers as the UEP,
4     will you know who I'm referring to?
5     A.   Absolutely.
6     Q.   And did you on behalf of Sparboe attend UEP meetings?
7     A.   I did.  I started attending meetings pretty early on.  I
8     would say from 1999 until I left in 2000 -- early 2006, I
9     probably never missed an annual meeting or special meeting,
10     for that matter.  I was there a lot.  I was at a lot of
11     meetings.
12     Q.   Did you ever attend meetings of the UEP Board of
13     Directors?
14     A.   Yes.
15     Q.   Were you a member of the UEP Board of Directors?
16     A.   I never was, not myself, no.
17     Q.   Was anybody from Sparboe a member of the UEP Board of
18     Directors?
19     A.   Yes.  Bob Sparboe was for a while and Wayne Carlson was
20     for a while.
21     Q.   Now, you mentioned a UEP Environmental Committee.  Did
22     you attend meetings of that committee on behalf of Sparboe?
23     A.   I did.
24     Q.   Okay.  And do you recall attending any other UEP
25     committee meetings?

121

1   A.   From time to time, I went along to the Animal Welfare
2   Committee meetings.  I attended some United States Egg
3   Marketing Association meetings, and I think you've already
4   mentioned I attended quite a few Board of Directors meetings.
5   Q.   And was there a UEP Marketing Committee?
6   A.   Yes.
7   Q.   Okay.  Did you attend any of those meetings?
8   A.   I did, yes.
9   Q.   Is it correct that you started attending various UEP
10  meetings shortly after you became employed in 1997?
11  A.   It was shortly after I maybe made one or two, but from
12  1999 through the end of my time there, I went to -- I'm going
13  to guess I went to every UEP meeting.
14  Q.   Okay.  Now, if I could direct your attention to the year
15  2002, do you recall any of the topics that were discussed
16  around that time at the UEP Board of Directors meetings that
17  you attended?
18  A.   Well, most certainly, you know, the -- since I was on the
19  Environmental Committee, any environmental issues, there was
20  an air emissions issue that was making its way through the
21  Environmental Protection Agency at that time.  So that was a
22  topic, but the big topic around that time would have been the
23  animal welfare initiative.
24  Q.   And when you say "the animal welfare initiative," is that
25  something that ultimately came to the UEP Certified Program

122

1   with the 100% rule?
2   A.   That's what it evolved to, yep.
3   Q.   And were there any issues discussed at the UEP board
4   meetings related to animal welfare at this time that caused
5   you as a representative of Sparboe at this meeting any
6   concern?
7   A.   Yes.  At that time, and probably earlier, almost from the
8   inception, I was concerned that we were maybe perpetrating or
9   having an Animal Welfare Program rolled out which was cloaking
10  or hiding a potential price-fixing issue behind it.
11  Q.   And what -- what led to that concern?
12  A.   I think everybody in the egg industry, the owners and
13  operators, we understand supply side economics.  For whatever
14  reasons, United Egg Producers, in my opinion, seemed hell-bent
15  on making sure we understood that, and we keep championing
16  it.  Rather than this is an animal welfare initiative program, they
17  were championing it as a supply demand, a way to reduce
18  supply.
19  Q.   How much of the discussion around the animal welfare
20  issue was focused on reducing supply and increasing prices?
21  A.   In my mind's eye, 95 percent or more.
22  Q.   And how much of the discussion on the animal welfare
23  issue was focused on animal welfare?
24  A.   Very limited amount.
25  Q.   And is your understanding based on your attendance at the

123

1   UEP board meetings?
2   A.   My own personal observations and my interactions with UEP
3   members and other people in the industry and my own colleagues
4   at work.
5   Q.   Okay.  And when you say your interactions with UEP, did
6   that include your attendance at UEP board meetings?
7   A.   Yes.
8   Q.   And does that include statements made at those UEP board
9   meetings in your presence?
10  A.   Most definitely.
11  Q.   Now, did you ever express to anybody in particular that
12  you were a member and your concerns that you've just outlined?
13  A.   I had discussions with -- the chair of the Environmental
14  Committee that I was on was Chad Gregory, and so I had
15  discussions with him.  I had discussions, personal discussions
16  with Gene Gregory.  I had discussions with kind of a kindred
17  soul.  He was the only other general counsel in the egg
18  industry at that time, a guy named Joe Miller from Rose Acres
19  and, you know, pretty much anybody who would listen.
20  Q.   And who was Chad Gregory?
21  A.   Chad at the time was, I believe, a secretary of the
22  United Egg Producers.  He is Gene Gregory's son and Gene was
23  an executive vice president of the United Egg Producers during
24  my time.
25  Q.   Did you -- did you have any discussions where you let

124

1   your concerns be known to anybody at UEP at any -- any
2   particular board meetings in terms of -- that you can recall,
3   in terms of locations or dates?
4   A.   Yeah, a couple of locations, I recall, and I'm better
5   with locations maybe than dates, but I know at a board meeting
6   in Albuquerque, New Mexico, I had a personal and rather
7   pointed discussion directly with Gene Gregory about my
8   concerns and then at an Annual Board Meeting in Washington,
9   D.C. with the Chairman Roger Deffner, and with Gene Gregory,
10  and I believe Al Pope might have even been there at that time
11  as well.  And Al is the president of United Egg Producers.
12  Q.   Now, did the UEP have a newsletter?
13  A.   They did.  United Voices is the name of it.
14  Q.   Okay.  And did the United Voices -- did you receive
15  United Voices in this time period?
16  A.   I did.
17  Q.   And did you read them when you received them?
18  A.   Yes, I did.
19  Q.   And during this time, when you were developing this
20  concern, did the United Voices play any role in developing
21  that concern?
22  A.   I think a pretty major part of that development.  Like I
23  said earlier, it seemed to me that United Egg Producers didn't
24  believe we as producers understood supply/demand economics and
25  so they kept preaching it and almost every issue would talk

125

1    about, Do you see what the Animal Welfare Program is doing to
2    the price of eggs?  It's, you know, the supply is continuing
3    to drop and thus the price is going up and it's working.  It's
4    serving a purposes for which we set it up.
5    Q.    And how often did you receive United Voices newsletters?
6    A.    I think they came every two weeks.  Initially it was a
7    paper -- when I first started it was a paper letter, but
8    ultimately it was in an e-mail format.  I think it was twice a
9    month.
10   Q.    In addition to the United Voices newsletters, were there
11   other written communications from the UEP that form the basis
12   of the concern that you have been expressing?
13   A.    Yeah.  From time to time we would get communications from
14   the executive staff in Atlanta, from the United Egg Producers
15   either through Gene Gregory or Al Pope and discussing various
16   things regarding the Animal Certified Care Program.
17   Q.    Mr. Mueller, let me show you what has been marked as
18   Plaintiffs' Exhibit 183.
19   A.    Okay.
20   Q.    Have you seen this document before?
21   A.    I have seen that before.
22   Q.    And did you see it on or about the date that it bears?
23   A.    April of -- 2nd -- yes, I did.  It would have been
24   shortly around that time.
25   Q.    And do you recall reading the document when you received

126

1    it?
2    A.    I do.
3    Q.    And can you identify for the jury what the document is
4    just in terms of title and date, please?
5    A.    The title is United States or U.S. Economic/Animal
6    Welfare Outlook, and it's a letter or a blurb from Al Pope,
7    President, United Egg Producers, that's dated April of 2003.
8          MR. AHERN:  Your Honor, we'd move for the admission
9    of Plaintiffs' Exhibit 183.
10         THE COURT:  Any objection?
11         MR. KING:  No objection.
12         THE COURT:  183 is admitted.
13         MR. AHERN:  May we publish it to the jury, please?
14         THE COURT:  Yes, you may.
15         (Exhibit received in evidence.)
16   BY MR. AHERN:
17   Q.    So a little further down on the first page, do you see
18   that there is a heading, Industry Economics?
19   A.    I see it.  Yep.
20   Q.    Now, at this point in time, in April 2003, was the
21   animal -- was the UEP Certified Program with the 100% rule
22   already underway?
23   A.    At that time, the implementing of the Animal Welfare
24   Program was well underway and I'm not sure in April of 2003 if
25   they had decided on the 100% rule or not, but it was

127

1    certainly -- probably was being discussed.
2    Q.    Now, under the heading Industry Economics, it says:
3    Obviously, the Animal Care Program has and will continue to
4    have an impact on supplies.  While producers always
5    demonstrate the uncanny ability to produce more than we need,
6    the phase-in will still tighten supplies.
7          Do you see that?
8    A.    I do.
9    Q.    And did you have an understanding at that time as to what
10   that meant?
11   A.    I did.  And I believe it meant that we're continuing to
12   put -- make efforts to tighten egg supply.
13   Q.    And -- was it your understanding that the reference
14   was that the UEP Certified Program was tightening supplies?
15         MR. KING:  Objection, leading.
16         THE COURT:  Sustained.  Do you want to ask your
17   question differently?
18   BY MR. AHERN:
19   Q.    Did you have an understanding as to whether or not this
20   passage meant that the UEP Certified Program was tightening
21   supplies?
22   A.    That was directly my understanding.
23   Q.    Now, do you recall this point that's being made in this
24   passage expressed at meetings of the UEP Board of Directors?
25   A.    Very, very often, yes.

128

1    Q.    And do you recall who expressed it at those meetings?
2    A.    Typically it was Gene Gregory.  From time to time it was
3    the chairman or Mike Barham.  There was a Roger Deffner.  I
4    remember each of them opening annual meetings and patting
5    ourselves on the back because the Animal Certified Welfare
6    Program was continuing to tighten supplies.
7    Q.    Did you have an understanding at the time as to what the
8    effect would be as to tightening supplies?
9    A.    Yes.
10   Q.    What was that understanding?
11   A.    That prices would go up.
12   Q.    And when you read this passage, did you have any reaction
13   with respect to it?
14   A.    I don't suppose I was having any reaction other than my
15   reaction that it had been for a long time, is that I don't
16   think we need to, you know, publicize these things out loud.
17   These are things which supply/demand economics dictates and
18   makes clear.
19   Q.    Okay, and if you look at the very bottom of the section
20   on industry economics, it says:  We've urged producers to
21   temper their desire to construct new buildings because as the
22   layers are given greater density their productivity improves
23   substantially.
24         Do you see that?
25   A.    I do.

129

1  Q.   And do you recall a point being expressed at the UEP
2  Board of Directors meetings that producers should temper their
3  desire to construct new buildings?
4  A.   I do recall that.
5  Q.   Mr. Mueller, let me show you what's been marked as
6  Plaintiffs' Exhibit 189.  Have you seen this document before?
7  A.   I have.
8  Q.   Did you see it on or about the date that it bears?
9  A.   Yes, by that time, by June of 2003, we would have been
10  receiving these over the e-mail, and so I was pretty prompt in
11  opening and reading these when they arrived.
12  Q.   And did you read the document when you received it?
13  A.   Yes, I would have.
14  Q.   And can you identify for the jury what the document is in
15  terms of the title and the date, please?
16  A.   It is the United Voices, United Egg.  It's our monthly --
17  or the trade association's monthly or bimonthly newsletter.
18  It says, Gene Gregory, editor, and the date is June 4th, 2003.
19       MR. AHERN:  Your Honor, Plaintiffs move for the
20  admission of Plaintiffs' Exhibit 189.
21       THE COURT:  Any objection?
22       MR. KING:  No objection.
23       MS. LEVINE:  No.
24       THE COURT:  189's admitted, and, yes, it may be
25  published.

130

1       (Exhibit received in evidence.)
2       MR. AHERN:  Thank you, Your Honor.
3  BY MR. AHERN:
4  Q.   Directing your attention, Mr. Mueller, to page 4, the
5  last page of the document.
6  A.   All right.
7  Q.   And do you see that there is a section entitled May's
8  Prices - Best in Many Years?
9  A.   I do see that.
10  Q.   And once again this is in June, on June 4th, 2003?
11  A.   Correct.
12  Q.   And do you have an understanding -- did you have an
13  understanding at that time as to what that meant?
14  A.   Other than taking it for what it says, that's the
15  understanding.
16  Q.   Okay.  And under the heading, it says in the -- in the
17  last portion of this section, it says:  These market
18  improvements can be attributed to, one, reduced pullet hatch
19  finally making an impact upon supplies.
20       And my question first of all is:  Did you have an
21  understanding as to what that meant at that time?
22  A.   Sure.  There had been an effort afoot leading the charge
23  of United Egg Producers that we needed to reduce our pullet
24  hatches and not be replacing birds at such a quick cycle as we
25  heretofore had been doing that.

131

1  Q.   Did you have an understanding at the time as to why the
2  UEP was communicating to its members that they should reduce
3  their pullet hatch?
4  A.   I did, and my understanding at the time was that this was
5  another effort to tighten supplies.
6  Q.   And now the second point says:  These market improvements
7  can be attributed to USEM exports reducing supplies at
8  critical times.
9       Do you see that?
10  A.   I do.
11  Q.   And did you have an understanding at that time as to what
12  that meant?
13  A.   I did, and it was referring to United States Egg
14  Marketers which is what the USEM is, offering export
15  opportunities to the producers at times when we thought there
16  was too many eggs in the U.S.
17  Q.   And what was the purpose of the -- did you have an
18  understanding as to what the purpose was of the USEM offering
19  export opportunities to the USEM members at times when prices
20  were low in the United States?
21  A.   I did have an understanding, and, once again, my
22  understanding was that this was an effort to tighten supplies.
23  Q.   And by tightening supplies, what would happen to prices?
24  A.   They would go up.
25  Q.   Now, the third item listed there is:  These market

132

1  improvements can be attributed to Animal Care Certified
2  Program beginning to work like many had projected.
3       Do you see that?
4  A.   I do.
5  Q.   And does that statement have any relation to the
6  testimony that you gave about UEP leadership patting itself on
7  the back?
8  A.   That's directly related to that, yes.
9  Q.   And did you have any understanding at the time as to what
10  this meant?
11  A.   Well, I had an understanding at the time that it also
12  meant that the -- it wasn't just United Egg Producers who had
13  projected that it would work like this from the beginning but
14  other producers had projected it, and so my understanding was
15  that those who projected this would be a supply demand
16  initiative and not truly an Animal Care Certified Program, and
17  it was coming to fruition.
18  Q.   And do you recall whether or not there was discussion at
19  the UEP board meetings and other UEP meetings that the Animal
20  Care Certified Program was beginning to work as it had been
21  projected?
22  A.   Oh, the board meetings and other gatherings were replete
23  with references to that.
24  Q.   All right.  Mr. Mueller, let me show you what's been
25  marked as -- as Plaintiffs' Exhibit 235.

133

1           And have you seen this document before?
2   A.   I have.  This looks like the two weeks later
3   United Voices edition from the one we just looked at.
4   Q.   And did you see it on or about the date that it bears?
5   A.   It would have been close to that, yes.
6   Q.   And did you read the document when you received it?
7   A.   I would have, yes.
8   Q.   And can you identify for the jury what this document is
9   in terms of the title and the date, please?
10  A.   This is another United Egg Producers, United Voices,
11  Gene Gregory, Editor, and the date is June 17, 2004.
12          MR. AHERN:  Your Honor, we move for the admission of
13  Plaintiffs' Exhibit 235.
14          MR. KING:  No objection.
15          MR. HARRIS:  Your Honor, we would ask for a limiting
16  instruction with respect to USEM.
17          THE COURT:  Any objection to that?
18          MR. AHERN:  Your Honor, I believe -- maybe a
19  sidebar, please.
20          (The following transpired at sidebar:)
21          THE COURT:  Why don't you ask --
22          MR. HARRIS:  My understanding is that this was a UEP
23  party statement and it's only UEP in that statement.
24          THE COURT:  Go ahead.
25          MR. AHERN:  Go ahead.

134

1           THE COURT:  No, no.
2           MR. AHERN:  The evidence is going to come in that
3   the UEP ran the USEM, and there's going to be a document,
4   we're going to see on a UEP letterhead --
5           THE COURT:  In 2004?
6           MR. AHERN:  Yes.
7           THE COURT:  I'm just asking.
8           MR. AHERN:  I believe so -- in 2001.
9           THE COURT:  No, no, but effective at least in 2004.
10          MR. HARRIS:  There's been no foundation that USEM --
11          THE COURT:  I know, but it's going to be hooked up
12  later, right?
13          MR. AHERN:  Yes.
14          THE COURT:  Do you have any doubt about that?
15          MS. SUMNER:  Yes.
16          MR. HARRIS:  Yes.
17          THE COURT:  Okay, what's the doubt?
18          MR. HARRIS:  I understand there is a management
19  agreement and that sometimes people who worked for UEP did
20  things on behalf of USEM.
21          THE COURT:  Is there any reference in this
22  particular newsletter to the export activity?
23          MR. HARRIS:  I don't believe there is, Your Honor.
24          MR. AHERN:  Your Honor, we have a document from 2001
25  on UEP letterhead which --

135

1           THE COURT:  That says what?
2           MR. AHERN:  Which is specifically an export related,
3   and I'm going to get into that with Mr. Mueller.  I mean --
4           THE COURT:  Well, if you can hook it up later to
5   USEM -- this is 2004.  There's no reference in the document to
6   the exports.  The fact that they had people there associated
7   with each other may not carry the day in terms of everybody
8   against whom this document would be used for.
9           MR. AHERN:  But my only point is that based on
10  documents prior to this, which I was going to ask Mr. Mueller
11  about later in a discrete section on exports.
12          THE COURT:  Yes.
13          MR. AHERN:  It's rather clear that the UEP is
14  sending out USEM communications, actually specifically
15  dedicated --
16          THE COURT:  Is this one of them?
17          MR. HARRIS:  No, it is not, Your Honor.
18          THE COURT:  Well, I'm just asking.  I mean, if you
19  line it up later, but for now, I think a limiting instruction
20  is inappropriate.
21          MR. AHERN:  Fair enough.
22          MR. HARRIS:  Thank you.
23          (End of sidebar.)
24          THE COURT:  So 235 is admitted as to UEP and
25  Rose Acre.  So that's another example, ladies and gentlemen,

136

1   of these limiting instructions.
2           (Exhibit received in evidence.)
3           Okay, you may proceed.
4           MR. AHERN:  Thank you.  May we publish the documents
5   to the jury?
6           THE COURT:  Yes.
7           MR. AHERN:  Thank you, Your Honor.
8   BY MR. AHERN:
9   Q.   Is this one of the United Voices newsletters that you
10  recall receiving?
11  A.   It is.
12  Q.   And directing you to the second page of the document,
13  there's a section which says:  Intentions to meet marketing
14  committee recommendation.
15          Do you see that?
16  A.   I do.
17  Q.   And it says:  The following companies have confirmed
18  their intention to follow UEP's Marketing Committee
19  recommendation of molting at 62 weeks of age and disposing of
20  spent hens by 108 weeks.
21          Do you see that?
22  A.   I do.
23  Q.   And did you have an understanding at that time as to what
24  that meant?
25  A.   Yes.  I did have an understanding at that time, and my

137

1　understanding was that it was again another effort to try to
2　tighten supply.
3　Q.　Okay.  And -- and do you recall whether or not there were
4　similar statements made in other United Voices newsletters
5　which would report to the UEP members that certain companies
6　had committed to these short-term measures?
7　　　　　MR. KING:  Objection, leading.
8　　　　　THE COURT:  Do you want to rephrase your question?
9　BY MR. AHERN:
10　Q.　Did you have an understanding at the time as to whether
11　or not there were -- I'm sorry.
12　　　　　Do you recall as to whether or not there were other
13　statements made in UEP -- in the United Voices similar to
14　this?
15　A.　The United Egg or the United Voices newsletters were
16　replete with references like this, and the discussion among
17　producer members talked about these kinds of things all the
18　time amongst ourselves.
19　Q.　And did the -- do you recall the UEP reporting to its
20　members, whether it did or whether it didn't, that certain
21　companies would be or would not be signing on to commitments
22　with respect to a recommendation to molt at 62 weeks and
23　dispose of spent hens by 108 weeks?
24　A.　Yes.  They would report and -- they would report and
25　would agree to sign on who had, yes, or by implication who

138

1　hadn't because your name's not on there.
2　Q.　And when you say "report," would the United Voices
3　identify specific companies?
4　A.　They would.
5　Q.　Okay.  And I believe you testified that you recalled attending
6　meetings of the UEP Marketing Committee; is that correct?
7　A.　I did.  Yes.
8　Q.　And were similar statements made and
9　recommendations made at the UEP Marketing Committee meetings
10　that you attended in terms of what -- what's contained here in
11　Plaintiffs' Exhibit 235?
12　A.　Yes, very similar statements, and they were very
13　frequently made at the Marketing Committee meetings I
14　attended.
15　Q.　Now, you testified previously to the concerns that you
16　and Sparboe had with respect to the UEP Certified Program with
17　the 100% rule, correct?
18　A.　Yes.
19　Q.　Okay.  And you testified that you had -- you had made
20　those concerns known to certain people in the UEP leadership,
21　correct?
22　A.　Yes, that's correct.
23　Q.　Other than the meetings that you identified in
24　Albuquerque and Washington, D.C., were there any other
25　meetings at which you expressed those concerns?

139

1　A.　Well, again, I was on the Scientific Committee, and we
2　had regular meetings along with the UEP annual, semiannual
3　meetings.  We had special meetings.  I always -- the
4　discussion would not only focus solely on the environmental
5　issues, but we would talk about other things going on.  So at
6　those meetings, we talked about it.  And I know pretty much
7　every meeting I attended from 1999 until I left, the subject
8　came up.
9　Q.　Okay, now in your answer just now, you started out by
10　saying that you were on the UEP Scientific Committee?
11　A.　Correct.
12　Q.　And did you misspeak, did you mean the environmental
13　committee?
14　A.　Oh, I'm sorry, yes, thank you.  I was on the
15　environmental committee.  Thank you.
16　Q.　Now, you mentioned an individual.  Was it Joe Miller?
17　A.　Correct.  He was general counsel for Rose Acres.
18　Q.　And was he on the environmental committee?
19　A.　He was.
20　Q.　And did you have any discussions with Mr. Miller about
21　your concerns about the UEP Certified Program with the
22　100% rule with Mr. Miller?
23　A.　I did.
24　Q.　And with respect to that, based on those discussions, did
25　you have an understanding from your discussions with

140

1　Mr. Miller as to what Rose Acre's position was with respect to
2　the 100% rule?
3　A.　Well, I had an understanding that their position was the
4　same as ours, that we were trying to figure out where we were
5　going to land with regard to the 100% rule.
6　Q.　Did you have an understanding as to whether or not
7　Rose Acre ultimately supported the 100% rule?
8　A.　My understanding was that they ultimately did support the
9　100% rule.
10　Q.　All right, Mr. Mueller.  I'd like to show you what's been
11　marked as Plaintiffs' Exhibit 197.
12　A.　All right.
13　Q.　Have you seen this document before?
14　A.　I have seen that before, yes.
15　Q.　And did you see it on or about the time that it bears?
16　A.　It would have been that date or shortly thereafter, yes.
17　Q.　And did you read the document when you received it?
18　A.　Yes.
19　Q.　Can you identify for the jury what this document is in
20　terms of the title and the date?
21　A.　This is a United Egg Producers, United Voices Edition,
22　Gene Gregory, Editor, and the date on this one is
23　September 11th, 2003.
24　Q.　All right.  And do you see on the first page there
25　there's a title in the section on the bottom saying:  Don't

141

```
1   screw up a good thing?
2   A.   I do see that.
3   Q.   Okay.  And did you have any understanding as to -- as to
4   what that meant when you read it?
5   A.   I did have an understanding as to what that meant when I
6   read it, and I can remember this issue specifically because it
7   kind of made me cringe when I read it saying, Gene, you don't
8   need to pat yourself on the back for something that's
9   happening.  It looks like you're trying to, you know, applaud
10  that the supply demand initiative we started is working here
11  and it's supposed to be an Animal Welfare Program.  So I was
12  annoyed by it.
13          MR. AHERN:  I apologize.  Plaintiffs move for the
14  admission of Plaintiffs' Exhibit 197.
15          MR. KING:  No objection.
16          THE COURT:  It's admitted.
17          (Exhibit received in evidence.)
18          MR. AHERN:  May I publish it to the jury,
19  Your Honor?
20          THE COURT:  Yes.
21  BY MR. AHERN:
22  Q.   I won't have you repeat your testimony, but just, of
23  course, we'll direct everyone's attention to the title:  Don't
24  screw up a good thing.
25          Now, if you turn to the second page of the document,
```

142

```
1   and do you see the second sentence on the page, it begins:
2   Backfilling of layer houses may also --
3   A.   Um, I see it now.  Thank you.  Yep.
4   Q.   Okay.  It says:  Backfilling of layer houses may also be
5   adding to the increased layer inventory.
6          Do you see that?
7   A.   Yes.
8   Q.   Did you have an understanding at the time as to what that
9   meant?
10  A.   Yes.  I did have an understanding at the time and that
11  was that our trade association was again expressing its
12  concern that we weren't following the directions or the
13  initiative regarding backfilling of our layer houses, that
14  they had undertaken.
15  Q.   And what was your understanding as to the effect of
16  backfilling on the UEP Certified Program and the 100% rule?
17  A.   Well, as the program evolved, there was discussion about
18  we should cease with backfilling and some producers
19  backfilled, some didn't, and the -- my understanding of what
20  we're talking about here is that backfilling layer houses may
21  also be increasing the layer inventory, and so there was a
22  concern that producers were backfilling and suggesting by that
23  that we should maybe stop doing so.
24  Q.   And did you have an understanding at the time as to what
25  the effect of stopping backfilling would have meant on the
```

143

```
1   nation's flock size?
2   A.   Well, it would continue to decrease the flock size and
3   tighten the supply, and thus by -- you know, it follows that
4   price would increase.
5   Q.   And now the last sentence in this section, do you see it
6   says:  One sure way?
7   A.   I do see that.
8   Q.   It says:  One sure way of having poorer egg prices is by
9   increasing egg supplies through holding hens longer and
10  keeping hens that should be disposed.  Don't screw up a good
11  thing.
12          Do you see that?
13  A.   I do.
14  Q.   And did you have any understanding at that time as to
15  what that meant?
16  A.   Yeah, again, this is the directive from our trade
17  association that you people need to be taught a lesson in
18  supply/demand economics, and so we're going to tell you to
19  continue to tighten supplies so the price will stay higher and
20  increase.
21  Q.   Thank you.  And do you recall any discussion at any of
22  the UEP meetings similar to this topic?
23  A.   The discussions at UEP meetings was extensive with this
24  sort of -- this sort of language, this sort of initiative.
25  Q.   Okay.  Now, if we could put back up Plaintiffs'
```

144

```
1   Exhibit 189.  Now, if you look on the third page of the
2   document, the second full paragraph, it begins:  It is truly
3   amazing?
4   A.   All right, I see it.
5   Q.   It says:  It is truly amazing how the Animal Care
6   Certified Program has grown from what began in 1999 as a
7   project to ask an independent Scientific Advisory Committee
8   for their recommendations on animal welfare.  It has since
9   grown into a full-fledged industry program in which now nearly
10  200 companies with ownership of more than 225 million layers
11  or more than 80 percent of the industry are committed.
12          Do you see that?
13  A.   I do.
14  Q.   And did you have any understanding at that time as to
15  what that meant?
16  A.   Well, I had an understanding at that time as to what it
17  meant and I felt it meant that, congratulations, you folks,
18  you're getting on board and it's having a result.
19  Q.   And -- and do you recall from time to time the UEP
20  reporting to its members the number of UEP members that were
21  signing up for the Certified Program with the 100% rule?
22  A.   It was very frequent they would tell us when people
23  signed up for it in compliance with the 100% rule.
24  Q.   And is this an example of that?
25  A.   Yes.
```

145

1   Q.   Now, do you have a recollection of attending a UEP board
2   meeting in Washington, D.C. during the first half of 2004?
3   A.   Well, I do, because I remember specifically having a
4   discussion with Roger Deffner, the chair, about the Animal
5   Welfare Program at that meeting.
6   Q.   All right, Mr. Mueller, let me show you what's been
7   marked as Plaintiffs' Exhibit 228.  Have you seen this
8   document before?
9   A.   I have.  The minutes would always come out shortly after
10  our meetings and I would read them.
11  Q.   And did you see it on or about the date that it bears?
12  A.   It would have been a little later in the month, those are
13  the actual dates that you highlighted of the dates of the
14  meeting, so I would have saw this probably a week later
15  probably -- more or less.
16  Q.   Did you read the document when you received it?
17  A.   Yes, I did.
18  Q.   And can you identify for the jury what this is in terms
19  of the title and the date, please.
20  A.   Yes.  The title is United Egg Producers Board of
21  Directors Meeting, May 11 and 12, 2004, Washington, D.C., and
22  these are the minutes.
23  Q.   On the second page of the document, there is a section on
24  that page under the -- okay.  Getting a little ahead of
25  myself.

146

1            MR. AHERN:  Plaintiffs move for the admission of
2   Plaintiffs' Exhibit 228, Your Honor.
3            THE COURT:  No objections?
4            MR. KING:  No objection.
5            THE COURT:  It's admitted.  228 is admitted.
6            MR. AHERN:  May we publish it to the jury?
7            THE COURT:  Yes.
8            (Exhibit received in evidence.)
9   BY MR. AHERN:
10  Q.   On the second page of the document, there's a section
11  under that page which is entitled, the heading, Marketing
12  Committee.
13           Do you see that?
14  A.   I do.
15  Q.   And it starts out by saying:  Committee Chairman Dolph
16  Baker presented the committee report and identified pending
17  problems for the financial stability of the industry if some
18  minor supply adjustments were not made very quickly.
19           Do you see that?
20  A.   I do.
21  Q.   And who is Dolph Baker?
22  A.   Dolph Baker was the chairman of the Marketing Committee
23  and I don't recall specifically his position, but he worked
24  for Cal-Maine, who at that time was the largest egg producer
25  in the United States.

147

1   Q.   And then there is a motion underneath that and it said it
2   was moved by Baker and seconded by Fortin to recommend that
3   the industry molt all flocks at 62 weeks and dispose of spent
4   hens by 108 weeks and that this plan of action take place
5   immediately and carry through until August 1st, 2004.  And
6   then it says that that motion carried.
7            Do you see that?
8   A.   I do.
9   Q.   And did you have any understanding at that time as to
10  what that meant?
11  A.   I did have an understanding and I did attend the
12  underlying Marketing Committee where they discussed this
13  motion and it was again an effort to tighten supplies.
14  Q.   And if you turn back to the first page of the document,
15  do you see the section entitled Members?
16  A.   Um-hum.
17  Q.   And do you see whether or not Marcus Rust is the head
18  right there?
19  A.   I do see his name right there.
20  Q.   And who is Marcus Rust?
21  A.   Marcus, I'm not sure if he was the president and CEO of
22  Rose Acres at that time, but he was an executive with Rose
23  Acres, and a part owner is my understanding.
24  Q.   And we saw a reference to the name Fortin.  Do you know
25  what that reference refers to?

148

1   A.   Yeah, his name is Joe Fortin, and I don't recall who Joe
2   worked for, but it was a Northeast producer.  I just recall
3   Joe because he's a very interesting and colorful character.  I
4   enjoyed him.
5   Q.   You testified earlier about the fact that you had
6   expressed your concerns about the UEP Certified Program with
7   the 100% rule to UEP leadership, correct?
8   A.   Correct.
9   Q.   And did there ever come a point in time when you
10  expressed those concerns in writing?
11  A.   There did come a point in time.
12  Q.   And how did you express those in writing?
13  A.   I wrote a letter on Sparboe letterhead and on behalf of
14  Sparboes to the general counsel for United Egg Producers, a
15  gentleman named Irving Isaacson.
16  Q.   Let me show you what's been marked as -- as Plaintiffs'
17  Exhibit 691.  Have you seen this document before?
18  A.   I have.  It looks like the letter I was just referring
19  to.
20  Q.   And what's the date on the letter?
21  A.   November 10, 2003.
22  Q.   And did you prepare this letter?
23  A.   I did.
24  Q.   And did you do so in the ordinary course of your -- of
25  Sparboe's business?

149

1  A.   Yes.

2  Q.   And in connection with your job responsibilities at

3  Sparboe?

4  A.   Correct.

5       MR. AHERN:  Your Honor, we move for the admission of

6  Plaintiffs' Exhibit 691.

7       THE COURT:  Which part of it?

8       MR. AHERN:  All of it.

9       THE COURT:  Well, so far you've got the first two

10 pages of 691.

11      MR. AHERN:  Okay.

12 BY MR. AHERN:

13 Q.   The second document attached here, I apologize, this is a

14 composite exhibit, what we call a composite exhibit where we

15 attach it -- a few documents together.  Do you recognize that

16 document?  The second document?

17 A.   Yes, I do.

18 Q.   And what is that document?

19 A.   And that's Mr. Isaacson's response to my letter.

20 Q.   And did you receive that document?

21 A.   I did.

22 Q.   Did you read it when you received it?

23 A.   Yes, sir.

24 Q.   And what is the date on that document?

25 A.   November 19, 2003.

150

1  Q.   And now turning to the third page of the -- I'm sorry,

2  the third document attached hereto, have you seen that

3  document before?

4  A.   I have seen that.

5  Q.   And did you review that document on or about the date

6  that it bears?

7  A.   Yes, it would have been shortly after that anyway.

8  Q.   And can you describe for the jury just very, very

9  briefly, the "to," the "from," the date, and the subject?

10 A.   The "to" is to the United Egg Producers Board.  It's from

11 Al Pope, who was President of United Egg Producers.  The date

12 is December 1st, 2003, and the subject is:  Sparboe Companies.

13      MR. AHERN:  Your Honor, we move for the admission of

14 Plaintiffs' Exhibit 691.

15      THE COURT:  691's admitted.

16      MR. KING:  Oh, Your Honor, we asked for a limiting

17 instruction, at least with respect to the top document, the

18 letter from Sparboe.

19      THE COURT:  Well, in terms of the redaction?

20      MR. KING:  And the letter itself, the unredacted

21 part.

22      MR. AHERN:  Your Honor, we would object to a

23 limiting instruction with respect to this, but if Your Honor

24 wants to give one, we would also suggest, if possible, some

25 language.

151

1       THE COURT:  I'll tell you what, why don't we take a

2  short break here, ladies and gentlemen, and I'll iron this

3  out.  There's no reason for you to have to watch this part of

4  it.  So why don't you take about ten minutes, and we'll be

5  back.  And we'll be going until about 4:30 today, so, you

6  know, use your break accordingly.  Okay, see you in a couple

7  of minutes.

8       THE DEPUTY CLERK:  All rise.

9       (Jury out.)

10      THE COURT:  Okay, I'll tell you what, Mr. Mueller,

11 why don't you excuse us for a moment.

12      THE WITNESS:  Okay.

13      THE COURT:  I just want to get, you know, precisely

14 what these instructions are going to be.  I don't want to keep

15 messing with this or making anything of an unintended mistake.

16      Mr. King.

17      MR. KING:  Oh.  We -- we do not object to the

18 admission of the November 5th, 2003 Sparboe letter.

19      THE COURT:  For notice.

20      MR. KING:  For notice.  We do not believe in any

21 way, shape, or form this could be a co-conspirator statement

22 because it is not in furtherance of any conspiracy.  We don't

23 have -- they can do whatever they want with the next two

24 letters.  We're happy with them.  If they want to admit them,

25 we don't object.

152

1       MR. AHERN:  Your Honor, we actually do believe it's

2  a co-conspirator statement, but I'm not going to spend a lot

3  of time on that.

4       THE COURT:  How do you do that?

5       MR. AHERN:  Because they -- they are -- they were a

6  member and participant of the UEP Certified Program.

7       THE COURT:  Well, why don't you skip to the

8  furtherance part.

9       MR. AHERN:  Correct.  The -- the "in furtherance"

10 part is here, they are participants, and what Mr. Mueller is

11 saying is there's a lot of talk about -- about supply and

12 demand and not a lot of talk about animal welfare, and he said

13 if these concerns are not addressed, if we -- he says in the

14 paragraph right below the blacked-out portion, he said, in

15 short, if not cared for properly, a strong case can be made

16 against the Animal Welfare Program.  So in our view --

17      THE COURT:  No.  What he's really talking about is a

18 concern about a hidden agenda.  It doesn't sound like it's in

19 furtherance of anything.  If anything, it sounds like it's a

20 brake against it.

21      MR. AHERN:  Okay, I understand Your Honor's position

22 there, okay.

23      THE COURT:  I'm -- I just want to get the language

24 on a limiting instruction.

25      MR. AHERN:  Oh, well, they are the ones who asked

153

```
1    for the limiting instruction.
2         THE COURT:  I know.  Do you have a quarrel with
3    that?
4         MR. AHERN:  I don't know --
5         THE COURT:  Other than what you've already said.
6         MR. AHERN:  I don't know what it's going to be.
7         THE COURT:  It's going to be that the November 5th,
8    2002 letter is admitted for purposes of showing notice to the
9    recipient or recipients of the concern.
10        MR. AHERN:  We don't have any problem with that.
11        THE COURT:  Okay.
12        MS. LEVINE:  We join that objection, UEP.
13        THE COURT:  Okay.
14        MR. HARRIS:  And USEM Marketers as well.  We think
15   we're in the same position with respect to this document.
16        THE COURT:  Okay.  Enjoy the break.
17        (Midafternoon break taken.)
18        (After recess:)
19        THE COURT:  I appreciate if counsel would confer and
20   see if we are on track to finish with Mr. Mueller.
21        MR. AHERN:  Yes.
22        THE COURT:  Yes?  Are you speaking with everybody?
23        MR. AHERN:  For my part.
24        MS. SUMNER:  How much longer?
25        MR. AHERN:  Maybe a half an hour.
```

154

```
1         THE COURT:  What did you say?
2         MR. LEVINE:  An hour.
3         THE COURT:  Okay, well, so I'm reviewing the bidding
4    here.
5         MR. KING:  Oh, if he's finished by -- if he's
6    finished by 3:15, I think our collective cross should be
7    finished by 4:30.
8         MS. LEVINE:  Are you going to be finished by 3:15?
9         MR. AHERN:  I was going to finish by 3:00.  If you
10   want to give me to 3:15, that's fine.  No, I'm kidding.
11        THE COURT:  I'm really -- in an abundance of
12   caution, if I have to keep the jury later than the 4:30-ish
13   time period, I sure want to give them a little warning to
14   that.
15        MR. KING:  If he sticks to a half hour, that
16   shouldn't be an issue.
17        (After recess:)
18        (Witness resumes the stand.)
19        THE DEPUTY CLERK:  All rise.
20        (Jury in.)
21        THE COURT:  Okay, you all can take your seats.
22   Thanks, ladies and gentlemen.  I straightened out what my job
23   was here in the next moment, and that is, where we left off
24   before the break was, yes, 691 will be admitted.  The first
25   part of this, it was a composite exhibit.  There's three
```

155

```
1    documents that are stapled together as the exhibit.  The first
2    one of the documents is a November 5th, 2003 piece of
3    correspondence, and that is being admitted into evidence for a
4    limited basis only, and this applies to all of the Defendants.
5         And the limited basis for your consideration of that
6    first part of Exhibit 691 is to use it only with respect to
7    the issue about whether or not the Defendants received some
8    sort of notice of the concern that is referred to in that
9    letter.  Okay, everybody, that's what we discussed.
10        (Exhibit received in evidence.)
11        MR. AHERN:  Thank you, Your Honor.
12        THE COURT:  Yes?  Yes?  I'm sure it was a yes.
13        Yes, Mr. King?
14        MR. KING:  Yes, that works.
15        THE COURT:  Okay.  Now you may proceed.
16        MR. AHERN:  May we publish the document?
17        THE COURT:  You may.
18   BY MR. AHERN:
19   Q.   And I hate to say this, but before we look at the
20   document, I need to -- I need to just ask you a question about
21   the conversations that you had with UEP leadership where you
22   expressed your -- your concern about the UEP Certified Program
23   with the 100% rule.  In terms of the discussion that you had
24   with Mr. Fort -- with Mr. Deffner, I'm sorry, in Washington,
25   D.C. that you identified, what did you tell Mr. Deffner in
```

156

```
1    terms of what your concerns were with respect to the UEP
2    Certified Program with the 100% rule?
3    A.   I talked to Mr. Deffner about my concerns.  They were the
4    same concerns I had talked to Gene Gregory and others about,
5    is that we've got an Animal Welfare Program that nobody's
6    talking about the success of the animal welfare part of it.
7    Nobody's talking about that our hens are being more humanely
8    treated, and thus, they're producing better eggs.
9         Nobody's talking about the fact that you can fail
10   part of the audit by getting a zero score on debeaking and
11   things like that, but as long as you're in compliance with the
12   space requirements, you're going to pass the audit.  Nobody
13   was talking about those things.
14        My concern was and always was that this is a supply
15   and demand issue, that if you're rolling it out this way, it's
16   going to be conceived as a price-fixing scheme.
17   Q.   And you told Mr. Deffner that?
18   A.   I did.
19   Q.   And what did you tell Mr. Gregory in Albuquerque with
20   respect to your concerns?
21   A.   In essence, the same thing.
22   Q.   And you said you had some conversations with Joe Miller,
23   who was the Rose Acre general counsel on the environmental
24   committee; is that correct?
25   A.   Correct.
```

157

1    Q.   And did you express your concerns to Mr. Miller about the
2    program?
3    A.   I expressed exactly the same kind of concerns, and I was
4    kind of asking for feedback -- am I all wet here?  Or is there
5    something I'm missing?
6    Q.   Thank you.  Now, going to Plaintiffs' Exhibit 691 and
7    looking at the -- at the first document, is -- can you
8    describe for the jury what this document is?
9    A.   This is a November 5th, 2003 letter from myself to
10   Irving Isaacson, and it's regarding United -- United Egg
11   Producers Animal Care Certified Program.
12   Q.   And turning to the second page of the document, is that
13   your signature?
14   A.   Yes, it is.
15   Q.   And you wrote this document?
16   A.   I did.
17   Q.   Okay.  Turning back to the first page, under the
18   blacked-out section, it says:  As we have relayed from time to
19   time to the UEP executive staff, the hidden agenda of the
20   Animal Welfare Program is concerning to us.  Do you see that?
21   A.   I do.
22   Q.   And it says here that you had relayed from time to time
23   concerns to the UEP staff.  Is that what you previously
24   testified to?
25   A.   Yes.  And I just related to Irving and to others, Don in

158

1    Albuquerque right after I drafted this letter.
2    Q.   When you referred to the hidden agenda, what were you
3    referring to?
4    A.   What I had talked to about earlier, the hidden agenda is
5    you're hiding your price fixing schematic behind an Animal
6    Welfare Program.
7    Q.   Now, the next sentence, it says:  In short, we believe if
8    not carried forward properly, a strong case could not be made
9    that the Animal Welfare Program is in essence a program being
10   offered by our trade association and its members to reduce
11   outputs in an effort to increase prices.
12        Do you see that?
13   A.   I do.
14   Q.   Is that a belief that you would have held at the time?
15   A.   Yes.
16   Q.   Is that once again a belief that you expressed to the UEP
17   staff prior to writing this letter?
18   A.   Numerous times.
19   Q.   And what, if anything, does that paragraph have, that
20   sense have to do with the hidden agenda that you referred to
21   in the prior sentence?
22   A.   Well, I think it -- at least it's trying to directly tie
23   it.  If you don't roll this out properly, meaning if this is
24   not offered and sold to the public and to our customers as
25   truly an Animal Welfare Program, they're going to start

159

1    conceiving and perceiving it -- or perceive it and start
2    conceiving it as a price-fixing schematic.
3    Q.   Now, referring to the second document in this
4    composite, can you identify that document?
5    A.   That is a response to my letter from Irving Isaacson.
6    Brann & Isaacson is the law firm and it is dated November 19,
7    2003.  So this is a couple of weeks after my letter.
8    Q.   And I believe you already testified that you recall
9    receiving this response, correct?
10   A.   I did.
11   Q.   And that you reviewed it and evaluated it after you
12   received it?
13   A.   Correct.
14   Q.   Seeing the document again and having reviewed it at the
15   time, did you feel this letter from Mr. Isaacson addressed
16   your concern about the hidden agenda that you had raised in
17   your November 5, 2003 letter?
18   A.   I think he completely missed the mark.
19   Q.   Now, do you recall whether or not at that time your
20   letter, the first document, was shared with the UEP Board of
21   Directors?
22   A.   My -- my intention is that it wasn't going to be shared
23   with anybody except Irving's eyes.  Ultimately, I learned that
24   it was shared with the Board.
25   Q.   Okay, now turning you -- turning to the third document of

160

1    this composite exhibit, Plaintiffs' Exhibit 691, I apologize
2    if I've asked you this before, but have you seen this document
3    before?
4    A.   I have.
5    Q.   Okay.  And does this document relate in any way to the
6    fact that you found out that your letter to Mr. Isaacson had
7    been -- had been shared with the UEP Board of Directors?
8    A.   I'm sorry.  What was the --
9    Q.   Does this document relate in any way to your
10   understanding at that time that your letter had been shared
11   with the UEP Board of Directors?
12   A.   It does.  You know, on the one hand it doesn't surprise
13   me.  On the other hand, it didn't surprise me that it was
14   shared with them, but on the other hand, it wasn't intended to
15   be shared with them.
16   Q.   But based on this document, did you have an understanding
17   as to whether it was shared with them?
18   A.   Yes, it clearly obviously was shared with them.
19   Q.   Now, Mr. Mueller, let me show you what's been marked as
20   Plaintiffs' Exhibit 200.
21   A.   I see it.
22   Q.   Have you seen this document before?
23   A.   I have seen that document before.  I was involved in the
24   initial drafting of it.
25   Q.   Okay.  And you were involved in the initial drafting of

161

1   it on or about the date that it bears?
2   A.   Yes.  Around that time, October 20th, and my
3   letter's dated November, we were -- internally we were talking
4   about, you know, doing some type of writing or bullet points,
5   writing to United Egg Producers in various forms or another to
6   get their attention regarding the concerns that we had.  Our
7   vocal pleas, they were falling on deaf ears.
8   Q.   And now since you were involved in preparing this
9   document, is it fair to say that you read the document around
10  the time that the date bears?
11  A.   It's very fair to say that.
12  Q.   Can you identify for the jury what the document is just
13  in terms of the date and who it's from and who it's to?
14  A.   It is a letter dated October 20th, 2003.  It's from
15  Robert Sparboe to Mr. Gene Gregory of the United Egg Producers
16  and it does have -- it does not have a reference or a
17  regarding --
18  Q.   And is it -- who is Mr. Robert Sparboe?
19  A.   He was the founder and president and owner of Sparboe
20  companies, Sparboe Farms.
21          MR. AHERN:  Your Honor, Plaintiffs move for the
22  admission of Plaintiffs' Exhibit 200.
23          MR. KING:  We object.  Foundation.  It doesn't also
24  appear to have ever been signed, the final.
25          THE COURT:  Well, that's limited to one page, right?

162

1           MR. AHERN:  It's two pages, Your Honor.
2           THE COURT:  Okay.  Is there a signed copy?
3           MR. AHERN:  We do not have a signed copy, but this
4   was produced out of the files of --
5           THE COURT:  I don't question where it came from, the
6   production.
7           MS. LEVINE:  That is not -- UEP also has an
8   Objection.  Hearsay.  There's no foundation.  It was not
9   produced by UEP.  There's no evidence UEP ever received it.
10          MR. AHERN:  I didn't say UEP, but it's produced out
11  of the files of a UEP member.
12          THE COURT:  A UEP member.
13          MR. AHERN:  Yes, in this case.
14          THE COURT:  Okay.  Do you know -- why don't you try
15  for some additional foundation about this exhibit.
16  BY MR. AHERN:
17  Q.   Mr. -- Mr. Mueller, you said that you had a role in
18  preparing this letter?
19  A.   That's correct.
20  Q.   And can you look to the third page of this letter?  It
21  has some handwriting on it?
22  A.   I see it.
23  Q.   Okay.  Is that Mr. Sparboe's handwriting?
24  A.   Yeah, I believe that is.
25  Q.   And do you know whether or not this -- whether or not

163

1   this -- well, strike that.
2           There's a CC on the second page.  Do you see that?
3   A.   Yes, I do.
4   Q.   Mike Bynum?
5   A.   Correct.
6   Q.   Who is Mike Bynum?
7   A.   He would have been the chairman of United Egg Producers
8   at that time, probably 2002/2003 chairperson.
9   Q.   Do you know what company he was with?
10  A.   I don't recall specifically, but I believe it was a
11  northwest United States producer over in the Washington -- or
12  state of Washington area.
13  Q.   Are you familiar with a company named NuCal?
14  A.   Yes.
15          MR. KING:  I'm going to object to leading questions.
16          THE COURT:  Well, that was not a leading question.
17  "Are you familiar with," it's not a leading question.  How do
18  you overcome the hearsay objection?
19          MR. AHERN:  I'm sorry.  We are offering this as a
20  limit -- for the limited purpose of showing what Sparboe had
21  communicated to the UEP and what the UEP was on notice of,
22  similar to other letters that we have offered.
23          THE COURT:  Ah, similar to other letters.  That
24  means this is more of the same?
25          MR. AHERN:  This is the last one.

164

1           MS. LEVINE:  Your Honor, the difference between
2   other letters is that there was a foundation that UEP actually
3   received it.  There is no evidence that this letter was ever
4   sent, ever received, it can't even be used for a limited
5   purpose.
6           THE COURT:  Okay, but there is some opportunity for
7   you to see if there's some more information that there is
8   about this letter available for its efficacy.
9   BY MR. AHERN:
10  Q.   Well, Mr. Mueller, do you know whether or not this letter
11  was sent to Mr. Gregory?
12  A.   I do not know if this letter ultimately was sent or not.
13  Q.   And given the fact that you had had a role in preparing
14  the letter, do you -- do you -- did you have an understanding
15  at the time as to whether this letter expressed
16  Sparboe's concerns about the UEP Certified Program and the
17  100% rule and was intended to put the UEP on notice of that?
18  A.   Yes, I had an understanding and, again, it's, you know,
19  putting them on notice of the concerns that are addressed in
20  reference in my letter of November 5th which would have been a
21  couple of weeks after this letter.  So the same concerns.
22          MR. AHERN:  Your Honor, we move for the admission of
23  Plaintiffs' Exhibit 200.
24          MR. KING:  The same objection.
25          MR. AHERN:  For purpose of notice.

165

```
1          THE COURT:  Okay.  I think this letter predates the
2   letter that's the first part of Plaintiffs' Exhibit 691, so
3   you've already got 691 in for notice.  You've said that this
4   is for the same purpose.  There is a bit of a flaw in terms of
5   its heredity.  I'll put it that way.  So if it comes up again,
6   we'll address it again, but you can move on now.  But for now,
7   200 is not admitted.
8          MR. AHERN:  Okay, thank you, Your Honor.
9   BY MR. AHERN:
10  Q.   Mr. Mueller, do you recall attending a meeting at the UEP
11  Board of Directors in January of 2005?
12  A.   I do.
13  Q.   And do you recall where that meeting took place?
14  A.   In January, it would have been in Atlanta, Georgia.
15  Winter meetings are always in Atlanta.  The summer meetings we
16  rotated.
17  Q.   And let me show you what's been marked as Plaintiffs'
18  Exhibit 662.
19  A.   I see it.
20          MR. KING:  Your Honor, just --  Your Honor, I just
21  have a quick question to be clear.
22          THE COURT:  For me.
23          MR. KING:  Well, can I ask counsel a question?
24          THE COURT:  Yes.
25          (Discussion held off the record.)
```

166

```
1          MR. AHERN:  Thank you, Your Honor.
2          THE COURT:  Yes.
3   BY MR. AHERN:
4   Q.   Did you see this document -- have you seen this document
5   before?
6   A.   I have.
7   Q.   And did you see it on or about the date that it bears?
8   A.   Yeah, it would have been a little bit after that date,
9   because these are the minutes from that date's meeting.
10  Q.   Do you recall receiving it, a copy of the document?
11  A.   Yes.
12  Q.   And did you read the document when you received it?
13  A.   I would have, yes.
14  Q.   And can you identify for the jury the title and the date
15  of the document?
16  A.   It's UEP, United Egg Producers Board of Directors,
17  January 25, 2005, Atlanta, Georgia and these are the minutes.
18          MR. AHERN:  Your Honor, Plaintiffs move for the
19  admission of Plaintiffs' Exhibit 662.
20          THE COURT:  662 is admitted.  The redacted version.
21          MR. AHERN:  Yes.
22          MR. KING:  I'm sorry.  Did we redact the -- is this
23  something that we redacted?
24          THE COURT:  This word "redacted," folks, means
25  blacked out, okay?  It makes lawyers and judges feel good to
```

167

```
1   use the word "redacted," but it's a blackout, okay?  And it's
2   really because there's something in -- you know, it's just not
3   important to the case and it's not for you to be considered
4   and that's what the blackout stuff is.
5          MR. KING:  I apologize, Your Honor.
6          THE COURT:  Not a problem.
7          MR. AHERN:  So no objection?
8          MR. KING:  No objection.
9          THE COURT:  The redacted version of 662 is admitted.
10          (Exhibit received in evidence.)
11          MR. AHERN:  Thank you, Your Honor.  May we publish
12  it to the jury?
13          THE COURT:  Yes, you may.
14  BY MR. AHERN:
15  Q.   Mr. Mueller, directing your attention to the fourth page
16  of this document, there is a heading entitled Animal Welfare
17  Committee Report.
18          Do you see that?
19  A.   I do.
20  Q.   Now, focusing on Motion Number 2, it says:  In order to
21  protect the integrity of the ACC program and logo, and in view
22  of the difficulty in preventing the commingling of certified
23  eggs with non-certified eggs, and to treat all egg producers
24  equally, it is hereby moved that no new licenses to market
25  Animal Care Certified eggs will be issued or renewed to
```

168

```
1   producers who are not ACC certified.  The motion carried with
2   a vote of 19 yes and eight nos.
3          Do you see that?
4   A.   I do.
5   Q.   Did you have an understanding at the time as to what this
6   meant?
7   A.   Yeah, I had an understanding at the time of what it
8   meant.
9   Q.   Can you tell us?
10  A.   My recollection, my understanding at that time was that
11  this was an effort to make sure that you're complying with the
12  100% rule.  And we're not going to even allow you to commingle
13  eggs with non-certified eggs with your own eggs, and we're
14  moving for a motion to put that -- make that part of the
15  program.
16  Q.   And did Sparboe have any concern about this motion?
17  A.   We sure did.
18  Q.   Can you tell the jury what that was?
19  A.   Well, we had -- part of our business was the fresh table
20  egg -- production of fresh table eggs.  Part of our business
21  was liquid eggs, and we had concerns we did not believe we
22  needed to have had all of our production dedicated --
23  100 percent of it dedicated to the Animal Welfare Program for
24  a few reasons.  First, we didn't have customer demand.  I
25  don't recall any customer ever demanding an Animal Welfare
```

169

```
1   Program.
2           Second, we had producers, long-term producer
3   contracts who -- they were not part of the program when we
4   entered into the contract, and so we had economic concern with
5   them.  And, third, we routinely took in eggs from our
6   egg-breaking business to fill orders which are going to be
7   cracked and broke and maybe ultimately moved on to liquid
8   form, pasteurized or otherwise, and we didn't need to obtain
9   those eggs to meet those demands from an ACC Certified
10  Program.  So we had all went with the 100% rule.
11  Q.   When you said there was no customer demand at Sparboe,
12  are you referring to the shell egg side of the business?
13  A.   Correct.
14  Q.   And the breaking side of the business?
15  A.   Well, mostly the shell side of the business.  On our
16  breaking side of the business, we did have one dedicated
17  customer in the form of McDonald's Cargills where we were
18  producing eggs for the McDonald's restaurants, but they had
19  their own separate set of welfare programs and we were
20  complying with those.
21  Q.   Did you have an understanding as to what was meant by ACC
22  certified?
23  A.   Yeah.  ACC certified was animal welfare certified care --
24  accredited or certified.  That was the emblem that they were
25  using to show that you were UEP animal certified care.
```

170

```
1   Q.   Now, based on your experience with Sparboe at this time
2   and having been employed by Sparboe since 1997, did Sparboe
3   have any difficulty with respect to the commingling of eggs
4   produced pursuant to an animal welfare standard and eggs that
5   were not produced in that way?
6   A.   Well, we had some difficulty with regards to the
7   economics of it.
8           You know, we had -- at one time we had nine separate
9   locations and approximately a million birds on each location,
10  and so what we were advocating for is that why can't we just
11  make one or two of these locations UEP animal certified, and
12  why do we need to make our entire production animal certified?
13  Because if we had the call for animal certified care eggs, we
14  could have gotten the one or two that was UEP certified and we
15  could continue with our other practices at the other
16  facilities.
17  Q.   So by this time, did Sparboe have experience dedicating a
18  single facility to producing eggs pursuant to an animal
19  welfare standard?
20  A.   Oh, yeah.  We were already doing it for the McDonald's
21  and Cargill commitment.
22  Q.   And at this time, there were other Sparboe facilities
23  that were producing eggs for customers that did not want eggs
24  produced pursuant to the same animal welfare standard that
25  McDonald's used?
```

171

```
1   A.   Right.
2           MR. KING:  Objection.  Leading.
3           THE COURT:  Well, do you want to rephrase the
4   question?  That one was leading.  A leading question, you know
5   what it is.
6   BY MR. AHERN:
7   Q.   So, Mr. Mueller, so I think you testified that by this
8   time, Sparboe already had experience in terms of producing
9   eggs for McDonald's pursuant to their animal welfare
10  standards?
11  A.   Correct.
12  Q.   At a dedicated facility, right?
13  A.   Yes.
14  Q.   And did Sparboe have other facilities where it was
15  producing eggs without respect to a particular animal welfare
16  standard?
17  A.   All of our -- all of our other production facilities
18  which attempted to comply with the animal certified care
19  welfare program.  The 100% rule did not start off in 1999.  It
20  was not part of the program.  It evolved to be the 100% rule,
21  and so we were concerned about the 100% rule.
22          To answer your question, all of our facilities were
23  in compliance and being audited by the UEP program.  We just
24  didn't understand the reason or the practicality of why they
25  had to be if we could dedicate one or two of our facilities
```

172

```
1   and make that 100 percent compliant.  I hope that makes sense.
2   Q.   Thank you.
3   A.   Yep.
4   Q.   Now, I believe you testified earlier that you were
5   involved in the -- in matters relating to the USEM; is that
6   correct?
7   A.   Yes.
8   Q.   And that's the United States Egg Marketers?
9   A.   Correct.
10  Q.   And what did the United States Egg Marketers do?
11  A.   Well, they were a marketing arm, an export -- I viewed
12  them as an exporting arm or marketing arm of United Egg
13  Producers.  I believe they were a separate entity, but they
14  were managed by United Egg Producers, the same people, and
15  they from time to time would knock on your door and sending
16  an e-mail or a message saying, We've got an export opportunity
17  we'd like you to consider, take advantage of.
18  Q.   And did you -- did you -- you previously referred to one
19  of your job responsibilities as reviewing agreements that
20  trade associations might want to have - might want Sparboe to
21  look at or to sign.
22  A.   Correct.
23  Q.   And did the USEM present agreements to Sparboe that you
24  had to look at and that they wanted Sparboe to sign?
25  A.   Yes.  They initially went through Wayne Carlson, our vice
```

173

1    president of logistics, or he procured and sold eggs for the
2    company.  And Wayne came to me one day and had me look at one
3    of their agreements, subsequently had me starting to attend
4    the marketing committee meetings with him as well.
5    Q.  Mr. Mueller, let me show you what's been marked as
6    Plaintiffs' Exhibit 82.
7              THE COURT:  82?
8              MR. AHERN:  82.
9              THE WITNESS:  Okay.
10   BY MR. AHERN:
11   Q.  Have you seen this document before?
12   A.  I have.
13   Q.  And did you see it on or about the date that it bears?
14   A.  Yes.
15   Q.  And do you recall receiving a copy of it?
16   A.  I would have received -- Wayne would have came and showed
17   me this.  I recall him coming and showing it.
18   Q.  And did you read it when you received it?
19   A.  Yes.
20   Q.  Can you identify for the jury the date, the "to," the
21   "from," and the subject line?
22   A.  Date is September 10th, 2001.  In capital bold letters:
23   Immediate reply is required.  And it's to members of United
24   States Egg Marketers or USEM, and it's from Gene Gregory.  The
25   subject is export opportunity.  And then underlined in bold

174

1    letters it says:  Need response by 8 a.m. Eastern Time,
2    Tuesday, September 11th.  So by 8 a.m. the next day.
3    Q.  Okay.
4              MR. AHERN:  Your Honor, Plaintiffs move for the
5    admission of Plaintiffs' Exhibit 82.
6              THE COURT:  Any objection?
7              MR. KING:  No objection.
8              THE COURT:  82 is admitted.
9              (Exhibit received in evidence.)
10             MR. AHERN:  May we publish to the jury?
11             THE COURT:  Yes.
12             MR. AHERN:  Thank you, Your Honor.
13   BY MR. AHERN:
14   Q.  Is this one of the types of documents that you referred
15   to receiving from USEM?
16   A.  Yes.
17   Q.  When you referred to the line that says:  Need your
18   response by 8 a.m. Eastern Time September -- Tuesday,
19   September 11th -- do you see that?
20   A.  I do.
21   Q.  And do you recall whether or not that was a typical time
22   frame that you --  that Sparboe was being asked to respond to
23   a request from the USEM?
24   A.  It was very typical to put a timeline on it.  This one in
25   particular, I remember striking me as -- I probably read it at

175

1    2:00 in the afternoon, and by 8 o'clock tomorrow morning, they
2    want our answer.  But it was very typical for them to say "we
3    need to know by" and then they would put a deadline on it.
4    Q.  And three paragraphs from the bottom, it says:  For those
5    requesting UEP to purchase the eggs in the open market, you
6    will be invoiced the difference between a sale price of $0.23
7    and the purchase price.
8              Do you see that?
9    A.  I do.
10   Q.  And above that, it says:  For those delivering USEM --
11   for those delivering eggs, USEM will pay members $0.20 per
12   dozen with the freight paid by USEM on an equalized basis.
13             Do you see that?
14   A.  I do.
15   Q.  What was your understanding as to what those two
16   paragraphs meant?
17   A.  My understanding was decide which one of these you want
18   to take a bigger bath on.
19   Q.  And what do you mean by that?
20   A.  Meaning you were going to pay $0.20 if you delivered and
21   you can arrange the freight of 23 on the open market.
22   Q.  Did you have an understanding as to why there would be an
23   invoice to a participant in the USEM export for this
24   difference?
25   A.  I -- no, I don't.  I didn't have an understanding, and I

176

1    don't right now anyway.
2    Q.  Did you have an understanding as to whether or not the
3    price that was being suggested in this -- let me put it this
4    way:  Do you recall whether or not at this time, the price
5    that was being suggested to export the eggs was above or below
6    the price that the eggs could be sold at in the United States?
7    A.  Yeah.  My understanding was that this was a price that's
8    going to be below what you could sell them for in the
9    United States.
10   Q.  And what was your understanding at the time, or did you
11   have an understanding at the time as to why USEM would be
12   recommending to sell eggs outside the United States for a
13   price that was lower than what they could be sold at in the
14   United States?
15   A.  Sure.  My understanding was it's another effort to
16   tighten supplies.  Let's get rid of some eggs so we can
17   tighten supplies and get the price to increase in what's left.
18   Q.  And did -- was the export program that the USEM
19   conducted, did that play any role in your concerns about there
20   being any supply-reduction program?
21   A.  It sure did.
22   Q.  Okay.  Now, did there come a time when Sparboe decided to
23   withdraw from USEM?
24   A.  Yes, there did come a time when we decided to withdraw.
25   Q.  And let me show you what's been marked as Plaintiffs'

177

```
1    Exhibit 692.
2    A.   I see it.
3    Q.   And have you seen this document before?
4    A.   I have.
5    Q.   And did you write this document?
6    A.   I did.
7    Q.   And can you identify for the jury what this document is?
8    A.   Yes.  It's a letter dated May 27, 2005.  It's addressed
9    to Mr. Larry Seger, the Chairman of the United States Egg
10   Marketers, and it's regarding to United States egg marketing
11   membership and export commitment.
12        MR. AHERN:  Your Honor, Plaintiffs move for the
13   admission of Plaintiffs' Exhibit 692.
14        THE COURT:  It's admitted.
15        (Exhibit received in evidence.)
16        MR. AHERN:  May we publish to the jury?
17        THE COURT:  Yes.
18   BY MR. AHERN:
19   Q.   So you wrote this letter, correct?
20   A.   I did.
21   Q.   And did you, in fact, send the letter to Mr. Seger?
22   A.   I did.
23   Q.   Now, did there come a point in time when Sparboe, around
24   this time in 2005, the same time as this letter, withdrew from
25   the UEP animal -- UEP Certified Program with the 100% rule?
```

178

```
1    A.   That was probably about a month after that.  I want to
2    say sometime in June for it to be effective on July 1st of
3    2005.
4    Q.   And how did Sparboe notify the UEP that it was
5    withdrawing from the UEP Certified Program with the 100% rule?
6    A.   As I recall, Bob Sparboe sent a letter to Mr. Al Pope to
7    that effect.
8    Q.   Mr. Mueller, let me show you what's been marked as
9    Plaintiffs' Exhibit 284.
10        Have you seen this document before?
11   A.   Yes.
12   Q.   And did you have any role in preparing this document?
13   A.   I drafted the document.
14   Q.   And do you know if this document was actually -- oh,
15   strike that.
16        And is that Mr. Sparboe's signature on the document?
17   A.   That is Bob Sparboe's signature.
18   Q.   And can you identify for the jury what this document is?
19   A.   This is a letter dated June 14, 2005, to Mr. Al Pope at
20   United Egg Producers, and it's notifying them that we would be
21   leaving the Animal Welfare Program effective July 1st, 2005.
22        MR. AHERN:  Your Honor, Plaintiffs -- I'm sorry,
23   Your Honor.  Plaintiffs move for the admission of Plaintiffs'
24   Exhibit 284.
25        MR. KING:  No objection.
```

179

```
1         THE COURT:  284 is admitted.
2         (Exhibit received in evidence.)
3         MR. AHERN:  May we publish the exhibit to the jury?
4         THE COURT:  Yes.
5         MR. AHERN:  Thank you, Your Honor.
6    BY MR. AHERN:
7    Q.   So are you copied on this letter?
8    A.   Yes, I am.
9    Q.   And is this the letter in which Sparboe notified the UEP
10   that it was withdrawing from the Certified Program effective
11   July 1st, 2005?
12   A.   Yes, that's the one I was referring to.
13   Q.   And did you have an understanding at this time as to why
14   Sparboe chose to withdraw from the Certified Program at this
15   time?
16   A.   For all of the reasons we've been discussing and I've
17   testified to here and that are mentioned in, for instance, my
18   November letter was the reasons we were withdrawing.
19   Q.   And so did this -- did the decision for Sparboe to
20   withdraw from the UEP Certified Program with the 100% rule,
21   did that have anything to do with the concerns that you've
22   testified to with respect to the Certified Program with the
23   100% rule being a supply management tool?
24   A.   It's directly related to that.
25   Q.   And does this have -- does Sparboe's decision to withdraw
```

180

```
1    have any relationship to your concerns as you expressed them
2    with respect to the hidden agenda?
3    A.   It's directly related to that as well.
4    Q.   And at the time that this letter was sent, withdrawing
5    Sparboe's membership from the Certified Program with the
6    100% rule, did you feel that the concerns that you and Sparboe
7    had expressed had been addressed adequately by the UEP?
8    A.   I felt they had been wholly and utterly unaddressed by
9    the UEP.
10   Q.   Now, do you recall at that time having any other
11   understanding -- strike that.
12        Did you have any understanding at that time as to
13   whether or not the UEP did anything in response to
14   Sparboe's decision to leave the Certified Program?
15   A.   Yeah.  I have an understanding of what they did.
16   Q.   And what was that -- what's that understanding?
17   A.   They started directly contacting customers that Sparboe
18   was notifying them that we had left the Animal Welfare
19   Program.
20   Q.   And without describing anything that's been told to you
21   by anybody else, can you -- can you be any more specific as to
22   your understanding as to what transpired in terms of the UEP
23   contacting Sparboe's customers?
24   A.   Yes.  I believe it was Walmart, if my recollection is
25   correct, but it might have had something to do with Target
```

181

1    stores, but it was Walmart for sure where Mr. Gene Gregory had
2    contacted some of the people involved in the direct
3    relationship of the Sparboe companies, our discussion with
4    them and notified them we left the Animal Care -- the ACC,
5    Animal Care Certified Program.
6    Q.   Did there come a point in time when Sparboe complained to
7    the UEP about this?
8    A.   They sure did.
9    Q.   And did Sparboe complain in writing?
10   A.   Yes.
11   Q.   And did you have any role in preparing that letter?
12   A.   I drafted the letter.
13   Q.   Mr. Mueller, let me show you what's been marked as
14   Plaintiffs' Exhibit 292.
15        Have you seen this document before?
16   A.   I have.
17   Q.   And did you have a role in preparing this document?
18   A.   Yes.  Again, I drafted the letter.
19   Q.   Do you know if this document was actually sent?
20   A.   This document was actually mailed.
21   Q.   And can you identify for the jury what this document is?
22   A.   It is a letter dated September 6th, 2005.  It's addressed
23   to Roger Deffner, chairman of United Egg Producers, and it's
24   regarding United Egg Producers' contact with Sparboe Company
25   customers.  It's from Bob Sparboe to Roger Deffner.

182

1    Q.   Now, the second page of the document, can you identify
2    what that is?
3    A.   Yes.  That is a June 10, 2005 letter from Al Pope to Bob
4    Sparboe that Bob had received, what, three months earlier.
5    Q.   Okay.  And did you see that document on or about the date
6    that it bears?
7    A.   Yes.
8         MR. AHERN:  Your Honor, we'd move for the
9    admission -- sorry.
10   BY MR. AHERN:
11   Q.   Just foundationally, was this -- this is not a composite
12   exhibit.  This second page is an attachment to the letter?
13   A.   Right.  We attached that to the letter Bob sent to
14   Al Pope.
15        MR. AHERN:  Your Honor, we'd move for the admission
16   of Plaintiffs' Exhibit 292.
17        MR. KING:  We object based on hearsay.
18        THE WITNESS:  Excuse me.  That Bob sent to Roger
19   Deffner.
20        MR. AHERN:  Your Honor, this was to put the UEP on
21   notice.
22        THE COURT:  So it's not being offered for the truth
23   of anything in the letter.
24        MR. AHERN:  That's correct.
25        THE COURT:  Only the communication of the letter.

183

1         MR. AHERN:  That's correct.
2         MR. KING:  With that instruction, no objection.
3         THE COURT:  Okay.  So, once again, folks, this is
4    one of these limiting instructions as to what the letter can
5    be considered to be and that is merely the fact that this
6    communication was made, and that's a limiting instruction that
7    applies to all of the Defendants.
8         MR. AHERN:  May I publish the exhibit to the jury?
9         THE COURT:  Yes, you may.
10        (Exhibit received in evidence.)
11   BY MR. AHERN:
12   Q.   Now, if you look at the second paragraph of
13   Mr. Sparboe's letter, it says:  On June 10, 2005, I contacted
14   Al Pope to inform him that the Sparboe companies would
15   voluntarily withdraw from the UEP -- sorry -- from the United
16   Egg Producers Animal Care Certified Program effective July 1,
17   2005.
18        Do you see that?
19   A.   I do see that.
20   Q.   And that's the withdrawal from the Certified Program made
21   by Sparboe that you've testified to just earlier, correct?
22   A.   Correct.
23   Q.   And then -- and then it goes on to say:  I subsequently
24   received a letter from Mr. Pope outlining the procedures that
25   UEP takes when a company either fails an audit or voluntarily

184

1    dismisses its commitment to participate in the Animal Care
2    Certified voluntary program.  The letter does not suggest that
3    UEP employees would communicate with Sparboe Companies'
4    customers in any way.  And then it says:  See attached letter.
5         Do you see that?
6    A.   Yep.  And that's the letter then that he's referring to
7    that we attached.
8    Q.   And did you have an understanding at that time whether or
9    not what's written in this letter is consistent with what you
10   understood the UEP was doing in terms of contacting
11   Sparboe's customers?
12   A.   I did have an understanding and that was -- my
13   understanding was that Gene Gregory in particular was directly
14   contacting customers telling them we'd left the program.
15   Q.   And the next paragraph says:  Thereafter, it came to my
16   attention that the UEP staff member, Gene Gregory, contacted
17   some of our customers, informing them of our withdrawal from
18   the program.
19        Do you see that?
20   A.   I do.
21   Q.   And then it says:  Mr. Gregory's actions clearly step
22   outside of UEP's stated procedures as outlined in the letter
23   we received from Mr. Pope.
24        Do you see that?
25   A.   I do.

185

1   Q.   And that letter was the letter that's been attached to
2   Mr. Sparboe's letter that we just looked at, correct?
3   A.   That's correct.
4   Q.   Then it says:  We further -- further, we interpret his
5   actions as unethical and inappropriate for an industry
6   organization to do to its membership.
7            Do you see that?
8   A.   Yes.
9   Q.   And do you have an understanding at that time as to what
10  that meant?
11  A.   Yes.  It meant that we were very put off by your actions,
12  Mr. Gene.
13          MR. AHERN:  Your Honor, I have no further questions.
14          THE COURT:  All right, cross-examination.
15          MR. KING:  Yes, Your Honor.
16                    CROSS-EXAMINATION
17  BY MR. KING:
18  Q.   Mr. Mueller, my name's Jim King.  I represent Defendant
19  Rose Acre Farms.  You mentioned a number of committees that
20  you've served on at UEP.  You didn't -- you've never served on
21  the Producer Committee for Animal Welfare, right?
22  A.   No.
23  Q.   You never served on the Scientific Advisory Committee,
24  right?
25  A.   No.

186

1   Q.   You were not involved in any of the negotiations going on
2   within the Producer Committee for Animal Welfare, correct?
3   A.   No.
4   Q.   And you weren't involved in any of the communications of
5   that the Producer Committee for Animal Welfare had with
6   members and leaders of the Food Marketing Institute, correct?
7   A.   Not directly, no.
8   Q.   Well, indirectly did you have any communications with
9   members of the Food Marketing Institute in any way connected
10  with the work of the Producer Committee for Animal Welfare?
11  A.   Through employees of Sparboe Company who were involved.
12  Q.   Did you, sir, have any direct communications with anyone?
13  A.   No.  I thought we were talking about indirect
14  communication.
15  Q.   All right.  These supply recommendations that UEP would
16  recommend from time to time, Sparboe never did any of those,
17  right, to your knowledge?
18  A.   No, we did some of them.
19  Q.   Oh, you did some of the supply recommendations?
20  A.   Yeah.
21  Q.   You believe that?
22  A.   Yeah.
23  Q.   Did you ever voice any concerns, any writing letters to
24  UEP about any concerns you may have about the short-term
25  supply recommendations?

187

1   A.   I think they were covered in the letters that we just
2   talked about.
3   Q.   Those letters we talked about with respect to Certified
4   Program, you believe also covered your concerns related to the
5   short-term supply recommendations?
6   A.   Yeah.
7   Q.   Did you ever write any letters to the UEP or Mr. Isaacson
8   related to exports?
9   A.   No.
10  Q.   Sparboe became certified, right, after the program came
11  out?
12  A.   Correct.
13  Q.   Correct?  And Sparboe was not a fan of the 100% rule?
14  A.   No.
15  Q.   You're -- the president, Bob Sparboe, didn't like it,
16  right?
17  A.   That's fair to say, yes.
18  Q.   Voted against it?
19  A.   Correct.
20  Q.   Very vocal against the 100% rule.  Would you agree with
21  that?
22  A.   I don't know that we were very vocal, but voted against
23  it.
24  Q.   Well, you attended meetings.  You talked about all these
25  meetings you're able to recall almost 20 years ago.  Do you

188

1   recall any time Mr. Sparboe vocalized opposition to the
2   100% rule and all these various meetings that you described
3   and you remember that you're here for today?
4   A.   Yes.  He did vocalize, as well as I did, as well as all
5   the other things you just talked about, USEM exports and
6   reductions, and we were very vocal about that.
7   Q.   Despite the vocal concerns raised by Mr. Sparboe and
8   yourself, after Sparboe joined the Certified Program in 2002,
9   and after the 100% rule went into effect in 2002, Sparboe
10  remained in the UEP, correct?
11  A.   Yes.
12  Q.   Sparboe remained part of the Certified Program, right?
13  A.   Yes.
14  Q.   And then the same for 2003, Sparboe remained in the UEP,
15  correct?
16  A.   Um-hum.
17  Q.   Yes?
18  A.   Yes.
19  Q.   And remained a member of the Certified Program?
20  A.   Yes.  We remained in it all the way up until July 1,
21  2005.
22  Q.   2004 member of UEP Certified Program, right?
23  A.   Correct.
24  Q.   And 2005 member of UEP Certified Program?
25  A.   Up until July 1st of 2005.

189

1    Q.   Now, you would agree with me that there's nothing in the
2    Certified Program that would limit a producer's ability to
3    expand, right?
4    A.   No, there's nothing limiting it, no.
5    Q.   So a new producer, although they may be certified, could
6    still build a new farm?
7    A.   If they were inclined to, yes.
8    Q.   Build new houses?
9    A.   Yes.
10   Q.   Add new cages?
11   A.   Yes.
12   Q.   All those things, right?
13   A.   Yep.
14   Q.   And you said that Sparboe, although it joined the
15   Certified Program, it didn't have any customers that demanded
16   it, right?
17   A.   I don't recall one customer asking for it.
18   Q.   And the Certified Program, not the customers demanding
19   it, it was costly, right?
20   A.   Well, yes.  Implementing it was -- there were cost
21   increases as you went from the 53 square inches to the next
22   phase, 67, and ultimately I believe it was going to land on
23   72.
24   Q.   I'd like to direct your attention to Plaintiffs'
25   Exhibit 691.  It's this letter that you sent on November 5,

190

1    2003, to Mr. Isaacson.
2    A.   All right.
3    Q.   I assume this letter was authorized by Bob Sparboe,
4    right, when you sent it?
5    A.   Yes.
6    Q.   And now, are you familiar with a settlement agreement
7    that was entered into between Sparboe and the Plaintiffs?
8    A.   I've never seen it.  I've been told that the only -- the
9    only thing that pertained to me was that I was required under
10   that Settlement Agreement, cooperative agreement, to come and
11   authenticate that letter, to appear and authenticate this
12   letter, if necessary.
13   Q.   And you did authenticate that letter, right?
14   A.   I did.
15   Q.   So you've never seen the terms of that Settlement
16   Agreement?
17   A.   No.
18   Q.   Did you sit with Mr. Ahern before testifying today?
19   A.   Yes.
20   Q.   How long did you meet with him?
21   A.   Total of maybe five hours.
22   Q.   Did he show you the exhibits that he showed you here
23   today?
24   A.   Yes.
25   Q.   Went through your -- his questions and your answers with

191

1    respect to those exhibits?
2    A.   Went through his questions.  I gave him my answers.
3    Q.   This letter, because under the Settlement Agreement
4    you're here to authenticate it, it's a big deal to the
5    Plaintiffs.  Would you agree with that?
6         MR. AHERN:  Objection, Your Honor.
7         THE COURT:  Overruled.
8         THE WITNESS:  I think it's probably a big deal to
9    them, sure.
10   BY MR. KING:
11   Q.   Right, because you're making pretty serious accusations
12   in this letter.  Would you agree with that?
13   A.   I don't know about accusations, but I'm making some
14   warnings.
15   Q.   So you sent this letter in 2003 making these warnings,
16   but Sparboe remains a member of the UEP, correct?
17   A.   For a couple more years, yep.
18   Q.   For two more years.  And a member of the Certified
19   Program for a couple more years, right?
20   A.   Correct.
21   Q.   And sir, it's correct, is it not, that you were just
22   asking questions in this letter, right?
23   A.   It's -- what's that?  I was just asking questions?
24   Q.   You were just asking questions?
25   A.   I was asking for a response from United Egg Producers to

192

1    those questions.
2    Q.   Yeah, you were -- you weren't making any allegations
3    concerning the motivations of UEP in promulgation of the
4    guidelines, were you?
5    A.   Not directly.  One might infer that I was, but no, not
6    directly I wasn't.
7    Q.   Let's look at -- let's look at what you actually said at
8    the time.
9         MR. KING:  Your Honor, can I approach the witness?
10        THE COURT:  Yes.
11   BY MR. KING:
12   Q.   Actually, I want to direct your attention to the second
13   page of this document.  It's been marked as Exhibit 657.  And
14   at the bottom, there appears to be an e-mail from you, sir,
15   John Mueller, John@sparboe.com dated November 22nd, 2003, to
16   Irving.
17   A.   Correct.
18   Q.   And is that Irving Isaacson?
19   A.   Yes.
20   Q.   Is that the same Irving Isaacson to whom you sent your
21   letter of November 5th, 2003?
22   A.   Yes, it is.
23   Q.   And Mr. Isaacson responded to your letter, right?
24   A.   Yes.
25   Q.   And you received his response, correct?

193

```
1   A.   On or about the 19th of November, correct.
2        MR. KING:  Your Honor, we move to admit at least the
3   second page of Exhibit 657.
4        THE COURT:  At least or only?
5        MR. KING:  Excuse me.  Only the second page of
6   Exhibit 657.
7        THE COURT:  Which is the --
8        MR. KING:  E-mail from Mr. --
9        THE COURT:  Mr. Mueller's e-mail?
10       MR. KING:  Yes.
11       THE COURT:  Any objection?
12       MR. AHERN:  No objection.
13       THE COURT:  Okay.  So page 2 of Exhibit 657 and only
14  page 2 is admitted.
15       (Page 2 of exhibit received in evidence.)
16       MR. KING:  And, Your Honor, may we publish page 2?
17       THE COURT:  Yes, you may.
18  BY MR. KING:
19  Q.   And in this e-mail, sir, you say:  Irving -- and that's
20  Mr. Isaacson, right?
21  A.   Correct.
22  Q.   And you say:  I have been away from the office for a
23  couple of days and will be as well again next week.  However,
24  I did want to acknowledge receipt of your letter responding to
25  mine of November 5th, 2003, as it pertains to the above
```

194

```
1   subject.
2        Do you see that?
3   A.   I do.
4   Q.   And that subject is the UEP Animal Welfare Program,
5   right?
6   A.   Um, I don't see a subject line on here, but I'll take you
7   for your word on that.
8   Q.   All right.  And that's again his response --
9   A.   Yep, there it is, UEP animal welfare.
10  Q.   You got it.  That's in response to your letter of
11  November 5, 2003?
12  A.   Yep.
13  Q.   And you say:  I will attempt to visit with you about this
14  matter.
15       MR. KING:  Can you pull it up, please?
16  BY MR. KING:
17  Q.   I will attempt to visit you about this matter in earnest
18  the week following Thanksgiving.  In the meantime, I wanted
19  you to know that I was simply asking questions and was not
20  making any allegations concerning the motivations of UEP in
21  promulgation of the guidelines.  Will visit with you in person
22  soon.
23       That's what you said just a few weeks after you
24  wrote your letter of November 5, 2003, true?
25  A.   True.  And you're putting an emphasis on making any
```

195

```
1   allegations, and what I was getting at was I was simply asking
2   questions.  Irving's response seems to think that I was making
3   allegations.  I was asking the questions, Irving.  You didn't
4   answer them, so when I talk to you in earnest about them --
5   Q.   Just to be clear, Mr. Isaacson -- you can put that
6   down -- Mr. Isaacson was the outside lawyer for UEP, right?
7   A.   Correct.
8   Q.   And he -- and you knew him?
9   A.   Yep.
10  Q.   In your letter, you said you were raising questions,
11  right?  Yes?
12  A.   Yes.
13  Q.   Raising legal questions?
14  A.   And other questions.
15  Q.   Right.  And you were -- you were writing this letter
16  lawyer to lawyer, right, asking -- asking Mr. Isaacson to look
17  at these issues lawyer to lawyer.  You're a lawyer, right?
18  A.   Yep.
19  Q.   And you were writing lawyer to lawyer, correct?
20  A.   Yes.
21  Q.   And this letter that was signed by you was based on your
22  legal education, your training, and experience, right?
23  A.   Yes.
24  Q.   Because you were the general counsel for Sparboe, right?
25  A.   That's correct.
```

196

```
1   Q.   And you were a member of the bar; is that correct?
2   A.   Yes.
3   Q.   Member of the Minnesota bar?
4   A.   Yes.
5   Q.   Good standing?
6   A.   Yes.
7   Q.   Have you always been in good standing in the Minnesota
8   bar?
9   A.   Yes.
10  Q.   Have you ever been disciplined?
11  A.   Yes.
12  Q.   And you were disciplined.  You were publicly reprimanded?
13  A.   Yes.
14  Q.   And you were on probation?
15  A.   Yes.
16  Q.   Your law license was on probation for two years?
17  A.   Okay.  Yes.
18  Q.   And that was before you joined Sparboe, correct?
19  A.   It was in 1995.
20  Q.   And in this letter that you wrote in November of 2003 --
21       MR. KING:  If we can put up Exhibit 691.
22  BY MR. KING:
23  Q.   One of the things you say here --
24  A.   I don't have it.  It hasn't come up.
25       MR. KING:  Can you give us Exhibit 691?
```

197

1      THE WITNESS:  There it is.
2  BY MR. KING:
3  Q.  I think you were asked some questions about this on
4  direct.
5      MR. KING:  If we can go to the second full paragraph
6  after the blocked out redaction.  No, no, the one right above
7  that.  Thank you.  There we go.
8  BY MR. KING:
9  Q.  And you were asked some questions, I think, about this
10  paragraph, and you said:  As we have relayed from time to time
11  to the UEP executive staff, the hidden agenda of the Animal
12  Welfare Program is concerning to us.
13      And then you say:  Essentially, in short, we believe
14  if not carried forward properly, a strong case could be made
15  that the Animal Welfare Program is in essence a program being
16  offered by the trade association and its members to reduce
17  outputs in an effort to increase prices, right?  That's what
18  you said --
19  A.  Yes.
20  Q.  -- right?
21      And I think you also indicated in response to
22  several questions from counsel that you would -- you're a
23  regular reader of United Voices?
24  A.  Yes.
25  Q.  And there would be times in the United Voices when

198

1  Mr. Gregory would say, hey, this program, this Certified
2  Program, the Animal Welfare Program, it's working in terms of
3  reducing flock sizes or egg supplies, right?
4      Didn't you say that?
5  A.  I testified to that Gene seemed to be giving us lessons
6  on supply demand, and the program was working with supply
7  demand, sure.
8  Q.  And that's what he said --
9  A.  Yep.
10  Q.  -- right?
11      And that's what you told this jury?
12  A.  It's working the way -- it's working the way that we want
13  it to.  It's reducing the supply.
14  Q.  By the way, Gene liked to pat himself on the back a lot,
15  right?
16  A.  I thought so.
17  Q.  If anything good was going on in the industry, he'd pat
18  himself on the back for those good things, right?
19  A.  Sure.
20  Q.  And if things weren't going too well, he may blame
21  others, right?
22  A.  Yeah, he would blame others by saying the producers
23  aren't following my directions.
24  Q.  And, in fact, sir, didn't he say ultimately in the
25  United Voices that the program is not working, that he was

199

1  wrong?  Didn't he say that?
2  A.  If you've got that United Voices, I guess I'd like to see
3  it.  I don't remember it.  I don't recall it.
4  Q.  You talked about a number of United Voices.  You didn't
5  talk about this one.
6      MR. KING:  So can we put up Exhibit 882, please.
7      May I approach, Your Honor?
8      THE COURT:  Yes.
9  BY MR. KING:
10  Q.  Again, Mr. Mueller, you were a regular reader of
11  United Voices, right?
12  A.  Correct.
13  Q.  And this is United Voices dated July 16, 2004, correct?
14  A.  Correct.
15  Q.  And this United Voices, you would have received in your
16  capacity as an officer of the Sparboe companies?
17  A.  Yes.
18      MR. KING:  Your Honor, we would move for the
19  admission of Exhibit 882.
20      THE COURT:  Any objection?
21      MR. AHERN:  No objection.
22      THE COURT:  882 is admitted, and yes, it may be
23  published.
24      (Exhibit received in evidence.)
25      MR. KING:  And we'd like to publish it.  Okay,

200

1  publish this.  Can we blow up the first two paragraphs as well
2  as the title of that first page.
3  BY MR. KING:
4  Q.  This is one of the United Voices newsletters that's dated
5  July 2004, a little more than two years after the Certified
6  Program comes into effect.  And Gene Gregory writes this
7  article and it says:  What happened to the egg market?
8      Right?  That's what he said?
9  A.  Yes.
10  Q.  And it said:  I've been writing in United Voices since
11  1992 and have on many occasions written about managing the
12  supply side of our business and to give UEP members warnings
13  of future problems if the supply side is not watched very
14  carefully.
15      That's what he says, right?
16  A.  He does.
17  Q.  And then he says, in the second paragraph:  The first
18  hatchery reductions to meet the Animal Care Certified Program
19  began in April 2002, and with 80 percent of the industry
20  committed to the program, we didn't think we would have to
21  worry about the unprofitable times for a few years.  How wrong
22  could we have been?  Producers found ways to minimize or
23  eliminate the supply management advantages of the program.
24      That's what he said, right?
25  A.  That's what he wrote.

201

1  Q.   It's not working.
2  A.   He's saying:  How wrong could we have been?  So he's
3  saying it's not working the way he envisioned it to be is how
4  I read it.
5  Q.   And, in fact, he says -- later in this article, he says
6  in black and white -- if you go to the last paragraph of the
7  first page --
8  A.   Okay.
9  Q.   -- he says:  While the Animal Care Certified Program was
10  never intended as a supply reduction program.
11         That's what he said, isn't it?
12  A.   Yes.
13  Q.   You can put that down.
14         In fact, earlier, sir --
15         MR. KING:  We can show Exhibit 197, Plaintiffs'
16  Exhibit 197 that was previously shown to the witness.
17  BY MR. KING:
18  Q.   And this is United Voices that you were shown.  It's from
19  September 11, 2003, about a year earlier than the last
20  United Voices I showed you, correct?  Ten months or so?
21  A.   Yep.
22  Q.   And, again, this is a little more than a year after the
23  Certified Program went into effect --
24  A.   Yes.
25  Q.   -- right?

202

1         And you were asked some questions about this article
2  that begins at the bottom first page where it says:  Don't
3  screw up a good thing?
4         And if you go to the second -- the second page, the
5  second full paragraph, and he's -- Gene Gregory's reporting in
6  2003, again, about 13 months -- 12 months or so -- no, more
7  than that, about 15 months after -- 14 months after the start
8  of the Certified Program, he said:  All of this adds up to a
9  forecast for the year-ending hen inventory of 284.8 million or
10  5.6 million greater than last year based upon a cull rate of
11  5.5 percent.  He's saying that the nation's flock size is
12  actually projected to grow, right?
13  A.   Yeah, he's saying it looks like it's growing by 5 million
14  birds above where it was.
15         MR. KING:  Take that down, please.
16  BY MR. KING:
17  Q.   If we can go back to your letter again, the November 2003
18  letter, Exhibit 691.
19  A.   All right.
20  Q.   The second page, you ask a number of, I guess, questions
21  that -- to Mr. Irving.  And the top paragraph, in the middle
22  of the paragraph, you ask:  The question will be asked, why
23  would they do that?  Who's to benefit from this?  The answer
24  is that the big players of which Sparboe would be considered
25  one, control politically UEP, and that they are a greedy

203

1  corporate farming money-grubbing SOBs.
2         And then you say:  Justice Departments will be
3  alerted, Attorney General watchdog groups will be alerted,
4  et cetera.
5         Sir, are you aware of any actions by any Justice
6  Department or any Attorney General claiming that UEP's Animal
7  Welfare Program was actually a program to reduce egg supplies
8  in order to raise egg prices?
9         MR. AHERN:  Your Honor, we would object to this.
10         THE COURT:  Question?
11         MR. AHERN:  Yes.
12         THE COURT:  Overruled.
13         THE WITNESS:  What was the question?
14  BY MR. KING:
15  Q.   Are you aware of any actions by any Justice Departments
16  or any attorney -- Attorneys General claiming that the UEP's
17  Animal Welfare Program was designed to reduce egg supplies in
18  order to raise egg prices?
19  A.   No, I'm not aware.
20         MR. KING:  I'll pass the witness, Your Honor.
21         THE COURT:  Anybody else going to cross-examine?
22         MS. LEVINE:  Yes, Your Honor.
23         THE COURT:  Go ahead.
24                      CROSS-EXAMINATION
25  BY MS. LEVINE:

204

1  Q.   Good afternoon, Mr. Mueller.
2  A.   Hi.
3  Q.   My name is Jan Levine and I represent UEP.  I'm just
4  going to ask you a couple of questions to follow up.
5  A.   Okay.
6         MS. LEVINE:  Can we put up PX-228?
7  BY MS. LEVINE:
8  Q.   Mr. Mueller, would you like a hard copy of that document?
9  A.   No.  This is fine.
10  Q.   Okay.  Is it up?
11  A.   I've got it here.
12  Q.   Okay.  Mr. Mueller, I think you testified when your
13  lawyer asked you questions that you attended this May 11 and
14  12, 2004, UEP Board of Directors meeting?
15  A.   I did.
16  Q.   And in fact, your name appears on those meeting minutes?
17  A.   Yes.
18  Q.   And you attended on behalf of your client, Sparboe?
19  A.   Yes.  My employer I was working for them.
20  Q.   I want you to turn to the second page and I think you
21  testified about this Marketing Committee motion.  Do you see
22  that, sir?
23  A.   Yep.
24  Q.   And you were there when it said carried, weren't you?
25  A.   Yes.

205

1   Q.   And you didn't stand up and object, did you, sir?
2   A.   No.
3   Q.   And you were concerned that your client was part of an
4 antitrust violation and you just sat there?
5   A.   It appears that's what happened.
6   Q.   You also testified that you were at the Marketing
7 Committee meeting where that motion was passed, isn't that so,
8 sir?
9   A.   Right.
10   Q.   Okay.
11   A.   I was a little more vocal at that Marketing Committee
12 meeting.
13   Q.   Yeah.
14         MS. LEVINE: May I approach the witness, Your Honor?
15         THE COURT: Yes.
16 BY MS. LEVINE:
17   Q.   I'm going to show you a copy of those Marketing Committee
18 minutes. Can you pull up PX-226, please. Tell me when you've
19 finished reviewing, please.
20   A.   Okay.
21   Q.   Okay. This is a copy of the UEP Marketing Committee
22 minutes that is referred to in PX-0228, correct, sir, May 10,
23 2004?
24   A.   This is referred to in which, you said?
25   Q.   The minutes we just talked about, the May 11 and 12,

206

1 2004, Washington, D.C. minutes?
2   A.   Yes.
3   Q.   Right. Do you see your name anywhere on those minutes,
4 sir?
5   A.   I don't.
6   Q.   That's because you were not at those meetings, right?
7   A.   I'm pretty sure I was. I went with Wayne Carlson.
8   Q.   Um-hum. But your name's not on the minutes, right?
9   A.   It's not.
10   Q.   And when you go to a meeting, UEP is very meticulous to
11 write down who's at those meetings, correct?
12   A.   For the most part, yes.
13   Q.   Yeah.
14         MS. LEVINE: Can I publish this to the jury, please?
15         THE COURT: Are you going to move for its admission?
16         MS. LEVINE: Yes. Is this already in evidence?
17         THE COURT: No.
18         MS. LEVINE: Yes. I'm sorry. Move this document
19 into evidence.
20         THE COURT: Any objections?
21         MR. AHERN: No objection.
22         THE COURT: 226 is admitted, and, yes, it may be
23 published.
24         (Exhibit received in evidence.)
25

207

1 BY MS. LEVINE:
2   Q.   So there's no evidence on this document that you even
3 attended the Marketing Committee minutes, correct?
4   A.   Well, I don't think I'd attend the Marketing Committee
5 minutes. It doesn't appear that I attended the meeting.
6   Q.   Okay. Thank you for that correction. So when you stated
7 you were at that meeting, you were wrong, correct?
8   A.   No. My recollection is I was at that meeting with Wayne
9 Carlson.
10   Q.   But your name does not appear on those minutes?
11   A.   That's correct.
12   Q.   Do you have any reason to believe that the person that
13 took those minutes purposely left you off?
14   A.   No, ma'am, I don't.
15   Q.   I want you to go back to PX-228.
16   A.   All right.
17   Q.   Now, you testified that you had some concern that you
18 went to so many UEP meetings and they never discussed animal
19 welfare, correct?
20   A.   I think I testified that they didn't put the animal
21 welfare part of the Animal Welfare Program to the forefront.
22   Q.   Um-hum. Can you turn to page 3 of this document.
23   A.   Okay, I'm there.
24   Q.   Do you see where there's an Animal Welfare Committee
25 report?

208

1   A.   If you can highlight it, maybe I could.
2   Q.   Animal -- if you come down to the second paragraph,
3 Animal Welfare Committee, Chairman Paul Bahan?
4   A.   Oh, okay, yeah.
5   Q.   There's a discussion about feeder space and cage
6 configuration research?
7   A.   Um-hum.
8   Q.   There was a motion, two motions above that?
9   A.   Um-hum.
10   Q.   Those are all about animal welfare, correct?
11   A.   Well, they are, but, again, at least the first one is
12 talking about cage space.
13   Q.   All right, cage space was part of the Animal Welfare
14 Program, correct?
15   A.   Both of them are dealing directly with, it looks like,
16 feeder or cage space.
17   Q.   Correct.
18   A.   Yeah.
19   Q.   And all part of the Animal Welfare Program; is that
20 correct, sir?
21   A.   Yes.
22   Q.   So it was discussed at this very meeting you were at,
23 correct?
24   A.   I told you that cage space was repeatedly discussed at
25 these meetings.

209

1   Q.   And did you tell everyone that feeder space was?
2   A.   No.  And maybe -- maybe what you're talking about here,
3   are you talking about feeder space, meaning the space on the
4   trough that they get to feed out of?
5   Q.   Yes, sir.
6   A.   Well, the space on the trough that they get to feed out
7   of is directly related to how many hens are in the cage.
8   Q.   That's where you see conspiracy in the whole Animal
9   Welfare Program, sir?
10  A.   I see what?
11  Q.   Conspiracy?
12  A.   Do I see conspiracy?
13  Q.   Yeah.
14  A.   No.  I warned if you don't do this properly, it may be
15  perceived or conceived as a conspiracy.
16  Q.   But you would agree with me that there was a full report
17  from the Animal Welfare Committee at this board meeting, would
18  you agree with me, sir?
19  A.   There was a full report regarding feeder space and I
20  suppose they must have given a full report, yes.
21  Q.   All right.  Thank you.  And if you keep turning the page,
22  you'll see that there are many speakers at this meeting.  You
23  can turn the page, sir.
24  A.   Okay.  Somebody turned it for me.
25  Q.   Technology is so key here.

210

1   A.   Yes.
2   Q.   And there are -- there are speakers, do you see the
3   speakers?
4   A.   I do.
5   Q.   Dr. Bob Brackett from the FDA?
6   A.   Yes.
7   Q.   Dr. Ron DeHaven from the USDA?
8   A.   Yes.
9   Q.   Congressman, politicians at this meeting?
10  A.   It looks like it.
11  Q.   Two of them, in fact, correct?
12  A.   Chris Chocola from Indiana was there, too.
13  Q.   Mr. Mueller, can you go back to the first page?
14  A.   No, but somebody will take me there.  I'm there.
15  Q.   Are you familiar with the trade journal called the Egg
16  Industry magazine?
17  A.   I more than likely read it, but unless I see a cover or
18  something from it, I won't recognize it just by the mention of
19  the name.
20  Q.   Do you know who Mr. John Todd is who was listed as a --
21  an attendee?
22  A.   Mr. John Todd is not ringing a bell to me.
23  Q.   Do you know whether he was a reporter for the Egg
24  Industry magazine?
25  A.   It wouldn't surprise me if he were.

211

1   Q.   Because reporters attended these meetings, right?
2   A.   They did.
3   Q.   They were public, correct?
4   A.   Yeah.  This is why I voiced concerns about why are you
5   talking about some of these things with reporters in the room.
6   Q.   Right, but when the motion carried that you thought was a
7   real problem under the antitrust laws, you remained silent,
8   correct, even though you were there on behalf of your client?
9   A.   I don't know that I thought that particular motion was a
10  real problem.  I thought the whole program was a real problem.
11  Q.   Okay.  Now, you testified that you were at almost every
12  UEP meeting, right?
13  A.   I did.
14  Q.   You did not attend the UEP Animal Welfare Committee
15  meetings, though, correct?  Bob Sparboe did on behalf of
16  Sparboe?
17  A.   Well, Bob Sparboe or Garth Sparboe.
18  Q.   But not you, sir?
19  A.   I don't think I did.
20  Q.   You have no basis for disagreeing with Mr. Sparboe's
21  recollection of what happened at those meetings, do you?
22  A.   No.
23  Q.   Okay.  And you have no basis for disagreeing with
24  Mr. Sparboe's views on the Producer Committee's beliefs or
25  intent, do you?

212

1   A.   No.  And when you say Mr. Sparboe, are you talking about
2   Garth and Bob?
3   Q.   I'm really talking about Garth who has testified here?
4   A.   Okay.  No, I have no basis for --
5   Q.   Disagreeing with him, correct?
6   A.   Right.
7   Q.   And, sir, you have no personal knowledge as to whether
8   anyone ever followed or implemented any of the recommendations
9   of the UEP Marketing Committee, do you?
10  A.   I'm sorry, ask that again.
11  Q.   The recommendations of the Marketing Committee that you
12  had talked about --
13  A.   Yep.
14  Q.   -- you have no personal knowledge about anyone ever
15  following them or implementing them, do you?
16  A.   Anyone, meaning anyone in the entire industry?
17  Q.   Yes.  Do you know whether anyone, you yourself have you
18  seen anyone implement them?
19  A.   No.
20  Q.   And Sparboe didn't implement them, right?
21  A.   Well, someone implemented the United States Egg Marketer
22  recommendations.
23  Q.   Yes.  The recommendations about early molt?
24  A.   Some of those were -- some of those were implemented.
25  Q.   By the Sparboe Company?

213

```
 1   A.   Yeah, some of them were.
 2   Q.   If I would tell you that Garth Sparboe testified that the
 3   Sparboe Company never did, would that change your opinion?
 4   A.   I would defer to Garth.
 5   Q.   Thank you, sir.
 6        Now, I'm correct, am I not, that egg producers buy
 7   and sell eggs from each other at times, sometimes producers
 8   are long and short and they buy and sell each other's eggs,
 9   right?
10   A.   Yes.
11   Q.   For producers whose customers demand certified eggs, it's
12   important for them to know from whom they could buy certified
13   eggs, correct?
14   A.   That would be important.
15   Q.   Right.  And they would have to know that?
16   A.   That I'm buying my eggs from a certified producer?
17   Q.   Right.
18   A.   If my customer's demanding, right?
19   Q.   Right.
20   A.   If you want to remain true to your customer, you should
21   know that.
22   Q.   Now, you testified that Sparboe was concerned that
23   Mr. Gregory went to a customer, correct?
24   A.   Yes.
25   Q.   You know that UEP sent Sparboe an apology, correct?
```

214

```
 1   A.   Yes.
 2   Q.   Now, you testified that Sparboe's reason for leaving the
 3   UEP Certified Program was directly related to this hidden
 4   agenda, correct?
 5   A.   I said one of the reasons for leaving was directly
 6   related to the hidden agenda.
 7   Q.   Okay, do you know who Greg Murch is?
 8   A.   I do.
 9   Q.   Who's Greg Murch?
10   A.   Greg was our vice president of production during my time
11   at Sparboe Companies.
12   Q.   And do you know who Marco Hahn is?
13   A.   I know the name, but I'm not sure of the company or
14   the -- his affiliation.  I believe he was an egg producer.
15   Q.   And you know who Beth Schnell is, of course?
16   A.   I've known her all my life.
17   Q.   And what is her position?
18   A.   She is now the President and CEO of Sparboe Companies.
19   Q.   And who is Wayne Carlson?
20   A.   Wayne was our -- what we called our vice president of
21   logistics when we were talking about earlier somebody having
22   to procure eggs when you're short sell.  When you're long,
23   Wayne was the guy in our company who did that.
24   Q.   I'd like to mark the next document as DCX-4.
25        MS. LEVINE:  May I approach the witness?
```

215

```
 1        THE COURT:  Yes.
 2   BY MS. LEVINE:
 3   Q.   Mr. Mueller?
 4   A.   Um-hum.
 5   Q.   I put before you an e-mail from Greg Murch, dated
 6   May 5th, 2005 --
 7   A.   Okay.
 8   Q.   -- to Mr. Barham, copy to Beth Schnell.
 9        You see that?
10   A.   I do.
11   Q.   And that e-mail starts off:  Dear Beth -- or Beth, I
12   apologize.
13        MR. AHERN:  Your Honor, is this --
14        MS. LEVINE:  For impeachment.
15   BY MS. LEVINE:
16   Q.   Tell me when you've finished that document.
17        THE COURT:  Hold on.  Let counsel catch up with you.
18   Meanwhile, Mr. Mueller, you can read the document.
19        MR. AHERN:  I'm sorry, any found- -- is there any
20   foundation he's seen this document before?
21        THE COURT:  Right now it's for impeachment.
22        MR. AHERN:  I don't believe it's proper.
23        THE COURT:  Well, we don't know yet because she
24   hasn't asked the question.  You're not going to be reading the
25   letter.  Focus on what you see as impeachment.  If you have a
```

216

```
 1   copy for me, that would be great.
 2        THE WITNESS:  All right.
 3   BY MS. LEVINE:
 4   Q.   This e-mail that is in front of you discusses
 5   Sparboe's reasons for leaving the Certified Program, correct?
 6   A.   Part of the reasons of why we're considering leaving the
 7   program.
 8   Q.   And nowhere in that two-page document does it say
 9   anything about price fixing, does it, sir?
10   A.   I didn't see that.
11   Q.   And nowhere in that e-mail does it talk about a hidden
12   agenda, does it, sir?
13   A.   I don't see that.
14   Q.   And nowhere in that e-mail does it talk about supply
15   reduction, does it, sir?
16   A.   I don't see that.
17   Q.   And, in fact, the only reason that's listed is because of
18   the cost of staying on the program, isn't that true, sir?
19   A.   There's other reasons listed, but --
20   Q.   They all have to do with Sparboe's finances, right?
21   A.   Yes.
22        MS. LEVINE:  No further questions, thank you.
23        THE COURT:  Any more cross-examination?
24        MR. HARRIS:  Just very briefly, Your Honor.
25
```

217

```
 1                    CROSS-EXAMINATION
 2   BY MR. HARRIS:
 3   Q.   Good morning, Mr. Mueller.  Alex Harris on behalf of
 4   U.S. Egg Marketers.
 5        THE COURT:  In what world is it morning?
 6        MR. HARRIS:  Afternoon, I suppose.  Time has just
 7   been flying.
 8        THE COURT:  We can change ages or something.  Sorry
 9   for the interruption.  Go ahead.
10   BY MR. HARRIS:
11   Q.   Mr. Mueller, you were asked about an export opportunity
12   in September 2001.  Do you recall those questions?
13   A.   I do.
14   Q.   Now, in September, 2001, do you know what each member of
15   USEM was getting in terms of price for their eggs?
16   A.   I do not other than what was stated on the one exhibit
17   mentioning $0.23, $0.20.
18   Q.   But that was what each USEM member was actually getting
19   in the marketplace for their eggs?
20   A.   That I wouldn't know, what the Urner Barry was on those
21   dates or what your pricing -- your price arrangements were
22   with any particular customer on that date.
23   Q.   And do you recall you said there was a response that they
24   were requesting by 8 a.m. the next morning?
25        Do you recall that?
```

218

```
 1   A.   I do.
 2   Q.   And they were asking for a response because the order was
 3   pending the approval of the majority of the membership.
 4        Do you recall that?
 5   A.   Okay, yep.
 6   Q.   Do you know if Sparboe voted in favor of taking that
 7   export opportunity?
 8   A.   I do not.  My inclination is to say that we passed
 9   because I -- my counsel to Wayne was I'm reluctant to vote on
10   something or participate in something where it's 2:30 in
11   the morning.  They need our answer by 8 o'clock tomorrow
12   morning.
13   Q.   So Sparboe made that decision independently on its own?
14   A.   If we participated, Wayne would have made that decision
15   independently.
16   Q.   Well, either way, whether you voted yes or no, you made
17   that decision independently, correct?
18   A.   Right.  Yes.
19        MR. HARRIS:  No further questions.  Thank you.
20        THE COURT:  Any redirect?
21        MR. AHERN:  Briefly, Your Honor.
22                    REDIRECT EXAMINATION
23   BY MR. AHERN:
24   Q.   Now, Mr. Mueller, you were -- you were shown Defendant's
25   Exhibit 657.
```

219

```
 1        MR. AHERN:  Can we pull that up?
 2   BY MR. AHERN:
 3   Q.   And this was your e-mail to Mr. Isaacson that you were
 4   examined on, correct?
 5   A.   Correct.
 6   Q.   And this came after Mr. Isaacson's letter responding to
 7   your letter of November 5th, 2003, correct?
 8   A.   Exactly.
 9   Q.   Okay.  And we didn't really talk much about that letter,
10   Mr. Isaacson's response.  Did you have an understanding at
11   that time as to whether or not Mr. Isaacson in his response
12   was conveying to you that he felt that your letter was making
13   personal attacks on -- various people at the UEP?
14   A.   Yeah, Mr. Isaacson's letter -- my testimony earlier was
15   that he completely missed the mark.  He didn't answer any of
16   these questions.  He just came back with sensational
17   accusations that we were missing the mark with regards to
18   animal welfare and the initiatives that they were purporting
19   to protect us from.  And so that's why in here, I talk about:
20   We need to talk about this in earnest because I think he
21   missed the mark.  I need to talk to you about my real
22   concerns.
23   Q.   Okay.  And so when you wrote in this e-mail that you were
24   not making any allegations, did you -- what did you mean to
25   convey by that?
```

220

```
 1   A.   I meant I wasn't making any allegations with regards to
 2   what he believed I was alleging -- if that's the right word --
 3   in his response letter to me.
 4   Q.   And did you -- did you have an understanding as to
 5   whether or not you meant to convey that you were not engaging
 6   in any personal attacks on anybody at UEP in your
 7   November 5th, 2003 letter?
 8   A.   Exactly.  I was trying to convey that, that I was just
 9   simply trying to ask you some questions, you haven't answered
10   them, and I want to talk to you about it further.
11   Q.   And after you wrote this e-mail to Mr. Isaacson, did you
12   feel any differently at all about your November 5th, 2003
13   letter?
14   A.   I don't think I felt any different whatsoever.  I felt
15   maybe that -- I felt as if they were ignoring the concerns
16   once again.
17   Q.   Now, Mr. Mueller, you were shown Defendants' Exhibit 882.
18        Do you see that?
19        MR. AHERN:  Sorry, can you pull that up, please?
20        THE WITNESS:  I'm still waiting.
21   BY MR. AHERN:
22   Q.   Okay.  There we go.
23   A.   Okay, yep.  I've got the hard copy as well.
24   Q.   Okay.  First of all, do you see in the second paragraph,
25   it says:  The first hatch reductions to meet the Animal Care
```

221

1  Certified Program began in April 2002, and with 80 percent of
2  the industry committed to the program, we didn't think we
3  would have to worry about unprofitable times for a few years.
4           Do you see that?
5  A.   I do.
6  Q.   And then -- then Mr. Gregory writes:  How wrong could
7  we have been?
8           Do you see that?
9  A.   I do.
10 Q.   And then Mr. Gregory writes:  Producers found ways to
11 minimize or eliminate the supply side management advantages of
12 the program.
13          Do you see that?
14 A.   Yeah, he scolds us for not following his directives
15 again.
16 Q.   And he's referring to the supply side management
17 advantages of the program, correct?
18 A.   Yes.
19 Q.   And how does that relate to the concerns that you had
20 expressed?
21 A.   It augurs right into the concerns I expressed.
22 Q.   Now, this is dated -- this is dated July 6th?
23 A.   16th.
24 Q.   16th, 2004; is that correct?
25 A.   Yes.

222

1            MR. AHERN:  Now, if we can pull up -- if my guy can
2  pull up Plaintiffs' Exhibit 197.  And if we can go to the
3  second page.
4  BY MR. AHERN:
5  Q.   And if we can go to the second sentence, full sentence
6  which says -- which says:  Backfilling of layer houses may
7  also be adding to the increased layer inventory.
8           Do you see that?
9  A.   I do.
10 Q.   And you had already testified with respect to that,
11 correct?
12 A.   Yes.
13 Q.   And -- and is it correct that your testimony was that
14 backfilling was -- was reducing the supply reduction effect of
15 the Certified Program?
16 A.   Correct.
17          MR. KING:  Objection, leading.
18          MR. AHERN:  I'm just restating his testimony.
19          THE COURT:  That would make it leading.  Do you want
20 to try it again?
21 Q.   Did you testify earlier that this sentence here referred
22 to the fact that backfilling was reducing the supply reduction
23 effect of the Certified Program?
24          MR. KING:  The same objection.
25          THE COURT:  Overruled.

223

1            THE WITNESS:  I did testify earlier to that.
2  BY MR. AHERN:
3  Q.   And this was in September -- this was on September 11 of
4  2003?
5  A.   Yes.
6  Q.   Okay.  So Mr. Gregory's comment about how could we --
7  comment about we didn't think we'd have to worry about
8  unprofitable times for a few years, did you have an
9  understanding as to how that related to this statement in
10 September 11, 2003, about backfilling?
11 A.   Yeah.  My understanding how that related was that if you
12 had followed my directives, that you would have more success
13 than we're showing here in the years subsequent September 2004
14 newsletter.  You didn't do what I asked you to do or what I
15 directed you to do and so now you're suffering the
16 consequences.
17 Q.   Now, let me show you what has been marked as Plaintiffs'
18 Exhibit 242.
19          Have you seen this document before?
20 A.   That would have been something I read in my normal course
21 and duties at Sparboe, so, yes.
22 Q.   Did you see it on or about the date that appears?
23 A.   Yes.
24 Q.   And did you read this document when you received it?
25 A.   I'm sure I did.

224

1  Q.   And can you identify the title of the document and the
2  date of the document for the jury?
3  A.   United Voices, Gene Gregory, editor.  This is July 28,
4  2004, edition and I'm -- I know for sure I would have read it
5  because I would have been interested specifically about the
6  Environmental Committee meeting in Chicago, so I know I read
7  this for sure.
8            MR. AHERN:  Your Honor, Plaintiffs move for the
9  admission of Plaintiffs' Exhibit 242.
10           MR. HARRIS:  Your Honor, USEM Marketers ask for a
11 limiting instruction on this exhibit as well.
12           THE COURT:  And you think this is in the scope of
13 the cross-examination?
14           MR. AHERN:  Yes.
15           THE COURT:  Okay.  So 242 will be admitted but not
16 as to USEM.
17           MR. AHERN:  And may we publish the exhibit?
18           THE COURT:  Oh, yes.
19           MR. AHERN:  Thank you, Your Honor.
20           (Exhibit received in evidence.)
21 BY MR. AHERN:
22 Q.   Now, turning to page 3 of the document, it's the second
23 full paragraph, it's a very short paragraph.
24 A.   Okay.
25 Q.   I'm sorry.  Let's go back to page 2 just briefly.  Do you

225

1  see towards the bottom it says:  Letter of egg market
2  comments?
3  A.  Yes.
4  Q.  Do you see that?
5  A.  Yep.
6  Q.  From Don Bell?
7  A.  Yeah.
8  Q.  And I don't know that we've talked to you about Don Bell,
9  but who is Don Bell?
10 A.  Don Bell was an egg economist guru who often was
11 consulted and published articles and whatnot regarding the
12 fresh shell table egg marketing in the United States.
13 Q.  And now going to the second page -- I'm sorry -- the
14 third page, the second full paragraph, it says:  Keep up the
15 good work and be proud of the fact that it could have been a
16 lot worse without the UEP Animal Welfare Program.
17      Do you see that?
18 A.  I do.
19 Q.  And did you have an understanding at the time as to what
20 that meant?
21 A.  Sure.  My understanding was that in the previous edition
22 two weeks earlier, where Gene is saying, How can we be so
23 wrong, Don is saying, Well, it could have been worse if you
24 hadn't been following the Animal Welfare Program or at least
25 some of it.

226

1  Q.  Thank you.
2      MR. AHERN:  Okay.  We can take that down.
3  BY MR. AHERN:
4  Q.  Now, I believe that in connection with the examination
5  about your November 4, 2003 letter, you were then -- you were
6  also asked about your e-mail to Mr. Isaacson about not making
7  allegations.
8      Do you recall that?
9  A.  I do.
10 Q.  Okay.  Now, you previously testified -- or let me put it
11 this way:  Did you previously testify that the hidden agenda
12 of the UEP Certified Program and the 100% rule, that your
13 concerns about that were based on your attendance at UEP board
14 meetings where there was a lot of discussion about supply
15 reduction and very little discussion about animal welfare?
16      MS. LEVINE:  Objection.
17      MR. KING:  Objection.  Leading.
18      THE COURT:  Well, it's not really leading, but we're
19 not going to go over the same material, are we?
20      MR. AHERN:  No, no.
21      THE COURT:  Okay.  Why don't you just ask the next
22 question.  The jury actually was paying very close attention
23 to what the testimony has been so you can just go from there.
24 BY MR. AHERN:
25 Q.  My point is that the -- the statement in your e-mail that

227

1  you weren't making allegations, does that have any effect on
2  your -- on what you view to be the basis for your concerns
3  that you expressed in the term "hidden agenda"?
4  A.  No, it doesn't.
5  Q.  And what was the basis for your concerns with respect to
6  the term, that you captured in the term "hidden agenda"?
7  A.  The hidden agenda that I was concerned about, once again,
8  was that you have an Animal Welfare Program that you're
9  propagating and trying to sell and implement as an Animal
10 Welfare Program, it doesn't really concern itself with animal
11 welfare much.  It concerns itself mostly with cage space and a
12 supply reduction, i.e., it could be viewed as a price-fixing
13 scheme.
14      MR. AHERN:  No further questions.
15      THE COURT:  Any recross?
16      MR. KING:  Your Honor, just briefly.
17      THE COURT:  Sure, go ahead.
18      MR. KING:  If we can put up Plaintiffs' Exhibit 242.
19          RECROSS-EXAMINATION
20 BY MR. KING:
21 Q.  Here we go.  Turn to the second page.  Mr. Mueller, you
22 were asked some questions about this United Voices, this
23 excerpt from Don Bell, this United Voices, dated July 28,
24 2004, correct?
25 A.  Correct.

228

1  Q.  And I think the jury's already heard this, but Don Bell
2  was somebody who was Avian sciences out at the University of
3  California Riverside?
4  A.  Yes.
5  Q.  He periodically would confer with UEP?
6  A.  Yes.
7  Q.  And this little excerpt, these few paragraphs in United
8  Voices, there's a letter, Egg Market Comments, from Don Bell.
9  Do you see that?
10 A.  I do.
11 Q.  And one of the things he's saying in here, is he not, is
12 that one of the results, or one of the by-products, I guess,
13 of the Animal Welfare Program in providing hens more cage
14 space is that you actually get more eggs from the hens, right?
15 A.  Yes.  He's saying that they seem to produce more eggs or
16 they seem to be better-producing if you give them a little
17 more space.
18 Q.  Happier hen produces more eggs, right?
19 A.  Yeah, you can take it that way.
20 Q.  Actually, he says and he indicates here that this is
21 something that producers didn't really take into account in
22 his experience, right?
23 A.  In his experience, that's what he says.
24 Q.  Yeah, he says:  One thing we seem to overlook is the
25 improved egg production rate which has occurred in spite of

229

1    keeping older hens to later cages.  We fully expected rates to
2    go up as we gave birds more space even though there were some
3    who failed to factor this into the equation.  I've always
4    said, take a bird out of each cage and increase the egg
5    production of the remaining hens by at least a dozen eggs.
6            Do you see that?
7    A.   Um-hum.
8    Q.   And so -- so is he saying -- is your interpretation he's
9    saying given more space, they'll produce about a dozen more
10   eggs a year?
11   A.   Yeah.  I think he's saying he's always said that.
12   There's no basis other than he's always said it, but that's
13   what he's saying.
14   Q.   And then this will continue until we reach 67 square
15   inches.  We still have an annual genetic improvements as well
16   between the first five months of 2003 and 2004.  We increased
17   our rate of production by 0.8 percent.  This doesn't seem like
18   much, but it represents 3 million fewer hens needed to provide
19   the same total egg production and it was done by altering the
20   nation's average cage space per hen by only a few inches,
21   right?
22   A.   Yep.
23   Q.   So you're getting more eggs per bird as a consequence of
24   giving them more space, right?
25   A.   Yes.

230

1            MR. KING:  Nothing further.
2            THE COURT:  Any more cross-examination?
3            MS. LEVINE:  No.
4            MR. HARRIS:  No.
5            THE COURT:  And a limited redirect.  Further
6    redirect examination.
7                 FURTHER REDIRECT EXAMINATION
8    BY MR. AHERN:
9    Q.   Mr. Mueller, do you know how many eggs an egg-laying hen
10   lays per year?
11   A.   At the time that I was at Sparboe Companies, my
12   understanding was that an egg lays about .8 or 8/10 of an egg
13   per day, so whatever the math is on 365 days would be how many
14   they lay per year.
15   Q.   Okay.  With respect to the topic that Mr. King just asked
16   you in terms of the increased productivity --
17   A.   Yes.
18   Q.   -- by providing a hen some more cage space, would you --
19   would you defer to Garth Sparboe as to whether or not that
20   increased productivity in any way offset the reduction in
21   supply from the Certified Program?
22   A.   I most certainly would.
23           MR. AHERN:  Nothing further, Your Honor.
24           THE COURT:  Mr. Mueller, travel safely.
25           THE WITNESS:  All right, thanks, Your Honor.