# ATTACHMENT 49

HIGHLY CONFIDENTIAL

1

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE: PROCESSED EGG PRODUCTS    |    MDL NO. 2002

ANTITRUST LITIGATION             |    08-MD-02002
_____

THIS DOCUMENT RELATES TO ALL     |

DIRECT ACTION PLAINTIFF ACTIONS  |
_____


IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
TWENTY-NINTH JUDICIAL DISTRICT

_____

ASSOCIATED WHOLESALE GROCERS,    |

INC., et al.,                    |

          Plaintiffs,            |

     v.                          |   Case No. 10-cv-2171

UNITED EGG PRODUCERS, et al.,    |

          Defendants.            |
_____

                         Tuesday, April 8, 2014

                         9:00 a.m.

                 HIGHLY CONFIDENTIAL

         VIDEOTAPED DEPOSITION OF TERRY W. PROFITT

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

2 (Pages 2 to 5)

---

**2**

1  Videotaped deposition of TERRY W. PROFITT, convened
2  at the law offices of Nilan Johnson Lewis, P.A., 120
3  South 6th Street, Suite 400, Minneapolis, Minnesota
4  55402, pursuant to notice, the proceedings being
5  recorded stenographically by Jonathan Wonnell, a
6  Registered Professional Court Reporter (NCRA #835577)
7  and Notary Public of the State of Minnesota, and
8  transcribed under his direction.

---

**4**

1  APPEARANCES: (Cont'd)
2  On behalf of the Direct Purchaser Plaintiffs:
3    DANIEL C. HEDLUND, ESQ.
4    Gustafson Gluek, PLLC
5    Canadian Pacific Plaza
6    120 South 6th Street, Suite 2600
7    Minneapolis, Minnesota 55402
8    (612) 333-8844
9    dhedlund@gustafsongluek.com
10
11  On behalf of Cargill:
12    ANDREW SVEEN, ESQ.
13    Nilan Johnson Lewis, P.A.
14    120 South 6th Street, Suite 400
15    Minneapolis, Minnesota 55402
16    (612) 305-7500
17    asveen@nilanjohnson.com
18      -- and --
19    JILL K. PEARSON, ESQ.
20    Cargill
21    15407 McGinty Road West, MS 24
22    Wayzata, Minnesota 55391
23    (952) 742-2296
24    jill_pearson@cargill.com

---

**3**

1  APPEARNCES:
2  On behalf of Sparboe Farms:
3    TROY J. HUTCHINSON, ESQ.
4    Hutchinson P.A.
5    907 East Wayzata Boulevard, Suite 330
6    Wayzata, Minnesota 55391
7    (952) 215-0141
8    thutchinson@hutchinson-legal.com
9
10  On behalf of Michael Foods:
11    WILLIAM L. GREENE, ESQ.
12    Stinson Leonard Street LLP
13    150 South Fifth Street, Suite 2300
14    Minneapolis, Minnesota 55402
15    (612) 335-7023
16    william.greene@leonard.com
17
18  On behalf of Associated Wholesale Grocers,
19      Inc., et al.:
20    BARRETT J. VAHLE, ESQ.
21    Stueve, Siegel & Hanson LLP
22    460 Nichols Road, Suite 200
23    Kansas City, Missouri 64112
24    (816) 714-7100
25    vahle@stuevesiegel.com

---

**5**

1  APPEARANCES: (Cont'd)
2
3  On behalf of The Kraft Plaintiffs:
4    RICHARD P. CAMPBELL, ESQ. (via phone)
5    Jenner & Block LLP
6    330 North Clark Street
7    Chicago, Illinois 60654-3456
8    (312) 840-9530
9    rcampbell@jenner.com
10
11  On behalf of Daybreak Foods:
12    CHRISTOPHER E. ONDECK, ESQ. (via phone)
13    ADRIAN FONTECILLA, ESQ.
14    Proskauer Rose LLP
15    1001 Pennsylvania Avenue, N.W., Suite
16     400 South
17    Washington, D.C. 20004-2533
18    (202) 416-5675
19    condeck@proskauer.com
20    afontecilla@proskauer.com
21
22  ALSO PRESENT:
23    DEAN HIBBEN, Videographer
24    SUSAN WHITMAN, paralegal

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

3 (Pages 6 to 9)

---

**6**

C O N T E N T S

1
2 WITNESS: TERRY W. PROFITT           PAGE
3     By Mr. Hutchinson:        10
4     By Mr. Ondeck:            28
5     By Mr. Greene:            46
6     By Mr. Vahle:             62
7     By Mr. Campbell:          88
8     By Mr. Hutchinson:        100
9     By Mr. Ondeck:            104
10    By Mr. Vahle:             108
11
12
13
14
15
16        E X H I B I T S   M A R K E D
17 LABEL/DESCRIPTION                  PAGE
18 Cargill 1 - Supply Agreement between Cargill    14
19    and Sparboe dated December 10, 2002 (26
20    pgs., No Bates)
21 Cargill 2 - Producer Meeting dated December 6,   67
22    2005 (NL 00217575)
23 Cargill 3 - UEP Marketing Committee minutes     67
24    dated 10/11/06 (NUCAL-08md2002-0000465 to
25    0000466)

---

**7**

1        E X H I B I T S   M A R K E D
2 LABEL/DESCRIPTION                  PAGE
3 Cargill 4 - UEP Marketing Committee minutes    67
4    dated 10/15/08 (UE 0917413 to 0917415)
5 Cargill 5 - Memo from Garth Sparboe (UE        67
6    0331921 to 0331933)
7 Cargill 6 - Letter from Norm Stocker (UE       67
8    0234602)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**8**

P R O C E E D I N G S

1
2               (9:34 a.m.)
3         THE VIDEOGRAPHER:  We are on the record.
4 This is the videotaped deposition of Terry W.
5 Profitt taken on April 8th 2014.  The time now is
6 approximately 9:34 a.m.
7         The deposition is being taken in the
8 matters of In Re: Processed Egg Products Antitrust
9 Litigation in the United States District Court for
10 the Eastern District of Pennsylvania, MDL Number
11 200208-MD-02002.
12         And also Associated Wholesale Groceries,
13 Incorporated, et al., versus United Egg Producers,
14 et al., in the District Court of Wyandotte County
15 Kansas, 29th Judicial District, Case Number
16 10-CV-2171.
17         The deposition is taking place in
18 Minneapolis, Minnesota.  My name is Dean Hibben.  I
19 am the videographer representing Henderson Legal
20 Services.  Will counsel please identify themselves
21 for the record.
22         MR. HUTCHINSON:  Troy Hutchinson on
23 behalf of Sparboe Farms.
24         MR. GREENE:  William Greene on behalf of
25 Michael Foods.

---

**9**

1         MR. VAHLE:  Barrett Vahle from Stueve
2 Siegel Hanson in Kansas City on behalf of the
3 plaintiffs in the Kansas litigation.
4         MR. HEDLUND:  Dan Hedlund, Gustafson
5 Gluek, on behalf of the Direct Purchaser
6 Plaintiffs.
7         MR. SVEEN:  Andy Sveen on behalf of
8 Cargill.
9         THE VIDEOGRAPHER:  Those on the phone,
10 please.
11         MR. CAMPBELL:  Richard Campbell of
12 Jenner & Block on behalf of the Kraft plaintiffs:
13 Kraft, Nestle, Kellogg and General Foods.
14         MR. ONDECK:  And you have Chris Ondeck,
15 last name is spelled O-n-d-e-c-k, of the law firm
16 Proskauer Rose, P-R-O-S-K-A-U-E-R, Rose on behalf
17 of the defendant Daybreak Foods.
18         THE VIDEOGRAPHER:  And would the court
19 reporter please swear in the witness.
20         * * * * *
21     Whereupon,
22         TERRY W. PROFITT,
23    called as a Witness, was duly sworn by
24    Jonathan Wonnell, a Notary Public in and
25    for the State of Minnesota, and was

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

4 (Pages 10 to 13)

---

**10**

examined and testified as follows.

\* \* \* \* \*

EXAMINATION BY COUNSEL FOR SPARBOE FARMS

BY MR. HUTCHINSON:

Q.   Good morning, Mr. Profitt. I'm Troy Hutchinson. I represent Sparboe Farms.

A.   Okay.

Q.   I'm going to be asking you some questions this morning. Just a couple things to keep in mind before we get started is to let finish asking my question before you start responding so we avoid talking over each other.

And the other thing is to remember to answer audibly rather than nodding your head or shaking your head so the court reporter can get a good record.

Mr. Profitt, where are you currently employed?

A.   Cargill Kitchen Solutions in Monticello, Minnesota.

Q.   And how long have you been employed at Cargill Kitchen Solutions?

A.   Since the 1980. Or with Cargill.

Q.   With Cargill since 1980?

A.   Correct.

---

**11**

Q.   And when did you join Cargill Kitchen Solutions?

A.   2000 -- excuse me. 1995.

Q.   And what is your current title?

A.   Vice president and director of manufacturing.

Q.   And how long have you held that title?

A.   Since 2004.

Q.   And prior to 2004, what was your title?

A.   I was complex manager at our Lake Odessa, Michigan facility from 1995 to 2004.

Q.   And what does Cargill Kitchen Solutions do?

A.   We're a seller and producer, processor, of further processed eggs.

Q.   And could you explain just for the record what further processed eggs are?

A.   These are eggs outside of the shell primarily, so we're selling eggs that are either broken in liquid, frozen, cooked type products versus what you would generally think of as a shell egg. We sell a percentage of shell eggs, but primarily in the further processed egg category.

Q.   And does Cargill Kitchen Solutions have its own laying hens?

---

**12**

A.   No. We do not own laying hens.

Q.   And so Cargill Kitchen Solutions purchases both the liquid egg and shell eggs from suppliers?

A.   That is correct.

Q.   And who -- since you've started at Cargill Kitchen Solutions, who have been Cargill Kitchen Solutions' primary egg suppliers?

A.   Primary would be Daybreak Foods, Herbruck's and at one point Sparboe Farms.

Q.   And you would -- Cargill Kitchen Solutions would purchase both shell eggs and liquid egg from those three suppliers?

A.   Today we do. Except Sparboe Farms, when I say today.

Q.   Well, Cargill Kitchen Solutions currently purchases liquid egg from Sparboe, correct?

A.   On a spot basis.

Q.   And can you remember when and what year Cargill Kitchen Solutions began purchasing eggs from Daybreak?

A.   I can't remember -- recollect the exact date. I know since 1980. Excuse me. Since 1995. Prior to that, I do not recollect or do not know.

---

**13**

Q.   So at least as early as 1995?

A.   To my recollection, correct.

Q.   And do you remember roughly when Cargill Kitchen Solutions began purchasing eggs from Sparboe Farms?

A.   Again, I can't remember. I can't recollect when we started buying specific eggs from Sparboe.

Q.   Would it have been prior to 2003?

A.   I would believe so, yes.

Q.   And did Cargill Kitchen Solutions, for the period of time that it was buying eggs from Sparboe Farms, have a long-term written contract with Sparboe Farms?

A.   Could you repeat the question?

Q.   Sure. Did Cargill Kitchen Solutions have a long-term written contract for the purchase of eggs from Sparboe Farms?

A.   Not to my knowledge prior to 2002. I just -- I don't know.

Q.   But starting in 2002, there was a written contract entered into?

A.   We did have a written contract on the Vincent facility in Vincent, Iowa.

Q.   And could you explain to me and for the

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                          April 8, 2014

5 (Pages 14 to 17)

### 14

¹ record how pricing was determined under that
² contract that was entered into in 2002?
³      A.   I cannot recollect the exact nature of
⁴ the pricing of that contract.
⁵      Q.   Was it set off of any kind of -- was
⁶ pricing set off of any kind of index?
⁷      A.   Are you talking about a specific
⁸ contract?
⁹      Q.   Well, the Sparboe contract with Cargill
¹⁰ Kitchen Solutions.
¹¹      A.   On which -- on the Vincent facility?
¹²      Q.   Well, you know what, it might be helpful
¹³ to have you refer to that contract.  So I will --
¹⁴ can we mark this as Cargill Exhibit 1, please.
¹⁵           (Cargill Exhibit 1 was marked for
¹⁶           identification.)
¹⁷      BY MR. HUTCHINSON:
¹⁸      Q.   Mr. Profitt, I've handed you what's been
¹⁹ marked as Cargill Exhibit 1.  Take some time to
²⁰ take a look at the exhibit.
²¹      MR. VAHLE:  Mr. Hutchinson, has this
²² been produced in the Kansas litigation?
²³      MR. HUTCHINSON:  I believe it has.
²⁴      MR. VAHLE:  I'm just seeing that there's
²⁵ no Bates numbers.

### 15

¹      A.   The copy I'm looking at is not a signed
² copy by Cargill.  It's only signed by Beth Schnell.
³      BY MR. HUTCHINSON:
⁴      Q.   Well, if you take a look at page 9, I
⁵ think that page is signed by --
⁶      A.   Okay.
⁷      Q.   -- somebody from Cargill.  Do you
⁸ recognize that signature?
⁹      A.   Yes.
¹⁰      Q.   Whose signature is that?
¹¹      A.   From Cargill?
¹²      Q.   Yes.
¹³      A.   Lee Skold.
¹⁴      Q.   And who is Lee Skold?
¹⁵      A.   At the time -- he's retired now.  At the
¹⁶ time, he was senior vice president for Cargill.
¹⁷      Q.   And is this the agreement that Cargill
¹⁸ Kitchen Solutions entered into in 2002 with Sparboe
¹⁹ Farms?
²⁰      MR. VAHLE:  Objection, lacks foundation,
²¹ calls for speculation.
²²      MR. SVEEN:  Go ahead and answer, if you
²³ can.
²⁴      A.   So this is the contract for the Vincent
²⁵ facility with Sparboe Farms.

### 16

¹      BY MR. HUTCHINSON:
²      Q.   And this contract covers how pricing
³ would be calculated, correct?
⁴      MR. VAHLE:  Same objections.
⁵      A.   You know, I am not involved, and did not
⁶ get involved directly in the pricing of this
⁷ contract.
⁸      BY MR. HUTCHINSON:
⁹      Q.   In the negotiation of the contract?
¹⁰      A.   In the pricing of the contract, I was
¹¹ not involved directly with that part of the
¹² contract.
¹³      Q.   But you understand how pricing worked at
¹⁴ Cargill Kitchen Solutions, right?
¹⁵      A.   I have knowledge of how the pricing
¹⁶ works, yes.
¹⁷      Q.   And was pricing determined -- the
¹⁸ pricing that Cargill charged to Sparboe Farms, how
¹⁹ was that price for eggs determined generally?
²⁰      A.   Generally, it is a grain-based pricing
²¹ program.
²²      Q.   And when you say grain-based, what
²³ specifically -- what went into determining what the
²⁴ grain price was?
²⁵      A.   Again, I did not directly be involved in

### 17

¹ that pricing.  The two grains that are involved
² primarily are soybean and corn.
³      Q.   But you would know in your position at
⁴ Cargill that that's how Cargill set prices for
⁵ Sparboe, correct?
⁶      A.   For grain-based pricing, that is how it
⁷ is put together.
⁸      Q.   And generally you know from your
⁹ position at Cargill that the grain-based pricing is
¹⁰ determined based on published grain prices,
¹¹ correct?
¹²      MR. VAHLE:  Objection, lacks foundation,
¹³ calls for speculation based on this witness'
¹⁴ testimony.
¹⁵      MR. SVEEN:  Go ahead.
¹⁶      A.   Again, I'm not directly involved in
¹⁷ pricing mechanism of the contract.
¹⁸      BY MR. HUTCHINSON:
¹⁹      Q.   But you understand how the pricing
²⁰ works, correct?
²¹      A.   I have a general knowledge --
²²      MR. VAHLE:  Hold on.  Objection.  Lacks
²³ foundation, calls for speculation.  Sorry to
²⁴ interrupt you, sir.
²⁵      A.   I have a general knowledge of how the

HIGHLY CONFIDENTIAL

Profitt, Terry                                         April 8, 2014

6 (Pages 18 to 21)

---

**18**

1  pricing mechanism works.
2        BY MR. HUTCHINSON:
3        Q.   And the pricing for the grain is based
4  on the Chicago Board of Trade published grain
5  prices, correct?
6        MR. VAHLE:  Same objections.
7        A.   I have a general knowledge of how the
8  pricing is set.
9        BY MR. HUTCHINSON:
10       Q.   And why don't you explain that general
11  knowledge to me, if you could.
12       A.   As I've stated, I know it is based on
13  two grains primarily, soybean and corn.
14       Q.   And how do you know that?
15       A.   Because of my general knowledge of being
16  involved in the business.
17       Q.   And do you know how -- what does Cargill
18  look at to determine what the price of corn and
19  soybeans would be?
20       MR. VAHLE:  Objection, calls for
21  speculation.
22       A.   Again, I am not involved in that portion
23  of the pricing mechanism.
24       BY MR. HUTCHINSON:
25       Q.   Okay.  Do you know how the price for

---

**19**

1  corn or soybeans is determined?
2        A.   I have a general knowledge of how that
3  is done.
4        Q.   And what is the general knowledge?
5        A.   That it is priced based upon the primary
6  ingredients of soybean and corn.
7        Q.   And why does Cargill purchase eggs?
8        A.   To deliver finished further processed
9  egg products to our customers.
10       Q.   And did Cargill require that its egg
11  suppliers adopt and maintain certain animal
12  management practices?
13       MR. SVEEN:  Objection, vague.  To the
14  extent you can answer, go ahead.
15       A.   We have specifications and requirements
16  specific to certain customers that we do have
17  requirements on.
18       BY MR. HUTCHINSON:
19       Q.   So let's -- in the instance of Sparboe
20  Farms, Cargill purchased eggs from Sparboe that
21  were produced at Sparboe's Vincent facility,
22  correct?
23       A.   That is correct.
24       Q.   And did Cargill require that Sparboe
25  have certain animal management practices at place

---

**20**

1  at that Vincent facility?
2        A.   Yes, we did.
3        Q.   And to the best of your knowledge, can
4  you tell me generally what those requirements are?
5        A.   Those requirements were based on a
6  specific customer's requirements that we supply.
7  And we presented those to Sparboe to follow those
8  guidelines and those requirements.
9        Q.   And who was the customer that you're
10  referring to?
11       A.   We're talking specifically the Vincent
12  location?
13       Q.   Correct.
14       A.   Those requirements were set forth with
15  us and McDonald's.
16       Q.   And so McDonald's insisted that
17  Cargill's suppliers satisfy those animal management
18  practices, correct?
19       MR. VAHLE:  Objection to the form.
20       A.   That is correct.
21       BY MR. HUTCHINSON:
22       Q.   If you could take a look at page 19 of
23  the Cargill contract.
24       A.   Okay.
25       Q.   You referenced that certain animal

---

**21**

1  management practices were presented to Sparboe and
2  that Cargill required those management practices.
3  Are the guidelines that are set forth in Exhibit D
4  some of those requirements?
5        MR. VAHLE:  Objection, lacks foundation,
6  vague and ambiguous.
7        A.   Yes.  That is correct.
8        BY MR. HUTCHINSON:
9        Q.   And if you could flip to page 20, the
10  next page.  At the top, it says "Cages."  Do you
11  see that?
12       A.   Yes.
13       Q.   And do you see where it says,
14  "McDonald's requires for each bird housed a minimum
15  of 72 square inches of capable space and a minimum
16  of 4 inches of cage front feeder space"?  Did I
17  read that correctly?
18       A.   Correct.
19       Q.   So Cargill required that Sparboe, at
20  that Vincent facility, have at least 72 square
21  inches of cage space per laying hen, correct?
22       MR. VAHLE:  Objection, lacks foundation.
23       A.   Yes.  Correct.
24       BY MR. HUTCHINSON:
25       Q.   And in your job duties at Cargill -- you

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

---

22

1  know, and let's focus on 2002 when this agreement
2  was entered into -- did your job duties involve in
3  any way -- well, what were your job duties in 2002?
4      A.   In 2002, as I stated, I was complex
5  manager of our Lake Odessa, Michigan facility.
6      Q.   And would that facility -- would shell
7  eggs and liquid eggs be brought into that facility?
8      A.   No, they were not.
9      Q.   And what did that facility do?
10     A.   That facility was strictly a liquid
11 further processed egg facility.
12     Q.   So just liquid eggs would be brought to
13 that facility?
14     A.   To that facility.  That is correct.
15     Q.   And those eggs would come from -- in
16 2002 from Daybreak or Sparboe?
17     A.   Or other various suppliers.
18     Q.   And so your job was to manage the entire
19 facility, correct?
20     A.   That is correct.
21     Q.   So did people involved in the egg
22 procurement -- were those people reporting to you?
23     A.   No, they were not.
24     Q.   Who did they report to?
25     A.   The procurement department or -- they

---

23

1  reported in to -- ultimately in to the president of
2  the company.
3      Q.   And so what were your specific job
4  duties and responsibilities?
5      A.   To run the complex at Lake Odessa to the
6  produce wholesome food safe products to supply our
7  customers.
8      Q.   And did you interface with your
9  customers?
10     A.   Yes.
11     Q.   And you -- McDonald's, for example.
12 Would McDonald's -- would you sit down with
13 McDonald's prior to selling them eggs?
14     A.   I have had interaction with McDonald's.
15     Q.   And they asked you and Cargill to supply
16 them with eggs that met certain animal welfare
17 requirements, correct?
18     A.   That is correct.
19     Q.   And did you understand that having
20 animal welfare requirements would have an impact on
21 the cost of those eggs?
22     A.   Yes.
23     Q.   And what was your understanding of the
24 impact that animal welfare requirements would have
25 on egg costs?

---

24

1      A.   That these requirements would increase
2  the space that each bird had, which would in turn
3  create a -- more investment to cover the space that
4  was required for these birds.
5      Q.   So it would result in the producers'
6  cost of production to increase, correct?
7      A.   That is correct.
8      Q.   And did you understand that Sparboe, for
9  example, in order to comply with these animal
10 welfare requirements from Cargill and McDonald's
11 that they would charge Cargill more for eggs?
12     A.   Yes.  I was aware of that.
13     Q.   And you would have been aware of that
14 back in 2002, correct?
15     A.   I was aware of it in 2002.
16     Q.   And why would Cargill agree to pay more
17 for eggs?
18          MR. VAHLE:  Objection, calls for
19 speculation.
20          MR. SVEEN:  You can answer if you know.
21     A.   Because we did realize that the
22 specifications and requirements we were placing on
23 that supplier would be an increase in investment
24 that they would have to make which constituted an
25 increase in the pricing structure.

---

25

1          BY MR. HUTCHINSON:
2      Q.   And did -- did you believe that these --
3  the compliance with these animal welfare practices,
4  would it add value to that product that Cargill was
5  buying from Sparboe?
6          MR. VAHLE:  Objection, vague and
7  ambiguous.
8      A.   These requirements added value to meet
9  the specifications of the customers we supplied.
10          BY MR. HUTCHINSON:
11     Q.   So ultimately that was something
12 McDonald's had asked for, and Cargill and Sparboe
13 were complying with McDonald's request, correct?
14     A.   That is correct.
15     Q.   At some point, did you communicate to
16 individuals at Sparboe that you believed that there
17 were benefits to membership in the United Egg
18 Producers?
19          MR. VAHLE:  Objection, lacks foundation.
20     A.   Specifically?
21          BY MR. HUTCHINSON:
22     Q.   Well, generally.
23     A.   So can you restate the question?
24     Q.   Sure.  You interacted with individuals
25 at Sparboe with some frequency between the years

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

8 (Pages 26 to 29)

---

**26**

2002 to present, correct?

A. Correct.

Q. And who would those individuals at Sparboe be?

A. They're various ones. I guess Bob Sparboe, Robert Sparboe, before he passed away. Beth Schnell, or Sparboe-Schnell. I guess I can't remember the guy's name now. He's left the company. But various leaders within the Sparboe group. But those are the two -- those are the two senior leaders in the Sparboe group. Robert Sparboe, before he passed away, and Beth Sparboe-Schnell.

Q. And you also interacted with an individual named Wayne Carlson, correct?

A. Correct.

Q. And he was an employee of Sparboe, right?

A. Yes.

Q. At some point between 2002 and present, did you have an understanding that Sparboe was not a member of UEP, the United Egg Producers, and not really aligned with UEP?

A. I became aware that they were not a member of UEP.

---

**27**

Q. And do you remember roughly when that was?

A. I can't recollect the exact time or year.

Q. Would it have been prior to 2008, do you think?

A. I can't recollect, again, exactly what time that would be.

Q. And when you discovered that Sparboe was not a member of UEP, in your mind, did you think it would have been beneficial for Sparboe to align itself with United Egg Producers?

MR. VAHLE: Objection to the form.

MR. SVEEN: I'll say the same objection. Go ahead, if you can answer.

A. As a personal relationship with Robert Sparboe, I felt it was -- I felt personally that I should suggest to Beth Sparboe-Schnell that membership with the UEP would be something that she could possibly draw benefit from going forward.

BY MR. HUTCHINSON:

Q. And you expressed your personal views with Ms. Schnell of Sparboe, correct?

A. That is correct.

MR. HUTCHINSON: I have no further

---

**28**

questions. Thank you, Mr. Profitt.

Anyone else have questions?

MR. ONDECK: Yeah. It's Chris Ondeck for Daybreak Foods. I'd like to follow up with questions specifically with regard to the Daybreak.

MR. HUTCHINSON: Go ahead, Chris.

MR. ONDECK: Okay. Mr. Profitt, good morning. Can you hear me well on the phone?

THE WITNESS: Yes, I can.

MR. ONDECK: Okay. Thank you. And I can hear you very well.

MR. SVEEN: Chris, can you hold on for just one second? Hold on for one second. Okay? Chris, are you there now?

MR. ONDECK: Yes.

MR. SVEEN: Okay. Go ahead.

EXAMINATION BY COUNSEL FOR DAYBREAK FOODS

BY MR. ONDECK:

Q. And, Mr. Profitt, as I mentioned, my name is Chris Ondeck. I'm with a law firm named Proskauer Rose and I'm representing Daybreak Foods in the cases in which this deposition is being taken.

I'm going to ask you questions that are similar in many respects to the questions that

---

**29**

Mr. Hutchinson asked you, but each of my questions will be with reference to Daybreak Foods. Does that make sense?

A. Yes.

Q. And so my first question is, are you familiar with Daybreak Foods?

A. Yes.

Q. And are they a supplier to Cargill Kitchen Solutions?

A. Yes, they are.

Q. And what do they -- what products do they supply to Cargill Kitchen Solutions?

A. They supply liquid egg products and, in addition, shell egg products or shell eggs.

Q. And -- I'm sorry for speaking over you. Is a majority of the product that Daybreak supplies either one or the other of those two that you just mentioned, liquid egg or shell egg?

A. There's a much higher percentage of liquid eggs than shell eggs.

Q. And to -- are you familiar with the Cargill Kitchen Solutions facilities that receive those products from Daybreak?

A. Yes, I am.

Q. And so now I'm going to ask you about

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

9 (Pages 30 to 33)

---

Page 30

```
 1   the time period from 1999 to the present.  From
 2   1999 to the present, which Cargill Kitchen
 3   Solutions facilities were supplied with product
 4   from Daybreak?
 5       A.   Lake Odessa, Michigan; Monticello,
 6   Minnesota; Mason City, Iowa.  I cannot tell you
 7   absolutely for sure if Big Lake, Minnesota.  I
 8   think there may be some.
 9       Q.   Okay.
10       A.   Those are the primary --
11       Q.   Go ahead, sir.
12       A.   Those are the primary locations.
13       Q.   Just to confirm, I heard you mention
14   facilities in the states of Michigan, Iowa and
15   Minnesota as far as you recollect at this time; is
16   that correct?
17       A.   That is correct.
18       Q.   And just to confirm, none of those
19   facilities is in the state of Kansas; is that
20   correct?
21       A.   That is correct.
22       Q.   And as far as you know, did Daybreak
23   ever supply Cargill Kitchen Solutions with product
24   that was delivered into the state of Kansas?
25       A.   Not to my knowledge.
```

Page 31

```
 1       Q.   And by that question, I should clarify.
 2   That was delivered by Daybreak to Cargill for
 3   delivery in the state of Kansas.
 4       A.   Not to my knowledge.  Not to my
 5   knowledge, any deliveries to Cargill in the state
 6   of Kansas.
 7       Q.   Thank you very much.  And also with
 8   regard to this -- the locations where products are
 9   delivered, does Daybreak control where Cargill
10   Kitchen Solutions -- once it's received product
11   from Daybreak, where Cargill Kitchen Solutions then
12   decides to sell that product --
13           MR. VAHLE:  Objection.
14           BY MR. ONDECK
15       Q.   -- downstream in the chain of commerce?
16           MR. VAHLE:  Objection to the form.
17       A.   Can you repeat the question?
18           BY MR. ONDECK
19       Q.   Sure.  Actually, let me withdraw that
20   question.  Let me break that up.
21           The question is, does Daybreak in any
22   way control the places to where Cargill Kitchen
23   Solutions sells its Cargill Kitchen Solutions
24   products?
25           MR. VAHLE:  Same objection.
```

Page 32

```
 1       A.   No, they do not.
 2           BY MR. ONDECK:
 3       Q.   Okay.  Thank you.  Just one or two more
 4   questions on this topic.  All right.  With regard
 5   to Kansas, again, are you familiar with any
 6   meetings that -- or other business activities that
 7   Daybreak would have conducted with Cargill Kitchen
 8   Solutions in the state of Kansas from 1999 to the
 9   present?
10       A.   I'm not familiar with any meetings that
11   may have taken place with Daybreak or Cargill in
12   the state of Kansas.
13       Q.   And you're not aware of any that
14   occurred; is that correct?
15       A.   I'm not aware of any.
16       Q.   Thank you.  Now I'm going to turn to
17   some of the same questions that Mr. Hutchinson
18   asked with regard to the pricing for product that
19   Cargill Kitchen Solutions paid.  These questions
20   will be with regard to Daybreak.
21           Similar to what you were discussing with
22   Mr. Hutchinson, is it correct that Cargill Kitchen
23   Solutions purchased product from Daybreak primarily
24   using a grain-based pricing contract?
25       A.   That is my general knowledge of the
```

Page 33

```
 1   pricing mechanism for Cargill Kitchen Solutions
 2   with Daybreak Foods.
 3       Q.   And, actually, just to get on the record
 4   the length of time that you've had any contact with
 5   Daybreak, have you been involved or aware of the
 6   relationship that Cargill Kitchen Solutions had
 7   with Daybreak as its supplier as part of your
 8   duties at the company?
 9       A.   Yes.  I was -- I am aware of the
10   relationship.
11       Q.   Have you yourself interacted with any of
12   the personnel at Daybreak?
13       A.   Yes.  I interact with the personnel of
14   Daybreak Foods.
15       Q.   And who would be your primary contact
16   there?
17       A.   I interact with the CEO, William Rehm.
18       Q.   And as part of that interaction, you're
19   generally familiar with the product and the pricing
20   mechanism used for Cargill Kitchen Solutions'
21   purchases of product from Daybreak?
22       A.   I'm generally knowledgeable of that --
23   of those.
24       Q.   Thank you.  And with reference to the
25   grain-based pricing contract used by Cargill
```

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

10 (Pages 34 to 37)

---

**34**

1  Kitchen Solutions to purchase product from
2  Daybreak, is it correct that it is based primarily
3  on two grains, soybean and corn?
4      MR. VAHLE:  Objection, lacks foundation.
5      You can answer.
6      **A.    That is my general knowledge of how the**
7  **pricing mechanism works.**
8      **BY MR. ONDECK**
9      Q.    And the -- strike that.
10      Is it correct that Cargill Kitchen
11  Solutions used a written supply agreement to
12  purchase product from Daybreak?
13      **A.    That is correct, to my general**
14  **knowledge.**
15      Q.    And in those supply agreements, did
16  Cargill Kitchen Solutions require the product to
17  comply with various specifications that Cargill
18  Kitchen Solutions set forth?
19      MR. VAHLE:  Objection, lacks foundation,
20  calls for speculation.
21      **A.    Yes.  There are customer-specific**
22  **requirements in those contracts.**
23      BY MR. ONDECK:
24      Q.    Thank you.  And is -- was one of those
25  specifications a maximum temperature requirement

---

**35**

1  for product?
2      MR. VAHLE:  Same objection.
3      **A.    That is correct.  There is a temperature**
4  **requirement in the contract of product being**
5  **received.  I assume that's what you mean with**
6  **"temperature."**
7      BY MR. ONDECK:
8      Q.    I do.
9      **A.    Okay.**
10      Q.    Thank you.  And was another of the
11  specifications in that product a requirement
12  regarding pH levels of the products?
13      **A.    To my knowledge, that is correct.**
14      Q.    Thank you.  And then last, was another
15  one of those requirements a requirement as to the
16  cage space specifications for egg-laying hens?
17      **A.    That is specific to a customer.  So I'm**
18  **not sure exactly what your question is -- is it a**
19  **general question or is it specific?**
20      Q.    It's general, and then I'm going to
21  follow with specific.
22      **A.    Okay.  Okay.  Go ahead.**
23      Q.    And I apologize.  I know we're on the
24  phone, and I don't want to speak over you.  So
25  whenever you're going to speak, I'll stop.

---

**36**

1      Let me turn to a specific question.  Are
2  you familiar that Cargill Kitchen Solutions is
3  supplied by product from a facility of Daybreak's
4  in Graettinger, Iowa?
5      **A.    Yes, I am aware of that.**
6      Q.    And is it correct that the product that
7  Daybreak supplies from Graettinger, Iowa has to
8  supply with Cargill Kitchen Solutions' requirements
9  for its customer, McDonald's?
10      **A.    Yes, I am aware of that.**
11      Q.    And now I'm going to ask you about cage
12  space requirements for that McDonald's contract.
13  With regard to cage space requirements, does
14  Cargill Kitchen Solutions require Daybreak to
15  provide 72 square inches' cage space per laying hen
16  in its Graettinger facility in order to supply
17  product to Cargill Kitchen Solutions for use with
18  McDonald's?
19      **A.    That is correct.**
20      Q.    Thank you.  And now I'm going to turn to
21  the other facilities that Daybreak supplies Cargill
22  Kitchen Solutions with product from.  And there are
23  four of them.  And I'm going to say their names and
24  ask you a specific question about each one.
25      The first of these four facilities that

---

**37**

1  I want to ask you about is Daybreak's Lake Mills
2  complex facility in Wisconsin.  And are you
3  generally familiar that Daybreak supplies Cargill
4  Kitchen Solutions with product from the Lake Mills
5  facility?
6      **A.    Generally knowledgeable.**
7      Q.    And is it correct that for that
8  facility, which is a facility that supplies Cargill
9  Kitchen Solutions with product that I believe is
10  not used for the McDonald's contract, is it correct
11  that Cargill Kitchen Solutions requires Daybreak to
12  allocate 67 square inches of cage space per hen at
13  that facility?
14      MR. VAHLE:  Objection to the form, lacks
15  foundation.
16      **A.    I am not aware of the specific**
17  **requirements for that location of Daybreak Foods.**
18      BY MR. ONDECK:
19      Q.    Okay.  And are you familiar with the
20  facility that Daybreak supplies product to Cargill
21  Kitchen Solutions generally?
22      **A.    Generally I'm aware of the locations of**
23  **those facilities.**
24      Q.    And if I were to represent to you that
25  in addition to the Graettinger facility, there are

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                 April 8, 2014

11 (Pages 38 to 41)

### 38

1  four other facilities that Daybreak supplies
2  Cargill Kitchen Solutions with product, namely the
3  Lake Mills facility in Wisconsin, the Creekwood
4  facility in Wisconsin, the Mad River facility in
5  Ohio and the Long Prairie facility in Minnesota,
6  would you have any reason to disagree that those
7  are the four facilities in addition to Graettinger
8  that supply Cargill Kitchen Solutions with product?
9          MR. VAHLE: Objection, lacks foundation,
10 compound.
11     A.  I have recollection that those are the
12 **facilities that do supply Cargill Kitchen Solutions**
13 **with product.**
14         BY MR. ONDECK:
15     Q.  Thank you.  And for those facilities,
16 Daybreak supplies Cargill Kitchen Solutions
17 pursuant to a written agreement similar to what's
18 used for the supplies from the Graettinger
19 facility; is that right?
20         MR. VAHLE:  Objection, lacks foundation.
21     A.  To my understanding.
22         BY MR. ONDECK:
23     Q.  And there's one difference in particular
24 for the agreement for those four facilities that I
25 want to ask you about.  Is that okay?

### 39

1      A.  Yeah.  That's okay.
2      Q.  And I apologize.  I'm just on the phone.
3  I want to try to be clear in what I'm asking you.
4  So thank you for bearing with me.
5      For those four facilities, is it
6  correct, to your understanding, that Cargill
7  Kitchen Solutions, as one of the specifications,
8  requires Daybreak to provide 67 square inches per
9  caged hen at those facilities?
10         MR. VAHLE:  Objection, lacks foundation,
11 calls for speculation.
12     A.  I am not aware of the requirements that
13 **procurement would place on Daybreak Foods as it**
14 **relates to those facilities.**
15         BY MR. ONDECK:
16     Q.  Do you have any reason to disagree with
17 the statement that Cargill Kitchen Solutions
18 requires Daybreak to provide 67 square inches per
19 caged hen at those facilities?
20         MR. VAHLE:  Objection, lacks foundation,
21 calls for speculation based on his previous
22 testimony.
23     A.  Could you restate the question?
24         BY MR. ONDECK:
25     Q.  Do you have any reason to disagree with

### 40

1  the statement that Cargill Kitchen Solutions
2  requires Daybreak to provide 67 square inches per
3  caged hen at those four facilities?
4          MR. VAHLE:  Same objections.
5      A.  I have no reason to agree or disagree.
6  I have no knowledge of what the requirements are
7  for those facilities.
8          BY MR. ONDECK:
9      Q.  Okay.  Do you know who a person in
10 Cargill Kitchen Solutions would be who would have
11 that knowledge?
12     A.  That would reside in our procurement
13 department.
14     Q.  And is one of the personnel in the
15 procurement department a gentleman named Norm
16 Stocker, S-t-o-c-k-e-r?
17     A.  That is correct.
18     Q.  And is he a person that your
19 understanding would be has knowledge with regard to
20 the question I'm asking you, cage space
21 requirements for a contract with Daybreak?
22     A.  That is correct.
23     Q.  Thank you.  Let me -- I'm just going to
24 look through my list, and I think we've handled
25 perhaps all the questions.  So if I could ask for

### 41

1  one minute and -- to go through it and I'll see if
2  I have any further questions.
3          Well, I have just a few further
4  questions.  We discussed earlier customer
5  requirements of Cargill Kitchen Solutions' customer
6  McDonald's, and in particular the requirement for
7  72 square inches' cage space per laying hen.  Do
8  you recall that?
9      A.  Yes.
10     Q.  And I'm going to ask you a question that
11 was similar to what Mr. Hutchinson asked you with
12 regard to the Sparboe, but this is in regard to
13 Daybreak.  And my question is, are you aware that
14 by requiring a larger amount of square inches of
15 cage space per laying hen that this created
16 additional cost for the producers of the product?
17         MR. VAHLE:  Objection to the form, calls
18 for speculation.
19     A.  Yes.  I am aware of the requirements and
20 **the cost implications of those requirements.**
21         BY MR. ONDECK:
22     Q.  Thank you.  And did you understand that
23 to comply with those requirements, for any
24 requirements that required Daybreak to increase
25 cage space square inches per hen, that Daybreak

HIGHLY CONFIDENTIAL

Profitt, Terry                                                April 8, 2014

12 (Pages 42 to 45)

---

42

1  would charge Cargill Kitchen Solutions more per
2  egg?
3      A.  Yes.  I am aware that the requirements
4  would have a cost implication to Daybreak Foods.
5      Q.   And I'm going to ask the same question.
6  I realize at the end of the last question I said
7  "per egg," and I want to ask the same question with
8  regard to liquid egg products.
9          So are you aware that complying with
10 increased cage space requirements would entail
11 Daybreak charging Cargill Kitchen Solutions more
12 for liquid egg product?
13         MR. VAHLE:  Object to form.
14     A.  Yes, I am aware.
15         BY MR. ONDECK:
16     Q.  Thank you.  And I'll take one minute,
17 and I think that I may be done.  I'm going to do a
18 quick check.
19         A couple other things.  Are you familiar
20 with United Egg Producers, referred to as UEP?
21     A.  Yes.  I am aware of the association.
22     Q.  Thank you.  And are you aware that UEP
23 published a set of animal management guidelines?
24         MR. VAHLE:  Objection, lacks foundation.
25     A.  Yes.  I am aware of UEP guidelines.

---

43

1          BY MR. ONDECK:
2      Q.   And are you familiar with UEP's
3  certified program under which egg and liquid egg
4  producers become certified as complying with the
5  UEP guidelines?
6          MR. VAHLE:  Objection to the form.
7      A.  I have a general knowledge of those
8  guidelines.
9          BY MR. ONDECK:
10     Q.  Thank you.  And were you aware that
11 Daybreak Foods was not certified under the UEP
12 guidelines?
13     A.  I have a general knowledge of that.
14     Q.  Thank you.  And you did not ever seek to
15 require that Daybreak became UEP certified, did
16 you?
17     A.  I did not ever seek to do that.
18     Q.  Thank you.  Did you require that
19 Daybreak's facilities that supplied other Daybreak
20 customers, not Cargill Kitchen Solutions -- did you
21 ever require that those facilities comply with any
22 animal management practices that Cargill Kitchen
23 Solutions set forth?
24         MR. VAHLE:  Objection, lacks foundation,
25 calls for speculation based on this witness'

---

44

1  previous testimony.
2      A.  I did not ever require Daybreak Foods to
3  have animal welfare requirements on any customers
4  except specific to our -- a specific location.
5          BY MR. ONDECK:
6      Q.   Thank you.  And I think my last question
7  is with regard to the time period at issue.  So I'm
8  going to ask you about the years at issue.  Do you
9  recall or -- strike that.
10         Is it your general recollection that
11 Cargill Kitchen Solutions' contracting with
12 Daybreak started to require cage space requirements
13 for laying hens beginning in 2007?
14     A.  I did not have recollection.  That
15 decision process resides in procurement.
16     Q.  Do you have any reason to disagree that
17 the cage space requirements in the contracts with
18 Daybreak began in 2007?
19         MR. VAHLE:  Objection, lacks foundation,
20 calls for speculation.
21     A.  Again, I do not agree or disagree.  I do
22 not have knowledge of that process.
23         BY MR. ONDECK:
24     Q.  Understood.  And is it your
25 understanding that for Daybreak to make the

---

45

1  conversion to provide greater cage space for each
2  laying hen, that that requires a phase-in period?
3          MR. VAHLE:  Objection, calls for
4  speculation, vague and ambiguous.
5      A.  I do have an understanding that it would
6  require a phase-in period.
7          MR. ONDECK:  Thank you very much,
8  Mr. Profitt, for answering my questions.  And at
9  this time, that's all the questions I have, though,
10 depending on questions that may be asked of you by
11 other people, I may ask for follow-up.  Thank you.
12         MR. HUTCHINSON:  Does anyone else on the
13 phone have any questions?
14         MR. GREENE:  I will have questions, but
15 I wondered if we could take a break.
16         MR. SVEEN:  That's fine.  Why don't we
17 take a five-minute break.  Is that okay with the
18 people on the phone?
19         MR. HUTCHINSON:  We're going to take a
20 five-minute break.
21         MR. CAMPBELL:  We're going --
22         MR. HUTCHINSON:  Yes, Dick?
23         MR. CAMPBELL:  I will have questions,
24 but I am going to go after the Kansas parties.  All
25 right?

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

13 (Pages 46 to 49)

---

**46**

1   MR. HUTCHINSON: Sounds good.
2   THE VIDEOGRAPHER: We're going off the
3   record at 10:28 a.m.
4   (Whereupon, a recess was taken from
5   10:28 a.m to 10:43 a.m.)
6   THE VIDEOGRAPHER: This is video
7   number 2 in the deposition of Terry Profitt taken
8   on April 8th 2014. The time now is 10:43 a.m.
9   EXAMINATION BY COUNSEL FOR MICHAEL FOODS
10   BY MR. GREENE:
11   Q. Good morning, Mr. Profitt. We met
12   before, but I'll reintroduce myself. I am William
13   Greene, counsel for Michael Foods. Good morning.
14   A. Good morning.
15   Q. You mentioned that Cargill Kitchen
16   Solutions produces and sells further processed
17   eggs; is that correct?
18   A. That is correct.
19   Q. Does Cargill Kitchen Solutions produce
20   or sell anything other than further processed eggs?
21   A. At this time, no.
22   Q. Okay. Was there a time when Cargill
23   Kitchen Solutions produced or sold something other
24   than further processed eggs?
25   A. We were in the shell egg business up

---

**47**

1   until 1989.
2   Q. But since 1989, Cargill Kitchen
3   Solutions has been involved solely in producing and
4   selling further processed eggs; is that correct?
5   A. That is correct.
6   Q. No other product lines?
7   A. No other product lines.
8   Q. I want to spend a little bit more time
9   on your background. I think that you indicated
10   that you joined Cargill Kitchen Solutions in
11   particular in 1995; is that correct?
12   A. That is correct.
13   Q. Okay. And from 1995 until 2004, you
14   were the complex manager at Lake Odessa, Michigan
15   facility. Did I get that correct?
16   A. That is correct.
17   Q. Okay. What product or products are
18   produced at the Lake Odessa, Michigan facility?
19   A. All further processed egg products.
20   Q. And are there any particular further
21   processed egg products that are produced at Lake,
22   Odessa Michigan?
23   A. They would fall into categories of
24   frozen, fresh and cooked products. Egg products.
25   Q. And when you say "fresh," what do you

---

**48**

1   mean by "fresh"?
2   A. Products that would have an extended
3   shelf life.
4   Q. So extended shelf life, would that be a
5   liquid egg product?
6   A. That would be refrigerated liquid egg
7   products.
8   Q. And can you explain? What do you mean
9   by "extended shelf life"?
10   A. Those products have a longer life than
11   in a fresh state.
12   Q. Are there other liquid egg products
13   other than extended shelf life egg products?
14   A. Which --
15   Q. Let me withdraw the question.
16   You referred to extended shelf life
17   liquid egg products, correct?
18   A. Yes, I have.
19   Q. Okay. To your knowledge, are there
20   liquid egg products sold that are not extended
21   shelf life liquid egg products?
22   A. I have no recollection or knowledge of
23   those types of products.
24   Q. To your knowledge, does Cargill sell any
25   liquid egg products other than extended shelf life

---

**49**

1   liquid egg products?
2   A. Can you restate the question?
3   Q. When you refer to extended shelf life
4   liquid egg products, the name itself, "extended,"
5   suggests it's longer than something. So what I'm
6   asking is, does Cargill sell any liquid egg
7   products other than extended shelf life liquid egg
8   products?
9   A. Not to my knowledge.
10   Q. Are you aware of any other manufacturers
11   that sell liquid egg products other than extended
12   shelf life liquid egg products?
13   A. Yes. I am aware that there's other
14   folks that would sell those types of products.
15   Q. And by "those types of products," you
16   mean liquid egg products that are not extended
17   shelf life liquid egg products, correct?
18   A. That is correct.
19   Q. What's the difference -- withdrawn.
20   What is the shelf life of an extended
21   shelf life liquid egg product?
22   MR. SVEEN: Counsel, I think we're
23   getting into some information considered
24   proprietary. Is there any reason this is relevant
25   to this litigation?

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                    April 8, 2014

14 (Pages 50 to 53)

---

**50**

1    MR. GREENE: Yes, it's relevant. And I
2  assume that Cargill will designate the testimony,
3  if it elects, highly confidential under the
4  protective order that applies. That means that it
5  only goes to outside counsel. So under those
6  circumstances, I understand it's propriety, but we
7  have a protective order in place.
8    MR. SVEEN: Explain to me how it's
9  relevant to this litigation.
10    MR. GREENE: Well, I don't need to do
11  that.
12    MR. SVEEN: We're a third party that you
13  brought here. Explain to me how it's relevant to
14  this litigation.
15    MR. GREENE: I'm not going to explain
16  how it's relevant to the litigation. I'm
17  representing to you in good faith it's relevant to
18  the litigation, and I don't need to explain to you
19  how it is relevant.
20    MR. SVEEN: I appreciate your position,
21  but -- can I talk to you --
22    MR. GREENE: Do you want to take a
23  break?
24    MR. SVEEN: Give us two seconds.
25    THE VIDEOGRAPHER: Going off the record

---

**51**

1  at 10:49.
2    (Whereupon, an off the record discussion
3  was held from 10:49 a.m to 10:57 a.m.)
4    THE VIDEOGRAPHER: We're back on the
5  record at 10:57 a.m.
6    BY MR. GREENE:
7    Q.  Hello, Mr. Profitt.
8    A.  Hi.
9    Q.  We've just taken a break. I understand
10  there's some sensitivity about competitively
11  sensitive information. As I explained, I
12  represent -- I'm counsel for Michael Foods. And
13  for the record, who is Cargill Kitchen Solutions'
14  principal competitor in the sale of further
15  processed eggs?
16    A.  Michael Foods.
17    Q.  We talked before the break about the
18  fact that Cargill produces extended shelf life
19  liquid eggs, correct?
20    A.  That is correct.
21    Q.  And these eggs have a longer shelf life
22  than -- call it standard liquid eggs. Would that
23  be fair?
24    A.  That is correct.
25    Q.  And the extended shelf life liquid eggs

---

**52**

1  are marketed in part based on their extended shelf
2  life; is that correct?
3    A.  That is correct.
4    Q.  In general terms, how are extended shelf
5  life eggs at Cargill produced in order to --
6  withdrawn.
7    In general terms, what is the production
8  process that Cargill uses to create the extended
9  shelf life in liquid eggs?
10    A.  You do that through pasteurization
11  process.
12    Q.  And is that a different pasteurization
13  process than the process that's used for standard
14  liquid eggs?
15    A.  Well, for example, people could sell raw
16  liquid eggs that were broken at the farm and taken,
17  let's say, to a food manufacturer that were not
18  pasteurized.
19    In order to get extended shelf life, you
20  must go through a pasteurization process to improve
21  the shelf life of, quote/unquote, a raw egg
22  product.
23    Q.  And is there any -- withdrawn.
24    There are, I take it, pasteurized liquid
25  eggs that have a standard shelf life, correct?

---

**53**

1    A.  There are various shelf lifes, depending
2  on the process you use to pasteurize those eggs.
3    Q.  What is the process that Cargill uses to
4  produce the longest of its extended shelf lives?
5    A.  We continue to use a high-temperature,
6  short-time pasteurization system at various
7  temperatures to achieve the various shelf life
8  specifications.
9    Q.  Is that a proprietary process?
10    A.  That is.
11    Q.  You testified earlier that Cargill
12  purchases both unpasteurized liquid egg and shell
13  egg to manufacture further process eggs; is that
14  correct?
15    A.  That is correct.
16    Q.  And I think at one point, you indicated
17  at least with one of the manufacturers that the
18  majority of the raw egg that Cargill purchases is
19  unpasteurized liquid as distinguished from shell
20  egg. Was that correct? Was that your testimony?
21  Let me withdraw it. I won't ask about the previous
22  testimony.
23    In the production of extended shelf life
24  liquid eggs, does Cargill use as its input
25  unpasteurized liquid or shell eggs?

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                 April 8, 2014

15 (Pages 54 to 57)

---

54

A.    In the process of liquid egg?  Is that --
Q.    Right.  I'm asking about extended shelf life liquid eggs.
A.    We use raw liquid egg.
Q.    In producing extended shelf life liquid eggs, does Cargill ever use as its input shell eggs?
A.    No, it does not.
Q.    Why not?
A.    We don't use that in our process by design.
Q.    And when you say "by design," what are the either advantages of using unpasteurized liquid or disadvantages of using shell?
A.    For the use of shell eggs in liquid -- for liquid raw, you have to break those eggs.  The breaking process is done at our suppliers.  We do not have breaking capacity at our plants.  So we could not use shell eggs for liquid processing.  It's physically impossible.
Q.    To the extent that Cargill buys shell eggs, what does Cargill Kitchen Solutions use those shell eggs for?
A.    We use those shell eggs for the process

---

55

of hard cooking and also sell shell eggs as still shell eggs to some key customers.
Q.    When you say "hard cooking," can you explain what you mean?
A.    Those eggs are boiled and peeled and then sold to customers.
Q.    They're sold as cooked eggs, correct?
A.    As cooked hard-boiled eggs.
Q.    Are they sold in a package?
A.    Yes, they are.
Q.    So would this be like a consumer grab-and-go food?
A.    There's a variation of products.  Most of our products are sold in food service.  There are some products that are sold in retail.
Q.    I'm talking particularly about the hard-cooked eggs.
A.    My last answer was specific to hard-cooked.
Q.    Okay.  You mentioned that at the Michigan facility that you were a complex manager, that the facility produced frozen, extended shelf life liquid and cooked egg products, correct?
A.    That is correct.
Q.    What cooked egg products does that

---

56

facility produce?
A.    There will be a variation of products there.
Q.    Can you give me some examples?
A.    A patty.  An egg patty.
Q.    You say an egg patty --
A.    That would be made into a sandwich.
Q.    Can you give me some other examples of cooked products that would be produced at that facility?
A.    There are variations of those different ingredients, but primarily a cooked patty product.
Q.    Earlier you mentioned, I think, four facilities:  Lake Odessa, Michigan; Monticello, Minnesota; Mason City, Iowa; and Big Lake, Minnesota.  Do you recall that?
A.    Correct.
Q.    Does Cargill Kitchen Solutions have any other facilities that produce further processed eggs?
A.    We have a facility in Etobicoke, Canada.
Q.    Can you spell that one for the record?
A.    E-t-b-i-c-o-k-e (sic).
Q.    In Canada?
A.    In Canada.

---

57

Q.    Does that produce products for the Canadian market?
A.    It does.
Q.    Okay.  So leaving that -- the Canadian facility, aside, are the four facilities that I mentioned before, Lake Odessa, Monticello, Mason City and Big Lake, the only U.S. egg-processing facilities of Cargill Kitchen Solutions?
A.    That is correct.
Q.    What is produced at Monticello, Minnesota?
A.    The three channels that I discussed:  Frozen, liquid, cooked.
Q.    The same as Lake Odessa?
A.    Frozen, liquid, cooked.
Q.    So is there any difference between the products that are produced in those two facilities?
A.    No.  Well, there are -- different customers are supplied from different -- but in general terms, they're very familiar.
Q.    I'm just asking about product categories.
A.    Categories, they're similar, yes.
Q.    And Mason City would be the same three categories?

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                    April 8, 2014

---

**58**

1    **A.   Correct.**
2    Q.   And Big Lake Minnesota, same categories?
3    **A.   No.**
4    Q.   What's produced in Big Lake, Minnesota?
5    **A.   We do hard-cooked shell egg-type**
6    **products.**
7    Q.   All hard cooked?
8    **A.   Not a hundred percent.**
9    Q.   What do you do at Big Lake, Minnesota,
10   other than hard-cooked products?
11   **A.   There's further processed cooked items**
12   **similar to what we would do at our other plants.**
13   Q.   These would be like the patties?
14   **A.   Correct.**
15   Q.   And then I believe you testified that in
16   2004, you became vice president and director of
17   manufacturing; is that correct?
18   **A.   That's correct.**
19   Q.   And is that a position that you continue
20   to hold -- you've held throughout, from 2004 to the
21   present?
22   **A.   That is correct.**
23   Q.   What's the position at Cargill Kitchen
24   Solutions that you report to?  What's the title of
25   the position that you report to?

---

**59**

1    **A.   President of Cargill Kitchen Solutions.**
2    Q.   And who else -- what other titles report
3    to the president of Cargill Kitchen Solutions?
4    **A.   Key functional areas.  You want me to go**
5    **through every one of them?**
6    Q.   Yeah.  Just in title or general terms.
7    **A.   Vice president/director of engineering,**
8    **vice president/controller, procurement manager, R&D**
9    **manager.  Is that enough or do you want --**
10   Q.   Is there anybody involved on the sales
11   side --
12   **A.   Yes.**
13   Q.   -- who reports to the president of the
14   company?
15   **A.   Correct.  Sales manager.  Marketing**
16   **manager.**
17   Q.   Do you participate in management
18   meetings with the other individuals who report to
19   the president of Cargill Kitchen Solutions?
20   **A.   Yes, I do.**
21   Q.   How often?
22   **A.   Weekly.**
23   Q.   And this goes back to 2004?
24   **A.   Yes.  Correct.**
25   Q.   And in the context -- during those

---

**60**

1    meetings, do you hear reports from the vice
2    president in charge of sales?
3    **A.   Yes, I do.**
4    Q.   And do you hear reports from the vice
5    president in charge of marketing?
6    **A.   Yes, I do.**
7    Q.   Do you hear reports about competition in
8    the further processed egg products industry?
9    **A.   Yes, I do.**
10   Q.   In the context of sitting -- of
11   participating in all of those meetings, do you have
12   familiarity with the other companies that sell the
13   same processed egg products that Cargill does?
14   **A.   Yes, I do.**
15   Q.   What other companies sell precooked egg
16   products?
17   **A.   To my knowledge, Michael Foods, Echo**
18   **Lake.**
19   Q.   Are you aware of any other companies
20   besides Michael Foods and Echo Lake that produce
21   precooked egg products?
22   **A.   Not to my knowledge.**
23   Q.   What other companies produce and sell
24   hard-cooked egg products?
25   **A.   There's numerous other companies that**

---

**61**

1    **sell hard-cooked.  I'm not familiar with all of**
2    **those companies.  I do -- well, I'm not familiar**
3    **with all of them.**
4    Q.   Are you familiar with any of them?
5    **A.   I am aware that Michael Foods sells**
6    **hard-cooked egg product.**
7    Q.   Is there any other company sitting here
8    today you can identify as a company that sells
9    hard-cooked egg products?
10   **A.   I'm aware that Almark in Georgia sells**
11   **hard-cooked egg products.**
12   Q.   What was the name of the company?
13   **A.   Almark.**
14   Q.   Can you spell that?
15   **A.   A-l-m-a-r-k.  I'm not totally --**
16   Q.   That's okay.
17   **A.   Close.**
18   Q.   Other than Michael Foods and Almark, can
19   you identify any other companies that sell
20   hard-cooked egg products?
21   **A.   Not that readily come to mind.**
22   Q.   What about extended shelf life liquid
23   egg products?  What other companies produce and
24   sell extended shelf life liquid egg products?
25   **A.   Besides ourselves?**

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                    April 8, 2014

17 (Pages 62 to 65)

62

1    Q.   Besides Cargill.
2    A.   To my knowledge, Michael Foods.  To my
3    knowledge, Rose Acre Farms.  To my knowledge,
4    Rembrandt Foods.  I guess those are the ones that
5    quickly come to mind.
6    Q.   Other than Cargill, Rose Acre, Michael
7    Foods and Rembrandt, are you aware of any other
8    companies that produce and sell extended shelf life
9    egg products?
10   A.   Not to my recollection.
11   Q.   And these answers -- I haven't been
12   asking you time frame, but have you understood the
13   answers about Cargill's competitors that I'm asking
14   about the period going back from 2004 for the
15   present?
16   A.   Yes, I'm aware of that.
17   Q.   Would your answer be different for any
18   portion of that period from 2004 to the present?
19   A.   To my knowledge, Rembrandt Foods was not
20   in the further processed egg production in 2004.
21   Q.   To the best of your knowledge, when did
22   Rembrandt begin selling further processed egg
23   products?
24   A.   I have no specific recollection of that.
25   Q.   Other than your clarification about

63

1    Rembrandt, your testimony about which companies
2    sell extended shelf life egg products, hard-cooked
3    eggs and precooked egg products, that testimony
4    would be the same from 2004 to the present,
5    correct?
6    A.   That is correct.
7    MR. GREENE:  I have no further
8    questions.  Thank you.
9    MR. VAHLE:  Any other defendants?
10   EXAMINATION BY COUNSEL FOR ASSOCIATED
11   WHOLESALE GROCERS
12   BY MR. VAHLE:
13   Q.   I have a few questions for you,
14   Mr. Profitt.  Again, my name is Barrett Vahle.  I
15   represent a company called Associated Wholesale
16   Grocers, who is a plaintiff in a piece of
17   litigation in Kansas.  Can you hear me fine?  We're
18   a little bit of a distance.
19   THE WITNESS:  Maybe you could speak up
20   just a little more.
21   MR. VAHLE:  Okay, I'll try to -- let's
22   go off the record for just a second and maybe
23   readjust.
24   THE VIDEOGRAPHER:  We're going off the
25   record at 11:14.

64

1    (Whereupon, an off the record discussion
2    was held from 11:14 a.m to 11:17 a.m.)
3    THE VIDEOGRAPHER:  We're back on the
4    record at 11:17 a.m.
5    BY MR. VAHLE:
6    Q.   Mr. Profitt, we juggled positions a
7    little bit.  Can you hear me a little bit better
8    now?
9    A.   Yes, that's good.
10   MR. VAHLE:  And can we ask for the
11   record who is on the phone at this time?
12   MR. ONDECK:  You still have Chris
13   Ondeck, representing Daybreak Foods.
14   MR. VAHLE:  Thank you, Mr. Ondeck.
15   MR. FONTECILLA:  Also representing
16   Daybreak Foods, Adrian Fontecilla with Proskauer
17   Rose.
18   MR. VAHLE:  Is Mr. Campbell on at this
19   time?
20   (No reply).
21   MR. VAHLE:  Perhaps not now.
22   BY MR. VAHLE:
23   Q.   Did you speak with counsel for Daybreak
24   before your deposition this morning?
25   A.   No, I did not speak with Daybreak

65

1    counsel.
2    Q.   Do you know whether your lawyer spoke
3    with Daybreak's counsel this morning?
4    A.   I have no --
5    MR. SVEEN:  Go ahead.
6    A.   I have no knowledge of whether they did
7    or did not.
8    BY MR. VAHLE:
9    Q.   Did you speak, either today or at any
10   time before this deposition, with anyone at
11   Daybreak about the deposition or the fact that you
12   were going to have your deposition taken?
13   A.   No, I did not.
14   Q.   You testified a little bit earlier about
15   McDonald's eggs produced by Daybreak.  Do you
16   recall that?
17   A.   Yes.
18   Q.   And do you recall testifying about the
19   Graettinger, Iowa facility at Daybreak?
20   A.   Yes.
21   Q.   And where are the eggs that are produced
22   at Daybreak's Graettinger, Iowa facility
23   distributed?
24   A.   Primarily, they go to our Mason City,
25   Iowa plant.

66

1    Q.   Okay.  And Mason City, Iowa, am I
2  correct that it produces egg products for
3  McDonald's?
4    A.   That is a primary customer.  There are
5  other customers in that plant as well.
6    Q.   Okay.  The McDonald's eggs at the Mason
7  City plant, what states are those shipped to?  What
8  areas of the country?
9    A.   The eggs produced in Mason City are
10 shipped primarily west of the Mississippi.
11   Q.   Primarily west of the Mississippi, and
12 that would include Kansas certainly?
13   A.   Most -- yeah, eggs would end up there.
14 I'm not sure what DC actually supplies Kansas.
15   Q.   Is it fair to say that you know that
16 some of Daybreak's eggs are supplied to McDonald's
17 stores in Kansas?
18   A.   To my knowledge, that would -- but I
19 don't know that specifically.
20   Q.   Okay.
21   A.   But it certainly would appear that way.
22   Q.   Are you familiar with a company or a
23 trade name called Sunny Fresh Farms?
24   A.   Specific to that, no.
25   Q.   Okay.  Was there -- and just the general

67

1  term "Sunny Fresh," have you heard of that before?
2    A.   Yes.  We have a product with that name
3  in it.
4    Q.   Okay.  And is that still the case today?
5    A.   That is correct.  It's not Sunny Fresh
6  Farms.  It's Sunny Fresh Foods.
7    Q.   Thank you.  And so am I correct that
8  Sunny Fresh Farms has never been a standalone
9  company, but it is a product made by Cargill
10 Kitchen Solutions, or a line of products?
11   A.   Let me be clear.  We have no product
12 called Sunny Fresh Farms.  We have a product called
13 Sunny Fresh Foods.
14   Q.   And for how long have you had the
15 product called Sunny Fresh Foods?
16   A.   For the last 15 years.
17   Q.   And what types of products fall within
18 the Sunny Fresh Foods line?
19   A.   It could be in the channels of
20 hard-cooked, frozen, extended shelf life liquid,
21 and further processed cooked side.
22   Q.   I think you testified earlier that
23 Cargill Kitchen Solutions does not own any
24 egg-laying hens, correct?
25   A.   That is correct.

68

1    Q.   Has that been true from 1999 through the
2  present?
3    A.   That is correct.
4    Q.   And Cargill Kitchen Solutions does not
5  produce any shell eggs, correct?
6    A.   That is correct.
7    Q.   Is Cargill Kitchen Solutions a farmer?
8    A.   No, they are not.
9    Q.   Are you a farmer?
10   A.   No, I am not.
11   Q.   Is Mr. Stocker a farmer?
12   A.   No, he is not.
13   Q.   Are you familiar with Mike Luker?
14   A.   Yes, I am.
15   Q.   And is Mr. Luker affiliated in some way
16 with Cargill Kitchen Solutions?
17   A.   He is past president of Cargill Kitchen
18 Solutions.
19   Q.   And for what period of time, if you
20 recall, was he president?
21   A.   From -- again, these are not exact.  I
22 think from like 2001-ish to 2008-ish.  In there.
23   Q.   Okay.
24   A.   9-ish.  I can't remember -- recollect
25 exactly.

69

1    Q.   Is it fair to say that Mr. Luker was not
2  a farmer?
3    A.   That is correct.
4    Q.   Have you heard of UEA?
5    A.   Yes, I have.
6    Q.   And what is UEA?
7    A.   It is an egg further processing
8  association.
9    Q.   Okay.  And is Cargill Kitchen Solutions
10 a member of UEA today?
11   A.   To my knowledge, it is.
12   Q.   And do you know -- can you identify the
13 period of time during which Cargill Kitchen
14 Solutions has been a member of UEA?
15   A.   I cannot give you specifics on the
16 tenure that we've been a member of UEA.
17   Q.   Has it been more than ten years?
18   A.   Again, I don't know.
19   Q.   You testified earlier that you knew at
20 least what UEP was, correct?
21   A.   Correct.
22   Q.   And have you from time to time attended
23 UEP meetings?
24   A.   Yes, I have.
25   Q.   And over what period of time did you

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

19 (Pages 70 to 73)

---

**70**

attend UEP meetings or have you attended UEP meetings?

A.   Various stages over the last 15 years.

Q.   Okay.  And what was the purpose from your perspective of you attending those meetings?

A.   To listen.

Q.   Okay.  And who else from Cargill Kitchen Solutions would have attended UEP meetings?

A.   Our procurement manager and at times our president of the company, and at times possibly a QA manager or someone of that nature.

Q.   And your procurement manager, is that Mr. Stocker?

A.   At present, correct.

Q.   Okay.  And Mr. Luker would have attended at some points?

A.   Occasionally.

Q.   Who else, if you recall, by name attended UEP meetings from Cargill Kitchen Solutions?

A.   I mean, going back years, Jerry Rose, who was a former president.

Q.   Anyone else you recall?

A.   I'm drawing a -- Mary Thompson, who was a past president.  And current president Chris

---

**71**

Roberts.

Q.   Now -- anyone else you can think of?

A.   Not off the top of my head.

Q.   Fair enough.  Is Cargill Kitchen Solutions a member of UEP?

A.   We are classified as an association member, but we are not a, quote/unquote, voting member, because we don't own any chickens.

Q.   Okay.  Have you heard of a group called United States Egg Marketers, or USEM?

A.   I recollect that from years ago.

Q.   Have you ever been to any meetings where USEM business was discussed that you recall?

A.   No, I have not.

Q.   So how often -- it appears to me, looking at records, that you attended UEP meetings fairly regularly.  Would that be fair to say?

MR. GREENE:  Objection to the form.

MR. SVEEN:  Same objection.  To the extent you can answer, you can.

A.   Yes, I have been to UEP meetings.  I don't know what constitutes regularly.

BY MR. VAHLE:

Q.   Okay.  How many times a year did you go to UEP meetings?

---

**72**

A.   Usually once.

Q.   Okay.  And was there a particular meeting that you went to?

A.   I would go to Atlanta, to that meeting, which is an annual poultry event that takes place in Atlanta, Georgia.

Q.   Okay.  Do you receive issues of the United Voices newsletter?

A.   Yes, I do.

Q.   And have you received those newsletters, say, over the last 15 years?

A.   Probably -- most recently, electronically.  Prior to electronically, probably didn't get copies of those letters.

Q.   Okay.  Do you recall when you started receiving those electronically?

A.   I can't recollect.

Q.   Okay.  Was it more than five years ago?

A.   Possibly.

Q.   Did you receive meeting minutes from UEP meetings?

A.   I received meeting minutes as a packet when you attended the meeting from the previous meeting.

Q.   Okay.

---

**73**

A.   For committee meetings.

Q.   Okay.  And what committee meetings did you attend over the years?

A.   I attended quality assurance committee meetings.  I attended animal welfare committee meetings.

What do they call it?  I forget the exact term, but political -- I mean, where they work with -- I mean with the government agency.

Q.   Government relations?

A.   There you go.  Couldn't think of the word.  The government relations committee.

Q.   Okay.  And how about the shell egg marketing committee?

A.   No.  I did not attend.

Q.   Never attended?

A.   Never attended.  To my knowledge.

Q.   Would it surprise you if meeting minutes reflected that you had attended?

A.   Could.  But I can't recollect when that was.

Q.   Okay.  Do you know -- have you met Irving Isaacson?

A.   I am aware of Irving, yes.

Q.   Okay.  Have you been in meetings with

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

20 (Pages 74 to 77)

---

74

1  Mr. Isaacson before?
2  **A.  I have sat in meetings where he was**
3  **there as legal counsel for UEP.**
4  Q.  Okay.  Did he speak during any of those
5  meetings?
6  **A.  Yes, he did.**
7  Q.  Okay.  What did he speak about that you
8  recall?
9  **A.  I cannot recall his exact words of what**
10 **he stated.  He made a statement at the beginning of**
11 **UEP meetings prior to the start of those meetings.**
12 **I can't recollect exactly what his words were.**
13 Q.  Did it relate to whether the persons
14 attending the meetings were farmers, were egg
15 producers?
16 **A.  I recollect words around "egg**
17 **producers."**
18 Q.  Did you ever leave after he gave that
19 preamble?
20 **A.  At -- again, I can't remember at**
21 **specific times.  Meetings changed as to who was in**
22 **attendance and who was there as an observer or**
23 **whatever.  So -- and I can't remember when.**
24 **There's been periods where there was**
25 **general discussions and then people that were not**

---

75

1  **members were asked to not be involved -- you know,**
2  **to leave the room.**
3  Q.  But sitting here today, certainly you
4  don't recall leaving the room based on this
5  preamble that you think Mr. Isaacson gave?
6  MR. SVEEN:  Objection to form.
7  MR. HUTCHINSON:  Objection to form.
8  **A.  I can't recall.**
9  BY MR. VAHLE:
10 Q.  Okay.  Do you know Kevin Haley?
11 **A.  No, I do not.**
12 Q.  Do you know any other lawyers who
13 represented UEP who were at those meetings?
14 **A.  I recollect their faces.  I can't**
15 **remember their names.**
16 Q.  Okay.  Do you recall at a meeting
17 discussing a supply management program that the
18 potato growers were working on?  Do you recall that
19 subject coming up?
20 **A.  I recollect the term "potato growers."**
21 Q.  Okay.  Do you recall who presented
22 information at that meeting?
23 **A.  I do not recall the name of the**
24 **individual.**
25 Q.  Okay.  Do you recall whether there was a

---

76

1  lawyer who was discussing that?
2  **A.  I do not recall the name or exactly who**
3  **discussed it.**
4  Q.  Okay.  Have you heard of the
5  Capper-Volstead Act?
6  **A.  I have heard of it, yes.**
7  Q.  And what is your understanding of what
8  that act is or what it means to you?
9  MR. SVEEN:  Object to the extent it
10 calls for a legal conclusion.  You can answer to
11 the extent you can.
12 **A.  I understand it's a legal -- what's the**
13 **right term?  But it is an act that allows entities**
14 **to have a discussion.  And that's really the extent**
15 **of my knowledge of it.**
16 BY MR. VAHLE:
17 Q.  Okay.  And when you talk about entities
18 having a discussion, in the context of UEA and UEP,
19 would you include Cargill Kitchen Solutions as one
20 of those entities?
21 **A.  No, I would not.**
22 Q.  Okay.  Why not?
23 **A.  Because we were not a member.**
24 Q.  Okay.  So you were a member of UEA,
25 correct?

---

77

1  **A.  Correct.**
2  Q.  You were not a member of UEP?
3  **A.  That is correct.**
4  Q.  You attended UEP meetings?
5  **A.  That is correct.**
6  Q.  Do you recall discussing at those
7  meetings or the issue coming up of flock
8  reductions?
9  **A.  I do not recall a meeting specific to**
10 **flock reductions.**
11 Q.  You don't recall that issue coming up at
12 all?
13 **A.  Can you -- I don't understand what your**
14 **question is.**
15 Q.  Do you recall meetings where shell egg
16 producers expressed their intentions to cut their
17 flock by 5 percent?
18 **A.  I do not recollect any shell egg**
19 **producer in a meeting announcing to the audience**
20 **that they were going to cut shell egg production.**
21 Q.  Do you recall that issue coming up, the
22 issue of the possibility or the intention to cut
23 shell egg production?
24 MR. SVEEN:  Object to the form.
25 **A.  I do not recall a discussion or a debate**

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

21 (Pages 78 to 81)

---

**78**

1 around reduction of flocks.
2     BY MR. VAHLE:
3     Q.  Do you recall any motions related to
4 that issue?
5     **A.  I don't recall any motions.**
6     Q.  Do you recall any discussion of early
7 molting?
8     **A.  I recall -- I do recall molting as a**
9 **part of how it related into discussions in the**
10 **animal welfare committee and how that was going to**
11 **take place.**
12     Q.  Okay.  Do you know Gene Gregory?
13     **A.  Yes, I do.**
14     Q.  Who is Mr. Gregory?
15     **A.  Currently he is a retired president/CEO**
16 **of United Egg Producers.**
17     Q.  Okay.  And did Mr. Gregory ever solicit
18 Cargill Kitchen Solutions' support for the UEP
19 Certified program?
20     **A.  Yes.  We've met with Mr. Gregory around**
21 **that topic.**
22     Q.  Okay.  And the purpose of the meeting
23 was that UEP and Mr. Gregory wanted Cargill Kitchen
24 Solutions to support the UEP Certified program,
25 correct?

---

**79**

1     **A.  Mr. Gregory asked us our opinion of the**
2 **program and if it's something that we would put**
3 **into our business.  Our answer was that's not**
4 **something that we saw value in at the time.**
5     Q.  The sales that Cargill Kitchen Solutions
6 makes to McDonald's -- well -- strike that.
7     Have you heard of the Urner Barry price
8 for eggs?
9     **A.  Yes, I have.**
10     Q.  And what is that -- what does that mean
11 to you?
12     **A.  Urner Barry is a marketing association**
13 **that helps set the value of the spot market of**
14 **shell eggs.  So it's a marketing -- or a**
15 **price-setting institution.**
16     Q.  And what role does the Urner Barry
17 market price play in your business of Cargill
18 Kitchen Solutions?
19     **A.  We do have some products that may be**
20 **priced off the Urner Barry and we do have some**
21 **products inbound that we may procure off the Urner**
22 **Barry market quote.**
23     Q.  And what sorts of inbound products do
24 you procure off the Urner Barry market quote?
25     **A.  Again, we're getting into procurement.**

---

**80**

1 **So I'm not positive as to the relationships in**
2 **those kind of things.  So, again, those are**
3 **primarily procurement.**
4     Q.  Okay.  And those would be questions for
5 Mr. Stocker?
6     **A.  Correct.**
7     Q.  Now, am I correct that during the last
8 ten to fifteen years, you have purchased eggs from
9 Daybreak based on the Urner Barry market quote?
10     **A.  That is correct.**
11     Q.  Okay.  And let's go through that a
12 little bit.  Do you purchase eggs today from
13 Daybreak based on the Urner Barry?
14     **A.  Again, I am not going to comment on**
15 **things that really take place in procurement.**
16     Q.  Okay.  Do you know the answer to my
17 question one way or the other, based on your
18 personal knowledge?
19     **A.  Based on my personal knowledge, I do not**
20 **know specifics of your question.**
21     Q.  Okay.  But you certainly do know that
22 over the -- since 2000, say, that you've purchased
23 eggs from Daybreak based on the Urner Barry?
24     **A.  That is correct.**
25     Q.  Okay.  And have you purchased eggs from

---

**81**

1 Sparboe since 2000 based on Urner Barry?
2     **A.  To my knowledge.**
3     Q.  Okay.  And the eggs that you sell to
4 McDonald's, is Urner Barry a part of the formula or
5 analysis that goes into that pricing structure?
6     **A.  To my knowledge, that pricing structure**
7 **is based on a grain-based pricing structure that**
8 **uses soybean and corn.**
9     Q.  Okay.  And if I -- again, if I wanted
10 details on that, it would be a question for
11 Mr. Stocker?
12     **A.  That is correct.**
13     Q.  And who would the person -- strike that.
14     You mentioned downstream sales based on
15 Urner Barry.  To your knowledge, again, what types
16 of products downstream that Cargill Kitchen
17 Solutions sell are based on Urner Barry?
18     MR. HUTCHINSON:  Objection to form.
19     **A.  Can I have a minute here?**
20     MR. SVEEN:  Sure.
21     THE VIDEOGRAPHER:  We're going off the
22 record at 11:41 a.m.
23     (Whereupon, a recess was taken from
24 11:41 a.m to 11:49 a.m.)
25     THE VIDEOGRAPHER:  We're back on the

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                                April 8, 2014

22 (Pages 82 to 85)

---

**82**

1  record at 11:49 a.m.
2      BY MR. VAHLE:
3      Q.   I have just a few more questions,
4  Mr. Profitt.
5      A.   Okay.
6      Q.   I appreciate your time.  Do you
7  understand you're still under oath?
8      A.   Yes.
9      Q.   Okay.  Can you just confirm for me that
10 some of the eggs -- some of the egg products sold
11 by Cargill Kitchen Solutions are priced based on
12 Urner Barry?
13     A.   Yes.  Urner Barry is a component in some
14 of the pricing.
15     Q.   Okay.  And would those include -- those
16 Urner Barry-priced eggs sold by Cargill Kitchen
17 Solutions, would those include eggs sold to you by
18 Daybreak?
19     A.   Some of those eggs would, correct.
20     Q.   Same question with Sparboe.
21     A.   To my knowledge.
22     Q.   Does Cargill Kitchen Solutions have any
23 business relationship with Rose Acre Farms?
24     A.   Not today.
25     Q.   Okay.  I take it that you did at some

---

**83**

1  point?
2      A.   To my knowledge, years ago.
3      Q.   And what was the relationship at
4  that time?
5      A.   We received eggs from them in a liquid
6  form, to my knowledge.
7      Q.   Okay.  Was that liquid egg pricing based
8  on Urner Barry?
9      A.   I have no recollection of what their
10 pricing was.
11     Q.   Okay.  Do you know Marcus Rust?
12     A.   I know Marcus Rust.
13     Q.   And how do you know Marcus Rust?
14     A.   I have met Mr. Rustic at industry
15 meetings.
16     Q.   And those would be UEP meetings?
17     A.   Or Urner Barry meetings.
18     Q.   Okay.  And how often did you go to Urner
19 Barry meetings?
20     A.   Most years.
21     Q.   And that's once a year?
22     A.   It's an annual meeting.
23     Q.   Is that coordinated with the Atlanta
24 meeting of UEP or is that something different?
25     A.   Two separate organizations.

---

**84**

1      Q.   Right.  So they're in a different place
2  and a different time?
3      A.   Correct.
4      Q.   And what sorts of issues -- strike that.
5      Why do you go to the Urner Barry
6  meetings?
7      A.   To listen.
8      Q.   Okay.  And what sort of information are
9  you listening to at Urner Barry meetings?
10     A.   They have guest speakers that come in
11 and talk about various topics.
12     Q.   Okay.  And in particular, the price of
13 eggs?
14     A.   No, not necessarily.
15     Q.   Okay.  What sorts of topics might be
16 discussed?
17     A.   The Urner Barry organization is a
18 pricing organization for various products beyond
19 eggs.
20     Q.   And this is not an egg-specific meeting?
21     A.   That is correct.
22     Q.   Got it.  Do you know K.Y. Hendrix?
23     A.   I know of him.
24     Q.   And who is he?
25     A.   He is a member -- or was a member, and

---

**85**

1  I'm not sure of his status today -- of Rose Acres.
2      Q.   You mentioned William Rehm at Daybreak
3  earlier.  Who else are you familiar with in the
4  Daybreak organization?
5      A.   Tony Rehm, his brother.  Some of the
6  live production people, those kind of people.  But
7  Tony Rehm and Bill Rehm are my two most
8  knowledgeable contacts.
9      Q.   Okay.  And you have contact with them in
10 the course of your business relationship, I take
11 it?
12     A.   Correct.
13     Q.   And you would also see them at UEP
14 meetings as well?
15     A.   Yes.
16     Q.   Okay.  Do you know Loren Ashe from
17 Daybreak?
18     A.   Yes, I do.
19     Q.   And would you see him at UEP meetings as
20 well?
21     A.   That is correct.
22     Q.   Okay.  What about Patricia or Pat
23 Stonger?
24     A.   Yes.
25     Q.   Okay.  And how do you know Ms. Stonger?

---

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

23 (Pages 86 to 89)

---

86

1       **A.   Again, from industry meetings and our**
2 **business relationship.**
3       Q.   Okay.  Do you know Paul Sauder?
4       **A.   Yes.  I know Paul.**
5       Q.   And how do you know Paul Sauder?
6       **A.   Again, he is a member of UEP, and I know**
7 **him from an association.**
8       Q.   Do you have any business relationship at
9 all with Sauder Eggs?
10       **A.   We do not do business with Sauder Eggs.**
11       MR. VAHLE:  That's all I have right now.
12 Thank you.
13       THE WITNESS:  Thank you.
14       MR. HUTCHINSON:  Mr. Campbell, do you
15 want to go ahead and ask your questions now?
16       MR. CAMPBELL:  Yes, Troy, I do.  I
17 apologize to the assembled group for the
18 awkwardness of this, but I would like the court
19 reporter to mark the following documents in the
20 next sequence.  I believe Exhibit 2 is next, but I
21 may be incorrect about that.
22       MR. HUTCHINSON:  You are correct about
23 that.
24       MR. CAMPBELL:  All right.  Exhibit 2
25 would be the producer meeting, December 6, 2005.

---

87

1       MR. HUTCHINSON:  Is there a Bates number
2 on it, Mr. Campbell?
3       MR. CAMPBELL:  There is.  NL217575.
4       MR. HUTCHINSON:  Mr. Campbell, can you
5 remind me who you represent?
6       MR. CAMPBELL:  Yes.  I was going to
7 explain that to Mr. Profitt.  My name is Richard
8 Campbell.  I'm with the law firm of Jenner & Block
9 in Chicago and elsewhere.  I represent Kraft,
10 Nestle, Kellogg and General Mills in this
11 litigation.
12       MR. HUTCHINSON:  Thank you.  I think it
13 makes sense to go off the record.  Are you going to
14 mark multiple exhibits now?
15       MR. CAMPBELL:  There are just five
16 exhibits, Troy.  I thought it would be easier to
17 just mark them.
18       MR. HUTCHINSON:  Yeah.  Let's just go
19 off the record and do it.
20       THE VIDEOGRAPHER:  We are going off the
21 record at 11:57 a.m.
22       (Whereupon, a recess was taken from
23 11:57 a.m to 12:02 p.m.)
24       (Cargill Exhibits 2 through 6 were
25       marked for identification.)

---

88

1       THE VIDEOGRAPHER:  We're back on the
2 record at 12:02 p.m.
3       EXAMINATION BY COUNSEL FOR THE KRAFT PLAINTIFFS
4       BY MR. CAMPBELL:
5       Q.   Mr. Profitt, my name is Richard
6 Campbell.  I am a lawyer with Jenner & Block in
7 Chicago.  I represent Kraft, Nestle, Kellogg and
8 General Mills in this Processed Eggs Litigation.  I
9 have a few questions for you, if I may.
10       You testified that Cargill Kitchen
11 Solutions was -- I thought you said an associate
12 member of UEP.  Is that correct?
13       **A.   To my understanding of our membership,**
14 **correct.**
15       Q.   What is an associate member?
16       **A.   We can attend meetings and those kind of**
17 **things, but we don't have, quote/unquote, voting**
18 **rights because we're not an owner of birds or**
19 **chickens.  We are not a producer.**
20       Q.   Who invited you to the UEP meetings that
21 you attended?
22       **A.   I mean, it's an industry meeting that**
23 **associates, equipment manufacturers, anyone**
24 **associated with the egg production, egg poultry**
25 **business can attend.**

---

89

1       Q.   And you testified earlier that you went
2 to those meetings, and I quote, to listen.  Is that
3 correct?
4       **A.   That is correct.**
5       Q.   And did you listen?
6       **A.   Yes, I did.**
7       Q.   All right.  And what did you hope to
8 learn?
9       **A.   It was a way for our company to keep an**
10 **understanding of the issues and the things that**
11 **were going on in the poultry -- or in the egg**
12 **industry.**
13       Q.   Did you participate in any of the
14 meetings?  And by that, I mean did you speak.
15       **A.   To my knowledge, I can't recollect**
16 **having spoken at these meetings, to my**
17 **recollection.**
18       Q.   Did you ever speak privately to any UEP
19 executives like Gene Gregory or Al Pope?
20       **A.   I can't remember what conversations I**
21 **may have had years ago.**
22       Q.   No.  My question was did you have such
23 conversations.
24       **A.   Have I ever spoke to Gene Gregory?  Yes,**
25 **I have.  Have I ever spoke to Al Pope?  Yes, I**

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                    April 8, 2014

24 (Pages 90 to 93)

---

**90**

have.

Q.   At UEP annual or committee meetings?

A.   **I have spoke to them at those meetings.**

Q.   All right.  If you'll look at Exhibit 2,
I assume Troy has passed out those to your counsel.

A.   **Yes.**

MR. CAMPBELL:  I'm sorry.  I missed
who's representing the witness here.

MR. SVEEN:  Andy Sveen on behalf of
Cargill.  And Mr. Profitt has the exhibits.

MR. CAMPBELL:  All right.  That's
wonderful.

BY MR. CAMPBELL:

Q.   If you'll look at Exhibit 2,
Mr. Profitt, which is entitled "Producer Meeting in
Minneapolis, December 6, 2005."  Do you see that?

A.   **Yes, I do.**

Q.   And it shows that you and Mr. Stocker
both attended that meeting; is that correct?

A.   **That is correct.**

Q.   Do you recall attending that meeting?

A.   **I do recall attending that meeting.**

Q.   All right.  And if you'll see in the
bold the words "Issues and concerns expressed by
producers."  Do you see that?

---

**91**

A.   **Yes.**

Q.   And if you'll look at the number 13
which reads, "The UEP Certified program is, as
such, a market restriction."  Do you remember
discussion of that issue?

A.   **No, I do not.**

Q.   Do you have a view -- strike that.

Does Cargill Kitchen Solutions have a
view as to whether or not the UEP Certified program
is a market restriction?

MR. HUTCHINSON:  Object to form.

A.   **No, we do not.**

BY MR. CAMPBELL:

Q.   Do you have a personal view as to
whether the UEP Certified program is a market
restriction?

A.   **No, I do not.**

Q.   All right.  If you'll turn to Exhibit 3.
Do you have it, Mr. Profitt?

A.   **Yes, I do.**

Q.   It's entitled "UEP Marketing Committee,
October 11th 2006, San Antonio, Texas," and it
shows you in attendance, fourth line up from the
bottom on the left side.  Do you see that?

A.   **Okay.  Yes, I see.**

---

**92**

Q.   Do you recall attending that meeting?

A.   **I recall attending meetings in San
Antonio, Texas, correct.**

Q.   All right.  And if you'll see in a bold
portion down there.  Underlined words "United
Potato Growers"?

A.   **That is correct.**

Q.   And it says, "Gregory reported hearing
from several members about the Wall Street Journal
story reporting on the forming of a cooperative to
address supply conditions by potato growers.  He
reported having spoken with the CEO of the United
Potato Growers about the potential for him and
their attorney to meet with UEP."

Does that refresh your recollection
about the discussion about United Potato Growers at
that meeting?

A.   **My recollection of that meeting was only
that I remember someone from the United Potato
Growers was there.  Specific to that meeting, I do
not recollect.**

Q.   And did that representative of United
Potato Growers speak?

A.   **To the best of my recollection.**

Q.   And what was the substance of what he

---

**93**

said?

A.   **As I just stated, I can't remember what
he said.**

Q.   All right.  If you'd turn to the second
page of that document, Exhibit 3, looking at the
bold and underlined in the center of the page
called "Call for Committee Recommendations."  Do
you see that?

A.   **Yes, I do.**

Q.   And the committee -- who's Doug Wicker?
Do you know?

A.   **I have no idea.**

Q.   All right.  It says, "Mr. Wicker spoke
in support of the industry committee to a hatch
reduction plan."

You testified in response to some
questions a few minutes ago you had no recollection
of any such discussions.  Do you recall that?

A.   **Yes.**

Q.   Does this refresh your recollection that
a hatch reduction plan was discussed at this
meeting?

A.   **No.  It does not refresh my
recollection.**

Q.   But you were there listening, right?

---

HIGHLY CONFIDENTIAL

Profitt, Terry                                                          April 8, 2014

25 (Pages 94 to 97)

---

**94**

1     **A.  That is correct.**
2     Q.  All right.  Would you please turn to
3  Exhibit 4 --
4     **A.  Okay.**
5     Q.  -- entitled "UEP Marketing Committee
6  Meeting Greensboro Georgia - October 15th 2008."
7     **A.  Okay.**
8     Q.  And it shows you under "Additional
9  Attendees," third line down in about the middle.
10    **A.  Okay.**
11    Q.  Do you see that?
12    **A.  Yes.**
13    Q.  Do you recall attending this meeting?
14    **A.  That meeting specifically, I don't**
15  **recall, but obviously --**
16    Q.  Do you have any reason -- I'm sorry.  I
17  interrupted you.  You go ahead.
18    **A.  Obviously I'm not denying that it shows**
19  **I was there.  I do not recall the meeting.**
20    Q.  All right.  Would you turn to the third
21  page which is Bates labeled ending in 15.
22    **A.  Okay.**
23    Q.  Do you know who Mike McGriff is?
24    **A.  Vaguely.  I think he's part of the UEP**
25  **government relations group.**

---

**95**

1     Q.  All right.  If you'll look under the
2  "Industry Statistics" which states that "Mike
3  McGriff of UEP provided a recap of industry
4  statistics."  Do you see that?
5     **A.  Yes, I do.**
6     Q.  And the first one states -- the first
7  bullet point states, "The monthly hen inventory for
8  July-September '08 was at the lowest level for any
9  period during the previous five years."  Do you
10  recall that discussion?
11    **A.  No, I do not.**
12    Q.  Do you recall any discussion about hen
13  inventory at any point in time in any meeting?
14    **A.  No, I do not.**
15    Q.  But, again, you were there listening,
16  right?
17    **A.  Yeah.  And -- yes, I was.**
18    Q.  Okay.  Would you be kind enough to turn
19  to Exhibit 5 which has -- appears to be on Sparboe
20  letterhead.
21    **A.  Yes.**
22    Q.  And it shows under number 9 that Sunny
23  Fresh Foods was supporting the position taken in
24  this memorandum.  Am I reading that correctly?
25     MR. SVEEN:  Take a look through the --

---

**96**

1     BY MR. CAMPBELL:
2     Q.  Take your time and read it, Mr. Profitt.
3  I don't mean read the whole document, but read
4  whatever you need to read in order to understand
5  it.
6     MR. SVEEN:  Page through it, Terry, just
7  so you know what this says.
8     MR. HUTCHINSON:  Mr. Campbell, are you
9  aware that this Exhibit 5 is actually multiple
10  documents?
11     MR. CAMPBELL:  I am.  That's how --
12  Troy, that's how I received them.  And I
13  understood -- they have consecutive numbers, so I
14  assumed that they went together.  I'm going to ask,
15  however, only about the first document, 21 through
16  25.
17     MR. SVEEN:  21 through 25 or 21 through
18  24?
19     MR. CAMPBELL:  I'm sorry.  I misspoke.
20  24.  You're correct.
21     THE WITNESS:  Go ahead.
22     BY MR. CAMPBELL
23    Q.  Yeah.  Maybe that would shortcut it.
24    Have you seen this document before,
25  Mr. Profitt?

---

**97**

1     **A.  No, I have not.**
2     Q.  If you'll turn to page 23.  You see in
3  the bottom right-hand corner --
4     MR. SVEEN:  It's page 3 of the document.
5     **A.  Okay.**
6     BY MR. CAMPBELL:
7     Q.  You'll see under "Problem No. 3 - The
8  Audit Process," and it says, "The audit program
9  could be construed to be unconcerned whether a
10  producer is humanely handling/molting and beak
11  trimming layers.  This is not true of density."  Do
12  you see that?
13    **A.  I'm sorry.  What part of this --**
14    Q.  "Problem No. 3 - The Audit Process" --
15    **A.  Okay.**
16    Q.  -- under numbered paragraph number 1.
17    **A.  Okay.  Okay.  State it again.**
18    Q.  The second sentence.  "Thus, the audit
19  program could be construed to be unconcerned
20  whether a producer is humanely handling/molting and
21  beak trimming layers.  This is not true of density.
22  Here there is a total knockout factor on space."
23    Did you ever discuss that statement with
24  anybody in Cargill Kitchen Solutions?
25    **A.  That statement specifically?  Not to my**

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

26 (Pages 98 to 101)

98

1  knowledge.
2      Q.   Did you ever discuss whether the UEP
3  Certified guidelines, in fact, treated different
4  elements of the guidelines differently in the
5  audit?
6          MR. SVEEN:  Objection to the form of the
7  question.
8          THE WITNESS:  I'm sorry.  I didn't
9  understand your objection.
10         MR. SVEEN:  To the extent you can
11  understand his question, go ahead and answer.
12     A.   We did not get involved in the UEP audit
13  process.  So I have no --
14      BY MR. CAMPBELL:
15     Q.   So the answer -- so the answer to my
16  question is, no, you had no such discussions,
17  correct?
18     A.   Correct.
19     Q.   All right.  That's fine.  Turn to
20  Exhibit 6, if you will.
21     A.   Okay.
22     Q.   Have you seen this letter from
23  Mr. Stocker before?
24     A.   No, I have not.
25     Q.   And who is -- you report to Mr. Stocker;

99

1  do you not?
2      A.   No, I do not.
3      Q.   Oh.  He's head of production?
4      A.   He's the head of procurement.
5      Q.   Procurement.  I'm sorry.  I misspoke.
6  You're right.  You said that clearly before.
7          Do you know who Ken Klippen is?
8      A.   I have met Mr. Klippen.
9      Q.   And what's your understanding of who he
10  is?
11     A.   I have no idea what he does today.  At
12  one point, he was a part of UEP and left UEP and I
13  think formed his own business.
14     Q.   All right.  If you'll look at the fourth
15  paragraph down --
16     A.   Okay.
17     Q.   -- it says, "In addition, it is clear
18  that UEA does have some autonomy issues.  It became
19  very clear at the last meeting that UEA is clearly
20  controlled by UEP."  Is that your understanding,
21  that UEA was clearly controlled by UEP?
22     A.   That was not my understanding at all.
23     Q.   All right.  Do you have a contrary
24  understanding?
25     A.   As previously stated, my understanding

100

1  of UEA is an egg further processing association,
2  not an egg -- chicken production association.
3      Q.   But that begs the question, does it not,
4  whether or not it's controlled by UEP?
5          MR. SVEEN:  Object to the form.
6      A.   I cannot speculate on what's in
7  someone's mind.
8      BY MR. CAMPBELL:
9      Q.   So you just don't know the answer to
10  that either way; is that correct?
11     A.   I do not know the answer of someone
12  believes it's a part of UEP.  I do not have an
13  answer for that.
14     Q.   Well, it doesn't say it's a part of.  It
15  says it's controlled by.  Do you have an answer for
16  that?
17         MR. GREENE:  Object to form.
18         MR. SVEEN:  Same objection.
19     A.   I am not an active participant in UEA;
20  therefore, not qualified to even discuss this.
21         MR. CAMPBELL:  All right.  I have no
22  further questions, gentlemen.
23         MR. HUTCHINSON:  I just have a couple of
24  questions on these documents.  Very short.
25      FURTHER EXAMINATION BY COUNSEL FOR SPARBOE FARMS

101

1      BY MR. HUTCHINSON:
2      Q.   Mr. Profitt, referring you to
3  Exhibit 2 --
4      A.   Okay.
5      Q.   -- do you see anyone listed in the
6  attendees at this meeting from Sparboe?
7      A.   No, I do not.
8      Q.   Do you recall whether anyone from
9  Sparboe attended this meeting?
10     A.   Vaguely I remember that there was a
11  representative there.
12     Q.   Do you know who it was?
13     A.   I thought it was Beth Schnell, but I
14  cannot remember exactly.  I can't.
15     Q.   And do you remember whether Ms. Schnell
16  spoke at the meeting at all?
17     A.   I do not remember whether she did or
18  didn't.
19     Q.   In Exhibit 3, do you see anyone from
20  Sparboe listed among those being present at this
21  meeting?
22     A.   Are you referring to the call to order
23  list of people there?
24     Q.   Yes.
25     A.   At a quick glance, I do not see anyone

HIGHLY CONFIDENTIAL

Profitt, Terry                                                April 8, 2014

27 (Pages 102 to 105)

---

102

1    that I can recollect was from Sparboe.
2        Q.    And do you recall whether anyone from
3    Sparboe attended this meeting?
4        A.    I cannot recall that, whether they did
5    or they didn't.
6        Q.    And I'll refer you to Exhibit 4. Do you
7    see anyone from Sparboe listed among the attendees
8    at this meeting?
9        A.    As of a quick scan, I do not see.
10       Q.    And do you remember, was anyone from
11   Sparboe in attendance at this meeting?
12       A.    Again, I can't remember myself attending
13   this meeting, even though it says I did.
14       Q.    And do you know that -- the meeting is
15   dated October 15th 2008. Do you know whether at
16   that time Sparboe was a UEP member?
17       A.    I do not remember when they were members
18   and when they weren't. I know they have been and
19   out and back. So I can't remember at what point
20   they were a member and at what point they were not
21   a member.
22       Q.    Did anyone from Sparboe ever communicate
23   to you their opinion of the UEP animal welfare
24   program?
25       A.    To my recollection, they -- Beth had

---

103

1    made comments to her opinions of UEP.
2        Q.    And what was Ms. Schnell's opinion of
3    the UEP animal welfare program?
4        A.    There were parts of the program, to my
5    recollection, that she did not a hundred percent
6    agree with. I cannot remember the specifics of
7    which parts she agreed with and which parts she did
8    not agree with.
9        Q.    So she voiced to you her disagreement
10   with that program, correct?
11       A.    As I said, she voiced some disagreements
12   with parts of the program. I can't remember which
13   parts.
14       Q.    And did anyone else from Sparboe express
15   similar disagreement or agreement with the UEP
16   program?
17            MR. VAHLE: Objection, restates the
18   witness' previous testimony.
19       A.    I did not have conversations with a lot
20   of other people in Sparboe about this topic.
21            MR. HUTCHINSON: I have no further
22   questions. We can go off the record.
23            MR. ONDECK: Actually, Troy -- excuse
24   me. A frog in my throat. Can I ask a couple
25   follow-up questions?

---

104

1            MR. SVEEN: Who is this?
2            MR. HUTCHINSON: That's Chris Ondeck.
3            MR. ONDECK: It's Chris Ondeck for
4    Daybreak Foods. So then just asking the people in
5    the room, is that okay?
6            MR. SVEEN: Yeah. Let's just push
7    through, I think. Yeah. Go ahead.
8    FURTHER EXAMINATION BY COUNSEL FOR DAYBREAK FOODS
9            BY MR. ONDECK:
10       Q.    All right. Mr. Profitt, so it's Chris
11   Ondeck, representing Daybreak Foods again. And
12   just a couple of follow-up questions.
13            You may recall that one of the lawyers
14   who questioned you two lawyers ago, his name is
15   Mr. Barrett Vahle, asked you about your knowledge
16   of something called the Capper-Volstead Act. Do
17   you recall that?
18       A.    Yes. I recall that question.
19       Q.    And just to confirm, you're not a
20   lawyer, are you?
21       A.    No, I'm not.
22       Q.    Okay. Do you hold yourself out as an
23   expert on the Capper-Volstead Act?
24       A.    I'm far from an expert in anything.
25       Q.    Okay. And also not an expert on the

---

105

1    Capper-Volstead Act?
2        A.    That is correct.
3        Q.    Okay. And just to specifically confirm,
4    are you familiar with the exact text of the words
5    in that statute?
6        A.    I am not.
7        Q.    And then the second question I'd like to
8    ask you is, you were asked by both of the lawyers
9    who previously questioned you about Cargill Kitchen
10   Solutions' attendance and participation at UEP
11   meetings. Do you recall that?
12       A.    Yes. I recall that.
13       Q.    And you stated -- I'm sorry to interrupt
14   you.
15            And you stated that UEP was not a member
16   that voted; is that correct?
17       A.    I don't understand the question.
18       Q.    I misspoke. You stated that Cargill
19   Kitchen Solutions was not a company that voted at
20   UEP meetings; is that correct?
21       A.    That is correct. We are not a voting
22   member of UEP.
23       Q.    Okay. To the best of your knowledge,
24   did Cargill Kitchen Solutions ever attempt to sneak
25   in a vote at a UEP vote?

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

28 (Pages 106 to 109)

---

**106**

1        MR. SVEEN:  Object to -- go ahead.
2    **A.   I'm sorry.  Not to my knowledge did we**
3  **ever try to sneak in a vote.**
4        **BY MR. ONDECK:**
5    Q.    Good.  Then the last thing that I wanted
6  to ask you about was you were asked questions by
7  Mr. Barrett Vahle about Urner Barry and sales that
8  were made using the Urner Barry index to Cargill
9  Kitchen Solutions.  Do you recall that generally?
10    **A.   Yes, I do.**
11    Q.    Okay.  And what I want to ask you about
12  is, is it your understanding that the majority of
13  products that Daybreak sells Cargill Kitchen
14  Solutions is sold pursuant to written supply
15  agreements?
16        MR. VAHLE:  Objection to form.
17    **A.   That is correct.**
18        MR. VAHLE:  Sorry to interrupt you.
19    **A.   That is correct.**
20        BY MR. ONDECK:
21    Q.    And just to confirm, those written
22  supply agreements contain pricing provisions that
23  use, as we discussed, grain-based pricing formulas
24  and do not use Urner Barry; is that correct?
25    **A.   To my general knowledge of those**

---

**107**

1  **contracts, that is correct.**
2    Q.    When is Urner Barry used for pricing
3  sales of products that Daybreak sells to Cargill
4  Kitchen Solutions?
5    **A.   Again, that is a procurement question**
6  **that I would feel more comfortable procurement**
7  **answering.  But as a general knowledge, those are**
8  **what we would call spot purchases.**
9    Q.    Okay.  And would it be your
10  understanding that the vast majority of product
11  that Daybreak sells Cargill Kitchen Solutions is
12  under contract and not spot purchases?
13        MR. VAHLE:  Objection to the form, lacks
14  foundation, calls for speculation.
15        BY MR. ONDECK:
16    Q.    You can answer.
17    **A.   That is correct.**
18        MR. ONDECK:  Okay.  Thank you very much
19  for your time.  And nothing further from me.
20        MR. HUTCHINSON:  Go off the record?
21        MR. VAHLE:  I just have one more
22  question.
23    FURTHER EXAMINATION BY COUNSEL FOR THE
24    ASSOCIATED WHOLESALE GROCERS

---

**108**

1    BY MR. VAHLE:
2    Q.    When Mr. Ondeck just asked you those
3  questions, were you changing any of the testimony
4  you gave previously?
5        MR. HUTCHINSON:  Objection to form.
6    **A.   To my knowledge, I haven't.  I've been**
7  **asked a lot of questions this morning, so I don't**
8  **think so.**
9        BY MR. VAHLE:
10    Q.    I understand.
11    **A.   But I don't think so.**
12        MR. VAHLE:  That's all I have.
13        THE VIDEOGRAPHER:  We're going off the
14  record at 12:29.
15        (Reading and signing reserved).
16        (Whereupon, at 12:29 p.m. the videotaped
17  deposition was adjourned.)
18        * * * * *

---

**109**

1        ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me, and any corrections appear on the attached Errata
8  Sheet signed by me.
9
10
11  _____    _____
12  (DATE)        (SIGNATURE)
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

Profitt, Terry

April 8, 2014

29 (Page 110)

110

1
2          REPORTER'S CERTIFICATE

3   STATE OF MINNESOTA           )
                          ss.
4   COUNTY OF HENNEPIN           )
        I hereby certify that I reported the
5   deposition of TERRY W. PROFITT on April 8, 2014, in
6   Minneapolis, Minnesota, and that the witness was by
    me first duly sworn to tell the whole truth;
7
8          That the testimony was transcribed by me
    and that this transcript is a true record of the
9   testimony of the witness;
10
           That the cost of the original has been
11  charged to the party who noticed the deposition,
12  and that all parties who ordered copies have been
    charged at the same rate for such copies;
13         That I am not a relative or employee or
14  attorney or counsel of any of the parties, or a
    relative or employee of such attorney or counsel;
15         That I am not financially interested in
16  the action and have no contract with the parties,
    attorneys, or persons with an interest in the
17  action that affects or has a substantial tendency
18  to affect my impartiality.
           WITNESS MY HAND AND SEAL THIS 10th day
19  of April, 2014.

20

21

22  _____
    Jonathan Wonnell
23  Notary Public, Hennepin County, Minnesota
24  My Commission expires January 31, 2017
25