# ATTACHMENT 50

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE: PROCESSED EGG PRODUCTS,    : MDL NO. 2002

ANTI TRUST LITIGATION             : 08-md-02002

_____

THIS DOCUMENT RELATES TO,          :

Kroger, Co. v. United Egg          : HIGHLY

Producers, et al.,                 : CONFIDENTIAL

No. 2:10-cv-06705 GP               :

_____

          Videotaped deposition of PAYTON PRUETT,

held at the offices of DECHERT, Cira Centre 2929

Arch Street, Philadelphia, Pennsylvania 19104, on

Tuesday, April 8, 2014, beginning at approximately

9:07 a.m., the proceedings being recorded

stenographically by Gail Inghram Verbano, Registered

Diplomate Reporter, Certified Realtime Reporter,

Certified Shorthand Reporter-CA (No. 8635), and

transcribed under her direction.

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

2 (Pages 2 to 5)

**2**

APPEARANCES:

On Behalf of R. W. Sauder, Inc.:
    CHRISTINE LEVIN, ESQUIRE
    christine.levin@dechert.com
    DECHERT
    Cira Centre
    2929 Arch Street
    Philadelphia, Pennsylvania 19104-2808
    215.994.4000
On behalf of Krogers Co. and the witness:
    KEVIN J. MURRAY, ESQUIRE
    kmurray@kennynachwalter.com
    KENNY NACHWALTER
    1100 Miami Center
    201 South Biscayne Boulevard
    Miami, Florida 33131
    308.373.1000
On Behalf of Midwest Poultry Services, L.P.:
    KATHY L. OSBORN, ESQUIRE
    kathy.osborn@faegrebd.com
    FAEGRE BAKER DANIELS, LLP
    300 N. Meridian Street, Suite 2700
    Indianapolis, Indiana 46204
    317.237.8261

**3**

TELEPHONIC APPEARANCES:
On behalf of Indirect Purchase Plaintiffs:
    PAUL NOVAK, ESQUIRE
    pnovak@milberg.com
    MILBERG, LLP
    One Kennedy Square
    777 Woodward Avenue, Suite 890
    Detroit, Michigan 48226
    313.309.1763
On Behalf of Rose Acre Farms, Inc.:
    MOLLY S. CRABTREE, ESQUIRE
    mcrabtree@porterwright.com
    PORTER WRIGHT MORRIS & ARTHUR, LLP
    41 South High Street
    Columbus, Ohio 43215-6194
    614.227.2015
On behalf of Michael Foods, Inc.:
    SHARON R. MARKOWITZ, ESQUIRE
    sharon.markowitz@stinsonleonard.com
    STINSON LEONARD & STREET
    150 South Fifth Street
    Suite 2300
    Minneapolis, Minnesota 55402
    612.335.1500
ALSO PRESENT: William Verbano, Videographer

**4**

C O N T E N T S

WITNESS:                                    PAGE
PAYTON PRUETT
    By Ms. Levin                            10
    By Mr. Murray                           251

E X H I B I T S

EXHIBIT          DESCRIPTION              PAGE
Exhibit 1    Acknowledgment of Receipt of the    19
             Protective Order Governing
             Confidential Discovery Material
             signed by Mr. Pruett
Exhibit 2    Notice of Deposition        20
Exhibit 3    Letter from PETA to J. Pichler,    64
             10-30-00; KRGEG-20496 to 498
Exhibit 4    Letter from L. Marmer to S.    72
             Gifford, 11-3-00; KRGEG-20500 to
             501
Exhibit 5    Letter from PETA to L. Marmer,    77
             11-13-2000; KRGEG-20490 to 493
Exhibit 6    Blank form letter from D. Penick,    85
             11-14-20; KRGEG00020502 through 03
Exhibit 7    Memo from L. Marmer to J. Pichler,    90
             1-8-01; KRGEG00020412 to 14

**5**

EXHIBIT          DESCRIPTION              PAGE
Exhibit 8    The Kroger Co. press release,    102
             7-3-01
Exhibit 9    Letter from PETA to L. Marmer,    105
             9-27-01; PETA65 to 66
Exhibit 10   Email communication, 2-20-02;    110
             FMI-2427 to 429
Exhibit 11   Email communication, 2-20-02;    119
             FMI-2422 to 424
Exhibit 12   Email communication; FMI-1078 to    124
             079
Exhibit 13   PETA news release, 5-21-02;    129
             FMI-1297
Exhibit 14   The Kroger Co. news release,    133
             5-31-02
Exhibit 15   Letter from C. Guerrett to B.    152
             Krouse, 5-26-04; KRGEGED-11562 to
             569
Exhibit 16   Kroger RFP, 12-1-03; KRGEG-18733    154
             to 738
Exhibit 17   Direct Action (Non-Class)    157
             Plaintiff The Kroger Company's
             Supplemental Responses to
             Defendant's First Set of
             Interrogatories

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Pruett, Payton                                          April 8, 2014

3 (Pages 6 to 9)

6

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | Agreement between the Kroger Co. and Rose Acre Farms, 2-4-07; KRGEG-19391 to 394 | 162 |
| Exhibit 19 | Agreement between the Kroger Co. and Rose Acre Farms, 4-27-08; KRGEGED-13093 to 096 | 162 |
| Exhibit 20 | Nondisclosure agreement between The Kroger Co. and Cal-Maine Foods, 1-30-07; CM-404142 to 147 | 162 |
| Exhibit 21 | Agreement between the Kroger Co. and Cal-Maine Foods, 4-2-7-08; KRGEG-18820 to 823 | 162 |
| Exhibit 22 | Agreement between the Kroger Co. and NuCal Foods, 5-1-10; KRGEG-19244 to 248 | 162 |
| Exhibit 23 | Agreement between the Kroger Co. and National Food Corp., 2-4-07; KRGEG-19290 to 291 | 162 |
| Exhibit 24 | Agreement between the Kroger Co. and Moark, LLC, 2-4-07; KRGEG-19185 to 199 | 162 |
| Exhibit 25 | Agreement between the Kroger Co. and Midwest Poultry Services, 2-1-04; KRGEG-19143 to 147 | 162 |

7

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | Guidelines for Laying Hens Standards; KRGEG00017271 to 287 | 167 |
| Exhibit 27 | Email communication, 2-11-08, with attachment; KRGEGED-10809 to 810 | 174 |
| Exhibit 28 | Email communication, 4-24-08; KRGEGED-10849 | 180 |
| Exhibit 29 | Kroger Animal Welfare Panel mission statement; KRGEG-17072 | 182 |
| Exhibit 30 | Email communication, 10-6-08; KRGEGED-10794 to 795 | 186 |
| Exhibit 31 | Agenda for Kroger Animal Welfare Panel meeting, 12-16-08; KRGEG-17070 to 071 | 189 |
| Exhibit 32 | Minutes for Kroger Animal Welfare Panel meeting, 12-16-08; KRGEG-17241 to 242 | 189 |
| Exhibit 33 | Letter from J. Kolenski to B. Krouse, 11-16-09; MPS-123670 | 213 |
| Exhibit 34 | Letter from J. Kolenski to R. Deffner, 4-7-10; KRGEGED-082 | 216 |
| Exhibit 35 | Email communication, 3-10-10; KRGEGED-20416 to 417 | 218 |

8

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 36 | Schedule 14A Information, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 | 227 |
| Exhibit 37 | Second Amended Complaint and Demand for Jury Trial | 230 |
| Exhibit 38 | Handwritten notes of Mr. Pruett | 236 |
| Exhibit 39 | Kroger 2009 Sustainability Report | 242 |
| Exhibit 40 | Kroger 2013 Sustainability Report | 242 |

9

1    Philadelphia, Pennsylvania
2    Tuesday, April 8, 2014; 9:07 a.m.
3        THE VIDEOGRAPHER:  We are going on the
4    record at 9:07 on Tuesday, April 8th, 2014.  This
5    is Volume 1, Disk 1 of the videotaped deposition of
6    Payton Pruett, taken by the defendants in the matter
7    of Processed Egg Products Antitrust Litigation,
8    MDL No. 2002 08-md-02002.  Filed in the United
9    States District Court, Eastern District of
10   Pennsylvania.
11       This deposition is being held at the Law
12   Offices of Dechert, LLP, Cira Centre, 2929 Arch
13   Street in Philadelphia, Pennsylvania.
14       My name is William Verbano, representing
15   Henderson Legal Services of Washington, D.C., and
16   I'm the legal video specialist.  The court reporter
17   today is Gail Verbano, also for Henderson Legal
18   Services.
19       Counsel will now state their appearance
20   and affiliation for the video record.
21       MS. LEVIN:  I'm Christine Levin of
22   Dechert, LLP.  And I'm appearing on behalf of
23   R.W. Sauder, Inc.
24       MS. OSBORN:  Kathy Osborn of Faegre
25   Baker Daniels, and I'm appearing on behalf of

## HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

---

**10**

1  Midwest Poultry Services.
2       MR. MURRAY:  Kevin Murray from Kenny
3  Nachwalter, representing the Kroger Company and the
4  witness, Mr. Payton Pruett.
5       MS. CRABTREE:  Molly Crabtree of Porter
6  Wright for defendant Rose Acre Farm.
7       MS. MARKOWITZ:  This is Sharon Markowitz
8  for Michael Foods on the phone.
9       THE VIDEOGRAPHER:  The court reporter
10  will now swear in the witness.
11              -  -  -
12       PAYTON PRUETT, having first been duly
13  sworn according to law, was examined and testified
14  as follows:
15              -  -  -
16            EXAMINATION
17  BY MS. LEVIN:
18       Q.  Would you state your name for the
19  record, please.
20       **A.  Payton Pruett.**
21       Q.  Mr. Pruett, have you ever had your
22  deposition taken before?
23       **A.  I have.**
24       Q.  How many times?
25       **A.  Once.**

---

**11**

1       Q.  In what connection?
2       **A.  My former employer, ConAgra Foods.**
3       Q.  What sort of case was the deposition?
4       **A.  It dealt with a food-processing**
5  **technology.**
6       Q.  And what were -- was it a patent case?
7       **A.  It was a patent case.**
8       Q.  How long ago was that?
9       **A.  10 or 11 years ago.**
10       Q.  I would -- we'll review just a few of
11  the rules.  I'm sure your counsel has reviewed them,
12  but no harm in a second round.
13       The first is we can't talk at the same
14  time because the court reporter is taking down what
15  we're saying.  So I'm as guilty of this as anybody,
16  but we'll try to avoid talking over each other.
17       The second is I need an oral response.
18  So nods of the head, waving of the hands doesn't
19  work.  It needs to be something oral that the
20  reporter can take down.
21       If at any point you want to take a
22  break, we can take a break.  As the court reporter
23  has advised us, the tape runs for about two hours.
24  And so if we can go that long, we'll go that long.
25  But if you need to take a break for any reason, the

---

**12**

1  only thing I would say is that if there's a question
2  pending, I would like for you to answer the question
3  before we take the break.
4       And last, if you can ask me to clarify
5  any question that you don't understand.  So if
6  there's some aspect of it, a word or a phrase,
7  you'll just ask me to either clarify it or we'll
8  have the court reporter read it back.
9       **A.  Okay.**
10       Q.  Okay?
11       By whom are you currently employed?
12       **A.  The Kroger Co.**
13       Q.  And how long have you been employed by
14  Kroger?
15       **A.  It will be nine years in May.**
16       Q.  So you began in 2005?
17       **A.  Correct.**
18       Q.  What was your first position with
19  Kroger?
20       **A.  My current position, vice president of**
21  **corporate food technology and regulatory compliance.**
22       Q.  Corporate?
23       **A.  Food technology and regulatory**
24  **compliance.**
25       Q.  And what does that job entail?

---

**13**

1       **A.  Primarily it is responsible for food**
2  **safety for our manufacturing and retail divisions,**
3  **regulatory compliance, product development for our**
4  **private label; occupational safety, responsibility**
5  **for our manufacturing plants; and quality assurance**
6  **for our private-label products produced by our**
7  **manufacturing plants as well as outside suppliers.**
8       Q.  And is that company-wide?
9       **A.  Yes.**
10       Q.  So is that for all the different
11  brands -- the banners, I'm sorry, the different
12  banners that Kroger --
13       **A.  For all our private-label banners;**
14  **correct.**
15       Q.  And for all the different banner
16  stores --
17       **A.  Yes.**
18       Q.  -- such as Dillons --
19       **A.  Yes.**
20       Q.  -- or King Soopers?
21       Tell me a little bit about regulatory
22  compliance and exactly what that entails.
23       **A.  That means adherence to the law, the**
24  **food laws; and in cases where it involves general**
25  **merchandise, same thing.**

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

5 (Pages 14 to 17)

---

**14**

Q. But it doesn't entail any sort of responsibility, for example, for compliance with animal welfare guidelines?

A. That would fall under regulatory compliance within quality assurance and food safety.

Q. So you do have some involvement with compliance with the animal --

A. I do. I do have some involvement.

Q. We've got to slow down.

You have involvement with ensuring compliance with animal welfare guidelines?

A. I do.

Q. Does that include animal welfare guidelines pertaining to egg-laying hens?

A. Yes.

Q. What is your responsibility in that regard?

A. To make sure our suppliers are adhering to industry best practices.

Q. What are those industry best practices?

A. Relative to egg layers, it would the UEP guidelines.

Q. And you have had this responsibility since 2005; is that correct?

A. Correct.

---

**15**

Q. Since 2005, has Kroger required all of its suppliers of eggs and egg products -- well, take it first with eggs -- shell eggs to comply with the UEP guidelines?

A. Yes.

Q. And has it required all of the suppliers of egg products to comply with the UEP guidelines?

A. Yes.

Q. Do you understand -- I guess I should make sure we're talking about the same thing with respect to egg products.

Have you reviewed the Complaint in this litigation?

A. I have.

Q. And are you familiar with the definition used in the Complaint for egg products?

A. To the best of my knowledge.

Q. Let's just make sure we are talking about the same thing.

Is it your understanding that egg products consist of eggs that have been removed from the shell and include whole eggs, whites, yokes and various blends that may include some non-egg ingredients that are processed and sold in liquid, frozen, and dried forms?

---

**16**

A. Yes.

Q. What does Kroger do to ensure compliance with the UEP guidelines with respect to egg-laying hens?

A. They require our suppliers to prove that they have adhered to these guidelines at least once a year by submission of an audit.

Q. An audit by whom?

A. By a third-party provider, our auditing company. They select.

Q. An auditing company that who selects?

A. The egg supplier.

Q. So the egg supplier selects an auditing company, and you require that the egg supplier provide you with the results of the audit?

A. Correct.

Q. And that continues to this day?

A. Yes.

Q. Why does Kroger require its egg suppliers to comply with the UEP guidelines?

A. Because it's the industry standard, just like all of our suppliers who are involved in animal products; we -- whether it's cattle, pork, chickens, egg layers, they need to adhere to industry standards for best practices for animal welfare and

---

**17**

husbandry.

Q. And when you say "industry standards," what industry are you speaking of?

A. I'm speaking of all industries overall. But each industry has standards in place that they work against.

Q. I guess what I'm getting at, is this a retail grocery industry standard?

A. It can be. It's typically a standard that has been created by scientists and experts, industry experts within that industry.

Q. In this particular case, I really want to focus on welfare guidelines as they pertain to egg-laying hens.

So is it your understanding that the guidelines, the UEP guidelines that Kroger requires its suppliers of eggs to abide by are guidelines that are created by scientists on behalf of -- what industry?

A. The egg-laying -- the egg-layer industry.

Q. But it's your understanding that those guidelines were created by scientists?

A. Correct.

Q. And has Kroger independently evaluated

---

Henderson Legal Services, Inc.

202-220-4158

www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

6 (Pages 18 to 21)

---

18

1  whether those guidelines are adequate to ensure
2  animal welfare?
3      **A. We have had third-party experts evaluate**
4  **the guidelines.**
5      Q. And what have those third-party experts
6  concluded?
7      **A. They indicate that they're adequate.**
8      Q. So they have concluded that the animal
9  welfare guidelines promulgated by UEP are adequate
10 to ensure animal welfare?
11     **A. Correct.**
12     Q. Did you have any involvement with the
13 development of the UEP guidelines?
14     **A. No.**
15     Q. Were those already in place by the time
16 you came to Kroger?
17     **A. Yes.**
18     Q. What was your job prior to Kroger?
19     **A. I was senior director of food safety at**
20 **ConAgra Foods.**
21     Q. How long were you in that position?
22     **A. Just over five years.**
23     Q. So roughly from 2000?
24     **A. Uh-huh -- yes.**
25     Q. In that position, did you have any

---

19

1  responsibility for animal welfare guidelines as they
2  would pertain to egg-laying hens?
3      **A. No.**
4      Q. Did you learn anything about what was
5  going on in the industry with respect to the
6  development of such guidelines while you were at
7  ConAgra Foods?
8      **A. No.**
9      Q. So was the first that you became aware
10 of the UEP guidelines for egg-laying hens your
11 employment by Kroger?
12     **A. Yes.**
13     MS. LEVIN: Let's take just one moment
14 to mark as Exhibit Kroger 1 a copy of Mr. Pruett's
15 acknowledgment of receipt of the protective order
16 governing confidential discovery material.
17     (Kroger Exhibit 1 was marked for
18 identification.)
19 BY MS. LEVIN:
20     Q. Mr. Pruett, can you take a look at
21 Plaintiff's Exhibit -- sorry -- Exhibit Kroger 1.
22     **A. Yes.**
23     Q. Is that your signature on Kroger 1?
24     **A. Yes.**
25     Q. And have you, in fact, reviewed the case

---

20

1  management order pertaining to the handling of
2  confidential material in this litigation?
3      **A. Yes.**
4      Q. And you understand it?
5      **A. Yes.**
6      Q. Let's mark as Exhibit Kroger 2 a copy of
7  the deposition notice.
8      (Kroger Exhibit 2 was marked for
9  identification.)
10 BY MS. LEVIN:
11     Q. Mr. Pruett, have you had a chance to
12 review Exhibit Kroger 2?
13     **A. Yes.**
14     Q. What is Exhibit Kroger 2?
15     **A. It's the deposition notice.**
16     Q. Have you seen the list of topics that
17 begin on Page 4 of the deposition notice?
18     **A. Yes.**
19     Q. You understand today that you are
20 testifying on behalf of Kroger Corporation with
21 respect to certain of these topics?
22     **A. Yes.**
23     Q. Can you tell me which topics you're
24 testifying with respect to.
25     **A. 1G, 13, 14, 16, 18, 19, 20, 21, 22, 23,**

---

21

1  **26, 27, 34, 35, 36 and 37.**
2      Q. Let's begin with Topic 13. And that
3  topic asks -- lists a couple of issues pertaining to
4  Kroger's corporate structure; is that correct?
5      **A. Yes.**
6      Q. What is Kroger's business?
7      **A. We are a grocery retailer.**
8      Q. And I understand that Kroger has a
9  couple of other sidelines relating to things such as
10 jewelry; is that correct?
11     **A. That is correct.**
12     Q. We're focusing on the retail grocery
13 part of the deposition today; okay?
14     **A. Correct.**
15     Q. I'm not interested in the other
16 businesses.
17     Is Kroger publicly held?
18     **A. Yes.**
19     Q. And is it important to Kroger that its
20 public statements be accurate?
21     **A. Yes.**
22     Q. Is it important to Kroger that its
23 public statements be truthful?
24     **A. Yes.**
25     Q. Why is that?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

7 (Pages 22 to 25)

---

**22**

1     A.  Because it's part of the integrity of
2  our business and how we want to reflect how we do
3  business to our customers.
4     Q.  So you expect customers to review public
5  statements and rely upon them?
6     MR. MURRAY:  Object to the form of the
7  question; calls for speculation.
8  BY MS. LEVIN:
9     Q.  Kroger expects consumers to review and
10  rely upon its public statements; is that correct?
11     MR. MURRAY:  Same objection.
12     You can answer if you know.
13     THE WITNESS:  I don't know the guidance
14  in that manner.  It's just available for our
15  customers' review.
16  BY MS. LEVIN:
17     Q.  Okay.  What stores or banners does
18  Kroger operate under?
19     A.  Kroger; Ralphs; Fred Meyer; QFC, Quality
20  Food Centers; Dillons; Smith's; Baker's.
21     Q.  King Soopers?
22     A.  King Soopers.
23     Q.  That's eight.  Is that as many as you're
24  aware of?
25     A.  And now Harris Teeter.

---

**23**

1     Q.  Harris Teeter is a new one?
2     A.  Uh-huh.
3     Q.  Any others that you recall?
4     A.  That is all I recall.
5     Q.  What about Food 4 Less?
6     A.  Yes.
7     Q.  That's also a banner that Kroger
8  operates under?
9     A.  Yes.  Food 4 Less in Southern
10  California; Food 4 Less in Chicago or in the
11  Midwest.
12     Q.  And what about City Market?
13     A.  City Market is part of King Soopers.
14     Q.  Do you know how many stores Kroger
15  operates, roughly?
16     A.  2650.
17     Q.  And other than Harris Teeter, has Kroger
18  operated under the banners that you just listed for
19  the period 2000 until the present?
20     A.  To the best of my knowledge.
21     Q.  Do all of the stores that you've listed
22  sell shell eggs?
23     A.  Yes.
24     Q.  And do they all sell egg products?
25     A.  To the best of my knowledge.

---

**24**

1     Q.  Do you know whether those stores sell
2  eggs under a Kroger brand name or under their own
3  store name or something else?
4     A.  Both.
5     Q.  Okay.  So some stores have their own
6  brand?
7     A.  Could you repeat the question or
8  clarify.
9     Q.  Well, for example, does Dillons sell
10  under a Dillons brand?
11     A.  I don't know.
12     Q.  Do you know whether it sells under a
13  Kroger brand?
14     A.  It would sell under one of those brands.
15     Q.  So a store that sells under its own
16  brand doesn't also sell under a Kroger brand?
17     A.  Let me give you an example.
18     Q.  Okay.
19     A.  We have some divisions that may be named
20  one thing on the front of the store, but they could
21  sell a Kroger-branded product.
22     Q.  Right.
23     A.  Right.
24     Q.  So -- well, I won't use an example,
25  because it might not be an example of that.  But

---

**25**

1  they sell either the Kroger brand egg or their own
2  brand egg?
3     A.  Our private label; yes.
4     Q.  Right.  And do some of those stores sell
5  under a different brand name?
6     A.  They could carry a national-branded
7  product.
8     Q.  Such as?
9     A.  Egg Beaters.
10     Q.  That's for egg products.
11     What about for shell eggs?
12     A.  I cannot give you any examples of
13  national brand or regionally branded products.
14     Q.  Eggland's Best, is that an example of a
15  national brand that these stores might sell?
16     A.  I know it as a national brand, but I'm
17  not certain if it's sold in our stores.
18     Q.  Other than Harris Teeter, which you
19  mentioned, to your knowledge, all of these stores
20  have been operated by Kroger from 2000 to the
21  present?
22     A.  Yes.
23     Q.  When was Harris Teeter acquired?
24     A.  Officially January of 2014.
25     Q.  Are there any other mergers,

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

26

1  acquisitions, any corporate alteration and structure
2  that you're aware of since 2000?
3      A. There were a couple of minor
4  acquisitions. Schnucks stores -- I believe eight
5  stores in Memphis.
6      Q. What is Schnucks?
7      A. It's a retail grocery company.
8      Q. When did that take place?
9      A. I can't recall.
10     Q. In the time period since you've been at
11 Kroger?
12     A. Yes, yes.
13     Q. Any other acquisitions?
14     A. Farmer Jack's in Michigan.
15        That's all I remember.
16     Q. But was that acquisition made since you
17 became employed by Kroger?
18     A. Yes.
19     Q. And that's also a retail grocery chain?
20     A. Yes.
21     Q. And does Schnucks operate under the
22 Schnucks banner? Are they called Schnucks stores?
23     A. I believe they're under the Kroger
24 banner now.
25     Q. And what about Farmer Jack's?

27

1      A. I do not know.
2      Q. I believe that odd noise is someone in
3  the room next to us raising the shade. It's just a
4  guess.
5        I'd like to turn now to the animal
6  welfare program and topics -- really Topics 18
7  through 22, which deal with a variety of different
8  issues pertaining to the animal welfare program.
9        Can you tell me what you did to prepare
10 for these various topics, Topics 18 through 22,
11 today?
12     A. I reviewed a number of documents. I
13 consulted with my attorney, Kevin Murray; Kroger law
14 department; and a few of my colleagues.
15     Q. Can you tell me what types of documents
16 you reviewed.
17     A. I reviewed our fact book about just the
18 overall business, businesses that are run by Kroger.
19 I went back and reviewed the UEP guidelines.
20        Our sustainability report, the most
21 recent addition; the Complaint; the deposition
22 notice.
23     Q. What kind of information -- well,
24 anything else that you reviewed?
25     A. I reviewed the egg supplier list; our

28

1  quality specifications -- overall quality
2  specifications for eggs; some historical documents;
3  press releases; communications that were sent to our
4  suppliers prior to my arrival at Kroger regarding
5  this topic.
6      Q. Did you review any correspondence with
7  either an organization known as PETA or FMI?
8      A. Yes.
9      Q. You say you consulted with counsel, and
10 I don't want to dig in to that. But how long did
11 you meet with Mr. Murray?
12     A. Total, five hours.
13     Q. And how much time did you spend
14 reviewing the documents that you've described?
15     A. I'm guessing 12 hours.
16     Q. Who in the Kroger law department did you
17 speak with?
18     A. Gentleman named Phil Pugh.
19     Q. And was that for the purpose of
20 obtaining factual information so that you could
21 testify today?
22        MR. MURRAY: Object to the form of the
23 question.
24        You can answer.
25        THE WITNESS: I consulted Phil to

29

1  prepare for this deposition.
2  BY MS. LEVIN:
3      Q. And did he provide you with factual
4  information pertinent to the topics that you've
5  identified in Exhibit 1?
6      A. He and others --
7      Q. I'm sorry. Not Exhibit 1. Exhibit 2.
8      A. He and others in the organization.
9      Q. Is there anybody else in the law
10 department that you met with?
11     A. Not regarding this topic.
12     Q. About other topics? Did you meet with
13 someone in the law department on other topics?
14        Well, when I asked you if you met with
15 someone else in the law department, you said not on
16 this topic.
17     A. Right.
18     Q. So now I'm asking if you met with
19 someone different in the law department on other
20 topics.
21     A. I met with Phil to prepare specifically
22 for this deposition.
23     Q. And then you mentioned colleagues.
24 Which of your colleagues did you meet with?
25     A. Lynn Marmer.

HIGHLY CONFIDENTIAL

Pruett, Payton                                        April 8, 2014

9 (Pages 30 to 33)

---

**30**

1   Q. What is Ms. Marmer's position?
2   A. She's group vice president of corporate
3   affairs.
4   Q. And who else did you meet with?
5   A. Brendon Cull.
6   Q. What's Mr. Cull's position?
7   A. Senior director of government affairs.
8   Q. Did you meet with anybody else?
9   A. I met with John Kolenski.
10  Q. What is Mr. Kolenski's position?
11  A. Senior director of food safety and
12  regulatory compliance.
13  Q. Anybody else that you met with?
14  A. Tom Klump briefly.
15  Q. What is Mr. Klump's position?
16  A. I don't know his exact title. He's
17  involved in procurement and sourcing of egg
18  products.
19  Q. And shell eggs?
20  A. Shell eggs.
21  And one other person?
22  Q. Yes.
23  A. Carole Guerrette.
24  Q. What's Ms. Guerrette's position?
25  A. She's a quality assurance technologist.

---

**31**

1   Q. And that's all the people that you met
2   with to prepare for Topics 18 through 22 of
3   Exhibit 2?
4   A. Yes.
5   Q. Has Ms. Marmer held the position of
6   group vice president of corporate affairs for the
7   entire time period that you have been at Kroger?
8   A. Yes.
9   Q. And has Mr. Cull been the senior
10  director of government affairs for the entire time
11  that you've been at Kroger?
12  A. No.
13  Q. What was his prior position?
14  A. He was with the Ohio government,
15  governor's office. I can't tell you the exact
16  position.
17  Q. But for his entire time at Kroger, he's
18  been the senior director of government affairs?
19  A. No.
20  Q. No? That's really what I was trying to
21  get at. What was his prior position at Kroger?
22  A. Director.
23  Q. Just the director of government affairs?
24  A. Yes.
25  Q. Did he hold that position when you

---

**32**

1   arrived at Kroger in 2005?
2   A. No.
3   Q. What was his position prior to that?
4   A. He was not at Kroger.
5   Q. At the time you arrived at Kroger in
6   2005, was Mr. Cull the director of government
7   affairs?
8   A. No.
9   Q. I guess I'm having a hard time
10  understanding what his prior position was at Kroger.
11  A. He was not at Kroger.
12  Q. What was he at?
13  A. I came in 2005.
14  Q. Right.
15  A. He came in a year, year and a half after
16  I arrived. So 2006.
17  Q. And what was the position that he came
18  in as? the director of government affairs?
19  A. He came in initially as a contractor.
20  Q. What type of contractor?
21  A. I can't tell you exactly what that job
22  title was or what all of his responsibilities
23  entailed. But he did work for Lynn Marmer as a
24  contractor.
25  Q. What about Mr. Kolenski; was he the

---

**33**

1   senior director of food safety when you arrived at
2   Kroger in 2005?
3   A. No.
4   Q. Do you know what position he held?
5   A. He was senior manager of food safety.
6   Q. And Mr. Klump in 2005, was he involved
7   in procurement and sourcing of shell eggs and egg
8   products?
9   A. I don't know.
10  Q. What about Carole Guerrette; did she
11  have the position you described when you arrived at
12  Kroger in 2005?
13  A. Yes.
14  Q. How long did you spend with Ms. Marmer?
15  A. A half an hour.
16  Q. What did Ms. Marmer tell you?
17  A. She reviewed her involvement with FMI
18  regarding animal welfare matters.
19  Q. And can you be more specific about what
20  Ms. Marmer told you.
21  A. Well, more specifically, her involvement
22  and Kroger's involvement regarding egg-layer animal
23  welfare.
24  Q. What was her involvement with that?
25  A. She contacted or worked with the food

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

10 (Pages 34 to 37)

34

1  marketing institute to start engaging them in
2  discussions about animal welfare and opportunities
3  for the retail industry.
4      Q. So was Ms. Marmer acting on behalf of
5  Kroger at that time?
6      A. She was representing Kroger.
7      Q. And did Ms. Marmer encourage FMI to
8  develop animal welfare guidelines for egg-laying
9  hens?
10         MR. MURRAY: Object to the form of the
11  question.
12         THE WITNESS: She -- if you're asking --
13  could you repeat the question.
14  BY MS. LEVIN:
15      Q. Why don't you read it back.
16      (Record read.)
17         MR. MURRAY: Same objection.
18         THE WITNESS: She encouraged FMI to
19  bring retailers together to discuss standardization
20  of best practices, which were in development or
21  already developed.
22  BY MS. LEVIN:
23      Q. So Ms. Marmer thought it was important
24  for retailers to work together to develop animal
25  welfare guidelines for egg-laying hens?

35

1         MR. MURRAY: Object to the form of the
2  question.
3         THE WITNESS: She thought it was
4  important for FMI to start engaging retailers to
5  work with their suppliers to start talking about
6  animal welfare best practices overall.
7         The discussion did involve best
8  practices around egg-laying hens.
9  BY MS. LEVIN:
10      Q. And I would like for us to focus as much
11  as we can on those particular animal welfare
12  guidelines.
13         Do you understand we're not concerned
14  about animal welfare guidelines for cows and pigs
15  and that sort of thing in this litigation; correct?
16      A. Yes, but I just want to give you a view
17  that it wasn't just about egg-laying hens.
18      Q. I understand, and I appreciate that.
19  But I just want to make clear when I am asking the
20  questions, I am focusing on the animal welfare
21  guidelines for egg-laying hens, unless I say
22  otherwise, because it's a long phrase; and it's
23  going to make this deposition longer if I have to
24  say it every time.
25         Why did Kroger believe that it was

36

1  important for retailers to work together with
2  suppliers on this particular subject?
3         MR. MURRAY: Object to the form of the
4  question.
5         THE WITNESS: Because it's the right
6  thing to do.
7  BY MS. LEVIN:
8      Q. Did Ms. Marmer tell you that Kroger was
9  receiving pressure from other organizations,
10  animal-rights-type organizations to develop animal
11  welfare guidelines in general?
12         MR. MURRAY: Object to the form of the
13  question.
14         THE WITNESS: There was pressure, and
15  PETA was given as the primary example.
16  BY MS. LEVIN:
17      Q. What is PETA?
18      A. People for the Ethical Treatment of
19  Animals.
20      Q. Did Ms. Marmer describe to you the type
21  of pressure that PETA was placing on, presumably,
22  Kroger to develop or adopt some sort of guideline?
23      A. She gave me a view.
24      Q. What was her view?
25      A. That there was some pressure on the

37

1  company from activist groups, such as PETA; but
2  ultimately that wasn't the motivation for our
3  adopting UEP guidelines for our egg suppliers.
4      Q. The motivation was, as you said, it's
5  the right thing to do?
6      A. Correct.
7      Q. And it's the right thing for all
8  egg-laying hens to be treated humanely?
9      A. Yes.
10      Q. What else did Ms. Marmer tell you?
11      A. She just discussed with me the general
12  engagement with FMI, leadership, talked about a
13  committee or group of people she was working with to
14  drive this initiative of developing best practice
15  for egg layers.
16         And I understand that the dialogue
17  started early 2000s.
18      Q. The dialogue within FMI?
19      A. FMI and other retailers.
20      Q. Including Kroger?
21      A. Including Kroger.
22      Q. Did Ms. Marmer describe for you why she
23  thought it was important for FMI and the retail --
24  for FMI retailers and producers to work together to
25  develop animal welfare guidelines for egg-laying

HIGHLY CONFIDENTIAL

Pruett, Payton                                              April 8, 2014

11 (Pages 38 to 41)

---

**38**

1  hens?
2        A.  Yes.
3        Q.  What did she say?
4        A.  She said that they were aware of the
5  activity in the food service and restaurant industry
6  regarding development of animal welfare policies,
7  including those for egg layers.
8        And drawing from the experience of
9  companies like McDonald's and Burger King, they did
10 not want to take the retail industry, an
11 individualized approach, to developing their own --
12 each company developing its own welfare policies or
13 guidelines.
14       So FMI was working with retailers to be
15 more proactive so they could come up with a
16 standardized set of guidelines.  And, thus, or to
17 avoid what was going on in the food service and
18 restaurant industry.
19       Q.  Can you describe what was going on in
20 the restaurant industry?
21       A.  From what I understand, PETA and perhaps
22 some other activist groups were approaching each of
23 those companies to talk to them about their animal
24 welfare policies.
25       Q.  Were two of those companies McDonald's

---

**39**

1  and Burger King?
2        A.  Yes.
3        Q.  And what had McDonald's and Burger King
4  done in reaction to the approach by PETA?
5        A.  I can't tell you specifically.
6        Q.  But they had -- you understood from
7  Ms. Marmer that McDonald's and Burger King had
8  developed their own animal welfare guidelines?
9        MR. MURRAY:  Object to the form of the
10 question, lack of foundation.
11       THE WITNESS:  I can't tell you
12 specifically.
13 BY MS. LEVIN:
14       Q.  But Ms. Marmer's and Kroger's goal in
15 working with FMI was to try to develop something
16 that was standardized across retailers?
17       MR. MURRAY:  Object to the form of the
18 question.
19       THE WITNESS:  Yes.
20 BY MS. LEVIN:
21       Q.  And why did Ms. Marmer think that it was
22 important to have something that was standardized
23 across retailers?
24       A.  In my conversation with Lynn Marmer,
25 that approach made sense.  Rather than having this

---

**40**

1  patchwork of animal welfare standards across the
2  industry, why not have a best practices policy or
3  set of guidelines that the industry could work from?
4  It seemed to make a lot of sense.
5        Q.  Did Ms. Marmer also tell you that one
6  goal of hers or one thought behind having this
7  standard set of guidelines was to ensure that all
8  retailers faced the same costs and implementation of
9  the animal welfare guidelines?
10       A.  She did not.
11       Q.  What else did Ms. Marmer tell you?
12       A.  That is all.
13       Q.  Did Ms. Marmer tell you that a goal of
14 FMI and its retailer members was to develop animal
15 welfare guidelines that were science-based?
16       MR. MURRAY:  Objection to the form of
17 the question.
18       THE WITNESS:  Yes.
19 BY MS. LEVIN:
20       Q.  What did she tell you about that?
21       A.  That -- that they expected the industry
22 to use science-based -- use a science-based approach
23 to develop the guidelines, people, experts who knew
24 what they were doing in animal welfare.
25       Q.  Did she tell you that she believed that

---

**41**

1  that had been accomplished?
2        MR. MURRAY:  Object to the form of the
3  question.
4        THE WITNESS:  She told me that she
5  believed that the standards were in development or
6  were developed; and the understanding of FMI in many
7  retailers was that most -- well, most of the egg
8  suppliers were in the process of implementing or had
9  implemented these best practices in animal welfare.
10 BY MS. LEVIN:
11       Q.  But did Ms. Marmer tell you that FMI
12 recruited a committee of experts to help it develop
13 science-based guidelines?
14       MR. MURRAY:  Object to the form of the
15 question.
16       THE WITNESS:  I would like to take a
17 break.
18 BY MS. LEVIN:
19       Q.  I would ask that you --
20       MR. MURRAY:  You got to answer the
21 question.
22 BY MS. LEVIN:
23       Q.  -- answer the question first.
24       A.  I know in our conversation that there
25 were scientific experts or a panel involved.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

12 (Pages 42 to 45)

---

42

1      Q.  And that this was a panel that was
2  recruited by FMI; correct?
3      A.  To the best of my knowledge.
4          MS. LEVIN:  Do you want to take a break
5  now?
6          THE WITNESS:  I would like to.
7          MS. LEVIN:  Okay.  Sure.
8          THE VIDEOGRAPHER:  We are going off the
9  record.  The time on video is 9:52.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  We are going back on
12 the record.  Time on video is 10:02.
13 BY MS. LEVIN:
14     Q.  Mr. Pruett, did Ms. Marmer tell you that
15 it was Kroger's goal to have all retailers adopt the
16 UEP animal welfare guidelines?
17         MR. MURRAY:  Object to the form of the
18 question.
19         THE WITNESS:  She did not say that.
20 BY MS. LEVIN:
21     Q.  Did she say that it was her hope that
22 all retailers would adopt the animal welfare
23 guidelines?
24         MR. MURRAY:  Same objection.
25         THE WITNESS:  She did not say that.

---

43

1  BY MS. LEVIN:
2      Q.  Did you ask her either of those
3  questions?
4      A.  I did not.
5      Q.  But she did tell you that she thought
6  that it would be good for there to be a standard set
7  of best practices?
8      A.  Yes.
9      Q.  Did Ms. Marmer tell you that she had any
10 question today about whether the UEP guidelines
11 were, in fact, science-based guidelines for the
12 humane treatment of egg-laying hens?
13     A.  That was not in our conversation.
14     Q.  Did she give you any reason to doubt
15 whether the UEP guidelines are, in fact,
16 science-based guidelines for the humane treatment of
17 egg-laying hens?
18         MR. MURRAY:  Object to the form of the
19 question.
20         THE WITNESS:  Repeat the question.
21         (Record read.)
22         MR. MURRAY:  Same objection.
23         THE WITNESS:  What do you mean by
24 "doubt"?
25 BY MS. LEVIN:

---

44

1      Q.  I'm happy to use whatever definition of
2  "doubt" that you might like to use.
3          THE WITNESS:  That didn't come up in our
4  conversation.
5  BY MS. LEVIN:
6      Q.  So you have no reason to believe that
7  Kroger doubts that the UEP guidelines are
8  science-based guidelines for the humane treatment of
9  egg-laying hens?
10         MR. MURRAY:  Object to the form of the
11 question.
12         THE WITNESS:  I have no doubt that the
13 experts working with the egg-layer industry who were
14 responsible for developing those guidelines would
15 doubt their scientific validity.
16 BY MS. LEVIN:
17     Q.  So you believe that the experts that
18 were involved with the development of the UEP animal
19 welfare guidelines were, in fact, experts in the
20 industry?
21     A.  To the best of my knowledge.
22     Q.  And Ms. Marmer gave you no reason to
23 question that, did she?
24         MR. MURRAY:  Object to the form of the
25 question.

---

45

1          THE WITNESS:  I don't know how I would
2  have gotten that from Lynn Marmer.
3  BY MS. LEVIN:
4      Q.  You understand that FMI had its own
5  panel of experts who were involved in the
6  development of or in the approval of the UEP animal
7  welfare guidelines; is that correct?
8      A.  Yes.
9      Q.  And I understand that today -- or do I
10 understand correctly that today Kroger has its own
11 panel of experts with respect to animal welfare
12 guidelines?
13     A.  Yes.
14     Q.  And that panel also addresses issues
15 pertaining to egg-laying hens; is that correct?
16     A.  Occasionally.
17     Q.  But that's part of its charge?
18     A.  Yes.
19     Q.  Has that panel of experts given you any
20 reason to doubt that the UEP animal welfare
21 guidelines are, in fact, science-based?
22     A.  No.
23     Q.  Has that panel made any suggestions to
24 you for amendments to the existing UEP animal
25 welfare guidelines?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                          April 8, 2014

13 (Pages 46 to 49)

---

**46**

1      A. Not to the best of my knowledge.
2      Q. Has that panel given any indication to
3   Kroger over the period of its existence that the UEP
4   animal welfare guidelines were anything other than
5   science-based guidelines for the humane treatment of
6   egg-laying hens?
7          MR. MURRAY: Object to the form of the
8   question.
9          THE WITNESS: I do not remember the
10  panel ever giving any indication that the UEP
11  guidelines were not adequate.
12  BY MS. LEVIN:
13     Q. Did you speak with any members of that
14  panel to prepare for your testimony today?
15     A. I did not.
16     Q. Let's talk a little bit about Mr. Cull,
17  who I believe you said was the senior director of
18  government affairs at Kroger; is that correct?
19     A. Yes.
20     Q. How long did you speak with Mr. Cull?
21     A. About a half an hour.
22     Q. What did Mr. Cull tell you?
23     A. Mr. Cull and I just discussed the state
24  of animal welfare, best practices and policies since
25  his time at Kroger.

---

**47**

1      Q. And what did he tell you about that?
2      A. It was a general conversation.
3      Q. I understand it was general.
4      A. Right; right.
5      Q. I'd like to know generally what he said.
6      A. Most of the conversation was about other
7   concerns in animal welfare since he joined the
8   company.
9      Q. What do you mean by "other concerns in
10  animal welfare"? And specifically as they relate to
11  egg-laying hens.
12     A. He could only speak about shareholder
13  proposals since 2006 that had involved egg laying or
14  egg layer animal welfare concerns.
15     Q. Has Kroger, in fact, received
16  shareholder proposals since 2006 relating to the
17  treatment of egg-laying hens?
18     A. They have.
19     Q. What are those proposals -- who has
20  submitted those proposals?
21     A. I believe all of the proposals have come
22  from HSUS.
23     Q. What have those proposals been?
24     A. I cannot remember the specific content
25  of the proposals.

---

**48**

1      Q. Can you remember generally what HSUS has
2   proposed to Kroger?
3      A. Other than encouraging our company to
4   continue to move forward with the industry best
5   practices around those described in the UEP
6   guidelines, I can't remember any other concerns or
7   issues in those proposals.
8      Q. I'd like to go back to Ms. Marmer for
9   just a minute.
10         What are her job responsibilities, do
11  you know, generally?
12     A. She's over external communications,
13  company communications. She also has responsibility
14  for our customer comments, or Customer Connect is
15  what it's called.
16     Q. What is Customer Connect?
17     A. It's a place where we receive customer
18  feedback.
19     Q. Okay. And is that a vehicle a customer
20  might use to inquire or encourage compliance with
21  animal welfare guidelines of some sort?
22     A. Not --
23         MR. MURRAY: Object to the form of the
24  question; calls for speculation.
25         You can answer.

---

**49**

1          THE WITNESS: Not generally.
2   BY MS. LEVIN:
3      Q. What sort of -- what is Customer
4   Connect, then?
5      A. It's our 1-800 number. So you have
6   individuals who get calls from customers when they
7   have complaints.
8      Q. What else is Ms. Marmer's -- does
9   Ms. Marmer's job entail?
10     A. Well, she has government affairs.
11     Q. And what does that include?
12     A. Government lobbying.
13     Q. Did Ms. Marmer describe whether any of
14  her -- did Ms. Marmer state whether she had engaged
15  in any kind of lobbying efforts relating to animal
16  welfare guidelines?
17     A. She did not.
18     Q. Did you ask?
19     A. I did not.
20     Q. What else is part of Ms. Marmer's job
21  portfolio?
22     A. She also deals with charitable giving.
23     Q. Anything else?
24     A. Those are her main responsibilities.
25     Q. Have you -- do you have any kind of

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

14 (Pages 50 to 53)

---

50

1  reporting relationship with Ms. Marmer?
2      **A. I do not.**
3      Q. Have you had any cause to work with her
4  on any matters since you became employed by Kroger?
5      **A. Yes.**
6      Q. Have you found Ms. Marmer to be accurate
7  in her representations to you?
8      MR. MURRAY: Object to the form of the
9  question.
10      THE WITNESS: To the best of my
11  knowledge.
12  BY MS. LEVIN:
13      Q. And you've found Ms. Marmer to be
14  truthful in her representations?
15      MR. MURRAY: Object to the form of the
16  question.
17      THE WITNESS: I trust Ms. Marmer as an
18  executive of the company. I have no reason not to
19  believe the veracity of her statement.
20  BY MS. LEVIN:
21      Q. And it would be important, wouldn't it,
22  for someone in charge of external communications to
23  be truthful and honest?
24      MR. MURRAY: Objection; calls for
25  speculation.

---

51

1      You can answer.
2      THE WITNESS: In my opinion, yes.
3  BY MS. LEVIN:
4      Q. Let's go back to Mr. Cull. You said
5  you're not really sure what types of proposals HSUS
6  may have made to Kroger at shareholder meetings; is
7  that correct?
8      **A. Yes.**
9      Q. So what else did Mr. Cull talk with you
10  about?
11      **A. Relative to egg-layer animal welfare**
12  **husbandry, that was it.**
13      Q. Did Mr. Cull describe for you any types
14  of regulatory actions that various states may have
15  taken with respect to animal welfare guidelines?
16      **A. No.**
17      Q. He didn't discuss with you the
18  proposition in California in 2008 pertaining to
19  cage-free eggs?
20      **A. It may have briefly come up in our**
21  **conversation.**
22      Q. So do you recall anything else that
23  Mr. Cull said to you?
24      **A. Not relative to this issue.**
25      Q. Relative to some other issue?

---

52

1      **A. Other animal welfare activities.**
2      Q. Were those other animal welfare
3  activities pertaining to egg-laying hens?
4      **A. No.**
5      Q. What do you recall that he told you
6  about these other animal welfare activities?
7      **A. Do you want me to discuss any animal**
8  **welfare activities outside of egg layers?**
9      Q. Do I want you to discuss that? I'd just
10  like to get a general idea of what Mr. Cull told you
11  about those other activities.
12      **A. We talked about controlled-atmosphere**
13  **killing for broilers. We discussed gestation crates**
14  **for hogs.**
15      Q. Anything else?
16      **A. That is all I remember.**
17      Q. Did you review any documents with
18  Mr. Cull?
19      **A. No.**
20      Q. Did Mr. Cull say whether he had reviewed
21  any documents before meeting with you?
22      **A. I don't remember that in our**
23  **conversation.**
24      Q. Did you review any documents with
25  Ms. Marmer in the time that you spent with her?

---

53

1      **A. I did.**
2      Q. What documents did you review with
3  Ms. Marmer?
4      **A. A letter from her to PETA in 2000; some**
5  **correspondence from PETA to our former CEO, Joe**
6  **Pichler, in 2001; and a 2002 press release.**
7      Q. Those are the only documents you
8  reviewed with Ms. Marmer; is that correct?
9      **A. That is all I remember.**
10      Q. How much time did you spend with
11  Mr. Kolenski preparing?
12      **A. An hour.**
13      Q. What did you learn from Mr. Kolenski?
14      **A. Our conversation was similar to the one**
15  **that I had with Brendon Cull.**
16      **We discussed this complaint, but we also**
17  **ended up discussing what has happened since I've**
18  **joined the company, 2005, with animal welfare**
19  **activities in general.**
20      Q. And what did Mr. Kolenski tell you had
21  happened since 2005?
22      **A. What I remember from the conversation is**
23  **that relative to this topic, we are continuing to**
24  **ask our suppliers to adhere to the UEP guidelines.**
25      Q. Did Mr. Kolenski tell you why Kroger

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

15 (Pages 54 to 57)

---

**54**

1    continues to ask suppliers to adhere to the UEP
2    guidelines?
3        **A. I don't remember that specifically**
4    **coming up in our conversation.**
5        Q. So you didn't ask him why Kroger
6    continues to ask suppliers to adhere to
7    UEP guidelines?
8        **A. I did not ask that question.**
9        Q. What else did you and Mr. Cull discuss?
10       MR. MURRAY: Cull or Kolenski?
11       MS. LEVIN: Kolenski. I'm sorry.
12       MR. MURRAY: You're switching between
13   people here.
14   BY MS. LEVIN:
15       Q. Kolenski.
16       **A. Other animal welfare activities.**
17       Q. Pertaining to egg-laying hens?
18       **A. No.**
19       Q. Do you recall anything else in your
20   discussion with Mr. Kolenski about animal welfare
21   guidelines pertaining to egg-laying hens?
22       **A. I do not.**
23       Q. How long was your meeting with
24   Mr. Klump?
25       **A. 20 minutes.**

---

**55**

1        Q. What did you discuss with Mr. Klump?
2        **A. Just some of his history around his**
3    **responsibilities for procuring egg and egg products.**
4        Q. What did Mr. Klump tell you?
5        **A. He just provided a general history of**
6    **his responsibilities.**
7        Q. And what were those responsibilities?
8        **A. That in the last few years he has been**
9    **responsible for sourcing egg -- shell egg and egg**
10   **products.**
11       Q. What more did Mr. Klump tell you?
12       **A. At a very high level, he talked about**
13   **pricing, you know, their approach to some models**
14   **around cost.**
15       Q. Anything else that you recall from your
16   conversation with Mr. Klump?
17       **A. No.**
18       Q. Did Mr. Klump tell you whether Kroger
19   required its shell egg and egg product producers to
20   comply with the UEP animal welfare guidelines?
21       **A. I don't remember that specifically**
22   **coming up in our conversation.**
23       Q. What was your purpose in speaking with
24   Mr. Klump?
25       **A. Just to better understand his overall**

---

**56**

1    responsibilities in egg procurement.
2        Q. Can you tell me about your conversation
3    with Ms. Guerrette.
4        **A. Yes.**
5        Q. How long did that take?
6        **A. About a half an hour.**
7        Q. What did you learn from Ms. Guerrette?
8        **A. That Carole has been involved with eggs**
9    **for about 10 years.**
10       Q. In what regard has Ms. Guerrette been
11   involved with eggs?
12       **A. Quality assurance.**
13       Q. What does that entail?
14       **A. Ensuring that eggs meet our**
15   **specifications, our quality specifications.**
16       Q. Is part of her job to ensure that your
17   suppliers are complying with the UEP animal welfare
18   guidelines?
19       **A. No.**
20       Q. What quality-assurance-type issues does
21   Ms. Guerrette address?
22       **A. Egg size, color, number of defects.**
23       Q. Anything else?
24       **A. Transport temperatures.**
25       Q. Anything else?

---

**57**

1        **A. Any customer complaints around the**
2    **quality of the eggs.**
3        Q. Anything else?
4        **A. No.**
5        Q. Did you learn anything from
6    Ms. Guerrette concerning the animal welfare
7    guidelines?
8        **A. That she's not involved.**
9        Q. Okay. Do -- does Mr. Kolenski have any
10   reporting relationship with you?
11       **A. Yes.**
12       Q. And what is that?
13       **A. He reports directly to me.**
14       Q. Who else reports directly to you?
15       **A. Define "directly."**
16       Q. Well, I'll use your definition again.
17       **A. John reports -- I do his performance**
18   **review.**
19       Q. We can use that as a way of evaluating.
20   Anybody else that you do a performance review for?
21       **A. Carole Guerrette.**
22       Q. Anybody else?
23       **A. I have a large department.**
24       Q. Well, if you could describe generally,
25   how many people are in your department?

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

## 58

A. 65.

Q. And they all report to you?

A. Not directly, but ultimately.

Q. But ultimately. And what do those 65 people do? And I don't want it one by one. But just generally, what does the department do?

A. I described that at the beginning of the deposition.

Q. So the department assists you in facilitating the job responsibilities that you described --

A. Yes.

Q. -- at the beginning?

Have Ms. Guerrette and Ms. Kolenski reported to you directly since you were first employed by Kroger?

A. No.

Q. When did Mr. Kolenski begin to report to you?

A. When I started at Kroger.

Q. Okay. And he's reported to you throughout your employment by Kroger?

A. Yes.

Q. When did Ms. Guerrette begin to report to you?

## 59

A. January of this year.

Q. Did her job position change in January?

A. No.

Q. Just a change in reporting requirements?

A. Yes.

Q. To whom do you report?

A. Erin Sharp.

Q. Who is Mr. Sharp?

A. Mrs.

Q. Ms. Sharp. Okay.

A. She's group vice president.

Q. What do you mean by "group vice president"?

A. Of manufacturing.

Q. What are Ms. Sharp's responsibilities?

A. She's over our 37 manufacturing plants.

Q. Does Kroger produce any of its own -- any of the eggs that it sells?

A. No.

Q. So Kroger procures all of its shell eggs and egg products from outside sources?

A. Yes.

Q. Did you discuss with Ms. Marmer or with any of these individuals what specific animal welfare practices with respect to egg-laying hens

## 60

were important to Kroger in 2000?

MR. MURRAY: Object to the form of the question.

THE WITNESS: Could you repeat the question.

(Record read.)

THE WITNESS: We didn't talk about specific requirements. We just talked about the UEP requirements overall.

BY MS. LEVIN:

Q. Do you know what particular animal welfare practices were of concern to Kroger in 2000?

A. Not all of them.

MR. MURRAY: Object to the form of the question.

BY MS. LEVIN:

Q. Do you know some of them?

A. The only one that I specifically know of, just based on conversations and documentation -- conversations I had, documentation I reviewed was those around egg layers.

Q. But in particular, what were the issues, the animal welfare issues pertaining to egg layers that were of importance to Kroger?

MR. MURRAY: Objection; asked and

## 61

answered.

THE WITNESS: The UEP requirements.

BY MS. LEVIN:

Q. Well, do you know whether cage-space requirements were an issue that was important to Kroger?

MR. MURRAY: Objection; asked and answered.

THE WITNESS: I wasn't with the company then, so I can't really tell you.

BY MS. LEVIN:

Q. You didn't learn from Ms. Marmer whether that was an issue?

A. I learned from Ms. Marmer that all of the requirements relative to animal welfare were being considered.

Q. All of the requirements that ultimately found their way into the UEP animal welfare guidelines?

MR. MURRAY: Object to the form of the question.

THE WITNESS: Found their way into the guidelines. I need --

BY MS. LEVIN:

Q. Became a part of the guidelines.

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

---

**62**

A.  What was important to the company was that the industry was following the best practices that their experts developed.

Q.  So it was important to Kroger that the retail grocery industry have uniform requirements?

MR. MURRAY:  Object to the form of the question, mischaracterizes prior testimony.

BY MS. LEVIN:

Q.  Is that correct?

A.  It was important that our suppliers follow the best practices that they had created and started standardizing.

Q.  That who had created?

A.  The suppliers, the egg suppliers.

Q.  Well, you understood, did you not, that Kroger requested that FMI begin to review the issue of animal welfare in 2001; correct?

A.  May I review that document?

Q.  I'm asking whether you understood that.

A.  I understood that in the conversation I had with Lynn Marmer.

Q.  And you understood from your conversation with Ms. Marmer that FMI teamed up with NCCR to jointly address animal welfare issues; correct?

---

**63**

A.  That was brought up in our conversation.

Q.  And you understood that that is what happened in 2001 and 2002; correct?

A.  Yes.

Q.  And you understood from Ms. Marmer that, as of 2002, FMI and NCCR had been working with their members and leading animal welfare experts to develop science-based guidelines that will strengthen animal welfare practices across species; correct?

A.  That's what I understood.

Q.  So the guidelines that we're talking about were guidelines that were first initiated by FMI and NCCR together with their science -- together with their panel of experts; correct?

MR. MURRAY:  Object to the form of the question.

THE WITNESS:  How I understood it was that the scientific experts at FMI were evaluating guidelines that had already been created by the eggs businesses.

BY MS. LEVIN:

Q.  So if Kroger stated in a press release in 2002 that FMI and NCCR have been working with their members and leading animal welfare experts to

---

**64**

develop science-based guidelines that will strengthen animal welfare practices across species, that would not be correct?

MR. MURRAY:  Object to the form of the question.

THE WITNESS:  I don't know if it's correct or not.  I'm just telling you how I understand it.

BY MS. LEVIN:

Q.  Well, we'll go through some documents to see if we can bolster your recollection.

MS. LEVIN:  I'd like to mark as Exhibit 3 a document bearing Bates No. KRGEG00020496 through 20498.

(Kroger Exhibit 3 was marked for identification.)

BY MS. LEVIN:

Q.  If you could take a minute to review Exhibit 3.

A.  I've reviewed this document.

Q.  You've had a chance to review Exhibit 3?

A.  Yes.

Q.  What is Exhibit 3?

A.  It is a letter from PETA to our former CEO.

---

**65**

Q.  Dated October 30, 2000; is that correct?

A.  Yes.

Q.  Did you discuss this letter -- did you discuss Exhibit 3 with Ms. Marmer when you met with her?

A.  I don't remember this specific letter.

Q.  But you discussed similar letters from PETA with Ms. Marmer?

A.  I remember letters from PETA but not this one.

Q.  Okay.  Does reviewing this letter at all refresh your recollection about whether McDonald's had adopted its own industry -- its own standards for dealing with egg-laying hens?

MR. MURRAY:  Object to the form of the question.

THE WITNESS:  I guess the issue I have with this letter, it's PETA's interpretation of what McDonald's is trying to do.

BY MS. LEVIN:

Q.  Well, I understand.  And we have some of Ms. Marmer's interpretations as well.  I'm just asking whether this refreshes your recollection at all in your discussions with Ms. Marmer or with anybody else that, in fact, McDonald's had

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                      April 8, 2014

---

66

1  instituted its own guidelines for egg-laying hens.
2       A. What I remember from the conversation
3  with Lynn Marmer is the discussion about McDonald's
4  and other food service companies being approached by
5  organizations like PETA and starting to develop
6  their own standards.
7  BY MS. LEVIN:
8       Q. Was it of concern -- well, do you know
9  whether McDonald's and other food service providers
10 were developing standards together, or were they
11 developing them separately?
12      MR. MURRAY: Objection; lack of
13 foundation.
14      THE WITNESS: What I remember from the
15 conversation with Lynn Marmer is that the food
16 service companies were working on individual
17 standards.
18 BY MS. LEVIN:
19      Q. And by "food service companies," you
20 mean McDonald's, for instance?
21      A. Yes.
22      Q. And Burger King perhaps?
23      A. Yes.
24      Q. And do you recall from your discussions
25 with Ms. Marmer that McDonald's and Burger King were

---

67

1  developing their standards separate and apart from
2  each other?
3       MR. MURRAY: Objection; lack of
4  foundation.
5       THE WITNESS: I don't know if they were
6  working together or not.
7  BY MS. LEVIN:
8       Q. What you did understand was that at
9  least McDonald's was developing its own regulations;
10 correct?
11      A. All I know in the conversation is that
12 they had developed their standards.
13      Q. "They" being McDonald's?
14      A. "They" being McDonald's.
15      Q. And you have no basis to dispute what is
16 said in Defendants' Exhibit 3 with respect to
17 McDonald's?
18      MR. MURRAY: Object to the form of the
19 question; lack of foundation.
20      THE WITNESS: I can't say whether this
21 is accurately representing McDonald's position.
22 It's from PETA.
23 BY MS. LEVIN:
24      Q. But you can't say that it's not
25 accurately representing McDonald's position, based

---

68

1  on the research you did to prepare for your
2  deposition today?
3       A. This specific document was not -- to the
4  best of my knowledge, I don't remember reviewing
5  McDonald's-specific standards.
6       Q. I understand that you don't recall
7  reviewing McDonald's-specific standards.
8       My question is whether -- as a basis of
9  your -- on the -- as part of your investigation to
10 prepare for your deposition today, you did not learn
11 anything that would enable you to dispute what's
12 stated in the second paragraph of Defendants'
13 Exhibit 3?
14      MR. MURRAY: Objection; asked and
15 answered.
16      THE WITNESS: All I know is that our
17 conversation that food service industry, McDonald's
18 being one of those companies, was on a track to
19 developing their own animal welfare standards. But
20 we did not talk about specifics.
21 BY MS. LEVIN:
22      Q. Okay. Did Ms. Marmer tell you whether
23 Kroger was going to consider just adopting
24 McDonald's animal welfare standards?
25      A. No.

---

69

1       Q. Did you discuss with her whether it was
2  a good thing or a bad thing that McDonald's was
3  developing its own animal welfare standards?
4       MR. MURRAY: Object to the form of the
5  question.
6       THE WITNESS: We did not talk about
7  McDonald's standards.
8  BY MS. LEVIN:
9       Q. Did Ms. Marmer express to you any
10 concern that she had, back in 2000/2001, about
11 retailers or chain restaurants or whatever
12 developing individual guidelines for animal welfare?
13      MR. MURRAY: Object to the form of the
14 question.
15      THE WITNESS: Could you read the
16 question back, please.
17      (Record read.)
18      THE WITNESS: She -- I don't know if I
19 would characterize it as "concern," as more than --
20 well, the food service industry is doing this on
21 their own and, you know, through FMI, we should be
22 working -- the retail industry, that is -- to
23 develop or not develop, but to seek best practices
24 that are standardized across the egg-laying -- or
25 the egg-layer industry.

---

## HIGHLY CONFIDENTIAL

Pruett, Payton                                              April 8, 2014

19 (Pages 70 to 73)

---

**70**

BY MS. LEVIN:

Q. You didn't discuss this particular document, you say, with Ms. Marmer?

**A. I don't remember it.**

Q. So you don't have any information as to how it came to be addressed to Mr. Pichler, but -- for these issues to wind up on Ms. Marmer's desk?

**A. Repeat the question.**

**(Record read.)**

MR. MURRAY: Object to the form of the question.

THE WITNESS: I don't know.

BY MS. LEVIN:

Q. Look at the second and third pages of Defendants' Exhibit 3 for just a minute and, in particular, paragraphs 5, 6, 8 -- 5, 6 and 8.

**A. Okay.**

Q. Do those paragraphs at all refresh your recollection from any of your conversations to prepare for your deposition today about the issues with respect to egg-laying hens that were of concern to Kroger in 2000?

MR. MURRAY: Objection to the form of the question.

THE WITNESS: As I said, these

---

**71**

requirements look specific to McDonald's, and we did not discuss any requirements specific to McDonald's.

And this is PETA trying to articulate their requirements.

BY MS. LEVIN:

Q. Right. It says, right before these numbered paragraphs, it says [reading]: We urge you, being Kroger, to make a commitment similar to the one that McDonald's has made by instituting the following changes.

And Paragraphs 5, 6 and 8 in particular pertain to egg-laying hens; is that correct?

**A. It appears that way.**

Q. And Paragraphs 5 relates to cage-space requirements; is that correct?

**A. Yes.**

Q. Was that an issue that was of concern to Kroger and -- prior to the development of any animal welfare guidelines?

MR. MURRAY: Object to the form of the question.

THE WITNESS: As I stated, the requirements that Kroger was trying to follow were those developed or -- the requirements we were wanting our egg suppliers to follow were those that

---

**72**

had been -- that were in development or had been developed by UEP.

MS. LEVIN: Let's mark as Exhibit 4 a document bearing Bates No. KRGEG00020500 through 01.

(Kroger Exhibit 4 was marked for identification.)

BY MS. LEVIN:

Q. Have you had a chance to review Exhibit 4?

**A. I have.**

Q. What is Exhibit 4?

**A. It's a letter from Mr. Sean Gifford from PETA -- or from Lynn Marmer, excuse me, to Sean Gifford at PETA.**

Q. And it's dated November 3, 2000; is that correct?

**A. Yes.**

Q. Does that appear to be Ms. Marmer's signature on the second page of Exhibit 4?

MR. MURRAY: Objection; lack of foundation.

THE WITNESS: I don't know --

BY MS. LEVIN:

Q. Do you have any reason --

**A. -- her signature.**

---

**73**

Q. Do you have any reason to believe it's not Ms. Marmer's signature on the second page of Exhibit 4?

MR. MURRAY: Objection; lack of foundation.

THE WITNESS: I don't know her signature, unless I've seen -- I could look at it now.

BY MS. LEVIN:

Q. Do you have any reason to dispute that is Ms. Marmer's signature on the second page of Exhibit 4?

MR. MURRAY: Objection; asked and answered.

THE WITNESS: I don't know if it's her signature.

BY MS. LEVIN:

Q. Is this is a document that you reviewed with Ms. Marmer to prepare for your deposition today?

**A. I specifically don't remember it.**

Q. Does Exhibit 4 appear to be a response by Ms. Marmer to Mr. Gifford's letter that is Exhibit 3?

MR. MURRAY: Objection; calls for

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

20 (Pages 74 to 77)

**74**

1 speculation.
2     THE WITNESS:  I don't know specifically
3 what it's in response to.
4 BY MS. LEVIN:
5     Q.  Well, it states in the first sentence
6 specifically what it's in response to, doesn't it?
7     **A.  It's talking about general requirements.**
8     Q.  Mr. Pruett, read the first sentence of
9 Exhibit 4.
10     **A.  [Reading]:  I am writing in response to**
11 **your recent letters requesting information about the**
12 **Kroger Company's position regarding the humane**
13 **treatment of animals by our beef, pork, chicken and**
14 **egg suppliers.**
15     Q.  And read the first sentence of
16 Exhibit 3, dated three days prior to Exhibit 4.
17     **A.  The first sentence?**
18     Q.  Yes.
19     **A.  [Reading]:  On behalf of People for the**
20 **Ethical Treatment of Animals, PETA, and our more**
21 **than 700,000 members and supporters, I am writing to**
22 **request a copy of your standards for the welfare of**
23 **animals raised by your beef, pork, chicken, egg and**
24 **dairy product suppliers and urge you to exceed**
25 **McDonald's new animal welfare standards.**

**75**

1     Q.  So does it appear that Exhibit 4 is in
2 response to Exhibit 3?
3     MR. MURRAY:  Same objection; asked and
4 answered, calls for speculation.
5     THE WITNESS:  Since I wasn't at the
6 company at this time, I don't know the intent of
7 Mr. Pichler and Mrs. Marmer as far as their
8 responses to PETA.
9 BY MS. LEVIN:
10     Q.  I'm not asking what their intent was,
11 Mr. Pruett.
12     Having read the first sentence of
13 Exhibit 3 and the first sentence of Exhibit 4,
14 you're not able to say whether Exhibit 4 is in
15 response to Exhibit 3?
16     MR. MURRAY:  Objection; asked and
17 answered.
18     THE WITNESS:  I would only be
19 speculating to say specifically in response.
20 BY MS. LEVIN:
21     Q.  Well, we certainly don't want you to
22 speculate.
23     **A.  Huh-uh.**
24     Q.  At the bottom of Exhibit 4, Ms. Marmer
25 writes [reading]:  The few suppliers that do use

**76**

1 cages provide at least 72 square inches of space per
2 animal.
3     Do you see that?
4     **A.  Yes.**
5     Q.  And someone has written "no" and "not
6 true."
7     Do you see that?
8     **A.  Yes.**
9     Q.  Do you know whether, as of November 3,
10 2000, it was true that your egg suppliers provided
11 at least 72 square inches of space per animal?
12     **A.  I do not.**
13     Q.  You don't have any information as to
14 whether the "not true" and -- who wrote "not true"
15 and "no" at that particular portion of Exhibit 4?
16     **A.  I do not.**
17     Q.  On the second page of Exhibit 4,
18 Ms. Marmer writes that they will share copies of the
19 correspondence PETA has provided, first to let them
20 know we take your concerns seriously and, second, to
21 encourage our suppliers to review the practices
22 adopted by McDonald's and the recommendations
23 contained in your letter.
24     Do you see that?
25     **A.  I do.**

**77**

1     Q.  Do you know whether Kroger, in fact,
2 shared copies of the correspondence PETA has
3 provided with its suppliers?
4     **A.  I do not.**
5     MS. LEVIN:  Let's mark as Exhibit 5 a
6 document bearing Bates No. KRGEG00020490.
7     (Kroger Exhibit 5 was marked for
8     identification.)
9     THE WITNESS:  I reviewed Exhibit 5.
10 BY MS. LEVIN:
11     Q.  What is Exhibit 5?
12     **A.  It's a note from Sean Gifford of PETA to**
13 **Lynn Marmer, a letter.**
14     Q.  The first page of Exhibit 5 references a
15 phone call that Ms. Marmer had with Mr. Gifford
16 earlier on the date that this communication was
17 written; is that correct?  It's not in the letter.
18 It's the fax cover sheet.
19     **A.  "I hope our conversation was helpful."**
20     Q.  Right.  So it references a conversation
21 that Ms. Marmer and Mr. Gifford had earlier on
22 November 13th; is that correct?
23     **A.  Yes.**
24     Q.  Did you discuss Defendants' Exhibit 5
25 with Ms. Marmer?

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

21 (Pages 78 to 81)

---

78

1    A. I don't remember this letter in our
2  discussions.
3    Q. Did you discuss with Ms. Marmer whether
4  she had any conversations with anyone from PETA
5  during the course of her dealings with them?
6    A. The only thing I remember from our
7  conversations is she had conversations with PETA,
8  but she didn't say specifically who the individuals
9  were.
10    Q. What did she tell you about her
11  conversations with PETA?
12    A. That they were talking to Kroger about,
13  you know, animal welfare opportunities.
14    Q. And did she tell you anything about
15  those conversations?
16    A. Only -- I remember that PETA was putting
17  pressure on the industry, some retailers, and Kroger
18  was one of those companies.
19    Q. But she didn't tell you specifically
20  what the issues were with respect to animal welfare
21  that PETA was putting pressure on Kroger about?
22    A. Just animal welfare issues in general.
23    Q. Did you ask her to give you any more
24  specificity as to what the issues were?
25    A. I did not.

---

79

1    Q. Do you have any doubt that Kroger
2  received Defendants' Exhibit 5 on or about
3  November 13th, 2000?
4    MR. MURRAY: Objection; lack of
5  foundation.
6    THE WITNESS: I can't speak to whether
7  Lynn Marmer received this or not.
8  BY MS. LEVIN:
9    Q. So you have no basis for denying that
10  Ms. Marmer received it?
11    MR. MURRAY: Same objection.
12    THE WITNESS: Like I said, I can't speak
13  for Mrs. Marmer.
14  BY MS. LEVIN:
15    Q. I'd like an answer to my question: Do
16  you have any basis for stating that Ms. Marmer did
17  not receive Defendants' Exhibit 5?
18    MR. MURRAY: Objection; lack of
19  foundation, asked and answered.
20  BY MS. LEVIN:
21    Q. Would you like the question read back?
22    A. Yes, please.
23    (Record read.)
24    MR. MURRAY: Same objection.
25    THE WITNESS: I can't speak for

---

80

1  Ms. Marmer. I don't know whether she received this
2  letter or not.
3  BY MS. LEVIN:
4    Q. You understand, Mr. Pruett, that you
5  were to prepare for your testimony here today and be
6  able to testify knowledgeably on one of several
7  subjects, one of which is Deposition Topic 18?
8    A. Yes.
9    Q. And that topic relates to pressure,
10  suggestions, coercions, threats, boycotts or other
11  efforts from animal rights groups, such as People
12  for the Ethical Treatment of Animals, for Kroger to
13  change, modify or explain with respect to eggs or
14  egg products, purchasing decisions, procurement
15  practices or suppliers, and so forth.
16    A. Yes.
17    MR. MURRAY: And I'll state for the
18  record that we extended an offer to counsel to
19  identify any particular documents she wanted the
20  witness educated on; and none were provided.
21    MS. LEVIN: Yes. That invitation was
22  extended in the middle of a deposition that I was
23  taking and you were defending and gave us exactly
24  24 hours, I believe, to respond.
25    MR. MURRAY: No. That was extended, and

---

81

1  it was renewed then. It was extended at the
2  meet-and-confer process at the beginning of the
3  deposition proceeding.
4    MS. LEVIN: Mr. Murray, I really don't
5  want to get into this. But I sent you or your
6  partner, Mr. Patton, a detailed email about our meet
7  and confer back last August. I asked you at least
8  twice in the last month whether you had any response
9  to that, and I got zero response from you.
10    That detailed description of our meet
11  and confer makes no reference to any request for any
12  documents. I received no such request from you
13  until April 1st.
14    MR. MURRAY: It was stated orally during
15  the meet and confer. The fact that you didn't note
16  it in your letter is self-serving, and it doesn't
17  mean anything.
18    MS. LEVIN: And I gave you two
19  opportunities, asked you to correct anything; and
20  you did not respond to either one of them. So --
21    MR. MURRAY: We did --
22    MS. LEVIN: -- that's what the record
23  reflects.
24    MR. MURRAY: We did renew the offer.
25    MS. LEVIN: That's what the record

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

22 (Pages 82 to 85)

---

**82**

1  reflects.
2      MR. MURRAY:  Well, the record reflects
3  exactly as I've stated it.
4  BY MS. LEVIN:
5      Q.  So you are unable, Mr. Pruett, to state
6  that Ms. Marmer did not receive a copy of
7  Defendants' Exhibit 5 on or about November 13th,
8  2000?
9      MR. MURRAY:  Objection; asked and
10  answered.
11      THE WITNESS:  I do not know whether she
12  received it or not.
13  BY MS. LEVIN:
14      Q.  So you can't state that she did not, can
15  you?
16      MR. MURRAY:  Same objection; asked and
17  answered.
18      THE WITNESS:  Mrs. Marmer is the only
19  one that can answer whether she received this letter
20  or not.
21  BY MS. LEVIN:
22      Q.  Exactly.  And you didn't ask Ms. Marmer
23  that question, did you?
24      A.  I did not.
25      Q.  You didn't review the document with

---

**83**

1  Ms. Marmer?
2      **A.  I don't remember this document during**
3  **our discussion.**
4      Q.  But you found other PETA correspondence
5  that you reviewed with Ms. Marmer; correct?
6      **A.  I remember one or two other letters.**
7      Q.  What were the dates of those letters?
8      **A.  There was one -- okay.  When I look at**
9  **my list -- my apologies -- this is on my list.**
10      Q.  So you did review Exhibit 5 with
11  Ms. Marmer?
12      MR. MURRAY:  No.  He's pointing to a
13  different document.
14      THE WITNESS:  No.  I -- I do have on my
15  list a Lynn Marmer letter to PETA.  That would be --
16  not -- it just says:  To PETA, 11/2000.
17  BY MS. LEVIN:
18      Q.  So would that be Exhibit 4?
19      **A.  That would be Exhibit 4.**
20      Q.  Would you like to correct your testimony
21  about --
22      **A.  I would like to correct my testimony.**
23      Q.  Would you like to correct your testimony
24  about whether that's Ms. Marmer's signature on
25  Exhibit 4?

---

**84**

1      **A.  I trust that it is her signature.**
2      Q.  Well, when you reviewed it with
3  Ms. Marmer, she didn't you that it is not her
4  signature, did she?
5      **A.  She did not.**
6      Q.  Did she discuss with you the sentence at
7  the end of the first page of Exhibit 4 that says,
8  "The few suppliers that do use cages provide at
9  least 72 square inches of space per animal"?
10      **A.  We did not discuss that specifically.**
11      Q.  Did you discuss who might have written
12  "not true" next to that sentence?
13      **A.  I actually do not remember seeing those**
14  **marks on the document.**
15      Q.  But it's possible that they were on the
16  document?
17      **A.  It's --**
18      MR. MURRAY:  Objection; calls for
19  speculation.
20  BY MS. LEVIN:
21      Q.  Is there anything else you'd like to
22  correct about your testimony with respect to
23  Exhibit 4?
24      **A.  All I can tell you is it's on my**
25  **document list, and it was -- it was discussed,**

---

**85**

1  **evidently.  But I don't remember getting any details**
2  **or talking about the 72 square inches of space.**
3      Q.  Your list also includes correspondence
4  from PETA from 2000?
5      **A.  I have the letter from Lynn Marmer to**
6  **PETA.  And I have correspondence -- PETA**
7  **correspondence to Mr. Pichler in 2001.  And this**
8  **says 2000, the note to Mr. Pichler.**
9      Q.  When you looked at Exhibit 4 and it said
10  to Mr. Gifford, I'm writing in response to your
11  recent letters requesting information about the
12  Kroger Company's position regarding the humane
13  treatment of animals by our beef, pork, chicken and
14  egg suppliers, did you ask Ms. Marmer what those
15  letters might have been?
16      **A.  I did not.**
17      MS. LEVIN:  Let's mark as Exhibit 6 a
18  document bearing Bates No. KRGEG00020502 through
19  '03.
20      (Kroger Exhibit 6 was marked for
21  identification.)
22      THE WITNESS:  I reviewed Exhibit 6.
23  BY MS. LEVIN:
24      Q.  What is Exhibit 6?
25      **A.  It appears to be a letter to our**

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                             April 8, 2014

23 (Pages 86 to 89)

---

**86**

1    suppliers -- that would be affected by animal
2    welfare issues, from Derrick Penick.
3         Q.  Do you know whether Exhibit 6 was, in
4    fact, sent to any suppliers?
5         A.  I do not.
6         Q.  Does Exhibit 6 appear to be the letter
7    referenced by Ms. Marmer in Exhibit 4, when she says
8    [reading]:  We will share with our suppliers copies
9    of the correspondence PETA has provided?
10        MR. MURRAY:  Objection; calls for
11   speculation.
12        THE WITNESS:  What was the question
13   again?
14   BY MS. LEVIN:
15        Q.  Whether it appears to be the letter
16   Ms. Marmer references in Exhibit 4 when she says
17   [reading]:  We will share with all of our suppliers
18   copies of the correspondence PETA has provided.
19        A.  I can't speak to whether this letter is
20   in direct relationship, Exhibit 6 to Exhibit 4.
21        Q.  You would agree with me Exhibit 4
22   says -- Ms. Marmer writes [reading]:  We will share
23   with all of our suppliers copies of the
24   correspondence PETA has provided for two purposes:
25   First, to let them know we take your concerns

---

**87**

1    seriously and, second, to encourage our suppliers to
2    review the practices adopted by McDonald's and the
3    recommendations contained in your letter.
4         Is that correct?
5         A.  That's how it reads.
6         Q.  And in Exhibit 6, which you cannot link
7    to Exhibit 4 at all, it states [reading]:  First, I
8    want to share copies of the three letters we have
9    received from PETA and let you know that we take the
10   organization's concerns seriously.
11        Is that correct?
12        A.  That's how it reads.
13        Q.  And then it says [reading]:  I want to
14   encourage you to review the practices adopted by
15   McDonald's and the recommendations contained in
16   PETA's letter; correct?
17        A.  That's how it reads.
18        Q.  And it further says [reading]:  I want
19   to let you know that we take the organization's
20   concerns seriously.
21        A.  That's what it says.
22        Q.  And yet you are unable to link the
23   language in Ms. Marmer's --
24        MR. MURRAY:  Objection;
25   mischaracterizes --

---

**88**

1    BY MS. LEVIN:
2         Q.  -- letter of Exhibit 4 with Exhibit 6?
3         A.  They appear to be related.
4         Q.  Exhibit 6 appears to be the letter
5    Ms. Marmer was referring to in Exhibit 4, doesn't
6    it?
7         (Discussion off the stenographic
8    record.)
9         THE WITNESS:  It appears to be related.
10   I'm not going to deny it.
11        MR. MURRAY:  I think we are taking a
12   break.
13        THE WITNESS:  Yeah.
14        THE VIDEOGRAPHER:  We are going off the
15   record.  This is the end of Disk 1.  Time on video
16   is 11:15.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  We are going back on
19   the record.  This is the beginning of Disk 2.  Time
20   on video is 11:26.
21   BY MS. LEVIN:
22        Q.  Mr. Pruett, I'd like to just ask another
23   couple of questions about Exhibit 6, if you have
24   that in front of you.
25        A.  I do.

---

**89**

1         Q.  Under -- about halfway down the first
2    page, it says Egg Production, and then it lists:
3    Prohibit forced molting; require that cages, if
4    used, be at least 72 square inches; prohibit battery
5    cages; and prohibit debeaking?
6         Do you see that part?
7         A.  I do.
8         Q.  Does that refresh your recollection from
9    any of your conversations with Ms. Marmer or any of
10   your review of documents about the issues that were
11   of concern at Kroger with respect to animal welfare
12   for egg-laying hens?
13        MR. MURRAY:  Object to the form of the
14   question.
15        THE WITNESS:  As I indicated, we did not
16   specifically talk about the requirements.  We talked
17   about the UEP guidance.  And that was the level of
18   detail we got into our conversations.
19   BY MS. LEVIN:
20        Q.  Do you understand that the guidelines
21   that were ultimately adopted by Kroger, in fact,
22   have provisions pertaining to molting, cage space
23   and debeaking?
24        A.  Yes; because they're articulated in UEP
25   guidelines.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                          April 8, 2014

24 (Pages 90 to 93)

---

90

1      MS. LEVIN:  Let's mark as Exhibit 7 a
2   document bearing Bates No. KRGEG00020412 through 14.
3      (Kroger Exhibit 7 was marked for
4   identification.)
5      MR. MURRAY:  Thank you.
6      (Pause.)
7      THE WITNESS:  I reviewed the exhibit,
8   Kroger 7.
9   BY MS. LEVIN:
10     Q.  So you had a chance to review Kroger
11  Exhibit 7?
12     A.  I have.
13     Q.  And what is Kroger Exhibit 7?
14     A.  It is a note or memo dated January 8,
15  2001, from Lynn Marmer to Joe Pichler.
16     Q.  And I believe you testified earlier that
17  Mr. Pichler was the CEO of Kroger in 2001?
18     A.  Yes.
19     Q.  Did Ms. Marmer report directly to
20  Mr. Pichler; do you know?
21     A.  I do not know.
22     Q.  But apparently on the issue of animal
23  welfare guidelines, she was reporting to Mr. Pichler
24  in Exhibit 7?
25     MR. MURRAY:  Objection to the form of

---

91

1   the question.
2      THE WITNESS:  It appears that she was
3   reporting information about animal welfare to
4   Mr. Pichler.
5   BY MS. LEVIN:
6      Q.  Did Ms. Marmer tell you that the issue
7   of animal welfare guidelines was important to
8   Mr. Pichler?
9      A.  That was not in our conversation.
10     Q.  Did Ms. Marmer tell you that animal
11  welfare guidelines were important to Kroger
12  management at the highest echelons?
13     MR. MURRAY:  Object to the form of the
14  question.
15     THE WITNESS:  Important in what way?
16  BY MS. LEVIN:
17     Q.  Important in that it was an issue that
18  the company wanted to devote resources to.
19     A.  That did not specifically come up in our
20  conversation.
21     Q.  Did something general come up in your
22  conversations with respect to upper management's
23  views towards animal welfare guidelines in 2001?
24     A.  I don't remember any conversations about
25  the feelings or importance of animal welfare issues

---

92

1   to upper management in the conversations I had with
2   Lynn Marmer.
3      Q.  But, in any event, as of January 8,
4   2001, Ms. Marmer was reporting to Mr. Pichler on
5   FMI's work on animal welfare issues; correct?
6      A.  That's what it appears to be reported on
7   in this letter.
8      Q.  And do you have any reason to doubt that
9   Ms. Marmer sent this memo to Mr. Pichler on
10  January 8, 2001?
11     A.  It appears that she did.
12     Q.  Was this a document that you reviewed
13  with Ms. Marmer in your preparation for your
14  deposition today?
15     A.  I am not familiar with this document.
16     Q.  In the second paragraph of Exhibit 7,
17  Ms. Marmer writes, "All of us are comfortable with
18  the background paper that FMI wrote entitled Animal
19  Welfare Issue."
20     Do you see that?
21     A.  Yes.
22     Q.  She says, "I suggested that they reorder
23  the policy suggestions; but, otherwise, the
24  substance was fine."
25     Do you see that?

---

93

1      A.  Yes.
2      Q.  Do Pages 2 and 3 of Exhibit 7 appear to
3   be the animal welfare background paper that
4   Ms. Marmer is referencing?
5      A.  It does appear to be that.
6      Q.  And Ms. Marmer has stated that she
7   agrees with the substance of the second and third
8   page of Exhibit 7; correct?
9      A.  It appears that she's doing so.
10     Q.  In the second paragraph of the second
11  page of Exhibit 7 --
12     A.  Yes.
13     Q.  -- it's stated [reading]:  FMI believes
14  this -- "this" being animal welfare issues -- is an
15  industry issue of importance to all of its members
16  and, therefore, proposes the development of an
17  industry policy that can be shared with our
18  customers and our suppliers in the producer
19  community.
20     Is that correct?
21     A.  That's how it reads.
22     Q.  So Kroger agreed with that statement in
23  Exhibit 7; correct?
24     MR. MURRAY:  Object to the form of the
25  question.

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Pruett, Payton                                             April 8, 2014

25 (Pages 94 to 97)

---

**94**

1    THE WITNESS: It says FMI believes. It
2 doesn't say Kroger believes.
3 BY MS. LEVIN:
4    Q. But Ms. Marmer says she agreed with the
5 substance of the background paper; correct?
6    MR. MURRAY: Object to the form of the
7 question; mischaracterizes the document.
8    THE WITNESS: I can't speak specifically
9 for Lynn Marmer whether she can speak for FMI and
10 their belief.
11 BY MS. LEVIN:
12    Q. I'm not asking about Ms. Marmer's view
13 of what FMI believed. I'm asking whether this
14 animal welfare issue background paper was a document
15 with which Kroger agreed.
16    A. It appears that Kroger was supporting
17 FMI's policies around animal welfare --
18    Q. Yes.
19    A. -- based on what's written in this
20 letter.
21    Q. Right. Ms. Marmer says [reading]: All
22 of us are comfortable with the background paper that
23 FMI wrote; correct?
24    A. Yes.
25    Q. And part of the background paper with

---

**95**

1 which Ms. Marmer and, therefore, Kroger is
2 comfortable is, this is an issue -- industry issue
3 of importance to all of FMI's members --
4    MR. MURRAY: Object to the form of the
5 question.
6 BY MS. LEVIN:
7    Q. -- and that an industry policy should be
8 developed that can be shared with customers and
9 suppliers; correct?
10    MR. MURRAY: Same objection.
11    THE WITNESS: That's how it reads.
12 BY MS. LEVIN:
13    Q. And Ms. Marmer supported that; correct?
14    MR. MURRAY: Object to the form of the
15 question.
16    THE WITNESS: I can only tell you what
17 is in this letter.
18 BY MS. LEVIN:
19    Q. And what it says is, Ms. Marmer is
20 comfortable with the background paper; correct?
21    A. That's how it reads.
22    Q. Did Ms. Marmer tell you that she was
23 uncomfortable with any background papers she
24 received from FMI?
25    A. She did not.

---

**96**

1    Q. The background paper further states,
2 [reading]: We -- being FMI -- are working to
3 identify animal welfare organizations and academic
4 experts to align ourselves with as we, FMI, develop
5 an animal welfare -- an industry animal welfare
6 policy and program.
7    Is that correct?
8    A. Where are you reading this?
9    Q. Under Current Activities. It's the
10 second sentence on the second page of Exhibit 7.
11    A. That's how it reads.
12    Q. That's another statement that Ms. Marmer
13 told Mr. Pichler she was comfortable with; correct?
14    A. That's what is written in the letter or
15 memo to Mr. Pichler.
16    Q. So according to this background paper
17 with which Ms. Marmer agreed, FMI was working to
18 develop an industry animal welfare policy; correct?
19    MR. MURRAY: Object to the form of the
20 question. It mischaracterizes the document.
21    THE WITNESS: That's how it reads; but I
22 cannot interpret what is meant by "develop," since I
23 was not with -- or working with Lynn Marmer in 2000.
24 BY MS. LEVIN:
25    Q. That's fine. We will let the jury

---

**97**

1 interpret "develop" as they see fit.
2    MR. MURRAY: That comment is uncalled
3 for.
4 BY MS. LEVIN:
5    Q. At the end of Defendants' Exhibit 7,
6 Ms. Marmer writes, "Thank you for your support at
7 the FMI Board meeting."
8    Do you see that?
9    A. Which page?
10    Q. The first page.
11    A. First page.
12    Q. Ms. Marmer's email or memo.
13    A. Which sentence?
14    Q. The very last one: "Thank you for your
15 support at the FMI Board meeting."
16    A. I see that.
17    Q. Do you know whether Mr. Pichler was a
18 member of the FMI board?
19    A. I do not.
20    Q. Was Ms. Marmer a member of the FMI
21 board?
22    A. I don't know.
23    Q. Did you discuss with Ms. Marmer the fact
24 that Safeway had received a threatening letter from
25 PETA sometime in late 2000 or early 2001?

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

26 (Pages 98 to 101)

98

1    A. I don't remember specifically talking
2  about a letter to Safeway.
3    Q. Did Ms. Marmer tell you that, after
4  pressuring the chain restaurant industry, such as
5  McDonald's and Burger King, that PETA then began to
6  focus on grocery retailers?
7    A. We had general conversations around
8  that.
9    Q. What did she tell you?
10   A. She indicated that the retail industry
11 was being approached, much like the food service
12 companies.
13   Q. And did she say that at that time Kroger
14 was concerned about becoming the target of some sort
15 of campaign by PETA?
16     MR. MURRAY: Object to the form of the
17 question.
18     THE WITNESS: I don't remember her
19 specifically saying that.
20 BY MS. LEVIN:
21   Q. What do you remember her generally
22 saying?
23   A. That there was pressure that was
24 starting to occur with the retailer -- retailers, or
25 the retail companies, much like the pressure that

99

1  was occurring with the food service companies.
2    Q. And what was that pressure?
3    A. PETA was starting to approach retailers.
4    Q. Approach retailers to develop some sort
5  of animal welfare guidelines?
6    A. Yes. That was our general conversation.
7    Q. Did Ms. Marmer take PETA's concerns
8  seriously?
9      MR. MURRAY: Object to the form of the
10 question. Calls for speculation.
11 BY MS. LEVIN:
12   Q. You did interview Ms. Marmer; right?
13   A. I did.
14   Q. Did Ms. Marmer express to you any
15 concern about the pressure that PETA was putting on
16 Kroger?
17   A. She talked about animal welfare as
18 related to -- that was one factor, the pressure;
19 PETA; and maybe any other animal welfare -- excuse
20 me -- activist groups were putting on companies at
21 that time.
22     But she also spoke in terms of doing
23 what was right for the company and our customer.
24   Q. I understand.
25     Did Ms. Marmer have a view that

100

1  customers were anxious to receive or purchase eggs
2  that had been produced in compliance with some sort
3  of animal welfare guidelines?
4    A. She only talked in terms of what the
5  company should do for its customers. She did not
6  specifically talk about customer feedback.
7    Q. Well, what do you mean "what the company
8  should do for its customers"?
9    A. That this was the right thing to do.
10   Q. So what the consumers were interested in
11 was not of interest to Ms. Marmer?
12     MR. MURRAY: Object to the form of the
13 question. Mischaracterizes his testimony.
14     THE WITNESS: I can't answer that for
15 Mrs. Marmer.
16 BY MS. LEVIN:
17   Q. You didn't discuss with Ms. Marmer
18 whether there was consumer interest in having eggs
19 available that had been produced by hens that had
20 been treated humanely?
21   A. We talked about in terms of what was
22 right for the company around animal welfare and what
23 the egg-layer companies or the egg-producing
24 companies should be doing.
25     But we did not talk about specific

101

1  consumer/customer feedback.
2    Q. I'm not interested in specific customer
3  feedback.
4      But when Kroger is deciding whether to
5  take a particular step, such as adopting animal
6  welfare guidelines, does it take into account
7  whether there's any demand for the product that will
8  result?
9      MR. MURRAY: Objection; calls for
10 speculation.
11     THE WITNESS: At that time, I can't tell
12 you what all the factors were -- all factors that
13 were considered in making that type of decision.
14 BY MS. LEVIN:
15   Q. I'm not asking for all factors. I'm
16 just wondering, asking whether consumer preference
17 was a factor that was taken into account.
18     THE WITNESS: I would only be
19 speculating.
20 BY MS. LEVIN:
21   Q. You didn't discuss that with Ms. Marmer?
22   A. Not specifically.
23   Q. So you have no idea one way or the other
24 whether consumers were interested in purchasing eggs
25 that had been produced from hens that had been

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

27 (Pages 102 to 105)

---

102

1 treated humanely?
2 MR. MURRAY: Objection; calls for
3 speculation.
4 THE WITNESS: I don't remember
5 specifically talking to Lynn Marmer about that.
6 MS. LEVIN: Let's mark as Exhibit 8 a
7 document that was obtained from the Kroger Web site.
8 (Kroger Exhibit 8 was marked for
9 identification.)
10 THE WITNESS: I've reviewed Exhibit 8.
11 BY MS. LEVIN:
12 Q. And what is Exhibit 8?
13 **A. It is a press release dated July 3rd,**
14 **2001.**
15 Q. And who issued the press release?
16 **A. Kroger.**
17 Q. Was this one of the press releases that
18 you reviewed to prepare for your testimony today?
19 **A. I reviewed a 2002 press release.**
20 Q. But not Defendants' Exhibit 8?
21 **A. It's not on my list.**
22 Q. So can you read the first sentence of
23 the second paragraph of Defendants' Exhibit 8, which
24 begins, "Under the new program."
25 Well, begin with the first sentence,

---

103

1 frankly -- the first paragraph and the second
2 paragraph.
3 **A. Okay. [Reading]: The Kroger Co. today**
4 **endorsed the Food Marketing Institute's new program**
5 **addressing animal welfare.**
6 MR. MURRAY: You missed the
7 parenthetical when you read that.
8 BY MS. LEVIN:
9 Q. You want to start over and get that
10 parenthetical as well?
11 **A. Yes. "The Kroger (NYSC: KR) today**
12 **endorsed the Food Marketing Institute's new program**
13 **addressing animal welfare.**
14 **"Under the new program, FMI is working**
15 **cooperatively with producers, processors and**
16 **independent animal welfare experts to promote 'best**
17 **practices' that will ensure animals are treated**
18 **humanely at every step of the production process."**
19 Q. And it continues to state that FMI is
20 working with advisers who include national experts
21 in animal husbandry?
22 **A. Yes.**
23 Q. So far as you know, was Defendants'
24 Exhibit 8 a correct statement on July 3, 2001?
25 **A. Yes.**

---

104

1 Q. Do you know why Kroger issued
2 Defendants' Exhibit 8?
3 **A. It wanted to make the public aware of**
4 **what we were doing in regards to animal welfare.**
5 Q. And part of what you were doing was
6 endorsing FMI's new program; correct?
7 MR. MURRAY: Object to the form of the
8 question.
9 THE WITNESS: That's how it reads.
10 BY MS. LEVIN:
11 Q. And Kroger further believed that the
12 animal welfare experts recruited by FMI are
13 well-respected national leaders in their fields; is
14 that correct? It's about two-thirds of the way down
15 the press release.
16 **A. That's how it reads.**
17 Q. And Kroger is working cooperatively with
18 FMI and with egg producers to develop the
19 guidelines; correct?
20 **A. That's how it reads.**
21 Q. It's not just how it reads; that's what
22 Kroger told the world; correct?
23 MR. MURRAY: Object to the form of the
24 question.
25 THE WITNESS: It's in the press release.

---

105

1 BY MS. LEVIN:
2 Q. And you have no reason to question the
3 accuracy of the press release?
4 **A. I do not.**
5 MS. LEVIN: Let mark as Exhibit 9 a
6 document bearing Bates No. PETA65 through 66.
7 (Kroger Exhibit 9 was marked for
8 identification.)
9 (Pause.)
10 THE WITNESS: I have reviewed Exhibit 9.
11 BY MS. LEVIN:
12 Q. Thank you.
13 What is Exhibit 9?
14 **A. It's a letter to Lynn Marmer,**
15 **September 27th, 2001, from Sean Gifford of PETA.**
16 Q. I believe you mentioned that some of the
17 PETA correspondence that you viewed with Ms. Marmer
18 was from 2001; and my question to you is whether
19 Defendants' Exhibit 9 was one of the documents you
20 reviewed with Ms. Marmer.
21 **A. This is not one of them.**
22 Q. What were the dates of the documents
23 that you reviewed with Ms. Marmer?
24 **A. I have another one listed as 2001. It**
25 **was a PETA correspondence to Mr. Pichler.**

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                                April 8, 2014

28 (Pages 106 to 109)

---

**106**

1     Q. Was that the only PETA correspondence
2 you reviewed with Ms. Marmer?
3     **A. And there was the one that I corrected**
4 **on 11/2000, a letter from Lynn Marmer to PETA.**
5     Q. Okay. But no other correspondence from
6 PETA other than the one to Mr. Pichler in 2001?
7     **A. That's what's on my list.**
8     Q. Let's take a look at the substance of
9 Exhibit 9. And if you look in the third full
10 paragraph of Exhibit 9, the second sentence, it
11 states: "Please understand that since PETA recently
12 called off its campaign against Wendy's (see
13 WickedWendy's.com), we will soon be turning our
14 attention to grocery store chains."
15     Do you see that?
16     **A. I do.**
17     Q. Is that a topic that you discussed with
18 Ms. Marmer?
19     **A. No.**
20     Q. Did you learn anything during the course
21 of your preparation about a statement by PETA that
22 it would soon be turning its attention to grocery
23 store chains?
24     **A. As I stated, I understood the**
25 **conversation I had with Lynn Marmer that there was**

---

**107**

1 **pressure on food service companies and that that**
2 **pressure was starting to be put on some retailers,**
3 **including Kroger.**
4     Q. And that pressure was coming from PETA;
5 correct?
6     **A. PETA is one activist group that I know**
7 **of.**
8     Q. What other activist groups?
9     **A. No other one came up.**
10     Q. So you did understand that at some point
11 in time PETA threatened Kroger that it would turn
12 its attention to grocery store chains; correct?
13     MR. MURRAY: Object to the form of the
14 question.
15     THE WITNESS: Threatened. I don't think
16 the term "threaten" was ever used. "Pressure" was a
17 term that was used.
18 BY MS. LEVIN:
19     Q. I accept that. PETA was pressuring
20 grocery store chains. You're more comfortable with
21 "pressuring"?
22     **A. We had some general conversation around**
23 **that.**
24     Q. And what was the general conversation?
25     **A. As I already stated, that there was**

---

**108**

1 **pressure that was being put on food service**
2 **companies and that pressure was starting to be**
3 **directed towards retailers, including Kroger.**
4     Q. And what sort of pressure was being
5 placed?
6     **A. Communication, letters. I heard**
7 **something about phone calls.**
8     Q. It states in the -- well, at the end of
9 that paragraph [reading]: By acting now, Kroger can
10 avoid the humiliation of being branded a corporate
11 animal abuser.
12     Do you see that?
13     **A. Yes.**
14     Q. Is that what you describe as pressure?
15     MR. MURRAY: Object to the form of the
16 question.
17     THE WITNESS: That did not specifically
18 come up in our conversation.
19 BY MS. LEVIN:
20     Q. But is that sentence something that you
21 would describe as pressure on Kroger?
22     MR. MURRAY: Objection to the form of
23 the question.
24     THE WITNESS: That could be a statement
25 that could be interpreted as pressure to any

---

**109**

1 retailer.
2 BY MS. LEVIN:
3     Q. Do you know whether Kroger took that as
4 pressure?
5     MR. MURRAY: Object to the form of the
6 question, calls for speculation.
7     THE WITNESS: I do not.
8 BY MS. LEVIN:
9     Q. You didn't discuss with Ms. Marmer what
10 she meant by "pressure"?
11     **A. We didn't get into that specifically.**
12     Q. She just told you that Kroger was
13 experiencing pressure from PETA?
14     **A. Yes.**
15     Q. But not what the pressure was?
16     **A. She did not get into details.**
17     Q. And you didn't ask her what she meant by
18 that?
19     **A. I did not.**
20     Q. In the last paragraph on the first page
21 of Exhibit 9, halfway through, Mr. Gifford writes
22 [reading]: What substantive steps, if any, has
23 Kroger taken to implement animal welfare guidelines
24 during the last 11 months of our communicating?
25     Do you see that?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

29 (Pages 110 to 113)

---

**110**

1    A. I do.
2    Q. Do you know what steps Kroger had taken
3  in the last 11 months, which would be from
4  October 2000 to September of 2001, to implement
5  animal welfare guidelines?
6    A. The only thing I can tell you from the
7  conversation I had with Lynn Marmer is that we were
8  working with FMI on having our suppliers adopt
9  industry best practices -- began adopting industry
10 best practices for animal welfare.
11       I cannot speak specifically to that time
12 frame.
13   Q. Well, that's the time frame we've been
14 looking at documents from that show communications
15 with FMI; correct?
16   A. Correct.
17       MS. LEVIN: Let's mark as Exhibit 10 a
18 document bearing Bates No. FMI 002427 to 2429.
19       (Kroger Exhibit 10 was marked for
20       identification.)
21 BY MS. LEVIN:
22   Q. Mr. Pruett, this is an email chain. And
23 as you probably know, sometimes it's easier to start
24 at the back and move forward. But the part of it
25 I'm most interested in is the middle portion that is

---

**111**

1  an email from Ms. Marmer.
2    A. I've reviewed Exhibit 10.
3    Q. And what is Exhibit 10?
4    A. Well, it is an email chain. It appears
5  to start with Karen Brown.
6    Q. Ms. Brown is with FMI?
7    A. Yes.
8       And it was sent on 2/14/2002, 11:14 a.m.
9  It's a bit fragmented. So I'm trying to -- it looks
10 like Brian Dowling sent another email on 2/19/2002,
11 5:02 p.m., to Lynn Marmer and some other
12 individuals.
13   Q. And in the middle, right below
14 Mr. Dowling's email, there's one from Ms. Marmer;
15 correct? To Karen, Ertharin and Brian.
16       Do you see where it says
17 "lmarmer@kroger.com wrote"?
18   A. Yes, I see that.
19   Q. That appears to be an email from
20 Ms. Harmer?
21   A. It does appear so.
22   Q. So on the first email in the chain, the
23 one from Karen Brown dated February 14th, 2002,
24 Ms. Marmer writes that the timeline established for
25 completing our work is June.

---

**112**

1       Do you see that, the last bullet point?
2    A. Where is this?
3    Q. The last bullet point in the email from
4  Ms. Brown dated February 14th, 2002.
5    A. "The timeline established for completing
6  our work by June. This is an internal working
7  document produced by FMI and NCCR only."
8    Q. And then you go to Ms. Marmer's
9  response. Ms. Marmer states, "I would like to urge
10 FMI to move more quickly."
11       Do you see that?
12   A. Where are you reading that again? I
13 see --
14   Q. On the first page of Exhibit 10. Right
15 underneath "lmarmer@kroger.com wrote." What
16 lmarmer@kroger.com wrote was, "I would like to urge
17 FMI to move more quickly."
18   A. I see that.
19   Q. Did you discuss with Ms. Marmer a
20 concern that FMI was moving too slowly in 2002?
21   A. I don't remember conversations about
22 speed. I remember conversations about working with
23 FMI and experts, scientific experts and other
24 retailers to adopt best practices that could be used
25 for the egg-producing industry. But I don't

---

**113**

1  remember a discussion about speed.
2    Q. Would you agree that, as of
3  February 2002, Ms. Marmer seems to be concerned that
4  FMI is not moving quickly enough?
5       MR. MURRAY: Object to the form of the
6  question.
7       THE WITNESS: That's how it reads.
8  BY MS. LEVIN:
9    Q. And Ms. Marmer then writes, "We started
10 the joint process over a year ago, knowing that the
11 activist community was looking to direct their
12 efforts towards the grocery industry after their
13 'successes' with McDonald's and Burger King."
14       Do you see that?
15   A. Which line again?
16   Q. It's the next sentence after, "I would
17 like to urge FMI to move more quickly."
18   A. I see that.
19   Q. Do you have any reason to doubt that
20 what Ms. Marmer said in that sentence and the
21 preceding sentence was true and correct at the time
22 that she wrote it?
23       MR. MURRAY: Objection; lack of
24 foundation.
25       THE WITNESS: I'm only reading how she

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

30 (Pages 114 to 117)

---

114

1 responded here.
2 BY MS. LEVIN:
3     Q. And you didn't discuss this email with
4 Ms. Marmer; right?
5     **A. I did not.**
6     Q. You don't have any reason to believe
7 that when Ms. Marmer wrote those sentences, she was
8 not being truthful?
9         MR. MURRAY: Objection; lack of
10 foundation.
11         THE WITNESS: I don't know how she felt
12 at that moment when she wrote the letter.
13 BY MS. LEVIN:
14     Q. So it's possible Ms. Marmer was lying
15 when she wrote those two sentences?
16         MR. MURRAY: Objection. Lack of
17 foundation.
18         THE WITNESS: I can't speak for
19 Ms. Marmer.
20 BY MS. LEVIN:
21     Q. You're here speaking on behalf of Kroger
22 Company today, Mr. Pruett. You understand that,
23 don't you?
24     **A. I do.**
25     Q. And do you have any doubt when

---

115

1 Ms. Marmer wrote those sentences that she believed
2 them to be true?
3         MR. MURRAY: Same objection.
4         THE WITNESS: I'm reading it like you
5 are.
6 BY MS. LEVIN:
7     Q. I understand you're reading it like I
8 am.
9         Do you have any reason to believe that
10 Ms. Marmer did not believe those sentences to be
11 true when she wrote that?
12         MR. MURRAY: Same objection, asked and
13 answered.
14         THE WITNESS: Based on what I know about
15 Lynn Marmer, she's truthful. And she meant what she
16 meant at that time.
17 BY MS. LEVIN:
18     Q. Ms. Marmer didn't tell you that she ever
19 came to regret any of the emails that she sent
20 relating to the animal welfare program?
21         MR. MURRAY: Objection to the form of
22 the question.
23         THE WITNESS: That never came up in a
24 conversation.
25 BY MS. LEVIN:

---

116

1     Q. Ms. Marmer didn't ever tell you that any
2 of her documents might contain inaccurate
3 statements, did she?
4     **A. She did not indicate that to me.**
5     Q. Ms. Marmer didn't tell you that she
6 changed her mind over the years about statements
7 that she made with respect to FMI or the animal
8 welfare program?
9         MR. MURRAY: Object to the form of the
10 question.
11         THE WITNESS: That was never brought up
12 in our conversations.
13 BY MS. LEVIN:
14     Q. On the Page 2428, the second page of
15 Exhibit 10, Ms. Marmer writes in the first complete
16 sentence: "As we have said all along, it is fine to
17 have the processing community involved, but the work
18 of the FMI group is to make advancements -- not just
19 endorse the easiest route for processors."
20         Do you see that sentence?
21     **A. Which line again?**
22     Q. It's the first full sentence on the
23 second page of Exhibit 10.
24     **A. I see it.**
25     Q. Who is the processing community?

---

117

1     **A. I can't tell you how she was defining**
2 **"processing community."**
3     Q. Well, what was the processing community?
4 Retailers?
5         MR. MURRAY: Objection to the form of
6 the question.
7         THE WITNESS: I would define "processing
8 community" as manufacturers, suppliers.
9 BY MS. LEVIN:
10     Q. Suppliers. For example, suppliers of
11 shell eggs and egg products?
12     **A. That's how --**
13         MR. MURRAY: Objection to the form of
14 the question, calls for speculation.
15         You can answer if you know.
16         THE WITNESS: I'm telling you how I
17 would define "processing community."
18 BY MS. LEVIN:
19     Q. Right. And that would be, amongst other
20 things, egg producers; correct?
21         MR. MURRAY: Objection; calls for
22 speculation.
23         THE WITNESS: Correct.
24 BY MS. LEVIN:
25     Q. So Kroger wanted to be in the vanguard

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                                April 8, 2014

31 (Pages 118 to 121)

---

**118**

1  in terms of developing animal welfare guidelines;
2  correct?
3      MR. MURRAY:  Object to the form of the
4  question.
5      THE WITNESS:  I can only tell you what I
6  am reading and in my conversations with Lynn Marmer,
7  that we wanted to be a leader in animal welfare.
8  BY MS. LEVIN:
9      Q.  And Kroger didn't want to just endorse
10 the easiest route for egg suppliers; correct?
11     MR. MURRAY:  Object to the form of the
12 question.
13     THE WITNESS:  That specifically did not
14 come up in our conversations.
15 BY MS. LEVIN:
16     Q.  But that's what Ms. Marmer stated in her
17 memo, her email that's a part of Defendants'
18 Exhibit 10?
19     A.  That's how it reads.
20     Q.  And you have no reason to question the
21 accuracy of it?
22     MR. MURRAY:  Objection; asked and
23 answered.
24     THE WITNESS:  I can only tell you what
25 she wrote at that time.

---

**120**

1  BY MS. LEVIN:
2      Q.  And what is Exhibit 11?
3      A.  It is an email from Karen Brown of FMI,
4  sent Wednesday, February 20th, 2002, 4:07 p.m.
5      Q.  And one of the recipients of Defendants'
6  Exhibit 11 was Ms. Marmer; is that correct?
7      A.  That is correct.
8      Q.  In the second paragraph of Exhibit 11 --
9  let's go to the first paragraph.
10         Ms. Brown writes [reading]:  When we put
11 the program together, a major program piece was
12 identification and establishment of a credible group
13 of scientific advisers who could work with us.
14         Do you see that?
15     MR. MURRAY:  "Who would work," not
16 "could."
17 BY MS. LEVIN:
18     Q.  Do you see that?
19     A.  Yes, I do.
20     Q.  Did you understand from Ms. Marmer that
21 there was, in fact, a -- the establishment of a
22 credible group of scientific advisers by FMI to work
23 on animal welfare issues?
24     A.  Yes, I did.
25     Q.  And did Ms. Marmer ever tell you that

---

**119**

1  BY MS. LEVIN:
2      Q.  And you have no reason to question it,
3  do you?
4      MR. MURRAY:  Same objection.
5      THE WITNESS:  Based on what I know about
6  Lynn Marmer, I have no reason to question, based on
7  what I know about her to date.
8  BY MS. LEVIN:
9      Q.  Well, do you have some reason to think
10 that Ms. Marmer has a history of untruthful conduct?
11     MR. MURRAY:  Object to the form of the
12 question.
13     THE WITNESS:  I do not.
14     MS. LEVIN:  Let's mark as Exhibit 11 a
15 document bearing Bates number FMI-002422 through
16 2424.
17         (Kroger Exhibit 11 was marked for
18         identification.)
19 BY MS. LEVIN:
20     Q.  You're welcome to read the whole
21 document.  It's really just the first email that
22 appears in Exhibit 11 that I have questions about.
23         (Pause.)
24     THE WITNESS:  I have reviewed
25 Exhibit 11.

---

**121**

1  she questioned the credentials of that group of
2  scientific advisers?
3      A.  There was no conversation specifically
4  about the credibility of the scientific advisers.
5      Q.  But Ms. Marmer didn't tell you that she
6  had any doubts about the scientific advisors, did
7  she?
8      MR. MURRAY:  Objection; asked and
9  answered.
10     THE WITNESS:  She did not.
11 BY MS. LEVIN:
12     Q.  In the second paragraph, Ms. Brown
13 writes, "In our work with the producer community,
14 our goal was to raise the bar -- and that has been
15 our mission and the basis of our discussions with 7
16 producer organizations.  They are anxious to have
17 our experts endorse their guidelines and have been
18 working hard to make changes and get buy-in from
19 their members."
20         Do you see that?
21     A.  I do.
22     Q.  Did you have any discussions with
23 Ms. Marmer about that particular subject?
24     MR. MURRAY:  Objection; overly broad.
25     THE WITNESS:  Are you speaking about

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

32 (Pages 122 to 125)

---

122

1   seven producer organizations?
2   BY MS. LEVIN:
3       Q. Right. Do you know who the seven
4   producer organizations were?
5       **A. I do not.**
6       Q. You do you know whether UEP was one of
7   them?
8       **A. I can't tell from this communication who**
9   **the seven producer organizations are.**
10      Q. Did Ms. Marmer tell you that the FMI
11  experts ultimately endorsed what became the UEP
12  guidelines for egg-laying hens?
13      MR. MURRAY: Objection to the form of
14  the question.
15      THE WITNESS: I don't think she used the
16  term "endorsed."
17  BY MS. LEVIN:
18      Q. What term did she use?
19      **A. When we talked about these advisers,**
20  **they evaluated the work of the experts in the**
21  **egg-producing industry to verify that the animal**
22  **welfare practices were adequate.**
23      Q. And did the FMI experts conclude that
24  what ultimately became the UEP animal welfare
25  guidelines for egg-laying hens were adequate?

---

123

1       MR. MURRAY: Objection; calls for
2   speculation.
3       THE WITNESS: I can't speak to what the
4   decision-making process was at that time.
5   BY MS. LEVIN:
6       Q. Well, Ms. Marmer never told you that the
7   FMI experts had any reason to question the UEP
8   guidelines for egg-laying hens, did she?
9       **A. Over the course of our conversation, it**
10  **appeared that the scientific advisers who were**
11  **working with FMI at that time were, for the most**
12  **part, able to do the evaluation of the program that**
13  **had already been developed by the industry.**
14      **So I trust they knew their stuff.**
15      Q. And Ms. -- you said they were, for the
16  most part, able to do the evaluation.
17      What do you mean "for the most part"?
18      **A. I don't know the individuals in the**
19  **panel. I'm saying that, for the most part, that**
20  **they were qualified to do what they were charged to**
21  **do.**
22      Q. But Ms. Marmer never told you or nobody
23  at Kroger ever told you, did they, that the experts
24  that FMI recruited ever questioned whether the UEP
25  guidelines for egg-laying hens were, in fact,

---

124

1   science-based guidelines for the humane treatment of
2   hens, did they?
3       MR. MURRAY: Object to the form of the
4   question.
5       THE WITNESS: What I gathered from our
6   conversations and what I know about FMI and the
7   scientific advisory committee at that time is that
8   the individuals who served on the committee had the
9   overall qualifications to determine whether UEP's
10  policies were adequate.
11  BY MS. LEVIN:
12      Q. And they, in fact, determined that what
13  became the UEP guidelines for egg-laying hens were,
14  in fact, adequate; correct?
15      **A. I would say they verified that they were**
16  **adequate.**
17      MS. LEVIN: Let's mark as Exhibit 12 a
18  document bearing Bates No. FMI-001078 through 1079.
19      (Kroger Exhibit 12 was marked for
20      identification.)
21      MR. MURRAY: Are you going to give a
22  copy to me?
23      MS. LEVIN: Yeah.
24      MR. MURRAY: Thank you.
25      (Pause.)

---

125

1       THE WITNESS: I reviewed Exhibit 12.
2   BY MS. LEVIN:
3       Q. What is Exhibit 12?
4       **A. It is an email from Karen Brown of FMI,**
5   **to Lynn Marmer -- well, actually --**
6       Q. Chronologically speaking, it's first an
7   email from Ms. Marmer to Karen Brown.
8       **A. To Karen Brown, and Karen Brown**
9   **responds --**
10      Q. Right.
11      **A. -- to Lynn Marmer.**
12      Q. Dated March 20th, 2002; is that
13  correct?
14      **A. That is correct.**
15      Q. Now, I think you testified earlier --
16  and you'll correct me if I don't have your words
17  exact. But you testified earlier that Ms. Marmer
18  told you that having industry-wide guidelines were
19  important; is that correct?
20      MR. MURRAY: Object to the form of the
21  question.
22      THE WITNESS: She told me that having
23  guidelines for -- harmonized, standardized
24  guidelines for the retail industry was important
25  relative to animal welfare.

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

33 (Pages 126 to 129)

126

BY MS. LEVIN:
Q. And that Kroger did not want to develop its own guidelines; correct?
A. We did not.
Q. Did she tell you why Kroger did not want to develop its own guidelines?
A. Because we're not in a position to develop our own guidelines.
Q. You need experts to do that; is that right?
A. Yes.
Q. And in this document, Ms. Marmer provides two reasons why it's important to have industry-wide guidelines; correct?
Sort of in the middle of the page.
A. Which sentence or sentences are you specifically referring to?
Q. "There are two purposes to having an industry-wide group."
A. Yes, I see that.
Q. What were the two reasons Ms. Marmer gave?
A. To not allow advocacy groups to pit one retailer against another and to move the industry standards so if there are costs, they're shared

127

across the industry.
Q. Did you have any discussion with Ms. Marmer about what she meant in this email?
A. We did not specifically talk about this email.
Q. Did you have any discussions about costs associated with animal welfare guidelines?
A. We did not.
Q. So you don't know whether -- well, Ms. Marmer appears to have understood, in Defendants' Exhibit 12, that there might be costs associated with implementation of animal welfare guidelines; correct?
MR. MURRAY: Objection; mischaracterizes the document, calls for speculation.
THE WITNESS: That's how it reads.
BY MS. LEVIN:
Q. And she wanted to be sure that if there were such costs, everybody shared them equally; correct?
MR. MURRAY: Objection; mischaracterizes the document, calls for speculation.
THE WITNESS: I can't speak for what she meant when she wrote that.
BY MS. LEVIN:

128

Q. Because you didn't ask her anything about this particular subject?
MR. MURRAY: Same objection.
THE WITNESS: We did not discuss this specific email.
BY MS. LEVIN:
Q. Well, I'm setting to one side the email; did you discuss the topic of costs that might result from animal welfare guidelines?
A. We did not specifically talk about cost.
Q. You have no reason to believe that anything Ms. Marmer wrote in Defendants' Exhibit 12 was incorrect or inaccurate, do you?
MR. MURRAY: Objection; lack of foundation.
THE WITNESS: I can't tell you specifically if it was accurate or not.
BY MS. LEVIN:
Q. You have no reason to question the accuracy of Ms. Marmer's words, do you?
A. In my general interactions and work with Lynn Marmer, I find her to be accurate and reliable and truthful.
Q. Let's mark as Exhibits --
MR. MURRAY: It's 12:30. If you're

129

switching to another document, let's take a lunch break.
MS. LEVIN: Okay. That's fine.
THE VIDEOGRAPHER: We are going off the record. This is the end of Disk 2, time on video is 12:29.
(Luncheon recess from 12:29 p.m. to 1:25 p.m.)
THE VIDEOGRAPHER: We are going back on the record. Time on video is 13:25. This is the beginning of Disk 3.
MS. LEVIN: I asked that the court reporter mark as Exhibit 13 a document bearing Bates No. FMI-001297.
(Kroger Exhibit 13 was marked for identification.)
(Pause.)
THE WITNESS: I reviewed Exhibit 13.
BY MS. LEVIN:
Q. And what is Exhibit 13?
A. It is a letter dated May 21st, 2002, it looks like, from Bruce Friedrich; or maybe a press release. Am I correct?
Q. On the right-hand side, it says "News release."

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

34 (Pages 130 to 133)

---

130

Do you see that?

A. Yes, news release. All right. It's a news release.

Q. A news release by PETA?

A. By PETA.

Q. And it's dated May 21, 2002?

A. Yes.

Q. And does it appear that this document, from the fax line at the top of the page, was received by Kroger?

A. It does.

Q. Do you know -- there's a little thing on the middle of the upper page that looks like sort of a Post-It type thing that people use for sending faxes. Do you see where I'm talking about?

A. The box?

Q. Yeah, the box.

A. Yes.

Q. And it says it's from Talithia Grant. Do you know who Ms. Grant is?

A. I do not.

Q. What about the handwritten name; do you recognize that name?

A. David Holtham.

Q. Holthouse? Holtham? I'm not sure.

---

131

A. I do not recognize --

Q. I was hoping maybe you would be able to tell us who that is.

Is the fax number there, (513) 621-3962, a Kroger fax number?

A. I can tell you that 513 is our area code. I can't tell you 621-3962 is a fax number in our building.

Q. Okay. Does a review of this -- well, is this a document that you reviewed in preparation for your testimony today?

A. I did not.

Q. The heading of it is "PETA Eyes Kroger for Cruelty Boycott."

Does that refresh your recollection about any conversations you had with Ms. Marmer or any of the other persons that you interviewed to prepare for your deposition about the pressure that PETA was putting on Kroger to develop animal welfare guidelines?

A. There were no references to a cruelty boycott.

Q. Were there any references, from anybody to any kind of boycott being organized or orchestrated by PETA?

---

132

A. No.

Q. So you have no way of disputing whether PETA was, in fact, organizing or contemplating organizing a boycott against Kroger?

MR. MURRAY: Objection; lack of foundation.

THE WITNESS: I can't speak to it.

BY MS. LEVIN:

Q. One way or the other?

A. No.

Q. Do you know -- there's a reference in the text of this press release to a Safeway Campaign. That's the end of the second full paragraph. Do you see -- it's the last two words, literally, of the paragraph.

A. "Its Safeway Campaign"?

Q. Right. Do you know what the Safeway Campaign was?

A. I do not.

Q. Did Ms. Marmer or anyone that you interviewed tell you that in May of 2002 PETA was stepping up its pressure on Kroger to develop animal welfare guidelines?

A. All I know in the conversations I had with Lynn Marmer is that PETA was in general putting

---

133

pressure on Kroger and other retailers to strengthen animal welfare guidelines. But any specific reference to a boycott or, you know, the situation at Safeway, we did not discuss that.

Q. Did Ms. Marmer or anyone that you interviewed tell you that, over time, PETA increased its pressure from its initial letters in 2000?

A. We did not talk about increased pressure. We just talked about pressure.

Q. Let's move on to a document which will be marked as Exhibit 14.

(Kroger Exhibit 14 was marked for identification.)

MS. CRABTREE: Do you have a Bates label for this document?

MS. LEVIN: Oh, I'm sorry. Yes. It's MPS00121367 through 368.

MS. CRABTREE: Okay. Thank you.

MR. MURRAY: I don't have a Bates number on this. Is this --

MS. CRABTREE: I don't think it's the same.

MS. LEVIN: Oh, I'm sorry. The Bates number I read to you is the produced version, which was cut off. So if you're curious as to what the

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

35 (Pages 134 to 137)

---

134

1  document looks like, that is, for those of you on
2  the phone, you can pull that up and see it.  It's
3  the May 31, 2002, press release; but I obtained it
4  from the Kroger Web site, because the one that was
5  produced in litigation, for some reason you can't
6  read the whole text.
7          THE WITNESS:  I've reviewed Exhibit 14.
8  BY MS. LEVIN:
9      Q.  What is Exhibit 14?
10     **A.  It's a press release.**
11     Q.  By Kroger Company?
12     **A.  Yes.**
13     Q.  And it's dated May 31, 2002?
14     **A.  Yes.**
15     Q.  Do you know whether this press release
16  remains on the Kroger Web site today?
17     **A.  I believe it is archived.**
18     Q.  But it's available for the public to
19  review; correct?
20     **A.  I believe that's true.**
21     Q.  Why does Kroger maintain this press
22  release on its Web site?
23     **A.  Specifically, this press release, I**
24  **can't tell you.  I know that we archive a lot of**
25  **press releases, not just for animal welfare.**

---

135

1      Q.  But if this press release is on the
2  Kroger Web site today, then Kroger is of the view
3  that it's correct and accurate; is that right?
4          MR. MURRAY:  Object to the form of the
5  question.
6          THE WITNESS:  I can't tell you that.  I
7  don't know who is responsible for viewing, you know,
8  whether this is still relevant or accurate for
9  today.
10  BY MS. LEVIN:
11     Q.  Well, would Kroger keep a press release
12  on its Web site that was incorrect?
13     **A.  I'm not responsible for reviewing the**
14  **press releases, so I can't speak to that.**
15     Q.  I understand that you're not responsible
16  for reviewing the press releases, Mr. Pruett.  But
17  my question was different.
18         My question was whether Kroger would
19  keep a press release on its Web site if it thought
20  it was inaccurate or incorrect.
21     **A.  I will say that the company makes every**
22  **effort it can to assure that the information it has**
23  **on its Web site is accurate and reliable.**
24     Q.  It's a publicly held company; correct?
25     **A.  Yes.**

---

136

1      Q.  And it has responsibilities in that
2  regard, to make sure that its public announcements
3  are true and accurate; correct?
4          MR. MURRAY:  Object to the form of the
5  question, calls for a legal conclusion.
6          THE WITNESS:  Again, I will say that I
7  believe the company makes every effort to ensure
8  that the information that's provided on its Web site
9  is accurate and reliable.
10  BY MS. LEVIN:
11     Q.  Did you learn anything in the course of
12  your review that would suggest to you that
13  Defendants' Exhibit 14 was not true and accurate at
14  the time it was issued?
15     **A.  I did not.**
16     Q.  Did you learn anything in the course of
17  your investigation that would suggest to you that
18  the statements made in the December -- I'm sorry --
19  in Defendants' Exhibit 14 were not true and correct
20  from May 31st, 2002, until this day?
21     **A.  Nothing in my investigation suggests**
22  **that any of this information is not accurate.**
23     Q.  Let's turn to the body of the press
24  release itself.
25         Press release says that FMI began

---

137

1  reviewing the issue of animal welfare in 2001 at the
2  request of its member companies, including Kroger,
3  Albertsons, Safeway and others.
4         Do you see that?  It's the second
5  sentence of the press release --
6     **A.  Yes.**
7     Q.  -- or the second paragraph.
8         That statement is true and correct to
9  the best of your knowledge?
10     **A.  Yes.**
11     Q.  That further states, later in that
12  paragraph "FMI and NCCR have been working with their
13  members and leading animal welfare experts to
14  develop science-based guidelines that will
15  strengthen animal welfare practices across species."
16         Do you see that sentence?
17     **A.  I do.**
18     Q.  And in the course of your investigation,
19  did you find that sentence to be true and correct?
20     **A.  I believe it's accurate.**
21     Q.  Further down in the press release, after
22  the list of the animal welfare experts, the second
23  paragraph after that, it says "Kroger said -- today
24  said it will communicate the guidelines to its
25  suppliers and will require its suppliers to adopt

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

36 (Pages 138 to 141)

---

138

1  them."
2          Is that correct?
3      A.  That's how I read it.
4      Q.  And as far as you know, based on your
5  investigation, that statement was true and correct?
6      A.  Yes.
7      Q.  Kroger intended to take FMI-developed
8  guidelines and require their suppliers to adopt
9  them; correct?
10         MR. MURRAY:  Object to the form of the
11 question.
12         THE WITNESS:  What I know in my
13 conversations about this particular document
14 involving Lynn Marmer was that we wanted to begin
15 communicating our requirements for animal welfare
16 with our suppliers.
17 BY MS. LEVIN:
18     Q.  And your requirements were those that
19 FMI and NCCR had been working with their members and
20 leading animal welfare experts to develop; correct?
21         MR. MURRAY:  Object to the form of the
22 question.
23         MS. LEVIN:  I'm reading right here from
24 the press release.
25         THE WITNESS:  That's how the press

---

139

1  release reads.
2  BY MS. LEVIN:
3      Q.  Well, and that's what you learned from
4  Ms. Marmer; correct?
5      A.  That she had been working with FMI and
6  that FMI had appointed this group of scientific
7  advisers to work with industry experts and the
8  different businesses.
9          I'm reading this as, you know, several
10 businesses, not just egg layers, to develop
11 guidelines or standards for their businesses to
12 assure best practices in animal welfare.
13     Q.  But this document says FMI and NCCR have
14 been working with their members -- that would be
15 Kroger, Albertsons, Safeway; correct?
16     A.  Uh-huh, that's what it says.
17     Q.  -- and leading animal welfare experts to
18 develop science-based guidelines.
19         Where do you get the "working with the
20 industry" piece from that?
21         MR. MURRAY:  Object to the form of the
22 question.
23         THE WITNESS:  I would take the members
24 as industry.
25 BY MS. LEVIN:

---

140

1      Q.  What kind of industry?
2      A.  The retail industries, that's the
3  membership.  And NCCR would be the food service
4  industry.
5      Q.  So when you say "working with industry,"
6  you mean with grocery retailers and with food
7  service/restaurants?
8      A.  Within the context of this sentence, I
9  would say that's true.
10     Q.  Okay.  And later down in the
11 paragraph -- I'm sorry.
12         Later down in the document, in the
13 paragraph that says "we look forward to the
14 guidelines"?
15     A.  Yes.
16     Q.  Ms. Marmer is quoted:  "We strongly
17 believe this joint industry effort, with retailers
18 and restaurants working together with leading animal
19 welfare experts, will make" -- can't see what the
20 word is.
21         MR. MURRAY:  "Progress."
22         MS. LEVIN:  Will make what?
23         MR. MURRAY:  "More progress."
24 BY MS. LEVIN:
25     Q.  -- "more progress in the humane

---

141

1  treatment of animals than any company could achieve
2  by acting alone."
3          Do you see that sentence?
4      A.  Yes.
5      Q.  So that was the point you've made
6  earlier today about Ms. Marmer saying that it was
7  important to have an industry-wide effort to develop
8  a single standard that could be practiced by all;
9  correct?
10     A.  Single, harmonized standard; correct.
11     Q.  And it was Kroger's hope that the retail
12 grocery industry would adopt this uniform standard;
13 correct?
14         MR. MURRAY:  Object to the form of the
15 question.
16         THE WITNESS:  It was -- I don't know if
17 I could say that it was Kroger's hope.  But it was,
18 in working with FMI, that the industry would adopt
19 guidelines.  I don't know if I can say at that time
20 Kroger was saying, "Safeway, you need to do this."
21         But they were working in collaboration,
22 according to Lynn Marmer, with other retailers at
23 FMI to have these standards developed.
24 BY MS. LEVIN:
25     Q.  And the hope was that the whole industry

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                              April 8, 2014

37 (Pages 142 to 145)

---

142

1  would adopt the same standard; correct?
2         MR. MURRAY:  Object to the form of the
3  question.
4         THE WITNESS:  In my conversations with
5  Lynn Marmer, that's how I understood it.
6  BY MS. LEVIN:
7         Q.  Now, in the next paragraph, there's a
8  reference to recommendations for auditing and
9  monitoring compliance.
10        Do you see that, in the third line down?
11        A.  Which paragraph again?
12        Q.  The very bottom.
13        A.  Okay.
14        Q.  I'm sorry.  I'm looking at a different
15  version of this.  It's a cut-off one.  But the
16  paragraph that says, She said the FMI/NCCR -- do you
17  see that paragraph?
18        A.  Yes.
19        Q.  It's the next-to-the-last paragraph on
20  the version you're looking at.
21        A.  Yes.
22        Q.  She makes a reference to recommendations
23  for auditing and monitor compliance.
24        Do you see that?
25        A.  Yes.

---

143

1         Q.  Did you talk with Ms. Marmer about what
2  she meant by that?
3         A.  We did not talk about this specific
4  statement.
5         Q.  Did you talk with her at all about the
6  need to monitor compliance with animal welfare
7  guidelines?
8         A.  When you say "the need to monitor," in
9  what context are you asking?
10        Q.  Well, I'm just looking at this sentence.
11  And so I'll add some elaboration as to what I take
12  from it, which is whether there was a need to
13  monitor compliance by, for example, egg producers
14  with the guidelines.
15        A.  We were, in the discussions I had with
16  Lynn Marmer, we were supportive of a process where
17  the egg producers would supply annual audits to
18  ensure that they continued to adhere to the UEP
19  guidelines.
20        Q.  And why was that important?
21        A.  Because we wanted to make sure that they
22  are meeting animal welfare standards; that the
23  industry -- their industry had developed and agreed
24  upon.
25        Q.  Well, when you say "their industry," I

---

144

1  thought we just agreed that FMI and NCCR were
2  working with their members and -- to develop the
3  guidelines.
4         A.  Well, the way I understood it and the
5  conversations I had with Lynn Marmer is that they
6  were evaluating guidelines that had already been
7  developed by the egg producers through UEP, and they
8  were already implementing some of those standards.
9         Q.  So this sentence in the May 31st, 2002
10  press release is incorrect?
11        MR. MURRAY:  Object to the form of the
12  question.
13        THE WITNESS:  I can't tell you -- again,
14  as I said earlier, develop?  I'm not certain in what
15  context they mean.
16  BY MS. LEVIN:
17        Q.  Well, I thought you had told me that
18  this sentence in the press release was correct, that
19  FMI and NCCR had been working with their members and
20  leading animal welfare experts to develop
21  science-based guidelines.
22        Are you now telling me that's incorrect?
23        MR. MURRAY:  Object to the form of the
24  question.
25        THE WITNESS:  I'm not telling you it's

---

145

1  incorrect, but I can't speak to the context of every
2  word, what they mean specifically by "develop."
3  BY MS. LEVIN:
4         Q.  Did you understand from Ms. Marmer that
5  FMI and NCCR were working with their members --
6  Kroger, Safeway, Albertsons -- and leading animal
7  welfare experts to develop science-based guidelines?
8         A.  I understood that they were working with
9  the industry, other retail members to evaluate --
10  and this is how I interpreted it -- standards that
11  were already in development or existing in the
12  egg-producing industry.
13        Q.  But that's not what the press release
14  that's in Exhibit 14 says, is it?
15        A.  No.  It's --
16        MR. MURRAY:  Object to the form of the
17  question.
18        THE WITNESS:  I'm reading it like you
19  are.  But, like I said, I can't tell you, again,
20  exactly what they mean by "develop."
21  BY MS. LEVIN:
22        Q.  So it was your understanding from your
23  conversation with Ms. Marmer that, regardless of
24  what this press release may or may not mean, that
25  the FMI panel of experts was reviewing guidelines

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Pruett, Payton                                April 8, 2014

38 (Pages 146 to 149)

146

1  that were, in fact, developed by someone else?
2       **A. By UEP.**
3       Q. And that those scientists ultimately
4  endorsed the guidelines that were developed by UEP?
5       **A. I would say they accepted them based on**
6  **good science. That they evaluated what was there**
7  **and then they supported those as being adequate**
8  **guidelines.**
9       Q. The "they" being the FMI panel of
10 experts?
11      **A. This panel of experts.**
12      Q. Did Ms. Marmer or did you learn in the
13 course of your investigation, when you say that they
14 were reviewing the UEP guidelines, did she tell you
15 whether the panel of experts made any suggestions to
16 UEP for changes to the guidelines?
17      **A. We did not specifically talk about that.**
18      Q. You didn't ask Ms. Marmer if that ever
19 happened?
20      **A. I can't remember in the course of our**
21 **conversation if we -- we talked about this advisory**
22 **board or group and a bit about their role. But as**
23 **far as any specific recommendations that they made**
24 **or discussions they had with the suppliers, that**
25 **never came up in the course of our conversations.**

147

1       Q. Can I ask a point of clarification. In
2  terms of the topics that you are designated to
3  discuss, is one of them the economic impact of
4  animal welfare guidelines? Is that something that
5  you've prepared to discuss today?
6       **A. Not the economic impact.**
7       MR. MURRAY: What topic number is that?
8       MS. LEVIN: Well, I think it could be
9  subsumed with Topic 16, Kroger's inclusion of animal
10 welfare requirements and its requests for bids,
11 contacts or other communications with egg or egg
12 product suppliers. That's one of the topics you've
13 designated Mr. Pruett for. And my understanding,
14 based on his earlier testimony today, is that
15 whether you think it's included by that or not, he
16 doesn't have an understanding of that particular
17 issue based on his interviews.
18      MR. MURRAY: He knows whether they were
19 included, the animal welfare guidelines. That's
20 what he's prepared on.
21      THE WITNESS: But when you're talking
22 about economic impact, the bid process, I just
23 generally know about the bid process. I'm not an
24 expert on cost analysis or cost impact.
25      MR. MURRAY: He knows that it's been

148

1  included in there and when.
2       MS. LEVIN: Right.
3       MR. MURRAY: That's what --
4  BY MS. LEVIN:
5       Q. Let me ask you this, Mr. Pruett: What
6  do you know about the bid process for shell eggs and
7  egg products?
8       **A. In very general terms, I know**
9  **occasionally we will go to our suppliers and say --**
10 **or -- you know, give us your most competitive**
11 **pricing for the eggs that you're going to supply**
12 **Kroger that will go into the various divisions.**
13      Q. And do you do that by what I call an RFP
14 or request for proposals?
15      **A. It's GNX, RFP.**
16      Q. And when you issue an RFP, do you
17 include in the RFP the factors or the criteria that
18 a supplier needs to meet in order to win a bid?
19      **A. The only ones I can speak to will be**
20 **quality. Food safety and quality requirements.**
21      Q. And why do you include those
22 requirements in an RFP?
23      **A. Because we want to make sure that our**
24 **suppliers are providing us with the safest, most**
25 **wholesome product they can.**

149

1       Q. And is it your understanding that the
2  requirements that are included in an RFP might
3  affect the price that a producer bids?
4       **A. Yes.**
5       Q. So if there is an inclusion in the RFP
6  for animal welfare certification, that's because
7  that's a factor that might affect the price that a
8  supplier bids; is that correct?
9       MR. MURRAY: Objection to the form of
10 the question, calls for speculation.
11      THE WITNESS: I can tell you that I
12 don't specifically get involved in pricing or cost
13 analysis for any of our products. I just provide
14 the standards to our procurement team, and they work
15 directly with the suppliers to determine a fair
16 price.
17 BY MS. LEVIN:
18      Q. But the standards that you provide are
19 standards which presumably would affect a bid;
20 correct?
21      **A. Yes, but I can't speak specifically to**
22 **the cost impact of those requirements.**
23      Q. Well, without regard to quantification
24 of the cost impact, can you speak to whether there
25 is a cost impact from the animal welfare guidelines?

HIGHLY CONFIDENTIAL

Pruett, Payton                                         April 8, 2014

39 (Pages 150 to 153)

---

150

1    MR. MURRAY: Objection; overly broad,
2  calls for speculation.
3    THE WITNESS: I can only tell you in
4  general terms, many times -- and it's not just
5  animal welfare requirements; it's if we ever go to a
6  chain -- when we ask suppliers to implement a
7  program -- and it could be animal welfare; it could
8  be a new quality or food safety requirement -- the
9  general response is that it's going to cost us more.
10   This is what I get through sourcing. I
11 don't talk directly to our suppliers about cost
12 concerns. But they come back and they say, This is
13 going to require more effort; this is going to
14 require more cost from our standpoint.
15   We have our own manufacturing
16 operations. We feel the same impact when we have to
17 take on new requirements.
18   But I will tell you that's the knee-jerk
19 response. And over time, that a lot of the things
20 that we require our suppliers -- or request our
21 suppliers to do when it comes to these additional
22 requirements are absorbed. They come back. And
23 over time, because either there's an improvement in
24 efficiency or improvement in how they conduct their
25 processes, they -- they absorb the costs many times.

---

151

1  And they actually recognize improvements.
2    That's been my general experience with
3  suppliers and new requirements, at least from my end
4  of the business.
5  BY MS. LEVIN:
6    Q. But you don't know whether any of that
7  occurred with respect to the animal welfare
8  guidelines?
9    A. I do not.
10   Q. And you didn't have any discussion with
11 Ms. Marmer or anyone else about whether Kroger was
12 aware that compliance with the animal welfare
13 guidelines would entail increased costs?
14   MR. MURRAY: Object to the form of the
15 question.
16   THE WITNESS: The only cost concerns
17 that I encountered in my investigation were based on
18 what I read in the Complaint.
19 BY MS. LEVIN:
20   Q. And what did you read in the Complaint?
21   A. That -- the Complaint indicated that
22 eggs -- that the egg producers were reducing their
23 egg supply and it was an artificially increasing
24 prices; and a lot of this was attributable to the
25 implementation of animal welfare guidelines and

---

152

1  practices.
2    But that's what I gleaned from my
3  investigation relative to any cost impacts.
4    Q. So what you gleaned from your
5  investigation was simply what was in the Complaint?
6    A. Yes.
7    Q. You didn't do any work to verify whether
8  that was correct or not?
9    A. I did not do that independently.
10   Q. And in the course of your investigation,
11 you didn't speak with anybody about these issues?
12   MR. MURRAY: Objection. It's not even
13 covered by this topic. I dispute the fact that
14 that's in Topic 16, that that's subsumed.
15   You can answer.
16   THE WITNESS: I did not have any
17 specific discussions about the impact of cost.
18   MS. LEVIN: Let's mark as Exhibit 15 a
19 document bearing Bates No. KRGEGED0001562 through
20 1569.
21   (Kroger Exhibit 15 was marked for
22 identification.)
23   THE WITNESS: I'm familiar with this
24 document.
25 BY MS. LEVIN:

---

153

1    Q. Okay. What is Exhibit 15?
2    A. Well, the letter is addressed from
3  Carole Guerrette to Bob Krouse at Midwest Poultry
4  regarding Kroger's requirements for food safety and
5  quality, and that's the attachment to the note or
6  the letter to Bob.
7    Q. And I believe you said earlier
8  Ms. Guerrette reported to you.
9    A. Yes, she does.
10   Q. But you didn't work at Kroger in
11 May 2004. So this is not something that
12 Ms. Guerrette prepared at your instruction?
13   A. No.
14   Q. Does Kroger send out a letter similar to
15 Exhibit 15 to its egg suppliers today?
16   A. It would be a similar document.
17   Q. Let's take a look at Page 4 of the
18 document. It's the fifth page of the document, but
19 there are numbers at the bottom of the page.
20   A. Yes.
21   Q. The bottom paragraph on that page --
22 "animal welfare certification" -- can you read that
23 for us.
24   A. [Reading]: All egg plants supplying
25 Kroger are required to show proof that they are a

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

40 (Pages 154 to 157)

---

154

1   "Certified Company" under the UEP guidelines for the
2   animal husbandry guidelines for US egg-laying
3   flocks. A copy must be included with your return
4   information.
5           Q. And was that, in fact, a requirement of
6   Kroger in May of 2004?
7           A. If it's in this document, yes.
8           Q. Does it remain a requirement of Kroger
9   today?
10          A. Yes.
11          Q. And that includes egg plants supplying
12  Kroger under a different banner? For example, King
13  Soopers?
14          A. Yes, our other divisions. Correct.
15          MS. LEVIN: Let's mark as Exhibit 16 a
16  document bearing Bates No. KRGEG00018733 through
17  18738.
18          (Kroger Exhibit 16 was marked for
19          identification.)
20          THE WITNESS: Before we have any
21  questions regarding this document, I really have to
22  go to the restroom.
23          MR. MURRAY: You had several glasses of
24  water at lunch.
25          THE WITNESS: I know. I really do need

---

155

1   to go.
2           THE VIDEOGRAPHER: We are going off the
3   record. The time on video is 14:05.
4           (Recess taken, during which
5           Ms. Osborn departed the deposition
6           proceedings.)
7           THE VIDEOGRAPHER: We are going back on
8   the record. The time on video is 14:11.
9   BY MS. LEVIN:
10          Q. So we are back on Exhibit 16. Have you
11  had a chance to review Exhibit 16?
12          A. I have.
13          Q. What is Exhibit 16?
14          A. It's a request for proposal from Kroger.
15  And it's going to -- it's regarding eggs. Ralphs,
16  Cala/Bell, Foods Co and Food 4 Less.
17          Q. And it's dated December 1, 2003; is that
18  correct?
19          A. Correct.
20          Q. Which was prior to your employment by
21  Kroger?
22          A. Yes.
23          Q. Are Ralphs, Cala/Bell, Foods Co and Food
24  4 Less all banners of the Kroger Company?
25          A. Food 4 Less and Ralphs are major

---

156

1   banners. Foods Co is. I can't tell you if
2   Cala/Bell is today.
3           Q. But in 2003 --
4           A. Yes.
5           Q. -- apparently it was.
6           A. Apparently it was.
7           Q. And can you explain what a banner store,
8   is, just so we're all on the same page.
9           A. A banner store is a Kroger-owned grocery
10  store that may have the Kroger name or another name
11  through acquisition.
12          Q. So it may operate under some name other
13  than Kroger?
14          A. Correct.
15          Q. At least to the consumers' eye.
16          Does Exhibit 16 resemble the requests
17  for proposal that are utilized today by Kroger?
18          A. I do not recognize the form of a bid as
19  such today at Kroger.
20          Q. Let's turn to the third page of
21  Exhibit 16. And you'll see Paragraph 13 [reading]:
22  Animal welfare Certification: Supplier must show
23  proof they are a "Certified Company" under
24  UEP guidelines for the "Animal Husbandry Guidelines
25  for U.S. Egg-Laying Flocks."

---

157

1           Do you see that sentence?
2           A. Yes, No. 13.
3           Q. And that is a requirement for any
4   company that hopes to win the bid under Exhibit 16?
5           A. Yes.
6           Q. And is that same requirement included in
7   Kroger's RFPs today for shell eggs?
8           A. It should be.
9           Q. And is it included in Kroger's RFPs for
10  egg products today?
11          A. It should be.
12          Q. And has it been included in RFPs for
13  both shell eggs and egg products, at least from
14  December 1, 2003, to the present?
15          A. To the best of my knowledge.
16          MS. LEVIN: Let's mark as Exhibit 17 a
17  document entitled "Direct Action (Non-Class)
18  Plaintiff The Kroger Company's Supplemental
19  Responses to Defendant's First Set of
20  Interrogatories."
21          (Kroger Exhibit 17 was marked for
22          identification.)
23  BY MS. LEVIN:
24          Q. And I'm not going to ask you a lot of
25  detailed questions about this. I really have some

---

HIGHLY CONFIDENTIAL

Pruett, Payton        April 8, 2014

---

**158**

general questions about Exhibit A.

    A. Which page are you referring to?

    Q. It's after Page 9.

    A. Okay.

    Q. Did you play any role in the development of Exhibit A to Exhibit 17?

    A. I had no direct involvement in development of this exhibit.

    Q. Does this appear to be a list of Kroger's suppliers of various shell eggs from 2005 to 2013?

    MR. MURRAY: 2004 dates in here, I see.

    MS. LEVIN: Maybe from 2004 to 2013.

    THE WITNESS: I recognize many of the suppliers, but I can't tell you if they are definitely suppliers today.

    I don't know all of our suppliers of eggs and egg products.

BY MS. LEVIN:

    Q. Yeah. I don't expect you to verify that this is an accurate list. We'll do that with Mr. Klump, who apparently was the one who prepared the chart. But I'd just like, as a foundation, whether this appears to be a list of a large number of suppliers of shell eggs to Kroger over the years.

---

**159**

    A. Yes.

    Q. You'll notice that, on the first five pages or six pages of Exhibit A to Exhibit 17, in the next-to-last column from the right, it says "Executed Contract"?

    A. Which page?

    Q. All of the first five pages.

    A. Okay.

    Q. Do you see in that column "Executed Contract, Executed Contract," over and over again?

    A. Yes.

    Q. And then you get to Page 7, and the last four entries say "Non Executed Contract." In fact, all of the entries for Mahard Egg Farm say "Non Executed Contract."

    Do you see that?

    A. Yes.

    Q. Do you know why there was not an executed contract with Mahard Egg Farm for the supply of shell eggs to Kroger?

    A. I do not.

    Q. Do you know whether there was an oral agreement with Mahard Egg Farms for the supply of shell eggs?

    A. I do not.

---

**160**

    Q. Do you know whether the agreement, whatever it may have been, with Mahard Egg Farm included a requirement that Mahard Egg Farm supplied eggs that were produced in compliance with the UEP guidelines?

    A. I can't speak to the specific supplier as to why it didn't meet contractual requirements. You'll have to ask our sourcing or procurement person. Yeah.

    Q. Well, I'm not suggesting that they didn't meet your requirements. I'm just asking whether, because you have been designated as the witness from -- from 1999 to the present, Kroger's inclusion of animal welfare requirements, including but not limited to UEP certified program requirements in its request for bids, contracts or other communications with egg or egg product suppliers. That's Topic 16.

    So, again, my question is whether -- whatever sort of agreement you had, executed or nonexecuted contract, whether your agreement with Mahard Egg Farm required that the eggs supplied to Kroger be produced in accordance with the animal welfare guidelines of UEP.

    A. All suppliers of egg and egg products

---

**161**

were required to adhere to our animal welfare requirements.

    Q. Whether they have an executed contract with Kroger or a nonexecuted contract with Kroger?

    A. Yes. Again, I'm speaking from the perspective of the requirements in the food safety and quality document that I believe was Exhibit 15; and then you see the same requirement in the request for proposal.

    So they would have been asked to adhere to our animal welfare requirements.

    Q. They would have been required to adhere to the animal welfare requirements; correct?

    A. It was a requirement.

    MS. LEVIN: I'm trying to think of an efficient way to do this. I have several contracts, all of which were -- most of which were signed by Mr. Klump, all of which contain the same provision that was in the RFP. And I'm happy to mark them all and have Mr. Pruett confirm that that was indeed a requirement of that particular contract.

    MR. MURRAY: Sure. If you want -- I don't have any problem with doing that.

    MS. LEVIN: We can have a stipulation if you want. I just -- I don't know if you want to

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

42 (Pages 162 to 165)

---

162

1  take the time to go through them all or not.
2            MR. MURRAY:  Why don't you just
3  introduce them all as exhibits.  It will make the
4  record clearer.
5            MS. LEVIN:  So I'm marking Exhibits 18,
6  19, 20, 21, 22, 23, 24 and 25.  And I will give them
7  to the reporter to start marking, and then we can go
8  through them.
9            The only question I'm going to have for
10  you, Mr. Pruett, is about a paragraph on the,
11  generally, the fourth page of the document about the
12  animal welfare certification.
13  BY MS. LEVIN:
14        Q.  Feel free to start reviewing them,
15  Mr. Pruett, as you receive them.
16            (Exhibits Kroger-18 through
17            Kroger-25 were marked for
18            identification.)
19            MS. LEVIN:  I have handed to the court
20  reporter a series of documents, and I'll read the
21  Bates numbers into the record.
22            Exhibit 18 is a document bearing Bates
23  No. KRGEG00019391 through 19394.
24            Exhibit 19 is a document bearing Bates
25  No. KRGEGED00013093 through 13096.

---

163

1            Exhibit 20 is a document bearing Bates
2  Nos. CM00404144 through -- I'm sorry.  It begins
3  CM00404142 through 147.
4            Exhibit 21 is KRGEG00018820 through '23.
5            Exhibit 22 is KRGEG00019290 through
6  '291.
7            Exhibit 23 is KRGEG00019244 through 248.
8            Exhibit 24 is KRGEG00019185 through
9  19199.
10            And Exhibit 25 is KRGEG00019143 through
11  '147.
12            THE WITNESS:  I've reviewed the animal
13  welfare certification requirement in each of these
14  documents.
15  BY MS. LEVIN:
16        Q.  And each of these documents, for
17  whatever time period it may cover and whatever
18  producer it may relate to, requires the producer to
19  show proof that it's a certified company under the
20  UEP guidelines for the animal welfare husbandry
21  guidelines for US egg-laying flocks; is that
22  correct?
23        A.  Yes.
24        Q.  And each contract also states that
25  Kroger will not accept any eggs from the producer

---

164

1  that have not been 100 percent produced to these
2  terms; is that correct?
3        A.  Yes.
4        Q.  Why did Kroger include that provision in
5  its contracts with its suppliers?
6        A.  Which provision?
7        Q.  Both of those provisions, the
8  requirement that the producer be a certified
9  producer and that all eggs be produced in accordance
10  with the animal welfare guidelines.
11        A.  Because it's our animal welfare
12  requirement.
13        Q.  Because Kroger believed that the
14  guidelines were valid guidelines?
15            MR. MURRAY:  Object to the form of the
16  question.
17            THE WITNESS:  Because the industry
18  experts who developed the guidelines thought they
19  were valid guidelines.
20  BY MS. LEVIN:
21        Q.  And Kroger relied upon those industry
22  experts; is that correct?
23        A.  Correct.
24        Q.  And Kroger believed that compliance with
25  the UEP animal welfare guidelines, I believe you

---

165

1  said, was the right thing to do?
2        A.  I did say that.
3        Q.  And Kroger believes today that
4  compliance with the animal welfare guidelines is the
5  right thing to do?
6            MR. MURRAY:  Object to the form of the
7  question.
8            THE WITNESS:  Specifically what
9  requirements are you talking about?
10  BY MS. LEVIN:
11        Q.  The requirements of the animal, the UEP
12  animal welfare guidelines.
13        A.  We agreed that our suppliers need to
14  comply to the UEP guidelines as stated today.
15        Q.  What does Kroger do if a supplier fails
16  an audit with respect to the animal welfare
17  guidelines?
18        A.  Well, we would disqualify them.
19        Q.  What do you mean --
20        A.  They would not be allowed to supply
21  Kroger any longer, because it's one of our
22  requirements to do business.
23        Q.  Is that supplier given some time to
24  bring its flocks into compliance?
25        A.  I would have to say it depends on how

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

43 (Pages 166 to 169)

---

166

1  severe the noncompliance is.
2      Q. Did you discuss this issue with
3  Mr. Kolenski?
4      A. We did not; because the best of my
5  knowledge, we have not encountered a supplier that's
6  been noncompliant.
7      Q. Has Kroger considered any alternatives
8  to the UEP animal welfare program?
9      A. Not since I've been with the company.
10     Q. Did you learn from any of your
11 interviews that Kroger ever considered any
12 alternatives to the animal welfare program?
13     A. No.
14     Q. Did Kroger ever consider the Sparboe
15 Farms process verified program?
16     A. Not since I've been with the company.
17     Q. Have you ever heard of the Sparboe Farms
18 process verified program?
19     A. I've only heard of Sparboe Farms, but
20 not that program.
21     Q. Have you heard of any other competing
22 animal welfare programs?
23     A. I can't remember any.
24     Q. Have you ever heard of the animal humane
25 certified program?

---

167

1      A. Animal humane certified program?
2  It sounds familiar, to be honest.
3      Q. I can show you something that might
4  prompt your recollection.
5      MS. LEVIN: Let's mark as Exhibit 26 a
6  document bearing Bates No. KRGEG00017271 through
7  17287.
8      (Kroger Exhibit 26 was marked for
9      identification.)
10 BY MS. LEVIN:
11     Q. And I don't intend to question you in
12 detail. I just wanted you to take a look at this
13 document and see if it refreshed your recollection
14 from any of your investigation about the animal
15 humane certified program.
16     A. I don't remember reviewing this
17 document.
18     Q. And it doesn't prod any memories about
19 any alternatives to the animal welfare program by
20 UEP?
21     A. It does not.
22     Q. Did you discuss with anyone during the
23 course of your investigation, cage-free eggs?
24     A. Yes. General discussions with John
25 Kolenski.

---

168

1      Q. What did you learn from Mr. Kolenski?
2      A. That the cage-free requirements were
3  included in the UEP guidelines as well.
4      Q. There were separate guidelines for
5  cage-free?
6      A. Right. That's how the document is
7  organized.
8      Q. Do you know when those guidelines were
9  included within the UEP guidelines?
10     A. I have two documents, 2008 and a 2010
11 reviewed. Those two documents, UEP documents, have
12 separate guidelines.
13     Q. So as best you understand it from your
14 investigation, there was a program developed for
15 cage-free -- eggs produced from cage-free hens
16 sometime around 2008?
17     A. I can only tell you that I reviewed the
18 guidelines only back to 2008. So I don't know if
19 guidelines existed prior to 2008.
20     Q. But as of 2008, you saw some guidelines
21 pertaining to cage-free hens; correct?
22     A. Correct.
23     Q. But the animal welfare guidelines that
24 you require your producers to comply with are not
25 cage-free guidelines, are they?

---

169

1      A. It doesn't state that we're specifically
2  calling those out. It's just saying under the UEP
3  guidelines, for the -- and I'm reading from Moark's
4  document.
5      Q. Hold on. You're reading from Exhibit --
6      A. I'm reading from Exhibit 24, which, as I
7  understand, is the same statement we have for all of
8  our suppliers.
9      Q. Right. Was your understanding that as
10 of February 4, 2007, the animal welfare guidelines
11 that you were -- that Kroger was requiring Moark to
12 comply with were cage-free guidelines?
13     A. I don't know in 2004 if they had
14 specific guidelines for cage-free. I only know from
15 2008 forward that there are cage-free guidelines in
16 the UEP animal welfare requirements.
17     Q. Okay. Well, is it your understanding
18 that since 2008, Kroger has required all of its
19 shell egg suppliers to provide only eggs produced by
20 cage-free hens?
21     A. No.
22     Q. No?
23     A. We have -- the requirements as stated,
24 from 2008 going forward, apply to what the producer
25 is supplying.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

44 (Pages 170 to 173)

---

**170**

1    Q.  Right.
2        A.  So if it's cage-free, they have to
3    adhere to the cage-free requirements, cage
4    requirements.
5        So what's ever applicable to their
6    business and it's outlined in the UEP requirements
7    is what they need to adhere to.
8        Q.  Right.  So if the company is bidding to
9    supply cage-free -- eggs produced by cage-free hens,
10   they have to comply with the UEP guidelines
11   pertaining to cage-free hens.  And if they're
12   producing other eggs or providing you with other
13   eggs, they comply with guidelines that pertain to
14   cage-space requirements?
15       A.  What's ever applicable to their
16   business.
17       Q.  Right.
18       Do you know whether cage-free eggs are
19   more expensive for Kroger to purchase than eggs from
20   caged hens?
21       A.  I could only generally say they're more
22   expensive, but I can't tell you a specific price.
23       Q.  I don't expect you to tell us a specific
24   price.
25       What's your understanding as to why

---

**171**

1    those eggs are more expensive?
2        A.  They're part of our specialty egg
3    program; like organic and natural, those are
4    more-expensive eggs.
5        Q.  And do you know why those eggs are more
6    expensive?
7        A.  Well, it's because they're premium eggs.
8    They're part of a premium egg program.  I can't
9    specifically tell you all the factors that go into
10   the pricing of those eggs.
11       Q.  Is it because the hens have more space,
12   and so there are fewer hens?
13       MR. MURRAY:  Object to the form of the
14   question; calls for speculation.
15       THE WITNESS:  It's not my area of
16   expertise.  A poultry scientist or veterinarian will
17   have to tell you that.
18   BY MS. LEVIN:
19       Q.  You just know that Kroger does pay
20   something more for eggs produced in accordance with
21   the cage-free guidelines than it pays for eggs
22   produced in accordance with the caged-space
23   guidelines?
24       A.  What I know is they cost more at the
25   stores for our customers, but I don't know what's

---

**172**

1    built into the profit margin.
2        Q.  So you don't know whether Kroger pays
3    more for those eggs or not?
4        A.  I don't know specifically what they pay
5    for those eggs and if it's always more than the
6    conventionally raised eggs.
7        Q.  But Kroger charges more for the eggs to
8    its customers?
9        A.  In general.
10       Q.  Do you know how it is that Kroger is
11   able to obtain a higher price for those eggs from
12   consumers -- for the cage-free eggs?
13       MR. MURRAY:  Object to the form of the
14   question, calls for speculation.
15       THE WITNESS:  I don't know those -- I
16   don't understand that analysis or I'm not privy to
17   that analysis.
18   BY MS. LEVIN:
19       Q.  But Kroger is able to do that; correct?
20       A.  They are able to get a higher price from
21   our customers for those eggs.
22       Q.  Do you know why or do you know when
23   Kroger began to sell eggs produced from cage-free
24   hens?
25       A.  No.

---

**173**

1    Q.  Do you know why Kroger began to sell
2    eggs produced from cage-free hens?
3        A.  Because it's what -- it was a type of
4    egg our customers wanted.
5        Q.  And Kroger is responsive to customer
6    demand; correct?
7        A.  Depending on the topic.
8        Q.  Well, with respect to the supply of
9    cage-free eggs, Kroger was responding to consumer
10   demand?
11       A.  I will say in general, we try to supply
12   our customers the products they want.  I can't
13   specifically tell you about the analysis that went
14   into determining, you know, when or what factors
15   were involved in offering cage-free eggs to our
16   customers.  That's a merchandising and sourcing
17   concern.
18       Q.  Do you know whether PETA was pressuring
19   Kroger to begin to supply cage-free eggs?
20       A.  I know that in some of their letters,
21   they were indicating that they wanted that option
22   for our customers.
23       Q.  So some of their letters to Kroger?
24       MR. MURRAY:  You got to say yes or no.
25       THE WITNESS:  Yes.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

45 (Pages 174 to 177)

---

174

1      MS. LEVIN:  Let's mark as Exhibit 27 a
2  document bearing Bates No. KRGEGED00010809 through
3  10810.
4          (Kroger Exhibit 27 was marked for
5          identification.)
6      THE WITNESS:  I've reviewed Exhibit 27.
7  BY MS. LEVIN:
8      Q.  What is Exhibit 27?
9      A.  It's a note -- email from Matt Prescott,
10  who is with PETA, to Lynn Marmer and copying Dave
11  Dillon.
12      Q.  And it's dated February 11, 2008; is
13  that correct?
14      A.  Yes.
15      Q.  And there is an attachment to
16  Mr. Prescott's email; is that correct?
17      A.  Yes.
18      Q.  And what is the subject of the
19  attachment?
20      A.  It's pretty much communicating to Lynn
21  Marmer what Safeway is doing around some animal
22  welfare initiatives.
23      Q.  What was Safeway doing, according to the
24  attachment to Exhibit 27 with respect to cage-free
25  eggs?

---

175

1      A.  Well, the second -- the first sentence
2  of the second paragraph says, "Safeway will
3  implement a new policy that gives buying preference
4  to cage-free eggs."
5      Q.  And Mr. Prescott in his email to
6  Ms. Marmer says, "I'd love to get the same letter
7  from Kroger."  Is that correct?
8      A.  That's what it says.
9      Q.  Did you discuss PETA's efforts to
10  persuade Kroger to offer cage-free eggs, with
11  Ms. Marmer?
12      A.  Not specifically.
13      Q.  Did you discuss it generally?
14      A.  It may have come up in general
15  discussions.
16      Q.  What did Ms. Marmer tell you?
17      A.  I can't remember specifically what she
18  said as far as, you know, the efforts to increase
19  cage-free.  I just know cage-free came up in
20  conversations with her.
21      Q.  And that PETA was pressuring Kroger to
22  sell cage-free eggs?
23      A.  PETA was pressuring Kroger about a lot
24  of practices around animal welfare.  Cage-free was
25  one of the things that came up.

---

176

1      Q.  And how did Kroger respond to the
2  pressure from PETA on the subject of cage-free eggs?
3      A.  I do know that we made some
4  announcements of press releases saying that we were
5  trying to increase the percentage of cage-free eggs
6  in our stores.
7      Q.  And when you say "trying to," what was
8  the issue with respect to increasing the percentage
9  of cage-free eggs sold in your store?
10      A.  I can't tell you the limitations other
11  than supply, available supply.  You'd have to speak
12  to somebody from procurement to talk about what the
13  limitations were.
14      Q.  So you don't know whether there was a
15  difficulty with getting a supply of cage-free eggs?
16      A.  All I understand is that there was
17  probably some limits around the supply; but I can't
18  tell you specifically what those limitations were.
19      Q.  But generally there were some
20  limitations with respect to obtaining cage-free eggs
21  for sale at Kroger stores?
22      A.  That's what I remember in
23  conversations -- and it's not necessarily specific
24  to conversations I've had with Lynn Marmer.  It's
25  what I've heard around the organization and what's

---

177

1  been indicated in press releases.
2      Q.  So this is a topic you're familiar with
3  independent of any conversations you had with
4  Ms. Marmer?
5      A.  Yeah; through press releases.  It's a
6  topic.  It's public.
7      Q.  Does Kroger have an internal group today
8  that focuses on animal welfare issues?
9      A.  Internal group?  Define "internal
10  group."
11      Q.  A group internal to Kroger, its own
12  group.
13      A.  We have an animal welfare panel, and the
14  internal group is part of the animal welfare panel.
15  We have internal associates or associates that are
16  part of Kroger that are part of the panel.
17      Q.  Did you have any involvement in
18  recruiting experts to serve on Kroger's animal
19  welfare panel?
20      A.  I did.
21      Q.  And whom did you recruit to serve on
22  that panel?
23      A.  It's turned over.  So I will tell you
24  who we started with and who we have today.
25      Q.  Okay.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

46 (Pages 178 to 181)

---

178

1  A. We had Dr. James Denton.
2  Q. And was Mr. Denton a specialist in
3  poultry --
4  A. Poultry.
5  Q. -- egg-laying hens?
6  A. Yes. Poultry and eggs.
7  Q. Okay.
8  A. And we had -- I'm trying to remember.
9  She's rotated off the panel.
10 Q. Anne Butler-Johnson? Was that --
11 A. Anna Butters-Johnson, Dr. Johnson, from
12 Iowa State. And then Ted McCollum from Texas A&M.
13 But Dr. Johnson is no longer on the panel.
14 Q. Is -- Dr. Johnson was a specialist in
15 pork welfare?
16 A. Correct.
17 Q. And who -- what was the third expert?
18 A. Beef.
19 Q. Beef. So Dr. Denton was the only one
20 that had any expertise in the area of poultry and
21 laying-hen welfare?
22 A. Correct.
23 Q. Has Dr. Denton been replaced?
24 A. He has been.
25 Q. Let's scroll back just a little bit.

---

179

1  Do you recall when Kroger first began to
2  recruit experts for an animal welfare panel?
3  A. 2008.
4  Q. Why did Kroger do that?
5  A. Because we wanted to have a third-party
6  view, academic experts to help guide us, the various
7  animal welfare issues that was facing the
8  organization.
9  Q. Had the FMI panel of experts disbanded
10 at this point?
11 A. I don't know.
12 Q. But Kroger was no longer relying upon
13 whatever panel FMI may have put together?
14 A. I will say we were still using the FMI
15 requirements --
16 Q. Right.
17 A. -- in all the applicable areas of our
18 business where animal welfare was a concern. But we
19 engaged this panel, since we're not really experts
20 in animal welfare, to give us their expert view if
21 the guidelines we had in each of those areas were
22 still adequate and to make sure that we're raising
23 the bar on those standards, on those requirements.
24 Q. You didn't create your own animal
25 welfare program because of any lack of confidence in

---

180

1  the FMI expert panel, did you?
2  A. We did not create our own program.
3  Q. I didn't say "program." I said "panel."
4  A. We -- sorry.
5  We brought this panel together to make
6  sure that our suppliers were adhering to the best
7  practices available to the industry. Because we are
8  not experts.
9  Q. Right. Was the one purpose of this --
10 or one assignment for this animal welfare panel to
11 review the UEP animal welfare guidelines for
12 egg-laying hens?
13 A. That would have been one of their tasks,
14 among the other animal welfare programs.
15 (Kroger Exhibit 28 was marked for
16 identification.)
17 BY MS. LEVIN:
18 Q. Let's just mark quickly as Exhibit 28 a
19 document bearing Bates No. KRGEGED00010849.
20 A. Yes. I reviewed Exhibit 28.
21 Q. And what is Exhibit 28?
22 A. It is an email from me to Lynn Marmer,
23 copying Brendon Cull, about the animal welfare
24 panel.
25 Q. And you, in fact, sent this email on or

---

181

1  about April 24, 2008?
2  A. Correct.
3  Q. Had Ms. Marmer -- well, why were you
4  creating experts to serve on an animal welfare
5  panel? Is that something Ms. Marmer had asked you
6  to do?
7  A. Lynn and I discussed it, but I can't
8  remember if she asked me to do it or I was getting
9  feedback from our merchandising leadership in those
10 areas -- meat, pork, egg and poultry -- to bring
11 this panel together, because they have been in and
12 out of the panel meetings themselves, like our vice
13 president of meat merchandising.
14 Q. Right. So someone -- you're not sure
15 who -- asked you to put the panel together?
16 A. I put the panel together. We discussed
17 it as a team and decided that it would be a good
18 idea to have outside experts.
19 Q. Okay. Who was on the panel besides the
20 three experts that you identified?
21 A. Brendon Cull, we've had two or three
22 vice presidents of merchandising. The director --
23 vice president of meat merchandising; the director
24 of meat merchandising; John Kolenski; myself.
25 Q. And how often has this panel met since

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                      April 8, 2014

47 (Pages 182 to 185)

---

**182**

2008?

A. At least once a year but no more than twice a year.

Q. Let's mark as Exhibit 29 a document bearing Bates No. KRGEG00017072.

(Kroger Exhibit 29 was marked for identification.)

(Pause.)

THE WITNESS: I reviewed Exhibit 29.

BY MS. LEVIN:

Q. What is Exhibit 29?

A. It's a mission statement that I wrote with the team, communication methodology and the primary roles of the panel members for the Kroger animal welfare panel.

Q. And one of the missions of the Kroger animal welfare panel was to provide expert, science-based knowledge and guidance to assist the nation's largest grocery retailer in developing policies, vendor standards and internal monitoring processes that will promote and advance the humane treatment of animals by the food industry; is that correct?

A. That is correct.

Q. And the nation's largest grocery

---

**183**

retailer is Kroger; is that correct?

A. Traditional retailer; correct.

Q. Well, it doesn't say "traditional" here, but I'll accept your amendment.

And under Audit Review Process, it says [reading]: The panel will be asked to review Kroger's animal welfare standards and a sampling of supplier animal welfare audits. According to each member's area of expertise, the panel will provide guidance and feedback regarding the appropriateness and effectiveness of the audit criteria, auditing process and format and scoring process for compliance with animal treatment standards; is that correct?

A. That's correct.

Q. And did the panel, in fact, review the UEP guidelines for egg-laying hens that were in existence in 2008?

A. That should have been part of Dr. Denton's review.

Q. Did Dr. Denton, in fact, conduct that review?

A. Without consulting my notes, I can't tell you exactly what he did. But it would have been a general expectation of each of the panel

---

**184**

members to look into their areas of expertise.

Q. What notes would you need to consult to verify what Dr. Denton did or did not do?

A. It would have to be the meeting notes that were taken in 2008 and 2009 and 2010 when he was part of the panel.

Q. Do you know whether those notes were produced in this litigation?

A. I do not know.

Q. But these are handwritten notes of yours?

A. Handwritten notes and minutes -- typed minutes.

Q. Typed minutes.

A. It could be a combination, depending on the year.

Q. But you didn't review those notes to prepare for your deposition today?

A. I did not review those notes.

Q. Even though one of the topics that you've been designated on is Topic 21 from 1999 to the present, any committees, working groups or other internal efforts by Kroger related to animal welfare or concerns about the treatment of animals?

A. Yes. I did not review the notes.

---

**185**

Q. So are you prepared today to testify on Topic 21?

A. Not without reviewing my notes.

Q. Any reasons why you didn't review your notes in order to testify today?

A. It's just something I didn't do.

Q. And you're unable to provide us with any testimony without review of those notes?

A. I cannot.

Q. Do you have a recollection of whether Dr. Denton made any suggestions to you about amendments to the UEP animal welfare guidelines for egg-laying hens?

A. Well, if he did, we didn't accept them, because we're still -- we still have the same requirement for our egg producers. We haven't modified them. We haven't added to them.

Q. Why was it important to -- for the animal welfare panel to study audit procedures?

A. We just want to make sure that they're measuring the right things against the guidelines for each of those industries.

Q. So the idea was to make sure that whatever it was that the animal welfare audit included, it included everything that was in the

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                      April 8, 2014

48 (Pages 186 to 189)

---

186

1  guidelines?
2      A. Yes.
3      MS. LEVIN: Let's mark as Exhibit 30 a
4  document bearing Bates No. KRGEGED00010794.
5      (Kroger Exhibit 30 was marked for
6      identification.)
7      MS. CRABTREE: Did you say 1079?
8      MS. LEVIN: And then a 4 -- 10794.
9      MS. CRABTREE: Thank you.
10      (Pause.)
11      THE WITNESS: I've reviewed Exhibit 30.
12  BY MS. LEVIN:
13      Q. And what is Exhibit 30?
14      A. It's an email from Brendon Cull to Lynn
15  Marmer copying me and Mark Van Buskirk, who was the
16  vice president of meat merchandising at the time.
17      Q. And Mr. Cull references a meeting -- the
18  date of Mr. Cull's email is October 6th, 2008;
19  correct?
20      A. Correct.
21      Q. And he references a first meeting of the
22  animal welfare panel for November of 2006; is that
23  correct?
24      A. Correct.
25      Q. Do you have a recollection of that

---

187

1  meeting?
2      A. Vague recollection. This was back in
3  2008.
4      Q. And what do you recall?
5      A. I remember having a face-to-face meeting
6  with the three panelists at that time, talking about
7  what they were seeing as animal welfare challenges
8  or opportunities in their industries.
9      Q. And do you recall what they saw as
10  challenges or opportunities with respect to
11  egg-laying hens?
12      A. I do not.
13      Q. Was this a meeting where you would have
14  taken notes?
15      A. I would have taken notes.
16      Q. Would you have taken notes at all of the
17  animal welfare panel meetings that you attended?
18      A. Yes.
19      Q. And do you have those notes today?
20      A. I do not.
21      Q. I don't mean with you here today, but in
22  your office, wherever that may be?
23      A. Yes.
24      Q. And one of the things that was going to
25  take place, according to Mr. Cull, at this first

---

188

1  meeting was a review of the current FMI animal
2  welfare program to determine if we need additional
3  standards; is that correct?
4      A. That's how I read it.
5      Q. And did that take place at that first
6  meeting of the animal welfare panel?
7      A. I can't remember if we talked
8  specifically about those standards.
9      Q. Do you recall anything else that was
10  discussed at the first meeting of the animal welfare
11  panel in November of 2006?
12      A. Not specific to egg layers or the
13  egg-producing industry.
14      Q. Do you recall anything in general about
15  the egg-laying industry that was discussed at the
16  first meeting?
17      A. I don't. But I do recall quite a bit of
18  discussion around controlled atmosphere stunning in
19  regards to poultry.
20      Q. And what is controlled-atmosphere
21  stunning?
22      A. It is for broilers, chicken broilers;
23  one of the ways to render them unconscious before
24  they're slaughtered by a reciprocating blade to
25  their throat.

---

189

1      Q. And, to your knowledge, at that point in
2  time, was Kroger receiving poultry that had been
3  subject to that procedure?
4      A. Not to my knowledge.
5      Q. Was there some issue that needed to be
6  discussed about that particular topic?
7      A. It was the hottest topic at that time in
8  regards to animal welfare. We had received
9  shareholder proposals.
10      Q. Pertaining to controlled-atmosphere
11  stunning?
12      A. Yes.
13      Q. But, again, that's not an issue with
14  respect to egg-laying hens; correct?
15      A. It is not.
16      Q. Let's mark as Exhibit -- I'll mark these
17  together as Exhibits 30 and 31; documents bearing
18  Bates No. KRGEG00017070 through '71; and as
19  Exhibit 31, a document bearing Bates
20  No. KRGEG00017241 through '42.
21      (Discussion off the stenographic
22      record.)
23      MS. LEVIN: I'll make that 31 and 32.
24      (Pause.)
25      (Kroger Exhibit 31 and Exhibit

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                              April 8, 2014

49 (Pages 190 to 193)

---

190

1  Kroger-32 were marked for
2  identification.)
3  THE WITNESS:  I've reviewed the
4  documents, 31 and 32.
5  BY MS. LEVIN:
6  Q.  What is Exhibit 31?
7  A.  31 is the agenda for the
8  December 16th, 2008 meeting.
9  Q.  And what is Exhibit 32?
10  A.  The minutes from that meeting.
11  Q.  And this is the meeting of the Kroger
12  panel animal welfare meeting?
13  A.  Yes.
14  Q.  Is that your handwriting that appears on
15  Exhibit 31?
16  A.  It is.
17  Q.  So these would be your notes from the
18  December 16, 2008 Kroger animal welfare meeting?
19  A.  Yes.  Those are my handwritten notes.
20  Q.  Does review of this document,
21  Exhibit 31, refresh your recollection at all about
22  what occurred at the December 16, 2008 animal
23  welfare meeting?
24  A.  It does.
25  Q.  What does it bring back to mind?

---

191

1  A.  It brings back -- I believe this was our
2  inaugural meeting.  This is the first time we had
3  brought the members together.
4  So we talked about -- we made
5  introductions, talked about the mission of the
6  panel.  And then each of the experts, as it's
7  indicated here, had 20 minutes to talk about what
8  was going on in their areas of expertise; review of
9  the audits and whether -- you know, are they
10  adequate or not to stand up to the guidelines or to
11  evaluate against a processor against those
12  guidelines.
13  Future Perspective on animal welfare,
14  Upcoming Meetings, Next Steps.
15  Q.  Your handwriting right next to the
16  "Kroger's Future Perspective on animal welfare,"
17  what does that say?
18  A.  "How to structure a process that ensures
19  that our 'standards' are keeping up."
20  Q.  What does that mean, "our standards are
21  keeping up"?
22  A.  Well, at that time -- I'm not certain
23  exactly what I meant.  But I know we were talking
24  about audits, so we wanted to make sure that the
25  audits that were being conducted against guidelines

---

192

1  were effective.  Therefore, you know, our -- our
2  suppliers, when it comes to animal welfare
3  requirements, adhering to those requirements.
4  Q.  Take a look at the backside of the
5  second page of Kroger Exhibit 31.  What is Page 2 of
6  that exhibit?
7  A.  It's an email from Lynn Marmer to me,
8  Mark Van Buskirk, copying John Kolenski.
9  Q.  And you'll see one of the things that
10  Ms. Marmer says in the first sentence is that Kroger
11  has been a leader in pushing the retail industry to
12  develop standards for species and working
13  collaboratively with trade associate groups like
14  AMI.
15  Do you see that?
16  A.  Yes.
17  Q.  And that was a view that Ms. Marmer
18  expressed to you during your interview with her;
19  correct?
20  A.  Yeah; that we have been an industry
21  leader.
22  Q.  In the development of animal welfare
23  guidelines; correct?
24  MR. MURRAY:  Object to the form of the
25  question.

---

193

1  THE WITNESS:  Well, I would say it's to
2  make sure that we have the right standards in place,
3  according to the experts.
4  BY MS. LEVIN:
5  Q.  Right.  But Kroger has been a leader in
6  attempting to ensure that animal welfare guidelines
7  were developed for egg-laying hens, amongst other
8  animals?
9  MR. MURRAY:  Objection to the form of
10  the question.
11  THE WITNESS:  All I can interpret this
12  is that it's a general statement about standards for
13  the entire industry, not just egg layers.  AMI is
14  American Meat Institute.
15  BY MS. LEVIN:
16  Q.  Well, I understand it's for species
17  beyond hens.  But one of the species that Ms. Marmer
18  is referring to there is egg-laying hens; correct?
19  MR. MURRAY:  Objection to the form of
20  the question.
21  THE WITNESS:  That would be speculation
22  on my part.
23  BY MS. LEVIN:
24  Q.  Well, you received this memo; correct?
25  A.  I did.

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

50 (Pages 194 to 197)

---

### 194

1       Q. And what did you speculate Ms. Marmer
2  meant when you received it?
3       **A. That she was talking about the industry**
4  **in general, and she made specific reference to the**
5  **American Meat Institute. So she's talking about all**
6  **industries where animal welfare is a concern.**
7       Q. Including egg-laying hens; correct?
8       **A. I don't read that in there, but . . .**
9       Q. Well, isn't that one of the "all
10  industries where animal welfare standards are a
11  concern"?
12       **A. It is one of the industries.**
13       Q. So when you say that she was concerned
14  about all industries in which animal welfare
15  guidelines are a concern, you understood her to
16  also be talking about egg-laying hens, didn't you?
17       **A. I could only assume that she was**
18  **including them.**
19       Q. That's how you understood it; correct?
20       **A. Yes. At the time we had three**
21  **industries represented, so we were talking about all**
22  **of those industries.**
23       Q. So it was Ms. Marmer's view that Kroger
24  has been a leader in pushing the retail industry's
25  developed standards for egg-laying hens amongst

### 195

1  other animals; correct?
2       **A. Well, again, how she uses "develop,"**
3  **this -- I don't know if she is saying "develop" in**
4  **terms of creating -- I don't know the context she's**
5  **using "develop."**
6       Q. Mr. Pruett, you received this email in
7  December of 2008; correct?
8       **A. Correct.**
9       Q. You were involved with developing an
10  animal welfare panel that included as part of its
11  mission review of the animal welfare guidelines for
12  egg-laying hens; correct?
13       **A. They would have -- that would have been**
14  **part of their work.**
15       Q. Do you have any doubt that when
16  Ms. Marmer sent you this email, what she was
17  referring to was developing standards for egg-laying
18  hens?
19       MR. MURRAY: Objection; asked and
20  answered.
21       THE WITNESS: The retail industry
22  cannot -- is not in a position to develop the
23  standards. The experts that work in the
24  supplier companies. They have the experts who can
25  develop the guidelines like they did at UEP. So,

### 196

1  again, the company --
2  BY MS. LEVIN:
3       Q. And Kroger was a leader in pushing for
4  that to happen; correct?
5       MR. MURRAY: He wasn't done with his
6  answer. He got cut off.
7       THE WITNESS: Again, when she says
8  "develop," I don't know if she literally means that
9  the retailers are developing the standards. They
10  don't have the expertise to develop the standards.
11  BY MS. LEVIN:
12       Q. I'm not asking if the -- if the -- if
13  Kroger was developing standards.
14       What Ms. Marmer wrote is, "Kroger has
15  been a leader in pushing the retail industry to
16  develop standards"; correct?
17       **A. That's what says in the note to me.**
18       Q. And one of the species that she was
19  referencing were egg-laying hens; correct?
20       MR. MURRAY: Objection; asked and
21  answered.
22       THE WITNESS: I don't have anything else
23  to say about that, because she's not specifically
24  talking about egg layers in that sentence.
25  BY MS. LEVIN:

### 197

1       Q. I understand she's not talking about
2  them. She's talking about species; correct?
3       **A. She's talking about species, all**
4  **species.**
5       Q. Including egg-laying hens; correct?
6       MR. MURRAY: Objection. Asked and
7  answered.
8       THE WITNESS: I don't have anything else
9  to say about it. I'm just reading it like you are.
10  BY MS. LEVIN:
11       Q. Yes. And you received it in 2008;
12  correct, Mr. Pruett?
13       **A. Correct.**
14       Q. And did you not understand at the time
15  that you received the second page of Exhibit 31 that
16  when Ms. Marmer wrote, "Kroger has been a leader in
17  pushing the retail industry to develop standards for
18  species," that one of the species she was referring
19  to were egg-laying hens?
20       **A. All I can say is, we had a**
21  **representative that was dealing with poultry and**
22  **eggs on the committee. And that's -- she was**
23  **responding to the work of that group.**
24       Q. Right.
25       **A. Right.**

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

51 (Pages 198 to 201)

---

198

1    Q. But the committee included an expert on
2  egg-laying hens; correct?
3        MR. MURRAY: Objection; mischaracterizes
4  his testimony.
5  BY MS. LEVIN:
6    Q. Dr. Denton was an expert on egg-laying
7  hens; correct?
8    **A. And poultry in general.**
9    Q. And poultry, but also egg-laying hens.
10 And Ms. Marmer was happy to see that Dr. Denton
11 would be meeting with you; correct?
12   **A. She doesn't say that.**
13   Q. "I'm glad to see your animal welfare
14 advisers are meeting." Do you see that? The very
15 first sentence of the email.
16   **A. Yeah, but she doesn't specifically point**
17 **out Dr. Denton. She just talks about the panel in**
18 **general.**
19   Q. Well, but Dr. Denton was on the panel;
20 correct, Mr. Pruett?
21   **A. Correct.**
22   Q. So she was happy that there was going to
23 be a meeting that included an expert on animal
24 welfare standards for egg-laying hens; correct?
25       MR. MURRAY: Objection to the form of

---

199

1  the question; mischaracterizes the document and the
2  testimony.
3       THE WITNESS: I can't speak to what she
4  meant when she made that statement, what she
5  specifically was thinking or saying or feeling.
6  BY MS. LEVIN:
7    Q. You were completely baffled when you
8  received this email?
9    **A. No, I wasn't completely baffled.**
10   Q. Then what did you understand she was
11 talking about?
12   **A. That she was talking about the animal**
13 **welfare panel.**
14   Q. That included an expert on egg-laying --
15   **A. Which just happened --**
16   Q. Which included an expert, Dr. Denton, on
17 animal welfare for egg-laying hens?
18       MR. MURRAY: Objection to the form of
19 the question; mischaracterizes the testimony.
20       THE WITNESS: I will say Dr. Denton, who
21 happens to be an expert in poultry and eggs, was
22 part of the panel.
23 BY MS. LEVIN:
24   Q. That she was glad to see was meeting;
25 correct?

---

200

1    **A. She was glad to see the panel --**
2    Q. Right.
3    **A. -- meeting.**
4    Q. In the third paragraph of Ms. Marmer's
5  email, she states, "We want to have a higher
6  standard for our company. We will always be
7  science-based. We want to push the supplier
8  community more than we have in the past."
9        Do you see that?
10   **A. Yes.**
11   Q. What did you understand Ms. Marmer to
12 mean when she sent you that sentence?
13   **A. That we want to have science-based**
14 **standards that meet or exceed the industry**
15 **requirements.**
16   Q. Right. So a higher standard than --
17   **A. Would be exceeding.**
18   Q. Right. And what did you understand by
19 "We want to push the supplier community more than we
20 have in the past"?
21   **A. We want them to agree to comply to**
22 **animal welfare requirements.**
23   Q. And did you understand the supplier
24 community to include those who supplied shell eggs
25 and egg products to Kroger?

---

201

1    **A. They would have been part of the**
2  **supplier community.**
3    Q. So Ms. Marmer, on behalf of Kroger,
4  stated that we, Kroger, want to push -- and in this
5  case, egg suppliers -- more than we have in the
6  past?
7        MR. MURRAY: Objection; mischaracterizes
8  the document.
9        THE WITNESS: She's talking about all
10 our suppliers in general. She doesn't specifically
11 say "egg suppliers."
12 BY MS. LEVIN:
13   Q. But one of the groups of suppliers she's
14 referring to are the suppliers of shell eggs and egg
15 products?
16       MR. MURRAY: Same objection.
17       THE WITNESS: I can only speak to, you
18 know, what she's written here.
19 BY MS. LEVIN:
20   Q. Right. Which you received. What did
21 you understand when you received it?
22   **A. That all of our suppliers need to be**
23 **meeting or exceeding animal welfare guidelines for**
24 **their individual industries.**
25   Q. And that included suppliers of shell

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                            April 8, 2014

52 (Pages 202 to 205)

---

202

1    eggs and egg products; correct?
2        A. They would have been part of this
3    evaluation.
4        Q. Part of the group that Kroger needs to
5    push; correct?
6        MR. MURRAY: Objection; form of the
7    question.
8        THE WITNESS: We want to push the
9    supplier community more than we have in the past.
10   BY MS. LEVIN:
11       Q. And that includes suppliers of shell
12   eggs and egg products?
13       A. I don't know what she means by "push."
14       Q. I'm not asking you what she means by
15   "push." We'll, again, allow others to determine
16   that since you are so puzzled by it.
17       But my question was whether the supplier
18   community she's referencing includes suppliers of
19   shell eggs and eggs products.
20       MR. MURRAY: Objection to the form of
21   the question and gratuitous comment.
22   BY MS. LEVIN:
23       Q. A supplier community that Kroger needs
24   to push includes the suppliers of shell eggs and egg
25   products; is that right?

---

203

1        A. They would have been represented by the
2    panel.
3        Q. And that was part of the supplier
4    community that Ms. Marmer said Kroger needs to push?
5        A. They are part of Kroger's supplier
6    community.
7        Q. That Kroger needs to push; correct?
8        A. She doesn't specifically say we're
9    pushing those specific suppliers. We're pushing --
10   we want all our suppliers to achieve the animal
11   welfare guidelines appropriate for each of their
12   industries.
13       Q. But Ms. Marmer says Kroger wants to push
14   the supplier community, and included within that
15   supplier community are the vendors of shell eggs and
16   egg products; correct?
17       MR. MURRAY: Objection to the form of
18   the question, asked and answered.
19       THE WITNESS: I've stated my
20   interpretation of Sentence 3.
21   BY MS. LEVIN:
22       Q. And included within the supplier
23   community that Kroger needs to push are the
24   suppliers of shell eggs and egg products; correct?
25       MR. MURRAY: Objection; asked and

---

204

1    answered.
2        THE WITNESS: They are part of Kroger's
3    supply base. So they were included as part of this
4    animal welfare panel's evaluation.
5    BY MS. LEVIN:
6        Q. And they were part of the supplier
7    community that Ms. Marmer said Kroger wants to push;
8    correct?
9        MR. MURRAY: Objection; asked and
10   answered.
11       MS. LEVIN: You know, if you can find --
12       MR. MURRAY: Mischaracterizes the
13   document.
14       MS. LEVIN: If you can find an answer in
15   all of that to that question, God bless you; but I
16   surely haven't heard it.
17       MR. MURRAY: I've heard it five
18   different times. He's told you that's all he can
19   interpret it.
20       THE WITNESS: That's all I'm going to
21   say about it. They are part of our supplier
22   community.
23   BY MS. LEVIN:
24       Q. And they are part of the supplier
25   community that Ms. Marmer said Kroger wants to

---

205

1    push --
2        MR. MURRAY: Objection to the form of
3    the question. Mischaracterizes the document.
4    BY MS. LEVIN:
5        Q. -- correct.
6        MR. MURRAY: And it -- it's already been
7    answered.
8        THE WITNESS: I feel like I've answered
9    the question.
10   BY MS. LEVIN:
11       Q. I understand you do. It's a very simple
12   yes-or-no question. Yes or no: When Ms. Marmer
13   wrote, "We want to push the supplier community," did
14   you understand that to include sellers of shell eggs
15   and egg products?
16       A. All I'm saying is I don't know what
17   Ms. Marmer was thinking when she said "push."
18       Q. I'm not asking you what she meant by
19   "push," Mr. Pruett. My question is really simple.
20   My question is, what did she mean by "supplier
21   community"? Did it include suppliers of shell eggs
22   and egg products?
23       A. They would have been part of our
24   supplier community.
25       Q. That Ms. Marmer was referencing in the

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

53 (Pages 206 to 209)

---

206

1   third sentence of Bullet Point 3 of Exhibit 31?
2          MR. MURRAY: Objection; mischaracterizes
3   the document and it's been asked and answered.
4          THE VIDEOGRAPHER: Two minutes,
5   Counselor.
6          THE WITNESS: I'm telling you how I'm
7   interpreting this.
8   BY MS. LEVIN:
9       Q. I would love to hear: How did you
10  interpret "supplier community"? Did you interpret
11  that phrase to include the suppliers of shell eggs
12  and egg products?
13      A. They would be part of our supplier
14  community, Kroger's supplier community.
15      Q. That Ms. Marmer said Kroger need to
16  push?
17         MR. MURRAY: Objection.
18         THE WITNESS: That's how it reads.
19         MS. LEVIN: Since we're near the end of
20  the tape, we'll take a break.
21         THE VIDEOGRAPHER: We are going off the
22  record. This is the end of Disk 3. Time on video
23  is 15:30.
24         (Recess taken.)
25         THE VIDEOGRAPHER: We are going back on

---

207

1   the record. This is the beginning of Disk 4. Time
2   on video is 15:39.
3   BY MS. LEVIN:
4       Q. Mr. Pruett, let's return to Exhibit 31
5   for just another minute or two.
6          You'll see that there's handwriting by
7   you, both on the first page of Exhibit 31, which
8   you've told us are your notes from the animal
9   welfare panel meeting of December 16, 2008. There
10  are also handwritten notes on Page 2 of Exhibit 31,
11  which is the email from Ms. Marmer to you.
12      A. Yes.
13      Q. Do you know whether the notes on the
14  email are from the meeting on December 16, 2008, or
15  from something else?
16      A. I don't know if they were associated
17  with the meeting.
18      Q. Do you recall calling Ms. Marmer after
19  you received the email that is the second page of
20  Exhibit 31?
21      A. I don't remember calling her.
22      Q. So you don't know whether these notes
23  are notes from a conversation that you had with
24  Ms. Marmer?
25      A. No, I can't say that I remember exactly

---

208

1   why I wrote these notes.
2       Q. The first note says, "Pushed retail
3   industry to develop standards."
4          Do you see that?
5       A. Yes.
6       Q. Was that referring to Kroger pushed
7   retail industry to develop standards?
8       A. It says, "Pushed retail industry to
9   develop standards."
10      Q. Right. Who pushed retail industry to
11  develop standards?
12      A. Since it doesn't say "Kroger," I don't
13  know if we're talking specifically about Kroger here
14  or some other entity.
15      Q. Well, the first sentence of Ms. Marmer's
16  Point No. 1 is, "Kroger has been a leader in pushing
17  the retail industry to develop standards"; correct?
18      A. That's what's indicated. That's what's
19  said.
20      Q. And your first handwritten entry is,
21  "Pushed retail to develop standards"; correct?
22      A. Correct.
23      Q. But you can't tell me whether, like
24  Ms. Marmer's email, the handwritten reference is
25  also to Kroger pushed retail industry to develop

---

209

1   standards?
2       A. I simply don't remember.
3       Q. The third bullet point in your
4   handwriting says, "Want to have higher standard.
5   But keep it balanced and science-based."
6          Did I read that correctly?
7       A. Correct.
8       Q. Do you recall what discussions you or
9   the panel may have had concerning the needs to keep
10  standards science-based?
11      A. Well, it goes back to what was indicated
12  earlier in the mission statement, which would have
13  been covered at that first meeting, Kroger
14  Exhibit 29.
15      Q. And specifically what part of the
16  mission statement?
17      A. The first paragraph of the mission
18  statement [reading]: To provide expert
19  science-based knowledge and guidance to assist the
20  nation's largest grocery retailer in developing
21  policies, vendor standards, and internal monitoring
22  process.
23      Q. So Kroger wanted to be sure that
24  whatever standards it required its shell egg and egg
25  product providers to follow, that they were

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

54 (Pages 210 to 213)

---

210

1  science-based standards; correct?
2      MR. MURRAY:  Object to the form of the
3  question.
4      THE WITNESS:  They would have been part
5  of this process, since Dr. Denton is part of the
6  committee -- or was part of the committee at that
7  time.
8  BY MS. LEVIN:
9      Q.  Right.  But part of the mission was to
10  ensure that whatever guidelines Kroger required its
11  shell egg and egg product providers to follow, that
12  they were expert science-based standards; correct?
13      **A.  That would be correct, since they were**
14  **part of the panel or Dr. Denton was part of the**
15  **panel.**
16      Q.  Ms. Marmer's email, in Point 6, part of
17  Exhibit 31, makes reference to the more extreme
18  advocacy groups.  And your handwritten notes at the
19  bottom make reference to "any reasonable advocacy
20  groups?"
21      Do you see those two references?
22      **A.  I do.**
23      Q.  Do you know what those two entries were
24  referring to?
25      **A.  "Any reasonable advocacy groups?  Will**

---

211

1  **research."**
2      Q.  Right.  Well, let's start with
3  Ms. Marmer's reference to extreme, more extreme
4  advocacy groups.  Do you know what she was referring
5  to?
6      **A.  She would have been referring to PETA**
7  **and HSUS.**
8      Q.  So you're able to interpret that
9  particular sentence?
10      **A.  Yes.**
11      Q.  Okay.  So PETA and HSUS?
12      **A.  Yes.**
13      Q.  And do you recall what you were
14  referring to when you said "any reasonable advocacy
15  groups?"
16      **A.  I do.**
17      Q.  What was that?
18      **A.  I was trying to figure out if or**
19  **identify any other advocacy groups other than PETA**
20  **and HSUS.**
21      Q.  Because PETA and HSUS were not
22  reasonable advocacy groups?
23      **A.  Well, I was hoping to find a consumer**
24  **group or advocacy group that was more reasonable.**
25      Q.  Did you find any advocacy group that was

---

212

1  more reasonable than PETA or HSUS?
2      **A.  We haven't identified anyone else to**
3  **work with.**
4      Q.  Let's look at Exhibit 32.  And the only
5  question I have for you is, are these, in fact, the
6  official minutes of the "Kroger Panel Animal Welfare
7  Meeting" of December 16, 2008?
8      **A.  These would be the minutes.**
9      Q.  Who kept the minutes?
10      "Who prepared them?" is really my
11  question.
12      **A.  John Kolenski would have prepared the**
13  **minutes.**
14      Q.  And would there be a review at the next
15  meeting and an approval of the minutes of the prior
16  meeting of the panel -- Kroger Panel animal welfare
17  Group?
18      **A.  We would send out the minutes to the**
19  **panel ahead of the next meeting, just to refresh**
20  **their memory on what was covered.**
21      Q.  Right.  And there was every effort made
22  to make sure that the minutes accurately reflected
23  what happened at the meeting?
24      **A.  John would have made every effort to do**
25  **that.**

---

213

1      Q.  Did you review the minutes to ensure
2  that they were accurate?
3      **A.  I can't tell you at that time I did.  He**
4  **could have sent them out without my review.**
5      Q.  Well, after you received them, did you
6  review them to make sure that they were accurate?
7      **A.  Yes.  I would have read them for**
8  **accuracy.**
9      Q.  And do you recall there being any
10  inaccuracies in Exhibit 32?
11      **A.  I don't remember any.**
12      Q.  Take just a minute to look at some
13  documents pertaining to compliance with animal
14  welfare guidelines.
15      MS. LEVIN:  I'm marking as Exhibit 33 a
16  document bearing Bates No. MPS-00123670.
17      (Kroger Exhibit 33 was marked for
18      identification.)
19      THE WITNESS:  I reviewed Exhibit 33.
20  BY MS. LEVIN:
21      Q.  And what is Exhibit 33?
22      **A.  It is a letter from John Kolenski to Bob**
23  **Krouse at Midwest Poultry.**
24      Q.  And the letter states in the second
25  sentence, "As you know, Kroger continues to require

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                      April 8, 2014

55 (Pages 214 to 217)

---

214

1    an annual third-party animal welfare audit be
2    conducted at each of your egg-laying facilities that
3    has the potential of shipping shell, liquid or dried
4    eggs to any Kroger retail division or Kroger
5    manufacturing facility."
6          Is that correct?
7          **A. Correct.**
8          Q. And then it asks Mr. Krouse to provide a
9    complete copy of each of your plant's most recent
10   animal welfare audits; correct?
11         **A. Yes.**
12         Q. Did you discuss with Mr. Kolenski this
13   particular document or any documents like it?
14         **A. I would have discussed the general**
15   **format of the documents for all of our suppliers**
16   **with John Kolenski, and he would have put in the**
17   **appropriate guidelines applicable to that supplier.**
18         Q. And did you discuss Defendants'
19   Exhibit 33 in your preparation for your deposition
20   today?
21         **A. We did not discuss this particular**
22   **letter.**
23         Q. Do you know whether Kroger sends a
24   letter like Exhibit 33 to all of its suppliers of
25   shell eggs or egg products on an annual basis?

---

215

1          **A. I can only tell you that this letter**
2    **would go out to a new supplier. I'm not certain if**
3    **we sent out a reminder letter every year.**
4          Q. Well, do you know whether Midwest
5    Poultry was a new supplier as of November 2009?
6          If you'd like to refresh your
7    recollection, you can look back at Exhibit 17.
8          **A. I know Midwest Poultry was a supplier.**
9          Q. But was it a new supplier in 2009?
10         **A. No, it wouldn't have been.**
11         Q. So was it Kroger's practice to send a
12   letter like Exhibit 33 to all of its suppliers of
13   shell eggs and eggs products on an annual basis?
14         **A. I don't know if this was a -- if this is**
15   **an annual letter or if it's -- it was a reminder**
16   **letter. We do have a requirement that we receive**
17   **third-party audits from each of our suppliers.**
18         Q. So if you received the third-party audit
19   just unsolicited from the supplier, you wouldn't
20   need to send out Exhibit 33; correct?
21         MR. MURRAY: Objection --
22         THE WITNESS: We have a --
23         MR. MURRAY: -- form of the question.
24         THE WITNESS: We have a system for
25   tracking supplier audits each year.

---

216

1    BY MS. LEVIN:
2          Q. So you have a system to ensure that
3    Kroger receives from each of its shell egg and egg
4    product suppliers some sort of animal welfare audit;
5    correct?
6          **A. Correct.**
7          Q. And that's to ensure that the supplier
8    is complying with the UEP animal welfare guidelines?
9          **A. Correct.**
10         MS. LEVIN: Let's mark as Exhibit 34 a
11   document bearing Bates No. KRGEGED -- I don't know
12   how many zeros that is -- 0000082. There may be one
13   more zero in there.
14         (Kroger Exhibit 34 was marked for
15         identification.)
16         THE WITNESS: I've reviewed Exhibit 34.
17   BY MS. LEVIN:
18         Q. What is Exhibit 34?
19         **A. It's a letter from John Kolenski to**
20   **Roger Deffner of National Food Corporation.**
21         Q. Dated April 7, 2010; is that correct?
22         **A. Correct.**
23         Q. And what is the substance of
24   Mr. Kolenski's letter to Mr. Deffner?
25         **A. It looks like his facility failed a UEP**

---

217

1    **audit on August 20th, 2009; and John is asking for**
2    **the following information as a follow-up to the**
3    **audit failure.**
4          Q. How would Kroger learn that a facility
5    had failed a UEP audit?
6          **A. It would be reported through the**
7    **database when they submit their audit. That's the**
8    **only way I know that he would have found out about**
9    **this.**
10         Q. So the supplier is required to submit
11   through some sort of database --
12         **A. Yes; annually.**
13         Q. -- an audit letter annually.
14         And that's been true since 2005?
15         **A. The audit database was not created until**
16   **about 2008.**
17         Q. Prior to 2008, how did Kroger go about
18   learning whether its egg suppliers were complying
19   with the UEP guidelines?
20         **A. It would have been a manual process.**
21   **They would have mailed in hard copies of their**
22   **audits.**
23         Q. So instead of submitting it
24   electronically, they actually mailed in a physical
25   copy?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

56 (Pages 218 to 221)

---

218

1    **A. Yes; for the files.**
2    Q. And if a supplier failed prior to 2008,
3    it would receive a letter similar to Exhibit 34?
4    **A. They would have received a similar**
5    **communication.**
6    Q. Let's mark as Exhibit 35 a document
7    bearing the Bates No. KRGEGED00020416 through '17.
8    (Kroger Exhibit 35 was marked for
9    identification.)
10   THE WITNESS: I've reviewed Exhibit 35.
11   BY MS. LEVIN:
12   Q. And what is Exhibit 35?
13   **A. It's an email from Jennifer Siewe to Tom**
14   **Klump, copying Dallas Lindley.**
15   Q. Who is Ms. Siewe?
16   **A. She was formerly a procurement**
17   **associate -- I don't know her exact title -- that**
18   **worked in our sourcing department.**
19   Q. Did she work for Mr. Klump?
20   **A. I cannot tell you if she directly**
21   **reported to Tom Klump or not.**
22   Q. But she worked in the same general area
23   of procurement?
24   **A. She worked in procurement.**
25   Q. Was her responsibilities -- did her

---

219

1    responsibilities include procurement of shell eggs
2    or egg products?
3    **A. I believe she was involved in that**
4    **supply chain.**
5    Q. The email from Ms. Siewe to Mr. Klump is
6    dated March 10, 2010; correct?
7    **A. Correct.**
8    Q. And the "re" line is Animal Care
9    Certified industrial eggs.
10   Do you see that?
11   **A. I do.**
12   Q. What are industrial eggs?
13   **A. Industrial eggs would be like ingredient**
14   **eggs.**
15   Q. So those would be eggs that go into
16   bakery products or other kinds of products that
17   Kroger makes itself?
18   **A. What we would formulate in our own**
19   **manufacturing plants.**
20   Q. And do you understand Animal Care
21   Certified to be a reference to the UEP animal
22   welfare guidelines?
23   **A. ACC -- what was -- what did ACC stand**
24   **for again?**
25   Q. Well, it says Animal Care Certified in

---

220

1    the "re" line.
2    **A. Okay.**
3    Q. And my question is whether you
4    understood Animal Care Certified to be a reference
5    to eggs produced in accordance with the UEP animal
6    welfare guidelines.
7    **A. I was not familiar with that**
8    **relationship.**
9    Q. So you don't know what ACC eggs are?
10   **A. I can't tell you I do.**
11   Q. Well, in the top email from Ms. Siewe
12   back to Mr. Klump, she says, "John Kolenski's group
13   has always advised that all of our suppliers should
14   be UEP-approved -- I'm not sure if this differs from
15   ACC."
16   Do you see that?
17   **A. Yes.**
18   Q. And you're not able to provide any light
19   on whether that is the same or different than --
20   whether ACC and UEP-approved are the same?
21   **A. Right. My assumption is it's a**
22   **different requirement, but I'm not familiar with**
23   **ACC.**
24   Q. But, as we know, you won't assume things
25   here today.

---

221

1    **A. Correct. I'm not familiar with ACC.**
2    Q. Mr. Kolenski's group, in any event, has
3    advised that all of the suppliers need to be
4    UEP-approved, even for industrial eggs; correct?
5    **A. Correct.**
6    Q. And that's been true since the advent of
7    Kroger's adoption of the UEP animal welfare
8    guidelines in its contracts?
9    **A. Yes.**
10   Q. And it remains true today?
11   **A. Yes.**
12   Q. Let's shift gears to a different topic
13   for just a minute. Maybe some of these will be
14   relatively quick.
15   One of the topics that you've been
16   designated is Topic 14, which reads: Your contacts
17   with the US Department of Justice, Florida Attorney
18   General or any other federal or state law
19   enforcement official in connection with any
20   investigation of possible antitrust violations
21   regarding the production or sale of eggs or egg
22   products that is related to the subject matter of
23   this litigation.
24   What did you do to educate yourself on
25   that topic?

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

57 (Pages 222 to 225)

---

222

1    THE WITNESS:  I didn't do anything to
2  educate myself in that topic because I haven't been
3  in contact with any of those agencies.
4  BY MS. LEVIN:
5    Q.  Well, you haven't been in contact with
6  any of the agencies.  I understand that.
7    Did you determine whether anyone at
8  Kroger had been in contact with any of those
9  agencies?
10   **A.  The only other person I consulted was**
11 **John Kolenski, and he said he had not.**
12   Q.  So you and Mr. Kolenski were the only
13 two people that you identified as having any
14 information relevant to Topic 14?
15   MR. MURRAY:  Objection to the form of
16 the question; mischaracterizes his testimony.
17   THE WITNESS:  We didn't identify
18 ourselves -- identify that we were the only two.  We
19 just acknowledged that neither one of us had been in
20 communication with any of those agencies.
21 BY MS. LEVIN:
22   Q.  But did you consider whether there might
23 be somebody else within Kroger who had had such
24 contacts?
25   **A.  We did not ask anybody else in the**

---

223

1  organization.
2    Q.  So you made no effort to determine
3  whether anyone within Kroger, other than you or
4  Mr. Kolenski, had had any contacts with the
5  Department of Justice, the Florida Attorney General
6  or any other federal or state law enforcement
7  officials?
8    **A.  I personally did not make the effort.**
9    Q.  Did somebody else make the effort?
10   **A.  Our law department could have.**
11   Q.  But did your law -- your law department
12 could have what?
13   **A.  Made an effort to determine if anybody**
14 **else at Kroger had been in communication with those**
15 **agencies.**
16   Q.  Did you ask your law department to make
17 that determination?
18   **A.  I did not.**
19   Q.  Did anybody ask your law department to
20 do that?
21   **A.  I don't know.**
22   Q.  Is there anybody else that you can think
23 of that you could have contacted who could have
24 provided you with information with respect to
25 Topic 14?

---

224

1    **A.  I don't.  John and I, generally**
2  **responsible for those contacts.**
3    Q.  Well, you're generally responsible for
4  them, but you don't really know if any others
5  occurred; correct?
6    MR. MURRAY:  Objection to the form of
7  the question.  It's argumentative.
8    THE WITNESS:  I don't know.
9  BY MS. LEVIN:
10   Q.  [Reading]:  Topic 22:  From 1999 to the
11 present, Kroger's participation in, membership in or
12 awareness of trade groups and trade associations in
13 the grocery store industry, including but not
14 limited to the Food Marketing Institute.
15   What did you do to prepare yourself for
16 Topic 22?
17   **A.  Other than our involvement with FMI, I**
18 **didn't evaluate or look into relationships with**
19 **other associations.**
20   Q.  So do you know whether Kroger belongs to
21 any other trade groups or trade associations in the
22 grocery store industry?
23   **A.  FMI is the only association that is**
24 **retail-oriented that we belong to.**
25   Q.  Are there other such associations?

---

225

1    **A.  FMI is the only one that I know that**
2  **represents retailers.**
3    Q.  Did you inquire as to whether there were
4  others?
5    **A.  I did not.**
6    Q.  What about Topic 23 [reading]:  From
7  1999 to the present, reports or discussions at
8  shareholder meetings concerning animal welfare
9  issues?
10   Do you see that?
11   **A.  Yes.**
12   Q.  What do you know about that topic?
13   **A.  I know that since I've been with the**
14 **company in 2005, there have been a variety of topics**
15 **involving animal welfare that have come in as**
16 **shareholder proposals.**
17   Q.  And have any of those shareholder
18 proposals pertained to egg-laying hens?
19   **A.  What I remember were two or three**
20 **relative to battery cages.**
21   Q.  What's a battery cage?
22   **A.  It's a cage, the caged environment for**
23 **egg layers.**
24   Q.  And did those proposals pertain to cage
25 space requirements?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                April 8, 2014

58 (Pages 226 to 229)

---

226

1        A.  A couple of them did mention cage space
2    requirements.
3        Q.  Do you know when those proposals were
4    made at shareholder meetings?
5        A.  I can't tell you the specific dates.  I
6    just know that they have come up in shareholder
7    proposals since I've joined the company.
8        Q.  Do you know what the proposals were?
9        A.  I told you the extent -- to the extent I
10    remember.
11        Are you talking about all animal welfare
12    or just cage-free?
13        Q.  Just the -- anything that pertains to
14    egg-laying hens.
15        A.  The only proposals I remember were
16    battery cages.
17        Q.  And what was the proposal?
18        A.  I can't remember the specific proposal.
19        Q.  Can you remember generally what it was
20    about, other than battery cages?
21        A.  I can't remember specifics.
22        Q.  Did you review any documents to prepare
23    for this -- for Topic 23?
24        A.  I reviewed a list of the shareholder
25    proposals relative to animal welfare; and I went --

---

227

1    I scanned -- I scanned the animal welfare issues,
2    which included battery cages.
3        Q.  Do you know whether the proposals that
4    were made were, in fact, made by animal welfare
5    groups like PETA?
6        A.  Either PETA or HS -- HSUS.
7        Q.  Okay.  Did the company take those
8    shareholder proposals seriously?
9        MR. MURRAY:  Object to the form of the
10    question.
11        THE WITNESS:  We consider all
12    shareholder proposals seriously.
13    BY MS. LEVIN:
14        Q.  And was a vote taken on the -- whatever
15    the animal welfare proposal was that you are
16    generally recalling?
17        A.  There's always a vote taken on
18    shareholder proposals.
19        MS. LEVIN:  Let's mark as Exhibit 36 a
20    document titled "Schedule 14A Information, Proxy
21    Statement Pursuant to Section 14(a) of the
22    Securities Exchange Act of 1934."
23        (Kroger Exhibit 36 was marked for
24        identification.)
25    BY MS. LEVIN:

---

228

1        Q.  And I'm not interested in the selection
2    of auditors.  I'm interested in the shareholder
3    resolution that appears at the bottom of, I guess,
4    the third or fourth page of Exhibit 36.
5        A.  Okay.  I've reviewed that portion of the
6    document.
7        Q.  What is Exhibit 36?
8        A.  Well, specifically, on -- it looks like
9    top of Page 46 of the exhibit, from the shareholder
10    proposal, a number for that page.
11        Q.  Right.
12        A.  It's a shareholder resolution relative
13    to egg-laying hens in cramped, wired battery cages.
14        Q.  And what is the gist of the shareholder
15    proposal here?
16        A.  It's a push for the vendor community to
17    embrace new best practices in animal welfare, and
18    they're talking specifically about egg-laying hens.
19        Q.  Is this one of the shareholder proposals
20    that you were referencing in your earlier testimony?
21        A.  Yes.  Since it involves battery cages, I
22    would have been referencing this one.
23        Q.  And do you recall that there were
24    additional shareholder proposals beyond that
25    represented in Exhibit 36?

---

229

1        A.  There were one or two other ones.
2        Q.  But you don't recall when they were
3    made?
4        A.  No.  I can't recall the year that the
5    proposals were submitted.
6        Q.  Do you recall whether they were after
7    2008?
8        A.  I can't tell you.
9        Q.  But the shareholder proposal embodied in
10    Exhibit 36 did not pass, to your knowledge?
11        A.  To the best of my knowledge, it did not
12    pass.
13        Q.  Let's look at Topic 37, which is
14    basically a series of topics pertaining to Kroger's
15    Complaint.
16        Have you reviewed the Complaint that
17    Kroger filed in this litigation?
18        A.  I did.
19        Q.  And, specifically, did you review the
20    Second Amended Complaint?
21        A.  I need a copy of the Complaint.
22        MS. LEVIN:  I have a copy -- I do if
23    that will help him to --
24        MR. MURRAY:  I think it will help.
25        THE WITNESS:  It would be helpful for me

---

HIGHLY CONFIDENTIAL

Pruett, Payton

April 8, 2014

59 (Pages 230 to 233)

---

230

1  to have a copy.
2          MS. LEVIN:  I'm marking as Exhibit 37 a
3  document captioned "Second Amended Complaint and
4  Demand for Jury Trial."
5          (Kroger Exhibit 37 was marked for
6  identification.)
7  BY MS. LEVIN:
8      Q.  Can you just flip through that and make
9  sure that doesn't have highlighting on it.  It's
10  possible -- it would be in the first couple of
11  pages.
12      A.  I don't see any highlighting.
13      Q.  Okay.  Then you don't have my copy.
14      A.  Could you repeat the question.
15      Q.  There's not a question.  I just asked
16  you to take a look at it.
17          Is Exhibit 37 the version of the
18  Complaint that you have reviewed?
19      A.  It appears to be the same version.
20      Q.  Did you review either the Second Amended
21  Complaint, the First Amended Complaint or the
22  Complaint prior to those documents being filed?
23      A.  I did not.
24      Q.  Do you know who did?
25      A.  I don't know specifically who did.

---

231

1          Someone in the law department.
2      Q.  What do you understand is the factual
3  basis for Kroger's contention that starting at
4  least 2000 and continuing at least through 2008,
5  defendants and their co-conspirators conspired to
6  and did curtail the production of eggs as well as
7  control and reduce the supply of eggs in order to
8  artificially increase the price of eggs sold above
9  competitive levels?
10          MR. MURRAY:  Objection; call for a legal
11  conclusion.
12          You can answer to the extent you have
13  knowledge.  And in answering the question, I would
14  caution you not to reveal any communications you've
15  had with counsel, either with Kroger or outside
16  counsel.
17          THE WITNESS:  The extent of my knowledge
18  is what I've read in the Complaint.
19  BY MS. LEVIN:
20      Q.  So you know nothing about the
21  allegations of the Complaint or the factual support
22  for the allegations of the Complaint beyond what is
23  in the Complaint?
24          MR. MURRAY:  Objection to the extent it
25  calls for a legal conclusion or invades

---

232

1  attorney-client privilege.
2          You can answer to the extent you know
3  independent of what you learned from your lawyers.
4          THE WITNESS:  Again, what I know is what
5  I read in the Complaint.
6  BY MS. LEVIN:
7      Q.  What do you understand is the factual
8  basis for that allegation?
9          MR. MURRAY:  Objection to the extent it
10  calls for a legal conclusion or to the extent your
11  answer would reveal information you've learned from
12  your lawyers.
13          THE WITNESS:  Could you repeat the
14  question.
15          (Record read.)
16          MR. MURRAY:  Same objection and same
17  caution about revealing communications with your
18  attorneys.
19          THE WITNESS:  Again, all I know is what
20  I've read in the Complaint.
21  BY MS. LEVIN:
22      Q.  What did you do to prepare for this
23  particular topic, 37?
24      A.  37 in the deposition notice?
25      Q.  Yes.

---

233

1      A.  Well, I reviewed the Complaint.  I had
2  discussions with internal counsel, outside counsel.
3  I talked to the individuals that I've indicated I
4  interviewed prior to this deposition.
5      Q.  What did the individuals that you
6  interviewed prior to the deposition tell you about
7  the factual basis for the allegations of the
8  Complaint?
9          MR. MURRAY:  And included among those
10  individuals were attorneys, so do not reveal any of
11  the information you learned from the attorneys.
12  Only from anybody else at Kroger.
13          THE WITNESS:  Beyond my attorneys, we
14  did not have any discussions.  John Kolenski,
15  Brendon Cull, Lynn Marmer, Tom Klump -- make sure I
16  got these on the list here -- and Carole Guerrette
17  regarding what is indicated in Section 37 of the
18  deposition notice.
19  BY MS. LEVIN:
20      Q.  You had no discussions with any of that
21  list of people about the factual basis for the
22  Complaint?
23      A.  I did not; only with my attorneys.
24      Q.  What do you understand is the gist of
25  the Complaint?

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                    April 8, 2014

60 (Pages 234 to 237)

---

234

1        MR. MURRAY:  In answering that question,
2   do not reveal any communications you've had with
3   your clients.  You can base it on your reading of
4   the Complaint.
5        THE WITNESS:  Based on my reading of the
6   Complaint, I understand that a group of plaintiffs,
7   retailers, including the Kroger Co., has issued this
8   Complaint or legal action against a group of egg
9   producers and UEP because of reduced -- reduction of
10  egg supply, and that reduction of egg supply has led
11  to an artificial increase in pricing.
12  BY MS. LEVIN:
13       Q.  And what do you understand was the means
14  by which the decrease in egg supply occurred?
15       MR. MURRAY:  Same instruction about
16  revealing any information you learned from your
17  lawyers.
18       THE WITNESS:  Again, I can only tell you
19  what I've learned from the Complaint.
20  BY MS. LEVIN:
21       Q.  So you didn't do anything in response to
22  Paragraph 37, other than talk to your attorneys,
23  which we're being told you can't reveal; is that
24  correct?
25       MR. MURRAY:  Objection; that

---

235

1   mischaracterizes his testimony.  He said he read the
2   Complaint.
3        THE WITNESS:  I read the Complaint.
4   BY MS. LEVIN:
5        Q.  Well, but you didn't do any independent
6   investigation of the factual allegations of the
7   Complaint?
8        A.  I did not do --
9        MR. MURRAY:  Objection; it would -- that
10  whole question would invade the attorney-client
11  privilege.
12       You can answer questions based on what
13  your understanding of the Complaint is.
14  BY MS. LEVIN:
15       Q.  Well, you can answer that question yes
16  or no.
17       A.  I did not do independent investigation.
18       Q.  So the only factual basis you can
19  provide me for the allegations in the Complaint are
20  the Complaint itself?
21       A.  Correct.  I just read the Complaint.
22       Q.  Mr. Pruett, I noticed that during the
23  course of the day, you've been referring to notes to
24  refresh your recollection; is that correct?
25       A.  I referred to these notes and one other

---

236

1   time I made a reference to notes.
2        Q.  And these notes have assisted you in
3   your testimony today?
4        A.  Yes.
5        MS. LEVIN:  Can we mark them as an
6   exhibit?
7        MR. MURRAY:  Can we make a copy of them
8   so I can have it before you mark it?
9        MS. LEVIN:  We can go off the record,
10  and I can run across the hall.
11       THE VIDEOGRAPHER:  We are going off the
12  record.  Time on video is 16:24.
13       (Recess taken.)
14       (Kroger Exhibit 38 was marked for
15       identification.)
16       THE VIDEOGRAPHER:  We are going back on
17  the record.  Time on video is 16:30.
18       MS. LEVIN:  Could you show Mr. Pruett
19  the document that has been marked as Exhibit 38.
20  BY MS. LEVIN:
21       Q.  What is Exhibit 38?
22       A.  It's a list of documents that I reviewed
23  before this deposition.
24       Q.  And is this the entirety of the list of
25  documents that you reviewed prior to the deposition?

---

237

1        A.  Yes.
2        Q.  How did you go about selecting the
3   documents that you were to review prior to the
4   deposition?
5        A.  I first went to our law department and
6   asked their advice about --
7        MR. MURRAY:  Don't tell them any advice
8   that was provided.
9   BY MS. LEVIN:
10       Q.  You can tell me the subject matter of
11  the request.
12       A.  I just wanted their guidance on which
13  documents I should view to get ready for this
14  deposition.
15       Q.  And did you add to the list of documents
16  anything of your own?
17       MR. MURRAY:  Objection to the form of
18  the question.
19       THE WITNESS:  No.  These were all
20  documents with legal counsel that I agreed to review
21  in preparation for the deposition.
22  BY MS. LEVIN:
23       Q.  And did the law department give you the
24  actual copies of the documents?
25       A.  I did not get copies of all these

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                        April 8, 2014

61 (Pages 238 to 241)

---

### 238

1  documents directly from the law department.
2      Q.  But you got copies of all of these
3  documents in some way?
4      A.  Yes.
5      Q.  Did you review anything that's not
6  listed on Defendants' Exhibit 38?
7      A.  No.  These are all the documents I
8  reviewed.
9      Q.  Did you have any recollection, when you
10  say "various FMI documents," what that refers to?
11      A.  Those would have been some of the
12  documents I reviewed in discussion with Lynn Marmer.
13      Q.  And those were documents created by FMI?
14      A.  They were either created by FMI or
15  communications from Lynn to FMI.
16      Q.  Did you have any difficulty
17  understanding any of the FMI documents that you
18  reviewed?
19      MR. MURRAY:  Object to the form of the
20  question.
21      THE WITNESS:  Difficulty
22  understanding -- what do you mean?
23  BY MS. LEVIN:
24      Q.  Well, when you read the documents, did
25  you find them difficult to understand?

---

### 240

1      Q.  Keith Neer.  Who is Mr. Neer?
2      A.  He was my predecessor.
3      Q.  So he's no longer employed by Kroger?
4      A.  No.
5      Q.  Did you make any effort to contact
6  Mr. Neer?
7      MR. MURRAY:  Objection to the question.
8      THE WITNESS:  I did not.
9  BY MR. STPHAO:
10      Q.  When Mr. Neer left the company, did you
11  inherit any files from him?
12      A.  I did inherit files.
13      Q.  Do you still have those files?
14      A.  My office still has the files.
15      Q.  Did you review any of those documents to
16  prepare for your testimony today?
17      A.  I did not review any documents that are
18  specifically in that binder.
19      Q.  Did you have any discussions with, I
20  guess it would be with Mr. Cull about any state
21  initiatives pertaining to animal welfare?
22      A.  I don't remember any conversations in
23  preparation for this deposition.
24      Q.  Are you familiar with any efforts by
25  states to regulate the conditions under which

---

### 239

1      MR. MURRAY:  Objection to the form of
2  the question.
3      THE WITNESS:  I did not find them
4  difficult to understand.
5  BY MS. LEVIN:
6      Q.  You were able to understand what FMI was
7  talking about in its documents that you reviewed?
8      A.  Yes.
9      Q.  In terms of the individuals that you
10  have, you have Kevin N. on the second page of
11  Exhibit 38 crossed out.
12      Who is Kevin N.?
13      A.  Kevin Murray.
14      MR. MURRAY:  I think the confusion stems
15  from that it is Kenny Nachwalter.  Kevin is similar
16  to Kenny and that often happens, I find, when I pass
17  out my business card.
18  BY MS. LEVIN:
19      Q.  So there was no Kevin N. that you were
20  thinking of interviewing and then decided not to
21  interview?
22      A.  No.  It was Kevin Murray.
23      Q.  Are you familiar with Kevin Neer at
24  Kroger?
25      A.  I'm familiar with Keith.

---

### 241

1  egg-laying hens are raised?
2      A.  I know that there are proposals, like in
3  California.
4      Q.  What do you know about the California
5  proposal?
6      A.  That there are concerns about egg
7  producers or egg layers in that state.
8      Q.  What are the concerns in California?
9      A.  If I remember correctly, it's about the
10  size of cages.
11      Q.  Has Kroger taken a position with respect
12  to any pending legislation in California or pending,
13  valid initiatives pertaining to egg-laying hens?
14      A.  Not to my knowledge.
15      Q.  Would it create problems for Kroger if
16  individual states adopted guidelines that varied
17  from state to state with respect to egg-laying hens?
18      MR. MURRAY:  Objection; calls for
19  speculation, also calls for a legal conclusion.
20      You can answer if you know.
21      THE WITNESS:  It would cause problems
22  because we would not have harmonized standards, from
23  an animal welfare standpoint.
24  BY MR. STPHAO:
25      Q.  Right.  And from Kroger's perspective,

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

62 (Pages 242 to 245)

---

242

1   harmonized standards are important; correct?
2       A.  Yes.
3       Q.  Are you familiar with something called
4   Kroger's annual sustainability report?
5       A.  I am.
6       MS. LEVIN:  And let's mark as Exhibit 39
7   a document entitled "Kroger, Doing Our Part, 2009
8   Sustainability Report."
9       (Kroger Exhibit 39 was marked for
10      identification.)
11      THE WITNESS:  I'm familiar with the
12  sustainability report, but I did not review 2008's
13  prior to this deposition.  I reviewed 2013's.
14      MS. LEVIN:  Okay.  Well, we can mark as
15  Exhibit 40 the 2013 sustainability report.
16      (Kroger Exhibit 40 was marked for
17      identification.)
18  BY MS. LEVIN:
19      Q.  So I have -- take a look at it, and the
20  pages I'm particularly interested in Exhibit 41
21  are Pages 30 and 31.
22      A.  Yes.
23      Q.  And in Exhibit 40, the page I'm
24  particularly interested in is Page 31.
25      MS. CRABTREE:  Sorry if I missed it.  Is

---

243

1   there a Bates label for this?
2       MS. LEVIN:  No, there's not.  These are
3   off of the Kroger Web site.
4       MS. CRABTREE:  Okay.  Thanks.
5   BY MS. LEVIN:
6       Q.  Do you have any role in preparing the
7   sustainability report for Kroger?
8       A.  John Kolenski helps with the preparation
9   of this report.
10      Q.  And he's helped with the preparation
11  since 2005?
12      A.  I can't tell you he's helped since 2005.
13  I just know he's helped in previous years.
14      Q.  Would he have helped with the 2009
15  sustainability report?
16      A.  Yes.
17      Q.  And would he have helped with the 2013
18  sustainability report?
19      A.  If there were any updates required, yes.
20      Q.  And are you aware that the
21  sustainability report is posted on the Kroger
22  Web site?
23      A.  I am.
24      Q.  So, again, it's posted on the Kroger Web
25  site for people to review and rely upon?

---

244

1       A.  It's there for the public to be able to
2   have access to.
3       Q.  And to rely upon it; correct?
4       A.  When you mean "rely upon," what are you
5   saying?
6       Q.  Well, I mean to be able to read it and
7   understand that the information contained in it is
8   accurate.
9       A.  Yes.
10      Q.  So in Exhibit 41, which is the 2014
11  sustainability report, on Page 30, it states that
12  Kroger's animal welfare panel of experts meet at
13  least once annually to review suppliers' compliance
14  with the FMI's animal welfare standards and other
15  best practices.
16      Do you see that?
17      A.  Yes.
18      Q.  And that's the animal welfare panel that
19  you organized and that you testified about
20  previously?
21      A.  Yes.
22      Q.  And the FMI animal welfare standards
23  would include the animal welfare guidelines for
24  egg-laying hens that we've been discussing today;
25  correct?

---

245

1       MR. MURRAY:  Object to the form of the
2   question.
3       THE WITNESS:  It would include all
4   standards for animal welfare, including egg layers.
5   BY MS. LEVIN:
6       Q.  And as of 2014, the Kroger animal
7   welfare panel has not found the UEP animal welfare
8   guidelines to be inadequate, has it?
9       A.  That is correct.  We're still using
10  those guidelines as our animal welfare standards for
11  egg layers.
12      Q.  Why did you review Exhibit 41 prior to
13  your deposition?
14      A.  Because it was one of the documents that
15  that was recommended for review by the law
16  department.
17      Q.  Let's take a look at Exhibit 40.  And
18  Exhibit 40 is the 2009 sustainability report.
19      A.  I have this listed as 39.
20      Q.  Have I got 2009 as 39?
21      A.  Yes.
22      Q.  And 2013 as 40?
23      A.  That's what I have.
24      Q.  Yeah.  I think you're right.  I think I
25  may have created --

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                                    April 8, 2014

63 (Pages 246 to 249)

---

246

1       MR. MURRAY: That's the official version
2   marked by the court reporter.
3       MS. LEVIN: -- a little bit of a muddle
4   in my inquiries about what I described as
5   Exhibit 41, which is, in fact, Exhibit 40. But I
6   think that the questions were sufficiently clear.
7   BY MS. LEVIN:
8       Q. Let's look at Exhibit 39, the 2009
9   sustainability report.
10      Do you see the second sentence on
11  Page 31 under "Animal Welfare" where it states,
12  "Kroger has provided retail grocery industry
13  leadership on this topic"?
14      A. Yes, I do.
15      Q. And the topic being referred to is the
16  humane treatment of animals from farm to table?
17      A. Yes.
18      Q. And that includes egg-laying hens?
19      MR. MURRAY: Objection to the form of
20  the question. Misstates the document.
21      THE WITNESS: It includes all animal
22  welfare standards.
23  BY MS. LEVIN:
24      Q. Including those pertaining to egg-laying
25  hens?

---

247

1       A. That would be part of the standards we
2   are evaluating in our guidelines.
3       Q. And the next sentence states that in
4   2001 Kroger began working with the Food Marketing
5   Institute (FMI) and the National Council of Chain
6   Restaurants (NCCR) to develop an industry-wide
7   program that would introduce science-based
8   guidelines to strengthen animal welfare practices;
9   correct?
10      A. Correct.
11      Q. And, again, what's being included within
12  that sentence would be guidelines pertaining to
13  egg-laying hens; correct?
14      MR. MURRAY: Object to the form of the
15  question; misstates the document.
16      THE WITNESS: They're part of our
17  supplier community.
18  BY MS. LEVIN:
19      Q. And part of the industry-wide program
20  that would introduce science based guidelines or
21  guidelines pertaining to egg-laying hens; correct?
22      MR. MURRAY: Same objection.
23      THE WITNESS: They are -- part of the
24  group of animal welfare standards that we consider
25  when we're talking about animal welfare.

---

248

1   BY MS. LEVIN:
2       Q. And that's part of what's being
3   referenced here in Exhibit 39; correct?
4       MR. MURRAY: Objection; misstates the
5   document.
6       THE WITNESS: If you want to interpret
7   that, that's one of the animal welfare standards,
8   yes. It would be included in -- in our animal
9   welfare initiative.
10  BY MS. LEVIN:
11      Q. I don't want to interpret anything,
12  Mr. Pruett. I want your understanding of the
13  document that appears on Kroger's Web site. And I
14  want to understand whether the reference to Kroger
15  beginning work with FMI and NCCR to develop an
16  industry-wide program that would introduce
17  science-based guidelines was referring, at least in
18  part, to guidelines pertaining to egg-laying hens.
19      MR. MURRAY: Objection.
20      THE WITNESS: That's not what it says,
21  but it is one of the animal welfare practices that
22  we consider because it's one of the species for
23  industries that we want to have guidelines for.
24  BY MS. LEVIN:
25      Q. It's one of the species that, in 2001,

---

249

1   Kroger began working with FMI and NCCR to develop
2   guidelines for; correct?
3       A. It was one of the species.
4       Q. Do you know whether there have been any
5   efforts in Ohio to promulgate some sort of different
6   guidelines pertaining to animal welfare?
7       A. The only one that I can recall are
8   gestation crates for hogs.
9       Q. You don't recall any pertaining to
10  egg-laying hens?
11      A. I don't.
12      Q. Are you familiar with an organization
13  called National Egg Regulation Origination or NERO?
14      A. I am not.
15      Q. Do you know what a Stakeholder
16  Engagement Meeting is?
17      A. I'm not familiar with that meeting
18  format.
19      Q. You've never heard of that group?
20      A. No.
21      MS. LEVIN: Let me just take a minute to
22  look through my outline and make sure I've gotten
23  everything. We can go off the record if you want.
24      MR. MURRAY: Sure.
25      MS. LEVIN: It's up to you.

---

HIGHLY CONFIDENTIAL

Pruett, Payton                                             April 8, 2014

64 (Pages 250 to 253)

---

**250**

1        THE VIDEOGRAPHER:  We are going off the
2   record.  Time on video is 16:51.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  We are going back on
5   the record.  The time on video is 16:54.
6        MS. LEVIN:  I have no further questions
7   at this time.  We do reserve the right to recall
8   Mr. Pruett if we determine it's necessary to obtain
9   answers to topics for which it would be my view that
10  he was not adequately prepared.
11       MR. MURRAY:  I disagree.  I think
12  Mr. Pruett did an extraordinary amount of
13  preparation for this deposition, and we would oppose
14  any such effort.
15       Do the people on the phone have any
16  questions?
17       MR. NOVACK:  This is Paul Novak.  I do
18  not.
19       MS. MARKOWITZ:  Sharon Markowitz.  I do
20  not either.
21       MS. CRABTREE:  Molly Crabtree.  I do
22  not.
23       MR. MURRAY:  I just have one very brief
24  area to ask about.
25                    - - -

---

**251**

1                  EXAMINATION
2   BY MR. MURRAY:
3        Q.  In the beginning of the deposition when
4   they were asking you about your background and all,
5   I don't believe you were asked about your
6   educational background.
7            Could you please provide us with the
8   studies you undertook and the degrees you obtained.
9        **A.  I received a bachelor's of science in**
10  **microbiology from East Tennessee State University in**
11  **1986.  I received a master's degree in food science**
12  **and technology in 1990 from Virginia Tech.  And from**
13  **the same university, I received my doctorate in food**
14  **science and technology.**
15       Q.  Ph.D. in food science?
16       **A.  Ph.D.**
17       Q.  What year was that?
18       **A.  1993.**
19       MR. MURRAY:  I have no further
20  questions.
21       MS. LEVIN:  I have no further questions.
22       THE VIDEOGRAPHER:  This concludes the
23  videotaped deposition of Payton Pruett on Tuesday,
24  April 8th, 2014.  We are off the record at 16:56.
25       MR. MURRAY:  And we are going to

---

**252**

1   designate the entire deposition as highly
2   confidential pursuant to protective order.  And do
3   not waive signature.
4            (Videotaped deposition adjourned
5   at 4:56 p.m.)
6
7
8
9            C E R T I F I C A T I O N
10
11
12       I hereby certify that I have read the
13  foregoing transcript of my deposition testimony, and
14  that my answers to the questions propounded, with
15  the attached corrections or changes, if any, are
16  true and correct.
17
18  ----------------------------------
    PAYTON PRUETT
19
20
21
22
23
24
25

---

**253**

1            CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Gail Inghram Verbano, Registered
4   Diplomate Reporter, Certified Realtime Reporter,
5   Certified Shorthand Reporter (CA) and Notary Public,
6   the officer before whom the foregoing proceedings
7   were taken, do hereby certify that the foregoing
8   transcript is a true and correct record of the
9   proceedings; that said proceedings were taken by me
10  stenographically and thereafter reduced to
11  typewriting under my supervision; and that I am
12  neither counsel for, related to, nor employed by any
13  of the parties to this case and have no interest,
14  financial or otherwise, in its outcome.
15
16
17
18  _____
    Gail Inghram Verbano, CSR, RDR, CRR
19  CA-CSR No. 8635
20
21
22
23
24
25

---