# ATTACHMENT 51

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF PENNSYLVANIA

3

4    IN RE:  PROCESSED EGG PRODUCTS    MDL NO. 2002

5    ANTITRUST LITIGATION              08-md-02002

6    _____

7    THIS DOCUMENT RELATES TO:

8    ALL ACTIONS

9

10

11            -- HIGHLY CONFIDENTIAL --

12

13      VIDEOTAPED DEPOSITION OF ROBERT RANDALL

14

15         Taken at Young, Wells Williams,

           4450 Old Canton Road, Suite 200,

16        Jackson, Mississippi, on Wednesday,

          April 16, 2014, beginning at 9:37 a.m.

17

18

19

20   REPORTED BY:

21      CELESTE O. WERKHEISER, RMR

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

```
 1  APPEARANCES:
 2     PATRICK AHERN, ESQUIRE
          Ahern & Associates, P.C.
 3        Three First National Plaza
          70 West Madison Street, Suite 1400
 4        Chicago, Illinois 60601
          Telephone: (312) 214-3784
 5        ATTORNEY FOR DIRECT ACTION PLAINTIFFS:
          WINN-DIXIE STORES, INC., H. J. HEINZ,
 6        C&S WHOLESALE GROCERS, INC. AND
          ROUNDIE'S SUPERMARKETS, INC.
 7
 8     MARK J. SCHIRMER, ESQUIRE
          Straus & Boies, LLP
 9        4041 University Drive, 5th Floor
          Fairfax, Virginia 22030
10        Telephone: (703) 764-8700
          Fax:  (703) 764-8704
11        ATTORNEY FOR INDIRECT PURCHASER
          PLAINTIFFS
12
13     SAMUEL RANDALL, ESQUIRE
          Kenny Nachwalter, P.A.
14        1100 Miami Center
          201 South Biscayne Boulevard
15        Miami, Florida 33131
          Telephone:  (305) 373-1000
16        Fax: (305) 372-1861
          ATTORNEY FOR THE KROGER PLAINTIFFS
17
18     DANIEL C. HEDLUND, ESQUIRE (VIA TELEPHONE)
          Gustafson Gluek, PLLC
19        Canadian Pacific Plaza
          120 South 6th Street, Suite 2600
20        Minneapolis, MN 55402
          Telephone: (612) 333-8844
21        Fax: (612) 339-6622
          ATTORNEY FOR DIRECT PURCHASER
22        PLAINTIFFS
23
24
25
```

Page 3

```
 1  APPEARANCES:  Continued
 2     BRYCE YOUNG, ESQUIRE (VIA TELEPHONE)
          Stinson Leonard Street, LLP
 3        150 South Fifth Street
          Suite 2300
 4        Minneapolis, MN 55402
          Telephone:  (612) 335-1500
 5        Fax:  (612) 335-1657
          ATTORNEY FOR DEFENDANT, MICHAEL FOODS,
 6        INC.
 7
       BRIAN ROBISON, ESQUIRE
 8        Gibson, Dunn & Crutcher, LLP
          2100 McKinney Avenue
 9        Dallas, Texas 75201-6912
          Telephone:  (214) 698-3100
10        Fax:  (214) 571-2928
          ATTORNEY FOR DEFENDANT, CAL-MAINE
11        FOODS
12
13  Videographer:  Darren Guastella
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           STIPULATION
 2        It is hereby stipulated and agreed by
 3  and between the parties hereto, through their
 4  respective attorneys of record, that this
 5  deposition may be taken at the time and place
 6  hereinbefore set forth, by Celeste O.
 7  Werkheiser, Registered Merit Reporter and Notary
 8  Public, pursuant to the Federal Rules of Civil
 9  Procedure, as amended;
10        That the formality of READING AND
11  SIGNING is specifically NOT WAIVED;
12        That all objections, except as to the
13  form of the questions and the responsiveness of
14  the answers, are reserved until such time as
15  this deposition, or any part thereof, may be
16  used or is sought to be used in evidence.
17           ---
18
19
20
21
22
23
24
25
```

Page 5

```
 1       T-A-B-L-E  O-F  C-O-N-T-E-N-T-S
 2  Examination By:                 Page
 3  Mr. Ahern...................................8
 4  Mr. Schirmer................................60
 5  Mr. Robison.................................78
 6  Mr. Schirmer................................155
 7  Mr. Randall.................................174
 8  Mr. Schirmer................................178
 9  Stipulation..................................4
10
11  Exhibits:
12  Exh 1  UEP Spent Hen Committee Minutes
          dated 10/9/02....................29
13
       Exh 2  UEP Meeting Documents..................31
14
       Exh 3  Shell Egg Marketing Committee Minutes
15        dated 5/16/2005.......................34
16  Exh 4  Shell Egg Marketing Committee
          Members, Agenda and Notes.............39
17
       Exh 5  Price Discovery Intention.............41
18
       Exh 6  General Manager's Meeting, Cal-Maine
19        Management Team Documents.............44
20  Exh 7  Form letter from Gene Gregory
          and Roger Deffner....................47
21
       Exh 8  Breeder Weekly Production Report.......50
22
       Exh 9  USEM Annual Membership Meeting
23        Minutes..............................52
24  Exh 10 Copy of E-mails.......................53
25  Exh 11 Weekly Price Checks...................54
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 EXHIBITS: Continued
2 Exh 12 Letter From Gene Gregory to
       Bob Randall, dated 11/29/2004.........141
3
   Exh 13 Intentions to Meet Market Needs
4       Options..............................142
5
6 Certificate of Court Reporter................181
7 Witness Signature Page.......................182
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1 VIDEOGRAPHER:
2        My name is Darren Guastella of
3 Veritext. The date today is April 16, 2014.
4 The time is approximately 9:37 a.m. The
5 deposition is being held at the offices of
6 Young, Wells, Williams located at 4450 Old
7 Canton Road, Suite 200, Jackson, Mississippi
8 39211.
9        And the caption of the case is In Re:
10 Processed Eggs Antitrust Litigation in the
11 United States District Court, Eastern District
12 of Pennsylvania. The witness is Robert Randall.
13        At this time the attorneys will
14 identify themselves and the parties they
15 represent. Afterwards, our court reporter,
16 Celeste Werkheiser, will swear in the witness
17 and we can proceed.
18 MR. AHERN:
19        Patrick Ahern on behalf of direct
20 action plaintiffs: Winn-Dixie Stores, Inc.,
21 H. J. Heinz, C&S Wholesale Grocers, Inc. and
22 Roundie's Supermarkets, Inc.
23 MR. SCHIRMER:
24        Mark Schirmer, Straus & Boies, on
25 behalf of the indirect purchaser plaintiffs.

Page 8

1 MR. RANDALL:
2        Samuel Randall, with Kenny
3 Nachwalter, on behalf of the Kroger plaintiffs.
4 MR. ROBISON:
5        Brian Robison, with the firm of
6 Gibson, Dunn & Crutcher, here on behalf of
7 Cal-Maine Foods and the witness.
8        ROBERT CLYDE RANDALL,
9     having been first duly sworn, was
10     examined and testified, as follows:
11        EXAMINATION
12 BY MR. AHERN:
13    Q.   Mr. Randall, would you state your
14 full name, please?
15    A.   Robert Clyde Randall.
16    Q.   And thank you for being here today.
17 Have you ever been deposed before?
18    A.   No.
19    Q.   So I'll go over some ground rules for
20 you. You have the right to hear and understand
21 my questions. If you don't hear one of my
22 questions fully, if you ask me to repeat it, I
23 will do so. You also have the right to
24 understand my questions. If you don't
25 understand a question that I ask you, I will

Page 9

1 rephrase it. If you answer one of my questions
2 and neither ask me to repeat it or rephrase it,
3 I'm going to assume that you have heard and
4 understood it; is that fair?
5    A.   Yep.
6    Q.   Okay. Mr. Robison, your attorney,
7 might make some objections from time to time,
8 and you're to answer over those objections
9 unless he instructs you not to answer.
10    A.   (Witness nodding head.)
11    Q.   Where do you currently reside?
12    A.   Lake City, Florida.
13    Q.   Okay. And are you currently
14 employed?
15    A.   Yes.
16    Q.   By who?
17    A.   Midwest Food Association.
18    Q.   How long have you been employed by
19 Midwest Food Association?
20    A.   Since December of 2010.
21    Q.   And what is Midwest Food Association?
22    A.   It is a group of egg producers that
23 formed a buying co-op. It's a group of
24 midsize-to-large egg producers that wanted the
25 buying power of a Cal-Maine or a Rose Acres when

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1 it came to certain items they use in their
2 day-to-day businesses, such as premix, vaccines
3 and paper goods, cases, flats, and day-old
4 chicks.
5 COURT REPORTER:
6      And what?
7   A.  Day-old chicks.
8 MR. AHERN:
9   Q.  And does the Midwest Food Association
10 have any connection to or affiliation with
11 Cal-Maine Foods?
12   A.  No.
13   Q.  When were you last employed by
14 Cal-Maine Foods?
15   A.  Would have been March of 2006, I
16 believe, is when I was asked not to come back.
17   Q.  Okay. Can you give us a little bit
18 of your educational history, please?
19   A.  Uh-huh. I have a bachelor's in
20 Biology in 1973 from Maryville College,
21 Maryville, Tennessee. I have an MS in animal
22 science, specializing in animal physiology from
23 the University of Tennessee, Knoxville. And I
24 have an MBA in accounting and finance from
25 Northern Illinois University in 1987. And then

Page 11

1 I have a 42-year continuing education program
2 with my wife. And I'm still learning every day.
3 Trust me.
4   Q.  Did you -- were you employed after
5 you graduated from college?
6   A.  Only doing part-time jobs while I was
7 in graduate school.
8   Q.  And when was your first -- when was
9 your first full-time job?
10   A.  In October of 1976 with DeKalb Ag
11 Research, Incorporated.
12   Q.  And after that position, what was
13 your next position?
14   A.  Well, I've had -- I had several
15 positions within that company from 1976 to 2000.
16 I went from Colorado to Fort Wayne, Indiana.
17 There I was an area sales manager. In
18 approximately 1982, moved to Memphis, was
19 promoted to regional manager where I had
20 operational and sales responsibilities for the
21 southwestern United States. A year later I was
22 transferred to the home office in DeKalb,
23 Illinois and was northern regional manager over
24 sales and operations in the northern U.S. and
25 Canada. And then approximately 1995, I was

Page 12

1 promoted to vice president of sales and
2 operations for the whole company. In 2000 they
3 were sold to a Dutch primary breeder called
4 Hendrix. At that point I ceased employment with
5 DeKalb.
6   Q.  And where did you go after that?
7   A.  I went to work July 1st of 2000 with
8 Lohmann Tierzuchtgmbh GMBH, a German poultry
9 breeding company, and was hired to start their
10 business in North America and Canada.
11   Q.  And how long were you with this
12 company?
13   A.  Until March 1st of 2003.
14   Q.  And where did you go?
15   A.  In May I started -- I went to a
16 company called Big Dutchman located in Holland,
17 Michigan, and was hired there as vice president
18 of North American sales.
19   Q.  What did Big Dutchman do?
20   A.  Make poultry equipment, cages,
21 feeding systems, watering systems for both the
22 layer and the broiler industries.
23   Q.  And how long were you with that
24 company?
25   A.  Just about a year.

Page 13

1   Q.  Where did you go after that?
2   A.  Hillandale Farms, Florida. Started,
3 I think, June of 2004.
4   Q.  What was your first position there?
5   A.  I was named a vice president. My job
6 was actually to learn what Jack Hayes and the
7 principal owner was doing so that when he could
8 retire, I could replace him, but things didn't
9 work out that way.
10   Q.  And when you say that you mean
11 because the company was sold?
12   A.  No. No. Our salesperson, whose name
13 is Mike Lindsey, left, went to work for Tampa
14 Farms, one of our competitors, and so 30 days
15 into the job, I was supposed to oversee sales.
16 And then about 30 days after that, Mr. Hayes and
17 son Eddie left because of family issues, and I
18 was also -- then I was put in charge of
19 production as well as sales, so I kind of got
20 thrown against the wall, see if I would stick.
21   Q.  Did your title change with these
22 additional responsibilities?
23   A.  No. Neither did my income.
24   Q.  This was in about July or August of
25 2004?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1     A.   Yep.
2     Q.   And did you have another position at
3  Hillandale before -- Hillandale Farms in Florida
4  before you left?
5     A.   No.  That's what I did until the
6  fateful day in March of '06.
7     Q.   What were your duties and
8  responsibilities at Hillandale Farms of Florida
9  then?
10    A.   Primarily I oversaw production.  Feed
11  formulations, flock movement, just overall
12  management of the layers and then also called on
13  basically the major -- major accounts that we
14  worked with.
15    Q.   And who are the major accounts that
16  you worked with?
17    A.   Walmart was the largest.  I would say
18  Winn-Dixie was the second, Publix was third,
19  Harvey's was probably fourth, and then beyond
20  that was a lot of small -- smaller accounts.
21    Q.   When you say you called on the major
22  customers, did you have day-to-day interaction
23  with them on the sales side?
24    A.   No.  As far as Walmart goes, they had
25  -- Walmart would have a couple meetings, one in

Page 15

1  the fall before the Thanksgiving, Christmas
2  holidays and one in the spring before the Easter
3  markets, which were the big -- big demand times
4  for eggs.  Winn-Dixie, the buyer basically just
5  called our logistics people to let them know how
6  many eggs they needed.  We had a unique
7  relationship with Winn-Dixie.
8     Q.   What do you mean by that?
9     A.   They used to be in the egg business.
10  They had their own egg processing plant.  We
11  bought it.  And when we bought it, we had all
12  their business in Florida.  That was part of the
13  deal.  So there really wasn't a need to actually
14  sell them.  The unique thing about them is they
15  continued to buy their own egg cartons
16  independent of us, which is -- they're the only
17  company I've ever known to do that, and so they
18  purchased their own cartons, the cartons were
19  shipped to our egg plants, and we put our eggs
20  in their cartons and delivered them to their
21  warehouses.  Everybody else, we would buy the
22  cartons.  But they were unique in that way.  And
23  post, I think it was a ten-year agreement, when
24  that agreement expired, Winn-Dixie could
25  entertain bids from outside producers but they

Page 16

1  had to give us right of first refusal.
2     Q.   And was this -- was this processing
3  plant -- did Hillandale Farms of Florida
4  purchase this out of bankruptcy?
5     A.   No.
6     Q.   Okay.
7     A.   This happened before they went into
8  Chapter 11.
9     Q.   And who was the individual that ran
10  that plant for Winn-Dixie?
11    A.   That, I don't know.  It happened
12  before I got to Hillandale.  Their egg buyer,
13  his name was Bob Welch.  And Winn Dixie -- in
14  fact, Bob Welch tried to take our Jacksonville
15  DC away from us.  I called the bankruptcy lawyer
16  or Winn-Dixie's lawyer in Jacksonville, I don't
17  recall his name, he wasn't aware of the
18  agreement, but I faxed him copies of it and
19  said, you know, you can't -- you can't take
20  Jacksonville away from us.  And he said, "Well,
21  who's trying to do that?"
22         I told him the guy, Bob Welch's name.
23  They didn't even know who their egg buyer was.
24  About ten days later Bob Welch was gone, so...
25  MR. ROBISON:

Page 17

1         For the benefit of the jury, when you
2  say "Jacksonville DC," what do you mean?
3     A.   Their distribution center located in
4  northern Florida.
5  MR. AHERN:
6     Q.   When you refer to Winn-Dixie having
7  its own egg processing plant, does that mean
8  that Winn-Dixie was purchasing shell eggs?
9     A.   Uh-huh.
10    Q.   From Hillandale Farms --
11    A.   No.
12    Q.   -- of Florida and then packaging
13  them?
14  MR. ROBISON:
15         Just make sure he gets to finish his
16  question.
17    A.   No.
18  MR. AHERN:
19    Q.   Okay.  Who was --
20    A.   Who were they buying eggs from?
21    Q.   Yeah.
22    A.   There was another entity in central
23  Florida.  I can't think of their names, but the
24  eggs were all produced under contract between
25  this egg production unit and Winn-Dixie.  And

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 the plant was in Bartow, Florida, by the way.
2     Q.    When -- when did Hillandale Farms of
3 Florida purchase this plant from Winn-Dixie?
4     A.    I am not exactly sure, to be honest
5 with you.
6     Q.    Was it before you --
7     A.    It was before I came.
8     Q.    -- arrived?
9     A.    Yes.
10     Q.    And after Hillandale Farms of Florida
11 purchased the plant, this processing plant from
12 Winn-Dixie, then Hillandale Farms of Florida had
13 a major supply relationship with Winn-Dixie.
14     A.    Yes.
15     Q.    Did your duties and responsibilities
16 change at all after at least the first month
17 during the time that you were at Hillandale
18 Farms of Florida?
19     A.    Somewhat, as I explained earlier.  I
20 all of a sudden had to be involved in sales, and
21 then about 30 days after that, all of production
22 was thrown on me as well.
23     Q.    Okay.  And beyond that, did your
24 duties and responsibilities change?
25     A.    No.

Page 19

1     Q.    Who owned Hillandale Farms of
2 Florida?
3     A.    There were five stockholders:  Jack
4 Hazen, and his son, Eddy, spelled E-D-D-Y,
5 together had 51 percent.  Orland Bethel, who
6 owns Hillandale Farms up north, owns 17 percent
7 about.  A gentleman by the name of Homer
8 Hunnicutt owned -- Homer was the largest single
9 stockholder with 35 percent.  And Dorman Mizell
10 owned either 2 or 5 percent.  I really was never
11 sure what Dorman owned.  But those were the five
12 stockholders in the company.
13     Q.    Was there any relationship between
14 Hillandale Farms of Florida and Hillandale Farms
15 of Pennsylvania?
16     A.    Occasionally we would work together
17 on longs and shorts.  We needed some eggs and
18 they had them available, we would buy them from
19 them and vice versa.
20     Q.    Do you know whether or not Hillandale
21 Farms of Pennsylvania identified Hillandale
22 Farms of Florida in its marketing materials?
23     A.    Yes.
24     Q.    They did?
25     A.    They did.

Page 20

1     Q.    As one of their facilities?
2     A.    They just listed Florida as one of
3 their locations.  Mr. Hazen wasn't happy with
4 that, but it didn't really affect us very much.
5     Q.    Now, Hillandale Farms of Florida, can
6 you tell me the plants and facilities that it
7 had?
8 MR. ROBISON:
9           Object to form.  Vague.
10     A.    Pardon me?
11 MR. ROBISON:
12           I objected to form as vague, but go
13 ahead and answer.
14     A.    I'll start, we had Robertsdale,
15 Alabama; Quincy, Florida; Lake City, Florida;
16 Mascotte, Florida; Bushnell, Florida; Lake
17 Wales, Florida; Brooksville, Florida; and there
18 was a complex we called Canoe Creek, but it was
19 basically in St. Cloud, Florida.  That should be
20 eight, nine?
21     Q.    Eight.  What type of facility was
22 Robertsdale, Alabama?
23     A.    Cage production, about 800,000 birds.
24 All of these are cage production facilities.
25     Q.    Were there any other types of

Page 21

1 facilities that Hillandale Farms of Florida
2 owned and operated?
3     A.    Owned?  Just about the time I was
4 leaving, there was -- we started a cage-free
5 operation in Moniac, Florida.  I think it's
6 right on the Florida/Georgia line.  We had
7 purchased some buildings and were in the process
8 of adding for production equipment when I left.
9 So they weren't -- they weren't producing
10 anything while I was there.
11     Q.    All of the facilities that you've
12 mentioned here, all of these cage production
13 facilities, Robertsdale, Quincy, Lake City,
14 Mascotte, Bushnell, Brooksville, and Canoe
15 Creek, St. Cloud, did all of those facilities --
16 were all of those facilities acquired when
17 Cal-Maine acquired Hillandale?
18 MR. ROBISON:
19           Object to form.  Foundation.
20     A.    I believe everything but Brooksville.
21 Brooksville is a farm we leased from Homer
22 Hunnicutt.  But to be quite honest, I never saw
23 the sales transactions to know, but --
24 MR. AHERN:
25     Q.    To the best of your knowledge.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

1    A.   To the best of my knowledge, yes.
2    Q.   And did all of the employees as well
3  transfer over to Cal-Maine?
4  MR. ROBISON:
5         Object to form.  Foundation and
6  speculation.
7    A.   Immediately, yes, but as time went
8  on, a lot of them went elsewhere.  There's still
9  some currently employed, so there was a mix.
10 Some did, some didn't.
11 MR. AHERN:
12   Q.   Where were you housed during this
13 period of time?
14   A.   In Lake City.
15   Q.   Okay.  Was that the headquarters?
16   A.   Yes.
17   Q.   And did that continue to be the
18 headquarters of the Hillandale operation for
19 Cal-Maine after Cal-Maine purchased it?
20 MR. ROBISON:
21        Object to form.  Foundation.
22   A.   For a time.  And then they've had
23 subsequent purchases and moved the headquarters
24 for Florida to Dade City.
25 MR. AHERN:

1    Q.   What was your -- what was your title
2  after Cal-Maine acquired Hillandale?
3    A.   I was still vice president and
4  general manager of the Hillandale entities.
5    Q.   Did you have the general manager
6  title before the acquisition?
7    A.   Yes.
8    Q.   Okay.  And so you got invited to the
9  Cal-Maine general manager meetings?
10   A.   One.
11   Q.   What kind of products did Hillandale
12 Farms of Florida produce?
13   A.   Exclusively shell eggs.
14   Q.   And were these all commodity shell
15 eggs?
16 MR. ROBISON:
17        Object to form.
18   A.   What do you mean?
19 MR. AHERN:
20   Q.   Were any of them specialty eggs, like
21 organic eggs or cage free?
22   A.   No, no.
23   Q.   So when -- when you use terminology
24 to talk about eggs that are produced, do you use
25 shell eggs and specialty eggs?

1    A.   Generally, yes.
2    Q.   Okay.  You don't use the term
3  commodity shell eggs.
4    A.   No.
5    Q.   And once again, your understanding of
6  specialty eggs is what?
7    A.   Anything that varies from a normal
8  shell egg, whether it's the way they're
9  produced, the way they're fed.  Tampa Farms had
10 what they called a four grain specialty eggs
11 that are sold in Publix.
12        I question from time to time whether
13 they really were using four grains, but that was
14 their -- one of their products.  No, they
15 actually had four.  Eggland's Best is another
16 specialty egg.  Some are cage produced, but
17 they're fed a unique diet to, I guess, justify
18 their higher price, but they have Eggland's Best
19 cage free, they have Eggland's Best organic, but
20 we exclusively just produced shell eggs.  We did
21 not get into the niche markets.
22   Q.   Other than eggs that are either cage
23 free, organic, or produced with a special diet,
24 are there any other types of specialty eggs?
25   A.   There's one that's an in-shell

1  pasturized egg.  I think it was called Davidson
2  or something.  Somebody at Purdue University
3  patented the -- but I know Publix carried some
4  of those in their stores, but we didn't handle
5  them.
6    Q.   Any other type of specialty egg?
7    A.   No.  Other than liquids.
8    Q.   What about, you know, an Omega 3?  Is
9  that a --
10   A.   Well, yeah, I mean, that's one of the
11 things -- again, that's one of these specialty
12 eggs based on what the birds are fed.
13   Q.   I understand.
14   A.   And that's one of the things
15 Eggland's Best claims is in their eggs, higher
16 Omega 3 fatty acids.
17   Q.   So anything else that would qualify
18 as a specialty egg in your knowledge?
19   A.   No.
20   Q.   Was Hillandale Farms of Florida a
21 member of the United Egg Processors
22 Organization?
23 MR. ROBISON:
24        Object to form.
25   A.   Processors?

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1 MR. AHERN:
2   Q.   I'm sorry, United Egg Producers --
3   A.   Yes.
4   Q.   -- Association?
5   A.   Yes.
6   Q.   And did employees from Hillandale
7 Farms of Florida participate on UEP committees?
8 By "UEP" I mean United Egg Producers?
9 MR. ROBISON:
10       Object to form.  Vague.
11   A.   One.  While I was there.
12 MR. AHERN:
13   Q.   One employee?
14   A.   Me.
15   Q.   Okay.  Did you overlap with an
16 individual by the name of Ray Chambers?
17   A.   Ray was there while I was there, yes.
18   Q.   Okay.  Did Ray go to a lot of UEP
19 meetings?
20   A.   No.  Not very many.  Just a few.
21   Q.   Okay.  I could show you some
22 documents to refresh your recollection.  What
23 meetings did you attend -- UEP meetings did you
24 attend?  Of which committees I should say?
25   A.   Several.  I mean, I -- I think on a

Page 27

1 Price Discovery Committee, I believe.  I think
2 that was about it.
3   Q.   Were you -- were you a member of the
4 Shell Egg Marketing Committee?
5   A.   No.
6   Q.   Okay.  Did you attend Shell Egg
7 Marketing Committee meetings?
8   A.   I may have sat in on some of them.
9   Q.   Was there a separate Price Discovery
10 Committee?
11   A.   Yes.  I think so.
12   Q.   And were you a member of that
13 committee?
14   A.   I don't recall.
15   Q.   And what was the Price Discovery
16 Committee?
17   A.   I'm not sure.
18   Q.   I mean, do you recall what its
19 purpose was?
20   A.   No.  To be honest, no.  Not
21 specifically.
22   Q.   Was Hillandale Farms of Florida a UEP
23 Certified company?
24   A.   Yes.
25   Q.   And did it have its own UEP Certified

Page 28

1 number?
2   A.   Yes.  I believe so.
3   Q.   Do you recall when Hillandale Farms
4 of Florida became a UEP Certified company?
5   A.   I think they were certified when I
6 came to work for them.
7   Q.   And did they remain certified during
8 the time that you worked for them?
9   A.   Yes.
10   Q.   And after Cal-Maine acquired
11 Hillandale, did Hillandale Farms of Florida then
12 fall within the Cal-Maine certification?
13 MR. ROBISON:
14       Object to form.  Foundation.
15   A.   That, I don't know.
16 MR. AHERN:
17   Q.   Okay.
18 MR. AHERN:
19       Can we go off the record?
20 VIDEOGRAPHER:
21       Yes, sir.  Hold one second, please.
22 We are now going off the record.  The time is
23 10:08 a.m.
24       (A recess was taken.)
25 VIDEOGRAPHER:

Page 29

1       We are now going back on the record.
2 The time is 10:26 a.m.  Would counsel attending
3 by phone please identify themselves for the
4 record?
5 MR. HEDLUND:
6       Yes, it's Dan Hedlund from the law
7 firm of Gustafson Gluek on behalf of the direct
8 purchaser plaintiffs.
9 MR. YOUNG:
10       This is Bryce Young from Stinson
11 Leonard Street on behalf of Michael Foods, Inc.
12 MR. AHERN:
13   Q.   Okay.  All right.  I'm going to ask
14 the court reporter to mark an exhibit.
15       (Exhibit 1 marked.)
16 MR. AHERN:
17   Q.   Mr. Randall, the court reporter has
18 handed you what's been marked as Exhibit Number
19 1.  It is a two-page document entitled, "UEP
20 Spent Hen Committee," dated October 9, 2002, and
21 it has the document control number CM00427883.
22       Would you take a moment to look at
23 that?  I'm not going to ask you very detailed
24 questions about it other than the fact that it
25 appears to list you as having attended.

HIGHLY CONFIDENTIAL

Page 30

1     A.   Okay.
2     Q.   Now, this is in October of 2002.
3  This is before you were with Hillandale Farms of
4  Florida?
5     A.   Absolutely.
6     Q.   And did you attend this meeting?
7     A.   Yes, I did.
8     Q.   And on whose behalf did you attend
9  this meeting?
10    A.   I was employed at that time by
11 Lohmann Tierzuchtgmbh.
12    Q.   Okay.  And I'm sorry, tell me once
13 again, they were -- they were a German --
14    A.   Primary breeder.
15    Q.   Primary breeder.  Okay.  What's your
16 understanding of what the UEP Spent Hen
17 Committee was?
18    A.   They were looking at, at the time --
19 I believe at this time in the industry people
20 were having a challenge getting rid of old hens.
21 When I first got into the industry, spent hens
22 were an asset.  We got paid -- the industry got
23 paid a decent price per pound for old hens.  The
24 broiler industry grew in leaps and bounds, and
25 what we term as broiler breeders, when they

Page 31

1  ended their usefulness, they went to the spent
2  hen market, and a broiler breeder weighs
3  probably six pounds or more; an old hen weighs
4  three to three and a quarter.  So the market for
5  spent laying hens was pretty much drying up.  It
6  was -- it was a liability.  You had to pay to
7  get rid of them.  And so they were looking for
8  outlets that might benefit the entire industry.
9     Q.   Okay.  Thank you.
10 MR. AHERN:
11        Can you mark that as an exhibit?
12        (Exhibit 2 marked.)
13 MR. AHERN:
14    Q.   Mr. Randall, thankfully I'm not going
15 to ask you to review this entire document, but
16 please take a look at it, and in particular, I'm
17 going to direct your attention to the third page
18 of the exhibit.  This is a document, the first
19 page says United Egg Producers, dated October
20 16, 2002 to the UEP board of directors.  The
21 subject is:  Minutes From the Annual Meeting.
22 And on the third page of the exhibit -- I'm
23 sorry, the document control numbers for the
24 entire exhibit are CM00415950 through 15965.  On
25 the third page of the exhibit, it is -- at the

Page 32

1  top it says:  UEP Annual Membership Meeting,
2  October 10, 2002, Savannah, Georgia.  And you
3  are listed as one of the staff and guests
4  attending.  Do you see that?
5     A.   Uh-huh.
6  MR. ROBISON:
7        You have to say "yes."
8     A.   Yes.
9  MR. AHERN:
10    Q.   Yeah, you need to say "yes."  And was
11 the purpose of you attending the UEP annual
12 membership meeting at this time in 2002 in
13 connection with your position at the German
14 primary breeder?
15    A.   Yes.
16    Q.   Did you know Ray Chambers at this
17 time?
18    A.   I knew him just from past experience.
19 He had worked at some egg producers -- at other
20 egg producers that I had called on over the
21 years.
22    Q.   Okay.  And then if you flip to the
23 5th page of the exhibit, which is at the bottom,
24 15954, at the top it says:  UEP Annual Board
25 Meeting, October 10 through 11, 2002, Savannah,

Page 33

1  Georgia.  And once again it lists you as having
2  attended that.
3     A.   Uh-huh.  Same meeting.
4     Q.   Okay.  So was your employer at the
5  time a UEP member?
6     A.   No.  We were UEA members.
7     Q.   And what's the UEA?
8     A.   Allied industries.  We were not
9  members of -- we weren't producers.  We were
10 members of allied industries that were invited
11 to come to the meetings, but we had no -- we
12 could not vote.
13    Q.   Okay.  And what does UEA stand for?
14    A.   That's a good question.  United Egg
15 Associates, I believe.
16    Q.   And this page also shows that Ray
17 Chambers attended.
18    A.   Correct.  But he didn't work for me.
19    Q.   Right.  How many of the UEP annual
20 membership meetings did you attend?
21    A.   Totally in my entire professional
22 career?
23    Q.   Yes.  We'll start with that.
24    A.   That's a good question.  I have no
25 idea.  Probably a minimum of ten.  But I don't

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1 recall. I attended them when I worked for
2 DeKalb. I attended them when I worked for
3 Lohmann and for Big Dutchman.
4 MR. AHERN:
5     Mark that, please.
6     (Exhibit 3 marked.)
7 MR. AHERN:
8     Q. Mr. Randall, the court reporter has
9 handed you what's been marked as Exhibit 3.
10    A. Uh-huh.
11    Q. And this is a document entitled,
12 "Shell Egg Marketing Committee, May 16, 2005,"
13 bearing the document control number CM00429173.
14 Take a minute to look at that. Familiarize
15 yourself with it, please.
16    A. Is the date wrong on the second page?
17    Q. I think it's the minutes -- oh, I
18 see. Yes. I think it probably is.
19    A. It says 2008.
20    Q. Right. No. I think that's a typo.
21 Okay. So this document contains a number of
22 things that has some -- on the third page it has
23 minutes from the UEP-Shell Egg Price Discovery
24 Committee Conference Call on April 1, 2005.
25 That's pages 3 and 4 of the exhibit. It has

Page 35

1 highlight notes from a meeting with Urner Barry
2 on -- the meeting was on March 4, 2005. Those
3 highlight notes are CM 00429177 through 78. It
4 also has a reference to a UEP-Shell Egg
5 Marketing Committee meeting January 24, 2005 in
6 Atlanta, Georgia, and the minutes of that
7 meeting, that's on CM 00429179 through 80.
8 Okay. Do you see all of that?
9     A. Yep.
10    Q. Okay. Now, according to this, you
11 were a member of the Shell Egg Marketing
12 Committee in May of 2005. Do you see that?
13    A. Yep.
14    Q. Does this refresh your recollection?
15    A. Yes.
16    Q. That you were a member of that
17 committee?
18    A. Yes.
19    Q. And at this time you were with --
20    A. Hillandale.
21    Q. Hillandale Farms of Florida?
22    A. Yes.
23    Q. And turning to page -- to the third
24 page, 29175, the UEP-Shell Egg Price Discovery
25 Committee Conference call April 1, 2005, the

Page 36

1 minutes, the chairman of that committee is who?
2 MR. ROBISON:
3     Object to form.
4 MR. AHERN:
5     Q. Is that Dolph Baker?
6     A. That I don't know. Yeah. It says:
7 "Chairman Dolph Baker," so apparently he was.
8     Q. And he was -- and what was his
9 position at that time; do you know?
10 MR. ROBISON:
11    Object to form.
12    A. No, I don't know.
13 MR. AHERN:
14    Q. He was --
15    A. I think he was vice president of
16 Cal-Maine, but I don't know.
17    Q. And then turning to the page 29179,
18 the minutes from the UEP-Shell Egg Marketing
19 Committee, January 24, 2005, Atlanta, Georgia.
20 That document shows you as attending. Do you
21 see that under "Committee Members"?
22    A. Yeah. It shows me as a committee
23 member, yes.
24    Q. Okay. And you were a committee
25 member at that time?

Page 37

1     A. Apparently, yes.
2     Q. If you look down that page, it says:
3 "Intentions to Meet Demand," the last paragraph.
4     A. Correct.
5     Q. And it says that, "Mooney reported
6 that the 'Economic Summit' held by UEP on
7 November 16, 2004 in Atlanta and summarized by
8 saying that as the egg breakers build more
9 in-line complexes, that the breakers will likely
10 need to purchase considerably less eggs from
11 shell egg producers. He presented a list of egg
12 producers that have made their 'intentions'
13 known for reducing the supply of either selling
14 hens four weeks early or reducing their flock by
15 5 percent. He called on everyone to notify UEP
16 by letter of how they intended to follow their
17 stated intention. He stated that this may have
18 already been helpful to the market but everyone
19 needed to stay committed to the program."
20     Do you see that?
21    A. Uh-huh.
22    Q. Do you recall this -- first of all,
23 did you attend the Economic Summit held by UEP
24 on November 16, 2004 in Atlanta?
25    A. I might have, but I'm not sure.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.   Okay.  And did Hillandale Farms of
2 Florida execute and an intention to either -- to
3 reduce supply by either selling hens four weeks
4 early or reducing their flock by 5 percent?
5    A.   Yes.
6    Q.   If you flip to the next page, there
7 is a reference to old or new business.
8    A.   Uh-huh.
9    Q.   Do you see that?
10   A.   Yep.
11   Q.   And it says, "Baker," referring to
12 Dolph Baker, "reported that all egg producers
13 should review their profit and loss information
14 for the weeks between Easter and Labor Day.  He
15 suggested that this review would confirm that
16 supply exceeded demand and that shell egg
17 producers have lost money most every year.  He
18 recommended that we encourage everyone to molt
19 flocks" -- that's M-O-L-T -- "at 62 to 63 weeks
20 during the period from Easter week through Labor
21 Day.  Others suggested that we needed to leave
22 some buildings empty during the summer months.
23 After considering discussion, the following
24 motion was made:
25      Motion:  It was moved by Osborne and

Page 39

1 seconded by Baker to recommend that the current
2 'intentions' program for flocks to be disposed
3 of four weeks earlier than previously scheduled
4 and/or flock size reduced by 5 percent be
5 extended through Labor Day."  And it says:
6 "Carried."
7    Q.   Do you recall that there was a motion
8 made to extend this intentions program to reduce
9 supply through Labor Day?
10   A.   Yes.
11   Q.   And do you recall that Mr. Baker made
12 the comments attributed to him in this document?
13   A.   I don't recall Dolph making those,
14 but he must have.  It was recorded by Mr.
15 Gregory.
16   Q.   Was Mr. Gregory, as far as you could
17 tell, a thorough and faithful recorder of
18 minutes?
19 MR. ROBISON:
20      Object to form.  Foundation,
21 speculation.
22   A.   Yeah.  That's a good question.
23      (Exhibit 4 marked.)
24 MR. AHERN:
25   Q.   Mr. Randall, the court reporter has

Page 40

1 handed you what's been marked as Exhibit 4.  And
2 it is entitled:  "Shell Egg Marketing Committee,
3 October 5, 2005, Seattle, Washington," bearing
4 the document control number CM00183449 through
5 183465.  Take a moment to look at that, please,
6 and familiarize yourself with it.
7      (Pause in proceedings.)
8    Q.   So have you had a chance to look at
9 it?
10   A.   Okay.
11   Q.   Okay.  This shows you as having
12 attended this, correct?
13   A.   Uh-huh.
14   Q.   And did you indeed attend this?
15   A.   I did.
16   Q.   Okay.  And on the second page there's
17 an agenda for the UEP Marketing Committee.  Do
18 you see that?
19   A.   Uh-huh.
20   Q.   Do you know whose handwriting there
21 is on this document?
22   A.   I have no idea.  I will tell you it's
23 not mine.
24   Q.   Okay.  You can put that aside now.
25   A.   Put that exhibit aside?

Page 41

1    Q.   Yes.  Let me just ask you:  At the
2 time that you attended this Shell Egg Marketing
3 Committee on October -- a meeting on October 5,
4 2005, you were doing so on behalf of Cal-Maine
5 at that point?
6 MR. ROBISON:
7      Object to form.  Foundation.
8    A.   I still, I believe, still worked for
9 Hillandale Farms, LLC at that time.  I mean, the
10 -- Cal-Maine had entered into their purchase
11 agreement, but I think we were still classified
12 as Hillandale.
13 MR. AHERN:
14   Q.   Okay.
15   A.   I may be wrong, but --
16   Q.   Okay.
17      (Exhibit 5 marked.)
18 MR. AHERN:
19   Q.   Mr. Randall, the court reporter has
20 handed you what's been marked as Exhibit 5.
21 This is a document entitled "Price Discovery
22 Intention" bearing the document control numbers
23 CM00181454 through 455.  Take a minute to look
24 at that, and I'll ask you a question about it.
25   A.   Okay.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    Q.   Okay.  So at the top of it it says,
2  "Price Discovery Intention," top of the first
3  page of Exhibit 5.  It says, "Price Discovery
4  Intention.  My company understands the
5  importance of an accurate price discovery system
6  in the daily trading in longs and shorts among
7  the shell egg industry.  We believe the system
8  should not penalize either the buyer or seller
9  but serve as a system by which surplus eggs can
10  move to the buyer without the buyer incurring
11  costs that are not recoverable.  (The seller
12  needs a buyer).
13        We therefore pledge our intention to
14  support the work of the Price Discovery
15  Committee for the most accurate price discovery
16  system possible."
17        And it shows your name in this
18  document for Hillandale/FL.  Is that Hillandale
19  Farms of Florida?
20    A.   Correct.
21    Q.   Did you execute this Price Discovery
22  Intention on behalf of Hillandale Farms of
23  Florida?
24    A.   Yes.
25    Q.   And is that your handwriting on the

Page 43

1  second page with your name and Hillandale Farms
2  of Florida down at the bottom?
3    A.   Yes.  As sloppy as it looks, that is
4  my handwriting.
5    Q.   What was your understanding of what
6  this intention was meant to be?
7    A.   As an industry, orders from our
8  customers fluctuate from time to time.  For
9  example, our normal orders from Walmart might be
10  30 loads a week, ten loads to each distribution
11  center in Florida, but during the holidays, that
12  jumps to 100 loads.  And if we've got to
13  purchase eggs to fill those hundred load orders,
14  we would depend on one of these other egg
15  producers to hopefully work with us, not expect
16  top dollar or market price for their eggs but to
17  work with us and get us eggs so that we can fill
18  our customers' needs and not lose our fanny in
19  the process.  And likewise, there are going to
20  be times where their customers' demands are high
21  and we might have surplus eggs, so it's just
22  kind of an understanding that we need to, as the
23  document says, not penalize either side.
24    Q.   Okay.
25    A.   Pretty straightforward.

Page 44

1        (Exhibit 6 marked.)
2  MR. AHERN:
3    Q.   Okay.  Mr. Randall, the court
4  reporter has handed you what's been marked as
5  Exhibit 6.  It is a document that is entitled:
6  "General Manager's Meeting, Cal-Maine Management
7  Team," bearing the document control numbers
8  CM00201588 through 1599.  Do you see that?
9    A.   Uh-huh.
10    Q.   And take a moment to look at this and
11  I'll ask you a question about it.
12    A.   All right.  All right.
13    Q.   Okay.  So I think you previously
14  testified that you were invited to one general
15  manager's meeting.
16    A.   Uh-huh.
17    Q.   Was this it?
18    A.   I believe so.
19    Q.   Okay.  I've always been curious as to
20  why they put the little guy with the two ice
21  cream cones on the -- on the top of this thing.
22    A.   You'll have to ask them.  I have no
23  idea.
24    Q.   All right.  So this is a -- this is
25  for a Cal-Maine Management Team, General

Page 45

1  Manager's Meeting on February 8th and 9th, 2006
2  in Jackson, Mississippi.
3    A.   Uh-huh.
4    Q.   You need to answer audibly.
5    A.   Yes.
6    Q.   And this is for the six months ending
7  November 26th, 2005?
8    A.   Apparently, yes.
9    Q.   So this is for the period of time
10  after Cal-Maine acquired Hillandale?
11  MR. ROBISON:
12        Objection.  Form.  Foundation.
13  Vague.
14    A.   It involved a partial period.  They
15  didn't own us for that full six months.
16  MR. AHERN:
17    Q.   Right.  Okay.  But it did involve a
18  period of time where -- after Cal-Maine acquired
19  Hillandale.
20  MR. ROBISON:
21        Objection.  Same objections.
22  MR. AHERN:
23    Q.   Correct?
24    A.   After the initial transaction, yes,
25  but they hadn't fully acquired it yet.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

1  Q.  All right.  So you were being invited
2 to this as a Cal-Maine general manager, correct?
3 MR. ROBISON:
4      Objection.  Foundation.
5  A.  I was invited as the vice president
6 and general manager of Hillandale Florida.
7 MR. AHERN:
8  Q.  But you were being invited to a
9 Cal-Maine general manager's meeting, correct?
10  A.  Correct.
11  Q.  And you did attend this, correct?
12  A.  I did.  With two of my employees.
13  Q.  Okay.  And who attended with you?
14  A.  Dave Pirkle and Daryl Sargent.
15  Q.  Okay.  And who is Daryl Sargent?
16  A.  He handled our logistics for
17 Hillandale.
18  Q.  Okay.
19  A.  And worked with other egg producers
20 on longs and shorts.  If he needed eggs or had
21 surplus, somebody would -- if somebody was short
22 in the industry, they would call him and see if
23 we had any surplus eggs we could pack for them.
24  Q.  Okay.  And he -- is he still with
25 Cal-Maine?

1  A.  As far as I know, yes.
2  Q.  Do you know what his position is
3 today?
4  A.  No.  I sure don't.
5  Q.  Okay.  You can set that aside.
6 MR. AHERN:
7      Can we go off the record?
8 VIDEOGRAPHER:
9      One moment, please.  We are now going
10 off the record.  The time is 11:01 a.m.
11      (A recess was taken.)
12 VIDEOGRAPHER:
13      We now are back on the record.  The
14 time is 11:15 a.m.
15      (Exhibit 7 marked.)
16 MR. AHERN:
17  Q.  Okay.  Mr. Randall, the court
18 reporter has handed you what's been marked as
19 Exhibit 7.  It's a multi-page document bearing
20 the document control numbers NL000439 to 441.
21 And have you seen this document before?
22  A.  I don't recall, but it's entirely
23 possible.
24  Q.  This is -- this is a form letter from
25 Roger Deffner, UEP chairman.

1  A.  Okay.
2  Q.  And Gene Gregory.
3  A.  Dated when?
4  Q.  Well, there's no date on it.  Best as
5 we can tell, it's late 2004.  You see the
6 reference on the first page to the, "UEP hosted
7 an 'Egg Industry Economic Summit' in Atlanta on
8 November 16th"?
9  A.  Yes.
10  Q.  Do you remember seeing a previous
11 document that referred to that?
12  A.  I believe so.
13 MR. ROBISON:
14      It's Exhibit 3, Patrick, 5th page.
15 MR. AHERN:
16  Q.  And on the last page of Exhibit 7, it
17 says:  "Supply - Demand Options (intentions)."
18  A.  Okay.
19  Q.  And do you see there it says --
20 there's a reference to Hillandale Farms of
21 Florida, it says "yes" on "Option 2."
22  A.  Uh-huh.
23  Q.  Do you see that?
24  A.  Yep.
25  Q.  Is that consistent with your prior

1 testimony that Hillandale Farms of Florida
2 expressed an intention to reduce supply --
3 MR. ROBISON:
4      Objection.
5 MR. AHERN:
6  Q.  -- at this time?
7 MR. ROBISON:
8      Objection.  Mischaracterizes.  Form.
9 Foundation.
10  A.  It supports what I had said earlier:
11 Option 2 was to reduce flock size by 5 percent
12 during a specific period of time.
13 MR. AHERN:
14  Q.  And Hillandale Farms of Florida did
15 that?
16 MR. ROBISON:
17      Object to form.
18  A.  Not intentionally.
19 MR. AHERN:
20  Q.  I see.
21  A.  Normal course of business, I signed
22 that agreement, but normal mortality during the
23 time period specified would reduce the flock by
24 the amount they wanted.  So we didn't have to do
25 anything different than we normally did.

HIGHLY CONFIDENTIAL

Page 50

1 Mortality runs .10 to .15 a week, and over that
2 12-week period, that would have taken out over 5
3 percent of our flock just from natural
4 attrition. So I said, yeah, we'll participate
5 but we didn't have to do anything special.
6     Q.  But Hillandale Farms of Florida did
7 execute the intention.
8     A.  We said we would do it knowing that
9 it was going to happen anyway. I was smarter
10 than they were.
11    Q.  Okay. And the other companies that
12 are listed on this list, they executed an
13 intention to reduce supply as well.
14 MR. ROBISON:
15        Object to form. Foundation.
16 Speculation.
17    A.  I assume so.
18 MR. AHERN:
19    Q.  All right. You can set that aside.
20        (Exhibit 8 marked.)
21 MR. AHERN:
22    Q.  Mr. Randall, the court reporter has
23 handed you what's been marked as Exhibit 8.
24    A.  Uh-huh.
25    Q.  And it bears the document control

Page 51

1 numbers CM00715135 through 136.
2     A.  Yep.
3     Q.  You are shown as being a cc on this.
4 This has a date of July 26th, 2005.
5     A.  Right.
6     Q.  Can you tell me what this is?
7     A.  Well, I don't know who sent it to be
8 honest with you. It doesn't say.
9     Q.  What is Gidden?
10    A.  Gidden is a breeder flock. Breeders,
11 not commercial birds. These are breeders.
12    Q.  Okay.
13    A.  We had our own hatchery in Callahan,
14 Florida, and this is one of the flocks that
15 supplied hatching eggs to our breeder flock.
16    Q.  And who's Dave Pirkle?
17    A.  Dave Pirkle was my employee that
18 oversaw the breeders and our started pullets. I
19 have no idea who Kitty is. She might meow for
20 all I know.
21    Q.  So is this -- is this a Hillandale
22 Farms of Florida document? Is this a type of
23 report that you guys -- that Hillandale Farms of
24 Florida generated?
25    A.  I believe so.

Page 52

1     Q.  So this is not a Cal-Maine document.
2     A.  Not -- not to my knowledge.
3        (Exhibit 9 marked.)
4 MR. AHERN:
5     Q.  Mr. Randall, the court reporter has
6 handed you what's been marked as Exhibit 9.
7     A.  Uh-huh.
8     Q.  And it is entitled: "United States
9 Egg Marketers (USEM) Annual Membership Meeting,
10 October 7th, 2005, Seattle, Washington," bearing
11 the document control numbers CM00403279 through
12 280. Did you attend this USEM annual membership
13 meeting on October 7th, 2005 in Seattle,
14 Washington?
15    A.  Apparently. Yes.
16    Q.  And was Hillandale Farms of Florida a
17 member of USEM?
18    A.  Yes.
19    Q.  Did Hillandale Farms of Florida
20 participate in exports of shell eggs through
21 USEM?
22 MR. ROBISON:
23        Object to form. Vague.
24    A.  From time to time, yes.
25 MR. AHERN:

Page 53

1     Q.  And this was after the time that
2 Cal-Maine had acquired Hillandale, correct?
3 MR. ROBISON:
4        Object to form. Foundation.
5     A.  It's after they entered into the
6 purchase agreement, but they had not acquired us
7 yet. We were still Hillandale, LLC.
8     Q.  And Hillandale, LLC -- no, strike
9 that. Okay. I'm done with that.
10        (Exhibit 10 marked.)
11 MR. AHERN:
12    Q.  Mr. Randall, the court reporter has
13 handed you what's been marked as Exhibit 10. It
14 is an e-mail chain starting with an e-mail from
15 Bob Scott to Joe Ward dated January 10, 2006;
16 bears the document control numbers CM00460999
17 through 461000. And you are shown as a cc. Did
18 you receive this document, this e-mail?
19    A.  I just did. I have no idea. But
20 apparently it was copied to me, but the initial
21 e-mail was sent on the 9th at the bottom. Mr.
22 Scott's is a response to whatever she sent.
23    Q.  Okay. Did you receive Mr. Scott's
24 e-mail?
25    A.  Yes.

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    Q.   Okay.  You see in the second
2  paragraph, second sentence it says:  "Flock
3  records are as critical as the P&L to evaluate"
4  -- it says "or performance."  Probably means
5  "our performance."  "In fact, it is the heart
6  of our business and represents over 50 percent
7  of our costs."
8         Do you see that?
9    A.   Uh-huh.
10   Q.   Do you have any understanding what
11  Mr. Scott meant by this?
12   A.   Let me read the whole thing.  Well,
13  if you read the first paragraph, it states why
14  they need accurate reports because it's critical
15  to the Animal Care Protection Program, Animal
16  Care Program.  And so he was just emphasizing
17  the fact that our records have to be accurate.
18   Q.   Okay.  And he says:  "As critical as
19  the P&L."  Do you have any understanding of what
20  that means?
21   A.   It's critical as to the profit and
22  loss.
23   Q.   Okay.  You can set that aside.
24        (Exhibit 11 marked.)
25  MR. AHERN:

Page 55

1    Q.   Mr. Randall, the court reporter has
2  handed you what's been marked as Exhibit 11.
3  And this is a document entitled:  "Weekly Price
4  Checks."
5    A.   Uh-huh.
6    Q.   And it has document control number
7  CM00717395 through 396.  Do you see that?
8    A.   Yep.
9    Q.   Now, I realize that this is dated
10  12-20-06, so it's after you had left the
11  company.
12   A.   Uh-huh.
13   Q.   But were there weekly price checks
14  that were done like this while you were still
15  with the company?
16   A.   Uh-huh.
17   Q.   You need to respond audibly.
18   A.   Yes.
19   Q.   Okay.  And it says down at the bottom
20  they need to be e-mailed weekly to Bob Scott,
21  Jeff Hardin, Daryl Sargent and Patrick
22  Cabellero; do you see that?
23   A.   Uh-huh.  Yes.
24   Q.   What was your understanding of the
25  purpose of the weekly price checks?

Page 56

1  MR. ROBISON:
2         Object to form.  Foundation.
3    A.   We were following up and seeing what
4  our customers were selling eggs that we were
5  selling to them for.
6  MR. AHERN:
7    Q.   Okay.
8    A.   And this would have had -- I mean,
9  the only ones pertinent to Florida would have
10  been Walmart, Publix, Winn-Dixie, Food Lion and
11  Harvey's.  I find it interesting Harvey's and
12  Food Lion were owned by the same people, and
13  they sold eggs for 20 cents difference, but Food
14  Lion may have had a special going on or
15  something.  But, yes, our -- one of our
16  employees or one of Cal-Maine's employees would
17  go out and visit our customers and see what
18  their retail price for eggs were.
19   Q.   Okay.
20  VIDEOGRAPHER:
21        Eight minutes on the tape.
22  MR. AHERN:
23   Q.   Who is Ken Paramore?
24   A.   He was a -- one of Cal-Maine's
25  salesmen, egg salesmen.

Page 57

1    Q.   Okay.  And did he have involvement
2  with the Hillandale Farms of Florida customers
3  after Cal-Maine acquired Hillandale?
4  MR. ROBISON:
5         Object to form.  Foundation.
6    A.   Once I left, I have no idea who Ken
7  had dealings with.  While I was still there, the
8  only customer that he dealt with was Food Lion
9  and Harvey's because he dealt with Food Lion's
10  headquarters in North Carolina or wherever they
11  were located.  But to my knowledge, he didn't
12  have anything to do with any of our other
13  customers while I was there.
14  MR. AHERN:
15        Okay.  Why won't we go off the record
16  and change the tape.
17  VIDEOGRAPHER:
18        One moment, please.  This is the end
19  of tape number one, the video deposition of
20  Robert Randall.  We are now off the record.  The
21  time is 11:32 a.m.
22        (A recess was taken.)
23  VIDEOGRAPHER:
24        This is the beginning of tape number
25  two in the video deposition of Robert Randall.

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1 We are now going back on the record. The time
2 is 11:44 a.m.
3 MR. AHERN:
4     Q.   Mr. Randall, a standard question in
5 these types of depositions involving former
6 employees is to ask them if they're being
7 compensated for their time in coming here to
8 testify. So, are you being compensated for your
9 time in coming here to testify?
10    A.   My travel expenses are supposed to be
11 covered and my time in this room is supposed to
12 be covered.
13    Q.   Okay. And do you know how your time
14 in this room is being covered?
15    A.   By -- hopefully by Cal-Maine.
16    Q.   Do you know at what rate?
17    A.   I set the rate.
18    Q.   What did you set?
19    A.   Well, I haven't told them yet.
20    Q.   What is your anticipation of what
21 you're going to tell them?
22    A.   $65 an hour. So I made 130,000 last
23 year, so that's a fair average rate.
24    Q.   And I don't want to get into any
25 confidentiality -- ask you to violate any

Page 59

1 confidentiality, but were you given a reason for
2 why you were let go from the company in -- was
3 it March of 2006?
4     A.   Uh-huh.
5     Q.   Do you feel comfortable telling that
6 reason?
7     A.   Basically I was told due to the
8 economic conditions. I was the highest paid
9 employee at Hillandale, so they stood to save
10 the most amount of money by asking me not to
11 show up the next day.
12    Q.   I see. Okay.
13    A.   Which was kind of a shock, but,
14 anyway.
15    Q.   I understand. Okay.
16 MR. AHERN:
17    All right. Thank you very much.
18 That's all the questions that I have. I'm going
19 to pass the witness here.
20 THE WITNESS:
21    Okay.
22 MR. ROBISON:
23    Let's go off the record for a second
24 so she's not having to type.
25 VIDEOGRAPHER:

Page 60

1     Hold, please. We are off the record.
2 The time is 11:46 a.m.
3     (Discussion off the record.)
4 VIDEOGRAPHER:
5     We are now back on the record. The
6 time is 11:48 a.m.
7             CROSS-EXAMINATION
8 BY MR. SCHIRMER:
9     Q.   Mr. Randall, I think I introduced
10 myself briefly. My name is Mark Schirmer. I
11 represent the indirect purchaser plaintiffs. I
12 will have a few questions for you. Then we'll
13 see if we can pass you around to the remaining
14 folks and get you out of here so you can get
15 your flight.
16    You said -- who employs you today?
17 Remind me?
18    A.   MFA, Midwest Food Association.
19    Q.   And what -- just refresh my
20 recollection, what is it that Midwest Food
21 Association does?
22    A.   They -- it's -- may be termed as a
23 buying co-op. I use that term not knowing if
24 they truly are a co-op, but they purchase as a
25 group. There's about 20 members that make up

Page 61

1 close to 30 million layers, and they use that 30
2 million layer as buying power when they go out
3 to buy premix cases, flats, cartons, vaccines
4 and day-old chicks. They may purchase other
5 items that I'm not aware of, but those are the
6 major items that they buy and use their volume.
7 It's like a smaller egg producer can get the
8 same volume discount that a Cal-Maine or a Rose
9 Acres can get without having to be that big.
10    Q.   What is premix?
11    A.   It's a portion of the feed that's
12 fed. It's got the vitamins, minerals. It's
13 called a vitamin/mineral premix. It's usually
14 about five pounds per ton is the inclusion rate
15 of most premixes.
16    Q.   By that you mean five pounds per ton
17 of feed?
18    A.   Yeah. Five pounds of premix per
19 2,000 pounds of feed.
20    Q.   And you also said that one of the
21 things MFA does is provide essentially group
22 purchasing for things like cases and cartons.
23    A.   Right.
24    Q.   Is it the carton the eggs come in?
25    A.   Yes.

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1    Q.   Okay.  And the same thing with
2  vaccines.  That's group purchasing of the
3  vaccines that are designed to deal with avian
4  diseases?
5    A.   Correct.
6    Q.   And you said something else about
7  buying one-day-old chicks?
8    A.   Day-old chicks, yes.
9    Q.   That's for people who don't have
10  their own hatcheries?
11    A.   None of the members have their own
12  hatchery.
13    Q.   Who are some of the members of MFA?
14    A.   Herbruck's would be the largest.
15  Konos, spelled K-o-n-o-s, Hemmelgarn in Ohio,
16  Pearl Valley Egg, Dakota Layers, Kreher's and
17  Giroux, both in New York, Country Charm in
18  Georgia.  And I for the life of -- I may not --
19  that's most of them.  I don't know them all.
20    Q.   How long have you worked for Midwest
21  Foods again?
22    A.   Since December of 2010.
23    Q.   Now, to your -- and during your
24  career, you have also been employed by firms
25  that are members of the UEP; is that correct?

Page 63

1    A.   Correct.
2    Q.   And does -- to your knowledge, is UEP
3  buy premix for any of its member?
4    A.   Not to my knowledge.
5    Q.   Does UEP buy cases and cartons for
6  any of its members?
7  MR. ROBISON:
8        Object to form.  Foundation.
9    A.   No.  Not to my knowledge.
10  MR. SCHIRMER:
11    Q.   To your knowledge, does UEP buy
12  vaccines for any of its members?
13    A.   No.
14  MR. ROBISON:
15        Object to form.  Foundation.
16  MR. SCHIRMER:
17    Q.   To your knowledge did UEP ever buy
18  day-old chicks for any of its members?
19  MR. ROBISON:
20        Object to form.
21    A.   No.
22  MR. SCHIRMER:
23    Q.   Now, when you -- so which of the
24  companies you've been employed by have been
25  members of UEP?

Page 64

1    A.   DeKalb Egg Research, or DeKalb
2  Poultry as it was at the end of my career, was a
3  member and Hillandale.
4    Q.   And you said one of your employers
5  was also a member of UEA.
6    A.   Correct. Lohmann.  Lohmann
7  Tierzuchtgmbh.
8    Q.   I'm not going to try write that down.
9  You also mentioned you were employed by a
10  company called, I think, Big Dutchman.
11    A.   Uh-huh.
12    Q.   I'm not certain I understand what Big
13  Dutchman did.  What did it do?
14    A.   We make manufactured and marketed
15  cages, feeding systems, watering systems, fans,
16  ventilation systems for the entire poultry
17  industry, not just the layer industry.  And it's
18  actually a German-owned company, but it
19  originated in Holland, Michigan, and that's
20  where it's still headquartered.
21    Q.   How long were you employed by Big
22  Dutchman?
23    A.   Just a year.
24    Q.   What was that period?
25    A.   May of '04 to -- May of '03 to June

Page 65

1  of '04. Excuse me.
2    Q.   In your job with Big Dutchman, did
3  you gain a familiarity with the service life of
4  cages for laying hens?
5    A.   Pretty much.
6    Q.   What was the average service life
7  during the period -- during that period for
8  cages that were -- for new cages?
9  MR. ROBISON:
10        Object to form.  Vague.
11    A.   Average?
12  MR. SCHIRMER:
13    Q.   Average.
14    A.   The average life of a cage is
15  probably 15 to 20 years depending on how well
16  they're taken care of.
17    Q.   How about -- you said that they
18  created feeding systems and watering systems.
19    A.   Uh-huh.
20    Q.   In your experience, what would be the
21  approximate lifespan of a feeding system for a
22  cage?
23    A.   Same as the cages.
24    Q.   Would the same be true of the
25  watering systems?

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    A.    Pretty much.  More -- yeah, in a cage
2    system, yes, the watering system, the whole
3    system would last 10 to 15 years on average, I
4    would say.
5    Q.    Now, you said something that I wasn't
6    understanding a little bit earlier today.  You
7    said that Hillandale Florida didn't really get
8    into niche --
9    A.    Niche markets.
10    Q.    What are niche markets?
11    A.    Well, specialty eggs.  All we
12    produced were standard shell eggs.  We didn't
13    produce Omega 3s, we didn't produce Eggland's
14    Best, we didn't produce cage free, we didn't
15    produce -- what do they call it?  It's not cage
16    free, but it's just --
17    MR. ROBISON:
18          Free range?
19    A.    Free range.  We didn't do any of
20    that.
21    MR. SCHIRMER:
22    Q.    Okay.  Would you pick up Exhibit
23    Number 2 for just a minute?  Exhibit Number 2,
24    which was introduced earlier, bears the Bates --
25    the Bates numbers were already introduced.  I

Page 67

1    would like you to turn to page -- that bears
2    Bates range CM00415959 in the lower-hand corner.
3    I can only read it without my glasses, so --
4    A.    This must be it.
5    Q.    At the top it says UEP Animal -- the
6    page I am looking at says:  "UEP Animal Welfare
7    Committee, October 9, 2002."
8    A.    Uh-huh.  Savannah, Georgia.
9    Q.    If you'll look down where it said --
10    there's a line -- where it says:  "UEP/UEA
11    Members, Staff and Guests."  It lists -- I think
12    it's 11 lines down you're listed right between
13    Fred Adams, Jeff Henning and Dolph Baker.
14    A.    Uh-huh.
15    Q.    Do you recall --
16    MR. ROBISON:
17          You have to say "yes."
18    A.    Yes.
19    MR. SCHIRMER:
20    Q.    Do you recall attending this meeting?
21    A.    Yes.
22    Q.    You attended it as a UEA member -- as
23    a representative of a UEA member?
24    A.    Yes.
25    Q.    And on the next page it talks about

Page 68

1    what's called a requirement for certified
2    status.  And there's a motion that's passed.  Do
3    you have an understanding, once you look at
4    that, do you have an understanding of what the
5    100 percent production -- what it means by 100
6    percent of the production facilities regardless
7    of how or where the eggs may be marketed?  It's
8    under the motion.
9    A.    Okay.  Okay.
10    Q.    Do you recall this discussion?
11    A.    Yes.
12    Q.    What was your understanding of what
13    was being voted on here?
14    A.    That a company that had multiple
15    facilities, if they were going to commit to the
16    100 percent, all of their facilities had to be
17    animal certified.
18    Q.    And this was a -- this was a meeting
19    of the UEP's Animal Welfare Committee?
20    A.    Yes.  I didn't vote.  I wasn't
21    allowed to vote, so --
22    Q.    You were allowed to come in and
23    listen?
24    MR. ROBISON:
25          Object to form.

Page 69

1    A.    We could sit and listen, yes.
2    MR. SCHIRMER:
3    Q.    That's enough on that one.
4          Would you please take a look at
5    Exhibit Number 4 which was introduced a little
6    bit earlier.  The first page shows the Shell
7    Eggs Marketing Committee.  Please turn to the
8    third and fourth page of the document.  They
9    bear Bates number CM00183452, 183453, I believe.
10    Look first at 183452.
11    A.    Uh-huh.
12    Q.    What is this?
13    MR. ROBISON:
14          Objection.  Form.  Foundation.
15    A.    Obviously it's a form produced by the
16    United States Department of Agriculture.
17    MR. SCHIRMER:
18    Q.    Have you seen this during the course
19    of your --
20    A.    I've seen similar during my eloquent
21    career, yes.
22    Q.    How long have you worked in the egg
23    industry, sir?
24    A.    38 years.
25    Q.    You said you've seen -- have you seen

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1 USDA Weekly Retail Shell Egg Feature Activity
2 Reports?
3    A.   Uh-huh.
4    Q.   You need to say "yes," please.
5    A.   Yes.  Sorry.
6    Q.   Thank you.  While you were at
7 Cal-Maine, to your knowledge, were these reports
8 that listed the U.S. Weekly Retail Shell Egg
9 Feature Activity reviewed by individuals at
10 Cal-Maine on a regular basis?
11 MR. ROBISON:
12        Object to form.  Foundation.
13 Speculation.
14    A.   No.
15 MR. SCHIRMER:
16    Q.   Would you look at Exhibit 5 for a
17 minute?  Now, the top of this is called Price
18 Discovery.  Remember you and Mr. -- you already
19 discussed this this morning.
20    A.   Uh-huh.
21    Q.   You and Mr. Ahern discussed this a
22 little bit earlier.
23    A.   Uh-huh.
24    Q.   You said -- as I understood your
25 testimony, you said that you were trying -- I

Page 71

1 didn't really understand you.  Frankly, I didn't
2 understand some of the testimony.  Why was it
3 important -- strike that.  I would object to the
4 form of that question.
5        You said that early this morning that
6 you apparently that this was about trying to
7 find a way to get -- find a price that was fair
8 to both buyer and seller.
9 MR. ROBISON:
10        Object to form.  Foundation.
11 Mischaracterizes.
12 MR. SCHIRMER:
13    Q.   Is that an accurate statement?
14    A.   Correct.
15    Q.   This is what's called Price Discovery
16 Intention.  Was there a mechanism in the egg
17 industry for price discovery in a spot market?
18 MR. ROBISON:
19        Object to form.  Vague.
20    A.   What do you mean?
21 MR. SCHIRMER:
22    Q.   Is there a quotation system for
23 prices on a daily basis?
24    A.   There is a quote, not produced by the
25 poultry industry but produced by a company in

Page 72

1 New York called Urner Barry.
2    Q.   What is Urner Barry?
3    A.   That's a good question.  They're a
4 price discovery company.  They use formulations.
5 I don't know.  You would have to ask them how
6 they formulate, but they look at, I believe,
7 they call an arbitrary group of egg producers,
8 not always the same ones, ask them what kind of
9 inventory they've got, if they have any
10 inventory, and he may ask them how eggs are
11 moving.  And he basis his decisions on whatever
12 he finds in his phone calls weekly.
13    Q.   Did the Urner Barry system provide
14 for a daily or weekly quotes at this time?
15    A.   Yes.
16    Q.   Was -- were -- in the purchases
17 between companies who were dealing with longs
18 and shorts, was the Urner Barry quotation used
19 as a benchmark for pricing eggs?
20 MR. ROBISON:
21        Object to form.  Foundation.
22 Speculation.
23    A.   It may have.  Some companies may have
24 used it.  Others --
25 MR. SCHIRMER:

Page 73

1    Q.   Did the companies you were at use it?
2    A.   -- may have used what their cost of
3 production was.
4    Q.   And the companies you were at, did --
5    A.   Well, it was only one that sold eggs.
6 And that was Hillandale.
7    Q.   At Hillandale -- did Hillandale, when
8 it was engaged in negotiating these long and
9 short -- contracts to cover its longs and
10 shorts, did it use the Urner Barry's quotations
11 as a benchmark for pricing -- for pricing the
12 eggs?
13 MR. ROBISON:
14        Object to form.  Foundation.
15    A.   I don't think so.  I think each
16 individual occurrence was transferred on its own
17 merit.  I mean, if the other part of it
18 determined whatever the -- whoever was buying
19 our long eggs, we depended on their honestly to
20 tell us what they were getting for them and what
21 they were willing to pay.
22 MR. SCHIRMER:
23    Q.   Okay.
24    A.   And, you know, when you're long on
25 eggs, your option is either selling them to them

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1 at whatever they want to do or take them to the
2 dump, and we would rather sell them than smell
3 them.
4     Q.    That's something that the -- that's
5 something the Rose Acre guys said as well. You
6 said you depended on their honesty. What do you
7 mean by that?
8     A.    Well --
9     Q.    What they were getting for their
10 eggs?
11    A.    Their integrity. I mean, if you find
12 out that they're not being honest with you,
13 you're not going to sell them any eggs in the
14 future.
15    Q.    Did they tell you what they --
16    A.    That's no different than in business
17 anywhere.
18    Q.    Did they tell you what they were
19 selling their eggs for? Was that what you're
20 talking about?
21 MR. ROBISON:
22         Object to form.
23    A.    Yes. They might have. Yes.
24 MR. SCHIRMER:
25    Q.    Okay. Would you turn to Exhibit 6?

Page 75

1 I really want you to -- this is the exhibit, the
2 general manager's meeting, the Cal-Maine one you
3 attended.
4     A.    Correct.
5     Q.    Would you look at the last page just
6 for a minute?
7     A.    Uh-huh.
8     Q.    It says: "Here's a list that" -- the
9 first sentence right after "Charlie" is:
10 "Here's a list of those attending the GM meeting
11 who will need books."
12        What does it mean? What were the
13 books?
14 MR. ROBISON:
15        Object to form. Speculation.
16    A.    I think we got books that contained a
17 lot of the information you've got in the
18 previous pages. It's shared with everybody,
19 production at the different locations around the
20 country.
21 MR. SCHIRMER:
22    Q.    And were these produced by Cal-Maine
23 in the ordinary course of business?
24    A.    The ordinary course of business for
25 their general manager's meeting, yes. Everybody

Page 76

1 had to prepare a report and bring it with them.
2     Q.    Okay.
3     A.    But there's nothing from Hillandale
4 in here, other than the three of us.
5     Q.    Do you have a recollection as to
6 whether these books might have been as much as
7 100 to 150 pages long?
8     A.    I don't think so.
9     Q.    Would you have a quick look at
10 Exhibit 10 for me? Mr. Ahern asked you about
11 this a little earlier today, and you said that
12 obviously the reports need to be accurate for
13 the corporate records. In the second paragraph,
14 though, it says, "Flock records are as critical
15 as the P&L to evaluate our performance. In
16 fact, it is the heart of our business, and
17 represents over 50 percent of our costs."
18        Obviously flock records don't
19 represent over 50 percent of your costs.
20    A.    No. The performance of the birds do.
21    Q.    So that's the cost of the flock and
22 maintain the flock?
23    A.    They're looking, you know, at --
24 MR. ROBISON:
25        Object to form.

Page 77

1     A.    -- at mortality that they're
2 exhibiting, feed consumption, all of those
3 things need to be accurate for management to
4 make the right decisions, right performance
5 decisions.
6 MR. SCHIRMER:
7     Q.    Because the performance of the flock
8 represents such a large portion of the cost?
9     A.    Correct.
10 MR. SCHIRMER:
11        I don't have anything else.
12 MR. ROBISON:
13        Do you have anymore?
14 MR. SCHIRMER:
15        No.
16 MR. ROBISON:
17        Any lawyers on the phone have any
18 questions?
19        All right. I'll take that as a no.
20 MR. RANDALL:
21        No. No questions. Thank you.
22 MR. ROBISON:
23        Okay. We'll take a lunch break and
24 I'm probably going to have some cleanup
25 questions briefly after that, but I think it

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

1 makes sense to take a lunch break. It's 12:05.
2 MR. HEDLUND:
3        What time do you want to reconvene?
4 MR. ROBISON:
5        1 o'clock, 1:15. I don't know how
6 long it will take to get lunch around here. Why
7 don't we go off the record so she doesn't have
8 to type everything we're saying.
9 VIDEOGRAPHER:
10       We are now going off the record. The
11 time is 12:08 p.m.
12       (A lunch recess was taken.)
13 VIDEOGRAPHER:
14       We are now back on the record. The
15 time is 1:13 p.m.
16             CROSS-EXAMINATION
17 BY MR. ROBISON:
18    Q.    Mr. Randall, I want to go back and
19 talk a little bit about your experience in the
20 egg industry. You testified this morning that
21 for a period of time you worked for DeKalb Ag
22 Research?
23    A.    Yes.
24    Q.    And how many years did you work at
25 DeKalb?

1    A.    24.
2    Q.    That's the 1976 through 2000 time
3 frame?
4    A.    Uh-huh. Yes.
5    Q.    Please walk the jury through what
6 your job positions were at DeKalb, start to
7 finish.
8    A.    Okay. When I started, I was
9 assistant manager of a -- what we call a pullet
10 farm in Hudson, Colorado. We had our own
11 hatchery. We hatched chicks and grew them to 18
12 weeks and delivered them to local egg producers
13 in the area. And I was out there just about a
14 year.
15    Q.    After that, what did you do?
16    A.    Moved to Fort Wayne, Indiana. The
17 company decided I should be a salesman which
18 scared the pants off me because I thought they
19 would give me a pickup truck and a -- with a
20 bunch of coops in the back and I would go
21 knocking on doors and say, "You want to buy a
22 chicken?" But it didn't work out that way. I
23 mean, I was in Indiana -- covered Indiana, Ohio,
24 and Michigan, and I was an area manager at the
25 time.

1    Q.    What does that mean, area manager?
2    A.    Well, I oversaw sales, initially
3 sales in that three-state area of commercial
4 day-old chicks, and at that time breeding stock
5 or breeders to distributors in the area. Later
6 I also picked up operational responsibilities
7 because we purchased one of our distributors,
8 and so it became a company-owned hatchery that I
9 was responsible for the P&L.
10    Q.    After -- I guess tell the jury how
11 many years you were in Fort Wayne, Indiana.
12    A.    About four.
13    Q.    And then after you were in sales in
14 Fort Wayne, Indiana, where did you go?
15    A.    I was promoted to what we called
16 regional manager, moved to Memphis, Tennessee,
17 and was responsible for sales and operations in
18 the southwestern U.S. I had a team of five
19 salesmen and covered states west of the
20 Mississippi basically to the Rocky mountains.
21    Q.    And how long did you have that
22 position?
23    A.    Just a year.
24    Q.    And after that, what happened?
25    A.    And then I was transferred to the

1 home office and named northern regional manager
2 which covered sales and operations in most of
3 the northern states above the Mason-Dixon line
4 and all of Canada and did that until about 1995
5 and then was promoted to vice president of sales
6 and operations for the whole company.
7    Q.    And you held that position until
8 2000?
9    A.    Until 2000 when the company was sold
10 to the Dutch.
11    Q.    Now, you testified earlier that for
12 some period of time DeKalb was a member of UEP.
13 Do you remember that?
14    A.    Yes.
15    Q.    And during that time, tell the jury
16 whether DeKalb had egg layers.
17    A.    Uh-huh. Yes, they did. They carried
18 about a quarter of a million birds in the
19 research farm that were test birds from
20 different genetic lines, and they would evaluate
21 the performance of those birds while they were
22 in production, and we sold the eggs.
23    Q.    Now, when you were in sales for
24 DeKalb, walk us through who some of your
25 customers were. Who was buying day-old chicks,

HIGHLY CONFIDENTIAL

Page 82

1 for example?
2    A.   If they weren't an integrator, which
3 means they had their own hatchery, like
4 Cal-Maine or Rose Acres, it was just about
5 everybody:  Michael Foods, Herbruck's, Weaver
6 Brothers in Ohio, Kreider Farms in Pennsylvania,
7 Esbenshade in Pennsylvania, Kreher Poultry in
8 New York, Giroux.  A lot of the people that are
9 MFA members.  And I also sold breeders to -- to
10 Rose Acres and to Hillandale in Florida, so they
11 were what we'd called parent stock customers of
12 mine.
13    Q.   Were some of the egg producer
14 customers of DeKalb also members of UEP?
15    A.   Uh-huh.  Yes.
16    Q.   Mr. Randall, the plaintiffs in this
17 case allege that the egg producer members of the
18 UEP, some of your customers at DeKalb, agreed to
19 reduce the flock size in their facilities and
20 thereby increase the price of the eggs.  While
21 you were at DeKalb in the late nineties, up to
22 2000, did you ever hear of any such agreement in
23 the industry?
24    A.   No.
25 MR. AHERN:

Page 83

1         Objection.  Beyond the scope.
2 MR. ROBISON:
3    Q.   Did you ever see any sign of such an
4 agreement?
5    A.   No.
6 MR. AHERN:
7         Same objection.
8 MR. SCHIRMER:
9         Object to form.
10 MR. ROBISON:
11    Q.   Did any egg producer say to you or
12 did any of the people you supervised, that they
13 were going to have to reduce their purchases of
14 day-old chicks from DeKalb because of some
15 agreement in the industry?
16 MR. AHERN:
17         Same objection.
18 MR. SCHIRMER:
19         Object to form.
20    A.   No.
21 MR. ROBISON:
22    Q.   Did you ever notice any decline in
23 customer purchases in the late nineties or
24 around 2000?
25 MR. AHERN:

Page 84

1         Same objection.
2 MR. SCHIRMER:
3         Object to form.
4    A.   No.  I mean, the only time we lost
5 business was when the bird -- our bird didn't
6 perform as well as the competitive strain.
7 MR. ROBISON:
8    Q.   Now, after you left DeKalb, you told
9 us in about June of 2000 you went to work for
10 Lohmann, correct?
11    A.   Yes.
12    Q.   And what did you do at Lohmann?
13    A.   I was hired to start Lohmann's
14 business in North America and Canada.
15    Q.   And what does that mean, "start their
16 business"?
17    A.   Well, at that point they had no
18 business, so I had to go out, locate potential
19 operations, potential distributors.  I bought a
20 farm in Canada for them, I didn't personally buy
21 it, where we placed what's called grandparents,
22 which is the grandparent line, then the parent
23 line, and then the commercial line is the
24 progression of birds.  So you start out with --
25 well, you actually start out with pure lines,

Page 85

1 which were in Europe.  They would hatch
2 grandparent lines, which came to Canada.  We
3 housed them in the GP operation up there, and
4 from those, we produced the parent stock that we
5 used in house and sold to people like
6 Hillandale.
7    Q.   Again, can you walk the jury through
8 who some of your customers were at Lohmann in
9 the 2000 to 2003 three time frame?
10    A.   Commercial egg customers?
11    Q.   Yes.
12    A.   Herbruck's, Kreider Farms, Wabash
13 Valley Produce, Hillandale, Michael Foods.  Out
14 on the West Coast, JS West.  Gemperle was a
15 customer out there.  I think Fremont Farms in
16 Iowa, Rembrandt, Sparboe, Fort Recovery Equity.
17 One was called Daylay Egg Farms.  I'm not even
18 sure if they're still in existence, but they
19 were a good customer.  ISE of America, a
20 Japanese-owned company.
21    Q.   Were some of these egg producers in
22 the 2000 to 2003 time frame that were buying
23 from Lohmann also members of UEP?
24    A.   I assume so, yes.  In fact, yes, I
25 saw them at meetings.

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    Q.   Okay.  Now, again, I want to ask you
2  during the 2000 to 2003 time frame, when you
3  were at Lohmann --
4    A.   Yes.
5    Q.   -- and your company is trying to sell
6  chicks to egg producers --
7    A.   Correct.
8    Q.   -- did you see any sign of any
9  agreement within the egg producing industry to
10 reduce flock size?
11 MR. AHERN:
12      Object to form.
13 MR. SCHIRMER:
14      Objection.
15   A.   In that period of time, no.
16 MR. ROBISON:
17   Q.   Did you ever hear of any such
18 agreement?
19 MR. SCHIRMER:
20      Object to form.
21 MR. AHERN:
22      Same objection.
23   A.   No.
24 MR. ROBISON:
25   Q.   Did you notice that UEP member's

Page 87

1  purchases were lower than non-UEP member
2  purchases?
3    A.   No.
4  MR. AHERN:
5      Same objection.
6  MR. SCHIRMER:
7      Object to form.
8  MR. ROBISON:
9    Q.   Did you ever hear from customers that
10 their purchases of day-old chicks were going to
11 have to decline because of some industry
12 agreement?
13 MR. SCHIRMER:
14      Objection.
15 MR. AHERN:
16      Same objection.
17   A.   No.
18 MR. ROBISON:
19   Q.   And did you notice any such decline
20 in UEP member purchases?
21   A.   No.
22 MR. SCHIRMER:
23      Objection.
24 MR. AHERN:
25      Objection.

Page 88

1    A.   No.  Our market share was growing in
2  leaps and bounds.
3  MR. ROBISON:
4    Q.   Now, next I think you testified you
5  worked for Big Dutchman; is that correct?
6    A.   Correct, yes.
7    Q.   And you worked for Big Dutchman from
8  roughly June of '03 until June of '04?
9    A.   Uh-huh.
10   Q.   And were you also involved in sales
11 for Big Dutchman?
12   A.   Yes.  Vice president of sales.
13   Q.   And do you remember any of the
14 customers of Big Dutchman that were buying cage
15 agreement?
16   A.   Uh-huh.  Yes.
17   Q.   Will you please walk through for the
18 jury any customers you remember.
19   A.   Giroux, Maxim in Texas, Kreider Farms
20 in Pennsylvania, Hickman in Arizona.  I can't
21 think of his -- Arnie Riebli, I believe is his
22 name, in southern California.  JS West in
23 California, Fremont Farms in Iowa, Rembrandt
24 Farms in Iowa.  I'm not sure of any other major
25 producers.  Herbruck's was a customer.

Page 89

1    Q.   And were some of these customers of
2  Big Dutchman also members of UEP?
3    A.   Yes.
4    Q.   I'm going to ask you the same kind of
5  question.  While you were at Big Dutchman, did
6  you notice any sign in the industry of egg
7  producers reducing their purchases of cage
8  equipment because of some sort of industry
9  agreement?
10   A.   No.
11 MR. AHERN:
12      Beyond the scope.
13 MR. SCHIRMER:
14      Objection.  Form.
15 MR. ROBISON:
16   Q.   Did anybody at Big Dutchman ever tell
17 you that they had noticed prior to your arrival
18 a decline in UEP member purchases of cage
19 agreement?
20   A.   No.
21 MR. AHERN:
22      Same objection.
23 MR. SCHIRMER:
24      Object to the form.
25 MR. ROBISON:

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1    Q.   And while you were there at Big
2 Dutchman, did you notice any decline in UEP
3 member purchases of cage equipment?
4    A.   No.
5 MR. SCHIRMER:
6        Object to the form.
7 MR. AHERN:
8        Objection.
9 MR. ROBISON:
10    Q.   I want to ask you a few questions
11 about the UEP Certified program.
12    A.   Uh-huh.  Yes.
13    Q.   You testified earlier that you
14 attended some UEP meetings where this program
15 was discussed.
16    A.   Uh-huh.  Yes.
17    Q.   Did the UEP Certified program ever
18 dictate the number of chickens, total number of
19 chickens that a certified producer could have?
20    A.   No.
21 MR. AHERN:
22        Objection.  Beyond the scope.
23 MR. SCHIRMER:
24        Object to form.
25 MR. ROBISON:

Page 91

1    Q.   Did the UEP Certified program dictate
2 the number of cages that a certified producer
3 could have?
4 MR. SCHIRMER:
5        Object to form.
6 MR. AHERN:
7        Same objection.
8    A.   The number of cages, no.
9 MR. AHERN:
10        Counsel, can I have a standing
11 objection to this line of questioning on the UEP
12 Certified program as beyond the scope?
13 MR. ROBISON:
14        How can it be beyond the scope when
15 you asked him about it on direct?
16 MR. AHERN:
17        I don't think I did ask him.
18 MR. ROBISON:
19        Well, Mr. Schirmer did.  You can have
20 whatever objection you want.  We'll hash it out
21 with --
22 MR. AHERN:
23        Rather than me having to repeat it
24 every --
25 MR. ROBISON:

Page 92

1        Absolutely.  Sure.
2    Q.   Does the UEP Certified program
3 dictate how many hen houses or barns a certified
4 producer can have?
5    A.   No.
6 MR. SCHIRMER:
7        Object to form.
8 MR. ROBISON:
9    Q.   Does the UEP Certified program
10 certify the number of eggs that a certified
11 producer could producer?
12    A.   No.
13    Q.   Based on your understanding attending
14 UEP meetings where the program was discussed and
15 working for Hillandale, which was a member of
16 the UEP Certified program, could a member of the
17 UEP Certified program build more barns --
18 MR. SCHIRMER:
19        Object to form.
20 MR. ROBISON:
21    Q.   -- to increase its flock size and
22 stay a member of the program?
23 MR. SCHIRMER:
24        Object to form.
25    A.   Yes.

Page 93

1 MR. ROBISON:
2    Q.   Now, let's walk through your time at
3 Hillandale.  I think you worked there from June
4 of 2004 until March of 2006?
5    A.   Correct.
6    Q.   And during that time, was Hillandale
7 Farms of Florida a member of the UEP Certified
8 program?
9    A.   Yes.
10    Q.   And during that time, did Hillandale
11 Farms of Florida ever increase its flock size?
12    A.   Yes.
13    Q.   Please explain to the jury how that
14 happened.
15    A.   We purchased a farm in Winter Park.
16 It consisted of three houses.  One got damaged
17 by a hurricane.  We replaced that house with new
18 equipment and built two more brand-new houses
19 beside it, so it was now a five-house complex.
20    Q.   Did you ever become aware of other
21 members of UEP that were in the Certified
22 program that also increased their flock sizes?
23 MR. SCHIRMER:
24        Object to form.
25    A.   Yes.  Maxim was building new

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1 complexes, Giroux were a couple that were adding
2 facilities. Some of the other people that were
3 building were probably UEA members and not UEP
4 members because they were exclusively breaking
5 eggs: would have been Rembrandt and Fremont
6 Farms of Iowa. Herbruck's were building at the
7 time. So there was quite a bit of construction.
8 Cal-Maine, I think, added a complex in Texas and
9 added production in Kansas at their Kansas
10 facilities, so...
11     Q.   Now, when Hillandale Farms of Florida
12 increased its flock size, do you remember anyone
13 from UEP calling to complain about that
14 expansion?
15 MR. SCHIRMER:
16         Object to form.
17     A.   No.
18 MR. ROBISON:
19     Q.   Did any other member of the UEP
20 Certified program object to Hillandale's
21 expansion?
22     A.   No.
23     Q.   Do you remember anyone from anywhere
24 complaining about Hillandale's expansion?
25 MR. SCHIRMER:

Page 95

1         Object to form.
2     A.   No.
3 MR. ROBISON:
4     Q.   Did Hillandale get kicked out of the
5 UEP Certified program?
6     A.   Nope.
7     Q.   Was Hillandale Florida kicked out of
8 UEP as a result of this expansion?
9 MR. SCHIRMER:
10         Object to form.
11     A.   No.
12 MR. ROBISON:
13     Q.   Did anyone ever contact, to your
14 knowledge, Hillandale Farms of Florida and
15 object that Hillandale's expansion of its
16 facilities violated some sort of agreement not
17 to make up for lost capacity due to the
18 Certified program?
19 MR. SCHIRMER:
20         Object to form.
21     A.   No.
22 MR. ROBISON:
23     Q.   If UEP -- if somebody from UEP had
24 called you when you were working at Hillandale
25 Farms of Florida and had objected to Hillandale

Page 96

1 expanding its flock and its capacity, what would
2 you have done?
3 MR. SCHIRMER:
4         Object to form.
5 MR. HEDLUND:
6         Object to the form.
7     A.   Probably ignored them. I mean, I did
8 what my bosses at the time, the owners of
9 Hillandale said what was right for us to do to
10 run the business. We needed more eggs. We
11 needed more chickens. We didn't want to
12 constantly rely on somebody else to supply us
13 with eggs.
14 MR. ROBISON:
15     Q.   Did your bosses ever say that they
16 were taking a risk by expanding their facilities
17 because somebody from UEP might object?
18 MR. SCHIRMER:
19         Object to form.
20     A.   No. Not because of -- I mean, they
21 were always taking a risk. Being in the egg
22 industry in a risky business, but --
23 MR. ROBISON:
24     Q.   Did Mr. Hazen, Jack Hazen, for
25 example, ever indicate to you that he thought

Page 97

1 there might be an adverse reaction from others
2 in the industry to this expansion?
3     A.   No.
4 MR. SCHIRMER:
5         Object to form.
6 MR. ROBISON:
7     Q.   Now, after you left Hillandale Farms
8 of Florida in March of 2006, what did you do?
9     A.   I left Hillandale, and I stayed -- I
10 mean, I stayed unemployed for about six months
11 and then worked for Lohmann Animal Health,
12 another German company.
13     Q.   How long did you work for Lohmann
14 Animal Health?
15     A.   Two years. I was -- it was -- they
16 wanted me to introduce their feed additive
17 business in the U.S.; feed additives being pure
18 vitamins, food colorants, different amino acids,
19 things that they specialized in. So in this
20 case I sold some to the egg industry, but some
21 to the broiler industry, a lot to the dairy
22 industry, and some to the swine industry. So it
23 wasn't a -- I wasn't exclusively tied in with
24 the layers.
25     Q.   When you worked for Lohmann Animal

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1 Health from October of 2006 through October of
2 2008, let's focus on your sales to the
3 egg-producing industry. Was Lohmann selling to
4 UEP members?
5 MR. SCHIRMER:
6      Object to form.
7   A.   No. We were selling -- I mean, they
8 may have been UEA members, but we were selling
9 mostly to feed mills.
10 MR. ROBISON:
11   Q.   Okay.
12   A.   And companies that handled feed
13 additives.
14   Q.   And after you left Lohmann Animal
15 Health, is that when your next stop was at the
16 Midwest Food Association?
17   A.   Uh-huh. Yes.
18   Q.   And I think you testified earlier
19 some of the members of the Midwest Food
20 Association are UEP members?
21   A.   I think they are all UEP members.
22   Q.   Are at least some of them also
23 members of the UEP Certified program?
24   A.   I assume so. Yes.
25   Q.   And walk the jury through exactly

Page 99

1 what it is you're helping them do. I know you
2 said MFA is a buyers co-op, helping these
3 companies buy certain products they need. What
4 else do you specifically do?
5   A.   Yeah, technically I'm not an employee
6 of MFA. I am a contract sales consultant for
7 them. And they hired me to sell commercial
8 day-old chicks out of their hatchery to a
9 specific group of non-members. I don't call on
10 their members. I just -- I have ten accounts
11 that I work with.
12   Q.   So you're, again, selling chickens?
13   A.   Yeah. I'm back selling day-old
14 chicks.
15   Q.   And can you tell the jury who some of
16 these customers are?
17   A.   Yes. Dixie Egg, STR Trading,
18 Chestnut Mountain Egg, L&R Farms, Mahard Egg
19 Farms, Feather Crest Farms, Michael Foods, a
20 company called Bucher Associates, spelled
21 B-u-c-h-e-r, and Kreider Farms in Pennsylvania
22 and ISE Farms -- ISE of America which are
23 located in the Carolinas, New Jersey and
24 Maryland, and that's pretty much it.
25   Q.   In your time working for working as a

Page 100

1 contract for the Midwest Food Association from
2 roughly December of 2009 to the present, have
3 you seen any sign of any sort of agreement among
4 UEP egg producers to reduce their flocks in
5 order to increase price?
6   A.   No.
7 MR. AHERN:
8      Objection. Beyond the scope.
9 MR. SCHIRMER:
10      Objection. Form.
11 MR. ROBISON:
12   Q.   Have you ever heard of that from any
13 UEP member?
14   A.   No.
15 MR. SCHIRMER:
16      Objection.
17 MR. AHERN:
18      Same objection.
19 MR. ROBISON:
20   Q.   Have you noticed that your sales of
21 chicks for the Midwest Food Association have
22 been lower to UEP members than to non-UEP
23 members?
24 MR. AHERN:
25      Object to form.

Page 101

1 MR. SCHIRMER:
2      Objection.
3   A.   No. No. I mean, all in all,
4 everybody's a UEP member that I deal with.
5 MR. ROBISON:
6   Q.   All your customers are UEP members?
7   A.   All those people are UEP members.
8   Q.   And has any one of them ever said
9 that their ability to buy from the Midwest Food
10 Association is limited by some sort of agreement
11 to reduce their flock size?
12   A.   No.
13 MR. AHERN:
14      Object to form.
15 MR. SCHIRMER:
16      Same objection.
17 MR. ROBISON:
18   Q.   If there were an agreement in the egg
19 industry to reduce supply in order to increase
20 price, do you think you would have heard about
21 it some time over the course of your 38 years in
22 the industry?
23 MR. HEDLUND:
24      Object to the form.
25 MR. AHERN:

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

1    Object to the form.
2 MR. SCHIRMER:
3       Objection.
4    A.   Yes.
5 MR. ROBISON:
6    Q.   Let's talk about the UEP Certified
7 program a little longer. Walk us through your
8 understanding of how the UEP Certified program
9 came about.
10   A.   Well, it was a multitude of things.
11 MR. AHERN:
12      I'm sorry, I need to object to the
13 form. Lack of foundation.
14   A.   Part of it is disease based. The
15 industry, back in the mid-eighties, got hit hard
16 with avian influenza, and then subsequent to
17 that, with salmonella enteritidis, and several
18 of UEP members got hit heart by lawsuits for
19 supposedly selling contaminated eggs. So there
20 was a strong push and support by USDA to come up
21 with a program to eliminate disease. At the
22 same time in Europe, and I knew this because of
23 my workings with Lohmann Tierzuchtgmbh, the
24 Green Party in Europe, while chicken farmers,
25 were not -- I guess were asleep at the wheel.

1 The Green Party voted that by 2015, or next
2 year, there can be no more eggs produced in
3 cages in the EU. And so there will be a huge
4 reduction in bird numbers in Europe, and egg
5 prices are going to go through the roof, but it
6 had nothing -- the egg producers there had
7 nothing to do with it. We wanted to -- I say
8 "we." United UEP's movement in developing this
9 program was to try and prevent what happened in
10 Europe happening in the United States. And that
11 was the -- we got voted that -- which is
12 basically happened in California -- that you
13 can't produce -- it mandates how birds have to
14 be raised, which in most cases will drastically
15 reduce bird numbers and raise egg prices.
16      In addition, we were getting --
17 because of the disease situation and food
18 safety, the FMI, the Food Marketing Institute,
19 that is the grocery stores' UEP, if you will,
20 was mandating that we do something to keep the
21 animal welfare people, whether it be PETA or
22 HSUS, from picketing their grocery stores or
23 fast food chains. So McDonald's came out with
24 their stipulations, Burger King came out with
25 their own stipulations as to the square inches

1 that we had to provide to birds, whether they be
2 white birds or brown birds. They were
3 different. So UEP was trying to put together a
4 program, not only to help with bird health and
5 minimize the health risk to our customers or our
6 customers' customers, they were trying to help
7 keep the animal welfare people off the doors of
8 the -- of our customers. And so that was the
9 reason behind it.
10   Q.   Mr. Randall, tell the jury how it is
11 you know all the information you just conveyed.
12 What's your basis for understanding the history
13 of the animal welfare program at UEP?
14   A.   Well, even back when I was at DeKalb,
15 there were animal rights people that were
16 breaking into hatcheries. They were pulling --
17 and this seems to be kind of hypocritical, but
18 they were -- had broken into several commercial
19 hatcheries and pulled the setter trays -- just
20 ripped them out and dumped the eggs on the floor
21 which were killing embryos. Now, do they really
22 care about the animals? No. But they would do
23 that. And what they tried to do was instill a
24 fight. They would tell the local press we're
25 going to be at such-and-such address at

1 such-and-such a time, and they wanted to -- what
2 they wanted on film was the hatchery managers
3 either beating the crap out of them or doing
4 something that fit their agenda.
5      And at that time, when I was at
6 DeKalb, we met with some of the local police
7 authorities that happened to be in York,
8 Pennsylvania, and the police captain said, We
9 have a couple of German Shepherds we would love
10 for those people to try and pet. I mean, they
11 were sympathetic to us; not to the animal
12 welfare people. So that happened.
13      There's a Midwest Poultry Show in
14 Minneapolis every year. Several years in a row
15 PETA showed up and were picketing outside, and
16 so it was pretty evident that they were -- and
17 plus there have been incidences where they've
18 planted people in different layer operations to
19 film and take pictures of things that would get
20 people's attention.
21   Q.   Did you attend UEP meetings where the
22 UEP Certified program was discussed?
23 MR. SCHIRMER:
24      Object to form.
25   A.   Uh-huh. Yes.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1 MR. ROBISON:
2     Q.   Now, in your view, based on your
3 experience at UEP meetings and your experience
4 working for UEP members and your experience
5 working for a company that was in the UEP
6 Certified program, was the UEP Certified program
7 a sincere animal welfare program?
8     A.   Yes.
9 MR. SCHIRMER:
10        Object to form.
11 MR. AHERN:
12        Objection.
13    A.   Absolutely.
14 MR. ROBISON:
15    Q.   The plaintiffs in this case have
16 alleged something very different.  They've
17 alleged that the UEP Certified program in secret
18 was a supply control program that was trumpeted
19 in public as an animal welfare program, but the
20 animal welfare piece of it was just a pretext.
21 What's your reaction to that allegation?
22 MR. HEDLUND:
23        Object --
24 MR. SCHIRMER:
25        Object to form.

Page 107

1     A.   Excuse me.  Go ahead.
2 MR. SCHIRMER:
3        He was just objecting.
4 MR. HEDLUND:
5        I just made an objection.  Go ahead.
6 MR. ROBISON:
7     Q.   You can ignore him.
8     A.   We worked in close conjunction with
9 UEP.  I mean, with the USDA.  I mean, to say
10 it's a joke, part of the program was that -- and
11 this would include any commercial egg hatchery
12 or any integrator, which Cal-Maine and Rose
13 Acres would fall into, but we had stringent
14 testing procedures for our breeding stock, and
15 if a breeder -- breeding flock tested salmonella
16 positive, we had to destroy them, and breeders
17 aren't cheap.  Breeders cost $12 a piece at day
18 of age.  It costs another four or five dollars
19 to grow them.  So when they're housed, they're
20 worth about $20 a piece, and, you know, somebody
21 like Rose Acres that has 200,000, that's 4
22 million dollars worth of breeders.  And if they
23 were to find them to be SE positive, they've got
24 to destroy them.  They had no option.  So it's
25 not a joke.  It wasn't a farce.  And trust me, a

Page 108

1 lot of people from time to time tested positive
2 and lost -- lost a lot of money.
3     Q.   Did the UEP Certified program have or
4 bring with it benefits to the chickens
5 themselves?
6 MR. SCHIRMER:
7        Object to form.
8     A.   I have mixed reactions to that
9 question.  I mean, the premise behind it was to
10 give the birds more space and they would produce
11 better.  Some of the lines of birds out there,
12 you can't get them to produce any better.  I
13 don't care what you do to them, unless you can
14 get a bird that will lay two eggs a day.  So it
15 -- the idea was that they would -- you would
16 gain production by giving the birds more room.
17 And I don't see that happening, really.
18        The genetics -- the genetic
19 improvements of the lines have moved faster than
20 a lot of people, I guess, would think they
21 would, but the birds out there today are pretty
22 -- you'd call them a hot rod compared to a Model
23 A Ford.
24 MR. ROBISON:
25    Q.   Earlier today you were asked

Page 109

1 questions about this so-called 100 percent rule.
2     A.   Uh-huh.
3     Q.   Do you remember those questions?
4     A.   Right.
5     Q.   Tell the jury what this 100 percent
6 rule was.
7     A.   Well, there were some people that
8 wanted to -- they had more than one complex or
9 more than one operation, and I think Sparboe
10 might have been an example of this, but they
11 wanted to have some farms be certified and some
12 not be certified.  And for the -- I'm trying to
13 think of the right word, but for the program to
14 be authentic and real, everything had to be
15 certified.  I mean, what was to keep them from
16 selling non-certified eggs, and, of course,
17 selling them to somebody else.  So it was trying
18 to add validity to the program.
19    Q.   Now, the plaintiffs allege the 100
20 percent rule had no animal welfare benefits.
21 That's their argument.  What's your response to
22 that?
23 MR. SCHIRMER:
24        Object to form.
25    A.   Well, the health -- there were

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 certainly health benefits to being on the
2 program. The testing for salmonella, the
3 testing for influenza and other health -- human
4 health risk issues were certainly a benefit for
5 being on the program. Benefit to the public.
6 MR. ROBISON:
7     Q. Have you ever heard of the concept of
8 backfilling?
9     A. Uh-huh. Yes.
10     Q. Explain to the jury what backfilling
11 is.
12     A. Well, when -- most of the industry
13 used to molt. When you would molt birds at 60
14 to 65 weeks of age, you would have lost maybe 10
15 to 20 percent of the birds at that time. And so
16 when they molted the flock, you would also lose
17 another 3 percent probably during the molt. And
18 then if you had an old flock that was ready to
19 go to soup or be a spent hen, you would take
20 birds, rather than send them to the spent hen
21 buyer, you would take birds and backfill that
22 house that you just molted and fill it back up.
23     Q. All right. And is it your
24 understanding at one point that the UEP
25 Certified program stated that backfilling was no

Page 111

1 longer permitted, except in certain
2 circumstances, like a catastrophic cause?
3     A. Yes.
4     Q. And do you have an understanding as
5 to why the certified guidelines were changed in
6 that way?
7     A. Again, the health risk to the birds.
8 Moving a family of birds from one house to
9 another, you were likely to -- and of different
10 ages were likely to transfer a disease of some
11 kind. And birds in a molt are really
12 susceptible to salmonella and other infections
13 because when you take feed away from them, which
14 was the main practice, mainly protein, the bird
15 loses all their antigens or antibodies. And so
16 if they get challenged while they're in a molt,
17 they're really susceptible. And if you bring
18 birds from another house in, you're kind of
19 asking for trouble.
20     Q. Now, when you were working at
21 Hillandale Farms of Florida, did Hillandale
22 Farms of Florida backfill its cages?
23     A. No.
24     Q. So when the certified guidelines were
25 changed to ban backfilling in almost all

Page 112

1 situations, did that have any affect on how
2 Hillandale Farms of Florida ran its operations?
3     A. No. We didn't molt either.
4     Q. Now, is it your understanding that
5 the UEP Certified program had some sort of an
6 audit procedure in place?
7     A. Yes.
8     Q. Explain to the jury what the audits
9 did for the Certified program.
10 MR. SCHIRMER:
11     Object to form.
12     A. It reviewed -- I mean, you had to
13 submit your cage sizes, house sizes, and bird
14 numbers, as you populated a new house, and we
15 were audited a minimum of, I think, twice a
16 year, but we had to keep all these reports
17 updated and actually USDA did the audits.
18 MR. ROBISON:
19     Q. Did USDA do the audits of Hillandale
20 when you were there?
21     A. Yes.
22     Q. And were the audits basically
23 confirming that the producer was complying with
24 the Certified program guidelines?
25 MR. SCHIRMER:

Page 113

1     Object to form.
2     A. It was confirming or telling us we
3 were in violation. And if you were in
4 violation, you had a short period of time, a
5 week or two weeks, to correct the violation.
6 And most of the time it would be -- they found a
7 cage that had too many chickens in it.
8 MR. ROBISON:
9     Q. Okay.
10     A. But pretty much that was all.
11     Q. So the U.S. Federal Government, the
12 USDA was the agency that would have actually
13 come out to Hillandale Farms of Florida and
14 perform the audits?
15     A. Correct.
16     Q. Have you ever heard of people
17 involved in an illegal conspiracy who would have
18 the Federal Government involved in auditing
19 member participation in the conspiracy?
20 MR. SCHIRMER:
21     Object to form.
22 MR. HEDLUND:
23     Object to the form.
24     A. Not up until recently.
25 MR. ROBISON:

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  Q.  And you know that's one of the
2  plaintiffs' allegations in this case?
3  A.  Yes.
4  Q.  Does that make any sense to you?
5  MR. SCHIRMER:
6  Object to form.
7  A.  No.
8  MR. ROBISON:
9  Q.  Does that seem kind of strange that
10  you would have a conspiracy with the government
11  as one of the enforcers?
12  A.  Yes.
13  MR. HEDLUND:
14  Object to the form.
15  MR. ROBISON:
16  Q.  Now, did you attend UEP meetings at
17  which USDA representatives were also present?
18  A.  Yes.
19  Q.  And did that happen often?
20  A.  Quite often.
21  MR. SCHIRMER:
22  Object to form.
23  MR. ROBISON:
24  Q.  And was animal welfare one of the
25  issues discussed at some of the meetings that

Page 115

1  USDA attended?
2  A.  Yes.
3  Q.  And did anyone from the USDA ever
4  voice an objection during one of these meetings
5  to the UEP Certified program?
6  A.  No.
7  MR. SCHIRMER:
8  Object to form.
9  MR. ROBISON:
10  Q.  I think you testified earlier about
11  some of the largest customers of Hillandale
12  Farms of Florida being Walmart, Publix and
13  Winn-Dixie.  Do you remember that?
14  A.  Correct.  Yes.
15  Q.  Now, from the 2004 time frame through
16  2006 when you were at Hillandale, did those
17  three grocery store chains pay the same price to
18  get eggs from Hillandale?
19  A.  No.
20  Q.  Walk the jury through any differences
21  in the purchase prices of Walmart, Publix and
22  Winn-Dixie.
23  A.  Generally -- well, I'll say the
24  differences in the way the eggs were handled, we
25  store-door delivered Publix eggs, we delivered

Page 116

1  Winn-Dixie's eggs to their distribution center
2  in Jacksonville, and Walmart picked their eggs
3  up at our dock.  So we had no transportation
4  costs for Walmart, we had more transportation
5  costs for Publix, and kind of in the middle was
6  Winn-Dixie.  Walmart paid us the most for our
7  eggs.  Publix and Winn-Dixie got cheaper eggs
8  than Walmart did.  But as you'll see from one of
9  these exhibits that was shown, Walmart sold
10  their eggs that they paid more for for less than
11  Winn-Dixie and Publix.
12  Q.  When you were at Hillandale, did you
13  take any steps to monitor retail prices at
14  Walmart, Publix, and Winn-Dixie?
15  A.  I mean, I shopped in all three stores
16  in Lake City, so I would always -- whether I
17  bought eggs or not, that was one place I always
18  headed, being in the industry, to, number one,
19  check the display, because they were our eggs
20  that they were selling, and to make sure that
21  the displays were right, but I also would also
22  monitor what they were selling our eggs for.
23  Q.  Okay.  And did you -- as an employee
24  at Hillandale Farms of Florida, did you have an
25  understanding of what Hillandale's profit margin

Page 117

1  was on eggs it was selling to Walmart, Publix,
2  and Winn-Dixie?
3  A.  Yes.  It varied week-to-week, but,
4  yes.
5  Q.  And by monitoring retail prices, did
6  you have an understanding of what profit margin
7  Walmart, Publix and Winn-Dixie were earning on
8  the eggs they sold to their stores?
9  MR. SCHIRMER:
10  Object to form.
11  A.  I had a guesstimate, but I got
12  reports on a weekly basis from Publix, so I knew
13  what their margins were.
14  Q.  And what were they?
15  A.  45 to 47 percent.
16  Q.  Did Hillandale ever earn a margin
17  like that?
18  A.  Even when we were losing money on
19  eggs, Publix was making 45 to 47 percent in the
20  grocery store.
21  Q.  Did Hillandale ever make a margin
22  anywhere close to 45 percent?
23  A.  Not while I was there.
24  Q.  Mr. Randall, when you were at
25  Hillandale in the '04 to '06 time frame, what

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 happened to egg prices? What happened to shell
2 egg prices during that time?
3 MR. SCHIRMER:
4        Object to form.
5    A.   They went into what we might call the
6 toilet. We were losing -- I mean, that's why I
7 lost my job.
8 MR. ROBISON:
9    Q.   Walk the jury through that. Explain
10 why it is you lost your job.
11 MR. SCHIRMER:
12        Object to form.
13    A.   Well, we were losing money. And as I
14 said, I was the highest paid employee at
15 Hillandale, LLC, so one of the easiest, quickest
16 ways to cut some expense in overhead was to let
17 me go. But the market was not favorable. It
18 had been the year prior to me going to
19 Hillandale. But the two years when I was there,
20 it was pretty disastrous.
21 MR. ROBISON:
22    Q.   What happened to the nation's flock
23 size during the two years you were at
24 Hillandale?
25 MR. SCHIRMER:

Page 119

1        Object to form.
2    A.   It grew.
3 MR. ROBISON:
4    Q.   Okay. During the two years you were
5 at Hillandale, did you attend some UEP meetings
6 where people talked about the bad market
7 conditions?
8    A.   Yes. I mean, no one would ever talk
9 specifics, but I mean, other people would say
10 they're losing their rear ends. And there were
11 some operations, I think, sold because of people
12 wanting to get out of the business.
13    Q.   Now, again, the plaintiffs allege
14 there was a conspiracy starting in 1999 or 2000
15 to reduce flocks so prices would increase. So
16 does that allegation make any sense based on
17 your knowledge of the facts --
18 MR. AHERN:
19        Object to form.
20 MR. ROBISON:
21    Q.   -- in 2004, 2005, 2006?
22 MR. SCHIRMER:
23        Object to form.
24    A.   If that's what they think happened,
25 it sure didn't.

Page 120

1 MR. ROBISON:
2    Q.   Did you ever hear anybody at an UEP
3 meeting somebody stand up and say, I can't
4 believe we have these low prices on these big
5 flocks because we should have had -- we should
6 have just the opposite because of this agreement
7 we struck in 1999?
8    A.   No.
9    Q.   Anyone ever say that?
10 MR. AHERN:
11        Object to form.
12 MR. SCHIRMER:
13        Object to form.
14 MR. HEDLUND:
15        Form.
16    A.   No.
17 MR. ROBISON:
18    Q.   Mr. Randall, I want to go through
19 some of the exhibits that you were shown
20 earlier. Let's start with Exhibit 1 to your
21 deposition.
22    A.   Okay.
23    Q.   You were shown this earlier. This is
24 supposed to be the minutes of the UEP Spent Hen
25 Committee, October 9, 2002. Do you see that?

Page 121

1    A.   Yes, sir.
2    Q.   And this meeting was apparently in
3 Savannah, Georgia. Do you see that?
4    A.   Yes.
5    Q.   And you were asked earlier whether
6 your name is listed here under "UEP/UEA Members,
7 Staff and Guests."
8    A.   Uh-huh. Yes.
9    Q.   And do you see your name there?
10    A.   Yes.
11    Q.   Did you cast any votes at this
12 meeting?
13    A.   No.
14    Q.   Did you speak at this meeting?
15    A.   No.
16    Q.   Did you have any input on what the
17 agenda would be for this meeting?
18    A.   Absolutely not.
19    Q.   And where were you working in October
20 of 2002?
21    A.   For Lohmann Tierzuchtgmbh.
22    Q.   And did Lohmann have spent hens that
23 it was trying to sell?
24    A.   From time to time, yes. From our
25 breeder flocks.

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    Q.   Do you remember now why it was you
2  attended that meeting in 2002?
3    A.   Well, as a UEA member, I attended --
4  I mean, to be quite honest, one of the reasons
5  was that we were going to play golf at a good
6  golf course, but, I mean, there were some things
7  discussed that I needed to keep abreast on as to
8  what was going on in the industry.  Although I
9  wasn't -- couldn't make any decisions, still it
10  was important to me to know where and what I
11  could get for spent hens because we carried a
12  quarter of a million breeders that would be sold
13  on an annual basis.
14    Q.   So there was a business reason for
15  Lohmann for you to attend.
16    A.   Yes.  Yes.
17    Q.   And do you know for sure whether you
18  attended this entire meeting?
19    A.   I was there for the duration, but UEP
20  breaks up into small meeting groups, so I didn't
21  attend every -- every committee meeting that was
22  there.
23    Q.   Go ahead.
24    A.   Only ones that I felt involved my
25  particular business.

Page 123

1    Q.   And were there sometimes when you
2  would attend a UEP meeting but then be asked to
3  leave because they needed to cover things with
4  just UEP members?
5  MR. SCHIRMER:
6        Object to form.
7    A.   From time to time, yes.
8  MR. ROBISON:
9    Q.   Let's look at Exhibit 2 now.
10    A.   Okay.
11    Q.   This is a collection of documents
12  that was faxed to people other than you on
13  October 16, 2002.  Do you see that?
14    A.   Uh-huh.
15    Q.   You need to say yes.
16    A.   Yes.
17    Q.   If you would flip to the third page
18  of the exhibit, please.  Bates number ending in
19  52 at the bottom.
20    A.   Okay.
21    Q.   This is for the UEP Annual Membership
22  Meeting, October 10, 2002, in Savannah, Georgia.
23  Do you see that?
24    A.   Yes.
25    Q.   And you were asked earlier whether

Page 124

1  your name appeared as someone in the "Staff and
2  Guests" category.
3    A.   Correct.
4    Q.   Do you think you attended this
5  meeting?
6    A.   Yes.  It's the same meeting that was
7  in --
8    Q.   Do you see the name Howard Magwire
9  three or four lines up from your name?
10    A.   Yes.
11    Q.   Who was Howard Magwire in 2002?
12    A.   Worked for USDA.
13    Q.   If you would flip two more pages,
14  Bates number ending in 54.  These are apparently
15  minutes from the UEP Annual Board Meeting,
16  October 10-11, 2002.  Do you see that?
17    A.   Yes, sir.
18    Q.   And you were asked earlier whether
19  your name was shown here as somebody attending.
20    A.   Yes.
21    Q.   Do you know whether you attended this
22  meeting?
23    A.   Yes, I did.
24    Q.   Do you, again, see Howard Magwire as
25  somebody attending this meeting a few lines up

Page 125

1  from you?
2    A.   Yes, I do.
3    Q.   Now, if you would flip two pages.
4  No, no, the page that ends in Bates number 56.
5    A.   Yes.
6    Q.   Up above near the top there's a
7  paragraph that starts "Motion Number 3."
8    A.   Yes.
9    Q.   And in the paragraph under that, it
10  says, "Gregory announced that Howard Magwire of
11  USDA/AMS and Bill Bauragardt of ARPAS had met
12  with the committee and had made commitments to
13  provide third party auditing of UEP's
14  guidelines."
15        Do you see that?
16    A.   Yes.
17    Q.   And is that consistent with your
18  memory that the USDA was one of the members
19  providing audits for the Certified program?
20    A.   Correct.  Yes.
21    Q.   If you'll flip to the next page,
22  Bates number ending in 57, you see a heading
23  there for "Guest Speakers"?
24    A.   Yes.
25    Q.   And do you see the name of Tim

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1 Hammonds there?
2    A.   Yes.
3    Q.   And who was he with?
4    A.   Food Marketing Institute.
5    Q.   And is Food Marketing Institute the
6 grocer trade association you mentioned earlier?
7    A.   I believe so, yes.
8    Q.   And you see Howard Magwire here
9 listed as a guest speaker?
10   A.   Yes.
11   Q.   Do you remember his presentation or
12 do you remember that he gave one?
13   A.   I remember he gave one, yes.
14   Q.   If you would flip two more pages,
15 please, Bates number ending in 59.  This is
16 minutes from the UEP Animal Welfare Committee,
17 October 9, 2002.  Do you see that?
18   A.   Yes, sir.
19   Q.   And you were asked earlier whether
20 your name is listed as attending as a UEP/UEA
21 members, staff and guests.
22   A.   Correct.
23   Q.   And then two lines up from the bottom
24 of those attendees, do you again see Howard
25 Magwire's name?

Page 127

1    A.   Yes, I do.
2    Q.   If you would flip one more page,
3 Bates number ending in 60, this is where you
4 were asked earlier today about the 100 percent
5 rule discussion.
6    A.   Uh-huh.  Yes.
7    Q.   And then if you would look down in
8 the middle of the page, after the 100 percent
9 rule discussion, you see a discussion here of
10 Howard Magwire for USDA.  Do you see that?
11   A.   Let me see.
12   Q.   Next to the paragraph "Authorized
13 Auditors."
14   A.   Yes.  It lists the same two gentlemen
15 and same firms, USDA and ARPAS as auditors.
16   Q.   Now, whenever the discussion up above
17 was happening about the 100 percent rule, do you
18 remember Mr. Magwire from USDA voicing any
19 concerns about the 100 percent rule?
20   A.   No.
21 MR. SCHIRMER:
22       Object to form.
23 MR. ROBISON:
24   Q.   Did he object to it in any way?
25   A.   No, sir.

Page 128

1 MR. SCHIRMER:
2       Object.
3 MR. AHERN:
4       Same objection.
5 MR. ROBISON:
6    Q.   Did he say he thought it was an
7 antitrust violation?
8    A.   No, sir.
9 MR. AHERN:
10       Object to form.
11 MR. ROBISON:
12   Q.   All right.  We are finished, I think,
13 with Exhibit 2.  Exhibit 3, Mr. Randall, you
14 were shown earlier today.  The cover page
15 shows:  Shell Egg Marketing Committee, May 16,
16 2005, in Washington, DC.  Do you see that?
17   A.   Correct.  Yes.
18   Q.   And your name is listed as a
19 committee member?
20   A.   Correct.
21   Q.   If you would flip through the page
22 that ends in Bates number 79, please.
23   A.   (Witness complies.)  Okay.
24   Q.   And you were asked about this this
25 morning.  This is the UEP-Shell Egg Marketing

Page 129

1 Committee Meeting minutes from January 24, 2005.
2 Do you see that?
3    A.   Yes, sir.
4    Q.   And do you see your name listed as a
5 member attending the meeting?
6    A.   I'm sure I'm there somewhere.  Okay.
7 Yes.
8    Q.   All right.  In the middle of the page
9 we see a reference to a USDA report.  Do you see
10 that?
11   A.   Yes.
12   Q.   And it says here that, "Michael
13 Sheats of USDA presented a report on the USDA
14 Market News reports and the proposed changes the
15 department is considering."
16       Do you see that?
17   A.   Yes.
18   Q.   Now, later on in the minutes we see
19 at the bottom of the page the paragraph that
20 opposing counsel mentioned to you.
21   A.   Uh-huh.  Yes.
22   Q.   Now, whenever there was this
23 discussion about the Economic Summit held on
24 November 16, 2004, and discussion about people
25 selling birds early or reducing flock size --

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1    A.   Correct.
2    Q.   -- did Mr. Sheats stand up and voice
3  any concerns about that?
4  MR. SCHIRMER:
5         Object to form.
6    A.   No.
7  MR. ROBISON:
8    Q.   Did he object in any way?
9    A.   No.
10  MR. SCHIRMER:
11        Object to form.
12  MR. ROBISON:
13   Q.   Flip one more page.  Page Bates
14  number ending in 81.  Do you see this?
15   A.   Yes.
16   Q.   Now, this is a press release from the
17  USDA.  Do you see that?
18   A.   Yes.
19   Q.   A Program Announcement?
20   A.   Uh-huh.  Yes.
21   Q.   And you see at the very first line of
22  the first paragraph, there's a date of April 15,
23  2005.
24   A.   Yes.
25   Q.   Now, have you had a chance to read

Page 131

1  this?  Why don't you read the first two
2  paragraphs and tell me when you're finished.
3    A.   (Witness complies.)  Okay.
4    Q.   What's going on here?  What is the
5  USDA announcing?
6  MR. SCHIRMER:
7         Object to form.
8    A.   They've just announced their intent
9  to purchase old fowl for the school lunch
10  program.
11  MR. ROBISON:
12   Q.   Look at the second paragraph.  I'm
13  going to read the second paragraph.  It says
14  here from the USDA press release, April 15,
15  2005, "Part of the shell egg oversupply problem
16  is an over abundance of layers.  Therefore, this
17  purchase will assist the egg industry by
18  reducing flock size to a profitable level while
19  providing a food commodity that is popular in
20  USDA's child nutrition and other domestic food
21  assistance programs."
22        Do you see that?
23   A.   Yes, sir.
24   Q.   So who, according to this press
25  release, is helping the egg industry reduce

Page 132

1  flock size to a profitable level?
2  MR. AHERN:
3         Object to form.
4    A.   United States Department of
5  Agriculture.
6  MR. ROBISON:
7    Q.   And did the USDA on a regular basis
8  purchase spent hens from egg producers?
9  MR. SCHIRMER:
10        Object to the form.
11   A.   I think they had at one time, and
12  then they moved away, and they obviously have
13  come back to actively participate in the spent
14  hen removal.
15  MR. ROBISON:
16   Q.   And in April of 2005, did the egg
17  industry have an oversupply of eggs?
18  MR. AHERN:
19        Object.
20  MR. SCHIRMER:
21        Object to form.
22   A.   The market was in the tank, yes.
23  MR. ROBISON:
24   Q.   And egg prices were very low,
25  correct?

Page 133

1  MR. SCHIRMER:
2         Object to form.
3    A.   Yes.
4  MR. ROBISON:
5    Q.   I think I'm finished with Exhibit 3.
6  Pull out Exhibit 5.
7    A.   Okay.
8    Q.   Exhibit 5 is this undated Price
9  Discovery Intention document.  Do you see that?
10   A.   Yes.
11   Q.   Now, was there anything about the
12  price discovery process at UEP that you
13  understood had anything to do with controlling
14  the supply of eggs in the market?
15   A.   No.
16   Q.   Was there anything about the price
17  discovery system that involved the UEP members
18  getting together to set the prices they would
19  charge for the eggs they were selling?
20   A.   No.
21   Q.   Were UEP members during this price
22  discovery process exchanging their price
23  information?
24  MR. SCHIRMER:
25        Object to the form.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    A.   I don't know.
2 MR. ROBISON:
3    Q.   Okay.  Was this Price Discovery
4 Intention document, that we see is Exhibit 5 to
5 your deposition, was this anything more than
6 just certain UEP members agreeing to deal fairly
7 with each other when they're in a long or a
8 short position?
9 MR. AHERN:
10       Object to the form.
11   A.   Yes.
12 MR. HEDLUND:
13       Object to the form of the question.
14 MR. ROBISON:
15   Q.   Was there anything more to it than
16 that?
17 MR. SCHIRMER:
18       Object to the form.
19 MR. AHERN:
20       Same objection.
21   A.   No.
22 MR. ROBISON:
23   Q.   Let's go to Exhibit 6.  You were
24 shown this document this morning.  This is
25 something related to a general manager's meeting

Page 135

1 at Cal-Maine.
2    A.   Correct.
3    Q.   Do you see that?
4    A.   Uh-huh.
5    Q.   And the meeting was in Jackson,
6 Mississippi in February of 2006; is that right?
7    A.   Yes, sir.
8    Q.   Now, as of February 2006, do you know
9 what the status was of Cal-Maine's acquisition
10 of Hillandale in Florida?
11   A.   I knew the acquisition of whatever
12 form it was in had begun, but I didn't know any
13 details about it at all.
14   Q.   Did Cal-Maine acquire the entire
15 entity all at once or was it staggered?
16 MR. AHERN:
17       Object to the form.
18   A.   No, it was a five-year -- five-year
19 purchase.
20 MR. ROBISON:
21   Q.   Now, if you'll flip to page 2 of this
22 exhibit ending in Bates number 89.  You see we
23 have a chart that's entitled "Cal-Maine Foods
24 Flock Comparison"?
25   A.   Correct.

Page 136

1    Q.   Do you see any of the Hillandale
2 Florida locations listed here?
3    A.   No.
4    Q.   How about the next page ending in 90?
5 Do you see any Hillandale Florida locations
6 listed here?
7    A.   No.
8    Q.   How about the next page ending in 91?
9    A.   No.
10   Q.   And finally, next page, ending in 92?
11   A.   No, sir.
12   Q.   Did you negotiate the transaction
13 between Hillandale and Cal-Maine?
14   A.   No.
15 MR. SCHIRMER:
16       Object to form.
17 MR. ROBISON:
18   Q.   Have you ever seen a transaction
19 document?
20   A.   No, sir.
21   Q.   Are you a lawyer?
22   A.   No, sir.
23   Q.   Let's go to Exhibit 7.  And you were
24 shown this document this morning, correct?
25   A.   Yes.

Page 137

1    Q.   And I don't think there's a date on
2 this, but there's a reference on page 1 of
3 Exhibit 7 to the Egg Economic Summit in Atlanta
4 on November 16th.  Do you see that?
5    A.   Yes.
6    Q.   And I think opposing counsel showed
7 you another document that placed that as a
8 meeting that occurred on November 16, 2004.
9    A.   Okay.
10   Q.   Now, I would like you to go to page 2
11 of the exhibit, which ends in Bates number 40.
12   A.   Okay.
13   Q.   And do you see a paragraph in the
14 middle with a bullet -- bullet point next to it?
15   A.   Yes.
16   Q.   It says here, "UEP presented a bleak
17 overview of the supply side of the business and
18 the pending problems with an ever-increasing
19 flock size at a time when demand appears to be
20 diminishing."
21       Do you see that?
22   A.   Yes.
23   Q.   Does the plaintiffs' conspiracy
24 theory make any sense to you based on this
25 statement?

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1    A.   No.
2  MR. SCHIRMER:
3        Object.  Form.
4  MR. AHERN:
5        Object.
6  MR. HEDLUND:
7        Object to the form.
8  MR. ROBISON:
9    Q.   The next sentence in Exhibit 7 says:
10  "We reported that the nation's flock is expected
11  to end 2004 with nearly 12 million more hens
12  than a year ago and that the year-ending flock
13  size of 2005 could be as many as 14 million more
14  than 2004 if adjustments are not quickly made."
15       Do you see that?
16   A.   Yes.
17   Q.   Again, does that make any sense to
18  you if the plaintiffs are right, that there's a
19  conspiracy that started in 1999 to reduce flock
20  size?
21  MR. AHERN:
22       Object to the form.
23   A.   No.
24  MR. HEDLUND:
25       Object to the form.

Page 139

1  MR. ROBISON:
2    Q.   Next sentence says:  "We presented a
3  supply/demand price relationship that indicated
4  prices could vary from 19 to 27 cents below
5  2004's average with a flock size of 11 million
6  more hens."
7        Do you see that?
8    A.   Yes, sir.
9    Q.   All right.  Where in this document
10  does Roger Deffner or Gene Gregory say that they
11  are really outraged by this market condition
12  because nobody's following the rule of this
13  conspiracy the plaintiffs say existed?
14  MR. AHERN:
15       Object to the form.
16  MR. SCHIRMER:
17       Object to form.
18  MR. HEDLUND:
19       Object to the form.
20   A.   It's not there.
21  MR. ROBISON:
22   Q.   Okay.  Let's go to the last page of
23  Exhibit 7.  This is a chart that you were shown
24  earlier.  And you see it's got some egg producer
25  names on the left, and then a column for "Option

Page 140

1  1" and "Option 2."  Do you see that?
2    A.   Yes.
3    Q.   And then there are certain UEP
4  members that have a "yes" under "Option 1"
5  and/or "Option 2."  Do you see that?
6    A.   Yes.
7    Q.   Do you know whether any of the UEP
8  members listed here, other than Hillandale Farms
9  of Florida, ever indicated -- ever really
10  indicated they were going to follow Option 1 or
11  Option 2?
12   A.   No.
13  MR. AHERN:
14       Object to form.
15  MR. SCHIRMER:
16       Object to form.
17  MR. ROBISON:
18   Q.   And of those that are listed here as
19  doing Option 1 and/or Option 2, do you know
20  whether any of them really followed through and
21  did it?
22  MR. AHERN:
23       Same objection.
24  MR. SCHIRMER:
25       Objection.

Page 141

1    A.   No, I don't.
2  MR. ROBISON:
3        Let's take a break and change the
4  tape.
5  VIDEOGRAPHER:
6        All right.  One moment.  This ends
7  tape number two in the video deposition of
8  Robert Randall.  The time is 2:14 p.m.
9        (A recess was taken.)
10  VIDEOGRAPHER:
11       This is the beginning of tape number
12  three in the deposition of Robert Randall.  We
13  are going back on the record.  The time is 2:31
14  p.m.
15  MR. ROBISON:
16   Q.   Mr. Randall, I'm going to focus on
17  the last page of Exhibit 7 for a second.  If we
18  can go back to that.  See there's a column there
19  for Option Number 1 and Option Number 2?
20   A.   Correct.
21   Q.   I want to show you some documents to
22  help the jury understand what those options
23  were, so I'm handing you Exhibit 12.
24       (Exhibit 12 marked.)
25   A.   Okay.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1 MR. ROBISON:
2    Q.   And just let me know when you're
3 finished reading that.
4    A.   Okay.
5    Q.   Now, Exhibit 12 is a letter from UEP
6 dated November 29, 2004, correct?
7    A.   Yes.
8    Q.   And it's a letter from Gene Gregory
9 at UEP, correct?
10   A.   Yes.
11   Q.   And you were at Hillandale Farms in
12 November of 2004?
13   A.   Yes.
14   Q.   Now, in this letter, Gene Gregory
15 says: "You signed an intention form for the
16 following:  To reduce my December 1, 2004 flock
17 size by 5 percent between the dates of January 1
18 through April 30, 2005."
19        Do you see that?
20   A.   Yes.
21   Q.   Now, I want to show you what I'm
22 going to mark as Exhibit 13 to your deposition.
23 Take a minute to look at that, please, and let
24 me know when you're finished.
25        (Exhibit 13 marked.)

Page 143

1    A.   Okay.
2 MR. ROBISON:
3    Q.   Now, Exhibit 13 is Bates numbered
4 DAY28917-18.  And does Exhibit 13 appear to be
5 the Option 1 and Option 2 that were presented as
6 options for UEP members at this Egg Economic
7 Summit in November of 2004?
8    A.   Yes.
9    Q.   And is it your best recollection that
10 you, or somebody from Hillandale Florida, signed
11 Option 2?
12   A.   Yes.
13   Q.   Now, after signing Option 2, did
14 Hillandale Farms of Florida take any action as
15 far as its flock size that it would not have
16 taken even if it hadn't signed Option Number 2?
17   A.   No.
18 MR. AHERN:
19        Object to the form.
20 MR. ROBISON:
21   Q.   Okay.  Explain to the jury as best
22 you can why Option Number 2 didn't really affect
23 Hillandale Farms of Florida's operations.
24 MR. SCHIRMER:
25        Object to form.

Page 144

1    A.   Well, from December 1st, which is the
2 flock size they're looking at, through April 30
3 is approximately 21 weeks, and we would lose --
4 we were -- normal mortality for our operations
5 were .12 -- 12.125 or .15 percent a week.
6 MR. ROBISON:
7    Q.   So that's what percentage of the
8 flock would just die naturally?
9    A.   They would die naturally.  And so
10 taking that figure times 21 is going to come out
11 to close to 4 percent loss just under natural
12 attrition and plus I knew we had a couple flocks
13 scheduled to go out anyway.  So without changing
14 anything, we were going to comply to Option 2
15 just under our normal course of business.  We
16 didn't have to do anything.
17   Q.   And so what was going to happen after
18 April 30 of 2005 to the Hillandale flock size?
19 MR. SCHIRMER:
20        Object to form.
21   A.   We'd continued to have normal
22 mortality, and we would continue to sell flocks
23 when we normally had them scheduled, and we
24 would replace -- we already had replacement
25 flocks growing at our pullet flocks.  So we just

Page 145

1 did business as usual.  This -- this, quote,
2 intention to meet market demand didn't really
3 affect us.
4 MR. ROBISON:
5    Q.   So did the fact that you signed
6 Option Number 2 sometime in late 2004, did it
7 have any net affect on Hillandale Farms of
8 Florida's flock size?
9    A.   No.
10 MR. AHERN:
11        Object to the form.
12   A.   Not out of the ordinary.
13 MR. ROBISON:
14   Q.   Then why would you have signed Option
15 2 near the end of 2004 --
16   A.   Well, there were two reasons --
17   Q.   -- if it wasn't going to have any
18 effects?
19 MR. SCHIRMER:
20        Objection.
21   A.   -- I wasn't going to sign Option 1
22 because I didn't want to kill flocks early, and
23 so that left me to sign Option 2, which as far
24 as probably UEP considered I was a good faith
25 member, but to me it didn't change our normal

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 course of doing business.
2 MR. ROBISON:
3    Q.   Do you know whether it changed the
4 normal course of doing business for any other
5 UEP member?
6    A.   No.
7 MR. SCHIRMER:
8        Object to form.
9 MR. AHERN:
10       Object to form.
11   A.   No, and I didn't care.
12 MR. ROBISON:
13   Q.   Let's look at Exhibit 11, please,
14 from this morning.
15   A.   Okay.
16   Q.   This is a retail price check.  One
17 side of the sheet is dated 12-13 of 2006, and
18 the other side of the sheet is dated 12-20-2006.
19 Do you see that?
20   A.   Uh-huh.  Yes.
21   Q.   Now, if we look at the Publix column,
22 for example, you said while you were at
23 Hillandale Farms of Florida you received
24 information from Publix showing its profit
25 margin on shell eggs, correct?

Page 147

1    A.   Correct.
2 MR. AHERN:
3        Object to the form.
4 MR. ROBISON:
5    Q.   And what did those Publix documents
6 show as its profit margin on shell eggs?
7    A.   47 percent.
8 MR. AHERN:
9        Objection.
10   A.   45 to 47.  It would fluctuate from
11 week-to-week.
12 MR. ROBISON:
13   Q.   So if I'm looking at the page of
14 Exhibit 11 that ends in Bates numbers 95.
15   A.   Okay.
16 COURT REPORTER:
17       95?
18   Q.   And if we go to the Publix column and
19 we read down, which size of eggs were the ones
20 where Publix was earning a 45 to 47 percent of
21 the margin?
22 MR. AHERN:
23       Object to the form.
24 MR. ROBISON:
25   Q.   Was it large, jumbo, extra large?

Page 148

1    A.   Pretty much across the board, but if
2 we just looked at large where they were selling
3 eggs for $1.29, I would guarantee you if you
4 went back to the records, they probably were
5 charged 88 to 90 cents for those eggs delivered.
6 Store delivered.  And so they made close to 40
7 cents a dozen on eggs that we sold them.  And it
8 didn't matter if we were making a profit or
9 losing money, they continually made 47 percent,
10 45 to 47 percent.
11       So if people are really concerned
12 about the consumer, they shouldn't be mad at us.
13 They should be mad at them for marking their
14 eggs up so high because their average markup on
15 other grocery items is 2 to 5 percent.
16   Q.   Much lower than on eggs.
17   A.   Why do they need 47 percent on eggs?
18 MR. AHERN:
19       Object to the form.
20 MR. ROBISON:
21   Q.   Mr. Randall, I asked you some
22 questions earlier today about some 2002 UEP
23 meetings that you attended as a UEA member.
24   A.   Correct.
25   Q.   At any point when you were attending

Page 149

1 UEP meetings as a UEA member, did you ever cast
2 a vote?
3    A.   No.
4 MR. SCHIRMER:
5        Object to form.
6 MR. ROBISON:
7    Q.   At any point when you were attending
8 UEP meetings as a UEA member, did you ever stand
9 up and give any sort of presentation?
10   A.   No.
11 MR. SCHIRMER:
12       Object to form.
13 MR. ROBISON:
14   Q.   At any point when you were attending
15 UEP meetings as a UEA member, did you have any
16 input on the agenda for the meeting?
17 MR. SCHIRMER:
18       Object to form.
19   A.   No.
20 MR. ROBISON:
21   Q.   Now, from time to time, when you were
22 attending UEP meetings, did certain members of
23 UEP make recommendations to other UEP members on
24 flock management, that sort of thing?
25 MR. SCHIRMER:

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1    Object to the form.
2    A.   Not to my knowledge, but, I mean,
3 there was -- to be quite honest, there was
4 always an exchange of maybe when the molting
5 practices changed, if they were having success,
6 how they did it.  If they were using certain
7 feed additives that were new to the industry,
8 people might have exchanged information there
9 because they use a by-product of ethanol
10 production now in the feed and they use
11 different percentages, so, I mean, there was
12 always information going back and forth on
13 production practices.
14 MR. ROBISON:
15    Q.   What about recommendations on
16 purchasing chicks?
17    A.   No.
18 MR. SCHIRMER:
19    Object to form.
20 MR. AHERN:
21    Objection.
22 MR. ROBISON:
23    Q.   Are you familiar with the size of the
24 U.S. laying flock from 1999 through the present,
25 2014?

Page 151

1 MR. SCHIRMER:
2    Object to form.
3    A.   Not directly.  I mean, it was in the
4 high 200's, 260 to 270 at one point, and it's up
5 over 300 million now, I believe.
6 MR. ROBISON:
7    Q.   So the layers have increased over
8 that time period?
9 MR. AHERN:
10    Object to form.
11    A.   The flock size has increased
12 steadily.
13 MR. ROBISON:
14    Q.   And what about egg prices?  Are egg
15 prices higher in 2014 than they were in 1999?
16 MR. AHERN:
17    Object to form.
18 MR. HEDLUND:
19    Object to the form.
20    A.   Yes.  Record egg prices were achieved
21 in the fall of 2013; prices people had never
22 seen before.
23 MR. ROBISON:
24    Q.   And what was happening to the
25 nation's flock in 2013?

Page 152

1 MR. AHERN:
2    Object to the form.
3    A.   It was as large as it's ever been.
4 MR. ROBISON:
5    Q.   In 2007 and 2008 -- well, strike
6 that.  What goes into the cost of producing
7 eggs?
8 MR. SCHIRMER:
9    Object to form.
10 MR. ROBISON:
11    Q.   You've worked for egg producers.
12 Walk the jury through what goes into the cost of
13 producing eggs.
14    A.   About 60 percent of the cost to
15 produce a dozen eggs is feed.  The rest is made
16 up of overhead, transportation, and other items,
17 but feed is the main -- main cost.
18    Q.   And what are the components of feed?
19    A.   Well, as I said earlier, there's a 5
20 pound premix that's put in.  There's generally a
21 form of calcium added, whether it's limestone,
22 oyster shell, but the bulk of the feed is corn
23 and soybeans.
24    Q.   What happened to the price of corn in
25 2007 and 2008?

Page 153

1 MR. AHERN:
2    Object to the form.
3 MR. HEDLUND:
4    Object to the form of the question.
5    A.   It went to an $8 a bushel range.
6 MR. ROBISON:
7    Q.   Where had it been before?
8    A.   Down to 4.
9 MR. AHERN:
10    Object to form.
11 MR. ROBISON:
12    Q.   And how do you know this?
13    A.   Because it's a daily -- I mean, it's
14 publicized, Chicago Board of Trade.
15    Q.   So if the price of corn more than
16 doubled in 2007, 2008, what happened to the cost
17 of producing eggs during that time?
18 MR. AHERN:
19    Object to the form.
20 MR. SCHIRMER:
21    Form.
22    A.   It would have gone up significantly.
23 MR. ROBISON:
24    Let's go off the record just for a
25 second while I check my notes.  I may be

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1 finished.
2 VIDEOGRAPHER:
3      We are going off the record. The
4 time is 2:43 p.m.
5      (A recess was taken.)
6 VIDEOGRAPHER:
7      We are now going back on the record.
8 The time is 2:53 p.m.
9 MR. ROBISON:
10     Q.  Mr. Randall, do you know how much
11 money Cal-Maine had to spend in order to get in
12 compliance and stay in compliance with the UEP
13 Certified program?
14 MR. AHERN:
15     Object to the form.
16     A.  No.
17 MR. ROBISON:
18     Q.  Do you know how much Cal-Maine has
19 had to spend in defending these lawsuits?
20     A.  No.  Absolutely not.
21     Q.  Would you have any way of calculating
22 any harm to Cal-Maine's reputation or goodwill
23 as a result of these lawsuits?
24 MR. SCHIRMER:
25     Object to form.

Page 155

1     A.  No.
2 MR. ROBISON:
3      No further questions.  I'll pass the
4 witness.
5           CROSS-EXAMINATION
6 BY MR. SCHIRMER:
7     Q.  I have a few more questions.  Let's
8 go back to Exhibit Number 7.
9 MR. HEDLUND:
10     I'm sorry.  Who's questioning now?
11 MR. SCHIRMER:
12     It's Mark Schirmer.  Is that Dan?
13 MR. HEDLUND:
14     Yes.
15 MR. SCHIRMER:
16     Q.  Let's go to page number NL00440 where
17 Mr. Robison asked you several questions about
18 the bullet point.
19     A.  Yes.
20     Q.  So -- and then right after he asked
21 the bullet point, you said you didn't recall
22 anybody getting up and complaining and saying,
23 oh, isn't this horrible because the supply and
24 demand is all out of whack.  Is that about
25 right?

Page 156

1 MR. ROBISON:
2      Objection.  Mischaracterizes.
3     A.  Yes.
4 MR. SCHIRMER:
5     Q.  Okay.  Isn't the next two paragraphs
6 asking people if they want to be part of the
7 solution by managing supply?
8 MR. ROBISON:
9      Totally mischaracterizes his
10 testimony and my question.  I object to that.
11 MR. SCHIRMER:
12     Fine.
13     Q.  Isn't that exactly what the next
14 paragraph is saying?  Isn't Gene Gregory and
15 Roger Deffner saying don't -- shouldn't you be
16 part of the solution to this overt supply by
17 helping reduce demand?
18 MR. ROBISON:
19     Objection.  It mischaracterizes the
20 document and the question and his testimony.
21 MR. SCHIRMER:
22     It doesn't mischaracterize the
23 document.  It's exactly what the word says.  It
24 says, If you want to be part of the solution, be
25 a part of these two ways of reducing demand.

Page 157

1 MR. ROBISON:
2      No.
3 MR. SCHIRMER:
4      Now, that's coaching the witness.
5 MR. ROBISON:
6      They can't produce demand.
7 MR. SCHIRMER:
8      By reducing supply, excuse me.  By
9 reducing supply.
10     Q.  Does this say that you ought to be
11 part of the solution by reducing the supply of
12 eggs?
13     A.  That's what that states by following
14 one of two options.
15     Q.  Right.
16     A.  We chose Option 2 which didn't affect
17 the way we did business.
18     Q.  Right.  But you don't know how it
19 would affect anyone else in the business; isn't
20 that right?
21     A.  It wasn't my business to know how it
22 affected anybody else.
23     Q.  And these people are soliciting
24 people to try and take one of these two
25 solutions in order to reduce supply so as to

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1 make supply and demand align better so as to
2 increase the prices, and that is exactly what
3 this is about.
4 MR. ROBISON:
5      Objection to form.
6      A.   It says nothing about price. It says
7 reducing supply.
8 MR. SCHIRMER:
9      Q.   Well -- yeah. Well, why would they
10 want to reduce supply?
11 MR. ROBISON:
12      Objection. Mischaracterizes and
13 speculation.
14      A.   You'd have to ask them.
15 MR. SCHIRMER:
16      Q.   Okay. Then what about the previous
17 sentence: "We presented a supply/demand price
18 relationship that indicates that prices could
19 vary from 19 to 27 cents below 2004's average
20 with a flock size of 11 million more hens."
21      See that?
22      A.   That's correct.
23      Q.   Why would the prices vary from 19 to
24 27 cents below 2004's average with a flock size
25 of 11 million more hens?

Page 159

1      A.   That's a supposition on their part.
2 There aren't 11 million more hens yet. That was
3 a projection based in previous statements.
4      Q.   Right. And why --
5      A.   And you don't know that you might
6 pick up new business in that time, so it's --
7 MR. SCHIRMER:
8      Q.   So demand would make -- would make a
9 difference. If demand went up, that might --
10      A.   Demand always make a difference.
11      Q.   So by the way, you said that -- for
12 example, I believe you said that this year or at
13 the end of last year, the flock size had been at
14 an all-time high.
15      A.   I said the profits were at an
16 all-time high.
17      Q.   And you said the flock was also --
18      A.   And the bird flocks had continued to
19 increase.
20      Q.   Hadn't demand also continued to
21 increase?
22      A.   It had to increase.
23      Q.   Okay. Now, let's go to number 3.
24 I'm done with that. I'm sorry. Forgive me.
25 MR. ROBISON:

Page 160

1      He's done with Exhibit 3.
2      A.   Oh, Exhibit 3. Okay.
3 MR. SCHIRMER:
4      Q.   Go to this second paragraph.
5      A.   Which page?
6      Q.   On page 429181. Excuse me. I'm
7 sorry. That was rude of me. I should have said
8 that first. It's the one that says "USDA
9 Program Announcement" that you were questioned
10 about earlier today.
11      A.   Uh-huh.
12      Q.   Okay?
13      A.   Yes.
14      Q.   Now, the second sentence that you
15 were read says: "Part of the" -- it says --
16 well, the first sentence says: "Part of the egg
17 shell oversupply problem is an over abundance of
18 layers. Therefore, this purchase will assist
19 the egg industry by reducing flock size to a
20 profitable level."
21      What do they mean by reducing flock
22 size to a profitable level?
23 MR. ROBISON:
24      Object to form.
25      A.   You would have to ask the USDA that

Page 161

1 wrote this, but --
2 MR. SCHIRMER:
3      Q.   What was your understanding of that?
4      A.   Well, since I hadn't seen it until
5 just today, it's -- it appears the United States
6 Government is trying to help the industry get
7 back to a profitable level.
8      Q.   And how are they doing that?
9      A.   Apparently by adding spent fowl to
10 the school lunch program.
11      Q.   And they're doing that by reducing
12 the flock size? Is that what they're doing? Is
13 that what it says here?
14      A.   They're making it easier for egg
15 producers to get rid of old fowl and to make
16 money doing it.
17      Q.   Well, does it say "reduce flock size
18 to a profitable level" or not?
19      A.   Well, that's what it says. That's
20 what the --
21      Q.   No, the --
22      A.   That's what the USDA says.
23      Q.   Okay. So you think the USDA is
24 wrong?
25 MR. ROBISON:

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1      Objection.
2    A.    No.
3  MR. ROBISON:
4        That total mischaracterizes his
5  testimony.
6    A.    What I'm telling you is an egg
7  producer isn't saying this, the United States
8  Government is saying this.
9  MR. SCHIRMER:
10    Q.    I'm fine with that.  Now, the
11  government here is acting as a market
12  participant; isn't that right?  They're
13  ostensibly going into the market and purchasing
14  layers.
15    A.    Apparently, yes.
16    Q.    Okay.  Are they -- do you understand
17  whether they were engaging in -- whether they
18  were regulating the industry by doing this?
19    A.    I have no idea.
20    Q.    Okay.  Now, also -- I'm done with
21  that.  I'm sorry.
22    A.    Okay.
23    Q.    You can put that away.  Now, you were
24  talking about the U.S. UEP program, UEP
25  Certified program.

Page 163

1    A.    Correct.
2    Q.    And its benefits.
3    A.    Yes.
4    Q.    And the benefits of the chickens.  Am
5  I -- do you remember having had a discussion
6  with Mr. Robison?
7    A.    Yes.
8    Q.    Is it your understanding that the UEP
9  program involves testing for salmonella and
10  avian influenza?
11    A.    Testing for salmonella it did, and
12  today it's an FDA program, not a USDA program.
13    Q.    Did the UEP program -- is it your
14  understanding that the UEP program involved
15  testing for the salmonella virus?
16    A.    Yes.
17    Q.    That was part of the UEP Animal
18  Welfare Program, the Certified Care Animal
19  Welfare Program?
20    A.    I believe so.
21    Q.    Do you know that?
22    A.    I said I believe so.
23    Q.    Okay.  Fair enough.  Now, you said
24  you also understood there were audit procedures;
25  is that correct?

Page 164

1    A.    Yes.
2    Q.    Do you understand whether you could
3  fail the air quality standard portion of the
4  audit and still pass the audit?
5    A.    I believe so.
6    Q.    Do you have an understanding whether
7  you could fail the cleanliness part of the audit
8  and still pass the audit?
9    A.    I think you got penalized so much for
10  each portion that you did not pass, and as I
11  said earlier, you had a time frame to rectify
12  anything that was pointed out that was in
13  violation of the plan.
14    Q.    Say you -- your only audit failures
15  were failure with regard to the ammonia levels
16  in the houses.
17    A.    Correct.  Okay.
18    Q.    Do you have an understanding as to
19  whether that would cause you to fail an audit?
20    A.    I don't think so.
21    Q.    Say that the only audit failure was a
22  cleanliness failure.  Do you have an
23  understanding as to whether that would cause you
24  to fail an audit?
25    A.    To be quite honest, I don't remember

Page 165

1  a cleanliness issue.
2    Q.    All right.  How about eliminating
3  dead birds.  Was that part of the audit?
4    A.    Could have been if they found an
5  excess number of dead in the cages, yes.
6    Q.    Okay.  And what part of the audit
7  would that be addressed to?  What part of the
8  standards?
9    A.    It's been -- I honestly can't answer
10  that.
11    Q.    Okay.  Do you know whether just that
12  failure alone, the excess number of dead birds,
13  would cause you to fail an audit?
14    A.    No, wouldn't.
15    Q.    Would a -- would having even one bird
16  too many in a house above the number allowed
17  under the UEP cage space guidelines cause
18  someone to fail an audit?
19    A.    It would cause -- you would get a
20  negative mark that that had to be rectified.
21  Even if there were ten cages that didn't have
22  enough birds in it, if they found one that had
23  too many, you got a -- you were called in.
24    Q.    Did you fail the audit?
25    A.    You wouldn't have totally failed the

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1 audit, no. You would have been given, again, a
2 warning and a chance to correct the problem.
3     Q. I can see that we're talking past
4 each other, so maybe I -- when the auditors came
5 in and if they found too many birds in a house
6 by one, would they have said that you failed
7 this audit and then given you a chance to
8 correct it?
9     A. You would have to ask them, I'll be
10 quite honest. We never failed an audit.
11     Q. Do you have an understanding as to
12 whether the guidelines called for a failure of
13 the audit if there's even one bird too many?
14     A. Yes.
15     Q. Do you have an understanding as to
16 whether after 2005 improper -- do you have an
17 understanding as to whether backfilling is
18 allowed under the UEP guidelines after 2005?
19     A. I'm not sure when UEP -- when the
20 Certified program eliminated that backfilling as
21 being acceptable.
22     Q. Okay. I will represent to you that
23 it was at least after 2004. Do you have an
24 understanding as to whether the UEP program at
25 some point banned the backfilling?

Page 167

1     A. Yes.
2     Q. And do you have an understanding as
3 to whether if an auditor found that there had
4 been backfilling, a UEP Certified company would
5 fail an audit?
6     A. I believe so. Unless they could
7 justify it.
8     Q. And what were the justifications?
9     A. Catastrophic loss.
10     Q. What is a catastrophic loss?
11     A. Tornado hits your house. That's a
12 catastrophe.
13     Q. Yes, it is.
14     A. Fire.
15     Q. Fire. Okay. In other words,
16 something --
17     A. Windstorm.
18     Q. Okay. Something that would cause --
19     A. Something outside the control of the
20 producer that caused you to lose hens would be a
21 catastrophic loss.
22     Q. One hen, two hens or the whole house
23 basically?
24 MR. ROBISON:
25        Object to form. Foundation.

Page 168

1     A. It could vary. Trust me, if they
2 only lost one or two hens, it wouldn't be quoted
3 as a catastrophe.
4 MR. SCHIRMER:
5     Q. I would think not.
6     A. Unless it was a one or two bird
7 house.
8     Q. Do you know of any commercial
9 producer that has a one or two bird house?
10     A. No.
11     Q. When you were at Hillandale Florida,
12 how many chicken houses did you have?
13     A. I would have to calculate it, but we
14 -- if you've got time, I can do it.
15     Q. On average, how many chickens were in
16 a chicken house?
17 MR. ROBISON:
18        Object to form.
19     A. Oh, in a chicken house. Well, again,
20 it varied. Different complexes had different
21 size houses, but Quincy had about 85,000 to a
22 house. Robertsdale had about the same. Lake
23 City had -- which was the second biggest complex
24 -- had 100,000 bird houses. Mascotte had 80s,
25 Canoe Creek had 80s, Bushnell had -- those were

Page 169

1 mostly 100, 125,000 bird houses. Lake Wales
2 were 125s, and Brooksville were 80s. I think
3 that's all of them.
4 MR. SCHIRMER:
5     Q. Would you describe your chicken
6 houses as fairly automated?
7     A. Totally automated.
8     Q. How many people would be engaged in
9 the daily maintenance of a single chicken house?
10     A. One man generally would take care of
11 two houses.
12     Q. You also testified earlier today --
13 thank you. I'm now switching topics, okay?
14       You also testified earlier today that
15 a number of USDA individuals had attended
16 meetings.
17     A. Uh-huh.
18     Q. And had listened to presentations,
19 listened to votes, and even may have been guest
20 speakers.
21     A. Correct.
22     Q. What was Mr. Magwire's job?
23     A. I -- you would have to ask him, but I
24 believe he was the USDA liaison between USDA and
25 the egg industry.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1    Q.    Do you have an understanding of Mr.
2  Magwire's background?
3    A.    No.
4    Q.    Do you know whether he was a lawyer?
5    A.    I have no idea.
6    Q.    Do you know whether he's an antitrust
7  lawyer?
8    A.    I don't know.
9    Q.    Do you have any idea -- do you know
10  whether the USDA enforces the U.S. antitrust
11  laws?
12    A.    No.
13    Q.    You're not a lawyer.
14    A.    No.  And I don't work for the USDA.
15    Q.    Okay.  How about Mr. Sheats, I guess
16  it was?  Do you have an understanding of what
17  his job was?
18    A.    No.
19    Q.    Do you have an understanding of what
20  his background was?
21    A.    No.
22    Q.    Do you have an understanding of what
23  his responsibilities were?
24    A.    Absolutely not.  I don't know that I
25  ever met him.

Page 171

1    Q.    Now, you were talking about a little
2  bit later in Mr. Robison's discussion, you were
3  talking about the profit margins --
4    A.    Uh-huh.
5    Q.    -- that both Hillandale Florida and
6  some of its customers made.  And you testified
7  about, I think, Exhibit 11.  I don't need you to
8  go back to it right now.  Do you remember that
9  discussion?
10    A.    Yes.
11    Q.    Okay.  Thank you.  When you were
12  talking about the discussion, you said that you
13  were pretty certain that you -- I guess it was
14  Hillandale Florida had sold Publix eggs for 88
15  to 90 cents at that time.
16    A.    Based on the exhibit that we were
17  given and what their cost or their price of eggs
18  were of large eggs and me knowing what their
19  margin was because they told us, they gave us
20  reports that said what their egg margins were,
21  we knew what they were.
22    Q.    Did any of your other clients --
23  customers tell you what their margins were?
24    A.    No.
25    Q.    With regard to Publix, you said

Page 172

1  something that you could go back to the records
2  and you would find what the exact prices were.
3  Am I right on that?
4    A.    I'm sure you could go back to the
5  dates where we supplied those eggs as long as
6  they haven't destroyed them and you could see
7  what Urner Barry was and you could see -- they
8  should have the transactions in their records of
9  what they sold eggs to all their customers for.
10    Q.    What would be the relevance of seeing
11  what Urner Barry was at that time?
12    A.    To see the relationship between what
13  -- you had asked the question earlier, if people
14  based their trades on Urner Barry.  That's what
15  we did.  That's what the entire U.S. market is
16  based on except today probably 70 percent of our
17  customers buy on a cost-plus basis instead of
18  the Urner Barry market.
19    Q.    70 percent of whose customers?
20    A.    Everybody's.  100 percent of
21  Walmart's eggs today are bought on a cost plus.
22  So you don't make a lot of money in a runaway
23  time, but you never lose money.
24    Q.    Do you sell to Walmart today?
25    A.    I don't, but Cal-Maine does.

Page 173

1    Q.    And Cal-Maine -- someone at Cal-Maine
2  has told you that all their sales to Walmart
3  today are on a cost-plus basis?
4    A.    No.  I talked to a guy that I work
5  with whose wife is a corporate director at
6  Walmart.
7    Q.    Who?  What's her name?
8    A.    Megan Greenfield.
9    Q.    Is she a buyer for Cal-Maine?
10    A.    No.  She's an executive.  She's a
11  vice president in the IT department.
12  MR. ROBISON:
13        At Walmart.
14    A.    At Walmart.
15  MR. SCHIRMER:
16    Q.    Okay.  You've said something else
17  that at the end, I believe, of Mr. Robison's
18  discussion.  You said that you knew that the
19  flock between -- was it 1999 and 2000 and today
20  had gone up suddenly?
21    A.    The U.S. flock size, yes.
22    Q.    Do you have an understanding of
23  whether the flock size was larger in 2011 than
24  in 2006?
25    A.    I don't have it, but I could find it.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1   Q.  The question was --
2   A.  No.
3   Q.  Do you know whether the flock size
4 was larger in 2012 than 2006?
5   A.  Not specifically.
6   Q.  Do you know whether the relationship
7 between the flock size in terms of its
8 relationship with the population is
9 approximately the same as it was in 2006?
10   A.  Relative to the U.S. population?
11   Q.  Right.
12   A.  I couldn't answer that.
13 MR. SCHIRMER:
14     I'm done.
15 MR. RANDALL:
16     Go off the record briefly.
17 VIDEOGRAPHER:
18     We are now going off the record. The
19 time is 3:12 p.m.
20     (Discussion off the record.)
21 VIDEOGRAPHER:
22     We are now going back on the record.
23 The time is 3:14 p.m.
24         CROSS-EXAMINATION
25 BY MR. RANDALL:

Page 175

1   Q.  Good afternoon, Mr. Randall.
2   A.  Hi, Mr. Randall. How are you?
3   Q.  This will be confusing for the
4 transcript. I represent the Kroger plaintiffs
5 in this case.
6   A.  Okay.
7   Q.  I just have some brief follow-up
8 questions about that issue you were talking
9 about with Publix's margins. And you had said
10 that Publix charged a margin of between 45 and
11 47 percent.
12   A.  They sent us -- I mean, I got it
13 e-mailed to me, I think, a sheet that showed
14 their margins for eggs.
15   Q.  And that was their gross margin?
16   A.  Yes.
17   Q.  And it doesn't factor in their costs
18 of renting their stores, right?
19   A.  I don't know what it involved. We
20 just saw that it showed it as their gross margin
21 for eggs.
22   Q.  And so the gross margin would be the
23 difference between what you sell the eggs to
24 Publix for and what eggs -- what price Publix
25 sells the eggs to its customers, right?

Page 176

1   A.  Sure.
2   Q.  And so Publix also has to pay for
3 rent for its stores, right?
4 MR. ROBISON:
5     Object to form.
6   A.  If they rent them. They may own
7 them. We don't know.
8 MR. RANDALL:
9   Q.  Publix would have to pay salary to
10 its employees.
11 MR. ROBISON:
12     Object to form. Foundation.
13 MR. RANDALL:
14   Q.  I just need an audible answer.
15   A.  Yes. I assume so.
16   Q.  Publix also has to bear the cost of
17 any eggs that are broken after they're purchased
18 that it can't sell to customers?
19 MR. ROBISON:
20     Object to form.
21   A.  Up to a point. If they got a lot of
22 broken eggs, we had to replace them.
23 MR. RANDALL:
24   Q.  And Publix would also bear the cost
25 of eggs that it could not sell within the

Page 177

1 shelf-life period.
2   A.  Yeah. If they couldn't sell them,
3 correct.
4   Q.  So there's -- so when you say there's
5 a 47 percent margin, there's some cost that
6 Publix must bear out of its gross margin to just
7 -- in order to sell the eggs, period?
8 MR. ROBISON:
9     Object to form. Foundation.
10   A.  I would assume so, yes.
11 MR. RANDALL:
12   Q.  And you're not factoring in those
13 costs.
14   A.  We don't know what those are.
15   Q.  But you're not able to factor them
16 in, right?
17   A.  Correct.
18   Q.  And you're also not aware of the
19 margin that Publix charges on any of the other
20 products in its stores.
21   A.  No. But it's well publicized what
22 the grocery industry margin levels are.
23 MR. RANDALL:
24     Okay. I have nothing further.
25   A.  Okay.

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1 MR. RANDALL:
2      Thank you.
3           CROSS-EXAMINATION
4 BY MR. SCHIRMER:
5    Q.   Where is it publicized on what the
6 grocery industries' margins are on various
7 items?
8    A.   I've heard it from somewhere. You
9 can Google it. You could go to Wikipedia.
10 You'll find it.
11    Q.   Do you have a source -- a specific
12 source that you've seen that in?
13    A.   No. Just as I've said, I've --
14 whether it's on CNBC or somewhere else, they've
15 quoted what grocery margins are. I've heard it
16 and I remembered it.
17 MR. SCHIRMER:
18      Okay.
19 MR. RANDALL:
20      We can go off the record.
21 MR. ROBISON:
22      Anybody on the phone have any
23 questions?
24 MR. YOUNG:
25      This is Bryce Young. I don't have

Page 179

1 any questions.
2 MR. HEDLUND:
3      Dan Hedlund. I don't.
4 VIDEOGRAPHER:
5      We are now off the record. The time
6 is 3:17 p.m.
7      (Discussion off the record.)
8 VIDEOGRAPHER:
9      We are now going back on the record.
10 The time is 3:18 p.m.
11 MR. RANDALL:
12      We can conclude for the day. Thank
13 you, Mr. Randall.
14 THE WITNESS:
15      You're welcome.
16 MR. ROBISON:
17      Plaintiffs have no questions.
18 Defense has no more questions. I think for the
19 sake of Publix and Cal-Maine and Walmart and a
20 whole bunch of other parties, we should
21 designate this transcript as highly confidential
22 for now, and later on the lawyers for both sides
23 can worry about what's confidential versus
24 highly confidential, but I think we ought to
25 have the court reporter designate the whole

Page 180

1 transcript for now as highly confidential.
2 MR. SCHIRMER:
3      That's fine.
4 MR. RANDALL:
5      That's fine.
6 MR. ROBISON:
7      All right. We're all wrapped up.
8 VIDEOGRAPHER:
9      One moment, please. This concludes
10 the videotape deposition of Robert Randall
11 consisting of three tapes. We're now going off
12 the record. The time is now 3:19 p.m.
13      (Deposition concluded at 3:19 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 181

1      CERTIFICATE OF COURT REPORTER
2    I, CELESTE O. WERKHEISER, Registered Merit
3 Reporter and Notary Public, in and for the
4 County of Hinds, State of Mississippi, hereby
5 certify that the foregoing pages contain a true
6 and correct transcript of the testimony of the
7 witness, as taken by me at the time and place
8 heretofore stated, and later reduced to
9 typewritten form by computer-aided transcription
10 under my supervision, to the best of my skill
11 and ability.
12    I further certify that I placed the witness
13 under oath to truthfully answer all questions in
14 this matter under the authority vested in me by
15 the State of Mississippi.
16    I further certify that I am not in the
17 employ of, or related to, any counsel or party
18 in this matter, and have no interest, monetary
19 or otherwise, in the final outcome of the
20 proceedings.
21    Witness my signature and seal, this the
22 18th day of April, 2014.
23
24
         Celeste O. Werkheiser, RMR, CSR #1307
25      My Commission Expires May 6, 2015

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1      ACKNOWLEDGMENT OF DEPONENT

2     I, ROBERT RANDALL, do hereby certify

3  that I have read the foregoing transcript of my

4  testimony taken on 4/16/14, and further certify

5  that it is a true and accurate record of my

6  testimony (with the exception of the corrections

7  listed below):

8  Page  Line       Correction

9  ___|____|_____|_____

10  ___|____|_____|_____

11  ___|____|_____|_____

12  ___|____|_____|_____

13  ___|____|_____|_____

14  ___|____|_____|_____

15  ___|____|_____|_____

16  ___|____|_____|_____

17  ___|____|_____|_____

18  ___|____|_____|_____

19  ___|____|_____|_____

20  ___|____|_____|_____

21       _____

         ROBERT RANDALL

22

    SUBSCRIBED AND SWORN TO BEFORE ME

23  THIS _____ DAY OF _____, 20___.

24

_____  _____

25  (NOTARY PUBLIC)    MY COMMISSION EXPIRES: