# ATTACHMENT 52

HIGHLY CONFIDENTIAL

```
              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF PENNSYLVANIA


     IN RE:  PROCESSED EGG PRODUCTS :
     ANTITRUST LITIGATION            :
     ------------------------------: MDL No. 2002
     THIS DOCUMENT APPLIES TO:      : 08-MD-02002
     ALL ACTIONS                    :
```

```
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

              -- HIGHLY CONFIDENTIAL --

     VIDEOTAPED 30(b)(6) DEPOSITION OF WILLIAM REHM

              TAKEN AT: Godfrey & Kahn

          LOCATED AT: 780 North Water Street

                   Milwaukee, WI

                   July 10, 2013

               9:25 a.m. to 4:44 p.m.

            REPORTED BY ANITA K. FOSS

          REGISTERED PROFESSIONAL REPORTER

     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

HIGHLY CONFIDENTIAL

Page 2

```
 1
 2          A P P E A R A N C E S
    BERNSTEIN LIEBHARD, LLP, by
 3      Mr. Ronald J. Aranoff and
        Mr. Cory Greenbaum
 4      10 East 40th Street
        New York, NY 10016-0201
 5      aranoff@bernlieb.com
        (212) 779-1414
 6      Appearing on behalf of direct purchaser
        class plaintiffs.
 7
 8   CROWELL & MORING, LLP, by
        Mr. Christopher E. Ondeck and
 9      Ms. Elisa F. Kantor
        1001 Pennsylvania Avenue, NW
10      Washington, DC 20004-2595
        condeck@crowell.com
11      (202) 624-2855
        Appearing on behalf of Daybreak Foods.
12
    VANEK, VICKERS & MASINI, by
13      Mr. John P. Bjork
        55 West Monroe Street, Suite 3500
14      Chicago, IL 60603
        jbjork@vaneklaw.com
15      (312) 224-1500
        Direct action plaintiffs, Publix Supermarkets,
16      and SuperValu.
17
    LEONARD, STREET & DEINARD PA, by
18      Mr. William L. Greene
        150 South Fifth Street, Suite 2300
19      Minneapolis, MN 55402-4238
        william.greene@leonard.com
20      612-335-1500
        Appearing on behalf of Michael Foods.
21
    BRIGGS & MORGAN, by
22      Mr. Troy Hutchinson
        80 South 8th Street
23      Minneapolis, MN 55402
        (612) 977-8415
24      thutchinson@briggs.com
        Appearing telephonically on behalf of Sparboe
25      Farms.
```

Page 3

```
 1
 2          A P P E A R A N C E S
    DINSMORE & SHOHL, LLP, by
 3      Mr. Thomas L. Czechowski
        1100 Courthouse Plaza, SW
 4      Dayton, OH 45402
        (937) 463-4928
 5      thomas.czechowski@dinsmore.com
        Appearing telephonically on behalf of Weaver
 6      Brothers.
 7   LOVELL, STEWART, HALEBIAN & JACOBSON, by
        Mr. Merrick Rayle
 8      61 Broadway, Suite 501
        New York, NY 10006
 9      (212) 608-1900
        Appearing telephonically on behalf of indirect
10      purchaser plaintiffs.
11   GIBSON, DUNN & CRUTCHER, LLP, by
        Mr. Jason C. McKenney
12      2100 McKinney Avenue
        Dallas, TX 75201-6912
13      (214) 698-3279
        jmckenney@gibsondunn.com
14      Appearing telephonically on behalf of Cal-Maine
        Foods.
15
    PORTER, WRIGHT, MORRIS & ARTHUR, by
16      Ms. Karri Allen and
        Mr. John C. Monica, Jr.
17      1919 Pennsylvania Avenue, NW, Suite 500
        Washington, DC 20006
18      (202) 778-3056
        kallen@porterwright.com
19      Appearing telephonically on behalf of Rose Acre
        Farms.
20
21   FAEGRE BAKER DANIELS, by
        Mr. Ryan M. Hurley
22      300 North Meridian Street, Suite 2700
        Indianapolis, IN 46204-1750
23      (317) 237-1144
        ryan.hurey@faegrebd.com
24      Appearing telephonically on behalf of Midwest
        Poultry Services.
25
```

Page 4

```
 1
 2          A P P E A R A N C E S
    PEPPER HAMILTON, LLP, by
 3      Mr. Evan Davis
        3000 Two Logan Square
 4      Philadelphia, PA 19103
        (215) 981-4714
 5      davis@pepperlaw.com
        Appearing telephonically on behalf of United Egg
 6      Producers.
 7          I N D E X
    Examination by            Page
 8   Mr. Aranoff. . . . . . . . . . . . . . .8
 9   Mr. Bjork. . . . . . . . . . . . . .234
10   Mr. Greene. . . . . . . . . . . . .276
11   Mr. Ondeck. . . . . . . . . . . . .287
    Mr. Aranoff. . . . . . . . . . . . .291
12
13          E X H I B I T S
14   Exhibit No.  Description       Identified
15   Exhibit 1  Deposition notice. . . . . . . . . .14
16   Exhibit 2  Plaintiff's notice of deposition
                under Rule 30(b)(6). . . . . . . .15
17
18   Exhibit 3  Letter from Elisa Kantor at
                Crowell Moring dated July 8, 2013. .15
19   Exhibit 4  Animal welfare meeting agenda from
                1/9/03, Bates DAY0023267. . . . . .101
20
21   Exhibit 5  Bates DAY0016876 through DAY0016886.
                United Voices newsletter. . . . . .105
22   Exhibit 6  United Voices newsletter, Bates
                DAY0016849 to DAY0016854. . . . . .111
23
24   Exhibit 7  UEP board of directors' set of
                minutes from January 14th through
25              January 15, 2002. Bates UE0308772
                through UE0308776. . . . . . . . .115
```

Page 5

```
 1
 2          E X H I B I T S
                                   Page
    Exhibit No.  Description       Identified
 3
 4   Exhibit 8  Article by Edward Clark titled
                Industry Executives Are Optimistic
 5              This Will Be a Profitable Year
                Because Companies Are Streamlining
 6              Layer Numbers to Compensate For
                Corn Prices. . . . . . . . . . . .123
 7   Exhibit 9  Bates DAY0013631 through DAY0013636.
                Letter from Sunny Fresh. . . . . . 143
 8
 9   Exhibit 10  UEP board of directors 1/25/05
                meeting minutes. Bates DAY0028028
10              through DAY0028035. . . . . . . . .156
11   Exhibit 11  Bates DAY0020542.  Letter from Mike
                Luke err dated 11/7/2003. . . . . .166
12   Exhibit 12  Daybreak Foods Inc.'s responses and
                objections to direct purchaser
13              plaintiff's first set of
                interrogatories. . . . . . . . . . 173
14
    Exhibit 13  Bates DAY0021496 to DAY0021502. . .190
15
    Exhibit 14  Document entitled Memorandum.
16              Bates DAY0014292 to DAY0014294. . .198
17   Exhibit 15  Bates DAY0024746 to DAY0024748. . .207
18   Exhibit 16  E-mail, Bates DAY0003359 through
                DAY0003360. . . . . . . . . . . . .217
19
    Exhibit 17  Bates DAY0003559.  E-mail. . . . . 221
20
    Exhibit 18  Chain e-mail, Bates DAY0002644
21              to DAY0002645. . . . . . . . . . .225
22   Exhibit 19  E-mail chain. Bates DAY0005094
                through DAY0005095. . . . . . . . .230
23
24   Exhibit 20  E-mail to Pat at Daybreak Foods
                DAY0002648. . . . . . . . . . . . 243
25
```

2 (Pages 2 to 5)

HIGHLY CONFIDENTIAL

Page 6

E X H I B I T S

Exhibit No.  Description                     Identified

Exhibit 21  DAY-DATA000004.  Second two pages
            are extracts from DAY-DATA000001. .262
Exhibit 22  Bates MFI0299891 through 914. Supply
            Agreement Confidential. . . . . . .282
Exhibit 23  Bates DAY0003611.  E-mail from
            Gene Gregory. . . . . . . . . . .289
            (Original exhibits attached to original
            transcript.  Copies provided to all counsel.)


R E Q U E S T S
(There were no requests made.)

---

Page 7

TRANSCRIPT OF PROCEEDINGS
(Exhibits 1 through 3 marked for identification.)
        THE VIDEOGRAPHER:  My name is Mark Lyle,
representing Veritext.  Today's date is July 10,
2013.  The time is approximately 9:25 a.m.  This
deposition is being held at the offices of Godfrey
& Kahn, 780 North Water Street, Milwaukee,
Wisconsin.  This is in the Processed Eggs Products
litigation, case pending in the US District Court
for the Eastern District of Pennsylvania.
        The name of the witness is William
Rehm.  And the court reporter today is Anita Foss
of Veritext.  First we'll have counsel present
introduce themselves and state who they represent,
and then we'll have the court reporter swear in the
witness.
        MR. ARANOFF:  Thank you.  Ronald Aranoff,
Bernstein Liebhard, LLP, 10 East 40th Street, New
York, on behalf of the direct purchaser class
plaintiffs.
        MR. GREENBAUM:  Cory Greenbaum, Bernstein
Liebhard, LLP, same address, and also on behalf of
the direct purchaser plaintiffs.
        MR. BJORK:  John Bjork, Vanek, Vickers,
Masini, on behalf of direct action plaintiffs,

---

Page 8

Publix Supermarkets, and SuperValu, Inc.
        MR. ONDECK:  Chris Ondeck, O-N-D-E-C-K,
from the law firm of Crowell & Moring in
Washington, D.C., representing Daybreak Foods and
the witness today.
        MS. KANTOR:  Elisa Kantor, also from
Crowell & Moring, for Daybreak.
        MR. GREENE:  William Greene from the law
firm of Leonard, Street & Deinard on behalf of
defendant Michael Foods.
        MR. ARANOFF:  There are also a number of
folks representing the direct purchaser class
plaintiffs and defendants that have already entered
appearances for the purposes of the court reporter,
and the court reporter will indicate their presence
on the transcript.
        WILLIAM REHM, called as a witness
        herein, having been first duly sworn on oath,
        was examined and testified as follows:
        E X A M I N A T I O N
BY MR. ARANOFF:
    Q.  Good morning, Mr. Rehm.  As I said, my
name is Ron Aranoff.  I had the pleasure of meeting
you just a few moments ago.  Could you, for the
record, please state your name, your business

---

Page 9

address, and your current employment?
    A.  William Rehm, Daybreak Foods.  The
address is 533 Tyranena Park Road, Lake Mills,
Wisconsin.
    Q.  And Mr. Rehm, have you ever been deposed
before?
    A.  Yes.
    Q.  And when was that?
    A.  Couple years ago.
    Q.  Was that in conjunction with your role at
the Daybreak Foods?
    A.  Yes.
    Q.  And what was the nature of that
testimony, please?
    A.  It was in connection with a neighborhood
dispute.
    Q.  Involving your business?
    A.  Yes.
    Q.  Could you give me just briefly some of
the details of that?
    A.  It was an expansion process that we were
going through in the state of Ohio, and the
neighborhood decided they would prefer we not
expand our facility.
    Q.  So this was more of a zoning type of --

3  (Pages 6 to 9)

HIGHLY CONFIDENTIAL

Page 10

1    A.  Yes.
2    Q.  -- type of issue that you were -- had
3  nothing to do with the sale of eggs or -- or any
4  other part of your business other than your
5  expansion of your facility; is that correct?
6    A.  Correct.
7    Q.  Okay.  Have you been deposed in any other
8  matter before?
9    A.  I don't recall.
10    Q.  Okay.  Have you ever given any sworn
11  testimony in any other setting other than in the
12  case that you're here for today?
13    A.  No.
14    Q.  I know you've been deposed before; I just
15  want to go over, before we begin, some just basic
16  procedures with respect to the depositions, make
17  the deposition a little easier for both of us.  I'm
18  going to be asking you a series of questions today.
19  You've been sworn and you understand that you're
20  testifying today under oath; is that correct?
21    A.  Correct.
22    Q.  Okay.  Is there any reason you can think
23  of today that you would not be able to testify
24  truthfully?
25    A.  No.

Page 11

1    Q.  Is there any reason that you can think
2  about today that would affect your ability to
3  recall events in the normal course?
4    A.  No.
5    Q.  Your lawyer may interpose objections
6  during the course of today's deposition.  If he
7  does so, unless he's objecting on the basis of
8  privilege and instructing you not to answer,
9  notwithstanding the fact that he's objecting,
10  you're still going to be responsible to answer my
11  questions.  Do you understand that?
12    A.  Yes.
13    MR. ONDECK:  Objection.
14  BY MR. ARANOFF:
15    Q.  Okay.  If you need to take a break during
16  the course of the deposition, as long as there's no
17  pending question, I'm happy to try to accommodate a
18  reasonable break schedule, okay?  If you have to
19  use the men's room or something like that, we'll
20  try to accommodate you as quickly as we possibly
21  can.  All right?
22    A.  Yes.
23    Q.  Okay.  Could you -- I'd like to show you
24  what's been previously marked as Exhibits 1, 2 and
25  3 for purposes of identification.  I'd ask you to

Page 12

1  just take a quick look at that if you wouldn't
2  mind.
3    MR. ONDECK:  Ron, while he's looking at
4  that, can I note for the record a standing
5  objection to the participation of an attorney for
6  the indirect purchaser plaintiffs, who I believe is
7  Mr. Rayle, R-A-Y-L-E, as Daybreak has been
8  dismissed from that case.  And that's a standing
9  objection.  And we can continue the deposition.
10    MR. ARANOFF:  Okay.  I mean, I think
11  that, just to follow up on that for a second,
12  Chris, I think what we decided before the
13  deposition was that we had agreed that all
14  objections, except for those with respect to form
15  and privilege, would be preserved and reserved for
16  some future time for potential adjudication by the
17  court or whomever.
18    MR. ONDECK:  Preserved, yes, I agree.
19    MR. ARANOFF:  Okay.
20    MR. GREENE:  Ron, can you put on the
21  record what 1 through 3 are?
22    MR. ARANOFF:  Yeah.  I'm just letting the
23  witness take a look at it.
24    MR. GREENE:  Okay.  Thank you.
25  BY MR. ARANOFF:

Page 13

1    Q.  Mr. Rehm, just let me know when you've
2  had a chance to look at it, then I can ask you a
3  series of questions, okay?
4    A.  Yes.
5    MR. DAVIS:  Excuse me.  This is Evan
6  Davis.  If we could also get the Bates numbers of
7  documents being shown to the witness.
8    MR. ARANOFF:  You can.  These are
9  deposition notices and a letter that was sent from
10  Elisa Kantor yesterday to various plaintiffs.
11  They're not Bates numbered, that's why I haven't
12  indicated them.
13    MR. DAVIS:  Thank you.
14    MR. ONDECK:  Ron, also while Mr. Rehm is
15  looking at the documents, I just want to note for
16  the record that some of the questions we anticipate
17  will adduce highly confidential information as to
18  Daybreak's business, and so we're going to want to
19  go through the process to mark -- we want the
20  entire deposition transcript as highly
21  confidential, and then we'll want to go through the
22  process of marking the specific portions which are
23  highly confidential under the protective order.
24    MR. ARANOFF:  Well, if you mark -- I mean
25  I don't have an objection to that, but if you're

HIGHLY CONFIDENTIAL

Page 14

1 marking the whole deposition highly confidential, I
2 don't know why you need to go through the
3 transcript and otherwise mark it. But I leave that
4 up to you.
5     MR. ONDECK: The whole transcript may not
6 eventually be highly confidential.
7     MR. ARANOFF: Okay.
8     THE WITNESS: Ron?
9 BY MR. ARANOFF:
10    Q. All set?
11    A. Yes.
12    Q. So for purposes of identification, I've
13 shown you what's been marked as Rehm 1. Take a
14 look at it. Is it fair to say that this document
15 is a deposition notice for you to appear here today
16 in your individual capacity as a witness for
17 Daybreak Farms?
18    A. No.
19    Q. Okay. What do you understand Exhibit 1
20 to be?
21    A. You referenced it as Daybreak Farms.
22 That's not our company.
23    Q. Daybreak Foods. I'm sorry, I misspoke.
24 Is that accurate?
25    A. Yes.

Page 15

1    Q. If you take a look at Exhibit 2,
2 Exhibit 2 is plaintiff's notice of deposition under
3 Rule 30(b)(6) to defendant Daybreak Foods,
4 Incorporated. Do you recognize this document?
5    A. Yes.
6    Q. Do you understand that you're testifying
7 today as a corporate representative for Daybreak
8 Foods, Incorporated?
9    A. Yes.
10    Q. And you'll notice that in the document,
11 beginning on page four, there's a schedule A
12 attached to what's been marked as Rehm Exhibit 2
13 for identification. And you understand that with
14 the exception of a number of these topics, which
15 we'll discuss in a second, you are the corporate
16 representative charged with speaking on behalf of
17 Daybreak Foods on behalf of these topics; is that
18 correct?
19    A. Yes.
20    Q. Okay. If you turn now to what's been
21 marked as Rehm Exhibit 3 for purposes of
22 identification. This is a letter that was sent
23 from Elisa Kantor at Crowell Moring to Steven
24 Asher, William Blechman, and Krishna Narine. And
25 it's dated July 8, 2013. Do you see that,

Page 16

1 Mr. Rehm?
2    A. Yes.
3    Q. Okay. And if you look at page two of the
4 document, you'll notice that in the middle of the
5 page there are a number of topics that your
6 counsel, Ms. Kantor, has indicated you would not be
7 prepared to talk about today as a corporate
8 designee for Daybreak Foods?
9     MR. ONDECK: Objection, foundation, legal
10 advice. You can answer.
11 BY MR. ARANOFF:
12    Q. Do you see -- do you see that?
13    A. Yes.
14    Q. Okay. So first let me, before we get to
15 the actual topics for a second, is it fair to say
16 that Mr. Ondeck, Christopher Ondeck, sitting next
17 to you is your counsel representing you in this
18 matter?
19    A. Mr. Ondeck represents Daybreak Foods and
20 myself, yes.
21    Q. So he represents both your company;
22 correct?
23    A. Yes.
24    Q. As well as you individually for the
25 purposes of this deposition and for the purposes of

Page 17

1 this case; is that correct?
2    A. Yes.
3    Q. And Ms. Kantor is also a lawyer working
4 together with Mr. Ondeck, and she also represents
5 you in this matter; is that correct?
6    A. Yes.
7    Q. And she also represents Daybreak Foods
8 with respect to this action?
9    A. Yes.
10    Q. Is there anybody else that represents you
11 in this case other than Ms. Kantor, Mr. Ondeck, or
12 the people that are at his firm?
13    A. No.
14    Q. Okay. Turning again to Exhibit 3 and the
15 topics that are indicated that you are not prepared
16 to speak about today, we look at number one, topic
17 17, it says that you're not prepared to discuss,
18 "Your contacts with any member or other
19 representative of the United Potato Growers
20 Association." Do you see where I'm reading?
21    A. Yes.
22    Q. Who at Daybreak Foods would be the person
23 most knowledgeable about that topic?
24    A. No one.
25    Q. There's not a person at Daybreak Foods

HIGHLY CONFIDENTIAL

Page 18

1  that would have any knowledge about United Potato
2  Growers Association; is that accurate?
3      A.  That's correct.
4      Q.  Okay.  Topic 18, the transactional data
5  you produced as part of the written discovery
6  process.  Who at Daybreak Foods would be the person
7  most knowledgeable about that topic?
8          MR. ONDECK: Objection, I'm going to
9  object to this line of questioning.  This is a
10 legal document, has legal conclusions in it.
11 There's -- the proper way to respond to this would
12 have been a meet-and-confer with us.  So I'm going
13 to object to this entire line of questioning.  The
14 meet-and-confer cannot be with the witness.
15 BY MR. ARANOFF:
16     Q.  Okay.  Who at the firm -- who at Daybreak
17 Foods would be the appropriate person with which to
18 talk about the transactional data that was produced
19 as part of your written discovery process?
20         MR. ONDECK: Same objection.
21 BY MR. ARANOFF:
22     Q.  You can answer that question.
23     A.  Myself.
24     Q.  Okay.  If you look at topic No. 28, it
25 says, "Your document storage locations, methods,

Page 19

1  and techniques, including your maintenance of
2  electronic records."  Who at Daybreak Foods would
3  be the most appropriate person to talk about that
4  topic?
5          MR. ONDECK: Same objection.
6          THE WITNESS:  Our IT gentlemen.
7  BY MR. ARANOFF:
8      Q.  And Mr. Rehm, who is that person at
9  Daybreak Foods?
10     A.  Mark Tucker and Loren Ash.
11         MR. ONDECK: I object to that answer.
12 Move to strike.
13 BY MR. ARANOFF:
14     Q.  Okay.  Topic 29, "All actions that you
15 took to preserve documents and other information
16 for this litigation."  Who would be the most
17 appropriate person at Daybreak Foods to discuss
18 that topic?
19         MR. ONDECK: Same objection.
20         THE WITNESS:  Myself.
21         MR. ONDECK: I object to that answer.
22 Move to strike.
23 BY MR. ARANOFF:
24     Q.  Topic 30, your search for documents to be
25 produced in response to plaintiff's request for

Page 20

1  production.  Who, if not you, would be the
2  appropriate person to discuss this topic on behalf
3  of Daybreak Foods?
4          MR. ONDECK: Same objection.
5          THE WITNESS:  Not sure.
6  BY MR. ARANOFF:
7      Q.  Did you do any kind of search for
8  documents in response to any document request that
9  was propounded on Daybreak Foods?
10         MR. ONDECK: Objection.
11         THE WITNESS:  Repeat that, please.
12 BY MR. ARANOFF:
13     Q.  Have you ever been asked by anyone to
14 look for documents with respect to this case?
15     A.  Yeah.
16         MR. ONDECK: Objection, calls for legal
17 advice.
18         THE WITNESS:  Yes.
19         MR. ARANOFF:  Are you instructing the
20 witness not to answer?
21         MR. ONDECK: No.
22         MR. ARANOFF:  Okay.
23         THE WITNESS:  We followed the
24 instructions of our legal counsel.
25 BY MR. ARANOFF:

Page 21

1      Q.  I'm not asking you to give me any
2  information that your legal counsel may have
3  communicated to you.  I'm saying did you conduct,
4  at any point in time, a search for responsive
5  documents in conjunction with this litigation?
6      A.  Yes.
7      Q.  Okay.  When was that done, Mr. Rehm?
8      A.  I don't recall.
9      Q.  Was it done in the last six months?
10     A.  I don't recall the specific time.
11     Q.  Give me a ballpark time.
12         MR. ONDECK: Objection, asked and
13 answered.
14 BY MR. ARANOFF:
15     Q.  You can answer.
16     A.  Subsequent to the start of the
17 litigation.
18     Q.  Okay.  Topic 37, your search for and
19 production of data and reports on egg retail
20 pricing from services such as IRI, AC Nielsen, or
21 other third-party reporting services.
22         MR. ONDECK: Same objection.
23 BY MR. ARANOFF:
24     Q.  I haven't even asked the question yet.
25 Who at Daybreak Foods would be the most

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL

Page 22

1  knowledgeable person to discuss this topic,
2  Mr. Rehm?
3      A.  No one.
4      Q.  Why is that?
5      A.  We don't utilize or look at any of those
6  things.
7      Q.  Okay.  Thank you.  I'm done with those
8  documents.  You can put them away.
9      MR. ONDECK:  Mrs. Court Reporter, where
10  do you want the witness' exhibits to go?
11      (Discussion held off the record.)
12  BY MR. ARANOFF:
13      Q.  Okay.  Mr. Rehm, could you please provide
14  me briefly with a bit about your educational
15  background, particularly where you went to college,
16  any post-college degrees that you might have, any
17  other seminars or courses that would comprise part
18  of your education.
19      A.  I have a BS degree from St. Norbert
20  College in DePere, Wisconsin with a degree in
21  business administration, emphasis in accounting.
22  I'm a licensed certified public accountant.  With
23  regard to your question on seminars, too expansive
24  to try to even list.
25      Q.  Fair enough.  Do you have any degree in

Page 23

1  economics?
2      A.  No.
3      Q.  Do you have any degree in marketing?
4      A.  No.
5      Q.  Do you have any degree in agriculture?
6      A.  No.
7      Q.  Any kind of -- what I mean by that -- you
8  look puzzled, so let me try to clarify a little
9  bit.  Do you have any agricultural background?
10      A.  Yes.
11      Q.  What's the basis for your agricultural
12  background?
13      A.  Hands-on experience.
14      Q.  And when you say hands-on experience, are
15  you talking specifically about the work that you
16  performed at Daybreak Foods?
17      A.  Worked on the farm.
18      Q.  And in particular, when you say "the
19  farm," you mean with respect to eggs and egg
20  products?
21      A.  With respect to egg production and pullet
22  growing, yes.
23      Q.  Any other experience in agriculture other
24  than just -- what you've just described?
25      A.  Row cropping.

Page 24

1      Q.  I'm sorry, I didn't hear you.
2      A.  Row cropping.
3      Q.  What is row cropping?
4      A.  Putting seeds in the ground, growing corn
5  and soybeans.
6      Q.  Okay.  Any other type of degree in terms
7  of scientific degree?  I know you have a BS in
8  accounting.
9      A.  I listed all my degrees, sir.  And I do
10  not have a degree in agriculture, I just have
11  experience.
12      Q.  What about any other science background?
13      A.  No.
14      Q.  You testified that you were a CPA.  Did
15  you ever practice as a certified public accountant?
16      A.  Yes.
17      Q.  For how many years?
18      A.  Nine or ten.
19      Q.  And where were you a CPA?
20      A.  At the time, the firm was called Virchow
21  Krause.  V-I-R-C-H-O-W.  Krause, K-R-A-U-S-E.  It's
22  now known as Baker Tilly.
23      Q.  And where is that accounting practice
24  located?
25      A.  I practiced in Watertown, Wisconsin.

Page 25

1      Q.  Do you have any idea where they're
2  actually headquartered?
3      A.  Madison, Wisconsin.
4      Q.  Did you work in any particular department
5  while you did your CPA work?  Were you -- did you
6  use your farming background at all with respect to
7  the kind of accounting practice that you performed?
8      A.  Actually, no.
9      Q.  What kind of clients, very generally, did
10  you work on?
11      A.  Manufacturers.
12      Q.  Manufacturers of what?
13      A.  Any number of things.
14      Q.  Is that the area that this accounting
15  firm specializes in?
16      A.  No.
17      Q.  What do they specialize in, if you know?
18      A.  They did generally everything.
19      Q.  And you were there, you said, for about
20  nine-and-a-half, ten years?
21      A.  About nine or ten years, yes.
22      Q.  And after you finished working in the --
23  as a CPA, you subsequently left that employment?
24      A.  Yes.
25      Q.  And where did you go after that?

7 (Pages 22 to 25)

HIGHLY CONFIDENTIAL

Page 26

1   A.  Daybreak Foods.
2   Q.  And Daybreak Foods was established when?
3   A.  My father established it in 19 -- I
4   believe 1967 is the incorporation year.
5   Q.  And your father is Robert Rehm?
6   A.  Robert Rehm, yes.
7   Q.  Rehm.  I'm sorry.
8   A.  That's okay.
9   Q.  Yeah, Robert Rehm?
10  A.  Senior.
11  Q.  All right.  And why did you make the
12  decision to go into your father's business?
13  A.  To a degree, disenchanted in the field I
14  was in at public accounting, and the opportunities
15  I thought were in front of me in the egg production
16  processing business.
17  Q.  Okay.  Can you briefly describe what
18  those opportunities were?
19  A.  Just advancement in my career, ability to
20  be more successful in the career, and provide for
21  my family in a better way.
22  Q.  Okay.  When you started at the
23  company -- and when I say "the company," I'm
24  referring of course to Daybreak Foods -- what was
25  your initial position?

Page 27

1   A.  I was either chief financial officer or
2   treasurer.  I don't recall which.
3   Q.  And do you have an understanding as you
4   sit here today about what year you started at
5   Daybreak Foods?
6   A.  1991-ish.
7   Q.  Okay.
8   A.  '91, '92.
9   Q.  So is it fair to say you started at
10  Daybreak Foods in 1991 and you believe that
11  your -- the position you had at the time was CFO,
12  or chief financial officer?
13  A.  Or treasurer.  And I'm not sure if it was
14  exactly '91 or if it was '92.  Early -- very early
15  '90s.
16  Q.  Okay.  Do you have any siblings?
17  A.  Yes.
18  Q.  And did those siblings work at Daybreak
19  Foods back when you started in '91?
20  A.  No, not all of them.
21  Q.  Which ones of them do?
22  A.  My two younger brothers.
23  Q.  And they are?
24  A.  Burton and Brent.
25  Q.  And --

Page 28

1   A.  I need to correct that.  I apologize.
2   Q.  No, that's fine.
3   A.  At the time I started, only my brother
4   Brent was at the company.
5   Q.  And do you know what Brent's position was
6   at the time?
7   A.  He was -- he worked in pullet growing.
8   MR. ONDECK:  Objection on the record.  I
9   might note the witness said pullet, P-U-L-L-E-T,
10  growing.  It'll be a term that's used a lot.
11  BY MR. ARANOFF:
12  Q.  Does -- this is Burton you were talking
13  about; correct?
14  A.  No.
15  Q.  This is who?
16  A.  Brent.
17  Q.  Brent.  Brent is -- okay.  So you have a
18  brother Brent and you have another brother Burton;
19  correct?
20  A.  Yes.
21  Q.  Your brother Burton, does he go by the
22  nickname Tony?
23  A.  Yes.
24  Q.  What does -- is Brent still with the
25  company today?

Page 29

1   A.  Yes.
2   Q.  And what is his current title?
3   A.  He's responsible for our pullet, pullet,
4   growing program.
5   Q.  That's P-U-L-L-E-T-T.  Only one T;
6   correct?
7   A.  Yes.
8   Q.  And what is -- and Burton's with the
9   company as well; correct?
10  A.  You can call him Tony.
11  Q.  Tony's with the company as well?
12  A.  Yes.
13  Q.  What was his role in 1991, if you recall?
14  A.  Supervisor of one of our processing
15  plants.
16  Q.  Which one?
17  A.  Long Prairie, Minnesota.
18  Q.  And is Tony still with the company today?
19  A.  Yes.
20  Q.  And what is his current title?
21  A.  Scheduling, marketing, and logistics.
22  Q.  Scheduling, marketing, and logistics?
23  A.  Yes.
24  Q.  What does that mean in terms of in
25  laymen's terms?  What does it mean to be in charge

8 (Pages 26 to 29)

HIGHLY CONFIDENTIAL

Page 30

1 of scheduling?
2    A.  Because of the business model we
3 incorporate with long-term contracts, Tony's
4 responsible for scheduling the delivery times of
5 all of our loads of -- of all of our loads of raw,
6 liquid, unpasteurized egg to -- for each of the
7 customers' facilities and each of the individual
8 customers.
9    Q.  Okay.  Let me -- okay.  And when you say
10 he's involved in marketing, what kind of marketing
11 is Tony involved in?
12    A.  Some of our -- some of our contracts are
13 for specific quantities of egg.  We try to match
14 our facility to a contract, but at times we may
15 produce a load or two more than what the contract
16 calls for.  And he will market that into
17 the -- into the public to another further
18 processor.
19    Q.  So if you have more supply than you're
20 required -- than you need at the current time, he's
21 in charge of marketing it to other potential
22 buyers?
23    A.  I wouldn't classify it in that way.
24    Q.  Okay.  Could you clarify that for me
25 then, please?

Page 31

1    A.  Yes.  Our model, our business model, is
2 to produce and sell eggs on a contracted basis to
3 our customers.  We only have three main customers.
4 And some of those contracts are make-it-take-it.
5 Whatever we produce at the farm, our customer
6 takes.  If it's 20 loads or if it's 18 loads or
7 it's 24 loads.  Some of our contracts are for
8 specific quantities.  For example, one contract is
9 for ten loads of liquid.  Ten loads of liquid, raw,
10 unpasteurized egg.
11    And if our complex produces eleven,
12 and our other complexes are in good balance, then
13 Tony will take that one extra load and market it to
14 another further processor for utilization in their
15 further processing activities.
16    Q.  Okay.  But it wouldn't go to one of your
17 three main purchasers; is that correct?
18    A.  It could, yes.
19    Q.  So it's anybody who's in need at the time
20 would get the benefit of the surplus; right?
21    MR. ONDECK:  Objection.
22    THE WITNESS:  I wouldn't characterize it
23 as "get benefit of."
24 BY MR. ARANOFF:
25    Q.  Okay.  So --

Page 32

1    A.  We have --
2    Q.  Okay.  Go ahead, explain.
3    A.  Go ahead, ask the question.
4    Q.  No, no, you were in the middle of
5 speaking and I was rude and I interrupted you.  So
6 I'm sorry.
7    A.  The products we produce are not
8 consumable by the general public.  They're raw,
9 unpasteurized.  So our customers -- we could very
10 well be selling to one of our contracted customers.
11 They -- however they utilize and what they do with
12 it, I don't know.  But you characterized it as the
13 benefit.  They have the opportunity to utilize that
14 product in their process.
15    Q.  Okay.  Let me -- let me just ask a few
16 follow-up questions to that.  First, as you
17 mentioned, that you have three main customers; is
18 that accurate?
19    A.  Correct.
20    Q.  Who are your three main customers?
21    A.  Cargill Kitchen Solutions, Michael Foods,
22 and Deb-El Foods.  D-E-B, hyphen, E-L, Foods.
23    Q.  And just so that we understand what we're
24 talking about in terms of products, because that's
25 obviously going to come up during the course of the

Page 33

1 deposition.  Does -- can you describe for me,
2 Mr. Rehm, the types of products that Daybreak Foods
3 produces?
4    A.  The focus of our business is on the
5 production of raw, unpasteurized, whole yolk and
6 white eggs.  In that our product is under contract,
7 meets our customers' very specific specifications
8 for bacterial counts, temperature, and quantity.
9 And what we do is very difficult to be replicated
10 by somebody that buys eggs in the open market and
11 tries to sell to our same specific customers.
12    Q.  Do you know whether anybody else supplies
13 the same product that you do to Cargill, Michael
14 Foods and Deb-El Foods?  In other words -- let me
15 ask a better question.  So strike that.
16    Do you know whether Cargill buys the
17 same product that you produce from any other
18 source?
19    A.  They buy from a few other people as well,
20 yes.
21    Q.  Who does Cargill buy from aside from you,
22 to the best of your knowledge?
23    A.  Herbruck's Poultry Ranch in Michigan.
24    Q.  Anyone else?
25    A.  Not sure of the rest.

VERITEXT REPORTING COMPANY
(212) 279-9424    www.veritext.com    (212) 490-3430

HIGHLY CONFIDENTIAL

Page 34

1    Q.  Okay.  How about Michael Foods.  Does
2  Michael Foods purchase the same product you sell
3  from any other sources?
4    A.  They purchase similar products from
5  several other companies.
6    Q.  I'm sorry, I misheard you.  Did you say
7  several other companies?
8    A.  Yes.
9    Q.  Okay.
10    A.  I'm not sure if I know the names of them
11  all.  Fremont Farms.  And I'm -- there's a couple
12  Fremont Farms, so I don't know if it's Fremont
13  Farms of Iowa or Fremont Farms.  I'm not sure which
14  one.  Center Fresh, to name a few.  I'm not sure
15  the rest.
16    Q.  Do you know whether Michael Foods, as an
17  example, purchases any of the same products that
18  you sell from any of the other defendants in this
19  action?
20    MR. ONDECK:  Objection, beyond witness'
21  personal knowledge.
22  BY MR. ARANOFF:
23    Q.  Well --
24    A.  I'm not sure.
25    Q.  Do you know whether Deb-El Foods

Page 35

1  purchases any products similar to what you sell
2  from any other source?
3    MR. ONDECK:  Same objection.
4    THE WITNESS:  I'm not sure.
5  BY MR. ARANOFF:
6    Q.  Does Daybreak Foods sell -- well,
7  withdrawn.  Just lost my mic.  Hold on a second.
8    A.  If you go above your button --
9    Q.  Maybe it'll be better.  Who knows.  Okay.
10  Sorry about that.  When I use the term "shell
11  eggs," do you have an understanding of what that
12  is?
13    A.  Yes.
14    Q.  What is a shell egg?
15    A.  Shell egg is an egg that's marketed to
16  the retail market for consumption by the general
17  population.
18    Q.  Does Daybreak Foods sell any shell eggs?
19    A.  Only occasionally to help create a
20  transition from what the facility we may have
21  acquired did, to what we wanted it to do because of
22  the acquisition.
23    Q.  So the answer is, essentially, sometimes;
24  correct?
25    MR. ONDECK:  Objection, mischaracterizes

Page 36

1  his testimony.
2    THE WITNESS:  No, no.
3    MR. ONDECK:  Let me object, please.
4    THE WITNESS:  I'm sorry.
5  BY MR. ARANOFF:
6    Q.  The answer is not sometimes?
7    A.  That's correct.
8    Q.  Okay.  So then maybe I misunderstood you.
9  Are there instances where Daybreak Foods, or any of
10  the farms that Daybreak Foods owns, sells shell
11  eggs as you've defined it?
12    A.  Rarely.  Rarely.
13    Q.  Okay.  To whom, to the best of your
14  knowledge, does Daybreak Foods sell shell eggs?
15    A.  On the limited occasion that we've done
16  it, it's because of a -- we've acquired a facility
17  and are transitioning from what they did, which was
18  shell marketing, to what we purchased the facility
19  for, which was liquid.  So we would have retained
20  or tried to maintain a relationship with that
21  company's existing customers through that
22  transition process till we could now produce
23  liquid, unpasteurized product.
24    Q.  I understand that.  But my question was
25  in the limited instances or, as you said, in the

Page 37

1  rare instances where you sell shell eggs, to whom
2  do you sell those shell eggs?
3    A.  Don't know.
4    Q.  Is there somebody at the company that
5  would have the answer to that question?
6    A.  It is such a rare occasion, I don't know.
7    Q.  When's the last time you can recall that
8  Daybreak Foods sold a shell egg to a single
9  customer?
10    A.  '08.
11    Q.  So it's your testimony today then,
12  Mr. Rehm, that Daybreak Foods has not sold a single
13  shell egg to a single customer in four to
14  five years; is that accurate?
15    MR. ONDECK:  Objection.  Sorry for
16  interrupting you.  Objection, misstates prior
17  testimony.
18  BY MR. ARANOFF:
19    Q.  You can answer.
20    A.  I don't believe the -- I don't believe
21  the -- this action goes beyond 2008.  I think it
22  stops there.
23    Q.  That's -- that doesn't respond to my
24  question.  My question is that do you -- going back
25  to what I had originally asked you.  Do you recall

10  (Pages 34 to 37)

HIGHLY CONFIDENTIAL

Page 38

1  any instances where Daybreak Foods sold a shell egg
2  to any customer since 2008, which is I think what
3  you testified to.
4          MR. ONDECK: Objection, asked and
5  answered.
6          THE WITNESS: I don't believe --
7          MR. ARANOFF: It wasn't asked and
8  answered.
9          THE WITNESS: I don't think that's the
10 scope of this litigation.
11         MR. ARANOFF: That's not for you to
12 decide, Mr. Rehm. You're supposed to answer the
13 questions that I ask and your counsel will
14 interject objections as he sees fit.
15         MR. ONDECK: I object to counsel
16 testifying.
17         MR. ARANOFF: Okay. But that's the way
18 it goes.
19 BY MR. ARANOFF:
20     Q. So I'd ask for you to please answer my
21 question.
22     A. I will reemphasize: I don't believe it's
23 a part of the scope of this litigation, to the best
24 of my knowledge, that stops in 2008.
25     Q. Okay.

Page 39

1      A. However --
2      Q. Yes?
3      A. -- if you want an answer to that
4  question, I would ask you to kindly restate your
5  question.
6      Q. Okay.
7          MR. ARANOFF: Can the court reporter read
8  back the last substantive question, please?
9          COURT REPORTER: "Do you recall any
10 instances where Daybreak Foods sold a shell egg to
11 any customer since 2008, which is I think what you
12 testified to."
13         MR. ONDECK: Same objection.
14         THE WITNESS: You would like a name of a
15 customer?
16 BY MR. ARANOFF:
17     Q. Yes, please.
18     A. Cargill Kitchen Solutions.
19     Q. Anyone else that you can think of?
20     A. Piggly Wiggly. That's a Wisconsin
21 company only.
22     Q. Okay.
23     A. I think there's possibly Piggly
24 Wigglys around the country, it's not --
25     Q. At any point in time did you sell any

Page 40

1  shell eggs, even one, to Michael Foods?
2      A. We did not sell any graded product to
3  Michael Foods.
4      Q. You seem to have made a distinction
5  between shell eggs and graded product. What was
6  the basis for that distinction?
7      A. We may have sold breaking stock to
8  Michael Foods in the interim. Let me -- we may
9  have sold breaking stock to Michael Foods in the
10 interim from an acquisition, to being able to
11 produce raw, liquid, whole egg at one of our
12 facilities.
13     Q. Okay. Can you define for me what a
14 graded egg is, please?
15     A. A graded egg is one that runs through
16 machinery that cleans it, washes it, sanitizes it
17 and weighs it according to size, small, medium,
18 large, extra large, jumbo.
19     Q. And can you define a breaking egg,
20 please?
21     A. A breaking egg is one that --- I'd ask
22 you more directly ask your question. I don't --
23     Q. Do you know what a breaking egg is?
24     A. Breaking stock?
25     Q. Yes.

Page 41

1      A. That's not a breaking egg.
2      Q. Okay. What is a breaking stock?
3      A. Breaking stock are eggs that are sold in
4  the open market to companies that then convert that
5  into liquid and process it for their purposes.
6      Q. Does breaking stock often take the form
7  of a shell egg?
8      A. I don't know.
9      Q. When I use the term "egg product," do you
10 understand what that term means?
11     A. I believe I understand my interpretation
12 of egg product.
13     Q. What is your understanding of an egg
14 product?
15     A. It's further processed product that is
16 eventually pasteurized, cooked, packaged, frozen,
17 dried, to name a few.
18     Q. Is it your understanding that Daybreak
19 Foods engages in the egg product business in
20 general?
21     A. No.
22     Q. How would you characterize what Daybreak
23 Foods does?
24     A. Daybreak Foods is an egg production
25 company that decides to market the egg it produces

11 (Pages 38 to 41)

HIGHLY CONFIDENTIAL

Page 42

1   outside the shell, and sells raw, unpasteurized
2   liquid products.
3       Q.  How does that differ from your definition
4   of an egg product?
5       A.  Because all egg products, by USDA
6   requirement and federal requirement, must be
7   pasteurized for human consumption.  The products
8   that we produce cannot be consumed directly by
9   anyone.
10      Q.  In other words, so is it fair to say that
11  in order for your product to be useful to a
12  potential buyer, it would have to be combined with
13  some other process to make it useable?
14          MR. ONDECK:  Objection, misstates prior
15  testimony.
16          THE WITNESS:  When you say "other buyer,"
17  I don't know who you're talking about.
18  BY MR. ARANOFF:
19      Q.  Well, when -- well, let me ask it a
20  better way.  What does, for example, Michael Foods
21  do with your product, to the best of your
22  knowledge, once it buys it?
23          MR. GREENE:  Objection.  Go ahead.
24          THE WITNESS:  They pasteurize, cook it --
25  could cook it, dry it, freeze it, or any other

Page 43

1   number of things that further processors do with it
2   BY MR. ARANOFF:
3       Q.  Would you characterize the product that
4   you produce and that Daybreak produces as a raw
5   material?
6           MR. ONDECK:  Objection.
7           THE WITNESS:  Our product is raw,
8   unpasteurized.
9   BY MR. ARANOFF:
10      Q.  Are you aware of any of the other
11  defendants in this action that produce the same
12  product, the raw, unpasteurized product that you
13  just discussed, any other defendants in this
14  litigation that produce the same product?
15      A.  I'm not sure what they produce.
16      Q.  Would your answer be the same as you just
17  described with what Michael Foods does with what
18  your product -- would the answer be the same for
19  what you believe Deb-El and Cargill do with your
20  product?
21      A.  They do different things, but at the end
22  of the day, they both pasteurize it and make it
23  ready for human consumption.
24      Q.  What does, to the best of your knowledge,
25  Deb-El do with the product it purchases from you?

Page 44

1       A.  Pasteurize, dry, freeze.  And beyond
2   that, I'm not sure.  I know they do other things,
3   but I'm not sure.
4       Q.  Okay.  And what about Cargill?
5       A.  Pasteurize, aseptically package, cook.
6       Q.  Do you sell any --
7           MR. ONDECK:  Objection.  Was the witness
8   finished answering?
9           THE WITNESS:  Yes.
10          MR. ARANOFF:  Oh, I thought he was.
11          THE WITNESS:  No, you're fine.
12  BY MR. ARANOFF:
13      Q.  Don't be shy about telling me --
14      A.  Telling you to shut up?
15      Q.  Yeah.
16      A.  No, I'm just kidding.
17      Q.  I try hard not to talk over you.  Does
18  Daybreak Foods sell product to a company called
19  Sunny Fresh Farms?
20      A.  No.
21      Q.  Was there ever a point in time when you
22  did?
23      A.  Not as Sunny Fresh Farms.
24      Q.  Okay.  Was there any entity that sounds
25  like Sunny Fresh Farms that you sold product to?

Page 45

1       A.  Sunny Fresh Foods.
2       Q.  How about Sunny Fresh Foods?
3       A.  Sunny Fresh Foods is Cargill Kitchen
4   Solutions.  It was a name change.
5       Q.  Do you have any idea when that name
6   change took place?
7       A.  No.
8       Q.  Was it in the last ten years?
9       A.  Yeah, I believe so.
10      Q.  I think we were talking earlier, before
11  we got off on somewhat of a tangent, about the job
12  description for your brother Tony at the company.
13  And I think you mentioned he has three jobs,
14  scheduling, marketing, and then there was a third
15  job.
16      A.  Logistics.
17      Q.  When you say that he was responsible for
18  logistics, what in particular do you mean?
19      A.  If we don't deliver -- some of our
20  products are delivered and some of our products are
21  picked up.  On the ones that are delivered, he
22  schedules either our own tanker and power units to
23  make the delivery or schedules outside vendors to
24  come and pick them up and deliver on time.
25      Q.  Let's talk about your delivery for a

12  (Pages 42 to 45)

HIGHLY CONFIDENTIAL

Page 46

1 second. Is it fair to say that you sell product
2 throughout the United States?
3     A. Predominantly, no.
4     Q. Predominantly, no?
5     A. We sell the bulk of our products in the
6 Midwest.
7     Q. I'll give you a second.
8     A. I apologize. Thank you.
9     Q. No, take your time.
10     A. Go ahead. No, go ahead, Ron.
11     Q. Do you have any -- I mean, I understand
12 what you said about predominantly you sell in the
13 Midwest, but do you have any customers, for
14 example, on the eastern seaboard?
15     A. Yes.
16     Q. And who are they?
17     A. Deb-El Foods.
18     Q. Okay. Any others that you can think of?
19     A. Michael Foods.
20     Q. Do you have any customers down south at
21 all?
22     A. No.
23     Q. No customers in places like Florida or
24 Texas or places like that?
25     A. That's correct.

Page 47

1     Q. Okay. Any customers on the west coast?
2     A. On a spot basis, we may have shipped,
3 during the course of this litigation, our raw,
4 unpasteurized egg to the west coast.
5     Q. Okay. Do you have --
6     A. But again --
7     Q. I'm sorry.
8     A. -- minimal.
9     Q. Do you have any understanding as to who
10 your customers are or who you would have sold to,
11 shall I say, on the west coast? Just an example.
12     A. No.
13     Q. But you're sure that you've sold product?
14     A. Somebody in Washington, the state of
15 Washington.
16     Q. So that's the Pacific northwest, west
17 coast; right?
18     A. That's west coast.
19     Q. Okay. Do you know whether any of the
20 customers to whom you sell, whether they sell their
21 product nationally, in other words, throughout the
22 United States?
23         MR. ONDECK: Objection.
24         THE WITNESS: The bulk of our products,
25 as I've told you and testified in the past, are

Page 48

1 sold under long-term contractual arrangements with
2 three main customers. The bulk of that is really
3 sold to two main customers, one being Michael
4 Foods, one being Cargill Kitchen Solutions. And
5 I'm -- I don't know where they sell their products
6 to. I assume that they cover the country.
7 BY MR. ARANOFF:
8     Q. And Cargill has been a steady customer of
9 Daybreak since you got to the company; is that
10 accurate?
11     A. As long as we reference Cargill and
12 Cargill Kitchen Solutions, that's who you're
13 referencing.
14     Q. Yes.
15     A. Cargill Kitchen Solutions was the first
16 liquid customer of our company.
17     Q. Okay. And when we're talking about
18 Cargill and Cargill Kitchens, I mean to the extent
19 that there's a distinction in the corporate entity
20 at any point in time, I would appreciate if you
21 just point that out to me. Otherwise, I'm going to
22 assume that Cargill includes Cargill, Cargill
23 Kitchens and, from what I think we talked about
24 earlier, also Sunny Fresh Foods.
25         MR. ONDECK: Objection.

Page 49

1 BY MR. ARANOFF:
2     Q. Is that fair? 'Cause I don't want to sit
3 and make that distinction every single time I ask
4 you a question.
5     A. When we started, the wholly-owned
6 subsidiary of Cargill was called Sunny Fresh Foods.
7 They changed the name to Cargill Kitchen Solutions.
8 So if I reference Cargill, I'm only referencing
9 Cargill Kitchen Solutions. If I intend to talk
10 about Cargill corporate, I will delineate that
11 specifically.
12     Q. Okay. Thank you. And we were talking
13 earlier about your -- just in terms of background,
14 your -- your other siblings. I know we talked
15 about Brent and Tony. I think you also have a
16 number of other siblings. I'll make --
17     A. Not too many.
18     Q. -- little easier. Robert, Jr.?
19     A. Yes.
20     Q. Does he work at the company?
21     A. Today, no.
22     Q. Did he work at any point?
23     A. Yes.
24     Q. Okay. In what capacity?
25     A. Logistics.

13 (Pages 46 to 49)

HIGHLY CONFIDENTIAL

Page 50

1    Q.  Okay.  And trying to be somewhat
2  sensitive to this:  Is there any specific
3  reason -- he's no longer with the company today;
4  right?
5    A.  He chose to take another path.
6    Q.  What line of work is he in now?
7    A.  You know, I'm not positive.
8    Q.  Okay.  I'll leave that alone.  You have
9  another brother William?
10   A.  That would be me.
11   Q.  Oh, that's you.  My mistake.  Sorry.  You
12  have a sister Betsy; right?
13   A.  Elizabeth, yes.  Betsy.
14   Q.  Is she involved at all with the company?
15   A.  Not anymore, no.
16   Q.  Has she ever been?
17   A.  Yes.
18   Q.  Okay.  When was that?
19   A.  I don't know when she started.  She left
20  in 2007-ish, 2008.  My older brother and my
21  youngest sister, my only sister, left employment
22  with Daybreak at the same time.
23   Q.  Okay.  And is Elizabeth married?
24   A.  Yes.
25   Q.  Does her husband work at Daybreak?

Page 51

1    A.  No.
2    Q.  What's his name, please?
3    A.  Lund, L-U-N-D.
4    Q.  Okay.  You have no other -- no other
5  siblings?
6    A.  No.  You did a good job getting them all.
7    Q.  Okay.  I try.  Just -- are you married,
8  Mr. Rehm?
9    A.  Yes.
10   Q.  What's your wife's name, please?
11   A.  Jaclyn, J-A-C-L-Y-N.
12   Q.  And does your wife work at the company at
13  all?
14   A.  No.
15   Q.  Do you have any children?
16   A.  Yes.
17   Q.  What are their names?
18   A.  Oldest is Russell; our middle is Clayton,
19  C-L-A-Y-T-O-N, and our youngest is Barrett,
20  B-A-R-R-E-T T.
21   Q.  Just real quick, do any of them work at
22  Daybreak Foods?
23   A.  Summer jobs.
24   Q.  But they're not full-time employees?
25   A.  No.  Our oldest turns 24 middle of this

Page 52

1  month.
2    Q.  I think you testified, just in terms of
3  background, I think you testified earlier that you
4  started out as either the treasurer or the CFO of
5  the company roughly 1991?
6    A.  Correct.
7    Q.  And at some point did your position
8  change?
9    A.  At some point I became the president of
10  the company.
11   Q.  Okay.  And am I correct that that was
12  roughly in the year 2000?
13   A.  No.
14   Q.  When was that?
15   A.  '96, '97, maybe '98.  I'm not sure which
16  year.
17   Q.  Okay.  And you're now the -- you're now
18  the owner of the company?
19   A.  I'm one of the owners of the company.
20   Q.  Right.  It's split among you and your
21  siblings; is that correct?
22   A.  And we have two non-family members that
23  have minority, very small ownership.
24   Q.  And who are those folks, please?
25   A.  Loren Asche, A-S-C-H-E, and Don Herman.

Page 53

1  No relationship to our chief financial officer.
2    Q.  I was about to ask you that.  What's the
3  name of your chief financial officer?
4    A.  Dick Herman.
5    Q.  Okay.  And just roughly, when you were
6  the CFO of the company or the treasurer of the
7  company, what were your general job descriptions at
8  that time?
9    A.  Anything and everything.
10   Q.  Does that differ at all from what you do
11  now as the president and CEO?
12   A.  The size and scope of our company was
13  significantly smaller at that time than it is
14  today, and so we are far more defined in our
15  responsibilities than we were at that time.
16   Q.  What percentage of ownership of the
17  company does Loren Asche have?
18   A.  I'm not sure.  We're fine.  Just keep
19  going.
20   Q.  But I don't want to let -- if Chris has
21  to step out --
22        MR. ONDECK:  We're going to refill with
23  water.
24        MR. ARANOFF:  Can I continue?
25        MR. ONDECK:  Please.

14  (Pages 50 to 53)

HIGHLY CONFIDENTIAL

Page 54

```
1   BY MR. ARANOFF:
2       Q.  I didn't hear if you answered me, so I
3   apologize --
4       A.  I'm not sure what his ownership
5   percentage is.
6       Q.  Let me back up.  Is Loren Asche a man or
7   a woman?
8       A.  Gentleman.  I almost said that before.
9       Q.  That was a wrong assumption on my part,
10  so I'm sorry.
11      A.  That's all right.
12      Q.  So Mr. Asche, you don't know what
13  percentage of the company he has?
14      A.  Not specifically.
15      Q.  Can you give me an estimate?
16      A.  Loren and Don own less than five percent
17  of the company.
18      Q.  What is Loren's -- aside from being a
19  part owner, what are Loren's responsibilities, to
20  the best of your knowledge?
21      A.  If it breathes, has feathers, and eats
22  feed, he's responsible.  So he's responsible for
23  all the layers, pullets, and feed mill activities.
24      Q.  And what about Don Herman, what is his
25  responsibility, aside from being an owner of the
```

Page 55

```
1   company?
2       A.  He runs one of our pullet farms in
3   Wisconsin.
4       Q.  Okay.  And Dick Herman is the current
5   CFO; correct?
6       A.  Correct.
7       Q.  And he has no relationship, I think you
8   testified earlier, no relationship at all to Don
9   Herman?
10      A.  Correct.
11      Q.  Who is Patricia Stonger?
12      A.  Pat Stonger is our director of quality
13  assurance at Daybreak Foods.
14      Q.  Patricia Stonger is a woman, I take it;
15  correct?
16      A.  Correct.
17      Q.  Okay.  And she's had that position for
18  quite awhile?
19      A.  Yeah.  I'm not sure how long Pat's been
20  with Daybreak.  More than ten years, I believe.
21      Q.  And I think I misheard you.  Could you
22  just state real quick, again, what her position at
23  the company is now?
24      A.  Director of quality assurance.
25      Q.  Was there any point in time where
```

Page 56

```
1   Patricia Stonger was director of technical services
2   and regulation affairs?
3       A.  I'm not sure what her specific title was.
4   She had input in that activity in connection with
5   the regulatory matters as it pertains to egg
6   quality and egg production.
7       Q.  Is there somebody that works at Daybreak
8   named Chris, I may pronounce this wrong, Roadle,
9   Ruddle?
10      A.  Raydel (phonetic.)
11      Q.  Raydel?
12      A.  Yes.
13      Q.  And who is Chris Raydel?
14      A.  Chris Raydel is -- I'm not sure what his
15  title is.  He works under our production division
16  with, I'm going to use the term logistics, on
17  pullet growing with crews and moving pullets from
18  the grow house to the layer house.
19      Q.  So is it fair to say that he is
20  essentially a production manager at Daybreak?
21      A.  No.
22      Q.  Okay.  Can you explain in laymen's terms
23  what responsibilities Chris Raydel has?
24      A.  I thought I just did.
25      Q.  I didn't understand what you said.
```

Page 57

```
1       A.  He is responsible for logistics as it
2   pertains to organizing the pullet activities and
3   moving pullets from the grow house to the layer
4   house.
5       Q.  And that differs from what your brother
6   who does logistics does; correct?
7       A.  My brother's logistics deals -- my
8   brother's logistics deals strictly with our egg
9   that we sell.
10      Q.  Okay.  How many employees are there
11  currently at Daybreak?
12      A.  Again, it's beyond the scope, is my
13  understanding, that this process ends in 2008.  But
14  as of right now, roughly 500 people work with us at
15  Daybreak.
16      Q.  Has that remained constant since you came
17  to the company?
18      A.  No.
19      Q.  How has that changed over the course of
20  time?
21      A.  Daybreak has grown significantly since I
22  started at the company.  And since we purchased my
23  father in January 2001, we've grown over
24  300 percent.  And there -- our employment base has
25  grown along with that.
```

HIGHLY CONFIDENTIAL

Page 58

1    Q.  And is there a board of directors at
2    Daybreak?
3    A.  Yes.
4    Q.  And can you -- how many people are on the
5    board of directors?
6    A.  We're in the process of making some
7    changes to that board, but historically it was just
8    three.
9    Q.  Okay.  When you say historically,
10   historically, who have the three people that have
11   served on that board?
12   A.  My brothers, Burton, Brent, and myself.
13   Q.  Okay.  And you're in the process -- you
14   said you're in the process of making a change?
15   A.  Yes.
16   Q.  Has that change been implemented?
17   A.  We are just about done.
18   Q.  Okay.  And can I get a preview as to
19   who's going to serve on the board now, next?
20   A.  Permanent positions on the board will be
21   the position of chief financial officer.
22   Q.  That would be Dick Herman?
23   A.  He sits in that position today, yes.  The
24   permanent position of president, and that would be
25   me today.  My brothers Tony, Burton -- I'm going to

Page 59

1    call him Tony.
2    Q.  Call him Tony.
3    A.  Thank you.  Nobody calls him Burton.
4    Q.  Well, I was just trying to be polite.
5    A.  You don't have to worry.  Burton, Tony,
6    and my brother Brent, have revolving positions on
7    the board.  And we have two outside board members.
8    Q.  And who are they?
9    A.  We have one selected, his name is Jerry
10   Rose, and he has been selected and elected to the
11   board.  And we're in the process of solidifying a
12   second outside board member.
13   Q.  And where does Jerry Rose work now?
14   A.  He's retired.
15       MR. ONDECK:  Objection, relevance.
16   BY MR. ARANOFF:
17   Q.  Okay.  Does Daybreak have a general
18   counsel?
19   A.  Yes.
20   Q.  And who's that?
21   A.  Barry Clegg.  C-L egg.  C-L-E-G-G.
22   Q.  That's cute.
23   A.  We worked hard at that one.
24   Q.  Okay.  And how long has Mr. Clegg been
25   with the company?

Page 60

1    A.  Mr. Clegg does not work for the company.
2    Q.  He's not an in-house lawyer?
3    A.  No.
4    Q.  Is he at a law firm?
5    A.  Yes.
6    Q.  What law firm is Mr. Clegg at?
7    A.  Gray Plant Mooty, in Minneapolis.
8    Q.  How long has Mr. Clegg been the general
9    counsel?
10   A.  I'm not sure.
11   Q.  Okay.  I'm sorry.
12   A.  We have been with Mr. Clegg or his
13   predecessor since the mid-'90s.
14   Q.  Aside from Mr. Ondeck and his firm and
15   Mr. Clegg, does Daybreak have any other attorneys?
16   A.  No.
17       THE VIDEOGRAPHER:  Excuse me.  When we
18   got a moment, there's a technical issue.
19       MR. ARANOFF:  We'll go off the record.
20       THE VIDEOGRAPHER:  Off the record at
21   10:18 p.m.
22           (Break taken.)
23       THE VIDEOGRAPHER:  We're back on the
24   record at 10:28 a.m.
25   BY MR. ARANOFF:

Page 61

1    Q.  Okay, Mr. Rehm.  What did you do to
2    prepare for your deposition today?
3    A.  Met with my counsel.
4    Q.  That's Mr. Ondeck?
5    A.  Yes.
6    Q.  For how long, roughly?
7    A.  Eight hours, maybe.
8    Q.  Was anybody else present during that
9    meeting?
10   A.  Elisa.
11   Q.  Anybody else?
12   A.  No.
13   Q.  Mr. Clegg?
14   A.  No.
15   Q.  Mr. Greene?
16   A.  No.
17   Q.  Without telling me what you reviewed, did
18   you review documents in preparation for today?
19   A.  We looked at a few minutes.
20   Q.  Okay.  Anything else?
21   A.  One slide to help organize in my head the
22   timeline on our construction and expansion projects
23   to make sure that I had those clear points in time.
24   That's all.
25   Q.  Okay.  Does anybody at the company know

16  (Pages 58 to 61)

HIGHLY CONFIDENTIAL

Page 62

1  that you're testifying today in this action?
2      A.  They know that I'm in deposition today,
3  yes.
4      Q.  About this case?
5      A.  Yes.
6      Q.  Have you had any discussion about your
7  testimony with anybody at the company?
8      A.  No.
9      Q.  Do you know a gentleman by the name of Ky
10 Hendricks?  Do you know who that is?
11     A.  If you refer to K-Y, Hendricks, from Rose
12 Acres.
13     Q.  He is from Rose Acre.  I actually think
14 his name is spelled K-Y.  But yes, we're talking
15 about the same person.  Do you know who that is?
16     A.  I know who that is.
17     Q.  Have you had any communication with
18 Mr. Hendricks in the last 60 days, roughly?
19     A.  No.
20     Q.  Did you, in preparation for your
21 testimony today, did you review a transcript of
22 Mr. Hendrick's deposition?
23     A.  No.
24     Q.  Do you know an individual named Gene
25 Gregory?

Page 63

1      A.  Yes.
2      Q.  Who is Gene Gregory?
3      A.  He's a retired past, I believe it was
4  president, of the United Egg Producers.
5      Q.  Have you had any communications with
6  Mr. Gregory in the last 60 days?
7      A.  In his retired capacity, he stopped at
8  our office and interviewed me in preparation for an
9  article he did about our company in United Voice.
10     Q.  When was that?  Do you have any idea,
11 roughly?
12     A.  Beginning, end of June.
13     Q.  Did you discuss his deposition testimony
14 at all with respect to this case?
15     A.  No.
16     Q.  Did you review a transcript of his
17 deposition testimony in preparation for today's --
18 for your testimony today?
19     A.  No.
20     Q.  Do you know an individual named Al Pope?
21     A.  Yes.
22     Q.  Who's Al Pope?
23     A.  He was, at one point, the president of
24 United Egg Producers prior to Gene Gregory.
25     Q.  And when's the last time you spoke with

Page 64

1  Mr. Pope?
2      A.  Years ago.
3      Q.  And is it fair to say that you have not
4  reviewed a transcript of his deposition in
5  preparation for your testimony today?
6      A.  Yes.
7      Q.  How many farms does Daybreak Foods
8  currently operate?
9      A.  Eight inline complexes, and we have
10 several contracted facilities.
11     Q.  So I'm going to try to make this as easy
12 as possible on you, because I'm sure it's not that
13 easy to remember, but fill in any gaps.  You have a
14 farm in Long Prairie, Minnesota?
15     A.  No, we have a processing plant in Long
16 Prairie, Minnesota.
17     Q.  And what exactly do you process there?
18     A.  We bring in eggs from our contract
19 facilities in Minnesota into our plant in Long
20 Prairie, where they are then put onto our breaking
21 machines for us to produce raw, unpasteurized,
22 liquid egg.
23     Q.  You understand when I use the term
24 "layer," you understand what a layer is?
25     A.  I know what I think a layer is, yes.

Page 65

1      Q.  What is your understanding of a layer?
2      A.  Process a laying hen.  A laying hen
3  chicken somewhere from 20 weeks to 110 weeks of
4  age.
5      Q.  20 weeks to 120 weeks, is that what you
6  said?
7      A.  110.
8      Q.  110 weeks of age.  Would you say that
9  that is a common term within the industry and that
10 people understand layer to mean the same as you do?
11         MR. ONDECK:  Objection.
12         THE WITNESS:  No.
13 BY MR. ARANOFF:
14     Q.  Have you heard people talk about layers
15 with a different definition than yours?
16     A.  They may not run layers as long as we run
17 layers.
18     Q.  So when you say your understanding of
19 layer, you're talking about layer as it relates to
20 Daybreak Foods; correct?
21     A.  Yes.
22     Q.  Okay.  Do you -- how many -- are there
23 any layers at the Long Prairie, Minnesota facility?
24     A.  Long Prairie is a production -- is a
25 processing plant.  And in Minnesota, we have

HIGHLY CONFIDENTIAL

Page 66

1 contract facilities that feeds the eggs into that
2 plant.
3    Q. Where are those facilities?
4    A. They're scattered around that geographic
5 area in Minnesota.
6    Q. Do you have -- do those facilities have
7 names?
8    A. Radine -- they're basically referred to
9 as the owner of the farm.
10    Q. Okay. And do you have an idea just
11 roughly how many of those you have in Long Prairie?
12    A. We have about 1.2 million hens on
13 contract in Minnesota.
14    Q. And you also have a facility in Lake
15 Mills, Wisconsin; correct?
16    A. We have two facilities in Lake Mills,
17 Wisconsin.
18    Q. And what kind of production goes on in
19 the Lake Mills facilities?
20    A. They're both inline production of raw,
21 unpasteurized liquid egg.
22    Q. What do you mean when you say "inline"?
23    A. That the plant and the hens are all on
24 the same farm and connected with one another. And
25 as the eggs come off the layer barn, they are

Page 67

1 transferred directly into the processing plant.
2    Q. How many -- how many layers are at each
3 of the Lake Mills facilities?
4    A. Each one has roughly 800,000 hens.
5    Q. Then you have a facility in, I may have
6 mispronounced this, Graettinger, Iowa?
7    A. Graettinger.
8    Q. Graettinger, Iowa. Okay. Excellent.
9 And what type of production goes on in Graettinger?
10    A. Daybreak produces eggs that we sell as
11 the eggs transfer into the processing room.
12    Q. Can you explain what that means, please?
13    A. We have a joint venture, a minority
14 business enterprise at Graettinger. The minority
15 business enterprise, MBE, owns the processing
16 plant. Daybreak -- Daybreak's sole activity at
17 that facility is to produce the eggs and convey
18 them to the processing plant, which at that point
19 are -- those eggs are sold to the minority
20 enterprise.
21    Q. When you -- well, let's break that down a
22 bit. The minority business entity, does it have a
23 name?
24    A. The Best Egg Company. Daybreak owns
25 49 percent, and a gentleman named Cornell Slade

Page 68

1 owns 51 percent.
2    Q. And when you -- you're talking about the
3 product that's -- that's generated at the
4 Graettinger facility, is that the same raw,
5 unprocessed product that we've been discussing up
6 until now?
7    A. The Best Egg Company produces raw,
8 unpasteurized liquid egg, yes. And that whole
9 process was generated as a customer solution trying
10 to create what a customer is asking us to complete.
11    Q. And are there layers at the Graettinger
12 facility?
13    A. Yes.
14    Q. And how many layers are there?
15    A. Approximately 1.6 million.
16    Q. And it's located in one place, right?
17 It's one facility?
18    A. One facility, one farm. It's an inline
19 complex.
20    Q. Then you have another facility, I
21 believe, in Oak Ridge, Iowa?
22    A. It's in Estherville, Iowa, referred to as
23 Oak Ridge.
24    Q. And does Daybreak own that entire
25 facility in totality?

Page 69

1    A. Yes.
2    Q. What kind of production goes on in the
3 Oak Ridge -- in the Estherville facility?
4    A. It is an inline production of raw,
5 unpasteurized egg.
6    Q. Does it have any minority business
7 entities that --
8    A. No.
9    Q. Why is that facility called Oak Ridge as
10 opposed to simply being a different facility named
11 Daybreak Farms -- or Daybreak Foods?
12    A. Because it sits behind a beautiful oak
13 ridge, and we try to be a little creative in our
14 naming of the facilities.
15    Q. Fair enough. You also have a facility in
16 Illinois?
17    A. No.
18    Q. Do you have -- do you currently have any
19 pullet farms? Do anything with pullets?
20    A. We have pullet farms, yes.
21    Q. Are there any other facilities
22 that -- that I haven't listed that are under the
23 auspices of Daybreak Foods?
24    A. Yes.
25    Q. Which are those?

18 (Pages 66 to 69)

HIGHLY CONFIDENTIAL

Page 70

1     A.  In Wisconsin, we have a facility referred
2  to as LMC, the Lake Mills Complex, and Creekwood
3  Farms.
4     Q.  And what gets produced at those farms?
5     A.  Raw, liquid, unpasteurized egg.
6     Q.  Are there layers at those facilities?
7     A.  Only in -- I don't mean to be smart, but
8  only a layer can produce an egg.  So yes, they
9  are -- inline complexes means that there are layers
10  and the plant are on the same farm.
11     Q.  Fair enough.  And how many layers are at
12  LMC in Creekwood?
13     A.  I believe you asked that already.  But
14  about 800,000.
15     Q.  Any other facilities you can think of
16  that we haven't mentioned?
17     A.  Layer complexes.  Under New Day Farms,
18  which is a wholly-owned subsidiary of Daybreak
19  Foods, we have two complexes in the state of Ohio.
20     Q.  What kind of product are produced at
21  those complexes?
22     A.  Raw, unpasteurized, liquid egg.
23     Q.  So I'm going to assume, as we continue on
24  with this, that the same product is produced at
25  each of these facilities unless you tell me

Page 71

1  otherwise.  Any other facilities that you can think
2  of?
3     A.  Those are our layer production processing
4  facilities, yes.
5     Q.  Does Daybreak own any additional
6  facilities for any other purposes that we haven't
7  already discussed?
8     A.  We own some feed mill operations and
9  pullet grain operations.
10     Q.  Okay.  Where are the feed mill
11  operations?
12     A.  Wisconsin and Iowa.
13     Q.  What kind of production is done there?
14     A.  We grind and mix our own feed.
15     Q.  Okay.  I think you mentioned one other.
16     A.  And we have a -- we have two stand-alone
17  pullet farms, one in Wisconsin, one in Iowa.
18     Q.  Where are those located?
19     A.  One's -- for ease, I'm just going to call
20  it just outside Lake Mills, Wisconsin.  The other
21  one's located outside of Spencer, Iowa.
22     Q.  Okay.  And same kind of operation goes on
23  at each of these facilities?
24     A.  They're pullet growing operations.
25     Q.  What's a pullet?

Page 72

1     A.  A pullet is a young chicken that we grow
2  to central maturity, so it's ready to start the
3  production of eggs.
4     Q.  Do any of the facilities that we
5  mentioned have hatcheries?
6     A.  No.
7     Q.  Do you know what a hatchery is?
8     A.  Yeah, I know what is hatchery is.  No.
9     Q.  What is a hatchery, just so we're clear?
10     A.  A hatchery is where fertile eggs are
11  taken for the incubation process in the production
12  of day-old baby chicks.
13     Q.  And is there any transport operation at
14  all from any of the facilities that we've
15  mentioned?  In other words --
16     A.  I don't understand.
17     Q.  -- are any -- are products out of any of
18  the facilities we mentioned, are they transported
19  to other places or to customers for delivery?
20     A.  Our products are trans -- our pullets are
21  transferred to one of our own layer complexes.  And
22  then our processing plants either deliver or,
23  depending upon the contract, the product is picked
24  up at our door from a layer complex.
25     Q.  Okay.  And is there any transport of

Page 73

1  product between the different facilities?
2     A.  As I said, from a pullet farm to a layer
3  farm, yes.
4     Q.  What about from a raw, unpasteurized farm
5  to another raw, unpasteurized farm?
6     A.  No.
7     Q.  Okay.  Would you consider Daybreak Foods
8  to be vertically integrated?
9        MR. ONDECK:  Objection, calls for a legal
10  conclusion.
11        THE WITNESS:  What do you mean by
12  "vertically integrated"?
13  BY MR. ARANOFF:
14     Q.  Well, you can handle every aspect of the
15  production of the product that you produce from
16  beginning to end; is that correct?
17     A.  No.
18        MR. ONDECK:  Objection.
19        MR. GREENE:  Objection.
20        THE WITNESS:  No.
21  BY MR. ARANOFF:
22     Q.  Okay.  Why do you say no?
23     A.  We don't handle any breeder stock, have
24  any breeder houses, and we do not own or operate
25  any hatcheries for the production of day-old baby

19  (Pages 70 to 73)

HIGHLY CONFIDENTIAL

Page 74

1    chicks.
2        Q.  Do you need to purchase any materials
3    from another source in order to produce your raw,
4    unpasteurized product?
5        A.  That's a pretty general question, so can
6    you be more specific?
7        Q.  In processing raw, unpasteurized eggs for
8    production to your customers, specifically, for
9    example, Michael Foods or Deb-El or Cargill, other
10   than the materials that you produce on your own at
11   your own facilities, do you have to buy any other
12   product and add them to the mix in order to -- in
13   order to produce your raw, unpasteurized eggs?
14       A.  Any products that we would need to buy
15   are not added to our raw, unpasteurized liquid,
16   they're utilized for cleaning, sanitation, pest
17   control, things of that nature, to operate the
18   facility.  But they're not -- it's not added to our
19   product in any way, shape or form.  That would be
20   an adulterated product and be not fit for human
21   consumption, even if I tried to sell it to any one
22   of our customers.
23       Q.  Okay.  Do you have an understanding as to
24   how large Daybreak Foods is compared to other
25   companies in the United States that produce raw,

Page 75

1    unpasteurized egg?
2        MR. ONDECK:  Objection, calls for
3    speculation.
4        THE WITNESS:  I don't know.
5    BY MR. ARANOFF:
6        Q.  Would you -- is it fair to say that
7    Daybreak Foods is one of the ten largest egg
8    producing companies in the United States?
9        A.  Yes.
10       MR. GREENE:  Objection.
11   BY MR. ARANOFF:
12       Q.  Okay.  Is it fair to say that Daybreak
13   Foods is one of the five largest egg breaking
14   companies in the United States?
15       A.  I don't know that for sure, but I believe
16   it to be true.
17       Q.  Okay.  Who else would comprise, in your
18   mind, the ten largest egg production companies in
19   the United States?
20       MR. ONDECK:  Objection.
21       MR. GREENE:  Object.
22       THE WITNESS:  I probably cannot tell you
23   all ten.
24   BY MR. ARANOFF:
25       Q.  Can you tell me the ones that --

Page 76

1        A.  I can tell you some.
2        Q.  Great.
3        A.  They'll get lost somewhere.  I believe
4    the largest is Cal-Maine; then there's Rose Acres,
5    Moark, Sparboe.  And then after that I don't know
6    who the rest of the top ten would be.
7        MR. ONDECK:  I object to the answer.
8    Move to strike.
9    BY MR. ARANOFF:
10       Q.  Okay.  And the five largest egg breaking
11   companies, aside from yourself, who would you
12   consider the four other largest egg breaking
13   companies in the United States?
14       MR. ONDECK:  Objection.
15       MR. GREENE:  Objection.
16       THE WITNESS:  In my opinion, I believe
17   that the people that break large quantities of egg
18   would include Michael's --
19   BY MR. ARANOFF:
20       Q.  When you say Michael, you mean Michael
21   Foods?
22       A.  Michael Foods.
23       Q.  Right.
24       A.  Sonsvagard (phonetic.)  And he has a
25   number of companies, so I'm not quite sure what

Page 77

1    umbrella they all fall under.  Rose Acres, I
2    believe, breaks a lot of eggs.  Rembrandt breaks a
3    lot of eggs.  To the best of my knowledge, those
4    are the larger egg people that break eggs.
5        Q.  Okay.  Does Daybreak Foods have any
6    policies in place with respect to animal welfare?
7        A.  We perform a lot of customer-driven
8    specifications as it relates to the egg production
9    and processing of our company.  And we have several
10   customer-driven programs that we incorporate for
11   the production of our eggs.
12       Q.  When you say "customer-driven," can you
13   explain what you mean by "customer-driven," please?
14       A.  At the request of our customer, they have
15   asked that we produce eggs utilizing certain
16   protocols.
17       Q.  And will that -- well, withdrawn.  Who at
18   Daybreak Foods is in charge of dealing with issues
19   from customers with respect to animal welfare
20   issues and inquiries?
21       A.  Any number of folks.
22       Q.  Would you deal with that directly?
23       A.  I could be one of them, yes.
24       Q.  So if a customer of Daybreak's called and
25   wanted to discuss an animal welfare issue, would it

20  (Pages 74 to 77)

HIGHLY CONFIDENTIAL

Page 78

1  be likely that they would ask for you?
2      A.  They may start with me.
3      Q.  And if they didn't get you for one reason
4  or another, whom else would they -- would they talk
5  to about animal welfare issues?
6      A.  I don't understand what you mean by if
7  they didn't get me.
8      Q.  Well, I think you testified, correct me
9  if I'm wrong, that you're one of the people at the
10 company that would be prepared to discuss with a
11 customer issues pertaining to animal welfare; is
12 that correct?
13     A.  I don't believe that's what you asked me.
14 I think you asked me am I the only one.  And I'm
15 one of a few people that could discuss that.
16     Q.  Okay.  Who are the other people that
17 could discuss that?
18     A.  Depending upon what level of specificity
19 it got to it, it may be Pat Stonger or Loren Asche.
20     Q.  And when you say "customer," is there any
21 standard -- if a customer didn't call but simply
22 made a -- made an inquiry for product from you, to
23 buy product from you, is there any standard that
24 you have in place with respect to animal welfare
25 that you abide by absent a specific request from a

Page 79

1  customer?
2          MR. ONDECK:  Objection, compound,
3  complex, ambiguous.
4  BY MR. ARANOFF:
5      Q.  You can answer.
6      A.  All of our major customers, with the
7  exception of Deb-El, have provided us with a
8  protocol for the humane treatment in production of
9  eggs.
10     Q.  And is it your experience that that
11 protocol is the same, largely, from customer to
12 customer?
13     A.  No.
14     Q.  How do they differ generally?
15     A.  Backfilling and density.
16     Q.  When you say backfilling and density,
17 what -- first let's start with backfilling.  What
18 is your understanding of the term backfilling?
19     A.  Well, chickens, as the human -- as well
20 as the human population, has a natural mortality
21 rate.  And there are certain times where mortality
22 maybe is a little higher than expectation, and we
23 have, through timing, other flocks that would --
24 that would normally be going to slaughter that we
25 could bring in and add back into the cages to bring

Page 80

1  the hen density of that farm back up to a more
2  reasonable level.
3      Q.  Okay.  And so your testimony today is
4  that each of your customers has a different
5  requirement with respect to animal welfare -- how
6  it wants you to handle backfilling issues?
7          MR. ONDECK:  Objection, misstates prior
8  testimony.
9          THE WITNESS:  That is one area where
10 there may be differences in how that may be
11 handled.
12 BY MR. ARANOFF:
13     Q.  Can you give me a practical example of
14 those kind of differences?
15     A.  One prohibits it entirely and one allows
16 it with specific circumstances needing to be met.
17     Q.  Okay.  Can you tell me, as you sit here
18 today, who prohibits it entirely?
19     A.  I believe under the McDonald's production
20 practices, they prohibit it entirely.
21     Q.  And can you tell me as you sit here today
22 who permits it and in what -- at what level?
23     A.  I believe that for some of the production
24 we produce for Cargill there is limited
25 availability for us to do some backfilling.

Page 81

1      Q.  How about for Michael Foods?
2      A.  I don't know specifically what their
3  protocol is.
4      Q.  Is there somebody at the company that
5  would know that information?
6      A.  I could postulate an assumption what I
7  believe it is, but I don't know with specificity.
8      Q.  Okay.  Go ahead and give it a try.
9          MR. GREENE:  Objection.
10         THE WITNESS:  I believe that --
11         MR. GREENE:  I'm sorry, objection, calls
12 for speculation.
13         THE WITNESS:  Okay.  I believe that they
14 would prefer that we not backfill.
15 BY MR. ARANOFF:
16     Q.  Michael Foods would prefer that you not
17 backfill?
18     A.  I believe that's a portion of their
19 program, but I don't know for sure with
20 specificity.
21     Q.  And just so I know, is there somebody at
22 Daybreak that would be in a better position to
23 answer that question definitively than you?
24     A.  Loren or Pat.
25     Q.  Okay.  Let's talk about -- you mentioned

21  (Pages 78 to 81)

HIGHLY CONFIDENTIAL

Page 82

1    density before; right?  What is -- when you talk
2    about density with respect to animal welfare
3    issues, what is meant by density?
4        A.  Cage density of how many hens you may
5    have in a specific cage.
6        Q.  And among your customers, they have
7    differences in terms of the kind of cage density
8    that they will allow?
9        A.  I'm not sure if I would characterize it
10   as that they would "allow" us.  I'd rather
11   characterize it as that is what they would prefer
12   us to utilize, otherwise they would not purchase
13   the products that we produce from us.
14       Q.  Okay.  And do you have an understanding
15   as you sit here today about what the requirements
16   of, for example, Deb-El would be with respect to
17   cage density?
18       A.  Deb-El's requirement is that we produce
19   eggs in a manner that is similar to United Egg
20   Producer's production practices.
21       Q.  And what about -- what about Cargill?
22       A.  They have any number of production
23   practices that they would like us to incorporate
24   depending upon the end user of the product.
25       Q.  Can you give any examples?

Page 83

1        A.  McDonald's, Burger King.
2        Q.  And what are those specifically?
3        A.  Those are specific programs that they
4    asked us to utilize in the production of eggs
5    for -- for -- for those -- for Cargill to utilize
6    in the production of their products for that
7    specific customer.
8        Q.  And what about Michael Foods?
9        A.  What -- I'm --
10       Q.  In terms of cage density, have they
11   communicated to you any requirements that they are
12   asking you to adhere to in order to buy your
13   product?
14       A.  Outside the scope of this litigation,
15   yes.  Subsequent to -- after 2008.
16       Q.  And what are those requirements?
17       A.  They would prefer that we utilize
18   54 square inches per hen.
19       Q.  And do you have an understanding as you
20   sit here today on whether or not that mirrors the
21   UEP guidelines for cage density?
22       MR. ONDECK:  Objection, assumes facts not
23   in evidence.
24       THE WITNESS:  Ask again, please.
25       MR. ARANOFF:  Could you read that

Page 84

1    question back, please?  I kind of like the way I
2    asked it.
3        COURT REPORTER:  "And do you have an
4    understanding as you sit here today on whether or
5    not that mirrors the UEP guidelines for cage
6    density?"
7        THE WITNESS:  I don't believe they're the
8    same as the United Egg Producer's program.
9    BY MR. ARANOFF:
10       Q.  Okay.  Is a Michael Foods' requirement
11   with respect to cage density more stringent or less
12   stringent than that of the UEP?
13       MR. ONDECK:  Objection to the form of the
14   question.
15       THE WITNESS:  We humanely handle all of
16   our hens at all of our locations.
17   BY MR. ARANOFF:
18       Q.  Right.  But that -- I appreciate that.
19   And my question was a little different.  My
20   question is whether or not the Michael Foods'
21   requirement for cage density, in order to buy your
22   product, is more stringent or less stringent than
23   the UEP guideline for cage density.
24       MR. ONDECK:  Objection, ambiguous to the
25   form of the question.

Page 85

1        THE WITNESS:  More stringent than -- I
2    don't understand the question.  We treat all of our
3    hens in a humane manner in the process of producing
4    eggs.
5    BY MR. ARANOFF:
6        Q.  Does the UEP -- when I say UEP, you
7    understand what I mean?
8        A.  United Egg Producers.
9        Q.  Right.  So we understand that.  Okay.
10   Does the UEP -- and we'll get into the UEP
11   shortly -- but does the UEP have guidelines with
12   respect of issues pertaining to cage density?
13       A.  The United Egg Producer's animal welfare
14   program has a holistic full program for the -- for
15   their desired production practices.
16       Q.  Okay.  And part of that is a guideline
17   for its members -- well, withdrawn.  Is it correct
18   that there is a guideline for its members to
19   utilize in terms of cage density for its birds?
20       MR. DAVIS:  This is Evan Davis.  I
21   object, lacks foundation.
22   BY MR. ARANOFF:
23       Q.  You can answer.
24       A.  I need you to repeat the question.
25       MR. ARANOFF:  Can I have the question

22  (Pages 82 to 85)

HIGHLY CONFIDENTIAL

Page 86

1    back, please?
2        COURT REPORTER:  "Is it correct that
3    there is a guideline for its members to utilize in
4    terms of cage density for its birds?"
5        THE WITNESS:  No.
6    BY MR. ARANOFF:
7      Q.  Okay.  Who's in charge of, at Daybreak,
8    at the Daybreak facility, for implementing the cage
9    space procedures?
10        MR. ONDECK:  Objection, assumes a fact
11    not in evidence.
12        THE WITNESS:  I don't understand.
13    BY MR. ARANOFF:
14      Q.  Is there someone at Daybreak Foods that
15    monitors the cage density requirements?
16      A.  There are several people within the
17    organization.
18      Q.  And who is that?
19      A.  Every general manager at every one of our
20    complexes is responsible for monitoring, along with
21    their production managers and supervisors, to make
22    sure that we are maintaining the proper density for
23    our customers that receive our raw, liquid,
24    unpasteurized product from that location.
25      Q.  Do you know -- are you familiar with the

Page 87

1    term "flock size management"?
2      A.  Flux or flock?
3      Q.  Flock.
4      A.  Size management?
5      Q.  Yeah.
6      A.  No.
7      Q.  Never heard that term before?
8      A.  No.
9      Q.  Is there someone at Daybreak that manages
10    and maintains the various flock sizes at the
11    various facilities in which there are birds?
12      A.  I don't know what you mean by "managing
13    flock size."  I don't know what that means.
14      Q.  Okay.  Have you heard of the term "chick
15    hatch reduction"?
16      A.  Yes.
17      Q.  What is your understanding of the chick
18    hatch reduction?
19      A.  Buy fewer day-old baby chicks.
20      Q.  Have you heard the term "molting"?
21      A.  Yes.
22      Q.  What does molting mean?
23      A.  Providing a rest period and rejuvenation
24    period for a laying hen.
25      Q.  Have you -- withdrawn.  Are there

Page 88

1    policies or procedures in place at Daybreak Foods
2    with respect to antitrust compliance policies?  In
3    other words, has your -- have your current 500
4    employees been trained in what they can and cannot
5    do with respect to the laws of the United States
6    with respect to antitrust issues?
7        MR. ONDECK:  Objection, confusing,
8    ambiguous.
9        THE WITNESS:  No.
10    BY MR. ARANOFF:
11      Q.  Has there been anyone that has
12    handed out a manual or handbook in which the
13    company's policies and procedures on antitrust have
14    been addressed?
15        MR. ONDECK:  Objection, asked and
16    answered.
17        THE WITNESS:  No.
18    BY MR. ARANOFF:
19      Q.  Has there ever been a point in time where
20    you personally have had a question in which you
21    thought that -- withdrawn.
22       Has there ever been a time where an
23    issue has come up that you thought has raised some
24    antitrust implications for you or for the company?
25        MR. ONDECK:  Objection, vague, ambiguous.

Page 89

1        THE WITNESS:  No.
2    BY MR. ARANOFF:
3      Q.  Have you ever -- withdrawn.  I think we
4    started talking about, a few moments ago, the UEP,
5    do you recall that?
6      A.  Yes.
7      Q.  And I think we agreed that UEP stands for
8    United Egg Producers; is that correct?
9      A.  Correct.
10      Q.  Aside from the UEP, do you know whether
11    Daybreak Foods is a member of any egg marketing
12    cooperatives?
13      A.  We are not.
14      Q.  Aside from -- besides the UEP, do you
15    know whether Daybreak Foods is a member of any
16    bargaining cooperatives?
17      A.  We are not.
18      Q.  Do you have an understanding as to when
19    Daybreak joined the UEP?
20        MR. ONDECK:  Objection.  I'm going to
21    object to the previous characterization of UEP.
22        MR. ARANOFF:  I'm sorry, what
23    characterization is that?
24        MR. ONDECK:  Egg bargaining, egg
25    marketing.

VERITEXT REPORTING COMPANY
(212) 279-9424    www.veritext.com    (212) 490-3430

HIGHLY CONFIDENTIAL

Page 90

BY MR. ARANOFF:
Q. Okay. You can answer. I think my question was when did Daybreak join the UEP?
A. I don't know.
Q. Do you have any understanding today as to whose decision it was to join the UEP?
A. Yes.
Q. And whose decision was that?
A. Mine.
Q. So is it fair then to say that Daybreak did not -- was not a member of the UEP until you joined the company, which I believe was, we said earlier, was in 1991?
A. 1991-ish. No, it would not be a correct statement.
Q. Okay. So how is that incorrect?
A. I believe that for quite awhile there were a number of years my father would become part of the United Egg Producers and -- big umbrella, because at times there were Midwest United Egg Producers that eventually got consolidated into the United Egg Producers. There were times that he would be a member for a year or two and then drop out.
Q. Is your -- and I try to be sensitive. Is

Page 91

your father still living?
A. Yes.
Q. And is he retired now?
A. He's fully retired, yes.
Q. He have anything to do with Daybreak?
A. Nothing at all.
Q. Where does your father currently reside?
A. Resides in Florida.
Q. Is he in reasonably good health?
A. Yeah, I think so.
Q. Good. I'm glad to hear it.
A. Thank you.
Q. So going back -- and I don't have it in front of me -- so essentially it was your father's idea initially to join the UEP?
A. When he was the president of the company, I assume that he was the person that decided that he would join or drop out.
Q. Have you been or -- withdrawn. Has Daybreak been a member of the UEP continuously since your father first decided to join in whatever year that was?
A. No.
MR. ONDECK: Objection, asked and answered.

Page 92

THE WITNESS: No.
MR. ONDECK: Please let me object.
THE WITNESS: Sorry.
BY MR. ARANOFF:
Q. Can you give me a sense, to the best of your ability, as to the years in which they were not members of the UEP?
A. Cannot.
Q. And I assume your father would be a better question to ask that to?
A. No.
Q. Who would be then?
A. Nobody. I have no recollection of what specific years we were and what specific years we weren't, sir.
Q. Do you have an understanding as you sit here today why your father initially joined the UEP?
A. No.
Q. Do you have an understanding -- well, withdrawn. Have you been a member of the UEP continuously since you've been at the company?
A. No.
Q. Do you have an understanding as to when -- I guess you rejoined the UEP at various

Page 93

times. Do you know when that was?
A. We probably joined in the mid-'90s and have been a member since that time.
Q. And have or have not?
A. Have been a member since that time.
Q. So roughly since 1995 Daybreak's --
A. Somewhere in that --
Q. In that area?
A. You can call it '95, but I don't know what year.
Q. If I said '95, you wouldn't argue with me; right?
A. Somewhere in that timeframe.
Q. Okay. Throughout your -- and when I say "your," I mean Daybreak Foods' tenure as a member of the UEP, on what committees has Daybreak served?
MR. ONDECK: Objection, assumes a fact not in evidence.
BY MR. ARANOFF:
Q. Well, okay. Has Daybreak served on any committees in the UEP?
A. Members of our organization have served on different committees within United Egg Producers.
Q. When you say "members of our

24 (Pages 90 to 93)

HIGHLY CONFIDENTIAL

Page 94

1  organization," you mean employees of --
2      A.  That would -- yes.
3      Q.  Okay.  What committees within the UEP
4  have those members served on?
5      A.  Environmental, government relations, food
6  safety, egg products price discovery.  Those are
7  the ones that I can recall.
8      Q.  How about animal welfare committee?
9      A.  No.
10     Q.  How about the scientific advisory
11  committee?
12     A.  No.  Not as -- the scientific advisory
13  committee were made up of members of the academic
14  community.
15     Q.  Okay.  Do you have an understanding as to
16  who from Daybreak served on the environmental
17  committee?
18     A.  Loren Asche.
19     Q.  Anyone else?
20     A.  They might have had me on there, but I
21  don't know that I ever participated.
22     Q.  Okay.  What about the government
23  relations committee?
24     A.  Myself; I believe Pat Stonger as well.
25     Q.  What about the food safety committee?

Page 95

1      A.  Pat Stonger.
2      Q.  And what about the egg product price
3  discovery committee?
4      A.  Myself.
5      Q.  Anybody else serve on any of these
6  committees that you haven't named thus far?
7      A.  I don't believe so.
8      Q.  Does the UEP have a board of directors?
9      A.  Yes.
10     Q.  Have you ever served on the UEP board of
11  directors?
12     A.  Yes.
13     Q.  When?
14     A.  Since 2003.
15     Q.  How are the board of directors of the UEP
16  selected?
17     A.  There are nominations made by members of
18  the United Egg Producers, and then with a slate of
19  nominated candidates, the members elect specific
20  members of -- board members by region of the United
21  States.
22     Q.  Have you been on the board of directors
23  of the UEP continuously since 2003?
24     A.  Yes.
25     Q.  Has anybody else from Daybreak served

Page 96

1  on -- as a member of the board of directors of the
2  UEP?
3      A.  No.
4      Q.  At any point in time when you were a
5  member at the UEP, did anyone give the members any
6  training on what you were or were not allowed to
7  discuss with competitors with respect to eggs?
8          MR. ONDECK:  Objection, calls for a legal
9  conclusion, confusing.
10         THE WITNESS:  It was -- the United Egg
11  Producers held itself out as a Capper-Volstead
12  Cooperative.
13  BY MR. ARANOFF:
14     Q.  As you sit here today, do you have an
15  understanding about what the purpose is of the UEP?
16         MR. DAVIS:  This is Evan Davis.  I'll
17  object to the lack of foundation.
18  BY MR. ARANOFF:
19     Q.  You can answer.
20     A.  Okay.  Generally, it is -- it allows for
21  egg production companies to gather and discuss
22  collaboratively the different issues that face us
23  as production companies.
24     Q.  Do you have an understanding of whether
25  the UEP has ever promoted any efforts among its

Page 97

1  members to manage the supply of egg or egg
2  products?
3      A.  As a Capper-Volstead Cooperative, that
4  was one of the things that was discussed.
5      Q.  When you say -- you say as a
6  Capper-Volstead Cooperative.  Have you or anyone at
7  Daybreak ever made any independent inquiry to
8  anyone with respect to the validity of the
9  Capper-Volstead denomination?
10     A.  No.  However, while attending meetings of
11  the UEP, if I can use --
12         MR. DAVIS:  Excuse me one second.  This
13  is Evan Davis.  I just want to say that UEP asserts
14  the attorney/client privilege over any advice that
15  flowed from counsel to UEP to its members,
16  including Daybreak or Mr. Rehm.
17         MR. ONDECK:  And I object and I instruct
18  you not to answer as to the substance of any
19  advice, but you can answer as to whether people
20  were present or advice was given.  But I instruct
21  you not to answer as to the substance of any
22  advice.
23         MR. ARANOFF:  I didn't ask for the
24  substance of any advice.  Let's start with that.
25  And if I could just have the question back.  I just

25  (Pages 94 to 97)

HIGHLY CONFIDENTIAL

Page 98

1 asked if any inquiry was made. So it's a yes or no
2 question.
3       COURT REPORTER: "Have you or anyone at
4 Daybreak ever made any independent inquiry to
5 anyone with respect to the validity of the
6 Capper-Volstead denomination?"
7       MR. ONDECK: Same objection. You can
8 answer subject to my objection.
9       THE WITNESS: As it pertains to United
10 Egg Producers, I assume is what you're referring
11 to?
12 BY MR. ARANOFF:
13      Q. Yes.
14      A. Didn't feel a need to, because while
15 attending several meetings, where we discussed a
16 multitude of issues, our legal -- the United Egg
17 Producer's legal counsel was present.
18      Q. But I'm not asking you with respect to
19 the -- what the UEP thought, I'm asking you with
20 respect to what you thought.
21      A. Because of that, I had reliance that we
22 were a Capper-Volstead Cooperative. And in
23 addition to that, the United Egg Producers asked us
24 to sign specific forms to delineate to make sure
25 that we were farmers and qualified for

Page 99

1 Capper-Volstead.
2       Q. Okay. Let me ask you this. I think you
3 testified earlier that people -- lawyers that have
4 represented you in the past include Mr. Ondeck,
5 who's sitting over here now; correct?
6       A. Yes.
7       Q. Ms. Kantor, who's sitting here today as
8 well?
9       A. Yes.
10      Q. I suppose other people at Mr. Ondeck's
11 firm; is that correct?
12      A. Yes.
13      Q. And then you testified earlier that
14 Mr. Clegg was also your -- has also been an
15 attorney of yours; is that correct?
16      MR. ONDECK: Objection, asked and
17 answered, argumentative.
18 BY MR. ARANOFF:
19      Q. Okay. Is that correct?
20      A. Yes.
21      Q. When you say attorneys for the UEP, who
22 would you be referring to specifically?
23      A. Attorneys from Brant & Isaacson.
24      Q. Okay. Those are not your lawyers, are
25 they?

Page 100

1       MR. ONDECK: Objection, calls for a legal
2 conclusion.
3       THE WITNESS: I believe I said they were
4 attorneys for United Egg Producers.
5 BY MR. ARANOFF:
6       Q. But they're not Daybreak lawyers;
7 correct?
8       MR. ONDECK: Objection, asked and
9 answered.
10      THE WITNESS: I answered that already,
11 sir. You're correct.
12 BY MR. ARANOFF:
13      Q. Okay.
14      MR. ARANOFF: Will you mark this, please?
15      (Exhibit 4 marked for identification.)
16      MR. ONDECK: Can I note for the record
17 that Mr. Rehm did very well on the memory test with
18 no exhibits.
19      MR. ARANOFF: Yes, he did. He's a very
20 nice man.
21      THE WITNESS: Thank you.
22      MR. ARANOFF: I can put that on the
23 record too.
24      THE WITNESS: Thank you very much.
25 BY MR. ARANOFF:

Page 101

1       Q. Mr. Rehm, I'm showing you what's been
2 marked as Rehm Exhibit 4 for purposes of
3 identification. This is a single document marked
4 confidential, bearing the Bates range DAY0023267.
5 Take a moment to take a look at that document, and
6 then I'm going to ask you a question.
7       A. Ron?
8       Q. All set?
9       A. Yeah.
10      Q. Okay. Do you recognize this document,
11 Mr. Rehm?
12      A. No.
13      Q. Do you have any recollection as you sit
14 here today of whether or not you were present at
15 the animal welfare meeting agenda on -- animal
16 welfare meeting, sorry, on January 9, 2003?
17      A. I'm not sure if I was present or not.
18      Q. Okay. If you look at the document,
19 Mr. Rehm, I want to call your attention to item
20 Roman numeral one says, "Comments on status of UEP
21 program and current implementation." Have I read
22 that correctly?
23      A. Yes.
24      Q. Okay. And you'll see there's a
25 subsection A there, and subsection A is Legal and

26 (Pages 98 to 101)

HIGHLY CONFIDENTIAL

Page 102

1  Antitrust Concerns.  Do you see that?
2      A.  Yes.
3      Q.  Okay.  Do you have any idea what legal
4  and antitrust concerns were discussed at this
5  meeting?
6          MR. ONDECK:  Objection.
7          MR. DAVIS:  This is Evan Davis.  I object
8  to the question as asking Mr. Rehm for privileged
9  advice.
10         MR. ARANOFF:  Okay.
11         MR. ONDECK:  All right.  Let me make my
12  objection.  So my objection is -- is the document
13  speaks for itself.  Calls for speculation.  And
14  those are my objections.
15  BY MR. ARANOFF:
16     Q.  Okay.  I'm not going to waste everybody's
17  time trying to refute objections.  If you know what
18  the legal and antitrust concerns are, your personal
19  attorney has not instructed you not to answer, so I
20  would ask that you answer the question.
21     A.  Do not know.
22     Q.  Okay.  If you -- do you recall, Mr. Rehm,
23  whether or not you ever had any discussion
24  subsequent to this meeting about any legal or
25  antitrust concerns on the status of the UEP program

Page 103

1  and the current implementation of it in or about
2  January of 2003?
3          MR. DAVIS:  This is Evan Davis.  I
4  restate my objection.
5          THE WITNESS:  No.
6  BY MR. ARANOFF:
7      Q.  Okay.  If you look at the bottom of the
8  page -- it's actually the middle of the page, but
9  the bottom of agenda, okay?  There's an asterisk.
10     A.  Yeah.
11     Q.  And it says, "Please return your agenda
12  at the end of the meeting."  Do you see that?
13     A.  Yes.
14     Q.  I read that correctly?
15     A.  Yes.
16     Q.  Do you have any understanding as to why
17  that moniker is there?
18     A.  Nope.
19         MR. ONDECK:  Objection, document speaks
20  for itself.  Please let me object.
21         THE WITNESS:  Sorry.
22         MR. DAVIS:  Excuse me, this is Evan
23  Davis.  I also object to a lack of foundation.
24  BY MR. ARANOFF:
25     Q.  Okay.  Mr. Rehm, I'm sorry to interrupt

Page 104

1  you.  I think your mic fell off.
2      A.  Thank you.
3      Q.  You're welcome.  Was it the policy -- to
4  the best of your knowledge, Mr. Rehm, when -- well,
5  withdrawn.  Was it standard policy for -- at UEP
6  meetings for agendas to be circulated?
7      A.  Yes.
8      Q.  Okay.  And were those agendas circulated
9  in advance of the meeting or were they circulated
10  at the meeting?
11     A.  Usually at the meeting.
12     Q.  And was it standard practice for there to
13  be a moniker or legend somewhere on the agenda
14  calling for it to be returned at the end of the
15  meeting?
16     A.  Not that I recall.
17     Q.  Okay.  Do you have an understanding as
18  you sit here today as to why then this particular
19  agenda was asked -- you were asked to return this
20  at the end of the meeting?
21         MR. ONDECK:  Objection, asked and
22  answered.
23         MR. DAVIS:  This is Evan Davis.  I
24  object, lack of foundation.
25         MR. ONDECK:  And objection, asked and

Page 105

1  answered.
2          THE WITNESS:  No.
3  BY MR. ARANOFF:
4      Q.  But this would be something that was not
5  commonplace --
6          MR. ONDECK:  Objection, asked and
7  answered.
8  BY MR. ARANOFF:
9      Q.  -- to the best of your ability -- best of
10  your knowledge, I mean?
11     A.  To my recollection, no.
12     Q.  Okay.
13     A.  Are we done with this?
14     Q.  Yes.  Thank you.
15     (Exhibit 5 marked for identification.)
16  BY MR. ARANOFF:
17     Q.  Okay.  Mr. Rehm, I've handed you what's
18  been marked as Rehm 5 for purposes of
19  identification.  It is a document, multi-page
20  document, bearing Bates numbers DAY0016876, and
21  goes through DAY0016886.  It is a United Voices, I
22  guess, newsletter, for lack of a better word, with
23  Gene Gregory as the editor, dated April 26, 2006.
24  I'd ask you to take a look at it and then look up
25  when you're done.  It's a large document.

27  (Pages 102 to 105)

HIGHLY CONFIDENTIAL

Page 106

```
 1            Just for the preservation of some
 2   time, I will tell you that I plan to just ask you a
 3   couple of questions with respect to the second
 4   paragraph on the first page.  All set?
 5        A.  Yes.
 6        Q.  You've had an --
 7        A.  As it pertains to --
 8        Q.  Right.  I don't want to shortchange you.
 9   If you want to look at any more of the document,
10   you can.  But the pertinent part -- if you need to
11   look at something else, you can let me know.
12        A.  If the questions are in reference to page
13   one, please proceed.
14        Q.  Okay.  Do you recognize this document?
15        A.  I recognize it as a United Voice
16   document, yes.
17        Q.  Just to set the foundation so my
18   colleagues don't yell and scream, let me ask this
19   question.  What is United Voices?
20        A.  It's -- I would refer to it as a
21   newsletter produced by the United Egg Producers.
22        Q.  And are you a recipient of these United
23   Voices newsletters?
24        A.  Yes.
25        Q.  And they come directly to you; is that
```

Page 107

```
 1   right?
 2        A.  Not necessarily.
 3        Q.  Okay.  Let me ask it a better way.  How
 4   often are these produced, to the best of your
 5   knowledge?
 6        A.  I don't --
 7        Q.  Monthly?
 8        A.  I don't know.  I don't know if they come
 9   monthly, semimonthly.
10        Q.  Is it fair to say that you see them and
11   review them?
12        A.  Yes.
13        Q.  Okay.  Now, if you -- if you look at the
14   first page, which is what we had -- where I said I
15   was going to draw your attention, it says -- the
16   topic on the first page is Size of the Layer Flock;
17   do you see that?
18        A.  Yes.
19        Q.  And then there's a second paragraph that
20   says, "Can you produce and market shell eggs
21   profitably at an Urner Barry large quote in the low
22   $0.60 per dozen or less?  Can you produce and
23   profitably market shell eggs as breaking stock at
24   $0.25 per dozen?  If not, then reduce your supply."
25   Do you see that?
```

Page 108

```
 1        A.  Yes.
 2        Q.  Have I read that correctly?
 3        A.  I believe so, yes.
 4        Q.  Do you recall ever having received this
 5   document?
 6        A.  No.
 7        Q.  Do you recall this issue that's raised in
 8   the language that I just read ever come up at a UEP
 9   meeting?
10        A.  They talk -- we talk about these types of
11   issues at variant points in times at the UEP level.
12        Q.  And do you recall -- but do you recall
13   this particular --
14        A.  This particular, no.
15        Q.  Okay.
16        A.  We do not sell our eggs based on Urner
17   Barry quote.  We do not sell shell eggs.  We do not
18   sell breaking stock as the primary course of our
19   business.  Our business model and our pricing model
20   is not predicated on Urner Barry, it's predicated
21   on a base price, with adjustments based on grains
22   from the Chicago Board of Trade.  CBOT, I may refer
23   to it as.  I apologize for talking too fast.
24        Q.  No, that's fine.  Have you completed your
25   answer?
```

Page 109

```
 1        A.  I believe so.
 2        Q.  Okay.  So when you received this, did
 3   you -- is it fair to say that you didn't react to
 4   this at all or think --
 5        A.  I -- I -- I apologize.
 6        Q.  Is it fair to say that upon receiving
 7   this, you didn't react to this at all?  Is that
 8   correct?
 9        MR. ONDECK:  Objection, mischaracterizes
10   prior testimony.  He doesn't remember receiving it.
11        THE WITNESS:  If -- if in fact I did
12   receive this and read this, it did not impact what
13   we did with our production at Daybreak Foods
14   because we are on program, and it's important for
15   us to be consistent and predictable in our
16   production from week to week, month to month,
17   quarter to quarter, year to year, because we have
18   to fill the contracts.  We do not adjust predicated
19   on the market value.
20   BY MR. ARANOFF:
21        Q.  Do you know whether any other UEP members
22   adopted and followed the language that's set forth
23   in this United Voices newsletter?
24        MR. ONDECK:  Objection, lack of
25   foundation.
```

28  (Pages 106 to 109)

HIGHLY CONFIDENTIAL

Page 110

1    THE WITNESS: Sir --
2    MR. ONDECK: Calls for speculation.
3    THE WITNESS: -- I don't know what they
4  do.
5  BY MR. ARANOFF:
6    Q. Well, you may or may not. The question
7  is, have you had any conversations with any of the
8  other UEP members in which this topic was
9  addressed?
10    A. I don't know whether they implemented it
11  or not.
12    Q. Do you recall ever having a discussion
13  along these lines with any of the other UEP
14  members?
15    A. Yeah, that we do not implement any of
16  these changes because of our program basis for
17  producing and selling eggs.
18    Q. Okay. But -- and you've answered that,
19  and I appreciate that. But I'm asking you whether
20  or not any of your fellow UEP members did, to the
21  best of your personal knowledge.
22    MR. ONDECK: Same objection.
23    THE WITNESS: Not -- I'm sorry. Not that
24  I know of.
25  BY MR. ARANOFF:

Page 111

1    Q. Okay.
2    A. Done with this one, sir?
3    Q. Yes.
4    THE VIDEOGRAPHER: We have about ten
5  minutes left on this tape.
6    MR. ARANOFF: Okay. We're going to keep
7  plowing away. I want Bill to get home tonight.
8    THE WITNESS: I don't have far to go.
9    MR. ARANOFF: Both Bills.
10    (Exhibit 6 marked for identification.)
11  BY MR. ARANOFF:
12    Q. Okay, Mr. Rehm, I'm showing you what's
13  been marked as Rehm Exhibit 6 for purposes of
14  identification. Again, it's a United Voices
15  newsletter, Bates range DAY0016849 to DAY0016854.
16  It's a March 16, 2006 newsletter. Take a look at
17  it, if you wouldn't mind. But again, for purposes
18  of trying to save some time, my questions will
19  largely be predicated on paragraphs one, two and
20  three of the document.
21    MR. ONDECK: Objection, this appears to
22  be two documents stapled together.
23    MR. ARANOFF: I don't know if it is or it
24  isn't, but it appears to me to be documents that
25  were provided sequentially. If it's two documents,

Page 112

1  it's two documents. But I think it's -- I'm pretty
2  sure it's one. But okay. Your observation is
3  noted.
4  BY MR. ARANOFF:
5    Q. All set, Mr. Rehm?
6    A. Sure.
7    Q. Okay. Do you recognize this document?
8    A. Same as the last document. It appears to
9  be a United Voice newsletter.
10    Q. And this would be the same kind of
11  newsletter that you -- I believe testified that you
12  received in the ordinary course; is that correct?
13    MR. ONDECK: Objection.
14    THE WITNESS: I'm not sure that's the way
15  I categorized it.
16  BY MR. ARANOFF:
17    Q. Okay. You do get these, though, right,
18  when they're sent out?
19    A. Eventually, yes.
20    Q. Okay. So if you take a look at the first
21  paragraph at the bottom, it says, "The message here
22  is to review your history of customer orders and
23  begin to reduce your supply accordingly. Don't
24  wait too late. Begin to reduce your supply a week
25  or two prior to Easter." Do you recall ever being

Page 113

1  in a UEP meeting in which this discussion took
2  place?
3    MR. ONDECK: Objection, lack of
4  foundation. Complex question.
5    THE WITNESS: I have been in meetings of
6  the United Egg Producers where we have talked about
7  flock management, supply management, because we are
8  a Capper-Volstead Cooperative. Can I specifically
9  tell you I was in a meeting when this specific, at
10  this specific time, where this was discussed? I do
11  not know.
12  BY MR. ARANOFF:
13    Q. Okay. Do you know whether Daybreak took
14  any action to comply with the language that I've
15  just read to you?
16    A. We do not do that. We do not manage our
17  supply predicated on the market. We have long-term
18  contracts that require us to be consistent in our
19  production, so that we produce the same amount of
20  eggs week after week, month after month, quarter
21  after quarter, year after year. So if we were to
22  do this, we would be in trouble of not being able
23  to meet our contractual obligations.
24    Q. Okay. If you look at the last sentence
25  of the third paragraph, it says, "At least one

29  (Pages 110 to 113)

HIGHLY CONFIDENTIAL

Page 114

1    company dedicated to breaking is taking notice and
2    has notified UEP that they are reducing hen numbers
3    in all houses by ten percent from their 1.6 million
4    layers." Do you see that?
5        A. Yes.
6        Q. Do you have an understanding as to which
7    company is being referenced in that -- in that
8    language that I just read to you?
9        A. No.
10       Q. Is that Daybreak?
11       A. No.
12       Q. Okay.
13           THE VIDEOGRAPHER: We have under five
14   minutes.
15           MR. ARANOFF: We might as well go off
16   before we start another document. All right, off
17   the record for a tape change.
18           THE VIDEOGRAPHER: This will conclude
19   disc one. We're off the record at 11:30 a.m.
20           (Break taken.)
21           THE VIDEOGRAPHER: We're back on the
22   record, the beginning of disc two of the deposition
23   of William Rehm. Today's date, July 10, 2013. The
24   time is 11:37 a.m.
25   BY MR. ARANOFF:

Page 115

1        Q. All right. Welcome back. Mr. Rehm, I'm
2    going to show you what's been marked as Rehm
3    Exhibit 7 for purposes of identification. Ask you
4    to take a look at it and then I will ask you some
5    questions. Again, this document is listed as
6    confidential. It bears Bates number UE0308772 and
7    continues through you UE0308776.
8            I'd ask you to take a look at it.
9    Particular emphasis will be the members and staff
10   and guests on the first page, as well as page
11   number four, which covers industry economics. All
12   set? Nope. Okay?
13       A. I'm sorry, you referenced what page with
14   regard to economics? Oh, industry. I apologize.
15       Q. Page -- no, don't apologize. Page four.
16       A. Yep, I got it.
17       Q. All set?
18       A. Yes.
19       Q. Okay. So you see that this is a UEP
20   board of directors' set of minutes from
21   January 14th through January 15th of 2002 in
22   Atlanta, Georgia. Do you recognize this document?
23       A. I recognize it as minutes of those
24   meetings.
25       Q. Do you have a recollection of whether or

Page 116

1    not you were at this meeting?
2        A. It says that I was there. Whether I was
3    there for the meeting in its entirety, I don't
4    know.
5        Q. You have no reason to doubt the fact that
6    it lists you as a member and that you were present
7    and attended this meeting; right?
8            MR. ONDECK: Objection.
9            THE WITNESS: I think I answered that.
10   It says I was there. I probably was there, but it
11   doesn't mean I was there for the meeting in its
12   entirety.
13   BY MR. ARANOFF:
14       Q. But you were certainly there at some
15   point of the meeting; correct?
16       A. Correct.
17       Q. Now, it also lists staff and guests; do
18   you see that?
19       A. Yes.
20       Q. Okay. And I want to ask you whether you
21   know -- do you know a gentleman by the name of
22   Terry Profitt?
23       A. Yes, I do.
24       Q. Who's Terry Profitt?
25       A. Terry Profitt is a hunting buddy of mine.

Page 117

1        Q. Okay. Do you have any professional
2    relationship with Mr. Profitt?
3        A. Mr. Profitt works for Cargill Kitchen
4    Solutions.
5        Q. Okay. Do you know whether Cargill
6    Kitchen Solutions was a member of the UEP?
7        A. They are not.
8        Q. Do you know -- let me ask this. Was
9    Mr. Profitt, prior to Cargill's acquisition of
10   Sunny Fresh, was Mr. Profitt a principal or
11   employee of Sunny Fresh?
12       A. No.
13       Q. Okay. Is Cargill in the business of egg
14   production?
15           MR. ONDECK: Objection.
16           THE WITNESS: During the timeframe of
17   this litigation, no.
18   BY MR. ARANOFF:
19       Q. Okay. Are they now?
20       A. No.
21       Q. Now, if you turn to page four, there's a
22   topic called Industry Economics; correct? Do you
23   see that?
24       A. Yes.
25       Q. It says, "Marketing committee chairman

30  (Pages 114 to 117)

HIGHLY CONFIDENTIAL

Page 118

1  Dolph Baker presented the latest USDA statistics of
2  hatch flock disposal and hen inventory. He pointed
3  out that after having exported 252 loads during the
4  period September - November, and USDA reporting
5  only 3.8 million more hens on December 1, 2001 than
6  on the same date of 2000, either we have a price
7  discovery problem or a statistical problem when
8  considering that Urner Barry's December large quote
9  in the northeast was 27.8 cents per dozen below the
10  same month of the previous year." Did I read that
11  correctly?
12      A. I believe so.
13      Q. Okay. Next paragraph says, "Baker also
14  announced that we have a crisis and that a crisis
15  management plan had been communicated to the
16  members, calling for early molt and early hen
17  disposal. The current egg prices indicated that
18  this plan was working." Do you see that?
19      A. Yes.
20      Q. Did I read that correctly?
21      A. I believe so.
22      Q. Okay. Do you have any recollection as
23  you sit here today of this discussion having taken
24  place at the UEP meeting in Atlanta, Georgia on
25  January 14th and 15, 2002?

Page 119

1          MR. ONDECK: Objection, lack of
2  foundation. Document speaks for itself. You can
3  answer.
4          THE WITNESS: I've been at meetings where
5  these types of things have been discussed. Was I
6  at this specific meeting and in the meeting at the
7  time this was discussed? I don't know.
8  BY MR. ARANOFF:
9      Q. Do you have an understanding as you sit
10  here today as to what was meant by Mr. Baker when
11  he said the current egg prices indicated that this
12  plan was working?
13          MR. ONDECK: Same objection.
14          THE WITNESS: Don't know. We are not
15  part of the United Egg Producers' certified
16  program. We have never followed any of the United
17  Egg Producers' requests for early molting, chick
18  reduction, or flock reduction. So what do they
19  mean by this? I don't know, because we do not sell
20  our eggs on the open market, Urner Barry. We sell
21  on a program basis based on the long-term
22  contracts. So what specifically they were
23  intending, I'm not Mr. Baker, so I don't know.
24  BY MR. ARANOFF:
25      Q. Okay. Well are the -- well, let me

Page 120

1  withdraw that. Are the UEP board of directors'
2  minutes circulated after they're written? Did you
3  get a copy of them in the ordinary course?
4      A. Not until the next meeting.
5      Q. Okay. And are you the person that
6  attends these meetings and would receive these
7  minutes?
8      A. Only as the member of Daybreak that
9  actually is on the board of directors.
10      Q. And do you read them when you get them?
11      A. Usually not.
12      Q. Okay. Does anybody at the company read
13  them?
14      A. No.
15      Q. Okay. If there was something in the
16  minutes that you had a problem with, would you have
17  voiced any opposition to it?
18      A. I don't normally read them.
19      Q. And nobody at the company reads them?
20      A. They're not on the board.
21      Q. I didn't ask you that. I said does
22  anybody at the company monitor the minutes of the
23  UEP meetings?
24      A. They're not on the board, sir, so they
25  would have no reason to read the minutes of the

Page 121

1  board.
2      Q. Do you have a file in your office
3  someplace that keeps all of the meeting minutes
4  from the UEP's meetings?
5      A. No.
6      Q. So they're -- what do you do with the
7  meeting minutes after they're distributed to you?
8      A. I really don't know, sir.
9      Q. You don't know what you do with the
10  minutes?
11      A. No, because they're part of a large
12  packet of material. And usually I dispose of them
13  after the meeting.
14      Q. Have you -- have you attended any UEP
15  board meetings since the inception of this lawsuit?
16      A. Yes.
17      Q. And were there meeting minutes that were
18  generated as a result of any of those meetings?
19      A. Yes.
20      Q. And you received the meeting minutes at
21  the next -- at the next meeting in the ordinary
22  course, as you just said?
23      A. Yes.
24      Q. And did you preserve those meeting
25  minutes or did you discard those too?

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL

Page 122

1     A.  No, they're somewhere in my files.  I
2  don't know where.
3     Q.  But anything prior to this lawsuit you
4  threw in the garbage?
5     A.  Yeah.  I don't -- didn't hang on to them.
6     Q.  Do you know -- and just to be clear, you
7  don't know what was meant when Mr. Baker said the
8  current egg prices indicated that this plan was
9  working?  You don't know what plan he's referring
10  to?
11     A.  No.
12     Q.  And just so that the record's clear, as
13  of the date of this meeting, to the best of your
14  knowledge, Cargill was not in the business of egg
15  production; is that correct?
16     A.  Cargill was in egg production until 1988,
17  when they sold their facility to Cal-Maine.
18     Q.  But they haven't been -- sorry.
19     A.  To the best of my knowledge -- to the
20  best of my knowledge, Mr. Profitt worked for
21  Cargill in other capacities.
22     Q.  Okay.
23     (Exhibit 8 marked for identification.)
24  BY MR. ARANOFF:
25     Q.  Mr. Rehm, I've put in front of you what's

Page 123

1  been marked as Rehm 8 for purposes of
2  identification.  It's a two-page document that's
3  not Bates numbered.  It is dated July -- it's
4  updated as of July 7, 2009.  It bears a date of
5  either February 12, 2007 or December 2, 2007.  It's
6  unclear.  But one way or the other.
7          And it is an article by Edward Clark,
8  editor, titled Industry Executives Are Optimistic
9  This Will Be a Profitable Year Because Companies
10  Are Streamlining Layer Numbers to Compensate For
11  Corn Prices.
12          I ask that you take a look at it and
13  then I'd like to ask you some questions when you're
14  ready.  Just to try to make it a little easier --
15     A.  Go ahead.
16     Q.  -- you can take your time, obviously.
17  I'm going to be asking you questions pertaining to
18  the quotes that are attributable to you, in large
19  part.  All set?
20     A.  Yes.
21     Q.  Okay.  You recognize this document,
22  Mr. Rehm?
23     A.  I don't recognize it as this document,
24  no.
25     Q.  Okay.

Page 124

1     A.  It may have been an article in the egg
2  industry, I'm not sure.
3     Q.  Do you know who Edward Clark is?
4     A.  No.
5     Q.  Do you ever have any recollection of
6  having sat and done -- or spoken with Mr. Clark at
7  all?
8     A.  I don't recall.  I know I never sat down
9  with him.
10     Q.  Is it the kind of thing you might have
11  discussed with him over the telephone?
12     A.  It's possible.  If it was him, I'm not
13  sure.
14     Q.  Okay.  Does Daybreak -- is Daybreak a
15  member of the -- well, withdrawn.  Do you know what
16  the USEM is?
17     A.  Yes.
18     Q.  What is the USEM?
19     A.  United States Egg Marketing, I believe.
20  We are not a member.
21     Q.  Has Daybreak Foods ever exported any of
22  its product outside of the United States?
23     A.  Yes.  We -- for a period of time we had a
24  customer in Canada that we sold eggs from Minnesota
25  to Canada on a regular basis.

Page 125

1     Q.  And that would -- again, when we talk
2  about the egg product that -- that Daybreak sold,
3  we're talking about raw, unpasteurized egg;
4  correct?
5     A.  Raw, unpasteurized, liquid egg.
6     Q.  And you were not a member of the USEM; is
7  that correct?
8     A.  That's correct.
9     Q.  And through whom did you do those
10  experts?
11     A.  They were a direct customer of Daybreak
12  Foods.
13     Q.  And when you say that they were a direct
14  customer, did you transport those goods
15  from -- those raw, unpasteurized eggs yourself, did
16  you contract somebody else to do it, did the
17  customer in Canada come and pick it up themselves?
18     A.  Any one of them.
19     Q.  And just so we're clear, who is this
20  customer in Canada?  Name.
21     A.  Give me a second to think of it.
22     Q.  Sure.  Absolutely.
23     A.  I can't think of the name.
24     MR. ONDECK:  Can I assist?  Is it
25  Innovatech?

HIGHLY CONFIDENTIAL

Page 126

1  THE WITNESS: Thank you. Yes.
2  BY MR. ARANOFF:
3  Q. Well, assist to Mr. Ondeck. Thank you.
4  And the name again is?
5  A. Canadian Innovatech, I believe is the
6  name.
7  Q. Do you know whether any other UEP members
8  also exported to Innovatech, Canada?
9  A. Do not.
10  Q. You do not?
11  A. I do not know.
12  Q. And this was just an individual export
13  that you did on your own?
14  A. It was an individual transaction that we
15  did on a regular basis.
16  Q. I'm sorry, do you still export to
17  Invatech, Canada?
18  A. Innovatech.
19  Q. Innovatech. Sorry.
20  A. We do not.
21  Q. From when to when were you exporting to
22  Nova tech?
23  A. I don't know when it started, and I'm not
24  sure when it ended, but we sold eggs to them for
25  quite a few years from our Minnesota operation.

Page 127

1  Q. But that wasn't through any kind of
2  cooperative; correct?
3  A. No, it was just -- they were a direct
4  customer of ours, and they needed -- they desired
5  raw, liquid, unpasteurized product for their
6  further processing activities. And we sold -- sold
7  to them over a period of time.
8  Q. Have you ever utilized the efforts of an
9  egg -- do you know -- withdrawn. Do you know what
10  an egg broker is?
11  A. Yes.
12  Q. I couldn't hear you.
13  A. Yes.
14  Q. What is an egg broker?
15  A. He is a person that helps put buyers and
16  sellers together. A person that wants to buy or
17  somebody wanting to sell, he helps find a home or
18  helps find a procurement of eggs.
19  Q. Have you ever utilized the services of an
20  eggs broker to export eggs?
21  A. No.
22  Q. Do you know a gentleman by the name of, I
23  don't know if it's pronounced Jergen or Yergen,
24  Fuchs, F-U-C-K -- F-U-C-H-S?
25  A. I know -- Yergen Fuchs. I know of him.

Page 128

1  Don't know -- I've never -- I don't have any
2  personal relationship with him.
3  Q. Do you have any professional relationship
4  with Mr. --
5  A. Or professional, no.
6  Q. But you've never -- just so that the
7  record's clear, you haven't done any exports
8  through Mr. Fuchs?
9  A. Correct.
10  Q. How did you come to -- to develop a
11  business relationship with Invatech, if I'm
12  pronouncing that right?
13  A. So let's be -- Innovatech.
14  Q. Innovatech. Sorry.
15  A. You know, I really don't know. I don't
16  know how we developed that relationship.
17  Q. What is the name of the person with whom
18  you deal at Innovatech?
19  A. They are not a customer of ours today.
20  Q. Okay. Who was the person that you dealt
21  with at Innovatech?
22  A. Hugh Weeb.
23  Q. H-U-G-H, first name; last name W-E-E-B?
24  A. I'm not sure.
25  Q. Is that --

Page 129

1  A. Sounds good to me.
2  Q. Is that at least phonetically correct?
3  A. Sounds good to me.
4  Q. Okay. Just turning to the -- to the
5  article that I put in front of you, which has been
6  marked as exhibit -- as Rehm Exhibit 8, if you look
7  at the second to last paragraph on the first page,
8  there's a quote that I believe is attributed to
9  you. There's -- there's a presentence and then a
10  quote.
11  The nonquoted portion says, "In late
12  January, the Urner Barry price in the Midwest was
13  $1.21/dozen for shell eggs, within $0.15 of
14  all-time highs." The following sentence, which is
15  a quote attributed to you, says, "I tend to think
16  the customers will buy eggs, whether the price per
17  dozen is $0.70 or $1.70." Then there's a dash, it
18  says Bill Rehm, Daybreak Foods. Do you see that?
19  A. Yep.
20  Q. Did I read all that correctly?
21  A. Pretty close.
22  Q. What --
23  A. It's Rehm.
24  Q. I apologize.
25  A. I don't mean to be picky.

33  (Pages 126 to 129)

HIGHLY CONFIDENTIAL

Page 130

1    Q.  No, I'm not.  It's me, not you.  Is that
2  a quote that you remember giving?
3    A.  Yes.
4    Q.  And do you stand by that quote today?
5    A.  Yes.  I believe that the consuming public
6  of retail shell eggs is an -- that's an inelastic
7  market.
8    Q.  I think you were in the middle of a
9  sentence.
10    A.  I think I finished it.
11    Q.  Okay.  It's an inelastic market.  And for
12  the record, can you explain or can you define what
13  you mean by an inelastic market?
14    A.  That when the consumer goes to the retail
15  grocery store to purchase eggs, I think milk falls
16  into that category as well, for the most part
17  they're going to buy that product whether it's
18  $0.70 or $1.70 because they want that product.
19    Q.  And is that -- that's your opinion;
20  correct?
21    A.  That's my opinion.
22    Q.  Okay.  And is that opinion -- has that
23  opinion been consistent over a period of time?  In
24  other words, your opinion over that hasn't changed
25  at all over time, does it?

Page 131

1    A.  I mean, we do not sell product into that
2  market, but that's my opinion of the retail shell
3  egg market.
4    Q.  Okay.  And then if you'll look at the
5  preceding paragraph, preceding sentence to your
6  quote, it references Urner Barry; right?  Do you
7  see that?
8    A.  Yeah.  In the sentence, "In late January
9  the Urner Barry?"
10    Q.  Yes.  Do you have an understanding of
11  what Urner Barry is?
12    A.  They're a market quoter.
13    Q.  And I think you testified earlier -- and
14  you or Mr. Ondeck will correct me if I'm wrong --
15  but I think you testified earlier that you don't
16  base your pricing, meaning Daybreak's pricing for
17  product, on the basis of Urner Barry; is that
18  correct?
19    A.  That's correct.
20    MR. ONDECK:  Objection.
21  BY MR. ARANOFF:
22    Q.  Okay.  Yours are based on long-term
23  contracts and cost-plus contracts; correct?
24    A.  Not cost-plus.  Base price contracts.
25    Q.  Base price contracts.  Would you agree

Page 132

1  that since the demand for eggs is inelastic, as you
2  just said, that that means that a price will only
3  modestly change depending upon the quantity of
4  demand or supply?
5    MR. ONDECK:  Objection.  Please let me
6  object.
7    THE WITNESS:  Thank you.
8    MR. ONDECK:  Calls for speculation,
9  confusing, lack of foundation.  You can answer.
10    THE WITNESS:  That is not what I said.
11  BY MR. ARANOFF:
12    Q.  Okay.
13    A.  I said the retail shell egg market, I
14  believe, is inelastic.
15    Q.  Do you believe that the liquid egg market
16  is inelastic?
17    A.  No.
18    Q.  Why is that?
19    A.  Because in some instances, I believe that
20  the products that are produced with our raw,
21  liquid, unpasteurized product is an ingredient in
22  somebody else's -- somebody else's manufacturing
23  product, and at times may get too high in price and
24  price itself out of consumption.
25    Q.  Would you agree with me that the quote

Page 133

1  attributed to you on page one doesn't -- does not
2  make a distinction between shell eggs and liquid
3  eggs?  It simply says "will buy eggs."  Do you see
4  that?
5    MR. ONDECK:  Objection.  I'm sorry for
6  cutting you off.  Objection, the document speaks
7  for itself, mischaracterizes the document and prior
8  testimony.
9  BY MR. ARANOFF:
10    Q.  Okay.
11    A.  No.  Because when we talk about that
12  Urner Barry price, it is reflective of the Urner
13  Barry shell egg market price.
14    Q.  Right.  But you don't base on Urner
15  Barry.
16    A.  No, I --
17    Q.  That's what you said before; right?
18    A.  That's right.
19    Q.  You said you don't base it on Urner
20  Barry.  So this quote appears, at least to me, to
21  be separate from the prior sentence; right?
22    A.  Wrong.
23    Q.  Okay.  You say wrong.  Okay.  Okay
24  turning to the second page of the document, under
25  Reduced Flock Size there's another quote, I believe

34  (Pages 130 to 133)

HIGHLY CONFIDENTIAL

Page 134

1  it's attributable to you. "Bill Rehm, president of
2  Daybreak Foods, Lake Mills, Wisconsin, notes that
3  there has been a fairly significant reduction in
4  the nation's flock size. 286 million birds
5  projected for 2007, versus 290 million in 2006.
6  'We are profitable now, but whether the reduction
7  keeps prices higher remains to be seen', he says."
8  Do you see that quote?
9      A. Yes.
10     Q. Do you see that paragraph?
11     A. Yep.
12     Q. Have I read that correctly?
13     A. Yes.
14     Q. Is that a quote that you remember giving?
15     A. Yes.
16     Q. Can you explain what you mean -- what you
17  meant by that quote?
18     MR. ONDECK: Objection, document speaks
19  for itself.
20     MR. ARANOFF: Well, it's a quote, so he
21  can tell us what he meant. It's a quote
22  attributable to him.
23     THE WITNESS: Well, it's easy to
24  understand that the inventory dropped four million
25  hens. I know what our cost -- I know what it

Page 135

1  typically costs to produce a dozen eggs. I know
2  what the Urner Barry is at different points in
3  time. I know whether that means it's profitable to
4  the industry or not. And I just -- at that point
5  you understand what I'm saying.
6      I know whether the industry that is
7  -- the bulk of the industry sells their eggs
8  predicated on Urner Barry quote. And I know what
9  our -- I know what typically it costs to produce a
10  dozen eggs, I know where that quote is, I know
11  whether -- typically whether that means is it
12  profitable or not.
13     And so when the market dropped,
14  when the number of birds dropped four million hens
15  in that period of time, I knew it meant that the
16  supply for the market was going to be less than it
17  was the previous year and would continue to be
18  profitable for those that sell their eggs on the
19  market. That is not us.
20     Q. Why are you monitoring the Urner Barry
21  pricing if you don't base your pricing on Urner
22  Barry?
23     MR. ONDECK: Objection, mischaracterizes
24  prior testimony.
25     THE WITNESS: I do not monitor it every

Page 136

1  day. I don't monitor it every week. I just
2  randomly keep an eye on what it is doing just to
3  have an understanding of what it is.
4  BY MR. ARANOFF:
5      Q. Why?
6      A. Why do you buy gas for your car?
7      Q. Because you need it to drive.
8      A. Because --
9      Q. Because you need to drive your car.
10     A. Not always.
11     Q. Right? If you're not basing your pricing
12  on Urner Barry, I'm curious as to why you're
13  monitoring the Urner Barry pricing at all.
14     A. Just to keep an eye on it. To understand
15  what it is. Just to understand what it is. Like
16  watching the baseball statistics of other teams
17  that you don't follow. You just -- what's the ERA
18  of -- of that pitcher. I don't know. You follow
19  it just to keep an eye on it.
20     Q. All right.
21     A. Doesn't mean you're a huge baseball fan.
22     Q. Okay. Now, it talks in here about there
23  has been a fairly significant reduction in the
24  nation's flock size, and then it gives some numbers
25  on that. Do you see that?

Page 137

1      A. Reduction in flock size, yes.
2      Q. Has Daybreak ever done anything at any of
3  its facilities to reduce its flock size?
4      A. We have eliminated contract production at
5  different times, predicated on the age of that
6  contract farm. But we have never reduced birds
7  because of market conditions. Again, I'll
8  reiterate my previous testimony. The bulk of our
9  eggs are sold on a long-term contract, so we need
10  and require consistent and predictable production
11  to meet our contracts. So no, we do not early
12  molt; no, we do not reduce our flock size; no, we
13  do not reduce our chick hatch. We need to be
14  consistent --
15     Q. Do you do any reduction, through any of
16  the means that you've just named, for purposes of
17  animal welfare transition? In other words, to
18  comply with new animal welfare guidelines.
19     A. Would you repeat my answer? I just want
20  to make sure I remember every one of them I said.
21     Q. Well, I just need the various forms
22  that --
23     A. Yeah.
24     Q. I think you mentioned backfilling, flock
25  reduction --

35 (Pages 134 to 137)

HIGHLY CONFIDENTIAL

Page 138

1      A.  No, I don't think I talked about
2    backfilling.  I think I talked about flock
3    reduction, chick hatch reduction, early molting.
4      Q.  For any of those then -- I'll make it a
5    little bit easier for you and the court reporter.
6    For any of those, have you done any reductions or
7    engaged in any reductions for purposes of animal
8    welfare transitions?
9          MR. ONDECK:  Objection to the definition
10   of "those."  I don't understand what -- what -- I'm
11   confused on the "those."
12         THE WITNESS:  If you're referring to
13   "those" as chick hatch reduction --
14   BY MR. ARANOFF:
15     Q.  Yes.
16     A.  Early molting --
17     Q.  Yes.
18     A.  And I don't remember the third one.
19         MR. ARANOFF:  We'll get it from the court
20   reporter.
21         COURT REPORTER:  Flock reduction, chick
22   hatch reduction, early molting.
23         THE WITNESS:  We, at the request of our
24   customers, follow their egg production processing
25   protocol.  So if their protocol asks for a

Page 139

1    different density level, as we restock those
2    houses, we adjust the number of hens that we buy to
3    comply with our customer's request.
4    BY MR. ARANOFF:
5      Q.  Okay.  If you continue on in the
6    paragraph, again, we're on page two, middle of the
7    page -- actually, directly the middle of the page,
8    second paragraph, under Reduced Flock Size -- you
9    see where I'm reading?  Okay.
10         It says, "Rehm adds that there is a
11   significant increase in demand for liquid eggs.
12   The key reason why, he says, is the 'huge
13   discrepancy' in prices for table eggs versus
14   breakers.  In late January, table eggs were priced
15   at $1.27, while eggs sold for breakers were not
16   even half that, $0.51.  As a result, 'anyone with
17   the ability to put eggs into a carton was doing
18   so', he says."  Do you see that?
19     A.  Yes.
20     Q.  Did I read that correctly?
21     A.  Yes.
22     Q.  Okay.  Do you have an understanding as
23   you sit here now as to why there was, at this time,
24   a significant increase in demand for liquid eggs?
25         MR. ONDECK:  Objection, document speaks

Page 140

1    for itself.
2    BY MR. ARANOFF:
3      Q.  You can answer.
4      A.  As the document says, there are breakers
5    that are not the same as Daybreak.  They buy
6    breaking stock, take it into their plant to produce
7    raw liquid egg.  We -- in those breakers, then I
8    found it difficult to buy enough eggs to take care
9    of their needs.  We -- I assume what I mean by that
10   is we were fielding numerous calls for raw liquid
11   product.
12         However, does it -- because of our
13   relationships with our customers and being
14   long-term and contractual, we couldn't fill it
15   because their requirements are very specific on
16   what we do and the quality of the product.  And
17   they're not the same type of product.
18     Q.  If you look at the next paragraph, it
19   says, "The widening of the price differential, he
20   says, is due to the United Egg Producers' animal
21   welfare program that most shell egg producers
22   participate in."  Do you see that?
23     A.  Yes.
24     Q.  I read that correctly?
25     A.  Yes.

Page 141

1      Q.  What did you mean when you said "the
2    widening price differential was due to the UEP
3    animal welfare program"?
4          MR. ONDECK:  Objection, document speaks
5    for itself.
6          THE WITNESS:  As shell egg producers were
7    participating in the phase-in of the program, it
8    had an initial impact of reducing the supply while
9    producers were trying to develop a strategy to keep
10   their supply consistent.  Then, consequently, it
11   drove the price of shell eggs up while not having
12   an impact on -- as much of an impact on the liquid
13   market pricing.
14         MR. ONDECK:  Object to that answer.  Move
15   to strike.
16   BY MR. ARANOFF:
17     Q.  Okay.  Okay.  Then if you look at the
18   impact on demand, which is the last paragraph of
19   the article -- you see where I am, Mr. Rehm?
20     A.  Uh-huh.
21     Q.  There's a quote, again attributable to
22   you.  It says, "I tend to think that consumers will
23   buy eggs whether the price per dozen is $0.70 or
24   $1.70,' Rehm says.  He adds that eggs are like
25   milk, products with inelastic demand, that is,

36  (Pages 138 to 141)

HIGHLY CONFIDENTIAL

Page 142

1  unrelated to price.  It's different with T-bone
2  steaks, he says.  'When consumers see high prices
3  on T-bones, they say, 'maybe I'll do something
4  different tonight.'"  Do you see that?
5      A.  Yes.
6      Q.  Did I read that correctly?
7      A.  Yes.
8      Q.  You agree with that?
9      A.  Again, for the retail shell egg market,
10  as I stated earlier in my testimony, I believe it
11  is an inelastic market but not a market that we are
12  in.  And I stand by that, yes.
13      Q.  But you don't -- you would agree with me,
14  would you not, that there's no differentiation in
15  anything that you said in this paragraph that
16  differentiates between shell eggs and egg products
17  or raw and unpasteurized eggs?  You don't see any
18  differentiation of that in there, do you?
19      MR. ONDECK:  Couple of objections.
20  Complex question, mischaracterizes prior testimony.
21      THE WITNESS:  I do not agree with you.
22  BY MR. ARANOFF:
23      Q.  Okay.
24      A.  I don't agree because it says that the
25  consumers will buy eggs.  So that's talking about

Page 143

1  the retail shell egg market.  So there is a
2  significant differentiation between what the
3  consumer buys at the retail shell egg market and
4  what we produce, which is unpasteurized, raw liquid
5  egg, which further processors use to pasteurize and
6  do their processes with.
7      MR. ARANOFF:  I am going to take a
8  five-minute break.
9      THE VIDEOGRAPHER:  We're going off the
10  record at 12:15 p.m.
11      (Break taken.)
12      THE VIDEOGRAPHER:  We're back on the
13  record.  The time 12:29 p.m.
14      (Exhibit 9 marked for identification.)
15  BY MR. ARANOFF:
16      Q.  Okay.  Mr. Rehm, I'm going to show you
17  what has been marked as Rehm Exhibit 9 for purposes
18  of identification.  It is a letter to you from
19  Sunny Fresh, and contains a few other pages
20  attached to it.  It is from Harry McNamee and
21  Warren Johnson.  The Bates range of the document
22  are DAY0013631 through DAY0013636.  Documents
23  labeled highly confidential and is dated August 23,
24  2000.  I'll show it to you.  Take a look at it.
25  I'm primarily interested with the first two pages.

Page 144

1      A.  Yes, sir.
2      Q.  Okay.  All set?
3      A.  I believe so.
4      Q.  Just so that we have some context, I know
5  we discussed this a little earlier today, so just
6  bear with me a second.  Do you recognize this
7  document at all, Mr. Rehm?
8      A.  I don't remember the document, no, but, I
9  mean, it speaks for itself.  But do I remember
10  receiving this document?  No.  But that's okay.
11      Q.  Okay.  And just for purposes of context,
12  you are familiar with Sunny Fresh; right?
13      A.  Correct.
14      Q.  Who is Sunny Fresh?
15      A.  They are a wholly-owned subsidiary of
16  Cargill, and now referred to as Cargill Kitchen
17  Solutions.
18      Q.  And just so that the record's clear, what
19  is the business of Sunny Fresh?  What do they do?
20      A.  Can you give me just a second?
21      MR. ONDECK:  We have a tangled mic.
22      MR. ARANOFF:  That's no problem.  Take
23  your time.
24      THE WITNESS:  Thank you, Ron.  Would you
25  repeat your question?

Page 145

1  BY MR. ARANOFF:
2      Q.  Sure.  Yeah.  What kind of business, a
3  brief description, generally, of what Sunny Fresh
4  does.  You just said that they're a wholly-owned
5  subsidiary of Cargill.  But if you could tell me
6  what they do?
7      A.  Yeah.  And now referred to as Cargill
8  Kitchen Solutions.  They were an egg further
9  processor that -- they're an egg further processor.
10      Q.  What specifically do they do in terms of
11  the processing?
12      A.  To the best of my knowledge, they
13  pasteurize, cook, package.
14      Q.  Okay.  And just again, so that we're
15  clear, what is -- what's the nature of the
16  relationship between Daybreak and Sunny Fresh,
17  which is Cargill Kitchen?
18      A.  Daybreak is a supplier; Cargill Kitchen
19  Solutions, Sunny Fresh foods, is one of our
20  customers.
21      Q.  And it's one of your three main
22  customers, I think you testified to that earlier;
23  correct?
24      A.  Yes, yes.
25      Q.  And again, we may have touched on this a

HIGHLY CONFIDENTIAL

Page 146

1  bit earlier, but I'm doing this more for context.
2  Did Sunny Fresh and/or Cargill Kitchen have their
3  own animal welfare guidelines that they wanted you
4  to adhere to in order to sell to them?
5      A.  At this time?
6      Q.  Yes.
7      A.  No.
8      Q.  Okay.  And did that -- at some point in
9  time did that change?
10     A.  Yes.
11     Q.  Do you have a recollection as to when
12 that was?
13     A.  No.
14     Q.  Is it true then that at this point in
15 time, today, there are various guidelines, animal
16 welfare guidelines, that if you want to sell to
17 Sunny Fresh Farms, you need to adhere to?
18     A.  If I want to sell on a long-term basis to
19 Sunny Fresh Foods, Cargill Kitchen Solutions, there
20 are specific guidelines that you would need to
21 follow to sell them on a long-term basis, yes.
22     Q.  I think I said "farms" again --
23     A.  That's why I just --
24     Q.  -- I meant "foods."  Okay.  You said that
25 on a long-term basis.  Does that differ from if you

Page 147

1  wanted to sell to Sunny Fresh or Cargill Kitchen on
2  a short-term basis, they would have a different set
3  of guidelines?
4      A.  On a spot basis, I believe Cargill
5  Kitchen Solutions goes to the market and procures
6  raw liquid whole egg.  I don't know what those
7  standards would be, if they have a specific
8  standard.
9      Q.  Give me a sense, if you wouldn't mind,
10 and if you know, as to what -- the type of volume
11 of business you do with Cargill Kitchen Solutions,
12 a/k/a Sunny Fresh Foods?
13     A.  Today, Cargill Kitchen Solutions is
14 roughly 70 percent of our volume.
15     Q.  And what is your total volume, roughly?
16     A.  Today, 250, 270 million dozen eggs.
17 Those are approximations.  I'm somewhat guessing
18 the exact number.
19     Q.  And what percentage is Michael Foods?
20     A.  I've not computed that in my head.
21 They'd be our second largest customer.
22     Q.  And then I guess Deb-El would be your
23 third?
24     MR. ONDECK:  We just note for the record
25 this is highly confidential information.

Page 148

1  BY MR. ARANOFF:
2      Q.  And do you have a sense of your gross
3  revenues per year from sales?  Do you have that
4  information?
5      A.  For what year?
6      Q.  Let's take your most recent year, 2012.
7  Has that been computed?
8      A.  Our fiscal year ends September, so yes,
9  our September year was done.  I don't know the
10 exact number, but I think on a consolidated basis
11 we're in the area of $270 million to $300 million
12 in revenue, gross revenue.
13     Q.  And has that grown exponentially over the
14 years, or is that an average?  Or where would 270
15 million to 300 million come in the history of
16 Daybreak and its enterprises?
17     MR. ONDECK:  Objection, complex question.
18     THE WITNESS:  Well, in simple terms, in
19 2000 we had three million; today we have
20 twelve-and-a-half million.  The revenue needs to
21 grow in proportion to the eggs, the number of hens,
22 that we have.  So we are at the highest -- higher
23 end of what we've ever been, yes.  We just -- we
24 just obtained a plateau in July of '12 of adding
25 some birds to our flock.

Page 149

1  BY MR. ARANOFF:
2      Q.  Okay.  And was Sunny Fresh, to the best
3  of your knowledge, ever a member of the UEP?
4      A.  No, they were not, and never participated
5  in -- in votes at the UEP.
6      Q.  Were they ever on any committees?
7      A.  No.
8      Q.  What about Cargill, same answer?
9      A.  Yes.
10     Q.  But they attended meetings; right?
11     A.  As participants -- I should
12 recharacterize that.  Not as -- as observers, not
13 as participants, and never participated in any
14 votes of the UEP, as did -- as any observer never
15 participated in any votes at the UEP.
16     Q.  Okay.  If you take a look -- withdrawn.
17 Do you know whether either Sunny Fresh or Cargill
18 Kitchen Solutions had any interaction at all with
19 the UEP scientific committee?
20     MR. DAVIS:  Object.  This is Evan Davis.
21 Lack of foundation.
22     THE WITNESS:  I'm not sure that they had
23 interaction with the entire scientific committee of
24 the UEP, but I believe they had interaction with
25 some members of that committee.

38  (Pages 146 to 149)

HIGHLY CONFIDENTIAL

Page 150

BY MR. ARANOFF:
2    Q.  Do you have an understanding as you sit
3    here today as to why they would be interacting with
4    the UEP scientific committee?
5        MR. DAVIS:  This is Evan Davis.  Same
6    objection.
7        MR. ONDECK:  Objection, assumes fact not
8    in evidence.
9        THE WITNESS:  I think that McDonald's
10   looked to Cargill Kitchens -- and you can refer to
11   it as Cargill Kitchens or Sunny Fresh, it doesn't
12   matter, they're one and the same, just name change.
13   McDonald's looked to Cargill Kitchens as its egg
14   expert.
15       So as McDonald's was evaluating the
16   process of developing its own animal welfare
17   standards for eggs that it would buy, they sold us
18   the assistance of Kitchen Solutions.  And
19   consequently, Kitchen Solutions interacted with
20   some of those members of the scientific community
21   that are on the animal welfare committee of the
22   UEP, because they were also on the animal welfare
23   committee -- I'm taking a little liberties calling
24   it the animal welfare committee -- for McDonald's.
25   BY MR. ARANOFF:

Page 151

1    Q.  Okay.  If you take a look at what's been
2    marked as Rehm Exhibit 9, I believe, you'll see
3    that this letter says, "Dear Mr. Rehm, as you may
4    know, Sunny Fresh and the UEP's scientific
5    committee on animal welfare have been working with
6    McDonald's to update the industry's welfare
7    guidelines for egg-laying hens."  Do you see that?
8        A.  Yep.
9        Q.  Now, obviously this refers to Sunny
10   Fresh.  I assume, just so that we keep the record
11   clear, that this is prior to the Cargill Kitchen's
12   name change; correct?
13       A.  Correct.
14       Q.  Okay.  But do you have an understanding
15   as to -- now as to why Sunny Fresh was working with
16   the UEP scientific committee and what --
17       MR. DAVIS:  Sorry.
18   BY MR. ARANOFF:
19       Q.  Yeah.  Do you have an understanding as to
20   why they were doing that?
21       MR. DAVIS:  Objection, calls for
22   speculation.
23       THE WITNESS:  I think that you've asked
24   that and I've answered that.
25   BY MR. ARANOFF:

Page 152

1    Q.  Okay.  And do you know what -- why they
2    were working with them, in response to what -- what
3    particular action or activity?
4        A.  I think they were working with the
5    scientific -- members of the scientific committee
6    to assist McDonald's in developing the standards
7    that they would utilize for the production of eggs,
8    and ultimately the liquid, raw, unpasteurized eggs
9    that it would purchase for its utilization in its
10   facilities.
11       Q.  Right.  But do you have an understanding
12   as to why there would have been a need to do this?
13       MR. DAVIS:  Same objection.
14   BY MR. ARANOFF:
15       Q.  Why was there a need for McDonald's to
16   update the industry's welfare guidelines for
17   egg-laying hens?
18       MR. ONDECK:  Yeah, objection.
19       MR. DAVIS:  Same objection.
20       MR. ONDECK:  Objection, calls for
21   speculation.
22       MR. ARANOFF:  Not if he knows.
23       THE WITNESS:  I don't know.
24   BY MR. ARANOFF:
25       Q.  If you look down on the bottom of the

Page 153

1    page, it's -- or the last bullet point on the first
2    page, it says, "If you operate a 'dedicated' egg
3    supply facility, we need to commence discussions
4    soon about some aspects of the new McDonald's
5    guidelines."  Do you see that?
6        A.  Yes.
7        Q.  I read that correctly?
8        A.  Yes.
9        Q.  You see that the word "dedicated" is in
10   quotes?
11       A.  Yes.
12       Q.  Do you know why "dedicated" is in quotes?
13       A.  Because there are some facilities that
14   the entire production from that facility goes -- is
15   sold to Cargill, and Cargill does its process and
16   sells that finished product to McDonald's.
17       Q.  Do you have an understanding as to why
18   there was a need to commence discussions soon about
19   some aspects of the new McDonald's guidelines?
20       A.  Because those hens were already in
21   production, producing eggs for McDonald's, versus
22   eggs that were going to be produced under in --
23   new houses under construction.
24       Q.  Then you'll see that on page two it says
25   "Some of the more significant" --

39  (Pages 150 to 153)

HIGHLY CONFIDENTIAL

|  | Page 154 |
|---|---|

1    A. Just a second.
2    Q. Sure.
3    A. I'm sorry. Go ahead.
4    Q. No, that's okay. Let me start again. On
5 page two it says, "Some of the more significant
6 changes under the new guidelines have to do with
7 minimum space requirements for the hens' access to
8 feeders, practices utilized to induce molting, and
9 beak trimming practices." Do you see that?
10    A. Yes.
11    Q. Do you have an understanding as to why
12 these more significant changes were necessary under
13 the new guidelines?
14    A. Why they were necessary?
15    Q. Yes.
16    A. Or why they're called significant?
17    Q. First why they were necessary, and then
18 why they're called significant.
19    A. I don't -- animal health and welfare
20 encompasses a large quantity of activity. Why
21 these are more significant than others is because
22 there were a major shift, especially on the cage
23 space and minimum, and access to feeders, is not a
24 correct description of the welfare activity.
25        But those were activities that have an

|  | Page 155 |
|---|---|

1 impact -- the largest impact on the cost structure
2 of an organization as you produce eggs. And I --
3 in this letter it uses the term "access to
4 feeders." That is really a mischaracterization of
5 the welfare program that McDonald's is -- has
6 requested.
7    Q. Okay. Well --
8    A. It makes it sound like we restrict hens
9 from having access to feeders, and that is
10 definitely not the case.
11    Q. Okay. But you don't have any
12 recollection of having received this letter from
13 Mr. McNamee and Mr. Johnson; right?
14    A. Well, I'm sure I received it. But do I
15 remember receiving it? I mean, that was a long
16 time ago, sir.
17    Q. Right.
18    A. I mean, that's 15 years ago.
19    Q. Let me just finish my question. You
20 wouldn't quibble with me if -- that you received
21 this document; right?
22    A. Yes, I agree.
23    Q. And you don't have any recollection as
24 you sit here today of having called them and having
25 taken any umbrage or taken any exception with any

|  | Page 156 |
|---|---|

1 of the things written in the letter?
2    A. We are a company that focuses on what our
3 customers would like to do. This is one aspect
4 of one thing that they asked us to do. We were
5 going to work hard, in tandem with our customers,
6 to figure out how to get this done for the quantity
7 of eggs that they asked us to produce.
8    Q. Right. But you don't recall, as you sit
9 here today, either having called up either
10 Mr. McNamee or Mr. Johnson and saying something
11 along the lines of your depiction of our -- of
12 issues related to access to feeders is a
13 mischaracterization, do you?
14    A. No, because I knew what they were really
15 talking about. I didn't need to nitpick the
16 letter. They're our customer.
17    Q. Okay. Fair enough.
18       (Exhibit 10 marked for identification.)
19 BY MR. ARANOFF:
20    Q. Showing you what's been marked as Rehm
21 Exhibit 10 for purposes of identification. This is
22 a UEP board of directors January 25, 2005 Atlanta,
23 Georgia meeting minutes. It's a multi-page
24 document that's labeled confidential. And it bears
25 Bates numbers DAY0028028 through DAY0028035. I'll

|  | Page 157 |
|---|---|

1 give you a minute or two to take a look at the
2 document.
3       The primary focus of what I'd like to
4 ask you, Mr. Rehm, appears on pages one in the
5 attendance list and then again on page three at the
6 top of the page.
7    MR. ONDECK: I object to the authenticity
8 of this document as described. It appears to have
9 two committee reports attached to the back. So
10 it's more than just the minutes.
11    MR. ARANOFF: Okay. Well, just for the
12 purposes of clearing the record, this is a document
13 produced by Daybreak Foods. I have no reason to
14 believe that it wasn't produced in the ordinary
15 course. The Bates ranges seem to be sequential.
16 And so it perhaps is two documents, perhaps not,
17 but the document speaks for itself.
18    MR. ONDECK: I don't mean to interrupt.
19 Did you want to direct attention to a particular --
20    MR. ARANOFF: I just did.
21    MR. ONDECK: I missed it.
22    MR. ARANOFF: Yeah, you were probably
23 objecting. Just having some fun with you, Chris.
24    MR. ONDECK: Ms. Court Reporter, could
25 you read back the part of the document that our

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

HIGHLY CONFIDENTIAL

<table>
<tr><td>

Page 158

1  attention was directed to?
2         COURT REPORTER: "The primary focus of
3  what I'd like to ask you, Mr. Rehm, appears on
4  pages one in the attendance list and then again on
5  page three at the top of the page."
6         MR. ONDECK: Thank you.
7         MR. ARANOFF: Did you want to try to play
8  "gotcha?"
9         MR. ONDECK: She did good. No, I just
10  missed it.
11         THE WITNESS: Okay.
12  BY MR. ARANOFF:
13     Q. All set? Yeah?
14     A. Yeah.
15     Q. Okay. So again, this is a UEP board of
16  directors' meeting minutes from January 25, 2005 in
17  Atlanta, Georgia. Do you recognize this?
18     A. Yes.
19     Q. And again, just so that we make sure the
20  record's clear, you see that the Bates range at the
21  bottom right-hand corner is -- is -- has the prefix
22  DAY; right?
23     A. Yes.
24     Q. Okay. First, if you take a look at the
25  board members and staff, okay, which is the first

</td><td>

Page 160

1  middle of the --
2     A. How many lines down?
3         MR. ONDECK: Objection, the document
4  speaks for itself. Calls for speculation. Best
5  evidence rule.
6  BY MR. ARANOFF:
7     Q. Okay. You see Terry Profitt's name
8  listed there?
9     A. Not at this point, no.
10     Q. Take a look. It's right over here.
11     A. I see it.
12     Q. Okay. If you look down another three
13  lines and slightly to the right, you'll see Norm
14  Stocker is also present?
15     A. Yes.
16         MR. ONDECK: Objection.
17  BY MR. ARANOFF:
18     Q. Or at least he's listed as present;
19  right?
20     A. He's listed as being there at some point
21  during the meeting.
22     Q. Okay. Do you know who Norm Stocker is?
23     A. Yes.
24     Q. Who's Norm Stocker?
25     A. He's risk manager and procurement person

</td></tr>
<tr><td>

Page 159

1  item there, it lists you as being present --
2     A. Yes.
3     Q. -- right? You agree with me on that?
4     A. I agree that I was there at some portions
5  of the meeting, not necessarily for all of the
6  meeting.
7     Q. Now you're also listed, Mr. Rehm, in the
8  members and guests, which, if you take a look, it's
9  about -- it's the second --
10     A. Yeah, I see that.
11     Q. -- second paragraph on there. Do you see
12  that?
13     A. Yeah.
14     Q. Do you have any understanding as to why
15  you'd be listed as both a board member and a
16  staff --
17     A. A mistake.
18     Q. It's not the policy to list like that,
19  it's just a typographical error, to the best of
20  your knowledge?
21     A. I wouldn't call it a typographical error.
22  I call it a mistake.
23     Q. Okay, fine. If you take a look, within
24  the member and guest section, you'll see Terry
25  Profitt was present. Is that accurate? About

</td><td>

Page 161

1  for Cargill Kitchen Solutions.
2     Q. And then the last person listed on the
3  members and guests list is an abbreviation for
4  brother, or B-R-O, dot Stan Gumula. Do you see
5  that?
6     A. Yeah.
7     Q. Do you know who that is?
8     A. Nope.
9     Q. Okay. Okay. If you turn to page four, I
10  believe it is, the top of the page -- is it four?
11  Hold on one second. Maybe I miscounted. I'm
12  sorry, it's three. Third page. Sorry.
13     A. You asked me to look at page three
14  before.
15     Q. Okay. Well, then I was right then and
16  wrong now. Sorry about that. Okay, you'll see
17  that there are two motions at the top, okay?
18     A. Uh-huh.
19     Q. The first motion -- I mean the second
20  motion says "Motion: It was moved by Mooney and
21  seconded by Dean to recommend that the current
22  'intentions program' for flocks to be disposed of
23  four weeks earlier than previously scheduled and/or
24  flock size reduction by five percent be extended
25  through Labor Day. Carried;" right?

</td></tr>
</table>

41 (Pages 158 to 161)

HIGHLY CONFIDENTIAL

Page 162

1    A.  Uh-huh.
2    Q.  Do you see that?  Did I read that
3  correctly?
4    A.  Yes.
5    Q.  Who is Mooney?
6    A.  That's the gentleman's last name who was
7  on the board.
8    Q.  Do you know his first name?
9    A.  Wayne, I believe.
10   Q.  Do you know what company?
11   A.  If you look on the front page, you might
12  figure that out.
13   Q.  Okay.  Do you know what company
14  Mr. Mooney's from?
15   A.  Used to be Pilgrims Pride.
16   Q.  And Dean would be Jim Dean?
17   A.  Yes.
18   Q.  Do you know what company he's from?
19   A.  No.
20   Q.  Okay.  Now, at the end -- well, I'll
21  withdraw that question.  Do you have an
22  understanding of what the purpose of this motion
23  was?
24   A.  I think the motion speaks for itself,
25  yeah.

Page 163

1    Q.  What is your understanding what the
2  purpose of the motion was?
3    A.  That they asked the members to
4  voluntarily reduce their flock size.
5    Q.  By five percent; right?
6    A.  Okay, sure.
7    Q.  That's what it says; right?
8    A.  That's what it says.
9    Q.  Do you have an understanding as you sit
10  here today as to what the purpose of reducing their
11  flock size by five percent was?
12   A.  I assume it was so that the shell egg
13  portion of the industry could better match its
14  supply with demand.
15   Q.  Right.  Do you think -- is it your
16  understanding that one of the purposes for this
17  motion was to reduce supply?
18       MR. ONDECK:  Objection.
19       MR. DAVIS:  Objection, lack of
20  foundation, speculation.
21       MR. ONDECK:  Yeah, I'm going to object,
22  same objection, and asked and answered.
23       THE WITNESS:  Isn't that what I just
24  said?
25  BY MR. ARANOFF:

Page 164

1    Q.  Okay.  Now, it says after the -- after
2  the -- after the motion it says "carried"; right?
3    A.  Yep.
4    Q.  What does it mean?
5    A.  It means that by a majority of the board,
6  the motion passed.
7    Q.  Do you know how you voted on this
8  particular issue?
9    A.  I don't know that I was in the room when
10  that motion was voted on.
11   Q.  You don't know that as you sit here
12  today?
13   A.  That's correct.
14   Q.  But you do know that at some point during
15  this UEP board of directors' meeting you were
16  present?
17   A.  Yes.
18   Q.  Okay.
19   A.  But again, this does not fit into the
20  model and business plan for Daybreak Foods.  So we
21  have never done a flock reduction because of
22  what -- or early molt because of this.
23   Q.  Now, do you know whether -- withdrawn.
24  Is there any mechanism by which votes are tallied,
25  you can see who voted at a particular UEP meeting

Page 165

1  on a particular motion, who voted yes and who voted
2  no?
3    A.  No.
4    Q.  Is there any mechanism at UEP meetings
5  where dissents to motions are logged?  In other
6  words, is there anyplace where somebody that
7  dissented to something that was agreed upon at an
8  UEP meeting would be memorialized?
9    A.  No.
10   Q.  No, you don't know, or no, it doesn't
11  exist?
12   A.  No, I don't believe that exists.
13   Q.  Okay.  Are you -- I think we talked about
14  it before, but my memory's not that great, so I'll
15  ask again.  Are you familiar with an entity called
16  the Best Egg Company?
17   A.  Yes.  That's the minority business
18  enterprise that we are part owner of.
19   Q.  And are you familiar with a gentleman by
20  the name of Bob Beavers?
21   A.  Yes.
22   Q.  And who was Bob Beavers?
23   A.  He was a prospective candidate that we
24  looked at as a possible minority investor, majority
25  owner in a minority business enterprise.

42  (Pages 162 to 165)

HIGHLY CONFIDENTIAL

Page 166

1     Q.  For what facility?
2     A.  The Best Egg Company.
3     Q.  And what was the result of that endeavor
4  with Mr. Beavers?
5     A.  We did not go forward with the activity
6  and chose a different investor instead.
7     Q.  Why is that?
8     A.  Didn't feel comfortable with the entire
9  arrangement with Mr. Beavers, nor did Kitchen
10  Solutions, so we chose not to move forward with it.
11     (Exhibit 11 marked for identification.)
12  BY MR. ARANOFF:
13     Q.  I show you what's been marked as Rehm
14  Exhibit No. 11.  It is a single-page document
15  bearing the legend Highly Confidential.  It is
16  Bates stamped DAY0020542.  It's a letter from Mike
17  Luker, president of Sunny Fresh, to Mr. Bill Rehm
18  dated November 7, 2003.  I'll give you a minute to
19  look at it and then ask you some questions.
20  Particular emphasis, for Chris, is on the first two
21  paragraphs.  All set?
22     A.  Yeah.
23     Q.  Okay.  You recognize this letter,
24  Mr. Rehm?
25     A.  Same thing as the past.  I -- you know,

Page 167

1  I'm sure it came to me.  Do I remember receiving
2  it?  No.  But it's clear to me, clearly from Mike
3  Luker, the then-president of Sunny Fresh Cargill
4  Kitchen Solutions.
5     Q.  Okay.  You see it says in the first
6  paragraph, "Dear Bill, in the last several months
7  both Sunny Fresh and Daybreak have been devoting a
8  tremendous amount of resources to the Best Daybreak
9  venture with Bob Beavers.  Despite these efforts,
10  it is now clear that the venture will not proceed."
11     Aside from what you've already told us
12  about the venture with Mr. Beavers, can you
13  enlighten us further as to what the reason why that
14  venture didn't proceed?
15     MR. ONDECK:  Objection, asked and
16  answered.
17     THE WITNESS:  Cargill approached us,
18  Cargill Kitchen Solutions, Sunny Fresh, approached
19  Daybreak and requested that we form a minority
20  business enterprise in order to be a portion of the
21  dedicated supply for McDonald's.  And that was all
22  at the request of McDonald's.  And at that time it
23  was going to be a complete inline complex, hens and
24  plant.
25     And in order to get the complex to

Page 168

1  the size required for the eggs requested for by
2  Cargill for McDonald's, we were going to expand the
3  facility.  As we walked down that path to
4  completing our relationship with Mr. Beavers, we
5  got significantly uncomfortable with Mr. Beavers
6  and his then-investors, and who really was bringing
7  the money to the table, Mr. Beavers or somebody
8  else.  And we chose to mutually, Cargill and
9  Daybreak, chose to mutually walk away from that
10  transaction.
11  BY MR. ARANOFF:
12     Q.  Do you know whether Mr. Beavers ever
13  entered in any kind of a relationship with any of
14  the other defendants in this case?
15     A.  To the best of my knowledge, no.
16     Q.  Okay.  The second paragraph of this
17  letter says, "While we were all disappointed with
18  how this deal has unfolded, we at Sunny Fresh want
19  to confirm that we are committed to the expansion
20  of the Graettinger facility.  Sunny Fresh is
21  relying upon the expansion to supply animal
22  welfare-compliant eggs to our most prominent
23  customer."
24     We talked about the Graettinger
25  facility previously; correct?

Page 169

1     A.  Yes.
2     Q.  In what way was Sunny Fresh going to
3  assist in the expansion of the Graettinger
4  facility?
5     A.  We put together a long-term agreement,
6  and that contract helped support the funding of the
7  expansion project, because we leveraged our balance
8  sheet to accomplish this -- these growth
9  opportunities.  And that balance -- that long-term
10  contract with somebody like Cargill helped support
11  that financing endeavor.
12     Q.  And then it says, "Sunny Fresh is relying
13  upon the expansion to supply animal
14  welfare-compliant eggs to our most prominent
15  customer."  I presume that that customer is
16  McDonald's?
17     A.  Yes.
18     Q.  Okay.  And can you explain what is meant
19  by you're relying upon the expansion to supply
20  animal welfare-compliant eggs to your most
21  prominent customer?
22     MR. ONDECK:  Objection.  Objection to any
23  implication that this is UEP welfare compliant.
24     THE WITNESS:  That we had hens already at
25  the farm, we had a breaking plant at the farm, we

43  (Pages 166 to 169)

HIGHLY CONFIDENTIAL

Page 170

1  did not have enough hens at the farm to comply and
2  supply Kitchen Solutions with liquid,
3  unpasteurized, raw product that complied with the
4  McDonald's desires and protocol for hen production.
5  BY MR. ARANOFF:
6     Q.  So just to be clear, Sunny Fresh funded
7  and supported the expansion of the Graettinger
8  facility; correct?
9     A.  Wrong.
10    Q.  Wrong? Okay.
11    A.  Wrong.  Between our own finances and
12  borrowed money from our financing partners, the
13  banks, we funded the expansion.  They supplied a
14  long-term contract, which they signed and executed,
15  and Daybreak Foods signed and executed, to support
16  that expansion.
17    Q.  Okay.  And then you'll see that in the
18  second paragraph -- third paragraph, sorry, it
19  says, "Now that the partnership is dissolving, we
20  understand that there may be financial obligations
21  that Daybreak will have to meet in the next several
22  weeks - before the revised loan for expansion can
23  be closed.  Sunny Fresh is ready to assist Daybreak
24  in the interim period so that the loan for the
25  expansion can be closed on schedule.  Best regards,

Page 171

1  Mike Luker."  Do you see that?
2    A.  Yes.
3    Q.  I read that correctly?
4    A.  Yes.
5    Q.  What financial obligations that Daybreak
6  had to meet in the next several weeks before the
7  revised loan for expansion can be closed are being
8  referenced here?
9    A.  The Daybreak at the -- Daybreak undertook
10  a significant financial risk to expand the farm,
11  because at the end of the day, that expanded farm,
12  along with the processing plant, was going to be
13  sold to a venture owned 51 percent by Bob Beavers
14  and 49 percent by Daybreak.  And there -- that's
15  how Daybreak was going to get paid its money back.
16      But when the venture didn't happen,
17  Cargill and Daybreak decided it wasn't the right
18  thing to do.  Daybreak was on the hook because we
19  were paying those bills and needed to finalize a
20  new loan because the original loan was going to be
21  in the joint venture.  Daybreak now had to secure a
22  loan to do all that within its own organization,
23  not within a minority business enterprise, to get
24  this done.
25      And they were offering to assist in

Page 172

1  any way they could or needed to to make sure that
2  we did not default on any payments to construction
3  companies, equipment companies, so that we could
4  keep the project moving forward, on time, to meet
5  all the deadlines.  They didn't have to do anything
6  because we got it done without them.  This is --
7  well --
8    Q.  In what way was Sunny Fresh ready to
9  assist Daybreak beyond anything that you've just
10  described?
11      MR. ONDECK:  Objection, calls for
12  speculation.
13      THE WITNESS:  I don't know.  We didn't
14  need anymore help.  We got it done.  They just
15  wanted me to know, and us to know, if we needed
16  them, they were there.  Didn't have to.
17  BY MR. ARANOFF:
18    Q.  When I use the term UEP certified eggs,
19  do you have an understanding of what that term
20  means?
21    A.  That those are eggs produced by companies
22  that are -- that belong to the UEP certified
23  program and follow that protocol.
24    Q.  Is it fair to say that your
25  understanding -- your understanding of the UEP

Page 173

1  certified program is an animal welfare program
2  organized by UEP to meet consumer demands and
3  preferences for egg produced -- for eggs produced
4  in a manner perceived as more humane and less
5  stressful to hens than traditional production
6  methods?
7      MR. ONDECK:  Objection.  That document
8  that appears that that question was read from
9  speaks for itself, and it's confusing.
10      MR. ARANOFF:  Okay.
11      THE WITNESS:  I don't believe I agree
12  with you.
13  BY MR. ARANOFF:
14    Q.  You don't agree with me.  Okay.
15    (Exhibit 12 marked for identification.)
16  BY MR. ARANOFF:
17    Q.  Mr. Rehm, I've handed you what's marked
18  as Daybreak -- I'm sorry, as Rehm Exhibit No. 12.
19  It is defendant Daybreak Foods Inc.'s responses and
20  objections to direct purchaser plaintiffs' first
21  set of interrogatories.  It does not have a Bates
22  number.
23      I want to direct your attention
24  to -- I'm going to ask you to take a look at
25  interrogatory number four on page eight.  And I'm

VERITEXT REPORTING COMPANY
(212) 279-9424    www.veritext.com    (212) 490-3430

HIGHLY CONFIDENTIAL

Page 174

1  going to also direct your attention to page ten.
2  All set?
3      A.  Yep.
4      Q.  Okay.
5          MR. ONDECK:  Actually, I object to the
6  prior question, if it was a reading of this
7  document, without identifying this document.  And
8  I'd like to confirm on the record whether or not
9  that question was reading from this document,
10  because then I'm going to add an objection that
11  that question was misleading and an attempt to
12  trick the witness.
13          MR. ARANOFF:  Well, that's not a valid
14  objection, A; none of those are.  B, I'm allowed to
15  read from whatever I want.  C, it's meaningless and
16  I don't even know what you're talking about.
17          MR. ONDECK:  Well, you can't trick the
18  witness --
19          MR. ARANOFF:  I didn't try to trick the
20  witness.  I asked him if that was his opinion.  He
21  said no.
22          MR. ONDECK:  Actually, do you want to
23  just tell us right now or do I need to go back?
24  Were you reading from our responses to
25  interrogatory number four?

Page 175

1          MR. ARANOFF:  Yes.  And there's nothing
2  improper about that, Chris.  Nothing.
3          MR. ONDECK:  Without identifying the
4  document or telling us that -- I said it was
5  confusing, and going back through the question,
6  yeah, I regard that as an attempt to mislead and
7  trick the witness.  Just so I'm on the record.
8          MR. ARANOFF:  Okay, you're on the record.
9  That's nonsense.
10  BY MR. ARANOFF:
11      Q.  So first turning your attention -- do you
12  recognize this document, Mr. Rehm?
13      A.  Yes.
14      Q.  And these are responses, correct, to
15  interrogatories that were propounded on you and
16  Daybreak; is that correct?
17      A.  Yes.
18      Q.  And have you seen this before?
19      A.  Yes.
20      Q.  Have you seen it in the last three days?
21      A.  No.
22      Q.  Okay.  If you look at page ten, you'll
23  see that there's a verification on page ten?
24      A.  Yep.
25      Q.  And the verification says, "I, William R.

Page 176

1  Rehm, verify under penalty of perjury that I have
2  read the foregoing responses and objections of
3  Daybreak Foods, Inc. to direct purchaser
4  plaintiffs' first set of interrogatories and that
5  the responses set forth therein are true and
6  correct to the best of my knowledge, information
7  and belief, executed this 18th day of July 2012 in
8  Lake Mills, Wisconsin."  And there's a signature
9  line for William R. Rehm, president and CEO of
10  Daybreak Foods, Inc., with a signature above the
11  signature line.  Do you see that?
12      A.  Yes.
13      Q.  I read that correctly?
14      A.  Yes.
15      Q.  Is that your signature?
16      A.  Yes.
17      Q.  Okay.  Now, turning to page -- back to
18  page eight for the moment, response to
19  interrogatory number four, you'll see that in the
20  second paragraph of response to interrogatory
21  number four it says, "Daybreak understands the
22  UEP-certified program to be an animal welfare
23  program organized by UEP to meet customer demands
24  and preferences for eggs produced in a manner
25  perceived as more humane and less stressful to hens

Page 177

1  than traditional production -- than traditional
2  production methods."  Do you see that?
3      A.  Yes.
4      Q.  Do you believe that to be accurate?
5      A.  Yes.
6      Q.  So when I read that to you before and you
7  said you don't agree with that, does this refresh
8  your recollection that you now agree that this
9  is an accurate response?
10      A.  I don't know that you have my correct
11  response to when you read it to me the very first
12  time.  I believe my response was "I don't believe I
13  agree with that," versus "no."
14      Q.  Do you now change your mind and say that
15  you do agree with it?
16      A.  Yes.
17      Q.  Okay.  What transpired that changes your
18  mind?
19          MR. ONDECK:  Objection, argumentative,
20  badgering the witness, inappropriate.
21          MR. ARANOFF:  Oh, stop.  What --
22          THE WITNESS:  We treat all our hens in a
23  humane manner.
24  BY MR. ARANOFF:
25      Q.  Right.  I didn't ask you that.  What I

45  (Pages 174 to 177)

HIGHLY CONFIDENTIAL

Page 178

1  asked you was why do you now believe this was
2  accurate but you didn't believe it was accurate
3  when I read it to you before?
4       MR. ONDECK:  Objection, asked and
5  answered.
6       THE WITNESS:  I wasn't sure if I agreed
7  the first time.  I didn't say I didn't agree with
8  it.
9  BY MR. ARANOFF:
10      Q.  Okay.  But you agree with it now and you
11  think that this is an accurate statement; correct?
12      A.  Yes.
13      Q.  If you continue on in your response to
14  interrogatory number four, it says, "To achieve
15  this goal, the UEP certified program sets forth
16  various guidelines for the conditions under which
17  egg-laying hens are raised and housed.  Daybreak
18  did not join the UEP certified program."  Do you
19  see that?
20      A.  Yes.
21      Q.  Okay.  And you understand what the UEP
22  certified program is; correct?
23      A.  Yes.
24      Q.  And just for clarity's sake, can you
25  explain what your understanding of that program is?

Page 179

1  And you can use the document to refresh your
2  recollection.
3       A.  I think it's on the record already, so I
4  don't need to reread it.
5       Q.  Fine.  And why didn't Daybreak join the
6  UEP certified program?
7       A.  We didn't believe in the full depth and
8  breadth of everything that was in the program
9  specifically.  We have numerous arguments against
10  the one hundred percent rule.  We fought that
11  battle several times.  And at the end of the day,
12  it did not fit into our business plan of what our
13  customers were asking us to do in production -- in
14  the humane production of eggs for their use and
15  their customers'.
16      Q.  And so in your view is there any
17  difference between eggs that are UEP certified and
18  eggs that are not UEP certified?
19      A.  I think for Daybreak, that we produce all
20  our eggs utilizing humane practices for our hens.
21      Q.  Okay.  But that's not what I asked you.
22  What I asked you was, do you think that there's --
23  do you believe there to be any difference between
24  eggs that are UEP certified versus eggs that are
25  not UEP certified?

Page 180

1       MR. ONDECK:  Objection, confusing
2  question.  Any physical difference?
3       THE WITNESS:  An egg is an egg, sir.
4  There's no difference in the egg.
5  BY MR. ARANOFF:
6       Q.  Do you think that there was anything
7  inferior in the product that you were selling
8  because it was not UEP certified?
9       A.  We humanely treat all of our hens in the
10  production of eggs that we then take into our
11  plants to deliver raw, unpasteurized liquid
12  product.
13      Q.  I understand that.  But what I'm asking
14  you is, do you believe that there's anything
15  inferior about the product that you were selling
16  because it was not UEP certified?
17      A.  I think at the end of the day, we do the
18  right thing for the hen in the humane treatment and
19  production processing of the eggs that we use in
20  our plants.
21      Q.  You're answering a question that's not
22  responsive to my question, Mr. Rehm.  So let me try
23  it again.  It's simply a yes or no answer.  Is
24  there --
25      A.  It's not.

Page 181

1       Q.  -- anything that you believe is inferior
2  about the eggs that you pro -- that you produce and
3  sell because they're not UEP certified?
4       MR. ONDECK:  Objection.  He's answered
5  twice the same questions.
6       MR. ARANOFF:  He hasn't answered my
7  question.
8       MR. ONDECK:  Can I finish my objection,
9  please?  He's answered the question twice.  Just
10  because you don't like the answer, you can't keep
11  asking and ask for one you like.
12      MR. ARANOFF:  That response is
13  nonresponsive to what I asked.
14      MR. ONDECK:  Then object.
15      MR. ARANOFF:  So objection, not
16  responsive, now I'll ask the question.  We'll do
17  this all day.  I just want to get a simple answer.
18  BY MR. ARANOFF:
19      Q.  Is there any difference -- withdrawn.  Is
20  the product that you sell in any way inferior as a
21  result of not being UEP certified?
22      MR. ONDECK:  Same objection.
23      THE WITNESS:  Read that back again,
24  please.
25      COURT REPORTER:  "Is the product that you

46  (Pages 178 to 181)

HIGHLY CONFIDENTIAL

Page 182

1    sell in any way inferior as a result of not being
2    UEP certified?"
3         THE WITNESS:  The product that we
4    produce, utilizing our customer animal welfare,
5    using our customer programs for the production of
6    eggs, meets and exceeds their product
7    specifications, which are extremely stringent.  And
8    those product specifications, whether they're
9    McDonald's or Burger King, are extremely high and
10   are the same.
11   BY MR. ARANOFF:
12        Q.  Okay, let me try it a different way.  I
13   just want a yes or no answer to this question,
14   okay?  Is there anything about your product that is
15   flawed or inferior as a result of not being UEP
16   certified, in your opinion?
17        MR. ONDECK:  Objection, confusing.  Do
18   you mean physically flawed or inferior?
19        MR. ARANOFF:  No.
20        MR. ONDECK:  Then it's confusing.
21        THE WITNESS:  What is flawed, or what
22   is -- what are you purporting to be flawed or not
23   flawed?
24   BY MR. ARANOFF:
25        Q.  Well, let me ask it a different way then

Page 183

1    so maybe I can clear it up.  Is there any benefit
2    in your mind to an egg being UEP certified?
3         A.  You have to look at our model.  And our
4    business model.  Our model is predicated on
5    understanding the customer, delivering what they
6    want, when they want, where they want it and how
7    they want it.  So I don't get your question.
8         Q.  Well, let me say this.  You don't have
9    any problem selling to your customers as a result
10   of you not being UEP certified; is that correct?
11        A.  Our model says we're going to listen to
12   what our customers ask and what they'd like us to
13   do in the production of our eggs and processing of
14   our eggs so that we meet and exceed their
15   expectation of what they need and want and desire
16   in the products that they use in their system.
17        Q.  Have you lost out on any customers as a
18   result of not being UEP certified?
19        A.  No.
20        Q.  Okay.  And just to recapitulate your
21   testimony from before, you believe that the
22   policies and procedures that you employ at Daybreak
23   are superior to the UEP certified egg; is that
24   correct?
25        MR. ONDECK:  Objection, mischaracterizes

Page 184

1    prior testimony.
2         THE WITNESS:  I believe that we follow
3    the policies and procedures that our customers
4    request us to utilize in the production of our eggs
5    to then take into our plants for processing in
6    delivering raw, unpasteurized, liquid eggs.
7    BY MR. ARANOFF:
8         Q.  And none of your customers require you to
9    be UEP certified; correct?
10        A.  That's correct.
11        MR. ARANOFF:  Okay.  We're going to go
12   off the record for a minute.
13        THE VIDEOGRAPHER:  We're going off the
14   record at 1:21 p.m.
15        (Break taken.)
16        THE VIDEOGRAPHER:  We're back on the
17   record, beginning of disc number three, of the
18   deposition of William Rehm.  Today's date July 10,
19   2013.  The time is 2:07 p.m.
20   BY MR. ARANOFF:
21        Q.  All right.  Good afternoon, Mr. Rehm.
22   You had -- you ate lunch?
23        A.  I think you call it eating lunch.
24        Q.  Okay.  You ate lunch.  Good.  Excellent.
25   And during the course of the lunch break did you

Page 185

1    have any discussions about the substance of your
2    testimony with your attorney?
3         A.  No.
4         Q.  Okay.  Do you have an understanding as to
5    what the definition of the hundred percent rule is?
6         A.  As it pertains to United Egg Producer's
7    certified program?
8         Q.  Yes, yes.
9         A.  I believe I understand it, yes.
10        Q.  Okay.  What is your understanding of the
11   UEP's hundred percent rule?
12        A.  That all chickens, laying hens, that you
13   own must comply with the United Egg Producer's
14   program in order to be a certified company and a
15   part of the United Egg Producer program.
16        Q.  And in particular, when you say the UEP's
17   program, what do you mean by "UEP program"?
18        A.  The United Egg Producer program for egg
19   production.
20        Q.  Okay.  Just for clarity's sake, when you
21   say "programs," would the animal welfare guidelines
22   be, in your mind, a program?  Do you need to comply
23   with that program in order to be a hundred percent
24   compliant?
25        A.  You're questioning deals with the hundred

47  (Pages 182 to 185)

HIGHLY CONFIDENTIAL

Page 186

1 percent rule as it pertains to the animal welfare
2 program?
3      Q.  Right.
4      A.  So to be a part of that program, all your
5 hens need to comply with the UEP animal welfare
6 program.
7      Q.  Are you using the term "program"
8 differently than "guidelines," or are those terms,
9 with respect to this issue, synonymous?
10     A.  With regards to --
11         MR. DAVIS:  Objection to form.
12 BY MR. ARANOFF:
13     Q.  You can answer.
14     A.  With regards to this question, program,
15 guidelines, however you want to reference it, as
16 pertains to the question you just asked me, they're
17 one and the same.
18     Q.  Okay.  Do you agree that you could meet
19 your, Daybreak's customers', demands for eggs
20 without complying with the UEP's hundred percent
21 rule?
22     A.  I'm sorry, would you say that again?
23     Q.  Do you agree that you could meet your
24 customers' demands for your product without being
25 compliant with the hundred percent -- with the

Page 187

1 UEP's hundred percent rule?
2      A.  I do not have a customer that has asked
3 us to comply with the UEP program.
4      Q.  Okay.  And so your customers are
5 satisfied with your product, correct, even though
6 you're not working in compliance, per se, with the
7 UEP's hundred percent rule; correct?
8          MR. ONDECK:  Objection, calls for
9 speculation.
10         THE WITNESS:  We follow the production
11 practices that our customers request us to follow
12 in the humane production of eggs for their
13 utilization.
14 BY MR. ARANOFF:
15     Q.  Okay.  And as far as you know, you're
16 not -- you are not compliant with the hundred
17 percent rule as dictated by the UEP; is that
18 correct?
19     A.  We're not a part of the UEP program.
20     Q.  Okay.  Has any of -- have any of your
21 customers, at any point in time, articulated to you
22 a complaint or concern that you're not compliant
23 with the UEP's hundred percent rule?
24     A.  No.
25         MR. ONDECK:  Objection, ambiguous time

Page 188

1 period.
2          THE WITNESS:  No, because you have it
3 backwards.  We comply with the requests of our
4 customers.  So if we comply with what they're
5 asking us to do, they're satisfied with what we're
6 doing to produce the eggs for their utilization,
7 "eggs" being raw, unpasteurized, liquid egg.
8 BY MR. ARANOFF:
9      Q.  Have any of your customers requested that
10 you be compliant with the UEP's hundred percent
11 rule?
12     A.  Again, we follow what our customers have
13 requested us to do, and no customer has requested
14 that we join the UEP animal welfare program.
15     Q.  And when you say "customers," you're
16 talking about the three main customers you talked
17 about before, correct, which are Cargill; right?
18     A.  Are you done or is that a question?
19     Q.  I'll give you all three at once then.
20     A.  Okay.
21     Q.  Cargill, Michael Foods, and Deb-El;
22 correct?
23     A.  That's correct.
24     Q.  Are there any other customers that you
25 can think of that you were referencing in your last

Page 189

1 answer?
2      A.  Those three customers will -- will
3 consume 95 to 98 percent of every egg we produce.
4      Q.  And McDonald's hasn't asked you to be
5 compliant with the UEP's hundred percent rule, have
6 they?
7      A.  Again, you're asking the same question.
8 We produce eggs in accordance with what our
9 customers ask us to do.  McDonald's is not our
10 customer.  Cargill supplies eggs to McDonald's.  We
11 produce the eggs for Cargill that goes to that
12 customer.
13     Q.  Okay.  Have you ever heard the term
14 "pooling" with respect to the egg industry?
15     A.  Yes.
16     Q.  What is your understanding of the term
17 pooling?
18     A.  When we were debating at the UEP level
19 the hundred percent rule, there was talk of
20 needing -- could we pool the eggs, i.e., those that
21 are produced utilizing the UEP animal welfare
22 guidelines and those that are produced using
23 different guidelines and pool them together, or do
24 those eggs need to be segregated.
25     Q.  Do you recall ever having given a speech

48  (Pages 186 to 189)

HIGHLY CONFIDENTIAL

Page 190

1  with respect to the issue of pooling?
2      A.  I recall giving a speech on the
3  100 percent rule.
4      Q.  Okay.
5      (Exhibit 13 marked for identification.)
6  BY MR. ARANOFF:
7      Q.  Mr. Rehm, I'm showing you what's been
8  marked as Exhibit No. 13 for identification.  It is
9  a document, multi-page -- it's a multi-page
10 document.  It bears the Confidential legend and the
11 Bates numbers DAY0021496 and continues, I believe
12 sequentially, for seven pages to DAY0021502.  I'll
13 give you a second to take a look at it.
14      Again, to try to move this along, I'm
15 particularly interested in paragraphs on the top of
16 page two, page three, and the bottom of page four.
17     A.  I'm sorry, top of page two?
18     Q.  The first paragraph on two, the big
19 paragraph on three, and the bottom paragraph on
20 four.
21     A.  Okay.  I think I've gotten through the
22 majority.
23     Q.  Okay.  If you look at the top of page
24 two, it says, "Somewhere along this journey, these
25 standards went through a metamorphosis, from

Page 191

1  science-based production practices into a universal
2  marketing program for all members of the UEP.  That
3  program calls for the establishment of a seal and a
4  UEP certification program that requires a hundred
5  percent of the company's production follow these
6  enhanced production practices.  With this, we will,
7  in essence, drive a wedge between the further
8  processing portion of our industry and the graded
9  side of the equation."  Do you see that?
10     A.  Yes.
11     Q.  Am I correct that this is a copy of the
12 speech you were referencing a few moments ago?
13     A.  I believe so, yes.
14     Q.  You talk about driving a wedge between
15 the further processing portion of our industry and
16 the graded side of the equation.  Can you explain
17 what you meant by that?
18     MR. ONDECK:  Objection, characterization
19 of what Mr. Rehm talked about.  Go ahead.
20     THE WITNESS:  The graded side of our
21 industry was willing to accept -- the vast majority
22 of the producers on the grading side of the
23 industry were willing to accept these added costs,
24 assuming that the market, over time, would
25 compensate them for this added cost of production.

Page 192

1      And people like Daybreak that
2  produce eggs that are broken and then sold into --
3  or broken by further processors and used in the
4  further processing segment of the industry, did not
5  feel as though those customers would be willing to
6  pay the price for the added cost, number one; and
7  number two, the hundred -- the one hundred percent
8  rule flew in the face of everything that Daybreak
9  was working towards in its business model, which is
10 that we listen to our customers and we want to
11 produce what the customer wants, where he wants it,
12 when he wants it, how he wants it.
13 BY MR. ARANOFF:
14     Q.  Just for clarity's sake, you see the
15 first sentence says, "Somewhere along this journey,
16 these standards."  Do you see that?
17     A.  Uh-huh.
18     Q.  What did you mean when you wrote "these
19 standards"?
20     A.  The whole thing references the United Egg
21 Producer's animal welfare standards.
22     Q.  Okay.  And you talk about a metamorphosis
23 from science-based production practices into a
24 universal marketing program for all members of the
25 UEP.  Do you see that?

Page 193

1      A.  Uh-huh.
2      Q.  What did you mean when you said that?
3      MR. ONDECK:  Objection.  Could the
4  witness answer verbally and not go "uh-huh."
5      THE WITNESS:  Sorry.  I apologize.  What
6  did I mean.  That means through the journey,
7  somehow the animal welfare committee decided that
8  they wanted, in order to participate in the
9  program, all of your hens had to be on the program
10 or you couldn't be a part of the program.  That was
11 part of -- when I say metamorphosis is a
12 transition.  This is not a destination.
13     Animal welfare program, whether
14 it's United Egg Producers or a specific
15 customer-driven program, is not a destination.
16 It's not, this is what we're going to do.  It never
17 changes because it's a journey.  And as we move on
18 the journey, we find better ways of accomplishing
19 that, otherwise we'd still all be driving a Model
20 A.
21     BY MR. ARANOFF:
22     Q.  So is it correct to say that the hundred
23 percent rule program moved from a science-based
24 production program to a marketing program; is that
25 accurate?

49  (Pages 190 to 193)

HIGHLY CONFIDENTIAL

Page 194

1    MR. ONDECK: Objection, document speaks
2 for itself.
3    THE WITNESS: No, I -- I think I said
4 what I said here. I don't think -- the components
5 of the program that pertain to what we're doing
6 with production are all science-based. But the
7 requirement for 100 percent of all your production
8 have to be there in order to participate in the
9 United Egg Producer's certified program was the
10 portion that I felt was not appropriate.
11 BY MR. ARANOFF:
12    Q. What did you mean when you said
13 "universal marketing program"?
14    A. That they were trying to create
15 everybody's eggs, being everybody producing the
16 eggs in the exact same fashion.
17    Q. For purposes -- for marketing purposes?
18    A. No. That everybody would produce eggs in
19 the exact same fashion. What are you going to do
20 with your product? Are you going to sit on it or
21 are you going to sell it?
22    Q. You're going to sell it; right?
23    A. Correct.
24    Q. All right. Now, you then move on, on the
25 top of page three, you say, "We, in essence, are

Page 195

1 forcing all producers to incur additional
2 production costs even though many of their
3 individual customers will likely refuse to pay a
4 premium." Do you see that?
5    A. Yes.
6    Q. What did you mean by that?
7    A. That we had several of our customers that
8 were unwilling to pay the additional production
9 costs that would be incurred in order to comply
10 with the standards of the United Egg Producers.
11 And again, back to our base business model, we do
12 what they ask for, when they want it, where they
13 want it and how they want it.
14    If they weren't asking for it, we
15 weren't going to do it for them because we want to
16 supply what they're looking for, not tell them what
17 they are going to get.
18    Q. So in your opinion, it didn't make sense
19 to follow a program that wasn't based on what the
20 customers were asking for; right?
21    MR. ONDECK: Objection, calls for
22 speculation.
23 BY MR. ARANOFF:
24    Q. Okay. You can answer.
25    A. We -- we did not join the program because

Page 196

1 our customers weren't asking for it.
2    Q. Okay. And then further down on page
3 three it said, "I would suggest that adding eight
4 to $0.10 to our cost of production will make us
5 inefficient producers, not geniuses, unless the
6 customer is willing to permanently pay the premium
7 associated with these enhanced practices." What
8 did you mean by that?
9    A. That the animal agriculture in general,
10 and specifically egg production, is an extremely
11 small margin business. We deal in fractions of
12 cents. And when you're adding whole pennies and
13 multiple of them in terms of eight to $0.10 a dozen
14 to the cost, it's a significant cost which puts you
15 in a far more volatile position, if you're a market
16 producer, to be in an upside down position.
17    Now, in our case, eight to $0.10,
18 because we're on a base price, with adjustment, but
19 predicated on the Chicago Board of Trade, if our
20 customers were not willing to pay that premium, we
21 would be upside down on every pound of egg we
22 produced and sold. We would, in essence, lose
23 money on every pound of egg we produced and sold.
24    Q. And then on the bottom of page four, it
25 says "For these and many other reasons, I" --

Page 197

1    A. Apologize. I'm not there yet. 'Cause
2 you're going to ask me is that right, and I'm not
3 there yet. Okay. Go ahead.
4    Q. "For these and many other reasons I
5 advocate that, first and foremost, we need to
6 listen to our customers and what they want. We
7 should avoid falling into the one-size-fits-all
8 syndrome, thus, I still feel we need to find some
9 compromised position from the hundred percent
10 requirement or no certification program." Right?
11 That was your position at that time?
12    A. Yes.
13    Q. And does that still remain your position
14 to this day?
15    A. Yes. We still are not part and still are
16 not members of the UEP certified program.
17    Q. Okay. As you sit here today, you don't
18 think that the product that you sell to your
19 customers is any way inferior as a result of not
20 having participated in the UEP's one hundred
21 percent rule program?
22    MR. ONDECK: Objection.
23    THE WITNESS: I thought we covered this
24 fairly extensively before we went to break, sir. I
25 don't think my answers have changed.

50  (Pages 194 to 197)

HIGHLY CONFIDENTIAL

Page 198

1  BY MR. ARANOFF:
2      Q.  But that was with respect to the UEP
3  certified program.  Now I'm asking you with respect
4  to the one hundred percent rule.  Do you think that
5  not being a hundred percent compliant with the
6  UEP's programs resulted in an inferior product on
7  your part?
8          MR. ONDECK:  Objection.
9          THE WITNESS:  We produce our eggs
10  utilizing humane practices and produce superior
11  quality product that meet and exceed our customer
12  specifications for the bacterial and microbial
13  portion, as well as temperature and everything else
14  that our customers are asking us to meet.
15  BY MR. ARANOFF:
16      Q.  So that's a no?
17          MR. ONDECK:  Objection, mischaracterizes
18  his testimony.
19          THE WITNESS:  I answered the question,
20  sir.
21          MR. ARANOFF:  Okay.
22          (Exhibit 14 marked for identification.)
23  BY MR. ARANOFF:
24      Q.  Mr. Rehm, I'm going to show you what's
25  been marked as Rehm Exhibit 14 for purposes of

Page 199

1  identification, a multi-page document bearing a
2  Confidential legend.  It's a document entitled
3  Memorandum, and it bears the Bates number
4  DAY0014292 and continues to DAY0014294.
5      For purposes of expediting this, I will
6  tell you that I intend to ask you questions only
7  with respect to the first page, under the title:
8  Problem Number One, the Hundred Percent Rule, and
9  just verify that it's your signature on the bottom
10  of page three.  All set?
11      A.  Yeah.  Yes.
12      Q.  Okay.  Recognize this document, Mr. Rehm?
13      A.  Yes, I do.
14      Q.  Okay.  And just for clarification
15  purposes, this document is -- bears your signature
16  at the bottom, William Rehm, president and CEO of
17  Daybreak Foods, Inc.?
18      A.  Yes.  And there are multiple signators to
19  this document.
20      Q.  Okay, I'm holding what I think is the
21  complete document, and I only see your signature on
22  it.
23      A.  No, I believe this document was produced
24  by Sparboe with members -- all the members of the
25  UEP that opposed the one hundred percent rule.  I'm

Page 200

1  signed on as a supporter of this memo because I
2  oppose the one hundred percent rule.
3      Q.  Right.  So how do you know that from the
4  basis of this document?  'Cause it only -- just for
5  the record, it only has your signature on it.  Are
6  you somehow claiming that this document is
7  incomplete?
8          MR. ONDECK:  Objection, mischaracterizes
9  that he would only know things from the basis of
10  the document.
11          THE WITNESS:  This is not a document that
12  I drafted and developed.  This is a document that I
13  believe was drafted by somebody at Sparboe,
14  possibly Garth Sparboe.  And I'm on here as a
15  signator.  And there are multiple signators to this
16  document supporting this memo.
17  BY MR. ARANOFF:
18      Q.  But when you say there's multiple
19  signators to the document, the document that you're
20  holding, which is three pages in length, for
21  purposes of clarification for the record, only
22  contains one signator on it; is that right?
23      A.  The document in its entirety, which I do
24  not have, never had in my file, was signed by
25  multiple UEP members supporting what was said in

Page 201

1  this memorandum to Al Pope and Gene Gregory.
2      Q.  Who are the -- besides Garth Sparboe, who
3  you just identified, is there anybody else that you
4  can recollect that was a signator to this document
5  even though their signature doesn't appear on the
6  document today?
7      A.  I would be speculating the other
8  signators to be Michael Foods.
9      Q.  Okay.  Anyone else?
10      A.  Jim Dean.  And these are pure
11  speculation.  I do not have -- because I've never
12  had in my hands all the signature pages of
13  everybody else.
14          MR. ONDECK:  I object to the authenticity
15  of this document.
16  BY MR. ARANOFF:
17      Q.  Well, it was produced from within
18  Daybreak's file because it bears the legend of
19  Daybreak on it.  So it was produced from someone in
20  your company, presumably you.
21      A.  Fine.
22      Q.  Before we address Mr. Ondeck's
23  objections, other than Michael Foods, Garth
24  Sparboe, and Jim Dean, is there anybody else that
25  you can think of that would have been a signator to

51  (Pages 198 to 201)

HIGHLY CONFIDENTIAL

Page 202

1  this document?
2       MR. ONDECK:  Objection, misstates
3  testimony.  You believe were signatories.
4       THE WITNESS:  Yes.  I'm not sure about
5  Wabash Valley, possibly.
6  BY MR. ARANOFF:
7       Q.  Anyone else?
8       A.  I know -- I believe there were more, but
9  I cannot recall who they may possibly be.
10      Q.  Okay.  And if I wanted to -- assuming
11 that you're correct and that there are more
12 signators to this document, do you know of anyone,
13 as you sit here today, that is in possession of a
14 full copy of this document?
15      A.  Do not.
16      Q.  Have you seen this fully executed
17 document at any point in time?
18      A.  No.
19      Q.  So how do you know that there are more
20 signatories to it?
21      A.  Because I -- this was -- I know that this
22 was something put together by the Sparboe
23 organization in soliciting support.  This is not a
24 document that I drafted.  And if you look at the
25 top, it says "to" and it says "from the

Page 203

1  undersigned."
2       Q.  Right.
3       A.  Not just me.  There are multiple
4  signators to the document.
5       Q.  Okay.  Well, for the record, the only
6  signator on this document, again, is you, Mr. Rehm.
7  There's a space after your signature and company, a
8  sizeable space which is blank, there's no signature
9  there.  And I'm unaware of there being any other
10 page of this document.  But that's a discussion
11 that perhaps we can have another time.
12      MR. ONDECK:  Object to counsel
13 testifying.
14      MR. ARANOFF:  Anyway --
15      MR. ONDECK:  I note on page three it
16 says, "This document is signed in counterparts,"
17 which is commonly understood in the legal field as
18 there could be multiple people signing on different
19 pages.
20      MR. ARANOFF:  Well, then the document
21 wasn't adequately produced because we don't have
22 the remaining pages.
23      MR. ONDECK:  I object to the authenticity
24 of this document.  It's a fragment.
25      MR. ARANOFF:  You produced it, so I guess

Page 204

1  you're objecting to your own production.
2       MR. ONDECK:  Correct.  It's a document
3  fragment.  I object.
4  BY MR. ARANOFF:
5       Q.  If you look at the middle of the first
6  page under problem number one, "the hundred percent
7  rule," it says, "The problem is particularly
8  troublesome to us for two reasons:  One, the
9  marketing economic perspectives involved, and two,
10 procedurally how it was adopted."  Okay.  Then, if
11 you skip three lines, or to the middle of the third
12 line of the first paragraph, it says, "Imposing the
13 hundred percent rule will have the effect of
14 commoditizing the market and thus increasing the
15 difficulty of differentiating and capturing higher
16 margins, especially for smaller producers.
17            It is inconceivable that the
18 demand for eggs in all of its forms will not suffer
19 as a result on increasing the production cost of
20 shellings.  True, prices may rise in the short-term
21 as flock sizes are decreased, but those gains will
22 be short lived and will not endure as supply and
23 demand move back to equilibrium."  Do you see that?
24      A.  Yes.
25      Q.  Have I read that correctly?

Page 205

1       A.  Yes.
2       Q.  Do you agree with this?
3       A.  I agree with the bulk of it.  The reason
4  for my signature on this document was supporting
5  the argument against the one hundred percent rule.
6  That's why I signed on.  All the intricacies of
7  Sparboe's arguments in here can, at times, be
8  verbose and at times be bullying.
9            My signature to be part of this group
10 of signators to the document was to show support
11 that I do not believe, and we do not believe, the
12 one hundred percent rule is the right way to go in
13 attacking -- the one hundred percent rule is not
14 appropriate.
15      Q.  Okay.  But --
16      MR. ONDECK:  Object to the answer.  Move
17 to strike the word "bullying."
18 BY MR. ARANOFF:
19      Q.  Okay.  But the signature at the bottom is
20 still your signature; correct?
21      A.  I've answered that.
22      Q.  Okay.  And are you aware at this time of
23 any -- having seen this document, of you having
24 responded to it or objected to it in any way,
25 shape, or form?

HIGHLY CONFIDENTIAL

Page 206

1    A.  No.
2    Q.  Okay.  Now, if you look at the bottom
3  also of page three of the document, above your
4  signature, about -- not the last paragraph, but the
5  penultimate paragraph says, "We believe, as we know
6  UEP does as well, that the main objective of animal
7  husbandry programs is to have one unified program
8  which is centered around customers' needs and
9  requirements.  Should we not be able to reach a
10  unified compromise or alternative program, our
11  industry will soon end up with exactly what it does
12  not want, fragmentation and discord."  Do you see
13  that?
14    A.  Yes.
15    Q.  Did I read that correctly?
16    A.  Yes.
17    Q.  What did you mean when you said
18  "fragmentation and discord"?
19      MR. ONDECK:  Objection.
20      THE WITNESS:  I didn't write it.
21  BY MR. ARANOFF:
22    Q.  But you signed onto it; right?
23    A.  Yes.
24    Q.  Okay.  So did you -- did you -- you
25  signed on to it assuming that you agreed with the

Page 207

1  positions taken in the document; correct?
2      MR. ONDECK:  Objection, mischaracterizes
3  prior testimony.
4  BY MR. ARANOFF:
5    Q.  Okay.
6    A.  I already testified that I've signed on
7  because I was opposed to the one hundred percent
8  rule.  And whatever way I could to get it in front
9  of the UEP, this was an additional way of showing
10  our opposition to the one hundred percent rule.
11    Q.  Okay.
12      (Exhibit 15 marked for identification.)
13  BY MR. ARANOFF:
14    Q.  Mr. Rehm, I'm going to show you what's
15  been marked as Rehm Exhibit 15 for purposes of
16  identification.
17    A.  Yep.
18    Q.  It's a three-page document labeled
19  Confidential, bearing the Bates number DAY0024746
20  and continuing to DAY0024748.  I'll give you a
21  minute to take a look at it.  I'm going to
22  primarily focus on the top of the first page, the
23  Roman numeral number one.  When you're all set, we
24  can --
25    A.  Okay.

Page 208

1    Q.  -- proceed.  All set?
2    A.  Yes.
3      MR. ONDECK:  Objection as to the
4  legibility of the copy of this document.
5      MR. ARANOFF:  What about it is illegible?
6      MR. ONDECK:  I can't read many of the
7  words.
8      MR. ARANOFF:  Again, this was a document
9  that was produced by Daybreak.  Presumably you guys
10  produced it.
11      MR. ONDECK:  It could have been written
12  in Chinese and we produced it.  I can't read it.
13      MR. ARANOFF:  Well, let's see.
14  BY MR. ARANOFF:
15    Q.  Did you write this document?  Is this
16  your handwriting?
17    A.  Yes.
18    Q.  And if you look at the top right-hand
19  corner, you'll see it says "page one of three."  Do
20  you see that?
21    A.  Yes.
22    Q.  There's a signature next to that.  Do you
23  know whose signature that is?
24    A.  To the right of it?
25    Q.  Yeah.  Or initials, I should say, to the

Page 209

1  right.
2    A.  Okay.  Those are my initials.
3    Q.  And there's a date underneath it?
4    A.  Yes.
5    Q.  Can you make out what the date is?
6    A.  2/6/03.
7    Q.  Okay.  And at the top it lists a variety
8  of people; do you see that?
9    A.  Yep.
10    Q.  Can you identify the people that are
11  listed there, please?
12    A.  Ken Looper, Paul Bahan, Joe Fortin, Bob
13  Krouse, Garth Sparboe, Bill Gaucher (phonetic.)
14    Q.  Okay.  And from what company is Ken
15  Looper?
16    A.  Cal-Maine Foods.
17    Q.  Okay.  And from what company is Paul
18  Bahan?
19    A.  Bahan.
20    Q.  Bahan.
21    A.  I'm not sure.  I'm thinking it's Tampa
22  Farm Services, but I'm not positive.
23    Q.  And Joe Fortin?
24    A.  Moark.
25    Q.  Okay.  And Bob Krouse?

53  (Pages 206 to 209)

HIGHLY CONFIDENTIAL

Page 210

1      A. Midwest Poultry Services.
2      Q. Okay. And Garth Sparboe?
3      A. Sparboe.
4      Q. Right. And Bill Gaucher is Gaucher or
5   Goshay?
6      A. Gaucher.
7      Q. Gaucher. Bill Gaucher.
8      A. Michael Foods.
9      Q. Do you have a recollection as you sit
10  here today when this was -- when you wrote this?
11     A. February 6, 2003.
12     Q. Okay. Do you remember -- do you remember
13  where you were when this was written?
14     A. I don't remember where specific I was. I
15  believe we were in Minneapolis at a meeting trying
16  to figure out if we could come -- develop a
17  compromise to the one hundred percent rule.
18     Q. Okay. To the best of your recollection,
19  going back to Exhibit No. 14, which we just talked
20  about, are these people that are on the handwritten
21  document, which is Exhibit 15, the additional
22  signators to Exhibit 14?
23     A. No.
24     Q. Okay. Are any of them the same other
25  than Garth Sparboe?

Page 211

1      A. Are any of them the same in what fashion?
2   As --
3      Q. Well, you testified -- let me try to be
4   as clear as I can. You testified just a few
5   moments ago with respect to Exhibit No. 14 that
6   there were other signators to this --
7      A. Yes.
8      Q. -- to this document, okay? One of whom
9   you thought was Garth Sparboe; right?
10     A. Yes.
11     Q. You mentioned a few others, all right?
12  Jim Dean was one, and there may be some others from
13  there. I'm asking you whether, when you look at
14  Exhibit No. 15, that refreshes your recollection as
15  to who some of the other signators to Exhibit
16  No. 14 might have been.
17     A. It does not refresh my memory.
18     Q. Okay. You see, in Roman numeral number
19  one, okay, it says, "Reason for one hundred percent
20  rule." You see that?
21     A. Uh-huh. Uh-huh.
22     Q. And A is supply management; right?
23     A. Uh-huh.
24     Q. Okay. Do you -- I presume that having
25  written this, you agree that one of the reasons for

Page 212

1   the hundred percent rule was supply management;
2   correct?
3      A. Wrong.
4      MR. ONDECK: Objection.
5   BY MR. ARANOFF:
6      Q. So why is that written there?
7      A. These are my notes from the meeting, and
8   we -- if you look at the top three names, Looper,
9   Bahan and Fortin, they're -- we had two
10  contingencies at this meeting. One contingency was
11  in support of the hundred percent rule, the other
12  contingency was opposed to the one hundred percent
13  rule. And we were trying to see could we get --
14  come to a meeting of the minds.
15     Q. Who is -- I'm sorry if I interrupted you.
16  No, go ahead.
17     MR. ONDECK: Please finish your answer.
18     THE WITNESS: These are just simply notes
19  that I took from their explanation of why they felt
20  the hundred percent rule was required.
21  BY MR. ARANOFF:
22     Q. Okay. And you say "they." So can you
23  please go through the people at the top of the page
24  and tell me which ones of those were in favor of
25  the hundred percent rule and which ones of those

Page 213

1   were against the hundred percent rule.
2      MR. ONDECK: Objection, I think it calls
3   for speculation.
4      MR. ARANOFF: Well, if you know, it's not
5   speculation. And you gotta stop doing that,
6   because that's a speaking objection.
7      MR. ONDECK: Objection, speculation.
8      MR. ARANOFF: Same response.
9      MR. ONDECK: That's not a speaking
10  objection.
11  BY MR. ARANOFF:
12     Q. Go ahead.
13     A. My expectation and understanding was
14  Looper, Bahan and Fortin were on the -- for the one
15  hundred percent rule; Sparboe, Gaucher, Krouse was
16  willing to be on both sides trying to create common
17  ground for everybody. And you know my position.
18     Q. Right. So when you said the reasons for
19  the hundred percent rule supply management, that
20  represented, to the best of your knowledge, the
21  opinions of Looper, Bahan, and Fortin?
22     A. And everybody that was in favor of the
23  one hundred percent rule at the United Egg
24  Producers.
25     Q. And then if you look at D, same under

HIGHLY CONFIDENTIAL

Page 214

1    Roman numeral one --
2        A.  Yep.
3        Q.  -- it says, "Wedged between breakers and
4    shell to prohibit breakers from selling shells."
5    Can you read what it says after that?
6        A.  Yeah.  "Shells to the grader at certain
7    times of the year."
8        Q.  What did you mean by that?
9        A.  That as we're going through here, this
10   was -- they told us why they thought, in A and B
11   and C, why they needed to have it, and then we put
12   down opposed to it because we -- we felt like this
13   was a reason that they wanted the hundred percent
14   rule, and that this would drive a wedge between the
15   shell egg market and the breaker -- breaker market.
16       Q.  Just a second.  Have you heard of an
17   entity -- and I think we may have talked about it
18   before, but again, just for context purposes, have
19   you heard of an entity called Day Lay Eggs?
20       A.  Yes.
21       Q.  What is Day Lay Eggs?
22       A.  It was a company in the state of Ohio
23   that produced and sold graded product.
24       Q.  Did there come a point in time where
25   Daybreak purchased day leg eggs?

Page 215

1        A.  We purchased the assets of day leg eggs,
2    not -- I need to recharacterize that.  I apologize.
3    We purchased certain assets of day leg eggs.
4        Q.  What assets of day leg eggs did you
5    purchase?
6        A.  We purchased a couple of their farms and
7    processing plants.
8        Q.  Was there ever a payment where -- well,
9    withdrawn.  What kind of products did day leg eggs
10   produce?
11       A.  I believe I said that already.  They're
12   an integrated market.
13       Q.  And just for purposes, again, of context,
14   when you say they're in the graded market, what
15   does that mean?
16       A.  Means that the eggs that they sold ended
17   up -- were sold to the retail establishments for
18   sale to the consumer.
19       Q.  And you may have said this, and I may
20   have missed it, so I apologize.  What year did you
21   make that acquisition?
22       A.  2007, I believe.
23       Q.  At any point in time prior to your
24   purchase of day leg eggs were day leg eggs UEP
25   certified?

Page 216

1        A.  Day Lay had a UEP certification number.
2        Q.  And upon your purchase of Day Lay Eggs in
3    roughly 2007, were they still UEP certified?
4        A.  At the time we acquired the assets, Day
5    Lay still had a UEP certified number.
6        Q.  Okay.  And when you purchased Day Lay
7    Eggs, was it your intention to keep them UEP
8    certified or to take them off the certification
9    program?
10           MR. ONDECK:  Objection,
11   mischaracterization.
12           THE WITNESS:  Day Lay had some customers
13   that we desired to try to maintain in the interim
14   while we transitioned the processing plants into
15   inline breaking operations.
16   BY MR. ARANOFF:
17       Q.  Did there come a point in time where Day
18   Lay went under some kind of a name change?
19       A.  Day Lay?
20       Q.  Yeah.
21       A.  I don't know.
22       Q.  Okay.  Is there any -- well, let me
23   withdraw that question.  Have you heard of an
24   entity called New Day Farms?
25       A.  New Day Farms is a wholly-owned

Page 217

1    subsidiary of Daybreak Foods.
2        Q.  At any point in time was -- is there any
3    relationship at all between New Day Farms and Day
4    Lay Egg Farms?  Are they related in any way other
5    than --
6        A.  I think I told you, sir.  New Day is a
7    wholly-owned subsidiary of Daybreak.
8        Q.  Right.
9        A.  And that is an entity that then acquired
10   the assets, some of the assets, of Day Lay Egg
11   Farm.
12           (Exhibit 16 marked for identification.)
13   BY MR. ARANOFF:
14       Q.  Mr. Rehm, I'm showing you what's been
15   marked as Rehm Exhibit 16 for purposes of
16   identification.  It's an e-mail, it's two pages in
17   length, labeled Highly Confidential.  Bates number
18   DAY0003359 through DAY0003360.  Take a look at the
19   document for a minute and then I'll ask you a
20   question.
21       A.  Okay.
22       Q.  Okay.  You recognize this document?
23       A.  Yes.
24       Q.  What do you recognize it to be?
25       A.  A memo from Gene Gregory.

55  (Pages 214 to 217)

HIGHLY CONFIDENTIAL

Page 218

1    Q.  And in particular, you'll see that this
2  is an e-mail from Gene Gregory to Linda Ricard and
3  Patricia at United Egg.  Who is Linda Ricard, do
4  you know?
5    A.  An employee of UEP.
6    Q.  And who is Patricia at United Egg?
7    A.  Same answer, no, I'm --
8    Q.  Did you say you don't know?
9    A.  Nope.
10    Q.  And you're CCd on it; right?
11    A.  Yes.
12    Q.  Okay.  And the subject is New Day Farm?
13    A.  Yes.
14    Q.  New Day Farms, LLC, I should say.  If you
15  look at the -- at the e-mail sent from Gene Gregory
16  to those individuals, it says, "Linda and Patricia,
17  the Day Lay Egg Farm assets in Ohio has been sold
18  to Bill Rehm personally and the farm name has been
19  changed to New Day Farms, LLC."  You see that?
20    A.  Uh-huh.
21    Q.  Okay.  You personally -- I assume
22  "personally" means different than Daybreak -- than
23  Daybreak; is that correct?  You bought than
24  personally?  You bought Day Lay Egg Farm's assets
25  in Ohio personally?

Page 219

1    A.  No.  Gene has it mischaracterized.
2    Q.  Okay.  So what's the correct answer to
3  that?
4    A.  New Day Farms purchased some of the
5  assets of Day Lay Egg Farm.
6    Q.  Okay.  And it says in the third
7  paragraph, "We have agreed to change Day Lay's UEP
8  certified," which UEP and certified are in quotes
9  and are bolded, "animal welfare status to the name
10  of New Day Farms, LLC, and transfer the
11  certification number 111 to New Day Farms, LLC.
12  Please change your records to reflect this.  And
13  any further published list of certified companies
14  should reflect New Day Farms, LLC as certified.  I
15  will notify USDA of this change, and that when the
16  2007 audit is conducted, that it be done so in the
17  name of New Day Farms, LLC."  Do you see that?
18    A.  Uh-huh.
19    Q.  Is that accurate?
20    MR. ONDECK:  Objection, confusing
21  question.
22    THE WITNESS:  It is what it is.  But
23  Gene, as he so often does, gets ahead of himself
24  and confused, and assumed that we were going to be
25  able to comply throughout New Day and Daybreak with

Page 220

1  the animal welfare standards, the one hundred
2  percent rule, and that didn't work.
3  BY MR. ARANOFF:
4    Q.  Why didn't that work?
5    A.  Because I thought if we had New Day, and
6  New Day was on the program, New Day's -- New Day's
7  eggs would be a hundred percent and Daybreak would
8  be fine.  And working with Gene, he misunderstood
9  and assumed that we were just making the change and
10  going to be a hundred percent all throughout.  And
11  we couldn't accept that, because again, we're back
12  to Daybreak, Daybreak, New Day, does what our
13  customers are looking for.
14    So Gene got out in front of himself.
15  We couldn't accept it.  Never became a certified
16  company, never had a certified number, never took
17  on the certification of 111 because we couldn't do
18  it.  We couldn't accept it because we're back to
19  the one hundred percent rule and all that.
20    Q.  So is it your testimony that New Day
21  Farms never became UEP certified?
22    A.  That's correct.
23    Q.  Then it says, "We are also working with
24  Bill to move Daybreak Foods -- Daybreak Foods into
25  the UEP certified status.  We will provide

Page 221

1  information as this transition is more clearly
2  identified."  And I assume that that's further
3  identification of what you were saying before of
4  Gene getting ahead of himself?
5    A.  Yes.
6    (Exhibit 17 marked for identification.)
7  BY MR. ARANOFF:
8    Q.  Mr. Rehm, I'm showing you what's been
9  marked as Rehm Exhibit 17 for purposes of
10  identification.  It's a single document labeled
11  Confidential, bearing the Bates range DAY0003559.
12  It purports to be an e-mail to Terry Baker, Toby
13  Catherman from you dated Wednesday, 8/15/2007, with
14  the subject of UEP certification.  Do you see that?
15    A.  Yes.
16    Q.  I'll give you a second to look at it, and
17  then we can talk about it.
18    A.  Okay.
19    Q.  Okay.  You recognize this e-mail?
20    A.  I don't recall writing it, but --
21    Q.  Okay.  First, who is Terry Baker?
22    A.  He is one of the, I want to call him
23  purchasing agents, for Michael Foods.
24    Q.  Okay.  And who is Toby Catherman?
25    A.  Same thing.

56  (Pages 218 to 221)

HIGHLY CONFIDENTIAL

Page 222

1    Q.  Okay.  It says, "Gentlemen" -- you
2  purportedly wrote this.  "Gentlemen, I would like
3  to have a conversation with the two of you sometime
4  today if possible.  Gene at the UEP is threatening
5  New Day Farms with explosion from the UEP certified
6  program unless we change Daybreak's production
7  practices at the Oak Ridge facility."  What
8  specifically were you referencing in this sentence?
9    A.  That he was not going to allow New Day to
10  have a UEP certified number.
11    Q.  And just for clarification purposes, I
12  read that correctly; right?
13    A.  Yeah.  Well, the spelling on my part
14  wasn't very good.
15    Q.  Right.  I'm not trying to embarrass you,
16  I'm just trying to clarify.  It says "explosion";
17  you meant "expulsion"; is that right?
18    A.  Yes.
19    Q.  So anyway, yeah, I think I might have
20  interrupted you.  So again, what did you mean
21  by -- by this sentence, just for clarity's sake?
22    A.  I thought I answered that.
23    Q.  You did, but I didn't hear you.  Could
24  you repeat what you said?
25    A.  No.  You can have her read it back if you

Page 223

1  want to hear it again.
2    Q.  Okay.
3        MR. ARANOFF:  Could you read his answer
4  back, please?
5        COURT REPORTER:  "That he was not going
6  to allow New Day to have a UEP certified number."
7  BY MR. ARANOFF:
8    Q.  Okay.  Was there anything else that he
9  threatened you with other than not giving you the
10  UEP certified number?
11        MR. ONDECK:  Objection, assumes facts not
12  in evidence.
13  BY MR. ARANOFF:
14    Q.  You can answer.
15    A.  Not that I'm aware of.
16    Q.  Okay.  And then it says, "Oak Ridge is
17  the location you receive the eggs from in Iowa, and
18  is the only New Day or Daybreak facility that is
19  not transitioning to the UEP animal welfare
20  production practices."  What did you mean by that?
21    A.  That all of our -- all of the
22  Daybreak/New Day facilities are either at or
23  in -- either are at or transitioning to a
24  customer-driven animal welfare production practices
25  program.

Page 224

1    Q.  But this says "UEP animal welfare
2  production practices"; do you see that?
3    A.  Uh-huh.
4    Q.  So why would you be referencing the UEP
5  animal welfare production practices when
6  you're -- when your practice had been customer
7  driven?
8    A.  Because not having a crystal ball and
9  knowing -- having a gentleman sitting across the
10  table asking the questions that you're asking, I
11  used those words in a very generic sense to
12  reference an animal welfare program.
13    Q.  Okay.  Have you ever heard of a gentleman
14  named Ken Klippen?
15    A.  Yes.
16    Q.  Who's Ken Klippen?
17    A.  I don't know how to describe him.
18    Q.  Okay.  Does he have anything to do with
19  the egg industry?
20    A.  I don't -- again, I don't know how to
21  describe that.  I don't know what he specifically
22  does.
23    Q.  Have you ever met with Ken Klippen?
24    A.  I know Ken Klippen.
25    Q.  Okay.  In what circumstance have you met

Page 225

1  him?
2    A.  I've met him at industry functions.
3    Q.  Has Mr. Klippen ever approached you about
4  joining on to an alternative animal welfare
5  program?
6    A.  He asked us about the process verified
7  program, which is a program established by the --
8  it's a USDA program.  And we did not sign onto it
9  and/or support it.  He approached us about things.
10  We didn't do anything with it.
11    Q.  Do you know whether Mr. Klippen ever
12  attended any UEP meetings?
13    A.  He probably did, yeah.
14    (Exhibit 18 marked for identification.)
15  BY MR. ARANOFF:
16    Q.  Mr. Rehm, I'll show you what's been
17  marked as Rehm Exhibit 18 for purposes of
18  identification.  This is a chain e-mail, two pages
19  long, bearing a Confidential legend.  And it is
20  Bates stamped DAY0002644 to DAY0002645.  I'll give
21  you a minute to take a look at it.
22        Going from the bottom to the top, the
23  bottom e-mail is from Ken Klippen to, I presume,
24  you, subject Yesterday's Meeting.  I assume you're
25  William at Daybreaksdot-com; right?

57  (Pages 222 to 225)

HIGHLY CONFIDENTIAL

Page 226

1    A.  Yes.
2    Q.  Then there's an e-mail on top of that
3  from you to Ken Klippen dated November 1, 2006. Do
4  you see that?
5    A.  Yes.
6    Q.  Okay.  Take a look at the document, then
7  I'll ask you a few questions.
8    A.  Yes.
9    Q.  Okay.  So let's start with the bottom.
10  You see that this is essentially a, looks like a
11  letter even though it's in e-mail form, from Ken
12  Klippen to you; right?
13    A.  Yeah.
14    Q.  Okay.  It says, "Dear Bill, I'm sorry you
15  missed yesterday's egg industry meeting at the
16  Marriott O'Hare hotel.  It was a productive
17  meeting, many said, as it provided the forum to
18  talk about an alternative animal welfare program
19  that would not mandate a hundred percent of your
20  production to be in compliance.
21       A customer-driven program is
22  defensible, as retailers are looking for assurances
23  of a program that meets their needs, not a program
24  requiring your production to be a hundred percent
25  under a solitary set of guidelines.  After all,

Page 227

1  you're selling eggs to your customers, not the
2  animal rights organizations who will never be
3  satisfied, nor ultimately accept, any caged layer
4  production."  Do you see that?
5    A.  Yes.
6    Q.  Have I read that accurately?
7    A.  Yes.
8    Q.  Okay.  And do you recall having received
9  this?
10    A.  Don't recall it.  But, you know, it's my
11  e-mail and I'm -- speaks for itself.
12    Q.  Okay.  And do you agree with this, with
13  what Mr. Klippen says here?
14    A.  No.  He was trying to solicit our
15  participation.  And I, trying to be kind, going
16  back to him, thanking him for the invitation.  But
17  at the end of the day, I was just being that, kind.
18    Q.  Did you ever join Ken Klippen's
19  alternative animal welfare program?
20    A.  No, I did not.
21    Q.  Do you have an understanding as you sit
22  here today about what the differences, if any,
23  there are between Ken Klippen's proposed animal
24  welfare program and that of the UEP?
25    A.  I do not know what they are.

Page 228

1    Q.  Did you ever get any materials for
2  consideration from Mr. Klippen to consider in
3  deciding whether you wanted to join his alternative
4  animal welfare program?
5    A.  Did not.
6    Q.  Okay.  So aside from this correspondence
7  between you and Mr. Klippen, do you recall ever
8  having had any other interaction with him with
9  respect to his animal welfare program?
10    A.  I do not recall.
11    Q.  Do you know whether any other egg
12  producing entities ever did join Mr. Klippen's
13  alternative animal welfare program?
14    A.  I do not know.
15    Q.  Do you know whether Mr. Klippen's
16  alternative animal welfare program is in effect
17  today?  Is it operational?
18    A.  I do not know.
19    Q.  Do you know -- withdrawn.  Has -- besides
20  you, is there anyone at your company, that you're
21  aware of, that has had any interaction with
22  Mr. Klippen with respect to his alternative animal
23  welfare program?
24    A.  No, there has -- there has not been, to
25  the best of my knowledge.

Page 229

1    Q.  Okay.  There's a second paragraph of the
2  letter from Mr. Klippen to you.  Says, "Several in
3  attendance at yesterday's meeting said they
4  appreciated the balance of opinions in the
5  discussions.  This contributed to more opinions
6  being expressed... something that appears to be
7  more difficult to do at other meetings where the
8  attendance is very large."
9       When it says "several in attendance at
10  yesterday's meeting," do you have any idea who
11  those people were?
12    A.  No.
13    Q.  Have you ever had any discussion with
14  anybody else with respect to joining the animal
15  welfare program that Mr. Klippen was pushing?
16    A.  I don't believe so, no.
17    Q.  Okay.  Then the next paragraph says,
18  "Yesterday's meeting concluded with the idea of
19  moving forward in the investigation of alternatives
20  for welfare programs.  A budget for such a program
21  will be developed and shared with the committee
22  established.  Following approval, we will press
23  forward with the program to be presented to you and
24  others interested during the US Poultry and Egg
25  Exposition in Atlanta this January.  Sincerely, Ken

58  (Pages 226 to 229)

HIGHLY CONFIDENTIAL

Page 230

1  Klippen."  Do you see that?
2      A.  Yes.
3      Q.  I've read that correctly?
4      A.  I believe so.
5      Q.  Did you ever receive a budget for this
6  alternative welfare program from Mr. Klippen?
7      A.  No.
8      Q.  Do you know as you sit here today whether
9  Michael Foods or anybody at Michael Foods had any
10  interaction at all with Ken Klippen?
11      MR. GREENE:  Objection, foundation.
12      THE WITNESS:  I don't know.
13  BY MR. ARANOFF:
14      Q.  Okay.  Did you ever hear of a gentleman
15  by the name of Craig Morris?
16      A.  That name does not sound familiar.
17      MR. ARANOFF:  Mark this.
18      (Exhibit 19 marked for identification.)
19  BY MR. ARANOFF:
20      Q.  Mr. Rehm, I'll show you what's been
21  marked as Rehm Exhibit 19 for purposes of
22  identification.  Again, it's an e-mail chain.  It's
23  a two-page document labeled Highly Confidential,
24  Bates number DAY0005094 through DAY0005095.  I'll
25  give you a second to look at it and then I'll ask

Page 231

1  you just a couple of questions.  All set?
2      A.  I think.
3      Q.  Okay.  You sure?  You sounded a little
4  tentative.  I don't want to rush you.
5      A.  Okay.
6      Q.  Okay.  Again, this is an e-mail chain, so
7  we'll start from the bottom and go up.  You'll see
8  that the last e-mail here is from -- purportedly
9  from you to Craig Morris; right?
10      A.  Uh-huh.
11      Q.  Does this refresh your recollection at
12  all as to who Craig Morris is?
13      A.  Not a clue.
14      Q.  Do you know what the abbreviation A like
15  Adam, M like Mary, S like Sam is next to
16  Mr. Morris' name?
17      A.  It's -- my interpretation would be that
18  it's a division of USDA.
19      Q.  Okay.  And this is an e-mail from you.
20  And it says, "Craig, thank you again for supporting
21  the USDA, the process verify program.  We feel this
22  is a great option for those companies that are not
23  UEP certified companies yet need to provide
24  customer verification of their customer-driven
25  animal welfare program that does not require a

Page 232

1  hundred percent compliance.  Feel free to contact
2  me at any time to help lend support to this program
3  for non-UEP certified companies."
4      You see that?  And then it gives your
5  phone number?
6      A.  Yep.
7      Q.  Okay.  Do you have any recollection of
8  having written this?
9      A.  No.
10      Q.  Okay.  Is the USDA processed verified
11  program the alternative animal welfare program that
12  was sponsored by Ken Klippen?
13      A.  I don't know.
14      A.  I didn't hear you.
15      A.  I do not know.
16      Q.  Okay.  Then if you look up, you'll see
17  that there's an e-mail from Craig Morris to both
18  Lloyd Day and Kenneth Clayton; you see that?
19      A.  Uh-huh.
20      Q.  Do you know who Lloyd Day is?
21      A.  I don't know who either of those
22  gentlemen are.
23      Q.  And you see the e-mail?  It's forwarded,
24  topic is UEP, subject to UEP.  It says, "Rough day
25  today with Gene and McCloud at UEP's animal welfare

Page 233

1  meeting.'  Do you know who McCloud is?
2      A.  Mike McCloud at McCloud, Watkins in DC, I
3  believe it is.
4      Q.  What is McCloud, Watkins, do you know?
5      A.  They work with the UEP, I believe, on
6  lobbying efforts.
7      Q.  So it's a lobbying firm, to the best of
8  your knowledge?
9      A.  I don't know.
10      Q.  Okay.  But they work on lobbying efforts?
11      A.  I believe.  I'm not positive.
12      Q.  Okay.  Continuing on, "They basically
13  told the group that we are going to destroy the egg
14  industry by working with Klippen and agreed to send
15  Lloyd a nasty letter outlining their concerns.
16  Several came up to me after the meeting to commend
17  me on keeping professional during the exchange.
18  The below is from a large breaker."  You see that?
19      A.  Uh-huh.
20      Q.  I've read that correctly?
21      A.  Yep.
22      Q.  Okay.  Do you know what he's referencing
23  when he says "the group" in the second sentence?
24  "They basically told the group."
25      A.  Don't know.

59  (Pages 230 to 233)

HIGHLY CONFIDENTIAL

Page 234

1    Q.  Okay.
2    A.  I mean, I can cut through some of this
3  for you if you want.  I mean at the end of the day,
4  I saw the process verified program through USDA as
5  a possible alternative for us to verify what we're
6  doing for our customers.  And I passed it up the
7  channel to Pat.
8    Q.  Okay.  Good.
9        THE WITNESS:  How far are we on the tape?
10  Is that -- if we're close to an end on the tape
11  or --
12       MR. ARANOFF:  I think that I am pretty
13  much done.  I may just take -- why don't we take a
14  break, I can do --
15       THE WITNESS:  Yeah, thanks.
16       THE VIDEOGRAPHER:  We're going off the
17  record at 3:10 p.m.
18        (Break taken.)
19       THE VIDEOGRAPHER:  We're back on the
20  record at 3:16.
21       MR. ARANOFF:  Okay.  And this is Ron
22  Aranoff.  I've completed my direct examination for
23  the moment.
24        E X A M I N A T I O N
25  BY MR. BJORK:

Page 235

1    Q.  Mr. Rehm, my name is John Bjork.  We met
2  earlier.  I represent direct action plaintiffs,
3  Publix and SuperValu.  I'm going to ask you a few
4  follow-up questions based on some of Ron's
5  questioning.  I'll do my best to make it quick, but
6  I might have to jump around a little bit.  So bear
7  with me.
8        THE WITNESS:  Can I make a request?  Can
9  you and Ron change?
10       MR. BJORK:  Yeah, absolutely.
11       THE WITNESS:  For me, it's easier to hear
12  you than down there.  Thank you, gentlemen.
13  BY MR. BJORK:
14    Q.  Sure.  So just to start, Mr. Rehm, I
15  wanted to touch quickly on some of the questioning
16  relating to New Day Farms.
17    A.  Okay.
18    Q.  How long after New Day Farms acquired Day
19  Lay did Day Lay continue to sell graded eggs?
20    A.  Let me try to correct your question --
21    Q.  Sure.
22    A.  -- make sure we have the right players,
23  'cause New Day, Day Lay, get back and forth.
24       Are you trying to ask me how long after New
25  Day acquired the assets -- a portion of the assets

Page 236

1  from Day Lay?
2    Q.  Correct.  Did Day Lay continue -- you
3  said before that Day Lay sold graded eggs; correct?
4    A.  Yes.
5    Q.  How long after the acquisition did Day
6  Lay continue to sell graded eggs?
7    A.  Okay.  I just want to make sure I have it
8  right.  I think they were -- I believe that Day Lay
9  was out of business at that point.
10    Q.  Okay.
11    A.  I believe that was basically the wrap-up
12  of their business at that point in time.
13    Q.  Okay.  When you say "wrap up," I mean,
14  are we talking that they continued to sell graded
15  eggs for six months after the acquisition, a year?
16    A.  They were out of business as it pertained
17  to the production and processing and sale of eggs.
18    Q.  Immediately -- well, when you took it
19  over, did the facilities that previously had been
20  run by Day Lay, did you continue to operate those
21  facilities, "you" being New Day Farms?
22    A.  That's why we acquired them, was to
23  create a -- transition them over to Daybreak's
24  business model, which is to convert it from the
25  shell market into the liquid market so that we

Page 237

1  could deliver unpasteurized, raw, liquid egg.
2    Q.  So New Day Farms never sold graded eggs?
3    A.  New Day Farms --
4        MR. ONDECK:  Objection, form of the
5  question.
6  BY MR. BJORK:
7    Q.  Go ahead.
8    A.  New Day Farms transitioned from the day
9  we acquired it to the day we were able to make the
10  transition in the plants.  Because it takes a
11  considerable amount of remodeling inside the
12  processing plant to convert it from a graded
13  facility to a breaking facility.  So we could
14  actually take the egg and separate it from the
15  shell and deliver raw, unpasteurized products for
16  our customers' utilization.
17    Q.  When you say there was a transition.  So
18  there was never any continuation of the sale of
19  graded eggs after the acquisition to New Day Farms?
20    A.  There was a transitional period where
21  some graded eggs were sold, yes.
22    Q.  And how long was that transitional
23  period?
24    A.  I don't know in terms of duration for
25  sure.

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

HIGHLY CONFIDENTIAL

Page 238

1  Q.  Okay.  If you could approximate?
2  A.  Under a year.
3  Q.  Under a year?
4  A.  Six months, you know.
5  Q.  Okay.
6  A.  I was -- like I said, it's a complex and
7  complicated and difficult process to transition
8  from shell/egg grading operation to an inline
9  breaking operation.  The Food Safety regulations,
10  the food integrity process, the building material
11  properties, are significantly different.
12  Q.  Okay.  Understood.  Now, during that
13  transition you approximated six months or so, or
14  less than a year, did you continue -- at those
15  facilities did you continue to adhere to the UEP
16  guidelines?
17  MR. ONDECK:  Objection to the form of the
18  question.  Also objection, that assumes facts not
19  in evidence.
20  THE WITNESS:  Yes and no.
21  BY MR. BJORK:
22  Q.  Okay.  Well, let's start with the -- what
23  do you mean by that?
24  A.  Some of the product was intended for
25  Cargill Kitchen Solutions.  And Cargill Kitchen

Page 239

1  Solutions, part of their production protocol was
2  that we adhere to production practices that were
3  similar to the United Egg Producers' program for
4  production.  And so as long as they were there
5  already, we took what they did and enhanced it to
6  our program that fully complied.  And the other
7  farm, they requested an alternative program that
8  did not require utilization of the UEP
9  production-type practices.
10  Q.  Okay did you adjust the cage space -- did
11  you reduce the cage space at all after the
12  acquisition at that -- those facilities?
13  MR. ONDECK:  Objection to the form of the
14  question.
15  THE WITNESS:  "Reduce" meaning what?
16  BY MR. BJORK:
17  Q.  Did you keep the same cage density?  Did
18  you continue that?
19  A.  Yes and no.
20  Q.  Okay.
21  A.  Again, depending upon -- there were two
22  farms.
23  Q.  Yep.
24  A.  Depending upon which farm you're talking
25  about, one, we maintained the same density, the

Page 240

1  other one we adjusted it to the customer density
2  based on what they were looking for there.
3  Eventually.  Not right away, but eventually.
4  Q.  What way was it adjusted?
5  A.  I think we probably added a hen or two
6  per cage.  I'm not sure how much.  It wasn't a huge
7  adjustment.  Slight.
8  Q.  Okay.  I want to talk a little bit about,
9  circle back to the committee memberships within the
10  UEP.  I know you listed the names of Loren Asche,
11  yourself, your brother Tony, and Pat Stonger as
12  being involved in various UEP committees.  That's
13  correct; right?
14  A.  Yes, that's correct.  I think that's
15  correct.
16  Q.  Were there any other Daybreak employees
17  that were on -- let me strike that.  Were any other
18  Daybreak employees on any other UEP committees?
19  A.  To the best of my knowledge, no.
20  Q.  Okay.  Any other Daybreak employees have
21  any other involvement generally with the UEP?
22  A.  They may have attended meetings at times,
23  yeah.
24  Q.  Who would those employees be?
25  A.  Oh, man, I don't know.

Page 241

1  Q.  Other than the four people.
2  A.  I mean, I don't know.
3  Q.  Okay.
4  A.  I mean, they had meetings in Iowa.  So
5  our general managers in Iowa might have been there.
6  Had meetings in Ohio, our general manager, he may
7  have gone to those meetings, you know.  You know,
8  some of them at times would go to Atlanta for the
9  international poultry exposition.  And in
10  conjunction with that, UEP has a meeting there they
11  may have attended some of those meetings as, you
12  know, a spectator to the process.
13  Q.  Understood.  As a member of the board of
14  directors, on average, how many meetings would you
15  attend a year?
16  MR. ONDECK:  Objection, assumes facts not
17  in evidence.
18  BY MR. BJORK:
19  Q.  Did you attend meetings as a member of
20  the UEP board of directors?
21  A.  Attended UEP board meetings, and I am on
22  the board, sir.
23  Q.  Okay.  And how -- my earlier question, on
24  average, how many would you say you attended --
25  from the period of 1999 to 2008, on average, how

61  (Pages 238 to 241)

HIGHLY CONFIDENTIAL

Page 242

1  many UEP board meetings would you say you attended?
2      A.  I believe UEP has three board meetings a
3  year.  I couldn't tell you how many I would attend
4  on a yearly basis.  Sometimes it was all three,
5  sometimes it was one, two.  It just -- it all
6  depended.  I didn't even -- there were times I
7  couldn't even make the annual meeting.
8      Q.  Okay.
9      A.  So --
10     Q.  Were you encouraged by anyone at the UEP
11 to attend?
12     A.  Family comes before business.
13     Q.  Uh-huh.
14     A.  And I have sons that are -- participate
15 in extracurricular activities.  And when they were
16 seniors in high school and they conflicted
17 with -- their sporting activities conflicted with
18 UEP meetings, I would miss UEP meetings and attend
19 their activities.
20     Q.  Okay.  Did you have any involvement in
21 the UEP animal welfare committee?
22     A.  No.
23     Q.  Did anyone at Daybreak have any
24 involvement in UEP animal welfare committee?
25         MR. ONDECK:  Objection, ambiguous time

Page 243

1  period.
2  BY MR. BJORK:
3      Q.  Go ahead.
4      A.  No.
5      Q.  Ever, to your recollection?
6      A.  Nobody from Daybreak was on the UEP
7  animal welfare committee.
8      Q.  That wasn't my question exactly.  Did it
9  have any involvement in the UEP animal welfare
10 committee?
11     A.  Well, would and could sit in as
12 spectators to the process of the committee.
13     Q.  Okay.  Mr. Rehm, I'm going to show you an
14 exhibit that I'll mark as No. 20.  And I apologize,
15 I only have three extra copies of this.
16        (Exhibit 20 marked for identification.)
17 BY MR. BJORK:
18     Q.  Take a look at it.  What I'm going to be
19 asking about, for your reference, is the top of the
20 page, the first message.  The exhibit is --
21         MR. DAVIS:  Can we get the Bates number?
22         MR. BJORK:  Yes.  It's DAY0002648.
23         THE WITNESS:  Uh-huh.
24 BY MR. BJORK:
25     Q.  Just let me know when you're ready.

Page 244

1      A.  Okay.  Go ahead.
2      Q.  So this looks to be an e-mail from --
3  from you to Pat at Daybreak Foods?
4      A.  Yes.
5      Q.  And you're asking about something with
6  respect to being on a committee to shape a new rule
7  for the UEP animal welfare.  Can you explain what
8  this message pertained to?
9         MR. ONDECK:  Objection, statement
10 contained within the question.
11 BY MR. BJORK:
12     Q.  Go ahead.  What was your understanding of
13 your message that you sent to Pat at Daybreak
14 Foods?
15     A.  I believe that what I'm asking is we had
16 a farm that comprised -- we had a farm comprised of
17 six layer barns and an inline breaking operation.
18 Half of those barns, we were requested by our
19 customer to follow BK, Burger King's, protocol,
20 while the other three we weren't required to follow
21 any specific customer protocol at that time.
22         And what I was asking Pat for was what
23 are the forms, processes, and everything that we're
24 doing at that farm so that we can ensure the BK
25 eggs end up in the BK liquid and the non-BK eggs

Page 245

1  end up in the non-BK liquid beyond a shadow of a
2  doubt.  Because this committee, I believe, is the
3  committee that met with people in favor of the one
4  hundred percent rule and people not in favor of the
5  one hundred percent rule.
6         Because this protocol that we used
7  showed that you could do -- you could produce eggs
8  on a farm and segregate the eggs and beyond a
9  shadow of a doubt know what eggs are -- ended up
10 where.
11     Q.  And when it says that the last sentence
12 I'm on a committee to shape a new rule for UEP
13 animal welfare, what committee are you referring
14 to?
15     A.  I'm talking about the document, I
16 believe, where a group of producers that were in
17 favor of the hundred percent rule met with a group
18 of producers that were not in favor of the hundred
19 percent rule.  And I wanted to know -- make sure I
20 understood what that protocol was so if I needed to
21 and had an opportunity to, I could bring that forth
22 to show that it can be done.
23     Q.  Okay.  So this wasn't referring to the
24 animal welfare committee?
25     A.  No, no.

62  (Pages 242 to 245)

HIGHLY CONFIDENTIAL

Page 246

1     Q. Okay. And the recipient of this e-mail
2 is Pat -- who is it?
3     A. Pat Stonger.
4     Q. Pat Stonger. Okay. Do you remember
5 there being a committee called the long-range
6 planning committee at the UEP?
7     A. I believe there was one, yeah, or --
8     Q. What was your understanding of that
9 committee?
10     A. I don't know.
11     Q. You don't know what they did?
12     A. I don't know what they did.
13     Q. Okay. Do you remember the UEP having a
14 committee called the marketing committee?
15     A. Shell egg price discovery committee, is
16 that what you're talking about?
17     Q. No, I think it's separate from that.
18     A. I don't know what it is then.
19     Q. Okay. Before, we talked a little bit
20 about -- actually, we talked extensively about some
21 of the UEP's instructions with regard to chick
22 hatch reduction, flock disposals, and the molting
23 practices of their members.
24        Is it your understanding that at times
25 throughout the relevant period, 1999 to 2008, that

Page 247

1 the UEP gave instructions to UEP members to reduce
2 chick hatch for the explicit purpose of reducing
3 supply?
4        MR. DAVIS: This is Evan Davis. I object
5 to the form of the question.
6        MR. ONDECK: Yeah, objection, complex,
7 ambiguous as to "instructions."
8 MR. BJORK:
9     Q. Go ahead.
10     A. I'd say, as testified earlier today,
11 Daybreak did not participate in any --
12     Q. That's not my question.
13        MR. ONDECK: Objection. Please let the
14 witness finish answering.
15        THE WITNESS: And the purpose of the
16 flock reduction, you know, I would imagine it was
17 because it was trying to better balance the supply
18 and demand economics.
19 BY MR. BJORK:
20     Q. In other words, reduce the supply?
21        MR. ONDECK: Objection.
22        THE WITNESS: That's not what I said.
23 Better balance the supply and demand economics.
24 BY MR. BJORK:
25     Q. What does that mean?

Page 248

1     A. Just what I said. It means to balance
2 them, the supply and demand economics.
3     Q. Okay. And was the purpose of that to
4 increase the price of eggs?
5        MR. ONDECK: Objection.
6        MR. DAVIS: Objection.
7        MR. ONDECK: Calls for speculation.
8        THE WITNESS: To better balance the
9 supply and demand economics of the industry.
10 BY MR. BJORK:
11     Q. And does -- by "better balance the supply
12 and demand," do you mean that the price of eggs
13 would go up as a result of better balancing supply
14 and demand?
15        MR. ONDECK: Objection, asked and
16 answered.
17        THE WITNESS: I don't believe that the
18 industry organization UEP would intentionally
19 suggest something that they anticipated would be
20 detrimental to its members.
21 BY MR. BJORK:
22     Q. Okay. But that wasn't -- my question
23 was --
24     A. Well, what do you think it means? I
25 mean, I answered your question.

Page 249

1     Q. What do I think what means?
2     A. I answered your question, sir.
3     Q. I don't believe you did. My question is
4 this. Is it your understanding that the purpose of
5 the UEP's directives with respect to chick hatch
6 reductions was to increase the supply of eggs or
7 egg products?
8        MR. ONDECK: Objection, confusing.
9        MR. DAVIS: Objection, lacks foundation.
10        THE WITNESS: Better balance the supply
11 and demand economics in the industry.
12 BY MR. BJORK:
13     Q. Okay. It's just a yes or no question.
14     A. Yeah, I hear you, and I answered your
15 question.
16        MR. BJORK: Can you read back the
17 question? Just a yes or no answer is all I'm
18 looking for.
19        THE WITNESS: I'm not going to give a yes
20 or no answer to a question I don't believe is a yes
21 or no question.
22        COURT REPORTER: "My question is this.
23 Is it your understanding that the purpose of the
24 UEP's directives with respect to chick hatch
25 reductions was to increase the supply of eggs or

63 (Pages 246 to 249)

HIGHLY CONFIDENTIAL

Page 250

egg products?"

MR. DAVIS:  This is Evan Davis.  I object to the phrasing of the question of UEP directives. I also object to the insinuation that the witness has any foundation to testify as to UEP's purpose.

MR. ONDECK:  I object, asked and answered several times.

BY MR. BJORK:

Q.  Mr. Rehm, would you agree -- do you agree that there were directives from the UEP to reduce chick hatch at various times throughout 1999 to 2008?

A.  No.

Q.  You do not?

A.  No.  You call them directives; they were recommendations.

Q.  Okay.  Were you -- do you know how those recommendations came to be?

A.  Not specifically.

Q.  Okay.  Did you ever have any involvement in any of those recommendations?

A.  No.

Q.  Okay.  Same question with -- or same line of questions with regard to the flock disposals. Do you know how -- the recommendations with regard

Page 251

to flock disposals?

A.  Same answer.

Q.  And neither you nor anyone at Daybreak participated in any of those recommendations?

A.  That's correct.

Q.  Okay.  Bear with me just a second.  How many of the facilities that Daybreak's -- Well, strike that.  During the period from 1999 to 2008, how many of Daybreak's facilities met the UEP guidelines with regard to cage space?

MR. ONDECK:  Objection, assumes a fact not in evidence.

THE WITNESS:  Daybreak follows the guidelines prescribed by our customers to humanely produce eggs.

BY MR. BJORK:

Q.  Uh-huh.

A.  And some of those would be -- some of those would prescribe cage density that would be comparable to the UEP, and others would not.  Of those that matched the UEP cage density, just UEP cage density.

Q.  Uh-huh.

A.  Because there could be others that had more, had provided greater space.  Three complexes

Page 252

Q.  Which complexes were those?

A.  Mad River, Creekwood, and LMC, and our contracts in -- contract production in Minnesota.

Q.  Okay.  And did the other five facilities with regard to cage space, they would not have satisfied the UEP guidelines?

A.  That's not right.

Q.  Is that what you're saying?

A.  No.

Q.  Well, that's my question.  Okay.  With regard to those other five facilities, did they meet the UEP guidelines during the period 1999 to 2008?

MR. ONDECK:  Objection.

MR. DAVIS:  I also object.

THE WITNESS:  Somewhat.

MR. DAVIS:  The question's misleading and it insinuates there were UEP guidelines beginning in 1999.

THE WITNESS:  Some exceeded the 67 that is in the UEP guidelines.

BY MR. BJORK:

Q.  Did any of the eight facilities not meet or exceed the UEP guidelines?

A.  There were two farms that had something

Page 253

other than 67, that was not greater than 67.

Q.  Okay.  And what were -- what two facilities were those?

A.  Farm three in Ohio, and Oak Ridge.

Q.  Okay.  Mr. Rehm, were you familiar with the UEP's ban on what was called commingling?  Do you have a recollection of that?

MR. ONDECK:  Objection.  Sorry.  Assumes a fact not in evidence.

THE WITNESS:  I don't know what you're talking about.

BY MR. BJORK:

Q.  You don't remember that?  I'll go back to that in a second.  Did the UEP have a ban on backfilling?

MR. DAVIS:  Object to the form of the question.

BY MR. BJORK:

Q.  Go ahead.

A.  I'm not sure if they did initially.  I believe eventually they added a portion in their program about backfilling.

Q.  When you say they added a portion, do you mean that they -- what they added was a ban on backfilling?

64  (Pages 250 to 253)

HIGHLY CONFIDENTIAL

Page 254

1    A.  I'm not sure if I recall specifically.
2  We're not a UEP certified company.
3    Q.  So you don't recall there being any sort
4  of required ban, is what you're saying?
5      MR. ONDECK:  Objection, asked and
6  answered and no foundation.  He stated he wasn't
7  certified.
8  BY MR. BJORK:
9    Q.  Do you believe that a -- if there was a
10  ban on backfilling, that it would have an impact on
11  the supply?
12      MR. ONDECK:  Objection, speculation.
13      MR. DAVIS:  Objection, lacks foundation.
14  BY MR. BJORK:
15    Q.  Go ahead.
16    A.  Not necessarily.
17    Q.  Why is that?
18    A.  I can't tell you what the livability of
19  any particular flock's going to be, let alone the
20  livability of a nashus (phonetic) flock.
21    Q.  Does Daybreak backfill?
22    A.  Under certain circumstances, yes.
23    Q.  Is that -- is backfilling done on a
24  facility-by-facility basis?
25    A.  It's done on a case-by-case basis.

Page 255

1    Q.  Okay.  Are you aware or do you have any
2  knowledge about the UEP's auditing processes?
3    A.  Minimal.
4      MR. ONDECK:  Objection.  Please let me
5  object.
6      THE WITNESS:  I'm sorry.
7      MR. ONDECK:  Lack of foundation.
8      THE WITNESS:  Minimal.
9  BY MR. BJORK:
10    Q.  Minimal?
11    A.  We're not a UEP certified company, so my
12  knowledge is of things I hear at the meetings.
13    Q.  Are you aware that there -- strike that.
14  Do you know that the UEP has an automatic failure
15  of an audit if a UEP member fails to meet the cage
16  space requirements of the UEP certified program?
17      MR. ONDECK:  Objection, assumes facts not
18  in evidence about automatic failures or not
19  automatic failures, and lack of foundation.  We are
20  going to have a continuing objection, lack of
21  foundation, to anything that he gets asked about
22  purposes of the UEP program.  He's stated no
23  foundation --
24      MR. BJORK:  Do you want to make a
25  standing objection?

Page 256

1      THE WITNESS:  We're not a UEP certified
2  company, so I don't know exactly what that audit
3  program says.
4  BY MR. BJORK:
5    Q.  So you don't have any knowledge of that?
6    A.  I have no factual knowledge to tell you
7  definitively one way or the other.
8    Q.  Do you recall any discussions about there
9  being automatic failures of audits as a result of
10  cage space?
11    A.  No.
12    Q.  Same question with regard to backfilling,
13  any knowledge of that?
14    A.  Nope.
15    Q.  Were you ever told by anyone at UEP, or
16  any members of the UEP, to keep your discussions
17  with regard to the UEP program private or
18  confidential?
19    A.  No.
20    Q.  Same question with regard to what we
21  talked about earlier, the hatch reductions, the
22  flock disposals, the enhanced molting.  Were there
23  ever any discussions within UEP about keeping those
24  sorts of decisions or recommendations confidential?
25    A.  No.  UEP held itself out as a

Page 257

1  Capper-Volstead Cooperative and, as such, we felt
2  it was proper and the right -- we were in the right
3  to have those discussions.
4    Q.  Okay.  Did you tell your -- back up.
5  Strike that.  Did Daybreak ever inform any of its
6  customers that these sort of actions, "actions"
7  being reduced chick hatch, flock disposals, induced
8  or moving up molding schedules, did you ever tell
9  your customers that these things were going on?
10      MR. ONDECK:  Objection.  Objections all
11  over the place.  Objection, to tell their customers
12  that they did a thing that he already testified
13  that he didn't do and he said has no foundation.
14      MR. BJORK:  Understood.
15      MR. GREENE:  Objection, confusing.
16      THE WITNESS:  Could you restate the
17  question for me, please?
18  BY MR. BJORK:
19    Q.  Sure.  Did Daybreak ever inform any of
20  its customers that the UEP was making
21  recommendations with regard to chick hatch
22  reductions and flock disposals?
23    A.  No.
24    Q.  Making recommendations to its members?
25    A.  No, because Daybreak works on a long-term

65  (Pages 254 to 257)

HIGHLY CONFIDENTIAL

Page 258

1     contractual basis with its customers to supply a
2     consistent amount of raw, liquid, unpasteurized
3     product to them on a daily, weekly, monthly basis.
4     So whether that -- that was happening or not
5     happening, it did not have an effect on the
6     relationship between our customers and Daybreak,
7     because we provide that product on a contractual,
8     long-term basis, consistent week to week, month to
9     month, year to year, quarter to quarter, take your
10    pick.
11       Q. Do you know if the United Voices
12    pub -- strike that. You're familiar with the
13    United Voices publication? We saw it as an exhibit
14    earlier today; correct?
15       A. Yes.
16       Q. Do you know if that publication was
17    circulated to anyone outside of the UEP?
18       A. Do not know.
19       Q. Mr. Rehm, I'm going to read you a list of
20    plaintiffs that are in the case that are other
21    direct action plaintiffs. And I'll do it one by
22    one. And I'd just like you to tell me if you've
23    had any business contacts with any of these
24    entities from the period 1999 to 2008. Just a
25    simple yes or no. And I'll read these -- these

Page 259

1     entities one by one.
2       A. Can you define "business contacts?"
3       Q. Well, what do you -- what do you
4    interpret -- what do you define as business
5    contact?
6       A. You're asking the question, so what do
7    you mean?
8       MR. ONDECK: At a break, I'm going to say
9    objection, ambiguous.
10    BY MR. BJORK:
11       Q. Let me broaden it out. I'm just going to
12    say: Have you had any contact with these entities
13    as the president of Daybreak Foods?
14       MR. ONDECK: Objection. Including, like,
15    eating their products?
16       THE WITNESS: Or being at the same
17    meeting?
18    BY MR. BJORK:
19       Q. Correct. I'm going to leave it as
20    business contact. If you don't understand -- if
21    you don't understand --
22       A. Go ahead and ask your one by one
23    question.
24       Q. Albertson's, LLC?
25       A. No.

Page 260

1       Q. Associated Wholesale Grocers, Inc.?
2       A. No.
3       Q. No. Okay. Konopko, Inc.?
4       A. I'm sorry, Konopko, Inc.?
5       Q. Konopko, Inc.
6       A. No.
7       Q. Four B Corporation?
8       A. No.
9       Q. General Mills?
10      A. No.
11      Q. Giant Eagle, Inc.?
12      A. No.
13      Q. Great Atlantic Pacific Tea Company?
14      A. No.
15      Q. HE Butt Grocery Company?
16      A. No.
17      Q. Hivey, Inc.?
18      A. No.
19      Q. Kellogg Company?
20      A. No.
21      Q. Kraft Foods?
22      A. No.
23      Q. Kroger Company?
24      A. No.
25      Q. Meyer, Inc. -- strike that. Mid Am Food

Page 261

1     Enterprises?
2       A. No.
3       Q. Nestle USA?
4       A. No.
5       Q. Publix Supermarkets?
6       A. No.
7       Q. Roundy's Supermarkets?
8       A. No.
9       Q. Safeway, Inc.?
10      A. No.
11      Q. SuperValu, Inc.?
12      A. No.
13      Q. Walgreen Company?
14      A. No.
15      Q. Winn Dixie?
16      A. No.
17      Q. Ask you a few questions, Mr. Rehm, about
18    the transactional data that Daybreak produced in
19    the case. And I'll show you the exhibit for that.
20      MR. ONDECK: I'll just note that in our
21    objections to the 30(b)(6) notice, we stated we're
22    not going to provide him as a corporate designee
23    for the transactional data. And we're open to
24    meeting and conferring, which wasn't done prior to
25    this. And there's better ways to access that data.

66 (Pages 258 to 261)

HIGHLY CONFIDENTIAL

Page 262

1  He can testify as to his personal knowledge.
2      MR. BJORK: Okay.
3      (Exhibit 21 marked for identification.)
4      MR. BJORK: Chris, I will tell you for
5  your identification these are extracts from -- the
6  first page is DAY-DATA000001 -- or 004, rather.
7  And the second two pages are extracts from
8  DAY-DATA000001.
9      THE WITNESS: How many pages should I
10 have?
11     MR. BJORK: Three.
12     MR. ONDECK: Yeah, I object to the
13 authenticity of this document because the copy I'm
14 holding doesn't have those Bates numbers. But he
15 can answer.
16     MR. BJORK: Okay.
17 BY MR. BJORK:
18     Q.  Mr. Rehm, have you ever examined or
19 looked at any of Daybreak's transactional data that
20 was produced in the case?
21     A.  Probably not extensively.
22     Q.  Okay. I'll ask you a few questions about
23 some of the -- some of the fields here. Do your
24 best to answer them. I realize you weren't
25 designated as the 30(b)(6) deponent on this topic,

Page 263

1  but we'd like to know your individual opinions on
2  the questions I'm going to ask. If you look at the
3  third column over, the title of the column is B-O-L
4  Pound. Can you -- do you have any idea what that
5  means?
6      A.  Bill of lading number.
7      Q.  Could it refer to anything else?
8      A.  Not to my knowledge.
9      Q.  How about the next column over, P-E-A?
10     A.  I don't know what PEA stands for.
11     Q.  Okay.
12     A.  I believe every load of liquid that we
13 produce has a PEA number. But I don't know what
14 that means.
15     Q.  Okay. So it's unique to each load of
16 liquid egg, is what you're saying?
17     A.  Each load of liquid egg that we sell and
18 deliver has a PEA number, but I do not know what
19 those initials stand for.
20     Q.  Understood. If you move on over,
21 there's a column titled Wait. Do you see that?
22     A.  Uh-huh.
23     Q.  And the column just to the right of that,
24 there's no title for it, but if you look at the
25 first four rows, there's either a W or a W-E. Do

Page 264

1  you see that?
2      A.  Uh-huh.
3      Q.  Do you know what that denotes?
4      A.  I would be guessing, but I'm thinking W
5  stands for white; W-E stands for whole egg. But
6  I'm surmising. I do not know definitively.
7      Q.  Okay. And then if you move to the next
8  column, it's Price, and then just to the right of
9  that there's a column that's also not labeled and
10 there's the letter C --
11     A.  Uh-huh.
12     Q.  -- that goes down, or C-A-W or M. Do you
13 know what those letters stand for?
14     A.  I believe C stands for contract. C-A-W
15 stands for contract animal welfare. So that's a
16 different pricing mechanism. And M probably stands
17 for market.
18     Q.  Under the price column, in the last four
19 rows there seems to be, you know, a rather large
20 number as compared to the prices in the first --
21 first four rows, 245.8 245.3, 332.
22     A.  I'm sorry, where are you looking?
23     Q.  If you look at the price column. I'm
24 sorry.
25     A.  Yeah, it would appear to me that there is

Page 265

1  a decimal issue. We don't sell our product at
2  $245.80. Pick your multiplier.
3      Q.  So you think that may be a --
4      A.  I think there's -- a decimal is just
5  simply in the wrong spot.
6      Q.  Do any of these fields or these column
7  titles refer to the product being sold that we
8  could identify? Looking at for instance -- let's
9  take, for example, there's -- the first row is
10 C-K-S-M-N. Do you see that for the customer?
11     A.  Yeah.
12     Q.  Within that row can you tell from that
13 what the product being sold is?
14     A.  I know this product is liquid,
15 unpasteurized product, but --
16     Q.  But are you able to tell that from --
17     A.  Because it's sold in weight. We sell our
18 liquid by weight. How many -- by pounds, not by
19 dozens. Because it has lost its identity as a
20 dozen because we've separated it from -- we
21 separated the egg from the shell and we're selling
22 pounds of liquid to our customers.
23     Q.  Okay. At what level does Daybreak track
24 product types that it sells? You know, do you
25 track it by -- by pounds, is that the way that

HIGHLY CONFIDENTIAL

Page 266

1  you -- strike that. Scratch that.
2      On the customer column there appears
3  to be abbreviations for certain of the customers.
4      A. Uh-huh.
5      Q. Are there any other documents that
6  Daybreak has that would indicate the full names for
7  those abbreviations, that you're aware of, or do
8  you know where we could find that information?
9      A. How about if I just tell you?
10     Q. Well, we have a lot of data, and this is
11 just a subset of it.
12     A. CKS, Cargill Kitchen Solutions; SF, Sunny
13 Fresh.
14     Q. Uh-huh.
15     A. Government Commodity/SF, we were working
16 with Cargill and we delivered it to -- we won a bid
17 for commodity product that we replaced through an
18 arbitrage process with Cargill. MG Waldbaum,
19 Gaylord, Minnesota, I think speaks for itself.
20     Q. But you're not aware of any document that
21 gives the full names for these abbreviations?
22     A. We have three main customers, Cargill,
23 Michael's, and Deb-El.
24     MR. ONDECK: Yeah, I object under the
25 best evidence rule. We would be happy to meet and

Page 267

1  confer on this and, you know, provide a key to the
2  extent that you are interested in that. All you
3  have to do is ask in the normal process.
4      MR. BJORK: Okay. We can talk about
5  that.
6      MR. ARANOFF: Just for the record -- this
7  is Ron Aranoff. I mean, I didn't go into these
8  topics during my examination, I just want the
9  record to be clear, because of the assertions that
10 there were other people at the company that would
11 be more knowledgeable about this and that we would
12 be able to resolve this. So I'm preserving my
13 right to inquire of that person if and when that
14 becomes necessary.
15     MR. ONDECK: I understand. We're going
16 to just state on the record and -- with our
17 objection that we'd like to first meet and confer.
18     MR. ARANOFF: I'm always happy to meet
19 and confer.
20 BY MR. BJORK:
21     Q. Mr. Rehm, before you testified that you
22 were the most appropriate person to testify to
23 transactional data related questions; correct?
24     A. Yes.
25     Q. Okay. Is there anyone else that would

Page 268

1  have any knowledge about this, that you know of, or
2  that you might be able to provide some of the
3  information that I've --
4      A. You know, there's no header, there's
5  nothing on here. You know, I don't know if you
6  redacted any portion off the top of here. I don't
7  have a clue where you got this from. And I don't
8  mean to be argumentative with you -- with you, but,
9  you know, I don't know if this is the document in
10 its entirety or not.
11     Q. Understood. But --
12     A. So I mean --
13     Q. Questions related to transaction data
14 should be directed to you; correct?
15     A. Yeah. But, I mean, you're digging into a
16 layer of the onion that's down at the core. You
17 know, at the end of the day, Daybreak's business
18 model is to sell raw, unpasteurized, liquid egg to
19 three main customers. Do we end up having a few
20 other customers in the process? Sure, because we
21 cannot perfectly match our production to what those
22 contracts say every week. So we might be a little
23 long, might be a little short one week. But what
24 you're trying to get at here I don't know.
25     Q. Understood. Just let me look over my

Page 269

1  notes. I just have a couple more questions. Have
2  you ever -- was Daybreak ever contacted by any
3  governmental entity recording potential antitrust
4  violations?
5      MR. ONDECK: Objection, ambiguous.
6      THE WITNESS: I'm not sure if this is
7  correct or not, but the state of Florida contacted
8  us, and Chris has handled that process. And to the
9  best of my knowledge, that's state. But I'm not
10 sure if that was in connection with antitrust or
11 what it was specifically in connection with.
12 BY MR. BJORK:
13     Q. When did that happen? When did they make
14 that contact?
15     A. Subsequent to the filing of this
16 litigation. But I -- what year specifically, I'm
17 sorry.
18     Q. Do you recall how they made the contact?
19     A. No.
20     Q. And you immediately forwarded -- strike
21 that. You personally never had any communications
22 with anyone from the state of Florida?
23     A. Correct.
24     Q. Did anyone from Daybreak have any
25 communications with the government entity from the

68  (Pages 266 to 269)

HIGHLY CONFIDENTIAL

Page 270

1 state of Florida regarding this investigation?
2     A.  That would be a correct statement.
3 Nobody else -- nobody did.
4     Q.  Nobody did.  Besides Chris.  Do you
5 remember who from the state of Florida contacted
6 you?
7     A.  No.
8     Q.  You don't remember what government entity
9 it was?
10     A.  Not specifically, no.  I'd be guessing.
11     Q.  Do you remember the name of the
12 individual?
13     A.  No.
14     Q.  Did the US Department of Justice ever
15 contact Daybreak with regard to an investigation
16 into antitrust violations?
17     A.  No.
18     Q.  You said earlier that you were involved
19 in Daybreak's collection of documents in the case;
20 correct?
21     A.  Yes.
22     Q.  Okay.  Who else from Daybreak was
23 involved in the collection?
24     MR. ONDECK:  Objection.  This is another
25 one he can only testify as to personal knowledge.

Page 271

1 BY MR. BJORK:
2     Q.  To the extent you know.
3     A.  Lisa, Pat, Dick, Loren, Tony, Chris, I
4 believe.
5     Q.  Lisa's last name is?
6     A.  Tucek.
7     Q.  What did you personally do to collect
8 documents?
9     A.  They were in my office.  They were right
10 there for me.
11     Q.  So you collected the paper documents in
12 your office?
13     A.  Correct.
14     Q.  Okay.  Did you search your e-mail?
15     A.  I let our IT person do whatever searching
16 needed to be done on the Internet.  Excuse me, I
17 shouldn't say the Internet.  On my computer.
18     MR. ONDECK:  Same objection to the line
19 of questioning.  We're not providing him as a
20 30(b)(6) for this topic.
21     MR. ARANOFF:  This is Ron Aranoff.  I
22 have my same reservation of rights with respect to
23 that in conjunction with the fact that he's not the
24 witness most knowledgeable, at least according to
25 Chris.

Page 272

1 BY MR. BJORK:
2     Q.  How did you know what documents to look
3 for in your document collection?
4     A.  I provided the documents to our -- to
5 Chris and his firm.
6     Q.  Right.
7     A.  I mean, my entire office, they grabbed
8 every file and went through everything.
9     Q.  You grabbed every file?
10     A.  They grabbed everything.  All my files,
11 they took them.
12     Q.  Every file in your office, they took?
13     MR. ONDECK:  We're getting close to legal
14 advice and work product, but you can -- you can
15 answer.
16     THE WITNESS:  Chris and his team came to
17 our office and then they came -- I'm not sure
18 which -- who specifically from his firm came into
19 my office and went through drawer by drawer and
20 they grabbed files and took them with them.
21 BY MR. BJORK:
22     Q.  Okay.  Did you ever see the document
23 requests that were issued by the direct purchaser
24 plaintiffs?
25     A.  Probably I have somewhere along the line.

Page 273

1     Q.  Okay.  But you didn't consult those --
2 those documents as part of your document
3 collection?
4     A.  I consulted --
5     MR. ONDECK:  Objection.
6     THE WITNESS:  I consulted with our legal
7 counsel.
8 BY MR. BJORK:
9     Q.  Okay.  Does Daybreak have a central
10 server?
11     MR. ONDECK:  Same objection.  He's not
12 the corporate designee.
13 BY MR. BJORK:
14     Q.  Understood.
15     A.  I believe we do.  I can turn computers on
16 and off, but don't get into -- you know, do what I
17 need to on the computer.
18     MR. ARANOFF:  And again, this is Ron
19 Aranoff.  Same reservation of rights.
20     MR. BJORK:  Right.  And we reserve our
21 rights too to depose the 30(b)(6) witness on this
22 topic, but we're asking --
23     MR. ONDECK:  We're not -- sorry for
24 interrupting.  We're not stating that he's not the
25 most knowledgeable person, we're stating that we're

HIGHLY CONFIDENTIAL

Page 274

1  not designating him because, subject to a meet and
2  confer, there are other ways this should have been
3  gotten.
4          MR. BJORK:  Well, you sent us your
5  30(b)(6) objections I belive it was two days before
6  the deposition.
7          MR. ONDECK:  You noticed his personal
8  deposition in April.  60 days after that, less than
9  two weeks before this deposition, the week before
10  the Fourth of July, you sent the 30(b)(6) notice.
11  We can fight about that all you want.  And we sent
12  you something saying meet and confer, and my phone
13  never rang.  So the onus is on you and all the
14  plaintiffs in the case.  Call us if you would like
15  to meet and confer, otherwise -- we're not saying
16  he's not the best person, we're saying let's meet
17  and confer.
18          MR. BJORK:  We can have that discussion
19  on another date.
20  BY MR. BJORK:
21      Q.  Mr. Rehm, do you know what a litigation
22  hold is?
23      A.  My assumption is that it's, if you're
24  involved in a litigation, you need to hold and not
25  dispose of documents.

Page 275

1      Q.  Do you know if a litigation hold was ever
2  put in place with respect to this case?
3      A.  Yes.
4      Q.  When did that happen?
5      A.  I don't know the specific date.
6      Q.  Do you know approximately when it went
7  into effect?
8      A.  No.  Again, we followed the advice of
9  counsel.
10      Q.  How was the litigation hold put into
11  place?
12      A.  I don't know at this time.
13      Q.  Do you know who would have received it?
14      A.  All the appropriate people that needed to
15  hold documents.
16      Q.  How many people would you say that would
17  have been?
18          MR. ONDECK:  Objection to the whole line
19  of questioning.  You could just as easily answer "I
20  followed the advice of counsel" and I'm gonna say
21  "I direct you not to answer."  But you can go ahead
22  and answer.
23          THE WITNESS:  We followed the advice of
24  counsel.
25          MR. ONDECK:  I direct you not to answer

Page 276

1  as to what our advice was.
2  BY MR. BJORK:
3      Q.  I don't want to know the specifics or the
4  substance of your communications.  Bear with me one
5  minute.  I think I'm done, but just let me go
6  through my notes again.  Just a minute.
7          MR. BJORK:  That's all I have.
8          THE VIDEOGRAPHER:  Okay.  I've got only
9  about five minutes left on this disc, so --
10          MR. ONDECK:  We're going to have a small
11  redirect, small redirect, but it may be more than
12  five minutes.
13          THE VIDEOGRAPHER:  Okay, then we should
14  go ahead and switch it.
15          MR. BJORK:  Yeah, let's do that.
16          THE VIDEOGRAPHER:  This will conclude
17  disc number three at 4:08 p.m.
18          (Break taken.)
19          THE VIDEOGRAPHER:  We're back on the
20  record, the beginning of disc number four of the
21  deposition of William Rehm.  Today's date July 10,
22  2013; the time 4:21 p.m.
23      E X A M I N A T I O N
24  BY MR. GREENE:
25      Q.  Mr. Rehm, we met before.  My name is

Page 277

1  William Greene.  I'm representing Michael Foods.
2  And I have some questions for you.  You testified
3  this morning about Exhibit 15.  I wonder if we can
4  get Exhibit 15 in front of the witness.  This is
5  the -- some handwritten notes.
6      A.  Okay.
7      Q.  I believe your testimony was that these
8  notes concerned a meeting that included some
9  persons who were in favor of the hundred percent
10  rule and some who were opposed to the hundred
11  percent rule; is that correct?
12      A.  Yes.
13      Q.  And I believe you went through and
14  identified, based on your understanding, some of
15  the individuals -- withdrawn.  I think you -- you
16  were asked about particular individuals and whether
17  you believe they were opposed or in favor of the
18  hundred percent rule, but I'm not sure you got to
19  all six individuals who are listed here.  So let me
20  just ask you.  Regarding the name Bill Gaucher, you
21  see that name there?
22      A.  Yes.
23      Q.  To the best of your understanding, at
24  that meeting, what was Mr. Gaucher's position on
25  the hundred percent rule?

HIGHLY CONFIDENTIAL

Page 278

1    A. He was opposed to the hundred percent
2 rule.
3    Q. Okay. And just a reminder, Mr. Gaucher
4 was affiliated with which company?
5    A. Michael Foods.
6    Q. I'd like to -- before I do that. I
7 believe this morning you testified that Daybreak
8 had grown over the years covered by this
9 litigation; correct?
10    A. Yes.
11    Q. I'll talk about the period from 1999 to
12 2008. Did Daybreak grow during that period?
13    A. Yes, we did.
14    MR. ARANOFF: Objection.
15 BY MR. GREENE:
16    Q. And so measured in, say, number of layers
17 owned by Daybreak, how much did it grow?
18    A. I believe in '99 we had three million
19 chickens, and by '98 we were at nine-and-a-half
20 million chickens.
21    Q. I'm sorry, which --
22    A. Roughly three million in '99 to
23 nine-and-a-half million in 2008.
24    Q. Okay. And how did that growth occur?
25    A. Through customers' desires for more

Page 279

1 products. Daybreak -- Daybreak's philosophy on
2 expansion is that we will grow because we have a
3 customer that desires more product. Unlike the
4 Field of Dreams that says "build it and they will
5 come," we go get and work with a customer for more
6 product, and then we go acquire, build, expand to
7 supply that request.
8    Q. So part of the growth that you described,
9 that occurred through the construction of new
10 facilities?
11    A. Yes.
12    Q. And how did you decide whether and when
13 to build new facilities?
14    A. It was predicated on the customer
15 demands. Customer product demands, I should say.
16    Q. And can you explain -- when you say
17 predicated on customer demands, what would be
18 necessary to sort of persuade you to construct a
19 new facility?
20    A. Again, it's -- our business model is
21 predicated on a long-term contract that uses a base
22 price with adjustments on the Chicago Board of
23 Trade. And that's a premise that we start with.
24 And that when a customer requests more product
25 utilizing that type of program, we will -- you

Page 280

1 know, that will then put us in a position to desire
2 to grow and expand a facility.
3    Q. Are there any prerequisites that you look
4 for before deciding to construct new facilities?
5    MR. ARANOFF: Objection.
6    THE WITNESS: It all starts for us -- it
7 all starts with the customer, not with wanting to
8 grow or build a new facility.
9 BY MR. GREENE:
10    Q. Okay. And if a customer tells you they
11 want more supply, what, if anything, would you want
12 from the customer before you'd be willing to build
13 additional facilities?
14    A. We would negotiate a long-term contract
15 that's executed by both parties, and we will grow
16 it -- build more, go buy and expand, whatever it
17 takes, depending upon what they're specifically
18 looking for, where, when and how, to get that done.
19    Q. Why would a long-term contract be
20 important to you?
21    A. For Daybreak, in our model, we lever our
22 balance sheet with bank financing to accomplish the
23 expansions that are done. And we can do that
24 because the bank has faith in us, trusts us, they
25 believe in us, they believe that we know what we're

Page 281

1 doing. And just as importantly, we have the
2 contract to support the stability of our cash flow
3 throughout -- through a long-term period of time to
4 support the funding of that debt.
5    Q. When you build new facilities, did you
6 obtain financing from a financial institution?
7    MR. ARANOFF: Objection.
8    THE WITNESS: Yes.
9 BY MR. GREENE:
10    Q. In other words, you had one or more
11 lenders?
12    A. We have a group. We have a bank group.
13    Q. And did those lenders communicate to you
14 any requirements that were necessary for you to
15 satisfy before they would finance new construction?
16    A. They wanted to see the contract.
17    Q. When you say the contract --
18    A. They want to see the contract for the
19 product that would be -- they want to see the
20 contract for the product we would produce from the
21 expansion, to support that growth, that expansion,
22 that additional debt.
23    Q. When you say the "contract," do you mean
24 the contract with the prospective customer?
25    A. Correct.

71  (Pages 278 to 281)

HIGHLY CONFIDENTIAL

Page 282

1    Q.  And that would be the customer that was
2  going to be purchasing the output from the
3  expansion?
4    A.  Correct.
5        MR. GREENE:  Go ahead and mark this as
6  the next exhibit number.
7        (Exhibit 22 marked for identification.)
8  BY MR. GREENE:
9    Q.  I'm going to show you -- I'll start with
10  the Bates number, then I'll identify the document.
11  Exhibit 22, Bates number MFI0299891 through 914
12  And this is a document that reads at the top,
13  Supply Agreement Confidential.  And the first
14  paragraph reads, "This agreement, made and entered
15  into as of this 2 day of December, 2003, by and
16  between MG Waldbaum Company, a Nebraska
17  corporation, d/b/a the Michael Foods and Products
18  Company, ('Michael') and Daybreak Foods, Inc., a
19  Wisconsin corporation ('producer.')"
20        Mr. Rehm, you can certainly look
21  through the document; I know it's a lengthy
22  document.  And I will point out, before I ask you
23  any questions, that if you look at the -- page six,
24  which ends with Bates number 896, there are
25  signatures on the document.  Do you see that?

Page 283

1    A.  Yes.
2    Q.  Okay.  Do you recognize Exhibit 22?
3    A.  Yes.
4    Q.  What is Exhibit 22?
5    A.  It is our contract between Daybreak and
6  Michael Foods for the product we produce for them
7  on a long-term basis.
8    Q.  And what product is that?
9    A.  In this case it would be liquid,
10  unpasteurized, whole egg.
11    Q.  And you referred earlier to, I think you
12  used the term "inline" to describe some eggs?
13    A.  That's correct.
14    Q.  Does this contract call for production of
15  inline egg?
16        MR. ARANOFF:  Objection.
17        THE WITNESS:  The egg that is produced to
18  fill this contract comes from an inline facility.
19  BY MR. GREENE:
20    Q.  The term -- paragraph one under the
21  supply agreement indicates the term, and it's --
22  the sentence under paragraph one reads, "Unless
23  otherwise terminated in accordance with the
24  provisions of section eleven thereof, the initial
25  term of this agreement will commence on April 27,

Page 284

1  2003 and continue until December 31, 2009." Do you
2  see that?
3    A.  Yes.
4    Q.  That would be a period of six-and-a-half
5  years; is that correct?
6    A.  Yes.
7    Q.  And would that qualify, in your mind, as
8  a long-term contract?
9    A.  Yes.
10    Q.  I want to direct your attention to the
11  quantity page, exhibit -- I should say --
12  withdrawn.  I want to direct your attention to page
13  seven, ends with Bates number 897, Exhibit A.
14    A.  Okay.
15    Q.  And you'll see that section three refers
16  to quantity.  Do you see that?
17    A.  Yes.
18    Q.  And the quantity, under this contract it
19  says 56,500,000 pounds annual volume; is that
20  correct?
21    A.  That's the expectation of the annual
22  volume from the facility, correct.
23    Q.  When you say the expectation, what do you
24  mean?
25    A.  This contract was, I use the term a

Page 285

1  make-it-take-it.  Whatever we produced at the farm
2  Michael's would take, but the expectation was that
3  it would average in the area of 56-and-a-half
4  million pounds annually.
5    Q.  When you say "the farm," what are you
6  referring to?
7    A.  Oak Ridge Farm.  The Oak Ridge facility.
8    Q.  So if one year -- under the contract, if
9  one year the Oak Ridge production was a little bit
10  more than 56.5 million, that would become the
11  quantity term for that year; is that correct?
12    A.  Correct.
13    Q.  And if it was a little bit less than
14  56.5 million, that would be the quantity term for
15  that year; correct?
16    A.  Correct.
17    Q.  Was there any discussion with Michael
18  Foods about expansion in connection with this
19  contract?
20    A.  We've talked about it at different times,
21  yes.
22    Q.  And in connection with this particular
23  contract -- withdrawn.  Did Daybreak expand its
24  facilities as a result of this contract,
25  Exhibit 22?

72  (Pages 282 to 285)

HIGHLY CONFIDENTIAL

Page 286

1  A.  Yes.  Excuse me, but they're talking on
2  the back side here.
3      MR. ONDECK:  Could people on the phone
4  mute their phones, please.
5  BY MR. GREENE:
6      Q.  Do you recall how many layers were --
7  withdrawn.  Do you recall the -- the increased
8  capacity that was added to Daybreak as a result of
9  Exhibit 22?
10     A.  No, I don't.
11     Q.  Were there other occasions where Daybreak
12 expanded its facilities as a result of a long-term
13 purchase agreement with Michael Foods?
14     MR. ARANOFF:  Objection.
15     THE WITNESS:  I believe so, yes.
16 BY MR. GREENE:
17     Q.  Exhibit 22, the supply agreement, did you
18 provide Exhibit 22 to the lenders that provided
19 financing for the expansion?
20     A.  Yes.
21     Q.  Was that a requirement?
22     A.  Yes.
23     Q.  You talked this morning a bit about
24 inline production.  Is the use of inline production
25 important for Daybreak to be able to meet product

Page 287

1  specifications?
2      A.  The use -- inline facilities
3  significantly enhance our ability to meet
4  consistently the product specifications for our
5  customers.  It's not impossible with offline, but
6  it's significantly easier and we get significantly
7  better microbial counts from inline production.
8      Q.  Could a company buy breaking eggs that it
9  did not produce itself and still satisfy those
10 specifications?
11     A.  To be able to consistently meet or exceed
12 those expectations would be extremely difficult to
13 do if you were buying eggs from somebody you
14 didn't -- if you were buying eggs that you didn't
15 produce yourself and did not control the full
16 process of from farm through to delivery to the
17 customer.
18     MR. GREENE:  No further questions.
19     MR. ONDECK:  Can I ask my one question
20 and then you can --
21     MR. ARANOFF:  I have a redirect.
22     MR. ONDECK:  All right.  Then so --
23     MR. ARANOFF:  You go ahead, then I'll go
24         E X A M I N A T I O N
25 BY MR. ONDECK:

Page 288

1      Q.  Okay.  This is Chris Ondeck from the law
2  firm of Crowell Moring representing Daybreak and
3  also the witness, Mr. Rehm, in this deposition.
4  Good afternoon, Mr. Rehm.  I'm going to ask you a
5  brief redirect.
6          I'm going to direct your attention to
7  Exhibit 16, which you've been asked about
8  previously.  If you could please turn to that
9  exhibit.  Was that document previously shown to
10 you?
11     A.  Yes.
12     Q.  What were you asked about, if anything,
13 about this document?
14     MR. ARANOFF:  Can I have a copy of the
15 document?
16     MR. ONDECK:  This is your Exhibit 16.
17     MR. ARANOFF:  Go ahead.  Thanks.
18 BY MR. ONDECK:
19     Q.  In particular with regard to whether or
20 not Daybreak became UEP certified.
21     MR. ARANOFF:  Objection.
22     THE WITNESS:  This is a document
23 where -- it's an e-mail from Gene Gregory, I'm
24 copied on it, and it is sent to, I believe two
25 members of the United Egg Producer's staff, where

Page 289

1  Gene Gregory got out in front of himself on the UEP
2  certified number previously owned by day lay,
3  indicating that New Day and Daybreak were in
4  compliance with the UEP certified one hundred
5  percent rule.
6  BY MR. ONDECK:
7      Q.  What was the date of this document?
8      A.  July 10, 2007.
9      MR. ONDECK:  Okay.  What exhibit number
10 are we up to?  I'm going to show you one document.
11     (Exhibit 23 marked for identification.)
12 BY MR. ONDECK:
13     Q.  So Mr. Rehm, I've just handed you a
14 one-page document that has Bates number DAY000361.
15 Do you recognize this document?
16     A.  It's an e-mail that I received from Gene
17 Gregory.
18     Q.  And what is the date on this document?
19     A.  September 4, 2007.
20     Q.  Subsequent to the July document that we
21 just looked at?
22     A.  Yes.
23     Q.  And what is -- what's going on in this
24 document?
25     MR. ARANOFF:  Objection.

73  (Pages 286 to 289)

HIGHLY CONFIDENTIAL

Page 290

1     MR. BJORK: Objection.
2     MR. ARANOFF: Vague, among other things.
3     THE WITNESS: Gene Gregory is informing
4  us that we do not qualify for the UEP certified
5  program because of the hundred percent rule.
6  BY MR. ONDECK:
7     Q. And is this the final outcome or not?
8     MR. ARANOFF: Objection.
9     THE WITNESS: Yes, this is the final
10 outcome. We do not qualify for the UEP certified
11 program because of the hundred percent rule.
12 BY MR. ONDECK:
13    Q. And so, just ask you again, is Daybreak
14 now, or has it ever been, a certified -- a member
15 of the UEP certified program or any of the names
16 under which it's operated?
17    A. We have never been in --
18    MR. ARANOFF: Objection, compound, asked
19 and answered. Variety of other things.
20    THE WITNESS: We have never been a UEP
21 certified company, we have never paid any of the
22 UEP certified dues or marketing assessments that
23 are attached thereto.
24    MR. ONDECK: No further questions.
25    E X A M I N A T I O N

Page 291

1  BY MR. ARANOFF:
2     Q. Okay, just a short redirect. This is Ron
3  Aranoff. Good afternoon, again, Mr. Rehm.
4     A. Hello.
5     Q. It's been a long day, so I'll try to make
6  it quick. Prior to your examination by Mr. Greene,
7  which took place a moment ago, did you have an
8  opportunity to confer with him in advance about the
9  subject of your testimony?
10    A. No.
11    Q. Okay. Prior to your -- prior to your
12 examination by Mr. Ondeck did you have an
13 opportunity to confer with him about the subject of
14 your testimony?
15    A. No.
16    Q. You had no discussion about the subject
17 of your testimony either with Mr. Greene or
18 Mr. Ondeck?
19    A. That's correct.
20    Q. Okay. Do you have any -- as part of your
21 relation -- your business relationship with Michael
22 Foods, do you have any indemnification agreement
23 with them with respect to your relationship?
24    MR. GREENE: Objection, beyond the scope.
25    THE WITNESS: I don't believe so, but --

Page 292

1  I'd say no. I'm not sure. I'd have to read the
2  contract in its entirety that is part of the
3  exhibit here.
4  BY MR. ARANOFF:
5     Q. Do you have any understanding with
6  Michael Foods as to -- well, withdrawn. Is Michael
7  Foods paying for any portion of your defense in
8  this action?
9     A. No.
10    Q. Okay. Do you have any relationship with
11 Michael Foods where they are paying for any of your
12 expenses associated with this litigation?
13    A. No.
14    Q. How about, same question for Cargill?
15    A. No.
16    Q. Same question for Deb-El Foods?
17    A. No.
18    Q. And so to the best of your understanding,
19 your litigation expenses are being paid entirely by
20 Daybreak?
21    A. No.
22    Q. Who's paying for your litigation
23 expenses?
24    A. We have an insurance policy that has paid
25 a portion of it, and we have paid a portion of it.

Page 293

1     Q. And who's your insurance carrier?
2     A. I do not know their name right now, but I
3  do know that we are about out of coverage.
4     MR. ONDECK: I'd just note that I think
5  we've stated that in written discovery that we
6  produced to you.
7     MR. ARANOFF: I'm not quibbling with it,
8  I'm just asking the question.
9  BY MR. ARANOFF:
10    Q. Do you have an understanding as you sit
11 here today about what the total amount of coverage
12 was?
13    A. I believe it was $2 million in total.
14    Q. And do you know how much of that has been
15 used?
16    A. More than a million nine.
17    MR. ARANOFF: Okay. Nothing further from
18 me.
19    MR. BJORK: Nothing either.
20    MR. ARANOFF: Okay, that concludes the
21 deposition.
22    THE VIDEOGRAPHER: There being nothing
23 further, this will conclude the deposition of
24 William Rehm. We're off the record at 4:44 p.m.
25 Four discs were used.

74 (Pages 290 to 293)

HIGHLY CONFIDENTIAL

Page 294

1          ACKNOWLEDGMENT OF DEPONENT
2      I, WILLIAM REHM, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true
5  and accurate record of my testimony (with the
6  exception of the corrections listed below):
7  Page  Line          Correction
8  ____|____|_____|_____
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20
21      _____
        WILLIAM REHM
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 20___.
24
   _____    _____
25 (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

Page 295

1      STATE OF WISCONSIN  )
                           ) ss.
2      COUNTY OF MILWAUKEE )
3          I, ANITA KORNBURGER-FOSS, Registered
4  Professional Reporter and Notary Public in and
5  for the State of Wisconsin, do hereby certify
6  that the preceding deposition was recorded by
7  me and reduced to writing under my personal
8  direction.
9          I further certify that said deposition was
10 taken at 780 North Water Street, Milwaukee,
11 Wisconsin, on July 10, 2013, commencing at 9:25
12 a.m. and concluding at 4:44 p.m.
13         I further certify that I am not a relative
14 or employee or attorney or counsel of any of
15 the parties, or a relative or employee of such
16 attorney or counsel, or financially interested
17 directly or indirectly in this action.
18         In witness whereof, I have hereunto set my
19 hand and affixed my seal of office at
20 Milwaukee, Wisconsin, this 23rd day of July,
21 2013.
22
23 _____
   ANITA KORNBURGER-FOSS, RPR - Notary Public
24 My commission expires May 13, 2017.
25

75 (Pages 294 to 295)