# ATTACHMENT 55

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS : MDL NO. 2002
ANTITRUST LITIGATION 08-MDL-02002

- - - - -

PHILADELPHIA, PA

MAY 10, 2018
DAY SEVEN

BEFORE: THE HONORABLE GENE E.K. PRATTER, J.

- - - - -

TRIAL TRANSCRIPT

- - - - -

KATHLEEN FELDMAN, CSR, CRR, RPR, CM
Official Court Reporter
Room 1234 - U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
(215) 779-5578

(Transcript produced by mechanical shorthand via C.A.T.)

to write something, as opposed to writing where the witness is.

THE COURT: Yes, let's see how it goes.

MR. LYONS: Okay, thank you.

THE COURT: The other thing is, if you knew how to do it on the computer, you could draw on the computer.

MR. LYONS: My kids could do that. I can't.

THE COURT: Okay.

(Witness resumes the stand.)

THE DEPUTY CLERK: All rise.

(Jury in.)

THE COURT: Please take your seats. Good morning, ladies and gentlemen. Bummer about the game, you know, nail-biter. You know, there's always next year, you know, all of the above. Okay, thank you so much for everybody getting here straightaway on time. We are, in fact, ready to resume.

Counsel, you may proceed.

MR. LYONS: Thank you, Your Honor.

DIRECT EXAMINATION (RESUMED)

BY MR. NEUWIRTH:

Q. Good morning, Ms. Reickard.

A. Good morning.

Q. Yesterday, we were talking about United States Egg Marketers and their export program, and you indicated that USEM took over the administration of that program in around

2000?

A. UEP took over.

Q. UEP took over. Thank you for correcting me.

A. Yes. Yes.

Q. Prior to UEP taking over the USEM marketing program and exporting eggs, isn't it true that United Egg Producers had its own export program?

A. I -- I didn't remember that, but I have seen minutes, so, yes.

Q. Okay.

MR. LYONS: Could I show you an exhibit, and, Counsel, this is Tab 6 in your binders.

May I approach, Your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. LYONS:

Q. So, Ms. Reickard, I placed an exhibit in front of you which is -- appears to be minutes of a UEP Export Committee meeting, February 1, 2000. Do you see that?

A. Yes.

Q. You attended that meeting; is that correct?

A. Yes.

MR. LYONS: Your Honor, I move admission of Plaintiffs' Exhibit 41.

MR. BARNES: No objection.

THE COURT: 41's admitted.

MR. LYONS: Can I have that displayed to the jury, please?

THE COURT: Sure.

BY MR. LYONS:

Q. Now, you see, Ms. Reickard, this is a meeting of the UEP Export Committee, and it lists you on the left-hand side, four lines down, as a member -- excuse me -- as someone who attended this meeting.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And then there's a reference to Chad Gregory in the middle of the page, and then to the right, there's Gene Gregory, his father?

A. Yes.

Q. If you go down to the minutes, it says: Gregory, which is Gene Gregory, reported that an order had been accepted for 100 containers, number 48 Class 1 or graded loose eggs and 20 containers of the same size eggs, and it continues on from there.

Do you see that?

A. Yes.

Q. And then it says -- he explained: If UEP's committee agreed to participate at the same percentages in the past,

that our share of the order would be 30 containers.

Do you see that?

A. Yes.

Q. So let me stop there for a second. So you recall that the United States Egg Marketers was exporting eggs?

A. Yes.

Q. Right. And then this appears to indicate that United Egg Producers would participate in those exports from time to time, does it not?

A. Yes, they were asked to supply eggs.

Q. Okay. And you were a vice president of United Egg Producers?

A. Yes.

Q. And you attended this particular meeting. Do you recall if you attended other export committee meetings?

A. I just don't remember.

Q. But you do recall at least that there was an export committee?

A. I guess there was, yes.

Q. Okay. Now, what is your understanding as to why United Egg Producers was participating in exports by United States Egg Marketers?

A. Well, they probably weren't able to supply all of the eggs themselves, and so they were going to the UEP marketing program to -- to get the eggs.

Q. When you say "they," you're referring to United States Egg Marketers?
A. Yes.
Q. United States Egg Marketers was going to export some eggs?
A. Right.
Q. They didn't have enough so they went to UEP to have UEP help fill and complete that order?
A. Yes.
Q. Now, after the UEP Export Committee agreed to pursue this particular export, they had to notify the membership of the United Egg Producers, correct?
A. Um, I --
Q. Well, let me see if I can help you out here. If I can ask you to take a look at the third paragraph from the bottom. It says: DeVries reported that we had secured export commitment forms from members representing more than 30 million hens and that an immediate effort would be made to gain the support from as many members as possible.
Do you see that?
A. Yes.
Q. Does that refresh your recollection that after the UEP Export Committee agreed to fund an export, they had to have the members help fund that export?
A. Yes.

MR. LYONS: Your Honor, I'm going to approach with an exhibit. It's Tab 5.
BY MR. LYONS:
Q. I've placed an exhibit in front of you that's a notice from United Egg Producers dated February 1, 2000, the same date as the conference call meeting.
Do you see that, ma'am?
A. Yes.
Q. And do you recognize this document?
A. Do I recognize what?
Q. Do you recognize this document?
A. Yes.
Q. Okay.
MR. LYONS: Your Honor, I'd move admission of Plaintiffs' Exhibit 40.
THE COURT: Any objection?
MR. BARNES: Yes, Your Honor, hearsay.
MR. LYONS: It's offered -- it's not offered for the truth of the contents, Your Honor. It's offered to prove the export announcement was made to the members of UEP.
THE COURT: I didn't hear that there was a dispute about that. I think that she said that it was. What does the document do to advance the ball here?
MR. LYONS: It identifies for the export committee's -- excuse me -- for the members of UEP that this

export was accepted by the Export Committee.
THE COURT: That's being offered for the truth of the acceptance?
MR. LYONS: No. The Board minutes do that. This is offered to indicate that the members are being asked to participate in this particular export, and there's an export commitment form attached to the e-mail.
THE COURT: Well, the objection is hearsay, and your response to that is it's not being offered for the truth of what's contained in the document, so why is the document being offered?
MR. LYONS: It's being offered to show that there was a form that was circulated that the witness hasn't testified to to the members asking them to complete the form.
THE COURT: Okay, on that basis and for that limited purpose, the document is admitted.
MR. LYONS: So can I have Exhibit P-40 on the screen.
BY MR. LYONS:
Q. You'll see, ma'am, this is an export order acceptance notification. If we go to the very last page of the exhibit, you'll see there's an export commitment form.
A. Yes.
Q. And it says: Our company recognizes the importance of a cooperative effort in filling large export orders of fresh

shell eggs. To confirm our commitment to this initiative, our company agrees to participate in all shell egg export orders taken by USEM and approved by the UEP Export Committee.
Do you see that?
A. I do.
Q. And isn't it true, ma'am, that this form was submitted to the membership of UEP and they were being asked to agree to the export?
A. Yes.
Q. And this is how UEP notified its members that there was an export that they were being requested to fill, correct?
A. Yes.
Q. Now, the second paragraph says: We understand that UEP's egg traders will purchase the eggs for any export delivery in the open market and allocate the profit or the loss from the export sale to participating companies at an equal rate per layer owned or managed by those having signed this form.
Do you see that, ma'am?
A. Yes, I do.
Q. Okay. Now, ma'am, it's your understanding that these exports were done periodically, true?
A. Yes.
Q. And as of 2000, did you have an understanding as to how the export program worked?

A. Yes, after we took over the management.

Q. Okay. I'm going to ask that you look at the first page of this exhibit. And if we could go to the second-to-the-last paragraph on the first page, the penultimate paragraphs. There's a sentence that begins: The difference between the purchase price of the eggs and the 28 cent sale price, and it continues on, will be charged to those members committed to support the export order. And it describes a win/win situation.

Do you see that ma'am?

A. Yes.

MR. BARNES: Your Honor, excuse me. I hate to interrupt Mr. Lyons' examination, but it sounds like he's really talking about the truth of the matter.

THE COURT: What's the objection?

MR. BARNES: Hearsay.

THE COURT: Okay. The document's been admitted for a limited purpose. Let's stick with that purpose, and we don't need to then read from the document that's been admitted.

BY MR. LYONS:

Q. Ma'am, let me ask you this question: When this announcement was sent to the members, was it your understanding that all of the members understood the purpose of the export?

MR. BIZAR: Calls for speculation, Your Honor, objection.

THE COURT: Sustained.

BY MR. LYONS:

Q. Did UEP make efforts to notify the membership of the reasons for the export?

A. I don't know. I don't remember this and this came from the Georgia office. I really don't know.

Q. You can put that down for a second.

A. Okay.

Q. I'm going to ask you a question in your capacity as a vice president of United Egg Producers --

A. Okay.

Q. -- who worked on the United States Egg Marketers export program.

A. Okay.

Q. What is your understanding as to whether the members of the United Egg Producers who participated in the exports understood the purpose of the program?

MR. BARNES: Same objection.

MR. BIZAR: Same objection.

MR. LYONS: It goes --

THE COURT: The question is did this witness have any such understanding.

BY MR. LYONS:

Q. Did you have an understanding as to whether or not the people who were participating in the program understood the purpose of the program?

MR. BIZAR: Your Honor, objection as foundation.

THE COURT: Overruled.

THE WITNESS: I assume they understood.

BY MR. LYONS:

Q. Now, isn't it true that United Egg Producers told the members if they had any questions about the program, they could contact United Egg Producers?

A. Yes.

Q. In fact, that's what the document says, correct?

A. Yes.

Q. Anyone having questions about how this actually works is invited to call the UEP office for further clarification.

MR. BARNES: Objection. Objection.

THE COURT: What's the objection?

MR. BARNES: The same objection.

THE COURT: Well, it's a cumulative question.

BY MR. LYONS:

Q. Did you ever receive a telephone call from anyone asking for clarification about the export program?

A. No.

Q. The entire time that you worked at United Egg Producers,

did you receive a letter, a fax, an e-mail from anyone questioning why this export program was in existence?

A. Not that I remember.

Q. And your -- you believe that the members understood the purpose?

A. I believe they did, yes.

Q. You understood that once an export was announced, the price of eggs would go up, correct?

A. Not necessarily.

MR. LYONS: Your Honor, I'm going to read from the witness's deposition. I believe counsel has copies of the deposition.

And if you'd like me to give a copy to the witness, I can, Your Honor.

THE COURT: I think that would be fair.

MR. LYONS: Okay.

BY MR. LYONS:

Q. Ms. Reickard, do you recall that you flew from Iowa to Philadelphia in 2014 to give a deposition?

A. Yes.

Q. And at that deposition, that was at a law firm's offices?

A. Yes.

Q. All right, and there was a court reporter --

A. Yes.

Q. -- who was taking everything down?

A. Yes.
Q. There was no judge there, but there was a court reporter and several lawyers, correct?
A. Yes.
Q. And the court reporter had administered an oath to you?
A. Yes.
Q. And that's the same oath you took yesterday when you agreed to testify truthfully, correct?
A. Yes.
Q. Now, at your deposition --
MR. LYONS: And, Counsel, for the record, this is at page 134 of her deposition, line 17.
BY MR. LYONS:
Q. Question: And what you had to pay for the eggs on the open market, was the greater -- was that greater than the price that you received for the purchase of eggs?
Attorney: Object to the form of the question.
The witness: The price of eggs changes daily, so once word is out about an export, more than likely the price is going to be going up. So depending on what day the eggs were purchased, it usually became more expensive to buy the eggs.
That was your testimony at your deposition, right, ma'am?
A. Yes, I said more than likely which --

Q. Okay, so it was your understanding, ma'am, isn't it true, that once an export was announced, the price of eggs was more than likely to go up?
A. More than likely yes.
Q. And wasn't it true, ma'am, that the purpose of the export program was to raise the domestic price of eggs?
A. Well, I'm sure that egg producers hoped that the domestic price would go up because they were probably losing money.
Q. The purpose was to raise the price of domestic eggs, correct?
MR. BARNES: Objection. Asked and answered.
THE COURT: Sustained.
MR. LYONS. Can I have Exhibit 25? Do you have 25?
MR. BIZAR: I apologize, I appreciate it.
BY MR. LYONS:
Q. Ms. Reickard, isn't it true that you actually told USEM members that the purpose of the export program was to raise the domestic price of eggs?
A. I don't know if I did that or not.
MR. LYONS: May I approach, Your Honor?
THE COURT: Yes, you may.
BY MR. LYONS:
Q. Ms. Reickard, I've placed an exhibit in front of you. It's a document on United Egg Producers stationery with Box 170 to 124 North 2nd Street Eldridge, Iowa. 52478 is the

ZIP code.
Do you recognize that address, ma'am?
A. Yes.
Q. The phone number is 563-285-9100. Do you recognize that phone number, ma'am?
A. Yes.
Q. That's your office, correct?
A. Yes.
Q. And this is an e-mail that you sent out to USEM members in November of 2006, and in that letter, you told them: We know that the loss on this export is high, but we hope that you understand that the purpose was to raise the domestic price of eggs and that was accomplished.
Correct?
A. This letter went out in my name because the invoices were included with it, but Gene Gregory is the one who actually wrote it.
Q. Do you dispute, ma'am, that the purpose of the export was to raise the domestic price of eggs?
A. That was the hope.
MR. LYONS: Your Honor, I move admission of Exhibit 200.
MR. BARNES: Objection.
THE COURT: Sustained.

BY MR. LYONS:
Q. Now, you created some forms, Ms. Reickard, with regard to the export program, right?
A. Yes.
Q. We looked at some of those yesterday?
A. Yes.
Q. Those are the case volume export reports, and we looked at Exhibit 206 and we looked at 216?
A. Yes.
Q. I'm going to show you a couple more, okay?
A. Okay.
MR. LYONS: 29, 30, and 31, Counsel.
Can I approach, Your Honor?
THE COURT: Yes.
BY MR. LYONS:
Q. Now, ma'am, I've placed Exhibit 229, 250, and 292 in front of you, and you recognize those as additional export case volume forms, correct, ma'am?
A. Yes.
Q. And these were prepared by you, correct?
A. Yes.
MR. LYONS: Your Honor, I'd move admission of Exhibits 229, 250, and 292.
MR. BARNES: No objection.
THE COURT: 229, 250, and 292, and they're admitted.

BY MR. LYONS:
Q. Now, we looked at these forms yesterday.
MR. LYONS: If I can have 229 on the screen.
BY MR. LYONS:
Q. This is the form for a different export than what we were looking at yesterday, right, ma'am?
A. Yes.
Q. But the form is the same?
A. Yes.
Q. Right. And you had changed the information on the form as needed, but generally, this was the form that you used when you were sending people invoices for exports, right?
A. Yes.
Q. Now, for every export that's listed here, if you go to the right-hand column, it says: Percent of loss.
Do you see that, ma'am?
A. Yes.
Q. And the loss is the loss on this particular export, correct?
A. Yes. That's correct.
Q. And that's the same for 229 and 250 and 292?
A. Correct.
Q. All right. And these were preprinted forms, right?
A. Preprinted?
Q. Well, you had this form on your computer, and you would

just cull it up as needed, correct?
A. Yes. Yes, and change things as needed.
Q. Right. But the one thing you never had to change was the column that said percent of loss, right? You never had to change that column? You changed the amount, but you never changed the title of the column?
A. No. No, I did not have to.
Q. Right. Because every export always resulted in a loss, true?
A. Of the eggs that -- that we had to go out and buy, yes.
Q. Well, the entire egg program, every time there was an export, to your knowledge, the export lost money, correct?
A. Well, the -- like I said, this is referring to the people that we bought eggs for.
Q. I understand. And we're going to spend some time talking about that, but overall, the shipment was a loss, right? You were buying eggs in the United States, selling them overseas, and you were buying them in the United States for a price that was higher than you could sell them overseas. And the entire export was a loss, isn't that true, ma'am?
A. Than selling them overseas?
Q. Let me ask it this way, and you can just give me a yes and no, if you can. If you can't, then tell me you can't, and then I'll move on to something else, and then we'll come back to it later with another exhibit.

A. Okay.
Q. Ms. Reickard, isn't it true that you know, as you sit here today, that every export that was done resulted in a loss to United States Egg Marketers?
MR. BARNES: Objection. Asked and answered.
THE COURT: Overruled.
MR. LYONS: I'm waiting for an answer. I didn't hear an answer.
THE COURT: When I overrule, that means you can go ahead and answer it. Sorry.
THE WITNESS: Okay.
THE COURT: Do you remember the question?
THE WITNESS: Yes, but I'm still answering it the same way.
BY MR. LYONS:
Q. Which is what?
A. The -- I mean, I have no knowledge of the people that supplied their own eggs, whether they lost money or not. I don't know that.
Q. Okay, well, let's put it this way: Certainly for the people who bought -- who asked United Egg Producers to go out and buy eggs for them to complete an export, those people lost money?
A. Yes, I said that. Yes.
Q. And just so that we're clear, on every export, every

export, where someone contacted United Egg Producers and asked them to buy eggs for me, because I don't have eggs, to fulfill this export, that person lost money; isn't that true?
A. That is true.
Q. So just so that I'm clear, if I'm sitting at home and I understand that there's an export going out, I'm going to contact United Egg Producers to say, I want to participate in this export, I want you to buy eggs for me because I don't have them, I want you to sell those eggs for me overseas, and then you're going to send me a bill.
That's how your program works, right, ma'am?
A. That is how it worked, yes.
Q. And the bill would be a payment that I would have to make because the export always lost money?
MR. BARNES: Objection.
THE COURT: Overruled -- you have asked this question before, so I think you can move on.
BY MR. LYONS:
Q. So did United Egg Producers tell people that the exports lost money?
A. I don't know if we told them or not.
Q. Do you recall United Egg Producers asking people to support the egg program?
A. Yes.
MR. LYONS: I'm going to ask you to take a look at

Tab 22, Counsel.

And that's Exhibit 201.

May I approach, Your Honor?

THE COURT: Yes. Except that in Tab 22 is a notebook that says it's Exhibit 315-G.

MR. LYONS: Yes, Your Honor, I apologize. The second page of that exhibit is Tab 201 -- is Exhibit 201. There was a copying error, so we had a couple of exhibits --

THE COURT: Okay. I just want to make sure I know what you're talking about here.

BY MR. LYONS:

Q. I have placed an exhibit in front of you, ma'am. It's the United Voices newsletter, dated November 30, 2006. Do you recognize this document?

A. Yes.

Q. Okay.

MR. LYONS: Your Honor, I'd move admission of Exhibit 201.

MR. BARNES: Objection. Hearsay.

THE COURT: Sustained.

BY MR. LYONS:

Q. Ms. Reickard, do you recall whether or not Mr. -- excuse me -- the R.W. Sauder company of Pennsylvania contributed to exports?

A. Yes.

Q. And do you recall whether UEP notified its membership from time to time that the Sauder company contributed to exports?

A. No, I don't remember if they notified them from time to time.

Q. You knew that Sauder company was delivering exports, correct, or contributing to exports?

A. On an export-by-export basis, they supported the export, yes.

Q. Okay. And then, in fact, the Sauder company submitted a membership application, correct?

A. They did, but that was later. I later discovered after --

Q. There's no question.

MR. LYONS: Your Honor, I'd move to strike everything after they said they did.

THE COURT: You're cutting her off?

MR. LYONS: She can answer. Then I'll ask to strike it, because she's answered the question.

THE COURT: Why don't you answer the question -- finish your answer.

THE WITNESS: They submitted a form, a membership form. I added them as a member, and later when I was invoicing them for dues, they told me that they weren't going to be a member, that they hadn't planned on it, and I didn't

realize that. They had apparently talked to Gene Gregory about it. He didn't tell me. And so --

THE COURT: Okay.

THE WITNESS: -- they just became a supporter.

THE COURT: Now, you don't want to talk about what other people said.

MR. LYONS: So I move to strike everything after they submitted the application.

THE COURT: All right. The testimony that went beyond answering the question about the submission of an application will be stricken.

MR. LYONS: Can I have Exhibit 9, please. May I approach with an exhibit, Tab 9, Exhibit 207?

THE COURT: Yes.

BY MR. LYONS:

Q. Do you recognize Exhibit 207, ma'am?

A. Yes.

Q. And that's the Membership Agreement that was submitted by the R.W. Sauder?

A. Yes.

MR. LYONS: Your Honor, I move admission of Plaintiffs' Exhibit 207.

MR. BIZAR: No objection, Your Honor.

THE COURT: 207 is admitted.

MR. LYONS: I ask that it be published and displayed

to the jury.

THE COURT: Yes, that's fine.

BY MR. LYONS:

Q. Do you recognize this, ma'am?

A. Yes.

Q. Now, this is similar to the form that Rose Acre submitted; isn't that correct?

A. Yes.

Q. So let me ask you to turn your attention to the submission by Sauder, which we are speaking about. When did you receive this application, if you recall?

A. Well, it's dated -- I mean, it would have gone to the Atlanta office. It's dated December 27 of '06.

MR. LYONS: Then can I have Exhibit 208 on the screen, which is in evidence of the -- that we looked at yesterday?

BY MR. LYONS:

Q. And this was just before the January 2000 sale of eggs that were supported, correct, ma'am?

A. That's correct.

MR. BIZAR: To be clear, Mr. Lyons, it's Tab 27?

MR. LYONS: Yes.

MR. BIZAR: Thank you.

BY MR. LYONS:

Q. Now, I'm going to show you another exhibit, ma'am, and I

apologize for the speed at which I'm moving. I'm trying to move a little bit faster. Do you recall if after this membership application was submitted, whether or not the United Egg Producers announced to the membership that R.W. Sauder Eggs had become a member?
A. After the export -- what did you say?
Q. After the membership application was submitted, do you recall if R.W. Sauder was announced to the membership of UEP as becoming a member of the USEM?
A. No, I don't recall.
Q. Let me see if I can refresh your recollection. It's Exhibit 440 and it's in Tab 22.
MR. LYONS: This is just for the purpose of refreshing the witness' recollection, Your Honor.
BY MR. LYONS:
Q. Ms. Reickard, if I show you Exhibit 440 for identification purposes only and ask you to take a look at that, and let me know whether that refreshes your memory as to whether or not UEP announced to the membership that R.W. Sauder had become a member.
A. Okay, I see that they did announce it, yes.
Q. Do you remember that happening?
A. No. I'm retired. It's been a long time.
Q. Just a few more exhibits on this. Now, at some point in time, you mentioned that Mr. Sauder or the Sauder company did

not actually become a member of the United States Egg Marketers. Did I understand that correctly?
A. That's correct.
Q. So you received a membership application; they participated in the January export, correct?
A. Yes.
Q. 2007.
And then they participated in the February export in 2007?
A. Yes.
Q. And at some point in and around that time, you understood that they might not actually become a member; is that correct?
A. Yes, I understood that they were not going to be members.
Q. And you received -- and did Mr. Gregory and you have any conversations about that?
A. We had an e-mail back and forth, yes.
Q. Okay. It's Exhibit 315B, Tab 22.
MR. LYONS: May I approach, Your Honor?
THE COURT: Yes, you may.
BY MR. LYONS:
Q. Is that the e-mail conversation you were referring to, ma'am?
A. Yes.
MR. LYONS: Your Honor, I move admission as Exhibit 315B.

MR. BIZAR: No objection, Your Honor.
MR. LYONS: And I ask --
THE COURT: Well, hold on. It's admitted. Now you may publish it.
BY MR. LYONS:
Q. Ms. Reickard, is that the e-mail conversation you had with Mr. Gregory? Do you see that?
A. Yes.
Q. It says: Sauder is not going to pay the USEM 2007 fee. The AP person said Paul just joined for this export and is not becoming a member. Please advise.
And then, Mr. Gregory responded: Paul talked to me about it. He is still a supporter but wants to work on each individual order rather than being an official member.
It continues on: He is concerned that he might legally not be qualified but wants to be a supportive.
Did I read that correctly?
A. Yes.
Q. At least as of this date, you understood that Mr. Sauder's company was going to be participating in the export program but not necessarily as a member, correct?
A. Yes.
Q. And he wasn't the only company to act in that way, correct?
A. That's correct. We had other supporters.

Q. There was a company called Wilcox?
A. Yes.
Q. And they would not join the USEM, right?
A. Right.
Q. They wanted to support it?
A. Yes.
Q. And for you, that was sometimes hard to tell the difference, correct, between a member and a supporter?
A. Um, well, I usually knew who was a member versus who was a supporter. That issue in January 1 was confusing.
MR. LYONS: May I approach, Your Honor?
THE COURT: Yes. Tab 23, Counsel, Exhibit 316G.
BY MR. LYONS:
Q. That's an e-mail dated March 29, 2007 between yourself and Gene Gregory, correct?
A. Yes.
Q. And then in that e-mail, you said it was hard to tell the difference between a member and a supporter, correct?
A. Right. In the way -- yes.
MR. LYONS: I move the admission of 316G, Your Honor.
MR. BIZAR: No objection, Your Honor.
THE COURT: Very well. 316G is admitted.
MR. LYONS: And if I could ask that it be published to the jury.

THE COURT: Go ahead.

BY MR. LYONS:

Q. It says here, it's an e-mail from you to Mr. Gregory: Wilcox will not join USEM, just support it. Hard to tell the difference, and that is also the same with Sauder and Willamette.

And you write: I noticed in the newsletter you listed them as a member, but they didn't join as far as I know.

Do you see that?

A. Yes.

Q. And, ma'am, it was hard to tell the difference between a member and a supporter because they basically acted in the same fashion except for paying dues, right?

MR. BIZAR: Objection.

THE COURT: Sustained.

BY MR. LYONS:

Q. Ma'am, why was it hard to tell the difference between a member and a supporter?

MR. BARNES: Objection.

THE COURT: Overruled.

THE WITNESS: Because they were all helping to support the exports by supplying eggs.

BY MR. LYONS:

Q. What about them supporting the export, what made that

different between a member and a supporter?

A. The supporter would supply eggs, help with the export, but they were not a member. They did not get to vote about the exports.

Q. If I understood correctly, members were obligated to participate in the export program, correct?

A. Members were, yes.

Q. Supporters were not obligated --

A. No, they were not.

Q. -- correct?

But when you filled out your forms for the export case volume, you listed supporters and made them contribute at the same level as members, correct?

MR. BIZAR: Objection. Mischaracterizes the testimony, Your Honor.

THE COURT: Hold on a second.

MR. BIZAR: The objection is that it mischaracterizes the testimony.

THE COURT: Okay, well, the witness is obviously free to answer the question if she understands it.

Can you answer the question?

THE WITNESS: Would you repeat it, please?

BY MR. LYONS:

Q. Sure. Let me see if I can help you. If we can take a look at Exhibit 216 -- excuse me. I'm sorry. 229. And if we

could go to the last page of Exhibit 229.

Do you see here the column here for members -- excuse me -- supporters, not members, right?

A. Yes.

Q. And it also says: Check with them?

A. Yes.

Q. And then for the Sauder company, it lists 2,100,000, and that's the number of hens they had as capacity, correct?

A. Yes.

Q. And if they're going to contribute to this export, you are asking them to contribute their pro-rata share, correct?

A. Well, they could say if that's what they wanted to do.

Q. You were asking them to contribute?

MR. BIZAR: Your Honor, I'm sorry. I'm sorry to interrupt, Mr. Lyons. But I have to object to the way that the exhibit is being displayed. The tech person --

THE COURT: The exhibit was admitted.

MR. BIZAR: Yes. But the way it's being displayed on the screen suggests that Mr. Sauder's company was a member, when, in fact, in the document itself it says supporters --

THE COURT: Okay. Okay, we're not going to have an argument here.

And I've lost track of what your purpose is for going back to 229 anyway. So pose the question and let's see -- let's move on.

MR. LYONS: Okay, so let's have the entire section that says "supporters, not members," "check with them" blown up so that I can address counsel's objection.

THE COURT: Pose the question again. What is the pending question?

BY MR. LYONS:

Q. They are listed here as providing eggs in their pro-rata share even though they're not a member, correct, ma'am?

A. That is correct.

Q. And my question to you is why are you asking them to contribute in their pro-rata share when they are not a member and can contribute at whatever level they want to?

A. Because that is apparently the level that they wanted to contribute.

Q. My question to you, ma'am, is did you ask them what level they wanted to contribute, or did every time you had an export where you were contacting a supporter, you specifically put down the pro-rata share and charged them their pro-rata share of eggs initially?

A. I'm not sure if I contacted them. Usually, I believe, Gene Gregory did. So I'm not sure how those conversations worked.

Q. Isn't it true, ma'am, that every export that a supporter who wasn't a member, it was calculated at the pro-rata share for that supporter?

A. Yes.
Q. Now, on this same form, the Wilcox Farms and Willamette Eggs are listed as supporters and they're not members, right?
A. That's correct.
Q. And they are being asked -- excuse me. They are asking United Egg Producers to buy eggs for them?
A. Yes.
Q. All right. And they're limiting the number of eggs that they're asking to buy to their pro-rata share in this exhibit?
A. Yes.
Q. And is it your understanding that they could have contributed at a level greater than what's indicated on this form?
A. Of course.
Q. Did you ever ask anyone who was a supporter to contribute more than their pro-rata share?
A. I don't know if Gene did or not.
Q. Did you ever do that?
A. No.
Q. Did you ever receive any indication from Mr. Gregory that he ever requested that someone contribute at more than their pro-rata share?
A. No, I don't know.
MR. LYONS: Tab 12, Exhibit 274.
May I approach, Your Honor?

THE COURT: Yes, you may.
BY MR. LYONS:
Q. I placed an exhibit in front of you, ma'am. It's a USEM document from August of 2008 listing members in support.
Do you recognize that document?
A. Yes.
MR. LYONS: Your Honor, I move admission of Exhibit 274.
MR. BARNES: Objection. Hearsay.
THE COURT: Do you have a reason that the document will be admitted or admissible?
MR. LYONS: It's offered to prove what was communicated to the members about producers.
THE COURT: Well, then we need to lay that foundation for that.
BY MR. LYONS:
Q. Does this indicate that not only are members listed but producers are listed?
MR. BIZAR: Speaking from the document, Your Honor.
BY MR. LYONS:
Q. Ma'am, let me ask you this question. Do you recall that United States Egg Marketers announced to its membership who the supporters were?
A. I don't -- this is not my document. I don't know who received it or --

Q. Let me ask a different question. Do you recall whether or not the membership was ever notified that there were producers who were paying their fair share of each export?
A. The membership of UEP?
Q. Yes.
A. Yes, I think they were.
Q. Okay. And to your knowledge, the term "paying your fair share of an export," was that a term that was used frequently at UEP to describe the export process?
A. It may have been.
Q. What types of eggs were exports, ma'am?
A. It varied. Sometimes it was graded, sometimes it was nest-run. It depended on what the exporter wanted.
Q. So graded eggs and nest-run eggs. I think we've talked about graded eggs in this trial, and you weren't here.
What's a nest-run egg?
A. Not graded.
Q. Any egg that's not graded?
A. I think so. You'd have to ask a producer about that.
Q. Okay. So let me ask you to take a look at -- I think it's going to be our next-to-last exhibit.
MR. LYONS: And I'm going to use the butcher block paper for this, Your Honor.
May I have someone from my team set that up for me?
MR. BIZAR: Your Honor, may I move around?

THE COURT: Sure.
MR. BIZAR: Thank you.
MR. LYONS: So, Your Honor, I was misled by my team. I thought this had legs. So with the Court's indulgence, can we put that on our counsel table?
THE COURT: Just put it wherever it works out.
MR. LYONS: Oh, it does have legs. Okay.
THE COURT: Ladies and gentlemen, one of the beauties of every trial is that every so often we get to go back to -- back to basics, and at some point in the not terribly distant past, we actually used to view exhibits this way as opposed to the computer. But it's always nice to see that we can go back to the basics. Maybe.
MR. LYONS: Okay. It's set up, and I'll move it a little bit just so I can see.
THE COURT: Any of you who need to scooch around, you may, of course.
MR. LYONS: May I approach, Your Honor?
THE COURT: Sure.
MR. LYONS: Let me just show these exhibits to counsel so they're here.
MR. DESTEFANO: Excuse me. May I inquire, is that Tab 20 in the binder?
MR. LYONS: Yes, Tab 20 and 18, Counsel.

BY MR. LYONS:
Q. So, Ms. Reickard, I've placed Exhibit 292 in front of you. Do you see that, ma'am?
A. Yes.
Q. And this refers to an export of eggs for an August 8th sale. Do you see that?
A. Yes.
Q. Do you recognize this document, ma'am?
A. Yes.
MR. LYONS: Your Honor, I'd move admission of Exhibit 292.
MR. BARNES: No objection.
THE COURT: 292 is admitted. I think it already was admitted, by the way.
MR. LYONS: Then I apologize, Your Honor. So Exhibit 292. I'm glad I didn't get an objection.
BY MR. LYONS:
Q. This is an August 8th sale, and if we could go to the second page for a second, you'll see there's some -- it says: Supporters, not members, check.
Do you see that?
A. Yes.
Q. And there's some handwritten notes at the bottom there. Do you see that, ma'am?
A. Yes.

Q. Do you recognize that handwriting?
A. It's mine.
Q. That's yours. And that was you calculating the loss per dozen on this export, correct?
A. I'm not sure what that is.
Q. Okay. Well, we'll go through it then.
A. Okay.
Q. And if I could ask you to take a look at Exhibit 273.
A. Okay.
Q. Do you recognize this form?
A. Yes.
Q. Okay. And this is a form that you regularly see which announced to UEP members that there was an export and what the price of the export was and what they were going to get paid, right?
A. I didn't normally see it. This came out of the Georgia office.
Q. So you -- did you utilize the information?
A. Not per se.
Q. Well, you had to collect -- you had to -- you had to calculate the amount of loss for every export, correct, ma'am?
A. That's correct.
Q. And in order to calculate the loss for every export, you had to know what the price that the exporter would receive when they shipped the eggs overseas, correct?

A. Correct.
Q. And you also had to know the price that the exporter would pay to buy the eggs in the United States, correct?
A. Correct.
Q. And that -- and this form is what provided you with that information; isn't that true?
A. I got all that information from Phyllis and Gene in the office.
Q. And they would use this form to give you that information?
A. I don't know.
MR. BARNES: Objection -- I'm sorry. I didn't mean to interrupt the witness.
BY MR. LYONS:
Q. So with regard to this export, you'll see that on --
MR. LYONS: Can I still have that on the screen, please.
BY MR. LYONS:
Q. If we look at the Loss column, it's 433,821.58 is the total loss on the bottom page for this export for people who were supplying eggs, correct?
A. Yes.
Q. And the number of eggs that were shipped overseas is the total through this column of those in the category under Purchase, right?

A. The total packed and purchases. The total of eggs that went overseas.
Q. Well, how many dozen went overseas?
A. Well, what I wrote there, I'm assuming, is the dozen from the 99,750 and the 72,289.
No, not those columns.
Q. If I multiply 2700 -- 27,461 cases by 30 cartons, that's the number that I get, right, 823,830?
A. Yes.
Q. Okay. So I'm going to use that on the board so that we're all on the same page, okay?
A. Okay.
Q. 823,830, those are the number of eggs, the dozen eggs that went overseas for this export, for those people who were asking you to buy eggs for them, correct?
A. Oh, you said that was 27,461 times 30?
Q. Yes.
A. Is that what you said?
Q. Yes.
A. Okay, yes.
Q. Okay. And then the loss is 4338251 -- 821.58?
A. Yes.
Q. And then you just basically did division. You divided the loss, 433,821.58 by 823,830, and you came out to 53 cents a dozen; isn't that true ma'am?

A. It looks like it.
Q. In fact, it's actually .5265, but you rounded up?
A. Possibly.
Q. 53 cents a dozen was the loss on this export. 53 cents a dozen lost?
A. To the people that didn't supply their own eggs.
Q. To the people who didn't supply their own eggs.
Now, in order to figure out that loss, you had to know how much the eggs were being purchased for in the United States, correct?
A. Yes.
Q. Purchase price in the US.
And then you had to know how much of eggs were going to sell for overseas, right?
A. Yes.
Q. And that loss was 53 cents a dozen?
A. Yes.
Q. And when you calculated this, you had to find out what the purchase price was that was overseas, and you used the price of 58 cents per dozen, correct, ma'am? And I direct your attention to Exhibit 273. Do you have that in front of you, ma'am?
A. Yes.
Q. If you look at the last paragraph, the sale price.
A. Yes. It apparently was 58 cents.

Q. So 58 cents was the sale price of the eggs overseas. And so the purchase price in the US was actually $1.11 per dozen, correct, because $1.11 minus 58 gives you 53 cents a dozen loss, correct? Isn't that true, ma'am?
You have eggs in the United States, you're buying them for $1.11, you're shipping them overseas at 58 cents. The person overseas is paying 58 cents per dozen eggs, and the loss for that shipment to the people who are saying buy my eggs is 53 cents a dozen. That's what you calculated?
A. That's what I calculated.
Q. So, ma'am, just so we're clear, and I'm not trying to trick you or anything, okay, so I want this to be clear. For those people who didn't have eggs, they would contact USEM and say, There's an export order. I have been asked -- and we can use the exhibit so that we're clear.
MR. LYONS: We can go to Exhibit 292, and you can just blow up the entire column that says Purchase.
MR. BARNES: Excuse me. Are we done with that?
MR. LYONS: No.
BY MR. LYONS:
Q. Every one --
MR. LYONS: Can everyone see that?
THE COURT: What's the question?
MR. LYONS: I was having it blown up.

BY MR. LYONS:
Q. Can you see where it says Purchase? For everyone who asked USEM to purchase eggs, you calculated a loss for them at 53 cents a dozen, correct, ma'am?
A. Yes.
Q. Okay. And so for all of those companies that were saying, Please purchase eggs for me, I want to support this export, I don't have eggs to contribute for this export, please buy the eggs, you would go out and pay $1.11, sell those eggs overseas for 58 cents, and they would have a loss of 53 cents a dozen; isn't that true?
A. We didn't pay $1.11 for each load of eggs. Each load of eggs was negotiated at different prices. So you can't just say $1.11.
Q. The average price was $1.11; isn't that true, ma'am?
A. Well, it looks like it would have been, yes.
Q. So the average price was $1.11 to get to an export price of 58 and a loss of 53. So I'll stand corrected and say the average price was $1.11, okay?
A. Okay.
Q. Now, just so that I'm clear, if I was asking you to -- excuse me.
If I'm a supporter and I want to contribute to this export, why would I -- or could you tell the jury why I would ask you to buy eggs in the United States for $1.11, sell them

overseas at 58 cents, and I would have to pay a loss of 53 cents a dozen? Why would I do that?
MR. BARNES: Objection, speculation.
THE COURT: Sustained.
BY MR. LYONS:
Q. Ma'am, isn't it true that you knew that the supporters who were doing that were doing that because they expected the domestic price of eggs to rise when the export was announced? And so even though they might lose money on this short-term deal, they would make money in the long term?
MR. BARNES: Same objection.
THE COURT: Well, I'll let her answer the question if she can. Then we're going to move on.
BY MR. LYONS:
Q. I'm sorry. I can't hear you.
A. I believe so.
Q. Okay, now, for the person who had their own eggs to sell, you paid 59 cents a dozen for those in this instance, correct? On an average price.
A. You mean 58?
Q. Let me ask you to take a look at Exhibit 273. And the penultimate paragraph says: USEM will pay.
Do you see that, ma'am?
A. In --
MR. BIZAR: Your Honor, that's not been admitted.

THE COURT: Hold on. Do you have an objection?

MR. LYONS: I'm not --

THE COURT: No, 273 has not been admitted.

MR. LYONS: I'm not asking to admit it. I'm just asking her to look at it.

THE COURT: Okay.

BY MR. LYONS:

Q. Exhibit 273, do you see that, ma'am?

A. Yes.

Q. Okay, now, in order for suppliers who had eggs, they would sell those eggs to USEM, and USEM would ship those eggs overseas, right?

A. Right.

Q. Okay. And in this instance, the sales price that they would get was 59 cents, correct? On average.

A. Why are you saying 59? It's 58.

Q. Could you just look at the paragraph that's not talking about the people who are buying eggs?

A. Oh, okay, all right. I was looking at the wrong paragraph. Okay.

Q. 59?

A. Okay.

Q. So these are the people who are asking to buy eggs, and we're just going to use the same piece of paper so we don't have to belabor the point, but for those people who have eggs,

who say, I have eggs, I'm going to contribute, pay me for those eggs, they're paying -- they're getting 59 cents, right?

A. Yes. Yes.

Q. So if I sell eggs here, I get 59 cents a dozen, right?

A. Yes.

Q. Now, just so that I'm clear, those people have eggs to sell. The domestic price that they could get is $1.11, but they chose to sell their eggs to USEM for 59 cents a dozen, isn't that true?

A. Well, they wouldn't have been able to sell them for $1.11, if the export hadn't been announced.

Q. You were buying eggs for $1.11, right?

A. After the export was announced.

Q. So you were buying eggs for $1.11, and the domestic market price went up. And people who had eggs to sell were selling those eggs to you for 59 cents, correct?

A. Yes.

Q. And so if they knew that the eggs price was going up and they had eggs to sell, they could sell those eggs on the market in the United States for $1.11, a dozen, but instead they would sell them to you for 59 cents a dozen?

MR. BIZAR: Objection, Your Honor. Asked and answered. It hasn't been established. It's assuming facts that aren't in evidence.

THE COURT: It's sustained.

BY MR. LYONS:

Q. Ma'am, isn't it true that the only reason that USEM and UEP did this export program was so that they knew that by shipping eggs overseas at a loss, that the domestic price would rise?

MR. BIZAR: Asked and answered, Your Honor.

THE COURT: Okay, last time you ask the question. Now you can answer it, and then you're either --

MR. LYONS: I'm done.

THE COURT: Okay. Can you answer the question?

THE WITNESS: They were -- they were selling at a loss more than likely because they had an oversupply.

MR. LYONS: No more questions, Your Honor.

THE COURT: How are we doing, ladies and gentlemen? Do we have to have a break? Okay, we're going to have a seven-and-a-half minute break, okay. Something under ten minutes, and we'll resume. Please don't talk about the case. We are going to pick it up again shortly.

THE DEPUTY CLERK: All rise.

(Jury out.)

THE COURT: You can get to enjoy the break, too, ma'am.

That's for everybody here.

(After recess:)

THE DEPUTY CLERK: All rise.

(Jury in.)

THE COURT: Okay, everybody, you may take your seats, and the cross-examination may commence.

CROSS-EXAMINATION

BY MR. BIZAR:

Q. Ms. Reickard, my name is Steve Bizar, and I represent R.W. Sauder. Have we met before today?

A. No.

Q. Have we ever spoken before?

A. No.

THE COURT: You need to keep your voice up, maybe just the mike.

There you go.

BY MR. BIZAR:

Q. So Mr. Lyons was talking to you about the negotiated market price and he drew that on his easel, which is $1.11.

Do you see that?

A. Yes.

Q. Do you recall Mr. Gregory ever complaining to you of the prices -- complaining to you about the prices that R.W. Sauder was charging USEM for exports?

A. I don't recall that, no.

Q. Okay. It could have happened, you just don't recall?

MR. LYONS: Objection. Leading a witness.

MR. BIZAR: I'm allowed to lead.

THE COURT: Uh, uh, uh. You don't talk to each other; you talk to me.

MR. BIZAR: Your Honor, I think I'm allowed to lead.

THE COURT: Okay, I'm going to overrule the objection.

Move along, please. Thanks.

BY MR. BIZAR:

Q. Do you see this $1.11 market price?

A. Yes.

Q. Do you happen to know whether that was the price Paul Sauder sold to UEP at?

A. I don't know.

Q. Okay.

MR. BIZAR: We can take this away now.

BY MR. BIZAR:

Q. So you testified on direct that Mr. Sauder filled out an application for USEM Membership. Do you recall that?

A. Yes.

Q. And that application was Plaintiffs' Exhibit 207.

MR. BIZAR: Can you bring that up?

You probably have it in front of you, but -- thank you.

BY MR. BIZAR:

Q. And do you recognize this as the Sauder company application for membership dated 27 December 2006?

A. Yes.

MR. BIZAR: And if we could bring out paragraph 2.

BY MR. BIZAR:

Q. Do you see where it says Membership Dues?

A. Yes.

Q. And it says: UEP members may become USEM members by making an export commitment as identified in Item 3 and paying an annual membership fee of 120 cents per layer. And it goes on and talks about nonUEP applicants.

Do you see that?

A. Yes.

Q. So did you understand that to be a USEM member, if you are a UEP member at the time, you'd have to fill out the application form and pay the membership fee?

A. Yes.

Q. And this is dated December 27, 2006, right?

A. Yes.

Q. And your testimony was that it went to the Atlanta office?

A. Yes.

Q. And then it was sent to you?

A. Yes.

Q. And to your knowledge, Mr. Sauder never paid that membership fee, correct?

A. That is correct.

Q. And Mr. Sauder never became a member, right?

A. That's correct.

Q. Mr. Sauder was a supporter?

A. Yes.

Q. And as a supporter, his company could not vote on whether or when to take an export; isn't that right?

A. That's right.

Q. In fact, they never voted on whether or when to take an export on or the terms of an export?

A. As far as -- that happened in the Georgia office. As far as I know, no.

Q. Okay, as far as you know, they didn't?

A. That's correct.

Q. Okay. So let's look at the January 2007 export list, which is in evidence. It's Plaintiffs' Exhibit 208.

MR. BIZAR: And if we could bring that up.

BY MR. BIZAR:

Q. And you have it in front of you as well.

And this is the export list for the January 2007 sale, which shows R.W. Sauder or Sauder R.W. as a member?

Do you see that?

A. Yes.

Q. So how long after you received the USEM application, the application of Sauder to join USEM did you make up this export list?

A. I don't remember.

Q. Sometime after you received the application?

A. Yes.

Q. And it was based in part on the application?

A. Yes.

Q. And it lists Sauder and it doesn't have anything in the Percentage of Loss column. Do you see that for Mr. Sauder?

A. Right.

Q. And we'll look at other documents that are like this that will be similar, but I just want to call your attention to that in advance.

So at the time that you prepared this January 2007 export sales document, you thought that Sauder was a member?

A. That's correct.

Q. Okay.

MR. BIZAR: And let's bring up Plaintiffs' Exhibit 216, also in evidence. This is at Tab 28.

BY MR. BIZAR:

Q. And this is the February 2007 sale?

A. Yes.

Q. Do you see that?

A. Yes.

Q. Now, and this is also one of the ones that lists Sauder as a member?

A. Yes.

Q. If you can bring that out.

How -- when did you invoice for dues to the members typically?

A. For USEM?

Q. Yes, for USEM.

A. Well --

Q. Let me ask you --

A. -- I don't remember.

Q. Okay.

A. It must have been January, since I was trying to collect it then.

Q. Right. And sometime after you invoiced Sauder company for dues, you realized that they were not going to pay the dues, they were not a member?

A. Yes, I was trying to collect because they hadn't paid.

Q. And this document, this export sale document for February 2007, was prepared before you had figured that out?

A. Obviously so, yes.

Q. You were trying to be meticulous and careful, but you just didn't have the information?

A. That's correct.

Q. Okay.

A. Gene didn't tell me.

Q. Okay, it happens in every office.

So let's look at a document that I've marked as a

cross-examination exhibit.

MR. BIZAR: And I'm going to approach the witness, Your Honor, and distribute the document, if I may.

THE COURT: You may.

MR. BIZAR: We'll call this Defendants' Cross-Examination Exhibit 97.

THE COURT: 97.

MR. BIZAR: 97. Can I have the Elmo?

BY MR. BIZAR:

Q. Let me -- before we display this, just go through this with you.

Does this appear to be one of your export lists for USEM layers for February 13, 2007?

A. This is the membership list.

Q. Ah. Do you recognize it?

A. Yes, I do.

Q. It's something that you would have prepared in the regular course of business?

A. Yes.

Q. As a regular practice?

A. Yes.

MR. BIZAR: Your Honor, may I offer Defense Cross-Examination Exhibit 97 into evidence?

MR. LYONS: No objection.

MR. BIZAR: May I display it?

THE COURT: Yes, you may.

BY MR. BIZAR:

Q. And, Ms. Reickard, this is the membership list for February 2007?

A. Yes.

Q. And am I right that it does not show R.W. Sauder as a member?

A. That is correct.

Q. On either side?

A. No.

Q. Thank you.

And then Mr. Lyons also showed you some other export documents, if you look at the April, May, 2007 sale which is Plaintiffs' Exhibit 226.

MR. BIZAR: Can we bring that up. That's in evidence as well. It's Tab 29.

BY MR. BIZAR:

Q. Do you recognize this as the export case volume for 2000 -- for April and May of 2007?

A. Yes.

Q. And, again, this does not list Sauder as a member, but for the first time Sauder is listed as a: Supporter, not member, check with them.

Do you see that?

A. It's not.

Q. You have to go to the second page. I'm sorry.

A. It's not displayed. Yes, that is correct.

MR. BIZAR: Can we just enlarge that to show Wilcox and Willamette. Thank you.

BY MR. BIZAR:

Q. So in this document -- so "supporter nonmember check with them" means is that Sauder had the opportunity to choose whether or not to participate in the export, right?

A. That is correct.

Q. It wasn't obligated --

A. No.

Q. -- to participate in the export?

A. Absolutely no.

Q. If he had eggs available, he could supply the eggs?

A. Yes.

Q. He could even supply them at $1.11, negotiated market price if he chose to?

A. That's correct.

Q. He didn't have to do that, though?

A. No.

Q. Now, it has in the far right column, which is Percentage of Loss --

A. Yes.

Q. -- there's dollars filled in for Wilcox and Willamette, right?

A. Yes.
Q. But you see there's no dollars filled in for Sauder?
A. That's correct.
Q. Does that mean Sauder was not billed for a percentage of loss by this document?
A. That's right. He supplied all of his own eggs.
Q. Thank you.
Let's look at Plaintiffs' Exhibit 229. And this is also in evidence.
MR. BIZAR: If we can bring it up.
BY MR. BIZAR:
It's August, September, 2007. And, again, in this particular document, Sauder is not listed as a member?
A. Correct.
Q. And they're on the back page as a supporter, not member. If you go to the second page, if you would.
A. Correct.
Q. And, again, Sauder is not billed for a percentage of loss, right?
A. That's correct.
Q. So Sauder's not subsidizing any other member's loss, right?
A. No. No.
Q. Is that correct?
A. That's correct.

Q. In fact, if that column is blank in every one of these forms, it means that Sauder is never subsidizing any member's loss?
A. Correct.
MR. LYONS: Objection. No foundation.
THE COURT: Overruled.
BY MR. BIZAR:
Q. Let's look at 250, which is also in evidence. Mr. Lyons saved us some time by putting this into evidence, and this is for June 2008, so we've skipped a period of time.
And, again, R.W. Sauder is not listed as a USEM member?
A. Correct.
Q. So it means that between any other document -- between the last document that we saw which was for August, September, 2007 and June, 2008, if there were any exports, he could have chosen to participate in them or chosen not to participate?
A. Correct.
Q. If you look at 250 on the second page, again, Sauder is listed as supporter, not member?
A. Yes.
Q. And you see there's nothing there in the column indicating that Sauder funded a percentage of loss?
A. Correct.
Q. So Sauder didn't contribute to subsidizing another

member's loss?
A. No, he didn't.
Q. And if we look at 292, I think that's the one, to the same effect, this is the August 2008 sale. Sauder, again, is listed as a supporter, not member on the second page?
A. Correct.
Q. That means he could choose to participate or not?
A. Correct.
Q. And it means -- there's nothing in the column for percentage of loss, so he didn't subsidize any other member's loss?
A. Correct.
Q. Okay. Now, you've never received a membership dues payment from R.W. Sauder, right?
A. No.
Q. And to your knowledge, as you sit here today, R.W. Sauder never voted on a terms of an export, right?
A. As far as I know, no.
Q. They wouldn't be able to vote as a nonmember?
A. That is correct.
Q. And R.W. Sauder never negotiated the terms of an export, right?
A. No.
Q. Do you have any idea whether R.W. Sauder had other export customers aside from UEP -- or USEM, rather?

A. No, I don't know.
Q. But he was free to have other export customers?
A. Of course.
Q. Now, Mr. Lyons also asked you about two other documents that I wanted to show you very briefly, if I may. One is Plaintiffs' Exhibit 40 -- if we could bring that up -- and this is a document entitled Export Order Accepted February 1, 2000. And there's a reference to the UEP document, and there's a reference -- there's a form on the fourth page, page ending in 621. It looks like this. It says: Export commitment?
A. Yes.
Q. It's not signed, is it?
A. No.
Q. In fact, Mr. Lyons didn't show you any form signed by R.W. Sauder, signed by Paul Sauder for any export commitment, did he?
A. No.
Q. And this form, this document has as its third page members having signed export commitment, and it has a listing of members, and you see no reference to R.W. Sauder there; is that right?
A. No, that's correct.
Q. This is just a form document --
A. Yes.

Q. -- right?
An empty unsigned form document?
A. Yes.
Q. And during the hours that you were on the stand, no signed commitment form was presented with R.W. Sauder, Paul Sauder's signature, right?
A. No.
Q. Let's look at Plaintiffs' Exhibit 445, also in evidence. And let's go to the second page of that.
And that's an export commitment, right?
A. Yes.
Q. Not signed by R.W. Sauder?
A. No.
Q. Not signed by Paul Sauder?
A. No.
Q. And there's no reference in this document to Paul Sauder?
A. No.
Q. It's just a form from September of 2001, right?
A. Correct.
Q. And during the hours that you were testifying previously, no signed commitment form was presented to you by R.W. Sauder, right?
A. No. That's correct.
MR. BIZAR: Was 315B entered into evidence? I think it was.

THE COURT: It was.
MR. BIZAR: Thank you, Your Honor.
Can we bring up 315B.
BY MR. BIZAR:
Q. Do you remember this, Ms. Reickard?
A. Yes.
Q. You were asked about this?
A. Yes.
Q. Your letter, your e-mail to Mr. Gregory at the bottom on January 31, 2007, it says: Sauder's not going to pay the USEM 2007 fee. The AP person said Paul just joined for this export, is not becoming a member. Please advise.
Do you see that?
A. Yes.
Q. You're asking Mr. Gregory to respond to you with instructions?
A. Yes. Yes.
Q. That is around the time you found out they weren't going to pay the dues, right?
A. Yes.
Q. And then Mr. Gregory responds and says: Yes, that is correct. Paul talked to me about it. He's still a supporter but wants to work on each individual order rather than being an official member.
Do you see that?

A. Yes.
Q. That's what he did?
A. That's exactly what he did.
Q. He worked on the orders when he chose to work on them and when he didn't want to work on them, when he didn't have eggs, he had another customer with a better price he didn't?
MR. LYONS: Objection.
THE COURT: Sustained.
MR. BIZAR: I don't think I have anything further, Your Honor. I'll try to get her back home.
THE COURT: Okay. Other cross-examination?
MR. BARNES: Yes, Your Honor.
THE COURT: Mr. Barnes.

CROSS-EXAMINATION

BY MR. BARNES:
Q. It's still morning, so I'll say good morning, Ms. Reickard.
A. Good morning.
Q. It's been a long day, long few days. I will try to be as brief as possible. I'm going to hand you a package, with the Court's permission, of certain summary exhibits, and I'm going to ask you about each exhibit, some very basic questions.
MR. BARNES: May I approach, Your Honor?
THE COURT: Yes, you may.
And these exhibits have been shared, Mr. Barnes,

with all counsel?
MR. BARNES: Yes, Your Honor.
THE COURT: Okay. Good.
BY MR. BARNES:
Q. Ms. Reickard, would you look at what I believe is the first summary exhibit in your package. It's marked as Defendants' Exhibit 1007 for identification. Let me know when you have that in front of you.
A. Yes.
Q. What is this document, Ms. Reickard?
A. It is a document that was compiled from all my invoices.
Q. Okay. Now, if you look --
MR. LYONS: I'm sorry, Counsel. I don't have a copy. I have everything but that one.
MR. BARNES: I'm sorry. Oh, there's a copy.
MR. LYONS: All good.
BY MR. BARNES:
Q. If you would look at the two columns, Member Name and Application Date, and, as you can see on the second, third and fourth pages, there are lists of member names, application dates, and then there are four other columns. Do you see that?
A. Yes.
Q. Did you supply or verify the accuracy of the information in each of those columns?

A. I verified it, yes.

MR. BARNES: Your Honor, I move the admission of Defendants' Exhibit 1007.

MR. LYONS: Without objection.

THE COURT: 1007 is admitted.

MR. BARNES: Thank you.

BY MR. BARNES:

Q. Now, attached to the first four pages of Exhibit 1007, there is a document, another document which says: United States Egg Marketers, Inc., Members List 2006-2008.

Do you see that, Ms. Reickard?

A. Yes.

Q. Could you briefly describe for the jury the information contained in the pages of that document, the Egg Marketers' members list?

A. Well, these were the references to the invoices.

Q. That you used to verify the accuracy?

A. Yes.

Q. And the numbers you see there, UE0214692, et cetera, we're not going to go through each of these, believe me.

A. I've already been through all of them, believe me.

Q. Okay, but for the benefit of the jury, so that they can understand this document, do those numbers represent numbers that were stamped on the documents you used to verify the accuracy of the information in this exhibit?

A. Yes.

Q. Now, let me direct your attention back to the first page, and as you'll see, there's a column that says Application Date. Where did you get the information to verify that information?

A. From the applications.

Q. From the membership applications?

A. Yes.

Q. Looking at the next columns -- we're not going to go through this number by number.

I'm sorry. May we publish this, Your Honor?

THE COURT: Yes.

MR. BARNES: Thank you.

Would you bring up the first page of 1007. I'm trying to finish quickly so I got ahead of myself. I apologize.

BY MR. BARNES:

Q. Okay, so there we have first page of 1007. You've already testified that the member name and application date, you verified from looking at the actual membership application of each member listed in this exhibit.

A. Yes.

Q. Okay. And, again, for benefit of the jury, since I didn't publish this at the right time, the last few pages are captioned: United States Egg Marketers, Inc., Membership

List. And this is after the first four pages.

I believe you previously testified that all of the numbers in that portion of the exhibit were numbers that were stamped upon the Membership Agreements and other documents that you used, that you personally looked at to verify the accuracy of this summary exhibit?

A. Yes.

Q. Now, directing your attention to the next four columns, and, again, we're not going to go through these numbers one at a time, but just so that the jury can understand what we're looking at, each column is -- well, it's captioned Member Reported Flock Capacity. The first column is an application date.

A. Yes.

Q. Do you see that column?

A. Yes.

Q. And what does that refer to?

A. The date that they signed the application.

Q. And is that the flock capacity that the member reported on that application on that date?

A. Yes.

Q. Now, again, there are three other columns captioned Member Reported Flock Capacity for the years 2006, 2007, and 2008. Do you see those columns?

A. Yes.

Q. And, again, were those flock capacities reported by the members for those years?

A. Yes.

Q. And, again, did you personally look at each underlying document to verify the accuracy of every number on this exhibit?

A. Yes.

Q. Okay. Now, would you just look at one column, the third under the member name, the third member down from the top, Brown Brothers Produce Company. And if you look over three columns, where it's member reported flock capacity for 2006, it says: Nonmember.

A. Correct.

Q. What does that mean? Can you explain that to the jury?

A. That means that he had withdrawn his membership. Excuse me.

Q. But he does report flock capacity in 2007 and 2008, correct?

A. He apparently joined again, yes.

Q. Thank you.

Now I'm going to direct your attention to another summary exhibit, which should be in the stack in front of you. And what's your next exhibit there, ma'am?

A. 1000.

Q. Okay. So if we could look at Defense Exhibit 1000 for

identification, could you look at the first page, please, and tell us what this document represents?

A. It represents the October 2006 export. It summarizes the total cases, the number of cases supplied by the members, and the percentage of the cases that were supplied by the members.

MR. BARNES: I move the admission of Plaintiffs' Summary Exhibit 1000.

MR. LYONS: No objection.

THE COURT: 1000 is admitted.

MR. BARNES: Can we publish the exhibit, Your Honor?

THE COURT: Yes, you may.

MR. BARNES: Can we have the first page of 1000 displayed, please, and the second page, as well.

BY MR. BARNES:

Q. Now, let me direct your attention to the second page. Let's look at the second page. There we go. And this is captioned Detail of USEM's October 2006 Egg Export. And indeed there's a lot of detail here, isn't there?

A. Yes, there is.

Q. Again, we're not going to go through each column, but if you can briefly describe for the jury what each column represents.

A. Um --

Q. Take container count is number one. What does that represent?

A. Container count just represents the number of loads for the export.

Q. And invoice number, what --

A. Is the invoice -- my invoice number to the exporter.

Q. And that's an invoice that you prepared?

A. Yes.

Q. There's a date which is self-explanatory. The buyer, I assume that's the person who is buying the eggs for export?

A. Yes, that's correct.

Q. Shipped via, what does that column --

A. That is the person supplying the eggs.

Q. Okay. And the next column is Shipped Via Member.

A. That's just stating whether it was a USEM marketers' member or not.

Q. And the number of cases is self-explanatory. And that would indicate the number of cases that that particular member or supporter, as the case maybe, supplied for that export?

A. That's the number of cases on that particular load.

Q. Right.

And, again, there's a document number -- a document control number in the very last column.

A. Yes.

Q. Now, did you personally review --

A. Every one of them, yes, I did.

Q. Thank you very much.

Now, would you look at the next exhibit, summary exhibit in your package.

A. 1001.

Q. Okay. And, again, could you identify Exhibit 1001.

A. It's a summary of the December 2006 export, listing the total cases, the cases supplied by the members, and the percentage of the cases supplied by members.

Q. And, again, for this exhibit, did you perform a verification process that you described for each and every entry looking at each and every supporting document?

A. Yes, I did.

MR. BARNES: Your Honor, I move the admission of Defendants' 1001.

MR. LYONS: Without objection.

THE COURT: 1001 is admitted.

MR. BARNES: Can you display 1001, please. May I publish it?

THE COURT: Yes.

MR. BARNES: Thank you.

BY MR. BARNES:

Q. Now, again, the format is the same as the prior exhibit, correct?

A. Yes.

Q. And the column that says Total Cases, is that the total cases in that export?

A. Yes.

Q. Cases supplied by members, I assume that's the total number of cases supplied by member eggs?

A. Yes.

Q. And the last column, the green highlighted column, does that represent the percentage of member eggs in that export?

A. Yes.

Q. And I assume that would be the same for the prior exhibit, 1000?

A. Yes.

Q. All right. Now, what's the next numbered exhibit, summary exhibit in your packet?

A. 1002.

Q. And, again, Ms. Reickard, to shorten this up, if you would look at Exhibit 1002, did you perform the same verification process on this exhibit as you did on the prior two exhibits?

A. Yes, I did.

MR. BARNES: Your Honor, I move the admission of 1002.

MR. LYONS: No objection.

THE COURT: It is admitted.

MR. BARNES: Would you pull up the first page of 1002, please.

BY MR. BARNES:
Q. And, again, I'm just going to direct your attention to the green box with the number 76.66 percent. What does that number indicate?
A. The number of cases that members supplied for that export.
Q. What's the next exhibit in your packet?
A. 1003.
Q. All right. Do you have that in front of you?
A. Yes.
Q. Thank you.
Again, I will ask you, did you perform the same verification process on Defense Exhibit 1003 as you did on the prior Defense summary exhibits for the other export loads?
A. Yes, I did.
MR. BARNES: Your Honor, I move the admission of Defense Exhibit 1003?
THE COURT: Any objection?
MR. LYONS: No objection.
THE COURT: It is also admitted.
MR. BARNES: Thank you, Your Honor. May I publish it?
THE COURT: Yes.
MR. BARNES: Will you pull up the first page of Defense Exhibit 1003.

BY MR. BARNES:
Q. And, again, directing your attention, Ms. Reickard, to the green-shaded portion of the first page, could you tell the jury what that number represents?
A. It's the number of cases that members supplied for this export. It's a percentage. I'm sorry.
Q. So, in this export, member eggs total 81.45 percent?
A. Correct.
Q. What is your next exhibit?
A. 1004.
Q. All right, you have that in front of you. Again, I will ask you, did you perform the same meticulous verification process on this exhibit that you performed on the prior summary exhibits?
A. Yes, I did.
MR. BARNES: Your Honor, I move the admission of Defense Exhibit 104 -- 1004.
MR. LYONS: Without objection.
THE COURT: That's fine. It's admitted.
MR. BARNES: May I publish it?
THE COURT: Yes.
MR. BARNES: Will you pull up the first page of Defense Exhibit 1004.
BY MR. BARNES:
Q. Again, directing your attention to the green-shaded

portion, there's a number there, 76.67 percent. What does that number represent?
A. That's the percentage of the total cases that members supplied.
Q. What is the next exhibit in your packet?
A. 1005.
Q. Did you perform the same meticulous verification of each and every item on each and every page of this exhibit that you did on all the others?
A. Yes, I did.
MR. BARNES: Your Honor, I move the admission of Defense Summary Exhibit 1005.
MR. LYONS: No objection.
THE COURT: It's admitted and may be published.
MR. BARNES: Thank you, Your Honor.
Will you pull up the first page, please.
BY MR. BARNES:
Q. Ms. Reickard, again, would you look at the green-shaded portion of the first page of Defense Exhibit 1005 and tell the jury what that represents?
A. Again, it's the percentage of cases that members supplied.
Q. And on this exhibit, it's 76.67 percent; is that correct?
A. Yes.
Q. And I think we're down to our final exhibit?

A. Yes. 1006.
Q. Correct. And I will ask you the same question I've been asking you before. Did you perform the same careful, meticulous verification of each and every item on each and every page of this exhibit?
A. I did. And I didn't get paid for any of this.
Q. I'm terribly sorry.
A. So am I.
MR. BARNES: Your Honor, I move the admission of Defense Exhibit 1006.
THE COURT: Any objection?
MR. LYONS: No objection.
THE COURT: Then it's admitted and it may be published.
MR. BARNES: Thank you, Your Honor.
BY MR. BARNES:
Q. Would you please take a look again at the green-shaded portion of Exhibit -- Defense Exhibit 1006 and tell the jury what that represents.
A. 74.72 percent of the cases were supplied by members.
Q. Okay. So we're looking at a total of seven exports in these summary exhibits; is that correct?
A. Yes.
Q. And is it also correct that in each and every one of these seven exports, the percentage of member eggs as opposed

to nonmember eggs exceeded 50 percent?
A. Definitely.
Q. Okay. Okay.
MR. BARNES: Could we pull up, please, Plaintiffs' Exhibit 229. I believe this has been admitted into evidence.
BY MR. BARNES:
Q. Let me know when you have that in front of you. Got it? Thank you.
Okay, Plaintiffs' Exhibit 229 is an export case volume summary form for the August, September 2007 exports; is that correct?
A. Yes.
Q. Now, would you look down the left-hand column close to the bottom. You'll see the name of Rose Acre. I know it's hard to see.
A. Yes.
Q. Okay. And in the Percentage of Loss column on that document, is there any number written in that column?
A. No.
Q. So Rose Acre did not receive a bill for any loss for this export?
A. That's correct.
Q. And, therefore, Rose Acre didn't subsidize any other members for this export?
A. No.

Q. And, again, I don't want to go through each and every export case volume form, but let me just ask you generally, did Rose Acre always supply its own eggs for the exports?
A. Yes, they did.
Q. Did Rose Acre ever get a bill for any share of any loss on any of the exports?
A. No.
Q. Did Rose Acre ever subsidize any losses for any other supporters of that export?
A. No.
MR. BARNES: Could we have Plaintiffs' 206, please. That's been admitted into evidence.
Show that to the jury and Ms. Reickard.
BY MR. BARNES:
Q. Can you see that?
A. Yes.
Q. And this is the Membership Agreement for Rose Acre Farms, correct?
A. Correct.
Q. Okay. Now I'm going to show you another document which is not yet in evidence, so we do not want to publish this to the jury at this time, but we'll get there. Defense Exhibit 590. Do you have it? Well, you have it somewhere in your book.
MR. LYONS: Plaintiffs' 590?

THE COURT: Pardon me?
MR. LYONS: Plaintiffs' 590?
MR. BARNES: No, Defendants' 590.
MR. LYONS: Can I just look?
MR. BARNES: Yes.
(Discussion off the record.)
MR. BARNES: Okay. I forgot I had the copies with me.
Okay. Whoops, I've got to have one back.
May I approach the witness, Your Honor?
THE COURT: Yes.
BY MR. BARNES:
Q. Ms. Reickard, I'm going to hand you a copy of what's been marked as Defense Exhibit 590. And I'm going to ask you to take a look at that and tell me if you recognize it.
A. I do.
Q. What is it?
A. It's Rose Acre's USEM marketers membership form -- application.
MR. LYONS: I apologize, Your Honor. Counsel handed me an exhibit, but he handed me 206; he didn't hand me 590.
MR. BARNES: I'm sorry. Here, I'm sorry. I have another copy, I hope. I'm sorry.
MR. LYONS: Okay.
MR. BARNES: Got it.

THE COURT: Just so we're all dealing with whatever number is given, it's 12-22-2007 Membership Agreement and Export Commitment?
MR. BARNES: That was exhibit -- the document that I've just handed the witness, I'll provide to the Court.
THE COURT: The answer is yes, it is?
MR. BARNES: Yes, it is, Your Honor.
THE COURT: Okay.
MR. LYONS: There's no objection to this exhibit, Your Honor.
THE COURT: Okay.
MR. BARNES: May we publish it?
THE COURT: Yes.
MR. BARNES: Could we pull up Defense Exhibit 590.
BY MR. BARNES:
Q. Now, there's a slight difference between this exhibit and Plaintiffs' Exhibit 206, which is another version of Rose Acre's Membership Agreement; is that correct?
A. Yes. Yes.
Q. What is the difference?
A. This was my copy when I received it. I keep records of the UEP membership layers. I did keep records, I'll say. And all of my records had to be the same whether it was the animal welfare records, whether it was the membership records, whether it was U.S. Egg Marketers. I always verified to check

that all the numbers were the same. And in October of every year, I verified numbers because when I send out dues invoices, I don't want to get them back corrected, make adjusting entries. So this 20 million, 586 was the number that Rose Acres had supplied to me in October, and so that was the number that I used for their Membership Agreement.

MR. BARNES: May we publish this, Your Honor?

THE COURT: Yes, you may.

MR. BARNES: Will you pull up Defense Exhibit 590 so the jury can see what you're talking about?

MR. LYONS: It's on the screen.

MR. BARNES: Pardon me.

MR. LYONS: It's on the screen already, Counsel.

MR. BARNES: I'm sorry. My eyesight isn't what it used to be.

BY MR. BARNES:

Q. Now, you referred to a handwritten number on this exhibit, Defense 590.

A. Yes.

Q. Could you direct the jury's attention to that number?

A. That's up at the top of the page, the 20 million, 586.

Q. And that's your handwriting?

A. Yes.

Q. And you got that number from Rose Acre?

A. I would have gotten that number from Rose Acre in October

before, yes.

Q. Okay. Now, that's more than the 20 million layers that they listed in their original application, which was Plaintiffs' Exhibit 206, correct?

A. Correct.

Q. Did USEM members from time to time increase, tell you that there was an increase in their cage capacity?

A. Oh, yes.

Q. Did they tell you there was a decrease in their cage capacity?

A. Yes.

Q. Now, just to clarify one final point, since I'm a little confused.

MR. BARNES: Could we have Plaintiffs' 229 again, please. This is the export case volume exhibit.

BY MR. BARNES:

Q. And if you again look at the right column, Mr. Lyons spent some time with you on this, the percentage of loss. I just want to make sure we all understand what that means. That does not mean, does it, that every export, total export, always resulted in a loss for every USEM member or for USEM itself?

A. That's correct.

Q. USEM as a company, as an entity, never itself lost money on an export?

A. That's correct.

Q. Now, were USEM members -- pardon me.

Were USEM supporters, first of all, they were free to sell their eggs to anybody at any time for any price?

A. That's correct.

Q. There was no obligation to sell them to USEM for export?

A. No.

Q. Now the USEM members had an obligation, correct?

A. Yes, yes.

Q. But to the extent that USEM members had excess eggs, they could sell them for any price to anybody?

A. That's correct.

Q. Now, Mr. Lyons went through some of the entries, and he did -- he had a do-it-yourself exhibit, which tended to show average prices and losses and all this. For any given member that participated in any USEM export, do you know whether that member made or lost money on that export?

A. No, I don't know.

Q. Do you know whether Rose Acre Farms, for example, when it sold eggs through the USEM export program, could have obtained a better price for those eggs?

A. No, I don't know that.

Q. Do you know whether those eggs were surplus to Rose Acre?

A. No, I don't.

Q. Would your answer be the same for any other USEM member?

A. Correct. Yes.

MR. BARNES: Ms. Reickard, I thank you for your patience. I have no further questions --

THE COURT: Any further --

MR. BARNES: -- at this point.

THE COURT: -- cross-examination?

MR. CALLOW: No, Your Honor, thank you.

THE COURT: Redirect?

MR. LYONS: Yes, Your Honor, thank you.

REDIRECT EXAMINATION

BY MR. LYONS:

Q. Ms. Reickard, thank you for your time today. I will be brief. I just want to cover a few things. Let me take a second to get set up here.

MR. LYONS: May I approach with two exhibits, Your Honor?

THE COURT: Yes.

MR. LYONS: And may I have D-1007, which is in evidence on the screen for the witness, please.

I mean for everyone, I apologize.

BY MR. LYONS:

Q. So, Ms. Reickard, let me ask --

MR. LYONS: If we could scroll down on this exhibit, which is in evidence, to the second page of the document, and the top line that references a member by the name of Fort

Recovery Equity.
BY MR. LYONS:
Q. Do you see that?
A. No. It's not here yet.
Q. Oh. I'm sorry.
MR. LYONS: The jury -- does the jury have 1007?
THE COURT: It was published, I recall -- as I recall.
MR. LYONS: Your Honor, I'd ask if Defense could cull up 1007, which is their exhibit.
THE COURT: Right. Could you do that for us, folks? There it is.
MR. LYONS: And if we can go to the second page.
BY MR. LYONS:
Q. Do you see there's a reference to Fort Recovery Equity?
A. Yes.
Q. Do you see that, ma'am?
A. Yes.
Q. Right? And then there's a little footnote for that, which is footnote Number 17. Do you see that, on that page?
A. Not yet.
Q. No, no, no, the -- next to the name Fort Recovery Equity, there is a footnote on that line.
A. Oh, I see that, yes.
Q. Do you see that, ma'am?

A. Yes.
Q. All right. And that's footnote 17, right?
A. Yes.
Q. Now, and then if I look at the fifth page of this exhibit and I go to footnote 17, there is an entry for the Bates number UEO302000. Do you see that, ma'am?
A. Yes.
Q. Okay, and that's the Bates number of the document that I handed you that's Exhibit 522, correct, for Fort Recovery?
A. Yes.
Q. That's the Membership Agreement for that company, correct?
A. Yes. Yes.
MR. LYONS: Your Honor, I move admission for Exhibit 522.
MR. BARNES: Your Honor, I'm going to object. It's beyond the scope.
THE COURT: No, I'll allow it. Go ahead.
MR. LYONS: Thank you.
And also if I can ask you to take a look at -- if we can have -- pull up Weiss Lake Egg Company, which is on page 4 of this exhibit.
BY MR. LYONS:
Q. And there's a footnote for that company which is line -- footnote 57. Do you see that, ma'am, on the screen in front

of you?
A. Yes.
Q. And you go to footnote 57 for that exhibit on page 7 of this document, there's a Bates number -- with a Bates number stamp UE0214790, right?
A. Yes.
Q. And that's the same Bates number of Exhibit D-139 that I placed before you, correct?
A. Yes.
MR. LYONS: We move admission of Exhibit D-139.
MR. BARNES: Same objection.
THE COURT: Okay, same ruling. Go ahead.
BY MR. LYONS:
Q. Now, ma'am, we looked at --
MR. LYONS: Can I have Exhibit 1000 displayed in the same way?
BY MR. LYONS:
Q. This was the summary of the USEM export for October 2006, and this is referring to the cases supplied by members. Do you see that?
A. Yes.
Q. Okay, and just so that I'm clear and for the benefit of everyone in the courtroom, when it says "cases supplied by members," that's referring to members who supplied eggs for the export, correct?

A. Yes.
Q. Okay, and then there was another part of the export that was used for people who asked UEP to buy eggs for them, correct?
A. Yes. Yes.
Q. And there's no charge that had been prepared with regard to those --
A. No.
Q. -- correct?
A. Correct.
Q. And so for -- this export is 54.51 percent of the members shows to supply eggs, and the remainder, the 49.45 percent, had you guys buy eggs for them?
A. Correct.
Q. And that would be consistent for all of the exhibits we just looked at, correct?
A. Yes.
Q. Now, this chart that shows the cases supplied by the members does not show the price that UEP paid those members for those eggs, correct?
A. No, it doesn't.
Q. And just so that we're clear, when members supplied eggs as part of an export, UEP paid the members for those eggs?
A. Yes.
Q. Okay. Mr. Bizar, I think, showed you my flip chart that

we used and said that Sauder had paid -- there was no evidence, and you didn't know what you paid Sauder for those eggs. And he asked you, he said, You don't know that Sauder was paid $1.11 for those eggs.

Do you remember him asking that question?

A. Yes. No, I don't know that.

Q. But you actually had records showing how much UEP paid everyone who supplied eggs for an export, correct?

A. Yes.

Q. UEP had those records, correct?

A. Yes.

Q. Because they sent a check to the person who supplied the eggs for the amount that -- that person received from the eggs that had been exported, correct?

A. Yes.

Q. And then the example that we looked at, the price was 59 cents that we looked on my flip chart, right?

A. That's right.

Q. That was a price that UEP paid those members for the eggs that they were supplying?

A. Yes.

Q. Okay. Now, Mr. --

MR. BIZAR: Bizar.

MR. LYONS: Thank you.

BY MR. LYONS:

Q. Mr. Bizar asked you some questions about whether Sauder subsidized this export or any export. Do you remember him asking you some questions about that?

A. Yes.

Q. I think counsel also asked the question, Did Rose Acre subsidize any export? Do you recall that?

A. Yes.

Q. What did you understand them to mean when they asked you whether they subsidized any export?

A. Well, I guess now that you ask that, I guess I'm not sure.

Q. You answered the question, didn't you, ma'am?

A. Yes, I did.

Q. You answered the question -- you didn't know what the question meant and you answered it anyway. Is that your testimony?

A. I guess that's true, yes.

MR. LYONS: I have nothing further.

THE COURT: Any further cross?

MR. BIZAR: One question, Your Honor.

THE COURT: Go ahead.

MR. BIZAR: I'd stay at the bench, but nobody can see me over there in the corner of the bench.

RECROSS-EXAMINATION

BY MR. BIZAR:

Q. Did you -- did Mr. Lyons show you any invoices to R.W. Sauder where USEM was asking R.W. Sauder to cut a check to USEM?

A. No.

MR. BIZAR: Okay, that's it. Thank you, Your Honor.

THE COURT: Mr. Barnes?

MR. BARNES: Yes.

RECROSS-EXAMINATION

BY MR. BARNES:

Q. The same question for Rose Acre Farms.

A. No.

Q. A few other questions on Defense Exhibit 522, which is the Fort Recovery application?

A. Yes.

Q. And Defense Exhibit 139, which is the application for Weiss Lake. I'm sorry.

Did you do anything to verify any of the numbers in this exhibit -- these two exhibits other than the number of layers?

A. No.

Q. So you did verify the number of layers?

A. Yes.

Q. But no other information in the exhibit?

A. No.

Q. Do you have an understanding of the term "contract grower," which is a word that appears in these exhibits?

A. Um, no, I don't.

MR. BARNES: Thank you. No further questions.

MR. LYONS: Just -- can I ask from here, Your Honor?

THE COURT: Sure.

RECROSS-EXAMINATION

BY MR. LYONS:

Q. Ma'am, with regard to the questions that counsel was just asking you, do you have any reason to believe that any of the information supplied on any of the membership agreements was inaccurate?

A. No, I don't have any reason to believe that.

MR. LYONS: Nothing further.

THE COURT: Okay. You're excused. Thank you very much. Travel safely. I hope you make your plane.

THE WITNESS: Thank you.

(Witness exits.)

THE COURT: Do you want to call your next witness?

MR. ARANOFF: May it please the Court, Your Honor, Plaintiffs call Robert Krouse.

THE COURT: While we do that, a very, very brief break? Don't chat. Just come on back.

THE DEPUTY CLERK: All rise.