# ATTACHMENT 57

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

372

IN THE DISTRICT COURT OF WAYNDOTTE COUNTY,

KANSAS

TWENTY-NINTH JUDICIAL DISTRICT

_____

ASSOCIATED WHOLESALE GROCERS,

INC., et al.,

           Plaintiffs,        Case No.

   V.               10CV2171

UNITED EGG PRODUCERS, et al.,   HIGHLY

          Defendants.     CONFIDENTIAL

_____

                  Volume II

                  Washington, D.C.

                  March 6, 2014

The deposition of MARCUS RUST

Was convened on Thursday, March 6, 2014,

Commencing at 9:08 a.m., at the offices of

Porter Wright, 1900 K Street, Northwest

Washington, D.C., before Paula G. Satkin,

Registered Professional Reporter and Notary

Public.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                              March 6, 2014

2 (Pages 373 to 376)

---

**373**

APPEARANCES:

On behalf of the Plaintiffs:
    PATRICK J. STUEVE, ESQ.
    DAVID A. HICKEY, ESQ.
    Stueve Siegel Hanson LLP
    460 Nichols Road, Suite 200
    Kansas City, Missouri 64112
    (816) 714-7100

On behalf of Rose Acre Farms:
    JOHN C. MONICA, JR., ESQ.
    DONALD M. BARNES, ESQ.
    Porter, Wright, Morris & Arthur LLP
    1900 K Street, NW
    Suite 1110
    Washington, DC 20006
    (202) 778-3000

---

**374**

A P P E A R A N C E S  (Cont'd)

On behalf of United Egg Producers and US Egg
    Marketers:
    JAN LEVINE, ESQ. (Via phone)
    WHITNEY REDDING, ESQ. (Via phone)
    Pepper Hamilton LLP
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, Pennsylvania 19103-2799
    (215) 981-4000

On behalf of the Defendants Land O'Lakes,
    Moark and Norco Ranch:
    VANESSA JACOBSEN, ESQ. (Via phone)
    Eimer Stahl LLP
    224 South Michigan Avenue, Suite 1100
    Chicago, Illinois 60604
    (312) 660-7600

---

**375**

ALSO PRESENT:
    JOSEPH A. MILLER
    General Counsel, Rose Acre Farms, Inc.

---

**376**

E X A M I N A T I O N

| By Mr. Stueve | 379 |
| By Mr. Barnes | 667 |
| By Mr. Stueve | 698 |
| By Mr. Barnes | 734 |
| By Mr. Stueve | 739 |

E X H I B I T S

| Exhibit No. | | Page No. |
|---|---|---|
| Exhibit 538 | RA 0067638-639 | 399 |
| Exhibit 539 | RA 0084872 | 406 |
| Exhibit 540 | RAUPDATE 0082871 | 414 |
| Exhibit 541 | RA 0068166-167 | 427 |
| Exhibit 542 | MFC 0017617 | 438 |
| Exhibit 543 | Moark 0019049 | 449 |
| Exhibit 544 | RA 0067466-67 | 457 |
| Exhibit 545 | RA 0071690-74 | 465 |
| Exhibit 546 | RAUPDATE 0034892 | 492 |
| Exhibit 547 | RAUPDATE 0035814-16 | 494 |
| Exhibit 548 | RAUPDATE 0034691 | 503 |
| Exhibit 549 | RAUPDATE 0039139 | 505 |
| Exhibit 550 | Flash Drive | 514 |

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

377

| 1  | Exhibit 551 | Document              | 517 |
| 2  | Exhibit 552 | Article               | 519 |
| 3  | Exhibit 553 | E-mail                | 524 |
| 4  | Exhibit 554 | RAFK 000174-75        | 526 |
| 5  | Exhibit 555 | RAFKS 0007213         | 529 |
| 6  | Exhibit 556 | RAFKS 0009116-919     | 531 |
| 7  | Exhibit 557 | FDA Warning Letter    | 543 |
| 8  | Exhibit 558 | RAUPDATE 0039242      | 545 |
| 9  | Exhibit 559 | UE PRIV 0000069-70    | 552 |
| 10 | Exhibit 560 | UE PRIV 0000071-72    | 557 |
| 11 | Exhibit 561 | NL 01200644-46L       | 570 |
| 12 | Exhibit 562 | RAUPDATE 0080669      | 573 |
| 13 | Exhibit 563 | UE 020105-07          | 582 |
| 14 | Exhibit 564 | RAUPDATE              | 586 |
| 15 | Exhibit 565 | RAUPDATE 0038374-77   | 595 |
| 16 | Exhibit 566 | UE 0707359-365        | 598 |
| 17 | Exhibit 567 | RAUPDATE 80438-40     | 613 |
| 18 | Exhibit 568 | RA 004766-70          | 620 |
| 19 | Exhibit 569 | FMI 000284-85         | 626 |
| 20 | Exhibit 570 | UE 0295185            | 629 |
| 21 | Exhibit 571 | Document              | 693 |
| 22 | Exhibit 572 | Document              | 741 |

378

1       P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins
3    videotape number one, volume II, in the
4    videotaped deposition of Marcus Rust.  Today's
5    date is March 6, 2014 and the time is
6    approximately 9:08 a.m.
7          Will attorneys please state their
8    presence for the record.
9          MR. STUEVE:  Yes.  I believe the
10   folks that are on the phone have already made
11   their appearance on the record.  This is Patrick
12   Stueve, Stueve Siegel Hanson, here on behalf of
13   the Plaintiffs, along with me is my associate
14   David Hickey.
15         MR. BARNES:  Donald Barnes, Porter
16   Wright Morris & Arthur.  We are counsel for Rose
17   Acre Farms.
18         MR. MONICA:  John Monica with
19   Mr. Barnes, who's my partner at Porter Wright.
20         MR. MILLER:  Joe Miller, general
21   counsel Rose Acre Farms.
22   Whereupon --

379

1               MARCUS RUST
2    a witness, called for examination, having been
3    previously duly sworn, was examined and
4    testified as follows:
5          EXAMINATION BY COUNSEL FOR PLAINTIFFS
6    BY MR. STUEVE:
7       Q.   Good morning, Mr. Rust.
8       A.   Good mornings.
9       Q.   You understand your testimony is
10   still under oath?
11      A.   Yes.
12      Q.   All right.  We ended yesterday
13   talking about the UEP, United Egg Producers.
14   You understand when I'm using UEP I'm referring
15   to United Egg Producers?
16      A.   Yes.
17      Q.   And their certified program.  And
18   I believe we established in February 2002 Rose
19   Acre joined UEP and signed up for the certified
20   program; is that correct?
21      A.   At the request of our customers.
22   Yes.

380

1       Q.   If you could, if you would just
2    answer my question.  We'll get into why you did
3    it, but if you could, if you could confirm in
4    February 2002 if that's when Rose Acre joined UEP
5    and also signed up for the UEP certified
6    program; is that correct?
7          MR. BARNES:  I'm going to object
8    to that, Pat.  That's not what he testified to.
9    I believe he testified he signed up for the
10   animal welfare program after he joined.  It was
11   not a simultaneous action.
12         MR. STUEVE:  I think what he said,
13   there was a period of time they qualified for
14   it, but as far as -- if you could, just let him
15   answer it.
16   BY MR. STUEVE:
17      Q.   It's my understanding that in
18   February of 2002 Rose Acre signed up for United
19   Egg Producers and actually executed an
20   agreement; is that correct?
21      A.   We executed an agreement that you
22   showed me a copy of here in February.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

4 (Pages 381 to 384)

---

**381**

1  Q.  2002?
2  A.  Yes.
3  Q.  And that was with United Egg
4  Producers; correct, sir?
5  A.  Correct.  Capper-Volstead co-op
6  group.
7  Q.  And was that your understanding at
8  the time you signed up, sir?
9  A.  Yes.
10  Q.  And what was the basis of that
11  understanding?
12  A.  Just a lot of the stuff they
13  explained about the Capper-Volstead co-op, what
14  they could do and couldn't do.
15  Q.  At the time you signed up?
16  A.  Yes.
17  Q.  Who was that it communicated that
18  to you?
19  A.  I think it was from memory the
20  Gregory's.
21  Q.  Okay.  And did they give you any
22  documents at that time?

---

**382**

1  A.  They could have.
2  Q.  Do you remember anything
3  specifically?
4  A.  Just -- they had -- through the
5  years they give us lots of paperwork saying this
6  is what they do and all the stuff they've
7  accomplished all that type of thing.
8  Q.  But specifically concerning
9  Capper-Volstead Act and whether or not the
10  Capper-Volstead Act, in fact, applied to UEP,
11  did they give you any specific documents?
12  A.  They gave us some at different
13  times.
14  Q.  Prior to joining?
15  A.  Yes.  Explaining what it was.  We
16  had our suspicions -- we was apprehensive of the
17  group.
18  Q.  And also apprehensive about
19  whether or not they were truly a Capper-Volstead
20  co-op?
21  A.  We had no doubt to believe they
22  weren't a Capper-Volstead co-op.

---

**383**

1  Q.  What were you skeptical about
2  then?
3  A.  Some of the things we heard.
4  Q.  About what?
5  A.  How do you mean?
6  Q.  Some of the things you heard about
7  what?
8  A.  About how -- what they did as far
9  as the recommendations or their so-called supply
10  management thing.
11  Q.  Okay.  You had heard rumors about
12  that?
13  A.  Yes.
14  Q.  All right.  And this was prior to
15  joining?
16  A.  They've done that for 20 years.
17  Q.  Okay.  And did you -- do you
18  recall though anything specifically that they
19  gave you at the time you joined in 2002
20  concerning Capper-Volstead and whether or not it
21  applied to UEP?
22  A.  Repeat your question again.

---

**384**

1  MR. STUEVE:  If you could read
2  back my question.
3  (The record was read as
4  requested.)
5  THE WITNESS:  Don't club me.
6  (The record was read as
7  requested.)
8  THE WITNESS:  Yes.  I remember
9  some things.  I don't remember exactly what they
10  were.  They had documents that they passed out,
11  brochure type stuff.
12  BY MR. STUEVE:
13  Q.  Do you remember specifically what
14  was in there about the Capper-Volstead Act?
15  A.  Just that they were for farmer
16  producers and that, you know, before we could
17  join we would have to be qualified.
18  Q.  And how would you qualify?
19  A.  We had to -- they had to verify
20  that we was a farmer producer.
21  Q.  How would they do that?
22  A.  I don't recall exactly, but we had

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

5 (Pages 385 to 388)

---

385

1 to certify that we had so many chickens and we
2 owned the chickens and that type of thing.
3        Q.   Do you remember them seeking
4 verification that you owned at least 50 percent
5 of the chickens that you --
6        A.   We owned 100 percent.
7        Q.   Right, but do you remember that
8 50 percent rule?
9        A.   I remember it from someplace.  I
10 don't know if it was then or later or when.
11        Q.   What was your understanding about
12 the 50 percent requirement?
13        A.   My understanding the 50 percent
14 requirement was like in a year's time 50 percent
15 of the eggs that you sold had to be eggs that
16 you produced or something to that effect.
17        Q.   Right.  And they, in fact, asked
18 you to verify that; did they not, UEP?
19        A.   I don't recollect that.
20        Q.   All right.  You don't remember
21 ever being asked that?
22        A.   They could have.

---

386

1        Q.   Okay.  Do you remember when they
2 asked you to verify that?
3        MR. BARNES:  Object to the form.
4        THE WITNESS:  I don't remember the
5 exact dates.  They had different things that you
6 had to sign papers and stuff for.
7 BY MR. STUEVE:
8        Q.   All right.  But you had an
9 understanding that in order for the UEP industry
10 association to have Capper-Volstead application
11 that the members had to be farmer producers; is
12 that correct?
13        A.   Yes.
14        Q.   All right.  And you understood
15 that if there were members that were not farmer
16 producers that that could jeopardize the
17 Capper-Volstead exemption that would apply to
18 UEP; correct?
19        A.   Repeat your we question again.
20        MR. STUEVE:  Read it back.
21        (The record was read as
22 requested.)

---

387

1        MS. REDDING:  Object to form.
2        THE WITNESS:  I had no reason to
3 believe any members were not farmer producers
4 were like we were.  If they signed the same
5 paper we did they had to be a farmer member or
6 they lied.
7 BY MR. STUEVE:
8        Q.   Right.  But if, in fact, someone
9 had lied and there was a member that was not a
10 farmer producer, you understood that that could
11 jeopardize the Capper-Volstead exemption that
12 may apply to UEP; is that fair enough?
13        A.   I can't say I understood that.  I
14 don't recollect that.
15        Q.   Now, it's also my understanding
16 that when you joined in February of 2002 that
17 you had communicated at that time to UEP Rose
18 Acre's intention to be UEP certified; fair
19 enough?
20        A.   I don't know what you mean by fair
21 enough.
22        MR. STUEVE:  If you could read

---

388

1 back my question, if you could just answer it
2 for me, sir.
3        (The record was read as
4 requested.)
5        THE WITNESS:  At the request of
6 our customers who were demanding we be in the
7 program, we did join the certified program.
8 BY MR. STUEVE:
9        Q.   Sir, my question is, I'm just
10 trying to confirm the timing.  That when you
11 joined --
12        A.   February of 2002.
13        Q.   In February 2002 when you joined
14 UEP you also communicated to UEP's management
15 Rose Acre's intention to join the UEP certified
16 program; is that correct?
17        A.   Yes.
18        Q.   All right.  Now --
19        A.   The only reason we joined.
20        Q.   Are you aware of any documents
21 you've testified that your customers, prior to
22 March of 2002, were demanding that you join the

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                     March 6, 2014

6 (Pages 389 to 392)

---

389

1  UEP certified program; is that correct?
2      **A.   Our customers had specifications**
3  **and in the specifications for you to be a**
4  **qualified supplier for them you had to be into**
5  **this certified program.**
6      Q.   And I want to know, do you have
7  any documents that would confirm that in March
8  of 2002 you had customers that in their
9  specifications were requiring your membership in
10 the certified program?
11     **A.   We may have.  We may not.  It may**
12 **have been a verbal telling to us by the**
13 **customer.**
14     Q.   In preparation for your deposition
15 today do you recall reviewing any documents that
16 verified that your customers in March of 2002 or
17 prior to that time were specifying that Rose
18 Acre be UEP certified?
19     **A.   I believe there was some,**
20 **someplace.**
21     Q.   And, sir, what document did you
22 review in preparation of your deposition?

---

390

1      **A.   I did not review any document to**
2  **that today.**
3      Q.   So in preparation for your
4  deposition you did not review any documents that
5  you recall that would show that your customers
6  were requiring as a specification that your eggs
7  be UEP certified in March of 2002; correct?
8      **A.   I believe I saw an FMI thing that**
9  **requested it.**
10     Q.   But FMI is not one of your
11 customers; correct?
12     **A.   They were a cooperative or**
13 **something, a trade association of our customers**
14 **who the customers had got together with and they**
15 **had this Board establish this program, this**
16 **certified program with UEP, which they asked us**
17 **to join.**
18     Q.   My question is very specific.  It
19 has to do with your customers.  Do you recall in
20 preparation for your deposition today reviewing
21 any documents that indicate that your customers
22 were requiring in March of 2002 --

---

391

1      **A.   I don't recollect any.**
2      Q.   Let me finish my question then you
3  can answer.
4      In preparation of your deposition
5  today do you recall reviewing any documents that
6  indicated that your customers were requiring
7  that Rose Acre's eggs be UEP certified in March
8  of 2002 or prior to that time?
9      MR. BARNES:  Objection.  Asked and
10 answered.
11 BY MR. STUEVE:
12     Q.   Go ahead and answer it now.
13     **A.   I don't recollect.**
14     Q.   Okay.  Let me show you what's been
15 previously marked 237.
16     This is another United Voices that
17 would have been sent out by UEP in March of
18 2002; correct, sir?
19     **A.   That's what it states.**
20     Q.   And this would have been after
21 you, Rose Acre had joined?
22     **A.   Yes.**

---

392

1      MR. BARNES:  Pat, we've had a
2  request from people on the phone to read in
3  the --
4      MR. STUEVE:  I'm doing that for
5  any new documents -- so they know, this is
6  Exhibit 237.  So if you could, if you could turn
7  to Bates range, the last three digits are 818,
8  Mr. Rust.  And actually, turn to the previous
9  page, if you would, and I'll just direct your
10 attention to the name of the topic here.
11     Mr. Rust, if you could turn first
12 to 817.  Do you see the title there, You Should
13 Implement Guidelines?  Do you see that?
14     THE WITNESS:  Uh-huh.
15 BY MR. STUEVE:
16     Q.   By Gene Gregory; is that right?
17     **A.   Yes.**
18     Q.   And under that title over on the
19 next page, 518, under, you should implement the
20 guidelines, the fourth paragraph down it states,
21 "that if all the industry were to follow the
22 guidelines."  Do you see that?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                              March 6, 2014

7 (Pages 393 to 396)

---

393

1    A.   Yes.
2    Q.   All right.  It states, "if all the
3  industry were to follow the guidelines through
4  the first step, this would resulted in a flock
5  size reduction of 13 million hens.  Place your
6  own estimate on how much the egg market will
7  rise even if half this reduction were to occur.
8  So the pay back for making this first step to
9  house average of 56 square inches is
10 tremendous."  Do you see that?
11   A.   Yes.
12   Q.   That's -- that economic purpose,
13 which is of cage space reductions, which is to
14 reduce supply and increase prices was the exact
15 concern that your family members had before you
16 joined; right?
17   A.   No.
18   Q.   And, in fact, it's the exact
19 concern that your brother had in 2008; correct?
20   A.   Repeat your question.  You lost --
21 make it a shorter question.
22   Q.   The fact that the guidelines were

---

394

1  being used to reduce egg supply and boost prices
2  under the agenda of animal welfare was the
3  concern that your brother had in 2008; correct?
4    A.   His concern was the prior to
5  animal welfare program.
6    Q.   And in fact, Mr. Rust, you were
7  concerned that this, in fact, was the underlying
8  purpose of the certified program even before you
9  joined it; right?
10   A.   We had suspicions of that.
11   Q.   Okay.  And, in fact, those -- the
12 suspicions that you had are confirmed in this --
13 in these communications in United Voices in
14 March of 2002; correct, sir?
15   A.   Repeat your question.
16   Q.   The concerns you had about the
17 underlying purpose of the animal welfare program
18 to be a supply management program is confirmed
19 in the communication that we just read; correct,
20 sir?
21   A.   We wanted to make sure it stayed
22 an animal welfare program and not a supply

---

395

1  management program.
2    Q.   And in fact, though, what's being
3  identified here by Gene Gregory, the president
4  of UEP, is that, in fact, its underlying purpose
5  was to restrict the supply and boost prices for
6  eggs; correct, sir?
7        MS. LEVINE:  Objection.  Jan
8  Levine.
9        THE WITNESS:  I don't agree with
10 that.
11 BY MR. STUEVE:
12   Q.   Certainly what he's outlining is
13 that the pay back for making this first step to
14 house average of 56 square inches is tremendous.
15 The pay back is by reducing the flock size of
16 13 million you reduce the supply of eggs and
17 boost prices for all egg producers.  That's the
18 pay back; right?
19        MR. BARNES:  Object to the form.
20        THE WITNESS:  Repeat your question
21 again.
22        MR. STUEVE:  Read it back.

---

396

1        (The record was read as
2  requested.)
3        THE WITNESS:  I do not agree with
4  your characterization of the statement you're
5  making.
6  BY MR. STUEVE:
7    Q.   Sir, if you would, can you confirm
8  for me that the pay back that he's referring to
9  in the United Voices document that we're looking
10 at is by reducing the flock size by 13 million,
11 that that will reduce the supply of eggs and
12 boost prices; correct, sir?
13   A.   I will agree that's what that
14 document says.
15   Q.   That's all I wanted you to answer.
16   A.   I have no problem with that.  I do
17 not agree with your characterization of it.
18   Q.   You agree that that's what the
19 document says; right?
20   A.   Yes.
21   Q.   And that the pay back he's
22 referring to here is by reducing the flock size

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

8 (Pages 397 to 400)

397

1  by 13 million that that will reduce the supply
2  of eggs and boost prices, that's the pay back
3  that he's identifying?
4      **A.   I don't agree with that.**
5          MR. BARNES:  Objection.
6  BY MR. STUEVE:
7      Q.   I know you don't agree with that,
8  but that's the pay back he's identifying?
9          MR. BARNES:  Objection.  Calls for
10  speculation as to what Mr. Gregory meant when he
11  wrote this.  If the witness wants to answer he
12  can go ahead and answer.
13          THE WITNESS:  I don't agree.
14  BY MR. STUEVE:
15      Q.   I understand you don't agree wit
16  it, but you understood that was the pay back he
17  was outlining; correct?
18          MR. BARNES:  Same objection.
19          THE WITNESS:  I never read that
20  document until today or until one of these
21  preparations.
22  BY MR. STUEVE:

398

1      Q.   You remember reading it in your
2  preparation?
3      **A.   Yes.**
4      Q.   All right.  And what I'm asking
5  you, I understand you don't agree with what he's
6  saying in here, but what Mr. Gregory was
7  outlining as far as the pay back was the
8  reduction in egg supply that would reduce egg
9  prices; correct?
10          MR. BARNES:  Same objection.
11          THE WITNESS:  I don't agree with
12  him.
13  BY MR. STUEVE:
14      Q.   You don't agree with him?
15      **A.   No.  That's what he says here.**
16          THE REPORTER:  Sir, can I please
17  ask you to try to wait until he finishes.
18          THE WITNESS:  That's what he says,
19  too.
20          MR. BARNES:  He doesn't listen to
21  me.
22          MR. STUEVE:  Let me show you --

399

1  Mark it first.
2          Show you what's been marked 538,
3  RA 0067638 through 639.
4          (Rust Exhibit Number 538 was
5  marked for identification.)
6  BY MR. STUEVE:
7      Q.   This is -- these are notes from
8  your mother; right?
9      **A.   Yes.**
10      Q.   She would have been the president
11  of Rose Acre at this time; right?
12      **A.   Correct.**
13      Q.   She's writing KY Hendrix; right,
14  your brother-in-law?
15      **A.   Correct.**
16      Q.   And what was his position at that
17  time at the company?
18      **A.   He was assistant flock manager.**
19      Q.   And he's the one that when you
20  joined UEP joined the committee responsible for
21  the animal welfare guidelines; correct, sir?
22      **A.   Yes.**

400

1      Q.   It says, "Ky, talked to Marcus,"
2  that would be you; right?
3      **A.   Correct.**
4      Q.   "Talked to Marcus last night about
5  UEP guidelines."  Do you see that?
6      **A.   Yes.**
7      Q.   "They are good, but we are
8  concerned with the what looks like the
9  underlying purpose," and she under scores that,
10  right, of the whole thing; right?
11      **A.   Correct.  That had been our**
12  **suspicions the whole time.**
13      Q.   The concern about the underlying
14  purpose was it was a supply management tool;
15  right?
16      **A.   We was afraid of that.  Yes.**
17      Q.   And that's in March 2002; right?
18      **A.   Correct.**
19      Q.   And despite those concerns you, in
20  fact, joined the UEP certified program; correct,
21  sir?
22      **A.   That's the reason we joined.  We**

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

9 (Pages 401 to 404)

---

401

1  looked at doing either volunteer -- the program
2  or the UEP.  We decided we wanted to be involved
3  into it to make sure that it stayed to the
4  program and never become a supply management
5  program.
6          Q.   The -- this note here is
7  March 27th of 2002.  That would have been
8  shortly after you joined UEP; right?
9          A.   Correct.
10         Q.   And you can confirm your mother
11 accurately depicted your concern and her concern
12 about the underlying purpose being a supply
13 management program; correct?
14         MR. BARNES:  Object to the form.
15 That's not what the document says.
16         THE WITNESS:  Repeat your
17 question.
18 BY MR. STUEVE:
19         Q.   I just want to make sure that she
20 mentions discussing with you that this note in
21 March 27th of '02 when she says "we" she's
22 referring to you and her when she's referring to

---

402

1  our concern about the underlying purpose, which
2  you've indicated the concern was it was a supply
3  management program; correct?
4          MR. BARNES:  Objection.
5          THE WITNESS:  Repeat your question
6  again.
7  BY MR. STUEVE:
8          Q.   You've already testified that the
9  underlying purpose concern was a concern that it
10 was a supply management program; correct?
11         A.   Correct.
12         Q.   I just want to confirm that this
13 note reflects that that was the concern both of
14 your mother and you at that time; fair enough?
15         A.   Yes.
16         Q.   All right.  Now, if you could --
17 show you what's been marked as Exhibit 110.
18         This is another United Voices
19 publication if you look down at the bottom left
20 hand corner, it's dated June 4, 2003; right?
21         A.   Yes.
22         Q.   And if you would, on that first

---

403

1  page -- by the way, this is United Voices that
2  was produced by Rose Acre as indicated by the
3  lower Bates range; right?
4          A.   Repeat your question.
5          Q.   RA you understands for Rose Acre
6  that's in the lower right-hand corner?
7          A.   So this was our document?
8          Q.   Yes.  It was produced by you.
9          A.   Okay.
10         Q.   If you would, the bottom, the last
11 paragraph there on the very first page.  It
12 says, "the hatch reduction to meet the space
13 allowance guidelines of the animal care
14 certified program are beginning to show egg
15 market value improvements.  This trend should
16 continue."  Do you see that?
17         A.   Yes.
18         Q.   And what's being communicated
19 there with respect to the egg market value
20 improvements is because of the hatch reduction
21 that is now leading to a reduction in the supply
22 of eggs, which is resulting in the boosting of

---

404

1  egg prices; correct, sir?
2          MR. BARNES:  Object to form.
3          THE WITNESS:  Repeat your
4  question.
5          MR. STUEVE:  I'll have her read it
6  back.
7          (The record was read as
8  requested.)
9          MR. BARNES:  Same objection.
10         THE WITNESS:  That's what it says
11 here.  I don't agree with that at all.
12 BY MR. STUEVE:
13         Q.   Now, if you would, on page 4 of
14 that document it's -- of the June 4th, 2003.  It
15 has, "these market improvements can be
16 attributed to."  Do you see that?
17         A.   Which line are we at?
18         Q.   Under May's prices, best in many
19 years?
20         A.   Okay.
21         Q.   It says, "these market
22 improvements can be attributed to."  Do you see

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                            March 6, 2014

---

405

1   that at the bottom there?
2       A.   Yes.  I see what it says.
3       Q.   And the first item there
4   identifies, "reduced pullet hatch finally making
5   an impact upon supplies."  That's referring to
6   the UEP certified guidelines; correct, sir?
7       A.   I assume that's what it is.
8       Q.   And then the third one there,
9   animal care certified program beginning to work
10  like many had projected.  Do you see that?
11      A.   I see what it says there.  Yes.
12      Q.   That's again referring to the
13  reduction in the supply of eggs; correct, sir?
14      A.   I don't agree with that, but
15  that's what it says.
16      Q.   And then the second item there
17  concerning the best prices in many years is,
18  "USEM exports reducing supplies at critical
19  times."  Do you see that?
20      A.   Yes.
21      Q.   That would have been exports
22  coordinated by USEM members to reduce the supply

---

406

1   of eggs during critical times to boost prices;
2   correct, sir?
3           MR. BARNES:  Object to the form.
4           THE WITNESS:  That's what it says.
5   I don't agree with it.
6           (Rust Exhibit Number 539 was
7   marked for identification.)
8   BY MR. STUEVE:
9       Q.   Show you what's been marked
10  Exhibit 539, this is Bates range RA 0084872.
11  One page.
12          Did you review Exhibit 539 in
13  preparation for your deposition?
14      A.   I don't recall.
15      Q.   This is your mother's handwriting,
16  is it not, sir?
17      A.   Yes.  It is.
18      Q.   And it's up at the top it's KY; is
19  that right?
20      A.   Yes.
21      Q.   It's dated December 30th, '02; is
22  that right?

---

407

1       A.   Yes.
2       Q.   And Rose Acre would have been a
3   member of --
4       A.   Trying to read it here.
5       Q.   Okay.
6       A.   Okay.  I don't think I saw this
7   document.
8       Q.   She states in the second
9   paragraph, "and KY would have been in charge of
10  the flocks"?
11      A.   Ky.
12      Q.   Ky.  Excuse me.  Ky would have
13  been in charge of the flocks at that time?
14      A.   He was assistant flock manager.
15      Q.   Who was the --
16      A.   My brother Anthony.  Ky worked for
17  Anthony.  He worked with the Donovan birds on
18  this farm.
19      Q.   The Donovan production facility?
20      A.   Yeah.
21      Q.   All right.  And this is
22  specifically concerning that, though; right?

---

408

1       A.   Right.
2       Q.   Approximately how many birds did
3   you have there at that time?
4       A.   Maybe 120 -- 30,000, something
5   like that.
6       Q.   It says, "I'm very, very concerned
7   about neck and breast molt that is showing up on
8   birds."  Do you see that?
9       A.   Yes.
10      Q.   What is she referring to?
11      A.   If the -- these were brown birds.
12  Most of the birds we had always had been raising had
13  been white birds and when you have a brown -- we
14  weren't sure if we were feeding them 100 percent
15  right, but what was happening is the feather
16  would come off around their neck.  It could be a
17  mechanical issue, maybe we had the feed troughs
18  not set high enough or too high and they rub
19  them off.  It could have been improper
20  nutrition.  We weren't sure at the time.  It may
21  have been the breed of the bird.  You get
22  different breeds of birds and, you know, our

---

## HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

409

1  white birds typically if they went in neck molt
2  you wouldn't see that kind of loss in egg
3  production.
4        Q.   And then down below she says,
5  "feed being run -- is feed being run deep enough
6  at ends of houses.  The birds are just plain
7  having to reach too far to get food."  Did I
8  read that correct?
9        A.   Yes.
10       Q.   "Either the food depth is too low
11 or the feeders are too low."  Do you see that?
12       A.   Yes.
13       Q.   "So birds were even bleeding on
14 the breast at Donovan.  This is no way to take
15 care of chickens.  We cannot allow this
16 condition to continue."  Do you see that?
17       A.   Yes.
18       Q.   Now, why was it that your mother
19 would have become aware of the fact that birds
20 were even bleeding on the breast at Donovan?
21 How would she even become aware of that?
22       A.   She may have went through.  She

410

1  would go to the farms on occasions.  She might
2  have walked through because she said at the
3  bottom it says, "P.S. breast looked okay."  So I
4  would assume, you know, she made a farm visit
5  and this was her report back to Ky from what she
6  saw.
7        Q.   It was only when he actually went
8  and physically inspected Donovan that she, in
9  fact, saw what was occurring there; is that
10 correct, sir?
11       A.   I have no firsthand knowledge.  I
12 just know what this says.
13       Q.   Now, did you pass the animal care
14 certified audit in December of 2002?
15       A.   This farm was not part of the
16 audit.
17       Q.   Why not?
18       A.   It's cage free.  Cage free farms
19 were not part -- they were automatically
20 qualified because they was cage free at that
21 time.
22       Q.   Well, sir, she's not referring to

411

1  birds that are cage free; is she, in paragraph
2  number one?
3        A.   Donovan was cage free.
4        Q.   So you're saying that the birds
5  she's referring to when she's says they're
6  having to reach too far to get food were not in
7  a cage?
8        A.   Correct.
9        Q.   Well, why would they have to reach
10 too far to get to their food?
11       A.   I didn't see what she saw.  Maybe
12 they had the feeder set too high.  I'm not sure.
13 The chickens are running loose and you've got
14 the trough hanging from the ceiling and there's
15 pans, the pan feeder there.  That was set too
16 high.  The chickens when they would reach up to
17 peck into it they could rub their necks on the
18 thing if it was set too high.  That's the only
19 thing I can figure.
20       Q.   Now, I thought Rose Acre had a
21 zero tolerance on animal care?
22       A.   That's why she wrote it up, sent

412

1  him the note.
2        Q.   Well, but if it wasn't for your
3  mom actually going and checking out the facility
4  this would have continued to happen; correct,
5  sir?
6        MR. BARNES:  Object to the form.
7  Calls for speculation.
8        THE WITNESS:  My mother if she saw
9  two birds and there was blood on two of them she
10 would be concerned with all birds.
11 BY MR. STUEVE:
12       Q.   It was not her responsibility.  It
13 was KY and your brother Anthony's responsibility
14 for care of the birds?
15       A.   That's correct.  That's why this
16 note is here.
17       Q.   My point is that she's the one
18 that had to tell them to correct this; correct,
19 sir?
20       MR. BARNES:  Objection.
21       THE WITNESS:  She saw something
22 there she didn't like and she told them.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

12 (Pages 413 to 416)

---

413

BY MR. STUEVE:
Q.    And the thing she was communicating to was the folks that, in fact, are responsible for taking care of the flocks; correct?
A.    Yes.  Ed at Donovan, my brother fired him.  He got terminated.  I don't know if it was over this incident, but there was another incident where he's one of -- he's one of the few people that was ever terminated for not taking care of birds properly.  He was terminated.  You can look at the employee records and see.  He called me every six months -- every six weeks wanting his job back.
Q.    Sir, my point is that it was your mother who had to write up the folks that, in fact, were responsible for taking care of the flocks; right?
MR. BARNES:  Objection to form.
THE WITNESS:  This was a note from her go through.

---

414

BY MR. STUEVE:
Q.    To the folks that, in fact, were responsibility for taking care of the birds; right?
A.    Correct.
(Rust Exhibit Number 540 was marked for identification.)
BY MR. STUEVE:
Q.    Show you what's been marked as 540.
And that's Bates range RAUPDATE 0082871.
Now, this is dated September 24, 2003; is that correct?
A.    I'm reading.  Yes.
Q.    I'm going to direct your attention to the note down at the bottom.
A.    Okay.
Q.    It says, "I want you to know on molts that we had a flock go above the 30 percent on body weight reduction.  I don't think this is good.  I cannot convince Anthony

---

415

of this.  If we get audited and they find this we will fail the audit.  I have done my best and don't know what to do now.  Thanks, KY;" is that correct?
A.    That's what it says.
Q.    That would have been a communication to Lois Rust; is that right?
A.    Yes.
Q.    And Anthony Rust, your brother, who was responsible for the entire Rose Acre flocks; right?
A.    Right.
Q.    And this is indicating that KY cannot convince Anthony that the 30 percent on body weight reduction must be complied with; right?
MR. BARNES:  Objection to form.
THE WITNESS:  Can I go into explanation?
BY MR. STUEVE:
Q.    I'm just asking you specifically that's what he's referring to?

---

416

MR. BARNES:  Same objection.
THE WITNESS:  I'm not sure what he's referring to.
BY MR. STUEVE:
Q.    You understood that one of the requirements of the UEP certified program was that if you were going to initiate a molt that it could not result in a bird losing more than 30 percent of the body weight; correct?
A.    I can't answer that question in the context that you're asking it.  I have to explain what the battle -- what they was fighting within the chicken.
Q.    I'm just asking you to answer my question.
A.    I can't answer it the way you asked it.
Q.    Read it back, please.  Ask you to answer it.
(The record was read as requested.)
BY MR. STUEVE:

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

13 (Pages 417 to 420)

---

**417**

1     Q.   Let me restate it.  The question
2  is not correct.
3          You understood that one of the
4  requirements of the UEP certified program was
5  that if you were going to initiate a molt birds
6  could not lose more than 30 percent of their
7  body weight; is that correct, sir?
8     A.   Yes.  That's one of the
9  requirements.
10    Q.   And in fact, KY has -- is
11 identifying a violation of that guideline that
12 he brought to the attention of Anthony; correct,
13 sir?
14    A.   He was concerned that we were
15 going to fail the audit.
16    Q.   Because he saw that the reduction
17 in body weight of the flock was greater than
18 30 percent; correct, sir?
19    A.   Can I explain something?
20    Q.   If you could just answer my
21 question.
22    A.   I can't.

---

**418**

1     Q.   If you could read it back and ask
2  him to answer it for me.
3          (The record was read as
4  requested.)
5          MR. BARNES:  Objection.
6          THE WITNESS:  I can't answer the
7  question.  You're calling -- we don't weigh the
8  flock.  You weigh individual chickens.  If
9  you've got a room of fat chickens and skinny
10 chickens and they all eat out of one feed trough
11 the weight loss that occurs to me a fat person
12 and Joe as a fat person, it's going to be
13 different than the weight loss that occurs to
14 the skinny guy over here.  And so what happens
15 is when the auditor come in and they have this
16 chicken weight and they say, oh, you can fail
17 the audit because this chicken over here weighs
18 too much, too less than what the fat chicken
19 weighs.  You're targeting, you're shotgunning,
20 when we molt the flock of birds you're taking
21 the feed away from all of them at once.  We have
22 fat chickens in there and skinny chickens.  What

---

**419**

1  happens is because they're in a cage and they
2  can't move around, once that feed is in front of
3  them you get four fat chickens in one cage and
4  four skinny chickens in that cage, the skinny
5  chickens got screwed.
6          MR. STUEVE:  I move to strike the
7  answer as nonresponsive.  If you would please
8  read the question back for me, please.  Ask you
9  to answer it.
10         (The record was read as
11 requested.)
12         MR. BARNES:  Objection to the
13 form.  Asked and answered.
14         THE WITNESS:  I've answered it.  I
15 don't know how to answer that.  You know, I
16 don't know what you're asking.
17 BY MR. STUEVE:
18    Q.   Sir, what he says is I want you to
19 know on molts that we had a flock go above the
20 30 percent on body weight reduction.  Did I read
21 that correctly?
22    A.   That's what it says there.

---

**420**

1     Q.   And that would, in fact, if that
2  were true as indicated by KY Hendrix that would
3  be a violation of one of the requirements of the
4  UEP certified guidelines; correct, sir?
5     A.   If the auditors found it that way
6  that's the way they would address it.
7     Q.   That would be a violation of one
8  of the requirements; correct, sir?
9     A.   Correct.
10    Q.   He then states, "I don't think
11 this is good."  That's KY Hendrix; right?
12    A.   Correct.
13    Q.   One of his responsibilities is
14 looking after the flock; right?
15    A.   And that's why I went into the fat
16 chicken and skinny chicken thing with you.
17    Q.   Sir, I don't think this is good,
18 that's from KY Hendrix, who is responsible for
19 taking care of the flock; correct, sir?
20    A.   That's a problem with molting.
21 That's why the animal righters want to kill us
22 or shoot us for molting chickens.  That's why

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II        March 6, 2014

14 (Pages 421 to 424)

---

421

they burn our feed trucks. That's why --

MR. STUEVE: Sir, if you could read back my question and ask you to answer, please.

(The record was read as requested.)

THE WITNESS: I still don't understand what you're asking.

BY MR. STUEVE:

Q. Why don't you read it again. Tell me what you don't understand about that question.

(The record was read as requested.)

THE WITNESS: I still don't understand what you're asking.

BY MR. STUEVE:

Q. The statement that says, "I don't think this is good," was made by KY Hendrix, who was responsible for overseeing the flocks at Rose Acre; correct, sir?

A. That's what it says.

---

422

Q. He goes on to say, "I cannot convince Anthony of this," who was your brother; right?

A. Correct.

Q. "If we got an audit and they find this, we will fail the audit." Did I read that correctly?

A. And I go back to that's why it was a skinny chicken and fat chicken. He had certain chickens who lost more weight than they should. When you got fat chickens and skinny chickens in a cage, you take all the feed away, your weight loss for the different ones -- you don't know what each individual chicken weighed before you started. You have an average, take a target average of the whole house. If we averaged this room up the eight of us may average 200 pounds a piece. If we take all the feed away the proportion of weight loss is going to be different for different birds where they started from.

MR. STUEVE: Move to strike the

---

423

answer as nonresponsive. I'd ask for you to read the question back and ask the witness to answer it, please.

(The record was read as requested.)

MR. BARNES: Mr. Stueve, to shorten this up, we'll stipulate you read it correctly.

MR. STUEVE: I want him to answer my question.

BY MR. STUEVE:

Q. Look at the notes. Are you at the notes there?

A. It says what it says.

Q. Hold on. Do you see the statement, "if we got audited and they find this, we will fail the audit." Do you see that statement?

A. Yes.

Q. That was a statement by KY Hendrix; right?

A. Yes.

---

424

Q. And what he's referring to is the violation of the requirement that flocks in molt cannot lose more than 30 percent of their body weight; correct, sir?

MR. BARNES: Objection.

THE WITNESS: I am not sure what he's referring to.

BY MR. STUEVE:

Q. He says, "I have done my best and don't know what to do now;" right?

A. I knew him and Anthony were at loggerheads over this fat chicken and skinny chicken thing in a cage.

Q. If you could, sir, he states, "I have done my best and don't know what to do now." Did I read that correctly?

A. That's what it says. You read that correctly. That's what it says.

Q. Now, and the Anthony that he's referring to there --

A. That's my brother.

Q. Who KY reported to; is that

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

15 (Pages 425 to 428)

---

425

correct?

A.   Correct.

Q.   All right.  Now, we saw earlier that in one of the brochures about Rose Acre that it has a zero tolerance policy with respect to animal welfare issues?

A.   Yes.

Q.   The 30 percent of body weight reduction requirement in the UEP guidelines, is that an animal welfare guideline?

A.   I believe it is.  Yes.

Q.   And one of your employees who's responsible for taking care of the flock believed that Rose Acre was in violation of that requirement; correct?

A.   But another one of the employees owners disagreed with his thinking of it.

MR. STUEVE:  Move to strike the answer as nonresponsive.  Ask you to read it back to him, ask you to answer it.

(The record was read as requested.)

---

426

MR. BARNES:  Objection.  Asked and answered.

THE WITNESS:  My brother thought it meant one thing, KY thought it meant another. I -- one is my brother, one is my brother-in-law.  Who is right or wrong, I have no idea.

MR. STUEVE:  I'm going to read back the question one more time.  I'm going to give you one more chance to answer it.

(The record was read as requested.)

MR. BARNES:  Same objection.

THE WITNESS:  One agreed.  One disagreed.  The document says.

BY MR. STUEVE:

Q.   Did -- do you know if Rose Acre failed the audit at the end of 2003?

A.   I don't recollect.

Q.   Now, even if Rose Acre had violated the 30 percent body weight reduction requirement, that still wouldn't result in

---

427

enough points to fail the overall audit; correct, sir?

A.   I'm not sure.  I don't recollect the points for which things were -- I don't think it would have.

(Rust Exhibit Number 541 was marked for identification.)

BY MR. STUEVE:

Q.   I'll show you what's been marked Exhibit 541, it's RA 0068166 to 167.  It's a document that was produced by Rose Acre.

Did you review this in preparation for your deposition today?

A.   I could have.  Let me read it first.

MR. BARNES:  Counsel, is that your underlining on the document?

MR. STUEVE:  No.  This was what was produced to us.

MR. BARNES:  Okay.

THE WITNESS:  I don't recall seeing this.

---

428

BY MR. STUEVE:

Q.   You can confirm the Bates range starts with RA at the bottom; right?

A.   Yes.

Q.   All right.  And if you could, if you look at the document, let's look at the underlined portion there, the bottom half starting with "however."  Do you see that?

A.   Uh-huh.

Q.   "However, for the most obvious measures of bird welfare, that is the number of birds dying, being cold and unfit and showing leg defects, there was no effect of stock density."  Do you see that?

A.   Yes.

Q.   "Rather, the study found that the big difference came from the temperature and humidity of the hen house, the moisture of the birds' litter and anomia in the air from their feces"?

A.   This is free range broiler chickens.  We don't raise broilers.  I have no

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

16 (Pages 429 to 432)

---

429

1    idea about broiler stuff.  This has no bearing
2    on us at all.  I don't know what it means.
3            MR. STUEVE:  Move to strike the
4    answer as nonresponsive.  Can you read my
5    question --
6            THE WITNESS:  I'm just reading
7    what it says here.  It says right here -- it
8    says, "her team monitored the health of
9    2.7 million broilers from ten major firms, which
10   produced these chickens for meat.  The study was
11   cited as finding that the chickens were housed
12   in the highest density and indeed jostled each
13   other for more and grew more slowly than others,
14   but added that however for the most obvious
15   measures of bird welfare, that is" --
16   BY MR. STUEVE:
17       Q.   Sir, that's not my question.  I'm
18   going to interrupt you because that is not my
19   question.  If you'd answer my question.
20           I ask your counsel to instruct him
21   to answer my question that I've asked.
22           MR. BARNES:  I've done so.  I

---

430

1    don't believe you had a question pending.
2            MR. STUEVE:  I did.
3            MR. BARNES:  Let's read it back.
4            THE WITNESS:  Read the question
5    back.
6            (The record was read as
7    requested.)
8            MR. BARNES:  Objection.  I don't
9    see a question mark at the end of that.  You
10   were reading the document into the record.
11   BY MR. STUEVE:
12       Q.   Let me -- I had asked that
13   question up above and he interrupted me.
14           So if you could, you see the
15   rather there starting with the word rather
16   that's underlined in Rose Acre's document?
17       A.   Yeah.
18       Q.   It -- does it state there in the
19   document produced by Rose Acre, that rather the
20   study found that the big difference came from
21   the temperature and humidity of the hen house,
22   the moisture of the birds' litter and ammonia in

---

431

1    the air from their feces.  Did I read that
2    correctly?
3        A.   That's what you read here
4    correctly.  Yes.
5        Q.   And then it says, "damp litter
6    from urine and higher levels of air anomia were
7    linked with higher concentrations of
8    cardiocoseriod (phonetic), a hormone that is
9    considered an indicator of stress and hen houses
10   that were badly managed where temperature and
11   humidity persistently fell below or rose beyond
12   the recommended range for the breed of chickens
13   were punished with higher mortality rates and
14   sicker, scrawnier birds."  Did I read that
15   correctly?
16       A.   That's what you're reading
17   correctly.  This is stupid.  This is a broiler
18   chicken.
19           MR. BARNES:  I just want the
20   record to reflect I'm going move to strike any
21   interrogation regarding this document, which has
22   nothing to do with the business of Rose Acre

---

432

1    Farms.  It has to do with broiler chickens.
2    Rose Acre doesn't produce broiler chickens.
3    BY MR. STUEVE:
4        Q.   Sir, if you would, who sent this
5    e-mail?  Can you -- do you know who
6    Mr. Armstrong is?
7        A.   Yes.  He was the head of the
8    Scientific Committee.
9        Q.   That -- for the animal welfare
10   program for UEP certified; correct?
11       A.   Right.
12       Q.   So the gentleman that was running
13   the program believed that this document was
14   relevant to the program; correct, sir?
15           MR. BARNES:  Object to that.
16           THE WITNESS:  I have no idea.
17   BY MR. STUEVE:
18       Q.   Well, he sent it to the members of
19   the Scientific Committee; correct?
20           MR. BARNES:  I object to that.
21           THE WITNESS:  I have no idea what
22   he sent them.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                        March 6, 2014

433

BY MR. STUEVE:
Q.   Well, I'm saying who.  Do you know who the folks are that he sent it to?
A.   Yeah.  They're the Scientific Committee.
Q.   Right.  The Scientific Committee that was purportedly responsible for developing the UEP certified guidelines; right?
A.   Yes.
Q.   And this document ultimately was provided to Rose Acre; correct?
A.   Yes.
Q.   All right.  Do you know what the ammonia standards were that were recommended by the Scientific Committee?
A.   There's a number.  I don't recollect what the standard is exactly.
Q.   And Rose Acre doesn't meet that ammonia standard; does it?
A.   In the wintertime sometimes we don't when it gets real cold out.
Q.   And have you ever failed an audit

434

as a result of that?
A.   I'm not sure that we have or not.
Q.   Well, you've never -- you've never been decertified as a result of Rose Acre not meeting ammonia requirements; correct?
A.   No.
Q.   Is that right?
A.   As long as you have chickens and manure in the chicken house, different weather conditions you can have too much ammonia.
Q.   My question is, I would ask for you to answer it, Rose Acre has never been decertified as a result of it not meeting the ammonia requirements of the UEP guidelines; correct, sir?
A.   Correct.
Q.   Show you what's previously been marked as Exhibit 248.
     This is United Voices dated August 12, 2004; is that correct?
A.   Yes.
Q.   And this is a United Voices that

435

was produced by Rose Acre; is that correct?
A.   Yes.
Q.   So if you could turn to page 2 of this document.  It's discussing the topic of backfilling, a loophole of a hangman noose?
A.   Okay.
Q.   Is that an editorial by Al Pope?
A.   Yes.
Q.   He's one of the folks at UEP you don't trust; is that right?
A.   Yes.
Q.   And he starts, "whose program is it anyway, this UEP animal certified program? It's really -- it's not really UEP's per se, certainly not UEP staff, know the program belongs to those of you who are participating in the program.  You decide how the program operates."  Did I read that correctly?
A.   Yes.
Q.   And he says, "in this regard, the original intent of permitting animal care certified companies to backfill was to

436

accommodate those few extra unexpected pullets from a grow out facility."  Do you see that?
A.   Yes.
Q.   What he's referring to there is that backfilling was permitted under the animal care certified program initially; is that right?
A.   Yes.
     MR. BARNES:  Object to form.
BY MR. STUEVE:
Q.   Backfilling was not considered an animal welfare issue under the guidelines as initially drafted; correct?
A.   I don't recollect that.  I don't recollect what the -- when the guidelines changed.
Q.   But you do recall they were changed; right?
A.   Right.
Q.   And the reason why they were changed was because the backfilling was reducing the impact of the supply reduction that the cage space requirement was intended to achieve;

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

---

437

1   correct, sir?
2           MS. LEVINE:  Objection.  Jan
3   Levine.
4           THE WITNESS:  Repeat the question
5   again.
6           MR. STUEVE:  Read it back, please.
7           (The record was read as
8   requested.)
9           MS. LEVINE:  Same objection.  Jan
10  Levine.
11          THE WITNESS:  I'm reading it.
12          MR. BARNES:  Do you want to repeat
13  your question?
14  BY MR. STUEVE:
15      Q.   Sir, do you want her to read it
16  back to you so you can answer it?
17      A.   Well, let me finish reading this.
18  Okay.
19          MR. STUEVE:  Can you read the
20  question back?
21          (The record was read as
22  requested.)

---

438

1           MS. LEVINE:  Same objection.
2           THE WITNESS:  That's what it says.
3   BY MR. STUEVE:
4       Q.   Now, let me show you what's been
5   marked as Exhibit 542.
6           (Rust Exhibit Number 542 was
7   marked for identification.)
8           MR. STUEVE:  Bates range MFC
9   0017617.
10          This is an e-mail dated
11  September 15, 2004 from Gene Gregory and it was
12  sent to, among others, KY Hendrix of Rose Acre;
13  is that correct, sir.
14          THE WITNESS:  Yes.
15  BY MR. STUEVE:
16      Q.   And if you would, in the first
17  paragraph there's the committee meeting in
18  the subject line is referring to an Animal
19  Welfare Committee meeting that occurred in New
20  Orleans on September 15, 2004; is that correct?
21      A.   That's what it says.  You said
22  September, it says October.

---

439

1       Q.   Excuse me.  October 20th; is that
2   right?
3       A.   Yes.
4       Q.   Okay.  Now, he discusses, says
5   identified below.  Do you see that?
6       A.   Where are you at?
7       Q.   A little bit further down it says,
8   "identified below are recommendations that came
9   from the area meetings that need to be on the
10  agenda and decisions made."  Do you see that?
11      A.   Yes.
12      Q.   So he's identifying what the
13  agenda is for the Animal Welfare Committee
14  meeting that's set for October 20th; right?
15      A.   Yes.
16      Q.   And the first one is, "disallow
17  backfilling of cages by animal care certified
18  companies."  Do you see that?
19      A.   Yes.
20      Q.   That, again, is an attempt to
21  address supply management issues; right?
22          MS. LEVINE:  Object to the form.

---

440

1           THE WITNESS:  I have no idea.  It
2   says right here number one, disallow backfilling
3   cages by animal care -- I don't see the supply
4   management part in there.
5   BY MR. STUEVE:
6       Q.   We just saw earlier, though, the
7   hangman noose that concerned --
8       A.   It also said in there that animal
9   care program was not an animal -- was not a
10  supply management program.
11      Q.   Right.  It said that and then it
12  goes on to talk about supply management issues;
13  doesn't it, Mr. Rust?
14          MR. BARNES:  Objection.
15          THE WITNESS:  I don't recollect --
16  I would have to go back and read it.
17  BY MR. STUEVE:
18      Q.   But the hangman noose, which we've
19  confirmed what they're talking about there, is
20  the use of backfilling, that backfilling was
21  reducing the impact of the cage space
22  requirements; correct?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

19 (Pages 441 to 444)

441

1        MR. BARNES:  Object to form.
2        THE WITNESS:  I'm not sure at that
3   point.
4   BY MR. STUEVE:
5        Q.   If you would, as far as the
6   timing, we were looking at Exhibit 248.  And
7   that -- that was the August 2004 United Voices;
8   right?
9        MR. BARNES:  Exhibit 248.
10  BY MR. STUEVE:
11       Q.   At the bottom.  If you would, on
12  the first page of Exhibit 248 that's -- that
13  came out in August 2004; right?
14       A.   Yes.
15       Q.   And that's the -- that we just
16  went through that had the article about
17  backfilling a loophole of a hangman noose;
18  right?
19       A.   It says a year later while the ATC
20  program --
21       Q.   Sir, if you could just answer my
22  question.

442

1        A.   I'm just reading what it says
2   here.
3        Q.   My question is, this is in August
4   of 2004 United Voices had the article
5   backfilling a loophole of a hangman noose;
6   right?
7        A.   Correct.
8        Q.   And then if you look at 542, the
9   agenda for the animal welfare meeting for
10  October 20th of that very same year; right,
11  2004; right?
12       A.   You got me confused here.
13       Q.   Just trying to walk through a
14  chronology here.  United Voices identifying the
15  backfilling a loophole of a hangman noose is
16  dated August 12, 2004; right?
17       A.   Yes.
18       Q.   Then if you could turn to 542 --
19  are you there?  This is Exhibit 542.  Are you
20  there?
21       A.   That's this one.
22       Q.   All right.  You can put the other

443

1   document away.  Just put 542 in front of you.
2        A.   Okay.
3        Q.   That's a document in September of
4   2004 proposing an agenda for October 20th of
5   2004; right?
6        A.   Yes.
7        Q.   So approximately three months
8   after the United Voices came out with the
9   article about backfilling this is proposing an
10  agenda for the Animal Welfare Committee and the
11  first item is disallow backfilling; right?
12       A.   Yes.
13       Q.   The second item is conduct random
14  audits of space per hen; right?
15       A.   Yes.
16       Q.   And again, that space per hen, in
17  order for the reduction in supply of eggs to
18  occur through the cage reduction requirements,
19  all of the certified companies need to comply
20  with that; right?
21       MR. BARNES:  Object to form.
22       THE WITNESS:  To meet the

444

1   requirements that our egg customers as Kroger,
2   Wal-Mart required, to get the space requirement
3   they wanted end of year we had to go into a
4   program that gave more space.
5        MR. STUEVE:  Move to strike the
6   answer as nonresponsive.  Read back my question
7   and ask you to answer for me, please.
8        (The record was read as
9   requested.)
10       MR. BARNES:  Same objection.  Go
11  ahead and answer it.
12       THE WITNESS:  I would say no.
13  BY MR. STUEVE:
14       Q.   The purpose of the random audits,
15  the random audits that were being proposed by
16  the animal welfare only pertained to space per
17  hen; correct?
18       A.   Correct.
19       Q.   All right.  They didn't suggest a
20  random audit for ammonia levels; correct?
21       A.   Correct.
22       Q.   They didn't suggest a random audit

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

20 (Pages 445 to 448)

---

445

1  for the 30 percent weight reduction requirement;
2  correct?
3        MR. BARNES:  Are you referring to
4  Exhibit 542?
5        THE WITNESS:  I think the audits
6  were random.
7  BY MR. STUEVE:
8     Q.  Sir, the reference in here to the
9  random audits was specific to space per hen;
10  right?
11        MR. BARNES:  Objection.  The
12  document speaks for itself.  It says what it
13  says.
14        THE WITNESS:  I'm not sure what
15  the audit parts were.
16  BY MR. STUEVE:
17     Q.  With respect to bullet point
18  number two, conduct random audits?
19     **A.  That's what that says.**
20     Q.  Of space per hen; right?
21     **A.  That's what that says.**
22     Q.  Not for any other item; correct?

---

446

1     **A.  It's not listed here.**
2     Q.  And then if you look at number
3  five it says, "establish a policy that animal
4  care certified companies may not purchase eggs
5  from noncertified companies."  Do you see that?
6     **A.  Yes.**
7     Q.  Were you aware that that was being
8  recommended by the Animal Welfare Committee?
9        MS. LEVINE:  Object to the form of
10  the question.
11        THE WITNESS:  I was not aware.
12  BY MR. STUEVE:
13     Q.  Do you remember that that policy
14  was ultimately adopted by the Board that you sat
15  on for UEP?
16        MS. LEVINE:  Object to the form of
17  the question.
18        THE WITNESS:  I don't recollect
19  right offhand.
20  BY MR. STUEVE:
21     Q.  I'll show you what's been marked
22  as 277.

---

447

1        This document, if you could, look
2  at the fourth bullet point down.
3        MR. BARNES:  Counsel, excuse me.
4  I don't know if the witness can see this
5  document.  It is marked highly confidential and
6  it was produced by Moark.  I don't know.  Are
7  you entitled to show him this?
8        MR. STUEVE:  I'm entitled to ask
9  any witness questions about documents in the
10  case.
11        MR. MONICA:  Not that we haven't
12  produced.  If it's marked highly confidential
13  and we didn't produce it, you can't show it to
14  him.
15        MR. STUEVE:  I'm entitled to ask
16  this witness a question about information that
17  is relevant to this topic.
18        MR. MONICA:  If you're violating
19  the protective order --
20        MR. STUEVE:  I don't believe I am.
21  I don't believe the protective order prevents me
22  from asking a corporate rep --

---

448

1        MR. MONICA:  Produced by another
2  company.  It's is highly confidential produced
3  by Moark.  It is proprietary information
4  produced by Moark.
5        MR. STUEVE:  Why don't we resolve
6  it off the record.
7        MR. MONICA:  Why don't we can take
8  a break.  It's been an hour and a half any way.
9        MR. BARNES:  That's fine.  Why
10  don't we give Moark's counsel the document
11  numbers.
12        MR. STUEVE:  Exhibit 277.
13        MR. BARNES:  In Gregory's
14  deposition it bears identification numbers
15  Moark --
16        MR. STUEVE:  Let's go off the
17  record.
18        MR. BARNES:  Yeah.
19        THE VIDEOGRAPHER:  Off the record
20  at 10:31 a.m.
21        (A brief recess was taken.)
22        THE VIDEOGRAPHER:  This is the

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

21 (Pages 449 to 452)

---

449

1    beginning of tape number two. Back on the
2    record at 10:50 a.m.
3            MR. STUEVE: Just for the record,
4    counsel for Rose Acre, prior to the break,
5    raised the issue of a highly confidential
6    document being presented to the witness. We
7    have resolved that issue with Moark, the
8    producing party. We've remarked the document as
9    and only the first and second pages as Rust 543
10   and it's Bates range Moark 0019049, actually
11   just the first page, 19049 and Moark has agreed
12   to designate just this page as confidential so
13   we can ask the witness a question.
14           Vanessa, is that correct.
15           MS. JACOBSEN: That is correct.
16           (Rust Exhibit Number 543 was
17   marked for identification.)
18   BY MR. STUEVE:
19       Q.  Okay. Let me show you what's been
20   marked as 543.
21           So, if you would, on the fourth
22   bullet point?

---

450

1        A.  I like the second paragraph best.
2        Q.  If you would, on the fourth bullet
3    point there?
4        A.  Fourth?
5        Q.  Yeah. Starting with the layer
6    inventory?
7        A.  Yes.
8        Q.  It says, "the layer inventory has
9    the potential to grow towards 300 million by
10   1/1/2006 unless the industry intervenes." Did I
11   read that correctly?
12       A.  Yes.
13       Q.  "This intervention has started
14   with the UEP restriction on backfilling cages to
15   meet animal care certification." Do you recall
16   that?
17       A.  That's what it says.
18       Q.  Do you remember voting as a Board
19   member to prevent backfilling?
20       A.  I don't recall the actual voting
21   on that, but --
22       Q.  You were aware that backfilling in

---

451

1    2006, four years after the UEP certified program
2    was first initiated backfilling was banned;
3    right?
4        A.  We were a backfilling company and
5    KY -- if it would have been a voting thing we
6    would have probably voted for backfilling to
7    continue.
8        Q.  But my question is, you were aware
9    that four years after the UEP certified program
10   was implemented that the Board approved a
11   prohibition against backfilling; correct?
12       A.  Yeah. Yeah.
13       Q.  All right. And it -- the purpose
14   of that was, in fact, to make sure that the
15   reduced cage requirements had their intended
16   effect of reducing the supply of eggs; correct,
17   sir?
18           MS. LEVINE: Objection.
19           THE WITNESS: I do not believe
20   that was the Scientific Committee's opinion of
21   it. There was a lot of argument about the
22   backfilling issue.

---

452

1    BY MR. STUEVE:
2        Q.  The economic justification for
3    prohibiting backfilling was to make sure that
4    the cage space requirements had their intended
5    effect of reducing the supply of eggs; correct,
6    sir?
7            MS. LEVINE: Objection.
8            THE WITNESS: Repeat the question.
9    You're making a statement. You're not making a
10   question.
11           MR. STUEVE: Read it back.
12           (The record was read as
13   requested.)
14           MS. LEVINE: Objection.
15           THE WITNESS: No.
16   BY MR. STUEVE:
17       Q.  That's certainly what's indicated
18   in Exhibit 543; isn't it, sir?
19       A.  That's what you say is indicated.
20   That's what it says.
21       Q.  Well, it says, "the layer
22   inventory has the potential to grow towards

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

22 (Pages 453 to 456)

453

1   300 million by 1/1/2006 unless the industry
2   intervenes;" right?
3       A.   That's what this document says.
4       Q.   The intervention that is
5   identified is the prohibition against
6   backfilling; right?
7       A.   That's what it says.
8       MR. BARNES:  Objection.
9   BY MR. STUEVE:
10      Q.   And the prohibition of backfilling
11  was intended to make sure that the cage space
12  reduction requirements had their intended
13  purpose of reducing the supply of eggs; correct,
14  sir?
15      A.   No.
16      MS. LEVINE:  Objection.
17  BY MR. STUEVE:
18      Q.   What was the economic
19  justification for backfilling, as outlined in
20  this document, sir?
21      MR. BARNES:  Objection.  There is
22  no evidence, there is no testimony this witness

454

1   has ever seen this document before, it was never
2   sent to him.  It's a Moark document.  We don't
3   know who wrote it.  You've obviously asked Gene
4   Gregory about it, but if this witness can answer
5   the question he can certainly try.  I think it's
6   an unfair question and I object to it.
7       THE WITNESS:  I have no knowledge
8   what they mean here.
9   BY MR. STUEVE:
10      Q.   You have no knowledge of what they
11  mean here?
12      A.   No.
13      Q.   All right.  You never heard any
14  discussion at the Board level that we needed to
15  pass the backfilling ban in order to ensure that
16  the cage space requirements had their intended
17  purpose of reducing the supply of eggs?
18      A.   I don't recall.
19      Q.   Is it your testimony that despite
20  the ban against backfilling that Rose Acre
21  continued to backfill?
22      A.   We were one of the primary

455

1   backfillers of the industry.
2       Q.   Did you ever -- did you admit to
3   anyone at the Board after the backfilling
4   requirement was implemented that you were
5   violating that requirement?
6       A.   We never violated it after it
7   become part of the program.
8       Q.   Well, I thought you just testified
9   you continued to backfill?
10      A.   No.  I testified that we were one
11  of the lead backfillers in the industry.
12      Q.   Right.  So did you stop
13  backfilling?
14      A.   Yes.
15      Q.   When?
16      A.   After the -- there was a lot of
17  discussion within the scientific community, KY
18  and my brother -- my brother always wanted to do
19  it and I don't recollect what KY's position was
20  on it.  We needed all the eggs we could get for
21  our breaking point.
22      Q.   You understood that the -- that

456

1   the implementation of the backfilling ban was a
2   supply management purpose?
3       A.   It was something that the
4   Scientific Committee had opposed from the
5   beginning, to my understanding.
6       Q.   Sir, that's not what's been
7   reflected in these documents we've looked at; is
8   it?
9       MS. LEVINE:  Objection.
10      THE WITNESS:  You have what's
11  called the hen pecking order.  And when you take
12  a chicken that doesn't -- that grew out of one
13  cage and put it in another cage the other
14  chickens will peck that chicken to death in that
15  cage.  You know, it increases mortality.
16  BY MR. STUEVE:
17      Q.   Sir, we've seen the backfilling
18  recommendation actually came from the -- not
19  from the Scientific Committee, but from the
20  committees at UEP; correct, sir?
21      MS. LEVINE:  Objection.
22      MR. BARNES:  Objection.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

23 (Pages 457 to 460)

---

457

1          THE WITNESS:  I don't recollect.
2   BY MR. STUEVE:
3          Q.   Did you vote as a Board member in
4   favor of the banning of backfilling in 2006?
5          **A.   I don't recollect how I voted on**
6   **that.  I would have probably voted against it.**
7          Q.   And the reason why you would have
8   voted against it was because it was a supply
9   restriction; fair enough, sir?
10         **A.   Repeat your question.**
11         MR. STUEVE:  Read it back to him,
12  please.
13         (The record was read as
14  requested.)
15         THE WITNESS:  I'm not sure -- go
16  through it again.
17         (The record was read as
18  requested.)
19         THE WITNESS:  Probably.
20         (Rust Exhibit Number 544 was
21  marked for identification.)
22         MR. STUEVE:  544 is RA 0067466

---

458

1   through 67.
2          If you would, on Exhibit 544 under
3   D, this is a document prepared by KY Hendrix to
4   all complex managers production managers;
5   correct.
6          THE WITNESS:  Yes.
7   BY MR. STUEVE:
8          Q.   And this is dated May 31, 2005?
9          **A.   Yes.**
10         Q.   And it says under D1, under molt
11  standards are a bit different than the previous
12  years.  Do you see that?
13         **A.   Yes.**
14         Q.   It says, "body weights need to be
15  monitored daily during the fast."  What we're
16  talking about the fast, this is the period in
17  which you all are withholding food from the
18  flock; correct?
19         **A.   Correct.**
20         Q.   "And this is something that I have
21  fought since the beginning and I have finally
22  given up on.  It will cost us five points if we

---

459

1   keep doing what we are doing currently."
2          And what he's referring to there
3   is that the body weight loss of the flocks is
4   exceeding the 30 percent limit; correct, sir?
5          MR. BARNES:  Object.
6          THE WITNESS:  I have no idea what
7   he's referring to.
8   BY MR. STUEVE:
9          Q.   Well, it will cost us five points
10  if we keep doing what we're doing currently.
11         What other requirement applied to
12  the fast other than the 30 percent requirement
13  in the animal welfare guidelines?
14         **A.   I'm not sure.**
15         Q.   Are you aware of any other?
16         **A.   I'm not sure on that part.**
17         Q.   But there -- he is, in fact,
18  acknowledging that Rose Acre is not in
19  compliance with the molting requirements;
20  correct, sir?
21         **A.   I'm not sure what he refers to**
22  **there.**

---

460

1          Q.   It says, "this is something that I
2   have fought since the beginning and I have
3   finally given up on.  It will cost us
4   five points if we keep doing what we are doing
5   currently.
6          If we lose five points I'm not too
7   worried as long as we pass the 170 or greater.
8   170 points is the least points you can get and
9   still pass."  Do you see that?
10         **A.   Yeah.**
11         Q.   Now, I thought Rose Acre had a
12  zero tolerance policy on animal welfare issues?
13         **A.   I'm not sure what he's referring**
14  **to here.**
15         Q.   This certainly doesn't indicate a
16  zero tolerance; does it?
17         MR. BARNES:  Objection to form.
18         THE WITNESS:  Nothing that talks
19  about animal welfare.  They're talking about
20  body weight.  I don't know what he's referring
21  to.
22  BY MR. STUEVE:

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

24 (Pages 461 to 464)

461

1      Q.   Now, over on the next page, bullet
2   point number three, it says, "backfilling should
3   have stopped by now"?
4      A.   Yeah.
5      Q.   See that.  So even though you
6   believed the backfilling ban was a supply
7   restriction, Rose Acre complied with that
8   requirement; is that correct, sir?
9              MR. BARNES:  Object to the form.
10             THE WITNESS:  State your question,
11  please.
12             MR. STUEVE:  Read it back for him,
13  please.
14             (The record was read as
15  requested.)
16             MR. BARNES:  Same objection.
17             THE WITNESS:  Yes.
18  BY MR. STUEVE:
19     Q.   Now, if you would, if you could
20  turn to Exhibit 111.  Why don't you give that to
21  me.  It will be quicker for me to find it.
22             MR. BARNES:  That's his own stack.

462

1              MR. STUEVE:  I'm sorry.
2              MR. BARNES:  Do you have 111?
3              MR. MONICA:  111 is the left pile.
4              MR. BARNES:  Good thinking.
5   BY MR. STUEVE:
6      Q.   Let me show you what we've
7   previously referred to as Exhibit 111 and these
8   are the minutes of June 2005 of the Marketing
9   Committee that you attended; is that correct?
10             MR. BARNES:  Counsel, will you
11  stop a second until we find the exhibit you're
12  talking about.  Give us a minute to catch up if
13  you would, please.
14             MR. STUEVE:  Sure.  You got it.
15             MR. BARNES:  I got it.
16             MR. STUEVE:  I'm just asking him
17  to confirm that the June 1, 2005 Marketing
18  Committee minutes and he attended that meeting.
19             MR. BARNES:  If he recalls.  Okay.
20  Yeah.
21             THE WITNESS:  It says I was.
22  Yeah.

463

1   BY MR. STUEVE:
2      Q.   All right.  And it says down here,
3   I want to direct your attention to, it's the
4   fourth paragraph under hatch report on that
5   first page.  It starts with some felt?
6      A.   Yes.  I'm down there.  Okay.
7      Q.   It says, "some felt that ACC
8   companies," that's certified companies; right,
9   that's what's being referred to there?
10     A.   Yes.
11     Q.   "Animal care certified companies
12  should speed up the phasing schedule for cage
13  space, while others said we should not change
14  the ACC schedule purely for economic reasons."
15  Do you see that?
16     A.   Yes.
17     Q.   Do you remember that discussion
18  occurring?
19     A.   Yes.  I was very vocal in being
20  anti move up.
21     Q.   And those who were pushing the
22  move up of the phase in they wanted to do that

464

1   because by increasing the cage space requirement
2   that would further reduce flock size and
3   hopefully boost prices; correct?
4              MR. BARNES:  Objection.  Calls for
5   speculation.
6              THE WITNESS:  Restate your
7   question.
8              MR. STUEVE:  Go ahead and read it
9   back to him.
10             (The record was read as
11  requested.)
12             MR. BARNES:  Same objection.
13             THE WITNESS:  I have no idea what
14  their individual thoughts were on them.
15  BY MR. STUEVE:
16     Q.   Well, you remember, though, that
17  discussion occurring at the Marketing Committee;
18  right?
19     A.   Yes.
20     Q.   All right.  And --
21     A.   And I was against the move up.
22     Q.   Right.  But the folks that were

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

25 (Pages 465 to 468)

---

465

1  for it, they were arguing for it because by
2  speeding up the implementation of the cage space
3  that would further reduce the flock size and
4  boost prices. That's why they were proposing
5  it; right?
6       **A.  I have no idea what their**
7  **individual company's reasonings were one way or**
8  **another or against it.**
9       Q.  You do recall that discussion
10 occurring at the Marketing Committee; right?
11      **A.  Yes.**
12      Q.  All right.
13      MR. BARNES:  This was a conference
14 call, not a meeting, according to the document.
15      (Rust Exhibit Number 545 was
16 marked for identification.)
17      MR. STUEVE:  Let me show you
18 what's been marked Rust Exhibit 545, Bates range
19 RA 0071690 through 74.
20      And can you confirm that this is
21 -- indicates the results of an audit?
22      THE WITNESS:  That's what it

---

466

1  appears to be.
2  BY MR. STUEVE:
3       Q.  In August of 2005; is that right?
4       **A.  That's what it appears to be.**
5  **Yes.**
6       Q.  And it indicates that on items
7  eight and nine, if you look down the first page,
8  number eight, "our concentrations of ammonia
9  within the cage area of the layer house
10 monitored and the points received were zero;" is
11 that correct?
12      **A.  Yes.  That's what it says.**
13      Q.  And would this -- does this audit
14 apply to all of your various production
15 facilities?
16      **A.  Repeat the question again.**
17      Q.  Yeah.  This says cage layers,
18 audit checklist.
19      Was this audit an audit of all of
20 your 15 or so production facilities?
21      **A.  This was not our facility.**
22      Q.  It says name of company, Rose Acre

---

467

1  Farms?
2       **A.  Yes, but it was not our facility.**
3       MR. BARNES:  It says name of
4  facility, Pat, Rice, at the very top right next
5  to what you're reading.
6  BY MR. STUEVE:
7       Q.  Okay.  So when you say name of
8  facility Rice, it says name of company Rose Acre
9  Farms.  This facility, what is the Rice
10 facility?
11      **A.  That's a contract farm in Georgia**
12 **that we terminated.**
13      Q.  Under the UEP certified program,
14 though, any of the facilities that you either
15 owned or purchased eggs from had to comply with
16 the certified program; is that right?
17      **A.  Correct.**
18      Q.  All right.  And this -- that's why
19 under the company for the name of the audit it's
20 Rose Acre Farms; right?
21      **A.  That's -- yes.  That's Rose Acre**
22 **Farms.**

---

468

1       Q.  And it -- in essence one of the
2  facilities under its control, Rose Acre Farms'
3  control, the concentration of ammonia within the
4  cage area of the layer house monitored they got
5  zero; correct?
6       MR. BARNES:  Objection to the form
7  of the question.
8       THE WITNESS:  It was a contract
9  farm.  In a contract farm we give them
10 guidelines, but we have no way of monitoring or
11 measuring what they do on a daily basis.
12 BY MR. STUEVE:
13      Q.  This contract farm for Rose Acre
14 did not meet the requirements set forth in item
15 number eight; is that correct?
16      **A.  Correct.**
17      Q.  And number nine was corrective
18 action taken when ammonia levels exceeded
19 50 parts per million.  That was also a zero; is
20 that correct?
21      **A.  Well, it says they weren't**
22 **monitored, so it doesn't say if they was over or**

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

26 (Pages 469 to 472)

---

469

1  under.
2      Q.   Well, on number nine it says
3  corrective action taken when ammonia levels
4  exceeded 50 parts per million, it says zero;
5  right?
6      A.   I don't see where it says the
7  ammonia level exceeded 50 parts.
8      Q.   I'm just reading the words there.
9  Number nine, if you could, it says was
10 corrective action taken when ammonia levels
11 exceed 50 parts per million and under that
12 category the points received were zero?
13     A.   Got a zero with a slash through
14 it. I have no idea what that means other than
15 zero. I don't see any place where it says the
16 ammonia was over 50 parts per million. It says
17 it wasn't monitored.
18     Q.   Sir, I'm just asking you to
19 confirm what the document says and it says under
20 item number nine, was corrective action taken
21 when ammonia levels exceed 50 parts per million.
22 That's what it says; right?

---

470

1      A.   I sincerely doubt -- this audit
2  was done August 30, 2005. That's summertime in
3  Georgia. Every fan in that farm would have been
4  on. There would not have been an ammonia level
5  in the house at that point in time.
6      Q.   Sir, I'm going to read back the
7  question. I'm going to give you one more chance
8  to answer it.
9          (The record was read as
10 requested.)
11         MR. BARNES:  Object to the form of
12 the question. The document speaks for itself.
13         THE WITNESS:  It doesn't say
14 ammonia levels exceeded 50 parts per million.
15 BY MR. STUEVE:
16     Q.   That's not my question.
17     A.   You asked the question that was
18 corrective action taken when it exceeded. It
19 doesn't show it exceeded 50 parts per million.
20 It wouldn't have in August.
21     Q.   Sir, on number nine on this audit
22 can you confirm item number nine, that's a

---

471

1  requirement; is it not?
2      A.   It is a requirement. Yes.
3      Q.   The requirement is was corrective
4  action taken when ammonia levels exceed 50 parts
5  per million. That's a requirement; right?
6      A.   I have no idea.
7      Q.   And you can confirm --
8      A.   I can confirm the document says
9  there's a circle with a slash that you can read
10 and see too.
11     Q.   Does that mean anything other to
12 you than zero?
13     A.   When I put a zero down I don't put
14 a slash through it. I don't know if that means
15 it doesn't matter. I don't know what it means
16 when you put a slash through a zero.
17     Q.   Over on the right hand column of
18 the possible 110 points there's 100; right, over
19 in the right hand column?
20     A.   Yes.
21     Q.   So that would be confirmation that
22 eight and nine would have been zeros; right,

---

472

1  sir?
2      A.   Correct.
3      Q.   Now, you volunteered that you
4  fired this contractor; is that right?
5      A.   We stopped all contracts in
6  Georgia.
7      Q.   When did you fire that contractor?
8      A.   I don't recall the date. The
9  records will show.
10     Q.   Was it in 2005?
11     A.   I said I do not recall the date.
12     Q.   Well, could it have been in 2006?
13         MR. BARNES:  Objection.
14         THE WITNESS:  It could have been
15 any time. I don't recall the date.
16 BY MR. STUEVE:
17     Q.   I want to be clear. Are you
18 saying you fired the contractor because of these
19 audit results?
20         MR. BARNES:  Object to the form of
21 the question.
22         THE WITNESS:  We terminated the

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

27 (Pages 473 to 476)

473

1    contract.
2    BY MR. STUEVE:
3        Q.   Did you terminate the contractor
4    as a result of these audit results?
5        A.   I have no idea.
6        Q.   Now, if you would, if you could
7    turn to Bates range RA -- it's 700, the last
8    three digits are 700.
9        A.   Okay.
10            MR. BARNES:  700.  Okay.
11   BY MR. STUEVE:
12       Q.   See up there under number of
13   layers observed, the first two rows says 25 and
14   25?  Do you see that in the first column 43, 16
15   by 20, 320 by 4?
16       A.   Right.
17       Q.   It has number of layers observed.
18   Do you see that?
19       A.   Yes.
20       Q.   Now, if you do the math, sir, that
21   would mean that there was only 45.7-square inch
22   per layer for those cage columns; correct, sir?

474

1            MR. BARNES:  Object to the form of
2    the question.
3            THE WITNESS:  I'm not sure what
4    you're referring to.
5    BY MR. STUEVE:
6        Q.   You've got total cage floor space
7    square inches 320; right, see that?
8        A.   Yes.
9            MR. BARNES:  Times four.
10   BY MR. STUEVE:
11       Q.   Times four.  You see where it says
12   25 layers observed?
13       A.   Yeah.
14       Q.   That would be seven hens per cage;
15   right?
16       A.   Get a calculator and do it here.
17   It says number of layers, that
18   would be 51.2 if I've done my math right.
19       Q.   That would not be in compliance
20   with the cage space requirements; correct, sir?
21       A.   They had an average -- it could
22   have been.  They had an averaging.  You was

475

1    allowed to have more in some cages than other
2    cages because of the different sizes.  I don't
3    know.  I'm not an expert which cages had which
4    dimensions that they allowed the averaging.
5        Q.   With respect to those cages,
6    though, those cages would not have been in
7    compliance with the cage space requirement?
8        A.   With respect -- I'm not sure.
9            MR. BARNES:  Object to the form of
10   the question.
11           MR. STUEVE:  I object to counsel
12   interrupting the witness's answer to prevent him
13   from answering it.
14   BY MR. STUEVE:
15       Q.   Sir, can you confirm for me that
16   if your math is correct that those cages would
17   not be in compliance with cage space
18   requirements?
19       A.   They use an averaging and it says
20   at the bottom 60.2 is average.
21       Q.   But I'm asking you, though, with
22   respect to those cages they would not be in

476

1    compliance with cage space requirements;
2    correct?
3            MR. BARNES:  Objection.
4            THE WITNESS:  I'm not asking how
5    they do adjusting.
6    BY MR. STUEVE:
7        Q.   I'm not asking you to adjust for
8    averaging.
9        A.   If that entire house was done that
10   space requirement that you're stating in line
11   one, it would not be in compliance.
12       Q.   Sir, if you would, if you could
13   turn to Bates range 97, the last two digits, so
14   it's earlier in the document?
15       A.   Which one?
16       Q.   The last two digits are 97.  I
17   don't need your calculator, I don't think.
18       A.   Which number?
19       Q.   The last two digits are 97?
20       A.   97?
21       Q.   Uh-huh.
22       A.   Okay.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

28 (Pages 477 to 480)

---

477

1     Q.    Now, this is Rose Acre Farms
2  again; right?
3     **A.    Yes.**
4     Q.    It says name of facility, Little
5  Number 1 and Number 2?
6     **A.    Contract farms.**
7     Q.    And where was that contract farm?
8     **A.    In Georgia.**
9     Q.    And under number eight it says,
10 "our concentrations of ammonia in the cage area
11 of the layer house monitored five points and
12 they got zero;" is that correct?
13    **A.    From memory I'm not sure any of**
14 **the contract farms monitored ammonia.**
15    Q.    That would be a violation of one
16 of the requirements of the guidelines; correct,
17 sir?
18    **A.    It's not a violation of the**
19 **guideline.  It's something they don't receive**
20 **points for.**
21    Q.    Well, you understood that it was a
22 requirement of the guidelines to monitor

---

478

1  ammonia; correct?
2     **A.    My understanding of the animal**
3  **welfare guidelines, everyone had this point**
4  **system.  You got so many points to work towards.**
5  **There were certain things you could allocate**
6  **yourself for say I'm not doing this part or this**
7  **part and still qualify.**
8     Q.    Which parts did Rose Acre decide
9  they were not going to comply with?
10    **A.    You would have to ask KY that**
11 **question.  I'm not sure.**
12    Q.    You're the corporate rep with
13 respect to the UEP certified program.  I'm
14 asking you which of those did Rose Acre decide
15 not to comply with?
16    **A.    I would have to look at the**
17 **documents.  We have 200 or 300 chicken houses.**
18 **Some houses are older than others.  You can't**
19 **meet certain requirements on certain houses and**
20 **certain houses you can.**
21    Q.    And then the next under number
22 nine was corrective action taken when ammonia

---

479

1  levels exceeded 50 parts per million.  There was
2  zero points for that, as well; right?
3     **A.    That's what it says.**
4     Q.    Now, we noticed up the deposition
5  of KY Hendrix, but he's not available; right?
6     **A.    He's somewhere in the ocean.**
7     Q.    Do you have the ability to get a
8  hold of him?
9     **A.    No.  He's not in cell phone**
10 **contact.  I don't think they've got cell phones**
11 **out there where they sail.**
12    Q.    Well, they eventually have to come
13 to shore; right, to get food and water?
14    **A.    Eventually.**
15    Q.    When is he expected to come back
16 to shore?
17    **A.    Quite honestly, I don't know.  I**
18 **know he had to call AAA once and they had to**
19 **rescue him because he ran out of gas.  I didn't**
20 **know they did that; did you, sailboat?**
21    Q.    That would give me a little bit
22 more confidence to try sailing if I knew AAA

---

480

1  would come out.
2     **A.    I agree with you.  I would never**
3  **get in a sailboat.  I have no idea where he is**
4  **today, sir.**
5     Q.    I understand that.  You do
6  understand he has to come to shore at some
7  point; right?
8     **A.    I think it's like -- I never seen**
9  **it.  I saw some pictures.  It looks like 30,**
10 **40 feet long sailboat.  Nothing I would sail**
11 **around the world in.  I wouldn't sail around the**
12 **world in a giant sailboat, let alone a little**
13 **one.**
14    MR. BARNES:  Are you done with
15 that, Pat?
16    MR. STUEVE:  I've got one more on
17 707.
18    MR. BARNES:  707, Marcus.  Turn to
19 707.
20 BY MR. STUEVE:
21    Q.    This is Rose Acre Farms' audit,
22 again, this one was September 2005; is that

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

29 (Pages 481 to 484)

---

481

1  right?
2      A.   Yes.
3      Q.   It identifies the name of the
4  facility Lincoln County?
5      A.   Yes.
6      Q.   Was that a contract farm?
7      A.   No.
8      Q.   That was one of the facilities
9  owned and operated?
10     A.   That's a Rose Acre owned facility.
11     Q.   Okay.  Look at number 11 there?
12     A.   Uh-huh.
13     Q.   It says, "are dead or injured
14 layers removed from cages daily."  Do you see
15 that?
16     A.   Yes.
17     Q.   And your facility got a zero; is
18 that correct?
19     A.   Evidently.  Yes.  That's what it
20 says.
21     Q.   That was one of the things that
22 was depicted in this videotape; right, was a

---

482

1  dead chicken that hadn't been removed; is that
2  right?
3          MR. BARNES:  Object to the form of
4  the question.  Vague and indefinite.
5  BY MR. STUEVE:
6      Q.   Do you understand my question?
7      A.   Repeat the question.
8          MR. STUEVE:  Yeah.
9          (The record was read as
10 requested.)
11         MR. BARNES:  Same objection.
12         THE WITNESS:  Yes.  I think, but
13 we're not sure it was ours.  What happens
14 whenever you have dead chickens, if you turn
15 when you're walking by and you miss one you miss
16 one.  If the auditor finds one that was missed
17 they write it down and you lose your points for
18 that.  Humans make mistakes.
19 BY MR. STUEVE:
20     Q.   Sir, my question, though, was one
21 of the things in the videotape concerning your
22 facility was the failure to remove a dead

---

483

1  chicken; is that correct, sir?
2          MR. BARNES:  Object to the form of
3  the question.  Misstates --
4          THE WITNESS:  The person who took
5  the video was also the person whose job was
6  supposed to pull that dead chicken.
7  BY MR. STUEVE:
8      Q.   Sir, if you could just answer my
9  question.
10         MR. BARNES:  Object to the form of
11 the question.
12         THE WITNESS:  I think I answered
13 it.
14         MR. STUEVE:  Read it back and ask
15 you to answer it for me.
16         (The record was read as
17 requested.)
18         MR. BARNES:  Object to the form.
19 We don't know what video counsel is talking
20 about.  I'm not sure the witness knows.  I
21 certainly don't know.
22         THE WITNESS:  I would have to see

---

484

1  the video to verify that.
2  BY MR. STUEVE:
3      Q.   That's your recollection; correct?
4      A.   My recollection was there was
5  things made in a video statement and our people
6  stated that the actual video of what was stated
7  was something that took place in somebody else's
8  chicken house, it wasn't ours.  And that's why
9  they invited the news media to come out and see
10 the video in that house.
11         MR. STUEVE:  Move to strike the
12 answer as nonresponsive.
13         MR. BARNES:  That's totally
14 responsive, counsel.
15 BY MR. STUEVE:
16     Q.   My question is, do you recall that
17 one of the topics in the video that you referred
18 to yesterday was the failure to remove a dead
19 chicken?
20         MR. BARNES:  Object to the form of
21 the question.  It's misleading.  He testified
22 that the video was Jerry mannered, it was

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

30 (Pages 485 to 488)

---

485

1  rigged.
2        THE WITNESS:  Whose chicken house
3  are you referring to?
4        MR. STUEVE:  I'm going to instruct
5  counsel to stop coaching the witness.  You've
6  been doing it several times this morning.  I ask
7  you stop doing it.  You can make your objection
8  to form.  I'm going to ask the witness the
9  question one more time and ask you to answer it.
10       MR. BARNES:  You can instruct me
11 all you want.  I'm going to instruct you not to
12 continue to misstate the witness's prior
13 testimony and distort the record of this
14 deposition.  Go ahead, ask the question again.
15 Marcus, please answer the question subject to my
16 objection.
17       (The record was read as
18 requested.)
19       THE WITNESS:  Which video and
20 which hen house are you referring to?
21 BY MR. STUEVE:
22       Q.  Sir, if you would, if you could

---

486

1  turn to 08 in this document, the next page.
2  This is, again, concerning an audit of one of
3  Rose Acre's facilities.
4        Item number five it says, "if so
5  was weight loss and mortality monitored daily."
6  Do you see that?  Zero points?
7        A.  Yes.
8        Q.  And this was what KY was
9  complaining about in the document we saw
10 earlier; right?
11       A.  I'm not sure what he was actually
12 referring to there.
13       Q.  Now, despite the failure to comply
14 with two of those requirements, because of the
15 point system Rose Acre did not fail the audit;
16 right?
17       A.  My understanding we didn't -- I
18 don't see anything that says we failed an audit
19 there.
20       Q.  Let's turn to 322.
21       A.  That in here?
22       MR. HICKEY:  New exhibit.

---

487

1        THE WITNESS:  Oh.  It's a new
2  exhibit.
3        MR. BARNES:  Put that up there.
4  322?
5        MR. HICKEY:  Previously marked.
6  BY MR. STUEVE:
7        Q.  I'll show you what's previously
8  been marked as 322.  Sir, if you look at -- this
9  is a communication from Gene Gregory to you
10 entitled subject Program Review.  Do you see
11 that?
12       A.  Yes.
13       MR. BARNES:  It's to a lot of
14 people.
15 BY MR. STUEVE:
16       Q.  And it says, "as I had time to
17 reflect upon the Board motion in Seattle that
18 now requires us at the January Board meeting to
19 have an open discussion of UEP's animal welfare,
20 UEP's certified program.  It causes me to expect
21 the debate of the 100 percent rule once again to
22 come up."  Do you know what he's referring to

---

488

1  there as the 100 percent rule?
2        A.  Not 100 percent for sure which
3  one.
4        Q.  What is your understanding of the
5  100 percent rule?
6        A.  Read through the rest of this.
7  I'm not 100 percent sure what he's talking
8  about.  Can I read it?
9        Q.  Yes.
10       A.  Okay.
11       Q.  What is your understand of the
12 100 percent rule, sir?
13       A.  If you owned chickens that you was
14 going to keep all your chickens under the animal
15 welfare program.
16       Q.  So this is different from the
17 prohibition of purchasing the requirement to
18 only purchase eggs that are certified; right?
19       A.  Correct.
20       Q.  All right.  And when was this --
21 the 100 percent rule implemented?
22       A.  After it come to light there were

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

31 (Pages 489 to 492)

---

489

several people having birds both ways.

Q.   And were you in favor of the 100 percent rule?

A.   Yes.

Q.   All right.  Now, that 100 percent rule would preclude your largest competitor in the egg production -- the egg processing market, which is Michael Foods, from being an UEP certified company; correct?

A.   How are you meaning that?

Q.   Well, Michael Foods, all of the eggs that either -- that was under contract or owned were not UEP certified facilities; right?

A.   Correct.

Q.   And so under the 100 percent rule Michael Foods would be precluded from joining the UEP certified program; right?

A.   I don't think so.  I think the -- restate your question.  You're confusing me.

Q.   As I understand it, the 100 percent rule was that any flock that's either owned or under contract or under control

---

490

that you use for your business had to be in compliance with UEP certified program; correct?

A.   Yes.

Q.   That rule would preclude a company like Michael Foods from becoming UEP certified; right?

A.   It was to my knowledge -- I don't think it was implemented that way.

Q.   There was an exception made for Michael Foods; right?

A.   Yes.

Q.   You voted against that exception; correct?

A.   I could have.  Yes.

Q.   And the reason why is that you did not want your principal competitor to be UEP certified; right?

A.   I didn't want them to be able to come in and go write a contract with another producer to come in and sell eggs to our -- the customers we had that -- with less cost production.

---

491

Q.   So you voted for the 100 percent rule when it was initially proposed; right?

A.   I believe I did.

Q.   And then when Michael Foods, a principal competitor of yours, sought an exception to that 100 percent rule you voted against it; right?

A.   Against them or against the rule?

Q.   Against them joining under that exception; right?

A.   I could have.

Q.   Now, if you will look under item number six, it says in that second sentence of number six it says, "keep in mind that the audit score sheet was set up on a point system whereby nothing at this time other than the space is cause for immediate failure."  Did I read that correctly?

A.   You read that.  That's what it says.

Q.   That's consistent with your recollection you testified earlier; right?

---

492

A.   Yes.

Q.   All right.

(Rust Exhibit Number 546 was marked for identification.)

BY MR. STUEVE:

Q.   I'll show you what's been marked Exhibit 546 RAUPDATE 34892.

This is an e-mail from Greg Hinton of Rose Acre; right?

A.   Yes.

Q.   Who was on the Marketing Committee in '06; right?

A.   Correct.

Q.   To KY Hendrix, who would have been on the Animal Welfare Committee; right?

A.   Yes.

Q.   It says, "KY, I think that your committee should make a motion that no certified producer can process noncertified eggs, shell or liquid, in their plant."  Did I read that correctly?

A.   Yes.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

32 (Pages 493 to 496)

---

493

1      Q.   That is the 100 percent rule, as
2  you understand it; right?
3      A.   Yes.
4      Q.   And that appears to have been an
5  idea that Greg Hinton was proposing, of your
6  company; right?
7      A.   Yes.
8      Q.   And that it was ultimately
9  adopted; correct, by UEP?
10      A.   Restate the question.
11      Q.   The 100 percent rule was adopted
12  by UEP; correct?
13      A.   To own birds I think.  Yes.
14      Q.   In fact, you wanted that rule to
15  apply to Michael Foods, but UEP made an
16  exception to the 100 percent rule; right?
17      A.   Correct.
18           MR. STUEVE:  Why don't we take
19  just a quick break here.
20           MR. BARNES:  Sure.  That's fine.
21           THE VIDEOGRAPHER:  Off the record
22  at 11:45 a.m.

---

494

1           (A brief recess was taken.)
2           THE VIDEOGRAPHER:  This -- back on
3  the record at 11:53 a.m.
4  BY MR. STUEVE:
5      Q.   I'm going to show you what's been
6  marked Exhibit 547, it's RAUPDATE 0035814
7  through 16.
8           (Rust Exhibit Number 547 was
9  marked for identification.)
10  BY MR. STUEVE:
11      Q.   Do you remember reviewing this
12  document in preparation for your deposition
13  today?
14      A.   Yes.  Vaguely.  Yeah.
15      Q.   Okay.  And is this the
16  communication back and forth between you and
17  Gene Gregory concerning exceptions that were
18  being contemplated being made for the 100
19  percent rule for Michael Foods?
20      A.   I need to read it before I can
21  answer that --
22      Q.   Okay.  You let me know when you're

---

495

1  ready.
2      A.   Okay.
3      Q.   I just have a general question.
4  Was this your communication back and forth with
5  Gene Gregory?
6      A.   Yes.
7      Q.   Concerning your opposition to
8  making an exception to the 100 percent rule for
9  Michael Foods?
10      A.   Could have been.  Yes.
11      Q.   And there were -- we've already
12  talked about, up to now, there's the 100 percent
13  rule that was adopted that we talked about, as
14  well as the policy not for UEP certified
15  companies not to be purchasing noncertified eggs
16  for their purposes; correct, sir?
17           MR. BARNES:  Object to form.
18           THE WITNESS:  Restate the
19  question.
20           MR. STUEVE:  Can you read it back
21  for me, please.
22           (The record was read as

---

496

1  requested.)
2           MR. STUEVE:  Let me rephrase it.
3           THE WITNESS:  It's hard to answer.
4  BY MR. STUEVE:
5      Q.   The first question that we talked
6  about the 100 percent rule; correct?
7      A.   Yes.
8      Q.   We also talked about the agreement
9  that UEP certified companies would not purchase
10  noncertified eggs for their uses; correct, sir?
11           MS. LEVINE:  Objection to the form
12  of the question.  Lack of foundation.
13           THE WITNESS:  Restate it again.
14  BY MR. STUEVE:
15      Q.   The -- we talked about the
16  100 percent rule?
17      A.   Right.
18      Q.   We also talked about the agreement
19  that UEP certified companies would not purchase
20  noncertified eggs for their uses; correct, sir?
21           MS. LEVINE:  Object to the form of
22  the question.  Lack of foundation.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

33 (Pages 497 to 500)

497

1       THE WITNESS:  She confuses me.
2   BY MR. STUEVE:
3       Q.   Just answer my question.
4       A.   Well, my attention span is not
5   good enough.  You have to excuse me on that.
6       MR. STUEVE:  Your objection is
7   noted, Jan.
8       MS. LEVINE:  I'm going to have a
9   continuing objection that that was an UEP rule
10  or ever was.  That was my basis.  If you want to
11  change the question that's fine, but that's the
12  continuing objection.
13      MR. STUEVE:  Read back my
14  question, please.
15      (The record was read as
16  requested.)
17      THE WITNESS:  I don't think so.
18  BY MR. STUEVE:
19      Q.   You don't remember looking at the
20  earlier documents concerning that policy?
21      A.   I remember looking at earlier
22  documents, but not in that context the way

498

1   you're saying that.
2       Q.   Well, when you became UEP
3   certified did you stop purchasing noncertified
4   eggs for your facilities?
5       A.   I think we have always bought
6   some, but not very many.
7       Q.   And you understood that UEP
8   companies that were UEP certified had agreed to
9   not purchase noncertified eggs; correct?
10      MS. LEVINE:  Objection.
11      THE WITNESS:  Restate your
12  question.
13      MR. STUEVE:  Can you read it back
14  for me.
15      (The record was read as
16  requested.)
17      THE WITNESS:  I'm having
18  difficulty.
19      MS. LEVINE:  Objection.
20      THE WITNESS:  I don't recall
21  exactly what -- I read this one document and it
22  says in there it says 95 percent or made some

499

1   suggestion and then you're saying 100 percent.
2   BY MR. STUEVE:
3       Q.   Let's look down here at the bottom
4   of the page here.  Gene Gregory states the last
5   sentence here, "we are fortunate" -- on the
6   first page, right at the bottom the very last
7   sentence.  Are you there where it says, "we are
8   fortunate."
9       A.   Yeah.
10      Q.   It says, "we are fortunate that
11  most UEP certified companies have already made a
12  company policy to not purchase any noncertified
13  eggs."  Do you see that?
14      A.   Yes.
15      Q.   That was a policy of Rose Acre;
16  was it not?
17      A.   Yes and no.
18      Q.   Okay.  Did you try to comply with
19  that policy?
20      A.   We tried, but there's times we
21  weren't able to.
22      Q.   You were aware other UEP certified

500

1   companies had committed to that same policy;
2   correct, sir?
3       MS. LEVINE:  Objection.
4       THE WITNESS:  I'm not aware of
5   what they committed.  I think some did.
6   BY MR. STUEVE:
7       Q.   Well, in fact, Gene Gregory was
8   confirming that to you in his communication to
9   you; right?
10      MS. LEVINE:  Objection.
11      THE WITNESS:  Yes.
12  BY MR. STUEVE:
13      Q.   Now, let me show you -- your
14  efforts to prevent Michael Foods from getting an
15  exception to the 100 percent rule was not
16  adopted; correct?
17      A.   Correct.
18      Q.   And they were allowed to join the
19  UEP certified program under a phase-in program;
20  correct?
21      A.   Correct.
22      Q.   All right.  And even under a

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

---

501

1  phase-in program, because they were such a large
2  company, that would require that all of the eggs
3  that they eventually purchased to be UEP
4  certified; right?
5       A.   What are you referring to with
6  right?
7       Q.   So you understood that the
8  phase-in for Michael Foods was that over a
9  period of years they ultimately would have to
10  get in compliance with the 100 percent rule,
11  which is all the eggs they purchased or produced
12  had to be UEP certified; right?
13       MS. LEVINE:  Objection.
14       THE WITNESS:  I hate to ask this
15  again, but I can't remember the first part of
16  the question that you just --
17       MR. STUEVE:  Why don't you read
18  back the question.
19       (The record was read as
20  requested.)
21       MS. LEVINE:  Objection.
22       THE WITNESS:  I don't think that's

---

503

1  would have an immediate effect on the price of
2  the eggs.  I don't know what you're -- I don't
3  understand what you're asking there.
4  BY MR. STUEVE:
5       Q.   Let me show you a document that
6  you prepared at the time.
7       A.   Okay.
8       Q.   Rust 548, RAUPDATE 0034691.
9       (Rust Exhibit Number 548 was
10  marked for identification.)
11  BY MR. STUEVE:
12       Q.   Do you see here the e-mail is the
13  middle from you to Brad Ginnane.  Who is Brad
14  Ginnane?
15       A.   He's our dried egg product sales
16  manager.
17       Q.   It says, "Brad, Michael just
18  announced they're going into the ACC program."
19  That's the UEP certified program; right?
20       A.   Correct.
21       Q.   "That alone will cause market to
22  go up.  Unsold and unpriced rights will be

---

502

1  correct.  I don't think that's what took place.
2  I think that's what I may have wished.
3  BY MR. STUEVE:
4       Q.   That's what you wanted; correct?
5       A.   I wanted all producers to have the
6  100 percent rule, that they didn't go out and
7  endorse -- I wanted everybody to treat all their
8  chickens the same, animal welfare.  That's what
9  we were in the program for, animal welfare.
10  BY MR. STUEVE:
11       Q.   Well, that included that they had
12  to comply with the cage space requirements;
13  right?
14       A.   Yes.
15       Q.   Now, you knew that when Michael
16  Foods joined the UEP certified program that
17  because of the cage space requirements that
18  would have an immediate boost in the price of
19  eggs; correct?
20       MR. BARNES:  Object to the form of
21  that question.
22       THE WITNESS:  I don't know how it

---

504

1  excellent property."  Do you see that?
2       A.   Yes.
3       Q.   And the reason why you believed
4  egg prices would immediately jump was because in
5  order for them to comply with the cage case
6  requirements that would reduce the egg supply
7  and boost the prices; correct, sir?
8       A.   No.
9       Q.   What are you referring to there?
10       A.   Egg whites is something you dried
11  and produce over the summer months, you buy at
12  low prices.
13       Q.   Uh-huh.
14       A.   Over the summer months you can
15  store egg whites for up to a year, year and a
16  half and even longer, I think.  And egg whites
17  eventually when the ACC program, if you look at
18  the step down effect, was going into the fall of
19  the year, the egg white powder will go up.  It's
20  not immediate.  It's going to be five to
21  six months from now.
22       Q.   Right.  But what you were saying

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

35 (Pages 505 to 508)

---

505

1  was that because they were joining the ACC
2  program, which had the cage space requirements
3  that they now had to comply with, that that
4  would result in higher prices; correct, sir?
5              MR. BARNES:  Objection to form.
6              THE WITNESS:  If you look right
7  here it says he replied back -- that's what I
8  thought, but he replied back and said the
9  inventory went up 5 percent in May, which means
10 more powder --
11 BY MR. STUEVE:
12     Q.   No.  You got the e-mail string
13 wrong.  He wrote you first, then you wrote.
14 What you were saying in there is that because
15 Michael Foods was joining the certified program
16 with its cage space requirements, that would
17 cause the market to go up; correct?
18             MR. BARNES:  Objection to form.
19             THE WITNESS:  What I printed there
20 is what I felt at the time, I guess.
21             (Rust Exhibit Number 549 was
22 marked for identification.)

---

506

1  BY MR. STUEVE:
2      Q.   Show you what's been marked as
3  Exhibit 549.  It's RAUPDATE 0039139.
4              It's Exhibit 549; is that right,
5  sir?
6      A.   Yes.
7      Q.   If you would the bottom half, I've
8  got a question for you.
9      A.   Let me read it.
10     Q.   Okay.
11     A.   Okay.
12     Q.   Do you see in that e-mail there
13 from you to Gene Gregory you use the term
14 "artificially high shell egg market"?  It says,
15 "creating a artificial high shell egg market."
16 Third sentence?
17     A.   Yes.
18     Q.   All right.  And what you mean by,
19 "creating a artificial high shell egg market,
20 that's the result of the supply management
21 programs implemented by UEP, specifically flock
22 reductions, early molts, and early sales or

---

507

1  early kills;" right?
2              MR. BARNES:  Object to form.
3              THE WITNESS:  Let me read this.
4      I state in here, "the shell egg
5  industry can not go into retreat with flock
6  reductions, early molts, and early sales.  This
7  only raises the shell egg industry's actual cost
8  of production, which then increases the
9  opportunities for the low cost in line liquid
10 providers.  By creating an artificial high shell
11 egg market it enhances their costs -- their sale
12 of the cost plus as a reason to enter into a
13 contract for a cost plus."
14 BY MR. STUEVE:
15     Q.   So when you're saying by creating
16 an artificial high shell egg market, you're
17 referring to the implementation by UEP of the
18 flock reduction, early molts and early kill
19 programs that we've seen; correct, sir?
20     **A.   I don't think.  So what I'm saying**
21 **there -- let me think here.  I've got to**
22 **remember the context and what I wrote it.  You**

---

508

1  **have to understand, I was always against the**
2  **early molts, the flock reductions and the early**
3  **sales and that's what I stated.**
4      Q.   The reason why you were against
5  those is because it created an artificially high
6  shell egg market; correct, sir?
7      **A.   On the large.**
8      Q.   Talking about large eggs?
9      **A.   Well, what happens is when people**
10 **start --**
11     Q.   Would you answer my question?  Are
12 you talking about large eggs when you say the
13 large?
14     **A.   Consumers want to buy large eggs.**
15 **All recipes call for large.  When you're**
16 **producing shell eggs you end up with the large**
17 **egg always sells at a premium to all the other**
18 **sizes of eggs.**
19     Q.   What you were communicating to
20 Gene is that you believed that the flock
21 reductions, early molts and early kills that
22 were coordinated by UEP created an artificially

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

---

509

1 high shell egg market; correct, sir?
2     **A.  I was saying the shell egg**
3 **industry could not go into retreat.**
4     Q.  Right.  What I'm saying, though,
5 is what was creating an artificially high shell
6 egg market was the flock reductions, early
7 molts, and early kills coordinated by the UEP;
8 correct, sir?
9     MR. BARNES:  Object to the form.
10     THE WITNESS:  You're adding words
11 into it.  That's not in there, what I stated.
12 BY MR. STUEVE:
13     Q.  I'm just asking you to confirm
14 what you were communicating to Gene Gregory?
15     **A.  What I wrote there is what I**
16 **wrote.**
17     Q.  And what you believed was that
18 UEP's efforts to coordinate flock reductions,
19 early molts, and early kills resulted in
20 artificially high shell egg market; correct,
21 sir?
22     MR. BARNES:  Object to form.

---

510

1 That's not what it says.
2     THE WITNESS:  What I was stating
3 there, when they go into those retreats it
4 raises the shell egg industry's actual cost.
5 When you raise the actual cost the price is
6 going to go up because you've raised the cost.
7 It don't mean your profits are going up.
8 BY MR. STUEVE:
9     Q.  And you believed that increase in
10 price was artificial; correct?
11     **A.  Somewhat.**
12     MR. STUEVE:  This is a good
13 breaking point right here.
14     MR. BARNES:  Fine.
15     THE VIDEOGRAPHER:  This is the end
16 of videotape number two.  Off the record at
17 12:17 p.m.
18     (Whereupon, at 12:17 p.m., a lunch
19 recess was taken.)
20
21
22

---

511

1     AFTERNOON SESSION
2     (1:23 p.m.)
3     THE VIDEOGRAPHER:  This is the
4 combining of videotape number three.  Back on
5 the record at 1:23 p.m.
6     MR. STUEVE:  Okay.  We are back on
7 the record.
8 BY MR. STUEVE:
9     Q.  I put in front of you a bent
10 computer, which is mine.  What we would what
11 we've done and we will mark it as an exhibit,
12 but we have found, I believe, the video that you
13 were referring to in yesterday's testimony.
14 Could you hit play?
15     MR. BARNES:  Let's see what we've
16 got here.  We want to see the video.
17 BY MR. STUEVE:
18     Q.  That's fine.  What I'm saying is
19 you can see it at an angle.
20     MR. BARNES:  Go ahead.
21     You've got to see it.
22 BY MR. STUEVE:

---

512

1     Q.  Are you ready?  Can you hit play?
2     **A.  Yeah.  Is there supposed to be**
3 **noise?**
4     MR. BARNES:  There's no sound.
5     MR. HICKEY:  There should be
6 sound.
7     MR. STUEVE:  Okay.  Maybe the
8 volume -- okay.  Maybe it's muted on here.  Here
9 we go.  Okay.  So let's go back.  Ready.  Now
10 let's try it with sound.
11     (Video being played for the
12 witness.)
13     MR. BARNES:  Back on the record.
14 Mr. Stueve has just shown the witness on his
15 computer a video.
16     MR. STUEVE:  Hold on.  I haven't
17 asked him a question yet.
18     MR. BARNES:  It doesn't matter.
19 I'm objecting to the use of the video on
20 numerous grounds.
21     MR. STUEVE:  Let me ask him a
22 question about it, then you can object to my

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

37 (Pages 513 to 516)

---

513

1   question.
2           MR. BARNES:  Well, I'm objecting
3   to not only your question.
4           MR. STUEVE:  Once you get your
5   objection out I'm going to ask him a question.
6   You can have a continuing objection to it.  I
7   don't want you to restate your objection again.
8           MR. BARNES:  I would like the
9   record to reflect a continuing objection with
10  the agreement of counsel to any further use or
11  interrogation of this witness or any other
12  witness by use of this video.  There are
13  numerous documented instances where videos of
14  this nature were staged, were put on by animal
15  rights activists and are not accurate.  There
16  have been documented instances where egg farmers
17  and other producers have been subject to these
18  false representations and false videos by
19  various radical animal rights groups.
20          Until this video is authenticated
21  and is shown to have anything to do with the
22  operations of my client, Rose Acre Farms, I'm

---

514

1   going to object to its use or introduction in
2   this case.
3           Mr. Stueve, you can go ahead and
4   ask your questions.
5           (Rust Exhibit Number 550 was
6   marked for identification.)
7   BY MR. STUEVE:
8       Q.   Thank you.
9           Mr. Rust, you did just witness the
10  video that was prepared by the Humane Society;
11  is that correct?
12      A.   Yes.
13      Q.   And was that the video that you
14  were referring to in your earlier deposition
15  testimony?
16      A.   I'm not sure about that.
17      Q.   Does it appear to be?
18          MR. BARNES:  Object to the form.
19  Asked and answered.
20          THE WITNESS:  The video that I was
21  referring to was the one that was showed on the
22  news channel at night and it wasn't that long.

---

515

1   BY MR. STUEVE:
2       Q.   Was a portion of what appeared on
3   the news channel appear in this Human Society
4   video?
5       A.   A portion appeared from what I
6   recollect --
7           MR. STUEVE:  And I just want to
8   mark for the record, can you confirm Exhibit 550
9   is the flash drive that we had plugged into the
10  computer you were watching?
11          THE WITNESS:  Yes.  I recognize
12  the water system on there that was not ours in
13  the laying hen cages, that's how I was able to
14  recognize it was not ours.
15  BY MR. STUEVE:
16      Q.   I'm asking you, the question has
17  to do with 550.  Can you confirm that this flash
18  drive was in the computer and that's what
19  contained the Humane Society video that we
20  played for you?
21      A.   It contains the video of what I
22  refer to as the water system that was not our

---

516

1   system.
2       Q.   That's not my question.  You just
3   saw a videotape; is that correct?
4       A.   I just saw a videotape of a system
5   that was not ours.
6       Q.   Sir, if you'll answer my question.
7   I'm not asking you about whether or not any
8   portion of that was your facility or not.  What
9   I'm asking you is you saw a Humane Society
10  videotape; is that correct?
11      A.   It is not of our facility.
12          MR. STUEVE:  Sir, I'm going to
13  note for the record the witness has not answered
14  my question.  This is taking a significant
15  amount of my time in two days.  If I don't get
16  done with my deposition today I reserve the
17  right to go back to the court and ask for more
18  time.
19          I'm going to ask you one more
20  time.  I'm trying to lay foundation for what's
21  on this flash driver.  Can you confirm for me
22  that we just showed a videotape that started off

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                March 6, 2014

38 (Pages 517 to 520)

---

517

1    with Humane Society; is that correct, sir?
2            THE WITNESS:  Yes.
3    BY MR. STUEVE:
4        Q.    And that came from, as far as you
5    could tell, a flash drive that was plugged into
6    a computer that was in front of you; is that
7    correct?
8        A.    Correct.
9        Q.    And that flash drive is marked as
10   Exhibit 550; is that correct?
11       A.    Correct.
12           MR. BARNES:  I'm making a further
13   objection.  You cut the witnesses off -- cut the
14   witness's answer off, Mr. Stueve, when he tried
15   to tell you that the situation depicted in that
16   video was not a picture of any Rose Acre Farm
17   operation.  You cut him off.  I think he's
18   entitled to state that for the record.  I have
19   think the jury is entitled to know that.  I know
20   you don't want to deceive the jury.
21           (Rust Exhibit Number 551 was
22   marked for identification.)

---

518

1    BY MR. STUEVE:
2        Q.    Sir, if you could identify what's
3    been marked as Exhibit 551 for me.  There's no
4    Bates range on this.
5        A.    Yes.
6        Q.    Have you seen this document
7    before?
8            MR. BARNES:  Counsel, could you
9    identify the source of this document?  It does
10   not appear to have been produced in this case.
11           MR. STUEVE:  Can you read the
12   question --
13           MR. BARNES:  Did you hear my
14   request?
15           MR. STUEVE:  I'm not going to
16   answer that.
17           MR. BARNES:  You're not going to
18   tell us where this document came from?
19           MR. STUEVE:  No.
20           MR. BARNES:  Then I object to any
21   further use of the document.
22           MR. STUEVE:  Can you read my

---

519

1    question back, please.
2            (The record was read as
3    requested.)
4            THE WITNESS:  No.
5            MR. BARNES:  Move to strike the
6    document.
7            (Rust Exhibit Number 552 was
8    marked for identification.)
9    BY MR. STUEVE:
10       Q.    Show you what's been marked as
11   Exhibit 552 -- I'm sorry.  Can you give me that
12   document back, please?  I gave you a highlighted
13   version and I want a clean version in front of
14   you.
15           MR. BARNES:  Is this still 552?
16           MR. STUEVE:  Yes.  It's still 552.
17   BY MR. STUEVE:
18       Q.    Let me show you what's marked 552,
19   it's an article that appeared in the Agra News
20   dated March 15, 2013.  Do you remember reviewing
21   this video -- or this article?
22           MS. LEVINE:  Could we get the

---

520

1    Bates number?
2            MR. STUEVE:  There is no Bates
3    number.
4            MR. MONICA:  Counsel, you are
5    presenting him documents your side has not
6    produced.  We would request you give us all
7    documents we previously asked for.  For the last
8    three years we've asked for documents and you
9    have not produced them.  Now you're taking them
10   and sticking them in front of the witness
11   without producing them in this case.
12   BY MR. STUEVE:
13       Q.    Mr. Rust, have you seen this
14   article before?
15       A.    I'm still reading it.
16       Q.    Okay.
17           MR. BARNES:  I object to this
18   document on the basis of authenticity.
19           MR. STUEVE:  Remember, counsel,
20   you reserved all your objections besides form.
21           MR. BARNES:  I just want to make
22   sure I don't forget this one.

---

# HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                               March 6, 2014

---

521

1     Counsel, do you have any more
2  documents you're going to use that you did not
3  produce in this litigation in accordance with
4  the rules applicable to discovery in the State
5  of Kansas?  Do you have any more of those you
6  haven't produced that are in the files and
7  records of your client?
8  BY MR. STUEVE:
9     Q.  Sir, are you familiar with that
10  article?
11     **A.  No.**
12     Q.  Okay.  If you would, on the first
13  page about halfway down it has the paragraph
14  that starts with the video.  It says, "the
15  video, a few minutes long, clip edited according
16  to Joe Miller, general counsel for Rose Acre
17  Farms, from six hours of tape shot at two
18  separate Iowa egg facilities was released in
19  April 2010, months after Carlson worked at the
20  Winterset farm.  He worked there a total of
21  13 days in February of 2010."
22     Did you see that in the article?

---

522

1     **A.  Yes.**
2     Q.  All right.  Were you aware that an
3  employee of Rose Acre that worked at their
4  Winterset farm had six hours of tape shot at two
5  separate Iowa egg facilities?
6     MR. BARNES:  Object to form.
7     THE WITNESS:  I only knew what was
8  said later.
9  BY MR. STUEVE:
10     Q.  So were you aware that your
11  general counsel was quoted in the paper as
12  saying that there was some six hours of tape
13  shot at two separate Iowa egg facilities?
14     MR. BARNES:  Objection.  Form.
15     THE WITNESS:  I know it now from
16  reading this.
17  BY MR. STUEVE:
18     Q.  Have you seen six hours of
19  videotape shot at two --
20     **A.  I have never seen six hours of**
21  **video shot at --**
22     Q.  Do you know what the basis of

---

523

1  general counsel for Rose Acre Farms statement
2  was that there was six hours of tape shot?
3     MR. BARNES:  Objection to the form
4  of the question.  Speculation.  Assumes fact not
5  in evidence.
6  BY MR. STUEVE:
7     Q.  I'm sorry.  Your counsel was
8  objecting.
9     **A.  I have no idea.**
10     Q.  Do you remember talking with your
11  general counsel about six hours of tape shot at
12  two facilities?
13     **A.  Could have.  I have no**
14  **recollection of it.**
15     Q.  This article appeared last year in
16  March of 2013; right?
17     **A.  That's what it says here.**
18     Q.  Okay.  But you on behalf of Rose
19  Acre are not aware of six house of videotape
20  that may be in Rose Acre's possession
21  concerning -- that was supposedly taken by this
22  former employee?

---

524

1     MR. BARNES:  Object to the form.
2     THE WITNESS:  I have never seen
3  it.
4  BY MR. STUEVE:
5     Q.  All right.  Now, let's -- that's
6  all on that document.  Thank you.
7     **A.  Can I talk to counsel here a**
8  **second?**
9     MR. BARNES:  Witness would like to
10  consult with counsel, sir.  You don't have a
11  question pending, so we're going to take a short
12  break.
13     THE VIDEOGRAPHER:  Off the record
14  at 1:39 p.m.
15     (Counsel confers with the witness
16  off the record.)
17     THE VIDEOGRAPHER:  Back on the
18  record at 1:42 p.m.
19  BY MR. STUEVE:
20     Q.  Let me show you what's been marked
21  as Exhibit 553.
22     (Rust Exhibit Number 553 was

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                                  March 6, 2014

---

525

1  marked for identification.)
2  BY MR. STUEVE:
3       Q.   If you look at the bottom of this
4  e-mail dated January 17, 2007, it's from Tony
5  Wesner to you; correct?
6       A.   Yes.
7       Q.   And it's -- he's asking, "why did
8  UEP vote in 25 parts per million for the
9  certified program." Do you see that?
10      A.   Yes.
11      Q.   Do you remember when that was
12 approved by UEP?
13      A.   I don't recollect exactly when it
14 took place.
15      Q.   Does that sound about right,
16 though, January 2007?
17      A.   Could have been.
18      Q.   Up at the top it says, "we cannot
19 meet 25 ppm in our houses." Do you see that?
20      A.   Correct.
21      Q.   And is that one of the
22 requirements that Rose Acre has determined it

---

526

1  will not comply with?
2       A.   During the winter months we cannot
3  comply with that at given times at certain
4  temperatures.
5       Q.   And has Moark lost its -- excuse
6  me. Has Rose Acre lost its certified status as
7  a result of not complying with the ammonia
8  requirements?
9       A.   No.
10      Q.   What's that? I'm sorry. You're
11 right. Thank you, David.
12          Show you what's been marked as
13 Exhibit 554 and it's RAFK 0001474 through 75.
14          (Rust Exhibit Number 554 was
15 marked for identification.)
16 BY MR. STUEVE:
17      Q.   I'll just direct your attention to
18 what I'm going to ask you about. It's down at
19 the bottom.
20          MR. BARNES: Excuse me, counsel,
21 can you give us a chance to look at the exhibit.
22 BY MR. STUEVE:

---

527

1       Q.   That's fine. I'm just going to
2  direct you to what I'm going to ask about,
3  Mr. Rust, down at that lower on the bottom of
4  1474 in that e-mail, about halfway down it says,
5  "did you know we reduced the output potential of
6  our farms by 25 to 30 percent with the cage
7  space increases to try and make a viable
8  program."
9       A.   Let me read this. I'm not sure.
10      Q.   Okay. Do you see that reference
11 there?
12      A.   Which reference?
13      Q.   That I just read to you?
14      A.   I'm still reading.
15      Q.   It's about halfway down the
16 paragraph at the bottom there of the first page.
17      A.   Let me finish reading it. Okay.
18 Now what are you asking.
19      Q.   About halfway down on the first
20 page of the e-mail that's dated June 21, 2011,
21 from you it says, "did you know we reduced the
22 output potential of our farms by 25 to

---

528

1  30 percent with the cage space increase." Do
2  you see that?
3       A.   Yes. I see that.
4       Q.   And that was a statement that you
5  made in June of 2011; correct?
6       A.   That was a question.
7       Q.   It says -- the question was, "did
8  you know we reduced the output potential of our
9  farms by 25 to 30 percent with cage space
10 increases," that was your statement; right?
11      A.   At some we did, at some we didn't.
12      Q.   Sir, if you could just confirm it
13 was your statement?
14      A.   Our records will show what we did.
15      Q.   Sir, if you can just confirm what
16 you put in your e-mail in June 21st of 2011 you
17 stated, "we reduced the output potential of our
18 farms by 25 to 30 percent with the cage space
19 increase." That's what you said; correct?
20      A.   Yeah, but we increased our bird
21 numbers every year, sir.
22      Q.   That's not my question. I'm going

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                           March 6, 2014

41 (Pages 529 to 532)

---

529

1  to ask you to read back my question.
2       A.   That's what it says, but that's --
3  you're taking it out of context again.
4       (The record was read as
5  requested.)
6            MR. BARNES:  Objection.
7            THE WITNESS:  To try and make a
8  viable program.
9            (Rust Exhibit Number 555 was
10 marked for identification.)
11 BY MR. STUEVE:
12      Q.   Show you what's been marked AS
13 Rust 555, Bates range RAFKS 0007213.
14           I want to direct your attention to
15 the last sentence of your -- it's the middle
16 e-mail there?
17      A.   I haven't read it yet.  Okay.
18 What about it?
19      Q.   I want to ask you simply about
20 your -- first of all, do you recall preparing
21 this e-mail?
22      A.   I don't recall preparing it, but I

---

530

1  remember having wrote it after reading it.
2       Q.   Okay.  And if you would, I direct
3  your attention to the last sentence of your
4  February 15, 2012 e-mail timed at 4:21 p.m., so
5  it's in the middle of the document.  The last
6  sentence there that says, "if you ask consumers
7  today which egg they prefer, one-third to
8  two-thirds will say cage free, but 90 percent of
9  them will buy the cheaper."  Do you see that?
10      A.   Correct.
11      Q.   Now, was that based on your
12 experience?
13      A.   Correct and it's still the
14 national experience.
15      Q.   That consumers are still sensitive
16 to price?
17      A.   When you go and look at something
18 you usually buy what's cheaper if you think it's
19 the same thing.
20      Q.   And that's been your experience
21 with respect to eggs; is that right?
22      A.   For the most part, but it's been

---

531

1  changing.
2       Q.   And that's what you were
3  reflecting in February 2012 in that e-mail; is
4  that correct?
5       A.   Yes.
6            (Rust Exhibit Number 556 was
7  marked for identification.)
8  BY MR. STUEVE:
9       Q.   Show you what's been marked 556,
10 it's RAFKS 0009116 through 919.
11           I just have a question about the
12 first paragraph there.
13      A.   This is marked highly
14 confidential.
15      Q.   It's actually produced by your
16 company.
17      A.   Okay.  That means I can.
18           MR. BARNES:  Correct.
19 BY MR. STUEVE:
20      Q.   In the first paragraph --
21      A.   I'm still reading, sir.
22      Q.   Have you finished the first

---

532

1  paragraph, because that's what my question is
2  about?
3       A.   No.
4            MR. BARNES:  Mr. Stueve, the
5  witness is entitled to look at the entire
6  document if he wants to, I would assume.
7            THE WITNESS:  I got to start over
8  now.
9  BY MR. STUEVE:
10      Q.   That's fine.  Take your time.
11 We're not going to get done with your depo and
12 I'll go back to the court.
13      A.   Okay.  I read the paragraph.
14      Q.   It says, the title is Rose Acre
15 Farms Versus Competition With Issues?
16      A.   Yes.
17      Q.   Do you see that?
18      A.   Yes.
19      Q.   Who prepared this?
20      A.   I did.
21      Q.   All right.  It says -- by the way,
22 do you remember when you prepared it?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                         March 6, 2014

42 (Pages 533 to 536)

---

533

1    A.    Not exactly.  Sometime after the
2  warning letters.
3    Q.    Okay.  And it says, "today in the
4  egg industry we have two types of producers,
5  those with warning letters those without."  Did
6  I read that correctly?
7    A.    Yes.
8    Q.    And those with warning letters
9  would include Rose Acre; is that right?
10   A.    Correct.
11   Q.    Who else were you aware of that
12 had warning letters?
13   A.    Sparboe, DeCoster, Forsman Farms,
14 I think Midwest Poultry.  Probably a dozen.  I
15 can't rattle off who they were.
16   Q.    And how did you become aware that
17 your competitors also had warning letters?
18   A.    There's an FDA registry that they
19 post the letters.
20   Q.    Okay.  It says, "our level of SE,"
21 is that salmonella?
22   A.    Yes.

---

534

1    Q.    It says, "our level of salmonella
2  positive has run higher than most of our bigger
3  competitors from the numbers generated by FDA."
4  Did I read that correctly?
5    A.    Yes.
6    Q.    And what numbers generated by FDA
7  are you referring to?
8    A.    One of the meetings, I forget
9  which one, they posted what they found at the
10 given farm levels and our level of incidents was
11 higher than some of the other people's.
12   Q.    And you indicated you wrote this
13 document after you had received warning letters
14 from the FDA; is that correct?
15   A.    Correct.
16   Q.    And how many warning letters had
17 you received?
18   A.    Just one.
19   Q.    Okay.  And but you indicated in
20 here, "this means they will be back and in full
21 force once they have all their budgets in
22 place;" is that correct?

---

535

1    A.    Yes.
2    Q.    So you were anticipating that once
3  the FDA was in full force and have all their
4  budgets in place that you may very well get
5  another warning letter; is that correct.
6         MR. BARNES:  Object to the form.
7         THE WITNESS:  Anything is
8  possible.
9  BY MR. STUEVE:
10   Q.    "This means that they will be back
11 and in full force once they have all their
12 budgets in place.  We are in the Midwest market
13 area with the most discounts before the SE rule
14 and the most displaced eggs since the Sparboe,
15 White County and -- warning letters."  Did I
16 read that correctly?
17   A.    Yes.
18   Q.    It says, "we were identified as
19 having the worst rodent control issues."  What
20 were you referring to there as we were
21 identified as having the worst rodent control
22 issues?

---

536

1    A.    We had the highest mouse count and
2  the investigator when they come to the farm they
3  took KY's -- KY has instigated a policy that if
4  you have a rodent level above their minimum
5  standard that they would come back in and do a
6  night inspection visit nightly.  And that person
7  would take a flashlight and walk up and down the
8  rows of the chicken house and look for rodents
9  and count them.  Then they would make a tally
10 sheet up and write how many they counted and
11 then they had to do it the next night, the next
12 night, the next night, the next night.
13        When FDA came in they took the
14 entire tally sheet numbers that the people had
15 wrote down as having seen.  Didn't say, you
16 know, it's no idea if they saw the same one the
17 night before or the night after.  They took that
18 entire tally sheet, added them up and said
19 that's how many mouse were reported.
20   Q.    And when you were referring we
21 were identified as having the worst rodent
22 control issues, where were you identified as

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

43 (Pages 537 to 540)

537

1  having the worst rodent control issues?
2      A.   At White County.
3      Q.   Was that on a website?  How were
4  you identified as having the worst rodent
5  control issues?
6      A.   Let me think.  We, if you look at
7  all -- FDA when they come in and do a report of
8  a farm they have what they call a 483, okay.  On
9  the 483 form they wrote us down for having a
10 higher count than any of the other farms as
11 reported, but what they accused us of was hiding
12 all the mice because they had six inspectors at
13 the farm for five days or six days and they
14 observed one of the least mice counts at the
15 farm that they had seen.  So what had happened,
16 their investigators used the report that was
17 generated by the mouse control program we had,
18 which only identified at night what they saw and
19 counted them.
20         MR. STUEVE:  I move to strike the
21 answer as nonresponsive.
22 BY MR. STUEVE:

538

1      Q.   What I'm trying to ask you is,
2  when we state we were identified as having the
3  worst rodent control issues, was that posted on
4  an FDA site that customers would have access to?
5      A.   I identified that by what I had
6  read of the other farm's 483s.
7      Q.   You go on to say, "this has not
8  set well with customers."  How would customers
9  know that Rose Acre had been identified as
10 having the worst rodent control issues?
11     A.   There were no other 483s or
12 warning letters that listed the amount of mice
13 that had been identified at our farm.
14     Q.   Sir, how would customers know?
15     A.   Public record.
16     Q.   So your customers could go to an
17 FDA website?
18     A.   As far as I know.
19     Q.   And they would see that you had
20 been written up by the FDA?
21     A.   That warning letter -- it states
22 there's no other warning letter that has that

539

1  amount of mice listed on it.
2      Q.   Okay.  And so -- and, in fact,
3  customers found out about this; is that right?
4      A.   Correct.
5      Q.   And how did you find out about the
6  fact that this did not set well with customers?
7      A.   We were black listed by a customer
8  and taken off the approved supplier list.
9      Q.   Who was that?
10     A.   The one that went out of business
11 in Chicago, KKR.  They went bankrupt or
12 something.  Shut down.
13     Q.   Was it a large grocery chain?
14     A.   A big grocery chain.  Dominick's.
15     Q.   Dominick's.  Okay.  And you said
16 this does not set well with our customers.  What
17 other customers brought it to your attention?
18     A.   Multiple QC departments.  We had
19 several customers that we could not ship eggs to
20 them from that facility.
21     Q.   And what were those customers?
22     A.   I don't recall offhand which ones

540

1  it was, but it was Dutch Farms, maybe.  There
2  were two or three -- four or five.  I'm not sure
3  how many.
4      Q.   You say, "we are still on black
5  list by some;" correct?
6      A.   Correct.
7      Q.   "And we have lost a couple cents
8  per dozen in selling price because of warning
9  letters given to us here in the Midwest"?
10     A.   Correct.
11     Q.   And when you say you've lost a
12 couple cents per dozen, how did that happen?
13     A.   We -- when you have a 1.5 million
14 bird farm and the people who -- all those eggs
15 at White County were being sold to a company
16 called Dutch Farms, the day we got
17 the notice letter we took all the eggs from that
18 farm and hauled them to our Pulaski County
19 grading facility and started breaking all those
20 and pasturized them so we could not be sued or
21 said we were sold adulterated egg products.  The
22 top of the warning letter states right in there

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

44 (Pages 541 to 544)

---

541

1  that you are notified that you may be selling
2  adulterated food products.
3         Q.   So that's how you loss cents per
4  dozen, because you couldn't sell it to Dutch
5  Farms you had to use it in your breaking
6  facility?
7         A.   Had to use it in breaking.
8         Q.   Now, did this result in you losing
9  your UEP certified -- UEP certification status?
10        A.   At that location?
11        Q.   Yeah.
12        A.   No.
13        Q.   If you could turn to the second
14  page of the document at the top.  You say, "Rose
15  Acre and Sparboe Family Farms are the only top
16  ten remaining with warning letters."  Do you see
17  that?
18        A.   Yes.
19        Q.   And what you mean by top ten?  Is
20  the top ten egg producers?
21        A.   Yes.
22        Q.   All right.  It says, "-- shipped

---

543

1         Q.   If you would, could you just
2  answer my question.  Under the UEP certified egg
3  program high-rise houses are not prohibited; is
4  that correct, sir?
5         A.   They don't prohibit any kind of
6  housing.
7         (Rust Exhibit Number 557 was
8  marked for identification.)
9  BY MR. STUEVE:
10        Q.   Show you what's been marked as 557
11  and can you confirm for me that that's the
12  warning letter from the FDA that you've been
13  testifying about?
14        A.   Yes.
15        Q.   And would this then be available
16  for your customers to review; is that correct?
17        A.   Correct.
18        MR. BARNES:  I'm going to make
19  another objection here, Mr. Stueve.  This is
20  another document which you have not previously
21  produced to us.  It obviously came from your
22  files.  I just ask if there are any more of

---

542

1  eggs he knew were positive.  People got sick.
2  We will be the number one target of FDA."  Did I
3  read that correctly?
4         A.   Yes.
5         Q.   "Count on it.  We are, as they see
6  it, big and rich"?
7         A.   Yes.
8         Q.   Okay.  Then it goes on to say, "we
9  have about 85 percent high-rise, which FDA views
10  as highest risk."  Do you see that?
11        A.   Yes.
12        Q.   What did you mean by that?
13        A.   A high-rise chicken house, FDA
14  looks at as the highest risk type of facility
15  for salmonella, SE in eggs.
16        Q.   Yet the UEP certified program did
17  not preclude high-rise egg -- chicken houses;
18  correct?
19        A.   You precluded high-rise chicken
20  houses at the onset of the program you would
21  have eliminated overnight 65 percent of the egg
22  production in the United States.

---

544

1  these you can give us before this deposition --
2         MR. STUEVE:  I have to chuckle
3  because we had to go to a public site to get
4  this warning letter because Rose Acre didn't
5  produce it.
6         MR. MONICA:  You didn't ask for
7  it.
8         MR. STUEVE:  Oh, yes we did.
9         MR. MONICA:  No.  You didn't.  Go
10  back and look.
11        MR. STUEVE:  I just want to make
12  sure that's your position.  The reason why you
13  didn't produce the FDA warning letter is because
14  we didn't ask for it?  Is that your position?  I
15  believe you just said.
16        MR. BARNES:  Just go ahead.
17        MR. STUEVE:  Did I understand you
18  right, counsel?
19        MR. BARNES:  Continue your
20  examination, Pat.  It's getting late.  I'm
21  getting tired.
22        MR. STUEVE:  You started it.  I

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

45 (Pages 545 to 548)

---

545

1  thought I had to respond.
2         MR. BARNES: I understand. I
3  understand.
4         THE WITNESS: This was just
5  printed because it's got the closeout letter
6  that only come two weeks ago, list at the
7  bottom, at the back.
8         MR. BARNES: Where is that?
9         THE WITNESS: Back page here.
10        MR. BARNES: Oh. I see. I see.
11 I see.
12        (Rust Exhibit Number 558 was
13 marked for identification.)
14 BY MR. STUEVE:
15        Q.   Let me show you what's been marked
16 as Rust Exhibit 558, RAUPDATE 0039242 through
17 44.
18        I've got one there. Let me find
19 this and I'll give you this other one.
20        MR. BARNES: All right.
21        THE WITNESS: I need to read all
22 this or?

---

546

1  BY MR. STUEVE:
2         Q.   No. I just have some specific
3  questions. First, up at the top of the exhibit
4  it's an e-mail from you to Gene Gregory. Can
5  you read that?
6         A.   All right. Okay.
7         Q.   You state in this e-mail about
8  halfway through that, "I've always been
9  disgusted with USEM efforts to market surplus
10 overseas. This has never sat well with some
11 folks, nor the producers in the countries that
12 we dumped into." Do you see that?
13        A.   Yes.
14        Q.   And you're referring to the USEM
15 exports; correct, sir?
16        A.   Correct.
17        Q.   And this is October 2006; is that
18 right?
19        A.   Yes.
20        Q.   And you joined USEM in 2006;
21 right?
22        A.   Sometime in that time period.

---

547

1         Q.   And, in fact, participated in USEM
2  exports for several years thereafter; correct,
3  sir?
4         A.   What dates did we start
5  participating? I think it was December, right
6  after this.
7         Q.   Now, if you would, down at the
8  bottom it just -- the first sentence there you
9  state, "Gene," down here from Marcus, "Gene,
10 something to bounce on your brain and walls, a
11 theory I have in surplus removal for shell egg
12 industry." Do you see that?
13        A.   Which page?
14        Q.   Right on the first page?
15        A.   Okay.
16        Q.   First sentence of your e-mail to
17 Gene Gregory down below dated October 19, 2006?
18        A.   Okay.
19        Q.   It says, "Gene, something to
20 bounce on your brain and walls, a theory I have
21 in surplus removal for shell egg industry"?
22        A.   Yeah.

---

548

1         Q.   Do you see that? Do you then set
2  out your theory there?
3         A.   Let me read it. Yeah. That was
4  my theory.
5         Q.   Sir, I'm going to show you what's
6  been marked as Exhibit 315.
7         And this is dated 12/10/03 and
8  there's a Capper-Volstead certification. It
9  says, "yes, more than 50 percent of all eggs
10 handled by our company, including the eggs
11 produced, contracted or purchased, are produced
12 on farms owned or operated by our company." Do
13 you see that?
14        A.   Yes.
15        Q.   And who signed that?
16        A.   I did.
17        Q.   Okay. Now, you understood that
18 that was important in order for UEP to be in
19 compliance with Capper-Volstead Act?
20        A.   You had to sign one of these to be
21 a member.
22        Q.   Okay. Now, Michael Foods was a

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

46 (Pages 549 to 552)

---

549

1    member of UEP eventually; right?
2        A.   Yes.  I think they already were.
3        Q.   And you know that 50 percent of
4    all the eggs they handled were not produced on
5    farms owned or operated by Michael Foods;
6    correct?
7            MR. BARNES:  Object to form.
8            THE WITNESS:  I have no idea of
9    their exact amounts.
10   BY MR. STUEVE:
11       Q.   Were you aware, sir, that -- that
12   of the -- that Michael Foods marketed or
13   controlled about 40 to 45 million birds and that
14   only 13 to 14 of those million of those birds
15   were actually owned by Michael Foods?
16       A.   I was not privy to what they
17   owned.  I knew they marketed a lot of eggs, but
18   I wasn't sure who owned, what kind of contract.
19   I had no involvement in any of their business
20   relations with their producer.
21       Q.   Okay.  Can you get 547 there?
22       A.   Okay.  I found 547.

---

550

1        Q.   There you go?
2            MR. BARNES:  You're a better man
3    than I am.
4    BY MR. STUEVE:
5        Q.   If you could, just turn to the 815
6    page.
7            MR. BARNES:  Can I look over his
8    shoulder rather than root for my exhibit?
9            THE WITNESS:  Page 15?
10   BY MR. STUEVE:
11       Q.   815.
12           MR. BARNES:  Before you ask him
13   questions --
14           MR. STUEVE:  Can I direct him to
15   where I want to ask?
16           MR. BARNES:  Sure.
17   BY MR. STUEVE:
18       Q.   I won't ask my question.  I'll
19   direct him from Marcus Rust to Gene Gregory.  It
20   starts with Gene.  Do you see that?
21       A.   Yeah.
22       Q.   "So Gene, what took place to

---

551

1    attempt to pass an amendment with affected Board
2    members not there is apprehensive.  Michaels and
3    Cargill are in the egg business for the money.
4    All the rest of the folks there are in it as a
5    way of life and to support that we are farmers.
6    They are processors who happen to own birds."
7    Do you see that?
8        A.   Yes.
9        Q.   You're referring to both Michael
10   Foods and Cargill; right?
11       A.   Right.
12       Q.   It was your view that the bulk of
13   their business was to process eggs and they just
14   happened to own, as you stated, own some birds;
15   right.
16           MR. BARNES:  Object to form.
17           THE WITNESS:  They started like
18   any of the rest of us did and they just grew and
19   grew and grew.
20   BY MR. STUEVE:
21       Q.   You knew, though, that they did
22   not own sufficient birds to come close to

---

552

1    supplying the eggs that they were processing and
2    selling; fair enough?
3        A.   I had no business understanding of
4    their actual contracts with their producers.
5    The only thing I knew was if their producer was
6    under contract to them they were not allowed to
7    sell to anybody else because they -- somehow
8    they was Michael's eggs.  At times we tried to
9    buy eggs from them, they wouldn't sell them.
10   Said they was under contract.
11           MR. MONICA:  You don't have
12   another notebook behind you; do you, Pat?
13           MR. BARNES:  David's got one under
14   the table.
15           (Laughter.)
16           (Rust Exhibit Number 559 was
17   marked for identification.)
18   BY MR. STUEVE:
19       Q.   Show you what's been marked as
20   Exhibit 559 and it's UE PRIV 0000069 through 70.
21       A.   This is marked highly
22   confidential.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

---

553

1    Q.   Right.  You can look at it.
2          MR. BARNES:  Jan, are you on?
3          MS. LEVINE:  Yes.  Can we see the
4    document?  Just one second.  We'll pull it up.
5          MR. BARNES:  The reason I ask it
6    says UE PRIV, P-R-I-V.
7          MR. MONICA:  Marcus, don't look at
8    it until they pull it up.  It will only take a
9    second.
10         MR. STUEVE:  Jan, I've got to keep
11   going here.
12         MS. LEVINE:  Greg Hinton from Rose
13   Acre is on it; is that correct?
14         MR. BARNES:  Yeah.
15         MR. STUEVE:  Sir, you can go ahead
16   and look at that.
17         THE WITNESS:  I can?
18         MR. STUEVE:  Correct.
19         MS. LEVINE:  What we're going to
20   do is we will have Mr. Rust sign Exhibit A and
21   this will just be under the protective order
22   under Exhibit 11, along with the other

---

554

1    documents.
2          MR. STUEVE:  Yes.  Okay.
3          MS. LEVINE:  Is that okay with
4    everybody?
5          MR. STUEVE:  That's okay with us.
6          MR. BARNES:  That's fine.
7          MR. STUEVE:  Yes.
8          MS. LEVINE:  We're marking this
9    part of the deposition as highly confidential,
10   same as for the previous highly confidential UEP
11   document under Exhibit A and we will have
12   Mr. Rust sign Exhibit A to keep the
13   confidentiality and this document should not be
14   shown to anyone outside.  I assume there is only
15   counsel in the room or only counsel will review
16   this document.
17         MR. HICKEY:  We might just have
18   Joe sign also.
19         MR. BARNES:  He's counsel of
20   record.
21         MR. HICKEY:  He's not outside
22   counsel.

---

555

1          MR. BARNES:  Well, that's a good
2    point.
3          MS. LEVINE:  I'll check the
4    confidentiality order.
5          MR. BARNES:  Check that, Jan, and
6    we'll comply with whatever you have to do.
7          MR. STUEVE:  Okay.
8          MR. BARNES:  Go ahead.
9    BY MR. STUEVE:
10   Q.   All right.  So if you would, 559,
11   Greg, this was minutes from egg products Market
12   Committee; is that right?
13   A.   Yes.
14   Q.   And Greg Hinton was a member of
15   that committee; is that correct?
16   A.   Yes.
17   Q.   And it says -- at that meeting was
18   UEP's attorney, Marty Eisenstein.  Do you know
19   who Marty Eisenstein is?
20   A.   I can't say I knew what his last
21   name was.
22   Q.   Do you know his first name?

---

556

1    A.   Yeah.  I think that's correct.
2    Q.   Marty?
3    A.   Yes.
4    Q.   Did you understand he was
5    affiliated with Mr. Isaacson?
6    A.   Yes.
7    Q.   And it says, "Einstein stated that
8    Capper-Volstead allows producers to talk about
9    costs, markets, and even prices of farm
10   products.  The challenge is when discussing
11   price or cost of egg products because this goes
12   beyond farm production and marketing of farm
13   products."  Did I read that correctly?
14   A.   That's what you read.
15   Q.   He said, "UEP provided the
16   protection for farm members, but this protection
17   did not extend beyond the production and
18   marketing of shell eggs or liquid eggs."  Did I
19   read that correctly?
20   A.   Yes.
21   Q.   And did Rose Acre have that
22   understanding with respect to the

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                        March 6, 2014

48 (Pages 557 to 560)

---

557

Capper-Volstead Act?

    **A.   That was my understanding.**

    Q.   Okay.  Then it says, "Einstein said it is important that certain guidelines be established to engage in exchange of information.  It is possible to provide information, but strict guidelines need to be followed.  They would include the following factors."  Did I read that correctly?

    **A.   Yes.**

    Q.   And then there are several that are listed there; is that correct?

    **A.   There are several other things listed.  Yeah.  I haven't read those.  Do I need to?**

    Q.   No.

    **A.   Are we done with this one?**

    MR. BARNES:  Yeah.  I think we're done.

    (Rust Exhibit Number 560 was marked for identification.)

BY MR. STUEVE:

---

558

    Q.   Let me show you what has been marked Exhibit 560.  This is UE PRIV 0000071 through 72 dated June 4, 2004.

    **A.   It's marked highly confidential.  It's okay.**

    MR. BARNES:  You're going to sign an exhibit, okay.  He can look at it; right, Jan?  Jan?

    MS. LEVINE:  Correct.  He's a member of that committee; right?

    MR. BARNES:  2004?

    MR. HICKEY:  It would have been Greg Hinton again.

    MS. LEVINE:  He would be allowed to look at under the protective order.  So we will just mark it highly confidential, but Mr. Miller would not be.  So these highly confidential ones should just be seen by counsel and Mr. Rust and Mr. Rust will sign the exhibit.

    MR. BARNES:  Okay.

    MS. LEVINE:  Thank you.

BY MR. STUEVE:

---

559

    Q.   Do you recall reviewing this document?

    **A.   No.**

    Q.   Show you what's been marked as Exhibit 134.

    I'm going to give you guys this.

    MR. BARNES:  Okay.

    THE VIDEOGRAPHER:  Off the record at 2:28 p.m.

    (A brief recess was taken.)

    THE VIDEOGRAPHER:  Back on the record at 2:38 p.m.

BY MR. STUEVE:

    Q.   During the break you had the opportunity to review Exhibit 134; is that correct, sir?

    **A.   Correct.**

    Q.   Did you review this document in preparation for your deposition today?

    **A.   I glanced at it.  Yes.**

    Q.   Okay.  Did you communicate with counsel about it?

---

560

    **A.   We looked at it.  They showed it to me.  Yes.**

    Q.   Okay.  All right.  And did you remember receiving this in February of 2006 from Roger Deffner?

    **A.   Vaguely.**

    Q.   And this would have been at the time you were contemplating putting together an egg producer co-op; correct?

    **A.   An egg product marketing co-op.**

    Q.   An eggs product co-op; is that correct?

    **A.   Correct.**

    Q.   And one of the requirements to be a member of that co-op would be you had to be UEP certified; is that right?

    **A.   Correct.**

    Q.   And --

    **A.   It was going to be a certified egg product marketing co-op.**

    Q.   And this Roger Deffner was one of the other egg producers that was involved in the

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

49 (Pages 561 to 564)

---

561

1   creation of the egg products co-op?
2       A.   In the attempt of the creation.
3   Correct.
4       Q.   All right.  And in your
5   communications with Roger Deffner, National
6   Foods, he sent you a couple of Capper-Volstead
7   pieces that you may have seen?
8       A.   Correct.
9       Q.   And, if you would, over on 85505
10  there's a -- the Brann & Isaacson law firm name
11  up at the top, it says attorney-client
12  privileged communications, it says UEP Marketing
13  Committee antitrust issues, November 16, 2004.
14  Do you see that?
15      A.   Correct.
16      Q.   Do you recall seeing this
17  document, the November 16, 2004 document in 2004
18  as part of the Marketing Committee?
19      A.   Could have.  I don't recall.
20      Q.   Okay.  Were you aware, sir, that
21  these documents were also presented at the
22  Economic Summit in November 2004?

---

562

1       A.   Could have been.
2       Q.   And if you would, if you look
3   under the bullet point that says on that page,
4   we're still on 505, "the following activities
5   are probably not protected."  Do you see that?
6       A.   Which one again?  Which page?
7       Q.   On that page, 505, that we were
8   just looking at, November 16, 2004.
9       A.   Okay.
10      Q.   The fourth bullet point down it
11  says, "the following activities are probably not
12  protected."  Do you see that?
13      A.   Correct.
14      Q.   And it says, the second bullet
15  point is, "boycott of nonmembers of
16  cooperative."  Do you see that?
17      A.   Yeah.
18      Q.   You know what boycott means; don't
19  you?
20      A.   I would assume.
21      Q.   What do you understand that to
22  mean?

---

563

1       A.   That's where you would do nothing
2   with somebody that wasn't a member of the co-op.
3       Q.   For example, refusing to purchase
4   eggs from a noncertified producer; right?
5           MR. BARNES:  Object to the form of
6   the question.  You're taking a legal opinion
7   letter with legal language and essentially
8   asking this layperson to interpret, particularly
9   the term boycott.  He's given you his every day
10  basic understanding, but to the extent that
11  you're relying on a lawyer's letter and
12  representation, I'll just object to the form.
13          MR. STUEVE:  If you would read
14  back my question and I'll ask you to answer it
15  for me, sir.
16          (The record was read as
17  requested.)
18          THE WITNESS:  And what are you
19  meaning, purchase?
20  BY MR. STUEVE:
21      Q.   The boycott of nonmembers of a
22  cooperative, an example of that would be where

---

564

1   you would refuse to purchase eggs from a
2   noncertified producer; correct?
3       A.   Are you asking if we did that?
4       Q.   No.  I'm asking if that's an
5   example of boycotting?
6       A.   That's what it states here.
7       Q.   And then what about it also said,
8   "what's probably not protected, efforts to
9   coerce members to join the cooperative."  What
10  was your understanding of that?
11      A.   I'm not sure what efforts to
12  coerce nonmembers would mean.
13      Q.   It says, "agreements with
14  nonmembers regarding prices, exchange of price
15  information."  What do you understand that to
16  mean?
17      A.   I guess that would mean -- I would
18  assume it would mean talking to a nonmember
19  about prices.
20      Q.   Now, and then under the gray area
21  it says, "agreements regarding supply of eggs to
22  the market."  Do you see that?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                        March 6, 2014

---

565

1     **A.   Correct.**
2     Q.   Did you remember reading that in
3  2004?
4     **A.   Yeah.**
5     Q.   Now, over on the next page there's
6  risks.  Under risk the first bullet point is,
7  "there's no clear holding in any case that
8  production limits are within the exemption, but
9  Alexander helps but only in the Ninth Circuit."
10  Do you see that?
11     **A.   Correct.  I see that.**
12     MR. BARNES:  Excuse me, Pat.  For
13  the record, it is incorrect.  It's Eighth
14  Circuit.  That was an Eighth Circuit decision.
15  BY MR. STUEVE:
16     Q.   But you see the statement there,
17  "there's no clear holding in any case that
18  production limits are within the exemption."  Do
19  you see that?
20     **A.   I have no idea what Alexander is.**
21     Q.   But you know what production
22  limits are; right?

---

566

1     **A.   I think so.**
2     Q.   Those would be agreements to
3  limit, for example, the supply of eggs; right?
4     **A.   If there was such an agreement.**
5     Q.   That would fall within that
6  category; right?
7     **A.   If there was a production limit**
8  **agreement that would be in the contract or**
9  **something.  Yeah.**
10     Q.   Now, if you look at some
11  absolutes.  It says, "if go beyond exchange of
12  information then should style the item as
13  marketing guidelines, i.e., how many eggs to
14  sell and not to produce or purchase."  Do you
15  see that?
16     **A.   I'm not sure what that means.**
17     Q.   And then it goes on to say under
18  some absolutes, "the quantities should be
19  guidelines and suggestions and there should be
20  no penalties for failure to follow;" right?
21     **A.   That's what it says.**
22     Q.   So, for example, if you -- under

---

567

1  UEP certified program, if you -- the only thing
2  that you could be decertified for was not
3  complying with the cage space requirement;
4  correct?
5     MS. LEVINE:  Objection.
6     THE WITNESS:  That could have
7  been.
8  BY MR. STUEVE:
9     Q.   Now, then it says, "there should
10  be no agreements with egg breakers, re:
11  Supply."  Do you see that?
12     **A.   Yeah.**
13     Q.   And then it says, "there should be
14  no attempt to set guidelines or limitations for
15  nonmembers."  Do you see that?
16     **A.   Correct.**
17     Q.   Then it goes on, the second to
18  last bullet point says, "there should be no
19  attempt to boycott or curtail business with a
20  nonmember regarding failure to follow
21  guidelines, for that matter, regarding any other
22  issues;" right?

---

568

1     **A.   That's what it says.  Yes.**
2     Q.   And then also under some
3  absolutes, "there should be no efforts to coerce
4  nonmembers to join UEP."  Did I read that
5  correctly?
6     **A.   Yes.**
7     Q.   And you would have read this in
8  November 2004; correct?
9     **A.   Yes.**
10     Q.   Now, also if you would, go back to
11  505.  The last three digits.  Do you see it?
12  The Bates range, I'm sorry.
13     MR. BARNES:  I'm sorry.  I'm
14  looking for Exhibit 505.  I'm sorry about that.
15  Thanks, David.  Okay.  I'm with you now.
16     MR. STUEVE:  That's what happens
17  when we get gray hair, we start losing the whole
18  day.
19     MR. BARNES:  Okay.
20  BY MR. STUEVE:
21     Q.   On 505 of Exhibit 134 you'll see
22  up there under the first bullet point there is a

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

51 (Pages 569 to 572)

---

**569**

1  reference to, "see Irving Isaacson February 5th,
2  1992 memo attached." Do you see that?
3       A.  Correct.
4       Q.  Now, if you turn to 507, can you
5  confirm that this is the beginning page of the
6  February 4th, 1992 Irving Isaacson memo?
7       A.  That's what it appears to be.
8       Q.  All right. And do you remember
9  reviewing this in November of 2004 when it was
10 distributed?
11      A.  I remember looking at it. I don't
12 remember word for word verbatim.
13      Q.  All right. If you would, on 511,
14 so the last three.
15          Do you see that -- are you at 511?
16      A.  Yes.
17      Q.  Under the section antitrust
18 consequences it says, "it should be pointed out
19 clearly and forcibly that there are no partial
20 farmer cooperatives." Did I read that
21 correctly?
22      A.  That's what it reads.

---

**570**

1       Q.  "Every single member of the
2  cooperative must be a bona fide agriculture
3  producer, whatever that term means;" right?
4       A.  That's what it says.
5       Q.  Okay.
6           (Rust Exhibit Number 561 was
7  marked for identification.)
8  BY MR. STUEVE:
9       Q.  I'll show you what's been marked
10 as Exhibit 561. This is NL 01200644 through 46.
11          This is minutes of a meeting of
12 the Board of Directors of Certified Egg
13 Products, Inc.
14          What was Certified Egg Products,
15 Inc.?
16      A.  I believe I explained that before.
17 It was an attempt to start a certified egg
18 products marketing co-op group.
19      Q.  And you attended the meeting;
20 correct?
21      A.  Yes.
22      Q.  And Randon Wilson was at the

---

**571**

1  meeting; is that right?
2       A.  Yes.
3       Q.  And he's the same attorney who UEP
4  asked to attend a meeting of United Egg
5  Producers to present the supply management
6  program that was being implemented for the
7  potato industry; is that correct, sir?
8       A.  Correct.
9       Q.  And did you invite him to this
10 meeting?
11      A.  I don't recall that I did.
12      Q.  Who paid his fees to attend this
13 meeting?
14      A.  I don't recall. I don't know --
15 this meeting?
16      Q.  Yeah.
17      A.  I think we did, the producer
18 group.
19      Q.  Okay. And would Rose Acre have
20 contributed to the payment of his fees?
21      A.  Yes, to this meeting.
22      Q.  Okay. Anyone else?

---

**572**

1       A.  I remember we ponied up some
2  money. I don't remember how much. I'm pretty
3  sure everybody paid.
4       Q.  Okay. Do you remember anything
5  specific about his presentation, sitting here
6  today?
7       A.  Not -- if you're asking me to
8  rattle off something, not a lot.
9       Q.  I just want to know, sitting here
10 today, do you remember anything specifically
11 Mr. Wilson provided concerning the
12 Capper-Volstead Act and its application to
13 Certified Egg Products, Inc. Co-op?
14      A.  He went through a whole bunch of
15 stuff. I can't recollect verbatim what anything
16 was.
17      Q.  Did you keep it?
18      A.  I would assume we did. I don't
19 know.
20      Q.  Okay. Best of your recollection,
21 you kept what he handed out?
22      A.  I have no idea.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

---

573

1    Q.   Do you have a file concerning your
2  efforts to start-up the Certified Egg Products,
3  Inc.?
4    A.   Someplace, I think.
5    Q.   Okay.  Do you know if that's been
6  produced to counsel?
7    A.   I would -- I don't know if it was
8  ever asked for.  I don't know.
9         MR. STUEVE:  We produced CEP
10  documents, I think they were from your file.
11  I'll have to double-check to see where they came
12  from.
13         MR. BARNES:  This document came
14  from -- that's got NL.
15         That's right.  That's NL.  It's
16  not signed, either.  Okay.
17         (Rust Exhibit Number 562 was
18  marked for identification.)
19  BY MR. STUEVE:
20    Q.   Show you what's been marked 562,
21  which is RAUPDATE 0080669 through 675.
22    A.   Okay.

---

574

1    Q.   This is dated October of 2006; is
2  that right, the cover page?
3    A.   Yeah.  That's what it's dated.
4    Q.   And this was right around the time
5  that UEP was considering whether to allow
6  Michael Foods, a significant competitor of Rose
7  Acre, to join the UEP certified program;
8  correct?
9    A.   It could have been.
10    Q.   And you all opposed that; correct?
11    A.   We have always felt producers
12  should treat all their birds the same.
13    Q.   If you just answer my question.
14         You opposed Michael Foods being
15  allowed into the UEP certified program without
16  compliance with the 100 percent rule; right?
17    A.   Correct.
18    Q.   All right.  And this is an e-mail
19  from Gene Gregory.  On the first page it says,
20  "during the Animal Welfare Committee meeting on
21  Tuesday, October 10th KY Hendrix from Rose Acre
22  Farms will introduce a motion regarding the

---

575

1  production and marketing of UEP certified eggs.
2  I've asked Kevin Haley to review this motion in
3  advance and provide his legal opinion in respect
4  to the antitrust violations.  Kevin just
5  completed his review yesterday and e-mailed it
6  to me.  Please now find attached the letter and
7  motion from Rose Acre's and Kevin Haley's
8  opinion."  Did I read that correctly?
9    A.   Yes.
10    Q.   Then, if you would, over on Bates
11  range 670 of Exhibit 562, that is the -- it to a
12  two page proposed motion that's signed by KY
13  Hendrix of Rose Acre; correct?
14    A.   Correct.
15    Q.   Did you help him prepare this
16  document?
17    A.   I don't recall.
18    Q.   This, in fact, incorporates the
19  very concept that you had presented to Gene
20  Gregory; is that correct?
21    A.   It incorporates the concept that I
22  had, but I don't recall if I participated in the

---

576

1  typing of this document.
2    Q.   But the concept is your concept;
3  right?
4    A.   Yes.
5    Q.   And it says, "any company which
6  sells or markets UEP certified shell eggs or egg
7  products may be approved to sell UEP certified
8  shell eggs and egg products if and only if the
9  following schedule is met:  2006, 95 percent of
10  all shell eggs and egg products sold or marketed
11  as certified;" right?
12    A.   That's what it says.  Yes.
13    Q.   So you were willing to make a very
14  slight adjustment to the 100 percent rule;
15  right?
16    A.   We wanted to get all producers to
17  get to treating all their chickens the same.
18    Q.   So if you would answer my
19  question, you are making a recommendation to
20  make a slight adjustment to the 100 percent
21  rule; right?
22    A.   To get them to treat their

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

53 (Pages 577 to 580)

---

577

1  chickens the same.  Yes.
2      Q.   And so rather than having
3  100 percent of the shell eggs and egg products
4  sold and marketed as certified, you would phase
5  that in from 95 percent to 100 percent over a
6  six year period; is that right?
7      A.   Yes.
8      Q.   All right.  And there was, in
9  fact, legal concerns raised about that; is that
10 correct?
11     A.   I have to read that.  I'm not
12 sure.
13     Q.   All right.
14     A.   What was your question?
15         MR. BARNES:  I don't think there
16 was one.
17 BY MR. STUEVE:
18     Q.   There were legal concerns raised
19 about your proposal; correct?
20     A.   Yes.
21     Q.   And were you provided a copy of
22 the Brann & Isaacson analysis?

---

578

1      A.   I don't recollect.
2      Q.   Okay.  Now, this was the firm that
3  Mr. Haley, Kevin Haley is a part of the firm
4  Brann & Isaacson that we already identified you
5  had some trust issues with; is that correct?
6      A.   Right.
7      Q.   And, if you would, on 74 on that
8  page, the last paragraph there the sentence
9  starts with if.  "If the motion is adopted," and
10 they're referring to Rose Acre's motion; right?
11     A.   Correct.
12     Q.   "If the motion is adopted the
13 program would add restraints on external
14 dealings that could expose the program to
15 greater antitrust scrutiny."  Did I read that
16 correctly?
17     A.   Yes.
18     Q.   "Secondly, as participation in the
19 program continues to grow, the imposition of
20 restriction on the marketing of uncertified eggs
21 creates ever increasing economic pressure for
22 noncertified companies to become certified

---

579

1  because it shrinks the market for uncertified
2  products."  Did I read that correctly?
3      A.   That's what it reads.
4      Q.   "In addition to being inherently
5  anticompetitive, this makes it more difficult to
6  argue that the program is truly voluntarily.
7  The clearest antitrust violations occur when an
8  organization or a major player within the
9  organization uses its position of strength to
10 develop a certification or standard that targets
11 a competitor or competing product for
12 exclusion."  Do you see that?
13     A.   Yes.
14     Q.   Do you remember those legal
15 concerns being raised?
16     A.   I remember something was raised.
17 I don't recall the exact details of it.
18     Q.   Did you ever ask Mr. Haley or Gene
19 Gregory that if --
20     A.   Me personally?
21     Q.   If you let me finish my question.
22         Did you ever ask, let me start

---

580

1  with Gene Gregory.
2         Did you ever ask Gene Gregory
3  after reviewing this document as to whether or
4  not those same concerns had been addressed
5  related to the 100 percent rule?
6      A.   Restate your question again.
7      Q.   After you read this document did
8  you go to Gene Gregory and say, well, wait a
9  minute.  If there are concerns about what I'm
10 proposing, what about the 100 percent rule?
11     A.   I don't recall reading this
12 document here.
13     Q.   You obviously were aware that your
14 motion was rejected; right?
15     A.   Yes.
16     Q.   And you were told, I assume, that
17 the principal objection to it was it raised
18 legal concerns?
19     A.   I don't recall.
20     Q.   Did you ever ask what legal
21 concerns there were?
22     A.   I don't recall.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

54 (Pages 581 to 584)

---

581

1    Q.   You currently were provided a copy
2  of those legal concerns; right?
3        A.   **This here?**
4    Q.   Yeah.
5        A.   **I don't recall having seen it.**
6    Q.   Well, if you would, going back to
7  the first page of 562, you're listed as a
8  recipient of this e-mail that attached Kevin
9  Haley's memorandum raising the legal concerns
10 concerning your motion; correct?
11       A.   **I do not recall the document.**
12   Q.   But you do -- you can confirm you
13 are listed here; right?
14       A.   **Which one?**
15   Q.   The --
16       A.   **Yes.  I would be listed on the**
17 **third line.  Correct.**
18   Q.   Did you -- did you confer with
19 Roger Wilson after receiving this memo from
20 Brann & Isaacson?
21       A.   **Who is Roger Wilson?**
22   Q.   Excuse me.  Randon Wilson?

---

582

1        A.   **I don't recall.**
2    Q.   Do you remember running by this
3  motion with Randon Wilson before it was
4  proposed?
5        A.   **I don't recall.**
6    Q.   Do you know if Randon Wilson had
7  any participation in the drafting of your
8  motion?
9        A.   **I don't recall that he did.**
10       MR. STUEVE:  I'm going to take a
11 quick break here.
12       THE VIDEOGRAPHER:  This is the end
13 of videotape number three.  Off the record at
14 3:08.
15       (A brief recess was taken.)
16       THE VIDEOGRAPHER:  This is the
17 beginning of tape number four.  Back on the
18 record at 3:22 p.m.
19       (Rust Exhibit Number 563 was
20 marked for identification.)
21 BY MR. STUEVE:
22   Q.   Let me show you what's been marked

---

583

1  Exhibit 563.  UE 020105 through 07.
2        This is a document from United Egg
3  Producers to Mr. Richard Brown of Urner Barry
4  Publications; is that correct?
5        A.   **Yes.**
6    Q.   This would have been
7  November 2002, that's the date of it; right?
8        A.   **That's when it's dated.  Correct.**
9    Q.   And this would have been after
10 Rose Acre had joined UEP; correct?
11       A.   **Yes.**
12   Q.   In fact, if you turn to 06 you'll
13 see Greg Hinton is listed as a committee member
14 participating in a call on November 22nd?
15       A.   **Yes.**
16   Q.   And it says, "UEP's Marketing
17 Committee met via conference call November 22nd
18 and in the discussion some members reminded us
19 that you had pledged when a great majority of
20 companies are animal care certified in trading
21 eggs Urner Barry would consider the shell egg
22 quote as a certified quote."  Did I read that

---

584

1  correctly?
2        A.   **Start over again.  I wasn't**
3  **100 percent where you was at.**
4    Q.   Right in the very first paragraph.
5        A.   **UEP Marketing Committee?**
6    Q.   Correct.
7        A.   **Okay.  What did you ask?**
8    Q.   It says, "UEP's Marketing
9  Committee met via conference call on
10 November 22nd and in the discussion some members
11 reminded us that you had pledged when a great
12 majority of companies are animal care certified
13 and trading eggs Urner Barry would consider the
14 shell egg quote as a certified quote."  Do you
15 see that?
16       A.   **Yes.**
17   Q.   In fact, is that what happened?
18       A.   **I think there were two different**
19 **quotes.**
20   Q.   There would be a quote for
21 certified and a quote for --
22       A.   **And a quote for regular, I think.**

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

55 (Pages 585 to 588)

---

585

1      Q.   And we've seen some documents in
2  which you were comparing the certified quote to
3  the noncertified quote.  Do you remember doing
4  that?
5      A.   Vaguely.
6      Q.   And the certified quote would be
7  higher than the noncertified quote; right?
8      A.   Yes.  It would need to be.  Yes.
9      Q.   Do you remember what the variance
10  was?  What the spread was?
11      A.   No.
12      Q.   Did you track that?
13      A.   Someone in our sales department
14  would have.  I didn't personally.
15      Q.   Would that have been under the
16  supervision of Greg Hinton?
17      A.   Yes.
18      Q.   Okay.  He would be the one to ask
19  that question?
20      A.   Yeah.
21      Q.   All right.  Now, it says in here,
22  "as of March of 2002, that with 213 million

---

586

1  layers now enrolled in the program and this
2  representing nearly 100 percent of the shell
3  eggs needed to supply the shell egg markets,
4  that the quote should now be considered as an
5  animal care certified quote."  Did I read that
6  correctly?
7      A.   Yes.
8           MR. BARNES:  Object to the form.
9  I don't think you did.  Go ahead and ask the
10  question.
11  BY MR. STUEVE:
12      Q.   Was that consist with your
13  understanding?
14      A.   That's what it says here.
15      Q.   Yeah.  Okay.
16           (Rust Exhibit Number 564 was
17  marked for identification.)
18  BY MR. STUEVE:
19      Q.   Show you what's been marked as
20  Exhibit 564, it's RAUPDATE 0035857.
21           Sir, if you would, if you look at
22  the bottom of 564, it's an e-mail from you to

---

587

1  Gene Gregory and then you -- at the last
2  sentence you say, "side subject, grapevine rumor
3  mill has it that Sparboe was going to use same
4  audit firm as UEP for their so-called good hen
5  program."  Do you see that?
6      A.   Yeah.
7      Q.   Do you remember learning that
8  through the rumor mill and reporting that to
9  Gene Gregory, the president of UEP?
10      A.   Repeat that question again.
11           MR. STUEVE:  You can read it back.
12           (The record was read as
13  requested.)
14           MS. LEVINE:  Objection.
15           THE WITNESS:  Evidently.  Correct.
16  Evidently.
17  BY MR. STUEVE:
18      Q.   Now, at this time you were aware
19  that Sparboe had left the UEP certified program;
20  correct?
21      A.   I don't remember the exact time.
22  There was a time period they left.

---

588

1      Q.   And you remember that they left
2  because they believed the certified program was
3  being used as a pretext to reduce the supply of
4  eggs and increase prices.  Do you remember that?
5           MR. BARNES:  Object to the form.
6           THE WITNESS:  My understanding the
7  reason they left was because they didn't want --
8  they wanted the ability to have chickens under
9  three different systems and still qualify as an
10  animal care producer.  They wanted to have
11  chickens at 45 or 48 inches for the egg products
12  industry.
13           They wanted to have chickens at
14  whatever the UEP number was at that given time.
15  And then they wanted to have chickens at the
16  McDonald's number.
17  BY MR. STUEVE:
18      Q.   They were opposed to the
19  100 percent rule because they believed that it
20  was a pretext to reduce the supply of eggs and
21  increase prices; correct?
22           MR. BARNES:  Object to the form of

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

56 (Pages 589 to 592)

589

1    the question.
2            THE WITNESS:  I think that is what
3    Bob believed.  Yes.
4    BY MR. STUEVE:
5        Q.    And you were -- you did not want
6    them, Sparboe, to have the ability to use an
7    alternative animal welfare program; correct?
8        A.    I wanted all producers to utilize
9    the same program so we could draw a line in the
10   sand with HSUSP, animal rights organizations and
11   defend that line and not give in and go cage
12   free again.
13       Q.    If you would, if you could just
14   answer my question.  If you would read it back.
15           (The record was read as
16   requested.)
17           THE WITNESS:  I did not -- I
18   didn't care if they used an alternative program.
19   What I cared about was there were certain
20   programs that may have allowed you to do
21   different things.  I wanted all chickens treated
22   the same.  If someone is going to be in the

590

1    animal welfare business you can't say you're a
2    good animal welfare person, you know, squeeze
3    chickens over on this farm, this farm do it this
4    way and this farm do it this way.  That's
5    evidently why McDonald's dumped Sparboe's.
6    BY MR. STUEVE:
7        Q.    Sir, the fact is you were upset
8    about the fact that Sparboe was attempting to
9    use an alternative animal welfare program;
10   correct?
11           MR. BARNES:  Object to form.
12           THE WITNESS:  I probably was.
13   Yeah.
14   BY MR. STUEVE:
15       Q.    That's why you were notifying Gene
16   Gregory they supposedly were using the same
17   audit firm as UEP; right?
18       A.    As you see there, it says side
19   subject, grapevine rumor mill has it that
20   Sparboe, I misspelled it, is going to use the
21   same audit firm as UEP for their so-called good
22   hen program.  That's what I relayed to Gene.

591

1        Q.    And then Gene indicates that, "we
2    are, this week, making our concerns known to
3    FMI;" is that correct?
4        A.    That's what it states there.  Yes.
5        Q.    And what Gene was hoping in
6    response to your concern is that FMI would not
7    accept this alternative animal welfare program
8    that Sparboe was utilizing; correct?
9            MR. BARNES:  Object to form.
10           MS. LEVINE:  Objection.
11           MR. BARNES:  You can answer.
12           THE WITNESS:  I heard that and now
13   I don't remember what he asked.
14           MR. STUEVE:  Read the question
15   back.
16           (The record was read as
17   requested.)
18           MR. BARNES:  Same objection.
19           THE WITNESS:  I have no idea what
20   Gene was hoping.
21   BY MR. STUEVE:
22       Q.    But he told you that he was going

592

1    to -- was going to raise our concerns to FMI;
2    right?
3        A.    That's what he told us.
4        Q.    And that that concern was that
5    Sparboe was using an alternative animal welfare
6    program; right?
7            MR. BARNES:  Objection.
8            MS. LEVINE:  Objection.
9            THE WITNESS:  I'm not sure that
10   was what the question stated, but.
11   BY MR. STUEVE:
12       Q.    You said, hey, wait a minute,
13   they're using the same audit firm as UEP; right?
14       A.    Yes.
15       Q.    You told that to Gene Gregory;
16   right?
17       A.    I said that's side subject,
18   grapevine rumor mill has it that Sparboe is
19   going to use the same audit firm as UEP for
20   their so-called good hen program.  That's what I
21   said.
22       Q.    And he said, "while SES is not

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                        March 6, 2014

57 (Pages 593 to 596)

593

1    associated with UEP's audit and not approved by
2    us, the SES audit is, however, approved by FMI."
3    So he's saying, look, the audit firm they're
4    using is approved by FMI and we're going to
5    raise our concerns to FMI; right?
6             MR. BARNES:  Object.
7             MS. LEVINE:  Objection.
8             THE WITNESS:  It does not say
9    raise.
10   BY MR. STUEVE:
11       Q.   It says we are this week making
12   our concerns known to FMI; right?
13       A.   That's what it says.
14       Q.   Okay.  Is that different to you
15   than raising?
16       A.   Different word.
17       Q.   Okay.  Let me rephrase it then.
18   You were told that UEP was going to make our
19   concerns known to FMI; right?
20       A.   That's what it says right there.
21       Q.   And the concern that you had was
22   shared by Gene Gregory; correct?

594

1             MR. BARNES:  Objection.  Form.
2             THE WITNESS:  I never really have
3    a concern.  It says, side subject, grapevine
4    rumor mill has it that Sparboe is going to use
5    the same audit firm as UEP for their so-called
6    good hen program.  That's what I said.
7    BY MR. STUEVE:
8        Q.   Right.  And your concern was is
9    that if FMI allowed Sparboe to use SES that
10   other egg producers would leave the certified
11   program and use SES just like Sparboe did;
12   right?
13            MR. BARNES:  Object to form.
14            THE WITNESS:  I see no place in my
15   notes I even mentioned FMI.  You're saying I
16   mentioned FMI.  I didn't mention FMI.
17   BY MR. STUEVE:
18       Q.   The reason why you reported the
19   fact that Sparboe was using the same audit firm
20   as UEP is you were concerned that if that were
21   permitted or approved by FMI that others would
22   leave the certified program and do the same

595

1    thing that Sparboe did; right, Mr. Rust?
2             MR. BARNES:  Object to form.
3             THE WITNESS:  I don't recollect
4    what my concern was, as I related no concern in
5    this e-mail.
6             (Rust Exhibit Number 565 was
7    marked for identification.)
8    BY MR. STUEVE:
9        Q.   Show you what's been marked as
10   565, it's RAUPDATE 0038374 through 77.
11            I'm going to ask you about the top
12   two e-mails on the first page of 565.  Have you
13   had a chance to review those?
14       A.   I'm reading.  Okay.  One page is
15   blank.
16       Q.   If you would, on your e-mail from
17   you to Gene Gregory, who was in management at
18   UEP; is that correct?
19       A.   Yeah.
20       Q.   He was one of the leaders of
21   United Egg Producers?
22       A.   Yeah.

596

1        Q.   Okay.  And it says, "Gene, scuttle
2    bug has it Michaels is still backfilling.
3    Industry spies at work.  Mexicans.  I think
4    Terry should be advised that maybe backfilling
5    isn't the wisest thing to do under the
6    microscope they're under."  Do you see that?
7        A.   Yes.
8        Q.   Now, this is before they had
9    joined; right?
10       A.   I don't recollect the actual date.
11       Q.   Well, you go on to say, "I realize
12   they are not on the program as of yet and is
13   legal but not in the question of the program."
14   Do you see that?
15       A.   Yeah.
16       Q.   So this would have been at the
17   time, again, where you were upset that they were
18   going to be permitted to join without
19   100 percent -- without compliance with the
20   100 percent rule; right?
21       A.   Could have been.
22       Q.   And so you were reporting to Gene

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

58 (Pages 597 to 600)

---

597

1   that, in fact, even before they joined that they
2   were engaged in backfilling; right?
3       **A.  Yeah.**
4       Q.  Do you remember how you learned
5   that Michaels was backfilling?
6       **A.  I don't recall.**
7       Q.  The only way you would know that
8   is if you had someone go into their facilities
9   and see that; right?
10       MR. BARNES:  Object to the form.
11       THE WITNESS:  We never ever have
12   had anyone go to any of our competitor's
13   facility without their knowledge of it.  You
14   don't do that in the egg business.
15   BY MR. STUEVE:
16       Q.  What were you referring to when
17   you said industry spies at work?
18       **A.  Someone must have called me or**
19   **something.  Rumor mill again.  There's always**
20   **people yakking.**
21       Q.  Well, you felt it was substantial
22   enough to report it to Gene Gregory; right?

---

598

1       **A.  Yeah.  Correct.**
2       **(Rust Exhibit Number 566 was**
3   **marked for identification.)**
4   BY MR. STUEVE:
5       Q.  Show you what's been marked as
6   566.  UE 0707359 through 365.  Here you go.
7       Let me -- this is a long e-mail
8   chain.  You don't have to read all of it.  I'll
9   direct you to the portions and then you read as
10   much as you need to answer my question.
11       If you'll look there is on the
12   first page of 566, at the top there's an e-mail
13   from Chad Gregory to you; is that right?
14       **A.  Very top one.  Yeah.**
15       Q.  And then below that is an e-mail
16   from you to Chad Gregory Re:  Klippen and
17   Sparboe; right?
18       **A.  Yeah.**
19       Q.  And there is below that an e-mail
20   from Chad Gregory to you; right?
21       **A.  That's what it appears.**
22       Q.  And then on the next page there is

---

599

1   from Chad Gregory to Chad Gregory, subject:
2   Klippen; right?
3       **A.  That's what it shows.**
4       Q.  And then attached is the egg
5   newsletter dated October 16, 2006; is that
6   right?
7       **A.  I see that.  Yes.**
8       Q.  And then it looks like there's a
9   long -- then just kind of cut and pasted of --
10   cut and pasted the egg newsletter.  Is that what
11   it looks like it follows?
12       **A.  I have no idea what it is.**
13       Q.  You would agree with me that under
14   that 360 under the --
15       **A.  Under here and I have no idea what**
16   **it is.**
17       Q.  It looks like it comes under the
18   egg newsletter; okay?
19       **A.  I have no knowledge.**
20       Q.  All right.  Now, this is -- let's
21   go back to the first page.  It says Marcus, this
22   is down at the bottom now.

---

600

1       It says, "rumor has it that Ken
2   Klippen and Sparboe."  Did he work for Sparboe
3   at the time?
4       **A.  I don't recall.**
5       Q.  "Rumor has it that Ken Klippen and
6   Sparboe are saying you are supportive of this
7   new organization being formed and you're going
8   to the October 30th meeting in Chicago."  Do you
9   see that?
10       **A.  Uh-huh.**
11       Q.  What was he referring to with
12   respect to the new organization?
13       **A.  That's what I'm looking at here.**
14   **Okay.  What was your question again?**
15       Q.  It says, "rumor has it that Ken
16   Klippen and Sparboe are saying you are
17   supportive of this new organization being
18   formed."  Do you remember what he was referring
19   to?
20       **A.  What he?**
21       Q.  Chad said, "hey, rumor has it that
22   you're supportive of this new organization that

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

59 (Pages 601 to 604)

---

601

1   Sparboe is organizing."  Do you remember what he
2   was referring to?
3         A.  No.  I don't remember what that
4   was.
5         Q.  This would have been, though, at
6   around the time you were aware of they were
7   setting -- they had left the UEP certified
8   program; right?
9         A.  Yeah.  They were trying to
10  establish another new program.  Yes.
11        Q.  An animal welfare program?
12        A.  Correct.
13        Q.  And Chad Gregory of UEP was making
14  you -- was bringing this rumor to your attention
15  and asking if, in fact, you were supportive of
16  this new animal welfare program; right?
17        A.  I was not.
18        Q.  Yeah, but he asked you if you
19  were; right?
20        A.  What it says here.
21        Q.  Okay.  And then you respond.  You
22  say, "no, I was not invited.  I might have went,

---

602

1   but do not believe we need a separate program."
2   Do you see that?
3         A.  Yeah.
4         Q.  Then you go on to say, "but I am
5   one, along with several others, who are
6   extremely frustrated now that UEP has endorsed
7   Michaels to sell certified alongside
8   noncertified."
9              That, again, is referring to the
10  fact that they got an exception to the
11  100 percent rule; right?
12        A.  They got allowed to have chickens
13  both ways through their contract situation.
14        Q.  Now, you said you, along with
15  several others.  Who else that you were aware of
16  was upset by that?
17        A.  I'm trying to remember.  There
18  were several.  Probably would have been other
19  potential people in the same position we were
20  in, breaking and grading.
21        Q.  Now, you can't remember anybody
22  specifically?

---

603

1         A.  Not specifically, but there was.
2         Q.  Was there anyone else in the UEP
3   certified program besides you in which Michael
4   Foods was a significant competitor?
5         A.  Ask the question again.
6         Q.  Was there anyone else in the UEP
7   certified program in which Michaels Foods was a
8   significant competitor on the egg product side?
9         A.  They was -- they had half or
10  better of the market.  So they were
11  significantly bigger than anybody in the product
12  business.
13        Q.  Now, you go up here, Chad Gregory
14  responds back and says, "let's stay in
15  communication.  I think we can work through a
16  lot of this without going out and starting a new
17  organization and a new animal welfare program.
18  That would only divide the industry even more;"
19  right?
20        A.  Yes.
21        Q.  Now, if animal welfare was what
22  was supposedly behind the United Egg Producers

---

604

1   certified program, what would be the problem
2   with having a separate animal welfare program?
3         A.  There were people who wanted to do
4   it all different ways.  They wanted to have
5   chickens this way, squeezed.  These chickens
6   this way and these chickens this way.  How can
7   you promote animal welfare if you're not going
8   to treat all your animals the same.
9         Q.  That's not my question.  My
10  question is what's the problem with having a
11  different animal welfare program than the UEP
12  certified program in the egg industry?
13        A.  The programs they were promoting
14  were ones that would allow you to have one
15  program here, another program here, another
16  program here, however the customer dictated and
17  the FMI -- what the customers wanted was they
18  wanted all of us producers to have the same
19  level playing field so they could get
20  competitive bids from the group as a whole.
21              They didn't want people having all
22  these different programs.  They didn't want

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

60 (Pages 605 to 608)

---

605

Hy-Vee having one program, Ingles having another program, Kroger having another program. Then all of a sudden you had all these people with different sets of rules for everybody. Every chicken this state one way, that state another way.

Q.   You were opposed to the animal welfare program that Sparboe was proposing because it did not have 100 percent rule, fair enough?

A.   No.  Not fair enough.  I was opposed to the program because it was not treating the animals the same.

Q.   That's meaning they didn't have 100 percent requirement; right?

A.   They were going to squeeze some chickens for one customer, give extra space to other chickens for another customer.  They only cared about making profits.  I was in this to stay in the egg business.  I didn't want to get our business shut down like my good friend Frank Zimmer in Germany had his business, what do you

---

606

call it, voted away by the politicians in that country.  Same damn thing could happen here.

Q.   When you're referring to the fact they were going to treat chickens differently, that, in fact, is the 100 percent rule; right?  You wanted them to be in an animal welfare program that required all of their facilities to -- and any eggs that they marketed to be certified?

MR. BARNES:  Object to the form.

BY MR. STUEVE:

Q.   Is that correct, sir?

MR. BARNES:  Marcus, wait until he finishes his question before you answer.  I object to the form.  Now he can go ahead and answer it.

BY MR. STUEVE:

Q.   Sir, you -- the reason why Sparboe left is they believed that the 100 percent requirement that we've been talking about was anticompetitive; correct?

MR. BARNES:  Object to form.

---

607

THE WITNESS:  No.  I do not believe they believed it was anticompetitive.  They believed that they had -- it was a business's right to go out and produce eggs and squeeze animals -- they wanted the ability to have animals at 45 inches for one company, 60 or whatever inches was for the UEP standard for that company and 80 or whatever it was for McDonald's.

BY MR. STUEVE:

Q.   Sir, if you look at Exhibit 566, Marcus -- right on the first page it says -- it says, "remember, they are still upset about the UEP program being 100 percent;" right?

A.   Which page?

Q.   On the very first page.

A.   Yes.

Q.   They want it to be customer driven; right?

A.   They want it to be customer driven by client.

Q.   Not mandated by the industry

---

608

organization; correct, sir?

A.   They didn't want it to be a moral standard set by the animal husbandry standards of the egg industry.

Q.   Right.  And then you go on and you say, "in fact, you're frustrated that the 100 percent rule wasn't applied to Michael Foods;" right?  That's in your next e-mail; right?

A.   Yeah.

MR. BARNES:  Object to the form.

BY MR. STUEVE:

Q.   And then he responds back and says, "look, we're both in agreement that we don't want a divided industry and have a new animal welfare program;" correct?

MR. BARNES:  Object to the form.

THE WITNESS:  Which one are you referring to now?

BY MR. STUEVE:

Q.   The very top e-mail.

A.   Okay.  What are you saying?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

61 (Pages 609 to 612)

---

609

1      Q.   He's writing back to you and
2  saying, "look, we're both in agreement, we don't
3  want a new animal welfare program;" right?
4      MR. BARNES:  Object to the form.
5      THE WITNESS:  That's what it says.
6  BY MR. STUEVE:
7      Q.   Okay.  Show you what's previously
8  been marked as Exhibit 305.
9      Do you remember receiving
10 Exhibit 305, sir?
11     **A.   I don't remember receiving it.**
12 **No.**
13     Q.   It says, "I've chosen a select few
14 of you to receive this e-mail and request your
15 help."  This is from Gene Gregory, one of the
16 leaders of UEP; correct?
17     **A.   Yeah.**
18     Q.   This was at the time that Sparboe
19 was developing this alternative animal welfare
20 program; right?
21     **A.   Yeah.**
22     Q.   And it specifically referenced

---

610

1  there, "you are aware we have expressed concerns
2  with USDA for allowing USDA process -- program
3  to be used for a producer to convey a marketing
4  message of animal welfare when the producer does
5  not apply science based animal welfare
6  guidelines on 100 percent of their production
7  flocks."  Do you see that?
8      **A.   Yeah.**
9      Q.   And that was specifically
10 targeting Sparboe; correct?
11     MR. BARNES:  Object to the form.
12     THE WITNESS:  I don't know.  I'm
13 trying to see who it was targeting.  I don't
14 know who it was targeting.
15 BY MR. STUEVE:
16     Q.   Well, were you aware of anyone
17 other than Sparboe that was conveying a
18 marketing message of animal welfare when their
19 producer does not apply science based animal
20 welfare guidelines on 100 percent of their
21 production flocks?
22     **A.   I don't remember.  I don't recall.**

---

611

1      Q.   This was UEP reaching out to you
2  and several other egg producers and encouraging
3  you to contact USDA and objecting to the USDA
4  allowing Sparboe to use the USDA process
5  verified program; right?
6      MR. BARNES:  Object to form.
7      THE WITNESS:  What are you asking
8  again now?
9  BY MR. STUEVE:
10     Q.   If you look at the last paragraph
11 it says, "Dolph Baker, our Washington, D.C. team
12 and I have been meeting with the Administrator
13 Day on August 15th to discuss this.  We need
14 your thoughts.  Would you please send me a fresh
15 e-mail, not respond on this one, and/or
16 preferably a letter on your letterhead stating
17 your position.  Also answering the questions we
18 posed above.  We need this as soon as possible.
19 Please do not share this with anyone else.
20 Thanks for any help you can provide."  Did I
21 read that correctly?
22     **A.   That's the way it reads.  I don't**

---

612

1  recall.
2      Q.   You don't recall receiving this?
3      **A.   I could have.  I don't recall this**
4  **specific.  Did I respond to it?  I don't**
5  **remember.**
6      Q.   If you look at the second to the
7  last paragraph on the first page it says --
8  Mr. Rust, if you can look at the second to last
9  paragraph on the first page.
10     **A.   Oh, first page.**
11     Q.   At the bottom there, "I'm afraid
12 that this program has a good chance of
13 undermining the UEP certified program.  Already
14 we've seen evidence that a producer is
15 misstating that he has the PVP program and is
16 trying to take a rather large account away from
17 an UEP certified company."  Do you see that?
18     **A.   Yeah.**
19     Q.   And that was referring to Sparboe;
20 correct, sir?
21     **A.   I have no idea.  I assume that.**
22     Q.   And do you remember the large

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

62 (Pages 613 to 616)

---

613

1  account that Sparboe was attempting to take from
2  a UEP certified company?
3       A.   From this e-mail, I'm not sure who
4  it would be.
5       Q.   Did you contact Mr. Gregory after
6  receiving this?
7       A.   I don't recall.
8            (Rust Exhibit Number 567 was
9  marked for identification.)
10 BY MR. STUEVE:
11      Q.   Show you what's been marked as
12 Exhibit 567.  This is RAUPDATE 80438 through 40.
13           Do you still have Exhibit 305 in
14 front of you, sir?
15      A.   Yeah.
16      Q.   Where is that?  Keep it right next
17 to you, will you, sir.  If you look back to 305,
18 Exhibit 305 for a minute, sir.
19           That date of that letter or e-mail
20 from Gene Gregory is August 3rd, 2007; right?
21      A.   What about it?
22      Q.   Can you confirm that?

---

614

1       A.   Yeah.
2       Q.   And then Exhibit 567 is dated
3  four days later, August 7th, 2007; is that
4  correct?
5       A.   Yeah.
6       Q.   And it's an e-mail from Joe
7  Miller, who would be the general counsel of Rose
8  Acre; right?
9       A.   Yeah.
10      Q.   To Gene Gregory.  Subject:  Letter
11 to USDA concerning shield.  Do you see that?
12      A.   Yes.
13      Q.   And it copies you; right?
14      A.   It's copied to me.  I don't
15 believe I read it.
16      Q.   As well as Greg Hinton; right?
17      A.   Yes.
18      Q.   In fact, you would have asked your
19 in-house lawyer to prepare that letter; correct?
20      A.   Not necessarily.
21      Q.   How else would he have known about
22 it, sir?

---

615

1       A.   Greg might have asked him.  And I
2  might have.  I don't recall it.
3       Q.   If you go back to Exhibit 305, is
4  there anyone else copied from Rose Acre, other
5  than you?
6       A.   No.
7       Q.   Does that refresh your
8  recollection, sir, that you were the one after
9  receiving Mr. Gregory's e-mail you asked the
10 in-house lawyer for Rose Acre to prepare the
11 letter?
12      A.   I evidently did.  I don't recall
13 it though.
14           MR. BARNES:  I'm going to
15 object -- excuse me, counsel.  Can I frame an
16 objection for the record?
17           MR. STUEVE:  You're objecting to a
18 question or?
19           MR. BARNES:  I'm objecting to use
20 of this document.  It appears to be a first
21 amendment protected petition to the U.S.
22 Government, which is protected activity.  And I

---

616

1  think it's improper to use this -- this
2  particular protected communication to try to
3  imply any type of wrongdoing on the part of
4  anybody.
5  BY MR. STUEVE:
6       Q.   Now, it says, "attached is a
7  letter you can take with you on your upcoming
8  meeting with USDA."  And Mr. Miller is referring
9  to the meeting that was referenced in
10 Mr. Gregory's August 3rd e-mail; right?
11      A.   Yeah.
12      Q.   "Attached is the letter you can
13 take with you on your upcoming meeting with USDA
14 concerning the use of the shield with programs
15 that have less than 100 percent participation.
16 This letter is similar to the one we sent to
17 Mr. Day on January 22nd, 2007."  Did I read that
18 correctly?
19      A.   That's what it says.
20      Q.   So had you already notified the
21 USDA of your complaints that Sparboe was using
22 the PVP -- process verified program?  Do you

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

63 (Pages 617 to 620)

---

**617**

1    remember?
2         A.   I don't remember.  Where does it
3    say Sparboe?
4         Q.   And then, sir --
5         A.   I said where does it say Sparboe?
6         Q.   I asked you earlier if you
7    believed that the one -- the entity -- the
8    example that was given in Gene Gregory's e-mail,
9    if you believed that was Sparboe.  Do you
10   remember that?
11        A.   No.  Which one was that?
12        Q.   Sir, if you could, if you could
13   look at 569 and attached to the e-mail from Joe
14   Miller to Gene Gregory, which you're copied on,
15   is that, in fact, the letter?
16        A.   Is that, in fact, which letter?
17        Q.   The letter that is referenced in
18   e-mail on the first page of 569?
19        A.   I would assume it would be.
20        Q.   You state in this letter that --
21        A.   I have to read the letter first.
22        Q.   Okay.

---

**618**

1         MR. BARNES:  Pat, it's 567.
2    You're going forward.  You've been calling it
3    569.
4         MR. STUEVE:  I wrote it wrong.
5    Okay.
6         THE WITNESS:  Okay.  What about
7    it?
8    BY MR. STUEVE:
9         Q.   Does the August 7, 2007 letter
10   that was prepared by Joseph Miller, general
11   counsel of Rose Acre Farms, is that the letter
12   that appears to be attach to the e-mail that's
13   on the first page of Exhibit 567?
14        A.   Yes.  It does.
15        Q.   And in the very first sentence to
16   the USDA it says, "it is our understanding that
17   USDA has decided to proceed with a program that
18   allows companies and individuals to place the
19   USDA shield on their products when they have
20   only partial production involved in their
21   operation."
22        A.   Yes.

---

**619**

1         Q.   And the example you were aware of
2    was Sparboe?
3         MR. BARNES:  Objection.
4         THE WITNESS:  Yes.  That would
5    have been one of them.
6    BY MR. STUEVE:
7         Q.   Can you name anyone else that you
8    can think of?
9         A.   I think DeCoster was doing the
10   same thing.
11        Q.   Okay.  And those would have been
12   two principal competitors of Rose Acre?
13        A.   Correct.
14        Q.   And you go on to state in the
15   second paragraph there -- Mr. Miller, general
16   counsel for Rose Acre, states in the second
17   paragraph towards the end, "in order to comply
18   with these requirements, Rose Acre Farms reduced
19   the number of birds per cage, which has amounted
20   to a reduction of literally millions of birds
21   from our operation."  Did I read that correctly?
22        A.   Yeah.

---

**620**

1         Q.   Was that an accurate statement,
2    sir?
3         A.   No.
4         Q.   That -- okay.
5         A.   We added birds all the time.
6         Q.   So the representation made by
7    general counsel of Rose Acre to the USDA in this
8    August 27, 2007 letter was just simply flat
9    false?
10        A.   You're trying to twist it around
11   and say something that didn't take place.
12        Q.   If you could read back my question
13   and I ask you to answer it for me.
14        (The record was read as
15   requested.)
16        THE WITNESS:  Yes and no.
17        (Rust Exhibit Number 568 was
18   marked for identification.)
19   BY MR. STUEVE:
20        Q.   Let me show you what's been marked
21   Exhibit 568, it's RA 004766 through 70.
22        And this is RA 004766 through 70,

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

64 (Pages 621 to 624)

---

621

Exhibit 568.  This was produced by Rose Acre, you can tell by the Bates range; is that correct?

A.  That's what it says at the bottom. Correct.

Q.  And this is a letter sent on behalf of UEP, United Egg Producers, to Wal-Mart; right?

A.  Yeah.

Q.  And it says at the request of Ron Whaley at CCF Brands.  What is CCF brands?

A.  Country Creek Farms Brand.

Q.  Right.  They were not a UEP member; right?

A.  I'm not sure.

Q.  They were the broker for Wal-Mart; right?

A.  I think they call them category advisor, but I don't know what that really means.

Q.  Okay.  They're not an egg producer; right?

---

622

A.  They have been.

Q.  In July of 2008 they were not an egg producer; were they, sir?

A.  I don't know if they were an egg producer or not an egg producer.

Q.  "At the request of Ron Whaley at CCF Brands, we are providing the attached report of our assessment of the UEP certified program in comparison to the limited information available on an individual egg producer program that is offering the verification by USDA process verified program, PVP."  Do you see that?

A.  That's what it says.

Q.  And, again, this is targeting Sparboe; correct, sir?

MR. BARNES:  Object to form.

THE WITNESS:  I'm not sure who it's targeting.  Does it say that here someplace?

BY MR. STUEVE:

Q.  Are you, sir, is there any other

---

623

nonUEP certified member that is offering -- that was making these claims other than Sparboe, that you're aware of?

A.  There may have been several.  I don't recall.

Q.  The only ones -- the only one you can recall is Sparboe; correct?

A.  I recollect them as a company.

Q.  You would have been a Board member of UEP at this time, as well; correct?

A.  Yeah.

Q.  If you look at the -- if you look at the last paragraph there on the very first page it says, it is for this reason -- excuse me.

"Wal-Mart is the largest retail buyer of eggs.  Your company has always been the strongest supporter of UEP program among all retailers.  It is for this reason we are providing this information in hopes that you will continuing requiring your egg suppliers to implement this program on 100 percent of --"

---

624

(Interruption.)

BY MR. STUEVE:

Q.  Let me start over.  Would you look at that last paragraph there.  It says, "Wal-Mart is the largest retail buyer of eggs. Your company has always been the strongest supporter of UEP program among all retailers. It is for this reason we are providing this information in hopes that you will continue requiring your egg suppliers to implement this program on 100 percent of an egg suppliers owned and contracted production."  Do you see that?

A.  Yeah.

Q.  Again, this was specifically urging Wal-Mart not to do business with a noncertified company; correct, sir?

MR. BARNES:  Object to the form of the question.

THE WITNESS:  That may be your interpretation.  I'm not sure.

BY MR. STUEVE:

Q.  Now, how did you end up with a

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

65 (Pages 625 to 628)

625

1  copy of this, sir?
2      A.  Probably through our sales
3  department.  I don't know.
4      Q.   Did the sales department use this
5  letter as part of their marketing efforts?
6      A.  I have no idea.
7      Q.   Why would the sales department
8  have it?
9          MR. BARNES:  Object to the form.
10         THE WITNESS:  I have no idea.  Do
11  we know who the custodian was?
12  BY MR. STUEVE:
13     Q.   Sir, you've testified repeatedly
14  that the reason why you joined UEP certified was
15  that FMI was really pushing this on egg
16  producers; is that correct?
17         MR. BARNES:  Object to the form.
18         THE WITNESS:  I don't know what
19  FMI was -- they was -- my understanding, we was
20  led to believe they was the group that through
21  Wal-Mart, Kroger, the various people that said
22  on some committee there had asked the United Egg

626

1  Producers to come up with a program to get the
2  animal rights activists off their backs.
3          (Rust Exhibit Number 569 was
4  marked for identification.)
5  BY MR. STUEVE:
6      Q.   Sir, I'm going to show you what's
7  been marked as Exhibit 569.  Its Bates range FMI
8  000284 to 285.
9      A.  Is there another Exhibit 569?
10         MR. STUEVE:  Actually, yeah.  Give
11  me that.  I did my favorite trick here.  I show
12  you what's been marked as 569.
13         This would have been -- this is a
14  United Egg Producers letter to Ms. Terrie Dort,
15  the National Council of Chain Store Restaurants.
16  Do you know who she is?
17         THE WITNESS:  No.
18  BY MR. STUEVE:
19     Q.   This was written by Gene -- excuse
20  me.  Al Pope, president; is that correct?
21     A.  That's what it says.  Yeah.
22     Q.   And you would have been a Board

627

1  member of UEP at this time; correct?
2          MR. BARNES:  Objection to form.
3  Go ahead and answer.
4          THE WITNESS:  I think I was.
5  Yeah.
6  BY MR. STUEVE:
7      Q.   Do you know who the National
8  Council of Chain Store Restaurants, what that
9  is?
10     A.  Yeah.  It was one of the
11  organizations for the restaurant association or
12  something.
13     Q.   Does it have any affiliation with
14  FMI?
15     A.  My understanding it did.
16     Q.   Okay.
17     A.  Of some type.
18     Q.   And this is a letter, it says, "we
19  were shocked and dismayed with your response to
20  my letter of September 16th."  Do you see that?
21     A.  Yeah.
22     Q.   It says, "UEP and its Board

628

1  members have worked extremely hard in developing
2  our animal care program."  Did I read that
3  correctly?
4      A.  Yeah.
5      Q.   "A program science based and
6  developed to protect our industry's egg
7  producers, members of NCCR, FMI and other
8  industry customers."  Do you see that?
9      A.  Yeah.
10     Q.   And at the bottom of the letter it
11  says, "the adoption of the program by nearly
12  80 percent of shell egg producers has been a
13  revolutionary event and I want to stress this,
14  Terrie, it has only been accomplished because
15  producers themselves have agreed to each of the
16  various parts of the program, the guidelines,
17  the third-party audit, the dispute resolution
18  system, et cetera.  In other words, from day one
19  this has been a shell egg producer self-driven
20  program."  Did I read that correctly?
21     A.  That's what that says.  Yeah.
22     Q.   Did you have a chance to review

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

66 (Pages 629 to 632)

---

629

this letter before it was sent out by Mr. Pope?

A. No. I'm not sure I ever saw it.

(Rust Exhibit Number 570 was marked for identification.)

BY MR. STUEVE:

Q. Show you what's been marked as Exhibit 570, which is Bates stamped UE 0295185.

A. Okay.

Q. Do you remember reviewing this document?

A. No.

Q. Were you aware of the -- of this issue?

A. Not particularly. I don't remember it.

Q. It says in the first paragraph, "this is a letter from SES Inc. to Gene Gregory, senior vice-president of United Egg Producers;" correct?

A. That's what it says.

Q. It says, "I would like to clarify several issues relative to the animal welfare

---

630

audit program, AWAP, developed by the National Council of Chain Restaurants, NCCR and FMI."

A. Yeah.

Q. Are you familiar with AWAP?

A. Not particularly. No. I can't identify it.

Q. Did Rose Acre ever consider using the animal welfare audit program of FMI?

A. I don't recollect that we did.

Q. What is your understanding of the animal welfare audit program that FMI sponsors?

A. I have very little understanding other than what program we was asked to use by our customers.

Q. And it's your testimony that, again, that your customers specifically requested the UEP certified program; right?

A. Correct.

Q. But you can't point to me any document that you recall reviewing in preparation of your deposition today; correct?

A. I know what I was told by our

---

631

sales department.

Q. Who at the sales department told you that in March of 2002 customers were demanding the UEP certified program?

A. Greg Hinton.

Q. Greg Hinton did?

A. Yeah.

Q. Now, the next paragraph says, "the first issue involves the role of my company, SES Inc., in this program." Are you familiar with SES?

A. No.

Q. "SES Inc. is the program administrator. As such we interact with FMI and NCCR, as well as the program's Technical Advisory Committee." Did I read that correctly?

A. That's what it says. Yeah. I think you did.

Q. Then it states, "we develop and implement training and conducting AWAP audits. We provide quality assurance and quality control for the program. We maintain the program

---

632

database and we interact with the auditing community." Did I read that correctly?

A. Yes.

Q. "AWAP is a NCCR and FMI program, not an SES program. Please refrain from stating AWAP is an SES program." Did I read that correctly?

A. Yeah.

Q. It says, "the second issue deals with the relationship between the AWAP audit and the United Egg Producers UEP animal care certified audit." Do you see that?

A. Yes.

Q. "In the spring of 2003 UEP informed SES, NCCR and FMI it would accept an AWAP audit in lieu of an animal care certified audit for those operations wishing to achieve or maintain their animal care certified status. Did I read that correctly?

A. Yeah.

Q. "Neither NCCR nor FMI have determined that an animal care certified audit

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

67 (Pages 633 to 636)

---

**633**

1  is equivalent to or should replace an AWAP
2  audit.  Suggesting equivalency is misleading and
3  incorrect."  Did I read that correctly?
4      **A.  Yes.  That's what it says.**
5          MR. BARNES:  Object to the form
6  and the question.  This is a gross waste of
7  time.  The document speaks for itself.  You've
8  sat here and read every line of a document that
9  this witness has indicated he has not seen
10  before.  It was not addressed to him.  There is
11  no indication that even Rose Acre received this
12  letter.  You sat here and you read every line.
13  The document speaks for itself.  This is a gross
14  waste of time and we -- you know, we've been
15  very patient.  You've done this repeatedly
16  throughout this deposition, but the document
17  speaks for itself.  If the witness has seen it
18  or if you have a specific question, but to sit
19  here and read sentence after sentence and ask
20  the witness if that's what the document says, I
21  object to that procedure.
22  BY MR. STUEVE:

---

**634**

1      Q.  Sir, you sat on the Board of UEP
2  in September of 2003; correct?
3      **A.  Yeah.**
4          MR. BARNES:  I object.  That
5  doesn't prove anything as far as this document
6  is concerned and as far as your reading every
7  sentence.
8  BY MR. STUEVE:
9      Q.  Did Mr. Gregory bring to the
10  Board's attention the fact that Frank Bryant,
11  the president of SES, believed that UEP was
12  making misleading and incorrect statements?
13      **A.  I have no recollection of that.**
14      Q.  This certainly would be something
15  that he would have been expected to bring to the
16  Board; correct?
17          MR. BARNES:  Object to the form of
18  the question.
19          THE WITNESS:  I have no idea.
20  BY MR. STUEVE:
21      Q.  You wouldn't expect him to bring
22  an issue like this before the Board of UEP?

---

**635**

1          MR. BARNES:  Same objection.
2          THE WITNESS:  I have no idea.
3  BY MR. STUEVE:
4      Q.  How long have you sat on the
5  Board, sir?
6      **A.  At this time?**
7      Q.  No.  Up through today?
8      **A.  This was 2003.**
9      Q.  Right.  But you sat on the Board
10  for over a decade; right?
11      **A.  12 years.**
12      Q.  Based on your experience serving
13  on the Board for over a decade, you would expect
14  that a senior VP of UEP would bring to the
15  Board's attention a letter accusing UEP of
16  engaging in misleading and incorrect statements;
17  correct?
18          MR. BARNES:  Object to the form.
19          THE WITNESS:  I have no idea.
20          MR. STUEVE:  Why don't we take a
21  break.
22          THE VIDEOGRAPHER:  Off the record

---

**636**

1  at 4:31 p.m.
2          (A brief recess was taken.)
3          THE VIDEOGRAPHER:  Back on the
4  record at 4:51 p.m.
5  BY MR. STUEVE:
6      Q.  You have in front of you,
7  Mr. Rust, back in front of you Exhibit 517,
8  which is the notice that was served on you in
9  this case?
10      **A.  Okay.**
11      Q.  If you could turn to topic number
12  two.  You've been designated on behalf of Rose
13  Acre to testify.  Do you have topic two in front
14  of you?
15      **A.  Correct.**
16      Q.  It says your membership in any
17  cooperative.  And then it says including the
18  identity of the cooperative.
19          We've asked you -- I've asked you
20  questions about Rose Acre's participation in
21  United Egg Producers; correct?
22      **A.  Correct.**

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

68 (Pages 637 to 640)

---

637

1    Q.   I've asked you about Rose Acre's
2  participation in United States Egg Marketers;
3  correct?
4    **A.   Yeah.**
5    Q.   I've asked you questions about the
6  Egg Products, Inc. Cooperative; correct?
7    **A.   Correct.  It never operated.**
8    Q.   Well, we certainly saw meeting
9  minutes; right?
10   **A.   Correct.**
11   Q.   All right.  Has Rose Acre been a
12 member of any other cooperative?
13   **A.   Not that I recollect.**
14   Q.   Okay.  Were there membership
15 agreements entered into with respect to the Egg
16 Products, Inc. cooperative?
17   **A.   Randon would have had the**
18 **membership agreements; correct.**
19   Q.   Okay.  He had prepared those?
20   **A.   Correct.**
21   Q.   With respect to all of the goods
22 that Rose Acre is required to purchase to run

---

638

1  its business, do you purchase goods from any
2  cooperatives?
3    **A.   We may purchase something from a**
4  **cooperative, but we do not -- correct, we do**
5  **purchase from a cooperative.**
6    Q.   Can you tell me which goods or
7  services you purchase from cooperatives?
8    **A.   We purchase diesel fuel and fuel**
9  **or gasoline from various cooperatives around our**
10 **location.  There would be maybe three or four**
11 **different ones.  Fuel -- miscellaneous farm**
12 **goods.  We would have a charge account set up at**
13 **the local co-op farm store in Indiana or like**
14 **northern Indiana, Seymour, Indiana.**
15   Q.   In addition to fuel, what types of
16 goods would you purchase from these
17 cooperatives?
18   **A.   May have been two by fours or, you**
19 **know, just hardware.  Miscellaneous.  They're**
20 **not co-ops related to the egg business of any**
21 **type.**
22   Q.   But they are cooperatives; right?

---

639

1    **A.   They're cooperatives.**
2    Q.   And do you have to be a member of
3  these co-ops in order to purchase from them?
4    **A.   I don't think so.**
5    Q.   Who would know that?
6    **A.   How do you mean?**
7    Q.   Who at Rose Acre would know
8  whether or not you have to be members of these
9  farm co-ops in order to purchase goods from
10 them?
11   **A.   Kent Ford.**
12   Q.   Who?
13   **A.   Kent Ford.**
14   Q.   Who is Kent Ford?
15   **A.   My purchasing agent.**
16   Q.   Where is he located?
17   **A.   At Seymour, Indiana.**
18   Q.   Okay.  Do you know, if you look at
19 topic number H, 2H, it says, whether you
20 purchase goods and services from a cooperative
21 and how the prices for such goods or services
22 are determined.  Do you see that?

---

640

1    **A.   Correct.**
2    Q.   It's my understanding in
3  preparation for your deposition today, you did
4  not speak with Kent Ford; is that correct?
5    **A.   Correct.**
6    Q.   Okay.  Do you know how the prices
7  for the fuel, for example, that you purchase
8  from these cooperatives is set?
9    **A.   Personally?**
10   Q.   Correct.
11   **A.   No.**
12      MR. BARNES:  I'm going to object
13 here because item number 2, you're referring to,
14 Mr. Stueve, is all prefaced by the words your
15 membership in any cooperative, including.  And
16 the witness said he doesn't think you have to be
17 a member to participate in these supply co-ops.
18 What I'm saying is I think you're distorting the
19 specification in the 30(b)(6).
20 BY MR. STUEVE:
21   Q.   If you look at J, it says, whether
22 the cooperative has buying power and leverages

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

69 (Pages 641 to 644)

---

641

1  that buying power.  Do you see that?
2      A.  Yes.
3      Q.  Did you talk to Kent Ford about
4  that topic?
5      A.  No.
6      Q.  Do you know whether these
7  cooperatives that you purchase goods and
8  services from, whether or not they engage in
9  bulk purchasing, for example, of fuel?
10     A.  The one owns a refinery.
11     Q.  Which one is that?
12     A.  It would be the Jackson Jennings
13 -- I forget, is it Country Mart has their --
14 what do they call it?  It's changed.
15     Q.  Just do your best?
16     A.  The co-op.  It has --
17     Q.  Where is the co-op located that
18 you're referring to?
19     A.  It used to be Indianapolis, but
20 there's been so many mergers, I'm not sure where
21 their offices are located at today.
22     Q.  Where are their facilities located

---

642

1  that you purchase from?
2      A.  The refinery is someplace in
3  Illinois, I think.
4      Q.  Do you remember the name of the
5  co-op?
6      A.  The local co-op that we purchase
7  from would be the Jackson Jennings co-op.
8      Q.  Okay.  Do you remember the names
9  of any other co-ops that you purchase goods and
10 services from?
11     A.  There is one I think called Agro
12 Key in northern Indiana.  Then there's one in --
13 I think they've changed their name.  I would
14 assume that there are some of these same types
15 of co-ops.  Any farming community you go into,
16 there's these little co-ops that are selling
17 goods and services and we've always bought from
18 them in the past.  I don't know if we have to be
19 a member or not.  I know you can drive up with
20 your car to their gas station and get gas and
21 you don't have to sign any agreement.
22     Q.  Do you know whether you're

---

643

1  eligible to receive any patronage from these
2  co-ops, based on the purchases that you make?
3      A.  There may be, there may not.  I'm
4  not sure.
5      Q.  Would Kent Ford be the one who
6  would know that?
7      A.  Kent Ford would know that.
8      Q.  Topic number 3.  It says, your
9  membership in any group purchasing organization?
10     A.  No.
11     Q.  Who would know that at Rose Acre?
12     MR. BARNES:  Object to form of the
13 question.  I think you misunderstood the
14 witness's answer when he said no.  Please go
15 ahead and ask.
16 BY MR. STUEVE:
17     Q.  I'm sorry?
18     MR. BARNES:  Are you a member of
19 any group purchasing?
20     MR. STUEVE:  If you would, let me
21 ask the question.
22     MR. BARNES:  I apologize.

---

644

1      THE WITNESS:  I answered that.
2      MR. BARNES:  Ask it again, please
3  ask it again.
4      THE WITNESS:  I answered too
5  quick, I think.
6      MR. BARNES:  Let him state the
7  question and then answer.
8  BY MR. STUEVE:
9      Q.  If you look at topic number 3, it
10 says, your membership in any group purchasing
11 organization.
12     Do you -- are you a member in any
13 group purchasing organization?
14     A.  I don't believe we are.  No.
15     Q.  Did you ask Kent Ford in
16 preparation for your deposition today whether or
17 not Rose Acre is a member of any group
18 purchasing organization?
19     A.  I think we would have, correct.  I
20 did not personally ask him, but I was told to
21 say no.
22     Q.  Okay.  I believe you've been

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

645

1    designated for topic number 6?
2            MR. MONICA:  Don't think so.
3            MR. BARNES:  I don't think so,
4    Pat.
5            MR. STUEVE:  That's Mr. Hinton;
6    right?
7            MR. BARNES:  I believe so.  I
8    don't have that list in front of me, but it
9    certainly wasn't Mr. Rust.
10   BY MR. STUEVE:
11       Q.   If you could, topic 16.  The topic
12   is, consolidation in the egg industry from 1990
13   to the present?
14       A.   Correct.
15       Q.   Do you see that topic?
16       A.   Correct.
17       Q.   Big broad terms, is it fair to say
18   that there has been significant consolidation in
19   the egg industry since 1999?
20       A.   Correct.
21       Q.   Okay.  And if you would, I'm going
22   to show you, refer you back to Exhibit 518.

646

1            If you turn to the second page of
2    that brochure, it has the history and growth of
3    Rose Acres.  Do you remember we looked at that?
4        A.   Correct.
5        Q.   And starting in 1973, you have
6    built Jen Acres, North Vernon; is that right?
7        A.   Correct.
8        Q.   Just to be clear, you've been
9    referring to that, it's spelled J-E-N,
10   A-C-R-E-S; is that right?
11       A.   Correct.
12       Q.   It's in North Vernon, Indiana;
13   right?
14       A.   Correct.
15       Q.   And the approximate number of
16   layers at that facility is 1.5 million; is that
17   right?
18       A.   Approximately.
19       Q.   Then in '78, you built Cort Acres
20   in Cortland, Indiana; is that right?
21           MR. BARNES:  I'm going to object
22   to these questions going back to the '70s.  That

647

1    period is not a part of your lawsuit and your
2    30(b)(6) specifies for a period of time from
3    1999.  I'll let you ask the witness questions
4    subject to my objection.  They're beyond the
5    scope of your own 30(b)(6) and your own lawsuit.
6    BY MR. STUEVE:
7        Q.   It says, 1978, built Cort Acres in
8    Cortland, Indiana; correct, sir?
9        A.   That's what it says.
10       Q.   And the approximate number of
11   layers at Cort Acres is 3 million; is that
12   correct?
13       A.   When?  What date?
14       Q.   Today.
15       A.   Today.  Correct.
16       Q.   And then in 1984, Rose Acre built
17   Newton County Egg Farm in Brook, Indiana; is
18   that right?
19       A.   Correct.
20       Q.   And Newton County today has
21   approximately 1.5 million layers; right?
22       A.   Approximately.

648

1        Q.   And then in 1985, Rose Acre built
2    White County Egg Farm in Monon, Indiana; right?
3    Is that correct?
4        A.   Correct.
5        Q.   And it has approximately
6    1.5 million layers; correct?
7        A.   Close.  Correct.
8        Q.   And then in 1986, Rose Acre built
9    Pulaski County Egg Farm in Francisville,
10   Indiana; correct?
11       A.   Correct.
12       Q.   And that has approximately
13   2 million layers; right?
14       A.   Correct.
15       Q.   And then in 1987, Rose Acre built
16   Winterset Egg Farm in Winterset, Iowa; correct?
17       A.   Correct.
18       Q.   And Winterset has approximately
19   1 million layers?
20       A.   Approximately.  Yeah.
21       Q.   And then in 1989, Rose Acre built
22   Guthrie Center Egg Farm in Guthrie Center, Iowa;

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

71 (Pages 649 to 652)

---

649

correct?

A.   Correct.

Q.   And Guthrie Center has approximately 1.5 million layers; right?

A.   Approximately.

Q.   And then in 1991, Rose Acre built Stuart Egg Farm in Stuart, Iowa; correct?

A.   Correct.

Q.   And Stuart has approximately 1.5 million layers; correct?

A.   Approximately.  Correct.

Q.   Then in 1993, Rose Acre purchased Marshall Egg Products in Marshall, Missouri; correct?

A.   Correct.

Q.   And does that have any egg laying facilities there?

A.   It owns Johnson County.

Q.   And Johnson County is in Knob Noster; right?

A.   Correct.

Q.   And Johnson County has

---

650

approximately 2 million layers; right?

A.   No.

Q.   How many does it have there?

A.   Best memory, a million 7.

Q.   Okay.  1.7 million?

A.   Capacity.  I don't know what the actual bird number would be.  The records will show that.

Q.   And then in 1994, you purchased the Johnson County Egg Farm in Knob Noster; right?

A.   That's one you just asked me.

MR. BARNES:  Just asked and answered.

BY MR. STUEVE:

Q.   Sir, I didn't ask -- I had asked you -- I asked you about Marshall Egg Products; right?

A.   I told you it owned Johnson County Egg Farm.

Q.   And so I just want the record to reflect the year after you purchased Marshall

---

651

Egg Products in Marshall, Missouri, you purchased Johnson County Egg Farm in Knob Noster; correct?

A.   Correct.

Q.   And then in 1995, Rose Acre purchased Lincoln County Egg Farm, Hawk Point, Missouri; right?  Is that correct?

A.   That date may be wrong.

Q.   When do you think it may have been?

A.   I would have to look at records to see.

Q.   Lincoln County has approximately 1 million layers?

A.   Yeah, or a little less.

Q.   And then in 1998, Rose Acre purchased NEPCO Egg Products in Social Circle, Georgia; is that right?

A.   Yeah, about then.

Q.   And does it own any egg laying facilities?

A.   No.

---

652

Q.   What is its primary purpose?

MR. BARNES:  Objection.  Asked and answered.  You asked him this earlier today or yesterday.  I can't remember when.

BY MR. STUEVE:

Q.   You can answer.

MR. BARNES:  Go ahead.  Tell him again.

THE WITNESS:  It's just an old closed down drying facility.

BY MR. STUEVE:

Q.   Very good.  I remember that now.

In 1999 Rose Acre built Oconee Egg Farm in Madison, Georgia; correct?

A.   Not quite correct.

Q.   What's inaccurate about the document?

A.   We had purchased the farm and then we come back and added birds to it another date.

Q.   Okay.  So you didn't actually build the Oconee Egg Farm?

A.   Correct.  We did not start it, we

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

72 (Pages 653 to 656)

---

653

1    just added production to it.
2        Q.    Okay.  And would you have actually
3    acquired it in 1999?
4        A.    We purchased that from a guy by
5    the name of Johnny Jacobs in '99, '98.  I'm not
6    sure of the exact date.
7        Q.    And the Oconee Egg Farm has
8    approximately 1 million layers; right?
9        A.    It's about 1 and a half million
10   today.
11       Q.    Okay.  Then in 2002, Rose Acre
12   purchased Donovan Egg Farm in Donovan, Illinois;
13   right?
14       A.    Correct.
15       Q.    Approximately how many layers are
16   there in Donovan?
17       A.    Then or today?
18       Q.    Today.
19       A.    150, 180, something like that.
20       Q.    Okay.  And then in 2004, Rose Acre
21   purchased Germantown Egg Farm in Germantown,
22   Indiana; right?

---

654

1        A.    Correct.
2        Q.    And Germantown has approximately
3    1 million layers; is that right?
4        A.    Pretty close.  8 or 900,000.  I
5    would have to look at records.
6        Q.    Okay.  And then in 2004, Rose Acre
7    also purchased County Line Egg Farm in
8    Frankfort, Indiana; right?
9        A.    Yeah.
10       Q.    And County Line has approximately
11   1 million layers; correct?
12       A.    Correct.  A tornado hit it.
13       Q.    And then in 2005, Rose Acre broke
14   ground on Hyde County Egg Farm in Pantego, North
15   Carolina; is that right?
16       A.    Correct.
17       Q.    And Hyde County has approximately
18   3 million layers?
19       A.    Capacity may be 3.5.
20       Q.    Approximately how many layers is
21   it?  3 or is it a little over?
22       A.    It would be now a little over 3.

---

655

1        Q.    Okay.  And then what's not listed
2    on here is Crystal Farms; right?
3        A.    Correct.
4        Q.    And when -- was that built or
5    acquired?
6        A.    That was acquired.
7        Q.    And approximately when was that
8    acquired?
9        A.    I would have to look at a date.
10   5, 6 years ago.  5 years ago.
11       Q.    So that would have been roughly
12   2008 timeframe?
13       A.    2008, 2010, somewhere in that time
14   period.
15       Q.    I believe you testified earlier
16   you estimated the number of layers there is
17   about 2 and a half million?
18       A.    No.
19       Q.    Okay.  What is it?
20       A.    It's about -- when we purchased
21   it, I think it was 1.3.  And we're in the
22   process of adding another 250,000, plus or

---

656

1    minus.
2        Q.    So currently, what is the layers?
3        A.    Currently?
4        Q.    Yeah.
5        A.    About 1.2, 1.3.
6        Q.    Are there any other egg production
7    facilities that we've not identified?
8        A.    No.
9        Q.    Now, if you would, if you could
10   turn to 523 again.  That was the Egg Industry
11   publication we looked at earlier.
12       A.    Yeah.
13       Q.    This document on the front page,
14   it says -- it ranks the top 11 egg producers.
15   And it says, nearly 151 million laying hens
16   housed by the top 11 egg companies in the US
17   represent just over half of the US total table
18   egg layer flocks as reported by the USDA.  Do
19   you see that?
20       A.    Correct.
21       Q.    And is that consistent with your
22   understanding?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

73 (Pages 657 to 660)

---

657

1      A.   That's what it says here.
2      Q.   That would certainly be an
3  indication of a substantial consolidation that
4  has occurred in the egg industry; right?
5      A.   Correct.
6      Q.   A lot less egg producers producing
7  a lot more eggs; fair enough?
8      A.   Correct.
9      Q.   Now, topic 17 is for each year
10 your total annual layers.  Do you see that?
11     A.   Which one?
12     Q.   Topic 17?
13     A.   Oh.  Okay.
14     Q.   And I believe you testified that
15 to the best of your recollection at least
16 currently the number of layers is 22 million
17 plus?
18     A.   That's the number that I last saw
19 on a weekly production, that list by house and
20 there's a total compilation at the bottom says
21 how many live chickens there is.
22     Q.   So there is a document that would

---

658

1  have the total number of live chickens for all
2  of the facilities?
3      A.   Every week.
4      Q.   Every week?
5      A.   Correct.
6          MR. BARNES:  I believe those have
7  been produced.  They, of course, are the best
8  evidence of the yearly flock totals for the
9  company.
10 BY MR. STUEVE:
11     Q.   We've seen some of those.  We
12 weren't quite sure what the numbers meant, and
13 so the total number of layers for all the
14 facilities would be included in those documents
15 on a weekly basis?
16     A.   Correct, it's weekly.  That's our
17 production record.
18     Q.   How is that count actually taken
19 -- how does it take place?
20     A.   How do you mean?
21     Q.   Obviously, there has to be some
22 estimate, right, with respect to the number of

---

659

1  layers.  You are not physically counting
2  22 million birds on a weekly basis; right?
3      A.   I've had accountants who come out
4  and wanted to do that.
5      Q.   They're like lawyers, they bill by
6  the hour; right?
7      A.   I left one of them in the hen
8  house for about a day.
9      Q.   In preparing your weekly
10 summaries, you are obviously not hand counting
11 22 million birds on a weekly basis; right?
12     A.   They computer and paper count
13 daily.  We start with a paper count from each
14 individual house where they pick the daily
15 mortality.  And then if they happen to move in
16 birds, they create a paper number that says this
17 is how many birds got moved into the house if
18 they move birds out, they make a report up on
19 how many birds got moved out.
20     Q.   So basically they're taking a
21 number and based on mortality count, reduce that
22 number based on hens moved into the house, they

---

660

1  increase that number.  Fair enough?
2      A.   Fair enough.
3      Q.   All right.  Topic 19 is the
4  entities that produce the eggs and egg products
5  you market and sell, and your ownership of any
6  of these entities.  We walked through that in
7  detail yesterday; correct?
8      A.   Correct.
9      Q.   Are there any entities that
10 produce eggs or egg products that we've not
11 identified?
12     A.   Trying to think here.  No.
13     Q.   Okay.  And then topic 20, you've
14 been designated for A through E and we talked
15 about your decision to join UEP.  We talked
16 about the membership agreement that you signed;
17 right?  Do you remember that?
18     A.   Correct.
19     Q.   Then we walked through the years
20 Rose Acre has been a UEP member.  Then we also
21 walked through the various committees that
22 members of Rose Acre are involved in; right?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                  March 6, 2014

74 (Pages 661 to 664)

---

661

1    A.   I think we did.
2    Q.   Okay.  Is there any involvement in
3  UEP from Rose Acre's standpoint that we haven't
4  talked about?
5    A.   I don't recollect any.
6    Q.   And then you're also designated
7  for topic 22, some of the items in there, which
8  is your membership in USEM.  We showed the
9  documentation that you -- Rose Acre joined in
10  2006?
11    A.   Correct.
12    Q.   Do you recall why you joined in
13  2006?
14    A.   Correct.
15    Q.   Why?
16    A.   We had just built our production
17  facility in North Carolina, and we was going to
18  have surplus eggs in an area that we would be
19  able to ship to Norfolk, which is one of the
20  largest shipping points out of the United
21  States.  And we was going to be in a great
22  position to market surplus eggs if they took any

---

662

1  export orders.
2    Q.   Did you have any facilities
3  anywhere else on the East Coast?
4    A.   No.
5    Q.   Well, you had your -- when did
6  you -- with respect to Oconee Egg Farms, that
7  was in Georgia; right?
8    A.   Correct.
9    Q.   You consider Georgia East Coast;
10  don't you?
11    A.   No.
12    MR. BARNES:  I don't think
13  Georgians would agree either.
14  BY MR. STUEVE:
15    Q.   You also had Crystal Farms in
16  Georgia as well; correct?
17    A.   Not when we joined USEM.
18    Q.   Okay.  That was after you joined
19  USEM?
20    A.   Correct.
21    Q.   So you had the Georgia facility,
22  the Oconee facility prior to joining USEM; is

---

663

1  that right?
2    A.   Correct.
3    Q.   Let's turn to topic 26.  That's
4  the Capper-Volstead Act and the Kansas
5  Cooperative Marketing Act topic.  Do you see
6  that?
7    A.   Correct.
8    Q.   We -- I showed you some documents
9  earlier that had Brann & Isaacson legal advice
10  from November 2004 memorandum and then it
11  attached the 1992 memorandum.  Do you recall
12  that?
13    A.   Correct.
14    Q.   We walked through those two
15  documents.  Do you have any knowledge concerning
16  the Capper-Volstead Act other than what was
17  contained in those two documents?
18    A.   Not much.
19    Q.   Do you recall ever having a
20  discussion with anyone at Brann & Isaacson
21  concerning the Capper-Volstead Act?
22    A.   No.

---

664

1    Q.   Okay.  Did you -- prior to the
2  filing of this lawsuit, you would have had
3  communications with Randon Wilson about the
4  Capper-Volstead Act; is that correct?
5    A.   Concerning the certified eggs
6  products attempt.
7    Q.   Do you remember anything specific
8  about the advice you got with respect to that
9  cooperative from Randon Wilson?
10    A.   Not much different than the other.
11    Q.   Okay.  Did you receive any other
12  level advice prior to the filing of the
13  antitrust lawsuits in '08 from any lawyer
14  concerning the Capper-Volstead Act?
15    MR. BARNES:  I'm going to object
16  to that to the extent it calls for privileged
17  communications.
18    MR. STUEVE:  I'm not asking for
19  the content, just subject matter.
20    MR. BARNES:  I'm sorry, you're
21  correct.  Go ahead.
22  BY MR. STUEVE:

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

75 (Pages 665 to 668)

---

665

1    Q.   Okay.  Just asking with respect to
2  the subject matter of the Capper-Volstead Act,
3  did you receive any other advice from a lawyer
4  prior to 2008?
5    **A.   I don't recollect any.**
6    Q.   Topic number 27 is -- let me ask
7  you this.  Do you have any knowledge of the
8  Kansas Cooperative Marketing Act?
9    **A.   Very little.**
10    Q.   Any that you can share with us
11  today?
12    **A.   No more than what I see here on**
13  **these papers.**
14    Q.   Then with respect to 27, other
15  state or federal statutes providing any
16  potential immunity from the Kansas Restraint of
17  Trade Act.  Are you aware of any?
18    **A.   No.**
19    Q.   And then topic 33.  He's?
20    MR. MONICA:  He's designated.
21  BY MR. STUEVE:
22    Q.   You've been designated -- any

---

666

1  communications between you and UEP, USEM or any
2  other defendant in this case or any other
3  attorneys regarding the legality of your
4  activities under the federal or state antitrust
5  laws.  Do you see that topic?
6    **A.   Correct.**
7    Q.   Again, we showed you the
8  Capper-Volstead related advice.  We walked
9  through that.  Do you recall any other documents
10  that you had -- would have received from either
11  UEP or USEM or any other defendant in this case
12  concerning the Capper-Volstead Act?
13    **A.   Don't recall any.**
14    Q.   Okay.  Do you remember any
15  communication between you and UEP, USEM,
16  concerning the Capper-Volstead Act?
17    **A.   Not that hasn't been shown or**
18  **disclosed here.  I don't recall any.**
19    MR. STUEVE:  I don't have any
20  further questions of the witness.
21    MR. BARNES:  Mr. Stueve, if you
22  would give us 10 minutes to whittle down my

---

667

1  stack.
2    MR. STUEVE:  Sure.
3    MR. BARNES:  That will be
4  appreciated.  Hopefully we can get through in
5  15 minutes or so.
6    MR. STUEVE:  Okay.
7    THE VIDEOGRAPHER:  This is the end
8  of videotape number 4.  Off the record at 5:27
9  p.m.
10    (A brief recess was taken.)
11    THE VIDEOGRAPHER:  This is the
12  beginning of tape number 5.  Back on the record
13  at 5:47 p.m.
14  EXAMINATION BY COUNSEL FOR ROSE ACRE FARMS
15  BY MR. BARNES:
16    Q.   Mr. Rust, you know who I am; don't
17  you?
18    **A.   Correct.  Most expensive guy I've**
19  **ever hired.**
20    Q.   We don't know what Mr. Stueve's
21  rates are, though.  I just have a few clean up
22  questions for you to clean up some areas of the

---

668

1  record.  I'll try to be very quick.  It's been a
2  long day, you're tired, counsel are tired.  Our
3  very excellent court reporter and videographer
4  are tired, so we'll try to make this as quick
5  and painless as possible, okay?
6    So please, it's late in the day.
7  Try to concentrate on my questions, if you will.
8    Were you ever a member of the UEP
9  Executive Committee?
10    **A.   No.**
11    Q.   There has been previous testimony,
12  Mr. Rust, about who can buy noncertified eggs,
13  whether UEP certified members can buy
14  noncertified eggs from other sources.  Can you
15  please tell us whether your company, Rose Acre
16  Farms, which is a UEP certified member, has been
17  for a decade, whether Rose Acre Farms currently
18  buys noncertified eggs?
19    MR. STUEVE:  Objection to form.
20  Compound.
21    THE WITNESS:  We buy some.
22  BY MR. BARNES:

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

76 (Pages 669 to 672)

---

669

1    Q.   How long have you -- you meaning
2  Rose Acre Farms -- purchased noncertified eggs?
3    **A.   Off and on during the whole time**
4  **of the whole program.**
5    Q.   Do you know whether other UEP
6  certified egg producing members also purchase
7  noncertified eggs?
8         MR. STUEVE:  Objection calls for
9  speculation on the part of the witness.
10        THE WITNESS:  Some have said they
11 have.
12 BY MR. BARNES:
13   Q.   Have you ever been sanctioned by
14 UEP for purchasing noncertified eggs?
15   **A.   No.**
16   Q.   Mr. Rust, I am going to redirect
17 your attention back to what Mr. Stueve marked as
18 Exhibit 536.  Can you find that exhibit, please?
19        MR. BARNES:  John, can you perhaps
20 give him a hand?  536.  For the record,
21 Exhibit 536 is a two page document bearing
22 identification number RA 0067468 to 0067469.

---

670

1         The first page appears to be a
2  memo or letter from KY Hendrix to Lois Rust,
3  Marcus Rust and others dated March 14, 2002.
4         MR. STUEVE:  Do you remember when
5  we covered that?
6         MR. BARNES:  Pat?
7         MR. MONICA:  What was the number,
8  Don?
9         MR. BARNES:  536.
10        THE WITNESS:  Here we go, bottom
11 one.
12        MR. BARNES:  Mr. Stueve, he's got
13 it.
14 BY MR. BARNES:
15   Q.   I'm going to direct your attention
16 to the second page, some of the handwritten
17 notes on the second page.  Take a minute to --
18 while Mr. Stueve -- give him an opportunity to
19 catch up.  Take a look at the handwritten notes,
20 please.  And when counsel is ready, I'll have a
21 couple questions for you.
22        MR. STUEVE:  Okay.

---

671

1  BY MR. BARNES:
2    Q.   Okay.  Mr. Rust, Mr. Stueve asked
3  you about certain parts of this exhibit.  I'm
4  going to ask you about other parts; okay?
5    **A.   Okay.**
6    Q.   Now, if you look again at the
7  second page, he did direct your attention in the
8  middle of the page to a sentence that says, "I
9  think some people think it will make them rich
10 or something."  Do you see that language, it's
11 six lines down.  It begins, I think?
12   **A.   Okay.**
13   Q.   I think some people.  It's in the
14 text.  I think some people think it will make
15 them rich or something.  Do you see that
16 language?
17   **A.   Correct.**
18   Q.   Would you look in the margin
19 immediately adjacent to that language and
20 there's a dash, do you see the handwritten dash?
21   **A.   Correct.**
22   Q.   And then there's handwritten

---

672

1  two words written next to that.  Do you see
2  that?
3    **A.   Correct.**
4    Q.   What does it say?
5    **A.   It won't.**
6    Q.   Take a look at the handwritten
7  notations on the right side of this document.  I
8  believe you already testified that's the
9  handwriting of your mother, Lois Rust; is that
10 correct?
11   **A.   Correct.**
12   Q.   And you previously testified in
13 response to some of Mr. Stueve's questions about
14 the attacks that certain radical animal rights
15 groups made on Rose Acre Farms.  Do you recall
16 that?
17        MR. STUEVE:  Objection.  Leading.
18        THE WITNESS:  Correct.
19 BY MR. BARNES:
20   Q.   Do you recall that testimony?
21   **A.   Correct.**
22   Q.   I believe you testified that a

---

## HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

---

673

1   truck was burned; is that correct?
2       A.   Correct.
3       Q.   And there was other acts of
4   violence that you testified to?
5       A.   Electrical transformers, water
6   plant.
7       Q.   Take a look at your mother's
8   handwriting in the middle of the page, it
9   begins, she said, this is guerilla, and she
10  underlined guerilla, warfare.
11      MR. STUEVE:  I'm going to object.
12      MR. BARNES:  Why?
13      MR. STUEVE:  Objection.  Leading.
14      MR. BARNES:  I haven't asked a
15  question yet.
16      MR. STUEVE:  You're reading the
17  handwritten note.
18      MR. BARNES:  Yeah, you did that
19  all afternoon.  You read documents all
20  afternoon.  I'm just doing what you did, Pat.
21      MR. STUEVE:  Objection.  Leading.
22      MR. BARNES:  Make your objection

---

674

1   but let me finish my question before you object.
2   BY MR. BARNES:
3       Q.   Your mom's handwritten note on the
4   right-hand side of this document?
5       A.   Correct.
6       Q.   I'm going to read it, you follow
7   along, you tell me if I've misread it, okay?
8       A.   Okay.
9       Q.   Better yet, why don't you read it
10  beginning with this?
11      A.   This is guerilla warfare we're in,
12  we've had one truck burned up already, and best
13  way is to keep a low profile because they,
14  animal welfare, want attention.
15      Q.   Thank you, Mr. Rust.  Did you
16  discuss the guerilla warfare that the animal --
17  radical animal rights groups were conducting
18  against Rose Acre with your mother?
19      A.   Correct.
20      Q.   Did that conduct -- did that
21  violence by these animal rights activists have
22  anything to do with your decision to join UEP

---

675

1   and the animal welfare program?
2       A.   Correct.  It did.
3       Q.   Now, directing your attention
4   further on down your mother's handwritten note,
5   and I'll see if -- I'll start the sentence and
6   see if you can pick it up.  It says, UEP did the
7   right thing.  Do you see that language?
8       A.   Right, to have the cage test done
9   as it was done scientifically.
10      MR. STUEVE:  Objection.  Testimony
11  is not responsive to the question.
12      MR. BARNES:  Well, I asked him to
13  read it.
14  BY MR. BARNES:
15      Q.   Her handwritten note as you've
16  read states, UEP did the right thing to have the
17  cage test as it was done scientifically.  Do you
18  see that?
19      A.   Correct.
20      Q.   Did you discuss that issue with
21  your mother?
22      A.   Correct.

---

676

1       Q.   Did you agree with your mother
2   that UEP did the right thing to have the cage
3   test, as it was done scientifically?
4       A.   Correct.
5       Q.   Okay.  Would you take a look,
6   Mr. Rust, at Exhibit 535, which was marked by
7   Mr. Stueve.  It should -- hopefully, it's the
8   one right before or after 536?
9       A.   Correct.
10      Q.   Okay.  We'll give counsel on the
11  other side of the table a chance to locate that
12  exhibit.
13      A.   It's marked highly confidential.
14      Q.   Pardon me?
15      A.   It's marked highly confidential.
16      Q.   Well, we're going to resolve that
17  with a stipulation at the end of your
18  deposition.  We've already discussed that.
19      MR. STUEVE:  I'm sorry.  Where are
20  we at?
21      MR. BARNES:  We're at 535.
22      MR. STUEVE:  Which document?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                March 6, 2014

---

677

1    MR. BARNES:  This is the special
2   called UEP marketing conference call,
3   September 24, 2001.
4    MR. STUEVE:  535.
5    MR. BARNES:  535, correct.
6    MR. STUEVE:  Got it.
7   BY MR. BARNES:
8    Q.   Mr. Rust, I only have one
9   question, maybe two, about this document.  The
10  document is dated September 24, 2001.  That was
11  before Rose Acre became a member of UEP; is that
12  correct?
13   A.   Yes.  It is.
14   Q.   There's a list in the front of
15  this document which says, Marketing Committee
16  Chairman Dolph Baker called the meeting to
17  order, the following were present.  There are
18  two or three lengthy lists of people.  Are any
19  of those people Rose Acre people?
20   A.   No.
21   Q.   Did you participate in this
22  conference call?

---

678

1    A.   No.
2    Q.   Next exhibit.  Would you look,
3   please, at 532, and, Pat, it looks something
4   like this.  It's an e-mail from Gene Gregory to
5   many, many, many people dated October 5th, 2006.
6    A.   552?
7    Q.   62.  I'm sorry, Marcus.  562.
8    A.   Okay.
9    Q.   Okay.  And while counsel is trying
10  to locate it, I'll tell you what I'm going to
11  direct your attention to, and I'll hold my
12  question until counsel is ready?
13   MR. STUEVE:  Got it.
14   MR. BARNES:  He's ready.  Good.
15  He's very quick.
16  BY MR. BARNES:
17   Q.   You've already testified about
18  this document, Mr. Rust.  I'm going to direct
19  your attention to the second page from the end.
20  Second page from the end.  And that has a
21  document identification number RAUPDATE 0080674.
22  And, again, for the record, and those playing at

---

679

1   home, this is Exhibit 562, it's an October 5,
2   2006, e-mail from Gene Gregory addressed to all.
3   It talks about an Animal Welfare Committee
4   meeting on Tuesday, October 10th.
5    You've already testified about
6   this exhibit, Mr. Rust, I'm not going to go over
7   that.  I want to direct your attention to the
8   Brann Isaacson memorandum, the second page of
9   the Brann Isaacson memorandum, and they were the
10  lawyers for UEP; correct?
11   A.   Correct.
12   Q.   The second page of this Brann
13  Isaacson memorandum, and it was written, by the
14  way, by Kevin Haley and David Sweetnam Berland.
15   Do you know who Kevin Haley is?
16   A.   Correct.
17   MR. STUEVE:  I'm going to object
18  to the form of the question.
19   THE WITNESS:  Yes. I know who
20  Kevin is.
21  BY MR. BARNES:
22   Q.   Who's Kevin Haley?

---

680

1    A.   Attorney for Isaacson.
2    Q.   Let me direct your attention,
3   Mr. Rust, to the second page from the end?
4    A.   Okay.
5    Q.   Which you're looking at.  It's
6   captioned discussion.  Do you see that section?
7    A.   Yes.
8    Q.   I direct your attention to the
9   second full paragraph from the top.
10   A.   Okay.
11   Q.   That language in the Brann &
12  Isaacson memorandum that was distributed within
13  UEP says, as it is currently constructed, the UEP
14  certified program does not create any
15  significant risk.  Do you see that language?
16   A.   Yes.
17   Q.   Were you ever told -- do you
18  recall ever being told that the UEP certified
19  program created any significant risk?
20   MR. STUEVE:  Objection, overly
21  broad.  Are you limiting that to UEP's counsel
22  or --

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                March 6, 2014

---

681

1  MR. BARNES: Let's take UEP's
2  counsel.
3  BY MR. BARNES:
4  Q. Did UEP's counsel ever tell you
5  that their opinion, which I just read in their
6  memorandum, did they ever reverse that opinion
7  and suggest to you that --
8  A. No.
9  Q. Let me finish my question. The
10 program does not create or does create
11 significant risk? Did you ever hear that from
12 anybody?
13 A. No.
14 MR. STUEVE: I'm just going to
15 note for the record that I think counsel has
16 waived the attorney-client privilege by asking
17 that question, and I tried to caution counsel
18 and so --
19 MR. BARNES: I misread your
20 caution.
21 MR. STUEVE: I tried to notify
22 you, so I'm just going to note that for the

---

682

1  record.
2  MR. BARNES: Well, we'll have to
3  argue about that later.
4  BY MR. BARNES:
5  Q. When I said, did you ever hear
6  that from anybody, what I meant to say was
7  anybody other than the Brann Isaacson lawyers
8  who are not your lawyers?
9  A. No.
10 Q. Okay. All right. Next exhibit I
11 would like to refer you to is 548. 548. It
12 bears identification number RAUPDATE 0034691
13 it's a one-page document dated June 15, 2006,
14 from you to Mr. Brad Ginnane?
15 A. What's the number again?
16 Q. 548.
17 MR. STUEVE: I'm sorry, what was
18 the exhibit number?
19 MR. BARNES: It was 548, Pat, it
20 was the June 15, 2006, e-mail series between
21 Marcus and Brad Ginnane. I'll give you a minute
22 to find it.

---

683

1  MR. STUEVE: Okay. 548.
2  MR. BARNES: 548. It's the one
3  about Michaels just announced they're going into
4  the ACC program.
5  THE WITNESS: Here. I found it.
6  MR. BARNES: You got it?
7  THE WITNESS: Yes.
8  MR. BARNES: Wait until Mr. Stueve
9  locates his copy.
10 MR. STUEVE: Can you give me the
11 date on that again?
12 MR. BARNES: Yeah, the date of the
13 document is June 15, 2006. That's the first
14 e-mail at the top of the document.
15 MR. STUEVE: I've got 549, so I'm
16 getting closer. 548.
17 MR. BARNES: Great.
18 MR. STUEVE: Thank you.
19 MR. BARNES: Okay.
20 BY MR. BARNES:
21 Q. Mr. Rust, you've already been
22 asked about this document by Mr. Stueve. I just

---

684

1  have one question for you. Mr. Stueve directed
2  your attention and asked you to read the
3  sentence under the middle e-mail the middle
4  e-mail from you to Mr. Ginnane dated Thursday,
5  June 15th. And he asked you to read that
6  language which says, Brad, Michaels just
7  announced they are going into the ACC program
8  and that alone will cause market to go up. Do
9  you see that language?
10 A. Yes.
11 MR. STUEVE: Objection to the form
12 of the question.
13 BY MR. BARNES:
14 Q. What market were you referring to
15 when you sent that e-mail to --
16 A. Egg white.
17 Q. The egg white market?
18 A. Yeah. Egg white powder
19 specifically.
20 Q. Okay. What was marked 134 -- now,
21 this was a Capper-Volstead referenced document
22 to help counsel locate it. It was a --

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

---

685

1      **A.   What number?**
2          MR. BARNES:  134.  It's -- the
3  first page appears to be an e-mail from Roger
4  Deffner to you, dated February 8th, 2006.  And
5  the subject is Capper-Volstead and it states
6  attachments Capper-Volstead summary pdf.
7  Capper-Volstead summary pdf.
8          I'm not going to ask you about the
9  whole thing, you've already testified about
10  this, Mr. Rust.  While counsel is locating the
11  document -- I'm not going to ask him any
12  questions until you find it.
13          MR. MONICA:  It's 134.
14          MR. BARNES:  134.  First page is
15  Roger Deffner to Marcus.
16          MR. STUEVE:  Hold on.  I'm
17  missing -- I'm sorry, it's right here, I got it.
18          MR. BARNES:  I'm just going to
19  direct his attention.
20          MR. STUEVE:  I got it.  Thank you.
21  BY MR. BARNES:
22      Q.   Mr. Rust, I just want to direct

---

686

1  your attention to a couple of lines in an
2  attachment to this document.  If you could go to
3  the fifth page, fifth page from the beginning
4  and that has a document identification number of
5  RA 0085507.
6      **A.   Okay.**
7      Q.   Find it?
8      **A.   Yes.**
9      Q.   The very -- and, again, this
10  appears to be a memo from Irving Isaacson to
11  Mr. Al Pope, RE:  Capper-Volstead qualification
12  dated February 4, 1992.  Do you see that?
13      **A.   Yes.**
14      Q.   Now, I would like to direct your
15  attention to the first paragraph.
16      **A.   Okay.**
17      Q.   Okay.  Under legal basis for
18  agriculture cooperative antitrust exemption.
19  And the second sentence in that first paragraph
20  states, "the bylaws of UEP and its regional
21  members are very carefully framed to allow only
22  bona fide agricultural producers or farmers to

---

687

1  become members."  Do you see that?
2      **A.   Yes.**
3      Q.   Was that your understanding?
4      **A.   Yes.**
5      Q.   The other sentence I would like to
6  direct your attention to, if you will turn after
7  that page to the third page after that page?
8      **A.   Third page after that page?**
9      Q.   Right.  This is in the Isaacson
10  opinion letter.  It's the bottom identification
11  number is RA 0085511.  5511.
12      **A.   Okay.**
13      Q.   Wait a second.  That's the
14  wrong -- that's the wrong page.
15      **A.   You got your tag covered up.**
16      Q.   Yeah.  I'm sorry.  I directed you
17  to the wrong page.  Excuse me.  It's getting
18  late.
19          What I meant to direct your
20  attention to was the second page of the Brann &
21  Isaacson opinion.
22          MR. STUEVE:  Are we still on

---

688

1  Exhibit 134?
2          MR. BARNES:  Yes, we are.  This,
3  Pat, is the memo from Irving Isaacson to Al Pope
4  RE:  Capper-Volstead qualification, February 4,
5  1992, which was an attachment to Exhibit 134.
6  BY MR. BARNES:
7      Q.   And, Marcus, I would like to
8  direct your attention to the second page?
9          MR. STUEVE:  Can you give me a
10  Bates number?
11          MR. BARNES:  Yes.  I'm sorry.
12  It's RA 0085508.
13  BY MR. BARNES:
14      Q.   Now, if you look at the bottom
15  paragraph in the Brann & Isaacson opinion
16  letter, beginning with the second sentence in
17  the bottom paragraph.  It says, if we had not
18  had Capper-Volstead protection, UEP as such
19  would not be in existence today and egg
20  producers would have suffered greatly as a
21  result.  In 1970, the legal status of UEP as a
22  federated agriculture cooperative was approved

---

Case: 1:11-cv-08808 Document #: 392-57 Filed: 10/23/23 Page 82 of 148 PageID #:17128

689

1   by the Federal District Court in New York in the
2   case of UEP versus Bauer, B-A-U-E-R,
3   International.  In other words, UEP has been
4   recognized as a legal agricultural cooperative
5   by the courts provided of course that its
6   membership retains status as producers or
7   farmers.  Is that your understanding, Mr. Rust?
8       A.   Yes.
9       Q.   Okay.  Let's -- we're almost
10  finished.  You're very patient.
11          I'm going to ask you to locate two
12  exhibits that are related.  The first is
13  Exhibit 111, and that is a document
14  identification MOARK 0001079.
15      A.   Okay.
16      Q.   It appears to be the minutes of
17  the UEP shell egg Marketing Committee conference
18  call, June 1, 2005.  That's the first document.
19          MR. STUEVE:  What's the exhibit
20  number?
21          MR. BARNES:  It's 111, Pat.
22          MR. STUEVE:  Okay.

690

1           MR. BARNES:  Previously marked
2   somewhere else.
3           MR. STUEVE:  What's the date on
4   that?
5           MR. BARNES:  June 1, 2005.
6           MR. STUEVE:  Okay.  I've got it.
7           MR. BARNES:  I would give you my
8   copy, but I've got it marked up.
9           MR. STUEVE:  It's my lucky day, I
10  opened it up to the -- right to Exhibit 111.
11          MR. BARNES:  Marvelous.
12  BY MR. BARNES:
13      Q.   Now, before I ask you anything
14  about Exhibit 111, Mr. Rust, I would like you to
15  also locate Exhibit 117, which Mr. Stueve, I
16  believe, has already established is related to
17  Exhibit 111.
18          Exhibit 117 bears the
19  identification number UE 07932299.  It's
20  Exhibit 117.  It's captioned, Egg Industry
21  Economic Alert.
22  BY MR. BARNES:

691

1       Q.   Do you have that document -- both
2   of those documents in front of you, Mr. Rust?
3       A.   Yes.
4       Q.   Now, directing your attention to
5   the second page of Exhibit 111, would you turn
6   there, please, second page of 111.  At the top
7   of that page, Mr. Stueve directed your attention
8   to a motion.  See at the very top of the page?
9       A.   Yeah.
10      Q.   It says, Motion:  It was moved by
11  Osborn and seconded by Schimpf, that UEP
12  distribute an economic alert to the members and
13  that the alert include a price forecast and a
14  list much possible options to correct the
15  oversupply problem, and it says the motion
16  carried.
17          Do you remember testifying about
18  that?
19      A.   Yes.
20      Q.   Okay.  Now, at the time of this
21  meeting, based on the language of that motion,
22  had an economic alert already been prepared?

692

1       A.   Not that I recollect.
2       Q.   Let me show you what is
3   Exhibit 117, which I think Mr. Stueve has
4   already established that this was the economic
5   alert that resulted from the motion in
6   Exhibit 111 that we've just referred to.  And
7   let me ask you, Mr. Rust, as a member of that
8   shell egg Marketing Committee referenced in
9   Exhibit 111, do you recall whether Exhibit 117,
10  the actual economic alert, was ever distributed
11  to the members of the shell egg Marketing
12  Committee?
13      A.   I don't recall it being.
14      Q.   Do you recall that the shell egg
15  Marketing Committee ever voted to approve and
16  distribute what has been marked as Exhibit 117?
17      A.   No.
18      Q.   Okay.  We are almost there.
19          MR. BARNES:  Now, what is our next
20  Exhibit Number?  Do we have that, David?
21          MR. HICKEY:  Yeah.
22          MR. BARNES:  You're wonderful.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                        March 6, 2014

82 (Pages 693 to 696)

---

693

1   I'm bringing you to my next deposition.
2       MR. HICKEY:  No, you're not.
3       (Rust Exhibit Number 571 was
4   marked for identification.)
5       MR. BARNES:  We've just marked
6   this as Rust Exhibit 571.  I'm going to hand
7   that to the witness, and I'm going to hand that
8   to Mr. Stueve.  And I need one copy.  Can you
9   share it with Pat, David?  I'm sorry -- here you
10  go.  Joe is going to give you his.
11      MR. STUEVE:  I object to these
12  questions beyond the scope of my examination.
13      MR. BARNES:  Well, it might have
14  been beyond the scope of your examination, but
15  it is not beyond the scope of the representation
16  you made on the record, Mr. Stueve.  You stated
17  very clearly that your client, AWG, never had a
18  specification for the purchase of shell eggs
19  that required UEP animal husbandry
20  certification.  You stated that on the record.
21      MR. STUEVE:  Sir, that was not the
22  result of any questioning.  That was -a.

---

694

1       MR. BARNES:  Gratuitous -- -
2       MR. STUEVE:  It was not a
3   gratuitous statement, and it's in fact the
4   truth, that it was not a question I asked this
5   witness, so you can go down this road, but this
6   -- this is beyond the scope of my examination,
7   and I object to it.
8       MR. BARNES:  You also promised, if
9   you recall, and the record will reflect, that
10  you would come back to the issue.
11      MR. STUEVE:  I didn't start the
12  issue.
13      MR. BARNES:  Well, you did.  You
14  stated -- and you said you would come back to
15  it.
16      MR. STUEVE:  I didn't start the
17  issue.
18      MR. BARNES:  So I am fulfilling
19  your promise to the court and the jury, we are
20  coming back to the issue.  You can object.  Your
21  objection is noted on the record.
22      MR. STUEVE:  I would also note

---

695

1   that this goes beyond the designation of this
2   witness with respect to Greg Hinton is the one
3   who was identified with respect to pricing.  So
4   it's beyond the scope of his designation.
5       MR. MONICA:  He's also produced
6   individually.  You know that.
7       MR. STUEVE:  Look, guys, all I'm
8   telling you, this is beyond the scope.  You can
9   review the record, I didn't ask him any
10  questions about any bidding process, so it's
11  beyond the scope.  Go ahead.  If you want to go
12  down this road, I've noted my objection.  I
13  can't stop you from doing it.
14      MR. BARNES:  You noted your
15  objection, but I just want to be clear.  Your
16  position is if a witness, a 30(b)(6) witness has
17  not been designated for a particular subject
18  matter, that witness cannot be interrogated on
19  another subject.  You cannot go outside the
20  30(b)(6) designation in interrogating the
21  witness.  Is that your position?
22      MR. STUEVE:  That's not my

---

696

1   position.
2       MR. BARNES:  That's what you said
3   on the record.
4       MR. STUEVE:  You -- my point was
5   that I did not ask him questions concerning
6   these topics, because he was not designated with
7   respect to those topics.
8       MR. BARNES:  Well, the record will
9   show what it shows.  Let's just -- let me ask
10  him the question, so we can go home.  All right?
11  Your objection is noted.
12      MR. STUEVE:  I get a continuing
13  objection.
14      MR. BARNES:  You certainly do.
15      MR. STUEVE:  Okay.  Fair enough.
16  BY MR. BARNES:
17      Q.  Mr. Rust, directing your attention
18  to Exhibit 571, it is labeled product
19  specification.  Can you tell from the front of
20  this document whose product specification this
21  is?
22      A.  AWG.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

---

697

1  Q.  And that's a company suing you;
2  right?
3      A.  Yeah.
4      Q.  Okay.  Would you look, Mr. Rust,
5  in the product specification description section
6  regarding shell eggs?
7      A.  Yeah.
8      Q.  And it has a number of
9  requirements in that section; does it not?
10     A.  Yeah.  It does.
11     Q.  Would you look at the last
12 sentence in that description section?
13     A.  Yeah.
14     Q.  Could you read that sentence into
15 the record, please?
16     A.  **All eggs must be produced from**
17 **hens certified to be managed in compliance with**
18 **the United Egg Producer animal husbandry**
19 **guidelines.**
20         MR. BARNES:  Thank you, Mr. Rust,
21 I have no further questions.  Oh, wait a minute.
22 I'm sorry, we have one clean up item.

---

698

1          MR. STUEVE:  We can do that after.
2  Let me get my questions.  We'll do that at the
3  end.
4          EXAMINATION BY COUNSEL FOR PLAINTIFFS
5  BY MR. STUEVE:
6      Q.  Let me start out by asking you,
7  Mr. Rust, there was a significant break between
8  my questioning and the questioning of your
9  counsel; is that correct?
10         MR. BARNES:  Well, I object to
11 that.  It was --
12 BY MR. STUEVE:
13     Q.  There was a break between my
14 questioning and when your counsel started asking
15 questions?
16         MR. BARNES:  It was a short break.
17         THE WITNESS:  A short break, yeah.
18 BY MR. STUEVE:
19     Q.  And you met with your counsel
20 during that?
21     A.  Yeah.
22     Q.  And you discussed the questions

---

699

1  with your counsel about what he was going to ask
2  you; right?
3      A.  **We went over different documents,**
4  **yeah.**
5      Q.  He told you what he was going to
6  ask you; right?
7      A.  Yeah.
8      Q.  Now, let's look at the document he
9  just put in front of you with respect to the --
10         MR. BARNES:  AWG.
11 BY MR. STUEVE:
12     Q.  The product specifications here?
13     A.  Yeah.
14     Q.  Were you involved in the bidding
15 of the 2013 -- the process of bidding for the
16 business of AWG?
17     A.  Yeah.
18     Q.  What was your role?
19     A.  **I was asked multiple questions**
20 **about whether or not we wanted to bid since they**
21 **were you suing us or not.**
22     Q.  Who asked you that?

---

700

1      A.  **Greg Hinton.**
2      Q.  No.  What I'm talking about is,
3  did you have any communications directly with
4  AWG?
5      A.  **No.**
6      Q.  Did you have any discussions with
7  AWG about what in fact were the specifications
8  they were looking for in the bidding process?
9      A.  **No.  Only discussions with Greg.**
10     Q.  Mr. Hinton would have been the one
11 who would have had those discussions; right?
12     A.  **Yeah.**
13     Q.  Now, do you know if these are all
14 of the specifications that Rose Acre asked from
15 AWG concerning the 2013 bid?
16         MR. BARNES:  Object to the form.
17         THE WITNESS:  I can't say for all.
18 BY MR. STUEVE:
19     Q.  Okay.  It bid not only on -- on
20 best choice shell eggs, but it bid on specialty
21 eggs as well; correct?
22     A.  **I would assume so.**

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

84 (Pages 701 to 704)

701

1      Q.    Do you know if the specifications
2  for the specialty eggs required UEP certified?
3      **A.    It says fresh shell eggs.**
4      Q.    Is your assumption that it did?
5      **A.    I would assume that it would.  I**
6  **don't know.**
7      Q.    Now, sir, your counsel has been at
8  the deposition of the individual responsible for
9  the document that's in front of you, and she
10  testified under oath that the actual wording
11  that is contained in here, including the words
12  that were read by your counsel, were actually
13  typed into this form document by MOARK, which
14  was the current supplier of AWG.  Are you aware
15  of that, sir?
16      MR. MONICA:  That's not what she
17  said.  It's a misrepresentation.
18      MR. BARNES:  I object to the
19  testimony by Mr. Stueve representing what
20  another witness said in another deposition.  I
21  object to that.  That testimony says what it
22  says and if he has a copy and wants to show it

702

1  to us, that's fine, but I object to him using --
2  characterizing another witness's testimony,
3  another of his client's testimony to try to
4  undermine what his own document says.
5  BY MR. STUEVE:
6      Q.    Go ahead and answer my question,
7  sir?
8      **A.    Repeat your question.**
9      MR. STUEVE:  Read it back to him.
10      (The record was read as
11  requested.)
12      MR. BARNES:  Objection.
13      THE WITNESS:  No.
14  BY MR. STUEVE:
15      Q.    And sir, you were aware that prior
16  to Rose Acre submitting a bid in 2013, that
17  MOARK was the exclusive supplier of shell eggs
18  to AWG; correct?
19      **A.    I did not know that.**
20      Q.    You are aware that, in fact, they
21  are UEP certified; right?
22      **A.    MOARK?**

703

1      Q.    Yeah.
2      **A.    I assume them to be.  Yeah.**
3      Q.    And so it would not be a surprise
4  to you that if MOARK prepared the specifications
5  for the eggs that it was providing AWG that it
6  would include in its specifications that its
7  eggs were UEP certified; correct?
8      MR. BARNES:  Object.  Object to
9  the form of the question.  If the witness can
10  answer it, go ahead.
11      THE WITNESS:  My general
12  knowledge, most egg customers we deal with they
13  write the specifications, and we only supply
14  what they tell us to supply.
15      MR. STUEVE:  Move to strike the
16  answer as nonresponsive.  I'm going to ask you
17  to read my question back to him and ask you to
18  answer my question.
19      MR. BARNES:  It is responsive.
20  What he's saying, Pat, is the obvious.  It's
21  unusual for a company --
22      MR. STUEVE:  Counsel.  Counsel, no

704

1  speaking objections.
2      (The record was read as
3  requested.)
4      MR. BARNES:  Objection.  Go ahead.
5      THE WITNESS:  It would surprise me
6  that a supermarket chain or seller would allow a
7  supplier to write the specification of their
8  brand.
9  BY MR. STUEVE:
10      Q.    Assuming that the documents that
11  have been produced in this case in fact show
12  that AWG asked MOARK to prepare the
13  specifications for MOARK's eggs, would it
14  surprise you that MOARK would include that its
15  eggs were UEP certified?
16      MR. BARNES:  Object to the form.
17      THE WITNESS:  Repeat your
18  question.
19      MR. STUEVE:  You can go ahead.
20      (The record was read as
21  requested.)
22      MR. BARNES:  Object to the form.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

85 (Pages 705 to 708)

---

705

1  Calls for speculation.
2           THE WITNESS:  Are you saying that
3  MOARK specified the egg?  I'm not sure what
4  you're saying there.
5  BY MR. STUEVE:
6        Q.   Sir, when you -- let me ask you
7  this.  Can you answer my question that I asked
8  you?
9        A.   If I can understand it.
10          MR. BARNES:  Objection.
11          MR. STUEVE:  Let me have her read
12  it back one more time.  Have her read it back
13  and tell me what you don't understand.
14          THE WITNESS:  I'm not a lawyer,
15  I'm a chicken farmer.
16  BY MR. STUEVE:
17        Q.   Let me just ask it this way, so we
18  can make it a little simpler.
19          If in fact AWG asked MOARK to
20  write the specifications for the eggs that MOARK
21  was providing to AWG, would it surprise you that
22  MOARK would list as one of those specifications

---

706

1  that its eggs are UEP certified?
2          MR. BARNES:  Object to the form of
3  the question.  There are two speculative
4  questions rolled into one.  If you can answer
5  it, go ahead.
6          THE WITNESS:  I have no knowledge.
7  BY MR. STUEVE:
8        Q.   You know they're UEP certified;
9  right, MOARK?
10        A.   I assume they are.
11        Q.   Now, if you look back at the
12  document that's in front of you, at the very
13  top, it says, notice, any variations in these
14  specifications must be preapproved by Associated
15  Wholesale Grocers quality assurance department.
16  Do you see that?
17        A.   Where is that at?
18        Q.   Right at the very top in all caps.
19        A.   Okay.
20        Q.   It specifically notifies Rose Acre
21  that, hey, if you want to change one of these
22  specifications, you can contact us and

---

707

1  specifically the quality assurance department;
2  is that correct?
3        A.   It doesn't say that.
4        Q.   That's what it says; right?
5        A.   It says any variation in these
6  specifications must be preapproved by Associated
7  Wholesale Grocers quality assurance department.
8        Q.   Right.  So it puts you on notice
9  that if you want to change one of these
10  specifications that's in this document that you
11  contact Associated Wholesale Grocers quality
12  assurance department; right?
13          MR. BARNES:  Objection, document
14  speaks for itself.
15  BY MR. STUEVE:
16        Q.   That's what it says; right?
17        A.   I'm reading -- I read you what it
18  says.
19        Q.   Now, in 2013, do you know who were
20  the folks who bid on the AWG's business besides
21  Rose Acre?
22        A.   I have no way of knowing that.

---

708

1        Q.   Mr. Hinton would know that; right?
2        A.   Not necessarily.
3        Q.   Do you know if there are -- if
4  there were any -- you just don't know who
5  submitted the bids; is that correct?
6        A.   Most -- any bid situation I've
7  ever been in, all we're usually told are there
8  are other suppliers bidding.
9          MR. BARNES:  Pat, before you go
10  on --
11  BY MR. STUEVE:
12        Q.   Do you know what percentage of the
13  shell egg production in the United States in
14  2013, what percentage of those eggs are UEP
15  certified?
16        A.   Not exactly, I wouldn't.
17        Q.   It would be over 90 percent?
18          MR. BARNES:  Objection.  Object to
19  the form.
20          THE WITNESS:  I would have to look
21  at a record someplace.  I have no memory of what
22  that percentage would be.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                March 6, 2014

86 (Pages 709 to 712)

---

709

BY MR. STUEVE:

Q.   It's substantial; right?

A.   **It would be substantial, but I have no memory of what the percentage would be.**

MR. BARNES:  And excuse me, Pat. Could I just ask a question?

MR. STUEVE:  No.

MR. BARNES:  I want to ask you a question.

MR. STUEVE:  No, I'm in my examination.  If you would --

MR. BARNES:  I'll hold it until you're finished, then I'll ask you.  Go ahead.

BY MR. STUEVE:

Q.   Sir, if you could look back at Exhibit 111, your counsel was asking you a question about this and 117.  Do you have that?

A.   **I'm finding 117.  Yeah.**

Q.   And, first of all, I want the record to be clear, that you were at the Marketing Committee, and there in fact was a vote, and that motion was carried that

---

710

Mr. Gregory was to in fact issue an economic alert and include in that a price forecast and a list of possible solutions to correct the oversupply problem; right?

MR. BARNES:  Object to the form.

THE WITNESS:  Yeah.

BY MR. STUEVE:

Q.   And if the committee takes action, and it's approved, Mr. Gregory is to follow that; correct?

A.   **Correct.**

Q.   And consistent with the direction of the committee, Exhibit 117 is an egg industry economic alert; correct?

A.   **Yeah.**

Q.   And consistent with the direction of the Marketing Committee, that economic alert includes the possible options to correct the oversupply problem; correct, sir?

MR. BARNES:  Object to the form of the question.

THE WITNESS:  Repeat your

---

711

question.

BY MR. STUEVE:

Q.   Yeah.  Consistent with the motion that was carried at the Marketing Committee that you were at, Exhibit 117, the economic alert, includes the possible solutions to correct the oversupply problem; right?

MR. BARNES:  Object to the form.

THE WITNESS:  It includes possible solutions.

BY MR. STUEVE:

Q.   And all of those pertain that are under the possible solutions, to the oversupply problem; correct?

MR. BARNES:  Object to the form.

THE WITNESS:  Could be.

BY MR. STUEVE:

Q.   Well, the first one is dispose of spent hens 4 weeks earlier than previously scheduled and/or reduce your flock size by 5 percent through Labor Day?

A.   **Voluntary suggestion, but yeah.**

---

712

Q.   That pertains to the oversupply problem; right?

A.   **It's a voluntary suggestion.**

Q.   That applies to the oversupply problem; correct, sir?

A.   **As some perceived it.  Yes.**

Q.   Number 2 is delay the hatch of all flocks.  That pertains to the oversupply problem; correct, sir?

A.   **That's a possible solution.**

Q.   Number 3, reduce all hatches by 5 percent for the next 6 weeks pertains to the oversupply problem; correct, sir?

MR. BARNES:  Object to the form. Misstates the language of the document.

BY MR. STUEVE:

Q.   Right?

A.   **Listed as a possible solution.**

Q.   Increase the hen disposal rate, reduce the chicken hatch, leave some houses empty, we'll make money, pertains to the oversupply problem; right, sir?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                                March 6, 2014

87 (Pages 713 to 716)

---

713

1      **A.   It is listed as a possible**
2  **solution on this paper.**
3      Q.   If you're selling surplus eggs to
4  the breakers, reduce your flock size.  That
5  pertains to the oversupply problem; correct,
6  sir?
7      **A.   It is listed on this paper.  I did**
8  **not vote on this paper.**
9      Q.   Now, you were also asked questions
10 by counsel after your prep session?
11     MR. BARNES:  Object to --
12 BY MR. STUEVE:
13     Q.   Exhibit 134; right?  Do you have
14 134 in front of you?
15     A.   Yeah.
16     Q.   Now, counsel directed your
17 attention to a few pages in this document;
18 right?  Do you remember that?
19     A.   A couple.
20     Q.   All right.  And then there was an
21 earlier document, I believe, and we'll get to
22 it, but it also pertained to legal advice that

---

714

1  you had seen from Brann & Isaacson concerning
2  UEP.  Do you remember those questions?
3      A.   Vaguely.
4      Q.   Okay.  Now, that same firm is the
5  firm that's providing the legal advice in both
6  of the documents that you're looking at; right?
7      A.   Yeah.
8      Q.   And that firm, if you look at page
9  505?
10     MR. BARNES:  Of 134?
11     MR. STUEVE:  Yep.  Of 134.
12 BY MR. STUEVE:
13     Q.   Do you see under activities, are
14 probably not protected.  Do you see that?  Do
15 you see that listed there?  See the activities
16 under are not protected?
17     A.   Yeah.
18     Q.   That firm made it clear that UEP
19 members could not boycott nonmembers of the
20 cooperative; right?
21     MR. BARNES:  Object to the form of
22 the question.  It misstates the document.

---

715

1  Misstates the evidence.
2  BY MR. STUEVE:
3      Q.   That's what it states; right?
4      MR. BARNES:  That's not what it
5  states.
6      MR. STUEVE:  Counsel, will you
7  stop using speaking objections.
8      MR. BARNES:  Well, you're
9  distorting the record, Mr. Stueve, you're
10 stating things that are not in the document.
11 BY MR. STUEVE:
12     Q.   Sir, do you have the document in
13 front of you?
14     A.   Yeah.
15     Q.   This is the Brann & Isaacson firm,
16 counsel to UEP, this was advice that was shared
17 with you; correct?
18     A.   Yeah.
19     Q.   In 2004; correct?
20     A.   Yeah.
21     Q.   And under the following activities
22 that are probably not protected, they made clear

---

716

1  that UEP members cannot boycott nonmembers;
2  correct?
3      MR. BARNES:  Probably.
4      MS. LEVINE:  Object to the form.
5  BY MR. STUEVE:
6      Q.   Do you see that?
7      **A.   I see where it says the following**
8  **activities probably are not protected.**
9      Q.   Underneath that, it says that UEP
10 members may not or cannot boycott nonmembers of
11 the cooperative; right?
12     MR. BARNES:  Object to the form.
13     THE WITNESS:  I read what it says
14 it says boycott of nonmembers of cooperative.
15 BY MR. STUEVE:
16     Q.   And then it says under the
17 category probably not protected, that UEP
18 members cannot coerce nonmembers to join the
19 cooperative; correct?
20     MR. BARNES:  Objection.  Asked and
21 answered.
22     Mr. Stueve, you've been through

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

88 (Pages 717 to 720)

---

717

1  this once. You know, it's tough enough to go
2  through it once, but you go through it
3  repeatedly. It's asked and answered.
4         MR. STUEVE: Go ahead and answer
5  my question, sir.
6         **A.   Which one again?**
7         MR. STUEVE: Read it back to him.
8         (The record was read as
9  requested.)
10        MR. BARNES: Same objection.
11        THE WITNESS: What are you asking?
12 BY MR. STUEVE:
13        Q.   That's what you were being
14 advised?
15        **A.   You're making a statement, I don't**
16 **know what you're asking.**
17        Q.   That's what you were being
18 advised; correct, sir?
19        **A.   I'm reading what it says here.**
20        Q.   And what it says is that you were
21 not to "coerce nonmembers to join the
22 cooperative;" right?

---

718

1         **A.   It says the following activities**
2  **are probably not protected and that is listed**
3  **underneath that statement there.**
4         Q.   And then over on the next page,
5  again, under some absolutes, do you see that?
6         **A.   Yeah.**
7         Q.   It says under the absolute, there
8  should be no attempt to boycott or curtail
9  business with a nonmember regarding failure to
10 follow guidelines or for that matter regarding
11 any other issues. Did I read that correctly,
12 sir?
13        MR. BARNES: Object to the form.
14 Asked and answered.
15        THE WITNESS: That is what you are
16 reading there. Yeah.
17 BY MR. STUEVE:
18        Q.   It also says under absolutes,
19 there should be no efforts to coerce nonmembers
20 to join UEP; correct, sir?
21        MR. BARNES: Same objection.
22 Document speaks for itself.

---

719

1         THE WITNESS: I'll repeat what it
2  says here that there should be -- the writing
3  says there should be no efforts to coerce
4  nonmembers to join UEP.
5  BY MR. STUEVE:
6         Q.   All right. Now, you were also
7  directed to 548, the middle sentence -- the
8  middle e-mail that you prepared June 15th, 2006;
9  right?
10        **A.   Yeah.**
11        Q.   The event that you attributed your
12 belief that the market would go up was Michael
13 Foods' announcement that it was going into the
14 certified program, and therefore was going to be
15 required to comply with cage space requirements;
16 correct, sir?
17        MR. BARNES: Objection to the
18 form. Asked and answered.
19        THE WITNESS: That's what that --
20 I'm not following what you're asking. You're
21 reading a statement that says that here, so what
22 are you asking?

---

720

1         MR. STUEVE: If you could read
2  back my question, and I ask for you to answer
3  it.
4         (The record was read as
5  requested.)
6         MR. BARNES: Same objection.
7         THE WITNESS: I'm still not sure
8  what you're asking me to refer to.
9  BY MR. STUEVE:
10        Q.   The event that you believed would
11 result in the market going up was Michael Foods
12 joining the certified program and now being
13 required to comply with cage space requirements;
14 correct, sir?
15        MR. BARNES: Same objection.
16        THE WITNESS: What are you asking
17 about?
18 BY MR. STUEVE:
19        Q.   Is that correct? If you could
20 read back my question, and listen to my question
21 and answer it for me, sir.
22        (The record was read as

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                         March 6, 2014

89 (Pages 721 to 724)

---

721

1  requested.)
2          THE WITNESS:  Yeah.
3  BY MR. STUEVE:
4      Q.  Now, you -- your counsel asked you
5  questions and used the term violence concerning
6  actions by the Humane Society; is that correct?
7      A.  Yeah.
8      Q.  Now, sir, you've been very vague
9  in your testimony about these alleged actions
10 that occurred at Rose Acre, so I want to hear
11 specifically.  You mentioned that there was and
12 you refer to your mom's note about a -- about
13 one truck burned up.  Do you remember that
14 reference?
15         MR. BARNES:  Object to the form of
16 the question, and object to Mr. Stueve's
17 testimony.  He wasn't vague about his
18 description of the activities by the animal
19 rights activists.
20         THE WITNESS:  There are multiple
21 things.
22 BY MR. STUEVE:

---

722

1      Q.  Let me ask you.  Let me -- you
2  said that.  You mentioned this truck being
3  burned; right?
4      A.  Yeah.
5      Q.  When did that occur?
6      A.  At night.
7      Q.  What year?
8      A.  I don't recall the exact date.
9      Q.  Did you file a police report?
10     A.  Yeah.
11     Q.  And do you have records of that
12 police report?
13     A.  I have no idea.
14     Q.  Was it written up in the paper?
15     A.  Of the person they went to their
16 website, and they published what they did.  And
17 that person ended up pleading guilty later and
18 serving -- he burnt down a laboratory in
19 Michigan, and served multiple years in prison
20 from my understanding.
21     Q.  Did that occur in 2002?
22     A.  He served prison after that.

---

723

1      Q.  Did the burnt truck, did that
2  occur in 2002?
3      A.  I don't recollect the exact time
4  it took place.
5      Q.  Could it have been several years
6  before 2002, sir?
7      A.  It could have been a day before
8  2002.  It could have been 2002.  It could have
9  been 2001, 1999.  I don't recall the exact -- I
10 would have to look at a document.
11     Q.  What other -- you identified a
12 burnt truck; is that correct?
13     A.  Correct.
14     Q.  And that other event did you say
15 occurred?
16     A.  They spray painted up on the side
17 of the feed mill, the owners should be in cages
18 like -- we should be in cages.
19         And then they used a high powered
20 rifle and shot out the electric transformers,
21 bang, bang.
22     Q.  Let me take these one at a time.

---

724

1  With respect to the spray paint on -- is it a
2  water tower?
3      A.  Side of our feed mall.
4      Q.  Side of the feed mill.  Where did
5  that occur?
6      A.  Jen Acres.
7      Q.  And what year?
8      A.  Before we joined the UEP program.
9      Q.  Could it have been several years
10 before, sir?
11         MR. BARNES:  Object to form.
12         THE WITNESS:  It may have been
13 one day, it may have been 10 years.  I don't
14 recollect without seeing the document.
15 BY MR. STUEVE:
16     Q.  Did you file a police report with
17 respect to that?
18     A.  It was in the newspaper.
19     Q.  It was?
20     A.  Yeah.
21     Q.  And then you also mentioned that
22 there were some shots fired?

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

90 (Pages 725 to 728)

---

### 725

1      **A. Yeah.**
2      Q. And where -- into what?
3      **A. Into the electric substation.**
4      Q. Okay. And when did that occur,
5 sir?
6      **A. Prior to us joining UEP.**
7      Q. Would that have been several years
8 before?
9      **A. It may have been one day, it may**
10 **have been 10 years. I don't recollect. I would**
11 **have to see records to see the date, I don't**
12 **remember.**
13      Q. What records would you look to,
14 sir?
15      **A. Quite frankly, that would probably**
16 **be -- I'm not sure it would be in company**
17 **records. It may be -- have to go -- it was in**
18 **all the newspapers.**
19      Q. Okay. In what location?
20      **A. That occurred in North Vernon.**
21      Q. And, sir, any other events that
22 you can recall?

---

### 726

1      **A. Yeah. Our water plant was**
2 **sabotaged in our Cort Acre operation.**
3      Q. And when did that occur?
4      **A. I don't recollect the date.**
5      Q. It could have been several years
6 before 2002, sir?
7      MR. BARNES: Object to form.
8      THE WITNESS: It could have been.
9 BY MR. STUEVE:
10      Q. And was there a police report
11 filed there?
12      **A. I believe there was.**
13      Q. Okay. Was it in the newspaper?
14      **A. I'm pretty sure it was.**
15      Q. All right. Do you remember what
16 newspapers?
17      **A. I would assume the local.**
18      Q. Okay.
19      **A. Then we had another event. The**
20 **FBI had notified us that one of our**
21 **facilities was -- I don't know how they knew,**
22 **but they had reason to believe a group was**

---

### 727

1 **getting ready to attack one of our Iowa**
2 **facilities.**
3      Q. Did it happen?
4      **A. No.**
5      Q. And was this written up in any
6 newspaper?
7      **A. I doubt if it was. They notified**
8 **us that through some kind of investigation they**
9 **were doing, they found evidence that this was**
10 **going to happen, and we put extra security, and**
11 **notified the police department and, you know,**
12 **animal terrorists, they burn stuff down in**
13 **Michigan. You know, you never know what they're**
14 **going to do.**
15      Q. Sir, with respect to the -- with
16 respect to this last incident you're talking
17 about, this threat was stopped. Did you
18 file any -- did you prepare any documentation of
19 that?
20      **A. In the -- which one again?**
21      Q. The last one you're referring to?
22      MR. BARNES: The FBI.

---

### 728

1      THE WITNESS: The FBI? We had
2 several emergency phone calls and discussions
3 about it trying -- I mean, when you've been
4 notified by the FBI that some idiots, terrorist
5 groups are going to come and burn one of your
6 facilities down, you get concerned. When they
7 burn the feed trucks, when they paint that the
8 owner should be in jail, you know, I don't like
9 that horse shit. You know, I --
10      MR. BARNES: Just relax.
11      THE WITNESS: I mean, to have our
12 own customers suing us and everything over a
13 program they asked us to be in, this is horse
14 shit.
15      MR. BARNES: Okay, just relax.
16 Just relax. Are you almost finished or should
17 we take a break? The witness -- it's late,
18 we've been at this 10 hours, okay? He's
19 obviously --
20      MR. STUEVE: I'm almost done here.
21 I would like to get an answer to my question, so
22 I'm going to ask it one more time.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                           March 6, 2014

---

729

BY MR. STUEVE:

Q.   Did you prepare any documentation with respect to your communications with the FBI, so we would be able to determine how far in the past that occurred?

**A.   I'm sure someplace somewhere there may be a log or something.  I don't have a clue. I don't remember.  The FBI might have it.**

MR. MONICA:  If you want it, we'll look for it.

MR. STUEVE:  Yeah.  I do.  With respect to all of this, that would be great if you've got it.

BY MR. STUEVE:

Q.   Now, counsel also asked you questions about 562.  Can you get that in front of you, sir?

MR. BARNES:  You already asked him about this, Pat.

MR. STUEVE:  No, I haven't.  This is the other Brann & Isaacson.

BY MR. STUEVE:

---

730

Q.   Sir, if you look at 562, your counsel asked questions about the Brann & Isaacson memo that is attached to 562.  Do you recall that?

**A.   I don't recall that.**

Q.   Well, if you would, look over on 674?

**A.   674.  Okay.**

Q.   Now, it says, as it's currently configured -- remember he read that language to you?

**A.   Yeah, I remember that.**

Q.   Now, there is no discussion either in that paragraph or any other paragraph in this memo about whether or not the 100 percent rule that was adopted by the UEP board is in fact an antitrust violation; correct, sir?

MR. BARNES:  Object to the form.

THE WITNESS:  It says here the UEP certified program serves a legitimate purpose of encouraging humane treatment of laying hens. That's why we were in the program, sir.

---

731

BY MR. STUEVE:

Q.   Sir, in fact, his memo determined that your phase-in of the 100 percent rule for Michael Foods was in fact an anticompetitive restraint, sir; right?

MR. BARNES:  Object to the form of the question.  Misstates the evidence.

THE WITNESS:  They had concerns about it.  Our rule was not approved.  What we suggested as a solution.

BY MR. STUEVE:

Q.   And your solution was a phase-in of the 100 percent rule; right, for Michael Foods?

**A.   Yes.**

Q.   If the motion is adopted, the program would add restraints on external dealings that could expose the program to greater antitrust scrutiny.  That's what he concluded; right?

**A.   I think that's what it says.**

Q.   He goes on to say, as

---

732

participation in the program continues to grow, the imposition of restriction on the marketing of uncertified eggs creates ever increasing economic pressure for noncertified companies to become certified because it shrinks the market for uncertified product; did I read that correctly?

MR. BARNES:  Objection, asked and answered.  You've read it twice now.  The language hasn't changed, the document speaks for itself.

BY MR. STUEVE:

Q.   It's the second item there?

**A.   You read so fast, I couldn't hear everything you said.  If you read what it says, that's what it is.**

Q.   If you would, do you see where secondly is?

**A.   I'm not even sure which page.**

Q.   It's on 674?

**A.   Okay.**

Q.   It says, secondly, as

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

733

1    participation in the program continues to grow,
2    the imposition of the restriction on the
3    marketing of uncertified eggs creates ever
4    increasing economic pressure for noncertified
5    companies to become certified because it shrinks
6    the market for uncertified product. Did I read
7    that correctly?
8        MR. BARNES: Object to form. It's
9    about the fourth time you've read it. The
10   language hasn't changed, the document speaks for
11   itself.
12       THE WITNESS: I can't find it.
13   BY MR. STUEVE:
14   Q.    At the bottom 674, and it says
15   secondly, it's four sentences up?
16   **A.    I believe you read what it says.**
17   Q.    Now, and in fact, the -- as I
18   asked you earlier, the substantial portion of
19   the shell egg production is now certified
20   companies; correct, sir?
21       MR. BARNES: Objection. Asked and
22   answered more than once.

734

1        THE WITNESS: I believe it could
2    be.
3        MR. STUEVE: I have no further
4    questions.
5    EXAMINATION BY COUNSEL FOR ROSE ACRE FARMS
6    BY MR. BARNES:
7    Q.    Mr. Rust, I do have just very few
8    questions.
9        First of all, let's look at -- I
10   think it's 571. This is the AWG product spec
11   for fresh shell eggs, which requires all eggs
12   must be produced from hens certified to be
13   managed in compliance with the UEP animal
14   husbandry guidelines. Do you have that?
15       MR. STUEVE: Objection, assumes
16   facts not in evidence.
17       THE WITNESS: Yeah.
18       MR. BARNES: Are you saying
19   they're a spurious document? Can we get a
20   stipulation, Mr. Stueve, that this is an
21   accurate spec that was generated by AWG? Can we
22   have that stipulation?

735

1        MR. STUEVE: It wasn't generated
2    by AWG.
3        MR. BARNES: You're telling me
4    this is not an AWG document. This spec is not
5    an AWG document? I think we should go to Judge
6    Duncan on this, and have Judge Duncan determine
7    --
8        MR. STUEVE: Counsel, you weren't
9    at AWG's deposition.
10       MR. BARNES: No, I wasn't. All
11   I'm asking you is, is this an AWG document? Can
12   we have that stipulation or not? You can argue
13   --
14       MR. STUEVE: I noted my
15   objections. You can ask the witness a question.
16       MR. BARNES: So you won't give me
17   a stipulation that this is an AWG document?
18       MR. STUEVE: You have the sworn
19   testimony of AWG --
20       MR. BARNES: I'm asking you for a
21   stipulation this is an AWG document.
22       MR. STUEVE: It is not an AWG

736

1    document, it's produced by SF.
2        MR. BARNES: You've got the AWG
3    logo up in the left. And again, the evidence
4    will show that it is an AWG document.
5    BY MR. BARNES:
6    Q.    Mr. Rust, obviously I've struck a
7    bone here with this line of questioning.
8        MR. STUEVE: I object to the
9    characterization. I have no bone left right
10   now.
11       MR. BARNES: I've struck
12   something.
13   BY MR. BARNES:
14   Q.    Mr. Rust, before Rose Acre
15   responded to the AWG specification for fresh
16   shell eggs, which included the UEP certified
17   requirement before Rose Acre responded, did
18   anybody from AWG tell Rose Acre that the UEP
19   certified requirement was put in this document
20   by MOARK?
21       MR. STUEVE: I'm going to object.
22   It calls for speculation on the part of this

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

93 (Pages 737 to 740)

---

737

witness.
BY MR. BARNES:
       Q.   You can answer.
            MR. STUEVE:  He's said he has had
no communications with AWG.  Hold on, let me
finish.
            It also assumes that in fact AWG
provided these specifications to Rose Acre.  And
so bottom line, it assumes facts not in
evidence, calls for speculation on the part of
this witness.
            MR. BARNES:  Anything else?
            MR. STUEVE:  No.
            MR. BARNES:  I just want to give
you an opportunity to add more.
            MR. STUEVE:  You keep misstating
the record.
            MR. BARNES:  Okay.
BY MR. BARNES:
       Q.   Mr. Rust, let me ask you again
before we were so rudely interrupted.  Did AWG
ever tell Rose Acre that a requirement in their

---

738

spec for fresh shell eggs, okay, regarding the
UEP certified animal husbandry guidelines was
placed in their specs by MOARK?
            MR. STUEVE:  Objection, calls --
hold on -- objection, calls for speculation on
the part of this witness.  He has already
testified he had no communication with AWG.
BY MR. BARNES:
       Q.   Can you answer the question?
       A.   Not that I'm aware of.
       Q.   Okay.  Let me direct your
attention, Mr. Rust, back to Exhibit 117.  This
is the egg industry economic alert.
            Do you have that in front of you?
       A.   Yep.
       Q.   Mr. Stueve, for at least the
second time took you through the possible
solutions that are listed in this document?
       A.   Yes.
       Q.   Do you see that, possible
solutions.  And I'm not going to read everyone
of them, he's read them a number of times, so

---

739

we've got more than enough of that in the record
I'll just note there are one, two, three, four,
five of these possible solutions?
            MR. STUEVE:  Objection.  First of
all, objection to the form of the question.  It
is loaded with a speech from counsel.
BY MR. BARNES:
       Q.   There are five items under the
possible solutions; are there not?
       A.   Yeah.
       Q.   Did you on behalf of Rose Acre
ever vote to adopt any of those solutions?
       A.   No.
            MR. BARNES:  Thank you, Mr. Rust.
            MR. STUEVE:  Hold on.  I've got a
follow-up question to your last question.
            MR. BARNES:  I'm probably going to
have another one.
            MR. STUEVE:  That's all right.
       EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. STUEVE:
       Q.   Do you have 571 in front of you?

---

740

            MR. BARNES:  Oh, the AWG spec.
BY MR. STUEVE:
       Q.   Do you have Exhibit 571 in front
of you?
       A.   Yeah.
       Q.   I want to make sure the record is
clear, you had no direct communication with AWG
concerning Rose Acre's bid for AWG's business in
2013; is that correct, sir?
       A.   I have never spoken to anyone who
works for AWG.
            MR. STUEVE:  I have no further
questions.
            MR. BARNES:  Mr. Rust, thank you
for your patience.  You've been here -- it is
now I guess 10 hours or so we've been at this,
and the cleaning crew is ready to come in.
            MR. MONICA:  Two things.  Is there
anyone on the phone that has questions for
Mr. Rust?
            MS. REDDING:  This is Whitney
Redding for Pepper Hamilton.  No questions here.

---

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

94 (Pages 741 to 744)

741

1    MR. MONICA:  Sounds like we're
2    good on the phone then.
3        MR. BARNES:  Okay.  John, why
4    don't you do this.
5        MR. MONICA:  Earlier in the
6    deposition, we had talked about getting Mr. Rust
7    to sign Exhibit A to the protective order in the
8    case which is an acknowledgment and consent that
9    he will keep the materials that have been
10   designated as highly confidential confidential
11   in this case and won't disclose them.  He has
12   since executed that exhibit.  I want you all to
13   look at it and make sure, and we're going to
14   mark this exhibit which includes it.
15       MR. STUEVE:  Sorry, I was
16   distracted.  Looks like the acknowledgement and
17   consent and it's been executed by Marcus Rust.
18   I think this is consistent with what Jan Levine
19   for UEP USEM had asked.
20       MR. MONICA:  We'll just mark that
21   as 572.
22       (Rust Exhibit Number 572 was

742

1    marked for identification.)
2        MR. STUEVE:  Great.  Thanks for
3    your time.
4        THE VIDEOGRAPHER:  This is the end
5    of the videotaped deposition.  Off the record at
6    7:00 p.m.
7        (Signature not waived.)
8        (Whereupon, at 7:00 p.m., the
9    deposition was concluded.)
10           - - - - -
11
12
13
14
15
16
17
18
19
20
21
22

743

1        ACKNOWLEDGMENT OF DEPONENT
2
3    I do hereby acknowledge that I have read
4    and examined the foregoing of the transcript of
5    my deposition and that:
6
7    (Check appropriate box):
8
9    ( ) the same is a true, correct and
10   complete transcription of the answers given by
11   me to the questions therein recorded.
12
13   ( ) except for the changes noted in the
14   attached errata sheet, the same is a true,
15   correct and complete transcription of the
16   answers given by me to the questions therein
17   recorded.
18
19
20
21   _____    _____
22   DATE            SIGNATURE

744

1        CERTIFICATE OF NOTARY PUBLIC
2    I, Paula G. Satkin, the officer before whom the
3    foregoing proceedings were taken, do hereby
4    certify that the witness whose testimony appears
5    in the foregoing proceeding was duly sworn by
6    me; that the testimony of said witness was taken
7    by me in stenotype and thereafter reduced to
8    typewriting under my direction; that said
9    proceedings is a true record of the testimony
10   given by said witness; that I am neither counsel
11   for, related to, nor employed by any of the
12   parties to the action in which these proceedings
13   were taken; and, further, that I am not a
14   relative or employee of any attorney or counsel
15   employed by the parties hereto, nor financially
16   or otherwise interested in the outcome of the
17   action.
18   My commission expires November 14, 2015.
19   _____
20       PAULA G. SATKIN
21     Notary Public in and for the
22       District of Columbia

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

1

**A**

**A-C-R-E-S**
646:10

**a.m** 372:17
378:6 448:20
449:2 493:22
494:3

**AAA** 479:18,22

**ability** 479:7
588:8 589:6
607:5

**able** 490:18
499:21 515:13
661:19 729:4

**absolute** 718:7

**absolutes**
566:11,18
568:3 718:5,18

**ACC** 463:7,14
503:18 504:17
505:1 683:4
684:7

**accept** 591:7
632:15

**access** 538:4

**accommodate**
436:1

**accomplished**
382:7 628:14

**account** 612:16
613:1 638:12

**accountants**
659:3

**accurate** 513:15
620:1 734:21

**accurately**
401:11

**accused** 537:11

**accusing** 635:15

**achieve** 436:22
632:17

**acknowledge**

743:3

**acknowledge...**
741:16

**acknowledging**
459:18

**acknowledgm...**
741:8 743:1

**acquired** 653:3
655:5,6,8

**Acre** 373:11
375:3 378:17
378:21 379:19
380:4,18
389:18 391:21
399:11 403:2,5
407:2 411:20
415:10 421:21
425:4,14
426:17,20
427:11 430:19
431:22 432:2
433:11,18
434:4,12 435:1
438:12 449:4
454:20 459:18
460:11 461:7
466:22 467:8
467:20,21
468:2,13 477:1
478:8,14
480:21 481:10
486:15 492:9
499:15 513:22
517:16 521:16
522:3 523:1,19
525:22 526:6
532:14 533:9
538:9 541:15
544:4 553:13
556:21 571:19
574:7,21
575:13 583:10

614:8 615:4,10
618:11 619:12
619:16,18
620:7 621:1
630:7 633:11
636:13 637:11
637:22 639:7
643:11 644:17
647:16 648:1,8
648:15,21
649:6,12 651:5
651:16 652:13
653:11,20
654:6,13
660:20,22
661:9 667:14
668:15,17
669:2 672:15
674:18 677:11
677:19 700:14
702:16 706:20
707:21 721:10
726:2 734:5
736:14,17,18
737:8,22
739:11

**Acre's** 387:18
388:15 391:7
430:16 486:3
523:20 575:7
578:10 636:20
637:1 661:3
740:8

**Acres** 646:3,6
646:19 647:7
647:11 724:6

**Act** 382:9,10
384:14 548:19
557:1 572:12
663:4,5,16,21
664:4,14 665:2
665:8,17

666:12,16

**action** 380:11
468:18 469:3
469:10,20
470:18 471:4
478:22 710:8
744:12,17

**actions** 721:6,9

**activists** 513:15
626:2 674:21
721:19

**activities** 562:4
562:11 666:4
714:13,15
715:21 716:8
718:1 721:18

**activity** 615:22

**acts** 673:3

**actual** 450:20
484:6 507:7
510:4,5 552:4
596:10 650:7
692:10 701:10

**add** 578:13
731:17 737:15

**added** 429:14
536:18 620:5
652:19 653:1

**adding** 509:10
655:22

**addition** 579:4
638:15

**address** 420:6
439:21

**addressed** 580:4
633:10 679:2

**adjacent** 671:19

**adjust** 476:7

**adjusting** 476:5

**adjustment**
576:14,20

**administrator**

611:12 631:14

**admit** 455:2

**adopt** 739:12

**adopted** 446:14
493:9,11
495:13 500:16
578:9,12
730:16 731:16

**adoption** 628:11

**adulterated**
540:21 541:2

**advance** 575:3

**advice** 663:9
664:8,12 665:3
666:8 713:22
714:5 715:16

**advised** 596:4
717:14,18

**advisor** 621:19

**Advisory** 631:16

**affiliated** 556:5

**affiliation**
627:13

**afraid** 400:16
612:11

**afternoon** 511:1
673:19,20

**agenda** 394:2
439:10,13
442:9 443:4,10

**agent** 639:15

**ago** 545:6
655:10,10

**Agra** 519:19

**agree** 395:9
396:3,13,17,18
397:4,7,13,15
398:5,11,14
404:11 405:14
406:5 480:2
599:13 676:1

**agreed** 426:14

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

2

449:11 498:8
628:15
**agreement**
380:20,21
496:8,18
513:10 566:4,8
608:14 609:2
642:21 660:16
**agreements**
564:13,21
566:2 567:10
637:15,18
**agricultural**
686:22 689:4
**agriculture**
570:2 686:18
688:22
**Agro** 642:11
**ahead** 391:12
397:12 444:11
464:8 485:14
511:20 514:3
544:16 553:15
555:8 586:9
606:15 627:3
643:15 652:7
664:21 695:11
702:6 703:10
704:4,19 706:5
709:13 717:4
**air** 428:19 431:1
431:6
**al** 372:6,9 435:7
626:20 686:11
688:3
**alert** 690:21
691:12,13,22
692:5,10 710:2
710:14,17
711:5 738:13
**Alexander**
565:9,20

**alleged** 721:9
**allocate** 478:5
**allow** 409:15
574:5 604:14
686:21 704:6
**allowance**
403:13
**allowed** 475:1,4
500:18 552:6
558:14 574:15
589:20 594:9
602:12
**allowing** 610:2
611:4
**allows** 556:8
618:18
**alongside** 602:7
**alternative**
589:7,18 590:9
591:7 592:5
609:19
**amendment**
551:1 615:21
**ammonia**
430:22 433:14
433:19 434:5
434:10,14
444:20 466:8
468:3,18 469:3
469:7,10,16,21
470:4,14 471:4
477:10,14
478:1,22 526:7
**amount** 516:15
538:12 539:1
**amounted**
619:19
**amounts** 549:9
**analysis** 577:22
**and/or** 611:15
711:20
**angle** 511:19

**animal** 380:10
394:2,5,17,22
399:21 403:13
405:9 410:13
411:21 420:21
425:6,10 432:9
435:13,21
436:5,11
438:18 439:13
439:17 440:3,8
440:9 442:9
443:10 444:16
446:3,8 450:15
459:13 460:12
460:19 463:11
478:2 487:19
488:14 492:15
502:8,9 513:14
513:19 574:20
583:20 584:12
586:5 588:10
589:7,10 590:1
590:2,9 591:7
592:5 601:11
601:16 603:17
603:21 604:2,7
604:11 605:7
606:6 608:3,16
609:3,19 610:4
610:5,18,19
626:2 628:2
629:22 630:8
630:11 632:11
632:16,18,22
672:14 674:14
674:16,17,21
675:1 679:3
693:19 697:18
721:18 727:12
734:13 738:2
**animals** 604:8
605:13 607:5,6

**announced**
503:18 683:3
684:7
**announcement**
719:13
**annual** 657:10
**anomia** 428:19
431:6
**answer** 380:2,15
388:1 391:3,12
396:15 397:11
397:12 416:10
416:14,16,19
417:20 418:2,6
419:7,9,15
421:3 423:1,3
423:9 425:19
425:20 426:10
429:4,19,21
434:12 437:16
441:21 444:6,7
444:11 454:4
470:8 475:12
483:8,15
484:12 485:9
485:15 494:21
496:3 497:3
508:11 516:6
517:14 518:16
537:21 543:2
563:14 574:13
576:18 589:14
591:11 598:10
606:14,16
620:13 627:3
643:14 644:7
652:6 702:6
703:10,16,18
705:7 706:4
717:4 720:2,21
728:21 737:3
738:9

**answered**
391:10 419:13
419:14 426:2
483:12 514:19
516:13 644:1,4
650:14 652:3
716:21 717:3
718:14 719:18
732:9 733:22
**answering**
475:13 611:17
**answers** 743:10
743:16
**Anthony** 407:16
407:17 414:22
415:9,14
417:12 422:2
424:11,19
**Anthony's**
412:13
**anti** 463:20
**anticipating**
535:2
**anticompetitive**
579:5 606:21
607:2 731:4
**antitrust** 561:13
569:17 575:4
578:15 579:7
664:13 666:4
686:18 730:17
731:19
**anybody** 552:7
602:21 603:11
616:4 681:12
682:6,7 736:18
**anyway** 435:13
**apologize**
643:22
**appear** 514:17
515:3 518:10
**appearance**

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

3

| | | | | |
|---|---|---|---|---|
| 378:11 | 443:7 646:18 | 454:3 470:17 | 720:16 735:11 | 685:6 |
| **APPEARAN...** | 647:21,22 | 512:17 514:19 | 735:20 | **attack** 727:1 |
| 373:1 | 648:5,12,18,20 | 520:7,8 571:4 | **assessment** | **attacks** 672:14 |
| **appeared** 515:2 | 649:4,5,9,11 | 573:8 575:2 | 622:8 | **attempt** 439:20 |
| 515:5 519:19 | 650:1 651:13 | 591:13 601:18 | **assistant** 399:18 | 551:1 561:2 |
| 523:15 | 653:8,15 654:2 | 614:18 615:1,9 | 407:14 | 567:14,19 |
| **appears** 466:1,4 | 654:10,17,20 | 617:6 625:22 | **associate** 378:13 | 570:17 664:6 |
| 493:4 569:7 | 655:7 | 630:13 636:19 | **associated** 372:5 | 718:8 |
| 598:21 615:20 | **April** 521:19 | 636:19 637:1,5 | 593:1 706:14 | **attempting** |
| 618:12 670:1 | **Arch** 374:10 | 650:12,13,16 | 707:6,11 | 590:8 613:1 |
| 685:3 686:10 | **area** 439:9 | 650:17 652:2,3 | **association** | **attend** 571:4,12 |
| 689:16 744:4 | 466:9 468:4 | 671:2 673:14 | 386:10 390:13 | **attended** 462:9 |
| **applicable** | 477:10 535:13 | 675:12 683:22 | 627:11 | 462:18 570:19 |
| 521:4 | 564:20 661:18 | 684:2,5 694:4 | **assume** 405:7 | **attention** 392:10 |
| **application** | **areas** 667:22 | 699:19,22 | 410:4 532:6 | 414:16 417:12 |
| 386:10 572:12 | **argue** 579:6 | 700:14 704:12 | 554:14 562:20 | 463:3 497:4 |
| **applied** 382:10 | 682:3 735:12 | 705:7,19 713:9 | 564:18 572:18 | 526:17 529:14 |
| 383:21 459:11 | **arguing** 465:1 | 716:20 717:3 | 580:16 612:21 | 530:3 539:17 |
| 608:7 | **argument** | 718:14 719:18 | 617:19 642:14 | 601:14 634:10 |
| **applies** 712:4 | 451:21 | 721:4 728:13 | 700:22 701:5 | 635:15 669:17 |
| **apply** 386:17 | **Armstrong** | 729:15,18 | 703:2 706:10 | 670:15 671:7 |
| 387:12 466:14 | 432:6 | 730:2 732:8 | 726:17 | 674:14 675:3 |
| 493:15 610:5 | **Arthur** 373:14 | 733:18,21 | **assumes** 523:4 | 678:11,19 |
| 610:19 | 378:16 | 741:19 | 734:15 737:7,9 | 679:7 680:2,8 |
| **appreciated** | **article** 377:2 | **asking** 398:4 | **Assuming** | 684:2 685:19 |
| 667:4 | 441:16 442:4 | 415:21 416:11 | 704:10 | 686:1,15 687:6 |
| **apprehensive** | 443:9 519:19 | 416:14 419:16 | **assumption** | 687:20 688:8 |
| 382:16,18 | 519:21 520:14 | 421:8,16 | 701:4 | 691:4,7 696:17 |
| 551:2 | 521:10,22 | 447:22 462:16 | **assurance** | 713:17 738:12 |
| **appropriate** | 523:15 | 469:18 475:21 | 631:21 706:15 | **attorney** 555:18 |
| 743:7 | **artificial** 506:15 | 476:4,7 478:14 | 707:1,7,12 | 571:3 680:1 |
| **approve** 692:15 | 506:19 507:10 | 503:3 509:13 | **ATC** 441:19 | 744:14 |
| **approved** | 507:16 510:10 | 515:16 516:7,9 | **attach** 618:12 | **attorney-client** |
| 451:10 525:12 | **artificially** | 525:7 527:18 | **attached** 569:2 | 561:11 681:16 |
| 539:8 576:7 | 506:14 508:5 | 563:8 564:3,4 | 575:6 581:8 | **attorneys** 378:7 |
| 593:1,2,4 | 508:22 509:5 | 572:7 601:15 | 599:4 616:6,12 | 666:3 |
| 594:21 688:22 | 509:20 | 611:7 664:18 | 617:13 622:7 | **attributed** |
| 710:9 731:9 | **asked** 385:17,21 | 665:1 681:16 | 663:11 730:3 | 404:16,22 |
| **approximate** | 386:2 390:16 | 698:6,14 | 743:14 | 719:11 |
| 646:15 647:10 | 391:9 416:17 | 709:16 717:11 | **attachment** | **audit** 410:14,16 |
| **approximately** | 419:13 426:1 | 717:16 719:20 | 686:2 688:5 | 415:2 417:15 |
| 378:6 408:2 | 429:21 430:12 | 719:22 720:8 | **attachments** | 418:17 422:5,6 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

4

427:1 433:22
444:20,22
445:15 465:21
466:13,18,19
466:19 467:19
470:1,21
472:19 473:4
480:21 486:2
486:15,18
491:14 587:4
590:17,21
592:13,19
593:1,2,3
594:5,19
628:17 630:1,8
630:11 632:10
632:12,16,17
632:22 633:2
**audited** 415:1
423:16
**auditing** 632:1
**auditor** 418:15
482:16
**auditors** 420:5
**audits** 443:14
444:14,15
445:5,9,18
631:20
**August** 434:20
441:7,13 442:3
442:16 466:3
470:2,20
611:13 613:20
614:3 616:10
618:9 620:8
**authenticated**
513:20
**authenticity**
520:18
**automatically**
410:19
**available** 479:5

543:15 622:10
**Avenue** 374:18
**average** 393:9
395:14 422:15
422:16,18
474:21 475:20
**averaged** 422:17
**averaging**
474:22 475:4
475:19 476:8
**AWAP** 630:1,4
631:20 632:4,6
632:10,16
633:1
**aware** 388:20
409:19,21
446:7,11
450:22 451:8
459:15 499:22
500:4 522:2,10
523:19 533:11
533:16 549:11
561:20 580:13
587:18 601:6
602:15 610:1
610:16 619:1
623:3 629:12
665:17 701:14
702:15,20
738:10
**AWG** 693:17
696:22 699:10
699:16 700:4,7
700:15 701:14
702:18 703:5
704:12 705:19
705:21 734:10
734:21 735:2,4
735:5,11,17,19
735:21,22
736:2,4,15,18
737:5,7,21

738:7 740:1,7
740:11
**AWG's** 707:20
735:9 740:8

_____

**B**

**B** 376:8
**B-A-U-E-R**
689:2
**back** 384:2
386:20 388:1
393:8 395:13
395:15,18,22
396:8,21 397:2
397:8,16 399:7
404:6 410:5
413:15 416:18
418:1 419:8
421:3 422:8
423:2 425:20
426:9 430:3,5
437:6,16,20
440:16 444:6
449:1 452:11
457:11 461:12
464:9 470:6
479:15 483:14
494:2,16 495:4
495:20 497:13
498:13 501:18
505:7,8 511:4
511:6 512:9,13
516:17 519:1
519:12 524:17
529:1 532:12
534:20 535:10
536:5 544:10
545:7,9 559:11
563:14 568:10
581:6 582:17
587:11 589:14
591:15 599:21

603:14 608:13
609:1 613:17
615:3 620:12
636:3,7 645:22
646:22 652:19
667:12 669:17
694:10,14,20
702:9 703:17
705:12,12
706:11 709:15
717:7 720:2,20
738:12
**backfill** 435:22
454:21 455:9
**backfillers**
455:1,11
**backfilling**
435:5 436:5,10
436:20 439:17
440:2,20,20
441:17 442:5
442:15 443:9
443:11 450:14
450:19,22
451:2,4,6,11
451:22 452:3
453:6,10,19
454:15,20
455:3,13 456:1
456:17 457:4
461:2,6 596:2
596:4 597:2,5
**backs** 626:2
**badly** 431:10
**Baker** 611:11
677:16
**ban** 454:15,20
456:1 461:6
**bang** 723:21,21
**bankrupt**
539:11
**banned** 451:2

**banning** 457:4
**Barnes** 373:13
376:3,5 378:15
378:15,19
380:7 386:3
391:9 392:1
395:19 397:5,9
397:18 398:10
398:20 401:14
402:4 404:2,9
406:3 412:6,20
413:20 415:17
416:1 418:5
419:12 423:6
424:5 426:1,13
427:16,20
429:22 430:3,8
431:19 432:15
432:20 436:8
437:12 440:14
441:1,9 443:21
444:10 445:3
445:11 447:3
448:9,13,18
453:8,21
456:22 459:5
460:17 461:9
461:16,22
462:2,4,10,15
462:19 464:4
464:12 465:13
467:3 468:6
470:11 472:13
472:20 473:10
474:1,9 475:9
476:3 480:14
480:18 482:3
482:11 483:2
483:10,18
484:13,20
485:10 487:3
487:13 493:20

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

5

495:17 502:20
505:5,18 507:2
509:9,22
510:14 511:15
511:20 512:4
512:13,18
513:2,8 514:18
517:12 518:8
518:13,17,20
519:5,15
520:17,21
522:6,14 523:3
524:1,9 526:20
529:6 531:18
532:4 535:6
543:18 544:16
544:19 545:2,8
545:10,20
549:7 550:2,7
550:12,16
551:16 552:13
553:2,5,14
554:6,19 555:1
555:5,8 557:18
558:6,11,20
559:7 563:5
565:12 568:13
568:19 573:13
577:15 586:8
588:5,22
590:11 591:9
591:11,18
592:7 593:6
594:1,13 595:2
597:10 606:10
606:13,22
608:11,17
609:4 610:11
611:6 615:14
615:19 618:1
619:3 622:17
624:17 625:9

625:17 627:2
633:5 634:4,17
635:1,18
640:12 643:12
643:18,22
644:2,6 645:3
645:7 646:21
650:13 652:2,7
658:6 662:12
664:15,20
666:21 667:3
667:15 668:22
669:12,19
670:6,9,12,14
671:1 672:19
673:12,14,18
673:22 674:2
675:12,14
676:21 677:1,5
677:7 678:14
678:16 679:21
681:1,3,19
682:2,4,19
683:2,6,8,12
683:17,19,20
684:13 685:2
685:14,18,21
688:2,6,11,13
689:21 690:1,5
690:7,11,12,22
692:19,22
693:5,13 694:1
694:8,13,18
695:14 696:2,8
696:14,16
697:20 698:10
698:16 699:10
700:16 701:18
702:12 703:8
703:19 704:4
704:16,22
705:10 706:2

707:13 708:9
708:18 709:5,8
709:12 710:5
710:20 711:8
711:15 712:14
713:11 714:10
714:21 715:4,8
716:3,12,20
717:10 718:13
718:21 719:17
720:6,15
721:15 724:11
726:7 727:22
728:10,15
729:18 730:18
731:6 732:8
733:8,21 734:6
734:18 735:3
735:10,16,20
736:2,5,11,13
737:2,12,14,18
737:19 738:8
739:7,14,17
740:1,14 741:3
**Barry** 583:3,21
584:13
**based** 530:11
610:5,19 628:5
635:12 643:2
659:21,22
691:21
**basic** 563:10
**basically** 659:20
**basis** 381:10
468:11 497:10
520:18 522:22
658:15 659:2
659:11 686:17
**Bates** 392:7
403:3 406:10
414:11 428:2
438:8 449:10

465:18 473:7
476:13 518:4
520:1,2 529:13
568:12 575:10
621:2 626:7
629:7 688:10
**battle** 416:12
**Bauer** 689:2
**bearing** 429:1
669:21
**bears** 448:14
682:12 690:18
**becoming** 490:5
**beginning**
403:14 405:9
449:1 456:5
458:21 460:2
569:5 582:17
667:12 674:10
686:3 688:16
**begins** 378:2
671:11 673:9
**behalf** 373:3,11
374:3,14
378:12 523:18
621:7 636:12
739:11
**belief** 719:12
**believe** 378:9
379:18 380:9
382:21 387:3
389:19 390:8
425:11 430:1
447:20,21
451:19 491:3
511:12 544:15
570:16 602:1
607:2 614:15
625:20 644:14
644:22 645:7
655:15 657:14
658:6 672:8,22

690:16 713:21
726:12,22
733:16 734:1
**believed** 425:14
432:13 461:6
504:3 508:20
509:17 510:9
588:2,19 589:3
606:19 607:2,3
617:7,9 634:11
720:10
**belongs** 435:16
**bent** 511:9
**Berland** 679:14
**best** 404:18
405:17 415:2
424:9,15 450:1
572:20 641:15
650:4 657:15
658:7 674:12
700:20
**better** 550:2
603:10 674:9
**beyond** 431:11
556:12,17
566:11 647:4
693:12,14,15
694:6 695:1,4
695:8,11
**bid** 699:20
700:15,19,20
702:16 707:20
708:6 740:8
**bidding** 695:10
699:14,15
700:8 708:8
**bids** 604:20
708:5
**big** 428:17
430:20 539:14
542:6 645:17
**bigger** 534:2

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                          March 6, 2014

6

603:11
**bill** 659:5
**bird** 408:21
  416:8 428:11
  429:15 528:20
  540:14 650:7
**birds** 407:17
  408:2,8,11,12
  408:13,22
  409:1,6,13,19
  411:1,4 412:9
  412:10,14
  413:11 414:3
  417:5 418:20
  422:20 428:12
  428:19 430:22
  431:14 489:1
  493:13 549:13
  549:14 551:6
  551:14,22
  574:12 619:19
  619:20 620:5
  652:19 659:2
  659:11,16,17
  659:18,19
**bit** 439:7 458:11
  479:21
**black** 539:7
  540:4
**blank** 595:15
**bleeding** 409:13
  409:20
**blood** 412:9
**board** 390:15
  446:14 450:18
  451:10 454:14
  455:3 457:3
  487:17,18
  551:1 570:12
  623:9 626:22
  627:22 634:1
  634:16,22

635:5,9,13
730:16
**Board's** 634:10
  635:15
**Bob** 589:3
**body** 414:21
  415:15 416:9
  417:7,17
  419:20 424:3
  425:8 426:21
  458:14 459:3
  460:20
**bona** 570:2
  686:22
**bone** 736:7,9
**boost** 394:1
  395:5,17
  396:12 397:2
  406:1 464:3
  465:4 502:18
  504:7
**boosting** 403:22
**bottom** 402:19
  403:10 405:1
  410:3 414:17
  428:3,7 441:11
  475:20 499:3,6
  506:7 525:3
  526:19 527:3
  527:16 545:7
  547:8 586:22
  599:22 612:11
  621:4 628:10
  657:20 670:10
  687:10 688:14
  688:17 733:14
  737:9
**bought** 498:5
  642:17
**bounce** 547:10
  547:20
**box** 743:7

**boycott** 562:15
  562:18 563:9
  563:21 567:19
  714:19 716:1
  716:10,14
  718:8
**boycotting**
  564:5
**Brad** 503:13,13
  503:17 682:14
  682:21 684:6
**brain** 547:10,20
**brand** 621:12
  704:8
**brands** 621:11
  621:11 622:7
**Brann** 561:10
  577:22 578:4
  581:20 663:9
  663:20 679:8,9
  679:12 680:11
  682:7 687:20
  688:15 714:1
  715:15 729:21
  730:2
**break** 448:8
  449:4 493:19
  524:12 559:14
  582:11 635:21
  698:7,13,16,17
  728:17
**breakers** 567:10
  713:4
**breaking** 455:21
  510:13 540:19
  541:5,7 602:20
**breast** 408:7
  409:14,20
  410:3
**breed** 408:21
  431:12
**breeds** 408:22

**brief** 448:21
  494:1 559:10
  582:15 636:2
  667:10
**bring** 634:9,15
  634:21 635:14
**bringing** 601:14
  693:1
**broad** 645:17
  680:21
**brochure**
  384:11 646:2
**brochures** 425:4
**broiler** 428:21
  429:1 431:17
  432:1,2
**broilers** 428:22
  429:9
**broke** 654:13
**broker** 621:16
**Brook** 647:17
**brother** 393:19
  394:3 407:16
  412:13 413:6
  415:9 422:2
  424:21 426:3,5
  455:18,18
**brother-in-law**
  399:14 426:6
**brought** 417:12
  539:17
**brown** 408:11
  408:13 583:3
**Bryant** 634:10
**budgets** 534:21
  535:4,12
**bug** 596:2
**build** 652:21
**built** 646:6,19
  647:7,16 648:1
  648:8,15,21
  649:6 652:13

655:4 661:16
**bulk** 551:12
  641:9
**bullet** 445:17
  447:2 449:22
  450:2 461:1
  562:3,10,14
  565:6 567:18
  568:22
**bunch** 572:14
**burn** 421:1
  727:12 728:5,7
**burned** 673:1
  674:12 721:13
  722:3
**burnt** 722:18
  723:1,12
**business** 431:22
  490:1 539:10
  549:19 551:3
  551:13 552:3
  567:19 590:1
  597:14 603:12
  605:20,21,22
  624:15 638:1
  638:20 699:16
  707:20 718:9
  740:8
**business's** 607:4
**buy** 504:11
  508:14 530:9
  530:18 552:9
  668:12,13,21
**buyer** 623:17
  624:5
**buying** 640:22
  641:1
**buys** 668:18
**bylaws** 686:20

---
**C**

**C** 373:12 374:1

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II							March 6, 2014

7

378:1
**cage** 393:13
  410:18,18,20
  411:1,3,7
  419:1,3,4
  422:12 424:13
  436:21 440:21
  443:18 451:15
  452:4 453:11
  454:16 456:13
  456:13,15
  463:12 464:1
  465:2 466:9,17
  468:4 473:22
  474:6,14,20
  475:7,17 476:1
  477:10 502:12
  502:17 504:5
  505:2,16 527:6
  528:1,9,18
  530:8 567:3
  589:11 619:19
  675:8,17 676:2
  719:15 720:13
**cages** 439:17
  440:3 450:14
  475:1,2,3,5,6
  475:16,22
  481:14 515:13
  723:17,18
**calculator**
  474:16 476:17
**call** 465:14
  479:18 508:15
  537:8 583:14
  583:17 584:9
  606:1 621:18
  641:14 677:2
  677:22 689:18
**called** 379:2
  413:13 456:11
  540:16 597:18

642:11 677:2
  677:16
**calling** 418:7
  618:2
**calls** 397:9
  412:7 464:4
  664:16 669:8
  705:1 728:2
  736:22 737:10
  738:4,5
**Capacity** 650:6
  654:19
**Capper-Volst...**
  381:5,13 382:9
  382:10,19,22
  383:20 384:14
  386:10,17
  387:11 548:8
  548:19 556:8
  557:1 561:6
  572:12 663:4
  663:16,21
  664:4,14 665:2
  666:8,12,16
  684:21 685:5,6
  685:7 686:11
  688:4,18
**caps** 706:18
**captioned** 680:6
  690:20
**car** 642:20
**cardiocoseriod**
  431:8
**care** 403:13
  405:9 409:15
  410:13 411:21
  412:14 413:4
  413:11,18
  414:3 420:19
  425:13 435:21
  436:6 439:17
  440:3,9 446:4

450:15 463:11
  583:20 584:12
  586:5 588:10
  589:18 628:2
  632:11,16,18
  632:22
**cared** 589:19
  605:19
**carefully** 686:21
**Cargill** 551:3,10
**Carlson** 521:19
**Carolina** 654:15
  661:17
**carried** 691:16
  709:22 711:4
**case** 372:7
  447:10 504:5
  514:2 518:10
  520:11 565:7
  565:17 636:9
  666:2,11 689:2
  704:11 741:8
  741:11
**catch** 462:12
  670:19
**category** 469:12
  566:6 621:18
  716:17
**cause** 491:17
  503:21 505:17
  684:8
**causes** 487:20
**caution** 681:17
  681:20
**CCF** 621:11,11
  622:7
**ceiling** 411:14
**cell** 479:9,10
**Center** 648:22
  648:22 649:3
**cents** 540:7,12
  541:3

**CEP** 573:9
**certain** 422:10
  478:5,19,19,20
  526:3 557:4
  589:19 671:3
  672:14
**certainly** 395:12
  435:15 452:17
  454:5 460:15
  483:21 634:14
  637:8 645:9
  657:2 696:14
**CERTIFICA...**
  744:1
**certification**
  450:15 541:9
  548:8 579:10
  693:20
**certified** 379:17
  379:19 380:5
  387:18 388:7
  388:15 389:1,5
  389:10,18
  390:7,16 391:7
  394:8 400:20
  403:14 405:6,9
  410:14 416:6
  417:4 420:4
  432:10 433:8
  435:13,22
  436:6 439:17
  443:19 446:4
  451:1,9 463:8
  463:11 467:13
  467:16 478:13
  487:20 488:18
  489:9,13,17
  490:2,5,17
  492:18 495:14
  496:9,19 498:3
  498:8 499:11
  499:22 500:19

501:4,12
  502:16 503:19
  505:15 525:9
  526:6 541:9
  542:16 543:2
  560:16,19
  567:1 570:12
  570:14,17
  572:13 573:2
  574:7,15 575:1
  576:6,7,11
  577:4 578:22
  583:20,22
  584:12,14,21
  585:2,6 586:5
  587:19 588:2
  594:10,22
  601:7 602:7
  603:3,7 604:1
  604:12 606:9
  612:13,17
  613:2 622:8
  623:1 625:14
  630:17 631:4
  632:12,16,18
  632:22 664:5
  668:13,16
  669:6 680:14
  680:18 697:17
  701:2 702:21
  703:7 704:15
  706:1,8 708:15
  719:14 720:12
  730:20 732:5
  733:5,19
  734:12 736:16
  736:19 738:2
**certify** 385:1
  744:4
**cetera** 628:18
**Chad** 598:13,16
  598:20 599:1,1

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

8

600:21 601:13 603:13
chain 539:13,14 598:8 626:15 627:8 630:2 704:6
Chairman 677:16
challenge 556:10
chance 426:10 470:7 526:21 595:13 612:12 628:22 676:11
change 463:13 497:11 706:21 707:9
changed 436:15 436:17,20 641:14 642:13 732:10 733:10
changes 743:13
changing 531:1
channel 514:22 515:3
characterizati... 396:4,17 736:9
characterizing 702:2
charge 407:9,13 638:12
cheaper 530:9 530:18
check 555:3,5 743:7
checking 412:3
checklist 466:18
Chicago 374:19 539:11 600:8
chicken 416:13 418:16,17,18 420:16,16

422:9,9,14
424:12,13
431:18 434:9
456:12,14
478:17 482:1
483:1,6 484:8
484:19 485:2
536:8 542:13
542:17,19
605:5 705:15
712:20
chickens 385:1
385:2,5 409:15
411:13,16
418:8,9,10,22
418:22 419:3,4
419:5 420:22
422:10,11,12
428:22 429:10
429:11 431:12
432:1,2 434:8
456:14 482:14
488:13,14
502:8 576:17
577:1 588:8,11
588:13,15
589:21 590:3
602:12 604:5,5
604:6 605:17
605:18 606:4
657:21 658:1
choice 700:20
chosen 609:13
chronology 442:14
chuckle 544:2
circle 471:9 651:17
Circuit 565:9,14 565:14
cited 429:11
City 373:8

claims 623:2
clarify 629:21
clean 519:13 667:21,22 697:22
cleaning 740:17
clear 472:17 565:7,17 646:8 695:15 709:20 714:18 715:22 740:7
clearest 579:7
clearly 569:19 693:17
client 513:22 521:7 607:21 693:17
client's 702:3
clip 521:15
close 551:22 648:7 654:4
closed 652:10
closeout 545:5
closer 683:16
club 384:5
clue 729:7
co-op 381:5,13 382:20,22 560:9,10,11,15 560:20 561:1 563:2 570:18 572:13 638:13 641:16,17 642:5,6,7
co-ops 638:20 639:3,9 640:17 642:9,15,16 643:2
coaching 485:5
Coast 662:3,9
coerce 564:9,12 568:3 716:18

717:21 718:19 719:3
cold 428:12 433:21
Columbia 744:22
column 471:17 471:19 473:14
columns 473:22
combining 511:4
come 408:16 418:15 479:12 479:15 480:1,6 484:9 487:22 488:22 490:19 490:20 536:2,5 537:7 545:6 551:22 626:1 652:19 659:3 694:10,14 728:5 740:17
comes 599:17
coming 694:20
Commencing 372:17
commission 744:18
committed 500:1,5
committee 399:20 432:8 432:19 433:5,6 433:15 438:17 438:19 439:13 443:10 446:8 456:4,19 462:9 462:18 464:17 465:10 492:11 492:15,18 555:12,15 558:10 561:13

561:18 574:20 583:13,17
584:5,9 625:22 631:16 668:9 677:15 679:3 689:17 692:8 692:12,15 709:21 710:8 710:13,17 711:4
Committee's 451:20
committees 456:20 660:21
communicate 559:21
communicated 381:17 387:17 388:14 403:18
communicating 413:3 508:19 509:14
communication 394:19 415:7 487:9 494:16 495:4 500:8 603:15 616:2 666:15 738:7 740:7
communicatio... 394:13 561:5 561:12 664:3 664:17 666:1 700:3 729:3 737:5
community 455:17 632:2 642:15
companies 435:22 439:18 443:19 446:4,5 463:8,8,11

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

9

495:15 496:9
496:19 498:8
499:11 500:1
578:22 583:20
584:12 618:18
656:16 732:4
733:5,20
**company** 399:17
448:2 451:4
466:22 467:8
467:19 489:9
490:4 493:6
499:12 501:2
531:16 540:15
548:10,12
576:5 607:6,8
612:17 613:2
623:8,17 624:6
624:16 631:9
658:9 668:15
697:1 703:21
725:16
**company's**
465:7
**comparing**
585:2
**comparison**
622:9
**competing**
579:11
**Competition**
532:15
**competitive**
604:20
**competitor**
489:6 490:16
491:5 574:6
579:11 603:4,8
**competitor's**
597:12
**competitors**
533:17 534:3

619:12
**compilation**
657:20
**complaining**
486:9
**complaints**
616:21
**complete** 743:10
743:15
**completed** 575:5
**complex** 458:4
**compliance**
459:19 474:19
475:7,17 476:1
476:11 490:2
501:10 548:19
574:16 596:19
697:17 734:13
**complied** 415:15
461:7
**comply** 443:19
467:15 478:9
478:15 486:13
499:18 502:12
504:5 505:3
526:1,3 555:6
619:17 719:15
720:13
**complying**
526:7 567:3
**Compound**
668:20
**computer**
511:10 512:15
515:10,18
517:6 659:12
**concentrate**
668:7
**concentration**
468:3
**concentrations**
431:7 466:8

477:10
**concept** 575:19
575:21 576:2,2
**concern** 393:15
393:19 394:3,4
400:13 401:11
401:11 402:1,2
402:9,9,13
591:6 592:4
593:21 594:3,8
595:4,4
**concerned** 394:7
400:8 408:6
412:10 417:14
440:7 594:20
634:6 728:6
**concerning**
382:8 383:20
405:17 407:22
482:21 486:2
494:17 495:7
497:20 523:21
572:11 573:1
581:10 614:11
616:14 663:15
663:21 664:5
664:14 666:12
666:16 696:5
700:15 714:1
721:5 740:8
**concerns** 394:16
400:19 577:9
577:18 579:15
580:4,9,18,21
581:2,9 591:2
592:1 593:5,12
593:19 610:1
731:8
**concluded**
731:20 742:9
**condition**
409:16

**conditions**
434:10
**conduct** 443:13
445:18 674:20
**conducting**
631:20 674:17
**confer** 581:18
**conference**
465:13 583:17
584:9 677:2,22
689:17
**confers** 524:15
**confidence**
479:22
**confidential**
372:10 447:5
447:12 448:2
449:5,12
531:14 552:22
554:9,10 558:4
558:16,18
676:13,15
741:10,10
**confidentiality**
554:13 555:4
**configured**
680:13 730:10
**confirm** 380:3
388:10 389:7
396:7 401:10
402:12 428:2
462:17 465:20
469:19 470:22
471:7,8 475:15
509:13 515:8
515:17 516:21
528:12,15
543:11 569:5
581:12 613:22
**confirmation**
471:21
**confirmed**

394:12,18
440:19
**confirming**
500:8
**confused** 442:12
**confuses** 497:1
**confusing**
489:19
**consent** 741:8
741:17
**consequences**
569:18
**consider** 583:21
584:13 630:7
662:9
**considered**
431:9 436:10
586:4
**considering**
574:5
**consist** 586:12
**consistent**
491:21 656:21
710:12,16
711:3 741:18
**consolidation**
645:12,18
657:3
**consult** 524:10
**consumers**
508:14 530:6
530:15
**Cont'd** 374:1
**contact** 479:10
611:3 613:5
706:22 707:11
**contained**
515:19 663:17
701:11
**contains** 515:21
**contemplated**
494:18

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

10

**contemplating**
560:8
**content** 664:19
**context** 416:11
497:22 507:22
529:3
**continue** 403:16
409:16 451:7
485:12 544:19
624:9
**continued** 412:4
454:21 455:9
**continues**
578:19 732:1
733:1
**continuing**
497:9,12 513:6
513:9 623:21
696:12
**contract** 467:11
468:8,9,13
473:1 477:6,7
477:14 481:6
489:12,22
490:19 507:13
549:18 552:6
552:10 566:8
602:13
**contracted**
548:11 624:12
**contractor**
472:4,7,18
473:3
**contracts** 472:5
552:4
**contributed**
571:20
**control** 468:2,3
489:22 535:19
535:21 536:22
537:1,5,17
538:3,10

631:21
**controlled**
549:13
**convened**
372:16
**convey** 610:3
**conveying**
610:17
**convince** 414:22
415:14 422:2
**cooperative**
390:12 562:16
563:22 564:9
570:2 636:17
636:18 637:6
637:12,16
638:4,5 639:20
640:15,22
663:5 664:9
665:8 686:18
688:22 689:4
714:20 716:11
716:14,19
717:22
**cooperatives**
569:20 638:2,7
638:9,17,22
639:1 640:8
641:7
**coordinate**
509:18
**coordinated**
405:22 508:22
509:7
**copied** 614:14
615:4 617:14
**copies** 614:13
**copy** 380:22
577:21 581:1
625:1 683:9
690:8 693:8
701:22

**corner** 402:20
403:6
**corporate**
447:22 478:12
**correct** 379:20
380:6,20 381:4
381:5 386:12
386:18 388:16
389:1 390:7,11
391:18 393:19
394:3,14,19
395:6 396:12
397:17 398:9
399:12,15,21
400:3,11,18,20
401:9,13 402:3
402:10,11
404:1 405:6,13
406:2 409:8
410:10 411:8
412:4,15,18,18
413:5 414:5,14
415:4 416:9
417:2,7,12,18
420:4,8,9,12
420:19 421:21
422:4 424:4
425:1,2,15
427:2 432:10
432:14,19
433:11 434:5
434:15,16,20
435:1 436:12
437:1 438:13
438:20 440:22
442:7 444:17
444:18,20,21
445:2,22
449:14,15
451:11,16
452:5 453:13
456:20 458:5

458:18,19
459:4,20 461:8
462:9 464:3
466:11 467:17
468:5,15,16,20
472:2 473:22
474:20 475:16
476:2 477:12
477:16 478:1
481:18 483:1
484:3 488:19
489:9,14 490:2
490:13 492:13
493:9,12,17
495:16 496:6
496:10,20
498:9 500:2,16
500:17,20,21
502:1,4,19
503:20 504:7
505:4,17
507:19 508:6
509:1,8,20
510:10 514:11
516:3,10 517:1
517:7,8,10,11
525:5,20 528:5
528:19 530:10
530:13 531:4
531:18 533:10
534:14,15,22
535:5 539:4
540:5,6,10
542:18 543:4
543:16,17
546:15,16
547:2 549:6
553:13,18
555:15 556:1
557:12 558:9
559:16,17
560:9,12,13,17

561:3,8,15
562:13 564:2
565:1,11 567:4
567:16 568:8
569:3 570:20
571:7,8 574:8
574:10,17
575:13,14,20
577:10,19
578:5,11
581:10,17
583:4,8,10
584:6 587:15
587:20 588:21
589:7 590:10
591:18 593:22
595:18 598:1
601:12 606:12
606:21 608:1
608:16 609:16
610:10 612:20
614:4,19
619:13 621:3,5
622:16 623:10
624:16 625:16
626:20 627:1
629:19 630:18
630:21 634:2
634:16 635:17
636:15,21,22
637:3,6,7,10
637:18,20
638:4 640:1,4
640:5,10
644:19 645:14
645:16,20
646:4,7,11,14
647:8,12,15,19
648:3,4,6,7,10
648:11,14,16
648:17 649:1,2
649:7,8,10,11

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                          March 6, 2014

11

649:14,15,21
651:3,4,7
652:14,15,22
653:14 654:1
654:11,12,16
655:3 656:20
657:5,8 658:5
658:16 660:7,8
660:18 661:11
661:14 662:8
662:16,20
663:2,7,13
664:4,21 666:6
667:18 671:17
671:21 672:3
672:10,11,18
672:21 673:1,2
674:5,19 675:2
675:19,22
676:4,9 677:5
677:12 679:10
679:11,16
691:14 698:9
700:21 702:18
703:7 707:2
708:5 710:3,10
710:11,14,18
710:19 711:6
711:14 712:5,9
712:13 713:5
715:17,19
716:2,19
717:18 718:20
719:16 720:14
720:19 721:6
723:12,13
730:17 733:20
740:9 743:9,15
**corrective**
468:17 469:3
469:10,20
470:18 471:3

478:22
**correctly** 419:21
422:7 423:8
424:16,18
431:2,4,15,17
435:18 450:11
491:18 492:21
533:6 534:4
535:16 542:3
556:13,19
557:9 568:5
569:21 575:8
578:16 579:2
584:1 586:6
611:21 616:18
619:21 628:3
628:20 631:16
632:2,7,19
633:3 718:11
732:7 733:7
**Cort** 646:19
647:7,11 726:2
**Cortland** 646:20
647:8
**cost** 458:22
459:9 460:3
490:21 507:7,9
507:12,13
510:4,5,6
556:11
**costs** 507:11
556:9
**Council** 626:15
627:8 630:2
**counsel** 375:3
378:16,21
379:5 427:16
429:20 447:3
448:10 449:4
462:10 475:11
483:19 484:14
485:5 513:10

518:8 520:4,19
521:1,16
522:11 523:1,7
523:11 524:7
524:10,15
526:20 544:18
554:15,15,19
554:22 558:18
559:22 573:6
614:7 615:15
618:11 619:16
620:7 667:14
668:2 670:20
676:10 678:9
678:12 680:21
681:2,4,15,17
684:22 685:10
698:4,9,14,19
699:1 701:7,12
703:22,22
709:16 713:10
713:16 715:6
715:16 721:4
729:15 730:2
734:5 735:8
739:6,20
744:10,14
**count** 536:1,9
537:10 542:5
658:18 659:12
659:13,21
**counted** 536:10
537:19
**counting** 659:1
659:10
**countries**
546:11
**country** 606:2
621:12 641:13
**counts** 537:14
**County** 372:1
481:4 535:15

537:2 540:15
540:18 647:17
647:20 648:2,9
649:18,19,22
650:10,19
651:2,6,13
654:7,10,14,17
**couple** 540:7,12
561:6 670:21
686:1 713:19
**course** 658:7
689:5
**court** 372:1
516:17 532:12
668:3 689:1
694:19
**courts** 689:5
**cover** 574:2
**covered** 670:5
687:15
**create** 659:16
680:14 681:10
681:10
**created** 508:5
508:22 680:19
**creates** 578:21
732:3 733:3
**creating** 506:15
506:19 507:10
507:15 509:5
**creation** 561:1,2
**Creek** 621:12
**crew** 740:17
**critical** 405:18
406:1
**Crystal** 655:2
662:15
**current** 701:14
**currently** 459:1
459:10 460:5
581:1 656:2,3
657:16 668:17

680:13 730:9
**curtail** 567:19
718:8
**custodian**
625:11
**customer**
389:13 539:7
604:16 605:17
605:18 607:18
607:20
**customers**
379:21 388:6
388:21 389:2,8
389:16 390:5
390:11,13,14
390:19,21
391:6 444:1
490:21 538:4,8
538:8,14,16
539:3,6,16,17
539:19,21
543:16 604:17
628:8 630:14
630:16 631:3
703:12 728:12
**cut** 517:13,13,17
599:9,10

**D**

**D** 378:1 458:3
**D.C** 372:13,19
611:11
**D1** 458:10
**daily** 458:15
468:11 481:14
486:5 659:13
659:14
**damn** 606:2
**damp** 431:5
**dash** 671:20,20
**database** 632:1
**date** 378:5 472:8

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

12

472:11,15
583:7 596:10
613:19 647:13
651:8 652:19
653:6 655:9
683:11,12
690:3 722:8
725:11 726:4
743:22
**dated** 402:20
406:21 414:13
434:19 438:10
442:16 458:8
519:20 525:4
527:20 547:17
548:7 558:3
574:1,3 583:8
599:5 614:2
670:3 677:10
678:5 682:13
684:4 685:4
686:12
**dates** 386:5
547:4
**David** 373:5
378:14 526:11
568:15 679:14
692:20 693:9
**David's** 552:13
**day** 540:16
563:9 568:18
611:13 616:17
628:18 659:8
668:2,6 690:9
711:21 723:7
724:13 725:9
**days** 516:15
521:21 537:13
537:13 614:3
**DC** 373:17
**dead** 481:13
482:1,14,22

483:6 484:18
**deal** 703:12
**dealings** 578:14
731:18
**deals** 632:9
**death** 456:14
**debate** 487:21
**decade** 635:10
635:13 668:17
**deceive** 517:20
**December**
406:21 410:14
547:5
**decertified**
434:4,13 567:2
**decide** 435:17
478:8,14
**decided** 401:2
618:17
**decision** 565:14
660:15 674:22
**decisions** 439:10
**DeCoster**
533:13 619:9
**deep** 409:5
**defects** 428:13
**defend** 589:11
**defendant** 666:2
666:11
**Defendants**
372:10 374:14
**Deffner** 560:5
560:21 561:5
685:4,15
**delay** 712:7
**demanding**
388:6,22 631:4
**density** 428:14
429:12
**department**
585:13 625:3,4
625:7 631:1,2

706:15 707:1,7
707:12 727:11
**departments**
539:18
**depicted** 401:11
481:22 517:15
**depo** 532:11
**DEPONENT**
743:1
**deposition**
372:15 378:4
389:14,22
390:4,20 391:4
406:13 427:13
448:14 479:4
485:14 494:12
514:14 516:16
544:1 554:9
559:19 630:21
633:16 640:3
644:16 676:18
693:1 701:8,20
735:9 741:6
742:5,9 743:5
**depth** 409:10
**description**
697:5,12
721:18
**designate**
449:12
**designated**
636:12 645:1
660:14 661:6
665:20,22
695:17 696:6
741:10
**designation**
695:1,4,20
**despite** 400:19
454:19 486:13
**detail** 660:7
**details** 579:17

**determine** 729:4
735:6
**determined**
525:22 632:22
639:22 731:2
**develop** 579:10
631:19
**developed** 628:6
630:1
**developing**
433:7 609:19
628:1
**dictated** 604:16
**diesel** 638:8
**difference**
428:17 430:20
**different** 382:12
386:5 408:22
418:13 422:13
422:20,20
434:9 458:11
475:2 488:16
584:18 588:9
589:21 593:14
593:16 604:4
604:11,22
605:4 638:11
664:10 699:3
**differently**
606:4
**difficult** 579:5
**difficulty**
498:18
**digits** 392:7
473:8 476:13
476:16,19
568:11
**dimensions**
475:4
**direct** 392:9
414:16 463:3
526:17 527:2

529:14 530:2
550:14,19
598:9 670:15
671:7 678:11
678:18 679:7
680:2,8 685:19
685:22 686:14
687:6,19 688:8
738:11 740:7
**directed** 684:1
687:16 691:7
713:16 719:7
**directing** 675:3
691:4 696:17
**direction** 710:12
710:16 744:8
**directly** 700:3
**Directors**
570:12
**disagreed**
425:17 426:15
**disallow** 439:16
440:2 443:11
**disclose** 741:11
**disclosed** 666:18
**discounts**
535:13
**discovery** 521:4
**discuss** 611:13
674:16 675:20
**discussed**
676:18 698:22
**discusses** 439:4
**discussing**
401:20 435:4
556:10
**discussion**
454:14 455:17
463:17 464:17
465:9 487:19
583:18 584:10
663:20 680:6

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

13

| | | | | |
|---|---|---|---|---|
| 730:13 | 458:3 465:14 | 735:11,17,21 | 653:12,12,16 | 581:8 586:22 |
| **discussions** | 469:19 470:12 | 736:1,4,19 | **Dort** 626:14 | 595:5,16 598:7 |
| 700:6,9,11 | 471:8 476:14 | 738:18 | **double-check** | 598:12,15,19 |
| 728:2 | 486:1,9 494:12 | **documentation** | 573:11 | 608:8,21 |
| **disgusted** 546:9 | 498:21 503:5 | 661:9 727:18 | **doubt** 382:21 | 609:14 611:15 |
| **dismayed** | 518:6,9,18,21 | 729:2 | 470:1 727:7 | 613:3,19 614:6 |
| 627:19 | 519:6,12 | **documented** | **dozen** 533:14 | 615:9 616:10 |
| **displaced** | 520:18 524:6 | 513:13,16 | 540:8,12 541:4 | 617:8,13,18 |
| 535:14 | 530:5 532:6 | **documents** | **drafted** 436:12 | 618:12 678:4 |
| **disposal** 712:19 | 534:13 541:14 | 381:22 382:11 | **drafting** 582:7 | 679:2 682:20 |
| **dispose** 711:18 | 543:20 553:4 | 384:10 388:20 | **draw** 589:9 | 683:14 684:3,4 |
| **dispute** 628:17 | 554:11,13,16 | 389:7,15 390:4 | **dried** 503:15 | 684:15 685:3 |
| **distort** 485:13 | 559:2,18 | 390:21 391:5 | 504:10 | 719:8 |
| **distorting** | 561:17,17 | 392:5 447:9 | **drive** 376:22 | **e-mailed** 575:5 |
| 640:18 715:9 | 573:13 575:16 | 456:7 478:17 | 515:9,18 517:5 | **e-mails** 595:12 |
| **distracted** | 576:1 580:3,7 | 497:20,22 | 517:9 642:19 | **earlier** 425:3 |
| 741:16 | 580:12 581:11 | 520:5,7,8 | **driven** 607:19 | 440:6 476:14 |
| **distribute** | 583:2 615:20 | 521:2 554:1 | 607:20 | 486:10 491:22 |
| 691:14 692:16 | 629:10 630:20 | 561:21 573:10 | **driver** 516:21 | 497:20,21 |
| **distributed** | 633:7,8,13,16 | 585:1 658:14 | **drying** 652:10 | 514:14 617:6 |
| 569:10 680:12 | 633:20 634:5 | 663:8,15,17 | **duly** 379:3 | 652:3 655:15 |
| 692:10 | 652:17 656:13 | 666:9 673:19 | 744:5 | 656:11 663:9 |
| **District** 372:1,3 | 657:22 669:21 | 691:2 699:3 | **dumped** 546:12 | 711:19 713:21 |
| 689:1 744:22 | 672:7 674:4 | 704:10 714:6 | 590:5 | 733:18 741:5 |
| **divide** 603:18 | 676:22 677:9 | **doing** 392:4 | **Duncan** 735:6,6 | **early** 506:22,22 |
| **divided** 608:15 | 677:10,15 | 401:1 459:1,1 | **Dutch** 540:1,16 | 507:1,6,6,18 |
| **document** 377:1 | 678:18,21 | 459:10,10 | 540:16 541:4 | 507:18 508:2,2 |
| 377:21,22 | 682:13 683:13 | 460:4,4 478:6 | **dying** 428:12 | 508:21,21 |
| 389:21 390:1 | 683:14,22 | 485:6,7 585:3 | | 509:6,7,19,19 |
| 396:9,14,19 | 684:21 685:11 | 619:9 673:20 | **E** | **East** 662:3,9 |
| 397:20 401:15 | 686:2,4 689:13 | 695:13 727:9 | **E** 374:1,1 376:1 | **eat** 418:10 |
| 403:7 404:14 | 689:18 691:1 | **Dolph** 611:11 | 376:8 378:1,1 | **economic** |
| 407:7 426:15 | 696:20 699:8 | 677:16 | 660:14 | 393:12 452:2 |
| 427:11,17 | 701:9,13 702:4 | **Dominick's** | **e-mail** 377:3 | 453:18 463:14 |
| 428:6 430:10 | 706:12 707:10 | 539:14,15 | 432:5 438:10 | 561:22 578:21 |
| 430:16,19 | 707:13 712:15 | **Don** 670:8 | 492:8 503:12 | 690:21 691:12 |
| 431:21 432:13 | 713:17,21 | **Donald** 373:13 | 505:12 506:12 | 691:22 692:4 |
| 433:10 435:4 | 714:22 715:10 | 378:15 | 525:4 527:4,20 | 692:10 710:1 |
| 443:1,3 445:12 | 715:12 718:22 | **Donovan** 407:17 | 528:16 529:16 | 710:14,17 |
| 447:1,5 448:10 | 723:10 724:14 | 407:19 409:14 | 529:21 530:4 | 711:5 732:4 |
| 449:6,8 453:3 | 732:10 733:10 | 409:20 410:8 | 531:3 546:4,7 | 733:4 738:13 |
| 453:20 454:1,2 | 734:19 735:4,5 | 411:3 413:6 | 547:16 574:18 | **Ed** 413:6 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II
March 6, 2014

14

**edited** 521:15
**editorial** 435:7
**effect** 385:16
  428:13 451:16
  452:5 503:1
  504:18
**efforts** 500:14
  509:18 546:9
  564:8,11 568:3
  573:2 625:5
  718:19 719:3
**egg** 372:9 374:3
  374:4 379:13
  379:15 380:19
  381:3 393:6
  394:1 395:17
  398:8,8 403:14
  403:19 404:1
  409:2 444:1
  489:7,7 503:15
  504:4,6,10,15
  504:16,19
  506:14,15,19
  507:4,7,11,16
  508:6,17 509:1
  509:2,6,20
  510:4 513:16
  521:18 522:5
  522:13 530:7
  533:4 540:21
  541:20 542:17
  542:21 543:2
  547:11,21
  551:3 555:11
  556:11 560:9
  560:10,19,22
  561:1 567:10
  570:12,14,17
  571:4 572:13
  573:2 576:6,8
  576:10 577:3
  583:2,21

584:14 586:3
588:11 594:10
595:21 597:14
599:4,10,18
603:8,22
604:12 605:20
608:4 611:2
621:7,21 622:3
622:4,5,10
623:21 624:10
624:11 625:15
625:22 626:14
628:6,12,19
629:18 632:11
636:21 637:2,6
637:15 638:20
645:12,19
647:17 648:2,9
648:16,22
649:7,13,16
650:10,17,20
651:1,2,6,17
651:20 652:13
652:21 653:7
653:12,21
654:7,14 656:6
656:10,14,16
656:18 657:4,6
660:4,10 662:6
669:6 684:16
684:17,18
688:19 689:17
690:20 692:8
692:11,14
697:18 703:12
705:3 708:13
710:13 733:19
738:13
**eggs** 385:15,15
390:6 391:7
395:6,16
396:11 397:2

403:22 405:13
406:1 443:17
446:4 451:16
452:5 453:13
454:17 455:20
467:15 488:18
489:12 490:20
492:19 495:15
496:10,20
498:4,9 499:13
501:2,11
502:19 503:2
508:8,12,14,16
508:18 530:21
535:14 539:19
540:14,17
542:1,15 548:9
548:10 549:4
549:17 551:13
552:1,8,9
556:18,18
560:11 563:4
564:1,21 566:3
566:13 575:1
576:6,8,10
577:3 578:20
583:21 584:13
586:3 588:4,20
606:8 607:4
623:17 624:5
657:7 660:4,10
661:18,22
664:5 668:12
668:14,18
669:2,7,14
693:18 697:6
697:16 700:20
700:21 701:2,3
702:17 703:5,7
704:13,15
705:20 706:1
708:14 713:3

732:3 733:3
734:11,11
736:16 738:1
**eight** 422:17
466:7,8 468:15
471:22 477:9
**Eighteenth**
374:10
**Eighth** 565:13
565:14
**Eimer** 374:17
**Einstein** 556:7
557:3
**Eisenstein**
555:18,19
**either** 401:1
409:10 467:14
489:12,22
573:16 662:13
666:10 730:13
**electric** 723:20
725:3
**Electrical** 673:5
**eligible** 643:1
**eliminated**
542:21
**else's** 484:7
**emergency**
728:2
**employed**
744:11,15
**employee**
413:12 522:3
523:22 744:14
**employees**
425:12,16
**empty** 712:21
**encouraging**
611:2 730:21
**ended** 379:12
722:17
**endorse** 502:7

**endorsed** 602:6
**ends** 409:6
**engage** 557:5
641:8
**engaged** 597:2
**engaging** 635:16
**enhances** 507:11
**enrolled** 586:1
**ensure** 454:15
**enter** 507:12
**entered** 637:15
**entire** 415:10
476:9 532:5
536:14,18
**entities** 660:4,6
660:9
**entitled** 447:7,8
447:15 487:10
517:18,19
532:5
**entity** 617:7
**equivalency**
633:2
**equivalent**
633:1
**errata** 743:14
**ESQ** 373:4,5,12
373:13 374:6,7
374:16
**essence** 468:1
**essentially** 563:7
**establish** 390:15
446:3 601:10
**established**
379:18 557:5
690:16 692:4
**estimate** 393:6
658:22
**estimated**
655:16
**et** 372:6,9
628:18

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

15

| | | | | |
|---|---|---|---|---|
| **event** 628:13 | **exceed** 469:11 | 377:7,8,9,10 | 598:2 607:11 | 382:15 |
| 719:11 720:10 | 469:21 471:4 | 377:11,12,13 | 609:8,10 613:8 | **explanation** |
| 723:14 726:19 | **exceeded** 468:18 | 377:14,15,16 | 613:12,13,18 | 415:19 |
| **events** 725:21 | 469:4,7 470:14 | 377:17,18,19 | 614:2 615:3 | **export** 662:1 |
| **eventually** | 470:18,19 | 377:20,21,22 | 618:13 620:17 | **exports** 405:18 |
| 479:12,14 | 479:1 | 392:6 399:4 | 620:21 621:1 | 405:21 546:15 |
| 501:3 504:17 | **exceeding** 459:4 | 402:17 406:6 | 626:3,7,9 | 547:2 |
| 549:1 | **excellent** 504:1 | 406:10,12 | 629:3,7 636:7 | **expose** 578:14 |
| **everybody** | 668:3 | 414:6 427:6,10 | 645:22 669:18 | 731:18 |
| 502:7 554:4 | **exception** 490:9 | 434:18 438:5,6 | 669:18,21 | **expressed** 610:1 |
| 572:3 605:4 | 490:12 491:6 | 441:6,9,12 | 671:3 676:6,12 | **extend** 556:17 |
| **evidence** 453:22 | 491:10 493:16 | 442:19 445:4 | 678:2 679:1,6 | **extent** 563:10 |
| 523:5 612:14 | 495:8 500:15 | 448:12 449:16 | 682:10,18 | 664:16 |
| 658:8 715:1 | 602:10 | 452:18 457:20 | 688:1,5 689:13 | **external** 578:13 |
| 727:9 731:7 | **exceptions** | 458:2 461:20 | 689:19 690:10 | 731:17 |
| 734:16 736:3 | 494:17 | 462:7,11 | 690:14,15,17 | **extra** 436:1 |
| 737:10 | **exchange** 557:5 | 465:15,18 | 690:18,20 | 605:17 727:10 |
| **evidently** 481:19 | 564:14 566:11 | 486:22 487:2 | 691:5 692:3,6 | **extremely** 602:6 |
| 587:15,16 | **exclusion** | 492:3,7 494:6 | 692:9,9,16,20 | 628:1 |
| 590:5 615:12 | 579:12 | 494:8 503:9 | 693:3,6 696:18 | |
| **exact** 386:5 | **exclusive** 702:17 | 505:21 506:3,4 | 709:16 710:13 | **F** |
| 393:14,18 | **excuse** 407:12 | 511:11 514:5 | 711:5 713:13 | **facilities** 466:15 |
| 549:9 579:17 | 439:1 447:3 | 515:8 517:10 | 738:12 740:3 | 466:20 467:14 |
| 587:21 653:6 | 497:5 526:5,20 | 517:21 518:3 | 741:7,12,14,22 | 468:2 481:8 |
| 722:8 723:3,9 | 565:12 581:22 | 519:7,11 | **exhibits** 689:12 | 486:3 489:13 |
| **exactly** 384:9,22 | 615:15 623:14 | 524:21,22 | **existence** 688:19 | 498:4 521:18 |
| 433:17 498:21 | 626:19 687:17 | 526:13,14,21 | **expect** 487:20 | 522:5,13 |
| 525:13 533:1 | 709:5 | 529:9 531:6 | 634:21 635:13 | 523:12 597:8 |
| 708:16 | **executed** 380:19 | 543:7 545:12 | **expected** 479:15 | 606:7 641:22 |
| **examination** | 380:21 741:12 | 545:16 546:3 | 634:15 | 649:17 651:21 |
| 379:2,5 544:20 | 741:17 | 548:6 550:8 | **expensive** | 656:7 658:2,14 |
| 667:14 693:12 | **Executive** 668:9 | 552:16,20 | 667:18 | 662:2 726:21 |
| 693:14 694:6 | **exemption** | 553:20,22 | **experience** | 727:2 728:6 |
| 698:4 709:11 | 386:17 387:11 | 554:11,12 | 530:12,14,20 | **facility** 407:19 |
| 734:5 739:20 | 565:8,18 | 557:20 558:2,7 | 635:12 | 412:3 436:2 |
| **examined** 379:3 | 668:18 | 558:19 559:5 | **expert** 475:3 | 466:21 467:2,4 |
| 743:4 | **exhibit** 376:9,10 | 559:15 568:14 | **expires** 744:18 | 467:8,9,10 |
| **example** 563:3 | 376:11,12,13 | 568:21 570:6 | **explain** 416:12 | 477:4 481:4,10 |
| 563:22 564:5 | 376:14,15,16 | 570:10 573:17 | 417:19 | 481:17 482:22 |
| 566:3,22 617:8 | 376:17,18,19 | 575:11 582:19 | **explained** | 516:8,11 |
| 619:1 640:7 | 376:20,21,22 | 583:1 586:16 | 381:13 570:16 | 539:20 540:19 |
| 641:9 | 377:1,2,3,4,5,6 | 586:20 595:6 | **Explaining** | 541:6 542:14 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

16

597:13 646:16
652:10 661:17
662:21,22
**fact** 382:10
385:17 387:8
393:18,22
394:6,7,11
395:2,4 400:20
409:19 410:9
413:3,18 414:2
417:10 420:1
451:14 459:17
493:14 500:7
523:4 539:2,6
547:1 575:18
577:9 583:12
584:17 590:7,8
594:19 597:1
601:15 602:10
606:3,5 608:6
614:18 617:15
617:16 634:10
694:3 700:7
702:20 704:11
705:19 709:21
710:1 730:16
731:2,4 733:17
737:7
**factors** 557:9
**facts** 734:16
737:9
**fail** 415:2
417:15 418:16
422:6 423:17
427:1 486:15
**failed** 426:18
433:22 486:18
**failure** 482:22
484:18 486:13
491:17 566:20
567:20 718:9
**fair** 387:12,18

387:20 402:14
457:9 552:2
605:9,11
645:17 657:7
660:1,2 696:15
**fall** 504:18
566:5
**false** 513:18,18
620:9
**familiar** 521:9
630:4 631:10
**family** 393:15
541:15
**fan** 470:3
**far** 380:14 383:8
398:7 409:7
411:6,10 441:5
517:4 538:18
634:5,6 729:4
**farm** 407:18
410:4,15
467:11 468:9,9
468:13 470:3
477:7 481:6
517:16 521:20
522:4 534:10
536:2 537:8,13
537:15 538:13
540:14,18
556:9,12,12,16
590:3,3,4
638:11,13
639:9 647:17
648:2,9,16,22
649:7 650:10
650:20 651:2,6
652:14,18,21
653:7,12,21
654:7,14
**farm's** 538:6
**farmer** 384:15
384:20 386:11

386:15 387:3,5
387:10 569:20
705:15
**farmers** 513:16
551:5 686:22
689:7
**farming** 642:15
**farms** 373:11
375:3 378:17
378:21 410:1
410:18 432:1
467:1,9,20,22
468:2 477:1,6
477:14 480:21
513:22 521:17
523:1 527:6,22
528:9,18
532:15 533:13
537:10 540:1
540:16,16
541:5,15
548:12 549:5
574:22 618:11
619:18 621:12
655:2 662:6,15
667:14 668:16
668:17 669:2
672:15 734:5
**fast** 458:15,16
459:12 732:14
**fat** 418:9,11,12
418:18,22
419:3 420:15
422:9,11
424:12
**favor** 457:4
489:2
**favorite** 626:11
**FBI** 726:20
727:22 728:1,4
729:4,8
**FDA** 377:7

533:18 534:3,6
534:14 535:3
536:13 537:7
538:4,17,20
542:2,9,13
543:12 544:13
**feather** 408:15
**February**
379:18 380:4
380:18,22
387:16 388:12
388:13 521:21
530:4 531:3
560:4 569:1,6
685:4 686:12
688:4
**feces** 428:20
431:1
**federal** 665:15
666:4 689:1
**federated**
688:22
**feed** 408:17
409:5,5 418:10
418:21 419:2
421:1 422:12
422:19 723:17
724:3,4 728:7
**feeder** 411:12
411:15
**feeders** 409:11
**feeding** 408:14
**fees** 571:12,20
**feet** 480:10
**fell** 431:11
**felt** 463:5,7
505:20 574:11
597:21
**fide** 570:2
686:22
**field** 604:19
**fifth** 686:3,3

**fighting** 416:13
**figure** 411:19
**file** 573:1,10
722:9 724:16
727:18
**filed** 726:11
**files** 521:6
543:22
**filing** 664:2,12
**finally** 405:4
458:21 460:3
**financially**
744:15
**find** 415:1 422:5
423:16 461:21
462:11 539:5
545:18 575:6
669:18 682:22
685:12 686:7
733:12
**finding** 429:11
709:18
**finds** 482:16
**fine** 448:9
493:20 497:11
510:14 511:18
527:1 532:10
554:6 702:1
**finish** 391:2
437:17 527:17
579:21 674:1
681:9 737:6
**finished** 531:22
689:10 709:13
728:16
**finishes** 398:17
606:14
**fire** 472:7
**fired** 413:7
472:4,18
724:22
**firm** 561:10

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

17

578:2,3 587:4
590:17,21
592:13,19
593:3 594:5,19
714:4,5,8,18
715:15
**firms** 429:9
**first** 392:11
393:4,8 395:13
399:1 402:22
403:11 405:3
427:15 438:16
439:16 441:12
443:11 449:9
449:11 451:2
463:5 466:7
473:13,14
496:5 499:6
501:15 505:13
521:12 527:16
527:19 529:20
531:12,20,22
546:3 547:8,14
547:16 555:22
565:6 568:22
574:19 581:7
584:4 595:12
598:12 599:21
607:12,16
612:7,9,10
615:20 617:18
617:21 618:13
618:15 623:13
629:16 631:9
670:1 683:13
685:3,14
686:15,19
689:12,18
709:19 711:18
734:9 739:4
**firsthand**
410:11

**five** 446:3
458:22 459:9
460:4,6 477:11
486:4 504:20
537:13 540:2
739:3,8
**flash** 376:22
515:9,17
516:21 517:5,9
**flashlight** 536:7
**flat** 620:8
**flock** 393:4
395:15 396:10
396:22 399:18
407:14 414:20
417:17 418:8
418:20 419:19
420:14,19
425:13 458:18
464:2 465:3
489:21 506:21
507:5,18 508:2
508:20 509:6
509:18 658:8
711:20 713:4
**flocks** 407:10,13
413:4,19
415:11 421:20
424:2 459:3
610:7,21
656:18 712:8
**floor** 474:6
**FMI** 377:19
390:8,10 591:3
591:6 592:1
593:2,4,5,12
593:19 594:9
594:15,16,16
594:21 604:17
625:15,19
626:7 627:14
628:7 630:2,8

630:11 631:14
632:4,15,21
**folks** 378:10
413:3,17 414:2
433:3 435:9
464:22 546:11
551:4 707:20
**follow** 392:21
393:3 566:20
567:20 674:6
710:9 718:10
**follow-up**
739:16
**followed** 557:8
**following** 557:8
562:4,11 576:9
677:17 715:21
716:7 718:1
719:20
**follows** 379:4
599:11
**food** 409:7,10
411:6,10
458:17 479:13
541:2
**Foods** 489:8,11
489:16 490:5
490:10 491:4
493:15 494:19
495:9 500:14
501:8 502:16
505:15 548:22
549:5,12,15
551:10 561:6
574:6,14 603:4
603:7 608:8
719:13 720:11
731:4,14
**force** 534:21
535:3,11
**forcibly** 569:19
**Ford** 639:11,13

639:14 640:4
641:3 643:5,7
644:15
**forecast** 691:13
710:2
**foregoing** 743:4
744:3,5
**forget** 520:22
534:8 641:13
**form** 386:3
387:1 395:19
401:14 404:2
406:3 412:6
413:20 415:17
419:13 436:8
439:22 441:1
443:21 446:9
446:16 460:17
461:9 468:6
470:11 472:20
474:1 475:9
482:3 483:2,10
483:18 484:20
485:8 495:17
496:11,21
502:20 505:5
505:18 507:2
509:9,22
514:18 520:20
522:6,14 523:3
524:1 535:6
537:9 549:7
551:16 563:5
563:12 586:8
588:5,22
590:11 591:9
594:1,13 595:2
597:10 606:10
606:15,22
608:11,17
609:4 610:11
611:6 622:17

624:17 625:9
625:17 627:2
633:5 634:17
635:18 643:12
668:19 679:18
684:11 700:16
701:13 703:9
704:16,22
706:2 708:19
710:5,20 711:8
711:15 712:14
714:21 716:4
716:12 718:13
719:18 721:15
724:11 726:7
730:18 731:6
733:8 739:5
**formed** 600:7,18
**former** 523:22
**Forsman** 533:13
**forth** 468:14
494:16 495:4
**fortunate** 499:5
499:8,10
**forward** 618:2
**fought** 458:21
460:2
**found** 420:5
428:16 430:20
511:12 534:9
539:3 549:22
683:5 727:9
**foundation**
496:12,22
516:20
**four** 419:3,4
451:1,9 474:9
474:11 540:2
582:17 614:3
638:10 733:15
739:2
**fours** 638:18

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

18

**fourth** 392:20
447:2 449:21
450:2,4 463:4
562:10 733:9
**frame** 615:15
**framed** 686:21
**Francisville**
648:9
**Frank** 605:21
634:10
**Frankfort** 654:8
**frankly** 725:15
**free** 410:18,18
410:20 411:1,3
428:21 530:8
589:12
**fresh** 611:14
701:3 734:11
736:15 738:1
**friend** 605:21
**front** 419:2
443:1 511:9
517:6 519:13
520:10 613:14
636:6,7,13
645:8 656:13
677:14 691:2
696:19 699:9
701:9 706:12
713:14 715:13
729:16 738:14
739:22 740:3
**frustrated** 602:6
608:6
**fuel** 638:8,8,11
638:15 640:7
641:9
**fulfilling** 694:18
**full** 534:20
535:3,11 680:9
**further** 439:7
464:2 465:3

513:10 517:12
518:21 666:20
675:4 697:21
734:3 740:12
744:13

      **G**

**G** 372:19 378:1
744:2,20
**gas** 479:19
642:20,20
**gasoline** 638:9
**Gene** 392:16
395:3 438:11
454:3 487:9
494:17 495:5
499:4 500:7
506:13 508:20
509:14 546:4
547:9,9,17,19
550:19,20,22
574:19 575:19
579:18 580:1,2
580:8 587:1,9
590:15,22
591:1,5,20
592:15 593:22
595:17 596:1
596:22 597:22
609:15 613:20
614:10 617:8
617:14 626:19
629:17 678:4
679:2
**general** 375:3
378:20 495:3
521:16 522:11
523:1,11 614:7
618:10 619:15
620:7 703:11
**generated** 534:3
534:6 537:17

734:21 735:1
**gentleman**
432:12
**Georgia** 467:11
470:3 472:6
477:8 651:18
652:14 662:7,9
662:16,21
**Georgians**
662:13
**Germantown**
653:21,21
654:2
**Germany**
605:22
**getting** 500:14
544:20,21
683:16 687:17
727:1 741:6
**giant** 480:12
**Ginnane** 503:13
503:14 682:14
682:21 684:4
**give** 381:21
382:5,11
426:10 448:10
461:20 462:12
468:9 470:7
479:21 519:11
520:6 526:21
544:1 545:19
559:6 589:11
605:17 626:10
666:22 669:20
670:18 676:10
682:21 683:10
688:9 690:7
693:10 735:16
737:14
**given** 458:22
460:3 526:3
534:10 540:9

563:9 588:14
617:8 743:10
743:16 744:10
**glanced** 559:20
**go** 391:12
397:12 410:1
413:22 414:20
415:18 419:19
422:8 440:16
444:3,10
448:16 457:15
464:8 485:14
490:19 502:6
503:22 504:19
505:17 507:5
509:3 510:3,6
511:20 512:9,9
514:3 516:17
530:17 532:12
538:7,16 544:3
544:9,16 550:1
553:15 555:8
566:11 568:10
580:8 586:9
589:11 596:11
597:8,12 598:6
599:21 602:4
603:13 606:15
607:4 608:5
615:3 619:14
627:3 642:15
643:14 652:7
664:21 670:10
679:6 684:8
686:2 693:10
694:5 695:11
695:11,19
696:10 702:6
703:10 704:4
704:19 706:5
708:9 709:13
717:1,2,4

719:12 725:17
735:5
**goes** 422:1
440:12 542:8
556:11 566:17
567:17 695:1
731:22
**going** 380:7
412:3 414:16
416:7 417:5,15
418:12 422:19
426:8,9 429:18
431:20 470:6,7
478:9 485:4,8
485:11 488:14
494:5 497:8
503:18 504:18
504:20 510:6,7
513:5 514:1
516:12,19
518:15,17
521:2 524:11
526:18 527:1,2
528:22 532:11
543:18 548:5
553:11,19
558:6 559:6
560:19 581:6
582:10 587:3
589:22 590:20
591:22 592:1
592:19 593:4
593:18 594:4
595:11 596:18
600:7 603:16
604:7 605:16
606:4 615:14
618:2 626:6
640:12 645:21
646:21,22
661:17,21
664:15 669:16

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                               March 6, 2014

19

670:15 671:4
673:11 674:6
676:16 678:10
678:18 679:6
679:17 681:14
681:22 683:3
684:7 685:8,11
685:18 689:11
693:6,7,10
699:1,5 703:16
719:13,14
720:11 727:10
727:14 728:5
728:22 736:21
738:21 739:17
741:13
**good** 379:7,8
400:7 414:22
420:11,17
421:19 462:4
497:5 510:12
555:1 587:4
590:2,21
592:20 594:6
605:21 612:12
652:12 678:14
741:2
**goods** 637:21
638:1,6,12,16
639:9,20,21
641:7 642:9,17
**Government**
615:22
**grading** 540:19
602:20
**grapevine** 587:2
590:19 592:18
594:3
**gratuitous** 694:1
694:3
**gray** 564:20
568:17

**great** 583:19
584:11 661:21
683:17 729:12
742:2
**greater** 417:17
460:7 578:15
731:19
**greatly** 688:20
**Greg** 492:8
493:5 553:12
555:11,14
558:13 583:13
585:16 614:16
615:1 631:5,6
625:2 700:1,9
**Gregory** 392:16
395:3 397:10
398:6 438:11
454:4 487:9
494:17 495:5
499:4 500:7
506:13 509:14
546:4 547:17
550:19 574:19
575:20 579:19
580:1,2,8
587:1,9 590:16
592:15 593:22
595:17 597:22
598:13,16,20
599:1,1 601:13
603:13 609:15
613:5,20
614:10 617:14
629:17 634:9
678:4 679:2
710:1,9
**Gregory's**
381:20 448:13
615:9 616:10
617:8
**grew** 429:13

456:12 551:18
551:19,19
**Grocers** 372:5
706:15 707:7
707:11
**grocery** 539:13
539:14
**gross** 633:6,13
**ground** 654:14
**grounds** 512:20
**group** 381:6
382:17 570:18
571:18 604:20
625:20 643:9
643:19 644:10
644:13,17
726:22
**groups** 513:19
672:15 674:17
728:5
**grow** 436:2
450:9 452:22
578:19 732:1
733:1
**growth** 646:2
**guerilla** 673:9
673:10 674:11
674:16
**guess** 505:20
564:17 740:16
**guideline**
417:11 425:10
477:19
**guidelines**
392:13,20,22
393:3,22
399:21 400:5
403:13 405:6
420:4 425:9
433:8 434:14
436:11,14
459:13 468:10

477:16,22
478:3 557:4,7
566:13,19
567:14,21
610:6,20
628:16 697:19
718:10 734:14
738:2
**guilty** 722:17
**Guthrie** 648:22
648:22 649:3
**guy** 418:14
653:4 667:18
**guys** 559:6
695:7

**H**

**H** 376:8 639:19
**hair** 568:17
**Haley** 575:2
578:3,3 579:18
679:14,15,22
**Haley's** 575:7
581:9
**half** 393:7 428:7
448:8 504:16
506:7 603:9
653:9 655:17
656:17
**halfway** 521:13
527:4,15,19
546:8
**Hamilton** 374:8
740:22
**hand** 402:20
471:17,19
659:10 669:20
693:6,7
**handed** 572:21
**handled** 548:10
549:4
**handwriting**

406:15 672:9
673:8
**handwritten**
670:16,19
671:20,22
672:6 673:17
674:3 675:4,15
**hanging** 411:14
**hangman** 435:5
440:7,18
441:17 442:5
442:15
**Hanson** 373:6
378:12
**happen** 412:4
540:12 551:6
606:2 659:15
727:3,10
**happened**
537:15 551:14
584:17
**happening**
408:15
**happens** 418:14
419:1 482:13
508:9 568:16
**hard** 496:3
628:1
**hardware**
638:19
**hatch** 403:12,20
405:4 463:4
712:7,20
**hatches** 712:11
**hate** 501:14
**hauled** 540:18
**Hawk** 651:6
**head** 432:7
**health** 429:8
**hear** 518:13
681:11 682:5
721:10 732:14

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

20

**heard** 383:3,6
383:11 454:13
591:12
**help** 575:15
609:15 611:20
684:22
**helps** 565:9
**hen** 428:18
430:21 431:9
443:14,16
444:17 445:9
445:20 456:11
485:20 515:13
587:4 590:22
592:20 594:6
659:7 712:19
**Hendrix** 399:13
420:2,11,18
421:19 423:21
438:12 458:3
479:5 492:14
574:21 575:13
670:2
**hens** 393:5
474:14 656:15
659:22 697:17
711:19 730:21
734:12
**hereto** 744:15
**hey** 592:12
600:21 706:21
**Hickey** 373:5
378:14 486:22
487:5 512:5
554:17,21
558:12 692:21
693:2
**hiding** 537:11
**high** 408:18,18
411:12,16,18
506:14,15,19
507:10,16

508:5 509:1,5
509:20 723:19
**high-rise** 542:9
542:13,17,19
543:3
**higher** 431:6,7
431:13 505:4
534:2,11
537:10 585:7
**highest** 429:12
536:1 542:10
542:14
**highlighted**
519:12
**highly** 372:9
447:5,12 448:2
449:5 531:13
552:21 554:9
554:10 558:4
558:16,17
676:13,15
741:10
**Hinton** 492:8
493:5 553:12
555:14 558:13
583:13 585:16
614:16 631:5,6
645:5 695:2
700:1,10 708:1
**hired** 667:19
**history** 646:2
**hit** 511:14 512:1
654:12
**hold** 423:15
479:8 512:16
678:11 685:16
709:12 737:5
738:5 739:15
**holding** 565:7
565:17
**home** 679:1
696:10

**honestly** 479:17
**hopefully** 464:3
667:4 676:7
**hopes** 623:20
624:9
**hoping** 591:5,20
**hormone** 431:8
**horse** 728:9,13
**hour** 448:8
659:6
**hours** 521:17
522:4,12,18,20
523:2,11
728:18 740:16
**house** 393:9
395:14 422:16
428:18 430:21
434:9 466:9
468:4 470:5
476:9 477:11
484:8,10 485:2
485:20 523:19
536:8 542:13
657:19 659:8
659:14,17,22
**housed** 429:11
656:16
**houses** 409:6
431:9 478:17
478:18,19,20
525:19 542:17
542:20 543:3
712:20
**housing** 543:6
**HSUSP** 589:10
**Human** 515:3
**humane** 514:10
515:19 516:9
517:1 721:6
730:21
**Humans** 482:18
**humidity** 428:18

430:21 431:11
**husbandry**
608:3 693:19
697:18 734:14
738:2
**Hy-Vee** 605:1
**Hyde** 654:14,17

_____

**I**

**i.e** 566:13
**idea** 426:7 429:1
432:16,21
440:1 459:6
464:13 465:6
469:14 471:6
473:5 480:3
493:5 523:9
536:16 549:8
565:20 572:22
591:19 599:12
599:15 612:21
625:6,10
634:19 635:2
635:19 722:13
**identification**
399:5 406:7
414:7 427:7
438:7 448:14
449:17 457:21
465:16 492:4
494:9 503:10
505:22 514:6
517:22 519:8
525:1 526:15
529:10 531:7
543:8 545:13
552:17 557:21
570:7 573:18
582:20 586:17
595:7 598:3
613:9 620:18
626:4 629:4

669:22 678:21
682:12 686:4
687:10 689:14
690:19 693:4
742:1
**identified** 395:3
439:5,8 453:5
535:18,21
536:21,22
537:4,18 538:2
538:5,9,13
578:4 656:7
660:11 695:3
723:11
**identifies** 405:4
481:3
**identify** 518:2,9
630:6
**identifying**
397:3,8 417:11
439:12 442:14
**identity** 636:18
**idiots** 728:4
**II** 372:12 378:3
**Illinois** 374:19
642:3 653:12
**immediate**
491:17 502:18
503:1 504:20
**immediately**
504:4 671:19
**immunity**
665:16
**impact** 405:5
436:21 440:21
**implement**
392:13,19
623:22 624:10
631:20
**implementation**
456:1 465:2
507:17

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

21

**implemented**
451:10 455:4
488:21 490:8
506:21 571:6
**imply** 616:3
**important**
548:18 557:4
**imposition**
578:19 732:2
733:2
**improper**
408:19 616:1
**improvements**
403:15,20
404:15,22
**in-house** 614:19
615:10
**inaccurate**
652:16
**inch** 473:21
**inches** 393:9
395:14 474:7
588:11 607:6,7
**incident** 413:8,9
727:16
**incidents** 534:10
**include** 533:9
557:8 691:13
703:6 704:14
710:2
**included** 502:11
658:14 736:16
**includes** 710:18
711:6,9 741:14
**including**
548:10 636:17
640:15 701:11
**incorporates**
575:18,21
**incorrect** 565:13
633:3 634:12
635:16

**increase** 393:14
510:9 528:1,19
588:4,21 660:1
712:19
**increased**
528:20
**increases** 456:15
507:8 527:7
528:10
**increasing** 464:1
578:21 732:3
733:4
**indefinite** 482:4
**Indiana** 638:13
638:14,14
639:17 642:12
646:12,20
647:8,17 648:2
648:10 653:22
654:8
**Indianapolis**
641:19
**indicate** 390:21
460:15
**indicated** 391:6
402:2 403:2
420:2 452:17
452:19 534:12
534:19 633:9
**indicates** 465:21
466:6 591:1
**indicating**
415:13
**indication**
633:11 657:3
**indicator** 431:9
**individual** 418:8
422:14 464:14
465:7 622:10
659:14 701:8
**individually**
695:6

**individuals**
618:18
**industry** 386:9
392:21 393:3
450:10 453:1
455:1,11 507:5
509:3 533:4
547:12,21
571:7 588:12
596:3 597:17
603:18 604:12
607:22 608:4
608:15 628:8
645:12,19
656:10 657:4
690:20 710:13
738:13
**industry's** 507:7
510:4 628:6
**information**
447:16 448:3
557:6,7 564:15
566:12 622:9
623:20 624:9
**informed**
632:15
**Ingles** 605:1
**inherently** 579:4
**initially** 436:6
436:12 491:2
**initiate** 416:7
417:5
**initiated** 451:2
**injured** 481:13
**inspected** 410:8
**inspection** 536:6
**inspectors**
537:12
**instances** 513:13
513:16
**instigated** 536:3
**instruct** 429:20

485:4,10,11
**intended** 436:22
451:15 452:4
453:11,12
454:16
**intent** 435:21
**intention** 387:18
388:15
**interact** 631:14
632:1
**interested**
744:16
**International**
689:3
**interpret** 563:8
**interpretation**
624:20
**interrogated**
695:18
**interrogating**
695:20
**interrogation**
431:21 513:11
**interrupt**
429:18
**interrupted**
430:13 737:21
**interrupting**
475:12
**Interruption**
624:1
**intervenes**
450:10 453:2
**intervention**
450:13 453:4
**introduce**
574:22
**introduction**
514:1
**inventory** 450:6
450:8 452:22
505:9

**investigation**
727:8
**investigator**
536:2
**investigators**
537:16
**invite** 571:9
**invited** 484:9
601:22
**involved** 401:2
560:22 618:20
660:22 699:14
**involvement**
549:19 661:2
**involves** 631:9
**Iowa** 521:18
522:5,13
648:16,22
649:7 727:1
**Irving** 569:1,6
686:10 688:3
**Isaacson** 556:5
561:10 569:1,6
577:22 578:4
581:20 663:9
663:20 679:8,9
679:13 680:1
680:12 682:7
686:10 687:9
687:21 688:3
688:15 714:1
715:15 729:21
730:3
**issue** 408:17
436:11 449:5,7
451:22 629:13
631:9 632:9
634:22 675:20
694:10,12,17
694:20 710:1
**issues** 425:6
439:21 440:12

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

22

460:12 532:15
535:19,22
536:22 537:1,5
538:3,10
561:13 567:22
578:5 629:22
718:11
**item** 405:3,16
443:11,13
445:22 468:14
469:20 470:22
486:4 491:12
566:12 640:13
697:22 732:13
**items** 466:6
661:7 739:8

— **J** —
**J** 373:4 640:21
**J-E-N** 646:9
**Jackson** 641:12
642:7
**Jacobs** 653:5
**JACOBSEN**
374:16 449:15
**jail** 728:8
**Jan** 374:6 395:7
437:2,9 497:7
553:2,10 555:5
558:8,8 741:18
**January** 487:18
525:4,16
616:17
**Jen** 646:6 724:6
**Jennings** 641:12
642:7
**jeopardize**
386:16 387:11
**Jerry** 484:22
**job** 413:14
483:5
**Joe** 378:20

418:12 521:16
554:18 614:6
617:13 693:10
**John** 373:12
378:18 669:19
741:3
**Johnny** 653:5
**Johnson** 649:18
649:19,22
650:10,19
651:2
**join** 384:17
388:7,15,22
390:17 500:18
564:9 568:4
574:7 596:18
660:15 674:22
716:18 717:21
718:20 719:4
**joined** 379:19
380:4,10
383:19 387:16
388:11,13,19
391:21 393:16
394:9 399:20
399:20 400:20
400:22 401:8
502:16 546:20
583:10 596:9
597:1 625:14
661:9,12
662:17,18
724:8
**joining** 382:14
383:15 489:16
491:9 505:1,15
662:22 720:12
725:6
**Joseph** 375:2
618:10
**jostled** 429:12
**JR** 373:12

**Judge** 735:5,6
**JUDICIAL**
372:3
**July** 622:2
**jump** 504:4
**June** 402:20
404:14 462:8
462:17 527:20
528:5,16 558:3
682:13,20
683:13 684:5
689:18 690:5
719:8
**jury** 517:19,20
694:19
**justification**
452:2 453:19

— **K** —
**K** 372:18 373:15
**Kansas** 372:2
373:8 521:5
663:4 665:8,16
**keep** 459:1,10
460:4 488:14
491:14 553:10
554:12 572:17
613:16 674:13
737:16 741:9
**Ken** 600:1,5,15
**Kent** 639:11,13
639:14 640:4
641:3 643:5,7
644:15
**kept** 572:21
**Kevin** 575:2,4,7
578:3 581:8
679:14,15,20
679:22
**Key** 642:12
**kill** 420:21
507:18

**kills** 507:1
508:21 509:7
509:19
**kind** 409:2
543:5 549:18
599:9 727:8
**KKR** 539:11
**Klippen** 598:16
599:2 600:2,5
600:16
**knew** 424:11
479:22 502:15
522:7 542:1
549:17 551:21
552:5 555:20
726:21
**Knob** 649:19
650:10 651:2
**know** 384:16
385:10 387:20
389:6 392:5
397:7 408:22
410:4,12 413:7
414:19 415:3
419:15,15,16
419:19 422:14
424:10,15
426:17 429:2
432:5 433:2,13
435:15 447:4,6
454:3 456:15
460:20 471:14
471:15 475:3
479:17,18,20
483:19,21
487:22 494:22
502:22 503:2
517:19,19
522:15,22
527:5,21 528:8
536:16 538:9
538:14,18

549:3 555:18
555:22 562:18
565:21 571:14
572:9,19 573:5
573:7,8 582:6
590:2 597:7
610:12,14
621:19 622:4
625:3,11,18
626:16 627:7
630:22 633:14
638:19 639:5,7
639:18 640:6
641:6 642:18
642:19,22
643:6,7,11
650:6 667:16
667:20 669:5
679:15,19
695:6 700:13
701:1,6 702:19
706:8 707:19
708:1,3,4,12
717:1,16
726:21 727:11
727:13,13
728:8,9
**knowing** 707:22
**knowledge**
410:11 454:7
454:10 490:7
597:13 599:19
663:15 665:7
703:12 706:6
**known** 591:2
593:12,19
614:21
**knows** 483:20
**Kroger** 444:1
605:2 625:21
**Ky** 399:13 400:1
406:18 407:9

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

23

407:11,12,12
407:16 410:5
412:13 415:3
415:13 417:10
420:2,11,18
421:19 423:20
424:22 426:4
438:12 451:5
455:17 458:3
478:10 479:5
486:8 492:14
492:17 536:3
574:21 575:12
670:2
**KY's** 455:19
536:3

**L**

**labeled** 696:18
**Labor** 711:21
**laboratory**
722:18
**Lack** 496:12,22
**Land** 374:14
**language** 563:7
671:10,16,19
675:7 680:11
680:15 684:6,9
691:21 712:15
730:10 732:10
733:10
**large** 501:1
508:7,8,12,13
508:14,15,16
539:13 612:16
612:22
**largest** 489:6
623:16 624:5
661:20
**late** 544:20
668:6 687:18
728:17

**Laughter**
552:15
**law** 561:10
**laws** 666:5
**lawsuit** 647:1,5
664:2
**lawsuits** 664:13
**lawyer** 614:19
615:10 664:13
665:3 705:14
**lawyer's** 563:11
**lawyers** 659:5
679:10 682:7,8
**lay** 516:20
**layer** 450:5,8
452:21 466:9
468:4 473:22
477:11 656:18
**layers** 466:17
473:13,17
474:12,17
481:14 586:1
646:16 647:11
647:21 648:6
648:13,19
649:4,10 650:1
651:14 653:8
653:15 654:3
654:11,18,20
655:16 656:2
657:10,16
658:13 659:1
**laying** 515:13
649:16 651:20
656:15 730:21
**layperson** 563:8
**lead** 455:11
**leaders** 595:20
609:16
**leading** 403:21
672:17 673:13
673:21

**learned** 597:4
**learning** 587:7
**leave** 594:10,22
712:20
**led** 625:20
**left** 402:19
462:3 587:19
587:22 588:1,7
601:7 606:19
659:7 736:3,9
**leg** 428:13
**legal** 563:6,7
575:3 577:9,18
579:14 580:18
580:20 581:2,9
596:13 663:9
686:17 688:21
689:4 713:22
714:5
**legality** 666:3
**legitimate**
730:20
**lengthy** 677:18
**let's** 428:6 430:3
448:16 486:20
499:3 511:15
512:9,10 524:5
599:20 603:14
663:3 681:1
689:9 696:9
699:8 734:9
**letter** 377:7
535:5 538:21
538:22 540:17
540:22 543:12
544:4,13 545:5
563:7,11 575:6
611:16 613:19
614:10,19
615:11 616:7
616:12,16
617:15,16,17

617:20,21
618:9,11 620:8
621:6 625:5
626:14 627:18
627:20 628:10
629:1,17
633:12 635:15
670:2 687:10
688:16
**letterhead**
611:16
**letters** 533:2,5,8
533:12,17,19
534:13,16
535:15 538:12
540:9 541:16
**level** 454:14
469:7 470:4
533:20 534:1
534:10 536:4
604:19 664:12
**levels** 431:6
444:20 468:18
469:3,10,21
470:14 471:4
479:1 534:10
**leverages**
640:22
**Levine** 374:6
395:7,8 437:2
437:3,9,10
438:1 439:22
446:9,16
451:18 452:7
452:14 453:16
456:9,21
496:11,21
497:8 498:10
498:19 500:3
500:10 501:13
501:21 519:22
553:3,12,19

554:3,8 555:3
558:9,14,21
567:5 587:14
591:10 592:8
593:7 716:4
741:18
**lied** 387:6,9
**lieu** 632:16
**life** 551:5
**light** 488:22
**limit** 459:4
566:3,7
**limitations**
567:14
**limited** 622:9
**limiting** 680:21
**limits** 565:8,18
565:22
**Lincoln** 481:4
651:6,13
**line** 404:17
438:18 476:10
507:9 581:17
589:9,11 633:8
633:12 654:7
654:10 736:7
737:9
**lines** 671:11
686:1
**linked** 431:7
**liquid** 492:20
507:9 556:18
**list** 539:8 540:5
545:6 645:8
657:19 677:14
691:14 705:22
710:3
**listed** 446:1
538:12 539:1,7
557:12,14
581:7,13,16
583:13 655:1

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

24

| | | | | |
|---|---|---|---|---|
| 712:18 713:1,7 | 599:9 635:4 | **looking** 396:9 | **m** 373:13 376:1 | 389:16 390:7 |
| 714:15 718:2 | 668:2 669:1 | 420:14 441:6 | 380:7 | 390:22 391:7 |
| 738:18 | **longer** 504:16 | 497:19,21 | **Madison** 652:14 | 391:17 394:14 |
| **listen** 398:20 | **look** 402:19 | 562:8 568:14 | **maintain** 631:22 | 400:17 401:7 |
| 720:20 | 413:12 423:12 | 569:11 600:13 | 632:18 | 401:21 519:20 |
| **lists** 677:18 | 428:6,6 442:8 | 680:5 700:8 | **major** 429:9 | 523:16 585:22 |
| **literally** 619:20 | 446:2 447:1 | 714:6 | 579:8 | 631:3 670:3 |
| **litigation** 521:3 | 466:7 478:16 | **looks** 400:8 | **majority** 583:19 | **Marcus** 372:15 |
| **litter** 428:19 | 481:11 487:8 | 480:9 542:14 | 584:12 | 378:4 379:1 |
| 430:22 431:5 | 491:12 499:3 | 599:8,11,17 | **making** 393:8 | 400:1,4 480:18 |
| **little** 439:7 | 504:17 505:6 | 678:3 741:16 | 395:13 396:5 | 485:15 547:9 |
| 477:4 479:21 | 525:3 526:21 | **loophole** 435:5 | 405:4 452:9,9 | 550:19 553:7 |
| 480:12 630:12 | 530:17 532:5 | 441:17 442:5 | 495:8 517:12 | 599:21 606:13 |
| 642:16 651:15 | 536:8 537:6 | 442:15 | 576:19 591:2 | 607:12 670:3 |
| 654:21,22 | 544:10 550:7 | **loose** 411:13 | 593:11 601:13 | 678:7 682:21 |
| 665:9 705:18 | 553:1,7,16 | **lose** 417:6 424:3 | 605:19 623:2 | 685:15 688:7 |
| **live** 657:21 | 558:7,15 562:2 | 460:6 482:17 | 634:12 717:15 | 741:17 |
| 658:1 | 566:10 586:21 | **losing** 416:8 | **mall** 724:3 | **margin** 671:18 |
| **LLP** 373:6,14 | 593:3 598:11 | 541:8 568:17 | **man** 550:2 | **mark** 399:1 |
| 374:8,17 | 607:11 608:14 | **loss** 409:2 | **managed** 431:10 | 430:9 511:11 |
| **loaded** 739:6 | 609:2 611:10 | 418:11,13 | 697:17 734:13 | 515:8 558:16 |
| **local** 638:13 | 612:6,8 613:17 | 422:13,19 | **management** | 741:14,20 |
| 642:6 726:17 | 617:13 623:12 | 459:3 486:5 | 383:10 388:14 | **marked** 391:15 |
| **locate** 676:11 | 623:12 624:3 | 541:3 | 394:18 395:1 | 399:2,5 402:17 |
| 678:10 684:22 | 639:18 640:21 | **lost** 393:20 | 400:14 401:4 | 406:7,9 414:7 |
| 689:11 690:15 | 644:9 651:11 | 422:10 526:5,6 | 401:13 402:3 | 414:9 427:7,9 |
| **located** 639:16 | 654:5 655:9 | 540:7,11 | 402:10 439:21 | 434:18 438:5,7 |
| 641:17,21,22 | 670:19 671:6 | **lot** 381:12 | 440:4,10,12 | 446:21 447:5 |
| **locates** 683:9 | 671:18 672:6 | 451:21 455:16 | 456:2 506:20 | 447:12 449:17 |
| **locating** 685:10 | 673:7 676:5 | 487:13 549:17 | 571:5 595:17 | 449:20 457:21 |
| **location** 541:10 | 678:2 688:14 | 572:8 603:16 | **manager** 399:18 | 465:16,18 |
| 638:10 725:19 | 695:7 697:4,11 | 657:6,7 | 407:14 503:16 | 487:5,8 492:4 |
| **log** 729:7 | 699:8 706:11 | **lots** 382:5 | **managers** 458:4 | 492:6 494:6,9 |
| **Logan** 374:9 | 708:20 709:15 | **low** 409:10,11 | 458:4 | 503:10 505:22 |
| **loggerheads** | 714:8 723:10 | 504:12 507:9 | **mandated** | 506:2 514:6 |
| 424:12 | 725:13 729:10 | 674:13 | 607:22 | 517:9,22 518:3 |
| **logo** 736:3 | 730:1,6 734:9 | **lower** 403:3,6 | **mannered** | 519:8,10,18 |
| **Lois** 415:7 670:2 | 741:13 | 527:3 | 484:22 | 524:20 525:1 |
| 672:9 | **looked** 401:1 | **lucky** 690:9 | **manure** 434:9 | 526:12,15 |
| **long** 434:8 460:7 | 410:3 456:7 | **lunch** 510:18 | **March** 372:14 | 529:10,12 |
| 480:10 514:22 | 560:1 646:3 | | 372:16 378:5 | 531:7,9,13 |
| 521:15 598:7 | 656:11 | **M** | 388:22 389:7 | 543:8,10 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                          March 6, 2014

| | | | | |
|---|---|---|---|---|
| 545:13,15 | 464:17 465:10 | 510:7 541:19 | 637:8 677:16 | 581:9 663:10 |
| 548:6 552:17 | 492:11 556:12 | 542:12 562:22 | 679:4 691:21 | 663:11 679:8,9 |
| 552:19,21 | 556:18 560:10 | 564:12,16,17 | **meetings** 439:9 | 679:13 680:12 |
| 557:21 558:2,4 | 560:20 561:12 | 564:18 639:6 | 534:8 | 681:6 |
| 559:4 570:7,9 | 561:18 566:13 | 658:20 728:3 | **member** 387:5,9 | **memory** 381:19 |
| 573:18,20 | 570:18 575:1 | 728:11 | 407:3 450:19 | 477:13 650:4 |
| 582:20,22 | 578:20 583:16 | **meaning** 489:10 | 457:3 548:21 | 708:21 709:4 |
| 586:17,19 | 584:5,8 610:3 | 563:19 605:14 | 549:1 555:14 | **mention** 594:16 |
| 595:7,9 598:3 | 610:18 625:5 | 669:1 | 558:10 560:15 | **mentioned** |
| 598:5 609:8 | 663:5 665:8 | **means** 429:2 | 563:2 570:1 | 594:15,16 |
| 613:9,11 | 677:2,15 | 469:14 471:14 | 583:13 621:14 | 721:11 722:2 |
| 620:18,20 | 689:17 692:8 | 471:15 505:9 | 623:1,9 627:1 | 724:21 |
| 626:4,7,12 | 692:11,15 | 531:17 534:20 | 637:12 639:2 | **mentions** 401:20 |
| 629:4,6 669:17 | 709:21 710:17 | 535:10 562:18 | 640:17 642:19 | **mergers** 641:20 |
| 676:6,13,15 | 711:4 732:2 | 566:16 570:3 | 643:18 644:12 | **message** 610:4 |
| 684:20 690:1,8 | 733:3 | 621:20 | 644:17 660:20 | 610:18 |
| 692:16 693:4,5 | **markets** 556:9 | **meant** 397:10 | 668:8,16 | **met** 576:9 |
| 742:1 | 576:6 586:3 | 426:4,4 658:12 | 677:11 692:7 | 583:17 584:9 |
| **market** 393:6 | **marking** 554:8 | 682:6 687:19 | **members** | 698:19 |
| 403:15,19 | **Marshall** 649:13 | **measures** | 386:11,15 | **Mexicans** 596:3 |
| 404:15,21 | 649:13 650:17 | 428:11 429:15 | 387:3 393:15 | **MFC** 376:14 |
| 489:7 503:21 | 650:22 651:1 | **measuring** | 405:22 432:18 | 438:8 |
| 505:17 506:14 | **Mart** 641:13 | 468:11 | 551:2 556:16 | **mice** 537:12,14 |
| 506:15,19 | **Marty** 555:18 | **meat** 429:10 | 564:9 583:18 | 538:12 539:1 |
| 507:11,16 | 555:19 556:2 | **mechanical** | 584:10 628:1,7 | **Michael** 489:8 |
| 508:6 509:1,6 | **Marvelous** | 408:17 | 639:8 660:22 | 489:11,16 |
| 509:20 535:12 | 690:11 | **media** 484:9 | 668:13 669:6 | 490:5,10 491:4 |
| 546:9 555:11 | **materials** 741:9 | **meet** 403:12 | 686:21 687:1 | 493:15 494:19 |
| 564:22 579:1 | **math** 473:20 | 433:18 443:22 | 691:12 692:11 | 495:9 500:14 |
| 603:10 660:5 | 474:18 475:16 | 450:15 468:14 | 714:19 716:1 | 501:8 502:15 |
| 661:22 684:8 | **matter** 471:15 | 478:19 525:19 | 716:10,18 | 503:17 505:15 |
| 684:14,17 | 512:18 567:21 | **meeting** 434:5 | **membership** | 548:22 549:5 |
| 719:12 720:11 | 664:19 665:2 | 434:13 438:17 | 389:9 636:16 | 549:12,15 |
| 732:5 733:6 | 695:18 718:10 | 438:19 439:14 | 637:14,18 | 551:9 574:6,14 |
| **marketed** | **May's** 404:18 | 442:9 462:18 | 640:15 643:9 | 603:3 608:7 |
| 549:12,17 | **McDonald's** | 465:14 487:18 | 644:10 660:16 | 719:12 720:11 |
| 576:10 577:4 | 588:16 590:5 | 555:17 570:11 | 661:8 689:6 | 731:4,13 |
| 606:8 | 607:9 | 570:19 571:1,4 | **memo** 569:2,6 | **Michael's** 552:8 |
| **Marketers** | **mean** 383:5 | 571:10,13,15 | 581:19 670:2 | **Michaels** 551:2 |
| 374:5 637:2 | 387:20 454:8 | 571:21 574:20 | 686:10 688:3 | 596:2 597:5 |
| **marketing** | 454:11 471:11 | 600:8 611:12 | 730:3,15 731:2 | 602:7 603:7 |
| 462:8,17 | 473:21 506:18 | 616:8,9,13 | **memorandum** | 683:3 684:6 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                    March 6, 2014

26

**Michigan**
  374:18 722:19
  727:13
**microscope**
  596:6
**middle** 503:13
  529:15 530:5
  671:8 673:8
  684:3,3 719:7
  719:8
**Midwest** 533:14
  535:12 540:9
**mill** 587:3,8
  590:19 592:18
  594:4 597:19
  723:17 724:4
**Miller** 375:2
  378:20,20
  521:16 558:17
  614:7 616:8
  617:14 618:10
  619:15
**million** 393:5
  395:16 396:10
  397:1 429:9
  450:9 453:1
  468:19 469:4
  469:11,16,21
  470:14,19
  471:5 479:1
  525:8 540:13
  549:13,14
  585:22 646:16
  647:11,21
  648:6,13,19
  649:4,10 650:1
  650:4,5 651:14
  653:8,9 654:3
  654:11,18
  655:17 656:15
  657:16 659:2
  659:11

**millions** 619:20
**mind** 491:14
**mine** 511:10
**minimum** 536:4
**minus** 656:1
**minute** 462:12
  580:9 592:12
  613:18 670:17
  682:21 697:21
**minutes** 462:8
  462:18 521:15
  555:11 570:11
  637:9 666:22
  667:5 689:16
**miscellaneous**
  638:11,19
**misleading**
  484:21 633:2
  634:12 635:16
**misread** 674:7
  681:19
**misrepresenta...**
  701:17
**missed** 482:16
**missing** 685:17
**Missouri** 373:8
  649:13 651:1,7
**misspelled**
  590:20
**misstate** 485:12
**misstates** 483:3
  712:15 714:22
  715:1 731:7
**misstating**
  612:15 737:16
**mistakes** 482:18
**misunderstood**
  643:13
**Moark** 374:15
  376:15 447:6
  448:3,4,15
  449:7,10,11

454:2 526:5
689:14 701:13
702:17,22
703:4 704:12
704:14 705:3
705:19,20,22
706:9 736:20
738:3
**Moark's** 448:10
  704:13
**moisture** 428:18
  430:22
**molt** 408:7
  409:1 416:7
  417:5 418:20
  424:2 458:10
**molting** 420:20
  420:22 459:19
**molts** 414:20
  419:19 506:22
  507:6,18 508:2
  508:21 509:7
  509:19
**mom** 412:3
**mom's** 674:3
  721:12
**money** 551:3
  572:2 712:21
**Monica** 373:12
  378:18,18
  447:11,18
  448:1,7 462:3
  520:4 544:6,9
  552:11 553:7
  645:2 665:20
  670:7 685:13
  695:5 701:16
  729:9 740:18
  741:1,5,20
**monitor** 477:22
**monitored**
  429:8 458:15

466:10 468:4
468:22 469:17
477:11,14
486:5
**monitoring**
  468:10
**Monon** 648:2
**months** 413:14
  443:7 504:11
  504:14,21
  521:19 526:2
**moral** 608:2
**morning** 379:7
  485:6
**mornings** 379:8
**Morris** 373:14
  378:16
**mortality**
  431:13 456:15
  486:5 659:15
  659:21
**mother** 399:8
  401:10 402:14
  409:18 412:8
  413:17 672:9
  674:18 675:21
  676:1
**mother's** 406:15
  673:7 675:4
**motion** 487:17
  492:18 574:22
  575:2,7,12
  578:9,10,12
  580:14 581:10
  582:3,8 691:8
  691:10,15,21
  692:5 709:22
  711:3 731:16
**mouse** 536:1,19
  537:17
**move** 419:2,6
  422:22 425:18

429:3 431:20
444:5 463:20
463:22 464:21
484:11 519:5
537:20 659:15
659:18 703:15
**moved** 659:17
  659:19,22
  691:10
**multiple** 539:18
  699:19 721:20
  722:19
**muted** 512:8

**N**

**N** 374:1 376:1,1
  378:1
**name** 392:10
  466:22 467:3,7
  467:8,19 477:4
  481:3 555:21
  555:22 561:10
  619:7 642:4,13
  653:5
**names** 642:8
**national** 530:14
  561:5 626:15
  627:7 630:1
**nature** 513:14
**NCCR** 628:7
  630:2 631:15
  632:4,15,21
**nearly** 586:2
  628:11 656:15
**necessarily**
  614:20 708:2
**neck** 408:7,16
  409:1
**necks** 411:17
**need** 439:9
  443:19 458:14
  476:17 494:20

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

27

| | | | | |
|---|---|---|---|---|
| 545:21 557:7 | 536:11,12,12 | **noose** 435:5 | 616:20 726:20 | 598:2 613:8 |
| 557:14 585:8 | 536:12,17,17 | 440:7,18 | 727:7,11 728:4 | 619:19 620:17 |
| 598:10 602:1 | 537:18 722:6 | 441:17 442:5 | **notifies** 706:20 | 626:3 629:3 |
| 611:13,18 | **nightly** 536:6 | 442:15 | **notify** 681:21 | 636:11 639:19 |
| 693:8 | **nine** 466:7 | **Norco** 374:15 | **notifying** 590:15 | 640:13 643:8 |
| **needed** 454:14 | 468:17 469:2,9 | **Norfolk** 661:19 | **November** | 644:9 645:1 |
| 455:20 586:3 | 469:20 470:21 | **North** 646:6,12 | 561:13,17,22 | 646:15 647:10 |
| **neither** 632:21 | 470:22 471:22 | 654:14 661:17 | 562:8 568:8 | 650:7 655:16 |
| 744:10 | 478:22 | 725:20 | 569:9 583:7,14 | 657:16,18 |
| **NEPCO** 651:17 | **Ninth** 565:9 | **northern** 638:14 | 583:17 584:10 | 658:1,13,22 |
| **never** 397:19 | **NL** 377:11 | 642:12 | 663:10 744:18 | 659:16,21,22 |
| 401:4 434:3,3 | 570:10 573:14 | **Northwest** | **number** 378:3 | 660:1 665:6 |
| 434:12 454:1 | 573:15 | 372:18 | 399:4 406:6 | 667:8,12 |
| 454:13 455:6 | **noise** 512:3 | **Noster** 649:20 | 411:2 414:6 | 669:22 670:7 |
| 480:2,8 522:20 | **noncertified** | 650:10 651:3 | 427:6 428:11 | 678:21 682:12 |
| 524:2 546:10 | 446:5 492:19 | **Notary** 372:20 | 433:16 438:6 | 682:15,18 |
| 594:2 597:11 | 495:15 496:10 | 744:1,21 | 440:2 445:18 | 685:1 686:4 |
| 637:7 693:17 | 496:20 498:3,9 | **notations** 672:7 | 446:2 449:1,16 | 687:11 688:10 |
| 727:13 740:10 | 499:12 563:4 | **note** 401:6,20 | 457:20 461:2 | 689:20 690:19 |
| **new** 392:5 | 564:2 578:22 | 402:13 412:1 | 465:15 466:8 | 692:20 693:3 |
| 438:19 486:22 | 585:3,7 602:8 | 412:16 413:21 | 468:15,17 | 697:8 712:7,11 |
| 487:1 600:7,12 | 624:16 668:12 | 414:17 516:13 | 469:2,9,20 | 738:22 741:22 |
| 600:17,22 | 668:14,18 | 673:17 674:3 | 470:21,22 | **numbers** 448:11 |
| 601:10,16 | 669:2,7,14 | 675:4,15 | 473:12,17 | 448:14 528:21 |
| 603:16,17 | 732:4 733:4 | 681:15,22 | 474:17 476:18 | 534:3,6 536:14 |
| 608:15 609:3 | **nonmember** | 694:22 721:12 | 477:5,5,9 | 658:12 |
| 689:1 | 564:18 567:20 | 739:2 | 478:21 481:11 | **numerous** |
| **news** 484:9 | 718:9 | **notebook** | 486:4 491:13 | 512:20 513:13 |
| 514:22 515:3 | **nonmembers** | 552:12 | 491:14 492:3 | **nutrition** 408:20 |
| 519:19 | 562:15 563:21 | **noted** 497:7 | 494:8 503:9 | **NW** 373:15 |
| **newsletter** 599:5 | 564:12,14 | 694:21 695:12 | 505:21 510:16 | |
| 599:10,18 | 567:15 568:4 | 695:14 696:11 | 511:4 514:5 | **O** |
| **newspaper** | 714:19 716:1 | 735:14 743:13 | 517:21 519:7 | **O** 376:1 378:1 |
| 724:18 726:13 | 716:10,14,18 | **notes** 399:7 | 520:1,3 524:22 | **O'Lakes** 374:14 |
| 727:6 | 717:21 718:19 | 423:12,13 | 526:14 529:9 | **oath** 379:10 |
| **newspapers** | 719:4 | 594:15 670:17 | 531:6 542:2 | 701:10 |
| 725:18 726:16 | **nonresponsive** | 670:19 | 543:7 545:12 | **object** 380:7 |
| **Newton** 647:17 | 419:7 423:1 | **notice** 540:17 | 552:16 557:20 | 386:3 387:1 |
| 647:20 | 425:19 429:4 | 636:8 706:13 | 570:6 573:17 | 395:19 401:14 |
| **Nichols** 373:7 | 444:6 484:12 | 707:8 | 582:13,17,19 | 404:2 406:3 |
| **night** 400:4 | 537:21 703:16 | **noticed** 479:4 | 586:16 588:14 | 412:6 432:15 |
| 514:22 536:6 | **nonUEP** 623:1 | **notified** 541:1 | 588:16 595:6 | 432:20 436:8 |

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                         March 6, 2014

28

| | | | | |
|---|---|---|---|---|
| 439:22 441:1 | 716:4,12 | 594:1 615:16 | 463:18 464:17 | 511:6 512:7,8 |
| 443:21 446:9 | 718:13 721:15 | 619:3 627:2 | 465:10 | 512:9 520:16 |
| 446:16 454:6 | 721:16 724:11 | 635:1 647:4 | **occurs** 418:11 | 521:12 523:18 |
| 459:5 461:9 | 726:7 730:18 | 652:2 668:19 | 418:13 | 527:10,17 |
| 470:11 472:20 | 731:6 733:8 | 669:8 672:17 | **ocean** 479:6 | 529:17 530:2 |
| 474:1 475:9,11 | 736:8,21 | 673:13,21,22 | **Oconee** 652:13 | 531:17 532:13 |
| 482:3 483:2,10 | **objecting** | 675:10 680:20 | 652:21 653:7 | 533:3,20 |
| 483:18 484:20 | 512:19 513:2 | 684:11 694:21 | 662:6,22 | 534:19 537:8 |
| 495:17 496:21 | 523:8 611:3 | 695:12,15 | **October** 438:22 | 539:2,15 542:8 |
| 502:20 507:2 | 615:17,19 | 696:11,13 | 439:1,14 | 546:6 547:15 |
| 509:9,22 | **objection** 391:9 | 702:12 704:4 | 442:10 443:4 | 547:18 548:17 |
| 512:22 514:1 | 395:7 397:5,9 | 705:10 707:13 | 546:17 547:17 | 548:22 549:21 |
| 514:18 518:20 | 397:18 398:10 | 708:18 716:20 | 574:1,21 599:5 | 549:22 554:2,3 |
| 520:17 522:6 | 402:4 404:9 | 717:10 718:21 | 600:8 678:5 | 554:5 555:7 |
| 524:1 535:6 | 412:20 413:20 | 719:17 720:6 | 679:1,4 | 557:3 558:5,7 |
| 549:7 551:16 | 415:17 416:1 | 720:15 732:8 | **offering** 622:11 | 558:20 559:7 |
| 563:5,12 586:8 | 418:5 419:12 | 733:21 734:15 | 623:1 | 559:21 560:3 |
| 588:5,22 | 424:5 426:1,13 | 738:4,5 739:4 | **offhand** 446:19 | 561:20 562:9 |
| 590:11 591:9 | 430:8 437:2,9 | 739:5 | 539:22 | 568:15,19 |
| 593:6 594:13 | 438:1 440:14 | **objections** | **officer** 744:2 | 570:5 571:19 |
| 595:2 597:10 | 444:10 445:11 | 520:20 704:1 | **offices** 372:17 | 571:22 572:4 |
| 606:10,15,22 | 451:18 452:7 | 715:7 735:15 | 641:21 | 572:20 573:5 |
| 608:11,17 | 452:14 453:8 | **observed** 473:13 | **oh** 418:16 487:1 | 573:16,22 |
| 609:4 610:11 | 453:16,21 | 473:17 474:12 | 544:8 545:10 | 578:2 584:7 |
| 611:6 615:15 | 456:9,21,22 | 537:14 | 612:10 657:13 | 585:18 586:15 |
| 622:17 624:17 | 460:17 461:16 | **obvious** 428:10 | 697:21 740:1 | 593:14,17 |
| 625:9,17 633:5 | 464:4,12 468:6 | 429:14 703:20 | **okay** 381:21 | 595:14 596:1 |
| 633:21 634:4 | 472:13 476:3 | **obviously** 454:3 | 383:11,17 | 599:18 600:14 |
| 634:17 635:18 | 482:11 485:7 | 543:21 580:13 | 386:1 391:14 | 601:21 608:22 |
| 640:12 643:12 | 485:16 496:11 | 658:21 659:10 | 394:11 403:9 | 609:7 617:22 |
| 646:21 664:15 | 497:6,9,12 | 728:19 736:6 | 404:20 407:5,6 | 618:5,6 619:11 |
| 673:11 674:1 | 498:10,19 | **occasions** 410:1 | 410:3 414:18 | 620:4 621:21 |
| 679:17 693:11 | 500:3,10 | **occur** 393:7 | 427:20 435:6 | 627:16 629:8 |
| 694:7,20 | 501:13,21 | 443:18 579:7 | 437:18 439:4 | 636:10 637:14 |
| 698:10 700:16 | 505:5,18 513:5 | 722:5,21 723:2 | 443:2 449:19 | 637:19 639:18 |
| 701:18,21 | 513:6,7,9 | 724:5 725:4 | 462:19 463:6 | 640:6 642:8 |
| 702:1 703:8,8 | 517:13 522:14 | 726:3 | 467:7 473:9,10 | 644:22 645:21 |
| 704:16,22 | 523:3 529:6 | **occurred** 438:19 | 476:22 481:11 | 650:5 652:20 |
| 706:2 708:18 | 543:19 567:5 | 657:4 721:10 | 488:10 494:15 | 653:2,11,20 |
| 710:5,20 711:8 | 580:17 587:14 | 723:15 725:20 | 494:22 495:2 | 654:6 655:1,19 |
| 711:15 712:14 | 591:10,18 | 729:5 | 499:18 503:7 | 657:13 660:13 |
| 713:11 714:21 | 592:7,8 593:7 | **occurring** 410:9 | 506:10,11 | 661:2 662:18 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

29

| | | | | |
|---|---|---|---|---|
| 664:1,11 665:1 | **operates** 435:18 | **original** 435:21 | **p.m** 510:17,18 | 718:4 732:19 |
| 666:14 667:6 | **operation** | **Orleans** 438:20 | 511:2,5 524:14 | **pages** 449:9 |
| 668:5 670:22 | 517:17 618:21 | **Osborn** 691:11 | 524:18 530:4 | 713:17 |
| 671:2,4,5,12 | 619:21 726:2 | **outcome** 744:16 | 559:9,12 | **paid** 571:12 |
| 674:7,8 676:5 | **operations** | **outlined** 453:19 | 582:18 636:1,4 | 572:3 |
| 676:10 678:8,9 | 513:22 632:17 | **outlining** 395:12 | 667:9,13 742:6 | **painless** 668:5 |
| 680:4,10 | **opinion** 451:20 | 397:17 398:7 | 742:8 | **paint** 724:1 |
| 682:10 683:1 | 563:6 575:3,8 | **output** 527:5,22 | **P.S** 410:3 | 728:7 |
| 683:19 684:20 | 681:5,6 687:10 | 528:8,17 | **page** 376:9 | **painted** 723:16 |
| 686:6,16,17 | 687:21 688:15 | **outside** 554:14 | 392:9,19 403:1 | **pan** 411:15 |
| 687:12 689:9 | **opportunities** | 554:21 695:19 | 403:11 404:13 | **pans** 411:15 |
| 689:15,22 | 507:9 | **overall** 427:1 | 406:11 435:3 | **Pantego** 654:14 |
| 690:6 691:20 | **opportunity** | **overly** 680:20 | 441:12 449:11 | **paper** 387:5 |
| 692:18 696:15 | 559:15 670:18 | **overnight** | 449:12 461:1 | 522:11 659:12 |
| 697:4 700:19 | 737:15 | 542:21 | 463:5 466:7 | 659:13,16 |
| 706:19 714:4 | **opposed** 456:4 | **overseas** 546:10 | 486:1 499:4,6 | 713:2,7,8 |
| 725:4,19 | 574:10,14 | **overseeing** | 521:13 527:16 | 722:14 |
| 726:13,18 | 588:18 605:7 | 421:20 | 527:20 541:14 | **papers** 386:6 |
| 728:15,18 | 605:12 | **oversupply** | 545:9 547:13 | 665:13 |
| 730:8 732:21 | **opposition** | 691:15 710:4 | 547:14 550:6,9 | **paperwork** |
| 737:18 738:1 | 495:7 | 710:19 711:7 | 562:3,6,7 | 382:5 |
| 738:11 741:3 | **options** 691:14 | 711:13 712:1,4 | 565:5 569:5 | **paragraph** |
| **old** 652:9 | 710:18 | 712:8,13,22 | 574:2,19 | 392:20 403:11 |
| **older** 478:18 | **order** 386:9 | 713:5 | 575:12 578:8 | 407:9 411:1 |
| **once** 418:21 | 443:17 447:19 | **owned** 385:2,4,6 | 581:7 595:12 | 438:17 450:1 |
| 419:2 479:18 | 447:21 454:15 | 467:15 481:9 | 595:14 598:12 | 463:4 521:13 |
| 487:21 513:4 | 456:11 504:5 | 481:10 488:13 | 598:22 599:21 | 527:16 531:12 |
| 534:21 535:2 | 548:18 553:21 | 489:13,22 | 607:12,15,16 | 531:20 532:1 |
| 535:11 717:1,2 | 555:4 558:15 | 548:12 549:5 | 612:7,9,10 | 532:13 578:8 |
| 733:22 | 619:17 639:3,9 | 549:15,17,18 | 617:18 618:13 | 584:4 611:10 |
| **one-page** 682:13 | 677:17 741:7 | 624:11 650:19 | 623:14 646:1 | 612:7,9 619:15 |
| **one-third** 530:7 | **orders** 662:1 | **owner** 728:8 | 656:13 669:21 | 619:17 623:13 |
| **ones** 422:13 | **organization** | **owners** 425:17 | 670:1,16,17 | 624:4 629:16 |
| 539:22 558:18 | 579:8,9 600:7 | 723:17 | 671:7,8 673:8 | 631:8 680:5 |
| 604:14 623:6 | 600:12,17,22 | **ownership** | 678:19,20 | 686:15,19 |
| 638:11 | 603:17 608:1 | 660:5 | 679:8,12 680:3 | 688:15,17 |
| **onset** 542:20 | 643:9 644:11 | **owns** 641:10 | 685:3,14 686:3 | 730:14,14 |
| **open** 487:19 | 644:13,18 | 649:18 | 686:3 687:7,7 | **Pardon** 676:14 |
| **opened** 690:10 | **organizations** | | 687:7,8,8,14 | **part** 410:15,19 |
| **operated** 481:9 | 589:10 627:11 | **P** | 687:17,20 | 440:4 455:7 |
| 548:12 549:5 | **organizing** | **P** 374:1,1 378:1 | 688:8 691:5,6 | 459:16 478:6,7 |
| 637:7 | 601:1 | **P-R-I-V** 553:6 | 691:7,8 714:8 | 501:15 530:22 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

30

554:9 561:18
578:3 616:3
625:5 647:1
669:9 736:22
737:10 738:6
**partial** 569:19
618:20
**participate**
640:17 677:21
**participated**
547:1 575:22
**participating**
435:16 547:5
583:14
**participation**
578:18 582:7
616:15 636:20
637:2 732:1
733:1
**particular** 616:2
695:17
**particularly**
563:8 629:14
630:5
**parties** 744:12
744:15
**partner** 378:19
**parts** 445:15
468:19 469:4,7
469:11,16,21
470:14,19
471:4 478:8
479:1 525:8
628:16 671:3,4
**party** 449:8
**pass** 410:13
454:15 460:7,9
551:1
**passed** 384:10
**pasted** 599:9,10
**pasturized**
540:20

**Pat** 380:8 392:1
467:4 480:15
544:20 552:12
565:12 618:1
645:4 670:6
673:20 678:3
682:19 688:3
689:21 693:9
703:20 708:9
709:5 729:19
**patience** 740:15
**patient** 633:15
689:10
**Patrick** 373:4
378:11
**patronage** 643:1
**Paula** 372:19
744:2,20
**pay** 393:8
395:13,15,18
396:8,21 397:2
397:8,16 398:7
**payment** 571:20
**pdf** 685:6,7
**peck** 411:17
456:14
**pecking** 456:11
**penalties** 566:20
**pending** 430:1
524:11
**Pennsylvania**
374:11
**people** 392:2
413:10 484:5
487:14 489:1
508:9 536:14
540:14 542:1
597:20 602:19
604:3,21 605:3
625:21 671:9
671:13,14
677:18,19,19

678:5
**people's** 534:11
**Pepper** 374:8
740:22
**perceived** 712:6
**percent** 385:4,6
385:8,12,13,14
408:14 414:21
415:14 416:9
417:6,18
419:20 424:3
425:8 426:21
445:1 459:4,12
487:21 488:1,2
488:5,7,12,21
489:3,5,15,21
491:1,6 493:1
493:11,16
494:19 495:8
495:12 496:6
496:16 498:22
499:1 500:15
501:10 502:6
505:9 527:6
528:1,9,18
530:8 542:9,21
548:9 549:3
574:16 576:9
576:14,20
577:3,5,5
580:5,10 584:3
586:2 588:19
596:19,20
602:11 605:9
605:15 606:5
606:19 607:14
608:7 610:6,20
616:15 623:22
624:11 628:12
708:17 711:21
712:12 730:15
731:3,13

**percentage**
708:12,14,22
709:4
**period** 380:13
458:16 501:9
546:22 577:6
587:22 647:1,2
655:14
**permitted** 436:5
594:21 596:18
**permitting**
435:21
**persistently**
431:11
**person** 418:11
418:12 483:4,5
536:6 590:2
722:15,17
**personally**
579:20 585:14
640:9 644:20
**pertain** 711:12
**pertained**
444:16 713:22
**pertains** 712:1,8
712:12,21
713:5
**petition** 615:21
**phase** 463:22
577:4
**phase-in** 500:19
501:1,8 731:3
731:12
**phasing** 463:12
**Philadelphia**
374:11
**phone** 374:6,7
374:16 378:10
392:2 479:9
728:2 740:19
741:2
**phones** 479:10

**phonetic** 431:8
**physically** 410:8
659:1
**pick** 659:14
675:6
**picture** 517:16
**pictures** 480:9
**piece** 422:18
**pieces** 561:7
**pile** 462:3
**place** 393:5
469:15 484:7
502:1 525:14
534:22 535:4
535:12 550:22
594:14 618:18
620:11 658:19
723:4
**placed** 738:3
**plain** 409:6
**Plaintiffs** 372:7
373:3 378:13
379:5 698:4
739:20
**plant** 492:20
673:6 726:1
**play** 511:14
512:1
**played** 512:11
515:20
**player** 579:8
**playing** 604:19
678:22
**pleading** 722:17
**please** 378:7
398:16 416:18
419:7,8 421:4
423:3 437:6
444:7 457:12
461:11,13
462:13 485:15
495:21 497:14

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

31

519:1,12 575:6
611:14,19
632:5 643:14
644:2 668:6,15
669:18 670:20
678:3 691:6
697:15
**pledged** 583:19
584:11
**plugged** 515:9
517:5
**plus** 507:12,13
655:22 657:17
**point** 412:17
413:16 441:3
445:17 447:2
449:22 450:3
455:21 461:2
470:5 478:3
480:7 486:15
491:15 510:13
555:2 562:3,10
562:15 565:6
567:18 568:22
630:19 651:6
696:4
**pointed** 569:18
**points** 427:1,4
458:22 459:9
460:4,6,8,8
466:10 469:12
471:18 477:11
477:20 478:4
479:2 482:17
486:6 661:20
**police** 722:9,12
724:16 726:10
727:11
**policy** 425:5
446:3,13
460:12 495:14
497:20 499:12

499:15,19
500:1 536:3
**politicians**
606:1
**ponied** 572:1
**Pope** 435:7
626:20 629:1
686:11 688:3
**Porter** 372:18
373:14 378:15
378:19
**portion** 428:7
515:2,5 516:8
733:18
**portions** 598:9
**posed** 611:18
**position** 399:16
455:19 544:12
544:14 579:9
602:19 611:17
661:22 695:16
695:21 696:1
**positive** 534:2
542:1
**possession**
523:20
**possible** 471:18
535:8 557:6
611:18 668:5
691:14 710:3
710:18 711:6,9
711:13 712:10
712:18 713:1
738:17,20
739:3,9
**post** 533:19
**posted** 534:9
538:3
**potato** 571:7
**potential** 450:9
452:22 527:5
527:22 528:8

528:17 602:19
665:16
**Poultry** 533:14
**pounds** 422:18
**powder** 504:19
505:10 684:18
**power** 640:22
641:1
**powered** 723:19
**ppm** 525:19
**preapproved**
706:14 707:6
**preclude** 489:6
490:4 542:17
**precluded**
489:16 542:19
**prefaced** 640:14
**prefer** 530:7
**preferably**
611:16
**premium**
508:17
**prep** 713:10
**preparation**
389:14,22
390:3,20 391:4
398:2 406:13
427:12 494:12
559:19 630:21
640:3 644:16
**preparations**
397:21
**prepare** 575:15
614:19 615:10
704:12 727:18
729:2
**prepared** 458:3
503:6 514:10
532:19,22
618:10 637:19
691:22 703:4
719:8

**preparing**
529:20,22
659:9
**presence** 378:8
**present** 375:1
571:5 645:13
677:17
**presentation**
572:5
**presented** 449:6
561:21 575:19
**presenting**
520:5
**president** 395:3
399:10 587:9
626:20 634:11
**pressure** 578:21
732:4 733:4
**pretext** 588:3,20
**pretty** 572:2
654:4 726:14
**prevent** 450:19
475:12 500:14
**prevents** 447:21
**previous** 392:8
458:11 554:10
668:11
**previously**
379:3 391:15
434:17 462:7
487:5,7 520:7
543:20 609:7
672:12 690:1
711:19
**price** 502:18
503:1 510:5,10
530:16 540:8
556:11 564:14
691:13 710:2
**prices** 393:14
394:1 395:5,17
396:12 397:2

398:9 404:1,18
405:17 406:1
464:3 465:4
504:4,7,12
505:4 556:9
564:14,19
588:4,21
639:21 640:6
**pricing** 695:3
**primary** 454:22
652:1
**principal**
490:16 491:5
580:17 619:12
**printed** 505:19
545:5
**prior** 382:14
383:14 388:21
389:17 391:8
394:4 449:4
485:12 662:22
664:1,12 665:4
702:15 725:6
**prison** 722:19
722:22
**PRIV** 377:9,10
552:20 553:6
558:2
**privilege** 681:16
**privileged**
561:12 664:16
**privy** 549:16
**probably** 451:6
457:6,19
533:14 562:5
562:11 564:8
590:12 602:18
625:2 714:14
715:22 716:3,8
716:17 718:2
725:15 739:17
**problem** 396:16

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

32

420:20 604:1
604:10 691:15
710:4,19 711:7
711:14 712:2,5
712:9,13,22
713:5
**procedure**
633:21
**proceed** 618:17
**proceeding**
744:5
**proceedings**
744:3,9,12
**process** 492:19
551:13 610:2
611:4 616:22
622:12 655:22
695:10 699:15
700:8
**processing**
489:7 552:1
**processors**
551:6
**produce** 432:2
447:13 504:11
521:3 544:5,13
566:14 607:4
660:4,10
**produced**
385:16 403:2,8
427:11,19
429:10 430:19
435:1 447:6,12
448:1,2,4
501:11 518:10
520:6,9 521:6
531:15 543:21
548:11,11
549:4 573:6,9
621:1 658:7
695:5 697:16
704:11 734:12

736:1
**producer**
384:20 387:10
490:20 492:19
549:20 552:5
560:9 563:4
564:2 570:3
571:17 588:10
610:3,4,19
612:14 621:22
622:3,5,5,10
628:19 697:18
**producers** 372:9
374:3 379:13
379:15 380:19
381:4 384:16
386:11,16
387:3 395:17
502:5 513:17
533:4 541:20
546:11 552:4
556:8 560:22
571:5 574:11
576:16 583:3
589:8 594:10
595:21 603:22
604:18 611:2
621:7 625:16
626:1,14 628:7
628:12,15
629:18 632:11
636:21 656:14
657:6 686:22
688:20 689:6
**producing**
449:8 508:16
520:11 657:6
669:6
**product** 503:15
560:10,11,20
579:11 603:8
603:11 696:18

696:20 697:5
699:12 732:6
733:6 734:10
**production**
407:19 409:3
458:4 466:14
466:20 489:7
490:22 507:8
542:22 556:12
556:17 565:8
565:18,21
566:7 575:1
610:6,21
618:20 624:12
653:1 656:6
657:19 658:17
661:16 708:13
733:19
**products** 540:21
541:2 555:11
556:10,11,13
561:1 570:13
570:14,18
572:13 573:2
576:7,8,10
577:3 579:2
588:11 618:19
637:6,16
649:13 650:17
651:1,17 660:4
660:10 664:6
**Professional**
372:20
**profile** 674:13
**profits** 510:7
605:19
**program** 379:17
379:20 380:6
380:10 388:7,7
388:16 389:1,5
389:10 390:15
390:16 394:5,8

394:17,18,22
395:1 400:20
401:1,4,5,13
402:3,10
403:14 405:9
416:6 417:4
432:10,13,14
435:12,13,15
435:17,17
436:6 440:9,10
441:20 444:4
451:1,9 455:7
467:13,16
478:13 487:10
487:20 488:15
489:17 490:2
500:19,19
501:1 502:9,16
503:18,19
504:17 505:2
505:15 525:9
527:8 529:8
537:17 542:16
542:20 543:3
567:1 571:6
574:7,15
578:13,14,19
579:6 586:1
587:5,19 588:2
589:7,9,18
590:9,22 591:7
592:6,20 594:6
594:11,22
596:12,13
601:8,10,11,16
602:1 603:3,7
603:17 604:1,2
604:11,12,15
604:15,16
605:1,2,2,8,12
606:7 607:14
608:16 609:3

609:20 610:2
611:5 612:12
612:13,15
616:22 618:17
622:8,10,12
623:18,22
624:7,11 626:1
628:2,5,11,16
628:20 630:1,8
630:11,13,17
631:4,10,13,22
631:22 632:4,5
632:6 669:4
675:1 680:14
680:19 681:10
683:4 684:7
719:14 720:12
724:8 728:13
730:20,22
731:17,18
732:1 733:1
**program's**
631:15
**programs**
506:21 507:19
589:20 604:13
604:22 616:14
**prohibit** 543:5
**prohibited**
543:3
**prohibiting**
452:3
**prohibition**
451:11 453:5
453:10 488:17
**projected**
405:10
**promise** 694:19
**promised** 694:8
**promote** 604:7
**promoting**
604:13

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

33

| | | | | |
|---|---|---|---|---|
| **properly** 413:11 | **public** 372:21 | 641:9 643:9,19 | 566:18 | 515:16 516:2,6 |
| **property** 504:1 | 538:15 544:3 | 644:10,13,18 | **question** 380:2 | 516:14 518:12 |
| **proportion** | 744:1,21 | 669:14 | 383:22 384:2 | 519:1 523:4 |
| 422:19 | **publication** | **purely** 463:14 | 386:19 388:1,9 | 524:11 528:6,7 |
| **proposal** 577:19 | 402:19 656:11 | **purportedly** | 390:18 391:2 | 528:22 529:1 |
| **proposed** | **Publications** | 433:7 | 393:20,21 | 531:11 532:1 |
| 444:15 491:2 | 583:4 | **purpose** 393:12 | 394:15 395:20 | 543:2 550:18 |
| 575:12 582:4 | **published** | 394:8,17 395:4 | 401:17 402:5 | 563:6,14 |
| **proposing** 443:4 | 722:16 | 400:9,14 | 403:4 404:4 | 574:13 576:19 |
| 443:9 465:4 | **Pulaski** 540:18 | 401:12 402:1,9 | 416:10,15 | 577:14 579:21 |
| 493:5 580:10 | 648:9 | 444:14 451:13 | 417:1,21 418:7 | 580:6 585:19 |
| 605:8 | **pull** 483:6 553:4 | 453:13 454:17 | 419:8 421:3,12 | 586:10 587:10 |
| **proprietary** | 553:8 | 456:2 652:1 | 423:2,10 426:9 | 589:1,14 |
| 448:3 | **pullet** 405:4 | 730:20 | 429:5,17,19,19 | 591:14 592:10 |
| **protect** 628:6 | **pullets** 436:1 | **purposes** 495:16 | 429:21 430:1,4 | 596:13 598:10 |
| **protected** 562:5 | **punished** | **pushing** 463:21 | 430:9,13 | 600:14 603:5 |
| 562:12 564:8 | 431:13 | 625:15 | 434:11 437:4 | 604:9,10 |
| 615:21,22 | **purchase** 446:4 | **put** 442:22 | 437:13,20 | 606:14 615:18 |
| 616:2 714:14 | 488:18 496:9 | 443:1 456:13 | 441:22 442:3 | 620:12 624:18 |
| 714:16 715:22 | 496:19 498:9 | 471:13,13,16 | 444:6 446:10 | 633:6,18 |
| 716:8,17 718:2 | 499:12 563:3 | 487:3 511:9 | 446:17 447:16 | 634:18 643:13 |
| **protection** | 563:19 564:1 | 513:14 528:16 | 449:13 451:8 | 643:21 644:7 |
| 556:16,16 | 566:14 637:22 | 699:9 727:10 | 452:8,10 454:5 | 673:15 674:1 |
| 688:18 | 638:1,3,5,7,8 | 736:19 | 454:6 457:10 | 675:11 677:9 |
| **protective** | 638:16 639:3,9 | **puts** 707:8 | 461:10 464:7 | 678:12 679:18 |
| 447:19,21 | 639:20 640:7 | **putting** 560:8 | 466:16 468:7 | 681:9,17 684:1 |
| 553:21 558:15 | 641:7 642:1,6 | **PVP** 612:15 | 470:7,12,16,17 | 684:12 694:4 |
| 741:7 | 642:9 669:6 | 616:22 622:12 | 472:21 474:2 | 696:10 702:6,8 |
| **prove** 634:5 | 693:18 | | 475:10 478:11 | 703:9,17,18 |
| **provide** 557:6 | **purchased** | **Q** | 482:4,6,7,20 | 704:18 705:7 |
| 575:3 611:20 | 467:15 501:3 | **QC** 539:18 | 483:3,9,11 | 706:3 709:6,9 |
| 631:21 | 501:11 548:11 | **qualification** | 484:16,21 | 709:17 710:21 |
| **provided** 433:11 | 649:12 650:9 | 686:11 688:4 | 485:9,14,15 | 711:1 714:22 |
| 556:15 572:11 | 650:22 651:2,6 | **qualified** 380:13 | 489:19 493:10 | 717:5 720:2,20 |
| 577:21 581:1 | 651:17 652:18 | 384:17 389:4 | 495:3,19 496:5 | 720:20 721:16 |
| 689:5 737:8 | 653:4,12,21 | 410:20 | 496:12,22 | 728:21 731:7 |
| **providers** | 654:7 655:20 | **qualify** 384:18 | 497:3,11,14 | 735:15 738:9 |
| 507:10 | 669:2 | 478:7 588:9 | 498:12 501:16 | 739:5,16,16 |
| **providing** 622:7 | **purchases** 643:2 | **quality** 631:21 | 501:18 502:21 | **questioning** |
| 623:20 624:8 | **purchasing** | 631:21 706:15 | 506:8 508:11 | 693:22 698:8,8 |
| 665:15 703:5 | 488:17 495:15 | 707:1,7,11 | 512:17,22 | 698:14 736:7 |
| 705:21 714:5 | 498:3 639:15 | **quantities** | 513:1,3,5 | **questions** 447:9 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                        March 6, 2014

34

| | | | | |
|---|---|---|---|---|
| 514:4 546:3 | 688:12 | 572:8 | 482:9 483:14 | 704:20 705:11 |
| 550:13 611:17 | **radical** 513:19 | **RAUPDATE** | 483:16 485:17 | 705:12 707:17 |
| 636:20 637:5 | 672:14 674:17 | 376:12,18,19 | 488:6,8 491:17 | 716:13 717:7,8 |
| 646:22 647:3 | **RAFK** 377:4 | 376:20,21 | 491:19 492:20 | 718:11 720:1,4 |
| 666:20 667:22 | 526:13 | 377:8,12,14,15 | 494:20 495:20 | 720:20,22 |
| 668:7 670:21 | **RAFKS** 377:5,6 | 377:17 414:11 | 495:22 497:13 | 730:10 732:6,9 |
| 672:13 685:12 | 529:13 531:10 | 492:7 494:6 | 497:15 498:13 | 732:14,15 |
| 693:12 695:10 | **raise** 428:22 | 503:8 506:3 | 498:15,21 | 733:6,9,16 |
| 696:5 697:21 | 510:5 592:1 | 545:16 573:21 | 501:17,19 | 738:21,22 |
| 698:2,15,22 | 593:5,9 | 586:20 595:10 | 506:9 507:3 | 743:3 |
| 699:19 706:4 | **raised** 449:5 | 613:12 678:21 | 518:11,22 | **reading** 398:1 |
| 713:9 714:2 | 510:6 577:9,18 | 682:12 | 519:2 527:9,13 | 414:15 429:6 |
| 721:5 729:16 | 579:15,16 | **reach** 409:7 | 529:1,4,17 | 430:10 431:16 |
| 730:2 734:4,8 | 580:17 | 411:6,9,16 | 532:13 533:6 | 437:11,17 |
| 740:13,19,22 | **raises** 507:7 | **reaching** 611:1 | 534:4 535:16 | 442:1 467:5 |
| 743:11,16 | 510:4 | **read** 384:1,3,6 | 538:6 542:3 | 469:8 520:15 |
| **quick** 493:19 | **raising** 408:12 | 386:20,21 | 545:21 546:5 | 522:16 527:14 |
| 582:11 644:5 | 581:9 593:15 | 387:22 388:3 | 548:3 556:13 | 527:17 530:1 |
| 668:1,4 678:15 | **ran** 479:19 | 392:2 394:19 | 556:14,19 | 531:21 565:2 |
| **quicker** 461:21 | **Ranch** 374:15 | 395:22 396:1 | 557:9,14 | 580:11 595:14 |
| **quite** 479:17 | **random** 443:13 | 397:19 404:5,7 | 563:13,16 | 634:6 673:16 |
| 652:15 658:12 | 444:14,15,20 | 407:4 409:8 | 568:4,7 569:20 | 707:17 717:19 |
| 725:15 | 444:22 445:6,9 | 416:18,20 | 575:8 577:11 | 718:16 719:21 |
| **quote** 583:22,22 | 445:18 | 418:1,3 419:8 | 578:15 579:2 | **reads** 569:22 |
| 584:14,14,20 | **Randon** 570:22 | 419:10,20 | 580:7 583:22 | 579:3 611:22 |
| 584:21,22 | 581:22 582:3,6 | 421:3,5,10,13 | 586:5 587:11 | **ready** 495:1 |
| 585:2,3,6,7 | 637:17 664:3,9 | 422:6 423:2,4 | 587:12 589:14 | 512:1,9 670:20 |
| 586:4,5 | **range** 392:7 | 423:7 424:16 | 589:15 591:14 | 678:12,14 |
| **quoted** 522:11 | 403:3 406:10 | 424:17 425:19 | 591:16 598:8,9 | 727:1 740:17 |
| **quotes** 584:19 | 414:11 428:2 | 425:21 426:8 | 611:21 614:15 | **real** 433:21 |
| | 428:21 431:12 | 426:11 427:14 | 616:17 617:21 | **realize** 596:11 |
| **R** | 438:8 449:10 | 429:4 430:3,4 | 619:21 620:12 | **really** 435:14,14 |
| **R** 374:1 378:1 | 465:18 473:7 | 430:6 431:1,3 | 620:14 628:2 | 594:2 621:19 |
| **RA** 376:10,11 | 476:13 518:4 | 431:14 435:18 | 628:20 631:16 | 625:15 |
| 376:13,16,17 | 529:13 568:12 | 437:6,7,15,19 | 632:2,6,19 | **reason** 387:2 |
| 377:18 399:3 | 575:11 621:2 | 437:21 440:16 | 633:3,8,12,19 | 388:19 400:22 |
| 403:5 406:10 | 626:7 | 444:6,8 450:11 | 673:19 674:6,9 | 436:19 457:7 |
| 427:10 428:3 | **ranks** 656:14 | 452:11,12 | 675:13,16 | 490:15 504:3 |
| 457:22 465:19 | **rate** 712:19 | 457:11,13,17 | 681:5 684:2,5 | 507:12 508:4 |
| 473:7 620:21 | **rates** 431:13 | 461:12,14 | 697:14 701:12 | 544:12 553:5 |
| 620:22 669:22 | 667:21 | 464:8,10 470:6 | 702:9,10 | 588:7 594:18 |
| 686:5 687:11 | **rattle** 533:15 | 470:9 471:9 | 703:17 704:2 | 606:18 623:14 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

35

623:19 624:8
625:14 726:22
**reasonings**
465:7
**reasons** 463:14
**recall** 383:18
384:22 389:15
390:5,19 391:5
406:14 427:21
436:16 450:15
450:20 454:18
465:9 472:8,11
472:15 484:16
498:20 529:20
529:22 539:22
559:1 561:16
561:19 571:11
571:14 575:17
575:22 579:17
580:11,19,22
581:5,11 582:1
582:5,9 597:6
600:4 610:22
612:1,2,3
613:7 615:2,12
623:5,7 630:20
661:12 663:11
663:19 666:9
666:13,18
672:15,20
680:18 692:9
692:13,14
694:9 722:8
723:9 725:22
730:4,5
**recalls** 462:19
**receive** 477:19
609:14 643:1
664:11 665:3
**received** 466:10
469:12 534:13
534:17 633:11

666:10
**receiving** 560:4
581:19 609:9
609:11 612:2
613:6 615:9
**recess** 448:21
494:1 510:19
559:10 582:15
636:2 667:10
**recipes** 508:15
**recipient** 581:8
**recognize**
515:11,14
**recognized**
689:4
**recollect** 385:19
387:14 391:1
391:13 426:19
427:3 433:17
436:13,14
440:15 446:18
455:19 457:1,5
515:6 525:13
572:15 578:1
595:3 596:10
623:8 630:9
637:13 661:5
665:5 692:1
723:3 724:14
725:10 726:4
**recollection**
484:3,4 491:22
523:14 572:20
615:8 634:13
657:15
**recommendat...**
456:18 576:19
**recommendat...**
383:9 439:8
**recommended**
431:12 433:14
446:8

**record** 378:8,11
384:3,6 386:21
388:3 396:1
404:7 416:20
418:3 419:10
421:5,13 423:4
425:21 426:11
430:6,10
431:20 437:7
437:21 444:8
448:6,17,19
449:2,3 452:12
457:13,17
461:14 464:10
470:9 482:9
483:16 485:13
485:17 493:21
494:3 495:22
497:15 498:15
501:19 510:16
511:5,7 512:13
513:9 515:8
516:13 517:18
519:2 524:13
524:16,18
529:4 538:15
554:20 559:8
559:12 563:16
565:13 582:13
582:18 587:12
589:15 591:16
615:16 620:14
635:22 636:4
650:21 658:17
667:8,12 668:1
669:20 678:22
681:15 682:1
693:16,20
694:9,21 695:9
696:3,8 697:15
702:10 704:2
704:20 708:21

709:20 715:9
717:8 720:4,22
737:17 739:1
740:6 742:5
744:9
**recorded** 743:11
743:17
**records** 413:13
472:9 521:7
528:14 650:7
651:11 654:5
722:11 725:11
725:13,17
**Redding** 374:7
387:1 740:21
740:22
**redirect** 669:16
**reduce** 393:14
394:1 395:16
396:11 397:1
398:8 405:22
464:2 465:3
504:6 588:3,20
659:21 711:20
712:11,20
713:4
**reduced** 405:4
451:15 527:5
527:21 528:8
528:17 619:18
744:7
**reducing** 395:15
396:10,22
405:18 436:20
440:21 451:16
452:5 453:13
454:17
**reduction** 393:5
393:7 398:8
403:12,20,21
405:13 414:21
415:15 417:16

419:20 425:9
426:21 436:21
443:17,18
445:1 453:12
507:18 619:20
**reductions**
393:13 506:22
507:6 508:2,21
509:6,18
**refer** 515:22
645:22 682:11
720:8 721:12
**reference** 445:8
527:10,12
569:1 721:14
**referenced**
609:22 616:9
617:17 684:21
692:8
**referred** 462:7
463:9 484:17
692:6
**referring** 379:14
396:8,22
401:22,22
405:5,12
408:10 410:22
411:5 415:22
416:3 424:1,7
424:20 436:4
438:18 445:3
459:2,7 460:13
460:20 474:4
485:3,20
486:12 487:22
501:5 504:9
507:17 511:13
514:14,21
534:7 535:20
536:20 546:14
551:9 578:10
597:16 600:11

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

36

| | | | | |
|---|---|---|---|---|
| 600:18 601:2 | 728:16 | 725:12 726:15 | 596:22 | 719:15 720:13 |
| 602:9 606:3 | **relayed** 590:22 | 729:8 730:10 | **represent** | **requirement** |
| 608:19 612:19 | **released** 521:18 | 730:12 | 656:17 | 385:12,14 |
| 616:8 640:13 | **relevant** 432:14 | **reminded** | **representation** | 424:2 425:9,15 |
| 641:18 646:9 | 447:17 | 583:18 584:11 | 563:12 620:6 | 426:22 436:22 |
| 684:14 727:21 | **relying** 563:11 | **removal** 547:11 | 693:15 | 444:2 445:1 |
| **refers** 459:21 | **remaining** | 547:21 | **representations** | 455:4,5 459:11 |
| **refinery** 641:10 | 541:16 | **remove** 482:22 | 513:18 | 459:12 461:8 |
| 642:2 | **remarked** 449:8 | 484:18 | **representing** | 464:1 471:1,2 |
| **reflect** 431:20 | **remember** | **removed** 481:14 | 586:2 701:19 | 471:3,5 475:7 |
| 487:17 513:9 | 382:2 384:8,9 | 482:1 | **request** 379:21 | 476:10 477:22 |
| 650:22 694:9 | 384:13 385:3,7 | **rep** 447:22 | 388:5 392:2 | 488:17 567:3 |
| **reflected** 456:7 | 385:9,20 386:1 | 478:12 | 518:14 520:6 | 605:15 606:20 |
| **reflecting** 531:3 | 386:4 398:1 | **repeat** 383:22 | 609:14 621:10 | 736:17,19 |
| **reflects** 402:13 | 446:13 450:18 | 386:19 393:20 | 622:6 | 737:22 |
| **refrain** 632:5 | 463:17 464:16 | 394:15 395:20 | **requested** 384:4 | **requirements** |
| **refresh** 615:7 | 494:11 497:19 | 401:16 402:5 | 384:7 386:22 | 416:6 417:4,9 |
| **refuse** 564:1 | 497:21 501:15 | 403:4 404:3 | 388:4 390:9 | 420:3,8 434:5 |
| **refusing** 563:3 | 507:22 519:20 | 437:4,12 452:8 | 396:2 404:8 | 434:14 440:22 |
| **regard** 435:20 | 520:19 523:10 | 457:10 466:16 | 416:21 418:4 | 443:18 444:1 |
| **regarding** | 525:11 530:1 | 482:7 587:10 | 419:11 421:6 | 451:15 452:4 |
| 431:21 564:14 | 532:22 560:4 | 702:8 704:17 | 421:14 423:5 | 453:12 454:16 |
| 564:21 567:20 | 565:2 569:8,11 | 710:22 719:1 | 425:22 426:12 | 459:19 468:14 |
| 567:21 574:22 | 569:12 572:1,2 | **repeatedly** | 430:7 437:8,22 | 474:20 475:18 |
| 666:3 697:6 | 572:4,10 | 625:13 633:15 | 444:9 452:13 | 476:1 477:16 |
| 718:9,10 738:1 | 579:14,16 | 717:3 | 457:14,18 | 478:19 486:14 |
| **regional** 686:20 | 582:2 585:3,9 | **rephrase** 496:2 | 461:15 464:11 | 502:12,17 |
| **Registered** | 587:7,21 588:1 | 593:17 | 470:10 482:10 | 504:6 505:2,16 |
| 372:20 | 588:4 591:13 | **replace** 633:1 | 483:17 485:18 | 525:22 526:8 |
| **registry** 533:18 | 597:4 600:18 | **replied** 505:7,8 | 496:1 497:16 | 560:14 619:18 |
| **regular** 584:22 | 601:1,3 602:17 | **report** 410:5 | 498:16 501:20 | 697:9 719:15 |
| **rejected** 580:14 | 602:21 607:13 | 463:4 537:7,16 | 519:3 529:5 | 720:13 |
| **related** 580:5 | 609:9,11 | 597:22 622:7 | 563:17 587:13 | **requires** 487:18 |
| 595:4 638:20 | 610:22 612:5 | 659:18 722:9 | 589:16 591:17 | 734:11 |
| 666:8 689:12 | 612:22 617:1,2 | 722:12 724:16 | 620:15 630:17 | **requiring** 389:9 |
| 690:16 744:11 | 617:10 629:9 | 726:10 | 702:11 704:3 | 390:6,22 391:6 |
| **relations** 549:20 | 629:15 642:4,8 | **reported** 424:22 | 704:21 717:9 | 623:21 624:10 |
| **relationship** | 646:3 652:4,12 | 536:19 537:11 | 720:5 721:1 | **rescue** 479:19 |
| 632:10 | 660:17 664:7 | 594:18 656:18 | **require** 501:2 | **reserve** 516:16 |
| **relative** 629:22 | 666:14 670:4 | **reporter** 372:20 | **required** 444:2 | **reserved** 520:20 |
| 744:14 | 691:17 713:18 | 398:16 668:3 | 606:7 637:22 | **resolution** |
| **relax** 728:10,15 | 714:2 721:13 | **reporting** 587:8 | 693:19 701:2 | 628:17 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

37

| | | | | |
|---|---|---|---|---|
| **resolve** 448:5 | 464:6 489:19 | 543:16 554:15 | 434:7 435:10 | 528:10 530:21 |
| 676:16 | 493:10 495:18 | 559:15,18 | 436:6,17,18 | 532:21 533:9 |
| **resolved** 449:7 | 496:13 498:11 | 575:2,5 595:13 | 439:2,14,21 | 539:3 540:22 |
| **respect** 403:19 | 513:7 580:6 | 628:22 695:9 | 440:2,11 441:8 | 541:22 544:18 |
| 425:5 445:17 | **restaurant** | **reviewing** | 441:13,18 | 545:20 546:6 |
| 475:5,8,22 | 627:11 | 389:15 390:20 | 442:6,10,11,16 | 546:18,21 |
| 478:13 530:21 | **Restaurants** | 391:5 494:11 | 442:22 443:5 | 547:5,14 549:1 |
| 556:22 575:3 | 626:15 627:8 | 519:20 559:1 | 443:11,14,20 | 551:10,11,15 |
| 600:12 637:15 | 630:2 | 569:9 580:3 | 444:19 445:10 | 553:1 555:10 |
| 637:21 658:22 | **restraint** 665:16 | 629:9 630:20 | 445:20 446:19 | 555:12 558:7 |
| 662:6 664:8 | 731:5 | **revolutionary** | 451:3,13 453:2 | 558:10 560:3 |
| 665:1,14 695:2 | **restraints** | 628:13 | 453:6 454:13 | 560:16 561:4 |
| 695:3 696:7 | 578:13 731:17 | **Rice** 467:4,8,9 | 455:12 463:2,8 | 563:4 565:22 |
| 699:9 724:1,17 | **restrict** 395:5 | **rich** 542:6 671:9 | 464:18,20,22 | 566:3,6,20 |
| 727:15,16 | **restriction** | 671:15 | 465:5,10,12 | 567:22 569:8 |
| 729:3,12 | 450:14 457:9 | **Richard** 583:3 | 466:3 467:4,16 | 569:13 570:3 |
| **respond** 545:1 | 461:7 578:20 | **rifle** 723:20 | 467:18,20 | 571:1 573:15 |
| 601:21 611:15 | 732:2 733:2 | **rigged** 485:1 | 469:5,22 471:5 | 574:2,4,16,18 |
| 612:4 | **result** 416:8 | **right** 379:12 | 471:17,18,19 | 576:3,11,15,21 |
| **responded** | 426:22 434:1,4 | 383:14 385:7 | 471:22 472:4 | 577:6,8,13 |
| 736:15,17 | 434:13 473:4 | 385:17,20 | 473:16 474:7 | 578:6,10 |
| **responds** 603:14 | 505:4 506:20 | 386:8,14 387:8 | 474:15,18 | 580:14 581:2 |
| 608:13 | 526:7 541:8 | 388:18 392:16 | 477:2 479:2,5 | 581:13 583:7 |
| **response** 591:6 | 688:21 693:22 | 393:2,16 394:9 | 479:13 480:7 | 584:4 585:7,21 |
| 627:19 672:13 | 720:11 | 395:18 396:19 | 481:1,22 482:2 | 590:17 592:2,6 |
| **responsibilities** | **resulted** 393:4 | 398:4 399:8,11 | 486:10,16 | 592:13,16 |
| 420:13 | 509:19 692:5 | 399:13 400:2 | 488:18,20 | 593:5,12,19,20 |
| **responsibility** | **resulting** 403:22 | 400:10,10,15 | 489:5,13,17 | 594:8,12 595:1 |
| 412:12,13 | **results** 465:21 | 400:17 401:8 | 490:6,10,17 | 596:9,20 597:2 |
| 414:3 | 472:19 473:4 | 402:16,20 | 491:2,7,10,22 | 597:9,22 |
| **responsible** | **retail** 623:16 | 403:3 406:19 | 492:2,9,12,15 | 598:13,17,20 |
| 399:20 413:4 | 624:5 | 406:22 407:21 | 493:2,6,16 | 599:2,6,20 |
| 413:18 415:10 | **retailers** 623:19 | 407:22 408:1 | 496:17 499:6 | 601:8,16,19 |
| 420:18 421:20 | 624:7 | 408:15 413:19 | 500:9,22 501:4 | 602:11 603:19 |
| 425:13 433:7 | **retains** 689:6 | 414:4 415:7,11 | 501:6,12 | 605:15 606:5 |
| 701:8 | **retreat** 507:5 | 415:12,16 | 502:13 503:19 | 607:4,12,14,19 |
| **responsive** | 509:3 | 420:11,14 | 504:22 505:6 | 608:5,8,9 |
| 484:14 675:11 | **retreats** 510:3 | 422:3 423:21 | 506:4,18 507:1 | 609:3,20 611:5 |
| 703:19 | **reverse** 681:6 | 424:10 425:3 | 509:4 510:13 | 613:16,20 |
| **rest** 488:6 551:4 | **review** 389:22 | 426:6 428:3,5 | 516:17 522:2 | 614:8,13,16 |
| 551:18 | 390:1,4 406:12 | 429:7 432:11 | 523:16 524:5 | 616:10 621:8 |
| **restate** 417:1 | 427:12 487:10 | 433:6,8,13 | 525:15 526:11 | 621:13,14,17 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                March 6, 2014

38

621:22 623:7
630:17 635:9
635:10 637:9
637:11 638:22
645:6 646:6,10
646:13,17,20
647:18,21
648:2,13 649:4
649:20 650:1
650:11,18
651:7,18 653:8
653:13,22
654:3,8,15
655:2 657:4
658:22 659:2,6
659:11 660:3
660:17,22
662:7 663:1
672:7 675:7,8
675:16 676:2,8
682:10 685:17
687:9 690:10
696:10 697:2
699:2,6 700:11
702:21 706:9
706:18 707:4,8
707:12,16
708:1 709:2
710:4 711:7
712:2,17,22
713:13,18,20
714:6,20 715:3
716:11 717:22
719:6,9 722:3
726:15 731:5
731:13,20
736:9 739:19
**right-hand**
403:6 674:4
**righters** 420:21
**rights** 503:22
513:15,19

589:10 626:2
672:14 674:17
674:21 721:19
**rise** 393:7
**risk** 542:10,14
565:6 680:15
680:19 681:11
**risks** 565:6
**road** 373:7
694:5 695:12
**rodent** 535:19
535:21 536:4
536:21 537:1,4
538:3,10
**rodents** 536:8
**Roger** 560:5,21
561:5 581:19
581:21 685:3
685:15
**role** 631:9
699:18
**rolled** 706:4
**Ron** 621:10
622:6
**room** 418:9
422:17 554:15
**root** 550:8
**rose** 373:11
375:3 378:16
378:21 379:18
380:4,18
387:17 388:15
389:17 391:7
391:21 399:11
403:2,5 407:2
411:20 415:10
421:21 425:4
425:14 426:17
426:20 427:11
430:16,19
431:11,22
432:2 433:11

433:18 434:4
434:12 435:1
438:12 449:4
454:20 459:18
460:11 461:7
466:22 467:8
467:20,21
468:2,13 477:1
478:8,14
480:21 481:10
486:3,15 492:9
499:15 513:22
517:16 521:16
522:3 523:1,18
523:20 525:22
526:6 532:14
533:9 538:9
541:14 544:4
553:12 556:21
571:19 574:6
574:21 575:7
575:13 578:10
583:10 614:7
615:4,10
618:11 619:12
619:16,18
620:7 621:1
630:7 633:11
636:12,20
637:1,11,22
639:7 643:11
644:17 646:3
647:16 648:1,8
648:15,21
649:6,12 651:5
651:16 652:13
653:11,20
654:6,13
660:20,22
661:3,9 667:14
668:15,17
669:2 672:15

674:18 677:11
677:19 700:14
702:16 706:20
707:21 721:10
734:5 736:14
736:17,18
737:8,22
739:11 740:8
**roughly** 655:11
**rows** 473:13
536:8
**rub** 408:18
411:17
**rudely** 737:21
**rule** 385:8
487:21 488:1,5
488:12,21
489:3,6,15,21
490:4 491:2,6
491:8 493:1,11
493:14,16
494:19 495:8
495:13 496:6
496:16 497:9
500:15 501:10
502:6 535:13
574:16 576:14
576:21 580:5
580:10 588:19
596:20 602:11
605:9 606:5
608:7 730:15
731:3,9,13
**rules** 521:4
605:4
**rumor** 587:2,8
590:19 592:18
594:4 597:19
600:1,5,15,21
601:14
**rumors** 383:11
**run** 409:5,5

534:2 637:22
**running** 411:13
432:12 582:2
**Rust** 372:15
378:4 379:1,7
392:8,11 394:6
399:4 406:6
414:6 415:7,9
427:6 438:6
440:13 449:9
449:16 457:20
465:15,18
492:3 494:8
503:8,9 505:21
514:5,9 517:21
519:7 520:13
524:22 526:14
527:3 529:9,13
531:6 543:7
545:12,16
550:19 552:16
553:20 554:12
557:20 558:19
558:19 570:6
573:17 582:19
586:16 595:1,6
598:2 612:8
613:8 620:17
626:3 629:3
636:7 645:9
667:16 668:12
669:16 670:2,3
671:2 672:9
674:15 676:6
677:8 678:18
679:6 680:3
683:21 685:10
685:22 689:7
690:14 691:2
692:7 693:3,6
696:17 697:4
697:20 698:7

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

39

734:7 736:6,14
737:20 738:12
739:14 740:14
740:20 741:6
741:17,22

**S**

**S** 374:1 376:8
378:1
**sabotaged** 726:2
**sail** 479:11
480:10,11
**sailboat** 479:20
480:3,10,12
**sailing** 479:22
**sale** 507:11
**sales** 503:15
506:22 507:6
508:3 585:13
625:2,4,7
631:1,2
**salmonella**
533:21 534:1
542:15
**sanctioned**
669:13
**sand** 589:10
**sat** 446:14
546:10 633:8
633:12 634:1
635:4,9
**Satkin** 372:19
744:2,20
**saw** 390:8 407:6
410:6,9 411:11
412:8,21
417:16 425:3
440:6 480:9
486:9 516:3,4
516:9 536:16
537:18 629:2
637:8 657:18

**saying** 382:5
398:6 411:4
433:2 472:18
498:1 499:1
504:22 505:14
507:15,20
509:2,4 511:18
522:12 593:3
594:15 600:6
600:16 608:22
609:2 640:18
703:20 705:2,4
734:18
**says** 396:14,19
398:15,18
400:1 401:15
401:21 403:12
404:10,21
405:2,11,15
406:4 408:6
409:4 410:3,12
411:5 414:19
415:5 419:18
419:22 421:18
421:22 423:14
423:14 424:9
424:17,18
426:15 429:7,7
429:8 431:5
435:20 438:2
438:21,22
439:4,7 440:2
441:19 442:1
445:12,13,19
445:21 446:3
450:8,17
452:20,21
453:3,7 458:10
458:14 460:1
461:2 462:21
463:2,7 466:12
466:17,22

467:3,8 468:21
469:2,4,6,9,15
469:16,19,19
469:22 471:8
473:13 474:11
474:17 475:19
477:4,9 479:3
481:13,20
486:4,18
487:16 491:13
491:14,20
492:17 498:22
498:22 499:7
499:10 503:17
505:7 506:14
510:1 521:14
523:17 525:18
527:4,21 528:7
529:2 530:6
532:14,21
533:3,20 534:1
535:18 541:22
547:19 548:9
553:6 555:17
556:7 557:3
561:11,12
562:3,11,14
564:13,21
566:11,21
567:9,13,18
568:1 569:18
570:4 574:19
576:5,12
583:16 584:8
585:21 586:14
590:18 593:11
593:13,20
594:3 596:1
599:21 600:1
600:15 601:20
603:14 607:12
607:13 608:14

609:5,13
611:11 612:7
616:6,19
618:16 621:4
621:10 622:14
623:14 624:4
626:21 627:18
627:22 628:11
628:21 629:16
629:20,21
631:8,17 632:9
633:4,20
636:16,17
639:19 640:21
643:8 644:10
647:7,9 656:14
656:15 657:1
657:20 659:16
671:8 675:6
677:15 680:13
684:6 688:17
691:10,15
701:3,21,22
702:4 706:13
707:4,5,16,18
716:7,9,13,14
716:16 717:19
717:20 718:1,7
718:18 719:2,3
719:21 730:9
730:19 731:21
732:15,22
733:14,16
**schedule** 463:12
463:14 576:9
**scheduled**
711:20
**Schimpf** 691:11
**science** 610:5,19
628:5
**scientific** 432:8
432:19 433:4,6

433:15 451:20
455:17 456:4
456:19
**scientifically**
675:9,17 676:3
**scope** 647:5
693:12,14,15
694:6 695:4,8
695:11
**score** 491:15
**scores** 400:9
**scrawnier**
431:14
**screwed** 419:5
**scrutiny** 578:15
731:19
**scuttle** 596:1
**se** 435:14 533:20
535:13 542:15
**Seattle** 487:17
**second** 405:16
407:8 443:13
449:9 450:1
462:11 491:13
524:8 541:13
553:4,9 562:14
567:17 612:6,8
619:15,16
632:9 646:1
670:16,17
671:7 678:19
678:20 679:8
679:12 680:3,9
686:19 687:13
687:20 688:8
688:16 691:5,6
732:13 738:17
**seconded** 691:11
**secondly** 578:18
732:18,22
733:15
**section** 569:17

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

40

680:6 697:5,9
697:12
**security** 727:10
**see** 392:12,13,22
393:10 400:5
403:16 404:16
404:22 405:2
405:10,11,19
408:8 409:2,11
409:16 411:11
413:13 423:15
423:17 428:8
428:14 430:9
430:14 436:2
439:5,10,18
440:3 446:5
447:4 458:12
460:9 461:5
463:15 469:6
469:15 471:10
473:12,14,18
474:7,11
481:14 483:22
484:9 486:6,18
487:10 499:13
503:12 504:1
506:12 511:15
511:16,19,21
521:22 525:9
525:19 527:10
528:2,3 530:9
532:17 538:19
541:16 542:5
542:10 545:10
545:10,11
546:12 547:12
548:1,13
550:20 551:7
553:3 561:14
562:5,12,16
564:22 565:10
565:11,16,19

566:15 567:11
567:15 568:11
568:21 569:1,2
569:15 573:11
579:12 583:13
584:15 587:5
590:18 594:14
596:6,14 597:9
599:7 600:9
602:2 610:7,13
612:17 614:11
622:12 624:12
627:20 628:8
632:12 639:22
641:1 645:15
651:12 656:19
657:10 663:5
665:12 666:5
671:10,15,20
672:1 675:5,6
675:7,18 680:6
680:15 684:9
686:12 687:1
691:8 706:16
714:13,14,15
714:15 716:6,7
718:5 725:11
725:11 732:17
738:20
**seeing** 427:22
561:16 724:14
**seeking** 385:3
**seen** 454:1
456:17 480:8
507:19 518:6
520:13 522:18
522:20 524:2
536:15 537:15
558:18 561:7
581:5 585:1
612:14 633:9
633:17 658:11

714:1
**select** 609:13
**self-driven**
628:19
**sell** 490:20
541:4 552:7,9
566:14 576:7
602:7 660:5
**seller** 704:6
**selling** 540:8
541:1 552:2
642:16 713:3
**sells** 508:17
576:6
**send** 611:14
**senior** 629:18
635:14
**sensitive** 530:15
**sent** 391:17
411:22 432:4
432:18,22
433:3 438:12
454:2 561:6
616:16 621:6
629:1 684:15
**sentence** 491:13
499:5,7 506:16
529:15 530:3,6
547:8,16 578:8
587:2 618:15
633:19,19
634:7 671:8
675:5 684:3
686:19 687:5
688:16 697:12
697:14 719:7
**sentences**
733:15
**separate** 521:18
522:5,13 602:1
604:2
**September**

414:13 438:11
438:20,22
443:3 480:22
627:20 634:2
677:3,10
**series** 682:20
**served** 636:8
722:19,22
**serves** 730:20
**services** 638:7
639:20,21
641:8 642:10
642:17
**serving** 635:12
722:18
**SES** 592:22
593:2 594:9,11
629:17 631:9
631:11,13
632:5,6,15
634:11
**session** 511:1
713:10
**set** 408:18
411:12,15,18
439:14 468:14
491:15 538:8
539:6,16 548:1
567:14 608:3
638:12 640:8
**sets** 605:4
**setting** 601:7
**seven** 474:14
**Seymour** 638:14
639:17
**SF** 736:1
**share** 611:19
665:10 693:9
**shared** 593:22
715:16
**sheet** 491:15
536:10,14,18

743:14
**shell** 492:19
506:14,15,19
507:4,7,10,16
508:6,16 509:1
509:2,5,20
510:4 547:11
547:21 556:18
576:6,8,10
577:3 583:21
584:14 586:2,3
628:12,19
689:17 692:8
692:11,14
693:18 697:6
700:20 701:3
702:17 708:13
733:19 734:11
736:16 738:1
**shield** 614:11
616:14 618:19
**ship** 539:19
661:19
**shipped** 541:22
**shipping** 661:20
**shit** 728:9,14
**shocked** 627:19
**shoot** 420:22
**shore** 479:13,16
480:6
**short** 524:11
698:16,17
**shorten** 423:7
**shorter** 393:21
**shortly** 401:8
**shot** 521:17
522:4,13,19,21
523:2,11
723:20
**shotgunning**
418:19
**shots** 724:22

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                   March 6, 2014

41

**shoulder** 550:8
**show** 390:5
  391:14 398:22
  399:2 402:17
  403:14 406:9
  414:9 427:9
  434:17 438:4
  446:21 447:7
  447:13 449:19
  462:6 465:17
  470:19 472:9
  487:7 492:6
  494:5 500:13
  503:5 506:2
  519:10,18
  524:20 526:12
  528:14 529:12
  531:9 543:10
  545:15 548:5
  552:19 558:1
  559:4 570:9
  573:20 582:22
  586:19 595:9
  598:5 609:7
  613:11 620:20
  626:6,11 629:6
  645:22 650:8
  692:2 696:9
  701:22 704:11
  736:4
**showed** 380:22
  514:21 516:22
  560:1 661:8
  663:8 666:7
**showing** 408:7
  428:12
**shown** 512:14
  513:21 554:14
  666:17
**shows** 599:3
  696:9
**shrinks** 579:1

732:5 733:5
**shut** 539:12
  605:21
**sick** 542:1
**sicker** 431:14
**side** 520:5 587:2
  590:18 592:7
  594:3 603:8
  672:7 674:4
  676:11 723:16
  724:3,4
**Siegel** 373:6
  378:12
**sign** 386:6
  548:20 553:20
  554:12,18
  558:6,19
  642:21 741:7
**Signature** 742:7
  743:22
**signed** 379:19
  380:5,9,18
  381:8,15 387:4
  548:15 573:16
  575:12 660:16
**significant**
  516:14 574:6
  603:4,8 645:18
  680:15,19
  681:11 698:7
**significantly**
  603:11
**similar** 616:16
**simpler** 705:18
**simply** 529:19
  620:8
**simultaneous**
  380:11
**sincerely** 470:1
**single** 570:1
**sir** 381:4,8 388:2
  388:9 389:21

391:18 394:14
394:20 395:6
396:7,12
398:16 399:21
400:21 404:1
405:6,13 406:2
406:16 410:10
410:22 412:5
412:19 413:16
417:7,13,18
419:18 420:4,8
420:17,19
421:2,21 424:4
424:14 427:2
429:17 432:4
432:14 434:15
437:1,15
438:13 441:21
445:8 451:17
452:6,18
453:14,20
456:6,17,20
457:9 459:4,20
461:8 469:18
470:6,21 472:1
473:20,22
474:20 475:15
476:12 477:17
480:4 482:20
483:1,8 485:22
487:8 488:12
495:16 496:10
496:20 500:2
504:7 505:4
506:5 507:19
508:6 509:1,8
509:21 516:6
516:12 517:1
518:2 521:9
524:10 528:12
528:15,21
531:21 538:14

543:4 546:15
547:3 548:5
549:11 553:15
559:16 561:20
563:15 571:7
586:21 590:7
606:12,18
607:11 608:1
609:10 612:20
613:14,17,18
614:22 615:8
617:4,12 620:2
622:3,16,22
624:16 625:1
625:13 626:6
634:1 635:5
647:8 650:16
693:21 701:7
701:15 702:7
702:15 705:6
709:15 710:19
712:5,9,13,22
713:6 715:12
717:5,18
718:12,20
719:16 720:14
720:21 721:8
723:6 724:10
725:5,14,21
726:6 727:15
729:17 730:1
730:17,22
731:2,5 733:20
740:9
**sit** 633:18
**site** 538:4 544:3
**sitting** 572:5,9
**situation** 517:15
  602:13 708:6
**six** 413:14,14
  491:13,14
  504:21 521:17

522:4,12,18,20
523:2,11,19
537:12,13
577:6 671:11
**size** 393:5
  395:15 396:10
  396:22 464:2
  465:3 711:20
  713:4
**sizes** 475:2
  508:18
**skeptical** 383:1
**skinny** 418:9,14
  418:22 419:4,4
  420:16 422:9
  422:11 424:12
**slash** 469:13
  471:9,14,16
**slight** 576:14,20
**slowly** 429:13
**so-called** 383:9
  587:4 590:21
  592:20 594:5
**Social** 651:17
**Society** 514:10
  515:3,19 516:9
  517:1 721:6
**sold** 385:15
  540:15,21
  576:10 577:4
**solution** 712:10
  712:18 713:2
  731:10,12
**solutions** 710:3
  711:6,10,13
  738:18,21
  739:3,9,12
**somebody** 484:7
  563:2
**someplace** 385:9
  389:20 573:4
  622:20 642:2

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

42

| | | | | |
|---|---|---|---|---|
| 708:21 729:6 | 592:5,18 594:4 | **specification** | 393:9 395:14 | 430:18 461:10 |
| **Somewhat** | 594:9,11,19 | 390:6 640:19 | 474:7 | 507:4 517:18 |
| 510:11 | 595:1 598:17 | 693:18 696:19 | **squeeze** 590:2 | 521:4 538:2 |
| **soon** 611:18 | 600:2,2,6,16 | 696:20 697:5 | 605:16 607:5 | 546:7 547:9 |
| **sorry** 462:1 | 601:1 605:8 | 704:7 736:15 | **squeezed** 604:5 | 605:5,5 617:20 |
| 519:11 523:7 | 606:18 609:18 | **specifications** | **stack** 461:22 | 619:14 644:6 |
| 526:10 568:12 | 610:10,17 | 389:2,3,9 | 667:1 | 665:15 666:4 |
| 568:13,14 | 611:4 612:19 | 699:12 700:7 | **staff** 435:15 | **stated** 484:6,6 |
| 643:17 664:20 | 613:1 616:21 | 700:14 701:1 | **staged** 513:14 | 508:3 509:11 |
| 676:19 678:7 | 617:3,5,9 | 703:4,6,13 | **Stahl** 374:17 | 528:17 551:14 |
| 682:17 685:17 | 619:2 622:16 | 704:13 705:20 | **stamped** 629:7 | 556:7 592:10 |
| 687:16 688:11 | 623:2,7 | 705:22 706:14 | **standard** 433:17 | 693:16,20 |
| 693:9 697:22 | **Sparboe's** 590:5 | 706:22 707:6 | 433:19 536:5 | 694:14 |
| 741:15 | **speak** 640:4 | 707:10 737:8 | 579:10 607:7 | **statement** 396:4 |
| **sought** 491:5 | **speaking** 704:1 | **specified** 705:3 | 608:3 | 421:18 423:16 |
| **sound** 512:4,6 | 715:7 | **specifies** 647:2 | **standards** | 423:18,20 |
| 512:10 525:15 | **speaks** 445:12 | **specifying** | 433:14 458:11 | 452:9 484:5 |
| **Sounds** 741:1 | 470:12 633:7 | 389:17 | 608:3 | 523:1 528:4,10 |
| **source** 518:9 | 633:13,17 | **specs** 738:3 | **standpoint** | 528:13 565:16 |
| **sources** 668:14 | 707:14 718:22 | **speculation** | 661:3 | 620:1 694:3 |
| **South** 374:18 | 732:10 733:10 | 397:10 412:7 | **start** 508:10 | 717:15 718:3 |
| **space** 393:13 | **spec** 734:10,21 | 464:5 523:4 | 532:7 547:4 | 719:21 |
| 403:12 436:22 | 735:4 738:1 | 669:9 705:1 | 568:17 570:17 | **statements** |
| 440:21 443:14 | 740:1 | 736:22 737:10 | 579:22 584:2 | 634:12 635:16 |
| 443:16 444:2,4 | **special** 677:1 | 738:5 | 624:3 652:22 | **states** 391:19 |
| 444:16 445:9 | **specialty** 700:20 | **speculative** | 659:13 675:5 | 392:20 393:2 |
| 445:20 452:4 | 701:2 | 706:3 | 694:11,16 | 407:8 420:10 |
| 453:11 454:16 | **specific** 382:11 | **speech** 739:6 | 698:6 | 424:14 499:4 |
| 463:13 464:1 | 390:18 445:9 | **speed** 463:12 | **start-up** 573:2 | 538:21 540:22 |
| 465:2 474:6,20 | 546:2 572:5 | **speeding** 465:2 | **started** 422:15 | 542:22 564:6 |
| 475:7,17 476:1 | 612:4 633:18 | **spelled** 646:9 | 422:21 450:13 | 591:4 619:16 |
| 476:10 491:16 | 664:7 | **spent** 711:19 | 516:22 540:19 | 631:19 637:2 |
| 502:12,17 | **specifically** | **spies** 596:3 | 544:22 551:17 | 661:21 675:16 |
| 505:2,16 527:7 | 382:3,8 383:18 | 597:17 | 698:14 | 685:5 686:20 |
| 528:1,9,18 | 384:13 407:22 | **spoken** 740:10 | **starting** 428:8 | 708:13 715:3,5 |
| 567:3 605:17 | 415:21 506:21 | **sponsors** 630:11 | 430:15 450:5 | **stating** 476:10 |
| 719:15 720:13 | 572:10 602:22 | **spray** 723:16 | 603:16 646:5 | 510:2 611:16 |
| **span** 497:4 | 603:1 609:22 | 724:1 | **starts** 428:3 | 632:5 715:10 |
| **Sparboe** 533:13 | 610:9 624:14 | **spread** 585:10 | 435:12 463:5 | **station** 642:20 |
| 535:14 541:15 | 630:16 684:19 | **spring** 632:14 | 521:14 550:20 | **status** 526:6 |
| 587:3,19 589:6 | 706:20 707:1 | **spurious** 734:19 | 578:9 | 541:9 632:18 |
| 590:8,20 591:8 | 721:11 | **square** 374:9 | **state** 378:7 | 688:21 689:6 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

43

**statutes** 665:15
**stay** 603:14
  605:20
**stayed** 394:21
  401:3
**stenotype** 744:7
**step** 393:4,8
  395:13 504:18
**sticking** 520:10
**stipulate** 423:7
**stipulation**
  676:17 734:20
  734:22 735:12
  735:17,21
**stock** 428:13
**stop** 455:12
  462:11 485:5,7
  498:3 695:13
  715:7
**stopped** 461:3
  472:5 727:17
**store** 504:15
  626:15 627:8
  638:13
**Street** 372:18
  373:15
**Streets** 374:10
**strength** 579:9
**stress** 431:9
  628:13
**strict** 557:7
**strike** 419:6
  422:22 425:18
  429:3 431:20
  444:5 484:11
  519:5 537:20
  703:15
**string** 505:12
**strongest** 623:18
  624:6
**struck** 736:6,11
**Stuart** 649:7,7,9

**study** 428:16
  429:10 430:20
**Stueve** 373:4,6
  376:2,4,6
  378:9,12,12
  379:6 380:12
  380:16 384:1
  384:12 386:7
  386:20 387:7
  387:22 388:8
  391:11 392:4
  392:15 395:11
  395:22 396:6
  397:6,14,22
  398:13,22
  399:6 401:18
  402:7 404:5,12
  406:8 412:11
  413:1 414:1,8
  415:20 416:4
  416:22 419:6
  419:17 421:2,9
  421:17 422:22
  423:6,9,11
  424:8 425:18
  426:8,16 427:8
  427:18 428:1
  429:3,16 430:2
  430:11 432:3
  432:17 433:1
  436:9 437:6,14
  437:19 438:3,8
  438:15 440:5
  440:17 441:4
  441:10 444:5
  444:13 445:7
  445:16 446:12
  446:20 447:8
  447:15,20
  448:5,12,16
  449:3,18 452:1
  452:11,16

453:9,17 454:9
456:16 457:2
457:11,22
458:7 459:8
460:22 461:12
461:18 462:1,5
462:14,16
463:1 464:8,15
465:17 466:2
467:6 468:12
470:15 472:16
473:2,11 474:5
474:10 475:11
475:14 476:6
480:16,20
482:5,8,19
483:7,14 484:2
484:11,15
485:4,21 487:6
487:15 492:5
493:18 494:4
494:10 495:20
496:2,4,14
497:2,6,13,18
498:13 499:2
500:6,12
501:17 502:3
502:10 503:4
503:11 505:11
506:1 507:14
509:12 510:8
510:12 511:6,8
511:17,22
512:7,14,16,21
513:4 514:3,7
515:1,7,15
516:12 517:3
517:14 518:1
518:11,15,19
518:22 519:9
519:16,17
520:2,12,19

521:8 522:9,17
523:6 524:4,19
525:2 526:16
526:22 529:11
531:8,19 532:4
532:9 535:9
537:20,22
543:9,19 544:2
544:8,11,17,22
545:14 546:1
549:10 550:4
550:10,14,17
551:20 552:18
553:10,15,18
554:2,5,7
555:7,9 557:22
558:22 559:13
563:13,20
565:15 567:8
568:16,20
570:8 573:9,19
577:17 582:10
582:21 586:11
586:18 587:11
587:17 588:17
589:4 590:6,14
591:14,21
592:11 593:10
594:7,17 595:8
597:15 598:4
606:11,17
607:10 608:12
608:20 609:6
610:15 611:9
613:10 615:17
616:5 618:4,8
619:6 620:19
622:21 624:2
624:21 625:12
626:5,10,18
627:6 629:5
633:22 634:8

634:20 635:3
635:20 636:5
640:14,20
643:16,20
644:8 645:5,10
647:6 650:15
652:5,11
658:10 662:14
664:18,22
665:21 666:19
666:21 667:2,6
668:19 669:8
669:17 670:4
670:12,18,22
671:2 672:17
673:11,13,16
673:21 675:10
676:7,19,22
677:4,6 678:13
679:17 680:20
681:14,21
682:17 683:1,8
683:10,15,18
683:22 684:1
684:11 685:16
685:20 687:22
688:9 689:19
689:22 690:3,6
690:9,15 691:7
692:3 693:8,11
693:16,21
694:2,11,16,22
695:7,22 696:4
696:12,15
698:1,5,12,18
699:11 700:18
701:19 702:5,9
702:14 703:15
703:22 704:9
704:19 705:5
705:11,16
706:7 707:15

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

44

| | | | | |
|---|---|---|---|---|
| 708:11 709:1,7 | 685:5 695:17 | 585:16 | **sure** 394:21 | 679:14 |
| 709:10,14 | 695:19 | **supplier** 389:4 | 401:3,19 | **sworn** 379:3 |
| 710:7 711:2,11 | **submitted** 708:5 | 539:8 701:14 | 408:14,20 | 735:18 744:5 |
| 711:17 712:16 | **submitting** | 702:17 704:7 | 411:12 416:2 | **system** 478:4 |
| 713:12 714:11 | 702:16 | **suppliers** | 424:6 427:3 | 486:15 491:15 |
| 714:12 715:2,6 | **substantial** | 623:21 624:10 | 434:2 441:2 | 515:12,22 |
| 715:9,11 716:5 | 597:21 657:3 | 624:11 708:8 | 445:14 451:14 | 516:1,4 628:18 |
| 716:15,22 | 709:2,3 733:18 | **supplies** 405:5 | 452:3 453:11 | **systems** 588:9 |
| 717:4,7,12 | **substation** | 405:18 | 457:15 459:14 | |
| 718:17 719:5 | 725:3 | **supply** 383:9 | 459:16,21 | **T** |
| 720:1,9,18 | **sudden** 605:3 | 393:14 394:1 | 460:13 462:14 | **T** 376:1,8 |
| 721:3,22 | **sued** 540:20 | 394:18,22 | 474:3 475:8 | **table** 552:14 |
| 724:15 726:9 | **suffered** 688:20 | 395:5,16 | 477:13 478:11 | 656:17 676:11 |
| 728:20 729:1 | **sufficient** | 396:11 397:1 | 482:13 483:20 | **tag** 687:15 |
| 729:11,14,20 | 551:22 | 398:8 400:14 | 486:11 488:2,7 | **take** 409:14 |
| 729:22 731:1 | **suggest** 444:19 | 401:4,12 402:2 | 493:20 514:16 | 422:12,15,18 |
| 731:11 732:12 | 444:22 681:7 | 402:10 403:21 | 520:22 527:9 | 448:7 456:11 |
| 733:13 734:3 | **suggested** | 405:13,22 | 540:2 544:12 | 493:18 524:11 |
| 734:15,20 | 731:10 | 436:21 439:21 | 549:18 550:16 | 532:10 536:7 |
| 735:1,8,14,18 | **Suggesting** | 440:3,10,12 | 564:11 566:16 | 553:8 582:10 |
| 735:22 736:8 | 633:2 | 443:17 451:16 | 572:3 577:12 | 612:16 613:1 |
| 736:21 737:4 | **suggestion** | 452:5 453:13 | 592:9 613:3 | 616:7,13 |
| 737:13,16 | 499:1 711:22 | 454:17 456:2 | 621:15 622:18 | 620:11 635:20 |
| 738:4,16 739:4 | 712:3 | 457:8 461:6 | 624:20 629:2 | 658:19 670:17 |
| 739:15,19,21 | **suggestions** | 504:6 506:20 | 641:20 643:4 | 670:19 672:6 |
| 740:2,12 | 566:19 | 564:21 566:3 | 653:6 658:12 | 673:7 676:5 |
| 741:15 742:2 | **suing** 697:1 | 567:11 571:5 | 667:2 705:3 | 681:1 723:22 |
| **Stueve's** 667:20 | 699:21 728:12 | 586:3 588:3,20 | 720:7 725:16 | 728:17 |
| 672:13 721:16 | **Suite** 373:7,16 | 640:17 703:13 | 726:14 729:6 | **taken** 448:21 |
| **stuff** 381:12 | 374:18 | 703:14 | 732:19 740:6 | 468:18 469:3 |
| 382:6 384:11 | **summaries** | **supplying** 552:1 | 741:13 | 469:10,20 |
| 386:6 429:1 | 659:10 | **support** 551:5 | **surplus** 546:9 | 470:18 471:4 |
| 572:15 727:12 | **summary** 685:6 | **supporter** | 547:11,21 | 478:22 494:1 |
| **stupid** 431:17 | 685:7 | 623:18 624:7 | 661:18,22 | 510:19 523:21 |
| **style** 566:12 | **summer** 504:11 | **supportive** | 713:3 | 539:8 559:10 |
| **subject** 438:18 | 504:14 | 600:6,17,22 | **surprise** 703:3 | 582:15 636:2 |
| 485:15 487:10 | **summertime** | 601:15 | 704:5,14 | 658:18 667:10 |
| 513:17 587:2 | 470:2 | **supposed** 483:6 | 705:21 | 744:3,6,13 |
| 590:19 592:17 | **Summit** 561:22 | 512:2 | **suspicions** | **takes** 710:8 |
| 594:3 599:1 | **supermarket** | **supposedly** | 382:16 394:10 | **talk** 440:12 |
| 614:10 647:4 | 704:6 | 523:21 590:16 | 394:12 400:12 | 524:7 556:8 |
| 664:19 665:2 | **supervision** | 603:22 | **Sweetnam** | 641:3 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                      March 6, 2014

45

| | | | | |
|---|---|---|---|---|
| **talked** 400:1,4 | **temperature** | 701:21 702:2,3 | 482:12 483:12 | 460:11 505:8 |
| 495:12,13 | 428:17 430:21 | 721:9,17 | 489:18,18 | 545:1 |
| 496:5,8,15,18 | 431:10 | 735:19 744:4,6 | 490:8 492:17 | **thoughts** 464:14 |
| 660:14,15 | **temperatures** | 744:9 | 493:13 497:17 | 611:14 |
| 661:4 741:6 | 526:4 | **text** 671:14 | 498:5 500:5 | **threat** 727:17 |
| **talking** 379:13 | **ten** 429:9 541:16 | **thank** 514:8 | 501:22 502:1,2 | **three** 392:7 |
| 440:19 458:16 | 541:19,20 | 524:6 526:11 | 504:16 507:20 | 443:7 461:2 |
| 460:19 462:12 | **term** 506:13 | 558:21 674:15 | 507:21 517:17 | 473:8 511:4 |
| 483:19 488:7 | 563:9 570:3 | 683:18 685:20 | 517:19 530:18 | 520:8 540:2 |
| 508:8,12 | 721:5 | 697:20 739:14 | 533:14 537:6 | 568:11 569:14 |
| 523:10 564:18 | **terminate** 473:3 | 740:14 | 547:5 549:2 | 582:13 588:9 |
| 606:20 700:2 | **terminated** | **Thanks** 415:3 | 556:1 557:18 | 638:10 677:18 |
| 727:16 | 413:7,10,12 | 568:15 611:20 | 566:1 571:17 | 739:2 |
| **talks** 460:18 | 467:12 472:22 | 742:2 | 573:4,10 | **Thursday** |
| 679:3 | **terms** 645:17 | **theory** 547:11 | 577:15 584:18 | 372:16 684:4 |
| **tally** 536:9,14,18 | **Terrie** 626:14 | 547:20 548:2,4 | 584:22 586:9 | **time** 378:5 |
| **tape** 449:1 | 628:14 | **thing** 382:7 | 589:2 596:3 | 380:13 381:8 |
| 521:17 522:4 | **terrorist** 728:4 | 383:10 385:2 | 603:15 616:1 | 381:15,22 |
| 522:12 523:2 | **terrorists** | 390:8 400:10 | 619:8,9 621:18 | 383:19 385:14 |
| 523:11 582:17 | 727:12 | 411:18,19 | 627:4 631:18 | 387:17 389:17 |
| 667:12 | **Terry** 596:4 | 413:2 420:16 | 639:4 640:16 | 391:8 399:11 |
| **target** 422:16 | **test** 675:8,17 | 424:13 426:4 | 640:18 642:3 | 399:17 400:12 |
| 542:2 | 676:3 | 451:5 530:19 | 642:11,13 | 402:14 407:13 |
| **targeting** 418:19 | **testified** 379:4 | 552:5 567:1 | 643:13 644:5 | 408:3,20 |
| 610:10,13,14 | 380:8,9 388:21 | 595:1 596:5 | 644:19 645:2,3 | 410:21 426:9 |
| 622:15,19 | 402:8 455:8,10 | 606:2 619:10 | 651:9 655:21 | 470:5 472:15 |
| **targets** 579:10 | 484:21 491:22 | 675:7,16 676:2 | 660:12 661:1 | 485:9 487:16 |
| **team** 429:8 | 625:13 655:15 | 685:9 | 662:12 671:9,9 | 491:16 503:6 |
| 611:11 | 657:14 672:8 | **things** 383:3,6 | 671:11,13,14 | 505:20 516:15 |
| **Technical** | 672:12,22 | 384:9 386:5 | 671:14 681:15 | 516:18,20 |
| 631:15 | 673:4 678:17 | 427:4 478:5 | 692:3 731:21 | 532:10 546:22 |
| **tell** 412:18 | 679:5 685:9 | 481:21 482:21 | 734:10 735:5 | 560:8 574:4 |
| 421:10 517:5 | 701:10 738:7 | 484:5 557:13 | 741:18 | 587:18,21,22 |
| 517:15 518:18 | **testify** 636:13 | 589:21 715:10 | **thinking** 425:17 | 588:14 596:17 |
| 621:2 638:6 | **testifying** | 721:21 740:18 | 462:4 | 600:3 601:6 |
| 652:7 668:15 | 543:13 691:17 | **think** 380:12 | **third** 405:8 | 609:18 620:5 |
| 674:7 678:10 | **testimony** 379:9 | 381:19 407:6 | 506:16 581:17 | 623:10 627:1 |
| 681:4 696:19 | 453:22 454:19 | 414:22 420:10 | 687:7,8 | 633:7,14 635:6 |
| 703:14 705:13 | 485:13 511:13 | 420:17 421:19 | **third-party** | 647:2 655:13 |
| 736:18 737:22 | 514:15 630:15 | 427:5 445:5 | 628:17 | 669:3 691:20 |
| **telling** 389:12 | 668:11 672:20 | 454:5 476:17 | **thought** 411:20 | 705:12 723:3 |
| 695:8 735:3 | 675:10 701:19 | 479:10 480:8 | 426:3,4 455:8 | 723:22 728:22 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

46

733:9 738:17
742:3
**timed** 530:4
**timeframe**
655:12
**times** 382:13
405:19 406:1
474:9,11 485:6
499:20 526:3
552:8 738:22
**timing** 388:10
441:6
**tired** 544:21
668:2,2,4
**title** 392:12,18
532:14
**today** 389:15
390:2,20 391:5
397:20 427:13
480:4 494:13
516:16 530:7
533:3 559:19
572:6,10
630:21 635:7
640:3 641:21
644:16 647:14
647:15,20
652:3 653:10
653:17,18
665:11 688:19
**Today's** 378:4
**told** 412:22
580:16 591:22
592:3,15
593:18 630:22
631:2 644:20
650:19 680:17
680:18 699:5
708:7
**tolerance**
411:21 425:5
460:12,16

**Tony** 525:4
**tool** 400:14
**top** 406:18
467:4 525:18
540:22 541:14
541:15,19,20
546:3 561:11
595:11 598:12
598:14 608:21
656:14,16
680:9 683:14
691:6,8 706:13
706:18
**topic** 392:10
435:4 447:17
636:11,13
639:19 641:4
643:8 644:9
645:1,11,11,15
657:9,12 660:3
660:13 661:7
663:3,5 665:6
665:19 666:5
**topics** 484:17
696:6,7
**tornado** 654:12
**total** 474:6
521:20 656:17
657:10,20
658:1,13
**totally** 484:13
**totals** 658:8
**tough** 717:1
**tower** 724:2
**track** 585:12
**trade** 390:13
665:17
**trading** 583:20
584:13
**training** 631:20
**transcript** 743:4
**transcription**

743:10,15
**transformers**
673:5 723:20
**treat** 502:7
574:12 576:22
604:8 606:4
**treated** 589:21
**treating** 576:17
605:13
**treatment**
730:21
**tremendous**
393:10 395:14
**trend** 403:15
**trick** 626:11
**tried** 499:20
517:14 552:8
681:17,21
**trough** 411:14
418:10
**troughs** 408:17
**truck** 673:1
674:12 721:13
722:2 723:1,12
**trucks** 421:1
728:7
**true** 420:2 743:9
743:14 744:9
**truly** 382:19
579:6
**trust** 435:10
578:5
**truth** 694:4
**try** 398:17 454:5
479:22 499:18
512:10 527:7
529:7 616:2
668:1,4,7
702:3
**trying** 388:10
407:4 442:13
516:20 538:1

601:9 602:17
610:13 612:16
620:10 660:12
678:9 728:3
**Tuesday** 574:21
679:4
**turn** 392:6,8,11
435:3 442:18
461:20 473:7
476:13 480:18
482:14 486:1
486:20 541:13
550:5 569:4
583:12 636:11
646:1 656:10
663:3 687:6
691:5
**TWENTY-NI...**
372:3
**twice** 732:9
**twist** 620:10
**two** 374:9 412:9
412:9 445:18
449:1 473:13
476:13,16,19
486:14 510:16
516:15 521:17
522:4,13,19
523:12 533:4
540:2 545:6
575:12 584:18
595:12 619:12
636:12,13
638:18 663:14
663:17 669:21
672:1 677:9,18
689:11 706:3
739:2 740:18
**two-thirds**
530:8
**type** 382:7
384:11 385:2

542:14 616:3
627:17 638:21
**typed** 701:13
**types** 533:4
638:15 642:14
**typewriting**
744:8
**typically** 409:1
**typing** 576:1

—————————
**U**
**U.S** 615:21
**UE** 377:9,10,13
377:16,20
552:20 553:6
558:2 583:1
598:6 629:7
690:19
**UEP** 379:13,14
379:19 380:4,5
382:10 383:21
385:18 386:9
386:18 387:12
387:17,18
388:14,15
389:1,18 390:7
390:16 391:7
391:17 395:4
399:20 400:5
400:20 401:2,8
405:6 416:6
417:4 420:4
425:9 432:10
433:8 434:14
435:9,13,15
446:15 450:14
451:1,9 456:20
467:13 478:13
489:8,13,17
490:2,5,16
493:9,12,15
495:14 496:9

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

47

| | | | | |
|---|---|---|---|---|
| 496:19 497:9 | 674:22 675:6 | **underlying** | 455:22 477:21 | **use** 440:20 |
| 498:2,7,8 | 675:16 676:2 | 394:7,17 395:4 | 498:7 501:7 | 475:19 490:1 |
| 499:11,22 | 677:2,11 | 400:9,13 | 548:17 | 506:13 512:19 |
| 500:19 501:3 | 679:10 680:13 | 401:12 402:1,9 | **unexpected** | 513:10,12 |
| 501:12 502:16 | 680:13,18 | **undermine** | 436:1 | 514:1 518:21 |
| 503:19 506:21 | 686:20 688:18 | 702:4 | **unfair** 454:6 | 521:2 541:5,7 |
| 507:17 508:22 | 688:21 689:2,3 | **undermining** | **unfit** 428:12 | 587:3 589:6 |
| 509:7 525:8,12 | 689:17 691:11 | 612:13 | **United** 372:9 | 590:9,20 |
| 541:9,9 542:16 | 693:19 701:2 | **underneath** | 374:3 379:13 | 592:19 594:4,9 |
| 543:2 548:18 | 702:21 703:7 | 716:9 718:3 | 379:15 380:18 | 594:11 611:4 |
| 549:1 554:10 | 704:15 706:1,8 | **understand** | 381:3 391:16 | 615:19 616:1 |
| 556:15 560:16 | 708:14 714:2 | 379:9,14 | 394:13 396:9 | 616:14 625:4 |
| 561:12 567:1 | 714:18 715:16 | 397:15 398:5 | 402:18 403:1 | 630:13 |
| 568:4 571:3 | 716:1,9,17 | 421:8,11,16 | 434:19,22 | **USEM** 405:18 |
| 574:5,7,15 | 718:20 719:4 | 480:5,6 482:6 | 441:7 442:4,14 | 405:22 546:9 |
| 575:1 576:6,7 | 724:8 725:6 | 488:11 489:20 | 443:8 542:22 | 546:14,20 |
| 583:10 584:5 | 730:16,19 | 493:2 503:3 | 571:4 583:2 | 547:1 661:8 |
| 587:4,9,19 | 734:13 736:16 | 508:1 544:17 | 595:21 603:22 | 662:17,19,22 |
| 588:14 590:17 | 736:18 738:2 | 545:2,3 556:4 | 621:7 625:22 | 666:1,11,15 |
| 590:21 592:13 | 741:19 | 562:21 564:15 | 626:14 629:18 | 741:19 |
| 592:19 593:18 | **UEP's** 388:14 | 705:9,13 | 632:11 636:21 | **uses** 496:10,20 |
| 594:5,20 | 435:14 487:19 | **understanding** | 637:2 661:20 | 579:9 |
| 595:18 601:7 | 487:20 509:18 | 380:17 381:7 | 697:18 708:13 | **usually** 530:18 |
| 601:13 602:6 | 555:18 583:16 | 381:11 385:11 | **unpriced** 503:22 | 708:7 |
| 603:2,6 604:11 | 584:8 593:1 | 385:13 386:9 | **Unsold** 503:22 | **utilize** 589:8 |
| 607:7,14 | 680:21 681:1,4 | 387:15 456:5 | **unusual** 703:21 | **utilizing** 591:8 |
| 609:16 611:1 | **Uh-huh** 392:14 | 478:2 486:17 | **upcoming** 616:7 | |
| 612:13,17 | 428:9 476:21 | 488:4 552:3 | 616:13 | **V** |
| 613:2 621:7,13 | 481:12 504:13 | 556:22 557:2 | **upset** 590:7 | **V** 372:8 |
| 622:8 623:10 | 600:10 | 563:10 564:10 | 596:17 602:16 | **vague** 482:4 |
| 623:18 624:7 | **ultimately** | 586:13 588:6 | 607:13 | 721:8,17 |
| 625:14 627:1 | 433:10 446:14 | 618:16 625:19 | **urging** 624:15 | **Vaguely** 494:14 |
| 627:22 630:17 | 493:8 501:9 | 627:15 630:10 | **urine** 431:6 | 560:6 585:5 |
| 631:4 632:11 | **uncertified** | 630:12 640:2 | **Urner** 583:3,21 | 714:3 |
| 632:14 634:1 | 578:20 579:1 | 656:22 687:3 | 584:13 | **value** 403:15,19 |
| 634:11,22 | 732:3,6 733:3 | 689:7 722:20 | **USDA** 610:2,2 | **Vanessa** 374:16 |
| 635:14,15 | 733:6 | **understands** | 611:3,3,4 | 449:14 |
| 660:15,20 | **underlined** | 403:5 | 614:11 616:8 | **variance** 585:9 |
| 661:3 666:1,11 | 428:7 430:16 | **understood** | 616:13,21 | **variation** 707:5 |
| 666:15 668:8 | 673:10 | 386:14 387:10 | 618:16,17,19 | **variations** |
| 668:13,16 | **underlining** | 387:13 397:16 | 620:7 622:11 | 706:13 |
| 669:5,14 | 427:17 | 416:5 417:3 | 656:18 | **various** 466:14 |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

48

513:19 625:21
628:16 638:9
660:21
**verbal** 389:12
**verbatim** 569:12
572:15
**verification**
385:4 622:11
**verified** 389:16
611:5 616:22
622:12
**verify** 384:19
385:18 386:2
484:1
**Vernon** 646:6
646:12 725:20
**version** 519:13
519:13
**versus** 532:15
689:2
**viable** 527:7
529:8
**vice-president**
629:18
**video** 483:5,19
484:1,5,6,10
484:17,22
485:19 511:12
511:16 512:11
512:15,19
513:12,20
514:10,13,20
515:4,19,21
517:16 519:21
521:14,15
522:21
**videographer**
378:2 448:19
448:22 493:21
494:2 510:15
511:3 524:13
524:17 559:8

559:11 582:12
582:16 635:22
636:3 667:7,11
668:3 742:4
**videos** 513:13
513:18
**videotape** 378:3
481:22 482:21
510:16 511:4
516:3,4,10,22
522:19 523:19
582:13 667:8
**videotaped**
378:4 742:5
**view** 551:12
**views** 542:9
**violated** 426:21
455:6
**violating** 447:18
455:5
**violation** 417:11
420:3,7 424:2
425:14 477:15
477:18 730:17
**violations** 575:4
579:7
**violence** 673:4
674:21 721:5
**visit** 410:4 536:6
**vocal** 463:19
**Voices** 391:16
394:13 396:9
402:18 403:1
434:19,22
441:7 442:4,14
443:8
**volume** 372:12
378:3 512:8
**voluntarily**
579:6
**voluntary**
711:22 712:3

**volunteer** 401:1
**volunteered**
472:3
**vote** 457:3 525:8
709:22 713:8
739:12
**voted** 451:6
457:5,6,8
490:12 491:1,6
606:1 692:15
**voting** 450:18
450:20 451:5
**VP** 635:14

## W

**wait** 398:17
580:8 592:12
606:13 683:8
687:13 697:21
**waived** 681:16
742:7
**Wal-Mart** 444:2
621:8,16
623:16 624:5
624:15 625:21
**walk** 442:13
536:7
**walked** 410:2
660:6,19,21
663:14 666:8
**walking** 482:15
**walls** 547:10,20
**want** 389:6
401:19 402:12
414:19 419:18
420:21 423:9
431:19 437:12
437:15 463:3
472:17 485:11
490:16,18
497:10 508:14
511:16 513:7

515:7 517:20
519:13 520:21
529:14,19
544:11 550:15
572:9 588:7
589:5 604:21
604:22 605:20
607:18,20
608:2,15 609:3
628:13 650:21
674:14 679:7
685:22 695:11
695:15 706:21
707:9 709:8,19
721:10 729:9
737:14 740:6
741:12
**wanted** 394:21
396:15 401:2
444:3 455:18
463:22 493:14
502:4,5,7
576:16 588:8
588:10,13,15
589:8,21 604:3
604:4,17,18
606:6 607:5
659:4 699:20
**wanting** 413:14
**wants** 397:11
532:6 701:22
**warfare** 673:10
674:11,16
**warning** 377:7
533:2,5,8,12
533:17 534:13
534:16 535:5
535:15 538:12
538:21,22
540:8,22
541:16 543:12
544:4,13

**Washington**
372:13,19
373:17 611:11
**wasn't** 412:2
469:17 484:8
514:22 549:18
563:2 584:2
608:7 645:9
721:17 735:1
735:10
**waste** 633:6,14
**watching**
515:10
**water** 479:13
515:12,22
673:5 724:2
726:1
**way** 403:1
409:14 416:16
420:5,6 448:8
465:7 468:10
490:8 497:22
532:21 551:5
590:4,4 597:7
604:5,6,6
605:5,6 611:22
674:13 679:14
705:17 707:22
**WAYNDOTTE**
372:1
**ways** 489:1
602:13 604:4
**we'll** 380:2
423:7 553:4
555:6 668:4
676:10 682:2
698:2 712:21
713:21 729:9
741:20
**we're** 396:9
458:15 459:10
482:13 524:11

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

49

532:11 553:19
554:8 557:18
562:4 593:4
608:14 609:2
655:21 674:11
676:16,21
689:9 708:7
741:1,13
**we've** 392:1
440:18 449:8
456:7,17 462:6
495:11 507:19
511:11,15
520:8 585:1
606:20 612:14
633:14 636:19
642:17 656:7
658:11 660:10
674:12 676:18
692:6 693:5
728:18 739:1
740:16
**weather** 434:9
**website** 537:3
538:17 722:16
**week** 591:2
593:11 658:3,4
**weekly** 657:19
658:15,16
659:2,9,11
**weeks** 413:14
545:6 711:19
712:12
**weigh** 418:7,8
**weighed** 422:14
**weighs** 418:17
418:19
**weight** 414:21
415:15 416:9
417:7,17
418:11,13,16
419:20 422:10

422:13,19
424:4 425:8
426:21 445:1
459:3 460:20
486:5
**weights** 458:14
**welfare** 380:10
394:2,5,17,22
399:21 425:6
425:10 428:11
429:15 432:9
436:11 438:19
439:13 442:9
443:10 444:16
446:8 459:13
460:12,19
478:3 487:19
488:15 492:15
502:8,9 574:20
589:7 590:1,2
590:9 591:7
592:5 601:11
601:16 603:17
603:21 604:2,7
604:11 605:8
606:6 608:16
609:3,19 610:4
610:5,18,20
629:22 630:8
630:11 674:14
675:1 679:3
**went** 409:1,22
410:7 420:15
441:16 505:9
539:10,11
572:14 601:22
699:3 722:15
**weren't** 382:22
408:14,20
468:21 499:21
658:12 735:8
**Wesner** 525:5

**Whaley** 621:11
622:6
**white** 408:13
409:1 504:19
535:15 537:2
540:15 648:2
684:16,17,18
**whites** 504:10
504:15,16
**Whitney** 374:7
740:21
**whittle** 666:22
**Wholesale** 372:5
706:15 707:7
707:11
**willing** 576:13
**Wilson** 570:22
572:11 581:19
581:21,22
582:3,6 664:3
664:9
**winter** 526:2
**Winterset**
521:20 522:4
648:16,16,18
**wintertime**
433:20
**wisest** 596:5
**wished** 502:2
**wishing** 632:17
**wit** 397:15
**withholding**
458:17
**witness** 379:2
384:5,8 386:4
387:2 388:5
392:14 395:9
395:20 396:3
397:11,13,19
398:11,18
401:16 402:5
404:3,10 406:4

412:8,21
413:21 415:18
416:2 418:6
419:14 421:7
421:15 423:2
424:6 426:3,14
427:21 429:6
430:4 432:16
432:21 437:4
437:11 438:2
438:14 440:1
440:15 441:2
443:22 444:12
445:5,14
446:11,18
447:4,9,16
449:6,13
451:19 452:8
452:15 453:22
454:4,7 456:10
457:1,15,19
458:6 459:6
460:18 461:10
461:17 462:21
464:6,13
465:22 468:8
470:13 472:14
472:22 474:3
476:4 482:12
483:4,12,20,22
485:2,5,8,19
487:1 495:18
496:3,13 497:1
497:17 498:11
498:17,20
500:4,11
501:14,22
502:22 505:6
505:19 507:3
509:10 510:2
512:12,14
513:11,12

514:9,20
515:11 516:13
517:2 519:4
520:10 522:7
522:15 524:2,9
524:15 529:7
532:5,7 535:7
545:4,9,21
549:8 550:9
551:17 553:17
563:18 567:6
587:15 588:6
589:2,17
590:12 591:12
591:19 592:9
593:8 594:2,14
595:3 597:17
607:1 608:18
609:5 610:12
611:7 618:6
619:4 620:16
622:18 624:19
625:10,18
626:17 627:4
633:9,17,20
634:19 635:2
635:19 640:16
644:1,4 647:3
652:9 666:20
668:21 669:9
669:10 670:10
672:18 679:19
683:5,7 693:7
694:5 695:2,16
695:16,18,21
698:17 700:17
701:20 702:13
703:9,11 704:5
704:17 705:2
705:14 706:6
708:20 710:6
710:22 711:9

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II                                    March 6, 2014

50

| | | | | |
|---|---|---|---|---|
| 711:16 716:13 | 426:22 470:20 | 499:9 512:2 | 718:6,16 | 471:12,13,16 |
| 717:11 718:15 | 480:11 552:9 | 528:20 541:11 | 719:10 721:2,7 | 477:12 479:2 |
| 719:1,19 720:7 | 634:21 708:16 | 547:22 548:3 | 722:4,10 | 481:17 486:6 |
| 720:16 721:2 | **Wright** 372:18 | 550:21 553:14 | 724:20 725:1 | **zeros** 471:22 |
| 721:20 724:12 | 373:14 378:16 | 556:1 557:14 | 726:1 729:11 | **Zimmer** 605:22 |
| 726:8 728:1,11 | 378:19 | 557:18 562:17 | 730:12 734:17 | |
| 728:17 730:19 | **write** 413:17 | 565:4 566:9 | 739:10 740:5 | **0** |
| 731:8 733:12 | 482:17 490:19 | 567:12 571:16 | **year** 441:19 | **0000069** 552:20 |
| 734:1,17 | 536:10 703:13 | 574:3 581:4 | 442:10 444:3 | **0000069-70** |
| 735:15 737:1 | 704:7 705:20 | 585:20 586:15 | 504:15,15,19 | 377:9 |
| 737:11 738:6 | **writing** 399:13 | 587:6 590:13 | 523:15 528:21 | **0000071** 558:2 |
| 744:4,6,10 | 609:1 719:2 | 595:19,22 | 577:6 650:22 | **0000071-72** |
| **witness's** 475:12 | **written** 538:20 | 596:15 597:3 | 657:9 722:7 | 377:10 |
| 485:12 517:14 | 626:19 672:1 | 598:1,14,18 | 724:7 | **0001079** 689:14 |
| 643:14 702:2 | 679:13 722:14 | 601:9,18 602:3 | **year's** 385:14 | **0001474** 526:13 |
| **witnesses** | 727:5 | 608:10 609:17 | **yearly** 658:8 | **000174-75** 377:4 |
| 517:13 | **wrong** 426:6 | 609:21 610:8 | **years** 382:5 | **000284** 626:8 |
| **wonderful** | 505:13 618:4 | 612:18 613:15 | 383:16 404:19 | **000284-85** |
| 692:22 | 651:8 687:14 | 614:1,5,9 | 405:17 451:1,9 | 377:19 |
| **word** 430:15 | 687:14,17 | 616:11 619:22 | 458:12 501:9 | **0007213** 377:5 |
| 569:12,12 | **wrongdoing** | 621:9 623:11 | 520:8 547:2 | 529:13 |
| 593:16 | 616:3 | 624:13 626:10 | 635:11 655:10 | **0009116** 531:10 |
| **wording** 701:10 | **wrote** 397:11 | 626:21 627:5 | 655:10 660:19 | **0009116-919** |
| **words** 469:8 | 411:22 454:3 | 627:10,21 | 722:19 723:5 | 377:6 |
| 509:10 628:18 | 505:13,13 | 628:4,9,21 | 724:9,13 725:7 | **0017617** 376:14 |
| 640:14 672:1 | 507:22 509:15 | 630:3 631:7,17 | 725:10 726:5 | 438:9 |
| 689:3 701:11 | 509:16 530:1 | 632:8,20 634:3 | **Yep** 714:11 | **0019049** 376:15 |
| **work** 405:9 | 534:12 536:15 | 637:4 648:20 | 738:15 | 449:10 |
| 478:4 596:3 | 537:9 618:4 | 651:15,19 | **yesterday** | **0034691** 376:20 |
| 597:17 600:2 | | 654:9 656:4,12 | 379:12 484:18 | 503:8 682:12 |
| 603:15 | **X** | 673:18 683:12 | 575:5 652:4 | **0034892** 376:18 |
| **worked** 407:16 | **X** 376:1,8 | 684:18 687:16 | 660:7 | **0035814** 494:6 |
| 407:17 521:19 | | 691:9 692:21 | **yesterday's** | **0035814-16** |
| 521:20 522:3 | **Y** | 697:3,7,10,13 | 511:13 | 376:19 |
| 628:1 | **yakking** 597:20 | 698:17,21 | **York** 689:1 | **0035857** 586:20 |
| **works** 740:11 | **yeah** 407:20 | 699:4,7,13,17 | | **0038374** 595:10 |
| **world** 480:11,12 | 430:17 433:4 | 700:12 703:1,2 | **Z** | **0038374-77** |
| **worried** 460:7 | 448:18 450:5 | 709:18 710:6 | **zero** 411:21 | 377:15 |
| **worst** 535:19,21 | 451:12,12 | 710:15 711:3 | 425:5 460:12 | **0039139** 376:21 |
| 536:21 537:1,4 | 460:10 461:4 | 711:22 713:15 | 460:16 466:10 | 506:3 |
| 538:3,10 | 462:20,22 | 714:7,17 | 468:5,19 469:4 | **0039242** 377:8 |
| **wouldn't** 409:2 | 466:17 474:13 | 715:14,18,20 | 469:12,13,15 | 545:16 |
| | 482:8 494:14 | | | |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

51

**004766** 620:21
620:22
**004766-70**
377:18
**0067466** 457:22
**0067466-67**
376:16
**0067468** 669:22
**0067469** 669:22
**0067638** 399:3
**0067638-639**
376:10
**0068166** 427:10
**0068166-167**
376:13
**0071690** 465:19
**0071690-74**
376:17
**0080669** 377:12
573:21
**0080674** 678:21
**0082871** 376:12
414:12
**0084872** 376:11
406:10
**0085507** 686:5
**0085508** 688:12
**0085511** 687:11
**01200644**
570:10
**01200644-46L**
377:11
**02** 401:21
406:21
**020105** 583:1
**020105-07**
377:13
**0295185** 377:20
629:7
**06** 492:12
583:12
**07** 583:1

**0707359** 598:6
**0707359-365**
377:16
**07932299**
690:19
**08** 486:1 664:13

**1**
**1** 462:17 477:5
648:19 651:14
653:8,9 654:3
654:11 689:18
690:5
**1.2** 656:5
**1.3** 655:21 656:5
**1.5** 540:13
646:16 647:21
648:6 649:4,10
**1.7** 650:5
**1/1/2006** 450:10
453:1
**1:23** 511:2,5
**1:39** 524:14
**1:42** 524:18
**10** 666:22
724:13 725:10
728:18 740:16
**10:31** 448:20
**10:50** 449:2
**100** 385:6
408:14 471:18
487:21 488:1,2
488:5,7,12,21
489:3,5,15,21
491:1,6 493:1
493:11,16
494:18 495:8
495:12 496:6
496:16 499:1
500:15 501:10
502:6 574:16
576:14,20

577:3,5 580:5
580:10 584:3
586:2 588:19
596:19,20
602:11 605:9
605:15 606:5
606:19 607:14
608:7 610:6,20
616:15 623:22
624:11 730:15
731:3,13
**10CV2171**
372:8
**10th** 574:21
679:4
**11** 481:11
553:22 656:14
656:16
**11:45** 493:22
**11:53** 494:3
**110** 402:17
471:18
**1100** 374:18
**111** 461:20
462:2,3,7
689:13,21
690:10,14,17
691:5,6 692:6
692:9 709:16
**1110** 373:16
**117** 690:15,18
690:20 692:3,9
692:16 709:17
709:18 710:13
711:5 738:12
**12** 434:20
442:16 635:11
**12/10/03** 548:7
**12:17** 510:17,18
**120** 408:4
**13** 393:5 395:16
396:10 397:1

521:21 549:14
**134** 559:5,15
568:21 684:20
685:2,13,14
688:1,5 713:13
713:14 714:10
714:11
**14** 549:14 670:3
744:18
**1474** 527:4
**15** 438:11,20
466:20 519:20
530:4 550:9
667:5 682:13
682:20 683:13
**150** 653:19
**151** 656:15
**15th** 611:13
684:5 719:8
**16** 473:14 494:7
561:13,17
562:8 599:5
645:11
**167** 427:10
**16th** 627:20
**17** 525:4 657:9
657:12
**170** 460:7,8
**180** 653:19
**19** 547:17 660:3
**1900** 372:18
373:15
**19049** 449:11
**19103-2799**
374:11
**1970** 688:21
**1973** 646:5
**1978** 647:7
**1984** 647:16
**1985** 648:1
**1986** 648:8
**1987** 648:15

**1989** 648:21
**1990** 645:12
**1991** 649:6
**1992** 569:2,6
663:11 686:12
688:5
**1993** 649:12
**1994** 650:9
**1995** 651:5
**1998** 651:16
**1999** 645:19
647:3 652:13
653:3 723:9

**2**
**2** 435:3 477:5
640:13 648:13
650:1 655:17
712:7
**2.7** 429:9
**2:28** 559:9
**2:38** 559:12
**20** 383:16
473:15 660:13
**200** 373:7
422:18 478:17
**20006** 373:17
**2001** 677:3,10
723:9
**2002** 379:18
380:4,18 381:1
383:19 387:16
388:12,13,22
389:8,16 390:7
390:22 391:8
391:18 394:14
400:17 401:7
410:14 583:7
585:22 631:3
653:11 670:3
722:21 723:2,6
723:8,8 726:6

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

52

| | | | | |
|---|---|---|---|---|
| **2003** 402:20 | **2012** 530:4 | **3** | **3rd** 613:20 | **50** 385:4,8,12,13 |
| 404:14 414:14 | 531:3 | **3** 643:8 644:9 | 616:10 | 385:14 468:19 |
| 426:18 632:14 | **2013** 519:20 | 647:11 654:18 | | 469:4,7,11,16 |
| 634:2 635:8 | 523:16 699:15 | 654:21,22 | **4** | 469:21 470:14 |
| **2004** 434:20 | 700:15 702:16 | 712:11 | **4** 402:20 404:13 | 470:19 471:4 |
| 438:11,20 | 707:19 708:14 | **3.5** 654:19 | 473:15 558:3 | 479:1 548:9 |
| 441:7,13 442:4 | 740:9 | **3:08** 582:14 | 667:8 686:12 | 549:3 |
| 442:11,16 | **2014** 372:14,16 | **3:22** 582:18 | 688:4 711:19 | **503** 376:20 |
| 443:4,5 558:3 | 378:5 | **30** 414:21 | **4:21** 530:4 | **505** 376:21 |
| 558:11 561:13 | **2015** 744:18 | 415:14 416:9 | **4:31** 636:1 | 562:4,7 568:11 |
| 561:17,17,22 | **202** 373:18 | 417:6,18 | **4:51** 636:4 | 568:14,21 |
| 562:8 565:3 | **20th** 439:1,14 | 419:20 424:3 | **40** 480:10 | 714:9 |
| 568:8 569:9 | 442:10 443:4 | 425:8 426:21 | 549:13 613:12 | **507** 569:4 |
| 653:20 654:6 | **21** 527:20 | 445:1 459:4,12 | **406** 376:11 | **51.2** 474:18 |
| 663:10 715:19 | **213** 585:22 | 470:2 480:9 | **414** 376:12 | **511** 569:13,15 |
| **2005** 458:8 | **215** 374:12 | 527:6 528:1,9 | **427** 376:13 | **514** 376:22 |
| 462:8,17 466:3 | **21st** 528:16 | 528:18 | **43** 473:14 | **517** 377:1 636:7 |
| 470:2 472:10 | **22** 657:16 659:2 | **30(b)(6)** 640:19 | **438** 376:14 | **518** 392:19 |
| 480:22 654:13 | 659:11 661:7 | 647:2,5 695:16 | **44** 545:17 | 645:22 |
| 689:18 690:5 | **224** 374:18 | 695:20 | **449** 376:15 | **519** 377:2 |
| **2006** 451:1 | **22nd** 583:14,17 | **30,000** 408:4 | **45** 549:13 | **523** 656:10 |
| 457:4 472:12 | 584:10 616:17 | **300** 450:9 453:1 | 588:11 607:6 | **524** 377:3 |
| 546:17,20 | **237** 391:15 | 478:17 | **45.7-square** | **526** 377:4 |
| 547:17 560:4 | 392:6 | **3000** 374:9 | 473:21 | **529** 377:5 |
| 574:1 576:9 | **24** 414:13 677:3 | **305** 609:8,10 | **457** 376:16 | **531** 377:6 |
| 599:5 661:10 | 677:10 | 613:13,17,18 | **46** 570:10 | **532** 678:3 |
| 661:13 678:5 | **248** 434:18 | 615:3 | **460** 373:7 | **535** 676:6,21 |
| 679:2 682:13 | 441:6,9,12 | **30th** 406:21 | **465** 376:17 | 677:4,5 |
| 682:20 683:13 | **25** 473:13,14 | 600:8 | **48** 588:11 | **536** 669:18,20 |
| 685:4 719:8 | 474:12 525:8 | **31** 458:8 | **483** 537:8,9 | 669:21 670:9 |
| **2007** 525:4,16 | 525:19 527:6 | **312** 374:20 | **483s** 538:6,11 | 676:8 |
| 613:20 614:3 | 527:22 528:9 | **315** 548:6 | **492** 376:18 | **538** 376:10 |
| 616:17 618:9 | 528:18 | **320** 473:15 | **494** 376:19 | 399:2,4 |
| 620:8 | **250,000** 655:22 | 474:7 | **4th** 404:14 | **539** 376:11 |
| **2008** 393:19 | **26** 663:3 | **322** 486:20 | 569:6 | 406:6,10,12 |
| 394:3 622:2 | **27** 620:8 665:6 | 487:4,8 | | **540** 376:12 |
| 655:12,13 | 665:14 | **33** 665:19 | **5** | 414:6,10 |
| 665:4 | **277** 446:22 | **34892** 492:7 | **5** 505:9 655:10 | **541** 376:13 |
| **2010** 521:19,21 | 448:12 | **360** 599:14 | 655:10 667:12 | 427:6,10 |
| 655:13 | **27th** 401:7,21 | **365** 598:6 | 679:1 711:21 | **542** 376:14 |
| **2011** 527:20 | **285** 626:8 | **379** 376:2 | 712:12 | 438:5,6 442:8 |
| 528:5,16 | **2H** 639:19 | **399** 376:10 | **5:27** 667:8 | 442:18,19 |
| | | | **5:47** 667:13 | |

HIGHLY CONFIDENTIAL

Rust, Marcus - Vol. II

March 6, 2014

53

| | | | |
|---|---|---|---|
| 443:1 445:4 | **558** 377:8 | **573** 377:12 | **734** 376:5 |
| **543** 376:15 | 545:12,16 | **582** 377:13 | **739** 376:6 |
| 377:7 449:9,16 | **559** 377:9 | **586** 377:14 | **74** 465:19 578:7 |
| 449:20 452:18 | 552:16,20 | **595** 377:15 | **741** 377:22 |
| **544** 376:16 | 555:10 | **598** 377:16 | **75** 526:13 |
| 457:20,22 | **56** 393:9 395:14 | **5th** 569:1 678:5 | **77** 595:10 |
| 458:2 | **560** 377:10 | ——— | **778-3000** 373:18 |
| **545** 376:17 | 557:20 558:2 | **6** | **78** 646:19 |
| 377:8 465:15 | **561** 377:11 | **6** 372:14,16 | **7th** 614:3 |
| 465:18 | 570:6,10 | 378:5 645:1 | ——— |
| **546** 376:18 | **562** 377:12 | 655:10 712:12 | **8** |
| 492:3,7 | 573:17,20 | **60** 607:6 | **8** 654:4 |
| **547** 376:19 | 575:11 581:7 | **60.2** 475:20 | **80** 607:8 628:12 |
| 494:6,8 549:21 | 678:7 679:1 | **60604** 374:19 | **80438** 613:12 |
| 549:22 | 729:16 730:1,3 | **613** 377:17 | **80438-40** 377:17 |
| **548** 376:20 | **563** 377:13 | **62** 678:7 | **815** 550:5,11 |
| 503:8,9 682:11 | 582:19 583:1 | **620** 377:18 | **816** 373:9 |
| 682:11,16,19 | **564** 377:14 | **626** 377:19 | **817** 392:12 |
| 683:1,2,16 | 586:16,20,22 | **629** 377:20 | **818** 392:7 |
| 719:7 | **565** 377:15 | **639** 399:3 | **85** 542:9 |
| **549** 376:21 | 595:6,10,12 | **64112** 373:8 | **85505** 561:9 |
| 505:21 506:3,4 | **566** 377:16 | **65** 542:21 | **8th** 685:4 |
| 683:15 | 598:2,6,12 | **660-7600** 374:20 | ——— |
| **550** 376:22 | 607:11 | **667** 376:3 | **9** |
| 514:5 515:8,17 | **567** 377:17 | **67** 458:1 | **9:08** 372:17 |
| 517:10 | 613:8,12 614:2 | **670** 575:11 | 378:6 |
| **551** 377:1 | 618:1,13 | **674** 730:7,8 | **90** 530:8 708:17 |
| 517:21 518:3 | **568** 377:18 | 732:20 733:14 | **900,000** 654:4 |
| **5511** 687:11 | 620:17,21 | **675** 573:21 | **919** 531:10 |
| **552** 377:2,9 | 621:1 | **693** 377:21 | **95** 498:22 576:9 |
| 519:7,11,15,16 | **569** 377:19 | **698** 376:4 | 577:5 |
| 519:18 678:6 | 617:13,18 | ——— | **97** 476:13,16,19 |
| **553** 377:3 | 618:3 626:3,7 | **7** | 476:20 |
| 524:21,22 | 626:9,12 | **7** 618:9 650:4 | **98** 653:5 |
| **554** 377:4 | **570** 377:11,20 | **7:00** 742:6,8 | **981-4000** 374:12 |
| 526:13,14 | 629:3,7 | **70** 552:20 | **99** 653:5 |
| **555** 377:5 529:9 | **571** 377:21 | 620:21,22 | |
| 529:13 | 693:3,6 696:18 | **700** 473:7,8,10 | |
| **556** 377:6 531:6 | 734:10 739:22 | **707** 480:17,18 | |
| 531:9 | 740:3 | 480:19 | |
| **557** 377:7,10 | **572** 377:22 | **70s** 646:22 | |
| 543:7,10 | 741:21,22 | **714-7100** 373:9 | |
| | | **72** 558:3 | |