# ATTACHMENT 60

1                    IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4

5    IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
6

7                              - - - - -

8

9                         PHILADELPHIA, PA

10
                           MAY 14, 2018
11                          DAY NINE

12
     BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14
                              - - - - -
15
                         TRIAL TRANSCRIPT
16
                              - - - - -
17

18

19

20
                  KATHLEEN FELDMAN, CSR, CRR, RPR, CM
21                Official Court Reporter
                  Room 1234 - U.S. Courthouse
22                601 Market Street
                  Philadelphia, PA  19106
23                (215) 779-5578

24

25       (Transcript produced by mechanical shorthand via C.A.T.)

22

```
1              THE COURT:  Yes, okay.  Well, better you than me.
2   Go on in there.
3              Can we bring Mr. Rust back?
4              (Witness resumes the stand.)
5              THE DEPUTY CLERK:  All rise.
6              (Jury in.)
7              THE COURT:  Okay, everybody, please take your seats.
8   Good morning, folks.  Thank you very much for being here on
9   time.  We've been working.  It was a little slower than I had
10  hoped it would be this morning.  I hope you all had a very
11  nice weekend, even though the weather was stinky yesterday.
12  Here we are.  Mr. Rust is back on the stand.
13             Sir, you're still under oath.
14             THE WITNESS:  Yes.
15             THE COURT:  And we may resume.
16             MR. NEUWIRTH:  Good morning, Your Honor.
17             Good morning, Mr. Rust.
18             Good morning, ladies and gentlemen.
19               DIRECT EXAMINATION (CONTINUED)
20  BY MR. NEUWIRTH:
21  Q.   Mr. Rust, let's pick up where we left off on Friday
22  afternoon.  And just to reorient ourselves as to where we
23  were, do you recall acknowledging on Friday afternoon that you
24  had testified under oath earlier in the case, that the UEP
25  Certified Program never made the animal rights groups happy?
```

23

```
1   A.   Yes.
2   Q.   Okay.  Now, it's true, isn't it, that even after joining
3   the program, you still tried to hide from the activists what
4   actually happened to the hens, correct?
5   A.   No.
6   Q.   Let's take a look at your deposition transcript
7   from this case, which I believe you have before you.  And I'd
8   appreciate if you could turn to page 55 in that transcript.
9              And you'll see there a reference to Exhibit 2, which
10  is the United Voices newsletter.  That's down towards the
11  bottom of the page around line 17.  And do you see there's a
12  Bates range given there for this newsletter?  I can represent
13  to you --
14  A.   Which line are we talking?
15  Q.   This is on page 55, line 17.
16  A.   Okay.
17  Q.   And do you see it says, Exhibit 2, United Voices
18  newsletter, Bates UE0875297 to 304, was marked for
19  identification?  Do you see that?
20  A.   Yes.
21  Q.   Okay.  And I can represent to you that that document is
22  already in evidence here in this case.  It's Plaintiffs'
23  Exhibit 113, which has previously been admitted.
24             MR. NEUWIRTH:  And so, in light of that, Your Honor,
25  I'd like to put that exhibit up again as a point of reference
```

24

```
1   for this discussion.
2              THE COURT:  Agreed that it's the right designation?
3              MR. KING:  No objection.
4              THE COURT:  Okay.
5              MR. KING:  It was offered for a limited purpose.
6              THE COURT:  Go ahead.
7              MR. NEUWIRTH:  Thank you.
8              So if we could put up Plaintiffs' Exhibit 113.
9   BY MR. NEUWIRTH:
10  Q.   And do you see that this is a United Voices newsletter
11  dated September 11, 2003, correct?
12  A.   Yes.
13  Q.   And that would be approximately a year or so after Rose
14  Acre had joined the United Egg Producers Certified Program at
15  some point in 2002, correct?
16  A.   You're saying this was 202?
17  Q.   No, this is September 2003.
18  A.   Yes, that would be about a year or so after, a year and a
19  half.
20  Q.   Okay.  About a year and a half after Rose Acre had
21  already joined the program.
22             And do you see that on the bottom of the first page,
23  there's an article with the title Don't Screw Up a Good Thing.
24  Do you see that?
25  A.   Yes.
```

25

```
1   Q.   Okay.  And if you look at the second page, the end of
2   that story, do you see that the last line in the story says --
3              MR. NEUWIRTH:  If you can pull it up so I can read
4   it?  I apologize.  I'm just going to walk over.
5   BY MR. NEUWIRTH:
6   Q.   It says:  One sure way of having poorer egg prices is by
7   increasing egg supplies through holding hens longer and
8   keeping hens that should be disposed.  Don't screw up a good
9   thing!
10             Do you see that?
11  A.   Yes.
12  Q.   And do you recall that at this deposition where we were
13  just looking at the transcript, you were asked directly about
14  this line in the story, the line that says:  One sure way of
15  having poorer egg prices is by increasing egg supplies through
16  holding hens longer and keeping hens that should be disposed?
17             Do you recall being asked about that line?
18  A.   Not particularly.
19  Q.   Okay.  So let me ask you, if you can look again at the
20  transcript that you have in front of you, and do you see that
21  you're asked on page 55, starting at line 23:  Mr. Rust, I've
22  just handed you what's been marked as Exhibit 2, which is a
23  September 2003 edition of United Voices newsletter?
24             And the Bates range is given, and you're asked:  Is
25  that correct?
```

26

```
 1              And you say, Yes.
 2              Correct?
 3    A.   Can I take this apart?
 4    Q.   Sure.  Please.
 5    A.   Okay.  What line are you referring to?
 6    Q.   So I've started at the bottom of page 55, and it says:
 7    Mr. Rust, I just handed you what's been marked as Exhibit 2,
 8         which is a September 2003 edition of United Voices newsletter.
 9              Do you see that?
10    A.   Yes.
11    Q.   And do you see that you agreed that that was what you had
12    been handed?  That's on the top of page 56.
13    A.   You're saying that's what I was handed, and I agreed to
14    that?
15    Q.   Correct.
16    A.   Yes, I guess that's what I did.
17    Q.   Okay.  And then if we turn ahead now, you're asked a few
18    questions about the document.  If you turn ahead to page 58 of
19    the transcript.
20    A.   Okay.
21    Q.   And if you look at line 18, do you see that you are asked
22    the following question?  On page 2, the newsletter says:  "One
23    sure way of having poorer egg prices is by increasing egg
24    supplies through holding hens longer and keeping hens that
25    should be disposed."
```

27

```
 1              Do you see that?
 2    A.   Yes.
 3    Q.   And then you were asked a number of questions about that.
 4              And do you see that on page 59, starting at line 15,
 5    in answer to some questions about that, you gave an answer
 6    that included the following statement, starting at line 17:
 7    If the producers hang on to a lot of birds and don't sell
 8    them, that can cause the egg supply to be longer.
 9              Do you see that?
10    A.   Yes.
11    Q.   And do you see that you were then asked:  What do you
12    mean by longer?
13              Correct?
14    A.   Yes.
15    Q.   And do you recall that in response to that question:
16    What do you mean by longer, that --
17    A.   What are you asking?
18    Q.   My question is, do you recall that in response to that
19    question:  What do you mean by longer?  You acknowledged that
20    it is not a good thing to show the animal rights groups what
21    happens to all of the hens, and so as an industry, you don't
22    fully tell what happens to the hens?
23    A.   This is generally accepted, you know -- you know, when
24    you put the birds, you take them and put them in a kill cart
25    and it's an approved method of killing, then we dump them in
```

28

```
 1    dump trailers.  And they take them to the landfill, and then
 2    they bury them.
 3    Q.   My question was, do you recall that in response to the
 4    question I just read to you, you testified that:  It's not a
 5    good thing to show the animal rights groups what happens to
 6    all of the hens, and so as an industry, you don't fully tell
 7    what happens to the hens?
 8    A.   We don't go out and advertise to our customers that we
 9    take our chickens, when they're -- when they're -- there's no
10    market for disposed egg-laying hens.  We take those hens, and
11    the accepted practice is to take them to the landfill, and
12    they bury them.
13    Q.   Okay.  So my question was not about what you tell your
14    customers.
15              My question was, whether you recall, when you were
16    testifying under oath, you said that:  It's not a good thing
17    to show the animal rights groups what happens to all of the
18    hens, and so as an industry, you don't fully tell what happens
19    to the hens.
20              Do you recall testifying to that?
21    A.   Not exactly, but, you know, when you have old hens and
22    you have animal activists, animal activists most are consumers
23    and, you know, unfortunately, you know, when you make -- you
24    have the options for years, there's, you know, if there's a
25    whole bunch of old hens to get rid of, there is no place to
```

29

```
 1    take them.  So you take them to the landfill and dump them.
 2    And they take them.  They charge us $200 a semi load, or
 3    whatever it is, and they dump them.
 4    Q.   Since you said you don't recall exactly what you said, or
 5    that you don't recall what I read to you is what you said,
 6    let's look at what you said.
 7              MR. NEUWIRTH:  Could we please play MR59.
 8              (Video excerpt played.)
 9              Answer:  If people don't sell their chickens or
10    don't kill them, you know, how many get killed is kind of a
11    guesstimate in the industry.  You know, no one really reports
12    their numbers of what gets killed because of how they kill
13    them.  You know, animal rightists don't like it, but, you
14    know, at times we put them in dump trailers, take them to the
15    landfills, and dump them, cover them up with dirt, and, you
16    know, it creates, you know, lots of -- we had newspaper photos
17    once that someone took pictures of the chickens that didn't
18    die in the landfill, and then, you know, we don't like -- it's
19    not a good thing to show the animal rights groups what happens
20    to all the birds.  So we, as an industry, don't fully tell
21    what happens to the birds.
22              (Video excerpt stopped.)
23    BY MR. NEUWIRTH:
24    Q.   And that was you testifying, correct?
25    A.   That's what I told you previously.  We take them to the
```

30

```
1   landfill.
2   Q.   Now, Mr. Rust, after Rose Acre joined the United Egg
3   Producers, I think you told us that you became a member of the
4   Board of Directors of the United Egg Producers, correct?
5   A.   Yes.
6   Q.   And as a member of the Board, were you aware that when
7   the Producers Committee on Animal Welfare released the
8   Guidelines for the Certified Program, the members of the
9   United Egg Producers Scientific Committee for Animal Welfare
10  told the United Egg Producers that they did not want their
11  names on the Guidelines?
12  A.   I don't remember that.
13  Q.   Okay.  Now, after Rose Acre joined the Certified Program
14  in 2002, what happened to Rose Acre's production of shell
15  eggs?
16  A.   What do you mean what happened?
17  Q.   Well, did Rose Acre's production of shell eggs increase
18  or decrease?
19  A.   We have always increased our egg supply.
20  Q.   And what happened after Rose Acre joined the Certified
21  Program to Rose Acre's number of laying hens?  Did the number
22  of hens in the flock increase, stay the same, or decrease?
23  A.   Over the time period, it would have increased annually.
24  Q.   And so that was starting right after Rose Acre joined the
25  program?
```

31

```
1   A.   Yes.  We was always increasing our chicken space.
2   Q.   And as the person who is now the CEO and as the person
3   who during this period was the vice president, as you
4   testified on Friday, do you feel very confident about your
5   understanding of what happened to the flock of laying hens at
6   Rose Acre after Rose Acre joined the Certified Program?
7   A.   Yes.  We increased it.  I know we added space.  We had to
8   add a lot of space.  We had to borrow a lot of money to build
9   new housing to make up for the extra space needed for the
10  chickens.
11  Q.   Okay, so if that's true, why is it that in 2005, you told
12  Roger Deffner, who at the time was the Chairman of the United
13  Egg Producers, that even with new construction and remodeling
14  of existing facilities, Rose Acre was still about 1 million
15  hens below what the company's flock had been before joining
16  the Certified Program?
17  A.   I would have to look at the records.  I don't recall
18  them.
19  Q.   Okay.  Let me give you a document that we have designated
20  as Plaintiffs' Exhibit 501.
21       MR. NEUWIRTH:  May I approach, Your Honor?
22       THE COURT:  Yes, you may.
23  BY MR. NEUWIRTH:
24  Q.   And do you see that what's been marked as Exhibit 501 is
25  a chain of e-mails that was produced with consecutive Bates
```

32

```
1   numbers NL1081 through 1083?  Do you see that?
2   A.   I'm reading this to get myself familiar.
3   Q.   Okay.
4   A.   Yeah.
5   Q.   And do you see on the second and third page of this
6   document, starting at the bottom of the second page, there is
7   an e-mail that Mr. Deffner sent to you on June 1st, 2005?  Do
8   you see that?
9   A.   Which -- where are we referring to?
10  Q.   At the bottom of the second page of the document, there's
11  an e-mail which says from Roger Deffner to Marcus Rust --
12  A.   Yes.
13  Q.   -- and the subject is ACC program.  Do you see that?
14  A.   Yes.
15  Q.   And do you see that on that same day, right above that,
16  is an e-mail that you sent to Mr. Deffner in response,
17  correct?
18  A.   Yes.
19       MR. NEUWIRTH:  Your Honor, we would move for the
20  admission of Plaintiffs' Exhibit 501.
21       MR. KING:  Your Honor, we object to portions of this
22  e-mail chain as hearsay.
23       MR. NEUWIRTH:  Your Honor, we are -- we are --
24       THE COURT:  You're only offering the June 1, 2005,
25  from Mr. Deffner to Mr. Rust and Mr. Rust's response.
```

33

```
1        MR. NEUWIRTH:  We are prepared to do that,
2   Your Honor.
3        THE COURT:  Okay.  So page 1 of the exhibit and the
4   top of page 2 of the exhibit are not being offered.
5        MR. NEUWIRTH:  Correct, Your Honor.
6        THE COURT:  Okay, does everybody understand that?
7        MR. KING:  Yes, Your Honor.
8        THE COURT:  And with that revision, is there still
9   an objection?
10       MR. KING:  No, no, Your Honor.
11       THE COURT:  Okay.  So that limited portion of
12  Exhibit 501 is admitted and may be published but not the rest
13  of it.
14       MR. NEUWIRTH:  Thank you.  And so I would ask if we
15  could publish for the jury the document and only showing
16  starting on the second page with the e-mail from Mr. Rust to
17  Mr. Deffner.
18  BY MR. NEUWIRTH:
19  Q.   And, in this e-mail, it's correct, isn't it, that after
20  discussing with Mr. Deffner in your message some new
21  construction that was being undertaken and some remodeling
22  that was taking place at Rose Acre, you said the following,
23  about five lines from the bottom, beginning with the phrase,
24  "We have been running."
25       Do you see that it says:  We have been running about
```

34

1  a million birds behind our pre-ACP capacity even with new
2  construction and remodeling.  We have calculated that when we
3  get our NC project complete, we will done nothing more than
4  staying even as a company bird numberwise for previous five
5  years or pre-ACP.
6          Do you see that you said that?  That's what you
7  said --
8  A.  Yes.
9  Q.  -- at the time.
10         And does this refresh your recollection that as of
11 2005, you had told Mr. Deffner of the United Egg
12 Producers, that as of that time, even with any new
13 construction and remodeling that Rose Acre had undertaken, you
14 were still a million birds behind where you had been before
15 joining the Certified Program?
16 A.  Yes.  Whenever you're talking to competitors, you never
17 really tell them exactly what you're doing and everything, and
18 we had -- you know, if you look at our records and stuff,
19 you'll see that we actually had probably more birds than what
20 we admitted to.  That's, you know -- we never ever gave total
21 answers to any of our competitors.
22 Q.  Let me make sure I understand this.  What you're saying
23 is that when you wrote to Mr. Deffner, you were not being
24 straightforward with him about what was happening with Rose
25 Acre's hen supply; is that right?

35

1  A.  Not a thousand percent I wasn't.  They was a competitor
2  in the marketplace, and we didn't want people knowing what we
3  were doing.
4  Q.  Okay.  Now, was it your policy to also not be
5  straightforward about the number of hens you had in your
6  supply when talking to the Government of the United States?
7  A.  We gave -- with any -- whoever gave our actual numbers to
8  the Government would have gave the proper numbers to the
9  Government.  I didn't do that.  Someone in our company would
10 have.  Our records have to be accurate, and they are accurate.
11 Q.  Let me hand you a document that's been marked as
12 Plaintiffs' Exhibit 502.
13        MR. NEUWIRTH:  May I approach, Your Honor?
14        THE COURT:  Yes, you may.
15 BY MR. NEUWIRTH:
16 Q.  Now, Mr. Rust, your testimony is that when talking to
17 Mr. Deffner, the Chairman of the United Egg Producers, about
18 Rose Acre having a million fewer hens than it did at the start
19 of the Certified Program as of 2005, you were not being
20 straight with him because his company was a competitor of
21 yours, correct?
22 A.  Correct.  We were building new housing in three or four
23 different locations at once.  I don't know exactly what the
24 chicken numbers were.  I know, you know, we were going to make
25 sure we kept ahead of the game, and I think we did.

36

1  Q.  Right.  And so when you wrote in your e-mail to
2  Mr. Deffner describing all of those new locations and telling
3  him, Well, we're still a million birds short of where we were
4  even with all that new construction and remodeling, you didn't
5  want to tell him exactly what was going on because he was a
6  competitor, correct?
7  A.  Correct.  And if you look at the UEP schedule and how
8  they did the bird placement for the animal care program,
9  you'll see that the math that I stated to Mr. Deffner does not
10 work with the math that if you took the program in place,
11 because it was a new construction we were adding.
12 Q.  Okay.  So do you see that what you have in front of you
13 is an e-mail from Joe Miller to Marcus Rust and Tony Wessner,
14 dated January 22nd, 2007?  Do you see that?
15 A.  Yes.
16 Q.  And I take it you don't deny that you are the Marcus Rust
17 on that e-mail, do you?
18 A.  That would be me, I think.
19 Q.  And Joe Miller was the general counsel of Rose Acre,
20 correct?
21 A.  Right.
22 Q.  And who was Tony Wessner?
23 A.  He was the chief operating officer.
24 Q.  Of what company?
25 A.  At that time, he was the vice president of Rose Acre

37

1  Farms.
2  Q.  Right.  So you and Mr. Wessner and Mr. Miller were all
3  senior officers at the time of Rose Acre, correct?
4  A.  Yes.
5  Q.  And you also copied Gene Gregory, correct?
6  A.  That's what it says there, yeah.
7  Q.  Who was either at that point the vice president or maybe
8  already the president of the United Egg Producers, correct?
9  A.  I'm not sure what his title was at that time.
10 Q.  But you knew he was a senior officer?
11 A.  Yeah.  He was one of the top people.
12 Q.  Okay.  Now let's look at your e-mail.  This is an e-mail
13 that Joe Miller sent to you, among others, saying:  The
14 attached letter was sent to AMS concerning the AMS use of the
15 PVP shield.
16        Do you see that?
17 A.  Yes.
18 Q.  What is AMS?
19 A.  Agricultural Marketing Service a division of USDA.
20 Q.  And USDA is the United States Department of Agriculture,
21 a branch of the United States Government, correct?
22 A.  Yes.
23 Q.  And what was the PVP shield?
24 A.  From my memory, it was a process verified program.
25 Q.  That was a program that Sparboe was using?

38

1   A.   That was a program that Sparboe -- Sparboe wanted to
2   bring in a program that was going to allow people to keep
3   chickens at 45 inches and keep chickens at 67, whatever
4   dimension they wanted, you know, so they could produce eggs
5   under all the different methods.
6   Q.   Right.  So this cover e-mail makes clear that what is
7   being sent to you is a letter that your general counsel, Rose
8   Acre's general counsel, Mr. Miller, sent to the AMS portion of
9   USDA, the U.S. Department of Agriculture, correct?
10  A.   Correct.
11          MR. NEUWIRTH:  Your Honor, we would move for the
12  admission of Plaintiffs' Exhibit 502.
13          MR. KING:  No objection.
14          THE COURT:  502 is admitted.
15          MR. NEUWIRTH:  If we can put up Plaintiffs'
16  Exhibit 502, this e-mail.
17  BY MR. NEUWIRTH:
18  Q.   Just to be clear, as you've been discussing, this is an
19  e-mail from Joe Miller, the general counsel of Rose Acre to
20  you and to Mr. Wessner, who you said was the chief operating
21  officer, I believe, as well as Gene Gregory, correct?  And it
22  says the attached letter was sent to AMS, right?
23  A.   That's what it says.
24  Q.   Now, let's look at the next page, which is the attached
25  letter.  This is a letter from January 22nd, 2007, correct?

39

1   A.   Yes.
2   Q.   And it's addressed to Mr. Lloyd Day, the administrator of
3   USDA-AMS in Washington, D.C., correct?
4   A.   Yes.
5   Q.   And Mr. Day was not a competitor of Rose Acre, was he?
6   A.   No.  He was an Agricultural Marketing Service.
7   Q.   Of the United States Government, correct?
8   A.   Correct.  That's not the statistical division.  It's
9   different.
10  Q.   Okay.  And the United States Government is not a
11  competitor of Rose Acre, is it?
12  A.   No.
13  Q.   Now, let's look at the letter.  The first paragraph of
14  the letter after saying, Dear Mr. Lloyd, says:  Rose Acre
15  Farms is one of the largest egg producers in the US.
16          Do you see that?
17  A.   What line are you on?
18  Q.   The first line of the letter after "Dear Mr. Lloyd," it
19  says:  Rose Acre Farms is one of the largest egg producers in
20  the US.
21          Right?
22  A.   Yes.  Yes, yes, I see it.
23  Q.   And then it says:  We have also been very committed to
24  the UEP Certified egg program.
25          Correct?

40

1   A.   Correct.
2   Q.   So this is what Mr. Miller was telling the United States
3   Department of Agriculture, correct?
4   A.   Correct.
5   Q.   It then says:  The program was developed using a
6   Scientific Committee which studied and recommended Animal
7   Welfare Guidelines to implement for the welfare of the
8   chickens.
9          Correct?
10  A.   Yes.
11  Q.   Again, what you were telling to the United States
12  Department of Agriculture, correct?
13  A.   Correct.
14  Q.   It then says:  In order to comply with these
15  requirements, Rose Acre reduced the number of birds per
16  cage which has amounted to a reduction of literally millions
17  of birds from our operation.
18          Do you see that?
19  A.   Yes.
20  Q.   And that is what Mr. Miller, in this letter, told the
21  United States Department of Agriculture on January 22nd, 2007.
22  Correct?
23  A.   It also does not say that we added over $100 million
24  worth of new houses in that same time period, sir.
25  Q.   So let me understand.  Your position now is that when

41

1   Rose Acre told the United States Department of Agriculture
2   that you had to reduce literally millions -- there was a
3   reduction of literally millions of birds from our operation,
4   you left out that that was offset by some sort of
5   construction, right?
6   A.   No, sir.  What we done was we had to increase cage space.
7   We added, I don't know, 10, 20 chicken houses at various
8   operations around the country.  When we added all this space,
9   what we were referring to here -- when we started the program,
10  we had, I forget the exact number, say, 20 million chickens.
11  When we had to meet the program, we had to reduce in those
12  houses 3, 4, maybe 5 million chickens.  I forget the exact
13  amount that we had to take out.
14          But at the time, and all of our records will show,
15  we added chicken houses at every farm we could and added new
16  space.
17          What we didn't -- what Joe did not say in here is
18  this was -- we reduced the number of birds in our present
19  operation, but we also added all that time period new housing.
20  Q.   Okay.  Now, I think you've just acknowledged that what
21  this letter says is, there's been a reduction of literally
22  millions of birds from our operation, and nowhere in the
23  letter does it say anything about what you are now claiming
24  was some counter balancing expansion of your number of hens in
25  the flock, correct?

42

```
1    A.   Sir, I was out there building those facilities.  We added
2    them.  I can't help what Joe wrote there.  You know, that's
3    what he did say, but I think he was inferring to what we
4    reduced.
5    Q.   Okay.  Show me where in this letter -- well, you agree he
6    infers -- you're saying he suggested that there was a
7    reduction, correct?
8    A.   He's saying from our operation.  If you take our
9    operation pre-2002 and you take the exact hen space that we
10   had, we took out one or two chickens for every cage from that.
11   But we also, during that time period, added new housing back
12   at many locations.  We never went backwards on our bird
13   numbers.
14   Q.   Show me where it says in this letter that
15   Mr. Miller's statement to the United States Department of
16   Agriculture, that there was a reduction of literally millions
17   of birds from our operation.  Show me in this letter where it
18   says that that is limited to the houses that existed at the
19   time you joined the program and is disregarding what you may
20   have done in terms of remodeling or new construction.  Does it
21   say that anywhere in this letter?
22   A.   Not that I see, it does not.
23   Q.   Right.  So what we see is that in 2005, you told
24   Mr. Deffner, the Chairman of the United Egg Producers, that
25   notwithstanding any new production, you were a million layers,
```

43

```
1    a million hens below where you had been before the start of
2    the Certified Program.  And now in January 2007, Mr. Miller,
3    your general counsel, on a letter that you received a copy of
4    at the time, told the United States Department of Agriculture
5    that as a result of your participation in the program, there
6    had been a reduction of literally millions of birds from our
7    operation.  Right?  That's what the documents say, correct?
8    A.   That's what the document says.
9    Q.   Now, this was not the last time that this message was
10   given to the United States Government, is it?
11   A.   I don't know.
12   Q.   Well, let me ask if you can look at what we've marked as
13   Plaintiffs' Exhibit 503.
14        MR. NEUWIRTH:  May I approach, Your Honor?
15        THE COURT:  Yes, you may.
16   BY MR. NEUWIRTH:
17   Q.   And it's correct, isn't it, that what I've handed to you,
18   which has been marked as Plaintiffs' Exhibit 503 for
19   identification, is an e-mail from seven months after the
20   letter we just looked at.  Correct?
21        The first page is an e-mail from Joe Miller, your
22   general counsel, dated August 7, 2007, correct?
23   A.   Yes.
24   Q.   And it's an e-mail that Mr. Miller sent to Gene Gregory
25   at the United Egg Producers, and that the two people who are
```

44

```
1    copied are you, Marcus Rust, and another officer of Rose Acre,
2    Greg Hinton.  Correct?
3    A.   Yes.
4    Q.   And do you see that this is an e-mail that states:
5    Attached is a letter Eugene Gregory -- it's addressed to
6    Mr. Gregory -- can take with you on your upcoming meeting with
7    USDA.
8        Do you see that?
9    A.   Yes.
10       MR. NEUWIRTH:  Your Honor, we would move for the
11   admission of Plaintiffs' Exhibit 503.
12       MR. KING:  No objection.
13       THE COURT:  503 is admitted.
14       And, Mr. Neuwirth, as I mentioned, we have to stop
15   at 11, and so I'm going to interrupt you here.
16       MR. NEUWIRTH:  Okay, thank you, Your Honor.
17       THE COURT:  Unless you have just very briefly five
18   minutes.
19       MR. NEUWIRTH:  I think within five minutes or less I
20   can finish my questions.
21       THE COURT:  Okay.  Go ahead.  We'll do that.  We'll
22   finish 503.
23       MR. NEUWIRTH:  Thank you.
24       If we can put this up.
25   BY MR. NEUWIRTH:
```

45

```
1    Q.   This, again, as you see, is this e-mail, if we can just
2    show the jury, it's this e-mail from August 7, 2007, with you
3    copied, where Mr. Miller tells Gene Gregory that:  Attached is
4    a letter you can take with you on your upcoming meeting with
5    USDA.
6        Do you see that?
7    A.   Yes.
8    Q.   Do you see the next line says:  This letter is similar to
9    one we sent Mr. Day on January 22, 2007?
10       Do you see that?
11   A.   Yes.
12   Q.   That's the letter we just look at, correct?
13   A.   Yes.
14   Q.   Now, if we turn to the second page, we see that once
15   again, this letter is a letter from Mr. Miller addressed to
16   Lloyd Day, the administrator of the AMS at the U.S. Department
17   of Agriculture, correct?
18   A.   Yes.
19   Q.   Washington, D.C., correct?
20   A.   Yes.
21   Q.   This time the letter starts a little differently,
22   correct?
23       It says:  It is our understanding that USDA has
24   decided to proceed with a program that allows companies and
25   individuals to place the USDA shield on their products when
```

46

```
1    they have only partial production involved in their operation.
2              Do you see that?
3    A.   Yes.
4    Q.   And once again, Rose Acre, in the next paragraph, at the
5    end of the paragraph says:  In order to comply with these
6    requirements -- clearly the requirements of the Certified
7    Program being mentioned there -- Rose Acre reduced the number
8    of birds per cage which has amounted to a reduction of
9    literally millions of birds from our operation.
10             Correct?
11   A.   Yes.  Again, I said, the reason we -- I think the reason
12   Joe was stating that, he was trying to emphasize with the
13   Government how many birds we took out of the our existing
14   housing.  We did not go into this with them saying we built
15   all these chicken houses, which we had done.
16             MR. NEUWIRTH:  We can take a break, Your Honor.
17   Thank you very much.
18             THE COURT:  All right.  Ladies and gentlemen, as I
19   mentioned to you, we have to take kind of a long luncheon
20   break here today.  We will resume -- I need you back here,
21   1:45 to resume.  I hope that you can enjoy some of the things
22   in the neighborhood here, or that you -- during the lunchtime,
23   or that you just enjoy having a little bit longer time.  But
24   it's important that you not talk about the case.  When we get
25   back at 1:45, we'll pick it up then.  There's more evidence to
```

68

```
1    really a question of the point -- you know, the point of using
2    a very complicated collection of exhibits with somebody
3    who's never seen them before and won't have heard how they
4    were created.
5              MR. LYONS:  Again, Your Honor, I understand the
6    Court's concern.
7              THE COURT:  Okay, enough said.  Mr. Rust, you can
8    come on back.  Sorry.
9              (Witness resumes the stand.)
10             THE DEPUTY CLERK:  All rise.
11             (Jury in.)
12             THE COURT:  Okay, everybody, please take your seats.
13             Mr. Neuwirth, you may resume.
14             MR. NEUWIRTH:  Good afternoon, Mr. Rust.  Good
15   afternoon, ladies and gentlemen.
16   BY MR. NEUWIRTH:
17   Q.   Mr. Rust, Greg Hinton was Rose Acre's vice president of
18   sales in 2007, correct?
19   A.   Yes.
20   Q.   And in that role, one of Mr. Hinton's responsibilities
21   was interacting with Rose Acre's customers, correct?
22   A.   As sales manager, he would do that.
23   Q.   Did Mr. Hinton behind keep you informed of what he was
24   doing with major customers?
25   A.   Sometimes he did, if it's something he thought I should
```

69

```
1    be aware of or not aware of.  I can't say everything, but most
2    stuff -- or some stuff is what he deemed pertinent.
3    Q.   And is it correct that Kraft Foods was a significant
4    customer of Rose Acre in 2007?
5    A.   Yes.
6    Q.   And that's an account, a customer account, you would have
7    cared about, correct?
8    A.   Yes.
9    Q.   Let me hand you what has been marked as Plaintiffs'
10   Exhibit 8.
11             MR. NEUWIRTH:  May I approach, Your Honor?
12             THE COURT:  Yes.
13   BY MR. NEUWIRTH:
14   Q.   And, Mr. Rust, do you see that this is a letter dated
15   May 30, 2007 that Greg Hinton, the vice president of sales, at
16   Rose Acre wrote to John Gregorich at Kraft Foods in Madison,
17   Wisconsin?
18   A.   Yes.
19   Q.   And this is on Rose Acre letterhead, correct?
20   A.   Correct.
21   Q.   And it includes with the letter some attached charts,
22   correct?
23   A.   I have to look.  Yeah.
24   Q.   And do you also see that on the back of the document is
25   an e-mail dated Thursday, May 31st, 2007, from Mr. Hinton of
```

70

```
1    Rose Acre to Mr. Gregorich of Kraft?
2    A.   That's what it appears to be, yes.
3    Q.   Okay.
4              MR. NEUWIRTH:  Your Honor, we would move for the
5    admission of Plaintiffs' Exhibit 8.
6              MR. KING:  No objection.
7              THE COURT:  P-8 is admitted and may be published.
8              MR. NEUWIRTH:  Thank you, Your Honor.
9              So if we could put this up.
10   BY MR. NEUWIRTH:
11   Q.   Now, just to put this in perspective timewise, this
12   morning we looked at two letters that Rose Acre, Rose
13   Acre's general counsel had prepared for the U.S. Department of
14   Agriculture, one in January of 2007, and one in August
15   of 2007.  You remember that, correct?
16   A.   Yes.
17   Q.   So this letter is written in May of 2007, almost in the
18   middle of the time of those two letters, correct?
19   A.   I think that's correct.
20   Q.   And let me ask you --
21             MR. NEUWIRTH:  If we can pull this up.
22   BY MR. NEUWIRTH:
23   Q.   We already established that this was from Mr. Hinton,
24   your vice president of sales, to Mr. Gregorich at Kraft Foods.
25             Do you see that there is -- in the first
```

71

```
 1   paragraph --
 2           MR. NEUWIRTH:  If we can pull that up.
 3   BY MR. NEUWIRTH:
 4   Q.  -- the statement that:  Rose Acre Farms would like to
 5   offer Kraft Foods the option of renewing our existing egg
 6   product supply agreement that is scheduled to terminate on
 7   June 30, 2007.
 8           Do you see that?
 9   A.  Yes.
10   Q.  And do you see that it then says:  The only change to the
11   current agreement is to price the eggs off the Urner Barry
12   Animal Welfare Certified Market to meet Kraft's new animal
13   welfare requirements.
14           Do you see that?
15   A.  Yes.
16   Q.  And so is it correct that as of May 30, 2007, you
17   understood that Kraft had advised Rose Acre that it wanted to
18   buy Certified eggs, eggs under the UEP Certified Program?
19   A.  You'd have to ask Greg that question.  I didn't -- wasn't
20   in on any of those conversations.
21   Q.  Okay.  But you don't -- that's what the -- letter
22   certainly --
23   A.  That's what the letter says.
24   Q.  Right.  And then do you see that there's reference, as we
25   just saw, to the price of eggs off the Urner Barry Animal
```

72

```
 1   Welfare Certified Market.  Do you see that?
 2   A.  Yes.
 3   Q.  And it's correct, isn't it, that Urner Barry is a
 4   service, a company that sends out reports of, among other
 5   things, shell egg prices, correct?
 6   A.  My understanding, they send out reports for like 100-plus
 7   years.  They've done -- they do meat, fish, all kinds of
 8   animal products.
 9   Q.  And one of the products that they do is shell eggs,
10   correct?
11   A.  Yes.
12   Q.  And do you recall that as of 2007, Urner Barry published
13   both a price for Certified shell eggs and for non-Certified
14   shell eggs?
15   A.  I remember they did a change.  I have no idea when.
16   Q.  Okay.  In fact, if we look at the back of this document
17   at the last page, there's an e-mail that Mr. Hinton from Rose
18   Acre had sent to Mr. Gregorich at Kraft.  Do you see that on
19   that last page in the e-mail, Mr. Hinton, from your company,
20   says to Mr. Gregorich of Kraft:  Here is the comparison for
21   the last four months on the Certified and non-Certified egg
22   markets.
23           Do you see that?
24   A.  Yes.
25   Q.  And do you see the subject of this e-mail is UB Markets.
```

73

```
 1   So that would be Urner Barry Markets, correct?
 2   A.  Yes.
 3   Q.  And then do you see listed here for those four months,
 4   February, March, April and May, are Certified and
 5   non-Certified prices for whole eggs and for yolks.  Do you see
 6   that?
 7   A.  Yes.
 8   Q.  Okay.  So returning to the letter on page 1, the second
 9   paragraph after discussing this new contract then says:  Since
10   our last contract in two -- began in 2005, there have been
11   many changes in the cost of producing eggs.
12           Do you see that?
13   A.  Yes.
14   Q.  And then it says:  First, the rising feed prices have had
15   the largest impact on our cost of production.
16           Do you see that?
17   A.  Yes.
18   Q.  It then says:  Also complying with the new UEP Animal
19   Care Certified Guidelines has caused a decrease in our overall
20   bird numbers and resulted in an increase in production costs.
21           Do you see that?
22   A.  Yes.  It dated our breaking plants.
23   Q.  And where does it say that that's limited to your
24   breaking plants in this letter?
25   A.  It doesn't.  I just stated that that's -- we had three
```

74

```
 1   plants that could supply Kraft where we had breaking.  Our
 2   bird numbers at those farms actually had dropped for a time
 3   period until we added production back to two of them.
 4   Q.  So the start of this paragraph, which says:  Since our
 5   last contract began in 2005, there have been many changes in
 6   the costs of producing eggs.
 7           It doesn't speak there only about breaking eggs,
 8   does it?
 9   A.  No.
10   Q.  And the next sentence that we looked at, which says:
11   Also complying with the new UEP Animal Care Certified
12   Guidelines has caused a decrease in our overall bird numbers.
13           It says:  Overall bird numbers, correct?
14   A.  That's what it says there.  I don't think that's correct,
15   but that's what it says.
16   Q.  So this is another document with a mistake?
17   A.  It could be.  You have to look at your production numbers
18   and see what they were.
19   Q.  But this document shows, doesn't it, that in 2007, the
20   same year that Rose Acre was telling the United States
21   Department of Agriculture that it had had a reduction of
22   millions of birds through its participation in the UEP
23   Certified Program, Rose Acre was telling the same thing to one
24   of its major customers, correct?
25   A.  No, that's incorrect.  If you go back and read the
```

75

```
 1   letter, he says, "literally."  When he says, "literally," he
 2   was impressed -- trying to impress AMS, which is Agricultural
 3   Marketing Service, how many birds we had taken out of the
 4   existing production facilities we had.  We weren't doing any
 5   of the places where we had talked about where we increased and
 6   added all our new chicken houses.
 7   Q.   This letter to Kraft doesn't have the word "literally" in
 8   it, does it?
 9   A.   No, it does not.
10   Q.   And this letter to Kraft says:  Complying with the new
11   UEP Animal Care Certified Guidelines has caused a decrease in
12   our overall bird numbers.
13        Correct?
14   A.   That's what it says.
15   Q.   Now, this is not the only time Rose Acre told its
16   customers that the Certified Program was causing its number of
17   laying hens to drop, is it?
18   A.   We had a lot of facilities that our bird numbers dropped
19   at.  Some customers were close to some of those facilities,
20   some were far away.  A lot of the birds we were adding we were
21   adding in North Carolina.  No bird we added in North Carolina
22   would have been a beneficial egg to ship back to Indiana for
23   Kraft.
24   Q.   But your letter to Kraft didn't make that -- not your
25   letter, Rose Acre's letter to Kraft --
```

76

```
 1   A.   They wrote that letter.
 2   Q.   Right.  Rose Acre's letter to Kraft didn't make that
 3   distinction.  Rose Acre's letter to Kraft said:  Our overall
 4   bird numbers are down.
 5        Didn't it?
 6   A.   That's what it says there.
 7   Q.   And now, if I can ask you to look at what's been
 8   previously marked as Plaintiffs' Exhibit 127.
 9        MR. NEUWIRTH:  If I may approach, Your Honor.
10        THE COURT:  Sure.
11   BY MR. NEUWIRTH:
12   Q.   And is it correct that what we have here, that we've
13   marked as Plaintiffs' Exhibit 127, is e-mails from July
14   of 2004, between Greg Hinton, Rose Acre's vice-president for
15   sales, and Ray Harmon of the company Cracker Barrel?
16   A.   That's what it says, yes.
17   Q.   And was Cracker Barrel another customer of Rose Acre?
18   A.   Yes.  Still are today.
19   Q.   And is it a significant customer?
20   A.   Yes.
21   Q.   And do you see here that Mr. Hinton identified himself as
22   coming from Rose Acre Farms in this e-mail?  At the bottom of
23   the --
24   A.   Yes.  Yes.
25        MR. NEUWIRTH:  Your Honor, we would move for the
```

77

```
 1   admission of Plaintiffs' Exhibit 127.
 2        MR. KING:  No objection.
 3        THE COURT:  127 may be admitted and it may be
 4   published.
 5        MR. NEUWIRTH:  Thank you.
 6        And if we could put it up.
 7   BY MR. NEUWIRTH:
 8   Q.   If we could start with the earlier e-mail, which is the
 9   one that's lower on the page, from Mr. Hinton to Ray Harmon of
10   Cracker Barrel.  Do you see that the first thing that
11   Mr. Hinton mentions in his e-mail, he says:  Here is Don
12   Bell's forecast for the large egg market as of June 10, 2004.
13        Do you see that?
14   A.   Yes.
15   Q.   And then do you see that he has monthly prices listed,
16   correct?
17   A.   Yes.
18   Q.   And those would be prices for a dozen eggs?
19   A.   Yes.
20   Q.   And do you see that he then mentions that he got some
21   reports that there's been another outbreak of bird flu in
22   China and Thailand, but then he says:  There have not been any
23   outbreaks in the US recently.
24        Do you see that?
25   A.   Yes.
```

78

```
 1   Q.   He then says:  The next reduction in flock size for the
 2   Animal Care Certified Program will take place with chicks
 3   hatched April 1st, 2005, when we go from 59 square inches to
 4   61 per bird.
 5        Do you see that?
 6   A.   Yes.
 7   Q.   And so this document, Mr. Hinton was telling Rose
 8   Acre's significant customer, Cracker Barrel, that on
 9   April 1st, 2005, when under the Certified Program, the cage
10   space requirement would go from 59 inches to 61 inches per
11   bird, this would be the next reduction in flock size.  That's
12   what it says, correct?
13   A.   That's -- yeah.  Next, going to the next square inches.
14   It's about the square inches per bird.
15   Q.   Right.  And so -- and he refers to that as when the next
16   reduction in flock size will take place, correct?
17   A.   For the program, correct.
18   Q.   Now, you agree -- if we could turn to a different subject
19   now.
20        You agree, don't you, that molting of hens can occur
21   naturally?  There will come a time when hens will molt.
22   A.   Every bird will go for a molt if it lives long enough.
23   Q.   Okay.  You also agree that -- that it's possible for an
24   egg producer to trigger a molt by withholding food for some
25   period of time, correct?
```

79

1   A.   That is what the egg producing people call forced
2   molting.
3   Q.   And it's the case, isn't it, that -- that when you want
4   to cause a molt, in your experience, that requires taking food
5   away from the hens for ten days to two weeks, correct?
6   A.   It's a combination of a special diet and taking the feed
7   away for time periods.
8   Q.   And that time period is ten days to two weeks, correct?
9   A.   I'm not sure.  I don't remember the exact days of any of
10  that, but, you know, my brother run the production.  I just
11  knew the time period.  I don't know the exact time period.
12  Q.   Well, didn't you previously recall with some specificity
13  that it was ten days to two weeks?
14  A.   I think that's what it is.  I don't know -- I could be
15  wrong on the exact date.
16  Q.   Okay.
17  A.   I think it goes to body weight.  You watch a body weight
18  and you have to weigh the birds daily, and then once you get a
19  certain bird weight, then you bring them back to full feed --
20  or partial feed, not full feed.
21  Q.   Okay.  You have your -- I believe your deposition
22  transcript from the Kansas?
23            THE COURT:  Mr. Neuwirth, can you take a moment?
24  Thank you.  Go ahead.
25            MR. NEUWIRTH:  Thank you, Your Honor.

80

1            THE COURT:  My electronic allergies.
2   BY MR. NEUWIRTH:
3   Q.   You -- you have, I think, in front of you your transcript
4   of the deposition, the testimony you gave in that case we
5   mentioned yesterday in Kansas, and if you could look at
6   page 241 in that transcript beginning at line 8, you will see
7   the following testimony:  Can we play MRK241A, please.
8            (Video excerpt played.)
9            Question:  But it says molt.  How do you initiate a
10  molt?
11           Answer:  You take the feed away from the chickens
12  for about ten days, two weeks.
13           (Video excerpt stopped.)
14  BY MR. NEUWIRTH:
15  Q.   So does that refresh your recollection?
16  A.   Yeah, I don't know exactly.  I said 10 to 14.  It may be
17  nine days, it may be eight, it may be ten, it may be 14, it
18  may be 15.  I'm not sure exactly.  It goes by body weight.
19  Q.   Okay.  And you referred to that at the deposition as
20  putting the chickens on a diet, right?
21  A.   Correct.
22  Q.   And you said that even though -- you said you don't call
23  it starving; you call it putting chickens on a diet, correct?
24  A.   If you starve something, it dies, you know.  If you're --
25  you know, if you put food back in front of it and it's eating

81

1   and gaining weight, you know, it's back -- it will come back
2   to its normal size, but, you know, when you put it on a diet,
3   you know, it's like I have three stents put in me.  I went
4   from 290 pounds to 235 and now I gained back.  I didn't molt
5   very well.
6   Q.   And when you were -- did you ever go through a period
7   where someone told you you couldn't eat for 10 to 14 days?
8   A.   No.  But that's a normal practice for farmers to do with
9   chickens.  It's just what we've always done.
10  Q.   Now, you knew from your participation at the United Egg
11  Producers Board meetings and committee meetings, correct, that
12  the United Egg Producers was telling its members that they
13  could help the industry by molting at certain points in time,
14  correct?
15  A.   Yes.  They've always done that.
16  Q.   And did a point come where you were ever present at
17  meetings of either the Marketing Committee that you told us
18  that you were on or other meetings, the Board or otherwise,
19  where you were present when these recommendations about
20  molting at certain points of time were discussed?
21  A.   Yes, I was at meetings that they discussed molting.
22  Q.   And do you recall that at some of these meetings, it was
23  affirmatively voted to adopt a resolution to call for molting
24  at a certain point of time and slaughter of hens at a certain
25  point in time?

82

1   A.   Many times the Marketing Committee would look at the
2   USDA-generated records and they'd come back to their members
3   and tell them, you know, this is a voluntary program, you guys
4   need to look at your personal position, see if it makes sense
5   for you to molt, not molt, sell early or do whatever.  You
6   know, this is what we think the market's going to be.
7            And that's the kind of decisions that they did
8   there.
9   Q.   And do you recall that at some of these meetings that you
10  attended, members of the United Egg Producers would be asked
11  to affirmatively state their intentions to participate in
12  early molting or early slaughter?
13  A.   They never ever had anyone stand up and take a roll call
14  who was going to molt, not molt, or anything like that.  There
15  was a couple of the times that they passed out these sheets
16  that would ask people to fill out what you -- your intentions,
17  what you thought you was going to do, and, you know, we never
18  did participate in that program.
19  Q.   Now, let me hand you what has been previously marked as
20  Plaintiffs' Exhibit 150.
21           MR. NEUWIRTH:  I'd like to approach, Your Honor.
22           THE COURT:  Sure.
23           THE WITNESS:  Read through this one thing that you
24  had me open up to that you never had me look at?
25  BY MR. NEUWIRTH:

83

```
 1   Q.   Yes.  We were done.  I think what I had asked you -- I
 2   think what I had asked you to look at there was just the
 3   written version of the testimony we played a minute ago so you
 4   would have it in front of you.  But let me hand you now
 5   Plaintiffs' Exhibit 150.
 6        And do you see that these are minutes of a meeting
 7   of the United Egg Producers Shell Egg Marketing Committee on
 8   January 24th, 2005, in Atlanta, Georgia?
 9   A.   Yes.
10   Q.   And do you see that there's a paragraph with the heading,
11   UEP Members, Guests, and Staff that lists Marcus Rust in the
12   second line as one of the people who attended the meeting?
13   A.   Yes, I would have been in the audience.
14   Q.   And do you recognize this as the type of minutes that the
15   United Egg Producers would regularly prepare following
16   meetings of committees like the Shell Egg Marketing Committee?
17   A.   It looks like what they would have done.  I never did pay
18   that much attention to them.
19   Q.   Okay.
20        MR. NEUWIRTH:  We would move for the admission,
21   Your Honor, of Plaintiffs' Exhibit 150.
22        MR. KING:  No objection.
23        THE COURT:  150 admitted.
24        MR. NEUWIRTH:  And if we could put that up for the
25   jury.
```

84

```
 1   BY MR. NEUWIRTH:
 2   Q.   Do you see that in these minutes, from this January 24th,
 3   2005 meeting, there is a heading at the bottom of the page,
 4   Intentions to Meet Demand?  Do you see that?
 5   A.   Yes.
 6   Q.   And do you see that it says there that Mooney reported --
 7   this would have been Wayne Mooney, correct?
 8   A.   Yes.
 9   Q.   And do you recall who Wayne Mooney was?
10   A.   I remember he worked for Pilgrim's egg farms.
11   Q.   One of the egg producers that was a member of the United
12   Egg Producers?
13   A.   Yes.  It was a broiler and a layer company.
14   Q.   So a company that made both chickens and eggs?
15   A.   Yes.  There wasn't many of them, just him, I think.  And
16   George was there too.
17   Q.   Okay.  And do you see that it says:  Mooney reported on
18   the economic summit held by UEP on November 16, 2004 in
19   Atlanta and summarized by saying that as the egg breakers
20   build more in line complexes, that the breakers will likely
21   need to purchase considerably less eggs from shell egg
22   producers.
23        Do you see that?
24   A.   Yes.
25   Q.   He presented a list of egg producers that have made their
```

85

```
 1   intentions known for reducing the supply by either selling
 2   hens four weeks early or reducing their flock by 5 percent.
 3        Do you see that?
 4   A.   Yes.
 5   Q.   And then it says:  He called on everyone to notify UEP by
 6   letter of how they intended to follow their stated intention.
 7        Do you see that?
 8   A.   Yes.
 9   Q.   And then it says:  He stated that this may have already
10   been helpful to the market, but everyone needed to stay
11   committed to the program.
12        Do you see that?
13   A.   Yes.
14   Q.   And so at this time, you would have been aware from your
15   attendance at this meeting that these steps were underway by
16   the United Egg Producers, correct?
17   A.   This was part of their voluntary program that they had
18   people.  They always gave these projections and set forth.
19   They always done this and did it.
20   Q.   Okay.  Now, do you -- is it your position that you never
21   voted in favor of early molting or early slaughter at the
22   United Egg Producers?
23   A.   I have never voted for early slaughter or to molt.  We're
24   a company, we're fully integrated.  All of our facilities, we
25   go back from production all the time to have the least cost
```

86

```
 1   possible.
 2   Q.   Okay.  Let me show you what has been marked as
 3   Plaintiffs' Exhibit 173.
 4        And do you see that what is before you on the first
 5   page is an e-mail from Gene Gregory dated March 31st, 2006
 6   that's sent to a group of people, including you?
 7   A.   Yes.
 8   Q.   And it's on the subject of the UEP Marketing Committee.
 9        Do you see that?
10   A.   Yes.
11   Q.   And it's dated March 31st, 2006 and it says:  To all,
12   please find minutes from today's meeting.
13        Correct?
14   A.   Yes.
15   Q.   And behind that e-mail are the minutes of that UEP
16   Marketing Committee conference call dated March 31st, 2006,
17   correct?
18   A.   Correct.
19   Q.   And under the heading Call to Order, it lists the
20   following people being present, and one of the people listed
21   as being present is you, Marcus Rust, correct?
22   A.   Correct.
23   Q.   And are these the type of minutes that normally would
24   have been created following something like a Marketing
25   Committee conference call?
```

87

1   A.   Yes.
2        MR. NEUWIRTH:  Your Honor, we move the admission of
3   Plaintiffs' Exhibit 173.
4        MR. KING:  No objection.
5        THE COURT:   173 is admitted.
6   BY MR. NEUWIRTH:
7   Q.   And do you see that in the minutes, which are on the
8   second page of the document --
9   A.   Yes.
10  Q.   -- that about two-thirds of the way down the page, it
11  says:  After considerable discussion, the following motion was
12  made?  And it says, motion:  It was moved by Baker and
13  seconded by Schimpf, to recommend to the members a program
14  calling for flocks to be molted six weeks earlier than
15  previously scheduled and to dispose of spent hens six weeks
16  earlier than previously scheduled.
17       Do you see that?
18  A.   Yes.
19  Q.   And do you see that it says:  Motion passed unanimously?
20  A.   Yes.  But I would have never voted for that.
21  Q.   And so when it says "motion passed unanimously," is it
22  your position that the United Egg Producers must have made a
23  mistake when they put these minutes together?
24  A.   It might have been my mistake.  My office is in a truck
25  shop that's on the second floor, and we don't have a lot of

88

1   insulation in our walls.  And when I go on a conference call,
2   I always put my phone on the mute thing.  And I don't know if
3   one of these Marketing Committees, if I've ever maybe once or
4   twice ever even said anything.  So I would have had -- the
5   meeting during the minutes, I probably would have had my phone
6   on conference or on mute, and then when they would ask for a
7   roll call, even if I would have voted not or of I would have
8   abstained, it wouldn't have showed up because I was still on
9   mute.
10  Q.   Right.  So your position is even though the minutes say
11  this was a unanimous vote, your phone must have been on mute
12  while the vote was taking place?
13  A.   Must have been because I would have voted no.
14  Q.   And that's what you testified when you were asked about
15  this several years ago under oath, correct?
16  A.   Correct.
17  Q.   And can you let me know if this was your testimony?
18       MR. NEUWIRTH:  If we can play that, please.
19       MR. KING:  Your Honor, there's nothing to impeach.
20  Objection.
21       THE COURT:  Correct.  Objection is sustained.
22       MR. NEUWIRTH:  Okay.
23  BY MR. NEUWIRTH:
24  Q.   Now, isn't it the case that in this instance, Mr. Gregory
25  e-mailed these minutes to you directly along with the other

89

1   members of the committee, and there's no indication that you
2   undertook to correct these minutes in any way, is there?
3   A.   I -- I've never corrected the minutes -- meetings of any
4   minutes I've ever read in my life, and I don't think I read
5   10 percent of the minutes that I'm sent of anything.
6   Q.   Okay.  Well, it's correct that after this meeting on
7   March 31st, 2006, you then attended a meeting of the Shell Egg
8   Marketing Committee that took place on May 15th, 2006, right?
9   A.   I'd have to see a document.
10  Q.   Okay.
11       MR. NEUWIRTH:  May I approach, Your Honor?
12       THE COURT:  Yes.
13  BY MR. NEUWIRTH:
14  Q.   And do you see that what I've handed you is a document
15  that has the heading Shell Egg Marketing Committee, May 15th,
16  2006, in Washington, D.C., and on the committee members listed
17  your name appears as one of them, correct?
18  A.   Yes, I was a member.  Let me see.  It states in the
19  minutes here that I was there.
20  Q.   Right.  And if you look on the second page, do you see
21  that the minutes -- that included with this packet is an
22  agenda for that meeting on May 15th, 2006?
23  A.   I'm not following you.
24  Q.   I think if you look on the second page of the packet --
25  it's a double-sided packet, so if you look at the very first

90

1   page -- very first page -- you've got it flipped over.
2   A.   The minutes?
3   Q.   No.  If you look at the very first page of the document.
4   A.   Ah.
5   Q.   No, the other side, please.  I'm sorry.  The first page.
6   No, that's the last page.  The first page, yes.
7        Now, if you turn it, do you see that there's an
8   agenda there --
9   A.   Right.
10  Q.   -- for this Marketing Committee meeting?
11  A.   Yes.
12  Q.   Okay.  And is this packet of materials the type of packet
13  that normally would have been given out at one of these
14  Marketing Committee meetings?
15  A.   Yes.
16       MR. NEUWIRTH:  Your Honor, we would move for the
17  admission of Plaintiffs' Exhibit 177.
18       MR. KING:  No objection.
19       THE COURT:  177 is admitted.
20
21       MR. NEUWIRTH:  So if we can put up the second page
22  of the document.
23  BY MR. NEUWIRTH:
24  Q.   Do you see that on the agenda, the second item listed is
25  minutes of previous meeting.  Do you see that?

91

1   A.   Yes.
2   Q.   And it was the normal practice, wasn't it, that when the
3   Marketing Committee would meet, one of the typical agenda
4   items would be to ask for approval of the minutes from the
5   prior meeting, right?
6   A.   Yes.  But they didn't read them out loud or nothing.
7   Q.   But the members of the committee got them.  In fact, if
8   we look at the next page in this packet of materials, the
9   first thing after the agenda is a copy of those minutes
10  that -- from the March 31st, 2006 meeting, correct?
11  A.   Yes.
12  Q.   And that's the minutes, as we see down below, which
13  include the motion that is listed as having passed unanimously
14  for there to be an early molt and an early disposal of spent
15  hens, right?
16  A.   Yes.  But like I said earlier, there's less than
17  10 percent chance that I would have even read these minutes.
18  Q.   Okay.
19       MR. NEUWIRTH:  And let me hand you another document,
20  if I could, Your Honor, which is Plaintiffs' Exhibit 188.
21  BY MR. NEUWIRTH:
22  Q.   And this is now a meeting of the Shell Egg Marketing
23  Committee on October 11th, 2006 in San Antonio, Texas,
24  correct?
25  A.   Yes.  I think this was at the time of the annual UEP

92

1   meeting.  It wasn't just the marketing.  This was the annual
2   UEP meeting.
3   Q.   And do you see on the first page, again, there are
4   committee members listed, and your name is there?
5   A.   Yes, sir.
6   Q.   And do you see that there are a number of checks next to
7   certain names, and yours is one of the names that has a check
8   next to it?
9   A.   Yes.
10  Q.   And, again, this is the type of packet that would have
11  been given out normally at these meetings?
12  A.   Yes.
13       MR. NEUWIRTH:  And, Your Honor, we would, therefore,
14  move for the admission of Plaintiffs' Exhibit 188.
15       MR. KING:  No objection.
16       THE COURT:  188 is admitted.
17       MR. NEUWIRTH:  Okay.  And if we can put this up.
18  BY MR. NEUWIRTH:
19  Q.   I'd ask you now, again, to look at this time the third
20  page of the document, which has the heading Shell Egg
21  Marketing Committee, October 11, 2006.  And if you look on the
22  agenda at Item 3, instead of saying, Minutes of previous
23  meeting, this times it says:  Minutes of previous meetings.
24       Do you see that?
25  A.   You got me lost.  Where are we at?

93

1   Q.   Third page in the packet.
2   A.   The one that says Number 3?
3   Q.   It's actually just the third page in packet.  It actually
4   has the number 1 on the bottom on the center of the page.  And
5   it has the heading:  Shell Egg Marketing Committee, October
6   11, 2006.
7   A.   Right.
8   Q.   And do you see under the agenda that the third item
9   listed is minutes of previous meetings, plural.
10  A.   Yes.
11  Q.   And if you look behind that, do you see that not only are
12  there the minutes from the May 15th, 2006 meeting, but there
13  is also, after that, another copy of the minutes of the
14  March 31st, 2006 meeting?
15  A.   Yes, there's two sets.
16  Q.   And, again, these are the March 31st, 2006 minutes, which
17  say that:  The motion to have early molting six weeks earlier
18  than scheduled and to dispose of spent hens six weeks earlier
19  than scheduled was a motion that passed unanimously.
20       Correct?
21  A.   That's what it says, yes.
22  Q.   So what we have in terms of documents is minutes from a
23  March 31st, 2006 meeting which says that the motion passed
24  unanimously.
25       And then two subsequent meetings where the minutes

94

1   were reviewed and voted on, and it's your position that you
2   must have abstained, the minutes were incorrect, and that
3   neither of the subsequent meetings, you never pointed out that
4   there was a mistake?
5   A.   That's correct.  I never did point out that there was a
6   mistake.
7   Q.   We've talked a bit about Gene Gregory --
8   A.   Are you through with this?
9   Q.   Yes, sir.
10  A.   Okay.
11  Q.   We've talked about Gene Gregory, who you recall was a
12  senior officer of the United Egg Producers?
13  A.   Yes.
14  Q.   And you recall, even if you don't recall the exact year,
15  that ultimately after Al Pope retired as president of the
16  United Egg Producers, Gene Gregory became the president,
17  correct?
18  A.   Correct.
19  Q.   And Mr. Gregory, like all officers of the United Egg
20  Producers, served at the pleasure of the Board of Directors,
21  correct?
22  A.   Yes.
23  Q.   And the Board of Directors was made up of representatives
24  of shell egg producers, like yourself, correct?
25  A.   The Board of Directors had shell egg producers that had

95

1   multiple kinds of egg producers on it.
2   Q.   And do you recall any instance during your tenure on the
3   Board of Directors where the Board of Directors discussed the
4   possibility of removing Mr. Gregory from his position as an
5   officer of the United Egg Producers?
6   A.   I think that would only have been discussed at the
7   Executive Committee.  I don't think that was ever a discussion
8   at the Board meetings that I attended.
9   Q.   Did you ever hear in your years at the United Egg
10  Producers when Mr. Gregory was working there that there was
11  any effort underway to remove him as an officer of the United
12  Egg Producers?
13  A.   Gene was the fighter for all egg farmers.  I mean, he
14  really believed -- he was a crusader in what he believed, and
15  I don't know of any reason anyone would want to remove him.
16  Q.   Okay.  Now, are you familiar -- you are familiar with the
17  practice known as backfilling?
18  A.   Yes.
19  Q.   And backfilling is the practice where if you have a
20  henhouse with hens that are in it for some period of time and
21  some of them die or are removed for any reason, you would put
22  new laying hens into the empty cage, that's backfilling,
23  correct?
24  A.   They weren't really what you would call new.  They would
25  be old hens that was taken out of another building and instead

96

1   of being killed, you would place them into this other house.
2   Q.   Okay.
3   A.   If you had room.
4   Q.   Right.  And it's correct, isn't it, that the reason that
5   egg producers would backfill would be so that they could
6   produce more eggs in the cages that they had, right?
7   A.   Yes.
8   Q.   And when the United Egg Producers Certified Program was
9   originally created, backfilling was permitted under that
10  program, correct?
11  A.   It was permitted, but it wasn't liked by some of the
12  people.
13  Q.   But it was permitted?
14  A.   Correct.
15  Q.   And, in fact, when the Scientific Committee did its
16  original report, there was no recommendation to prevent
17  backfilling, was there?
18  A.   I don't recall exactly, but I don't think there was.
19  Q.   And certainly, as you said, when the program was
20  originally adopted through the Producers Committee, there was
21  no ban on backfilling at the time, right?
22  A.   Not that I remember.
23  Q.   Well, in fact, beyond not remembering it, isn't it the
24  case that -- that the United Egg Producers expressly let
25  members know that they were allowed to backfill under the

97

1   program when it was first adopted?
2   A.   Re -- I kind of lost you there.
3   Q.   Isn't it the case that the United Egg Producers, after
4   the Certified Program was first adopted, let producers know
5   that they were allowed to backfill?
6   A.   Yes.
7   Q.   And isn't it also the case that Rose Acre itself was
8   regularly engaged in backfilling during the first years of its
9   participation in the Certified Program?
10  A.   We had always backfilled.
11  Q.   And you continued to do that after you join the Certified
12  Program?
13  A.   Yeah, until we couldn't.  Yes.
14  Q.   And when you say "until we couldn't," that was until the
15  Certified Program was changed to prohibit backfilling,
16  correct?
17  A.   Correct.
18  Q.   Now, you recall, don't you, that at one point when
19  backfilling was still allowed under the Certified Program, you
20  received a copy of the United Voices newsletter where Al Pope,
21  who was then still the president, expressed some concern to
22  members that the benefits of the Certified Program were being
23  undermined by the fact that egg producers were backfilling,
24  right?
25  A.   I -- I did not personally read all of the things.  I

98

1   don't remember reading the United newsletters that had that in
2   there.  I was on a slow Internet connection in my office and,
3   you know, to read that it might take ten minutes for it to
4   download and it wasn't worth it.
5   Q.   Okay.
6            MR. NEUWIRTH:  If I may approach, Your Honor, let me
7   hand Mr. Rust Plaintiffs' Exhibit 505, if that pleases the
8   Court.
9            THE COURT:  Certainly.
10  BY MR. NEUWIRTH:
11  Q.   And do you see that Plaintiffs' Exhibit 505 is an e-mail
12  dated August 12, 2004 from Patricia Huff, of the United Egg
13  Producers to you, Marcus Rust?
14  A.   Yes.
15  Q.   And the subject is UEP Newsletter, correct?
16  A.   Correct.  I think I was on the mailing list.  I think
17  they sent them out to all UEP members.
18  Q.   And this is the type of e-mail that you would have
19  regularly received, correct, from United Egg Producers for
20  their United Voices newsletter?
21  A.   I would assume I would have received it.  I have no way
22  of knowing if I got this or didn't.
23  Q.   Well, this shows on the bottom that this was produced
24  from Rose Acre's files, correct?  RA1085 is the number that's
25  on the document which would indicate --

99

1   A.   That would mean that they found it in my e-mail file.
2   Q.   Right.  And if they did, that would suggest that it
3   was --
4   A.   That wouldn't mean I read it, sir.
5   Q.   The question I had is was it received in your e-mail?
6   A.   Yes.
7   Q.   Okay.  And do you see that attached to this e-mail is a
8   United Voices newsletter dated August 12, 2004?
9   A.   Yes.
10  Q.   And this is --
11       MR. NEUWIRTH:  Your Honor, we would move for the
12  admission of Plaintiffs' Exhibit 506.
13       MR. KING:  Objection.  Hearsay.  But we would agree
14  for a limited purpose.
15       THE COURT:  Okay.  505 will be admitted for the
16  limited purpose for the receipt of the document.
17       MR. NEUWIRTH:  Right.
18  BY MR. NEUWIRTH:
19  Q.   And you agree, Mr. Rust, that you would not have been the
20  only person that would normally have received a United Voices
21  newsletter.  I think you said they were regularly sent to all
22  members?
23  A.   Yeah.  I would assume there's other people or companies
24  that may have got it too.  I have no idea.
25  Q.   Right.  And you would have understood that other egg

100

1   producers who were members of the United Egg Producers would
2   have also received it at the same time that you did, right?
3   A.   Yes.
4   Q.   Okay.  And do you see that --
5        MR. NEUWIRTH:  And let me ask if we can put up the
6   document.  Let's turn to the first page of the newsletter
7   which is up there.
8   BY MR. NEUWIRTH:
9   Q.   Do you see that on the -- do you see that in the lower
10  corner, it says August 12, 2004, and if we turn to the second
11  page of the document, do you see that there's an article there
12  which says:  Backfilling, a loophole of a hangman's noose?
13  And it says:  Editorial by Al Pope.
14       Do you see that?
15  A.   Yes.
16  Q.   And Al Pope at this time was the president of the United
17  Egg Producers, correct?
18  A.   I think he was at that time, yes.
19  Q.   And do you see that there is a third paragraph there
20  which says:  A year later and while the ACC program was never
21  a supply management program, the backfill provision, in my
22  opinion, is contributing or even causing some of the
23  disorderly marketing and poor egg prices that we are currently
24  experiencing?
25       Do you see that?

101

1   A.   Yes.
2   Q.   Have we shot ourselves in the foot with this
3   well-intended provision?
4        Do you see that?
5   A.   Yes.
6   Q.   And then it says:  Is it a noose that is strangling the
7   opportunity of enjoying, once again, the favorable prices for
8   our product we expected this fall.
9        Do you see that?
10  A.   Yes.
11  Q.   And do you recall at this time, when Rose Acre was
12  actively engaged in backfilling as part of its business, that
13  at least Al Pope and maybe others at the UEP were starting to
14  question whether backfilling was good for business?
15  A.   I can't tell you what their opinions were.  I know what
16  ours was.
17  Q.   But my question to you was not what their opinions were.
18  My question was do you recall hearing that members of the UEP
19  or officers at the UEP were concerned about backfilling and
20  its impact on the business?
21  A.   My brother-in-law, K.Y. Hendrix, was one of the
22  proponents.  He always thought it was better to backfill the
23  bird rather than kill it.  So, you know, we always -- we
24  always liked putting bird -- you know, if you had some extra
25  birds, rather than kill them, place them in the house and

102

1   continue, you know, with more production, but, you know, it
2   was not the best thing for the birds.
3   Q.   Well, I take it you recall that Mr. Hendrix's opinion was
4   that it was more humane to backfill than to kill them,
5   correct?
6   A.   If you was the individual chicken that got sent to the
7   slaughter or to the disposal, you would naturally think being
8   backfilled would be better than the option.  Now, the problem
9   becomes when you put that chicken in a cage with other birds,
10  then hen pecking or so-called pecking order would take over
11  and the bird might get pecked out, and that's why the
12  Scientific Committee was against it.
13  Q.   Well, Scientific Committee originally, as we said
14  earlier, didn't make a recommendation against backfilling,
15  correct?
16  A.   They didn't.  At that point in time they hadn't studied
17  that much, I don't think.  I don't know for sure.
18  Q.   And then you recall, as I think you said, that at least
19  Al Pope, who was the president of the UEP, was expressing the
20  concern that backfilling could be bad for business, correct?
21  A.   He was one of those that was part of their so-called, you
22  know, advising members of supply, and he probably thought it
23  was something uncertain.
24  Q.   And then it's correct, isn't it, that in December
25  of 2004, the UEP made a ban on backfilling part of the

103

1  Certified Program?
2  A.   I don't remember the exact date.
3  Q.   Okay.  And do you recall that once the ban on backfilling
4  went into effect, the United -- your company stopped
5  backfilling?
6  A.   We would have whenever we -- we would have according to
7  what the program rules were.
8  Q.   Right.  And it's true, isn't it, that your
9  brother-in-law, K.Y. Hendrix, felt that it was more humane for
10  the hens to backfill than to do the alternative, which you
11  also described today, which was to slaughter them?
12  A.   Correct.
13       THE COURT:  Mr. Neuwirth, is this all right to
14  interrupt you?
15       MR. NEUWIRTH:  Yes, it's a good time.  Thank you.
16       THE COURT:  All right, ladies and gentlemen, we will
17  have a ten-minute break.  Don't talk about the case, but come
18  straight on back, and we will resume and go to 4:30 today.
19       THE DEPUTY CLERK:  All rise.
20       (Jury out.)
21       THE COURT:  Mr. Rust, you can step down and enjoy
22  the break, too.
23       (Witness exits.)
24       THE COURT:  Could I have Counsels' attention here.
25       Ms. Feldman, on the record.

104

1       With respect to the issue of this other witness and
2  the exhibit -- and the summary exhibit, is there unanimity in
3  terms of doing the background testimony outside the presence
4  of the jury or does somebody want it in the jury's presence?
5       MR. KING:  On behalf of Defendants, it's fine to do
6  it outside the presence of the jury.
7       THE COURT:  Perhaps you shouldn't have said that in
8  the presence of the Plaintiffs' counsel.
9       MR. NEUWIRTH:  No, I -- just as -- I just want to
10  check with Mr. Lyons, who's out of the courtroom, to confirm
11  that he agrees with the rest of us that we're all on the same
12  page here.  I think we are that it's fine to do it before
13  Your Honor.
14       THE COURT:  Well, the question -- I'll be here no
15  matter what.  The question is whether the jury is.
16       MR. NEUWIRTH:  Right.  We understand.  We're fine,
17  Your Honor.
18       THE COURT:  So we'll do it at 4:30.
19       MR. NEUWIRTH:  Yes.
20       THE COURT:  Okay.  Everybody's agreed on that?
21       ALL COUNSEL:  Yes.
22       THE COURT:  Okay, fine.
23       THE DEPUTY CLERK:  All rise.
24       (Jury in.)
25       THE COURT:  Okay, everybody may take their seats.

105

1       Mr. Neuwirth, you may resume.
2       MR. NEUWIRTH:  Thank you, Your Honor.
3  BY MR. NEUWIRTH:
4  Q.   Mr. Rust, let's turn to the subject of exports.
5       I believe you testified on Friday that although Rose
6  Acre joined the United Egg Producers in 2002, Rose Acre did
7  not join the United States Egg Marketers until later, I think
8  you said 2006; is that correct?
9  A.   I think December of 2006, maybe.
10  Q.   And you're familiar with United States Egg Marketers
11  being an organization that, during this period, was focused
12  primarily on exports, correct?
13  A.   It was the co-op that was going to market the eggs around
14  the world, yes.
15  Q.   And from the time that Rose Acre joined United States Egg
16  Marketers, you became a member of the Board of United States
17  Egg Marketers, correct?
18  A.   I don't know if I was on it immediately.  I think within
19  maybe the first year or something.  There was a time period I
20  was on it, and then I might have been on the Board and then I
21  was on an export committee, I think.  I don't remember the
22  exact dates.
23  Q.   That export committee, though, was a committee of the
24  United Egg Producers, correct?
25  A.   No.  The export committee was -- there was an export

106

1  committee in U.S. Egg Marketers.
2  Q.   Okay.  And do you recall that by 2007, you were on the
3  Board of United States Egg Marketers?
4  A.   If that's what the record shows.  I don't recall the
5  exact date.  I think I was.
6  Q.   Now, it's correct, isn't it, that the first United States
7  Egg Marketers' export that Rose Acre participated in was in
8  January of 2007.  Does that sound right?
9  A.   It seems like it was shortly after we joined, so I think
10  that could be.  I think -- I don't remember the exact dates of
11  the shipments.
12  Q.   Okay.  Now, when you testified on Friday, I had asked you
13  about your becoming involved in the United Egg Producers and
14  you made a point of pointing out that although you had joined
15  the United Egg Producers in 2002, you hadn't joined United
16  States Egg Marketers until several years later, right?
17  A.   Correct.  We joined U.S. Egg Marketing co-op when we had
18  surplus eggs in our North Carolina facility.
19  Q.   Well, we'll come back to that in one second.
20       But let me ask you first, do you recall that after
21  early 2003, United States Egg Marketers actually had no
22  exports for the remainder of 2003, none in 2004, none in 2005,
23  and then none until late 2006?
24  A.   I don't know.  I don't -- I was a member of them, I
25  wouldn't know what they would have had or not at that time.

Q. And presumably if USEM was not engaged in any exports, there also would have been no reason to join, correct?
A. Like I say, I don't know what -- I don't recall what they did from -- I had no reason to know what they did.
Q. Okay. Now, do you recall that once Rose Acre became a member of USEM, the United States Egg Marketers, I think you said in December 2006, Rose Acre then began participating regularly in United States Egg Marketers' exports?
A. Yes.
Q. And that in the year 2007, that -- and through mid-2008, Rose Acre participated in six exports by the United States Egg Marketers?
A. If that's what the records show, correct.
Q. But that sounds right, doesn't it?
A. It could be, yes.
Q. And at the very least, you know that Rose Acre was regularly participating during that time in these exports, correct?
A. Yes.
Q. Now, you mentioned a second ago a facility of Rose Acre in North Carolina, correct?
A. Yes.
Q. And isn't it the case that here before the jury -- I think you were present for opening statements, correct?
A. Yes.

Q. Of both sides, correct?
A. Correct.
Q. And do you recall hearing your counsel tell the jury, your counsel for Rose Acre tell the jury that Rose Acre joined the UEP Certified Program, "for one reason and one reason only," because Rose Acre, "had just opened up this egg farm in Hyde County, North Carolina."
Do you remember that?
MR. KING: Your Honor, objection. I think -- well --
THE COURT: If the witness has a different recollection, that's one thing. Of course, it's up to the jury to recall what the jury remembers from various opening statements, which, as I have been at pains to emphasize, what the lawyers say is not evidence.
MR. NEUWIRTH: Right.
MR. KING: Your Honor, the question made -- there may be a problem in the question that Mr. Neuwirth would like to correct.
THE COURT: Then he'll have a chance to rephrase his question.
BY MR. NEUWIRTH:
Q. Well, rather than take the time to pull up the opening, let me just ask you this: When you were here, do you recall Rose Acre's counsel telling the jury that the one and only

reason why Rose Acre joined the UEP Certified -- I'm sorry -- joined the USEM export program when it did was because Rose Acre had just opened up an egg farm in Hyde County, North Carolina?
A. I don't recall him saying that exactly. If that's what they said exactly, I guess that's what they said. I don't know.
Q. Well, let me ask you this: Do you feel that the one and only reason that Rose Acre joined the United States Egg Marketers when it did was because Rose Acre had just opened up a facility in Hyde County, North Carolina?
A. I recall we had done it because we had surplus eggs.
Q. And didn't you even say a few minutes ago today that those eggs were in Hyde County, North Carolina?
A. We would have had eggs in Hyde County, that would have been close to the border at Norfolk.
Q. And is it your position that the Hyde County facility had something to do with the decision to export when you started exporting in 2007 and 2008?
A. It would have been a major part of it.
Q. And why do you say it would have been a major part of it?
A. Because we was building a new farm in North Carolina and we was going to have surplus eggs going forward.
Q. And, in fact, haven't you taken the position previously under oath that because you had just built this facility in

North Carolina and you were going to have surplus eggs in that area, it would make sense for you to become involved in exporting?
A. We was already involved in exporting. It was just, you know, it was going to be more, more potential markets, you know, for our surplus eggs.
Q. And did Rose Acre have facilities anywhere else on the East Coast besides the Hyde County, North Carolina facility?
A. The closest we would have had would have been probably Georgia and -- but -- but it wasn't near -- this was near Atlanta, so it's quite aways from the coast yet.
Q. Now, do you dispute that the North Carolina facility at Hyde County was the reason that you became involved in the United States Egg Marketers when you did?
A. It was the main reason.
Q. Okay. Now, I think you mentioned earlier that you recall there were roughly six exports in 2007 and 2008 that Rose Acre participated in with United States Egg Marketers, right?
A. Yes.
Q. In how many of those six exports did Rose Acre supply eggs from its Hyde County facility?
A. I would -- I would have no idea on that.
Q. Would you be surprised if it was just one?
A. I would have no idea.
Q. And if you have no idea where the eggs came from, are you

111

1   able to say today that the Hyde County facility was the source
2   of the eggs that were used for export by Rose Acre?
3   A.   I know we've exported a lot of eggs from that farm.  I
4   don't know to which orders.  I don't get into individuals'
5   titles.
6   Q.   Well, do you recall in 2007 and 2008, Rose Acre, in those
7   United States Egg Marketers exports, supplied millions of
8   dozen of eggs for export?
9   A.   We supplied a lot.  I have no idea what the actual dozens
10  were.
11  Q.   And of those millions of dozens of eggs that were given
12  by Rose Acre to United States Egg Marketers for export in 2007
13  and 2008, do you have any idea, as you sit here today, what
14  percentage of those eggs actually came from that Hyde County
15  facility in North Carolina?
16  A.   I have no idea whatsoever, sir.
17  Q.   So would you agree that it could have been as little as
18  just 2 or 3 percent?
19  A.   It could have been 1 percent; it could have been
20  99 percent.  I don't know.
21  Q.   And it would make a difference, wouldn't it, if it was
22  1 percent as opposed to 99 percent, right?
23  A.   I'm not sure if that would have been a decision made by
24  the logistics and our sales department.  Not me.
25  Q.   But if it was just 1 percent, that would suggest that the

112

1   Hyde County facility in North Carolina, in fact, did not turn
2   out to be a source of most of the eggs that Rose Acre supplied
3   for export, correct?
4   A.   I remember some of the exports we did were shipped from
5   our Iowa facility because it was one of the few facilities
6   that was -- approved by Japan for eggs to go to Japan, and
7   other than that, I couldn't tell you where any of the eggs for
8   any of the exports come from.
9   Q.   And in 2007 and 2008, how many of the six USEM exports
10  that Rose Acre participated in involved sales of eggs to
11  Japan?
12  A.   I have no idea.  I just know that it took place.
13  Q.   In 2007 and 2008?
14  A.   I don't know the dates, sir.
15  Q.   Okay.  Now, what role would you have had in approving
16  eggs being used for exports through USEM?
17  A.   Through USEM?
18  Q.   Right.
19  A.   I would have only -- I would have been on the -- after --
20  a short time after having joined, I was on the export
21  committee and they would bring to the committee a volume and a
22  price that someone around the world was willing to pay, and
23  then I would take my knowledge of the egg industry and say
24  yeah, that's what I thought, that was good.  And other members
25  of the committee would do the same thing.

113

1   Q.   Now, in fact, you expressed concern, didn't you, about
2   discussions that were taking place at United States Egg
3   Marketers that you participated in, right?
4   A.   How do you mean, sir?
5   Q.   Well, you expressed concern in 2007, didn't you, that
6   these discussions which involved stabilizing and possibly
7   influencing the market were not taking place at a high enough
8   level of confidentiality, right?
9   A.   I don't agree with everything in your statement there,
10  but in the -- with relation to -- I sent an e-mail to Mr. --
11  to Larry Seger.  One of the times that there was an export, I
12  called Greg Hinton, who's our sales manager, and he kind of
13  laughed at me and goes, Yeah, he says this other guy already
14  told him all the information about the export.
15          And I was flabbergasted because I thought it wasn't
16  approved.  You know, we was just talking about it, and a guy
17  outside the group knew all about it.
18  Q.   Mr. Rust, the question I asked was whether you had
19  expressed concern with regard to discussions at USEM about
20  stabilizing and possibly influencing the market.  And then you
21  said to me you didn't agree with everything in my question.
22  Is that the part of the question you didn't agree with?
23  A.   Yes.
24  Q.   Okay.  Let me hand you a document that has been marked as
25  Plaintiffs' Exhibit 230.

114

1           And I apologize, I may have to grab it from my
2   larger box.  Just give me one second, please.
3           MR. NEUWIRTH:  May I approach, Your Honor?
4           THE COURT:  Yes, you may.
5   BY MR. NEUWIRTH:
6   Q.   And, Mr. Rust, this is in fact, isn't it, the e-mail you
7   mentioned before that you sent to Larry Seger of United States
8   Egg Marketers, right?
9   A.   Yes.
10  Q.   And this is an e-mail dated August 9th, 2007 from Marcus
11  Rust to Larry Seger on the bottom, and then up above, there's
12  a response that Larry Seger sent to you, correct?
13  A.   Yeah.
14  Q.   And the subject of these e-mails is US Egg Marketer
15  Calls, correct?
16  A.   Correct.
17          MR. NEUWIRTH:  Your Honor, we would move for the
18  admission of Plaintiffs' Exhibit 230.
19          MR. KING:  No objection.
20          THE COURT:  230 is admitted.
21          R. NEUWIRTH:  Okay, and if we could put this up.
22  BY MR. NEUWIRTH:
23  Q.   And do you see at the bottom of the page, it's your
24  e-mail, dated August 9, 2007, from you to Larry Seger?  Do you
25  see that on the second -- the bottom of the page?

115

```
1    A.    Yes.  Yes.
2    And I'd like you to look at this e-mail, and then if we
3    can go down about five lines, do you see it begins, there's --
4    after a dash, it says:  I do not think.
5              Do you see that?
6    A.    Yes.
7    Q.    And it says, doesn't it, in this e-mail you wrote:  I do
8    not think this is necessary for TWT member position calls, but
9    feel anytime we are talking of issues that would stabilize and
10   possibly influence the market, they should be held on a little
11   more stricter CONF call level, number two.
12             Do you see that?
13   A.    Yes.
14   Q.    Does this refresh your recollection that the concern you
15   were expressing to Mr. Seger was expressly about discussion of
16   issues that would stabilize and possibly influence the market?
17   A.    I don't think you said "possibly."  I thought you left
18   that out.  Your question was pretty long and I -- you know, I
19   have a hard time with long questions and I -- if I said -- if
20   you had it in your question, and she writes it that way, then
21   I'm wrong in what I said there.
22   Q.    Right.  The record will say what it says.
23             THE COURT:  Mr. Neuwirth.
24             MR. NEUWIRTH:  Yes, I'm moving on.
25   BY MR. NEUWIRTH:
```

116

```
1    Q.    And whatever may have been said in those earlier
2    questions, this shows that you felt that there were
3    discussions taking place regarding issues that would stabilize
4    and possibly influence the market, right?
5    A.    Yes.
6    Q.    And you thought that those discussions should be held on
7    a little more stricter CONF call level, right?
8    A.    Yes.
9    Q.    And what is that stricter CONF call level mean?  Is that
10   a higher level of confidentiality on the call?
11   A.    What the issue was, is there was a broker guy that knew
12   more about what was taking place on a supposed confidential
13   co-op member call, and I remember when we joined U.S. Egg
14   Marketers, everything -- we was told everything had to be in
15   strict confidence because it was a cooperative of farmers, and
16   whenever they felt stuff and they're talking about it, it
17   wasn't for general public information.  And this was the rules
18   of the U.S. Department of Agriculture had set on co-ops.
19             And when Mr. Rexing had contacted Mr. Hinton in our
20   sales department and informed him of everything that had been
21   discussed, I knew there was someone on the call or most likely
22   someone who gave him the call information and he sat in on the
23   call, and he was one who would always try to buy -- if the
24   market -- if he thought the market was moving one way or the
25   other, he'd always try to buy an extra load or two of eggs,
```

117

```
1    not a lot.  And to me, if you're out there trying to export
2    eggs, it's something that, you know, I thought it -- we
3    thought it was supposed to be confidential, so I assumed it
4    should have been confidential, and I was relaying the message
5    to Seger that it wasn't.
6    Q.    Now, you wrote this e-mail yourself in 2007, correct?
7    A.    Yes.
8    Q.    Show me if there's anyplace here where the word "co-op"
9    appears.
10   A.    That's US Egg Marketers.  Co-op is a co-op.
11   Q.    Where does it say co-op?
12   A.    It doesn't.  I just know what the group was and as a
13   member what my responsibilities were supposed to be, you know,
14   my recollection from when we joined.
15   Q.    Now, in fact, doesn't this e-mail say that what you're
16   concerned about is not what you just described but that
17   Michael Foods and Cargill are going to lay blame on high
18   markets to the exports that U.S. Egg Marketers have done,
19   right?
20   A.    What had happened is if you look at the price of
21   feedstuff, the cost -- the main ingredient of eggs is feed.
22   And in 2007, there was a time period where grain prices went
23   from -- I forget how cheap they were, but it was by a 30 or a
24   40 percent increase which was very significant.  And I was
25   afraid that the Michaels and Cargills were going to blame the
```

118

```
1    exports that we had done on the price of eggs going up when in
2    reality, the price, it was more based on the cost of the
3    underlying feed costs going up.
4    Q.    Now, Michael Foods is the Michaels you're referring to,
5    correct?
6    A.    Correct.
7    Q.    And the company Cargill, which is a major food company,
8    is the Cargill you're referring -- is the company you're
9    referring to, correct?
10   A.    Right.
11   Q.    And neither of them is a broker, is it?
12   A.    No.
13   Q.    And so the concern you express here has nothing to do
14   with what you just described about brokers.  Your concern is,
15   "You can bet your last dollar" that -- "You can bet your last
16   dollar the Michaels, Cargills and whoever is going to lay
17   blame on high markets we have to the exports we have done,
18   it's their simple way out to justify raising prices and put
19   blame elsewhere than their own high costs."
20             That's what you listed at the time as the concern
21   you had with this information not being kept confidential,
22   correct?
23   A.    No.  That was my -- not the concern -- the concern was
24   over the first thing about Mr. Rexing -- it was not about --
25   the confidentiality was not about that one.  It was only about
```

119

```
1   Mr. Rexing.
2   Q.   So this line that you wrote here:  You can bet your last
3   dollar, the Michaels, Cargills and whoever's going to lay
4   blame on high markets --
5   A.   That was number two.
6   Q.   You just didn't mean that?
7   A.   It says -- if you'll read right here, it says, you know,
8   I had made the issue about the call level, and then this is
9   number two.  It says right at the beginning:  Larry did some
10  notes I took after listening to the call today.  Number one,
11  reference to that other part.
12          Number two is only -- I was only stating what I
13  thought Michaels and Cargill would be telling their customers
14  as to why they was raising prices.  They tried to blame it on
15  what few eggs U.S. Egg Marketers exported.  U.S. Egg Marketers
16  exported, I don't even think -- very few eggs.
17  Q.   Right.  And you agreed, I take it, that a small change in
18  the egg supply can have a big impact on the price of eggs,
19  right?
20  A.   At different times it could have.
21  Q.   Now, Mr. Seger, who you sent that e-mail to, he was the
22  head of USEM, right?
23  A.   Yes.  He was the chairman.
24  Q.   He was the chairman of the Board, and, in fact, he was
25  not a paid employee, but, as the chairman, he was actually
```

120

```
1   with the company Wabash Valley Produce, correct?
2   A.   Correct.
3   Q.   Which was what?
4   A.   They were an egg breaking company in southern Indiana.
5   Q.   Right.  And they were one of the companies that
6   participated in the exports, correct?
7   A.   Yes.
8   Q.   Now, we spoke a little bit on Friday about the 100% rule,
9   right?
10  A.   Yes.
11  Q.   And this was a rule that I think we established was part
12  of the Certified Program virtually from the time that Rose
13  Acre became involved with the program, right?
14  A.   I don't recall if it was at the very beginning.  I know
15  someplace in there it was, and we was always a strong
16  supporter of the 100% rule.
17  Q.   Right.  And I believe that you testified on Friday that
18  your staunch support of the rule reflected a concern that
19  there were increased costs associated with having fewer hens
20  in the cage and that this was an opportunity to be part of a
21  program where all the producers would be subject to the same
22  requirements, correct?
23  A.   We wanted all producers to have the same square inches
24  per their birds so we at least had one thing that we could
25  point at and say, Yeah, we're in this program; this is what
```

121

```
1   we're doing.  It was all about square inches per the chicken,
2   not how many hens the producer had.
3   Q.   Well, in fact, you told us on Friday, didn't you, that a
4   producer can make the most money by having the hens in a space
5   of just 45 inches, right?
6   A.   Given times, given grain prices, yes.
7   Q.   And I think you said that that's because when they're
8   limited to 45 square inches each, they can't move very much
9   and they don't eat as much, correct?
10  A.   Correct.
11  Q.   And so the cost of feed is less, correct?
12  A.   Correct.
13  Q.   And I think you said that this was something you could
14  compare to locking kids up in a closet so that they wouldn't
15  run around all day and eat as much, right?
16  A.   Well, if they don't expend the energy, they're not going
17  to consume for the energy.
18  Q.   Right.  And you explained, didn't you, that given that
19  45 square inches per hen is, to use your term, the space at
20  which the producer can make the most money, it's more
21  expensive, you told us, to have the hens in cages where they
22  have more space, something like 53 or 56 inches?
23  A.   If a cage costs $10, and you can put five chickens in it,
24  that's $2 a chicken.  If you can only put two chickens in it,
25  that's $5 a chicken.  Your capital costs goes up relative to
```

122

```
1   how many chickens you put in the cage.
2   Q.   And not just your capital cost, but you told us that if
3   you have fewer hens in the cage, your feed costs go up because
4   they can move around more, they're exercising more and they
5   want to eat more, correct?
6   A.   Correct.
7          THE COURT:  Mr. Neuwirth, we're not going to redo
8   all of Friday, are we?
9          MR. NEUWIRTH:  No, not at all.  I'm just quickly
10  laying the groundwork for some questions for --
11         THE COURT:  Well, you are -- quickly is one of those
12  adverbs.  Let's move on.
13         MR. NEUWIRTH:  Okay.
14  BY MR. NEUWIRTH:
15  Q.   Now, let's flash ahead now to 2005.  And do you recall
16  that in 2005, there were several companies that were concerned
17  about the 100% rule and about certain marketing requirements
18  related to the 100% rule that had been adopted by the United
19  Egg Producers?
20  A.   Repeat your question.
21  Q.   Okay.  Do you recall that in early 2005, there were
22  several major egg producers that were concerned about the 100%
23  rule and related marketing provisions that had been adopted at
24  that time by the United Egg Producers?
25  A.   I don't recall that during the entire Animal Welfare
```

123

```
1   Program, there were various producers of various eggs.  I
2   don't recall the exact date.  You know, there was many people
3   through the time periods that did not like what we called the
4   100% rule.
5   Q.  And do you recall specifically that in 2005, Michael
6   Foods and Midwest Poultry and Sparboe and a group of other
7   Midwestern egg producers were concerned about the way that the
8   100% rule was being enforced?
9   A.  They didn't agree with our reasoning of how we thought it
10  should be.  I always thought, you know, if the farmer is going
11  to take care of these chickens for one customer one way and
12  say this is a good Animal Welfare Program for these chickens,
13  how can that farmer then go and stick them in a closet for
14  another customer and still be honorable to the customer that
15  they agreed to take care of their animals for in a more
16  appropriate manner.
17  Q.  But isn't it true that when you fought to keep the 100%
18  rule in effect at that time, what you just said was not the
19  reason you did it, but because you were concerned that it
20  would give other egg companies a competitive advantage if they
21  didn't have to stick with the 100% rule the way you had?
22  A.  That's an absolute fact.  Anyone that had their chickens,
23  then they would keep them at 45, and if they was honoring one
24  customer and saying we're doing it at 67, you know, they was
25  only taking care of their chickens for just a few for that
```

124

```
1   customer.  They weren't treating all their animals the same.
2   Q.  And that's exactly what you were saying on Friday, right?
3   That because it's cheaper, your costs are lower when you have
4   hens at only 45 square inches each.  If you're competing
5   against the company that has some of its hens with more space,
6   but other hens at 45 inches only, whereas you're complying
7   with the 100% rule, they'll be able to produce their eggs at a
8   lower cost than you, right?
9   A.  I have no problem with them doing it.  I have -- the
10  problem I had was them also being able to say -- they come
11  over here for other customers and say, we're going to produce
12  it this way, you know -- if you look at tennis shoe companies,
13  there are tennis shoe companies that would quit producing
14  tennis shoes in a certain country because they didn't like the
15  way the workers were being treated, you know, and they would
16  put this rule in for all the countries that produced, not just
17  that one, they'd do it for all.
18      And, you know, we're in a situation when we
19  developed and spent money on this program we had, we wanted
20  the producers and that program to follow those rules and say
21  we're all treating our chickens the same.
22  Q.  Now, we'll take a look in a minute at exactly what you
23  said at this time, but just to be clear, you recall that among
24  the companies at this time that was complaining about the
25  application of the 100% rule was Midwest Poultry, the company
```

125

```
1   headed by Mr. Krouse, correct?
2   A.  Yes.
3   Q.  And he joined with Michael Foods in complaining to the
4   UEP and trying at that time to get the 100% rule and the
5   marketing rules changed, right?
6   A.  I don't recall the exact time period, but he was in -- he
7   was on the opposite side of the fence, I'll agree with that.
8   Q.  Right.  And just so that we have the time period
9   straight, let me hand you a document that's already in
10  evidence, Plaintiffs' Exhibit 158.
11      MR. NEUWIRTH:  If I may approach, Your Honor?
12      THE COURT:  You may.
13      MR. NEUWIRTH:  And, Your Honor, this is already in
14  evidence and so I would propose to show it to the jury now.
15      THE COURT:  Go ahead.
16      MR. NEUWIRTH:  Thank you, Your Honor.
17      If we could put up Plaintiffs' Exhibit 158.
18  BY MR. NEUWIRTH:
19  Q.  And do you see that this is an April 20th, 2005 memo from
20  Gene Gregory to a group of people, including K.Y. Hendrix?
21  You'll see that on the very first page of the document.
22  A.  Yes.  Yes.
23  Q.  And K.Y. Hendrix, again, was your brother-in-law,
24  correct?
25  A.  Yes.
```

126

```
1   Q.  And you and Mr. Hendrix would regularly discuss what was
2   going on at the United Egg Producers, correct?
3   A.  At given times, yes.
4   Q.  And this shows, doesn't it, that at this meeting that
5   took place on April 19, 2005, where the minutes are attached,
6   if you turn to the fourth page of the document, you'll see
7   there's a heading, Challenges of Policy Regarding Who May
8   Market Animal Care Certified Eggs.  And do you see that it
9   begins:  Bob Krouse was joined by Toby Catherman and Terry
10  Baker and reported that they represented several producers
11  that were extremely concerned with the motion adopted in
12  January that stated the following.
13      And then there is a description of the motion there.
14      And does this refresh your recollection that in
15  2005, Bob Krouse of Midwest Poultry, and Toby Catherman and
16  Terry Baker of Michael Foods were telling United Egg Producers
17  that they had a concern about the program, its marketing
18  requirements, et cetera?
19  A.  Yes, I would agree with that.
20  Q.  Okay.  Now, do you recall that that same year, you then
21  went and told -- let me rephrase that.
22      Do you recall that same year you wrote to Gene
23  Gregory, the senior officer of the United Egg Producers, that
24  if there were any change to the 100% rule, Rose Acre would
25  drop out of the Certified Program?
```

127

1    A.   I think I threatened that, yes.
2    Q.   And let me show you a document that has previously been
3    marked as Plaintiffs' Exhibit 9 -- one second.  One second,
4    please.  I have it.  I have it.
5         MR. NEUWIRTH:  If I may approach, Your Honor?
6         THE COURT:  You may.
7    BY MR. NEUWIRTH:
8    Q.   And, Mr. Rust, is it correct that what I've just handed
9    you, at the bottom of the page is the e-mail that you sent to
10   Gene Gregory on December 30th, 2005, regarding the ACC or
11   Animal Care Certified Program?
12   A.   What about it?
13   Q.   Is this e-mail that you sent to Mr. Gregory on
14   December 30th, 2005 related to the Animal Care Certified
15   Program?
16   A.   Yes.
17   Q.   And above it is a response that Mr. Gregory then sent to
18   you that same day?
19   A.   Yes.
20        MR. NEUWIRTH:  Your Honor, we would move for the
21   admission of Plaintiffs' Exhibit 9.
22        MR. KING:  No objection.
23        THE COURT:  P-9 is admitted.
24        MR. NEUWIRTH:  And if we could put that up and if we
25   could highlight the e-mail on the bottom.

128

1    BY MR. NEUWIRTH:
2    Q.   I think you had testified a few minutes ago that you
3    remember having sent Mr. Gregory an e-mail threatening to
4    leave the program, and you begin this e-mail by saying:
5    Contrary to any rumors you may be hearing, we are not dropping
6    out of the ACC program.  What has been said that we were if
7    breaker demands were met, we will drop out of UEP if the
8    leeway is granted to the Minn-Iowa Group.
9         Do you see that?
10   A.   Yes.
11   Q.   And it's correct, isn't it, that the Minn-Iowa group was
12   the group that included Michael Foods and others from the
13   Midwest, correct?
14   A.   Correct.
15   Q.   And it's correct that what you were saying here, that the
16   leeway you're talking about is leeway on compliance with the
17   100% rule, right?
18   A.   I was very upset with the fact that the -- Michael Foods,
19   some of the companies that did not join in to the Animal
20   Welfare Program originally come back in and wanted in, but
21   they didn't have to go through the cost period where we had
22   actually -- we had to go out and spend a lot of money building
23   new henhouses to keep our bird numbers up.  They didn't.  They
24   just wrote a contract to other producers for lesser square
25   inches than what we had.  And by doing that, we were setting

129

1    their -- you know, sacrificing the economy of our scale at our
2    expense and giving them a free ride, I thought, at the time.
3    Q.   Okay.  Now, after this, you had some follow-up
4    correspondence with Mr. Gregory where you expressed some
5    concerns that giving this leeway to Michael Foods would allow
6    Michael Foods to sell eggs at a better price than Rose Acre
7    could, right?
8    A.   They were going to have the option -- they were selling
9    non-Certified eggs from 45 inches, but yet getting the benefit
10   of the program, the Animal Welfare Program that all the rest
11   of the producers had endorsed that they didn't endorse.  And
12   they was letting them come into it without paying the price of
13   having to go out and do it.  We just didn't think it was fair.
14   Q.   Right.  And the concern that you expressly noted to
15   Mr. Gregory was that they would be able to sell eggs at a
16   lower price than Rose Acre, right?
17   A.   They were going to have -- they were inducing, or
18   whatever you want to call it, getting people to produce at a
19   lower cost, and so they would have those eggs.  And then they
20   was going to come in and have their eggs that we didn't -- in
21   our family we didn't want to go out and buy eggs from somebody
22   else.  We wanted to produce the eggs.  Our goal was to produce
23   as many eggs as we could ourself.  And with Michaels having
24   the advantage of both programs, it just -- it wasn't fair.
25   Q.   And what wasn't fair in your view was that Michael Foods

130

1    was going to be able to sell at a lower price, correct?
2    A.   They were going to be able to tell 45-inch eggs at a
3    lower price than we were selling 67-inch, and they was also
4    having the advantage of selling the 67 of which we were not
5    doing that.  We were not doing the 45-inch thing.  We just
6    didn't feel that was -- you could be part of an Animal Welfare
7    Program and treat two different groups of chickens or incite
8    other producers to treat those chickens, you know, give them
9    half a sheet of paper.  You know, you're suing us for giving
10   us 67, which is two-thirds, and, you know, HSUS wanted us to
11   give a whole page or more.  And Michaels was going out and
12   giving them only a half of page of space.  Now, you just can't
13   be part of an Animal Welfare Program and not treat your
14   animals the same, sir.
15   Q.   Now, when you wrote to Mr. Gregory in 2005 and 2006, what
16   you said was you were concerned about the price that Michael
17   Foods would be able to sell at, right?
18   A.   They can sell -- if it costs you less to produce, they
19   can sell cheaper.
20        MR. NEUWIRTH:  If you'll pardon me for turning away,
21   I am just going to retrieve another document from the box.
22        If I could approach, Your Honor, I'd like to hand
23   the witness what's been marked as Plaintiffs' Exhibit 10.
24   BY MR. NEUWIRTH:
25   Q.   And is it correct that what we have here over two pages

131

```
1    is an e-mail chain between you and Mr. Gregory in April
2    of 2006?
3    A.   Yes.
4    Q.   And is it correct that one of those e-mails is on the
5    bottom of the first page, it's dated April 21st, 2006, that
6    you sent to Mr. Gregory?
7    A.   What did you ask, again?  I'm sorry.
8    Q.   Is it correct that on the bottom of the first page is an
9    e-mail that you sent on April 21st, 2006 to Mr. Gregory?
10   A.   Yes, I think -- yes.
11   Q.   Okay.
12        MR. NEUWIRTH:  Your Honor, we would move for the
13   admission of Plaintiffs' Exhibit 10.
14        MR. KING:  No objection.
15        MR. NEUWIRTH:  Okay.
16        THE COURT:  Well, not yet okay.  I want to talk with
17   counsel briefly over here at sidebar, excuse me, ladies and
18   gentlemen.
19        (The following transpired at sidebar:)
20        THE COURT:  I want to talk about this after we're
21   done with the jury, but I'm puzzled at going through the
22   testimonial evidence.  Where there's no discrepancy, he's not
23   fighting you about things.  He's saying various things and
24   then you're going over the very same material, taking huge
25   amounts of time with documents, as documentary evidence, when
```

132

```
1    we shouldn't be doing this twice.  I understand -- I mean, I
2    understand from a -- a theatrical standpoint what you're
3    doing, I think you're a great lawyer, but that doesn't mean
4    we're going to do every single point twice.
5        MR. NEUWIRTH:  I understand what Your Honor --
6        THE COURT:  We just went through the two exhibits, 9
7    and the one before that, 150-something or other.  I mean,
8    there was no point because he just agreed to all of that, and
9    then you went through and read the document.  I would like
10   that not to be the MO going forward.
11        MR. NEUWIRTH:  Okay.  We can accommodate that and be
12   responsive.
13        THE COURT:  Okay.  No problem.
14        (End of sidebar.)
15        THE COURT:  P-10 is admitted.
16   BY MR. NEUWIRTH:
17   Q.   And, Mr. Rust, I just have one question about this
18   document to follow up to what you've previously told us about
19   your views at this time on something I don't think you've
20   mentioned before.
21        MR. NEUWIRTH:  If we could put this up, this is
22   Plaintiffs' Exhibit 10.
23   BY MR. NEUWIRTH:
24   Q.   And if we can look at the e-mail that you wrote to
25   Mr. Gregory.  In this e-mail, you actually quantify, don't
```

133

```
1    you, what it costs Rose Acre to comply with the requirements
2    of the Certified Program, correct?
3    A.   Yes.  It costs us over $100 million, you know, which
4    was -- we had to go borrow the money to build all these new
5    facilities and extra houses so we could give all of our birds
6    more space, and they was going to let Michaels into the start
7    program and all they had to do was write someone a contract
8    and they could get eggs produced at, you know, 40 or 45 inches
9    and, you know, we -- and then turn around and start selling
10   their own eggs in the program that -- you know, that we wanted
11   everyone to be a part of, but it was unfair.
12   Q.   Well, Mr. Rust, in this e-mail, there actually is no
13   mention of $100 million amount.  I would direct you to
14   about --
15   A.   The production losses.  When you -- when you spend
16   100 million on new facilities, you know, we had other
17   facilities that was no longer producing.  You know, when
18   you took that chicken out of the cage and gave it more space,
19   we had to go build the new.  So we were not able to recoup
20   that cost where we borrowed money to build those facilities at
21   a higher or a lower square inch when we built it.
22        Now we was at this greater square inch.  So our
23   production costs on those facilities was going up and that's
24   how -- I was just speculating a number.  That's what I would
25   guess it cost us extra to produce eggs at those farms that we
```

134

```
1    took those birds out of, out of those houses.
2    Q.   In this e-mail to Mr. Gregory, in fact, the only cost to
3    Rose Acre that you mentioned is listed here about ten lines
4    down, right?  You say:  We, meaning Rose Acre, took 10 to 20
5    million in production losses to comply with this program.
6    Right?
7    A.   Yes.
8    Q.   That's the cost you told Mr. Gregory about?
9    A.   Yes.  That was an estimated.
10   Q.   And these are -- production losses means you produced 10
11   to $20 million less by complying with the program, correct?
12   A.   We produced less eggs from those facilities.
13   Q.   Okay.  And once again, this e-mail doesn't distinguish
14   certain facilities from others, correct?  All you talk about
15   here, all you tell Mr. Gregory is that you have 10 to 20
16   million in production losses, right?
17   A.   In my sense of thinking, when we joined the program, we
18   had the capacity for -- let's say it was 20 million birds,
19   okay?  If we never added one house to capacity or one new
20   building anyplace to have stayed in the program at the end of
21   the year, we would only have 15 million.  So our production
22   costs went up at all those other farms because we was
23   producing less dozens of those original houses.
24        What the attorney here is failing to understand is
25   we had to spend lots of money to build extra facilities so we
```

135

```
 1   could produce more eggs out of those other farms to make up
 2   for the birds that we pulled out of the first group of houses.
 3   Q.   And my only question, Mr. Rust, is that in this e-mail to
 4   Mr. Gregory, it's true, isn't it, that you do talk about the
 5   10 to 20 million in production losses, but you don't say
 6   anything about what you're saying now, that there were other
 7   investments in growth?
 8   A.   Mr. Gregory had been in the egg business long enough.  He
 9   would have understand that.  The ladies and gentlemen of the
10   jury have no idea what I'm talking about in this e-mail, sir.
11   Q.   Okay.  Now, you had some follow-up discussion by e-mail
12   with Mr. Gregory the next month where you described what you
13   saw as developments in the market, correct?
14   A.   I --
15   Q.   I haven't handed it to you yet.
16   A.   Okay.
17   Q.   I'm just asking you generally.
18   A.   How can I say if it's correct if I don't know.  I need to
19   look at it.
20   Q.   Okay.  I apologize again.  Just give me one second.
21        MR. NEUWIRTH:  May I approach, Your Honor?
22        THE COURT:  Yes, you may.
23   BY MR. NEUWIRTH:
24   Q.   Let me hand you what's been marked as Plaintiffs'
25   Exhibit 179.
```

136

```
 1        And is it correct that this is an e-mail chain
 2   between you and Mr. Gregory in May of 2006?
 3   A.   Yes.
 4   Q.   And is it correct that this is a continuation of your
 5   concern about the prospect that the United Egg Producers was
 6   going to give Michael Foods some sort of a break on the
 7   100% rule?
 8   A.   Yes.
 9   Q.   Now, do you see that on the first page, there's an e-mail
10   that you sent to Mr. Gregory on May 22nd, 2006?
11   A.   The one that speaks to a 95 to 99 percent rule?
12   Q.   Yes?
13   A.   Yes.
14        MR. NEUWIRTH:  Your Honor, we would move for the
15   admission of Plaintiffs' 179.
16        THE COURT:  The whole thing?  There's four pages of
17   text.
18        MR. NEUWIRTH:  I think that what we could do is move
19   for the admission just of the e-mails between Mr. Gregory and
20   Mr. Rust and we could -- we could leave out the e-mail at the
21   bottom of the last page and then -- the three e-mails on
22   the -- the three last e-mails that involve other individuals
23   as well.
24        MR. KING:  Your Honor, that would -- we would not
25   object to that except with respect to the middle e-mail on
```

137

```
 1   page 1, the 4:06 p.m. e-mail of May 22nd, we would object to
 2   the last sentence based on Rule 403.
 3        THE COURT:  I already ruled on that, that some of
 4   that was to be redacted.  I recall quite distinctly.
 5        MR. NEUWIRTH:  And I can do this at sidebar or I
 6   don't want to say anything in front of the jury.
 7        THE COURT:  Fair enough.  But I know that I've
 8   addressed this.
 9        MR. NEUWIRTH:  I understand, Your Honor, and what we
10   were hoping to do is lay a foundation now that we have the
11   witness for the admission.
12        THE COURT:  Then you'll have to do that after hours,
13   not right now.
14        MR. NEUWIRTH:  Thank you, Your Honor.
15        THE COURT:  We'll revisit this since I don't think
16   that we're going to finish this witness before 4:30 today.
17        MR. NEUWIRTH:  Ah, okay, thank you, Your Honor.
18   BY MR. NEUWIRTH:
19   Q.   So let's put this to the side and we can move on from
20   that.
21        MR. NEUWIRTH:  In fact, Your Honor, according to my
22   watch, at least, it's almost 4:30.  This may be --
23        THE COURT:  Well, you've been moving your clock a
24   little faster than mine.
25        MR. NEUWIRTH:  Okay.
```