# ATTACHMENT 61

1                    IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
5

6

7                            - - - - -

8                       PHILADELPHIA, PA

9                          - - - - -

10                      NOVEMBER 13, 2019

11                         - - - - -

12

13   BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.

14                          - - - - -

15                TRANSCRIPT OF TRIAL PROCEEDINGS

16                            DAY 8

17                          - - - - -

18

19

20

21             KATHLEEN FELDMAN, CSR, CRR, RPR, CM
               Official Court Reporter
22             Room 1234 - U.S. Courthouse
               601 Market Street
23             Philadelphia, PA  19106
               (215) 779-5578
24

25
          (Transcript produced by mechanical shorthand via C.A.T.)

52

```
1   keep them shorter than longer or break them up in some
2   fashion, I think you-all will be much happier.
3           MR. BLECHMAN:  We understand, Your Honor, and my
4   understanding is that the Bell and the Gregory deposition
5   videos were the two longest.
6           THE COURT:  Whatever.
7           MR. BLECHMAN:  But --
8           THE COURT:  I'm just making the observation.
9           MR. BLECHMAN:  Thank you, Your Honor.
10          THE COURT:  We're going to try and keep the
11  temperature in here as cool as possible for similar reasons.
12          MR. BLECHMAN:  Thank you.
13          THE COURT:  Okay.
14          THE DEPUTY CLERK:  All rise.
15          (Jury in.)
16          THE COURT:  Okay, you-all may take your seats and
17  the Plaintiff may call the next witness.
18          MR. SLATER:  Your Honor, Plaintiffs call Mr. Marcus
19  Rust.
20          THE DEPUTY CLERK:  Please remain standing and raise
21  your right hand.
22          (Witness sworn.)
23          THE DEPUTY CLERK:  Could you please have a seat.
24  Please state your full name and spell your last name for the
25  record.
```

53

```
1           THE WITNESS:  Marcus David Rust.
2           MR. SLATER:  Your Honor --
3           THE COURT:  Is it R-U-S-T?  Right?
4           THE WITNESS:  R-U-S-T like in cruise.
5           THE COURT:  Good morning, Mr. Rust.  How are you?
6           THE WITNESS:  Fine.
7           MR. SLATER:  Your Honor, may I introduce myself to
8   the jury?
9           THE COURT:  Sure.
10          MR. SLATER:  I am Paul Slater.  I represent
11  SuperValu and Publix.
12                  MARCUS DAVID RUST,
13
14
15
16
17
18
19
20
21
22
23
24
25
```

54

```
1       called as a witness herein by the Plaintiffs, having been
2       first duly sworn, was examined and testified as follows:
3                   DIRECT EXAMINATION
4   BY MR. SLATER:
5   Q.   Mr. Rust, good morning.
6   A.   Good morning.
7   Q.   Mr. Rust, I believe you are the president and CEO of Rose
8   Acre?
9   A.   I'm CEO in title.
10  Q.   And you became the CEO in 2011?
11  A.   Yes.
12  Q.   And prior to being the CEO, you were the vice president?
13  A.   Yes.
14  Q.   When did you become the vice president?
15  A.   I own the family farm-type thing, and we had to have
16  titles.  So I'm not sure.  The titles get stuck on paperwork
17  back in the '70s, the late '70s and, you know, I don't
18  remember what years or dates or what the titles were, you
19  know.
20  Q.   Is it fair to say that prior to 2000, you were performing
21  essentially the same services that you now perform as the CEO?
22  A.   Yes.
23  Q.   Rose Acre, I believe, is the second largest egg producer
24  in the United States?
25  A.   Yes.
```

55

```
1   Q.   And I believe you testified before you worked for Rose
2   Acre your entire life; is that right?
3   A.   Yes.
4   Q.   And you referred to it as a family farm?
5   A.   Yes.
6   Q.   That's a fairly modest description of the business, isn't
7   it?
8   A.   Well, yeah, but, you know, that's our -- my grandfather
9   was a farmer.  My -- both -- both grandparents raised chickens
10  and that's what we do today.
11  Q.   And today you have 18 facilities in eight different
12  states?
13  A.   Probably about right, yes.
14  Q.   And you have about 24 million hens, give or take?
15  A.   Give or take.
16  Q.   Just about 24 million.  Is that about the right number?
17  A.   Yes.
18  Q.   And those hens lay about 7 billion eggs per year?
19  A.   I think that -- some -- one of the papers I reviewed
20  yesterday said 6.9 billion, so it's real close.
21  Q.   And each one of your farms has multiple buildings?
22  A.   Yes.
23  Q.   And some of them are highly automated?
24  A.   All are highly automated.
25  Q.   It goes right from the chicken to the package and
```

56

1 untouched by human hands?
2 A.  Yes.
3 Q.  Can I show you PX-624.
4       MR. SLATER:  May I approach, Your Honor?
5       THE COURT:  Yes, you may.
6       MR. SLATER:  Thank you.
7 BY MR. SLATER:
8 Q.  Mr. Rust, is that a consolidated financial statement of
9 Rose Acre dated June 2008?
10 A.  Yes.
11 Q.  And is June your corporate year end?
12 A.  Yes.
13 Q.  So in June, financial statement would be for a full year?
14 A.  Um, if it's -- says June, it may only be that month.  I'm
15 not sure without looking.
16 Q.  If it's more than just the month of June, it would be for
17 a year?
18 A.  If it's more than a month of June, yes, it would be for a
19 year.
20 Q.  Okay.
21       MR. SLATER:  Your Honor, I offer PX-624.
22       THE COURT:  Is there any objection?
23       MR. KING:  No objection, Your Honor.
24       THE COURT:  Then 624 is admitted.
25       (Exhibit received in evidence.)

57

1       MR. SLATER:  Your Honor, may I have permission to
2 publish the document to the jury?
3       THE COURT:  Yes.
4 BY MR. SLATER:
5 Q.  And referring to the page with the Bates number that ends
6 in 780, and, Mr. Rust, this would be the page again that ends
7 in the Bates Number 780.  I think it's the fourth page in the
8 document.
9 A.  You say fourth from the back?
10 Q.  Fourth from the front.
11 A.  Fourth from the front.
12 Q.  Do you have that, sir?
13 A.  Is there a number at the bottom?
14 Q.  There is.  The number at the bottom is RA0081780.
15 A.  Okay.  Yes.
16 Q.  Okay.  And if you look at the column that's labeled
17 Revenue?
18 A.  Yes.
19 Q.  Do you see that for shell eggs in 2008, you had revenue
20 of $414 million, approximately?
21 A.  Yes.
22 Q.  And then you had revenue for processed eggs of
23 $106 million?
24 A.  Yes.
25 Q.  Now, did you produce the processed eggs that went into

58

1 the sales that made up that $106 million?
2 A.  We may have.  Some of them may have been bought.  I'm not
3 sure without looking.
4 Q.  What percentage of the eggs that you sell for processed
5 eggs are purchased as opposed to raised yourself?
6 A.  Repeat the question again, please.
7 Q.  Yes.  Sure.  What percentage of the eggs that Rose Acre
8 sells are -- turns into processed eggs do you produce yourself
9 and what percentage do you buy from other people?
10 A.  I would say we're over 95.  90, 95 percent we produce
11 ourselves.
12 Q.  And if you'll look at the column over on the right-hand
13 side, it says YTD.  That's year to date?
14 A.  Yes.
15 Q.  Per dozen cents?
16 A.  Yes.
17 Q.  Is that the price which you've gotten on average for a
18 dozen shell eggs and the price below that for a dozen
19 processed eggs?
20 A.  No.
21 Q.  What is it?
22 A.  That would be the -- if you look total revenue, when we
23 figure our costs per dozen, that 23.28, that is how many cents
24 per dozen of the total revenue related back to egg products.
25 It's just a statistical number.  The price for processed eggs

59

1 sales per dozen would be much higher than that.
2       That's -- of all the dollars in that month, you
3 know, if you took that, it says $1.32 revenue per dozen eggs.
4 $0.90 would have come from shell egg sales.  $0.23 would have
5 come from processed egg sales.  It's not what they got per
6 dozen.  That's what the total dollars per sale was.
7 Q.  Thank you.  I appreciate that.
8       And looking at the bottom, it shows total revenue
9 for that year of $608 million.
10 A.  Yes.
11 Q.  And it shows earnings from operations of $182 million?
12 A.  Yes.
13 Q.  And would you look at the next page, please.  In the
14 column on the left which is captioned Revenue, do you see
15 that?
16 A.  Yes.
17 Q.  Okay, it's got soybean products.  Aside from producing
18 and selling eggs, do you sell soybeans?
19 A.  We have a soybean processing plant where we buy soybeans
20 and then we process the meal for our chickens, and then we
21 sell the oil and some of the excess meal off to other people.
22 Q.  Okay.  And you also have backhauling.  Do you have a
23 trucking operation?
24 A.  Our egg trucks that deliver eggs to our customers, you
25 know, to maximize cost efficiencies, we also backhaul freight.

60

```
1   We have a truck.  We try to haul something back, and that
2   would be revenue for the truck.
3   Q.   And you also sell manure?
4   A.   Yes.
5   Q.   And you also have some rental income?
6   A.   Yes.
7   Q.   Now, what do you rent?
8   A.   Probably some of the different -- we've got stuff in
9   eight different states.  We don't -- we farm a lot of our
10  ground in Indiana, but in other states, we rent the ground
11  out.  So it would be farmer income, I'm guessing.
12  Q.   And foreign operations revenue, what's that?
13  A.   That would -- my -- my little brother moved to South
14  America in 1989, and we have a farm and soybean -- we grow
15  soybeans there.
16  Q.   Which little brother is that?
17  A.   James.
18  Q.   Which?
19  A.   Brother James.
20  Q.   James.
21       Now, Rose Acre joined the UEP in 2002; is that
22  correct?
23  A.   Correct.
24  Q.   February 2002?
25  A.   I believe that was -- yes.
```

61

```
1   Q.   And the UEP is an industrywide association of egg
2   producers?
3   A.   Yes.
4   Q.   And the other egg producer members of the UEP were
5   competitors of yours?
6   A.   Yes.  The UEP was a cooperative -- Capper-Volstead
7   cooperative, farmers' cooperative.
8   Q.   So you're all farmers and you're all competitors?
9   A.   Yep.
10  Q.   At the time you joined the UEP, you became the
11  representative of Rose Acre as a member on the UEP Board of
12  Directors?
13  A.   Yes.
14  Q.   And I believe you're still on the Board of Directors?
15  A.   Yes.
16  Q.   So you've been there since approximately 2002 to date?
17  A.   Yes.
18  Q.   And the other members of the Board of Directors were
19  either owners of producers, egg producers, or were high level
20  employees of egg producers; is that right?
21  A.   Yes.
22  Q.   And you took over your responsibilities -- you took your
23  responsibilities at the Board of Directors pretty seriously?
24  A.   Yes.
25  Q.   Tried to stay abreast of what the UEP was doing and why
```

62

```
1   it was doing it?
2   A.   Yes.
3   Q.   Is it fair to say that the board members worked together
4   to further the interests of the UEP?
5   A.   That's probably a fair statement.
6   Q.   And when you served on the board, you were also trying to
7   further the interests of Rose Acre; is that right?
8   A.   Yes.
9   Q.   Now, when you joined Rose Acre, you became a member of
10  the Marketing Committee of the UEP?
11  A.   You mean when we joined.  You said when I joined Rose
12  Acres?
13  Q.   I believe so.  Oh.
14  A.   Or UEP?
15  Q.   Thank you.  Thank you very much.
16       When you became a member of the UEP, you joined --
17  you became a member of the marketing committee of the UEP?
18  A.   Yes.  I don't know about that.  I know I was on the
19  marketing committee at various times.  I'm not sure exactly
20  when it was.  I don't think I was immediately.
21  Q.   Was it within a few months?
22  A.   I don't remember.
23  Q.   You also regularly attended the meetings of the UEP
24  Animal Welfare Committee even though you weren't on that
25  committee; isn't that true?
```

63

```
1   A.   Yes.
2   Q.   And you did that because you wanted to stay informed as
3   to what the Animal Welfare Committee was doing and why it was
4   doing it?
5   A.   Yes.
6   Q.   Who is Ky Hendrix?
7   A.   My brother-in-law.
8   Q.   Married to your sister?
9   A.   Married to my sister Ruth Ann.
10  Q.   And Mr. Hendrix worked for Rose Acre?
11  A.   Yes.
12  Q.   Is he retired now?
13  A.   Yes.
14  Q.   When did he retire?
15  A.   About 2012, I think.
16  Q.   And is it "Ky" or is it "Ky" (phonetic)?
17  A.   It's - his real name is Brian.
18  Q.   I presume if I refer to him as Brian, nobody would know
19  what I was talking about.
20  A.   Being he was my sister's boyfriend at the time and then
21  he worked for me, I always -- had a southern accent and he
22  actually lived in Kentucky for about four months with his
23  grandfather or father or cousin or something, but he sounded
24  like he was -- he had that southern accent from Kentucky, and
25  I used to call him Ky.
```

64

1   Q.   Okay, we'll stay with Ky then.

2        Is it fair to say that both you and Ky took the

3   positions with the UEP because you wanted to keep up with what

4   the UEP was doing and why it was doing it?

5   A.   Yes.

6   Q.   And one of the reasons you wanted to keep tabs on what

7   was being done and said at the UEP, was because you had heard

8   rumors that the UEP might be making marketing recommendations

9   relating to supply management of eggs?

10  A.   The UEP has always had a program of where they tell their

11  farmers what to expect in the egg market and what they should

12  do and not do as far as production.  Several UEP members in

13  the past -- then we had three different lawsuits filed against

14  us by UEP members for selling eggs too cheaply to their

15  customers.  And we've always been about growth, you know,

16  growing our business, and producing eggs the cheapest way

17  possible, and we were highly suspicious of what some of the

18  UEP members were doing or not doing.

19  Q.   And your suspicion was they were trying to manage the

20  supply of eggs and raise price as opposed to doing something

21  else; is that right?

22  A.   Yes.

23  Q.   Now, when you joined the UEP, Rose Acre did not join the

24  Certified Program right away, did you?

25  A.   No.  It was just a few months later.

65

1   Q.   Now, you join the UEP in February and you joined the

2   Certified Program in April?

3   A.   Yes.  We had several customers that were demanding that

4   we join the Animal Welfare Program that UEP offered and that

5   was the main reason we joined UEP.  Because, you know, if we

6   was going to be part of a program, you know, we wanted to make

7   sure what the rules were, that we could live with them at our

8   farms.  And, you know, if you're going to do something that's

9   good for the chicken, you know, it also has to be good for the

10  farmer.

11  Q.   And -- excuse me, were you through?

12  A.   And that's why we joined the program.

13  Q.   And when you joined the program, you agreed to follow the

14  rules of the Certified Program?

15  A.   Yes.

16  Q.   And can I show you PX-712.

17       MR. SLATER:  May I approach, Your Honor?

18       THE COURT:  Yes.

19  BY MR. SLATER:

20  Q.   Mr. Rust, this is an application for certification of

21  Animal Husbandry Certified Company.  Do you see that?

22  A.   Yes.

23       MR. SLATER:  I move the admission of PX-712, Your

24  Honor.

25       THE COURT:  Any objection?

66

1        MR. KING:  No objection, Your Honor.

2        THE COURT:  712 is admitted.

3        (Exhibit received in evidence.)

4   BY MR. SLATER:

5   Q.   Okay, and this is -- if you look at the last page of the

6   document, there's a signature page form there.

7   A.   Yes.

8   Q.   And it says, Rose Acre, and it's signed by somebody.  Do

9   you know whose signature that is?

10  A.   Greg Hinton.

11  Q.   And Greg Hinton, yeah -- it says e-mail down there,

12  GHinton.

13       Who is Greg Hinton?

14  A.   He is our sales manager.

15  Q.   Okay.  And if you look at the upper left-hand corner of

16  the document, there's a little note that --

17       MR. SLATER:  If I didn't have people to tell me what

18  to do, I wouldn't have the vaguest idea.

19       May we publish the document to the jury, Your Honor?

20       THE COURT:  Yes, you may.

21       MR. SLATER:  Thank you.  I apologize.

22       THE COURT:  No.

23  BY MR. SLATER:

24  Q.   Mr. Rust, are you still on the last page?

25  A.   Yes.

67

1   Q.   Do you see the e-mail line at the top of the page on the

2   far left corner, it says April 1, 2002?

3   A.   Yes.

4   Q.   Up at the very top.

5        And is that the date that you believe Mr. Hinton

6   sent the signed form to the UEP agreeing to join the program?

7   A.   I would assume it was.

8   Q.   And if you look back on the first page of the document,

9   please, and I'm looking at the second paragraph:  The company

10  understands that in order to achieve the certification, it

11  must commit to meeting UEP guidelines on 100 percent of their

12  egg production facilities.

13       Do you see that?

14  A.   Yes.

15  Q.   So when you joined the program, you agreed to what's been

16  referred to as the 100% rule?

17  A.   Yes.

18  Q.   And you agreed to adhere to that?

19  A.   Yes.

20  Q.   And you did adhere to it?

21  A.   Yes.

22  Q.   And the next line down, it says:  The company further

23  agrees to provide UEP with a listing of all company egg

24  production facilities designated by house number or name,

25  location, and total square inches of cage space per house.

68

1      Do you see that?
2   A.   Yes.
3   Q.   Okay.  Now, that was to monitor the facilities of the
4   members of the Certified Program and make sure that they
5   weren't cheating by producing uncertified eggs in some of
6   their houses?
7   A.   Repeat your question again.
8   Q.   Sure.  Maybe I'll break it down in a couple of parts and
9   make it simpler.
10      This was an agreement by the members of the program
11   that they would tell the UEP how many houses they had, what
12   facilities, what their capacity was essentially?
13   A.   To say -- yeah, you had to measure how many inches of
14   space you had in each house.
15   Q.   And that was to make sure that people were complying with
16   the 100% rule?
17   A.   For the chickens in that house.
18   Q.   And the 100% rule required the -- all of the facilities
19   of that producer to be compliant with the rules, correct?
20   A.   Correct.  But you could have all the houses you wanted.
21   There was no limit on houses, just how many chickens you could
22   have in that space.
23   Q.   We'll get to that.  I promise you.
24      If you look down at the last paragraph on the first
25   page:  The company commits to meeting the space allowance

69

1   guideline as detailed below.
2      And then you've got, you know, on that page and at
3   the top of the next page, the phase-in schedule for the per
4   inches per hen per cage, correct?
5   A.   Yes.
6   Q.   And what's listed here are for the white hens, not the
7   brown hens?
8   A.   They don't specify, I don't think.
9   Q.   All right.  There are other documents, we'll show it.
10   A.   Okay.
11   Q.   If you look at the second page:  The company agrees --
12   that would be Rose Acre -- agrees to be audited annually.
13      Do you see that?
14   A.   Yes.
15   Q.   Okay.  And, again, that was an agreement between Rose
16   Acre and the UEP that you would be audited, correct?
17   A.   It was -- yes, for the Animal Welfare Program.
18   Q.   Okay, and the audit was, amongst other things, to
19   determine whether you were compliant with the 100% rule?
20   A.   Yes, because that's what the Supermarkets wanted.
21   Q.   We'll get to that, too.
22   A.   Okay.
23   Q.   And the next line down:  The company agrees to provide
24   the UEP with a copy of the audit results upon the completion
25   of each audit.

70

1      Do you see that?
2   A.   What paragraph are you in?
3   Q.   It's just below the one with regard to the audit.
4   A.   You mean to this here on the screen?
5   Q.   The one on the screen will be fine, yeah.
6   A.   Okay.  Yes.
7   Q.   Okay.  And then there's a line that says:  UEP will...
8      Do you see that?
9   A.   Yep.
10   Q.   Okay.  Now, in return for the promises that were being
11   made by the member, in this case, Rose Acre, the UEP was
12   promising that it would do certain things for you, correct?
13   A.   I guess they were, yes.
14   Q.   And they were promising that you could use their
15   certified label so long as you remained compliant with the
16   program?
17   A.   Correct.
18   Q.   So this was an agreement between you and the UEP?
19   A.   Yes.
20   Q.   You agree to adhere to the rules, they agree that you can
21   use the certified label of the UEP?
22   A.   Yes.
23   Q.   And isn't it true that every company that joined the
24   Certified Program had to sign one of these applications?
25   A.   It's my understanding.

71

1   Q.   Isn't it also true that each member of the UEP Certified
2   Program knew that the other members of the Certified Program
3   also had to sign this application and agree to follow these
4   rules?
5   A.   Repeat the question again.  I'm not sure what you're
6   asking.
7   Q.   Okay.  Isn't it true that all of the members of the UEP
8   Certified Program knew that not only they, but that the other
9   producers also had to sign this agreement to adhere to the
10   rules?
11   A.   I can't speak for them, but, you know, from our
12   perspective, that's what we was told.
13      MR. SLATER:  We have PX-112.
14      May I approach, Your Honor?
15      THE COURT:  Yes.
16   BY MR. SLATER:
17   Q.   Mr. Rust, this is a United Voices newsletter dated
18   March 25, 2002.  United Egg Producers, Gene Gregory editor.
19   Do you recognize that document?
20   A.   It looks to be one of the UEP newsletters.
21      MR. SLATER:  I move the admission of PX-112.
22      THE COURT:  Well, it's already there.  It's already
23   in.
24      MR. SLATER:  In that case, I withdraw it.  Thank
25   you.

72

1   BY MR. SLATER:
2   Q.   Mr. Rust, do you see the list of companies on the first
3   page there?
4   A.   Yes.
5   Q.   And this was the UEP --
6        MR. GERMAINE:  Publish it.
7        MR. SLATER:  Can I publish the document?
8        THE COURT:  Well, yes, it's been published already,
9   so it can be published again.
10       MR. SLATER:  Thank you.
11  BY MR. SLATER:
12  Q.   Mr. Rust, if you look at the first page of the document.
13  A.   Yes.
14  Q.   That's a list of the companies who had joined the
15  Certified Program that is being circulated by the UEP to all
16  of its members.
17  A.   Yes.
18  Q.   And it's telling all of the members that these people
19  have already signed up.
20  A.   Correct.
21       MR. SLATER:  Now, could I have PX-109.
22       May I approach, Your Honor?
23       THE COURT:  Yes.
24  BY MR. SLATER:
25  Q.   Mr. Rust, this appears to be an e-mail from Ky Hendrix to

73

1   Lois Rust, who I believe is your mother; is that correct?
2   A.   Yes.
3   Q.   And also to you, and it's dated March 14, 2002, correct?
4   A.   Yes.
5        MR. SLATER:  I move the admission of PX-109.
6        MS. SUMNER:  Your Honor, we have an objection.
7   Hearsay.
8        THE COURT:  It is indeed hearsay.
9        MR. KING:  No objection on behalf of Rose Acre.
10       THE COURT:  No objection?
11       MR. KING:  On behalf of Rose Acre Farms.
12       MR. HARRIS:  We have the same hearsay objection.
13       THE COURT:  Okay, three objections on the basis of
14  hearsay.
15       MR. SLATER:  What -- can I confer with counsel for a
16  second?
17       THE COURT:  Sure.
18       MR. SLATER:  Your Honor, I don't think I'm going to
19  be using the document for anything that would be hearsay.  If
20  I do, counsel is more than welcome to object again and I'll
21  address it at that time.  I don't believe what we're using it
22  for is hearsay.
23       MS. SUMNER:  Well, then we would need a limiting
24  instruction.  We think that it can't be used for that purpose
25  and certainly can't be admitted for that purpose because the

78

1        THE COURT:  Okay.  So the objections are from UEP
2   and USEM to the admission.
3        MS. SUMNER:  And a limiting instruction for us.
4        THE COURT:  Well, I mean, in the absence of a
5   limiting instruction.  That's the objection, right?
6        MR. HARRIS:  Notice to Rose Acre would not be notice
7   to USEM or UEP.
8        MR. SLATER:  It's not being presented as notice.
9        THE COURT:  Why don't you-all get your chickens in a
10  row here.  And then if you want to offer the document within a
11  certain perimeter or parameter, whichever your preference is,
12  then that would be great, okay, but I want to get back to
13  using these folks.
14       MR. SLATER:  I'll offer it just against Rose Acre.
15       THE COURT:  Okay.
16       MS. SUMNER:  Thank you.
17       THE COURT:  Good work.
18       (End of sidebar.)
19       THE COURT:  As I understand it, Counsel, you are
20  offering Exhibit 109 as to Rose Acre only, not as to UEP or
21  USEM.  Is that my -- is that correct?
22       MR. SLATER:  Correct, Your Honor.
23       THE COURT:  Okay.  With that limitation, then 109 is
24  admitted as to Rose Acre.
25       (Exhibit received in evidence.)

79

1   BY MR. SLATER:
2   Q.   Now, Mr. Rust, this document is dated March 14, 2002.  Do
3   you see that up at the top?
4        MR. SLATER:  May we publish to the jury, Your Honor?
5        THE COURT:  Yes.
6        MR. SLATER:  Thank you.
7        THE WITNESS:  I can see it on the screen -- okay,
8   yeah, I see it.
9   BY MR. SLATER:
10  Q.   Okay.  Now, that's a couple of weeks before you joined
11  the Certified Program, correct?
12  A.   I think that's correct.
13  Q.   Okay.  Now, if you'll look down at the third paragraph,
14  it says:  This commingling of eggs at a plant really disturbs
15  me.  There will be people out there that cheat like crazy with
16  the way the rules are setting up.
17       Do you see that?
18  A.   Yes.
19  Q.   Now, is it fair to say that Mr. Hendrix was concerned
20  that people would cheat on the UEP rules and not adhere to
21  them?
22  A.   Yeah, that's what it says.
23  Q.   And he was afraid that they would sell uncertified eggs
24  as certified eggs; is that right?
25  A.   Yes.

80

1  Q.  And -- okay.  Take a look at the next paragraph.  I don't
2  know if the common person is really going to notice the
3  stricter -- until they get to the cash register line and they
4  have to pay 20 to $0.30 more per dozen.  I think this is when
5  the price discovery will hit the customer.  Supply and demand
6  will kick in.  The customer has the final say on egg price.
7       Do you see that?
8  A.  Yes, I think he was -- he might have been talking about
9  cage-free production versus UEP production.  I'm not sure.
10 Q.  Well, he seems to be talking about the UEP Animal Welfare
11 Guidelines and audit, which is the top line of the subject of
12 the document, correct?  Subject:  UEP Animal Welfare
13 Guidelines and Audit?
14 A.  Yes, yes, yes.
15 Q.  Yes.  So what he's saying, isn't it, that he expects that
16 the uncertified eggs will cost 20 to 30 percent -- 20 to $0.30
17 less than a dozen certified eggs, correct?
18 A.  If they got to that kind of price differential, there
19 would be people who would cheat.
20 Q.  And also, he's saying supply and demand will kick in.
21 Mr. Hendrix believed that there was a demand amongst consumers
22 for the cheaper uncertified eggs, correct?
23 A.  No.  There was a demand among the retailers who were
24 demanding the UEP Certified Program.  You know, we had to
25 supply the retailers.  The retailers sold it to the consumer.

81

1  Q.  And if the consumer is telling the retailer, I want the
2  cheaper, less expensive eggs, the retailer is going to buy
3  those eggs and satisfy the demand of his customer, isn't he?
4  A.  Well, the retailers that we had demanded we get into the
5  program.  I mean, one of the top, first beginning companies to
6  join the UEP Animal Certified Program was Wegmans.  Wegmans
7  owned their own chickens.  They wanted the program too.
8  Q.  Okay.  Isn't it true that Mr. Hendrix believed that there
9  was a demand amongst consumers for the cheaper uncertified
10 eggs?  And that's who he's talking about when he says:  Supply
11 and demand will kick in.  The customer has the final say on
12 egg price.
13      Do you see that?
14 A.  Yes.
15 Q.  Okay.  And that's what Mr. Hendrix was saying?
16 A.  That's what he felt, yes.
17 Q.  That there was a demand for the cheaper uncertified eggs
18 amongst consumers.  And by "consumers," I mean people like you
19 and me who go to the grocery store and buy eggs.
20 A.  Yeah, but we don't own the grocery stores.  The retailer
21 does.  They tell us what to deliver and that's what we deliver
22 to the grocery store.  If they wanted -- if they wanted the
23 cheapest eggs, they would -- you know, that's what they
24 bought, but they wanted a certified egg that had so many
25 square inches per bird.

82

1  Q.  Like I said, Mr. Rust, for the third time, we'll get to
2  that.  You'll have your chance.
3       And when Mr. Hendrix says the consumer has the final
4  say on egg price, do you see that?
5  A.  Yes.
6  Q.  You agree with that, don't you?
7  A.  Yeah, the customer's always right.
8  Q.  And you believe that the consumer should be given a
9  choice?
10 A.  Yes.
11 Q.  So the consumer should be able to choose, I want this egg
12 or I want that egg, right?
13 A.  Yes.  But we don't own the grocery stores.
14 Q.  Yeah, I understand that.
15      Now, the last thing I want to look at on this is --
16 well, maybe not the last thing.  Do you see in the middle of
17 the first paragraph on the second page of the document:  I
18 really don't know what this whole motive is, but I think there
19 is more to it than animal welfare.  I think some people think
20 it will make them rich or something.
21      Do you see that?
22 A.  Yes.
23 Q.  And then over on the right hand -- left-hand column,
24 there's some handwriting.  Do you see that?
25 A.  Yes.

83

1  Q.  And I believe that's the handwriting of your mother,
2  Lois Rust?
3  A.  Yes.
4  Q.  And it says:  It won't.
5  A.  Correct.
6  Q.  Do you see that?
7       And it says that next to the statement:  I don't
8  really know what this whole motive is, but I think there is
9  more to it than animal welfare.  I think some people will
10 think it will make them rich or something.
11      And your mother writes:  It won't.
12      Do you see that?
13 A.  Yes.
14 Q.  And she did not write that it won't make egg supply go
15 down or egg prices go up, did she?
16 A.  I don't see where she wrote that here.
17 Q.  Okay, so you know in March before you joined the UEP, the
18 Certified Program, of Mr. Ky Hendrix's concerns, right?
19 A.  Yes.
20 Q.  And you discussed those concerns with your mother, I
21 believe?
22 A.  Yes.
23 Q.  PX-116.
24      MR. SLATER:  May I approach, Your Honor?
25      THE COURT:  Yes.

84

```
1   BY MR. SLATER:
2   Q.   Is this a handwritten note from your mother?
3   A.   Yes.
4   Q.   Dated 3-27-02?
5   A.   Yes.
6   Q.   And it is to Ky Hendrix; is that right?
7   A.   Yes.
8        MR. SLATER:  I offer PX-116.
9        MR. KING:  No objection on behalf of Rose Acre.
10       MS. SUMNER:  Objection on behalf of USEM, hearsay --
11  or UEP.  Sorry.
12       MR. HARRIS:  UEP has the same as USEM.
13       MR. SLATER:  Your Honor, this is not being offered
14  for truth of anything.
15       THE COURT:  So you have no objection to it being
16  admitted on the same basis as 109; is that right?  Which is
17  that it's admitted as to Rose Acre only and not as to the
18  other two Defendants, whoever they are.
19       MR. SLATER:  That's fine.
20       THE COURT:  Okay.
21       MS. SUMNER:  Thank you.
22       THE COURT:  So, folks, I'm going to admit
23  Exhibit 116.  Yes, it may be published, and it's admitted only
24  as to Rose Acre.
25       MR. SLATER:  Now I've got you working for me.
```

85

```
1        THE COURT:  I just work for the taxpayers.
2        MR. SLATER:  Thank you, Your Honor.
3        THE COURT:  No problem.
4        (Exhibit received into evidence.)
5   BY MR. SLATER:
6   Q.   Mr. Rust, at the beginning of this, it says:  KY talked
7   to Marcus last night.
8        And then it goes, and there's a -- looks like an "A"
9   with a circle around it.  Does your mother mean "about"?
10  A.   What again?
11  Q.   If you look at the first line of the e-mail it says:
12  Talked to Marcus last night, and there's a little --
13  A.   Yeah, I think it's that little swirly thing that you see
14  on your keyboard.  I don't know what they call it.
15  Q.   And how would I read that, about?  Talked to Marcus last
16  night about UEP Guidelines?
17  A.   Our family is -- none of us are English intellects and my
18  kids, when we go to restaurants, they like to listen to me
19  pronounce fancy names.  And then mom, she -- that was her
20  shortcut, I think.
21  Q.   But so I can read it as "about"?
22  A.   Yeah.  I think so.
23  Q.   Talked to Marcus last night about UEP Guidelines.
24       Do you see that?
25  A.   Yes.
```

86

```
1   Q.   And then it goes on:  They are good, but we --
2        And do you think the "we" refers to both you and
3   her?
4   A.   It was the whole family.
5   Q.   -- we are concerned with what looks like the underlying
6   purpose of the whole thing.  Thanks, L. Rust.
7        Do you see that?
8   A.   Yes.
9   Q.   Okay.  So you and your mother agreed at this time that
10  the underlying purpose of the program was not animal welfare?
11  A.   No, we didn't agree to that.
12  Q.   We are concerned with what looks like the underlying
13  purpose of the whole thing.
14       If the underlying purpose was animal welfare, why
15  would you be concerned?
16  A.   We were -- you have to understand, we -- at the time that
17  we joined UEP, we were very untrusting.  We -- we'd spent six,
18  seven years in court in a lawsuit that we won with our
19  competitors who were suing us because they said we stole their
20  egg markets because we priced them cheap -- we was able to
21  produce eggs cheaper than they could.  And so we sold them to
22  the stores.  And they said because it was predatory pricing,
23  then running them out of business, they wanted to sue us.  We
24  won the lawsuit, but UEP's law firm was the same firm that
25  started the lawsuits for three different producer groups who
```

87

```
1   sued us.  We were very apprehensive of UEP as a whole.
2        MR. SLATER:  Move to strike as nonresponsive, Your
3   Honor.
4        MR. KING:  Your Honor, he was being perfectly
5   responsive to his question.
6        THE COURT:  Yes, I think the question was --
7        MR. SLATER:  The question was --
8        THE COURT:  Well, I heard the question.  I think it
9   was broad enough to allow that response.  If you want to
10  tighten up the question and ask another question, you may.
11  BY MR. SLATER:
12  Q.   Mr. Rust, the question was:  If the purpose of the
13  underlying program was to support animal welfare, you wouldn't
14  have to be concerned, would you?
15  A.   No, we would not have to be.
16  Q.   You would only have to be concerned if the purpose of the
17  underlying program was to do something else?
18  A.   Repeat what you're saying, again.
19  Q.   You would only have to be concerned if the purpose of the
20  underlying program was to do something else?
21  A.   I would assume, yes.
22  Q.   And I think you already said that you were suspicious of
23  the motives of the UEP.
24  A.   You have to understand, UEP was a cooperative of egg
25  farmers who, for the previous 20 years, had always went out
```

88

```
1   trying to figure out ways to make farming better for egg
2   farmers.  Because, see, in the '70s and '80s -- the '60s, '70s
3   and the '80s a lot of the Supermarket chains went out and
4   developed their own egg farms.  Kroger was the largest egg
5   producer in the United States for a time period.  Jewel, they
6   had three farms in Illinois.  You know, we were farmers and
7   when the Supermarkets figured out you can put chickens in
8   cages and cut your production costs to almost half of what it
9   was before, when -- before 1966, every chicken we owned was
10  cage free.  And my father and mom went and visited egg city,
11  which Kroger later bought, had like 2
12  million chickens on one farm.  And, you know, it was just
13  wall-to-wall chickens, and they could produce eggs at half the
14  cost we could.  And this was owned by Kroger.  And that's who
15  we had -- you know, we had to sell to the big grocery store
16  chains.
17          And, you know, we -- dad figured out -- they was
18  doing it all with birds on one farm, which meant that you
19  could do -- raise all the birds healthwise do it.  With what
20  we figured out was how to automate them.  We put in conveyer
21  belts to bring the eggs in and then we built one of the first
22  inline egg farms in the world.  Where we had an egg grader,
23  three chicken houses and we had 100,000 chickens and it took
24  four people to process the eggs.  And then we went and built a
25  bigger farm and bigger farm, and that's the only way we could
```

89

```
1   compete with the Supermarkets.
2          MR. SLATER:  Move to strike as nonresponsive, Your
3   Honor.
4          THE COURT:  Well, I'll tell you, Counsel, you called
5   this witness.  There hasn't been a limitation or a restriction
6   on the -- having called this witness in anything other than as
7   a direct -- as part of your direct case.  If you wish to alter
8   that or modify the terms on which you've called the witness,
9   then you may, but for now I'm going to let the answer stand.
10         MR. SLATER:  Move for the right to cross-examine the
11  witness as an adverse witness, Your Honor.
12         THE COURT:  Very well.  Going forward, that's fine.
13         MR. SLATER:  Thank you.
14  BY MR. SLATER:
15  Q.  Mr. Rust, isn't it true that one of the things you were
16  concerned about was that the UEP was coordinating egg
17  producers to restrict supply of eggs to boost prices?
18  A.  Yes.
19  Q.  And about the same time you received the note from your
20  mother, the producers' Animal Welfare Committee voted to
21  recommend to the Board of the UEP that the certified company
22  who was a member of the Certified Program, not be allowed to
23  produce and sell uncertified eggs; isn't that right?
24  A.  Yes.
25  Q.  And that would be true even if the uncertified egg came
```

90

```
1   from a different farm?
2   A.  Repeat your -- I'm not following what you're asking here.
3   Q.  Yes.  That would be true, you would not be able to
4   produce an uncertified egg even if that egg was produced at a
5   different farm than the farm where you produced certified
6   eggs?
7   A.  Under the same ownership.  We did not want different --
8   you know, if you think -- you were doing animal welfare, you
9   couldn't do it on one farm and then not do it on another.  You
10  know, that would just -- it wouldn't be right.
11  Q.  Okay.
12         MR. SLATER:  And could I have PX-115.
13         May I approach, Your Honor?
14         THE COURT:  Yes.
15  BY MR. SLATER:
16  Q.  Mr. Rust, isn't this the Producer Committee for Animal
17  Welfare minutes of the March 26, 2002, meeting?
18  A.  That's what it says.
19         MR. SLATER:  I move the admission of PX-115, Your
20  Honor.
21         THE COURT:  The good news is, it's already in.
22         MR. SLATER:  Thank you.
23  BY MR. SLATER:
24  Q.  Mr. Rust, if you look at the top, this is a committee
25  meeting that you attended?
```

91

```
1   A.  I don't see my name listed there.
2   Q.  If you look at the very top.
3   A.  Oh, yeah, I was the very first one.  Sorry about that.
4   Q.  That's quite all right.
5          And then if you look down -- two-thirds of the way
6   down on the first page, it says, Motion.  Do you see that?
7   A.  Yes.
8   Q.  Okay, it was moved by Lausecker.  Who is Mr. Lausecker?
9   A.  That would have been Kurt Lausecker.  He was with a farm
10  called Daylay Egg Farms.  It was a German-owned egg farm in
11  Ohio.
12  Q.  And seconded by Arias to recommend to the Board of
13  Directors that the certified company status be changed to
14  require a 100 percent commitment on all company facilities,
15  eggs graded and marketed regardless of how the egg may be
16  marketed.  The 100 percent commitment is intended to be
17  inclusive of all company entities, affiliates.  And it says
18  the motion carried by a vote of eight to three, correct?
19  A.  Yes.
20  Q.  And you voted in favor, didn't you?
21  A.  I don't remember.
22  Q.  Did you vote --
23  A.  I would think I would have voted for the 100%.
24  Q.  You were very strongly in favor of the 100% rule, weren't
25  you?
```

92

```
1   A.   We thought if you was going to produce chickens that you
2   should treat all your chickens the same.
3   Q.   And throughout the process, you were a very strong
4   advocate of not only the 100% rule, but of tightening the 100%
5   rule, correct?
6   A.   Yes, because if you don't take care of your chickens the
7   same, you know, it's exactly what happened to Sparboe.  You
8   know, they went out and had two different methods of
9   production and the animal rights crucified them.  We didn't
10  want the program to be destroyed because FMI had asked us
11  to -- you know, they wanted the whole program to go faster
12  than we what we could even do.
13  Q.   Were you here for the opening statements?
14  A.   I was here for the very opening.
15  Q.   Yeah.  And your counsel told the jury that the program
16  would lack integrity if you could sell an uncertified egg at
17  the same time you sold a certified egg.  Do you recall that?
18  A.   Yes.
19  Q.   Okay.  Do you believe it would lack integrity?
20  A.   Yes.
21  Q.   Do you believe it would lack integrity for a Supermarket
22  to sell a certified egg to somebody who requested it?
23  A.   I don't --  for the Supermarket?
24  Q.   Yes.
25  A.   I don't think -- they could sell whatever they wanted.
```

93

```
1   We only produced what they wanted to buy from us.
2   Q.   You've said that.  Do you believe it would lack integrity
3   for a Supermarket who truthfully sold a certified egg labeled
4   as a certified egg to also sell to a different customer who
5   came in and said, I want a less expensive egg, do you think it
6   would lack integrity for the Supermarket to say, I will sell
7   you that less expensive egg?
8   A.   There were Supermarkets that sold both kinds of eggs.
9   Q.   Yes, the question is would it lack integrity, sir?
10  A.   I think it would on the Supermarket, that's their choice.
11  I mean, you know, what they put in --
12  Q.   My question is would it lack integrity --
13  A.   From my perspective, it would, because -- because then
14  they're buying eggs from two different methods and it makes
15  the program not mean anything for what the purpose of it was
16  supposed to be.
17  Q.   So you think it would lack integrity for the Supermarket
18  to meet consumer demand?  A consumer walks into the store and
19  says, I want an uncertified, less expensive egg, and you think
20  it lacks integrity for that Supermarket --
21  A.   For the producer, not the Supermarket.
22  Q.   -- to satisfy that demand?
23  A.   Not the Supermarket.  The Supermarket is a retailer of
24  selling goods they buy.  They had the choice to buy multiple
25  eggs from multiple other farms that were not UEP Certified.
```

94

```
1   There were producers who doubled in size at the same time we
2   entered into the program.
3   Q.   Sir, what percentage of all the egg producers in the
4   country, what percentage of their total facilities were
5   committed to the UEP Certified Program?
6   A.   At its peak -- I'd have to go look at the records.
7   Q.   95 percent, right?
8   A.   At one time, is what I heard, something like that.
9   Q.   Okay.  So where is this Supermarket -- first of all,
10  Supermarkets need to buy from large producers, don't they?
11  A.   Yeah.
12  A.   They can't buy from little small producers, because they
13  can't deliver to all of the Supermarkets spread over the
14  various states.
15  A.   There's plenty of competition out there that will --
16  there's plenty of people, if they're willing to pay the price.
17  But the problem was, sir, the Supermarkets didn't want
18  non-certified eggs.  You know, they wanted the checkout ring
19  to go up.  They wanted the highest price.  We set out there,
20  we produced cage-free eggs that no one will buy.  The
21  Supermarkets went out and demanded and they filled all the
22  animal activists -- in 2025 we're only selling cage-free eggs.
23  We don't have the facilities to produce the eggs for all of
24  our customers.  We can't afford it.
25  Q.   Which Supermarkets told you that?
```

95

```
1   A.   Every one we sell to.
2   Q.   You personally?
3   A.   Not me personally.  They told our sales department --
4            MR. SLATER:  Move to strike as hearsay, Your Honor.
5            THE COURT:  Overruled.
6   BY MR. SLATER:
7   Q.   Not one customer told you personally that they would only
8   buy certified eggs; isn't that true?
9   A.   Kroger told me that.
10  Q.   When?
11  A.   In -- I forget what year it was, but it was --
12  Q.   2001, before the 100% rule was in place?
13  A.   Kroger told us that we had to -- we were selling
14  Kroger --
15  Q.   My question, sir, is when?
16  A.   Walmart and Kroger both told us that we had to buy --
17  Q.   When?
18  A.   -- or we had to produce certified eggs or I was going to
19  lose their business.
20  Q.   When?
21  A.   Before we joined this program.  We only joined the
22  program at the customer's demand.
23  Q.   When did they tell you they would only buy certified
24  eggs?
25  A.   I don't remember the exact date.  It was before March
```

96

1   of 20th -- of 2002, I can tell you that.
2   Q.   And that's before the 100% rule was passed; isn't that
3   right?
4   A.   I -- that would be correct.
5   Q.   It was also before the backfilling rule was passed,
6   wasn't it?
7   A.   Yes.
8   Q.   By four years?
9   A.   I'm not sure of the exact time.
10  Q.   Well, I was wrong anyway.  It's three.
11  A.   Okay.
12  Q.   Okay, so you've said that for the producer, it would lack
13  integrity to produce an uncertified egg and a certified egg;
14  is that correct?
15  A.   The producer would, correct.
16  Q.   Okay.  So you're telling me that it would be lacking in
17  integrity for you to satisfy the demand of one of your
18  customers if that customer came to you and said, I would like
19  to buy an uncertified egg, it will be truthfully displayed in
20  my store as an uncertified egg, I want to sell it to a
21  customer who wants a lower price egg.
22       And you're telling me it would be -- lack integrity
23  for you to sell that man that egg, correct?
24  A.   Repeat all that.  You're getting me confused.
25  Q.   I'd be happy to.  If a supermarket wanted to buy an

97

1   uncertified egg to satisfy the demand of consumers who wanted
2   to buy low cost eggs, you're telling me it would lack
3   integrity for you to produce an uncertified egg for that buyer
4   if you were also producing certified eggs?
5   A.   Yes, we believed the integrity of our farm, you know,
6   there's -- if you're doing something and you say you're going
7   to produce at 67 inches, you know, that's what we agreed to
8   do.  And it would be like Nike.  If Nike was having tennis
9   shoes made in Vietnam by workers and they could get tennis
10  shoes made with slave labor in China from a prison camp, you
11  know, they could have two different kinds.  Nike would never
12  do that.
13  Q.   Okay.
14  A.   You know, they're going to make -- because they could
15  save money by going to the Chinese, you know, to slave labor
16  camp in China, but they don't.  We -- at the same time, we had
17  to develop -- you know, with the program, we wanted our
18  consumers to know that we gave this much space, because FMI
19  and the Supermarkets demanded that they wanted a program that
20  they had assembled that on their cartons.  I mean, the egg
21  cartons we sold to everyone, the grocery store's brand.  They
22  put the UEP Certified shield on them, and that's what we had
23  for packing.  That's what they wanted for their customers.
24  Q.   For some of their customers, that was what they wanted.
25  And you're telling me it would lack integrity if they wanted

98

1   something else for a customer without the shield of the
2   "certified" label on it and it would lack integrity for you to
3   produce and sell that product to your customer demanding,
4   expressing a demand for that product, right?
5   A.   We -- from our personal feeling, we were not going to do
6   two methods of production.  You know, it would be like, you
7   know, producing for what anyone wants.  That's not how -- if
8   you believe anything about animal welfare, you're not going to
9   squeeze chickens for one customer and not for another.
10  Q.   And you believed in animal welfare and that's why you did
11  this; is that right?
12  A.   Sir, I've watched in Europe, they have banned owning
13  chickens in cages.  You know, we --
14  Q.   Sir, the question is:  Did you do this for animal
15  welfare?
16  A.   Yes.  Hens.  Yes.  We was trying to satisfy people to --
17  they burn our feed truck, they shot out our electric
18  transformer.
19  Q.   There's no question pending, sir.
20  A.   You want to know why.  We had to do something because
21  people didn't like us having chickens in cages.
22       MR. SLATER:  There's no question pending.  Move to
23  strike, Your Honor.
24       THE COURT:  And I think the question was:  You
25  believed in animal welfare and that's why you did this; is

99

1   that right?  Is there another question?
2        MR. SLATER:  There will be.
3   BY MR. SLATER:
4   Q.   And you think it's perfectly okay for Rose Acre to agree
5   with other egg producers that none of you will produce that
6   less expensive uncertified egg; is that correct?
7   A.   Repeat your question again.
8   Q.   You think it's okay for Rose Acre to agree with other
9   producers of eggs that none of you will produce that
10  uncertified egg, correct?
11  A.   That was rules of the program.
12  Q.   And you agreed to the program?
13  A.   Yes.
14  Q.   And so do the other producers?
15  A.   That were in it.  There's a lot of producers not in it.
16  Q.   And the producer who developed that program were at the
17  UEP and they themselves were egg competitors, correct?
18  A.   At the request of FMI, the Food Marketing Institute,
19  which is the grocery store chain.  And you have Wegmans
20  sitting on the UEP.  They were a UEP member and they were one
21  of the leading chains in the country.  They wanted the program
22  too.
23  Q.   Okay.  And when you say they asked for it, you're
24  referring to Kroger and Walmart who asked you in 2001 for
25  certified eggs prior to the time the 100% rule was passed,

100

```
 1   prior to the time the audit was structured, and prior to the
 2   time that the no backfill rule was adopted, correct?
 3   A.   Yes.
 4   Q.   Let me show you what has been marked Plaintiffs'
 5   Exhibit -- it should be 308.
 6        Mr. Rust, let me show you what's been marked
 7   Plaintiffs' Exhibit 344.
 8        MR. SLATER:  May I approach, Your Honor?
 9        THE COURT:  Yes.
10   BY MR. SLATER:
11   Q.   Mr. Rust, this is an e-mail from you to Chad Gregory at
12   the UEP and also to Gene Gregory, Jim Hull.
13        Who is Jim Hull?
14   A.   I think at that time Jim Hull was a -- he run a breaking
15   plant, company in -- I think it was Blackshear, Georgia.
16   Q.   And Roger Deffner?
17   A.   Roger Deffner worked for a company called National Foods
18   in Seattle, Washington.
19   Q.   And this is dated May 31, 2006.  Do you see that?
20   A.   Yes.
21        MR. SLATER:  Move the admission of PX-344.
22        MR. KING:  No objection on behalf of Rose Acre.
23        MS. SUMNER:  Objection on behalf of UEP, hearsay.
24        MR. HARRIS:  For USEM as well.  Hearsay.
25        THE COURT:  Response to the objection?
```

101

```
 1        MR. SLATER:  This is stating the concerns of
 2   Mr. Marcus Rust to the UEP amongst others.
 3        THE COURT:  Well --
 4        MR. SLATER:  It's a statement --
 5        THE COURT:  I didn't read the document.
 6        MR. SLATER:  It's a statement of the witness.
 7        THE COURT:  Pardon?
 8        MR. SLATER:  It's a statement of the witness.  This
 9   is his e-mail.
10        THE COURT:  Okay, well...
11        MR. SLATER:  It's not unavailable.
12        THE COURT:  He's not unavailable.  Yes.  That's
13   quite true.  He's right here.  What's your technical response
14   to the objection?  As a federal rule of evidence matter?  You
15   can certainly ask Mr. Rust questions.  And the document can
16   certainly be admitted as to Rose Acre because there's no
17   objection as to Rose Acre.  And if there's another reason for
18   admitting it as to the other Defendants, perhaps UEP as
19   opposed to USEM, then you can probably say that.
20        MR. SLATER:  Your Honor, this is a notice to the UEP
21   of concerns with this program.
22        THE COURT:  Which would be notice?
23        MR. SLATER:  Yes.
24        MS. SUMNER:  We would request a limiting instruction
25   for notice for UEP.
```

102

```
 1        MR. HARRIS:  And USEM would request a limiting
 2   instruction that it is not against USEM.
 3        MR. SLATER:  It's not offered against USEM.
 4        THE COURT:  All right.  It's admitted as to Rose
 5   Acre.  It's admitted for purposes of notice vis-à-vis UEP.
 6   Okay?
 7        MR. SLATER:  Thank you.
 8        THE COURT:  No problem.  Yes, it may be published.
 9        MR. SLATER:  May I publish to the jury, Your Honor?
10        THE COURT:  Yep.
11        MR. SLATER:  Thank you.
12   BY MR. SLATER:
13   Q.   Mr. Rust, do you see at the top, it says:  My computer at
14   work crashed.  I have lost all other e-mail addresses.  Please
15   forward to any other board member that you may feel -- that
16   you may feel may be concerned of the dilution that is
17   happening to our program.
18        And by "program," you were referring to the
19   Certified Program, correct?
20   A.   Yes.
21   Q.   What was the dilution that you thought might be
22   happening?
23   A.   We had various players in the industry that went and
24   created side companies to produce non-certified eggs and they
25   were -- they owned this, but they were selling eggs in the
```

103

```
 1   markets.
 2   Q.   And they were producing uncertified eggs and you wanted
 3   to stop that, right?
 4   A.   We didn't want them to be able to be in the program and
 5   sell certified eggs and those other eggs.  That was -- it
 6   just -- you know, it just wasn't --
 7   Q.   And if you weren't in the program and couldn't sell
 8   certified eggs, you would be cut out of the side of the market
 9   where the purchaser wanted a Certified Program egg?
10   A.   We didn't want people producing or competitors producing
11   for -- for the Supermarkets under -- saying they was a
12   certified producer and then turning around and having another
13   farm and selling to other people and not, because then all of
14   a sudden, the animal rights would be coming and taking videos
15   of what was happening at one farm and saying:  This is a UEP
16   Certified producer that's out there doing these bad things to
17   their chickens.
18        MR. SLATER:  Your Honor, again, I move to strike as
19   nonresponsive.
20        The question was:  You were concerned that the
21   purchasers of the eggs --
22        THE COURT:  And the question was if you weren't in
23   the program and couldn't sell certified eggs, you would be cut
24   out of the side where the purchaser wanted a certified program
25   egg?  That was the question.
```

104

```
1            MR. SLATER:  Yes.  Yes.
2            THE COURT:  Well, okay.  Are you done with your
3   answer?
4            THE WITNESS:  I think I am.
5            THE COURT:  Why don't you ask another question.
6   BY MR. SLATER:
7   Q.   Mr. Rust, if you weren't in the program, you couldn't
8   satisfy the demand of your customers who wanted to buy a
9   certified egg, correct?
10  A.   Run that by me again.
11  Q.   If you weren't in the program, you couldn't satisfy the
12  demand of a customer who wanted to buy a certified egg?
13  A.   You say non-certified or certified?
14  Q.   Certified.
15  A.   You got me lost.  Start again.
16  Q.   If you were not in the program --
17  A.   Right.
18  Q.   -- you could not sell -- if you were not in the program,
19  you could not sell a certified egg.  You could only sell a
20  certified egg if you were in the program, right?
21  A.   No.  We sold certified eggs to people who weren't in the
22  program, that they sold to customers who wanted certified
23  eggs.  Ron Kreider, Kreider Farms.
24  Q.   You were in the program?
25  A.   Correct.
```

105

```
1   Q.   If you were not in the program, you couldn't sell a
2   certified egg, could you?  You couldn't use the label that
3   says "certified egg"?
4   A.   If you were not in the program.
5   Q.   Correct.
6   A.   Correct.
7   Q.   Okay.  So for a company not to be in the program, they
8   would have to cut themselves out of the side of the market
9   that was demanding certified eggs, correct?
10  A.   No.  They could buy them from a certified company for
11  their customer that wanted certified eggs.
12  Q.   And if you're a large producer and you can only buy from
13  large egg farmers, there were none who weren't selling
14  certified eggs only, were there, with 95 percent of the
15  capacity devoted to the program?
16  A.   I don't think at the time -- what date or time period are
17  you referring to?
18  Q.   Any time period you want.
19  A.   Well, at the beginning of the program, I don't think
20  there was 60 or 70 percent of the producers on the program.
21  Q.   It was 83 percent immediately, wasn't it?
22  A.   Whatever those numbers are, I'm not sure.  I don't
23  remember.
24  Q.   Where was --
25  A.   It wasn't 95 percent, I do remember that.
```

106

```
1   Q.   It got to 95 percent, didn't it?
2   A.   Yes, because long-term, the customers demanded it -- I
3   mean, the producers.
4   Q.   And at that point, a purchaser who wanted a certified egg
5   could not buy an uncertified egg from his regular large
6   suppliers, could he?
7   A.   Not from certified producer.  We had people who wanted
8   it.  We could buy them from Ron Kreider.  Kreider Farms here
9   in Pennsylvania was one of the largest non-certified producers
10  there was, still is today.  He doubled his business.  He done
11  well.
12  Q.   Now, isn't it true that you were concerned that big city
13  chains like those in FMI who wanted to buy certified eggs
14  would also want to buy uncertified eggs for consumers who just
15  wanted a low-priced egg?  Isn't that true?
16  A.   The best of my understanding, none of the big -- the big
17  chains because they were being picketed and attacked, or not
18  attacked, but they were being threatened with picketers and
19  that type of thing.  They only wanted certified eggs.  The ma
20  and pa grocery store in downtown Philadelphia or New York
21  City, they didn't care.  They would buy the others because the
22  animal rightists would never go picket that store.  And that's
23  why there was two kind of eggs being produced, you know, for
24  two kinds of customers.  You had your small independents, who
25  bought non-certified eggs, and you had your big chains they
```

107

```
1   didn't want to fight with animal activists.
2   Q.   Sir, do you recall being deposed in this matter on
3   March 7, 2017?
4   A.   I've been deposed a lot on this matter.  I don't recall
5   what date.
6            MR. SLATER:  Counsel, this is page 310 at lines 21
7   over to page 311.
8            Can we have that up on the screen?  This is the dep,
9   310.
10  BY MR. SLATER:
11  Q.   Now, at the time that you gave this deposition, you were
12  sworn to tell the truth?
13  A.   Yes.
14  Q.   And you did tell the truth?
15  A.   I think so.
16  Q.   And were you asked these questions and did you give these
17  answers:  Do you recall writing this e-mail?
18            I have to read it first.
19            Why don't you read it.
20            Answer --
21  A.   This one here?  Yes, I read this one.
22  Q.   No, no, this is from the deposition.
23  A.   What again?
24  Q.   This is from the deposition I'm reading.
25  A.   Okay.
```

108

1   Q.   Okay.  Answer:  Yes.
2        Do you recall what this was about?
3        Yes.
4        What was it about, sir?
5        It was about what we call the 100% rule.
6        Question:  And it said in the third line down, it's
7   not really the third sentence, I don't think.  It says:  If
8   the present motion before the board passes, it will lead to
9   purely folks offering whatever is cheapest and will force
10  sellers into the big city markets to go get side deals with
11  producers for lower cost not in the program eggs.
12       Answer:  Yes.
13       What does that mean?
14       Answer:  There was producers who, to get advantage
15  of what the big chains wanted, you know, which, you know,
16  under the FMI group, they wanted people in the Animal Care
17  Program.  You're smaller in the New York City market, in the
18  Chicago market, where you're dealing with large ethnic groups,
19  there's a lot of those people, the only thing they cared about
20  was the price of eggs.  They didn't care if you hung the
21  chicken by its neck and had a hundred of them hanging there,
22  as long as the eggs were cheap.  They didn't care how the
23  animal was raised.  There were producers who had one farm
24  under the UEP Program and selling to Walmart, and there was
25  others -- they had other facilities that were selling eggs to

109

1   the inner city markets at the lesser cost.  Doing both
2   productions, method of productions, there was some gerrymander
3   ownership rules.
4        Did you give that answer to that question?
5        MR. KING:  Objection, this is improper impeachment.
6   That answer that he just read is not inconsistent with the
7   question and answer that Mr. Marcus Rust was asked on the
8   stand.
9        THE COURT:  Okay, well, I'm going to allow Mr. Rust
10  to now answer the question, did he give that testimony?
11  Whether it's technically the most precise way of impeachment,
12  I think is a matter of some debate.  But now can we move on.
13  BY MR. SLATER:
14  Q.   Were you asked those questions and did you give those
15  answers?
16  A.   Yes.
17  Q.   Okay, so you would agree with me that there was demand,
18  especially in the big cities, by sellers of eggs who wanted
19  uncertified eggs to sell to their customers, right?
20  A.   There were big city buyers who never cared about any
21  Animal Welfare Program.  The only thing they wanted was the
22  cheap eggs.
23  Q.   My question, sir, is, they wanted cheap, less expensive
24  eggs, correct?
25  A.   Yes.

110

1   Q.   And you say in the e-mail, back to Exhibit 344:  If the
2   present motion before the board passes, it will lead to purely
3   folks offering whatever is cheapest.
4        Do you see that?
5   A.   Yes.
6   Q.   And you were opposed to that?
7   A.   I was opposed to the seller being able to produce both
8   under the program and not under the -- I had no problem if
9   someone wanted to produce not under the program.  That was
10  their prerogative.  But if -- they could not be in the program
11  and say they were Animal Welfare Certified and giving this
12  much space to their chickens here and not giving that same
13  space over here.
14  Q.   And that's not what you said in your e-mail, is it?  What
15  you said is:  If the present motion before the board passes,
16  it will lead to purely folks offering whatever is cheapest.
17       And you were opposed to that, weren't you?
18  A.   No, you've gotten me confused here.  What are you saying
19  again?
20  Q.   I'm reading from your e-mail, sir.
21  A.   Yeah.
22  Q.   And your e-mail says:  If the present motion before the
23  Board passes it will lead to purely folks offering whatever is
24  cheapest.
25       Do you see that?

111

1   A.   That's what I wrote.
2   Q.   Okay.  And you were opposed to that, that's why you were
3   writing this e-mail?
4   A.   I thought we had to have the 100%.
5   Q.   And then it says:  It will force sellers into big city
6   markets.
7        Who are the sellers you were referring to?  Is that
8   the egg farmer sellers or the grocery store sellers?
9   A.   I think I was referring to the actual jobbers or
10  distributors in the big city markets.  Every big city has a
11  wholesaler like that we would sell a lot of eggs to and then
12  they would sell to 30 or 40 or 50 different small stores.
13  Q.   Okay, so you thought that the jobbers in the cities --
14  A.   The jobbers.
15  Q.   -- would want to buy inexpensive eggs and sell them to
16  stores who wanted to satisfy the demand of their customers for
17  inexpensive, uncertified eggs?
18  A.   Yes.
19  Q.   And you wanted to stop that?
20  A.   No.
21  Q.   That is the purpose of your e-mail?
22  A.   I was only wanting to stop certified sellers from having
23  two different methods of production.
24  Q.   Aren't you telling the members of the board that you want
25  to stop the dilution of the program and the dilution of the

112

```
1   program is what you're describing in the e-mail?
2   A.   We had a guy by the name of Jack DeCoster who had a farm
3   in Iowa, and he started it up under his son-in-law's name.
4   Jack financed it but he put it under his son-in-law's name.
5   He was taking eggs from that farm and selling them --
6   everything Jack owned he was under the Certified Program.  But
7   he went and took eggs from this other farm and was selling
8   them into the inner city markets.  Better price -- he was
9   getting the benefit of both worlds.
10  Q.   So you wanted to stop --
11  A.   I didn't want --
12  Q.   -- jobbers from selling uncertified eggs or having access
13  to uncertified eggs to sell to their customers, right?
14  A.   Jobbers could buy from anyone they choose.  I just didn't
15  want certified producers having two methods of production.
16  That ruined the program, you know.
17  Q.   You then go on and you say:  It will also force producers
18  who are 100 percent to figure out how not to be.
19          Do you see that?
20  A.   Yep.
21  Q.   You were concerned that if people could sell uncertified
22  eggs to people who were demanding them, that people would
23  leave the program?
24  A.   There would be people that were cheating, then that --
25  when I say, Dilution of the program, I was only concerned, you
```

113

```
1   know -- we spent, you know, lots of time and effort.  We had
2   to reduce -- we had to give our space -- chickens more space.
3   When we gave more space, we went out and built new henhouses
4   to give them more space.  There was other producers who took
5   chickens out of one farm and then they built a new henhouse
6   but then they said we're going to sell those eggs under the
7   non-certified program.  And so two-thirds of their eggs were
8   being sold under the program, one-third not.  They were
9   reaping -- they got the benefit of the program and also we're
10  sitting there, you know, we're in a race.  We're trying to
11  compete.  You know, it's just like NASCAR.  They regulate the
12  size of the engine and then they regulate how much the car
13  weighs.
14          But you, as a producer, or you, as the driver, you
15  get a push on the pedal and drive as fast as you want.  We can
16  own all the chicken houses we wanted, we just had to follow
17  the rules of the program.
18  Q.   Okay, so you thought that if somebody wanted to make a
19  certified egg and truthfully sell it as a certified egg, and
20  also make an uncertified egg and sell it as an uncertified
21  egg, that he would have a competitive advantage over you?
22  A.   Yes.
23  Q.   And that's why you wanted to stop people with 100%
24  rule --
25  A.   I didn't want people --
```

114

```
1   Q.   -- from being able to do that?
2   A.   Being able to do both, correct.
3   Q.   Okay, you didn't want to do both and you, therefore,
4   wanted to stop everybody else from being able to do both
5   because that would give them a competitive advantage over Rose
6   Acre, correct?
7   A.   Yes.  And using the program.
8   Q.   We've been talking about the Certified Program.  Maybe
9   it's time we actually looked at what the program entailed.
10          PX-308.
11          MR. SLATER:  Your Honor, this document might take a
12  while.  We're close to the time we wanted to break.  I can do
13  it or not at your --
14          THE COURT:  No, that's helpful.  So why don't we --
15  well, let me check with Mr. Coyle on something.
16          (Discussion off the record.)
17          THE COURT:  I appreciate the heads-up on -- in terms
18  of the amount of time and you are quite correct.
19          I had indicated, ladies and gentlemen, to the
20  lawyers that I needed to take the trial this morning up to
21  about 12:45, because I have a matter on the criminal docket
22  that I have to take care of over the lunchtime.  So we're
23  going to have kind of a longer lunch break, and I'm going
24  to -- we're going to break now, and I'm going to ask you all
25  to come back by 2:15.  That should allow me -- and since I see
```

115

```
1   some of the lawyers in the next matter, here in the courtroom,
2   it will encourage them to realize that I need to move with
3   some alacrity in this other matter over the lunch break.  So I
4   hope you all have a very nice lunchtime.  Don't discuss the
5   case.  We'll be back at 2:15 to resume.  All right.
6           THE DEPUTY CLERK:  All rise.
7           (Jury out.)
8           THE COURT:  Okay, you all heard what I -- how I'll
9   be spending my time.  And you can -- just maybe just clear off
10  a little space there.  This is not a particularly fearsome
11  matter.  So if these two desks can just be more or less
12  cleared up a little bit.  Don't worry about it too much.
13          You guys don't have to move anything.  You're fine.
14          (Luncheon recess taken.)
15          (After luncheon recess:)
16          (Marcus Rust resumes the stand.)
17          THE DEPUTY CLERK:  All rise.
18          (Jury in.)
19          THE COURT:  Okay, you all can take your seats.  Make
20  yourselves comfortable, and Mr. Rust is back here.
21          You're still under oath, sir.
22          And you may resume your direct examination.
23          MR. SLATER:  Thank you, Your Honor.
24              DIRECT EXAMINATION (CONT.)
25  BY MR. SLATER:
```

116

1   Q.   Mr. Rust, before we broke, I was turning to PX-308.  Did
2   I give you that document?
3   A.   Yes.
4   Q.   You have it in front of you?
5   A.   Yes.
6   Q.   Mr. Rust, this is a copy of the United Egg Producers
7   Animal Husbandry Guidelines for U.S. Egg-Laying Flocks, and
8   this is the 2006 edition?
9   A.   Yes.
10          MR. SLATER:  Your Honor, I'd offer PX-308.
11          THE COURT:  Any objection.
12          MR. KING:  No objection on behalf of Rose Acre.
13          THE COURT:  308 is admitted.
14          (Exhibit received in evidence.)
15  BY MR. SLATER:
16  Q.   Mr. Rust, if I could, I'd kind of like to go through the
17  document just so we could all see it in one place.
18          MR. SLATER:  Could I publish it to the jury?
19          THE COURT:  Yes.
20          MR. SLATER:  I'll remember that sooner or later.
21          THE COURT:  I'll give you a sticky and you can put
22  it there.
23          MR. SLATER:  When I learned how to do this --
24          THE COURT:  No, no.
25          MR. SLATER:  -- there was no TV.

117

1           THE COURT:  Not to worry.  Not to worry.  Not to
2   worry.
3           MR. SLATER:  Thank you, Your Honor.
4   BY MR. SLATER:
5   Q.   Mr. Rust, what I'd like to do is just walk through this
6   so we can see in one place how the rules worked.  Would you
7   look, please, at the first page.  No, the coverage pulley,
8   sir.  Do you see at the top it says:  United Egg Producers
9   Certified, that label?
10  A.   Yes.
11  Q.   Is that the logo that we've been talking about?
12  A.   Yeah, that's the one the grocery stores put on their
13  branded cartons.
14  Q.   Okay.  And that's a pretty valuable thing to be able to
15  put on your eggs because people who want to buy certified eggs
16  identify what they want to buy from that label?
17  A.   Yes, the grocery stores print it on their branded carton.
18  Q.   Okay, and like I said, that's got real value because if
19  you've had a buyer who wants a certified egg, that's how he
20  knows what it is that he's looking for?
21  A.   Yes.
22  Q.   And would you look at the bottom, it says:  Copyright
23  2003.
24          Do you see that?
25  A.   Yes.

118

1   Q.   Okay.  Did the rules change at all between 2003 and 2006?
2   A.   From my recollection, from the time they were started
3   until they were even until today, they come once a year, they
4   look at various things and decide if they're changing
5   something.  It's a work in progress because no one had ever
6   done it before.
7   Q.   Okay.  So there might be minor changes between this and
8   some of the other versions?
9   A.   Yes.
10  Q.   If you'd look, please, sir, at page 3 of the document and
11  down at the bottom where it says:  United Egg Producers
12  Certified.
13          Do you see that down at the very bottom of the page?
14  A.   Yes.
15  Q.   And it says:  While the Animal Husbandry Guidelines were
16  presented to the egg industry as a voluntary program, it has
17  since evolved into the committed United Egg Producers
18  Certified Program.
19          Do you see that?
20  A.   Yes.
21  Q.   Is that consistent with your understanding of how the
22  program worked?
23  A.   To my best understanding, yeah.
24  Q.   And, Mr. Rust, I assume that in your business career
25  you've entered into a number of contracts?

119

1   A.   Yes.
2   Q.   And those would be agreements to buy pieces of land, buy
3   equipment, et cetera?
4   A.   Yes.
5   Q.   And did you voluntarily enter into those contracts?
6   A.   Yes.
7   Q.   And those were contracts or agreements, nonetheless, that
8   you voluntarily entered into them, correct?
9   A.   Yes.
10  Q.   Now, if you'll look, please, at -- again at the bottom of
11  page 3, it says:  In addition to meeting the Animal Husbandry
12  Guidelines, a company must meet the requirements as detailed
13  on page 16 through 19 to be recognized as United Egg Producers
14  certified.
15          Do you see that?
16  A.   Yeah.
17  Q.   Okay, so those are the rules that you have to adhere to
18  and that you're agreeing to adhere to in order to use that
19  logo on page 1?
20  A.   That's what it says.
21  Q.   And we'll get to page 16 through 19 in a minute, but
22  first I'd like you to turn to page 6.  Do you see at the top
23  it says:  Backfilling?
24  A.   Yeah.
25  Q.   And the first sentence says:  Other than a catastrophic

120

1  event, backfilling of cages to replace mortality is prohibited
2  under the United Egg Producers Certified Program.
3          Do you see that?
4  A.   Yes.
5  Q.   Now that's what we've been referring to as the no
6  backfilling rule?
7  A.   Yes.
8  Q.   Okay.  And if you would look, please, at page 15.  Are
9  you there?
10  A.   Yeah, I'm on page 15.
11  Q.   Thank you.  And up at the top it says:  Time Period for
12  Implementation.  And then it has the phased-in dates for when
13  you have to go to the expanded number of inches per hen,
14  correct?
15  A.   Correct.
16  Q.   And there are, one, two, three, four -- five different
17  time periods there?
18  A.   Yes.
19  Q.   And they have a separate inch per hen for White Leghorn
20  and also for brown layers.  For example, April 1, 2002 --
21  A.   Yeah.
22  Q.   -- 56 inches for the White Leghorn, 63 inches for the
23  brown?
24  A.   Yeah, they've got this -- they've got this separate
25  charge for brown bird.  The brown birds are a little bit

121

1  bigger.
2  Q.   Little bit bigger bird.
3          Will you turn to page 16, please.  Up at the top
4  where it says United Egg Producers Certified Compliance, and
5  it says:
6          Certification:  A company desiring to be recognized
7  as United Egg Producers Certified must file an application for
8  certification, sign a dispute resolution, successfully pass an
9  audit and pay the annual administrative and public relation
10  fees.
11          Do you see that?
12  A.   Yes.
13  Q.   Now, that's the application that we looked at earlier
14  that Rose Acre had signed?
15  A.   Right.  I assume it would be, yes.
16  Q.   Okay, and this is where it says that everybody has to
17  sign one of those who's in the program?
18  A.   Yes.
19  Q.   And then under Audit, it says:  To assure compliance with
20  the Animal Husbandry Guidelines.
21          Do you see that?
22  A.   Under Audit?
23  Q.   Yes.
24  A.   Yes.
25  Q.   Okay, and that's to prevent people from cheating on the

122

1  program?
2  A.   An audit is just to make sure that people follow what
3  rules they were assigned to follow.  Qualifying, I guess,
4  you'd call it.  You know, your race car, you have to qualify
5  the car before you get to run it.
6  Q.   And then down at the bottom on the audit section, it
7  says:  Audits require 170 points of a 200 point total for a
8  passing score.
9          Do you see that?
10  A.   Yes.
11  Q.   Okay.  And that reflects that -- you have a certain
12  number of points off if you didn't comply with an animal
13  welfare rule, right?
14  A.   Yes.
15  Q.   For example, for ammonia, if you had too much ammonia in
16  the henhouse, you would lose five points?
17  A.   Whatever it states, yes.
18  Q.   Okay.  And it wasn't until you got up to 30 points being
19  deducted that you failed the audit?
20  A.   I guess that's what it says, yes.
21  Q.   Okay.  But then it goes on and it says:  Failure to meet
22  the space allowance guidelines, evidence of backfilling cages
23  and commingling on certified and non-certified eggs will be
24  cause for failure of the audit regardless of the total points
25  achieved.

123

1          Do you see that?
2  A.   Yes.
3  Q.   Okay.  So those criteria didn't really depend on the
4  number of points you were awarded or not awarded.  It was
5  automatic failure?
6  A.   I think the document speaks for itself.
7  Q.   And that's automatic failure, right?
8  A.   Yeah.  I think.
9  Q.   Would you turn to page 18, please.  And up at the top it
10  says:  Additional Requirement for United Egg Producers
11  Certified Companies.
12          Do you see that?
13  A.   Yes.
14  Q.   And below that it says:  UEP's Board of Directors has
15  established additional requirements for companies that have
16  filed applications to be recognized as an UEP Certified
17  company.
18          Do you see that?
19  A.   Yes.
20  Q.   And then it says under paragraph 1, I'll just read the
21  first part of it:  A UEP certified company must implement the
22  Animal Husbandry Guidelines on 100% of the company's owned,
23  contract or affiliate facilities, site or location, regardless
24  of where or how eggs may be marketed.
25          Do you see that?

124

1   A.   Yes.

2   Q.   Okay, now that's what we've referred to as the 100% rule?

3   A.   I guess so.

4   Q.   And if you violated the 100% rule, you automatically

5   failed the audit?

6   A.   I think so.  Yes.

7   Q.   And then in paragraph 3, below, it says:  The certified

8   company must file monthly compliance reports with the UEP.

9        Do you see that?

10  A.   Yes.

11  Q.   Okay.  That was to check on people to make sure they

12  weren't cheating on the program, right?

13  A.   I'm not sure what the monthly compliance reports actually

14  entailed.  I don't remember.

15  Q.   Do you know if the purpose was to make sure people were

16  complying with the program?

17  A.   I'm sure it was.

18       MR. SLATER:  Okay.  PX-459.

19       May I approach, Your Honor?

20       THE COURT:  Yes, you may.

21       THE WITNESS:  Are you done with this?

22       MR. SLATER:  Yes.

23       Your Honor, could I have a second to talk to

24  counsel?

25       THE COURT:  Sure.

125

1        MR. SLATER:  Sorry, Your Honor, we had redacted some

2   notes at the end of this pursuant to the Court's order.  I was

3   just making sure that we were okay with that with counsel.

4        THE COURT:  Everybody on board then?

5        MR. SLATER:  Yes.

6   BY MR. SLATER:

7   Q.   Mr. Rust, I show you what's marked PX-459, and that's

8   a -- an audit that was done at Rose Acre and it's dated

9   March 3rd, 2008.  And the date is over on the upper right-hand

10  corner.  Do you see that?

11  A.   Yes.

12  Q.   Okay.

13       MR. SLATER:  Your Honor, we would offer PX-459.

14       THE COURT:  As redacted?

15       MR. SLATER:  As redacted, yes, Your Honor.

16       MR. KING:  Yes, no objection.  Just make sure that

17  the last page of this one isn't shown, published to the jury.

18       MR. SLATER:  Yes.

19       MR. KING:  I don't believe they're going to show the

20  last page.

21       MR. SLATER:  No, we aren't, and I'd be happy to take

22  the last page off, if you'd prefer.

23       MR. GERMAINE:  We've redacted the last page already.

24       MR. HARRIS:  Your Honor, objection on behalf of the

25  USEM.

126

1        MR. SLATER:  It's only against UEP and Rose Acre

2   only.

3        THE COURT:  Okay, so it's page 1 of 459 admitted as

4   to Rose Acre and UEP only.

5        MR. SLATER:  No, it's page 4 that's not admitted,

6   the first three.

7        THE COURT:  But 1 through 3.

8        MR. SLATER:  Yes.

9        THE COURT:  Not page 4.  Okay.

10       MR. SLATER:  Correct.

11       THE COURT:  Go ahead.

12       MR. SLATER:  Thank you, Judge.

13       (Exhibit received in evidence.)

14  BY MR. SLATER:

15  Q.   Mr. Rust, do you have the document in front of you?

16  A.   Yes.

17  Q.   I'd like to just go through an explanation of how this

18  worked.  If you look on the first page, it says:  Is there

19  evidence of prohibited backfilling?

20       Do you see that?

21  A.   Yes.

22  Q.   That's point 1.  And then there's just a check yes or no.

23  Do you see that?

24  A.   Yes.

25  Q.   And if you got a yes, you would fail the audit

127

1   automatically, correct?

2   A.   I would assume so.

3   Q.   Okay.  And then:  Is there evidence of commingling

4   certified and non-certified eggs?

5        And the same thing, there's an answer, yes or no,

6   right?

7   A.   Yes.

8   Q.   And then there's point 3:  Does the facility provide the

9   required average cage space?

10       And, again, on that, there's a line over on the

11  right --

12       MR. SLATER:  I did it again.  Can I publish it to

13  the jury, Your Honor?

14       THE COURT:  Yes, you may.

15       MR. SLATER:  David, thank you.

16  BY MR. SLATER:

17  Q.   Mr. Rust, looking again at the point 3, which is the

18  white layers and under that the brown layers on page 1, and if

19  you go over, there's a line across the page from that on the

20  right-hand column, and it says:  Points -- possible points.

21  And then on the next column it says:  Points received.

22       Do you see that?

23  A.   Yes.

24  Q.   Okay.  And the possible points for the cage space

25  allowance is 45, correct?

128

1   A.    That's what it says.

2   Q.    Okay.  So if you violated that, you would receive 45

3   points off, which would mean you automatically fail, correct?

4   A.    I would assume that's what it means.

5   Q.    Okay.  There are 200 points -- perhaps we should turn to

6   page 3.  Do you see where it says:  Total points, a minimum

7   score of 170 points is required to pass?

8         Do you see that?

9   A.    On page 3?

10  Q.    The title is on the screen if it helps you, sir.

11  A.    Yes.

12  Q.    Okay.  And over on the right-hand side, it says:

13  Possible points, 200.

14        Those are the total points available on the audit,

15  correct?

16  A.    Yes.

17  Q.    And it says:  Points received.

18        In your case 190.  So you passed, correct?

19  A.    That's what it says here.

20  Q.    Okay.  But you needed 170 points to pass.

21  A.    To fail or to pass?

22  Q.    Well, to pass, you needed a minimum of 170 points.

23  A.    Huh?

24  Q.    In order to pass you needed a minimum of 170 --

25  A.    Yeah, but you said --

129

1   Q.    Did I say it backwards?

2   A.    I think you said it backwards.

3   Q.    Okay.  Can we agree then in order to pass you needed a

4   minimum of 170 --

5   A.    I think it says what it says here.

6   Q.    Okay.  And if you lost 45 points because you didn't have

7   the proper cage space, you would fail because you'd only have

8   155 points and you need at least 170 to pass, right?

9   A.    Yes.

10  Q.    Now, would you look at line 14, please, on the first

11  page.  And 14 says -- you're challenging my eyes.

12        Are one farm layers including the daily removed of

13  those layers that are dead or injured, euthanized, or

14  depopulated in a humane manner in accordance with the written

15  procedures, complaints with the UEP Guidelines.

16        Do you see that?

17  A.    Yes.

18  Q.    And it says you have a possible points on that of ten

19  points; and Rose Acre, on this audit, got zero points.

20  Correct?

21  A.    Yes.

22  Q.    Okay.  Now, if -- how often were you audited?  Quarterly?

23  A.    No.  We had a couple hundred houses in the program and I

24  think -- I don't recollect exactly how many times, but I know

25  it was -- there was like an annual audit of each farm and each

130

1   house on the farm, so I guess there would be 200 of these

2   sheets for each year, or 300, or whatever it was.

3   Q.    Okay.  Now, if at this house that was audited on the form

4   we're looking at, 259, if you failed point 14 on the humane

5   disposal of hens in your next audit, what would happen?

6   A.    I think this would be the same thing.  I think the -- the

7   reason it had the points system was different producers had

8   different ways of, you know, euthanizing.  Different ways of

9   -- they had different houses, so you'd have -- some houses had

10  no ammonia, some houses had higher ammonia, so they

11  established the point system that allowed the producers, you

12  know, you would be failing in one thing because the design of

13  your building was such that you really couldn't make it work

14  under the 100 percent of what they gave the points for.  It

15  was -- it was a way of adapting producers to come in to new

16  types of housing without just saying, You can't use that

17  chicken house anymore.  You know, it was just, you know, the

18  Supermarkets' main concern was square inches --

19  Q.    And you could fail point 14?

20        THE COURT:  Could you all do one at a time?  Because

21  see Ms. Feldman here?  She's really creating a record because

22  it's very tough for her to take.

23        MR. SLATER:  Thank you, Your Honor.

24        THE WITNESS:  I guess she's mad at me too.

25  BY MR. SLATER:

131

1   Q.    Mr. Rust, Rose Acre could fail line 14 repeatedly,

2   couldn't it?

3   A.    Yes.

4   Q.    And you wouldn't lose the certification?

5   A.    I don't know -- I don't know why.

6   Q.    You wouldn't lose your certification unless you failed so

7   many other things that had added up to 30 points; isn't that

8   correct?

9   A.    That's correct.

10        MR. SLATER:  Could we have Plaintiffs' Exhibit 694.

11        May I approach, Your Honor?

12        THE COURT:  Yes, you may.

13        MR. SLATER:  Could I have a moment, Your Honor?

14        THE COURT:  Yes.

15  BY MR. SLATER:

16  Q.    Mr. Rust, this is a copy of an audit of Rose Acre Farms

17  done on 4-21-05.  Do you see that?

18  A.    Yes.

19        MR. SLATER:  I would offer PX-694, Your Honor.

20        THE COURT:  As to Rose Acre and UEP?

21        MR. SLATER:  Yes.

22        THE COURT:  But not as to USEM.

23        MR. SLATER:  Correct, Your Honor, thank you.

24        THE COURT:  And there is a redaction on this

25  version; is that right?

132

1    MR. SLATER:  No.  On this one, no redactions.
2    THE COURT:  I'm looking at a great big black space
3  on my copy here.
4    MR. SLATER:  Oh, in the middle of the -- I don't
5  know if that's a redaction or just a blank space on the
6  document, but we've got the same document you do.
7    MR. KING:  We believe, Your Honor, they're only
8  intending to offer the first three pages of this document.
9    Is that correct?
10    MR. SLATER:  Yes.
11    MR. KING:  Okay, there's no objection on behalf of
12  Rose Acre.
13    MS. SUMNER:  I'm sorry.  You said the first three
14  only?
15    MR. SLATER:  Yes.
16    MS. SUMNER:  Yes, we have no objection.
17    THE COURT:  Okay.  Pages 1, 2, and 3 of Exhibit 694
18  are admitted and may be published as to Rose Acre and UEP.
19    (Exhibit received in evidence.)
20    MR. SLATER:  You thought I was going to forget
21  again, didn't you?
22    THE COURT:  No.  It did not cross my mind.
23  BY MR. SLATER:
24  Q.  Mr. Rust, I'd like to direct your attention to the lines
25  8 and 9 at the bottom left-hand corner of the first page.  Do

133

1  you see those?
2  A.  Yes.
3  Q.  It says:  Are concentrations of ammonia within the cage
4  area of the layer house monitored?  And then point nine:  Was
5  corrective action taken when ammonia levels exceed 50 parts
6  per million.
7    Do you see those two lines?
8  A.  Yes.
9  Q.  And on each of those lines, there was a total available
10  of five points?
11  A.  I'm not sure -- I -- I -- I'm just assuming from
12  what the inspector was doing -- have you ever been in Georgia
13  in August?
14  Q.  I don't know.
15  A.  It's one hot humid place.
16  Q.  Yes, I'm sure.
17  A.  I'm assuming the circle with the slash means they didn't
18  even take the reading because these are curtain-sided houses
19  and the curtains would have been all open, and there would
20  have been no inside that house there to test.
21  Q.  Are you -- or do you know that the zero on those two
22  lines means zero?
23  A.  Well, it's got a zero with a slash through it.
24  Q.  Right.
25  A.  I'm assuming they didn't attempt to take the reading.

134

1  Q.  You think they took the points away from you without even
2  doing a test?
3  A.  They may have.  I don't know.  I'm just telling you.  You
4  asked me to look at the document.
5  Q.  Okay.
6  A.  I didn't know -- I know in August, you couldn't take an
7  ammonia reading in a chicken house in Georgia, because it's
8  all open air.
9  Q.  And if you look at the third page, they deducted ten
10  points, and the only ten points that could have been deducted
11  are from lines 8 and 9.
12    That's the only thing shown where you didn't pass,
13  correct?
14  A.  I didn't do the audit.  I just know you can't take an
15  ammonia test if the curtains are open.
16  Q.  You don't know if the curtains were opened, you don't
17  know the temperature on that date, do you?
18  A.  If it's August in Georgia, it's going to be 80 or
19  90 degrees outside, and if the curtains are up, the chickens
20  are going to suffocate and die.
21  Q.  Do you know what the temperature was on April 21st, 2005,
22  not August?
23  A.  It says August the 30th on the form.
24  Q.  Oh, date of audit.  I see.
25  A.  I know it was still warm.

135

1  Q.  Do you think they took ten points away from you without
2  ever doing the test?
3  A.  I have no idea.  I just know -- I know a chicken house in
4  Georgia in August isn't going to have its curtains closed.
5  It's going to be open.
6  Q.  The reason that ammonia is regulated by the guidelines is
7  because too much ammonia can make the chickens go blind; isn't
8  that right?
9  A.  Correct.
10  Q.  And, as I understand it, the ammonia gets into the
11  chicken house because it's in the chicken poop; is that right?
12  A.  The ammonia gets -- there's a reaction that takes place
13  in the manure as it kind of composts or whatever.  And, you
14  know, if you ever have a compost in your garden or something,
15  when you stir it, you'll see that there will be a release of
16  ammonia.  The same thing happens in a chicken house, the
17  manure in the storage area underneath.
18  Q.  And, again, if one failed the ammonia test and lost five
19  points or failed both lines, 8, 9, you could fail those two
20  items consecutively in audit after audit after audit at that
21  chicken house without ever failing the audit if you complied
22  with the other provisions in the rules, right?
23  A.  If you tried to comply with the ammonia rule year round
24  in the chicken industry -- and the reason they put points is
25  70 or 80 percent of the chicken houses at one time in the

136

```
 1   wintertime, when the houses are closed up, you can have 15,
 2   20, 25, 30 bites of ammonia in that house from the manure in
 3   the house.  And if they would have outlawed it and said it was
 4   a failure, no one could have committed to the program.
 5          You know, this was a way that was done and the
 6   Scientific Committee agreed that we had to take points off
 7   because it was a way that you just couldn't change overnight.
 8   It's the way it's always been done and, you know, we wanted to
 9   take care of the birds.  We always made sure we never had too
10   much ammonia because if you had too much ammonia, people can't
11   go in and take care of that -- birds either because, you know,
12   your eyes will start watering.  If it will hurt a chicken, it
13   will hurt a human too.
14   Q.   You apparently fail the test that I just showed you,
15   right?  You got zero points on those two items?
16   A.   It says that for August, but honestly --
17   Q.   You weren't there, were you?
18          THE COURT:  One at a time, folks, please.
19          THE WITNESS:  I was not there.  I didn't fill out
20   the form.  I don't know what a circle means, a zero with a
21   slash through it.  I don't know what that means.
22   BY MR. SLATER:
23   Q.   Mr. Rust, isn't it true that Rose Acre wasn't too worried
24   about not meeting an Animal Welfare Guideline as long as you
25   got the 170 points and passed the audit?
```

137

```
 1   A.   We had facilities and farms that we knew certain things
 2   you couldn't pass on the points areas, and the goal and
 3   purpose was to improve the welfare for the animals and by, you
 4   know -- you know, just like certain houses, they would --
 5   they'd have what they called a -- you'd have certain -- the
 6   cages, you couldn't divide the square inches.  So you were
 7   allowed to have them a little bit crowded in one cage, but the
 8   other cage had to have more room because it was an averaging.
 9          And when they put the program in for all the
10   farmers, you know, it was the desire of us as producers -- you
11   know, the main reason we got interested in the program was we
12   didn't want to have our type of housing outlawed, you know,
13   because it was an old design.
14   Q.   Yeah.  My question was:  Isn't it true that Rose Acre
15   wasn't too worried about not meeting an Animal Welfare
16   Guideline as long as you got 170 points and passed the audit?
17   Isn't that correct?
18   A.   We worried about it, but it's one of those -- we made
19   sure that we got at least 170, you know, to pass.  We had to
20   pass for, you know, what our program was.
21   Q.   PX-709.
22          MR. SLATER:  May I approach, Your Honor?
23          THE COURT:  Yes, you may.
24   BY MR. SLATER:
25   Q.   Mr. Rust, this is an e-mail from Mr. Ky Hendrix to all
```

138

```
 1   complex managers/production managers at Rose Acre, dated
 2   May 31, 2005, with regard to the subject, 2005 UEP Animal
 3   Husbandry Guideline in document; isn't that correct?
 4   A.   Yes.
 5          MR. SLATER:  I offer PX-709, Your Honor.
 6          MS. SUMNER:  Your Honor, objection, UEP.  Hearsay.
 7          MR. HARRIS:  And objection for USEM, Your Honor.
 8          MR. SLATER:  I offer it just against Rose Acre.
 9          MR. KING:  Your Honor, I guess I object.  I don't
10   believe this is a complete document.  I believe there's a
11   second page of the document.
12          We don't have the second page.  We only have the
13   front page.  I do need to see the second page just to make
14   sure it's complete.
15          MR. SLATER:  Do you have it --
16          THE COURT:  Okay, how about, folks, you don't need
17   to watch this part of these proceedings.  Why don't you all
18   take about a ten-minute break, and we'll -- we'll discuss
19   without you the composition of the exhibit.  Please don't talk
20   about the case.  I'll see you in about ten minutes.
21          THE DEPUTY CLERK:  All rise.
22          (Jury out.)
23          MR. SLATER:  Your Honor, I apologize.  The back
24   page --
25          THE COURT:  It happens.
```

139

```
 1          MR. SLATER:  -- it's a one-page document.  It
 2   printed on both sides.
 3          THE COURT:  It happens.  I just don't think it
 4   serves anybody to, you know, watch the sausage get made.
 5   Okay.
 6          (Recess taken.)
 7          THE DEPUTY CLERK:  All rise.
 8          THE COURT:  Do you have this figured out?
 9          MR. KING:  Yes, Your Honor.
10          THE COURT:  Great.
11          Bring the jury back.
12          THE DEPUTY CLERK:  All rise.
13          (Jury in.)
14          THE COURT:  Okay, you all can sit down.  Ladies and
15   gentlemen, thanks very much.  I think we've figured out, you
16   know, what pages, et cetera.
17          So you may proceed.  We're at Exhibit 709, I
18   believe.
19          MR. SLATER:  Yes.  Can I offer that against Rose
20   Acre?
21          THE COURT:  Okay, that was the two pages, right?
22          MR. SLATER:  Yes.
23          MR. KING:  We have two pages, no objection on behalf
24   of Rose Acre.
25          THE COURT:  Okay, it's admitted as to Rose Acre
```

140

```
1    only.
2              (Exhibit received in evidence.)
3    BY MR. SLATER:
4    Q.   Mr. Rust, do you see at the top -- do you have a copy of
5    709?
6    A.   I don't have a copy of the corrected one.
7              MR. SLATER:  Thank you.
8              Can we publish that to the jury, Your Honor?
9              THE COURT:  Which part?
10             MR. SLATER:  Just the first page.
11             THE COURT:  Okay.  Go ahead.
12             MR. SLATER:  Thank you.
13   BY MR. SLATER:
14   Q.   Mr. Rust, do you have Exhibit 709 in front of you?
15   A.   I have -- my both sides are blank.
16   Q.   Yes, we won't be discussing the back page.
17   A.   Oh, okay.  Okay.
18   Q.   Do you have that?
19   A.   Yes.
20   Q.   And this is from Ky Hendrix to all complex
21   managers/production managers at Rose Acre?
22   A.   That's what it says, yeah.
23   Q.   And was Mr. Hendrix the chief of your flock, if that's
24   the right terminology?
25   A.   Yeah, he worked with all of the Animal Care Guidelines.
```

141

```
1    Q.   Okay.  And he was the guy who was sort of in charge of
2    that?
3    A.   Yes.
4    Q.   And this is dated May 31, 2005.  If you would like,
5    please, sir, under paragraph D, where it says:  Molt standards
6    are a bit different than the previous years.
7    A.   Yes.
8    Q.   Do you see that?
9              And it says, under point 1:  Body weights need to be
10   monitored daily during the fast.  This is something that I
11   have fought since the beginning and I have finally given up
12   on.  It will cost us five points if we keep doing what we are
13   doing currently.  If we lose five points, I am not too worried
14   as long as we pass with 170 or greater.
15             Do you see that?
16   A.   Yes.
17   Q.   And that was what the head of the flock manager -- that's
18   what the flock manager at Rose Acre told the employees at Rose
19   Acre who were in charge of this, right?
20   A.   Yes.
21   Q.   Now, you actually did not think it was a violation of the
22   Animal Welfare Guidelines to fail to meet one of the
23   provisions of the guidelines so long as you passed the audit;
24   isn't that correct?
25   A.   Yes.  I stated, there was different -- you got points and
```

142

```
1    the reason for the points was not everyone could meet every
2    absolute thing.
3    Q.   And you thought that you could allocate to yourself
4    certain of the items in the Animal Welfare Guidelines that you
5    weren't going to comply with, right?
6    A.   Yes, we had housing that would not meet those
7    requirements.
8    Q.   And you thought that was in keeping with the Animal
9    Welfare Guidelines?
10   A.   It was fair to the people who had already investigated in
11   the chicken houses of what they had.  You know, we were just
12   trying to make use -- we couldn't go out and do what FMI
13   wanted, which was change everything in three years.  That's
14   physically impossible.
15             MR. SLATER:  Could I have PX-403?
16             May I approach, Your Honor?
17             THE COURT:  Yes.
18   BY MR. SLATER:
19   Q.   Mr. Rust, this is a letter to John Gregorich from Greg
20   Hinton.  Could you tell me who Greg Hinton is?
21   A.   He's our sales manager.
22   Q.   And this is dated May 30, 2007?
23   A.   Yes.
24   Q.   Okay.
25             MR. SLATER:  I would offer PX-403 against Rose Acre
```

143

```
1    only, Your Honor.
2              MR. KING:  No objection.
3              THE COURT:  It's admitted for that purpose and with
4    that limitation.
5              (Exhibit received in evidence.)
6    BY MR. SLATER:
7    Q.   Just as an aside, Mr. Rust, would you look at the very
8    top of the document, the second sentence?  It says:  The only
9    change to the current agreement is to price the eggs off Urner
10   Barry Animal Welfare Certified market.
11             Do you see that?
12             MR. SLATER:  Publish it.
13             THE WITNESS:  Yes.
14             THE COURT:  Go ahead.
15             MR. SLATER:  May I publish to the jury, Your Honor?
16             THE COURT:  Yes.  Yes.
17             MR. SLATER:  I ought to ask for a rebate from our
18   videographer.
19   BY MR. SLATER:
20   Q.   Are you looking at that sentence, Mr. Rust?
21   A.   Yes.
22   Q.   Could you tell me what Urner Barry is?
23   A.   Urner Barry was a market reporting company.  They
24   reported what the fish markets were, the meat markets, the --
25   they had this published price sheet that -- I forget if they
```

144

```
 1    publish it daily or weekly that they published.  They used it
 2    every day of what the prices -- the wholesale prices were all
 3    around the U.S. for all of the -- any kind of poultry, turkey,
 4    pig, beef, eggs, different kinds of fish.  You know, it was a
 5    market reporter and they tracked what each of the industries
 6    or, you know, what people got for their product.
 7    Q.   Is it fair to say it's a price index that would track the
 8    entire market?
 9    A.   I guess you could say it was kind of like the New York
10    stock index.  They would publish, you know, corn was $3,
11    tomorrow it might be 3.01 and then it might be 2.99 the next
12    day.  They just printed on paper and sent that to everybody.
13    Q.   And it was common for people to price off the Urner Barry
14    index?
15    A.   Yes.
16    Q.   In other words, if you had a particularly good customer,
17    you might quote them a rate of $0.02 below Urner Barry?
18    A.   Yes.
19    Q.   And the price would then fluctuate so as long as it was
20    $0.02 below the index?
21    A.   It was a common index that all the grocery chains,
22    retailers, and the producers would agree to use.
23    Q.   And if you look at the second paragraph of the letter,
24    Mr. Hinton says:  Also complying with -- let me strike that.
25         As a general matter, is it fair to say that
```

145

```
 1    Mr. Hinton is explaining to Kraft Food why the prices you're
 2    quoting are going up some?
 3    A.   Yes.
 4    Q.   Okay.  And then Mr. Hinton explains why that's taking
 5    place?
 6    A.   Yes.
 7    Q.   And if you'll look at the second paragraph, Mr. Hinton
 8    writes:  Also complying with the new UEP Animal Care Certified
 9    Guidelines has caused a decrease in our overall bird numbers
10    and resulted in an increase in production costs.
11         Do you see that?
12    A.   Yes.
13    Q.   Okay.  So Mr. Hinton was telling one of your customers in
14    2007, May of 2007, that the Animal Care Certified Guidelines
15    had caused the decrease in the overall bird count at Rose
16    Acre; is that right?
17    A.   Well, that's what it says there, but what happened, we
18    ended up with less chickens in one part of the country than
19    the other part.
20    Q.   Mr. Rust, I was only asking you if that's what the letter
21    says.
22    A.   Okay.  That's what it says.
23    Q.   And it then says:  Resulted in an increase in production
24    costs.
25         Do you see that?
```

146

```
 1    A.   Yes.
 2    Q.   Okay.  Now, as I understand it -- and I certainly know
 3    much less about eggs and chickens than almost anybody in this
 4    room, but as I understand it, when you give a chicken more
 5    space within a cage, the chicken moves around more and as a
 6    result, it expends more energy and therefore eats more; is
 7    that right?
 8    A.   Correct.
 9    Q.   Okay.  So if you have less hen space in a cage, the hens
10    don't move as much, they eat less, and your costs go down
11    because your feed costs are lower; is that right?
12    A.   Correct.
13    Q.   Okay.  So the guidelines, by expanding the amount of
14    inches per chicken actually led to the chickens eating more
15    and caused your prices to go up -- excuse me -- caused your
16    costs to go up?
17    A.   Correct.
18    Q.   And in order to recover your costs, you then had to raise
19    the price, correct?
20    A.   The market would take care of the pricing.  We just had a
21    formula based on the marketing, the so-called market.
22    Q.   And if most of the producers were experiencing the same
23    increase in costs because chickens were being given more
24    space, then all of them would be raising their price to
25    recover the costs; isn't that correct?
```

147

```
 1    A.   Not really.  It -- the pricing depends upon what the
 2    total overall demand is and the supply is times of the year.
 3    So your cost goes up, but the demand may have went down.  The
 4    higher eggs are, the less people will buy them.
 5    Q.   And when you said "supply" in that last answer, you meant
 6    market supply, correct?
 7    A.   No -- supply, market, it's all the same difference.
 8    Q.   What I meant was, you were referring to the total market
 9    supply, the number of eggs produced by all the producers, not
10    just by Rose Acre?
11    A.   Yeah, the market is how many eggs are out there.
12    Q.   And the price moves with the market -- the total market
13    supply, correct?
14    A.   Yes.  And the demand.
15    Q.   And the demand?
16    A.   Your highest -- the highest period of the year where we
17    have the most production is during the holiday month.  And
18    that's when the absolute highest egg prices occur, and it's
19    also when the highest production occurs.  The spring of the
20    year, when we have the least production, we also have the
21    least egg price because you guys ain't buying them, you know,
22    in the summertime.  You know, it's warm, people don't eat.
23    Q.   Okay.  So it's fair to say that the price is dependent on
24    the total market demand by which -- I mean demand of all the
25    consumers and the total market supply by which I mean the
```

148

```
 1    supply of all the producers, right?
 2    A.   Yes, that's what makes the market.
 3    Q.   Okay.  And if Rose Acre's output goes up or down a little
 4    bit, that's not going to move the market, is it?
 5    A.   No, no, not really.
 6    Q.   You're just not a big enough part of the entire market so
 7    that a movement in your output would change the market price,
 8    correct?
 9    A.   Repeat your question.  I'm not sure what you're asking
10    here.  You're saying --
11    Q.   I'm just saying that if Rose Acre was 95 percent of the
12    market all by itself, and I understand you're not, if you
13    were, then if you increased your output, that would change the
14    entire market because you're such a big part of the entire
15    market.  But Rose Acre isn't 95 percent and as a result, a
16    change in your output isn't going to change the market price?
17    A.   I guess changing our output would be like me putting my
18    finger in a five-gallon bucket of water.  And did the level go
19    up?  Yeah, a little.
20    Q.   Okay.  Now, Mr. Rust, the cage space restrictions which
21    as we saw a few minutes ago had, what, five or six different
22    phase-ins where you had to give the chicken more inches every
23    phase-in period.  By the time the entire program was phased
24    in, which I think was 2008, maybe, if Rose Acre had done
25    nothing to expand or increase its capacity, the loss of
```

149

```
 1    capacity from complying with the cage space restrictions would
 2    have reduced your output by about 20 to 25 percent; is that
 3    right?
 4    A.   That would be a good approximate.
 5    Q.   PX-137, please.
 6         MR. SLATER:  May I approach, Your Honor?
 7         THE COURT:  Yes.
 8    BY MR. SLATER:
 9    Q.   Mr. Rust, this is a Rose Acre Farms square inch effect
10    summary page.  Do you see that?
11    A.   Yes.
12    Q.   And it's dated down at the bottom on the lower left-hand.
13         MR. SLATER:  May I publish to the jury, Your Honor?
14         THE COURT:  Not yet.
15         MR. SLATER:  Thank you.  I just can't get it right.
16    BY MR. SLATER:
17    Q.   Mr. Rust, this was dated about August 16th, 2002?
18    A.   Yes.
19    Q.   And was this an attempt by Rose Acre to estimate the
20    capacity loss that you would suffer just by looking at the
21    cage space restrictions?
22    A.   Yes, at each individual location.  Then what we had to do
23    is we took these numbers --
24    Q.   Let me introduce the document.
25    A.   Okay.
```

150

```
 1         MR. SLATER:  Your Honor, I'd offer PX-137 against
 2    Rose Acre only.
 3         MR. KING:  No objection on behalf of Rose Acre.
 4         THE COURT:  137 is admitted as to Rose Acre only.
 5    Yes, it may be published.
 6         MR. SLATER:  Thank you.
 7         (Exhibit received in evidence.)
 8    BY MR. SLATER:
 9    Q.   Mr. Rust, I just would like to go through this and
10    understand how you did the calculation.  If you look at the
11    upper left-hand corner of the document, there's a listing
12    there for Cort Acre?
13    A.   Yes.
14    Q.   Is that one of your facilities?
15    A.   Yeah, but it's spelled wrong.  Someone must have knew it
16    was going to end up here.
17    Q.   I didn't do it.
18    A.   It's actually spelled C-O-R-T.
19    Q.   C-O-R-T, okay.
20         And there's an estimate there of the loss of
21    capacity that you would experience for each of the cage space
22    restrictions.  And do you see that?
23    A.   Yes.
24    Q.   And at the last restriction, there's an estimate that
25    Cort Acre would suffer a 26.66 percent loss in capacity due to
```

151

```
 1    cage space restrictions alone.
 2    A.   Yes.
 3    Q.   And if you'll look at the far right-hand lower corner,
 4    there's a company total.  That's a summary; is that right?
 5    A.   Yes.
 6    Q.   And it estimates that by the time all the cage space
 7    restrictions are in, that you will have suffered a
 8    21.41 percent capacity loss at your facilities, correct?
 9    A.   Correct.
10    Q.   Okay.  Now, getting back not to -- let's take Rose Acre
11    first.  Whether your output went up enough through expansion
12    and constructing new facilities enough to offset that
13    21 percent reduction in capacity is an empirical question,
14    correct?
15    A.   A what kind of question?
16    Q.   Empirical.  It's a arithmetic, it's a count.
17    A.   I -- is it a mathematical or --
18    Q.   Yeah.
19    A.   Yeah.
20    Q.   Okay.  So in order to decide whether capacity went up or
21    down, you count noses, or in this case, maybe you count beaks,
22    but what you're doing is counting the capacity, how much did
23    it go down because of cage space, how much did it go up
24    because of expansion, right?
25    A.   Correct.
```

152

```
 1   Q.   And you come up with a net number, right?
 2   A.   Yeah.  This is what going in the program was going to
 3   cost us in hen numbers if we didn't expand.
 4   Q.   Okay.  Correct.  Now let me ask you, and that's true for
 5   the market as well as it is for Rose Acre, whether the entire
 6   market -- strike that.
 7        How much the entire market lost in capacity is an
 8   arithmetic or mathematical question?
 9   A.   Yes.  That's why when the FMI wanted a three-year
10   phase-in, you know, us producers, we knew we couldn't do that.
11   There was just no way.
12   Q.   Okay.  And whether -- how much the industry -- not just
13   Rose Acre, all of you -- how much you grew by expansion,
14   building new facilities is also a mathematical question,
15   correct?
16   A.   Yes.
17   Q.   Okay.  That's what I mean by an empirical question.  It's
18   just arithmetic.  It's a count, correct?
19   A.   It's a word I'm not familiar with, so...
20   Q.   The word "empirical"?
21   A.   Yes.
22   Q.   I won't use it.  Okay.
23        Now, isn't it true, Mr. Rust, that there were many
24   producers who did not like the 100% rule?
25   A.   I think that at any given time there's probably maybe 15
```

153

```
 1   to 30 percent, just various times, different producers didn't
 2   like it for one reason or another.  The egg breakers didn't
 3   like it the most.
 4   Q.   And the reason -- or the people who were opposed to the
 5   100% rule, they wanted to produce and sell both certified and
 6   non-certified eggs, correct?
 7   A.   Yes.
 8   Q.   And they wanted to be able to satisfy the demand of the
 9   customer who came to them for both a certified egg and also
10   for an uncertified egg, correct?
11   A.   I would assume so.
12   Q.   Now, you have some -- now, prior to the time that UEP
13   instituted the Certified Program, there was a Scientific
14   Advisory Committee that made certain recommendations; isn't
15   that right?
16   A.   Yes, there's several of the members of the UEP's
17   Scientific Advisory Committee were also part of FMI's Advisory
18   Committee for Animal Welfare.
19   Q.   At different times?
20   A.   At different times.
21   Q.   And the recommendations of the Scientific Committee did
22   not include 100% rule, did it?
23   A.   I don't recall what took place when.  I'd have to look at
24   the document.
25   Q.   And maybe -- you may not remember this either, but the
```

154

```
 1   recommendations of the Scientific Advisory Committee did not
 2   call for a program where anybody would agree to do anything,
 3   did they?
 4   A.   I don't recall that.  I don't recall what they did.
 5   Q.   And under the recommendations of the Scientific Advisory
 6   Committee, there would be a list of, what I'll call best
 7   practices, if that's okay?
 8   A.   I know some of the time -- some of them were opposed to
 9   the backfilling, some were opposed to molting.  They had
10   different -- different people had different opinions of
11   different programs.
12   Q.   The Scientific Advisory Committee wanted -- delivered its
13   report to the UEP, said not one word about backfilling, did
14   they?
15   A.   I don't recall.
16   Q.   Okay.  My question is:  The Scientific Advisory Committee
17   proposed a list of best practices, correct?
18   A.   To the best of my memory, they did.
19   Q.   And they said you should not do this to a hen, you should
20   not do that to a hen, correct?
21   A.   I don't remember what they were called at what time
22   period.  I'd have to look at a document.
23   Q.   Now, at that time, if nothing had happened other than the
24   Scientific Advisory Committee publishing those best practices,
25   a producer could put on his packaging, I comply with the best
```

155

```
 1   practices recommended by the Scientific Advisory Committee.
 2   Correct?
 3   A.   They could just put the symbol on there.  I don't know if
 4   they could put all that wording on.
 5   Q.   Well, they could advise the customer be it either --
 6   A.   The customers all had a copy of the UEP Certified
 7   Program, it was on the website, it was published every place.
 8   Q.   Maybe you could answer my question.
 9   A.   Okay.
10   Q.   The --
11   A.   Well, you're asking me about it and I'm just telling you,
12   it was every place, so I'm not sure what you're asking.
13   Q.   Yeah, well, I wasn't asking you where it was or who you
14   think you saw it.
15        THE COURT:  Okay, why don't you just ask the
16   question.
17        MR. SLATER:  Thank you, Judge.
18   BY MR. SLATER:
19   Q.   Mr. Rust, isn't it true that a supermarket or a producer
20   could put on its packaging, We comply with the Scientific
21   Advisory Committee recommendations, period, full stop?  They
22   could do that, couldn't they?
23   A.   I'm not sure.
24   Q.   Why couldn't they do that?
25   A.   I think they could only put that animal welfare symbol on
```

156

```
 1  their package.  I -- I don't know what they could do or
 2  couldn't do.  We didn't control the packaging.  The
 3  Supermarkets controlled what was on the packages.
 4  Q.  Well, the UEP controlled who could use their certified
 5  label, right?
 6  A.  Correct.
 7  Q.  And they could tell anybody who honestly complies with
 8  those recommendations, you can use our label, correct?
 9  A.  That's what the Supermarkets wanted, correct.
10  Q.  That's all they wanted, right?
11  A.  The Supermarkets demanded it, I mean.
12  Q.  And then you could put on your packaging, We do not
13  comply with the recommended guidelines, and you could sell
14  that egg to anybody who wanted to buy it and express the
15  demand for it, right?
16  A.  It was interesting for me yesterday was the
17  supermarket --
18  Q.  Could you answer my question?
19  A.  They don't even print "cage" on the caged eggs.  They put
20  cage free on the ones that are not, but they don't say the
21  ones that are cage or caged.
22  Q.  Mr. Rust, can you answer my question?  A producer or a
23  supermarket could put on the package either we comply with the
24  recommended guidelines or we do not, correct?
25  A.  I think they would have to get permission from whoever
```

157

```
 1  that -- I don't think you can print on someone's package
 2  without permission of the group that gave that.  I don't
 3  think.  I don't know.
 4  Q.  Okay.  You don't know?
 5  A.  Because it says copyright, so they'd have to ask
 6  somebody.
 7  Q.  Okay, forget about the logo.  They just print on the
 8  practice, We comply with the best practices recommended by the
 9  UEP Certified Committee.
10  A.  I don't know what --
11  Q.  The Scientific Committee, excuse me.
12  A.  I don't know what they did.  It's their packaging.
13  Q.  I'm not asking you what they did.  I'm asking you what
14  they could have done.
15  A.  I guess they could have put anything on it.
16  Q.  The Scientific Advisory Committee came out with a list of
17  best practices and sellers of eggs could put on that
18  practice -- could put on their packaging, We comply with those
19  best practices, or we don't, or say nothing?
20  A.  I guess they could print whatever they wanted.  It's
21  their carton.
22  Q.  Okay.  And then the consumer could choose if he wanted an
23  egg produced with these best practices, he could buy one; if he
24  wanted an egg produced ignoring the best practices, he could
25  buy that, correct?
```

158

```
 1  A.  Correct.  That was the Supermarket's decision what the
 2  consumer got, not ours.
 3  Q.  And then supply and demand would control how many
 4  certified eggs and how many uncertified eggs were produced;
 5  isn't that correct?
 6  A.  I -- I can't say that for certain one way or the other,
 7  but I know the certified market was usually a couple cents
 8  higher than the non-certified.
 9  Q.  Okay.  And wouldn't you expect that if customers,
10  consumers like you and me, were demanding lower priced eggs --
11  strike the question.  We've been through that.
12          Now, isn't it also true that the recommendations of
13  the Scientific Advisory Committee had no requirement that
14  anybody promised would adhere to any of the rules or any of
15  the recommendations?
16  A.  I'm not sure what you're asking there.
17  Q.  Do you know whether the recommendations of the Scientific
18  Advisory Committee called for anybody to have to promise or
19  agree to follow any of the recommendations?
20  A.  I would have to look at the documents to see that.  I'm
21  not sure.
22  Q.  Isn't it true that the recommendations of the Scientific
23  Advisory Committee contained not one word about an audit?
24  A.  About what?
25  Q.  An audit.
```

159

```
 1  A.  FMI required the audits.
 2  Q.  We're asking about the recommendations of the Scientific
 3  Advisory Committee.  Isn't it true that they didn't contain
 4  one word about an audit?
 5  A.  I don't know.  I'd have to read it to see.
 6  Q.  Mr. Rust, you're aware of the fact that the USDA, the
 7  United States Department of Agriculture provides a service
 8  where if you have an Animal Welfare Program they will audit
 9  that program for you?
10  A.  Yes.
11  Q.  So any producer wanting to adhere to the recommendations
12  of the Scientific Advisory Committee could ask the USDA to
13  come in and audit their facility and then they could put on
14  their package if they passed the audit that the USDA says we
15  comply with these best practices; isn't that true?
16  A.  Yes, that's the program Sparboe used.
17          MR. SLATER:  Could we have PX-601.
18          May I approach, Your Honor?
19          THE COURT:  Yes.
20  BY MR. SLATER:
21  Q.  Would you look at the second page of the document,
22  please.  Do you see in the middle of the page there appears to
23  be an e-mail from you to a Mr. Roger Deffner?
24  A.  Yeah, I'm trying to figure out which is the second page.
25  Q.  It has a Bates number at the bottom, which ends in the
```

160

```
1   digits 82.
2   A.   Well, the one has a date on it and the other one looks
3   like it's just half of something.
4   Q.   Do you have the second page of the document?
5   A.   The what?
6   Q.   Do you have the second page?  Do you see the --
7   A.   I have the second page, but my second page is just --
8   it's not a full any -- it's just a half of a sentence.
9   Q.   That should be the third page.
10       MR. SLATER:  Do we have a -- we'll come back to
11  that.
12       MR. KING:  You can use mine.
13  BY MR. SLATER:
14  Q.   Mr. Rust, I'd like to hand you what your counsel has
15  graciously offered me, which is a full copy of PX-601.
16  A.   Okay.
17  Q.   Do you have the second page now?
18  A.   Yeah.  Let me read it.
19  Q.   Do you have that?
20  A.   Yeah, I'm refreshing my memory of it.
21  Q.   And this is an e-mail from you to Mr. Roger Deffner,
22  dated June 1, 2005, with regard to the ACC program.  Do you
23  see that?
24  A.   Yes.
25  Q.   And ACC program was another way to describe the Certified
```

161

```
1   Program?
2   A.   This was an abbreviation for Animal Certified or Animal
3   Care.
4   Q.   Certified Program?
5   A.   Yeah, I get confused of all those acronyms.
6   Q.   It was an acronym to describe the Certified Program; is
7   that correct?
8   A.   Correct.
9   Q.   If you'll look down towards the bottom of the e-mail from
10  you to Mr. Deffner --
11       MR. SLATER:  Your Honor, we would offer PX-601
12  against Rose Acre only.
13       MR. KING:  No objection on behalf of Rose Acre.
14       MS. SUMNER:  Your Honor, we have an objection on
15  behalf of UEP, not to the particular e-mail that Mr. Slater is
16  referencing right now, but we would request that the rest of
17  this document be redacted if it's going to go to the jury.
18  It's hearsay.
19       THE COURT:  Which part is which?
20       MS. SUMNER:  Well, on the first page, there are two
21  e-mails that we would request be redacted.
22       THE COURT:  Okay, as I understand it, Mr. Slater,
23  you're not focusing on the first page at all, right?
24       MR. SLATER:  That's correct, Your Honor.
25       THE COURT:  So the only exhibit that you really want
```

162

```
1   to use is page what of 601?
2        MR. SLATER:  It's page 2 of 601.
3        THE COURT:  Okay, does it have a Bates number?
4        Bates, ladies and gentlemen, is this little system.
5   It's like an automatic numbering thing, and it just goes
6   berserk and puts numbers on a bunch of pieces of paper.  It
7   was created by somebody named Bates.  So that's what we're
8   talking about.
9        MR. SLATER:  ML001082.
10       THE COURT:  Is that the only piece of paper being
11  offered?
12       MR. SLATER:  Yes.
13       THE COURT:  Okay, there's no objection from Rose
14  Acre?
15       MR. KING:  No objection to the entire document.
16       THE COURT:  Okay.  What about everybody else?
17       MS. SUMNER:  Can we just have one minute?
18       THE COURT:  It's not being offered as to USEM.
19       MR. KING:  Your Honor, can I just have 30 seconds?
20       THE COURT:  Sure.
21       MS. SUMNER:  We still request that the first page be
22  redacted.
23       THE COURT:  I think page 1's not even being offered.
24       MS. SUMNER:  If it's not -- what we have is page 1,
25  and if it's not coming in, then we have no objection to pages
```

163

```
1   2 and 3.
2        MR. SLATER:  I'm only offering page 2.
3        THE COURT:  If I keep going, maybe we'll have no
4   page offering.
5        MR. SLATER:  Your Honor, I'll offer page 2.
6        THE COURT:  Okay, so it's page 2 only, from the
7   document previously identified as a three-page document,
8   numbered 601.
9        MR. SLATER:  Correct.
10       THE COURT:  So we're only going to be dealing with
11  page 2, and that is admitted.
12       MR. SLATER:  Thank you, Your Honor.
13       THE COURT:  But not as to USEM.
14       (Exhibit received in evidence.)
15       MR. SLATER:  May I publish to the jury?
16       THE COURT:  That page?
17       MR. SLATER:  Yes.
18       THE COURT:  Yes.
19       MR. SLATER:  All right.
20  BY MR. SLATER:
21  Q.   Mr. Rust, you identified Roger Deffner earlier as being
22  an egg producer on the West Coast.  I think Seattle, you said?
23  A.   Seattle, Washington.
24  Q.   Okay.  Would you look, please, at the e-mail from you to
25  him.  And I'm looking about two-thirds of the way down, the
```

164

```
1    paragraph where it starts:  We as a company have had over 13
2    houses.
3            Do you see that, where I'm starting to read?  I
4    believe if you look at the screen, our videographer has come
5    up with it.
6    A.   Yes.
7    Q.   Okay.  So we as a company have over 13 houses set empty
8    for last year and a half during a remodel program.  All the
9    birds will be placed by December 1.  We also have three new
10   houses in Iowa and two in Illinois to be in production at the
11   same time period.  With all the new bird square inches
12   standards, we will have 2 million -- we will have 2 million
13   more birds laying eggs on January 1 than we had this
14   January 1.  We have been running about a million birds behind
15   our pre-ACP capacity even with the construction and
16   remodeling.  We have calculated that when we get our NC --
17   that's North Carolina -- project complete, we will have done
18   nothing more than staying even as a company bird numbers-wise
19   for the previous five years.
20           Do you see that?
21   A.   Yes.
22   Q.   Okay.  Now, isn't it true, that the population of the
23   United States grows about 1 percent a year?
24   A.   It's -- I think it's between a half and one every year.
25   Sometimes it's a little higher.  I haven't looked at it for a
```

165

```
1    little bit, but that's probably a fair statement.
2    Q.   And as the population goes up, the output of eggs has to
3    go up because there are more people eating the eggs, correct?
4    A.   Yes.
5    Q.   So in order to stay even, you actually have to grow at
6    about 1 percent a year, correct?
7    A.   In different areas of the country.  Where we were
8    primarily in the Midwest, some of those areas might have lost
9    people, you know, or didn't gain as fast.  There's other
10   regions of the country that have far faster growth.
11   Q.   You're in Indiana, aren't you?
12   A.   Yeah, but one of the reasons we went to North Carolina,
13   because it was a growth population area than Indiana.
14   Q.   Indiana was growing during these areas.
15   A.   Very slow compared to North Carolina.
16   Q.   It was growing more than 1 percent a year.
17   A.   I don't recall exactly what it was, but North Carolina
18   was greatly increased versus Indiana.
19   Q.   Isn't it true that Indiana was a bit of a boom town in --
20   from 2003 to 2010?
21   A.   In population growth?
22   Q.   Yeah.
23   A.   I don't think so.  I --
24   Q.   Okay.
25   A.   I can't -- I haven't sat there and looked at the numbers,
```

166

```
1    but -- but I don't recollect, you know, our demand going up
2    that much at the same store sales.  I don't think the
3    population increased that much.
4    Q.   Okay.  So that's what you told Mr. Deffner on June 1,
5    2005, correct?
6    A.   Yes.
7    Q.   Okay.
8            MR. SLATER:  Could we have PX-602.
9            May I approach, Your Honor?
10           THE COURT:  Yes.
11   BY MR. SLATER:
12   Q.   Let me ask you this, Mr. Rust, without looking at the
13   document.  Apparently we're missing a page, but let me just
14   ask the questions.
15           Can you tell me what AMS is?
16   A.   It's Agricultural Marketing Service.
17   Q.   And that's an arm of the United States Department of
18   Agriculture?
19   A.   Yes.
20   Q.   And can you tell me what PVP is?
21   A.   That was a Process Verified Program.
22   Q.   And that was the alternative Animal Welfare Program that
23   was being developed amongst other people by Mr. Sparboe?
24   A.   There was probably, I don't know, 15 or 20 egg producers
25   who went out and done their own.  They wanted the program
```

167

```
1    where they could have certain amount of their chickens on a
2    program similar to UEP's, and then they'd have other birds
3    that they were raising for McDonald's that -- 70-some square
4    inches of bird, and then they also had birds that they were
5    raising for Michael's at 45 inches a bird.
6    Q.   So it was a -- an Animal Welfare Program that had no 100%
7    rule; is that correct?
8    A.   Correct.  He was allowed to squeeze chickens and he's
9    allowed to collect premiums from people willing to pay a big
10   price.
11   Q.   And you could sell those chickens to whoever was
12   demanding them, correct?
13   A.   Yes.  The eggs, not the chickens.
14   Q.   Now, who was Joseph A. Miller?
15   A.   He was our attorney.  Still is.
16   Q.   He's your general counsel?
17   A.   Yes.
18   Q.   And do you have Exhibit 602?
19           MR. GERMAINE:  Everybody has it now.
20           MR. SLATER:  The whole exhibit?
21           MR. GERMAINE:  Everybody has the whole exhibit.  The
22   attachment, though, there is no digital file for.
23           (Discussion off the record.)
24   BY MR. SLATER:
25   Q.   Mr. Rust, would you look, please, at --
```

168

```
 1            MR. SLATER:  I would offer PX-602, Your Honor.
 2            THE COURT:  And what is 602?
 3            MR. SLATER:  Excuse me?
 4            THE COURT:  602, I see, is one -- one-line e-mail.
 5   Is that what 602 is, or is there more to 602?
 6            MR. SLATER:  There's a letter attached to 602.
 7            THE COURT:  But yes or no, it's attached.
 8   BY MR. SLATER:
 9   Q.   Mr. Rust, is the letter attached to your e-mail?
10   A.   Yes.
11            MR. SLATER:  Yes.
12            THE COURT:  What's being offered, the whole thing?
13            MR. SLATER:  Yes.  Well, I'll lay a foundation.
14            THE WITNESS:  No.  It's paper.  These others have
15   been stapled.  Does that matter?
16   BY MR. SLATER:
17   Q.   No.  Okay.  The e-mail --
18            THE COURT:  Hold on.  I just don't know what the
19   survey here is of the group.
20            MR. KING:  Rose Acre does not object to this
21   exhibit.
22            THE COURT:  Which one of the exhibit?
23            MR. KING:  All parts.
24            THE COURT:  Whatever they are?
25            MR. KING:  Yes.
```

169

```
 1            THE COURT:  Okay.  Yep.
 2            MR. HARRIS:  USEM does object on hearsay.
 3            THE COURT:  Okay.  It's not being offered as to
 4   USEM, I take it, right?
 5            MR. SLATER:  Right.
 6            THE COURT:  What about UEP?
 7            MS. SUMNER:  No objection from UEP.
 8            THE COURT:  Okay, have at it.
 9            (Exhibit received in evidence.)
10            MR. SLATER:  Thank you, Your Honor.
11   BY MR. SLATER:
12   Q.   Mr. Rust, if you look at the first page of the short
13   e-mail, that's from Joe Miller, your general counsel.  It's to
14   you and a Tony Wesner, and it's cc'd to Gene Gregory.
15            Can you tell me why this was cc'd to Gene Gregory?
16   A.   He would be UEP.  I have no idea why he sent it.  You'd
17   have to ask Joe for that.
18   Q.   Do you know if the UEP worked with Mr. Miller in sending
19   this letter to the AMS, which is the marketing arm of the
20   United States Department of Agriculture?
21   A.   I have no idea on that.
22   Q.   Okay.  Now, it says attached -- the attached letter was
23   sent to AMS -- that's the Agricultural Marketing Service, I
24   believe -- concerning the AMS use of the PVP shield, and the
25   PVP shield was the USDA Certified Animal Welfare Program of
```

170

```
 1   Mr. Sparboe -- that Sparboe Farms was involved in, correct?
 2   A.   Correct.
 3   Q.   Okay.  And if you look at the second page, the attached
 4   letter from Rose Acre's counsel to a Mr. Lloyd Day, the
 5   administrator of --
 6   A.   The second page of the letter or the second page of the
 7   exhibit?
 8   Q.   The second page of the exhibit.  I'm sorry.
 9   A.   Okay.
10            MR. SLATER:  Can I publish this to the jury,
11   Your Honor?
12            THE COURT:  Yes.
13            MR. SLATER:  Thank you.
14   BY MR. SLATER:
15   Q.   Do you see beginning of the third paragraph of the
16   letter, second sentence:  With the recent announcement that
17   the USDA would allow anybody the documents of process and that
18   abides by that process can receive and put on their curtains
19   the USDA PVP shield.  We have to question what the purpose of
20   the shield or the program actually offers.
21            Do you see that?
22   A.   Yes.
23   Q.   Okay.  And just below that, the letter from your general
24   counsel says:  This would seem to border on falsely misleading
25   consumers.
```

171

```
 1            Do you see that?
 2   A.   Yes.
 3   Q.   Okay.  Did you talk to your counsel about this letter
 4   before it was sent to the United States Government?
 5   A.   I don't recall.
 6   Q.   Your counsel is telling the United States Government that
 7   it would be false and misleading to allow somebody to publish
 8   on their carton that they complied with an alternative Animal
 9   Care Welfare Guideline that did not have a 100% rule; is that
10   correct?
11   A.   That was our feeling.
12   Q.   Okay.  What would be false about putting on your carton,
13   We comply with the PVP recommendations?
14   A.   Well, then you were going out and telling --
15   Q.   Let me rephrase it.  I apologize.
16            What would be false or misleading about putting on
17   your carton, This egg was produced in compliance with the PVP
18   guidelines, if that was true?  What would be false and
19   misleading about that?
20   A.   I'm not sure anything would be false about that.
21   Q.   Okay.  Going on, on the first paragraph, about two-thirds
22   of the way down, it says:  But allowing the PVP shield to be
23   used by anybody that has a specified process which has been
24   documented, regardless of the basis for that process, would
25   seem to be telling consumers that the shield means something
```

172

1    when all it would be indicating is that a process had been
2    followed.
3            Do you see that?
4    A.    Yes.
5    Q.    Okay.  If the process was an animal care standard
6    developed by people who understood what that meant and how
7    animals should be treated, why would the statement that we
8    comply with the standard be meaningless?
9    A.    United Egg Producers, you know, farmers, we went out and
10   developed an Animal Welfare Program advertising to consumers
11   this is what the program is.  We're -- we treat all of our
12   chickens the same.  The Government was going to come in and
13   they allowed the process for people to mimic what we had spent
14   all of the time and effort in developing to say we're doing
15   the same thing, but in reality, they were keeping chickens
16   both ways.  It was just, you know --
17   Q.    The difference was they didn't have 100% rule and you
18   did?
19   A.    Correct.
20   Q.    Okay.  And then if you look at the second page of the
21   document, the first full paragraph:  Another major problem
22   presented by AMS -- that's the Agricultural Marketing
23   Service -- is that by allowing less than 100 percent of the
24   production to use the shield -- that would be the USDA shield,
25   correct?

173

1    A.    Correct.
2    Q.    -- a facility is one of -- at a facility is one of
3    policing the authenticity of the program.
4            Do you see that?
5    A.    Yes.
6    Q.    Okay.  The USDA would come in and certify whether what
7    you were saying was true or not.
8            Didn't we just discuss that?
9    A.    Yes.
10   Q.    Okay.  And then it says at the bottom of that paragraph:
11   Which makes the use of the PVP shield all the more egregious
12   in this situation.  There is no possible way USDA/AMS will be
13   able to give any type of validity to this type of program.
14           Do you see that?
15   A.    Yes.
16   Q.    Okay.  You wanted the USDA to not participate in or to
17   certify the PVP program as being in compliance with the list
18   of guidelines that they wanted to adopt?
19   A.    Run that question by me again.
20   Q.    Yes.  Rose Acre wanted to stop the United States
21   Government from certifying the PVP program as complying with
22   Animal Care Guidelines adopted by that program, absent the
23   100% rule, and you wanted to stop the Government from saying,
24   Yes, this -- the standards of this program are met; isn't that
25   true?

174

1    A.    We thought it would give the Government a black eye
2    verifying that birds were being animal certified protected or
3    produced when they would allow the producer two different
4    methods of production under the cage --
5    Q.    You were doing this to protect the Government from
6    itself?
7    A.    Well, it's hard to protect the Government from anything.
8    Watch TV today.
9    Q.    What you wanted to do was stop the Government from
10   certifying the compliance of producers with a PVP shield;
11   isn't that correct?
12   A.    It was detrimental to what the UEP had -- what the
13   producers had developed in their program because now they
14   was -- the Government was going to take a shield and put it on
15   a carton and say, oh, you're doing the same thing.
16   Q.    No, it wasn't going to say you're doing the same thing,
17   was it?
18   A.    That's what -- the consumer would make --
19           THE COURT:  One at a time, folks.
20   BY MR. SLATER:
21   Q.    It was going to say these eggs comply with the PVP
22   requirements, correct?  They were not going to say it complies
23   with a certified program of the UEP.
24   A.    I don't recall what it said.  I'm sorry.
25   Q.    And then it says:  We urge USDA AMS to reconsider the use

175

1    of the PVP logo to be used only with those programs that
2    include 100 percent of the production is covered by the
3    program.
4            Do you see that?
5    A.    Yes.
6    Q.    You were urging the Government, don't certify this
7    program unless they include a 100% rule, correct?
8    A.    That was our feeling, correct.
9            MR. SLATER:  PX-609.
10   BY MR. SLATER:
11   Q.    Let me ask this:  Mr. Rust, isn't it true that the
12   Government rejected your request?
13   A.    I believe they did, correct.
14   Q.    And they certified the PVP program and said the USDA
15   certification logo could be used with the PVP program,
16   correct?
17   A.    Correct.
18   Q.    Mr. Rust, do you still have Exhibit 308 in front of you?
19   This is the 2006 edition of the Certified Program.
20   A.    I've got all of them here somewhere.  Okay.  Yes.
21   Q.    Would you go to page 6 of the document, please?
22   A.    Page what?
23   Q.    Six.
24   A.    Okay.
25   Q.    Up at the top of the page, it says:  Backfilling.

176

1   A.   Yes.
2   Q.   And then it says:  Other than a catastrophic event,
3   backfilling of cages to replace mortality is prohibited under
4   the United Egg Producers Certified Program.
5            Do you see that?
6   A.   Yes.
7   Q.   That's what we've referred to as the no backfilling rule?
8   A.   Yes.
9   Q.   And then it says:  This policy became effective
10  February 1, 2005.  Is that correct?
11  A.   Yes.
12  Q.   With the exception of pullets being grown for housing
13  through June 1, 2005.
14           There was a short period of time for people to
15  adjust to the program, right?
16  A.   That's what I think it is, yes.
17  Q.   Then it says:  A catastrophic event is defined as a
18  national disaster, disease problem, or other event beyond the
19  control of the producer.
20           Do you see that?
21  A.   Yes.
22  Q.   Okay.  It says:  Under these circumstances, backfilling
23  of hens up to 90 percent of the original flock capacity shall
24  be permitted.
25           Do you see that?

177

1   A.   Yes.
2   Q.   So backfilling was permitted if something terrible
3   happened to the entire flock?
4   A.   Correct.
5   Q.   Okay.  And then you could replace the flock, correct?
6   A.   I don't know if you could replace the flock.  You could
7   backfill.
8   Q.   Okay.  Up to 90 percent?
9   A.   Of it.  Correct.
10  Q.   Why limit it to 90 percent?
11  A.   I don't recall.
12  Q.   You'd agree with me if you could backfill up to 100
13  percent you would have more hens and more output, right?
14  A.   Well, if you -- but if you went to 100 percent then it
15  wasn't a backfill, it was a new flock.
16  Q.   Okay, 99 percent, does that make you happy?
17  A.   Um, I don't know why --
18  Q.   Well, it's your understanding --
19  A.   I think the 90 percent was the -- the target for the
20  actual mortality of the flock, normal.  And that's what I
21  think they targeted it as the backfill rule.  You could do
22  90 percent of the original.
23  Q.   We've talked a lot about backfilling but I don't think
24  we've actually had a definition of it.  Can you tell me what
25  backfilling is, Mr. Rust?

178

1   A.   Okay.  Backfilling is something that -- because we had
2   breaking plants and we molted all our flocks -- we did a lot
3   of; and through the years and what you would do, when it comes
4   time to molt your birds, you would go pick out a sister flock
5   that would be very similar in age and then you would take --
6   and you'd take birds from that flock and put them into the
7   house to replace all the mortality.  And then when you filled
8   -- then you would put them in a molt, which is where we would
9   restrict the feed and the birds would lose their feathers and
10  then they would grow back new feathers.  This is chickens, as
11  a natural process, will molt about one time every 12 to 13
12  months, you know, just in nature.
13           We do what they call the forced molting, which is
14  where you remove the feed for anywhere from six to ten days,
15  or 12 days, depending on the weight of the bird, how fat they
16  were, it's kind of like if we go on a fasting diet for so many
17  days, you know, we put the bird -- they could lose up to, I
18  forget the exact weight, 20 percent or 25 percent of their
19  body weight, which would be all the fat, and then you'd put
20  them on a restricted feed program back and then they would
21  grow all new feathers and they'd start laying like a pullet
22  again, and you would actually, after the molt you'd be back up
23  and they'd be laying at a rate of 85 percent production
24  instead of 65 percent, they'd braid a leg -- when I say "braid
25  a leg," a flock that was 75 weeks old back then, they may have

179

1   been laying 65 eggs per hundred chickens.
2            When you put them through a molt and re -- renovate
3   the bird, and you give them feed again, then they'll be laying
4   85 eggs per bird, and that's the rate of lay.
5   Q.   Mr. Rust, the question was what is backfilling, not
6   molting.  The backfilling process is when you --
7   A.   For part -- for us it was part of it.
8   Q.   When a hen dies and you have an empty space in a cage, if
9   you put a different hen into that cage, that's backfilling,
10  correct?
11  A.   Yeah, but you had to have that hen to put back into it.
12  Q.   If you didn't have the hen you couldn't do it, I get
13  that.
14  A.   Right.
15  Q.   And the reason the producers would backfill is that
16  somebody could produce more eggs in the cages they had,
17  correct?
18  A.   To produce more eggs from the cage space.
19  Q.   And the Scientific Advisory Committee issued a report
20  before the Certified Program -- strike that.
21           MR. SLATER:  Could we have PX-52.
22           Actually, Your Honor, I believe this may be in
23  evidence.
24           THE COURT:  You are right.
25           MR. SLATER:  For the first time today.

180

1     May I approach, Your Honor?
2     THE COURT:  Yes.
3 BY MR. SLATER:
4 Q.   Now, Mr. Rust, this is a document dated September 2000
5 and it's submitted by a Scientific Advisory Committee on
6 animal welfare.  Do you see that?
7 A.   Yes.
8 Q.   Now, this was before you joined the UEP or the Certified
9 Program.  Are you familiar with this document?
10 A.   I probably have seen it through this trial, but my
11 brother-in-law and my brother would have had more -- and David
12 Hurd would have had a lot more dealings with it than I would.
13 Q.   On a day-to-day basis through the business as opposed to
14 the litigation?
15 A.   Correct.  Yes.
16 Q.   Do you know whether there's anywhere in the Scientific
17 Advisory Committee document that mentions backfilling and says
18 it should be banned?
19 A.   I would have to sit here and read it.  I don't remember.
20 Q.   Okay.  Well, it's been admitted into evidence.  You don't
21 know of anyplace in there that mentions backfilling, do you?
22 A.   I -- I can't say honestly I've ever read this
23 document 100 percent.
24 Q.   Okay.  And you don't know of anything in there that
25 mentions the 100% rule, do you?

181

1 A.   I -- you know, I'm sure I've read parts of the document
2 through the years, but that was something my brother-in-law
3 would have done.
4 Q.   And by your brother-in-law are you referring to Mr. Ky
5 Hendrix?
6 A.   Ky, yes.
7     MR. SLATER:  Let me have PX-243.
8 BY MR. SLATER:
9 Q.   Mr. Rust, I'd like to show you what's been --
10     MR. SLATER:  May I approach, Your Honor?
11     THE COURT:  Yes, you may.
12 BY MR. SLATER:
13 Q.   -- what's been marked PX-243.  And that is a copy of the
14 United Voices dated August 12th, 2004.  Do you see that?
15 A.   Yes.
16 Q.   Okay.
17     MR. SLATER:  Your Honor, I would offer PX-243 into
18 evidence.
19     MR. KING:  No objection, Your Honor.
20     MR. HARRIS:  No objection.
21     MS. SUMNER:  No objection.
22     THE COURT:  243 is admitted.
23     (Exhibit received in evidence.)
24     MR. SLATER:  Thank you, Your Honor.
25 BY MR. SLATER:

182

1 Q.   Would you look, please -- put that aside for a second.  I
2 got ahead of myself.
3     When the Certified Program began and you first
4 joined it, backfilling was permitted; is that correct?
5 A.   Yes.
6 Q.   And Rose Acre itself had always backfilled; isn't that
7 correct?
8 A.   At our breaking plant.
9 Q.   And Mr. Ky Hendrix, your brother-in-law, believed it was
10 more humane to backfill than to kill the bird; isn't that
11 correct?
12 A.   Yes.
13 Q.   Now, after you joined the UEP Certified Program, you
14 continued to backfill; isn't that right?
15 A.   Yes.
16 Q.   And Rose Acre continued to backfill right up until the
17 time that the UEP banned backfilling; isn't that correct?
18 A.   Correct.
19 Q.   And at that time, you stopped because it would be
20 contrary to the rules you agreed to follow; is that correct?
21 A.   Yes.
22 Q.   Isn't it true that Rose Acre saw nothing wrong with
23 backfilling?
24 A.   It was very good for the producer because it gave you the
25 most economic use of your cage.  But for the actual chicken

183

1 involved, if you could get past the fact that it wasn't -- it
2 was going to be killed anyhow, the other chickens in the cage
3 had their pecking order, then what would happen is the
4 chickens would peck and you'd have much higher mortality
5 percentages with backfilled birds than you'd have for regular
6 birds.
7 Q.   And there was some concern or talk about putting a hen
8 into a different flock and introducing catastrophic disease to
9 the flock.  Do you recall that?
10 A.   We tried to keep all of our backfills only onto that farm
11 and on a given farm, sometimes you wouldn't have the birds of
12 the right age so you couldn't backfill.  By keeping them on
13 that farm, you didn't bring disease from other farms to that
14 farm.
15 Q.   And if you thought that you would kill an entire house of
16 100,000 birds by backfilling, you wouldn't have done it, would
17 you?
18 A.   We had a situation in Iowa during that bird flu, where
19 every bird on two farms died.
20 Q.   Was that from backfilling?
21 A.   No, but it was from one of our people going from one farm
22 to the next farm.
23 Q.   Okay.  If you thought that by backfilling you would kill
24 an entire flock, you wouldn't --
25 A.   No, you wouldn't dare do it.  I mean, today, because of

184

1   the AI thing and because of the disease, you wouldn't backfill
2   from another farm.  You know, the biosecurity, you wouldn't do
3   it.  I think --
4   Q.  Now, the reason you did it was because it allowed you to
5   increase your output of eggs, correct?
6   A.  It allowed us to have more eggs from that space, correct.
7       MR. SLATER:  Could I have PX-603, please.
8       I strike that, Your Honor.  I misspoke.  The wrong
9   document.
10      THE COURT:  Forget 603?
11      MR. SLATER:  It's now been marked as PX-243.
12  BY MR. SLATER:
13  Q.  And this was the document that I had handed you before we
14  started talking about Rose Acre's practices on backfilling.
15  A.  Yes.
16  Q.  If you'll look at the second page of that document --
17      MR. GERMAINE:  Your Honor, may we publish it to the
18  jury, please?
19      THE COURT:  Okay.  243's been admitted.  Yes, so go
20  ahead.
21      MR. SLATER:  Thank you, Your Honor.
22  BY MR. SLATER:
23  Q.  If you look at the second page of the document, please,
24  Mr. Rust.
25  A.  Run that by me again.  I was looking at the screen.

185

1   Q.  Yeah, would you look, please, at the second page of
2   Exhibit PX-243.
3   A.  Yes.
4   Q.  And at the top, there is an editorial by Al Pope.  Do you
5   see that?
6   A.  Yes.
7   Q.  And just to refresh everybody's recollection, who is Al
8   Pope?
9   A.  He was -- I think he was head of the UEP at that time,
10  maybe.
11  Q.  And the title of his article is Backfilling - a Loophole
12  of a Hangman's Noose, editorial by Al Pope.
13      Do you see that?
14  A.  Yes.
15  Q.  Now, Mr. Pope goes on to discuss -- and I'm looking at
16  the very bottom of the second paragraph.  He's talking about
17  the 2003 change the policy to allow for backfilling at any
18  time with any age bird.
19      Do you see that?
20  A.  Yes.
21  Q.  So in 2004, the policy at the UEP and the Certified
22  Program allowed for backfilling at any time with any age bird,
23  correct?
24  A.  Correct.
25  Q.  Okay.  And now if you'll look at the next paragraph, it

186

1   says:  The backfill provision, in my opinion, is contributing
2   or even causing some of the disorderly marketing and poor egg
3   prices that we are currently experiencing.
4       Then in bold print:  We have shot ourselves in the
5   foot with this well-intended provision -- or it's a question:
6   Have we shot ourselves in the foot with this well-intended
7   provision?  Is it a noose that is strangling the opportunity
8   of enjoying, once again, the favorable prices for our product
9   we expected this fall?
10      Do you see that?
11  A.  Yes.
12  Q.  So apparently Mr. Pope thought the backfilling was
13  hurting the price of eggs, correct?
14  A.  I assume that from reading that, yes.
15  Q.  And then at the end of the editorial, it says:  I do
16  think you should eliminate or severely limit any backfill
17  provisions and return to the favorable market conditions we
18  enjoyed this past spring.
19      Do you see that?
20  A.  Yes.
21      MR. SLATER:  Now, can I have PX-261, please.
22      May I approach, Your Honor?
23      THE COURT:  Yes.
24  BY MR. SLATER:
25  Q.  Mr. Rust, this is a UEP Board of Directors conference

187

1   call from December 16, 2004; is that correct?
2   A.  Yeah, I think so.
3       MR. SLATER:  Your Honor, offer PX-261.
4       MR. KING:  No objection.
5       MS. SUMNER:  No objection.
6       MR. HARRIS:  No objection.
7       THE COURT:  261 is admitted.
8       (Exhibit received in evidence.)
9       MR. SLATER:  Thank you, Your Honor.
10  BY MR. SLATER:
11  Q.  Would you look, please, about halfway down the page, sir,
12  where it says:  Motion.
13  A.  Yes.
14  Q.  Okay.  Now, this is approximately four months after the
15  editorial by Al Pope appeared in the United Voices?
16  A.  Yes.
17  Q.  And the motion by the UEP -- to the UEP Board of
18  Directors is stated to be:
19      Motion:  Backfilling is prohibited under the animal
20  care --
21      MR. SLATER:  Can we publish to the jury?
22      THE COURT:  Oh, yes.
23  BY MR. SLATER:
24  Q.  Do you see where it says:
25      Motion:  Backfilling is prohibited under the Animal

188

1  Care Certified Program?
2              Do you see that?
3  A.   Yes.
4  Q.   And then if you look a little bit below that, it says:
5  The above motion was made by Oldenkamp and seconded by Fortin
6  and carried with one no vote.
7              Do you see that?
8  A.   Yes.
9  Q.   So four months after the A1 Pope editorial, the Board of
10  Directors of the UEP banned backfilling; is that correct?
11  A.   That's what it says here, yes.
12  Q.   And that was included in the Certified Program rules,
13  correct?
14  A.   Yes.
15  Q.   And if you look at the bottom of the page, there's
16  another motion.  Motion:  That unauthorized backfilling be
17  treated the same as cage space allowance and therefore will
18  result in a failed audit.
19              Do you see that?
20  A.   Yes.
21  Q.   And that carried unanimously?
22  A.   That's what it says.
23  Q.   And at that point, the UEP banned backfilling within the
24  Certified Program, correct?
25  A.   Yes.  I don't think I was on this call.

189

1  Q.   You were on the board at that time, weren't you?
2  A.   Yes.
3  Q.   I'd like to talk a little bit about exports, if that's
4  all right, sir.
5              THE COURT:  Well, does that seem to be a new topic?
6              MR. SLATER:  It is.
7              THE COURT:  And it's just about 4:30.  Why don't we
8  stop, if that wouldn't intrude on your plans.
9              MR. SLATER:  Not at all, Your Honor.
10              THE COURT:  Okay.  So we'll stop.
11              MR. SLATER:  I'd like to try to regain my voice
12  before tomorrow.
13              THE COURT:  Oh, no, that's quite all right.
14              So, folks, we're going to stop for the day and aim
15  to gather tomorrow morning at 9:30.  And meanwhile, just have
16  a very pleasant evening.  I hope it doesn't get too chilly out
17  or that somebody's patio flowers have been shocked into
18  whatever during the day.  But please don't talk about the case
19  or do any research.
20              We'll get together tomorrow and resume, and I'll be
21  talking with the lawyers to make sure that we're on track.  I
22  think we are, pretty much, just to give you my sense of
23  things; but thank you, you're extremely attentive and we all
24  appreciate it.  See you tomorrow.  Safe journeys home.
25              THE DEPUTY CLERK:  All rise.