# ATTACHMENT 62

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   IN RE:  PROCESSED EGG PRODUCTS:        MDL NO. 2002
     ANTITRUST LITIGATION                   08-MDL-02002
 5

 6

 7                           - - - - -

                        PHILADELPHIA, PA
 8
                            - - - - -
 9
                        NOVEMBER 14, 2019
10
                            - - - - -
11

12
     BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.
13

14                          - - - - -

15               TRANSCRIPT OF TRIAL PROCEEDINGS

16                          DAY 9

17                          - - - - -

18

19

20

21               KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                 Official Court Reporter
22               Room 1234 - U.S. Courthouse
                 601 Market Street
23               Philadelphia, PA  19106
                 (215) 779-5578
24

25
           (Transcript produced by mechanical shorthand via C.A.T.)
```

5

1    THE COURT: Okay, everybody. You may take your
2    seats.
3         Good morning, Mr. Rust. You remain under oath, sir,
4    okay?
5         THE WITNESS: Yes.
6         THE COURT: Mr. Slater, you may continue.
7         How was the evening? Everybody good? Excellent.
8    Thanks so much for being here on time. At 9:28, Mr. Coyle
9    came and told me everybody was ready. A record. Thank you
10   very much.
11        Go ahead.
12        MR. SLATER: May I, Your Honor?
13        THE COURT: Yes.
14        MR. SLATER: Thank you.
15   BY MR. SLATER:
16   Q.   Mr. Rust, when we left yesterday, we were just about to
17   start talking about exports, if that's okay?
18   A.   Yes.
19   Q.   Rose Acre became a member of the United States egg
20   marketing in December 2006; is that right?
21   A.   That's about right, yes.
22        MR. SLATER: And can I have PX-430, please.
23        May I approach, Your Honor?
24        THE COURT: Yes, you may.
25   BY MR. SLATER:

6

1    Q.   Mr. Rust. Mr. Rust, this is a copy of the United States
2    Egg Marketers' USEM Membership Agreement and Export Commitment
3    2007, and I believe it is signed by -- could you tell me whose
4    signature that is above?
5    A.   That's mine.
6    Q.   That's your signature?
7    A.   You can't read it, but it's mine.
8    Q.   I'll take your word for it.
9         MR. SLATER: Your Honor, I would offer -- it's
10   already in evidence.
11        Can we publish that to the jury, Your Honor?
12        THE COURT: Yes.
13   BY MR. SLATER:
14   Q.   At the top of the document, Mr. Rust, in paragraph 1, it
15   says that: Membership is available to any person, firm, or
16   partnership, entity engaged in the production of table eggs on
17   farms owned or leased by such entity and who agrees to the
18   commitment below for participation in the export sales.
19        Do you see that?
20   A.   Yes.
21   Q.   So this is an agreement, right?
22   A.   Yes.
23   Q.   And it's an agreement with other egg producers to engage
24   in export activity, correct?
25   A.   It was an agreement to be a membership.

7

1    Q.   And the membership was with other egg producers, correct?
2    A.   Yes.
3    Q.   And this is dated, just for the record, December 22nd,
4    2007. And you had joined the USEM approximately a year
5    earlier than that?
6    A.   Was that a question?
7    Q.   Yes.
8    A.   And what was the question again?
9    Q.   This is dated 2007. You had joined the USEM
10   approximately a year earlier than this document. This is a
11   commitment for one of the export programs, right?
12   A.   I think that's what you said the date was.
13   Q.   And Rose Acre, if I understand it correctly, participated
14   in six export programs in 2007 and 2008; is that correct?
15   A.   That could be the number. The paperwork should show it.
16   Q.   And prior to joining the USEM, Rose Acre had exported
17   eggs itself; is that correct?
18   A.   Yes.
19   Q.   And for how long had you been doing that?
20   A.   Well, we probably exported eggs for 20 years.
21   Q.   When you had surplus eggs, would you export them, was
22   that what you were doing?
23   A.   Given times there would be surplus. Given times there
24   would be countries around the world that would be short and
25   they'd pay a big premium. You know, it just -- it could be a

8

1    premium and it could be a surplus item.
2    Q.   And you had no trouble engaging in export activity before
3    you joined the USEM, did you?
4    A.   Had no trouble what?
5    Q.   Engaging in export activity prior to joining the USEM?
6    A.   Most of the time when you had a big buyer overseas, we
7    couldn't do the amount they wanted.
8    Q.   Now, if -- if I understand it correctly, some of the eggs
9    which you exported in these USEM export programs came from
10   your Iowa facility in, what, to Japan?
11   A.   Yes.
12   Q.   And you don't actually know how many of the eggs, which
13   were exported in these six export programs with the USEM, came
14   from your North Carolina facility in Hyde County?
15   A.   I'd have to look at paperwork to determine that.
16   Q.   Okay, but as you sit here now, you don't know, do you?
17   A.   Not offhand, no.
18        MR. SLATER: Could I have PX-51, please.
19        May I approach, Your Honor?
20        THE COURT: Yes.
21        MR. SLATER: I believe PX-51 is already in evidence,
22   Your Honor.
23        THE COURT: That's correct.
24        MR. SLATER: May I publish to the jury?
25        THE COURT: Yes, of course.

9

```
1   BY MR. SLATER:
2   Q.   Mr. Rust, this is a UEP document referring to the subject
3   of the USEM Membership and Export Commitment, and it's from
4   Gene Gregory.  Now, Gene Gregory was playing a managerial role
5   for USEM as -- when he was employed by UEP; is that correct?
6   A.   Repeat the question again.
7   Q.   Sure.  Gene Gregory was employed by the UEP, correct?
8   A.   Correct.
9   Q.   And he was -- he was performing managerial services for
10  the USEM while he was employed by UEP; isn't that correct?
11  A.   That was my understanding, yes.
12  Q.   Okay.  And this is a memo from Gene Gregory with regard
13  to some of the purposes of the USEM.  And at the bottom of the
14  first page, do you see where it says:  Would you please show
15  me your support by filling out the USEM Membership Agreement
16  and returning it to us as quickly as possible?
17           And then in all bold print, it says:  Help yourself
18  improve your egg price.
19           Do you see that?
20  A.   Yes.  Yes.
21  Q.   Did you ever discuss that with Gene Gregory?
22  A.   I don't recall that I did.
23  Q.   Would you look at the next page, please.  It says:
24  Reasons to be a participant in a National Shell Egg Export
25  Program and Membership of USEM.
```

10

```
1            Do you see that at the top?
2   A.   Yes.
3   Q.   And then if you look down for the fourth bullet point,
4   please:  The primary reason to be a supporter of the export
5   effort is to help improve your egg price and thereby create a
6   greater return in your business.
7            Do you see that?
8   A.   Yes.
9   Q.   And then if you look down at point 5 in the Facts About
10  Shell Egg Exports, do you see that?
11  A.   Where are we at?
12  Q.   In the middle of that page, there's a caption that says:
13  Facts About Shell Egg Exports.
14  A.   Yes.
15  Q.   And then for point 5 under that --
16  A.   Yes.
17  Q.   -- it says:  Exports remove inventory that may be
18  burdensome to the U.S. market.
19           Do you see that?
20  A.   Yes.
21  Q.   So the idea was to remove some eggs that were causing an
22  excess supply in the U.S. market which would cause a reduction
23  in price in the U.S. market; is that correct?
24           MR. KING:  Your Honor --
25           THE WITNESS:  Yes, it would be surplus.
```

11

```
1            MR. KING:  Your Honor, we would object based on
2   foundation.  This is seven years before they joined USEM.
3            THE COURT:  Do you want to rephrase your question?
4   BY MR. SLATER:
5   Q.   Did you ever discuss the purposes behind the USEM Export
6   Program with Gene Gregory?
7   A.   I don't recall that I did.
8   Q.   Did you ever discuss the purposes of the USEM Export
9   Program with anybody?
10  A.   With our own sales department.
11  Q.   Anybody at the USEM or the UEP?
12  A.   I'm sure I did.  I don't recall with whom.
13  Q.   Did anybody ever tell you that the purpose was something
14  other than to reduce the supply -- strike the question.
15           The next point at point 6 says:  A substantial
16  export order usually tightens supply and results in a higher
17  market for all eggs sold domestically.
18           Do you see that?  Point 6.
19  A.   Point 6, yes, I see that.
20  Q.   Did you ever discuss that with Gene Gregory?
21  A.   No, not that I remember.
22  Q.   Did you ever hear somebody say that that was one of the
23  reasons to be a participant in the USEM?
24  A.   We joined USEM to be to export our surplus eggs
25  because --
```

12

```
1   Q.   The question is, did you ever hear anybody say that as a
2   reason for being a member of the USEM Export Program?
3   A.   I mean, we export corn, we export soy beans.
4   Q.   Sir, your question --
5   A.   You're saying I can't export eggs?  Is that what you're
6   asking?
7   Q.   The question is, did you ever hear anybody say that one
8   of the reasons to be an export -- to be a member of the USEM
9   was not because it would result in tightening supplies and
10  result in a higher market for all eggs sold domestically?
11  A.   I don't recall that.
12  Q.   Did you ever hear anybody say that that was one of the
13  purposes of being in the USEM Export Program?
14  A.   Well, I think it was to remove surplus from the U.S.
15  market.
16  Q.   Would you look, please, at the next page.  And it's
17  captioned, Benefits of Export Order and Why Everybody Should
18  Participate.  And below that where I'd like to direct your
19  attention to, it says:  Why should you be an export
20  participating member of USEM?
21           And then it answers the question.  The intent of
22  taking a large volume export order for a short period of
23  delivery is to reduce the domestic supply and thereby increase
24  the domestic price of eggs.
25           Do you see that?
```

13

```
1   A.   Yes, I see that.
2   Q.   Is that consistent with your understanding of what the
3   purpose of being in the export program was?
4   A.   That's not the reason that we joined, sir.
5   Q.   Is that consistent with your understanding of why the
6   USEM Export Program was created?
7   A.   I -- I don't know why.  We joined it, many years after
8   they had been doing exports.  I don't know when they created
9   it, any of this.
10  Q.   Do you have any information that the purposes for which
11  the USEM Export Program was created changed from 2000 until
12  when you joined in December 2006?
13  A.   It was a -- my understanding of U.S. Egg Marketers, it
14  was a cooperative of producers who -- you know, farmers
15  producing eggs --
16  Q.   Sir --
17  A.   -- as they were using it to sell surplus eggs into the
18  world markets and large quantities.
19  Q.   The question is whether you have any information that the
20  purposes of the USEM Export Program changed between 2000, when
21  this document was written?
22  A.   I have no information on that.
23       MR. SLATER:  Can we have PX-413, please.
24       May I approach, Your Honor?
25       THE COURT:  Yes.
```

14

```
1   BY MR. SLATER:
2   Q.   Mr. Rust, I show you what's been marked Plaintiffs'
3   Exhibit 413, and the bottom portion of that page is an e-mail
4   from you to a Mr. Larry Seger, and the subject is:  U.S. Egg
5   Export Marketers' Calls.
6        Do you see that?
7   A.   Yes.
8   Q.   Can you tell me who Larry Seger is?
9   A.   Larry Seger was the -- one of the owners of Wabash Valley
10  Farms.  They was an egg producer that was a breaker only in
11  southern Indiana.
12  Q.   And did he have a position at the USEM?
13  A.   He was like chairman of it, I think.
14  Q.   President maybe?
15  A.   Yeah, something like that.
16  Q.   And the date of this e-mail is August 9, 2007.  Do you
17  see that?
18  A.   Yes.
19       MR. SLATER:  I would offer PX-413 against Rose Acre
20  and USEM.
21       MR. KING:  No objection on behalf of Rose Acre.
22       MR. HARRIS:  USEM does object on the basis of
23  hearsay, Your Honor.
24       THE COURT:  Your response, Mr. Slater.
25       MR. SLATER:  This would be subject to the ruling
```

15

```
1   that Your Honor made.  I won't go into the exact
2   description --
3        THE COURT:  Well -- I'll admit the document at this
4   point.
5        (Exhibit received in evidence.)
6        MR. SLATER:  Thank you, Your Honor.
7        THE COURT:  It's as to Rose Acre and USEM only.
8        MR. SLATER:  Correct.  Thank you.
9   BY MR. SLATER:
10  Q.   Mr. Rust, do you see in your e-mail -- have I --
11       MR. SLATER:  Could I publish the document to the
12  jury, Your Honor?
13       THE COURT:  Yes.
14       MR. SLATER:  Thank you.
15  BY MR. SLATER:
16  Q.   Do you see in your e-mail about three lines down, where
17  you say:  I called Greg H. about 45 minutes after the call?
18  Who is Greg H.?
19  A.   Greg Hinton, our salesperson.
20  Q.   And the subject of this is:  U.S. Egg Marketers Call.
21  Was there a conference call amongst the people participating
22  in the USEM?
23  A.   Yes.  It was one of the first calls I had been on.
24  Q.   Okay.  And it says:  I called Greg H. about 45 minutes
25  after the call, and Joe Rexing had already told him the
```

16

```
1   details of the sale.
2        And sale is in quotes.  Do you see that?
3   A.   Yes.
4   Q.   Was that a proposed USEM export sale?
5   A.   I think it was.
6   Q.   And you then go on:  I do not think this is necessary for
7   t-w-t...
8        Can you tell me what that is?
9   A.   I have no idea what I meant by t-w-t.  I -- I --
10  Q.   Okay.
11  A.   I don't know.
12  Q.   ...for t-w-t member position calls, but feel anytime we
13  are talking about issues that would stabilize and possibly
14  influence the market, they should be held on a little more
15  stricter conference call level.
16       Do you see that?
17  A.   Yes.
18  Q.   So you thought that the content of the discussion had
19  gotten out and it shouldn't have?
20  A.   Well, for me, to be on a co-op, cooperative call, you
21  know, farmers, what it took in place was, you know, they start
22  to call and they tell everyone everything on there is
23  absolutely strict, confidential, and it's not to be discussed
24  with anyone in the industry until the sale is made.  And so I
25  called my sales manager, and he told me everything about the
```

17

```
 1  call that he had heard from the guy that we sell eggs to.
 2  Q.   And you thought that matters that would stabilize and
 3  possibly influence the market should be held on a more
 4  confidential basis, correct?
 5  A.   I thought it should be more confidential because, you
 6  know, when a little -- when a small egg peddler can go out
 7  there and know what the market, you know, if it's going to
 8  change -- in the egg market you always have -- you know, price
 9  of a load of eggs can vary if it's surplus or not, a nickel to
10  $0.10 a dozen.  And if people think the market's going to go
11  up, they try to sell that extra load for more money.  If they
12  think it's going to go down, they're willing to take more.  So
13  the smaller dealers, he would call in and try to buy extra
14  eggs from them every time he heard there was an export.
15  Q.   And because the export might move the market, you wanted
16  to keep it confidential until the time that the export was
17  announced, correct?
18  A.   It didn't change the market that much.  It was always the
19  influence of the market, that basis, you know.
20  Q.   It would influence the market --
21       THE COURT:  One at a time, folks, please.  Okay.
22  Let him finish his answer and then you can ask him the next
23  question.
24       THE WITNESS:  It's the basis, if you ever sold corn,
25  you know, the local elevator, you've got the Chicago market
```

18

```
 1  and then the elevator will have a price that might be $0.10
 2  over the Chicago market or might be $0.10 under, and that
 3  basis is different with every producer in the country on what
 4  they're willing to sell their eggs for.  And that basis is
 5  what really changes and that's what you're concerned about,
 6  because we're selling our surplus to these dealers, and if
 7  they know that there's going to be an export, they know that
 8  basis changes.  The overall market might not change but that
 9  basis does.
10  Q.   Do I understand what you're saying here is that the
11  export sale would stabilize and possibly influence the market?
12  Isn't that what your e-mail says?
13  A.   It's very possible, yes.
14  Q.   You and I discussed yesterday that if you just looked at
15  the cage space changes due to the Certified Program, inches
16  per bird, that your capacity would have dropped about
17  25 percent if you just look at that; isn't that right?
18  A.   Yes.
19  Q.   Okay.  And I told you then that you would have the chance
20  to talk about expansion, and I'm good to my word, so I'm going
21  to let you talk about it.
22       You built a new facility in North Carolina in
23  Hyde County, didn't you?
24  A.   Yes.
25  Q.   Okay.  And it took you a long time to build that
```

19

```
 1  facility, didn't it?
 2  A.   It took us probably about five years.  We -- our bankers
 3  cut -- you know, we tried to finish it, but we couldn't get
 4  the money to finish it because the egg market got real bad and
 5  we lost so much money that, you know, we had to have --
 6  come-to-Jesus meeting with our bankers.
 7  Q.   And before you started construction of the Hyde County
 8  facility, you had to get permits, correct?
 9  A.   Yes.
10  Q.   And some of those are environmentally sensitive permits?
11  A.   Yes.  According to the river keepers and people, you
12  know, the train groups.
13  Q.   And it takes a long time to get those permits even before
14  you start construction; isn't that correct?
15  A.   I believe we spent over two, three -- about two years or
16  so.
17  Q.   Well, actually, haven't you testified that it took you
18  four to five years to get the permits?
19  A.   It could have been.  I forget, you know.  Two, three,
20  four, five, it was a long time.
21  Q.   And then it took you another four to five years to
22  actually physically construct the facility, correct?
23  A.   Yes.
24  Q.   And you mentioned your bankers.  Rose Acre is the second
25  largest egg producer in the United States, and you had trouble
```

20

```
 1  getting the capital from your bank.  That's your line of
 2  credit to bill the facility; isn't that correct?
 3  A.   Yes.
 4  Q.   And other egg producers who are not nearly as solvent as
 5  Rose Acre would even have more trouble getting capital to
 6  build new facilities; isn't that correct?
 7  A.   There was producers that went out of business in that
 8  time period.
 9  Q.   And wouldn't you agree that the length of time it takes
10  to get the permits, the length of time that it takes to build
11  the facility, and the capital deeds to build the facility
12  would deter people from trying to build new facilities?
13  A.   Well, not really, because you have to build new
14  facilities to replace your old.  You know, it's kind of --
15  it's like buying a new car.  Your car can go so long.  You can
16  always get one more year, but, you know.
17  Q.   Would you agree that those factors are a barrier to
18  successful -- to your ability to successfully build a new
19  facility?
20  A.   No.  It's -- there was always people -- Cargill and
21  different companies were offering contracts for people to go
22  out and do cost plus, that, you know, you'd have a minimum
23  amount of profit you could make, but they'd offer cost plus
24  and bankers would loan money for that type of facility.
25  Q.   Do you think the length of time that it takes to complete
```

21

```
 1   the project would tend to discourage people from building a
 2   brand-new facility?
 3   A.   No.  There's places in the United States you didn't even
 4   have to file for a permit to build a complex.
 5   Q.   That wasn't North Carolina, was it?
 6   A.   No, it was not.
 7   Q.   Now, when you joined the Certified Program, you had about
 8   22 million birds, give or take?
 9   A.   I don't recall exactly.
10   Q.   22 million sound about right?
11   A.   It could be.  Someplace in one of these documents here.
12   Q.   I've actually seen a couple of different numbers --
13   A.   Yeah.
14   Q.   -- but they're all around 22 million.
15        Now, your testimony is that you built the North
16   Carolina facility in order to add capacity; is that right?
17   A.   That was our original goal and intention, yes.
18   Q.   And if you had implemented -- if you had not implemented
19   the cage space requirements and you had also added capacity
20   through new construction of your North Carolina facility, your
21   flock would have been much larger than 22 million, correct?
22   A.   Repeat that again.
23   Q.   Yeah.  If you hadn't reduced --
24   A.   If we had or had not?
25   Q.   Had not.
```

22

```
 1   A.   Had not reduced.
 2   Q.   I apologize.  My voice is failing.  If you had not
 3   participated in the cage space expansion per bird and you had
 4   continued to have capacity for approximately 22 million birds
 5   and you had then expanded and built the North Carolina
 6   facility, you would have had far more birds than 22 million;
 7   isn't that correct?
 8   A.   Maybe, maybe not.  It depends.  We would have that
 9   market.  You have to have someone to buy the eggs or you don't
10   do anything without a chicken.
11   Q.   In fact, you would have had, you think, 30 to 40 million
12   birds, a lot more than you had today; isn't that correct?
13   A.   Any number is possible if you have enough money, but it
14   depends on what the egg market is and what the customer demand
15   is.
16   Q.   Can I show you, please, PX-695.
17        MR. SLATER:  May I approach, Your Honor?
18        THE COURT:  Yes.
19   BY MR. SLATER:
20   Q.   This is an organization chart of Rose Acre Farms
21   governance, dated April 13, 2007; is that correct, sir?
22   A.   Yes.
23        MR. SLATER:  I offer PX-695, Your Honor.
24        MR. KING:  No objection on behalf of Rose Acre.
25        THE COURT:  695 is admitted as to Rose Acre.
```

23

```
 1        (Exhibit received in evidence.)
 2   BY MR. SLATER:
 3   Q.   And in the middle of the page of the enlarged box at the
 4   top, it says:  Rose Acre Farms' Board of Directors.
 5        Do you see that?
 6   A.   Yes.
 7   Q.   And it says:  Lois Rust.
 8        That's your mother?
 9   A.   Yes.
10   Q.   Anthony Rust, that's one of your brothers?
11   A.   It's my older brother.
12        MR. SLATER:  Can I publish this to the jury,
13   Your Honor?
14        THE COURT:  Yes.
15   BY MR. SLATER:
16   Q.   And then --
17        THE COURT:  Would you like some water, sir?
18        THE WITNESS:  I'm going to take a cough drop.
19        THE COURT:  Okay.
20        THE WITNESS:  I've got a little scratchy throat.
21        MR. SLATER:  Can I have one for me?
22        THE WITNESS:  Yeah, I've got extras.  Do you want
23   one?  Here.
24        MR. SLATER:  No, thank you.
25   BY MR. SLATER:
```

24

```
 1   Q.   Then it lists yourself, Marcus Rust.  Do you see that?
 2   A.   Yes.
 3   Q.   And then a couple of spots down it lists John Rust.  Do
 4   you see that?
 5   A.   Yes.
 6   Q.   And John was one of your brothers?
 7   A.   Yes, younger brother.
 8        MR. SLATER:  PX-445.
 9        May I approach, Your Honor?
10        THE COURT:  Yes, you may.
11   BY MR. SLATER:
12   Q.   Mr. Rust, I show you what's been marked as Plaintiffs'
13   Exhibit 445, which is an e-mail chain.  The bottom e-mail is
14   from John, your brother, to you, dated February 13, 2008.  Do
15   you see that?
16   A.   Yes.
17   Q.   And the top e-mail is an e-mail from you responding to
18   John, dated the same day.  Do you see that?
19   A.   Yes.
20        MR. SLATER:  Your Honor, I would offer PX-445
21   against Rose Acre only.
22        MR. KING:  No objection.
23        THE COURT:  And it is thus admitted.  And yes, it
24   may be published.
25        (Exhibit received in evidence.)
```

25

1           MR. SLATER:  Thank you, Your Honor.
2           THE COURT:  Yes.
3   BY MR. SLATER:
4   Q.   Mr. Rust, could we look at the first paragraph of the
5   e-mail from your brother to you.  Now, it says:  Well, I know,
6   that's why I think it's silly to have arguments about cage
7   space per bird.  I don't think we have anything to be ashamed
8   of by putting as many hens per cage as conditions permit as
9   that is doing what is economically right for consumers rather
10  than trying to restrict cage space to boost prices under the
11  alleged agenda of animal rights.
12          Do you see that?
13  A.   Yes.
14  Q.   Okay.  And then your brother went on -- and I'm looking
15  at the second paragraph of his e-mail, it says:  We lose the
16  moral right to argue for continued right of low cost
17  production costs when we, ourselves, are manipulating the
18  system under false pretenses.
19          Do you see that?
20  A.   Yes.
21  Q.   And the third paragraph:  Should be caged birds and
22  cage-free, let the consumers pick.  The cage density thing is
23  morally wrong, in my opinion, and long-term is going to give
24  us a huge black eye with consumers who just want --
25          It says:  Just what economical food.

26

1           Should that be just want?
2   A.   Run that by me again.
3   Q.   Do you think that's a typo where it says:  Is going to
4   give us a huge black eye with consumers who just what -- do
5   you think that should be want?
6   A.   I would assume it would be want.
7   Q.   -- who just want economical food.
8           Now, that's what your brother said to you and then
9   you responded to him the same day.  And will you look at your
10  e-mail at the top.  And in the first line, it says:  We have a
11  defensible dimension.
12          Do you see that?
13  A.   Yes.
14  Q.   And on the second line, it says:  Something around 63 to
15  70 is a, quote, very defensible position.
16          Do you see that?
17  A.   Yes, that's when your mortality changes.
18  Q.   And then you go down in the next line, and it says:  We
19  can defend.
20          Do you see that?
21  A.   Yes.
22  Q.   Okay.  You're telling your brother that you have a
23  defensible position against the accusation that you were
24  trying to suppress output; is that correct?
25  A.   Repeat that question.

27

1   Q.   You're telling your brother that you have a defensible
2   position against the accusation that you are trying to
3   suppress output, correct?
4   A.   There was nothing about suppressing output.  It was all
5   about -- my brother was very adamant that it should be caged
6   eggs or noncaged eggs.  He was very upset with, you know, how
7   none of the stores ever --
8   Q.   Mr. Rust, that's not the question.
9   A.   I'm just telling you what the background --
10  Q.   I understand what you're telling me.  I'm asking you what
11  you were saying to your brother, and you told him you had a
12  defensible position, correct?
13  A.   Yes.
14  Q.   Okay.  You did not tell him that the market is not being
15  manipulated on false pretenses.  You did not say that in your
16  response, did you?
17  A.   No.
18          MR. SLATER:  Defendants' Exhibit 571, please.
19          May I approach, Your Honor?
20          THE COURT:  Yes.
21  BY MR. SLATER:
22  Q.   This appears to be an e-mail from you, Mr. Rust, to a
23  Mark Friedow, dated July 11, 2005.  And could you tell me who
24  Mark Friedow is?
25  A.   Mark Friedow was a -- he worked for a subsidiary of

28

1   Sparboe that sold feed ingredients.
2   Q.   And this is with regard to Feedstuffs' article.  Was that
3   an article dealing with Feedstuffs' ingredients?
4   A.   Probably.
5   Q.   And at the top of the e-mail, you say --
6           MR. SLATER:  I move the admission of D --
7   Defendants' 571 against Rose Acre only, Your Honor.
8           THE COURT:  Any objection?
9           MR. KING:  No objection.
10          THE COURT:  It's so admitted.
11          (Exhibit received in evidence.)
12  BY MR. SLATER:
13  Q.   And in the first line, it says about halfway through the
14  first line:  But we, as an industry --
15          MR. SLATER:  May I publish it to the jury, Your
16  Honor?
17          THE COURT:  Yes.
18          MR. SLATER:  One of these days, I'll remember.
19  BY MR. SLATER:
20  Q.   Do you see where it says:  We, as an industry, have to
21  pick a square inch number that was acceptable to BK -- that's
22  Burger King; is that right?
23  A.   What again?
24  Q.   BK means Burger King?
25  A.   Yes.

29

1    Q.   And then it goes on:  -- McDonald's, then document and
2    prove it industrywide, then agree as an industry.
3            Do you see that?
4    A.   Yes.
5    Q.   And then you go on:  We cannot adopt different standards
6    for different customers.
7            Do you see that?
8    A.   Yes.
9    Q.   You thought it important that all of the producers get
10   together and agree as an industry to what you were going to
11   do?
12   A.   I thought it was very important that we all get together
13   and agree on the square inch per bird.  There was never any
14   agreement to restrict how many chicken houses or chickens any
15   of us had.  We just wanted to have the same standard so that
16   when a customer come to us to bid, we was all doing it the
17   same way.
18   Q.   Okay.
19   A.   You know, Burger King had 72 inches and McDonald's had --
20   no, Burger King was 75, I think, and Burger King -- or
21   McDonald's, 72.  In the industry to keep costs low for
22   cheapest eggs possible we could live with, we decided 67, by
23   the Scientific Committee.
24   Q.   And part of the industrywide agreement was the 100%
25   rule --

30

1    A.   Part of the Animal Care Certified Program, yes.
2    Q.   -- was the 100% rule and the no backfilling rule,
3    correct?
4    A.   Correct.
5            MR. SLATER:  Your Honor, I think I'm through.  Can I
6    have a second?
7            THE COURT:  Yes.
8            MR. SLATER:  Nothing further at this time, Your
9    Honor.
10           THE COURT:  Any cross-examination or direct or
11   whatever -- any further questioning from anybody?
12           MR. KING:  Yes, Your Honor.
13           THE COURT:  Okay.  Mr. King, you may proceed.
14           MR. KING:  Your Honor, I have some exhibits I may
15   use, I'm not sure if I'm going to use them all, but I tried to
16   assemble most of them in a book to try not to go back and
17   forth.
18           I may refer to some things in there.  Just keep it
19   there.
20                   CROSS-EXAMINATION
21   BY MR. KING:
22   Q.   Mr. Rust, excuse me, yesterday at the beginning of the
23   testimony, your testimony, you were asked some questions about
24   Rose Acre.  Do you remember that?
25           You were given the financial statements from 2008

31

1    and asked some questions about Rose Acre and its being a
2    family farm.  Do you remember those questions?
3    A.   Yes.
4    Q.   You also were asked some questions about what Rose Acre
5    sold during that time, correct?
6    A.   Yes.
7    Q.   The types of products it sells.
8            So -- is Rose Acre still a family farm?
9    A.   Yes.  We're the -- actually the largest family egg farm
10   in the United States.
11   Q.   And you told Mr. Slater in response to his questions that
12   Rose Acre is today the second largest egg farm in the United
13   States, correct?
14   A.   Yes.
15   Q.   And has it always been the second largest egg farm in the
16   United States?
17   A.   We have never been number one.
18   Q.   Well, when did Rose Acre start?
19   A.   Rose Acre started with my grandfather with 500 chickens
20   in 1939.
21   Q.   And when did -- when did the name Rose Acre Farms
22   actually become the name of the company?
23   A.   In early '60s.
24   Q.   And in the early '60s who was running Rose Acre Farms?
25   A.   My mom and dad.

32

1    Q.   And did your mother and father continue to run Rose Acre
2    Farms?
3    A.   Yes.  My father had -- up until 1965, he was in -- or
4    '64, him and his brother had a bulldozing excavation business
5    and, you know, mom took care of the chicken part at that time
6    and dad and Uncle Chester were bulldozing, custom harvesting
7    business.
8    Q.   And I believe you said yesterday that you have worked for
9    Rose Acre Farms essentially all your life; is that correct?
10   A.   I started picking eggs out of the henhouse when I was
11   nine or ten years old.
12   Q.   And from nine or ten years old, have you continuously
13   worked for Rose Acre Farms?
14   A.   Yes, I've done nothing else.
15   Q.   To this day?
16   A.   To this day.
17   Q.   Is your father still alive?
18   A.   My father passed away 13, 14 years ago.
19   Q.   And your mother, she's still alive?
20   A.   Yes.
21   Q.   Did she at one point run the business?
22   A.   Yes.
23   Q.   What were the years when she was actually running the
24   business?
25   A.   Probably from '88 or '89 through 2011.  And she was

33

1    chairman up until two years ago, I think.
2    Q.   And in 2011, what executive position did your mother
3    hold?
4    A.   She was -- up to 2011 or at 2011?
5    Q.   At the time that she stepped down in 2011.
6    A.   She held chairman after 2011.
7    Q.   Before then, was she either the CEO --
8    A.   She was the president.
9    Q.   And you're now the president?
10   A.   I'm actually the CEO and we have a chief operating
11   officer, Tony Wesner.
12   Q.   Is there any difference at Rose Acre Farms -- any
13   difference with respect to the responsibilities of the
14   president and the CEO?
15   A.   I don't think so.  We hired these expert guys to come in
16   and they set titles for everybody, so --
17   Q.   Did you succeed your mother?
18   A.   Yes.
19   Q.   So for how long was your mother the president or CEO of
20   Rose Acre Farms?
21   A.   Twenty -- well, '88 through 2011 would have been 23
22   years.
23   Q.   And was she recognized in the agriculture industry?
24   A.   Yes.  She had a -- she actually got a woman of the year
25   or something like that, some kind of an award for top

34

1    businesswoman or top 50 or something like that once.
2    Q.   How many brothers and sisters do you have?
3    A.   I've got four brothers and two sisters.
4    Q.   And your brothers and sisters, were they also involved in
5    Rose Acre Farms?
6    A.   Everyone's done something.
7    Q.   And does the Rust family continue to own Rose Acre Farms?
8    A.   Yes.  Yes.
9    Q.   When Rose Acre Farms first started out, did it house its
10   hens in cages?
11   A.   Until 1966, every chicken we owned was cage-free.  And
12   then watching what was happening with the industry, you know,
13   it was supermarket chains were building their own chicken
14   farms and putting in cages, feed companies were building farms
15   and putting in cages, and by going to cages, it become more
16   like a machine or more mechanical instead of having --
17   everything we had done prior was kind of hand-gathered.  We
18   had mechanical feeding, but everything else -- the litter, you
19   had to go in and clean out and everything by hand, and with
20   the cage system, you could automate.  And, you know, that's
21   what the big grocery chains -- Kroger, I think, at one time
22   was the largest egg producer in the world.
23   Q.   What products -- you were asked some questions about the
24   products.  Rose Acre produces shell eggs, right?
25   A.   Our main focus is shell eggs.  We use products to get rid

35

1    of our surpluses.
2    Q.   And just to be clear, shell eggs are the eggs that we
3    find in carton when you buy at the grocery store?
4    A.   At the grocery store.
5    Q.   And egg products, we heard a little bit about that.  What
6    are egg products?
7    A.   They're the egg yolk, whole egg, stuff they make cake
8    mixes, mayonnaise, ice cream, just any kind of what we call
9    industrial use, but it's just, you know, large -- Kraft,
10   Unilever, Nestle, Mars -- M&M, Mars, all people we sell eggs
11   to.
12   Q.   Are there any other eggs or egg products that Rose Acre
13   sells besides what you just described, the liquid egg?
14   A.   Yeah.  We started a new product.  We're making tortilla
15   wrap out of egg whites.  We're going to be making lasagna
16   noodles out of eggs, a lot of new -- the egg business is kind
17   of an exciting business going forward now.
18   Q.   Does Rose Acre still use the cages in its production of
19   eggs?
20   A.   Actually, because all the supermarket chains have said
21   they're all going to switch to cage-free in 2023 to 2025,
22   everything we have built in the last five, six years now has
23   been cage-free, and we're today probably the largest cage-free
24   producer in the country.
25   Q.   Does Rose Acre have any plans to build any other farms

36

1    that use cages?
2    A.   We have to make some money first.  No, we're not going to
3    build any more caged houses.  No.
4    Q.   And what prompted Rose Acre to build these cage-free
5    facilities such that you're probably the largest cage-free
6    producer?
7    A.   Well, it started out -- we know several states -- there's
8    like five states now that have banned cages at certain dates,
9    and so, you know, we're building new cage-free to be able to
10   supply those markets.  We went to Arizona and built a new farm
11   there to supply California.
12   Q.   And just to be clear, who does Rose Acre sell its eggs
13   to?
14   A.   We sell to all the top chains in the United States.
15   Kroger, Walmart...
16   Q.   Well, let's just talk about shell eggs first.
17   A.   Shell eggs.  Okay, today we're selling -- we lost the
18   Kroger shell egg account.  We sell liquid.  We sell Aldi,
19   Lidl, Save-A-Lot, some -- we pack for a company that sells to
20   AGP.  We sell to Schnucks.  We sell to -- I'm trying to
21   remember the chains' name.
22   Q.   That's okay.  Historically have you sold to Walmart?
23   A.   Yes.
24   Q.   Do you still sell to Walmart?
25   A.   Yes.  They're our biggest customer.

37

1   Q.   Historically you've sold to Kroger?
2   A.   Historically, yes.
3   Q.   Shell eggs?
4   A.   Shell eggs.
5   Q.   I want to pull up an exhibit that you were shown
6   yesterday.  It's exhibit -- I think it's PX-109, if we could
7   put it up, please, and I assume the jury can see it.  It's
8   published.  You were asked some questions about this document
9   yesterday by Mr. Slater.  This is the memo that your
10  brother-in-law Ky Hendrix wrote to you and -- you and your
11  mother and a few others in March of 2002.  I'll give you some
12  time to see if you can find it.
13  A.   Yeah.
14  Q.   It's one of the first exhibits.  It's probably near the
15  bottom.
16  A.   At the bottom.  109, yeah.
17  Q.   Do you have that in front of you?
18  A.   Yes.
19  Q.   And do you remember yesterday, you were asked some
20  questions about a statement that Mr. Hendrix makes at the
21  bottom of page 1 where he says:  I don't know if the common
22  person is really going to notice the sticker until they get --
23  until they get to the cash register line.  They have to pay 20
24  to $0.30 more per dozen.
25       Do you see that?

38

1   A.   Yes.
2   Q.   Just to be clear, Rose Acre -- does Rose Acre sell shell
3   eggs to you or me or any -- or anyone else who wants to buy
4   shell eggs?  Can I go --
5   A.   We --
6   Q.   Rose Acre sells to the retailers, right?
7   A.   We sell to the retail chains, yes.
8   Q.   The individual consumer, do they buy eggs from Rose Acre?
9   A.   No.  We're wholesale only.
10  Q.   And who sells shell eggs to the consumer?
11  A.   The retail grocery stores.
12  Q.   And who ultimately sets the price that consumers are
13  charged for shell eggs?
14  A.   The retail grocery stores.
15  Q.   You can put that down, please.
16       You were asked some questions yesterday about Rose
17  Acre and its decision to join the UEP.  Again, Rose Acre
18  joined the United Egg Producers in 2002, right?
19  A.   Yes.
20  Q.   And why did you join -- why did Rose Acre decide to join
21  the UEP?
22  A.   We had customers demanding that we be in the Animal Care
23  Certified program.
24       MR. SLATER:  Your Honor, objection.  Can I have a
25  foundation on this?

39

1        THE COURT:  Do you want to ask any more questions on
2   this?
3        MR. KING:  I do want to ask more questions, but I
4   think the foundation was laid.
5        THE COURT:  Okay, well, why don't we hear the more
6   questions then.
7   BY MR. KING:
8   Q.   Mr. Rust, and then Rose Acre ultimately joined or became
9   part of the UEP Certified Program, right?
10  A.   Yes.
11  Q.   It was approximately April of 2002?
12  A.   Approximately, yes.
13  Q.   And you were -- you were asked some questions about --
14  questions that Rose Acre had about the Certified Program,
15  right?
16  A.   Yes.
17  Q.   Questions that your mother had, right?
18  A.   Yes.
19  Q.   Questions that your brother-in-law Ky Hendrix had, right?
20  A.   It was -- the whole program was something that was -- you
21  know, everyone was kind of told that this ain't how it is
22  today, probably ain't how it's going to look in five years or
23  ten years, and then we wanted to be a part of the process if
24  they was going to be changing it.
25  Q.   Was animal welfare something that concerned you,

40

1   Mr. Rust, about Rose Acre's business?
2   A.   Yes.
3   Q.   Was that concern -- did that concern predate or occur
4   before Rose Acre joined UEP in the Certified Program?
5   A.   We had been concerned about the animal activists' welfare
6   issues since the early or mid, late '90s.  We had trucks burnt
7   -- or truck burned.  We had the power transmission thing shot
8   out by the activists.  We had a water plant sabotaged.
9   Q.   Let me ask, when's the first time, Mr. Rust, you recall
10  actually having concerns about animal rights activism and how
11  it could affect your business?
12  A.   We was watching what was happening in Europe, and we
13  watched -- I had a good friend when he was young, he actually
14  come and live with me for six months and his family had an egg
15  farm in Germany.  And due to the course of about eight or nine
16  years, I watched them.  The legislature went in and voted
17  cages -- made it illegal to have cages in Germany, and that
18  was his business.  They lost their manufacturing -- they
19  couldn't sell or make cages or use cages, and they got voted
20  out, you know, by the legislature.
21  Q.   And why was that a concern for you, Mr. Rust?
22  A.   Everything we had was invested in chicken cages, and if
23  you see countries and states start outlawing cages, you become
24  very concerned about your existence as a farmer.
25  Q.   And you mentioned that there was some vandalism --

41

1   A.   Yes.
2   Q.   -- that occurred.
3        Do you know at which -- at which farm did this
4   occur?
5   A.   Cort Acres is where they sabotaged the water system.  Jen
6   Acres is where they burnt the feed truck and spray-painted on
7   the middle of -- that our family should be treated like our
8   chickens are or something to that effect.
9   Q.   You mentioned Cort Acres.  Is that in Indiana?
10  A.   Yes.
11  Q.   And Jen Acres, where is that?
12  A.   That's Indiana.
13       And then we had -- the FBI notified us that they had
14  picked up leads somehow in an investigation that we were being
15  ready to be -- our Guthrie Center, Iowa facility was going to
16  be attacked.
17  Q.   This -- whatever you said happened to the truck in Jen
18  Acres, right, is that what you said?
19  A.   Jen Acres.
20  Q.   When did that occur?
21  A.   I think 2000, maybe.
22  Q.   2000.  Did you see -- did you actually see --
23  A.   Yeah, I went over and I looked at the truck, you know,
24  wanted to see if there was anything salvageable or nothing was
25  salvageable.

42

1        MR. KING:  Can we put up Exhibit D-467 and publish
2   it to the jury.
3   BY MR. KING:
4   Q.   Mr. Rust, do you recognize what is -- it's in your
5   notebook.  You can actually see it on the screen.
6   A.   Yeah, I can see it on the screen.
7   Q.   Do you recognize the photograph which is depicted at
8   Exhibit D-467?
9   A.   Yes.
10  Q.   And what is that?
11  A.   Well, it's what used to be our feed truck.
12  Q.   Is that the feed truck that was burned at Jen Acres?
13  A.   Yes.
14  Q.   And did you actually see it?
15  A.   Yes.
16  Q.   Did you see it in this condition?
17  A.   Yes.
18  Q.   Does -- is this photograph a fair and accurate
19  representation of what you saw at Jen Acres in 2000?
20  A.   Yes.
21       MR. KING:  Your Honor, we would now offer
22  Exhibit D-467 into evidence.
23       THE COURT:  Any objection?
24       MR. SLATER:  No objection, Your Honor.
25       THE COURT:  467 was admitted.

43

1        (Exhibit received in evidence.)
2        MR. KING:  I'm looking at the note here, and may I
3   please publish it to the jury?
4        THE COURT:  Yes.
5   BY MR. KING:
6   Q.   And so, Mr. Rust, tell us what we're seeing here in 467.
7   What are we looking at?
8   A.   That's a semi tractor trailer.  That big tank, like on
9   the back side is what actually holds the feed.  The truck is a
10  power unit.  It has the hydraulic system that runs the auger
11  that puts the feed into the chicken house feed bins.
12  Q.   So that used to be a semi truck?
13  A.   Yes.
14  Q.   What happened to it?
15  A.   They torched it.
16  Q.   Do you know how it was torched?
17  A.   I have no idea.  They burned it.
18  Q.   We can put that down.
19       Did you see anything else at Jen Acres that
20  concerned you with respect to animal rights activism?
21  A.   Well, they shot out the power transformer.
22  Q.   Anything else?
23  A.   They paint -- spray painted on the side of the feed mill.
24  Q.   Could we put up Exhibit D-469, please.
25       This is a little -- a little darker of a picture.

44

1   Do you see it on the screen, Mr. Rust?
2   A.   Yes.
3   Q.   And what is it we see here that's in this photograph
4   that's marked D-469?
5   A.   Exploiter, animal exploiter.  Your turn to be something.
6   ALS, Animal Liberation Front.
7   Q.   Well, ALF.  Is that -- ALF, that's an acronym --
8   A.   Yes.
9   Q.   -- you mentioned.
10       What is Animal Liberation Front?
11  A.   Animal Liberation Front.
12  Q.   What is that?
13  A.   It's a far, I don't know, right or left, whatever you
14  call it, group that goes out and they destroy laboratories up
15  in Michigan.  They've done a lot of bad stuff around.
16  Q.   And, sir, you saw this graffiti?
17  A.   Yes.
18  Q.   And this was -- where was it?
19  A.   On the side of our feed mill.
20       MR. KING:  Your Honor, we'd now offer Defendants'
21  Exhibit 469 into evidence.
22       THE COURT:  Any objection?
23       MR. SLATER:  No.
24       THE COURT:  469 is admitted.
25       (Exhibit received in evidence.)

45

1    MR. KING:  Publish it to the jury, Your Honor?

2    THE COURT:  Yes.  Is there a way of --

3    MR. KING:  I don't know whether there's a way to

4    lighten it up.  You may have to squint a little bit.

5    THE COURT:  Okay.

6    BY MR. KING:

7    Q.  Mr. Rust, this shows the graffiti you just described for

8    the benefit of the jury?

9    A.  Correct.

10   Q.  When you saw this graffiti adjacent to the burned out

11   truck, what did you think?

12   A.  The first question in mind, what are they going to burn

13   up next?  You know, because when you have stuff all over --

14   you know, we didn't have fences up, we didn't have guards at

15   night, you know.  We ended up -- we had to put guards at all

16   of our facilities at night and, you know, it's a scary thing

17   when people start just burning stuff or shooting out

18   transformers.

19   Q.  Did that worry you?

20   A.  Yes.

21   Q.  Did that worry you about the business?

22   A.  Yes.  I mean, if our generators wouldn't have kicked on,

23   we would have lost all the chickens on that farm.

24   Q.  Now, you can put that down now.  So even after this,

25   though, why did Rose Acre join UEP?

46

1    A.  We wanted to figure out -- our customers were demanding

2    us to be in this Animal Welfare Program.

3    MR. SLATER:  Your Honor, I have a foundation for

4    this.

5    THE COURT:  You're objecting because you think

6    there's been no foundation laid for the reference to

7    "customers."  Do you wish to --

8    BY MR. KING:

9    Q.  Let's just focus --

10   THE COURT:  -- address this more?

11   BY MR. KING:

12   Q.  Let's just focus right now.  This occurred in 2000,

13   correct?

14   A.  Right.

15   Q.  Rose Acre did not join UEP until 2002?

16   A.  Right.

17   Q.  Roughly two years.  In those two years, why didn't Rose

18   Acre join UEP?

19   A.  Well, honestly, you know, we weren't fully trustful of

20   the UEP group because of our previous lawsuits with a bunch of

21   the members that we ultimately won, but it was -- you know,

22   you just -- you don't feel good about a group of people, a

23   bunch of them had sued you.

24   Q.  So the decision ultimately was made in February 2002 to

25   join the UEP?

47

1    A.  Yes.

2    Q.  And within the family, was that -- did everyone -- was

3    everyone within the family supportive of that decision of Rose

4    Acre joining the UEP?

5    A.  No.

6    Q.  And why is that?  For the reasons you've already

7    described?

8    A.  For the reasons I've just described.

9    Q.  And what was your position, your view with respect to

10   whether Rose Acre should join the UEP?

11   A.  At that time, I felt we -- our customers were demanding

12   that we, you know, adopt the program, and I wasn't going to be

13   a part of a program that --

14   MR. SLATER:  Your Honor, I object again.  No

15   foundation.

16   THE COURT:  Your objection to the question?

17   MR. SLATER:  I'm objecting to the hearsay answer

18   we're about to get without any foundation being --

19   THE COURT:  Overruled.

20   BY MR. KING:

21   Q.  You may continue, Mr. Rust.

22   A.  I forgot what I was answering.

23   Q.  Just, in general, without trying to repeat the last stuff

24   you already said, why is it -- were you supportive of joining

25   the UEP?  Were you, in and around February of 2002, were you

48

1    supportive?

2    A.  I was supportive then.  You know, I didn't know that we

3    had any choices.

4    Q.  And why do you say you didn't have any choices?

5    A.  Well, our two biggest customers were telling us that we

6    had to have the -- that we were going to have to have Animal

7    Care Certified on, you know, for us to keep being a supplier

8    to them.

9    Q.  And those two biggest --

10   MR. SLATER:  Your Honor, I object and move that be

11   stricken as hearsay.

12   THE COURT:  Overruled.  The question was why did Mr.

13   Rust do or believe something.  It was not for the truth of the

14   matter.

15   BY MR. KING:

16   Q.  And who were the two biggest customers of Rose Acre

17   telling Rose Acre that you had to be part of this program?

18   A.  Walmart and Kroger.

19   MR. SLATER:  Object.  Hearsay, Your Honor.

20   THE COURT:  Overruled.

21   MR. KING:  If I can confer with counsel.

22   Sorry.

23   MR. SLATER:  Mr. King, I don't believe it was.

24   MR. KING:  My apologies.

25   May I approach the witness, Your Honor?

49

1      THE COURT: Yes, you may.
2  BY MR. KING:
3  Q.   Mr. Rust, I'm handing you what's been marked as
4  Plaintiffs' Exhibit PX-103.
5      It's already been admitted into evidence, I
6  understand, so if we can show it to the jury.
7      And this is entitled United Egg Producers Membership
8  Agreement.  Have you seen this document before?
9  A.   I probably have.  I signed my name on it.
10 Q.   Okay.  Is this -- is this the agreement by which Rose
11 Acre joined the UEP?
12 A.   Right.  I think so.
13 Q.   And was this -- to your knowledge, was this agreement
14 with the UEP or was it with the members of the UEP?
15 A.   It was with UEP.
16 Q.   And at the time that Rose Acre -- it says, there's a --
17 it's not the best copy, but if you see the middle, it says:
18 Membership categories and capacity.
19     Do you see that?
20 A.   Yes.
21 Q.   And then it says:  Egg producer.  And then it says:
22 Capacity, 16 million.  Do you know what that 16 million refers
23 to?
24 A.   That was the capacity we had for birds.
25 Q.   How many hens, 16 million hens?

50

1  A.   16 million hens.
2  Q.   Okay.  You can put that down.
3      And then -- and then Rose Acre joined the -- you
4  became part of -- you became certified under the Certified
5  Program, correct?
6  A.   Correct.
7  Q.   And I believe you were shown an exhibit yesterday, it's
8  PX-712, it's already been admitted in evidence.
9      And it's probably near the bottom of the stack.  I
10 apologize for all the papers that you have there.
11 A.   Yes, I can see it here.
12 Q.   You can see it there.  And you were shown this yesterday
13 and this is the application to become a certified company
14 under the UEP Certified Program?
15 A.   Yes.
16 Q.   Do you remember being asked questions about that?
17 A.   Yes.
18 Q.   And this application, was this with UEP or was it with
19 UEP's members?
20 A.   It was with UEP.
21 Q.   Only with UEP?
22 A.   Yes.
23 Q.   You mentioned after -- you can put that down.
24     You mentioned after -- that Rose Acre's customers,
25 specifically Walmart and Kroger, required -- they were going

51

1  to require certified eggs.  Did they ultimately require
2  certified eggs after Rose Acre joined the program?
3  A.   MR. SLATER:  Your Honor, objection.  Hearsay.
4      MR. KING:  I don't believe it's hearsay.  I'm asking
5  what he understands their customers required.
6  Q.
7      THE COURT:  So the question is
8  Mr. Rust's understanding.
9      You may proceed.
10     THE WITNESS:  All of our retail chains today require
11 us to put the UEP Certified label on all their cartons.
12 BY MR. KING:
13 Q.   Did Kroger, after UEP -- excuse me.  After Rose Acre
14 joined the UEP Certified Program, is it your understanding
15 that Kroger required its egg producers to be certified under
16 the UEP Certified Program?
17 A.   Yes.
18 Q.   And that would include Rose Acre?
19 A.   Yes.
20 Q.   And at any time when Kroger was a customer of Rose
21 Farms, do you know of any time when Kroger said, We don't want
22 eggs produced under the Certified Program?
23 A.   To my knowledge, they've always -- it's always been 100
24 percent under the program.  They were one of the first people
25 that demanded it.

52

1  Q.   Did -- did Kroger or anyone from Kroger, and for that
2  matter, any of the retail customers, Supermarket chains that
3  Rose Acre has served, have any of them ever come to Rose Acre
4  and say, We don't want certified eggs, we only want
5  uncertified eggs or non-certified eggs?
6  A.   We have never had a retail chain request non-certified
7  eggs.  They've always requested -- because they have it --
8  they own the labels.  You know, when you go to pack their
9  label, that's what it says on the box, so you've got to make
10 sure that you meet their specifications.
11 Q.   That's a good point.  You were asked some questions
12 yesterday about why didn't Rose Acre put on -- on the carton,
13 label on the carton saying something along the lines, this egg
14 or these eggs were produced in accordance with the
15 recommendations of the Scientific Advisory Committee?  Do you
16 remember those questions?
17 A.   Yes.
18 Q.   Does Rose Acre determine what's going to be -- what
19 labels are going to be put on the carton?
20 A.   No, that's all Supermarket trademark brand.  They're the
21 ones -- 100 percent control what goes on a carton.
22 Q.   If a customer like Walmart or Kroger or Giant Eagle wants
23 that Certified Program label on one of its cartons, is that
24 decision made by Rose Acre or is it made by Rose
25 Acre's customer, one of these Supermarket chains?

53

1   A.   Well, what -- the way a lot of the Supermarkets work,
2   they actually -- they buy the material from the carton
3   manufacturer and then they actually sell it to us.  So
4   anything that's there is what they put on it.  We're just, you
5   know, we purchase their material and pack the eggs in it and
6   sell it back to them.
7   Q.   Is it your understanding of the Certified Program,
8   Mr. Rust, that a certified producer cannot sell non-certified
9   eggs?
10  A.   We can sell non-certified eggs, yes.
11  Q.   Can a certified producer produce non-certified eggs?
12  A.   Yes.
13  Q.   It can.  And so --
14  A.   We can't maintain the chickens that way.  We had a lot of
15  wholesale customers that we would sell loose eggs or surplus
16  eggs to that didn't, you know, require animal care, and we
17  would just sell them loose eggs.
18  Q.   Well, let's say you had a customer who wanted
19  non-certified eggs and -- could you go out and buy non -- not
20  loose eggs but non-certified Grade A eggs?
21  A.   Yes.
22  Q.   Say they wanted them.  Could you sell those to a
23  customer?
24  A.   Yes.
25  Q.   Would you have to buy them?

54

1   A.   We'd have to buy them from someone else.  Well, not -- we
2   could pack non-certified -- we could pack -- if a carton
3   didn't have the certification on it, we would still have to
4   pack that.  If we wanted to go buy non-certified eggs from
5   someone else, we could do that, but we could not put them in a
6   certified carton.
7   Q.   I'd like to ask you about some documents that you were
8   shown yesterday, and I apologize, these are going to be
9   somewhat out of order chronologically, but after -- after,
10  just after Rose Acre joined the Certified Program, did Rose
11  Acre comply with the Certified Program?
12  A.   Yes.
13  Q.   And is it a certified producer to this day?
14  A.   Yes.
15  Q.   I want to skip to an exhibit that you were already shown
16  near the end of today, it's Exhibit PX-445.  This is the
17  e-mail between you and your brother, John, you were just asked
18  some questions about this recently.  Do you remember that?
19  A.   Yes.
20  Q.   Now, this was -- the e-mail that your brother, John,
21  wrote on February 13th, 2008, right?
22  A.   Yes.
23  Q.   And at the time, your brother, John, did he have any
24  responsibilities at Rose Acre with respect to the production
25  of eggs at that time?

55

1   A.   No.
2   Q.   Did your brother, John, in 2008 or at any time before
3   2008, play any role with respect to the Certified Program?
4   A.   No.
5   Q.   Did your brother, John, in or before 2008, was he at all
6   active or did he participate in any activities of the UEP?
7   A.   No.
8   Q.   And was your brother, John, opposed to the use of cage
9   production?
10  A.   No.  But he -- he preferred cage-free production.
11  Q.   Now, when your brother -- when your brother says that --
12  says that:  I don't think we have anything to be ashamed of by
13  putting as many hens per cage as conditions permit.  That is
14  doing what is economically right for consumers, rather than
15  trying to restrict cage space to boost prices under the
16  alleged agenda of animal rights, what did you interpret your
17  brother, John's, statements to mean?
18  A.   Well, we were arguing about -- he had sent me some
19  pictures that he had taken of some -- our free-roaming
20  chickens and he was bragging how great they were and
21  everything, and then we ended up into this argument, so --
22  Q.   Did you agree with your brother, John's, statements here?
23  A.   No.
24  Q.   And when you responded, what were you trying to say when
25  you responded to him?

56

1   A.   Well, I was trying to protect our right to have cages
2   and, you know, John, at that point, he had already -- he
3   thought the whole market would go cage-free in a matter of,
4   you know, 20 -- 10 or 20 years and he wanted just to produce
5   what we had in our cages and call it cage production.  And I
6   wanted to try to save cage production because, you know, it's
7   truly the most economical way to produce eggs, is in a cage,
8   but --
9   Q.   At any time, Mr. Rust, from the start of Rose
10  Acre's participation in UEP and participation in the Certified
11  Program, at any time from 2002 to this day, did you ever
12  believe that Rose Acre's participation in the Certified
13  Program was part of some larger effort to reduce egg supplies
14  in order to raise egg prices?
15  A.   No, I never did believe that.
16  Q.   Did you believe it was a legitimate Animal Welfare
17  Program?
18  A.   Yes.
19  Q.   Now -- you can put that down.
20       Now, after Rose Acre joined the UEP in 2002 and
21  became part of the Certified Program, Rose Acre -- you
22  yourself joined the board of UEP?
23  A.   Yes.
24  Q.   And you and some other officers and employees of Rose
25  Acre participated on various committees of the UEP?

57

```
 1   A.   Yes.
 2   Q.   And why -- why did -- why did you decide -- why did Rose
 3   Acre yourself decide to participate in these various
 4   committees?
 5   A.   We wanted to know what was going on.
 6   Q.   Going on with what?
 7   A.   With the whole program that we wanted to help control our
 8   destiny.  You know, of what we was going to do with cage
 9   production.
10   Q.   What concerns did you have with respect to controlling
11   your destiny that prompted you and the others at Rose Acre to
12   participate on these various committees?
13   A.   In the past, when we've been in the various lawsuits with
14   UEP, we knew a lot of the producers there was only in the UEP
15   Program.  They were into the -- UEP has always been about how
16   you get the best possible price for their farmers.  They was
17   always telling the farmers, you need to do this, you need to
18   do that, you'll increase your price.  Well, we was one of
19   those -- we went out and we just tried to maximize production
20   and produce absolute cheapest we could, and that was the
21   direct conflict, you know, with some of the members there.
22   Q.   Now, when Rose Acre joined the UEP, did Rose Acre have
23   some understanding that the number of birds that Rose Acre had
24   per house was going to change?
25   A.   We knew the -- the number of birds per house could be
```

58

```
 1   anything.  It all depended on how many square -- the only
 2   thing that was regulated by UEP for chicken numbers was the
 3   space you gave the chicken.  We could have as many chicken
 4   houses as we wanted with -- I thought it was a great program
 5   from that standpoint.
 6   Q.   So let's pull up PX-137.  It's the document you were
 7   shown yesterday.
 8   A.   Which one?
 9             MR. KING:  If you can publish this to the jury,
10   please.
11   BY MR. KING:
12   Q.   This is Rose Acre Farms' summary page, appears to be
13   dated somewhere around August 2002.  I'll wait for you to find
14   it.
15   A.   Yeah, I see it right here.
16   Q.   And, Mr. Rust, what is this -- what is this document
17   intended to show?
18   A.   It was showing what our capacity would be at each of our
19   locations when we adopted the program, and what we had to do
20   then was look at our customer demand at each of those areas
21   and determine how many chickens we could add at each of the
22   locations we had to get -- we had add hen space so we could
23   keep all of our customers satisfied.
24   Q.   So this shows an approximate reduction of around
25   21 percent total as a result of the Certified Program?
```

59

```
 1   A.   In lost hen space, yes.
 2   Q.   And did Rose Acre intend to lose 21 percent of its hen
 3   population due to the Certified Program?
 4   A.   Absolutely not.
 5   Q.   What did it plan to do?
 6   A.   We went and -- we identified every farm that we could add
 7   the extra hen space to, and we went out and built new houses
 8   or we remodeled and put in more cages.
 9   Q.   New cages in existing houses?
10   A.   In an existing house, yes.
11   Q.   Did -- was Rose Acre able to offset by expanding any of
12   the -- any of the capacity loss caused by the Certified
13   Program?
14   A.   We was able to overall total expand and offset all of the
15   loss capacity.
16   Q.   From 2002 to 2012, did Rose Acre expand its capacity?
17   A.   Yes.
18   Q.   Did it expand the number of hens it had?
19   A.   Yes.
20   Q.   Did it expand the number of eggs it produced?
21   A.   Yes.
22   Q.   You were asked some questions yesterday about the
23   100% rule.  Do you remember those questions?
24   A.   Yes.
25   Q.   And you indicated that you were supportive of the
```

60

```
 1   100% rule?
 2   A.   Yes.
 3   Q.   Why were you supportive of the 100% rule?
 4   A.   Just made everything the same.
 5   Q.   Sir, say again.
 6   A.   Well, they would -- you're talking -- the 100% rule.
 7   Q.   The 100% rule.  Why were you supportive, sir, of the
 8   100% rule that was part of the certified program?
 9   A.   Because you wanted everything -- all your chickens to be
10   treated the same.  We didn't want people -- you couldn't have
11   a program and have people then, you know, one room treating
12   their chickens one way and then in another room for someone
13   else treating them another way.  You know, with today's cell
14   phones and stuff, that will be on a video someplace.
15   Q.   Did you ever voice those concerns about the 100% rule to
16   the leadership at UEP?
17   A.   Yes.
18   Q.   Did you ever voice those concerns at more meetings with
19   UEP?
20   A.   Yes.
21   Q.   Did you ever think at any time, Mr. Rust, that the
22   Certified Program should be used as a, quote/unquote, economic
23   tool?
24   A.   I was 100 percent opinion and very vocal about it cannot
25   be an economic tool.
```

61

1    Q.   If I could show you a document that was marked yesterday,
2    it's PX-601.  If we can go to the second page.  And you were
3    asked some questions.  This is an e-mail --
4         MR. KING:  Well, we don't need to blow that up yet.
5    BY MR. KING:
6    Q.   You were asked some questions about this.  This was an
7    e-mail exchange between you and Roger Deffner sometime in
8    June 2005.  It might be easier to look on the screen.  We'll
9    help you out here.
10   A.   Yeah, yeah.
11   Q.   Can you see that okay?
12   A.   I can barely see that.
13   Q.   There we go.
14        You were asked some questions about this yesterday
15   and you were actually responding to an e-mail that Mr. Deffner
16   wrote, right?
17   A.   Yes.
18   Q.   And if we can show the e-mail you were responding to at
19   the very bottom of the page, and Mr. Deffner says:  Marcus, I
20   want to take a minute and thank you for voicing the position
21   that many of us agree with regarding using the ACC Program...
22        That's the Animal Care Program, right, the Animal
23   Welfare Program?
24   A.   Yes.
25   Q.   ...as an economic tool.  I could not agree with you more

62

1    and I will do everything I can to be sure this does not happen
2    on my farm.  Thanks for speaking up.
3    A.   He said his "term."
4    Q.   I'm sorry?
5    A.   You said "farm."  His "term."
6    Q.   His term.  I'm sorry.  I can't read.
7         Do you recall that someone was speaking up about
8    speaking up at a UEP meeting?
9    A.   Multiple times you would have certain people that would
10   say they wanted to speed up the hatch date or the -- some of
11   the limitations and we stood up and said -- I would stand up
12   and say, No, you can't do that.  This is not for economic
13   benefit.  This is the program.  We've got to stay on the
14   program.
15   Q.   Could we pull up another exhibit you were shown
16   yesterday, if I can find it.  It's Exhibit PX-344.  If we
17   could blow up that top e-mail, this is an e-mail dated
18   May 2006, and you were asked some questions about an e-mail
19   that you sent to a number of folks, including Gene Gregory and
20   Mr. Deffner.
21        And do you remember being asked questions about
22   this?
23   A.   Yes.
24   Q.   And you're expressing some concerns about some producers
25   who were certified selling non-certified eggs.  Is that

63

1    basically what you were talking about?
2    A.   There was some people doing both methods.
3    Q.   And then there was a long back and forth between you and
4    counsel about selling at small grocers and big cities?
5    A.   Yes.
6    Q.   And -- and you said you were concerned about that
7    non-certified eggs -- the small grocers don't necessarily
8    demand certified eggs, right?
9    A.   Small retailers did not demand for certified eggs.
10   Q.   It was the larger retailers?
11   A.   All the large -- anyone who had multiple locations that
12   was afraid of being picketed wanted the certified eggs.
13   Q.   To your knowledge, sir, in this lawsuit, are there any
14   small grocers, grocery chains who are suing?
15   A.   No.
16   Q.   Are they all large ones?
17   A.   All large.
18   Q.   And let me just make this clear or have you make this
19   clear for the jury.  If Kroger and Walmart had not told Rose
20   Acre Farms that it had to get on the Certified Program, would
21   Rose Acre have joined the Certified Program?
22   A.   I doubt if we would have.
23   Q.   Would Rose Acre have even joined the UEP?
24   A.   No.
25   Q.   Was everything that Rose Acre did, was that in response

64

1    to customer demand?
2    A.   Yes.
3    Q.   I'd like to show you another exhibit that you were asked
4    some questions about yesterday, and that is PX-403.  And this
5    is a letter again that is from Greg Hinton to John Gregorich
6    at Kraft Foods dated May 30, 2007.
7         Do you remember being asked questions about this
8    yesterday?
9    A.   Yes.
10   Q.   And I want to just -- a few questions related to this.
11   If you look at the second sentence of the first paragraph, it
12   says:  The only change to the current agreement is price
13   the eggs off the Urner Barry animal welfare certified market
14   to meet Kraft's new animal welfare requirements.
15        Do you see that?
16   A.   Yes.
17   Q.   Was Kraft at the time asking for certified eggs?
18   A.   Yes.
19   Q.   Was Kraft -- to your knowledge, did Kraft ask for
20   certified eggs before, around 2007?
21   A.   I don't -- I don't think they did before.
22   Q.   And Kraft, did they buy shell eggs or liquid egg or what
23   did they buy?
24   A.   They just bought liquid egg products.
25   Q.   Did -- when the Certified Program first came into

65

1   existence in 2002, were buyers of egg products like liquid
2   egg, were they requiring certified eggs?
3   A.   No.
4   Q.   That happened later?
5   A.   That happened later.
6   Q.   Do buyers of liquid egg today ask for certified eggs?
7   A.   Most do.
8   Q.   And then it says, the second paragraph, which I believe
9   you were asked some questions about:  So since our last
10  contract began in 2005, there have been many changes in the
11  cost of producing eggs.  The rising feed prices have had the
12  largest impact on our cost of production.
13       Do you see that second sentence?
14  A.   Yes.
15  Q.   What do you understand that to refer to, the rising fee
16  prices have had the largest impact on our costs of production?
17  A.   Right around 2007 or whatever it was, we had a
18  dramatic -- the price of corn went from like $3 a bushel to --
19  we paid some farmers $8 a bushel for corn.  So the cost of our
20  feed over doubled.
21  Q.   Is the cost of feed a significant factor in what you
22  charged for eggs?
23  A.   It's our number one expense.
24  Q.   And then it says:  Also complying with the new UEP Animal
25  Care Certified Guidelines has caused a decrease in our overall

66

1   bird numbers and resulted in an increase in production costs.
2   Q.   Do you know -- do you have any understanding of what that's
3   referring to?
4   A.   It's referring to when we added the space, you know, to
5   our overall bird numbers, what we had at the time by going to
6   that space thing, our so-called capacity went down unless we
7   increased it on the farms.
8   Q.   And that increasing capacity, was that the cause that
9   affected the prices?
10  A.   Yes, it affected the prices.
11  Q.   Capital costs?
12  A.   Capital costs and feed costs a little bit.
13  Q.   I'd like to show you PX-602, which again, you were asked
14  some questions about yesterday.  If we could go to the
15  second -- the second page.  You were shown -- you were asked
16  some questions about this letter dated January 22nd, 2007,
17  from your general counsel, Joe Miller, Joseph Miller to the
18  United States Department of Agriculture.
19       Do you remember being asked some questions about
20  that?
21  A.   Yes.  Yes.
22  Q.   And do you remember that this letter was addressing
23  concerns, at least Mr. Miller on behalf of Rose Acre was
24  raising with respect to something known as the PVP or Process
25  Verified Program?

67

1   A.   Yes.
2   Q.   Were there producers -- I think you already said this.
3   The PVP, Process Verified Program, was similar to the
4   Certified Program; is that right?
5   A.   Similar, yes.
6   Q.   But it had no 100% rule?
7   A.   Correct.
8   Q.   And was there a particular producer that really pushed
9   this PVP program, to your knowledge?
10  A.   Sparboe did.
11  Q.   And the jury's already heard a couple employees -- at
12  least Garth Sparboe testified here earlier.
13       And are you aware of an incident that occurred with
14  respect to Sparboe where one of their farms was featured on
15  the ABC News show 20/20?
16  A.   Yes.
17  Q.   And that they lost some customers as a consequence of
18  that?
19  A.   They lost their entire McDonald's business, and
20  SuperValu, I think at the time, and also Hy-Vee.
21  Q.   And was Sparboe at that time, when that -- to your
22  knowledge, at that time that 20/20 program was broadcast, were
23  they a member of the Certified Program?
24  A.   No.
25  Q.   Were they -- were they following the PVP program?

68

1   A.   They were following the PVP.
2   Q.   If you know, Mr. Rust, does the PVP program exist today?
3   A.   I don't think it does.
4   Q.   Do you know of any producer --
5   A.   I don't know.
6   Q.   -- that follows the PVP program?
7   A.   No.
8   Q.   Is Sparboe today a member of the Certified Program?
9   A.   Yes.
10       THE COURT:  Counsel, I think we'll take a break now
11  for the midmorning.  Let everybody stretch a little bit.
12       MR. KING:  I've only got a few more minutes, but
13  yes, we'll take a break and it will allow me to regroup.
14       THE COURT:  Okay.  Well, it will allow the jury to
15  regroup.  So we'll do that, for that reason.
16       Ten minutes, folks.  Stick around the 10th floor,
17  please.  Don't discuss the case, but we'll get back to work
18  here in about ten minutes.  Thanks very much.
19       THE DEPUTY CLERK:  All rise.
20       (Jury out.)
21       THE COURT:  Mr. Rust, you can step down too.  Enjoy
22  the break.
23       See you all back here in about ten minutes.
24       MR. BLECHMAN:  Thank you, Your Honor.
25       (After recess:)

69

1          (Marcus Rust resumes the stand.)
2          THE COURT:  Okay, everybody, back in business?  You
3  can bring the jury back.
4          What's the general estimate as to whether or not all
5  the questioning of Mr. Rust will be done by a conventional
6  lunchtime?
7          MR. KING:  I believe I have five, six,
8  seven minutes, maybe less.
9          THE COURT:  Okay.
10          MR. SLATER:  I'll have far less than a half hour.
11  Probably 15 minutes, but we'll see how it goes.
12          MS. SUMNER:  We don't have any questions at this
13  time.
14          THE COURT:  So I guess the question then might be
15  what is next on our docket?
16          MR. BLECHMAN:  Your Honor, we have a witness, live,
17  to testify next and, in fact, I was talking to Defense Counsel
18  to gauge whether -- when we should have him here.  We'll do
19  this at the Court's pleasure.  We can start the testimony, but
20  it probably won't go that long before the Court wants to
21  break, but the witness is Mitch Hill from H-E-B, and we're
22  prepared to put him on the witness stand subject to the
23  Court's preference in terms of the calendar.
24          THE COURT:  So he'd be available at noon-ish.
25          MR. BLECHMAN:  Yes, Your Honor.

70

1          THE COURT:  Okay.  Well, let's see how it goes.
2          MR. BLECHMAN:  Very well.
3          THE DEPUTY CLERK:  All rise.
4          (Jury in.)
5          THE COURT:  Okay, everybody.  You may take your
6  seats.
7          Mr. King, you may proceed.
8  BY MR. KING:
9  Q.  Mr. Rust, I want to ask you just a couple questions to
10  finish up about exports.  You were asked questions by
11  Mr. Slater about Rose Acre's joining the United States Egg
12  Marketers, USEM, and then participating in certain exports.
13          Do you remember those questions?
14  A.  Yes.
15  Q.  And again, Rose Acre joined USEM in -- at least the
16  agreement was in 2007, right?
17  A.  Correct.
18  Q.  And I want to just show you a couple of things real
19  quick.
20          MR. KING:  Bring up PX-103 again, if you could,
21  please.
22  BY MR. KING:
23  Q.  PX-103 again, Mr. Rust, is the UEP Membership Agreement
24  that Rose Acre signed in February of 2002.
25          Does that look familiar?  Right?

71

1  A.  Yes.
2  Q.  And you already answered, if we could blow that up under
3  membership category's capacity, where you have 16 million
4  capacity, that's the number of hens that Rose Acre had at the
5  time?
6  A.  Capacity.
7  Q.  Now, if we can put that down.  Now I'd like to show you
8  what was marked previously this morning as PX-430.  And this
9  is a little less than five years later.  This is the USEM
10  Membership Agreement Export Commitment that Rose Acre signed.
11  A.  Yes.
12  Q.  And that's your signature, as you indicated, right?
13  A.  Yes.
14  Q.  And, again, this agreement with USEM, was Rose Acre
15  agreeing with USEM or was it agreeing with USEM's members in
16  entering this agreement?
17  A.  Just with USEM.
18  Q.  All right.  And if you look under Section 1, there's also
19  a blank that's filled in on the house capacity of layers owned
20  by the applicant.
21          Do you see that?
22  A.  Yes.
23  Q.  Now it says 20 million?
24  A.  Yes.
25  Q.  And previously under the UEP application, it was 16 --

72

1  A.  Yes.
2  Q.  -- right?
3          So does this indicate that Rose Acre grew?
4  A.  Yes.
5  Q.  All right.  If you could put that down.  You were asked
6  some questions about a document, if we can just put up the
7  first page, PX-51.  You were asked a number of questions about
8  this document and some statements that are in it.  This is a
9  memo written from Gene Gregory, August 29th, 2000, to UEP
10  members and the subject was USEM Membership and Export
11  Commitment.
12          Do you see that?
13  A.  Yes.
14  Q.  August 29, 2000, Rose Acre was not a member of UEP,
15  correct?
16  A.  Correct.
17  Q.  August 29th, 2000, Rose Acre was not a member of USEM,
18  correct?
19  A.  Correct.
20  Q.  Do you ever recall at any time before this litigation or
21  even today ever receiving this memo from Gene Gregory?
22  A.  No.
23  Q.  You mentioned several times surplus eggs.  Do you
24  remember that?
25  A.  Yes.

73

1    Q.   What are surplus eggs?
2    A.   That's the eggs that you don't have a market for.
3    Q.   And what would Rose Acre typically do when it had eggs
4    that it didn't have a market for?
5    A.   Sometimes we broke them.  Sometimes, you know, you just
6    figured you'd sell them wherever.  Sometimes we exported.
7    Wherever you could find a willing buyer, you'd --
8    Q.   Did you ever throw away eggs?
9    A.   Years ago, we did once.
10   Q.   Do you do that now?
11   A.   No.  We have breaking plants.
12   Q.   And are there certain times of year when Rose Acre tends
13   to have surplus eggs?
14   A.   Yes, during the summer months.
15   Q.   When demand is low?
16   A.   And right after Easter.
17   Q.   And why did Rose Acre decide to join USEM, United States
18   Egg Marketers, on or about January of 2007?
19   A.   Because we had increased our capacity and we was going to
20   have a lot more surplus eggs to sell and we was going to be in
21   a good position to supply them.
22   Q.   Now, explain -- explain to the ladies and gentlemen of
23   the jury how it is an export decision was made by USEM from
24   your experience?
25   A.   From my experience, when they had an export committee,

74

1    and the committee would go out and seek the international
2    buyers or brokers to see what country or what groups were
3    looking for eggs and, you know, because if there wasn't anyone
4    looking for them, no one would buy them.
5    Q.   Was there -- was there an entity within USEM that had to
6    vote to approve an export?
7    A.   The export committee had to vote on a price that was
8    acceptable, and then it would be up to the broker on the other
9    end how many they could sell.
10   Q.   Were you part of that committee?
11   A.   Yes.
12   Q.   Would you vote on exports?
13   A.   Yes.
14   Q.   And were there -- how would you decide whether to vote
15   whether you had an export or not?
16   A.   If it was a price we could get more -- you know, we
17   thought was going to be more than what we thought the market
18   was going to be here, we'd vote to do it.
19   Q.   So when you voted for an export, did you sell or did you
20   export right away or was it down the road?
21   A.   It would be anywheres from two weeks to eight weeks.  It
22   could be up to two months down the road, so a lot of times it
23   was speculation.
24   Q.   Speculation on what you thought the egg price to be?
25   A.   What we thought the egg market would be in two weeks or

75

1    eight weeks.
2    Q.   Were prices sometimes lower than you anticipated?
3    A.   Sometimes they were lower and sometimes they went higher.
4    Q.   Did you ever vote for an export where the price you
5    thought was going to be lower than what you could get in the
6    domestic market?
7    A.   No.
8    Q.   Did you ever just rubber stamp a vote to approve an
9    export?
10   A.   Do what again?
11   Q.   Rubber stamp?
12   A.   Agree.
13   Q.   Not think about it?
14   A.   No.  No.
15   Q.   Did you ever disagree with a proposed export, voice your
16   objection to an export?
17   A.   Yes.
18   Q.   Because the price was too low?
19   A.   Too cheap.
20   Q.   Too cheap.
21        Mr. Rust, again, one more question for you.  Did
22   Rose Acre agree with its competitors at any time from 2000 to
23   2012, or even until today, 2000 to today, did Rose Acre at any
24   time agree with its competitors to reduce the supply of eggs
25   in order to raise the egg prices?

76

1    A.   No, never.
2        MR. KING:  Nothing further.
3        THE COURT:  Any further questions before I return to
4    Mr. Slater for any follow-up?
5        MS. SUMNER:  No, Your Honor.
6        MR. HARRIS:  No, Your Honor.
7        THE COURT:  Okay, Mr. Slater, do you have anything
8    more?
9        MR. SLATER:  Not very much, but a few questions.
10               REDIRECT EXAMINATION
11   BY MR. SLATER:
12   Q.   Mr. Rust, you just testified that you joined the UEP
13   because Walmart and Kroger told they only would buy
14   certified eggs?
15   A.   Yes.
16   Q.   And you joined the UEP on February 1, 2002, correct?
17   A.   I think that's correct.  Yes.
18   Q.   Plaintiffs' Cross Exhibit 1.
19        MR. SLATER:  May I approach, Your Honor?
20        THE COURT:  Yes, you may.
21        MR. SLATER:  Thank you.
22   BY MR. SLATER:
23   Q.   Mr. Rust, I'd like to show you a document.  The cover
24   page is an e-mail from sraterman@kroger.com to Greg Hinton.
25        Do you see that?

77

```
1    A.   Yes.
2    Q.   It's dated January 31st, 2002?
3    A.   Yes.
4    Q.   And the subject is:  Phoenix egg negotiations.
5    A.   Yes.
6    Q.   And Mr. Hinton, I believe you previously had identified
7    as the head of marketing at Rose Acre?
8    A.   Yes.
9              MR. SLATER:  Your Honor, we offer Plaintiffs' Cross
10   Exhibit 1 only against Rose Acre.
11             MR. KING:  No objection.
12             THE COURT:  It's admitted.
13             (Exhibit received in evidence.)
14   BY MR. KING:
15   Q.   Mr. Rust, this is an e-mail --
16             MR. GERMAINE:  Your Honor, can we publish it to the
17   jury, please?
18             MR. SLATER:  Your Honor, can we publish?
19             THE COURT:  Yes.
20             MR. SLATER:  Thank you.
21   BY MR. KING:
22   Q.   This is an e-mail from Kroger to Rose Acre, setting forth
23   the terms on which Kroger will purchase eggs from Rose Acre,
24   is it not?
25   A.   I have never seen this document.
```

78

```
1    Q.   Can you read it?
2    A.   I can read it, yes.
3    Q.   And this is an e-mail from Kroger to your marketing
4    manager, Greg Hinton, and it sets forth the terms at which
5    Kroger will purchase eggs from Rose Acre, does it not?
6    A.   I don't know.  I'd have to read it.  Give me a few
7    minutes.
8    Q.   Yes, it might help you if you start at the page that ends
9    in the Bates Numbers 548.
10   A.   It looks like some kind of Internet business.
11             MS. SUMNER:  Your Honor, this appears to be a
12   different document than the one that is on the screen.
13             THE COURT:  I don't know what "this" is.
14             MS. SUMNER:  Mr. Slater, I don't know if you --
15             (Discussion off the record.)
16   BY MR. SLATER:
17   Q.   Mr. Rust, if you'll look -- does this appear to you to be
18   a presentation by Kroger of the terms on which it will buy
19   eggs from Rose Acre dated January 31st, 2002 --
20   A.   It looks like some kind of Internet business kind of
21   thing.
22   Q.   You think it's an Internet business thing?
23   A.   That's what it looks like.
24   Q.   Is this first page an e-mail --
25   A.   It says:  Global Net Exchange Training.
```

79

```
1    Q.   Yeah, is the first page an e-mail to Greg Hinton, your
2    marketing manager?
3    A.   Yes.
4    Q.   Okay, will you look, please, at page -- that ends in
5    Bates Numbers 548?  Do you see that?
6    A.   Yes.
7    Q.   And at the top, it says:  Pace Dairy.
8              Do you see that?
9    A.   Yes.
10   Q.   Pace Dairy is the Purchaser for Kroger, isn't it?
11   A.   Yes.
12   Q.   Okay.  And it then goes on and at the top says:  This
13   agreement supersedes any previous agreement between Pace Dairy
14   and -- then it leaves brackets for supplier to be
15   determined -- and shall be effective on February 3, 2002.
16             Do you see that?
17   A.   It looks to be a bid.  I don't know anything about it,
18   sir.
19   Q.   Yeah.  And it's a bid from Kroger to buy eggs from Rose
20   Acre sent to your marketing manager, Mr. Hinton, and it
21   doesn't say a word about certified eggs, does it?
22   A.   I don't see it on here that it does.  But like I said,
23   I've never seen this document.
24   Q.   PX -- and that document was dated the day before you
25   joined the UEP, correct?
```

80

```
1    A.   It was dated January the 31st of 2002.
2    Q.   And you joined the UEP on February 1st, 2002, didn't you?
3    A.   Correct.
4    Q.   Would you look --
5              MR. SLATER:  Could I have PX-615.
6              May I approach, Your Honor?
7              THE COURT:  Yes, you may.
8    BY MR. SLATER:
9    Q.   If you'll look, please, at the bottom of the first page
10   of the document, sir, this is an e-mail from a Kelli Crossland
11   at Walmart.com.  Do you see that?
12   A.   Yes.
13   Q.   And it's dated April 15, 2002, do you see that?
14   A.   Yes.
15   Q.   And one of the people it is sent to is a Mr. Justin
16   Whaley.  Do you see that?
17   A.   Yes.
18   Q.   And the subject is:  Egg Supply, Plants, Specs, and
19   Updates.
20             Do you see that?
21   A.   Yes.
22   Q.   And then if you look up at the next e-mail, Mr. Whaley
23   copies this to a number of people, and if you'll look at the
24   third line at the top, one of them is Greg Hinton, the
25   marketing manager at Rose Acre Farms, correct?
```

81

```
1    A.    Yes.
2              MR. SLATER:  Your Honor, I offer PX-615 against Rose
3    Acre only.
4              MR. KING:  No objection.
5              THE COURT:  615 is so admitted.
6              (Exhibit received in evidence.)
7    BY MR. SLATER:
8    Q.    Sir, if you will look, please, at the page --
9              MR. SLATER:  Can we publish to the jury?
10             THE COURT:  Yes.
11             MR. SLATER:  Thank you, Your Honor.
12   BY MR. SLATER:
13   Q.    Would you look, please, at the page, sir, that ends in
14   the Bates Number 690.  Do you see that?
15   A.    I'm lost here.  Which -- which page?
16   Q.    It's the page that ends in the Bates Number 690, and I
17   believe it should be the third page of the document that you
18   have.
19   A.    The third page of the document?
20   Q.    Yes, sir.  It's on the screen.  It's the one that starts:
21   Updates for Walmart Stores, Inc., Egg Specs Requirement.
22   A.    Oh, yeah.  Yes.
23   Q.    Do you see that?
24   A.    Yes.
25   Q.    And the Updates for the Egg Specs Requirement say nothing
```

82

```
1    about the Certified Egg Program or certified eggs, does it?
2    A.    I think that was all told to us verbally because they
3    hadn't -- the program hadn't yet started yet.  They were
4    telling us we would have to be part of the program, so it
5    wouldn't be on the spec --
6    Q.    When you say "we," who?  Who told -- did you speak to
7    somebody?
8    A.    I spoke to Justin Whaley, who was the category manager
9    for Walmart, that Walmart had --
10   Q.    And Justin Whaley is the gentleman who forwarded these
11   specs to Rose Acre?
12   A.    That was the current specs because the program hadn't
13   started yet, sir.
14   Q.    And you said that you joined the UEP because Kroger and
15   Walmart told you they would only buy certified eggs?
16   A.    They were going to go to that program.
17   Q.    The program was in existence --
18   A.    It was not --
19   Q.    -- in April -- this document is dated April 2002,
20   correct?
21   A.    Correct.
22   Q.    The program was in existence in April 2002, correct?
23   A.    I don't think the phase-in started yet then.
24   Q.    The program had started, hadn't it?
25   A.    The program had, but the part the Supermarkets were
```

83

```
1    concerned about had not started yet.  That was my
2    understanding.
3    Q.    And this document, if you'll look at the next page, it
4    says:  Grade A shell egg specifications.
5              Do you see that up at the top?
6    A.    Yes.
7    Q.    It says not a word about being compliant with the
8    Certified Program, does it?
9    A.    I think at that time, no one was yet, sir.
10   Q.    And on this set of specifications, there's no end date,
11   is there?
12   A.    No, the specifications change every year.
13   Q.    Now, at the time that you joined the UEP, February 1st,
14   2002, whatever anybody had asked you about, the Certified
15   Program did not include the 100% rule, the no backfilling
16   rule, and the audit provision had not been formulated; isn't
17   that true?
18   A.    It was our understanding everything was a work in
19   progress, yes.
20   Q.    And anything to join or ask for certified eggs did not
21   include, prior to February 1, 2002, a 100% rule, a no
22   backfilling provision, or the audit because those had not even
23   been done yet; isn't that true?
24   A.    My understanding, none of it had been done yet.
25   Q.    Did you ever talk to Justin Whaley about the 100% rule?
```

84

```
1    A.    Yes, I believe so.
2              MR. SLATER:  I have no further questions, Your
3    Honor.
4              THE COURT:  Anything more from anybody?
5              MR. KING:  I have just a few questions, Your Honor.
6              THE COURT:  Go ahead.
7              MR. SLATER:  I have one more question, I apologize.
8              THE COURT:  Ah, okay.
9    BY MR. SLATER:
10   Q.    Mr. Rust, did you -- who at Kroger did you talk to about
11   the 100% rule?
12   A.    A guy by the name of Tom Klump.
13   Q.    And who is Tom Klump?
14   A.    He was the buyer at Pace.
15             MR. SLATER:  Your Honor, could I pass the witness to
16   Mr. Blechman?
17             MR. KING:  Objection.  One examiner per --
18             THE COURT:  Well, that's a little bit out of our
19   working arrangement, I believe.
20             MR. SLATER:  Your Honor, we've tried very hard to
21   have just one questioner per witness.  The Defendants have
22   been using different lawyers for different clients.
23             THE COURT:  Excuse me?
24             MR. SLATER:  The Defendants have been using
25   different lawyers for different clients and they've had
```

85

```
 1   multiple lawyers question.
 2          THE COURT:  Okay, we're not going to have this
 3   discussion right now.  If there was going to be a different
 4   method of operating, it should have been brought to the
 5   Court's attention in some other fashion.  You can have a
 6   couple of moments to confer, if you'd like.
 7          MR. SLATER:  Can I have a moment?
 8          MR. BLECHMAN:  Thank you, Your Honor.  Thank you.
 9          THE COURT:  You can do that.
10          Do you have a couple more questions?
11          MR. SLATER:  I do.
12          THE COURT:  Go ahead.
13          MR. SLATER:  Thank you.
14   BY MR. SLATER:
15   Q.   Mr. Rust, when did you speak to Mr. Klump?
16   A.   It would have been at one of the Southeastern
17   expositions, it was an international poultry show.  Mr. Klump
18   would attend, his boss would attend and we always had an
19   arrangement to go out to dinner.
20   Q.   When was this?
21   A.   I don't -- it would have been -- every year we sold them
22   eggs we went out to dinner with them at the Southeastern show.
23   Q.   Do you know what year this occurred?
24   A.   No.
25   Q.   Who else was present besides Mr. Klump?
```

86

```
 1   A.   Greg Hinton and Amanda --
 2   Q.   Amanda?
 3   A.   Amanda Jackson in our sales department.
 4   Q.   Anybody else from Kroger?
 5   A.   Tom's boss.  I forget his name.
 6   Q.   And what was Mr. Klump's position at Kroger?
 7   A.   He was the -- I guess he was the buyer for the egg buyer.
 8   Q.   And what did Mr. -- what did you say to Mr. Klump and
 9   what did he say to you about the 100% rule?
10   A.   It was just discussed.  I don't remember exactly what we
11   said, but we talked about the whole Animal Welfare Program.
12   And how it was evolving and changing.
13   Q.   Did you discuss the no backfilling rule?
14   A.   I don't recall that.
15   Q.   Did you discuss the audit?
16   A.   They would have demanded the audits.  They're very big on
17   all audits.  They come in and audit, we have these, what they
18   call the SQF, where they audit the sanitation and the plants
19   and they come in and verify that those audits have all been
20   completed.
21   Q.   Did they do their own audit or did they get the
22   UEP's audit?
23   A.   SQF is some kind of, like, auditing -- there's an
24   auditing service that goes around and they do their report and
25   then they send that in to the Supermarkets and/or the
```

87

```
 1   industrial buyers that they're doing the audits for.
 2   Q.   Is that the UEP audit --
 3   A.   No.
 4   Q.   -- is that just a separate --
 5   A.   No.  That's separate.  Grocery stores are real big on --
 6   for liability reasons, they want all these audits done.
 7   Q.   But they don't get the UEP audits; they do their own?
 8   A.   The grocery stores?
 9   Q.   Yes.
10   A.   No.  They would -- they would -- UEP, we could have
11   used -- UEP offered what they call the Five Star Program and
12   the grocery stores, a lot of them would accept that, too.
13   Q.   Did Kroger or Walmart accept that?
14   A.   You'd have to ask Greg Hinton that question.  I'm not
15   sure which ones they accepted.
16   Q.   Would Greg Hinton be the person who would be most
17   knowledgeable about the two documents I've shown you, PX-615
18   and Plaintiffs' Cross 1?
19   A.   I would assume so.
20   Q.   Mr. Rust, did Mr. Klump say anything else to you about
21   the program?
22   A.   He thought it was a great program.
23   Q.   And did you say anything else to him?
24   A.   I -- I talked to him.  Probably went out to dinner with
25   him eight or ten times, and we talked about a lot of stuff
```

88

```
 1   during those times.  And I have no recollection exactly what
 2   was said at any of those times.
 3   Q.   And this could have been in 2004, 2005, 2006.  You don't
 4   know?
 5   A.   It could have been 1995.  You know, we had Kroger people
 6   fly to one of our farms in 1976.
 7   Q.   So is it fair to say you don't know when the conversation
 8   occurred?
 9   A.   Tom did.  He wasn't in that position back then.  It would
10   have been in the 2000s, at some point in time when he was
11   involved.
12   Q.   Any time in the 2000s?
13   A.   That's what I would speculate.  I don't remember the
14   exact dates.
15          MR. SLATER:  Nothing further, Your Honor.
16          THE COURT:  Mr. King.
17          MR. KING:  I have some redirect or whatever,
18   re-redirect.
19          THE COURT:  You're back.
20          MR. KING:  I'm back.
21                  REDIRECT EXAMINATION
22   BY MR. KING:
23   Q.   You were shown a couple exhibits, one from Walmart and
24   one from Pace Dairy.  What is Pace -- explain to the jury what
25   Pace Dairy is.
```

89

1   A.   Pace Dairy a owned division of Kroger that they done --
2   they made like American Kraft processed cheese there where
3   they'd melt cheese and make the slices and do the wrapping.
4   That's the plant they did that at.
5   Q.   Did Pace Dairy at any time purchase eggs for Kroger?
6   A.   At that time, they did most of the purchasing.
7   Q.   Now --
8   A.   It was -- it was just -- I don't know why they called it
9   Pace Dairy.  It was Kroger.
10  Q.   Okay.  You indicated in response to
11  Mr. Slater's questions that the program -- although the
12  Certified Program came into existence in April 2002, it wasn't
13  fully implemented?
14  A.   Correct.
15       MR. KING:  So if we can just pull up -- we'll use
16  this one already marked as an exhibit.  It's the 2006 edition
17  of the Certified Program.  It's PX-308.  It's already been
18  admitted.  And if we could turn to -- it's page 15.  Actually,
19  it's PX-16.  I guess it's page 16.  There we go.  If we can
20  just blow up the table right there.
21  BY MR. KING:
22  Q.   You mentioned the phase-in, phase-in of cage space
23  requirements?
24  A.   Yes.
25  Q.   And the phase-in, it began on April 1st, 2002, right?

90

1   A.   Yes.
2   Q.   For -- for chicks that were hatched after April 1st,
3   2002, right?
4   A.   Correct.
5   Q.   And so how -- how was this phase-in, to your
6   understanding, supposed to work after it went into effect in
7   April of 2002?
8   A.   Well, there would be no eggs from this program available
9   until probably January of the following year and then just
10  very few.
11  Q.   In 2003?
12  A.   It would be January 2003 before any would be available.
13  Q.   And did a producer before -- like Rose Acre, before it
14  became certified under this phase-in, did it have to pass an
15  audit?  Do you remember?
16  A.   I don't recollect that.
17  Q.   Okay.  Do you remember exactly when Rose Acre became
18  certified?
19  A.   The record would show.  I don't remember the exact date.
20  Q.   I'd like to hand to you what we'll mark as Exhibit D-24.
21       MR. KING:  A copy for the Court.  Counsel.
22       May I approach the witness, Your Honor?
23       THE COURT:  Yes.
24  BY MR. KING:
25  Q.   This is -- it says Pace Dairy at the very top, Rose Acre

91

1   Farms.  And it appears to be an agreement between Pace Dairy
2   and Rose Acre Farms?
3   A.   Yes.
4   Q.   February 2, 2003 -- effective on February 2nd, 2003; is
5   that right?
6   A.   Yes.
7   Q.   And remain in effect until January 31, 2004?
8   A.   Yes.
9   Q.   And if I look at the very back page of the document, it
10  appears to be signed?
11  A.   Yes.
12  Q.   By whom?
13  A.   Gary Stull.
14  Q.   On behalf of who?
15  A.   Kroger.
16  Q.   And it's actually signed on behalf of Pace Dairy?
17  A.   Yes.
18  Q.   And then who signed on behalf of Rose Acre?
19  A.   Greg Hinton.
20  Q.   And is this -- is this -- what is this document?  Is it a
21  contract?
22  A.   It's a contract.
23  Q.   Is it a contract that you would have had some
24  responsibility for at Rose Acre?
25  A.   Greg would have had.

92

1   Q.   And would you have had some responsibility at the time as
2   vice president of the company?
3   A.   I might have seen it; I might not have.
4   Q.   Does this appear to be an agreement between Rose Acre and
5   Pace Dairy?
6   A.   Yes.
7   Q.   And you recognize Mr. Hinton's signature?
8   A.   Yes.
9       MR. KING:  Your Honor, we'd like to now offer
10  Exhibit D-24 into evidence.
11       MR. SLATER:  No objection.
12       MR. BLECHMAN:  No objection, Your Honor.
13       THE COURT:  D-24 is admitted.
14       (Exhibit received in evidence.)
15  BY MR. KING:
16  Q.   All right.  So this agreement, again we'll go to the
17  first page, please.  The first page, if we could cull out the
18  first paragraph.  It says:  This agreement supersedes any
19  previous agreement between Pace Dairy...
20       Again, you said that's really Kroger, right?
21  A.   Correct.
22  Q.   ...and Rose Acre Farms and shall be effective on
23  February 2, 2003, and shall remain in effect until January,
24  2004.
25  A.   Correct.

93

1   Q.   And so this is after the Certified Program actually takes
2   hold in 2003, right?
3   A.   This would have been the first eggs that actually got
4   produced under the program.
5   Q.   And if you could turn, sir, to the last page,
6   paragraph 15, Roman Numeral XV, if we could cull that out, and
7   it says, does it not:  Animal welfare certification.  Rose
8   Acre Farms must show proof that they are a certified company
9   under the UEP Guidelines for the Animal Husbandry Guidelines
10  for U.S. Egg-Laying Flocks.  A copy must be attached to this
11  contract.  Kroger will not accept any eggs from Rose Acre
12  Farms that have not been 100 percent produced in these terms.
13            Do you see that, sir?
14  A.   Yes.
15  Q.   And what did you understand that to mean?
16  A.   This was the program or what they told us before we
17  joined that they was going to.  And we had to be part of it if
18  we was going to sell them eggs.
19  Q.   Is Kroger a large company?
20  A.   They're the second largest food retailer in the U.S., or
21  the world maybe, I'm not sure.
22  Q.   As between Rose Acre and Kroger, who sets the terms for
23  purchases of eggs, Kroger or Rose Acre?
24  A.   Kroger.
25  Q.   And is it conceivable to you, Mr. Rust, that Kroger,

94

1   which put this provision in its contracts, did not understand
2   what it required -- what being a certified company required?
3            MR. BLECHMAN:  Objection, Your Honor.  That calls
4   for speculation by this witness.
5            THE COURT:  Well, the question is whether it's
6   conceivable to the witness.  So focusing on that part of the
7   question, I'll overrule the objection.
8            THE WITNESS:  Repeat the question.
9   BY MR. KING:
10  Q.   Is it conceivable to you, Mr. Rust, that a company like
11  Kroger, the second largest retailer in the United States, one
12  of the largest supermarket chains in the United States, is it
13  conceivable to you that they would not understand what it
14  meant to be a certified company under the UEP Guidelines for
15  the Animal Husbandry Guidelines for U.S. Egg-Laying Flocks?
16  A.   Not conceivable.  They wouldn't know what it was.  They
17  were part of FMI that wanted and asked for the program.
18  Q.   Was it conceivable to you in 2003, when this contract was
19  entered into, that they would not understand that?
20  A.   No.
21  Q.   What about later, down the road, when they ordered eggs
22  from Rose Acre?
23  A.   They still demand it today.
24  Q.   And I'd also like to show you another document, sir.
25            By the way, what is -- what is Country Creek?

95

1   There's an organization called Country Creek?
2   A.   Country Creek is an independent company in Bentonville,
3   Arkansas, that Walmart hired as what they call their category
4   manager to manage all their egg purchases.
5   Q.   Do they still handle egg purchases or --
6   A.   They're still very involved.  I don't know the details,
7   but they're still very involved.  They're probably still the
8   largest supplier.
9   Q.   Did Rose Acre sell eggs to Walmart through Country Creek?
10  A.   Yes.
11  Q.   I'm going to hand you what we'll mark as Exhibit PX-716.
12            MR. KING:  This is for the Court.
13            May I approach the witness, Your Honor?
14            THE COURT:  Yes, you may.
15  BY MR. KING:
16  Q.   Mr. Rust, I've handed you what's been marked as PX-716.
17  The cover is an e-mail from Justin Whaley.  You mentioned
18  Justin Whaley earlier?
19  A.   Yes.
20  Q.   And again, who is Justin Whaley?
21  A.   He was the guy with Country Creek Foods.
22  Q.   Country Creek?
23  A.   Yeah.  He was one of the proprietors or whatever you call
24  it, one of the partners in it.
25  Q.   Did he have responsibility for the acquisition of eggs?

96

1   A.   Yes.
2   Q.   Did he have responsibility for the acquisition,
3   procurement of eggs for Kroger -- I mean, excuse me -- for
4   Walmart?  I apologize.
5   A.   Yes.
6   Q.   All right.  And this is -- the e-mail's dated March 7,
7   2007, and it's to Greg Hinton?
8   A.   Yes.
9   Q.   And then attached to the e-mail is -- it looks like a
10  draft supply agreement.  Do you see that?
11  A.   Yes.
12  Q.   And it's a draft agreement between Rose Acre and
13  CCF Brands?
14  A.   Yeah.
15  Q.   What is CCF Brands?
16  A.   Country Creek Foods Brands.
17  Q.   And then -- and then if you go maybe midway through the
18  document, if you go -- it's Bates-numbered, I guess if you use
19  the bottom Bates number, PX07160014.
20  A.   Okay.
21  Q.   And this is a business guide, CCF Brands?
22  A.   Yes.
23  Q.   It looks like it was provided to Rose Acre through
24  Mr. Hinton?
25  A.   That's what it looks like.

97

```
1   Q.   Is this something -- this business guide for CCF Brands
2   supplying partners, is this something that you would have had
3   some responsibility for in connection with the business of
4   Rose Acre?
5   A.   Yeah, Greg would.
6   Q.   And did Greg work under you?
7   A.   Yes.
8        MR. KING:  Your Honor, we'd now like to offer
9   Exhibit PX-716 into evidence.
10       MR. SLATER:  No objection.
11       THE COURT:  716 is admitted.
12       (Exhibit received in evidence.)
13  BY MR. KING:
14  Q.   And if we can focus on the CCF business guide, again, CCF
15  is Country Creek, correct?
16  A.   Country Creek.
17  Q.   Country Creek business eggs for Walmart?
18  A.   They're what they call the category manager, whatever
19  that means.
20  Q.   And this business guide, which is attached to a draft
21  supply agreement, if you go to the second page, and it says --
22       MR. KING:  No, second page, I'm sorry.  There we go.
23  If you can cull out the top, there we go.  Yeah, the top
24  there.
25  BY MR. KING:
```

98

```
1   Q.   It says:  CCF Brands, WM expectations.
2        Do you have any idea what WM means?
3   A.   Walmart.
4   Q.   Walmart.
5        And do you see where it says that:  We require all
6   supplying partners have good business practices, be
7   trustworthy and provide the highest quality product and
8   services in all facets of the business?
9        Do you see that?
10  A.   Yes.
11  Q.   And then if you go to the third sentence, it says:  We
12  require that all companies be a member of the United Egg
13  Producers Animal Care Certified ACC Program.
14       Do you see that?
15  A.   Yes.
16  Q.   And what do you understand that to mean?
17  A.   That anyone selling them has to be a member of that
18  program.
19  Q.   And you were -- you were shown earlier some
20  specifications for Walmart that were from, I think, around
21  2002.  If you could go to the second -- the next page of this
22  document.
23  A.   Um-hum.
24  Q.   And do you see where it says -- it says -- cull at the
25  very top.  There we go, yeah.
```

99

```
1        Where it says:  Walmart Store, Inc., Grade A shell
2   egg specifications.
3        Do you see that?
4   A.   Yeah.
5   Q.   What do you understand this to show?
6   A.   Their specifications.
7   Q.   For eggs?
8   A.   For eggs.
9   Q.   Shell eggs?
10  A.   Shell eggs.
11  Q.   And if we could turn a few pages in, it's PX7160019.  Do
12  you see that?  It's part of the specifications.  And if we
13  could go down to the third-to-the-last paragraph, if we could
14  cull that out.
15       Do you see that?
16  A.   Yes.
17  Q.   And it says -- actually, can we cull -- we can't really
18  see it very well.
19  A.   I can see it.
20  Q.   All right.  Do you see where it says -- the third
21  paragraph there:  Suppliers must also abide by the FMI --
22  wrong one.
23       Suppliers must also abide by the FMI and UEP Animal
24  Care Guidelines.
25       Do you see that?
```

100

```
1   A.   Yes.
2   Q.   What did you understand that to mean?
3   A.   We had to follow their rules and be under the Animal
4   Welfare Program.
5   Q.   And if we could go back to PX-71616, the first page of
6   the specifications, the very top.  Do you see where it says:
7   Date issued?
8   A.   Yes.
9   Q.   The very top.  And what's that date?
10  A.   2004.
11  Q.   August 16, 2004.
12  A.   Yes.
13  Q.   And that's after the Certified Program took hold in early
14  2003?
15  A.   Yes.
16       MR. KING:  Nothing further.
17       THE COURT:  Anything more from anybody?
18          FURTHER REDIRECT EXAMINATION
19  BY MR. SLATER:
20  Q.   Do you have D-24 in front of you?
21  A.   Yes.
22  Q.   Okay, this document is dated February 2nd, 2003, correct?
23  A.   Yes.
24  Q.   And that's before the backfilling ban was put into place
25  in 2005?
```

101

```
1   A.   I think so.
2   Q.   By 2003, what percentage of the productive egg capacity
3   in the country had signed up to be in the UEP Certified
4   Program?
5   A.   I don't recall that number.
6   Q.   It was over 90 percent, wasn't it?
7   A.   I don't think it was that high that early.  I don't
8   remember, but I -- you'd have to look at one of these -- I'm
9   sure it's in the newsletters some place.
10  Q.   Wasn't it up to 80 percent almost immediately?
11  A.   I don't recall the number, sir.
12  Q.   Do you know Gary Stull?
13  A.   Yeah.  He was the former -- he retired.  He used -- he
14  was the first egg buyer we dealt with there.
15  Q.   And with regard to the PX-716 -- I'm not sure exactly of
16  the place in the document, but your counsel read a line from
17  the document that said the supplier had to comply with both
18  the FMI and the UEP Guidelines.  Do you recall that?
19  A.   Yes.
20  Q.   Okay.  Have you reviewed the FMI Guidelines?
21  A.   I think I did.  I don't recall specifically, but I think
22  it was -- that was one my brother-in-law did.
23  Q.   It doesn't include the 100% rule, does it?
24  A.   I don't recall.
25  Q.   It doesn't include a no backfilling rule, does it?
```

102

```
1   A.   I don't recall.
2        MR. SLATER:  No further questions, Your Honor.
3        MR. KING:  Nothing further.
4        THE COURT:  Okay.  Mr. Rust, you may step down.
5        Ladies and gentlemen, although I know there is
6   another witness ready to proceed, I have some homework for the
7   kids that are being kept for lunch recess, so I'm going to
8   excuse you now for your lunchtime, asking you to be back at
9   like 20 after one, okay?  So a teeny bit more than an hour.
10  We will resume then.  There is a live witness at that time --
11  Yes?
12       MR. BLECHMAN:  Yes, Your Honor.
13       THE COURT:  So enjoy the lunchtime.  Stay warm.
14  Don't talk about the case and we'll see you in a bit.
15       THE DEPUTY CLERK:  All rise.
16       (Jury out.)
17       THE COURT:  Okay, those of you who are uninterested
18  in the Hendrix deposition designation dispute, you may enjoy
19  lunch.  Those of you who are just desperate to wait and see
20  what happens there can stay around.
21       MR. BLECHMAN:  While people are getting into
22  position, if I might ask a question.
23       THE COURT:  Sure.
24       MR. BLECHMAN:  I've noted that the same law firm
25  that represents UEP and USEM has had different lawyers
```