# ATTACHMENT 63

Page 1

1  IN THE DISTRICT COURT OF WAYNDOTTE COUNTY, KANSAS
2       TWENTY-NINTH JUDICIAL DISTRICT
3  _____
4  ASSOCIATED WHOLESALE GROCERS,   |
5  INC., et al.,                   |
6       Plaintiffs,     | Case No. 10CV2171
7    v.                            |
8  UNITED EGG PRODUCERS, et al.,   |  HIGHLY CONFIDENTIAL
9       Defendants.     |
10 _____
11            Monday, February 17, 2014
12            9:00 a.m.
13
14      Videotaped deposition of BETH SCHNELL, convened at
15 the law offices of Hutchinson P.A., 907 East Wayzata
16 Boulevard, Suite 330, Wayzata, Minnesota 55391, pursuant
17 to notice, the proceedings being recorded
18 stenographically by Jonathan Wonnell, a Registered
19 Professional Court Reporter (NCRA #835577) and Notary
20 Public of the State of Minnesota, and transcribed under
21 his direction.
22
23
24
25

Page 2

1        A P P E A R A N C E S   O F   C O U N S E L
2
3       On behalf of the Plaintiffs:
4           RACHEL E. SCHWARTZ, ESQ.
5           Stueve Siegel Hanson LLP
6           460 Nichols Road, Suite 200
7           Kansas City, Missouri 64112
8           (816) 714-7110
9           schwartz@stuevesiegel.com
10
11      On behalf of Sparboe Farms:
12          TROY J. HUTCHINSON, ESQ.
13          Hutchinson P.A.
14          907 East Wayzata Boulevard, Suite 330
15          Wayzata, Minnesota 55391
16          (952) 215-0141
17          thutchinson@hutchinson-legal.com
18
19      On behalf of Rose Acre Farms:
20          MOLLY S. CRABTREE, ESQ.
21          Porter, Wright, Morris & Arthur LLP
22          41 South High Street, Suites 2800-3200
23          Columbus, Ohio 43215-6194
24          (614) 227-2015
25          mcrabtree@porterwright.com

Page 3

1        A P P E A R A N C E S  (Cont'd)
2
3       On behalf of United Egg Producers and US Egg
4          Marketers:
5           ROBIN P. SUMNER, ESQ. (via phone)
6           Pepper Hamilton LLP
7           3000 Two Logan Square
8           Eighteenth and Arch Streets
9           Philadelphia, Pennsylvania 19103-2799
10          (215) 981-4000
11
12      On behalf of the Defendants Land O'Lakes,
13         Moark and Norco Ranch:
14          TRAVIS A. KENNEDY, ESQ. (via phone)
15          Eimer Stahl LLP
16          224 South Michigan Avenue, Suite 1100
17          Chicago, Illinois 60604
18          (312) 660-7600
19          tkennedy@eimerstahl.com
20
21
22
23
24
25

Page 4

1        A P P E A R A N C E S  (Cont'd)
2
3       On behalf of Midwest Poultry:
4           E. JASON BURKE, ESQ. (via phone)
5           Faegre Baker Daniels
6           311 South Wacker Drive, Suite 4400
7           Chicago, Illinois 60606-6622
8           (312) 212-2264
9           jason.burke@faegrebd.com
10
11
12 ALSO PRESENT:
13     ADAM WALLIN, Videographer
14     JONATHAN WONNELL, Court Reporter
15
16
17
18
19
20
21
22
23
24
25

Page 5

```
 1        C O N T E N T S
 2 WITNESS                        PAGE
 3 BETH SCHNELL
 4    Examination By Ms. Schwartz:      10
 5
 6       Afternoon Session - Page  135
 7
 8      E X H I B I T S   M A R K E D
 9 LABEL/DESCRIPTION               PAGE
10 Plaintiff's Exhibit 478 - Amended Notice of    14
     Deposition
11
   Plaintiff's Exhibit 479 - Org chart (SF106730)   23
12
   Plaintiff's Exhibit 480 - Org chart (SF123870)   27
13
   Plaintiff's Exhibit 481 - PowerPoint presentation  36
14   (SFKS000481 to 000490)
15 Plaintiff's Exhibit 482 - E-mail from Lee      56
     Regensburger (SFKS000235 to 000259)
16
   Plaintiff's Exhibit 483 - PowerPoint presentation  63
17   (SF007294 to 007305)
18 Plaintiff's Exhibit 484 - List of UEP Board of   90
     Directors (UE0847760 to 0847766)
19
   Plaintiff's Exhibit 485 - Sparboe's Supplemental  95
20   Objections and Responses to Plaintiff's
     First Requests for Admission to the Egg
21   Producer Defendants
22 Plaintiff's Exhibit 486 - List of UEP Producer   100
     Committee For Animal Welfare members
23   (UE0331878)
24 Plaintiff's Exhibit 487 - Minutes from May 2001 UEP 107
     Board of Directors meeting (UE0296013 to
25   0296015)
```

Page 6

```
 1    E X H I B I T S   M A R K E D   (Cont'd)
 2 LABEL/DESCRIPTION               PAGE
 3 Plaintiff's Exhibit 488 - History of UEP Animal   109
     Care Certified Program (SF121458 to 121459)
 4
   Plaintiff's Exhibit 489 - E-mail from Gene Gregory  118
 5   (MPS-Kansas00078052 to 00078057)
 6 Plaintiff's Exhibit 490 - E-mail from Garth Sparboe 140
     (SF000138 to 000139)
 7
   Plaintiff's Exhibit 491 - Faxed letter from Gene   149
 8   Gregory (UE0331258 to 0331270)
 9 Plaintiff's Exhibit 492 - Memo from Brian Joyer   154
     (SF123824 to 123825)
10
   Plaintiff's Exhibit 493 - E-mail from Ken Zachman  159
11   (SF000153 to 000154)
12 Plaintiff's Exhibit 494 - E-mail from Ken Murch   161
     (SF00155 to 00156)
13
   Plaintiff's Exhibit 495 - Cage layers audit    170
14   documents (SF124902, 124903, 124906 to 124907
     and 124910 to 124911)
15
   Plaintiff's Exhibit 496 - Letter from Robert    187
16   Sparboe (SF067800 to 067801)
17 Plaintiff's Exhibit 497 - Letter from Bob Sparboe  190
     (SF105990 to 105991)
18
   Plaintiff's Exhibit 498 - Letter from Bob Sparboe  190
19   (SF047547 to 047548)
20 Plaintiff's Exhibit 499 - Letter from Robert    194
     Sparboe (SF000165 to 000166)
21
   Plaintiff's Exhibit 500 - Memo from Bob Sparboe   202
22   (SF047721 to 047727)
23 Plaintiff's Exhibit 501 - Letter from Bob Sparboe  207
     (SF000875 to 000876)
24
25
```

Page 7

```
 1    E X H I B I T S   M A R K E D   (Cont'd)
 2 LABEL/DESCRIPTION               PAGE
 3 Plaintiff's Exhibit 502 - Fax from John Mueller   220
     (UE_PRIV_131 to 0000133)
 4
   Plaintiff's Exhibit 503 - Handwritten notes    223
 5   (SF120568 to 120569)
 6 Plaintiff's Exhibit 504 - Letter from Bob Sparboe  226
     (SF000172)
 7
   Plaintiff's Exhibit 505 - Letter from Beth Sparboe  234
 8   Schnell (SF121272)
 9 Plaintiff's Exhibit 506 - E-mail from Chad Gregory  238
     (SF124613 to 124619)
10
   Plaintiff's Exhibit 507 - Video from Mercy for   261
11   Animals (stored on a zip drive when
     introduced)
12
   Plaintiff's Exhibit 508 - Letter from Elizabeth   262
13   Waltrip (SF124149 to 124156)
14 Plaintiff's Exhibit 509 - E-mail from Gene Gregory  264
     (RAFKS12296 to 0012299)
15
   Plaintiff's Exhibit 510 - Article printed from    266
16   thedenverchannel.com entitled "Egg Farm
     Backs Off Spokesman's Cruelty Video
17   'Staged' Claim"
18 Plaintiff's Exhibit 511 - E-mail from Judy Sillman  271
     (PLTF183941-AWG to 0183943-AWG)
19
   Plaintiff's Exhibit 512 - E-mail from Gene Gregory  272
20   (CM-KS-29403 to 29405)
21 Plaintiff's Exhibit 513 - "United Voices" dated   283
     3/6/2000 (NL003281 to 03290)
22
   Plaintiff's Exhibit 514 - Invoice from EUP     285
23   (UE0101227 to 1011228)
24 Plaintiff's Exhibit 515 - Letter from Linda     321
     Whiteside (SFKS000407 to 000408)
25
```

Page 8

```
 1    E X H I B I T S   M A R K E D   (Cont'd)
 2 LABEL/DESCRIPTION               PAGE
 3 Plaintiff's Exhibit 516 - E-mail from Michael    322
     Johnson (SFKS000421 to 000422)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

1    P R O C E E D I N G S
2                    (9:09 a.m.)
3        THE VIDEOGRAPHER:  We are on the record.
4    This is the videotaped deposition of Beth Schnell
5    taken on February 17th 2014.  The time now is
6    9:07 a.m.  This deposition is being taken in the
7    matter of Associated Wholesale Grocers
8    Incorporated, et al. versus United Egg Producers,
9    et al. in the District Court of Wyandotte County,
10   Kansas, 29th Judicial District, Case Number
11   10CV2171.
12       This deposition is taking place in
13   Wayzata, Minnesota.  My name is Adam Wallin.  I am
14   the videographer representing Henderson Legal
15   Services.  Will counsel please identify themselves
16   for the record.
17       MS. SCHWARTZ:  Rachel Schwartz, counsel
18   for the plaintiffs.
19       MR. HUTCHINSON:  Troy Hutchinson on
20   behalf of Sparboe Farms.
21       MS. CRABTREE:  Molly Crabtree on behalf
22   of Rose Acre Farms.
23       MR. HUTCHINSON:  If we can have the
24   attorneys on the phone identify themselves.
25       MS. SUMNER:  Robin Sumner on behalf of

Page 10

1    the United Egg Producers and United Egg Marketers.
2        MR. BURKE:  Jason Burke on behalf of
3    Midwest Poultry Services.
4        MR. KENNEDY:  Travis Kennedy on behalf
5    Moark, LLC, Moark Incorporation, Land O'Lakes and
6    Norco Ranch.
7        MR. HUTCHINSON:  Robin, we missed your
8    name on the audio.
9        MS. SUMNER:  All right.  Robin Sumner,
10   Pepper Hamilton, LLP, on behalf of UEP and USEM.
11       MS. SCHWARTZ:  Is there anybody else on
12   the phone?
13            * * * * *
14   Whereupon,
15            BETH SCHNELL,
16   called as a Witness, was duly sworn by
17   Jonathan Wonnell, a Notary Public in and
18   for the State of Minnesota, and was
19   examined and testified as follows.
20            * * * * *
21   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
22   BY MS. SCHWARTZ:
23   Q.   Good morning, Ms. Schnell.
24   A.   Good morning.
25   Q.   We met for the first time just a few

Page 11

1    minutes ago.  My name is Rachel Schwartz and I'm
2    here today on behalf of the plaintiffs.  Thank you
3    for coming on this very snowy morning, although I
4    understand this is more typical weather in
5    Minnesota than we are used to elsewhere.  As I told
6    Troy, this is a blizzard in Kansas as opposed to
7    just a Monday.
8        I appreciate you taking the time out of
9    your schedule for the deposition today.  Have you
10   had your deposition taken before?
11   A.   In this case?
12   Q.   Let's start with ever.
13   A.   I have.
14   Q.   And so you understand today that you are
15   under oath?
16   A.   Yes.
17   Q.   And you understand that your testimony
18   today is being transcribed by the court reporter?
19   A.   Yes.
20   Q.   And you understand that you're also
21   being videotaped today?
22   A.   Yes.
23   Q.   And you understand that the deposition
24   this morning is for the litigation that's currently
25   pending in Kansas?

Page 12

1    A.   Yes.
2    Q.   And you understand that by being under
3    oath, your job today is to tell the truth, correct?
4    A.   Yes.
5    Q.   And if I ask you a question and you
6    don't understand, can I have your assurance you'll
7    ask me to clarify if you need any help
8    understanding the questions?
9    A.   I will.
10   Q.   And to make sure that we have got a
11   clean transcript today, if you can -- and you've
12   done a good job already -- but just make sure to
13   verbalize yes or no rather than a shake of the
14   head.
15   A.   I will.
16   Q.   There may be times during the day where
17   your counsel may object.  If you'll let him get his
18   objection on the record, and then I will ask you to
19   answer my question if you can.  Okay?
20   A.   Yes.
21   Q.   And if you need to take a break at any
22   time during the day, I hope you'll let me know.
23   And if we're in the middle of a question, we'll
24   finish that question and we can take a break at
25   your convenience.

Page 13

1    A.    Okay.  Thank you.
2    Q.    I'll probably end up taking a break
3 about every hour or so just to give us a chance to
4 stand up.  Now, you've said you've had your
5 deposition taken before, correct?
6    A.    Mm-hmm.
7    Q.    How many times?
8    A.    Well, I had one deposition taken in the
9 matter of an estate matter with my father's estate.
10 Twice.  I've had two.
11    Q.    And outside of the two depositions for
12 an estate matter, have you had your deposition
13 taken before?
14    A.    Not to my recollection.
15    Q.    And you have not been deposed in the
16 litigation that's currently occurring in
17 Pennsylvania; is that correct?
18    A.    No.  No.
19    Q.    And other than those two depositions in
20 an estate matter, have you ever had your deposition
21 taken?
22    A.    Not to my recollection.
23    Q.    If we could go ahead and mark what is
24 Deposition Exhibit 478, which is the amended
25 deposition notice.

Page 14

1          (Plaintiff's Exhibit 478 was marked
2              for identification.)
3          BY MS. SCHWARTZ:
4    Q.    And let me start by asking have you seen
5 this document before?
6    A.    Yes.
7    Q.    And do you recall when the first time
8 you saw this document was?
9    A.    I don't recall.
10    Q.    Now, you've mentioned that you've had
11 your deposition taken twice before.  I assume
12 neither of those was in a corporate representative
13 capacity?
14    A.    I don't know.
15    Q.    Let me ask.  For your deposition in the
16 estate matter --
17    A.    No.
18    Q.    -- was the deposition just of you
19 personally?
20    A.    No.  It was a matter as a trustee.
21    Q.    As a trustee.  Okay.  And do you
22 understand today that you are being deposed both in
23 your individual capacity and as a representative of
24 Sparboe?
25    A.    I do, yes.

Page 15

1    Q.    And what do you understand your
2 testimony today on behalf of the company to entail?
3    A.    The company's activities surrounding
4 this case from 1999 to present.
5    Q.    And do you understand that it's not just
6 your personal --
7    A.    Correct, I do.
8    Q.    -- knowledge; that you are testifying
9 today on behalf of the company as if the company
10 were being deposed today?
11    A.    I understand that.
12    Q.    And what did you do to prepare for this
13 deposition today?
14    A.    I had numerous meetings with Troy,
15 reviewed numerous documents, had -- spent a great
16 deal of time with Troy and others in meetings on
17 the phone.
18    Q.    Okay.  Do you remember when the first
19 one of those meetings to prepare for the deposition
20 today occurred?
21    A.    I do not.  It's been a long time of
22 preparation.  So I don't remember when the first
23 specific meeting took place.
24    Q.    Fair to say it's before this week?
25    A.    Absolutely.

Page 16

1    Q.    And before last week?
2    A.    Yes.
3    Q.    Do you have a sense as to whether any of
4 those meetings occurred even in 2013?
5    A.    I think this case has been going on for
6 years.  So I would -- before 2013 or 2014?
7    Q.    Fair enough.  Let me step back.  I'm not
8 asking about meetings you may have had with
9 Mr. Hutchinson to discuss the lawsuit in general.
10    A.    Yeah.
11    Q.    I'm asking specifically about any
12 meetings you've been in to prepare for the
13 deposition today.
14    A.    I -- hmm.  I guess I would say there
15 have been discussions and meetings related to the
16 Kansas case, as we referred to it, in 2013, yes.
17    Q.    And at what time did you understand that
18 you were going to be Sparboe's corporate
19 representative at the deposition today?
20    A.    At some point, I'm sure, in 2013.
21    Q.    And you mentioned that you've had
22 numerous meetings, correct?
23    A.    Mm-hmm.
24    Q.    And reviewed documents, correct?
25    A.    Mm-hmm.

Page 17

1    Q.    And you've had communications with
2  others as well, correct?
3    A.    Mm-hmm.
4    Q.    Let me start with the meetings that
5  you've had.  Other than Mr. Hutchinson, who has
6  been at any of those meetings?
7    A.    Oh.  I think that's a difficult question
8  because as we've looked at various -- maybe they've
9  been by phone call, but we've certainly been
10 contacting salespeople or -- are you asking me
11 specifically who has been in attendance?
12   Q.    I am.  And let me break that question
13 for you.
14   A.    Perhaps you could be more clear on that.
15   Q.    At any of these meetings, have you met
16 with anyone who is not a current or former Sparboe
17 employee?
18   A.    No.
19   Q.    And to the best of your recollection,
20 who have you met with that is a current or former
21 Sparboe employee to prepare specifically for
22 today's deposition?
23   A.    And you're asking for the names?
24   Q.    Correct.
25   A.    Wayne Carlson.  Ken Zachman.  Mike

Page 18

1  Johnson.  Other people to prepare -- Craig Boesen.
2  And I'd say those -- that's probably the extent.
3    Q.    And are these all current employees at
4  Sparboe?
5    A.    Yes.
6    Q.    Did you meet with any former employees?
7    A.    Garth Sparboe is a contractual employee,
8  and we met with Garth Sparboe as well.
9    Q.    Sitting here today, do you specifically
10 recall anyone else?
11   A.    No.  Perhaps there are others, but at
12 the top of my head, no.
13   Q.    Fair enough.  And you had mentioned that
14 you had reviewed documents to prepare for today.
15   A.    Mm-hmm.
16   Q.    To the best of your knowledge, have all
17 of those documents been produced in this
18 litigation?
19   A.    I'm sure they have.  We've produced
20 thousands of documents.
21   Q.    Sitting here today, do you specifically
22 recall any document you reviewed that has not been
23 produced in this litigation?
24   A.    No.
25   Q.    Did you take any notes during those

Page 19

1  preparation sessions?
2    A.    Probably not.  Maybe jotted down on
3  documents on copies of things.
4    Q.    And looking at what's in front of you,
5  it doesn't appear that any of those notes are with
6  you today?
7    A.    Hmm-mm.
8    Q.    Let me ask with regard to the Kansas
9  litigation -- and do you mind if we refer to that
10 as the Kansas litigation throughout the day?
11   A.    No problem.
12   Q.    And the other litigation is the
13 multi-district litigation that's occurring in
14 Pennsylvania.
15   A.    Mm-hmm.
16   Q.    If I refer to the MDL litigation, will
17 you know what I'm talking about?
18   A.    That's consistent with our terminology.
19   Q.    Very good.  Make this easier for all of
20 us.  Talking specifically of about the Kansas
21 litigation, when do you recall first becoming aware
22 of the Kansas litigation?
23   A.    Probably when we were -- when Troy
24 informed me that we were named a defendant in the
25 case.  I don't have the date.

Page 20

1    Q.    If I would represent that the lawsuit
2  was filed in December of 2010, would you imagine
3  that it would be around that time period?
4    A.    I would, yes.
5    Q.    And at that time, Sparboe was already
6  involved in the MDL litigation, correct?
7    A.    I believe so.
8    Q.    And you had been involved in that
9  litigation since approximately 2008; is that
10 correct?
11   A.    No.  I don't think so.  I think we were
12 involved in that case later but, again, I would
13 have to verify the dates.  I don't have the dates
14 in my head.
15   Q.    To the best of your recollection, were
16 you involved with that litigation when the first
17 lawsuits were filed?
18   A.    No.
19   Q.    You were involved later?
20   A.    Yes.
21   Q.    And to your recollection sitting here,
22 what was it that brought Sparboe into the
23 litigation in the MDL?
24   A.    I do not -- I'm not sure why we are in
25 that case.  I have -- I can't understand why we're

Page 21

1 involved that case, or were involved in that case.
2     Q.    And are you currently still involved in
3 the MDL litigation?
4     A.    Yes.
5     Q.    And in what capacity are you involved in
6 the MDL litigation?
7     A.    Is that what we refer to as the opt-out
8 case, the MDL?
9         MR. HUTCHINSON:  Yes.
10     A.    Correct.  We were named as a member of
11 the United Egg Producers as an egg production
12 company in the opt-out case.
13         BY MS. SCHWARTZ:
14     Q.    And that's distinguishing from the class
15 cases --
16     A.    Correct.
17     Q.    -- that are pending in the MDL?
18         Other than the individuals that we've
19 talked about who are current Sparboe employees and
20 a contractual employee for Sparboe, have you met
21 with anyone else to prepare for the deposition
22 today?
23     A.    No.
24     Q.    Have you met with counsel for any other
25 defendant in this litigation?

Page 22

1     A.    No.
2     Q.    Throughout the day, I'll be referring to
3 the document that you've got in front of you, which
4 is Deposition Exhibit 478.  And if you can turn to
5 page 2 of that, and you see starting on page 2 that
6 you've got a number 1 and a number 2 on that page?
7     A.    Mm-hmm.
8     Q.    Do you see that?
9     A.    Yes.
10     Q.    And do you understand that these are
11 topics that you are going to be speaking on today?
12     A.    Mm-hmm.
13     Q.    And to your knowledge, you have been
14 produced today to speak on all of these topics,
15 correct?
16     A.    Correct.
17     Q.    Great.  We're actually going to start
18 with topic number 1, which is your corporate
19 structure, including your subsidiaries, joint
20 ventures, acquisitions, trade names and any other
21 entity in which you share profits or losses.  Do
22 you see that?
23     A.    Mm-hmm.
24     Q.    And what did you do to prepare for this
25 topic?

Page 23

1     A.    I didn't -- I just understand this.
2     Q.    Fair enough.  I assume other topics took
3 more preparation than this one.
4     A.    Yeah.
5     Q.    To help with this, the discussion of
6 this topic, I've got a couple of your
7 organizational charts.
8     A.    Mm-hmm.
9     Q.    So let me go ahead and mark as
10 Exhibit 479 --
11         MR. HUTCHINSON:  So, Rachel, just to --
12 a point of clarification.  Right now when you're
13 using "you" and "your," you're referring to Sparboe
14 Farms, correct?
15         MS. SCHWARTZ:  I am.  Correct.  The
16 named defendant in the Kansas litigation.
17         THE WITNESS:  Correct.  That's my
18 understanding, right?
19         MR. HUTCHINSON:  Right.
20         (Plaintiff's Exhibit 479 was marked
21         for identification.)
22         BY MS. SCHWARTZ:
23     Q.    Marked as Exhibit 479 is Bates number
24 SF106730.  And this document is entitled "Sparboe
25 Company's Current Sales Marketing Group."  Do you

Page 24

1 see that?
2     A.    I do.
3     Q.    And at the bottom, it looks like it has
4 a date from 2004.
5     A.    Yes.
6     Q.    And would this be consistent with your
7 recollection of Sparboe's structure partially back
8 in 2004?
9     A.    Mm-hmm.
10     Q.    And it shows -- I assume that's you
11 listed as the senior vice president of sales and
12 marketing?
13     A.    Yes.
14     Q.    And today your current title is chief
15 executive officer and president --
16     A.    Correct.
17     Q.    -- is that correct?
18         Do you hold any other titles with the
19 company?
20     A.    I do not.
21     Q.    And did you become the chief executive
22 officer in 2007?
23     A.    No.
24     Q.    When did you become the CEO?
25     A.    2005.

1   Q.   And from -- if I understand correctly,
2 your father, Robert Sparboe, founded the company?
3   A.   Correct.
4   Q.   And that was in 1954?
5   A.   Correct.
6   Q.   And I often see him going by Bob
7 Sparboe; is that correct?
8   A.   Yes.
9   Q.   And was he the CEO up until his passing
10 in 2005?
11   A.   Correct.
12   Q.   Okay.  And looking at this org chart,
13 are any of the individuals listed on here still
14 with the company?
15   A.   Jim -- Jim is.
16   Q.   And that is Jim --
17   A.   Wade.
18   Q.   And is he still the director of food
19 service sales?
20   A.   His title is director of sales.  Yes.
21 He would hold that same title.
22   Q.   And the director of retail sales is
23 listed as Lee.
24   A.   Mm-hmm.
25   Q.   Is he still with the company?

1   A.   No.
2   Q.   And when did he leave, to the best of
3 your knowledge?
4   A.   I don't recall.  I'd have to get back to
5 you on that.
6   Q.   Would it have been multiple years ago?
7   A.   Yeah.
8   Q.   And a Dave is listed as the director for
9 Sparboe Foods.
10   A.   Mm-hmm.
11   Q.   And who is that?
12   A.   Dave Cisneros.
13   Q.   And is he still with the company?
14   A.   No.
15   Q.   And do you recall approximately when he
16 would have left?
17   A.   I do not.  I'm sorry.
18   Q.   Would that also have been multiple years
19 ago?
20   A.   Mm-hmm.  Yeah.
21   Q.   And so looking at this, Mr. Hutchinson
22 raised a good question as to the different Sparboe
23 entities.  What is Sparboe Foods?  Is that the
24 egg -- the layer-owning company?
25   A.   No.

1   Q.   That is not.  What does Sparboe Foods
2 do?
3   A.   Sparboe Foods processes eggs.  Sparboe
4 Foods is the egg-breaking business.
5   Q.   And is that today still the case?
6   A.   Correct.
7   Q.   And are you the CEO of Sparboe Foods as
8 well?
9   A.   Correct.
10   Q.   And does Sparboe Foods own any of your
11 layers?
12   A.   No.
13   Q.   So all of your layers are owned by
14 Sparboe Farms?
15   A.   Correct.
16   Q.   And throughout the day, again, Sparboe
17 Farms is who you're here to testify on behalf of.
18   A.   Yes.  That's my understanding.
19   Q.   I'm going to mark as Exhibit 480 a
20 document Bates labeled SF123870.
21        (Plaintiff's Exhibit 480 was marked
22        for identification.)
23        BY MS. SCHWARTZ:
24   Q.   And at the top, this is listed as the
25 organization chart of Sparboe Companies.  Do you

1 see that?
2   A.   Mm-hmm.
3   Q.   And it appears down in the right-hand
4 corner to have a date of May of 2000.
5   A.   Mm-hmm.
6   Q.   And although this is stepping back in
7 time a little bit from the org chart we just looked
8 at, this looks like a more robust depiction of the
9 organization.  Back in 2000, if we can walk through
10 this, the president would have been your father,
11 Bob Sparboe?
12   A.   Yes.
13   Q.   And would you have been listed there as
14 the senior vice president?
15   A.   Yes.
16   Q.   And that is the senior vice president of
17 marketing and further processing there a little bit
18 on the right-hand side, correct?
19   A.   Mm-hmm.
20   Q.   And the senior vice president of
21 operations is listed as Greg Murch.
22   A.   Mm-hmm.
23   Q.   And is he still with the company?
24   A.   No.
25   Q.   And do you have a sense as to when he

Page 29

1 would have left the company?
2    A.   It would have been 2008 maybe.  I would
3 have to verify that.
4    Q.   And let me ask just about a couple of
5 other people on here whose names are going to come
6 up throughout the day.
7    A.   Mm-hmm.
8    Q.   Going down the list there on the
9 left-hand side, we've talked about Mr. Sparboe.
10 Ken Zachman?
11    A.   Mm-hmm.
12    Q.   And is that one of the individuals you
13 mentioned that you met with?
14    A.   Yes.
15    Q.   And he's listed as an administrative
16 assistant on this org chart, correct?
17    A.   No.  The controller.
18    Q.   Oh, I'm sorry.  The controller there on
19 the right-hand side.  And is his title still as a
20 controller?
21    A.   No.  He's no longer the controller.
22    Q.   Do you know what his title is?
23    A.   That's a good question.  Yes.  It's
24 something to do with financial analyst.  I would
25 have to verify that.  I'm sorry.

Page 30

1    Q.   Does he perform many of the same roles
2 as a financial analyst that he would have as the
3 controller?
4    A.   No.
5    Q.   How is his job today different?
6    A.   We have a different controller today.
7    Q.   And who is your controller today?
8    A.   Craig Boesen.
9    Q.   Who you mentioned meeting with as well?
10    A.   Mm-hmm.  Correct.
11    Q.   Moving down that list, number 3, is that
12 Nita Nurmi?
13    A.   Yup.  Nita.
14    Q.   Nita Nurmi.  And she's listed as an
15 administrative assistant, correct?
16    A.   Correct.
17    Q.   And is she still with the company?
18    A.   Yes.
19    Q.   And is she still in that capacity?
20    A.   No.
21    Q.   What capacity is she in now?
22    A.   Safety -- manager of safety.
23    Q.   And then number 4 is John Mueller.
24    A.   Yes.
25    Q.   And he's listed as an attorney, correct?

Page 31

1    A.   Correct.
2    Q.   And it looks like on the org chart, he
3 was listed as human resources and legal.
4    A.   Yes.
5    Q.   And is he still with the company?
6    A.   No.
7    Q.   And when did Mr. Mueller leave the
8 company?
9    A.   I don't recall.
10    Q.   Would that also have been many years
11 ago?
12    A.   Mm-hmm.  Many years ago.
13    Q.   And under what circumstances did
14 Mr. Mueller leave the company?
15    A.   He was asked to leave the company.
16    Q.   And why was he asked to leave the
17 company?
18    A.   We were -- we were -- well, he reported
19 to a president, a different president, at the time.
20 We just eliminated the in-house counsel position.
21    Q.   And who was the president he would have
22 been reporting to at the time?
23    A.   Jerry Kaminski.
24    Q.   And do you have a sense as to how long
25 Mr. Mueller would have been with the company?

Page 32

1    A.   I don't.
2    Q.   Was he still with the company when you
3 became the CEO?
4    A.   Yes.
5    Q.   So let me ask more about that.  Back in
6 approximately 2000, you would have been the senior
7 vice president of marketing and further processing?
8    A.   I don't recall when I was given the
9 senior vice president title.
10    Q.   Okay.
11    A.   But I was a vice president perhaps or a
12 senior vice president.
13    Q.   And then in 2005, you became the CEO?
14    A.   Mm-hmm.
15    Q.   Were you also made the president at that
16 same time?
17    A.   Just both at the same time.
18    Q.   Trying to understand when John Kaminski
19 would have been president.
20    A.   Jerry Kaminski?
21    Q.   Jerry Kaminski.  Back in 2000 to 2005,
22 would Bob Sparboe have been the CEO and the
23 president during that time?
24    A.   Yes.  Yes.
25    Q.   Starting in 2005, who became the

Page 33

1 president?
2    A.    I was.  And then Jerry Kaminski was
3 hired.  He was with us for one year.  I hired him
4 to -- as president, and he stayed with us about one
5 year during 2006.  So I retained the CEO title.
6    Q.    And why did Mr. Kaminski leave?
7    A.    He took another position.
8    Q.    And at that time, you took on the title
9 as president as well?
10    A.    Mm-hmm.  Yes.
11    Q.    Going back to Exhibit 480, going down
12 the list of people, number 9 is Wayne Carlson.  Do
13 you see that?
14    A.    Yes.
15    Q.    And he is listed as -- if I can find
16 where the number 9 is.  Do you know what his title
17 would have been?
18    A.    Well, here it says coordination manager.
19 I don't know if that was his title.  But that would
20 be his number.  Number 9 attaches to coordination
21 manager.
22    Q.    And he is still with the company today,
23 correct?
24    A.    Yes.
25    Q.    And he was a coordination -- in charge

Page 34

1 of coordination, it sounds like, back in the 2000
2 time period.  What is his title today?
3    A.    Senior vice president of supply chain.
4    Q.    Listed as number 10 is Garth Sparboe.
5    A.    Mm-hmm.
6    Q.    And is that your brother?
7    A.    Yes.
8    Q.    Okay.  And at this time, what would
9 Garth Sparboe's title have been?
10    A.    Well, I don't see it on here.  I don't
11 know.
12    Q.    Outside of looking at this chart, do you
13 have a sense as to what his title would have been?
14    A.    I don't see it on here, number 10.  I'm
15 not sure he's on this chart.
16    Q.    Putting aside the chart, do you have --
17 do you know what his title would have been back in
18 the 2000 time period?
19    A.    I don't.
20    Q.    And you mentioned that he is a
21 contract -- a contractor for Sparboe today,
22 correct?
23    A.    Mm-hmm.
24    Q.    Would he have been a contractor back in
25 the 2000 time period?

Page 35

1    A.    An employee.  And I don't know when he
2 started, but he was an employee at some point in
3 the 2000s.
4    Q.    And what were his job responsibilities
5 back in the 2000 time period?
6    A.    He handled some sales.  He represented
7 the company on the animal welfare committee, or on
8 the development of the animal welfare program with
9 the United Egg Producers.  A variety of things for
10 Bob.
11    Q.    And when did his status with the company
12 change from being a full-time employee to being a
13 contractor?
14    A.    I believe he left the company 2003 or --
15 no.  I don't know.  I'd have to verify that.  I'm
16 sorry.  I don't recall.
17    Q.    And why did he leave the company?
18    A.    He chose to leave.
19    Q.    And what is his contracting capacity
20 today?
21    A.    He's just -- he is a resource.  He's
22 just a resource for us.  He has institutional
23 knowledge about the industry.  So he's a resource.
24    Q.    And is he currently employed elsewhere?
25    A.    He has his own business.

Page 36

1    Q.    And what is that business?
2    A.    He's in real estate and rental
3 properties.
4    Q.    Fair to say it's outside of the egg
5 industry?
6    A.    It is definitely outside of the egg
7 industry.
8    Q.    And looked down the rest of the people
9 on that org chart, I don't believe you mentioned
10 meeting with anyone else who would have been listed
11 there on the left-hand side; is that correct?
12    A.    Correct.
13    Q.    You can put that aside.  I'm going to
14 mark what is Deposition Exhibit 481.
15         (Plaintiff's Exhibit 481 was marked
16         for identification.)
17       BY MS. SCHWARTZ:
18    Q.    And this is Bates number SFKS000481.
19 And do you see at the bottom of the page the Bates
20 number there, the SFKS at the bottom right-hand
21 corner?
22    A.    Mm-hmm.
23    Q.    And do you understand that Bates numbers
24 with an SF prefix were produced by Sparboe in this
25 litigation?

Page 37

1    A.    Correct.
2    Q.    And this appears to be a presentation or
3  a PowerPoint put together by Michael Johnson in
4  March of 2013.
5    A.    Mm-hmm.
6    Q.    And it appears that this was a
7  presentation that may have been done for AWG.
8    A.    Mm-hmm.
9    Q.    Have you seen this document before?
10   A.    I have.
11   Q.    If I could -- sorry.  The last of our
12 org charts.  If you can turn to the page that ends
13 with 85.
14   A.    Mm-hmm.
15   Q.    And this would have been put together in
16 2013.
17   A.    Mm-hmm.
18   Q.    Looking at this organizational structure
19 on page 85, is this consistent with the
20 organization of Sparboe today?
21   A.    This is not an official org structure.
22 It is not, no.
23   Q.    Is the org chart today for the company
24 closer to being what we looked at before from the
25 2000 org chart?

Page 38

1    A.    No.
2    Q.    Is it simpler than this chart or --
3    A.    Yes.
4    Q.    Okay.  Looking at this chart, though,
5  Exhibit 481, it lists you as the president,
6  correct?
7    A.    Mm-hmm.
8    Q.    And that is correct?
9    A.    Yes.
10   Q.    And is your executive assistant still
11 Grace Hoke?
12   A.    Yes.  Yes.
13   Q.    And then looking down this chart a
14 little bit, Mike Johnson is listed as the director
15 of sales strategy and DB.
16   A.    BD.
17   Q.    Oh, I'm sorry, BD.  And what is BD?
18   A.    Business development.
19   Q.    Do you have a current 2013
20 organizational chart?
21   A.    I presume we do.
22   Q.    Looking at this chart in Exhibit 481,
23 why do you know that this is not the current
24 organizational chart?
25   A.    Because I have a new vice president of

Page 39

1  sales.
2    Q.    And who is that new VP?
3    A.    Steve LaQua.  L-a-Q-U-A.
4    Q.    And has he replaced Steve -- is that
5  Cosell?
6    A.    No.  He has not.
7    Q.    It's a new position?
8    A.    Mm-hmm.
9    Q.    Okay.  And where would that new position
10 be on this chart?
11   A.    Over Jim Wade on the left.
12   Q.    Okay.  And would Steve -- would Steve
13 LaQua then still report to you?
14   A.    Yes.
15   Q.    To the best of your recollection, when
16 was this new position created?
17   A.    Today is his third week.
18   Q.    Okay.
19   A.    I don't have to think too hard about
20 that.
21   Q.    Get the easy questions out in the
22 morning.  Was there an individual in Steve LaQua's
23 position before his hiring?
24   A.    No.
25   Q.    So is it possible that this is -- if he

Page 40

1  was just hired three weeks ago, that would have
2  been right at the end of -- right at the beginning
3  of 2014, correct?
4    A.    Yes.
5    Q.    So would this have accurately
6  represented the structure in the 2013 time period?
7    A.    No.
8    Q.    What other changes would need to be made
9  to this?
10   A.    Mike Johnson reported to Steve Kosel in
11 a different role.
12   Q.    And what role was that?
13   A.    Director of logistics, I believe, is his
14 title.
15   Q.    And any additional changes?
16   A.    Are you asking me for how does -- how
17 did -- could you clarify your question?
18   Q.    Sure.  If we're talking in the 2013 time
19 period, I'm trying to understand what other changes
20 would need to be made to this chart to make it
21 accurate.
22   A.    What month?
23   Q.    Let's say towards the end of the year.
24 Fair enough.
25   A.    Okay.  December.  Let's see.  Wayne

Page 41

1  Carlson is not in this chart, and he would be in
2  here as a senior vice president.
3      Q.   And does he report to you --
4      A.   The accounting group is not -- this was
5  put together as an org structure that would touch a
6  customer.  It's not an official org structure.  So
7  I just want to be clear on that.  This is not --
8  this would not be a human relations -- or human
9  resources-developed org structure.
10         My guess is what Mike was showing was
11 contact points that a customer might have with our
12 company.
13     Q.   Fair enough.  Does Mr. Carlson currently
14 report to you?
15     A.   Yes.
16     Q.   And to the best of your recollection, do
17 you remember when Mr. Carlson would have joined the
18 organization?
19     A.   In the '80s.  I don't know the year.
20     Q.   Okay.  Is Ken Klippen currently
21 associated with Sparboe?
22     A.   No.
23     Q.   And when did that relationship end?
24     A.   I don't recall the year.
25     Q.   Do you recall when that relationship

Page 42

1  would have begun?
2      A.   I would say it was approximately 2008.
3      Q.   And what was the nature of the
4  relationship between Sparboe and Mr. Klippen in
5  2008?
6      A.   When he became an employee, he was hired
7  as a -- I believe his title -- again, I may not
8  have this right -- was director of government
9  relations and animal welfare.  And he was -- we
10 were not a member of UEP, so he was dealing with
11 legislative issues, animal welfare issues, and was
12 developing or had already developed an animal care
13 program for us called the PVP program.  Process
14 verified.
15     Q.   And Mr. Klippen was previously an
16 employee of UEP; is that correct?
17     A.   Yes.
18     Q.   And do you know what his role was with
19 UEP?
20     A.   I do not.  He may have been a vice
21 president.  I don't know.
22     Q.   And so he was hired, to the best of your
23 recollection, approximately in 2008, correct?
24     A.   Yeah.  I can't -- I mean, I would need
25 to verify that.

Page 43

1      Q.   And hired, to the best of your
2  recollection, as the director of government
3  relations and animal welfare?
4      A.   Mm-hmm.
5      Q.   And what were his responsibilities with
6  your company?
7      A.   At that time, we were developing a
8  program that would meet our customers' needs for
9  animal welfare production guidelines that would
10 allow us to sell our eggs to companies that
11 required that.
12         And so in addition with other egg
13 companies, there were other egg companies working
14 with Ken prior to his employment with us, we
15 developed a USDA program -- Ken developed a USDA
16 program -- that was -- not only had the animal care
17 and scientific guidelines that were -- you know,
18 that we developed, but also had almost an ISO 9001
19 program.  It was a quality program, so it was an
20 animal care program and a quality program.  And Ken
21 was working on that prior to his employment with
22 us.  So that was his number one responsibility.
23     Q.   And would Mr. Klippen have reported to
24 you in that role back in the 2008 time period?
25     A.   No.

Page 44

1      Q.   To the best of your recollection, who
2  would have been his supervisor?
3      A.   Wayne Carlson.
4      Q.   And did his title change during his
5  employment with you?
6      A.   Not to my recollection.
7      Q.   And to the best of your recollection,
8  when did that employment come to an end?
9      A.   2012, I believe.
10     Q.   And why did that employment come to an
11 end?
12     A.   We rejoined United Egg Producers in 2012
13 and we didn't have a need for his services anymore.
14     Q.   Was he terminated?
15     A.   Yes.
16     Q.   Did he have any form of employment
17 agreement with you that required termination for
18 cause?
19     A.   Can you with -- could you clarify that?
20     Q.   During his time when he was working with
21 you, did he have an employment agreement with the
22 company?
23     A.   I don't recall.
24     Q.   Okay.  He was terminated, to the best of
25 your recollection, in 2012?

Page 45

1    A.    Mm-hmm.  We eliminated the position.
2    Q.    And prior to joining you in 2008, why
3 did he leave UEP, to the best of your knowledge?
4    A.    I do not know.
5    Q.    Is it fair to characterize that not as
6 an amicable parting?
7    A.    I don't know.
8    Q.    Was he unemployed at the time that you
9 hired him?
10    A.    I believe he had his own company.
11    Q.    And did he close that company during the
12 time that he was employed by you?
13    A.    I don't think so.  But, again, I don't
14 know.  I should say I don't know.
15    Q.    Did he work up here in Minnesota?
16    A.    No.
17    Q.    Where did he work out of?
18    A.    He worked out of -- he was based out of
19 his home.
20    Q.    And his home was in?
21    A.    Pennsylvania.
22    Q.    Taking a step back just a little bit on
23 your relationship with the company, it sounds like
24 you've been with Sparboe for more than 20 years; is
25 that correct?

Page 46

1    A.    Yes.
2    Q.    Do you recall when you first joined the
3 company?
4    A.    It was in the '80s.
5    Q.    And do you recall what your first title
6 would have been?
7    A.    Probably sales representative or account
8 manager or something of that nature.
9    Q.    And then you've worked your way through
10 the company to become the CEO?
11    A.    Yes.
12    Q.    And your father built this company from
13 scratch, as I understand?
14    A.    Correct.
15    Q.    And he started it when he came back from
16 the Korean War back in the '50s; is that correct?
17    A.    You've read our website.
18    Q.    I have.  And when it started out, it was
19 known as the Sparboe Chick Company; is that
20 correct?
21    A.    Correct.
22    Q.    When did that name become Sparboe Farms?
23    A.    Oh, I don't recall.
24    Q.    Sometime well before the 2000s, fair to
25 say?

Page 47

1    A.    Could you clarify your question?
2    Q.    I'm trying to learn when the company
3 would have gone from the Sparboe Chick Company to
4 the Sparboe Farms.
5    A.    Oh, it actually went to -- there were
6 several other renditions.
7    Q.    And was one of those renditions Sparboe
8 Summit?
9    A.    Yes.
10    Q.    And what was Sparboe Summit?  Was it
11 just a previous name for Sparboe Farms?
12    A.    Correct.
13    Q.    And if we're talking about just from
14 approximately 1999 through today --
15    A.    Mm-hmm.
16    Q.    -- to the best of your recollection,
17 other than Sparboe Summit, has Sparboe Farms had
18 any other names?
19    A.    Could you clarify that question, please?
20    Q.    During what time period would Sparboe
21 Summit have been in existence?
22    A.    I'd have to -- I don't know that off the
23 top of my head.
24    Q.    To the best of your recollection, when
25 would the present company have been first known as

Page 48

1 Sparboe Farms?
2    A.    In 2008.
3    Q.    And would the name prior to 2008 have
4 been Sparboe Summit?
5    A.    Yes.
6    Q.    And sitting here today, do you have any
7 sense as to when you would have started using the
8 Sparboe Summit name?
9    A.    I don't.
10    Q.    And what is Farm Egg Products?
11    A.    Well, that -- Farm Egg was affiliated
12 with the Humboldt operation, the farm.
13    Q.    And how did Farm Egg come to be
14 associated or affiliated with Sparboe?
15    A.    Through an acquisition.
16    Q.    And when did that acquisition take
17 place?
18    A.    I don't recall.
19    Q.    Would it have been in the 2000s?
20    A.    No.
21    Q.    Would it have been before the 2000s?
22    A.    I believe so.
23    Q.    And would Farm Egg have been wholly
24 owned by Sparboe?
25    A.    I can't answer that.  I don't recall.

Page 49

1    Q.    And what does Farm Egg do?
2    A.    Farm Egg isn't in existence.
3    Q.    And to the best of your recollection,
4  when did it go out of existence?
5    A.    I can't recall.
6    Q.    During the time that it was in
7  existence, what did Farm Egg do?
8    A.    Produce eggs.
9    Q.    And where were those eggs produced?
10   A.    I don't recall.
11   Q.    And it was affiliated with Humboldt?
12   A.    I believe so.
13   Q.    And where was Humboldt based?
14   A.    In Iowa.
15   Q.    And are the Farm Egg farms still part of
16  Sparboe?
17   A.    Perhaps some of them are.
18   Q.    Sitting here today, though, as to when
19  that acquisition occurred, you don't recall the
20  exact date?
21   A.    I don't.
22   Q.    Trying to get a sense as to the time
23  frame as to whether you think it would have been
24  before 2000, approximately?
25   A.    I believe so.  But I should say I don't

Page 50

1  recall.
2    Q.    And would you -- would Mr. Sparboe have
3  ended up being the president of that organization
4  as well?
5    A.    No.
6    Q.    Was it kept separate from Sparboe?
7    A.    It was a part of our overall operation.
8    Q.    And I'm trying to get a better sense as
9  to the relationship between some of the different
10  farms that you owned.
11   A.    Mm-hmm.
12   Q.    Farm Egg, to the best of your
13  recollection, would have been owned by Sparboe?
14   A.    Mm-hmm.
15   Q.    And sitting here today, do you recall
16  whether that would have been a hundred percent
17  ownership of Farm Egg?
18   A.    By Sparboe?
19   Q.    Mm-hmm.
20   A.    I don't recall.
21   Q.    And did Farm Egg produce shell eggs?
22   A.    Yes.
23   Q.    And from Sparboe's perspective, they
24  would have owned the eggs coming off of those
25  farms?

Page 51

1    A.    Sparboe, as in Sparboe Farms?
2    Q.    Correct.
3    A.    Or what entity?  I just want to be
4  really clear.  I want to make sure I'm clearly
5  understanding who you're asking about.
6    Q.    Fair enough.  So to the best of your
7  recollection, there was an acquisition of Farm Egg
8  by Sparboe Farms, correct?
9    A.    Uh-huh.  At some point.
10   Q.    And to the best of your recollection,
11  you think it would have been a hundred percent
12  ownership by Sparboe Farms?
13   A.    I can't answer that.  I don't know that.
14  I don't recall.
15   Q.    With whom may you have shared ownership
16  of those farms?
17   A.    It may not have been that -- specific
18  companies.  Because I'm assuming you're asking
19  Sparboe Summit Farms.
20   Q.    Correct.
21   A.    Yeah.  No, I don't know.
22   Q.    So starting from its early days as a
23  chick company that would have been just producing
24  the little baby chicks, not the hens -- is that
25  correct?

Page 52

1    A.    You're asking about Sparboe Chick
2  Company in the 1950s?
3    Q.    Correct.  Let's go back to the 1950s.
4        MR. HUTCHINSON:  I'm going to object
5  just to the extent that your deposition notice
6  asked for information between 1999 and present.
7  Ms. Schnell has cleared her schedule for today to
8  be here, but she does have limited time, so I'd
9  like to steer us back into something within the
10  last couple of decades.
11       MS. SCHWARTZ:  And I am on my way there
12  with just a few questions to get some context as to
13  how the organization has changed over time.
14       BY MS. SCHWARTZ:
15   Q.    By the time you joined the company in
16  approximately the 1980s, was Sparboe producing eggs
17  from its layer farms at that time?
18   A.    Yes.
19   Q.    And that would have been a change from
20  back in the 1950s, to the best of your
21  recollection?
22   A.    Right.
23   Q.    And today Sparboe Farms is a vertically
24  integrated company?
25       MR. HUTCHINSON:  Objection to the extent

Page 53

1 that calls for a legal conclusion. But if you
2 understand what "vertically integrated" means --
3          THE WITNESS: Yes. Yes.
4          MR. HUTCHINSON: -- you can go ahead and
5 answer.
6      A.   Right. We are not a vertically
7 integrated company because we do not have breeders,
8 we do not have a hatchery. So we are not -- we
9 would not, by our industry standards, be called a
10 vertically integrated company. We would be close,
11 but not technically.
12          BY MS. SCHWARTZ:
13      Q.   And as I understand it, you own farms
14 that would have the layers on the farms.
15      A.   Mm-hmm.
16      Q.   Walk me through the process of the hens
17 producing eggs on your farm, just going to walk
18 through that process with a couple of questions.
19      A.   Okay.
20      Q.   Do you own all of the hens that are
21 producing Sparboe eggs?
22      A.   Yes. So -- well -- and, of course, we
23 buy -- in our industry, everybody buys and sells
24 eggs from each other. But we do not have a
25 hatchery. We buy our chicks at a day old. So that

Page 54

1 is the distinction in vertically integrated that I
2 want to be clear on.
3          We buy day-old chicks and we raise them
4 as pullets and then we move them into the layer
5 house, and we manage and care for those hens
6 throughout their laying life. We gather the eggs
7 and process the eggs and carton the eggs and serve
8 our customers then at that point.
9      Q.   And that would continue through the
10 transportation of getting the eggs to your
11 customers --
12      A.   In some cases, they pick up and in some,
13 cases we deliver. Yes.
14      Q.   And to the best of your recollection,
15 Sparboe has never suggested that its vertical
16 integration is a reason for a customer to do
17 business with Sparboe?
18      A.   No. I think -- I don't know that that
19 would be the correct term. But what we tell our
20 customers is that we manage from the day-old
21 chick -- a hatchery doesn't necessarily, in my
22 opinion, have anything to do with the service of a
23 customer.
24          But we manage from the time the chick is
25 a day old, from the time the hen is born as a chick

Page 55

1 to the time our customer receives the eggs, we
2 control that entire process. So in that context,
3 we may have talked about that as a benefit to our
4 customers. But we are not vertically integrated in
5 that we have breeders and hatcheries and -- we
6 don't have that function. Never have.
7      Q.   Let's --
8      A.   Nor have we ever represented that, to my
9 knowledge, that we have breeders or a hatchery to a
10 customer.
11          MS. SCHWARTZ: Let's go ahead and take
12 our first break.
13          THE VIDEOGRAPHER: We are going off the
14 record at 10:03 a.m.
15          (Whereupon, a recess was taken from
16 10:02 a.m to 10:10 a.m.)
17          THE VIDEOGRAPHER: We are back on the
18 record at 10:11 a.m.
19          BY MS. SCHWARTZ:
20      Q.   Back on the record after a quick break.
21 Just want to make sure there have been no changes
22 on folks who are listening on the phone or if
23 anybody else has joined since we made appearances
24 earlier.
25          (No reply).

Page 56

1          MS. SCHWARTZ: Very good.
2          BY MS. SCHWARTZ:
3      Q.   Ms. Schnell, do you recall before the
4 break we were talking about before Sparboe Farms is
5 a vertically integrated entity?
6      A.   Mm-hmm.
7      Q.   I'm going to show you what we're marking
8 Depo Exhibit 482, which is a document which starts
9 with Bates label SFKS000235.
10          (Plaintiff's Exhibit 482 was marked
11          for identification.)
12          BY MS. SCHWARTZ:
13      Q.   And on that first page -- and I'll give
14 you the chance to look through it in just a
15 second -- you see that this is a January 10th 2006
16 e-mail?
17      A.   Mm-hmm.
18      Q.   On the very front page.
19      A.   Yeah.
20      Q.   And this is to you from Lee
21 Regensburger.
22      A.   Mm-hmm.
23      Q.   And who is Lee again?
24      A.   I think if you look on the -- he was a
25 salesperson with our company.

Page 57

1    Q.   And to the best of your recollection,
2  was he one of the individuals involved in the
3  solicitation of potential business from AWG back in
4  the 2006 time period?
5    A.   Yes.
6    Q.   Okay.  And if you turn to that third
7  page, you see that it's entitled "Sparboe Farms New
8  Partnership Opportunity."  Do you see that?
9    A.   Third page?
10   Q.   Sorry.  Of that whole document.  The one
11 that in the corner that is 237.  You're looking at
12 it.
13   A.   Yes.
14   Q.   And you see that's entitled "New
15 Partnership Opportunity January 6, 2006"?
16   A.   Yes.  Mm-hmm.
17   Q.   Have you seen this document before?
18   A.   Perhaps, yes.
19   Q.   And to the best of your recollection,
20 was this a presentation made to Associated
21 Wholesaler Grocers?
22   A.   I don't know.
23   Q.   Do you know why Lee would have sent this
24 to you?
25   A.   He may have been -- he may have been

Page 58

1  preparing it to present or he may have been marking
2  up a proposal.  But I can't say if it was ever
3  presented.
4    Q.   And sitting here today, do you recall
5  that Sparboe Farms did solicit business
6  opportunities from AWG in 2006?
7    A.   I don't.
8    Q.   If you turn to the next page from what
9  you're looking at right now, you'll see that it's
10 entitled "Contents."  And if you look at the second
11 bullet point, it says, "Why partner with Sparboe
12 Farms?"  Do you see that?
13   A.   Mm-hmm.  Yes.
14   Q.   And do you see that the first bullet
15 underneath it is "Vertical Integration"?
16   A.   Mm-hmm.
17   Q.   And if you turn to the next page, I'll
18 ask you to read that first bullet point on page
19 239.
20   A.   So "Since 1954"?
21   Q.   Correct.
22   A.   -- "when Bob Sparboe first started as a
23 baby chick producer and distributor, the Sparboe
24 companies have evolved into a multi-faceted
25 financially secure organization whose complete

Page 59

1  integration makes it one of the industry's most
2  stable producers."
3    Q.   And it's important when you are
4  presenting to customers that you are being accurate
5  and truthful about your company?
6    A.   Mm-hmm.
7    Q.   If you continue on in this document and
8  you go to page 242 --
9    A.   All right.
10   Q.   -- and at the top it says, "Why partner
11 with Sparboe Farms?"  Do you see that?
12   A.   Mm-hmm.
13   Q.   And do you see that the first bullet
14 point is "Vertical Integration"?
15   A.   Yes.
16   Q.   And underneath that, it says, "Beginning
17 with the customized feeding programs for pullets
18 and layers, managed by Agrotech, and ending with
19 the delivery of freshly laid shell eggs, Sparboe
20 Farms controls the entire vertically integrated
21 process."
22   A.   Correct.
23   Q.   Did I read that correctly?
24   A.   You did.
25   Q.   And, again, this was a benefit that

Page 60

1  Sparboe was telling its customers about its
2  farm-to-store operations, correct?
3    A.   Yep.
4    Q.   And Sparboe was characterizing itself as
5  a vertically integrated company, correct?
6    A.   In this particular case, that appears to
7  be the case.
8    Q.   To close out topic number 1, we've
9  talked about a couple of different names that
10 Sparboe Farms has been known as throughout the
11 years.
12   A.   Mm-hmm.
13   Q.   Are there any additional entities in
14 which Sparboe Farms shares profits and losses?
15   A.   Could you be more clear in your
16 question?
17   Q.   Sure.  Sparboe Foods, which we've talked
18 about, is that a hundred percent owned by Sparboe
19 Farms?
20   A.   Today.
21   Q.   Today.  And when did that change?
22   A.   2008.
23   Q.   And prior to 2008, what was the
24 ownership relationship between Sparboe Farms and
25 Sparboe Foods?

Page 61

1    A.    They were sister organizations.
2    Q.    Was there a parent company?
3    A.    No.
4    Q.    And why did that change in 2008?
5    A.    We did a statutory merger.
6    Q.    Are there any additional companies under
7  the Sparboe Farms umbrella?
8    A.    No.
9    Q.    Does Sparboe Farms receive profits from
10 any other company?
11   A.    Customers.  I'm -- could you be clear?
12 Could you clarify your --
13   Q.    Sure.  I assume profits from Sparboe
14 Foods now flow into Sparboe Farms?
15   A.    Correct.
16   Q.    Are there any other companies --
17   A.    No.
18   Q.    -- that have profits that would flow
19 into Sparboe Farms?
20   A.    No.
21   Q.    Okay.  If you can take back out
22 Exhibit 478 which is the deposition notice, we were
23 just talking about topic number 1.  Are there any
24 additional -- any additional information that you
25 have related to topic number 1 that we haven't

Page 62

1 already covered?
2    A.    No.
3    Q.    We are actually going to move now down
4 to topic number 14.  Just skip down a little bit.
5 And topic 14 is, "Your principal competitors and
6 whether you compete with these companies in selling
7 eggs and egg products to AWG or AWG's members."  Do
8 you see that?
9    A.    Mm-hmm.  I do.
10   Q.    And, again, you are here to provide the
11 testimony on behalf of that topic.  And is this
12 similar to topic 1, that you were already
13 knowledgeable about this topic, or did you talk to
14 people specifically about this topic?
15   A.    Could you be clear on your question?
16   Q.    In preparing to testify with regard to
17 topic 14, did you talk with anyone specifically
18 about this topic?
19   A.    No.
20   Q.    Okay.  Who are Sparboe's principal
21 competitors?
22   A.    In what context?
23   Q.    Let's start in the time period of 2000
24 to the present, and we're looking specifically at
25 the sale of shell eggs.

Page 63

1    A.    To?
2    Q.    To anyone.
3    A.    To anybody?
4    Q.    Mm-hmm.  If someone were to say to you,
5 who are your principal competitors, what would
6 Sparboe say are its principal competitors in the
7 marketplace?
8    A.    And could you be clear on which
9 marketplace you're talking about?
10   Q.    The sale of shell eggs.
11   A.    Well, in the case of AWG?
12   Q.    Let's start more general than that.
13   A.    Our competitors would be other egg
14 producers typically that are in the region where
15 the customer's distribution point is held.
16   Q.    Let me go ahead and mark as Exhibit
17 483 --
18        (Plaintiff's Exhibit 483 was marked
19         for identification.)
20        BY MS. SCHWARTZ:
21   Q.    Exhibit 483 has the Bates label at the
22 bottom starting with SF007294.  And is this a
23 document you've seen before?
24   A.    I don't recall.
25   Q.    Looking at the very front page of this

Page 64

1 document, it appears to be a PowerPoint
2 presentation entitled "Accelerating the Growth."
3    A.    Mm-hmm.
4    Q.    Is that correct?
5    A.    Yes.
6    Q.    Do you recall discussions at Sparboe
7 about what its market share could look like if it
8 increased by 20 percent?
9    A.    I don't recall this particular document.
10   Q.    If you can flip to page -- the Bates
11 ends with 302.  And it says, "Who is our
12 competition?"  A couple more pages.
13   A.    Here we go.
14   Q.    Do you see that at the top, "Who is our
15 competition?"
16   A.    I do.
17   Q.    And is it fair to say that Cal-Maine
18 Foods is one of your competitors?
19   A.    In some markets.
20   Q.    And in what markets would those be?
21   A.    In the south-central parts of the U.S.
22   Q.    And is it fair to say that Moark is one
23 of your competitors?
24   A.    Yes.
25   Q.    And is it fair to say that Rose Acre is

1 one of your competitors?

2    A.    Yes.

3    Q.    And are there any other companies you
4 would add to this list that includes Cal-Maine,
5 Moark and Rose Acre as your principal competitors?

6    A.    Yes.

7    Q.    And who are those companies?

8    A.    Well, that's a very broad question.
9 Crystal Farms.  S&R.  There's many.  Would you like
10 me to list all of the people we consider
11 competitors?  I'd be happy to do that.

12    Q.    If somebody asked you for who your top
13 five competitors are --

14    A.    Oh, top five competitors.  That's a
15 different question.

16    Q.    -- would Cal-Maine be on that list?

17    A.    Probably not.

18    Q.    Would Moark?

19    A.    Yes.

20    Q.    Would Rose Acre?

21    A.    Yes.

22    Q.    So we've got two.  Who else would you
23 add to a top-five list of your principal
24 competitors?

25    A.    Crystal Farms.  S&R.  Hickman.  How many

1 do we have?

2    Q.    You've got five.

3    A.    Okay.

4    Q.    Does that list change if we are talking
5 about egg products?

6    A.    Yes.

7    Q.    And what would a list of your top five
8 competitors look like if we were talking about egg
9 products?

10    A.    Michael Foods.  Rembrandt.  I suppose
11 Rose Acre.  Sonstegard.  I may be missing some.
12 Cargill Kitchen Solutions.  Not really.  I'm not
13 going to say them.  I retract that.

14    Q.    We'll say there's a top four.

15    A.    Okay.  Thank you.

16    Q.    Going back to the shell eggs, who is, in
17 your view, your primary competitor for your sale of
18 shell eggs?

19    A.    In which customer -- which channel?
20 Which market?  Which -- it depends on what -- I
21 guess I would ask you to be more clear in the
22 question or more specific.

23    Q.    Out of the five you listed, there's not
24 one in particular who you seem to always compete --
25 be competing with for business?

1    A.    It just depends on the prospect.

2    Q.    And as we look at that list, Moark is a
3 defendant in the Kansas litigation, correct?

4    A.    I understand that.

5    Q.    And Rose Acre is a defendant in the
6 Kansas litigation, correct?

7    A.    Mm-hmm.

8    Q.    And Crystal Farms is not.  And neither
9 are S&R and Hickman.  To the best of your
10 knowledge, are all five of those UEP members or
11 were UEP members?

12    A.    I believe so, yes.

13    Q.    And if you can on that same document
14 flip back to what actually is page 7.  It's
15 entitled "Who are their nonproducing egg marketers
16 we should look at?"

17    A.    Mm-hmm.

18    Q.    And it has six companies listed there.
19 Do you see that?

20    A.    Yes.

21    Q.    And Country Creek Farm is the first one
22 listed there.  Do you see that?

23    A.    Yes.

24    Q.    And it's listed as -- the
25 location/market is Wal-Mart.

1    A.    Mm-hmm.

2    Q.    Do you consider Country Creek Farms to
3 be an egg producer?

4    A.    No.

5    Q.    Do you consider them to be an egg
6 producer?

7    A.    Yes.

8    Q.    And to you, what is the difference
9 between those two?

10    A.    Country Creek does not produce -- in
11 this context, I believe whoever presented --
12 prepared this -- Country Creek does not produce
13 eggs.

14    Q.    Does it sell eggs?

15    A.    Yes.

16    Q.    So it goes into the marketplace and buys
17 eggs?

18    A.    They're a middle -- a broker.

19    Q.    So it is buying eggs that others have --

20    A.    Correct.

21    Q.    -- produced.

22         And is Dutch Farms the same?

23    A.    Correct.

24    Q.    And Hidden Villa?

25    A.    During this time period, yes.  I believe

Page 69

1  Hidden Villa may own -- I don't know.  I don't know
2  if they own birds.
3      Q.    And Hillandale of Pennsylvania?
4      A.    I don't believe that's true.  I believe
5  they're a producer.
6      Q.    And Eggland's Best?
7      A.    Marketing company.
8      Q.    And Crystal Farms?
9      A.    Marketing company affiliated with
10  Michael Foods.
11      Q.    In terms of the shell eggs, you had
12  listed Crystal Farms as one of your competitors.
13      A.    Mm-hmm.
14      Q.    Is it Crystal Farms or Michael Foods who
15  you would view as your competitor?
16      A.    Crystal Farms.  Michael Foods is not in
17  the shell egg business.
18      Q.    And in terms of competing for business
19  from AWG, is it fair to say that Moark has been one
20  of your principal competitors in competing for that
21  business?
22      A.    I believe -- I presume there were many
23  companies, but Moark and Rose Acre both were
24  competing against us for that business most
25  recently.

Page 70

1      Q.    Sitting here today, are you aware of any
2  other companies --
3      A.    No.  Well, I should let you finish your
4  question.  I'm sorry.
5      Q.    Fair enough.
6      A.    I was going to say -- please finish.
7      Q.    Sitting here today, are you aware of any
8  other companies with whom you were competing for
9  ABG's business besides Moark and Rose Acre?
10      A.    No.
11      Q.    Do you have any additional information
12  to provide with regard to topic 14?
13      A.    No.
14      Q.    We are moving on to topic 20.  And topic
15  20 is -- has a number of subparts, but it's fair to
16  say that this is the UEP topic, if you will.
17      A.    Mm-hmm.
18      Q.    And if I refer to UEP, you know that I'm
19  referring to United Egg Producers?
20      A.    I do.
21      Q.    And we're going to break this topic up
22  into a couple of things.  Starting in about 1999 --
23  actually, let me scratch that and go back.  Sitting
24  here today, do you know when Sparboe joined UEP for
25  the first time?

Page 71

1      A.    I do not.
2      Q.    By 1999, was Sparboe a UEP member?
3      A.    I believe so.
4      Q.    And as I understand it, Sparboe was a
5  UEP member in 2000 as well?
6      A.    I believe so.
7      Q.    2001, correct?
8      A.    I believe so.
9      Q.    2002?
10      A.    Yes.
11      Q.    2003?
12      A.    Yes.
13      Q.    2004?
14      A.    Yes.
15      Q.    A member for part of 2005, correct?
16      A.    Correct.
17      Q.    Not a member in 2006?
18      A.    No.
19      Q.    And in 2007, towards the end of the
20  year, sought to rejoin UEP, correct?
21      A.    I believe it was 2008.
22      Q.    I'll go back and look at those specific
23  dates.  Starting in 2008 through the present, is
24  Sparboe a UEP member?
25      A.    Yes.

Page 72

1      Q.    And was a UEP member for every one of
2  those years?
3      A.    I don't recall.
4      Q.    Let's take them year by year.  To the
5  best of your recollection, Sparboe was a UEP member
6  in 2008?
7      A.    I believe it was 2008 when we rejoined.
8      Q.    Was Sparboe a UEP member in 2009?
9      A.    I believe so.
10      Q.    In 2010?
11      A.    You know, I don't recall.
12      Q.    Is there something in particular that's
13  giving you pause with regard to 2010?
14      A.    No.
15      Q.    Was Sparboe a UEP member in 2011?
16      A.    No, I don't believe so.
17      Q.    Was Sparboe a UEP member in 2012?
18      A.    We joined UEP in January of -- or
19  February of 2012.  Yes, I believe.
20      Q.    And was Sparboe a UEP member in 2013?
21      A.    Yes.
22      Q.    And is Sparboe a UEP member in 2014?
23      A.    Yes.
24      Q.    Do you know why Sparboe originally
25  joined UEP?  That's subpart A.

Page 73

1    A.    Most egg producers were a member of UEP,
2  and we were an egg producer.
3    Q.    Is it the largest egg trade group in the
4  country?
5    A.    To my knowledge.
6    Q.    And sitting here today, you don't recall
7  when exactly you would have joined?
8    A.    I do not.  I don't have that date.
9    Q.    And this is not meant to be a spelling
10  test, so I will take out documents on these.  I'm
11  going to look at committee membership throughout
12  the years.
13    A.    Mm-hmm.
14    Q.    It's fair to say that during --
15  particularly prior to 2007, Sparboe was on multiple
16  committees for UEP, correct?
17    A.    Probably.
18    Q.    And you yourself served on at least one
19  committee during that time, correct?
20    A.    Very briefly, yes.
21    Q.    And why were Sparboe employees serving
22  on these committees?
23    A.    They were asked to serve.
24    Q.    And who asked them?
25    A.    I presume UEP board members or UEP

Page 74

1  staff.
2    Q.    So, for instance, you in particular, you
3  were specifically requested to serve on a
4  committee?
5    A.    Well, they may have been asked or they
6  may have volunteered.  I mean, I can't say.  I
7  don't know why -- I should have -- let me rephrase
8  my answer.  I don't know why they were on the board
9  or how they came to be on the committees.  Not on
10  the board.  On the committees.
11    Q.    And what were the advantages to Sparboe
12  of its members sitting on UEP committees?
13    A.    Being aware, learning.
14    Q.    And let's break that up a little bit.  I
15  assume it was being aware about the industry
16  generally?
17    A.    Mm-hmm.
18    Q.    It also gave you the opportunity to
19  learn more about your competitors as well, correct?
20    A.    It gave you the opportunity to learn
21  about what was happening in Washington.  Perhaps to
22  learn what initiatives were taking place in various
23  states in terms of environmental regulation.  It
24  gave you the opportunity to learn about the
25  scientific research that was being done.

Page 75

1  Frequently there were speakers.  It was an
2  important -- it was an important resource for the
3  egg industry to learn about matters that pertained
4  to our production.  Regulatory, political.
5    Q.    Most of these have previously been
6  marked as deposition exhibits.  I hand you what is
7  previously marked Exhibit 122.  And these are the
8  UEP committees for 1999.  Do you see that on the
9  front page?
10    A.    Mm-hmm.  I do.
11    Q.    And if you flip to the Bates number that
12  ends 157, at the top it says, "Egg products price
13  discovery."  Do you see that?
14    A.    Mm-hmm.
15    Q.    And the objective for that committee --
16  and let me read from the top -- is "To develop a
17  better understanding of the egg products pricing
18  system, to monitor and make recommendations
19  concerning the egg products pricing systems,
20  provide a framework for members to communicate with
21  the market reporter."  Do you see that at the top?
22    A.    Mm-hmm.
23    Q.    And if you look on the right-hand
24  column, you see that Greg Murch is listed there?
25    A.    Mm-hmm.

Page 76

1    Q.    And so Greg Murch is a -- obviously
2  listed as Sparboe Summit Farms, but that was a
3  Sparboe employee at the time?
4    A.    Correct.
5    Q.    And so beyond the government and the
6  political side at UEP, there was also the
7  opportunity to participate in discussions about
8  pricing systems?
9    A.    I don't know that.
10    Q.    Sitting here today, do you have an
11  understanding other than how UEP described its own
12  committee?
13    A.    I was not on that committee, so I can't
14  speak to that.
15    Q.    And do you know why Mr. Murch wanted to
16  serve on the price discovery committee?
17    A.    Sparboe Farms at some point had
18  purchased an egg-breaking company.  And I assume he
19  may have been -- I don't know why he was on the
20  committee.  But we were just getting into the
21  egg-breaking business about that time.
22    Q.    And looking at that page, we see at the
23  top left-hand corner is Paul Osborn of Moark,
24  correct?
25    A.    Mm-hmm.

Page 77

1    Q.    And that's, again, one of the people you
2 might identify as a potential competitor for AWG's
3 business, for example?
4    A.    Mm-hmm.  Right.
5    Q.    And I'm not aware of any other Sparboe
6 employees that participated on committees in 1999.
7 I don't know if you know to the contrary.
8    A.    I don't know.  I'm sorry.
9    Q.    In 2000 -- and I'll hand you what has
10 been previously marked as Exhibit 123.  These are
11 the committee appointments for 2000.  Do you see
12 that on the front page?
13    A.    Mm-hmm.  I do.
14    Q.    And if you go to page ending with 46 --
15    A.    Yup.
16    Q.    -- you'll see that your father, Bob
17 Sparboe, is listed as part of the government
18 relations committee, correct?
19    A.    Correct.
20    Q.    Put that aside.  We'll go as quickly as
21 we can through the committee appointments.  In
22 2000, a new committee was formed at the UEP.  And
23 it was the industry animal welfare committee.  And
24 let me hand you what's previously been marked as
25 Exhibit 208.  And let's start actually by looking

Page 78

1 at the top of this page.  Do you know what this
2 document is?
3    A.    Mm-hmm.
4    Q.    And what is it?
5    A.    It's the newsletter from the United Egg
6 Producers.
7    Q.    And is this something that would be a
8 benefit of membership in the UEP that you would
9 receive this newsletter?
10    A.    I believe members received this, yes.
11    Q.    Did you ever receive copies of United
12 Voices?
13    A.    If not directly, through someone that
14 got it.
15    Q.    And is that a document that you would
16 take the time to read normally?
17    A.    Sometimes.
18    Q.    And why is that?
19    A.    Well, because there was information on
20 what was going on legislatively or within the egg
21 industry.
22    Q.    Would others in your organization have
23 read this as well?
24    A.    I can't -- I don't know.
25    Q.    Sitting here today, do you know if

Page 79

1 others would have received copies of this?
2    A.    Perhaps, yes.
3    Q.    Looking at the very front page of this,
4 it's dated March 20th of 2000.  Do you see that in
5 the right-hand corner?
6    A.    I do.
7    Q.    And on the left-hand side is a column
8 called "Producer Committee Formed for Animal
9 Welfare."  Do you see that?
10    A.    I do.
11    Q.    And is this consistent with your
12 understanding that Garth Sparboe was appointed to
13 serve on the industry animal welfare committee
14 starting in 2000?
15    A.    Yes.
16    Q.    And this was a brand-new committee at
17 UEP, correct?
18    A.    I believe so.
19    Q.    Okay.  And you had mentioned previously
20 that that was one of the things that Mr. Sparboe
21 did for the company, was he served on this
22 committee?
23    A.    Yes.
24    Q.    And would he report back to you or
25 others at the company the progress that this

Page 80

1 committee was making?
2    A.    Mm-hmm.  Yes.
3    Q.    And this is -- strike that.
4        And if you continue on on that column,
5 you'll see the last paragraph, and that little bit
6 of the article says, "Wilcox has scheduled the
7 first meeting of the producer committee for March
8 20th and 21st."  Do you see that?
9    A.    Mm-hmm.  I do.
10    Q.    And as far as sitting here today, that
11 begins the -- let me take a step back and ask a
12 different question.
13        Sitting here today, that was the
14 beginning of the work at UEP towards an animal
15 welfare-type program?
16    A.    I don't know that.  It appears that was
17 when the committee began its official work,
18 according to this document.
19    Q.    All right.  Going on to 2001, this
20 document has previously been marked as Exhibit 124.
21 And this is the UEP committee appointments for
22 2001, correct?
23    A.    Okay.  Yup.  Yes.
24    Q.    And if you go to the page that ends with
25 80, this is the government relations committee?

Page 81

1    A.    Mm-hmm.
2    Q.    And it lists Garth Sparboe again as a
3 member of that committee?
4    A.    Yes.
5    Q.    And if you turn to page ending with 92,
6 there is a quality assurance food safety committee,
7 and Bob Sparboe is listed as a committee member for
8 that as well.
9    A.    Okay.  Yes.
10    Q.    And if you turn that page, we see the
11 UEP producer committee for animal welfare, and
12 Garth Sparboe is listed under that.
13    A.    Yes.
14    Q.    I believe that is all the committee
15 appointments for '01.  If we move on to 2002, I
16 believe we've got the exact same committees.  And
17 this is Deposition Exhibit 125.  And, again, the
18 first page of Exhibit 125 are the committee
19 appointments for 2002.  Do you see that?
20    A.    Okay.  I do.
21    Q.    And if you turn to the page ending with
22 95, do you see that Garth Sparboe is listed on the
23 government relations committee?
24    A.    Yes.
25    Q.    If you turn to the page ending with 04,

Page 82

1 you see that Bob Sparboe is listed on the quality
2 assurance food safety committee?
3    A.    Mm-hmm.  Yes.
4    Q.    And if you turn to the next page, this
5 is again the UEP producer committee for animal
6 welfare and Garth Sparboe is a committee member on
7 that committee, correct?
8    A.    Yes.
9    Q.    One of the strange quirks of this
10 litigation, we do not have committee minutes for
11 2003, so far as we can tell.  Sitting here today,
12 do you have any knowledge as to what committees
13 Sparboe may have participated on in the 2003 time
14 period?
15    A.    I don't.
16    Q.    To the best of your knowledge, did Garth
17 Sparboe continue serving on the animal welfare
18 committee in 2003?
19    A.    I don't know.
20    Q.    So 2004.  This has previously been
21 marked as 126.  And these are the committee
22 appointments for 2004 for the UEP.  And if you turn
23 to the page that ends with 12, you are listed as a
24 member of the shell egg marketing committee,
25 correct?

Page 83

1    A.    Yes.
2    Q.    And do you recall serving on that
3 committee in 2004?
4    A.    I recall that.
5    Q.    And would you have attended meetings in
6 2004 on behalf of the committee?
7    A.    I recall attending one.
8    Q.    And do you see under the objective
9 listed for this committee it says, in part,
10 "Consider and recommend marketing proposals in view
11 of current and future supply/demand.  Review the
12 UEP egg trading program."  Do you see that?
13    A.    Mm-hmm.
14    Q.    And the UEP egg trading program, was
15 that the egg trading that was done at USEM or was
16 that something --
17    A.    I believe so.
18    Q.    Okay.  If you continue on in this
19 document going to the document that ends with 17,
20 there is an environmental committee and John
21 Mueller is listed as a committee member for the
22 environmental committee, correct?
23    A.    Mm-hmm.
24    Q.    And, again, he was Sparboe's general
25 counsel at the time?

Page 84

1    A.    Yes.
2    Q.    Was there a particular reason why
3 Sparboe's general counsel was serving on the
4 environmental committee?
5    A.    John -- in our company, John handled the
6 permitting matters with the Minnesota pollution
7 control or for all of our permitting.  So in his
8 capacity as handling our permits, it made sense for
9 him to participate on that committee.
10    Q.    And if you'll turn to the next page,
11 you'll see that there's a quality assurance food
12 safety committee.  And Wayne Carlson is listed as a
13 Sparboe committee member, correct?
14    A.    Yes.  I see that.
15    Q.    And at the top of that, we see that Ken
16 Klippen is the staff coordinator for UEP.
17    A.    Mm-hmm.
18    Q.    That takes care of 2004.  2005 is
19 previously marked as Deposition Exhibit 127.  And
20 this is again the committee appointments for 2005.
21 And if you turn to the document that ends in 88,
22 you are again listed as a committee member for the
23 shell egg marketing committee, correct?
24    A.    Yes.
25    Q.    And to the best of your recollection,

Page 85

1  did you participate in that committee in 2005?
2      A.  I don't recall.
3      Q.  And if you continue to the document that
4  ends in 92, you see that again listed on the
5  environmental committee is John Mueller on behalf
6  of Sparboe, correct?
7      A.  Yes.
8      Q.  And if you go to page 94, again under
9  the quality assurance food safety committee, you've
10  got again Wayne Carlson serving on behalf of
11  Sparboe, correct?
12     A.  Yes.
13     Q.  And if you turn to -- never mind.
14         Did Sparboe ever have anyone take Garth
15  Sparboe's place on the animal welfare committee
16  when he resigned?
17     A.  Not to my knowledge, no.
18     Q.  And as we discussed, for part of 2005
19  and 2006, Sparboe was not a UEP member, correct?
20         MR. HUTCHINSON:  For what years, Rachel?
21         MS. SCHWARTZ:  2005 and 2006.
22     A.  For part of 2005 and 2006, I believe
23  that's correct.
24         BY MS. SCHWARTZ:
25     Q.  And during those times when you were not

Page 86

1  a UEP member, did Sparboe participate in anything
2  UEP-related?
3      A.  I doubt it.
4      Q.  Did you attend any UEP meetings as an
5  observer?
6      A.  No.
7      Q.  Did you receive any United Voices during
8  that time?
9      A.  We may have indirectly.
10     Q.  But they were not sent to you, to the
11  best of your recollection, directly from UEP?
12     A.  No.
13     Q.  Why during that time did you want to
14  receive copies of United Voices?
15     A.  We didn't want to.
16     Q.  Did you ever tell anyone providing those
17  to you indirectly to stop sending them to you?
18     A.  I don't recall.
19     Q.  Let's look -- and we'll come back to
20  that time period in just a moment, but let me go
21  ahead and finish out the committees.  In 2008 --
22  I'll hand you what's previously been marked as
23  Exhibit 130.  And these are the committee
24  appointments for 2008.  Do you see that?
25     A.  I do.

Page 87

1      Q.  And if you turn to the page that ends
2  with 50, you'll see that Wayne Carlson is listed
3  for the shell egg marketing committee?
4      A.  Yeah.
5      Q.  And that's the committee that you
6  previously served on; is that correct?
7      A.  Correct.
8      Q.  And why did Mr. Carlson serve on that
9  committee instead of you in that time period?
10     A.  Well, I was president of the company.
11  Mr. Carlson had a customer that requested that our
12  company rejoin UEP and be more active in UEP.  And
13  so he did that based on a customer's request.
14     Q.  Got it.  And we'll come back to that in
15  just a second.  Let me go ahead and finish out.  If
16  you turn to the page that ends with 58, there is a
17  quality assurance food safety committee, and a
18  Dr. Hugo Medina is listed on behalf of Sparboe.
19     A.  Mm-hmm.  Yes.
20     Q.  And who is Dr. Medina?
21     A.  Dr. Medina is -- was our company
22  veterinarian.
23     Q.  And is he no longer with the company?
24     A.  He's no longer living.
25     Q.  And do you know when he passed away?

Page 88

1      A.  I don't recall.  It's several years.
2      Q.  Previously marked as Exhibit 131 are the
3  2009 committee appointments.  And if you turn to a
4  page that ends with 25, Wayne Carlson is listed as
5  a member of the shell egg marketing committee,
6  correct?
7      A.  He is.
8      Q.  And if you turn to a page that ends with
9  30, Dr. Medina is listed again as a quality
10  assurance food safety committee member.
11     A.  Yes.
12     Q.  After 2009, did Sparboe participate in
13  any UEP committees?
14     A.  I don't recall.
15     Q.  And why would Sparboe not have been a
16  committee member following many years of service on
17  the committee starting in 2010?
18     A.  I don't know.
19     Q.  Has Sparboe asked to join any of the
20  committees?
21     A.  Doubtfully.  I doubt it.
22     Q.  Do you have anyone on a committee in
23  2014?
24     A.  I do not believe so.
25     Q.  Now, we've looked at the specific UEP

Page 89

1  committee, but UEP also has a --
2      A.   You know, may I go back to that last
3  question?
4      Q.   Please.  Go ahead.
5      A.   Steve Kosel has been invited to serve on
6  a committee, but I don't believe he is on a
7  committee.  So I should say I don't know.  And I
8  guess that's what I said.  I don't know.
9      Q.   Do you recall which committee may have
10  invited Mr. Kosel?
11     A.   I don't.  I don't.
12         MR. HUTCHINSON:  And just to clarify,
13  prior to that -- prior to asking about 2014, were
14  you asking about '09, 2010, when -- I think
15  Ms. Schnell testified earlier that Sparboe had left
16  the UEP and she wasn't sure on when, but I thought
17  she said '09 or 2010.
18         MS. SCHWARTZ:  I'm going to object that
19  you're testifying on behalf of the witness.  I
20  think the witness answered that in 2010 through
21  2013, there were no committee members.
22         BY MS. SCHWARTZ:
23     Q.   And I'm happy to give you the
24  opportunity to clarify that.  But Sparboe Farms did
25  not have a committee member on any UEP committee in

Page 90

1  2010, correct?
2      A.   I don't recall.
3      Q.   In 2011?
4      A.   I don't recall.
5      Q.   And in 2012?
6      A.   I'm quite certain we did not.
7      Q.   And in 2013?
8      A.   I don't recall.
9      Q.   In addition to the specific UEP
10  committees, UEP also had a board of directors,
11  correct?
12     A.   Yes.
13     Q.   And what was, to the best of your
14  understanding, the board of directors entrusted
15  with doing on behalf of the UEP?
16     A.   I have absolutely no idea.
17     Q.   Sparboe had individuals who served on
18  the board of directors, correct?
19     A.   That's my understanding.
20     Q.   Okay.  The good news is these are all in
21  a single document.  I'm marking now what is
22  Exhibit 484, which is Bates labeled UE0847760.
23         (Plaintiff's Exhibit 484 was marked
24            for identification.)
25

Page 91

1          BY MS. SCHWARTZ:
2      Q.   And at the top, it says UEP board of
3  directors.  Do you see that on the front page?
4      A.   Yes.
5      Q.   And it starts in 1998 and it appears to
6  continue through 2008.  Do you see that on the very
7  last page?
8      A.   Yes.
9      Q.   In 1998, Sparboe does not appear to sit
10  on the board of directors.  Is that correct?
11     A.   Correct.
12     Q.   And the same in 1999?
13     A.   Correct.
14     Q.   In 2000, if you look towards the end of
15  that list, Bob Sparboe is listed --
16     A.   Yes.
17     Q.   -- as a board of directors member; is
18  that correct?
19     A.   Yes.
20     Q.   And in 2001, if you turn to the next
21  page, Kent Tigges is listed as a board of directors
22  member.  Do you see that?
23     A.   I see his name, yes.
24     Q.   And he's listed as being with Farm Egg.
25  Do you see that?

Page 92

1      A.   Yes.
2      Q.   And we've talked about Farm Egg before,
3  today, correct?
4      A.   Mm-hmm.
5      Q.   To the best of your recollection, would
6  Sparboe have owned Farm Egg in 2001?
7      A.   Sparboe bought the assets of Farm Egg.
8  Kent Tigges was never an employee of Sparboe Farms.
9      Q.   And in 2002, Mr. Tigges is again listed
10  for Farm Egg, but, again, he was not a Sparboe
11  employee at that time?
12     A.   That company may have remained in
13  existence.  I don't know.  I don't know anything
14  about Mr. Tigges.
15     Q.   In 2003, Garth Sparboe is listed as a
16  board of directors member, correct?
17     A.   Yes.
18     Q.   And in 2004, if you go to the next page,
19  you'll see that Wayne Carlson on behalf of Sparboe
20  is listed as a board of directors member?
21     A.   Yes.
22     Q.   And on the next page, Wayne Carlson is
23  again listed as a 2005 board of directors member
24  for Sparboe, correct?
25     A.   Yes.

Page 93

1    Q.    And then at least through 2008, I don't
2  believe that Sparboe was listed as a board of
3  directors member, correct?
4    A.    Correct.
5    Q.    Since 2008, has Sparboe served on the
6  UEP board of directors?
7    A.    No.
8       MS. SCHWARTZ:  I think we're going to be
9  pretty close to the end of the tape, so why don't
10 we go ahead and take another break.
11      THE VIDEOGRAPHER:  We are going off the
12 record at 11:03 a.m.
13      (Whereupon, a recess was taken from
14 11:03 a.m to 11:12 a.m.)
15      THE VIDEOGRAPHER:  We're back on the
16 record.  This is a continuing videotaped deposition
17 of Beth S. Schnell taken on February 17th 2014.
18 The time now is 11:12 a.m.
19      BY MS. SCHWARTZ:
20   Q.    And before the break, we were talking
21 about Sparboe's participation in UEP committees and
22 the board of directors, correct?
23   A.    Mm-hmm.
24   Q.    And in addition to those committee
25 meetings, did Sparboe attend things like the UEP

Page 94

1  annual board meeting?
2    A.    It's possible.
3    Q.    And sitting here today, do you remember
4  specifically whether Sparboe has attended any
5  specific board meeting?
6    A.    I recall one in Savannah.  Other members
7  of our management team may have been in attendance
8  at the annual meeting.  That would not surprise me.
9       MR. HUTCHINSON:  Were you asking about
10 board meetings or the annual meeting?
11      MS. SCHWARTZ:  I will ask about both.  I
12 think she answered the question.
13      MR. HUTCHINSON:  Well, I don't think --
14 I think she answered the question about an annual
15 meeting in Savannah.
16      THE WITNESS:  Yeah.  It was an annual
17 meeting in Savannah that I referred to.
18      BY MS. SCHWARTZ:
19   Q.    And so Sparboe has over time attended
20 the annual meetings?
21   A.    I can speak to the one annual meeting I
22 attended.
23   Q.    Okay.  And has participated in board
24 meetings as well?
25   A.    I would say yes.

Page 95

1    Q.    Okay.  I'm going to go ahead and mark as
2  485, these are Sparboe's Supplemental Objections
3  and Responses to Plaintiff's First Requests for
4  Admission to the Egg Producer Defendants.  Do you
5  see that on the front page?
6       (Plaintiff's Exhibit 485 was marked
7       for identification.)
8    A.    Yes.
9       BY MS. SCHWARTZ:
10   Q.    And have you seen this document before?
11   A.    I believe so.
12   Q.    And I will represent to you that this
13 was served on us on this past Friday, February 14th
14 2014.  You can see that on the very last page with
15 the certificate of service.
16   A.    Yeah.  No.  I don't think I've seen this
17 document, actually.  I should say no.
18   Q.    Do you recall reviewing any responses to
19 requests for admissions in this lawsuit?
20   A.    Could you clarify the question?
21   Q.    Are you aware that plaintiffs in this
22 litigation have served on Sparboe requests for
23 admissions?
24   A.    Yes.
25   Q.    And are you aware of what requests for

Page 96

1  admissions are?
2    A.    Yes.
3    Q.    They ask a company to either admit or
4  deny a statement essentially, correct?
5    A.    I believe so, yes.
6    Q.    And have you had any involvement in
7  helping to answer the requests for admissions on
8  behalf of Sparboe?
9    A.    No.  I'm not a lawyer.
10   Q.    I was just asking if you had any
11 involvement in providing the factual background for
12 these responses.  And it sounds like the answer is
13 no?
14      MR. HUTCHINSON:  Objection.  That
15 misstates the testimony.  That's not what she said.
16      THE WITNESS:  Could you restate that.  I
17 guess I'm unclear as to what you're specifically
18 asking me.
19      BY MS. SCHWARTZ:
20   Q.    Did you have any participation in
21 providing the facts for responding to the requests
22 for admissions, to the extent you know?
23   A.    We worked together for a great deal of
24 time pulling together information that was
25 requested.

Page 97

1    MR. HUTCHINSON: And I'm going to object
2 to the extent that the question asks the witness to
3 reveal any attorney-client privileged
4 communications.
5    BY MS. SCHWARTZ:
6    Q.   And I am not trying to invade that
7 privilege at all. I was just wondering if, sitting
8 here today, if you had any specific involvement
9 with the requests for admissions.
10    A.   Well, perhaps I should read the
11 document. Would you like to take the --
12    Q.   Why don't we go ahead with that, and
13 I'll actually direct your attention to page 4, if
14 you could. That's where the requests really start.
15 And you'll see Request Number 1 was asking Sparboe
16 to admit that you were a member of UEP in 1999,
17 correct?
18    A.   Mm-hmm.
19    Q.   And Sparboe admitted that, correct?
20    A.   Yes.
21    Q.   And the next request asks for Sparboe to
22 "Admit that you attended at least one UEP meeting
23 in 1999," correct?
24    A.   That's the question.
25    Q.   And the response is, "After reasonable

Page 98

1 inquiry, the information known or readily
2 attainable to Sparboe at this time is insufficient
3 to enable it to admit or deny Request Number 2."
4 Do you see that?
5    A.   Correct.
6    Q.   Sitting here today, do you know whether
7 Sparboe attended at least one UEP meeting in 1999?
8    A.   I do not have enough information to
9 answer that question.
10    Q.   Let me hand you what's previously been
11 marked as Exhibit 146.
12    MR. HUTCHINSON: And for the record,
13 this is a document Bates labeled UE0297719, which
14 was produced in the case by the United Egg
15 Producers.
16    BY MS. SCHWARTZ:
17    Q.   And at the top of this document, you see
18 it's entitled "UEP Annual Board Meeting and
19 Executive Conference." Do you see that?
20    A.   I do.
21    Q.   And it's October 14th through the 15th
22 of 1999, correct?
23    A.   Yes.
24    Q.   And if you look down that page where it
25 says that the meeting was called to order and it

Page 99

1 lists the members who attended --
2    A.   Yes.
3    Q.   -- if you go to the far right column,
4 third from the bottom, do you see that Bob Sparboe
5 is listed?
6    A.   I do.
7    Q.   And it appears from the meeting minutes
8 from the UEP annual board meeting that Sparboe
9 would have attended that board meeting in 1999,
10 correct?
11    A.   Yes.
12    Q.   And so it's fair to say that Sparboe
13 would admit that it attended at least one UEP
14 meeting in 1999?
15    A.   Based on this, I would say yes.
16    Q.   If you go down to Request Number 4, it
17 says, "Admit that you attended at least one UEP
18 meeting in 2000." Do you see that?
19    A.   I do.
20    Q.   And do you see that the response to that
21 is the same as it was to Request Number 2?
22    A.   Yes.
23    Q.   If you would mark as Exhibit 486, which
24 is a document with the Bates range UE0331878.
25    A.   Uh-huh.

Page 100

1    (Plaintiff's Exhibit 486 was marked
2       for identification.)
3    BY MS. SCHWARTZ:
4    Q.   And this is the UEP producer committee
5 for animal welfare, May 15th of 2000. Do you see
6 that?
7    A.   I do.
8    Q.   And do you see that Garth Sparboe is
9 listed as a committee member at that meeting?
10    A.   Yes.
11    MR. HUTCHINSON: Objection,
12 mischaracterizes the document.
13    BY MS. SCHWARTZ:
14    Q.   And I'll ask you again --
15    A.   Ah, that's a good point.
16    Q.   Do you see that he is listed as a
17 committee member for the May 15th, 2000 meeting?
18    A.   I believe we already confirmed that
19 Garth was a member of that committee in 2000 in a
20 prior question, didn't we? Let me look at this
21 document.
22    Q.   We did.
23    A.   So let me just verify that. I believe
24 that I testified that Garth was a member of the
25 animal welfare committee in 2000. But I'll verify

Page 101

1 that.
2    Q.    Correct.  And as a member in 2000, did
3 he attend committee meetings?
4    A.    I didn't manage Garth's schedule nor do
5 I have access to his calendar.
6    Q.    And sitting here today, you don't know
7 whether he attended the May 15th meeting?
8    A.    I do not.  I know he attended meetings,
9 but I can't tell you if he attended that meeting,
10 if there was a meeting.
11    Q.    Let me pull what's previously been
12 marked as Exhibit 213.  And this is the UEP board
13 of directors meeting minutes for May 15th through
14 the 18th of 2000.  And if you look down, the
15 members who attended this meeting on that first
16 column on the left-hand side, you see Bob Sparboe,
17 correct?
18    A.    Yes.
19        MR. HUTCHINSON:  Objection.  That
20 mischaracterizes what the document says.
21        BY MS. SCHWARTZ:
22    Q.    Let me ask again.  Do you see on the
23 left-hand side there that Bob Sparboe is listed as
24 a member at --
25        MR. HUTCHINSON: Well, Ms. Schwartz, I

Page 102

1 don't like you trying to trick the witness here.  I
2 mean, it doesn't say that these people attended
3 this meeting.  It just lists the members.
4        BY MS. SCHWARTZ:
5    Q.    Let me read you the sentence right
6 before the members are listed.  "The chairman
7 called for introductions of all attendees.  Those
8 being present included."  Do you see that sentence?
9    A.    Mm-hmm.
10    Q.    And listed under members is Bob Sparboe,
11 correct?
12    A.    I see his name on the list.
13    Q.    Following the sentence that says "Those
14 being present included:"?
15    A.    Right.
16    Q.    And Bob Sparboe is then listed following
17 that colon, correct?
18    A.    I cannot attest to where Bob Sparboe or
19 Garth Sparboe were, if they attended a meeting or
20 didn't attend a meeting.  I don't feel that I can
21 testify to that.
22    Q.    And --
23    A.    If they were in Washington, D.C. and
24 didn't attend the meeting or did attend the
25 meeting, I don't know how I can testify to their

Page 103

1 whereabouts.
2    Q.    And to prepare to testify today on
3 behalf of the company --
4    A.    Yes.
5    Q.    -- you understand that one of the topics
6 today was attendance and participation at UEP
7 meetings, correct?
8    A.    Correct.
9    Q.    And to become knowledgeable about that
10 topic, what did you do specifically to prepare for
11 that?
12    A.    I did not check with Bob's schedule for
13 every hour of the day that he was at a meeting in a
14 particular city.
15        MR. HUTCHINSON:  I want to also note for
16 the record that this is a document that is Bates
17 labeled United Egg Producers and was produced in
18 the case by United Egg Producers.
19        MS. SCHWARTZ:  And I'm going to ask
20 Mr. Hutchinson to stop testifying.  We've already
21 read the Bates label in this case.
22        THE WITNESS:  Mm-hmm.
23        BY MS. SCHWARTZ:
24    Q.    Let me ask you again, you understand
25 that you're here today to provide corporate

Page 104

1 representative testimony, correct?
2    A.    Correct.  Correct.
3    Q.    And this is not just your personal
4 knowledge, it's the knowledge of the company,
5 correct?
6    A.    Correct.
7    Q.    And what did you do to determine whether
8 Sparboe had attended UEP meetings in any given
9 year?
10    A.    Could you ask me -- could you give me
11 some examples of what you would have expected me to
12 do?
13    Q.    I'm asking what you did.
14        MR. HUTCHINSON:  Are you asking her if
15 she reviewed documents produced by United Egg
16 Producers?
17        MS. SCHWARTZ:  Can you read my question
18 back to the witness.
19        (Whereupon, the requested portion of
20 testimony was read back by the reporter.)
21        MR. HUTCHINSON:  And she provided you
22 that testimony at the beginning of this deposition.
23    A.    I said that Bob Sparboe -- or that
24 various members of Sparboe's management team
25 participated in UEP meetings and were on various

Page 105

1 committees.
2       BY MS. SCHWARTZ:
3    Q.    And I'm asking you specifically with
4 regard to whether there was participation in the
5 year 2000.  I have a request for admission response
6 that says you don't know.  And I'm asking you with
7 regard to the meeting minutes from the board of
8 directors in 2000 that lists those being present
9 included --
10    A.    Right.
11    Q.    -- Bob Sparboe --
12    A.    Correct.
13    Q.    -- would it be your expectation that he
14 was present at this meeting?
15    A.    I actually -- I have no way of knowing.
16 Bob Sparboe attended many meetings and would have
17 other meetings set up.  He may have been there for
18 part of the meeting.  I can't speak to where -- I
19 cannot testify if Bob Sparboe sat in for this
20 entire meeting.
21    Q.    I'm not asking for the entire meeting.
22 I'm asking to the best of your knowledge sitting
23 here today, you don't know whether he attended,
24 correct?
25    A.    I'm reading a document that has been

Page 106

1 provided by UEP that says Bob Sparboe was in
2 attendance.  And you're asking me to verify if he
3 was in attendance.  And I'm saying I didn't -- I
4 don't have access to Bob Sparboe's calendar from
5 2000.  And he's not living and I can't ask him if
6 he was in attendance.
7    Q.    And you'll see in the column next to
8 him, Garth Sparboe is listed, correct?
9    A.    Correct.
10    Q.    Sitting here today, do you have any
11 reason to doubt that the meeting minutes for the
12 board of directors for 2004 were incorrect where
13 they listed both Bob Sparboe and Garth Sparboe --
14    A.    No.
15    Q.    -- as those being present?
16    A.    I don't.
17    Q.    And again, looking at your response with
18 regard to attending a UEP meeting in 2000, do you
19 have any reason to believe that Garth Sparboe and
20 Bob Sparboe did not attend at least one UEP meeting
21 in 2000?
22    A.    I do not.
23    Q.    Then let's go down to Request Number 6.
24 It says, "Admit that you attended at least one UEP
25 meeting in 2001," correct?

Page 107

1    A.    Mm-hmm.
2    Q.    And sitting here today, do you have any
3 independent recollection on whether Sparboe
4 attended a UEP meeting in 2001?
5    A.    I do not have any recollection.
6    Q.    Then let me mark as Exhibit 487 a
7 document that is Bates labeled UE0296013.
8          (Plaintiff's Exhibit 487 was marked
9              for identification.)
10       BY MS. SCHWARTZ:
11    Q.    And this is the UEP board of directors
12 meeting minutes for May 16th through the 17th of
13 2001, correct?
14    A.    Mm-hmm.  Yes.
15    Q.    And you see the very first sentence that
16 says, "The meeting was called to order by Chairman
17 Carl Lofgren with the following being present."  Do
18 you see that?
19    A.    Mm-hmm.  I do.
20    Q.    And do you see under the individuals who
21 are listed as being present that Garth Sparboe is
22 listed?
23    A.    Yes.
24    Q.    And sitting here today, do you have any
25 reason to doubt that the meeting minutes reflecting

Page 108

1 Garth Sparboe's attendance at a 2001 board of
2 directors meeting are incorrect?
3    A.    No.
4    Q.    And, again, going back to the request
5 for admissions, then, it appears that in 2001,
6 Sparboe attended at least one UEP meeting, correct?
7    A.    Correct.
8    Q.    I'm going to combine finishing out of
9 this topic, which is the UEP topic, along with
10 topic number 24 because I think it makes sense to
11 talk about these together.  Topic 24 is the UEP
12 certified topic, correct?
13    A.    Correct.
14    Q.    And let's go ahead and start from the
15 beginning of this.  As we looked at before, Garth
16 Sparboe was appointed to serve on the first animal
17 welfare committee for UEP, correct?
18    A.    Correct.
19    Q.    And is it fair to characterize that
20 Sparboe was instrumental in the early development
21 of the UEP certified program?
22    A.    I would say not instrumental, no.
23    Q.    How would you characterize it?
24    A.    Participating.  I suppose you could say
25 Garth was instrumental.  I don't know.  What --

Page 109

1 could you define what you mean by "instrumental"?
2 I mean, is there a --
3          MS. SCHWARTZ:  Let's go ahead and mark
4 as Exhibit 488 --
5          (Plaintiff's Exhibit 488 was marked
6          for identification.)
7          BY MS. SCHWARTZ:
8     Q.    And you see at the bottom of this
9 document, it has the Bates label SF at the bottom,
10 correct?
11    A.    Yes.
12    Q.    And, again, this is a document that
13 would have been produced by Sparboe in this
14 litigation, correct?
15    A.    Okay.
16    Q.    Correct?
17    A.    Yes.
18    Q.    And have you ever seen this document
19 before?
20    A.    I need to -- may I review it?
21    Q.    Please.
22    A.    (Reading).
23          MS. SUMNER:  Rachel, could you read the
24 Bates number for those of us on the phone?
25          MS. SCHWARTZ: Sure.  It's SF121458.

Page 110

1          MS. SUMNER:  Thank you.
2          BY MS. SCHWARTZ:
3     Q.    Have you had the chance to read through
4 this document?
5     A.    Thank you.  Yes.
6     Q.    And have you seen this document before?
7     A.    I must have, yes.
8     Q.    And I'm just going to focus on the last
9 sentence of the first paragraph.  And it says, "The
10 Sparboe company was very instrumental early on in
11 the development of this program" --
12    A.    Yes.
13    Q.    -- "working tirelessly to assure that
14 the scientific guidelines were realistic and
15 economically prudent, in addition to meeting the
16 expectations of the animal welfare advocates." Did
17 I read that correctly?
18    A.    Correct.  Yes.  Exactly.
19    Q.    And is that a fair characterization of
20 Sparboe's early involvement with the development of
21 the program?
22    A.    I believe so.
23    Q.    I'll put this aside.  We'll come back to
24 that.  Let me show you what's previously been
25 marked as Exhibit 104.

Page 111

1     A.    (Reading).
2     Q.    And the title of this document is "UEP
3 Animal Welfare Committee Meeting, May 15th of
4 2000."  Do you see that at the top?
5     A.    Mm-hmm.
6     Q.    Have you seen this document before?
7     A.    I don't recall.  Yeah.  It's Don Bell's
8 work.  I've seen them.
9     Q.    Do you recall back in the 2000 time
10 period that Sparboe was involved in reviewing the
11 possibility of changing the cage spaces anywhere
12 from 48 inches to the 64 inches, as reflected on
13 this meeting minutes?
14    A.    I don't recall.
15    Q.    Would Garth Sparboe have kept you
16 involved with the discussions at the animal welfare
17 committees?
18    A.    In a broad sense.
19    Q.    Would he have -- who would he have
20 primarily been reporting back to at the company
21 about what was happening in the committees?
22    A.    The management team or Bob Sparboe.
23 Garth Sparboe's role was largely as it relates to
24 production and the animal care aspect of the
25 program.

Page 112

1     Q.    And who would have been his supervisor
2 at that time?  Was it his father?
3     A.    In this regard, yes.
4     Q.    And why was it important for Sparboe to
5 have somebody on the animal welfare committee?
6     A.    Because we were very, very concerned
7 about making sure that we met our customers' needs.
8 We had different customers.  We had one customer in
9 particular that was going down a path with their
10 own specific production guidelines.  And the United
11 Egg Producers was working on developing production
12 guidelines with the scientific animal welfare
13 committee that were different.  And there were
14 other discussions with other food service companies
15 that were yet different.
16          So we saw the potential for three, and
17 we were very concerned -- we just -- as all
18 producers were concerned that we make sure we're
19 apprised of what are the developments.  Our focus
20 was on our own specific customers.
21    Q.    And the customer you were referencing
22 who was developing its own animal welfare
23 guidelines, is that McDonald's?
24    A.    Correct.
25    Q.    And by 2000, did McDonald's already have

Page 113

1 animal welfare guidelines in place?
2    A.   I believe so.
3    Q.   And to the best of your recollection
4 sitting here today, do you recall what those
5 requirements were in a broad sense?
6    A.   I do.
7    Q.   And what were they?
8    A.   72 square inches.
9    Q.   And by 72 square inches, you mean --
10 what do you mean by that?
11   A.   72 square inches per hen, and there were
12 a number of other requirements in the program.  And
13 we responded to our customers' requests and
14 complied with their requirements.
15   Q.   So in 2000, Sparboe would have had some
16 of its facilities that were complying with the 72
17 inches?
18   A.   Not in 2000.  At some point later than
19 that.
20   Q.   Okay.
21   A.   We were beginning our relationship.
22   Q.   And if you look at the bottom of the
23 very first page, you see that it says, "Increasing
24 space allowances would have two major effects."  Do
25 you see that?

Page 114

1    A.   Yes.
2    Q.   And the first one says in part, "A
3 positioning of the industry as a pro welfare step."
4 Do you see that?
5    A.   I do.
6    Q.   And then the second one says, "An
7 increase in space allowance would inevitably reduce
8 the layer population and thereby reduce the surplus
9 production problems affecting the industry over the
10 past 20 years."  Do you see that?
11   A.   I do.
12   Q.   And in 2000, is it fair to say that the
13 egg industry had had surplus production problems?
14   A.   I don't know that.
15   Q.   Is it --
16   A.   They may have.  Some producers may have.
17   Q.   Sparboe was not concerned in 2000 about
18 an excess supply of eggs on the market?
19   A.   No.
20   Q.   And Sparboe was not concerned in 2000
21 about low prices for eggs?
22   A.   Well, I presume Sparboe -- all producers
23 are concerned about -- no.  I don't -- I can't say.
24 I don't know.
25   Q.   Sitting here today, is it your testimony

Page 115

1 that you don't know that there was a surplus
2 production of eggs in 2000?
3    A.   I don't recall.
4    Q.   Do you recall discussions in 2000 at UEP
5 about surplus eggs?
6    A.   I personally don't recall.  Our interest
7 in UEP was exclusively towards getting the animal
8 care program developed in a way that would meet
9 specific customers' needs for an animal care
10 program that they were receiving pressure from
11 animal activists.
12        To my knowledge, Sparboe Farms never
13 engaged in conversations about reduction of egg
14 supply with anybody.
15        MS. SCHWARTZ:  Move to strike that as
16 nonresponsive.
17        BY MS. SCHWARTZ:
18   Q.   We'll come back to that on a separate
19 topic.  Why -- what background did Garth Sparboe
20 have with regard to animal welfare prior to his
21 participation on the animal welfare committee?
22   A.   He grew up in the industry.
23   Q.   Any specific training?  Did he have a
24 higher education or anything in animal welfare
25 issues?

Page 116

1    A.   No.
2    Q.   So the expertise that he would have
3 brought to serving on the committee was his
4 background of growing up in the industry?
5        MR. HUTCHINSON:  Objection, asked and
6 answered.
7        BY MS. SCHWARTZ:
8    Q.   You can go ahead and answer my question.
9    A.   I don't know.  I don't know that there
10 was any specific expertise required or
11 qualifications to serve on that committee.  I'm not
12 aware of any qualifications that were required.
13   Q.   And I'm asking what quantifications he
14 may have had, not that it was necessarily a
15 requirement.  So outside of growing up in the
16 industry, was there any additional --
17   A.   Garth had served -- or I believe was
18 serving in a sales capacity.  He was meeting with
19 customers.  He understood and was meeting with
20 customers to find out what their expectations were.
21   Q.   But no specific higher education degree,
22 for instance, in an animal welfare --
23   A.   No.
24   Q.   Any specific other training on that?
25   A.   Hmm-mm.

Page 117

1    Q.    And is it your understanding that Garth
2  Sparboe was specifically asked to help design the
3  implementation timeline for any potential phase-in?
4    A.    He was engaged in those discussions.
5    Q.    And he actually did some of the early
6  work on the implementation time line, didn't he?
7    A.    I believe so.
8    Q.    And do you know why specifically he
9  was --
10   A.    He was, I believe, concerned about
11 disruption to making sure that we had eggs
12 available for the customers.
13   Q.    And to your knowledge, was --
14   A.    It would take the industry a while to
15 build --
16   Q.    I'm sorry.  I didn't mean to interrupt
17 you.
18   A.    I'm sorry.  It's not relevant.
19   Q.    Other than McDonald's, did you have
20 customers in the 2000 time period who were
21 demanding an animal welfare program?
22   A.    Sparboe Farms did not, to my knowledge.
23   Q.    And in 2000, McDonald's would have
24 already had their animal welfare program --
25   A.    I believe so.

Page 118

1    Q.    -- in place?
2          So they were not asking you to create a
3  new animal welfare program?
4    A.    Sparboe Farms -- or excuse me --
5  McDonald's and Cargill Kitchen Solutions developed
6  their own program.
7    Q.    And to the best of your knowledge, that
8  would have been in place, at least the beginning
9  part of it, in 2000?
10   A.    I believe the work was done, yes.
11         MS. SCHWARTZ:  I'm marking as
12 Exhibit 489 a document with the Bates label
13 MPS-Kansas 00078052.
14         (Plaintiff's Exhibit 489 was marked
15         for identification.)
16         BY MS. SCHWARTZ:
17   Q.    And this appears to be a printout of an
18 e-mail, showing you how times have changed, it's at
19 mindspring.com.  But do you see at the top that
20 it's from Gene Gregory and to Bob Krouse and Garth
21 Sparboe?
22   A.    Yes.
23   Q.    And Bob Krouse is the president of
24 Midwest Poultry, correct?
25   A.    I believe so, yes.

Page 119

1    Q.    And the date on that is October 3rd of
2  2000.  Do you see that?
3    A.    Yes.
4    Q.    And as you go down this e-mail, you see
5  Mr. Gregory starts by saying -- by asking both Bob
6  Krouse and Garth Sparboe to bring a copy of the
7  McDonald's guidelines along with them to the
8  meeting.  So that's consistent with your
9  recollection that McDonald's had guidelines in
10 place at least by October of 2000?
11   A.    Yes.  I believe so.
12   Q.    And you'll see in that first sentence --
13 or in that first paragraph it starts off with, "I
14 view this meeting as a goal to accomplish the
15 following."  Do you see that?
16   A.    Yes.
17   Q.    That part of the goal of an upcoming
18 meeting with McDonald's was to "demonstrate to
19 McDonald's the importance of changing their
20 guidelines to be nearly the same as the UEP
21 producer committee guidelines."  Do you see that?
22   A.    Yes.
23   Q.    And at the time -- and if you've got
24 that document still in front of you, the minutes --
25   A.    This one (Indicating)?

Page 120

1    Q.    Correct.  What was previously marked as
2  Exhibit 104.  I don't see 72 inches as one of the
3  cage allowance considerations that they were
4  discussing, at least back at that May 15th meeting,
5  correct?
6    A.    Correct.
7    Q.    And to the best of your recollection, at
8  that time, McDonald's would have had a 72
9  inch-requirement?
10   A.    On page 2, number 4C, it refers to 72
11 square inch.  I don't know.  I didn't write this
12 document.  I just see 72 inches on there.
13   Q.    Oh.  Sorry.  Let me refer you back to
14 the May 15th 2004 meeting minutes.
15   A.    Yeah.
16   Q.    And you're looking on which page?
17   A.    I don't know what this means, but I just
18 see 72 square inches under B4.
19   Q.    I see that.  On the first page, though,
20 let's take a look at this, under "cage space
21 allowance considerations," do you see that there
22 was an analysis done from between 48 inches to 64
23 inches, correct?
24   A.    Mm-hmm.
25   Q.    And you're correct that on the next

Page 121

1 page, there's a discussion of potentially 72 inches
2 by 2015.
3     A.    Mm-hmm.  Correct.
4     Q.    But I don't see any analysis of the 72
5 inches there.  Do you?
6     A.    (Reading).  I'm not -- is there a
7 question?  I'm sorry.  You have to rephrase your
8 question.  So I thought we were --
9     Q.    No.  I'm sorry.  I thought you were
10 looking at that document.
11     A.    Mm-mm.
12     Q.    It does not appear, at least on the face
13 of that document, that there was an analysis done
14 of the 72 inches, correct?
15     A.    I don't know if there was -- I don't
16 know.
17     Q.    On the face --
18     A.    I don't know if the industry was looking
19 at 72 square inches.  I know that McDonald's that
20 his stated 72 square inches was what they wanted.
21 I believe Burger King had a different density.
22     Q.    And does the UEP-certified program today
23 mandate 72 inches?
24     A.    No.
25     Q.    To the best of your knowledge, did the

Page 122

1 UEP program ever mandate 72 square inches for hens?
2     A.    No.
3     Q.    But at the time back in 2000, McDonald's
4 was requiring that higher number, correct?
5     A.    Correct.
6     Q.    And so it appears from this that part of
7 the hope of Mr. Gregory's upcoming meeting with
8 McDonald's was to get them to change from the 72
9 inches to a lower number, correct?
10     A.    That's what this e-mail looks like, yes.
11     Q.    And if you turn to the next page, if you
12 go to the page that has at the bottom 54 -- where
13 there's a comparison of animal welfare guidelines.
14 Do you see that?
15     A.    Mm-hmm.  I do.
16     Q.    And there, consistent with your
17 recollection, McDonald's had a minimum of 72 square
18 inches of cage space, correct?
19     A.    Correct.
20     Q.    And it shows -- the next one talks about
21 the scientific committee report.  Sitting here
22 today, do you assume that that's the UEP scientific
23 committee?
24     A.    I believe so.
25     Q.    And you were aware that UEP had formed a

Page 123

1 scientific committee back in 2000, correct?
2     A.    I was.
3     Q.    And there was also the UEP producer
4 committee as well?
5     A.    Correct.
6     Q.    And it appears that the producer
7 committee -- it appears that the scientific
8 committee had recommended 67 to 86 square inches,
9 correct?
10     A.    Correct.
11     Q.    And 86 inches, again, have never been
12 part of the UEP certified program, correct?
13     A.    No.
14     Q.    And what is the highest square inch that
15 the UEP certified program has ever required?
16     A.    67 square inches.
17     Q.    So the minimum of the space allowance
18 range that was recommended by the scientific
19 committee report, correct?
20     A.    Correct.
21     Q.    And if you go down that same paragraph,
22 the scientific committee had recommended a minimum
23 feeder space of four inches per bird, correct?
24     A.    Correct.  Well, let me rephrase that.
25           You're saying the scientific committee.

Page 124

1     Q.    Correct.  And let me rephrase.
2     A.    Correct.
3     Q.    The scientific committee had recommended
4 a minimum feeder space of four inches per bird.
5     A.    Mm-hmm.
6     Q.    And what is -- if you could explain to a
7 layman what the feeder space is.
8     A.    That if all the chickens happen to line
9 up side by side and eat at the feeder at the same
10 time, they would each need to have four inches.
11     Q.    So the feeder space talks about how
12 much --
13     A.    The length of the cage, the housing
14 unit, making sure that if they were all lined up at
15 exactly the same time...
16     Q.    And the scientific committee had
17 recommended a minimum of four inches per bird,
18 correct?
19     A.    Mm-hmm.  Correct.
20     Q.    Does the UEP-certified program today
21 have a four-inch minimum --
22     A.    I do not believe so.
23     Q.    -- for -- let me go ahead and finish
24 that question.
25           Does the UEP-certified program today

Page 125

1  have a four-inch minimum for the feeder space?
2      A.    To my knowledge, no.
3      Q.    And as you go down this page, if you go
4  to lighting, it looks like McDonald's had very
5  specific requirements for lighting.
6          Is that fair to say?
7      A.    I'm not an expert on the lighting system
8  of the McDonald's program.
9      Q.    It had what looks like a minimum of 13
10  hours of light during the day.
11      A.    Mm-hmm.
12      Q.    Correct?
13      A.    According to this, yes.
14      Q.    And in the UEP-certified program today,
15  are there minimums for lighting?
16      A.    Yes.
17      Q.    And what are those minimums?
18      A.    They're measured in for the candles.
19      Q.    And can you explain what a foot-candle
20  is?
21      A.    It's a measurement of light.  And they
22  measure it throughout the height of the barn.  And
23  each bird is required to have at least one-half
24  foot-candle.
25      Q.    And do you have a sense as to what the

Page 126

1  size of a foot-candle is?
2      A.    It's a measurement of light that you use
3  a tool to measure the light.  But I am not an
4  expert on lighting.
5      Q.    And if you turn the page, there's air
6  quality and temperature control.  Do you see that?
7      A.    I do.
8      Q.    Do you know sitting here today what the
9  current UEP guidelines are for air quality?
10      A.    I'm not an expert on air quality.
11      Q.    Sitting here today, do you know what
12  those requirements are?
13      A.    No.  I know there are requirements.  I
14  can't -- I can't quote them off the top of my head.
15      Q.    And it looks like if you read what the
16  scientific advisory committee recommended, the
17  second sentence of that says, "Good ventilation,
18  waste management and husbandry practices usually
19  result in acceptable air quality."  Do you see
20  that?
21      A.    Yes.
22      Q.    And down under the producer committee
23  guidelines, do you see that the difference is that
24  it says "sufficient ventilation"?
25      A.    Yes.

Page 127

1      Q.    And sitting here today, do you recall
2  whether the UEP guidelines today are "sufficient
3  ventilation" or "good ventilation"?
4      A.    I can't -- I don't know what the
5  distinction is between "sufficient" and "good."  I
6  can tell you as an egg producer for my whole life,
7  it's very important for the hens to have good air
8  quality.  So every farmer wants good air quality in
9  their farm.
10      Q.    And in particular, it's important to
11  minimize carbon monoxide?
12      A.    Correct.
13      Q.    And why is that?
14      A.    Well, the ammonia isn't -- you just want
15  to have clean air for the chickens.
16      Q.    And the ammonia comes in through what
17  process?  What's bringing that into --
18      A.    I'm just not a scientist.  Ammonia is in
19  the barn naturally through the waste and through
20  the -- but I'm not a scientist, so I'm not
21  qualified to answer your question.
22      Q.    The next section talks about the
23  differences with molting.  And can you explain what
24  feed withdrawal molting is?
25      A.    Layers that were -- the natural tendency

Page 128

1  for a layer is to go through a rest period.  And
2  we -- in commercial egg production, we duplicate
3  that through -- we create a winter-type environment
4  for the birds where they don't have -- they go
5  through a period -- we don't do this.  In some
6  flocks, they molt.  In other flocks, they don't
7  molt.  So can you define exactly what you'd like me
8  to answer in regard to molting?
9      Q.    I am asking what feed withdrawal molting
10  is.
11      A.    So some producers will withdraw feed
12  from the chicken to duplicate the winter season in
13  which they would stop their reproductive cycle and
14  give their reproductive cycle a break.
15      Q.    And that --
16      A.    It's one of the husbandry management
17  practices that some producers use.
18      Q.    Has Sparboe, from 1999 through the
19  present, ever done feed withdrawal molting?
20      A.    Yes.
21      Q.    Does it do it today?
22      A.    No.
23      Q.    When did it stop?
24      A.    I don't -- I can't answer that.  I don't
25  know when.

Page 129

1    Q.    And is feed withdrawal molting allowed
2  in the UEP-certified program?
3    A.    No.
4    Q.    So it's fair to say by at least the time
5  Sparboe became a UEP-certified program that they
6  would have stopped feed withdrawal molting?
7    A.    Absolutely.
8    Q.    And what is your understanding as to why
9  McDonald's would not accept feed withdrawal
10  molting?
11    A.    I don't know.
12    Q.    What is your understanding of the
13  objections to feed withdrawal molting?
14    A.    It has to do with the animal care --
15  animal -- perception of animal care, hen care.
16    Q.    That there is a perception that that
17  might be inhumane?
18    A.    Mm-hmm.  I believe so.
19    Q.    And if you go to the very last page of
20  that document, there is an implementation period.
21  Do you see that?
22    A.    Mm-hmm.
23    Q.    And do you see that the scientific
24  committee "made no recommendation of when
25  guidelines would be implemented"?  Do you see that?

Page 130

1    A.    Yes.
2    Q.    And that's consistent with your
3  recollection that they did not make a specific
4  recommendation on when the guidelines would be
5  implemented?
6    A.    Is this implementation of the feed
7  withdrawal -- what specific implementation period
8  are we looking at?  I'm not that familiar with this
9  document.
10    Q.    Let me ask more generally.  Were you
11  aware of any specific recommendation made by the
12  UEP scientific advisory committee as to when the
13  animal guidelines would be implemented?
14    A.    No.
15    Q.    And were you aware of any specific
16  recommendation from the UEP scientific advisory
17  committee as to when to phase in the cage
18  reductions?
19    A.    Yes.
20    Q.    They spoke specifically on when to phase
21  in the cage reductions?
22    A.    There was a -- clarify your question for
23  me, please.  I'm getting confused.
24    Q.    As part of the UEP-certified program,
25  there were phase-ins of --

Page 131

1    A.    Correct.
2    Q.    Fair enough.  Are you aware that the
3  scientific advisory committee provided a timeline
4  for those phase-ins?
5    A.    I don't know.
6    Q.    And it sounded like that was something
7  that Garth Sparboe was involved in, was trying to
8  put together a schedule for the phase-ins?
9    A.    No.  Garth -- he was not involved in
10  putting that schedule together.  He was in
11  discussions about how -- the implications of it.
12  But the phase-in schedule -- I just was trying to
13  draw the connection between the feed and the
14  molting and all of that and the -- I don't recall
15  that the scientific committee made a phase-in
16  schedule about specific components of the animal
17  care program.  I thought that's what was your
18  question.
19    Q.    Okay.
20    A.    And as far as the phase-in itself, I
21  don't know if UEP did that or if the scientific
22  committee made that recommendation on when the
23  phase-in should be done.
24    Q.    But you recall that --
25    A.    I recall discussions about it, yeah.

Page 132

1    Q.    And that Garth Sparboe was involved in
2  those discussions?
3    A.    Correct.
4    Q.    And to the best of your recollection,
5  when was the first UEP scientific -- when was the
6  first UEP guidelines completed?
7    A.    I don't recall.
8    Q.    Sparboe applied in 2002 to be a
9  UEP-certified company, correct?
10    A.    Their number.
11    Q.    And actually received a certified number
12  of 130 to begin with, correct?
13    A.    Mm-hmm.  Correct.
14    Q.    And 2002 was the first time you could
15  apply to be a UEP-certified member?
16    A.    Mm-hmm.
17    Q.    And at that time, by 2002, other than
18  McDonald's, did you have any customers who were
19  demanding that you implement an animal welfare
20  policy?
21    A.    That was our whole entire problem, is
22  that because we're a very customer-focused company,
23  we did not have that many customers demanding that
24  we be UEP certified.  And many of our customers
25  didn't have any concern at all about animal care,

Page 133

1 and a large chunk of our customers.

2     So we were fighting and trying to make
3 sure that we could put certain farms on the program
4 for those customers that required it and, as
5 exampled with our relationship with Cargill and
6 McDonald's, we produced eggs from chickens that
7 were provided with greater than density than what
8 UEP offered. So we were very customer-focused and
9 very concerned with the UEP regarding the hundred
10 percent rule, when that began.

11     So as you can see, we got a
12 certification number early on, very supportive of
13 the animal welfare components and the production
14 components of the program.

15    MS. SCHWARTZ: Let me just ask. It's
16 noon right now. This may make sense to take a
17 lunch break, but I don't know if food is here or --

18    MR. HUTCHINSON: I think I heard
19 somebody out there.

20    MS. SCHWARTZ: All right. This may be a
21 good time to take a break.

22    MR. HUTCHINSON: Okay.

23    THE VIDEOGRAPHER: We are going to off
24 the record at 12:05 p.m.

25

Page 134

1    (Whereupon, at 12:05 p.m. a lunch recess
2 was taken.)

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

1    A F T E R N O O N  S E S S I O N

2     (12:51 p.m.)

3    * * * * *

4    Whereupon,

5     BETH SCHNELL,

6 the witness testifying at the time of

7 recess, having been previously duly

8 sworn, was further examined and testified

9 as follows.

10    * * * * *

11 EXAMINATION RESUMED BY COUNSEL FOR THE PLAINTIFF

12    THE VIDEOGRAPHER: We are back on the
13 record at 12:51 p.m.

14    BY MS. SCHWARTZ:

15  Q.  We are back on the record after lunch
16 and it sounds like everybody is still on the phone
17 from this morning, so no changes in attendees yet.

18    And where we had left off right before
19 lunch was Sparboe had applied and obtained its UEP
20 certification in 2002, correct?

21  A.  Yes.

22  Q.  And in 2002, was Sparboe in compliance
23 with all of the requirements of the certified
24 program at that time?

25  A.  No.

Page 136

1  Q.  And what requirements were you not in
2 compliance with?

3  A.  That was the phase-in -- we didn't have
4 all of our birds on the program at that time.

5  Q.  Was it a situation that you were in the
6 process of transitioning those birds to be in the
7 program?

8  A.  No.

9  Q.  It was the intention to keep a certain
10 number of birds off of the program?

11  A.  Correct.

12  Q.  And in a rough percentage of your total
13 birds, what birds were you wanting to keep off of
14 the program?

15  A.  Generally speaking, more than half of
16 our birds were not on the UEP program at that
17 point. They were either on the program specified
18 to another customer or they were birds that we were
19 producing under our normal production guidelines
20 for customers that did not require the UEP program.

21  Q.  And for customers that didn't require
22 the UEP program, what was your cage density back in
23 2002?

24  A.  That varied. Generally speaking, 53 or
25 54 square inches per hen.

Page 137

1    Q.    And the -- do you remember the initial
2 phase-in numbers for the UEP-certified program?
3    A.    Which numbers?
4    Q.    The first one that you did not believe
5 you were in compliance with at that time.
6    A.    I think at first it was 59 or 57.
7    Q.    And your best guess is about 50 percent
8 or so of your layers would not have been either
9 transitioning towards the UEP certified --
10   A.    It's a difficult question to answer
11 because every year you have a different number of
12 birds. We were growing quite a bit at that time.
13 We were building new barns. We were expanding.
14 And so when I speak of birds that we committed to
15 the programs, those birds were fully compliant for
16 the barns that we had committed to be on the
17 UEP-certified program.
18   Q.    And in a rough estimate, how many of
19 your birds had you committed to be on the UEP
20 program?
21   A.    Generally speaking, our complexes, which
22 were the farms.
23   Q.    And how does that break down across your
24 company? How many of your complexes were you
25 committing to the UEP program?

Page 138

1    A.    In what year?
2    Q.    In 2002, right when the program starts.
3    A.    Oh. I can't answer that. I don't
4 recall.
5    Q.    Today how many complexes do you have?
6    A.    We have five.
7    Q.    And you have complexes here in
8 Minnesota?
9    A.    Correct. We have -- we grade eggs out
10 of five complexes.
11   Q.    Complexes in Minnesota?
12   A.    Iowa.
13   Q.    Iowa?
14   A.    Colorado.
15   Q.    Just those three states?
16   A.    Correct.
17   Q.    And would that have been the same back
18 in 2002?
19   A.    No. We had more.
20   Q.    Were they in additional states than --
21   A.    No.
22   Q.    -- those three?
23         Okay. And of those complexes, how many
24 of those were committed to be UEP certified?
25   A.    At what year?

Page 139

1    Q.    In 2002.
2    A.    I don't recall.
3    Q.    Okay. One question as it relates to the
4 origins of the UEP-certified program. It was Garth
5 Sparboe's perception that the animal welfare issue
6 was really being driven by McDonald's, wasn't it?
7    A.    Could you restate that question?
8    Q.    Sure. As it relates to the origin of
9 the UEP certified, it was Garth Sparboe's
10 perception that the animal welfare issue was really
11 being driven by McDonald's, wasn't it?
12   A.    No. No. The animal welfare issue was
13 driven by the activists.
14   Q.    In terms of the welfare issues that led
15 to the UEP-certified program, did he believe that
16 that was being driven in large part by McDonald's?
17   A.    Garth believed that we were, as we
18 always have, watched our customers and potential
19 customers in terms of the issues they're dealing
20 with. And we are very concerned if our customers
21 are having to deal with an issue. And we could see
22 the activists were going to go beyond McDonald's.
23         So I think Garth's perception was that
24 if the activists are working on converting
25 McDonald's, or pressuring McDonald's, it won't be

Page 140

1 long and they'll be converting our -- you know --
2 not converting, but they will be pressuring our
3 customers potentially as well. So that was his
4 perception is that, looking forward, perhaps our
5 customers may be pressured by activists as well.
6         MS. SCHWARTZ: Let me mark as
7 Exhibit 490, It's Bates labeled SF138.
8         (Plaintiff's Exhibit 490 was marked
9         for identification.)
10        BY MS. SCHWARTZ:
11   Q.    And this appears to be a memo put
12 together by Garth Sparboe on -- with a date of
13 May 21st of 2002. Do you see that?
14   A.    Mm-hmm. I do.
15   Q.    And the subject line is "United Egg
16 Producers/Food Marketing Institute Animal Welfare
17 Program."
18   A.    Mm-hmm.
19   Q.    Do you see that?
20   A.    Right.
21   Q.    And at the top of that page, is that the
22 Sparboe Farms -- or would that have been the
23 Sparboe Farms fax number?
24   A.    Yes. It may have been. Yes.
25   Q.    And who are Mike Tetmeyer and Matt

1 Dugan, if you know?

2    A.    Mike Tetmeyer was with Hy-Vee.  Matt

3 Dugan is with PDI.

4    Q.    And what is the second one?

5    A.    PDI.

6    Q.    And PDI?  And what is PDI?

7    A.    It's affiliated with Hy-Vee, a retail

8 operation in Iowa.

9    Q.    Were these customers of yours back in

10 2002?

11    A.    They may have been.

12    Q.    Does Hy-Vee remain one of your customers

13 today?

14    A.    No.

15    Q.    And if you look down to what starts with

16 the number one.  Do you see that?

17    A.    Mm-hmm.

18    Q.    And it says, "The animal welfare issue

19 regarding eggs has been 'driven' by McDonald's in

20 the United States.  In 1999, McDonald's formally

21 asked UEP to commission a scientific committee to

22 study the issues.  McDonald's consumes 3 percent of

23 all U.S. eggs."  Is that correct?

24    A.    Yes.

25    Q.    And Garth Sparboe was Sparboe's

1 representative on the animal welfare committee,

2 correct?

3    A.    Mm-hmm.  Mm-hmm.

4    Q.    Was he the person most knowledgeable at

5 Sparboe as it related to these animal welfare

6 programs?

7    A.    Perhaps in this context.

8    Q.    And this was, again, providing

9 information to what you believe would have been two

10 of your customers at the time?

11    A.    Mm-hmm.

12    Q.    Okay.  And to your recollection, when

13 did Sparboe first consider leaving the

14 UEP-certified program?

15    A.    In 2003 and '4 as the -- 2003 and '4.

16    Q.    And was the implementation of the

17 hundred percent rule the reason that Sparboe --

18    A.    Yes.

19    Q.    Let me go ahead and finish.

20    A.    Sorry.

21    Q.    Was the implementation of the

22 100 percent rule the reason that Sparboe began to

23 consider leaving the UEP certified program?

24    A.    I would say yes.

25    Q.    And can you describe for me what is the

1 hundred percent rule?

2    A.    Well, it mandated that an egg producer

3 would have to commit 100 percent of the layers they

4 own to the program.

5    Q.    And that means if you were an egg

6 producer and none of your customers wanted

7 UEP-certified eggs, but you wanted to be a

8 UEP-certified producer, 100 percent of your layers

9 needed to be in the program?

10    A.    Well, I don't know about the first part

11 of that.  What is the relevance of the first part

12 of that question?

13    Q.    Well, let me break it up.  If you wanted

14 to be a UEP-certified producer --

15    A.    Mm-hmm.

16    Q.    -- 100 percent of the layers you owned

17 needed to be in the program, correct?

18    A.    That's correct.

19    Q.    And that meant the layers you owned in

20 Minnesota, the layers you owned in Iowa and the

21 layers you owned in Colorado, correct?

22    A.    Correct.

23    Q.    And whether your clients wanted

24 UEP-certified eggs or not was not a factor on

25 whether -- let me start over.

1        If you had one customer only who wanted

2 UEP-certified eggs and you wanted to provide that

3 customer with UEP-certified eggs --

4    A.    Mm-hmm.

5    Q.    -- 100 percent of your eggs needed to be

6 UEP certified, correct?

7    A.    Because the customer would have mandated

8 that seal and requested that program, and because

9 the customer requested that program, it forced you

10 to put 100 percent of your birds on the program,

11 because in order to get the seal, you had to have

12 the audit, and in order to have the audit, they

13 would audit 100 percent of your flock.

14    Q.    And could you go out as a

15 non-UEP-certified producer and just buy

16 UEP-certified eggs for your customers?

17    A.    No.  You had to be -- I don't understand

18 that specifically.  But it's my understanding

19 people were able to get at one point a license to

20 handle UEP-certified eggs.  We were never involved

21 in that.

22    Q.    Sparboe never had just a license?

23    A.    No.

24    Q.    And today do those licenses still exist

25 in the UEP-certified program?

1    A.   I don't know.  I do not know.

2    Q.   Why did Sparboe not seek out one of

3  those licenses?

4    A.   We weren't qualified because we owned

5  layers.

6    Q.   And so the only people that were

7  qualified for those licenses, to the best of your

8  knowledge, were non-producers?

9    A.   I don't -- I can't -- I don't know that.

10  I don't know.  I'm not sure who was qualified, but

11  we were not.

12    Q.   And your understanding is you were not

13  because you owned hens?

14    A.   I don't know.  I'm not sure why we were

15  not.  But we just -- we weren't.  That wasn't an

16  option for us, so --

17    Q.   And of your customer base back in 2002,

18  did you have anyone that was asking you to join the

19  UEP-certified program?

20    A.   We were very much aware that our

21  customers were aware of the program.  FMI was

22  engaged early on in the 2000s, and FMI was looking

23  at the program requesting to be a part of -- I

24  think FMI was a part of some of it.

25        So we anticipated our customers would be

1  asking for it.  So that's why we were aware of it.

2  And we were -- we had customers asking for it as

3  early as 2003, requiring the UEP seal.

4    Q.   And who were those customers in 2003?

5    A.   Albertson's.

6    Q.   Anyone else?

7    A.   There may be others.  I don't recall.

8    Q.   And from Sparboe's perspective, who was

9  pushing for the 100 percent rule?

10    A.   I have no idea.  I do not know.

11    Q.   Who were the vocal proponents for the

12  100 percent rule?

13    A.   I don't know that either.  Gene Gregory

14  representing the board or whomever was making the

15  decision.

16    Q.   And was there anybody else in the

17  organization, sitting here today, that you believe

18  was in favor of the 100 percent rule?

19    A.   I don't know of anybody else.

20    Q.   Is it your testimony that nobody other

21  than Gene Gregory wanted the hundred percent rule?

22    A.   No.  I don't know who was making those

23  decisions.  I wasn't on the board, so I don't know.

24    Q.   But, again, Sparboe was on the board

25  during this time, as we looked at earlier today,

1  that Sparboe sat on the board of directors for a

2  number of those years.

3    A.   Mm-hmm.

4    Q.   What was Sparboe's understanding of who

5  was pushing for the 100 percent rule?

6    A.   I don't know.

7        MR. HUTCHINSON:  Objection, asked and

8  answered.

9        BY MS. SCHWARTZ:

10    Q.   To the best of your knowledge, who was

11  opposed to the 100 percent rule back in that early

12  time period?

13    A.   I don't know specific individual

14  companies or individuals.

15    Q.   Did Sparboe work with anyone else to try

16  to defeat the hundred percent rule from being a

17  part of the UEP-certified program?

18    A.   Yes.  Sparboe talked with other

19  producers, Amon Baer.  But, yes, I think Sparboe

20  talked with other producers to -- it was quite --

21  Sparboe did, yes.

22    Q.   Other than Amon Baer, were there other

23  producers with whom Sparboe was talking to about

24  opposition to the hundred percent rule?

25    A.   Michael Foods.  That's probably all I

1  can remember.

2    Q.   And what was your understanding as to

3  why Amon Baer and Michael Foods were opposed to the

4  hundred percent rule?

5    A.   Customers.  Their customers were not

6  expecting or demanding it.

7    Q.   So from Sparboe's perspective, it is

8  fair to say that their customers were not demanding

9  either a UEP-certified program or the hundred

10  percent rule?

11    A.   I don't think that's correct.

12    Q.   Is it fair to say that from Sparboe's

13  perspective, their customers were not demanding the

14  hundred percent rule?

15    A.   I would say that's correct.

16    Q.   And did Garth Sparboe ever bring back to

17  the company concerns that the animal welfare issue

18  was transitioning to a supply and demand program?

19    A.   No.

20    Q.   Are you aware of his knowledge of

21  concerns raised by others in the industry that the

22  animal welfare program was becoming a supply/demand

23  program?

24    A.   Am I aware that -- could you restate

25  that question?  I just want --

Page 149

1    Q.   Are you aware of concerns raised by
2  others in the industry that the animal welfare
3  program was becoming a supply/demand program?
4    A.   No.
5         (Plaintiff's Exhibit 491 was marked
6         for identification.)
7       BY MS. SCHWARTZ:
8    Q.   I've marked as Exhibit 491 Bates range
9  UE0331258.  And this -- the first page appears to
10 be a fax dated January 30th of 2002.
11   A.   Mm-hmm.
12   Q.   Do you see that?
13   A.   I do.
14   Q.   Have you seen this document before?
15   A.   No.
16   Q.   And this appears to be a letter, if you
17 flip to the second page of this document, from Gene
18 Gregory, correct?
19   A.   Correct.
20   Q.   And this is sent on UEP letterhead,
21 correct?
22   A.   Mm-hmm.  Yes.
23   Q.   To Ken Looper, correct?
24   A.   Correct.
25   Q.   And who is Ken Looper?

Page 150

1    A.   Ken Looper I believe was the COO of
2  Cal-Maine at the time.
3    Q.   And if you look at the second paragraph
4  of this and the very last two sentences, it says,
5  "In writing this, I have sought the edit and
6  opinions of Bob Krouse, Garth Sparboe and Kurt
7  Kreher, all of which are committee members.  They
8  have been very helpful and supportive."  Do you see
9  that?
10   A.   Mm-hmm.
11   Q.   And if you turn to the second page of
12 this document, you'll see at the very bottom that
13 there is a cc to Garth Sparboe.  Do you see that?
14   A.   Mm-hmm.  I do.
15   Q.   And again, sitting here today, this
16 doesn't refresh your recollection about seeing
17 this?
18   A.   No.  I don't believe I've seen this
19 document.
20   Q.   The second to the last paragraph on the
21 second page, can you read the paragraph that starts
22 with "please understand"?
23   A.   "Please understand that the number of
24 producers have asked me when this issue has changed
25 from an animal welfare issue to a supply/demand

Page 151

1  program.  In saying so, they are telling me that we
2  should meet all of the guidelines, not just the
3  space allowance.  So we are trying to listen to all
4  sides of the issue."
5    Q.   Did Garth Sparboe bring back to the
6  company that there were a number of producers who
7  were inquiring of Gene Gregory as to why -- as to
8  when the UEP-certified program had changed from an
9  animal welfare issue to a supply/demand program?
10      MR. HUTCHINSON:  Objection, asked and
11 answered.
12      BY MS. SCHWARTZ:
13   Q.   You can answer my question.
14   A.   I think that Garth Sparboe was working
15 on the animal care aspects of the program.
16   Q.   And I'll go ahead and repeat my
17 question.  Did he bring back to the company and was
18 the company aware that producers were raising
19 concerns with Gene Gregory that the animal welfare
20 issue was changing to a supply/demand program?
21      MR. HUTCHINSON:  Objection.  This is now
22 the third time you've asked this question.
23   A.   I can't speak to what other producers
24 were thinking or saying in meetings I wasn't in
25 attendance in.

Page 152

1      BY MS. SCHWARTZ:
2    Q.   And that's not what I've asked you.  I'm
3  asking, Garth Sparboe was Sparboe's member on the
4  animal welfare committee, correct?
5    A.   Correct.
6    Q.   He would have been aware of this letter
7  because he's copied on it, correct?
8    A.   Correct.
9    Q.   And he would have been aware that Gene
10 Gregory was hearing from "a number of producers"
11 that folks were raising "concerns that it had
12 changed from an animal welfare issue to a
13 supply/demand program?
14   A.   Right.
15      MR. HUTCHINSON:  Ms. Schwartz, you asked
16 the witness this question and she gave you an
17 answer.  It's on the record.  You have given her
18 this document, you asked if it refreshed her
19 memory.  She said no, and now you've asked the same
20 question three more times.  Respectfully, you've
21 gotten your answer.  Can we move on?
22      BY MS. SCHWARTZ:
23   Q.   You can answer my question.
24   A.   I can't speak to what Gene Gregory was
25 referring to in this letter.

Page 153

1    Q.    To your knowledge, did Garth Sparboe
2 ever write back to Gene Gregory?
3    A.    I have no knowledge of that.  I know
4 that Garth Sparboe was working on the 100 percent
5 rule.
6    Q.    And did Sparboe in 2002 share the
7 concerns that the UEP-certified program was
8 changing from an animal welfare issue to a
9 supply/demand program?
10    A.    I don't think so.  I think Sparboe Farms
11 was very concerned about a program that was a
12 workable, and we were trying to everything we could
13 to get UEP to remove the 100 percent rule, which
14 was very challenging for our company.  And --
15    Q.    Did Sparboe's position on that change
16 over the years?  Did they come to believe or come
17 to raise concerns that the animal welfare program
18 was becoming a supply management program?
19    A.    I think Sparboe Farms consistently
20 believed it was an animal care program driven by
21 our customer demand and customers' needs.  So I
22 don't think our position changed over the years.
23    Q.    And, again, you've mentioned in that
24 response driven by your customer demands.  But in
25 2002, as we've discussed, other than McDonald's,

Page 154

1 who had its own animal welfare program, none of
2 your customers had approached you at that time to
3 ask for an animal welfare program?
4    A.    Albertson's was talking about it.  FMI
5 was looking at it.  FMI was in the midst of taking
6 a look at the whole animal welfare issue, and many
7 of our customers were members of FMI and NCCR.
8    Q.    And I'm specifically asking whether any
9 of your customers came to you to ask for an animal
10 welfare program in 2002.
11    A.    In 2000, one customer did, yes.
12    Q.    Outside of the McDonald's context.
13    A.    I don't recall.  There was a lot of
14 conversation about the animal activism community
15 amongst our customers and concern.
16       MS. SCHWARTZ:  Marking what is
17 Exhibit 492, and this is SF123824.
18       (Plaintiff's Exhibit 492 was marked
19       for identification.)
20       MS. SUMNER:  Can you repeat that number,
21 Rachel?
22       MS. SCHWARTZ:  SF123824.
23       MS. SUMNER:  Thank you.
24       BY MS. SCHWARTZ:
25    Q.    And we were just talking about the 2002

Page 155

1 time period.  But let's take a look at this memo.
2 This is dated June 5th of 2003, correct?
3    A.    Correct.
4    Q.    And have you seen this before?
5    A.    Yes.
6    Q.    And the first sentence says, "Per Beth's
7 request, I have drafted the following memo,"
8 correct?
9    A.    Correct.
10    Q.    And who is Brian Joyner [sic]?
11    A.    Brian Joyer is an employee of our
12 company.
13    Q.    And in 2003, to the best of your
14 recollection, what would his position have been?
15    A.    He would have been a -- I think quality
16 manager -- quality supervisor.
17    Q.    Sitting here today, do you have any
18 doubt that you had asked Mr. Joyer to prepare this
19 memo to circulate?
20    A.    No.
21    Q.    And the three people to whom this was
22 sent, are these all Sparboe employees?
23    A.    Yes.  Were Sparboe employees.
24    Q.    And Terry Colhein?
25    A.    Mm-hmm.

Page 156

1    Q.    What was --
2    A.    Sales rep.
3    Q.    Jim Wade?
4    A.    Sales rep.
5    Q.    And Wendy Ham?
6    A.    Customer service.
7    Q.    And was the purpose of this to start
8 looking and to survey your customers to see what
9 their thoughts were with regard to the animal
10 welfare program?
11    A.    As I've already testified, we understood
12 that this was being discussed in FMI and among
13 large major companies.  Our regional customers, we
14 wanted to -- I guess what we were looking for here
15 was to understand their awareness of it and their
16 interest of it.  But more importantly, this was
17 focusing on the cost side of it.
18       As I mentioned earlier, we had customers
19 that required greater than UEP density.  And so we
20 would have produced at whatever density our
21 customers wanted.  But we wanted to begin looking
22 at the cost structure on this program.
23    Q.    And the very last sentence on that
24 page -- well, the two last sentences on that page.
25 This is dated June of 2003, and it says --

Page 157

1    A.    Mm-hmm.
2    Q.    -- "Currently Sparboe Farms is compliant
3  with the United Egg Producers animal welfare
4  program."
5          Would that have been true at the time?
6    A.    On the farms that we were dedicated to
7  it, yes.
8    Q.    And the next sentence says, "Our
9  customers have been showing little interest in the
10 animal welfare program.  Because of this, we are
11 considering complying with all aspects of the
12 program excluding the space allowance."  Is that
13 correct?
14   A.    That's what it says.
15   Q.    And would -- to your knowledge sitting
16 here today, was there a written response to this
17 from you or the three people who received this
18 disputing that your customers had been showing
19 little interest in the animal welfare program?
20   A.    Who would have written that document?
21   Q.    I'm asking you whether anyone did.
22   A.    Well, again, Ms. Schwartz, we were going
23 through a long assessment of our customer needs.
24 This was just an example of the work we were doing
25 to assess what our customers wanted and needed.

Page 158

1  And the UEP program was a commitment we had made
2  from an animal care program.  But this is just an
3  example of the work we were doing that justified
4  why we couldn't go along with the 100 percent rule,
5  because we didn't -- we didn't have customers at
6  every one of our locations that demanded it.
7    Q.    And was it true in 2003 in June that
8  your customers had been showing little interest in
9  the animal welfare program?
10   A.    We had some major customers that had an
11 interest in an animal welfare program, Albertson's
12 being one of them.
13   Q.    Would Mr. Joyer have been knowledgeable
14 about the interest that your customers would have
15 had in the animal welfare program?
16   A.    No, because he worked in our
17 compliance -- or not compliance.  Excuse me.
18 Quality area.  So I tasked him to dig into the
19 program and put this report together for me.  So he
20 was not in the sales department.
21   Q.    And did your salespeople respond in
22 writing, to the extent you know, responding that
23 there had been -- that that sentence was incorrect?
24   A.    I don't -- I don't know.  This was at a
25 time we were developing an alternative program.

Page 159

1          MS. SCHWARTZ:  I'll go ahead and mark as
2  Exhibit 493 a document with the Bates label SF153.
3          (Plaintiff's Exhibit 493 was marked
4          for identification.)
5  BY MS. SCHWARTZ:
6    Q.    And this appears to be an e-mail from
7  Ken Zachman to Bob Sparboe's personal e-mail
8  account; is that correct?
9    A.    Correct.
10   Q.    And dated October 19th of 2002, correct?
11   A.    Mm-hmm.  Correct.
12   Q.    And what was Ken Zachman's position at
13 Sparboe at the time?
14   A.    I believe controller.
15   Q.    And it was -- let me ask.  The
16 handwriting there on the right-hand side, do you
17 have any sense as to whose handwriting that might
18 be?
19   A.    It may be Bob's.
20   Q.    Okay.  And the subject line of this
21 e-mail is the animal welfare issue, correct?
22   A.    Correct.
23   Q.    And Ken Zachman wrote, "Quite frankly,
24 if UEP had quit playing games and simply called the
25 program what it is, a voluntary cutback on animal

Page 160

1  numbers, I think the whole matter would have played
2  out long ago and enough companies would have gone
3  along with it to help the market."  Correct?
4    A.    That's what it says.
5    Q.    And down at 4, Mr. Zachman was proposing
6  different approaches to the animal welfare issue,
7  correct?
8    A.    Mm-hmm.
9    Q.    And one of those approaches was to sell
10 the flocks that didn't comply with the animal
11 welfare program and to keep the ones that did,
12 correct?
13   A.    Mm-hmm.
14   Q.    And the handwriting appears to say
15 "agrees with Garth"?
16   A.    Mm-hmm.
17   Q.    Is that what you think the handwriting
18 says on the side there?
19   A.    Mm-hmm.
20   Q.    And your best recollection is that that
21 might be your father's handwriting there on the
22 side?
23   A.    It might be.  It may be.
24   Q.    Okay.  Let me show you an e-mail from
25 the same day.  This is Exhibit 494.  And it's

Page 161

1  SF155.
2       (Plaintiff's Exhibit 494 was marked
3       for identification.)
4       BY MS. SCHWARTZ:
5   Q.  This is, again, an October 19th 2002
6  e-mail.  This one is from Greg Murch, correct?
7   A.  Correct.
8   Q.  And in 2002, what would Mr. Murch's
9  responsibilities at the company have been?
10   A.  He was the vice president of operations.
11   Q.  So he, too, appears to be discussing
12  various options that Sparboe has with regard to the
13  animal welfare program, correct?
14   A.  Mm-hmm.
15   Q.  And in number 5, it was Mr. Murch's
16  understanding that any reduction in the number of
17  laying hens within the United States will increase
18  the market price for eggs, correct?
19   A.  That's what he says.
20   Q.  And is that your understanding of the
21  market as well, that a reduction in the number of
22  laying hens will increase the market price for
23  eggs?
24   A.  The market price for eggs is established
25  by a variety of things:  Feed cost, supply, demand.

Page 162

1  So I don't necessarily agree with that.
2   Q.  But Mr. Murch was in charge -- he was
3  the VP of your operations at that time?
4   A.  Mm-hmm.
5   Q.  He would have been knowledgeable about
6  how Sparboe prices its eggs, for example?
7   A.  Not necessarily, no.  He ran our
8  production side.
9   Q.  So he was familiar with --
10   A.  Chickens.
11   Q.  -- particularly with supply?
12   A.  Chickens.  He was not in charge of
13  supply, the supply chain.  He was in charge of
14  production and plants.
15   Q.  And his concern, as you go down the
16  page, he says, "You will note that I have not even
17  addressed the AW," animal welfare, "portions of the
18  equation.  I think the cutback program can stand on
19  its own merits.  I view the animal welfare benefit
20  a bonus.  If we participate 100 percent, whatever
21  our customer requires this year, we will be able to
22  accommodate."  Do you see that?
23   A.  Oh.  In the second to the last.
24  (Reading).  I see that paragraph.
25   Q.  And above that, he does an estimate on

Page 163

1  what he thinks would be a return on the investment,
2  correct?
3   A.  Where do you see return on investment,
4  if that happens?
5   Q.  Let's look up -- the paragraph right
6  before.  His recommendation was that Sparboe should
7  participate in the program 100 percent, correct?
8   A.  Mm-hmm.
9   Q.  And that is what Sparboe is doing today,
10  correct?
11   A.  Right.  Greg was looking at this from a
12  cost perspective, which was his job as running our
13  production.  It looks like he was talking about the
14  cost to convert.
15   Q.  And his concern was another year of egg
16  prices that are below the cost of production,
17  correct?
18   A.  Mm-hmm.  Where are you at now when you
19  read that?  Above that?
20   Q.  Keep going down that sentence.  "With
21  the current state of economics in our industry, we
22  need to do something to avoid another year of egg
23  prices that are below the cost of production,"
24  correct?
25   A.  Right.  I read that.

Page 164

1   Q.  And if you go on, you'll see that
2  there's an "if" in quotes.
3   A.  Mm-hmm.
4   Q.  "'If' that happens, we will have a very
5  good return on our investment of .0041 dollars,"
6  correct?
7   A.  Correct.
8   Q.  And so he was calculating what he
9  thought might be the economic benefits of Sparboe
10  going to 100 percent of all of their flocks in the
11  program, correct?
12   A.  Mm-hmm.
13   Q.  And I apologize.  Is Mr. Murch still
14  with the company today?
15   A.  No.
16   Q.  Was he with the company when the
17  decision was made to rejoin the UEP-certified
18  program?
19   A.  In what year?
20   Q.  In 2013.
21   A.  No.  We didn't -- 2013 is not when we
22  reached -- that's an incorrect statement.  We
23  rejoined the animal care certified program in 2012.
24   Q.  I apologize.  In 2012, was he still with
25  the company?

Page 165

1   A.   No.
2   Q.   As we move into 2003, Sparboe worked to
3   try to get the UEP 100 percent rule to not be part
4   of the program, correct?
5   A.   Correct.
6   Q.   And what actions did Sparboe take to try
7   to ensure that the 100 percent rule was not
8   included in the UEP-certified program?
9   A.   I believe there were letters and
10  conversations with UEP staff.  I believe Sparboe
11  was vocal at meetings.
12  Q.   Is there anything else?
13  A.   Not that I recall.
14  Q.   And Garth Sparboe had specifically made
15  presentations at those meetings or recommendations
16  at those meetings to avoid having the hundred
17  percent rule incorporated into the UEP-certified
18  guidelines, correct?
19  A.   That's correct.
20  Q.   And did he work with any other
21  defendants in the Kansas litigation in those
22  efforts?
23  A.   I don't recall.
24  Q.   Did you have an understanding in 2003 as
25  to which other UEP members were opposed to the

Page 166

1   100 percent rule?
2   A.   Not really, no.
3   Q.   Let's go ahead and look at previously
4   marked Exhibit 378.  And have you seen this memo
5   before?
6   A.   I believe so, yes.
7   Q.   And this is a January 20th 2003 memo
8   from Garth Sparboe, correct?
9   A.   Mm-hmm.  Correct.
10  Q.   And this was -- the Re: line is "Request
11  for reconsideration," correct?
12  A.   Correct.
13  Q.   And cc'd on this memo is John Mueller,
14  correct?
15  A.   Mm-hmm.
16  Q.   And at that time, he would have been the
17  in-house counsel for Sparboe; is that correct?
18  A.   And our human resource manager.
19  Q.   Presumably, he was not copied on this
20  memo because of his human resource responsibilities
21  at Sparboe; is that fair to say?
22  A.   Yes.
23  Q.   And do you have an understanding as to
24  why John Mueller was copied on this memo in 2003?
25  A.   No.

Page 167

1   Q.   And this memorandum says, "The following
2   named egg producers and/or egg processors have
3   signed the memorandum supporting request for
4   reconsideration."  Do you see that?
5   A.   I do.
6   Q.   And does this refresh your recollection
7   that Sparboe was working with some other UEP
8   members at this time, again, to oppose the
9   100 percent rule?
10  A.   Yes.
11  Q.   And Sparboe is listed first, correct?
12  A.   Mm-hmm.
13  Q.   Number 2 is Michael Foods, correct?
14  A.   Mm-hmm.
15  Q.   Number 4 is Daybreak Foods?
16  A.   Mm-hmm.
17  Q.   Number 10 is Midwest Poultry?
18  A.   Mm-hmm.
19  Q.   And 1, 2, 4 and 10 are all defendants in
20  the Kansas litigation, correct?
21  A.   Yes, I guess.  I assume you know.
22  Q.   And what was -- the purpose of this memo
23  was to ask UEP to reconsider the 100 percent rule,
24  correct?
25  A.   That is correct.

Page 168

1   Q.   And I want to go to the second page of
2   that.  Problem number one is listed as the hundred
3   percent rule, correct?
4   A.   Yes.
5   Q.   I want to go to that next page.  This is
6   the page that has 50 at the bottom of it, the Bates
7   number.
8   A.   Mm-hmm.
9   Q.   Sparboe was not just raising the hundred
10  percent rule in this memo, correct?  Also listed is
11  problem number 3, the audit process?
12  A.   I see that.
13  Q.   And what was Sparboe's concern about the
14  audit process seeming flawed?
15  A.   It appears as though they were concerned
16  about the subjectivity and consistency of the audit
17  process.
18  Q.   And why was Sparboe concerned that the
19  audit seemed subjective?
20  A.   I don't have an answer to that.
21  Q.   And the memo says, "The audit program
22  could be construed to be unconcerned whether a
23  producer is humanely handling/molting and
24  de-trimming layers.  This is not true of density.
25  Here there is a total knockout factor on space."

Page 169

1  Do you see that?
2      A.   Mm-hmm.
3      Q.   And could you explain what that means?
4      A.   I don't -- I think it meant that the --
5  I'm really not clear on this.  What I can say is
6  that these producers were trying to come up with
7  objections to the hundred percent rule.
8          And I think this was another effort by a
9  group of the named producers on this document who
10 had customers that weren't requiring the hundred
11 percent rule to create -- you know, to get the
12 attention of UEP.  And this looks like it was one
13 more attempt to get the United Egg Producers -- to
14 create awareness or to create concern about these
15 producers' needs as it relates to their customers
16 and the 100 percent rule.
17     Q.   And specifically with regard to the
18 audit, Sparboe, as one of the signatures to this
19 memo, was raising the concern that "A producer can
20 fail the significant portions of the beak trimming,
21 handling, transportation, slaughter and molting
22 portions of the audit and still receive a passing
23 score," correct?
24     A.   Mm-hmm.  I read that.
25     Q.   And does that remain the case today with

Page 170

1  the UEP-certified program?
2      A.   I don't know.  I'm not that familiar
3  with the audit itself.
4      Q.   Let's go ahead and mark as
5  Exhibit 495 -- this is a compilation of a couple of
6  pages that were taken from a very, very lengthy
7  document.  I think it was two hundred and some odd
8  pages, and it starts off with SF124902, and it
9  includes a re-audit page as well, along with -- let
10 me just read all of the Bates numbers so there's no
11 confusion.  SF124902 through -03, then there are
12 two UE documents, UE958987 through -88.
13 Actually -- I'm sorry.  Let me start over.  That's
14 the confusion.  These are all Sparboe doc numbers.
15 They're double Bates numbered.  That's the problem.
16 Starting over, it's SF124902 through -03.  And then
17 we've got 124906 through -07.  And -910 through
18 -911.  Okay.
19          (Plaintiff's Exhibit 495 was marked
20           for identification.)
21     MS. SCHWARTZ:  Okay.  I'm going to
22 object to this document as not being an authentic
23 document in that it seems to be an incomplete
24 document and mixing documents produced by multiple
25 parties.

Page 171

1      BY MS. SCHWARTZ:
2      Q.   And, Ms. Schnell, lets start on that
3  very first page.  Do you see in the bottom
4  right-hand side corner that there is an SF Bates
5  number there?  Sorry, bottom left-hand corner.
6      A.   Yes.
7      Q.   And if you turn the page, you'll see
8  that there's an SF Bates number there as well?
9      A.   Mm-hmm.
10     Q.   And if you turn the page again, on the
11 right-hand side, you'll see that there's an SF
12 Bates number on the right-hand side?
13     A.   Yes.
14     MR. HUTCHINSON:  And my objection, just
15 to be clear is --
16     MS. SCHWARTZ:  Let me finish --
17     MR. HUTCHINSON:  -- that they're
18 non-sequential Bates numbers.  It appears that
19 there are pages missing to this document.
20     MS. SCHWARTZ:  And let me continue to
21 ask --
22     BY MS. SCHWARTZ:
23     Q.   We were just looking at the document
24 that ends with 907 on the right-hand side.
25     A.   Okay.

Page 172

1      Q.   And then we've got 910 through 911 as
2  the last two pages.  Correct?
3      MR. HUTCHINSON:  No, that's not correct.
4  Where is 9?
5      THE WITNESS:  It's 910.
6      MR. HUTCHINSON:  Oh, 910 and 911.  Okay.
7  I see.  There is not a 909 and there is not a 908.
8  Both of those pages appear to be missing.
9      BY MS. SCHWARTZ:
10     Q.   And let me represent to you that Sparboe
11 had produced a 200-plus page document that was the
12 results of the 2012 cage layer audit checklist.  I
13 had just a couple of questions about a few of the
14 pages in there.
15     A.   Mm-hmm.
16     Q.   And let me ask you, who at Sparboe in
17 2012 would have been in charge of the audit for
18 UEP?
19     A.   Mike Schmidt.
20     Q.   And were you aware in 2012 that certain
21 facilities did not pass the UEP-certified audit on
22 their first try?
23     A.   On their first try, yes.
24     Q.   Okay.  And are you familiar with these
25 audit checklists at all?

Page 173

1     A.    I am.
2     Q.    Okay.  Let's go ahead and look at that
3  first page.  And midway through that page on the
4  right-hand side, there's a line that says "Total
5  Points."  Do you see that?
6     A.    Right.
7     Q.    Right above the pass/fail check boxes?
8     A.    Mm-hmm.
9     Q.    And it says you need 180 points to pass,
10  and it looks like there are 200 points possible,
11  correct?
12     A.    Correct.
13     Q.    And so this was for the Glen Arceneau
14  facility?
15     A.    Arseno.
16     Q.    And this was one of Sparboe Farms'
17  facilities?
18     A.    Actually, he's an independent farmer.
19  We own the birds.  So he's a farmer that we work
20  with.
21     Q.    These are eggs that you are having
22  certified for the program, though, that they are
23  Sparboe Farms eggs?
24     A.    (Nods head.)
25     Q.    Okay.  And if you look at line number 5,

Page 174

1  there is the line for "Is feed and water kept so
2  that it remains in a fresh condition?"  Do you see
3  that?
4     A.    Yes.
5     Q.    And it looks like the total possible
6  points is 5, correct?
7     A.    Correct.
8     Q.    And Sparboe got a zero on that, correct?
9     A.    Yeah.  It looks like a zero.
10     Q.    And if you go up to the total points
11  possible, it seems like those are the five points
12  missing from the 200, correct?
13     A.    Yeah.  I'd have to familiarize myself
14  with this particular audit.  I'm sorry.  I'm not
15  familiar with this specific one.
16     Q.    Up on the total points there --
17     A.    Yeah, I see that.
18     Q.    -- you see that there's the 200, and it
19  looks like Sparboe got a score of 195?
20     A.    Yes.
21     Q.    And as far as I can tell, the only
22  points that were missing from that were those five
23  points in line 5; is that correct?
24     A.    Okay.  I guess, yes.
25     Q.    So it is possible to pass the UEP audit

Page 175

1  with obtaining a zero in "Is feed and water kept so
2  that it remains in a fresh condition," correct?
3     A.    No.  I can't testify to that.  I would
4  have to verify.  I can't confirm that.  I don't
5  believe that would be the case.
6     Q.    And would Mike Schmidt be the most
7  knowledgeable person at Sparboe currently?
8     A.    Mm-hmm.
9     Q.    And did you meet with Mike Schmidt in
10  advance of today to prepare for your deposition to
11  talk on compliance with the requirements of the
12  UEP-certified program or audits related to the
13  UEP-certified program?
14     A.    No.  I generally know them.  I don't
15  need to prepare for them.  But in this case, we
16  have hundreds of flocks -- hundreds of flocks --
17  that get audited at various times, and these audits
18  were done in 2002 very quickly so that we could get
19  back into the UEP program.
20        So I don't know about this one -- what
21  I'm saying is I'm not familiar with this one
22  particular audit or why we did not pass the feed
23  and water.  I find that very unusual.
24     Q.    Okay.
25     A.    Highly suspicious.  We provide all of

Page 176

1  our layers with feed and water.  So that's --
2  anyway, what I'm saying is I can't speak to that
3  specific line item on this specific audit.
4     Q.    And let's flip to the third page of this
5  exhibit.  And this appears to be a checklist
6  showing a failure for a facility, correct?  An
7  initial failure.
8     A.    Mm-hmm.  Again, I'm not familiar with
9  this specific audit.  It was a day later, it
10  appears.  Hmm.  Hmm.
11     Q.    And it appears that based on the
12  handwriting at the top, it says that this facility
13  was re-audited on 2/29 of '12.  Do you see that?
14     A.    Mm-hmm.
15     Q.    And what we were looking at on those
16  first two pages are dated 2/29 of '12 showing a
17  passed audit?
18     A.    Yeah.
19     Q.    And on the third page of this document,
20  looking under the Section 1, Housing and Space
21  Allowance --
22     A.    Mm-hmm.
23     Q.    -- do you see that the layers,
24  Section 3, that is allocated 40 total points,
25  correct?

Page 177

1    A.   Mm-hmm.
2    Q.   And it appears that on that initial
3  audit on the 28th that zero points were received
4  for that category?
5    A.   Mm-hmm.
6    Q.   It looks like the next day, it passed
7  that category, but at least on the 28th, it appears
8  that there was a failure on that day with the
9  audit?
10   A.   I can't attest to this audit.  I'm
11 sorry.  I don't know why they would go back a day
12 later.  And I don't know how you could fail on one
13 day -- or get zero on one day and 40 on the next.
14   Q.   That's a good question.
15   A.   So I'm sorry.  And I don't know why
16 there would be no water -- feed or water in a fresh
17 condition.  So there must have been something
18 unusual with that audit.
19   Q.   And on the -- we looked at the 29th
20 already, and there was a zero for the feed and
21 water kept in a fresh condition.  If you look on
22 the 28th, there was also a zero for that, correct?
23   A.   Correct.
24   Q.   With Sparboe receiving what appears to
25 be a zero on the cage layer and housing and space

Page 178

1  allowance, it was not possible to pass the audit on
2  that day, correct?
3    A.   I don't know.  I don't understand -- I
4  don't understand this particular audit.
5    Q.   Well, if that criteria is given 40
6  possible points --
7    A.   Mm-hmm.
8    Q.   -- and you have to have 180 points to
9  pass, it's not possible to pass the audit by
10 failing that criteria, is it?
11   A.   I think if you don't have 180 points,
12 you don't pass.
13   Q.   So if you lost 40 points because of a
14 failure to meet the 67 inches, that would result in
15 a failed audit?
16   A.   Right.  But I can't attest that we
17 didn't meet the 67 square inches.  That's what I'm
18 saying.  I don't understand the circumstances here.
19 Those birds were at 67 square inches.  So I'm not
20 sure what that was about.
21       It looks like the next day, they passed.
22 So I don't understand.  There must have been a
23 technicality in this audit that I'm not prepared --
24 I didn't prepare for this one specific audit.  I'm
25 sorry.

Page 179

1    Q.   And let's look at one last -- these last
2  two pages.  And these say that they're on the 2011
3  cage layered audit.  And why was Sparboe being
4  UEP-certified audited in 2011?  Do you know?
5    A.   The audit took place in '12.  The audit
6  took place in January of 2012.  We were not -- we
7  were not members of the certified program until
8  2012.  They must have just used an old form.  But
9  it looks like the audit took place in '12.
10   Q.   And it looks like this is the same total
11 number of points available, but it's again out of a
12 200 score, correct?
13   A.   Mm-hmm.
14   Q.   And to your knowledge, is that still the
15 scoring today?
16   A.   I believe so.
17   Q.   And, again, you have to have 180 points
18 to pass, correct?
19   A.   That's my understanding.
20   Q.   And this facility passed on that date in
21 2012, correct?
22   A.   Mm-hmm.
23   Q.   And it looks like the facility is
24 Vincent?
25   A.   Correct.

Page 180

1    Q.   And is that still one of your facilities
2  today?
3    A.   No.
4    Q.   When did -- why is that no longer one of
5  your facilities?
6    A.   We were obligated to sell that farm.  We
7  sold that farm.
8    Q.   And why were you obligated?
9    A.   We lost the customer.
10   Q.   And which customer received eggs from
11 this facility?
12   A.   Cargill.
13   Q.   And if you look at line -- if you look
14 at the total number points, it appears that this
15 facility got a 190 out of 200.
16   A.   That's what this audit says.
17   Q.   And if you go down to line -- and under
18 the total points, you see that the checkbox for
19 "pass" is checked, correct?
20   A.   I see that.
21   Q.   So it appears that this facility would
22 have passed the audit in 2012?
23   A.   Mm-hmm.
24   Q.   And if you go down to line 13, it says,
25 "Our on-farm layers, including the daily removal of

Page 181

1 those layers that are dead or injured, euthanized
2 and depopulated in a humane manner in accordance
3 with written procedures compliant with the UEP
4 guidelines." Do you see that?
5     A.    I do.
6     Q.    And it looks like it's a total possible
7 points of 10 there?
8     A.    Mm-hmm.
9     Q.    And it appears that Sparboe got a zero
10 for that, correct?
11    A.    Mm-hmm.
12    Q.    And yet still passed the audit for that
13 facility, correct?
14    A.    Yes.
15         MS. SCHWARTZ:  We've got to take a break
16 to switch the tape.
17         THE VIDEOGRAPHER:  We are going off the
18 record at 1:55 p.m.
19         (Whereupon, a recess was taken from 1:55
20 p.m to 2:07 p.m.)
21         THE VIDEOGRAPHER:  We are back on the
22 record.  This is the continuing videotaped
23 deposition of Beth S. Schnell taken on
24 February 17th 2014.  The time now is 2:07 p.m.
25

Page 182

1         BY MS. SCHWARTZ:
2     Q.    Before we took our break, we were
3 talking about the UEP audit.  And if you could get
4 back out the Exhibit 378, which was the 2003 memo.
5 And we had been looking at the 2012 audit that
6 Sparboe had gone through when it rejoined the
7 UEP-certified program, correct?
8     A.    Correct.
9     Q.    And sitting here today, to the best of
10 your recollection, are those audit guidelines still
11 in place today?
12    A.    I have no idea.
13    Q.    Okay.
14    A.    That was -- there's ten years.
15         Are you asking between this document and
16 this document?  There's eleven years' or ten years'
17 difference.
18    Q.    No.  No.  Let me be clear.  Sorry about
19 that.
20    A.    Or are you asking -- sorry.
21    Q.    The audit guidelines that we were
22 looking at in 2012, to the best of your knowledge,
23 are those still the numbers in play today in 2014?
24    A.    And I can't say that either.  I don't
25 know.

Page 183

1     Q.    Okay.  But it appears -- the concern
2 that Sparboe was raising back in 2002, that the
3 knockout factor in the audit was on space, is still
4 within the audit guidelines today?
5     A.    I don't -- I can't -- I don't know that.
6     Q.    Again, the space in the 2012 guidelines
7 were allocated 40 points, correct?
8     A.    Correct.  Yes.
9     Q.    And to pass the audit out of 200
10 possible points, you had to score 180, correct?
11    A.    Correct.
12    Q.    So if you got a zero on the space
13 requirement, a zero out of 40, you would fail the
14 audit, correct?
15    A.    If you got a zero.  But I don't know
16 that you couldn't get something in between 0 and
17 40.
18    Q.    No.  I understand that.
19    A.    Yeah.
20    Q.    But getting a zero, a failure to comply
21 with the space guidelines --
22    A.    So the question is if you got a 160,
23 would you fail, yes.
24    Q.    So assuming you passed all other aspects
25 of the audit and got a zero only as it relates to

Page 184

1 the cage space, you would still fail the UEP audit?
2     A.    I believe so.
3     Q.    In February of 2003, it looks like it
4 was the last effort at a board meeting to defeat
5 the hundred percent rule.  And let me show you
6 what's previously been marked as Exhibit 381.
7         MR. BURKE:  Hi, Robin.  This is Jason
8 Burke.  Is there a Bates range on that?
9         MS. SCHWARTZ:  It's Exhibit 381 and it's
10 UE0329122.
11        MR. BURKE:  Thanks.
12        BY MS. SCHWARTZ:
13    Q.    And if you look at the front page, these
14 appear to be the minutes from the February 26th
15 2003 UEP producer committee for animal welfare,
16 correct?
17    A.    Correct.
18    Q.    And if you go down to the last really
19 full paragraph on this page, it says, "Bahan
20 announced that the compromised committee was
21 recommending that there be no change to UEP's
22 current policy and that a vote would not be taken.
23 He did say that the challenge committee could come
24 back at a future meeting of the committee or board
25 and make the same or another proposal at any time."

Page 185

1 Do you see that?
2     A.    Mm-hmm.
3     Q.    So at this meeting, it appears -- let me
4 turn to the second page of this document.  And the
5 second page is entitled "Proposal for Change of
6 UEP's 100 Percent Commitment of Welfare
7 Guidelines."  Do you see that?
8     A.    Right.
9     Q.    And it appears it was submitted on
10 behalf of Garth Sparboe, correct?
11     A.    Mm-hmm.
12     Q.    Bob Krouse of Midwest Poultry, correct?
13     A.    Right.
14     Q.    Jim Dean and Bill Goucher?
15     A.    Mm-hmm.
16     Q.    And do you know with which company Jim
17 Dean is with?
18     A.    Jim Dean, I believe, is with Center
19 Fresh.
20     Q.    And what about Bill Goucher?
21     A.    Michael Foods.
22     Q.    And the proposal that this subcommittee
23 was making was to essentially allow producers to
24 have part of their flock UEP certified and part of
25 the flock not UEP certified, correct?

Page 186

1     A.    Yes.
2     Q.    And this is what Sparboe was hoping was
3 going to be added to the UEP-certified program,
4 correct?
5     A.    Correct.
6     Q.    And it appears that Garth Sparboe
7 appeared at this meeting, correct, on the first
8 page?
9     A.    I believe it was a call.
10     Q.    Or I'm sorry.  On the call, yes.  And he
11 is actually listed as representing the challenge
12 along with Bob Krouse, Jim Dean, Bob Goucher.  Do
13 you see that?
14     A.    Yes.
15     Q.    And it's fair to say that they lost in
16 the committee?
17     A.    That's correct.
18     Q.    And was it at this time that Sparboe
19 decided or began to decide to leave the UEP
20 program?
21     A.    At this moment in time?  I can't say
22 that.  I know that this was -- we were continuing
23 to try to get this process changed.  There may have
24 been additional attempts.  I don't recall.
25     Q.    And did your brother resign from the UEP

Page 187

1 board of directors and on the animal welfare
2 committee in part because of this?
3     A.    He may have.
4     MS. SCHWARTZ:  Go ahead and mark as
5 Exhibit 496, it is SF067800.
6         (Plaintiff's Exhibit 496 was marked
7         for identification.)
8     BY MS. SCHWARTZ:
9     Q.    This appears to be a draft of a letter
10 dated March 15th 2003.
11     A.    Yes.
12     Q.    Have you seen this document before?
13     A.    I have.
14     Q.    And to your knowledge, was a final
15 version of this letter sent to Al Pope?
16     A.    I have -- I do not know if this was sent
17 or not.
18     Q.    And this was listed under the signature
19 block for your father, who's listed as the Sparboe
20 president, correct?
21     A.    Correct.
22     Q.    Did he draft this himself?
23     A.    I suspect he did, but I don't know.  I
24 don't know.
25     Q.    And it says in that first paragraph --

Page 188

1 let me back up.
2         This is a March 15th 2003 letter on
3 Sparboe's letterhead to Al Pope and Gene Gregory,
4 both at the UEP, correct?
5     A.    Correct.
6     Q.    And Al Pope was the president of UEP
7 back in that 2003 time period?
8     A.    Correct.
9     Q.    And the first paragraph of the letter
10 says, "As you are aware, Garth Sparboe recently
11 resigned his board of directors position and seat
12 on the animal welfare committee with the United Egg
13 Producers.  This was done because of an array of
14 reasons which I am certain you are acutely aware
15 of."  Do you see that?
16     A.    I do.
17     Q.    And is it your belief that this would be
18 related to the vote on the hundred percent rule?
19     A.    I don't know that.
20     Q.    Were there other reasons that Al Pope
21 and Gene Gregory would have been aware of in the
22 2003 time period that would have led to Garth
23 Sparboe's resignation?
24     A.    He may have been beginning his departure
25 from our company at that time, resignation from our

Page 189

1 company. But I don't know the exact dates.
2    Q.    And this letter appears to indicate that
3 Sparboe was planning to stay as a UEP member on
4 part of its flock.
5    A.    It was a proposal.
6    Q.    And was the proposal to essentially
7 split the company in half?
8    A.    We were considering all options to be
9 able to comply with the animal care program that
10 customers did or could need while meeting other
11 customers' needs to have liquid egg.
12    Q.    And Bob Sparboe's concern was even
13 continuing to remain in the program -- let me step
14 back.
15        Bob Sparboe voiced the concern in this
16 letter that "If, however, we determine that the
17 program's 'hidden agenda' in any manner deviates
18 from the core purpose of the program, we will
19 withdraw. Even the appearance of impropriety will
20 cause our withdrawal." Do you see that?
21    A.    I do.
22    Q.    And do you have an understanding as to
23 what the hidden agenda is he was referring to?
24    A.    I do not.
25    Q.    To your knowledge, was this letter ever

Page 190

1 sent?
2    A.    I don't know.
3    Q.    Okay. What impropriety was Mr. Sparboe
4 concerned about?
5    A.    I don't know.
6    Q.    Would you have seen this letter back in
7 the 2003 time period?
8    A.    No. I became aware of this letter as we
9 were pulling documents.
10    Q.    Throughout 2003, it appears Mr. Sparboe
11 wrote a series of drafts of letters to Al Pope at
12 UEP, and I'm going to mark two of them.
13        MR. HUTCHINSON: I'm going to object to
14 the extent that your question assumes facts not in
15 evidence as to who authored this document.
16        MS. SCHWARTZ: Marked as Exhibit 497 is
17 SF105990.
18        (Plaintiff's Exhibit 497 was marked
19            for identification.)
20        MS. SCHWARTZ: And then marked as
21 Exhibit 498 is SF047547.
22        (Plaintiff's Exhibit 498 was marked
23            for identification.)
24        BY MS. SCHWARTZ:
25    Q.    Let me give you a chance to read both of

Page 191

1 those.
2    A.    (Reading).
3    Q.    Have you seen the drafts of these
4 letters before today?
5    A.    I presume, yes.
6    Q.    And to your knowledge, was a final
7 version of this -- of one of these letters sent to
8 Al Pope of the UEP?
9    A.    I believe -- I don't know. Bob was
10 working with different people on correspondence. I
11 don't know if he sent one or not.
12    Q.    And, again, both of these letters have
13 his signature block at the end. Would it be your
14 expectation that he would have been drafting these?
15    A.    It's possible he may have sought input
16 from other people. But with his signature block,
17 he would have drafted the final version, yes, I
18 would assume, if it went.
19    Q.    And both of these are dated June 23rd.
20 They're slightly different, so let's go ahead and
21 start with 497 first.
22    A.    Okay.
23    Q.    And this is the one with SF105990. The
24 second paragraph of the letter says, in part, "UEP
25 originally created the animal welfare program with

Page 192

1 a valid objective: To provide an industry-wide,
2 scientifically-approved resource for producers or
3 customers who have been targeted by activist
4 organizations. It has evolved into an
5 all-or-nothing production program mandated and
6 controlled by UEP."
7        That's what written here in this letter,
8 correct?
9    A.    I read that.
10    Q.    And did Bob Sparboe ever tell you that
11 he believed that the UEP-certified program had
12 evolved into an all-or-nothing production program
13 mandated and controlled by UEP?
14    A.    Well, he wrote this. But I don't know
15 that he -- I don't recall him ever saying that.
16    Q.    If you turn to the second page of this
17 letter, he wrote again, "As this program approaches
18 its second year, Sparboe Farms customer interest in
19 this program remains insignificant." Do you see
20 that?
21    A.    Mm-hmm.
22    Q.    And Mr. Sparboe would have been
23 knowledgeable about what his customers wanted from
24 their eggs, correct?
25    A.    Mm-hmm.

Page 193

1    Q.   If we turn to the next letter, this is
2 Exhibit 498.  He says in part in that first
3 paragraph, "As you are aware, Sparboe Farms
4 supported this objective and actively participated
5 in the development of the guidelines."  And you'd
6 agree with that sentence, correct?
7    A.   What objective?  Scientifically
8 supported animal care standards for producers and
9 customers who may be targeted?  Yes, I support
10 that.
11    Q.   And that Sparboe actively participated
12 in the development of the UEP guidelines, correct?
13    A.   Early on, yes.
14    Q.   And then he writes, "The program has
15 evolved into a production supply program which
16 requires producers to commit 100 percent of their
17 flock in order to have access to the UEP animal
18 care certified shield," correct?
19    A.   Yes.
20    Q.   And on the next page it says, "We feel
21 the all-or-nothing aspect of the program is an
22 unfair trade practice.  Further, we are concerned
23 that the 100 percent rule may be seen as an
24 intentional effort to increase egg prices.  As
25 such, it may be seen as anticonsumer."  Did you see

Page 194

1 that?
2    A.   One moment, please.  Yes.
3    Q.   And, again, at the bottom of that page
4 is just his signature block, correct?
5    A.   Correct.
6    Q.   And I'm going to hand you -- marking as
7 Exhibit 499, and this is a July 10th 2003 dated
8 letter with the Bates number at the bottom of
9 SF000165 through -66.
10        (Plaintiff's Exhibit 499 was marked
11            for identification.)
12    BY MS. SCHWARTZ:
13    Q.   And have you seen this letter before?
14    A.   Yes.
15    Q.   And to your knowledge, was this letter
16 sent to Al Pope as a final -- was this letter sent
17 to Al Pope?
18    A.   I believe so.
19    Q.   And at the top, it says that it was sent
20 by certified mail, return receipt requested.
21    A.   Mm-hmm.
22    Q.   And it starts off, "Dear Al, thank you
23 for the meeting on July 7th 2003.  The purpose of
24 our meeting and of this letter was for us to go on
25 the record with the United Egg Producers

Page 195

1 association expressing our concerns with the animal
2 welfare program."
3    A.   Mm-hmm.
4    Q.   Are you aware of who would have
5 participated in that July 7th meeting?
6    A.   I think -- I know Bob did.  I don't know
7 who else.
8    Q.   Do you know who for UEP may have been in
9 attendance at that meeting?
10    A.   Al Pope.
11    Q.   So to the best of your recollection, it
12 would have been the two of them at that meeting?
13    A.   I think so.
14    Q.   The next paragraph says, "During our
15 meeting, we asked for, and you indicated we could
16 receive indicia of proof from your legal counsel
17 that the United Egg Producers is and remains a
18 viable agricultural cooperative association.  If
19 you have not yet made this request of Irving,
20 please do so now and feel free to forward this
21 letter to his attention so that he can respond
22 directly to John or me at the address listed
23 above."  And is the "Irving" Irv Isaacson?
24    A.   I believe so.
25    Q.   And he was counsel for UEP, correct?

Page 196

1    A.   Yes.
2    Q.   And "John" likely refers to John
3 Mueller, who's copied on this letter as well?
4    A.   Right.
5    Q.   And that, again, would have been
6 Sparboe's in-house legal counsel?
7    A.   Correct.
8    Q.   And you were actually copied on this
9 letter as well?
10    A.   I see that.
11    Q.   The fourth paragraph on that page says,
12 "However, what concerns us is the 'hidden agenda'
13 of the animal welfare program.  In short, we
14 believe that if not carried forward properly, a
15 strong case could be made that the animal welfare
16 program is, in essence, a program being offered by
17 our trade association and its members to reduce
18 outputs in an effort to increase prices."  Do you
19 see that?
20    A.   I do.
21    Q.   And he says, "Naturally, that strikes of
22 price fixing to us, and we have concerns about
23 future claims of this sort being made against the
24 association and/or its members."
25    A.   Mm-hmm.

Page 197

1    Q.    He says in the next paragraph, "We feel
2  that ultimately the UEP mandate of a 100 percent
3  participation in the production standards to the
4  animal welfare program may be tantamount to an
5  unfair practice."
6         And he goes on in that paragraph to ask
7  for a response from UEP as to why they will not
8  reconsider the 100 percent rule, correct?
9    A.    Yes.
10   Q.    Was his concern about an unfair trade
11 practice limited solely to the hundred percent rule
12 or were there other issues that he was concerned
13 about?
14        MR. HUTCHINSON:  Objection to the extent
15 that that question assumes facts not in evidence.
16   A.    I'm not aware of any other concerns.  I
17 can't speak to that.
18        BY MS. SCHWARTZ:
19   Q.    Is it fair to say you would have had a
20 conversation with your father about this letter
21 before it went out?
22   A.    I was aware of this letter.
23   Q.    Did you have the opportunity to review
24 this letter before it went out?
25   A.    Probably was aware of the letter, but

Page 198

1  may not have been allowed to review it.
2    Q.    And he was still the president of
3  Sparboe at that time in 2003?
4    A.    Correct.  He was making one last effort
5  to meet with Al Pope personally on the 100 percent
6  rule after numerous attempts through committees and
7  through the normal chart of -- course of events
8  with UEP had failed, I think this was Bob's
9  last-ditch effort to get the Al Pope to meet with
10 him one on one to raise another -- to take another
11 stab at trying to get the industry to consider
12 removing the 100 percent rule.
13   Q.    But they had met in person, correct?
14   A.    I believe on July 7th, they met.
15   Q.    And, again, it appears that he was told
16 that they were not removing the 100 percent rule at
17 that time, and that from Mr. Sparboe's perspective,
18 that raised unfair trade practice issues to him,
19 correct?
20        MR. HUTCHINSON:  Objection, assumes
21 facts not in evidence.
22        BY MS. SCHWARTZ:
23   Q.    And let me quote.  He said, "Naturally,
24 that strikes of price fixing to us," correct?
25   A.    I think what's said was if not handled

Page 199

1  correctly.  I think he was speaking to
2  potentialities.  And I think he was trying to
3  create -- he was trying to stir up additional
4  concerns that might get the UEP to reconsider the
5  100 percent rule.  I'm not aware of any facts,
6  never heard of any facts of any specific issues
7  that would have been behind this letter.
8    Q.    When you received a copy of this letter,
9  do you recall talking to your father about this
10 letter?
11   A.    I don't recall a specific meeting, no.
12   Q.    Did you receive correspondence from
13 UEP's legal counsel, as requested in here,
14 providing a written response?
15   A.    Yes.
16   Q.    You did?
17   A.    I believe Bob did.  The company did,
18 yes.
19   Q.    And one of the promises made at the end
20 of this letter was if Sparboe determines that the
21 program's agenda in any manner strays from the core
22 purposes of the program, we will withdraw, correct?
23   A.    Where is that paragraph?
24   Q.    The very last paragraph on the second
25 page.

Page 200

1    A.    Oh, yes.  I see that.
2    Q.    And Sparboe does end up withdrawing from
3  the UEP-certified program in 2005, correct?
4    A.    Two years later, yes.  Correct.
5    Q.    To your knowledge, did Mr. Mueller
6  review this letter before it went out?
7    A.    I'm sure he did.
8    Q.    Would it have been your father's
9  practice, if legal issues were being raised, to
10 consult with Mr. Mueller?
11   A.    Yes.
12   Q.    Let's go ahead and mark -- one last
13 question on Exhibit 499.  What was the nature of
14 the concern that Mr. Sparboe had as to asking why
15 UEP remains a viable agricultural cooperative?
16   A.    Again, I think -- I think that question
17 was raised just to try to stir up questions among
18 board members to trying to get them to look at the
19 100 percent rule.  And I believe that -- the
20 genesis of that was regarding Cal-Maine being a
21 publicly traded company.  And I think he was just
22 thinking about areas that may have caused concern
23 for the United Egg Producers to qualify.  And so I
24 recall conversations he had regarding Cal-Maine
25 being a public company.

1    Q.    At this point in 2003, your father has
2  been in the egg industry for 50 -- almost 50 years
3  at that point?
4    A.    Mm-hmm.
5    Q.    It's fair to say a well-respected member
6  of the industry?
7    A.    Maybe.  I think so.
8    Q.    An innovator in the industry, going from
9  a chick hatchery to --
10    A.    We never went from a chick hatchery.  He
11  never operated a chick hatchery.
12    Q.    From raising baby chicks to one of the
13  largest egg companies in the country?
14    A.    Mm-hmm.
15    Q.    Was it his -- do you recall him ever
16  sending a letter to anyone else raising
17  restraint-of-trade concerns in any other contexts?
18    A.    Well, I don't recall that specifically.
19  But we didn't necessarily -- he didn't necessarily
20  get along always with the industry.  So it wasn't
21  unusual at all that he would send a letter
22  questioning some practice that United Egg Producers
23  was doing.  I mean, he was very -- we didn't just
24  follow along with the rest of the producers.  He
25  was always inclined to question and ask questions.

1  So I would think that it wasn't at all uncommon for
2  him to raise questions to the United Egg Producers.
3    Q.    Do you recall him, prior to this letter
4  in 2003, ever raising antitrust concerns with UEP?
5    A.    I recall conversations about the
6  Capper-Volstead.  I remember having -- hearing
7  discussions about that.  When those took place, I
8  don't recall.
9    Q.    Let's go ahead and mark as
10  Exhibit 500 -- and Exhibit 500 is Bates label
11  SF047721.
12          (Plaintiff's Exhibit 500 was marked
13          for identification.)
14      BY MS. SCHWARTZ:
15    Q.    And this is a July 22nd 2003 memo.
16    A.    Mm-hmm.
17    Q.    Have you seen this before?
18    A.    I believe so, yes.
19    Q.    And this is a memo from Brian Joyer to
20  Bob Sparboe, correct?
21    A.    Yes.
22    Q.    And it looks like they are -- the memo
23  discusses different options for how Sparboe can go
24  forward with regard to the UEP-certified program,
25  correct?

1    A.    Yes.  Could you restate that question?
2  I'm sorry.  I want to make sure I heard your
3  question.
4    Q.    The memo appears to discuss options for
5  Sparboe in terms of proceeding with the
6  UEP-certified program?
7    A.    Correct.
8    Q.    And, again, on that first page, one of
9  the options was to stay -- was to be 100 percent
10  committed to the UEP-certified program, correct?
11    A.    Correct.
12    Q.    And at the time in 2003, that would not
13  have been the case, correct?
14    A.    Probably not, no.  I don't recall.  I
15  don't recall the dates of when the 100 percent rule
16  was passed, and so I'd have to look back at the
17  dates.
18    Q.    If that was in existence at the time,
19  you would not have been complying with the
20  100 percent rule?
21    A.    Probably not.
22    Q.    And under the weaknesses identified for
23  staying committed to the program, B is "We do not
24  have 100 percent of our customers interested in the
25  program."

1    A.    Correct.
2    Q.    And so by 2003, you still had some
3  portion of your customers who were not interested
4  in buying UEP-certified eggs?
5    A.    We did.
6    Q.    Do you have a sense as to how large of a
7  percentage of your customers that would have been
8  in 2003?
9    A.    Again, as I testified this morning,
10  every year, our volume grew and changed and every
11  year our customer mix changed.  So it's helpful if
12  you would give me a point in time.  And in 2003, as
13  the president of the company today, but not at that
14  time, I don't know exactly the mix of our customers
15  and I don't exactly recall the production.
16          But I can tell you that consistently
17  throughout this time, we had substantial volume
18  committed to customers that did not require the
19  program.
20    Q.    Would you -- "substantial" meaning close
21  to 50 percent?
22    A.    Probably.
23    Q.    And on the second page of that document
24  is a list of what are called threats for remaining
25  100 percent committed to the program.

Page 205

1    A.    Mm-hmm.  Correct.
2    Q.    And the first one is "Activist
3  organizations are not satisfied with program and
4  refer to it as the 'animal cruelty certified.'"
5    A.    Correct.
6    Q.    Had you heard that term before seeing
7  this?
8    A.    I think there was lots of different
9  activist groups that were taking a stab at our
10  program during those days.  So I don't recall
11  specifically.
12    Q.    B is "Antitrust issues have not yet been
13  clarified."  Do you see that?
14    A.    I do.
15    Q.    And sitting here today, do you have an
16  understanding of what those antitrust issues would
17  have been?
18    A.    I think we had raised those as another
19  hurdle for the industry.  And I think that letter
20  was written in July, and this was just a few days
21  later.  So I presume he's referring to UEP perhaps
22  had not responded to our Capper-Volstead inquiries.
23    Q.    And it would presumably also have been
24  the additional concerns that Mr. Sparboe raised
25  about the risk of the program being an effort to

Page 206

1  reduce outputs?
2    A.    No.  No.  I don't think Brian is just
3  using -- I don't think Brian had any understanding
4  of antitrust or anything else.  He was a very young
5  quality manager in our company at that time, and
6  I'm not sure why he chose to use that word, but I'm
7  assuming what he meant was the questions Bob was
8  raising on the Capper-Volstead questions for the
9  industry.  But, again, I didn't write this
10  document, so I'm not specifically clear.
11    Q.    So it could have been; you just don't
12  know?
13    A.    I don't think so.  Brian -- he was not a
14  lawyer.  I don't think he had any knowledge of what
15  antitrust was.  He was a very young employee in our
16  company that managed our quality program.  So I
17  guess I can't really --
18    Q.    It's fair to say, sitting here today,
19  you don't have personal knowledge as to what he
20  meant by "the antitrust issues have not been
21  clarified"?
22    A.    My guess is he was referring to the
23  meeting that Bob -- he was aware of the meeting Bob
24  had with Al Pope and the request for the UEP to
25  respond to his questions.

Page 207

1    Q.    And under D, it says, "The UEP audit
2  program is not endorsed by FMI/NCCR."
3    A.    Mm-hmm.
4    Q.    And was that true at the time in 2003?
5    A.    I don't know that for a fact.
6    Q.    In 2003, wasn't FMI asking to have the
7  audit done through SES?
8    A.    There was some -- there were some goings
9  on around what -- who was going to be auditing.
10  And I think Brian's role in our company was to be
11  on top of those audit responsibilities.  And I
12  think what he was pointing out here was that it
13  wasn't clear yet how that was going to come down.
14  But there were some variations in the audit, who
15  was going to do the auditing, early on.
16    MS. SCHWARTZ:  Let me mark as Exhibit
17  501 -- I just have one question about this.  It's
18  Bates SF875.
19        (Plaintiff's Exhibit 501 was marked
20          for identification.)
21    BY MS. SCHWARTZ:
22    Q.    And on the second page, do you know
23  whose handwriting that is?  Is that yours, by
24  chance?
25    A.    I don't know.  This is the same copy of

Page 208

1  the letter we've already looked at, correct?
2    Q.    Correct.
3    A.    A document.
4    Q.    And it's different handwriting than we
5  had seen on a previous version.
6    A.    Yeah.  I don't know whose handwriting
7  that is.  It could be mine.  I don't know.
8    Q.    The handwriting looks like it has an
9  addition of "reduced supply and" before the
10  sentence saying in part "to increase egg prices."
11  Do you see that?
12    A.    Mm-hmm.
13    Q.    And that is -- it's possible that that's
14  your handwriting?
15    A.    Right.
16    Q.    And that would have been an edit that
17  you had made to the draft of the letter that
18  Mr. Sparboe had put together?
19    A.    Well, I don't -- I'm just not -- if
20  you'd just give me a minute to read this.  This
21  letter, I don't believe, was sent.  I don't
22  remember who wrote this letter either.  (Reading.)
23  What's your question on the table right now?
24    Q.    I'm just trying to figure out the
25  handwriting.

Page 209

1    A.   Yeah. I don't recall. I don't recall
2 whose handwriting this is. And I don't recall
3 being involved in -- this letter, I don't believe,
4 was sent.
5    Q.   But that's possible that's your
6 handwriting on this?
7    A.   It's possible.
8    Q.   Okay. And in response to the request
9 from Mr. Sparboe to have in writing -- sorry. I'm
10 not sure that I've seen a written response --
11 strike that.
12       We will come back to that. Let's take a
13 look at one letter before we get there. Was it
14 your understanding that if UEP did not relinquish
15 the 100 percent rule that Sparboe was going to
16 withdraw from the UEP-certified program?
17    A.   At what point in time?
18    Q.   In 2003.
19    A.   I was not sure that had been determined
20 yet. It was two years later that we withdrew.
21 But -- so I think at 2003, that was not the case.
22 We were troubled.
23    Q.   Let me show you what's previously been
24 marked as Exhibit 283. And at the bottom of this
25 page you'll see that it has a Bates number starting

Page 210

1 with NL, which I can represent to you is another
2 defendant in the Kansas litigation. This was not
3 actually produced by Sparboe. Is this a letter
4 you've seen before?
5    A.   Probably.
6    Q.   And to your knowledge, was this letter
7 sent?
8    A.   Well, if it was produced by Gene
9 Gregory, I assume it was sent.
10    Q.   And let me clarify. It was not produced
11 by Gene Gregory. It was produced by one of the
12 other defendants in our litigation.
13    A.   Oh, okay. I do not know if it was sent.
14    Q.   Do you have any idea how another
15 defendant would have received a copy of this if it
16 had not been sent?
17    A.   I have no idea.
18    Q.   Okay. And this looks in some ways
19 similar to the drafts of the letters we've looked
20 at before. Some of the language is similar.
21 You'll see on the second paragraph on the first
22 page something -- and let me ask before that --
23 again, there is a signature block for Robert
24 Sparboe on the second page. Would it be your
25 expectation the he had drafted this?

Page 211

1    A.   Not necessarily.
2    Q.   And why not on this one?
3    A.   Well, I don't know on any of these. I
4 mean, it's clear that there were a lot of
5 correspondence. I don't know.
6    Q.   Did he often draft his own letters?
7    A.   He did. But I think there may have been
8 input from John Mueller on some. This one, I don't
9 know.
10    Q.   And John Mueller, again, would have been
11 the legal counsel for Sparboe at the time?
12    A.   Yes. Correct.
13    Q.   And so that second paragraph on the
14 first page, it says -- talking about the UEP animal
15 welfare program, it says, "This program has evolved
16 into a production supply program which requires
17 producers to commit 100 percent of their flock in
18 order to have access to the UEP animal care
19 certified ACC seal." Do you see that?
20    A.   You're in the second paragraph or the
21 third paragraph?
22    Q.   Second paragraph.
23    A.   Okay. I see that.
24    Q.   And if you go down that page with what's
25 underlined, the copy we had, it says,

Page 212

1 "Unfortunately, if the UEP does not relinquish the
2 100 percent rule, many producers, including Sparboe
3 Companies, may be forced to withdraw due to
4 economic hardship." Do you see that?
5    A.   Mm-hmm.
6    Q.   And, again, this appears to be, at least
7 in 2003, Sparboe thinking about withdrawing from
8 the UEP program if the hundred percent rule isn't
9 removed?
10    A.   Mm-hmm.
11    Q.   On the next page is a different
12 paragraph than what we've seen in some of these
13 other drafts. It says in part, "Secondly, we
14 understand that there are current discussions and
15 recommendations to the board regarding prohibiting
16 the handling and sale of eggs between ACC and
17 non-ACC companies could be viewed as a trade
18 restriction that will most certainly impact the
19 supply of each type of egg throughout the U.S."
20 And do you see that sentence?
21    A.   I do.
22    Q.   And ACC was an earlier --
23    A.   Version of animal care. It was the
24 animal care program.
25    Q.   And it goes on to say, "Restricting egg

Page 213

1 sales between ACC and non-ACC companies will have
2 seriously negative implications for many producers
3 and our customers."
4      And was that a concern of Sparboe, that
5 there was going to be a restriction on the egg
6 sales between ACC and non-ACC companies?
7      A.   I think the concern was that our ability
8 to provide eggs to our customers and not be able to
9 buy them from a noncertified company if our
10 customer said -- if we had a customer that wanted
11 certified eggs and we were -- our flocks were being
12 rotated and we didn't have enough eggs and we would
13 want to go to our customer and buy eggs from a
14 noncertified customer to meet their customer
15 demand, I think that's what that's referring to.
16      So when we refer to the ability to
17 supply a customer's needs, if you weren't able to,
18 you know, freely trade those eggs back and forth.
19 And I think the other issue was that some companies
20 that were breaking eggs did not have the
21 certification. So some of this had to had to with
22 the breaking industry and the shell egg industry.
23      Q.   And so again, from Sparboe's
24 perspective, this was another example of putting
25 Sparboe at odd with their customer needs?

Page 214

1      A.   Well, our customers were all different.
2 I mean, we had liquid customers that didn't care.
3 I mean, there just simply was no requirement at
4 all. And we had customers on the other spectrum
5 that very, very focused on density and animal care
6 and they audited us, so we had a broad spectrum.
7      And I think what we are referring to --
8 or whoever wrote this letter was referring to was
9 that other companies may also have -- I don't know
10 what other companies' customer needs were. We can
11 only speak to what our needs were. And perhaps
12 there was some assumptions that other companies may
13 also have the issue. But we would have been forced
14 to come out of the UEP program and develop our
15 alternative program, which we did.
16      We went ahead and developed an
17 alternative program to the UEP program that did not
18 require a hundred percent, and invested, you know,
19 a great amount of time and energy into coming up
20 with a scientifically-based program, USDA program,
21 that would meet our customer needs on the animal
22 care aspects.
23      Q.   And Sparboe believed that that developed
24 program accomplished the same animal welfare goal
25 while still allowing Sparboe the flexibility to

Page 215

1 meet their customers' needs?
2      A.   In our particular case, that was true,
3 yes.
4      Q.   Previously marked as Exhibit 116 is --
5      A.   Can I add a caveat to that, the last
6 question? With the exception of the customers that
7 required the ACC seal or the UEP seal, we were
8 disallowed from doing business with those
9 companies.
10      So we could meet -- our PVP program
11 would meet customers' needs if they didn't mandate
12 the ACC seal. And we did have customers and we did
13 lose business customers over the years because
14 while we were not an ACC provider, we couldn't sell
15 to those companies. So -- including AWG would be
16 an example where we were not allowed -- I mean, if
17 we couldn't have an ACC or UEP seal, we just
18 couldn't approach -- we couldn't do business with
19 certain companies. So I just want to be clear that
20 the PVP program worked as an alternative program in
21 some cases, but not in all cases.
22      Q.   And we'll come back on a different topic
23 and talk about the assertion you just made with
24 regard to AWG.
25      A.   Okay.

Page 216

1      Q.   Moving along to the November 5th letter,
2 this is previously marked as Exhibit 116.
3      A.   (Reading.)
4      Q.   And this is a letter actually sent by
5 John Mueller to Irv Isaacson, correct?
6      A.   Yup. Yes.
7      Q.   And, again, John Mueller at this time
8 would have still been Sparboe's in-house counsel?
9      A.   Yes.
10      Q.   Employed full time at Sparboe?
11      A.   Yes.
12      Q.   And looking at the paragraph that
13 starts, "As we have relayed from time to time to
14 the UEP executive staff, the 'hidden agenda' of the
15 animal welfare program is concerning to us." And
16 we've seen that language "hidden agenda" in
17 previous drafts of letters that we've looked at
18 today, correct?
19      A.   I believe we saw it in one other letter,
20 yes.
21      Q.   And it goes on to say, "The animal
22 welfare program is, in essence, a program being
23 offered by our trade association and its members to
24 reduce outputs in an effort to increase prices."
25 Do you see that in part?

Page 217

1    A.    I believe it says, "if not carried out
2 properly, a strong case could be made."
3    Q.    And he goes on to say, "Naturally, that
4 strikes as price fixing."  And, again, that
5 language was in --
6    A.    The previous letter.
7    Q.    -- the previous letter by Mr. Sparboe,
8 correct?
9    A.    Perhaps with John Mueller's input, yes.
10    Q.    And it goes on to say in that next
11 paragraph, "Additionally, we feel that ultimately
12 the UEP mandate (it truly is not voluntary) of a
13 100 percent participation in the production of
14 standards to the animal welfare program may be
15 tantamount to an unfair trade practice."  And that
16 similar language was included in a previous letter
17 as well, correct?
18    A.    Could you refer to which letter
19 specifically you're talking about?
20    Q.    Well, we've seen it in a couple of
21 different letters.  Exhibit 499 would be one of
22 them.
23    A.    Right.  Yes.
24    Q.    And if you look at the second page of
25 this Exhibit 116, that second paragraph on that

Page 218

1 page says, "Another scenario could be consumers,
2 led by goodness, who knows yet what (if our animal
3 welfare program is not consumer driving, the
4 program is bound to fail).  These consumer groups
5 will say: 'UEP, this smells funny.'  You got
6 together with your members and 'voluntarily agreed'
7 to reduce outputs by 20 percent.  We know what you
8 are up to and why."
9         And the next paragraph says, "Naturally,
10 you get the message.  We are concerned about taking
11 affirmative steps to be participating in a
12 'conspiracy' (even arguably) to such an extent that
13 legal liabilities would attach to the association
14 and/or its members."
15         And this letter is copied to Bob Sparboe
16 as well, correct, at the bottom?
17    A.    Yes.
18    Q.    And you're aware that the litigation
19 pending in Kansas at its core essentially alleges
20 that there is a conspiracy by the named defendants
21 in the group to reduce the output in the United
22 States?
23    A.    I'm not a lawyer.  So if those are the
24 exact words, I can't confirm.
25    Q.    Is it your understanding of the Kansas

Page 219

1 litigation that it is alleging a conspiracy
2 among --
3    A.    Egg producers.
4    Q.    -- egg producers to reduce output and
5 drive up prices?
6    A.    Generally, I guess that's my
7 understanding.
8    Q.    And you had mentioned earlier that you
9 believed that UEP had sent a written response?
10    A.    I don't recall if they did.  I would
11 assume they did, but I don't know.
12    Q.    And previously marked as Exhibit 219 is
13 a letter from Irving Isaacson dated November 19th
14 of 2003.  And again Brann & Isaacson and Irving
15 Isaacson would have been legal counsel for UEP?
16    A.    Yes.
17    Q.    And is this the letter that you were
18 remembering as a response?
19    A.    I was remember that there was a letter,
20 yes.
21    Q.    And no specific questions.  I wanted to
22 make sure that was the letter you had in mind.
23         MS. SCHWARTZ:  I think we may take a
24 quick break.  Let me get my next set of documents
25 together.

Page 220

1         THE VIDEOGRAPHER:  We are going off the
2 record at 3:06 p.m.
3         (Whereupon, a recess was taken from
4 3:06 p.m. to 3:27 p.m.)
5         THE VIDEOGRAPHER:  We are back on the
6 record at 3:27 p.m.
7         BY MS. SCHWARTZ:
8    Q.    We were in the 2004 time period, I
9 think, when we left off on the last break.
10 Continuing through that time period, marked as
11 Exhibit 502 is a document with the Bates label
12 UE_PRIV_131.
13         (Plaintiff's Exhibit 502 was marked
14         for identification.)
15         BY MS. SCHWARTZ:
16    Q.    And this appears to be a fax from John
17 Mueller to Irv Isaacson.
18         Is this a document you've seen before?
19    A.    No.
20    Q.    It's got a date of November 2nd 2004.
21 And on the very first page, it looks like it's a
22 handwritten cover sheet.  And on the second page in
23 relevant part, it appears to be a request from
24 Mr. Mueller to Mr. Isaacson to look at the attached
25 letter and "Counsel me as to whether there are any

Page 221

1 antitrust concerns involved with getting the
2 producers together to discuss the contemplated
3 subjects." Do you see that on this letter?
4    A.    On the front -- what paragraph is it in
5 exactly?
6    Q.    Sorry. On the second page, that's the
7 one with 132 on the bottom --
8    A.    Yeah.
9    Q.    -- the second paragraph.
10    A.    "Could you take a look at the attached
11 letter." Okay. I see that.
12    Q.    And the attached letter appears to be
13 the invitation to an economic summit in 2004.
14    A.    Mm-hmm.
15    Q.    Do you see that?
16    A.    I do.
17    Q.    And do you know who directed Mr. Mueller
18 to send this communication to Irv Isaacson?
19    A.    No, I don't.
20    Q.    And to your knowledge, did he get a
21 response back from Mr. Isaacson?
22    A.    I do not know.
23    Q.    And to your knowledge, did any employee
24 for Sparboe attend the economic summit in 2004?
25    A.    I don't know.

Page 222

1    Q.    Did Mr. Mueller make a recommendation as
2 to whether anyone should or should not attend the
3 summit?
4    A.    It looks like he was looking for
5 direction from Irving Isaacson, based on this.
6    Q.    And to your knowledge, he did not
7 receive that direction from Mr. Isaacson?
8    A.    I don't know. I don't recall.
9    Q.    Do you recall having a discussion with
10 Mr. Mueller about the economic summit?
11    A.    It looks like he was looking to talk
12 with Bob and Wayne Carlson about attending the
13 summit, and so he wanted to get feedback as it
14 relates to the concern. And I don't know if he
15 received a response.
16    Q.    And sitting here today, you don't know
17 whether anyone from Sparboe attended the economic
18 summit?
19    A.    I don't recall.
20    Q.    You don't recall one way or the other?
21    A.    I don't recall.
22    Q.    As we turn to 2005, Sparboe is still a
23 UEP member, correct?
24    A.    For half of the year.
25    Q.    And is still, at the beginning of the

Page 223

1 year, a member of the UEP-certified program?
2    A.    I believe we had some of our farms on
3 the program, yes.
4         MS. SCHWARTZ:  Let me mark as
5 Exhibit 504 [sic] a document Bates labeled
6 SF120568.
7              (Plaintiff's Exhibit 503 was marked
8              for identification.)
9 BY MS. SCHWARTZ:
10    Q.    And it has a date at the top of 5/11 of
11 2005. Do you see that?
12         MR. HUTCHINSON:  Did we skip 503?
13 BY MS. SCHWARTZ:
14    Q.    So Exhibit 503 is SF120568. And at the
15 top of that, there's a date of 5/11 of 2005. Do
16 you see that?
17    A.    Yes.
18    Q.    And looking at this, do you know whose
19 handwritten notes these are?
20    A.    No. I was trying to figure that out. I
21 don't know.
22    Q.    Down at the bottom, it shows the Bates
23 number of SF, showing again that these are -- this
24 is a document produced by Sparboe. It appears to
25 discuss ongoing discussions with what I assume to

Page 224

1 be Michael Foods. Is that correct?
2    A.    I'm assuming that's what this means,
3 yes.
4    Q.    And it appears as though Sparboe was
5 having at least some discussions with Michael Foods
6 in 2005 about potentially the creation of an
7 alternative animal welfare program?
8    A.    Correct.
9    Q.    And if you look at number 4 on that
10 list --
11    A.    Mm-hmm.
12    Q.    -- it says "2 option Greg O." Do you
13 know who that is?
14    A.    Greg Ostrander.
15    Q.    At Michael Foods?
16    A.    Correct.
17    Q.    And it says in parens "lawyers working."
18 And under that, it appears to say "fight UEP, sue
19 them." Do you see that?
20    A.    Mm-hmm.
21    Q.    And why was Sparboe considering in 2005
22 the possibility of fighting UEP or suing them?
23    A.    We were just continuing to want to be
24 having access an animal care program that we could
25 provide -- that we could participate in and offer

Page 225

1 the eggs for our customers without putting the eggs
2 that were not required to be on the program.
3      So we were working on developing another
4 animal care program with Michael Foods and we were
5 having conversations about development -- there
6 were discussions about developing an alternative
7 program.
8   Q.   It's fair --
9   A.   I don't know why this person would have
10 written "sue them." I don't understand that. But
11 we were looking to develop an alternative -- at
12 that point, we were engaged in development of an
13 alternative program.
14   Q.   It's fair to say Sparboe never did sue
15 UEP?
16   A.   No.
17   Q.   Starting in -- when we get to June 14th
18 of 2005, there's a letter in which Sparboe
19 withdraws officially from the UEP-certified care
20 program, correct?
21   A.   Correct.
22   Q.   And that was effective July 1st of 2005?
23   A.   Correct.
24   Q.   And what was the final straw that led to
25 Sparboe sending that letter and withdrawing from

Page 226

1 the UEP-certified program?
2   A.   I believe it had to do with the ongoing
3 continued phases of the density program and the
4 incrementally more restrictive guidelines, you
5 know, that were coming down in terms of the
6 density.
7      And so it got to the point where we were
8 need to -- from a flock scheduling and production
9 standpoint, it appeared as though we were not -- we
10 could no longer stay a member of that program,
11 based on our customer needs. And we had an
12 alternative -- by that point, I believe the PVP
13 program was in place.
14   MS. SCHWARTZ:   Let me go ahead and mark
15 this as Exhibit -- that should be 504.
16      (Plaintiff's Exhibit 504 was marked
17      for identification.)
18 BY MS. SCHWARTZ:
19   Q.   And that will be SF000172. And this is
20 a copy of the letter that Sparboe sent to withdraw
21 from the UEP-certified program?
22   A.   Did you state that as a question?
23   Q.   Correct?
24   A.   Yes.
25   Q.   Okay. So that was effective July 1st of

Page 227

1 2005, correct?
2   A.   Correct.
3   Q.   Even before the July 1st 2005 date, you
4 were aware that UEP was contacting your customers
5 to let them know that you were no longer UEP
6 certified, correct?
7   A.   Correct.
8   Q.   And to your knowledge, which customers
9 did UEP contact to inform them of that?
10   A.   At what point in time?
11   Q.   Right around that June and July period
12 when you were withdrawing from UEP.
13   A.   I believe they contacted some
14 customers -- a customer in Canada and Wal-Mart.
15 Albertsons. I'm not clear on what specific dates
16 those contacts were made.
17   Q.   And is the Canadian customer CEMA?
18   A.   Correct. Canadian Egg Marketing Board
19 [sic].
20   Q.   And what did you understand that these
21 customers were being told?
22   A.   That Sparboe Farms was not a member of
23 the United Egg Producers animal care program.
24   Q.   And did you believe that was appropriate
25 that your trade group was reaching out to your

Page 228

1 customers to tell them that?
2   A.   Absolutely not.
3   Q.   And why did you feel that that was
4 inappropriate?
5   A.   I don't feel that's in the scope of what
6 UEP is supposed to do.
7   Q.   And you were still a UEP member at that
8 time, correct?
9   A.   Correct.
10   Q.   And did this create confusion for your
11 customers as to why they were being contacted by
12 UEP?
13   A.   No. I believe our customers were
14 annoyed. I don't believe it created confusion.
15   Q.   Were you aware that UEP was doing this
16 to any other companies?
17   A.   I was.
18   Q.   And which other companies were you aware
19 of who were having their customers contacted by
20 UEP?
21   A.   Krieder Farms.
22   Q.   And what's your understanding of what
23 happened with Krieder Farms' customers?
24   A.   In terms of the contact or if -- they
25 retained their customer, to my knowledge.

Page 229

1    Q.    What was your understanding of the
2  contact that had happened?
3    A.    I don't have any detail on that.
4    Q.    And how did you find out that UEP was
5  doing that, was contacting your customers?
6    A.    Our customers told us.
7    Q.    UEP didn't directly tell you?
8    A.    No.
9    Q.    And did you confront UEP about that?
10   A.    Yes.
11   Q.    And what did UEP tell you?
12   A.    That that was not their -- that they
13 would not do that, that that was not their mission,
14 their responsibility or their purpose.  That they
15 don't -- they shouldn't do that.
16   Q.    Did they deny that they had done it?
17   A.    Not to my knowledge.
18   Q.    I'll show you what's previously been
19 marked as Exhibit 293, which is SF927.  And this is
20 a September 6th 2005 letter from Bob Sparboe to
21 Roger Deffner, who appears to have been the
22 chairman of the UEP at the time.  Correct?
23   A.    Mm-hmm.  I believe so, yes.
24   Q.    And is this the communication that
25 Sparboe had with UEP about those contacts -- the

Page 230

1  contacting of Sparboe's customers?
2    A.    Yeah.  It may have -- there may have --
3  this is one, yes.
4    Q.    And looking at the bottom of that letter
5  with the cc list, who is Tom Fraser?
6    A.    An attorney at Fredrickson & Byron.  I
7  don't know Tom Fraser.
8    Q.    Is that a law firm that Sparboe has
9  used?
10   A.    Correct.
11   Q.    And Mr. Mueller was still at that time
12 the general counsel for Sparboe?
13   A.    Yes.
14   Q.    Why was Mr. Sparboe copying an outside
15 lawyer and the inside counsel on this letter?
16   A.    I don't know.
17   Q.    Was Sparboe contemplating at that time
18 taking some action against UEP for these contacts?
19   A.    There may have been discussions between
20 John Mueller and Bob Sparboe as to appropriate -- I
21 don't -- I can't testify to that because I don't
22 know the nature of their conversations.  I wasn't
23 party to them.
24   Q.    But Sparboe believed it was "an
25 international and unjustified interference with our

Page 231

1  contractual relationships with these customers,"
2  correct?
3    A.    According to this letter, yes.
4    Q.    And that Sparboe believed that the UEP
5  board should be aware of the potential liability of
6  its staff interfering with its members' specific
7  customers' relationships.  Do you see that?
8    A.    Correct.
9    Q.    And at the very bottom, the last
10 sentence is, "If it does not, we may be forced to
11 take legal action."  Do you see that?
12   A.    Correct.
13   Q.    Was the Fredrickson & Byron law firm a
14 firm that had been doing day-to-day work for
15 Sparboe?
16   A.    The Fredrickson & Byron law firm was
17 working on estate matters at Sparboe and personal
18 matters for Bob.  I'm not aware of any other
19 corporate law work that they were doing.  But in
20 this context, I presume there was -- that was --
21 that was what John was working with them on.
22   Q.    And UEP responded on September 12th in a
23 letter previously marked as Exhibit 294, and that
24 is SF928.  And have you seen this letter before?
25   A.    Yes.

Page 232

1    Q.    And it starts off with UEP saying that
2  they're not aware of what Sparboe customers to
3  which you are referring.
4    A.    Mm-hmm.
5    Q.    Did you believe that to be a true
6  statement?
7    A.    I think Mr. Deffner is speaking of
8  himself personally.
9    Q.    It was Sparboe's understanding that UEP
10 had directly contacted these customers, correct?
11   A.    Correct.
12   Q.    Was it Gene Gregory?
13   A.    It was Gene and Chad Gregory, I believe,
14 but Gene Gregory mostly, yes.
15   Q.    And at that time, Gene Gregory, as you
16 see on the left, is listed as the senior vice
17 president for UEP and Chad Gregory is the vice
18 president for UEP?
19   A.    Yes.
20   Q.    And the letter goes on to say, "We
21 respond to companies who may be members' customers,
22 but only when they call us or are requested by our
23 member and then only with non-confidential
24 information."  Do you see that sentence?
25   A.    I do.

Page 233

1    Q.    Was it your understanding that your
2 customers had directly contacted UEP?
3    A.    This refers to that -- no. The customer
4 I'm referring to, one of them, had not contacted
5 UEP, to my knowledge.
6    Q.    And which one was that?
7    A.    In fact, his statement was, "Will you
8 please keep Gene Gregory off my case. Can you keep
9 Gene Gregory off my case."
10   Q.    So, again, from Sparboe's perspective,
11 it appears that UEP had directly reached out to
12 those customers, and not that these customers had
13 contacted UEP?
14   A.    That's my understanding. I don't have
15 any knowledge why those customers would have
16 contacted UEP.
17   Q.    And it goes on to say, "We sincerely
18 apologize if any unintentional actions by us caused
19 the Sparboe Companies any embarrassed." Was it
20 your understanding that these were unintentional
21 communications with your customers?
22   A.    Not -- no.
23   Q.    And again, in September of 2005, you
24 were still a UEP member, correct?
25   A.    No, we were not. As of July 1st, we

Page 234

1 were no longer a UEP member.
2    Q.    I think you were no longer UEP certified
3 as of July 1st. And let me just mark the next
4 exhibit.
5    A.    Correct. That's correct.
6    Q.    So as of September, you're still a UEP
7 member, but no longer a UEP-certified company,
8 correct?
9    A.    Correct.
10   Q.    Okay. And Exhibit 505 is SF121272.
11         (Plaintiff's Exhibit 505 was marked
12          for identification.)
13       BY MS. SCHWARTZ:
14   Q.    And this appears to be a November 11th
15 2005 letter from you to Dolph Baker; is that
16 correct?
17   A.    Correct.
18   Q.    Do you know whether this letter was sent
19 in a final format?
20   A.    I believe it was.
21   Q.    And Dolph Baker, again, is the chairman
22 of UEP at the time, correct?
23   A.    Yes.
24   Q.    And the first sentence says, "After much
25 thought and deliberation, the Sparboe Company has

Page 235

1 decided to drop its membership in United Egg
2 Producers."
3    A.    Correct.
4    Q.    And it goes on to say, "It is apparent
5 that the philosophical, economic and overall
6 business strategies of our companies do not
7 coincide with the majority membership of United Egg
8 Producers. As such, we believe that it is in our
9 best interests to face that reality and move on.
10 Please be aware that continuing efforts by UEP
11 staff members to discredit our company in the eyes
12 of our customers or the industry will not be
13 tolerated."
14       Did you write this letter?
15   A.    I did.
16   Q.    And you had just recently become the
17 president and CEO of the company at that time,
18 hadn't you?
19   A.    About four weeks earlier. Not even
20 that. Three weeks earlier.
21   Q.    And I assume that, as you said, that it
22 was a thoughtful and deliberate action for Sparboe
23 to drop its membership in the trade group that it
24 had been a member of for more than a decade at that
25 point?

Page 236

1    A.    Correct.
2    Q.    Did the contacting of your customers
3 factor into your decision to drop the membership?
4    A.    Yes.
5    Q.    And also the hundred percent rule would
6 have been another factor as to why you dropped your
7 membership?
8    A.    Yes.
9    Q.    Were there other reasons for why you
10 dropped your membership besides those two?
11   A.    No.
12   Q.    Those were the two primary ones?
13   A.    Yes.
14   Q.    So from -- from November of 2005 until
15 the end of 2007, Sparboe is not a UEP member,
16 correct?
17   A.    Correct.
18   Q.    Not a UEP-certified --
19   A.    No.
20   Q.    Did you attend -- and I think we
21 discussed this this morning -- you didn't attend
22 any UEP meeting during that time?
23   A.    No.
24   Q.    Did not participate in any other UEP
25 functions during that time, to the best of your

Page 237

1 knowledge?
2    A.   To the best of my knowledge, no.
3    Q.   And you had said this morning that Wayne
4 Carlson had a customer who wanted Sparboe to rejoin
5 UEP.
6    A.   Correct.
7    Q.   And which customer was that?
8    A.   Cargill.
9    Q.   And why did Cargill care that Sparboe
10 was a UEP member?
11    A.   I don't know.
12    Q.   What is your understanding that that was
13 the basis for why Wayne Carlson wanted to rejoin
14 UEP?
15    A.   Because we're a very customer-focused
16 company, and when a customer made a request that we
17 become a part of the industry association, be
18 engaged and involved with the industry trade
19 association, Wayne felt it was very important to do
20 that.  Cargill was a mainly customer of ours.
21    Q.   He never shared with you as to why
22 Cargill wanted you back as part of the UEP?
23    A.   No.  I think it was just the fraternity
24 and to be a part of the -- to be a part of the
25 industry.

Page 238

1    Q.   Was Cargill a UEP member?
2    A.   I think an allied -- I don't know.
3 Perhaps an allied member.  Cargill is not an egg
4 producer.
5    Q.   And let me mark as Exhibit 506 what is
6 Bates labeled SF124613.
7         (Plaintiff's Exhibit 506 was marked
8          for identification.)
9    A.   That's 2007 and 2008.  Okay.
10         BY MS. SCHWARTZ:
11    Q.   And this appears to be an e-mail dated
12 October 9th of 2007 from Chad Gregory, correct?
13    A.   Yes.
14    Q.   And as we looked at before, Chad Gregory
15 was a vice president at least earlier in time at
16 UEP?
17    A.   Correct.
18    Q.   And sent to Wayne Carlson, correct?
19    A.   Correct.
20    Q.   And it starts off, "Wayne, first I want
21 to thank you for the call and the good news.  The
22 UEP family welcomes you and your company back."  Do
23 you see that?
24    A.   Yup.
25    Q.   And it attaches a UEP membership

Page 239

1 agreement form and then provides information on the
2 dues for Sparboe to pay if they wanted to be in for
3 2007 and for 2008, correct?
4    A.   You're asking specifically about the
5 dues, the timing of the dues?
6    Q.   Just asking that the e-mail provides
7 first the membership agreement, correct?
8    A.   I see that.
9    Q.   And in the body of the e-mail, Chad
10 Gregory lists what your dues would be for 2008,
11 correct?
12    A.   Correct.
13    Q.   $34,500, correct?
14    A.   Correct.
15    Q.   And if you wanted to join for the
16 remainder of 2007, you had dues of a little more
17 than $8000, correct?
18    A.   Correct.
19    Q.   Sitting here today, do you recall
20 whether you did join for the remainder of 2007?
21    A.   I don't recall.  My recollection is that
22 we joined in 2008, as I have stated earlier.  I
23 don't recall if he paid -- Wayne may have paid
24 those last three months.  I don't recall.  I'm
25 sorry.

Page 240

1    Q.   And that is not an insignificant amount
2 of money for the dues to be a member of the trade
3 group, correct?
4    A.   It's relative, I guess.
5    Q.   And it's based off of the layers that
6 you have at the given time, correct?
7    A.   Yes.
8    Q.   And so Sparboe's request for you to
9 rejoin would have cost you $34,000 and change in
10 2008?
11    A.   Mm-hmm.
12    Q.   Is that something that you would have
13 sought reimbursement from or anything else from
14 Cargill?
15    A.   No.  No.
16    Q.   Other than a customer wanting you to
17 rejoin, were there any other reasons for wanting to
18 rejoin UEP in late 2007, beginning of 2008?
19    A.   We sell a lot of eggs to other egg
20 producers who we were not -- politically we needed
21 to be -- I just think a line.  Just it's important
22 for us to be a part of the group to understand
23 what's going on with the Washington lobbying and
24 whatever.
25         So, no, I just think it was important to

Page 241

1  be a part of the trade association. So there was
2  no other specific reason. But Cargill was very,
3  very clear on wanting us to be a member of the UEP.
4      Q.   The decision to rejoin UEP, though,
5  didn't change your decision to remain outside of
6  the UEP-certified program at that time?
7      A.   Correct.
8      Q.   We looked this morning.
9           It doesn't appear that there was a
10  robust committee presence after rejoining.
11     A.   No.
12     Q.   Was it mainly Wayne Carlson at that
13  point who was participating at UEP?
14     A.   Others may have attended meetings, but
15  we weren't actively involved in any board or
16  committee that I recall.
17     Q.   To your knowledge, would you have
18  attended any meetings after that time period?
19     A.   Not likely, no.
20     Q.   And so behind -- during this same time
21  period, Sparboe was developing its own animal
22  welfare program, correct?
23     A.   Yes.
24     Q.   And this is the PVP program that you've
25  mentioned today?

Page 242

1      A.   Correct.
2      Q.   And Sparboe was no longer -- let me
3  ask -- is Sparboe still a PVP company?
4      A.   No.
5      Q.   Are there any PVP companies that you're
6  aware of?
7      A.   I don't know.
8      Q.   And when did Sparboe leave the PVP
9  program?
10     A.   In 2012.
11     Q.   And were you aware prior to leaving the
12  PVP program that UEP was working behind the scenes
13  to discredit the PVP program?
14     A.   I was.
15     Q.   And what was your knowledge of those
16  actions?
17     A.   I just became aware of a meeting that
18  took place between Ken Klippen and Gene Gregory
19  that was fairly contentious.
20     Q.   And at that time, Mr. Klippen would have
21  left UEP and was working at Sparboe?
22     A.   Correct.
23     Q.   And what was the nature of that
24  conversation?
25     A.   I just think -- I don't think

Page 243

1  Mr. Gregory appreciated that there was an
2  alternative program that was being offered to
3  customers. There may have been some personal
4  relationship issues between Mr. Gregory and
5  Mr. Klippen that I'm not aware of.
6      Q.   From Sparboe's perspective, did the PVP
7  program provide all of the animal welfare benefits
8  that were available on the UEP-certified program?
9      A.   Yes.
10     Q.   With one significant exception, correct,
11  that you were allowed to have some of your flock
12  not be certified?
13     A.   It did not require a 100 percent rule.
14     Q.   And what was Mr. Klippen's relationship
15  with the PVP program? Did he develop it?
16     A.   Correct. Before becoming an employee of
17  our company, he had a company of his own and began
18  the development of a USDA verified process program
19  which you can verify anything, and he developed a
20  verification of process with a scientific committee
21  of his own which ultimately became incorporated
22  into our PVP program. So he had begun the work on
23  this as an independent entity prior to becoming an
24  employee of our company.
25     Q.   Was the PVP program a proprietary

Page 244

1  program by Sparboe?
2      A.   Yes. By Mr. Klippen.
3      Q.   And were there other companies besides
4  Sparboe who were PVP-certified companies?
5      A.   At the -- yes, there were. But they
6  were independent. I wasn't -- I mean, I didn't
7  know who they were necessarily. I had a general
8  context. But Mr. Klippen, when he was an
9  independent producer -- or company, worked with
10  those companies.
11     Q.   And during this same time period, it
12  appears that Sparboe was successful in obtaining
13  business or perhaps more business from Wal-Mart?
14     A.   Correct.
15     Q.   And were you aware of efforts to
16  discredit the program specifically as it related to
17  Wal-Mart in the hopes that Wal-Mart would start
18  buying from other people?
19     A.   I was.
20     Q.   And what's your knowledge of those
21  actions?
22     A.   I just believe our competitors -- our
23  competitors were talking about their program. I
24  mean -- talking about the UEP program and the
25  benefits of that program.

1    Q.    And who specifically are you referring
2  to?
3    A.    Country Creek, and Gene Gregory made
4  contact with Wal-Mart regarding the specific
5  program.
6    Q.    And in what time period did the Wal-Mart
7  business come to Sparboe?
8    A.    I can't recall the exact date. I'm
9  sorry.
10    Q.    And Wal-Mart at the time did not require
11  UEP certification for its eggs?
12    A.    They did require it of some producers
13  and we were successful in selling our PVP program
14  as a means of meeting their animal care program
15  needs. So I believe they had a requirement of an
16  animal care program.
17    Q.    And who headed up those efforts at
18  Sparboe?
19    A.    Well, Lee Regensburger was our sales
20  contact at Wal-Mart. Various people.
21    Q.    Who performed the audit for the PVP
22  program?
23    A.    It was USDA, a division of -- it was
24  through the USDA. I don't know the specific names.
25    Q.    And was there a concern by Wal-Mart that

1  it wanted confirmation that you had passed the
2  audits before going forward with the relationship?
3    A.    I don't recall that. I don't -- we
4  would have provided that, had they asked for it.
5  And we may have.
6    Q.    It looks like at least from the
7  documents produced in the case, it appeared that
8  the Wal-Mart relationship was in the 2008 time
9  period. I don't know if that refreshes your
10  recollection.
11    A.    Yes.
12    Q.    Would you have completed a PVP audit in
13  2008?
14    A.    At the locations where we were supplying
15  Wal-Mart, yes.
16    Q.    Was Wal-Mart asking to have all of your
17  locations audited?
18    A.    No.
19    Q.    And for how long did the Wal-Mart
20  relationship go?
21    A.    We lost the business in an RFP process
22  in the summer of 2011 in August.
23    Q.    And an RFP process, meaning a request
24  for --
25    A.    Proposal.

1    Q.    And so Sparboe would have submitted a
2  bid as a part of that process?
3    A.    We did, yes.
4    Q.    And to whom did you lose that business?
5    A.    Rose Acres and Moark, I believe.
6    Q.    And were you given an explanation for
7  why you lost the business to them?
8    A.    Price.
9    Q.    Is that your expectation, if you lose an
10  RFP proposal, that it's price based?
11    A.    There's a lot of reasons, but in that
12  case, it was price.
13    Q.    Was Sparboe involved in opposing a
14  potential change in the law in Arizona that would
15  have codified the requirements of the UEP-certified
16  program?
17    A.    We probably were. I vaguely remember
18  discussing that. We had a customer in Arizona.
19    Q.    Do you recall that Sparboe sent a letter
20  opposing the change in the law?
21    A.    I don't exactly recall. But we may
22  have.
23    Q.    I want to skip ahead in time a little
24  bit to the 2011 time period. Actually, first let
25  me ask one question about 2010.

1          Sparboe was involved in an egg recall in
2  2010 related to eggs it had purchased from
3  Hillandale; is that correct?
4    A.    Decoster. Yeah. Hillandale. I'm
5  sorry. It was Hillandale.
6    Q.    Okay. And --
7    A.    Let me think about that. They were eggs
8  purchased at Wright County. And I don't recall if
9  they were Hillandale or Decoster, but it was one of
10  those two.
11    Q.    Let me show you what's previously been
12  marked as Exhibit 84.
13          MS. CRABTREE: What number was that,
14  Rachel?
15          MR. HUTCHINSON: 84. 8-4.
16          MS. SCHWARTZ: And there is no Bates
17  number on that.
18          BY MS. SCHWARTZ:
19    Q.    And this is a press release that was on
20  the Food and Drug Administration website. Does
21  this refresh your recollection?
22    A.    Yes. It was both.
23    Q.    And it was the Wright County Egg, which
24  is the Decoster Farms in Iowa --
25    A.    Correct.

Page 249

1    Q.    -- and Hillandale Farms?
2    A.    Yes.
3    Q.    And these were not eggs that were
4 produced at Sparboe Farms, correct?
5    A.    No.
6    Q.    These are eggs you would have gone into
7 the marketplace to purchase from these companies to
8 sell?
9    A.    Correct.
10   Q.    And if you go down after the paragraph
11 that starts "For immediate release," you see that
12 there's a sentence that says, "Eggs affected by
13 this recall were distributed to grocery stores and
14 food service companies in the following states,"
15 and then one of those states listed is Kansas.  Do
16 you see that?
17   A.    Mm-hmm.
18   Q.    And how would you have known that your
19 eggs that you had purchased from either Wright
20 County or Hillandale then ended up in Kansas?
21        MR. HUTCHINSON: Objection, assumes
22 facts not in evidence.
23        THE WITNESS: So should I answer that
24 question?
25

Page 250

1        BY MS. SCHWARTZ:
2    Q.    Yes.
3    A.    I don't know that we had any facts.  I
4 know that when this was going on, we were overly
5 cautious in making sure that we were looking at
6 where any potential eggs could have been sold,
7 so --
8    Q.    And how --
9    A.    But I personally wasn't involved in
10 this, so I can't speak to the specifics of how that
11 list of state names came up.
12   Q.    And who would have been involved at
13 Sparboe --
14   A.    Mike Schmidt.
15   Q.    He'll be thrilled to hear how many times
16 his name has come up today.
17        Sitting here today, you don't know how
18 he would have gone about determining where the --
19 where eggs may have ended up for sale?
20   A.    Well, I know, because the eggs were
21 purchased from another producer to fill in, which
22 is very typical.  And we had high demand and
23 brought in a load of eggs from each of these
24 locations.  And my guess is they looked at when
25 they would have run those eggs and made a list of

Page 251

1 potential customers that would have been served or
2 potential -- so -- but I have no way of knowing --
3 it's very difficult to ascertain specifically where
4 which eggs go on any given day.
5    Q.    And it appears that those eggs were sold
6 to at least Albertson's; is that correct?
7    A.    Yes.
8    Q.    Sitting here today, do you recall if any
9 of your other customers would have received those
10 eggs as well?
11   A.    Other than the ones listed on this list?
12   Q.    Other than -- other than Albertson's.
13   A.    This was quite a process, Ms. Schwartz.
14 And there were a series of investigations and this
15 became -- I don't know which of the documents this
16 is.  It looks like it was the original recall.  But
17 I'm not prepared to say that that was the
18 conclusive list of customers or that those
19 customers did receive the eggs.
20        I know that this was a process.  And
21 when you've got an operation shipping eggs, it's
22 very difficult to know specifically where those
23 eggs -- when they leave your farm in specific
24 states.  Also, a distributer could be in Iowa and
25 distribute -- it's just -- you never know.

Page 252

1    Q.    And it's fair to say that Sparboe
2 received negative attention, in part, because of
3 the recall of these eggs?
4    A.    Negative attention?  Meaning we received
5 negative attention?
6    Q.    Did Sparboe receive negative publicity?
7    A.    Oh, negative publicity.  Oh, I presume
8 so, yes.
9    Q.    And that ended up being not just Sparboe
10 that was impacted by that recall; it impacted a
11 number of other producers, correct?
12   A.    Yes.
13   Q.    And it was fair to characterize it as a
14 large recall?
15   A.    It was.
16   Q.    Is it one of the largest recalls that
17 you can remember being in during your time in the
18 egg industry?
19   A.    Well, it's one of the largest, yes.
20        MS. SCHWARTZ: Let's take a quick break.
21        THE VIDEOGRAPHER: We are going off the
22 record at 4:14 p.m.
23        (Whereupon, a recess was taken from
24 4:14 p.m to 4:29 p.m.)
25        THE VIDEOGRAPHER: We are back on the

Page 253

1 record. This is the continuing videotaped
2 deposition of Beth S. Schnell taken on
3 February 17th 2014. The time now is 4:30 p.m.
4        BY MS. SCHWARTZ:
5     Q.   If you could pull out of your stack of
6 exhibits in front of you, we're looking for
7 Exhibit 488 which we looked at a little earlier
8 today. It was a two-page document talking about
9 the history of the UEP certified and the animal
10 care certified program.
11        And do you recall that we looked at this
12 a little earlier today?
13     A.   I do.
14     Q.   And this had on the second page of it
15 Mr. Sparboe's name, your name, Greg Murch and Dave
16 Cisneros there on the second page?
17     A.   Yes.
18     Q.   And I just have a few last questions on
19 this document. If you look at the third paragraph
20 on the first page, and it starts off, "A seal was
21 created to monitor compliance by producers and
22 retailers." Do you see that?
23     A.   I do.
24     Q.   "And U.S. egg producers were encouraged
25 to buy and sell only with other ACC companies."

Page 254

1 And Sparboe believed that sentence to be true,
2 correct, that egg producers were encouraged to buy
3 and sell only with other ACC companies?
4     A.   I don't know -- I guess that is true.
5     Q.   And the letter says, "It's effectively
6 blackballing those producers who chose not to
7 participate."
8     A.   It says that.
9     Q.   And, again, this is a letter that has
10 your name at the bottom of it. Did you believe the
11 UEP-certified program and the way it was
12 implemented was effectively blackballing those
13 producers who chose not to participate?
14     A.   I believe at some points in time, that
15 could have been true.
16     Q.   And in Sparboe's case, in particular
17 with regard to contacts to your customers to
18 encourage them not to buy from you because you were
19 not UEP certified, would that be an example?
20     A.   I believe that's an example, yes.
21     Q.   One follow-up question with regard to
22 your UEP membership. You had mentioned -- we had
23 talked earlier that Sparboe had rejoined UEP in
24 2008, and you had mentioned earlier in the day that
25 you thought there was a period of time around 2010

Page 255

1 or 2011 when Sparboe dropped out of UEP again.
2        MR. HUTCHINSON: Objection, that
3 mischaracterizes her prior testimony.
4        BY MS. SCHWARTZ:
5     Q.   Well, let me ask, was Sparboe a UEP
6 member in 2010?
7     A.   No.
8     Q.   And when did Sparboe drop its UEP
9 membership?
10     A.   I believe we dropped -- I don't recall
11 the exact dates.
12     Q.   And why did Sparboe, again, drop its UEP
13 membership at that time?
14     A.   At what time?
15     Q.   Well, let me ask. Sparboe was a UEP
16 member in 2009, correct?
17     A.   I don't recall that. I can't recall.
18 I'm sorry, the dates are just really becoming very
19 blurred and I'm becoming tired. So we're talking
20 about what point in time, 2009?
21     Q.   We know that Sparboe rejoined in 2008.
22     A.   Correct.
23     Q.   You testified earlier that Wayne Carlson
24 had a customer who wanted Sparboe to rejoin.
25     A.   Correct.

Page 256

1     Q.   Did Sparboe remain a UEP member in 2009?
2     A.   At some point, we again dropped out of
3 UEP. And that's the date I'm just unclear on. I'm
4 sorry. It's been a long day and I'm not exactly
5 sure. But we -- I believe we discontinued our
6 membership.
7     Q.   And was Cargill still one of your
8 customers during --
9     A.   Yes.
10     Q.   -- in 2010, for instance?
11     A.   Yes.
12     Q.   And they were no longer asking Sparboe
13 to be a UEP member?
14     A.   No. I would not be able to confirm
15 that, no.
16     Q.   Why did Sparboe decide to drop its
17 membership for a second time?
18     A.   Sparboe -- I think that we were trying
19 to -- I guess I don't recall.
20     Q.   You have no recollection on behalf of
21 the company as to why you would have dropped your
22 membership again in 2010?
23     A.   I believe it may -- I'm sorry. I'm
24 just -- my brain is just -- I'm tired.
25     Q.   And would Sparboe have been a UEP member

Page 257

1 in 2011?
2    A.    No.
3    Q.    And Sparboe rejoins the UEP group in
4 2012, correct?
5    A.    Correct.
6    Q.    And how do you know, sitting here, for
7 sure that you were not a UEP member in 2011?
8    A.    Well, we were targeted as a -- we were
9 targeted because we were not a member of UEP by the
10 animal rights activists.
11    Q.    And what is the basis for your knowledge
12 as to why you were targeted?
13    A.    Well, I believe that people that were on
14 the United Egg Producers program had -- were
15 provided safe harbor or coverage by the animal
16 rights people not to attack them because of the --
17 that UEP was working together with HSUS to develop
18 animal care standards and guidelines that were
19 acceptable to the activist community.
20        And Sparboe Farms was operating with our
21 own program at that time, and so I believe -- I
22 personally believe we were targeted because we were
23 not a part of that program.
24    Q.    But you don't have any e-mail or a
25 conversation that you would have had with somebody

Page 258

1 that would have provided that information to you;
2 it's just your personal belief?
3    A.    Well, I experienced a pretty dramatic
4 undercover video situation.
5    Q.    And that's as good a segue as any.
6        We have actually what we'll end up
7 marking as Exhibit 507.  And if you can just hit
8 the touchpad.
9        MR. HUTCHINSON:  I'm not going to play
10 it.  And before we play anything, I'm going to
11 object to this exhibit on -- one, I don't know what
12 it is, but it certainly is not an authentic
13 document that was produced in this case.
14        If it's a video of a broadcast of some
15 purported video, I'm going to object as it's both
16 hearsay and hearsay upon hearsay.  I have no way of
17 authenticating either what you're about to show,
18 whatever was given to any broadcast company or the
19 video that was taken as being an authentic
20 document.
21        And so -- and I should also say, Rachel,
22 at the outset of this, we neglected to sort of
23 cover our agreement that all the parties have on
24 objections today.  We're just -- we're preserving
25 all objections, correct?

Page 259

1        MS. SCHWARTZ:  That's correct.
2        MR. HUTCHINSON:  So with that, I can
3 assist you on -- just so you don't have to get up
4 and push play, if you walk me through what you want
5 me to push here, I'll do it.
6        BY MS. SCHWARTZ:
7    Q.    Let me ask just a few questions before
8 we look at this.  And your objections are noted.
9        You are aware that a video was taken by
10 what purports to be Mercy for Animals?
11    A.    I am.
12    Q.    And this video became public in November
13 of 2011, correct?
14    A.    Correct.
15    Q.    And is it your understanding that the
16 video was taken of Sparboe Farms' properties?
17    A.    That's my understanding.
18    Q.    And have you seen the video?
19    A.    Yes.
20    Q.    And are you aware that the video is
21 posted on YouTube, for instance?
22    A.    I am.
23    Q.    And if you would see the video again, I
24 assume this is something that would be familiar to
25 you?

Page 260

1    A.    It may be.
2        MS. SCHWARTZ:  Okay.  You can go ahead
3 and start that.
4        MR. HUTCHINSON:  What do you want me to
5 do?
6        MS. SCHWARTZ:  Press the touchpad.  And
7 then all you're going to need to do is press --
8 move it, control down.
9        MR. HUTCHINSON:  Hit "play"?
10        MS. SCHWARTZ:  Yes.
11        (Whereupon the video was played.)
12        MS. SUMNER:  Hello?
13        MR. HUTCHINSON:  We're watching a video.
14        MS. CRABTREE:  There's no audio.
15        MS. SUMNER:  Oh.  There's no audio for
16 the video?
17        MS. CRABTREE:  Nope.
18        MS. SUMNER:  Okay.
19        (Whereupon the playing of the video
20 ended.)
21        MS. SCHWARTZ:  That's the end of that.
22 If you can hand me my laptop.
23        MR. HUTCHINSON:  Certainly.
24        BY MS. SCHWARTZ:
25    Q.    What we just watched was played off of

Page 261

1 this flash drive, which we're going to go ahead and
2 mark as Exhibit 507.
3       (Plaintiff's Exhibit 507 was marked
4       for identification.)
5       BY MS. SCHWARTZ:
6  Q.   Is that the video that you were
7 referring to?
8  A.   No. I have not seen that video.
9  Q.   There is a separate video on YouTube?
10  A.   I have seen the video on the 20/20 story
11 video.
12  Q.   And are excerpts of that video used on
13 the 20/20 video?
14  A.   Yes.
15  Q.   And the 20/20 that you're referring to
16 was actually a story done by the television show
17 20/20?
18  A.   Yes.
19  Q.   And was it focused solely on Sparboe
20 Farms?
21  A.   Yes.
22  Q.   And the story was not only about the
23 video, but it was also about a warning letter that
24 the FDA had sent to Sparboe Farms right around that
25 same time, correct?

Page 262

1  A.   It was.
2  Q.   And let me go ahead and mark as Exhibit
3 508 --
4  A.   Not the same time. What was the date on
5 the warning letter? I'm sorry. The warning
6 letter. The audits -- yes. The warning letter was
7 from that same time.
8       (Plaintiff's Exhibit 508 was marked
9       for identification.)
10      BY MS. SCHWARTZ:
11  Q.   Marked as Exhibit 508 is SF124149, and
12 this is a document produced by Sparboe in the
13 litigation dated November 16th of 2011. Do you see
14 that?
15  A.   Yes.
16  Q.   And this is what's called a warning
17 letter from the FDA, which is the Food and Drug
18 Administration, correct?
19  A.   Yes.
20  Q.   And what is a warning letter from the
21 FDA, generally?
22  A.   I -- in this case, it was referring to
23 audits that took place on our farm many, many
24 months prior. I don't have the -- I'm not a
25 technician in terms of the FDA's vernacular on

Page 263

1 their warning letters.
2  Q.   And if you look at the third paragraph
3 on that front page, it says, "We found that the
4 above-listed facilities have serious violations of
5 the prevention of salmonella." Do you see that?
6  A.   Yes.
7  Q.   And was that essentially what the letter
8 was about, was violations of the prevention of
9 salmonella rules and regulations?
10  A.   It related to the salmonella enteritidis
11 prevention plan and all aspects of the plan that
12 was in place.
13  Q.   And this came out on November 16th -- or
14 at least it's dated November 16th of 2011. Do you
15 recall when the 20/20 special was?
16  A.   November 18th, I believe.
17      Or the date -- it was basically the next
18 day, the 17th perhaps.
19  Q.   Okay. And what was the fallout from the
20 20/20 special on Sparboe?
21  A.   For our company?
22  Q.   Yes.
23  A.   We lost about more than 50 percent of
24 our customers. And those customers included McDonald's,

Page 264

1 correct?
2  A.   Yes.
3  Q.   Target, correct?
4  A.   Yes.
5  Q.   Who were -- were those the two primary
6 customers that you lost?
7  A.   No. We lost other customers as well.
8  Q.   Who were some of the other customers
9 that you lost?
10  A.   Woodman's, Byerly's, Lunds, Hy-Vee
11 eventually.
12  Q.   And were you aware that around that same
13 time period, UEP gave a statement regarding the
14 20/20 news report?
15  A.   I may have been.
16      (Plaintiff's Exhibit 509 was marked
17      for identification.)
18      BY MS. SCHWARTZ:
19  Q.   I'm marking as Exhibit 509 a document
20 with the Bates label RAFKS12296. And this appears
21 to be a November -- at the top, a November 18th
22 2011 e-mail from Gene Gregory. Do you see that?
23  A.   I do.
24  Q.   And it appears to be an e-mail sent to
25 many names I recognize as being UEP members. Do

Page 265

1 you agree?
2     A.   They're -- I see names on there that are
3 UEP members.
4     Q.   And the e-mail says, "In response to the
5 story aired this morning on Good Morning America
6 and expected to air on 20/20 tonight, Golin Harris
7 has provided the two attached statements.  We
8 suggest we all try to communicate the same
9 messages, should the media inquire."
10        And if you turn to the third page of
11 this exhibit, you see that there's the statement of
12 United Egg Producers regarding the 20/20 news
13 report.  Do you see that?
14     A.   What was your question?
15     Q.   Sorry.  The title of this is the
16 "Statement of United Egg Producers Regarding 20/20
17 News Report"?
18     A.   Yes.  I see that.
19     Q.   And the very first paragraph says, "The
20 video that has been broadcast today involves a
21 company that is not a member of United Egg
22 Producers and does not participate in the UEP
23 certified animal welfare program.  We have no
24 knowledge about the conditions or operation of that
25 farm or company."  Do you see that?

Page 266

1     A.   I do.
2     Q.   And does that refresh your recollection
3 at least as of November 18th of 2011, you were not
4 a UEP member at that time?
5     A.   I think that's consistent with what I
6 said.
7     Q.   Did you think it was appropriate that
8 UEP had put together this statement?
9     A.   I have no opinion on that.
10     Q.   Sitting here today, you have no opinion
11 on whether that was an appropriate thing for a
12 trade group to do?
13     A.   I don't think it's an appropriate thing
14 for a trade group to do.
15     Q.   And did Sparboe initially deny that the
16 video was taken at their facilities?
17     A.   No.
18     Q.   Was Ken Klippen still employed by
19 Sparboe in that November 2011 time frame?
20     A.   Yes.
21     Q.   Let me go ahead and mark as Exhibit
22 510 --
23          (Plaintiff's Exhibit 510 was marked
24          for identification.)
25          MR. HUTCHINSON:  Before we -- has this

Page 267

1 been produced, Rachel?
2          MS. SCHWARTZ:  It has not.
3          MR. HUTCHINSON:  Okay.
4          MS. SCHWARTZ:  I can represent that this
5 has been printed off of the website that is listed
6 at the top, which was thedenverchannel.com.
7          MR. HUTCHINSON:  We'll preserve our
8 objections to this document as well.  And I would
9 note that, you know, to the extent that your
10 production isn't complete, we would ask that you
11 get that complete as soon as possible.
12          MS. SCHWARTZ:  Troy, these are all
13 documents that are responsive to our doc request,
14 too, so we are not sure why this has not been
15 produced in the production request as well.  But be
16 that as it may --
17          MR. HUTCHINSON:  Well, we're going to
18 produce documents that we have in our possession.
19 I don't -- and Sparboe does not have documents from
20 www.thedenverchannel.com in its possession or
21 control.
22          BY MS. SCHWARTZ:
23     Q.   And if you've had a chance to read this,
24 this article, have you seen this before?
25     A.   Do you want me to read it?  I have not

Page 268

1 read it.  Would you like me to take the time right
2 now?  I'd be happy to read it.
3          (Reading).
4          MR. HUTCHINSON:  While Ms. Schnell is
5 reading this, just to the extent we're going to
6 continue this deposition on another day, we would
7 ask that you produce all the documents and exhibits
8 that you intend to use during the deposition in
9 advance of the deposition so that we can avoid
10 wasting time.
11          And in the future, we may -- I may
12 instruct the witness not to answer questions
13 related to exhibits that aren't produced.  So I'll
14 just make that record now.  Because this is a waste
15 of time.
16     A.   Are we going to be talking about all of
17 this as well?
18          BY MS. SCHWARTZ:
19     Q.   No, we're not.  It's just the first few
20 pages.  And let me start by asking who was Chuck
21 Sanger?
22     A.   Chuck Sanger was a public relations
23 person.  He was you our spokesman.
24     Q.   And was he hired after the 20/20 --
25     A.   He was hired to represent us during this

1 situation.

2    Q.    And does this refresh your recollection
3 that it appears that Mr. Klippen had originally
4 said that he thought that this was staged?

5    A.    In this particular interview, yes.

6    Q.    And Sparboe was clear that they didn't
7 have any evidence to suggest that it was staged,
8 correct?

9    A.    Could -- I don't understand your
10 question.

11    Q.    Despite what Mr. Klippen had said,
12 Sparboe came out and said -- Mr. Sanger, in
13 particular, said that you had no evidence that this
14 was a staged event?

15    A.    What he said was that's not our official
16 position.

17    Q.    And he goes on to say, "We don't have
18 evidence to suggest it was staged," correct?

19    A.    He said we don't have evidence to
20 suggest it was staged.

21    Q.    And Sparboe changed rather dramatically
22 what it was doing on the animal welfare front after
23 the 20/20 video, didn't it?

24    A.    In what regard?

25    Q.    It came back to the UEP-certified

1 program, correct?

2    A.    It did. But could you clarify what
3 you -- when you say we changed what we were doing,
4 I guess I'd like to have clarification on that
5 question.

6    Q.    Well, you had quit the UEP certified
7 program back in 2005, correct?

8    A.    Correct. But what -- could you clarify
9 what you mean by we had changed what we were doing?

10    Q.    Let me just ask. From 2005 through
11 2012, you were not a UEP-certified member correct?

12    A.    That's correct.

13    Q.    And following the 20/20 video, you
14 became a UEP-certified member again?

15    A.    We did, to get cover for -- protection
16 from animal activism.

17    Q.    And it appeared that -- before I ask
18 that question, let me follow up on one last
19 question as it related to the customers that you
20 lost during that time period.

21        In addition to the specific customers
22 you had at that time, did you also lose prospects
23 as well?

24    A.    We did.

25    Q.    And who were some of those prospects at

1 the time?

2    A.    At that period of time, we went
3 through -- we weren't prospecting anybody. Let me
4 put it that way. It was very difficult for us to
5 sell our eggs. And we were not -- Safeway would
6 not buy from us. Nestle, I believe, would not buy
7 from us. Other egg producers would not buy from
8 us.

9    Q.    And five days after the 20/20 news
10 segment, AWG canceled its appointment with you,
11 didn't they?

12    A.    That's correct.

13        MS. SCHWARTZ: And I'd like mark as
14 Exhibit 511 a document that is PLTF183941-AWG.

15        (Plaintiff's Exhibit 511 was marked
16        for identification.)

17    BY MS. SCHWARTZ:

18    Q.    And who is Judy Sillman?

19    A.    Judy was a sales representative for us.

20    Q.    And based on the e-mails, it looks like
21 she was coordinating with Associated Wholesale
22 Grocers for Sparboe to come and visit?

23    A.    That's what it looks like.

24    Q.    And Sparboe was confirmed on
25 November 11th to be coming on December 1st to AWG?

1    A.    Yes.

2    Q.    And on November 23rd, which, again, is
3 five days after the 20/20 video, there's a November
4 23rd e-mail from Linda Whiteside to Judy Sillman
5 that says, "Judy, we need to cancel the meeting
6 scheduled for December 1st. Thanks." Do you see
7 that?

8    A.    I do.

9    Q.    And Judy responded, "I understand. We
10 will touch base with you later in 2012."

11        And did you understand at the time, that
12 that meeting was canceled in light of the 20/20
13 reports and the other media reports at the time?

14    A.    I would have assumed so.

15    Q.    It appears in December of 2011 that
16 Sparboe officially asked to come back for its
17 membership in UEP, correct?

18    A.    We did.

19    Q.    And do you recall sending a letter to
20 Gene Gregory?

21    A.    I do.

22        MS. SCHWARTZ: I'm marking as
23 Exhibit 512, which is CM-KS-29403.

24        (Plaintiff's Exhibit 512 was marked
25        for identification.)

Page 273

1    BY MS. SCHWARTZ:
2    Q.   And if you look at the third page of
3 this, this appears to be your letter to Gene
4 Gregory, correct?
5    A.   Yes.
6    Q.   And if you look at the third paragraph
7 which says, in part, "Going forward, Sparboe Farms
8 will support industry initiatives in scientific
9 research, legislative and regulatory efforts.  We
10 would like to get our operations audited and
11 approved for the UEP-certified program as soon as
12 possible.  I respectfully ask that you reinstate
13 Sparboe Farms' membership in the United Egg
14 Producers.  I assure you that we will be positive
15 and supportive."
16    A.   I wrote that.
17    Q.   With your request to come back to the
18 UEP-certified program, you did not ask UEP to
19 change any aspects of the program, correct?
20    A.   We were extremely desperate to sell the
21 eggs that we were producing, having lost a
22 tremendous number of customers.  The industry would
23 not buy from us.  And we believed that we had -- I
24 believed that I had made an error in not working in
25 a way that would not directly cause the animal

Page 274

1 activists to target us.
2        So I recognized the error of that
3 decision, and decided it would be best for us to be
4 a part of the industry, the general broad industry
5 animal care program, and to be a member of UEP,
6 which gave us protection from further undercover
7 video activity on our farms.
8    Q.   And again, you did not ask upon
9 readmission to the certified program that they
10 change any of those criteria that were in place?
11    A.   I was hardly in a position to ask for
12 any favors to anything at UEP at that point.
13    Q.   It's fair to say the answer is no, you
14 did not --
15    A.   The answer is definitely no.
16    Q.   And so at that time, the 100 percent
17 rule was still in place at the end of 2012,
18 correct?
19    A.   Was it?  I presume it was, yes.
20    Q.   Is it still in effect today?
21    A.   I believe it is, yes.  We ended up
22 selling a number of birds at that point.  Our
23 company today is half the size in terms of the
24 number of chickens we have.  In order for us to
25 comply with the hundred percent rule, we ended up

Page 275

1 selling 50 percent of our chickens.  We made a
2 major change to be able to comply with the UEP
3 program.
4    Q.   During your time when you had been a UEP
5 member, were you aware of any board meeting that
6 needed to be called to discuss a potential request
7 for membership?
8        MR. HUTCHINSON:  Objection, vague as to
9 time.
10    A.   When?
11        BY MS. SCHWARTZ:
12    Q.   During the time that you were a UEP
13 member, do you recall there ever needing to be a
14 board meeting to discuss a request for membership?
15    A.   I was never on the board, so I would not
16 have been aware of those.
17    Q.   Sitting here today on behalf of Sparboe,
18 you're not aware of any meeting?
19    A.   I'm not.
20    Q.   Were you aware prior to today that UEP
21 had called a board meeting to discuss your request
22 for UEP certification?
23    A.   I am.
24    Q.   And do you have an understanding of what
25 happened at that meeting?

Page 276

1    A.   I do not.
2    Q.   It is fair to say that your UEP
3 membership was reinstated, correct?
4    A.   It was.
5    Q.   And you were allowed to join the
6 UEP-certified program?
7    A.   We were.
8    Q.   Do you recall when you were notified
9 about those?
10    A.   About having the certification?
11    Q.   About your membership request being
12 granted.
13    A.   I don't recall exactly, no.
14    Q.   Do you remember how you found out you
15 were reinstated?
16    A.   I don't.
17    Q.   And with regard to the UEP-certified
18 program, it appears in March of 2012 you received
19 your new certification number.
20    A.   Mm-hmm.
21    Q.   You are now number 395, it appears?
22    A.   I'm not aware of that.
23    Q.   Would it surprise you that the reaction
24 to your request to rejoin both UEP and rejoin the
25 UEP-certified program was met with the phrase "I

Page 277

1 guess hell just froze over?"
2    A.   I'm not aware of that.
3    Q.   I assume that does not surprise you that
4 members were surprised that you were back in the
5 UEP program?
6    A.   I have no opinion about that whatsoever.
7    Q.   So as we look back at the depo exhibit
8 that lists the topics for today, we're just
9 finishing up topic 20, which was your membership in
10 UEP.
11        With the exception of G, which we'll get
12 to in a moment, G through J, do you have any
13 additional information to provide with regard to
14 your UEP membership, the years you were a UEP
15 member and your participation in UEP?
16    A.   Do I have any additional information in
17 what regard?
18    Q.   In regard to those topics, have we
19 covered your knowledge of your participation and
20 involvement with UEP?
21    A.   I think you've been pretty thorough in
22 your questioning.  I don't --
23    Q.   We were also finishing up topic 24.  I
24 think we've covered that.
25        All right.  Switching gears to your

Page 278

1 membership in USEM.  Sitting here today, do you
2 recall what years Sparboe was a USEM member?
3    A.   I believe it was in the early -- late
4 '99 -- maybe 2000, something like that.
5    Q.   And through its -- I believe you dropped
6 your USEM membership in 2005?
7    A.   I believe at the same time.
8    Q.   And have you rejoined USEM?
9    A.   No.
10    Q.   Outside of your participation with USEM,
11 does Sparboe export eggs?
12    A.   Yes.
13    Q.   And do you do that on your own?
14    A.   Yes.
15    Q.   It's not in conjunction with another
16 group?
17    A.   What do you mean by a group?
18    Q.   Like a USEM or --
19    A.   No.
20    Q.   -- another cooperative?
21        And do you have specific countries to
22 which you export?
23    A.   A variety of countries.
24    Q.   Just opportunistic?
25    A.   Yes.

Page 279

1    Q.   And why did you join USEM?
2    A.   Because we had eggs to sell.
3    Q.   And by joining USEM and being a member
4 of USEM, you were committed to any export that was
5 agreed upon by its membership, correct?
6    A.   I don't know that for a fact.
7    Q.   Do you recall signing a USEM membership
8 form?
9    A.   I did not.
10    Q.   And why not?
11    A.   Others in our company may have, but I
12 did not personally.  I'm not familiar with that
13 document.
14    Q.   And do you recall that there were -- for
15 any USEM export, that a company had one of two
16 options once an export was approved; you could
17 provide your own eggs or you could have USEM obtain
18 eggs on your behalf?
19        MR. HUTCHINSON:  Objection, assumes
20 facts not in evidence.
21    A.   Yeah.  I don't have any specific
22 knowledge of that.
23        BY MS. SCHWARTZ:
24    Q.   Who at your company would be the most
25 knowledgeable about USEM?

Page 280

1    A.   Wayne Carlson.
2    Q.   And did you talk with him specifically
3 with regard to topic 22?
4    A.   Yes.  We discussed it.
5    Q.   And topic 22 is your membership --
6    A.   Actually, let me just -- before I say
7 yes, let me look at topic 22.  Yes.
8    Q.   Which is, generally speaking, your
9 membership and participation in USEM?
10    A.   Correct.
11    Q.   And so to the best of your recollection,
12 you -- Sparboe joined USEM around 2000?
13    A.   That's my recollection.
14    Q.   And from 2000 through 2005, did Sparboe
15 participate in all of the exports that were
16 approved by USEM?
17    A.   Not all of them, no.  I don't know.
18    Q.   So if you were to look at the list of
19 the exports that were approved during that time
20 sitting here today, would you know whether Sparboe
21 participated in all of those?
22    A.   I would not.
23    Q.   Let me show you what's previously been
24 marked as Exhibit 355, which is UE0245344.  And
25 this is a February 14th 2000 copy of United Voices.

Page 281

1 Do you see that at the top?
2    A.   Yes.
3    Q.   And if you look on the left-hand side,
4 this United Voices is talking about that the UEP
5 export committee has approved the participation
6 with United States egg marketers in filling an
7 export.  Do you see that?
8    A.   I do.
9    Q.   And sitting here today, you don't know
10 whether Sparboe would have participated in that
11 export or not?
12    A.   I don't recall specifically, no.
13    Q.   And if you go down that page, you'll see
14 that it says, "As a result of filling this export
15 order, all producers will benefit from much
16 improved prices, while only some producers will
17 provide the financial funding to cover the cost."
18 Do you see that?
19    A.   I'm sorry.  Where are you?  You're in
20 the right-hand column or the left-hand column?
21    Q.   I'm sorry.  Still in the left-hand
22 column, the fourth paragraph down.
23    A.   Okay.  I see that.
24    Q.   And it goes on the right-hand column to
25 describe how those costs are shared amongst

Page 282

1 participants?
2    A.   Mm-hmm.
3    Q.   And it says, "The cost is the difference
4 between what UEP traders must pay producers for the
5 eggs and the sale price committed on the export.
6 The cost is then divided by those producers having
7 made a financial commitment based upon a per-bird
8 rate.  The more producers involved, the less cost
9 for everyone."  Do you see that?
10    A.   Mm-hmm.
11    Q.   And is that consistent with your
12 understanding of participation in USEM and the
13 costs associated with it?
14    A.   No.  My understanding is that we sold
15 eggs at a specific price -- there was a sale and a
16 price was published, and you would sign up for that
17 and you would fill what you could for that
18 commitment.
19    Q.   And Sparboe always produced -- always
20 provided its own eggs to these exports?
21    A.   To my knowledge.
22    MR. HUTCHINSON:  Objection, assumes
23 facts not in evidence.
24    BY MS. SCHWARTZ:
25    Q.   And, I'm sorry, what was your answer?

Page 283

1    A.   I said to my knowledge.
2    Q.   Let me show you what we're marking as
3 Exhibit 513, which is Bates labeled NL003281.
4        (Plaintiff's Exhibit 513 was marked
5         for identification.)
6    BY MS. SCHWARTZ:
7    Q.   And this is a March 6th copy of United
8 Voices.  Do you see that at the top?
9    A.   I'm sorry.  What page are you on?
10    Q.   Just the very first one.
11    A.   Yes.
12    Q.   And that's a March 6th 2000 --
13    A.   I see that.
14    Q.   If you would flip just to the second
15 page, you'll see on the right-hand side a column
16 entitled "Benefit of February Export Order."  Do
17 you see that?
18    A.   Yes.
19    Q.   And in the second paragraph there, there
20 is an analysis done of what this export did to the
21 Urner Barry large quote in the midwestern region.
22 Do you see that?
23    A.   Mm-hmm.
24    Q.   And that there's an estimate that the
25 export would convert to an increased income of

Page 284

1 $183,750.  Do you see that?
2    A.   I do.
3    Q.   And it goes on to say that while all
4 producers benefited, not all producers provided
5 financial support for that.  And if you go down
6 that column, you'll see that there's a list of the
7 companies that came forward to provide support
8 since the last newsletter.  And do you see that
9 Sparboe is listed there?
10    A.   Mm-hmm.
11    Q.   Is that consistent with your
12 recollection, that by March 6th --
13    A.   I don't know what -- I'm sorry.  Finish
14 your question.  Excuse me.
15    Q.   Is that consistent with your
16 recollection, that by March 6th of 2000, that
17 Sparboe would have been involved with providing
18 financial support to USEM?
19    A.   That is not my -- that is not consistent
20 with my understanding.  What -- my understanding is
21 that we sold eggs through U.S. Egg Marketers.
22    Q.   Do you recall whether anyone at Sparboe
23 responded to this United Voices to indicate that
24 this was an error that Sparboe had come forward to
25 provide --

Page 285

1    A.   I don't know that.
2         MS. SCHWARTZ:  Marking as Exhibit 514,
3  this is an invoice dated October 15th of 2001 from
4  UEP.  Do you see that?
5         (Plaintiff's Exhibit 514 was marked
6         for identification.)
7    A.   Mm-hmm.
8         BY MS. SCHWARTZ:
9    Q.   And it appears to be an invoice to
10  Sparboe.  And if you look down at the description,
11  it says, "Export number 2 loss."  And it shows a
12  price of $22,723.  Do you see that?
13    A.   Mm-hmm.  I do.
14    Q.   And is that your understanding that
15  Sparboe had received a loss on an export that it
16  had participated in?
17    A.   I'm not -- I can't testify to that.  I'm
18  sorry.  I don't know.
19    Q.   And, again, Wayne Carlson would be the
20  individual at your company who would know that?
21    A.   I would guess, yes.
22    Q.   And if there were additional export loss
23  invoices that Sparboe received from UEP, would your
24  testimony be the same, that you don't know the
25  nature of why there was an export loss?

Page 286

1    A.   Yes.
2    Q.   Let me show you what's previously been
3  marked as Exhibit 50.  And Exhibit 50 has a Bates
4  label of UE0020984.  And this appears to have a fax
5  line on the left-hand side of February 6th of 2002.
6  And listed is -- the title at the top is "Case
7  Volume for Exports."  Do you see that?
8    A.   I do.
9    Q.   And if you look at the second page,
10  you'll see that Sparboe Companies is listed there,
11  correct?
12    A.   Correct.
13    Q.   And if you follow that line all the way
14  across, you'll see that Sparboe is listed as
15  "purchase" as opposed to other USEM members who are
16  listed as "pack."
17    A.   I see the word "purchase."
18    Q.   And sitting here today,, you understand
19  that that was USEM or UEP purchasing eggs on
20  Sparboe's behalf for those exports?
21    A.   I can't say I know that, no.  I don't
22  know what that means.  And I don't know the timing
23  of this.  It looks like it was February 8th of '02.
24  I've never seen this document before.
25    Q.   And if there were a series of additional

Page 287

1  documents that looked like this showing whether
2  Sparboe packed or purchased, would your testimony
3  be the same, that you simply don't know what that
4  document means?
5    A.   It's a UEP document.  I'm guessing
6  nobody has seen this in the industry.
7    Q.   Uh-huh.  Sitting here today, that
8  doesn't refresh your recollection as to whether
9  Sparboe had eggs purchased on its behalf?
10    A.   Nobody at Sparboe Farms would know what
11  other companies in the industry were doing and
12  participating with this program.  So I don't think
13  the Sparboe company could testify to this.
14    Q.   Well, I'm not asking with regard to any
15  other company.  I'm asking specifically with regard
16  to Sparboe.
17    A.   Correct.  I don't know that anyone in
18  our company could testify to this because I've
19  never seen this document before.  And we wouldn't
20  have been privy to who's participating in the U.S.
21  Egg Marketers at what level.
22    Q.   But somebody at Sparboe Farms was
23  responsible for deciding whether Sparboe was going
24  to participate in any specific export; is that
25  correct?

Page 288

1    A.   I believe Bob Sparboe made the decision
2  to join U.S. Egg Marketers.
3    Q.   And would he have been the individual
4  who would have decided for each export whether
5  Sparboe was going to participate or not?
6    A.   My guess is he would have been that
7  individual.
8    Q.   Would Wayne Carlson have had any of
9  those responsibilities in the 2004/2005 time frame?
10    A.   I believe Wayne Carlson and Bob Sparboe
11  would have jointly discussed export opportunities.
12    Q.   Specifically through USEM?
13    A.   Or any export opportunities.  We
14  exported outside of U.S. Egg Marketers.
15    Q.   And was the purpose of the export to
16  strengthen the current domestic market?
17    A.   No.  I think the export opportunities
18  were to sell surplus eggs.
19    Q.   But if you were receiving a loss for the
20  eggs that were being sold?
21    A.   I think it's many times we sell eggs at
22  a loss in the commodity business.  There are lots
23  of times eggs are sold at a loss.  And when you
24  have a surplus of eggs, you have to -- in our
25  industry, we say you sell them or you smell them.

Page 289

1  And so you have to sell. And in this case,
2  exporting the eggs, an opportunity to sell the eggs
3  export was an option.
4      Q.   And let me hand you what's previously
5  been marked as Plaintiff's Exhibit 173. And this
6  is a memo from USEM, and at the bottom you see
7  that's Larry Seger, who was the USEM chairman. Do
8  you see that?
9      A.   Yes.
10     Q.   And if you look at the second paragraph,
11 the second paragraph says, "The main purpose of
12 exports is to strengthen the current market.
13 Unquestionably, that always happens. Strengthening
14 a weak market or raising a steady market is what
15 exports are meant to accomplish in the short run."
16 Do you see that?
17     A.   I see that.
18     Q.   And was it Sparboe's hope that by
19 participating in USEM and participating in the
20 exports that it would strengthen a weak market or
21 strengthen the current market?
22     A.   Sparboe's involvement in U.S. Egg
23 Marketers was exclusively to move surplus eggs.
24     Q.   But sitting here today, you do not know
25 why you received invoices from UEP that have export

Page 290

1  losses on them, correct?
2      A.   Do you have confirmation that these were
3  paid?
4      Q.   Let me ask the questions.
5      A.   Yeah.
6      Q.   Sitting here today, you don't know why
7  there were invoices sent to Sparboe that show an
8  export loss in the description?
9      A.   I can't speak to that specific invoice,
10 no.
11     Q.   And sitting here today, you don't know
12 that for each opportunity that Sparboe participated
13 in on -- with export for USEM, that you provided
14 eggs for every single one of those exports?
15     A.   I can't sit here today and say that we
16 participated in every single export.
17     Q.   But sitting here today, you don't know
18 which exports you may have provided eggs to or had
19 eggs purchased on your behalf?
20     A.   We sold millions of dozens of eggs every
21 year. I don't know specifically which eggs were
22 sold when and to which -- I mean, it would be
23 impossible for me to sit here today, as you say,
24 and know exactly which of those were participated
25 in.

Page 291

1      Q.   And looking at the documents that we've
2  looked at so far does not refresh your
3  recollection?
4      A.   In this document -- I've not seen this
5  document before. Is this -- I'm sorry. Is this
6  the document you're referring to?
7      Q.   I have a whole host of those. We can go
8  through all of them, if you'd like. I know that it
9  is getting late in the day, and I'm trying to make
10 this go as quickly as we can.
11        But looking at a document similar to
12 that one would not refresh your recollection as to
13 whether you packed eggs for an export or whether
14 you had eggs purchased on your behalf?
15     A.   I guess the answer is no, because there
16 were many years and many eggs sold. I don't recall
17 any specific export.
18     Q.   So as we look at topic 22 and we go down
19 to category H there, your profits or losses from
20 each USEM export sale, is there a document that
21 Sparboe has produced in this litigation that would
22 refresh your recollection?
23     A.   To my knowledge, no.
24     Q.   And why did Sparboe quit USEM in 2005?
25     A.   I think we withdrew at that point our

Page 292

1  affiliation with any and all United Egg Producers
2  activities.
3      Q.   And why have you not rejoined USEM?
4      A.   Because we have other export
5  opportunities.
6      Q.   And your knowledge of the impact that an
7  USEM export would have on supply of eggs in the
8  United States, sitting here today, what is your
9  knowledge of that impact?
10     A.   Of the impact? I think it's moving
11 surplus eggs.
12     Q.   But if USEM had purchased eggs on your
13 behalf, those would not have been your surplus
14 eggs, correct?
15     A.   I can't answer that question.
16     Q.   And do you know what impact exports have
17 on the price of eggs or egg products in the United
18 States?
19     A.   I think that varies dramatically on the
20 time, the domestic markets, the international
21 markets, the supply, the production, feed cost.
22 There's a lot of things that impact egg markets in
23 the United States.
24     Q.   But we already looked at one copy of the
25 United Voices where there was a calculation of the

Page 293

1 impact of an egg export, correct?
2    A.   Mm-hmm.
3    Q.   Do you recall other United Voices having
4 a similar analysis?
5    A.   I don't.  But I think -- I'm not sure
6 that was an accurate -- I think perhaps Gene was
7 trying to take credit for something he had done.
8 There might have been some chest-beating there.
9    Q.   And did you ever respond to the United
10 Voices listing those impacts to correct those?
11    A.   Personally, no.
12    Q.   Are you aware of anybody at Sparboe who
13 did?
14    A.   I'm not aware of anybody at Sparboe who
15 did.  We had a lot of things to do, and correcting
16 Gene Gregory's correspondence wasn't top of our
17 list.
18    Q.   Let me show you what's been previously
19 been marked as Exhibit 18.  And Exhibit 18 is
20 USEM-KSPJ3.  And this on the front page appears to
21 be a memo from Gene Gregory to individuals at UEP
22 and USEM, correct?
23    A.   One moment.  I'm just reviewing
24 something.  Yes.  I'm looking at this e-mail.
25    Q.   And there's a fax line at the top that

Page 294

1 shows November 22nd of 2000.  Do you see that?
2    A.   I do.
3    Q.   And if you go down to the bottom of
4 page, you see -- and it's underlined -- "committed
5 to supply eggs and ship to port."  Do you see that?
6    A.   Yes.
7    Q.   And it, for example, lists Cal-Maine
8 Foods as committed to shipping 5,062 cases that
9 they were going to supply and ship to the port?
10    A.   Mm-hmm.
11    Q.   If you turn the page under the heading
12 "Request Their Share Be Purchased by UEP" --
13    A.   Mm-hmm.
14    Q.   -- and if you go down third to the
15 bottom, Sparboe is listed there with an allocation
16 of 1,922 cases.  Do you see that?
17    A.   Mm-hmm.  I do.
18    Q.   Does this refresh your recollection that
19 Sparboe would, on occasion, request that their
20 share of the exports be purchased by UEP?
21    A.   No.
22    Q.   Based on this document, it appears
23 possible that Sparboe, on occasion, asked UEP to
24 purchase their share, correct?
25    A.   It appears, yes.

Page 295

1    Q.   And in that case, Sparboe was not
2 providing its surplus eggs; they were actually
3 being purchased out in the marketplace, correct?
4    A.   It's possible that that was the case.
5    Q.   Did Sparboe participate or attend any
6 USEM meetings?
7    A.   I believe so.
8    Q.   And would that have been frequent,
9 often?  How would you characterize that?
10    A.   I don't even know how often they were
11 held.
12    Q.   And do you know who from Sparboe would
13 have attended those meetings?
14    A.   Wayne Carlson.
15    Q.   For the exports that Sparboe does on its
16 own --
17    A.   Mm-hmm.
18    Q.   -- does Sparboe always provide its own
19 eggs for those exports?
20    A.   Yes.
21    Q.   Has Sparboe ever participated in an
22 export opportunity on its own where it's gone into
23 the marketplace to buy eggs to export?
24    A.   I can't answer that.
25    Q.   Sitting here today, do you know of any

Page 296

1 examples where you would have done that?
2    A.   It's possible we would have done that
3 once at one -- for one particular customer.
4    Q.   And sitting here today, what makes you
5 think that you may have done that once for a
6 customer?
7    A.   I don't think we've done it.  It could
8 have happened.  We supplied one customer with a
9 great deal of eggs over a period of time.  And I
10 don't know.  But it's -- I'm just saying it's
11 possible it could have happened.
12    Q.   But sitting here today, you have no
13 specific recollection that it actually happened?
14    A.   I can't prove that it did or didn't,
15 yes.
16    Q.   Other than what we've discussed here
17 with regard to USEM, do you have any additional
18 information to provide relevant to the topic on
19 USEM?
20    A.   We were -- no.
21    Q.   All right.  Switching topics again,
22 we're actually going back to topic 20.  And we did
23 not cover items -- well, let me ask one question
24 about F and we can cross that off.
25         We had talked previously about the 2004

1  economic summit, and if I recall correctly, you
2  don't remember one way or the other whether Sparboe
3  would have attended that economic summit in 2004.
4      A.   Do you have the date on that?
5      Q.   I do not have the exact month.
6      A.   Okay.
7      Q.   I believe your testimony earlier today
8  was you don't recall --
9      A.   I think we looked at a letter that was
10  inviting people to it.
11     Q.   We did.  I just don't have that in front
12  of me right now.
13     A.   I don't recall.  I know we were invited.
14     Q.   It's fair to say Sparboe would not have
15  attended the economic summit in 2007 since you were
16  not a UEP member?
17     A.   Correct.
18     Q.   All right.  Going on to categories G
19  through J, you were aware during your time as a UEP
20  member -- and let's talk about this from the period
21  of time of 2000 through 2005 --
22     A.   Mm-hmm.
23     Q.   -- that UEP would make recommendations
24  to its members on supply/demand topics?
25     A.   On supply and demand topics?

1      Q.   Yes.
2      A.   I don't recall them making
3  recommendations on demand.
4      Q.   Do you recall that UEP would recommend
5  coordinated molts by its members?
6      A.   I have recollection of that.
7      Q.   Do you recall that UEP would recommend
8  early molts by its members?
9      A.   I believe that was discussed.
10     Q.   Do you recall that UEP would recommend
11  early slaughter of hens?
12     A.   I do.
13     Q.   And do you recall that UEP would
14  recommend early molts?
15     A.   I believe that was the case.
16     Q.   And do you recall how you learned about
17  those recommendations?
18     A.   I recall seeing a document requesting us
19  to commit to participating in one of those.
20     Q.   Do you remember any additional documents
21  discussing those topics?
22     A.   Not necessarily.
23     Q.   Do you recall that it would have been
24  discussed in the United Voices?
25     A.   Probably.

1      Q.   And do you recall that that also would
2  have been the subject of discussions at UEP
3  committee meetings as well?
4      A.   It may have been.  I don't -- I
5  wasn't -- I don't recall specifics, but it may have
6  been.
7      Q.   And with regard to these
8  recommendations, did Sparboe ever raise concerns to
9  UEP about these recommendations?
10     A.   I don't know.
11     Q.   Sitting here today, you don't recall any
12  concern that they would have raised to UEP?
13     A.   I think we've read a lot of e-mails and
14  correspondence of concerns that were raised to UEP.
15  As it relates to molting practices?  I don't
16  recall, no.
17     Q.   And with regard to the other items that
18  we talked about, molting, slaughter, early
19  disposal, a couple that we did not talk about,
20  changes to chick placement, do you remember
21  recommendations with regard to chick placements?
22     A.   From UEP?
23     Q.   Mm-hmm.
24     A.   I believe they discussed that, yes.
25     Q.   And do you recall that in the United

1  Voices that Mr. Gregory would discuss the impact of
2  those supply recommendations?
3      A.   He liked doing that.  Yes, I do.
4      Q.   And do you recall, again, Sparboe ever
5  contacting Gene Gregory, in writing or otherwise,
6  to dispute the analysis he was putting in United
7  Voices, for instance?
8      A.   I do not.
9      Q.   And did -- to your knowledge, did
10  Sparboe ever vote against any of those
11  recommendations in committee meetings or at the
12  board of directors meetings?
13     A.   I would have no evidence that we did or
14  did not, but I would guess that we would have voted
15  against it.  But I have no evidence, so the answer
16  is no.
17     Q.   And sitting here today, there's no
18  documents you can think of that would refresh your
19  recollection on that?
20     A.   There may be, but I don't have them in
21  my possession.
22     Q.   And with regard to Sparboe itself, was
23  Sparboe aware that others in the industry were
24  following those recommendations?
25     A.   Yes.

Page 301

1    Q.   And how was Sparboe aware of that?
2    A.   Because -- I guess because of -- I don't
3  know.  I guess I'm not -- I guess we weren't aware
4  that others were -- I guess I could -- I'd have to
5  say no, we were not aware.
6         We were aware that there was an effort
7  to get people to do it.  We were not aware -- we
8  would not have known what other companies did.  We
9  would have no way of knowing, I guess, who signed
10  up and who didn't.  We did not sign up.  At least
11  in the one I recall.
12    Q.   But you are aware that there were
13  companies who did sign those intention forms?
14         MR. HUTCHINSON:  Objection, calls for
15  expectation.
16    A.   Yeah, I was going to say, that would be
17  speculation on my part, and I could not say that.
18  I would have no way of knowing if other companies
19  cooperated.  No way of verifying if other companies
20  cooperated.  And we weren't interested in that.  We
21  were just doing what we were doing and -- we're not
22  going to do that.
23         BY MS. SCHWARTZ:
24    Q.   Why did the UEP committee and then as
25  approved by the board make those recommendations?

Page 302

1         MR. HUTCHINSON:  Objection, calls for
2  speculation.
3    A.   I would have no way of knowing why they
4  did that.
5         BY MS. SCHWARTZ:
6    Q.   When Sparboe sat on the board of
7  directors for UEP, why -- what was Sparboe's
8  understanding as to why those recommendations were
9  being made?
10         MR. HUTCHINSON:  Objection, vague as to
11  time.
12    A.   I don't know.  Many nominations would
13  come to the board that would be developed out of
14  committees in different groups.  So just -- I would
15  have no way of knowing.
16         BY MS. SCHWARTZ:
17    Q.   And the group that you sat on, the
18  marketing committee group, did some of those
19  recommendations come out of that committee?
20         MR. HUTCHINSON:  Objection.  You know,
21  it's -- Ms. Snell was on a committee for a very
22  limited amount of time, and you're confusing the
23  issue here by talking about recommendations that
24  UEP made at a different period of time.  So I think
25  it's unfair to the witness to try to confuse the

Page 303

1  record.
2         I think -- if you want to ask about a
3  specific period of time, then I think that is the
4  fairer thing to the witness, especially given the
5  hour.
6         BY MS. SCHWARTZ:  And I will go through
7  all of those specific documents.  But there are a
8  lot of them, and I've been told that my time is
9  ending close to 6:00 tonight.  So I'm trying to
10  make this as efficient as possible.  So let me ask
11  again.
12         BY MR. HUTCHINSON:
13    Q.   You served on the UEP marketing
14  committee, correct?
15    A.   For a very brief time.
16    Q.   And on your time with the marketing
17  committee, did the committee make any
18  recommendations -- any supply recommendations?
19    A.   No.  I was on the marketing committee
20  regarding -- no.  I don't believe that marketing --
21  I don't recall.  That's been ten years ago.  I
22  don't recall.
23    Q.   And sitting here today to testify on
24  behalf of Sparboe, are you aware of any Sparboe
25  employees who sat on committees or boards at UEP

Page 304

1  where these recommendations were made or voted on?
2    A.   I presume over the years, there were
3  discussions in various committee meetings.
4    Q.   Where Sparboe would have had an employee
5  present?
6         MR. HUTCHINSON:  Objection, calls for
7  speculation.
8    A.   I don't know.  I mean, I -- yeah.  I'm
9  speculating.  I would have no evidence to say that
10  a Sparboe employee was sitting in a committee
11  meeting when there was a decision or discussion
12  about early molt.
13         BY MR. HUTCHINSON:
14    Q.   And so to prepare for topic 20G, which
15  was your knowledge of the industry or collective
16  efforts to decrease the egg supply or raise the
17  price of eggs and public disclosures of the same,
18  and the participation by any other defendant in
19  those same actions, what did you do to prepare for
20  those topics?
21         MR. HUTCHINSON:  And objection to the
22  form of the question in that it assumes facts not
23  in evidence about Sparboe having any knowledge
24  about any of that.
25    A.   I -- yeah.  I could not prepare because

Page 305

1 I was -- it was ten years' worth of meetings and
2 activities that we were not involved in.
3      BY MR. HUTCHINSON:
4      Q.   But sitting here today, you don't know
5 whether there was a Sparboe member sitting on a
6 committee where those recommendations were made,
7 correct?
8      A.   Ms. Schwartz, it would be absolutely
9 impossible for me to remember who was sitting in
10 any given room at any given meeting at any given
11 time over the last ten years.
12      MR. HUTCHINSON:  And I'm going to object
13 to the question as vague.  I mean, what committee
14 at what period of time?
15      MS. SCHWARTZ:  Then we're going to have
16 to go through all of them.  I mean, that's the
17 reality of this.  And we can pull every United
18 Voices and look at them, we can pull all of the
19 committee minutes and look at them.  I was hoping
20 to avoid having to do that, but now we're going to
21 have to.
22      MR. HUTCHINSON:  Well, we may have to,
23 because the witness isn't just going to talk in
24 vague generalities about, you know, meetings over a
25 15-year period involving, you know, some dozen

Page 306

1 different committees, none of which you're
2 specifying in your question.
3      So it's just not fair to the witness,
4 especially after a -- you know, we've been going at
5 this for nine hours now.  So if you're at a good
6 point, Rachel, just to stop for the day, you can
7 come back another day and ask about your specific
8 committees.
9      BY MS. SCHWARTZ:
10      Q.   If you can pull out Deposition
11 Exhibit 146, it's in the stack in front of you.
12 These are the board meeting minutes from 1999.  We
13 looked at these very early in the day.  It's the
14 UEP annual board meeting.
15      So let's look as an example -- we looked
16 at this earlier.  This was the October 14th through
17 16th 1999 minutes.  And on that front page, you'll
18 recall that both Garth Sparboe and Bob Sparboe are
19 listed as attendees?
20      A.   Yes.
21      Q.   And if you'll turn to the third page of
22 that document, which is Bates labeled at
23 UE0297721 --
24      A.   Yes.
25      Q.   -- you'll see that there is a marketing

Page 307

1 committee report.  Do you see that?
2      A.   Yes.
3      Q.   And if you go down to the motion, it
4 says, "It was moved by Baker and seconded by Krouse
5 that UEP submit a supply program to the members in
6 which they voluntarily participate.  The program is
7 to include the following:
8      "1.  To reduce each member's flock size
9 by 5 percent as quickly as possible and to maintain
10 this through July 1st of 2000.
11      "2.  To immediately molt 5 percent of
12 your flock.
13      "3.  To establish a committee to review
14 by no later than November 10th a hatch reduction
15 program."
16      Do you see that?
17      A.   I do.
18      Q.   And you see that the motion, "It was
19 moved by Baker and seconded by Gary West that UEP
20 staff communicate a program of responsible growth
21 for the industry to companies that may be
22 considering expansion by new construction."
23      And do you see that both motions were
24 carried with no opposition?
25      A.   Yes.

Page 308

1      Q.   Does this refresh your recollection that
2 Sparboe would have had attendees in person at
3 meetings in which supply recommendations were made
4 by UEP?
5      A.   Again, I would say that I can't confirm
6 that they were a member of the marketing committee.
7 It confirms that this activity took place at this
8 board meeting.
9      Q.   And again --
10      A.   I would need to go back and confirm who
11 was in attendance at the committee meeting and if
12 they were on the committee.  I would need to verify
13 that.
14      Q.   If you'll --
15      A.   I believe Garth Sparboe served on the
16 animal welfare committee.
17      Q.   If you'll look at the first page again,
18 these are the minutes of the UEP annual board
19 meeting and executive conference.  Correct?  Do you
20 see that on the front page?
21      A.   Yes.
22      Q.   And if you turn to the second page under
23 the chairman's opening comments, the last sentence
24 says, "He reported the committee reports would be
25 presented on each of the issues."

Page 309

1    A.    Mm-hmm.
2    Q.    And then you see that the minutes were
3  discussed and there was a vote.  Special guest
4  reports were given.  And it continues on to that
5  next page.
6    A.    Mm-hmm.
7    Q.    Do you see that these were the reports
8  given at the UEP annual board meeting?
9    A.    Yes.
10   Q.    Okay.  And, again, the vote was made at
11 the board meeting and that motion carried, correct?
12   A.    That's what it says.
13   Q.    And do you recall that UEP would follow
14 up on these votes with reminders to its members to
15 follow what was sometimes called the plan of
16 action?
17   A.    I remember in one instance, yes.
18   Q.    So let me show you an example.
19 Previously marked as Exhibit 351 has a -- it's
20 UE0204517.  And at the top, you see that it's an
21 October 20th 1999 date.  Do you see that?
22   A.    Yes.
23   Q.    And we were just previously looking at
24 the minutes from the October 14th to 15th board
25 meeting?

Page 310

1    A.    Yes.  I do.
2    Q.    And you'll see in that box in the middle
3  of the page, it says, "UEP board of directors
4  recently approved the following plan of action."
5  Do you see that?
6    A.    Correct.
7    Q.    And it was a recommendation that each
8  UEP member should reduce their flock size by
9  5 percent as quickly as possible?
10   A.    Yes.
11   Q.    And maintain this through July 1st 2000.
12 And, two, each UEP member should immediately molt
13 5 percent of their flock?
14   A.    Right.
15   Q.    Is this the specific document you had
16 recalled?
17   A.    No.
18   Q.    Okay.  It was one similar to this?
19   A.    I don't know that it was similar, but --
20 I didn't -- what is your question about this
21 specific document?
22   Q.    I'm --
23   A.    I'm just unclear on what you're looking
24 for here.
25   Q.    I was asking whether you had recalled

Page 311

1  seeing these documents, these types of documents
2  before.
3    A.    I don't recall seeing this specific
4  document, no.
5    Q.    But you recall that UEP would, on
6  occasion, send out these types of reminders?
7    A.    I do.  Yes.  And I think I said that
8  earlier in my testimony.  Didn't I?  I think that's
9  what I -- I did say that.
10       MR. HUTCHINSON:  Rachel, Ms. Crabtree
11 had to leave to catch her flight.  Are you at a
12 good place to stop?  Are you getting close?
13       MS. SCHWARTZ:  We can make our record
14 here in a little bit.  I need to ask a couple of
15 different -- a couple of additional questions on a
16 few other topics before we close for the evening.
17       MR. HUTCHINSON:  Well, how much longer?
18 I mean, if you can wrap it up in the next couple of
19 minutes.  But it's been a long day.  We've already
20 had one counsel have to leave.  The witness has
21 been under examination now for nine hours, so --
22       MS. SCHWARTZ:  If you can give me just a
23 quick break of two minutes, I will spend maybe an
24 additional 15 or 20 minutes.
25       MR. HUTCHINSON:  No.  We're not going to

Page 312

1  stay that long tonight, Rachel.  If you've got to
2  come back another day anyway, you can ask your
3  questions on another day.  We've got to wrap it up
4  in the next couple minutes here.  It looks like
5  you're at a good place to stop.
6        MS. SCHWARTZ:  I have a few additional
7  questions of things that were raised during the day
8  that we need to wrap up today.
9        BY MS. SCHWARTZ:
10   Q.    And that is, why don't we start with AWG
11 to follow up on a statement that was made earlier
12 today.  Sparboe Farms has never successfully sold
13 eggs to AWG, correct?
14   A.    That's correct.
15   Q.    To your knowledge, has Sparboe Farms
16 sold eggs to any of AWG's members?
17   A.    I don't know that.
18   Q.    Are you aware that AWG's members buy
19 eggs outside of AWG?
20   A.    I would guess that's true.  Yes.  I'm
21 not aware of that, but I would not be surprised.
22   Q.    Has Sparboe approached any of AWG's
23 members to buy eggs from Sparboe?
24   A.    I don't know that.
25   Q.    And sitting here today, your knowledge

Page 313

1 of AWG, is it based on the salespeople in your
2 office who have had contact with AWG?
3    A.    Mm-hmm.
4    Q.    And so you know sitting here today that
5 AWG is a grocery wholesaler?
6    A.    Correct.
7    Q.    And does Sparboe sell to any other
8 grocery wholesalers?
9    A.    Yes, we do.
10    Q.    And who are those grocery wholesalers?
11    A.    SuperValu, Affiliated Foods, Fairway,
12 among others.
13    Q.    And why does Sparboe like selling to
14 grocery wholesalers?
15        MR. HUTCHINSON:  Objection, assumes
16 facts not in evidence.
17    A.    They're a customer for the product we
18 produce.
19        BY MS. SCHWARTZ:
20    Q.    And you would have solicited all three
21 of those to buy from Sparboe, correct?
22    A.    We may have solicited them.  They may
23 have solicited us.
24    Q.    And what are some of the advantages to
25 Sparboe of selling to these types of grocery

Page 314

1 wholesalers?
2    A.    They're a customer for our products.
3    Q.    Do you specifically approach grocery
4 wholesalers to sell to them if they're in your
5 markets?
6    A.    I don't understand the question.
7    Q.    You've said that they are just a
8 purchaser for your products, correct?
9    A.    Mm-hmm.
10    Q.    Does Sparboe try to solicit larger
11 purchasers?
12    A.    We sell to small independent companies.
13 Dells is an example of a small retailer.  And they
14 are affiliated with Associated Grocers today.
15    Q.    But looking historically, you have sold
16 to some very large purchasers, whether it is a
17 Target or a McDonald's or some of the grocery
18 wholesalers that you've listed here?
19    A.    And we sell to some very small customers
20 as well.
21    Q.    And what are, from Sparboe's
22 perspective, if any, the advantages of selling to a
23 larger purchaser as oppose to, say, an individual
24 grocery store?
25    A.    There's good and bad in all different

Page 315

1 kinds of business.  There's advantages in selling
2 to large customers for economies of scale.  There's
3 advantages in selling to smaller companies --
4 customers, because of relationship and -- there's
5 lots of reasons why we do business with a variety
6 of different customers.
7    Q.    And in addition to the economies of
8 scale, what are some of the other advantages of
9 selling to larger purchasers?
10    A.    I can't think of any.
11    Q.    Does it decrease the logistics sometimes
12 for Sparboe in terms of dealing with a single
13 entity as opposed to dealing with multiple small
14 stores?
15    A.    Right.  I think I said economies of
16 scale.
17    Q.    Okay.
18    A.    Yes.
19    Q.    And those logistical benefits could
20 extend to transportation potentially?
21    A.    Absolutely.
22    Q.    And what other logistical and economy of
23 scale advantages are there?
24        MR. HUTCHINSON:  Objection, asked and
25 answered.

Page 316

1    A.    Yeah.  I think those are -- I think
2 those are the ones.
3        BY MS. SCHWARTZ:
4    Q.    Does it decrease from an administrative
5 perspective the number of people, for instance,
6 that Sparboe would have to have employed in a sales
7 capacity?
8    A.    No.  In fact, at times, it increases it
9 because we are to provide more services, more
10 people on the street, more support.  Some customers
11 don't require that; others do.
12    Q.    And what are some of those services that
13 Sparboe provides to its customers?  Obviously you
14 sell them eggs?
15    A.    Mm-hmm.
16    Q.    What additional services do you provide?
17    A.    It depends on the customer.
18    Q.    For example, do you help with
19 advertising for your customers?
20    A.    We provide -- in some cases, we provide
21 our customers with recommendations on what size or
22 when would be the most effective time to promote
23 eggs.
24    Q.    And do you --
25    A.    We provide counseling on tie-in with

Page 317

1  other products, et cetera.
2      Q.   Do you also provide promotional
3  discounts to your customers?
4      A.   It depends on the program.  If the
5  customer requests that, we will, if it's built into
6  their program.
7      Q.   And for the three grocery wholesalers
8  that you mentioned, SuperValu, Affiliated and
9  Fairway --
10     A.   Mm-hmm.
11     Q.   -- what additional services do you
12  provide to those companies?
13     A.   Oh, we work their food shows.  We work
14  with -- we work with them -- in one case, we worked
15  with them on their charitable program in terms of a
16  food shelf program that we did.  We provide support
17  to their retail stores if they want that.  We can
18  provide nutritional information.  We become a
19  liaison between our customer and the marketing
20  information that's available through the American
21  Egg Board.
22     Q.   So specifically with regard to AWG, when
23  do you recall that Sparboe first approached AWG
24  about possibly selling them eggs?
25     A.   In my research into preparation for

Page 318

1  this, it looks like 2006.  There may have been
2  other -- we may have been contacting them prior to
3  that as well.
4      Q.   And do you recall when the first bid was
5  that Sparboe participated in?  Would that have also
6  been, to your recollection, the 2006 time period?
7      A.   I'm not sure it was technically a bid or
8  if we presented a proposal.  It appears as though
9  AWG sought a proposal from us to kind of test the
10  water on pricing to see if we were qualified to be
11  a part of a bid.
12     Q.   And are you, sitting here today, aware
13  of AWG awarding its business outside of the bid
14  process?
15     A.   I have no knowledge of that.
16     Q.   And in 2006, to the best of your
17  recollection, it may have been a presentation
18  rather than an actual bid process to AIG?
19     A.   My recollection -- or my understanding
20  is that we were invited to submit a proposal, yes.
21  So I don't know -- how would you clarify your
22  question?  Was it an RFP process?  Is that what
23  you're asking?
24     Q.   That is what I'm asking.
25     A.   I think we were asked to submit a price

Page 319

1  prior to the RFP process.
2      Q.   And your understanding is that AWG has
3  continued to buy its eggs from Moark primarily; is
4  that correct?
5      A.   That's my understanding.
6          MR. HUTCHINSON:  Objection, assumes
7  facts not in evidence.
8          BY MS. SCHWARTZ:
9      Q.   And you are aware that it has also
10  purchased eggs from other defendants in the
11  litigation?
12     A.   I'm not aware of that.
13         MR. HUTCHINSON:  Ms. Schwartz, we really
14  need to wrap it up for the day.  This is a
15  multiparty litigation, and we've already lost an
16  attorney who was appearing on behalf of Rose Acres
17  because she had to leave to catch her flight.  So
18  out of respect for parties that are now absent, we
19  do need to wrap it up.
20         BY MS. SCHWARTZ:
21     Q.   Sitting here today, are you aware, does
22  AWG put the UEP-certified stamp on its egg cartons?
23     A.   I believe they do.
24     Q.   And what is the basis for that
25  knowledge?

Page 320

1      A.   It was in a request for proposal in
2  January of this year, past last year.
3      Q.   And -- but to your knowledge sitting
4  here today, you have not seen the carton that shows
5  the UEP-certified logo on the cartoon?
6      A.   I don't believe there are any AWG stores
7  in this particular market where I live.
8      Q.   So the answer to that is, no, you have
9  not seen a UEP stamp on an AWG carton?
10     A.   I personally have not.  But it was a
11  part of the request for proposal in the most recent
12  letter that we received.
13     Q.   And in that request for proposal, it
14  asked whether you were or were not UEP certified,
15  correct?
16     A.   No.  I think it requested -- I would
17  have to review it.  I believe it requested that you
18  acknowledge or demonstrate your compliance with the
19  United Egg -- it specifically stated the United Egg
20  Producers program.
21     Q.   And it was Sparboe's -- well, let me
22  ask -- you specifically recall that the RFP
23  required that?
24     A.   I just simply saw a letter,
25  Ms. Schwartz.  I don't know if that was a

Page 321

1 requirement of the proposal. But I did see a
2 letter.
3     Q.   So sitting here today, you don't know
4 whether that was a requirement of --
5        MR. HUTCHINSON: Objection. That
6 characterizes her prior testimony.
7     A.   When we see a specification of a United
8 Egg Producers program in a letter from a customer,
9 we assume that that means the customer expects the
10 United Egg Producers program.
11        BY MS. SCHWARTZ:
12     Q.   And you received an invitation from AWG
13 to participate in the bid program in 2013, correct?
14     A.   I don't know that.
15     Q.   Do you recall whether that letter
16 required UEP certification?
17     A.   I believe it did.
18     Q.   We'll just go ahead and mark my copy.
19 We're marking as Exhibit 515 Bates label
20 SFKS000407.
21        (Plaintiff's Exhibit 515 was marked
22        for identification.)
23        THE WITNESS: (Reading). Did you ask me
24 a question about this document?
25

Page 322

1        BY MS. SCHWARTZ:
2     Q.   Is that the letter you recall?
3     A.   No, it is not.
4     Q.   Do you recall that there was a
5 discussion between Britta Schnell and Michael
6 Johnson and Jim Wade regarding whether AWG required
7 UEP certification?
8     A.   I don't recall that.
9     Q.   And is Britta a relation to you?
10     A.   She is.
11     Q.   Is she your daughter?
12     A.   She is.
13     Q.   And this would have been in February of
14 2013. And, again, I understand that time is short,
15 so I will hand you again my copy of this document
16 which we are marking as Exhibit 516.
17        (Plaintiff's Exhibit 516 was marked
18        for identification.)
19        BY MS. SCHWARTZ:
20     Q.   And this is SFKS421.
21     A.   (Reading).
22     Q.   And if we can look at the second -- the
23 back page of that --
24     A.   Mm-hmm.
25     Q.   -- you can see that Brita writes --

Page 323

1 under a subheading that's "AWG Bid," she writes,
2 "They ask about SQF and UEP certified, but it isn't
3 stated as a must. Do we know if the cartons bear
4 any seals?" Do you see that?
5     A.   Mm-hmm. I do.
6     Q.   And would that have been Brita Schnell
7 reviewing the AWG specifications?
8     A.   It looks like that's the case.
9     Q.   Have you ever participated in one of
10 AWG's food shows?
11     A.   I can't say.
12     Q.   But a food show is something you may
13 participate in with some of the other grocery
14 wholesalers you mentioned?
15     A.   Absolutely.
16     Q.   And why does Sparboe participate in
17 those food shows?
18     A.   To support the private label program of
19 our customers, to be there to answer product
20 questions for their retailers.
21     Q.   And so that's a situation, for example,
22 with the wholesalers that that's your opportunity
23 to talk with their members?
24     A.   If they have questions about the
25 product. Sometimes the wholesaler will be -- will

Page 324

1 have a whole private label booth and will be a part
2 of the private label booth.
3     Q.   And have there been instances where
4 Sparboe has made sales at a food show?
5     A.   We would, yes.
6        MR. HUTCHINSON: Okay. We're done.
7 You've moved on to a new topic now, Rachel. You're
8 not talking about interaction with AWG. I've been
9 more than lenient in letting you finish that up,
10 but you've clearly moved on to something new now,
11 and it's 6:15.
12        We've had one attorney have to leave 20
13 minutes ago now, so this will conclude today's
14 deposition.
15        MS. SCHWARTZ: Ms. Schnell, you're
16 welcome to leave, but we have a record to make here
17 at the end of the day just relating to the
18 continuation of your deposition that you're welcome
19 to stay for, but if you want to leave, I understand
20 as well, but I'm going to put this on the record.
21        MR. HUTCHINSON: Okay. Go ahead.
22        MS. SCHWARTZ: The plaintiffs noticed
23 two depositions originally for three days. We
24 noticed an individual fact deposition and a
25 corporate representative deposition.

1        From the very beginning, we had
2   estimated that those depositions would take three
3   total days, consistent with our experience in this
4   litigation thus far.
5        We served the deposition notice on
6   January 3rd.  I waited for Mr. Hutchinson to
7   provide availability for his witness for over a
8   month after he said that those original dates did
9   not work.
10       When I learned that Ms. Schnell would be
11  produced as the corporate rep, I agreed to try to
12  complete the deposition in two days, but was clear
13  at all times that this deposition would take two
14  full days.
15       I worked with Mr. Hutchinson to find
16  dates that would work for his witness.  He
17  repeatedly refused to give us consecutive days for
18  this deposition, despite asking plaintiffs to
19  rearrange the depositions of former employees so
20  that they could be done on days that were more
21  convenient for his travel schedule, which we
22  happily did.
23       I have traveled all the way to
24  Minneapolis.  The deposition notice was noticed for
25  today, Monday, the 17th.  The deposition notice was

1   also noticed for February 19th on Wednesday because
2   Mr. Hutchinson had said his witness could not do
3   two consecutive days.  Although it was inconvenient
4   and expensive, we were willing to waste one full
5   day here in Minneapolis to continue this deposition
6   on Wednesday.
7        It's my understanding that this
8   deposition is not continuing on Wednesday.  Counsel
9   for Rose Acre did leave, but that was her choice
10  earlier this evening and she left to go catch an
11  early flight for the day.
12       My flights are not -- we booked all of
13  our travel and confirmed all of our travel with
14  the -- consistent with our deposition notice to
15  take this deposition for a second day.  And now
16  with very few of the corporate rep topics actually
17  completed, I'm being told at 6:17 that the
18  deposition is not only finished for today, but
19  finished for this week with no additional day
20  provided for when this deposition will resume.
21       MR. HUTCHINSON:  And I'll make my record
22  now.  What, Ms. Schwartz, you have just recited as
23  fact will be directly disputed and refuted by our
24  e-mail correspondence.  You asked for -- I told you
25  I could find you two executive days, but that it

1   would be in March or April.
2        You told me, no, I want a date in
3   February.  I told you I can't find two dates in a
4   row for Ms. Schnell in February.  I had a difficult
5   enough time finding one day.  I have herself
6   available today, she had to cancel meetings, move
7   things around.
8        You went ahead and noticed her
9   deposition for two days this week, despite the fact
10  that before doing so, I told you she was not
11  available two days this week.  She has a board
12  meeting tomorrow, she has a board meeting on
13  Thursday with several other meetings this week,
14  including on Wednesday.  And she needs Wednesday to
15  get ready for her board meeting on Thursday.
16       You knew that before you issued your
17  amended deposition notices.  And you knew that
18  before you booked your travel.  I told you that
19  repeatedly, both on the phone and via e-mail.  So
20  this is your making.  No one is denying you the
21  opportunity to spend another day deposing
22  Ms. Schnell.  But you knew that it wasn't going to
23  happen two days in a row in February and you chose
24  to come here today and start the deposition.
25       We'll find another day for you, but it's

1   going to have to be when there's availability for
2   Ms. Schnell.
3        MS. SCHWARTZ:  And just a brief
4   response.  The close of discovery in this case end
5   at the beginning of March, so suggesting dates in
6   April was not helpful to the discussion of
7   scheduling of this deposition.
8        We were willing to be flexible anytime
9   in the entire month of February, after waiting a
10  full month to get dates.  And the depositions were
11  properly noticed.  You sought no relief from the
12  Court for the dates contained in the deposition
13  notice.  We traveled to Minneapolis and will seek
14  all relief from the Court, including, as I've
15  explained in the e-mails, transportation costs, the
16  time and expense involved in coming up here and
17  only getting one day of the deposition, and any
18  other relief from the Court.
19       MR. HUTCHINSON:  Well, I offered you --
20  you could have come in March and had multiple days
21  in a row.  You chose not to do that.  I told you
22  immediately upon your serving the first deposition
23  notice that the days you picked without any
24  consultation to me weren't going to work.
25       So this is your doing, Ms. Schwartz, and

Page 329

1 you chose to come here. And you can come back.
2 We'll make her available for a date. But, again,
3 she's the CEO and president of a business. She
4 doesn't have multiple days in a row to make
5 available for you on demand.
6        THE VIDEOGRAPHER: Is that it?
7        MS. SCHWARTZ: Thanks.
8        THE VIDEOGRAPHER: We are going off the
9 record at 6:21 p.m.
10        (Reading and signing reserved).
11        (Whereupon, at 6:21 p.m. the videotaped
12 deposition was adjourned.)
13              * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 331

1        REPORTER'S CERTIFICATE
2 STATE OF MINNESOTA          )
3                     ss.
4 COUNTY OF RAMSEY          )
5        I hereby certify that I reported the
deposition of BETH SCHNELL on February 17, 2014, in
6 Wayzata, Minnesota, and that the witness was by me
first duly sworn to tell the whole truth;
7        That the testimony was transcribed by me
and that this transcript is a true record of the
8 testimony of the witness;
        That the cost of the original has been
9 charged to the party who noticed the deposition,
and that all parties who ordered copies have been
10 charged at the same rate for such copies;
        That I am not a relative or employee or
11 attorney or counsel of any of the parties, or a
relative or employee of such attorney or counsel;
12        That I am not financially interested in
the action and have no contract with the parties,
13 attorneys, or persons with an interest in the
action that affects or has a substantial tendency
14 to affect my impartiality.
        WITNESS MY HAND AND SEAL THIS 28th day
15 of February, 2014.
16
17
18
19 _____
20 Jonathan Wonnell
21 Notary Public, Hennepin County, Minnesota
22 My Commission expires January 31, 2017
23
24
25

Page 330

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, _____, do hereby
4 acknowledge that I have read and examined the
5 foregoing testimony, and the same is a true, correct
6 and complete transcription of the testimony given by
7 me, and any corrections appear on the attached Errata
8 Sheet signed by me.
9
10
11 _____     _____
12    (DATE)              (SIGNATURE)
13
14
15
16
17
18
19
20
21
22
23
24
25