# ATTACHMENT 64

HIGHLY CONFIDENTIAL

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF PENNSYLVANIA

3

4  IN RE:  PROCESSED EGG PRODUCTS     MDL No. 2002

5  ANTITRUST LITIGATION               08-md-02002

6  _____

7  THIS DOCUMENT RELATES TO:

8  ALL DIRECT PURCHASER ACTIONS

9  _____

10

11          ** HIGHLY CONFIDENTIAL **

12

13      VIDEOTAPED RULE 30(b)(6) DEPOSITION OF

14              SPARBOE FARMS, INC.

15          BY BETH SPARBOE SCHNELL

16            Taken April 22, 2014

17          Commencing at 9:15 a.m.

18

19

20

21

22

23      COURT REPORTER:  ANNE HEGERMAN

24

25

HIGHLY CONFIDENTIAL

Page 2

1    Videotaped Rule 30(b)(6) deposition of SPARBOE

2 FARMS, INC., by BETH SPARBOE SCHNELL, taken on April 22, 2014,

3 commencing at 9:15 a.m., at the law firm of HUTCHINSON, P.A.,

4 1907 East Wayzata Boulevard, Suite 330, Wayzata, Minnesota,

5 before Anne Hegerman, Court Reporter, and Notary Public of

6 and for the State of Minnesota.

7

8         * * * * * * * * * *

9         APPEARANCES

10

11 COUNSEL ON BEHALF OF SPARBOE FARMS, INC:

12    Troy J. Hutchinson, Esquire

13    HUTCHINSON, P.A.

14    1907 East Wayzata Boulevard, Suite 330

15    Wayzata, Minnesota 55391

16    (952) 215-0141

17    thutchinson@hutchinson-legal.com

18

19

20

21

22

23

24

25 (APPEARANCES Continued on next page.)

Page 4

1 (APPEARANCES Continued.)

2

3 COUNSEL ON BEHALF OF INDIRECT PURCHASER PLAINTIFFS:

4    Charles Slidders, Esquire

5    MILBERG, LLP

6    One Pennsylvania Plaza

7    New York, New York 10119

8    (646) 733-5727

9    cslidders@milberg.com

10

11 COUNSEL ON BEHALF OF MICHAEL FOODS:

12    William L. Greene, Esquire

13    STINSON LEONARD STREET

14    150 South Fifth Street, Suite 2300

15    Minneapolis, Minnesota 55402

16    (612) 335-1568

17    william.greene@stinsonleonard.com

18

19

20

21

22

23

24

25 (APPEARANCES Continued on next page.)

Page 3

1 (APPEARANCES Continued.)

2

3 COUNSEL ON BEHALF OF KROGER PLAINTIFFS:

4    Douglas H. Patton, Esquire

5    KENNY NACHWALTER

6    1100 Miami Center, 201 South Biscayne Boulevard

7    Miami, Florida 33131-4327

8    (305) 373-1000

9    dpatton@kennynachwalter.com

10

11 COUNSEL ON BEHALF OF KANSAS PLAINTIFFS:

12    Rachel E. Schwartz, Esquire

13    STUEVE SIEGEL HANSON

14    460 Nichols Road, Suite 200

15    Kansas City, Missouri 64112

16    (816) 714-7125

17    schwartz@stuevesiegel.com

18

19

20

21

22

23

24

25 (APPEARANCES Continued on next page.)

Page 5

1 (APPEARANCES Continued.)

2

3 COUNSEL ON BEHALF OF UNITED EGG PRODUCERS, INC. AND

4 UNITED STATES EGG MARKETERS (TELEPHONICALLY):

5    Jan P. Levine, Esquire

6    PEPPER HAMILTON, LLP

7    3000 Two Logan Square

8    Eighteenth and Arch Streets

9    Philadelphia, Pennsylvania 19103-2799

10    (215) 981-4714

11    levinej@pepperlaw.com

12

13 COUNSEL ON BEHALF OF MOARK, LLC AND NORCO RANCH, INC.

14 (TELEPHONICALLY):

15    Arin C. Aragona, Esquire

16    EIMER STAHL, LLP

17    224 South Michigan Avenue, Suite 1100

18    Chicago, Illinois 60604

19    (312) 660-7679

20    aaragona@eimerstahl.com

21

22

23

24

25 (APPEARANCES Continued on next page.)

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1  (APPEARANCES Continued.)

2

3  COUNSEL ON BEHALF OF ROSE ACRE FARMS (TELEPHONICALLY):

4      Molly S. Crabtree, Esquire

5      PORTER WRIGHT MORRIS & ARTHUR, LLP

6      41 South High Street, Suites 2800-3200

7      Columbus, Ohio 43215

8      (614) 227-2015

9      mcrabtree@porterwright.com

10  ALSO PRESENT:

11      Charles Bonin, Videographer

12

13

14

15          * * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

Page 7

1          * * * * * * * * * *

2              INDEX

3  WITNESS:  BETH SPARBOE SCHNELL          PAGE

4

5  TRANSCRIPT OF PROCEEDINGS.........................11

6  EXAMINATION BY MR. PATTON.........................12

7  AFTERNOON SESSION..............................136-137

8

9  INSTRUCTIONS NOT TO ANSWER:  (None.)

10

11  PRODUCTION/INFORMATION REQUESTS:  (None.)

12

13

14          * * * * * * * * * *

15

16

17

18

19

20

21

22

23

24

25

Page 8

1          * * * * * * * * * *

2              INDEX OF EXHIBITS

3  SCHNELL EXHIBITS MARKED:                    PAGE

4

5  EXHIBIT 1:  Direct Action Plaintiffs' Amended

6          Notice of Videotaped Deposition

7          Under Rule 30(b)(6) to Defendant

8          Sparboe Farms, Inc.....................32

9

10  EXHIBIT 2:  Organizational chart of

11          Sparboe Companies, SF123870............57

12

13  EXHIBIT 3:  UEP Board of Directors,

14          February 24, 2000, Dallas, Texas,

15          Minutes, UE0296996 to 0296999,

16          CONFIDENTIAL..........................102

17

18  EXHIBIT 4:  UEP Marketing Committee,

19          May 16, 2000, Washington, D.C.,

20          UE0307864 to 0307883, CONFIDENTIAL.....105

21

22  EXHIBIT 5:  United Egg Producers Committee

23          Appointments for 2001,

24          UE0308215 to 308235, CONFIDENTIAL.....108

25  (EXHIBITS Continued on next page.)

Page 9

1  (EXHIBITS Continued.)

2  SCHNELL EXHIBITS MARKED                    PAGE

3

4  EXHIBIT 6:  United Egg Producers Committee

5          Appointments for 2002,

6          CM00414891 to 414911, CONFIDENTIAL.....111

7

8  EXHIBIT 7:  United Egg Producers Committee

9          Appointments for 2004,

10          NL000085 to 107, CONFIDENTIAL.........115

11

12  EXHIBIT 8:  UEP Marketing Committee,

13          May 10, 2004, Washington, D.C.,

14          CM00189887 to 189903, CONFIDENTIAL.....119

15

16  EXHIBIT 9:  United Egg Producers Committee

17          Appointments for 2005,

18          UE0754510 to 754533, CONFIDENTIAL.....127

19

20  EXHIBIT 10:  Shell Egg Marketing Committee,

21          January 24, 2005,

22          UE0309066 to 309095, CONFIDENTIAL.....128

23

24

25  (EXHIBITS Continued on next page.)

HIGHLY CONFIDENTIAL

Page 10

1  (EXHIBITS Continued.)
2  SCHNELL EXHIBITS MARKED          PAGE
3
4  EXHIBIT 11:  United Egg Producers Committee
5          Appointments for 2006,
6          BELL-D-00027071 to 27079,
7          CONFIDENTIAL........................135
8
9
10              * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24  (Original exhibits retained with original transcript;
25  copies provided to counsel.)

Page 11

1              * * * * * * * * * *
2          TRANSCRIPT OF PROCEEDINGS
3  VIDEOGRAPHER:  Good morning.
4          We are on the record.  My name is
5  Charles Bonin, representing Veritext National Deposition
6  and Litigation Services in New York.
7          Today's date is April 22, 2014.  The time is
8  approximately 9:15 a.m.  This deposition is being held at
9  Hutchinson, P.A. located at 1907 East Wayzata Boulevard,
10  Suite 330, Wayzata, Minnesota, and it's being taken by
11  counsel for the plaintiffs.
12          The caption of this case is In Re, colon,
13  Processed Eggs Antitrust Litigation.  This case is filed in
14  the United States District Court Eastern District of
15  Pennsylvania, Case Number 08, dash, MD, dash, 02002.  The
16  name of the witness is Beth Sparboe Schnell.
17          At this time the attorneys present in the
18  room and attending remotely will identify themselves and
19  the parties they represent.
20  MR. PATTON:  Doug Patton with the firm of
21  Kenny Nachwalter on behalf of the Kroger plaintiffs.
22  MS. SCHWARTZ:  Rachel Schwartz of
23  Stueve Siegel Hanson on behalf of the Kansas plaintiffs.
24  MR. SLIDDERS:  Charles Slidders of the firm
25  of Milberg, LLP on behalf of the indirect purchaser

Page 12

1  plaintiffs.
2          MR. CARLSON:  Scott Carlson on behalf of the
3  class of direct purchasers.
4          MR. GREENE:  William Greene of the law firm
5  of Stinson Leonard Street on behalf of Michael Foods.
6          MR. HUTCHINSON:  Troy Hutchinson on behalf
7  of Sparboe Farms and the witness, Ms. Schnell.
8          MR. PATTON:  On the phone?
9          MR. HUTCHINSON:  On the phone?
10          MS. CRABTREE:  Oh, Molly Crabtree for
11  Rose Acre Farms.
12          MS. LEVINE:  Jan Levine for UEP and USEM.
13          MR. ARAGONA:  Arin Aragona for Moark, LLC
14  and Norco Ranch, Inc.
15          VIDEOGRAPHER:  Our court reporter,
16  Anne Hegerman, representing Veritext, New York, will swear
17  in the witness and we can proceed.
18          BETH SPARBOE SCHNELL,
19  duly sworn, was examined and testified as follows:
20              * * * * * * * * * *
21          EXAMINATION
22  BY MR. PATTON:
23  Q.  Good morning.  Would you please introduce
24  yourself for the record?
25  A.  My name is Beth Schnell.

Page 13

1  Q.  And what is your current address, Ms. Schnell?
2  A.  1907 Wayzata -- Hackamore Lane.  God, I'm giving
3  you the office address.  19210 Hackamore Road,
4  Hamel, Minnesota.
5  Q.  And you understand that you've taken an oath to
6  testify truthfully today?
7  A.  I do.
8  Q.  Is there any reason that you cannot?
9  A.  No.
10  Q.  Are you on any medication --
11  A.  No.
12  Q.  -- that prevents you from testifying truthfully?
13  A.  No.
14  Q.  Okay.  I know you've been deposed before, but
15  just as a matter of review, it's important that the court
16  reporter take down my question and your answer, so if we
17  could leave ourselves a little break between the two, and
18  then also if there's an answer that you feel compelled to
19  answer in a "yes" or "no" fashion, do that rather than
20  "uh-huhs" or "uh-uhs," because --
21  A.  Okay.
22  Q.  -- those are ambiguous answers.
23          What did you do to prepare for your deposition
24  today?
25  A.  I reviewed a lot of documents.  I've spent years

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1 involved in this case.
2    Q.   How many documents?
3    A.   I have no idea, many.
4    Q.   Were they Sparboe documents?
5    A.   Yes.
6    Q.   Were they UEP documents?
7    A.   Yes.
8    Q.   Did they help you refresh your recollection at
9 all?
10   A.   They did.
11   Q.   When we go through some documents today, I may
12 ask you if these are one of the -- if this is a document
13 that you had --
14   A.   Yes.
15   Q.   -- looked at.
16        You know that you're also designated as a
17 corporate representative today to testify on behalf of
18 Sparboe?
19   A.   Yes.
20   Q.   What did you do in preparation for that
21 obligation?
22   A.   The same.
23   Q.   All right.  Did you speak with any individuals in
24 preparation for your deposition?
25   A.   Yes.

Page 15

1    Q.   Who?
2    A.   Employees.
3    Q.   Well, which employees?
4    A.   Over the -- could you define the term of the
5 period of time during which you're asking the question for?
6    Q.   Sure.  In preparation for your deposition as
7 a 30(b)(6) witness, did you speak with individuals in order
8 to educate yourself to give testimony today?
9    A.   Well, yes.
10   Q.   And which individuals?
11   A.   Our management team, Wayne Carlson.
12   Q.   And who else?
13   A.   Steve Kosel.
14   Q.   Anyone else?
15   A.   I guess in preparation for today specifically, I
16 mean, that's a difficult question because this has been
17 going on for eight or nine, you know, eight years, so --
18   Q.   Right.  Well, in preparation for your testimony
19 today, did you speak with John Mueller?
20   A.   I did.
21   Q.   And what did you speak with him about?
22   A.   We reviewed documents.
23   Q.   And what documents, if you recall?
24   A.   UEP notes.  We just -- I don't know.  We just
25 discussed.  We looked notes.  We looked at paperwork.  We

Page 16

1 looked at UEP minutes.
2    Q.   And when did you meet with Mr. Mueller?
3    A.   Yesterday.
4    Q.   All right.  And was that here?
5    A.   Mm-mm, yes.
6    Q.   How long did your meeting last?
7    A.   Several hours.
8    Q.   Was counsel present?
9    A.   Yes.
10   Q.   Did you review the letter that he wrote in
11 November of 2003 to the UEP?
12   A.   We did.
13   Q.   And why did you review that document?
14   A.   Because I think our counsel was preparing us for
15 our depositions.
16   Q.   Okay.  Did you meet with Wayne Carlson?
17   A.   I did.
18   Q.   And when did you meet with Mr. Carlson?
19   A.   I meet with Wayne Carlson every week.
20   Q.   But in preparation for this deposition?
21   A.   In preparation for this deposition specifically?
22 Could you define specifically what it is you're driving at?
23   Q.   Yeah, for your testimony that you've been
24 designated to testify on.
25        MR. HUTCHINSON:  And I'll object as vague as

Page 17

1 to the time frame.
2        THE WITNESS:  Yeah, that's vague.
3 BY MR. PATTON
4    Q.   When did you -- when's the last time you spoke
5 with Mr. Carlson?
6    A.   Yesterday afternoon.
7    Q.   And how long did you meet with him?
8    A.   Pertaining to this deposition --
9    Q.   Yes.
10   A.   -- specifically?
11        A couple of hours.
12   Q.   And was counsel present?
13   A.   Yes.
14   Q.   How many, how many discussions have you had with
15 Mr. Carlson pertaining to this deposition?
16   A.   Preparation for this deposition, many.
17   Q.   Many?  How many times would you --
18   A.   I can't say.
19   Q.   Okay.  What about Garth Sparboe, when did you
20 speak with him last --
21   A.   Yesterday.
22   Q.   -- in preparation for this deposition?
23   A.   Yesterday.
24   Q.   And how long did you speak with Mr. Sparboe?
25   A.   Two hours.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1    Q.   So you had a busy day yesterday?
2    A.   I did.
3    Q.   And where is Mr. Garth Sparboe located?
4    A.   At the moment?
5    Q.   Yeah.
6    A.   He lives in Des Moines, Iowa.
7    Q.   Was he here, when you spoke with him?
8    A.   He was.
9    Q.   So he's in town.
10        Let's go through some background and we'll come
11   back to the 30(b)(6) notices.  Is there anyone else
12   that you -- before we get to background, is there anyone else
13   you spoke with --
14   A.   I don't recall.
15   Q.   -- in preparation?
16   A.   No.
17   Q.   What about Mr. Murch?  Did I say that right?
18   A.   No.
19   Q.   What about Ms. Dean?
20   A.   No.
21   Q.   What about Mr. Zachman?
22   A.   No.
23   Q.   Is Mr. Zachman still with the company?
24   A.   He is.
25   Q.   And, well, we'll get to that.

Page 19

1        Is Mr. Murch still with the company?
2    A.   No.
3    Q.   And is Ms. Dean still with the company?
4    A.   No.
5    Q.   Other than the individuals you've identified is
6    there anyone else you've spoken to in preparation for your
7    deposition?
8    A.   I don't recall.
9    Q.   Did you read any deposition transcripts?
10   A.   My own.
11   Q.   And which transcript was that?
12   A.   From the Kansas.  From the Kansas deposition.
13   Q.   And was there information in that deposition that
14   you relied on in preparation for your deposition today?
15   A.   No.
16   Q.   Why did you review it?
17   A.   I just was interested in reviewing it.  I scanned
18   it.
19   Q.   Did you review it in preparation for your
20   deposition today?
21        MR. HUTCHINSON:  Objection; asked and
22   answered.
23        THE WITNESS:  Yeah.
24   BY MR. PATTON
25   Q.   You did?

Page 20

1    A.   Yeah, I reviewed it prior to today.
2    Q.   And did it refresh your recollection as to
3    answers you had given in that deposition?
4    A.   Yeah, I scanned the document.  I didn't read
5    every single word.
6    Q.   Okay.  How long were you deposed in the Kansas
7    litigation?
8    A.   Many hours.  A full day.
9    Q.   And did you review the transcript and sign it in
10   the case?
11        MR. HUTCHINSON:  Objection; asked and
12   answered.
13        THE WITNESS:  Did I review the transcript?
14   BY MR. PATTON
15   Q.   My question is slightly different.  Have you
16   reviewed the transcript and signed it?
17   A.   I don't recall signing it.
18   Q.   All right.  Do you have an expectation that
19   you'll sign it soon?
20   A.   I don't know.
21   Q.   I want to focus on your educational background.
22   Did you attend university?
23   A.   I attended a college.
24   Q.   Which college?
25   A.   Gustavus Adolphus College.

Page 21

1    Q.   And when did you graduate?
2    A.   1982.
3    Q.   And did you have a scholastic focus or any area
4    of educational focus?
5    A.   I did.
6    Q.   What was that?
7    A.   A double major in economics, business, and
8    Spanish.
9    Q.   And after graduation in 1982, did you go on to
10   any higher education?
11   A.   No.
12   Q.   Well, what did you do after graduating?
13   A.   I worked for an advertising agency in
14   Minneapolis.
15   Q.   And for how long were you with the advertising
16   agency?
17   A.   About two years.
18   Q.   And what was the advertising agency?
19   A.   Campbell Mithun.
20   Q.   And what was your position?
21   A.   I was in the media department.
22   Q.   And then after that what did you do?
23   A.   Then I went to work for a food brokerage firm in
24   Minneapolis.
25   Q.   And so does that bring us to 1984?

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1    A.   Mm-hmm.
2    Q.   And I'll take that as a "yes."
3    A.   Yes, sorry.
4    Q.   So in 1984 what was the firm that you started
5 with?
6    A.   The name of the company was Timmons-Sheehan
7 Manufacturers Rep.
8    Q.   And what is -- when you said food brokerage firm,
9 what was its business?
10    A.   They were a manufacturers rep to the retail
11 business, grocery stores.
12    Q.   What grocery stores?
13    A.   All the Twin City and Minnesota-based grocery
14 stores of all types.
15    Q.   So it was more of a local rather than national?
16    A.   At that time it was.  Today it's been
17 incorporated into a national firm.
18    Q.   At that time did it have any dealings with the
19 Sparboe Company?
20    A.   No.
21    Q.   How long -- what was your position with the
22 Timmons firm?
23    A.   I was a sales supervisor.
24    Q.   And how long were you with Timmons?
25    A.   Approximately, two years.

Page 23

1    Q.   And then what did you do?  That brings us to
2 around 1986?
3    A.   Yes.
4    Q.   What did you do after that?
5    A.   And then I returned to the family business.
6    Q.   All right.  And by family business, you're
7 referring to Sparboe?
8    A.   Sparboe.
9    Q.   And what was your first position in 1986 with
10 Sparboe?
11    A.   I was in the sales department.
12    Q.   What?  Sales?
13    A.   My title?
14    Q.   Yeah.
15    A.   I don't remember.  Probably account manager or
16 sales representative.
17    Q.   Can you walk us through your positions at Sparboe
18 starting in 1986?  How long were you an account manager or
19 in the sales department?
20    A.   Boy, well, I spent most of my career in the sales
21 organization, moving into sales management, and ultimately
22 vice president of sales.
23    Q.   Well, when you started in 1986 as sales manager,
24 what where your duties and responsibilities?
25    A.   Calling on customers.

Page 24

1    Q.   And national customers?  Local customers?
2    A.   No, at that time we had regional, regional
3 customers, wholesalers and retailers.
4    Q.   And can you expand on that?  By wholesalers and
5 retailers, what types of businesses are you referring?
6    A.   Companies like Supervalu.
7    Q.   Supervalu is locally located?
8    A.   Minneapolis.
9    Q.   In Minneapolis?
10    A.   Mm-hmm.
11    Q.   Target?
12    A.   Not at that time.
13    Q.   What other companies?
14    A.   At that time Red Owl was a retailer around, food
15 service companies.
16    Q.   And by food service companies, what do you mean?
17    A.   Monarch Foods, and, you know, many of these
18 companies don't exist today.
19    Q.   And --
20    A.   And then we had individual stores, so we would,
21 we would have customers that were individual grocery stores
22 that were on a route, so we had route delivery people.
23    Q.   Like an independent --
24    A.   Yeah, just grocery stores.
25    Q.   -- grocery store?

Page 25

1         And when you say you were a sales manager, what
2 did that entail?
3    A.   I would go out and call on the customer and get
4 their business, if we needed to, or service their business,
5 support their business, help them.
6    Q.   And what product were you supplying or --
7    A.   Shell eggs.
8    Q.   Shell eggs at the time period?
9    A.   Mm-hmm.
10    Q.   Was Sparboe engaged in further egg processing or
11 breaking eggs?
12    A.   Not at that time.
13    Q.   So when you called on food service companies,
14 were you also selling shell eggs?
15    A.   Yes.
16    Q.   How long again did you stay in that position?  I
17 apologize.
18    A.   Indefinitely.
19    Q.   Okay.  When did your title change?
20    A.   I'm still in sales.
21    Q.   When did your title change, if at all?
22    A.   I became a vice -- titles, I should say, are not
23 a big deal in our company, so forgive me for not having
24 these dates, because we don't, we're not big on titles, but
25 I earned the vice president title probably in 1997 or '8,

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  something like that, so maybe 13 to 15 years later.
2      Q.  Did your job responsibilities between 1986
3  and 1997 largely stay the same or did they change?
4      A.  No, pretty much the same.
5      Q.  And did the business grow?
6      A.  Modestly.
7      Q.  Okay.  And explain that to me.  If your
8  responsibilities changed, basically saying they stayed the
9  same --
10     A.  Mm-hmm.
11     Q.  -- then I'm thinking that perhaps the realm or
12 the scope of your work --
13     A.  Yeah.
14     Q.  -- increased, and so could you walk me through
15 that?
16     A.  I was calling on customers and serving customers
17 and supporting customers and selling the eggs we produced.
18     Q.  Did Sparboe's scope of supply expand from
19 regional to more national?
20     A.  No, not at that time.
21     Q.  So between 1986 and 1997, what would you, how
22 would you define the Sparboe's business market?
23     A.  I think --
24         MR. HUTCHINSON:  Objection to form.
25

Page 27

1  BY MR. PATTON:
2      Q.  And by region?
3      A.  So could you restate the question?
4      Q.  Yeah.  From '86 though '97, please describe the
5  business, the region in which Sparboe did business in the
6  United States.
7      A.  Very regional, very much the five states
8  surrounding Minnesota; North Dakota, South Dakota.  Perhaps
9  at that time, I can't recall, we may have been a little bit
10 into Nebraska, northern Nebraska, Iowa, Wisconsin.
11     Q.  And, of course, Minnesota?
12     A.  So we call that the Midwest.
13     Q.  Including Minnesota?
14     A.  Mm-hmm.
15     Q.  So we've got six states.  And now in 1997, when
16 you became or your title changed to vice president, how did
17 your duties and responsibilities change?
18     A.  Not at all.
19     Q.  It was a title, change in title?  And how long
20 did you hold the title of vice president?
21     A.  At some point along the way, I became a senior
22 vice president.
23     Q.  Do you have a rough date on that?
24     A.  Which meant absolutely no difference in my job
25 title.

Page 28

1      Q.  And do you have a rough sense of when that
2  occurred?
3      A.  I know exactly when.  Oh, when I became a
4  senior --
5      Q.  Senior vice president.
6      A.  No.
7      Q.  Been in the mid-2000s thereabout or early --
8      A.  Probably around then.  Maybe around 2000
9  something.  I don't know, recall the date.
10     Q.  All right.  And had Sparboe's business
11 between '97 and 2000, when you became senior vice
12 president, did Sparboe's business regionally change at all?
13         MR. HUTCHINSON:  Objection to form.
14 BY MR. PATTON:
15     Q.  Let me, what I'm trying to get at is, did the
16 scope of Sparboe's business change between the time you
17 were vice president in 1997 and became senior vice
18 president in 2000?
19         MR. HUTCHINSON:  Objection to form.
20         WITNESS:  Well, our company, I mean, we were
21 just on a modest growth projection, so the title really
22 didn't represent any change in our business model at all.
23 I took on additional responsibilities at that time for
24 running our liquid egg business, so my responsibilities
25 changed when I became senior vice president.

Page 29

1  BY MR. PATTON:
2      Q.  How did they change?
3      A.  As I mentioned, I was managing the
4  liquid-breaking operation at that time.
5      Q.  What is the liquid-breaking operation?
6      A.  Where eggs are cracked and broken and put into
7  liquid form.
8      Q.  And then provided to food service companies?
9      A.  Nope.
10     Q.  To what kind of customers?
11     A.  We sold to other egg industry companies at that
12 time largely, so we would sell to other egg companies.
13     Q.  Help me understand.  When you say other egg
14 companies, what do you mean?
15     A.  Other companies that would take the liquid egg
16 and add more value to it, so we were breaking the eggs and
17 selling tanker loads of eggs at that time to other egg
18 companies who further processed the eggs.
19     Q.  So would that include perhaps defendants in this
20 case like Michael Foods or Cal-Maine?  And I'm just
21 guessing.
22     A.  It could, yes.
23     Q.  So tell me what kind of customers Sparboe was
24 supplying with its liquid egg business.
25         MR. HUTCHINSON:  Objection; asked and

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1 answered.
2 BY MR. PATTON
3    Q.   Identify the companies, please.
4    A.   Other companies that would take a liquid product,
5 and maybe do other value-added products to it.
6    Q.   What specific companies, if you can identify
7 them?
8    A.   We sold to Sonstegard.  We sold eggs to
9 Cargill Kitchen Solutions, which was Sunny Fresh at the
10 time, Michael Foods.  I don't have a complete list of
11 customers.
12   Q.   When did Sparboe begin in the liquid egg
13 business?
14   A.   We acquired a small breaking plant in Iowa in the
15 late '90s.  I don't recall the specific date.
16   Q.   Do you know what plant that was?
17   A.   Cal-Mar Foods was the name of the firm.
18   Q.   And that's when that became part of your
19 responsibility to also sell?
20   A.   Not immediately, but after we owned it for a
21 while, I took that responsibility.
22   Q.   Who did you take the responsibility from?
23   A.   Greg Murch.
24   Q.   Now, did your job title or did your
25 responsibilities change again after you became senior

Page 31

1 vice president?
2    A.   No.  That was when I got the --
3    Q.   I apologize.  You became senior vice president in
4 and around 2000.  How long did you hold that position?
5    A.   Until October 8 of 2005.
6    Q.   And what position did you take at that time?
7    A.   President.
8    Q.   President, and who made you president?
9    A.   Me.
10   Q.   Okay.  And how did your duties or
11 responsibilities change when you became president?
12   A.   Dramatically.
13   Q.   And what additional responsibilities did you take
14 on?
15   A.   Well, as the president of the company, you take
16 on, you take on, you ultimately have all the
17 responsibilities.
18   Q.   Okay.  So --
19   A.   I mean, ultimately your company.
20   Q.   -- by October 8, 2005, you were running the
21 company; is that a fair statement?
22   A.   In title.
23   Q.   Why do you say in title?
24   A.   I was running the company.  It was my father
25 passed away, so I took over the responsibilities.

Page 32

1    Q.   I understand.  I didn't want to --
2    A.   Yeah, so I guess I'm not sure.  What are you
3 asking me?
4    Q.   I mean, but what were your responsibilities as
5 president of the company?
6    A.   Well, I was responsible to all of our customers.
7 I was responsible to all of our employees.  I was
8 responsible to make sure that our business enterprise moved
9 forward.
10   Q.   At that time period, how many employees, when you
11 became president in October of 2005, how many employees?
12   A.   Approximately, 600.
13   Q.   And 600 employees, and how many people or how
14 many individuals reported directly to you at that time?
15   A.   A handful maybe.  I don't recall specifically.
16   Q.   Well, let me, let's do this.  We're going to come
17 back to some organizational things in a minute.  I'd like
18 to mark the 30(b)(6) notice we served in this case.
19       (Exhibit Number 1 was marked for identification
20       by Mr. Patton.)
21 BY MR. PATTON
22   Q.   I'll hand you what's been marked as
23 Schnell Exhibit 1.
24       MR. PATTON:  I didn't know that there was
25 going to be a bunch of defendants here, I am sorry.

Page 33

1 BY MR. PATTON
2    Q.   Have you seen this document before, Ms. Schnell?
3       MR. HUTCHINSON:  Can we go off the record
4 for one minute?
5       MR. PATTON:  Sure.
6       VIDEOGRAPHER:  We are going off the record.
7       The time is 9:37 a.m.
8       (Discussion was held off the record.)
9       VIDEOGRAPHER:  We are back on the record.
10      The time is 9:40 a.m.
11 BY MR. PATTON
12   Q.   Ms. Schnell, have you seen this document before?
13   A.   I don't recall.
14   Q.   Well, let's walk through the document quickly to
15 see what subjects you're prepared to talk about or testify
16 to today.  If you turn to page 5, you'll see the
17 instructions identify the time period 1999 through 2008.
18   A.   So which line?  I'm sorry, which line are you on?
19 Oh, starting at the bottom?
20   Q.   Instructions, yeah.
21       The time period covered by these topics is 1999
22 through December 2008?
23   A.   Yes.
24   Q.   Are you prepared to testify on those dates?
25   A.   I am.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1    Q.   And then if we turn back to Schedule A, are you
2 prepared to testify on subject two, which is
3 Capper-Volstead compliance by you, meaning Sparboe?
4    A.   Yes.
5    Q.   Topic three, Sparboe's flock size during this
6 time period?
7    A.   Yes.
8    Q.   Your topic four, chick hatch reduction?  I'm
9 sorry, your chick hatch and reasons for changes in your
10 chick hatch volume?
11   A.   I am.
12   Q.   All right.  Let's go to topic seven.  Are you
13 able to testify about Sparboe's participation in the UEP --
14   A.   Yes.
15   Q.   -- certified program?
16      Topic eight?
17   A.   Yes.
18   Q.   Your purchase of eggs for resale?
19   A.   I'm probably --
20      MR. HUTCHINSON:  And I'm going to object to
21 the extent that, you know, your question is assuming that
22 there are all of these things.  Correct?
23      MR. PATTON:  Well, that would make it easy.
24 BY MR. PATTON
25   Q.   Ms. Sparboe, during the 1999 through 2008 --

Page 35

1    A.   But I would not be prepared to testify to every
2 egg transaction that took place in the company over nine
3 years, so --
4    Q.   Okay.  But did --
5    A.   -- I would have to say, no, I am not prepared to
6 answer that.
7    Q.   The easy way, did Sparboe purchase eggs for
8 resale during the '99 through 2000 time period?
9    A.   I would suspect we did.
10   Q.   All right.  And why would you suspect that?
11   A.   Because we sold specialty eggs to meet our
12 customers' needs, so we would buy organic or cage-free
13 eggs.  I know that for a fact.
14   Q.   All right.  And what may make it easy on this
15 subject is, as far as eggs, shell eggs or further processed
16 eggs that were raised in cages, did Sparboe buy eggs?
17   A.   We -- well, we bought eggs.  Yes, we bought eggs
18 from other people in one manner or another during that
19 period of time from chickens that would have been raised in
20 cages, yes.
21   Q.   All right.
22   A.   As a company, we would have.
23   Q.   And why would Sparboe have done that?
24   A.   In our Sparboe Foods division, we would buy eggs
25 from companies that were long -- or we had contracts with

Page 36

1 other people to buy their eggs, and those chickens were in
2 cages, and we would have brought those eggs into our
3 company.
4    Q.   And then marketed them under the Sparboe name?
5    A.   Broken them probably, in that case, yeah.
6    Q.   Okay.  So is it your testimony that when Sparboe
7 did buy eggs, they were largely for processing, not for
8 shell egg marketing?
9      MR. HUTCHINSON:  Objection; form.
10      WITNESS:  I can't -- I can't agree to that,
11 no.  I mean, I'm not prepared to answer that.
12 BY MR. PATTON
13   Q.   At times that would happen?
14   A.   Yeah, for sure.
15   Q.   Okay.  While we're on that, let's just stick on
16 that subject then.  What entities did Sparboe buy eggs
17 from?
18      MR. HUTCHINSON:  Objection to form.
19      WITNESS:  I'm not prepared to answer that
20 either.  From -- I don't know.  I would have to research
21 that.  I don't know.
22 BY MR. PATTON
23   Q.   So you wouldn't know the companies?
24   A.   Mm-mm.
25      MR. HUTCHINSON:  From what period of time?

Page 37

1      MR. PATTON:  From 1999 through 2008.
2      MR. HUTCHINSON:  All of them?
3      THE WITNESS:  Yeah, so could you be clearer?
4 So you're asking for our foods division or our farms
5 division or collectively?
6 BY MR. PATTON
7    Q.   Well, topic nine says your purchase of eggs for
8 resale, including your supplier and annual purchase volumes
9 for each supplier.  And it would be the manner in which you
10 price prices for your eggs, prices for your purchases of
11 eggs for resale are established, so let's start with "A."
12      Can you identify which suppliers Sparboe bought
13 eggs from?
14      MR. HUTCHINSON:  Objection; vague.
15      WITNESS:  Not prepared to answer that.
16 BY MR. PATTON
17   Q.   Do you have a general sense of the annual volume
18 of --
19   A.   Not prepared.  No, I don't.
20   Q.   Okay.  And would you be prepared to say the
21 manner in which prices for the eggs you purchased were set
22 for resale?
23   A.   The manner in which prices are set for resale?
24 Could you specifically talk about which market you're
25 talking about there?

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.   Well, what -- I don't know, so what markets
2  did --
3    A.   Yeah, well, I mean, so I mentioned that we have
4  the liquid business, and we also, of course, have a shell
5  egg business, and then we have specialty eggs, and so
6  there's many different channels of customers.
7    Q.   So let's focus on liquid for now.
8    A.   Liquid eggs are sold on a market that's quoted
9  daily.
10   Q.   Is that the Urner Berry market?
11   A.   Mm-hmm.
12   Q.   So it's Urner Berry for liquid eggs?
13   A.   Typically, and yes, and sometimes, yes, that's
14  one way of pricing liquid eggs.
15   Q.   What's the other way or other ways?
16   A.   There are some contracts that are cost plus,
17  some, but largely, our customers, we sold our eggs on the
18  market.
19   Q.   Now, when you purchased eggs, how was the price
20  set?
21   A.   On the market.  On the market for the most part.
22   Q.   So you would go to a supplier and buy eggs at
23  market price?
24   A.   Buy them over the trade, over the clearinghouse,
25  in some cases.

Page 39

1    Q.   And then you would break them and resell them at
2  market price?
3    A.   Mm-hmm, mm-hmm.
4    Q.   How did you make money?
5    A.   Well, you -- the markets are different.  You buy
6  shell eggs, and you sell liquid eggs on the market.  That's
7  one differentiation.
8    Q.   Is the --
9    A.   And you don't always make money, believe me.
10   Q.   Right.  So there would typically be a difference
11  in price between shell and liquid?
12   A.   Always moving.
13   Q.   Is there a way to generalize and say that the
14  prices are higher for processed eggs than they are for
15  shell eggs or is it the other way around?
16   A.   No.  It changes every day.  Every week the
17  markets move.
18   Q.   Generally, at what percentage -- Sparboe, for
19  instance, what percentage of eggs did it buy as opposed to
20  produce itself?
21   A.   So what percent, I would say, the vast majority
22  we produce ourselves.
23   Q.   And could you put a number on that?
24   A.   Not with certainty.
25   Q.   Would, say, 80 to 90 percent of Sparboe eggs --

Page 40

1    A.   I would say it's close to that, yes.
2    Q.   To 80?
3    A.   Way north of.  Way north of.  I can't say for
4  sure, but it would be the majority.  Can I say that?
5    Q.   Yes.
6    A.   Okay.
7    Q.   Okay.  Let's go, subjects 10, 11, and 12 deal
8  with backfilling, molting, flock disposal practices, and 13
9  is beak trimming.  Do you have -- are you able to speak to
10  those practices today?
11   A.   In general terms, yes.
12   Q.   What about topic 15, your contracts -- your
13  contacts with UEP's scientific advisory committee?
14   A.   I would not be able to testify about that.
15   Q.   Your contacts with any of the direct action
16  plaintiffs, direct purchaser plaintiffs, and indirect
17  purchasers in this case?
18   A.   I was in charge of sales, so I would suppose,
19  yes.
20   Q.   Okay.  How about 19?  Sparboe's sponsorship of
21  animal welfare studies?
22   A.   I guess, in general terms, I would.  I'm not
23  aware of any.
24   Q.   And topic 20, complaints or investigations
25  regarding your treatment of hens, including any

Page 41

1  investigations via complaints to the
2  Federal Trade Commission?
3    A.   Generally.
4    Q.   Okay.  Topic 24, all new facilities for layer
5  hens that you constructed, that Sparboe constructed or
6  acquired?
7    A.   Yes.
8    Q.   And then Sparboe's commitments or intentions,
9  topic 27, commitments or intentions to provide to UEP,
10  Sparboe provided to UEP to manage, control, or reduce flock
11  size?
12        MR. HUTCHINSON:  And I'm going to object
13  to --
14        WITNESS:  Yeah.
15        MR. HUTCHINSON:  -- that, that assumes facts
16  not in evidence.
17        THE WITNESS:  Yeah, and I can't, no, I'm
18  not.  I can't.  I can't attest.  I mean, I -- I guess, I
19  can attest to it as much as I know.
20  BY MR. PATTON:
21   Q.   And so it asks for all commitments or intentions
22  Sparboe provided to UEP to manage, control, or reduce flock
23  size.
24   A.   Oh, okay.
25        MR. HUTCHINSON:  Same objection.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 BY MR. PATTON
2   Q.   You can answer.
3   A.   I can speak to that.
4   Q.   All right.  So I think we're done with that
5 document.
6   A.   Okay.
7   Q.   Let's talk about Sparboe's organization for a
8 minute.  Throughout the 2000s, for instance, Sparboe was
9 the fifth largest egg producer in the United States; is
10 that right?
11   A.   At some points.  Not the entire time.
12   Q.   Well, let's start in 2000.  Was it the fifth
13 largest?
14   A.   I don't recall.
15   Q.   At what point, I mean, today, today, and I've
16 seen documents in the case identifying Sparboe as the fifth
17 largest producer in the United States.
18   A.   Mm-hmm.
19         MR. HUTCHINSON:  Objection to form.
20 BY MR. PATTON
21   Q.   When did that happen?
22         MR. HUTCHINSON:  Sorry, Doug.
23         WITNESS:  I believe there was about a
24 three-year period of time when we were, perhaps
25 from about 200-- about -- I don't recall the specific

Page 43

1 years, but there was a short period of time during the
2 decade that we would have been the fifth largest.
3 BY MR. PATTON
4   Q.   Would that have been --
5   A.   According to Egg Industry Magazine.
6   Q.   Right.  And would that have been in the
7 early 2000s or late 2000s?
8   A.   Probably midway to the later.
9   Q.   Was it '04, '05, '06?
10   A.   No.
11   Q.   No?
12   A.   No, I'm guessing.  I can't confirm the specific
13 dates.  I don't want to.  I don't recall the specific
14 dates.
15   Q.   Has Sparboe at least always been in the top ten?
16   A.   Not -- we are no longer in the top ten.
17   Q.   Well, through -- let's focus on '99 through 2010.
18   A.   And I can't confirm that we were always in the
19 top ten, no.
20   Q.   What does --
21   A.   But I would say a good chunk of the time we would
22 have been in the top ten.
23   Q.   Maybe we can do this by sales percentage.  What
24 is, in dollars, the volume?  What were the average annual
25 dollars in sales that Sparboe had?

Page 44

1   A.   Well, I have to tell you that's virtually
2 impossible to say, because every year the dollars in the
3 market changed, and every year the number of eggs we would
4 sell would change because of moving, moving production
5 numbers, so, and in our industry that's difficult.
6   Q.   Well, let's say in 2000 to 2005, what were
7 Sparboe's annual revenues on average?
8   A.   I don't recall.
9   Q.   Over 100 million?  Below 100 million?
10   A.   Over 100 million.
11   Q.   Over 150?
12   A.   Very likely.
13   Q.   All right.  So let's use, and I'm just speaking
14 in general terms --
15   A.   Mm-hmm.
16   Q.   -- what about two hundred, two hundred thousand,
17 were you --
18   A.   I would be speculating.
19   Q.   All right.  But certainly between 150,000
20 and 200,000?
21   A.   Yes, I would say, yes.
22   Q.   From the 2005 to 2010 period, were those revenues
23 also over 150 million a year?
24   A.   I would say, yes.
25   Q.   And when, if you were to break up those revenues

Page 45

1 between shell eggs and processed eggs, roughly what
2 percentage would be attributable to shell eggs?
3   A.   Again, it would vary by year, but I would say
4 probably 60 to 70 percent would be shell eggs.
5   Q.   Was there ever a point where Sparboe's revenues
6 exceeded 200 million, that you can recall?
7   A.   Yes.
8   Q.   When?
9   A.   I'm guessing in 2010.
10   Q.   And in 2010 it exceeded by how much?
11   A.   I don't recall the specifics.
12   Q.   Are there documents that would tell us that?
13   A.   What our annual revenues were?
14   Q.   Yes.
15   A.   Yes.
16   Q.   And what type of document would you look to?
17   A.   A financial statement.
18   Q.   And does Sparboe maintain audited financial
19 statements?
20   A.   We do.
21   Q.   Who is your outside auditor?
22   A.   Our outside auditor has been Moore Stephens
23 for --
24   Q.   And they audit, they have audited Sparboe's
25 financial statements from 2000 through 2010?

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    A.  Not the entire time, no.
2    Q.  When did they?  When did they start?
3    A.  In 200- -- I believe 200- -- 2007, I believe.
4    Q.  Prior to that who was your outside auditor?
5    A.  An auditing firm in Willmar, Minnesota, named
6  Parker, Latham Parker.
7    Q.  And what is Sparboe's financial year?
8    A.  June 30.
9    Q.  June 30 to July 1?
10   A.  Mm-hmm.  I mean, July 1.  We close on June 30.
11  Excuse me.  I thought you meant what is our closing date.
12   Q.  So Sparboe's financial year is July 1 through
13  June 30?
14   A.  Correct.
15   Q.  Does Sparboe maintain profit and loss statements?
16   A.  We do.
17   Q.  And how are those maintained?  On a weekly,
18  daily, monthly --
19   A.  Monthly.
20   Q.  And who is in charge of generating those today?
21   A.  Our accounting department.
22   Q.  And is that headed, was that headed by
23  Ken Zachman for a while?
24   A.  At one time.
25   Q.  For how long did Mr. Zachman head that?

Page 47

1    A.  I can't recall.  It was Cathy Dean headed that
2  during the period of time, probably, that we're talking
3  about.
4    Q.  In addition to annual audited financials and
5  monthly profit and loss statements, what other type of
6  financial records does, did Sparboe maintain during
7  the 2000 to 2010 --
8    A.  None.
9    Q.  -- time period?
10   A.  Yeah, none.
11   Q.  None?  Does Sparboe have any other means of
12  managing or monitoring its profit besides the profit and
13  loss statements?
14       MR. HUTCHINSON:  I'm going to object to
15  these questions as outside of the scope of your 30(b)(6).
16  What topic are you on, Mr. Patton?
17       MR. PATTON:  Well, I'm going to ask her as
18  an individual, as an individual witness, those questions,
19  as the president of the company.
20  BY MR. PATTON:
21   Q.  Does Sparboe track, for instance, its plants,
22  each individual plant's, and by plant, I mean, farm --
23   A.  Mm-hmm.
24   Q.  -- profits?
25   A.  No.

Page 48

1    Q.  Does it maintain or does it monitor individually
2  its, what's the right word, farm --
3    A.  Mm-hmm.
4    Q.  -- or plant or facility?  That's --
5    A.  Yeah.
6    Q.  -- facility?
7    A.  Mm-hmm.
8       MR. HUTCHINSON:  Objection; calls for
9  speculation on behalf of this witness.
10  BY MR. PATTON:
11   Q.  Okay.  So let's, for instance, use one of -- as
12  an example, one of Sparboe's facilities like the Goodell
13  facility.
14   A.  Mm-hmm.
15   Q.  What accounting methodology does Sparboe use to
16  determine the cost, the production, the output?
17   A.  We have --
18       MR. HUTCHINSON:  Objection; calls for
19  speculation.
20       You can answer, if you know.
21       WITNESS:  Yeah, I have -- I am just unclear.
22  Are you asking for how we manage our costs or how we manage
23  our -- I guess I'm just unclear what you're looking for.
24  BY MR. PATTON:
25   Q.  Sure.  And I probably won't do a good job of

Page 49

1  this, but at some point --
2    A.  Well, I mean, just, if you can give me the
3  context of what are you --
4    Q.  Right.  I'm --
5    A.  Are you trying to say how do we manage, how
6  efficiently we're operating, or how well we're operating,
7  or --
8    Q.  Nope.  So if you generate a monthly P&L --
9    A.  Mm-hmm.
10   Q.  -- and you have, you know, six or seven
11  facilities --
12   A.  Mm-hmm.
13   Q.  -- how does the performance from that facility
14  end up reflecting, being reflected in the P&L?  So what at
15  the facility level do you monitor?
16   A.  Costs.
17       MR. HUTCHINSON:  Objection; calls for
18  speculation.
19  BY MR. PATTON:
20   Q.  Costs?
21   A.  Mm-hmm.
22   Q.  And how does Sparboe monitor those costs?
23       MR. HUTCHINSON:  Objection; calls for
24  speculation.
25

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1 BY MR. PATTON
2    Q.  Is there a report?
3    A.  Our feed costs, our production numbers, our labor
4 costs, our -- yes, we manage our costs.
5    Q.  Okay.  And are those costs delineated in a report
6 that are generated on a per plant --
7    A.  The same report I referred to earlier.
8    Q.  The profit and loss report?
9    A.  Mm-hmm.
10    Q.  And so the accounting department gets information
11 from each plant and then rolls those up into a profit and
12 loss statement?
13        MR. HUTCHINSON:  Objection; calls for
14 speculation.
15        WITNESS:  I'm not sure how that -- I'm not
16 sure what your question is about how they get the
17 information.  Is that the crux of your question?
18 BY MR. PATTON
19    Q.  Yeah, how does -- how do you know what the costs
20 for the Litchfield plant were for the month?
21    A.  Through accounts payable.
22    Q.  Okay.
23    A.  I don't know how they -- I'm not qualified to
24 answer specifically.  I don't work in the accounting
25 department.

Page 51

1    Q.  How do you know the sales out of that?  Does
2 Sparboe monitor the sales out of that particular plant?
3    A.  I guess, yeah.
4    Q.  How?  Is there a report?
5    A.  Not by -- not specifically by plant.
6    Q.  At what level are sales monitored?
7    A.  Corporately.
8    Q.  And that's in the P&L?
9    A.  Mm-hmm.
10    Q.  All right.  Now, who owns Sparboe today?
11    A.  I do.
12    Q.  And does anyone else own Sparboe?  You're the 100
13 percent owner?
14    A.  Mm-hmm.
15    Q.  Now, as of October 5, 2008, or prior to
16 October 5, 2008, who owned -- I'm sorry, let me ask that
17 again.
18        Prior to October 8, 2005 --
19    A.  It was actually October 5, but --
20    Q.  Okay.  October 5, 2005, right?
21    A.  Mm-hmm.
22    Q.  Who owned Sparboe?
23    A.  Bob Sparboe and a series of trusts.
24    Q.  And what were those trusts or who are those
25 trusts?

Page 52

1    A.  I'm not -- it's incredibly complicated, and I'm
2 not -- I can't -- I can't specifically state.  A number of
3 trusts that Bob Sparboe created for the benefit of his
4 family.
5    Q.  How many?  Do you know how many types?
6        MR. HUTCHINSON:  Objection.
7        WITNESS:  Many.
8        MR. HUTCHINSON:  Calls for speculation.
9 BY MR. PATTON
10    Q.  Many?
11    A.  Mm-hmm.
12    Q.  Which family members were covered by the trust?
13    A.  His children.
14    Q.  And that would be, in addition to yourself?
15    A.  Myself and two brothers.
16    Q.  Garth?
17    A.  Yes.
18    Q.  And?
19    A.  Mark.
20    Q.  Does Mark work for Sparboe?
21    A.  No.
22    Q.  In addition to Garth, Mark, and yourself were
23 there any other owners that had an interest in
24 Sparboe Companies by form of trust?
25    A.  No.

Page 53

1    Q.  Do you know what percentage of --
2    A.  Oh, my children, yes.
3    Q.  Prior to 2005?
4    A.  Yes.
5    Q.  To what percentage was Sparboe Companies owned by
6 a trust versus owned by Mr. Sparboe prior to
7 October 5, 2008?
8    A.  I can't -- I don't recall the specific
9 percentage.
10    Q.  Today you're the 100 percent owner?
11    A.  I am.
12    Q.  And so did you, I take it, you had to buy out the
13 trusts?
14    A.  I did.
15    Q.  And how much did that cost?
16    A.  It's -- I don't recall.
17    Q.  Okay.  How is -- there's no other family members
18 today that have any other ownership interests in
19 Sparboe Farms?
20    A.  Myself, and some trusts that I've set up for my
21 children.
22    Q.  Okay.  So as of -- at what point in time after
23 October 5, 2008, did you become the sole owner?
24    A.  2008.
25    Q.  2008.  Now, how was -- and I'm going to ask this

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1 in just very general terms. How is Sparboe managed on a
2 daily basis from its -- for its -- start it again.
3      How is Sparboe's business managed on a daily
4 basis?
5      MR. HUTCHINSON: Objection to form.
6      WITNESS: Could you be more specific?
7 BY MR. PATTON
8  Q. Yeah, maybe I'll ask it this way. Does Sparboe
9 have a board?
10  A. We have an advisory board.
11  Q. And what is an advisory board?
12  A. A board that has been set up to advise me and the
13 management in governance of the company.
14  Q. And how many members are on the advisory board?
15  A. Five.
16  Q. Five?
17  A. Mm-hmm.
18  Q. And has that changed over time?
19  A. No.
20  Q. So that will make it easy then. Who's been --
21 who are the members of the advisory board, and when did --
22 let me ask it this way. When did the advisory board start?
23  A. In February of 2006.
24  Q. And is that something you created?
25  A. I did.

Page 55

1  Q. And who sits on the advisory board?
2  A. Gary Hokkanen.
3  Q. And who is Mr. Hokkanen?
4  A. How do you want me to describe Mr. Hokkanen?
5  Q. What does he do for work?
6  A. Gary Hokkanen has his own business, and he's a
7 consultant to private companies.
8  Q. Okay. And who else is on the advisory board?
9  A. Russ Nicholas.
10  Q. And who is he?
11  A. A partner at Deloitte & Touche.
12  Q. That's an outside auditor?
13  A. Mm-hmm.
14  Q. But not your outside auditor?
15  A. At the time, not, no. They do our tax work
16 today, but at the time we had no business affiliation.
17  Q. Are they your outside auditor today?
18  A. No.
19  Q. Who else is on the advisory board?
20  A. Mike Helgeson.
21  Q. And what is his business?
22  A. He, at the time, or is currently still the
23 president and owner of Gold'n Plump Chicken, a broiler
24 operation in Minnesota.
25  Q. And who else?

Page 56

1  A. My husband, Bob Schnell.
2  Q. And what is his business?
3  A. He's in the insurance business.
4  Q. And we're missing one more person.
5  A. Oh, and today, and I added a year ago. I added
6 another advisory board member. Her name is Kathi Tunheim.
7  Q. And what is her job?
8  A. She's a professor.
9  Q. In what area?
10  A. Organizational behavior.
11  Q. And how frequently does the advisory board meet?
12  A. Quarterly.
13  Q. And has that always been the case since 2006?
14  A. Every quarter.
15  Q. And are they paid a stipend or compensated in any
16 way?
17  A. They are.
18  Q. Is there any other boards in addition to the
19 advisory board?
20  A. No.
21  Q. Is there an executive board?
22  A. Myself and my husband are officers.
23  Q. Is there a management team that you look to as
24 president to deal with the immediate management of --
25  A. Absolutely.

Page 57

1  Q. And who is that?
2  A. Steve. Today? What period of time?
3  Q. Yeah, through -- starting in '05 and through
4 today.
5  A. Would you like me to list every change of --
6  Q. No. I'm just -- maybe generally described the
7 management team, as you probably have identified, in those
8 terms.
9  A. There has always been a senior financial officer,
10 a senior sales leader, a senior operations.
11  Q. So it's at the senior level?
12  A. Mm-hmm.
13  Q. Let me mark --
14  A. And HR.
15  Q. And HR. Let me mark Exhibit 2 to your
16 deposition. While I'm handing you this, I'm going to
17 represent that this is an organizational chart that we
18 found. There weren't many, if any, that were produced
19 other than this one, that we could find, so it's dated.
20 It's from 2000, but we can walk through it.
21  A. So --
22      (Exhibit Number 2 was marked for identification
23      by Mr. Patton.)
24 BY MR. PATTON
25  Q. What is Exhibit 2, if you know?

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1    A.  It says it's an organization chart of
2 Sparboe Companies.
3    Q.  And was this chart maintained in the ordinary
4 course of Sparboe's business?
5    A.  This would have been a chart that would have been
6 while my father was president of the company.
7    Q.  Okay.  And your father would have been president,
8 right?
9    A.  Correct.
10    Q.  Let's go through it this way.  Position number
11 two is Ken Zachman?
12    A.  Mm-hmm.
13    Q.  Was he the controller and head of accounting?
14    A.  At the time, I presume.  I'm trying to find him
15 on the org chart.
16        MS. CRABTREE:  Excuse me.  This is
17 Molly Crabtree.  Could we get the Bates number, please?
18        MR. PATTON:  SF123870.
19        MS. CRABTREE:  Thank you.
20 BY MR. PATTON
21    Q.  How long was Mr. Zachman -- and again, focusing,
22 let's just say 2000 to 2010.
23    A.  Mm-hmm.
24    Q.  That's when all of these questions are going to
25 be about.

Page 59

1    A.  Mm-hmm.
2    Q.  How long was Mr. Zachman the controller or the
3 head of accounting?
4    A.  I don't recall the exact date that he was no
5 longer the controller.  I don't recall.  It would have been
6 at some point in 2006 or something like that, '6 or '7.
7    Q.  And who replaced him?
8    A.  Craig Boesen.
9    Q.  And Mr. Zachman's responsibilities, what were
10 they?
11    A.  I can't -- I don't know specifically.
12    Q.  But he's in charge of monitoring the financials
13 of the company?
14    A.  I think, at this time, that was Cathy Dean's
15 role.  She was brought in as a -- I don't know what year
16 this was from even.
17    Q.  2000.
18    A.  I believe Cathy Dean had been -- I don't know
19 when she was hired.
20    Q.  Did Mr. Zachman, and then his replacement,
21 Mr. Boesen, was his responsibilities to generate the
22 monthly P&L statements?
23    A.  Yes.
24    Q.  And also the annual financials?
25    A.  Yes.

Page 60

1    Q.  And so they would be in charge of monitoring
2 costs, expenses, overhead --
3    A.  Mm-hmm.
4    Q.  -- sales --
5    A.  Yes.
6    Q.  -- profits and all of those things; is that
7 right?
8    A.  Yes.
9    Q.  If we go to position number three, administrative
10 assistant, who is Nita Nurmi?
11    A.  It was my father's administrative assistant.
12    Q.  Is she -- is it a woman?
13    A.  A woman, yes, Nita.
14    Q.  Nita, is she still with the company?
15    A.  She is.
16    Q.  And what are her duties and responsibilities?
17    A.  Today she runs our safety.  She runs safety for
18 the company, and works inside of our HR department.
19    Q.  Is she your administrative assistant?
20    A.  No.
21    Q.  Do you have one?
22    A.  I do.
23    Q.  Who is that?
24    A.  Her name is Grace Hoke.
25    Q.  Grace Hoke, okay.  Where we come into this

Page 61

1 position, human resources and legal, that indicates that
2 that's John Mueller, an attorney.
3    A.  Correct.
4    Q.  Do you see that?
5    A.  Mm-hmm.
6    Q.  When did Mr. Mueller start with the company?
7    A.  I don't know.
8    Q.  Well, at least before 2000?
9    A.  Mm-hmm.
10    Q.  Like --
11    A.  It looks like he was employed in 2000, so he was
12 here in 2000, yes.
13    Q.  And how long did he stay with the company?
14    A.  I think John left in 2006.
15    Q.  Why did he leave the company?
16    A.  I don't know.  He didn't report to me at the
17 time.
18    Q.  But you were president at the time?
19    A.  I was.  No, I was not president at the time.
20    Q.  In 2006?
21    A.  Mm-mm.  For one year, I was not president of the
22 company.
23    Q.  Okay.  Who was?  So between October 5, 2005, I
24 thought you told me you became president in October.
25    A.  I did.

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1   Q.  Okay.  So --
2   A.  But in 200- -- February of 2006, I brought in a
3 president who was -- took the report of John.
4   Q.  Okay.  Let's back up a little bit.  You became
5 president on October 5, 2005?
6   A.  Mm-hmm.
7   Q.  But then in February 2006 you brought in a
8 president?
9   A.  I did.
10   Q.  Who was that individual?
11   A.  Jerry Kaminski.
12   Q.  And why did you bring him in?
13   A.  Because I had my hands full.
14   Q.  Okay.  And how long did Mr. Kaminski stay as a
15 president?
16   A.  About a year.
17   Q.  And he -- you replaced him?
18   A.  I took the position back.
19   Q.  And did he stay with the company?
20   A.  No, he left.
21   Q.  Okay.  Now, you indicated Mr. Mueller left at
22 some point, too?
23   A.  Mm-hmm, it was during Jerry Kaminski's tenure.
24   Q.  Did Mr. Kaminski terminate him?
25   A.  I believe so.

Page 63

1   Q.  Do you know why?
2   A.  I don't.
3   Q.  You never heard of any reasons why Mr. Mueller
4 was terminated?
5   A.  I just think Jerry was setting up his management
6 team, and there were several changes during that time,
7 including Greg Murch.
8   Q.  With also terminating Mr. Murch?
9   A.  Well, I mean, I'm just saying, he created his org
10 structure at that time.
11   Q.  Was Mr. Murch terminated during this time period
12 as well?
13   A.  I don't know that he was terminated, but his
14 employment ended as well.
15   Q.  It indicates here that Mr. Mueller's
16 responsibilities included human resources and legal.  Can
17 you explain the difference between those two positions?
18   A.  I can't, because of this -- he reported in to my
19 father at the time.
20   Q.  Did Mr. Mueller also engage in additional roles
21 besides simply being in-house legal counsel for Sparboe?
22   A.  Such as?
23   Q.  Well, I've seen that he has participated in UEP
24 meetings.  I see that he's been on committees for the UEP,
25 so I'm curious, did he wear more than just a hat of being

Page 64

1 in-house legal counsel?
2   A.  I think in his role as legal counsel one of his
3 duties was to address issues of permitting matters that
4 have to do with compliance with state, you know.
5   Q.  State law compliance?
6   A.  Mm-hmm.
7   Q.  Environmental?
8   A.  Compliance, environmental.
9   Q.  And what was his duties and responsibilities with
10 respect to human resources?
11   A.  I can't speak to -- I don't know specifically,
12 because he didn't know, but he, I think he managed the
13 human resource area, but I'm not -- he didn't report to me.
14 I didn't -- I can't speak to -- I don't even know what his
15 job description looked like at that time, so I can't really
16 address that.
17   Q.  Okay.  It indicates here that you were senior
18 president of marketing and further processing, and that's
19 the position you identified --
20   A.  Correct.
21   Q.  -- already for us?
22     Now, there's also a position for Wayne Carlson?
23   A.  Mm-hmm.
24   Q.  And I'm trying to find it.  He is the -- Wayne is
25 number nine here, coordination manager.  What was his

Page 65

1 responsibilities during this time period?
2   A.  Supply chain basically.
3   Q.  And what does that mean?
4   A.  I think, if you read this, you'll see it was
5 making sure that eggs were in the right place at the right
6 time.
7   Q.  Okay.  Inventory control --
8   A.  Mm-hmm.
9   Q.  -- plant coordination, processing, warehousing --
10   A.  Yep.
11   Q.  -- shipping and receiving?
12     Did he call on -- did he deal on marketing to
13 customers at all?
14   A.  He would support our sales efforts in making sure
15 we were able to deliver what we promised our customers.  In
16 other words, that we had the right eggs at the right farm
17 to meet our customer demands.
18   Q.  And coordinate with the sales and marketing side?
19   A.  He just made it happen every day, when orders
20 would come in, and he just made sure we had the eggs to
21 serve the customers.
22   Q.  It also shows that --
23   A.  He also handled the freight.
24   Q.  Okay.  I'm sorry.  He reported to Mr. Murch?
25   A.  He did.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q.   What was Mr. Murch's responsibilities?
2    A.   Vice pres, senior VP of all operations.
3    Q.   And --
4    A.   So he had the birds, the plants, and the supply
5  chain.
6    Q.   And the sales?
7    A.   No.
8    Q.   So sales was separate from operations?
9    A.   In the -- with the exception of the longs and
10 shorts on the supply chain side.
11   Q.   Long and shorts.  That's the purchase and sale?
12   A.   Correct.
13   Q.   So Mr. Carlson would --
14   A.   Moving eggs to the breaking plant, or it's --
15 that would be his role.
16   Q.   When you say moving eggs to the breaking plant,
17 would that mean taking shell eggs and then moving them over
18 to the --
19   A.   Mm-hmm.
20   Q.   -- processing plant?
21   A.   Correct.
22   Q.   Would shell eggs that you would normally sell to
23 a customer could then --
24   A.   Mm-hmm.
25   Q.   -- could be taken --

Page 67

1    A.   Mm-hmm.
2    Q.   -- and moved to --
3    A.   Right.
4    Q.   I didn't --
5    A.   So --
6    Q.   I didn't ask that part.  So Sparboe makes,
7  produces a shell egg, and it can either, that egg can
8  either go to a retail customer --
9    A.   Mm-hmm.
10   Q.   -- or it could be moved over into further
11 processing?
12   A.   Right.  So if our customer normally orders ten
13 loads of eggs a day, a week, and they have an ad and they
14 order 20, he makes sure there's enough eggs at that plant
15 to make their 20 eggs, but the next week they're going to
16 only order five, so the extra five loads that are at that
17 farm normally have to be shifted somewhere else, so that,
18 that's a very key function in our ability to serve our
19 customer.  Otherwise we wouldn't have the right eggs at the
20 right location to meet their demand, so that would have
21 been -- that was his role in the company, very important
22 role.
23   Q.   Now, the -- I'm going to get into your plants in
24 a minute here.  It indicates here that there is a
25 Center Bank and a Center Agency.  What does that refer to?

Page 68

1    A.   A bank and an agency.
2    Q.   And what is Sparboe's relationship with the bank
3  and the agency?
4        MR. HUTCHINSON:  Objection to form.
5        WITNESS:  Sparboe --
6        MR. HUTCHINSON:  What time period?
7  BY MR. PATTON:
8    Q.   Let's start in 2000, in this time period.
9    A.   The Sparboe company had nothing to do with the
10 agency or the bank.
11   Q.   Why is a Center Bank and a Center Agency listed
12 on the organizational chart of Sparboe Companies?
13   A.   Because this is my father's org chart, but they
14 are completely separate entities, separate ownership.
15   Q.   What is the Center Bank?
16   A.   It's a national bank.
17   Q.   Where is it located?
18   A.   Litchfield, Minnesota.
19   Q.   And did Sparboe Companies have an interest in
20 the --
21   A.   None.
22   Q.   -- Center Bank?
23        Is it true that at some point your father
24 purchased the Center Bank?
25   A.   He did.  He owned it.

Page 69

1    Q.   He owned it?  I actually went on the Center Bank
2  web page, and I read something that in -- I'm going to
3  paraphrase, but at some point, maybe it was in the 50s
4  or 60s or something or in the 70s, the Center Bank was
5  going under, and so your father decided to, with some other
6  individuals, buy the bank.
7        MR. HUTCHINSON:  Objection to form.
8        WITNESS:  Not true.
9  BY MR. PATTON:
10   Q.   Okay.  What happened?
11   A.   Regarding how he bought the bank?
12   Q.   Yeah.
13   A.   He was on the bank board.  It was a First Bank
14 branch in Litchfield, and he had served on the bank board
15 for a number of years, and the bank holding company decided
16 to get out of the ag lending business and community banking
17 at that time, and this bank was slated as one of the banks
18 that was going to be divested, and he was able to purchase
19 the bank, and he did.
20   Q.   And did he own the bank personally or did
21 Sparboe Companies own the bank?
22   A.   Personally.
23   Q.   And the bank, over the years, has had members
24 who've also been on the board of directors for Sparboe,
25 right?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1       MR. HUTCHINSON: Objection to form.
2       WITNESS: Myself.
3 BY MR. PATTON
4   Q.  Yeah, you, I know that.
5   A.  Bob Sparboe.
6   Q.  Bob Sparboe, yourself --
7   A.  Mm-hmm.
8   Q.  -- Wayne Carlson have all sat on the board, and
9 Garth Sparboe have all sat on the board at the bank, right?
10  A.  In recent years, yes.
11  Q.  And do you have an ownership interest in that
12 bank?
13  A.  No.
14  Q.  Did you have an ownership interest?
15  A.  Oh, I -- all directors have -- I personally
16 have -- yes, I have a small --
17      MR. HUTCHINSON: Objection to form. Are you
18 asking -- who are you asking? Her as her individual
19 capacity?
20      MR. PATTON: As an individual witness,
21 whether she -- not in her 30(b)(6) capacity.
22      MR. HUTCHINSON: Okay. So you're not asking
23 her of Sparboe?
24 BY MR. PATTON
25  Q.  I'm asking if Ms. Beth Schnell,

Page 71

1 Beth Sparboe Schnell --
2   A.  Mm-hmm.
3   Q.  -- had or has an interest in the Center Bank.
4   A.  Yeah.
5   Q.  Yeah.
6   A.  By law, I believe. I may not be correct on this,
7 but by law bank directors are obligated to have -- purchase
8 a share, so I purchased in 1987 a share.
9   Q.  And when your father passed, and I apologize to
10 ask this again, but what happened to his interest in the --
11  A.  It's in a trust.
12  Q.  And it's in a trust that went to family members?
13  A.  Nope. It's in an estate.
14  Q.  Okay. So an estate still owns Mr. Sparboe's
15 interest in the Center --
16  A.  Yes.
17  Q.  -- in the bank?
18  A.  Yes.
19  Q.  And what about Garth Sparboe and Wayne Carlson?
20 Do they have a financial interest in the bank?
21  A.  They each were required to buy one share, or
22 whatever the numbers of shares is. Every board director is
23 obligated to buy their -- a share of some percentage.
24  Q.  Who owns the Center Bank today, if you know?
25      MR. HUTCHINSON: Objection; calls for

Page 72

1 speculation.
2       WITNESS: Who owns what?
3 BY MR. PATTON
4   Q.  The bank.
5   A.  Robert Sparboe's estate.
6   Q.  Okay. In its entirety?
7   A.  With the exception of the shares that are owned
8 by the directors, which is 3 percent collectively, or less.
9   Q.  Who are the beneficiaries of Mr. Sparboe's
10 estate?
11  A.  How is this relevant?
12      MR. HUTCHINSON: It's not.
13 BY MR. PATTON
14  Q.  Well, are you a beneficiary of Mr. Sparboe's
15 estate?
16  A.  You know --
17      MR. PATTON: I'm going to object.
18      WITNESS: I just don't understand how this
19 has anything to do with --
20      MR. HUTCHINSON: I'm going to object to this
21 line of --
22      WITNESS: -- what we're talking about,
23 but --
24      COURT REPORTER: One at a time, please.
25      MR. HUTCHINSON: All right. Let me make my

Page 73

1 objection. I'm going to object to this as way outside the
2 scope of this litigation. She's already --
3       THE WITNESS: I don't see that on here
4 anywhere.
5       MR. HUTCHINSON: She's already testified
6 that Sparboe Farms has no ownership interest in the bank,
7 so you don't have to answer these questions.
8       THE WITNESS: Thank you.
9 BY MR. PATTON
10  Q.  Well, the organizational chart, the reason I'm
11 asking these is because you produced in this litigation an
12 organizational chart that shows that the Sparboe company
13 manages, operates, or has some relationship with the
14 Center Bank and the Center Agency.
15      I understand that perhaps Sparboe Companies
16 don't, but it's listed on an org chart, and so I will not
17 ask anymore questions about the bank other than I'd like to
18 know about the agency. If I could have just a description
19 of what the Center Agency is?
20  A.  The agency was affiliated at the time with the
21 bank.
22  Q.  Is that an insurance agency?
23  A.  Correct.
24  Q.  Okay. And did your father own an insurance
25 agency as well?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1    A.   He did.
2    Q.   And is that owned today by his estate?
3    A.   No.
4    Q.   Who owns the Center Agency?
5    A.   My husband bought the agency out of the estate.
6    Q.   And he owns that with you?
7    A.   Today, yes.
8         MR. PATTON:  Okay.  Now, how long have we
9  been going?  Maybe we should take a break.
10        VIDEOGRAPHER:  About an hour.
11        MR. PATTON:  Let's take a break.
12        VIDEOGRAPHER:  We are going off the record.
13        The time is 10:19 a.m.
14   (A break was taken.)
15        VIDEOGRAPHER:  We are back on the record.
16        The time is 10:41 a.m.
17 BY MR. PATTON:
18   Q.   Okay.  I'd like to change our focus now to the
19 facilities or farms that Sparboe has.
20   A.   Mm-hmm.
21   Q.   And I'd like to focus again on the time
22 period 2000 to 2010.  Do you call them farms or facilities,
23 so I know?
24   A.   We call them complexes.
25   Q.   Complexes, okay.  Tell me what complexes Sparboe

Page 75

1  had and where they were located.
2    A.   Our -- by name?
3    Q.   Yes, please.
4         MR. HUTCHINSON:  For what time period?
5  BY MR. PATTON:
6    Q.   Let's start in 2000, and hopefully they stayed
7  the same, but if you've added a facility, I'd like to know.
8    A.   In Litchfield, Minnesota, we have a farm, a
9  complex.
10   Q.   Complex?
11   A.   In Goodell, Iowa.  In Humboldt, Iowa.
12 In Hudson, Colorado.  We have a complex that we have
13 in Britt, Iowa.
14   Q.   Is that called the New Horizon?
15   A.   Mm-hmm.
16   Q.   Okay.  Any more?
17   A.   Are you speaking, how -- define a -- so --
18   Q.   Well, if you look at this org chart, you'll see
19 there's Litchfield, Goodell, Eagle, Hudson, and
20 New Horizon, right?
21   A.   Where is that?  I'm sorry.  Oh, here.
22   Q.   Yeah.
23   A.   Okay, right, okay.  So then Eagle Grove and
24 Vincent were two locations that we had.  We had Eagle Grove
25 in 2000, and then we built -- Vincent came on board during

Page 76

1  the decade.
2    Q.   Where is Vincent located?
3    A.   Right across the street from Eagle.
4    Q.   And where is that?
5    A.   In Iowa, sorry.
6    Q.   So beginning in 2000, you had at least the
7  Littlefield [sic], the Goodell, the Humboldt, the Hudson,
8  and the Britt or New Horizon facility?
9    A.   And Eagle.
10   Q.   And Eagle, and then you built the Vincent
11 facility when?
12   A.   Starting in about 2001.
13   Q.   And from that time, from 2001 to 2010, did you
14 add any new complexes or eliminate any new complexes?
15   A.   No elimination, but we grew a lot.
16   Q.   And by grow a lot, what do you mean?
17   A.   Vincent was a green, what we call a green field.
18 It started with nothing and it became --
19   Q.   And it's next door to the Eagle facility,
20 correct?
21   A.   Correct, across the street.
22   Q.   Now, with respect to the Littlefield complexes,
23 is that a shell egg or a further processing egg facility?
24   A.   Litchfield, and it's shell.
25   Q.   All shell?

Page 77

1    A.   Yes.
2    Q.   Can you segregate these facilities into
3  processing facilities or nonprocessing facilities?
4    A.   All the facilities are shell egg facilities with
5  the exception of Vincent.
6    Q.   And that's a processing --
7    A.   That's -- it was both.
8    Q.   And you had indicated that you had acquired a
9  processing facility in Iowa in the late '90s --
10   A.   Mm-hmm.
11   Q.   -- in order to start doing, processing eggs --
12   A.   Mm-hmm.
13   Q.   -- when your job responsibility changed?
14   A.   Yes.
15   Q.   And it was the Cal-Mar, did you say?
16   A.   Cal-Mar.
17   Q.   Cal-Mar?
18   A.   Cal-Mar Foods.
19   Q.   And what facility has that been --
20   A.   There are no chickens there.  It's just a plant.
21   Q.   Oh, okay.  Who supplies the Cal-Mar facility?
22   A.   We do.
23   Q.   Out of what facility?  Out of what complex?
24   A.   All of them.
25   Q.   Okay.  So all of the complexes, including the

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

1 Colorado one?
2     A.  Not -- well, mostly Iowa and Minnesota.
3     Q.  So where is Cal-Mar?
4     A.  Well, it's in north, north central to
5 northeastern Iowa.
6     Q.  Iowa, and that's a processing facility, and so
7 what you're saying is the Iowa plants and the Minnesota
8 plants would ship eggs to that further --
9     A.  Mm-hmm, mm-hmm.
10    Q.  -- processing facility and then they would be
11 changed, sold as breaking eggs from there?
12    A.  Yes.
13    Q.  The Litchfield complex, how many layers,
14 theatrically, how many layers can it hold?
15    A.  About a million two.
16    Q.  And has that changed over time?
17    A.  Yeah, it's -- we've torn down.  Yes, it's changed
18 over time.
19    Q.  When I'm talking, I'm focusing on 2000 to 2010
20 only.
21    A.  Oh, no, it didn't change.
22    Q.  And Goodell?
23    A.  No, that -- I'm sorry, I need to just think.  So
24 could you rephrase your question about Litchfield?
25    Q.  Yeah.  My questions are, from the 2000 to 2010

1 time period, I want to understand what I would call the
2 theoretical capacity.
3     A.  Yes.
4     Q.  The maximum amount of birds that you can have
5 laying hens, not what their actual population was.
6     A.  Okay.
7     Q.  So Litchfield, you had said --
8     A.  Litchfield grew by 240,000 birds.
9     Q.  Over the time period?
10    A.  Mm-hmm.
11    Q.  So it -- but what's its maximum theoretical
12 capacity as of 2010?  Let's do it that way.
13    A.  It was about a million --
14    Q.  -- two?
15    A.  -- two.
16    Q.  And initially in 2001, it was at one?
17    A.  Something like that, yeah.
18    Q.  And then the Goodell, Iowa, facility?
19    A.  That has not grown, and that farm is also about a
20 million.
21    Q.  One million?
22    A.  A million.
23    Q.  Humboldt, same question.
24    A.  I don't recall the specific number of birds
25 there.  That has not -- we have not added layers there.

1     Q.  About a million?
2     A.  No new barns there.  During that period of time,
3 probably about a million.
4     Q.  And the Hudson, Colorado, facility?
5     A.  We grew that facility, so the numbers were
6 different every year, so I am going to have to have you --
7     Q.  Well --
8     A.  How would you like me to answer the question?
9     Q.  -- just I would say, on average what is the --
10 by 2010 what was the theoretical number of layers you could
11 have at that facility?
12        MR. HUTCHINSON:  Objection to form.
13        WITNESS:  I'm just trying to think of the
14 year.  I'm guessing that farm, just because I'm unclear on
15 when the construction began, that farm was about a million,
16 probably a million two in 2010.
17 BY MR. PATTON:
18    Q.  And --
19    A.  And that's a guess.  I have to tell you that's
20 a -- I'm guessing.
21    Q.  That's Hudson we're talking about?
22    A.  Colorado, yeah.
23    Q.  And how many?  Did you add additional farms over
24 the 2000 to 2010 time period?
25    A.  Additional barns.

1     Q.  Barns?
2     A.  That's --
3        MR. HUTCHINSON:  Objection; vague as to --
4 are you asking about Hudson?
5        MR. PATTON:  Yes.
6        WITNESS:  So you're asking me if we added --
7 I'm just trying to think.  We did add barns, but I don't
8 remember the year.  I have to just tell you, I can't recall
9 the specific year we added a number of birds there.
10 BY MR. PATTON:
11    Q.  Okay.  And the New Horizon, where is that located
12 again?
13    A.  In Britt, Iowa.
14    Q.  Britt, Iowa, and what's its theoretical capacity?
15        MR. HUTCHINSON:  Objection to form.  You can
16 answer, if you understand.
17        WITNESS:  It's approximately a million,
18 million two.
19 BY MR. PATTON:
20    Q.  And then the Eagle facility?
21    A.  Same, about a million two.
22    Q.  And the Vincent facility is one that you added
23 for processing in 2001?
24    A.  We did, yep, the Vincent.  Are you asking --
25 what's your question?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1    Q.   You added it in 2001, correct?
2    A.   Mm-hmm, over time.
3    Q.   And it was primarily for processing, is that --
4    A.   It was split 50-50, about 50-50.
5    Q.   How many layers at the facility, when it --
6    A.   About 2.4.
7    Q.   2.4 million layers?
8    A.   Mm-hmm.
9    Q.   And has that changed over time at the Vincent
10   facility?
11   A.   Not between -- I'm trying to think of the dates.
12   Q.   What regions does the Littlefield or did the
13   Littlefield complex apply?
14        MR. HUTCHINSON:  Objection to form.
15        WITNESS:  That would be difficult to answer.
16        MR. HUTCHINSON:  Just for the record, I'm
17   not familiar with a Littlefield.
18   BY MR. PATTON
19   Q.   I'm sorry, Litchfield.
20        Let me -- maybe I can go at it this way.  I'm
21   trying to understand the regions in which Sparboe sells
22   eggs in the United States during the 2000 to 2010 time
23   period.
24   A.   Mm-hmm.
25   Q.   For instance, what regions in the United States

Page 83

1    did Sparboe supply?
2    A.   It would vary by year.
3    Q.   Okay.  Can you tell me from in 2000?
4    A.   At which farm?
5    Q.   Well, just all of Sparboe's supplies.  Does it
6    sell -- let's say states.  Did it sell to New Jersey?  To
7    Massachusetts?  Are there states that it supplied eggs
8    into?
9    A.   I can't tell you by state by year.  I wouldn't be
10   able to remember that.
11   Q.   Well, how about by complex?  Does the Litchfield
12   complex supply a certain region that Sparboe sells to?
13   A.   It would possibly change, depending on the year
14   or the customer, so it wouldn't be specific in any given
15   year.
16   Q.   Within -- what I'm struggling with is in this
17   Sparboe, for instance, are there certain states that
18   Sparboe never sold eggs into?
19   A.   Yeah, absolutely.
20   Q.   And which ones are those during the 2000 to 2010
21   time period?
22   A.   So could you define selling eggs into?
23   Q.   Yeah, let's start with shell eggs.
24   A.   Right, but define selling eggs into.
25   Q.   Supply a retailer and that's --

Page 84

1    A.   So where our truck would deliver to a customer in
2    that state?
3    Q.   Yeah.
4    A.   Kansas.
5    Q.   Kansas is the only state?
6    A.   No, there would be others.
7    Q.   What other states?
8    A.   So could you define, is the question where we
9    take, sell an egg, sell eggs --
10   Q.   Yeah, I'm --
11   A.   -- and take and invoice a customer in a specific
12   state?
13   Q.   Well --
14   A.   I mean, is that what you're -- I'm just curious.
15   Q.   Yeah, I'm -- the reason I'm -- I don't want to
16   spend a lot of time on this, but what I'm trying to say is,
17   I know that you ship eggs, but you probably also use
18   distributors, right?
19   A.   Right.
20   Q.   And you don't know where the distributors end up
21   selling or supplying their eggs?
22        MR. HUTCHINSON:  Objection.
23        WITNESS:  No.  I think your question was do
24   we invoice or sell customers our eggs, where we knowingly
25   ship eggs into a state.

Page 85

1    BY MR. PATTON
2    Q.   Between the time period 2000 and 2010, what are
3    the major markets that Sparboe sold eggs into?
4    A.   Iowa, Wisconsin, North and South Dakota,
5    Colorado.
6    Q.   All right.
7    A.   Wyoming, California.  There are many states.
8    Q.   Okay.  Are there limitations upon the way that --
9    are there limitations upon the nature of eggs, i.e. the
10   freight or the costs to ship them, that limit how far you
11   can ship them?
12   A.   Are there limitations on freight?  You mean,
13   physically, are you speaking?
14   Q.   Are there financial limitations that make it cost
15   prohibitive for Sparboe to supply eggs, for instance, to
16   the northeast?
17   A.   Well, freight is a factor.
18   Q.   All right.  What other factors?
19   A.   I guess freight is probably the biggest, or the
20   customers' opportunity to buy from other suppliers more
21   cheaply.
22   Q.   And the identify of competitors in certain
23   markets?
24   A.   Yeah, I would say.
25   Q.   How is freight a limitation?

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    A.  If it's a full truck load or a partial truck
2  load, if there are lanes that are efficient or, you know,
3  you've got a distribution center that's in a difficult
4  place for them to get a backhaul out of.
5    Q.  From what facility did Sparboe serve the
6  California market?
7    A.  Over those ten years, probably every facility.
8    Q.  And how would you serve, how would eggs go from
9  Colorado to California?  By truck?
10    A.  Mm-hmm, yes.
11    Q.  And are those refrigerated trucks?
12    A.  Yes.
13    Q.  What were the customers in California that you
14  were supplying during that time period?
15    A.  I don't have a list.
16    Q.  All right.  Do you have an idea of what
17  retailers?
18    A.  Target.
19    Q.  I'll start a new page.  California is Target?
20    A.  Mm-hmm.
21    Q.  What other retailers did you supply in
22  California?
23    A.  That's probably all we had.
24    Q.  What about South Dakota?  What retailers?
25    A.  Nash Finch.

Page 87

1    Q.  In Iowa?
2    A.  Hy-Vee.
3    Q.  Any other?
4    A.  Oh, yeah.  I mean, would you like a list of all
5  of our customers in Iowa?
6    Q.  Well, particularly some of the plaintiffs in this
7  case, is what I would be interested in.  And in Colorado
8  what major retailers would you supply?
9        MR. HUTCHINSON:  Objection to form.
10        WITNESS:  At what point in time?
11  BY MR. PATTON:
12    Q.  At any point in time.
13    A.  Retailers.
14    Q.  Grocery retailers?
15    A.  We supplied for a brief period of time in, I
16  believe in the 2000s, Sam's Club, Albertsons.  That's all I
17  recall.
18    Q.  And who in Wisconsin?
19    A.  Woodman's.
20    Q.  And did you supply Kroger at all?
21    A.  No.
22    Q.  Did you supply A&P?
23    A.  No.
24    Q.  Did you supply Safeway?
25    A.  No.  We weren't able to for many of those years.

Page 88

1    Q.  All right.  And what about a company called
2  Conopco?
3    A.  Who?
4    Q.  Unilever?
5    A.  No.
6    Q.  Did you ever sell to Winn-Dixie?
7    A.  No.
8    Q.  How about HEB?
9    A.  No.
10    Q.  They're in Texas primarily, right?
11    A.  Mm-hmm.
12    Q.  Are you aware they have essentially a sole source
13  supply contract with Cal-Maine?
14    A.  I did not know that.
15    Q.  How about Supervalu?
16    A.  Yes.
17    Q.  You supplied them in Minnesota?
18    A.  Mm-hmm.
19    Q.  General Mills?
20    A.  No.
21    Q.  Giant Eagle?
22    A.  No.
23    Q.  Kellogg?
24    A.  No.
25    Q.  Kraft?

Page 89

1    A.  I don't believe so.
2    Q.  Nestle?
3    A.  No.
4    Q.  Publix?
5    A.  (Shakes head.)
6    Q.  Roundy's?
7    A.  No.
8    Q.  Waldron?
9    A.  No.
10    Q.  Winn-Dixie?
11    A.  No.
12    Q.  So not at all during the 2000 to 2000 [sic] time
13  period did you sell to those customers?
14    A.  Many of those customers required UEP
15  certification, and we didn't have the UEP certification, so
16  we couldn't.
17    Q.  We'll get to that.  But my point is, let's say
18  prior to the 2000 to 2005 time period, you never sold to
19  those companies, right?
20    A.  I don't recall.  I don't think so.
21    Q.  And then after 2005 you never sold to those
22  companies, right?
23    A.  Not directly.
24    Q.  And have you ever supplied eggs into Texas?
25    A.  To Target.

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1 Q. In Texas?
2 A. Yep, mm-hmm.
3 Q. Who are your major -- who are Sparboe's major
4 competitors?
5 A. In what products and in what time?
6 Q. Shell eggs, 2000 to 2010.
7 MR. HUTCHINSON: Objection to form, and I'll
8 object to the extent that it calls for a legal conclusion.
9 WITNESS: So could you please clarify the
10 question for me?
11 BY MR. PATTON:
12 Q. Sure. Do you know what a competitor is?
13 A. I do.
14 Q. Would you consider, for instance, Cal-Maine to be
15 a competitor of Sparboe's?
16 A. I believe so.
17 Q. And in what markets?
18 A. Texas.
19 Q. Any particular regions of Texas?
20 A. No.
21 Q. And that's the only state?
22 A. No, I -- Cal-Maine is everywhere. They're in the
23 egg business and we're in the egg business.
24 Q. Right. So other than the states you've
25 identified, Iowa, Wisconsin, North Dakota, South Dakota,

Page 91

1 Colorado, Wyoming, and California, are there any other
2 states --
3 A. Yes.
4 Q. -- that you supply into?
5 A. Yes.
6 Q. Which ones?
7 A. Now, today or --
8 Q. During 2000 and 2010.
9 A. So you're asking me what states did we ship eggs
10 into and sell to customers in during that ten-year period
11 of time?
12 Q. Either through a distributor or on your own.
13 A. I'm not prepared to answer that question.
14 Q. So there may be more states other than Iowa,
15 Wisconsin, North Dakota, and South Dakota?
16 A. I suspect so.
17 Q. Illinois?
18 A. Yes.
19 Q. So to the extent another egg supplier supplied
20 eggs in those states, would you consider them a competitor?
21 A. Yes.
22 Q. So for instance, Moark, would that be a
23 competitor?
24 A. Yes.
25 Q. Rose Acre?

Page 92

1 A. Yes.
2 Q. Was Michael Foods a competitor?
3 A. Yes.
4 Q. Daybreak?
5 A. In what markets? What products? Are you asking
6 shell eggs?
7 Q. Shell.
8 A. In 2000 to 2010, I don't know that I would
9 consider Daybreak a competitor at that time.
10 Q. How about Hillandale?
11 A. Yes.
12 Q. Is a competitor Souder?
13 A. Not a competitor of ours.
14 Q. Midwest Poultry?
15 A. I suspect they would be considered a competitor.
16 Q. Now, following 2000 and the time period
17 after 2010, did Sparboe eliminate or sell any of these
18 plants?
19 A. Yes.
20 Q. Which plants?
21 A. Vincent and Eagle Grove.
22 Q. And why did Sparboe sell those plants?
23 A. Because we were not able to sell the eggs
24 profitably.
25 Q. Did something happen in 2011 that reduced

Page 93

1 Sparboe's sales?
2 A. Yes.
3 Q. What was that?
4 A. We lost many customers.
5 Q. Because of the ABC 20/20 report?
6 A. Correct.
7 Q. And because of the FDA salmonella finding?
8 A. I suspect there were many reasons.
9 Q. What were the reasons?
10 A. Largely the story. The 20/20 story.
11 Q. And what customers did you lose?
12 A. Target.
13 Q. McDonald's?
14 A. McDonald's.
15 Q. Other retailers?
16 A. Yes.
17 Q. Which retailers?
18 A. Woodman's.
19 Q. Any more?
20 A. At what specific date?
21 Q. After the November 16, 2011 --
22 A. But how long after that?
23 Q. Well, anytime after that.
24 Hy-Vee was a customer that you lost, right?
25 A. We did.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1    Q.   And you know that Hy-Vee actually wanted to stick
2  with Sparboe, did it not?
3            MR. HUTCHINSON:  Objection to form.
4            WITNESS:  I don't know that.
5  BY MR. PATTON
6    Q.   And are you aware that Hy-Vee actually conducted
7  a visit of one of your facilities, and at that point found
8  it to not be -- found the conditions not to be acceptable,
9  and then it discontinued its purchases from Sparboe?
10    A.   I'm aware that Hy-Vee made a visit to our farm.
11  I'm aware that Hy-Vee conducted an RFP for their egg
12  business, and we lost their business.
13    Q.   And that was after the 2011 ABC news?
14    A.   Yes.
15    Q.   What other customers in addition to McDonald's
16  and Target did Sparboe lose, was not able to make sales to
17  anymore after exposure of that?
18    A.   Cargill, Michael Foods.
19    Q.   Supervalu?
20    A.   No, Supervalu bought eggs from us.  They
21  discontinued us briefly, and we were able to -- we got
22  their business back.
23    Q.   What were the revenues in 200- -- how did the
24  revenues following the ABC news break compare with the
25  revenues prior to that day?

Page 95

1    A.   Devastatingly different.
2    Q.   And is that the reason you had to sell the
3  Vincent and Eagle facilities?
4    A.   Yes.
5    Q.   Who did you sell the Eagle and Vincent facilities
6  to?
7    A.   Daybreak.
8    Q.   Were you able to get a competitive price for it?
9    A.   It was a sale.  I don't know.  I'm not -- I don't
10  know.  No, I don't -- I don't think so.
11    Q.   When you say devastating, what was the magnitude
12  of difference between the --
13    A.   I'm sorry?
14    Q.   -- the magnitude of the year prior and the year
15  after the ABC news break?
16    A.   Sparboe Farms was -- we were not able to sell
17  eggs to industry peers, companies that might normally trade
18  eggs back and forth.  Our industry colleagues didn't buy
19  our eggs.  Our customers wouldn't buy our eggs.  It was --
20  it was -- it was -- frankly, we're still dealing with that.
21    Q.   How about the FDA, the exposure of the FDA story
22  on the salmonella?
23         And I'll get to that, but the FDA also found at
24  least several facilities that Sparboe was operating had not
25  instituted the correct procedures to protect against

Page 96

1  salmonella.  Do you remember that?
2            MR. HUTCHINSON:  Objection to form.  That
3  assumes facts not in evidence.
4            WITNESS:  I don't agree with that.
5  BY MR. PATTON
6    Q.   But do you remember the FDA making a finding at
7  or about the same time the ABC news story broke?
8            MR. HUTCHINSON:  Objection.  Same objection.
9            WITNESS:  Do I remember the FDA making a
10  finding, no.
11  BY MR. PATTON
12    Q.   Or issuing findings in November of 2011 as well?
13            MR. HUTCHINSON:  Same objection.
14            WITNESS:  I remember the FDA generating a
15  letter that was made available to 20/20 at that same time.
16  BY MR. PATTON
17    Q.   How does Sparboe generally set its prices for
18  eggs --
19    A.   Can I just --
20    Q.   -- for shell eggs?
21            MR. HUTCHINSON:  Objection; vague.
22            WITNESS:  I'd like to just go back.  May I
23  add something to my last statement?
24            MR. HUTCHINSON:  Of course.
25

Page 97

1  BY MR. PATTON
2    Q.   Sure.
3    A.   So what the FDA did was drafted a letter relating
4  to audits that had taken place as long as seven months
5  prior, so there was no direct relationship to the letter
6  that was leaked to 20/20 and a finding at our farms, so I
7  just want to be clear about that.
8    Q.   Right.  I have the letter.
9    A.   Okay.
10    Q.   And we can use it, but I understand that they --
11    A.   Yeah.
12    Q.   -- inspected several facilities in the May and
13  April time period, but the findings weren't issued until
14  November.
15    A.   Interestingly enough, the day before the 20/20
16  story.
17    Q.   But they were still similar findings, correct?
18            MR. HUTCHINSON:  Objection.  Objection to
19  form.
20  BY MR. PATTON
21    Q.   The findings were that there was lack of proper
22  procedures in place to protect against salmonella?
23            MR. HUTCHINSON:  Objection to form.
24            WITNESS:  No.
25

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1 BY MR. PATTON
2    Q.  All right.  Well, we don't -- when did Sparboe
3 join the UEP?
4    A.  I don't recall.
5    Q.  Had it been a member of the UEP for many years
6 back in the '50s, '60s, '70s?
7    A.  No.
8    Q.  '80s?
9    A.  I don't know when Sparboe Farms joined UEP.
10    Q.  Can you put it on a decade?
11         MR. HUTCHINSON:  Objection; asked and
12 answered.
13         WITNESS:  I don't -- I can't.
14 BY MR. PATTON
15    Q.  Prior to 2000, it was a member?
16    A.  I believe so.
17    Q.  And was your dad always, or Mr. Sparboe, a
18 participant in UEP?
19    A.  No.
20    Q.  What is the UEP?
21    A.  It's a Capper-Volstead group.  It's a cooperative
22 of egg farmers and the work they did and do is largely
23 around legislative matters and regulatory issues and
24 science-based research that the industry can benefit from
25 collectively.

Page 99

1    Q.  Did the UEP physically sell eggs, that you're
2 aware of?
3    A.  I don't think so.
4    Q.  Did the UEP ever deliver eggs to customers?
5    A.  Not that I'm aware of.
6    Q.  So let me -- I'll just keep this moving.  Do you
7 recall that Bob Sparboe was a member of the board of
8 directors of the UEP in 2000?
9    A.  I have seen that in documents.
10    Q.  And are you aware that he was also a member of
11 the marketing committee beginning in 2000?
12    A.  I'm not -- I can't confirm that.
13    Q.  Let's mark some exhibits real quick.
14         Why was Sparboe a member of the UEP?
15    A.  Initially, I can't answer.  I don't know.
16    Q.  Was it in Sparboe's best interest, business
17 interest to be a member of the UEP, at least from the
18 period 2000 through 2007?
19         MR. HUTCHINSON:  Objection; vague.
20         Are you asking her at that time or --
21         MR. PATTON:  Yeah.
22         MR. HUTCHINSON:  -- from her perspective
23 now?
24 BY MR. PATTON
25    Q.  There came a point when Sparboe quit the UEP,

Page 100

1 effective July 2005, right?
2    A.  Mm-hmm.
3    Q.  Is that right?
4    A.  Yes.
5    Q.  And so from that time period, from when Sparboe
6 was a member of the UEP up until 2005, why was it a member
7 of the UEP?
8    A.  So are you asking specifically for the 2000
9 to 2005 period?
10    Q.  Yes.
11    A.  Well, I don't know why.  I will -- I suspect, I
12 suspect that Sparboe Farms was -- I know Sparboe Farms was
13 very interested in being a part of the animal, the science
14 work that was being done around animal, animal densities,
15 and being aware of what was going on in Europe.  The egg
16 industry was talking a lot about that, and making sure that
17 we were supporting what United Egg Producers was doing from
18 a science research base on the animal humane care
19 guidelines that were being developed.
20    Q.  Would Sparboe have -- was it in Sparboe's best
21 business interest to be a member of the UEP during that
22 time period?
23    A.  I don't know.
24    Q.  Well, would Sparboe have not been a member of
25 the UEP, if it didn't at least see some advantage of being

Page 101

1 a member?
2         MR. HUTCHINSON:  Objection; vague.
3         I think you're unclear.
4 BY MR. PATTON
5    Q.  Did Sparboe see an advantage of being a member of
6 the UEP between 2000 and 2005?
7         MR. HUTCHINSON:  Objection; vague as to
8 time.
9         WITNESS:  I can't speak for Bob Sparboe.
10 BY MR. PATTON
11    Q.  Okay.  Well, you know that also Garth Sparboe,
12 yourself, and Wayne Carlson were members of various UEP
13 committees during that time period?
14    A.  Yes.
15    Q.  So you must have seen some advantage by being a
16 member of the UEP and participating on committees; isn't
17 that fair?
18    A.  I think that, I think it was important to know
19 what the research was being done, and Garth Sparboe became
20 very engaged in working with the animal care, the animal
21 welfare, I should call it, committee, and making sure that
22 the guidelines that were being developed by the scientific
23 committee were applicable to industry, and that we would be
24 able to effectively roll those out in all different kinds
25 of barns in a way that wouldn't be harmful to the birds

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1 or --
2      Q.  Garth was -- Garth Sparboe was an integral part
3 of the animal welfare program and the development of the
4 guidelines; isn't that right?
5          MR. HUTCHINSON:  Objection to form.
6          WITNESS:  Yeah, I don't know that, because I
7 didn't serve on that committee.
8 BY MR. PATTON
9      Q.  Let's go through participation on the welfare
10 committee.  You agree that Mr. Bob Sparboe was a member of
11 the board of directors during 1999 and 2000?
12      A.  I can't recall specifically.
13      Q.  Well, let's go through some documents then.
14      A.  Okay.
15      (Exhibit Number 3 was marked for identification
16      by Mr. Patton.)
17 BY MR. PATTON
18      Q.  I'm going to hand you what's been marked as
19 Exhibit 3.  Take a look at Exhibit 3.  This is a UEP
20 document.
21          MR. HUTCHINSON:  Do you have a copy?
22          MR. PATTON:  Oh, didn't I give you one?
23          MR. HUTCHINSON:  Thank you.
24 BY MR. PATTON
25      Q.  Exhibit 3 are the minutes of a UEP board of

Page 103

1 directors meeting dated February in Dallas.  Do you see
2 that?
3      A.  Mm-hmm.
4      Q.  Yes?
5      A.  I see that.
6      Q.  And do you see that it lists Bob Sparboe as one
7 of the members of the board of directors?
8      A.  I see his name, yes.
9      Q.  And that indicates that he was a member of the
10 board of directors, does it not?
11      A.  I can't -- I can't testify to that because I
12 don't know anything about this document.
13      Q.  As the 30(b)(6) witness for Sparboe, one of the
14 subjects was its participation in the UEP.  You don't have
15 any basis to --
16      A.  I just -- I don't have access to UEP's database
17 to see that Bob was a member.  I believe Bob -- this states
18 that Bob was at that meeting, so . . .
19      Q.  And if you turn to the second page, it indicates
20 at this meeting, February of 2000, that the animal -- do
21 you see where it says animal welfare?
22      A.  Mm-hmm.
23      Q.  That the animal welfare committee had presented a
24 report on its findings, do you see that?
25      A.  Yes.

Page 104

1      Q.  And so presumably your father was aware in 2000
2 that a committee, that the scientific advisory committee on
3 animal welfare had been developing a program?
4          MR. HUTCHINSON:  Objection; calls for
5 speculation.
6          WITNESS:  I don't know what my father was
7 aware of at that time.
8 BY MR. PATTON
9      Q.  You have no reason to dispute that these minutes
10 are not accurate?
11      A.  No.
12      Q.  When you attended UEP meetings, did they endeavor
13 to take accurate minutes?
14      A.  I don't know.
15      Q.  You've reviewed committee minutes --
16      A.  Mm-hmm.
17      Q.  -- have you not?
18      A.  Some.
19      Q.  And you were, yourself, on the marketing
20 committee in 2004 and 2005?
21      A.  Briefly.
22      Q.  For two years, right?
23      A.  Briefly.
24      Q.  Are you aware that your dad, I'm sorry,
25 Mr. Sparboe, was also a member of the UEP marketing

Page 105

1 committee in 2000?
2      A.  I believe he was on a committee perhaps at that
3 time.  I don't recall.  May I see that document?
4      Q.  Sure.
5      (Exhibit Number 4 was marked for identification
6      by Mr. Patton.)
7 BY MR. PATTON
8      Q.  I'm going to hand you what's been marked as
9 Exhibit 4.
10          MR. GREENE:  For the benefit of the people
11 on the phone, if you could read the Bates numbers in.
12          MS. CRABTREE:  Yes, please.
13 BY MR. PATTON
14      Q.  Yeah, I've handed you Exhibit 4, which
15 is UE0307864.
16          MR. GREENE:  What was the last number?
17          MR. PATTON:  Eight, six, four.
18          MR. GREENE:  We usually do the whole range,
19 but . . .
20 BY MR. PATTON
21      Q.  This indicates, does it not -- well, let me have
22 you identify Exhibit 4 as a UEP marketing committee
23 meeting, and it identifies Bob Sparboe as a member as of
24 May 16, 2000?
25          MR. HUTCHINSON:  Objection to form.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1 BY MR. PATTON
2   Q.  Do you see that?
3   A.  Mm-hmm.
4   Q.  On the front page there's a check next to his
5 name?
6   A.  Yes.
7   Q.  Do you have any reason to dispute that
8 Mr. Sparboe was not a member of the UEP marketing committee
9 as of this time period?
10   A.  I have no reason to confirm or dispute that he
11 was at this meeting.
12   Q.  And you have no reason to dispute that he was a
13 member of the marketing committee either, right?
14   A.  No.
15   Q.  All right.  Now, were you aware that as early
16 as 2000 the UEP marketing committee would encourage its
17 members to reduce their flocks by 5 percent and accelerate
18 or engage in molts?
19   A.  I was aware of that.
20   Q.  Are you on page 7870?
21   A.  Mm-hmm.
22   Q.  Yes?
23   A.  Yes.
24   Q.  And do you see that the marketing committee
25 approved the following plan of action on December 19 for

Page 107

1 the year 2000?
2   A.  Mm-hmm.
3   Q.  By no later than June 1 each member should reduce
4 their flocks by 5 percent and --
5       MR. HUTCHINSON:  I'm going to object to
6 your -- I'm sorry.
7       MR. PATTON:  I didn't finish my question.
8       MR. HUTCHINSON:  I'm sorry, Doug.
9 BY MR. PATTON:
10   Q.  -- and maintain it through July 1 and that by no
11 later than January 1 each member should molt 5 percent of
12 their flock.  Do you see that?
13       MR. HUTCHINSON:  I'm going to object to your
14 characterization of this document.  I don't see
15 Mr. Sparboe's name on the minutes.
16       THE WITNESS:  Right.
17       MR. HUTCHINSON:  Maybe I'm missing it.
18       WITNESS:  No, he -- it's not that he -- it
19 doesn't state that he was at the meeting.
20 BY MR. PATTON:
21   Q.  All right.  But he was --
22   A.  He is listed as a committee member, but it
23 doesn't -- this is identified as Washington and this is
24 identified as Dallas.
25   Q.  Right.

Page 108

1   A.  So I don't know which is which.
2   Q.  Is it possible that Mr. Sparboe didn't attend the
3 Dallas meeting?
4   A.  I can't confirm specifically which meeting
5 Mr. Sparboe attended.
6   Q.  But he was a member of the marketing committee
7 in 2000, right?
8   A.  This document states that he was a member of the
9 marketing committee, at least on the Washington document.
10   Q.  Okay.  Are you aware that Garth Sparboe was a
11 member of the government relations committee of the UEP
12 beginning in 2001?
13   A.  May I see that?  Sorry, I -- you know, these
14 are --
15   Q.  I'm happy to do it.
16   A.  It was a long time ago.
17       (Exhibit Number 5 was marked for identification
18       by Mr. Patton.)
19 BY MR. PATTON:
20   Q.  So let me hand you what's been marked as
21 Exhibit 5 to your deposition, and it bears Bates
22 stamp UE0308215.
23   A.  Okay.
24   Q.  And my questions will be that, can you, as
25 the 30(b)(6) witness of Sparboe, confirm that

Page 109

1 Mr. Garth Sparboe was a member of the government relations
2 committee, that Mr. Bob Sparboe was a member of the quality
3 assurance committee, and then Mr. Garth Sparboe was a
4 member of the UEP producer committee for animal welfare --
5       MR. HUTCHINSON:  Objection to form.
6 BY MR. PATTON:
7   Q.  -- as of 2001?  And I can show you, if you want
8 to follow me to page, I'm sorry, page 218, Bates numbers
9 ending 218.
10   A.  Okay.  Oh, gosh, sorry.
11   Q.  Do you see that's the government relations
12 committee?
13   A.  Yes.
14   Q.  If you turn the page, you'll see Mr. Sparboe's
15 name, Garth Sparboe?
16   A.  Yes, I see that.
17   Q.  If you turn to page 22- -- I'm sorry, 230.
18   A.  230?
19   Q.  That's the quality assurance committee, and if
20 you turn the page, you'll see Bob Sparboe's name?
21   A.  Bob Sparboe, yes.
22   Q.  Was quality assurance and food safety an
23 important concern of Mr. Bob Sparboe?
24   A.  I -- I don't know why he was on that particular
25 committee, but of course quality and food safety are

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 important to our company, yes.
2    Q.  And if you look at the last, the page 232,
3 there's the animal welfare committee, and you see
4 Garth Sparboe listed there as well?
5    A.  Yes.
6    Q.  Correct?
7    A.  Yes.
8    Q.  Now, if you turn the page to the last page,
9 you'll see the name Don Bell.  Do you know who Don Bell is?
10    A.  I do.
11    Q.  He's on the scientific advisory committee?
12    A.  Yes.
13    Q.  And Mr. Bell had advised Sparboe from time to
14 time on economic issues, had he not?
15    A.  I wouldn't confirm.  I don't know.
16    Q.  Do you know whether, do you have a recollection
17 if Mr. Bell actually advised Sparboe on the virtues of
18 forced molting?
19    A.  I don't recall.
20    Q.  Let me ask you, if you were aware that in 2002
21 Mr. Garth Sparboe continued on the government relations
22 committee, that Mr. Bob Sparboe also served on the quality
23 assurance committee, and Garth Sparboe also continued to
24 serve on the animal welfare committee, is that consistent
25 with your recollection?

Page 111

1    A.  May I see those?
2    Q.  Okay.
3        (Exhibit Number 6 was marked for identification
4        by Mr. Patton.)
5 BY MR. PATTON:
6    Q.  I'm going to hand you what's been marked as
7 Exhibit 6 to your deposition, and it's a document bearing
8 Bates Number CM00414891.  Turn to page CM0414895.
9    A.  Yeah.
10    Q.  Ending in 95, you'll see that Garth Sparboe is a
11 member of the government relations committee?
12    A.  I see that.
13    Q.  Turn to page 904, you'll see Bob Sparboe on the
14 quality assurance committee?
15    A.  Excuse me, 904.
16    Q.  And if you turn to the welfare committee on 905,
17 you'll see that it also lists Mr. Sparboe, Garth Sparboe,
18 as a member on the welfare committee, right?
19    A.  There it is, yes.
20    Q.  Yes, and that's consistent, is it not?
21    A.  With the previous year.
22    Q.  Yeah.  And as Sparboe's 30(b)(6) witness, you
23 don't dispute the accuracy or the fact that these, that
24 Mr. Sparboe and Mister -- both Mr. Bob Sparboe and
25 Garth Sparboe were members of these committees?

Page 112

1        MR. HUTCHINSON:  Objection to form.
2        WITNESS:  I will confirm that their names
3 are on these lists.
4 BY MR. PATTON:
5    Q.  So you, as Sparboe's 30(b)(6) witness, you're not
6 able to testify as to the membership of Bob Sparboe,
7 Garth Sparboe, and other individuals' participation on
8 UEP's committees?
9        MR. HUTCHINSON:  Objection to form.
10        WITNESS:  I think it's the term of
11 participation.
12 BY MR. PATTON:
13    Q.  Okay.  What's on these were listed as members of
14 these committees?
15    A.  Mm-hmm.
16    Q.  Do you dispute that?
17    A.  No, I said that.  I confirm that they're listed
18 as members of these committees.
19    Q.  Right.  And then 2004, are you aware that
20 Wayne Carlson became a member of the USEM?
21    A.  Yes.
22    Q.  And do you know what the USEM is?
23    A.  U.S. Egg Marketers.
24    Q.  All right.  And then Sparboe had participated
25 in -- as a member of the USEM and participated -- strike

Page 113

1 that.
2        Sparboe was a member of the USEM, right?
3    A.  Yes.
4    Q.  And it had been, at least starting in 2000?
5    A.  I don't know the beginning date of when we were
6 members of U.S. Egg Marketers.
7    Q.  And as a participant in the U.S. Egg Marketers,
8 Sparboe exported markets out of the United States; is that
9 right?
10    A.  Yes.
11    Q.  And it did that through the USEM?
12    A.  Correct.
13    Q.  And did it pay dues into the USEM?
14    A.  I don't know.
15    Q.  In 2004, how would we find that out?  Is there
16 records of dues paid?
17    A.  I would believe so, yes.
18    Q.  And would those be hard to find?
19    A.  No, I don't think so.
20    Q.  And as far as dues that Sparboe paid to the UEP,
21 would there be records of those dues also?
22    A.  It depends on how far back our records are.
23    Q.  Okay.  Do you have a rough idea of how much you
24 paid as a member of UEP?
25    A.  I do not.

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  Q.  Do you know how --
2         MR. HUTCHINSON:  Objection to form.
3  BY MR. PATTON
4    Q.  Are you aware, at least that when Sparboe
5  rejoined the UEP in 2007, its dues were about $35,000 a
6  year?
7    A.  In 2007?
8    Q.  Yeah.
9    A.  That sounds about right.
10   Q.  So would you think that during the 2000-2005 time
11 period Sparboe paid roughly around $30,000, $35,000 a year
12 to be a member of the UEP?
13        MR. HUTCHINSON:  Objection to form.
14        WITNESS:  I can't confirm that.
15 BY MR. PATTON
16   Q.  Do you know how dues at the UEP are assessed?  Is
17 it based on market share?
18   A.  I don't recall specifically.
19   Q.  Is it based on sales?
20   A.  I think it's --
21        MR. HUTCHINSON:  Objection to form.
22        WITNESS:  I don't know.
23 BY MR. PATTON
24   Q.  You have no idea how dues --
25        MR. HUTCHINSON:  Objection; asked and

Page 115

1 answered.
2 BY MR. PATTON
3    Q.  Do you have an understanding how the UEP
4  determined the dues that Sparboe paid as a --
5    A.  At which time?
6    Q.  From 2000 to 2005.
7        MR. HUTCHINSON:  Same objection.
8        And remember to wait until Mr. Patton is
9  done --
10       THE WITNESS:  Okay.
11       MR. HUTCHINSON:  -- speaking to start
12 answering.
13       WITNESS:  I believe dues are assessed based
14 on your bird population.
15 BY MR. PATTON
16   Q.  Okay.  So the number of the flock size?
17   A.  Correct.
18   Q.  Bigger the flock, the bigger the dues?
19   A.  I -- I -- there may -- I -- I don't know.
20       MR. PATTON:  Okay.  We can take a break.
21       VIDEOGRAPHER:  We are going off the record.
22       The time is 11:26 a.m.
23       (A break was taken.)
24       (Exhibit Number 7 was marked for identification
25       by Mr. Patton.)

Page 116

1         VIDEOGRAPHER:  We are back on the record.
2         This marks the beginning of videotape number
3  two in the deposition of Beth Schnell.
4         The time is 11:45 a.m.
5  BY MR. PATTON
6    Q.  Ms. Schnell, I've placed in front of you
7  Exhibit 7, and it is, it bears Bates Number NL0000085, and
8  it is committee appointments for 2004 for the
9  United Egg Producers.  Do you see that?
10   A.  I do.
11   Q.  And you became a member of the marketing
12 committee, did you not, in 2004?
13   A.  I did.
14   Q.  And do you see your name listed as a member?
15   A.  Yes.
16   Q.  And how was it that -- or why did you join the
17 marketing committee?
18   A.  I was asked to join.
19   Q.  By whom?
20   A.  By UEP, I believe.
21   Q.  And did you refuse?
22   A.  No.  I went to a meeting.
23   Q.  Who from the UEP asked you to join?
24   A.  I think I was invited by Gene Gregory.
25   Q.  And Mr. Gregory's position was what?

Page 117

1    A.  Vice president at the time.
2    Q.  He worked with Al Pope [phonetic]?
3    A.  Yes.
4    Q.  And if you turn, what do you understand your
5  duties and responsibilities to be on the marketing
6  committee?
7    A.  I really wasn't sure.  I wasn't a member.  I
8  hadn't gone to a lot of UEP meetings, and I really wasn't
9  sure, to be honest, what the responsibility was.
10   Q.  Did you consult with anybody within Sparboe to
11 determine what your responsibilities were?
12   A.  No.  I think at that time we thought it would be
13 important to learn, I mean, to learn about what was going
14 on, and I didn't really understand specifically what the
15 committee did at the time.
16   Q.  Well, because Mr. Sparboe had been on the
17 committee, so I'm curious --
18   A.  Right, right.
19   Q.  -- if you conferred with him.
20   A.  My guess is, I was asked to replace him after he
21 didn't participate.
22   Q.  Now, if you turn to NL0000098, you'll see
23 Mr. Mueller's name --
24   A.  Yes.
25   Q.  -- for Sparboe company, and he's listed on the

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 environmental committee. Do you see that?

2    A. Correct.

3    Q. Why was Mr. Mueller participating on the

4 environmental committee of the UEP?

5    A. John's role as our -- John's role in our company

6 was to deal with matters of the environment, permitting, so

7 understanding what was going on with the EPA, understanding

8 all of those kinds of things, which are very important in

9 terms of expanding, and any time you do anything in terms

10 of building a new barn there was a lot of permitting

11 issues, and that was John's responsibility in our company.

12    Q. So in addition to giving legal advice to the

13 company, he was also involved in permitting and having to

14 understand environmental issues?

15    A. Compliance matters, yes.

16    Q. Do you know if he needed special legal skills or

17 knowledge in order to be a member of the environmental

18 committee?

19    A. No, I don't believe so.

20    Q. Okay.

21    A. I don't. Not that I'm aware of.

22    Q. Okay. And if you look at the quality and

23 assurance page, which is 99, you'll see that

24 Mr. Wayne Carlson joined the quality and assurance

25 committee and he replaced Mr. Sparboe. Is that right?

Page 119

1    A. Yes.

2    Q. And was it Mr. Sparboe that asked Wayne to be on

3 the committee?

4    A. I assume so, yes.

5    Q. So we've seen now, at least for two or three

6 years, that Sparboe had at least three members of its

7 business on various members of the UEP, right?

8    A. Right. At this time we were engaged with the

9 work UEP was doing, which would benefit our company as

10 well, food safety, understanding what was going, regulatory

11 environment, legislative, Washington matters, and it was

12 important to be -- these committees ran concurrent at the

13 same time, and so if you didn't have somebody in each room,

14 you might not get the information.

15    (Exhibit Number 8 was marked for identification

16    by Mr. Patton.)

17 BY MR. PATTON

18    Q. Let me hand you what's been marked as Exhibit 8

19 to your deposition, and it is a document bearing

20 CMO000189887, and it is the UEP marketing committee minutes

21 from May 10, 2004, and I'm going to apologize. There's

22 some highlighting on this document that came through on the

23 copy, and maybe I can get that switched out at some point,

24 but it's not going to affect your ability to read the

25 document.

Page 120

1    MR. HUTCHINSON: Thank you.

2 BY MR. PATTON

3    Q. Now, Exhibit 8 is marketing committee minutes

4 from May 10, 2004, and do you see that your name is listed

5 as one of the committee members?

6    A. Yes.

7    Q. Do you recall attending this meeting in May?

8    A. I do not.

9    Q. If you look --

10    A. It looks like I was present.

11    Q. And one of the things that was reviewed was the

12 prior minutes from January 26, 2004. Do you see that?

13    A. Could you rephrase the question?

14    Q. Sure. If you look at the agenda for the

15 May 10, 2004, meeting, it was -- the number two point on

16 the agenda is minutes of the January 26, 2004, meeting. Do

17 you see that?

18    A. Yes, yes.

19    Q. If you turn the page, you'll see the

20 January 26, 2004 --

21    A. Yes.

22    Q. -- minutes of the marketing committee, and you

23 were in attendance --

24    A. Yes.

25    Q. -- at that, too?

Page 121

1    A. Yes.

2    Q. And that was in Atlanta, Georgia?

3    A. Yes.

4    Q. And do you recall, as you sit here today, going

5 to that meeting in Atlanta, Georgia?

6    A. I believe so, yes.

7    Q. And, well, what do you recall being discussed at

8 that meeting?

9    A. I was -- that was ten years ago.

10    Q. Okay.

11    A. I don't specifically remember.

12    Q. Well, one of the things that were reviewed at the

13 marketing committee meetings was the -- were statistics of

14 the pullet hatches and chick hatches and that type of

15 information?

16    A. Mm-hmm.

17    Q. And yes?

18    A. I see that here, yes.

19    Q. You would review statistics of pullet hatch, hen

20 slaughter, laying hen numbers; is that right?

21    A. Yes.

22    MR. HUTCHINSON: Objection to form.

23 BY MR. PATTON

24    Q. Now, let me have you turn to page 899 of this

25 document, and these are attached to the January 2004

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

1 minutes. Do you see where it says, "Animal care certified
2 program has resulted in 24 million less pullets being
3 hatched since April 2002 than the comparable 23 preceding
4 months"?
5    A. Mm-hmm, yes.
6    Q. Do you see that? Was it your understanding that
7 one of the purposes of the animal care certified program
8 was to reduce pullet hatch?
9    A. I don't understand that.
10    Q. You have no understanding of what this reference
11 is to?
12    A. This -- I can see what this document is
13 referencing, but I can speak only for our company.
14    Q. Well, you were at this meeting, and so I'm trying
15 to ask you.
16    A. But that doesn't -- yeah, okay.
17    Q. What I'm trying to ask you, at this meeting, it's
18 true, is it not, that a presentation was made indicating
19 that the animal care certified program had resulted
20 in 24 million less pullets hatched in the preceding 23
21 months, right?
22    A. Mm-hmm, yes.
23    Q. Now, at this meeting did you object or raise any
24 concerns to that finding?
25    A. What I can tell you is Sparboe Farms consistently

1 believed that the animal care program was designed to deal
2 with the animal rights, desires, for our company to comply
3 with husbandry guidelines that were acceptable to that
4 community. Sparboe Farms never ever bought into a program
5 that would reduce supply or in any way do anything to head
6 to the market. Our commitment was strictly to dealing with
7 the animal husbandry needs, and I think that's what I know
8 for sure, and we never signed on to any supply reduction.
9 We never engaged in any of these activities, so if this was
10 a part of a meeting --
11    Q. So thank you for that response, but did
12 Garth Sparboe tell you that?
13    A. Tell me what?
14    Q. What you just said, because from what I can see,
15 Mr. Garth Sparboe and Bob Sparboe were acutely aware of the
16 fact that the guidelines and the certification program that
17 extend out of that were specifically designed to reduce the
18 output of eggs in United States.
19        MR. HUTCHINSON: Objection to form,
20 argumentive.
21        WITNESS: The Sparboe Company was supporting
22 the science about the animal care program from the very
23 beginning, engaged, and actively engaged, in the science in
24 a way that would allow us to meet our customers'
25 expectations for animal husbandry guidelines, and early on

1 in the program of developing those guidelines, the
2 Sparboe Company never engaged or complied with anything
3 that had to do with anything that had to do with any kind
4 of supply reduction.
5 BY MR. PATTON:
6    Q. So is it your testimony that during the
7 development of the UEP 2000 and 2002 guidelines, Sparboe
8 had no knowledge of the purpose of the guidelines was to
9 reduce egg output and raise prices?
10        MR. HUTCHINSON: Objection to form.
11        WITNESS: Yeah, I don't know. I can't
12 confirm that that was the -- I don't believe that was the
13 objective of the program.
14 BY MR. PATTON:
15    Q. You don't believe that both Mr. Bob Sparboe and
16 Garth Sparboe knew exactly that the UEP guidelines and the
17 certification program that followed later were supply
18 restriction?
19    A. I can't confirm that, but Sparboe -- the
20 Sparboe Company had -- we had issues with the ability to
21 comply with what UEP and FMI required us to do with
22 the 100 percent rule, which was why a few years later we
23 withdrew from this program and developed our own program,
24 which was an animal husbandry program that did not require
25 us to have 100 percent rule, which FMI and UEP were

1 required through the current program.
2    Q. You said the UEP required that?
3    A. Correct.
4    Q. Okay. If you turn to the page, turn to the
5 page 900, which is one of the slides from the meeting that
6 you were at, do you see three? It says, "The cage space
7 guidelines will continue to require less hens per house."
8        Do you see that?
9    A. Mm-hmm, yep.
10    Q. Now, you understand that the UEP guidelines, as
11 part of their guidelines, had a cage space limitation that
12 was a phase in?
13    A. Yep.
14    Q. When you saw this, did you understand what they
15 meant, that the cage space will continue to require less
16 hens per hen per house?
17    A. That was the basis of the program.
18    Q. All right. And less hens means less eggs, right?
19        MR. HUTCHINSON: Objection to form.
20        WITNESS: No, not necessarily.
21 BY MR. PATTON:
22    Q. Well, I'm curious about that because --
23    A. Because you just -- we just build more barns in
24 order to meet our customers' demand, so that didn't mean
25 that the customers weren't buying any less eggs. You had

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1 to expand, and we added a lot of chicken barns during those
2 years in order to meet the need of our customers.
3    Q.  Do you understand that the UEP had been
4 cautioning and advising its members not to build new farms?
5    A.  I can't speak to what the UEP was doing.
6    Q.  Well, let's turn the page.  This meeting that you
7 were at, one of the cautions is, "Will we expand too
8 rapidly?"
9        And do you see where it says, "The answer is no.
10 Collectively, as producers build facilities to replace lost
11 production, we will create a national surplus below the
12 cost of production even while still meeting guidelines in
13 the animal aware program, animal care certification
14 program"?
15    A.  Mm-hmm.
16    Q.  Do you see that?
17    A.  I do.
18    Q.  Wasn't that one of the things that the UEP was
19 warning against, that its members not build new farms?
20    A.  I think you'll have to ask UEP that.
21    Q.  Well, as a member of the marketing committee,
22 isn't that something you were advocating members not do?
23        MR. HUTCHINSON:  Objection; asked and
24 answered.
25        WITNESS:  That was never anything I

Page 127

1 personally or our company advocated.
2 BY MR. PATTON
3    Q.  Let's look at 2005.  You were still a member of
4 the marketing committee in 2005; is that correct?
5    A.  We withdrew from UEP in the summer of 2005, so
6 depending on what meeting you're looking at.
7    Q.  Well, I'm just saying in the beginning of 2005
8 you were still appointed to the committee, right?
9    A.  I may have been.  May I see that document?
10    Q.  Sure.  I'm going to mark Exhibit 9 to your
11 deposition.
12        (Exhibit Number 9 was marked for identification
13        by Mr. Patton.)
14 BY MR. PATTON
15    Q.  Exhibit 9 is a list of UEP committee appointments
16 for 2005, bearing UE0754510.  If you turn to the page
17 that's entitled "Shell Egg Marketing Committee," which
18 is 517, you'll see that you're listed as a member, correct?
19    A.  Yes.
20    Q.  And so was that a two-year obligation?
21    A.  I don't recall.
22    Q.  Well, you were on the committee for '04, and now
23 you're on for '05, right?
24    A.  My name is on the list.
25

Page 128

1        (Exhibit Number 10 was marked for identification
2        by Mr. Patton.)
3 BY MR. PATTON
4    Q.  Let me show you what's been marked as Exhibit 9
5 to your deposition, I'm sorry, 10 to your deposition, and
6 these are the minutes of shell egg marketing committee
7 dated January 2005, and bearing Bates stamp 0E- -- start
8 again -- bearing Bates Number UE0309066.
9        MR. SLIDDERS:  Could you repeat that Bates
10 number, please?
11        MR. PATTON:  UE0309066.
12 BY MR. PATTON
13    Q.  Exhibit 10 is a shell egg marketing committee, I
14 guess meeting report, and it shows you, your name being
15 checked on the front page.  Do you see that?
16    A.  Yes.
17    Q.  And you know that you also attended an
18 October 20, 2004, meeting in New Orleans?
19    A.  In 2004.
20    Q.  Do you recall going to New Orleans for that
21 meeting?
22    A.  Yes, I do.
23    Q.  If you turn the page, you'll see where it says on
24 the second page, I'm sorry, on page Bates-numbered 069
25 there is a heading that reads area recommendations.  Do you

Page 129

1 see that?
2    A.  Yes.
3    Q.  And it says, "Develop a program to reduce the
4 flock by 5 percent with the goal of reducing the nation's
5 flock size by 8 to 10 million."
6        Were you present when there was a discussion of
7 marketing committee members to develop a flock reduction
8 by 5 percent?
9    A.  I recall that meeting.
10    Q.  Yeah, and how would the members of the committee
11 institute such a program, if you recall?
12        MS. LEVINE:  Object to the form of the
13 question.
14        COURT REPORTER:  I'm sorry, who is speaking?
15        MS. LEVINE:  Jan Levine, counsel for UEP.
16        WITNESS:  Could you restate your question?
17 BY MR. PATTON
18    Q.  Sure.  How would -- as a member of this
19 committee, how were you to develop a program to reduce
20 flock by 5 percent?  How were you going to go about it?
21        MS. LEVINE:  Object to the form of the
22 question.
23        MR. HUTCHINSON:  Object to the form.
24        WITNESS:  I'm not -- I think you need to
25 ask UEP that question.

33 (Pages 126 - 129)

BY MR. PATTON
Q. As a member of the committee, wouldn't you recommend to the membership to take a vote on that and then there would be a vote?
A. I believe this document says there was a vote, does it not?
Q. Yeah. And it was carried, was it not?
A. It appears to have been carried.
Q. So the --
A. I did not vote for this.
Q. Oh, Sparboe didn't vote for it?
A. We did not vote for this.
Q. You recall that?
A. I absolutely recall that. Nor did we comply with any of this.
Q. Was it important, however, for Sparboe to, in its presence at the membership meeting, support the flock reduction program?
A. Could you please restate that?
Q. Sure. If Sparboe, if you're saying Sparboe didn't comply with this, wasn't it in your best interest to make sure that other suppliers did comply with the flock reduction?
A. No.
Q. If other members reduced their flocks by five

percent, wouldn't that raise or have the potential of raising the price of eggs nationally?
A. Absolutely. We had no interest in that. I -- none.
Q. Let me have you -- why do the minutes not reflect here that you voted against it?
A. UEP did not report minutes that way.
Q. So, well, I've seen minutes where it says vote, no vote, or pass but one no vote.
A. Have you?
Q. Yeah. Are you absolutely certain you voted against this?
MR. HUTCHINSON: Objection; asked and answered.
WITNESS: I've answered that.
MR. HUTCHINSON: The document nowhere says that this was carried unanimously.
BY MR. PATTON
Q. But as a member of the committee, the committee, the vote carried by committee, right?
A. Apparently.
Q. And did you take any efforts to encourage people to not pursue a 5 percent molt?
A. I didn't feel that was my -- no, I don't know. No, I would not have taken any motion, any. I would never

take any action to tell a competitor what to do with their supply.
Q. There's -- towards the end of this document there's a presentation that was made, and it bears UE082, and I'll hold it up so you can see it.
Do you see that chart? It says benefit of reducing at 95 percent capacity?
A. Mm-hmm.
Q. Is that a "yes"?
A. I see that.
Q. Yes. This is a chart that explains how by reducing a flock by 5 percent egg prices go up, does it not?
MR. HUTCHINSON: Objection to form.
WITNESS: Yes, it does say that.
BY MR. PATTON
Q. That's simple economics, right? When supply is tight, price goes up?
MR. HUTCHINSON: Objection to form.
WITNESS: I can't speak to this document. Gene Gregory was the staff person for UEP for this committee and these were documents that he created and would have presented to the committee. This in no way reflects Sparboe's thinking or my personal thinking as it relates to this issue.

BY MR. PATTON
Q. But this was presented at a committee that you were on, right?
A. I was at this committee, yes, on this committee.
Q. And if you go to the previous page, you'll see it says supply-demand relationship between price. I'm sorry, it's the page probably right behind it, supply-demand relationship with price.
A. Mm-hmm.
Q. Is it consistent with your view that annual population increases by about 1 percent?
A. Human population?
Q. Yeah.
A. That's -- I think that's understood.
Q. And so when -- in projecting egg supply, is it understood that egg supply can increase by 1 percent just to account for population growth?
MR. HUTCHINSON: Objection; calls for speculation.
WITNESS: And there are other variables in terms of demand and the products that are used and export and disease. Demand might not stay the same, but disease might or you might have a disease in one state that wipes out 1 or 2 percent of the egg -- or the flock, so there are many, many variables that impact supply.

HIGHLY CONFIDENTIAL

Page 134

1 BY MR. PATTON
2   Q. And when that happens, price goes up?
3   A. When what happens?
4   Q. When there's a supply restriction?
5       MR. HUTCHINSON: Objection to form.
6       WITNESS: Not always, no.
7 BY MR. PATTON
8   Q. Well, let's look at this one, benefit of
9 production at 95 percent capacity, that we have in front of
10 you, Bates Number 82. This indicates, does it not, that
11 by -- in the little boxes there, that by -- the example
12 he's giving is 100,000 hens, and if you reduce that
13 to 95,000 hens, egg prices goes from 67 cents to 82 cents.
14     Do you see that?
15   A. I do.
16       MR. HUTCHINSON: Objection to form.
17 BY MR. PATTON
18   Q. Huh?
19   A. Yes, I see that.
20   Q. And was this something you were discussing and
21 acknowledging at the marketing committee?
22   A. I don't recall what the context of that
23 particular meeting was, but I would have to defer to
24 Mr. Gregory.
25   Q. I mean, did you stand up and dispute that and

Page 135

1 say, I've got other economics that don't support that
2 theory?
3   A. I did not stand up and say that I have other
4 economics that dispute that theory.
5   Q. Okay. Let me ask you about 2006. In 2006, did
6 you become -- were you a member of the UEP marketing
7 committee, I'm sorry, the government relations committee?
8   A. Personally?
9   Q. Yeah, I have -- I'm going to ask you, or I can
10 mark it. I have minutes. I have a list of appointments
11 from 2006, and it shows you as a member of the government
12 relations committee.
13       MR. HUTCHINSON: Objection to form.
14       WITNESS: I can't confirm that.
15 BY MR. PATTON
16   Q. Let me mark it just in case and we'll deal with
17 that. Because there came a point where you, where Sparboe
18 temporarily, I guess is the word, quit the UEP?
19   A. I don't --
20       MR. HUTCHINSON: Objection to form.
21     (Exhibit Number 11 was marked for identification
22     by Mr. Patton.)
23       MR. HUTCHINSON: Thank you.
24 BY MR. PATTON
25   Q. If you turn to -- this is Bates-stamped

Page 136

1 Bell-D-00027071.
2   A. Mm-hmm.
3   Q. And you see you're listed as a member of the
4 government relations committee in 2006?
5   A. I see my name on this list, but I was never a
6 member of the government relations committee of UEP.
7   Q. So this is an error probably?
8   A. We were not members of UEP in 2006. This
9 document looks like it was drafted in October of 2005, and
10 we were no longer members of UEP, so I couldn't have been
11 on the committee.
12   Q. When did UEP rejoin the --
13     (REPORTER'S NOTE): Interruption by
14 teleconference administration.)
15       MR. HUTCHINSON: We better go off the
16 record.
17       MR. PATTON: Okay.
18       VIDEOGRAPHER: We are going off the record.
19     The time is 12:09 p.m.
20   (Discussion was held off the record.)
21   (A lunch break was taken.)
22       VIDEOGRAPHER: We are back on the record.
23     The time is 1:21 p.m.
24     * * * * * * * * * *
25     AFTERNOON SESSION

Page 137

1       MR. PATTON: I am suspending my questions of
2 the witness at this time.
3       MS. SCHWARTZ: And so I'm ready to begin.
4     This is Rachel Schwartz on behalf of the
5 Kansas plaintiffs. This deposition was cross-noticed in
6 the Kansas case as a continuation of the notice that
7 plaintiffs had originally served. It's 1:21 and I am ready
8 to begin questions of the witness with regard to what she's
9 already been discussed today, and there is no witness here
10 in the room as of 1:21.
11     And at 1:11 today I received an email from
12 Molly Crabtree copying Troy Hutchinson, saying, and I'll
13 read it in full, quote:
14     "Troy, per our conversation, we agree
15     that Rose Acre will renotice Ms. Schnell's
16     deposition on a future date other than
17     today. The notice for today is withdrawn,
18     and once we have a date that works for
19     everyone, we are happy to reissue it.
20     Thanks, Molly."
21     That's the entire email that I received
22 today at 1:11 p.m., following the lunch break in this
23 deposition. The plaintiffs in the Kansas case have
24 incurred the cost, the substantial cost and time to fly
25 here from Kansas City for the deposition today. I am

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1 prepared to begin the questions we have for the witness.
2 The witness never returned from lunch, and the first we
3 hear about this deposition being canceled is by an email
4 at 1:11 today.
5          We will object to any attempt to reschedule
6 this deposition. There is plenty of time available today.
7 We have approximately five more hours at a minimum that are
8 available even under the seven-hour rule, which is not
9 applicable to Kansas.
10          And in addition to this, I asked off the
11 record prior to coming onto the record whether there was an
12 emergency that led to this rescheduling and there is none.
13 There is no medical condition. There is no family
14 emergency. There is no emergency that is the basis for
15 rescheduling this deposition. It has just been
16 unilaterally canceled with an intent to reschedule it,
17 which we will object to, and we will also go to the court
18 to seek our costs and expenses for flying out today with --
19 to take questions of the witness who did not even return
20 after the lunch break.
21          MR. HUTCHINSON: Let me make a brief record
22 in response to that.
23          Ms. Schwartz, do you have a deposition
24 notice that you noticed a deposition today?
25          MS. SCHWARTZ: We were cross-noticed in this

Page 139

1 case, and flew all the way out here for a deposition that
2 began this morning.
3          MR. HUTCHINSON: But you did not notice the
4 deposition?
5          MS. SCHWARTZ: The testimony that was taken
6 this morning is applicable to the Kansas case, and --
7          MR. HUTCHINSON: So --
8          MS. SCHWARTZ: -- it is a continuation of
9 the deposition notice that was previously served by the
10 plaintiffs in the Kansas case.
11          MR. HUTCHINSON: Well --
12          MS. SCHWARTZ: That's specifically what the
13 cross-notice says.
14          MR. HUTCHINSON: -- you previously took
15 deposition, and defendants noticed Ms. Schnell and Sparboe
16 for today so that they had an opportunity to conduct cross
17 of your direct examination that you already had, so they've
18 now withdrawn that for today to reschedule it later, and
19 that's all that's happening. You'll have an opportunity to
20 appear later as well, but they've withdrawn that notice.
21 You didn't notice a deposition for today. That's all
22 that's happening.
23          MS. SCHWARTZ: And as you know, Troy, at the
24 first day of the deposition with this witness, the
25 deposition was cutoff unilaterally again by Sparboe. There

Page 140

1 was refusal by Sparboe to produce the witness for a second
2 day of 30(b)(6) testimony despite again traveling out to
3 Minnesota to take this deposition. We've now done this a
4 second time. We are not even given the opportunity today
5 to follow up on questions that have been taken this morning
6 for testimony that the defendants intend to use in the
7 Kansas case and was noticed for the Kansas case and we're
8 not even given the opportunity to discuss those topics --
9          MR. HUTCHINSON: Well --
10          MS. SCHWARTZ: -- much less the other
11 topics.
12          MR. HUTCHINSON: -- that's not true,
13 Ms. Schwartz. The deposition, the first deposition that
14 you took already, you had over a full day. It was late in
15 the evening when we finished that for the day, and you have
16 an opportunity at some point in the future to take
17 additional testimony. No one's denied you that
18 opportunity. It's just not going to happen today. We'll
19 reschedule it for a mutually agreed upon date.
20          MR. SLIDDERS: For the indirect purchaser
21 plaintiffs' perspective, can I confirm firstly that will
22 there will be no further questions of Ms. Schnell today,
23 and that the indirect purchaser plaintiffs will also be
24 given the opportunity to take further testimony in the
25 future?

Page 141

1          MR. HUTCHINSON: No, absolutely not.
2 Sparboe is not a party to that case. We have never
3 received a subpoena from the indirect purchasers, and as
4 far as we're concerned, we have nothing to do with that
5 case.
6          MR. SLIDDERS: Okay. So your
7 representations to the court and an email to Mr. Bovans
8 that you would allow us to participate informally does not
9 apply in the future?
10          MR. HUTCHINSON: There's no deposition in
11 the MVL case at this point. If there is in the future, we
12 can talk about it, but there's no deposition going forward
13 today.
14          MR. SLIDDERS: Is there depositions going
15 forward tomorrow of Mr. Mueller?
16          MR. HUTCHINSON: That remains to be seen.
17 We can let you know at -- probably today, but my -- I
18 anticipate that all those depositions this week will be
19 postponed.
20          MS. SCHWARTZ: Does that include the Cargill
21 deposition for this week as well?
22          MR. HUTCHINSON: I did not notice that
23 deposition.
24          MS. SCHWARTZ: Well, let's make it clear on
25 the record today as to whether the deposition for tomorrow

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1 is going forward. That's also been cross-noticed in the
2 Kansas case.
3          MR. HUTCHINSON: That deposition is not
4 going forward tomorrow.
5          MR. SLIDDERS: That's the deposition of
6 Mr. Mueller?
7          MR. HUTCHINSON: Correct.
8          MR. SLIDDERS: The deposition of Mr. Carlson
9 scheduled for Thursday?
10          MR. HUTCHINSON: That is not going forward.
11          MR. SLIDDERS: The deposition of Mr. Sparboe
12 scheduled for Friday?
13          MR. HUTCHINSON: That is not going forward.
14 That's my understanding.
15          MR. SLIDDERS: Well, can we take that on the
16 record now as confirmation that they are not going forward?
17          MR. HUTCHINSON: Mr. Patton?
18          Mr. Patton noticed them, so I will defer to
19 him.
20          MR. PATTON: I'm standing down from those
21 notices.
22          MR. SLIDDERS: When you say you're standing
23 down from those notices, are you putting those back in
24 abeyance?
25          COURT REPORTER: I'm sorry, I didn't hear

Page 143

1 that.
2          MR. SLIDDERS: Are you putting those notices
3 in abeyance?
4          MR. PATTON: I don't -- I'm not going to go
5 forward with them tomorrow. That's all I can say.
6          MR. SLIDDERS: And can you confirm that
7 you're not going forward with them on Thursday and Friday?
8          MR. PATTON: Yes.
9          MR. SLIDDERS: Okay. So the depositions of
10 Mr. Mueller, Mr. Carlson, and Mr. Sparboe, and the rest of
11 the deposition of Ms. Schnell, Sparboe, Schnell, will not
12 be proceeding this week; is that correct?
13          MR. HUTCHINSON: That's correct.
14          MS. SCHWARTZ: And just for the record, the
15 deposition of Mr. Mueller was also cross-noticed in the
16 Kansas case. We had traveled to Minneapolis in part to
17 participate in Ms. Schnell's depo and in Mr. Mueller's
18 deposition and would object again to any attempt to
19 renotice those in the Kansas case.
20          Again, there's been no articulation of an
21 emergency or anything else that has come up today that
22 would prompt the rescheduling of these depositions, and
23 counsel are all here present and ready to proceed and we've
24 been told we cannot.
25          MS. CRABTREE: This is Molly Crabtree.

Page 144

1          I do not know what's going on, but we have
2 not withdrawn the Mueller notice. I don't know if we will
3 or not.
4          MS. SCHWARTZ: Well, that needs to be
5 figured out right now, and we want to put this on the
6 record.
7          MR. SLIDDERS: As far as we're concerned,
8 Mr. Hutchinson has represented that the Mueller deposition
9 will not be going forward tomorrow.
10          MR. HUTCHINSON: That's true. We agreed to
11 produce him because he was noticed in the MVL. He's a
12 third party, a nonparty. He was never subpoenaed, but we
13 agreed to produce him. Mr. Patton has indicated that
14 deposition is not moving forward tomorrow, so Mr. Mueller
15 will not be appearing tomorrow, but for the defendants who
16 noticed him for tomorrow in the Kansas case, we can agree
17 to a later date that's mutually convenient for the parties
18 and the witness.
19          MS. CRABTREE: Rose Acre can't compel him to
20 appear tomorrow because we did not subpoena him, so we'll
21 have to work out -- we have no control over whether he
22 shows up tomorrow or not.
23          MR. HUTCHINSON: Right. And we'll agree to
24 make him available at a later date.
25          MS. SCHWARTZ: Is there anybody on the line

Page 145

1 who can confirm whether or not the Cargill deposition is
2 going forward this week that's also here in Minneapolis?
3          MS. CRABTREE: Rachel, what day is that?
4          MS. SCHWARTZ: It's also Thursday.
5          MR. HUTCHINSON: Are we done with the record
6 or --
7          MS. SCHWARTZ: Well, no. I want this on the
8 record as well.
9          MR. HUTCHINSON: Because that was noticed by
10 a party that's not represented today. It was represented
11 by Daybreak, who has no attorney here today, so I don't
12 think anyone can tell you that. But I don't think the
13 goings on of Sparboe depositions will impact notices that
14 Daybreak sent to some other party. I don't think that. I
15 don't think there's any relation.
16          MS. SCHWARTZ: Troy, will you just confirm
17 on the record, so that there's no confusion about this
18 later in the day, Ms. Schnell has not had a medical
19 emergency come up today, correct?
20          MR. HUTCHINSON: I'm not going to get into
21 Ms. Schnell's health, but I -- you know, that's not the
22 reason that the deposition has been canceled, Rachel.
23          MS. SCHWARTZ: Then can you say on the
24 record, what is the basis for the cancellation today?
25          MR. HUTCHINSON: I'd rather not.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1        MS. SCHWARTZ:  And we have that on the
2 record.  That's fine.  I just wanted to make sure that was
3 on the record.  I don't think there's anything else we need
4 on the record.
5        MR. SLIDDERS:  That's for all?  Are you sure
6 that's for all three witnesses coming in the next three
7 days?
8        MR. HUTCHINSON:  I'm sorry?
9        MR. SLIDDERS:  You're not prepared to share
10 a reason for why the depositions with Mr. Mueller,
11 Mr. Carlson, and Mr. Sparboe will not be proceeding in the
12 next three days?
13       MR. HUTCHINSON:  Oh, I know why they're not
14 proceeding.  Mr. Patton has decided to not go forward with
15 those depositions this week, and he's the party that
16 noticed them, so . . .
17       MR. SLIDDERS:  Yep.
18       COURT REPORTER:  Can the parties please
19 state their transcript preferences on the record, if they
20 want a copy?
21       MS. SCHWARTZ:  Yeah, you've got -- hopefully
22 they should have --
23       MR. SLIDDERS:  We've got standing --
24       COURT REPORTER:  Everybody's got a standard
25 order?

Page 147

1       MR. PATTON:  (Nods head.)
2       MR. HUTCHINSON:  (Nods head.)
3       MR. SLIDDERS:  Yeah.
4       MS. SCHWARTZ:  Yeah.
5       VIDEOGRAPHER:  This marks the end of the
6 deposition.  Going off the record at 1:32 p.m.
7       (The deposition was concluded at 1:32 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1       REPORTER'S CERTIFICATE
2 STATE OF MINNESOTA  )
            ) SS
3 COUNTY OF RAMSEY   )
4    I hereby certify that I reported the videotaped
    deposition of BETH SPARBOE SCHNELL on April 22, 2014, in
5 Wayzata, Minnesota, and that the witness was by me first
    duly sworn to tell the whole truth;
6
7    That the testimony was transcribed by me and is a true
    record of the testimony of the witness;
8
9    That the cost of the original has been charged to the
    party who noticed the deposition, and that all parties who
10 ordered copies have been charged at the same rate for such
    copies;
11
12   That I am not a relative or employee or attorney or
    counsel of any of the parties, or a relative or employee of
13 such attorney or counsel;
14   That I am not financially interested in the action and
    have no contract with the parties, attorneys, or persons
15 with an interest in the action that affects or has a
    substantial tendency to affect my impartiality;
16
17
18
19   WITNESS MY HAND AND SEAL THIS 2nd day of May 2014.
20
21
22
23
24      Anne Hegerman, Court Reporter
       Notary Public, Ramsey County, Minnesota
25      My commission expires January 31, 2016.

Page 149

1    ACKNOWLEDGMENT OF DEPONENT
2    I, BETH SPARBOE SCHNELL , do hereby certify
3 that I have read the foregoing transcript of my
4 testimony taken on 4/22/14, and further certify
5 that it is a true and accurate record of my
6 testimony (with the exception of the corrections
7 listed below):
8 Page  Line       Correction
9 ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21
      _____
      BETH SPARBOE SCHNELL
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 20___.
24
  _____   _____
25 (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

VERITEXT REPORTING COMPANY
212-279-9424    www.veritext.com    212-490-3430