# ATTACHMENT 66

HIGHLY CONFIDENTIAL

Stocker, Norm                                            April 24, 2014

1

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA
_____
                                |
                                |
IN RE: PROCESSED EGG PRODUCTS   |   MDL NO. 2002
                                |
ANTITRUST LITIGATION            |   08-MD-02002
                                |
_____
                                |
THIS DOCUMENT RELATES TO ALL    |
                                |
ACTIONS                         |
                                |
_____


IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
TWENTY-NINTH JUDICIAL DISTRICT

_____
                                |
ASSOCIATED WHOLESALE GROCERS,   |
INC., et al.,                   |
     Plaintiffs and Counter-    |
     Defendants,                |   Case No. 10-cv-2171
                                |   Division III
     v.                         |
                                |
UNITED EGG PRODUCERS, et al.,   |
          Defendants.           |
_____


                    Thursday, April 24, 2014
                    9:30 a.m.


                HIGHLY CONFIDENTIAL


        Videotaped deposition of NORM STOCKER

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

2 (Pages 2 to 5)



**2**

1  Videotaped deposition of NORM STOCKER, convened at
2  the law offices of Nilan Johnson Lewis, P.A., 120 South
3  6th Street, Suite 400, Minneapolis, Minnesota 55402,
4  pursuant to notice, the proceedings being recorded
5  stenographically by Jonathan Wonnell, a Registered
6  Professional Court Reporter (NCRA #835577) and Notary
7  Public of the State of Minnesota, and transcribed under
8  his direction.

**4**

1  A P P E A R A N C E S (Cont'd)
2
3  On behalf of Cargill:
4      ANDREW SVEEN, ESQ.
5      Nilan Johnson Lewis, P.A.
6      120 South 6th Street, Suite 400
7      Minneapolis, Minnesota 55402
8      (612) 305-7500
9      asveen@nilanjohnson.com
10         -- and --
11     JILL K. PEARSON, ESQ.
12     Cargill
13     15407 McGinty Road West, MS 24
14     Wayzata, Minnesota 55391
15     (952) 742-2296
16     jill_pearson@cargill.com

**3**

1  A P P E A R A N C E S   O F   C O U N S E L
2
3  On behalf of Daybreak Foods:
4      ADRIAN FONTECILLA, ESQ.
5      Proskauer Rose LLP
6      1001 Pennsylvania Avenue, N.W,  Suite
7       400 South
8      Washington, D.C. 20004
9      (202) 416-6800
10     afontecilla@proskauer.com
11
12  On behalf of Associated Wholesale Grocers,
13     Inc., et al.:
14     RACHEL E. SCHWARTZ, ESQ.
15     Stueve, Siegel & Hanson LLP
16     460 Nichols Road, Suite 200
17     Kansas City, Missouri 64112
18     (816) 714-7100
19     schwartz@stuevesiegel.com

**5**

1  A P P E A R A N C E S (Cont'd)
2
3  On behalf of Sparboe Farms:
4      MATTHEW HARTUNG, ESQ.
5      TROY J. HUTCHINSON, ESQ. (via phone)
6      Hutchinson P.A.
7      907 East Wayzata Boulevard, Suite 330
8      Wayzata, Minnesota 55391
9      (952) 215-0141
10     mhartung@hutchinson-legal.com
11     thutchinson@hutchinson-legal.com
12
13  On behalf of Michael Foods:
14     SHARON R. MARKOWITZ, ESQ.
15     Stinson Leonard Street
16     150 South Fifth Street, Suite 2300
17     Minneapolis, Minnesota 55402
18     (612) 335-1974
19     sharon.markowitz@stinsonleonard.com

HIGHLY CONFIDENTIAL

Stocker, Norm                                    April 24, 2014

3 (Pages 6 to 9)

---

**6**

A P P E A R A N C E S (Cont'd)

On behalf of the Direct Purchaser Plaintiffs:
MICHELLE J. LOOBY, ESQ.
Gustafson Gluek, PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 333-8844
mlooby@gustafsongluek.com
-- and --
JAMES T. ALMON, ESQ. (via phone)
Kenny Nachwalter
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
(305) 373-1000
jalmon@kennynachwalter.com

ALSO PRESENT:
SUSAN WHITMAN, paralegal, Cargill

---

**7**

C O N T E N T S

WITNESS                                    PAGE
NORM R. STOCKER
  By Mr. Fontecilla:                        10
  By Mr. Hartung:                           38
  By Ms. Schwartz:                          47
  By Mr. Fontecilla:                       116
  By Ms. Schwartz:                         121

E X H I B I T S   M A R K E D
LABEL/DESCRIPTION                          PAGE
Exhibit 1 - Supply agreement between Cargill   38
  and Sparboe dated 12/10/02 (23 pgs., no
  Bates)
Exhibit 2 - UEP Animal Welfare Committee       58
  minutes dated 10/9/02 (UE 0153388 through
  0153390)
Exhibit 3 - UEP Annual Membership Meeting      62
  minutes from 10/2002 (UE 0227225 through
  0227227)
Exhibit 4 - Shell Egg Marketing Committee      68
  minutes dated 10/20/04 (NL 004133 through
  004134)
Exhibit 5 - UEP Board of Directors minutes     83
  dated 1/24/06 (NL 000972 through 000975)

Exhibit 6 - UEP Producer Committee for Animal  86
  Welfare meeting minutes dated 1/23/07 (UE
  0154009 through 0154001)

Exhibit 7 - E-mail from Norm Stocker dated     98
  10/15/07 (DAY 0026242 through 0026244)

---

**8**

P R O C E E D I N G S
(9:34 a.m.)

THE VIDEOGRAPHER: We are on the record. This is the videotaped deposition of Norm R. Stocker taken on April 24th 2014.

The time now is 9:34 a.m. This deposition is being taken In Re: Processed Egg Products Antitrust Litigation in the United States District Court for the Eastern District of Pennsylvania, Case Number 08-MD-02002, and also cross-noticed in the case Associated Wholesale Grocers Incorporated, et al. versus United Egg Producers, et al. in the District Court of Wyandotte County, Kansas, 29th Judicial District, Case Number 10-CV-2171.

This deposition is taking place in Minneapolis, Minnesota. My name is Adam Wallin. I'm the videographer representing Henderson Legal Services. Will counsel please identify themselves for the record.

MR. FONTECILLA: Good morning. Adrian Fontecilla with the firm Proskauer Rose on behalf of defendant Daybreak Foods.

MR. HARTUNG: Matthew Hartung with Hutchinson, PA on behalf of Sparboe Farms.

---

**9**

MS. MARKOWITZ: Sharon Markowitz with Simpson Leonard Street on behalf of Michael Foods.

MS. LOOBY: Michelle Looby, Gustafson Gluek, on behalf of the direct purchaser plaintiffs.

MS. SCHWARTZ: Rachel Schwartz of Stueve Siegel Hanson on behalf of the Kansas plaintiffs.

MR. ALMON: James Almon from Kenny Nachwalter on behalf of the direct action plaintiffs and the corporate plaintiffs.

MR. SVEEN: Andy Sveen along with Jill Pearson and Susan Whitman on behalf of Cargill, third-party witness.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

MR. FONTECILLA: Troy, do you want to introduce yourself for the record?

MR. HUTCHINSON: Yeah. And I'm having a really hard time hearing everybody. I don't know if there's anything you can do with the phone audio.

MR. SVEEN: Just a second, Troy. Troy, is that better?

MR. HUTCHINSON: Yeah. That is a lot better. Thank you. Troy Hutchinson on behalf of

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Stocker, Norm                                                    April 24, 2014

4 (Pages 10 to 13)

---

**10**

1 Sparboe Farms.
2             * * * * *
3 Whereupon,
4             NORM R. STOCKER,
5 called as a Witness, was duly sworn by
6 Jonathan Wonnell, a Notary Public in and
7 for the State of Minnesota, and was
8 examined and testified as follows.
9             * * * * *
10 EXAMINATION BY COUNSEL FOR DAYBREAK FOODS
11             BY MR. FONTECILLA:
12     Q.   Good morning, Mr. Stocker.  My name is
13 Adrian Fontecilla.  I represent defendant Daybreak
14 Foods in the eggs litigation that was introduced
15 earlier.
16         I'm going to go over a couple of quick
17 ground rules.  The first one is that the court
18 reporter is going to be typing everything today, so
19 we need to speak a little slowly, and I will try to
20 do that as well.  The other rule is that he's going
21 to need verbal responses form you.  No nods of the
22 head, no mm-hmms.  They'll need to be yes or nos or
23 some kind of verbal response.  Do you understand
24 that?
25     A.   Yes.

---

**11**

1     Q.   And if you need a break, just let us
2 know.  If you don't understand any of my questions
3 or any of the questions that other attorneys might
4 ask you, just feel free to just let me know you
5 don't understand.  I'll rephrase it.
6         And my questions today are going to be
7 from the time 1999 through 2008, so you can get
8 your mind around that time period unless I'm asking
9 about a specific year.
10         What company do you work for,
11 Mr. Stocker?
12     A.   I work for Cargill Kitchen Solutions.
13     Q.   And what does Cargill Kitchen Solutions
14 do?
15     A.   Basically we're in the egg further
16 processing business within Cargill.
17     Q.   And what products does Cargill Kitchen
18 Solutions sell?
19     A.   Products are further processed eggs
20 products, liquid -- liquid products in different
21 packaging types, cooked products, omelettes,
22 patties and hard-cooked eggs, french toast.
23     Q.   And are you familiar with an entity
24 named Sun Fresh Farms?
25     A.   I'm familiar with Sunny Fresh Foods.

---

**12**

1     Q.   Sunny Fresh Foods.  Excuse me.
2     A.   Yes.  That was our company.  We were a
3 wholly owned subsidiary prior to changing our name
4 to tie up to the Cargill brand.  So prior to
5 Cargill Kitchen Solutions, Inc., we were Sunny
6 Fresh Foods, Inc.
7     Q.   And what year did the name change?
8     A.   I don't actually recall specifically.
9 It was probably five years ago.
10     Q.   And when did you start working at
11 Cargill Kitchen Solutions or Sunny Fresh Foods?
12     A.   I came to Sunny Fresh Foods back in July
13 of 1999.
14     Q.   And is it okay with you today if when I
15 refer to Cargill, I'm meaning Cargill Kitchen
16 Solutions or, if the time period is correct, Sunny
17 Fresh Foods in that case?  Is that okay with you?
18     A.   Yes.
19     Q.   And just correct me if in any instance
20 that's not accurate.  What was your position when
21 you first started at Cargill?
22     A.   In July of '99, I came on board as the
23 risk manager for Sunny Fresh Foods.
24     Q.   And how long were you in that position?
25     A.   I was in that role for four years.

---

**13**

1     Q.   And what position did you move to after
2 you were risk manager?
3     A.   In July of 2003, I took over as head of
4 procurement, as procurement manager.
5     Q.   And is that the position you're in
6 today?
7     A.   My role today is director of supply
8 chain.
9     Q.   And when did you move to director of
10 supply chain?
11     A.   Two and a half to -- two and a half
12 years ago.
13     Q.   So around 2012?
14     A.   Yes.  '12 or '11.  I actually can't
15 recall.  I'm sorry.
16     Q.   And in your role as head of procurement
17 and director of supply chain, based on those jobs,
18 are you familiar with the products that Cargill
19 purchased between 1999 and 2008?  Generally
20 familiar.
21     A.   Yes, I had responsibility for our egg
22 purchases over all those years.
23     Q.   And that would include purchases of
24 shell eggs as well as liquid egg product?
25     A.   That is correct.

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

5 (Pages 14 to 17)

14

1    Q.   And based on your roles at Cargill
2    Kitchen Solutions, are you familiar with the
3    products that Cargill sold during that time period?
4    A.   Yes.
5    Q.   And are you generally familiar with the
6    identity of the suppliers that Cargill used?
7    A.   Yes.
8    Q.   And are you generally familiar with the
9    pricing terms under which Cargill purchased any
10   products from its suppliers?
11   A.   Yes.
12   Q.   And are you generally familiar with the
13   contracts or business arrangements under which
14   Cargill purchased those products?
15   A.   Which time period, again?
16   Q.   1999 through 2008.
17   A.   More familiar from 2003 forward.  We had
18   a different gentleman who's retired now that was in
19   charge of egg procurement when I got there in '99
20   through 2003.  So the contracts are in the files,
21   but I didn't directly negotiate those prior to July
22   of 2003.
23   Q.   And are you generally familiar with
24   Cargill's customers between 1999 and 2008?
25   A.   Yes.

15

1    Q.   And are you generally familiar with any
2    specifications they required of the products that
3    Cargill purchased?
4    A.   Could you be more specific on the
5    specifications?
6    Q.   Sure.  Just generally aware of whether
7    they had specifications and what those might be.
8    A.   I was more aware of the standards they
9    expected of me on egg buying; much less aware of
10   finished product specifications, for example.  So I
11   knew what I was expected to buy on the inbound side
12   to meet the customers' outbound requirements, but
13   QA was more in charge of the outbound stuff.
14   Q.   When you mean outbound, you mean
15   downstream sales to --
16   A.   Micro, sensory, all that kind of stuff
17   that goes with the finished product requirement.
18   That was in other departments.
19   Q.   Do you know whether Cargill owns
20   egg-laying hens?
21   A.   Yes.
22   Q.   And does it today own any egg-laying
23   hens?
24   A.   Cargill does not own any egg-laying
25   hens.

16

1    Q.   And has that been the case since 1999?
2    A.   Yes.
3    Q.   And are you familiar with the term
4    "further processed egg products," which I think you
5    mentioned earlier?
6    A.   Yes, I am.
7    Q.   And how are you familiar with that term?
8    A.   For the most part, that's the industry
9    that we feel we're in on the egg product side, is
10   in further processed egg products.
11   Q.   Those are the products that Cargill
12   sells?
13   A.   That is correct.
14   Q.   And are you familiar with the term "raw,
15   unpasteurized liquid egg"?
16   A.   Yes.
17   Q.   And how are you familiar with that term?
18   A.   All the liquid egg product that we bring
19   in is raw, unpasteurized liquid egg products.
20   Q.   And that's the product that uses an
21   ingredient to make further processed egg products;
22   is that correct?
23   A.   That is correct.
24   Q.   And how, if at all, is the raw,
25   unpasteurized liquid egg different from what is

17

1    commonly referred to as eggs?
2    A.   The difference would be is that raw
3    products are still under USDA continuous inspection
4    and are not yet ready for consumer purchase.
5    Q.   And in addition of raw, unpasteurized
6    liquid egg, does Cargill purchase any other
7    products in connection with its manufacturing of
8    further processed egg products?
9    A.   Specifically egg type?
10   Q.   Yes.
11   A.   We buy shell eggs, for example, for hard
12   cooking.
13   Q.   Between 1999 and today, has Cargill
14   purchased raw, unpasteurized liquid egg from
15   Daybreak?
16   A.   Yes.
17   Q.   And for that same time period, has
18   Cargill purchased raw, unpasteurized liquid egg
19   from Daybreak pursuant to long-term supply
20   contracts?
21   A.   Yes.
22   Q.   And are you familiar with the term
23   "grain-based formulas"?
24   A.   Yes, I am.
25   Q.   And how are you familiar with that term?

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

6 (Pages 18 to 21)

---

**18**

A. Many of our purchase agreements are based on grain-based pricing methods.

Q. And what is a grain-based pricing method, if you could explain that, please?

A. At a high level, it's basically a purchasing agreement that utilizes corn and soybean meal prices on the Chicago Board of Trade to price the liquid egg coming -- the raw liquid egg coming into our plants.

Q. And are the corn and soybean and other ingredients that you mentioned, are those ingredients that are used in connection with the feed used for egg-laying hens?

A. That is correct.

Q. And that's why the formula for the supply contracts that Cargill uses incorporates that, right?

MS. SCHWARTZ: Objection to form.

A. That is correct. Sorry.

BY MR. FONTECILLA:

Q. The other rule I should have gone other is some attorneys in the room might object from time to time, and your attorney may instruct you not to answer, but otherwise, just feel free to answer the question or ask me to repeat it.

---

**19**

In the supply contracts that Cargill had with Daybreak between 1999 and the present, what was the price term that was included in those supply contracts?

MR. SVEEN: Object.

A. The price term?

BY MR. FONTECILLA:

Q. Sure. Were the prices under those supply contracts between Cargill and Daybreak -- did they employ a grain-based formula like we just discussed?

A. Yes. They were based on grain prices.

Q. Were the supply contracts between Cargill and Daybreak between 1999 and 2008 ever based on an Urner Barry index?

A. Not that I recall.

Q. And between 1999 and 2008, was all of the raw, unpasteurized liquid egg that Cargill purchased from Daybreak pursuant to long-term agreements?

A. No, it was not.

Q. In what other ways did Cargill purchase raw, unpasteurized liquid egg from Daybreak?

A. We occasionally would buy based on the Urner Barry market as needed.

---

**20**

Q. And is that sometimes commonly referred to as a market purchase or a spot basis purchase?

A. Yes. It would be.

Q. And in what instances would Cargill need to purchase raw, unpasteurized liquid egg from Daybreak on a market basis if it had long-term supply agreements?

A. Primarily to fill in gaps due to seasonality of our customers' demands.

Q. Between 1999 and the present, if you can approximately estimate, approximately how frequently has Cargill purchased raw, unpasteurized liquid egg from Daybreak on a market basis?

A. Could you define "frequently"?

Q. Sure. Is it from, you know, extremely rare to extremely frequent, you know, in your own words?

MS. SCHWARTZ: Objection, calls for speculation.

A. It's closer to extremely rare.

BY MR. FONTECILLA:

Q. And what is the basis for your characterization of that?

A. It's not a predominant part of our purchasing from Daybreak Foods. It's an occasional

---

**21**

part.

Q. In those occasional or extremely rare instances where Cargill purchased raw, unpasteurized eggs from Daybreak on a market basis, how is the pricing determined in those instances?

A. Primarily from the prior Thursday quote from Urner Barry.

Q. Has it ever been -- have those market-basis purchases ever been based on a grain-based formula?

A. Not that I'm aware of.

Q. Is the pricing that is used in those market purchases negotiated between Cargill and Daybreak?

A. Only to the degree that we agree on the day and which part -- which relevant Urner Barry quote we're utilizing.

Q. Is the price term used in those market purchases by Cargill from Daybreak imposed on Cargill by Daybreak?

MS. SCHWARTZ: Objection, form.

MR. SVEEN: Answer it if you can.

A. No, it's not.

BY MR. FONTECILLA:

Q. Did Daybreak ever refuse to use pricing

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

7 (Pages 22 to 25)

---

**22**

1  terms requested by Cargill in purchasing raw,
2  unpasteurized liquid egg?
3      **A.  Could you clarify that a little, please?**
4      Q.  Sure.  Were there ever instances when
5  Cargill sought to purchase raw, unpasteurized
6  liquid egg and requested a type of pricing, and
7  Daybreak refused to adhere to that request?
8      **A.  Yes.**
9      Q.  And what instances were those?
10     **A.  I don't recall any specifics, but**
11 **there -- like with any relationship, if I'm out**
12 **looking for egg and if they've got it, we come to**
13 **terms; if they don't, they can't always provide me**
14 **product.  So in my mind, that's a time when you**
15 **don't come to terms on -- I have a need and they**
16 **don't have a supply, and that's no agreement.**
17     Q.  In those instances when the parties are
18 unable to come to terms, to the best of your
19 recollection, between 1999 and today, has that
20 inability to reach terms ever arisen as a result of
21 Daybreak refusing to adhere to a specific pricing
22 formula or pricing mechanism?
23     MS. SCHWARTZ:  Objection, form.
24     MR. SVEEN:  Same objection.  Asked and
25 answered.  If you can understand the question --

---

**23**

1      **A.  I'm not sure I understand that question.**
2      BY MR. FONTECILLA:
3      Q.  For what purposes, if any, does Cargill
4  purchase raw, unpasteurized liquid egg from
5  Daybreak?
6      **A.  To meet our customers' needs.**
7      Q.  And generally what are those customers'
8  needs in connection with Cargill's purchases of
9  raw, unpasteurized liquid egg from Daybreak?
10     **A.  The needs are generally, you know,**
11 **within a defined spec, so there are multiple needs.**
12 **Product availability.  It could be animal husbandry**
13 **standards, could be microbe levels, could be**
14 **finished product sensory evaluations, et cetera.**
15 **So multiple characteristics to meet the finished**
16 **customers' needs.**
17     Q.  Did the finished customer for Cargill,
18 between 1999 and 2008, ever require certain
19 specifications related to the animal welfare
20 practices used in the egg-laying hen process?
21     **A.  Yes.**
22     Q.  And did any of those specifications
23 relate to the cage space allocation requirements to
24 be used by the egg producer?
25     **A.  Yes.**

---

**24**

1      Q.  And did Cargill include those animal
2  welfare specifications required by its customers in
3  Cargill's supply agreements with Daybreak?
4      **A.  Yes.**
5      Q.  And did Cargill require Daybreak to
6  comply with those specifications?
7      **A.  Yes.**
8      Q.  And specifically, did Cargill include in
9  its supply agreements with Daybreak specifications
10 related to the cage space allocation for egg-laying
11 hens?
12     **A.  Yes.**
13     Q.  And were those the specifications that
14 were -- excuse me.  Were those the specifications
15 that were required by Cargill's finished product
16 customer?
17     **A.  In most cases.  It was either Cargill's**
18 **requirement or our customers' requirement.**
19     Q.  And did the cage space allocation
20 specifications require that Daybreak allow a
21 minimum amount of space per hen in the cages?
22     **A.  Could you repeat the question?**
23     Q.  Sure.  Were some of the specifications
24 we've been discussing that were included in the
25 supply agreements between Daybreak and Cargill that

---

**25**

1  related to cage space, did those require a minimum
2  amount of space for each egg-laying hen?
3      **A.  Yes.**
4      Q.  Did Cargill believe that having Daybreak
5  comply with those cage space requirements add value
6  to Cargill?
7      MS. SCHWARTZ:  Objection to form.
8      MR. SVEEN:  You can answer.
9      **A.  Yes.**
10     BY MR. FONTECILLA:
11     Q.  Are you generally familiar with the
12 Daybreak facilities that were involved in
13 manufacturing the raw, unpasteurized liquid egg
14 that was ultimately sold to Cargill?
15     **A.  Yes.**
16     Q.  And can you identify those facilities,
17 please?
18     **A.  Just to be clear, are you asking the**
19 **ones that I have long-term contracts with?**
20     Q.  We'll start with those, yes.
21     **A.  Yes.  One facility is in Long Prairie,**
22 **Minnesota.  There are two facilities around Lake**
23 **Mills, Wisconsin.  There is one facility in**
24 **Graettinger, Iowa.  And there's another facility**
25 **in -- I want to say it's West Mansfield, Ohio, I**

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

8 (Pages 26 to 29)

---

26

think is the proper town.  In what time period are you talking?  Up through 2008?

Q.    Between 1999 and 2008.

A.    That would cover it.

Q.    You mentioned two facilities near Lake Mills.  Is one of those the Creekwood facility?

A.    That is correct.

Q.    And the one in Ohio, is it also commonly referred to or sometimes referred to as the Mad River facility?

A.    That is correct.

Q.    So if my math is correct, that's five facilities that Daybreak uses to supply Cargill with its raw, unpasteurized liquid egg between 1999 and 2008; is that right?

A.    That is correct.

Q.    So I'm going to ask a couple questions about each one, and I'll start with the Creekwood facility.  At any time between 1999 and 2008, did Cargill require that Daybreak adopt the minimum cage space requirements we discussed earlier at its Creekwood facility?

A.    Yes.  That was required from inception, which I believe was in 2008.

Q.    And what was the cage space per hen

---

27

required by Cargill at that facility?

A.    We were supporting the UEP animal husbandry guidelines which had a phase-in based on hatch date of the hens that ultimately phased into 67 square inches in 2010 across all the barns.

Q.    And was that a requirement that Cargill required of Daybreak because of a customer, a finished product customer requirement of Cargill's?

A.    Yes.  We were trying to meet our customers' needs.

Q.    And did Daybreak comply with Cargill's requirement for cage space allocation at the Creekwood facility?

A.    Yes.

Q.    And when did Daybreak finish phasing in the cage space requirement?

A.    I don't recall the specific dates, but it was sometime in 2010 that I believe it was phased in across all barns.

Q.    And at the Lake Mills facility in Wisconsin at any time between 1999 and 2008, did Cargill require that Daybreak adopt a minimum cage space requirement at that facility?

A.    Yes, we did sometime around 2006.

Q.    And what was the cage space per hen that

---

28

Cargill required of Daybreak at that facility?

A.    It was similar to Creekwood in that it supported the phase-in of the United Egg Producers' animal husbandry guidelines.  So ultimately to be at 67 square inches upon the agreed-upon phase-in program.

Q.    And did Cargill require that cage space allocation because it was a specification required by Cargill's finished product customer?

A.    Yes.  We were meeting our customers' needs.

Q.    And when did Daybreak finish phasing in the cage space requirement at the Lake Mills facility?

A.    I believe that was in early 2010 as well.

Q.    And at the Long Prairie facility -- that's in Minnesota, right?

A.    That is correct.

Q.    And at any time between 1999 and 2008, did Cargill require that Daybreak adopt a cage space minimum requirement at that facility?

A.    Yes.  We required that at the same time as we initiated that requirement for the Lake Mills facility.

---

29

Q.    And that was in 2008?

A.    We requested that in 2006.  The phase-in for the program occurred over several years and was ultimately phased in by 2010.

Q.    And what was the cage space per hen requirement that Cargill required of Daybreak at its Long Prairie facility?

A.    That went to 67 square inches as well.

Q.    And did Daybreak comply with that requirement ultimately?

A.    Yes, they did.

Q.    And at the Mad River facility in Ohio at any time between 1999 and 2008, did Cargill require Daybreak to adopt a minimum cage space requirement?

A.    Yes.  That was required at the beginning when they purchased that facility.

Q.    And about what year was that, if you can remember?

A.    I believe it was 2007.

Q.    And what was the cage space per hen requirement that Cargill required of Daybreak at that facility?

A.    That was the same, in that it required 67 square inches upon completion of the phase-in which, again, I believe occurred early in 2010.

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

9 (Pages 30 to 33)

---

30

Q.    And at the Graettinger facility at any time between 1999 and 2008, did Cargill require Daybreak to adopt minimum cage space requirements?

A.    Yes, we did.

Q.    And what was the cage space requirement that Cargill required of Daybreak at its Graettinger facility?

A.    Graettinger was 72 square inches minimum.

Q.    And did Cargill require this cage space allocation because it was required of Cargill's finished product customer?

A.    Yes.  It was a customer request.

Q.    And did Daybreak comply with the requirement?

A.    Yes, they did.

Q.    And when was the phase-in completed at the Graettinger facility?

A.    I don't recall the specific dates, but that was a quicker implementation.  I believe it was either 2004 or 2005.

Q.    Going back to the Long Prairie facility, was the minimum cage space requirement that Cargill required of Daybreak at the Long Prairie facility a -- was it required because it was a specification

---

31

required of Cargill by its customer?

A.    Yes.  We were trying to meet our customers' needs.

Q.    And is that also the case at the Mad River facility in Ohio?

A.    Yes.  That is correct.

Q.    Are you aware whether Daybreak operates any facilities that do not supply Cargill with raw, unpasteurized liquid egg?

A.    Yes.

Q.    And has Cargill ever required Daybreak to implement minimum cage space requirements at those facilities?

A.    No, we have not.

Q.    And why not?

A.    We only have guidelines on the eggs we're buying from Daybreak to meet our customers' needs, and let them choose to do what they want with the rest of their business.

Q.    And earlier you mentioned UEP animal husbandry guidelines.  Between 1999 and today, has Cargill ever required Daybreak to comply with the UEP animal husbandry guidelines in their entirety?

A.    No.  We have not.

Q.    And are you aware of whether the UEP

---

32

animal husbandry guidelines include a minimum cage space requirement?

A.    Yes.

Q.    And were the requirements that Cargill required of Daybreak sometimes similar or consistent with those cage space requirements?

A.    Yes, they were.

Q.    And was that because those were the guidelines that were specified by Cargill's customers?

MS. SCHWARTZ:  Objection, form.

A.    They were required either by Cargill or to meet our customers' needs.

BY MR. FONTECILLA:

Q.    Are there any Daybreak facilities that supply Cargill with raw, unpasteurized liquid egg where Cargill does not have a minimum cage space requirement?

A.    An occasional market purchase could meet that criteria.

Q.    And are you aware of the identity of the Daybreak facility that might supply Cargill with any raw, unpasteurized liquid egg that it purchases on a market basis?

A.    Yes.

---

33

Q.    Would those be the same facilities that we discussed earlier?

A.    The Long Prairie facility would have the ability to do a market purchase.

Q.    Do you have an understanding of the term "UEP certified"?

A.    Yes.

Q.    And what do you understand that term to mean?

A.    UEP certified means a producer is following 100 percent off the UEP animal husbandry guidelines and criteria.

Q.    Did Daybreak -- excuse me.

Did Cargill ever require Daybreak to be certified by the UEP?

A.    No.

Q.    Did Cargill ever require Daybreak to participate in the UEP Certified program?

A.    No.

Q.    Did Cargill ever require Daybreak or any of Daybreak's facilities to be audited by the UEP?

A.    No.

Q.    Did Cargill ever require Daybreak to send the results of any audit or reports of its facility to UEP?

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                          April 24, 2014

10 (Pages 34 to 37)

---

34

1    A.   No.
2    Q.   Did Cargill ever require Daybreak to
3  sell to Cargill UEP Certified shell eggs?
4    A.   No.
5    Q.   And kind of shifting gears a little bit
6  to shell eggs for a moment, between 1999 and 2008,
7  in those instances where Cargill purchased shell
8  eggs from Daybreak, did it require that those shell
9  eggs be produced pursuant to any animal welfare
10 guidelines?
11   A.   No.
12   Q.   Are you generally familiar with any cost
13 implications that might result as a result of
14 Cargill implementing any requirements or
15 specifications related to animal welfare?
16   A.   Yes.
17   Q.   And are you aware of whether Daybreak
18 would have sustained or incurred any costs in
19 connection with complying with Cargill's animal
20 welfare specifications?
21   MR. SVEEN:  Objection, calls for
22 speculation.
23   A.   Yes.
24   BY MR. FONTECILLA:
25   Q.   And how would you be aware of that?

---

35

1    A.   Through negotiations and discussions
2  about the cost implications of those decisions.
3    Q.   Did Daybreak, between 1999 and 2008,
4  share that information with Cargill?
5    A.   Yes.
6    Q.   And, specifically, were you aware at any
7  time between 1999 and 2008 whether Daybreak's
8  compliance with animal welfare specifications in
9  the long-term supply agreements with Cargill would
10 affect the cost for Daybreak to produce raw,
11 unpasteurized liquid egg that it sold to Cargill?
12   A.   Yes.
13   Q.   And what is your understanding of what
14 those cost implications would be?
15   A.   The primary cost impact was the density,
16 amount of space per bird.
17   Q.   And how did that affect the cost?
18   A.   In simple terms, you have fewer birds in
19 a house or in a cage, and so you have, in essence,
20 more depreciation per bird or more housing cost.
21   Q.   And were you made aware of this before
22 entering into the supply agreements that had the
23 animal welfare specifications?
24   A.   Yes.
25   Q.   Did Cargill knowingly agree to pay more

---

36

1  for the raw, unpasteurized liquid egg that Daybreak
2  was going to supply it by conforming to the animal
3  welfare practices required in the supply
4  agreements?
5    MS. SCHWARTZ:  Objection to form.
6    A.   Yes.
7    BY MR. FONTECILLA:
8    Q.   And did it do that because Cargill
9  believed that those practices added value?
10   A.   Yes.  We were meeting customer needs.
11   Q.   Are you aware of a term "animal welfare
12 premium"?
13   A.   Yes.
14   Q.   What is your understanding of that term?
15   A.   It generally is a term that's utilized
16 to talk about the higher cost of producing eggs at
17 a different animal husbandry practice than is
18 conventionally understood.
19   Q.   And between 1999 and 2008, has Cargill
20 paid Daybreak an animal welfare premium in
21 connection with its purchases of raw, unpasteurized
22 liquid egg?
23   A.   Yes.
24   Q.   And was that premium negotiated between
25 Daybreak and Cargill prior to entering into the

---

37

1  long-term supply agreement that might include that
2  premium?
3    A.   Yes.
4    Q.   Are you aware that a lawsuit has been
5  filed against Daybreak and other egg producers?
6    A.   Yes.
7    Q.   And are you aware that that lawsuit
8  alleges in part that the UEP guidelines we
9  discussed earlier were not actually designed for
10 the welfare of the animals but, instead, were a
11 mechanism by which egg producers sought to limit
12 the supply of eggs in the United States?
13   A.   Yes.
14   Q.   Do you have any reason to believe that
15 that allegation is accurate?
16   MR. SVEEN:  You're asking for his
17 personal opinion on a legal issue?  I'm going to
18 object to calls for a legal conclusion, but if you
19 have a personal opinion, you can give it to him.
20   A.   Yeah.  So not understanding the total
21 legalities of it, could you repeat the question?
22   BY MR. FONTECILLA:
23   Q.   Sure.  Is there anything that, in your
24 personal recollection or personal understanding,
25 that you believe is consistent with the plaintiff's

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

11 (Pages 38 to 41)

---

38

1   allegation that the UEP guidelines are nothing more
2   than an effort to limit the supply of eggs?
3           MR. SVEEN:  Objection that it calls for
4   a legal conclusion.  Foundation.  But answer if you
5   can, I guess.
6       **A.   No.  Actually, I think they set the**
7   **program up to try to prevent that.**
8           MR. FONTECILLA:  Okay.  I have no
9   further questions.  Thank you, Mr. Stocker.
10          MR. HARTUNG:  I have a few questions,
11  but could we take a short break?  Five minutes?
12          MR. SVEEN:  Sure.
13          THE VIDEOGRAPHER:  We are going off the
14  record at 10:10 a.m.
15          (Whereupon, a recess was taken from
16  10:10 a.m to 10:19 a.m.)
17          THE VIDEOGRAPHER:  We are back on the
18  record at 10:19 a.m.
19          EXAMINATION BY COUNSEL FOR SPARBOE FARMS
20          BY MR. HARTUNG:
21      Q.   Good morning, Mr. Stocker.  My name is
22  Matthew Hartung, I'm counsel representing Sparboe
23  Farms.  I'm going to hand you a document here
24  marked as Exhibit 1.
25          (Stocker Exhibit 1 was marked for

---

39

1           identification.)
2           BY MR. HARTUNG:
3       Q.   And take some time and look this over,
4   if you would.
5       **A.   (Reading).**
6           MS. SCHWARTZ:  Matthew, has this been
7   produced in the litigation?  I see there's no Bates
8   number along the bottom of this document.
9           MR. HARTUNG:  Right.  I believe it has,
10  but I can get back to you.  I'm fairly certain it
11  has.
12          MS. SCHWARTZ:  Sparboe has produced this
13  in the litigation?
14          MR. HARTUNG:  I think so.
15          BY MR. HARTUNG:
16      Q.   Have you seen this document before?
17      **A.   Yes, I have.**
18      Q.   And what is it?
19      **A.   This is the original supply agreement**
20  **between Cargill and Sparboe regarding a facility**
21  **referred to as Vincent.**
22      Q.   Now, is this a business document of
23  Cargill Kitchen Solutions?
24      **A.   I do believe we created this document.**
25      Q.   Could you turn to page 9.  And do you

---

40

1   recognize the signature on the right?
2       **A.   Yes, I do.**
3       Q.   Whose signature is that?
4       **A.   That is Lee Skold.**
5       Q.   And who is Lee Skold?
6       **A.   Lee Skold at the time was the vice**
7   **president and our platform leader for the Sunny**
8   **Fresh Foods business at that time.**
9       Q.   Is this the agreement that Cargill
10  Kitchen Solutions entered into with Sparboe Farms
11  in 2002?
12      **A.   That is correct.**
13      Q.   And you were involved in these
14  agreements?
15      **A.   I was -- I was not the head of**
16  **procurement at this time.  I took over in July of**
17  **2003.  So I knew of these agreements and was**
18  **involved in some of the discussions behind the**
19  **scenes and on the side, but was not the direct**
20  **negotiator of these contracts.**
21      Q.   But post 2002, you were involved in
22  these agreements?
23      **A.   Post -- this agreement was signed in**
24  **December of 2002.  So I was not the head of**
25  **procurement at that point in time.  I was more**

---

41

1   **involved when I took over as the head of**
2   **procurement post this agreement being signed.**
3       Q.   And you were involved in similar
4   agreements as to this document after this document
5   was produced?
6           MS. SCHWARTZ:  Objection, form.
7           BY MR. HARTUNG:
8       Q.   I'm sorry.  I'll restate that.  You were
9   involved in subsequent agreements once you took
10  over as the head of procurement?
11          MR. SVEEN:  Objection, vague.  Answer if
12  you can.
13      **A.   I was involved in this agreement going**
14  **forward and any amendments to it at that point, as**
15  **well as all the other supplier agreements with**
16  **other suppliers.**
17          BY MR. HARTUNG:
18      Q.   Is there anything about the pricing
19  information in this agreement that changed?
20      **A.   That changed from the initiation?**
21      Q.   Yes.
22      **A.   Contractual or routine pricing --**
23  **monthly pricing updates?  I'm not sure I understand**
24  **the question.**
25      Q.   Is the pricing information in this

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

12 (Pages 42 to 45)

---

42

1  agreement similar to that in the agreements you
2  were involved in going forward?
3      MS. SCHWARTZ:  Objection, form.
4      A.   The pricing was based off grain, which
5  is corn and soybean meal, which is -- in that
6  respect, it's similar to other grain-based
7  agreements that I put together subsequent -- or
8  following this.
9      BY MR. HARTUNG:
10     Q.   And I know you touched upon this earlier
11 with Daybreak's counsel, but could you briefly
12 explain what grain-based pricing is?
13     A.   A grain-based contract is one where
14 primarily corn and soybean meal prices are used to
15 reset pricing on a periodic basis.
16     Q.   And was this the pricing that was
17 generally used to determine the price between
18 Cargill and Sparboe?
19     A.   Grain was used for what we term subject
20 to this location, which we termed the Vincent
21 location.
22     Q.   And where were these prices established
23 or published?
24     A.   If you're referring to the grain prices,
25 those were published on the Chicago Board of Trade.

---

43

1      Q.   So the Urner Barry index was not used
2  for pricing for the contract between Cargill and
3  Sparboe?
4      A.   There was no Urner Barry component as
5  part of this contract.
6      Q.   Do you know why Cargill Kitchen
7  Solutions wanted to use a grain-based contract
8  rather than set pricing under Urner Barry with
9  Sparboe?
10     A.   We feel the grain-based pricing aligns
11 with our customer needs.
12     Q.   And why was that?
13     A.   It provides more stable, predictable
14 pricing.
15     Q.   Now, in your experience, is there a
16 correlation in egg prices and soybean and corn?
17     A.   In my opinion, there is a correlation
18 over long periods of time, but there are periods of
19 variation where they don't align.
20     Q.   In your opinion, when they do align, why
21 is that?
22     A.   I think it's like any market.  A
23 producer has to be allowed to make a reasonable
24 rate of return to stay in business.  When they
25 don't, you get differences in supply and demand and

---

44

1  markets that don't reflect the cost of production.
2      Q.   Did Cargill require Sparboe to comply
3  with animal welfare requirements?
4      A.   We did for the Vincent facility, yes.
5      Q.   And would that include cage space?
6      A.   Yes.
7      Q.   And what was the cage space requirement?
8      A.   The requirement at Vincent was 72 square
9  inches.
10     Q.   And was Cargill's requirement with
11 Sparboe -- did that allocate more space than the
12 cage space required by UEP?
13     A.   The UEP requirement was 67 square
14 inches, and our requirement in this contract was 72
15 square inches.
16     MR. HARTUNG:  I have nothing further.
17     MS. LOOBY:  I have no questions.
18     MS. SCHWARTZ:  Troy, on the phone, do
19 you have any questions?  I assume not.
20     MR. HARTUNG:  Why don't we take a break.
21     MR. HUTCHINSON:  Did someone ask me a
22 question?
23     MR. SVEEN:  No.  I think, Troy -- you
24 don't have any questions.  Your associate asked
25 questions.

---

45

1      MR. HUTCHINSON:  Well, I --
2      MR. SVEEN:  We're not going to have two
3  lawyers for one party ask questions here.
4      MR. HUTCHINSON:  Right.  Why don't we go
5  off the record, and Matt and I can talk.
6      MR. SVEEN:  Well, I'd like to keep this
7  moving, if we can.  If we take another break, you
8  can talk to him, and I suppose if it goes around
9  again, you can do some follow-up.  How does that
10 sound?
11     MR. HUTCHINSON:  Well, I mean, it's up
12 to you.  I have a couple of questions that I'd like
13 to ask the witness.  I'm happy to just ask them or
14 I can talk to Matt.  It's your choice.  Whatever
15 you think will be more efficient.
16     MR. SVEEN:  Well, it was your choice not
17 to come here, so --
18     MR. HUTCHINSON:  Well, not really.  I
19 wasn't involved in the scheduling, and I'm in
20 Virginia right now.  I would have loved to be
21 there, but I unfortunately had another obligation
22 in this case.  Why don't we just take a 30-second
23 break so I can confer with my colleague.
24     MR. SVEEN:  That's fine.
25     MR. HUTCHINSON:  Okay.  Thank you.

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                               April 24, 2014

13 (Pages 46 to 49)

---

**46**

1       MS. SCHWARTZ: Are there any other
2   defendants who intend to ask questions?
3       MR. FONTECILLA: I think those are all
4   the --
5       MR. SVEEN: Let's just do 30 seconds and
6   then we'll --
7       THE VIDEOGRAPHER: We're going off the
8   record at 10:27 a.m.
9       (Whereupon, a recess was taken from
10  10:27 a.m to 10:31 a.m.)
11      THE VIDEOGRAPHER: We are back on the
12  record at 10:31 a.m.
13      BY MR. HARTUNG:
14      Q.  Mr. Stocker, I have just a couple of
15  more questions. Did anyone from Sparboe discuss
16  cost with you regarding animal welfare?
17      A.  Yes.
18      Q.  And did Cargill agree to pay more for
19  eggs from Sparboe because of animal welfare
20  requirements?
21      A.  At the Vincent facility, that is
22  correct, with this contract.
23      Q.  And why was that?
24      A.  To meet customer requirements.
25      Q.  Did Cargill feel as though it added

---

**47**

1   value?
2       A.  Yes.
3       MR. HARTUNG: No further questions.
4   EXAMINATION BY COUNSEL FOR THE KANSAS PLAINTIFFS
5       BY MS. SCHWARTZ:
6       Q.  Good morning, Mr. Stocker. My name is
7   Rachel Schwartz, and I'm here on behalf of the
8   plaintiffs in the Kansas litigation. Are you aware
9   of the Kansas litigation?
10      A.  At a high level, yes.
11      Q.  Fair enough. This is a case that's
12  currently pending in Kansas City, Kansas on behalf
13  of a grocery wholesaler and a couple of locally
14  owned grocery stores. Are you aware of that?
15      A.  Not specifically who they are, no.
16      Q.  Fair enough. I just have a couple of
17  questions today. This testimony, along with being
18  in the multidistrict litigation, is also being
19  taken for the Kansas litigation and could be played
20  in front of a jury in Kansas. Are you aware of
21  that?
22      A.  I am now.
23      Q.  Fair enough. A couple of background
24  questions with regard to Cargill, and if you don't
25  mind, I will use the same language we used earlier,

---

**48**

1   that it may be referring to Sunny Fresh Foods as
2   well. And please correct me if you need to make
3   any distinctions between those entities. Okay?
4       A.  Okay.
5       Q.  Now, Cargill has been a UEA member,
6   correct?
7       A.  That is correct.
8       Q.  And could you explain what UEA is?
9       A.  UEA is a trade association underneath --
10  organized under, for lack of a better term, the UEP
11  umbrella. It is to represent the further
12  processing part of the egg industry, so those folks
13  involved in the liquid side of the business.
14      Q.  And Cargill has been a UEA member since
15  how early? Do you recall?
16      MR. FONTECILLA: Objection, foundation.
17      A.  I don't recall the specifics. As long
18  as I can recall as procurement manager in 2003. I
19  believe we've been a member since that -- at least
20  that long.
21      BY MS. SCHWARTZ:
22      Q.  And Cargill has never been a UEP member,
23  correct?
24      A.  That is correct.
25      Q.  And with regard to UEA, have you served

---

**49**

1   on the executive committee for UEA?
2       A.  Yes.
3       Q.  And for how many years did you serve on
4   the executive committee for UEA?
5       A.  I'm not actually sure. Today I'm on the
6   executive committee. It's been several years.
7       Q.  And do you recall raising any concerns
8   about UEP's control of UEA?
9       MR. FONTECILLA: Objection, vague.
10      A.  I don't recall.
11      BY MS. SCHWARTZ:
12      Q.  Let me show you what's previously been
13  marked as Cargill 6.
14      MR. FONTECILLA: Ms. Schwartz, has the
15  witness signed the protective order?
16      MS. SCHWARTZ: He has.
17      BY MS. SCHWARTZ:
18      Q.  And Cargill 6 is UE0234602. And it's a
19  January 8th 2004 letter that appears to be written
20  by you; is that correct?
21      A.  That is correct.
22      Q.  And sent to Ken Klippen?
23      A.  That is correct.
24      Q.  And who is Ken Klippen?
25      A.  At the time, Ken was the UEA

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                          April 24, 2014

14 (Pages 50 to 53)

---

**50**

representative based in D.C.

Q.   And have you had a chance to review this document?

A.   I just did read it, yes.

Q.   Do you remember sending this to Mr. Klippen?

A.   Actually, no.

Q.   Let's take a look at the fourth paragraph here.  And it starts off, "In addition, it is clear that UEA does have some autonomy issues.  It became very clear at the last meeting that UEA is clearly controlled by UEP.  UEP has grown into a very strong organization, and maybe it makes sense for UEP to represent all of its producers."

Do you see those sentences?

A.   Yes, I do.

Q.   Looking at that today, does that refresh your recollection?

MR. FONTECILLA:  Objection, vague.

A.   Not really.

BY MS. SCHWARTZ:

Q.   Do you remember any concerns you had in the 2004 time period about UEP controlling UEA?

MR. FONTECILLA:  Objection, vague, form.

---

**51**

A.   No, not that I recall.

BY MS. SCHWARTZ:

Q.   Did Cargill quit UEA at any time from 1999 to the present?

MR. FONTECILLA:  Objection, form.

A.   I don't know about '99, but 2003 and forward when I was in charge of procurement, I'm not aware of any periods where we dropped out of UEA.

BY MS. SCHWARTZ:

Q.   And sitting here today, this document does not refresh your recollection as to any concerns you had about UEP controlling UEA?

MR. FONTECILLA:  Objection, form, calls for speculation.

A.   No, I do not recall.

BY MS. SCHWARTZ:

Q.   Do you remember any conversations with Mr. Klippen or others affiliated with UEP about UEP's control over UEA?

MR. FONTECILLA:  Objection, compound.

A.   I don't remember any specific conversations, no.

BY MS. SCHWARTZ:

Q.   You personally attended UEP meetings,

---

**52**

correct?

A.   That is correct.

Q.   From 1999 through the present, can you estimate how many UEP meetings you would have attended?

A.   Probably started attending from 2003 forward.  To the present, you said?

Q.   Correct.

A.   Probably attend on average two UEP meetings a year in that time frame, so approximately 20.

Q.   Were there specific meetings you would normally attend?

A.   The meetings we usually tried to attend were three.  One was the meeting held at the -- in Atlanta in January in conjunction with the southeastern poultry show.  There usually was a midwest producers meeting held in Des Moines in advance of the national meeting, which usually occurs in the fall.  Those are the three primary meetings that, if available, I try to attend.

Q.   And why did you believe it was important to attend UEP meetings?

MR. FONTECILLA:  Objection.

A.   Primarily for networking with our

---

**53**

producers which would be at those meetings, efficient use of time.  And, secondarily, to sit in meetings and listen.

BY MS. SCHWARTZ:

Q.   And were there particular areas you were there to listen to at these meetings?

MR. FONTECILLA:  Objection, vague.

A.   We generally sat in on as many meetings as we could sit and listen in at.

BY MS. SCHWARTZ:

Q.   And would you also attend committee meetings?

A.   Yes.

Q.   And were there particular committees whose meetings you tried to attend?

A.   I tried to attend as many as the scheduling would allow.

Q.   Were there any in particular that were the priorities for you to attend?

MR. FONTECILLA:  Objection, form.

A.   Is your question on committee meetings specifically?

BY MS. SCHWARTZ:

Q.   Correct.

A.   There were more likely -- do you have a

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                      April 24, 2014

15 (Pages 54 to 57)

---

54

1  list of the committee meetings specifically that
2  you're asking about?
3      Q.  Sure.  Let me ask you just about a
4  couple specifically.  The UEP Animal Welfare
5  Committee, would that be a committee meeting you
6  would attend on occasion?
7      A.  Yes.  We would attend that meeting.
8      Q.  And what about the shell egg marketing
9  committee?
10     A.  Yes.  We would attend that meeting.
11     Q.  And --
12         MR. FONTECILLA:  Objection to the last
13  question.
14         BY MS. SCHWARTZ:
15     Q.  What about the board of directors
16  meetings?
17         MR. FONTECILLA:  Objection, form.
18     A.  Yes.  We would attend that meeting as
19  well.
20         BY MS. SCHWARTZ:
21     Q.  And what about the UEP marketing
22  committee?  Would that be another committee that
23  you would attend on occasion?
24         MR. FONTECILLA:  Objection to form.
25     A.  Yes.  We would attend the marketing

---

55

1  committee meeting.
2         BY MS. SCHWARTZ:
3      Q.  And sitting here today, do you recall
4  specifically any other committee meetings you may
5  have attended?
6      A.  There is a government affairs meeting,
7  committee meeting, as well as a food safety
8  committee meeting that we try to attend as well.
9      Q.  And the testimony this morning had
10  focused on the 1999 through 2008 time period, if
11  you recall.  The litigation in Kansas actually
12  continues through today, so let me ask just a few
13  questions about the 2008 to the present time
14  period.
15         Do you still attend UEP meetings?
16     A.  Yes, I do.
17     Q.  From 2008 to the present, has your
18  attendance at those meetings changed relative to
19  the time prior to 2008?
20     A.  No.  I still try to attend all the same
21  meetings today that I did before.
22     Q.  And as part of attending those meetings,
23  would you receive an agenda for those meetings?
24         MR. FONTECILLA:  Objection.
25     A.  Yes.  We receive the same e-mails that

---

56

1  the membership does.
2         BY MS. SCHWARTZ:
3      Q.  And would you also receive minutes from
4  those meetings?
5         MR. FONTECILLA:  Objection.
6      A.  Those minutes are part of the packet
7  handed out at the meeting.
8         BY MS. SCHWARTZ:
9      Q.  And what else might be included in a
10  packet that you'd receive for a meeting?
11     A.  There might be a bio on a guest speaker
12  as well as potentially, for example, in food safety
13  they might have a packet of new government
14  regulation detailing the regulations that are
15  coming down or what's being proposed.
16     Q.  Anything else, sitting here today, that
17  you recall specifically?
18         MR. FONTECILLA:  Objection, vague.
19     A.  No.
20         BY MS. SCHWARTZ:
21     Q.  Would you personally have received the
22  United Voices newsletter?
23     A.  Yes.
24     Q.  And to the best of your recollection,
25  would you have started to receive that back in the

---

57

1  2003 time period?
2         MR. FONTECILLA:  Objection, vague.
3      A.  Yes.
4         BY MS. SCHWARTZ:
5      Q.  And do you still receive that today?
6      A.  Yes.
7      Q.  And specifically with regard to the UEP
8  meetings, I want to ask you just a couple of
9  questions about some of the meetings you've
10  attended over the years.
11         And to the best of your recollection, do
12  you recall as a UEA member whether you --
13  whether -- let me start over.
14         Could UEA members raise motions in UEP
15  meetings?
16         MR. FONTECILLA:  Objection, foundation,
17  calls for speculation, vague as to the time period.
18         MR. SVEEN:  Go ahead.
19     A.  No.  We were just there to listen.
20         BY MS. SCHWARTZ:
21     Q.  Do you ever recall UEA -- motions
22  suggested by UEA that were raised at UEP meetings?
23         MR. FONTECILLA:  Objection, vague, calls
24  for speculation.
25     A.  Could you repeat the question, please?

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                April 24, 2014

---

58

1      BY MS. SCHWARTZ:
2      Q.   Sure.  It may be easier just to pull it
3   out.
4           (Stocker Exhibit 2 was marked for
5           identification.)
6      BY MS. SCHWARTZ:
7      Q.   Let me show you what's being marked as
8   Exhibit 2.  And these are UEP Animal Welfare
9   Committee minutes from October 9th 2002.  Do you
10  see that at the top?
11          MR. FONTECILLA:  Objection.
12     A.   I do see that.
13     BY MS. SCHWARTZ:
14     Q.   And at the bottom, you'll see that it's
15  Bates numbered UE0153388.  And if I can have you
16  look at the section on the first page that's
17  entitled "UEP UEA Members Staff and Guests."  Do
18  you see that paragraph?
19     A.   Yes, I do.
20     Q.   If you go down to the fifth line from
21  the bottom of that paragraph, do you see your name?
22     A.   Yes, I do.
23     Q.   And if you look two over, do you see the
24  name Terry Profitt?
25     A.   Yes, I do.

---

59

1      Q.   And is that another employee at Cargill?
2      A.   Yes.
3      Q.   And why would both of you have attended
4   the same UEP meeting?
5           MR. FONTECILLA:  Objection, calls for
6   speculation.
7      A.   At times, there were concurrent
8   committee meetings occurring, and so we often found
9   it was good to have two of us there so we could
10  attend two simultaneous meetings.
11     BY MS. SCHWARTZ:
12     Q.   And if you turn to the second page of
13  this document, you'll see at the bottom of that
14  page that there is a section entitled "UEA Further
15  Processor Motion."  Do you see that?
16     A.   Yes, I do.
17     Q.   And was that the -- was Cargill a UEA
18  further processor member?
19          MR. FONTECILLA:  Objection.
20     A.   I believe so.  Again, this is prior to
21  2003, so -- but I believe so.
22     BY MS. SCHWARTZ:
23     Q.   Does this refresh your recollection that
24  on occasion UEP meetings may involve a discussion
25  of a motion from the UEA members?

---

60

1           MR. FONTECILLA:  Objection, foundation.
2      A.   It may have, but very rare.
3      BY MS. SCHWARTZ:
4      Q.   And if you look at the top of that same
5   page --
6      A.   Page 2?
7      Q.   Yes.
8      A.   Okay.
9      Q.   You'll see that there's a heading
10  entitled "Requirement for Certified Status."  Do
11  you see that?
12     A.   Yes, I do.
13     Q.   And do you know -- that first sentence
14  said, "Kraus reported that previous motions
15  required that the board reconfirm the commitment of
16  100 percent of their production facilities."  Do
17  you see that sentence?
18     A.   Yes, I do.
19     Q.   And do you have an understanding of what
20  has been called in this litigation the 100 percent
21  rule?
22          MR. FONTECILLA:  Objection, foundation.
23          MR. SVEEN:  I'm just going to object to
24  the extent you're asking -- what he knows about
25  this litigation has come from conversations with

---

61

1   me.  So I may have mentioned that, but if you could
2   explain it to him, I'd appreciate that.
3           MS. SCHWARTZ:  Fair enough.
4      BY MS. SCHWARTZ:
5      Q.   I'm not trying to ask you anything about
6   your conversations with your attorney.
7           Are you aware of, outside of the
8   discussions with your attorney, whether from
9   attendance at meetings or otherwise, are you aware
10  of what is sometimes called the 100 percent rule?
11          MR. FONTECILLA:  Objection, vague.
12     A.   Yes, I am.
13     BY MS. SCHWARTZ:
14     Q.   And what is your understanding of that?
15     A.   It is a rule to be certified that
16  required all of a producer's farms to meet the
17  animal husbandry requirements across all farms to
18  be certified.
19     Q.   And to your understanding, the 100
20  percent rule -- and, actually, strike that.  We'll
21  come back to that.
22          Do you recall whether Cargill was ever
23  required to fill out a Capper-Volstead
24  certification --
25          MR. FONTECILLA:  Objection.

---

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

17 (Pages 62 to 65)

---

**62**

1  BY MS. SCHWARTZ:
2      Q.  -- to attend UEP meetings?
3      MR. FONTECILLA:  Objection, foundation,
4  calls for speculation, calls for a legal
5  conclusion.
6      A.  I don't recall ever filling out a
7  Capper-Volstead form.
8          (Stocker Exhibit 3 was marked for
9          identification.)
10     BY MS. SCHWARTZ:
11     Q.  I'm handing you what has been marked as
12  Exhibit Number 3.  And Exhibit 3 is Bates labeled
13  UE0227225.  And at the top it says it's a UEP
14  annual membership meeting.  Do you see that at the
15  top of this document?
16     A.  Yes, I do.
17     Q.  And if you look again down to the staffs
18  and guest section, do you see that on the first
19  page?
20     A.  Yes, I do.
21     Q.  And if you look about four lines from
22  the bottom of that to the right-hand side, do you
23  see that you are listed as an attendee of this
24  meeting?
25     A.  Yes, I do.

---

**63**

1      Q.  Other than looking at this document, do
2  you recall attending specifically the October 10th
3  2002 annual meeting?
4      A.  Yes.  I remember being in Savannah.
5      Q.  Fair enough.  It's a great town.  Hard
6  to forget.
7          If you turn to the third page of this
8  document, do you see that it's entitled
9  "Capper-Volstead Certification"?  Do you see that?
10     A.  Yes.
11     Q.  And let me give you a chance to read
12  that whole page.
13     A.  (Reading).
14     Q.  And sitting here today, did you ever
15  complete a form like this for UEP?
16     MR. FONTECILLA:  I'm going to object to
17  foundation to the extent that the witness hasn't
18  testified that he's ever seen this document.
19     A.  No.  We wouldn't have signed this.
20     BY MS. SCHWARTZ:
21     Q.  To the best of your recollection, you
22  don't know of anybody else at Cargill who may have
23  filled out a form like this?
24     MR. FONTECILLA:  Objection, calls for
25  speculation.

---

**64**

1      A.  No.  We weren't UEP members.
2      BY MS. SCHWARTZ:
3      Q.  And could Cargill, back in the 2002 time
4  period, have certified that more than 50 percent of
5  all eggs handled by Cargill were produced on farms
6  owned or operated by Cargill?
7      MR. FONTECILLA:  Objection, foundation,
8  calls for speculation.  The witness has testified
9  that his role as the procurement manager started in
10  the 2002 time period.
11     A.  No.  We didn't own egg-laying hens.
12     BY MS. SCHWARTZ:
13     Q.  And that would be true today as well?
14     A.  That is correct.
15     Q.  Now, we talked for a moment about the
16  100 percent rule.  Was Cargill opposed to the
17  100 percent rule?
18     MR. FONTECILLA:  Objection.
19     A.  Yes.
20     BY MS. SCHWARTZ:
21     Q.  And why was that?
22     MR. SVEEN:  I'm just going to object to
23  foundation.  To the extent you understand why that
24  position was, you can tell her.
25     A.  The 100 percent rule, we thought

---

**65**

1  customers should have the right to choose.
2      BY MS. SCHWARTZ:
3      Q.  And how did the 100 percent rule limit a
4  customer's right to choose?
5      MR. FONTECILLA:  Objection, calls for
6  speculation.
7      A.  To the extent that a producer had to,
8  you know -- implied in the name is a hundred
9  percent.  So all your farms or none of your farms.
10  So to the degree it impacted the customer's ability
11  to buy from an individual producer, that was the
12  extent of the impact.
13     BY MS. SCHWARTZ:
14     Q.  And in 2003 when you would have taken on
15  responsibility for procurement, did you have
16  customers at that time who were not asking for
17  animal welfare regulations for the products they
18  purchased from Cargill?
19     MR. FONTECILLA:  Objection, vague,
20  compound.
21     A.  All customers would have animal welfare
22  requirements.  If the question is more specific to
23  a density, could you re-phrase the question?
24     BY MS. SCHWARTZ:
25     Q.  I'd be happy to.  In 2003, did you have

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                April 24, 2014

18 (Pages 66 to 69)

---

**66**

1  customers who were not demanding specific cage
2  densities for the products they purchased from
3  Cargill?
4           MR. FONTECILLA:  Objection, vague.
5        **A.   That is correct.**
6           BY MS. SCHWARTZ:
7        Q.   And who would some of those customers
8  have been in the 2003 time period?
9           MR. FONTECILLA:  Same objection.
10       **A.   Are you asking customers that did not**
11  **request 67 inch or standard egg in 2003?**
12          BY MS. SCHWARTZ:
13       Q.   Correct.
14       **A.   Is that the specific question?**
15          **In 2003, many customers were not**
16  **requesting 67 inches at the time.**
17       Q.   Did you have customers who were not
18  requiring any minimum cage space in the 2003 time
19  period?
20       **A.   Yes.**
21       Q.   And who would some of those customers
22  have been back in the 2003 time period?
23       **A.   It would probably be easier to say which**
24  **customers had requirements.**
25       Q.   Why don't we try that, then.  In the

---

**67**

1  2003 time period, McDonald's was one of Cargill's
2  customers, correct?
3        **A.   That is correct.**
4           MR. FONTECILLA:  Objection.
5           BY MS. SCHWARTZ:
6        Q.   And in the 2003 time period, they had a
7  requirement for a minimum cage space for the
8  products they purchased from you?
9        **A.   McDonald's had their own animal**
10  **husbandry standards, correct.**
11       Q.   And sitting here today, do you recall
12  what those cage space requirements were for
13  McDonald's?
14       **A.   Yes.**
15       Q.   And what were they?
16       **A.   McDonald's standard was 72 square inches**
17  **minimum.**
18       Q.   And do you recall approximately when
19  that minimum began?
20       **A.   Approximately 2002.**
21       Q.   And is that still the case today?
22          MR. FONTECILLA:  Objection, vague.
23       **A.   Today McDonald's still has a 72-inch**
24  **minimum standard.**
25

---

**68**

1           BY MS. SCHWARTZ:
2        Q.   And from the time period of 2002 through
3  2008, McDonald's requirements of the 72 square
4  inches was greater than what was required under the
5  UEP Certified guidelines, correct?
6        **A.   That is correct.**
7        Q.   And during that time period, the UEP's
8  highest number was 67 square inches; is that
9  correct?
10          MR. FONTECILLA:  Objection, foundation.
11          MR. SVEEN:  I join.  To the extent you
12  know, you can answer.
13       **A.   I actually don't think they were at 67**
14  **inches by 2008.  There was a phase-in.  So even**
15  **UEP's may not have been at 67 in 2008.**
16          BY MS. SCHWARTZ:
17       Q.   Do you remember attending any UEP
18  meetings where there was a recommendation for
19  producers to reduce their flock size?
20          MR. FONTECILLA:  Objection, foundation.
21       **A.   To reduce their flock -- just reduce**
22  **their flock size, no, I don't.**
23          (Stocker Exhibit 4 was marked for
24          identification.)
25

---

**69**

1           BY MS. SCHWARTZ:
2        Q.   I'm handing you what's being marked as
3  Exhibit 4.  This was in the Kansas litigation
4  previously marked as Exhibit 215.  And this is
5  NL004133.  And on the front page, it says it's a
6  shell egg marketing committee minutes.  Do you see
7  that on the front page?
8           MR. FONTECILLA:  Objection.
9        **A.   Yes, I do.**
10          BY MS. SCHWARTZ:
11       Q.   And this is for October 20th of 2004.
12  Do you see that?
13       **A.   Yes.**
14       Q.   And if you look down under -- on the
15  first page to the section that says "Other
16  Attendees" and you look four lines from the bottom
17  of that, do you see that you are listed as an
18  attendee?
19       **A.   Yes, I do.**
20       Q.   And if you turn to the second page of
21  this document, do you see the top sentence -- let
22  me give you a chance to review that document if you
23  haven't had the chance.  I've got a couple of
24  questions just about that second page.
25       **A.   (Reading).**

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

19 (Pages 70 to 73)

---

70

Q.   And the first sentence at the top of the second page says, "Gregory presented further reports and pleaded with the attendees to take care of business by reducing their flock age, stop backfilling and the use of old, depreciated houses."  Do you see that?

A.   Yes, I do.

Q.   Do you recall attending this meeting in New Orleans?

A.   Yes.  I remember being in New Orleans.

Q.   And does this refresh your recollection as to a discussion at this meeting about reducing flock age, backfilling and the use of old, depreciated houses?

MR. FONTECILLA:  Objection, foundation.  The witness testified that he's never seen this document.

A.   I don't recall the specific discussion.

BY MS. SCHWARTZ:

Q.   Do you have an understanding today of what Mr. Gregory meant by "take care of business"?

MR. FONTECILLA:  Objection, calls for speculation.

MR. SVEEN:  Objection, foundation.  You can answer if you know.

---

71

A.   I would have to read the document a little further.  I'm not sure if it's in the context of animal welfare or some other objective.

BY MS. SCHWARTZ:

Q.   If you go down, you'll see there's a heading there called "Area Meeting Recommendations."  Do you see that?

A.   Yes, I do.

Q.   And does that refresh your recollection that there was a discussion about developing a program to reduce the flock by 5 percent with a goal of reducing the nation's flock size by 8 to 10 million hens?

MR. FONTECILLA:  Objection, foundation, calls for speculation, mischaracterizes the document.

A.   I apologize.  Could you repeat that question.

MS. SCHWARTZ:  Sure.

BY MS. SCHWARTZ:

Q.   Does this section entitled the "Area Meeting Recommendations" refresh your recollection that on occasion, or on at least one occasion, a UEP meeting discussed a program to reduce the flock by 5 percent with a goal of reducing the nation's

---

72

flock size by 8 to 10 million hens?

MR. FONTECILLA:  Same objection, and form.

A.   I don't recall the specific discussions.  But I do recall this type of instance happening.

BY MS. SCHWARTZ:

Q.   Do you recall that happening at more than just this meeting?

MR. FONTECILLA:  Objection, vague.

A.   I don't recall any specific meetings.

BY MS. SCHWARTZ:

Q.   If you look at the paragraph under these recommendations, you'll see that there's a reference to Irving Isaacson.

A.   Yes.

Q.   And do you know who Irving Isaacson is?

A.   Yes.

Q.   And who is he?

A.   He was UEP's legal counsel.

Q.   And did he also provide legal advice to UEA?

MR. FONTECILLA:  Objection, vague, calls for speculation.

A.   I believe -- I believe so at the time.  Back at this time.  Back in 2003, '04, '05-type

---

73

time period.

BY MS. SCHWARTZ:

Q.   And did Cargill participate in any USEM meetings?

MR. FONTECILLA:  Objection.

A.   No.

BY MS. SCHWARTZ:

Q.   Fair to say you wouldn't know whether Mr. Isaacson had provided legal advice to USEM?

MR. FONTECILLA:  Objection.

A.   I would have no idea.

BY MS. SCHWARTZ:

Q.   And if you look down that same page that we were looking at, it appears that there was a motion for, quote, "It was moved by Wicker and seconded by Shrimp to recommend to the board a plan for hens currently scheduled for disposal between December 1st 2004 and July 1st 2005 be disposed of four weeks early or reduce your flock size by 5 percent."  Do you see that?

A.   Yes, I do.

Q.   And it appears that that motion carried?

MR. FONTECILLA:  Objection.

A.   Yes.  That's what it appears.

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                April 24, 2014

74

1  BY MS. SCHWARTZ:
2      Q.   And you had spoken earlier this morning
3  about the impact on price if you reduced --
4  actually, let me start over.
5          You had spoken this morning about the
6  impact on cost if you reduced the number of hens in
7  a cage.  Do you recall those questions this
8  morning?
9      **A.   Yes, I do.**
10     Q.   And it was your testimony that if there
11 were fewer hens in a cage, that may have an impact
12 on cost?
13     **A.   That is correct.**
14     Q.   And would you also anticipate an impact
15 on cost by a producer having fewer hens generally?
16         MR. FONTECILLA:  Objection, vague, calls
17 for speculation.
18     **A.   One producer by themselves, no.  Could**
19 **you rephrase the question?**
20         BY MS. SCHWARTZ:
21     Q.   Well, let me ask, why would -- it's your
22 expectation that if there were fewer hens in a
23 cage, that would lead to higher prices -- or a
24 higher cost?
25         MR. FONTECILLA:  Objection.

75

1          MR. SVEEN:  Objection to the extent it
2  misstates his testimony.  Explain your answer.
3      **A.   That would increase the cost at that**
4  **specific facility.  That is correct.**
5          BY MS. SCHWARTZ:
6      Q.   And if you had that same facility, but
7  fewer overall hens at that facility, would you
8  expect cost to go up as well?
9      **A.   It would depend on supply and demand.**
10 **So in other words, you might have fewer hens there,**
11 **but if you built to add hens somewhere else from an**
12 **economic standpoint, supply and demand is still**
13 **balanced.**
14     Q.   But without the additional building,
15 would it have been your expectation that that could
16 have led to higher costs?
17         MR. FONTECILLA:  Objection,
18 mischaracterizes the witness' testimony.
19     **A.   Yes.  If demand is the same and supply**
20 **is down, prices go up.**
21         BY MS. SCHWARTZ:
22     Q.   And you can put that document away.
23     **A.   Thank you.**
24     Q.   Do you recall whether you or others from
25 Cargill attended the economic summit in -- let me

76

1  start over.
2          Do you recall whether you or others at
3  Cargill attended UEP's economic summit?
4          MR. SVEEN:  Objection, vague.
5          MR. FONTECILLA:  Objection.
6      **A.   Could you tell me where it was at or**
7  **what time frame, please?**
8          BY MS. SCHWARTZ:
9      Q.   It would have been in the 2004 time
10 period.  Do you recall attending what was called
11 the economic summit?
12     **A.   Where was it at?**
13     Q.   The location --
14     **A.   The name just -- I apologize.  The name**
15 **doesn't ring a bell to me, the economic summit.**
16     Q.   And that's fine.  If to the best of your
17 recollection that's not a term that sounds familiar
18 to you, that's --
19     **A.   No.**
20     Q.   Okay.  Do you recall attending a
21 producer meeting in Minneapolis in 2005?
22     **A.   Yes.**
23         MR. FONTECILLA:  Objection.
24         BY MS. SCHWARTZ:
25     Q.   And what do you recall about that

77

1  meeting?
2      **A.   I recall it was down by the airport**
3  **somewhere.**
4      Q.   And do you recall why you had attended
5  that meeting?
6      **A.   At a high level, I think just to talk**
7  **about open issues with UEP and suppliers.**
8      Q.   Let me show you what's previously been
9  marked as Cargill 2.  This was marked at the last
10 Cargill deposition as Exhibit Number 2 with the
11 Bates number NL00217575 I believe there at the
12 bottom.  And do you see at the top it's entitled
13 "Producer Meeting in Minneapolis, December 6th
14 2005"?
15     **A.   Yes, I do.**
16         MR. FONTECILLA:  And I'm just going to
17 make a clarification objection on the record to the
18 extent you're characterizing the testimony of
19 Mr. Terry Profitt as a deposition on behalf of the
20 company Cargill.
21         BY MS. SCHWARTZ:
22     Q.   And is this the meeting that you had
23 remembered attending?
24     **A.   I believe so, if it was down by the**
25 **airport.**

HIGHLY CONFIDENTIAL

Stocker, Norm                                                April 24, 2014

21 (Pages 78 to 81)

---

**78**

Q.   Fair enough.  And you see on the front -- first line of this, it says "Individuals Present."  It appears that both you and Mr. Profitt attended this meeting?

A.   That is correct.

Q.   And to the best of your recollection, was this a UEP committee meeting?

A.   I do not believe this was a UEP committee meeting.

Q.   Do you know why this meeting was held?

MR. FONTECILLA:  Objection, calls for speculation.

A.   I think it was held to address concerns of midwest producers with some aspects of UEP and their programs.

BY MS. SCHWARTZ:

Q.   And why did you attend this meeting?

A.   Similar to why we attend UEP meetings, to listen and learn, understand issues important to our industry.

Q.   It's fair to say, however, that Cargill is not a producer, correct?

MR. FONTECILLA:  Objection.

A.   That is correct.

---

**79**

BY MS. SCHWARTZ:

Q.   And do you see that there's a heading there entitled "Issues and Concerns Expressed by Producers"?  Do you see that?

A.   Yes, I do.

Q.   And do you remember that an issue or concern expressed by producers was, quote, the 100 percent rule of the UEP Certified animal welfare program?

MR. FONTECILLA:  Objection, vague.

A.   Yes, I do recall there was an issue with the 100 percent rule.

BY MS. SCHWARTZ:

Q.   And do you recall what the issue with the 100 percent rule was?

A.   The primary issue was the right to choose by producers and/or consumers.

Q.   And can you explain what you mean by that?

A.   So, for example, if -- let's say I had a customer that wanted UEP Certified product.  My only ability to get that product would be to go a producer that was UEP certified, which implies they have to follow the 100 percent rule.  So if I needed eggs from one farm, it could potentially

---

**80**

impact the other farms.

Q.   And did the 100 percent rule impact Cargill?

MR. FONTECILLA:  Objection, vague.

A.   Not that I can recall.

BY MS. SCHWARTZ:

Q.   Did it limit -- well, let me ask, if Cargill had a customer that wanted UEP Certified eggs, that -- Cargill had a limited number of producers who may be UEP certified, correct?

MR. FONTECILLA:  Objection, form, vague and improper hypothetical.

A.   I'm sorry.  Can you repeat the question?

BY MS. SCHWARTZ:

Q.   And let me rephrase.  If Cargill wanted -- if Cargill's customers wanted UEP Certified eggs, Cargill would need to acquire those from producers who were UEP Certified producers, correct?

MR. FONTECILLA:  Objection, vague, form, calls for speculation.

MR. SVEEN:  Potentially we could shortcut this.  Did Cargill have any customers who required UEP Certified eggs?

THE WITNESS:  I recall one customer.

---

**81**

Actually, no, I take that back.  They did not require UEP Certified.  They were like the other customers and required an animal husbandry standard.  But we never bought or marketed UEP-certified product.

BY MS. SCHWARTZ:

Q.   And which customer was that?

A.   We had many customers that asked for eggs produced under an animal husbandry standard that had among its requirements 67 square inches.

Q.   Was Cargill asking for the UEP Certified program?

A.   We did not.

Q.   And if you look under this same exhibit, if you look down to 13, do you have an understanding of why the UEP Certified program might be a market restriction?

MR. FONTECILLA:  Objection.

A.   I think it's the same discussion, the 100 percent rule, to whatever degree that could impact a producer or a customer's right.

BY MS. SCHWARTZ:

Q.   Today are all of Cargill's customers demanding that Cargill's products be produced in compliance with the UEP Certified program?

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                    April 24, 2014

22 (Pages 82 to 85)

---

**82**

1    A.   No.  Today we have no customers that we
2  do UEP Certified on.  We have our own programs.
3    Q.   And what are the other animal welfare
4  programs that your customers may require?  And let
5  me ask -- we've talked about McDonald's.
6    A.   Mm-hmm.
7    Q.   Are there other animal welfare programs
8  under which Cargill sells products to its
9  customers?
10    MR. SVEEN:  Objection to the extent it
11  misstates his testimony on program.  Go ahead.
12    A.   We have customers that would like the
13  eggs we buy to be produced under an animal
14  husbandry standard that is very similar to the UEP
15  program.  But we do not have any customers that
16  require certification of those eggs.  We do our own
17  internal audits.
18    BY MS. SCHWARTZ:
19    Q.   And what are the other animal husbandry
20  standards or requirements that your customers have
21  requested?
22    A.   The main areas are in the area of cage
23  space, which we've talked about, feed access, water
24  access, bird handling procedures, environment.
25  Different broad buckets of issues that are

---

**83**

1  monitored and audited.
2    Q.   Do you recall attending the UEP board of
3  directors meeting in Atlanta, Georgia, in 2006?
4    A.   Was that in January of 2006?
5    Q.   It was.
6    A.   I don't recall that specific meeting
7  because we meet -- they have a meeting in Atlanta
8  every year.  But I likely would have been at that
9  meeting.
10    Q.   Let me mark as Exhibit Number 5 --
11    (Stocker Exhibit 5 was marked for
12    identification.)
13    BY MS. SCHWARTZ:
14    Q.   And Exhibit Number 5 has Bates number
15  NL000972 at the bottom.  And this appear to be the
16  minutes from the UEP board of directors meeting
17  from January 24th of 2006.  Do you see that at the
18  top?
19    A.   Yes, I do.
20    Q.   And if you go down to the members and
21  guests section, if you look four lines from the
22  bottom of that, it appears that you attended this
23  meeting?
24    A.   Yes.
25    Q.   And if you go three lines above that, it

---

**84**

1  appears Mr. Profitt attended this meeting as well?
2    A.   Yes.
3    Q.   And if you turn to the second page of
4  this document under the section entitled "Open
5  Discussion" -- and I'll give you a chance to read
6  through that section.
7    A.   (Reading).
8    Q.   Other than what you see on these
9  minutes, do you have a recollection of any
10  discussion at this meeting regarding the hundred
11  percent rule?
12    A.   No.  I don't recall any specific
13  discussion.
14    Q.   Did Cargill ever voice its opposition or
15  concern with the 100 percent rule to UEP?
16    MR. FONTECILLA:  Objection.
17    A.   Yes.  We would have talked with UEP
18  leadership about it outside of these meetings.
19    BY MS. SCHWARTZ:
20    Q.   And do you recall with whom you would
21  have spoken?
22    A.   Most likely would have been directly
23  with Gene Gregory.
24    Q.   And do you recall whether that was a
25  single conversation with Mr. Gregory?

---

**85**

1    A.   That -- we likely would have had that
2  conversation in varying lengths a couple different
3  times.
4    Q.   And would the concerns you have raised
5  with Mr. Gregory been consistent with what you've
6  testified to this morning?
7    A.   Yes.
8    Q.   Do you recall specifically any
9  additional concerns regarding the hundred percent
10  rule that you discussed with Mr. Gregory?
11    A.   I don't recall anything specifically,
12  no.
13    Q.   Do you need to take a break?  I'm happy
14  to --
15    A.   I'm fine.
16    MR. SVEEN:  He doesn't want to look at
17  any more minutes from meeting he doesn't remember.
18    MS. SCHWARTZ:  They are a riveting read.
19  I will give you that.
20    BY MS. SCHWARTZ:
21    Q.   Let me have you take back out what was
22  marked this morning as Exhibit 1.  And let me have
23  you turn to page 19 of this document.  And that
24  document appears to be an Exhibit D, McDonald's
25  animal welfare guidelines.  Do you see that?

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

23 (Pages 86 to 89)

---

86

1      A.   Yes, I do.
2      Q.   And are you familiar with McDonald's
3 animal welfare guidelines?
4      A.   Yes.
5      Q.   And this document which we discussed
6 earlier is from 2002, correct?
7      A.   That is correct.
8      Q.   To your knowledge, have the McDonald's
9 animal welfare guidelines changed since the 2002
10 time period?
11      A.   I believe there have been some
12 modifications to their program over the years.
13      Q.   Sitting here today, do you remember
14 specifically what those modifications may have
15 been?
16      A.   I don't remember -- no. I don't
17 remember the specifics. But I know, like anything,
18 we've evolved them a little bit over time.
19      Q.   And if you'll keep that document out in
20 front of you, I'm going to hand you another
21 document which I'm marking as Exhibit Number 6.
22      (Stocker Exhibit 6 was marked for
23      identification.)
24      BY MS. SCHWARTZ:
25      Q.   And I apologize. I promise we're

---

87

1 getting to the end of the meeting minutes. What
2 you've got in front of you is entitled "UEP
3 Producer Committee for Animal Welfare," January
4 23rd of 2007. Do you see that at the top?
5      A.   Yes, I do.
6      Q.   And that appears to be another Atlanta
7 meeting in January; fair to say?
8      A.   That is correct.
9      Q.   And if you again look under the
10 attendees for that meeting and you look at the
11 third line from the bottom of that list, do you see
12 that you attended this meeting?
13      A.   Yes.
14      Q.   And two lines above that, it appears
15 Mr. Profitt attended that meeting as well?
16      A.   That is correct.
17      Q.   Great. And if you could pull Exhibit 1,
18 that Exhibit D, and have that in front of you at
19 the same time, I just wanted to ask you a couple of
20 questions.
21      You had mentioned earlier that the
22 McDonald's animal welfare program evolved over
23 time, correct?
24      A.   I believe so, yes.
25      Q.   And the UEP Certified program evolved

---

88

1 over time as well, correct?
2      MR. FONTECILLA: Objection to the extent
3 you're talking about the UEP Certified program, and
4 it mischaracterizes the witness' testimony. And
5 foundation.
6      MR. SVEEN: To the extent you know about
7 the --
8      A.   UEP's animal husbandry standards within
9 their program did change over time.
10      BY MS. SCHWARTZ:
11      Q.   And if you look down on Exhibit 6, which
12 are those minutes that you've got in front of you,
13 I'm going to be focused on the section that says
14 "Audit Subcommittee Report." Do you see that
15 section?
16      A.   Yes, I do.
17      Q.   And I'll give you a chance just to read
18 through that section.
19      A.   (Reading) Okay.
20      Q.   And if you turn to -- if you look at
21 number 2 under that section, it says -- well, let
22 me ask a more basic question. Did you understand
23 that in the 2007 time period that UEP was making
24 changes to its audit guidelines for 2007?
25      MR. FONTECILLA: Objection, foundation,

---

89

1 vague.
2      A.   I recall it's changed over times, and
3 this seems accurate.
4      BY MS. SCHWARTZ:
5      Q.   And if you look at number 2, it appears
6 that there was a change in the ammonia standards
7 from 50 to 25. Do you see that?
8      MR. FONTECILLA: Objection, vague.
9      A.   Yes, I do see that.
10      BY MS. SCHWARTZ:
11      Q.   And if you turn to Exhibit 1 and if you
12 turn to page 20 and if you -- do you see the
13 section entitled "Air Quality and Temperature
14 Control." Do you see that?
15      A.   Yes, I do.
16      Q.   And if you look at number 3, it appears
17 that in 2002 McDonald's was requiring "ammonia
18 concentration to which the birds are exposed should
19 ideally be less than 10 ppm and should not exceed
20 25 ppm except for temporary excesses." Do you see
21 that?
22      MR. HARTUNG: Objection, speculation.
23      A.   Yes, I see that.
24      BY MS. SCHWARTZ:
25      Q.   And to the best of your knowledge

---

# HIGHLY CONFIDENTIAL

Stocker, Norm                                                    April 24, 2014

## 90

sitting here today, was that McDonald's requirement back in the 2002 time period?

MR. HARTUNG: Objection.

MR. FONTECILLA: Objection.

A. Yes, this requirement and this document from 2002 was McDonald's requirement back then.

BY MS. SCHWARTZ:

Q. And Cargill would have required producers producing McDonald's products to meet these requirements, correct?

MR. FONTECILLA: Objection, vague, characterizes the witness' testimony.

A. The standards in the contract is what we expected.

BY MS. SCHWARTZ:

Q. And more than expected; it was a requirement, correct?

MR. FONTECILLA: Same objection.

A. Yes, it was a requirement of the contract.

BY MS. SCHWARTZ:

Q. And so in the 2002 time period, it appears that -- let me take a step back.

In 2002, McDonald's allowed a lower concentration for ammonia than what was allowed by

## 91

the UEP animal husbandry guidelines?

MR. FONTECILLA: Objection, foundation, calls for speculation.

A. Yes, the guidelines in this document, 2007, are different from what McDonald's guidelines were.

BY MS. SCHWARTZ:

Q. And the McDonald's guidelines had a lower amount of ammonia that birds were allowed to be exposed to at that time, correct?

MR. FONTECILLA: Same objection.

A. Yes, that's correct.

BY MS. SCHWARTZ:

Q. And do you have an understanding as to the impact ammonia levels could have on hens?

A. Not very well.

Q. Do you have any understanding?

A. Not a scientific understanding, no.

Q. Do you know why McDonald's had a requirement and a maximum that hens could be -- let me start over.

Sitting here today, do you have an understanding as to why McDonald's had a maximum ammonia concentration for the hens that produced their eggs?

## 92

MR. SVEEN: Objection, foundation.

MR. FONTECILLA: Objection, vague.

MR. SVEEN: If you know --

A. It was a requirement determined by their scientific committee.

BY MS. SCHWARTZ:

Q. But sitting here today, you don't have any specific knowledge as to that number?

MR. FONTECILLA: Same objection.

A. I was not on the scientific committee.

BY MS. SCHWARTZ:

Q. If you turn on Exhibit 1, the supply agreement, if you turn back the page before --

A. Page 19?

Q. Yes.

MR. SVEEN: Counsel, is your point that McDonald's requirements in 2002 were more stringent than the UEP requirements at that point? I mean, can we just ask that question rather than go --

MS. SCHWARTZ: I'm happy to ask that question.

BY MS. SCHWARTZ:

Q. Is it fair to say that in 2002 --

MR. SVEEN: There are components of the --

## 93

BY MS. SCHWARTZ:

Q. -- that there were components of the McDonald's animal welfare guidelines that were more stringent than the UEP guidelines at that time?

A. Yes. They had requirements that were different; for example, 72 inches versus 67.

Q. And at that time, Cargill required its producers to comply with the animal welfare guidelines for any products that would be supplied to McDonald's?

MR. FONTECILLA: Objection, vague.

A. McDonald's required the eggs produced under contract specifically for McDonald's to meet those criteria as established in this contract.

BY MS. SCHWARTZ:

Q. And, therefore, Cargill required its suppliers for McDonald's to meet those requirements as well?

MR. FONTECILLA: Same objection.

A. We required it in alignment with customer needs.

BY MS. SCHWARTZ:

Q. And in the 2002 time period, did Sparboe ever tell you that it was impossible to produce eggs in compliance with the McDonald's animal

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

25 (Pages 94 to 97)

94

1 welfare guidelines?
2           MR. HARTUNG:  Objection, foundation.
3      A.   Well, they weren't producing any eggs in
4 2002.  So to that degree, there weren't -- there
5 wasn't a supply -- there weren't any eggs until
6 after that.
7           BY MS. SCHWARTZ:
8      Q.   When did Sparboe begin selling eggs or
9 egg products to Cargill?
10          MR. HARTUNG:  Objection, foundation.
11     A.   For McDonald's or --
12          BY MS. SCHWARTZ:
13     Q.   For McDonald's?
14     A.   The time period, I believe, is laid out
15 in this contract when the first eggs became
16 available, which I believe were in 2003.
17     Q.   Then let me ask the same question with
18 regard to 2003.  Did Sparboe ever tell Cargill that
19 it was impossible to produce eggs or egg products
20 in compliance with the McDonald's animal welfare
21 guidelines?
22          MR. SVEEN:  Objection, foundation.
23     A.   Not that I'm aware of.
24          BY MS. SCHWARTZ:
25     Q.   Did Daybreak also produce eggs or egg

95

1 products for your McDonald's customer?
2           MR. CAMPBELL:  Objection to the
3 characterization of "egg" and "egg products" and
4 mischaracterizes the witness' testimony.
5      A.   The Graettinger contract we talked about
6 earlier in 2003, I believe, was amended to be under
7 the McDonald's guidelines.
8           BY MS. SCHWARTZ:
9      Q.   And the eggs or egg products intended
10 for McDonald's, would those eggs have to be
11 produced under these same animal welfare guidelines
12 that we're looking at in Exhibit 1?
13          MR. FONTECILLA:  Same objection,
14 mischaracterizes the witness' testimony as to eggs
15 and egg products.  The witness has testified that
16 Cargill purchases raw, unpasteurized liquid egg.
17     A.   The Graettinger contract was for liquid
18 egg products that would have had a similar
19 Exhibit D as is in this contract we're talking
20 about.
21          BY MS. SCHWARTZ:
22     Q.   Did Daybreak ever tell Cargill that it
23 was not possible to produce eggs or egg products
24 consistent with the McDonald's animal welfare
25 guidelines?

96

1           MR. SVEEN:  Objection, foundation.  To
2 the extent you know...
3           MR. FONTECILLA:  And I'm going to just
4 make a standing objection to the extent counsel
5 insists on continuing to use the term or phrase
6 "egg and egg products" because it mischaracterizes
7 the witness' testimony.
8      A.   At the Graettinger facility, I'm not
9 aware of them not being able to meet our needs.
10          BY MS. SCHWARTZ:
11     Q.   And you can put those documents away.
12          Has Cargill ever required one of its
13 suppliers to be a UEP member?
14     A.   No.
15     Q.   Specifically, do you recall whether
16 Cargill ever required Sparboe to rejoin UEP?
17     A.   I recall that we have never required
18 that in any contracts or discussions.
19     Q.   Do you know who Kevin Haley is?
20     A.   I believe he was one of the attorneys
21 for UEP back in the mid 2000s, if that's the right
22 name.
23     Q.   Would he --
24     A.   If that's the right person.
25     Q.   Sorry to interrupt you.  Do you have an

97

1 understanding today as to whether he would have
2 provided legal advice to UEA as well?
3      A.   I don't recall that.  I just don't
4 recall.
5           MS. SCHWARTZ:  Why don't we take a quick
6 break.  I just have a couple more questions, but
7 I'll get my documents marked and be ready to finish
8 this up.
9           MR. SVEEN:  Okay.
10          THE WITNESS:  Okay.
11          THE VIDEOGRAPHER:  We are going off the
12 record at 11:36 a.m.
13          (Whereupon, a recess was taken from
14 11:36 a.m to 11:43 a.m.)
15          THE VIDEOGRAPHER:  We are back on the
16 record.  This is the continuing videotaped
17 deposition of Norm R. Stocker taken on April 24th
18 2014.  The time now is 11:43 a.m.
19          BY MS. SCHWARTZ:
20     Q.   We are back on the record after a quick
21 break, and I have hopefully just a couple more
22 questions for you.  I wanted to ask you if you have
23 an understanding of what the term "master case"
24 means with regard to packaging.
25     A.   Yes.  It's basically a corrugated box.

HIGHLY CONFIDENTIAL

Stocker, Norm                                        April 24, 2014

26 (Pages 98 to 101)

---

**98**

1    Q.   And how does Cargill use a master case?
2    **A.   At egg plants or within Cargill's**
3    **facilities?**
4    Q.   Let me go ahead and mark this, and it
5    may just be easier to look at this.  I'm marking as
6    Exhibit 7 -- I'll give you the chance to read these
7    e-mails all the way through.
8         (Stocker Exhibit 7 was marked for
9         identification.)
10        BY MS. SCHWARTZ:
11   Q.   And Exhibit 7 is Bates labeled
12   DAY0026242.
13   **A.   (Reading).**
14   Q.   And have you had the chance to read
15   these e-mails?
16   **A.   Not every word, but skimmed over it,**
17   **yes.**
18   Q.   And these appear to be a series of
19   e-mails from 2005 and then 2007, correct?
20   **A.   Yes.**
21   Q.   And they appear to discuss shell egg
22   master cases?
23   **A.   That is correct.**
24   Q.   And, again, what are shell egg master
25   cases?

---

**99**

1    **A.   In this context, it was a master case**
2    **that held flats of shell eggs for sale to a**
3    **customer.**
4    Q.   And the e-mails discuss how those master
5    cases are going to be labeled, correct?
6         MR. FONTECILLA:  Objection.  The
7    document speaks for itself.
8    **A.   Yeah.  It talks about State**
9    **requirements, State labeling requirements and**
10   **stuff, yes.**
11        BY MS. SCHWARTZ:
12   Q.   And why don't we start on the second
13   page of this document.
14   **A.   Okay.**
15   Q.   And if we look at the September 8th 2005
16   e-mail from a Rosalind -- is it Zils?
17   **A.   I'm sorry.**
18   Q.   September 8th --
19   **A.   In the middle of the page?  Rosalind**
20   **Zils is correct.**
21   Q.   And who is Rosalind Zils?
22   **A.   At this time period, Rosalind was the**
23   **McDonald's supply chain manager within Cargill**
24   **Kitchen Solutions, or Sunny Fresh at the time.**
25   Q.   And with regard to McDonald's, what

---

**100**

1    would her responsibilities have been?
2         MR. FONTECILLA:  Objection, vague.
3    **A.   Ros's responsibilities would have been**
4    **to ensure McDonald's got what they needed when they**
5    **needed it and in line with the requirements.**
6         BY MS. SCHWARTZ:
7    Q.   And that would be -- let me step back.
8         Does Cargill take care of the actual
9    delivery of eggs to McDonald's?
10   **A.   Today we do not.  Back then, we might**
11   **have.**
12   Q.   And her e-mail writes in part, "The
13   answer to the question about whether or not all
14   master cases should be compliant with all states is
15   yes.  Our shell egg contingency plan requires all
16   locations to be able to back each other up."  Do
17   you see that?
18        MR. FONTECILLA:  Objection.
19   **A.   Yes.**
20        BY MS. SCHWARTZ:
21   Q.   And what is a shell egg contingency
22   plan?
23   **A.   In this specific case, it's a plan to**
24   **ensure that we always keep McDonald's restaurants**
25   **supplied with shell eggs.**

---

**101**

1    Q.   And with regard to Cargill's shell egg
2    contingency plan for McDonald's, can you describe
3    in some more specificity what that is?
4    **A.   At a high level in this case, it was**
5    **making sure we had master case either printed or**
6    **printing plates for specific locations that were**
7    **not part of the routine supply chain, should that**
8    **routine supply chain have a problem and we need to**
9    **go to a subsequent facility to get shell eggs for**
10   **McDonald's.**
11   Q.   So if your usual facility that was
12   supplying McDonald's had an emergency or lack of
13   supply or something that impacted the eggs, it's
14   the ability for Cargill to locate eggs somewhere
15   else?
16        MR. FONTECILLA:  Objection, form.
17   **A.   It could be that or even an increased**
18   **demand in a promotional period.**
19        BY MS. SCHWARTZ:
20   Q.   And if you turn -- and it appears from
21   this e-mail that --
22   **A.   Which page are you on now?**
23   Q.   Let's keep on page 2.
24   **A.   Okay.**
25   Q.   Do you have an understanding of -- well,

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                    April 24, 2014

27 (Pages 102 to 105)

---

**102**

1  let me ask, were you involved at all with master
2  case labeling?
3      A.   I personally was not.
4      Q.   Do you have an understanding of
5  generally what States may require on a label?
6      A.   About -- not specifically other than
7  some States have licensing requirements and some
8  States don't.
9      Q.   And if you turn to the first page of
10  this e-mail string, and now we're looking at an
11  October 15th 2007 e-mail.  Do you see that there
12  are two of them actually on that front page?
13      A.   Yes, I do.
14      Q.   And the bottom one is from Lolita
15  Luchsinger.
16      A.   Luchsinger.
17      Q.   Luchsinger.
18      A.   Correct.
19      Q.   And what was her role at Cargill?
20      A.   Her role is in supply quality assurance.
21      Q.   And if you go down that e-mail, this
22  e-mail was sent to you and two others at Daybreak
23  Foods, correct?
24      A.   Yes.
25      Q.   And do you know who

---

**103**

1  William@DaybreakFoods.com would be?
2      A.   Yes.
3      Q.   And who is that?
4      A.   That is Bill Rehm.
5      Q.   And do you have an understanding of who
6  Pat@DaybreakFoods.com is?
7      A.   Yes.
8      Q.   And who is that?
9      A.   That is Pat Stonger, although her last
10  name is changed now.
11      Q.   And who are those two individuals?
12      A.   Bill is the president, and Pat is in
13  charge of QA.
14      Q.   And if you look down on this e-mail,
15  you'll see number 2 there.
16      A.   Yes.
17      Q.   And it says, "To make both suppliers
18  compliant with all State requirements, here is the
19  language that should be put on the case."  Do you
20  see that sentence?
21      A.   Yes, I do.
22      Q.   And below that, it says in part "Kansas
23  permit"?
24      A.   Yes.  I see that.
25      Q.   And do you have an understanding of what

---

**104**

1  that means?
2      A.   Not really, other than it's the -- I
3  assume it's the license number for the State of
4  Kansas.
5      Q.   Does Cargill sell eggs in the state
6  of -- sell eggs or egg products in the state of
7  Kansas?
8          MR. FONTECILLA:  Objection, foundation.
9      A.   Cargill has customers in Kansas, yes.
10          BY MS. SCHWARTZ:
11      Q.   And is one of those customers
12  McDonald's?
13          MR. FONTECILLA:  Same objection.
14      A.   I'm not sure if they have a DC in Kansas
15  or not.  We sell to the distribution centers.
16          BY MS. SCHWARTZ:
17      Q.   Do you have an understanding of why a
18  Kansas permit might be required?
19          MR. FONTECILLA:  Objection, calls for
20  speculation, calls for a legal conclusion,
21  foundation.
22      A.   Because the shell egg eventually gets
23  consumed or used in a restaurant in that state.
24          BY MS. SCHWARTZ:
25      Q.   And do you understand this e-mail

---

**105**

1  that -- this string of e-mails that Cargill's
2  master cases that were going to McDonald's
3  locations needed to have this Kansas permit number
4  on the label?
5          MR. FONTECILLA:  Objection, calls for a
6  legal conclusion, calls for speculation, vague,
7  mischaracterizes the document.
8      A.   As part of our contingency plan, we
9  basically make sure that all locations can go to
10  any state, because in a contingency, you don't have
11  time to deal with this.  So you do it in case.  You
12  may never use it.
13          BY MS. SCHWARTZ:
14      Q.   And who would have been putting the --
15  who physically would have been putting the labels
16  on the master cases?
17      A.   The manufacturer of the master case.
18      Q.   Is that something that Cargill
19  coordinates?
20          MR. FONTECILLA:  Objection, vague.
21      A.   Generally the supplier works with their
22  corrugate or master case supplier.  We do require
23  sign-off on that printing plate before it's
24  produced.
25

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                  April 24, 2014

28 (Pages 106 to 109)

---

106

1    BY MS. SCHWARTZ:
2    Q.    And in this case, do you know, was
3    Daybreak responsible for the labeling for these
4    McDonald's eggs?
5         MR. FONTECILLA:  Objection.
6    A.    They would have been responsible to have
7    a label that was approved by Cargill and
8    McDonald's.
9         BY MS. SCHWARTZ:
10   Q.    And also in that paragraph 2 -- do you
11   know the time period in which Cargill may have been
12   supplying the McDonald's facilities in Kansas?
13        MR. FONTECILLA:  Objection, foundation.
14   A.    I don't -- again, our transaction ends
15   at the sale to the distribution center.  And so I
16   don't know specifically if there was a
17   distribution -- if there was or is a DC in Kansas.
18        BY MS. SCHWARTZ:
19   Q.    I see that there -- it certainly doesn't
20   appear that you've got all of the states listed
21   there.  Correct?
22        MR. FONTECILLA:  Objection, vague.
23   A.    I assume it's all the states that have a
24   requirement.
25

---

107

1    BY MS. SCHWARTZ:
2    Q.    And did Cargill serve the McDonald's
3    restaurants that were west of the Mississippi?
4         MR. FONTECILLA:  Objection,
5    mischaracterizes the witness' testimony about
6    serving restaurants.
7    A.    Cargill sold at this time period shell
8    eggs and egg products to McDonald's distribution
9    centers west of the Mississippi.
10        BY MS. SCHWARTZ:
11   Q.    To the best of your knowledge, was
12   Cargill the sole supplier for those restaurants --
13   for those facilities west of the Mississippi?
14        MR. FONTECILLA:  Objection, form.
15   A.    Yes.  For those distribution centers and
16   egg products for McDonald's, we were the sole
17   supplier.
18        BY MS. SCHWARTZ:
19   Q.    And these e-mails are from 2005 and
20   2007.  Sitting here today, does Cargill continue to
21   supply McDonald's distribution facilities west of
22   the Mississippi?
23   A.    Yes, we do.
24   Q.    Did that change at any time from 2007 to
25   the present?

---

108

1         MR. FONTECILLA:  Objection, vague, form.
2    A.    No.  Unless a distribution center
3    changed.  But we supplied all of them west of the
4    Mississippi.
5         BY MS. SCHWARTZ:
6    Q.    You can put that away.
7         You had testified earlier this morning
8    about the Urner Barry pricing, correct?
9    A.    Correct.
10   Q.    Do you have an understanding of the
11   factors that impact the Urner Barry price?
12   A.    Yes.
13   Q.    And what is your understanding?
14   A.    Urner Barry basically -- report is a
15   market reporting service, and reports what they
16   think egg products, in this specific case, are
17   trading at today.
18   Q.    And would supply and demand factors, to
19   your knowledge, impact the Urner Barry price?
20        MR. FONTECILLA:  Objection, foundation,
21   calls for speculation.
22   A.    The Urner Barry quotation would reflect
23   the current market fundamentals.
24        BY MS. SCHWARTZ:
25   Q.    And would those market fundamentals

---

109

1    include the supply of eggs in the country?
2         MR. FONTECILLA:  Same objection.
3    A.    Yes.  The quotation would reflect the
4    balance of supply and demand.
5         BY MS. SCHWARTZ:
6    Q.    And just one last document to pull out.
7    If you can pull back out that Exhibit 1.  It's the
8    supply agreement.  If you would turn to page 3 --
9    and, actually, let me ask you a question before we
10   look specifically at the document.
11        Did Cargill have the right to
12   renegotiate its prices during the term of the
13   contract with Sparboe, for example?
14        MR. HARTUNG:  Objection, foundation.
15   A.    Without reviewing this specific
16   contract, most of our contracts have the right for
17   both parties to mutually agree upon changes.
18        BY MS. SCHWARTZ:
19   Q.    And sitting here today, do you recall
20   whether Cargill ever approached Sparboe
21   specifically during the time from 2003 to the
22   present to discuss and renegotiate the prices?
23        MR. HARTUNG:  Objection, foundation.
24   A.    We would have had discussions regarding
25   things that impacted cost at that facility.

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                           April 24, 2014

29 (Pages 110 to 113)

---

110

BY MS. SCHWARTZ:

Q.   Do you remember specifically any of those discussions?

MR. HARTUNG:  Same objection.

A.   I remember having discussions several times with David Cisneros at the time with Sparboe looking at the annual performance and having those renegotiations.

BY MS. SCHWARTZ:

Q.   And what about with regard to Daybreak, the same question?  Do you remember having any discussions with Daybreak from 2003 to the present regarding the pricing of the products you purchased from Daybreak?

A.   Yes.  I've, over the years, had discussions and renegotiated contracts mutually with Daybreak.

Q.   And let's take these apart again.  With regard to Sparboe, did Cargill ever renegotiate because it thought the prices were too high?

MR. HARTUNG:  Objection, foundation.

A.   As a buyer, I always think the price is high.  The only renegotiations we had were based on, for example, in the Sparboe contract specifically, this animal husbandry standard didn't

---

111

exist, so they had to put estimates together.  Once we knew better how this facility was performing, there was, in one specific instance, a reduction in the base pricing because some of the projections were conservative.  And so we mutually agreed to make an adjustment.

BY MS. SCHWARTZ:

Q.   And the same question with regard to Daybreak.  Do you recall from 2003 to the present any renegotiation by Cargill because they thought the price was too high?

MR. FONTECILLA:  Objection, calls for speculation.

A.   I recall at the Graettinger facility specifically the same situation in regards to the McDonald's animal husbandry standards, where once we knew more about how the birds would perform, that we made a one-time adjustment in the base pricing to reflect that.

BY MS. SCHWARTZ:

Q.   Do you ever compare the Urner Barry price with the price that you were receiving from a supplier?

MR. FONTECILLA:  Objection, vague.

A.   Every -- yeah, I guess I don't

---

112

understand the question.

BY MS. SCHWARTZ:

Q.   In -- you had testified earlier, as a buyer, you always think prices are too high.

A.   Yes.

Q.   Do you ever compare the price that Cargill is receiving to compare it with the Urner Barry price that's available in the market?

MR. FONTECILLA:  Objection, mischaracterizes the witness' testimony, vague.

A.   For grain-based contracts, the market is irrelevant to me.  They're more about the cost of producing eggs.

BY MS. SCHWARTZ:

Q.   With regard to the market purchases you've made, you testified this morning that Cargill has made market purchases from Daybreak, correct?

A.   That is correct.

Q.   Has Cargill also made market purchases from Sparboe?

A.   Yes.  That is correct.

Q.   And I don't know all of the producers that Cargill may do business with.  So let me ask just a couple of questions.  Does Cargill buy from,

---

113

for example, Rose Acre?

A.   It's been many years.

Q.   Would it have been --

A.   We likely did in the past, but it's been a long time.

Q.   Would it have been since 1999?

MR. FONTECILLA:  Objection.  I'm just going to make an objection to the extent that these questions do not specify a particular product or time period.

A.   My memory says if we did, it was less than a handful of loads.

BY MS. SCHWARTZ:

Q.   Sitting here today, do you recall whether those purchases would have been on the market?

A.   If we had purchased from Rose Acres, they would have been considered a market -- a market purchase, yes.

Q.   Sitting here today, do you recall whether Cargill has purchased from Ohio Fresh?

MR. FONTECILLA:  Same objection.

A.   I'm not familiar with any purchases from Ohio Fresh or any of its predecessor companies that were basically the same facilities.

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                  April 24, 2014

30 (Pages 114 to 117)

---

114

BY MS. SCHWARTZ:

Q.   And sitting here today, has Cargill purchased on a market basis from Sauder?

MR. FONTECILLA:  Same objection.

A.   No, we have not, that I'm aware of.

BY MS. SCHWARTZ:

Q.   Going back to both Sparboe and Daybreak -- and I'll take them individually -- back in the -- looking at 2003 to the present --

A.   Okay.

Q.   -- would it be your understanding that Cargill would have made a market purchase every year or --

A.   From --

MR. FONTECILLA:  Object -- sorry, Mr. Stocker.  Sorry to interrupt.  I just want to make an objection as to form, and the question was vague and compound.

MS. SCHWARTZ:  And let me finish my question, and then you're welcome to make any objection you want.

MR. FONTECILLA:  I'm sorry, Counsel, I thought you were finished.

BY MS. SCHWARTZ:

Q.   Starting from the time frame -- all of

---

115

these questions will be from 2003 to the present.

A.   Okay.  And specific to which supplier again?  I apologize.

Q.   Let's start with Daybreak.

A.   Okay.

Q.   Would it be your expectation that Cargill had made a market purchase from Daybreak in each of those years?

MR. FONTECILLA:  Objection.

A.   It's likely.

BY MS. SCHWARTZ:

Q.   And the same question with regard to Sparboe.  Would it be your expectation that Cargill would have made a market purchase from Sparboe in each of those years?

MR. HARTUNG:  Objection.

A.   Yes.

MS. SCHWARTZ:  I have no further questions.  Thank you very much for your time, sir.

THE WITNESS:  You're welcome.

MR. SVEEN:  Anybody else -- anybody on the phone?

MR. ALMON:  This is James Almon.  I don't have any questions.

MS. SCHWARTZ:  Do any other

---

116

plaintiffs' counsel on the phone have any questions?  Plaintiffs' counsel in the room?

Okay.  I have a few follow-up questions. I don't need to take a break.

THE WITNESS:  Yeah, I'm good.

EXAMINATION BY COUNSEL FOR DAYBREAK FOODS

BY MR. FONTECILLA:

Q.   Mr. Stocker, thank you for your patience today.  Just a couple quick questions.  Do you remember Ms. Schwartz some time ago asking you some questions about the Capper-Volstead Act?  Do you recall that?

A.   Yes, I do.

Q.   Are you an expert with regards to Capper-Volstead?

A.   No, I'm not an expert.

Q.   Are you familiar with the text of the law that's referred to as Capper-Volstead?

A.   I'm fairly sure I've never read it.

Q.   And if you could refer to Exhibit 7, which is the last exhibit that was shown to you there, the contingency plan that is referred to in that document, that does not in any way mean that it was actually enacted for any particular facility or State; is that correct?

---

117

MS. SCHWARTZ:  Objection to form.

A.   We have -- that is correct.

Our contingency plans -- we have lots of contingency plans.  Not all of them get utilized.

BY MR. FONTECILLA:

Q.   And the fact that Cargill's contingency plan may or may not require certain requirements as to labels for a case does not actually mean that cases with any particular label were ever produced; is that right?

MS. SCHWARTZ:  Objection to form.

A.   That is correct.  Even some of the text in here indicates have the plates ready, but not print the master case.

BY MR. FONTECILLA:

Q.   And is there any way looking at this document to determine whether any cases with any particular permit number as listed on the first page were ever produced?

A.   I'd have to read through.  Could you rephrase the question please, or restate it?

Q.   Are you aware of -- sitting here today or based on your personal recollection, aware of any cases ever being made with the labels as described here in the first page of Exhibit 7?

---

HIGHLY CONFIDENTIAL

Stocker, Norm                                                    April 24, 2014

31 (Pages 118 to 121)

---

**118**

1    A.   Yes.  We would have made cases.

2    Q.   Can you recall any cases being sent out

3  by Daybreak that would have had any of the

4  particular specific text that is listed here in the

5  first page of Exhibit 7, to the best of your

6  recollection?

7    A.  I don't recall a situation where that --

8  where we would have sent out a case from Daybreak

9  with these specifications on it.

10   Q.   And there's no way to tell from this

11 document whether Daybreak ever shipped any cases

12 with any of these particular labels as described on

13 page 1 of Exhibit 7; is that correct?

14   A.  That is correct.

15   Q.   Okay.  And just two more questions.  And

16 we can set this document aside.  Earlier do you

17 recall Ms. Schwartz asking you certain questions

18 about customers who did not request a 67-inch cage

19 space requirement?

20   A.  I recall that discussion, yes.

21   Q.   Do customers of Cargill request cage

22 space requirements that are above 67 inches from

23 time to time between 1999 and 2008?

24   A.  Yes.  We have customers that have a

25 higher standard.

---

**119**

1    Q.   And some of the customers request 67

2  inches as one of the cage space requirements as

3  well; is that correct?

4    A.  We have some customers -- yes, that is

5  correct.

6    Q.   And do some customers require a less

7  cage space requirement than 67 inches or no cage

8  space requirement at all?

9    A.  That is correct.

10   Q.   And Ms. Schwartz also started off her

11 questioning to you by making certain statements

12 about a time period after 2008.  Do you recall

13 that?

14   A.  I do recall that.

15   Q.   Would any of your testimony to my

16 questions earlier today about the Daybreak

17 facilities and the animal welfare requirements --

18 would that have changed if I had mentioned the time

19 period 2008 to the present?

20   MR. SVEEN:  I'm going to object to the

21 form of that question.

22   MS. SCHWARTZ:  And same objection.  It

23 requires essentially re-asking every question from

24 the entire morning.

25   A.  Yeah.  Is there a different way you

---

**120**

1  could restate the question?

2    BY MR. FONTECILLA:

3    Q.   Sure.  I'll just try one more time.

4    A.  Okay.

5    Q.   Did the general -- do you remember

6  testifying generally that the requirements and

7  specifications required of Daybreak under the

8  supply agreements including cage space

9  requirements -- do you recall that?

10   A.  I do recall that.

11   Q.   And do you recall testifying that some

12 of those requirements were included in the supply

13 contract because Cargill's customers required those

14 specifications of Cargill?  Do you recall that?

15   A.  I do recall that.

16   Q.   And would that general testimony change

17 if I had asked those questions earlier for the time

18 period 2008 to 2008?

19   MR. SVEEN:  Objection.  It's the same

20 objection.  It's still re-asking all the questions

21 from this morning.

22   A.  I'm not aware of any of the answers that

23 would have changed if the time period had been

24 lengthened.

25   MR. FONTECILLA:  I have no further

---

**121**

1  questions.

2    EXAMINATION BY COUNSEL FOR THE KANSAS PLAINTIFFS

3    BY MS. SCHWARTZ:

4    Q.  I have one last follow-up question.

5    A.  Sure.

6    Q.  To your knowledge, was Daybreak aware

7  that Cargill was supplying McDonald's west of the

8  Mississippi?

9    A.  Yes.

10   MS. SCHWARTZ:  No further questions.

11   MR. SVEEN:  Everybody good?  All right.

12   THE VIDEOGRAPHER:  We're going off the

13 record at 12:13 p.m.

14   (Reading and signing reserved).

15   (Whereupon, at 12:13 p.m. the videotaped

16 deposition was adjourned.)

17   * * * * *

---

HIGHLY CONFIDENTIAL

Stocker, Norm

April 24, 2014

32 (Pages 122 to 123)

122

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata Sheet signed by me.

_____    _____
(DATE)                    (SIGNATURE)

123

REPORTER'S CERTIFICATE

STATE OF MINNESOTA          )
                                             ss.
COUNTY OF HENNEPIN          )

I hereby certify that I reported the deposition of NORM R. STOCKER on April 24, 2014, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and that this transcript is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality.

WITNESS MY HAND AND SEAL THIS 28th day of April, 2014.

_____
Jonathan Wonnell
Notary Public, Hennepin County, Minnesota
My Commission expires January 31, 2017