# ATTACHMENT 68

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF PENNSYLVANIA

3

4     IN RE:  PROCESSED EGG PRODUCTS  MDL NO. 2002

5     ANTITRUST LITIGATION           08-md-02002

6     _____

7     THIS DOCUMENT RELATES TO:

8     ALL ACTIONS

9

10

11             -- HIGHLY CONFIDENTIAL --

12

13        VIDEOTAPED DEPOSITION OF STEVE STORM

                PURSUANT TO RULE 30(b)(6)

14

15          Taken at Young, Wells Williams,

            4450 Old Canton Road, Suite 200,

16          Jackson, Mississippi, on Friday,

         April 25, 2014, beginning at 9:09 a.m.

17

18

19

20    REPORTED BY:

21        CELESTE O. WERKHEISER, RMR

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

1 APPEARANCES:
2
    DANIEL E. BIRKHAEUSER, ESQUIRE
3   Bramson, Plutzik, Mahler & Birkhaeuser
    2125 Oak Grove Road, Suite 120
4   Walnut Creek, California 94598
    Telephone: (925) 945-0200
5   Fax: (925) 945-8792
        ATTORNEY FOR INDIRECT PURCHASER
6   PLAINTIFFS
7
    AMY N. L. HANSON, ESQUIRE
8   (VIA TELEPHONE)
    Keller Rohrback, LLP
    1201 3rd Avenue, Suite 3200
9   Seattle, Washington 98101
10  Telephone: (206) 224-7435
        ATTORNEY FOR DIRECT PURCHASER
11  PLAINTIFFS
12
    WILLIAM GREEN, ESQUIRE
13  (VIA TELEPHONE)
    Stinson Leonard Street, LLP
14  150 South Fifth Street
    Suite 2300
15  Minneapolis, MN 55402
    Telephone: (612) 335-1500
16  Fax: (612) 335-1657
        ATTORNEY FOR DEFENDANT,
17      MICHAEL FOODS, INC.
18
    BRIAN ROBISON, ESQUIRE
19  Gibson, Dunn & Crutcher, LLP
    2100 McKinney Avenue
20  Dallas, Texas 75201-6912
    Telephone: (214) 698-3100
21  Fax: (214) 571-2928
22
    -and-
23
24
25

Page 3

1 APPEARANCES: (Continued)
2
    ROBERT L. HOLLADAY, JR., ESQUIRE
3   Cal-Maine Foods, Inc.
    3320 W. Woodrow Wilson Avenue
4   Jackson, Mississippi 39209
    Telephone: (601) 948-4813
5       ATTORNEYS FOR DEFENDANT, CAL-MAINE
    FOODS
6
7   PATRICK AHERN, ESQUIRE
    Ahern & Associates, P.C.
8   Three First National Plaza
    70 West Madison Street, Suite 1400
9   Chicago, Illinois 60601
    Telephone: (312) 214-3784
10      ATTORNEY FOR DIRECT ACTION
        PLAINTIFFS: WINN-DIXIE STORES, INC.,
11  H. J. HEINZ, C&S WHOLESALE GROCERS,
    INC. AND ROUNDIE'S SUPERMARKETS, INC.
12
13
14
15
16
17
18
19
20
21
22
23
24
25 Videographer: Darren Guastella

Page 4

1       STIPULATION
2       It is hereby stipulated and agreed by
3   and between the parties hereto, through their
4   respective attorneys of record, that this
5   deposition may be taken at the time and place
6   hereinbefore set forth, by Celeste O.
7   Werkheiser, Registered Merit Reporter and Notary
8   Public, pursuant to the Federal Rules of Civil
9   Procedure, as amended;
10      That the formality of READING AND
11  SIGNING is specifically NOT WAIVED;
12      That all objections, except as to the
13  form of the questions and the responsiveness of
14  the answers, are reserved until such time as
15  this deposition, or any part thereof, may be
16  used or is sought to be used in evidence.
17          ---
18
19
20
21
22
23
24
25

Page 5

1       T-A-B-L-E  O-F  C-O-N-T-E-N-T-S
2 Examination By:            Page
3 Mr. Birkhaeuser.............................8
4 Mr. Ahern...................................150
5 Stipulation.................................4
6
7 Exhibits:
8 Exh 95  UEP Animal Welfare Committee Meeting
        Minutes 10/11/00.......................26
9
    Exh 96  UEP Producer Committee for Animal
10  Welfare Meeting Minutes 5/14/01..........32
11 Exh 97  UEP Producer Committee for Animal
        Welfare Meeting Minutes 10/17/01........35
12
    Exh 98  UEP Producer Committee for Animal
13  Welfare Meeting Minutes 11/14/01.........42
14 Exh 99  UEP Producer Committee for Animal
        Welfare Meeting Minutes 3/26/02..........50
15
    Exh 100  UEP Producer Committee for Animal
16  Welfare Meeting Minutes 10/9/02..........57
17 Exh 101  UEP Producer Committee for Animal
        Welfare Meeting Minutes 1/21/03..........60
18
    Exh 102  UEP Producer Committee for Animal
19  Welfare Meeting Minutes 2/26/03..........66
20 Exh 103  UEP Producer Committee for Animal
        Welfare Meeting Minutes 5/12/03..........68
21
    Exh 104  UEP Producer Committee for Animal
22  Welfare Meeting Minutes 5/30/03..........75
23 Exh 105  UEP Animal Welfare Committee Meeting
        Minutes 10/22/03.......................77
24
    Exh 106  UEP Producer Committee for Animal
25  Welfare Meeting Minutes 3/3/04...........80

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 Exhibits:  (Continued)
2 Exh 107  UEP Producer Committee for Animal
        Welfare Meeting Minutes 5/10/04.........85
3
    Exh 108  Joint Meeting of UEP Scientific
4      Advisory Committee and UEP Producer
        Committee for Animal Welfare
5      Minutes 6/10-11/04.....................87
6 Exh 109  Animal Welfare and Public Relations
        Committee Minutes 10/20/04..............90
7
    Exh 110  UEP Producer Committee for Animal
8      Welfare Meeting Minutes 12/7-8/04.......92
9 Exh 111  Minutes of meeting of the UEP Producer
        Committee for Animal Welfare 1/24/05....98
10
    Exh 112  Minutes of the Producer Committee for
11     Animal Welfare dated 4/19/05...........101
12 Exh 113  UEP Producer Committee for Animal
        Welfare Meeting Minutes 12/1/06.......104
13
    Exh 114  UEP Animal Welfare Committee Meeting
14     Minutes 10/10/06......................106
15 Exh 115  Cal-Maine Foods, Inc. and Rose Acre
        Farms Inc.'s Counterclaim Against
16     Direct Action Plaintiffs...............150
17
    Certificate of Court Reporter..............158
18
    Witness Signature Page.....................159
19
20
21
22
23
24
25

Page 7

1 VIDEOGRAPHER:
2        My name is Darren Guastella of
3 Veritext.  The date today is April the 25th,
4 2014.  The time is approximately 9:09 a.m.  The
5 deposition is being held at the offices of
6 Young, Wells, Williams, 4450 Old Canton Road,
7 Suite 200, Jackson, Mississippi 39211.
8        The caption of the case is In Re
9 Processed Egg Anti-Trust Litigation in the
10 United States District Court, Eastern District
11 of Pennsylvania.  The witness is Steve Storm.
12        At this time, the attorneys will
13 identify themselves and the party they
14 represent, after which the court reporter,
15 Celeste Werkheiser, will swear the witness, and
16 we may proceed.
17 MR. BIRKHAEUSER:
18        Good morning, Mr. Stern.
19 THE WITNESS:
20        Good morning.
21        (Off the record.)
22 MR. BIRKHAEUSER:
23        I'm Dan Birkhaeuser with Bramson,
24 Plutzik, Mahler & Birkhaeuser, representing the
25 indirect purchaser plaintiffs.

Page 8

1 MR. AHERN:
2        Patrick Ahern for Winn-Dixie
3 plaintiffs.
4 MR. HOLLADAY:
5        Rob Holladay, Cal-Maine Foods.
6 MR. ROBISON:
7        Brian Robison, Cal-Maine Foods.
8 COURT REPORTER:
9        On the phone?
10 MR. GREEN:
11        William Green, of Stinson, Leonard,
12 Street, counsel for Michael Foods.
13 MS. HANSON:
14        And Amy Hanson, from Keller Rohrback,
15 for the direct purchaser plaintiffs.
16        STEVE STORM
17     having been first duly sworn, was
18     examined and testified, as follows:
19        EXAMINATION
20 BY MR. BIRKHAEUSER:
21     Q.   Mr. Storm, today we're going to
22 conduct your deposition under the Rule 30(b)(6),
23 which generally requires you to speak on behalf
24 of Cal-Maine.
25        And the first topic is your

Page 9

1 membership and participation in the UEP,
2 including elected and appointed positions you
3 held, committees that you served on, your
4 meeting attendance, motions made, and vows taken
5 at UEP meetings.
6        And it's my understanding that you
7 have been designated to speak on this topic on
8 behalf of Cal-Maine, with respect to Cal-Maine's
9 involvement with the UEP animal welfare
10 committee.
11 MR. BIRKHAEUSER:
12        Is that correct, Counsel?
13 MR. ROBISON:
14        Yes, that's right.
15 MR. BIRKHAEUSER:
16     Q.   Okay.  Are you indeed the person most
17 knowledgeable at Cal-Maine about Cal-Maine's
18 involvement with the UEP animal welfare
19 committee?
20     A.   Yes, sir.
21     Q.   What is the general purpose of the
22 committee?
23     A.   The committee was formed to develop
24 an animal welfare program for UEP and present it
25 to UEP Board for ratification.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1    Q.    And whose idea was it to form an
2  animal welfare committee?
3    A.    I'm sure that I was there and
4  involved at that time.  I was on the committee
5  after it was formed -- or as it was formed.
6    Q.    And what was the date of the
7  formation of the committee?
8    A.    1999.
9    Q.    What month?
10   A.    I'm not certain.
11   Q.    What's your best recollection?
12   A.    In the summer of '99.  Summer.  Might
13  have been May.
14   Q.    When was the first meeting held?
15   A.    At that time.
16   Q.    In the summer of 1999?  Were minutes
17  prepared of that meeting?
18   A.    To my knowledge, yeah.  Minutes were
19  prepared for all committee meetings.
20   Q.    Who prepared the minutes?
21   A.    UEP staff.
22   Q.    So that would be Mr. Gregory?
23   A.    Typically.  Almost always.
24   Q.    How often did the committee meet?
25   A.    There was no set schedule for

Page 11

1  meetings.  They met as required.
2        In the beginning, there were several
3  meetings where the -- to try to get the program
4  developed.  And as time went on, the committee
5  remained in place and now meets predominantly
6  when there are UEP general meetings or Board
7  meetings.
8    Q.    So at the present time the committee
9  meets when there are UEP Board meetings.
10   A.    Yes.
11   Q.    But that wasn't always the case in
12  the past.
13   A.    And it's not required.  It's just --
14  but that's the history.  We were meeting at the
15  time there were Board meetings.  Initially,
16  there were additional meetings.
17   Q.    Additional meetings of the --
18   A.    Of the committee.  Of the animal
19  welfare committee.
20   Q.    Did the animal welfare committee
21  interact with other committees of the UEP?
22  MR. ROBISON:
23        Object to form.  Vague.
24   A.    Generally I would say no, however, as
25  time went on, there was a public relations

Page 12

1  committee that was formed as an outshoot of the
2  welfare committee activities, and so, to some
3  extent, they interacted, I guess.
4  MR. BIRKHAEUSER:
5    Q.    How about the scientific committee?
6  Did the animal welfare committee interact with
7  the scientific committee?
8  MR. ROBISON:
9        Object to form.  Vague.
10   A.    The scientific committee was a
11  committee of individuals formed outside of UEP.
12  United Egg Producers asked Dr. Jeff Armstrong to
13  put together a committee for the purpose of
14  producing scientific reasons and to determine
15  proper welfare for chickens.
16        The committee met, and I
17  understand -- they were together prior to the
18  producer committee.  And at the conclusion of
19  their work when they had documents to present,
20  the producer committee was formed.
21  MR. BIRKHAEUSER:
22   Q.    And by the producer committee, you
23  mean the producer committee for animal welfare.
24   A.    That's what I mean.
25   Q.    Do you call it the producer

Page 13

1  committee?
2    A.    Sometimes.
3    Q.    Okay.  And also the animal welfare
4  committee?
5    A.    Yes, sir.
6    Q.    So if I call it today at the
7  deposition, if I say the "producer committee,"
8  you'll understand I mean the producer committee
9  for animal welfare.
10   A.    Yes, sir, I will.
11   Q.    If I call it the "animal welfare
12  committee," you'll understand that it's the
13  producer committee for animal welfare.
14        Did the producer committee ever
15  attend scientific committee meetings?
16   A.    No, not as a committee.  There was a
17  time or two that the committee chairman attended
18  some of those meetings for a particular purpose,
19  but not routinely.
20  MR. ROBISON:
21        Just to be clear, when you say the
22  chairman, chairman of which committee?
23   A.    Chairman of the -- there are times
24  when the chairman of the animal welfare
25  committee, the producer committee has attended

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1 the scientific committee meetings that I know
2 of.
3 MR. BIRKHAEUSER:
4   Q.   Did you ever attend a scientific
5 committee meeting?
6   A.   No, sir.
7   Q.   Where did the scientific committee
8 meet?
9   A.   I don't know.  I think, in various
10 places, but I don't know where they met.
11   Q.   Did the producer committee for animal
12 welfare always meet in person?
13   A.   I'm sorry?  Would you ask it again?
14   Q.   Did the producer committee always
15 meet in person?
16   A.   No, occasionally by conference call.
17   Q.   Was there correspondence amongst
18 members of the producer committee, e-mails or
19 letters, that you're aware of?
20 MR. ROBISON:
21       Object to form.  Vague.
22   A.   From time to time.  Just usually to
23 follow up on some assigned task or something to
24 that extent that result -- resulting from a
25 committee meeting.

Page 15

1 MR. BIRKHAEUSER:
2   Q.   Did the producer committee ever
3 create subcommittees?
4   A.   I'm aware that an audit committee was
5 created as a subcommittee to the producers'
6 animal welfare committee.
7   Q.   And when did that happen?
8   A.   It happened about the -- after the
9 first round of audits or so, about, I'm going to
10 say, 2003 or '4.  As -- after the program was
11 installed and after audits came around and it
12 became necessary to review the audit from
13 year-to-year, update it as necessary, the audit
14 committee would make recommendations and carry
15 it back to the producer committee.
16   Q.   And you used the word "installed" in
17 your answer.  When in your mind was the program
18 installed?
19 MR. ROBISON:
20       Object to form.  Vague.
21   A.   Approximately 2002 is when people
22 began to join the certified program.
23 MR. BIRKHAEUSER:
24   Q.   That was about April of 2002?
25   A.   Could be, yes, sir.

Page 16

1   Q.   Did Mr. Gregory attend every meeting?
2   A.   In the early years, yes.  He was
3 the -- there's always a staff UEP person that
4 attends every committee meeting, so somebody
5 from staff's assigned to every committee, and he
6 was the one that handled those duties for the
7 UEP organization.
8   Q.   Did Mr. Chad Gregory attend the
9 meetings?
10   A.   Not routinely, but he did from time
11 to time.
12   Q.   Can we take a look at Exhibit 85 from
13 yesterday?  Do you have that in front of you,
14 sir?
15   A.   I have 85.
16   Q.   Exhibit 85 is a copy of the minutes
17 of a May 15, 2000, producer committee for animal
18 welfare, correct?
19   A.   Yes, sir.
20   Q.   The minutes indicate that there were
21 several consultants that attended the meeting.
22 Who's Mr. Steve Rieger?
23   A.   Rieger.
24 MR. ROBISON:
25       Object to form.

Page 17

1 MR. BIRKHAEUSER:
2   Q.   Did Mr. Steve Rieger attend the
3 meeting?
4   A.   I think he did.
5   Q.   Who is Mr. Rieger?
6   A.   Mr. Rieger, at one time he was
7 employed by Hy-Line hatcheries.  I don't know if
8 he was at this time or not.
9   Q.   In what capacity did Mr. Rieger
10 consult?
11 MR. ROBISON:
12       Object to form.  Vague.
13   A.   I'm not precisely sure what the --
14 this is early in the process, and all of these
15 people listed as consultants, most of them were
16 on the scientific committee.  They were there
17 because there were a lot of questions by the
18 producer committee members regarding the
19 document referred to here as Humane Guidelines
20 for U.S. Egg Laying Flocks, which was the one
21 prepared by the scientific committee for UEP.
22       And so all -- any of them would have
23 been there for just interpretation of this --
24 what do you mean when you say -- you know, a
25 particular guideline.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 MR. BIRKHAEUSER:
2     Q.   Was Mr. Rieger on the scientific
3 committee?
4     A.   I don't think he was.
5     Q.   Who is Dr. Joy Mench?
6     A.   Dr. Joy Mench was on the scientific
7 committee.
8     Q.   And do you know Dr. Mench?
9     A.   I've met Dr. Mench before.  I'm
10 not -- I don't think I would consider myself an
11 acquaintance at all.
12     Q.   Do you know anything about
13 Dr. Mench's background?
14     A.   No.  I think -- there's several of
15 the members, especially originally, that were
16 animal welfare specialists or interested in
17 animal welfare.  Their career had taken them in
18 that direction.
19          And different ones were -- had
20 specialized areas.  Some were interested in just
21 the behavior of laying hens.  Others were
22 interested in beak trimming.  Others were
23 interested in various phases or various points.
24 They were -- I understood some of them were
25 selected because they wanted a broad input for

Page 19

1 all areas that needed consideration.
2     Q.   Did you have anything to do with the
3 selection of the members of the scientific
4 community?
5     A.   No, not at all.  I don't think anyone
6 from UEP did.
7     Q.   Your answer is that you don't think
8 anyone from UEP had anything to do with the
9 selection of the scientific committee members?
10     A.   UEP selected Dr. Jeff Armstrong to
11 put together a committee.
12     Q.   Okay.  And Mr. Armstrong was on the
13 committee.
14     A.   He was the Chairman of that
15 committee, and then he populated the committee,
16 or these committee members.
17     Q.   So UEP -- I'm sorry.
18     A.   That's all.
19     Q.   Okay.  So the UEP did have something
20 to do with the selection of committee members of
21 the scientific committee?
22 MR. ROBISON:
23          Object to form.  Mischaracterizes.
24     A.   They had something to do with the
25 selection of Dr. Jeff Armstrong, but he had a

Page 20

1 free hand to select who he wanted after that, to
2 my knowledge.
3 MR. BIRKHAEUSER:
4     Q.   Okay.  I'm going to ask the question
5 again because it got interrupted.  The UEP did
6 have -- did participate in the composition of
7 the scientific committee?
8 MR. ROBISON:
9          Objection.  Mischaracterizes.
10     A.   Well, to me, that question means that
11 they had input to selecting all the members, and
12 that answer is no.  They had input to select the
13 Chairman of that committee.
14 MR. BIRKHAEUSER:
15     Q.   Who's Dr. Jeff Armstrong?
16     A.   He was the -- he was selected to be
17 Chairman of the animal welfare committee --
18 pardon me, the scientific committee, animal
19 welfare scientific committee.  At that time, he
20 was a professor at Purdue University.
21     Q.   And what was Dr. Armstrong's
22 specialty?
23     A.   I'm not sure what his specialty was.
24     Q.   How long had he been a professor at
25 Purdue University in May of 2000?

Page 21

1     A.   I don't know.  I was not involved in
2 his selection personally.
3     Q.   Who's Dr. Janice Swanson?
4     A.   She's a member of the committee
5 selected by Dr. Armstrong.  At the time --
6 initially she was -- I do happen to know that
7 she was at Kansas State University.
8     Q.   You said that she was a member of the
9 committee.  By that, you mean the scientific
10 committee?
11     A.   Yes, I do.
12     Q.   What was Dr. Swanson's specialty?
13     A.   You know, I hate -- she was more in
14 behavioral aspects of chickens.  And I would
15 hate to try to define it further because, truly,
16 I get them confused from, you know, some of
17 these individuals.
18     Q.   So as you sit here today, you're not
19 aware of the specialty of Dr. Swanson?
20     A.   No.  She was a welfare specialist
21 regarding chickens.  That's for sure.
22     Q.   Who was Mr. Donald Bell?
23     A.   Don Bell was a professor at -- I
24 think, at University of California system at
25 Riverside, I believe, for many years.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

1    Q.   What was Mr. Bell's specialty?
2    A.   I'm not sure.  He was not -- I do
3  know that he was not a welfare -- his specialty
4  was not animal welfare.  His specialty was
5  broader than that, but involving the chicken and
6  egg industry.
7    Q.   What were the names of the other
8  scientific committee members in May 2000?
9    A.   I'm not sure I can call them all.  I
10  think Scotti Hester was one.  Let's see.  We had
11  Joy Mench and Janice Swanson.  There were at
12  least a couple of more.  I'm not sure who.
13    Q.   What was Mr. Hester's specialty?
14    A.   Ms. Hester.
15    Q.   Ms. Hester?
16    A.   Uh-huh.
17    Q.   I thought you said Scott, I'm sorry.
18    A.   Scotti.
19    Q.   Okay.  What was Ms. Hester's
20  specialty?
21    A.   I think it was welfare.  And I think
22  it had more to do with beak trimming.
23    Q.   In this May 15, 2000, meeting, the
24  committee moved to accept the recommendations
25  and goals of the scientific committee with the

1  implementation plans of phasing in the cage
2  space allowance to be presented for approval at
3  the October Board meeting, correct?
4  MR. ROBISON:
5        Object to the form.
6  Mischaracterizes.
7    A.   Yes.  I think it notes a motion to
8  that extent.
9  MR. BIRKHAEUSER:
10    Q.   After the discussion of the mandatory
11  program and the voluntary program and the
12  implementation timeline, there's a
13  parenthetical.  Do you see that?
14    A.   Yes.
15    Q.   These minutes were in May, correct?
16    A.   Yes, from the May meeting.
17    Q.   And the parenthetical notes that the
18  Board of Directors took a position in opposition
19  to any legislative efforts to create a mandatory
20  program; is that correct?
21    A.   Yes.  That's what it says.
22    Q.   So these minutes were prepared after
23  the October meeting?
24    A.   Obviously.
25  MR. ROBISON:

1        Object to form.
2  MR. BIRKHAEUSER:
3    Q.   Is that your recollection?
4    A.   Oh, pardon me.  October meeting?
5  They were prepared after the May meeting.
6    Q.   It refers to an October Board
7  meeting; is that correct?
8  MR. ROBISON:
9        Object to form.
10    A.   I see that.  In the motion, it said
11  that the producer animal welfare committee
12  accepted the hard work of the scientific
13  committee and thanked them, said we're going to
14  take this, and in this motion it says that
15  they're going to work on phases of this and
16  present it at the October meeting.
17  MR. BIRKHAEUSER:
18    Q.   And the October meeting is five
19  months away.
20    A.   Yes.
21    Q.   And then in the parenthetical, we
22  know the results of the October meeting,
23  correct?
24  MR. ROBISON:
25        Object to form.

1    A.   I don't see that at all.  It just
2  says that, you know -- I don't know where the
3  information from that parenthetical comes from.
4  MR. BIRKHAEUSER:
5    Q.   Okay.
6    A.   Or -- it just is -- as a side note to
7  these minutes, it notes that the Board is in
8  opposition to legislative efforts for a
9  mandatory program.
10    Q.   When we state the October Board
11  meeting -- I'm sorry, strike that.
12        In the motion itself, it refers to an
13  October Board meeting.  What Board is that
14  motion referring to?
15    A.   The UEP Board.  All action of the
16  animal welfare committee is -- their
17  recommendations don't carry weight except that
18  it's a recommendation to the Board for further
19  consideration to accept or reject or deal with
20  it.
21    Q.   In May 2000, who were the Board
22  members of the UEP?
23  MR. ROBISON:
24        Object to form.  Foundation.
25    A.   Well, I'm sure that's a matter of

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1 record, but I don't know who all.
2 MR. BIRKHAEUSER:
3    Q.   Do you remember any of the Board
4 members?
5 MR. ROBISON:
6        Same.
7    A.   I'm sure Cal-Maine had -- at that
8 time, I would expect Dolph Baker and Ken Looper,
9 but others -- you know, there were others that
10 were typically on the Board, and I can probably
11 name most -- a lot of them, but I don't know
12 that for positive.
13        (Exhibit 95 marked.)
14 MR. BIRKHAEUSER:
15        For those on the phone, we are
16 marking Exhibit 95, and it bears the Bates
17 number UE0153177, and it's a two-page document.
18    Q.   Do you recognize Exhibit 95, sir?
19    A.   Yes.
20    Q.   And is this a true copy of the UEP
21 animal welfare committee meeting dated
22 October 11, 2000?
23    A.   I believe it is.
24    Q.   Do you recall traveling to Ponte
25 Vedra Beach, Florida?

Page 27

1    A.   I do.  Got in very late that night.
2    Q.   Have you had a chance to -- all
3 right.  In these minutes it reflects that the
4 committee was discussing husbandry guidelines;
5 is that correct?
6    A.   Yes.  That's referring to the
7 scientific committee document.
8    Q.   Okay.  Can you look at the husbandry
9 guidelines, number 3?
10    A.   Yes.
11    Q.   Guideline number 3 concerns ammonia
12 concentration, correct?
13    A.   Yes, it does.
14    Q.   And ammonia is a by-product of the
15 decomposition of urine, correct?
16    A.   I think it probably is.
17    Q.   And feces also?
18    A.   I would say so.
19    Q.   And this guideline deals with
20 permissible amounts of ammonia in cages,
21 correct?
22 MR. ROBISON:
23        Object to form.
24    A.   It deals with ammonia concentration
25 to which the birds are exposed.  And, yes, those

Page 28

1 birds are in cages.
2 MR. BIRKHAEUSER:
3    Q.   So it would deal with the amount of
4 ammonia that was going to be permissible in the
5 cages.
6 MR. ROBISON:
7        Same.
8    A.   Yes.
9 MR. BIRKHAEUSER:
10    Q.   And the animal welfare committee was
11 considering a motion dealing with the
12 permissible amount of ammonia, correct?
13 MR. ROBISON:
14        Object to form.
15    A.   Yes.  This was one of all the
16 important items which were discussed.  It was
17 presented by the scientific committee and then
18 was reviewed, discussed, in order to produce a
19 document that the membership could use in their
20 production facilities.
21        And so this is early in the process.
22 It was dealing with that issue at that time to
23 take the scientific committee recommendation and
24 wind up with a guideline for our membership.
25 MR. BIRKHAEUSER:

Page 29

1    Q.   The scientific committee was
2 recommending a limit of 25 parts per million of
3 ammonia at that time, correct?
4    A.   Yeah.  I think that's correct.
5    Q.   And the animal welfare committee
6 ultimately recommended a limit of 50 parts per
7 million; is that correct?
8 MR. ROBISON:
9        Object to form.  Vague.
10    A.   Yes, that is correct.
11 MR. BIRKHAEUSER:
12    Q.   So the animal welfare committee was
13 permitting a level of ammonia concentration that
14 was twice that of the recommendation of the
15 scientific committee.
16 MR. ROBISON:
17        Objection.  Vague.
18    A.   50 is 25 times two.
19 MR. BIRKHAEUSER:
20    Q.   Cage stocking density was also
21 discussed at this meeting, correct?
22    A.   Yes.
23    Q.   Do you recall the discussion?
24    A.   Well, again, these are early
25 discussions and before the first program was

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1 completed for -- and presented to the Board.
2      As I recall, the scientific committee
3 recommended stocking density of 67 to 80, a
4 range. And we were trying to deal with that
5 because the prevalent stocking densities in the
6 industry ranged from approximately 48 to 50 -- a
7 little in excess of 50 inches.
8      And so the discussion pertained to
9 how are we going to deal with this, how are we
10 going to make this work.
11    Q.  When you say cage stocking density,
12 what do you mean?
13    A.  That means how many birds you put in
14 a cage and how much room that bird has within
15 the cage.
16    Q.  And so a cage stocking density of 67
17 would mean what?
18    A.  67 square inches per bird.
19    Q.  And how big were the most prevalent
20 cages at that time?
21    A.  Well, there are a lot of different
22 cage sizes. At that time, the largest ones were
23 probably -- would probably have, say, 480 square
24 inches in a cage, and they're just probably a
25 dozen different sizes that were smaller than

Page 31

1 that, and some that were even larger.
2    Q.  So in a typical 480-square-inch cage,
3 how many birds were housed in that cage before
4 the guidelines?
5 MR. ROBISON:
6      Objection. Vague.
7    A.  That was determined by each
8 individual producer that owned the cage and the
9 house.
10 MR. BIRKHAEUSER:
11    Q.  Did Cal-Maine have 480-square-inch
12 cages?
13 MR. ROBISON:
14      Object to form. Vague.
15    A.  We had a few.
16 MR. BIRKHAEUSER:
17    Q.  And before the guidelines, how many
18 hens would Cal-Maine put in the 480-square-inch
19 cage?
20    A.  At the beginning of the guidelines,
21 in those cages we housed nine birds in those
22 cages, which would come out to a little more
23 than 50 inches per bird.
24    Q.  Did other producers put more birds
25 in --

Page 32

1 MR. ROBISON:
2      Object to the form. Foundation.
3    A.  No, I don't -- there's no way I can
4 know that for sure.
5 MR. BIRKHAEUSER:
6    Q.  Did the animal welfare committee
7 visit the facilities of any other producers to
8 formulate any of its recommendations to the UEP
9 Board?
10 MR. ROBISON:
11      Objection. Vague.
12    A.  Not as a committee.
13 MR. BIRKHAEUSER:
14    Q.  The committee was comprised of
15 producers.
16    A.  Yes. The UEP is comprised of
17 producers. It was required in order to be
18 Capper-Volstead.
19      (Exhibit 96 marked.)
20 MR. BIRKHAEUSER:
21      For the record, we're marking
22 Exhibit 96, which bears the Bates stamp
23 UE0153468 through 469.
24    Q.  Have you had a chance to review
25 Exhibit 96, sir?

Page 33

1    A.  Yes, sir, I have.
2    Q.  I'd like to ask you a couple of
3 questions about the paragraph that's entitled
4 "Report from the Scientific Committee."
5      These meetings reflect the fact that
6 the scientific committee had completed its
7 recommendations to the animal welfare committee;
8 is that correct?
9    A.  Yes. I mean, they had previously
10 presented their findings to us. Is that your
11 question?
12    Q.  Yes. And the committee is -- the
13 producer committee is thanking the scientific
14 committee for its efforts, correct?
15    A.  The Chairman of the producer
16 committee, Bob Krouse, met with that committee
17 and thanked them for their efforts.
18    Q.  And if you could turn to the second
19 page --
20    A.  Yes, sir.
21    Q.  -- and the comments of Mr. Sparboe.
22 The producer committee passed a motion that
23 before any significant activities of the
24 scientific committee is enlisted, the producer
25 committee must first be advised of and approve

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1 these activities. Is that correct?
2    A.  That's the motion.
3    Q.  And that motion passed, correct?
4    A.  Yes.
5    Q.  To pass a motion in the producer
6 committee, what was required?
7    A.  Well --
8 MR. ROBISON:
9        Object to form. Vague.
10 MR. BIRKHAEUSER:
11      I'm sorry. Let me rephrase that
12 question. Was a simple majority required to
13 approve a motion in the producer committee?
14    A.  Yes.
15    Q.  And what was a quorum? What
16 constituted a quorum of the producer committee?
17    A.  I'm not sure I know that.
18    Q.  Do you know how many members the
19 committee, the producer committee had at its
20 inception?
21    A.  No, not offhand. The membership
22 could change every year. Committees were
23 assigned annually by the Chairman of UEP.
24 Committee chairman were also assigned annually.
25    Q.  Did the composition of the producer

Page 35

1 committee change over time?
2    A.  Yes.
3    Q.  Did the membership of the producer
4 committee increase or decrease over time?
5    A.  Generally increased.
6    Q.  Were there any bylaws of the producer
7 committee?
8    A.  No. We operated as a committee of
9 the UEP.
10    Q.  The motion that carried at the
11 May 14, 2001, producer committee, do you know if
12 that was altered at any time?
13    A.  Do you mean has it changed since
14 then?
15    Q.  Yes.
16    A.  I don't know. Offhand I can't tell
17 you if it passed the full Board. This was
18 just -- it carried committee and was presented
19 to the full Board.
20      (Exhibit 97 marked.)
21 MR. BIRKHAEUSER:
22      For the record, we've just marked
23 Exhibit 97, which is CM00275722 through 24. Can
24 you tell me when you've finished reviewing the
25 document, sir?

Page 36

1    A.  Yes, sir.
2    Q.  Is this a true copy of the minutes of
3 a meeting of the UEP producer committee for
4 animal welfare held on October 17, 2001?
5    A.  Appears so.
6    Q.  The meeting was held in Henderson,
7 Nevada. Do you recall attending?
8    A.  This is the one I yesterday mentioned
9 that I could not be certain I attended --
10    Q.  Okay.
11    A.  -- personally.
12    Q.  Generally, what's being discussed in
13 this meeting is the schedule for phasing in the
14 space allowance requirements, correct?
15    A.  That's one of the items, yes.
16    Q.  Okay. Do you recall discussing
17 yesterday Mr. Looper's presentation on phasing
18 in the cage space requirements?
19    A.  Yes.
20    Q.  And Mr. Looper was of the opinion
21 that the phase-in could occur more quickly given
22 normal mortality of hens, correct?
23 MR. ROBISON:
24      Object to form.
25    A.  He presented some numbers that

Page 37

1 involved factoring in normal mortality. I'm not
2 sure he was saying it could happen more quickly.
3 MR. BIRKHAEUSER:
4    Q.  Okay. Can you review the second to
5 last paragraph on the first page of Exhibit 97?
6    A.  The one after the motion?
7    Q.  Yes.
8    A.  Okay.
9    Q.  Does that refresh your recollection
10 as to whether Mr. Looper was of the opinion --
11    A.  Yes.
12    Q.  -- that the cage space requirements
13 could be implemented more quickly?
14    A.  This paragraph in the minutes says
15 that he presented that concept and said that it
16 could be implemented much quicker.
17    Q.  Did you have discussions with
18 Mr. Looper about the phase-in schedule in and
19 around October 2001?
20    A.  I think I did, just in general.
21    Q.  Did Mr. Looper speak to others about
22 his opinions about the phase-in schedule --
23 MR. ROBISON:
24      Object to form.
25 MR. BIRKHAEUSER:

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.   -- to your knowledge?
2  MR. ROBISON:
3        Foundation.
4    A.   I don't know.
5  MR. BIRKHAEUSER:
6    Q.   Do you know whether he spoke at UEP
7  meetings?
8    A.   Oh, he was on the Board, so if it
9  came up on the Board meeting, I'm sure he spoke
10 to the Board.
11   Q.   You don't recall specific instances
12 when you were in attendance?
13   A.   No.  I generally was not in
14 attendance at Board meetings.
15   Q.   How about general meetings?
16   A.   The same.  General meeting is a
17 formality at one of the Board meetings to elect
18 officers, if you're referring to a general UEP
19 meeting.
20   Q.   I'm referring to a general UEP
21 meeting.  And I'll just rephrase the question.
22 Do you recall Mr. Looper speaking at any general
23 UEP meetings about the phase-in of cage space
24 requirements?
25   A.   Well, the -- you know, Mr. Looper was

Page 39

1  an active member of the Board.  And he spoke to
2  the Board and dealt with the Board, and I'm sure
3  he had a lot of input and was able to express
4  his opinions in the Board meetings.
5        The problems here, this was -- at
6  this point in time, there was difficulty in --
7  to get the producers of UEP to accept the moving
8  from where they were to the recommendations of
9  the scientific committee.  And so a lot of these
10 discussions were exploring the concept of not
11 going there all at once, that it would be too
12 disruptive, and that you would not have the time
13 to replace those chickens, so they needed to
14 spread things out.
15       And there was a -- and I don't
16 remember exactly in relation to this meeting,
17 but there were various time schedules suggested
18 for converting to that, as much as 12 years.
19 And then it was -- then the concept of house
20 averaging became involved, and that made it more
21 palatable for the membership to accept.
22       And then FMI is involved here, and
23 they were requesting that the time frame be
24 reduced more.
25       So, you know, all of this was a

Page 40

1  discussion about reaching a compromise on, you
2  know, where we wind up in doing this and how do
3  we do it and do it in a manner that the
4  membership would want to accept it and we could
5  move forward.
6        And at this particular point in time,
7  exactly what all this meant -- this was a part
8  of that ongoing discussion.
9    Q.   And as of October 17, the producer
10 committee for animal welfare had not reached
11 conclusions about the phase-in of the cage space
12 requirements, correct?
13 MR. ROBISON:
14       Object to the form.
15   A.   It's still under discussion here.
16 MR. BIRKHAEUSER:
17   Q.   Okay.
18   A.   Well, there were guidelines in 2000.
19 And it spoke to a phase-in, but it didn't define
20 how you got there and so forth.  So it was --
21 the guidelines initially written -- that were
22 written by the producer committee utilizing the
23 information from the scientific committee, they
24 were completed, but they were not endorsed -- or
25 they were officially accepted, but they were not

Page 41

1  employed.  Nobody could do them.  They couldn't
2  afford to do them.
3        And one hang up was how in the world
4  do you get from current stocking practices to
5  the required ones.  And it was a terrific jump.
6    Q.   And the animal welfare committee had
7  not yet developed a schedule for the phase-in of
8  the cage space requirements.
9  MR. ROBISON:
10       Object to form.  Mischaracterizes.
11 Asked and answered.
12   A.   Well, they were discussing that
13 phase-in here.
14 MR. BIRKHAEUSER:
15   Q.   Correct.
16   A.   And this is not the one we wound up
17 with, so I'd say we had not completed that at
18 this point.
19   Q.   And indeed, on the second page, we
20 still have discussion about the phase-in going
21 from -- generally from February 2003 to June
22 2006, correct?
23   A.   Right.
24 MR. ROBISON:
25       Objection.  Incomplete.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    A.   It appears so.
2         (Exhibit 98 marked.)
3  MR. BIRKHAEUSER:
4         For the record, we're marking as
5  Exhibit 98 a document entitled UE0174658 through
6  59.
7    Q.   Have you had a chance to review
8  Exhibit 98?
9    A.   Yes, sir.
10   Q.   Is Exhibit 98 a true copy of the
11 minutes of the producer committee for animal
12 welfare dated November 14, 2001?
13   A.   Yes, I believe so.
14   Q.   Did you attend that meeting?
15   A.   Yes.
16   Q.   You remember traveling to Chicago?
17   A.   Yes, sir.
18   Q.   So we're now in November of 2001, and
19 the committee is still discussing a phase-in
20 timeline for the cage space allowance, correct?
21   A.   Correct.
22   Q.   And the committee is considering two
23 different options; is that correct?
24   A.   No, I don't think there were two
25 options that they were considering.

Page 43

1    Q.   The committee had two motions that
2  were presented at the November 14, 2001 --
3    A.   I'll say there were two options
4  presented for --
5    Q.   Please let me finish my question
6  because if you don't then your answer doesn't
7  respond to my question.
8         So the committee was considering two
9  motions for the phase-in of cage space
10 requirements at its November 14, 2001 meeting;
11 is that correct?
12   A.   Well, according to the minutes, we
13 considered three motions, one after the other,
14 and two of them appeared to deal with cage
15 space.
16   Q.   Thank you.  So the committee
17 considered two motions related to cage space.
18   A.   Is there a question?
19   Q.   Is that true?
20   A.   Yes.
21   Q.   The first motion had an ultimate date
22 of August 1, 2005, for achieving the 67 average
23 square inches per hen; is that correct?
24   A.   Not precisely, no, that's not
25 correct.

Page 44

1    Q.   In what way is that not correct?
2    A.   It says that for beginning August 5,
3  2005, all birds hatched from that point forward
4  would then be housed at the 67 inches; but,
5  August 2005 was not the point that all birds
6  would be at 67 inches.
7    Q.   Okay.  So the end date for compliance
8  with the 67 average square inches per hen was
9  August 1, 2005, but it would be limited to hens
10 that were hatched after that date.
11   A.   Yes.  And by the time the entire
12 flock got there would depend on how long you
13 kept chickens.  If you had a young flock in
14 July, it might be two years before they had to
15 comply.
16   Q.   Okay.  That motion was defeated,
17 correct?
18   A.   Yes.
19   Q.   The second motion was that -- had an
20 end date where the 64 average square inches per
21 hen hatched on or after April 1, 2005; is that
22 correct?
23   A.   Yes.
24   Q.   They would have to achieve 67 average
25 square inches per hen.  And that's an earlier

Page 45

1  date than the motion that was rejected by the
2  Board.
3    A.   Yes.
4  MR. ROBISON:
5         Committee.
6  MR. BIRKHAEUSER:
7    Q.   Sorry.  The April 1 deadline was
8  earlier than the August 1 deadline that was
9  rejected by the Board?
10 MR. ROBISON:
11        Same.  Committee.
12   A.   Yes.
13 MR. BIRKHAEUSER:
14   Q.   The committee.  I'm sorry.  The
15 phase-in schedule approved by the committee
16 started with a hatch date of April 1, 2002,
17 correct?
18   A.   Within the time frame of this
19 meeting, that's correct.
20   Q.   So in November of 2001, the motion
21 that the producer committee passed had a
22 beginning date of hens hatched on or after
23 April 1, 2002?
24   A.   I'm sorry.  You need to ask me again,
25 please.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    Q.   Sure.  The motion that was approved
2 by the animal welfare committee in November of
3 2001 had the phase-in schedule based upon a
4 hatch date of April 1, 2002?  I'm sorry, 2000 --
5 yeah, 2002.
6 MR. ROBISON:
7         Object to form.
8    A.   2002 was the first point of change,
9 and that would be at 61 inches, it says here.
10 MR. BIRKHAEUSER:
11   Q.   Right.
12   A.   Yes.
13   Q.   That would be the first step of the
14 phase-in.
15   A.   Yes, sir.
16   Q.   And that's what the animal welfare
17 committee passed in November -- on November 14
18 of 2001.
19   A.   Yes.  It's right here in the minutes.
20   Q.   So the first phase would be scheduled
21 to commence in about five months, five months
22 after the committee meeting.
23 MR. ROBISON:
24         Object to form.
25   A.   Yes.

Page 47

1 MR. BIRKHAEUSER:
2    Q.   Will you look at Exhibit 87, sir?  So
3 by April of 2002, Cal-Maine had already signed
4 up for the certification program, correct?
5 MR. ROBISON:
6         Object to form.  Mischaracterizes.
7    A.   Yes.  I think that's what's indicated
8 here.  This is not a Cal-Maine document.  It's
9 an e-mail from other sources, but it has
10 attached a list of animal husbandry certified
11 companies.  And we were -- we signed up fairly
12 early in that process.
13 MR. BIRKHAEUSER:
14   Q.   So by the time the phase-in was ready
15 to commence, Cal-Maine had --
16   A.   Well --
17   Q.   -- submitted its application for
18 certification.
19 MR. ROBISON:
20         Objection.  Mischaracterizes.
21   A.   -- if you're referring to our
22 discussion on the prior exhibit, that phase-in
23 schedule that we just discussed was -- were
24 motions in committee, and it's still not the one
25 that we employed.  So somewhere along the way,

Page 48

1 either in -- either the full Board or at some
2 other point, there were further changes, so --
3 but to your point, we signed up in -- prior
4 to -- or by April.
5 MR. BIRKHAEUSER:
6    Q.   Cal-Maine was planning on --
7 Cal-Maine had discussed internally whether it
8 would become a certified company under the UEP
9 guidelines, correct?
10 MR. ROBISON:
11         Objection.  Outside the scope.
12   A.   Yes.  The -- our largest customer had
13 included this in their specifications.  And --
14 MR. BIRKHAEUSER:
15   Q.   Let me just cut you off there.
16   A.   Oh, okay.
17   Q.   The question was Cal-Maine had
18 discussed the matter internally.
19 MR. ROBISON:
20         Objection.  Outside the scope of the
21 notice.
22   A.   Cal-Maine had discussed the matter
23 internally, of course.
24 MR. BIRKHAEUSER:
25   Q.   And Cal-Maine's Vice President of

Page 49

1 Operations was on the animal welfare committee,
2 correct?
3    A.   That's correct.
4    Q.   And Cal-Maine's President was on the
5 Board of the UEP, correct?
6 MR. ROBISON:
7         Objection.  Vague.  Outside the scope
8 of the notice.
9    A.   Yes.
10 MR. BIRKHAEUSER:
11   Q.   And Cal-Maine considered it a leader
12 in the industry, correct?
13 MR. ROBISON:
14         Objection.  Vague.  Outside the
15 notice.
16   A.   Do we consider ourselves to be
17 leaders of the industry?
18 MR. BIRKHAEUSER:
19   Q.   Yes.
20   A.   Well, we try to be good leaders of
21 the industry.
22   Q.   And Cal-Maine supported the United
23 Egg Producers, correct?
24 MR. ROBISON:
25         Objection.  Way, way too vague.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1 Outside the scope. Not notified on this topic.
2    A.   Cal-Maine was a member of UEP, and if
3 we weren't supporters, we would not be members.
4 MR. BIRKHAEUSER:
5         Why don't we take a break for about
6 five minutes.
7 VIDEOGRAPHER:
8         We are now going off the record. The
9 time is 10:16 a.m.
10        (A recess was taken.)
11 VIDEOGRAPHER:
12        This begins tape number two in the
13 video deposition of Steve Storm. We are now
14 going back on the record. The time is
15 10:29 a.m.
16 MR. BIRKHAEUSER:
17        For the record, the witness is
18 reviewing Exhibit 99, which is UE0153419 through
19 422.
20        (Exhibit 99 marked.)
21    Q.   Have you had a chance to review
22 Exhibit 99, sir?
23    A.   Yes, sir.
24    Q.   Is Exhibit 99 a true copy of the
25 minutes of a meeting of the producer committee

Page 51

1 for animal welfare that was held on March 26,
2 2002?
3    A.   Yes, sir.
4    Q.   Did you attend that meeting in
5 person?
6    A.   Yes, sir.
7    Q.   I'd like to focus your attention
8 first on the motion that is reflected on page 1.
9 At the meeting on March 26, 2002, did the animal
10 welfare committee approve a motion that required
11 a 100 percent commitment on all company
12 facilities, no matter how the eggs might be
13 marketed?
14 MR. ROBISON:
15        Object to form.
16    A.   Is that a question?
17 MR. BIRKHAEUSER:
18    Q.   Yes. I'll read it back for you if
19 you like. At the meeting on March 26, 2002, did
20 the animal welfare committee approve a motion
21 that required 100 percent commitment on all
22 company facilities, no matter how the eggs might
23 be marketed?
24 MR. ROBISON:
25        Same.

Page 52

1    A.   Yes.
2 MR. BIRKHAEUSER:
3    Q.   During your participation in the
4 animal welfare committee, did you refer to this
5 motion as the 100 percent rule?
6    A.   Possibly. If someone said that, this
7 is what they're referring to.
8    Q.   Okay. The requirement that all
9 company facilities must comply with the animal
10 welfare guidelines, correct?
11    A.   Yes. And I think it's even broader
12 than that. Everything under which -- over which
13 you have control, that this -- this program is
14 an animal welfare program, and there's no reason
15 to treat some chickens one way and other
16 chickens another way.
17    Q.   When you say it's broader than that,
18 it also includes affiliates, correct?
19    A.   Affiliates, anything in which you --
20 I mean, there's a lot of legal ways to own
21 chickens and structure businesses, but if --
22 whatever your scope of control is, it's to
23 include everything.
24    Q.   And the 100 percent rule was raised
25 at the meeting March 26, 2002, and it passed at

Page 53

1 the same meeting; is that correct?
2    A.   Yes. It passed by the committee.
3    Q.   By the committee.
4         Committee also discussed audit and
5 audit procedures at that meeting, correct?
6    A.   Yes. There are a series of motions
7 that relate to the establishing of an audit
8 worksheet.
9    Q.   And some of the requirements of that
10 audit, correct?
11    A.   Yes, I think so, but mostly the
12 identifying areas and scoring them is an audit
13 point.
14    Q.   In terms of scoring, the committee
15 was recommending a total scoring point system
16 consisting of 200 points, correct?
17    A.   Correct.
18    Q.   And in order to pass an audit, a
19 company would have to obtain a grade of
20 85 percent, correct?
21 MR. ROBISON:
22        Object to form. Vague on time.
23    A.   There's a motion to that effect.
24 MR. BIRKHAEUSER:
25    Q.   And did the motion carry?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    A.   Yes.
2    Q.   Okay.  And for the purposes of my
3  question on this document, I'm only talking
4  about what the animal welfare committee was
5  considering and what it was recommending, not
6  what was ultimately decided by the Board, okay?
7    A.   Okay.
8    Q.   So under the scoring system of
9  200 points, a company would need 170 points to
10 pass; is that correct?
11 MR. ROBISON:
12       Object to form.
13   A.   Yes.  85 percent of 200 is 170.
14 MR. BIRKHAEUSER:
15   Q.   170.  And the committee approved a
16 motion that would assign 110 points to housing
17 and space allowance; is that correct?
18   A.   Housing and space allowance was a
19 section of the audit that had several entries,
20 and, yes, it would have -- it was assigned 110
21 points.
22   Q.   And the committee passed a motion
23 that would recommend that 30 points be assigned
24 to beak trimming, molting, and then handling and
25 transportation each; is that correct?

Page 55

1  MR. ROBISON:
2        Object to form.  Mischaracterizes.
3    A.   Yes, that's correct.
4  MR. BIRKHAEUSER:
5    Q.   And then the committee recommended --
6  I'm sorry, the committee approved a breakdown of
7  5 points per item under the beak trimming
8  category; is that correct?
9  MR. ROBISON:
10       Object to form.
11   A.   That's correct.
12 MR. BIRKHAEUSER:
13   Q.   And 5 points per line item under
14 molting; is that correct?
15 MR. ROBISON:
16       Object to form.
17   A.   Yes.
18 MR. BIRKHAEUSER:
19   Q.   And then three points per line item
20 under handling and transportation; is that
21 correct?
22   A.   Yes.
23   Q.   So under the point system that the
24 committee was recommending, a company could fail
25 the beak trimming requirement but still pass the

Page 56

1  audit; is that correct?
2    A.   If you're doing the math, they could
3  lose a total of 30 points, and if it all came
4  from beak trimming, that's a possibility.
5    Q.   They could lose every point under
6  beak trimming and still pass the audit; is that
7  correct?
8    A.   If they got every point in all the
9  other portions.
10   Q.   And a company could fail every
11 requirement under molting but still pass the
12 audit under the system that the committee was
13 proposing; is that correct?
14   A.   That's correct.
15   Q.   And then a company could fail every
16 requirement under handling and transportation,
17 and they would still pass the audit; is that
18 correct?
19 MR. ROBISON:
20       Object to form.
21   A.   That's correct.  And, in fact,
22 initially it was easier than that.  The last
23 motion on the page was for the initial time
24 period only a 70 percent passing grade was
25 required.

Page 57

1  MR. BIRKHAEUSER:
2    Q.   Thank you.
3    A.   And it was a lot of question as to
4  how the outside auditors were going to interpret
5  these issues and so forth.
6    Q.   But if a company failed every
7  requirement under housing and space allowance,
8  it would fail the audit, correct?
9    A.   That's correct.
10 MR. ROBISON:
11       Object to form.
12 MR. BIRKHAEUSER:
13       For the record, the witness is
14 reviewing Exhibit 100, which is UE0153388.
15       (Exhibit 100 marked.)
16   Q.   Have you completed your review of
17 Exhibit 100?
18   A.   Yes, sir, I have.
19   Q.   Is Exhibit 100 a true copy of minutes
20 of a UEP animal welfare committee that was held
21 on October 9, 2002?
22   A.   Yes.
23   Q.   Did you attend the meeting
24 personally?
25   A.   I did.

15 (Pages 54 - 57)

Page 58

1    Q.   You traveled to Savannah, Georgia?
2    A.   Yes, I did.
3    Q.   On page 2 of the minutes, the
4 committee again addressed the 100 percent rule,
5 correct?
6    A.   Yes.
7    Q.   And Mr. Krouse was asked -- excuse
8 me. Mr. Krouse reported that previous motions
9 required that the Board reconfirm the commitment
10 of 100 percent of the production facilities; is
11 that correct?
12 MR. ROBISON:
13        Object to form.
14    A.   I'm not sure of the reason for it,
15 but it was brought up for a vote again.
16 MR. BIRKHAEUSER:
17    Q.   And by the Board, what's being
18 referred to in these minutes is the Board of
19 Directors of the UEP, correct?
20    A.   Yes.
21    Q.   And then at the meeting on October 9,
22 2002, the animal welfare committee reconfirmed
23 the status that a company must commit to
24 implementing the welfare guidelines on
25 100 percent of all production facilities,

Page 59

1 regardless of how or where the eggs may be
2 marketed; is that correct?
3    A.   Correct.
4    Q.   And that the 100 percent commitment
5 is intended to be inclusive of all company
6 entities and affiliates; is that correct?
7    A.   Yes, sir.
8    Q.   And that motion carried; is that
9 correct?
10    A.   10 to 2.
11    Q.   Can you turn to the last page of
12 Exhibit 100, on the subject of monthly
13 compliance reports? Do you recall -- who is
14 Rikard who's been referred to in the monthly
15 compliance reports?
16    A.   It's Linda Rikard. She's either an
17 employee or Vice President of -- still an
18 employee of UEP. Her office is in Iowa.
19    Q.   Do you recall Linda Rikard reporting
20 on the number of companies that had filed their
21 August compliance reports?
22    A.   Seems like, yes.
23    Q.   Do you recall her stating that
24 letters had been sent to companies that were
25 even one bird over the allowable limit to meet

Page 60

1 the space requirements?
2    A.   I do.
3    Q.   Did you believe that those letters
4 were, in fact, sent?
5    A.   Absolutely. Even received one or
6 two.
7 MR. BIRKHAEUSER:
8        For the record, we're marking
9 Exhibit 101, which is a document with the Bates
10 stamp of UE0329124 through 126.
11        (Exhibit 101 marked.)
12    Q.   Have you completed your review of
13 Exhibit 101?
14    A.   Yes, sir, I have.
15    Q.   And is Exhibit 101 a true copy of the
16 minutes of an animal welfare committee meeting
17 dated January 21, 2003?
18 MR. ROBISON:
19        Object to form.
20    A.   Yes, it is.
21 MR. BIRKHAEUSER:
22    Q.   Did you attend the meeting reflected
23 in Exhibit 101?
24    A.   Yes, I did.
25    Q.   On the first page of Exhibit 101, the

Page 61

1 committee discussed audit procedures, correct?
2    A.   Yes.
3    Q.   There are two acronyms that are used
4 in that discussion. The first is USDA, and the
5 second is ARPAS. What's ARPAS?
6    A.   A division of USDA.
7    Q.   And USDA is the United States
8 Department of Agriculture?
9    A.   It is.
10    Q.   And did you, in fact, have meetings
11 with the USDA regarding audit procedures?
12    A.   Yes.
13    Q.   And the committee wanted the USDA to
14 become an auditor of the animal welfare
15 requirements, correct?
16    A.   Yes.
17    Q.   And the committee --
18    A.   I'm sorry.
19    Q.   I didn't mean to stop your answer. I
20 thought you had completed it.
21    A.   Yes. We wanted USDA to be a part of
22 it. We thought they were a reputable outside
23 party and could relate to our industry and our
24 business and understand what they see.
25        And as -- not only that, but we

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  relied upon USDA to take the manual under which
2  we were -- contained all of the producer
3  guidelines, and they wrote the criteria for
4  auditors on, here's what the manual says, and
5  here's what it means to you as an auditor when
6  you're on site.
7      They interpreted that and provided a
8  training document to train auditors.
9      Q.  And having the USDA audit the animal
10 welfare requirements would lend credibility to
11 the program; is that correct?
12     A.  Well, generally an outside third
13 party, reputable third party was needed to lend
14 credibility, and they were a good one.
15     Q.  And you reported to the committee
16 about a mock audit that was conducted at the
17 Cal-Maine Edwards farm; is that correct?
18     A.  Yes, it is correct.
19     Q.  And where is the Cal-Maine Edwards
20 farm?
21     A.  It's in Mississippi, about 30 miles
22 south and west of Jackson.
23     Q.  And during this meeting, Cal-Maine
24 assisted in auditor training; is that correct?
25     A.  To some extent.  Would you like for

Page 63

1  me to tell you about the meeting?
2      Q.  Let me just ask a very specific
3  question.  Did Cal-Maine help train the auditors
4  by using its facilities at the Edwards farm?
5      A.  We enhanced their ability to train,
6  and we certainly did not hinder it.
7      Q.  If you could turn to page 2 of the
8  exhibit.  At the bottom -- I'm sorry.  And I'm
9  referring specifically to the paragraph that
10 begins:  "Challenge to 100 percent policy and
11 co-mingling."
12     So at this meeting there was a
13 challenge to the 100 percent rule; is that
14 correct?
15     A.  Yes.
16     Q.  And the challenge related to certain
17 individuals desiring to phase in their program
18 as their market needs occurred; is that correct?
19 MR. ROBISON:
20     Object to form.
21     A.  Not exactly.
22 MR. BIRKHAEUSER:
23     Q.  The challenge was brought by
24 Mr. Garth Sparboe, correct?
25     A.  Yes.

Page 64

1      Q.  And the challenge related to
2  marketing arrangements with Michael Foods and
3  Sunny Fresh Foods, correct?
4  MR. ROBISON:
5      Object to form.  Mischaracterizes.
6      A.  I believe so.
7  MR. BIRKHAEUSER:
8      Q.  He asked the committee to give
9  consideration to compromises that would allow
10 the group to phase in the program as their
11 market needs occurred; is that correct?
12 MR. ROBISON:
13     Object to form.  Asked and answered.
14     A.  Yes.  That's the report here.
15 MR. BIRKHAEUSER:
16     Q.  Okay.
17     A.  They were asking permission to not
18 treat all of their chickens the same and still
19 be on the program.
20     Q.  Did Cal-Maine ever conduct a study in
21 any way relating to co-mingling of eggs?
22 MR. ROBISON:
23     Object to form.  Outside the notice.
24     A.  I don't think so.
25 MR. BIRKHAEUSER:

Page 65

1      Q.  And at the bottom of page 9126,
2  there's a discussion of backfilling; is that
3  correct?
4      A.  Yes.
5      Q.  And, again, backfilling is the
6  practice of replacing hens that have died; is
7  that correct?
8      A.  Yes.
9      Q.  And after discussing the requirement
10 in January of 2003, there was no recommendation
11 for any change of the backfill policy; is that
12 correct?
13     A.  No.  I think that was just a point of
14 interest.  That was discussed in a meeting, just
15 brought out to the membership.
16     Q.  And at this point in time,
17 backfilling was permitted.
18     A.  Yes.
19     Q.  Okay.
20     A.  I might say it was permitted by the
21 animal welfare committee and their program for
22 the membership.  It was not recommended by the
23 scientific committee.
24     Q.  Thank you.  So the animal welfare
25 committee did not endorse -- did not adopt the

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1 scientific committee's recommendations about
2 backfilling as of January 2003, correct?
3    A.   No. I think they -- I don't know if
4 they specified that, but, as it became aware of
5 what was going on, they were against it for the
6 basic reasons of animal welfare.
7        So they're aware of this, being parts
8 of meetings, but they were -- they saw it going
9 on, but that was not their recommendation.
10 MR. BIRKHAEUSER:
11       We will mark this Exhibit 102.
12       (Exhibit 102 marked.)
13 MR. BIRKHAEUSER:
14       For the record, we're marking as
15 Exhibit 102 a document bearing the Bates number
16 CM00415763 through 65.
17    Q.   Have you completed your review of
18 Exhibit 102?
19    A.   Yes.
20    Q.   Does Exhibit 102 -- is Exhibit 102 a
21 true copy of the minutes of a UEP producer
22 committee for animal welfare conference call
23 that was held on February 26, 2003?
24    A.   Yes.
25    Q.   During this meeting there was further

Page 67

1 discussion of the 100 percent rule, correct?
2    A.   The purpose of the call was to
3 further discuss the 100 percent rule.
4    Q.   And, again, there was a discussion of
5 creating exemptions from the 100 percent rule,
6 correct?
7 MR. ROBISON:
8        Object to form.
9    A.   There was a proposal for that.
10 MR. BIRKHAEUSER:
11    Q.   And the proposal was being presented
12 by Mr. Krouse, correct?
13 MR. ROBISON:
14       Object to form.
15    A.   Well, the -- during that time there
16 was discussion about being able to apply less
17 than the 100 percent rule for the breakers, the
18 breaking industry. And Krouse was saying, look,
19 if we're going to do it for the breakers, I want
20 to do it, too.
21       And there were some producers wanted
22 the ability not to be 100 percent, some wanted
23 to be on it. They're a very independent group.
24 They had their personal reasons for which they
25 desired.

Page 68

1        And initially through this, Krouse's
2 position was that he favored not being 100
3 percent, so he proposed that -- he was part of
4 the group that wanted to review it.
5 MR. BIRKHAEUSER:
6    Q.   And after the parties desiring a
7 change to the 100 percent rule presented their
8 views, the committee did not take a vote to
9 change the 100 percent rule; is that correct?
10    A.   There was no action on this call.
11    Q.   However, the comments generally
12 favored no change to UEP's current policy by a
13 count of nine to four; is that correct?
14    A.   That's the statement. I presume it's
15 correct. There was no motion to be considered.
16    Q.   And you believe that the minutes
17 accurately reflect the discussions that were
18 held during this --
19    A.   I do.
20    Q.   -- February 26, 2003, conference
21 call, correct?
22    A.   I do.
23       (Exhibit 103 marked.)
24 MR. BIRKHAEUSER:
25       For the record, the witness is

Page 69

1 reviewing Exhibit 103, which is document bearing
2 the Bates numbers CM00225709 through 712.
3    A.   I'm through with my review.
4    Q.   Thank you. Does Exhibit 103 -- is
5 Exhibit 103 a true copy of the minutes of the
6 UEP producer committee for animal welfare held
7 on May 12, 2003?
8    A.   Yes, I think so.
9    Q.   And did you attend this meeting
10 personally?
11    A.   Yes, I did.
12    Q.   I'd like to focus your attention to
13 the first page, the scientific committee
14 recommendations. It notes that Paul -- do
15 pronounce it Bahan?
16    A.   Bahan.
17    Q.   -- Bahan, B-a-h-a-n, and Mr. Gregory
18 reported having met with the scientific advisory
19 committee on March 1.
20       Mr. Bahan was the Chairman of the
21 animal welfare committee at this time?
22    A.   Yes.
23    Q.   And Mr. Gregory, does that refer to
24 Gene Gregory?
25    A.   It does.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    Q.   And Mr. Bahan and Mr. Gregory are
2  reporting recommendations from the scientific
3  committee; is that correct?
4    A.   Yes.
5    Q.   Under the first numbered item, the
6  scientific committee is recommending that the
7  ammonia to which birds are exposed should not
8  exceed 25 parts per million; is that correct?
9  MR. ROBISON:
10       Object to form.
11    A.   That's the first item, yes.
12  MR. BIRKHAEUSER:
13    Q.   Is that your recollection --
14    A.   Yes.
15    Q.   -- from attending the meeting?
16       And at the current time, the animal
17  welfare committee had approved requirements that
18  were in excess of 25 parts per million, correct?
19  MR. ROBISON:
20       Object to form.
21    A.   Yes.  Twice the size, 50.
22  MR. BIRKHAEUSER:
23    Q.   Okay.
24    A.   Could I say something further about
25  this?

Page 71

1    Q.   I'm going to ask you another question
2  in one second.
3    A.   I take that as a no.
4  MR. ROBISON:
5       If you need to explain something, go
6  ahead.
7    A.   I would like to explain it further.
8  MR. ROBISON:
9       Yeah.
10  MR. BIRKHAEUSER:
11    Q.   You'll have the opportunity --
12  MR. ROBISON:
13       No, no, no, no.  You've cut him off
14  before.  We don't need to cut a witness off if
15  he was trying to explain an answer.
16  MR. AHERN:
17       No.  He finished his answer.  You'll
18  have the opportunity to ask him questions later.
19  MR. ROBISON:
20       No.  Go ahead and finish your answer.
21  MR. BIRKHAEUSER:
22    Q.   I have another question.
23  MR. AHERN:
24       I think that's improper, Mr. Robison.
25  MR. ROBISON:

Page 72

1       I know you do.
2  MR. BIRKHAEUSER:
3    Q.   On page 2, there's a motion --
4  MR. ROBISON:
5       You guys don't want the truth, you
6  don't want a full answer to the question?
7  MR. BIRKHAEUSER:
8       I would like an answer to the
9  questions that I ask.  If you want to ask other
10  questions -- I asked him whether --
11  MR. ROBISON:
12       I know you asked a question.  What
13  he's saying is his answer was not complete, and
14  now you're cutting him off and going on to
15  something else.
16  MR. AHERN:
17       He stopped his answer.  He was done.
18  MR. BIRKHAEUSER:
19       You have the opportunity to ask
20  questions.
21  MR. ROBISON:
22       If you need to finish your answer,
23  finish it.
24    A.   Well, the answer I gave was not quite
25  complete.

Page 73

1  MR. ROBISON:
2       Okay.  Then finish it.
3    A.   The relationship between -- as the
4  program went on beyond the initial point in 2000
5  and to this point, the relationship of the
6  committee and -- of the scientific committee and
7  the welfare committee was that the scientific
8  committee had their recommendations, and we had
9  our program together, and they weren't the same.
10       That was okay with the scientific
11  committee as long as we always moved towards
12  their recommendations.  At any point in time
13  that they had reason to have concern, they
14  brought it up.
15       This is an example.  They were not
16  satisfied with the 50 parts per million, and
17  they were pressuring the committee to consider
18  further restrictions on this item.
19       Likewise, any time that other science
20  was available to -- for interpretation on any of
21  these areas, they were open to consideration on
22  that.
23       That was all I wanted to add to it.
24  MR. AHERN:
25       Are you done with your answer

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1 fully --
2     A.   Yes.
3 MR. AHERN:
4         -- now at this time?
5         Objection.  Improper coaching by his
6 counsel.  Move to strike as non-responsive.
7 MR. ROBISON:
8         This is not coaching, Patrick.
9 MR. AHERN:
10        You told him it was incomplete, and
11 he said, my answer was incomplete.
12 MR. ROBISON:
13        I didn't say it was incomplete.  He
14 said it was incomplete.  You guys wouldn't let
15 him finish it.  I didn't tell him what to say.
16 MR. BIRKHAEUSER:
17    Q.   On page 2 at the top, there's a
18 motion; is that correct?
19    A.   Which page would you regard as
20 page 2?
21    Q.   The page ending in Bates number 5711.
22 Thank you, because there is a cover page.
23    A.   There is a motion.  That's correct.
24    Q.   And the animal welfare committee
25 decided to table the scientific committee

Page 75

1 recommendations until further research is
2 conducted; is that correct?
3    A.   The report is that it carried.
4    Q.   So the -- as a result of the May 12,
5 2003, meeting, the animal welfare committee was
6 not going to adopt the scientific committee's
7 recommendations to lower hens' exposure to
8 ammonia to the levels recommended by the
9 scientific committee; is that correct?
10 MR. ROBISON:
11        Object to form.
12    A.   No.  That's not what it says.  It
13 says they were going to table the
14 recommendations.
15 MR. BIRKHAEUSER:
16    Q.   It was unwilling, as of May 12, 2003,
17 to adopt the scientific committee's
18 recommendations with respect to ammonia
19 concentration, correct?
20 MR. ROBISON:
21        Object to form.
22    A.   Yes.  On that day, they were not
23 going to accept them.
24        (Exhibit 104 marked.)
25 MR. BIRKHAEUSER:

Page 76

1         For the record, we're marking
2 Exhibit 104, which is UE0329116.  It's a single
3 page.
4    Q.   Have you completed your --
5    A.   Yes, I have reviewed it.
6    Q.   Does Exhibit 104 -- is Exhibit 104 a
7 true copy of the minutes of a meeting of the UEP
8 producer committee for animal welfare held by
9 conference call on May 30, 2003?
10    A.   Yes, I believe so.
11    Q.   And did you participate in that call?
12    A.   Yes, I did.
13    Q.   I have just one question.  It's on
14 the third paragraph.  Do you recall Mr. Gregory
15 recommending approval of the FMI-NCCR audit?
16    A.   I recall FMI being the driver behind
17 all of this, and they were insisting upon the
18 ability to appoint the third party audits and
19 being involved in that.
20    Q.   FMI is the Food Marketing Institute?
21    A.   Food Marketing Institute.
22    Q.   Do you recall Mr. Gregory
23 recommending approval of the FMI audit being
24 added to the list of approved auditors?
25    A.   Yes.

Page 77

1    Q.   Do you recall him recommending it
2 because it was our only way to be involved and
3 protect the interest of our members?
4 MR. ROBISON:
5         Object to form.
6    A.   No, I don't really recall the reason.
7 MR. BIRKHAEUSER:
8    Q.   Do you recall Mr. Gregory expressing
9 the belief that since it was the intent of FMI
10 to continue in the audit process with or without
11 our support, he felt it would be wise to be
12 involved?
13    A.   I don't actually recall that, but it
14 makes good sense.
15    Q.   And you believe that the Exhibit 104
16 accurately reflects the discussion of the
17 conference call that was held on May 30?
18    A.   Yes.  I think so.
19        (Exhibit 105 marked.)
20 MR. BIRKHAEUSER:
21        For the record, the witness is
22 reviewing Exhibit 105, which is UE0153327
23 through 29.
24    A.   I've reviewed the document.
25    Q.   At the bottom of the page ending in

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 328, there's further discussion of the ammonia
2 standards, correct?
3     A.    Yes.
4     Q.    And the scientific committee is
5 continuing to urge the UEP to limit the amount
6 of ammonia permitted to 25 parts per million; is
7 that correct?
8 MR. ROBISON:
9         Object to the form.
10     A.    I don't know that they're continuing.
11 They have made their point, and we're still
12 responding to it.
13 MR. BIRKHAEUSER:
14     Q.    And the response by the committee, as
15 reflected in the October 27, 2003, minutes --
16 MR. ROBISON:
17         Object to form.
18     A.    Pardon me?
19 MR. BIRKHAEUSER:
20     Q.    -- is to --
21     A.    What minutes?
22     Q.    I haven't completed my question yet.
23         -- is to recommend that the Board
24 acknowledges being in support of working toward
25 a 25-part-per-million ammonia standard; is that

Page 79

1 correct?
2 MR. ROBISON:
3         Object to form.
4     A.    In this document you're referring to,
5 the 22nd, the committee agreed to be working
6 towards that. We wanted to get there, but the
7 problems were the ability to accurately and
8 truly measure ammonia levels in all the
9 different housing types.
10         The ability to do that was not easily
11 attainable, and we began to work on different
12 meters and ways to measure the ammonia, and
13 whether the standards means any one time or an
14 average over a 24-hour period and -- there were
15 a lot of things being considered, how to assess
16 that.
17 MR. BIRKHAEUSER:
18     Q.    Is that reflected in the minutes
19 contained in Exhibit 105?
20     A.    No. That's what they meant by
21 working towards it. That's what we discussed at
22 the time.
23     Q.    Guidelines at that time permitted
24 50 parts per million of ammonia concentration,
25 correct?

Page 80

1     A.    Yes.
2     Q.    And at that time the audits tested
3 for 50 parts per million, correct?
4     A.    Yes.
5 MR. BIRKHAEUSER:
6         Let me take a quick break.
7 VIDEOGRAPHER:
8         We are now going off the record. The
9 time is 11:23 a.m.
10         (A recess was taken.)
11 VIDEOGRAPHER:
12         We are now going back on the record.
13 The time is 11:31 a.m.
14 MR. BIRKHAEUSER:
15         And for the record, we're marking
16 Exhibit 106, which is CM00225601 through 02.
17         (Exhibit 106 marked.)
18     Q.    Have you completed your review of
19 Exhibit 106?
20     A.    I have.
21     Q.    Does Exhibit 106 constitute the
22 minutes of the producer committee for animal
23 welfare that was held on March 3, 2004?
24     A.    Yes.
25     Q.    Do you believe it accurately reflects

Page 81

1 the meeting that was held on March 3, 2004?
2     A.    Yes.
3     Q.    Did Mr. Armstrong attend that meeting
4 in person?
5     A.    I thought that he did. It shows that
6 he was present.
7     Q.    And did you attend in person?
8     A.    I did.
9     Q.    And, again, Mr. Armstrong is the
10 chairman of the scientific advisory committee,
11 correct?
12     A.    Yes.
13     Q.    And Mr. Armstrong has appeared at the
14 animal welfare committee to express the
15 scientific committee's views regarding certain
16 of the scientific committee's recommendations,
17 correct?
18     A.    Yes. The -- it shows that the
19 scientific committee had concern about some of
20 the cage equipment still being offered on the
21 market that would not support the
22 recommendations, and he was bringing that forth,
23 that those could still be bought, and that in
24 order to maintain the full support of the
25 scientific committee, we should always, as an

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1 industry, be moving towards their standards and
2 never away from them.
3    Q.   Thank you.  If you look at the second
4 full paragraph, the one that begins with
5 Mr. Armstrong's name?
6    A.   Yes.
7    Q.   And the second full sentence in that
8 paragraph.
9    A.   Yes.
10    Q.   Mr. Armstrong is expressing his views
11 that UEP could lose the committee's support if
12 they regressed from current standards when
13 installing new equipment; is that correct?
14    A.   Right.  I just said that.
15    Q.   Okay.  I thought that your previous
16 answer concerned old equipment.  Mr. Armstrong
17 is concerned about manure dropping on lower
18 cages, correct?
19 MR. ROBISON:
20       Object to form.
21    A.   That's one of his concerns.
22 MR. BIRKHAEUSER:
23    Q.   And another one of his concerns is
24 feeder space, correct?
25    A.   That's one of his concerns.

Page 83

1    Q.   And there's discussion during this
2 animal welfare committee meeting of providing
3 10 centimeters of feeder space per hen, correct?
4 MR. ROBISON:
5       Object to form.  Incomplete.
6    A.   Yes.  There's -- and I think there's
7 some ongoing research at this point in time as
8 well.
9 MR. BIRKHAEUSER:
10    Q.   I think we'll see the research coming
11 in subsequent meetings.
12    A.   Okay.
13    Q.   And these scientists always talk in
14 metric.  10 centimeters is approximately how
15 many inches; do you know?
16    A.   Oh, I guess it would be about four
17 inches, a little bit less.
18    Q.   And currently those cages provided
19 about three inches of feeder space, correct?
20 MR. ROBISON:
21       Object to form.  Vague.
22    A.   Most cages did not provide four
23 inches per bird, but that's changing as the hen
24 count changed through the progress of the
25 program.

Page 84

1 MR. BIRKHAEUSER:
2    Q.   But most were only off by about an
3 inch --
4    A.   No more.
5    Q.   -- is that correct?
6    A.   No more.
7    Q.   And Mr. Armstrong's also presenting
8 the scientific committee's views that manure
9 shouldn't drop from cages that are stacked upon
10 each other; is that correct?
11    A.   Yes.
12    Q.   So manure shouldn't be dropping from
13 the upper cages into the lower cages.
14    A.   Correct.
15    Q.   And there was a motion that was made
16 to reflect the scientific committee's views; is
17 that correct?
18    A.   Yes.
19    Q.   And ultimately that motion was
20 withheld, correct?
21    A.   Yes, it was.
22    Q.   And no action was taken on it at the
23 March 3, 2004, meeting.
24    A.   No.  It was placed on the agenda for
25 May, it says, on the next scheduled meeting.

Page 85

1       (Exhibit 107 marked.)
2 MR. BIRKHAEUSER:
3       For the record, we've marked
4 Exhibit 107, which is UE0153279 through 80.
5    Q.   Have you completed your review?
6    A.   I have.
7    Q.   I've got just a couple questions.
8 They're both on the second page.
9       Did Dr. Armstrong personally
10 attend -- well, first of all -- strike that
11 question.
12       Does Exhibit 107 constitute the
13 minutes of the meeting of the producer committee
14 for animal welfare that was held on May 10,
15 2004?
16    A.   Yes.
17    Q.   Did Dr. Armstrong personally attend
18 the animal welfare committee meeting?
19    A.   Yes, it's noted Dr. Jeff Armstrong is
20 present.
21    Q.   And, again, he was pleading the case
22 of the scientific committee --
23    A.   Absolutely.
24    Q.   -- with respect to feeder space and
25 the manure issue --

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1  MR. ROBISON:
2      Object to form.
3  MR. BIRKHAEUSER:
4      Q.  -- correct?
5  MR. ROBISON:
6      Same.
7      A.  Yes.  I think so.
8  MR. BIRKHAEUSER:
9      Q.  And Mr. Armstrong was asking for four
10 inches of feeder space per bird, per hen; is
11 that correct?
12     A.  The scientific committee's
13 recommendation is four inches per bird or
14 greater.  Four to six.  I think they expressed
15 four to six in their documents.
16     Q.  A minimum of four inches --
17     A.  Yes.
18     Q.  -- of feeder space per bird.  And the
19 animal welfare committee approved a
20 recommendation to the Board that research take
21 place on feeder space, correct?
22     A.  Correct.
23     Q.  And further recommended to the Board
24 that three inches of feeder space per hen be
25 required on new equipment and for all hens

Page 87

1  housed after April 1, 2005, correct?
2      A.  We had no strict provision for the
3  amount of feeder space to be allowed, so that
4  motion provided a baseline of three inches while
5  research is going on.  And three inches could be
6  accepted by the membership.
7      Q.  Because, as you just testified, three
8  inches is pretty much the standard that people
9  already used.
10 MR. ROBISON:
11     Object to the form.
12     A.  Right.
13 MR. BIRKHAEUSER:
14     For the record, we've marked
15 Exhibit 108, which is UE0153266 through 69.
16     (Exhibit 108 marked.)
17     Q.  Again, I'm principally interested in
18 the discussion on page 2, complete the feeder
19 space research.
20     A.  Okay.  I'm ready.
21     Q.  So does Exhibit 108 constitute the
22 minutes of a meeting held on June 10 through 11,
23 2004, of the scientific advisory committee and
24 the UEP producer committee for animal welfare?
25     A.  Yes.

Page 88

1      Q.  And at this meeting, again, the issue
2  of feeder space was discussed, correct?
3      A.  Yes.
4      Q.  And the animal welfare committee's
5  decision was to have a study about feeder space.
6      A.  The recommendation was we needed more
7  science to represent the modern facilities and
8  the modern genetics.
9      Q.  You needed more research to decide
10 whether to increase the feeder space by
11 approximately an inch; is that correct?
12     A.  Yes.  The equipment companies were
13 beginning to come out with equipment for less
14 than three inches.  In order to help meet some
15 of the other requirements such as cage space,
16 they had to reconfigure the cage in such a way
17 that it would further limit feeder space, and
18 that was a concern to the committee.
19     Q.  And the Board ended up deciding to
20 table its previous recommendation of at least
21 three inches of feeder space, correct?
22 MR. ROBISON:
23     Object to form.
24     A.  It refers here to a tabled motion, so
25 I'm sure that was at the Board.

Page 89

1  MR. BIRKHAEUSER:
2      Q.  And that was approved.
3  MR. ROBISON:
4      Same objection.
5      A.  No.
6  MR. BIRKHAEUSER:
7      Q.  I'm sorry.  I'm just talking about
8  the animal welfare committee, not the Board.
9      A.  Right.  This -- these minutes refer
10 to the three inches of feeder space that were
11 considered in the meeting before --
12     Q.  Correct.
13     A.  -- and regarding that as a tabled
14 motion.  That's what I think -- isn't that what
15 it says here?
16     Q.  On page 267, there was a motion by
17 Krouse, correct?  The very last motion that was
18 considered by the animal welfare committee on
19 June 10, 2004 --
20     A.  Yes.
21     Q.  -- there was a motion by Krouse.
22     A.  Correct.
23     Q.  And the motion was to table the
24 motion recommending at least three linear inches
25 of feeder space off the table, and recommended

23 (Pages 86 - 89)

Page 90

1 that it be defeated in consideration of today's
2 motions, correct?
3     A.   Yes.  And that carried.
4     Q.   And that carried.  So that was
5 approved by the producer committee for animal
6 welfare on June 10?
7     A.   So that removed the three-inch
8 minimum.
9     Q.   Okay.  Thank you.
10         (Exhibit 109 marked.)
11 MR. BIRKHAEUSER:
12         For the record the witness is now
13 reviewing Exhibit 109, which bears the Bates
14 stamp NL000792 through 4.
15     Q.   I'm principally interested in the
16 last page.  I just want to follow the
17 progression of the feeder space issue.
18     A.   Yes.
19     Q.   Does Exhibit 109 constitute the
20 minutes of the meeting of the animal welfare
21 public relations committee held on October 20,
22 2004?
23     A.   Yes.
24     Q.   And on page 3, did Dr. Armstrong
25 actually attend that meeting held in

Page 91

1 New Orleans?
2     A.   I believe so.
3     Q.   And did you attend?
4     A.   Yes.
5     Q.   Dr. Armstrong presented a project
6 that was proposed at Purdue University; is that
7 correct?
8     A.   Yes.  One of the committee members,
9 Dr. Patricia Hester from Purdue, designed a
10 research project for feeder space, and he was
11 presenting that.
12     Q.   When you say he, do you mean
13 Mr. Armstrong was --
14     A.   He being Dr. Armstrong.
15     Q.   Thank you.  So when you say he, you
16 meant Dr. Armstrong was presenting the research
17 project, correct?
18     A.   Yes.  That's what I meant.
19     Q.   And ultimately the animal welfare
20 committee asked Dr. Armstrong to go back to the
21 scientific committee and redesign the study
22 about feeder space, correct?
23 MR. ROBISON:
24         Object to form.
25     A.   That's what it says.  I don't recall

Page 92

1 the reasons exactly, but yes.
2 MR. BIRKHAEUSER:
3     Q.   And there was a motion to that
4 effect, and that motion carried, correct?
5     A.   Well --
6 MR. ROBISON:
7         Same objection.
8     A.   -- the motion that I see here was
9 that they redesigned -- that they design a
10 companion project and epidemiological study, and
11 that was carried.
12 MR. BIRKHAEUSER:
13     Q.   That was carried.
14         (Exhibit 110 marked.)
15 MR. BIRKHAEUSER:
16         For the record, the witness is
17 reviewing Exhibit 110, which is a document
18 bearing the Bates stamp UE0153237 through 41.
19     A.   Okay.
20     Q.   Does Exhibit 110 constitute the
21 minutes of a meeting dated September 7 through 8
22 of the producer committee for animal welfare?
23     A.   I think it says December 7 and 8.
24     Q.   I apologize if I misspoke.  Does it
25 constitute --

Page 93

1     A.   Yes.
2     Q.   -- the minutes of the meeting dated
3 December 7 through 8, 2004, of the producer
4 committee for animal welfare?
5     A.   It does.
6     Q.   And did you attend that meeting?
7     A.   Yes.
8     Q.   This meeting occurred for two days in
9 Chicago, correct?
10     A.   Yes, sir.
11     Q.   And on the first page there's a
12 discussion of backfilling.  Do you see that?
13     A.   I do.
14     Q.   Up until the end of December 2004,
15 backfilling had been permitted under the animal
16 welfare program, correct?
17     A.   Yes.
18     Q.   And at this meeting the producer
19 committee for animal welfare decided to prohibit
20 backfilling; is that correct?
21 MR. ROBISON:
22         Object to form.
23     A.   The -- I think there was a motion
24 almost to that effect saying that -- prohibiting
25 backfilling except under extreme circumstances.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1 MR. BIRKHAEUSER:
2     Q.    And the extreme circumstances are
3 catastrophes, correct?
4     A.    Yes.
5     Q.    So if there's a natural disaster,
6 then backfilling would be permitted.
7     A.    Even an unnatural disaster, but, yes.
8     Q.    Some extreme circumstance.
9         Can you turn to page 2, the second
10 motion.  According to these minutes, you moved
11 to recommend to the Board that unauthorized
12 backfilling be treated the same as cage space
13 allowance and therefore will result in a failed
14 audit; is that correct?
15    A.    Yes.
16    Q.    And that motion carried?
17    A.    It says unanimously.
18    Q.    On the page ending in 239, there's a
19 discussion of cage configuration and manure
20 drop-through again; is that correct?
21    A.    Yes, there is.
22    Q.    Okay.  And with respect to those
23 issues, the committee decided to appoint a
24 subcommittee, correct, to further investigate?
25    A.    The chairman decided to appoint a

Page 95

1 subcommittee.
2     Q.    And the Chairman had that under
3 authority in the animal welfare --
4     A.    He had the authority.
5     Q.    The Chairman had that authority in
6 the animal welfare committee; is that true?
7     A.    The Chairman had that authority.
8     Q.    Okay.
9     A.    And I think the subcommittee was to
10 survey the various equipment suppliers to
11 address what currently is being provided in
12 terms of some of the concerns of the scientific
13 committee.
14    Q.    And just generally those concerns
15 were cages that would permit a hen to actually
16 stand upright in the entire -- throughout the
17 entire area of the cage?
18 MR. ROBISON:
19        Object to form.
20 MR. BIRKHAEUSER:
21    Q.    Is that correct?
22    A.    It involved things like the
23 dimensions, the cage height, the shape, the --
24 various things like that.  The style.
25    Q.    Slant-back cage wouldn't permit the

Page 96

1 hen to be able to stand upright throughout the
2 entire cage, right?
3     A.    Possibly.
4     Q.    And then manure drop-through, that's
5 the issue that we talked about before, correct?
6     A.    Some cage designs allow more of that
7 than others.  Some none.  So just all of those
8 issues.
9     Q.    And the scientific committee was
10 concerned because it had visited farms, and it
11 saw manure dropping from higher cages into lower
12 cages.
13 MR. ROBISON:
14        Object to form.
15    A.    I don't know if they visited farms or
16 not, but they may have.
17 MR. BIRKHAEUSER:
18    Q.    I believe we saw that in some
19 previous minutes.
20 MR. ROBISON:
21        Object to form.
22    A.    It's certainly plausible.
23 VIDEOGRAPHER:
24        Five minutes.
25 MR. BIRKHAEUSER:

Page 97

1     Q.    In any event, Chairman Oldenkamp has
2 appointed a subcommittee to address those
3 concerns; is that correct?
4     A.    That is correct.
5     Q.    And then a little bit further down
6 there's a motion relating to audits; is that
7 correct?
8     A.    That's correct.
9     Q.    And the motion required that all
10 animal care certified audits be random, correct?
11    A.    Yes.
12    Q.    And that the auditors would provide
13 the company no more than one week prior notice
14 to when the audit would be conducted.
15 MR. ROBISON:
16        Object to form.
17    A.    That's the motion.
18 MR. BIRKHAEUSER:
19    Q.    And that motion carried, correct?
20    A.    Yes.
21 VIDEOGRAPHER:
22        Three minutes.
23 MR. BIRKHAEUSER:
24        Why don't we go off the record.
25 VIDEOGRAPHER:

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1 This the end of tape number two of
2 the deposition of Steve Storm. We are now going
3 off the record. The time is 12:02 p.m.
4 (A recess was taken.)
5 VIDEOGRAPHER:
6 This is the beginning of tape number
7 three in the video deposition of Steve Storm.
8 We are now going back on the record. The time
9 is 1:03 p.m.
10 MR. BIRKHAEUSER:
11 Q. Good afternoon, Mr. Storm. During
12 our break, I handed you Exhibit 111. And for
13 the record, that contains the Bates number
14 UE0210295 through 298.
15 (Exhibit 111 marked.)
16 Q. And my first question -- I'm sorry.
17 I'll give you a chance to review the document.
18 A. I think I'm ready.
19 Q. My first question appears on page 2,
20 which is Bates marked 295. I guess before I
21 ask, I should ask you if these two constitute
22 the minutes of a meeting of the UEP producer
23 committee for animal welfare held on January 24,
24 2005.
25 A. Yes.

Page 99

1 Q. And on page 2, under Sysco audits --
2 A. Yes.
3 Q. -- there's a motion that's being made
4 by Mr. Krouse that the UEP only share the
5 results of a past animal care certified audit
6 with any retail food service or other customer
7 after having received a letter or signed form
8 from the animal care certified company; is that
9 correct?
10 MR. ROBISON:
11 Object to form.
12 A. Yes, I believe so.
13 MR. BIRKHAEUSER:
14 Q. And that motion carried, correct?
15 A. Yes.
16 Q. And so under this proposal by the
17 animal welfare committee, the results of an
18 audit would not be shared with any third party
19 unless the UEP had signed written consent from
20 the audited company.
21 MR. ROBISON:
22 Objection. Mischaracterizes.
23 Assumes facts. Mischaracterizes the document
24 and reality.
25 A. This motion says that only past audit

Page 100

1 results may be shared, and then only with a
2 letter from the audited firm which is renewed
3 annually.
4 MR. BIRKHAEUSER:
5 Q. A letter received by the UEP.
6 A. That they -- yes.
7 Q. And on page 2 --
8 A. Which page is that, sir?
9 Q. I'm sorry. On the page that ends in
10 297, we have a motion dealing with floor space.
11 That was a motion that was first considered
12 about a year before.
13 A. Yes.
14 Q. And the committee was recommending
15 through this motion that cage systems purchased
16 for new construction by June 1, 2005, and
17 installed after December 31 of 2005, have a
18 minimum weighted cage height of 16 inches; is
19 that correct?
20 A. Yes. That's correct. And no manure
21 pass-through.
22 Q. I was just going to ask that question
23 separately. So the committee also decided that
24 for new construction by June 1, 2005, and
25 installed after December 31, 2005, that those

Page 101

1 cages not permit manure to pass through; is that
2 correct?
3 A. Yes.
4 Q. Then on the last page that ends in
5 98, we're back to the feeder space issue, and
6 that issue is still being researched; is that
7 correct?
8 MR. ROBISON:
9 Object to form.
10 A. I think the report is that that's
11 been approved and funded so that it could begin.
12 MR. BIRKHAEUSER:
13 Q. So the research has not yet been
14 commenced.
15 A. Looks like it's -- all the
16 preliminaries appear to be done at this point,
17 and it's time to commence.
18 Q. Now it's going to be researched.
19 A. Yes.
20 (Exhibit 112 marked.)
21 MR. BIRKHAEUSER:
22 For the record, we're now looking at
23 Exhibit 112, which bears the Bates numbers
24 UE0153124 through 127.
25 A. Okay, sir.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    Q.   You've completed your review?
2    A.   I have.
3    Q.   Does Exhibit 112 constitute the
4  minutes of the producer committee for animal
5  welfare dated April 19, 2005?
6    A.   Yes.
7    Q.   And did you attend that meeting in
8  person?
9    A.   Yes.
10   Q.   Okay.  So on the page that ends in
11 125, Dr. Armstrong is, again, appearing before
12 the committee, correct?
13   A.   Yes. He's in attendance.
14   Q.   And, again, he's presenting the
15 scientific committee's views on feeder space; is
16 that correct?
17 MR. ROBISON:
18       Object to form.
19   A.   Yeah.  He was dealing with several
20 issues that day, and feeder space is one of
21 them.
22 MR. BIRKHAEUSER:
23   Q.   Thank you.  And this time he's
24 presenting a recommendation from the scientific
25 committee recommending that producers provide

Page 103

1  ideally four inches and a minimum of three
2  inches of feeder space for all new construction;
3  is that correct?
4  MR. ROBISON:
5        Object to form.
6    A.   Yes. It's correct.
7  MR. BIRKHAEUSER:
8    Q.   And previously the scientific
9  committee had recommended four inches.
10   A.   Previously they had recommended four
11 to six inches, and now, due to more recent
12 information, they were agreed to reduce that
13 while further testing or further investigation
14 is done.
15   Q.   And a motion was made to recommend to
16 the Board welfare guidelines for feeder space of
17 no less than three inches per layer; is that
18 correct?
19 MR. ROBISON:
20       Object to form.  Incomplete.
21   A.   Well, yes.  I think that's correct.
22 MR. BIRKHAEUSER:
23   Q.   And that motion was withdrawn.
24   A.   Yes.  There's a later motion in that
25 meeting that addresses it, I think.

Page 104

1    Q.   I think so, too.  We'll get there in
2  just a second.
3    A.   Okay.
4    Q.   Did Dr. Armstrong also print --
5  excuse me.
6        All right.  On the page that ends in
7  126, there's another motion made at the end of
8  the meeting on feeder space, correct?
9    A.   Correct.
10   Q.   And you made the motion, and it was
11 seconded by Mr. Bynum, correct?
12   A.   Yes.
13   Q.   And the motion is that effective
14 April 1, 2008, all new facilities, new
15 construction must be built to provide no less
16 than three linear inches of feeder space per
17 layer; is that correct?
18   A.   Yes.  It passed.
19   Q.   And that motion passed.
20       (Exhibit 113 marked.)
21 MR. BIRKHAEUSER:
22       For the record, the witness is
23 reviewing Exhibit 113, which bears the Bates
24 number UE0153065.  I'm sorry.  It goes on for
25 two pages.  So it goes on for one additional

Page 105

1  page.  It ends in 66.
2    A.   I think I'm ready.
3    Q.   Okay.  Does Exhibit 113 constitute
4  the minutes of a meeting held on December 1,
5  2005, of the producer committee for animal
6  welfare?
7    A.   Yes, it does.
8    Q.   And it took place in Chicago,
9  Illinois?
10   A.   Yes, sir.
11   Q.   And you were present?
12   A.   Yes, sir.
13   Q.   And on the bottom of page 65 and
14 spilling over to page 66, there's a report from
15 Mr. Gregory on the study being conducted of
16 feeder space, correct?
17   A.   Yes.
18   Q.   And as of December 1, 2005, that
19 issue is still under study.
20 MR. ROBISON:
21       Object to form.  Vague.
22   A.   Yes.  And he's announcing that they
23 hope to do a further study, an epidemiological
24 study as well.
25 MR. BIRKHAEUSER:

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1    Q.  Okay.  Thank you.
2      (Exhibit 114 marked.)
3 MR. BIRKHAEUSER:
4      For the record, we're looking at
5 Exhibit 114, Bates numbered UE0152993 through
6 996.
7    A.  All right, sir.
8    Q.  Okay.  And I'm directing you to page
9 995.  And we're discussing the ammonia
10 guidelines -- strike that.
11      On page 995, the committee is
12 discussing the ammonia guidelines, correct?
13    A.  Yes.
14    Q.  And Mr. Gregory reported to the
15 committee that when it was writing the
16 guidelines of the UEP certified program, there
17 was a difference of opinion on the ability of
18 the industry to meet the scientific committee's
19 recommendation in regard to ammonia; is that
20 correct?
21 MR. ROBISON:
22      Object to form.  Vague.
23    A.  Yes, that's the report here.
24 MR. BIRKHAEUSER:
25    Q.  And Mr. Gregory reports that, given

Page 107

1 the industry has had nearly four years to work
2 with the ammonia issue, he was recommending that
3 the UEP certified guidelines be changed to be
4 consistent with the scientific committee
5 recommendations; is that correct?
6 MR. ROBISON:
7      Objection.  Incomplete.
8    A.  That's what it says, sir.
9 MR. BIRKHAEUSER:
10    Q.  And there was a motion by Mr. Krouse
11 to revise the UEP certified guidelines that the
12 ammonia concentration to which birds should be
13 exposed should be ideally less than 10 parts per
14 million, and should not exceed 25 parts per
15 million, but temporary accesses should not
16 adversely affect bird health; is that correct?
17    A.  I might point out that the committee
18 was slow to get to this point because the OSHA
19 standard for humans is at 50 parts per million,
20 and we were concerned about the ability of
21 everyone to meet that standard; but, at this
22 point, it was determined to move ahead, and it
23 went to 25 parts per million in this motion.
24    Q.  So the OSHA standard for humans is
25 50 parts per million.

Page 108

1    A.  To my knowledge, it's still there.
2 It was at this time.
3    Q.  And that was the recommendation --
4 that was the previous recommendation --
5    A.  That was one of the points of
6 consideration as we established our program
7 originally.  But the scientific committee
8 continued to recommend the change, and we're
9 responsive to their wishes.  And now --
10 gradually we got there -- we're moving there.
11    Q.  And I guess that's my point because
12 before you told us about the human standard, the
13 question I had asked was that in this motion the
14 animal welfare committee was approving the
15 scientific committee's recommendation of
16 25 parts per million --
17    A.  That is correct.
18    Q.  -- at its October 10, 2006, meeting
19 in San Antonio.
20    A.  Yes.
21 MR. BIRKHAEUSER:
22      Okay.  I would like to move on now to
23 topic number 8 of the deposition notice under
24 Rule 30(b)(6).  And that topic requires
25 Cal-Maine to produce a witness regarding its

Page 109

1 cage space allowances, including any changes
2 over time to your cage space allowances and
3 reasons for same, and the impact of changes to
4 cage space allowances on your house or farm
5 capacity or population.
6      It's my understanding that Mr. Storm
7 has been designated for that topic.
8 MR. ROBISON:
9      Subject to objections, but, yes.
10 MR. BIRKHAEUSER:
11    Q.  Are you indeed the person most
12 knowledgeable at Cal-Maine regarding cage space
13 allowances?
14    A.  I'm certainly knowledgeable of it.
15    Q.  How did you prepare to respond to
16 this topic?
17    A.  I reviewed the guidelines and our
18 history, and which we complied with the
19 guidelines.
20    Q.  Did you research Cal-Maine's cage
21 space allowances prior to the guidelines?
22    A.  I'm aware of them.
23    Q.  Did you speak with any other
24 Cal-Maine employees about the topics set forth
25 in topic number 8?

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1   A.   The topic being the --
2   Q.   Cage space allowance.
3   A.   -- the implementation of the cage
4 space allowance.
5   Q.   Cage space allowances, changes over
6 time to cage space allowances, and the impact of
7 changes to cage space allowances.
8   A.   No. I was fully aware of what they
9 were throughout our company.
10   Q.   Did you review any documents relating
11 to cage space allowances?
12   A.   Yes. I reviewed the -- number one,
13 the guidelines, just to review the timing
14 requirements.
15   Q.   Any other documents that you --
16   A.   And it was -- throughout the
17 progress, throughout the period, it was a weekly
18 concern. We were dealing with it daily on
19 meeting those guidelines.
20   Q.   I'm sorry. The question deals with
21 documents. The question deals with documents,
22 and I asked you whether you reviewed any
23 documents, and you told me that you reviewed the
24 guidelines.
25     Did you review any other documents

Page 111

1 besides the guidelines in order to testify
2 today?
3   A.   No.
4 MR. ROBISON:
5     You mean about topic 8?
6 MR. BIRKHAEUSER:
7     About topic 8. I'm sorry.
8   Q.   No?
9   A.   No.
10   Q.   Prior to the institution of the
11 guidelines, what were Cal-Maine's cage space
12 allowances?
13   A.   They varied somewhat. They were
14 predominantly 53 and a third inches. There was
15 some in the 60-plus-inch range and a few that
16 were -- we had a couple of contract houses that
17 were near 48 inches.
18     And prior to the implementation of
19 that, we produced a sheet to note the square
20 inches in every house and how many birds that we
21 housed in there and what that was, and then what
22 would be the allowed bird numbers by house going
23 forward through the program. And that's the
24 manner in which we refilled houses as time went
25 along through the program.

Page 112

1   Q.   Okay. So once the program was
2 instituted -- and in your mind, what's that
3 date?
4   A.   The date would be -- the first date
5 that affected us was April 1, 2002, for chicks
6 hatched after that date. Their housing date
7 would be in the summer when they were mature,
8 some 17 weeks later.
9   Q.   So for all chicks hatched after
10 April 1, 2002, what were the cage space
11 allowances?
12   A.   For white chickens, 56 square inches
13 per bird. We had a few brown chickens that
14 were -- came into play, but not many, and those
15 were at 63 square inches per bird at that point.
16   Q.   And how did that change over time?
17 MR. ROBISON:
18     Object to form. Vague.
19   A.   How did the housing rates change?
20 MR. BIRKHAEUSER:
21   Q.   Yes.
22   A.   According to the animal welfare
23 guidelines, chicks hatched after October 1,
24 2003, when they were housed in the layer house,
25 they were housed at 59 square inches for white

Page 113

1 birds and 66 square inches for brown birds. And
2 I can read you the remainder of the program, if
3 you'd like.
4   Q.   Please.
5   A.   Then in April 1, 2005, was the next
6 point. And at that point, chicks hatched then
7 or after were housed at 61 square inches for
8 white chickens and 68 square inches for brown.
9     At October 1, 2006, was the next
10 date. And for that, it's 64 square inches per
11 bird for white birds and 72 square inches for
12 brown birds.
13     And the final date is April 1, 2008,
14 67 square inches for white birds and 76 square
15 inches for the brown birds, brown cage birds.
16     Cage free birds are on a different
17 schedule altogether.
18   Q.   And Cal-Maine had some cage free
19 birds, correct?
20   A.   Yes.
21   Q.   But the large majority of its birds
22 were caged birds.
23   A.   That's correct. All of these -- what
24 I read you applies as indicated, but it's
25 enforced on a house averaging basis for existing

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1 houses. So you would consider -- it's almost
2 like you would consider the house as one big
3 cage and calculate the bird requirements.
4        For newer facilities that were
5 put in place by December 31 of '03, those
6 cages -- those houses had to comply on a cage
7 basis, not a house averaging basis.
8    Q.    So essentially it's your testimony
9 that Cal-Maine complied with the animal welfare
10 guidelines with respect to cage limitations --
11 cage space limitations.
12    A.    Precisely.
13    Q.    And were you responsible at Cal-Maine
14 for insuring compliance with the animal welfare
15 guidelines?
16 MR. ROBISON:
17        Object to form.
18    A.    I was not a police officer in that
19 respect, but our upper management directed us to
20 work the program and do it as indicated, and
21 this is exactly what we did in all areas of
22 operation.
23 MR. BIRKHAEUSER:
24    Q.    And what upper management directed
25 you to comply with the animal welfare

Page 115

1 guidelines?
2    A.    Our President.
3    Q.    Mr. Baker?
4    A.    Yes.
5    Q.    Generally, the guidelines required
6 Cal-Maine to reduce the hen population, at least
7 at first, in a given house; is that correct?
8 MR. ROBISON:
9        Object to form. Mischaracterizes.
10 Best evidence.
11    A.    For the space available within an
12 existing house, there were -- more space was
13 given to each individual hen, resulting in fewer
14 hens per house.
15 MR. BIRKHAEUSER:
16    Q.    Fewer hens per house after the
17 guidelines were complied with?
18 MR. ROBISON:
19        Same objections.
20    A.    Yes.
21 MR. BIRKHAEUSER:
22    Q.    I'm sorry. There was just a little
23 confusion in your answer, so I just wanted to
24 make sure we're clear. So after Cal-Maine
25 complied with the guidelines in April 1 of 2002,

Page 116

1 this resulted in fewer hens per house.
2 MR. ROBISON:
3        Objection. Same objections.
4    A.    It did for those existing houses. It
5 did not necessarily result in fewer hens for
6 Cal-Maine.
7 MR. BIRKHAEUSER:
8    Q.    Sure. I'm going to just confine my
9 answers for this part of the questions to the
10 actual houses that contain hens. I'm not going
11 to ask you questions about Cal-Maine's
12 operations as a whole.
13        In October of 2003, we have our next
14 change, where we're increasing the space to
15 59 for white and 66 for brown chickens, correct?
16    A.    Yes.
17    Q.    And did that also result in the
18 reduction of the number of hens that could be
19 housed in any given house?
20 MR. ROBISON:
21        Same objections.
22    A.    Yes. In each step increasing amount
23 of space was devoted to individual birds, which
24 resulted in fewer hens in the existing
25 structure.

Page 117

1 MR. BIRKHAEUSER:
2    Q.    So hens were reduced in any given
3 house in April of 2005.
4 MR. ROBISON:
5        Same objections.
6    A.    I think that was the next step, yes.
7 MR. BIRKHAEUSER:
8    Q.    And then hens were reduced in any
9 given house in October of 2006.
10 MR. ROBISON:
11        Same objections.
12    A.    Yes.
13 MR. BIRKHAEUSER:
14    Q.    And then hens were reduced in any
15 given house in April of 2008.
16 MR. ROBISON:
17        Same objections.
18    A.    This was done in a lot of small
19 steps, so as to be able to continue to take care
20 of our customers.
21 MR. BIRKHAEUSER:
22    Q.    I understand. What documents, to
23 your knowledge, reflect Cal-Maine's compliance
24 with the animal welfare guidelines?
25    A.    The -- specifically we have

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 production records on every flock every week.
2    Q.    And what are those records called?
3 Are they called production records per flock?
4    A.    That would do.  Everybody knows what
5 that would mean.
6        Just the historical data on
7 performance in terms of eggs laid, mortality,
8 feed consumed, things like that.
9    Q.    Okay.  Are those documents
10 computerized?
11    A.    Yes and no.
12    Q.    Are there any hard copy reports that
13 are prepared?
14    A.    Yes.  Usually -- yes, I think there
15 are, but we predominantly receive those in
16 summary.
17    Q.    Okay.  And so, for example, the flock
18 reduction reports that we saw yesterday that
19 were prepared at the Monday meetings, those
20 would represent flock reduction resulting from
21 Cal-Maine's compliance with the animal welfare
22 guidelines; is that correct?
23 MR. ROBISON:
24        Object to form.  Mischaracterizes.
25    A.    I don't think you could determine

Page 119

1 anything from that report.  I think it's just --
2 this just indicates the total number of birds
3 that we had each week, the total number of
4 layers each week.
5        Now, I don't think it would indicate
6 whether or not we were on the program because we
7 bought facilities, we built facilities.  When
8 there's a change, it's -- this change -- every
9 one of these changes was for a period of about a
10 year and a half, so over the year and a half
11 there was a change with every hatch.  So it's a
12 gradual change.
13        And to -- you couldn't look at that
14 report and, I would say, determine anything
15 about where -- our compliance or anything like
16 that as to this program.
17 MR. BIRKHAEUSER:
18    Q.    So did you bring any documents today
19 reflecting Cal-Maine's compliance with the
20 animal welfare guidelines with respect to flock
21 reduction?
22    A.    No.
23    Q.    So I guess I'm wondering, if I wanted
24 to find those documents, what would they be
25 called?

Page 120

1    A.    Flock records.  If you wanted to know
2 about our compliance, you should probably look
3 at the audits.  There's many audits for various
4 locations every year.
5    Q.    My -- if I wanted to look at the
6 reduction in hens that resulted from Cal-Maine's
7 compliance with the animal welfare guidelines,
8 would I consult the flock records?
9 MR. ROBISON:
10        Object to form.  Assumes facts.
11    A.    I don't really know how you could do
12 that.  I don't know how I could do that.
13 MR. BIRKHAEUSER:
14    Q.    Were flock records -- you said
15 sometimes flock records were printed out?
16    A.    Yes.
17    Q.    And was that a report that was
18 prepared and physically delivered to certain
19 officers or employees of Cal-Maine?
20 MR. ROBISON:
21        Object to form.  Foundation.
22    A.    Employees, yes.
23 MR. BIRKHAEUSER:
24    Q.    Which employees?
25    A.    Well, the employees at each location

Page 121

1 would deal with individual records for
2 individual flocks that they had control over.
3    Q.    And were they created on Excel spread
4 sheets or in what format?
5    A.    No.  There was a particular program
6 that we used, a computer program --
7    Q.    What was that --
8    A.    -- during those years.
9    Q.    I'm sorry?
10    A.    During those years.
11    Q.    What was that program called?
12    A.    It was written by Chilson Management
13 systems, and I think it's the flock program, I
14 guess.
15    Q.    So if somebody wanted to understand
16 this data of the flock at any given time, they
17 would consult the Chilson records?
18 MR. ROBISON:
19        Object to form.
20    A.    Exactly what do you mean -- excuse
21 me, what do you mean?  To understand what,
22 exactly?
23 MR. BIRKHAEUSER:
24    Q.    If they wanted to understand
25 statistics relating to the flock, they would

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1 consult records that were maintained on the
2 Chilson system.
3 MR. ROBISON:
4       Object to form. Vague.
5       A.   From the individual flock records, we
6 would summarize a lot of that information into
7 various different reports by location and
8 otherwise, even into a total per week.
9          The number, for example, you referred
10 to while ago on that report that you had showed
11 a total number of hens for all of Cal-Maine on
12 that week. That is true.
13         Now, does it show that we were
14 increasing or decreasing according to this
15 program? I don't think you could ever look at
16 that enough to make any determination about
17 that. It just won't reflect that.
18 MR. BIRKHAEUSER:
19      Q.   Were Chilson records prepared -- who
20 entered the data for the records of the Chilson
21 system?
22 MR. ROBISON:
23         Object to form.
24      A.   Accountants at our locations around
25 the company, like 25 or 30 places.

Page 123

1 MR. BIRKHAEUSER:
2      Q.   Some of the locations that we
3 discussed yesterday, for example.
4      A.   For example. That's some of our
5 locations.
6      Q.   And what type of data would they
7 enter with respect to the flock?
8 MR. ROBISON:
9         Object to form.
10     A.   Well, you know, it's an ongoing
11 weekly changing record for a flock. And so you
12 show initially the birds that went into the
13 house. And then every week you've got
14 information about feed consumed, about eggs
15 produced, about the mortality of the flocks and
16 other related information to that.
17 MR. BIRKHAEUSER:
18     Q.   And in a given facility, are records
19 kept on a house-by-house basis?
20 MR. ROBISON:
21         Object to form. Vague.
22     A.   Yes, they are.
23 MR. BIRKHAEUSER:
24     Q.   And the records kept on the
25 house-to-house basis would show the population

Page 124

1 of the house at any given time, correct?
2      A.   Every week you affect it by
3 mortality, and the remainder is the remaining
4 population.
5      Q.   And the Chilson system then gives you
6 the ability to generate reports on a
7 company-wide basis; is that correct?
8 MR. ROBISON:
9         Object to form.
10     A.   No. They're just local reports that
11 are -- some of which are then compiled on a
12 company-wide basis.
13 MR. BIRKHAEUSER:
14     Q.   I understand. And who compiles the
15 reports on a company-wide basis?
16     A.   Some of that's done in our Jackson
17 office. The one you were looking at is such a
18 report.
19     Q.   So the report that we discussed that
20 was presented at the Monday meetings, those were
21 generated by Jackson staff; is that correct?
22 MR. ROBISON:
23         Object to form.
24     A.   Yes. The paper was generated. The
25 report was a compilation of location reports

Page 125

1 into a total.
2 MR. BIRKHAEUSER:
3      Q.   Topic number 10 is your backfilling
4 practices and any changes to those practices.
5 The topic goes on: "This includes the number of
6 hens that you backfilled by year-end location,
7 farm, and house."
8          I understand that you are being
9 offered as the person most knowledgeable about
10 that topic; is that correct?
11 MR. ROBISON:
12         Object to form.
13     A.   Yes. That's correct.
14 MR. BIRKHAEUSER:
15     Q.   What did you do to prepare to respond
16 to this topic?
17     A.   I reviewed our programs, our
18 procedures over that period of time.
19     Q.   And where are those -- are those
20 procedures in written form?
21     A.   Not at this point. We don't do that
22 anymore. We -- I might say that prior to the
23 animal welfare program we did not backfill. Or
24 if we did, it would be very occasional.
25         At the onset of the program, we, too,

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1 were worried about being short of eggs for
2 customers and thought that at molt time we
3 should try to refill these houses to get the
4 most eggs possible out of the houses for our
5 customers.
6         And we did that for a period of time,
7 a year or something like that; but, in the
8 course of that, as we -- there's a lot of
9 different ways to accomplish that, and different
10 facilities demand different methods. But
11 around -- as we did that around our company for
12 some several months, we came to the conclusion
13 that it wasn't worthwhile for Cal-Maine to
14 backfill and stopped doing so at about the same
15 time.
16         I think we had a couple locations
17 still backfilling when the rules were changed,
18 and at that time all backfilling ceased with
19 Cal-Maine.
20    Q.   Okay.  You were a little bit vague in
21 the time period in your response.  When was it
22 that Cal-Maine as a company policy stopped
23 backfilling?
24 MR. ROBISON:
25         Object to form.

Page 127

1    A.   We finally stopped totally when it
2 was stopped by rule of the animal welfare
3 program.
4 MR. BIRKHAEUSER:
5    Q.   And do you have a date in mind for
6 when that was?
7    A.   We looked at that date a few minutes
8 ago.  I don't recall that at this moment.
9    Q.   Sure.  But that was, again, the
10 animal welfare committee that would make a
11 recommendation to the Board, which would
12 ultimately be approved --
13    A.   The last time we saw that was about
14 when it happened.
15    Q.   All right.  So whenever it was that
16 the Board finally approved the backfilling ban,
17 Cal-Maine ceased its backfilling practices.
18 MR. ROBISON:
19         Object to form.
20    A.   Right.
21 MR. BIRKHAEUSER:
22    Q.   Is that correct?
23 MR. ROBISON:
24         Same objection.
25    A.   In total.  But we had largely

Page 128

1 discontinued before then, as it happens.  That's
2 just the way it worked out.
3 MR. BIRKHAEUSER:
4    Q.   Are there any documents that reflect
5 the amount of backfilling that occurred prior to
6 the ban by the animal welfare guidelines?
7    A.   That would show numbers --
8    Q.   Yes.
9    A.   -- of birds backfilled?  No, except
10 that it was in the -- those numbers were
11 included in the flock files that were maintained
12 at the locations and that were audited by the
13 outside auditors.  So those numbers exist and
14 existed, but they're not accumulated or known as
15 a total number or anything like that.
16    Q.   It's unknown to Cal-Maine how many
17 hens were backfilled in a given year during the
18 time when Cal-Maine engaged in that practice; is
19 that correct?
20    A.   In total, yeah, we don't know that
21 number.  We could probably find it, but we don't
22 know it.
23    Q.   So since you don't know the total
24 number, then you certainly couldn't identify
25 that by year or location; is that correct?

Page 129

1    A.   No.  But we began that in late '02,
2 early '03, when we began to feel some of the
3 effects of -- in the chicken houses.  We were
4 concerned about producing enough eggs for our
5 customers.
6    Q.   When you say you began that --
7    A.   We began backfilling, trying it here
8 and there.  Then more of it was occurring after
9 that, trying to determine a process or a
10 procedure for that.
11    Q.   So if I understand your testimony,
12 before the guidelines were instituted, Cal-Maine
13 didn't backfill at all.
14    A.   No.
15    Q.   And once the guidelines were
16 instituted, Cal-Maine started to backfill a
17 little bit.
18    A.   We experimented.
19    Q.   And then the guidelines came out that
20 prohibited backfilling, and Cal-Maine stopped
21 backfilling.
22 MR. ROBISON:
23         Object to form.
24 MR. BIRKHAEUSER:
25    Q.   Is that correct?

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1    A.   That's correct.  Technically correct.
2 But we were already discontinuing by the time
3 that final date came, but at that time there was
4 a place or two still doing some.
5    Q.   Okay.  Topic number 11 is your
6 molting practices and any changes to those
7 practices.  This includes the number of hens
8 that you molted by year and by location, farm,
9 and house.
10        Are you the person most knowledgeable
11 at Cal-Maine about its molting practices?
12 MR. ROBISON:
13        Object to form.
14    A.   I'm certainly equally knowledgeable.
15 MR. BIRKHAEUSER:
16    Q.   You're prepared to respond as the
17 corporate designee to this topic?
18 MR. ROBISON:
19        Same objections.
20    A.   As it relates to our practices, yes.
21 MR. BIRKHAEUSER:
22    Q.   How did you prepare to respond to
23 this topic?
24    A.   You know, I'm prepared every day.
25 I'm fully aware of it and have been for all

Page 131

1 these times.
2    Q.   Did you speak with any other
3 Cal-Maine employees to prepare your testimony
4 today?
5    A.   No.
6    Q.   Did you consult any documents?
7    A.   Not concerning molting.
8    Q.   Okay.  So prior to the institution of
9 the animal welfare guidelines, what were
10 Cal-Maine's molting practices?
11    A.   It's our practice to molt all of our
12 white leghorn chickens.
13    Q.   It was your practice to molt all of
14 the white leghorn chickens?
15    A.   Yes.  And not molt typically the
16 brown chickens.  There are always exceptions,
17 but our program was to do that.
18    Q.   And how did Cal-Maine molt its white
19 leghorn chickens before the guidelines?
20    A.   We initiated the molt by removing
21 feed.
22    Q.   Did Cal-Maine adjust the light?
23    A.   Yes.  Yeah, we had a light program
24 regarding that -- pardon me, did I jump in?
25    Q.   Yeah.

Page 132

1    A.   I'm sorry.
2    Q.   It's okay.  It's just the record.  If
3 you interrupt, then we don't know really what
4 you've answered.
5        So did Cal-Maine adjust the light to
6 which hens were exposed in order to induce molt
7 prior to the guidelines?
8    A.   Yes.  Lighting was part of the
9 program, adjusting lighting.
10    Q.   Were there any other components to
11 Cal-Maine's molting program prior to the
12 guidelines?
13    A.   Yes, one other.  We artificially
14 heated the houses keeping a warm temperature for
15 the chickens.
16    Q.   And prior to the guidelines, did
17 Cal-Maine have any requirements relating to the
18 body weight of the hens at the end of the molt?
19    A.   Yes.  The objective was always to
20 achieve a good molt with a minimum mortality.
21 And one of the ways to determine the success of
22 the molt was to look at the change in body
23 weight.
24    Q.   Did Cal-Maine have any standards
25 relating to body weight at the end of the molt

Page 133

1 prior to the guidelines?
2 MR. ROBISON:
3        Object to form.  Vague.
4    A.   Our program involved a premolt
5 weight, average weight of a sample of the house,
6 and then the target weight involved at what
7 point that you began to feed back -- return feed
8 to the chickens, not at the end of the molt.
9 MR. BIRKHAEUSER:
10    Q.   And what was that target weight as it
11 presented -- as a percentage of the starting
12 weight?
13    A.   Under ideal conditions, it would be
14 approximately 35 percent.
15    Q.   And that was prior to the guidelines.
16    A.   Yes, sir.
17    Q.   And then did those practices change
18 once the guidelines were instituted?
19    A.   Yes.
20    Q.   How did they change?
21    A.   Well, no, not initially, because the
22 initial -- most of the -- well, let me
23 rephrase -- resay.  We continued to withdraw
24 feed because that was allowed initially with the
25 guidelines.  And we adjusted our weight target

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 back to about 30 percent because that was the
2 target of the animal welfare guideline.
3    Q. And then did the practice that you've
4 just articulated change further?
5    A. The practice that changed further was
6 that when the committee and UEP further adopted
7 to allow only non-feed withdrawal molts, then we
8 complied with that. We changed our practice to
9 no longer withdraw feed.
10    Q. And when did Cal-Maine stop
11 withdrawing feed?
12 MR. ROBISON:
13     Object to form.
14    A. When we had to.
15 MR. BIRKHAEUSER:
16    Q. Whenever the UEP Board approved the
17 welfare guidelines that prohibited feed
18 withdrawal?
19    A. That is correct.
20    Q. Whenever that date was, Cal-Maine
21 complied?
22    A. That's correct.
23 MR. BIRKHAEUSER:
24     Let's go off the record for just
25 about five minutes.

Page 135

1 VIDEOGRAPHER:
2     One moment. We are now going off the
3 record. The time is 2:01 p.m.
4     (A recess was taken.)
5 VIDEOGRAPHER:
6     We are now going back on the record.
7 The time is 2707 p.m.
8 MR. BIRKHAEUSER:
9    Q. Okay, sir. Topic 12 is your flock
10 disposal practices and any changes to those
11 practices. Are you indeed the person most
12 knowledgeable at Cal-Maine about its flock
13 disposal practices?
14 MR. ROBISON:
15     Object to form.
16    A. I am equally knowledgeable as anybody
17 else.
18 MR. BIRKHAEUSER:
19    Q. Okay. So let's use the guideline
20 implementation as a benchmark for time again in
21 your response.
22     What were Cal-Maine's flock disposal
23 practices prior to the guidelines?
24    A. When you say flock disposal, I assume
25 you mean the -- what do you do with spent hens

Page 136

1 when it's time to sell birds or get rid of old
2 birds.
3    Q. And how do you spent them?
4    A. What we -- forever, the preferred
5 method has been to sell them to a
6 slaughterhouse, and that's always our
7 preference. It's typically the most economic
8 thing to do as well.
9     Over the course of the -- there's
10 been times in the last 10 to 15 years when that
11 market was not available, that option was not
12 available, for a variety of reasons which are
13 not especially important, and I won't go into
14 them, but it became unavailable for a period of
15 time, and at that time we had to find some
16 alternative method to dispose of hens.
17     And we at that point went primarily
18 to rendering. Rendering companies initially
19 were -- they were hesitant about accepting too
20 many hens, too many as relates to the size of
21 their rendering operation, because the feathers
22 posed a problem for most of them and their
23 products.
24     But eventually, a process was worked
25 out so that that could be overcome, and

Page 137

1 rendering companies could, in fact, take most of
2 even the national flocks.
3     As time went along, the availability
4 of slaughter came back into the picture and is
5 now the -- once again, the preferred means of
6 disposing of hens.
7     During the time that slaughter was
8 unavailable, we also had another alternative
9 means, and that was, in a couple of areas,
10 composting.
11     Either way -- when we move birds out
12 of the house to the slaughterhouse, they move
13 out live on cage carts. For rendering or for
14 composting, we have to kill the birds before
15 they leave the house or as they leave the
16 chicken house.
17    Q. And you're speaking now of hens,
18 correct?
19    A. Yes, I am.
20    Q. Does Cal-Maine have records that
21 reflect the number of slaughter, number of hens
22 slaughtered during a given time period?
23    A. Yes. They all are.
24    Q. And what are those records called?
25    A. Well, it depends on what you exactly

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1 mean. Every flock record shows how many you
2 dispose of at the end of that final cycle, for
3 one thing. Then we count those birds, and we
4 show those as sold to the slaughter plant.
5        We recap those numbers across the
6 company and look at how many every week
7 happen -- that are disposed of. So -- did I hit
8 upon it somewhere there?
9     Q.   I guess the whole purpose of my
10 question is to be able to identify the records
11 when I see them because I'm not a Cal-Maine
12 employee, and I don't have you standing over my
13 shoulder when I'm looking at Cal-Maine records.
14 So the purpose of my question is to identify the
15 documents.
16        To the best of your knowledge, what
17 would the records be called that reflect the
18 number of hens that are slaughtered at any given
19 time?
20     A.   Well, the way you say that confuses
21 me a little, but flock records will show how
22 many were moved out of the house whenever it's
23 disposed of, no matter what the means.
24        Now, to say how many are slaughtered
25 at any given time, if that means a week or a day

Page 139

1 or a month or a year, we do look at that. We do
2 total that by the week in some of our reports,
3 in a weekly situation report. It's just a
4 summary of the information supplied by the
5 locations.
6     Q.   So let me just try it a little bit
7 different. The flock records are computerized?
8     A.   Yes.
9     Q.   Do you have an understanding of what
10 a data field is?
11     A.   Sounds like a database to me.
12     Q.   Are the flock records a database as
13 you understand that term?
14     A.   You know, I'm not sure. We're in
15 about a four-year period of transitioning to a
16 new ERP system, which involves our flock system,
17 and I would be very hesitant to try to tell you
18 exactly how that works.
19     Q.   Do you ever use Excel spreadsheets?
20     A.   I do.
21     Q.   Okay. Excel spreadsheets have
22 columns.
23     A.   Yes, they do.
24     Q.   And the columns sometimes have
25 titles. Are the flock records ever presented in

Page 140

1 a format that resembles an Excel spreadsheet?
2     A.   Somewhat.
3     Q.   What would the column be called that
4 deals with slaughter?
5     A.   On the ones that we have that look
6 like an Excel spreadsheet, that column is not on
7 there.
8     Q.   If you wanted to -- are any written
9 reports prepared in hard copy format that relate
10 to slaughter?
11     A.   Slaughter only? Not that I'm aware
12 of. There could be, but I don't see it. I'm
13 not aware of it.
14     Q.   How about mortality?
15     A.   What we do have is a weekly situation
16 report that has on there somewhere the totals
17 for this week of slaughter, of birds removed
18 from the flock, birds put into the flock and so
19 forth. So we have weekly totals across the
20 company.
21     Q.   Excellent. So the weekly totals
22 would contain figures relating to slaughter.
23     A.   Yes, or disappearance -- well, not
24 just disappearance. The spent hens removed from
25 the flocks.

Page 141

1     Q.   That would include natural mortality,
2 correct?
3     A.   No. It would include slaughter or
4 rendering or whatever you do to dispose of the
5 flock.
6     Q.   So the disappearance figure on the
7 weekly report would include all hens that didn't
8 meet a natural death?
9 MR. ROBISON:
10        Object to form.
11 MR. BIRKHAEUSER:
12        That's a bad one.
13     Q.   The weekly report would contain --
14 would show a disappearance number; is that
15 correct?
16     A.   The weekly report would show the
17 ending number of hens and -- it shows a summary
18 across the entire company. It shows how many
19 birds you have -- or how many came into the
20 flock, how many exited the flock, what mortality
21 was, and so forth. Also, some productivity
22 information.
23     Q.   Did it have a figure that's
24 specifically listed as disappearance?
25     A.   Not disappearance, but it has sold, I

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1 think is what the term is on that report.
2   Q.   Sold.
3   A.   Meaning birds that were removed as
4 spent hens.
5   Q.   Okay.
6   A.   We used to always sell them. Now
7 sometimes you don't get to sell them. They just
8 still leave, though.
9   Q.   We still call it -- Cal-Maine still
10 calls it sold.
11   A.   Yeah, on that report.
12   Q.   And that means that it was
13 slaughtered.
14   A.   (Witness nodding head.)
15   Q.   Yes?
16   A.   Yes.
17   Q.   The next topic is topic number 13,
18 your beak trimming practices and any changes to
19 those practices.
20     Are you indeed the person most
21 knowledgeable at Cal-Maine about the beak
22 trimming?
23 MR. ROBISON:
24     Object to form.
25   A.   I'm fully knowledgeable of that.

Page 143

1 MR. BIRKHAEUSER:
2   Q.   About Cal-Maine's beak trimming
3 practices?
4   A.   I'm fully knowledgeable about it.
5   Q.   Are you prepared to respond to that
6 category today?
7   A.   Yes, sir.
8   Q.   Did you need to speak to anybody to
9 respond today on behalf of Cal-Maine --
10   A.   No.
11   Q.   -- with respect to that topic?
12     Did you have to review any documents?
13   A.   No.
14   Q.   Let's, again, use the animal welfare
15 program as a time reference, if necessary, for
16 this topic. What were Cal-Maine's beak trimming
17 practices prior to the animal welfare
18 guidelines?
19   A.   Some several years prior to the
20 initiation of the program, we trimmed all
21 day-old chicks, and then they would be trimmed
22 again at about -- for a second beak trimming at
23 about 12 weeks of age.
24     More recently, just prior to the
25 onset of the animal welfare program, we beak

Page 144

1 trimmed all chickens -- all baby chicks that
2 were going to be grown in open side houses, and
3 the ones that were going to be totally enclosed
4 were not beak trimmed. In either case, they
5 were trimmed again at about ten weeks.
6     Upon beginning the animal welfare
7 program, we went back to trimming all birds at
8 day old, and then -- most birds were also as
9 needed, but mostly were trimmed again at about
10 eight weeks, to be within the guidelines.
11   Q.   Did Cal-Maine's method of trimming
12 beaks change after the institution of the
13 guidelines?
14   A.   Not as a requirement. They, in fact,
15 did change some at the hatchery because of just
16 new technology.
17   Q.   Are there any records that reflect
18 Cal-Maine's beak trimming practices?
19   A.   I doubt it.
20   Q.   Any training --
21   A.   Well, there's records in the flock
22 records at the locations. That would be where
23 the pullets are grown.
24   Q.   There would be records that X number
25 of birds had their beaks trimmed?

Page 145

1   A.   There are also flock records for
2 pullets during that stage, which those records
3 are transferred with the birds to the layer
4 house. So there's some record there.
5     And I think it would indicate on the
6 delivery papers about week trimming at day old,
7 too.
8   Q.   Pullets are transferred to the laying
9 houses at about 20 weeks?
10   A.   The leghorns at about 17 weeks. The
11 browns at about 15 or 16.
12   Q.   So week trimming occurs before the
13 pullets enter the layer house.
14   A.   Yes, as they are about eight weeks is
15 the last.
16   Q.   And how would one identify the beak
17 trimming in the flock records?
18   A.   It'd just be some entry or some
19 document within the folder of information.
20     There would be other information from
21 the pullets, like the vaccination record, which
22 is quite extensive, the mortality records, the
23 weights at various points in time, feeding
24 history, and anything abnormal that might have
25 occurred.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1    Q.    You were talking about mortality.
2  Does beak trimming cause death?
3    A.    No.
4    Q.    I just wasn't understanding your
5  response.  What I'm looking for is how would I
6  identify in the flock records activities
7  relating to beak trimming?
8    A.    It would be something that said they
9  trimmed beaks here.
10    Q.    On a given hen or on --
11    A.    For that flock on a given week,
12  probably.
13    Q.    Okay.  So week -- it would say for a
14  given flock, week three, beaks were trimmed.
15    A.    Yes.
16    Q.    Topic number 15 is your contacts with
17  UEP's scientific advisory committee.  Are you
18  the person responsible at Cal-Maine for its
19  contacts with the scientific advisory committee?
20    A.    Yes.
21  MR. ROBISON:
22          Object to form.
23    A.    Yes.
24  MR. BIRKHAEUSER:
25    Q.    Do you know whether any employees

Page 147

1  other than yourself met with members of the UEP
2  scientific advisory committee?
3  MR. ROBISON:
4          Object to form.
5    A.    I contacted within our company Dolph
6  Baker and also Dr. Ryn McDonald to ask them to
7  be sure about -- if they knew of any time we
8  might have had contact.  And based upon their
9  responses and my own personal knowledge of the
10  situation, we have had -- the only time that
11  we've been in or around the welfare committee,
12  the scientific animal welfare committee, is
13  during meetings as documented that they might
14  have attended some of our meetings, some of our
15  producer meetings.
16  MR. BIRKHAEUSER:
17    Q.    So the only contacts that any
18  Cal-Maine employees have had with the scientific
19  advisory committee has been pursuant to other
20  UEP meetings for which there are minutes that
21  have been prepared.
22  MR. ROBISON:
23          Object to form.
24    A.    Yes.  I don't think it's worth
25  mentioning, but I will.  Dr. McDonald mentioned

Page 148

1  that she attended some other meeting at which
2  one or two of those members did attend, but they
3  knew they were -- she knew she was at the same
4  meeting as them, but it was a large meeting, and
5  they were not in contact.
6  MR. BIRKHAEUSER:
7    Q.    Topic number 19 is Cal-Maine's
8  sponsorship of any animal welfare studies.  Are
9  you the person most knowledgeable at Cal-Maine
10  about its sponsorship of any animal welfare
11  studies?
12  MR. ROBISON:
13          Object to form.
14    A.    Yes.
15  MR. BIRKHAEUSER:
16    Q.    Did you speak with anyone else at
17  Cal-Maine about your response to this topic?
18    A.    No.
19    Q.    Has Cal-Maine sponsored -- was
20  Cal-Maine the sponsor of any animal welfare
21  studies?
22    A.    Cal-Maine -- I think the general
23  answer is no.  Cal-Maine did support -- there
24  was a large fundraising effort to raise money
25  for a new facility at Michigan State recently,

Page 149

1  and we contributed to that.  And that's -- that
2  was three or four years ago.  That facility is
3  finished.  And it was for the purpose of doing
4  animal welfare studies.
5          Other than that, we have contributed
6  to other university studies, but not for animal
7  welfare.  We've supplied chickens for study to
8  Auburn University and to Mississippi State
9  University.  And we have encouraged some
10  equipment suppliers to donate equipment in small
11  amounts to these universities for the purpose of
12  having facilities on their farm for which they
13  do testing.
14    Q.    Cal-Maine did not sponsor any animal
15  welfare studies in connection with the animal
16  welfare requirements promulgated by the UEP; is
17  that correct?
18    A.    If I understand you, no.
19  MR. BIRKHAEUSER:
20          All right.  That's all I have.  Thank
21  you very much.  Why don't we go off the record.
22  MR. AHERN:
23          We don't need to go off the record.
24  Is that all right?
25  MR. ROBISON:

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1      Oh, yeah.  Sure.
2 VIDEOGRAPHER:
3      We have nine minutes.
4 MR. ROBISON:
5      People on the phone, we're just
6 switching questioning lawyers.  We're not taking
7 a real break.
8           CROSS-EXAMINATION
9 BY MR. AHERN:
10   Q.   Mr. Storm, my name is Patrick Ahern.
11 We met earlier.
12   A.   Yes, we did.
13   Q.   The court reporter has handed you
14 what's been marked as Exhibit 115.  It is a copy
15 of the Cal-Maine's and Rose Acre's Counterclaim
16 Against Certain Direct Action Plaintiffs in this
17 case.  Have you seen that document before?
18      (Exhibit 115 marked.)
19   A.   Yes.
20 MR. ROBISON:
21      What are we doing here?  This isn't
22 part of our 30(b)(6) notice.
23 MR. AHERN:
24      I was just going to ask him if he's
25 he's seen it before, if he had any input into

Page 151

1 it, if he has any knowledge of any facts
2 relating to it.
3 MR. ROBISON:
4      I'm going to object on this as being
5 outside the scope of the notice.
6 MR. AHERN:
7   Q.   Have you seen this document before?
8   A.   I saw it for the first time on
9 Tuesday.
10   Q.   Did you review it before was filed?
11   A.   When was it filed?
12   Q.   A long time ago.
13   A.   No.  I've never seen it before last
14 Tuesday --
15   Q.   A few months ago.
16   A.   -- Tuesday of this week.
17   Q.   So you didn't have any input into
18 this document?
19   A.   None whatsoever.
20   Q.   Other than what you already testified
21 to here in the last two days, do you have any
22 knowledge of any facts that relate to this --
23 that support the allegations in this
24 counterclaim?
25 MR. ROBISON:

Page 152

1      Object to the form.
2   A.   You know, I'm not sure how to answer
3 that.  I have knowledge of the development of
4 the animal welfare program and how it occurred.
5 We've discussed that over the last couple days.
6 MR. AHERN:
7   Q.   Right.  In addition to that, are
8 there any other facts that you have -- knowledge
9 of facts that you have that relate to the
10 allegations contained in the counterclaim?
11 MR. ROBISON:
12      Same objection.
13   A.   That's very general.  I don't -- I
14 can't think of anything.  If you had a specific
15 item, I would know.
16 MR. AHERN:
17   Q.   Were you aware, Mr. Storm, that in
18 November of 2010 that certain direct action
19 plaintiffs filed lawsuits against Cal-Maine and
20 other egg suppliers?
21 MR. ROBISON:
22      Objection.
23   A.   I know that happened at some point,
24 yes.
25 MR. AHERN:

Page 153

1   Q.   All right.  And after those lawsuits
2 were filed, did Cal-Maine ever produce non-UEP
3 certified eggs?
4 MR. ROBISON:
5      Object to form.  Outside the scope of
6 the notice.  Foundation.
7   A.   To my knowledge, we have not -- well,
8 we have not produced any non-certified eggs
9 since we entered the program because we are
10 certified continually through that time.
11 MR. AHERN:
12   Q.   Okay.  So the question is, after the
13 lawsuits were filed, did Cal-Maine ever produce
14 non-UEP certified eggs?
15 MR. ROBISON:
16      Same objections.
17   A.   No.
18 MR. AHERN:
19   Q.   Did Cal-Maine ever consider producing
20 non-UEP certified eggs?
21 MR. ROBISON:
22      Same objections.
23   A.   I don't know.
24 MR. AHERN:
25   Q.   Were you ever part of any such

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1 consideration?
2    A.   No.
3 MR. ROBISON:
4       Same.
5 MR. AHERN:
6    Q.   And did Cal-Maine ever consider
7 whether to produce non-UEP certified eggs and
8 UEP certified eggs?
9 MR. ROBISON:
10      Same objections.  Outside the notice.
11 Lacks foundation.
12    A.   I would not be a part of that
13 decision.
14 MR. AHERN:
15    Q.   Okay.  So you were not part of any
16 discussion relating to that, correct?
17 MR. ROBISON:
18      Same.
19    A.   No.
20 MR. AHERN:
21    Q.   Now, Cal-Maine can produce non-UEP
22 certified eggs, correct?
23 MR. ROBISON:
24      Same objections.  Outside the notice.
25 Speculation.  Foundation.

Page 155

1    A.   Well, I don't know.  I mean, if --
2 we're a certified program, and we're compliant
3 with those procedures, so they just are
4 certified.
5 MR. AHERN:
6    Q.   Setting aside the UEP certified
7 program, if Cal-Maine wanted to produce non-UEP
8 certified eggs, it could do that, correct?
9 MR. ROBISON:
10      All the same objections.
11    A.   I would think so.
12 MR. AHERN:
13    Q.   All you got to do is put more birds
14 in the cages, right?
15 MR. ROBISON:
16      Same objections.
17    A.   Well, and other things, yes.
18 MR. AHERN:
19    Q.   All right.  But Cal-Maine has not
20 thought to do that since the lawsuits were
21 filed, correct?
22 MR. ROBISON:
23      All the same objections.
24    A.   I don't know what Cal-Maine has
25 thought to do.

Page 156

1 MR. AHERN:
2    Q.   But you haven't been privy to any
3 such discussions.
4 MR. ROBISON:
5       All the same objections.
6    A.   None at all.
7 MR. AHERN:
8       I have nothing further.
9 MR. ROBISON:
10      Anybody on the phone?  Any questions?
11 MS. HANSON:
12      Not from me.
13 MR. GREEN:
14      No.
15 MR. ROBISON:
16      All right.  We are wrapped up.  We're
17 finished.  And we'll sign and return as usual.
18      Just real quick, what do y'all want
19 to do about confidentiality designations between
20 now and when we designate?  I can't remember if
21 the protective order designates them
22 automatically or --
23 MR. BIRKHAEUSER:
24      I can't either.  I've never been
25 asked that question in this case.

Page 157

1 MR. GREEN:
2       Are we on the record?
3 MR. ROBISON:
4       Yeah.  We're still on the record
5 because I want to designate if we're going to
6 designate while we're on the record.
7       Let's do highly confidential, just to
8 be safe, in case there's some fact that some
9 party in the case would want to be highly
10 confidential.  And then when we get the
11 transcript, we'll do the normal designation, if
12 that's acceptable.
13 MR. AHERN:
14      That's fine.
15 MR. ROBISON:
16      All right.  Now we're really off the
17 record.
18 VIDEOGRAPHER:
19      This concludes the videotape
20 deposition of Steve Storm consisting of three
21 tapes.  We are now going off the record.  The
22 time is 2:35 p.m.
23      (Deposition concluded at 2:35 p.m.)
24
25

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1        CERTIFICATE OF COURT REPORTER

2      I, CELESTE O. WERKHEISER, Registered Merit

3  Reporter and Notary Public, in and for the

4  County of Hinds, State of Mississippi, hereby

5  certify that the foregoing pages contain a true

6  and correct transcript of the testimony of the

7  witness, as taken by me at the time and place

8  heretofore stated, and later reduced to

9  typewritten form by computer-aided transcription

10  under my supervision, to the best of my skill

11  and ability.

12     I further certify that I placed the witness

13  under oath to truthfully answer all questions in

14  this matter under the authority vested in me by

15  the State of Mississippi.

16     I further certify that I am not in the

17  employ of, or related to, any counsel or party

18  in this matter, and have no interest, monetary

19  or otherwise, in the final outcome of the

20  proceedings.

21     Witness my signature and seal, this the 9th

22  day of May, 2014.

23

24

       Celeste O. Werkheiser, RMR, CSR #1307

25      My Commission Expires May 6, 2015

Page 159

1      ACKNOWLEDGMENT OF DEPONENT

2       I, STEVE STORM, do hereby certify

3  that I have read the foregoing transcript of my

4  testimony taken on 4/25/14, and further certify

5  that it is a true and accurate record of my

6  testimony (with the exception of the corrections

7  listed below):

8  Page  Line      Correction

9  ____|____|_____|_____

10  ____|____|_____|_____

11  ____|____|_____|_____

12  ____|____|_____|_____

13  ____|____|_____|_____

14  ____|____|_____|_____

15  ____|____|_____|_____

16  ____|____|_____|_____

17  ____|____|_____|_____

18  ____|____|_____|_____

19  ____|____|_____|_____

20  ____|____|_____|_____

21      _____

       STEVE STORM

22

    SUBSCRIBED AND SWORN TO BEFORE ME

23  THIS _____ DAY OF _____, 20___.

24

  _____   _____

25  (NOTARY PUBLIC)   MY COMMISSION EXPIRES:

41 (Pages 158 - 159)