# ATTACHMENT 69

Page 1

```
1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF PENNSYLVANIA
3  -------------------------------)
4  IN RE:  PROCESSED EGG PRODUCTS  )
5  ANTITRUST LITIGATION            )
6  -------------------------------)  MDL NO. 2002
7  THIS DOCUMENT RELATES TO        )  08-md-02002
8  Kroger, Inc. v. United Egg      )
9  Producers, et al.,              )  HIGHLY
10 No. 2:10-cv-06705GP             )  CONFIDENTIAL
11 ************************************************
12
13      The videotaped deposition upon oral
14 examination of GARY A. STULL, a witness produced
15 and sworn before me, Tara Gandel Hudson, RPR, CRR,
16 a Notary Public in and for the County of Marion,
17 State of Indiana, taken on behalf of the defendants
18 at the offices of FAEGRE BAKER DANIELS, 300 N.
19 Meridian Street, Suite 2700, Indianapolis, Marion
20 County, Indiana, on the 1st day of April, 2014,
21 commencing at the hour of 9:32 a.m., pursuant to
22 the Federal Rules of Civil Procedure.
23
24
25
```

Page 2

```
1  APPEARANCES:
2
3  On behalf of the indirect purchaser Plaintiffs:
4       PAUL NOVAK, ESQ.
5       (Appearing telephonically)
6       Milberg, LLP
7       One Kennedy Square
8       777 Woodward Avenue, Suite 890
9       Detroit, MI 48226
10      313/309-1760, 212/594-5300
11      pnovak@milberg.com
12
13 On behalf of the Kroger Plaintiffs and the
14 witness:
15      KEVIN J. MURRAY, ESQ.
16      Kenny Nachwalter
17      1100 Miami Center
18      201 South Biscayne Boulevard
19      Miami, FL 33131
20      305/737-1000
21      kmurray@kennynachwalter.com
22
23
24
25
```

Page 3

```
1  APPEARANCES:
2
3  On behalf of Defendant Midwest Poultry Services:
4       KATHY LYNN OSBORN, ESQ.
5       Faegre Baker Daniels
6       300 N. Meridian Street
7       Suite 2700
8       Indianapolis, IN  46204
9       312/237-8261
10      kathy.osborn@faegreBD.com
11
12 On behalf of the Defendant Rose Acre Farms:
13      MOLLY S. CRABTREE, ESQ.
14      Porter Wright
15      41 South High Street
16      Suites 2800-3200
17      Columbus, OH  43215
18      614/227-2015
19      mcrabtree@porterwright.com
20
21
22
23
24
25
```

Page 4

```
1  APPEARANCES:
2
3  On behalf of the Defendant R.W. Sauder:
4       CHRISTINE C. LEVIN ESQ.
5       Dechert LLP
6       Cira Centre
7       2929 Arch Street
8       Philadelphia, PA  19104
9       215/994-4000
10      christine.levin@dechert.com
11
12 ALSO PRESENT:
13      Sara Williams, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1     I N D E X   O F   E X A M I N A T I O N
2 DIRECT EXAMINATION ..............................9
3    Questions by Christine C. Levin
4 FURTHER DIRECT EXAMINATION ...................215
5    Questions by Paul Novak
6 CROSS-EXAMINATION ............................216
7    Questions by Kevin J. Murray
8 REDIRECT EXAMINATION .........................219
9    Questions by Christine C. Levin
10
11     I N D E X   O F   E X H I B I T S
12 Deposition Exhibit No.:
13 Exhibit 1 Kroger.com Website Printout, .......21
14     MPS-00121367
15 Exhibit 1 (A) The KrogerCo.com Website ........21
16     Printout
17 Exhibit 2 Acknowledgment and Consent .........22
18 Exhibit 3 10-1-02 Memorandum, ................33
19     KRGEG00019788-792
20 Exhibit 4 8-2-05 Letter, Stull to ............44
21     Gregory, DAY0029730
22 Exhibit 5 Animal Welfare Policy, .............52
23     MPS-00087588
24 Exhibit 6 Request for Proposal, ..............80
25     KRGEG00018733-738

Page 6

1 Exhibit 7 Rose Acre Farms Agreement, .........89
2     KRGEG00019436-443
3 Exhibit 8 Rose Acre Farms Certification, ....100
4     KRGEG00020141
5 Exhibit 9 Rose Acre Farms Certification, ....100
6     KRGEG00019397
7 Exhibit 10 Cal-Maine Foods Agreement, ........102
8     KRGEG00018833-836
9 Exhibit 11 NuCal Foods, Inc. Agreement, ......113
10     KRGEG00019290-19291
11 Exhibit 12 Midwest Poultry Services, L.P. ....113
12     Agreement, KRGEG00019063-070
13 Exhibit 13 8-1-03 Email Chain, Subject .......113
14     Ralph's Eggs, KRGEGED00010798-799
15 Exhibit 14 9-27-02 Letter, Krouse to .........113
16     Stull, MPS-0093359-360
17 Exhibit 15 4-4-03 Letter, Krouse to Stull, ...113
18     MPS-000092027-034
19 Exhibit 16 2-2-04 Letter, Krouse to Stull, ...113
20     MPS-00093368-369
21 Exhibit 17 1-9-04 Memorandum, Willardson .....156
22     to Sumner, MOARK-IPP-0004913-915
23 Exhibit 18 1-26-04 Memorandum, Hodges to .....158
24     Stull, MOARK0001462-463
25 Exhibit 19 8-25-03 Letter, Lillywhite to .....192

Page 7

1     Stull, KRGEG00019358-359
2 Exhibit 20 4-13-05 Email, Lillywhite to ......195
3     Stull, KRGEG00019366
4 Exhibit 21 11-18-04 Letter, Krouse to ........197
5     Stull, KRGEG00019171-183
6 Exhibit 22 9-12-05 Letter, Krouse to .........200
7     Stull, KRGEG00019004-007
8 Exhibit 23 9-23-05 Letter, Krouse to .........203
9     Stull, KRGEG00019008-009
10 Exhibit 24 4-20-05 Letter, Krouse to .........207
11     Stull, MPS-00048631
12 Exhibit 25 Handwritten Document, .............208
13     KRGEG00019303-304
14 Exhibit 26 Untitled Document, ................208
15     KRGEG00018723
16 Exhibit 27 IEC Spring Meeting 2004, ..........209
17     MPS-00123649-652
18
19
20
21
22
23
24
25

Page 8

1      THE VIDEOGRAPHER: This is the video
2 deposition of Gary Stull taken in the matter of
3 "In Re: Processed Egg Products Antitrust
4 Litigation," in the United States District Court
5 for the Eastern District of Pennsylvania.
6      MDL No. 2002 08-MD-02002.
7      Today's date is Tuesday, April 1st,
8 2014. This deposition is being held at the law
9 offices of Faegre Baker Daniels, 300 North
10 Meridian Street, Suite 2700, Indianapolis,
11 Indiana. My name is Sara Williams, and I am the
12 video specialist. The court reporter is Tara
13 Hudson. We represent Henderson Legal Services.
14      The time is 9:32 a.m., and we are on
15 the record. Could counsel please state their
16 names and the parties they represent.
17      MS. LEVIN: Christine Levin for RW
18 Sauder.
19      MS. CRABTREE: Molly Crabtree for Rose
20 Acre Farms.
21      MS. OSBORN: Kathy Osborn for Midwest
22 Poultry Services.
23      MR. MURRAY: Kevin Murray from Kenny
24 Nachwalter on behalf of the Kroger Company and
25 the witness Mr. Stull.

Page 9

1    THE VIDEOGRAPHER: The court reporter
2  may swear in the witness.
3    GARY A. STULL,
4  having been first duly sworn to tell the truth, the
5  whole truth and nothing but the truth relating to
6  said matter, was examined and testified as follows:
7  DIRECT EXAMINATION,
8    QUESTIONS BY CHRISTINE C. LEVIN:
9    Q   Could you state your name for the
10 record, please.
11   A   Gary Stull.
12   Q   Mr. Stull, thank you for coming here
13 today. I don't know if you are familiar with the
14 litigation, but I'd just like to know, have you
15 ever been deposed before?
16   A   Yes.
17   Q   How many times?
18   A   Once.
19   Q   When was that?
20   A   You know, I can't recall that. I
21 honestly don't remember.
22   Q   Okay. But while you were employed by
23 Kroger?
24   A   Yes.
25   Q   Was the deposition in conjunction with

Page 10

1  your Kroger employment?
2    A   Yes.
3    Q   What do you recall the subject matter
4  of the litigation?
5    A   Honestly, I don't. Honestly, I don't.
6  I've been retired for eight years --
7    Q   Okay.
8    A   -- and I stopped thinking about work
9  eight years ago. I have three wonderful
10 grandchildren that take my time. They live
11 quarter mile away, and I spend all my days with
12 them.
13   Q   Okay. Well, that's very nice.
14   We'll just review some of the rules of
15 the road --
16   A   Okay.
17   Q   -- since it's been a while since you've
18 been deposed. First of all, we can't talk at the
19 same time, so I would ask that you wait for me to
20 finish my question before you start your answer
21 so that our court reporter can get down
22 everything that's being said.
23   The second is that you need to reply
24 verbally. Hand gestures or nods of the head will
25 not be recorded by the court reporter. So we

Page 11

1  need a "yes" or "no" if it's a "yes" or "no" type
2  question.
3    We generally go for about an hour or an
4  hour and a half at a time because that's how long
5  the videographer's tape lasts. But if you need a
6  break at any point or you need to get up and
7  stretch your legs or whatever, feel free to ask
8  for that. Okay? This is not a contest to see if
9  you can make it for the full hour and a half.
10   And if you don't understand a question
11 that I have asked, you are welcome to ask me to
12 repeat the question or to rephrase the question
13 so that you can understand and answer it.
14   Is there any reason you can't testify
15 truthfully today? You're not taking any
16 medications or anything of that sort?
17   A   I take medications but I don't think I
18 take anything that would affect --
19   Q   Okay.
20   A   -- testifying.
21   Q   Good enough.
22   A   In my past life I was involved in
23 some -- I was injured, and one of the things that
24 happened, I was in an explosion. And I don't
25 know if I have TBI or not, but it's quite a

Page 12

1  possibility. I'm a disabled veteran and I
2  receive pension for several issues.
3    Q   Okay. What is TBI?
4    A   TBI? Traumatic brain injury.
5    Q   Okay. Are you represented by counsel
6  today?
7    A   Yes.
8    Q   And when did you retain counsel?
9    A   Couple weeks ago.
10   Q   Have you ever been employed by Kroger?
11   A   Yes.
12   Q   Can you tell me the years when you were
13 employed by Kroger?
14   A   I -- when I retired, I had been with
15 Kroger for 32 years.
16   Q   And when did you retire?
17   A   February 2006.
18   Q   So if my math serves me correctly, you
19 were employed by Kroger beginning in around 1974?
20 Does that sound right?
21   A   Something like that.
22   Q   Okay. Can you go through as nearly as
23 possible your positions with Kroger beginning in
24 1974.
25   A   Certainly. I began as a night shift

Page 13

1  foreman in an egg plant. I worked my way up to
2  general foreman. The plant, it was in Coldwater,
3  Michigan. That plant closed. I went to another
4  egg plant in Wabash, Indiana. I was there until
5  that plant closed. Then I went to -- let's see.
6      I went to Crawfordsville with the
7  cheese plant and worked as a cheese sales manager
8  for a period of time. And then I came back to
9  eggs and went to Farina, Illinois, and worked at
10  a -- Kroger had a breaker plant there in Farina,
11  which we sold while I was there. I was there
12  three months and had to move again.
13      And moved to Crawfordsville, back with
14  the cheese plant. And then I went into working
15  as the -- was asked to come back to eggs as a
16  sales manager for eggs. And I was there until my
17  retirement. But please don't ask me years
18  because I can't recall that.
19      Q   Well, I'm not going to ask you the
20  years for each of them, but do you recall roughly
21  when you became the sales manager for eggs? Or
22  roughly how long you were the sales manager for
23  eggs?
24      A   Honestly, I don't know. I mean I would
25  just -- I didn't really separate that out, so I

Page 14

1  can't recall that.
2      Q   Okay. Were you ever -- did you ever
3  have the title of general manager of egg
4  procurement?
5      A   Yes, I think so.
6      Q   And do you know what time period that
7  was?
8      A   No, I do not.
9      Q   Which of these positions that you've
10  described here for me included the general
11  manager of egg procurement title?
12      A   The last one.
13      Q   The sales manager for eggs?
14      A   Mm-hmm.
15      Q   So can you tell me about your
16  responsibilities as sales manager for eggs?
17      A   That was really the procurement -- the
18  title was as manager because that's what Kroger
19  had in place, but I was procurement manager in
20  reality.
21      Q   Okay. And what were those
22  responsibilities?
23      A   Procure eggs for the Kroger Company.
24  And maintain the quality.
25      Q   Right. And, let's step back for just a

Page 15

1  minute and talk a little bit about the Kroger
2  corporate structure. And I'm not going to get
3  into great detail with you, but I'd just like to
4  get a little bit of a basis here.
5      I understand Kroger embraces a number
6  of different banners or names for their different
7  grocery chains; is that correct?
8      A   Yes.
9      Q   Do you recall the names of some of
10  those banners is what I've always referred to
11  them as?
12      A   Kroger.
13      Q   Right.
14      A   Ralph's.
15      Q   Mm-hmm.
16      A   I'm trying to think, it's been so long
17  since I've remembered them. I'm sure you
18  probably have them somewhere. I can't really
19  remember the rest of them.
20      Q   Do you recall King Soopers?
21      A   Oh, yes. King Soopers. I'm sorry.
22      Q   And Smith's?
23      A   I don't recall Smith's.
24      Q   You don't recall that? Okay, but there
25  were a number of different banners --

Page 16

1      A   Yes.
2      Q   -- under which the Kroger chain
3  operated; correct?
4      A   Yes.
5      Q   And were your egg procurement
6  responsibilities for all of those chains?
7      A   Yes.
8      Q   And were the procurement
9  responsibilities nationwide?
10      A   Yes.
11      Q   We'll come back to some of that, but I
12  wanted to get just a little bit of a basis for
13  exactly what it was you did.
14      Did your procurement include shell
15  eggs?
16      A   Yes.
17      Q   As well as egg products?
18      A   I really -- egg products were a very
19  small part. Most of the divisions took care of
20  that themselves.
21      Q   So, when you say most of the divisions,
22  you mean the different banner stores?
23      A   Correct.
24      Q   So you say that you left Kroger in
25  February of 2006 for retirement? Is that

Page 17

1  correct?
2      A    Yes.
3      Q    Did you leave on good terms?
4      A    Yes.
5      Q    I mean this was just a retirement;
6  correct?
7      A    Correct.
8      Q    Do you have any ongoing financial
9  relationship with Kroger by way of a pension, for
10 example?
11     A    Yes.
12     Q    I'd like to begin by discussing the
13 animal welfare program for egg-laying hens, which
14 is what this litigation is about.  Do you
15 understand that that's -- maybe I should just ask
16 you.  What do you understand the litigation is
17 about?
18     A    I first learned of the litigation when
19 I received the letter dated February 14th of this
20 year.  I know I have had no contact with Kroger Company
21 over my retirement.  I have the letter that you
22 sent me in 2013 --
23     Q    Right.
24     A    -- but that didn't say anything about
25 litigation.  So I first became aware of any kind

Page 18

1  of litigation in February when I received that
2  letter.
3      Q    In February of 2014?
4      A    Yes.
5      Q    But what do you understand the
6  litigation to be about?
7          MR. MURRAY:  And let me say in
8  answering that question, please do not reveal any
9  information that you've learned from counsel.  If
10 you can answer the question independent of
11 discussions you've had with your lawyers, go
12 ahead and do so.  If you can't, then point that
13 out.
14     A    Okay.  The only -- the only thing I can
15 tell you is, when I got that letter, then I knew
16 there was litigation.  I had no idea what it was
17 about.  It just said Kroger versus United Egg
18 Producers.
19     Q    When you say "that letter," you mean
20 the letter that I sent you?
21     A    Yes.  The second one.
22     Q    Well, do you recall animal welfare
23 issues being a topic of discussion at Kroger in
24 the early 2000s?
25     A    At Kroger?

Page 19

1      Q    Yes.
2      A    No, not really.
3      Q    Do you recall -- or do you know an
4  organization known as PETA?
5      A    Yes.
6      Q    Do you know what "PETA" stands for?
7      A    Yes.
8      Q    What does it stand for?
9      A    People for the Ethical Treatment of
10 Animals.
11     Q    Do you recall in the earlier 2000s PETA
12 pressuring various food organizations to adopt
13 animal welfare guidelines?
14     A    Yes.
15     Q    What do you recall about that?
16     A    Can you be more specific than that,
17 what --
18     Q    Well, I'd like to get your general
19 recollection, if you have one.
20     A    I know that McDonald's was involved.
21     Q    Okay.
22     A    And that PETA was active in pursuing a
23 lot of the fast food places.
24     Q    Okay.  So you recall PETA pursuing
25 McDonald's --

Page 20

1      A    Yes.
2      Q    -- you said?  Do you recall PETA
3  pursuing Burger King, for instance?
4      A    Not specifically.
5      Q    But you recall that they were pursuing
6  various fast food restaurants?
7      A    Correct.
8      Q    Do you recall PETA at some point in
9  time turning its attention towards retail
10 grocers?
11     A    You know, I really can't answer that
12 because I really don't recall if they -- if they
13 specifically targeted grocery stores or not.
14     Q    Okay.  Well, we'll look at some
15 documents that might refresh your recollection on
16 that.
17         Do you know what FMI is?
18     A    I don't know what it stands for.  I
19 don't know what FMI is.
20     Q    Do you know generally what the
21 organization does?
22     A    No.  I can't recall.  I'm not -- I'm
23 not trying to be evasive.  I honestly can't
24 recall.
25     Q    Okay.  Do you recall that it's a trade

Page 21

1  association for food marketing organizations?
2      A   I really don't recall that.
3      Q   Do you recall whether Kroger belonged
4  to FMI at the time -- I would like to focus this
5  deposition, frankly, on 2000 until the time that
6  you retired.
7      A   Okay.
8      Q   That's basically the time period I'm
9  interested in.
10         Do you recall that FMI -- I mean that
11  Kroger belonged to FMI during that time period?
12     A   I wasn't intimate with that, so I can't
13  say if they did or not.  I --
14     Q   Okay.  Let's mark a couple of documents
15  as exhibits, 1 and 1-A.  We'll see if this helps
16  refresh your recollection a bit.
17         (Deposition Exhibits 1 and 1-A were
18  marked for identification.)
19         MR. MURRAY:  Why are we using 1-A
20  instead of 2?  Is that just because you have them
21  marked that way?
22         MS. LEVIN:  Because they're the same
23  document, and one is cut off and the other is
24  not.
25         So this I'd like to mark as Exhibit 1,

Page 22

1  a document bearing the Bates No. MPS-00121367,
2  and as Exhibit 1-A a press release that was
3  obtained from the Kroger Company website.
4          MR. MURRAY:  The Kroger one's fine, and
5  the other one is stamped confidential, highly
6  confidential.
7          MS. LEVIN:  It is stamped highly
8  confidential, and we can begin by having
9  Mr. Stull sign an acknowledgment under the case
10  management order and the protective order, if
11  you'd like to review that with him.
12         MR. MURRAY:  Okay.  Why don't we go off
13  the record and I'll go outside and talk to him
14  about this.
15         MS. LEVIN:  Okay.
16         THE VIDEOGRAPHER:  We're going off the
17  record.  The time is 9:48 a.m.
18         (A recess was taken.)
19         (Deposition Exhibit 2 was marked for
20  identification.)
21         THE VIDEOGRAPHER:  We are back on the
22  record.  The time is 9:52 a.m.
23         MS. LEVIN:  Let the record reflect --
24  go ahead.
25         MR. NOVAK:  This is Paul Novak on

Page 23

1  behalf of the indirect purchasers.  I'd like the
2  record to reflect that I'll be participating on
3  behalf of the indirect purchasers today.  I
4  actually came in a few minutes prior to the last
5  going off -- prior to going off the record.
6          And in addition, I'd also like to
7  reflect that the first notification that I
8  believe indirect purchaser plaintiffs received of
9  the date of this deposition was when the court
10  reporting firm provided notification to us on
11  last Friday.  And for that reason, we both object
12  to the timeliness, or lack of timeliness, in the
13  notification that the deposition was going
14  forward, and reserve our rights with respect to
15  that.
16         MR. MURRAY:  This is counsel for
17  Mr. Stull and Kroger.  We had nothing to do with
18  notifying the parties in the case about this
19  deposition, and from our perspective this is the
20  one and only time Mr. Stull is going to appear.
21         MS. LEVIN:  From my perspective, if
22  you're correct that the first you learned about
23  this was last week, then we apologize.  I'm not
24  in my office and so I really am not able to
25  determine whether that's correct or not.

Page 24

1          Let the record reflect that while we
2  were off the record, we marked as Exhibit Stull 2
3  a copy of Mr. Stull's signed commitment to abide
4  by the protective order with respect to
5  confidential and highly confidential information
6  that he may be seeing today.
7      Q   Mr. Stull, have you had a chance to
8  review Exhibits 1 and 1-A?
9      A   I'm in the process of doing that right
10  now.
11     Q   Okay.  Let me know when you're
12  finished.
13         I will represent to you, and you're
14  certainly welcome to satisfy yourself, but
15  Defendant's Exhibit 1 is a press release by
16  Kroger that has been cut off on the right-hand
17  side, and so we printed out the same press
18  release from the Kroger website so as to capture
19  a few letters that seemed to be missing from
20  Exhibit 1.
21     A   I've pretty much familiarized myself.
22     Q   Can you just state for the record what
23  Defendant's Exhibit 1 and 1-A appear to be?
24     A   Exhibit 1 and 1-A appear to be a press
25  release from the Kroger Company dated May 31st,

Page 25

1  2002.
2      Q     And what's the subject matter of
3  Defendant's Exhibit 1 and 1-A?
4      A     It says Kroger to support animal
5  welfare guidelines developed by the Food
6  Marketing Institute.
7      Q     And does Exhibit 1 refresh your
8  recollection that FMI stands for the Food
9  Marketing Institute?
10     A     I can see that now, yes.
11     Q     And at the top of Exhibit 1 you'll see
12 some notations that reflect that it appears you,
13 Gary Stull, sent Defendant's Exhibit 1 to Bob
14 Krouse. Do you see that?
15     A     Yes.
16     Q     Do you recall sending Defendant's
17 Exhibit 1 to Mr. Krouse?
18     A     I don't specifically recall it, but it
19 has my name on it.
20     Q     You don't question that you sent
21 Defendant's Exhibit 1 to Mr. Krouse on or about
22 June 26, 2002?
23         MR. MURRAY: Objection. Lack of
24 foundation. You can answer if you know.
25     A     No.

Page 26

1      Q     Mr. Stull, do you see in the upper
2  right-hand corner a fax number and then June 26,
3  2002?
4         OnDefendant's Exhibit 1.
5      A     I see -- where would I see that?
6      Q     At the very top of the page on the
7  right-hand side.
8      A     Okay. I see it, where it says June 26,
9  2002?
10     Q     Correct. So do you have any doubt that
11 you in fact sent Defendant's Exhibit 1 to
12 Mr. Krouse on June 26, 2002?
13     A     I don't recall sending it.
14     Q     You don't recall, but do you question
15 whether you did in light of the notations on the
16 document?
17     A     I would say, you know, that it's on
18 there.
19     Q     Who is Mr. Krouse?
20     A     Bob Krouse was with Midwest Poultry.
21     Q     And was Midwest Poultry a supplier to
22 Kroger of shell eggs --
23     A     Yeah --
24     Q     -- in 2002?
25     A     Yes. I'm sorry. I interrupted you.

Page 27

1      Q     Do you know why you would have sent
2  Defendant's Exhibit 1 to Mr. Krouse in June of
3  2002?
4         MR. MURRAY: Objection. Calls for
5  speculation. You can answer if you know.
6      Q     Mr. Krouse [sic], you understand, I
7  only want you to answer things if you know;
8  correct?
9      A     Correct.
10     Q     Good.
11         MS. LEVIN: We don't need to continue
12 to coach him in that fashion.
13         MR. MURRAY: I'm not coaching him. I'm
14 making an objection for the record.
15     Q     Mr. Stull, can you answer the question?
16         MR. MURRAY: I'll make whatever
17 objections I feel are appropriate.
18     A     I can't -- would you restate the
19 question, please?
20         MS. LEVIN: Can you read the question
21 back for Mr. Stull.
22         (The reporter read the requested
23 question.)
24         MR. MURRAY: Can you also read my
25 objection.

Page 28

1  I'll renew my objection.
2         MS. LEVIN: The question says "Do you
3  know?"
4         MR. MURRAY: My objection is calls for
5  speculation. You can answer if you know.
6      A     No. I don't recall.
7      Q     Let's take a look at the text of the
8  press release and see if it refreshes your
9  recollection on what was going on at Kroger with
10 respect to animal welfare in the early 2000s.
11         See at the first sentence it says, "The
12 Kroger Company today said it continues to support
13 the Food Marketing Institute's development of an
14 animal welfare program."
15         Do you recall that in May of 2002
16 Kroger was supporting the Food Marketing
17 Institute's development of an animal welfare
18 program?
19     A     I have the document in front of me that
20 says that.
21     Q     But do you recall whether that was
22 taking place at that time? Does this refresh
23 your recollection?
24     A     I don't recall. It's been eight years.
25 It's hard to pin down what happened eight years

Page 29

1  ago.
2      Q    I understand.  It's actually been
3  twelve years, so --
4      A    Twelve years ago.
5      Q    We understand that you don't have a
6  crystal clear recollection.  My question is
7  really whether you recall generally that that was
8  going on in your job at the time?
9      A    Yes.
10     Q    And do you recall that the company at
11 that point in time was going to require its
12 suppliers to adopt the best practice guidelines
13 when they were issued by FMI?
14     A    I read that in this press release.
15     Q    Do you recall whether the animal
16 welfare guidelines that were being considered at
17 this point in time included guidelines for
18 egg-laying hens?
19     A    If -- I would be speculating at this
20 point to say anything.  Because -- and the only
21 reason why I say that is I can't recall
22 specifically if it was or not.  So a "yes" or
23 "no" answer, I can't give you that.
24     Q    Do you recall generally whether the
25 animal welfare program that was being developed

Page 30

1  by the Food Marketing Institute included
2  guidelines for egg-laying hens?
3          MR. MURRAY:  Objection.  Asked and
4  answered.  You can answer if you know.
5      A    You would have to consult with Lynn
6  Marmer as to whether it was, because it's not
7  specifically laid out in here.
8      Q    Okay.  Well, we've got some other
9  documents we can look at that will perhaps help
10 prod your memory.
11         Do you recall -- going to the second
12 paragraph it states, "FMI began reviewing the
13 issue of animal welfare in 2001 at the request of
14 its member companies including Kroger,
15 Albertson's, Safeway, and others."  Do you recall
16 Kroger encouraging FMI to look at the issue of
17 animal welfare in 2001?
18     A    That would be speculation.
19     Q    Do you have any reason to doubt the
20 accuracy of this press release by Kroger that's
21 contained in Defendant's Exhibit 1 and 1-A?
22     A    No.
23     Q    Do you recall that the guidelines that
24 were being explored by FMI were to be
25 science-based guidelines?

Page 31

1      A    Is that stated in here?
2      Q    Yes.  It's right before the list of
3  names, the bullet point list of names.
4      A    It states that in this press release.
5      Q    Do you have any reason to doubt the
6  accuracy of that statement in the press release?
7      A    This press release was by a Kroger
8  group vice president.  That's a little above my
9  pay grade.
10     Q    Well, I understand that.  But I'm
11 asking whether you have any reason to doubt the
12 accuracy of the statements in this press release.
13     A    I have confidence in what a Kroger vice
14 president would say.
15     Q    Would you have sent the press release
16 to Mr. Krouse if you had questioned the accuracy
17 of the statements in the press release?
18         MR. MURRAY:  Objection.  Calls for
19 speculation.
20     A    If Kroger -- if the Kroger corporate
21 vice president of corporate affairs said that's
22 where our position is, I wouldn't question that
23 position.
24     Q    And you wouldn't have sent Defendant's
25 Exhibit 1 to Mr. Krouse if you believed it

Page 32

1  contained inaccurate statements; would you?
2          MR. MURRAY:  Objection.  Calls for
3  speculation.
4      A    I'll go back to my other answer.  If it
5  was put out by a Kroger group vice president,
6  then I have confidence in Kroger's system.
7      Q    It states further down in the
8  next-to-last paragraph that "Kroger has supported
9  the FMI/NCCR Animal Welfare Program since its
10 inception and we will continue to support its
11 ongoing research."  Do you see that sentence?
12     A    Uh-huh.  Yes.
13     Q    Do you have any reason to question the
14 accuracy of that sentence?
15     A    Once again, I have confidence in the
16 Kroger system.  And if Lynn Marmer said that, I
17 have confidence that that's the position.
18     Q    Do you have a recollection that Kroger
19 supported the animal welfare program since its
20 inception?
21     A    I don't have a personal memory of it,
22 but it states that here.  And once again, I have
23 absolute confidence that if Lynn Marmer of the
24 Kroger Company said we did, we did.
25     Q    Does reviewing Exhibit 1 or 1-A bring

Page 33

1  back any other recollection to you concerning the
2  early involvement of Kroger with the animal
3  welfare program?
4      A   No.
5          MS. LEVIN:  Let's mark as Exhibit 3 a
6  document bearing Bates No. KRGEG00019788 through
7  792.
8          (Deposition Exhibit 3 was marked for
9  identification.)
10     Q   Mr. Stull, if you'll let me know when
11 you've had a chance to review Defendant's Exhibit
12 3, then we'll talk about it a little bit.
13         And to expedite your review, I will not
14 be asking any questions about the last page but
15 you're certainly free to review it.
16     A   I've reviewed it.
17     Q   You've had a chance to review
18 Defendant's Exhibit 3?
19     A   Yes.
20     Q   Or Stull Exhibit 3?
21         Mr. Stull, the first question I have is
22 whether looking at this -- well, let me first ask
23 you what Defendant's Exhibit 3 appears to be?
24     A   It states that it's a letter initiated
25 by Lisa Beth Miller announcing that we would

Page 34

1  continue to support the Food Marketing
2  Institute's development of an animal welfare
3  program, and that the company would require its
4  suppliers to adopt the program's best practice
5  guidelines when they are issued.
6      Q   And the date of Exhibit 3 is October 1,
7  2002?
8      A   Yes.
9      Q   Who is Lisa Beth Miller?  Do you
10 recall?
11     A   Lisa Beth Miller was my boss.
12     Q   And what was her position?
13     A   She was marketing manager, dairy
14 products.
15     Q   And Lisa Beth Miller was your boss for
16 the entire time that you were the manager of egg
17 procurement?
18     A   No.
19     Q   Can you explain who was your -- who you
20 did report to when you were general manager of
21 egg procurement?
22     A   Lisa Beth was one of the people that
23 occupied that position.  There were others that I
24 reported to along the way, but I don't recall.
25     Q   You don't recall, but you always

Page 35

1  reported to whoever held the position of
2  marketing manager, dairy products?
3      A   Correct.
4      Q   How many people reported to you?
5      A   Reported to me?
6      Q   Yes.
7      A   At one time I had one person reporting
8  to me.
9      Q   And otherwise you had no one reporting?
10     A   Otherwise I had no one.
11     Q   Who was the person, or at least what
12 was the position of the person that the person
13 who reported to you held?
14     A   She was a field inspector that went out
15 to maintain quality by visiting suppliers
16 unannounced.
17     Q   So she would make unannounced visits,
18 for example, to various egg providers?
19     A   Correct.
20     Q   And do you recall her name?
21     A   I recall her maiden name.
22     Q   I just would like a name to make the
23 record a little bit easier.
24     A   Anita Graffiti.
25     Q   Graffiti as in --

Page 36

1      A   (Nodding affirmatively)
2      Q   -- markings on walls?
3      A   Yes.
4          MR. MURRAY:  Makes it memorable.
5          MS. LEVIN:  It makes it easier to
6  remember, that's exactly right.
7      Q   So --
8      A   Her father was a cement contractor.
9      Q   That's interesting.  So Ms. Graffiti
10 would make unannounced visits to egg suppliers or
11 egg producers for Kroger Company.  And what sorts
12 of things was Ms. Graffiti looking for when she
13 made these unannounced visits?
14     A   Kroger had certain quality standards
15 that we required all suppliers to meet.  Anita's
16 function was to go out to the suppliers and make
17 sure that those standards were being maintained.
18 An example would be level -- levels of checks or
19 cracked eggs that would be allowed in a 100-egg
20 sample.  Grade A eggs that would be allowed in
21 samples.  We didn't allow Grade B.  But she would
22 go out and maintain those Kroger-established
23 quality requirements.
24     Q   And did Ms. Graffiti have anything to
25 do with monitoring whether animal welfare

Page 37

1  guidelines were followed?
2      A   No.
3      Q   Okay.  Let's go back to Exhibit 3.  You
4  notice that you were one of the cc:'s on Exhibit
5  3?
6      A   Yes.
7      Q   Do you have any recollection of
8  receiving Exhibit 3?
9      A   Not specifically.  I received many
10  things.
11      Q   I'm sure you did.  And I ask the
12  question only because I need to.  I understand
13  it's very difficult to remember a document twelve
14  years ago.
15          You've mentioned Lynn Marmer a number
16  of times.  Do you see Ms. Marmer received Exhibit
17  3 as well?  Her name's right next to yours.
18      A   Oh, yes.
19      Q   Who was Lynn Marmer?
20      A   I'm going to refer back to Exhibit 1
21  because I don't know her exact title.
22          She was the Kroger group vice president
23  for corporate affairs.
24      Q   And do you know what Ms. Marmer's
25  responsibilities were?

Page 38

1      A   Once again, that's above my pay grade.
2  I don't.
3      Q   Okay.  Do you recall whether she was
4  some sort of liaison to FMI?
5      A   I can't answer that.  I don't know.
6      Q   Taking a look at the list of recipients
7  of -- Exhibit 3.  If you'll see about halfway
8  down the list of the two lists -- no, on the
9  first page.
10      A   Okay.
11      Q   There are a number of names followed by
12  various division names.  King Soopers, Fry's,
13  Ralph's.  Does that refresh your recollection at
14  all as to some of the different banners that
15  Kroger operates under?
16      A   When I look at that list, I would guess
17  that that's primarily at that time the list of
18  Kroger divisions.
19      Q   And would that be -- from Dillon on
20  down, would those all be names of various banners
21  under which Kroger operates stores?
22      A   Yes.
23      Q   So Dillon, King Soopers, Fry's,
24  Ralph's, Food 4 Less, Smith's, and Fred Meyer
25  were all banners under which Kroger operated in

Page 39

1  2002?
2      A   And also QFC.
3      Q   And QFC.
4          Do you recall whether that list of
5  banners changed between 2000 and 2006 when you
6  retired?
7      A   No.  I do not.  I'm sorry.
8      Q   Let's take a look at the second page of
9  Exhibit 3.  And when you described what the topic
10  or the subject matter of Exhibit 3 was, you read
11  the first sentence here about the company
12  announcing its continued support of FMI's
13  development of an animal welfare program.
14  Correct?
15      A   Correct.
16      Q   Does this refresh your recollection at
17  all that FMI was developing an animal welfare
18  program and that Kroger was in support of that
19  development?
20      A   I read this first sentence and it tells
21  me that.
22      Q   But you have no independent
23  recollection?
24      A   No.
25      Q   Do you question the accuracy of the

Page 40

1  first sentence of the text of Exhibit 3?
2      A   No.  I never questioned my boss.
3      Q   That's a good policy.
4          Do you recall that the company was
5  going to require its suppliers to adopt the
6  guidelines once they were issued?
7      A   I read that in this press release;
8  therefore, my memory's tainted already because
9  I'm reading it here.  Do I recall it
10  independently?  No.
11      Q   Further down in the third paragraph,
12  the document references placing top priority on
13  the comfort, health and safety of chickens.  Does
14  this refresh your recollection that the --
15  amongst the animal welfare guidelines being
16  developed, one was for egg-laying hens?
17      A   When I read this it talks about
18  increased space -- cage space per hen.  I would
19  assume that's referring to egg-laying hens.
20      Q   And do you recall that one set of
21  animal welfare guidelines that were being
22  developed was for egg-laying hens?
23      A   Specifically, no.  I don't.
24      Q   Do you recall there being an issue
25  about cage space per hen which was being

Page 41

1  discussed by Kroger?
2      A   I read that here.  Therefore, I think
3  my recollection is tainted already.  Do I --
4  would I have recollected it without this
5  document?  No.  Probably not.
6      Q   Well, I'm not asking you -- and I am
7  concerned when you say it's tainted.  I'm really
8  asking you whether reading this refreshes your
9  recollection at all.  I understand that absent
10 looking at any documents you don't have a
11 recollection.  My question to you is whether this
12 helps refresh your recollection.
13     A   I know that there was some issues about
14 animal welfare things, but do I recall anything
15 specifically?  No, I do not.
16     Q   And does reviewing this document help
17 you recall that one of the issues was with
18 respect to cage space?
19     A   I see it there, so I would say yes.
20     Q   And do you recall that one of the
21 issues was about molting of hens?
22     A   Once again, I see it here.  I wouldn't
23 have recalled it specifically without seeing it
24 here.
25     Q   Okay.  But would you --

Page 42

1      A   So this does -- this does tell me that
2  it was an issue, yes.
3      Q   And it refreshes your recollection?
4      A   It's hard to say if it's my
5  recollection or I'm reading it here.  Do I see it
6  here?  Yes.  Do I remember if I recalled it?  Not
7  specifically, no.
8      Q   Let's talk a little bit -- I just want
9  to rewind just briefly about the time when you
10 were employed by Kroger working as a foreman or a
11 general foreman in egg plants.  At that period of
12 time did Kroger have its own supply, or have its
13 own farms for egg-laying hens?
14     A   No.
15     Q   What was the relationship between the
16 egg plant that you worked at and Kroger?  What
17 was the business that they were engaged in?
18     A   The egg plant produced Kroger product.
19 Kroger eggs.
20     Q   But when you say produced, what do you
21 mean?
22     A   Packaged.
23     Q   So --
24     A   We brought eggs in and packaged them.
25     Q   So the Kroger -- Kroger didn't own any

Page 43

1  farms at that point in time?
2      MR. MURRAY:  Egg farms or other kind of
3  farms?
4      MS. LEVIN:  Egg farms.
5      A   Not at the facility I worked at.
6      Q   Did they -- did Kroger own egg farms at
7  other facilities?
8      A   Yes.
9      Q   During that time period did you become
10 at all familiar with animal husbandry for hens?
11     A   No.
12     Q   On the next-to-last sentence, or the
13 next-to-last paragraph on the text of Lisa Beth
14 Miller's memo in Exhibit 3, there's a reference
15 to "working with Papetti's and Nulaid, our
16 Corporate Brand supplier of egg substitutes in
17 order to determine their ability to comply as
18 quickly as possible."
19     What are egg substitutes?
20     A   When you take -- break eggs out and you
21 take the yoke out and you just have whites left,
22 and they'll put a little oil in with it to make
23 it whip together, that's an egg substitute.
24     Q   So it would be something like what is
25 sold under the brand name Egg Beaters?

Page 44

1      A   Correct.
2      Q   And who are Papetti's and Nulaid?
3      A   They were suppliers of egg substitutes.
4      Q   And was this reference here to
5  Papetti's and Nulaid's ability to comply as
6  quickly as possible a reference to their ability
7  to comply with the animal welfare guidelines?
8      A   I would assume that from the letter.  I
9  did not deal with Papetti's or Nulaid.
10     Q   Did you have any responsibility for egg
11 products or egg substitutes?
12     A   No.
13     Q   Your sole procurement responsibilities
14 were with respect to shell eggs?
15     A   Correct.
16     MS. LEVIN:  I'm going to mark as
17 Exhibit 4 a document bearing the Bates No.
18 DAY0029730.
19     (Deposition Exhibit 4 was marked for
20 identification.)
21     Q   Mr. Stull, you'll let me know when
22 you've had a chance to review Exhibit 4.
23     You've completed your review of Exhibit
24 4, Mr. Stull?
25     A   Yes, I have.

Page 45

1    Q    What is Exhibit 4?
2    A    Exhibit 4 is a letter to Mr. Gene
3  Gregory, senior vice president for UEP.
4    Q    It's dated August 2nd, 2005?
5    A    Correct.
6    Q    And is that your signature on Exhibit
7  4?
8    A    Yes, it is.
9    Q    Do you recall rescinding -- sending
10 Exhibit 4 to Mr. Gregory?
11   A    Specifically?  No.  I retired four
12 months after this was --
13   Q    I understand.  Do you have any doubt
14 that you sent Exhibit 4 to Mr. Gregory?
15   A    No.
16   Q    And did you attempt in preparing
17 Exhibit 4 to make truthful and accurate
18 statements?
19   A    I'm not sure that I prepared this
20 letter.  The reason why I say that is some
21 letters were sent to me and -- by suppliers
22 encouraging me to sign them and send them on.
23   Q    And when you signed them and sent them
24 on, did you review them for accuracy before
25 signing and sending them?

Page 46

1    A    On this particular letter, I honestly
2  have to say I was preparing to leave the company,
3  I had already turned in my retirement notice, and
4  a lot of things came across my desk at that time.
5  Do I recall specifically reviewing this?  No, I
6  don't.
7    Q    Do you have a recollection of someone
8  sending you this Exhibit 4 for your signature?
9    A    No.  Not specifically.
10   Q    So you don't -- aren't testifying today
11 that somebody else prepared Exhibit 4 and sent it
12 to you for signature?
13       MR. MURRAY:  Objection.
14 Mischaracterizes his testimony.
15   A    You know, I can't recall if I -- as I
16 said, many things came across my desk then.
17   Q    I understand.  But you signed Exhibit 4
18 and sent it to Mr. Gregory; correct?
19   A    Yes.
20   Q    And you stated in Exhibit 4 that Kroger
21 has supported the animal certified -- animal care
22 certified program from the very beginning.
23 That's the first sentence in the fifth paragraph.
24   A    It stated that in the letter, yes.
25   Q    And do you have any doubt about the

Page 47

1  accuracy of that sentence in Exhibit 4?
2    A    I don't know if I do or not because it
3  happened quite a while ago.
4    Q    It's in fact consistent, is it not,
5  with -- Mr. Stull, with Defendant's Exhibit 1,
6  which is the press release which you've testified
7  you have no reason to question?
8    A    Correct.
9    Q    So your statement that Kroger has
10 supported the animal care certified program from
11 the very beginning is consistent with Defendant's
12 Exhibit 1; correct?
13   A    I don't know that it states it -- I
14 don't --
15   Q    Well, look down at the next-to-last
16 paragraph on the first page of Defendant's
17 Exhibit 1.  It states "Kroger has supported the
18 FMI/NCCR Animal Welfare Program since its
19 inception."  So you don't have any doubt about
20 the accuracy of this sentence in the matter --
21   A    Okay.
22   Q    -- in Defendant's Exhibit 4; do you?
23   A    It stated that in Exhibit 1, then I
24 have no question to doubt -- no reason to doubt
25 it because I don't doubt Kroger's position.

Page 48

1    Q    When you stated in Exhibit 4 that
2  Kroger has supported the animal care certified
3  program from the very beginning, that was a
4  correct statement?  It was an accurate statement?
5    A    If we're referring to what was talked
6  about in Exhibit 1, yes.
7    Q    The second sentence in that same
8  paragraph, "We were instrumental in seeing that
9  the Food Marketing Institute assembled a panel of
10 leading national experts in animal welfare
11 practices."
12       Do you see that sentence?
13   A    Yes.
14   Q    Do you have any reason to question
15 that -- the accuracy of that sentence in the
16 letter that you sent to Mr. Gregory in Exhibit 4?
17   A    Once again, referring to Exhibit 1, it
18 says -- it says that in Exhibit 1.  So no, I
19 don't have it -- I don't question Kroger's
20 decision.
21   Q    Well, you don't question the accuracy
22 of that sentence in Defendant's Exhibit 4; do
23 you?
24       MR. MURRAY:  Objection.  Asked and
25 answered.

Page 49

1    A    Yeah, I have no reason to question what
2  Kroger said.
3    Q    Well, do you have any reason to
4  question what you said in Exhibit 4 and signed
5  your name to?
6    A    If it's the same thing that Kroger
7  said, no, I don't.
8    Q    Well, does it appear to you to be the
9  same thing that Kroger said?
10    A    Yes.
11    Q    So you have no reason to question the
12  sentence in Defendant's Exhibit 4 that states,
13  "We were instrumental in seeing that the Food
14  Marketing Institute assemble a panel of leading
15  national experts in animal welfare practices"?
16    A    Yes.
17    Q    In the third paragraph in
18  Defendant's -- or in Exhibit 4 it states, "The
19  Animal Care Certified program allows customers to
20  know that science-based animal welfare standards
21  are being used." Do you have any reason to
22  question that sentence in Exhibit 4?
23    A    No.
24    Q    Right before that --
25        Why was it important for customers to

Page 50

1  know that the science-based animal welfare
2  standards were being used?
3    A    It would be speculative of me to say
4  why Kroger felt that was important. I think you
5  have to refer back to Kroger's response in their
6  corporate news release. I don't -- I don't speak
7  for Kroger retail. My function was to procure
8  eggs, not to sell them.
9    Q    Let's take a look at the rest of that
10  third paragraph. It says, "First, it is
11  important for Kroger to meet the needs of our
12  customers. Animal welfare is important to many
13  consumers." Do you have any reason to question
14  those words which you wrote to Mr. Gregory in
15  Exhibit 4?
16    A    No.
17    Q    In the next paragraph down you state,
18  "One benefit of the Animal Care Certified program
19  is that it provides a uniform set of requirements
20  for all participating egg producers, allowing for
21  the free flow of product." Do you see that
22  sentence?
23    A    Yes.
24    Q    Do you have any reason to question the
25  accuracy of that sentence in Exhibit 4?

Page 51

1    A    Not when it was written, no.
2    Q    Well, would there be some other time
3  when you might question the accuracy of that
4  sentence?
5    A    No. But I can only refer to the time
6  when it was written.
7    Q    I understand. But I'm just -- you
8  know, when you couch it in that way, it sounds
9  like perhaps you have reason to believe that at
10  some different point in time that sentence would
11  not have been correct.
12    A    The only -- the only reason why I
13  answer like that is because it was eight years
14  ago. So I can't speak for anything that's
15  happened after that time.
16    Q    I understand. But you don't have any
17  reason sitting here today to have a particular
18  reason to question the accuracy of that sentence?
19    A    No.
20    Q    Do you have a recollection or does this
21  refresh your recollection that at some point in
22  time prior to August of 2005 there was not a
23  uniform set of requirements and that that was
24  causing problems in the egg industry?
25    A    I will refer back to Exhibit 3 where

Page 52

1  Lisa Beth talked about the guidelines placing top
2  priority on comfort, health, and safety of
3  chickens, and just basically say I supported my
4  supervisor's positions.
5    Q    Are there any --
6        We've gone over some of the sentences
7  in Exhibit 4. Are there any sentences in Exhibit
8  4 that you question the accuracy of?
9        MR. MURRAY: Objection. Overly broad.
10  You can answer if you know.
11    A    You know, I really -- I'm looking at it
12  after eight years. I don't know.
13    Q    But you don't have any reason to
14  question --
15    A    I don't have any recollection of it.
16    Q    You don't have any reason to question
17  the accuracy of any of the other sentences in
18  Exhibit 4?
19    A    No.
20        MS. LEVIN: Let's mark as Exhibit 5 a
21  document bearing the Bates No. MPS-00087588.
22        (Deposition Exhibit 5 was marked for
23  identification.)
24    Q    And again, Mr. Stull, if you'll let me
25  know when you've had a chance to review Exhibit

Page 53

1  5, I would appreciate it.
2    A  I've read it.
3    Q  You've had a chance to review
4  Defendant's -- I keep calling it Defendant's
5  Exhibit -- Exhibit 5?
6    A  Yes.
7    Q  What is Exhibit 5?
8    A  It appears to be an animal welfare
9  policy.
10    Q  And do you have any idea who would have
11  prepared Exhibit 5?
12    A  No.
13    Q  Have you ever seen Exhibit 5 before?
14    A  Not that I recall.
15    Q  Let's take a look at the very first
16  sentence where it says, "Kroger was one of the
17  first major supermarket companies to adopt
18  meaningful animal welfare guidelines."  Do you
19  see that?
20    A  Yes, I do.
21    Q  Do you have any reason to doubt the
22  accuracy of that statement?
23       MR. MURRAY:  Objection.  Lack of
24  foundation.  You can answer if you know.
25    A  I would say probably I would need to

Page 54

1  know where this came from.  But if it was put out
2  by a senior Kroger person, I wouldn't doubt it.
3    Q  Well, in the second paragraph it
4  states, "In 2001, Kroger began working closely
5  with the Food Marketing Institute and the
6  National Council of Chain Restaurants to develop
7  an industry-wide program that would introduce
8  science-based guidelines to strengthen animal
9  welfare practices across species."  Do you see
10  that?
11    A  Yes.
12    Q  Do you have any reason to question the
13  accuracy of that sentence?
14    A  No.
15       MR. MURRAY:  Same objection.
16    A  No.
17    Q  In fact it's consistent with your
18  letter that is contained in Exhibit 4; is it not?
19    A  Yes.
20    Q  It further states that "Kroger" -- and
21  this is on -- in that same second paragraph of
22  Exhibit 5, Kroger requires all of our suppliers
23  to adopt these "best practices" animal welfare
24  standards for Krogers, and monitors -- and Kroger
25  monitors our suppliers for compliance with these

Page 55

1  standards.  Do you see that sentence?
2    A  Yes.
3    Q  Was it correct that Kroger required all
4  of its egg -- shell egg suppliers to adopt the
5  animal welfare standards referenced in this
6  document?
7    A  Yes.
8    Q  And the next sentence -- the next
9  paragraph, I'm sorry, of Exhibit 5, the first
10  sentence states, "We believe this joint industry
11  effort with retailers and restaurants working
12  together with leading animal welfare experts will
13  make more progress in the humane treatment of
14  animals than any company could achieve by acting
15  alone."
16       Do you see that sentence?
17    A  Yes, I do.
18    Q  Do you have any reason to doubt the
19  accuracy of that sentence?
20       MR. MURRAY:  Objection.  Calls for
21  speculation.
22    A  I could -- I could speculate and say
23  yes.
24    Q  Let's talk a little bit about shell egg
25  procurement --

Page 56

1    A  Okay.
2    Q  To make sure I understand --
3       MR. MURRAY:  If we're switching gears,
4  why don't we take a break.  We've been going
5  about an hour.
6       MS. LEVIN:  That's fine.
7       THE WITNESS:  That's a good idea.
8       THE VIDEOGRAPHER:  We're going off the
9  record.  The time is 10:44 a.m.
10       (A recess was taken.)
11       THE VIDEOGRAPHER:  We're going back on
12  the record.  The time is -- this is the beginning
13  of Tape 2.  The time is 10:58 a.m., and we are
14  back on the record.
15    Q  Mr. Stull, I'd like to turn now to your
16  responsibilities for egg procurement, and how the
17  procurement process worked, if you recall.
18    A  Okay.
19    Q  What do you recall just generally about
20  procurement process for shell eggs?
21       MR. MURRAY:  Objection.  Overly broad.
22  You can answer.
23    A  Quality was number one.
24    Q  Quality was number one in terms of your
25  selection of a supplier?  Is that what you're

Page 57

1  saying?
2      A    All suppliers had to match up to a
3  quality standard, a Kroger quality standard.
4      Q    How did you go about obtaining
5  suppliers?
6      A    There's a very limited pool of
7  suppliers, so I contracted with them.
8      Q    How did you go about reaching the point
9  where you were going to contract with a supplier?
10     A    I would solicit bids.
11     Q    Did you issue a request for proposals
12  or request for bids?
13     A    Mm-hmm.
14     Q    Is that a "yes"?
15         MR. MURRAY:  Got to say "yes" or "no."
16     A    I'm sorry.  Yes.
17     Q    Okay.  Can you tell me how that process
18  worked?
19     A    On an annual basis I would solicit
20  quotes from suppliers.
21     Q    On an annual basis?
22     A    Uh-huh.
23     Q    And were the quotes for nationwide
24  supply of eggs?
25     A    No single supplier could supply

Page 58

1  nationwide.
2      Q    So the requests were for regional
3  quotes?
4      A    Yes.
5      Q    How many regions were there?  Roughly?
6      A    If you look at the list of chains, and
7  you look at where they're located, I think Kroger
8  at that time had stores in 34 states.  And so you
9  had -- you had regions that were all over, from
10  coast to coast.
11     Q    So when you issued a request for
12  proposal, or request for bid -- RFP I usually
13  call it -- it was for a particular region; is
14  that correct?
15     A    Yes.
16     Q    And was that request, the RFP, to
17  supply all of the stores that operated -- all the
18  Kroger stores that operated in that region
19  regardless of the banner?
20     A    No.  Not necessarily.
21     Q    How did that work then?
22     A    I would have -- I would pick a supplier
23  to handle a division.  For example, Atlanta is a
24  division.  Or Indianapolis is a division.
25     Q    How many divisions were there?

Page 59

1      A    I don't recall exactly.  I think the
2  list that Lisa Beth had on her -- in that exhibit
3  probably has all the divisions.
4      Q    In Exhibit 3?
5      A    Yes.
6      Q    So there was an Atlanta, Cincinnati,
7  Central, Delta, Columbus, Mid-South, Michigan,
8  Mid-Atlantic, and Southwest Division in terms of
9  regions?
10     A    Correct.
11     Q    And then there were divisions under
12  certain -- certain banners, Dillon, King Soopers,
13  Fry, and so forth?
14     A    Yes.
15     Q    And so the bids that were being
16  solicited for the divisions that are by cities or
17  sections of the country were not for the supply
18  of eggs to these particular banner divisions such
19  as King Soopers, Fry's, and Ralph's.  Is that
20  correct?
21     A    Yes.  Yes.
22     Q    So you would --
23     A    But there was always the possibility.
24  I mean they could cross over.
25     Q    Okay.  So when you solicited bids for

Page 60

1  the King Soopers division, was that for all King
2  Soopers stores regardless of location?
3      A    Yes.
4      Q    Does King Soopers operate in any
5  particular geographic region?
6      A    Yes.
7      Q    What region is that?
8      A    Colorado.  Denver, primarily, I think
9  is King Soopers.
10     Q    And does Fry's --
11     A    King Soopers has its own label.  It's
12  not a Kroger label.  It's a King Sooper label.
13     Q    For eggs, for shell eggs?  But you
14  solicited bids for the supply of eggs to King
15  Soopers separately from the supply of eggs to
16  other stores?
17     A    Yes.
18     Q    And those eggs appeared in the King
19  Soopers stores under the King Sooper label?
20     A    Yes.
21     Q    Did Kroger supply the packaging for
22  those eggs?
23     A    Yes.
24     Q    Okay.  And is the same true for Fry's
25  division, that is you solicited separate

Page 61

1  proposals for supply of eggs to the Fry's
2  division?
3      A    I can't remember exactly if I did or
4  not. The only reason why I'm saying that, I --
5  some of the -- some of the stores were in close
6  proximity to each other.
7      Q    What do you mean, some of the stores?
8      A    Well, some of the divisions.
9      Q    Where does Fry's have stores?
10     A    I can't tell you that. I don't know.
11 I don't remember that anymore.
12     Q    Do you remember roughly what region of
13 the country Fry's operated in?
14     A    No, I do not.
15     Q    What about Ralph's? Do you recall what
16 region of the country Ralph's operated in?
17     A    Yes, I do.
18     Q    Where?
19     A    California. Southern California.
20     Q    And did you solicit eggs -- separate
21 RFPs for the supply of shell eggs to the Ralph's
22 Division?
23     A    Yes.
24     Q    Where does Food 4 Less operate?
25     A    (No response)

Page 62

1      Q    Or where did Food 4 Less operate?
2      A    They -- that just started when I was
3  going to the end of my Kroger career. I know
4  they're in Chicago area, but I can't really tell
5  you much about them because I didn't do much with
6  them.
7      Q    This Exhibit 3 that has the term
8  Food 4 Less in it is dated October 2002.
9      A    Right.
10     Q    Which is four years before you left;
11 correct? Or three and a half years?
12     A    Three years. Mm-hmm.
13     Q    So you had three years of working with
14 Food 4 Less; correct?
15     A    You know, I'm not -- I can't answer
16 that with any degree of certainty because I think
17 there were other suppliers in place at the time
18 that were not through the Kroger procurement.
19     Q    Can you explain what you mean by that?
20     A    Some of the divisions had their own
21 procurement.
22     Q    So you didn't do the procurement for
23 certain of the divisions that appear in Exhibit
24 3?
25     A    Yes. Some of the procurement. Some of

Page 63

1  it I did and some of it was done directly.
2      Q    But you believe that Food 4 Less may
3  have done its own shell egg procurement during
4  the time you were employed by Kroger?
5      A    I did some of it. I know I did. But
6  I -- some of it was done directly by the
7  division.
8      Q    When you did the procurement for
9  Food 4 Less, was a separate RFP issued
10 specifically for the Food 4 Less division supply
11 contract?
12     A    I'm trying to think back if they had
13 their own packaging or not, and I can't recall if
14 they did. If they had their own packaging, I
15 would have done a separate bid for them, but I
16 don't recall that.
17     Q    If they didn't have their own
18 packaging, what would the packaging appear like
19 in the store? What kind of packaging would they
20 have?
21     A    Would you restate that, what you mean?
22     Q    Well, you've testified, for example,
23 that the King Soopers had its own packaging.
24     A    Correct.
25     Q    And so the eggs that were sold to King

Page 64

1  Soopers appeared in cartons that specifically
2  said King Soopers.
3      A    Correct.
4      Q    If Food 4 Less did not have its own
5  packaging, what sort of packaging did it use?
6      A    Oh, I see what you mean. It would have
7  been a Kroger label.
8      Q    And if you did the procurement for
9  Food 4 Less, would that have been under the
10 Kroger label?
11     A    The part that I did for Food 4 Less
12 would be -- would have been under a Kroger label.
13 They had other labels that they solicited and got
14 themselves directly.
15     Q    Do you know what labels those were?
16     A    I can't recall.
17     Q    Would the labels have been the labels
18 for the suppliers supplying the eggs?
19         MR. MURRAY: Objection. Calls for
20 speculation.
21     A    Yeah, I --
22     Q    You just don't recall?
23     A    I don't recall because it wasn't part
24 of my service.
25     Q    So Food 4 Less would have sold eggs

Page 65

1  under the Kroger label and under some other
2  unspecified labels, perhaps?
3      A   Correct.
4      Q   What about the Smith's division, where
5  did that operate?
6      A   (No response)
7      Q   Do you recall?
8      A   I can't recall.
9      Q   Do you recall generally the region of
10  the country?
11      A   Honestly, no, I do not.
12      Q   Did you do separate RFP for procurement
13  of shell eggs for the Smith's division?
14      A   I can't recall if I did or not.
15      Q   What about the Fred Meyer division, do
16  you know where that operated?
17      A   Yes.
18      Q   Where did that operate?
19      A   The Northwest.
20      Q   And did you do separate RFPs for the
21  procurement of shell eggs for the Fred Meyer
22  division?
23      A   Yes.
24      Q   Now we've been talking about shell
25  eggs.  I just wanted to clarify my understanding.

Page 66

1  You did no procurement for egg products; is that
2  correct?
3      A   Not -- not in later years.  As I stated
4  earlier, at one point I was the sale manager for
5  a Kroger breaking plant before, so --
6      Q   When was that?
7      A   I don't recall.  I can't remember the
8  years.  It was a very short time.
9      Q   Was it prior to 1999?
10      A   I can't recall.
11      Q   When you were the -- when you were
12  working at the breaker plant, what exactly were
13  your responsibilities?
14      A   I was the sales manager.
15      Q   So, again, you were responsible for the
16  procurement of egg products; is that what you
17  did?
18      A   No.
19      Q   What did you do?
20      A   I monitored the sales to Kroger.
21      Q   What do you mean, monitored the sales?
22      A   You know, I have to tell you, when I
23  explained that I was only there for three months
24  and then the plant closed, I was mostly learning
25  the ropes.  I really -- I really can't say what I

Page 67

1  did there because I wasn't there long enough to
2  do much.
3      Q   But it had something to do with egg
4  products?
5      A   It was a breaker plant that supplied
6  egg products.
7      Q   Did it have anything to do with the
8  procurement of egg products?
9      A   Not that I can recall.
10      Q   There are several other divisions
11  listed on Exhibit 3 that are all geographic
12  divisions.  And rather than go through them one
13  by one, I would ask whether you issued separate
14  RFPs for the provision of shell eggs for each of
15  those divisions?
16      A   Some of the divisions I used one
17  supplier for.  We had -- it depended on -- like
18  Cincinnati and Central are very close together,
19  so I would use one supplier.  I would solicit
20  both of those with one supplier.
21      Q   And when you solicited an R -- when you
22  issued an RFP for the supply of shell eggs to the
23  Cincinnati and Central divisions, was that for
24  all Kroger stores regardless of the banner they
25  were operating under?

Page 68

1      A   No.  Those would just be Kroger label.
2  These are Kroger label divisions.
3      Q   So for all of these divisions that are
4  described as geographic regions in Exhibit 3, it
5  was for the supply of shell eggs under the Kroger
6  label; correct?
7      A   That's correct.
8      Q   And only to stores operating under the
9  Kroger banner?  Is that correct?
10      A   That's correct.
11      Q   Are there stores in those regions that
12  operate -- that are owned by Kroger and operate
13  under a different banner?
14      A   I can't recall.
15      Q   So when you issued -- I assume you
16  issued an RF -- you issued an RFP; correct?
17      A   Would you explain what an R --
18      Q   A request for proposal.
19      A   Okay.  Yes.
20      Q   And what kind of information was
21  contained in an RFP?  Can you explain how that
22  works?
23      A   I would offer -- for an example,
24  Cincinnati division, I would say for all the
25  sales, eggs, procurement, to go to that division,

1  you know, it's up for grabs who wants it,
2  basically, and put it out for bid.
3      Q    How did you go about disseminating the
4  RFP?
5      A    Supply and demand.
6      Q    Well, I mean did you have particular
7  suppliers that you sent it to?  Or potential
8  suppliers?
9      A    I would send it to supply -- any
10 supplier was allowed to bid on anything.
11     Q    Well, I understand that.  I'm trying to
12 figure out how the supplier learned that the
13 opportunity to bid was available?
14     A    Oh, okay.  Well, the -- I would contact
15 them and say, you know, bid's up in this
16 particular division, soliciting bids for
17 Cincinnati division, and then I would get bids
18 in, competitive bidding, in from different
19 suppliers.
20     Q    Did you have a list of potential
21 suppliers that you selected to send the RFP to?
22     A    Yes.
23     Q    Did the RFP contain any information
24 about Kroger's requirements for shell eggs?
25     A    Yes -- yes.  Quality requirements.

1      Q    And do you recall what types of
2  requirements were in the RFP?
3      A    Yes.  Quality.
4      Q    And what do you mean by quality?
5      A    Kroger had standards on how many A
6  Grade eggs are in per 100-egg sample or per
7  carton and has a requirement of how many checks,
8  or cracked eggs, can be in a carton.  What the
9  interior quality is, whether they're -- they have
10 to be A Grade eggs.
11     Q    How do you measure interior quality of
12 the egg?
13     A    Well, you take an egg and you put it in
14 front of a candling light and you twirl it, and
15 you watch where that -- watch that yolk go
16 around, and it tells you -- it comes right up to
17 the surface, it tells you that's not an A Grade
18 egg.  If it stays kind of down in there sort of,
19 you're pretty sure it's an A Grade egg.  You look
20 at the air cell to determine if it's expanded or
21 not.  A small, tight air cell says they're A or
22 double A quality.  If the air cell is a little
23 bigger, it can still be an A, and then it gets
24 into a B, and then it gets into ones you don't
25 want.

1      Q    So Kroger would sample, take a certain
2  sampling of an egg shipment to satisfy itself
3  that the shipment met the requirements for Grade
4  A eggs?
5      A    Yes.  But we also did supplier visits.
6      Q    Excuse me?
7      A    We did -- we would go to a supplier.
8  Remember when we talked about Anita?
9      Q    That's what Ms. Graffiti --
10     A    Yes.
11     Q    -- did?
12     A    Correct.
13     Q    So you said that one of your criteria
14 for selection was quality.  Were there any other
15 criteria for selection of a supplier?
16     A    Price.
17     Q    Anything else?
18     A    That was pretty much it.
19     Q    Was there any weight placed on
20 reliability of the supplier?
21     A    Yes.
22     Q    What about customer service of the
23 supplier?
24     A    As with any supplier of any product,
25 you expect service and you expect customer

1  service.
2      Q    Was there a requirement that the
3  suppliers of shell eggs meet the UEP animal
4  welfare guidelines?
5      A    I can't recall specifically if there
6  was or not.  I think at the time most suppliers
7  were doing it.
8      Q    Okay.  Well, we'll take a look at some
9  of the documents to see if it refreshes your
10 recollection.
11          Do you recall -- I don't know if you
12 know who the defendants are in the case.  Are you
13 aware of what egg producers are defendants in
14 this litigation?
15     A    The only information I have is what you
16 sent me on that.
17     Q    Okay.  Do you recall what suppliers
18 Kroger bought from while you were the egg
19 procurement manager?
20     A    Most of them, I think.
21     Q    Can you tell me the ones you recall?
22     A    Midwest Poultry.  Cal-Maine Foods.
23 Rose Acres.  And then Norco in California.
24     Q    Norco, that is part of Moark?
25     A    Yes.  I don't think they were then

Page 73

1 but --
2  Q  That's okay. Do you recall buying from
3 NuCal?
4  A  I'm trying think of who NuCal was. Did
5 they -- were they up in the Northwest?
6  Q  Sadly I can't tell you.
7  A  Well, National Foods was one, I think.
8 And that's about the stretch of my memory right
9 now.
10  Q  Okay. Do you recall ever buying any
11 shell eggs from Daybreak?
12  A  I probably did at one time or another.
13  Q  What about RW Sauder?
14  A  I don't think so.
15  Q  Ohio Fresh?
16  A  I can't recall that specifically.
17  Q  Any Hillandale? Any firm that has the
18 name Hillandale in it?
19  A  Yes.
20  Q  You recall purchasing from Hillandale?
21  A  Yes.
22  Q  And what about Sparboe Farms?
23  A  No.
24  Q  So looking at this list, do you recall
25 what divisions or banners you purchased eggs from

Page 74

1 Hillandale for?
2  A  From Hillandale?
3  Q  Yes. And if it helps to have
4 Defendant's Exhibit -- or Exhibit 3 in front of
5 you to refresh your memory as to what all the
6 divisions were, feel free to look back.
7  A  I'm looking at it right now.
8     You know, I can't remember specifically
9 where Hillandale went. I would guess it would be
10 somewhere close to their geographic area.
11  Q  Is it generally the case that egg
12 suppliers serve customers that are in some sort
13 of geographic proximity to their farms?
14  A  Pretty much.
15     MR. MURRAY: Objection. Vague. You
16 can answer.
17     THE WITNESS: Okay.
18  A  Pretty much.
19  Q  Do you know roughly what that
20 geographic reach might be?
21  A  By supplier?
22  Q  No, just if there's a rule of thumb.
23 No more than 500 miles? A thousand miles?
24  A  No. No. I mean reliable suppliers
25 could have business that would be a long stretch

Page 75

1 from them.
2  Q  That are a long stretch from their
3 farms --
4  A  Yes.
5  Q  -- the farms where the hens --
6  A  Mm-hmm.
7  Q  You need to say "yes."
8  A  I'm sorry. Yes. I forgot. Excuse me.
9  Q  Right. And would that add an extra
10 component of transportation cost?
11  A  Yes.
12  Q  So what about Midwest? Do you recall
13 what region or divisions Midwest supplied eggs to
14 while you were the manager of egg procurement?
15  A  Yes.
16  Q  What were those?
17  A  Cincinnati, Central, Columbus. I'm not
18 sure if Mid-South was one or not. Midwest was
19 the most reliable supplier that I had.
20  Q  What do you mean they were the most
21 reliable supplier?
22  A  They met the requirements. Consistent
23 quality, service.
24  Q  Price?
25  A  Price.

Page 76

1  Q  Anything else that made them the most
2 reliable supplier?
3  A  They would fill in in any division
4 where I needed extra help.
5  Q  What do you mean by that?
6  A  I was not in charge of retail, and so I
7 did not set any retail prices or have any input
8 in retail pricing. Sometimes the division would
9 have a feature going, and the normal supplier
10 couldn't handle the volume. Then I would have to
11 find other supplier sources to fill that volume.
12  Q  So when you say a division had a -- did
13 you say a feature going?
14  A  Uh-huh.
15  Q  So if they had what might be described
16 as a promotional price, for example --
17  A  Right.
18  Q  -- to try to push volume, as a result
19 you might need extra eggs for that division --
20  A  Yes.
21  Q  -- beyond what your incumbent supplier
22 could supply.
23  A  Yes.
24  Q  Is that correct? So you would turn to
25 Midwest for that additional supply?

Page 77

1  A   Yes, among others.
2  Q   Right.  But this came up because you
3  mentioned Midwest in this context.
4  A   Yes.
5  Q   When Midwest filled in that additional
6  supply, was the pricing done in accordance with
7  the existing Midwest contract?
8  A   Yes.
9  Q   Okay.  Let's go back to Cal-Maine.  Do
10 you recall what regions Cal-Maine provided eggs
11 for?
12 A   In looking at the list of divisions, I
13 would say Mid-South, because that's
14 geographically closer to their operation.
15 Q   So Cal-Maine provided -- if you're
16 correct that it was Mid-South -- provided the
17 requirements for -- Kroger's requirements for
18 shell eggs to the Kroger stores in the Mid-South?
19 A   Yes.
20 Q   But not for any other stores, just the
21 Kroger banner stores?
22 A   As far as I can recall, yes.
23 Q   What about Rose Acre?
24 A   Rose Acres would supply a division.
25 Q   Excuse me?

Page 78

1  A   They would supply a division and do
2  fill-in.
3  Q   Do you recall what division they
4  supplied?
5  A   No.  No, I'm sorry, I don't.
6  Q   What about Norco/Moark?
7  A   In what?
8  Q   What division do you recall?  0what
9  division --
10 A   Ralph's.
11 Q   Any other divisions?
12 A   Not that I can recall.
13 Q   What about National?  Do you recall
14 what division National supplied?
15 A   Fred Meyer and QFC.
16 Q   Any other divisions for National?
17 A   No.
18 Q   So there are a few divisions here on
19 this list that you haven't mentioned.  Do you
20 recall who the supplier was for the Atlanta
21 Division?
22 A   No.
23 Q   Do you recall who the supplier of shell
24 eggs was for the Delta Division?
25 A   Understand that I changed suppliers on

Page 79

1  an annual basis, and it's hard for me to say
2  specifically who was.  I know the Midwest
3  divisions because they had been a supplier for me
4  for years.  Some of the other suppliers switched.
5  So the answer to your question, no, I can't.
6  Q   Where is the Delta Division?
7  A   In the South.
8  Q   Do you know roughly where in the South?
9  A   Nashville.  That's a guess.  It's --
10 it's been a long time since I've thought about
11 these things.
12 Q   I understand.  You're doing remarkably
13 well, I think, on any number of points.
14     You mentioned that suppliers changed.
15 Was Cal-Maine the supplier for the Mid-South for
16 the entire time period from say 2000 to 2006?
17 A   I can't answer that.
18 Q   You can't answer.
19 A   I don't know.  I can't recall.
20 Q   You mentioned that you sometimes
21 switched suppliers; correct?
22 A   Yes.
23 Q   For a given division?  What factors did
24 you take into account when you switched
25 suppliers?

Page 80

1  A   As I said before, quality, price,
2  service.
3  Q   When you switched suppliers, was that
4  as a result of the RFP process?  I guess what I'm
5  asking, did you ever get halfway through a
6  contract with a supplier and say, "Boy, did I
7  make a wrong call here.  We need to switch
8  suppliers"?
9      MR. MURRAY:  Objection to the form of
10 the question.
11 A   You know, I can't recall that I ever
12 did that.
13     MS. LEVIN:  So I'd like to mark as
14 Exhibit 6 a document bearing Bates No.
15 KRGEG00018733 through 18738.
16     (Deposition Exhibit 6 was marked for
17 identification.)
18 Q   And Mr. Stull, if you'll let me know
19 when you've had an opportunity to review
20 Defendant's Exhibit 6.
21 A   All right.
22 Q   You've had a chance to review
23 Exhibit 6, Mr. Stull?
24 A   Yes.
25 Q   What is Exhibit 6?

Page 81

1     A    It's a request for proposal --
2  proposal.  It was a Global Net Xchange bid.
3     Q    It's dated December 1, 2003; is that
4  correct?
5     A    December 10?  Oh, yeah, December 1, I'm
6  sorry, 2003.
7     Q    And on the last page of Exhibit 6, the
8  name "Gary" appears.  Do you see that?
9     A    Yes.
10     Q    Is that you?
11     A    It's an electronic print.  I would
12  assume it's me, but it's not my signature
13  obviously.
14     Q    I understand it's not your signature,
15  but were you responsible for preparing RFPs?
16     A    Yes.
17     Q    And you were responsible for preparing
18  specifically Exhibit 6; is that correct?
19     A    No, I did not prepare Exhibit 6.
20     Q    Who prepared Exhibit 6?
21     A    I believe that was a corporate
22  preparer.  These were -- these were -- it was
23  prepared somewhere within the Kroger system.  But
24  I can't tell you -- this was probably the first
25  Global Net Xchange bid.

Page 82

1     Q    Can you explain what a Global Net
2  Xchange is, or was in 2003?
3     A    I can tell you what it says here.  It
4  says suppliers will submit pricing via an online
5  negotiation process hosted by the Global Net
6  Xchange.  That's -- I mean, that's what it was.
7  It just went on -- and there was a time frame for
8  bids to be taken; and, as it said, it opens at
9  2:00 p.m. on the 10th and closes at 3:00 p.m. on
10  the 10th.
11     Q    So the Global Net Xchange was an online
12  process for producers to submit bids to fulfill
13  the contract that RFP -- or Exhibit 6 was issued
14  for?
15     A    Correct.
16     Q    And Exhibit 6 references request for
17  proposal of the Kroger Company eggs, Ralph's,
18  Cala Bell, FoodsCo, and Food 4 Less.  Do you see
19  that at the top?
20     A    Yes.
21     Q    Were those -- Ralph's, Cala Bell,
22  FoodsCo, and Food 4 Less -- banners under which
23  the Kroger Company operated in 2003?
24     A    Yes.
25     Q    Would the eggs that were to be supplied

Page 83

1  pursuant to Exhibit 6 have been under or packaged
2  in accordance with each of those banners'
3  specified packaging?
4     A    I can't reply -- I'm not sure.  There
5  may have been one banner used in all the stores,
6  but I can't -- I can't recall.
7     Q    If you turn to the third page of
8  Exhibit 6, it references in paragraph numbered 8,
9  "Packaging material:  All pricing includes
10  packaging material purchased from the Kroger
11  Company as follows."  Do you see that?
12     A    Yes.
13     Q    Did Kroger require all of its shell egg
14  suppliers to purchase packaging from Kroger?
15     A    Yes.
16     Q    And the price was -- that the bidder
17  submitted was to include as a part of its price
18  the cost of the packaging that it would be
19  required to purchase from Kroger?
20     A    As I read No. 8 it says, "all pricing
21  includes packaging material purchased from
22  Kroger Co. as follows."
23     Q    Do you know whether the price at which
24  Kroger sold the packaging material to the shell
25  egg producer included a profit for Kroger?

Page 84

1     A    I can't recall.
2     Q    Can you explain what these references
3  are?  2X6 @ 76.50/M; do you know what that means?
4     A    Oh.  Those -- that would be a
5  two-by-six carton, or a three-by-six carton, that
6  would have the numbers of eggs that would be in
7  the carton.
8     Q    What's a two-by-six?
9     A    That's a standard one-dozen carton.
10     Q    Is that perforated in the middle so you
11  can have two cartons of six each?
12     A    Well, it just means there's two columns
13  of six eggs on each side for a total of 12 eggs
14  in a dozen.
15     Q    And three-by-six would be one and a
16  half dozen?
17     A    Correct.
18     Q    What about 6ct?
19     A    Six count.  That would be a six-pack.
20  Instead of splitting them, it's a separate
21  six-pack.
22     Q    Six eggs?
23     A    Correct.
24     Q    And what's Jumbo?
25     A    That would be a one dozen jumbo size

1  eggs carton.
2     Q    And what about a sleeve?  What's that?
3     A    A sleeve would vary.  It would either
4  be two dozen or two and a half dozen eggs.
5     Q    Okay.  And then with the pricing it
6  says at 76.50/M.  Do you know what that means in
7  terms of the price for the two-by-six?
8     A    The M refers to per thousand.
9     Q    So the price that the shell egg
10  producer needed to incorporate into its price for
11  the eggs was 76.50 per thousand for eggs packaged
12  in a two-by-six carton.  Is that correct?
13     A    That's correct.
14     Q    The next paragraph says, "All quotes
15  are based on the Midwest Urner Barry white egg
16  quote."  Do you see that reference?
17     A    Yes.
18     Q    What's the Urner Barry white egg quote?
19     A    Urner Barry is an egg market that --
20  it's used as a standard for pricing.  It's been
21  around for many, many years.  And that's what
22  pricing basis is used in the egg industry.
23     Q    Okay.  We'll come back to that a little
24  bit later.  But let's move down to paragraph 13.
25  "Animal Welfare Certification: Supplier must show

1  proof they are a 'Certified Company' under UEP
2  guidelines for the 'Animal Husbandry Guidelines
3  for U.S. Egg Laying Flocks.'"  Do you see that
4  sentence?
5     A    Yes.
6     Q    So, again, this was a requirement that
7  Kroger imposed on all parties that would be
8  bidding in response to Exhibit 6 --
9         MR. MURRAY:  Object to the form of the
10  question.
11     Q    -- is that correct?
12     A    As I said, this bid was put together by
13  the Kroger Co.  I can't answer other than what I
14  see right there.
15     Q    But you were responsible for deciding
16  to whom to award the successful -- to whom to
17  award the contract that was being solicited by
18  Exhibit 6; correct?
19     A    Yes.
20     Q    And was it your understanding that one
21  of the things that the successful bidder had to
22  show was that it was a certified company under
23  UEP guidelines for the animal husbandry
24  guidelines for U.S. egg-laying flocks?
25     A    That's what it states in the bid, yes.

1     Q    In fact it states on the preceding page
2  of Exhibit 6 under paragraph IV, "The following
3  describes many, but not necessarily all, of the
4  services, agreement terms, and specifications you
5  must include in the response to this RFP";
6  correct?
7     A    I'm sorry, what -- what page are you
8  on?
9     Q    The second page, the page prior to the
10  one we were looking at.
11     A    Okay.
12     Q    Roman numeral IV.  Do you see where it
13  states, "The following describes many, but not
14  necessarily all, of the services, agreement
15  terms, and specifications you must include in the
16  response to this RFP"?  Do you see that sentence?
17     A    Yes, I do.
18     Q    And one of the services, agreement
19  terms, and specifications the bidder must include
20  was proof that it was a certified company under
21  the UEP guidelines for the animal husbandry
22  guidelines for U.S. egg-laying flocks; correct?
23     A    That's what's in the contract.
24     Q    And you understood that the successful
25  bidder would have to comply with that animal

1  welfare certification; correct?
2         MR. MURRAY:  Objection.
3  Mischaracterizes his testimony.  You can answer.
4     A    The only thing I can refer to is what's
5  written down here.  I don't recall anything about
6  this.
7     Q    Well, the purpose of issuing an RFP is
8  what?
9     A    (No response)
10     Q    What is the purpose of issuing an RFP?
11     A    To get product.
12     Q    To obtain product.  And part of what
13  you put in your RFP are the terms that you're
14  requiring the successful bidder to meet; correct?
15     A    What's in there are the requirements.
16  It's not -- I mentioned it.  I didn't put this
17  particular bid together.  This was a -- I
18  supplied some of the information, but this is
19  kind of like a standard bid.  This is not one of
20  the normal things that I would have done.
21     Q    But you were responsible for
22  determining whether the successful bidder met the
23  requirements set forth in paragraphs 1 through 13
24  of subsection IV of Exhibit 6; correct?
25     A    Yes.

Page 89

1    Q    Did you ever see an RFP that did not
2    require the successful bidder to meet the animal
3    welfare certification under the UEP guidelines?
4    A    I can't recall.
5    Q    Did you ever receive -- well, let's
6    turn to the last page of Exhibit 6. I see that
7    there, under Conclusion, it states that RFP
8    questions are to be submitted to you. Do you see
9    that sentence?
10    A    Yes.
11    Q    Did you ever receive any questions
12    about whether the animal welfare certification
13    requirements were really something that Kroger
14    required the successful bidder to meet?
15    A    I can't recall.
16    Q    Did you ever tell anybody that the
17    animal welfare certification requirements were
18    something that did not need to be met by the
19    successful bidder?
20    A    I can't recall.
21    MS. LEVIN: I'd like to mark as Exhibit
22    7 a document bearing Bates No. KRGEG0001944
23    through 19451.
24    (Deposition Exhibit 7 was marked for
25    identification.)

Page 90

1    MR. NOVAK: Counsel, this is Paul
2    Novak. While the witness is reviewing the
3    document, could you reread the Bates page
4    numbers?
5    MS. LEVIN: Sure. KRGEG00019444
6    through 451.
7    Okay. There's a little -- yeah.
8    Apparently there were two copies produced of the
9    same document. The one that the witness is
10    looking at is 19436 through 19443.
11    Q    Have you completed your review of
12    Exhibit 7, Mr. Stull?
13    A    Yes.
14    Q    What is Exhibit 7?
15    A    An agreement between Pace Dairy and
16    Rose Acre Farms for egg procurement for Atlanta,
17    Georgia, and Phoenix, Arizona.
18    Q    And it's to cover the period
19    February 1, 2004 through January 28, 2005; is
20    that correct?
21    A    That's correct.
22    Q    On page -- it's the fifth page of
23    Exhibit 7, Bates No. 19440 -- is that your
24    signature on behalf of Pace Dairy Foods of
25    Indiana?

Page 91

1    A    Yes, it is.
2    Q    What is Pace Dairy?
3    A    Pace Dairy is a wholly-owned subsidiary
4    of the Kroger Company.
5    Q    What's the business of Pace Dairy?
6    A    It's a cheese processing plant.
7    Q    Why is Pace Dairy entering into a
8    contract for the procurement of shell eggs?
9    A    At the time that's where my office was.
10    And I was -- I was at that time reporting to the
11    manager at Pace Dairy. It just kind of -- when I
12    was getting close to retirement, I did not want
13    to move, and so I stayed in Crawfordsville,
14    Indiana, and I was allowed to stay there. I had
15    my office in Pace Dairy.
16    Q    Well, was this contract for the supply
17    of shell eggs to Pace Dairy?
18    A    No.
19    Q    To whom were the eggs purchased under
20    this contract to be supplied?
21    A    They were to supply Kroger divisions in
22    Atlanta and Phoenix, Arizona.
23    Q    So Kroger was the purchaser of the
24    shell eggs covered by Exhibit 7; correct?
25    A    Correct.

Page 92

1    Q    Would -- or do you recall whether
2    Exhibit 7 was a contract that was awarded
3    pursuant to an RFP?
4    A    I would assume it is, yes.
5    Q    Did you award contracts other than
6    pursuant to an RFP while you were the general
7    manager of egg procurement for Kroger?
8    A    I don't recall.
9    Q    Was it generally the case that an RFP
10    issued prior to the award of contract for the
11    purchase of shell eggs?
12    MR. MURRAY: Objection. Asked and
13    answered.
14    A    I can't recall.
15    Q    Exhibit 7 states that the volume to be
16    supplied by Rose Acre Farms to Kroger is to
17    reflect the total weekly need of the above
18    warehouses referencing Atlanta, Georgia, and
19    Phoenix, Arizona. Do you see that?
20    A    Yes.
21    Q    Were the eggs delivered on a weekly --
22    to be delivered on a weekly basis to those
23    locations?
24    A    They were delivered daily.
25    Q    Then what is the reference to the total

Page 93

1 weekly needs of the above warehouses?
2    A   To supply on a daily basis what they
3 need on a weekly period of time.
4    Q   Well, was an estimate provided to Rose
5 Acre Farms for the amount that you would need on
6 a weekly basis?
7    A   We could work -- we worked off prior
8 sales, but, as I said, I had no control over any
9 feature activity. So if a division featured
10 eggs, then the volume would go up, but history
11 was used mostly.
12    Q   Well, I understand. But I'm just
13 trying to understand how the total weekly needs
14 were communicated to Rose Acre -- if they were
15 communicated to Rose Acre.
16    A   Orders were received on a daily basis
17 directly to Rose Acre from the division, and they
18 would have to fill those orders.
19    Q   So the order between -- from Kroger to
20 Rose Acre was a daily order?
21    A   Yes.
22    Q   And Rose Acre was required to fulfill
23 all of Kroger's requirements for the two
24 warehouses listed in Exhibit 7?
25    A   Yes.

Page 94

1    Q   But as you've said, if Kroger decided
2 to run a promotion for some time period and the
3 demand increased, you might have to go to Midwest
4 or some other supplier to fill in the additional
5 volume required?
6    A   Yes.
7    Q   Let's take a look at the fourth page of
8 Exhibit 7. You'll see at the bottom of that page
9 there's a paragraph Animal Welfare Certification.
10 "Rose Acre Farms must show proof that they are a
11 'Certified Company' under the UEP guidelines for
12 the 'Animal Husbandry Guidelines for U.S. Egg
13 Laying Flocks.' A copy must be attached to this
14 contract. Kroger will not accept any eggs from
15 Rose Acre Farms that have not been 100 percent
16 produced in these terms." Do you see that?
17    A   Yes.
18    Q   Was it your understanding that Rose
19 Acre was in fact required to show proof that it
20 was a certified company under the UEP guidelines
21 that are referenced in paragraph XV?
22    A   I read there that Rose Acre Farms must
23 show proof that they are a certified company.
24    Q   Well, this is a contract that you
25 signed. What did you understand that sentence to

Page 95

1 mean?
2    A   Just what it says. I mean, I can't
3 recall anything outside of what's written down
4 here.
5    Q   Well, do you have any doubt about
6 whether Rose Acre Farms was required to show
7 proof that it was a certified company under the
8 UEP guidelines --
9        MR. MURRAY: Objection.
10    Q   -- by Kroger?
11        MR. MURRAY: Objection. Lack of
12 foundation. You can answer if you know.
13    A   Outside of what you see there, I can't
14 answer that.
15    Q   Did you ever tell Rose Acre that that
16 provision of Exhibit 7 did not need to be
17 complied with?
18    A   I can't recall.
19    Q   Well, you don't recall ever telling
20 Rose Acre that; do you?
21    A   I can't recall that.
22    Q   Do you recall ever hearing that anybody
23 else told Rose Acre that it did not need to
24 comply with the provisions of paragraph XV?
25    A   That's kind of -- it would be

Page 96

1 speculation. I don't recall it.
2    Q   Do you know why it is that Kroger would
3 not accept any eggs from Rose Acre Farms that
4 have not been 100 percent produced in these
5 terms?
6        MR. MURRAY: Objection. Lack of
7 foundation. You can answer if you know.
8    A   I can't recall.
9    Q   Let's take a look at page 442, which is
10 right after your signature. Is that your
11 signature on page 442 of Exhibit 7?
12    A   Where would I find -- is this the page
13 you were referring to (indicating)? I don't know
14 what 442 is.
15    Q   It's the number down at the bottom of
16 the page, on the right-hand corner. 19442.
17    A   Oh, I see. I see 1944. There's a hole
18 punch took the 2 off.
19    Q   Well, that's a problem.
20        Is that your signature on page 19442 of
21 Exhibit 7?
22    A   Yes, it is.
23    Q   And does -- what is page 19442 of
24 Exhibit 7?
25    A   It's a letter to me from Greg Hinton

Page 97

1  outlining a new ledger account pricing structure.
2      Q    19442, are we looking at the right
3  page?
4          I don't think you're looking at 19442.
5  I think you're looking at 19444 which is the last
6  page of the exhibit.
7      A    Oh, okay.  Okay.
8      Q    If you can turn to that page.
9      A    I'm sorry.
10     Q    Do you have a page 19442?
11     A    I don't -- yes.  I do.  I see it now.
12     Q    At the bottom of the page?
13     A    I see it, yeah.  I'm sorry.
14     Q    And is that your signature on page
15  19442?
16     A    Yes.
17     Q    And what is page 19442 of Exhibit 7?
18     A    It's a letter that extends all
19  conditions and terms of the previous agreement
20  between the Kroger Co. and Rose Acre Farms and in
21  effect until January 28th, 2005.
22     Q    Okay.  And let's go to the next page,
23  19443.
24     A    Now I know where to look.
25     Q    I think you may have gone -- well, what

Page 98

1  are you looking at?
2      A    Well, I don't know because I've got --
3  I've got 1944- and a hole punch.
4      Q    Well, do you see a page that's
5  October 17, 2005?
6      A    Yes.
7      Q    That's the page I want to be looking
8  at.
9          Is that your signature on the page
10  captioned "October 17, 2005"?
11     A    Yes.
12     Q    And what is that page?
13     A    This is a letter that will extend the
14  existing contract until January 31st, 2007.
15     Q    So, again, all terms and pricings
16  remain unchanged; correct?
17     A    Correct.
18     Q    So for the time period February 1, 2004
19  through January 31, 2007, Kroger's contract with
20  Rose Acre Farms required that Rose Acre Farms
21  show proof it was a certified company under the
22  UEP animal welfare guidelines and further
23  required that all eggs from Rose Acre Farms be
24  100 percent produced in accordance with those
25  guidelines.  Is that correct?

Page 99

1      MR. MURRAY:  Objection to the form of
2  the question.  Calls for a legal conclusion.  You
3  can answer if you know.
4      A    I can't recall.  I mean, it refers to
5  the contract.
6      Q    Well, the original contract, as you
7  have already agreed, the contract dated
8  February 1, 2004, through January 28, 2005, in
9  fact required Rose Acre Farms to show proof that
10  it was a certified company under the UEP
11  guidelines; correct?
12     MR. MURRAY:  Object to the form of the
13  question.  Misstates his testimony.  You can
14  answer if you know.
15     A    I can only refer to what it says in the
16  print here.  I don't recall anything outside of
17  this because it was --
18     Q    But that's what it says --
19     A    -- back then.  Yes.
20     Q    -- Rose Acre Farms must show proof;
21  correct?
22     A    Referring back to --
23     Q    Paragraph XV of the February --
24     A    XV?  Yes, that's what it says there.
25     Q    Okay.  And for the two contract

Page 100

1  extensions, until January 28, 2006, and then the
2  second one until January 31, 2007, both required
3  that all conditions and terms of the previous
4  agreement remain in effect; correct?
5      A    Yes.
6      MS. LEVIN:  I'd like to mark two
7  documents, Exhibits 8 and 9.  And Exhibit 8 will
8  be the document bearing Bates No. KRGEG00020141,
9  and Exhibit 9 will be the document bearing Bates
10  No. KRGEG00019397.
11     (Deposition Exhibits 8 and 9 were
12  marked for identification.)
13     Q    Have you had an opportunity to review
14  Exhibits 8 and 9, Mr. Stull?
15     A    Yes.
16     MS. LEVIN:  And I will apologize,
17  there's some highlighting on them that I'm quite
18  sure did not appear in the originals, and we
19  can -- if people want, we can substitute
20  unhighlighted copies at a later date.  I'm not
21  sure that it's particularly illuminating.
22     Q    What is Defendant's -- what is Exhibit
23  8?
24     A    It says it's a certification for eggs
25  produced by animal husbandry certified company

Page 101

1  Rose Acre Farms.
2      Q     And the date is April 1, 2002; is that
3  correct?
4      A     Yes.
5      Q     And what is Exhibit 9?
6      A     The -- basically the same thing.
7      Q     But a different date?
8      A     But a different date.
9      Q     What is the date of Exhibit 9?
10     A     June 27, 2006.
11     Q     Did Kroger require its shell egg
12  suppliers to provide this sort of certification
13  that's represented in Exhibits 8 and 9?
14         MR. MURRAY:  I'm going to object to
15  Exhibit 9.  This is a document that's dated after
16  he had retired from Kroger.  You can answer.
17     A     I don't recall ever seeing it.
18     Q     You don't recall ever requiring the
19  submission of a certificate like that in Exhibit
20  8 or 9?
21     A     No, I don't -- I don't recall.
22     Q     Do you know whether anybody at Kroger
23  was in charge of ensuring that shell egg
24  suppliers were in compliant with the -- in
25  compliance with the UEP animal welfare guidelines

Page 102

1  for egg-laying flocks?
2      A     It would be speculation.
3      Q     Let's take a look at a document that I
4  will mark as Exhibit 10.  And it bears Bates No.
5  KREEG00018833 through 36.
6         (Deposition Exhibit 10 was marked for
7  identification.)
8      Q     You'll let me know when you're finished
9  reviewing Exhibit 10.
10         I'm sorry to do this, but I'd like to
11  rewind just for one minute to Exhibit 7.
12     A     Sure.
13     Q     And compare that with Exhibit 3.
14         Exhibit 3 is the October 1, 2002, memo
15  from Lisa Beth Miller.  You may already have it
16  out because we were looking at it earlier.
17     A     Okay.  I do.
18     Q     Okay.  On Exhibit 7 we mentioned that
19  the contract was for the supply of shell eggs to
20  the Atlanta, Georgia, and Phoenix, Arizona,
21  warehouse locations; correct?
22     A     Yes.
23     Q     And is the Atlanta, Georgia, warehouse
24  the warehouse for the Atlanta Division on Exhibit
25  3?

Page 103

1      A     Yes.
2      Q     And is there a division that the
3  Phoenix, Arizona, warehouse corresponds to on
4  Exhibit 3?
5      A     Yes.
6      Q     Which division is that?
7      A     That would be Fry's.
8      Q     Okay.  You can put Exhibit 7 to one
9  side.  But do keep Exhibit 3 out because I'll
10  have the same question about some other
11  contracts.
12         So what is Exhibit 10?
13     A     An agreement between Cal-Maine Foods
14  and Pace Dairy for supplying the eggs used to
15  Kroger at the warehouse location in Memphis,
16  Tennessee.
17     Q     So we can get this out of the way now.
18  Is there a division that the Memphis, Tennessee,
19  warehouse corresponds to on Exhibit 3?
20     A     I think it's Mid-South.  I'm not a
21  hundred percent sure right now, but I think it
22  is.
23     Q     And Exhibit 10 is for the time period
24  February 1, 2004, through January 29, 2005?
25     A     Correct.

Page 104

1      Q     Is that your signature on the last page
2  of Exhibit 10?
3      A     Yes, it is.
4      Q     Similar to Exhibit 7, although Exhibit
5  10 is an agreement between Pace Dairy and
6  Cal-Maine Foods, is it correct that it is for the
7  supply of shell eggs to Kroger stores via the
8  Memphis, Tennessee, warehouse location?
9         MR. MURRAY:  Objection to the form of
10  the question.
11     A     Would you restate that, please?
12         MS. LEVIN:  Can you read it back.
13         (The reporter read the requested
14  question.)
15         MR. MURRAY:  Same objection.
16     A     Yes.
17     Q     And let's turn to the final page of
18  Exhibit 10 again.  Paragraph XIV -- the second
19  paragraph XIV, I suspect it's supposed to be
20  paragraph XV -- Animal Welfare Certification; do
21  you see that paragraph?
22     A     Yes, I do.
23     Q     And again, the provision reads,
24  "Cal-Maine Foods, Inc., must show proof that they
25  are a 'Certified Company' under the UEP

Page 105

1  guidelines for the 'Animal Husbandry Guidelines
2  for U.S. Egg Laying Flocks.'"  Do you see that
3  sentence?
4     A   Yes, I do.
5     Q   Was it your understanding when you
6  signed Exhibit 10 that it was a requirement that
7  Cal-Maine -- Cal-Maine Foods comply with the UEP
8  animal welfare guidelines?
9        MR. MURRAY:  Objection.  Form of the
10  question.  You can answer if you know.
11     A   All I can tell you is what it states
12  there.
13     Q   Did you read --
14     A   My recollection is old.
15     Q   Did you read contracts before you
16  signed them for Kroger?
17     A   Usually.
18     Q   Did you read shell egg procurement
19  contracts before you signed them for Kroger?
20        MR. MURRAY:  Objection to the form of
21  the question.
22     A   I can't recall.
23     Q   If you had any questions about the
24  terms of a contract that you were signing on
25  behalf of Kroger, would you have asked someone

Page 106

1  what they meant?
2        MR. MURRAY:  Objection.  Calls for
3  speculation.
4     A   I can't -- I can't recall.
5     Q   You don't recall having any question
6  about the meaning of paragraph -- the paragraph
7  pertaining to animal welfare certification when
8  you signed Exhibit 10?
9     A   Those decisions were above my pay
10  grade.  In Kroger --
11     Q   I'm not asking who made the decision,
12  Mr. Stull, I'm asking whether you understood the
13  concept --
14        MR. MURRAY:  You cut him off.  He was
15  explaining something.
16        MS. LEVIN:  He's not answering the
17  question.
18        MR. MURRAY:  You cut him off.
19        MS. LEVIN:  Fine.
20     Q   Then complete your answer, Mr. Stull.
21     A   It's not -- it's not -- I don't -- I
22  didn't question Kroger.
23     Q   Okay.  What did you understand -- what
24  do you today understand the paragraph pertaining
25  to animal welfare -- welfare certification to

Page 107

1  mean?
2        MR. MURRAY:  Objection.  Lack of
3  foundation.  You can answer if you know.
4     A   Today, you know, my memory was as -- I
5  don't remember much about my work experience.
6  And so, I have no -- I have no -- I mean I'm not
7  interested in what's there today.
8     Q   Well, I understand.  Then let's ask
9  about the time period.  I was trying to make it
10  easier for you.  But we can --
11     A   Oh, I'm sorry.
12     Q   -- go back to 2004.  Did you have an
13  understanding at the time that you signed Exhibit
14  10 what the meaning of the paragraph relating to
15  animal welfare certification was?
16        MR. MURRAY:  Object to the form of the
17  question.
18     A   I can't recall.
19     Q   Did you ever tell anyone from Cal-Maine
20  that the requirements of the provisions of the
21  animal welfare certification paragraph in Exhibit
22  10 did not need to be complied with?
23     A   I can't recall.
24     Q   You don't recall anybody ever telling
25  anybody from Cal-Maine that, though; do you?

Page 108

1        MR. MURRAY:  Objection.  Asked and
2  answered.
3     A   I -- I don't recall.
4     Q   You have no recollection of stating
5  that to Cal-Maine?
6        MR. MURRAY:  Objection.  Asked and
7  answered.
8     A   I can't recall it.
9     Q   And could you read the last sentence of
10  Exhibit 10.
11     A   "Kroger will not accept any eggs from
12  Cal-Maine Foods, Incorporated, that has not
13  been -- have not been 100 percent produced in
14  these terms."
15     Q   And the terms are referring to the
16  animal welfare guidelines for UEP; is that
17  correct?
18        MR. MURRAY:  Objection.  Calls for a
19  legal conclusion.  And misstates the document.
20     Q   Is that your understanding, Mr. --
21  Mr. Stull?
22     A   I go with what's -- you know, I can
23  only say it's there, what's there is there.  I
24  don't recall it.
25     Q   Let's do it this way.  Why don't you

Page 109

1  read the entirety of paragraph XIV, Animal
2  Welfare Certification, into the record.
3      A   Okay. "Animal Welfare Certification.
4  Cal-Maine Foods, Incorporated, must show proof
5  that they are a 'Certified Company' under the UEP
6  guidelines for the 'Animal Husbandry Guidelines
7  for U.S. Egg Laying Flocks.' A copy must be
8  attached to this contract. Kroger will not
9  accept any eggs from Cal-Maine Foods,
10  Incorporated, that have not been 100 percent
11  produced in these terms."
12      Q   And you have no understanding of what
13  that paragraph means; is that your testimony?
14      MR. MURRAY: Objection. Asked and
15  answered.
16      A   I understand what it's saying.
17      Q   And what do you understand it to be
18  saying?
19      A   That Cal-Maine Foods, Incorporated,
20  must show proof that they are a certified company
21  under the UEP guidelines for the animal husbandry
22  guidelines for U.S. egg laying flocks. A copy
23  must be attached to this contract. Kroger will
24  not accept any eggs from Cal-Maine Foods,
25  Incorporated, that have not been 100 percent

Page 110

1  produced in these terms.
2      Q   And that contract provision is in fact
3  consistent with the RFP that we were looking at
4  earlier today as Exhibit 6; correct?
5      A   Correct.
6      Q   And it's also consistent with the
7  letter that you sent to Mr. Gregory on
8  August 2nd, 2005, that is Exhibit --
9      A   Regarding that letter --
10      Q   -- 4?
11      A   -- I think I said at the time that I
12  wasn't really sure that I initiated that letter.
13  And I can tell you that's not my style of
14  writing. I would assume that somebody sent me
15  that letter and asked me to sign it.
16      Q   Mr. Stull, you have been very reluctant
17  to assume anything today, and we've instructed
18  you several times not to assume anything. So we
19  don't want testimony about assumptions.
20      MR. MURRAY: Objection.
21      MS. LEVIN: No.
22      MR. MURRAY: You're not here to --
23  you're not here to lecture the witness. You can
24  ask questions, and he can give you answers.
25  You're not here to lecture my client.

Page 111

1      MS. LEVIN: I will do as I see fit,
2  Mr. Murray.
3      MR. MURRAY: Well, I'm not going to let
4  you -- I'm not going to let you lecture my
5  client. If you're not asking a question --
6      Q   Mr. Stull, do you have a recollection
7  of somebody else preparing Exhibit 4?
8      A   No.
9      Q   And you signed Exhibit 4; correct?
10      A   That's my signature.
11      Q   And you believed at the time that you
12  signed Exhibit 4 that the representations in that
13  letter were correct?
14      MR. MURRAY: Objection.
15  Mischaracterizes prior testimony.
16      A   As I -- as I said before, that letter
17  was signed shortly before I retired. A lot of
18  things crossed my desk that I may have -- may
19  have signed that I really didn't read thoroughly.
20      Q   Well, we've gone through various
21  provisions and we've got your testimony on what
22  you thought. Do you have anything to add beyond
23  what you've now said about Exhibit 4?
24      MR. MURRAY: Objection. Broad.
25      A   No.

Page 112

1      Q   And you don't have a recollection of
2  somebody else providing you Exhibit 4 and asking
3  you to sign it; do you?
4      A   No.
5      Q   Thank you.
6      THE VIDEOGRAPHER: Counsel?
7      MS. LEVIN: Yes?
8      THE VIDEOGRAPHER: Do you mind if we do
9  a tape change? We have --
10      MS. LEVIN: No.
11      THE VIDEOGRAPHER: -- a few minutes
12  left.
13      MS. LEVIN: Okay. Fine.
14      MR. MURRAY: Let's do lunch.
15      MS. LEVIN: What time is it?
16      THE VIDEOGRAPHER: We're going off the
17  record. The time is 12:28 p.m.
18      (A recess was taken.)
19
20
21
22
23
24
25

1     A F T E R N O O N   S E S S I O N
2 DIRECT EXAMINATION, (CONTINUING),
3    QUESTIONS BY CHRISTINE C. LEVIN:
4     (Deposition Exhibits 11 through 16 were
5 marked for identification.)
6     THE VIDEOGRAPHER: This is the
7 beginning of Tape 3. The time is 1:19 p.m., and
8 we are back on the record.
9    Q   Good afternoon, Mr. Stull.
10   A   Good afternoon.
11   Q   I'm going to ask the court reporter to
12 share with you a document that we have marked as
13 Exhibit 11, and it bears Bates Nos. KRGEG00019290
14 through 291.
15     MR. MURRAY: Counsel, could I please
16 have a copy?
17     MS. LEVIN: I'm sorry. I think there's
18 two copies of the same thing stapled together.
19 It's the same thing stapled together. Two copies
20 of the same thing. He needs to look at the first
21 piece of paper.
22   Q   Have you had a chance to review Exhibit
23 11, Mr. Stull?
24   A   I'm sorry?
25   Q   Have you had a chance to review Exhibit

1 11?
2   A   I've started. I haven't finished it
3 yet.
4   Q   Have you completed your review of
5 Exhibit 11?
6   A   Yes, I have.
7   Q   What is Exhibit 11?
8   A   It's an agreement between the Kroger
9 Company and NuCal Foods to supply eggs to the
10 Ralph's, FoodsCo, and Cala warehouses located in
11 Northern California and/or in the DSD stores.
12   Q   What's a DSD store?
13   A   Direct store delivery. In that they do
14 not go through a warehouse, the supplier would
15 deliver directly to the store.
16   Q   And was that direct store delivery for
17 the Ralph's, FoodsCo, and Cala banner stores?
18   A   It was for some of them, but I couldn't
19 tell you which -- if it was for all of them.
20   Q   But it would at least be limited to
21 those three brands; correct?
22   A   Correct.
23   Q   Take a look at the bottom of the first
24 page, paragraph 10, Animal Welfare Certification.
25 Could you read that into the record?

1   A   "NuCal Foods, Incorporated, must show
2 proof that they are a 'Certified Company' under
3 UEP guidelines for the 'Animal Husbandry
4 Guidelines for U.S. Egg Laying Flocks.' A copy
5 must be attached to this contract."
6   Q   So paragraph 10 contained a requirement
7 for NuCal Foods?
8   A   To prove that they are a certified
9 company, yes.
10   Q   Is that your signature on page 19291?
11   A   Yes.
12   Q   What was the time period -- let's go
13 back to the first page. And there's some
14 handwriting, but underneath the handwriting it
15 states the contract should be effective April 1,
16 2005, to January 26, 2008; is that correct?
17   A   That's correct.
18   Q   Is it your understanding that that's
19 the time period that was covered by the contract
20 that was signed by you?
21   A   Yes.
22   Q   And --
23   A   Although I was surprised it was not
24 signed by NuCal as well.
25   Q   The -- then there's some handwriting

1 that's marked out April 1, 2005, and looks
2 like -- can you read what date is written in
3 instead of April 1, 2005?
4   A   As near as I can tell it says
5 April 27th, 2008.
6   Q   So if there was a contract between
7 Kroger and NuCal's for April 27th, 2008 --
8 beginning April 27, 2008, that would not have
9 been signed by you; correct?
10   A   Correct.
11   Q   Okay. Let's go to a document that has
12 been marked as Exhibit 12. And it bears Bates
13 Nos. KREGE00019063 through 19070. Let me know
14 when you have completed your review.
15     Mr. Stull, did you do anything to
16 prepare for your deposition today?
17   A   No.
18   Q   You didn't meet with counsel to prepare
19 for the deposition?
20   A   I talked with my lawyer.
21   Q   How long did you speak with your
22 lawyer?
23   A   A while. I didn't -- I don't own a
24 watch. I don't keep track of time.
25   Q   I understand that, but surely you know

Page 117

1  whether it was one hour or one day, for instance?
2      A   Oh.  Hour, hour and a half, I would
3  guess.
4      Q   Did you review any documents during the
5  course of that time?
6          MR. MURRAY:  Don't tell them anything
7  that you discussed.
8      Q   Haven't asked you anything that was
9  discussed.
10         MR. MURRAY:  Just warning so nothing
11  comes out.
12     Q   Let's go back to Exhibit 12.  What is
13  Exhibit 12?
14     A   It's a contract between Pace Dairy and
15  Midwest Poultry.  When I say Pace Dairy, that's
16  the Kroger Company.
17     Q   Okay.  And for the supply of eggs to
18  various Kroger warehouses; correct?
19     A   Correct.
20     Q   The date of the contract is what?
21     A   February 1, 2004, through January 28,
22  2006.
23     Q   And on the fourth page of Exhibit 12,
24  is that your signature?
25     A   Yes, it is.

Page 118

1      Q   Now looking back at Exhibit 3 again,
2  I'd like to go through the same exercise of
3  determining which of the divisions correlate with
4  these particular warehouse locations.
5      A   All right.
6      Q   Was there a division that correlated to
7  the Shelbyville, Indiana, warehouse?
8      A   Yes.  That would be the Central
9  Division.
10     Q   And what about Detroit, Michigan?
11     A   That would be the Michigan Division.
12     Q   Louisville, Kentucky?
13     A   Mid-South Division.
14     Q   Columbus, Ohio?
15     A   I believe the Columbus Division.
16     Q   And Roanoke, Virginia?
17     A   That would be the Mid-Atlantic
18  Division.
19     Q   And was there just one warehouse for
20  each of these divisions in Exhibit 3?
21     A   Yes.
22     Q   Now, for certain of the egg purchases
23  covered by Exhibit 12 there's reference to a cost
24  plus program.  Do you see that in the last
25  paragraph on the first page of Exhibit 12?

Page 119

1      A   Yes.
2      Q   Do you know why Midwest eggs were
3  purchased on the basis of cost plus program?
4      A   It was a mutual -- excuse me -- a
5  mutual arrangement between Kroger and Midwest
6  Poultry to achieve the best price at a fair
7  market value.
8      Q   And did you have a cost plus program
9  with any other of your suppliers while you were
10  the egg procurement general manager?
11     A   I -- I honestly can't recall if I did
12  or not.  I know I had it with Midwest Poultry.
13  If I did, I'm sure you have a copy of it.
14     Q   Again, we'll come back to pricing a
15  little bit later, but if you could turn to the
16  fourth page where your signature appears on
17  Exhibit 12.
18     A   Yes.
19     Q   Could you read into the record the
20  paragraph XIV on that page?
21     A   Animal Welfare Certification.  Midwest
22  Poultry Services, L.P., must show proof that they
23  are a 'Certified Company' under UEP guidelines
24  for the 'Animal Husbandry Guidelines for U.S. Egg
25  Laying Flocks.'  A copy must be attached to the

Page 120

1  contract.  Kroger will not accept any eggs from
2  Midwest Poultry Services that have not been
3  100 percent produced in these terms."
4      Q   And your understanding was that this
5  was a requirement under the contract to Midwest?
6          MR. MURRAY:  Objection to the form of
7  the question.
8      A   My understanding is just what's -- you
9  know, you read what's in there.
10     Q   But your understanding is that Midwest
11  Poultry had to show proof of their compliance of
12  the guidelines?
13         MR. MURRAY:  Same objection.
14     A   It says Kroger will not accept eggs
15  from Midwest Poultry Services that have not been
16  100 percent produced in these terms.
17     Q   And you never told Midwest Poultry that
18  that particular paragraph did not need to be
19  adhered to or complied with?
20     A   I don't recall.
21     Q   Well, do you recall ever telling
22  Midwest Poultry that the requirement under the
23  heading animal welfare certification need not be
24  complied with?
25     A   I don't recall.

Page 121

1    Q    Let's turn to the last page of Exhibit
2  12. Can you tell me what that is?
3    A    It's an extension of the existing
4  contract until January 31st, 2007.
5    Q    The existing contract being the first
6  four pages of Exhibit 12?
7    A    Yes.
8    Q    And is that your signature on the last
9  page of Exhibit 12?
10    A    Yes, it is.
11    Q    And looking at the next-to-the-last
12  page of Exhibit 12, what is that?
13    A    Yes.
14    Q    What is that page?
15    A    It's an animal care certification for
16  Midwest Poultry Service.
17    Q    Reflecting that the company has passed
18  an animal welfare audit for the calendar year
19  2003; correct?
20    A    Correct.
21    Q    Let's move on to Exhibit 13, which is a
22  document bearing Bates No. KRGEGED00010798 and
23  99. As you'll see, it's an email chain, so
24  sometimes it's a little easier to start at the
25  end and review it, but I leave that up to you.

Page 122

1      Have you finished your review of
2  Exhibit 13?
3    A    Pardon me?
4    Q    Have you completed your review of
5  Exhibit 13?
6    A    Yes, I have.
7    Q    And is Exhibit 13 a series of emails
8  relating to Ralph's eggs that includes an email
9  from you dated August 1, 2003?
10    A    Yes.
11    Q    Let's turn on to the back side of
12  Exhibit 13. And I'd like to focus your attention
13  on that last piece of the email chain from Bob
14  Zincke sent by Mary LaBolt to Geoffrey Covert.
15  Do you see that?
16    A    Yes, I do.
17    Q    Who is Bob Zincke, if I'm saying his
18  name right?
19    A    He is a Kroger person. I'm not sure
20  exactly what his title is, but he's in senior
21  management.
22    Q    Did he have anything to do with egg
23  procurement?
24    A    No.
25    Q    Was he ever the person that you

Page 123

1  reported to?
2    A    Not -- no. Not directly.
3    Q    Do you recall who Geoffrey Covert is?
4    A    Yes, I do.
5    Q    And who is Mr. Covert?
6    A    Geoffrey Covert was the vice president
7  of manufacturing.
8    Q    Could you read the text of the email
9  from Bob to Mr. Covert?
10    A    "Ralph says we negotiated a 1.7-cent
11  increase per dozen cost in eggs for animal care.
12  What is this about?"
13    Q    Okay. And then going further up in the
14  chain, Mr. Covert's response to Bob, which
15  appears at the top of the second page, you can
16  see the transmission link. So Mr. Covert's
17  response is that he's copying you; correct?
18    A    Mm-hmm.
19    Q    Who buys all of our eggs nationally; is
20  that correct?
21    A    Yes.
22    Q    And, then, let's go on to your response
23  to this question about Ralph's negotiation of a
24  1.7-cent increase per dozen eggs. Do you see
25  that? Can you read into the record your response

Page 124

1  to Mr. Covert?
2      MR. MURRAY: That's not a question.
3  He's not going to do any more reading into the
4  record. You can ask him a question. That's not
5  a question.
6      MS. LEVIN: Are you instructing him not
7  to answer?
8      MR. MURRAY: I'm telling him he doesn't
9  have to read. He can read it to himself and
10  answer questions.
11      MS. LEVIN: I'd like for the record to
12  reflect what the document says, unless you're
13  instructing him not to answer.
14      MR. MURRAY: It's not a question. It's
15  not a question.
16      MS. LEVIN: It is a question.
17      MR. MURRAY: What?
18      MS. LEVIN: Mr. Murray, I've asked him
19  to read that sentence.
20      MR. MURRAY: We're not -- but that's
21  not a proper procedure. We're not going to do
22  that.
23      MS. LEVIN: All right. If you're
24  not -- we have been doing it for depositions
25  taken by you ad infinitum. I'm happy to hear --

Page 125

1  let me finish -- I'm happy to hear that it's
2  improper to have witnesses read things into the
3  record because we will certainly stop doing it on
4  our side.
5       MR. MURRAY: Okay.
6    Q   Mr. Stull, would you please read into
7  the record you response to --
8       Tell us, what was your response to
9  Mr. Covert, if you can do that without reading it
10 into the record?
11   A   My response was that we support the FMI
12 guidelines.
13   Q   Your response was that the corporation,
14 Kroger, supports the FMI guidelines; correct?
15   A   Yes.
16   Q   And what were the FMI guidelines that
17 the corporate -- that Kroger had made the
18 decision to support?
19   A   I can't -- I can't recall what the
20 guidelines were.
21   Q   Well, read the rest of the sentence.
22 Does that help you with what the guidelines were?
23   A   Yes. I can see what it says there,
24 that --
25   Q   Okay, what did it say?

Page 126

1    A   Calling for fewer birds per cage as
2  well as other costs associated with animal
3  welfare.
4    Q   Correct. So the guidelines that you
5  say that Kroger made the decision to accept were
6  the FMI guidelines adopting the UEP producer
7  standards for animal welfare; correct?
8    A   Correct.
9    Q   And you're also saying that the
10 corporation made that decision to -- as well --
11 adopt as well other costs associated with animal
12 welfare; correct?
13   A   I'm not sure I follow your question.
14   Q   Well, why don't you read the sentence
15 that I was just quoting from.
16   A   Okay.
17   Q   Why don't you read that aloud, and then
18 you'll understand the question, I think.
19       MR. MURRAY: You can read it to
20 yourself.
21   A   Okay, I've read the question -- read
22 the sentence.
23   Q   Okay. And the sentence says that
24 Kroger made the decision as well to accept other
25 costs associated with animal welfare; correct?

Page 127

1    A   (No response)
2    Q   Those were your words; correct? Mr. --
3  Mr. Stull?
4    A   I'm trying to find where it says that.
5    Q   Why don't you read the first sentence.
6    A   I see where it says costs would rise
7  due to the costs associated to suppliers to
8  manage the program.
9    Q   Right. Those were your words back to
10 Mr. Covert. Read that -- why don't you read that
11 entire sentence for us.
12       MR. MURRAY: You can read it to
13 yourself.
14       MS. LEVIN: Are you instructing him not
15 to read --
16       MR. MURRAY: I'm telling him --
17       MS. LEVIN: Okay, you're not
18 instructing him not to answer, then just -- we
19 hear your objection.
20   Q   Could you please --
21       MR. MURRAY: But it's not a question.
22       MS. LEVIN: It is a question. I said,
23 "Would you please read that second sentence of
24 your email for the record." That is a question.
25 If you're instructing --

Page 128

1        MR. MURRAY: Okay, the answer's "yes"
2  or "no" to that. It's not to read it.
3        MS. LEVIN: Mr. Murray, are you
4  instructing your witness not to read into the
5  record --
6        MR. MURRAY: I'm telling him --
7        MS. LEVIN: -- his very words from his
8  email? Because we'll get on the phone with the
9  judge right now if that's your instruction.
10       MR. MURRAY: I'm telling him to read
11 the sentence and then answer questions on it.
12   Q   Mr. Stull, would you please read for
13 the record the second sentence in your email?
14       Your lawyer's not instructing you not
15 to answer, so you can decide personally --
16   A   I don't understand --
17       MR. MURRAY: He doesn't have to do it.
18   A   I -- I don't understand why you want to
19 read that into the record.
20   Q   Because I'd like the record to reflect
21 what your words were back to Mr. Covert. What
22 were your words back to Mr. Covert?
23   A   Aren't they right here in print?
24   Q   Yes, they are, and I would like --
25   A   Then why do I need to read them out

Page 129

1 loud?
2    Q    Are you -- Mr. Stull, if you are not
3 going to answer my questions, we'll have to get
4 on the phone with the judge.
5         MR. MURRAY:  He's willing to answer
6 your questions.
7         MS. LEVIN:  Okay.
8    Q    Then answer --
9         MR. MURRAY:  Ask him a question about
10 it.
11        MS. LEVIN:  I asked him a question.  I
12 asked him, "What was your response back to
13 Mr. Covert?"
14        MR. MURRAY:  You can answer.
15   A    My response is exactly what's written
16 down here.
17   Q    Okay.  Well, please tell us what is
18 written.
19        MR. MURRAY:  Objection.  Asked and
20 answered.
21   Q    Mr. Stull, are you going to decline to
22 tell us what your answer was besides referring to
23 the document?
24        MR. MURRAY:  You're mischaracterizing
25 what he said.  He did tell you what he's -- the

Page 130

1 answer.
2         MS. OSBORN:  Mr. Murray, I want to
3 state an objection for the record on behalf of
4 Midwest.  We have sat through days and days and
5 days of depositions in this matter where
6 plaintiffs have done nothing more than ask our
7 witnesses to read into the record documents and
8 statements in documents.  I would ask that
9 Mr. Stull please read into the record what
10 Ms. Levin is asking him to read.
11        MS. CRABTREE:  I second that objection
12 for Rose Acre.
13   Q    Mr. Stull, if we can't get you to do
14 this, we'll need to get on the phone with the
15 judge.  And if we can't get the judge on the
16 phone today, we'll conclude the deposition and
17 we'll go to the judge, and I suspect we will end
18 up back here with you having to do what I'm
19 asking you to do.  This is not an improper
20 procedure.
21        Would you please read for us into the
22 record what your response was to Mr. Covert.
23   A    Are you referring to that one sentence?
24   Q    I would like for you to read all three
25 sentences, quite frankly.

Page 131

1         MR. MURRAY:  Object.  It's not a
2 question.
3         MS. LEVIN:  We hear you.
4    Q    Can you please --
5         MR. MURRAY:  That's uncalled for.
6         MS. LEVIN:  I think I've been
7 incredibly patient with this bogus objection.
8    Q    Can you please read into the record
9 your response to Mr. Covert?
10        MR. MURRAY:  It's entirely uncalled
11 for.
12   Q    Can you do that, Mr. Stull?
13   A    I don't see any point in doing it, but
14 I --
15   Q    I understand that you don't see any
16 point, Mr. -- Mr. Stull, but I've been taking
17 depositions for a long time and this is something
18 that we do sometimes.  And, so, I'm asking you
19 very nicely if you would please read into the
20 record your response to Mr. Covert.
21        MR. MURRAY:  Objection to the form of
22 the question.
23   A    (No response)
24   Q    These were your words?
25   A    These are my words.

Page 132

1    Q    Okay.  Let's hear them.
2    A    "The corporation made the decision to
3 support the FMI guidelines adopting the UEP --
4 United Egg Producers standards for animal welfare
5 calling for fewer birds per cage as well as other
6 costs associated with animal welfare (evidenced
7 by the May 31st, 2002, News Release on the Kroger
8 website).  Corporate Category Management
9 communicated these guidelines to the divisions
10 and mentioned then that our costs would rise due
11 to the costs associated to suppliers to manage
12 the program.  We continue to talk about this on
13 our monthly Perishable calls, so I'm a little
14 surprised there is a question.  By the way, the
15 average cost increase for the industry is 2.5
16 cents."
17   Q    Is this an email that you wrote?  Are
18 those your words?
19   A    It sounds like a little higher level
20 than I normally write.  Umm --
21   Q    Do you question what --
22        MR. MURRAY:  Let him finish.  Let him
23 finish his answer.
24   A    Sometimes --
25        MR. MURRAY:  Please.

Page 133

1    A    Sometimes some things were prepared and
2  I just passed them along.
3    Q    Prepared by whom?
4    A    In this case, probably somebody within
5  the category management.
6    Q    Do you have a --
7    A    Corporate category management.
8    Q    Do you have a recollection of somebody
9  in corporate category management dictating these
10  words to you for inclusion in the email?
11    A    No, I -- no, I don't.
12    Q    Do you have any doubt that you prepared
13  this email and sent it to Mr. Covert?
14        MR. MURRAY:  Objection to the form of
15  the question.  Mischaracterizes his testimony.
16    A    I know I sent the email.
17    Q    Okay.  Do you have any doubt about the
18  accuracy of the words in the email?
19    A    You're asking me to remember something
20  from eight years ago, as far as accuracy, and I
21  can honestly say I don't -- I don't recall.
22    Q    Was it your practice to send emails
23  that were not accurate or that you knew were not
24  accurate at the time you were sending them?
25        MR. MURRAY:  Objection to the form of

Page 134

1  the question.
2    A    No.  I tried to be accurate.
3    Q    Okay.  And it was your understanding at
4  the time you sent this email that it was correct
5  that corporate category management had mentioned
6  that Kroger's costs would rise due to the cost
7  associated with the suppliers to manage the
8  animal welfare program; correct?
9        MR. MURRAY:  Objection.  Lack of
10  foundation.
11    A    You're asking me to remember something
12  that I can't remember from that long ago.
13    Q    But you don't have any doubt about the
14  voracity of that sentence; do you?
15    A    I can't answer that.  I don't know.
16    Q    Would you have included it in your
17  email if you thought it was false?
18    A    No.  I would not include anything that
19  I thought was false, but that doesn't necessarily
20  make it true.
21    Q    What costs were you referring to when
22  you said costs would rise?
23    A    Egg costs.
24    Q    Your cost of procuring eggs; correct?
25  Kroger's cost of procuring eggs?

Page 135

1    A    It's saying that the costs for the
2  industry would drive costs for the supplier.
3    Q    Explain what you mean by that.  Who is
4  the -- I take that back.
5        Who is the "our" referring to when it
6  says "our costs would rise"?
7    A    I'm trying to find that.
8    Q    It's in the second sentence.  At the
9  end of the fourth line and the beginning of the
10  fifth line of your email response to Mr. Covert.
11    A    The one where it says "We continue to
12  talk"?
13    Q    No, it's in the sentence before that.
14  Right above that.  The fourth line, not the
15  fifth.  "Our costs," who was the "our"?
16    A    The suppliers were telling us their
17  costs would rise.  So, naturally, in the
18  contracting situation, that would cause our costs
19  to rise.
20    Q    Kroger's costs?
21    A    Kroger's costs.
22    Q    And it further states that "We continue
23  to talk about this on our monthly Perishable
24  calls."  What were the monthly perishable calls?
25    A    I was not in the monthly perishable

Page 136

1  calls.  So I really -- I really can't refer to
2  that.  As I said, I worked for Lisa Beth Miller.
3    Q    Okay.  Let's move on to Exhibit 14
4  which bears Bates Nos. MPS-00093359.
5        Have you had a chance to review Exhibit
6  14?
7    A    Yes.
8    Q    What is Exhibit 14?
9    A    A letter to me from Midwest Poultry.
10  It's a copy of our agreement for the increased
11  price for certified animal care shell eggs.
12    Q    What's the date of Exhibit 14?
13    A    9-27-02.
14    Q    Do you have any doubt that you received
15  Exhibit 14 on or about September 27, 2002?
16    A    No.
17    Q    So does -- Exhibit 14 reflects that
18  there was an agreement between Midwest and Kroger
19  about a price increase for costs associated with
20  the animal care program; correct?
21    A    We were told there would be a price
22  increase.
23    Q    Okay.  Who told you that?
24    A    Bob Krouse.
25    Q    So there was no secret to you or to

Page 137

1  Kroger that the animal welfare program would
2  bring about an increase in Kroger's cost of
3  purchasing eggs; was there?
4      MR. MURRAY: Object to the form of the
5  question.
6      A  We knew there would -- we were informed
7  that there would be price increases.
8      Q  Midwest didn't hide that fact from you;
9  did it?
10     A  No.
11     Q  Did you have similar discussions with
12 other suppliers?
13     A  I don't know if I did or not. If you
14 have -- if you have things to put in the record
15 that go to other suppliers, then I could agree to
16 it, but I honestly can't recall if I did this
17 with other suppliers or not.
18     Q  Well, did you have an understanding
19 that the animal welfare program brought about an
20 increase in costs to egg -- shell egg producers?
21     A  I was informed by Midwest Poultry that
22 they would.
23     Q  And would it be fair to say that if
24 Midwest Poultry would experience increased costs
25 as a result of the animal welfare program, that

Page 138

1  other suppliers who were also required by Kroger
2  to produce eggs in accordance with those same
3  guidelines would likewise have increased costs?
4      MR. MURRAY: Objection to the form of
5  the question. Calls for speculation.
6      A  I'm afraid I have to agree with the
7  speculation clause. I really don't know the -- I
8  don't know because I didn't go out and inspect
9  coops or anything to see what the effects of the
10 requirements were.
11     Q  Did you understand from Mr. Krouse why
12 the animal welfare program would cause a price
13 increase for the eggs you were purchasing from
14 Midwest?
15     A  My memory is kind of dim, but Bob
16 Krouse was a good supplier, and I pretty much
17 trusted his word.
18     Q  Would it make sense to you that if
19 there are fewer -- or if hens require increased
20 space in cages, that that would bring about
21 increased costs --
22     MR. MURRAY: Objection. Calls --
23     Q  -- for the producer?
24     MR. MURRAY: Objection. Calls for
25 speculation. Lack of foundation.

Page 139

1      A  It makes -- it makes sense that less
2  birds in a cage would produce less eggs, but
3  really they produce more.
4      Q  Fewer hens in a cage causes an increase
5  in egg production; is that your understanding?
6      A  It's possible. That was, I think, the
7  contention.
8      Q  Okay. Did you ever inquire of other
9  producers whether the animal welfare program
10 would cause an increase in costs and therefore an
11 increase in price to Kroger?
12     A  I can't recall.
13     Q  But it was the animal welfare program
14 guidelines that Mr. Krouse explained to you
15 brought about the increase in price from Midwest;
16 correct?
17     A  I think that's what's stated in the
18 letter.
19     Q  Right. And Kroger required all of its
20 other producers also to comply with those same
21 animal welfare guidelines; correct?
22     A  I believe that's what's in Exhibit 3.
23     Q  So if Midwest experienced an increase
24 in costs as a result of the animal welfare
25 guidelines, would it make sense that other

Page 140

1  producers likewise experienced increased costs as
2  a result of the animal welfare guidelines?
3      MR. MURRAY: Objection. Asked and
4  answered. Calls for speculation.
5      A  Would you restate the question?
6      MS. LEVIN: Can you read it back.
7      (The reporter read the requested
8  question.)
9      MR. MURRAY: Objection to the question.
10 Asked and answered, calls for speculation.
11     A  No.
12     Q  That would not make sense to you?
13     A  Not -- not to me.
14     Q  Why not?
15     A  Each producer has their own set of
16 criteria on how they produce things.
17     Q  But you're requiring everyone to follow
18 the animal welfare guidelines; correct?
19     A  That's what's stated in this Exhibit 3,
20 yes.
21     Q  And it's stated in every last contract
22 we've looked at today too; correct?
23     A  Yes.
24     Q  And Mr. Krouse is stating to you that
25 the animal welfare guidelines are what are

Page 141

1  causing an increase in his costs, and that it's
2  therefore going to create a price increase for
3  Kroger; correct?
4      A    That's what the letter says.
5      Q    What is the basis for your view that it
6  may be that those same animal welfare guidelines
7  that cause an increase in price for Midwest would
8  not cause an increase in price for Rose Acre
9  foods, Cal-Maine, NuCal, and the other producer
10 contracts that we've looked at?
11     MR. MURRAY: Objection. Asked and
12 answered.
13     A    You know, it would be speculation for
14 me to tell you that. But let me just do a quick
15 example. If I'm driving a car and I get ten
16 miles to the gallon where somebody else is
17 driving a car and gets 20 miles to the gallon,
18 we're both driving cars but one does a better job
19 than the other.
20     Q    Correct. And if you have those two
21 cars -- let's go with that -- one getting
22 10 miles to the gallon and the other getting
23 20 miles to the gallon and both of those drivers
24 are required to put a thousand pounds in the
25 trunk, would you expect that to have a decrease

Page 142

1  in mileage for each of those cars?
2      MR. MURRAY: Objection. Calls for
3  speculation, lack of foundation.
4      A    We are getting into a pretty
5  speculative area.
6      Q    I'm trying to use your analogy, Mr. --
7      A    I understand.
8      Q    -- Mr. Stull, you're the one who raised
9  it; not me.
10     A    Okay. It depends if you're going
11 uphill or downhill, doesn't it?
12     Q    Everybody's driving on the same, flat
13 level surface.
14     MR. MURRAY: Same objection.
15     A    I'd be truly speculating if I said you
16 could do that.
17     Q    Okay. Let's take a look at the second
18 page of Exhibit 14. These are the -- what's
19 titled Certified Animal Care Production Cost
20 Product -- Projections. Do you see that?
21     A    Yes, I do.
22     THE REPORTER:  "It's titled" --
23     MS. LEVIN:  Certified Animal Care
24 Production Cost Projections.
25     Q    Can you explain the second page of

Page 143

1  Exhibit 14 for us?
2      A    These are costs per dozen that Midwest
3  Poultry put together and sent to me.
4      Q    Do you have a recollection that the
5  cage space requirements of the animal welfare
6  guidelines were to be phased in? That is to say
7  they were not to go from 48 inches per --
8  48 inches per hen to 67 inches overnight but were
9  to be stepped up gradually?
10     A    That's the assumption that's made in
11 this pricing.
12     Q    Okay.
13     A    I'd like to add that these -- these
14 things were in place before I talked with
15 Mr. Krouse.
16     Q    What things were in place before you
17 talked with Mr. Krouse?
18     A    These -- this planned phase-in.
19     Q    Do you know when the animal welfare
20 guidelines were first promulgated by UEP?
21     A    No, I don't know.
22     Q    So how can you say it was in place
23 before you spoke with Mr. Krouse as reflected in
24 Exhibit 14?
25     MR. MURRAY: Objection to the form of

Page 144

1  the question.
2      A    You know, I can't recall the specifics.
3  It's just an assumption that I made.
4      Q    Okay. Well, Mr. Stull, we're not here
5  to get assumptions today.
6      A    I understand.
7      Q    We're here to get facts that you
8  recall, and that's why we're looking at documents
9  to try to refresh your recollection. Does this
10 document refresh your recollection that there
11 were a phase-in of the cage space requirements of
12 the animal welfare program?
13     A    I see it in black and white across the
14 top of this paper.
15     Q    I'm sorry. The cage space requirements
16 were going to go from 48 inches to 56, to 59, to
17 61, to 64, and then to 67; is that correct?
18     A    That's correct as it's printed.
19     Q    And Mr. Krouse was explaining to you
20 that the costs for production would increase as
21 the cage space requirements increased; correct?
22     A    Yes.
23     Q    And those same cage space requirements
24 were required of all of your producers; correct?
25 Your shell egg producers?

Page 145

1    MR. MURRAY: Objection. Form of the
2 question.
3    A   I'll refer you back to Document 3.
4    Q   And what part of Document 3, Exhibit 3,
5 are you referring us to?
6    A   The third paragraph.
7    Q   Where in the third paragraph are you
8 referring?
9    A   Where it talks about increased cage
10 space per hen.
11   Q   Right.  And if we would go back to the
12 contracts that we've reviewed, each of them has
13 required your producers -- your shell egg
14 producers -- to comply 100 percent with those
15 guidelines; correct?
16   A   I believe, yes, that's correct.
17   Q   Okay.  And then you negotiated with
18 Mr. Krouse how much Kroger would pay for the
19 increased costs of production for eggs produced
20 in accordance with the animal welfare program?
21   A   Define "negotiated."
22   Q   As in the first page of Exhibit 14
23 says, "Attached is a copy of our agreed-upon
24 price increase."  Was that a product of a
25 negotiation?

Page 146

1    A   I was -- that price increase of .0075
2 for the tenth period, those are numbers that I
3 was told would be the price increase.
4    Q   But you understood that those numbers
5 would be a price increase and that they were
6 engendered by the animal welfare program,
7 compliance with the cage space requirements;
8 correct?
9    A   I had no way of verifying those
10 numbers.
11   Q   Well, I understand you had no way of
12 verifying those numbers, but you agreed with
13 Mr. Krouse to permit that additional charge to be
14 made to Kroger; correct?
15   A   Yes.  That's correct.
16   Q   Did you do anything to try to determine
17 whether that was a fair price increase?
18   A   No.
19   Q   Did you review the numbers on the
20 exhibit, on the second page of Exhibit 14, to
21 determine whether those numbers were accurate or
22 fair?
23   A   I had no way of determining whether
24 they were active -- accurate or fair.
25   Q   But you --

Page 147

1    A   And when we're talking about the
2 cage -- the animal welfare stuff, I had no way of
3 determining that.
4    Q   But you agreed upon those numbers with
5 Mr. Krouse?
6    A   I had confidence in his honesty.
7    Q   Okay.  Let's take a look -- do you have
8 any reason to doubt whether those costs were in
9 fact incurred by -- by Midwest in conjunction
10 with its compliance with the animal welfare
11 guidelines?
12       MR. MURRAY: Objection.  Lack of
13 foundation.
14   A   That would be -- I mean, I had no way
15 of telling.  It would be speculation for me to
16 say "yes" or "no."
17   Q   But you have no reason sitting here
18 today to question that; do you?
19       MR. MURRAY: Objection.
20 Mischaracterizes his testimony.
21   A   Today?  No.  I have no -- nothing
22 today.  I've been retired for eight years.  I'm
23 not -- you know, I'm not involved in it.  So --
24   Q   I know you --
25   A   -- I have no objection.

Page 148

1    Q   At the time you took no steps to
2 ascertain whether these numbers were in fact --
3 correctly illustrated the increased costs to
4 Midwest as a result of compliance with the animal
5 welfare guidelines?
6    A   Correct.
7    Q   And you took no steps to ascertain
8 whether any of your other producers incurred
9 increased costs for compliance with the animal
10 welfare guidelines?
11   A   I can't recall with anyone else.
12   Q   Was there anybody else at Kroger who
13 would have been in charge of ascertaining whether
14 it was correct or fair to be paying more for eggs
15 as a result of compliance with the animal welfare
16 guidelines?
17       MR. MURRAY: Object to the form of the
18 question.
19   A   I can't speak for anyone else at
20 Kroger.
21   Q   Was there anyone else you had to
22 consult with before signing a contract with an
23 egg supplier on -- did you make that decision
24 whether to sign those contracts?
25   A   I honestly can't recall.

Page 149

1    Q    Were you the one who decided whether
2  the price -- were you the one who decided to whom
3  to award a contract as a result of the bidding
4  process?
5    A    Yes.
6    Q    And did you have to consult with anyone
7  about that award?
8    A    Only in certain circumstances.
9    Q    What circumstances?
10   A    They had to meet -- for instance, when
11  we talked about Exhibit -- the GNX bid.
12   Q    The RFP in Exhibit 6?
13   A    Yes.  The Global Net Xchange bid.
14   Q    Right.
15   A    That was -- that was a test, and yes, I
16  did have to consult with other people.
17   Q    Did you have to consult with anybody
18  about the pricing in any of the contracts for
19  procurement of shell eggs?
20   A    No.
21   Q    Let's look at Exhibit 15.  And it is a
22  document bearing Bates Nos. MPS-00092027 through
23  927034.  And I can tell you, Mr. Stull, that all
24  of my questions are going to be devoted to the
25  first page.

Page 150

1    A    Okay.  So I just need to familiarize
2  myself with the first page?
3    Q    I think that will do it.  I'm not going
4  to ask you to explain the detailed numbers and
5  charts.
6    A    That's very good because I probably
7  couldn't do it at this point.
8    Q    What is Exhibit 15?
9    A    What is Exhibit --
10   Q    What is Exhibit 15?
11   A    What is it?  It's a letter to me from
12  Robert Krouse regarding our agreement to lock in
13  the corn and soybean meal components of the shell
14  egg program.
15   Q    And the date is April 4th, 2003?
16   A    I'm looking for it.
17   Q    At the top.
18   A    Yes.
19   Q    Do you have any doubt that you received
20  a copy of Exhibit 15 on or about April 4, 2003?
21   A    No.
22   Q    Okay.  Let's take a look at the first
23  two sentences of the second paragraph.  Could you
24  read those for us, please?
25   A    "As you can see, the cap price is

Page 151

1  $0.7119 per dozen for large eggs.  This price is
2  based on the average Certified Animal Care cost
3  over the time period involved.  The actual" --
4    Q    That's enough there.  So again, as of
5  April 4th, 2003, you understood that Midwest
6  Poultry incurred costs as a result of compliance
7  with the animal welfare guidelines; correct?
8        MR. MURRAY:  Object to the form of the
9  question.
10   A    This was -- this was talking about corn
11  and soybean meal components for shell eggs.
12   Q    Well, I understand that that's part of
13  what the document's talking about, but then the
14  sentence that you just read makes reference to
15  the certified animal care cost.  And my question
16  to you is whether, as a result of your review of
17  this document, you understand that Midwest
18  communicated to you that its price would be
19  higher as a result of the costs it incurred by
20  complying with the animal welfare guidelines?
21       MR. MURRAY:  Object to the form of the
22  question and mischaracterizes the document.
23   A    All I can say is you can read whatever
24  you want into this, but as I -- as I read it,
25  it's just -- it's an agreement to lock in corn

Page 152

1  and soybean prices.  Anything else is secondary.
2    Q    Well, secondary, but you did understand
3  that there was a price cap -- correct? -- per
4  dozen for large eggs?
5    A    Yes.
6    Q    And that that price included a charge
7  for compliance with the animal welfare
8  guidelines; correct?
9        MR. MURRAY:  Object to the form of the
10  question.  Mischaracterizes the document.
11   A    I'm going to have to say I really don't
12  know, because I don't know how -- you'd have to
13  look at the breakdown to see what the costs are.
14   Q    Well, since you're having difficulty,
15  let's turn to page 92031 of the document.  Does
16  that help you at all?
17   A    What page are we talking about?  92031?
18  Okay.
19   Q    Correct.  Does that help you at all
20  with answering my question?
21   A    That page supports that price that's
22  stated on the first page.
23   Q    And it breaks out a component for
24  animal care cost; correct?
25   A    That's correct.

Page 153

1    Q    And that was for compliance with the
2  animal welfare guidelines that was a requirement
3  contained in your contract with Midwest?
4    A    I'm not an accountant, so I can't
5  really say if that was what's there. But on the
6  first page it says it's in that price.
7    Q    Do you have any reason to doubt the
8  voracity of that statement on the first page?
9    A    As I said, Mr. Krouse and I had a good
10 arrangement. I trusted him. As far as the
11 voracity of it, I had no way of confirming or
12 denying it other than my trust in Mr. Krouse.
13   Q    But you understood that Midwest was
14 including in its price a component for compliance
15 with the animal welfare guidelines; correct?
16   MR. MURRAY:  Object to the form of the
17 question.
18   A    That's -- that's what this letter says.
19   Q    Okay. Let's move on to Exhibit 16.
20 And it is a document bearing Bates Nos.
21 MPS-00093368 through 93369.
22        And again, Mr. Stull, my objections
23 [sic] will really just focus on the first page.
24   A    Okay.
25   MR. MURRAY:  It's what she said.

Page 154

1        THE WITNESS:  Yes.
2    Q    What is Exhibit 16?
3    A    It's a letter to me from Bob Krouse at
4  Midwest Poultry Services.
5    Q    And what's the date of Exhibit 16?
6    A    February 2nd, 2004.
7    Q    Do you have any doubt that you received
8  Exhibit 16 on or about February 2nd, 2004?
9    A    No.
10   Q    Let's take a look at the second
11 paragraph. It states in the second sentence,
12 "Since we agreed to include the additional costs
13 of the animal welfare program, which average
14 .0291 in 2004, would it be simplest to make the
15 contract price .0759 back for this year?" Do you
16 see that?
17   A    Yes, I do.
18   Q    Does that refresh your recollection
19 that you agreed with Mr. Krouse to include the
20 additional costs of the animal welfare program in
21 Midwest's price to Kroger?
22   A    I can't verify any of the numbers.
23   Q    I understand that. I'm not asking you
24 about the specific numbers, I'm asking whether
25 this refreshes your recollection that you agreed

Page 155

1  to include the additional costs, whatever they
2  may be, of the animal welfare program in
3  Midwest's price to Kroger?
4    A    That's what the letter says.
5    Q    Do you have any reason to doubt the
6  accuracy of the letter from Mr. Krouse to you on
7  this particular point?
8    A    You know, it would be speculation for
9  me to say at this point do I have any question --
10 or any doubt. As I said before, I had high
11 regard for Mr. Krouse and respected his opinion.
12   Q    Well, we've now reviewed Exhibits 14,
13 15, and 16, all of which make reference to
14 additional costs from the animal welfare program.
15 And my question to you is, it was no secret to
16 Kroger, was it, that Midwest's costs increased as
17 a result of compliance with the animal welfare
18 program and that those costs were being passed on
19 to Kroger?
20   MR. MURRAY:  Object to the form of the
21 question. Mischaracterizes the document and
22 misstates his prior testimony.
23   A    I can only refer to the letter.
24   Q    Okay. And the letter, as far as you
25 know, is accurate; correct? Exhibit 16?

Page 156

1    A    As far as I can recall.
2    Q    Okay. That's all we're asking.
3        Let's move on to Exhibit 17 which will
4  be a document bearing Bates No. MOARK-IPP-0004913
5  through 4915.
6        (Deposition Exhibit 17 was marked for
7  identification.)
8        MS. LEVIN:  It appears to have an extra
9  page attached to it.
10   Q    And my questions about Exhibit 19 are
11 going to focus on the second page at the bottom,
12 Ralph's/Food 4 Less Bid.
13        THE REPORTER:  Exhibit 19 or 17?
14        MS. LEVIN:  Oh. 17?
15        THE REPORTER:  Yes.
16        MS. LEVIN:  Okay. Got carried away.
17   Q    Have you had a chance to review that
18 paragraph?
19   A    Yes, I did.
20   Q    What is Exhibit 17?
21   A    It's a letter to Arnie Sumner and MOARK
22 from Craig Willardson.
23   Q    Do you know who Craig Willardson was?
24   A    I don't know what his position -- his
25 title was, but he was the -- like the plant

Page 157

1    manager at the egg plant. I'm sure he had a
2    bigger title than that, but that's all I knew.
3        Q    Did you have dealings with him with
4    respect to egg procurement?
5        A    Minimal contact, but yes.
6        Q    Okay. On the paragraph that I asked
7    that you look at on the bottom of the second page
8    of Exhibit 17, that makes a reference to "Mark
9    and I met with Gary Stull." Do you see that in
10   the third line?
11       A    Yes, I do.
12       Q    Do you know who Mark was?
13       A    I honestly can't recall who Mark was.
14       Q    No last name or what he might have
15   done?
16       A    Huh-uh.
17       Q    Okay. And then at the bottom of that
18   page it says, "Ralph's is looking for a lower
19   price and no ACC charge." Do you see that
20   sentence?
21       A    Yes. I see that sentence.
22       Q    Do you know what an ACC charge was?
23       A    No idea.
24       Q    Does it sound like it might have been
25   the animal care certified charge that we've seen

Page 158

1    references to in Exhibits 15 and 14 and 13?
2            MR. MURRAY: Objection. Asked and
3    answered, calls for speculation.
4        A    (No response)
5        Q    Do you have a recollection of
6    attempting with MOARK to obtain eggs without
7    having to pay the increased --
8        A    I don't -- I don't have any
9    recollection. Sorry.
10       Q    For animal -- well --
11           MS. LEVIN: Could you go back and tell
12   me how far I got with that question.
13           THE REPORTER: Sure.
14           THE WITNESS: I apologize for the
15   interruption.
16           MS. LEVIN: It's okay.
17           (The reporter read the requested
18   question.)
19       Q    -- charge for the animal welfare
20   program on behalf of Ralph's?
21       A    No, I have no recollection.
22           MS. LEVIN: I would like to mark as
23   Exhibit 18 a document bearing Bates Nos.
24   MOARK000o1 -- 0001462 through 63.
25           (Deposition Exhibit 18 was marked for

Page 159

1    identification.)
2        Q    And I'm not interested in the first
3    paragraph about King Sooper, but I will have some
4    questions about the other paragraphs.
5            Have you had a chance to review Exhibit
6    18?
7        A    Yes.
8        Q    And what is Exhibit 18?
9        A    It's a letter to me from Bob Hodges
10   regarding discussion items in Atlanta.
11       Q    What's the date of Exhibit 18?
12       A    January 26th, 2004.
13       Q    Do you have any doubt about whether you
14   received a copy of Exhibit 18 on or about
15   January 26, 2004?
16       A    I have no specific recollection of it,
17   but I have no doubt that it came to me.
18       Q    And who is Bob Hodges?
19       A    I honestly can't remember who Bob
20   Hodges is.
21       Q    Let's look at the third bullet point
22   under animal care certification. Do you see
23   that?
24       A    Yes.
25       Q    Could you read that for us, please?

Page 160

1        A    "ACC Phase 2 begins the first of
2    February 2004, and we anticipate a cost of
3    $0.0100 per dozen for the cage space changes in
4    this phase and would like to ask -- establish the
5    new cost for the ACC program for King's, Smith's,
6    and Ralph's as soon as possible."
7        Q    So MOARK also communicated to you that
8    the requirement of compliance with the animal
9    welfare guidelines would result in an increased
10   cost because of the cage space changes; is that
11   correct?
12           MR. MURRAY: Objection.
13   Mischaracterizes the document.
14       A    I can go with -- only refer to what it
15   says in the document.
16       Q    Well, is that a fair characterization
17   of what it says in the document and what he was
18   communicating to you?
19           MR. MURRAY: Same objection.
20       A    It says we anticipate a cost of a cent
21   per dozen for the cage space changes.
22       Q    So Kroger understood that MOARK, like
23   Midwest, was going to increase -- was going to
24   experience a cost increase as a result of
25   implementation of the cage space requirements of

Page 161

1  the animal welfare program; correct?
2      MR. MURRAY: Objection. Misstates --
3  misstates the document, calls for speculation.
4      A    The only thing I would like to point
5  out there is that Midwest's price was three
6  quarters of a cent and this is one cent. It's
7  kind of like the cars.
8      Q    Okay. But it was a cost increase;
9  correct?
10     A    That's what it says, yes.
11     Q    Okay. And MOARK wanted to establish a
12  new price to Kroger for the shell eggs that were
13  being sold for King's, Smith's, and Ralph's as
14  soon as possible? Is that correct?
15     A    That's what's stated in the letter.
16        MR. MURRAY: We've been going over an
17  hour and ten minutes or so.
18        MS. LEVIN: This is good because I was
19  just about to move to another subject.
20        MR. MURRAY: Okay.
21        THE VIDEOGRAPHER: We are going off the
22  record. The time is 2:28 p.m.
23        (A recess was taken.)
24        THE VIDEOGRAPHER: This is the
25  beginning of Tape 4. The time is 2:40 p.m., and

Page 162

1  we are back on the record.
2      Q    Mr. Stull, I'm going to switch now a
3  bit to pricing of eggs, and my first question is
4  whether during the time that you were the general
5  manager of egg procurement you kept track in any
6  way of the market prices for shell eggs?
7      A    The Urner Barry report was very, very
8  readily available, and yes, I did -- I did follow
9  the Urner Barry.
10     Q    So you followed the Urner Barry report?
11        Do you have any recollection as to what
12  affects the price of eggs?
13     A    The recollection I have, I think -- I
14  think that letter from Mr. Krouse had it layed
15  out pretty well on what the costs were that
16  affected the shell egg price.
17     Q    The costs in terms of the feed costs?
18     A    For the producer.
19     Q    Right. What about in terms of other
20  types of costs? Is there a seasonality to the
21  cost of eggs?
22     A    It's a true commodity, shell eggs are,
23  and it's a market-driven supply/demand thing. At
24  certain times of the year, Easter, Christmas,
25  Thanksgiving -- we as a society cook three times

Page 163

1  a year. Most other times we don't cook. And so
2  it's -- at those three times of the year, there
3  is a seasonal demand for eggs.
4      Q    And did that affect the price of eggs
5  that you recall?
6      A    Oh, yes.
7      Q    How did it affect them?
8      A    As a truly price-driven commodity, the
9  higher the demand on a static supply, the higher
10  the price.
11     Q    But that depends upon it being a static
12  supply; correct?
13     A    Correct.
14     Q    If there's an increase in production
15  during those times to account for the increased
16  supply, that would lesson the effect on the
17  price; correct?
18     A    If there were increased production,
19  that would.
20     Q    Are there other types of things that
21  affect the cost of eggs such as dietary trends,
22  for example?
23     A    Yes. Atkins diet was one that affected
24  it, and some other. Some other things like that
25  affected the consumption.

Page 164

1      Q    How did the Atkins diet affect the cost
2  of procuring eggs?
3      A    I'm not real sure. I -- I never
4  subscribed to the Atkins diet, so I really don't
5  know exactly. But anything that came along like
6  that that was trendy or, by the same token, the
7  negative things could affect it. If it came out
8  in the news that there was salmonella in shell
9  eggs (indicating) the demand --
10     Q    Down goes the demand?
11     A    Down goes the demand.
12     Q    And down goes the price?
13     A    Price follows demand.
14     Q    And what about, for example, some sort
15  of weather-related problem? Excessive heat,
16  excessive drought, would that affect the price?
17     A    Yes, but it would have to be a
18  long-term thing. I mean you get big snow storms
19  and people run to the store and buy three items:
20  Bread, milk, and eggs.
21     Q    We're all eating French toast during
22  the snow; aren't we?
23     A    And I'm not sure what egg -- people do
24  with them after they have them.
25     Q    Right.

1    A    They don't wait until Thanksgiving.
2    Q    Okay.  Is there anything else you can
3  think of that would affect the cost of procuring
4  eggs?
5    A    Umm --
6    Q    What about fuel costs?
7    A    Yes.  I'm sure that does.  It wasn't
8  much of an issue when I was still procuring
9  because we really hadn't hit the pricing that we
10  have now with fuel.  I know as a consumer when I
11  go to the pump and pay 3.75 a gallon, it affects
12  me.
13    Q    It hurts, doesn't it?
14    A    It does.
15    Q    Was transportation costs included in
16  the prices that you negotiated for shell eggs?
17    A    Yes.
18    Q    So there was not a separate charge
19  added on for transportation, as you recall?
20    A    Not per se, but there was some -- some
21  adjustments made when the fuel costs started
22  soaring.
23    Q    Like a fuel surcharge maybe?
24    A    Correct.
25    Q    Okay.  Let's go back to Exhibit 7,

1  which is the Rose Acre Farms contract.  And I
2  wanted to focus your attention on the pricing
3  aspects of this, which we sort of skipped over
4  the first time.
5        So you've mentioned the Urner Barry a
6  couple times.  Can you explain what Urner Barry
7  is?
8    A    Urner Barry is just a standard that
9  everyone in the egg industry uses as a basis for
10  pricing.
11    Q    And do you know how Urner Barry is
12  calculated?
13    A    I'm not sure if it's witchcraft or --
14  but they put out a price that says this is the
15  price that Urner Barry says eggs are worth right
16  now, and then you use that as a basis to buy.
17    Q    And the price is per dozen; correct?
18    A    Yes.
19    Q    And is it based on egg size, different
20  Urner Barry for different sizes of eggs?
21    A    They have different price quotes for
22  each different size.
23    Q    Okay.  And do they also have different
24  price quotes for different regions of the
25  country?

1    A    I believe so.
2    Q    Okay.  Let's take a look at Exhibit 7
3  here, and it focuses on the Midwest.  If you look
4  down under carton eggs, Grade A jumbo it talks
5  about the midwest Urner Barry large market.
6    A    Correct.
7    Q    So that would be whatever Urner Barry
8  has attached to the market for large eggs in
9  whatever the midwest might be?
10    A    Correct.
11    Q    Correct?  And the large market number
12  appears to be used for both large and extra large
13  and jumbo.  Is that correct?
14    A    Yes.
15    Q    And then there's a different Urner
16  Barry number for the medium eggs; correct?
17    A    Correct.
18    Q    And a different Urner Barry number for
19  small eggs; correct?
20    A    Correct.
21    Q    And then there is a Grade A large brown
22  that is the Urner Barry large market again.  Do
23  you see that?
24    A    Yes.
25    Q    Was there a separate number for brown

1  eggs versus white eggs?
2    A    You mean a separate price?
3    Q    A separate Urner Barry number.
4    A    I'm not sure if there was or not.
5  There may have been.  We based everything off
6  the -- either the large, medium, or small market.
7    Q    Okay.  And it says -- if you'll see the
8  last sentence before the table, it says all Urner
9  Barry quotes are based on a white egg --
10    A    Correct.
11    Q    -- correct?  So at least with Mid- --
12  at least with Rose Acre, you used the white egg
13  large market for brown eggs for your pricing?
14    A    Correct.
15    Q    Now, for the Grade A jumbo it has
16  plus .0077.  Can you explain to me what that
17  means in terms of the price for Grade A jumbo
18  eggs?
19    A    Yes.  Whatever the large market was on
20  the particular pricing day, it would be that
21  large market plus .0077.
22    Q    Okay.  And what about for Grade A extra
23  large?  That looks like the number's different.
24    A    That would be whatever the midwest
25  Urner Barry large market was minus -- you know,

Page 169

1  less this amount.
2     Q    Less .0785?
3     A    For the extra large, yes.
4     Q    Okay.  Is that what's referred to as a
5  number being back of Urner Barry?
6     A    Yes, it is.
7     Q    Is there a similar phrase for ones that
8  are larger than Urner Barry?
9     A    Over, I guess.
10    Q    Over or front or anything?  You don't
11 know?
12    A    No.
13    Q    So do you recall what other regions
14 besides Midwest there were for the Urner Barry?
15    A    There -- I can't remember.  I know
16 there were other regions, but I based everything
17 off the Midwest.
18    Q    Okay.  Well, for Rose Acre?
19    A    For Rose Acre.
20    Q    If you want to take a quick look at
21 Exhibit 10, which is the Cal-Maine contract, it
22 makes reference to the south central Urner Barry
23 market.
24    A    Yes.  And like I say, I know there are
25 other markets, but I couldn't tell you exactly.

Page 170

1     Q    So you remember the south central, and
2  then in Exhibit 11, the NuCal contract, it's
3  typed in midwest, but it's been marked through
4  and it says California Urner Barry large market.
5     A    That occurred after my -- after I'd
6  left.
7     Q    Right.  Do you have a recollection of
8  there being any markets besides midwest and south
9  central?
10    A    No, I can't recall.
11    Q    And do you know whether the Urner Barry
12 prices in -- or the Urner Barry number for
13 midwest large market, when it moved, always moved
14 in the same direction as the south central
15 number?  So, for example, if the midwest Urner
16 Barry large market went up, did the south central
17 Urner Barry large market also go up?
18    A    Not necessarily.
19    Q    So sometimes those went in different
20 directions?
21    A    Right.
22    Q    Let's take a look at the second page of
23 Exhibit 7.  There's a reference to the trailing
24 market average.  Can you explain what that means?
25    A    (No response)

Page 171

1     Q    It's under Roman numeral III.
2     A    Oh, okay.  You know, I can tell you
3  exactly what it says here in this -- if you ask
4  me -- if you ask me what it is now, I couldn't
5  tell you without some help.
6     Q    Does this refresh your recollection at
7  all?
8     A    It does.  It's the -- it's a
9  four-week -- they take the Thursday market for
10 all four weeks and average it.
11    Q    So did the Urner Barry number change
12 weekly?
13    A    It changed daily.
14    Q    It changed daily.  And so the trailing
15 market average looked at the Thursday number for
16 four weeks, averaged it, and then applied it to
17 the sales for the coming week?
18    A    Correct.
19    Q    And so the price for eggs got
20 recalculated on a weekly basis -- is that
21 correct? -- under this contract?
22    A    Well, it got recalculated off a
23 four-week average.
24    Q    Right.
25    A    But that changed, you know, every four

Page 172

1  weeks, so --
2     Q    So you only did this recalculation
3  every four weeks?
4     A    (No response)
5     Q    I'm just trying to figure out how often
6  the price changed.
7     A    Okay.  This is terrible for me to say
8  because I did this for many years, but I can't
9  really recall if it was a --
10    Q    Well, in this --
11    A    Originally it was set to change every
12 week.
13    Q    Right.
14    A    But with the trailing average, I think
15 we went to a once-a-month pricing.
16    Q    It does say this average market will be
17 fixed for the following four-week Kroger period.
18 So your recollection is that the price that
19 Kroger paid to Rose Acre Farms, or any other
20 contract that has this provision in it, was reset
21 every four weeks, it was based on whatever
22 appropriate Urner Barry market number is
23 referenced in the contract, and you looked at the
24 Urner Barry price for the prior four Thursdays
25 and averaged it?

Page 173

1    A    Correct.
2    Q    Okay.  Do you recall there ever being a
3  previous Thursday approach used?
4    A    Previous Thursday?
5    Q    Right.
6    A    I don't recall that, no.
7    Q    Okay.  There's some documents that we
8  can take a look and see if that helps you at all.
9        And you said before that the price that
10  was paid to Rose Acre, the price that Rose Acre
11  bid, was to include packaging costs for the
12  purchase of packaging from Kroger; correct?
13    A    Correct.
14    Q    So this number for Grade A jumbo, .0077
15  ahead or above the Urner Barry large market,
16  included in it some cost -- I guess it's jumbo
17  eggs, so it would have included $79 per thousand
18  cartons for jumbo eggs?
19    A    Correct.  The cost of the cartons and
20  shipping containers.  All shipping containers
21  were included in this quote.
22    Q    Okay.  And the eggs are to be priced
23  FOB.  What does that mean?
24    A    Delivered to the Kroger warehouse.
25    Q    Okay.  Was transportation cost to be

Page 174

1  included in the prices set forth in this
2  contract?
3    A    Yes.
4    Q    Were there any discounts that were
5  applied for sales under a contract such as
6  Exhibit 7?
7    A    You mean by the supplier to Kroger?
8    Q    A prompt payment discount, for
9  instance?
10    A    I think -- I think it was stated in --
11  I know in reading the contracts there was
12  something about a prompt payment had a quarter of
13  a cent or something like that.  Not -- and not
14  apparently on this particular contract.
15    Q    Well, it says terms net 20 days from
16  receipt of invoice.  What does that mean?
17    A    It means we would pay within 20 days
18  from receiving the invoice.
19    Q    Okay.  And there's -- I don't see
20  anything in this contract -- perhaps you do --
21  that would say there's any kind of prompt payment
22  discount or anything of that sort.  Do you?
23    A    I didn't see it on this one, no.
24    Q    But you think there may have been
25  contracts that had that?

Page 175

1    A    I think some of the ones we looked at
2  previously had that.
3    Q    Let's take a look at Exhibit 11, which
4  is the NuCal contract.  If you'll look at -- you
5  got it?
6    A    Yes, I do.
7    Q    Paragraph 4 of Exhibit 11.
8    A    Mm-hmm.
9    Q    It makes reference to terms, 2 percent
10  10, net 45 days from receipt of goods.  Do you
11  see that?
12    A    Yes, I do.
13    Q    Can you explain what that means in
14  terms of pricing?
15    A    We would get 2 percent if we paid
16  within 10 days, and the net was due in 45 days.
17    Q    So that was an -- what I would call an
18  off invoice discount?
19    A    Yes.
20    Q    In other words, if you would have
21  billed -- if you were billed a hundred dollars,
22  the invoice would say a hundred dollars, but if
23  you paid it promptly you could -- within ten days
24  you could pay only $98?
25    A    Yes.

Page 176

1    Q    That's how that works; correct?
2    A    Yes, it is.  Sorry about the head bob,
3  I just get out of the habit here.
4    Q    Let's take a look at Exhibit 12.
5  That's the Midwest contract.
6    A    I'm going to have to search a little
7  bit because I don't have them in -- somehow
8  they're not in order.
9    Q    It's the Midwest contract if that helps
10  you locate it.
11        MR. MURRAY:  Here it is.
12        THE WITNESS:  Oh, I had it sitting over
13  there.
14        MR. MURRAY:  It was sitting over there.
15  You wouldn't have found it in the pile.
16    A    Okay.  Yes, I have it.
17    Q    Okay.  The Midwest contract says that
18  Kroger will be going to a cost plus program.  Can
19  you explain what a cost plus program is?
20    A    It's -- it's a fixed price.  It's -- if
21  you look at -- I think in the back here there's
22  an example.
23    Q    Well, let's just -- yeah, we'll get to
24  that.
25    A    Okay.

Page 177

1    Q    But -- and you'll be able to explain
2  what A and B are.  I think I know, but may not be
3  a hundred percent sure.  But can you just give us
4  a general idea of what a cost plus program is?
5    A    Sure.  Midwest would tell me what their
6  cost was, their bare cost, and we would agree to
7  some plus to that cost.
8    Q    Okay.  And was it your recollection
9  that as of February 1, 2004, all of the eggs that
10  Kroger purchased from Midwest, until the time you
11  retired, obviously, were on a cost plus program?
12    A    Yes.
13    Q    Did you use a cost plus pricing method
14  with any other supplier besides Midwest?
15    A    You know, I can't recall if it ever got
16  in place, but if you -- if you look at that
17  NuCal -- the Monarch bid --
18    Q    MOARK?
19    A    -- the one for the West Coast.
20    Q    Oh.  NuCal.
21    A    NuCal?  It talked about looking at a
22  cost plus program.  I can't recall right now if
23  we ever put it in place or not.
24    Q    Okay.  Because Exhibit 11 does have an
25  Urner Barry-based pricing mechanism in it under

Page 178

1  paragraph 2; correct?
2    A    Correct.  I think there was resistance.
3    Q    But you think there's a reference in
4  Exhibit 11 somewhere to switching to a cost plus
5  program?
6    A    Exploring it.  I thought I read that.
7    Q    I'm not seeing any reference to that.
8  And I just would like to understand whether
9  that's something you're recalling independently.
10    A    I was -- I think if you look at
11  Exhibit 6.
12    Q    Okay.
13    A    I thought I saw in my reading there
14  that --
15         Maybe I just imagined it.  It's
16  possible.
17    Q    But you think it's possible that with
18  NuCal there was consideration?
19    A    I think it might have been proposed,
20  but I'm not positive.  I just thought I read it
21  today in one of these documents.
22    Q    Okay.  So other than the possibility of
23  NuCal, do you recall any other egg suppliers that
24  you discussed the possibility of a cost plus
25  program with?

Page 179

1    A    No.
2    Q    Now we'll get to the cost plus, but I
3  wanted to explore just a little bit at the top of
4  page 2 where it says that "If Midwest should
5  supply other divisions, the following pricing
6  should apply," and it's another Urner Barry-based
7  mechanism.
8    A    Yes.
9    Q    What does it mean if Midwest Poultry
10  should supply other divisions?
11    A    For example, if the supplier that was
12  supplying Atlanta couldn't meet a seasonal
13  demand --
14    Q    Right.
15    A    -- or some type of demand and I had to
16  find eggs somewhere, I would take them from
17  Midwest Poultry to Atlanta.
18    Q    Right.  And --
19    A    But that was -- that was on a spot
20  basis.
21    Q    Right.
22    A    And so this pricing was put into place
23  to cover those spot shipments.
24    Q    So rather than using a cost plus
25  methodology for those shipments, you used an

Page 180

1  Urner Barry-based approach; correct?
2    A    Correct.
3    Q    And that would be for any shipment by
4  Midwest to a location other than the five
5  warehouses shown on the first page of Exhibit 12?
6    A    Yes.
7    Q    In Exhibit -- in Roman numeral III, it
8  appears that brown eggs were also billed based on
9  an Urner Barry-based price; is that correct?
10    A    That's correct.
11    Q    And underneath the reference to the
12  Urner brownie -- Urner Barry brown egg --
13         MS. LEVIN:  I want a brownie.  That's
14  my little after-lunch problem.
15    Q    -- it makes a reference to a pick-up
16  allowance.  What is that?
17    A    That would be if Kroger -- well, at
18  that time Kroger fleet swung by and picked up the
19  eggs instead of having them delivered --
20    Q    Then --
21    A    -- then there would be --
22    Q    -- Kroger would -- go ahead.
23    A    -- then Kroger would get a pickup
24  allowance from Midwest Poultry.
25    Q    So it would get a 1.3-cent-per-dozen

Page 181

1  discount?
2    A    Yes.
3    Q    Now, there is a reference on the first
4  page of Exhibit 12 to Attachments A and
5  Attachment B.  And it appears to me -- well, why
6  don't you tell us what the difference is in
7  Attachment A and Attachment B.
8    A    Understand you're asking me to go back
9  into an old memory bank.
10    Q    Well, again, it says Attachment A shows
11  how the formula for the cost plus pricing is
12  derived.
13    A    Okay.
14    Q    And Exhibit B reflects the cost sheet
15  Midwest Poultry will send each month for the cost
16  change.  So --
17    A    Okay.
18    Q    -- let's look at A.
19    A    A is the general format.
20    Q    Right.
21    A    And B is the specific one.  Where on A
22  they refer to feed cost per pound and then they
23  have some examples --
24    Q    Mm-hmm.
25    A    -- on B it's the actual feed cost per

Page 182

1  dozen -- per pound.
2    Q    Okay.  And how frequently was the cost
3  plus price determined?
4    A    I'm going to have to look at the
5  contract really quick to see if I can find that
6  because I don't recall exactly.
7    Q    Well, the last sentence on the first
8  page of Exhibit 12 says, "Attachment B reflects
9  the cost sheet Midwest Poultry will send to Pace
10  Dairy each month for the cost change."
11    A    Then that's what it was, once a month.
12    Q    So once a month, Midwest Poultry sent
13  to you a calculation of their costs, which in
14  turn dictated what the price would be for the
15  following month?
16    A    Correct.
17    Q    Okay.  Let's take a look at Attachment
18  A, which is, I believe you said, the general
19  methodology; correct?
20    A    Yes.
21    Q    So the second sentence in Attachment A
22  of Exhibit 12 says -- appears that the formula is
23  total shell egg cost per dozen equals the shell
24  egg processing cost plus the shell egg production
25  cost; correct?

Page 183

1    A    Correct.
2    Q    What is the processing cost per dozen?
3    A    When the egg comes out of the chicken
4  house and goes across the grading machine, it
5  becomes a processing cost.  And that's the cost
6  to take that egg, grade it, and put it in a
7  carton.
8    Q    Okay.  So it's post laying --
9    A    Yes.
10    Q    -- as it were?
11    A    Yes.
12    Q    And the cost to get it into the carton,
13  does that include the cost of -- the
14  transportation cost?
15    A    I believe that included everything.
16    Q    Okay.  And what about the shell egg
17  production cost?
18    A    That was the cost that -- what it cost
19  the supplier to produce an egg.  Or a dozen eggs.
20  I'm sorry.
21    Q    And do you know what would be included
22  in processing costs, what types of expenses?
23    A    I think if you go to the Attachment B
24  it spells it out pretty clearly, the shell egg
25  processing cost.

Page 184

1    Q    Well, let's just --
2    A    That's what Midwest told me the cost
3  was to produce the egg.
4    Q    Let's stick with Attachment A for just
5  a minute --
6    A    Sure.
7    Q    -- and see if we can get our way
8  through that.
9        So the shell egg production cost, the
10  next sentence says it's the feed cost plus a
11  fixed production cost per dozen.  Do you see
12  that?
13    A    Yes.
14    Q    And do you know what was included in
15  the fixed production cost?
16    A    I can't recall that now.
17    Q    Okay.  But the feed cost is then
18  calculated below that sentence?
19    A    Correct.
20    Q    And it basically calculates -- well,
21  can you tell me how that was done?
22    A    That was done by Midwest Poultry.
23    Q    Mm-hmm.
24    A    And basically it's what it cost per
25  dozen to feed the birds.

1    Q   And the two feed costs are corn and
2 soybean?
3    A   Correct.
4    Q   Okay. So then you take the feed cost
5 per dozen which appears to be .2416. Do you see
6 that line?
7    A   Feed cost per dozen?
8    Q   Yes. If you go maybe three quarters of
9 the way down the page, there's a line that says
10 feed cost per dozen and then there's a
11 calculation and it says it equals .2416.
12    A   Yes, I see that.
13    Q   And then you add to that the .1866
14 fixed costs to give you a total shell egg
15 production cost of .4282; is that the way that
16 part worked?
17    A   Yes.
18    Q   Then you add back in the shell egg
19 processing cost of .2449; correct?
20    A   Correct.
21    Q   And those two numbers give you the
22 total shell egg cost per dozen of .6731 in this
23 case?
24    A   Correct.
25    Q   And was that the price you then paid

1 Kroger, or was there something added on to that?
2      MR. MURRAY: Objection to the form of
3 the question. You said paid Kroger.
4    Q   I'm sorry. That you paid Midwest?
5    A   Right. Yeah, I was kind of confused by
6 that myself.
7    Q   Well, yeah, that would be confusing.
8    A   Yes, this is the -- this would be the
9 price that would be paid.
10    Q   So where's the plus come in?
11    A   Well, that's included in. That was
12 included in the shell egg processing cost per
13 dozen, I believe.
14    Q   The processing cost included the plus
15 component of the cost plus?
16    A   Yes.
17    Q   And was this price calculated here,
18 this .6731, the price for all eggs regardless of
19 size?
20    A   You know, I can't recall that. I think
21 if you look at Attachment B, you look at the
22 total Kroger cost per dozen, you'll notice that
23 it's different than the total shell egg cost per
24 dozen.
25    Q   Right.

1    A   And it's different for each size.
2    Q   Right. So do you know how those
3 numbers at the bottom of Attachment B were
4 calculated? How you got to the 1.0172 for jumbo
5 eggs?
6    A   After eight years, no, I cannot tell
7 you that.
8    Q   But there was presumably something
9 added on to the -- in this case .6732 cost per
10 dozen to reach a price for jumbo eggs?
11    A   Yes.
12    Q   Was one of the things that was added on
13 certified animal care at .0291 per dozen?
14    A   I believe that's what the -- that's
15 what it calls for there.
16    Q   So again, the cost plus program with
17 Midwest included a component for the animal
18 welfare program costs; correct?
19    A   It included -- it was presented to me
20 as a total package price. This is what it cost
21 me to get eggs.
22    Q   Right. And part of what it cost you
23 was .0291 for certified animal care; correct?
24      MR. MURRAY: Objection.
25 Mischaracterizes his testimony.

1    A   That's what it says here. I
2 couldn't -- I couldn't verify that that's the
3 correct amount. It's --
4    Q   Well, you couldn't --
5    A   -- it changed, and so I -- it would
6 change.
7    Q   Right. You couldn't verify the feed
8 costs either; correct?
9    A   That's correct, because that also
10 varied.
11    Q   Or the soybeans cost?
12    A   That also varied depending on the
13 market.
14    Q   Okay. You couldn't -- you didn't
15 verify any of the numbers in any of your cost
16 plus program contracts with Midwest. Is that
17 what you're saying?
18    A   I'm saying that you could find out what
19 the soybean costs were and what the corn costs
20 were, because those were -- you know, they were
21 off a market.
22    Q   And did you verify those costs, or did
23 you just take Mr. Krouse's word for it?
24    A   I took Mr. Krouse's word for it.
25    Q   What is Offsize Differential? Do you

Page 189

1 know what that refers to?
2     A    No.  But the reason why I'm smiling is
3 what it reminds me of is when I get my gas bill.
4 There's a charge in there that says "for delivery
5 of gas."  And you wonder what the heck is that
6 for?
7     Q    Well --
8     A    That's kind of -- kind of here.  I
9 can't recall what it's for.
10     Q    Do you believe at the time you
11 understood what it was for?
12     MR. MURRAY:  Objection to form of the
13 question.  Calls for speculation.
14     A    I was much more knowledgeable on egg
15 pricing and egg costs when I was involved with
16 it.  I've let my mind rust for a while --
17     Q    I understand --
18     A    -- and so I can't honestly answer that.
19 I would hope I did.  I would hate to think that I
20 would accept pricing and not be able to get some
21 idea of where it came from.  But I can't tell you
22 with any definitive answer today about that.
23     Q    I'm just trying to understand what
24 offsize differential refers to, not whether that
25 number is correct, accurate, or what it's based

Page 190

1 on.  Do you know what that means?
2     A    At this point, no.  I think you would
3 have to -- if you ask Midwest Poultry, they could
4 probably tell you.
5     Q    What about Feature Allowance, do you
6 know what that refers to?
7     A    That would refer to if a Kroger
8 division decides to feature eggs, then because of
9 the volume increase, Midwest would give an
10 allowance because they're selling more eggs.
11     Q    So if Kroger ran a special of some sort
12 for shell eggs that increased the demand, Midwest
13 would support that through an allowance?
14     A    Yes.
15     Q    And was there some trigger for how much
16 increased demand was required before the feature
17 allowance kicked in?
18     A    Not that I recall.
19     Q    So the feature allowance was
20 incorporated into the price of all the eggs you
21 purchased from Midwest?
22     A    I'm not sure.  I'm not sure -- I can't
23 tell you definitively if it was just the feature
24 size or if it was for all eggs.  As I recall, I
25 think it was just feature size, but I can't -- I

Page 191

1 can't say that for sure.
2     Q    So would that number be calculated on a
3 monthly basis depending upon whether Kroger ran a
4 special that month?
5     A    Weekly.
6     Q    Weekly?
7     A    The features were weekly.  And so it
8 would be a weekly allowance.
9     Q    But you don't recall if the -- if the
10 cost plus price was only recalculated on a
11 monthly basis, then was the feature allowance
12 only calculated on a monthly basis?
13     A    The feature allowance was a per-dozen
14 allowance, so it didn't really matter what the
15 cost plus pricing was.  If there was a feature
16 going on, there would be an allowance of 1.7
17 cents.
18     Q    And it applied to all eggs purchased?
19     A    It would apply to the feature dozen, I
20 believe.
21     Q    So if it was a feature for Grade A
22 large eggs, it applied to all Grade A large eggs?
23     A    Correct.
24     Q    But just for a week as opposed to a
25 month?

Page 192

1     A    That's correct.
2     Q    Did Midwest ever contact you to -- or
3 ask that you verify that you had in fact run a
4 feature when you were requesting the allowance?
5     A    I don't -- I don't think they did, but
6 I can't say for sure.  I mean, they would know by
7 the increase in volume whether there was a
8 feature or not.
9     MS. LEVIN:  I'm going to mark as
10 Exhibit 18 a document bearing Bates
11 No. KRGEG00 --
12     MS. CRABTREE:  I think you're on 19.
13     MS. LEVIN:  You're right.  Exhibit 19,
14 a document bearing Bates No. KRGEG00019358 and
15 59.
16     MR. NOVAK:  I'm sorry, could you repeat
17 the Bates number on that?
18     MS. LEVIN:  KRGEG19358 to 59.  And I'm
19 not so concerned about the second page, just the
20 first page.
21     (Deposition Exhibit 19 was marked for
22 identification.)
23     Q    Have you had a chance to review Exhibit
24 19?
25     A    The first page, yes.

Page 193

1    Q   And what is Exhibit 19?
2    A   It's a letter to me from Cliff
3  Lillywhite talking about a sliding scale concept
4  of pricing.
5    Q   And the date of Exhibit 19 is
6  August 25, 2003?
7    A   Correct.
8    Q   Do you recall who Mr. Lillywhite was?
9    A   I can't remember who -- what company he
10  worked for.
11    Q   Do you --
12    A   But I recall him.
13    Q   Okay.  Do you recall what the sliding
14  scale concept was?
15    A   In looking at the letter, I understand
16  what the sliding scale was.  The left-hand
17  column, the Mid-West Urner Barry Thursday large
18  quote --
19    Q   Mm-hmm.
20    A   -- if it was in that particular price
21  range, like 40 to 45, he proposed the price would
22  be eight cents a dozen discount to the Urner
23  Barry.  And as the market went up, the discount
24  would rise.
25    Q   So as the Urner Barry Thursday quote

Page 194

1  increased, the discount by whomever
2  Mr. Lillywhite worked for to Kroger would
3  increase.
4    A   Correct.
5    Q   Is that correct?
6      Do you know whether a sliding scale
7  concept was ever used in any of your contracts
8  for the procurement of shell eggs?
9    A   I cannot remember for sure.
10    Q   Mr. Lillywhite says that this concept
11  seems to have benefits to both parties.  Do you
12  see that?
13    A   Yes.
14    Q   Do you know what the benefit might have
15  been to Kroger or to a shell egg supplier of the
16  sliding scale concept?
17    A   Well, as you're procuring eggs, if you
18  look at -- if it were a fixed price of eight
19  cents a dozen back, then you would pay eight
20  cents a dozen back whether the market was 40
21  cents or 55 cents.  But if you use a sliding
22  scale, as the market goes up, your cost would go
23  down to a --
24    Q   So if a Kroger was --
25    A   -- to kind of accommodate the market

Page 195

1  change.
2    Q   From Kroger's perspective it gets an
3  increased discount as the Urner Barry market goes
4  up?
5    A   Correct.
6    Q   What would be the benefit to the
7  supplier of that?
8    A   Not being a supplier --
9      MR. MURRAY:  Objection.  Calls for
10  speculation.
11    A   Yeah.  Not being a supplier, I couldn't
12  answer that.
13      MS. LEVIN:  Let's mark as our next
14  exhibit a document bearing -- I'm going to put
15  that one aside for a minute.  I'm sorry, I'm
16  trying to find this particular document.
17      THE WITNESS:  I just want to say I'm
18  glad to see I'm not the only one that has trouble
19  keeping track of --
20      MS. LEVIN:  -- finding -- yeah, but
21  mine -- a document bearing Bates No. --
22      I'd like to mark as Exhibit 20 a
23  document bearing Bates No. KRGEG00019366.
24      (Deposition Exhibit 20 was marked for
25  identification.)

Page 196

1    A   Now I know who Cliff Lillywhite worked
2  for.
3    Q   Okay.  We'll get to that after you've
4  taken a minute to review Exhibit 20.
5      Have you had a chance to review Exhibit
6  20?
7    A   Yes, I have.
8    Q   And what is Exhibit 20?
9    A   It is a letter to me from Cliff
10  Lillywhite at Oakdell Egg Farms discussing a few
11  items.
12    Q   And Exhibit 20 is dated April 13th,
13  2005?
14    A   Yes.
15    Q   Okay.  And what was Oakdell Egg Farms?
16  Was that a supplier to Kroger?
17    A   Yes.  As far as I can recall.
18    Q   Do you recall what region Oakdell
19  supplied eggs to Kroger for?  What division?
20    A   No, I cannot recall.
21    Q   Do you recall when Oakdell supplied
22  eggs to Kroger?
23    A   In looking at this letter I would
24  assume it was in effect in 2005, but I haven't
25  got -- I can't really recall exactly when.

Page 197

1    Q   Okay.  The second heading in Exhibit 20
2   references sliding scale.  Do you have a
3   recollection of what sliding scale -- scale is?
4    A   That was what we just referred to --
5    Q   Okay.
6    A   -- in Document 19.
7    Q   Gotcha.  Later on in that very same
8   paragraph it says, "As in the past, we will
9   continue charging a flat price for each period,
10   based on the prior Kroger period's scale price."
11   Do you know what that means?
12   A   I can't recall anymore.
13       I think Oakdell was a supplier, but not
14   a primary supplier.
15   Q   Okay.
16   MS. LEVIN:  Let's mark as Exhibit 21 a
17   document bearing Bates No. KRGEG00019171.
18       (Deposition Exhibit 21 was marked for
19   identification.)
20   Q   And I will only be questioning you
21   about the first page.
22       What is Exhibit -- have you a chance --
23   have you had a chance to review Exhibit 21?
24   A   I've read the first page.
25   Q   And what is the first page of Exhibit

Page 198

1   21?
2    A   It's a letter to me from Robert Krouse
3   at Midwest Poultry Services regarding our
4   agreement on November 11th, 2004, to lock in corn
5   and soybean prices.
6    Q   Can you explain to me exactly what that
7   means?
8    A   One of the variables in the cost plus
9   pricing that we had with Midwest Poultry was the
10   cost of soybeans and corn, which is one of the
11   larger costs in the production of shell eggs.
12   And by locking into a price we were able to
13   hold -- that would hold the price for a period of
14   time.
15   Q   So the price that was being locked in
16   to was for corn and soybean; correct?
17   A   Correct.
18   Q   What are puts?  It makes reference to
19   purchasing corn puts.
20   A   These are market-driven things, puts
21   and -- what's the other one? -- strike price?
22   Q   Mm-hmm.
23   A   I'm not sure now.  At the time it was
24   explained to me, but I have forgotten.  It just
25   has something to do with if there's a crop

Page 199

1   failure and you've got a contract out for some
2   corn and there's not enough corn, there's -- you
3   can sell it for a bigger price.  But I'm not
4   really sure about puts and takes.  You'd really
5   have to ask Mr. Krouse about that.
6    Q   Okay.  You don't know how locking in or
7   purchasing puts with particular strike prices
8   would protect Kroger in the event of a decline in
9   the corn market?
10   A   I don't know exactly, no.  It would be,
11   you know, buy long and sell short, basically.
12   Q   Did you try to verify whether
13   Mr. Krouse would have in fact purchased corn
14   puts, for example?
15   A   Mr. Krouse was very good about that.
16   He would invite me to meet with him and the
17   person who sits on the -- purchased the -- the
18   guy that bought the corn, I can't think of what
19   his title would be, but it's kind of like a stock
20   broker, only it's a commodities broker.
21   Q   Right.
22   A   And we would have periodic meetings
23   where he would explain to Mr. Krouse and I what
24   the corn pricing was going to do and where it was
25   going to go and what --

Page 200

1    Q   And then --
2    A   -- was going on.
3    Q   And then Mr. Krouse decided whether to
4   lock in on that particular price for a period of
5   time?
6    A   Yes.
7    Q   And that's the purpose of Exhibit 21,
8   to communicate to you that he has locked in on
9   that price for a particular period?
10   A   Correct.
11   Q   And the idea here is to maintain some
12   sort of steadiness in your cost plus contract?
13   A   That's correct.
14   MS. LEVIN:  Let's mark as Exhibit 22 a
15   document bearing Bates No. KRGEG00019004 through
16   07.
17       (Deposition Exhibit 22 was marked for
18   identification.)
19   Q   And while she's putting the sticker on
20   let me just ask you, Mr. Stull, do you have any
21   doubt that you received Exhibit 21 on or about
22   November 18, 2004?
23   A   No.
24   Q   Again, I'll just be questioning you
25   about the first page of Exhibit 22.

Page 201

1     Have you had a chance to review
2  Defendant's Exhibit 22?
3     A   Yes, I have.
4     Q   Does Exhibit 22 appear to be similar in
5  nature to Exhibit 21 in that it is providing you
6  with information on locking in to corn and
7  soybean meal components --
8     A   Yes.
9     Q   -- of the shell egg program?
10    What was the time period covered by
11 Exhibit 21, the last one that we looked at?
12    A   May 22nd, 2005, through January 28th,
13 2006.
14    Q   And Exhibit 22, what time period does
15 that cover?
16    A   January 29, 2006, ending January 27,
17 2007.
18    Q   So if you have the cost component, the
19 corn and soybean meal cost component locked in
20 for an entire period, one-year period, as
21 reflected in Exhibit 22, did that mean that
22 your -- your price to -- that you paid to Kroger
23 remained flat for that entire period of time?
24    MR. MURRAY:  Object to the form of the
25 question.

Page 202

1     A   I think just as a point of -- if you
2  look at the back page --
3     Q   Yes.
4     A   -- it shows you.  You can see the
5  Kroger pricing straight across it stayed -- for
6  that period of time it stayed pretty constant.
7     Q   So page 3 of Exhibit 22 is a graph of
8  what Kroger's shell egg prices were expected to
9  be --
10    A   Correct.
11    Q   -- from February '06 to January of '07?
12    A   Correct.
13    Q   And it was expected to -- I'm having a
14 hard time figuring out where the -- which of
15 these two axes is over time.
16    A   I -- I believe those prices are per
17 month prices.
18    Q   Beginning when?  What would be the
19 February '06 price?
20    A   In looking at the graph, I would say it
21 would be the -- you'd go to the left-hand side.
22    Q   .7243?
23    A   Yes.
24    Q   And then each new entry to the right is
25 a subsequent month?

Page 203

1     A   Yes.
2     MS. LEVIN:  Let's mark as Exhibit --
3     Q   Well, do you have any doubt that you
4  received Exhibit 22 on or about September 12th,
5  2005?
6     A   No.
7     MS. LEVIN:  Let's mark as Exhibit 23 a
8  document bearing Bates No. KRGEG000 -- 00019008
9  to 09.
10    (Deposition Exhibit 23 was marked for
11 identification.)
12    Q   We don't need to study the second page.
13    Have you had a chance to review Exhibit
14 23?
15    A   Yes, I have.
16    Q   What is Exhibit 23?
17    A   It's a letter to me from Robert Krouse
18 talking about our grain hedging status and the
19 corn puts.
20    Q   Okay.  And Exhibit 23 is dated
21 September 23, 2005?
22    A   My birthday.  Yes.
23    Q   How nice.
24    Do you have any doubt that you received
25 Exhibit 23 on or about September 23, 2005?

Page 204

1     A   No.
2     Q   What is a grain hedging status?  Or
3  what is grain hedging?
4     A   That's that mysterious puts and cuts
5  thing.  You would have to be a commodities trader
6  to understand -- be able to explain it, and I
7  can't.
8     Q   Right.  Do you understand the second
9  paragraph of Exhibit 23?
10    A   Yes.
11    Q   What does that refer to?
12    A   The puts -- net profit from the sale of
13 the corn puts was $321,000, and that -- then that
14 went into the Kroger feature allowance cost.
15    Q   So whatever a put is, Exhibit 23
16 reflects that the put was sold?
17    A   Yes.
18    Q   There was a profit?
19    A   Yes.
20    Q   And did that profit go to Kroger?  Is
21 that correct?
22    A   It went into -- yes.  It went into the
23 Kroger feature allowance.
24    Q   What is the feature allowance?
25    A   When Kroger would feature eggs, we

Page 205

1  would try to find ways to get the price down.
2  And when you have a fixed price, like on a cost
3  plus price, there's no negotiating that price
4  down, except if you have something like this that
5  could go into offset cost.
6      Q   Well, if you look back on Exhibit 22 on
7  the second page, which is one of several Kroger
8  cost plus shell egg program documents, we talked
9  about this in conjunction with a different
10 exhibit, but there is a reference to feature
11 allowance.
12     A   Correct.  This is -- this would be in
13 addition to feature allowance.
14     Q   So this is in addition to whatever
15 feature allowance was already baked into the
16 contract, or into the cost plus?
17     A   Correct.
18     Q   And how did you then draw on the
19 feature allowance that came as a result of the
20 corn puts profit?
21     A   It would be based on dozens sold.  The
22 more dozens that Kroger sold, they would dip into
23 this and use it.
24     Q   Okay.  And was there again a trigger
25 for a level above which you had to sell before

Page 206

1  you could draw on the feature allowance?
2      A   Not that I recall.
3      Q   I'm struggling with what triggers being
4  able to draw on the feature allowance.
5          MR. MURRAY:  Is that a question?
6          MS. LEVIN:  Yes, it is.
7          MR. MURRAY:  Objection to the form of
8  the question.
9      A   It would be sales, I would think, you
10 know, based off retroactively.
11     Q   Mm-hmm.  Do you know how Kroger went
12 about -- you know, from a flow of money, how
13 Kroger went about obtaining the feature allowance
14 funds?
15     A   I honestly can't answer that.  I can't
16 recall it.
17     Q   Do you know whether you'd get an
18 invoice that would reflect a discount for a
19 feature allowance or is that much less you had to
20 pay Midwest on an invoice?
21     A   I can't recall.  I can't recall if
22 that's how it was done or not.
23     Q   Okay.
24         MS. LEVIN:  Let's mark as Exhibit 24 a
25 document bearing Bates No. MPS-00048631.

Page 207

1          (Deposition Exhibit 24 was marked for
2  identification.)
3      Q   Have you had a chance to review Exhibit
4  24?
5      A   Yes, I have.
6      Q   And what is Exhibit 24?
7      A   It's a letter to me from Robert Krouse
8  of Midwest Poultry regarding some feature pricing
9  on eggs.
10     Q   And what -- there's a reference in the
11 first sentence -- well, what's the date of
12 Exhibit 24?
13     A   Pardon me?
14     Q   What's the date of Exhibit 24?
15     A   April 20th, 2005.
16     Q   And do you have any doubt about whether
17 you received Exhibit 24 on or about April 20th,
18 2005?
19     A   No, I do not.
20     Q   There's a reference in the first
21 sentence to "Four More Value pricing for all
22 medium eggs."
23         THE REPORTER:  I'm sorry.  Excuse me.
24 To --
25         MS. LEVIN:  For More Value pricing --

Page 208

1          MR. MURRAY:  It's all caps at the
2  beginning of each word.
3          MS. LEVIN:  -- for all medium eggs.
4      Q   Do you see that?
5      A   I see that.
6      Q   Do you have a recollection as to what
7  For More Value pricing refers to?
8      A   No, I do not.
9          MS. LEVIN:  I'd like to mark as Exhibit
10 25 a document bearing Bates No. KRGEG00019303.
11         (Deposition Exhibit 25 was marked for
12 identification.)
13     Q   And Mr. Stull, I might only have one
14 question for you, so before you spend too much
15 time studying, my question is, do you recognize
16 the handwriting on Exhibit 25?
17     A   No, I do not.
18     Q   Not -- not your handwriting under any
19 circumstances?
20     A   Not mine at all.
21     Q   I think that's the only question I have
22 on that document.
23         MS. LEVIN:  Let's mark as Exhibit 26 a
24 document bearing Bates No. KRGEG00018723.
25         (Deposition Exhibit 26 was marked for

Page 209

1  identification.)
2    Q   And my only -- my only question is
3  whether this appears to be a document that was
4  prepared by you?
5    A   No.  It's not prepared by me.
6        MS. LEVIN:  And I would like to mark as
7  Exhibit 27 a document bearing Bates No.
8  MPS-00123649.
9        You're not going to like your picture
10 in this one.  It's very unflattering.
11       (Deposition Exhibit 27 was marked for
12 identification.)
13       MR. MURRAY:  I think you look rather
14 dashing.
15       MS. OSBORN:  Looks like an Andy Warhol
16 pop art piece.
17       THE WITNESS:  Different glasses.
18 That's about all I can tell you.
19       MS. LEVIN:  I believe it's just the
20 first page.  The second page appears to be
21 pertaining to somebody else.
22       THE WITNESS:  Right.
23    Q   Have you had a chance to review Exhibit
24 27?
25    A   Yes.

Page 210

1    Q   And what is Exhibit 27?
2    A   It's a press release, or an article
3  from the -- the International Egg Commission.
4    Q   Do you know what International Egg
5  Commission is?
6    A   It's a group of international egg
7  people, I would assume.
8    Q   Well, does the first page of Exhibit 27
9  reflect an interview that you gave to the
10 International Egg Commission in the spring of
11 2004?
12    A   Yes.
13    Q   What was the occasion for this
14 interview?
15    A   I'm not -- I was invited to a meeting,
16 and I'm not really sure going back what -- what
17 was the occasion.
18    Q   But there was some sort of publication
19 that arose out of that meeting; is that correct?
20    A   Yes.  This.
21    Q   Right.  And does the International Egg
22 Commission periodically put out a publication of
23 some sort?
24    A   I can't answer that.  I don't know.
25 This is the first and only time I was involved

Page 211

1  with it.
2    Q   But apparently the International Egg
3  Commission put out a publication about their
4  spring meeting in 2004?
5    A   Yes.
6    Q   I'd like to direct your attention --
7  and you've had a chance to review Exhibit 27.
8  Does it appear to be an accurate rendition of the
9  comments that you made to the interviewer?
10       MR. MURRAY:  Objection to the form of
11 the question.
12    A   I can't recall if it is or not.  I
13 mean, it's -- that was a while back.
14    Q   Right.
15    A   Ten years ago.
16    Q   Towards the bottom of the second column
17 it states, "They now ensured that their supplies
18 were compliant with the United Egg Producers'
19 (UEP) Guidelines on keeping hens."  Do you see
20 that?
21    A   Umm --
22    Q   It's almost all the way down,
23 next-to-last paragraph.
24    A   I see that, yes.
25    Q   Who was the "they"?

Page 212

1    A   You know, I'm not sure.  You notice
2  where I spoke they put quotation marks around it,
3  and they quoted what I said.  That's not in
4  quotation marks at all.
5    Q   Well, I understand it's not --
6    A   I'm sure that, you know, there's
7  some -- I don't know if I said it or if that's
8  just assumptions made by whoever wrote this
9  article.
10    Q   But my --
11    A   But if it's not quoted, it's not
12 anything I can take claim of.
13    Q   My question is who the "they" appears
14 to refer to?
15    A   I think my guess would be -- and this
16 would be a guess; I'm not qualified to say who
17 they're referring to -- would be retailers.
18    Q   Such as Kroger?
19    A   All retailers.
20    Q   Well, would you have been qualified to
21 speak on what all retailers were doing?
22    A   No.  That's why that's not quoted
23 there, because I didn't say it.
24    Q   As of spring of 2004 was Kroger in fact
25 ensuring that their egg suppliers were compliant

Page 213

1 with the United Egg Producers's guidelines on
2 keeping hens?
3          MR. MURRAY: Object to the form of the
4 question.
5     A  In talking over today, we would have to
6 refer to the -- I don't know about the time
7 frame. I will stand by what's in all the
8 documents we've put in that have been agreed to.
9 But I don't -- I don't know if that -- if we were
10 in total compliance then or not, I don't know
11 what the status was. I can't recall it.
12    Q  You haven't seen any documents today
13 that reflect -- that don't include a requirement
14 that an egg supplier be compliant with the United
15 Egg Producers' guidelines on keeping hens?
16          MR. MURRAY: Object to the form of the
17 question.
18    A  In what you've shown me? I believe
19 that it was in the documents that we looked at
20 today.
21    Q  Okay.
22          MS. LEVIN: I have nothing further.
23          MS. CRABTREE: Nothing from me, thank
24 you.
25          MS. OSBORN: And nothing from me.

Page 214

1          MR. MURRAY: Okay. I got a couple
2 quick questions. Can you pull out Exhibit 4
3 again, please?
4          MR. NOVAK: This is Paul Novak on the
5 phone. I don't know where in the sequence of
6 questioning you'd like me to go.
7          MS. LEVIN: Kroger's counsel was about
8 to go.
9          MR. MURRAY: Who do you represent,
10 Mr. Novak?
11          MR. NOVAK: Indirect purchaser
12 plaintiffs.
13          MR. MURRAY: All right. Why don't you
14 go, and then I'll go at the end. I'm sorry, I
15 forgot that we still had someone on the phone
16 you've been so well behaved. So quiet.
17          MR. NOVAK: I'm not surprised at all
18 that folks may have forgotten that I was hanging
19 out on the phone.
20          MR. MURRAY: Go ahead and ask your
21 questions.
22          MS. LEVIN: Ask away.
23          MR. NOVAK: Okay. I'm going to take it
24 off speaker so that hopefully I'm easier to hear.
25          MR. MURRAY: Thank you.

Page 215

1 FURTHER DIRECT EXAMINATION,
2     QUESTIONS BY PAUL NOVAK:
3     Q  Mr. Stull, I just wanted to be clear.
4 You had testified I think that you had supply
5 agreements at various times with Cal-Maine, Rose
6 Acre, Norco Ranch, National Food, Hillandale,
7 NuCal and Midwest, perhaps among others; is that
8 correct?
9     A  Yes.
10    Q  Okay. And a lot of the questioning
11 today has been about whether the pricing under
12 those contracts is based at least in part upon a
13 posted Urner Barry price. For all of the
14 different producers that I just referenced, with
15 the exception of Midwest, was an Urner Barry
16 price part of how the price for those suppliers'
17 eggs were calculated?
18    A  Yes, I believe so.
19    Q  Okay. And I think you testified that
20 when you discussed the concept of cost plus
21 pricing with other producers in the industry,
22 there was resistance to that; is that correct?
23          MS. LEVIN: I'll object to the form.
24    A  You know, I can -- I can't say with
25 accuracy if it was with all of them, but with

Page 216

1 some of them, yes.
2     Q  All right.
3          MR. NOVAK: That's all I have.
4          MR. MURRAY: Okay. I just have a
5 couple questions.
6 CROSS-EXAMINATION,
7     QUESTIONS BY KEVIN J. MURRAY:
8     Q  Looking at Exhibit 4 --
9     A  Yes.
10    Q  -- other than by looking at the -- this
11 letter and the title of Mr. Gene Gregory, would
12 you know who Mr. Gregory is or was?
13    A  I would not recognize him if he walked
14 in the door.
15    Q  Okay. Looking at the language in this
16 letter that's been marked as Exhibit 4, can you
17 tell if this is something you drafted or if it
18 was drafted by somebody else?
19          MS. LEVIN: Object to the form. Asked
20 and answered several times.
21    Q  You can answer. I'll repeat the
22 question if you want me to.
23    A  Yes, please.
24    Q  Looking at the language that's used in
25 this letter, can you tell if that's something

Page 217

1 that you would have drafted or if it was drafted
2 by someone else?
3         MS. LEVIN: And I'll object to form.
4 Asked and answered, and calls for speculation as
5 phrased.
6     A   It doesn't appear that it's my style of
7 writing.
8     Q   There's a reference in the letter to
9 the Animal Care Certified program. Do you see
10 that?
11    A   Yes, I do.
12    Q   Okay. Did any of the egg producers who
13 bid on eggs at Kroger ever tell you that the
14 FC -- FTC determined that the term animal care
15 was misleading?
16    A   I can't recall that.
17    Q   Okay. Did any of the egg producers who
18 submitted bids to Kroger ever tell you that the
19 UEP's goal in pursuing the animal welfare
20 guidelines and certification program was to
21 reduce the supply and raise the price of eggs?
22    A   No.
23    Q   Okay. Did any of the egg suppliers who
24 submitted bids to Kroger ever tell you about
25 exporting eggs at below cost?

Page 218

1     A   No.
2     Q   Did any of the egg suppliers who
3 submitted bids to Kroger ever tell you that the
4 UEP members were discouraged from building new
5 henhouses --
6     A   No.
7     Q   -- once these guidelines were passed?
8     A   No.
9         MS. OSBORN: Objection. Assumes facts
10 not in evidence.
11        MR. MURRAY: Okay.
12    Q   Did any of the egg suppliers who
13 submitted bids to Kroger ever tell you that the
14 UEP animal welfare program was a hidden agenda
15 for price fixing?
16    A   No.
17        MS. OSBORN: Same objection.
18    Q   Would it be fair to say that Kroger had
19 no direct input in the drafting of the UEP
20 guidelines?
21        MS. LEVIN: Object to the form.
22    A   Would you repeat the question, please?
23    Q   Would it be fair to say that Kroger had
24 no direct input into the drafting of the UEP
25 guidelines?

Page 219

1         MS. LEVIN: Object to the form.
2     A   Yes.
3     Q   Kroger was not a member of the UEP; was
4 it?
5     A   No.
6     Q   Okay.
7         MR. MURRAY: I have no further
8 questions.
9         MS. LEVIN: Just a slight redirect.
10 REDIRECT EXAMINATION,
11    QUESTIONS BY CHRISTINE C. LEVIN:
12    Q   Mr. Stull, what's the basis for your
13 testimony that Kroger had no input into the
14 drafting of the UEP guidelines?
15    A   I'm not sure what you're asking me.
16    Q   What's the basis for your testimony
17 that you just gave that Kroger had no input into
18 the drafting of the animal welfare guidelines?
19    A   To my knowledge, they didn't.
20    Q   But you don't know one way or the other
21 whether Kroger had any input into the drafting of
22 the animal welfare guidelines; do you?
23    A   I know I had no input into it.
24    Q   You had no input, but it's quite
25 possible that Ms. Marmer, for instance, had input

Page 220

1 into the drafting of the animal welfare
2 guidelines?
3         MR. MURRAY: Object to the form of the
4 question. Calls for speculation.
5     A   I don't know how to say this other than
6 to say I can't speak for other people within the
7 Kroger organization.
8     Q   I understand.
9     A   Whether she did or not, I have no idea.
10    Q   But when asked whether you -- Kroger
11 had any input into the drafting of the animal
12 welfare guidelines, your testimony was no. That
13 was not correct; was it?
14    A   I thought we were talking about me
15 personally.
16    Q   The question was not you personally, it
17 was Kroger. So that testimony was incorrect?
18        MR. MURRAY: Object to the form of the
19 question.
20    A   I personally had no input into the UEP
21 guidelines.
22    Q   And you don't know one way or the other
23 whether Kroger did?
24    A   That's correct. I don't know.
25        MS. LEVIN: Thank you.

Page 221

1    MR. MURRAY:  I think you're done.
2    THE VIDEOGRAPHER:  This concludes the
3  deposition of Gary Stull.  The time is 4:03 --
4  almost -- p.m., and we are off the record.
5    MR. MURRAY:  We're going to designate
6  this at least for the time being highly
7  confidential, and we don't waive the reading and
8  signing.
9    AND FURTHER THE DEPONENT SAITH NOT.
10
11
12
13   _____
14     GARY A. STULL
15
16  Subscribed and sworn to and before me
17  this _____ day of _____, 20_____.
18
19
20  _____
21     Notary Public
22
23
24
25

Page 222

1  STATE OF INDIANA        )
2                          ) SS:
3  COUNTY OF MARION        )
4    I, Tara Gandel Hudson, RPR, CRR, a Notary
5  Public in and for the County of Marion, State of
6  Indiana at large, do hereby certify that the
7  deponent herein, GARY STULL, was by me first duly
8  sworn to tell the truth, the whole truth, and
9  nothing but the truth in the aforementioned matter;
10    That the foregoing deposition was taken on
11  behalf of the Defendants at the offices of FAEGRE
12  BAKER DANIELS, 300 North Meridian Street, Suite
13  2700, Indianapolis, Marion County, Indiana, on the
14  1st day of April, 2014, commencing at the hour of
15  9:32 a.m., pursuant to the Federal Rules of Civil
16  Procedure;
17    That said deposition was taken down in
18  stenographic notes and translated into an English
19  transcript under my direction, and that said
20  transcript is a true record of the testimony given
21  by the said deponent; and that the signature of
22  said deponent to his deposition was requested;
23    That the parties were represented by their
24  counsel as aforementioned.
25    I do further certify that I am a disinterested

Page 223

1  person in this cause of action; that I am not a
2  relative or attorney of either party, or otherwise
3  interested in the event of this action, and am not
4  in the employ of the attorneys for either party.
5    IN WITNESS WHEREOF, I have hereunto set my
6  hand and affixed my notarial seal this _____ day
7  of _____, 2014.
8
9     _____
10        N O T A R Y   P U B L I C
11
12  My Commission Expires:
13  April 9, 2016
14
15  County of Residence:
16  Marion
17
18
19
20
21
22
23
24
25