# ATTACHMENT 71

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                          March 20, 2014

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE:   PROCESSED EGG PRODUCTS

ANTITRUST LITIGATION                    MDL NO. 2002

_____   08-md-02002


HIGHLY CONFIDENTIAL


VIDEO DEPOSITION OF KELLY J. TOBEY

Taken at 2510 Capital Avenue, SW

Battle Creek, Michigan

Commencing at 8:35 a.m.

Thursday, March 20, 2014

Before Trisha Cameron, RPR, CSR-6175

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                    March 20, 2014

2 (Pages 2 to 5)

---

**2**

APPEARANCES:
MR. RICHARD CAMPBELL
MS. SARAH ANSARI
Jenner & Block
353 North Clark Street
Chicago, Illinois 60654
(312) 923-2818
E-mail: rcampbell@jenner.com
    Appearing on behalf of The Kellogg Company.

MR. WILLIAM GREENE
Stinson, Leonard, Street, L.L.P.
150 South Fifth Street
Suite 2300
Minneapolis, Minnesota 55402
(612) 335-1500
E-mail: william.greene@stinsonleonard.com
    Appearing on behalf of Michael Foods.

ALSO PRESENT: Mark Myers, videographer.

---

**4**

Battle Creek, Michigan
March 20, 2014
About 8:35 a.m.
                * * *
    VIDEOGRAPHER: We are now on the record.
This is the videotaped deposition of Kelly Tobey being
taken in Battle Creek, Michigan. Today is Thursday,
March 20th, 2014. The time is now 8:35 a.m.
    And at this time, will the attorneys please
state their appearances for the record, and the court
reporter please swear in the witness.
    MR. GREENE: William Greene, G-r-e-e-n-e, of
the law firm of Stinson Leonard Street. Counsel for
Defendant Michael Foods.
    MS. ANSARI: Sarah Ansari of Jenner & Block,
LLP, on behalf of Kellogg and the deponent.
    MR. CAMPBELL: Richard Campbell, Jenner &
Block, on behalf of Kellogg.
                * * *
    KELLY J. TOBEY,
    having been first duly sworn,
    was examined and testified as follows:
                * * *

---

**3**

I N D E X
WITNESS:                        PAGE
KELLY J. TOBEY
Examination by Mr. Greene            5
Examination by Ms. Ansari           71
Further Examination by Mr. Greene   75


E X H I B I T S
Exhibit 1                       50
Exhibit 2                       69

---

**5**

EXAMINATION
BY MR. GREENE:
Q.  Good morning, Ms. Tobey. We had a chance to meet just
before the deposition. But once again, I'm William
Greene. I'm going to be taking your deposition today.
I'm sure Ms. Ansari and Mr. Campbell explained the
procedure, but I'm just going to go over it very
briefly. I'm going to be asking you questions this
morning and asking you to respond.
    The court reporter is going to be taking down
everything we both say. So it will be important for
you to give an audible response. You can't -- not just
a nod of the head. Is that okay?
A.  That's okay, yes.
Q.  And it's important for her benefit that we not talk
over each other. I will try and not interrupt you, and
it would be best for you to just wait for the end of
the question to start talking so we're not talking over
each other. Okay?
A.  Okay.
Q.  I will try and make my questions as clear as I can.
Sometimes I won't be entirely successful. So if you
don't understand a question, if anything is confusing,
please just let me know, and I'll do my best to
rephrase the question. Okay?

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                    March 20, 2014

3 (Pages 6 to 9)

---

**6**

1    A.   Okay.
2    Q.   If you do answer a question, I'm going to assume that
3         you understood the question; is that fair?
4    A.   That's fair, yes.
5    Q.   Okay.  If you need or want a break at any point, just
6         let us know.  We'll be glad to take a break.  We take
7         breaks from time to time in any event.  But if you want
8         a break, let us know.  I would just ask if a question
9         is pending, go ahead and complete the answer to the
10        question before we take the break.  Okay?
11   A.   Okay.
12   Q.   All right.  Is there any reason why you can't give full
13        and complete testimony this morning?
14   A.   No.
15   Q.   All right.  Could you please state and spell your name
16        for the record.
17   A.   Yep.  Kelly, K-E-L-L-Y, Tobey, T-O-B-E-Y.
18   Q.   What is your address?
19   A.   191 Bansill Drive, B-A-N-S-I-L-L.  That's here in
20        Battle Creek.
21   Q.   And where are you employed?
22   A.   Kellogg Company.
23   Q.   What's your business address?
24   A.   It's 4 East Hamlin Avenue.
25   Q.   In Battle Creek?

---

**7**

1    A.   In Battle Creek, yes.
2    Q.   What is your current position with the Kellogg Company?
3    A.   Director of quality supplier management.
4    Q.   How long have you had that position?
5    A.   That position just for a couple of months.
6    Q.   All right.  When did you first start working at
7         Kellogg?
8    A.   In 1999.
9    Q.   Have you been working at Kellogg continuously since
10        1999?
11   A.   Yes, I have.
12   Q.   All right.  Can we -- can I get your educational
13        background starting with after high school?
14   A.   Uh-huh.  Yep.  I have a bachelor's degree from Sienna
15        Heights University.
16   Q.   Where is that located?
17   A.   In Adrian, Michigan.
18   Q.   And when did you receive that degree?
19   A.   That was in 2001.
20   Q.   So you started working at Kellogg's before you
21        graduated from college?
22   A.   Yes.
23   Q.   Was the Kellogg's position, the one you got in 1999,
24        your first employment position?
25   A.   No.

---

**8**

1    Q.   Okay.
2    A.   It was my first with --
3    Q.   With Kellogg?
4    A.   Right.
5    Q.   Let's back up then.  And tell me about your first
6         employment position, first job.
7    A.   First job like out of high school?
8    Q.   Yeah.  I'm not interested in sort of part-time jobs
9         while you were in high school.  But the -- maybe the
10        first post-high school job.
11   A.   Okay.  I was a manager of a Hickory Farms retail store.
12   Q.   And when did you have that position?
13   A.   That was from about '89 until I'm guessing it would
14        have been around '94, '95.
15   Q.   All right.  And what did you do after Hickory Farms?
16   A.   I worked for M-66 Auto Body as an office manager.
17   Q.   What's the name of the company?
18   A.   M-66 Auto Body.
19   Q.   Where is that?
20   A.   Here in Battle Creek.
21   Q.   And over what time did you have that position?
22   A.   That would have been '95 probably until about '98, '97,
23        '98.
24   Q.   Okay.  And what did you do after that?
25   A.   After that, I was doing some temp positions at Kellogg

---

**9**

1         Company through Employment Group.
2    Q.   And where at Kellogg were you temping?
3    A.   I was in a couple different departments.  Strategy
4         development was one of them, and then procurement was
5         one of them.
6    Q.   And in procurement, who did you work for?
7    A.   Charles Vaughn.
8    Q.   Okay.  So what did you do after the Kellogg temp
9         positions?
10   A.   I was hired into the position I was temping in.  That
11        was my first Kellogg role.
12   Q.   And what was your first -- was it a full-time job?
13   A.   Yes.
14   Q.   What was your first full-time job at Kellogg?
15   A.   Administrative assistant for packaging procurement.
16   Q.   That's 1999?
17   A.   Yes.
18   Q.   And you said you got your bachelor's degree in 2001?
19   A.   Yes.
20   Q.   So were you going to school at the same time you were
21        working at Kellogg?
22   A.   Yes.  I already had two associate's degrees prior to
23        temping, starting my temp position.  And I had gone
24        back to Sienna Heights and started my bachelor's degree
25        prior to being hired by Kellogg.

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                          March 20, 2014

4 (Pages 10 to 13)

**10**

1    Q.  Okay.  What were your associate's degrees in?
2    A.  Management and accounting.
3    Q.  Where did you earn them, those degrees?
4    A.  Through Kellogg Community College.
5    Q.  What were your responsibilities as administrative
6        assistant for packaging procurement?
7    A.  Schedule meetings.  I would review documentation for
8        the packaging buyers.  I mean, there was various things
9        they would ask me to do.  There was some invoices I
10       would work on.
11   Q.  And what does -- in packaging procurement, what does
12       that department buy?
13   A.  So packaging that would go -- cartons, cases, liners
14       for the food.
15   Q.  Okay.  Would that be things like corrugated boxes?
16   A.  Yes.  Yep.
17   Q.  I don't know.  I may have asked.  But how long were you
18       in the position of administrative assistant for
19       packaging procurement?
20   A.  About nine months.
21   Q.  So still in 1999 or 2000?
22   A.  That would have gone into 2000.
23   Q.  2000?
24   A.  Uh-huh.
25   Q.  And what was your next position at Kellogg's?

**11**

1    A.  It was price coordinator for packaging procurement.
2    Q.  What did you do as price coordinator for packaging
3        procurement?
4    A.  So I worked with the buyers.  I would set up purchase
5        orders for them.  I would enter them into the system.
6        If invoices came in and they didn't match the prices on
7        the purchase orders, I would work to resolve those
8        discrepancies.
9    Q.  Who was your supervisor in that position?
10   A.  Lisa VanFulpen.
11   Q.  Can you spell the last name?
12   A.  V-A-N, and I think it's capital F-U-L-P-E-N, to the
13       best of my recollection.
14   Q.  How long were you in that position?
15   A.  About a year.
16   Q.  So does that bring us into 2001?
17   A.  Yes.  Yeah, 2001.  Probably a little over a year
18       because my next position started in January of 2002.
19   Q.  What position did you start in January of 2002?
20   A.  I was raw material associate buyer.
21   Q.  Who was your supervisor?
22   A.  Shelly VanTreeck.
23   Q.  Can you spell that one.
24   A.  Yep.  V-A-N, capital T-R-E-E-C-K.
25   Q.  How long were you in the position of raw material

**12**

1        associate buyer?
2    A.  Probably about a year and a half or so.  I was in
3        procurement up until 2012, fall of 2012.  So I was in
4        raw material procurement for that time.  So a period of
5        about twelve years.  And I had various positions within
6        the raw material procurement team.
7    Q.  Okay.  So the -- I'm trying -- the position that you
8        started in January of 2002 --
9    A.  Uh-huh.
10   Q.  -- were you in that position for about a year and a
11       half?
12   A.  Yes.
13   Q.  So into the middle of 2003?
14   A.  Uh-huh.  Yes.
15   Q.  What were your responsibilities in that position?
16   A.  I was a buyer, and I had categories of chemicals and
17       conditioners, some of our blends.  And then I took on
18       eggs during that time, egg portfolio.
19   Q.  What are blends?
20   A.  Blends would be raw materials that are blended
21       together, and then we buy what's called a pre-mix.
22   Q.  Can you give me an example of a blend?
23   A.  Yes.  If we have spices put together and then they're
24       added as a topical seasoning to a cracker, that would
25       be a spice blend.  We had sweet blends, vitamin blends.

**13**

1    Q.  I think you said you took on eggs at some point.  When
2        did eggs become part of your responsibility?
3    A.  To the best of my recollection, it was in the late
4        summer or early fall of 2002.
5    Q.  And how long did your responsibilities include egg
6        purchasing?
7    A.  Again, to the best of my recollection, it was about a
8        year.  I think until late 2003.  It could have been
9        early 2004.
10   Q.  So I want to see if I understand correctly.  You had
11       some involvement with egg purchasing from late summer
12       early fall of 2002 until late 2003 or early 2004?
13   A.  Yes.
14   Q.  So to the best of your recollection, a year and a half
15       or less?
16   A.  Uh-huh.  Yes.
17   Q.  All right.  I want to complete your work history at
18       Kellogg, and then we'll come back.  While -- during
19       that period when you were purchasing eggs, were you --
20       did you also have chemicals, conditioners, and blends
21       throughout that period?
22   A.  Yes.
23   Q.  During the period when you were purchasing eggs, were
24       there any other products you were purchasing other than
25       those?

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                                  March 20, 2014

5 (Pages 14 to 17)

### 14

1   A.  Not that I recall.
2   Q.  All right.  At the point when you stopped being
3      involved in purchasing eggs, did you take on a new
4      position?
5   A.  I can't remember exactly when I went from associate
6      buyer to buyer, but my categories did change.
7   Q.  Okay.  What's the difference between associate buyer
8      and buyer?
9   A.  It's just progression in -- progression in learning
10     categories.
11  Q.  When you were an associate buyer and you were involved
12     in eggs, was there anybody else at Kellogg's who was
13     involved in purchasing eggs?
14  A.  No.
15  Q.  When you were an associate buyer involved in purchasing
16     eggs, who was your supervisor?
17  A.  Shelly VanTreeck.
18  Q.  Okay.  And she was your supervisor throughout the time
19     that you purchased eggs?
20  A.  Well, she was -- I believe there was a change, and
21     Christine Wentworth was also -- she was -- both of them
22     were my managers, and I don't remember the exact
23     timeframe but --
24  Q.  Okay.  So did you become a buyer as distinguished from
25     an associate buyer in late 2003, early 2004?

### 15

1   A.  Yes.
2   Q.  And when you became a buyer as opposed to associate
3      buyer, did you stop being involved in eggs?
4   A.  I don't know if that was the exact time it changed.  I
5      know my categories did change in 2004.
6   Q.  Okay.  So may or may not have coincided with you
7      becoming a buyer?
8   A.  Correct.
9   Q.  When did your categories change?
10  A.  2004.  I remember taking on the fruit category.
11  Q.  In 2004 you stopped purchasing eggs?
12  A.  Yes.
13  Q.  Correct?
14  A.  Yes.
15  Q.  And you started purchasing fruit?
16  A.  Yes.
17  Q.  What does purchasing fruit entail?  Are you purchasing
18     fresh fruit?
19  A.  No.  We have freeze dried fruit.  We have fruit purees
20     that go in the fillings.  We have some fruit pieces.
21     So various different types of fruits.
22  Q.  But you weren't buying perishable fruits?
23  A.  No.
24  Q.  And at this point or at some point you got the title of
25     buyer?

### 16

1   A.  Yes.
2   Q.  All right.  And who was supervising you when you were
3      buyer in 2004?
4   A.  Could have been Christine Wentworth.  Could have been
5      Shelly VanTreeck.
6   Q.  So what was your next position or -- withdrawn.  In
7      your progression at Kellogg's from that point, are you
8      getting new positions or are you simply changing the
9      portfolio of products you're buying?
10  A.  Both occurred.
11  Q.  Okay.  Well, let's talk about both then.
12  A.  Okay.
13  Q.  What was the next change in your employment at
14     Kellogg's either in your position or in the products
15     you were buying?
16  A.  In the products I was buying they changed pretty often.
17     I would change every usually six to nine months
18     depending on what was going on with our team.
19  Q.  Was that common within procurement at Kellogg's?
20  A.  Yes, it was common.
21  Q.  To change people frequently?
22  A.  Right.  Change roles, change categories that were being
23     purchased.
24  Q.  Did anyone at Kellogg's ever explain the rationale for
25     changing people frequently?

### 17

1   A.  Well, I don't know that anybody explained the
2      rationale.
3   Q.  Do you have some understanding of the rationale?
4   A.  Yes.  It could depend if there were changes in
5      personnel.  If there were -- you know, if someone came
6      in with a background in a different commodity, then
7      we'd want to make that change.  Progression in the
8      role, you could take on something that was more
9      strategic or more difficult.
10  Q.  Okay.  So what was the next -- what was your next
11     progression at Kellogg's after you were buying fruit in
12     the 2004 period?
13  A.  As for my next position?
14  Q.  Yes.
15  A.  Next position would have been senior manager.
16  Q.  When did you take that position?
17  A.  In 2004.  No.  2009.
18  Q.  In 2009?
19  A.  2009.
20  Q.  So between 2004 and 2009 you were a buyer?
21  A.  Yes.
22  Q.  Let's talk about the products you went through during
23     that period.  Were you fruit throughout 2004 through
24     2009?
25  A.  No.

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                     March 20, 2014

6 (Pages 18 to 21)

---

**18**

1  Q.  So after fruit, what did you buy?
2  A.  I had fruit.  I had wheat and flour for a period of
3      time.  I had soy.  I had flavors.  We have about -- to
4      give you context, we have about 36 different material
5      categories.  Over the course of my time in procurement,
6      I managed about two-thirds of those, and a couple of
7      them more -- I had the vitamin portfolio two different
8      times.
9  Q.  When you say 36 different categories, would eggs be one
10     of those 36?
11 A.  Yes.
12 Q.  And you at one point or another, you handled close to
13     two-thirds of the categories?
14 A.  Yes.
15 Q.  All right.  You became a senior manager in 2009?
16 A.  Yes.
17 Q.  And what was the -- what were your responsibilities in
18     that position?
19 A.  So my responsibilities, I still had a couple categories
20     I was managing, and I also became a people manager.
21 Q.  Still had a couple categories of buying?
22 A.  Yes.
23 Q.  Were you still involved in procurement?
24 A.  Yes.
25 Q.  As far as managing people, what did that entail?

---

**19**

1  A.  That entailed writing development reviews.  And I had
2      started out with two people that were reporting to me.
3      So I had accountability to make sure that they were
4      meeting their objectives and purchasing, signing off on
5      the contracts they were committing to.
6  Q.  Did you have responsibility over still a particular set
7      of products?
8  A.  I did personally.  So I was managing a vitamin category
9      at that time.  And then my direct reports would have
10     various categories.  So I would have oversight on all
11     those.
12 Q.  Okay.  Who did you report to when you were a senior
13     manager in 2009?
14 A.  John Wolf.
15 Q.  Was that the first time you reported to John Wolf?
16 A.  Yes.
17 Q.  Had you worked with Mr. Wolf in any capacity before
18     2009?
19 A.  Yes.  He was the director of the raw material team.  So
20     that's who Shelly VanTreeck and Christine Wentworth
21     reported to.
22 Q.  So when you were buying eggs, he was a level above your
23     supervisors?
24 A.  At that time -- I'm trying to remember when John came
25     into his role because when I was first hired by Shelly

---

**20**

1      in 2002, Margie Secander was the -- that was senior
2      director of the raw material team.
3  Q.  The position that John Wolf would later occupy?
4  A.  Yes.
5  Q.  You're not sure when you were an egg buyer if John Wolf
6      was in that position or not?
7  A.  I don't recall that he was.  But there was a change
8      with Margie, I believe it was late 2002.
9  Q.  What did you do for Kellogg's after you were senior
10     manager?
11 A.  After senior manager in 2012 I moved into the quality
12     supplier management team as a technical manager.
13 Q.  What does the quality supplier management team do?
14 A.  We have oversight over approving suppliers and raw
15     materials for -- well, suppliers and raw materials.  So
16     it's all on the raw material side.
17 Q.  I think you used the term technical manager.
18 A.  Uh-huh.
19 Q.  What does that mean?
20 A.  It's pretty much the same as a senior manager.  It's a
21     technical manager.  We're in the research and
22     development building.  It's just different terminology
23     they use.
24 Q.  Who do you work with in the quality supplier management
25     team?

---

**21**

1  A.  I report into Ann Barea, B-A-R-E-A.
2  Q.  Okay.  And what is her position?
3  A.  She is senior director, quality supplier management.
4  Q.  And does quality supply management cover all 36
5      categories?
6  A.  Yes.
7  Q.  Are the people in quality -- are there people in
8      quality supply management who have technical or
9      scientific backgrounds?
10 A.  Yes.
11 Q.  I think you mentioned research and development.  Are
12     there research and development people who work in
13     quality supply management?
14 A.  No.
15 Q.  They're separate?
16 A.  Yes.
17 Q.  But there are some technical or scientific personnel
18     who work in quality supply management?
19 A.  Yes.
20 Q.  What do the technical or scientific people do?
21 A.  They are the actual QIM, so quality ingredient
22     managers.  And they would write specifications and do
23     supplier approvals.  And then manage questions --
24     technical questions that come from plants or suppliers.
25 Q.  What does it mean to write specifications?

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                  March 20, 2014

7 (Pages 22 to 25)

### Page 22

1    A.  To develop a specification for a raw material.
2    Q.  Can you explain what does that mean, to develop a
3        specification for raw material.
4    A.  So based on parameters we have from quality,
5        functionality, and food safety, we would put those
6        parameters into the spec and then review that with the
7        supplier, make sure we have agreement and alignment.
8    Q.  I have in 2012 you joined the quality supply management
9        team as a technical manager, correct?
10   A.  Yes.
11   Q.  And is that your position today?
12   A.  No.  Today I'm director of quality supplier management.
13       So that change was effective January 1st.
14   Q.  Of 2014?
15   A.  Yes.
16   Q.  Oh, congratulations.
17   A.  Thank you.
18   Q.  And so we're current?
19   A.  Yes.
20   Q.  All right.  Let's go back to the position that involved
21       eggs.  Let's see if I can find it.  If I -- if my notes
22       are correct, we're dealing with a period of a year and
23       a half or less.
24   A.  Yes.
25   Q.  Okay.  From late summer early fall of 2002, to late

### Page 23

1        2003 or early 2004, correct?
2    A.  Correct.  Yep.
3    Q.  And at that point you were an associate buyer; is that
4        right?
5    A.  Yes.
6    Q.  Was that true throughout the time that you were
7        involved in eggs?
8    A.  Yes.
9    Q.  Prior to the period when you started working on buying
10       eggs for Kellogg's, did you have any background
11       involving eggs?
12   A.  No.
13   Q.  When you took on that responsibility regarding eggs,
14       did you get any training involving eggs?
15   A.  I'm sure I did.  I don't remember exactly.  I can't
16       give you specifics on what that would have entailed.
17   Q.  Do you remember who trained you?
18   A.  I believe it was Kim Caldarone who had eggs prior to
19       myself.  She was with -- she was with the Keebler
20       company when we acquired Keebler.
21   Q.  When was that -- when did that acquisition occur?
22   A.  That was in late 2001.
23   Q.  Was Kellogg's buying eggs before that?
24   A.  Yes, we were.
25   Q.  Was Kim Caldarone buying already the eggs for Kellogg's

### Page 24

1        before you took the position?
2    A.  I don't remember exactly.  I do remember when we
3        purchased Keebler and we had folks in both
4        organizations that were buying the same commodities,
5        that they were working on putting those together.  So
6        that would have been part of our normal process.
7    Q.  Let me clear up one thing at the outset because we used
8        the term eggs.  When you were involved in purchasing
9        during this year and a half period, did Kellogg's ever
10       buy shell eggs?
11   A.  Buy shell eggs?  We bought -- no.
12   Q.  Right.  We're going to talk about egg products.
13   A.  Right.
14   Q.  But I'm specifically focusing on eggs in the shell.
15   A.  Okay.
16   Q.  Did Kellogg's buy eggs -- buy shell eggs?
17   A.  No.
18   Q.  To your knowledge, has Kellogg's ever purchased shell
19       eggs?
20   A.  Not to my knowledge.
21   Q.  Okay.  So I'm going to try and use the term egg
22       products.  But from this point on, if we're referring
23       to eggs, we're not talking about shell eggs; is that
24       fair?
25   A.  Yes, that's fair.

### Page 25

1    Q.  When you started in your position involving the
2        purchase of egg products, what were the egg products
3        that Kellogg's purchased?
4    A.  We purchased liquid whole eggs, dried whole eggs, and
5        dried egg whites or powdered egg whites.
6    Q.  Do you use dried or powdered interchangeably, is that
7        the same term?
8    A.  Yes.
9    Q.  So those three.  I've got liquid whole eggs, dried
10       whole eggs, and dried or powdered egg whites.
11   A.  Yes.
12   Q.  Okay.  Anything else?
13   A.  Not to my recollection.
14   Q.  Okay.  What Kellogg's products were the liquid whole
15       eggs used to make?
16   A.  Eggos.
17   Q.  Eggo waffles?
18   A.  Yes.
19   Q.  Anything else?
20   A.  Not to my recollection, no.
21   Q.  And where are the Eggo waffles -- where were the Eggo
22       waffles made?
23   A.  I believe it went into two.  It would have been Blue
24       Anchor, New Jersey, and Rossville, Tennessee.
25   Q.  What Kellogg's products were the dried whole eggs used

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                      March 20, 2014

8 (Pages 26 to 29)

---

### 26

1  to make?
2  A.  It would have gone into Eggo waffles as well in a
3      couple of the plants and some of the cookies from
4      Keebler.
5  Q.  Were the dried whole eggs used to make any other
6      products?
7  A.  Not to my recollection.
8  Q.  Where are the -- you said where the Eggo waffles were
9      made.  Where were the cookies made?
10 A.  There were several different -- several different
11     plants.
12 Q.  Can you -- to the best of your recollection, can you
13     list those plants?
14 A.  Charlotte, North Carolina; Florence, Kentucky; Augusta,
15     Georgia; Grand Rapids, Michigan.
16 Q.  All right.  And were the dried whole eggs used to make
17     any products other than the Eggo waffles or the
18     cookies?
19 A.  Not to my recollection.
20 Q.  And the final category, the dried egg whites.
21 A.  Uh-huh.
22 Q.  What Kellogg's products were the dried egg whites used
23     to make?
24 A.  Those went into our veggie foods in our Zanesville,
25     Ohio, plants.

### 27

1  Q.  When you say the "veggie foods," what do you mean?
2  A.  Worthington Foods and MorningStar Farms are the brands.
3  Q.  And can you just elaborate?  When you say veggie foods,
4      what kind of foods are we talking about?
5  A.  They're meat substitute products.
6  Q.  And are they all made -- at the time you were buying,
7      were they all made in Zanesville, Ohio?
8  A.  Yes.  Well, yes.  And then we had a couple
9      co-manufacturers.  But I believe all the egg whites
10     went to Zanesville.
11 Q.  Do you recognize a plant location called Worthington?
12 A.  Yes.
13 Q.  Were there any egg products that were ordered for the
14     Worthington location?
15 A.  They could have gone there.  Worthington was in
16     Dearborn, Ohio.  So it's close to the Zanesville plant.
17     And they did some pre-blends there.  So the egg whites
18     could have been part of a pre-mix that they would have
19     put together.  That would have been for the same
20     finished food.  It would have been for the Worthington
21     products, MorningStar Farms.
22 Q.  Let me ask you to take a look at Neal Exhibit 10.
23     MR. CAMPBELL:  I don't think we have it.
24     Show us which one that is, Bill.
25     MR. GREENE:  It's this one right here.

### 28

1      MS. ANSARI:  Okay.
2      MR. GREENE:  I have --
3      MS. ANSARI:  Sorry.  We just --
4      MR. CAMPBELL:  We have many of them but not
5  all.
6      MR. GREENE:  I have an extra set from
7  yesterday.  So I'll use my notebook.
8      MS. ANSARI:  Thank you very much.  Thank you.
9  BY MR. GREENE:
10 Q.  Now, Neal Exhibit 10 is a document bates numbered
11     KEL00017901 to 17902.  The bates number KEL, Ms. Tobey,
12     it means it was produced by Kellogg's.
13 A.  Okay.
14 Q.  And this is an e-mail string that -- I think all of the
15     e-mails are occurring January 6th, 2003.
16 A.  Okay.
17 Q.  There are it looks like four of them.  And at this
18     point, January in 2003, you were an associate buyer
19     involved in eggs?
20 A.  Yes.
21 Q.  Okay.  I wonder if you can identify some of the people
22     who are in this correspondence.  There's a reference to
23     Trudy Cravens.
24 A.  Uh-huh.
25 Q.  Who was Trudy Cravens?

### 29

1  A.  Trudy Cravens, I don't recollect what her position was.
2      I know she was at the plant in Zanesville or
3      Worthington.
4  Q.  Do you use those two, Zanesville or Worthington,
5      interchangeably because they work so closely together?
6  A.  Yes, I do.  Uh-huh.
7  Q.  But you don't recall anything else about her position?
8  A.  No.
9  Q.  Okay.  And there's a -- there is a reference to Kurt
10     Plouse.  I don't know if I'm pronouncing it correctly.
11     P-L-O-U-S-E.
12 A.  Uh-huh.
13 Q.  Who was Mr. Plouse?
14 A.  I don't recall what his position was.
15 Q.  Now, if you look at the correspondence and with these
16     e-mails, I usually assume the last comes first.
17 A.  Yes.
18 Q.  So I'm going to the second page at the bottom.
19 A.  Uh-huh.
20 Q.  You write to Ms. Cravens, we're currently bidding out
21     our egg business for 2003.  I sent out a request for
22     information and received a question on specification
23     number, and it includes a number.  Do you see that?
24 A.  Yes, I do.
25 Q.  And then below where it says thanks, Kelly, you wrote

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                    March 20, 2014

9 (Pages 30 to 33)

---

**30**

1    my question regarding specification No. 109110 pertains
2    to the gel strength (listed in chemical properties) as
3    to if less than 300 is a correct statement, question
4    mark. Also, if gel strength is a requirement for the
5    Certificate of Analysis, what is the preferred method
6    of testing for gel strength, or is a specific lab used
7    for that testing. Do you see that?
8    A. Yes.
9    Q. Can you explain what you were asking in this e-mail?
10   A. To the best of my recollection, that bottom paragraph
11   would have been taken directly from a question a
12   supplier sent to me. So I would have just copied and
13   pasted that here for Trudy to respond to.
14   Q. Did you have some independent understanding of what the
15   -- what the supplier was asking?
16   A. Yes. Gel strengths would be critical in our process to
17   hold veggie patties together. So it's a critical
18   parameter of the eggs.
19   Q. Can you explain that a little bit. First, let's talk
20   about the product.
21   A. Yep.
22   Q. These are -- what is a veggie patty?
23   A. Veggie patty is a soy based -- so it's a meet
24   substitute patty. So it's based of soy. And to get
25   the properties -- to get the product to bind together,

---

**31**

1    you need some type of binder. So in this product, egg
2    white was the binder used or one of the binders used.
3    Q. So just so I'm -- let's see if I can understand it in a
4    little less technical way. You're trying to get soy to
5    function a little bit more like a hamburger or other
6    kind of patty?
7    A. Uh-huh.
8    Q. Is that right?
9    A. Yes.
10   Q. And in order to do that, you need the ingredients that
11   you're using to help bind the product together?
12   A. Yes.
13   Q. Okay. And egg whites were used to make that binding
14   possible?
15   A. Yes.
16   Q. Okay.
17   A. As one ingredient, yes.
18   Q. As one ingredient. And I think you referred -- I think
19   you indicated that gel strength would be critical in
20   that process.
21   A. Yes.
22   Q. And if the gel strength wasn't sort of up to the
23   standard, then the product wouldn't function the way it
24   needed to?
25   A. That's correct.

---

**32**

1    Q. And the question is then it appears to be passed from
2    Trudy to Kurt Plouse. Is that how you read this?
3    A. Yes.
4    Q. And then Kurt Plouse offers what looks to me like a
5    more technical answer. Do you see that?
6    A. Yes, I do.
7    Q. Which from that would you conclude that Kurt Plouse has
8    some kind of technical position?
9    A. Yes, I would.
10   Q. All right. And he writes yes, less than 300 is the
11   specification, as it is a test that measures the drop
12   of a penetrometer --
13   A. Uh-huh.
14   Q. -- cone into an egg gel. The less the penetration, the
15   stronger the gel. This is an in-house method developed
16   in Worthington many years ago and cannot be related to
17   other gel strength methods by other labs. What does
18   that mean?
19   A. It means that any standard -- or I take it to mean any
20   other standard lab analysis that would be commonly done
21   for eggs, this test that was done at Worthington was
22   different. So it couldn't be replicated in a standard
23   lab.
24   Q. So it wouldn't be sufficient for Kellogg's to know that
25   a -- that an egg product had satisfied some other

---

**33**

1    commercial standard, correct?
2    A. Without -- without doing this type of test, right?
3    Q. In order to make sure the product would work for
4    Kellogg's, it would have to pass the Kellogg's specific
5    test.
6    A. Yes.
7    Q. All right.
8    A. And I'd say unless that type of test could be
9    replicated by another -- by another lab analysis.
10   Q. All right. And what Mr. Plouse is saying is at least
11   at this stage, it cannot be related to other gel
12   strength methods by other labs.
13   A. Yes.
14   Q. Okay.
15   A. Correct.
16   Q. That is for Kellogg's -- for Kellogg's to be able to
17   use it, Kellogg's had to be satisfied it passed the
18   Kellogg's test?
19   A. Uh-huh. Yes.
20   Q. And then he goes on, a word of caution. If we are,
21   quote, bidding out, unquote, our egg business, it
22   should be remembered that there have been occasions in
23   the past when egg white solids passed laboratory
24   testing but did not pass functionality testing on the
25   bench or in the plant.

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.        March 20, 2014

10 (Pages 34 to 37)

### 34

1   A.   Uh-huh.

2   Q.   What does that mean?

3   A.   I take that to mean that there may have been other test

4     results that would have been on a specification or on a

5     supplier's COA, Certificate of Analysis, that may have

6     passed what we had as our spec. But if this type of

7     test was not performed, then it may not pass our

8     functionality requirements.

9   Q.   And you had -- as the egg buyer, did you have

10     experience where products supplied by particular egg

11     product suppliers did not pass Kellogg's tests?

12   A.   Not to my recollection at the time of my tenure during

13     eggs.

14   Q.   Well, you see the next sentence says most noticeable is

15     the incident with Sonstegard egg white solids in August

16     2001. Do you see that?

17   A.   I do.

18   Q.   Were you familiar with that incident?

19   A.   No, I'm not.

20   Q.   Well, were you -- you learned about the incident when

21     you were an egg buyer, correct?

22   A.   Yes.

23   Q.   What did you learn about that incident?

24   A.   I don't remember other than what I'm reading here.

25   Q.   Was it your understanding based on what you were

### 35

1     hearing from other people at Kellogg that the

2     Sonstegard product had failed this gel strength test?

3   A.   That's what I infer from reading this e-mail. Yes.

4   Q.   And you see at the top of the page this is -- appears

5     to be the final e-mail, this now from Trudy to you,

6     correct?

7   A.   Yes.

8   Q.   And she writes -- and I'm -- you can always read any

9     portion that you want. I'm not necessarily going to

10     read every word.

11       Kurt raises an important point regarding

12     testing on the bench and in production before we accept

13     a bid on egg whites. For many of our products, the

14     functionality of the egg whites is critical to the

15     texture of the product. Do you see that?

16   A.   Yes, I do.

17   Q.   Was that your understanding, that the functionality of

18     the egg whites was critical to the texture of the

19     product?

20   A.   Yes, it was.

21   Q.   And was it also your understanding as the egg buyer

22     that the testing that was done by Kellogg's was

23     critical to getting the right eggs?

24   A.   Yes.

25   Q.   Okay. And Kellogg's as a company placed a high value

### 36

1     on the quality of its products, correct?

2   A.   Yes.

3   Q.   And is it also the case that Kellogg's places a high

4     value on the quality of the ingredients it uses?

5   A.   Yes.

6   Q.   And the appropriateness and functionality of those

7     ingredients?

8   A.   Yes.

9   Q.   As the egg buyer, did you consider the egg white solids

10     of one supplier to be interchangeable with egg white

11     solids that would be offered by any other supplier?

12   A.   I would only assume that if they had been tested by our

13     facility.

14   Q.   And if they hadn't been tested by your facility, you

15     would not treat them as interchangeable?

16   A.   No.

17   Q.   I want to look at Neal Exhibit 11. This is KEL00017906

18     to 17907. This is I think just a few days after the

19     previous correspondence that we were looking at. The

20     previous correspondence I think was January 6th. This

21     correspondence is January 9th.

22   A.   Uh-huh.

23   Q.   And this is, I believe, three e-mails in the string.

24     The earliest of them apparently from Ronald McDermott.

25     Who was Ronald McDermott at this time?

### 37

1   A.   I believe he was the plant manager at that time.

2   Q.   How does plant manager relate to the other people that

3     we were seeing in these e-mails?

4   A.   He would have been over all the entire operations of

5     the plant. Trudy Cravens, I don't remember exactly

6     what her role was at the plant at that time.

7   Q.   So Ron McDermott would have been sort of above Trudy

8     Cravens in the hierarchy of those plants, the plants

9     Zanesville and Worthington?

10   A.   Yes.

11   Q.   Okay. And in the e-mail that Mr. McDermott writes to

12     you on Thursday, January 9th at 11:06 a.m. -- and

13     again, feel free to read all the document, even if I

14     just read selected portions. It says as you probably

15     know from Shashi or others, we had a major problem here

16     with Sonstegard EWS. Would you read EWS as egg white

17     solids?

18   A.   Yes, I would.

19   Q.   And so, again, Mr. McDermott is telling you about the

20     Sonstegard problem that you identified before?

21   A.   Uh-huh. Yes.

22   Q.   In the following sentence, it says in the end, Shashi

23     and Pat Mitchell told Sonstegard that they were going

24     back to MG Waldbaum/Wakefield, the sentence goes on.

25     Do you recognize who MG Waldbaum/Wakefield is?

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                    March 20, 2014

11 (Pages 38 to 41)

---

**38**

1  A. I'm familiar with them as a supplier.
2  Q. Do you know who -- if they are affiliated with anyone
3     else?
4  A. I do not, no.
5  Q. You don't recognize any affiliation between MG Waldbaum
6     and any other company?
7  A. No.
8  Q. But your reading here and your understanding was that
9     after the problems with the Sonstegard product, the
10    company decided to go back to another vendor,
11    MG Waldbaum to buy the egg white solids?
12 A. Yes.
13 Q. And that was based on the characteristics, physical
14    characteristics of the egg white solids, correct?
15 A. Correct.
16 Q. That the Sonstegard egg white solids did not perform
17    the way that the MG Waldbaum egg white solids
18    performed, correct?
19 A. Correct.
20 Q. And the decision to go from Sonstegard to MG Waldbaum
21    wasn't based on price, correct?
22 A. That would be correct from what I'm reading here. Yes.
23 Q. From the final paragraph -- I'm sorry. Second to last
24    paragraph of Mr. McDermott's e-mail. I guess the main
25    point for us is that with highly functional ingredients

---

**39**

1     such as EWS with other proteins we need to be cautious.
2     And then the paragraph goes on. What was your
3     understanding of what Mr. McDermott meant by that
4     sentence?
5  A. We just need to make sure that we have the right
6     functionality in place when we're contracting for an
7     egg white solid.
8  Q. In other words, Kellogg's would need to make sure that
9     it was not simply buying an egg white solid but buying
10    a particular egg white solid that would meet it's
11    needs, correct?
12 A. Correct.
13 Q. What did you do to prepare for your deposition today?
14 A. I had a discussion with these two folks a couple of
15    days ago at the office.
16 Q. And these two folks would be Mr. Campbell and
17    Ms. Ansari?
18 A. Yes.
19 Q. Not the court reporter and the videographer, you did
20    didn't talk to them before?
21 A. No.
22 Q. When was that, a couple days ago you said?
23 A. Tuesday, I believe.
24 Q. How long did you meet with them?
25 A. For about 45 minutes.

---

**40**

1  Q. And other than that meeting for 45 minutes, did you do
2     anything else to prepare for your deposition?
3  A. No.
4  Q. Did you review documents at that session?
5  A. We reviewed a couple documents, yes.
6  Q. Do you have familiarity with the term reverse auction?
7  A. Yes, I do.
8  Q. Okay. What is a reverse auction?
9  A. When you go out for a bid, so we put items out for
10    contract, and we'd start with -- you could put in a
11    price, the top price you're willing to pay. And then
12    the suppliers would price below that and put in their
13    bids if they chose to do so.
14 Q. Can you explain -- were reverse auctions used in
15    procurement of eggs?
16 A. At that time, they were. It was something that we were
17    trialing.
18 Q. I'm sorry. What was the word?
19 A. Trialing, that we were looking at to see if it would
20    work. We picked a couple different categories that we
21    used the technology.
22 Q. Can you explain a little bit more about the mechanics
23    of the reverse auction.
24 A. Uh-huh. You would invite the suppliers to participate.
25    We reviewed specifications and collected documentation

---

**41**

1     beforehand. And then it was an auction. So there was
2     a time period for the auction. They would log onto an
3     internet site. They would have visibility to each
4     specification by number and the volume, and then they
5     would be able to enter their pricing. It was a live
6     auction so suppliers would put their bids in, and the
7     screen would refresh so they could see what the latest
8     bid was. They had visibility to see what the lowest
9     bid was. They knew what their bid was so they knew if
10    they were lowest bid or not. And then for the period
11    of time the auction was open, they had opportunity to
12    continue to bid as much as they wanted to during that
13    period.
14 Q. So like a live auction, they -- anybody can decide
15    before the gavel comes down to make one more bid to
16    sort of put themselves at the head of the line,
17    correct?
18 A. Correct.
19 Q. In this instance by offering a lower price than the
20    then lowest price, correct?
21 A. Correct.
22 Q. And how often did you use this reverse auction process
23    during the time you were an egg buyer?
24 A. Twice that I remember.
25 Q. And do you recall how much movement there was in the

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                      March 20, 2014

12 (Pages 42 to 45)

---

**42**

1    price from the sort of opening bid until sort of the
2    final winning bid?
3  **A.  I don't recall.**
4  Q.  Are you able to estimate?
5  **A.  No.  Not without looking at documents.**
6  Q.  Did Kellogg's stay with this reverse auction method in
7    egg buying after these -- I think you used the word
8    trial.  After you conducted this trial?
9  **A.  No.**
10  Q.  Why not?
11  **A.  I don't know exactly why not.  We didn't use it in the**
12    **raw material team after that, after those two examples**
13    **that we did.**
14  Q.  In terms of a timeframe, when were reverse auctions in
15    use for egg buying?
16  **A.  Well, it would have been the bid that I did in 20 --**
17    **that was 2003.**
18  Q.  Uh-huh.
19  **A.  That would have been the time.**
20  Q.  And to your knowledge, by 2004 they weren't using them
21    anymore?
22  **A.  Not for the raw material team.  It could have been for**
23    **packaging or indirect materials.**
24  Q.  But for eggs by 2004 they weren't doing reverse
25    auctions?

---

**43**

1  **A.  No.**
2  Q.  Do you know how Kellogg's was soliciting bids for egg
3    purchase -- egg suppliers once it stopped using reverse
4    auctions?
5  **A.  No.  It would have been, to my knowledge, just the**
6    **typical, you know, RFP, request for proposal.  You**
7    **would do -- send out Excel spreadsheet with volumes on**
8    **it.  You would attach to that your specifications, the**
9    **plants that it would be shipping to.  And then you'd**
10    **request pricing to be entered into a model.**
11  Q.  So you're just comparing various proposals as opposed
12    to running this auction where companies are responding
13    to each other?
14  **A.  Correct.  You'd have a deadline when pricing was due.**
15    **Uh-huh.**
16    MR. GREENE:  Can I take a look at the packet.
17    MS. ANSARI:  Uh-huh.
18  BY MR. GREENE:
19  Q.  Can you take a look at Neal Exhibit 27.
20    MR. GREENE:  I think I need to look at this
21    one.
22    MS. ANSARI:  That's okay.
23  BY MR. GREENE:
24  Q.  Can I -- I need to have that one in front of me because
25    it's in a different spot.  I apologize, Ms. Tobey.  I'm

---

**44**

1    trying to locate some documents.
2    Neal Exhibit 27 is KEL 00006455.  Do you
3    recall -- this is an e-mail from a Bruce Pigsley to a
4    group of people that includes you.  Do you see that?
5  **A.  Yes, I do.**
6  Q.  Okay.  And who was Bruce Pigsley?
7  **A.  Bruce Pigsley was part of the cost savings team, to the**
8    **best of my recollection.**
9  Q.  Okay.  And the subject was financial review of
10    replacement of egg with methocyl at Worthington.
11  **A.  Uh-huh.**
12  Q.  Do you recall an initiative involving the replacement
13    of egg with methocyl at Worthington?
14  **A.  I do.**
15  Q.  Okay.  What is methocyl?
16  **A.  Methocyl is short for methycellulose, and it's an**
17    **ingredient that has gelling properties.**
18  Q.  Okay.  What is it made of?
19  **A.  I'd have to -- I'd have to look at a specification.**
20  Q.  It's not egg?
21  **A.  It's not egg, no.**
22  Q.  And do you recall the background of this project?
23  **A.  I do.**
24  Q.  What was the background of this project?
25  **A.  There were opportunities for cost savings.  There was**

---

**45**

1    **also a potential opportunity to make the -- our**
2    **Worthington product vegan by removing the egg.**
3  Q.  And what was the outcome of the project?
4  **A.  I think we were -- at the very end of it, we were able**
5    **to remove some of the egg.  So we made a partial**
6    **replacement, but we did not do 100 percent replacement.**
7  Q.  You reduced the amount of egg that was purchased or
8    used in each unit of the product; is that correct?
9  **A.  Yes, to the best of my recollection.  Yes.**
10  Q.  And the -- you say one of the motivations for the
11    replacement was to reduce the cost of producing the
12    product?
13  **A.  Yes.**
14  Q.  So this was a way of avoiding some of the costs of
15    purchasing egg?
16  **A.  Yes.**
17  Q.  Do you know when the project was completed?
18  **A.  I don't recall, no.**
19    MR. GREENE:  Is exhibit --
20    MS. ANSARI:  Which one?
21    MR. GREENE:  The Second Amended Complaint,
22    Exhibit 14.
23    MR. CAMPBELL:  I have it, Bill.
24    MS. ANSARI:  22.
25  BY MR. GREENE:

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                        March 20, 2014

13 (Pages 46 to 49)

**46**

1  Q.  Could you look at Neal Exhibit 22.
2        MS. ANSARI:  Do you want it?
3        MR. GREENE:  Yeah.
4  BY MR. GREENE:
5  Q.  This one I'm going to underscore the guidance that you
6     can read whatever you want, but you're not required to
7     read the entire document.
8  A.  Thank you.
9  Q.  This is the -- Neal Exhibit 22 is a Second Amended
10    Complaint filed in the litigation, In re: Processed Egg
11    Products Antitrust Litigation, of March 6, 2013.  It's
12    a 98-page document.  And I'll represent to you, and you
13    can see in the middle of the page, this is the
14    complaint of the plaintiffs that include the Kellogg
15    Company.  Do you see that?
16 A.  Yes, I do.
17 Q.  Have you seen this complaint before?
18 A.  Just this morning --
19 Q.  Okay.
20 A.  -- briefly.
21 Q.  The first time you saw the complaint?
22 A.  Yes.
23 Q.  Okay.  Had you seen any previous versions of the
24    complaints in this litigation?
25 A.  No, I have not.

**47**

1  Q.  Okay.  When was the first time you learned about this
2     litigation?
3  A.  A couple of years ago to the best of my recollection.
4  Q.  Do you know if you heard or learned about the case
5     before the lawsuit was filed?
6  A.  Not to my knowledge, no.
7  Q.  You believe you heard about it after it was filed?
8  A.  Yes.
9  Q.  I'm going to direct your attention to --
10       MR. CAMPBELL:  46, Bill.
11 BY MR. GREENE:
12 Q.  -- page 46.  Your clairvoyant counsel anticipated.
13    Paragraph 105.
14       MS. ANSARI:  Oh, here.
15 BY MR. GREENE:
16 Q.  And the document is two-sided so that can throw you
17    some.  We're also going to be looking at page 47.  In
18    the complaint, which again is a complaint filed by
19    Kellogg and other plaintiffs, paragraph 105 says, as of
20    2010, the ten largest producers owned approximately
21    49 percent of the total industry layers.  The top
22    20 egg producers owned approximately 55 percent of
23    laying hens.  Do you see that?
24 A.  Yes, I do.
25 Q.  And then you see that there is a list of the top

**48**

1  20 producers.
2  A.  Uh-huh.
3  Q.  With layers in production and percent of layers in U.S.
4     Do you see that?
5  A.  Yes.
6  Q.  Which of these -- looking at these 20 producers, which
7     of these companies made proposals to supply Kellogg's
8     with egg products during the period when you were egg
9     buyer?
10 A.  I believe that Rose Acre did and then Michaels Foods.
11    And I believe those are the only -- those are the only
12    two.
13 Q.  Okay.  So you mentioned Michael Foods and Rose Acre.
14 A.  Yes.
15 Q.  Just to be clear, did any of the other 18 producers
16    listed in paragraph 105 make proposals to supply
17    Kellogg's with egg products?
18 A.  Not during my tenure that I recollect.  No.
19 Q.  During your time as egg buyer, did you have any
20    communications with any of the other 18 companies
21    listed in the chart in paragraph 105?
22 A.  No.
23 Q.  Did you think of any of those 18 companies as viable
24    candidates to supply Kellogg's with egg products?
25 A.  No.

**49**

1        MR. GREENE:  Okay.  Why don't we take a
2  break.
3        VIDEOGRAPHER:  Going off the record at
4  9:42 a.m.
5        (Recess taken)
6        VIDEOGRAPHER:  We are back on the record at
7  9:47 a.m.
8  BY MR. GREENE:
9  Q.  Ms. Tobey, I'd like you to look at Neal Exhibits 5 and
10    4.  I'll suggest you look at 5 first.  And for the
11    record, while you're reading, Exhibit 5 is an e-mail
12    from Kelly Tobey to Bob Kellert, Tuesday,
13    March, 11th, 2003.  It's KEL00018543.  And then there's
14    an XLS page, second page, of 00018544.  And Neal
15    Exhibit 4 is bates numbered KEL00021449 through 21461.
16    Do you recognize Exhibit 5?
17 A.  Yes.
18 Q.  Okay.  And who is Bob Kellert?
19 A.  Bob Kellert was my sales contact at Bender Goodman.  He
20    represented Michael Foods.
21 Q.  Okay.  And the e-mail in the first sentence indicates
22    here is the sheet that details out your award by plant
23    with a fixed price per pound.  Do you see that?
24 A.  Yes.
25 Q.  And the document attached reflects the terms of a fixed

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                                    March 20, 2014

14 (Pages 50 to 53)

---

**50**

1  price contract with Bender Goodman?
2  A.  Yes.
3  Q.  And on the second page of Exhibit 5, on the right side
4  are all the fixed prices; is that right?
5  A.  Yes.
6  Q.  Okay.  Okay.  Looking now at Exhibit 4.  What is
7  Exhibit 4, Neal Exhibit 4, I should say?
8  A.  It looks like a presentation dec that was put together
9  on the egg portfolio.
10  Q.  All right.  Do you recognize the presentation?  I can
11  represent -- I believe I can represent -- I've got to
12  look at my e-mail again.  I believe that with the
13  production data that Kellogg sent over with the
14  document, you were indicated as the custodian for the
15  document.
16  A.  Okay.
17  Q.  Is this a presentation that you did?
18  A.  I don't recall.  But if you have that information, I'd
19  say that I probably was.
20  Q.  Well, let me show you.
21       MR. GREENE:  Let's mark this as
22  Tobey Exhibit 1.
23       (Exhibit No. 1 marked)
24  BY MR. GREENE:
25  Q.  And Tobey Exhibit 1 is KEL00017963.  Now, this is --

---

**51**

1  these are two e-mails written on July 31st, 2003; is
2  that correct?  Oh, I'm not connected?
3  A.  Yes.
4  Q.  So I probably got cutoff with my microphone.  These are
5  two e-mails written July 31, 2003, correct?
6  A.  Yes.
7  Q.  The first is from you to Christine Wentworth?
8  A.  Yes.
9  Q.  At that time Ms. Wentworth was your supervisor?
10  A.  Yes.
11  Q.  And then a reply e-mail from Ms. Wentworth to you; is
12  that right?
13  A.  Yes.
14  Q.  Okay.  And the subject is egg slides.  And there is --
15  there is an attachment to the -- your original --
16  there's an indication that there was an attachment to
17  your original e-mail to Ms. Wentworth.
18  A.  Yes.
19  Q.  File 2004 risk.PPT.  Do you see that?
20  A.  Yes.
21  Q.  I don't believe that the attachment shows up in her
22  reply the way Outlook works, but I'm not sure of that.
23  In any event, does Tobey Exhibit 1 refresh your
24  recollection about the slide presentation that's marked
25  as Neal Exhibit 4?

---

**52**

1  A.  Yes.
2  Q.  Okay.  And so what is Neal Exhibit 4, the PowerPoint
3  presentation?
4  A.  It looks like it was a presentation -- it looks from
5  the context of the e-mail that there were -- we were
6  under contract, and prices were escalating in the
7  market.  And we were reviewing potentially adjusting
8  the contract and taking pricing out for a longer length
9  of time.
10  Q.  Okay.  So let's break that down a bit.  It appears if
11  I'm looking at -- your e-mail is written at the end of
12  July, July 31st, correct?
13  A.  Right.  Correct.
14  Q.  And then I see some referencing in the PowerPoint
15  presentation, Neal Exhibit 4, to August of 2003.  For
16  example, the third slide, 21451, egg whites update, it
17  says market has increased from $1.67 a pound as of
18  January 10th, to $3.75 a pound as of August 4th.  Do
19  you see that?
20  A.  Correct.  Yep.
21  Q.  So is it -- is it fair to conclude that this
22  presentation was provided to management in August of
23  2003?
24  A.  It's probably fair to conclude that.
25  Q.  All right.  You couldn't be providing market prices on

---

**53**

1  August 4th unless it was already August, correct?
2  A.  Correct.  Yes.
3  Q.  In your previous response you observed that prices were
4  escalating; is that correct?
5  A.  Yes.
6  Q.  Okay.  And you had entered into a contract with Bender
7  Goodman in about March of 2003?
8  A.  Yes.
9  Q.  Correct.  And that was a 12-month contract?
10  A.  Yes.
11  Q.  And so Bender Goodman was then obligated to provide you
12  with the egg products indicated at the fixed price in
13  the contract, correct?
14  A.  Correct.
15  Q.  For an entire year?
16  A.  Yes.
17  Q.  And what you're seeing now in August is the price --
18  the market prices for the products that Bender Goodman
19  was obligated to provide were escalating above the
20  amounts in that original contract, correct?
21  A.  Correct.
22  Q.  So with that as backdrop, what was the purpose of this
23  presentation?
24  A.  You know, to the best of my recollection, I'd say it
25  was -- we were looking at -- we were potentially then

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                    March 20, 2014

15 (Pages 54 to 57)

---

**54**

1    contacted by the supplier, that they wanted some relief
2    on the contract, and so we were looking at what they
3    had requested versus the contract period we had
4    coverage for with them and potentially extending that
5    contract out further beyond what we had current
6    coverage for.
7  Q.  When you use the term coverage, what do you mean?
8  A.  I mean coverage as far as a fixed price contract
9    through a certain period of time.
10  Q.  So when you use the term coverage, it means fixed price
11    contract?
12  A.  Yes.
13  Q.  And when you get coverage out on a contract, six months
14    forward, a year forward, that gives Kellogg's
15    protection against rising prices, correct?
16  A.  Yes.
17  Q.  And when you don't have coverage, then you have risk
18    associated with rising prices, correct?
19  A.  Yes. It could be the other way around. If it was a
20    deescalating market, we would be locked into a price
21    higher than market.
22  Q.  But with coverage, you have a fixed price, correct?
23  A.  Yes.
24  Q.  And you know what you're going to pay?
25  A.  Know what we're going to pay.

---

**55**

1  Q.  So in this instance you have coverage through early
2    2004 at the fixed price, but you have no coverage for
3    the remainder of 2004, correct?
4  A.  Correct.
5  Q.  Okay. I want to -- again, you can look at any portion
6    of a document you want. If you look at KEL00021455,
7    you're explaining here that there's dried egg vendor
8    issues, correct?
9  A.  Uh-huh. Yes.
10  Q.  And Michael Foods -- you write that Michael Foods owns
11    40 percent of the flock that supplies their eggs, and
12    the remaining 60 percent is contracted out, correct?
13  A.  Yes.
14  Q.  So you understand Michael Foods was buying a
15    substantial volume of their eggs?
16  A.  Yes.
17  Q.  And you note in the bullet second from the bottom, the
18    remaining volume owed to Kellogg's multiplied by
19    today's market price will put Michael Foods at a
20    $4,600,000 loss on our contract. Do you see that?
21  A.  Yes.
22  Q.  And that was your assessment at the time?
23  A.  That was my assessment at the time.
24  Q.  And you also write that the 4.6 million could easily
25    exceed 6 million if prices continue to rise, correct?

---

**56**

1  A.  Yes.
2  Q.  That was also your assessment?
3  A.  Yes.
4  Q.  So in the next slide, you include at the top Kellogg
5    consideration. So this was the proposal, correct?
6  A.  Yes.
7  Q.  Okay. And this next slide, I mean, 21456, the
8    suggestion is offer Michael Foods some relief while
9    ensuring we deliver our 5 and 7 budget savings and
10    manage our risk for 2004.
11  A.  Yes.
12  Q.  What does that mean?
13  A.  It means what we were putting together would meet
14    requirements for our budget. We would manage risk for
15    2004 and give Michaels relief on the escalating market
16    for a period of time.
17  Q.  So just so I understand, when we say relief, what do
18    you mean by relief?
19  A.  By relief, I mean, that the price -- the market price
20    where it currently was versus what we agreed to pay on
21    our contract was significantly more. So we would
22    -- we would decrease that range.
23  Q.  By relief, fair to say that you would pay Bender
24    Goodman more for the egg products -- withdrawn.
25    There's a -- the Bender Goodman contract covered the

---

**57**

1    period from early 2003 to early 2004?
2  A.  Correct.
3  Q.  And you had a contractual right to demand all the egg
4    products under that contract under the original fixed
5    prices, correct?
6  A.  That's correct.
7  Q.  When you talk about relief, you talk about offering to
8    pay more for the -- those egg products during that
9    contract period than the contracted price?
10  A.  Yes. As part of that relief. So that's specific to
11    that portion. But then the other adjustment would be
12    we're looking out at the part of 2004 that we didn't
13    have coverage and where we thought the market was going
14    to be. So you negotiate that price earlier, you know,
15    based on what our anticipation was of where market
16    would go. So potentially offsetting some future cost
17    increase.
18  Q.  So there's a trade going on here?
19  A.  Yes.
20  Q.  You're saying to Bender Goodman and to Michael Foods
21    we'll pay you more than we're obligated to pay you
22    during the contractural period early 2003 to early
23    2004.
24  A.  Yes.
25  Q.  And in exchange for that, we will get a favorable

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.  March 20, 2014

16 (Pages 58 to 61)

---

**58**

1 contract that will extend coverage into 2004, the rest
2 of 2004?
3 A. **Correct. For some period, yeah. I don't know the**
4 **exact period. But correct.**
5 Q. Okay. In order to offer that kind of price relief,
6 you'd be looking for a good contract for 2004, correct?
7 A. **Yes.**
8 Q. You were looking for some kind of trade off or
9 compensation for the price relief, right?
10 A. **Right.**
11 Q. So the -- if we flip a couple more pages to 21458 --
12 I'm sorry. Let's go to 21457. We'll look at both
13 21457 and 21458 because 21457 says potential Kellogg
14 offer 2003 and 21458 says potential Kellogg offer 2004.
15 So they kind of go together as a set, don't they?
16 A. **Yes.**
17 Q. Okay. So the offer for 2003, 21457, is you say I have
18 an offer that would increase Michael Foods contract by
19 $125,000 in 2003, correct?
20 A. **Yes.**
21 Q. You're saying you're going to pay $125,000 more in 2003
22 than they're entitled to receive under the contract?
23 A. **Correct.**
24 Q. And then if you go to 21458, you have the potential
25 Kellogg offer of 2004, correct?

---

**59**

1 A. **Yes.**
2 Q. Okay. And here you are proposing to start a new
3 12-month contract January 1, 2004, on the egg whites.
4 The new 12-month contract would bring your coverage out
5 into -- all the way through the end of 2004, correct?
6 A. **Correct.**
7 Q. You didn't have that at the point -- at the time you're
8 presenting this slide presentation you didn't have
9 coverage for the last --
10 A. **Nine.**
11 Q. -- nine months or so of 2004?
12 A. **Correct.**
13 Q. But under this proposal you would have that coverage, a
14 fixed price contract for the remainder of 2004,
15 correct?
16 A. **Correct.**
17 Q. And you're proposing to offer a floor and ceiling on
18 the market price such that Kellogg's price would remain
19 a dollar a pound below market, correct?
20 A. **Correct.**
21 Q. And that would be a good deal for Kellogg's, correct?
22 A. **Correct.**
23 Q. Because you can't go out to any supplier and say I want
24 a dollar below the market, right?
25 A. **Right.**

---

**60**

1 Q. And so, for example, in the next slide, 21459, where
2 you write egg white offer slash risk, at the bottom of
3 the chart, it says Kellogg's price will remain at $1 a
4 pound under the market for all of 2004. And you point
5 out the current contract allows for seven months of
6 risk in 2004, correct?
7 A. **Yes.**
8 Q. Okay.
9 A. **Correct.**
10 Q. So without a new contract, you're at risk for seven
11 months in 2004, correct?
12 A. **Correct.**
13 Q. But under this proposal, you get coverage, a fixed
14 price for the remainder of 2004, correct?
15 A. **Yes.**
16 Q. Okay. And did Kellogg's go forward on this proposal?
17 A. **I honestly don't remember.**
18 Q. Okay.
19 MR. CAMPBELL: Are you through with that
20 exhibit, Bill?
21 MR. GREENE: I think so, yeah.
22 MR. CAMPBELL: Do you need an exhibit?
23 MR. GREENE: I do, but I don't know if I
24 marked it. Let's go off for just a moment.
25 VIDEOGRAPHER: Going off the record at

---

**61**

1 10:08 a.m.
2 (Recess taken)
3 VIDEOGRAPHER: We're back on the record at
4 10:10 a.m.
5 BY MR. GREENE:
6 Q. I'm going to ask you to take a look at Neal Exhibit 6.
7 A. **Yes.**
8 Q. I'll point out to you that Neal Exhibit 6, it doesn't
9 list you as a sender -- oh, I'm sorry. Neal Exhibit 6
10 on the front end you are the sender. From
11 bobeggs@aol.com to Kelly Tobey.
12 A. **Yeah. I was the receiver. Yep.**
13 Q. You receive that, and then there was an attachment. I
14 meant the attachment didn't have you as a sender or
15 receiver. So subsequent to your August 2003 slide
16 presentation, did you enter into further negotiations
17 with Bender Goodman?
18 A. **Yes.**
19 Q. Okay. And as a result of those negotiations, did you
20 enter into an agreement to give Bender Goodman and
21 Michael Foods price relief from the contract -- fixed
22 price contract we looked at earlier?
23 A. **Yes. From looking at this, it looked like we did.**
24 **Yes.**
25 Q. And if you look at part of the second page of the

---

## HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                      March 20, 2014

---

**62**

1  proposal -- I'm sorry. The second page of Exhibit 6,
2  you agreed on a contract that would extend the whole
3  egg supply through December 31st, 2004, correct?
4  **A.  Correct.**
5  Q.  Okay. And it was at a fixed price of $2.43 per pound
6  delivered with usual freight adjustments?
7  **A.  Yes.**
8  Q.  And that price was higher than the price that Bender
9  Goodman was entitled to under the contract executed in
10 early 2003, correct?
11 **A.  I believe so. I'd have to go look at that.**
12 Q.  Why don't you go back and look.
13 **A.  Yes.**
14 Q.  So you granted some price relief?
15 **A.  Yes.**
16 Q.  And in exchange you got coverage through the remainder
17 of 2004, correct?
18 **A.  Yes.**
19 Q.  Now, by the time this contract expired in December of
20 2004, this most recent contract, you were already done
21 with your position purchasing eggs, correct?
22 **A.  Yes.**
23 Q.  Okay. So you didn't -- withdrawn. Did you negotiate
24 the next major egg products contract for Kellogg's?
25 **A.  Not to my knowledge, no.**

---

**63**

1  Q.  Do you know anything about the terms of later egg
2  products contracts that were negotiated between
3  Kellogg's and egg products suppliers?
4  **A.  No, I don't.**
5  Q.  During the period that you were purchasing egg products
6  for Kellogg's -- and let's set up that period again.
7  It's -- remind me start and finish dates.
8  **A.  2002 -- probably late summer or early fall 2002 through**
9  **early 2004.**
10 Q.  Thank you.
11 **A.  2004. Yep.**
12 Q.  I know you testified to that before.
13 **A.  Yep.**
14 Q.  Did you -- withdrawn. Were you aware of any policies
15 at Kellogg's regarding animal welfare?
16 **A.  No.**
17 Q.  Do you recall any discussions within Kellogg's about
18 animal welfare issues related to the treatment of layer
19 hens?
20 **A.  No.**
21 Q.  The topic never came up to your recollection?
22 **A.  No.**
23 Q.  Do you recall the topic coming up in discussions with
24 any egg product suppliers?
25 **A.  Yes.**

---

**64**

1  Q.  Okay. What do you recall about those discussions?
2  **A.  I just recall that it was being mentioned. I believe**
3  **-- I'm not sure of the timeframe. But that it was an**
4  **initiative somewhat driven by Wal-Mart. And that's**
5  **really the extent of what I had heard about it.**
6  Q.  And who did you hear that from?
7  **A.  I don't remember exactly. I would say it was**
8  **information from suppliers.**
9  Q.  And you don't recall which suppliers?
10 **A.  No, I don't.**
11 Q.  Do you recall what they -- the suppliers who spoke to
12 you, do you recall what they said about Wal-Mart?
13 **A.  I just remember the topic being about the size of space**
14 **in the cage for the hens.**
15 Q.  Do you recall what -- sort of what Wal-Mart's place was
16 in that discussion?
17 **A.  They wanted more space for the hens.**
18 Q.  So you were hearing from suppliers that Wal-Mart wanted
19 more space in the cage for the hens?
20 **A.  Yes.**
21 Q.  Okay. Do you recall anything else about animal welfare
22 during that period?
23 **A.  No.**
24 Q.  Do you recall a program called the UEP Certified
25 Program?

---

**65**

1  **A.  No.**
2  Q.  It doesn't ring any bell for you?
3  **A.  I mean, I know it's United Egg Producers.**
4  Q.  Right.
5  **A.  But beyond that, no.**
6  Q.  But during the period when you were a buyer, you don't
7  recall hearing anything about that program?
8  **A.  No.**
9  Q.  Do you recall hearing anything about animal welfare
10 standards being implemented in -- among egg producers?
11 **A.  No.**
12      MR. GREENE: Let's take a break. We're
13 almost done. I need to just dig through. I don't need
14 to make her sit here while I dig through to look for a
15 document.
16      VIDEOGRAPHER: Going off the record at
17 10:18 a.m.
18      (Recess taken)
19      VIDEOGRAPHER: We're back on the record at
20 10:30 a.m.
21 BY MR. GREENE:
22 Q.  We were talking about animal welfare before the break,
23 Ms. Tobey. Can you look at Neal Exhibit 23. This is a
24 procurement overview 4/1/04, KEL00003178 through 3228.
25 And, again, this is one of those large documents where

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                          March 20, 2014

18 (Pages 66 to 69)

---

**66**

1  I tell you you can read as much of it as you want.  But
2  I'm going to direct you to the page that ends 3209,
3  which is closer to the back.
4  A.  Okay.
5  Q.  Do you recognize this type of document, procurement
6  overview?
7  A.  Yes, I do.
8  Q.  And what is a procurement overview?
9  A.  This would have been a document put out I believe it
10  was on a monthly basis, and it encompassed the whole
11  raw material spend in departments.  So it would give an
12  update on coverage, where we had open and then how we
13  were doing against market.
14  Q.  And before we said coverage.  Where you had the fixed
15  price contracts in place?
16  A.  Yes.  So volumes.  Yes.
17  Q.  And were you still involved in eggs in April 2004?
18  A.  Yes.
19  Q.  Okay.  So as the person involved in egg buying, would
20  you prepare the pages that would concern eggs?
21  A.  I would have given information to our risk management
22  team, and they put these decs together.
23  Q.  I want to just direct your attention toward the bottom
24  of the page where it says risks and opportunities to
25  strategy.

---

**67**

1  A.  Uh-huh.
2  Q.  It says farmers holding onto older hens due to
3  increased profits.  Do you see that?
4  A.  Yes.
5  Q.  And then it says, new flock must be given increased
6  cage space per animal welfare guidelines.  Do you see
7  that?
8  A.  I do.
9  Q.  Would you have been the person providing that
10  information for this dec?
11  A.  I would have been the person giving some direction to
12  this information.  Yes.  So this could have come from
13  myself.  It could have also come from our risk
14  management team.
15  Q.  When you say the "risk management team," who are you
16  referring to?
17  A.  There was a gentleman, Jim Roestel.
18  Q.  And what would his -- what would his responsibilities
19  had been?
20  A.  He was responsible mostly for the grains that we buy on
21  the Board of Trade.  So to make recommendations on when
22  we should lock in pricing and for how long.  But he
23  also got involved in discussions on other categories.
24  So we would very typically have discussions on here's
25  what we're hearing from suppliers, here's what we're

---

**68**

1  hearing from market.
2  Q.  And his name, is it Jim Roestel?
3  A.  Roestel, R-O-E-S-T-E-L.
4  Q.  To your knowledge, did Mr. Reostel's responsibilities
5  include tracking developments in the -- among egg
6  producers?
7  A.  No.
8  Q.  Now, looking at this line from slide 3209 in April of
9  2004, what did you mean when it says new flocks must be
10  given increased cage space per animal welfare
11  guidelines?
12  A.  Would have been that any new birds in the cages had to
13  have -- there was increased space regulations.
14  Q.  You became aware -- did you become aware of such
15  increased space regulations at the time that you were
16  an egg buyer?
17  A.  Just to the knowledge that I shared in my earlier
18  testimony, that I was aware that Wal-Mart -- it was
19  something that they were pushing.
20  Q.  And beyond Wal-Mart pushing it, were you aware of any
21  actions that were taken either by any groups or
22  governmental organizations to establish cage space per
23  animal welfare guidelines?
24  A.  No.
25  Q.  So this doesn't refresh your recollection as to

---

**69**

1  anything beyond what you testified before about
2  Wal-Mart?
3  A.  No.
4         MR. GREENE:  Let's mark this as Tobey 2.
5         (Exhibit No. 2 marked)
6  BY MR. GREENE:
7  Q.  I'm showing you what's been marked as Tobey Exhibit 2,
8  KEL00021208 through 21254.  The cover reads
9  proceedings, future trends in animal agriculture,
10  standards for food animal production, status,
11  wellbeing, and social responsibility, September 28 --
12  I'm sorry.  September 18, 2002.  With an address in
13  Washington, D.C.  Do you see that?
14  A.  I do, yes.
15  Q.  In September of 2002, were you the egg buyer at
16  Kellogg's?
17  A.  Yes.
18  Q.  Okay.  Did you attend what appears to be this program
19  in Washington, D.C., on future trends in animal
20  agriculture?
21  A.  No, I did not.
22  Q.  Do you know whether anyone at Kellogg's attended this
23  program?
24  A.  No.
25  Q.  It has a Kellogg's production stamp on it.  So just

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                    March 20, 2014

19 (Pages 70 to 73)

---

**70**

1  asking do you know how it is this particular document
2  came to be in Kellogg's possession?
3  A.  I don't, no.
4  Q.  Did you have any discussions with anybody about --
5  withdrawn.  Since you left the position involving
6  purchasing egg products -- which you left in 2004,
7  correct?
8  A.  Correct.
9  Q.  Since that time, have you had any positions that have
10  been involved in any way with egg products?
11  A.  When I joined the quality team, Dan Bigelow was one of
12  my direct reports.  So this would have been in 2012.
13  And he had oversight from a quality perspective for
14  eggs for a period of time.
15  Q.  He had responsibility related to eggs?
16  A.  From a quality perspective.
17  Q.  From a quality perspective?
18  A.  From a quality perspective.
19  Q.  Did you deal with any issues relating to eggs during
20  that period?
21  A.  No.  Not that I -- not that I recall.
22  Q.  So even though it was in his area of responsibility,
23  you don't recall him bringing you any issues relating
24  to eggs?
25  A.  No.

---

**71**

1  Q.  Do you recall any discussions with anybody about animal
2  welfare issues other than what you've already testified
3  to today?
4  A.  No.
5  MR. GREENE:  Okay.  I don't have anything
6  further at this time.
7  MR. CAMPBELL:  Do you need the documents?
8  MS. ANSARI:  Yes.  I need Exhibit 10 or 11.
9  MR. CAMPBELL:  Do you have it there, Kelly?
10  MS. ANSARI:  She has it, but I wanted to see
11  if we had it in front of us.  Okay.  Here's 10.  I've
12  got it.
13  EXAMINATION
14  BY MS. ANSARI:
15  Q.  Good afternoon, Ms. Tobey -- or good morning.  I just
16  have a couple questions for you, and then we can get
17  out of here.
18  A.  Okay.
19  Q.  A couple of times during your testimony -- Mr. Greene's
20  questioning, he talked about the term coverage.  Do you
21  remember that?
22  A.  Yes.
23  Q.  And coverage -- he discussed that coverage meant a
24  contract being at a fixed price, correct?
25  A.  Yes.

---

**72**

1  Q.  But coverage can also mean under a contract it's just
2  an egg supplier's covering your needs for a certain
3  point of time, correct?
4  A.  Right.
5  Q.  And that could be at a fixed price, correct?
6  A.  Yes.
7  Q.  But it could also be at a fluctuating price?
8  A.  Yes.
9  Q.  So coverage means that a supplier is providing eggs
10  that you need for a certain amount of time?
11  A.  Correct.
12  Q.  At whatever price?
13  A.  Right.
14  Q.  Do you recall Mr. Greene showing you an exhibit, the
15  Second Amended Complaint, correct?
16  A.  Yes.
17  Q.  Okay.  And that listed 20 suppliers, correct?
18  A.  Right.
19  Q.  And you recalled two suppliers, Rose Acre and Michael
20  Foods, providing eggs to Kellogg, correct?
21  A.  Yes.
22  Q.  Okay.  If any of the other 18 suppliers responded to an
23  RFP, would you have considered those suppliers?
24  A.  I would have, yes.
25  Q.  Okay.  Can you take a look at exhibit -- Neal Exhibit

---

**73**

1  11.  Do you recall when Mr. Greene asked you the
2  question about Kellogg's purchases of egg white solids
3  being based on quality, not price?
4  A.  Yes.
5  Q.  Okay.  If several suppliers could meet quality
6  standards, would price play into your decision making?
7  A.  Yes.
8  Q.  Can you turn to Neal Exhibit 4, please.
9  A.  Yep.
10  Q.  Okay.  And if you could turn to the page that ends
11  bates No. 1458.  It's titled Potential Kellogg Offer
12  2004.
13  A.  Yes.
14  Q.  Do you see where it says -- at the top of this page it
15  says Potential Offer, Kellogg Offer 2004, correct?
16  A.  Yes.
17  Q.  Do you see the second bullet point states offer of
18  floor and ceiling on the market price.  Kellogg's price
19  will remain $1 per pound below market.  Do you see
20  that?
21  A.  Yes.
22  Q.  Okay.  Is the market price the same as Urner Barry
23  market pricing?
24  A.  Yes.
25  Q.  So your potential Kellogg offer in 2004 would be based

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.                                              March 20, 2014

20 (Pages 74 to 77)

---

**74**

1  on an Urner Barry market price minus $1, correct?
2  A.  Yes.
3  Q.  So the price would fluctuate?
4  A.  Yes.  That's true.
5  Q.  And it would not be a fixed price?
6  A.  Correct.
7  Q.  Okay.  And this is for egg whites?
8  A.  This was for egg whites.
9  Q.  Okay.  If you could take a look at Exhibit 6, please.
10  Turn to the Exhibit 6.  I'm going to direct your
11  attention to the second to last paragraph that starts
12  with on -- and I'll read it.
13      It states on April 15th, 2004, the Urner
14  Barry truckload average price per pound for dried egg
15  whites will be used to calculate thusly.  If the Urner
16  Barry average price exceeds $6.07 per pound, the
17  difference above that amount will be divided in half
18  and added to the selling price.  Do you see where it
19  says that?
20  A.  Yes, I do.
21  Q.  So for dried egg whites, the price would be based on
22  Urner Barry, correct?
23  A.  Correct.
24  Q.  And it would fluctuate?
25  A.  Yes.

---

**75**

1  Q.  So it would not be fixed?
2  A.  Correct.
3      MS. ANSARI:  I have no further questions.
4      MR. GREENE:  Okay.  I have some followup.
5      FURTHER EXAMINATION
6  BY MR. GREENE:
7  Q.  If you could, take a look at Exhibit 6 again.
8  Ms. Ansari was just questioning you about it.
9  A.  Yes.
10  Q.  Just to be clear, the contract that you entered with
11  Bender Goodman in early 2004, the price of whole eggs
12  was to be fixed for the remainder of the year, correct?
13  A.  That's true, yes.
14  Q.  Okay.  And you were coming off of a fixed price
15  contract with Bender Goodman from early 2003 to early
16  2004, correct?
17  A.  Yes.
18  Q.  And we had looked at the document where there was a
19  long list of fixed prices that Bender Goodman was
20  offering, correct?
21  A.  Correct.
22  Q.  Okay.  And when you sign the new contract that
23  summarized in Neal Exhibit 6 as to whole eggs, you,
24  again, fixed the price for the remainder of the year,
25  correct?

---

**76**

1  A.  Yes, for whole eggs.  Yes.
2  Q.  Okay.  Ms. Ansari asked you about the 18 suppliers.  Do
3  you recall that we showed you the Second Amended
4  Complaint?  There were 20 suppliers -- I'm sorry.
5  There were 20 egg producers listed with the number of
6  their layer hens, correct?
7  A.  Yes.
8  Q.  And you identified two that you had -- I believe had
9  made proposals to supply Kellogg's with egg products,
10  correct?
11  A.  Correct.
12  Q.  Okay.  And Ms. Ansari asked, I think, before in her
13  questioning if any of them had come to you, you would
14  have considered a proposal or something along those
15  lines, correct?
16  A.  Correct.
17  Q.  Do you know if any of those 18 companies were capable
18  of producing egg products?
19  A.  No.
20  Q.  So as you sit here today, you don't know whether any of
21  those 18 companies even produced egg products?
22  A.  Correct.
23  Q.  Okay.
24      MR. GREENE:  Now we do need to go off because
25  you need to show me.

---

**77**

1      VIDEOGRAPHER:  Going off the record at
2  10:47 a.m.
3      (Recess taken)
4      VIDEOGRAPHER:  We are back on the record at
5  10:50 a.m.
6  BY MR. GREENE:
7  Q.  Ms. Tobey, do you recall this morning I asked you about
8  coverage in the context of the Bender Goodman contract?
9  A.  Yes.
10  Q.  And I think you told me one of the reasons Kellogg's
11  wants to get coverage is to protect itself against
12  future risk, correct?
13  A.  Correct.
14  Q.  Getting coverage is a way to reduce or eliminate risk,
15  correct?
16  A.  Yes.
17  Q.  Okay.  And this morning when I asked you when you use
18  the term coverage, what do you mean, you said I mean,
19  coverage as far as a fixed price contract through a
20  certain period of time.  Do you recall that?
21  A.  Yes.
22  Q.  And I asked you, so when you use the term coverage, it
23  means fixed price contract.  And you said yes.  Do you
24  recall that?
25  A.  Yes.

---

HIGHLY CONFIDENTIAL

Tobey, Kelly J.

March 20, 2014

21 (Pages 78 to 81)

### 78

1 Q. And is that still your testimony?
2 A. Coverage can mean fixed price. Coverage could also be
3 volume over a period of time for a price that moves
4 within a window, because I would consider coverage in
5 the document you showed me where we had a price window
6 on Urner Barry and that price would fluctuate. That's
7 coverage as well for our volume, but not at a fixed
8 price.
9 Q. So are you changing your testimony from the testimony
10 this morning?
11 A. Yes.
12 Q. Okay. Now, one of the -- if one of the goals of
13 coverage is eliminating risk, one of the risks that
14 you're attempting to eliminate is the risk that the
15 market is going to escalate, correct?
16 A. That's correct. But it could also be eliminating risk
17 or understanding what we're -- what pricing we're going
18 to take on or what level we're willing to have for
19 risk. And remember, I also stated that you could be in
20 a deescalating market.
21 Q. Right. So if you have a contract that is tied to Urner
22 Barry prices, then Kellogg's is -- would be at risk for
23 paying more money for its eggs as the Urner Barry
24 market went up, correct?
25 A. That's correct.

### 79

1 Q. Okay. And one of the things that Kellogg's was looking
2 to do when it tried to secure coverage was to eliminate
3 that very risk, correct?
4 A. Yes.
5 Q. Okay. And so when you used the term coverage, you were
6 talking about ways to avoid the risks associated with a
7 rising Urner Barry market, correct?
8 MS. ANSARI: Objection. Mischaracterizes her
9 testimony.
10 BY MR. GREENE:
11 Q. Is that correct?
12 A. Coverage can mean different things. So I'd say
13 coverage could be fixed price for a period of time. It
14 can be a volume contract that you're going to deliver
15 X amount of volume or that volume goes up or down. You
16 have to deliver all the volume we require within a
17 certain price fluctuation. So it can be -- it can be
18 either way.
19 Q. When you say "within a certain price fluctuation,"
20 would that include a ceiling?
21 A. It could, yes.
22 Q. And when you have a ceiling, you may have an index
23 price subject to a ceiling, correct?
24 A. We may. We also had whole egg liquid egg prices that
25 were recalculated every three months based on the

### 80

1 market. So that would be fluctuated pricing. But we
2 had a contract which could be characterized as coverage
3 for a period of time. But we had an agreement that
4 within that contract, price would fluctuate at a
5 certain interval.
6 Q. Okay. Were there contracts you entered into where
7 there was some kind of index mechanism but also a
8 ceiling?
9 A. Yes.
10 Q. So even the market mechanism could bring the price up
11 to a certain level. But once the market went higher,
12 the price would be set at the ceiling, correct?
13 A. Correct.
14 Q. Even though there's a market mechanism there, that kind
15 of contract would at least protect you against rising
16 prices above the ceiling, correct?
17 A. Right. And we had the one with the ceiling. But we
18 also had when it went above that, we split the
19 difference. So the ceiling wasn't the absolute top.
20 Q. And then when you -- when you split the difference,
21 then that reduces the impact of the higher market price
22 on Kellogg's as compared to bearing the whole market
23 price?
24 A. Yes.
25 Q. Let me rephrase the last question because I'm not sure

### 81

1 -- even though you answered it, I'm not sure how clear
2 it was.
3 When you have a mechanism -- pricing
4 mechanism where the buyer and seller split any increase
5 in the market index above a particular ceiling, then
6 the buyer and seller are sharing the risk of price
7 increases above the ceiling, correct?
8 A. Correct.
9 Q. And by sharing it, at least Kellogg's reduces some of
10 the risk, correct?
11 A. Correct.
12 Q. During the breaks did you discuss your testimony at all
13 with Counsel?
14 A. No.
15 MR. GREENE: I have nothing further.
16 MR. CAMPBELL: I get to ask my questions now.
17 MR. GREENE: Okay.
18 MS. ANSARI: We have nothing.
19 MR. CAMPBELL: Thanks. We have nothing.
20 MS. ANSARI: Nothing further.
21 MR. CAMPBELL: We have no further questions.
22 We will not waive signature. We will -- thanks, Mark.
23 We will read and sign.
24 VIDEOGRAPHER: All right. This concludes the
25 deposition. We're going off the record at 10:57 a.m.

HIGHLY CONFIDENTIAL

Tobey, Kelly J.

March 20, 2014

22 (Pages 82 to 84)

---

**82**

(Deposition concluded at 10:57 a.m.)

\* \* \*

---

**83**

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata Sheet signed by me.

_____     _____
(DATE)          (SIGNATURE)

---

**84**

CERTIFICATE OF NOTARY PUBLIC

STATE OF MICHIGAN )
              )
COUNTY OF MACOMB  )

I, Trisha N. Cameron, Certified Shorthand Reporter and Notary Public in and for the State of Michigan, do hereby certify that the witness whose attached deposition was taken before me in the above cause was first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth; that the testimony contained herein was by me reduced to writing in the presence of the witness by means of Stenography; afterwards transcribed by means of computer-aided transcription; and that the deposition is a true and complete transcript of the testimony given by the witness to the best of my ability. I further certify I am not connected by blood or marriage with any of the parties, their attorneys or agents; that I am not an employee of either of them; and that I am not interested directly, indirectly, or financially in the matter of controversy.

_____

Trisha N. Cameron, RPR, CSR-6175
Notary Public, Macomb County, Michigan
My Commission Expires 5-24-18

---