# ATTACHMENT 73

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DIVISION OF PENNSYLVANIA

```
---------------------------X
                           :
IN RE: PROCESSED EGG       :
PRODUCTS ANTITRUST         :
LITIGATION                 : MDL NO. 2002
                           : 08-md-02002
************************    :
THIS DOCUMENT RELATES TO:  :
ALL ACTIONS                :
                           :
                           :
                           :
---------------------------X
```

- - - - -

HIGHLY CONFIDENTIAL

- - - - -

Videotaped deposition
William E. Trask, III


April 24, 2014
1:20 p.m.


Taken at:
Nestlé USA
30003 Bainbridge Road

Solon, Ohio




Donnalee Cotone, RMR, CRR

NCRA Realtime Systems Administrator

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

2 (Pages 2 to 5)

---

**2**

APPEARANCES:

On behalf of Defendants Michael Foods, Inc.
and Papetti's Hygrade Egg Products, Inc.:
   Stinson Leonard Street LLP, by
   DOUGLAS R. BOETTGE, ESQ.
   150 South Fifth Street, Suite 2300
   Minneapolis, Minnesota  55402
   612-335-1500
   douglas.boettge@stinsonleonard.com

On behalf of Nestlé USA and The
Deponent:
   Jenner & Block, LLP, by
   RICHARD P. CAMPBELL, ESQ.
   353 North Clark Street
   Chicago, Illinois  60654-3456
   312-222-9350
   rcampbell@jenner.com

ALSO PRESENT:
   Keith McGregor, The Videographer
   Douglas B. Besman, Esq.
   Senior Counsel, Nestlé USA
   ~ ~ ~ ~ ~

---

**4**

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Case Management Order No. 10 ... (Protective Order) | 22 |
| Exhibit 2 | E-Mail Chain, Bates Labeled .... NES00000458-00000459 | 35 |
| Exhibit 3 | E-Mail from William Trask to ... Steven Feyman and Ed Lewis, dated11-11-08 w/Attachment, Bates Labeled NES00000130 | 65 |
| Exhibit 4 | E-Mail Chain, Bates Labeled .... NES00000111-00000114 | 82 |
| Exhibit 5 | E-Mail Chain, Bates Labeled ... NES00002013-00002015 | 88 |
| Exhibit 6 | Supplier Strategy Sorted by .... Vendor, Bates Labeled NES0004291 | 95 |
| Exhibit 7 | E-Mail Chain, Bates Labeled .... NES00002084-00002085 | 101 |
| Exhibit 8 | Quantity Contract: ............ 4615064924, Bates Labeled NES00004517-00004528 | 105 |
| Exhibit 9 | Speed Analysis, Bates Labeled .. NES0004501 | 111 |
| Exhibit 10 | Quality Contract:  4615077821, . Bates Labeled NES00004502-00004507 | 112 |
| Exhibit 11 | E-Mail Chain, Bates Labeled .... NES00000177-00000183 | 113 |
| Exhibit 12 | Two E-Mails, Bates Labeled ..... NEX0000076 | 121 |

---

**3**

TRANSCRIPT INDEX

PAGE

APPEARANCES.................................  2

INDEX OF EXHIBITS.............................  4

EXAMINATION OF WILLIAM E. TRASK:
BY MR. BOETTGE................................  7

REPORTER'S CERTIFICATE........................ 157

---

**5**

INDEX OF EXHIBITS (Continued.)

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 13 | E-Mail from Ed Lewis to ........ Various Recipients w/Attachment, Bates Labeled NES00000482-00000484 | 124 |
| Exhibit 14 | E-Mail Chain, Bates Labeled .... NES00000403-00000405 | 129 |
| Exhibit 15 | E-Mail Chain, Bates Labeled .... MFI01093250109326 | 133 |
| Exhibit 16 | E-Mail Chain w/Attachment, ..... Bates Labeled NES00000394-00000396 | 140 |
| Exhibit 17 | E-Mail Chain, Bates Labeled .... NES00000499-00000502 | 145 |
| Exhibit 18 | E-Mail Chain w/Attachment, ..... Bates Labeled NES00000072-00000075 | 152 |

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                    April 24, 2014

3 (Pages 6 to 9)

---

**6**

1       THE VIDEOGRAPHER:  We're on the
2   record.  I'm Keith McGregor and I represent
3   Henderson Legal Services.  The date is
4   April 24th, 2014, and the time is 1:20.  The
5   deposition is taking place at 30003 Bainbridge
6   Road, Cleveland, Ohio.
7       This is Case Number MDL 2002
8   entitled In re:  Processed Egg Products
9   Antitrust Litigation, in the United States
10  District Court for the Eastern District of
11  Pennsylvania.  The deponent this afternoon is
12  William Trask.  Our court reporter is
13  Donnalee Cotone.
14      Will counsel please state their
15  appearances.
16      MR. BOETTGE:  Doug Boettge with the
17  law firm of Stinson Leonard Street, representing
18  Michael Foods.
19      MR. CAMPBELL:  Richard Campbell of
20  Jenner & Block representing Nestlé and the
21  deponent, Mr. Trask.
22      THE VIDEOGRAPHER:  Thank you.
23      Will the court reporter please swear
24  the witness.
25

---

**7**

1       WILLIAM E. TRASK, III, of lawful age,
2   called for examination, being by me first duly
3   sworn, as hereinafter certified, deposed and
4   said as follows:
5       EXAMINATION OF WILLIAM E. TRASK, III
6   BY MR. BOETTGE:
7       Q.   Good afternoon, Mr. Trask.  My name
8   is Doug Boettge.  We met a few minutes earlier.
9   I represent the defendant Michael Foods in this
10  matter.
11      Could you state your full name and
12  address, please?
13      A.   **William Edmond Trask, III, and my**
14  **current address is 15719 Fernway Avenue,**
15  **Cleveland, Ohio, 44111.**
16      Q.   Mr. Trask, have you ever had your
17  deposition taken before?
18      A.   **No.**
19      Q.   Let me explain a few of the ground
20  rules.  I'll be asking you this afternoon a
21  series of questions and the court reporter will
22  be taking down your answers.
23      Do you understand?
24      A.   **Mm-hmm.  Yes.**
25      Q.   And it's important that in doing

---

**8**

1   this, you answer my questions audibly because
2   the court reporter can't write down head shakes.
3       Is that fair?
4       A.   **Right.  I got -- yes, I understand.**
5       Q.   And if at any time this afternoon
6   you don't understand one of my questions, I'd
7   ask that you stop and ask for clarification.
8       Is that fair?
9       A.   **That's fair.**
10      Q.   And likewise, if at any time today
11  you do answer one of my questions, I'll
12  understand that you did understand my question.
13      Is that fair as well?
14      A.   **Yes.**
15      Q.   Any reason you can't give full and
16  complete testimony this afternoon, Mr. Trask?
17      A.   **No.**
18      Q.   What did you do to prepare for your
19  deposition?
20      A.   **Just spoke with my attorney.**
21      Q.   And when did you do so?
22      A.   **Earlier today, and then we had a**
23  **brief conversation on the phone, I think, last**
24  **week maybe or early this week.**
25      Q.   Did you speak to anyone else in

---

**9**

1   preparation for the deposition today?
2       A.   **No.**
3       Q.   Did you review any documents in
4   preparation for your deposition?
5       A.   **No.**
6       Q.   Could you briefly give me your
7   educational background?
8       A.   **BSBA from Bowling Green State**
9   **University where I specialized in purchasing**
10  **supply chain and production operations**
11  **management.**
12      Q.   And when did you get that degree?
13      A.   **When?**
14      Q.   Yes.
15      A.   **2004, May.**
16      Q.   And what did you do after obtaining
17  your degree?
18      A.   **I continued -- I received a job**
19  **offer from Pressco Technology, which is right**
20  **down the street in Solon, and I was a**
21  **buyer/planner with them.**
22      Q.   And it's Pressco Technology?  What
23  did they do?
24      A.   **Yeah.  They're a high speed vision**
25  **inspection company for bottles and cans in the**

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                     April 24, 2014

4 (Pages 10 to 13)

---

10

1    beverage industry.
2       Q.  And how long did you hold that
3    position?
4       **A.  Approximately three years and a**
5    **couple of months.**
6       Q.  So that takes us through
7    approximately 2007?
8       **A.  Yes.**
9       Q.  What did you do after that?
10       **A.  I accepted a position here at**
11    **Nestlé.**
12       Q.  And what was the position that you
13    accepted?
14       **A.  Sourcing specialist.**
15       Q.  And how long did you hold that
16    position at Nestlé?
17       **A.  Approximately two years and eight**
18    **months roughly.**
19       Q.  Can you give me some rough
20    parameters of what those dates were?  When you
21    started and when you left.
22       **A.  July 2007 through May -- or through**
23    **maybe February/March 2010.**
24       Q.  Did your position change while you
25    were at Nestlé?

---

11

1       **A.  The position itself, no.  But I**
2    **gained responsibilities.**
3       Q.  Who did you report to?
4       **A.  When I first started, Ed Lewis, and**
5    **then Steve Feyman.**
6       Q.  And then?
7       **A.  Steve Feyman.**
8       Q.  And for what period of time did you
9    report to Mr. Lewis?
10       **A.  I would say within the first 6 to 12**
11    **months.  I can't -- I don't recall exactly a**
12    **time frame, but then Steve came in shortly**
13    **within that time frame beginning in 2008 maybe.**
14    **I can't remember.**
15       Q.  Did Mr. Feyman replace Mr. Lewis?
16       **A.  Eventually, yeah.**
17       Q.  Is Mr. Lewis still with Nestlé?
18       **A.  No.**
19       Q.  And do you know when he left?
20       **A.  I don't recall.  Sometime in 2008 or**
21    **'9. I can't remember.**
22       Q.  Do you recall who Mr. Lewis reported
23    to?
24       **A.  I believe Steve Warner.**
25       Q.  And what was Mr. Lewis' position?

---

12

1       **A.  Group manager of ingredients.**
2       Q.  And then Mr. Warner's position?
3       **A.  He was the head of purchasing.  I'm**
4    **not sure what . . .**
5       Q.  And Mr. Warner is still with Nestlé?
6       **A.  Yes.  I think so.  I mean, I don't**
7    **know.**
8       Q.  So let's talk a little bit about
9    your position as sourcing specialist.
10       What were your responsibilities?
11       **A.  When I first started, it was to**
12    **support other sourcing managers with projects or**
13    **anything they needed help with.**
14       Q.  You used the term "sourcing
15    managers."
16       Is that different than the group
17    manager of ingredients?
18       **A.  Yes.**
19       Q.  How is that different?
20       **A.  Sourcing managers -- or I think I**
21    **called it purchasing managers, but they**
22    **basically managed a whole category.  So for**
23    **instance, there was someone who managed**
24    **vegetables; someone who managed miscellaneous**
25    **ingredients; someone who managed meat protein**

---

13

1    **and chicken.  So they were departmentalized**
2    **based on a certain commodity.**
3       **And then the group manager oversaw**
4    **the activities for those particular purchasing**
5    **managers.**
6       Q.  So was there a source manager then
7    assigned to each different commodity?
8       **A.  Yeah, for the most part.  I think**
9    **so.**
10       Q.  Who was the source manager for eggs?
11       **A.  When I came in?**
12       Q.  Yes.
13       **A.  Jacki Pecek.**
14       Q.  And did that change at all while you
15    were there?
16       **A.  Yes.**
17       Q.  How so?
18       **A.  There was a personal issue she had**
19    **to deal with and she was out for an extended**
20    **period of time.  Then I was asked to assume the**
21    **role and then transition into the egg buyer.**
22       Q.  So is it fair to say that when you
23    started, you supported Miss Pecek?
24       **A.  I don't recall to what degree, but I**
25    **mean, I was available as a resource.**

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

5 (Pages 14 to 17)

---

14

1    Q.    And then you at some point
2  transitioned into her role as source manager for
3  eggs?
4    A.    For eggs, yeah.
5    Q.    Do you recall when that occurred?
6    A.    The dates are kind of fuzzy, but I
7  think towards the end of 2007, beginning of
8  2008.
9    Q.    So when you started, before you took
10 over Miss Pecek's role, did you have
11 responsibilities for ingredients other than
12 eggs?
13   A.    I supported other ingredients, but
14 no, not direct ingredients, no.  And I -- upon
15 getting eggs, I kind of inherited like
16 breadcrumbs and acidulants, soy products and
17 stuff like that.
18   Q.    Okay.  So let me back up.
19       When you started as sourcing
20 specialist --
21   A.    Mm-hmm.
22   Q.    -- you were involved in a number of
23 different ingredients?
24   A.    Yes.  I supported the purchasing
25 managers with . . .

---

15

1    Q.    And then at some point you
2  transitioned into Miss Pecek's role as a
3  sourcing manager?
4    A.    Not sourcing -- I wasn't a sourcing
5  manager.  I was still a sourcing specialist, so
6  I had a hybrid role where I managed those two
7  categories, and then I also had a support
8  function as well.  So it was more of a
9  hybrid role.
10   Q.    And what categories did you manager?
11   A.    It was eggs, bread crumbs,
12 acidulants, beer, liquor, wine and vinegar.  I'm
13 trying to think back.  Calcium stearates, I
14 think, too.
15   Q.    What are acidulants?
16   A.    What are acidulants?
17   Q.    Yeah.
18   A.    I think just -- I forget actually.
19 I want to say lactic acid.  I can't remember.
20   Q.    What portion of your time was
21 involved with eggs as opposed to the other
22 ingredients you mentioned?
23   A.    It was more a portion of the time.
24 It was a greater portion.
25   Q.    More than 50 percent of the time on

---

16

1  eggs?
2    A.    Roughly.
3    Q.    You indicated that your direct
4  supervisor was initially Ed Lewis?
5    A.    Yes.
6    Q.    And I recall you indicated he was
7  group manager of ingredients?
8    A.    Yes.
9    Q.    And what ingredients was he the
10 manager of?
11   A.    Well, he oversaw, so like there
12 was -- like I said, there were purchasing
13 managers and he was head of the purchasing
14 managers, so he oversaw the purchases for
15 vegetables and there's a miscellaneous
16 ingredient category.  Then beef and chicken,
17 like poultry, and then like eggs and all that
18 stuff.
19   Q.    Were there people at Nestlé that you
20 would regularly communicate with about egg
21 purchasing?
22   A.    I mean, I would give updates to my
23 boss.
24   Q.    And that would have been Ed Lewis?
25   A.    Yes.

---

17

1    Q.    Anyone else you would communicate
2  with with respect to egg purchasing?
3    A.    I mean, eventually when Steve Feyman
4  came -- when Steve Feyman came in to transition
5  into Ed's role, then I would communicate that to
6  him as well.
7    Q.    Was there anyone at Nestlé you would
8  talk to so that you could have a better
9  understanding of what eggs were necessary in a
10 particular product?
11   A.    I don't understand what -- can
12 you -- I don't understand that question.
13   Q.    Sure.  So why don't you describe
14 more of what your responsibilities were as a
15 sourcing specialist.
16   A.    Within eggs or just in general?
17   Q.    Within eggs.
18   A.    Within eggs?  Well, I mean, I would
19 essentially manage the category to where I
20 strategically source the egg ingredients as --
21 you kind of look at this like a power profile --
22 what vendors are involved, you know, what's the
23 volume for each particular item, where it's
24 used, specifications, understanding that; then
25 understanding the competitive set to see

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                          April 24, 2014

6 (Pages 18 to 21)

| 18 | 20 |
|---|---|
| 1 where -- what other vendors offer the product | 1 understand because it's -- the person who had |
| 2 that we're procuring. | 2 the position was on a leave of absence, so I |
| 3 Q. And as an example of understanding | 3 didn't really have any resources then. |
| 4 the specifications, who would you talk to at | 4 Q. And what resources did you look to |
| 5 Nestlé that would help you understand the | 5 outside of Nestlé? |
| 6 specifications? | 6 A. The Internet. |
| 7 A. Probably -- I mean, I don't recall | 7 Q. And what particularly on the |
| 8 who I spoke to regarding specifications. | 8 Internet? |
| 9 Q. Would they be technical people? | 9 A. I just Googled probably egg |
| 10 A. They could have been, yeah. | 10 producers and then that's about it. |
| 11 Q. And you indicated part of your | 11 Q. What about the market? How |
| 12 responsibilities included understanding kind of | 12 did you understand what was happening in the egg |
| 13 the marketplace, which vendors were selling the | 13 market in your position? |
| 14 different eggs? | 14 A. I reached out to the vendors and |
| 15 A. Yeah. | 15 also talked to Informa. |
| 16 Q. Who did you work with at Nestlé to | 16 Q. What's Informa? |
| 17 help you identify particular vendors? | 17 A. They're an egg -- well, they're an |
| 18 MR. CAMPBELL: Objection as to form. | 18 entity that tracks the markets for eggs. |
| 19 THE WITNESS: What's that? | 19 Q. And what did you do with the |
| 20 MR. CAMPBELL: Can we stop just one | 20 information that you obtained from Informa? |
| 21 minute? | 21 A. I used it to -- I used it to better |
| 22 MR. BOETTGE: Sure. | 22 understand how -- where the market is going, |
| 23 THE VIDEOGRAPHER: Off the record. | 23 what the current conditions are and -- |
| 24 (Whereupon, Douglas B. Besman, Esq. | 24 Q. And how was that helpful to you as |
| 25 joined the deposition.) | 25 an egg buyer? |

| 19 | 21 |
|---|---|
| 1 (Discussion held off the record.) | 1 A. So I understand where the market's |
| 2 THE VIDEOGRAPHER: We're back on the | 2 heading for purchasing activities. |
| 3 record. The time is 1:35. | 3 Q. Mr. Trask, we've marked as |
| 4 BY MR. BOETTGE: | 4 Deposition Exhibit 1 a Protective -- the |
| 5 Q. Before we broke, Mr. Trask, your | 5 Protective Order that's in the case, and I've |
| 6 counsel had interposed an objection to my | 6 done so as an abundance of caution to the extent |
| 7 question, and Mr. Campbell can add to this, but | 7 I may be showing you documents that have been |
| 8 when he objects, there's still a question | 8 marked as confidential or highly confidential. |
| 9 pending, and I ask that you answer to the extent | 9 This is a document that has a number |
| 10 that you understand the question unless | 10 of provisions that principally provide that you |
| 11 Mr. Campbell specifically instructs you not to | 11 agree to keep the documents and the information |
| 12 answer the question. | 12 learned from those documents confidential. |
| 13 Is that fair? | 13 And if you want to take a look at |
| 14 MR. CAMPBELL: He understands that. | 14 that briefly, feel free to do so. There's an |
| 15 BY MR. BOETTGE: | 15 acknowledgment form on the last page that I ask |
| 16 Q. Would you like me to ask the | 16 that you execute. |
| 17 question again? | 17 MR. CAMPBELL: I've reviewed this, |
| 18 A. Yes. | 18 Bill, and this is common in each of these |
| 19 Q. What I was trying to understand, | 19 depositions, and witnesses sign this Protective |
| 20 Mr. Trask, was when you were looking at the | 20 Order agreeing that they will not disclose the |
| 21 competitive marketplace to identify particular | 21 substance of any confidential documents to |
| 22 vendors, who at Nestlé helped you in that | 22 anybody else. |
| 23 process? | 23 So I would advise you to go ahead |
| 24 A. I don't recall anyone helping me. I | 24 and just sign it. |
| 25 reached out to people outside Nestlé to | 25 THE WITNESS: Okay. |

## HIGHLY CONFIDENTIAL

Trask, III, William E.                                   April 24, 2014

7 (Pages 22 to 25)

---

**22**

BY MR. BOETTGE:
Q.   Okay.
A.   **Right now or . . .**
MR. CAMPBELL:  Yes, right now.
Did you mark that as an exhibit,
Doug?
MR. BOETTGE:  I did.  That will be
Exhibit 1.
MR. CAMPBELL:  All right.
- - - - -
(Thereupon, Deposition Exhibit 1,
Case Management Order No. 10
(Protective Order), was marked for
purposes of identification.)
- - - - -
BY MR. BOETTGE:
Q.   Thank you, Mr. Trask.
While you were at Nestlé, did any
Nestlé subsidiaries or affiliates purchase shell
eggs?
A.   **What do you mean?  Like a --**
Q.   Eggs that were still --
A.   **-- different divisions of the Nestlé**
**or --**
Q.   Correct.

---

**23**

A.   **I bought for them.**
Q.   Now, let me clarify my distinction
then.
Do you understand the distinction
between egg products and shell eggs?
A.   **Can you clarify that?**
Q.   Sure.
When I refer to a shell egg, what
I'll be referring to is an egg that is purchased
and is still in its shell form.
A.   **Oh, no.**
Q.   You're not aware of Nestlé having
purchased any shell eggs?
A.   **Not in shell form.  Like, so you're**
**saying get an egg and they in turn would receive**
**an egg that's still in contact in its shell?**
Q.   Correct.
A.   **Yeah, I don't recall that.**
Q.   Let's talk for a moment about Nestlé
and the family of companies while you were at
Nestlé.
Which Nestlé affiliates or entities
did you purchase eggs on behalf of?
A.   **Häagen-Dazs, Dreyer's, Nestlé Toll**
**House, confection group, Buitoni, Lean Cuisine,**

---

**24**

Stouffer's.  That's all I can recall off the top
of my head.
Q.   Do you know if there are any other
divisions or companies within the Nestlé family
of companies that purchase egg products?
A.   **I think the pet food division is a**
**secondary market that I didn't get involved in.**
Q.   Any others?
A.   **I don't recall.**
Q.   So is it fair to say if there were
eggs being purchased by the Nestlé family of
companies or divisions, you would have been
involved in that purchase while you were at
Nestlé?
A.   **Well, I mean, like for the pet**
**foods, I wasn't involved in that.**
Q.   Apart from the pet food, that's
true?
A.   **As far as I can recall, yeah.**
Q.   Let's take Dreyer's for an example.
Is Dreyer's a separate corporate
entity of Nestlé?
A.   **Well, the way I understood it was**
**Häagen-Dazs is West Coast and Dreyer's is East**
**Coast.**

---

**25**

Q.   Do you know anything about their
corporate arrangement or status while you were
at Nestlé?
A.   **I don't recall.**
Q.   You mentioned West Coast versus East
Coast.
So why don't you tell me what you
mean by that.
A.   **West of the Mississippi, east of the**
**Mississippi.  So Häagen-Dazs is a brand that was**
**primarily used on the West Coast.  And then**
**Dreyer's was the predominant brand on the East**
**Coast.**
Q.   Did you understand Dreyer's to be a
separate entity?
A.   **Not necessarily.**
Q.   What about Nestlé Toll House?  What
was the -- is that a separate division of Nestlé
or was that a corporate entity within Nestlé?
A.   **I believe it was a division.**
Q.   And then you mentioned convection
[sic]?
A.   **Confection.**
Q.   Confection?
A.   **Like candies.**

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                April 24, 2014

8 (Pages 26 to 29)

---

26

1    Q.    And could you describe that a little
2    bit more, what you mean by that?
3        A.    Well, Willy Wonka type stuff.
4        Q.    Is that a separate division of
5    Nestlé?
6        A.    I believe so.
7        Q.    And then Buitoni?  What is Buitoni?
8        A.    Pasta.
9        Q.    And is that a separate division of
10   Nestlé?
11       A.    I believe so.
12       Q.    Same question with Lean Cuisine,
13   separate division of Nestlé or same company?
14       A.    Separate division.
15       Q.    And the same with Stouffer's?
16       A.    Yes.
17       Q.    Is that a separate division or a
18   separate company?
19       A.    Division.
20       Q.    Would you negotiate egg purchases on
21   behalf of each of these divisions we've
22   identified?
23       A.    Yes.
24       Q.    And using Dreyer's as an example,
25   would Dreyer's be the company that signed the

---

27

1    contract with the supplier?
2        A.    I don't recall how that was taken
3    back then.  I don't recall how that was handled.
4        Q.    Okay.  So you don't recall whether
5    it would have been Dreyer's signing the contract
6    as opposed to a Nestlé entity signing the
7    contract; is that fair?
8        A.    Yeah, I don't recall.
9        Q.    And is that the same, that would
10   hold true with the other divisions you
11   mentioned?  The Häagen-Dazs, the Toll House,
12   confection?  You don't recall who was the
13   purchaser identified in those contracts?
14       A.    Right.  I mean, I purchased in those
15   contracts, but I don't recall where the
16   signature took place.
17       Q.    I guess I'm a little confused.  You
18   said you don't recall where the signature took
19   place.
20       A.    Well, I think your question was who
21   we signed off on the contracts, right?
22       Q.    What was the entity that was listed
23   as the buyer in those contracts?
24       A.    Me.
25       Q.    You?

---

28

1        A.    Yeah.  I was the buyer for the eggs.
2        Q.    Okay.  But obviously, you weren't
3    personally responsible if nobody paid for those
4    eggs, correct?  You bought those on behalf of
5    another entity?
6        A.    Yeah.
7        Q.    And what entity did you buy those
8    eggs on behalf of?
9        A.    So who did I -- so -- so I bought
10   them on behalf of the divisions that were using
11   the eggs.
12       Q.    And do you recall in the contracts
13   themselves whether the division was identified
14   as the buyer or was it a Nestlé entity
15   identified as the buyer in --
16       A.    Nestlé Business Services.
17       Q.    What is Nestlé Business Services?
18       A.    NBS, it's the group that
19   they're -- they're called NBS.  Nestlé Business
20   Services.  It's the purchasing group.
21       Q.    So your understanding is that a
22   Nestlé purchasing group was identified as the
23   buyer in the contracts where Nestlé was
24   purchasing eggs?
25       A.    Yeah.

---

29

1        Q.    Is Nestlé Business Services, as you
2    recall, a separate entity?
3        A.    I believe it's a third-party
4    purchasing group hired by Nestlé, the way I
5    recall.
6        Q.    What do you mean by a third-party?
7        A.    That's just kind of what it is.  I
8    mean, they -- from what I understand is Nestlé
9    Business Services is a third party that Nestlé,
10   I believe, hires on behalf of them to do all
11   their purchases.
12       Q.    Does Nestlé Business Services have
13   their own employees?
14       A.    I'm not sure how that's identified.
15   I'm not sure how that's -- I'm not sure if
16   it's -- they have their own employees, yes, so I
17   don't know how that's distinguished within
18   Nestlé itself anymore.
19       Q.    So Nestlé Business Services has its
20   own separate group of employees, correct?
21       A.    I believe so.
22       Q.    Did you work for Nestlé Business
23   Services?
24       A.    Mm-hmm.  I was in that group.
25       Q.    Who did you understand your employer

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

9 (Pages 30 to 33)

---

**30**

1  to be when you were at Nestlé?
2      A.   Nestlé.
3      Q.   When you say "Nestlé," Nestlé, Inc.,
4  Nestlé --
5      A.   Nestlé USA.
6      Q.   Nestlé USA.
7           And what did you understand to be
8  the relationship between Nestlé USA and Nestlé
9  Business Services?
10      A.   That we provide a service for them
11  and that's it.
12      Q.   So you understood that Nestlé
13  Business Services provided a service to Nestlé
14  USA?
15      A.   Yes.
16      Q.   But Nestlé USA was a separate
17  company than Nestlé Business Services, correct?
18      A.   I don't know if that's true.  I
19  don't know how to distinguish them.
20      Q.   Where is Häagen-Dazs manufactured?
21      A.   The West Coast.  I don't recall
22  where.
23      Q.   And what types of eggs are used in
24  Häagen-Dazs?
25      A.   Liquid sugar egg yolks.

---

**31**

1      Q.   Any other egg products?
2      A.   For Häagen-Dazs?
3      Q.   Yeah.
4      A.   I think there was a -- like a liquid
5  egg white, but I'm not 100 percent sure.  It was
6  a small amount.  It was a very small amount.
7      Q.   What about Dreyer's?  What types of
8  egg products were used in Dreyer's product?
9      A.   The same.  Liquid sugar egg yolks.
10      Q.   And some liquid egg whites?
11      A.   I think so.
12      Q.   And do you recall where Dreyer's was
13  manufactured?
14      A.   On the East Coast unless -- yeah, on
15  the East Coast.
16      Q.   What about Toll House?
17      A.   That was East Coast, and I can't
18  remember where it was manufactured.
19      Q.   And what type of egg products are
20  used in Nestlé Toll House?
21      A.   Dried whole eggs.
22      Q.   Say that again?
23      A.   Dried whole eggs.
24      Q.   Dried whole.
25           Anything else?

---

**32**

1      A.   Not that I recall.
2      Q.   What about for the confection group?
3      A.   I want to say dried egg whites.
4      Q.   Buitoni, what type of egg products
5  were used for Buitoni products?
6      A.   Buitoni.  Liquid whole eggs.
7      Q.   How about Lean Cuisine?
8      A.   I want to say that's where the
9  liquid -- or where the dry yolks were, but I'm
10  not 100 percent sure.
11      Q.   And where was Lean Cuisine
12  manufactured?
13      A.   Right here.  Lean Cuisine and
14  Stouffer's.
15           THE REPORTER:  I'm sorry, I didn't
16  hear you.
17           THE WITNESS:  Lean Cuisine and
18  Stouffer's, I think it's a mixture.
19  BY MR. BOETTGE:
20      Q.   In Solon, Ohio?
21      A.   Solon.
22      Q.   Solon?
23      A.   Yes.
24      Q.   And you might have mentioned, where
25  is the Buitoni manufactured?

---

**33**

1      A.   I don't recall.  I believe it was
2  the East Coast.
3      Q.   And Stouffer's also uses dried
4  yolks?
5      A.   I think, but I don't recall.
6      Q.   Anything else that you recall?
7      A.   I don't know.
8      Q.   Do you recall which vendors supplied
9  egg for Häagen-Dazs?
10      A.   Vaguely.
11      Q.   Which ones?
12      A.   West Coast was Golden Oval, which
13  was eventually bought out by Rembrandt Foods.
14           On the East Coast, I forget.  I
15  mean, at one point it was Michael Foods and I
16  forget -- and I forget who else may have
17  supplied it.
18      Q.   What about Rose Acre?
19      A.   Yeah.
20      Q.   Do you recall if Rose Acre supplied
21  Häagen-Dazs with ice cream -- or with eggs?
22      A.   I don't recall if they did or not.
23      Q.   What about Dreyer's?
24      A.   I don't recall.
25      Q.   Toll House?

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                April 24, 2014

---

**34**

1    A.   Liquid whole -- or sorry.  Dried
2  whole eggs.
3    Q.   And who supplied the dried whole
4  eggs?
5    A.   Michael Foods did at the beginning
6  and then the business was transitioned to Rose
7  Acre.
8    Q.   Do you recall when that transition
9  occurred?
10    A.   Probably '08/'09.
11    Q.   What about the confection -- the
12  dried white egg whites?  Who were those
13  purchased from?
14    A.   Same scenarios.  It was Michael
15  Foods and I believe it went to Rose Acre.
16    Q.   Do you recall the circumstances of
17  that transfer from Michael Foods to Rose Acre?
18    A.   Why we switched?
19    Q.   Yes.
20    A.   Because Michael Foods' prices were
21  very high.
22    Q.   Were you involved in that decision?
23    A.   Yeah.
24    Q.   What about the liquid whole eggs for
25  Buitoni?

---

**35**

1    A.   Michael Foods produced -- supplied
2  it at the beginning and then it was transitioned
3  to Ballas.
4    Q.   To who?
5    A.   Ballas Eggs.
6    Q.   When did that transition occur?
7    A.   Roughly the same time frame.  I
8  don't recall the exact time frame.  So the
9  2008/2009 time frame.
10    Q.   What about the dried yolks used in
11  Lean Cuisine?
12    A.   I believe it was Michael Foods and
13  then switched to Rose Acre.
14    Q.   And I may have asked you this, but,
15  again, with respect to the Dreyer's eggs, do you
16  recall who supplied eggs for Dreyer's?
17    A.   I can't remember off the top of my
18  head.
19           - - - - -
20         (Thereupon, Deposition Exhibit 2,
21         E-Mail Chain, Bates Labeled
22         NES00000458-00000459, was marked for
23         purposes of identification.)
24           - - - - -
25    Q.   What I'm showing you, Mr. Trask, is

---

**36**

1  a document that's Bates numbered NES00000458.
2  It's an e-mail chain between yourself and
3  Mr. Lewis and Mr. Feyman.
4    Do you see that?
5    A.   Yes.
6    Q.   And I'll represent to you that
7  documents that are Bates numbered or have a
8  label in the lower right with an NES --
9    A.   Okay.
10    Q.   -- are documents that were produced
11  in the litigation by Nestlé.
12    A.   Okay.
13    Q.   I'm going to focus your attention on
14  the bottom e-mail.
15    A.   Mm-hmm.
16    Q.   And the subject line is E-Mail To
17  John Hill.
18    Do you see that?
19    A.   Yes.
20    Q.   Who is John Hill?
21    A.   He was the head procurement
22  individual for Häagen-Dazs.
23    Q.   Dreyer's as well?
24    A.   I don't recall if it was Dreyer's.
25  He may have been.

---

**37**

1    Q.   And what's your relationship of
2  Edy's at Nestlé?
3    A.   I think that's a brand of one of
4  the -- either Dreyer's or Häagen-Dazs.
5    Q.   And the e-mail begins with you
6  offering your overall sense or your overall
7  strategy for 2009.
8    Do you see that?
9    A.   Yes.  I'm looking at it right now.
10    Q.   Why were you providing your strategy
11  thoughts?
12    A.   Because that's our -- one of our job
13  functions is developing a strategy.
14    Q.   And how often did you share your
15  strategy thoughts?
16    A.   I think it was an ongoing discussion
17  until we made a decision on, you know, where to
18  go forward.  I mean, overall it was -- it was an
19  evolving type thing, because as the market
20  changes, you kind of look at what your
21  strategies are, so . . .
22    Q.   And if you turn to the next page,
23  there's a reference on top of the -- in the full
24  paragraph there, "According to Informa."
25    Do you see that?

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                    April 24, 2014

---

**38**

1  A.   Mm-hmm.
2  Q.   I think you had mentioned Informa
3  earlier.
4  A.   Yeah.
5  Q.   Did you have a -- did Nestlé have a
6  subscription to Informa or how did that
7  information from Informa come to you?
8  A.   Yes.  I made phone calls to the
9  representative.
10  Q.   To who?
11  A.   To the representative from Informa,
12  so just my contact there.
13  Q.   And do you recall that person's
14  name?
15  A.   I remember his last name.  I think
16  it was Jordan or something.
17  Q.   Mark Jordan?
18  A.   Yeah, that sounds about right.
19  Q.   And how often would you speak with
20  Mr. Jordan?
21  A.   Weekly.
22  Q.   Were those set calls that were
23  prearranged?
24  A.   No, not necessarily.  I mean, if I
25  had questions, I would call him, you know.

---

**39**

1  Q.   And how was Informa compensated for
2  that?
3  A.   I don't recall.
4  Q.   Did you receive any other
5  information from Informa other than the
6  telephone communications you had with
7  Mr. Jordan?
8  A.   I believe he'd send me e-mails.
9  Q.   And do you recall what types of
10  questions you would ask Mr. Jordan?
11  A.   Generally, from what I can think of,
12  is mostly market-driven questions,
13  supply/demand, like future projections, current
14  situation, stuff like that.
15  (Short interruption.)
16  MR. CAMPBELL:  Is anybody on the
17  phone?  Hang it up.
18  You're not much of a draw, Doug.
19  MR. BOETTGE:  I hope to do better
20  tomorrow.
21  BY MR. BOETTGE:
22  Q.   Mr. Trask, what did Nestlé do with
23  your strategy recommendations?
24  A.   I think they helped us formulate
25  what we would do going forward as far as

---

**40**

1  supplier selection and just the price strategy.
2  Q.   I want to bring your attention to
3  the second paragraph of your e-mail to Mr. Lewis
4  and Mr. Feyman.  You write, "I plan to wrap up
5  the negotiations."
6  Could you describe those
7  negotiations that you were wrapping up?
8  A.   I don't specifically remember what
9  they were, but generally, they were just
10  negotiating pricing with the vendors that were
11  soliciting quotes.
12  Q.   When you say "vendors that were
13  soliciting quotes" --
14  A.   That were responding to bids that I
15  sent them.
16  Q.   Would you be the one who would be
17  sending them bids?
18  A.   Mm-hmm.
19  THE REPORTER:  Yes?
20  THE WITNESS:  Yes.  Yes.
21  BY MR. BOETTGE:
22  Q.   And how would you decide which
23  vendors to solicit bids from?
24  A.   If they're able to supply what you,
25  know, we require, what product we require.

---

**41**

1  Q.   You note here that you're planning
2  to wrap up negotiations and have contracts ready
3  to be placed by the beginning or middle of
4  November.
5  Do you see that?
6  A.   Yes.
7  Q.   And was there a seasonal aspect to
8  your price negotiations?
9  A.   I mean, typically they would go
10  either annual or quarterly, but they -- I mean,
11  they'd be defined in a calendar year.
12  Q.   What's that?
13  A.   They would be defined in a calendar
14  year, from what I recall, because . . .
15  Q.   And you note here that "The quotes
16  will cover 6-month and 12-month pricing."
17  Do you see that?
18  A.   Yes.
19  Q.   What did you mean by that?
20  A.   So either the pricing would be good
21  for 6 months or 12 months.
22  Q.   What do you mean by "good for 6
23  months or 12 months"?
24  A.   Meaning the agreement -- if the
25  price they submitted for a 6-month quote would

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

12 (Pages 42 to 45)

---

42

be X and a price submitted for a 12-month quote would be Y, so based on the information we received from Informa and any kind of market research they gave us, we kind of made a decision based on what was the best strategy going forward.

Q.   So if you would purchase eggs on a 12-month basis, is it your understanding the price of that egg would then not change during the duration of the 12-month contract?

A.   Can you say that again?  Sorry.  I was looking over some . . .

Q.   Sure.

Just to clarify, you noted that you were looking at prices for 6 months and 12 months, correct?

A.   Correct.

Q.   And is it fair to understand if you would purchase eggs pursuant to a 12-month contract, the price that Nestlé would be paying for those eggs would stay the same throughout the year?

A.   It depends if it was a formula price or a fixed price.

Q.   And describe for me what the

---

43

distinction is between the two.

A.   Well, formula is variable and fixed is not.

THE REPORTER:  Are you saying formal or formula?

THE WITNESS:  Formula.

BY MR. BOETTGE:

Q.   So in a fixed contract, the price that Nestlé would pay for the eggs would not change --

A.   Correct.

Q.   -- during the period of the 12 months?

A.   If we agree to that.

Q.   And did Nestlé agree to 12-month fixed contracts?

A.   I don't recall that we did.  A lot of it -- this was -- we did very little fixed contracting during that -- for this 2009 strategy.

Q.   And why was that?

A.   Because I believe the market was -- because in 2008 the market was coming down off of historic highs.

Q.   Prior to the 2008/2009 period, do

---

44

you recall Nestlé entering into fixed contracts?

MR. CAMPBELL:  Objection as to form. Lack of foundation.

You may answer that, Bill.

THE WITNESS:  Oh, I don't recall.

MR. CAMPBELL:  Doug, could we take a short bathroom break?

MR. BOETTGE:  Sure.  We can do that now.

MR. CAMPBELL:  Is that okay?

MR. BOETTGE:  Sure.  That's fine.

THE VIDEOGRAPHER:  Off the record. The time is 2:06.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 2:11.

BY MR. BOETTGE:

Q.   Mr. Trask, are you familiar with the term "Urner Berry"?

A.   Yes.

Q.   What is Urner Berry?

A.   I believe it's just a certification of eggs.  A certification of eggs.  A standard to meet.

Q.   I'm wondering if you're confusing --

---

45

A.   Oh, I was thinking at UEP.  Urner Berry is the -- yeah, I confused that.  Sorry. Urner Berry is the -- would be like the formula, how the formulas were . . .

Q.   Do you have a sense of what the Urner Berry market is or was?

A.   I don't recall.

Q.   I want to focus again, we were talking before we broke about fixed price contracts.

A.   Yes.

Q.   And so if I understand, if Nestlé enters into a 6-month contract, is the price that Nestlé pays affected by what happens to the market of shell egg prices?

MR. CAMPBELL:  Objection as to form.

You can answer, Bill.

THE WITNESS:  Oh, okay.

I don't recall.

BY MR. BOETTGE:

Q.   Let's just walk this through.

I think you had told me that in a fixed price contract, the price that Nestlé pays stays the same for the full six months, correct?

A.   For the term of the contract, yeah.

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                       April 24, 2014

13 (Pages 46 to 49)

---

**46**

Q.   Or at least there's an agreement at the beginning of the contract what price Nestlé would be paying at the end of the contract; is that fair?

A.   **During the time frame. Yeah. So, yeah, if it's fixed for six months between January and June, then that's what the same price -- regardless what the market does, it's the same price.**

Q.   And likewise, it's regardless of, for example, the supply of layer hens, correct?

A.   **I mean, that's kind of how the fixed price, I think, is established is based on the current market conditions. They also -- for a fixed price they hedged any kind of insurance on top of that because they're taking a risk on volume.**

Q.   But, again, during that time period of the contract, the price that Nestlé paid would not be affected by the supply of layer hens during that period, correct?

A.   **Correct. Yeah, during that period.**

Q.   And you noted that the fixed price, at the time that it's entered into -- well, let me ask you this: Do you know for certain how

---

**47**

vendors set their fixed price?

A.   **I didn't -- I don't know.**

Q.   So it's possible that a vendor could have set its fixed price based on that vendor's cost of production, correct?

MR. CAMPBELL:  Objection as to form. There's no foundation for that and it's speculative.

You can answer that, Bill.

THE WITNESS:  Say that again.

BY MR. BOETTGE:

Q.   So it's possible that a vendor could set its fixed price based on its cost of production, correct?

A.   **I don't know.**

Q.   You wouldn't know either way, correct?

A.   **I wouldn't know.**

Q.   I want to touch briefly on your background. I didn't follow up.

You indicated you left Nestlé, I believe, February/March 2010?

A.   **Yes.**

Q.   Where did you go afterwards?

A.   **Beechnut Baby Food.**

---

**48**

Q.   And what did you do for Beechnut Baby Food?

A.   **I was a buyer of packaging.**

Q.   And how long did you do that?

A.   **About a year and eight months.**

Q.   And where did you go to after Beechnut?

A.   **Associated Materials, which is where I am at currently.**

Q.   Say that again?

A.   **Which is where I am at currently.**

Q.   Associated Materials?

A.   **Associated Materials, yeah.**

Q.   And what do you do for Associated Materials?

A.   **Sourcing manager.**

Q.   And what items do you source?

A.   **Chemicals, resins, packaging and MRO.**

Q.   MRO standing for?

A.   **Maintenance review -- or maintenance, repair and operations.**

Q.   Why did you choose to leave Nestlé in March of 2010?

A.   **A career opportunity.**

---

**49**

Q.   Were the 6 to 12-month time frames something that Nestlé would ask its vendors to bid on?

A.   **Not necessarily.**

Q.   In other words, were those time frames dictated by Nestlé?

A.   **No.**

Q.   Did Nestlé tell its vendors what periods of time they would seek for their contracts?

A.   **No.**

Q.   Your e-mail to Mr. Lewis and Mr. Feyman is broken up by different -- or has four different locations.

A.   **Mm-hmm.**

Q.   And what is the significance of each of those locations?

A.   **I believe -- Bakersfield and Tulare, that was Häagen-Dazs. Laurel was Dreyer's. Fort Wayne, Houston, I forget what that was, and Salt Lake City, I forget what that was as well.**

Q.   Given, I think, your testimony that Mr. Hill was involved with Dreyer's?

A.   **Um-mmm, Dreyer's and Häagen-Dazs.**

Q.   Is it likely then Fort Wayne,

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

14 (Pages 50 to 53)

---

**50**

Houston and Salt Lake City were locations
related to Dreyer's or Häagen-Dazs?
     A.   I don't think it was.  I don't
recall.  I don't think it was, though.
     Q.   Did Mr. Hill have responsibilities
other than Dreyer's and Häagen-Dazs?
     A.   I don't know.
     Q.   And did you make separate purchasing
decisions based on each location?
     A.   Excuse me?  Say that again.
     Q.   Did you make separate purchase
decisions based on location?
     A.   Somewhat, yes.
     Q.   How did location impact your
purchase decisions?
     A.   Well, you couldn't
necessarily -- for a West Coast plant, you
couldn't necessarily transport liquid eggs from
the East Coast to the West Coast because of
spoil rates, and typically, you would try to
find a West Coast vendor to service the West
Coast plants and vice versa.
     Q.   I want to focus your attention now
on the third bullet underneath the Bakersfield
heading.

---

**51**

     A.   Okay.
     Q.   It begins, "Depending on what
happens with the cage-free legislation ballot in
November."
          What is that a reference to?
     A.   I think there was a cage-free
ballot -- I don't know specifics on that, but
it's legislation, I think, in California.
     Q.   Why did you believe it was important
for you to include in your e-mail?
     A.   Because it would impact us whether
we had to procure cage-free eggs or not.
     Q.   Would it impact the purchaser or
would it impact the supplier?
     A.   What do you mean "the purchaser"?
     Q.   In other words, did you recall the
legislation would have precluded a California
location from buying eggs that were not
cage-free produced outside of California?
     A.   I think that was a question that
was -- I didn't know the answer to that
question.
     Q.   What did you mean by, "Might need to
change our supply focus"?
     A.   Where?

---

**52**

     Q.   Continuing that third bullet.
"Depending on what happens with
the...legislation we might need to change our
supply focus."
     A.   So probably the current vendor
didn't provide those type of eggs.
     Q.   Did you have a sense at the time
that if that legislation was passed, the costs of
California produced eggs would go up?
     A.   Yes.
     Q.   Why so?
     A.   I don't recall the specifics, but at
a high level, it would require more cost and
more costly infrastructure, so less laying hens,
less cages per square foot, something to that
degree.
     Q.   And that would increase costs to the
supplier?
     A.   Well, to us as well, yeah.  Yeah.
     Q.   So increased costs to supplier --
     A.   Could --
     Q.   -- would then result in increased
costs to Nestlé?
     A.   It could, yeah.
     Q.   But did you have an understanding

---

**53**

that complying with those -- if that legislation
were passed, that would result in increased
costs to the producers?
     A.   It could, yeah.
     Q.   What do you mean by "it could"?
     A.   I mean, I don't know for sure.  I
mean, I would assume it would be, but . . .
     Q.   I think there's a reference right
underneath that bullet that begins, "If Dreyer's
can lift their UEP requirements, a possible
alternative could be Rembrandt Foods in Iowa."
          Do you see that?
     A.   Mm-hmm.
     Q.   Why did you write that?
     A.   Because they provided liquid sugar
egg yokes but they weren't UEP certified, which
is what Dreyer's and Häagen-Dazs required driven
by outside requirements.
     Q.   What were the outside requirements?
     A.   Well, I think it was just reacting
to what Ben & Jerry's was doing with their
animal friendly business focus.
     Q.   What was Ben & Jerry's doing?
     A.   I don't recall exactly what they
were doing, but they had a green type focus and

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                          April 24, 2014

15 (Pages 54 to 57)

---

54

1    cage-free and stuff like that.
2        Q.    But this isn't cage-free, correct?
3    This is UEP?
4        A.    UEP, but there's certain guidelines
5    to be UEP certified and I don't recall what
6    those guidelines are, but they're more strict
7    than just having hens in a -- in a barn, but
8    there are guidelines as to what would qualify as
9    a UEP.   Certain living conditions and stuff like
10   that.
11       Q.    Any other outside requirements that
12   drove the requirement of Dreyer's and
13   Häagen-Dazs to use UEP certified egg?
14       A.    Other than Ben & Jerry's, I'm not
15   aware.
16       Q.    Are you aware of any pressure that
17   Nestlé received from customers to have UEP
18   certified eggs in their supply?
19       A.    I don't recall.
20       Q.    Were you involved in any discussions
21   at Nestlé relating to the reasons that Dreyer's
22   and Häagen-Dazs required -- let me withdraw the
23   question.
24            Do you recall when Dreyer's and
25   Häagen-Dazs began requiring?

---

55

1        A.    No, I don't recall.
2        Q.    Did they require when you were
3    there?  By the time you started they had already
4    had the requirement?
5        A.    Yeah.
6        MR. CAMPBELL:  Objection as to form.
7    BY MR. BOETTGE:
8        Q.    Do you recall whether there was a
9    premium or upgrade associated with the purchase
10   of UEP certified eggs?
11       A.    Yes.
12       Q.    What do you recall about that?
13       A.    Can you be more specific?
14       Q.    Sure.  Do you recall the amount of
15   the upcharge or premium?
16       A.    I don't recall the exact amount, but
17   it was in the range of, I would say around
18   3¢-ish, 3 to 5¢.
19       Q.    And when you negotiated UEP
20   certified eggs, was that premium or upcharge
21   discussed with the vendor?
22       A.    I believe so, yeah.
23       Q.    And is it fair to say then, in fact,
24   Nestlé did pay the premium or upcharge to
25   acquire the UEP certified egg?

---

56

1        A.    Yes.
2        Q.    And again, the reason that they were
3    willing to pay the premium was to react to what
4    Ben & Jerry's was doing in the market?
5        A.    Yes, I believe so.
6        Q.    Were you aware, Mr. Trask, when you
7    were at Nestlé, that Nestlé could buy UEP egg
8    only from a supplier that was a certified UEP
9    producer?
10       A.    I don't recall.
11       Q.    Was it your understanding,
12   Mr. Trask, that to -- well, I'll withdraw the
13   question.
14            So we mentioned a number of
15   divisions earlier that you purchased eggs on
16   behalf of, including Buitoni, confection, et
17   cetera.
18            Do you recall that discussion?
19       A.    Yes.
20       Q.    Was it only Häagen-Dazs and Dreyer's
21   that requested or required UEP certified eggs?
22       A.    I believe so, yes.
23       Q.    Why was that?
24       A.    I think it was just because of the
25   market pressures from Ben & Jerry's.  And

---

57

1    Ben & Jerry's doesn't participate in other
2    things outside of ice cream, so . . . as far as
3    I know.
4        THE REPORTER:  Did you say "does" or
5    "doesn't"?
6        THE WITNESS:  I don't think they do,
7    outside of ice cream, as far as I know.
8    BY MR. BOETTGE:
9        Q.    So for those other divisions that we
10   just mentioned, the Buitoni, confection, all
11   others than Häagen-Dazs and Dreyer's, you
12   purchased on behalf of Nestlé non-UEP certified
13   egg?
14       A.    Outside of Dreyer's and Häagen-Dazs,
15   I don't believe there's a requirement for UEP
16   certified eggs.
17       Q.    So was it your understanding you
18   were purchasing non-UEP certified eggs?
19       A.    I believe so, yeah.
20       Q.    Do you recall if Nestlé purchased
21   UEP certified eggs from Michael Foods?
22       A.    I don't recall.  I believe at one
23   point Michael Foods was supplying the liquid
24   sugar egg yolks, but I don't recall that
25   distinction.

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                          April 24, 2014

16 (Pages 58 to 61)

58

1      Q.    So if I understand you, you recall
2   at some point Michael Foods selling the sugared
3   yolks, correct?
4      A.    I believe. I'm not 100 percent sure
5   on that. I believe they were.
6      Q.    And if they were selling UEP sugared
7   yolks to Dreyer's, it's your understanding then
8   that those sugared yolks would have been UEP
9   certified?
10      A.    Yes.
11      Q.    Do you know any other vendors that
12   have sold Dreyer's UEP certified egg or
13   Häagen-Dazs UEP certified egg?
14      A.    I know on the West Coast there was
15   just the Golden Oval, and then eventually
16   Rembrandt brought Golden Oval and operated that
17   plant, so . . . But on the East Coast, I can't
18   remember.
19      Q.    Do you have a recollection as to
20   whether Rose Acre sold Nestlé UEP certified
21   eggs?
22      A.    I don't recall.
23      Q.    And just for clarification, when I'm
24   using "Nestlé" in the deposition, I'm referring
25   to it broadly as all of the divisions we've

59

1   talked about earlier; is that fair?
2      A.    Okay. Yes.
3      Q.    Moving down to the bottom of this
4   first page, there's a notation that for Laurel,
5   that you are "Currently soliciting both fixed
6   and formula pricing for Michael Foods."
7         Do you see that?
8      A.    Yeah.
9      Q.    Why were you soliciting both fixed
10   and formula pricing?
11      A.    Just to see what the quote looked
12   like.
13      Q.    Would you explain that?
14      A.    Well, depending on what they offered
15   on the formula price or fixed price. Then
16   comparing that against other offers, you try to
17   gauge what the competitiveness is.
18      Q.    Do you recall any instances when you
19   would have shared prices that you were quoted
20   with a third party such as Informa to help you
21   make an informed decision?
22      A.    Huh-uh.
23      Q.    Why not?
24      A.    Like I said, I guess I don't recall
25   sharing our pricing with Informa. I don't think

60

1   that's kind of what I would do in that
2   situation.
3      Q.    Well, my question was more specific
4   as to quotes that you were offered that perhaps
5   you hadn't agreed upon yet.
6      A.    Oh, no, I wouldn't do that.
7      Q.    Were there other vendors that you
8   solicited fixed pricing from?
9      A.    In what -- like in any division or
10   anything in Nestlé?
11      Q.    Any division.
12      A.    Yeah. I mean, we went through the
13   bid process. We associated fixed and formula.
14      Q.    And what are some advantages of a
15   contract that has fixed pricing?
16      A.    Well, an advantage is if the market
17   is projected to go up, you kind of want to hedge
18   a little and fix the price while the market's at
19   a certain -- below a level where you think it
20   might go. So . . .
21      Q.    And if you would do so, you would be
22   protected, then, from those increases in the
23   market?
24      A.    Hypothetically.
25      Q.    What do you mean by

61

1   "hypothetically"? Wouldn't, in fact, that be
2   the case if you did have a contract that fixed
3   the price?
4      A.    Well, it depends what the market
5   did. So hypothetically, if the market did go
6   up, then, yeah, you would -- there would be a
7   cost avoidance, but if it went down then, you
8   know, it wouldn't.
9      Q.    And lastly, Mr. Trask, you make a
10   recommendation at the end of your
11   e-mail -- well, let me step back. It says, "We
12   will not be in a position to make a final
13   recommendation until the quotes come in."
14         The next sentence, "When we have
15   them we will get with DGIC" --
16      A.    Mm-hmm.
17      Q.    -- "to discuss the appropriate mix
18   and meet DGIC's tolerance for fixed versus
19   variable pricing."
20         Do you see that?
21      A.    (Witness nodding in the
22   affirmative.)
23         THE REPORTER: Yes?
24         THE WITNESS: Yes.
25   BY MR. BOETTGE:

HIGHLY CONFIDENTIAL

Trask, III, William E.                                  April 24, 2014

17 (Pages 62 to 65)

---

**62**

1      Q.    Who was DGIC?
2      A.    I believe it's Dreyer's brand ice
3  cream, I think.  I think it's a Dreyer's -- I
4  think.  I can't remember.
5      Q.    And what did you mean by "their
6  tolerance"?
7      A.    So there is a projection based on --
8  so when we get the quotes in, we look at what a
9  formula price might look like through the life
10 of the contract or a fixed price through the
11 life of the contract, and then we kind of see
12 would they tolerate -- what would they tolerate
13 better, what would they -- looking at the options,
14 what would they think.
15     Q.    Was there a different tolerance for
16 fixed pricing than there was for formula
17 pricing?
18     A.    You mean tolerance from the
19 perspective of any of the other divisions?
20     Q.    Well, I'm just trying to get a sense
21 of what's meant here when you said "to meet
22 their tolerance for fixed versus variable
23 pricing."
24     A.    Yeah.  So what would they allow.
25 Like is this okay for them to -- is the fixed

---

**63**

1  price -- are they okay doing fixed price net
2  portion or formula price net portion.  Like
3  what's their tolerance level.  Like do they want
4  to do it, stuff like that.
5      Q.    Does your use of "tolerance" there
6  in that context incorporate the concept of risk?
7      A.    Yes.  Sure.
8      Q.    How so?
9      A.    So they look at the -- it's just
10 based on what the -- what the projections were
11 at the time, what a fixed price formula would
12 look like or a variable price formula.  So if
13 they're willing to take a risk on formula price
14 based on market projections and kind of where
15 we're looking projected to layout versus a fixed
16 price.  So it's just their appetite for . . .
17     Q.    And did the tolerances vary based on
18 divisions you were purchasing on behalf of?
19     A.    I don't recall what the tolerance
20 levels were, but, yeah --
21     Q.    Do you recall that they varied
22 between the different divisions?
23     A.    Not too much, because it was mostly
24 a -- when we entered into these agreements, it
25 was a -- a lot of it was trying to leverage as

---

**64**

1  much volume as possible, like for different
2  divisions, so we don't have 12 different
3  suppliers supplying the whole division.  We
4  limit it to a few.
5      Q.    And why was it helpful for Nestlé to
6  leverage as much volume from certain vendors?
7      A.    You just get the most -- hopefully,
8  the thought there is getting a competitive
9  offer.
10     Q.    Do you recall any instances in
11 which, in fact, Nestlé would receive a greater
12 rebate or discount based on the volume of
13 product that it bought from a particular vendor?
14     MR. CAMPBELL:  Objection as to form.
15     THE WITNESS:  I don't recall any
16 particular rebates or discounts.  I mean, I
17 don't recall any specifics around that.
18 BY MR. BOETTGE:
19     Q.    Do you recall any discussions with
20 particular vendors that, in fact, they would
21 provide a lower price if, in fact, Nestlé would
22 commit to a certain volume of purchases?
23     A.    I don't think it was formed in that
24 way.  I think it was understood that if you
25 buy -- it wasn't broken out like that in the

---

**65**

1  bid.  It was kind of, here's the bid package for
2  all the eggs we buy.  Now, if they bid on
3  100 percent of the volume and you only gave them
4  10 percent, I'm not sure the competitive pricing
5  for a lower volume would remain the same,
6  but . . .
7      Q.    Did you help prepare the bid
8  package?
9      A.    Yes.
10     Q.    What did it look like?
11     A.    I believe it was an Excel document
12 or -- no.  We used -- oh, shoot.  I forgot -- we
13 used an electronic sourcing, Ariba, I think.  I
14 believe we used Ariba, yeah.
15          - - - - -
16          (Thereupon, Deposition Exhibit 3,
17          E-Mail from William Trask to Steven
18          Feyman and Ed Lewis, dated 11-11-08
19          w/Attachment, Bates Labeled
20          NES00000130, was marked for purposes
21          of identification.)
22          - - - - -
23     Q.    What I'm showing you is a document
24 that's NES0000130.  It's an e-mail from yourself
25 to Steve Feyman, Ed Lewis, and the subject is

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                          April 24, 2014

18 (Pages 66 to 69)

---

66

1    Ariba Analysis.
2        Do you see that?
3    A.   Yes.
4    Q.   And this is the same Ariba that you
5    just mentioned that was used to help prepare bid
6    packages?
7    A.   Yes.
8    Q.   So what is this document that we're
9    looking at, the Ariba analysis?
10   A.   It looks like it was -- it just
11   looks like the part number listed above the
12   plants, that's the part number for that
13   particular egg product, and it went down to --
14   Q.   Let me stop you right there just to
15   be clear.
16       So when you mention the part number
17   above a plant, that's, as an example here, I see
18   above Bloomington, Illinois, 22000301.
19   A.   Yes.
20   Q.   Is that a particular egg product?
21   A.   Yeah.  It looks like it's the egg
22   whites powder spray.
23   Q.   Got it.
24   A.   That's like an internal part number.
25   Q.   Okay.  So this Ariba analysis is

---

67

1    broken up both by product and by location?
2    A.   Correct.
3    Q.   And why was that done?
4    A.   Well, it was done just so that we
5    could separate the plant cost and understand
6    total volume for that plant for each product.
7    Q.   Okay.  All right.  What else is
8    shown in this document?
9    A.   Let's see here.  The vendors that
10   are bidding in the business are on the top.
11   Q.   I understand this is in Excel?
12   A.   Yes.
13   Q.   And is this --
14   A.   It's an import, it looks like, from
15   Ariba.
16   Q.   Ariba is a separate software
17   program?
18   A.   Yes.
19   Q.   And what would you -- what would be
20   the purpose of Ariba?
21   A.   It's an electronic bid service.
22   Q.   Would vendors enter information
23   directly into Ariba?
24   A.   Mm-hmm.  Yeah, they have their own
25   account and they log in and they submit their

---

68

1    bid accordingly.
2    Q.   How often would the electronic bid
3    events occur?
4    A.   Whenever there was a bid -- I mean,
5    when the bidding process -- there's a specific
6    time period for bidding process, so, you know,
7    before the -- I would say a month or two, two to
8    three months before the end of the contract.  So
9    it gives you ample time to plan.
10   Q.   And then would Ariba populate the
11   information that's on this Excel spreadsheet or
12   would this be from you?
13   A.   Ariba.  I believe if I read the
14   first page accurately, it imported it from
15   Ariba.
16   Q.   And so let's take a look at that
17   first product, the egg albumin powder spray.
18       Do you see that?
19   A.   Yes.
20   Q.   And then under Michael Foods, and I
21   guess if there's blanks, does that suggest the
22   vendor did not bid to sell that product to that
23   plant?
24   A.   Correct.
25   Q.   And then for Michael Foods there's

---

69

1    various prices per pound for, it looks like four
2    different periods for fixed prices.
3        Do you see that?
4    A.   Mm-hmm.
5        THE REPORTER:  Yes?
6        THE WITNESS:  Yes.
7    BY MR. BOETTGE:
8    Q.   And then does this suggest that
9    Michael Foods was proposing a fixed price of
10   this product to be sold October through December
11   of $4.80?
12   A.   Yeah.  So we broke it out by quarter
13   and it looks like we did a year.
14   Q.   But the year one, and that's
15   Line 2.1.6, correct?
16   A.   Correct.
17   Q.   That's a formula, correct?
18   A.   Yes.
19   Q.   And the fixed prices are above and
20   the fixed prices are listed per quarter,
21   correct?
22   A.   It looks like it, yes.
23   Q.   So if you had purchased from Michael
24   Foods for 2009 -- let me step back.  When would
25   you sign the contract that's referenced here or

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

19 (Pages 70 to 73)

---

**70**

1    that's being addressed here?
2        A.   I don't recall.
3        Q.   So if this -- the e-mail is dated
4    November 2008.
5        A.   Okay.
6        Q.   And so you've got prices per pound
7    going January to March, April through June, July
8    through September, October through December.
9            Do you see that?
10       A.   Yes.
11       Q.   So is this contemplating an annual
12   contract that would cover January through
13   December 2009?
14           MR. CAMPBELL:  Objection as to form.
15           THE WITNESS:  Yes.
16   BY MR. BOETTGE:
17       Q.   So Michael Foods is proposing if you
18   signed this contract prior to January 2009, they
19   would tell you what price you would be paying
20   for in December of 2009, correct?
21       A.   Under the fixed portion or --
22       Q.   Under the fixed portion, correct.
23       A.   Correct.
24       Q.   Then under the formula, there's a
25   separate price per pound, correct?

---

**71**

1        A.   Correct.
2        Q.   I want to skip down to the next
3    item, which would be the 22002210.
4        A.   Okay.
5        Q.   I want to focus specifically at that
6    line, 2.2.7, for formula pricing.
7            Do you see that?
8        A.   Okay.  Yes.
9        Q.   And there's a reference to -- under
10   Michael Foods, could you read that?
11       A.   "11-7-8.  Michael Foods GB
12   proposal."
13       Q.   And what is your understanding of
14   what GB references there?
15       A.   I don't recall.
16       Q.   Do you have a sense as to whether GB
17   in that context would reference a grain-based
18   proposal?
19       A.   It may have been.
20       Q.   Do you know of any other use of GB
21   that would have been included there?
22       A.   No.
23       Q.   Would you refer to grain-based
24   contracts as GB from time to time?
25       A.   I don't recall referring to GB.

---

**72**

1        Q.   Do you know any other reason GB
2    would be indicated there other than there being
3    a grain-based contract?
4        A.   No.  It makes sense.
5        Q.   Do you have any recollection while
6    you were at Nestlé of Michael Foods proposing a
7    grain-based contract other than what's
8    referenced on this exhibit?
9        A.   Vaguely.
10       Q.   What do you recall?
11       A.   I recall a multiyear commitment.
12       Q.   And which years were part of that
13   multiyear commitment?
14       A.   I think it was up to a
15   three-to-five-year commitment.  I can't
16   remember -- I can't recall what the time frame
17   was.
18       Q.   When do you recall receiving that
19   solicitation or bid?
20       A.   Probably within this time frame
21   here.  I don't recall exactly.
22       Q.   What was your understanding of what
23   a grain-based contract was?
24       A.   Based on fluctuations in grain.
25       Q.   You indicated -- say that again.

---

**73**

1    Based on corn prices and --
2        A.   Grain.  I don't know exactly what it
3    was, but . . .
4        Q.   But your understanding is that there
5    were -- that the price of corn would impact the
6    price that you'd pay for eggs under the
7    contract?
8        A.   Yes.
9        Q.   Do you recall whether any other
10   commodity would have impacted the price that you
11   pay under a grain-based contract?
12       A.   I don't recall.
13       Q.   So under a grain-based contract, you
14   could look at the price for corn and that would
15   inform what your price for eggs would be in that
16   month?
17           MR. CAMPBELL:  Objection as to form.
18   That's not the testimony.
19           THE WITNESS:  I don't recall how
20   that was, how it would play out.
21   BY MR. BOETTGE:
22       Q.   How did corn prices -- how were corn
23   prices used in a grain-based contract?
24       A.   I don't remember, but the function
25   of corn is to feed the chickens and that was a

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                            April 24, 2014

74

high portion of the cost.
Q.    Did you understand there was a
relationship between the price of corn and the
price at which eggs would be sold under a
grain-based contract?
A.    I understand it was a cost driver.
Q.    Meaning that the higher cost there
would be in corn, the higher price Nestlé would
pay for eggs?
A.    Essentially.
Q.    Do you recall what the other cost
drivers were in a grain-based contract?
A.    No.
Q.    Do you recall whether the market
price of shell eggs would be a driver in a
grain-based contract?
A.    I don't recall.
Q.    You note that you have a vague
recollection of receiving a grain-based proposal
from Michael Foods, correct?
A.    Mm-hmm.
     THE REPORTER:  Yes?
     THE WITNESS:  Yes.
BY MR. BOETTGE:
Q.    Who else at Nestlé would be familiar

75

with Michael Foods' grain-based proposal that
you're referencing?
A.    Probably Steve Feyman.
Q.    Anyone else?
A.    Maybe Ed Lewis.
Q.    You mentioned a three to five-year
commitment.
     What did you mean by that?
A.    Well, I think if you entered in a
grain-based contract, it's not something you go
from a year-to-year.  You enter into a
three-to-five-year commitment.  Meaning you're
locked into that fluctuation for three to five
years.
Q.    Did Nestlé ask Michael Foods to send
it a grain-based contract?
A.    I believe so.  We inquired about
what it would look like.
Q.    Why?
A.    To understand different pricing
options.
Q.    Do you recall discussing Michael
Foods' grain-based pricing proposal with anyone
at Nestlé?
A.    Vaguely.  If I did, it would have

76

been with Steve Feyman or Ed Lewis.
Q.    What do you recall about those
discussions?
A.    The only thing I recall is just
presenting what the grain-based contract looked
like and what the commitment was.
Q.    Do you recall what you said in
presenting the proposal?
A.    No.
Q.    Do you recall the reaction of others
at Nestlé -- or let me just step back.
     Do you recall Nestlé's reaction to
receiving Michael Foods' grain-based proposal?
A.    No.  I think the -- just briefly,
like the appetite of a long commitment was
something that was not considered to be -- maybe
we wouldn't have the appetite for that long of a
commitment.
Q.    Why not?
A.    Locked into the same price group for
three to five years.  When the cost of the eggs
fluctuates so much, it was just kind of
something that wasn't, I'm sure, as strongly
considered at the time.
Q.    So, in fact, Nestlé believed there

77

may be some benefit to paying price that's based
on the market price of eggs?
A.    I don't recall what their reaction
was.
Q.    But, again, your comment was with
respect to being locked into a price for three
to five years that was untethered -- that was my
word -- but not tied to the cost of eggs,
correct?
A.    I don't recall it being like that.
Q.    Well, then what was the discussion
about the Michael Foods grain-based proposal?
A.    I really don't recollect what the
exact discussions were, but the only thing I do
recall is it being based on the fluctuations of
grain in a three to five-year window.
Q.    So there was a concern of being
subject to fluctuations of grain for three to
five years?
A.    I would say that's -- yeah.  Or any
other component within that formula that may
have existed.
Q.    You mentioned earlier the cost of
eggs fluctuating.
     What did you mean by that in

HIGHLY CONFIDENTIAL

Trask, III, William E.                                        April 24, 2014

21 (Pages 78 to 81)

---

78

1  connection with a grain-based contract?
2      A.  Well, since grain is one of -- a
3  major cost driver in the price of eggs, it would
4  inherently make it a variable in the cost of
5  eggs.
6      Q.  I guess I'm a little bit confused.
7          Did you understand that the
8  grain-based contract you'd be -- the cost that
9  you'd be paying would be based on the cost of
10  grain?
11      A.  I think it was a cost -- it was a
12  driver in the formula.  I don't recall what the
13  formula exactly looked like.
14      Q.  Did you understand a grain-based
15  contract would protect Nestlé against
16  fluctuations in the market price of eggs?
17      A.  I -- I don't know how to -- I don't
18  know how much or what happened to that.
19      Q.  Did you recall that it would provide
20  some protection against the market price of
21  eggs?
22      A.  I recall it was suggested it could,
23  but I'm not sure how it would have played out.
24          THE WITNESS:  Thank you.
25  BY MR. BOETTGE:

---

79

1      Q.  So back to Exhibit 3, the Ariba
2  analysis.
3      A.  Yes.
4      Q.  What would be the result of your
5  putting -- or what would be the purpose, again,
6  of your putting this spreadsheet together?
7      A.  So they compile information in one
8  spreadsheet?
9      Q.  Correct.  Yeah.  What was the reason
10  that -- what would you do with that spreadsheet
11  then?
12      A.  To compile it and analyze it side by
13  side.
14      Q.  Would you share it with others in
15  your group?
16      A.  Yeah.  So the individuals that I
17  reported to.  So Steve Feyman.
18      Q.  Let me go back real quickly to
19  Exhibit 2, the e-mail chain from September
20  of 2008.
21      A.  Okay.
22      Q.  And specifically, the second
23  sentence of that first paragraph that begins,
24  "Below is a sense of overall strategy."  I guess
25  it's the third sentence.

---

80

1      A.  Okay.  Beginning with "However"?
2      Q.  Correct.  Could you read that for
3  me?
4      A.  "However, I am not sure how
5  reluctant our suppliers would be to agree to
6  something like that since formula-based pricing
7  is only a true benefit to both parties if it
8  covers a long period of time."
9      Q.  What did you mean by that?
10      A.  It means in a formula price, as the
11  market fluctuates up and down, there are times
12  when it could benefit one party and not the
13  other party.
14      Q.  What was the purpose of it being a
15  longer period of time?  What's the significance
16  of that?
17      A.  I think being a longer period of
18  time is referred to closer to 12 months than one
19  month.  So a longer period of time, like it
20  wouldn't be -- you wouldn't want to do a formula
21  price by a month, so that's kind of what that
22  means.
23      Q.  Why wouldn't you want to do a
24  formula price for one month?
25      A.  I guess you could, but it fluctuates

---

81

1  monthly.
2      Q.  And you wouldn't want the price to
3  fluctuate monthly?
4      A.  No, it -- I mean, with the formula
5  price, that's how it's set up.  It fluctuates
6  monthly, so . . .
7      Q.  And then what's the benefit
8  of -- why is something like that only a true
9  benefit if it covers -- if the formula price
10  covers a long period of time?
11      A.  I think that's from the supplier's
12  point of view.  And I think I just wasn't
13  sure -- in that sentence I wasn't sure what the
14  supplier's point of view would be like.
15      Q.  When you say "something like that,"
16  do you know what you're referring to?
17      A.  What do you mean?
18      Q.  Well, maybe the second sentence will
19  help.  It states, "I will explore any
20  opportunities we may have in negotiating a
21  hybrid contract where we can utilize formula and
22  fixed pricing at our discretion"?
23      A.  Oh, maybe as a thought during the
24  strategy if they would be interested in looking
25  at fixed and formula options throughout the year

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                April 24, 2014

82

1  for the same product.  But -- and then my next
2  statement was, not sure how reluctant, if they
3  would agree to something like that, so . . .
4      Q.   And again, why wouldn't the supplier
5  not want to enter into a hybrid contract that's
6  referenced here?
7      A.   Maybe they see no benefit on their
8  side?  I mean, I don't know.
9          MR. BOETTGE:  We're on 4?
10         - - - - -
11     (Thereupon, Deposition Exhibit 4,
12     E-Mail Chain, Bates Labeled
13     NES00000111-00000114, was marked for
14     purposes of identification.)
15         - - - - -
16     Q.   Showing you what we've marked as
17 Trask Exhibit 4.  It's Bates-stamped
18 NES00000111.
19     I want to focus your attention on
20 the first paragraph.
21     A.   Okay.
22     Q.   And the note, "We will continue to
23 take advantage of the formula-based pricing from
24 Ballas."
25         What did you mean by "take

83

1  advantage"?
2      A.   I think it was a more competitive
3  formula price than Michael Foods.
4      Q.   Then you note, "We are splitting the
5  Laurel business with Michael Foods at a 50/50
6  split."
7      A.   Okay.
8      Q.   And what do you mean by that?
9      A.   It means 50 percent was Michael
10 Foods and 50 percent was another vendor.
11     Q.   And the other vendor, Ballas?
12     A.   It may have been.
13     Q.   And you note, "I'd like to increase
14 the split to a 60/40 or a 70/30 split."
15         Do you see that?
16     A.   Yes.
17     Q.   And you state, "I think it's still a
18 good idea to keep Michael Foods in the mix
19 because they provide a fixed price which we can
20 hedge against if the market drives the formula
21 price through the roof."
22         What did you mean by that?
23     A.   Well, if we enter into an agreement
24 for a formula price with Ballas, then we're able
25 to average our costs down, if the prices are

84

1  going up, we're able to fix a cost at a lower
2  level than what we project the formula price to
3  go.  Then we can help average our cost down.
4      Q.   I'll turn your attention to the
5  third page of the e-mail.
6      A.   Okay.
7      Q.   An e-mail from you to John Hill and
8  there's another individual, Monte Mace.
9          Who is Monte Mace?
10     A.   He worked for John Hill.  He was in
11 purchasing as well.
12     Q.   And then Steve Warner is identified
13 as well, correct?
14     A.   Yes.
15     Q.   And what is reflected in the e-mail
16 that's on this third page?
17     A.   I'd have to read it.  Hold on.
18     (Document review.)
19         It looks as though just a market
20 update.
21     Q.   And would this have been a market
22 update you would have prepared based on
23 discussions you had with Informa?
24     A.   Yeah.  Yes.
25     Q.   And you note the subject, Informa

85

1  Weekly Egg Comments.
2          Is this consistent with what you
3  -- I'm sorry.  This is the subject of the third
4  e-mail, the third page?
5      A.   Yeah.  I know.  I was just checking
6  dates.
7      Q.   Sure.  Is this consistent with your
8  testimony earlier that you would speak with
9  Informa approximately on a weekly basis?
10     A.   Mm-hmm.  Yes.
11     Q.   And you prepared -- did you then
12 forward the information that you obtained from
13 talking with Informa to others in your group on
14 an weekly basis?
15     A.   Probably just individuals within
16 this e-mail.
17     Q.   And you would have sent them
18 information that you learned from Informa on a
19 weekly basis as well?
20     A.   Yeah.  I know I sent John Hill a
21 separate report, egg report, on, you know, the
22 market of eggs, so . . .
23     Q.   Is what you sent John Hill different
24 than what is reflected here or is this an
25 example of that?

HIGHLY CONFIDENTIAL

Trask, III, William E.                                April 24, 2014

23 (Pages 86 to 89)

---

86

1     A.   This is an example of it.  It was a
2  format.  I forgot -- I think it was a one-page
3  PowerPoint thing.  I can't remember what it
4  looked like, to be honest.
5     Q.   And you would prepare that one-page
6  PowerPoint weekly?
7     A.   I don't recall if it was weekly or
8  monthly.
9     Q.   Do you recall if that document had a
10 name?
11    A.   No, I don't recall.
12    Q.   Do you know who else you would have
13 sent it to?
14    A.   Steve Feyman would be copied, but
15 I'd just send it to John Hill as an update.
16    Q.   And how was that PowerPoint
17 different than what's reflected here as an
18 example of the Informa weekly egg comments?
19    A.   It was more focused towards Dreyer's
20 than Häagen-Dazs.
21    Q.   And I note in your e-mail you
22 distinguish between shell egg values and egg
23 product values.
24         Do you see that?
25    A.   Mm-hmm.

---

87

1     Q.   And why did you do that?
2     A.   I think that was probably just
3  encompassing the update from Informa.
4     Q.   And did you have an understanding
5  that the shell egg market was a separate market
6  than the egg product market?
7     A.   Yes.
8     Q.   The first sentence of that second
9  paragraph, could you state that?
10    A.   "The Urner Berry northeast and
11 midwest large shell egg markets really lost
12 steam and fell 12¢, $1.17 per dozen and $1.14
13 per dozen respectfully."
14    Q.   You know, I made a mistake.  I
15 actually wanted to direct your attention to the
16 first sentence of the second paragraph.  My
17 mistake.  "Egg product values didn't budge"?
18    A.   Second sentence?
19    Q.   First sentence, second paragraph.
20    A.   "Egg product values didn't budge
21 once again this past week and have been
22 surprisingly strong and resilient to changing
23 market conditions of late."
24    Q.   What did you mean by that?
25    A.   Just that they didn't change.

---

88

1              - - - - -
2         (Thereupon, Deposition Exhibit 5,
3         E-Mail Chain, Bates Labeled
4         NES00002013-00002015, was marked for
5         purposes of identification.)
6              - - - - -
7     Q.   I'm showing you what's been marked
8  as Trask Exhibit 5.  It's an e-mail chain, Bates
9  number NES00002013.  It goes to 2015.
10         Do you recognize this document?
11    A.   Specifically, no.
12    Q.   Do you recognize it to be an e-mail
13 chain?
14    A.   Yes, it's an e-mail chain.
15    Q.   I want to focus your attention on
16 the last page.  Let me step back.  The second
17 page, the bottom e-mail is an e-mail from
18 yourself to Joe Roberts.
19    A.   Okay.
20    Q.   Who is Joe Roberts?
21    A.   I forget.
22    Q.   And the subject is Joseph's Pasta
23 Liquid Whole Egg Overview.
24    A.   Okay.
25    Q.   What is Joseph's Pasta?

---

89

1     A.   I think they're just a pasta
2  division of Nestlé.  So they're more the gourmet
3  pastas.
4     Q.   Is it separate from Buitoni?
5     A.   Yes.
6     Q.   Was it another group that you were
7  responsible for purchasing eggs on behalf of?
8     A.   I can't remember on -- I think he
9  may have bought himself.  I'm not -- I can't
10 remember.
11    Q.   But if he did buy himself, did you
12 assist him in that process?
13    A.   I gave him prime market intelligence
14 in this is what I thought, you know, what I
15 compiled on our side.
16    Q.   And then you have on the last page a
17 list of suppliers?
18    A.   Okay.
19    Q.   And does this reflect that Michael
20 Foods offered both fixed and formula pricing?
21    A.   Yes.  That's what it says.  So it
22 says 6-month breaking stock formula price,
23 12-month formula price and 12 months fixed
24 price.
25    Q.   And in fact, you knew that 12 month

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

24 (Pages 90 to 93)

90

1  fixed price at this time, correct?
2       A.   I mean, I don't recall.  But it
3  looks like their annualized 12 months fixed cost
4  is in that fourth bullet.
5       Q.   As 85.3¢?
6       A.   Yeah, that's what it looks like.
7       Q.   And so you had an understanding that
8  if you had purchased or contracted with Michael
9  Foods for a 12-month fixed contract, you knew 12
10 months out you'd be paying 85.3 cents for the
11 egg under that contract, correct?
12      A.   Yes.  There's a fixed for a 12-month
13 period of time.
14      Q.   And then there's a notation of
15 "Shelf life 84 days."
16           Why did you include that?
17      A.   Because it's important for
18 understanding order patterns and inventory
19 strategies.
20      Q.   Is it fair to say that a supplier
21 that provides a longer shelf life is more
22 valuable to Nestlé than one that cannot provide
23 such a long shelf life?
24      A.   I guess it depends.  I don't know.
25      Q.   How did a shelf life impact your

91

1  understanding of order patterns and inventory
2  strategies?
3       A.   Well, you'd have to -- 12
4  life -- 12-day shelf life, you could only keep
5  it on your shelf for probably 10 days by the
6  time it gets to your facility or it goes bad.
7  Or 84 days, you have -- you could -- there's
8  more flexibility in your planning.
9       Q.   Was that a benefit to Nestlé to have
10 more flexibility in its planning?
11      A.   I don't recall at the time.
12      Q.   The recommendation at the bottom was
13 to use Michael Foods' formula pricing, correct?
14      A.   Correct.
15      Q.   And then you note, "The other
16 determining factor is the longer shelf life."
17           What did you mean by that?
18      A.   Well, maybe the -- it looks like
19 after reading that, it looks like they had a
20 competitive formula price, and then another
21 factor in choosing them was longer shelf life.
22      Q.   And that was a factor that was
23 helpful to you and supported the
24 decision -- your recommendation to choose
25 Michael Foods, correct?

92

1       A.   That's what it looks like.
2       Q.   Do you recall if any other egg
3  product companies provided a shelf life as long
4  as Michael Foods for this product?
5       A.   What product was this for?
6       Q.   I believe this was for liquid whole
7  egg.
8       A.   I don't recall.
9       Q.   You noted with a shorter shelf life
10 you would need to turn that inventory over by
11 the end of its shelf life?
12      A.   Yeah.
13      Q.   Was it a benefit to Nestlé to not
14 have to be concerned about having to turn over
15 inventory in such a short time period?
16      A.   It may have been, yes.
17      Q.   As an egg buyer, Mr. Trask, was
18 there a difference in your mind between an egg
19 producer who produced primarily market-based
20 shell eggs and those producers that produced egg
21 products?
22      A.   What's the distinction between the
23 two?  I forget.
24      Q.   Yeah, did you understand a
25 difference between those producers who

93

1  principally produced shell eggs versus those
2  producers who principally produced egg products?
3       MR. CAMPBELL:   Objection as to form.
4  It's vague as to what "difference" means in that
5  context.
6           You may answer, Bill.
7           THE WITNESS:  Okay.
8           So I guess the egg -- egg -- there
9  is people who produce the eggs and then people
10 who manufacture the eggs into end products that
11 we use.
12 BY MR. BOETTGE:
13      Q.   And you recognize there was a
14 difference between those two producers?
15      A.   To a degree, yes.
16      Q.   And what did you understand those
17 differences to be?
18      A.   Well, it depends.  One processed the
19 eggs and the other one provided the eggs.
20      Q.   And did you understand that
21 producers generally would focus either on being
22 a shell egg producer versus other producers who
23 would focus principally on producing egg
24 products?
25           MR. CAMPBELL:  Objection as to form.

HIGHLY CONFIDENTIAL

Trask, III, William E.                                     April 24, 2014

94

1   Lack of foundation.
2           THE WITNESS:  Can you ask your
3   question again?  Can you ask the question again?
4   BY MR. BOETTGE:
5       Q.   Did you recognize a difference
6   between those producers who principally produced
7   shell eggs as opposed to those producers who
8   principally produced egg products?
9       A.   Yes.
10      Q.   Do you have some idea that the
11  producers who focused on shell eggs had a
12  different kind of experience in the market than
13  those producers who produced egg products?
14          MR. CAMPBELL:  Objection.  I don't
15  understand the word "experience" in that
16  context.
17  BY MR. BOETTGE:
18      Q.   I'll withdraw the question.
19      A.   Yeah.  Okay.
20          MR. CAMPBELL:  Doug, I notice you're
21  almost at the end of the tape.  I don't know
22  what -- what do you want -- can you finish or --
23          MR. BOETTGE:  I do.  I think this is
24  a good time for a break.
25          MR. CAMPBELL:  Okay.

95

1           THE VIDEOGRAPHER:  We're off the
2   record.  This is the end of media segment 1.
3   The time is 3:18.  We're off the record.
4           (Recess taken.)
5           THE VIDEOGRAPHER:  We're back on the
6   record.  The time is 3:29.
7           MR. BOETTGE:  Mark that Exhibit 6.
8           - - - - -
9           (Thereupon, Deposition Exhibit 6,
10          Supplier Strategy Sorted by Vendor,
11          Bates Labeled NES00004291, was
12          marked for purposes of
13          identification.)
14          - - - - -
15  BY MR. BOETTGE:
16      Q.   Showing you, Mr. Trask, what has
17  been marked as Exhibit 6.  It's got a Bates
18  number reference at the bottom, NES00004291.
19  It's identified as a Supplier Strategy Sorted by
20  Vendor.
21          Do you recognize this type of
22  document?
23      A.   No.
24      Q.   There's a column on this document
25  referred to as Strategy.

96

1           Do you see that?
2       A.   Yes.
3       Q.   And there are different notations,
4   Exit Core, T3, Speciality.
5           Do you see that?
6       A.   Yes.
7       Q.   Are you familiar with any of those
8   terms?
9       A.   No.
10      Q.   You testified earlier that part of
11  your functions as a sourcing specialist was to
12  obtain information about vendors.
13      A.   Uh-huh.
14      Q.   Did you ever have occasion to
15  essentially rank vendors against each other?
16      A.   I think there is a Kraljic matrix
17  that we used to see where they were as far as --
18  what was it?  Leverage, strategic, bottleneck or
19  --
20          THE REPORTER:  Leverage?
21          THE WITNESS:  Leverage, strategic,
22  bottleneck, and that's -- I kind of recall those
23  are the things.  There's like a quadrant type
24  thing.
25  BY MR. BOETTGE:

97

1       Q.   I misheard you.
2           Did you say a quadrant matrix.
3       A.   Yeah.  It was a quadrant matrix.
4   It's a Kraljic matrix.  That's what it's called.
5           THE REPORTER:  Kraljic?
6           THE WITNESS:  Yeah.  It's
7   C-R-A-J-L-I-K [sic], I think.
8   BY MR. BOETTGE:
9       Q.   Were you involved in preparing those
10  matrices?
11      A.   Yeah.  I mean, we would just kind of
12  input some data that would help put
13  the -- position the supplier where they were.
14      Q.   Would you prepare a separate matrix
15  for different ingredient categories?
16      A.   Yeah, I think I would.
17      Q.   So you would have a separate matrix
18  for the egg category?
19      A.   I believe so, yeah.
20      Q.   How frequently would you prepare
21  such a matrix?
22      A.   I think in the beginning the
23  strategy sessions.  So we kind of develop our
24  strategy.  It just could help you if your
25  suppliers -- where it falls in the quadrant,

HIGHLY CONFIDENTIAL

Trask, III, William E.                                                April 24, 2014

26 (Pages 98 to 101)

---

98

1  whether it be strategic, bottleneck, critical or
2  leverage, so . . .
3           THE REPORTER:  What was it, the
4  middle word?
5           THE WITNESS:  There is strategic,
6  there is leverage, there's critical and then
7  there's bottleneck.
8  BY MR. BOETTGE:
9      Q.    And you indicated that you would
10 prepare such a matrix whenever there would be an
11 opportunity to evaluate the vendors or how --
12     A.    Yeah, it was something that they
13 would use.
14     Q.    And that they would be --
15     A.    Well, that other purchasing managers
16 would use and what I would use as far as
17 analyzing some of the categories that I managed
18 and then positioning the vendors within that
19 category.
20     Q.    And how often, what was the
21 frequency of putting those matrices together?
22     A.    I don't know.  Once or twice a year.
23     Q.    And can you quickly describe each of
24 these parts of the quadrant?  What was strategy?
25     A.    Strategic is kind of -- there's an X

---

99

1  and Y matrix.  I can't recall like what
2  the -- what it was, but strategic is kind of
3  like a strategic partnership.  Generally, it's a
4  specialty type item that you would want to have
5  a partnership with the supplier.
6           Noncritical is something that's a
7  low dollar, a low value.
8           Bottleneck is something where it's
9  low -- high value, but there's not really many
10 alternatives out there.
11          And critical means it's a critical
12 situation where you need to figure out an
13 alternative strategy.
14     Q.    And how would a vendor -- what
15 factors would cause a vendor to be more
16 strategic versus less strategic?
17     A.    There was a sheet you inputted data.
18 I don't recall what was in that sheet.
19     Q.    Was it based on the type of products
20 that those manufacturers would sell?
21     A.    I don't recall what it was.
22     Q.    When you mentioned strategic, I
23 think you used the term "in a partnership with
24 supplier."
25     A.    Mm-hmm.

---

100

1      Q.    What did you mean by that?
2      A.    It just -- strategic partnership.
3  So they may offer -- they may supply a critical
4  item within your supply chain and you kind of
5  develop a partnership with them to maintain
6  supply and, you know, get value out of the
7  process.
8      Q.    Can you recall any examples of
9  vendors in which Nestlé had a strategic
10 partnership?
11     A.    No.
12     Q.    Do you recall any products that fell
13 in that category?
14     A.    No.
15     Q.    Was the quality of eggs that Nestlé
16 obtained important to Nestlé?
17     A.    Yes.
18     Q.    Why?
19     A.    Because you don't want spilled eggs.
20     Q.    Is it fair to say that quality is
21 particularly important for an egg products
22 manufacturer?
23     A.    Yeah, I would say it's important for
24 any vendor.
25     Q.    In your mind, did any of the vendors

---

101

1  distinguish themselves with the quality of eggs
2  that they supplied?
3      A.    I don't recall.
4      Q.    Do you recall looking at research
5  and development as a consideration --
6      A.    What do you mean --
7      Q.    -- as to how you would evaluate a
8  vendor?  Whether that vendor had research and
9  development capabilities?
10     A.    I don't recall.
11          - - - - -
12          (Thereupon, Deposition Exhibit 7,
13          E-Mail Chain, Bates Labeled
14          NES00002084-00002085, was marked for
15          purposes of identification.)
16          - - - - -
17     Q.    I'm showing you a document that's
18 been marked Trask Exhibit 7.  It's Bates labeled
19 NES00002084 to 2085.
20          Do you see that you're identified as
21 a recipient of the top e-mail?
22     A.    Yes.
23     Q.    Who is Ned Rokke?
24     A.    He's a purchasing counterpart in
25 Minnetonka, Minnesota.

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

---

102

1 Q.   You say "counterpart."
2      What do you mean by that?
3 A.   Counterpart.  You know, he's kind
4 of -- he's in the purchasing department in
5 Nestlé USA.
6 Q.   Did Nestlé have egg producers -- let
7 me step back.
8      Do you know if Ned Rokke was
9 involved with egg purchases?
10 A.   I don't recall, but if I would read
11 this e-mail, it looks like he may have been
12 involved to some degree.
13 Q.   Why don't you look through the whole
14 e-mail.
15 A.   (Document review.)  Okay.
16 Q.   What do you understand was the
17 reason Mr. Rokke was sending this e-mail to you?
18 A.   I don't recall.
19 Q.   Do you recall the conversation
20 that's referenced in the top e-mail?
21 A.   Vaguely.
22 Q.   What do you recall about it?
23 A.   That he contacted me.  That's all I
24 really recall.
25 Q.   He notes "Note comments from R&D

---

103

1 relative to our conversation."
2      What's the reference to R&D there?
3 A.   I have no idea.
4 Q.   Do you understand R&D to stand for
5 research and development?
6 A.   Yes.
7 Q.   And from time to time did you
8 interact with individuals at Nestlé from
9 research and development?
10 A.   Yeah, I may have.
11 Q.   What would be the reasons that you
12 would have?
13 A.   Maybe during a panel where we tested
14 the eggs, maybe get their feedback on how the
15 particular egg, how that was -- how that worked
16 in the formula -- not the formula, but
17 the -- the recipe, whatever.
18 Q.   Do you recall working with any R&D
19 individuals employed with the vendor?
20 A.   Not -- no.
21 Q.   Do you recall any instances in which
22 Nestlé and a vendor worked together to prepare a
23 particular egg product or to come together
24 to --
25 A.   I don't recall anything specialized,

---

104

1 no.
2 Q.   I want to direct your attention to
3 the top of the second page.
4 A.   Okay.
5 Q.   There's a statement that "Egg
6 products have a high potential for
7 microbiological contamination."
8      What does that mean?
9 A.   I do not know.
10 Q.   And it notes that this particular
11 vendor "had a proven track record of delivering
12 a product that met our exacting microstandards."
13      Do you recall what "microstandards"
14 are?
15 A.   I think it was just part of the
16 specification.
17 Q.   And did you have an understanding
18 that Nestlé's specifications were particularly
19 exacting?
20 A.   What do you mean "exacting"?
21 Q.   Well, you say a word here, a term
22 here in the e-mail, "delivering a product that
23 met our exacting microstandards."
24      Do you know what's meant there by
25 exacting?

---

105

1 A.   No.
2      - - - - -
3      (Thereupon, Deposition Exhibit 8,
4      Quantity Contract:  4615064924,
5      Bates Labeled NES00004517-00004528,
6      was marked for purposes of
7      identification.)
8      - - - - -
9 Q.   Showing you what we've marked as
10 Trask Exhibit 8.  It's Bates-stamped NES0004517.
11      Do you recognize this document?
12 A.   Vaguely, yes.
13 Q.   And what do you understand this
14 document to be?
15 A.   I don't know.  It looks like a
16 blanket contract/purchase order from SAP.
17 Q.   Can you describe for me what that
18 means?
19 A.   Well, it's essentially a blanket
20 purchase order for various products within the
21 egg category outlining the volume per item, per
22 plant and the price.
23 Q.   I see in capital letters towards the
24 bottom it states, "THIS BLANKET
25 CONTRACT/PURCHASE ORDER."

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

---

**106**

1      Is that consistent with your
2  understanding that this is a blanket
3  contract/purchase order?
4      A.  Yeah.
5      Q.  And who is this with?
6      A.  It looks like vendor Michael Foods.
7      Q.  And there's a reference to a
8  Quantity Contract with a number at the top left.
9      A.  Where?
10     Q.  Top left, first page.  It states,
11 Quantity Contract.
12     A.  Okay.
13     Q.  What's that a reference to?
14     A.  I think that's a reference to the
15 contract number.
16     Q.  And there's the date of the
17 contract, June 15th, 2008?
18     A.  Yes.
19     Q.  And what's referenced by -- or
20 what's the significance of the start date,
21 July 1, 2008, and end date, December 31st, 2008?
22     A.  Well, it looks like a 6-month
23 period.
24     Q.  That same section I referenced
25 earlier that appears to be a blanket

---

**107**

1  contract/purchase order --
2      A.  Okay.
3      Q.  -- states further, "and all
4  subsequent purchase orders/advices/releases
5  pertaining hereto are subject to 'The terms and
6  conditions of purchase for Nestlé affiliated
7  entities in North America.'"
8      Do you know what that's a reference
9  to?
10     A.  No.
11     Q.  You don't know to what the Nestlé
12 affiliated entities in North America relates?
13     A.  Huh-uh.
14     THE REPORTER:  Is that a no?
15     THE WITNESS:  No.  Sorry.
16 BY MR. BOETTGE:
17     Q.  And then at the bottom of the
18 document on the first page there's a reference
19 to different conditions being valid.
20     Do you see that?
21     A.  Where?  No.
22     Q.  On the first page, last --
23     A.  Okay.  Yeah, conditions valid, yes,
24 I see it.
25     Q.  And then it has dates, conditions

---

**108**

1  valid 6-15, 2008 to 9-28, 2008, and then it has
2  a gross price, $5.72.
3      Do you see that?
4      A.  Yes.
5      Q.  And what's your understanding as to
6  the meaning of that?
7      A.  I want to say the pricing was valid
8  during that time frame.
9      Q.  You noted that this is a document
10 from SAP?
11     A.  I believe it is.
12     Q.  What do you mean by that?  What's
13 SAP?
14     A.  It's an operating system used to
15 create purchase orders.
16     Q.  So this is the document that Nestlé
17 prepared?
18     A.  Yes.
19     Q.  And do you see your name on the
20 first page?  Is your reference Bill Trask?
21     A.  Yes.
22     Q.  And why are you identified on there?
23     A.  Because I created the -- because I
24 created this document in SAP.
25     Q.  And what would you do with a

---

**109**

1  document like this?
2      A.  This is essentially a blanket
3  purchase order, so the plants who are identified
4  in each line item are able to --
5      THE REPORTER:  The plants who are
6  the what?
7      THE WITNESS:  The plants who are
8  identified in each line item are able to pull
9  volume from the conditions of this contract,
10 so -- at that price.
11 BY MR. BOETTGE:
12     Q.  So sticking with this first item,
13 this is identified as material number 22000301.
14     Do you see that?
15     A.  Yes.
16     Q.  And this is the egg albumen powder
17 spray?
18     A.  Yes.
19     Q.  And there's a reference to a
20 condition on the second page.
21     A.  Yes.
22     Q.  Condition valid from 10-1-2008 to
23 12-31, 2008.
24     Do you see that?
25     A.  Yes.

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                      April 24, 2014

29 (Pages 110 to 113)

---

110

1    Q.   So there's a price there of $5.98?
2    A.   Yes.
3    Q.   So is it your testimony that a
4  plant -- and here, I guess the plant is
5  Bloomington, Illinois.
6          Do you see that?
7    A.   Yes.
8    Q.   If Bloomington, Illinois were to
9  acquire from Michael Foods this egg albumen
10 powder spray between October 1, 2008 to
11 December 31, 2008, the price that they would pay
12 would be $5.98?
13   A.   Yes.
14   Q.   How is that price determined?
15   A.   Well, I think Michael Foods
16 determined that based on what they think the
17 market.
18   Q.   It's a price you received from
19 Michael Foods?
20   A.   Mm-hmm.
21   Q.   Did you negotiate prices with
22 Michael Foods?
23   A.   To some degree.  I don't recall to
24 what degree that it was.
25   Q.   There's a reference in the first

---

111

1  page to the Nestlé's supplier code?
2    A.   Where is that?  Oh, yeah.  Yeah, I
3  see it.
4    Q.   What was the Nestlé's supplier code?
5    A.   I don't recall what that was.
6          - - - - -
7          (Thereupon, Deposition Exhibit 9,
8          Speed Analysis, Bates Labeled
9          NES0004501, was marked for purposes
10         of identification.)
11         - - - - -
12   Q.   What I've marked as Trask Exhibit 9
13 is an excerpt of data that was produced by
14 Nestlé in the litigation.  It's identified as
15 Bates number NES00004501.  I'll represent that
16 it was a 52-page document when it would be
17 printed from start to finish, and I've produced
18 here the first two pages and the last two pages.
19   A.   Okay.
20   Q.   Are you familiar with this
21 arrangement of data?
22   A.   No.
23   Q.   You're not familiar with a spend
24 analysis?
25   A.   I've never seen -- I don't recall

---

112

1  seeing anything like this.
2          - - - - -
3          (Thereupon, Deposition Exhibit 10,
4          Quality Contract:  4615077821, Bates
5          Labeled NES00004502-00004507, was
6          marked for purposes of
7          identification.)
8          - - - - -
9    Q.   I'm showing you what I've marked as
10 Trask Exhibit 10.
11   A.   Okay.
12   Q.   This is, I think, just an extra
13 copy.
14   A.   Oh, yeah.  Sure.  Okay.
15   Q.   And what do you understand -- or let
16 me step back.  Trask Exhibit 10 is a document
17 Bates-stamped NES0004502.
18         And what do you understand Trask
19 Exhibit 10 purports to be?
20   A.   The same document as before, which
21 is a blanket contract/purchase order from SAP.
22   Q.   And this is for a different period
23 of time, correct?
24   A.   Yeah.  Yes.
25   Q.   And what's the period of time that

---

113

1  Trask Exhibit 10 covers?
2    A.   It looks like 12-22-08 to 12-31-09.
3  So it looks like a 12-month period.
4    Q.   And does how you explained how to
5  read Trask 8 apply to Trask 10, that these were
6  prices that the various plants could pay or what
7  they would pay if they pulled product from?
8    A.   Yes.
9    Q.   With the exception that this would
10 be prices that would be for a full year,
11 correct?
12   A.   It looks like it, yes.
13         - - - - -
14         (Thereupon, Deposition Exhibit 11,
15         E-Mail Chain, Bates Labeled
16         NES00000177-00000183, was marked for
17         purposes of identification.)
18         - - - - -
19   Q.   What I'm showing you, Mr. Trask, is
20 a document we've marked Exhibit 11.  It's
21 Bates-stamped NES0000177.  It's an e-mail chain
22 involving you and several others.
23   A.   (Document review.)
24   Q.   I want to focus your attention to
25 the bottom e-mail.  It's on the fourth page, an

---

HIGHLY CONFIDENTIAL

Trask, III, William E.        April 24, 2014

30 (Pages 114 to 117)

---

114

e-mail from yourself to John Hill.

    A.   **Okay.**

    Q.   And there's a section entitled Market Outlook.

          What was Market Outlook?

    A.   **Just the outlook of the market.**

    Q.   And again, what was the reason that you're providing this to Mr. Hill?

    A.   **So he understands what the market dynamics are.**

    Q.   And I believe the fourth bullet has a reference to commodity future markets?

    A.   **Okay.**

    Q.   "That represent the major input costs for egg producers and further processors: Corn, soybean meal and crude oil."

          Do you see that?

    A.   **Yes.**

    Q.   And what was your reason for including that information in this market outlook?

    A.   **Because of base drivers in feed and fuel, probably.**

    Q.   And what impact would that have?

    A.   **I don't know what the exact impact**

---

115

would be.

    Q.   Would it have some impact -- how would the price of fuel and feed and corn impact Nestlé?

    A.   **It would impact the cost of the egg.**

    Q.   And you note at the bottom of this page 5 a recommendation for the Laurel plant to use an 80/20 approach, favoring Ballas formula price and a quarter one Michael Foods fixed price of $1.14.

          Do you see that?

    A.   **Yes.**

    Q.   And then it states, "This decision is based having secure supply and a secondary source into Laurel."

          What did you mean by that?

    A.   **What do you mean, like --**

    Q.   Well, what did you mean by --

    A.   **You have secure supply and then a secondary source, so you had two sources in Laurel instead of one. Because Ballas is a relatively new vendor, I believe.**

    Q.   Why would it be a benefit to have two sources?

    A.   **To secure supply.**

---

116

    Q.   In case the other supplier wasn't able to perform?

    A.   **Yeah. Exactly.**

    Q.   I want to move all the way to the first page --

    A.   **Sure.**

    Q.   -- of the e-mail. And particularly, the second to the top e-mail from John Hill, December 4th, to you and Monte Mace.

    A.   **Okay.**

    Q.   I think you indicated Mr. Mace is in purchasing and helps support John Hill?

    A.   **Yes.**

    Q.   Is there any significance of a representation that he's with operations?

    A.   **I don't know exactly what his role was, but I know he was in the purchasing type role.**

    Q.   Who would ultimately make the final decision to enter into a contract with a vendor involving Dreyer's?

    A.   **Who would?**

    Q.   Yeah.

    A.   **I think it was a joint effort. So it was a -- so I was a portion of it. You know,**

---

117

some of the stakeholders hold a portion of it, so . . .

          THE REPORTER: Stake --

          THE WITNESS: Stakeholders.

BY MR. BOETTGE:

    Q.   And in that context, who would the stakeholders be?

    A.   **Well, I mean, John Hill, Monte Mace and Steve Feyman, and then Steve Warner would be informed as well since he was the head of purchasing.**

          **So as you can see, as I look through this, we kind of gave him my recommendations and, you know, that's kind of what . . .**

    Q.   Would anyone else from Dreyer's be involved in that decision?

    A.   **Not that I'm aware of.**

    Q.   I want to focus your attention on that first line of the e-mail.

    A.   **Which?**

    Q.   Of the e-mail from Mr. Hill --

    A.   **John Hill, okay.**

    Q.   -- to you on December 4th and the statement, "As I think you know Dreyer's senior management has a very strong bias to being as

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

31 (Pages 118 to 121)

---

118

1  close to the market as possible for most things
2  we buy."
3      A.   Okay.
4      Q.   What was your understanding as to
5  what Mr. Hill meant by Dreyer's wanting to be as
6  close to the market as possible?
7      A.   Meaning they want their price for
8  eggs, from what I understand -- or what they're
9  buying to be close to the market price.
10     Q.   The market price for eggs?
11     A.   Yeah, I think -- I believe so,
12 because the subject matter looks like it's
13 liquid egg yolk.
14     Q.   So you understood Mr. Hill to be
15 telling you that Dreyer's management wanted to
16 pay as close as possible to market price for
17 eggs?
18     A.   Yes.
19     Q.   And was there an alternative that he
20 had available to him, or Dreyer's had available?
21     A.   I don't recall.
22     Q.   Would a fixed contract be an
23 alternative, too?
24     A.   Yeah, it could be an alternative.
25     Q.   Was this then a way of Mr. Hill

---

119

1  saying, all things being equal, we'd rather be
2  with that formula that's tied to the market than
3  in a fixed contract?
4      A.   I think that's -- it could be true.
5  I mean, I think it's kind of speculative at this
6  point looking at the way he words it.
7      Q.   But was that your understanding by
8  Dreyer's having a strong bias to being as close
9  to the market as possible?
10     A.   You know what? It doesn't really
11 define the time frame there, so I don't
12 know -- I can't remember if he was referring to
13 as close as possible under current conditions or
14 throughout the term of the agreement or what. I
15 don't recall what that context was.
16     Q.   Then the statement, "We are more
17 concerned about that KPI than simply beating
18 2009 budget."
19          What's KPI?
20     A.   Key performance indicators.
21     Q.   And what's the key performance
22 indicator that's referenced here?
23     A.   I don't know exactly what he was
24 referencing there.
25     Q.   And the last paragraph on that page

---

120

1  notes, "With that as a background we have also a
2  strong bias to only book with suppliers who are
3  prepared to offer formula pricing, because our
4  current perspective is that any fixed price
5  commitments will look even more expensive on a
6  relative basis in the coming months."
7          What do you understand him to mean
8  there?
9      A.   Well, basically the market was
10 projected to -- was projecting for a decrease,
11 so to enter into a fixed price when -- at a
12 higher point in the market when it's coming
13 down, that's the strategy you want to follow.
14 So being close to the market as possible during
15 a formula price where the market is looking --
16 forecasting a drop is the direction that you
17 want to go.
18     Q.   There's a note from Mr. Hill in that
19 sentence in the first paragraph that we focused
20 on that "being as close to the market as
21 possible" that is -- or the reason would
22 be -- or the statement, "due to our competitive
23 position in the finished product marketplace."
24          What was your understanding as to
25 what Mr. Hill meant by "due to our competitive

---

121

1  position in the finished product marketplace"?
2      A.   Position between Häagen-Dazs and
3  Ben & Jerry's or any other competition.
4      Q.   And how did being in that
5  competition inform Dreyer's wanting to be as
6  close to the market as possible?
7      A.   Say that again?
8      Q.   How did being in a competitive
9  position in the finished product marketplace
10 inform Dreyer's having a bias to being as close
11 to the market as possible?
12     A.   Because our costs -- our import cost
13 would be lower, so we could be more competitive
14 in the marketplace.
15          (Discussion held off the record.)
16          - - - - -
17          (Thereupon, Deposition Exhibit 12,
18          Two E-Mails, Bates Labeled
19          NEX0000076, was marked for purposes
20          of identification.)
21          - - - - -
22     Q.   What I'm now showing, you,
23 Mr. Trask, has been marked Trask Exhibit 12
24 Bates stamped NES000076, another e-mail chain.
25 You're the author of the top e-mail.  You're

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                      April 24, 2014

32 (Pages 122 to 125)

---

122

1  writing to Monte Mace.
2          Do you see that?
3      A.   Yes.
4      Q.   And you note, "Ballas is now running
5  even with Michael Foods."
6          Do you see that?
7      A.   Yes.
8      Q.   And was Ballas another vendor?
9      A.   Yes.
10     Q.   Then you state, "Unless the whites
11 start climbing in value, I would start leaning
12 on Michael Foods to deliver product."
13         What did you mean by "whites start
14 climbing in value"?
15     A.   I don't exactly remember, but whites
16 are referring to the white part of the egg.
17 Whites are typically the protein and the yolks
18 are the yellow portion.  So in order
19 to -- there's an offset, liquid sugar egg yolks,
20 so you have to consider the cost of the egg
21 whites aside from the egg yolks.
22         So . . .
23     Q.   What do you mean, you had to
24 consider the cost of the egg white as opposed to
25 the egg yolk?

---

123

1      A.   Well, I think that's kind of -- I
2  don't recall the dynamics within that, but
3  generally speaking, there's a separate market
4  for egg whites and egg yolks, so . . .
5          And then during the production
6  process, you separate the egg whites from the
7  yolks and that's kind of how you . . .
8      Q.   Was the price relationship between
9  egg white and egg yolk something that Nestlé
10 looked at?
11     A.   Yeah.  It looked at it, but it
12 fluctuated.  There was no consistency from what
13 I recall.
14     Q.   What is the reference there to
15 Michael Foods in Exhibit 12?
16     A.   What do you mean?
17     Q.   You note, "Unless the whites start
18 climbing in value, I would start leaning on
19 Michael Foods to deliver product."
20     A.   Okay.
21     Q.   What was the reason that you would
22 lean on Michael Foods unless the whites started
23 climbing in value?
24     A.   I don't recall.
25     Q.   Does this reflect that at this point

---

124

1  in 2008, there was an election that -- I believe
2  this is Dreyer's -- could choose between whether
3  they wanted to purchase from Ballas versus
4  Michael Foods?
5      A.   Yeah.  I mean, I think they're both
6  in the bid process.
7      Q.   And, in fact, the "lean on Michael
8  Foods to deliver product," was this a reference
9  to an existing contract and a desire to purchase
10 more under the contract with Michael Foods than
11 with Ballas?
12     A.   I don't know.
13         - - - - -
14         (Thereupon, Deposition Exhibit 13,
15         E-Mail from Ed Lewis to Various
16         Recipients w/Attachment, Bates
17         Labeled NES00000482-00000484, was
18         marked for purposes of
19         identification.)
20         - - - - -
21     Q.   Showing as you what's been marked as
22 Exhibit 13, Bates stamp NES0000482.  It's an
23 e-mail from Ed Lewis to John Hill, and you and
24 several others are copied on the e-mail.  And
25 there's a reference in the cover e-mail with

---

125

1  respect to yolks and whites.
2          What's your understanding as to what
3  Mr. Lewis is providing here?
4      A.   Let me read it again.  (Document
5  review.)
6          Basically it's trying to link the
7  yolk market to the whites or whole egg markets,
8  and they weren't following what -- see, it looks
9  like the whites and the wholes, they were going
10 down, but the yolks for some reason, they didn't
11 show the weakness that the other two egg
12 products showed.
13     Q.   So the yolks were not following the
14 pricing trends of whites?
15     A.   From whole whites from what I see
16 right here.
17     Q.   Let's look at the attachment.
18     A.   Okay.
19     Q.   Do you recall this -- do you recall
20 discussions when you were at Nestlé about yolks
21 and whites?
22     A.   Yeah.
23     Q.   And is this --
24     A.   Yes.
25     Q.   -- kind of an example of Nestlé kind

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                        April 24, 2014

33 (Pages 126 to 129)

126

1  of fleshing out yolk and white pricing and
2  trying to understand it?
3        A.   Yes, it's a -- it's an example.
4        Q.   And I want to focus you on the first
5  bullet under Why on the page of the attachment.
6        A.   Okay.
7        Q.   And again, do you know what the Why
8  is answering here?
9        A.   No.  I'd have to read through
10  the . . .
11            (Document review.)
12            It's probably why yolks had been a
13  price leader compared to wholes and whites.
14        Q.   Is that also an understanding as to
15  why yolks have not followed the pricing trends
16  of whites and wholes?
17        A.   Does it -- you're asking me if it
18  answers the question of why?
19        Q.   Yes.
20        A.   I don't know if it directly answers
21  it.
22        Q.   But is that what it's attempting to
23  answer?
24        A.   Yeah.  It's trying to make sense of
25  the market.

127

1        Q.   And why the pricing for white
2  doesn't follow the pricing for wholes and yolk?
3        A.   Right.
4        Q.   And then the first bullet notes,
5  "Relatively inelastic demand due to few
6  alternatives versus egg whites, which compete
7  against other proteins, for example, vital wheat
8  gluten."
9            Do you see that?
10        A.   Yes.
11        Q.   And what is meant by "relatively
12  inelastic demand?
13        A.   Meaning egg whites have a lot of
14  different competition as opposed to, I think
15  yolks don't have many substitutes.
16        Q.   What are some of the competition
17  that egg whites have?
18        A.   It says right here, other proteins
19  or vital wheat gluten.
20        Q.   Do you recall any others?
21        A.   No.
22        Q.   Then the next bullet notes, "Low
23  white demand means that if an egg is separated
24  to provide yolks, yolks are going to bear the
25  majority of the cost."

128

1            Do you see that?
2        A.   Yes.
3        Q.   What is that a reference to?
4        A.   Reference to how possibly the cost
5  structure is calculated.
6        Q.   The first bullet notes that "Yolks
7  have been the price leader compared to wholes
8  and whites."
9        A.   Mm-hmm.
10        Q.   And again, what did you understand
11  "price leader" meant in that context?
12        A.   In that context, I would think it
13  means it leads in price.  Like it's a higher
14  price.
15        Q.   Do you recall conversations with
16  Informa relating to the market differences in
17  whites versus yolk versus whole?
18        A.   I don't recall specific
19  conversations, but I do recall probably
20  reviewing that with them.
21            MR. BOETTGE:  Are we on 12?
22            THE REPORTER:  14.
23            MR. BOETTGE:  14.
24
25

129

1            - - - - -
2            (Thereupon, Deposition Exhibit 14,
3            E-Mail Chain, Bates Labeled
4            NES00000403-00000405, was marked for
5            purposes of identification.)
6            - - - - -
7  BY MR. BOETTGE:
8        Q.   Mr. Trask, I'm showing you what
9  we've marked as Trask Exhibit 14, Bates-stamped
10  NES0000403, another e-mail chain in which you're
11  both, I think, a recipient of.
12        A.   (Document review.)  Okay.
13        Q.   What was the reason that
14  Steve Warner was forwarding the information
15  that's reflected in here to you?
16        A.   After reading the first e-mail, it
17  looks like it was a possible substitute for
18  Buitoni or cookie dough.
19        Q.   When you say "a possible
20  substitute," what do you mean?
21        A.   It could possibly substitute egg
22  with another substance.
23        Q.   Other than egg?
24        A.   Yes.
25        Q.   Was it your experience that some egg

HIGHLY CONFIDENTIAL

Trask, III, William E.                    April 24, 2014

34 (Pages 130 to 133)

---

130

1   product purchasers were converting from the use
2   of eggs to alternative products?
3        A.   No.  I think it was just more of an
4   idea.
5        Q.   Do you recall whether this was
6   something that Nestlé had done?
7        A.   What do you mean, like?
8        Q.   Had changed out its formula from
9   eggs or reduced the amount of eggs it used in
10  the formula to another product?
11       A.   I don't recall them doing it for
12  eggs, but I think at any rate, you're going to
13  look at possible substitutes for the product
14  you're providing -- the product you're
15  purchasing to put in your product you're
16  providing.
17       Q.   And what would be the reasons that
18  you would look for alternatives?
19       A.   Costs, maybe it helps
20  improve -- there's lead time improvements,
21  there's quality is better.  It's a less risk
22  region as far as growing.  There's lots of
23  different things that could be considered.
24       Q.   There's a reference in the second
25  sentence from Mr. Lewis of, "This may be a way

---

131

1   to further reduce eggs in Toll House cookie
2   dough."
3        Do you see that?
4        A.   Yes.
5        Q.   Did you have an understanding that
6   Nestlé had already reduced the eggs that it used
7   in preparing Nestlé cookie dough?
8        A.   I don't recall.
9        Q.   You have a direction here from
10  Mr. Lewis "to touch base with them to get
11  discuss opportunities."
12       Who was the "them" that Mr. Lewis
13  was referring to?
14       A.   Probably, I would -- just by reading
15  this, I would assume it was folks at Toll House.
16       Q.   And perhaps, in fact, Buitoni
17  because that's a reference from Mr. Warner in
18  his earlier e-mail?
19       A.   Oh, yeah.  Yes.
20       Q.   And did you follow up -- or recall
21  following up with Buitoni or Toll House in
22  connection with a replacement of egg with whey
23  protein?
24       A.   I mean, I probably did.  I don't
25  recall anything specifically.

---

132

1        Q.   Do you recall during your time at
2   Nestlé whether Nestlé was any member of a trade
3   group?
4        A.   I don't recall.
5        Q.   While you were at Nestlé, did you
6   become aware of any initiatives within Nestlé on
7   the subject of animal welfare?
8        A.   Well, I think initiative was on the
9   Dreyer side.
10       Q.   And that was in connection with the
11  UEP certified program?
12       A.   UEP, yeah.  Potentially, the egg
13  legislation in California.
14       Q.   Even apart from eggs specifically,
15  did you have any understanding when you were at
16  Nestlé that there was a company policy relating
17  to animal welfare?
18       A.   I don't recall.
19       Q.   Apart from a discussion relating to
20  Dreyer's and Häagen-Dazs' requirement for
21  certified eggs, do you recall any other
22  discussions at Nestlé relating to animal
23  welfare?
24       A.   There may have been, but I don't
25  recall anything specifically.

---

133

1        Q.   When did you first become aware of
2   the UEP certified program?
3        A.   I don't remember.
4   Closely -- probably when -- during my tenure of
5   trying -- of managing the egg category.
6        MR. BOETTGE:  You know what?  Let's
7   go off the record for a minute.
8        THE VIDEOGRAPHER:  Off the record.
9   (Discussion held off the record.)
10       - - - - -
11       (Thereupon, Deposition Exhibit 15,
12       E-Mail Chain, Bates Labeled
13       MFI01093250109326, was marked for
14       purposes of identification.)
15       - - - - -
16       THE VIDEOGRAPHER:  We're back on the
17  record.  The time is 4:32.
18  BY MR. BOETTGE:
19       Q.   Mr. Trask, I'm showing you an e-mail
20  that was produced by Michael Foods in this case.
21  It's been marked Exhibit 15.  It's Bates-stamped
22  MFI 0109325 to 9326.  And as I noted to your
23  counsel, off the record, we have at Michael
24  Foods redacted for this deposition an internal
25  e-mail at Michael Foods --

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                                          April 24, 2014

35 (Pages 134 to 137)

---

134

1       A.   Okay.
2       Q.   -- at the very top portion of the
3  first page.
4            And I want to direct your attention
5  to the e-mail from an Ed Lewis --
6       A.   Yeah.
7       Q.   -- that -- and again, he was your
8  supervisor?
9       A.   Yes.
10      Q.   And he's asking, "What upcharge
11 would there be if Danville were to ask for UEP
12 whole eggs."
13           What was your understanding as to
14 why he was asking Michael Foods that question?
15      A.   Because they didn't currently use
16 UEP eggs, so we wanted to understand what the
17 upcharge was for UEP eggs.
18      Q.   And what was Danville?
19      A.   I think that was Buitoni pasta.  I
20 can't remember.
21      Q.   So there was another part of Nestlé
22 that was purchasing eggs from Michael Foods that
23 were not certified?
24      A.   Mm-hmm.
25           THE REPORTER:  Yes?

---

135

1            THE WITNESS:  Yes.
2  BY MR. BOETTGE:
3       Q.   And Mr. Lewis is asking Michael
4  Foods what the upcharge would be if Danville
5  were to be supplied with UEP whole eggs?
6       A.   Yes.
7       Q.   And then there's a response on the
8  first page of the exhibit from Mr. Brommer at
9  Michael Foods.
10           Do you recall Mr. Brommer?
11      A.   Yes.
12      Q.   And what was his position at Michael
13 Foods that you recall?
14      A.   He was my sales contact.
15      Q.   And the response to your question
16 was that it would cost 4¢ per pound to supply
17 Buitoni or Danville with the certified egg, the
18 UEP egg, correct?
19      A.   Mm-hmm.
20      Q.   And then there's a note that Michael
21 Foods today only is able to supply UEP product
22 as liquid egg.
23           Do you see that?
24      A.   Yes.
25      Q.   And I may have asked you this

---

136

1  earlier.
2            Do you have a recollection that, in
3  fact, Michael Foods sold Nestlé UEP certified
4  egg?
5       A.   I don't recall.
6       Q.   But the e-mail that we are
7  discussing is consistent with your understanding
8  that Michael Foods was selling at this time
9  non-certified egg as well to --
10      A.   Correct.
11      Q.   -- Nestlé, correct?
12      A.   Mm-hmm.  Yes.
13      Q.   So in a sense here Michael Foods is
14 offering Nestlé a choice whether it would like
15 to purchase some of its eggs certified or
16 noncertified, correct?
17      A.   Yes.
18      Q.   And if Nestlé agreed for certified
19 eggs, Nestlé would have to pay a premium for
20 those eggs, correct?
21      A.   Correct.
22      Q.   And the reason for there being a
23 surcharge is that it would costs Michael Foods
24 more for those eggs, correct?
25           MR. CAMPBELL:  Object as to form.

---

137

1            THE WITNESS:  I don't know it would
2  cost more to -- I don't know, but I guess the
3  cost of UEP certification around that is more
4  expensive because of the guidelines.  To be
5  certified in that UEP is different than someone
6  who's not.  So I'm not sure what the costs were.
7  But, I mean, it was my understanding that the
8  UEP certification was more expensive because of
9  that.
10 BY MR. BOETTGE:
11      Q.   Then there's an e-mail at the top
12 from Mr. Lewis to Mr. Brommer that you're copied
13 on.  And he notes, "What we're doing is
14 preparing to answer questions if Häagen-Dazs'
15 preference for UEP, by implication, puts
16 pressure on other Nestlé brands."
17      A.   Mm-hmm.
18      Q.   What was your understanding as to
19 what Mr. Lewis meant by that?
20      A.   If Häagen-Dazs were to prefer UEP,
21 what would that mean for the rest of our brands?
22 So we're trying to understand the cost
23 implication if that requirement gets transferred
24 to other businesses within -- under Nestlé.
25      Q.   And what was the pressure that

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

36 (Pages 138 to 141)

138

1  Mr. Lewis was -- what did you understand was the
2  pressure that Mr. Lewis was referring to in that
3  e-mail?
4       A.   Meaning it would put pressure on
5  other brands to follow Häagen-Dazs if they
6  were . . .
7       Q.   Where would that pressure come from
8  for those other brands?
9       A.   I don't know.
10      Q.   And how does the fact of an upcharge
11 help Mr. Lewis, in your understanding, answer
12 questions if the preference for UEP put pressure
13 on other Nestlé brands?
14      A.   So we understand the cost impact.
15      Q.   Did you have an understanding that
16 Michael Foods was a company that was permitted
17 to sell UEP certified eggs?
18      A.   Meaning?
19      Q.   They had the ability to do so.
20      A.   Yeah.  I mean, looking at their
21 e-mail, it looks like they did, only on liquid
22 products.
23      Q.   Did you have an understanding that
24 Rose Acre also was a company that was permitted
25 to sell UEP certified eggs?

140

1  of pressure it would be.  I mean, it could be.
2  I don't know.
3       Q.   Would it be any other kind of
4  pressure that Nestlé would feel would force it
5  into having to purchase UEP certified egg?
6       A.   It could be external pressures like
7  you said, like the customers or the market, but,
8  yeah, I can't speculate on what that would be, I
9  mean . . .
10      Q.   And if, in fact, Nestlé would
11 receive that pressure, it would be a benefit to
12 Nestlé to be able to have suppliers that could
13 supply UEP certified egg, correct?
14      A.   Correct.
15              - - - - -
16          (Thereupon, Deposition Exhibit 16,
17          E-Mail Chain w/Attachment, Bates
18          Labeled NES00000394-00000396, was
19          marked for purposes of
20          identification.)
21              - - - - -
22      Q.   Showing you what has been marked as
23 Exhibit 16, NES0000394.  It's an e-mail from
24 Dale Bohman at NBS Purchasing.
25          Who is Dale Bohman?

139

1       A.   I don't recall.
2       Q.   Did you have an understanding that
3  in order to sell UEP certified eggs, a company
4  would need to join the UEP certified program?
5       A.   I didn't.  I don't recall.
6       Q.   Do you know if anyone at Nestlé ever
7  expressed any concern or objections to the fact
8  that Michael Foods was able to sell UEP
9  certified eggs?
10      A.   I don't think they had any concerns
11 that I can think of.
12      Q.   In fact, as an egg buyer, Nestlé
13 would have wanted Michael Foods to be able to
14 sell UEP certified eggs, correct?
15          MR. CAMPBELL:  Objection as to form.
16          THE WITNESS:  I think they're
17 understanding what their capabilities were.  I
18 mean, if it was something where we were
19 pressured into and we had to react, we had to
20 understand what they were able to supply us and
21 support us.  If they could support us.
22 BY MR. BOETTGE:
23      Q.   And that pressure that you're
24 referring to would be customer pressure?
25      A.   It could be.  I don't know what kind

141

1       A.   He's was a purchasing manager.
2       Q.   And how did he relate in the
3  hierarchy of sourcing specialists?  And I think
4  you mentioned Mr. Lewis was a product manager?
5       A.   Yeah.  So like someone like myself
6  would support Dale in his -- any kind of
7  activities he would have and then he reported to
8  Ed Lewis -- or Steve Feyman, the group manager.
9       Q.   Did Dale Bohman focus on particular
10 product consideration?
11      A.   Meat, like beef.
12      Q.   I want to turn your attention to the
13 last page of the attachment.
14      A.   Mm-hmm.
15      Q.   And this is a document relating to
16 eggs, correct?
17      A.   That's what it looks like, yes.
18      Q.   And just real quickly, across the
19 top, DGIC, I think we talked about earlier.
20          You understand that is a reference
21 to Dreyer's?
22      A.   Dreyer's ice cream, yeah.
23      Q.   Baking.  What is that a reference
24 to?
25      A.   Toll House.

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

142

1    Q.   And Denver?
2    A.   I want to say that was like
3  scrambled eggs.  So there's like, IQF,
4  individually quick frozen eggs for their Hot
5  Pockets division.
6    Q.   And who supplied those eggs?
7    A.   Cargill Kitchen Solutions.
8    Q.   And then there's Meals.
9         What's that's in reference to?
10   A.   I would assume it's like Lean
11 Cuisine and Stouffer's and stuff like that.
12   Q.   And then Buitoni is the pasta we
13 discussed earlier?
14   A.   Correct.
15   Q.   And then there's a number of items
16 down the left.  Let's go through those quickly.
17        What's Cover?
18   A.   I think it's the coverage of volume.
19 So if you're on a fixed price for a whole year,
20 it's 100 percent.  If you're at a formula price,
21 I would think you're covered for -- you know,
22 you're covered for that long period of time.
23   Q.   And then Budget Price?
24   A.   Budget, I believe the price that was
25 put into the budget.

143

1    Q.   Project Ownership Price?
2    A.   I don't recall.
3    Q.   And then you have the Current Market
4  Price?
5    A.   Yeah.  So maybe project ownership
6  price is what our current price was and the
7  current market price is where the current market
8  is.
9    Q.   And then there's a note here of
10 Strategy to "move between fixed and formula
11 pricing as markets dictate."
12        Do you see that?
13   A.   Mm-hmm.
14   Q.   And what's that a reference to?
15   A.   Two different pricing options, fixed
16 or formula, depending where the market's going.
17   Q.   And then the comment "Buitoni, DGIC,
18 Laurel"?
19        What is the reference that there's
20 two locations listed?
21   A.   It looks like those are the two
22 liquid -- two plants that we receive liquid
23 eggs.
24   Q.   Two, you said --
25   A.   Two plants that we receive

144

1  liquid -- or two divisions, sorry, that we
2  receive the liquid eggs.
3    Q.   Then there's a comment about
4  evaluating alternatives to sugar yolks and
5  Häagen-Dazs.
6         Do you see that?
7    A.   Yes.
8    Q.   And what's that a reference to?
9    A.   Looking at supply alternatives to
10 the current.
11   Q.   Supply alternatives?
12   A.   Mm-hmm.  Different sources of
13 supply.
14   Q.   And then the comment, "Challenge use
15 of animal welfare eggs in Häagen-Dazs."
16        What's that a reference to?
17   A.   I don't know.  It looks like just do
18 we need to use animal welfare eggs.
19   Q.   Do you recall whether Häagen-Dazs
20 did at this time?
21   A.   I don't recall.
22   Q.   And do you know why the "challenge
23 use of animal welfare eggs" is shown in this
24 strategy?
25   A.   I would suspect it was the animal

145

1  welfare eggs were higher costs, so the challenge
2  in the position, do we need to use it or not,
3  would be a way to look at different pricing
4  mechanisms.
5    Q.   You can in a sense save cost --
6    A.   Yes.
7    Q.   -- if you elected not to use UEP
8  certified egg, correct?
9    A.   Correct.
10   Q.   Are you familiar with the name Diane
11 McIntyre?
12   A.   No.
13        - - - - -
14        (Thereupon, Deposition Exhibit 17,
15        E-Mail Chain, Bates Labeled
16        NES00000499-00000502, was marked for
17        purposes of identification.)
18        - - - - -
19   Q.   I believe we're on Trask Exhibit 17,
20 an e-mail Bates-stamped NES0000499.  This is an
21 e-mail chain.
22        Let's start on the second page.  The
23 top e-mail is an e-mail from Mr. Lewis, and do
24 you see that you're copied on this e-mail?
25   A.   Yeah.

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

38 (Pages 146 to 149)

---

146

1       Q.   And also, I see Jacki Pecek's name?
2       A.   Yeah.
3       Q.   I had understood that you
4   essentially replaced Jacki Pecek after a leave
5   of absence.
6       Did she come back then during this
7   time?
8       A.   Yes.  I didn't replace her, but I
9   replaced some of her responsibilities.
10      Q.   Understood.
11      And there's a comment from
12  Mr. Lewis, "We are addressing this issue with
13  Häagen-Dazs right now."
14      And maybe I'll let you take a look
15  at the e-mail because I'm going to ask you what
16  was the issue that they're addressing with
17  Häagen-Dazs.
18      A.   I don't know.  I'd have to look at
19  the e-mail.  (Document review.)
20      I think it's just using the
21  certification of animal welfare on our -- on our
22  eggs, from what I understand.
23      And then also he's raising the
24  concern, Ed is, on the concern, what would that
25  mean with other Nestlé brands, long-term impact.

---

147

1       Q.   There's a statement, "Häagen-Dazs
2   wants to use animal welfare eggs."
3       Do you see that?
4       A.   Yes.  Mm-hmm.
5       Q.   And do you mean -- what did you
6   understand animal welfare in that context to
7   mean?
8       A.   UEP.
9       Q.   Do you have a recollection of
10  Häagen-Dazs wanting to use UEP eggs at this
11  time?
12      A.   Yeah, I -- vaguely, yeah, I
13  mean . . .
14      Q.   Does this suggest to you whether
15  Häagen-Dazs at this time, the time the e-mail
16  was written, was, in fact, using UEP certified
17  eggs?
18      A.   I don't know.
19      Q.   There's a note about paying a
20  premium, 3 to $400,000 annually for those.
21      A.   Yeah.
22      Q.   What are the "those" that are
23  referenced there?
24      A.   I don't know.  I would assume -- I
25  have no idea.

---

148

1       Q.   Would it be the certified eggs that
2   are being paid a premium for?
3       A.   Could be, yeah.
4       Q.   Well, is this a reference to
5   Häagen-Dazs wanting to use animal welfare eggs,
6   correct?
7       A.   Okay.  Yeah.
8       Q.   And Mr. Lewis is looking at the
9   issue of whether Häagen-Dazs should use animal
10  welfare eggs?
11      A.   I think so.
12      Q.   So with that as background,
13  understanding that a reference to paying a
14  premium for those would be a premium for
15  Nestlé's purchase of certified eggs?
16      A.   Yeah.  It's hard to determine that,
17  but -- I mean, based on that context, but --
18      Q.   Is that a fair inference from the
19  context?
20      MR. CAMPBELL:  I object as to form.
21  There's nothing about certified eggs in here.
22      THE WITNESS:  Yeah, I don't -- I
23  don't know.
24  BY MR. BOETTGE:
25      Q.   Is it your understanding that the

---

149

1   premium was being paid to purchase UEP certified
2   eggs?
3       A.   It could have been.
4       Q.   And then there's a note that, "We
5   pay premium for those and are limited in our
6   supplier base."
7       What was your understanding what
8   Mr. Lewis meant by Nestlé being limited in its
9   supplier base?
10      A.   Probably a limited amount of
11  suppliers that supply whatever he was alluding
12  to.
13      Q.   The animal welfare eggs?
14      A.   Could be, yeah.  I don't know.
15      Q.   Then there's the last sentence, "A
16  side issue that Mary may be aware of is what
17  does an animal welfare claim by one Nestlé brand
18  imply about other Nestlé brands."
19      A.   Yeah.
20      Q.   What was the concern there that was
21  being addressed?
22      A.   Probably if we claim animal welfare
23  on one brand and we don't another, does that
24  mean -- what is the implications for the other
25  brands that don't claim animal welfare?  So

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

39 (Pages 150 to 153)

---

150

1  would it hurt us?  Would it not?
2      Q.   And how would it hurt you?
3      A.   I don't know.
4      Q.   Move down to the bottom of the page.
5  There's an e-mail from Denise Shurney.
6      A.   Okay.
7      Q.   Do you know who Denise Shurney is?
8      A.   No.
9      Q.   Do you know what Regulatory Affairs
10 was?
11     A.   Yes.
12     Q.   What was Regulatory Affairs?
13     A.   Just make sure that we are compliant
14 with whatever we claim.
15     Q.   Who is Ken Kostal?
16     A.   Ken Kostal was a purchasing manager
17 of poultry and seafood, I believe, at the time.
18     Q.   There's a comment from Denise at the
19 bottom, or a statement, "Animal raising claims
20 are an informative consumer communication that
21 could differentiate our products from our
22 competitors."
23         What was meant by that sentence?
24     A.   It could mean that consumers know
25 that we -- or whatever company is sensitive to

---

151

1  animal rights and we only work with vendors who
2  are sensitive to those rights that animals have,
3  is what I would assume.
4      Q.   And that would be a positive thing
5  for Nestlé?
6      A.   It could be.  I don't know.
7      Q.   Let's go to the first page of the
8  e-mail.  And this is an e-mail from Mary Marr.
9          Do you know who Mary Marr is?
10     A.   No.
11     Q.   She's writing to Denise Shurney and
12 to your boss at the time, Ed Lewis.
13     A.   Okay.
14     Q.   That "Nestlé would be in favor of
15 supporting standardized guidelines for animal
16 raising claims for meat and poultry."
17         Do you see that?
18     A.   Okay.  Yeah.
19     Q.   And was it your understanding that
20 UEP was a standardized guideline for animal
21 raising claims?
22         MR. CAMPBELL:  I object to the form.
23 It's talking about meat and poultry, not eggs.
24         THE WITNESS:  Yeah, I don't know.  I
25 don't know.

---

152

1  BY MR. BOETTGE:
2      Q.   Is it your understanding poultry
3  would include chickens?
4      A.   Yeah, that's what poultry is.
5      Q.   Did you have an understanding that
6  this was a reference to eggs?
7      A.   No.
8      Q.   Didn't know one way or the other?
9      A.   No.
10         - - - - -
11         (Thereupon, Deposition Exhibit 18,
12         E-Mail Chain w/Attachment, Bates
13         Labeled NES00000072-00000075, was
14         marked for purposes of
15         identification.)
16         - - - - -
17     Q.   Showing you, Mr. Trask, what we've
18 marked as Trask Exhibit 18.  It's Bates-stamped
19 NES0000072, and it's an e-mail, at least the top
20 e-mail is from you to Steve Feyman and Ed Lewis.
21     A.   Okay.
22     Q.   Do you recall this e-mail?
23     A.   Nope.
24     Q.   Do you understand it to be an e-mail
25 relating or comparing UEP and other animal

---

153

1  welfare requirements?
2      A.   Yeah, looking at it, yes.
3      Q.   And was this information that you
4  had asked Mr. Diercks to supply you?
5      A.   I believe so, yes.
6      Q.   Why did you ask him to provide this
7  to you?
8      A.   Probably just so I understand the
9  differences between -- so I don't think
10 Rembrandt had -- could use UEP eggs, so to
11 understand what the differences were maybe would
12 help us make a decision on if UEP is necessary
13 or not, or what the differences were, really.
14     Q.   Do you recall what you did with this
15 information?
16     A.   No.  I think it was just -- no, I
17 don't.
18     Q.   Were you asked by Mr. Feyman or
19 Mr. Lewis or anyone else at Nestlé to obtain the
20 information?
21     A.   I may have been.  I don't recall.
22     Q.   Mr. Trask, are you aware that Nestlé
23 has filed a lawsuit against a number of
24 entities, including United Egg Producers and a
25 number of other, a number of egg producers?

---

HIGHLY CONFIDENTIAL

Trask, III, William E.                                    April 24, 2014

40 (Pages 154 to 157)

---

154

1      A.   Yes.
2      Q.   What's your understandings of the
3  allegations in the lawsuit?
4          MR. CAMPBELL:  I object and instruct
5  the witness not to answer to the extent that his
6  understanding, if any, is based upon
7  conversations with counsel.  If he has any
8  understanding outside of conversations with me,
9  then he may answer.
10 BY MR. BOETTGE:
11     Q.   That's fair.
12         And do you have an understanding of
13 the allegations in the lawsuit apart from
14 information you learned from talking with
15 counsel?
16     A.   Just that there was something with
17 pricing, and that's about it.
18     Q.   Have you talked to anyone at Nestlé
19 about the lawsuit?
20     A.   No.
21     Q.   Were you made aware of the lawsuit
22 before it was filed?
23     A.   I don't -- I don't know.  I
24 think -- I have no idea what the timing is.
25         MR. BOETTGE:  Take a short break.

---

155

1          THE VIDEOGRAPHER:  Off the record.
2  The time is 5:00.
3          (Discussion held off the record.)
4          THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 5:04.
6          MR. BOETTGE:  Mr. Trask, thank you
7  for your time this afternoon.  I have no further
8  questions.
9          THE WITNESS:  Thanks.
10         MR. CAMPBELL:  We have no questions.
11 We will not waive signature.  We'll read and
12 sign.
13         THE VIDEOGRAPHER:  Thank you.
14         This concludes the deposition of
15 William Trask.  We're off the record.  It's
16 5:04.
17
18     (The deposition was concluded.)
19         - - - - -
20
21
22
23
24
25

---

156

1              ACKNOWLEDGMENT OF DEPONENT
2
3          I, _____, do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me, and any corrections appear on the attached Errata
8  Sheet signed by me.
9
10
11  _____    _____
12  (DATE)              (SIGNATURE)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

157

1              REPORTER'S CERTIFICATE
2
3    The State of Ohio   )
4                        )  SS:
5    County of Cuyahoga.  )
6
7          I, Donnalee Cotone, a Notary Public
8  within and for the State of Ohio, duly
9  commissioned and qualified, do hereby certify
10 that the within named witness, WILLIAM E. TRASK,
11 was by me first duly sworn to testify the truth,
12 the whole truth and nothing but the truth in the
13 cause aforesaid; that the testimony then given
14 by the above-referenced witness was by me
15 reduced to stenotypy in the presence of said
16 witness; afterwards transcribed, and that the
17 foregoing is a true and correct transcription of
18 the testimony so given by the above-referenced
19 witness.
20         I do further certify that this
21 deposition was taken at the time and place in
22 the foregoing caption specified and was
23 completed without adjournment.
24
25     (Certificate continued on next page.)

---

HIGHLY CONFIDENTIAL

Trask, III, William E.

April 24, 2014

41 (Page 158)

158

1    (Certificate continued.)
2
3         I do further certify that I am not a
4    relative, counsel or attorney for either party
5    or otherwise financially interested in the
6    events of this action; nor is the court
7    reporting firm with which I am affiliated under
8    a contract as defined in Civil Rule 28(D).
9         IN WITNESS WHEREOF, I have hereunto
10   set my hand and affixed my seal of office at
11   Cleveland, Ohio, on this 1st day of
12   May, 2014.
13
14
15
16
17   _____
18       Donnalee Cotone, Notary Public
19       within and for the State of Ohio
20
21   My commission expires February 7, 2017.
22
23
24
25