# ATTACHMENT 74

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF PENNSYLVANIA

3

4    -------------------------------------------

5    IN RE:  PROCESSED EGG PRODUCTS  MDL No. 2002

6    ANTITRUST LITIGATION            08-md-02002

7    -------------------------------------------

8    THIS DOCUMENT RELATES TO:

9    ALL ACTIONS

10   -------------------------------------------

11              ** HIGHLY CONFIDENTIAL **

12

13           VIDEOTAPED 30(b)(6) DEPOSITION

14              OF MICHAEL FODOS, INC.

15               BY MARK WESTPHAL

16                    AND

17               MARK WESTPHAL

18               INDIVIDUALLY

19           Thursday, April 10, 2014

20               9:05 a.m.

21

22

23

24

25   Reported by:  Dana Anderson-Linnell

HIGHLY CONFIDENTIAL

Page 2

1 DEPOSITION OF MARK WESTPHAL taken on Thursday,
2 April 10, 2014, commencing at 9:05 a.m. at the
3 offices of Stinson, Leonard, Street, 150 South Fifth
4 Street, Suite 2300, Minneapolis, Minnesota, before
5 Dana S. Anderson-Linnell, a Shorthand Reporter and
6 Notary Public in and of the State of Minnesota.
7         ***********************
8
9        APPEARANCES
10
11 On Behalf of the Direct Purchaser Plaintiff
12 Class:
13 Lee Turner Friedman, Esquire
14 QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
15 51 Madison Avenue, 22nd Floor
16 New York, New York 10010
17 Phone: 212.849.7000
18 Email: leefriedman@quinnemanuel.com
19
20
21 (Appearances continued on the next page.)
22
23
24
25

Page 3

1 APPEARANCES (continued):
2
3 On Behalf of the Direct Action Plaintiffs:
4 James T. Malysiak, Esquire
5 JENNER & BLOCK, LLP
6 353 North Clark Street
7 Chicago, Illinois 60654-3456
8 Phone: 312.222.9350
9 Email: jmalysiak@jenner.com
10
11
12 On Behalf of the Indirect Purchaser Plaintiffs:
13 Keith D. Essenmacher, Esquire
14 LOVELL, STEWART, HALEBIAN, JACOBSON, LLP
15 500 Fifth Avenue
16 New York, New York 10110
17 Phone: 212.608.1900
18 Email: kessenmacher@lshllp.com
19
20
21 (Appearances continued on the next page.)
22
23
24
25

Page 4

1 APPEARANCES (continued):
2
3 On Behalf of Michael Foods Inc.:
4 William L. Greene, Esquire
5 STINSON LEONARD STREET
6 150 South Fifth Street, Suite 2300
7 Minneapolis, Minnesota 55402
8 Phone: 612.335.1568
9 Email: william.greene@leonard.com
10
11
12 On Behalf of United Egg Producers and
13 United States Egg Marketers:
14 Whitney R. Redding, Esquire (via telephone)
15 PEPPER HAMILTON, LLP
16 3000 Two Logan Square
17 Eighteenth and Arch Streets
18 Philadelphia, Pennsylvania 19103-2799
19 Phone: 215.981.4245
20 Email: reddingw@pepperlaw.com
21
22
23 (Appearances continued on next page.)
24
25

Page 5

1 APPEARANCES (continued):
2
3 On Behalf of Michael Foods Inc.:
4 Carrie M. Anderson, Esquire (via telephone)
5 WEIL, GOTSHAL & MANGES, LLP
6 1300 Eye Street, NW, Suite 900
7 Washington, District of Columbia 20005
8 Phone: 202.682.7231
9 Email: carrie.anderson@weil.com
10
11
12 On Behalf of the Direct Purchaser Plaintiff
13 Class:
14 Cory A. Greenbaum, Esquire
15 BERNSTEIN LIEBHARD, LLP
16 10 East 40th Street
17 New York, New York 10016
18 Phone: 212.779.1414
19 Email: cgreenbaum@bernlieb.com
20
21
22 ALSO PRESENT: Carolyn Wolski, Michael Foods
23        Dave Young, videographer
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 INDEX
2
3 WITNESS: Mark Westphal          PAGE
4
5 EXAMINATION BY:
6 Ms. Turner Friedman          10
7 Mr. Essenmacher          80
8
9
10 INDEX OF EXHIBITS:
11
12 Westphal Exhibit 1 - Notice          16
13
14 Westphal Exhibit 2 - April 3, 2014 letter     17
15
16 Westphal Exhibit 3 - HIGHLY CONFIDENTIAL -
17 org chart, Bates MFI0160747          30
18
19 Westphal Exhibit 4 - Management presentation
20 draft, Bates MFI0156884 to 948          36
21
22 Westphal Exhibit 5 - Food ingredient sales
23 meeting, Bates MFI0098462 to 486          52
24
25

Page 7

1 INDEX OF EXHIBITS (continued):          PAGE
2
3 Westphal Exhibit 6 - CONFIDENTIAL - Email
4 chain, Bates MFI0133867 to 68          58
5
6 Westphal Exhibit 7 - Earnings conference
7 call Thomson StreetEvents          60
8
9 Westphal Exhibit 8 - CONFIDENTIAL - Email
10 chain, Bates MFI0033973 to 76          69
11
12 Westphal Exhibit 9 - Business conduct policy,
13 Bates MFI0053741 to 763          71
14
15 Westphal Exhibit 10 - HIGHLY CONFIDENTIAL -
16 Email, Bates MFI0618320 to 321          77
17
18
19
20
21
22
23
24
25

Page 8

1          THE VIDEOGRAPHER: We are on the
2 record. Please note that the microphones are
3 sensitive and may pick up whispering and
4 private conversations. Please turn off all
5 cell phones or place them away from the
6 microphones as they can cause interference to
7 the deposition audio. Recording will continue
8 until all parties agree to go off the record.
9          My name is Dave Young. I'm
10 representing Veritext.
11          Today's date is April 10, 2014.
12 The time is 9:05 a.m.
13          This deposition is being held at
14 Stinson, Leonard, Street located at 150 South
15 Fifth Street, Minneapolis, Minnesota.
16          The caption of this case is In Re:
17 Processed Eggs Antitrust Litigation. Case is
18 filed in the United States District Court for
19 the Eastern District of Pennsylvania, Case
20 Number MDL 20208 MD 02002.
21          The name of the witness is
22 Mark Westphal, a 30(b)(6) witness for
23 Michael Foods.
24          At this time will the attorneys
25 please identify themselves and state whom they

Page 9

1 represent.
2          MS. TURNER FRIEDMAN: My name is
3 Lee Turner Friedman from Quinn, Emanuel,
4 Urquhart & Sullivan on behalf of the Direct
5 Purchaser Plaintiffs.
6          MR. GREENBAUM: Cory Greenbaum from
7 Bernstein Liebhard also on behalf of the
8 Direct Purchaser Plaintiffs.
9          MR. MALYSIAK: James Malysiak from
10 Jenner and Block Chicago for the Direct Action
11 Plaintiffs.
12          MR. ESSENMACHER: Keith
13 Essenmacher, Lovell, Stewart, Halebian and
14 Jacobson representing the Indirect Purchaser
15 Plaintiffs.
16          MR. GREENE: William Greene of
17 Stinson, Leonard, Street representing
18 Defendant Michael Foods.
19          Ms. Anderson: Carrie Anderson of
20 Weil, Gotshal representing Michael Foods.
21          MS. REDDING: Whitney Redding from
22 Pepper Hamilton representing United Egg
23 Producers and United States Egg Marketers.
24          THE VIDEOGRAPHER: Our court
25 reporter is Dana Anderson representing

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

1  Veritext.
2        Will she please swear in the
3  witness.
4
5        MARK WESTPHAL,
6  called as a witness, being first duly sworn, was
7  examined and testified as follows:
8
9        EXAMINATION
10
11  BY MS. TURNER FRIEDMAN:
12  Q.  Good morning.  How are you?
13  A.  Good morning.
14        MS. TURNER FRIEDMAN:  Just before
15  we get started, I mentioned this to Bill and
16  Carrie, I know you're on the phone.  We had
17  some correspondence about the scope of the
18  30(b)(6) topics including Michael Foods had
19  agree to provide some Bates numbers of certain
20  documents and designate past testimony.  And I
21  know we haven't fully resolved those issues in
22  the sense that we haven't yet gotten Bates
23  numbers or got the designation of testimony.
24        We just want to reserve our rights
25  to object or seek further testimony if that

1  becomes necessary, which we don't expect that
2  it will, but just wanted to put that on the
3  record.
4        MR. GREENE:  Okay.
5  BY MS. TURNER FRIEDMAN:
6  Q.  Now, can you please state your name for
7  the record.
8  A.  Mark Westphal.
9  Q.  Mark, have you been deposed before?
10  A.  I have.
11  Q.  Can you tell me when?
12  A.  One time; 2012.
13  Q.  What was that in regards to?
14  A.  A litigation titled National Pasturized
15  Eggs versus Michael Foods.
16  Q.  What was the general subject of that
17  litigation?
18  A.  It was a patent infringement case.
19  Q.  Did you testify in your personal
20  capacity?
21  A.  I did.
22  Q.  Not as a 30(b)(6) witness?
23  A.  No.
24  Q.  Were there any antitrust claims in that
25  action?

1  A.  No.
2  Q.  And who is your employer?
3  A.  Michael Foods.
4  Q.  Is it Michael Food Incorporated?
5  A.  Actually Michael Foods Group
6  Incorporated.
7  Q.  What is the relationship between Michael
8  Foods Group Incorporated and Michael Foods
9  Incorporated?
10  A.  Michael Foods Group is the highest parent
11  of the organization.
12  Q.  And what is your business address?
13  A.  It's 301 Carlson Parkway in Minnetonka,
14  Minnesota; zip 55401 or 305, sorry.
15  Q.  So I know you've been deposed before, but
16  I just want to go over a few basics?
17  A.  Sure.
18  Q.  First is if you can make sure to answer
19  audibly, say yes or no rather than a head
20  shake or a head nod so that the court reporter
21  can get down what you're saying.
22  A.  Okay.
23  Q.  If you can try to talk slowly, I will try
24  to talk slowly.  And please, if I'm talking
25  too quickly or if you don't understand my

1  questions for any other reason, let me know,
2  ask me again, ask me for clarification, don't
3  hesitate to do that.
4  A.  Okay.
5  Q.  We can't talk over each other.  So if you
6  could wait for me to finish my question and
7  then answer, I will wait for you to finish
8  your answer before I jump into my next
9  question.  And of course you can take a break
10  whenever you want.  This isn't an endurance
11  test.  The only thing I'll ask is that if
12  there's a question pending, that you answer
13  the question before asking for a break unless
14  of course it's to discuss privilege concerns
15  with counsel.
16        Again, if you don't understand any of my
17  questions, don't hesitate to ask for
18  clarification?
19        MR. GREENE:  Before we get to the
20  substance of the questioning, could we just --
21  we don't need to go off the record.  But I'm
22  wondering if the court reporter could just
23  help with the --
24        THE COURT REPORTER:  I'm going to
25  go off the written record.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1     I think we should go off the video.
2     THE VIDEOGRAPHER:  We are going off
3  the record.
4     The time now is 9:11 a.m.
5     (Off the record.)
6     THE VIDEOGRAPHER:  We are back on
7  the record.
8     Time now is 9:15.
9  BY MS. TURNER FRIEDMAN:
10  Q.   Mr. Westphal, is that how you say your
11  name?
12  A.   Yes.
13  Q.   Okay.  What did you do to prepare for
14  your deposition today?
15  A.   I met with external counsel a couple
16  times, including yesterday, and had a
17  conversation also with my general counsel.
18  Q.   Okay.  And a couple of times, is that two
19  times?
20  A.   Two.
21  Q.   When was the first meeting?
22  A.   Roughly two weeks, three weeks ago
23  probably.
24  Q.   How long was that meeting approximately?
25  A.   Three hours.

Page 15

1  Q.   Did you look at any documents?
2  A.   I refreshed myself with the topics that
3  were presented to me as 30(b)(6) topics, gave
4  a lot of thought to my experience in the
5  company, my current job today relative to
6  those topics to be prepared for today.
7  Q.   Okay.  Did you talk to any attorneys for
8  any of the other defendants in this case other
9  than Michael Foods?
10  A.   I did not.
11  Q.   Have you talked to anybody else at the
12  case within Michael Foods other than the
13  general counsel and external counsel that you
14  identified?
15  A.   I did discuss two topics with
16  Mark Anderson, our general manager of retail,
17  to clarify my understanding of a couple of the
18  topics.  And I also spoke with the head of our
19  HR, Dennis Woodward, in regards to one of the
20  topics.
21  Q.   Okay.  I can go through the topics with
22  you.  But do you remember off the top of your
23  head which of the topics you spoke to your
24  head of HR about?
25  A.   The question on the antitrust policies

Page 16

1  within the company.
2  Q.   And do you remember the two topics that
3  you spoke to Mark Anderson about?
4  A.   I spoke to Mark regarding pricing in
5  retail to confirm my understanding, and also,
6  I believe it was the last topic on my list,
7  relative to how we communicate with our retail
8  customers in regards to shell eggs.
9  Q.   Okay.  Have you spoken with any of the
10  other employees of Michael Foods who have been
11  deposed in this case about your deposition?
12  A.   Not about my deposition.
13  Q.   Have you read any of their testimony or
14  summaries of their testimony?
15  A.   No.
16  Q.   All right.  I'm going to hand you
17  Exhibit --
18     MS. TURNER FRIEDMAN:  Are we doing
19  one?
20     MR. GREENE:  Call this Westphal 1?
21     MS. TURNER FRIEDMAN:  Sure.  That
22  would be great.
23     (Exhibit Number 1 marked for
24  identification.)
25  BY MS. TURNER FRIEDMAN:

Page 17

1  Q.   Have you seen this document before?
2  A.   (Reviews document.)  I have not seen this
3  specific document, no.
4  Q.   I can represent to you that this is a
5  list of all the original topics for which
6  Michael Foods was noticed for a 30(b)(6)
7  deposition.
8     Have you seen part of this list before?
9  A.   I received a list that had topic numbers
10  on it and a description of those topics.
11  Q.   Okay.  Well, let's do this.
12     MS. TURNER FRIEDMAN:  We'll do
13  Westphal Exhibit 2, which is this one.
14     (Exhibit Number 2 marked for
15  identification.)
16  BY MS. TURNER FRIEDMAN:
17  Q.   So this is a letter that we received from
18  Michael Foods' counsel regarding this
19  deposition.  And if you look on the back,
20  there is a list of topics.  I don't know if
21  this is the same list that you've seen.
22  A.   This is the same list, yes.
23  Q.   Great.  So you understand that you're
24  here to testify as a corporate representative
25  on these particular topics?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1    A.   I do.
2    Q.   Okay.  Well, let's go through them.  So
3    the first topic is topic 9-B:  The manner in
4    which prices for Michael Foods purchases of
5    eggs for resale are established.
6         So is it correct that you're here today
7    to testify as a corporate representative on
8    this topic?
9    A.   Yes.
10   Q.   And what did you do to prepare on this
11   topic?
12   A.   Went through my experiences with the
13   company relative to this topic, my knowledge
14   both inside the business working directly with
15   this and in my role as chief financial officer
16   of the company.
17   Q.   Did you review any documents in preparing
18   for this topic?
19   A.   Not for this topic.
20   Q.   Do you believe that you are the employee
21   of Michael Foods most knowledgeable about this
22   topic?
23   A.   I am knowledgeable about this topic.
24   Q.   Who else would you say might be knowledge
25   about this topic at Michael Foods?

Page 19

1    A.   I really can't say.
2    Q.   Okay.  All right.  So topic 16 is:
3    Michael Foods will designate a corporate
4    representative to provide testimony with
5    respect to Michael Foods general strategies
6    for selling and marketing eggs including to
7    customers such as Plaintiffs and including the
8    negotiation of those sales.
9         Do you understand that you're here to
10   serve as a corporate representative to testify
11   on this topic?
12   A.   Yes.
13   Q.   And what did you do to prepare for this
14   topic?
15   A.   Again, leaning on my experience working
16   within the business specifically related to
17   this topic, and then my general knowledge as
18   my role as CFO with specific knowledge related
19   to that topic.
20   Q.   Did you review any documents to prepare
21   for this topic?
22   A.   Not for purposes of the deposition, no.
23   Q.   So is it fair to say that for the purpose
24   of this topic, you're relying primarily on
25   your personal knowledge?

Page 20

1    A.   Yes, and experience in the company.
2    Q.   So topics 21 and 31:  Michael Foods will
3    designate a corporate representative to
4    provide testimony as to the extent to which
5    Michael Foods and/or the subsidiaries of
6    Michael Foods is involved in hatching, rearing
7    of birds, feeding, production, processing,
8    packaging, marketing and distribution.
9         So you understand that you're here to
10   testify as to this topic as well?
11   A.   Yes.
12   Q.   Okay.  And what did you do to prepare for
13   this topic?
14   A.   Again, reflected on my experiences in the
15   company, my knowledge both within the business
16   and as CFO of the company.
17   Q.   Did you talk to anybody at Michael Foods
18   about this topic?
19   A.   Relative to the deposition, no.
20   Q.   Did you look at any documents relative to
21   the deposition?
22   A.   Relative to the deposition, no.
23   Q.   So again, is it fair to say that for the
24   purpose of this topic, you're relying
25   primarily on your personal knowledge and

Page 21

1    experience in the business?
2    A.   Correct.
3    Q.   Topic 22 is Michael Foods setting of
4    prices for eggs and egg products, including
5    how egg and egg product prices have carried
6    over time and reasons for those changes.
7         You understand that you're here today to
8    testify as a corporate representative on this
9    topic as well?
10   A.   Yes.
11   Q.   Okay.  What did you do to prepare for
12   this particular topic?
13   A.   Similar to the 9-B.  I guess I didn't see
14   a differentiation here between 9-B, so it was
15   relying on, again, my experience within
16   business relative to pricing in my role as CFO
17   of the company.  I also did -- in the case of
18   this topic, as it was not clear specific to
19   retail or other channels, I did speak to Mark
20   Anderson in regards to this topic.
21   Q.   I can see a trend, but I'm going to go
22   through each one of these.  No surprises yet.
23   Okay.
24        Did you look at any documents to prepare
25   for your testimony on this topic?

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1    A.    Not on topic 22.
2    Q.    Okay.  Topic 34, Michael Foods' antitrust
3    compliance programs, so you understand that
4    you're here to serve as a corporate
5    representative on this topic as well?
6    A.    Yes.
7    Q.    What did you do to prepare for this
8    topic?
9    A.    On this topic I did review our business
10   conduct policy currently.  I also reviewed
11   some prior year business conduct policies.
12   And then reflected on my experience here, I am
13   a part of the business conduct committee.  We
14   have a three-person committee.  I am one of
15   those individuals on that committee today.  So
16   reflected on the experiences and our
17   responsibilities under that committee.  I also
18   spoke to our general counsel, Carrie Wolski,
19   in regards to this topic.
20   Q.    Did you look at any other documents other
21   than the business conduct policies that you
22   mentioned?
23   A.    No, just the business conduct policies.
24   Q.    I believe you may have mentioned on this
25   topic that you also spoke to somebody from HR.

Page 23

1         Am I remembering correctly?
2    A.    Oh, I apologize.  Yes.  Dennis Woodward
3    also, our head of HR, in addition to Carrie.
4    Q.    Okay.  Then topic 37, which, if any, data
5    reports on egg retail pricing from services
6    such as IRI, ACNielson or other third-party
7    reporting services to which Michael Foods
8    subscribes, you understand that you're here to
9    testify on this topic on behalf of Michael
10   Foods?
11   A.    Yes.
12   Q.    What did you do to prepare on this topic?
13   A.    Reflected on my experiences here of
14   receiving a monthly report.  I am part of that
15   distribution list.  I also spoke to Mark
16   Anderson, our general manager of retail, to
17   confirm my understanding related to this
18   topic.
19   Q.    Okay.  And then number 38, the
20   relationship between farm price, the price
21   Michael Foods pays for shell eggs it purchases
22   and the retail prices of shell eggs, you
23   understand that you're here to testify on
24   behalf of Michael Foods on this topic as well?
25   A.    Yes.

Page 24

1    Q.    And what did you do to prepare for this
2    topic?
3    A.    I didn't do anything, because I was not
4    clear on what the topic related to.
5    Q.    Okay.  So is it fair to say for the
6    purpose of this topic you're relying on your
7    personal knowledge to the extent you get
8    questions?
9    A.    Yes.
10   Q.    Okay.  And then topic 39, how Michael
11   Foods generally communicates with retailers
12   regarding the purchase of shell eggs, you
13   understand that you're here also to testify
14   about this topic?
15   A.    Yes.
16   Q.    And what did you do to prepare for this
17   topic?
18   A.    I did speak to Mark Anderson, our general
19   manager of retail, to confirm my understanding
20   related to this topic.
21   Q.    Okay.  All right.  Let's take a step back
22   for a second and just do some background if
23   that's okay.
24        How long have you been working at Michael
25   Foods?

Page 25

1    A.    I am approaching my 19th year with
2    Michael Foods.
3    Q.    Let's start earlier and then move up
4    then.
5         Did you go to college?
6    A.    I did.
7    Q.    Where did you go to college?
8    A.    I graduated from Mankato State
9    University.
10   Q.    What year?
11   A.    1989.
12   Q.    What was your major?
13   A.    Bachelor of Science in accounting.
14   Q.    Did you go to any further school after
15   you graduated?
16   A.    I did not.
17   Q.    What did you do after you graduated
18   work-wise?
19   A.    I actually interned with a company called
20   Grant Thornton in Minneapolis.  They're a
21   national public accounting firm.  I then went
22   to work with Grant Thornton after graduating
23   from Mankato State here in the Minneapolis
24   office.
25   Q.    Okay.  How long did you work with Grant

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

1　Thornton?
2　A.　I worked with them from 1989 to June of
3　1995.
4　Q.　What was your job with Grant Thornton?
5　A.　I was in the audit department, worked my
6　way up to senior manager in the audit
7　department.　And my primary client, both my
8　internship and my employment with Grant
9　Thornton, was Michael Foods.
10　Q.　Forgive me for not knowing this.　But
11　what does it mean to work in the audit
12　department at a national public accounting
13　firm?
14　A.　We executed financial audits of
15　companies.　So we were the auditors of record
16　for Michael Foods, and then I worked on a
17　number of other clients.
18　Q.　And then in 1985 -- no, '95 -- I can't
19　remember if you said '85 or '95.
20　A.　'95.
21　Q.　'95.　1995, what did you do then?
22　A.　June of 1995, I was hired by John Reedy,
23　the then-CFO of Michael Foods, to come work
24　for Michael Foods in their corporate office.
25　Q.　What was your job in their corporate

1　office in 1995?
2　A.　Initially it was to lay out the financial
3　reporting strategy around SAP.　SAP is a
4　computer system that we were in the process of
5　implementing at Michael Foods.　So I began in
6　that role shortly after I was hired.　We
7　started the due diligence on an acquisition of
8　a company by the name of Papetti's.　And I led
9　the due diligence effort associated with that
10　acquisition.　I then took -- once we acquired
11　that company in February of '97, I replaced
12　the CFO of Papetti's and relocated to
13　New Jersey where their headquarters were.
14　Q.　How long did you work as CFO of
15　Papetti's?
16　A.　I was there from 1997 to the middle of
17　2001.
18　Q.　In that role as CFO?
19　A.　Yes.
20　Q.　And what did you do in 2001?
21　A.　I relocated back here to Minneapolis.　We
22　brought all the back-office operations of
23　Papetti's back to Minneapolis to the corporate
24　office.　And I took a role, which was vice
25　president of sales, planning and analysis,

1　which was a role that was side by side.　We
2　were the finance support network of the sales
3　organization for food service and food
4　ingredient and I led that organization.
5　Q.　Can you explain to me what the financial
6　support aspect of that would have entailed?
7　A.　It involved working directly with sales,
8　directly with vice president of sales.　And it
9　was providing the support needed to either
10　negotiate with our customers, make
11　recommendations on pricing, to go to customers
12　at times.　It involved actually meeting with
13　customers, negotiating with our sales folks.
14　Our organization also supported sales through
15　knowledge of grain markets, egg markets that
16　the sales folks may not have been as familiar
17　with.　And then the other part of that
18　organization that I led was working the I'll
19　call it day-to-day operations of the revenue
20　cycle of the business.　So it was pricing an
21　order, billing an order and, you know, making
22　sure that that pricing was in relation to the
23　contract.
24　Q.　And how long did you stay in your role as
25　VP of sales, planning and analysis?

1　A.　I stayed in that role until January 30th
2　of 2006.　At that time I was essentially
3　pulled out of that role.　I was promoted to
4　senior vice president of finance.　I was
5　placed in a role that -- for succession plan
6　and development purposes I was being groomed
7　to take over the CFO role.　Our CFO was
8　planning on retiring.　So I worked side by
9　side -- I reported directly to John Reedy, our
10　CFO.　I also worked side by side with a
11　gentleman by the name of J.D. Clarkson --
12　Q.　Uh-huh.
13　A.　-- who was pulled out of the business
14　into president and COO.　And his ultimate
15　succession was to become the CEO of the
16　company.
17　Q.　And now you are CFO of Michael Foods?
18　A.　So I worked in that role until
19　January 1st of 2008 when I took over the CFO
20　role of Michael Foods.
21　Q.　I just want to go back for a moment.
22　When you were VP of sales, planning and
23　analysis, was that just for Papetti's, or was
24　that for all of Michael Foods?
25　A.　That was for all of Michael Foods.

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1  Q.  That was for all of Michael Foods.  Did
2  Papetti's have its own VP of sales and
3  analysis at the time or --
4  A.  So when we bought Papetti's they were a
5  very family-oriented company.  So they didn't
6  have some of these resources.  So I spent a
7  lot of time in New Jersey setting up that
8  function relative to the Papetti's sales
9  organization.  When we came back to
10  Minneapolis on the back office we were also
11  combining our sales forces.  So we went from
12  two sales forces to one sales force that was
13  supported solely by the sales, planning and
14  analysis organization.
15  Q.  Okay.
16      MS. TURNER FRIEDMAN:  I'm going to
17  do this.  Wait.  We have to label it first.
18      (Exhibit Number 3 marked for
19  identification.)
20  BY MS. TURNER FRIEDMAN:
21  Q.  Have you seen this document before?
22  A.  (Reviews document.)  I've seen a lot of
23  organization charts.  I'm not sure
24  specifically if I've seen this one.
25  Q.  Okay.  If you look under -- in very small

Page 31

1  writing under the bottom box that appears to
2  be dated February 22nd, 2005.
3  A.  Okay.
4  Q.  I don't know if you can tell.  I think.
5  Okay.  So in February of 2005 we just
6  discussed you were in the role of senior vice
7  president of finance?
8  A.  No, I took that role January 30th of
9  2006.
10  Q.  Oh, 2006.  My mistake.  I have that
11  written down.
12      So you were still doing sales, planning
13  and analysis as of 2006?
14  A.  Yes.  We renamed it customer planning and
15  analysis.  So it was initially set up as
16  sales, planning and analysis, but it's the
17  same role.
18  Q.  The same role?
19  A.  Yes.
20  Q.  And does this accurately represent sort
21  of the reporting chain with respect to your
22  job in 2005?
23  A.  This does not have -- this is I'll call
24  it the operational organizational chart.  So I
25  actually reported directly to John Reedy, our

Page 32

1  CFO.
2  Q.  Okay.
3  A.  But from a business standpoint this was
4  the business structure of the organization.
5  Q.  What is Northern Star Company at the top
6  up here?
7  A.  That is another subsidiary that Michael
8  Foods owns that sells refrigerated potato
9  products.
10  Q.  So did you in your role as -- you know,
11  when you were working in sales, planning and
12  analysis, work in only egg products?
13  A.  No, egg products and potato products.
14  Q.  Did all of the people on this org chart
15  work in the egg products division as well as
16  with respect to potato products for Michael
17  Foods?
18  A.  Some of these folks also would have had
19  dealings with our cheese company, Crystal
20  Farms.
21  Q.  Okay.  When you were in your role as VP
22  of sales, planning and analysis, did you ever
23  attend any UEP meetings?
24  A.  No.
25  Q.  Were you ever a UEP board member?

Page 33

1  A.  No.
2  Q.  Ever a UEP committee member?
3  A.  No.
4  Q.  Were you involved in any way in the
5  decision of Michael Foods to join the UEP
6  Certified program, which I believe was also
7  known as the UEP animal welfare program at
8  some time?
9      MR. GREENE:  I'm going to object on
10  the grounds that we're beyond the scope of the
11  30(b)(6) deposition.  I'll allow the witness
12  to answer this particular question, but I do
13  want to just make my record now that he's here
14  to testify -- he's not -- he was not noticed
15  individually.  He's here to testify on behalf
16  of these topics and UEP Certified program is
17  not one of those topics.
18      MS. TURNER FRIEDMAN:  Understood.
19  BY MS. TURNER FRIEDMAN:
20  Q.  You can answer the question.
21  A.  I was aware of the discussions.  I was
22  not involved in any way in the decision.
23  Q.  Okay.  In your -- in the work you did in
24  sales, were you at all involved in analyzing
25  whether any of Michael Foods' customers wanted

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1  certified eggs at that time?
2  A.  I was not.
3  Q.  So Michael Foods has an egg products
4  division, correct?
5  A.  Correct.
6  Q.  Is that its own corporate entity?
7  A.  We have multiple legal entities that make
8  up a -- what we call a reporting segment
9  called egg products.
10  Q.  What are the legal entities that make up
11  that reporting segment?
12  A.  There are a number of them.  The larger
13  ones are M.G. Walbaum company, Papetti's
14  Hygrade Egg Products.
15  Q.  Are there any others that you can think
16  of?
17  A.  I don't believe there are.  But the legal
18  structure -- I'm not perfectly familiar with
19  the legal structure.  But those are the two
20  primary entities.
21       MR. GREENE:  And for the record,
22  when Mr. Westphal is asked questions that
23  aren't on the list of topics, that is not
24  corporate testimony.
25       MS. TURNER FRIEDMAN:  Okay.

Page 35

1  BY MS. TURNER FRIEDMAN:
2  Q.  Does Michael Foods Incorporated, that
3  entity to your knowledge own any egg
4  production facilities?
5  A.  Not to my knowledge.
6  Q.  Do you know if they own any pullet farms?
7  A.  Not to my knowledge.
8  Q.  Any layer houses?
9  A.  Not to my knowledge.
10  Q.  Egg processing facilities?
11  A.  Not to my knowledge.
12  Q.  Packaging facilities?
13  A.  Not to my knowledge.
14  Q.  Okay.  Is it your understanding that any
15  egg processing or egg production facilities
16  within the Michael Foods company would be
17  owned by one of the subsidiary companies?
18  A.  That's my understanding, yes.
19       (Carolyn Wolski enters the
20  deposition.)
21  BY MS. TURNER FRIEDMAN:
22  Q.  Does Michael Foods Incorporated do its
23  own marketing of egg products?
24  A.  No.
25  Q.  Would the subsidiaries of Michael Foods

Page 36

1  Incorporated handle the marketing of the egg
2  products for Michael Foods?
3  A.  Yes.
4  Q.  What about distribution of Michael Foods'
5  egg products, is that done by Michael Foods
6  Incorporated?
7  A.  Again, I believe it's all owned by the
8  subsidiaries.
9  Q.  Okay.  Let's do Westphal 4.
10       (Exhibit Number 4 marked for
11  identification.)
12  BY MS. TURNER FRIEDMAN:
13  Q.  So this one, it got stapled a little
14  weirdly.  I found that the best way to look at
15  it is like this (indicating) and then we can
16  flip that one to the extent that helps.
17       Have you ever seen this presentation or
18  this document before?
19  A.  (Reviews document.)  I'm familiar with
20  the management presentation from August of
21  2007.
22  Q.  Did you participate in this presentation?
23  A.  I did, yes.
24  Q.  Okay.  I'm going to --
25       MR. GREENE:  Do you want to put the

Page 37

1  Bates numbers in the record?
2       MS. TURNER FRIEDMAN:  Oh, sure.
3  The Bates number of this document is
4  MFI0156884.
5  BY MS. TURNER FRIEDMAN:
6  Q.  And this is an August -- appears to be an
7  August 2007 draft management presentation for
8  Michael Foods.  I'm going to direct your
9  attention to the fourth page of the
10  presentation, which has a timeline on it.
11  It's page MFI0156887.  I just want to
12  understand a little bit about the relationship
13  between the subsidiaries and Michael Foods
14  Incorporated and who does what.
15  A.  Okay.
16  Q.  So I'm going to start at the beginning.
17  In 1987, Michael Foods went public, is that
18  correct?
19  A.  That is correct.
20  Q.  Okay.
21       MR. GREENE:  And once again, I
22  don't believe that this testimony concerns any
23  of the topics.  But I'll go ahead and let you
24  question him on this.
25       MS. TURNER FRIEDMAN:  I think this

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1  is relevant to topics 21 and 31 which is the
2  extent to which Michael Foods and its
3  subsidiaries does the various parts of the egg
4  production business, which I'm getting there.
5      MR. GREENE:  Okay.
6  BY MS. TURNER FRIEDMAN:
7  Q.   Okay.  Do you know if in 1987, when
8  Michael Foods became a public company, whether
9  it owned any egg production facilities?
10  A.   I don't know in 1987.
11  Q.   Okay.  Did Michael Foods produce
12  egg -- processed egg products in 1987, do you
13  know?
14  A.   Michael Foods?  Which entity are you
15  referring to?
16  Q.   I guess I'm referring to the new -- the
17  Michael Foods Inc. which became its own
18  company, I believe -- is that in 1987?
19  A.   Michael Foods was the holding company,
20  the parent company, if you will, of the
21  acquisition.  There were subsidiaries then
22  under Michael Foods when we went public.
23  Q.   What were the subsidiaries under Michael
24  Foods when you went public, do you know?
25  A.   I believe they would have been Northern

Page 39

1  Star, Crystal Foods at the time and a company
2  that we no longer own by the name of Kohler
3  Mixed Specialties.
4  Q.   Okay.  Do you know which subsidiary of
5  Michael Foods was in the processed eggs
6  products business at this time, at the time
7  the company went public?
8  A.   I don't believe we were in the processed
9  eggs business.
10  Q.   Okay.
11  A.   Let me just make sure of the timeline
12  here; yes, that's correct.
13  Q.   So do you know when Michael Foods got
14  into the processed eggs business?
15  A.   Not specifically but shortly after
16  that -- that IPO.
17  Q.   And would that be with the acquisition of
18  M.G. Waldbaum Company in 1998?
19  A.   There were two acquisitions, but that was
20  the -- that was the big acquisition that got
21  us into that -- into that business.  We had
22  the technology prior to the acquisition of
23  Waldbaum through other acquisition, a very
24  small acquisition.  But from a scale
25  standpoint, the acquisition of Waldbaum was

Page 40

1  the entry into that business.
2  Q.   Okay.  Do you know when Michael Foods
3  entered the processed eggs products business
4  whether Michael Foods produced any of its own
5  eggs?
6  A.   Produced their own, meaning...
7  Q.   Meaning layer houses that laid eggs.
8  A.   M.G. Waldbaum did, yes.  So as part of
9  that acquisition, we acquired laying
10  facilities.
11  Q.   So M.G. Waldbaum had layer facilities.
12  Does it still have laying facilities?
13  A.   Yes.
14  Q.   Are you aware of whether it's had --
15  M.G. Waldbaum has had laying facilities
16  consistently since 1988?
17  A.   They have.
18  Q.   And M.G. Waldbaum does it have pullet
19  houses as well?
20  A.   Yes.
21  Q.   It owns pullet houses.
22      Do you know if it owned pullet houses as
23  far back as 1988?
24  A.   They did, yes.
25  Q.   Does M.G. Waldbaum own breaking

Page 41

1  facilities?
2  A.   We don't have breaking facilities.
3  Q.   Is that the wrong term?
4  A.   We have processing facilities that
5  include breaking operations.
6  Q.   Okay.  When I say:  Does Michael Foods --
7  or does M.G. Waldbaum have in-line breaking
8  facilities, is that something that is a
9  reasonable question to ask?
10  A.   That is a reasonable question.
11  Q.   Does M.G. Waldbaum own in-line breaking
12  facilities?
13  A.   We do; not all of them, but we do own
14  some in-line breaking facilities.
15  Q.   When you say "not all of them," what does
16  that mean?
17  A.   You have in-line, which is our Gaylord,
18  Minnesota where the eggs come directly from
19  the layer houses into the production facility.
20  And you have offline breaking which is I have
21  a farm and I have a breaking operation at that
22  farm where I break the eggs, bring the liquid
23  into the plant.  Or you could have a facility
24  that is just producing shell eggs.  We are
25  then trucking those into a facility that has a

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1　breaking machine in the facility and we're
2　breaking those eggs in the facility.
3　Q.　Does M.G. Waldbaum own any shell egg
4　production facilities in the last category
5　that you just described where those eggs are
6　then taken by truck to a breaking facility
7　somewhere else?
8　A.　We do.  It is all local, though.  So it's
9　literally you're trucking them a short
10　distance from some of our farms into our own
11　breaking facilities.
12　Q.　Okay.  Are all of the eggs produced --
13　well, let me take a step back.  I'm referring
14　to M.G. Waldbaum, because that's the
15　subsidiary I know that we're talking about.
16　　　What is the relationship between
17　M.G. Waldbaum and Papetti's?
18　A.　They were two separate legal entities.
19　So the acquisition of Waldbaum in the late
20　'80s was an egg company.  Papetti's, which we
21　acquired in February of 1997, was also an egg
22　products company, so they are two separate
23　subsidiaries as we have them legally today.
24　The business today is run as an egg products
25　business.

Page 43

1　Q.　Okay.  Does each subsidiary own its own
2　egg processing facilities?
3　A.　Egg processing facilities, yes.
4　Q.　Okay.  Does each subsidiary own its own
5　layer houses?  Well, does Papetti's own any
6　layer houses?
7　A.　Papetti's does not own any layer houses.
8　Q.　Is Papetti's only in the further
9　processing aspect of the business?
10　A.　Correct.  So we receive shell eggs, we
11　buy shell eggs from the outside.  Those are
12　delivered into the processing plants, and we
13　process the egg there.
14　Q.　So to the extent that Michael Foods and
15　its subsidiaries produces its own eggs, that
16　would be through the facilities with
17　M.G. Waldbaum Company?
18　A.　That's correct.
19　Q.　Okay.  Once we have a further egged --
20　further egg processed product, whether it
21　comes from M.G. Waldbaum Company or Papetti's,
22　are those sold through the same team of
23　people -- let me strike that question.
24　　　You I believe testified that it's largely
25　run as one business at this stage?

Page 44

1　A.　Correct.
2　Q.　Are the egg products coming out of
3　Papetti's and coming out of M.G. Waldbaum
4　Company sold through the same team of people
5　at Michael Foods?
6　A.　Yes, they are.
7　Q.　Who does the actual distribution of those
8　egg products, physical distribution of those
9　egg products?
10　A.　They're done through centralized
11　distribution centers.  So when we distribute
12　product to customers, we are distributing
13　eggs, potatoes and to certain customers cheese
14　all on the same truck.  So it's a centralized
15　distribution point.
16　Q.　Owned by Michael Foods?
17　A.　I'm not positive of the ownership.  It's
18　not going to be Michael Foods.  It's going to
19　be -- I think the Gaylord, Minnesota
20　distribution facility I believe is owned by
21　the egg products company.  There's a
22　distribution center in Lake Mills, Wisconsin
23　that's owned by Crystal Farms.  So it's owned
24　within the subsidiaries, not completely
25　positive of exactly who owns them.

Page 45

1　Q.　Do you know if the trucks are also owned
2　by the Michael Foods group of companies?
3　A.　Again, the subsidiaries, they would be
4　owned by those, yes.
5　Q.　So Michael Foods, to the best of your
6　knowledge, doesn't use any third parties to
7　distribute or to physically distribute their
8　egg products?
9　A.　We have a dual-pronged, if you will,
10　distribution system.  So we have some of our
11　own distribution centers that we distribute
12　product directly from.  We also contract for
13　third-party distribution centers.  So for
14　instance, on the east coast, we don't own a
15　distribution facility out there.  We go
16　through a third party to do the logistics
17　there.
18　Q.　Okay.  For domestic -- for Michael Foods
19　domestic egg products business, are there any
20　other subsidiaries other than M.G. Waldbaum
21　and Papetti's that you know of that own the
22　processing or egg production facilities used
23　by Michael Foods?
24　A.　No.
25　Q.　Am I right that there's a subsidiary of

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1  Michael Foods called MFI Food Canada Limited?
2  A.   That's correct.
3  Q.   Does that do any domestic egg products
4  business?
5  A.   Nothing domestic. It's all Canadian.
6  Q.   Okay. Would you agree that certain egg
7  production facilities owned by Michael Foods
8  are fully integrated?
9        MR. GREENE: Objection, vague.
10       THE WITNESS: Owned by Michael
11  Foods, no.
12  BY MS. TURNER FRIEDMAN:
13  Q.   Would you agree that any of the egg --
14  certain egg production facilities owned by
15  Michael Foods or its subsidiaries are fully
16  integrated?
17  A.   How would you define "fully integrated"?
18  Q.   Meaning that the same facility is
19  involved in -- from the production of eggs all
20  the way through the processing of egg
21  products.
22  A.   So what we have -- we don't have any
23  hatcheries. We buy day-old chicks. We put
24  those day-old chicks into pullet facilities.
25  We raise those chicks to 16 to 18 weeks of

Page 47

1  age. Those then go into our layer facilities.
2  They become productive at 21 weeks. And from
3  that point those eggs are then utilized
4  within -- within the organization to process
5  egg products.
6  Q.   And then those processed egg products are
7  sold and distributed by the Michael Foods
8  group of companies?
9  A.   Yes.
10  Q.   Do you know what percentage of the eggs
11  processed by Michael Foods comes from its own
12  laying hens?
13  A.   So approximately today roughly 25 percent
14  of the total requirements of sales to
15  customers come from what we would call
16  internally produced eggs.
17  Q.   Okay. Are you aware of in 2013
18  M.G. Waldbaum acquiring a company called
19  Primera Foods Corporation?
20  A.   I am familiar with that.
21  Q.   Were you involved in that acquisition?
22  A.   I was.
23  Q.   Is Primera Foods now a subsidiary of
24  M.G. Waldbaum?
25  A.   I believe M.G. Waldbaum acquired them.

Page 48

1  Again, the legal structure I'm not clear on.
2  But I believe M.G. Waldbaum was the acquiring
3  entity. I don't believe they're a subsidiary
4  for Primera Foods.
5  Q.   Do you know if Primera Foods owned any
6  laying hens at the time it was acquired or at
7  the time its assets were acquired?
8  A.   They did not own any, no.
9  Q.   So M.G. Waldbaum would have acquired only
10  egg processing facilities?
11  A.   We acquired two egg processing facilities
12  in conjunction with the acquisition.
13  Q.   Are you aware that before Michael Foods
14  owned or purchased the acquisitions -- strike
15  that. Let me try again. Trying to stay clear
16  with my legal entities.
17       Before M.G. Waldbaum purchased Primera
18  Foods, are you aware that it was owned by a
19  company called ESI Holdings?
20  A.   Yes.
21  Q.   Are you familiar with a company called
22  Creekwood Farms Incorporated?
23  A.   I am not.
24  Q.   I think I'm done with this one.
25       MS. TURNER FRIEDMAN: Could we take

Page 49

1  a five-minute break? Is that okay?
2       THE VIDEOGRAPHER: We are going off
3  the record.
4       The time is 9:55.
5       (Recess.)
6       THE VIDEOGRAPHER: We are back on
7  the record.
8       Time now is 10:07.
9  BY MS. TURNER FRIEDMAN:
10  Q.   I have a couple quick more questions
11  about the subsidiaries structure, and then we
12  can move on. But we didn't talk at all about
13  Crystal Farms. Can you tell me what --
14  Crystal Farm or Crystal Farms, first of all?
15  A.   Crystal Farms.
16  Q.   Crystal Farms. What is Crystal Farms'
17  involvement in the egg business?
18  A.   They distribute to their retail customers
19  a variety of what I would call dairy case
20  products; cheese, butter, margarine, bagels.
21  And they also, relative to eggs, they
22  distribute some shell eggs.
23  Q.   Are those shell eggs that are produced on
24  the facilities owned by M.G. Waldbaum and
25  Papetti's?

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1    A.   Some of the shell eggs are produced at an
2    M.G. Waldbaum facility in Le Sueur, Minnesota.
3    The other portion of those eggs that we sell
4    at retail are purchased from an outside
5    vendor, S and R Egg Company.
6    Q.   Aside from Crystal Farms, am I right that
7    Michael Foods generally has three channels of
8    customers to which it sells and markets its
9    eggs?
10   A.   Correct.  Food service, food ingredient
11   and retail is what we name those channels.
12   Q.   Are M.G. Waldbaum and Papetti's involved
13   in the sale of egg products to all three of
14   those different types of channels?
15   A.   Yes.
16   Q.   So it's not the case that one
17   subsidiary's eggs are sold to one type of
18   customer and the other subsidiary's egg
19   products are sold to another type of customer?
20   A.   No.
21   Q.   Okay.  Now move on for a minute now to
22   topic 16 which is the general strategies for
23   selling and marketing eggs.
24   A.   Okay.
25   Q.   You mentioned -- well, when you were the

Page 51

1    VP of sales, planning and analysis, you
2    provided support to the sales team, correct?
3    A.   Correct.
4    Q.   And what years was that again?
5    A.   Beginning in Minneapolis in mid 2001 and
6    ending in 2006, January 30th of 2006.
7    Q.   And as part of that role, part of the
8    support that you provided to the sales team
9    was related to knowledge of the grain markets
10   and egg markets?
11   A.   Correct.
12   Q.   Can you describe a little bit more about
13   what that would have entailed?
14   A.   So it entails educating yourself relative
15   to the -- both markets, so grain markets
16   around Chicago Board of Trade, what's
17   happening obviously with the crops.  We have
18   advisors to our procurement group that advise
19   us on, you know, markets being in tune with
20   our procurement folks to understand how
21   they're viewing those.  And then similarly on
22   the egg products side, understanding the Urner
23   Barry egg markets, understanding the dynamics
24   of that market working with egg procurement to
25   understand their views of those markets and

Page 52

1    just generally a market education of both of
2    those grain and egg markets.
3    Q.   In order for the sales team -- strike
4    that, please.
5        In order to assist the sales team in
6    being best able to sell eggs to the various
7    customers?
8    A.   Yes.  It was putting them in a position
9    to be educated and be able to talk
10   intelligently to customers as they're
11   negotiating the price.
12   Q.   Okay.  I'm going to --
13       MS. TURNER FRIEDMAN:  What number
14   are we at?
15       THE COURT REPORTER:  Five.
16       (Exhibit Number 5 marked for
17   identification.)
18   BY MS. TURNER FRIEDMAN:
19   Q.   So this is MFI0098462.  And it appears to
20   be a -- it's a document called MFI Food
21   Ingredient Sales Meeting dated April 15, 2008.
22       Have you seen this document?
23   A.   (Reviews document.)
24       MR. GREENE:  Lee, we usually
25   including the whole range.

Page 53

1        MS. TURNER FRIEDMAN:  Oh, okay.  So
2    it starts MFI0098462 and ends at MFI0098486.
3        THE WITNESS:  I don't believe I've
4    seen this specific document.
5    BY MS. TURNER FRIEDMAN:
6    Q.   I know this document is dated in 2008.
7    In 2008 would you have been at a meeting such
8    as this one, a food ingredient sales meeting?
9        MR. GREENE:  Objection to the form.
10       MS. TURNER FRIEDMAN:  I can
11   rephrase.
12   BY MS. TURNER FRIEDMAN:
13   Q.   In 2008 would you have attended, if not
14   necessarily this particular meeting, but food
15   ingredient sales meetings?
16   A.   If this was the food ingredient national
17   sales meeting that Terry was presenting at, I
18   attended that meeting.  But I attended it for
19   purposes of presenting a different topic.
20   Q.   Okay.  When you were in your role in
21   sales, planning, analysis from 2001 to 2006,
22   would you have attended this type of meeting?
23   A.   Yes.
24   Q.   I'm going to direct your attention to
25   page 3.

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1   A.   Uh-huh.
2   Q.   This appears to be a slide discussing the
3   2007 Urner Barry markets, correct?
4   A.   Appears to be, yes.
5   Q.   The second dash, not necessarily bullet
6   point, but the second dash on this slide says
7   Lower-Layer Inventories.
8       In your experience from 2001 to 2006, are
9   lower-layer inventories the type of thing that
10  could impact the egg market?
11  A.   Sorry.  Could you repeat the question.
12  Q.   Sure.  Slower?
13  A.   Yeah.
14  Q.   In your experience analyzing the egg
15  markets from 2001 to 2006, are lower-layer
16  inventories, is that a factor that could
17  impact the egg market?
18      MR. GREENE:  I just want to ask:
19  Are we on one of the topics here, or are you
20  asking Mr. Westphal in his individual
21  capacity?
22      MS. TURNER FRIEDMAN:  I think we're
23  within topic 16 about general strategies for
24  selling and marketing eggs.  My next question
25  will be:  Is that something that was

Page 55

1   considered in your role when you were
2   supporting the sales team?
3       But if the objection is there, it's
4   noted.
5       THE WITNESS:  In my capacity, USDA
6   issues layer numbers every month.  In my
7   capacity, that was one of the factors that we
8   would look at in again understanding the
9   market, understanding the environment relative
10  to where the egg market might be going.  That
11  was one of the factors, yes.
12  BY MS. TURNER FRIEDMAN:
13  Q.   And that's one of the factors that in
14  educating yourself about the market, you were
15  aware could impact the prices in the egg
16  market?
17  A.   It was one of the factors that we would
18  look at.
19  Q.   Is it also the case that timely U.S. egg
20  marketers shell egg exports, which is the
21  fourth bullet on this list, one of the factors
22  that you would look at?
23  A.   We did -- I did not personally look at
24  that data point.
25  Q.   Do you know if your team did?

Page 56

1   A.   My team would not have within that group,
2   no.
3   Q.   Why would your team not have?
4   A.   That was just not one of the factors as
5   we worked with our customers that we took into
6   account as we looked at the environment.
7   Q.   Are you aware of other teams that would
8   have taken that into account when considering
9   the market for eggs?
10  A.   Not that I am aware of.
11  Q.   Would you agree that the continued impact
12  of UEP Certified animal welfare guidelines to
13  increase the space for hens is one of the
14  market factors you considered during that
15  time?
16  A.   We've considered density as part of the
17  UEP Certified program.  The way that we looked
18  at it was that didn't -- we still had to go
19  find eggs.  People weren't restricted by the
20  ability to build new facilities.  So we
21  obviously were aware of the density portion of
22  the UEP Certified.  Our whole idea was we've
23  got to go out to find eggs to sell the
24  customers.  And we were frankly, from my
25  group, from a pricing side, we were more

Page 57

1   concerned of what is it going to cost us to go
2   out and buy incremental eggs to support our
3   customers' requirements and whether we were
4   going to be able to price those to those
5   customers.
6   Q.   And did you consider cage densities
7   because you knew that there could be an impact
8   on price based on these cage densities?
9   A.   No.  We assumed cage densities because we
10  knew what was happening with our own
11  facilities.  We were reducing our flock size
12  by 3 million birds to get to the densities for
13  UEP Certified.  That was going to raise our
14  costs relative to our internal flocks.  And
15  then we made an assessment of what it would
16  cost us incrementally to go out and purchase
17  that liquid to replace to ship to our
18  customers.
19      So we were focused on trying to identify
20  what was the ultimate cost.  That's how we
21  price our product, such that we would be able
22  to go to our customers and make every attempt
23  to pass those increased costs on to our
24  customers.
25  Q.   And similarly is it the case that, on the

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  last bullet point here:  Limited construction
2  of newer remodelled layer facilities would
3  factor into your knowledge of the egg market
4  in pricing your products?
5  A.   I wouldn't have specific knowledge of
6  that.  This would have been our procurement
7  group.
8  Q.   Okay.
9      (Exhibit Number 6 marked for
10  identification.)
11  BY MS. TURNER FRIEDMAN:
12  Q.   So Westphal 6, and the Bates number is
13  MFI0133867 to 868.  This was previously
14  Ostrander 11.
15    Do you recall receiving this email chain?
16  A.   (Reviews document.)  I don't recall it
17  from back in 2007.  I see that I was copied on
18  it, yes.
19  Q.   Okay.  Do you see that you were copied on
20  what is the last email in the chain and the
21  second to the last email in the chain it
22  appears?
23  A.   Yes.
24  Q.   Which were dated January 3, 2007?
25  A.   Yes.

Page 59

1  Q.   Okay.  Do you see down at the bottom of
2  the page there's an email from Vince O'Brien
3  to Gregg Ostrander that then becomes part of
4  the chain?
5  A.   Yes.
6  Q.   Okay.  And that email states:  Greg, It
7  appears that the egg market is getting ready
8  for another run-up with the upcoming shell egg
9  export to Europe.  The export is for 300
10  containers, approximately nine to 10 million
11  liquid pounds over four weeks.  In late 2006
12  the export was about eight containers.  So
13  this obviously is more significant.  Vince.
14    Do you see that?
15  A.   Yes.
16  Q.   And then do you see the following email
17  from Gregg Ostrander to Vince O'Brien?  It
18  says:  Let's make sure we are capitalizing on
19  our pricing.
20    Do you see that?
21  A.   Yes.
22  Q.   Does this email refresh your recollection
23  about whether exports were being considered by
24  the sales team in its knowledge of the egg
25  market when determining its pricing?

Page 60

1  A.   So I was in a different role during this
2  time period.  So I can't speak specifically to
3  what was being considered by the sales
4  organization at this point in time.
5  Q.   Okay.
6  A.   I was in a different role.
7  Q.   But that doesn't change your answer as to
8  whether or not exports were considered when
9  you were in your role in sales from 2001 to
10  2006?
11  A.   That's correct.
12      (Exhibit Number 7 marked for
13  identification.)
14  BY MS. TURNER FRIEDMAN:
15  Q.   So this is Westphal 7.  And this is a
16  public document that I believe was also
17  produced in this case, but this for some
18  reason didn't print out with Bates numbers.
19  But it's also a public document.  And it's
20  titled Final Transcript Thomson StreetEvents
21  MIKL Q2 2008 Michael Foods Earnings Conference
22  Call dated August 12th, 2008.
23  A.   Okay.
24  Q.   All right.  Have you seen this document?
25  A.   (Reviews document.)  I have not seen this

Page 61

1  specific document.
2  Q.   Okay.  Do you recall this particular
3  earnings conference call?
4  A.   I don't recall the specific call, but I
5  would've been a part of it.
6  Q.   Okay.
7  A.   I was in my role as CFO during this
8  period of time.
9  Q.   And if you flip to page 2, Mark -- who is
10  Mark Witmer?
11  A.   He was our treasury -- treasurer and
12  secretary reporting to me at that time.
13  Q.   Okay.  And I believe it -- if we go to
14  the second paragraph under where he begins
15  speaking, it says:  I will tell you who is in
16  the room with me.  We have Dave Johnson, our
17  president and CEO, and Mark Westphal, our CFO.
18  A.   Correct.
19  Q.   So it appears that you were at that
20  meeting?
21  A.   I was.
22  Q.   Okay.  What are these earnings conference
23  calls for?
24  A.   So during this period of time we are --
25  we are owned by private equity.  Private

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  equity is -- part of the model of private
2  equity is you have debt, whether that be bank
3  debt or in this case we have something called
4  subordinated notes, which are bonds, in
5  essence. We have bondholders. So investors
6  in our bonds. And we are not obligated to do
7  this. But as part of the communication
8  process to make sure our bondholders kind of
9  understand what's happening in our business
10 we've had a practice of holding a quarterly
11 conference call with our bondholders.
12 Q.  All right. And in these conference calls
13 is it typical to talk about sales and the
14 results of those sales?
15 A.  It's a pretty typical agenda where we
16 talk about the quarterly results. We talk
17 about each segment's results for the quarter.
18 And then we typically give what we call a tone
19 of business for the coming quarter to give,
20 you know, bondholders an idea of kind of what
21 our outlook is for the next quarter.
22 Q.  Okay. On page 2 of the transcript, so
23 that's the third page of the document, if you
24 go -- it's almost all the way down the page,
25 the fourth from the bottom paragraph that

Page 63

1  starts: On the sales side...
2  A.  Okay.
3       MR. GREENE: Mr. Westphal, you can
4  read --
5       MS. TURNER FRIEDMAN: Oh, yes.
6       MR. GREENE: -- as much of the
7  document as you want.
8       THE WITNESS: I will.
9       MS. TURNER FRIEDMAN: Absolutely.
10 BY MS. TURNER FRIEDMAN:
11 Q.  Let me know when you're ready.
12 A.  So you're just asking about that one
13 paragraph there?
14 Q.  And the paragraph after.
15 A.  Okay. (Reviews document.) Okay.
16 Q.  Okay. Do you see where it says: On the
17 sales side the 31 percent dollar sales gain
18 reflects notable inflation from the egg
19 market. The market remained well above
20 historical levels driven in part by the high
21 cost of feeds.
22       Do you see where it says that?
23 A.  Yes.
24 Q.  And then do you see the following
25 paragraph where it says: Another factor

Page 64

1  supporting high egg prices is a short-term
2  contraction of supply due to the broad
3  adoption of animal well-being programs on bird
4  density. These are supported by trade groups
5  out there, UEP and so on.
6       Do you see where it says that?
7  A.  I do.
8       MR. GREENE: And just for the
9  record, you didn't complete the entirety of
10 the previous paragraph.
11       MS. TURNER FRIEDMAN: You're right.
12       MR. GREENE: So there was some
13 material in between.
14       MS. TURNER FRIEDMAN: That's
15 correct.
16 BY MS. TURNER FRIEDMAN:
17 Q.  Okay. And my question is just: Do you
18 recall -- well, do you recall high egg prices
19 in the egg market in mid 2008?
20 A.  Recall two things, two costs being high.
21 Grain costs were extremely high in 2008, which
22 it extended a trend from late in 2006. And
23 also during that period of time it was a
24 relatively high egg market also. So we had
25 both sides of our cost inputs, both the grains

Page 65

1  and the eggs were high during this period of
2  time.
3  Q.  And do you recall one of the factors
4  contributing to high egg prices during that
5  time being the short-term contraction of
6  supply due to the broad adoption of animal
7  well-being programs on bird density?
8  A.  That was relative to what we were doing
9  internally. So we -- you know, bird density
10 was again one of the factors that was
11 affecting cost. And by the term "short term,"
12 you know, it -- it isn't -- it took us time to
13 go replace that liquid on a long-term basis.
14 So what we were trying to communicate to debt
15 holders was there is a short-term impact of
16 bird density until you can replace those
17 birds.
18       MR. GREENE: Also, I think,
19 Counsel, we're straining the limits of the
20 topic here. I mean, I'll let you go on,
21 but --
22       MS. TURNER FRIEDMAN: I don't have
23 a thousand more questions on this.
24       MR. GREENE: Okay.
25       MS. TURNER FRIEDMAN: Okay.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1      THE WITNESS:  And just to make
2  clear, what he's referring to as egg market
3  is -- in the first paragraph is grain-related.
4  So the wording that you skipped there, so
5  that -- so two years of remarkable compounding
6  of feed costs very inflationary is
7  specifically related to grains.  This --
8  during this period of time, grain costs were
9  absolutely skyrocketing as a result of the
10  ethanol industry in the U.S.
11  BY MS. TURNER FRIEDMAN:
12  Q.   This paragraph, another factor supporting
13  high egg prices, doesn't say anything about
14  grain costs, does it?
15  A.   Feed cost.  Feed cost is grain.
16  Q.   I'm sorry.  I --
17  A.   What you feed a chicken is --
18  Q.   I was referring to the second paragraph.
19  A.   Oh.  I'm sorry.
20  Q.   Another factor supporting high egg prices
21  is a short-term contraction of supply.  That
22  paragraph doesn't say anything about feed or
23  grain cost, does it?
24  A.   That would've been relative to the Urner
25  Barry egg market that we buy --

Page 67

1  Q.   Okay.  So what this paragraph is saying
2  to the best of your knowledge is that another
3  factor supporting high egg prices in the Urner
4  Barry market is the short-term contraction of
5  supply?
6  A.   A factor, yes.
7  Q.   Great.
8  A.   Uh-huh.
9  Q.   And if we can go a little further down
10  the document to page 12.
11  A.   Okay.
12  Q.   I believe this is the question and answer
13  session.  Halfway down the page do you see
14  where Mark Witmer is responding to a question?
15  A.   Yes.  In the middle of the page?
16  Q.   Yes.
17  A.   Uh-huh.
18  Q.   And do you see where he says:  Supply has
19  been pressured through the animal well-being
20  efforts I think by the industry.
21  A.   Just give me a moment to read the
22  question if you would.
23  Q.   Sure.  And you can read as much as you
24  need in context, of course.  Take your time.
25  A.   (Reviews document.)  Okay.

Page 68

1  Q.   Okay.  Do you see where he says, "Supply
2  has been pressured through the animal
3  well-being efforts I think by the industry"?
4  A.   Yes.
5  Q.   And you see where he goes on to say:  You
6  know Urner Barry is really a supply and demand
7  market.  Over time economically it certainly
8  has to be linked in with grains.  But in the
9  short term I think we have consistently
10  indicated that it does not take much of a
11  change in either the supply side or the demand
12  side to dramatically affect that market.
13      Do you see where it says that?
14  A.   Yes.  Uh-huh.
15  Q.   Okay.  And is that consistent with what
16  he said on the first page, that one of the
17  things contributing to the egg market at this
18  time was the condensed supply of eggs in the
19  egg market?
20      MR. GREENE:  Objection, lack of
21  foundation.  And I'll also point out on this
22  line of questioning Mr. Westphal is speaking
23  in his individual capacity.
24      THE WITNESS:  What he's saying here
25  is that the supply and demand factor, the

Page 69

1  economics of the egg market, a disruption in
2  supply or a change in supply or a change in
3  demand in a relative-type basis can have an
4  economic impact on that market.
5  BY MS. TURNER FRIEDMAN:
6  Q.   And in your own personal knowledge, do
7  you recall that the animal welfare initiatives
8  being discussed here were one of the primary
9  contributors to that supply side change during
10  this time period?
11  A.   It was one of the contributors.
12  Q.   That's all I have on that.
13      (Exhibit Number 8 marked for
14  identification.)
15  BY MS. TURNER FRIEDMAN:
16  Q.   And I'll direct your attention -- I know
17  you're not copied on the email.  I'm more
18  interested to know whether you've seen the
19  attachment separate and apart from the cover
20  email.  And this document for the record is
21  MFI0033973 through MFI0033975.
22  A.   (Reviews document.)  I have not seen this
23  document, no.
24  Q.   Okay.  And I only have one question for
25  you on this document.  If you -- on page -- so

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1  the first page of the attachment, which is --
2  ends in 33974.
3  A.  Okay.
4  Q.  Great.  And I don't know if you want to
5  take -- you're welcome to take the time to
6  read the document.  But what I just want to
7  ask is -- that paragraph reads:  The
8  difficulty comes in meeting the phase-in
9  schedule for the cage space allowance.
10  Michael Foods said they currently have no
11  customers asking for certified egg buyers,
12  and they don't think the volume will ever be
13  big among ingredient buyers and export
14  accounts.  They still believe that the program
15  should be customer driven, but have recognized
16  that they need to be a partner with the
17  industry and encourage their customers to
18  accept the program and its costs.
19      Do you see that?
20  A.  I do.
21  Q.  And my only question for you is:  Are you
22  aware of any efforts taken by Michael Foods to
23  encourage Michael Foods' customers to accept
24  the UEP program and its costs?
25      THE WITNESS:  Can you read that

Page 71

1  back.
2      MS. TURNER FRIEDMAN:  Okay.
3      MR. GREENE:  I'm going to object to
4  it.
5      But go ahead.
6      (Whereupon, the court reporter read
7  back the previous question.)
8      MR. GREENE:  I object to the form,
9  lack of foundation and to the questioning on a
10  document that the witness didn't -- doesn't
11  recognize from somebody -- from another
12  author, all of those objections.
13      But go ahead.
14      THE WITNESS:  I am not aware of any
15  instances to your question.
16  BY MS. TURNER FRIEDMAN:
17  Q.  Okay.  Thank you.
18      MS. TURNER FRIEDMAN:  Let's use
19  Westphal 9.
20      (Exhibit Number 9 marked for
21  identification.)
22  BY MS. TURNER FRIEDMAN:
23  Q.  This is MFI0053741 through MFI0053763.
24  A.  Okay.
25  Q.  Have you seen this document?

Page 72

1  A.  (Reviews document.)  I'm not sure what
2  year this is.  But I've seen this form of
3  document.  It's one of the years of business
4  conduct policies, which have tended to be
5  relatively similar year over year.
6  Q.  I believe you mentioned earlier that you
7  reviewed the current business conduct policy?
8  A.  I did.  In detail I reviewed the current
9  one.
10  Q.  So based on the current business conduct
11  policy or your own personal knowledge, does
12  Michael Foods have a formal antitrust policy?
13  A.  There is antitrust provisions within the
14  business conduct policy, yes.
15  Q.  And the current antitrust provisions
16  within the business conduct policy, what do
17  those entail?
18  A.  It outlines compliance with antitrust
19  laws.  It outlines the expectations of an
20  employee with dealings with competitors.  It
21  outlines expectations of employees relative to
22  dealing with customers.  And there's a fourth
23  that's called fair dealings in all aspects of
24  the business and what the expectations are for
25  employees.

Page 73

1  Q.  Did you sign this when you became an
2  employee of Michael Foods?
3  A.  Not just when you sign -- not when you
4  become an employee.  So this is an annual
5  process that we go through with all of our
6  employees that are salaried in nature or have
7  supervisory responsibilities.  So we have an
8  annual process in place.  It used to be
9  manual, which you see in this document which
10  you actually had to sign the last page, submit
11  that with -- to HR.  It would go into your
12  file.  Today we do that electronically.  So
13  it's done on an electronic basis where you are
14  required to read, certify and report any
15  instances that you have knowledge of relative
16  to noncompliance with the business conduct
17  policy.
18  Q.  Who would be included in salaried or
19  supervisory employees to your knowledge?
20  A.  So salaried employee -- salaried
21  employees.  So --
22  Q.  Well, I guess my question is -- well, do
23  the employees of M.G. Waldbaum Company sign
24  the antitrust policy -- or the business
25  conduct policy?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1   A.  Yeah.  So we administer this as Michael
2 Foods.
3   Q.  Okay.
4   A.  So the business conduct committee today
5 is three corporate employees of Michael Foods.
6 It was -- I'm not sure who it was here.  So
7 these would've been three corporate employees
8 of Michael Foods, including my predecessor as
9 part of that committee.  And each of our -- so
10 it's administrated as Michael Foods through
11 the payroll -- HR department so that all
12 salaried employees regardless of what
13 organization they work for in Michael Foods
14 are required to sign off on that policy.
15   Q.  Does the business conduct committee ever
16 hold any training programs with its -- with
17 Michael Foods' staff on these antitrust
18 requirements?
19   A.  So the business conduct committee itself
20 is responsible for drafting the policy each
21 year, reviewing it, you know, making any
22 changes to the policy.  The conduct committee
23 is responsible for oversight of that process
24 of certification from our employees.  The
25 conduct committee also reviews any conflicts

Page 75

1 of interest or any of the things that come
2 back from employees.  We review that and then
3 report that to our audit committee.  The
4 specific training is not directed by the
5 business conduct committee.
6   Q.  Is specific antitrust training conducted
7 by anyone else at Michael Foods?
8   A.  Yes.  Carrie Wolski, our general counsel,
9 has done training with our sales and marketing
10 organizations typically in conjunction with
11 their national sales meetings.  And then we
12 have had an instance in my time at Michael
13 Foods some specific training relative to
14 Robinson-Patman that was done with senior
15 management of the company and senior sales
16 associates.
17   Q.  Aside from signing the business conduct
18 policy on an annual basis, do Michael Foods'
19 employees have to verify in any other way that
20 they are not engaging in anticompetitive
21 behavior?
22   A.  No.  This is our process within the
23 company to annually confirm that folks are
24 complying with the policy.
25   Q.  And if you could please turn to 7 -- the

Page 76

1 Bates number ending in 757.
2   A.  Okay.
3   Q.  And I believe at the bottom of that page
4 is where the antitrust compliance section
5 starts?
6   A.  That's correct.
7   Q.  And if you go to the top of the next page
8 at 758, it says:  If you engage in any conduct
9 or practice that may involve the antitrust
10 laws, you should be guided by this policy and
11 you should seek advice of company legal
12 counsel.
13      Do you know if any employees of Michael
14 Foods have ever sought advice of company legal
15 counsel with respect to UEP programs and any
16 antitrust concerns related to those programs?
17   A.  I am not aware of any.
18   Q.  And then on the next page, 759, on the
19 bottom of the first paragraph it says:  If you
20 attend a trade association meeting and become
21 aware that competitors are discussing improper
22 subjects, you should leave the meeting
23 immediately and advise your superior and
24 company legal counsel.
25      Are you aware of anyone having advised

Page 77

1 their superior about concerns regarding UEP
2 meetings and antitrust concerns?
3   A.  I am not aware of any.
4   Q.  Are you aware of anyone advising legal
5 counsel about antitrust concerns regarding UEP
6 meetings?
7   A.  I am not aware of any.
8   Q.  I think that's all I have on that.
9      MS. TURNER FRIEDMAN:  And then
10 we're at number 10.
11      (Exhibit Number 10 marked for
12 identification.)
13 BY MS. TURNER FRIEDMAN:
14   Q.  This may be my last one.  This is a
15 document with Bates numbers MFI0618320 ending
16 MFI0618321.  And this is an email from Gregg
17 Ostrander dated September 23rd, 2008.
18      Do you recall receiving this email?
19   A.  (Reviews document.)
20   Q.  Take your time reading it, of course.
21   A.  Uh-huh.  I don't recall it specifically,
22 but obviously I was copied on it.
23   Q.  If you look at the attachment, internal
24 statement re DOJ investigation into egg
25 product sales, about three lines in says:  As

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1  you most likely know, in late March of this
2  year we received subpoenas from the Department
3  of Justice related to this matter.
4      I assume this -- well, are you familiar
5  with subpoenas that Michael Foods received
6  from the Department of Justice related to the
7  egg industry?
8      MR. GREENE:  It's a yes-or-no
9  question.
10     THE WITNESS:  Yes.
11 BY MS. TURNER FRIEDMAN:
12 Q.    Are you aware of any changes to Michael
13 Foods' antitrust policies that occurred
14 following the receipt of those subpoenas?
15 A.   No.
16 Q.   Are you aware of any changes to Michael
17 Foods' antitrust policies following this
18 lawsuit?
19 A.   Which lawsuit?
20 Q.   The lawsuit -- sorry.  The lawsuit that
21 you're testifying in, the civil litigation
22 involving antitrust claims for the eggs
23 products industry -- egg products industry.
24     MR. GREENE:  Can you ask the
25 question again?

Page 79

1      MS. TURNER FRIEDMAN:  I can.
2  BY MS. TURNER FRIEDMAN:
3  Q.   Are you aware of any changes in Michael
4  Foods' antitrust policies as a result of
5  Michael Foods having been named as a defendant
6  in this lawsuit related to claims of antitrust
7  violations in the egg products industry?
8      MR. GREENE:  Objection to the
9  characterization of the lawsuit.
10     Go ahead.
11     THE WITNESS:  I am not.
12 BY MS. TURNER FRIEDMAN:
13 Q.   Okay.
14     MS. TURNER FRIEDMAN:  I think that
15 might be all I have.  So if we could just take
16 a few minutes of a break just to make sure
17 that's the case.  I may have a couple more
18 questions.  But if not, I'll pass it along.
19     THE VIDEOGRAPHER:  We are going off
20 the record.
21     The time now is 10:43.
22     (Recess.)
23     THE VIDEOGRAPHER:  We are back on
24 the record.
25     Time now is 10:57.

Page 80

1      MS. TURNER FRIEDMAN:  I have no
2  further questions on behalf of the Direct
3  Purchaser Plaintiffs at this time.
4
5          EXAMINATION
6
7  BY MR. ESSENMACHER:
8  Q.   Good morning.
9  A.   Good morning.
10 Q.   My name is Keith Essenmacher.  I
11 represent the Indirect Purchasers in this
12 action.  And as I said on the break, I'm going
13 to try to be brief.
14 A.   All right.
15 Q.   Okay.  Has Michael Foods conducted any
16 independent studies or analysis on retail
17 pricing of shell eggs?
18 A.   No.
19 Q.   Okay.  Has Michael Foods conducted any
20 independent study or analysis based on
21 demographics for purchasing habits of shell
22 eggs demographics being economics, you know,
23 that sort of thing?
24     MR. GREENE:  I'll allow the witness
25 to answer.  But I just want to point out it's

Page 81

1  not a topic on the list.  He's answering in
2  his individual capacity.
3      THE WITNESS:  Sorry.  Can you
4  repeat the question.
5  BY MR. ESSENMACHER:
6  Q.   Has Michael Foods conducted any
7  independent study or analysis on demographic
8  purchasing habits of shell eggs?
9  A.   Of shell eggs?
10 Q.   Yes.
11 A.   No.
12 Q.   Okay.  Does Michael Foods consider the
13 retail price when setting the wholesale price
14 for shell eggs?  Is that one of the factors in
15 setting the wholesale price?
16 A.   Our price to the retailer is formulaic,
17 so it's on a formula.
18 Q.   Okay.  And is the retail price, is that
19 any kind of consideration, what the retail
20 price will be?
21 A.   We don't have any -- the retailer sets
22 the ultimate price to the consumer.  We have a
23 formula price as to how we sell it into the
24 retailers' warehouse.
25 Q.   Thank you.  And this is more of a general

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1  question: Does demand for eggs change when
2  the wholesale price changes?
3       MR. GREENE: Well, again, we're off
4  topic. So at this point all the questions as
5  to Mr. Westphal here are in his individual
6  capacity not on behalf of the company. And at
7  some point we're going to need to cut this
8  off. But I'll let him answer.
9       THE WITNESS: We've not done any
10  elasticity studies relative to shell eggs at
11  retail, which would answer your question.
12       MR. ESSENMACHER: Thank you. To
13  shut this off, that was my final question. I
14  have no further questions.
15       MR. MALYSIAK: No questions for the
16  Direct Action Purchasers.
17       MR. GREENE: We'll read and sign.
18       THE VIDEOGRAPHER: This concludes
19  today's deposition.
20       The time now is 11:00.
21       (Deposition concluded at
22  11:00 a.m.)
23       ***************
24
25

Page 83

1       REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA   )
3                        ) ss.
   COUNTY OF HENNEPIN   )
4
       I hereby certify that I reported the
5  deposition of Mark Westphal on April 10, 2014 in
   Minneapolis, Minnesota, and that the witness was by
6  me first duly sworn to tell the whole truth;
7
       That the testimony was transcribed by me
8  and is a true record of the testimony of the
   witness;
9
10       That the cost of the original has been
   charged to the party who noticed the deposition,
11  and that all parties who ordered copies have been
   charged at the same rate for such copies;
12
13       That I am not a relative or employee or
   attorney or counsel of any of the parties, or a
14  relative or employee of such attorney or counsel;
15       That I am not financially interested in the
   action and have no contract with the parties,
16  attorneys, or persons with an interest in the
   action that affects or has a substantial tendency
17  to affect my impartiality;
18       That the right to read and sign the
   deposition transcript by the witness was reserved.
19
20       WITNESS MY HAND AND SEAL THIS 10th day of
   April, 2014.
21
22
23
24  Dana S. Anderson-Linnell
   Notary Public, Hennepin County, MN
25  My commission expires 1/31/2015

Page 84

1       ACKNOWLEDGMENT OF DEPONENT
2       I, MARK WESTPHAL, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony taken on 4/10/14, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the corrections
7  listed below):
8  Page   Line          Correction
9  ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  ____|____|_____|_____
21       _____
          MARK WESTPHAL
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
   _____   _____
25  (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

22 (Pages 82 - 84)