UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **KRAFT FOODS GLOBAL, INC.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-08808 |
| | ) | Judge Steven C. Seeger |
| **UNITED EGG PRODUCERS, INC.**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION TO PRECLUDE DEFENDANTS' MITIGATION EVIDENCE**

**I.      INTRODUCTION**

In their Motion to Preclude Defendants' Mitigation Evidence (ECF No. 393), Plaintiffs seek to prevent Defendants from introducing certain evidence that is clearly relevant to the issues in Phase I of this case.  Plaintiffs' motion is based in part on Rose Acre's statement, at the beginning of its opening, that "plaintiffs had choices, and … they took advantage of those choices."  (Tr. Vol. 3-B at 818 (Oct. 19, 2023) (quoted, in part, in Motion at 2).)  Rose Acre asserted that "[t]he egg product market is different [from] the shell egg market. … It's not the same.  There are different players who play different roles." (*Id.* at 818-819.)  Rose Acre noted that, for example, Rembrandt Foods (the third largest egg producer in the United States) and Primera were both major suppliers of one or more of the Plaintiffs, and that neither was UEP Certified.  (*Id.* at 819.)  And Rose Acre pointed out that three of the Plaintiffs – Kraft, Nestlé, and Kellogg – chose to "demand[ ] the UEP Certified Program." (*Id.* at 839.)  Although Plaintiff "General Mills did not specifically ask for certified eggs[,]" Rose Acre noted that General Mills could have obtained non-Certified eggs if it had wanted them.  (*Id.* at 839.)  Rose Acre explained

that Rembrandt Foods and Primera "were the primary egg suppliers for General Mills," and reiterated that those two suppliers "weren't UEP certified." (*Id.*)

Rose Acre's opening said nothing about grain-based pricing or Plaintiffs' ability to reduce their purchases of egg products. Yet Plaintiffs somehow misconstrue the points above as an argument that "Plaintiffs could have negotiated to avoid or lessen the impact of the conspiracy by contracting to price their egg products without reference to the Urner-Barry index"; that "perhaps Plaintiffs could have made their products with fewer—or no—egg products"; or "that Plaintiffs could have been better negotiators and gotten better prices for the egg products they bought." (Motion at 2; *see also id.* at 3-4.) Plaintiffs characterize all of this, moreover, as mitigation evidence, which they argue is irrelevant in a horizontal price-fixing case or, at the very least, admissible only in the damages phase of this case.

Plaintiffs have completely misinterpreted Rose Acre's opening and the arguments that Defendants intend to present. Defendants will not present this evidence to show that Plaintiffs could have reduced their alleged damages by making different choices. Rather, Defendants will present this evidence to show, contrary to Plaintiffs' arguments, that the UEP Certified Program did not consume the markets for eggs or egg products and that large portions of the egg-products market (and the egg products the Plaintiffs purchased) were not priced off the Urner Barry index, thus undermining their expert's ability to show injury. Thus, the evidence that Plaintiffs now ask this Court to exclude is relevant to four points, all of which are at issue in the liability phase of this trial.

*First*, the fact that non-Certified eggs were available for purchase bears directly on whether the Certified program is a restraint on trade. The development of a Certified egg provided consumers with another choice, in addition to non-Certified eggs. That is

2

quintessential competition and Defendants should not be precluded from demonstrating that options remained in the market.

*Second*, evidence regarding Plaintiffs' ability to obtain egg products from non-Certified suppliers is relevant to defining the relevant market and the economic plausibility of the conspiracy that Plaintiffs have alleged, as well as their theory that the UEP Certified Program left Plaintiffs with no choice but to suffer injury by overpaying for egg products. Plaintiffs' expert witness Dr. Michael Baye has opined that "[f]eatures of the egg industry (*e.g.,* highly inelastic market demand and barriers to entry) were conducive to … the allegations that the conspiracy raised prices through supply reductions coordinated by … UEP[.]" (Baye Report ¶ 11.)[1] Evidence that the demand for egg products was less inelastic than the demand for shell eggs, or that the Plaintiffs were able to (and did) purchase egg products made from non-Certified eggs, would tend to undermine Dr. Baye's arguments regarding the plausibility of the alleged conspiracy and its supposed ability to raise prices.

*Third*, evidence of the differences between the shell egg and egg product industries (including the predominant use of grain-based contracts) is relevant to determining whether shell eggs and egg products are both part of the same market and whether Plaintiffs can show injury by relying on the Urner Barry index. Defendants will argue that that eggs and egg products are not part of the same market, and therefore Plaintiffs cannot demonstrate an unreasonable restraint of trade in a relevant market.

*Finally,* evidence that the Plaintiffs had greater bargaining power, and could have negotiated fixed-cost or grain-based contracts, is relevant to antitrust injury. (*See*, *e.g*., ECF No. 343 at 2 (parties stipulating that they could offer "argument or evidence regarding (1) a Party's

---

[1] Relevant portions of Dr. Baye's report are attached as Exhibit A.

bargaining power, market power, ability to harm competition, financial condition, revenues, profits, relative size, expansion or lack thereof, when offered for a purpose other than" whether Defendants can or cannot withstand a judgment against them; or Plaintiffs should or should not receive a judgment because of their financial status, "or (2) whether Plaintiffs were injured or suffered damages").)

For all of these reasons, Defendants respectfully request that Plaintiffs' motion be denied.

## II. LAW AND ARGUMENT

### A. Plaintiffs' Motion Should Be Denied Because the Evidence At Issue Is Relevant to Liability and Injury.

The Court has recognized that "[t]o state a claim for relief under § 1 [of the Sherman Act], a plaintiff must show the following three prongs: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." ECF No. 292 at 11, quoting *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021). The evidence that Plaintiffs seek to shield from the jury is relevant to each of those liability prongs.

### 1. The evidence at issue is relevant to whether the Certified Program was part of a conspiracy to drive up the price of shell eggs and egg products.

First, the evidence at issue is relevant to whether a conspiracy to restrict the egg supply and drive up egg prices actually occurred. "As a starting point, Plaintiffs must establish by a preponderance of the evidence that a conspiracy existed." (ECF No. 294 at 11, citing *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016).) Judge Pratter held, in the MDL proceedings, that there was no evidence that the parties to the UEP Certified Program entered into a "'side agreement' … to refrain from new [hen housing]." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1036 (E.D. Pa. 2016); *see also id.* at 1052-53. And Plaintiffs' expert Dr.

4

Baye acknowledged in the trial of the Direct Action Plaintiffs' (DAPs') claims that this is not the kind of case where "a bunch of egg producers got in a smoke-filled room and decided to … unilaterally raise all their prices in a coordinated fashion[.]" (Dec. 2, 2019 Tr. at 38:9-22, attached as Exhibit B.) Instead, what evidence Plaintiffs have is circumstantial.

To support their argument that the Certified Program was part of a conspiracy to reduce the egg supply and increase the price of shell eggs and egg products, Plaintiffs will rely on the testimony of their expert witness, Dr. Baye. As noted above, Dr. Baye opined in his main report that "[f]eatures of the egg industry," including "highly inelastic market demand and barriers to entry[,] were conducive to … [the formation of a] conspiracy [to raise] prices through supply reductions coordinated by the UEP and USEM industry trade associations." (Baye Rep. ¶ 11.) Dr. Baye stated that "egg products … are necessary for producing the food products demanded by their customers" (*id.* ¶ 61) and that "[f]ood manufacturers do not have alternatives that are close substitutes for eggs" (*id.* ¶ 64). Dr. Baye further opined that entry into the egg production market was "unlikely to defeat price increases in a timely fashion," given the time and expense required to enter the egg production industry. (*Id.* ¶ 85.) For these reasons, Dr. Baye opined that the alleged conspirators "stood to gain from the alleged conspiracy. As a matter of economics, coordinated supply reductions generally lead to higher prices in industries where demand is inelastic and entry is not timely." (*Id.* ¶ 97.)

The evidence Plaintiffs now seek to exclude responds, in part, to these arguments of Dr. Baye. The fact that there were egg producers in the market who were not Certified, and who were already providing eggs for the ultimate use of food manufacturers like the Plaintiffs, would tend to rebut Dr. Baye's theory that the Certified Program was likely to increase egg product prices. And if Defendants are able to produce evidence that the Plaintiffs could have

5

manufactured their food products without the use of egg products, or with *fewer* egg products, that would suggest that demand for egg products is less inelastic than Plaintiffs suggest. Either way, these types of evidence are clearly relevant to Plaintiffs' ability to prove the existence of a conspiracy through circumstantial evidence. Additionally, evidence regarding the availability of non-Certified eggs tends to show that the market was not restrained and that customer choice was increased, and negates any inference that there was insufficient product to meet demand.

For these reasons, the Court should deny Plaintiffs' motion *in limine*.

### 2. The evidence at issue is relevant to whether egg products are in the same "market" as shell eggs.

Second, the evidence at issue is relevant to whether shell eggs and egg products are within the same market. "Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006)). Put differently, "a plaintiff's threshold burden under the Rule of Reason analysis involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Id.* at 337 (citing *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987)).

For purposes of Sherman Act Section 1, "[a] 'relevant market' … is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-917 (7th Cir. 2020) (quoting *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). It excludes products that are "too different" and suppliers "who are not likely to shift promptly to offer

6

defendant's customers a suitably proximate (in both product and geographic terms) alternative." *Id.* (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 530a).

The parties propose different market definitions. The report of Plaintiffs' expert, Dr. Baye, asserts that shell eggs and egg products are in the same product market. Dr. Baye based that conclusion on his findings that "there are no close substitutes for eggs – regardless of whether one considers shell, liquid, dried, or frozen eggs"; that "[a] reduction in egg production means that fewer eggs are available for making processing shell eggs or egg products"; and that "a hypothetical monopolist could profitably increase the price of virtually every egg and egg product in this market … ." (Baye Rep. ¶¶ 90-92.) In contrast, the report of Defendants' expert, Dr. Jonathan Walker, opines that "there is no such thing as a cognizable U.S. market that includes shell eggs, raw unpasteurized liquid egg, industrial egg products and high-value added egg products." (Walker Rep. ¶ 51.)[2] Dr. Walker based that conclusion on his finding that "not all shell eggs, raw unpasteurized liquid egg, pasteurized liquid egg, industrial egg products and high value-added egg products are substitutable with each other" and that "capacity is not readily diverted from production of one of these product groups to another[.]" (*Id.*; *see also id.* ¶¶ 52- 54.) Dr. Walker also notes that "[s]ome egg product prices move independently from shell egg prices and from other egg product prices." (*Id.* ¶ 55.)

As this Court has recognized, Judge Pratter, in the MDL proceedings, commented that she was "troubled in the past by the relative lack of attention the DAPs have paid to the differences between shell eggs and egg products.'" (ECF No. 272 at 7, quoting *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 511 (E.D. Pa. 2019).) Here, Defendants intend to examine those differences. Explaining why shell eggs and egg products are not in the same

---

[2] Relevant portions of Dr. Walker's report are attached as Exhibit C.

7

market will require describing the egg products market, including (as Rose Acre said in its opening) who the "players" are and what they do. (Tr. Vol. 3-B at 818 (Oct. 19, 2023).) Defendants may also, as part of their presentation of evidence, describe the ways in which contracts for egg products differ from contracts for shell eggs. Evidence that the Plaintiffs could have "reformulated their products to use non-egg substitutes" (Motion at 4) would also be relevant to market definition. All of this is relevant to the three-prong test for liability under Sherman Act Section 1. For this reason, as well, the Court should deny Plaintiffs' motion *in limine*.

### 3. The evidence at issue is relevant to whether the Certified Program was likely to injure, and actually did injure, the Plaintiffs.

Third, the evidence that the Plaintiffs seek to exclude is relevant to injury. That Plaintiffs had the option of negotiating – and did negotiate – fixed-cost or grain-based contracts and chose to tie the price to Urner Barry suggests that they received exactly what they demanded and were not injured. Similarly, if Plaintiffs could have purchased non-Certified eggs and chose not to, they were not injured. Moreover, large customers have greater negotiating power, and their size and ability to purchase large quantities of eggs gives them influence that must be accounted for when attempting to determine antitrust injury. (*See, e.g.,* ECF No. 343.) The size and purchasing power of a company like Kraft, Kellogg, General Mills, or Nestlé could enable them to defeat any alleged price increase and would allow them the ability to determine their pricing matrix. For these reasons, when the DAPs attempted in the MDL proceedings to exclude evidence that the Plaintiffs were much bigger companies than the defendants, the court denied that motion. (*See Kraft Foods Global, Inc., et al. v. United Egg Producers, Inc., et al.*, Case No. 2:12-cv-00088 (E.D. Pa.), ECF No. 1979.) Judge Pratter agreed that "the parties' financial conditions and relative sizes … are relevant to their relative bargaining power, whether the

defendants' conduct could harm competition, and whether the DAPs were injured or suffered damages." (*Id.* at 1 n.1.) The court continued: "The DAPs' bargaining power, financial conditions, and relative size are also relevant to whether they could defeat any alleged price increase. This evidence is relevant to determine antitrust injury and damages." (*Id.* at 2 n.1.)

The same arguments apply here. The fact that Plaintiffs are significantly larger and more profitable than the Defendant egg producers tends to rebut Plaintiffs' theory that the alleged conspirators somehow bullied the Plaintiffs into buying egg products made from Certified eggs, or into paying for egg products based on Urner Barry. For this reason as well, the Court should deny Plaintiffs' motion *in limine*.

### III.  CONCLUSION

Plaintiffs' motion *in limine* to preclude Defendants from offering "mitigation evidence" during the liability phase of this trial is misguided and unnecessary. Defendants do not intend to "present[] evidence or argument suggesting Plaintiffs should have reduced the amount of damage they suffered through different behavior" (Motion at 6) in this phase of the trial. The evidence that Plaintiffs seek to exclude is relevant to market definition (*i.e.*, whether shell eggs and egg products are part of the same market); whether the egg product industry was conducive to a conspiracy like the one Plaintiffs allege, as Plaintiffs' expert Dr. Baye has opined; and, if the jury concludes there was a conspiracy to increase shell egg and egg product prices by reducing the supply of eggs, whether the Plaintiffs have demonstrated that the conspiracy injured them.

For each of the reasons discussed above, the Plaintiffs' Motion to Preclude Defendants' Mitigation Evidence should be denied.

Dated:  October 25, 2023                          Respectfully submitted,

*/s/ James A. King*
James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

**Counsel for Defendant Rose Acre Farms, Inc.**

*/s/ Robin P. Sumner*
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square, 18th and Arch
Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

**Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.**

*/s/ Patrick M. Collins*
*Patrick M. Collins (pcollins@kslaw.com)*
*Livia M. Kiser (lkiser@kslaw.com)*
*Patrick M. Otlewski (potlewski@kslaw.com)*
*Abigail Hoverman Terry (aterry@kslaw.com)*
*KING & SPALDING LLP*
*110 North Wacker Drive, 38th Floor*
*Chicago, IL 60606*
*Tel: (312) 995-6333*

*Lohr Beck (lohr.beck@kslaw.com)*
*(pro hac vice)*
*KING & SPALDING LLP*
*1180 Peachtree Street, NE, Suite 1600*
*Atlanta, GA 30309*
*Tel: (404) 572-2812*

*Brian E. Robison (brian@brownfoxlaw.com)*
*(pro hac vice)*
*BROWN FOX PLLC*
*6303 Cowboys Way, Suite 450*
*Frisco, TX 75034*
*Tel: (972) 707-2809*

**Counsel for Defendant Cal-Maine Foods, Inc.**