# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., ) ) ) ) | |
| Plaintiffs, ) | No. 1:11-cv-08808 |
| ) | |
| v. ) | Judge Steven C. Seeger |
| ) | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. ) ) ) ) ) | |
| Defendants. ) | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION
TO PRECLUDE DEFENDANTS' MITIGATION EVIDENCE**

Plaintiffs moved to preclude Defendants from presenting mitigation evidence in this horizontal restraint case. Alternatively, Plaintiffs moved to limit that evidence to the damage phase of the trial because it relates, if at all, to damages. Plaintiffs addressed the following expected mitigation evidence: (1) voluminous deposition and other testimony about grain based contracts, decisions to purchase eggs based on grain prices, proposals to consider such pricing, and other pricing topics; (2) evidence suggesting Plaintiffs should have purchased from others or at different prices; or (3) evidence they should have substituted other raw materials for eggs in their products.

In their response, Defendants do not dispute that mitigation evidence is irrelevant in horizontal restraint cases. Defendants do not dispute that, if allowed, mitigation evidence belongs in Phase 2. Nor do Defendants address the three types of evidence the motion concerns. Instead, Defendants make four arguments:

1. Defendants argue that the existence of non-certified eggs bears on whether the Defendants restrained trade. Dkt. 404, 2-3. Plaintiffs have not sought to exclude testimony that

not every egg was certified. The evidence will show that the conspiracy was effective in reducing supply and increasing price even though not every egg producer was in it. OPEC has been effective in increasing oil prices even though not every oil producing nation (including the U.S.) is a member.

2. Defendants suggest they intend to cross-examine Dr. Baye on the differences between eggs and egg products. Again, that is not the subject of the mitigation motion, and Dr. Baye has provided the basis for his opinions. *Id*. 3.

3. Defendants suggest that the existence and "the predominant use of grain-based contracts" (an assertion Defendants do not support) somehow distinguishes between egg and egg product markets and "whether Plaintiffs can show injury by relying on the Urner Barry index." *Id*. Plaintiffs address that argument in point 1, below.

4. Defendants argue the fact that Plaintiffs "could have" negotiated different deals is relevant to antitrust injury." *Id*. As we show in point 2, *what happened* is proof of antitrust injury. In this case, the evidence will be that what happened is that Defendants conspired to increase prices and injured Plaintiffs by increasing the prices they actually paid for egg products. What *could have* happened is relevant, if at all, on the issue of mitigation.

**Argument**

1. **The Existence of Grain-Based Contracts Does Not Prove Eggs and Egg Products Are In Different Markets.**

As best we understand it, Defendants argue that what Plaintiffs call mitigation evidence is relevant to show eggs and egg products are in different markets. This is not the subject of disclosed expert proof. Defendants' economic expert, Dr. Walker, did not opine that eggs and egg products were in different markets because of the method in which they were priced. He did not opine the pricing method was relevant to market definition. Dr. Walker did not opine that certified eggs and non-certified eggs were in separate markets or that eggs priced on Urner Barry and eggs priced on

grain-based contracts were separate markets. He only took issue with Dr. Baye's market definitions, and for reasons other than the mitigation-type evidence that Defendants now champion.

The way in which egg products are priced does not alter the market definition.

To understand this point, it is important to realize that "grain-based pricing" is simply a different way to set the price of eggs or egg products. To use an example close to our hearts, law firms provide legal services. Some clients hire our law firm by paying hourly rates, some pay a fixed fee, others pay contingent fees, and some pay a combination of various methods. Yet, each client receives the same product: legal services. The evidence will be that eggs and egg products are priced in various ways. Some buyers pay a fixed fee per unit, some pay a rate that floats with the Urner Barry index, and others pay rates that float with the price of grain, fuel, or other inputs. Some pay a combination. The complexities are endless, limited only by business imagination. And, pricing methods changed over time. Yet regardless of pricing method, consumers get the same product.

Plaintiffs considered and certain Plaintiffs entered into some grain based contracts in and around 2008 and 2009. The documents show, and the testimony will be, that in that time frame, the Urner Barry index was increasing rapidly. Plaintiffs contend that was a result of the conspiracy. *See e.g.,* Plaintiffs Tr. Ex. 482 at p. 23 (Kellogg chart on June 11, 2008 reflecting increasing dried white prices between January 2006 and April 2008) and p. 25 (Kellogg noting "Current low Flock Size," "Historically low dried stocks," "Record high exports" and "Record profits."); Plaintiffs Tr. Ex. 480 at p. 23 (Kellogg chart reflecting increasing prices for various egg products by type and month from January 2006 until May 2008 and reporting "Continued record export demand, retail demand weakening," "2008 production continues ~2% lower than 2007").

3

Despite Plaintiffs' size (and alleged leverage), egg vendors were no longer willing to commit to fixed price contracts, even with companies as large as Plaintiffs. *See id.* at p. 25 (Kellogg was "[s]earching for Suppliers willing to lock price long-term in the face of market volatility"); Plaintiffs Tr. Ex. 490 at p. 8 (Kellogg stating it was "[u]nable to contract long-term, producers demand pricing follow the market"); and Plaintiffs Tr. Ex. 480 at p. 23 (Kellogg reporting "Price volatility preventing long-term, fixed price contracts" and "Evaluating proposal to base price off of grain futures" providing "hedging opportunity, eliminates month-to-month volatility").

Vendors proposed a variety of pricing options based on all sorts of inputs. Even some so-called grain based contracts were linked in part to Urner Barry. *See e.g,* Plaintiffs Tr. Ex. 506 (Nestle email reflecting a wide variety of pricing proposals, including one where "the inputs for the grain based model are Corn, Soybean Meal, Whole Egg, Egg Whites, and Egg Yolk.") In weighing these myriad pricing formulas, Nestle considered the market. Following a "Market Outlook," Nestle stated its best proposed "Strategy" "[m]oving into 2009 … is through formula pricing, unless there is an extremely attractive fixed price." Nestle thought "[l]ower input costs, increasing supplies, and general economic weakness support lower egg values in 2009." *Id*. That prediction was incorrect. Plaintiffs made different choices – some Plaintiffs, such as Kellogg, which is adept at purchasing grain and can hedge its grain costs, adopted a grain based pricing model. At times, even contracts providing grain based pricing were tied to the Urner Barry index in part. Plaintiffs Trial Ex. 344. Kellogg's Master Agreement with Michael Foods for a three-year term reflected a formula that included both grain based and Urner Barry pricing. Nestle analyzed the market and reached its own conclusion based on its business judgment on where the market would move. Plaintiffs Trial Ex. 506 at p. 3.

This varied experienced supports the following conclusions:
- The egg market reflected many pricing models;

4

- Grain based pricing was one way customers tried to respond to the conspiracy-increased prices;
- Even grain based pricing models were often based on the price of eggs;
- Grain based pricing can be higher or can be lower than the Urner Barry index, depending on the contract variations and the relevant grain market.

None of this establishes that an egg product sold under one pricing method is in a different product market than an egg sold in a different manner. Instead, the evidence Defendants seek to introduce is intended to blame Plaintiffs for not mitigating and to make the effect of the conspiracy more complicated than it was. Neither justification is proper.

**2. Evidence of What Plaintiffs Could Have Done Is Mitigation Evidence.**

Defendants' final argument is that Plaintiffs had "greater bargaining power and ***could have*** negotiated fixed-cost or grain-based contracts," which they claim is relevant to antitrust injury. Dkt. 404 at 3, emph. added. They also argue "Plaintiffs had the option of negotiating" contracts not tied to Urner Barry, but ***chose to do so anyway***. The Defendants claim if Plaintiffs "could have" purchased eggs in other ways, they have no injury. *Id*. at 8, emph. added. By speaking in terms of what Plaintiffs could have done, Defendants ignore the injury that actually occurred. There are several problems with this argument.

First, it is a mitigation argument. Defendants do not claim Plaintiffs were not injured, they only claim they could have reduced their injury by altering their behavior. In other words, Plaintiffs could have mitigated their damages.

Second, it proves too much. Unless a conspiracy has 100% of the market, the claim can always be made that plaintiffs should have figured it out and gone elsewhere. This argument runs head first into the authority Defendants ignore. As Plaintiffs proved in their motion, in a horizontal conspiracy, effects on the market price of a commodity affect all buyers, regardless of whom they

5

buy from. As a result, "antitrust injury occurs the moment the purchaser incurs an overcharge ... [a]nd in a price-fixing conspiracy, the amount of damages is established by the amount of the overcharge." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 684 (N.D. Ga. 2016).

Third, it is speculative. There is no evidence in this case that Plaintiffs could have replaced their entire purchases at lower costs. If there is such evidence, that is a mitigation argument for Phase 2, if at all.

### 4. There Will Be Some Testimony About Plaintiffs' Actual Contracting Experiences.

In his injury and particularly his damage testimony, Dr. Baye filters out damages Plaintiffs incurred due to things other than the price of eggs. Representatives of the Plaintiffs will testify about what they observed in the market, what options they faced, and what they did in response to market developments. That testimony will undoubtedly mention the different ways in which the specific products were priced, bought, and sold. Defendants are aware of that testimony. But neither their deposition designations nor cross examination should suggest that these Plaintiffs could have mitigated their damages. Similarly, Defendants may not offer testimony, at least in Phase 1, about pricing models and alternatives to infer that the Plaintiffs are responsible for their injuries.

### Conclusion

For the foregoing reasons, the Court should bar Defendants from presenting evidence or argument suggesting Plaintiffs should have reduced the amount of damage they suffered through different behavior. In the alternative, any such mitigation evidence and argument should be reserved for Phase 2.

October 25, 2023                              Respectfully submitted.


                                                    *Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company*

                                                    /s/ *Brandon D. Fox*
Brandon D. Fox
Amy M. Gallegos (*pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com