UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., )<br>)<br>) | |
| ) | |
| Plaintiffs, ) | No. 1:11-cv-08808 |
| ) | |
| v. ) | Judge Steven C. Seeger |
| ) | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. )<br>)<br>)<br>) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
TO EXCLUDE IN-TRIAL EXPANSION OF DEFINED CONSPIRACY**

Defendants contend Plaintiffs have somehow expanded the conspiracy through evidence presented at trial, and they seek relief limiting the conspiracy to the Defendants and those co-conspirators Plaintiffs addressed in opening statements and in particular trial examinations. Defendants' motion misstates the law of conspiracy and the evidence in this case. In opposition to Defendants' motion, Plaintiffs correct several statements Defendants make about the history of the case and further demonstrate that Defendants are not entitled to relief.

*Background*

***Defendants Have Consistently Described A Broad Conspiracy***. From the filing of their Complaint to the present, Plaintiffs have alleged a conspiracy that involves far more than the Defendants who remain before the Court in this trial. Defendants' motion recognizes this much. They acknowledge that the Second Amended Complaint alleged claims against 17 co-conspirators. They recite that after the filing of that lawsuit, named defendants were voluntarily dismissed through settlements or for other reasons. While the Complaint identified 17 conspirators, the

Complaint alleged that the conspiracy went beyond even those entities and that other unnamed persons and companies participated in the alleged conspiracy.  Dkt. 417 3-4.

The case has narrowed from the initial pleading.  Plaintiffs have chosen to focus in this lawsuit, and particularly at trial, on those Defendants and co-conspirators who participated in the unlawful conspiracy and who sold eggs to Plaintiffs.  That reflects a decision on how best to prove the case against the remaining defendants, not a narrowing of the alleged conspiracy.  Addressing other entities would prolong the trial and confuse the jury.  Proving, for example, that Wilcox Farms, whose executive headed up key UEP committees and participated in the restrictive programs, was a conspirator would not influence the damages in the case, as Plaintiffs did not purchase from Wilcox Farms.  The same is true of NuCal Foods and many others.  Proof against these producers is unnecessary to prove the broader conspiracy. Plaintiffs made a strategic choice, as is their right, to focus on those entities whose actions result in the damages claimed by Plaintiffs.

***Plaintiffs' Claims In This Case Have Been Consistent With That Decision***.  Plaintiffs have given Defendants fair notice that they intend to pursue relief against Defendants and complain of the conduct of specific co-conspirators, but that does not mean that every other participant in the UEP Certified program is blameless.  Nor have Plaintiffs ever suggested the other producers are blameless.

Defendants point to the *Santiago* proffer, for example, but in that proffer Plaintiffs made their position clear. In the proffer, Plaintiffs sought to establish the existence of a prima facie case of liability against the Defendants and certain co-conspirators whose conduct would be at issue in this trial.  The purpose of that proffer was to demonstrate that certain statements were not hearsay within the co-conspirator rule so that the testimony could be admitted.  (Dkt. 164 at 4.)  Plaintiffs did not suggest the few conspirators that would be the subject of the trial were the only conspiracy

participants. Instead, Plaintiffs focused on the evidence they intended to present at trial as would be necessary to prove the existence of the conspiracy that damaged Plaintiffs.

In their response, Defendants made a claim similar to the argument they raise here. (*See* Dkt. 203 at 4 ("Plaintiffs should have alleged that all 200+ members of UEP and all 50+ members of USEM were coconspirators. Plaintiffs have not.").) Plaintiffs explained in reply that it did not matter they only proved that certain entities were participants in the conspiracy. (Dkt. 239 at 10-11.) Plaintiffs stated "[w]hile there were other participants in the UEP Certified Program, there is no reason for Plaintiffs to spend a moment establishing them as co-conspirators." Plaintiffs explained that they did not address them in the *Santiago* proffer briefing because they "are neither suing them nor seeking to use their statements against Defendants." *(Id*. at 10.) Plaintiffs also explained that not asserting claims against the other producers does not mean that they are not members of the conspiracy. It is well established that a plaintiff (or the Government when in a similar position to Plaintiffs here) does not need to charge or allege the participation of all conspirators—in fact, a defendant "can be convicted of a conspiracy with an unnamed person." (*Id.* (quoting *United States v. Wells*, 646 F.3d 1097, 1103 (8th Cir. 2011) (affirming conviction where government did not charge all coconspirators)).)[1]

***A Jury May Find that Agreeing to Take Part in the UEP Certified Program Alone is Sufficient to Determine that a Producer was a Co-Conspirator***. Defendants make the conclusory and baseless claim that an egg producer did not become a member solely by participating in the UEP certified program. Yet if an egg producer agreed to join the program understanding that it

---

[1] Defendants made this same argument to the MDL Court, which rejected the argument, noting that "[a]lthough the Court certainly d[id] not find that all UEP members were necessarily members of the conspiracy, the [plaintiffs] ha[d] established that at least some were," which the MDL Court found sufficient to support the admission of co-conspirator hearsay. *Processed Egg Prod.*, 2019 WL 5656101, at *19.

was intended to restrict supply, the mere joining of the program would be sufficient conduct for a jury to find the producer was a co-conspirator. The same is true for the short-term measures and export program.

### *The Court Should Deny Defendants' Motion*

1. *A Plaintiff Is Not Required To Sue All members Of A Conspiracy*.

It is well established that a plaintiff bringing a conspiracy action may choose the defendants the plaintiff intends to sue and the co-conspirators plaintiff intends to address. The plaintiff need not sue every member of the conspiracy, or even introduce proof as to every member of the conspiracy. *See In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2011 WL 3300577, at *2 (E.D. Tenn. Aug. 1, 2011) ("It is not at all unusual for some, but not all, of the alleged coconspirators to be on trial while others have settled or entered guilty pleas. The Court will simply instruct the jury, both preliminarily and as part of the final instructions, that there is no requirement in a conspiracy case that all alleged coconspirators be tried in the same proceeding in one trial."). Consistent with that law, Plaintiffs narrowed their case and they have only sued certain Defendants, but that does not mean others are blameless.

To suggest that entities that are not before the Court are innocent, as Defendants suggest, would run afoul of established law. Plaintiffs have settled with certain defendants. Other former defendants have not even been mentioned in this case. Defendants suggest that those parties are blameless. Yet that inference is contrary to the facts, as Defendants surely know. To address this factual issue would improperly raise questions about those settlements, yet a jury cannot speculate as to why other potential conspirators were not sued or are no longer in the case. *Cf. United States v. Barrientos*, 758 F.2d 1152, 1156-57 (7th Cir. 1985) (affirming use of instruction that jury should not speculate as to why a defendant is not before them because the jury's "singular focus" should be on "the remaining defendant's guilt or innocence.")

### 2. *Plaintiffs Have Already Proven The Breadth of the Conspiracy*

Plaintiffs have proven the conspiracy reaches far beyond the particular Defendants, starting with the fact that the Plaintiffs have sued the UEP and the USEM. The evidence shows that the practices challenged in this suit were adopted by the UEP and enforced upon its members, whether they were named as defendants or coconspirators. The role of these associations proves the conspiracy affected more than the five producers Plaintiffs have sued or named as coconspirators.

In a similar case involving an association, the Supreme Court made clear that it is appropriate in measuring the economic impact of a conspiracy involving an association to look to the effect of the association's action. In *NCAA v. Bd. of Regents*, 468 U.S. 85 (1984) (footnotes omitted, emphasis added), the Court stated that the challenged practice of the NCAA impacted the market through all of its members:

> It is also undeniable that these practices share characteristics of restraints we have previously held unreasonable. **The NCAA is an association of schools which compete against each other to attract television revenues, not to mention fans and athletes. As the District Court found, the policies of the NCAA with respect to television rights are ultimately controlled by the vote of member institutions. By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another**. A restraint of this type has often been held to be unreasonable as a matter of law. Because it places a ceiling on the number of games member institutions may televise, the horizontal agreement places an artificial limit on the quantity of televised football that is available to broadcasters and consumers. By restraining the quantity of television rights available for sale, the challenged practices create a limitation on output; our cases have held that such limitations are unreasonable restraints of trade. Moreover, the District Court found that the minimum aggregate price in fact operates to preclude any price negotiation between broadcasters and institutions, thereby constituting horizontal price fixing, perhaps the paradigm of an unreasonable restraint of trade.

*Id*. at 99-100. The Court found that the Association had market power, thus impacting the entire industry. The Seventh Circuit explained how this same principle applied to a trade association. *See Vogel v. American Society of Appraisers*, 744 F.2d 598, 604 (7th Cir. 1984) (plaintiff could prove a trade association's market power by showing that the association's "members as a group have a

5

substantial share of the market"); *United States v. Realty Multi-List*, 629 F.2d 1351, 1374 (5th Cir. 1980) (association had market power where members constituted a majority of active real estate brokers in relevant area); *Moehrl v. National Association of Realtors*, 492 F. Supp. 3d 768, 779 (N.D. Ill. 2020) (claim that corporate defendant required others to join the association "*gives them the power to impose the NAR's rules upon the entire industry*" (emphasis added)).

Here, the evidence likewise shows that UEP and USEM conspired with its members and others to limit egg supply. That fact is sufficient to implicate the industry-wide consequences of the UEP's actions. Two such members are Rose Acre and Cal Maine—but there were others who also participated in and benefited from the programs that UEP and USEM sponsored and that form the core of the conspiracy. The Certified Program was designed to use a purported hen welfare program to limit egg supply and raise egg prices, which it did. Defendants Cal-Maine and Rose Acre were instrumental in guiding the design and operation of the Certified Program to achieve those anticompetitive effects. The Defendants and other co-conspirators in this case caused the antitrust injury to Plaintiffs which is the focus here.

### 3. *Plaintiffs' Position Does Not Affect the Definition of the Relevant Market*.

Defendants next argue that further specification is needed to define the relevant market or, more appropriately, to prove the conspiracy had market power within the relevant market.

*First*, market power is relevant in this case only if it is as tried as a rule of reason case. It is not relevant to a per se case. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

*Second*, even in a rule of reason case, proof of market power is not necessary. Market power is an indirect way to prove the existence of injury. In fact, market power is defined as the ability to cause an antitrust injury. The Supreme Court has held that a plaintiff need not prove market power, even in a rule of reason case, where the anticompetitive impact is proven. In *Federal*

*Trade Comm'n v. Indiana Federation of Dentists*, the Court evaluated a conspiracy among dentists to withhold x-rays from insurers. 476 U.S. 447 (1986). The defendants argued the FTC's failure to engage in a market power analysis was fatal to its finding of a violation under the rule of reason. *Id*. at 460. The Supreme Court rejected this argument, finding that proof of "actual, sustained adverse effects on competition" in those areas in which the Defendants operated was sufficient to support a finding that the restraint was unreasonable. *Id.* at 460-61. Where Plaintiff establishes the anticompetitive effect, proof of market power to demonstrate the anticompetitive effect could occur is unnecessary. *Id.* at 461.

In this case, Dr. Baye's analysis shows the existence of injury, making separate proof of market power irrelevant. His analysis demonstrates an increase in price above the "but for" world during the conspiracy period. The ability to maintain an elevated price is direct proof of market power. If non-conspirators had the ability to increase output to offset the restrictive conduct by the co-conspirators, Defendants would not have been able to maintain the elevated price Dr. Baye has observed.

*Third*, to the extent proof of market power is needed, the record contains that evidence. Defendants demonstrated the conspirators Plaintiffs chose to sue controlled the UEP (as well as the USEM which UEP controlled). They were instrumental in the UEP actions and decisions. Through their conspiratorial actions, they controlled the actions of other egg producers in the UEP. The evidence has shown that up to 95% of egg production was within the UEP certified program. Producers owning more than half of the egg-laying flocks in the United States participated in USEM exports. There were times when the *United Voices* tracked the large numbers of producers, with corresponding large flock sizes, who had signed up for the short-term measures. The conspiracy was effective because these Defendants and their named co-conspirators directed

policy and controlled the actions of egg producers, resulting in an increase in price. No more proof, or specification of conspirators, is needed.

Defendants suggest the existence of non-conspirators, whose ability to influence the market was sufficient to counteract any conspiratorial overcharge. While that is an interesting theory, it is unsupported by data. There is no evidence that egg producers not in the conspiracy operated to counteract the conspiratorial overcharge.

4. *Plaintiffs' Evidence Demonstrates They Were Injured By The Conspiracy*.

Defendants' final argument is that greater specificity in the definition of conspiracy is needed to show injury and causation. Again, Dr. Baye's testimony demonstrates the existence of injury. That injury is traceable to the UEP program, originated and sponsored by one of the core conspirators—UEP itself. He then ties the inflated price caused by the restrictive measures to purchases made by Plaintiffs from Rose Acre, Michael Foods, and Wabash Valley. Dr. Baye's regression analysis eliminates other potential causes of that injury. No greater proof is needed. Defendants are not left with a moving target. They know exactly which target to shoot at.

### Conclusion

For the foregoing reasons, Defendants' motion, which misapprehends the claims in this case and the theories Plaintiffs have consistently pursued, should be denied.

October 30, 2023

Respectfully submitted.

*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company*

 /s/ *Brandon D. Fox*
Brandon D. Fox
Amy M. Gallegos (*pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071

Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com

James T. Malysiak
Joel T. Pelz
Andrianna D. Kastanek
Angela M. Allen
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
jmalysiak@jenner.com
jpelz@jenner.com
akastanek@jenner.com
aallen@jenner.com