# Exhibit 2

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

108 S.Ct. 1931
Supreme Court of the United States

ALLIED TUBE & CONDUIT CORPORATION,
Petitioner
v.
INDIAN HEAD, INC.

No. 87–157
|
Argued Feb. 24, 1988.
|
Decided June 13, 1988.

**Synopsis**
Manufacturer of polyvinyl chloride electrical conduits brought antitrust action against manufacturer of steel electrical conduits, for conspiring to prevent inclusion of polyvinyl chloride conduit in industry standards. The United States District Court for the Southern District of New York, John E. Sprizzo, J., entered judgment notwithstanding verdict in favor of steel conduit manufacturer, and polyvinyl chloride conduit manufacturer appealed. The Court of Appeals, 817 F.2d 938, vacated and remanded, and certiorari was granted. The United States Supreme Court, Justice Brennan, held that efforts to influence setting of private association's product standards, which were routinely adopted by state and local governments, did not qualify for *Noerr* immunity.

Affirmed.

Justice White filed dissenting opinion in which Justice O'Connor joined.

**Procedural Posture(s):** On Appeal.

West Headnotes (15)

[1]  **Antitrust and Trade Regulation**
Petitioning government

Concerted efforts to restrain or monopolize trade by petitioning government officials are protected under *Noerr-Pennington* antitrust immunity doctrine.

68 Cases that cite this headnote

[2]  **Antitrust and Trade Regulation**
Efforts to Influence Government Action

Scope of protection under *Noerr-Pennington* doctrine depends on source, context and nature of anticompetitive restraint at issue.

70 Cases that cite this headnote

[3]  **Antitrust and Trade Regulation**
Petitioning government

Those urging governmental action, as opposed to private action, that results in restraint of trade or monopolization enjoy absolute immunity from antitrust liability for anticompetitive restraints. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

39 Cases that cite this headnote

[4]  **Antitrust and Trade Regulation** State Action

Anticompetitive restraint resulting directly from private action cannot form basis for antitrust liability when such restraint is incidental to valid effort to influence governmental action; validity of such effort and thus applicability of *Noerr* immunity varies with context and nature of activity. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

63 Cases that cite this headnote

[5]  **Antitrust and Trade Regulation** State Action

Publicity campaign directed at general public, seeking legislation or executive action, enjoys antitrust immunity, even when campaign employs unethical and

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 3 of 19 PageID #:19080

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

deceptive methods. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

18 Cases that cite this headnote

[6] **Antitrust and Trade Regulation** State Action

Private action that is not genuinely aimed at procuring favorable government action is mere sham, rather than valid effort to influence government action, and thus does not qualify for *Noerr* antitrust immunity. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

74 Cases that cite this headnote

[7] **Antitrust and Trade Regulation** Antitrust Law and Trade and Professional Associations

Concerted efforts to enforce private product standards face more rigorous antitrust scrutiny than rule of reason analysis applicable to concerted efforts to agree upon private product standards. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

12 Cases that cite this headnote

[8] **Antitrust and Trade Regulation** Political subdivisions; municipalities

Private association responsible for setting and publishing product standards and codes related to fire protection was not "quasi-legislative" body, for purposes of *Noerr* antitrust immunity doctrine, even though legislatures routinely adopted private association's product standards; no official authority had been conferred on private association by any government and decision-making body of association was composed, at least in part, of persons with economic incentive to restrain trade. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

51 Cases that cite this headnote

[9] **Antitrust and Trade Regulation** Political subdivisions; municipalities

*Noerr* doctrine does not immunize from antitrust liability every concerted effort that is generally intended to influence governmental action. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

12 Cases that cite this headnote

[10] **Antitrust and Trade Regulation** Political subdivisions; municipalities

Application of *Noerr* immunity to anticompetitive activity intended to influence the government depends not only on impact of activity, but also on context and nature of activity. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

6 Cases that cite this headnote

[11] **Antitrust and Trade Regulation** Political subdivisions; municipalities

Sham exception to *Noerr* antitrust immunity doctrine covers activity not genuinely intended to influence governmental action, rather than activity of defendant who genuinely seeks to achieve his governmental result, but through improper means. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

59 Cases that cite this headnote

[12] **Antitrust and Trade Regulation** State Action

Outside of political context, mere fact that anticompetitive activity is also intended to influence governmental action is not alone sufficient to render such activity immune from antitrust liability. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

3 Cases that cite this headnote

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 4 of 19 PageID #:19081

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

[13] **Antitrust and Trade Regulation**
Antitrust Law and Trade and Professional Associations

Private trade association cannot validate anticompetitive activities of its members simply by adopting rule that fails to provide such safeguards. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

4 Cases that cite this headnote

[14] **Antitrust and Trade Regulation**
Efforts to Influence Government Action

Economically interested party that exercises decision-making authority in formulating product standard for private association that comprises market participants enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

28 Cases that cite this headnote

[15] **Antitrust and Trade Regulation** State Action

Steel electrical conduit manufacturer's admitted attempts to influence private electrical standard-setting organization with respect to proposal to include polyvinyl chloride conduit in industry standards were not protected from Sherman Act scrutiny under *Noerr* immunity doctrine, which protected petitioning of government, even though state and local governments routinely incorporated organization's product standards into their legal codes; anticompetitive activity did not take place in open political arena, but rather, within confines of private standard-setting process, and agreement to exclude polyvinyl chloride conduit from standards was in part an implicit agreement not to trade in that type of electrical conduit. Sherman Anti-Trust Act, § 1, 15 U.S.C.A.

§ 1.

77 Cases that cite this headnote

**\*\*1933 \*492** *Syllabus*[*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

The National Fire Protection Association—a private organization that includes members representing industry, labor, academia, insurers, organized medicine, firefighters, and government—sets and publishes product standards and codes related to fire protection. Its National Electrical Code (Code), which establishes requirements for the design and installation of electrical wiring systems, is routinely adopted into law by a substantial number of state and local governments, and is widely adopted as setting acceptable standards by private product-certification laboratories, insurance underwriters, and electrical inspectors, contractors, and distributors. Throughout the relevant period, the Code permitted the use of electrical conduit made of steel. Respondent, a manufacturer of plastic conduit, initiated a proposal before the Association to extend Code approval to plastic conduit as well. The proposal was approved by one of the Association's professional panels, and thus could be adopted into the Code by a simple majority of the members attending the Association's 1980 annual meeting. Before the meeting was held, petitioner, the Nation's largest producer of steel conduit, members of the steel industry, other steel conduit manufacturers, and independent sales agents collectively agreed to exclude respondent's product from the 1981 Code by packing the annual meeting with new Association members whose only function was to vote against respondent's proposal. After the proposal was defeated at the meeting and an appeal to

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

the Association's Board of Directors was denied, respondent brought suit in Federal District Court, alleging that petitioner and others had unreasonably restrained trade in the electrical conduit market in violation of § 1 of the Sherman Act. The jury found petitioner liable, but the court granted a judgment n.o.v. for petitioner, reasoning that it was entitled to antitrust immunity under the doctrine of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. The Court of Appeals reversed.

*Held: Noerr* antitrust immunity does not apply to petitioner. Pp. 1936–1941.

(a) The scope of *Noerr* protection depends on the source, context, and nature of the anticompetitive restraint at issue. Where a restraint is the result of valid governmental action, as opposed to private action, **\*493** those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint. In this case, the relevant context is the standard-setting process of a private association without official authority that includes members having horizontal and vertical business relations and economic incentives to restrain competition. Such an association cannot be treated as a "quasi-legislative" body simply because legislatures routinely adopt its Code, and thus petitioner does not enjoy the immunity afforded those who merely urge the government to restrain trade. Pp. 1936–1938.

(b) Nor does *Noerr* immunity apply to petitioner on the theory that the exclusion of plastic conduit from the Code, and the effect that exclusion had of its own force in the marketplace, were incidental to a valid effort to influence governmental action. Although, because a large number of governments routinely adopt the Code into law, efforts to influence the Association's standard-setting process are arguably the most effective means of influencing legislation regulating electrical conduit, and although *Noerr* immunity is not limited to **\*\*1934** "direct" petitioning of government officials, the *Noerr* doctrine does not immunize every concerted activity that is genuinely intended to influence governmental action. There is no merit to the argument that, regardless of the Association's nonlegislative status, petitioner's efforts to influence the Association must be given the same wide berth accorded legislative lobbying or efforts to influence legislative action in the political arena. Pp. 1938–1940.

(c) Unlike the publicity campaign to influence legislation in *Noerr,* petitioner's activity did not take place in the open political arena, where partisanship is the hallmark of decisionmaking, but took place within the confines of a private standard-setting process. The validity of petitioner's efforts to influence the Code is not established, without more, by petitioner's literal compliance with the Association's rules, for the hope of the Code's procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition. An association cannot validate the anticompetitive activities of its members simply by adopting rules that fail to provide such safeguards. At least where, as here, an economically interested party exercises decisionmaking authority in formulating a product standard for a private association that comprises market participants, that party enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace. Pp. 1949–1941.

817 F.2d 938 (CA2 1987), affirmed.

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and MARSHALL, BLACKMUN, STEVENS, SCALIA, and KENNEDY, JJ., **\*494** joined. WHITE, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post,* p. ——.

**Attorneys and Law Firms**

Marvin E. Frankel argued the cause for petitioner. With him on the briefs were Robert M. Heller, Arthur B. Kramer, and Debora K. Grobman.

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 6 of 19 PageID #:19083

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

Fredric W. Yerman argued the cause for respondent. With him on the brief were Michael Malina, Randolph S. Sherman, and Richard A. De Sevo.\*

\* Briefs of amici curiae urging reversal were filed for the State of Illinois by Neil F. Hartigan, Attorney General, and Robert E. Davy, Jr., Assistant Attorney General; and for the Western Fire Chiefs Association et al. by William J. Meeske and Alexander D. Thomson.

Briefs of amici curiae urging affirmance were filed for the United States et al. by Solicitor General Fried, Assistant Attorney General Rule, Deputy Solicitor General Cohen, Deputy Assistant Attorney General Starling, Paul J. Larkin, Jr., Robert B. Nicholson, John J. Powers III, Marion L. Jetton, Robert D. Paul, and Ernest J. Isenstadt; and for the State of Alaska et al. by Robert Abrams, Attorney General of New York, O. Peter Sherwood, Solicitor General, and Lloyd E. Constantine, Susan Beth Farmer, Elizabeth M. O'Neill, and George W. Sampson, Assistant Attorneys General, Grace Berg Schaible, Attorney General of Alaska, Richard D. Monkmon, Assistant Attorney General, Robert K. Corbin, Attorney General of Arizona, John Steven Clark, Attorney General of Arkansas, Jeffrey A. Bell, Deputy Attorney General, John Van de Kamp, Attorney General of California, Andrea Ordin, Chief Assistant Attorney General, Thomas P. Dove, Deputy Attorney General, Duane Woodard, Attorney General of Colorado, Thomas P. McMahon, First Assistant Attorney General, Joseph I. Lieberman, Attorney General of Connecticut, Robert M. Langer, Assistant Attorney General, Warren Price III, Attorney General of Hawaii, Robert A. Marks, Supervising Deputy Attorney General, Thomas J. Miller, Attorney General of Iowa, John Perkins, Deputy Attorney General, James E. Tierney, Attorney General of Maine, Stephen L. Wessler, Assistant Attorney General, J. Joseph Curran, Jr., Attorney General of Maryland, Michael F. Brockmeyer, Assistant Attorney General, Frank J. Kelley, Attorney General of Michigan, Louis J. Caruso, Solicitor General, Robert C. Ard, Jr., Assistant Attorney General, Hubert H. Humphrey III, Attorney General of Minnesota, Cary Edwards, Attorney General of New Jersey, Laurel A. Price, Deputy Attorney General, Lacy H. Thornburg, Attorney General of North Carolina, Richard H. Carlton, Assistant Attorney General, Anthony J. Celebrezze, Jr., Attorney General of Ohio, Dave Frohnmayer, Attorney General of Oregon, LeRoy S. Zimmerman, Attorney General of Pennsylvania, Eugene F. Wayne, Chief Deputy Attorney General, James E. O'Neil, Attorney General of Rhode Island, Roger A. Tellinghuisen, Attorney General of South Dakota, Jim Mattox, Attorney General of Texas, Mary F. Keller, Executive Assistant Attorney General, John J. White, Assistant Attorney General, David L. Wilkinson, Attorney General of Utah, Kenneth O. Eikenberry, Attorney General of Washington, John R. Ellis, Deputy Attorney General, Tina Kondo, Assistant Attorney General, Charles G. Brown, Attorney General of West Virginia, Mark D. Kindt, Deputy Attorney General, Donald J. Hanaway, Attorney General of Wisconsin, and Kevin J. O'Connor, Assistant Attorney General.

**Opinion**

**\*495** Justice BRENNAN delivered the opinion of the Court.

Petitioner contends that its efforts to affect the product standard-setting process of a private association are immune from antitrust liability under the *Noerr* doctrine primarily because the association's standards are widely adopted into law by state and local governments. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (Noerr). The United States Court of Appeals for the Second Circuit held that *Noerr* immunity did not apply. We affirm.

I

The National Fire Protection Association (Association) is a private, voluntary organization with more than 31,500 individual and group members representing industry, labor, academia, insurers, organized medicine, firefighters, and government. The Association, among other things, publishes product standards and codes related to fire protection through

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 7 of 19 PageID #:19084

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

a process known as "consensus standard making." One of the codes it publishes is the National Electrical Code (Code), which establishes product and performance requirements for the design and installation of electrical wiring systems. Revised every three years, the Code is the most influential electrical code in the nation. A substantial number of state and local governments routinely adopt the Code into law with little or no change; private certification laboratories, such as Underwriters Laboratories, normally will not list and label **\*496** an electrical product that does not meet Code standards; many underwriters will refuse to insure structures that are not built in conformity with the Code; and many electrical inspectors, contractors, and distributors will not use a product that falls outside the Code.

**\*\*1935** Among the electrical products covered by the Code is electrical conduit, the hollow tubing used as a raceway to carry electrical wires through the walls and floors of buildings. Throughout the relevant period, the Code permitted using electrical conduit made of steel, and almost all conduit sold was in fact steel conduit. Starting in 1980, respondent began to offer plastic conduit made of polyvinyl chloride. Respondent claims its plastic conduit offers significant competitive advantages over steel conduit, including pliability, lower installed cost, and lower susceptibility to short circuiting. In 1980, however, there was also a scientific basis for concern that, during fires in high-rise buildings, polyvinyl chloride conduit might burn and emit toxic fumes.

Respondent initiated a proposal to include polyvinyl chloride conduit as an approved type of electrical conduit in the 1981 edition of the Code. Following approval by one of the Association's professional panels, this proposal was scheduled for consideration at the 1980 annual meeting, where it could be adopted or rejected by a simple majority of the members present. Alarmed that, if approved, respondent's product might pose a competitive threat to steel conduit, petitioner, the Nation's largest producer of steel conduit, met to plan strategy with, among others, members of the steel industry, other steel conduit manufacturers, and its independent sales agents. They collectively agreed to exclude respondent's product from the 1981 Code by packing the upcoming annual meeting with new Association members whose only function would be to vote against the polyvinyl chloride proposal.

Combined, the steel interests recruited 230 persons to join the Association and to attend the annual meeting to **\*497** vote against the proposal. Petitioner alone recruited 155 persons—including employees, executives, sales agents, the agents' employees, employees from two divisions that did not sell electrical products, and the wife of a national sales director. Petitioner and the other steel interests also paid over $100,000 for the membership, registration, and attendance expenses of these voters. At the annual meeting, the steel group voters were instructed where to sit and how and when to vote by group leaders who used walkie-talkies and hand signals to facilitate communication. Few of the steel group voters had any of the technical documentation necessary to follow the meeting. None of them spoke at the meeting to give their reasons for opposing the proposal to approve polyvinyl chloride conduit. Nonetheless, with their solid vote in opposition, the proposal was rejected and returned to committee by a vote of 394 to 390. Respondent appealed the membership's vote to the Association's Board of Directors, but the Board denied the appeal on the ground that, although the Association's rules had been circumvented, they had not been violated.[1]

[1] Respondent also sought a tentative interim amendment to the Code, but that was denied on the ground that there was not sufficient exigency to merit an interim amendment. The Association subsequently approved use of polyvinyl chloride conduit for buildings of less than three stories in the 1984 Code, and for all buildings in the 1987 Code.

In October 1981, respondent brought this suit in Federal District Court, alleging that petitioner and others had unreasonably restrained trade in the electrical conduit market in violation of § 1 of the Sherman Act. 26 Stat. 209, 15 U.S.C. § 1. A

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 8 of 19 PageID #:19085

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

bifurcated jury trial began in March 1985. Petitioner conceded that it had conspired with the other steel interests to exclude respondent's product from the Code and that it had a pecuniary interest to do so. The jury, instructed under the rule of reason that respondent carried the burden of showing that the anticompetitive effects of petitioner's actions outweighed any procompetitive benefits of standard *498 setting, found petitioner liable. In answers to special interrogatories, the jury found that petitioner did not violate any rules of the Association and acted, at least in part, based on a genuine belief that plastic conduit was unsafe, but that petitioner nonetheless **1936 did "subvert" the consensus standard-making process of the Association. App. 23–24. The jury also made special findings that petitioner's actions had an adverse impact on competition, were not the least restrictive means of expressing petitioner's opposition to the use of polyvinyl chloride conduit in the marketplace, and unreasonably restrained trade in violation of the antitrust laws. The jury then awarded respondent damages, to be trebled, of $3.8 million for lost profits resulting from the effect that excluding polyvinyl chloride conduit from the 1981 Code had of its own force in the marketplace. No damages were awarded for injuries stemming from the adoption of the 1981 Code by governmental entities.[2]

[2] Although the District Court was of the view that at trial respondent relied solely on the theory that its injury "flowed from legislative action," App. to Pet. for Cert. 31a, the Court of Appeals determined that respondent was awarded damages *only* on the theory "that the stigma of not obtaining [Code] approval of its products and [petitioner's] 'marketing' of that stigma caused independent marketplace harm to [respondent] in those jurisdictions *permitting* use of [polyvinyl chloride] conduit, as well as those which later adopted the 1984 [Code], which permitted use of [polyvinyl chloride] conduit in buildings less than three stories high. [Respondent] did *not* seek redress for any injury arising from the adoption of the [Code] by the various governments." 817 F.2d 938, 941, n. 3 (1987) (emphasis added). We decide the case as it was framed by the Court of Appeals.

The District Court then granted a judgment n.o.v. for petitioner, reasoning that *Noerr* immunity applied because the Association was "akin to a legislature" and because petitioner, "by the use of methods consistent with acceptable standards of political action, genuinely intended to influence the [Association] with respect to the National Electrical Code, and to thereby influence the various state and local legislative bodies which adopt the [Code]." App. to Pet. for *499 Cert. 28a, 30a. The Court of Appeals reversed, rejecting both the argument that the Association should be treated as a "quasi-legislative" body because legislatures routinely adopt the Code and the argument that efforts to influence the Code were immune under *Noerr* as indirect attempts to influence state and local governments. 817 F.2d 938 (1987). We granted certiorari to address important issues regarding the application of *Noerr* immunity to private standard-setting associations.[3] 484 U.S. 814, 108 S.Ct. 65, 98 L.Ed.2d 29 (1987).

[3] We also granted certiorari on the issue whether, if not immune under *Noerr,* petitioner's conduct violated the Sherman Act, but we now vacate our grant of that issue as improvident.

II

[1] [2] [3] [4] [5] [6] Concerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the doctrine established by *Noerr; Mine Workers v. Pennington,* 381 U.S. 657, 669–672, 85 S.Ct. 1585, 1593–1595, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The scope of this protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue. "[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 9 of 19 PageID #:19086

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

private action," those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint. *Noerr,* 365 U.S., at 136, 81 S.Ct., at 529; see also *Pennington, supra,* 381 U.S., at 671, 85 S.Ct., at 1594. In addition, where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is "incidental" to a valid effort to influence governmental action. *Noerr, supra,* 365 U.S., at 143, 81 S.Ct., at 532–533. The validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity. A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even **1937 when the campaign employs unethical *500 and deceptive methods. *Noerr, supra,* 365 U.S., at 140–141, 81 S.Ct., at 531. But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.[4] *California Motor Transport, supra,* 404 U.S., at 512–513, 92 S.Ct., at 612.

[4] Of course, in whatever forum, private action that is not genuinely aimed at procuring favorable government action is a mere sham that cannot be deemed a valid effort to influence government action. *Noerr,* 365 U.S., at 144, 81 S.Ct., at 533; *California Motor Transport,* 404 U.S., at 511, 92 S.Ct., at 612.

[7] In this case, the restraint of trade on which liability was predicated was the Association's exclusion of respondent's product from the Code, and no damages were imposed for the incorporation of that Code by any government. The relevant context is thus the standard-setting process of a private association. Typically, private standard-setting associations, like the Association in this case, include members having horizontal and vertical business relations. See generally 7 P. Areeda, Antitrust Law ¶ 1477, p. 343 (1986) (trade and standard-setting associations routinely treated as continuing conspiracies of their members). There is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm.[5] See *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 571, 102 S.Ct. 1935, 1945, 72 L.Ed.2d 330 (1982). Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny. See, *e.g., ibid.; Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam). See also *501 *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). When, however, private associations promulgate safety standards based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition, cf. *Hydrolevel, supra,* 456 U.S., at 570–573, 102 S.Ct., at 1944–1946 (noting absence of "meaningful safeguards"), those private standards can have significant procompetitive advantages. It is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations.[6]

[5] "Product standardization might impair competition in several ways.... [It] might deprive some consumers of a desired product, eliminate quality competition, exclude rival producers, or facilitate oligopolistic pricing by easing rivals' ability to monitor each other's prices." 7 P. Areeda, Antitrust Law ¶ 1503, p. 373 (1986).

[6] See 2 J. von Kalinowski, Antitrust Laws and Trade Regulation §§ 6I.01 [3], 6I.03, 6I.04, pp. 6I–6 to 6I–7, 6I–18 to 6I–29 (1981) (collecting cases). Concerted efforts to *enforce* (rather than just agree upon) private product standards face more rigorous antitrust scrutiny. See *Radiant Burners, Inc. v. Peoples Gas Light & Coke*

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 10 of 19 PageID #:19087

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

*Co.,* 364 U.S. 656, 659–660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961) (*per curiam*). See also *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

[8] Given this context, petitioner does not enjoy the immunity accorded those who merely urge the government to restrain trade. We agree with the Court of Appeals that the Association cannot be treated as a "quasi-legislative" body simply because legislatures routinely adopt the Code the Association publishes. 817 F.2d, at 943–944. Whatever *de facto* authority the Association enjoys, no official authority has been conferred on it by any government, and the decisionmaking body of the Association is composed, at least in part, of persons with economic incentives to restrain trade. See **1938 *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707–708, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962). See also *id.,* at 706–707, 82 S.Ct., at 1414–1415; *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791–792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975). "We may presume, absent a showing to the contrary, that [a government] acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on his or its own behalf." *Hallie v. Eau Claire,* 471 U.S. 34, 45, 105 S.Ct. 1713, 1719–1720, 85 L.Ed.2d 24 (1985). The dividing line between restraints resulting from governmental action and those resulting from private action *502 may not always be obvious.[7] But where, as here, the restraint is imposed by persons unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition, we have no difficulty concluding that the restraint has resulted from private action.

---

7  See, *e.g., California Motor Transport, supra,* 404 U.S., at 513, 92 S.Ct., at 613 (stating in dicta that "[c]onspiracy with a licensing authority to eliminate a competitor" or "bribery of a public purchasing agent" may violate the antitrust laws); *Mine Workers v. Pennington,* 381 U.S. 657, 671, and n. 4, 85 S.Ct. 1585, 1594, and n. 4, 14 L.Ed.2d 626 (1965) (holding that immunity applied but noting that the trade restraint at issue "was the act of a public official who is not claimed to be a co-conspirator" and contrasting *Continental Ore* ); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707–708, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962); 1 P. Areeda & D. Turner, Antitrust Law ¶ 206 (1978) (discussing the extent to which *Noerr* immunity should apply to commercial transactions involving the government). See also *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791–792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975); *Continental Ore, supra,* 370 U.S., at 706–707, 82 S.Ct., at 1414.

*Noerr* immunity might still apply, however, if, as petitioner argues, the exclusion of polyvinyl chloride conduit from the Code, and the effect that exclusion had of its own force in the marketplace, were incidental to a valid effort to influence governmental action. Petitioner notes that the lion's share of the anticompetitive effect in this case came from the predictable adoption of the Code into law by a large number of state and local governments. See 817 F.2d, at 939, n. 1. Indeed, petitioner argues that, because state and local governments rely so heavily on the Code and lack the resources or technical expertise to second-guess it, efforts to influence the Association's standard-setting process are the most effective means of influencing legislation regulating electrical conduit. This claim to *Noerr* immunity has some force. The effort to influence governmental action in this case certainly cannot be characterized as a sham given the actual adoption of the 1981 Code into a number of statutes and local ordinances. Nor can we quarrel with petitioner's contention that, given the widespread adoption of the Code into *503 law, any effect the 1981 Code had in the marketplace of its own force was, in the main, incidental to petitioner's genuine effort to influence governmental action.[8] And, as petitioner persuasively argues, the claim of *Noerr* immunity cannot be dismissed on the ground that the conduct at issue involved no "direct" petitioning of

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 11 of 19 PageID #:19088

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

government officials, for *Noerr* itself immunized a form of "indirect" petitioning. See *Noerr* (immunizing a publicity campaign directed at the general public on the ground that it was part of an effort to influence legislative and executive action).

[8]   The effect, independent of government action, that the 1981 Code had in the marketplace may to some extent have been exacerbated by petitioner's efforts to "market" the stigma respondent's product suffered by being excluded from the Code. See 817 F.2d, at 941, n. 3. Given our disposition *infra,* we need not decide whether, or to what extent, these "marketing" efforts alter the incidental status of the resulting anticompetitive harm. See generally *Noerr,* 365 U.S., at 142, 81 S.Ct., at 532 (noting that in that case there were "no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers").

[9] [10] Nonetheless, the validity of petitioner's actions remains an issue. We cannot agree with petitioner's absolutist position that the *Noerr* doctrine immunizes every concerted effort that is genuinely intended to influence governmental action. **1939 If all such conduct were immunized then, for example, competitors would be free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports. But see *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456–463, 65 S.Ct. 716, 725–729, 89 L.Ed. 1051 (1945). Horizontal conspiracies or boycotts designed to exact higher prices or other economic advantages from the government would be immunized on the ground that they are genuinely intended to influence the government to agree to the conspirators' terms. But see *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942). Firms could claim immunity for boycotts or horizontal output restrictions on the ground that they are intended to dramatize the plight of their industry and spur legislative action. Immunity might even be **504 claimed for anticompetitive mergers on the theory that they give the merging corporations added political clout. Nor is it necessarily dispositive that packing the Association's meeting may have been the most effective means of securing government action, for one could imagine situations where the most effective means of influencing government officials is bribery, and we have never suggested that that kind of attempt to influence the government merits protection. We thus conclude that the *Noerr* immunity of anticompetitive activity intended to influence the government depends not only on its impact, but also on the context and nature of the activity.

[11] [12] [13] [14] [15] Here petitioner's actions took place within the context of the standard-setting process of a private association. Having concluded that the Association is not a "quasi-legislative" body, we reject petitioner's argument that any efforts to influence the Association must be treated as efforts to influence a "quasi-legislature" and given the same wide berth accorded legislative lobbying. That rounding up supporters is an acceptable and constitutionally protected method of influencing elections does not mean that rounding up economically interested persons to set private standards must also be protected. Nor do we agree with petitioner's contention that, regardless of the Association's nonlegislative status, the effort to influence the Code should receive the same wide latitude given ethically dubious efforts to influence legislative action in the political arena, see *Noerr,* 365 U.S., at 140–141, 81 S.Ct., at 531, simply because the ultimate aim of the effort to influence the private standard-setting process was (principally) legislative action. The ultimate aim is not dispositive. A misrepresentation to a court would not necessarily be entitled to the same antitrust immunity allowed deceptive practices in the political arena simply because the odds were very good that the court's decision would be codified—nor for that matter would misrepresentations made under oath at a legislative committee hearing in the hopes of spurring legislative action.

*505 What distinguishes this case from *Noerr* and its progeny is that the context and nature of petitioner's

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 12 of 19 PageID #:19089

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

activity make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves. True, in *Noerr* we immunized conduct that could be characterized as a conspiracy among railroads to destroy business relations between truckers and their customers. *Noerr, supra,* 365 U.S., at 142, 81 S.Ct., at 532. But we noted there:

> "There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers. Moreover, all the evidence in the record, both oral and documentary, deals with the railroads' efforts to influence the passage and enforcement of laws. Circulars, speeches, newspaper articles, editorials, magazine articles, memoranda and all other documents discuss in one way or another the railroads' charges that heavy trucks injure the roads, violate the laws and create traffic hazards, and urge that truckers should be forced **1940** to pay a fair share of the costs of rebuilding the roads, that they should be compelled to obey the laws, and that limits should be placed upon the weight of the loads they are permitted to carry." 365 U.S., at 142–143, 81 S.Ct., at 532.

In light of those findings, we characterized the railroads' activity as a classic "attempt ... to influence legislation by a campaign of publicity," an "inevitable" and "incidental" effect of which was "the infliction of some direct injury upon the interests of the party against whom the campaign is directed." *Id.,* at 143, 81 S.Ct., at 532–533. The essential character of such a publicity campaign was, we concluded, political, and could not be segregated from the activity's impact on business. Rather, the plaintiff's cause of action simply embraced the inherent possibility in such political fights "that one group or the other will get hurt by the arguments that are made." *Id.,* at 144, 81 S.Ct., at 533. As a political activity, special factors counseled against regulating the publicity campaign under the antitrust laws:

> *506 "Insofar as [the Sherman] Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." *Id.,* 365 U.S., at 140–141, 81 S.Ct., at 531 (footnote omitted).

In *Noerr,* then, the political context and nature of the activity precluded inquiry into its antitrust validity.[9]

[9] Similarly in *California Motor Transport* any antitrust review of the validity of the activity at issue was limited and structured by the fact that there the antitrust defendants were "us[ing] the channels and procedures of state and federal agencies and courts." 404 U.S., at 511, 92 S.Ct., at 612; see also *id.,* at 512–513, 92 S.Ct., at 612–613.

Here the context and nature of the activity do not counsel against inquiry into its validity. Unlike the publicity campaign in *Noerr,* the activity at issue here did not take place in the open political arena, where partisanship is the hallmark of decisionmaking, but within the confines of a private standard-setting process. The validity of conduct within that process has long been defined and circumscribed by the antitrust laws without regard to whether the private standards are likely to be adopted into law. See *supra,* at 1937–1938. Indeed, because private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws only on the *507 understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits, see *ibid.,* the standards of conduct in this context are,

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 13 of 19 PageID #:19090

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

at least in some respects, more rigorous than the standards of conduct prevailing in the partisan political arena or in the adversarial process of adjudication. The activity at issue here thus cannot, as in *Noerr,* be characterized as an activity that has traditionally been regulated with extreme caution, see *Noerr,* 365 U.S., at 141, 81 S.Ct., at 531, or as an activity that "bear[s] little if any resemblance to the combinations normally held violative of the Sherman Act," *id.,* at 136, 81 S.Ct., at 529. And petitioner did not confine itself to efforts to persuade an independent decisionmaker, cf. *id.,* at 138, 139, 81 S.Ct., at 530 (describing the immunized conduct as "mere solicitation"); rather, it organized and orchestrated the actual exercise of the Association's decisionmaking authority in setting a standard. **1941 Nor can the setting of the Association's Code be characterized as merely an exercise of the power of persuasion, for it in part involves the exercise of market power. The Association's members, after all, include consumers, distributors, and manufacturers of electrical conduit, and any agreement to exclude polyvinyl chloride conduit from the Code is in part an implicit agreement not to trade in that type of electrical conduit. Cf. *id.* at 136, 81 S.Ct., at 529. Although one could reason backwards from the legislative impact of the Code to the conclusion that the conduct at issue here is "political," we think that, given the context and nature of the conduct, it can more aptly be characterized as commercial activity with a political impact. Just as the antitrust laws should not regulate political activities "simply because those activities have a commercial impact," *id.,* at 141, 81 S.Ct., at 531, so the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact.[10]

[10] It is admittedly difficult to draw the precise lines separating anticompetitive political activity that is immunized despite its commercial impact from anticompetitive commercial activity that is unprotected despite its political impact, and this is itself a case close to the line. For that reason we caution that our decision today depends on the context and nature of the activity.

Although criticizing the uncertainty of such a particularized inquiry, *post,* at 1945, the dissent does not dispute that the types of activity we describe *supra,* at 1938–1939, could not be immune under *Noerr* and fails to offer an intelligible alternative for distinguishing those non-immune activities from the activity at issue in this case. Rather, the dissent states without elaboration that the sham exception "is enough to guard against flagrant abuse," *post,* at 1945, apparently embracing the conclusion of the United States Court of Appeals for the Ninth Circuit that the sham exception covers the activity of a defendant who "genuinely seeks to achieve his governmental result, but does so *through improper means.*" *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458, 465, n. 5 (1987) (emphasis in original). Such a use of the word "sham" distorts its meaning and bears little relation to the sham exception *Noerr* described to cover activity that was not genuinely intended to influence governmental action. 365 U.S., at 144, 81 S.Ct., at 533. See also P. Areeda & H. Hovenkamp, Antitrust Law ¶ 203.1a, pp. 13–14 (Supp. 1987). More importantly, the Ninth Circuit's approach renders "sham" no more than a label courts could apply to activity they deem unworthy of antitrust immunity (probably based on unarticulated consideration of the nature and context of the activity), thus providing a certain superficial certainty but no real "intelligible guidance" to courts or litigants. *Post,* at 1944. Indeed, the Ninth Circuit concluded that the very activity the dissent deems protected was an unprotected "sham." 827 F.2d, at 465.

*508 *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), is not to the contrary. In that case we held that the First Amendment protected the nonviolent elements of a boycott of white merchants organized by the National

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 14 of 19 PageID #:19091

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

Association for the Advancement of Colored People and designed to make white government and business leaders comply with a list of demands for equality and racial justice. Although the boycotters intended to inflict economic injury on the merchants, the boycott was not motivated by any desire to lessen competition or to reap economic benefits but by the aim of vindicating rights of equality and freedom lying at the heart of the Constitution, and the boycotters were consumers who did not stand to profit financially from a lessening of competition in the boycotted market. *Id.,* 458 U.S., at 914–915, 102 S.Ct., at 3426. Here, in contrast, **\*509** petitioner was at least partially motivated by the desire to lessen competition, and, because of petitioner's line of business, stood to reap substantial economic benefits from making it difficult for respondent to compete.[11]

[11] Although the absence of such anticompetitive motives and incentives is relevant to determining whether petitioner's restraint of trade is protected under *Claiborne Hardware,* we do not suggest that the absence of anticompetitive purpose is necessary for *Noerr* immunity. As the dissent points out, in *Noerr* itself the major purpose of the activity at issue was anticompetitive. *Post,* at 1943–1944. Our statement that the "ultimate aim" of petitioner "is not dispositive," *supra,* at 1939, stands only for the proposition that, at least outside the political context, the mere fact that an anticompetitive activity is also intended to influence governmental action is not alone *sufficient* to render that activity immune from antitrust liability.

Thus in this case the context and nature of petitioner's efforts to influence the Code **\*\*1942** persuade us that the validity of those efforts must, despite their political impact, be evaluated under the standards of conduct set forth by the antitrust laws that govern the private standard-setting process. The antitrust validity of these efforts is not established, without more, by petitioner's literal compliance with the rules of the Association, for the hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition. An association cannot validate the anticompetitive activities of its members simply by adopting rules that fail to provide such safeguards.[12] The issue of immunity in this case thus collapses into the issue of antitrust liability. Although we do not here set forth the rules of antitrust liability governing the private standard-setting process, we hold that at least where, as here, an economically interested party exercises decision-making authority in formulating a product standard for a private association that comprises market participants, that **\*510** party enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace.

[12] Even petitioner's counsel concedes, for example, that *Noerr* would not apply if the Association had a rule giving the steel conduit manufacturers a veto over changes in the Code. Tr. of Oral Arg. 41–42.

This conclusion does not deprive state and local governments of input and information from interested individuals or organizations or leave petitioner without ample means to petition those governments. Cf. *Noerr,* 365 U.S., at 137–138, 81 S.Ct., at 529–530. See also *California Motor Transport,* 404 U.S., at 510, 92 S.Ct., at 611–612. Petitioner, and others concerned about the safety or competitive threat of polyvinyl chloride conduit, can, with full antitrust immunity, engage in concerted efforts to influence those governments through direct lobbying, publicity campaigns, and other traditional avenues of political expression. To the extent state and local governments are more difficult to persuade through these other avenues, that no doubt reflects their preference for and confidence in the nonpartisan consensus process that petitioner has undermined. Petitioner remains free to take advantage of the forum provided by the standard-setting process by presenting and vigorously arguing accurate scientific evidence before a nonpartisan private standard-setting body.[13] And petitioner can avoid the strictures of the private standard-setting process by attempting to influence legislatures through other forums. **\*511** What petitioner may not

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 15 of 19 PageID #:19092

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

do (without exposing itself to possible antitrust liability for direct injuries) is bias the process by, as in this case, stacking the private standard-setting body with decisionmakers sharing their economic interest in restraining competition.

13   The dissent mistakenly asserts that we today hold that *Noerr* immunity does not apply to mere efforts to persuade others to exclude a competitor's product from a private code. See *post,* at 1944–1945. Our holding is expressly limited to cases where an "economically interested party exercises *decisionmaking* authority in formulating a product standard for a private association that comprises market participants." *Supra* this page (emphasis added); see also *supra,* at 1940–1941 (relying in part on the distinction between activity involving the exercise of decisionmaking authority and market power and activity involving mere attempts to persuade an independent decisionmaker). Cf. *Noerr,* 365 U.S., at 136, 81 S.Ct., at 529. The dissent also mistakenly asserts that this description encompasses all private standard-setting associations. See *post,* at 1944. In fact, many such associations are composed of members with expertise but no economic interest in suppressing competition. See, *e.g., Sessions, supra,* at 461, and n. 2.

The judgment of the Court of Appeals is

*Affirmed.*

Justice WHITE, with whom Justice O'CONNOR joins, dissenting.
*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), held that the Sherman Act should not be construed **1943 to forbid joint efforts by railway companies seeking legislation that would disadvantage the trucking industry. These efforts for the most part involved a public relations campaign rather than direct lobbying of the lawmakers and were held not subject to antitrust challenge because of the fundamental importance of maintaining the free flow of information to the government and the right of the people to seek legislative relief, directly or indirectly. *Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), applied the rule to efforts to seek executive action and to administrative and adjudicative proceedings.

The Court now refuses to apply the rule of these cases to the participants in those private organizations, such as the National Fire Protection Association (NFPA), that regularly propound and publish health and safety standards for a variety of products and industries and then present these codes to state and local authorities for the purpose of having them enacted into law. The NFPA and those participating in the code-writing process will now be subject to antitrust liability if their efforts have anticompetitive effects and do not withstand scrutiny under the rule of reason. Believing that this result is a misapplication of the *Noerr* decision and an improvident construction of the Sherman Act, I respectfully dissent.

*512 This case presents an even stronger argument for immunity than did *Noerr* itself. That decision turned on whether the design or purpose of the conduct was to obtain or influence the passage or enforcement of laws. The Court concedes that petitioner's actions in this case constituted a "genuine effort to influence governmental action," *ante,* at 1938, and that this was its "ultimate aim," *ante,* at 1939. In *Noerr,* the publicity campaign was dispersed widely among the public in a broad but necessary diluted attempt to move public opinion in hopes that government officials would take note and respond accordingly. The campaign apparently had some influence on the passage of tax laws and other legislation favorable to the railroads in New Jersey, New York, and Ohio, and procured the Governor's veto of a bill that had been passed in Pennsylvania. See 365 U.S., at 130, 81 S.Ct., at 525–526; see also 155 F.Supp. 768, 777–801

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 16 of 19 PageID #:19093

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

(ED Pa.1957). Here, the NFPA actually drafted proposed legislation in the form of the National Electrical Code (NEC) and presented it countrywide. Not only were petitioner's efforts in this case designed to influence the passage of state laws, but there was also a much greater likelihood that they would be successful than was the case in *Noerr.* This is germane because it establishes a much greater likelihood that the "purpose" and "design" of petitioner's actions in this case was the "solicitation of governmental action with respect to the passage and enforcement of laws," 365 U.S., at 138, 81 S.Ct., at 530.

Rather than directly confronting the severe damage that today's decision does to the *Noerr* doctrine, the majority asserts that the "ultimate aim" of petitioner's efforts "is not dispositive." *Ante,* at 1939. That statement cannot be reconciled with the statements quoted earlier from *Noerr,* where it was held that even if one of the major purposes, or even the *sole* purpose, of the publicity campaign was "to destroy the truckers as competitors," 365 U.S., at 138, 81 S.Ct., at 530, those actions were immunized from antitrust liability because ultimately they were "directed toward obtaining governmental action," **\*513** *id.,* at 140, 81 S.Ct., at 531. The majority later doubles back on this statement, and suggests that it is important in this case that "petitioner was at least partially motivated by the desire to lessen competition, and ... stood to reap substantial economic benefits from making it difficult for respondent to compete." *Ante,* at 1942. It need hardly be said that all of this was also true in *Noerr.* Nobody condones fraud, bribery, **\*\*1944** or misrepresentation in any form, and other state and federal laws ensure that such conduct is punishable. But the point here is that conduct otherwise punishable under the antitrust laws either becomes immune from the operation of those laws when it is part of a larger design to influence the passage and enforcement of laws, or it does not. No workable boundaries to the *Noerr* doctrine are established by declaring, and then repeating at every turn, that everything depends on "the context and nature of" the activity, *ante,* at 1939, 1940, 1941, if we are unable to offer any further guidance about what this vague reference is supposed to mean, especially when the result here is so clearly wrong as long as *Noerr* itself is reputed to remain good law. One unfortunate consequence of today's decision, therefore, is that district courts and courts of appeals will be obliged to puzzle over claims raised under the doctrine without any intelligible guidance about when and why to apply it.

If there were no private code-writing organizations, and state legislatures themselves held the necessary hearing and wrote codes from scratch, then business concerns like Allied, together with their friends, could jointly testify with impunity about the safety of various products, even though they had anticompetitive motives in doing so. This much the majority concedes, as it does that the major purpose of the code-writing organizations is to influence legislative action. These days it is almost a foregone conclusion that the vast majority of the States will adopt these codes with little or no change. It is untenable to consider the code-writing process by such organizations as the NFPA as too far removed **\*514** from the legislative process to warrant application of the doctrine announced in *Noerr* and faithfully applied in other cases. This was the view of Judge Sneed and his colleagues on the Ninth Circuit in *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458 (1987), and the reasons they gave for applying *Noerr* in this context are much more persuasive than anything to the contrary the majority now has to offer.

The Court's decision is unfortunate for another reason. There are now over 400 private organizations preparing and publishing an enormous variety of codes and standards. State and local governments necessarily, and as a matter of course, turn to these proposed codes in the process of legislating to further the health and safety of their citizens. The code that is at issue in this case, for example, was adopted verbatim by 25 States and the District of Columbia; 19 others adopted it with only minor changes. It is the most widely disseminated and adopted model code in the world today. There is no doubt that the work of these private organizations contributes enormously to the public interest and that participation in their work

Case: 1:11-cv-08808 Document #: 462-2 Filed: 11/03/23 Page 17 of 19 PageID #:19094

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

by those who have the technical competence and experience to do so should not be discouraged.

The Court's decision today will surely do just that. It must inevitably be the case that codes such as the NEC will set standards that some products cannot satisfy and hence in the name of health and safety will reduce or prevent competition, as was the case here. Yet, putative competitors of the producer of such products will now think twice before urging in the course of the code-making process that those products not be approved; for if they are successful (or even if they are not), they may well become antitrust defendants facing treble-damages liability unless they can prove to a court and a jury that they had no evil motives but were merely "presenting and vigorously arguing accurate scientific evidence before a nonpartisan private standard-setting body," *ante* at 1942 (though with the knowing and inevitable result of eliminating competition). In this case, for example, even **\*515** if Allied had not resorted to the tactics it employed, but had done no more than successfully argue in good faith the hazards of using respondent's products, it would have inflicted the same damage on respondent and would **\*\*1945** have risked facing the same antitrust suit, with a jury ultimately deciding the health and safety implications of the products at issue.

The Court's suggestion that its decision will not affect the ability of these organizations to assist state and local governments is surely wrong. The Court's holding is "that at least where, as here, an economically interested party exercises decisionmaking authority in formulating a product standard for a private association that comprises market participants, that party enjoys no *Noerr* immunity from any antitrust liability flowing from the effects the standard has of its own force in the marketplace." *Ante,* at 1942. This description encompasses the structure and work of all such organizations as we now know them. The Court is saying, in effect, that where a private organization sets standards, the participants can be sued under the antitrust laws for *any* effects those standards have in the marketplace *other than* those flowing from their adoption into law. But the standards will have *some* effect in the marketplace even where they are also adopted into law, through publicity and other means, thus exposing the participants to liability. Henceforth, therefore, any private organization offers such standards at its peril, and without any of the breathing room enjoyed by other participants in the political process.

The alternative apparently envisioned by the Court is that an organization can gain the protection of the *Noerr* doctrine as long as nobody with any economic interest in the product is permitted to "exercis[e] decisionmaking authority" (*i.e.,* vote) on its recommendations as to particular product standards. Insisting that organizations like the NFPA conduct themselves like courts of law will have perverse effects. Legislatures are willing to rely on such organizations precisely because their standards are being set by those who **\*516** possess an expert understanding of the products and their uses, which are primarily if not entirely those who design, manufacture, sell, and distribute them. Sanitizing such bodies by discouraging the active participation of those with economic interests in the subject matter undermines their utility.

I fear that exposing organizations like the NFPA to antitrust liability will impair their usefulness by inhibiting frank and open discussion of the health and safety characteristics of new or old products that will be affected by their codes. The Court focuses on the tactics of petitioner that are thought to have subverted the entire process. But it is not suggested that if there are abuses, they are anything more than occasional happenings. The Court does speculate about the terrible practices that applying *Noerr* in this context could lead us to condone in future cases, *ante,* at 1938–1939, but these are no more than fantasies, since nothing of the sort occurred in the wake of *Noerr* itself. It seems to me that today's decision is therefore an unfortunate case of overkill.

Of course, the *Noerr* immunity is not unlimited and by its terms is unavailable where the alleged efforts to influence legislation are nothing but a sham. As the Ninth Circuit held, this limitation is enough to guard

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

against flagrant abuse. In any event, occasional abuse is insufficient ground to render the entire process less useful and reliable. I would reverse the judgment below and remand for further proceedings.

**All Citations**

486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

© 2023 Thomson Reuters. No claim to original U.S. Government Works. 17

**Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)**
108 S.Ct. 1931, 100 L.Ed.2d 497, 56 USLW 4539, 1988-1 Trade Cases P 68,062

---

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.