# Exhibit 3

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

99 S.Ct. 1551
Supreme Court of the United States

BROADCAST MUSIC, INC., et al., Petitioners,
v.
COLUMBIA BROADCASTING SYSTEM, INC.,
et al.

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS, et al.,
Petitioners,
v.
COLUMBIA BROADCASTING SYSTEM, INC.,
et al.

Nos. 77–1578, 77–1583
|
Argued Jan. 15, 1979.
|
Decided April 17, 1979.

**Synopsis**

Television network brought antitrust suit against licensing agencies for composers, writers and publishers and their members and affiliates, alleging that the system by which the agencies received fees for the issuance of blanket licenses to perform copyrighted musical compositions amounted to illegal price fixing. The United States District Court for the Southern District of New York, 400 F.Supp. 737, dismissed the complaint, and appeal was taken. The Court of Appeals, 562 F.2d 130, reversed and remanded for consideration of the appropriate remedy, holding that the blanket license arrangement was a form of price fixing that was per se illegal under the Sherman Act. Certiorari was granted, and the United States Supreme Court, Mr. Justice White, held that although the blanket license fee was set by the licensing agencies rather than by competition among individual copyright owners and although it was a fee for the use of any compositions covered by the license, where the blanket license arrangement accompanied the integration of sales, monitoring and enforcement against unauthorized copyright use, which would present difficult and expensive problems

if left to individual users and copyright owners, and where it appeared that the blanket license had provided an acceptable mechanism for at least a large part of the market for the performing rights to copyrighted musical compositions, the issuance of such blanket licenses did not constitute price fixing that was per se unlawful under the antitrust laws.

Judgment of the Court of Appeals reversed and remanded.

Mr. Justice Stevens concurred in part and dissented in part and filed opinion.

Opinions on remand, 607 F.2d 543 and 620 F.2d 930.

West Headnotes (12)

[1]     **Antitrust and Trade Regulation** 🔑 Per se
        **Antitrust and Trade Regulation** 🔑
        Presumptions and burden of proof

        The doctrine that certain agreements or practices are so plainly anticompetitive and so often lack any redeeming virtue that they are conclusively presumed illegal without further examination under the rule of reason that is generally applied in Sherman Act cases is a valid and useful tool of antitrust policy and enforcement; however, it is only after considerable experience with business practices that courts classify them as per se violations of the Sherman Act. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

        193 Cases that cite this headnote

[2]     **Antitrust and Trade Regulation** 🔑 Price
        Fixing in General

        For purpose of determining whether challenged conduct falls within or without the category to which courts apply the label "per se price fixing," a literal approach to the definition of "price fixing"

**Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)**

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

is overly simplistic and often overbroad; for example, when two partners set the price of their goods or services they are literally "price fixing" but they are not thereby in per se violation of the Sherman Act. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

85 Cases that cite this headnote

[3]  **Antitrust and Trade Regulation**
Antitrust Exemptions and Defenses

A consent judgment, even when entered at the behest of the antitrust division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

7 Cases that cite this headnote

[4]  **Antitrust and Trade Regulation**
Antitrust Exemptions and Defenses

Though television network which alleged that licensing agencies' practices violated antitrust laws was not bound by action of antitrust division in settling by consent decree prior antitrust action against the agencies, the consent decree, which imposed tight restrictions on the agencies' operations, was a fact of economic and legal life in the industry which the Court of Appeals should not have completely ignored in determining whether the licensing agencies' practices were per se antitrust violations. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

20 Cases that cite this headnote

[5]  **Copyrights and Intellectual Property**
Licenses and Royalties

Under the copyright laws, those who publicly perform copyrighted music have the burden of obtaining prior consent. 17 U.S.C.A. § 506.

11 Cases that cite this headnote

[6]  **Copyrights and Intellectual Property**
Performance and Display Rights

Nothing in the Copyright Act of 1976 indicates in the slightest that Congress intended to weaken the rights of copyright owners to control the public performance of musical compositions; quite the contrary is true. 17 U.S.C.A. § 506.

10 Cases that cite this headnote

[7]  **Antitrust and Trade Regulation**
Copyrights

The copyright law confers no rights on copyright owners to fix prices among themselves or otherwise to violate antitrust laws. 17 U.S.C.A. § 506; Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

14 Cases that cite this headnote

[8]  **Copyrights and Intellectual Property**
Rights in Sound Recordings

Because a musical composition can be "consumed" by many different people at the same time and without the creator's knowledge, the owner has no real way to demand reimbursement for the use of his property except through the copyright laws and an effective way to enforce those legal rights. 17 U.S.C.A. § 506.

8 Cases that cite this headnote

[9]  **Antitrust and Trade Regulation** Per se

In characterizing conduct that allegedly violates antitrust laws under the per se rule, court's inquiry must focus on whether the effect and, when it tends to show effect, the purpose of the practice is to threaten the proper operation of our predominantly free market economy, that is, whether the practice facially appears to

**Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)**

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or whether the practice appears designed to increase economic efficiency and render markets more rather than less competitive. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

97 Cases that cite this headnote

[10]   **Antitrust and Trade Regulation**
Copyrights

Issuance by licensing agencies of blanket licenses to copyrighted musical compositions giving licensees the right for a stated term to perform any and all compositions owned by the agencies' members or affiliates in exchange for fees ordinarily amounting to a percentage of total revenues or a flat dollar amount and not directly dependent on the amount or type of music used did not constitute price fixing that was per se unlawful under the antitrust laws. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

101 Cases that cite this headnote

[11]   **Antitrust and Trade Regulation**
Mergers and Acquisitions
**Antitrust and Trade Regulation**
Antitrust and Prices

Not all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints; mergers among competitors eliminate competition, including price competition, but are not per se illegal and joint ventures and other cooperative arrangements are also not usually unlawful as price-fixing schemes, when the agreement on price is necessary to market the product at all. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

183 Cases that cite this headnote

[12]   **Antitrust and Trade Regulation**
Copyrights

Under circumstances indicating fact that, over the years and in the face of available alternatives, arrangement whereby licensing agencies issued blanket licenses giving licensees right for a stated term to perform any and all musical compositions owned by members or affiliates of the licensing agencies had provided an acceptable mechanism for at least a large part of the market for performing rights to copyrighted musical compositions and where the blanket license plan accompanied the integration of sales, monitoring and enforcement against unauthorized copyright use, all of which would be difficult and expensive problems if left to individual users and owners, blanket license practice could not automatically be declared per se illegal under the Sherman Act but, rather, should be subjected to a more discriminating examination under the rule of reason. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

169 Cases that cite this headnote

**\*\*1553 \*1 Syllabus**[*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

Respondent Columbia Broadcasting System, Inc. (CBS), brought this action against petitioners, American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI), and their members and affiliates, alleging, *inter alia,* that the issuance by ASCAP and BMI to CBS of blanket licenses to copyrighted musical compositions at fees negotiated by them is illegal price fixing under the antitrust laws. Blanket licenses give the licensees the right to perform any and all of the compositions owned by the members or affiliates as often as the licensees desire for a stated term. Fees for blanket licenses are ordinarily a percentage of total revenues or a flat dollar amount, and do not directly depend on the amount or type of music used. After a trial limited to the issue of liability, the District Court dismissed the complaint, holding, *inter alia,* that the blanket license was not price fixing and a *per se* violation of the Sherman Act. The Court of Appeals reversed and remanded for consideration of the appropriate remedy, holding that the blanket license issued to television networks was a form of price fixing illegal *per se* under the Sherman Act and established copyright misuse. **\*2** *Held:* The issuance by ASCAP and BMI of blanket licenses does not constitute price fixing *per se* unlawful under the antitrust laws. Pp. 1556–1565.

(a) "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133–1134, 31 L.Ed.2d 515. And though there has been rather intensive antitrust scrutiny of ASCAP and BMI and their blanket licenses, that experience hardly counsels that this Court should outlaw the blanket license as a *per se* restraint of trade. Furthermore, the United States, by its *amicus* brief in the present case, urges that the blanket licenses, which consent decrees in earlier actions by the Government authorize ASCAP and BMI to issue to television networks, are not *per se* violations of the Sherman Act. And Congress, in the Copyright Act of 1976, has itself chosen to employ the blanket license and similar practices. Thus, there is no nearly universal view that the blanket licenses are a

form of price fixing subject to automatic condemnation under the Sherman Act, rather than to a careful assessment under the rule of reason generally applied in Sherman Act cases. Pp. 1556–1560.

(b) In characterizing the conduct of issuing blanket licenses under the *per se* rule, this Court's inquiry must focus on whether the effect and, here because it tends to show effect, the purpose of the practice are to threaten the proper operation of a predominantly free-market economy. The blanket license is not a "naked restrain[t] of trade with no purpose except stifling of competition," *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738, but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright **\*\*1554** use, which would be difficult and expensive problems if left to individual users and copyright owners. Although the blanket license fee is set by ASCAP and BMI rather than by competition among individual copyright owners, and although it is a fee for the use of any of the compositions covered by the license, the license cannot be wholly equated with a simple horizontal arrangement among competitors and is quite different from anything any individual owner could issue. In light of the background, which plainly indicates that over the years, and in the face of available alternatives including direct negotiation with individual copyright owners, the blanket license has provided an acceptable mechanism for at least a large part of the market for the performing rights to copyrighted musical compositions, it cannot automatically be declared illegal in all of its many manifestations. Rather, it should be subjected to a more discriminating examination under the rule of reason. Pp. 1560–1565.

**\*3** (c) The Court of Appeals' judgment holding that the licensing practices of ASCAP and BMI are *per se* violations of the Sherman Act, and the copyright misuse judgment dependent thereon, are reversed, and the case is remanded for further proceedings to consider any unresolved issues that CBS may have properly brought to the Court of Appeals, including an assessment under the rule of reason of the blanket

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

license as employed in the television industry. P. 1565.

2 Cir., 562 F.2d 130, reversed and remanded.

**Attorneys and Law Firms**

Jay H. Topkis, New York City, for petitioners in No. 77–1583.

Amalya L. Kearse, New York City, for petitioners in No. 77–1578.

Frank H. Easterbrook, Washington, D. C., for the United States, as amicus curiae, by special leave of Court.

Alan J. Hruska, New York City, for respondents in both cases.

**Opinion**

**\*4** Mr. Justice WHITE delivered the opinion of the Court.

This case involves an action under the antitrust and copyright laws brought by respondent Columbia Broadcasting System, Inc. (CBS), against petitioners, American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI), and their members and affiliates.[1] The basic question presented is whether the issuance by ASCAP and BMI to CBS of blanket licenses to copyrighted musical compositions at fees negotiated by them is price fixing *per se* unlawful under the antitrust laws.

[1]     The District Court certified the case as a defendant class action. 400 F.Supp. 737, 741 n. 2 (S.D.N.Y.1975).

I

CBS operates one of three national commercial television networks, supplying programs to approximately 200 affiliated stations and telecasting approximately 7,500 network programs per year.

Many, but not all, of these programs make use of copyrighted music recorded on the soundtrack. CBS also owns television and radio stations in various cities. It is " 'the giant of the world in the use of music rights,' " the " 'No. 1 outlet in the history of entertainment.' "[2]

[2]     Id., at 771, quoting a CBS witness. CBS is also a leading music publisher, with publishing subsidiaries affiliated with both ASCAP and BMI, and is the world's largest manufacturer and seller of records and tapes. Ibid.

Since 1897, the copyright laws have vested in the owner of a copyrighted musical composition the exclusive right to perform the work publicly for profit,[3] but the legal right is not self-enforcing. In 1914, Victor Herbert and a handful of other composers organized ASCAP because those who performed **\*5** copyrighted music for profit were so numerous and widespread, and **\*\*1555** most performances so fleeting, that as a practical matter it was impossible for the many individual copyright owners to negotiate with and license the users and to detect unauthorized uses. "ASCAP was organized as a 'clearing-house' for copyright owners and users to solve these problems" associated with the licensing of music. 400 F.Supp. 737, 741 (S.D.N.Y.1975). As ASCAP operates today, its 22,000 members grant it nonexclusive rights to license nondramatic performances of their works, and ASCAP issues licenses and distributes royalties to copyright owners in accordance with a schedule reflecting the nature and amount of the use of their music and other factors.

[3]     Act of Jan. 6, 1897, 29 Stat. 481.

BMI, a nonprofit corporation owned by members of the broadcasting industry,[4] was organized in 1939, is affiliated with or represents some 10,000 publishing companies and 20,000 authors and composers, and operates in much the same manner as ASCAP. Almost every domestic copyrighted composition is in the repertory either of ASCAP, with a total of three million compositions, or of BMI, with one million.

[4]     CBS was a leader of the broadcasters who

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

formed BMI, but it disposed of all of its interest in the corporation in 1959. 400 F.Supp., at 742.

Both organizations operate primarily through blanket licenses, which give the licensees the right to perform any and all of the compositions owned by the members or affiliates as often as the licensees desire for a stated term. Fees for blanket licenses are ordinarily a percentage of total revenues or a flat dollar amount, and do not directly depend on the amount or type of music used. Radio and television broadcasters are the largest users of music, and almost all of them hold blanket licenses from both ASCAP and BMI. Until this litigation, CBS held blanket licenses from both organizations for its television network on a continuous basis since the late 1940's and had never attempted to secure any other form of *6 license from either ASCAP[5] or any of its members. *Id.*, at 752–754.

[5]   Unless the context indicates otherwise, references to ASCAP alone in this opinion usually apply to BMI as well. See n. 20, *infra.*

The complaint filed by CBS charged various violations of the Sherman Act[6] and the copyright laws.[7] CBS argued that ASCAP and BMI are unlawful monopolies and that the blanket license is illegal price fixing, an unlawful tying arrangement, a concerted refusal to deal, and a misuse of copyrights. The District Court, though denying summary judgment to certain defendants, ruled that the practice did not fall within the *per se* rule. 337 F.Supp. 394, 398 (S.D.N.Y.1972). After an 8-week trial, limited to the issue of liability, the court dismissed the complaint, rejecting again the claim that the blanket license was price fixing and a *per se* violation of § 1 of the Sherman Act, and holding that since direct negotiation with individual copyright owners is available and feasible there is no undue restraint of trade, illegal tying, misuse of copyrights, or monopolization. 400 F.Supp., at 781–783.

[6]   15 U.S.C. §§ 1 and 2.

[7]   CBS seeks injunctive relief for the antitrust violations and a declaration of copyright misuse. 400 F.Supp., at 741.

Though agreeing with the District Court's factfinding and not disturbing its legal conclusions on the other antitrust theories of liability,[8] the Court of Appeals held that the blanket license issued to television networks was a form of price fixing illegal *per se* under the Sherman Act. 562 F.2d 130, 140 (CA2 1977). This conclusion, without more, settled the issue of liability under the Sherman Act, established copyright misuse,[9] and required reversal of the District **1556 Court's *7 judgment, as well as a remand to consider the appropriate remedy.[10]

[8]   The Court of Appeals affirmed the District Court's rejection of CBS's monopolization and tying contentions but did not rule on the District Court's conclusion that the blanket license was not an unreasonable restraint of trade. *See* 562 F.2d 130, 132, 135, 141 n. 29 (CA2 1977).

[9]   At CBS's suggestion, the Court of Appeals held that the challenged conduct constituted misuse of copyrights solely on the basis of its finding of unlawful price fixing. *Id.*, at 141 n. 29.

[10]   The Court of Appeals went on to suggest some guidelines as to remedy, indicating that despite its conclusion on liability the blanket license was not totally forbidden. The Court of Appeals said:

"Normally, after a finding of price-fixing, the remedy is an injunction against the price-fixing—in this case, the blanket license. We think, however, that if on remand a remedy can be fashioned which will ensure that the blanket license will not affect the price or negotiations for direct licenses, the blanket license need not be prohibited in all circumstances. The blanket license is not simply a 'naked restraint' ineluctably doomed to extinction. There is not enough evidence in the

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

present record to compel a finding that the blanket license does not serve a market need for those who wish full protection against infringement suits or who, for some other business reason, deem the blanket license desirable. The blanket license includes a practical covenant not to sue for infringement of any ASCAP copyright as well as an indemnification against suits by others.

"Our objection to the blanket license is that it reduces price competition among the members and provides a disincentive to compete. We think that these objections may be removed if ASCAP itself is required to provide some form of per use licensing which will ensure competition among the individual members with respect to those networks which wish to engage in per use licensing." *Id.*, at 140 (footnotes omitted).

ASCAP and BMI petitioned for certiorari, presenting the questions of the applicability of the *per se* rule and of whether this constitutes misuse of copyrights. CBS did not cross petition to challenge the failure to sustain its other antitrust claims. We granted certiorari because of the importance of the issues to the antitrust and copyright laws. 439 U.S. 817, 99 S.Ct. 77, 58 L.Ed.2d 107 (1978). Because we disagree with the Court of Appeals' conclusions with respect to the *per se* illegality of the blanket license, we reverse its judgment and remand the cause for further appropriate proceedings.

II

[1] In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, **\*8** the Court has held that certain agreements or practices are so "plainly anticompetitive," *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97

S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977), and so often "lack . . . any redeeming virtue," *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases. This *per se* rule is a valid and useful tool of antitrust policy and enforcement.[11] And agreements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the *per se* category.[12] But easy labels do not always supply ready answers.

[11]  "This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

See *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50 n. 16, 97 S.Ct. 2549, 2558 n. 16, 53 L.Ed.2d 568 (1977); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 609 n. 10, 92 S.Ct. 1126, 1134 n. 10, 31 L.Ed.2d 515 (1972).

[12]  See cases discussed in n. 14, *infra.*

A

[2]  To the Court of Appeals and CBS, the blanket license involves "price fixing" in the literal sense: the composers and publishing houses have joined together into an organization that sets its price for the blanket license it sells.[13] But this **\*9** is not a **\*\*1557** question simply of determining whether two or more potential

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

competitors have literally "fixed" a "price." As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act. See *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 280 (CA6 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "*per se* price fixing." That will often, but not always, be a simple matter.[14]

[13]     CBS also complains that it pays a flat fee regardless of the amount of use it makes of ASCAP compositions and even though many of its programs contain little or no music. We are unable to see how that alone could make out an antitrust violation or misuse of copyrights:

"Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. . . . Petitioner cannot complain because it must pay royalties whether it uses Hazeltine patents or not. What it acquired by the agreement into which it entered was the privilege to use any or all of the patents and developments as it desired to use them." *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950).

See also *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

[14]     Cf., *e. g., United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937,

100 L.Ed. 1209 (1956) (manufacturer/wholesaler agreed with independent wholesalers on prices to be charged on products it manufactured); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (firms controlling a substantial part of an industry agreed to purchase "surplus" gasoline with the intent and necessary effect of increasing the price); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927) (manufacturers and distributors of 82% of certain vitreous pottery fixtures agreed to sell at uniform prices).

Consequently, as we recognized in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations . . . ." See **10** *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). We have never examined a practice like this one before; indeed, the Court of Appeals recognized that "[i]n dealing with performing rights in the music industry we confront conditions both in copyright law and in antitrust law which are *sui generis.*" 562 F.2d, at 132. And though there has been rather intensive antitrust scrutiny of ASCAP and its blanket licenses, that experience hardly counsels that we should outlaw the blanket license as a *per se* restraint of trade.

B

This litigation and other cases involving ASCAP and its licensing practices have arisen out of the efforts of the creators of copyrighted musical compositions to collect for the public performance of their works, as they are entitled to do under the Copyright Act. As already indicated, ASCAP and BMI originated to make possible and to facilitate dealings between copyright owners and those who desire to use their music. Both organizations plainly involve concerted

action in a large and active line of commerce, and it is not surprising that, as the District Court found, "[n]either ASCAP nor BMI is a stranger to antitrust litigation." 400 F.Supp., at 743.

The Department of Justice first investigated allegations of anticompetitive conduct by ASCAP over 50 years ago.[15] A criminal complaint was filed in 1934, but the Government was granted a midtrial continuance and never returned to the courtroom. In separate complaints in 1941, the United States charged that the blanket license, which was then the only license **1558 offered by ASCAP and BMI, was an illegal restraint of trade and that arbitrary prices were being charged as the result of an illegal copyright pool.[16] The Government sought *11 to enjoin ASCAP's exclusive licensing powers and to require a different form of licensing by that organization. The case was settled by a consent decree that imposed tight restrictions on ASCAP's operations.[17] Following complaints relating to the television industry, successful private litigation against ASCAP by movie theaters,[18] and a Government challenge to ASCAP's arrangements with similar foreign organizations, the 1941 decree was reopened and extensively amended in 1950.[19]

[15]    Cohn, Music, Radio Broadcasters and the Sherman Act, 29 Geo.L.J. 407, 424 n. 91 (1941).

[16]    E. g., complaint in United States v. ASCAP, Civ. No. 13–95 (S.D.N.Y.1941), pp. 3–4.

[17]    United States v. ASCAP, 1940–1943 Trade Cases ¶ 56,104 (S.D.N.Y.1941).

[18]    See Alden-Rochelle, Inc. v. ASCAP, 80 F.Supp. 888 (S.D.N.Y.1948); M. Witmark & Sons v. Jensen, 80 F.Supp. 843 (D.C.Minn.1948), appeal dismissed sub nom. M. Witmark & Sons v. Berger Amusement Co., 177 F.2d 515 (CA8 1949).

[19]    United States v. ASCAP, 1950–1951 Trade Cases ¶ 62,595 (S.D.N.Y.1950).

Under the amended decree, which still substantially controls the activities of ASCAP, members may grant ASCAP only nonexclusive rights to license their works for public performance. Members, therefore, retain the rights individually to license public performances, along with the rights to license the use of their compositions for other purposes. ASCAP itself is forbidden to grant any license to perform one or more specified compositions in the ASCAP repertory unless both the user and the owner have requested it in writing to do so. ASCAP is required to grant to any user making written application a nonexclusive license to perform all ASCAP compositions either for a period of time or on a per-program basis. ASCAP may not insist on the blanket license, and the fee for the per-program license, which is to be based on the revenues for the program on which ASCAP music is played, must offer the applicant a genuine economic choice between the per-program license and the more common blanket license. If ASCAP and a putative licensee are unable to agree on a fee within 60 days, the applicant may apply to the District Court *12 for a determination of a reasonable fee, with ASCAP having the burden of proving reasonableness.[20]

[20]    BMI is in a similar situation. The original decree against BMI is reported as United States v. BMI, 1940–1943 Trade Cases ¶ 56,096 (E.D.Wis.1941). A new consent judgment was entered in 1966 following a monopolization complaint filed in 1964. United States v. BMI, 1966 Trade Cases ¶ 71,941 (S.D.N.Y.). The ASCAP and BMI decrees do vary in some respects. The BMI decree does not specify that BMI may only obtain nonexclusive rights from its affiliates or that the District Court may set the fee if the parties are unable to agree. Nonetheless, the parties stipulated, and the courts below accepted, that "CBS could secure direct licenses from BMI affiliates with the same ease or difficulty, as the case may be, as from ASCAP members." 400 F.Supp., at 745.

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

The 1950 decree, as amended from time to time, continues in effect, and the blanket license continues to be the primary instrument through which ASCAP conducts its business under the decree. The courts have twice construed the decree not to require ASCAP to issue licenses for selected portions of its repertory.[21] It also remains true that the decree guarantees the legal availability of direct licensing of performance rights by ASCAP members; and the District Court found, and in this respect the Court of Appeals agreed, that there are no practical impediments preventing direct dealing by the television networks if they so desire. Historically, they have not done so. Since 1946, CBS and other television networks have taken blanket licenses from ASCAP and BMI. It was not until this suit **1559 arose that the CBS network demanded any other kind of license.[22]

[21]  *United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.),* 208 F.Supp. 896 (S.D.N.Y.1962), aff'd, 331 F.2d 117 (CA2), cert. denied, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964); *United States v. ASCAP ( Application of National Broadcasting Co.),* 1971 Trade Cases ¶ 73,491 (S.D.N.Y.1970). See also *United States v. ASCAP (Motion of Metromedia, Inc.),* 341 F.2d 1003 (CA2 1965).

[22]  National Broadcasting Co. did, in 1971, request an annual blanket license for 2,217 specific ASCAP compositions most frequently used on its variety shows. It intended to acquire the remaining rights to background and theme music through direct transactions by it and its program packagers. See *United States v. ASCAP (Application of National Broadcasting Co.), supra.*

[3] [4] *13 Of course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties. See *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 690, 81

S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961), which involved this same decree. But it cannot be ignored that the Federal Executive and Judiciary have carefully scrutinized ASCAP and the challenged conduct, have imposed restrictions on various of ASCAP's practices, and, by the terms of the decree, stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices.[23] In these circumstances, we have a unique indicator that the challenged practice may have redeeming competitive virtues and that the search for those values is not almost sure to be in vain.[24] Thus, although CBS is not bound by the Antitrust Division's actions, the decree is a fact of economic and legal life in this industry, and the Court of Appeals should not have ignored it completely in analyzing the practice. See *id., at 694–695, 81 S.Ct., at 1315–1316.* That fact alone might not remove a naked price-fixing scheme from the ambit of the *per se* rule, but, as discussed *infra,* Part III, here we are uncertain whether the practice on its face has the effect, or could have been spurred by the purpose, of restraining competition among the individual composers.

[23]  1950–1951 Trade Cases ¶ 62,595, p. 63,756.

[24]  Cf. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S., at 50 n. 16, 97 S.Ct., at 2558 n.16. Moreover, unthinking application of the *per se* rule might upset the balancing of economic power and of procompetitive and anticompetitive effect presumably worked out in the decree.

After the consent decrees, the legality of the blanket license was challenged in suits brought by certain ASCAP members against individual radio stations for copyright infringement. The stations raised as a defense that the blanket license was a form of price fixing illegal under the Sherman Act. The parties *14 stipulated that it would be nearly impossible for each radio station to negotiate with each copyright holder separate licenses for the performance of his works on radio. Against this background, and relying heavily on the 1950 consent judgment, the Court of Appeals for

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

the Ninth Circuit rejected claims that ASCAP was a combination in restraint of trade and that the blanket license constituted illegal price fixing. *K–91, Inc. v. Gershwin Publishing Corp.,* 372 F.2d 1 (1967), cert. denied, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968).

The Department of Justice, with the principal responsibility for enforcing the Sherman Act and administering the consent decrees relevant to this case, agreed with the result reached by the Ninth Circuit. In a submission *amicus curiae* opposing one station's petition for certiorari in this Court, the Department stated that there must be "some kind of central licensing agency by which copyright holders may offer their works in a common pool to all who wish to use them." Memorandum for United States as *Amicus Curiae* on Pet. for Cert. in *K–91, Inc. v. Gershwin Publishing Corp.,* O.T. 1967, No. 147, pp. 10–11. And the Department elaborated on what it thought that fact meant for the proper application of the antitrust laws in this area:

"The Sherman Act has always been discriminatingly applied in the light of economic realities. There are situations in which competitors have been permitted to form joint selling agencies or other pooled activities, subject to strict limitations **1560 under the antitrust laws to guarantee against abuse of the collective power thus created. *Associated Press v. United States,* 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013]; *United States v. St. Louis Terminal,* 224 U.S. 383 [32 S.Ct. 507, 56 L.Ed. 810]; *Appalachian Coals, Inc. v. United States,* 288 U.S. 344 [53 S.Ct. 471, 77 L.Ed. 825]; *Chicago Board of Trade v. United States,* 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683]. This case appears to us to involve such a situation. The extraordinary number of users spread across the land, the ease with which a performance may be broadcast, the sheer volume **15 of copyrighted compositions, the enormous quantity of separate performances each year, the impracticability of negotiating individual licenses for each composition, and the ephemeral nature of each performance all combine to create unique market conditions for performance rights to recorded music." *Id.,* at 10 (footnote omitted).

The Department concluded that, in the circumstances of that case, the blanket licenses issued by ASCAP to individual radio stations were neither a *per se* violation of the Sherman Act nor an unreasonable restraint of trade.

As evidenced by its *amicus* brief in the present case, the Department remains of that view. Furthermore, the United States disagrees with the Court of Appeals in this case and urges that the blanket licenses, which the consent decree authorizes ASCAP to issue to television networks, are not *per se* violations of the Sherman Act. It takes no position, however, on whether the practice is an unreasonable restraint of trade in the context of the network television industry.

Finally, we note that Congress itself, in the new Copyright Act, has chosen to employ the blanket license and similar practices. Congress created a compulsory blanket license for secondary transmissions by cable television systems and provided that "[n]otwithstanding any provisions of the antitrust laws, . . . any claimants may agree among themselves as to the proportionate division of compulsory licensing fees among them, may lump their claims together and file them jointly or as a single claim, or may designate a common agent to receive payment on their behalf." 17 U.S.C. App. § 111(d)(5)(A). And the newly created compulsory license for the use of copyrighted compositions in jukeboxes is also a blanket license, which is payable to the performing-rights societies such as ASCAP unless an individual copyright holder can prove his entitlement to a share. § 116(c)(4). Moreover, in requiring noncommercial broadcasters to pay for their use of copyrighted music, Congress again provided that "[n]otwithstanding **16 any provision of the antitrust laws" copyright owners "may designate common agents to negotiate, agree to, pay, or receive payments." § 118(b). Though these provisions are not directly controlling, they do reflect an opinion that the blanket license, and ASCAP, are economically beneficial in at least some circumstances.

There have been District Court cases holding various ASCAP practices, including its licensing practices, to be violative of the Sherman Act,[25] but even so, there is

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

no nearly universal view that either the blanket or the per-program licenses issued by ASCAP at prices negotiated by it are a form of price fixing subject to automatic condemnation under the Sherman Act, rather than to a careful assessment under the rule of reason.

25     See cases cited n. 18, *supra*. Those cases involved licenses sold to individual movie theaters to "perform" compositions already on the motion pictures' soundtracks. ASCAP had barred its members from assigning performing rights to movie producers at the same time recording rights were licensed, and the theaters were effectively unable to engage in direct transactions for performing rights with individual copyright owners.

### III

Of course, we are no more bound than is CBS by the views of the Department of Justice, the results in the prior lower court **1561 cases, or the opinions of various experts about the merits of the blanket license. But while we must independently examine this practice, all those factors should caution us against too easily finding blanket licensing subject to *per se* invalidation.

### A

As a preliminary matter, we are mindful that the Court of Appeals' holding would appear to be quite difficult to contain. If, as the court held, there is a *per se* antitrust violation whenever ASCAP issues a blanket license to a television network for a single fee, why would it not also be automatically illegal for ASCAP to negotiate and issue blanket licenses to *17 individual radio or television stations or to other users who perform copyrighted music for profit?[26] Likewise, if the present network licenses issued through ASCAP on behalf of its members are *per se* violations, why would it not be equally illegal for the members to authorize ASCAP to issue licenses establishing

various categories of uses that a network might have for copyrighted music and setting a standard fee for each described use?

26     Certain individual television and radio stations, appearing here as *amici curiae*, argue that the *per se* rule should extend to ASCAP's blanket licenses with them as well. The television stations have filed an antitrust suit to that effect. *Buffalo Broadcasting Co. v. ASCAP*, 78 Civ. 5670 (SDNY, filed Nov. 27, 1978).

Although the Court of Appeals apparently thought the blanket license could be saved in some or even many applications, it seems to us that the *per se* rule does not accommodate itself to such flexibility and that the observations of the Court of Appeals with respect to remedy tend to impeach the *per se* basis for the holding of liability.[27]

27     See n. 10, *supra.* The Court of Appeals would apparently not outlaw the blanket license across the board but would permit it in various circumstances where it is deemed necessary or sufficiently desirable. It did not even enjoin blanket licensing with the television networks, the relief it realized would normally follow a finding of *per se* illegality of the license in that context. Instead, as requested by CBS, it remanded to the District Court to require ASCAP to offer in addition to blanket licensing some competitive form of per-use licensing. But per-use licensing by ASCAP, as recognized in the consent decrees, might be even more susceptible to the *per se* rule than blanket licensing. The rationale for this unusual relief in a *per se* case was that "[t]he blanket license is not simply a 'naked restraint' ineluctably doomed to extinction." 562 F.2d, at 140. To the contrary, the Court of Appeals found that the blanket license might well "serve a market need" for some. *Ibid.* This, it seems to us, is not the *per se* approach, which does not yield so

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

readily to circumstances, but in effect is a rather bobtailed application of the rule of reason, bobtailed in the sense that it is unaccompanied by the necessary analysis demonstrating why the particular licensing system is an undue competitive restraint.

[5] **\*18** CBS would prefer that ASCAP be authorized, indeed directed, to make all its compositions available at standard per-use rates within negotiated categories of use. 400 F.Supp., at 747 n. 7.[28] But if this in itself or in conjunction with blanket licensing constitutes illegal price fixing by copyright owners, CBS urges that an injunction issue forbidding ASCAP to issue any blanket license or to negotiate any fee except on behalf of an individual member for the use of his own copyrighted work or works.[29] Thus, we are called upon to determine that blanket licensing is unlawful across the board. We are quite sure, however, that the *per se* rule does not require any such holding.

[28]    Surely, if ASCAP abandoned the issuance of all licenses and confined its activities to policing the market and suing infringers, it could hardly be said that member copyright owners would be in violation of the antitrust laws by not having a common agent issue per-use licenses. Under the copyright laws, those who publicly perform copyrighted music have the burden of obtaining prior consent. Cf. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S., at 139–140, 89 S.Ct., at 1585–1586.

[29]    In its complaint, CBS alleged that it would be "wholly impracticable" for it to obtain individual licenses directly from the composers and publishing houses, but it now says that it would be willing to do exactly that if ASCAP were enjoined from granting blanket licenses to CBS or its competitors in the network television business.

**\*\*1562** B

[6] [7] [8]  In the first place, the line of commerce allegedly being restrained, the performing rights to copyrighted music, exists at all only because of the copyright laws. Those who would use copyrighted music in public performances must secure consent from the copyright owner or be liable at least for the statutory damages for each infringement and, if the conduct is willful and for the purpose of financial gain, to criminal penalties.[30] Furthermore, nothing in the Copyright Act of 1976 indicates in the slightest that Congress intended to weaken the rights of copyright owners to control the public **\*19** performance of musical compositions. Quite the contrary is true.[31] Although the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws, we would not expect that any market arrangements reasonably necessary to effectuate the rights that are granted would be deemed a *per se* violation of the Sherman Act. Otherwise, the commerce anticipated by the Copyright Act and protected against restraint by the Sherman Act would not exist at all or would exist only as a pale reminder of what Congress envisioned.[32]

[30]    17 U.S.C. App. § 506.

[31]    See Koenigsberg, The 1976 Copyright Act: Advances for the Creator, 26 Cleve.St.L.Rev. 515, 524, 528 (1977).

[32]    Cf. *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

Because a musical composition can be "consumed" by many different people at the same time and without the creator's knowledge, the "owner" has no real way to demand reimbursement for the use of his property except through the copyright laws *and* an effective way to enforce those legal rights. See *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 162, 95 S.Ct. 2040, 2047, 45 L.Ed.2d 84 (1975). It takes an organization of rather large size to monitor most or all uses and to deal with users on behalf of the composers. Moreover, it is

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

inefficient to have too many such organizations duplicating each other's monitoring of use.

### C

[9] More generally, in characterizing this conduct under the *per se* rule,[33] our inquiry must focus on whether the effect and, here because it tends to show effect, see *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978), the purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or **\*20** almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive." *Id*. at 441 n. 16, 98 S.Ct., at 2875 n. 16; see *National Society of Professional Engineers v. United States*, 435 U.S., at 688, 98 S.Ct., at 1363; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S., at 50 n. 16, 97 S.Ct., at 2558 n. 16; *Northern Pac. R. Co. v. United States*, 356 U.S., at 4, 78 S.Ct., at 517.

[33] The scrutiny occasionally required must not merely subsume the burdensome analysis required under the rule of reason, see *National Society of Professional Engineers v. United States*, 435 U.S. 679, 690–692, 98 S.Ct. 1355, 1364–1366, 55 L.Ed.2d 637 (1978), or else we should apply the rule of reason from the start. That is why the *per se* rule is not employed until after considerable experience with the type of challenged restraint.

[10] The blanket license, as we see it, is not a "naked restrain[t] of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use. See L. Sullivan,

Handbook of the Law of Antitrust § 59, p. 154 (1977). As we have already indicated, ASCAP and the blanket license developed together out of the practical situation in the marketplace: thousands of users, thousands of copyright owners, and millions of compositions. Most users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions, **\*\*1563** and the owners want a reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers. Indeed, as both the Court of Appeals and CBS recognize, the costs are prohibitive for licenses with individual radio stations, nightclubs, and restaurants, 562 F.2d, at 140, n. 26, and it was in that milieu that the blanket license arose.

A middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided. Also, individual fees for the use of individual compositions would presuppose an intricate schedule of fees and uses, as well as a difficult and expensive reporting problem for the user and policing task for the copyright owner. Historically, the market for public-performance rights organized itself largely around the single-fee blanket **\*21** license, which gave unlimited access to the repertory and reliable protection against infringement. When ASCAP's major and user-created competitor, BMI, came on the scene, it also turned to the blanket license.

With the advent of radio and television networks, market conditions changed, and the necessity for and advantages of a blanket license for those users may be far less obvious than is the case when the potential users are individual television or radio stations, or the thousands of other individuals and organizations performing copyrighted compositions in public.[34] But even for television network licenses, ASCAP reduces costs absolutely by creating a blanket license that is sold only a few, instead of thousands,[35] of times, and that obviates the need for closely monitoring the networks to see that they do not use more than they pay for.[36] ASCAP also provides the necessary resources for blanket sales and enforcement, resources

**Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)**

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

unavailable to the vast majority of composers and publishing houses. Moreover, a bulk license of some type is a necessary consequence of the integration necessary to achieve these efficiencies, and a necessary consequence of an aggregate license is that its price must be established.

[34]    And of course changes brought about by new technology or new marketing techniques might also undercut the justification for the practice.

[35]    The District Court found that CBS would require between 4,000 and 8,000 individual license transactions per year. 400 F.Supp., at 762.

[36]    To operate its system for distributing the license revenues to its members, ASCAP relies primarily on the networks' records of which compositions are used.

### D

This substantial lowering of costs, which is of course potentially beneficial to both sellers and buyers, differentiates the blanket license from individual use licenses. The blanket license is composed of the individual compositions plus the aggregating service. Here, the whole is truly greater than the **\*22** sum of its parts; it is, to some extent, a different product. The blanket license has certain unique characteristics: It allows the licensee immediate use of covered compositions, without the delay of prior individual negotiations[37] and great flexibility in the choice of musical material. Many consumers clearly prefer the characteristics and cost advantages of this marketable **\*\*1564** package,[38] and even small-performing rights societies that have occasionally arisen to compete with ASCAP and BMI have offered blanket licenses.[39] Thus, to the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material.[40] ASCAP, **\*23** in short, made a market in which

individual composers are inherently unable to compete fully effectively.[41]

[37]    See Timberg, The Antitrust Aspects of Merchandising Modern Music: The ASCAP Consent Judgment of 1950, 19 Law & Contemp.Prob. 294, 297 (1954) ("The disk-jockey's itchy fingers and the bandleader's restive baton, it is said, cannot wait for contracts to be drawn with ASCAP's individual publisher members, much less for the formal acquiescence of a characteristically unavailable composer or author"). Significantly, ASCAP deals only with nondramatic performance rights. Because of their nature, dramatic rights, such as for musicals, can be negotiated individually and well in advance of the time of performance. The same is true of various other rights, such as sheet music, recording, and synchronization, which are licensed on an individual basis.

[38]    Cf. *United States v. Grinnell Corp.*, 384 U.S. 563, 572–573, 86 S.Ct. 1698, 1704–1705, 16 L.Ed.2d 778 (1966); *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 356–357, 83 S.Ct. 1715, 1737–1738, 10 L.Ed.2d 915 (1963).

[39]    Comment, Music Copyright Associations and the Antitrust Laws, 25 Ind.L.J. 168, 170 (1950). See also Garner, *United States v. ASCAP* : The Licensing Provisions of the Amended Final Judgment of 1950, 23 Bull.Copyright Soc. 119, 149 (1975) ("no performing rights are licensed on other than a blanket basis in any nation in the world").

[40]    Moreover, because of the nature of the product—a composition can be simultaneously "consumed" by many users—composers have numerous markets and numerous incentives to produce, so the blanket license is unlikely to cause decreased output, one of the normal

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

undesirable effects of a cartel. And since popular songs get an increased share of ASCAP's revenue distributions, composers compete even within the blanket license in terms of productivity and consumer satisfaction.

[41]  Cf. *United States v. Socony-Vacuum Oil Co.*, 310 U.S., at 217, 60 S.Ct., at 841 (distinguishing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), on the ground that among the effects of the challenged rule there "was the creation of a public market"); *United States v. Trenton Potteries Co.*, 273 U.S., at 401, 47 S.Ct., at 381 (distinguishing *Chicago Bd. of Trade* on the ground that it did not involve "a price agreement among competitors in an open market").

E

[11]  Finally, we have some doubt—enough to counsel against application of the *per se* rule—about the extent to which this practice threatens the "central nervous system of the economy," *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940), that is, competitive pricing as the free market's means of allocating resources. Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints. Mergers among competitors eliminate competition, including price competition, but they are not *per se* illegal, and many of them withstand attack under any existing antitrust standard. Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.

[12]  Here, the blanket-license fee is not set by competition among individual copyright owners, and it is a fee for the use of any of the compositions

covered by the license. But the blanket license cannot be wholly equated with a simple horizontal arrangement among competitors. ASCAP does set the price for its blanket license, but that license is quite different from anything any individual owner could issue. The individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket **\*24** license to mask price fixing in such other markets.[42] Moreover, the substantial restraints placed on ASCAP and its members by the consent decree must not be ignored. The District Court found that there was no legal, practical, or conspiratorial impediment to CBS's obtaining individual licenses; CBS, in short, had a real choice.

[42]   "CBS does not claim that the individual members and affiliates ('sellers') of ASCAP and BMI have agreed among themselves as to the prices to be charged for the particular 'products' (compositions) offered by each of them." 400 F.Supp., at 748.

With this background in mind, which plainly enough indicates that over the years, and in the face of available alternatives, the blanket license has provided an acceptable mechanism for at least a large **\*\*1565** part of the market for the performing rights to copyrighted musical compositions, we cannot agree that it should automatically be declared illegal in all of its many manifestations. Rather, when attacked, it should be subjected to a more discriminating examination under the rule of reason. It may not ultimately survive that attack, but that is not the issue before us today.

IV

As we have noted, n. 27, *supra*, the enigmatic remarks of the Court of Appeals with respect to remedy appear to have departed from the court's strict, *per se* approach and to have invited a more careful analysis. But this left the general import of its judgment that the licensing practices of ASCAP and BMI under the consent decree are *per se* violations of the Sherman

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

Act. We reverse that judgment, and the copyright misuse judgment dependent upon it, see n. 9, *supra*, and remand for further proceedings to consider any unresolved issues that CBS may have properly brought to the Court of Appeals.[43] Of course, this will include an assessment under **\*25** the rule of reason of the blanket license as employed in the television industry, if that issue was preserved by CBS in the Court of Appeals.[44]

[43]  It is argued that the judgment of the Court of Appeals should nevertheless be affirmed on the ground that the blanket license is a tying arrangement in violation of § 1 of the Sherman Act or on the ground that ASCAP and BMI have monopolized the relevant market contrary to § 2. The District Court and the Court of Appeals rejected both submissions, and we do not disturb the latter's judgment in these respects, particularly since CBS did not file its own petition for certiorari challenging the Court of Appeals' failure to sustain its tying and monopolization claims.

[44]  The Court of Appeals did not address the rule-of-reason issue, and BMI insists that CBS did not preserve the question in that court. In any event, if the issue is open in the Court of Appeals, we prefer that that court first address the matter. Because of the United States' interest in the enforcement of the consent decree, we assume it will continue to play a role in this litigation on remand.

The judgment of the Court of Appeals is reversed, and the cases are remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice STEVENS, dissenting.

The Court holds that ASCAP's blanket license is not a species of price fixing categorically forbidden by the Sherman Act. I agree with that holding. The Court

remands the cases to the Court of Appeals, leaving open the question whether the blanket license as employed by ASCAP and BMI is unlawful under a rule-of-reason inquiry. I think that question is properly before us now and should be answered affirmatively.

There is ample precedent for affirmance of the judgment of the Court of Appeals on a ground that differs from its rationale, provided of course that we do not modify its judgment.[1] In this litigation, the judgment of the Court of Appeals was **\*26** not that blanket licenses may never be offered by ASCAP and BMI. Rather, its judgment directed the District Court to fashion relief requiring them to offer additional forms of license as well.[2] Even though that judgment may not be consistent with its stated conclusion that the blanket license is "illegal *per se*" as a kind of price fixing, it is entirely consistent with a conclusion that petitioners' exclusive all-or-nothing blanket-license policy violates the rule of reason.[3]

[1]  See *United States v. New York Telephone Co.,* 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376; *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 419, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851; *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 480–481, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784; *United States v. American Railway Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087.

[2]  562 F.2d 130, 140–141 (CA2 1977).

[3]  See *ante,* at 1561 n. 27 (describing relief ordered by Court of Appeals as "unusual" for a *per se* case, and suggesting that that court's decision appears more consistent with a rule-of-reason approach).

**\*\*1566** The Court of Appeals may well so decide on remand. In my judgment, however, a remand is not necessary.[4] The record before this Court is a full one, reflecting extensive discovery and eight weeks of trial. The District Court's findings of fact are thorough and well supported. They clearly reveal that the challenged policy does have a significant adverse

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

impact on competition. I would therefore affirm the judgment of the Court of Appeals.

[4]    That the rule-of-reason issues have been raised and preserved throughout seems to me clear. See 562 F.2d, at 134. ("CBS contends that the blanket licensing method is not only an illegal tie-in or blockbooking which in practical terms is coercive in effect, but is also an illegal price-fixing device, a per se violation . . ."); *id.*, at 141 n. 29. ("As noted, CBS also claims violation of § 2 of the Sherman Act. We need not go into the legal arguments on this point because they are grounded on its factual claim that there are barriers to direct licensing and 'bypass' of the ASCAP blanket license. The District Court, as noted rejected this contention and its findings are not clearly erroneous. The § 2 claim must therefore fail at this time and on this record"); Brief for Respondents 41.

I

In December 1969, the president of the CBS television network wrote to ASCAP and BMI requesting that each "promptly ... grant a new performance rights license which **\*27** will provide, effective January 1, 1970, for payments measured by the actual use of your music."[5] ASCAP and BMI each responded by stating that it considered CBS's request to be an application for a license in accordance with the provisions of its consent decree and would treat it as such,[6] even though neither decree provides for licensing on a per-composition or per-use basis.[7] Rather than pursuing further discussion, CBS instituted this suit.

[5]    400 F.Supp. 737, 753 (S.D.N.Y.1975).

[6]    ASCAP responded in a letter from its general counsel, stating that it would consider the request at its next board of directors meeting, and that it regarded it as

an application for a license consistent with the decree. The letter from BMI's president stated: "The BMI Consent Decree provides for several alternative licenses and we are ready to explore any of these with you." *Id.,* at 753–754.

[7]    See *ante*, at 1558, and n. 21.

Whether or not the CBS letter is considered a proper demand for per-use licensing is relevant, if at all, only on the question of relief. For the fact is, and it cannot seriously be questioned, that ASCAP and BMI have steadfastly adhered to the policy of only offering overall blanket or per-program licenses,[8] notwithstanding requests for more limited authorizations. Thus, ASCAP rejected a 1971 request by NBC for licenses for 2,217 specific compositions,[9] as well as an earlier request by a group of television stations for more limited authority than the blanket licenses which they were then **\*28** purchasing.[10] Neither ASCAP nor BMI has ever offered to license anything less than its entire portfolio, even on an experimental basis. Moreover, if the response to the CBS letter were not sufficient to characterize their consistent policy, the defense of this lawsuit surely is. It is the refusal to license anything less than the entire repertoire—rather than the decision to offer blanket licenses themselves—that raises the serious antitrust questions in this case.

[8]    The 1941 decree requires ASCAP to offer per-program licenses as an alternative to the blanket license. *United States v. ASCAP,* 1940–1943 Trade Cases ¶ 56,104, p. 404 (S.D.N.Y.). Analytically, however, there is little difference between the two. A per-program license also covers the entire ASCAP repertoire; it is therefore simply a miniblanket license. As is true of a long-term blanket license, the fees set are in no way dependent on the quantity or quality of the music used. See *infra,* at 1568–1569, *infra.*

[9]    See *United States v. ASCAP* (*Application of National Broadcasting Co.*), 1971 Trade

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

Cases ¶ 73,491 (S.D.N.Y.1970).

10  See *United States v. ASCAP* (*Application of Shenandoah Valley Broadcasting, Inc.*), 208 F.Supp. 896 (S.D.N.Y.1962), aff'd, 331 F.2d 117 (CA2 1964), cert. denied, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048.

**1567 II

Under our prior cases, there would be no question about the illegality of the blanket-only licensing policy if ASCAP and BMI were the exclusive sources of all licenses. A copyright, like a patent, is a statutory grant of monopoly privileges. The rules which prohibit a patentee from enlarging his statutory monopoly by conditioning a license on the purchase of unpatented goods,[11] or by refusing to grant a license under one patent unless the licensee also takes a license under another, are equally applicable to copyrights.[12]

11  *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; *International Business Machines Corp. v. United States,* 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; *United Shoe Machinery Corp. v. United States,* 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

12  Indeed, the leading cases condemning the practice of "blockbooking" involved copyrighted motion pictures, rather than patents. See *United States v. Paramount Pictures,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; *United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11.

It is clear, however, that the mere fact that the holder of several patents has granted a single package license covering them all does not establish any illegality.

This point was settled by *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312, and reconfirmed in *29 Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 137–138, 89 S.Ct. 1562, 1583–1585, 23 L.Ed.2d 129. The Court is therefore unquestionably correct in its conclusion that ASCAP's issuance of blanket licenses covering its entire inventory is not, standing alone, automatically unlawful. But both of those cases identify an important limitation on this rule. In the former, the Court was careful to point out that the record did not present the question whether the package license would have been unlawful if Hazeltine had refused to license on any other basis. 339 U.S., at 831, 70 S.Ct. at 896. And in the latter case, the Court held that the package license was illegal because of such a refusal. 395 U.S., at 140–141, 89 S.Ct., at 1585–1586.

Since ASCAP offers only blanket licenses, its licensing practices fall on the illegal side of the line drawn by the two *Hazeltine* cases. But there is a significant distinction: unlike Hazeltine, ASCAP does not have exclusive control of the copyrights in its portfolio, and it is perfectly possible—at least as a legal matter—for a user of music to negotiate directly with composers and publishers for whatever rights he may desire. The availability of a practical alternative alters the competitive effect of a blockbooking or blanket-licensing policy. ASCAP is therefore quite correct in its insistence that its blanket license cannot be categorically condemned on the authority of the blockbooking and package-licensing cases. While these cases are instructive, they do not directly answer the question whether the ASCAP practice is unlawful.

The answer to that question depends on an evaluation of the effect of the practice on competition in the relevant market. And, of course, it is well settled that a sales practice that is permissible for a small vendor, at least when no coercion is present, may be unreasonable when employed by a company that dominates the market.[13] We **1568 therefore must consider *30 what the record tells us about the competitive character of this market.

13  See *Tampa Electric Co. v. Nashville Coal*

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

*Co.,* 365 U.S. 320, 334, 81 S.Ct. 623, 631, 5 L.Ed.2d 580 (upholding requirements contract on the ground that "[t]here is here neither a seller with a dominant position in the market as in *Standard Fashion* [*Co. v. Magrane-Houston Co.,* 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653]; nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in *Standard Oil* [*Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371]; nor a plainly restrictive tying arrangement as in *International Salt* [*Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed.2d 20]"); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 610–612, 73 S.Ct. 872, 881–882, 97 L.Ed. 1277 (upholding challenged advertising practice because, while the volume of commerce affected was not " 'insignificant or insubstantial,' " seller was found not to occupy a "dominant position" in the relevant market). While our cases make clear that a violation of the Sherman Act requires both that the volume of commerce affected be substantial and that the seller enjoy a dominant position, see *id.,* at 608–609, 73 S.Ct., at 880–881, proof of actual compulsion has not been required, but cf. *Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc.,* 268 F.2d 246, 251 (CA2 1959), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121; *Milwaukee Towne Corp. v. Loew's, Inc.,* 190 F.2d 561 (CA7 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680. The critical question is one of the likely practical effect of the arrangement: whether the "court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric Co. v. Nashville Coal Co., supra,* 365 U.S., at 327, 81 S.Ct., at 628.

III

The market for music at issue here is wholly dominated by ASCAP-issued blanket licenses.[14] Virtually every domestic copyrighted composition is in the repertoire of either ASCAP or BMI. And again, virtually without exception, the only means that has been used to secure authority to perform such compositions is the blanket license.

[14]  As in the majority opinion, my references to ASCAP generally encompass BMI as well.

The blanket all-or-nothing license is patently discriminatory.[15] The user purchases full access to ASCAP's entire *31 repertoire, even though his needs could be satisfied by a far more limited selection. The price he pays for this access is unrelated either to the quantity or the quality of the music he actually uses, or, indeed, to what he would probably use in a competitive system. Rather, in this unique all-or-nothing system, the price is based on a percentage of the user's advertising revenues,[16] a measure that reflects the customer's ability to pay[17] but is totally unrelated to factors—such as the cost, quality, or quantity of the product—that normally affect price in a competitive market. The ASCAP system requires users to buy more music than they want at a price which, while not beyond their ability to pay and perhaps not even beyond what is "reasonable" for the access they are getting,[18] may well be far higher than what they would choose to spend for music in *32 a competitive system. It is a classic example of economic discrimination.

[15]  See Cirace, *CBS v. ASCAP:* An Economic Analysis of A Political Problem, 47 Ford.L.Rev. 277, 286 (1978) ("the all-or-nothing bargain allows the monopolist to reap the benefits of perfect price discrimination without confronting the problems posed by dealing with different buyers on different terms").

[16]  For many years prior to the

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

commencement of this action, the BMI blanket-license fee amounted to 1.09% of net receipts from sponsors after certain specified deductions. 400 F.Supp., at 743. The fee for access to ASCAP's larger repertoire was set at 2.5% of net receipts; in recent years, however, CBS has paid a flat negotiated fee, rather than a percentage, to ASCAP. 23 Jt.App. in CA2 No. 75–7600, pp. E1051–E1052, E1135.

[17] See Cirace, *supra*, at 288:

> "This history indicates that, from its inception, ASCAP exhibited a tendency to discriminate in price. A license fee based upon a percentage of gross revenue is discriminatory in that it grants the same number of rights to different licensees for different total dollar amounts, depending upon their ability to pay. The effectiveness of price discrimination is significantly enhanced by the all-or-nothing blanket license."

[18] Under the ASCAP consent decree, on receipt of an application, ASCAP is required to "advise the applicant in writing of the fee which it deems reasonable for the license requested." If the parties are unable to agree on the fee within 60 days of the application, the applicant may apply to the United States District Court for the Southern District of New York for the determination of a "reasonable fee." *United States v. ASCAP,* 1950–1951 Trade Cases ¶ 62,595, p. 63,754 (S.D.N.Y.1950). The BMI decree contains no similar provision for judicial determination of a reasonable fee.

The record plainly establishes that there is no price competition between separate musical compositions.[19]

Under a blanket license, it is no more expensive for a network **1569 to play the most popular current hit in prime time than it is to use an unknown composition as background music in a soap opera. Because the cost to the user is unaffected by the amount used on any program or on all programs, the user has no incentive to economize by, for example, substituting what would otherwise be less expensive songs for established favorites or by reducing the quantity of music used on a program. The blanket license thereby tends to encourage the use of more music, and also of a larger share of what is really more valuable music, than would be expected in a competitive system characterized by separate licenses. And since revenues are passed on to composers on a basis reflecting the character and frequency of the use of their music,[20] the tendency is to increase the rewards of the established composers at the expense of those less well known. Perhaps the prospect is in any event unlikely, but the blanket license does not present a new songwriter with any opportunity to try to *33 break into the market by offering his product for sale at an unusually low price. The absence of that opportunity, however unlikely it may be, is characteristic of a cartelized rather than a competitive market.[21]

[19] ASCAP's economic expert, Robert Nathan, was unequivocal on this point:

> "Q. Is there price competition under this system between separate musical compositions?
>
> "A. No sir." Tr. 3983.

[20] See 562 F.2d, at 136 n. 15. In determining royalties ASCAP distinguishes between feature, theme, and background uses of music. The 1950 amended decree requires ASCAP to distribute royalties on "a basis which gives primary consideration to the performance of the compositions." The 1960 decree provided for the additional option of receiving royalties under a deferred plan which provides additional compensation based on length of membership and the recognized status of the individual's works. See *United States v.*

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

*ASCAP,* 1960 Trade Cases ¶ 69,612, pp. 76,469–76,470 (S.D.N.Y.1960).

[21] See generally 2 P. Areeda & D. Turner, Antitrust Law 280–281, 342–345 (1978); Cirace, *supra,* n. 15, at 286–292.

The current state of the market cannot be explained on the ground that it could not operate competitively, or that issuance of more limited—and thus less restrictive—licenses by ASCAP is not feasible. The District Court's findings disclose no reason why music-performing rights could not be negotiated on a per-composition or per-use basis, either with the composer or publisher directly or with an agent such as ASCAP. In fact, ASCAP now compensates composers and publishers on precisely those bases.[22] If distributions of royalties can be calculated on a per-use and per-composition basis, it is difficult to see why royalties could not also be collected in the same way. Moreover, the record also shows that where ASCAP's blanket-license scheme does not govern, competitive markets do. A competitive market for "synch" rights exists,[23] and after the use of blanket licenses in the motion picture industry was discontinued,[24] such a market promptly developed in that industry.[25] In sum, the record demonstrates that the market at issue here is one that could be highly competitive, but is not competitive at all.

[22] See n. 20, *supra.*

[23] The "synch" right is the right to record a copyrighted song in synchronization with the film or videotape, and is obtained separately from the right to perform the music. It is the latter which is controlled by ASCAP and BMI. See *CBS, Inc. v. ASCAP,* 400 F.Supp., at 743.

[24] See *Alden-Rochelle, Inc. v. ASCAP,* 80 F.Supp. 888 (S.D.N.Y.1948).

[25] See *400 F.Supp., at 759–763;* 5 Jt.App. in CA2 No. 75–7600, pp. 775–777 (testimony of Albert Berman, managing director of the Harry Fox Agency, Inc.).

Television synch rights and movie performance and synch rights are handled by the Fox Agency, which serves as the broker for thousands of music publishers.

*34 IV

Since the record describes a market that could be competitive and is not, and since that market is dominated by two firms engaged in a single, blanket method of dealing, it surely seems logical to conclude that trade has been restrained unreasonably. ASCAP argues, however, that at least as to CBS, there has been no restraint at all since the network is free to deal directly with copyright holders.

**1570 The District Court found that CBS had failed to establish that it was compelled to take a blanket license from ASCAP. While CBS introduced evidence suggesting that a significant number of composers and publishers, satisfied as they are with the ASCAP system, would be "disinclined" to deal directly with the network, the court found such evidence unpersuasive in light of CBS's substantial market power in the music industry and the importance to copyright holders of network television exposure.[26] Moreover, it is arguable that CBS could go further and, along with the other television networks, use its economic resources to exploit destructive competition among purveyors of music by driving the price of performance rights down to a far lower level. But none of this demonstrates that ASCAP's practices are lawful, or that ASCAP cannot be held liable for injunctive relief at CBS's request.

[26] See *400 F.Supp., at 767–771.*

The fact that CBS has substantial market power does not deprive it of the right to complain when trade is restrained. Large buyers, as well as small, are protected by the antitrust laws. Indeed, even if the victim of a conspiracy is himself a wrongdoer, he has not forfeited the protection of the law.[27] Moreover, a conclusion that excessive competition would cause

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

one side of the market more harm than good may justify a legislative exemption from the antitrust laws, but does not **35 constitute a defense to a violation of the Sherman Act.[28] Even though characterizing CBS as an oligopolist may be relevant to the question of remedy, and even though free competition might adversely affect the income of a good many composers and publishers, these considerations do not affect the legality of ASCAP's conduct.

[27]   See *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138–140, 88 S.Ct. 1981, 1984–1985, 20 L.Ed.2d 982; *Simpson v. Union Oil Co.,* 377 U.S. 13, 16–17, 84 S.Ct. 1051, 1054–1055, 12 L.Ed.2d 98; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219.

[28]   See *National Society of Professional Engineers v. United States,* 435 U.S. 679, 689–690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637.

More basically, ASCAP's underlying argument that CBS must be viewed as having acted with complete freedom in choosing the blanket license is not supported by the District Court's findings. The District Court did not find that CBS could cancel its blanket license "tomorrow" and continue to use music in its programming and compete with the other networks. Nor did the District Court find that such a course was without any risk or expense. Rather, the District Court's finding was that within a year, during which it would continue to pay some millions of dollars for its annual blanket license, CBS would be able to develop the needed machinery and enter into the necessary contracts.[29] In other words, although the barriers to direct dealing by CBS as an alternative to paying for a blanket license are real and significant, they are not insurmountable.

[29]   See 400 F.Supp., at 762–765.

Far from establishing ASCAP's immunity from liability, these District Court findings, in my judgment, confirm the illegality of its conduct. Neither CBS nor any other user has been willing to assume the costs and risks associated with an attempt to purchase music on a competitive basis. The fact that an attempt by CBS to break down the ASCAP monopoly might well succeed does not preclude the conclusion that smaller and less powerful buyers are totally foreclosed from a competitive market.[30] Despite its size, CBS itself **36 may not obtain **1571 music on a competitive basis without incurring unprecedented costs and risks. The fear of unpredictable consequences, coupled with the certain and predictable costs and delays associated with a change in its method of purchasing music, unquestionably inhibits any CBS management decision to embark on a competitive crusade. Even if ASCAP offered CBS a special bargain to forestall any such crusade, that special arrangement would not cure the marketwide restraint.

[30]   For an individual user, the transaction costs involved in direct dealing with individual copyright holders may well be prohibitively high, at least in the absence of any broker or agency routinely handling such requests. Moreover, the District Court found that writers and publishers support and prefer the ASCAP system to direct dealing. *Id.,* at 767. While their apprehension at direct dealing with CBS could be overcome, the District Court found, by CBS's market power and the importance of television exposure, a similar conclusion is far less likely with respect to other users.

Whatever management decision CBS should or might have made, it is perfectly clear that the question whether competition in the market has been unduly restrained is not one that any single company's management is authorized to answer. It is often the case that an arrangement among competitors will not serve to eliminate competition forever, but only to delay its appearance or to increase the costs of new entry. That may well be the state of this market. Even without judicial intervention, the ASCAP monopoly might eventually be broken by CBS, if the benefits of doing so outweigh the significant costs and risks involved in commencing direct dealing.[31] But that

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

hardly means that the blanket-licensing **\*37** policy at issue here is lawful. An arrangement that produces marketwide price discrimination and significant barriers to entry unreasonably restrains trade even if the discrimination and the barriers have only a limited life expectancy. History suggests, however, that these restraints have an enduring character.

[31]     The risks involved in such a venture appear to be substantial. One significant risk, which may be traced directly to ASCAP and its members, relates to music "in the can"—music which has been performed on shows and movies already in the network's inventory, but for which the network must still secure performing rights. The networks accumulate substantial inventories of shows "in the can." And, as the Government has pointed out as *amicus curiae* :

"If they [the networks and television stations] were to discontinue the blanket license, they then would be required to obtain performance rights for these already-produced shows. This attempt would create an opportunity for the copyright owners, as a condition of granting performing rights, to attempt to obtain the entire value of the shows 'in the can.' It would produce, in other words, a case of bilateral monopoly. Because pricing is indeterminate in a bilateral monopoly, television networks would not terminate their blanket licenses until they had concluded an agreement with every owner of copyrighted music 'in the can' to allow future performance for an identified price; the networks then would determine whether that price was sufficiently low that termination of the blanket license would be profitable. But the prospect of such negotiations offers the copyrights owners an ability to misuse their rights in a way that ensures the continuation of blanket licensing despite a change in market conditions that may make other forms of licensing preferable." Brief for United States as *Amicus Curiae* 24–25.

This analysis is in no sense inconsistent with the findings of the District Court. The District Court did reject CBS's coercion argument as to music "in the can." But as the Government again points out, the District Court's findings were addressed essentially to a tie-in claim; "the court did not consider the possibility that the copyright owners' self-interested, non-coercive demands for compensation might nevertheless make the cost of CBS' dropping the blanket license sufficiently high that ASCAP and BMI could take this 'termination penalty' into account in setting fees for the blanket license." *Id.,* at 25 n. 23.

Antitrust policy requires that great aggregations of economic power be closely scrutinized. That duty is especially important when the aggregation is composed of statutory monopoly privileges. Our cases have repeatedly stressed the need to limit the privileges conferred by patent and copyright strictly to the scope of the statutory grant. The record in this case plainly discloses that the limits have been exceeded and that ASCAP and BMI exercise monopoly powers that far exceed the sum of the privileges of the individual copyright holders. **\*38** Indeed, ASCAP itself argues that its blanket license constitutes a product that is significantly different from the sum of its component parts. I agree with that premise, but I conclude that the aggregate is a monopolistic restraint of trade proscribed by the Sherman Act.

### All Citations

441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558, 1978-81 Copr.L.Dec. P 25,064

**Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979)**

99 S.Ct. 1551, 60 L.Ed.2d 1, 201 U.S.P.Q. 497, 1979-1 Trade Cases P 62,558...

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.