# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO THE COURT'S LIABILITY STANDARD QUESTIONS

Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
Sati Harutyunyan (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 S. Flower St.,
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com

Dated: November 11, 2023

In response to the questions this Court recently posed to the parties, Plaintiffs state: (1) the per se standard applies to horizontal price-fixing schemes, including output limiting schemes such as the scheme proven here, unless Defendants demonstrate the schemes satisfy the ancillary restraint doctrine; (2) the Court may apply the per se standard to certain restraints and the rule of reason to other restraints; and (3) because Defendants have not shown their scheme was an ancillary restraint, the evidence supports the application of the per se rule to the entire case. Finally, the Court is not bound by the MDL Court's rulings and should follow Seventh Circuit law.

1. **The Application of the Per Se Rule to Horizontal Agreements**.

Courts often state the per se rule applies to "naked" restraints and the rule of reason applies to other restraints. Naked restraints are generally those the court finds to be lacking a substantial procompetitive justification. *NCAA v. Board of Regents*, 468 U.S. 85, 98-104 (1984). To determine whether an agreement to limit output is naked, the Court must determine whether the output-restricting agreement is "subordinate and collateral" to meeting a legitimate and valuable goal and whether the agreement is "necessary" to achieve that goal. These governing legal principles flow from controlling decisions, discussed below, that support a per se rule in this case.

*First*, horizontal price-fixing restrictions are often termed naked restraints and are per se illegal. As Judge Durkin indicated in applying the per se rule in *Broiler Chicken*, collective agreements to reduce output are price fixing arrangements. *In re Broiler Chicken Antitr. Litig.*, 2022 WL 4303476 (N.D Ill. June 30, 2022) (price fixing is a per se violation; "[o]utput reduction with the intent to increase price can be a form of price fixing").

The per se rule ordinarily applies to horizontal, price fixing agreements. In *Toys "R" Us v. FTC,* 221 F.3d 928, 936 (7th Cir. 2000), the Seventh Circuit applied the per se rule to a complex horizontal and vertical relationship between and among *Toys R Us* and its suppliers to restrain sales to discount stores. As here, the output restricting scheme was organized as a hub and spoke

1

conspiracy. Despite the complexity of the relationship and defendants' proffered justifications, the Seventh Circuit affirmed the application of the per se rule. *Id*. at 930.

The Seventh Circuit applied a per se rule in *United States v. Andreas*, 216 F.32 645 (7th Cir. 2000), a criminal case arising out of the horizontal ADM lysine conspiracy. The charged conduct was complicated and reflected characteristics not previously seen in cases of this type. Despite the scheme's novelty, the Seventh Circuit affirmed the application of a per se rule. Horizontal price fixing, it noted, is subject to the per se rule even if it is implemented in a way that includes "clever characteristics." *Id.* at 667.

Similarly, in *Federal Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 431-432 (1990), the United States Supreme Court affirmed the application of the per se rule to a horizontal work stoppage agreement. The defendants agreed to collective action to obtain better funding so they could do a better job of representing their clients. Despite the societal benefit from their collective action, the Supreme Court applied the per se rule. The societal benefits that the defendants' collective action genuinely sought to achieve did not justify collective action to reduce output. The per se rule is most universally accepted in horizontal restraint cases. *See, e.g., International Outsourcing Services, LLC v. Blistex, Inc.*, 420 F.Supp.2d 860, 865 (N.D. Ill. 2006) ("the complaint sets forth a horizontal price fixing scheme" that "sufficiently alleges conduct prohibited per se by the Sherman Act.").

*Second,* courts apply the rule of reason to horizontal agreements where those agreements are ancillary to a procompetitive combination. The court recently explained in *In re Outpatient Cen. Empl. Antitr. Litig.*, 630 F. Supp 968, 987 (N.D. Ill. 2022):

> A horizontal market allocation agreement may escape per se treatment, however, if the restraint is "ancillary" rather than "naked." "A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros., Inc. v. Forest City Enters., Inc.,* 776 F.2d 185, 189 (7th Cir. 1985). On the other hand, a "naked" restraint is one "in which the restriction on competition is unaccompanied by new production or products." Id. at 188.

The Department of Justice and Federal Trade Commission summarized the law: if defendants in a horizontal agreement case "do not properly assert and establish a defense under the ancillary-restraints doctrine, the per se rule applies." *See* DOJ and FTC Amicus Brief, *Deslandes v. McDonald's USA, Inc.*, 81 F.4th 699 (7th Cir. 2023), at 14. (The brief is attached as Exhibit A.)

Judge Bork explained the ancillary restraint doctrine in *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). The defendant van line terminated contracts with affiliates that refused to abide by defendant's rules. The D.C. Circuit found this practice was not anticompetitive because it was "designed to make the van line more efficient rather than to decrease the output of its services and raise rates." *Id.* at 211. It explained defendant was not subject to the per se rule where the "agreement eliminating competition [is] subordinate and collateral to a separate, legitimate transaction." The ancillary restraint must serve "to make the main transaction more effective in accomplishing its purpose." *Id.* at 224.

In the Seventh Circuit, *Polk Brothers, Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) (Easterbrook, J.), is the leading case explaining this principle. There, two competitors agreed to develop a parcel as a new location for each. As a condition, they agreed not to sell certain product lines that were critical to the success of the other party. The Seventh Circuit found this was an ancillary restraint and applied the rule of reason because the evidence demonstrated that without the restriction of competing product sales, the stores would not have been built at all.

The Seventh Circuit applied the same principles, in a case involving an agreement between competing lawyers who dissolved their partnership and agreed to refrain from advertising in each other's primary markets. *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995). The lawyers argued the agreement not to advertise was ancillary to their agreement to divide their law firm into two firms. Although the Court agreed the law firm dissolution increased competition, it found the

agreement not to advertise was not ancillary because the advertising restriction was adopted later, and therefore was not necessary to achieve the procompetitive objective. *Id*. at 828.

Why this doctrine applies to our case can best be seen in the Seventh Circuit's recent decision in *Deslandes v. McDonald's USA, Inc*, 81 F.4th 699 (7th Cir. 2023). In *Deslandes*, plaintiffs challenged McDonald's' horizontal agreement requiring franchisees to refrain from hiring each other's employees. The "no poach" requirement was part of the *McDonald's* franchise agreement. *McDonald's* argued the franchise agreement was procompetitive by enabling McDonald's to maintain uniform standards of product quality and expand its operation from one hamburger stand to thousands. The district court agreed that the franchise agreement was procompetitive and dismissed the case as plaintiffs had alleged only a per se claim.

The Seventh Circuit reversed in an opinion authored by Judge Easterbrook and joined by Judges Wood and Ripple. The fact that the franchise agreement was procompetitive was not sufficient to apply the rule of reason. The Seventh Circuit held that where an anticompetitive horizontal agreement is part of a broader practice alleged to be procompetitive, the restraint must be ancillary before the court can apply the rule of reason. Policing this distinction, and echoing Judge Bork's decision in *Rothery*, the Court held that to be an ancillary restraint subject to the rule of reason, the defendants must first show the anticompetitive horizontal restriction is subordinate and collateral to the output enhancing portions of the agreement. Defendants must also prove that the horizontal restriction is necessary to accomplishing the procompetitive goals. The Seventh Circuit held that the no poach agreement could not be analyzed under the rule of reason unless two conditions were met on remand. First, McDonald's had to show that the no-poach agreement was subordinate to the franchise agreement. Second, it had to show that the franchise agreement would not achieve its output-enhancing goals without the no-poach agreement. Were the law otherwise,

conspirators could escape per se liability by tacking a price fixing agreement onto an agreement that arguably has beneficial aims.

As discussed above, the DOJ and FTC submitted an amicus brief (attached as Exhibit A) in the *McDonald's* case. The DOJ and FTC did not support either party. Instead, they explained the antitrust enforcers' view of the law. The DOJ and FTC advised the Seventh Circuit that a horizontal restriction may be analyzed under the rule of reason only where the defendant proved the restriction is subordinate and collateral to the procompetitive agreement and is necessary to accomplish the agreement's goals. We commend that brief to the Court for guidance. The Government's brief, as well as *McDonald's*, *Polk Brothers*, and *Blackburn*, demonstrate that to be considered under the rule of reason, Defendants must prove the challenged restraints are ancillary. As we show in response to Question 3, those requirements are not met in this case.[1]

### 2. *The Court May Evaluate Each Restriction Separately*.

The Count asked whether the challenged practices should be evaluated separately, or only in combination. To answer this question, the Court needs to look no further than the Third Circuit's decision resolving the appeal from the DPP class trial, *In re Processed Egg Prod. Antitr. Litig.*, 692 F.3d 719 (3d Cir. 2020). In that case, the class alleged an overarching conspiracy to inflate

---

[1] Defendants may rely, as they did in their prior filing, Dkt. 462, on *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 16 (1979) ("*BMI*"). *BMI* applied the rule of reason to a horizontal restraint for a different reason, which is not present here. Plaintiff in *BMI* challenged BMI's group license which set prices for broadcasting copyright works but also coordinated sales, marketing, royalty collection and the enforcement of copyright law. The Court relied on the amicus brief submitted by the DOJ (authored by then-Deputy Solicitor General Easterbrook). The Court agreed that the rule of reason should apply where the agreement allowed the market to exist. Without the blanket license, there would have been chaos in licensing. The Supreme Court relied on *BMI* in *NCAA v. Board of Regents*, 468 U.S. 85, 98-104 (1984), a case involving college football broadcasts. It applied the rule of reason because the NCAA's restrictions were necessary for the market to exist. It nevertheless found the NCAA restrictions were anticompetitive because they reduced output and raised prices. *Id.* at 120. (The case was argued by then-Professor Easterbrook.) Here, Defendants cannot show their restraints allowed the market to exist at all.

prices through separate methods and means. The plaintiffs argued every challenged restraint should be evaluated under the per se rule. The district court disagreed and applied the rule of reason. On appeal, the Third Circuit described the two standards of liability – rule of reason and per se—and stated that it was appropriate to apply different legal standards to the separate components of the conspiracy. The Court stated the law "does not require analysis of the distinct components of a conspiracy as if they were an undifferentiated and indistinguishable bunch of behaviors." *Id* at 727. The "various stratagems of an alleged conspiracy" do not need to be evaluated under a single standard. *Id*. Instead, "the court is free to determine which analytical standard should apply to each. It is possible that different aspects of an alleged conspiracy can have very different economic consequences, and that, accordingly, different standards should apply when assessing whether each has an unlawful anticompetitive effect." *Id*. at 728. Thus, there is ample authority to analyze the restraints under different substantive standards.

*How Should The Jury be Instructed?* Putting these two threads of analysis together, Plaintiffs submit that deciding whether a challenged restraint is "unreasonable," which is the second element of the claim, is a three-step process:

- First, the Court should decide if challenged horizontal restraints are unreasonable per se. As to those restraints the Court concludes are unreasonable per se, the Court should instruct the jury that the restraint is unreasonable.

- Second, as to any challenged restraint the Court does not find to be unreasonable per se, the Court should instruct the jury to decide whether the horizontal restraint is ancillary. The jury will decide if Defendants proved the horizontal restraint was: (1) subordinate and collateral to a legitimate business collaboration; and (2) necessary to accomplishing the procompetitive benefits of the legitimate business collaboration. If not, that restraint is unreasonable. If the jury finds at least one restraint is ancillary, the jury will proceed to the third step.

- Third, the jury decides whether the ancillary horizontal agreement is unlawful under the rule of reason, considering all of the facts and circumstances, including the restraints the Court or jury determined to be unreasonable per se.[2]

### 3. Trial Evidence Supports the Application of the Per Se Rule

The Court reserved judgment as to the proper legal standard until after the presentation of evidence. That evidence demonstrates Defendants agreed as horizontal competitors to reduce the supply of eggs to increase their price. The chief executives of each producer Defendant have admitted as much. Tr. 1033:23-1034:5 (Baker agreeing that Cal-Maine introduced motions and that Cal-Maine participated in all UEP recommendations for egg producers to manage, control, or reduce the size of egg laying flocks); Tr. 4472:1-5 (Rose Acre was concerned that "the UEP was coordinating egg producers to restrict supply of eggs to boost prices"). Documents produced by both trade associations acknowledge the anticompetitive purpose and effect of the restraints challenged in this case. Ex. 189 & 555 (USEM stating prices rose immediately as intended due to export); Ex. 374 & 405 (UEP stating short-term measures and exports raised prices); Ex. 159 (UEP President stating Animal Welfare Guidelines raised prices); Ex. 180 (UEP stating same for Certified Program). As horizontal restraints, Defendants' agreements are ordinarily treated under the per se rule. Defendants instead invite the Court to apply the rule of reason. Yet the rule of reason applies only to restraints that are ancillary to procompetitive agreements. Here, individually, and collectively, the challenged restraints are not ancillary.

### A. Short Term Measures and Exports Are Naked Restraints.

The evidence demonstrates the short-term measures were designed to reduce the production of eggs. Tr. 1035:11-17 (Baker testifying the recommendations to manage, control, or

---

[2] Plaintiffs' revised jury instructions track this approach, although they should be modified to make clear that the analysis in steps two (Instruction 9) and three (Instructions 10-14) is conducted on a restraint-by-restraint basis.

reduce the size of egg laying flocks came through the UEP's marketing committee and the recommendations went to all UEP members); Tr. 1056:6-1057:6, 1129:16-1131:16, & 1209:17-24 (Baker admitting that goal of coordinated short-term measures was to reduce supply). There is no evidence that short term measures improved the quality of eggs or output (in fact, they reduced the quantity of production). There is no evidence that short-term measures met customer demand. In fact, the short-term measures were not disclosed to customers. Defendants cannot demonstrate the short-term measures are subordinate or collateral to a procompetitive agreement or were necessary to achieve a procompetitive agreement's goals, and therefore the per se rule applies.

The same is true of the agreement of Defendants, including the USEM and its members, to export eggs to reduce the domestic supply. Tr. 1154:25-1155:19 (Baker testifying that Cal-Maine exported with his competitors and thereby restricted domestic egg supply); Tr. 1183:15-19 (Baker agreeing that "the intent of taking a large volume export order for a short period of delivery is to reduce the domestic supply and thereby increase the domestic price of eggs"). Defendants succeeded in reducing supply and increasing the price of eggs in the U.S. market. Ex. 189 (USEM stating prices rose immediately as intended because of export); Ex. 374 (UEP stating same); Ex. 555 (USEM announcing price increase from export). The export scheme is a naked restraint designed to limit supply and increase cost. It was not subordinate or collateral to a procompetitive agreement. It is not ancillary to an otherwise procompetitive agreement and therefore is subject to the per se rule.

### B.    *The Restraints in the UEP Certified Program Are Not Ancillary.*

The other restraints that were adopted at various times as part of the evolving UEP Certified Program likewise fail to meet the requirements of the ancillary restraint doctrine.

***Backfilling***.  The agreement among competitors to adopt a backfilling ban as part of the UEP Certified Program should be evaluated under the per se rule. The backfilling ban reduced the

supply of eggs and did not increase their quality. Tr. 1999:11-16 (Baker acknowledging that backfilling increased production, and that backfilling ban reduced production); Tr. 2367:21-23 (Rose Acre backfilled to increase its output of eggs: "It allowed us to have more eggs from that space"); *see also* Tr. 1359:9-1361:8 (Baker discussing Ex. 143 where Gregory pleaded with attendees "to take care of business by reducing their flock age, stop backfilling, and the use of old depreciated houses); Tr.1392:4-1397:6 (Baker discussing Ex. 371, "Backfilling – A loophole of a hangman's noose"). There is no evidence that customers demanded or were aware of the backfilling ban.[3]

Nor was collective action necessary to obtain whatever objectives or benefit could be accomplished through a backfilling ban. If a producer, such as Cal-Maine, thought that banning backfilling allowed it to increase its egg production or otherwise served the interest of animal husbandry, it was free to stop backfilling all on its own. A competitor does not need an agreement with its competitors to act in its economic self-interest. The invisible hand of competition rewards behavior in a party's self-interest. Collective action, such as banning backfilling, is needed to cause competitors to take steps that are contrary to their individual self-interest, such as reducing supply, but that will be profitable only if competitors agree to do the same thing.

That is the case with the backfilling ban. Each defendant was free to ban backfilling on its own if it made sense to do so. Yet backfilling increased production, and a skilled farmer could backfill in a way to avoid pecking order issues that could lead to increased mortality (and lower production). Tr. 1999:2-4 (Baker agreeing it is his understanding that many in the industry did

---

[3] Cal-Maine's VP of Sales, Jeff Hardin, testified he did not discuss details like backfilling with his customers: "My customers weren't interested in that. They never asked any questions about it." Tr. 3839:17-23. Cal-Maine's former VP of Sales, Ken Paramore, testified that he did not talk to his customers about things like backfilling and he was "not sure what it is, either." Tr. 4692:10-12. Walmart's Gary Pickett testified that he did not recall whether the UEP Certified Program allowed or disallowed backfilling. Tr. 4265:25-4266:2.

backfill); Tr. 2367:2-23 (Rust agreeing that Rose Acre had always backfilled, and his brother-in-law KY Hendrix believed it was more humane to backfill than to kill the bird); Tr. 4772:5-4773:4 (Hurd discussing Rose Acre's backfilling practice). But members of the UEP Certified Program agreed with each other to ban backfilling because they knew banning the practice would reduce supply and raise prices. As Al Pope colorfully stated, backfilling was the "hangman's noose." (Ex. 371 at p. 2).[4] As Al Pope noted in his editorial, "the original intent" of permitting backfilling "was to accommodate those few extra, unexpected pullets from grow-out facilities" because this "option would avoid the destruction and waste of what otherwise was a 'productive bird.'" *Id*. With the backfilling ban, they were killing in the name of purported animal welfare. This is the opposite of a procompetitive benefit and, without banning the practice, supply would remain high.

Indeed, the exception to the backfilling ban for catastrophic events, which limited backfilling of hens only up to 90 percent of the original flock capacity, proves the Defendants' goal was flock reduction. Mr. Baker testified that he could not think of any animal welfare reason why the exception for catastrophic events would not permit backfilling of up to 100 percent of the original flock capacity. Tr. 1976:10-1977:18; *see also* Tr. 3406:19-3407:6 (Dr. Armstrong could not recall an animal welfare reason for the 90 percent limit on backfilling after catastrophic events).

Applying the ancillary restraint test, banning backfilling was not necessary to achieve any salutary objectives of the UEP Certified Program. It was not needed to meet customer demand and any benefits it offered could be achieved entirely without collective action by competitors.

***100% Rule***. The 100% rule also should be evaluated under the per se standard. Defendants adopted the 100% rule as part of the UEP Certified Program to require producers and their

---

[4] Pope's editorial says nothing about any supposed welfare issues resulting from backfilling. Instead, he notes: "Have we shot ourselves in the foot with this well intended provision? Is it a 'noose' that is 'strangling' the opportunity of enjoying, once again, the favorable prices for our product we expected this fall?" Ex. 371 p. 2.

affiliated companies to produce only UEP Certified eggs if they intended to sell any UEP Certified eggs. Defendants agreed knowing—and intending—that broader and stricter enforcement of the UEP Program would reduce output. The 100% rule was designed with the goal of limiting output.

The 100% rule does not promote customer welfare. It required customers who did not want UEP Certified eggs to buy UEP Certified eggs. Far from enhancing consumer choice, it limited consumer choice. Nor did it require collective action. Individual farms should have been able to decide to offer UEP certification on all their eggs, some of their eggs, or none. The testimony of Marcus Rust demonstrates the objective of the 100% rule was not to promote customer welfare, but to restrain competition. Mr. Rust testified as follows:

Q.   Briefly, the issue here is whether or not someone can come into the certified program and be allowed to both sell certified eggs from one facility and noncertified eggs from a different facility that they either owned or was affiliated with them, correct?
A.   Correct.
Q.   And you were opposed to that, particularly as it would have applied to either Michael Foods or -- I think you referred to as the Minnesota Iowa Group?
A.   Yes. We wanted to be on the same competitive playing field.
Q.   You thought letting them do that, they would be cheaters?
A.   Yes. They would have an advantage over us.
Q.   Even though there were customers that wanted noncertified?
A.   Yes.

Tr. 4523:13-4524:2. In but a few lines, Mr. Rust acknowledged that the purpose of the 100% rule was to prevent producers from "cheating," that is, from selling non-Certified eggs at a lower price. In other words, the program was designed to prevent producers from taking actions that would be in their own economic self-interest and in the interests of their customers. In addition, the producers agreed to the rule despite the fact that there were customers who did not want it.[5] The

---

[5] Defendants may say some customers wanted UEP-certified eggs, but those customers did not know the Program was a supply reduction scheme. Still, even Defendants acknowledge that other customers did not want the Program. *See* Ex. 198 (UEP writing "very few of our customers are asking that the guidelines be part of their specifications"); Tr. 4442:1-10 (Rust testifying that "lots of the food manufacturing companies" "didn't care at that given time how many square inches we had per bird"); Tr. 4468:5-11 (Rust testifying about a belief that customers were "really not

100% rule reduced consumer choice. *See* Tr. 3645:11-19 (A. Airoso testifying that it was not appropriate for Walmart to decide for other customers how their eggs should be produced).

Applying the ancillary restraint doctrine, Defendants fail on both tests. The 100% rule is not subordinate or collateral to a legitimate objective; it is instead the engine that made the other restrictions powerful. Nor is it necessary to achieve procompetitive gains. It is designed to frustrate consumer choice.

***Henhouse Density***. Finally, that leaves UEP's henhouse density requirements. Defendants contend the henhouse density requirements should be evaluated under the rule of reason because they serve the procompetitive benefit of meeting consumer demand for improved conditions for laying hens. But Defendants have admitted that an agreement around henhouse density was not ancillary to serving customer demands. Tr. 1402:8-14 (Baker admitting that Cal-Maine could have increased cage space on its own). The evidence has shown that the henhouse density requirements have other requirements that refute Defendants' claim. The UEP did not mandate an increase in cage space per hen. Instead, for existing facilities it calculated density on a house average, with the result being that many hens experienced no additional cage space. The cage density requirements were enforced through an absolute audit procedure that provided no latitude for even a single excess hen. Finally, the henhouse density requirements were required to be implemented company wide. A producer with multiple farms could not comply with the requirements at one farm, from which it sold UEP Certified eggs, but not at other farms producing eggs for customers not wanting Certified eggs.

Defendants contend that the UEP cage density requirements are ancillary to other aspects of the UEP Certified Program. Yet, UEP's cage density requirements were not necessary to

---

interested in paying more for the eggs"). The 100% rule was designed to narrow customer choice and limit competition and increase price.

achieve other beneficial aspects of the UEP Certified Program, such as appropriate food, water, ventilation, and ammonia levels. An egg producer did not need to adopt UEP's density requirements to improve the lives of laying hens. To the contrary, in order to join the UEP Certified Program after June 1, 2006, companies had two options, one of which provided that "The company may depopulate all existing houses to the required cage space allowance, meet all other program requirements, pass an audit and then be immediately recognized as a UEP Certified company." (Ex. 404). Baker admitted that this meant a new company would have to destroy hens in order to reach the house average rule. Tr. 1978:7-13. When asked if he could think of any animal welfare reason why a new entrant into the Certified Program would have to destroy their hens in order to comply with an animal welfare program, Baker answered "Personally, I don't believe any farmer would take that option" and that he "wasn't on the Committee" and did not talk to his Cal-Maine colleague Steve Storm (who was on the Committee) about it. Tr. 1978:14-1979:5.

Nor were the UEP cage density requirements necessary to serve customer demand. UEP contends that certain customers wanted hens caged with additional space. The UEP requirements say nothing about space per hen, instead calculating space on a house-wide average for all existing facilities. UEP and Cal-Maine point to the fact that McDonald's demanded greater cage space in 1999. Yet McDonald's did not require a house-wide increase in cage space. It required instead a per hen increase in cage space, a requirement Cal-Maine and the UEP never met. So it is undisputed that the density restrictions did not meet the need Defendants identify. And, other producers met McDonald's' requirements without the anticompetitive aspects of the UEP Certified Program that were designed to reduce supply and increase price. Those suppliers increased cage space per hen at farms that supplied McDonald's, but McDonald's' cage-space requirement did not affect farms that sold to customers with different needs. Tr. 1968:14-1969:4 (Baker agreeing

13

that McDonald's could just buy eggs from the dedicated facility for McDonald's and the rest of the facilities could have produced eggs as other customers wanted).

Defendants may also argue that customers wanted improved animal welfare. Yet the design of the UEP Certified cage density requirements demonstrate animal welfare had nothing to do with it. In the language of the ancillary restraint cases, the density requirements were not necessary to improve the lives of hens. Evidence about the UEP audits shows that having one bird over the house average caused an automatic fail, even though complete compliance with the density requirements would not affect the space allowed for most hens in a facility. At the same time, documented proof of actual abuse of hens did not lead to an automatic fail. Consequently, the UEP cage density requirements were not reasonably necessary for any procompetitive goals.

The 100% rule also defeats Defendants' argument. Not every customer wanted eggs laid by chickens that had a particular amount of cage space per hen. Yet the UEP enforced that requirement upon every customer as long as any customer of the producer wanted Certified eggs.

Finally, the desire to meet customer demand does not justify the UEP's collective action. Recall that Cal-Maine never satisfied McDonald's request for humanely raised hens. Tr. 1964:24-1965:12. That demand was met by other egg producers who did not participate in the UEP Certified Program. Those other producers raised hens in barns that allowed appropriate cage density per hen, not per farm. Those other producers met McDonald's animal welfare requirements. The other producers met customer demand without the anticompetitive supply-reducing measures that UEP implemented and enforced.

### C. Considered Collectively, The Restraints Are Not Ancillary.

If the Court considers the restraints collectively, they should be evaluated under the per se rule. The evidence demonstrates that Defendants' actions to limit output, considered collectively, were not the result of a desire to meet customer demand. The UEP and USEM programs in

14

question were started with a desire to reduce supply and increase price. The Defendants did not respond to the demands of clients, such as McDonald's. They instead developed their own supply-reduction scheme and promoted it to customers as an animal welfare program. Nor were any of the supply reduction measures necessary to improve the lives of hens. Defendants could have done that by responding to McDonald's request for more cage space per hen, enforced with audits that turned on animal welfare, not supply reduction.[6] Finally, Defendants did not promulgate a legitimate voluntary standard, based on scientific inquiry, addressing customer concerns, and free from consideration of economic motivation. Instead, they created a self-interested program and required producers participating in the UEP Certified Program to adopt it, without exception.

* * * *

Finally, in evaluating these issues, the Court should follow Seventh Circuit law. As we have explained, Dkt. 289, App. 13-5, pp. 5-10, the Court is not bound by the decision of the MDL Court. Under Federal Rule of Civil Procedure 54, every order is interlocutory and subject to revision prior to final judgment. While Plaintiffs do not invite this Court to reconsider every ruling of the MDL court, Plaintiffs note that this Court has already disagreed with the MDL Court. *See, e.g.*, Dkt. 302 (refusal to admit the cruelty videos). The MDL Court's prior trial rulings on the standard of liability are not law of the case and could be changed even if they were.[7]

---

[6] UEP Scientific Committee Chairman Dr. Armstrong testified that the UEP program did not "put a scoring or guidelines in for abuse." Tr. 3354:1-6.

[7] The decisions in *Motorola Mobility LLC v. AU Optronics Corp.*, provide an example. In that antitrust case, plaintiffs challenged a foreign cartel's sale of LCD panels. Motorola filed suit in this district and was consolidated in an MDL proceeding in California. (Ultimately, settlements in excess of $1 billion were reached.) After the consolidated pre-trial proceedings, Motorola's complaint was remanded to this District. The MDL court had previously denied defendants' motion for summary judgment under the Foreign Trade Antitrust Improvement Act. Defendants renewed that motion on remand. Disagreeing with the MDL court, Judge Gottschall entered summary judgment resolving all but a small portion of the case. 2014 WL 258154. The Seventh Circuit affirmed, 746 F.3d 842 (7th Cir. 2014), and 775 F.3d 816 (7th Cir. 2015). *Motorola* demonstrates the district court retains the authority to reconsider decisions of an MDL court.

November 11, 2023

Respectfully submitted,

**Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlè USA, Inc. and The Kellogg Company**

 /s/ _Brandon D. Fox_
Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
Christopher M. Sheehan
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com
csheehan@jenner.com

Brandon D. Fox
Amy M. Gallegos (_admitted pro hac vice_)
Sati Harutyunyan (_admitted pro hac vice_)
JENNER & BLOCK LLP
515 S. Flower St.,
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com