UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) ) | |
| | ) | No. 1:11-cv-08808 |
| Plaintiffs, | ) ) | |
| | ) | Judge Steven C. Seeger |
| v. | ) ) | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUBMISSION IN RESPONSE TO
COURT'S THREE QUESTIONS**

**Question 1: When should a Court apply the per se rule to an alleged restraint on trade rather than the Rule of Reason?**

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain competition in a relevant market.[1] An agreement unreasonably restrains trade when its "effect upon competition in the marketplace is *substantially* adverse." *Lee Klinger Volkswagen, Inc. v. Chrysler Corp.*, 583 F.2d 910, 915 n.6 (7th Cir. 1978) (emphasis added); *see also Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F.Supp.2d 509, 515 (N.D. Ind. 2004), *aff'd*, 463 F.3d 710 (7th Cir. 2006). The per se rule and the Rule of Reason are two roads to "'to form a judgment about the competitive significance of the restraint. ... Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.'" *NCAA v. Board of Regents*, 468 U.S. 85, 103 (1984) (quotation omitted); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, (4th and 5th Eds. 2023) ¶1509 at 441 ("a per se rule is merely a special case of the rule of reason").

The Rule of Reason is "the accepted standard" for Section 1 cases. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885, 886-87 (2007) (noting that courts apply the per se rule "only after [they] have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason."); *In re Sulfuric*

---

[1] As discussed further *infra*, Plaintiffs must also show that it was the anticompetitive conduct, rather than any independent parallel action, that caused their injuries. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1985*)*.

*Acid Antitrust Litig.*, 703 F. 3d 1004, 1010-11 (7th Cir. 2012) ("The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever"); *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1271, 1283 (7th Cir. 1983). "Under this rule the fact finder weighs all the circumstances of a case to decide whether a restrictive practice should be prohibited as imposed an 'unreasonable restraint on competition," and it is necessary "to show anticompetitive effects, or actual harm to competition" before imposing liability. *Bunker Ramo*, 713 F.2d at 1283); *see also Eichorn v. AT&T Corp*, 248 F.3d 131, 143 (3d Cir. 2001) (noting under the Rule of Reason, courts "balance the effect of the alleged anti-competitive activity against its competitive purposes within the relevant product and geographic markets.").

In contrast, the per se rule applies only where "courts have had considerable experience with the type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effect." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1271, 1284 (7th Cir. 1983). The Seventh Circuit "has cautioned against over-zealous application of the *per se* doctrine and has noted a judicial reluctance to extend its use." *Id.* As such, per se treatment is appropriate only for conduct that has "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citation omitted), that its "economic impact . . . is . . . immediately obvious," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986) *see also Cont'l TV v. GTE Sylvania*, 433 U.S. 36, 49-50 (1977) ("Per se rules of

2

illegality are appropriate only when they relate to conduct that is manifestly anticompetitive."). In other words, the per se standard applies only to conduct without "any redeeming virtue," *Leegin*, 551 U.S. at 886 (citations omitted), and has "no purpose except stifling competition," *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963). Only in these exceptional circumstances will courts presume anticompetitive effect and therefore treat some "categories of restraints as necessarily illegal, eliminat[ing] the need to study the[ir] reasonableness." *Leegin*, 551 U.S. at 886 (citations omitted).

The test for determining what constitutes a per se unlawful agreement (versus one governed by the Rule of Reason) is one of substance, not semantics. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 8-9 (1979) ("*BMI*"). "The mere attachment of a per se label . . . does not automatically invoke the per se doctrine." *Bunker Ramo*, 713 F.2d at 1284; *see also Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 463 (3d Cir. 1998) ("[A]ssigning the label 'group boycott' … does not have a talismanic effect, automatically bringing the case under the per se rubric."). The rule is not one of pleading. Were it otherwise, an antitrust plaintiff could allege a collection of agreements that are "ancillary to a pro-competitive venture" and "cast all of these as *per se* violations . . . simply by contending that they are part of an 'overall' naked restraint" on trade. *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1378-79 (W.D. Wis. 1997). For this reason, on more than one occasion, the Supreme Court has applied the Rule of Reason to horizontal agreements that restrain price and output. *See NCAA,* 468 U.S. at 100 (deciding it inappropriate to

3

apply the per se rule to a restraint on price and output); *BMI,* 441 U.S. at 24-25 (declining to apply the per se rule to blanket licenses through which associations and their member competitors set the price for access to copyrighted music).

**Question 2: Does the same standard have to apply to each of the three legs of the stool (*i.e.*, (1) UEP Recommendations; (2) USEM Exports; and (3) the Certified Program?)**

Theoretically no, but in this case it should. Application of *Leegin* might require the Court to consider the character of the conspiracy's components when determining the standard that applies to each. 551 U.S. at 893. Here, however, only the Rule of Reason should apply because the Certified Program is the only so-called "restraint" that Plaintiffs' expert, Dr. Baye, contends had any sustained, measurable impact (though his analysis is unreliable for a host of reasons).[2] Without impact, there can be no substantial anticompetitive effect necessary to impose Section 1 liability. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993); *see also Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (proof of anticompetitive effect requires "the finding of actual, sustained adverse effects on competition"); *Audio Car Stereo, Inc. v. Little Guys, Inc.*, No. 04-C-3562, 2004 WL 3019298, at *6 (N.D. Ill. Dec. 28, 2004) (requiring "'actual, sustained adverse effects on competition' in a geographic area where Defendants had market power" in order to survive motion to dismiss).

---

[2] For starters, Dr. Baye claimed to have calculated the overall, nationwide shortfalls in egg production that he attributed to the Certified Program's cage-space requirements and/or backfilling ban. But unless each one of the 177 +/- egg producers that ever followed the Certified Guidelines is part of Plaintiffs' alleged conspiracy, Dr. Baye's analysis did not isolate the effects of the alleged conspiracy (*i.e.*, the aggregate effect of every co-conspirator) on the fresh egg or egg products markets. Oct. 31, 2023 Tr. at 2844:3-14.

Plaintiffs in this case have alleged one interwoven, "overarching" conspiracy involving both vertical and alleged horizontal restraints. However, because Dr. Baye admits that short term measures and exports had no demonstrable or sustained impact on supply or price, the whole ballgame here is the Certified Program. Oct. 30, 2023 Tr. 2567:6-11 (testifying that "killing birds" is not a "sustainable way to raise prices"); Oct. 31, 2023 Tr. 2811:13-18, 2815:11-14 (testify he could not determine with reasonable certainty whether molts or slaughter had any impact "positive or negative" on egg production); *Id.* at 2690:11-2691:12, 2819:5-12 (testifying that he could not quantify or isolate the impact of molts and slaughters on price); Oct. 30, 2023 Tr. 2590:15-20 (testifying that the exports were "sporadic" and "short-lived"); Oct. 31, 2023 Tr. 2696:6-21 (testifying that he could not determine with a degree of scientific certainty if any of the exports caused plaintiffs to pay higher prices). Sporadic and temporary market impacts like those theoretically caused by the short-term supply recommendations and exports are too insignificant to demonstrate anticompetitive effect under the Sherman Act. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc.*, 672 F.2d 1280, 1288 (7th Cir. 1982); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015) (restraint on trade that lasted seven months was "far too short as a matter of law to create the required substantial market wide harm of actual detrimental effects"), *aff'd*, 845 F.3d 1072 (11th Cir. 2016). Judge Pratter, applying *Leegin*, found that the Rule of Reason was the correct standard to apply to the Certified Program. Her holding, which was affirmed by the Third Circuit twice in *Eggs I* and *Eggs II*, and which is in no way

5

inconsistent with Seventh Circuit authority, is highly persuasive,[3] as is the reasoning in *Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative., Inc.*, 81 F.4th 323, 334 (3d Cir. 2023).[4]

**Question 3:  Why should UEP Recommendations and USEM Exports not be analyzed as per se restraints on trade?**

As described above, application of a per se rule in Section 1 cases is proper only when a court, based on considerable judicial experience, finds an alleged restraint to have a pernicious anticompetitive effect. *Leegin*, 551 U.S. at 886-87.  In this case,

---

[3] In earlier briefing before this Court, Plaintiffs argued that Judge Pratter "relied on Pennsylvania district court and Third Circuit decisions asserting that only schemes which have 'no purpose except stifling competition' deserve per se condemnation." (Prop. Pretrial Order, Plaintiffs' Objs., ECF No. 279-17, at 15).  Plaintiffs further claimed "[t]hat is not the standard" in the Seventh Circuit. *Id.*  Not so. To be clear, the standard for applying the *per se* rule comes from the Supreme Court.  There is **absolutely no** split in the Circuits as to the definition of per se conduct. Indeed, the "no-purpose-except-stifling-competition" standard for per se cases is derived from the Supreme Court's decision in *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) and the terminology is found repeatedly in Seventh Circuit opinions. *See United States v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000) (quoting *White Motor*, 372 U.S. at 263; *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 551 (7th Cir. 1992) ("It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and there are unreasonable 'per se.") (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 4566 U.S. 2, 9 (1984)); *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 788-89 (7th Cir. 1981) (association was "organized to ensure honest harness racing rather than to impose a 'naked restraint of trade with no purpose except stifling competition'"); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F.Supp.3d 968, (N.D. Ill. 2022) ("But if the restraint 'has no purpose except stifling competition,' it is a 'naked' restraint that is per se unlawful." (quoting *White Motor*, 372 U.S. at 263)); *Chicago Pro. Sports Ltd. P'ship v. NBA*, 754 F. Supp. 1336, 1357 (N.D. Ill. 1991) (a "naked restraint of trade with no purpose except stifling competition" may be condemned after a quick look analysis).

[4] In *Mushroom*, the Third Circuit "confront[ed] a tailored set of interrelated vertical and horizontal agreements among growers and distributors" and found that "[c]losest is the scheme the Supreme Court hypothesized in *Leegin*, which contemplated a situation where **'a vertical agreement setting minimum resale prices is entered upon to facilitate'** a horizontal agreement, 551 U.S. at 893," and "the scheme we confronted in *Toledo*, where the "purpose of the vertical agreement between a manufacturer and its dealers [was] to support illegal horizontal agreements between multiple dealers," 530 F.3d at 225."  The Third Circuit held that "***[i]n both, the courts landed on the rule of reason as the proper mode of analysis.*** *Id.* at 334 (emphasis added).

6

Plaintiffs allege that the vertical relationship between UEP and certain member egg producers facilitated a conspiracy that allegedly limited or restricted the domestic egg supply in order to raise the price of eggs and egg products through all of the following: (1) short-term supply recommendations by UEP, an agricultural association, to UEP members ("UEP Recommendations"); (2) 14 exports over a period of 8 years undertaken by some egg producer members of USEM and coordinated by USEM, in order to fill non-U.S. customer orders ("USEM Exports"); and (3) a science-based certification program setting minimum welfare standards for laying hens adopted by UEP and recommended to the members of two other trade associations, Food Marketing Institute (FMI) and National Council of Chain Restaurants (NCCR) (the "Certified Program"), which was open to both UEP egg producers and non-UEP egg producers alike. And although Plaintiffs characterize all the foregoing as an overarching conspiracy to "limit supply," in truth, no aspect of the alleged conspiracy involved an agreement to limit the supply of eggs, and during the so-called conspiracy period, there is evidence that egg production increased, and inflation-adjusted prices fell. *See*, *e.g.*, Oct. 31, 2023 Tr. 2766:8-14, Nov. 7, 2023 Tr. 4181:5-8.

In point of fact, (and perhaps demonstrating the chicken does in fact come first before the egg), Judge Durkin confronted an essentially identical issue in the *In re Broiler Chicken Antitrust Litigation* and applied the rule of reason. There, purchasers of chicken meat alleged broiler producers conspired to raise prices through information exchange via Agri Stats (not unlike the UEP Recommendations here). *Broiler Chicken*, ECF No. 6641, June 30, 2023 Slip Op. at 2 (Ex. A hereto). Plaintiffs

7

there contended broiler producers' exchange of information via Agri Stats was a principal means by which they shared information and colluded (*i.e.*, no different from United Voices here). *Id.* at, e.g., 32, 35. Judge Durkin determined that that claim was properly evaluated under the "rule of reason" framework. *Id.* at 62:

> To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

Judge Durkin then went on to apply this framework to grant the broiler producer defendants' summary judgment motion on this claim in advance of trial, observing that the sharing of Agri Stats' "general market production and pricing data" was insufficient to demonstrate an anticompetitive effect. *Id.* at 64-65.

There can be no doubt that the Certified Program must be judged under the Rule of Reason, as nothing about the Certified Program limited egg producers to grow their supply.[5] And as the Ninth Circuit aptly noted, a per se approach is not appropriate if "empirical analysis is required to determine [the] challenged restraint's

---

[5] *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 728–730 (3d Cir. 2020) ("*Eggs I*") (applying rule of reason analysis to the UEP Certified Program); *In re Process Egg Prods. Antitrust Litig.*, Nos. 20-1045, 20-1127, 850 Fed. Apx. 142, 147 (3d Cir. Mar. 15, 2021) ("*Eggs II*") (reaffirming prior ruling on rule of reason). In *Eggs I*, the Third Circuit noted that "[t]he Certification Program was not an express agreement to reduce the supply of eggs, much less to fix prices." 962 F.3d at 728. This is the law of the case, and there is no basis to deviate from a ruling that has now been twice litigated and twice affirmed on appeal. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (the law of the case doctrine "applies as much to the decisions of a coordinate court in the same case as to a court's own decisions").

net competitive effect." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011) (internal quotation marks omitted)).)

As explained above, in this case, at trial, Plaintiffs failed to adduce evidence that either the UEP Recommendations or the USEM Exports caused significant injury to the markets for eggs or egg products. As such, these activities inherently fail the "manifestly anticompetitive" test and lack the type of "pernicious effect" to warrant per se treatment. Moreover, the judiciary lacks the requisite experience with such hen-laying husbandry practices to condemn the practice outright.

Assuming for the sake of argument, however, that Plaintiffs had proffered any evidence of anticompetitive effect or antitrust injury arising from UEP Recommendations and USEM Exports sufficient to meet their burden, though they did not, the Rule of Reason still would apply because neither of these activities can be readily classified as the type of restraint with "no (or trivial) redeeming benefits ever" that always produces anticompetitive effect or harm to competition. *In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d at 1010-11; disc. *supra* at 1-4; *infra* at 9-12.

**UEP Recommendations**. Plaintiffs make much of UEP's occasional supply management recommendations to its members, publicized mostly via its in-house newsletter. But they offered no evidence that any of these recommendations had any anticompetitive effect, much less an obvious or pernicious one. To the contrary, there is evidence in the record that early molts and slaughters could result in a net increase in production during the higher demand periods. *See* Nov. 9, 2023 Tr. 4737 (Mr. Hurd testifying that "if you're doing a molt earlier, you're taking a bird that's in lower egg

production, and then after that molt time frame, it comes back in higher egg production. So you would have more eggs."). And when an operation slaughters less productive hens to replace with new young ones, the net result will be increased production. *Id.* at 4737:25-4738:5 (Mr. Hurd explaining that slaughtering less productive hens and replacing with younger hens would increase egg production). Molting and slaughtering are *bona fide* animal husbandry practices that all egg producers undertake. *See* Nov. 1, 2023 Tr. 3129:5-3130:4 (Dr. Armstrong explaining the role of molting in commercial production); *see also id.* at 3143:14-3144:1 (Dr. Armstrong explaining the role of slaughtering in commercial egg production). It would be legal error to apply the per se rule to conduct where the record establishes that Plaintiffs' expert could not say whether the challenged conduct had a net positive or negative impact on competition and where evidence exists that the conduct potentially resulted in net increase in supply.

Moreover, although UEP through member committees made the UEP Recommendations, they were "recommendations" in every sense—members did not have to follow them (there is direct evidence that some producers never did), there was no monitoring, there were no consequences, and such practices could potentially increase egg supply. The Seventh Circuit has been explicit that, in the context of alleged conspiracies between associations and members, "enforcement mechanisms <u>are</u> the 'restraints' of trade" and "[w]ithout them there is only uncoordinated individual action, the essence of competition." *Schachar v. Am. Acad. Of Opthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (emphasis added); *Allied Tube*

*& Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 n.6 (1988) ("Concerted efforts to *enforce* (rather than just agree upon) private product standards face more rigorous antitrust scrutiny.").

**USEM Exports**. Even if the Court considers USEM's export program to be a horizontal agreement, it would not be subject to per se analysis. The Supreme Court has excepted certain horizontal agreements—including practices that fix price and restrict competition—from per se treatment where they promote efficiency, improve consumer choice, or create a new product. *BMI,* 441 U.S. at 22; *see also NCAA*, 468 U.S. at 113; *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985) (analyzing an agreement among competitors to restrict competition under rule of reason because it was "at least potentially beneficial to consumers").[6]

Here, the evidence shows that the USEM Exports functioned as an outlet for surplus eggs during periods of low demand or when product was at risk of spoilage. *See* Oct. 26, 2023 Tr. 2150:9-11 (Ms. Blizzard explaining that the USEM "export market was just another avenue to sell eggs"); Oct. 24, 2023 Tr. 1646:3-11 (Mr. Baker explaining that surplus eggs were exported because of their limited shelf life); P-59

---

[6] There are demonstrable procompetitive benefits of exports. Courts in this district have acknowledged that international exports "benefit the nation's balance of payments and the economy as a whole." *F.T.C. v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 98 (N.D. Ill. 1981). "[C]ourts have recognized that the 'stimulation of additional international . . . activity is procompetitive and beneficial.'" *Id.* The International Trade Administration, U.S. Department of Commerce, has recognized that by teaming up with other U.S. companies to export, "American firms can increase their competitiveness and each firm can benefit from lower individual export costs and increase its efficiency in every phase of exporting."https://legacy.trade.gov/mas/ian/etca/tg_ian_002154.asp. Courts may take judicial notice of matters of public record, including on government websites. *See Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information on FDIC website).

(February 2007 USEM export calling for delivery of "class 1 gradable nest-run eggs");

Oct. 31, 2023 Tr. 2827:25-2828:3 (Dr. Baye testifying that exports were an option for

class 1 nest run eggs that could not be sold to breakers); P-599 (Nov. 23, 2004 United

Voices discussing how breakers were no longer buying surplus eggs); Nov. 8, 2023 Tr.

4367:18-19 (Mr. Rust testifying that for surplus eggs you either "'sell them or smell

them' because if eggs get old, they rot"). Producers' options for selling surplus eggs

domestically were dwindling given that breakers were building larger, in-line

facilities (primarily in the Midwest where transportation costs precluded shipments

from around the country), and no longer buying the shell egg producers' surplus eggs.

P-599; P-105 (Mar. 31, 2006 Marketing Committee minutes "suggest[ing] breakers

very likely will not be buying surplus shell eggs").

USEM provided egg producers with an opportunity to access an international

market. Mr. Baker on behalf of Cal-Maine testified that part of his goal in exporting

eggs to that "world market" was to "develop new customers." Oct. 25, 2023 Trial Tr.

1999:17-2000:1. Producers, such as Cal-Maine, saw the exports as an opportunity to

compete in the world market: "You never planned on them . . . [I]t's a world market. If

a country or countries needed eggs, they would try to buy them from us if we were

competitive." Oct. 25, 2023 Tr. 1889:7-9. Similarly, Mr. Rust on behalf of Rose Acre

explained the value of having USEM "constantly reaching out to the various brokers

in the world who would assemble large orders, and . . . make for shipments and get

prices." Nov. 8, 2023 Tr. at 4375:13-20. Access to this market was especially critical

because eggs are perishable goods. *Id.* at 4367:18-19. Accordingly, USEM became an

even more valuable resource for producers to "find a home for our surplus eggs." Oct.

23, 2023 Tr. 1183:10.

*     *     *     *     *

Plaintiffs appear to be arguing the per se standard should apply because (they

claim) the alleged conspiracy *was intended to* reduce the supply and raise the price of

eggs. *See*, *e.g.*, Pls. Resp. to Defs.' Mot., ECF No. 428 at 3-4 (claiming if a producer

joined the Certified Program "understanding that it was intended to restrict supply"

that would be sufficient for that producer to become a co-conspirator). But whether

an alleged conspirator "had profit-making motives in mind" is not dispositive of what

standard applies. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 775

(8th Cir. 2004). Indeed, to the extent intent is relevant at all, it is relevant only under

the Rule of Reason. *See Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238

(1918). And as to the Certified Program itself, courts have long recognized the

procompetitive advantages created by private industry associations and have applied

a rule of reason analysis to restrictions related to those standards. *Eggs I*, 962 F.3d

at 728-30; *Eggs II*, 850 Fed. Apx. at 147; *see also*, *e.g.*, *Allied Tube*, 486 U.S. at 501;

*see also Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010)

("Once a defendant comes forward with plausible procompetitive justification for the

challenged restraint, the 'quick look' presumption disappears and the overall

reasonableness of the restraint is assessed using a full-scale rule of reason analysis.").

In sum, the Rule of Reason is the correct standard to apply here. *Allied Tube*, 486

U.S. at 501.

13

Dated: November 11, 2023          Respectfully submitted,

*/s/ Patrick M. Collins*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski
(potlewski@kslaw.com)
Abigail Hoverman Terry
(aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison
(brian@brownfoxlaw.com)
(*pro hac vice*)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809
***Counsel for Defendant Cal-Maine
Foods, Inc.***

*/s/ Robin P. Sumner*
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square, 18th and
Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

*/s/ Donald M. Barnes*
Donald M. Barnes
(dbarnes@porterwright.com)
Jay L. Levine
(jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

14

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United
Egg Producers, Inc. & United
States Egg Marketers, Inc.***

James A. King
(jking@porterwright.com)
Allen T. Carter
(acarter@porterwright.com)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre
Farms, Inc.***

15