**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KRAFT FOODS GLOBAL, INC.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-08808 |
| | ) | Judge Steven C. Seeger |
| **UNITED EGG PRODUCERS, INC.**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION TO PRECLUDE CERTAIN TESTIMONY FROM DR. WALKER**

**Introduction**

On Monday, Defendants intend to present expert testimony from Dr. Jonathan Walker, a Managing Director at Secretariat Economists, to rebut the testimony of Plaintiffs' expert Dr. Michael Baye. Among other opinions, Dr. Baye has testified that "[e]conomic features of the egg industry made it economically plausible that defendants could collude to restrict supply and raise prices." (ECF No. 439, Slide 24.) In response, Dr. Walker is expected to testify that a conspiracy like the one Plaintiffs allege would be unlikely to reduce supply or raise prices. And where Dr. Baye has testified, based on his econometric regressions, that "[t]he conspiracy restricted the nation's flock size and egg production, inflated the market prices of eggs, and injured the plaintiffs" (*id.*, Slide 1), Dr. Walker is expected to testify that Dr. Baye's analysis is flawed; that its results are unreliable; and that Dr. Baye's testimony does not demonstrate that the alleged conspiracy affected egg product prices.

The testimony that Defendants intend to elicit from Dr. Walker will be consistent with the expert reports he prepared (attached to Plaintiffs' Motion as Exhibits A and B), which

counsel provided to the Plaintiffs eight and a half years ago.[1]  Plaintiffs' motion, which is filled with citations to the opinions that Plaintiffs now seek to exclude, proves this point.[2]  And, in fact, Plaintiffs already moved to exclude most of these very same opinions – including Dr. Walker's opinions about the effects of state laws on egg production and why it undermines Dr. Baye's production model – *in 2015*.  (*See* MDL ECF No. 1196.)  Judge Pratter denied that motion in a Memorandum Opinion that applied to all of the MDL actions, holding that Dr. Walker's opinion – that "such standards would likely have an impact on a statistical model" – is admissible because it "goes to challenging the validity of the models offered by the plaintiffs' expert . . . ." (MDL ECF No. 1431 at 7 (attached hereto as Exhibit 1)).

Nonetheless, in a pattern that Plaintiffs have repeated far too often during this trial, Plaintiffs have decided to re-raise many of these same concerns, along with new ones not previously included in any motion, in a post-midnight filing *two days* before Dr. Walker takes the stand.  The Court's Standing Order on Preparation of Final Pretrial Order, however, requires "any motions about expert qualifications, methodologies, and related matters within Rule 702, Rule 703, and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny" to be "filed at least sixty days before trial."  (Standing Order at 8.c.)  And the Court had previously asked the parties to "tee up" "any lingering expert issues" in early October.  (*See* Tr. 9-28-2023 at 131:14-15.)  Giving Plaintiffs a last-minute do-over on issues that they could and should have raised – and in some cases, *did* raise – well before trial would cause unavoidable and undue prejudice to Defendants.  For this reason alone, Plaintiffs' motion should be denied.

---

[1] Section 2 of the motion asks the Court to preclude testimony from Dr. Walker regarding a migration of egg production to Iowa during the period Dr. Baye analyzed, on the grounds that Dr. Walker did not address that topic in his reports.  (*See* Motion at 6-7.)  Defendants do not intend to elicit testimony from Dr. Walker on this topic.

[2] S*ee*, *e.g.*, Motion at 3 (referencing Walker Main Report ¶¶ 121-131), 7 (referencing Walker Main Report ¶ 248), 8 (referencing Walker Main Report ¶ 148), 9 (referencing Walker Main Report ¶ 243), and 10 (referencing Walker Supplemental Report ¶ 6).

Plaintiffs also should not be permitted to establish a new standard for Defendants' expert that did not apply to their own expert. Plaintiffs elicited testimony from Dr. Baye that he ended his models in 2012 because he believed cage-space laws going into effect in California in 2015 would affect flock size and egg production as early as 2013, and he "wanted to stop before the full implications of [those laws] would have … materialized in the market." (Tr. 10-30-2023 at 2539:14-21.) Yet Plaintiffs now describe the impact of state cage-space laws as "purely hypothetical," and ask the Court to "bar Dr. Walker from testifying about [them]" entirely. (Motion at 2.) Plaintiffs elicited testimony that the USEM exports "would have *materially* impacted domestic prices," though Dr. Baye admitted he did not know "exactly how long-lived these price increases are." (Tr. 10-30-2023 at 2590:19 – 2593:7 (emphasis added).) Plaintiffs now insist the magnitude and "duration of the effects of exports" is irrelevant, and that testimony from Dr. Walker mostly *agreeing* with Dr. Baye would "mislead[ ] the jury." (Motion at 7 and 9.) Plaintiffs elicited testimony from Dr. Baye that the 100% Rule "creat[ed] an environment" where farmers "selling non-certified eggs" would risk losing business "because who in their right mind wouldn't demand a certified egg[?]" (Tr. 10-30-2023 at 2607:12 – 2608:14.) Yet Plaintiffs seek to prevent Dr. Walker from opining that, in fact, "Plaintiffs could have purchased eggs from existing non-certified producers … ." (Motion at 8.) And Plaintiffs elicited testimony from Dr. Baye that entering the egg production business was "costly" and "difficult," and that this made collusion more plausible because "someone can't come in and undermine the high prices that you're receiving." (Tr. 10-30-2023 at 2609:22 – 2611:10.) Yet Plaintiffs ask the Court to prevent Dr. Walker from testifying that egg producers could have obtained loans to expand facilities and that companies as big as the Plaintiffs "could have financed the production of new non-certified eggs." (Motion at 8-10.) The same rules should apply to both sides.

3

For all of these reasons, as further explained below, Defendants United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. oppose Plaintiffs' belated, last-minute Motion to Preclude Certain Testimony from Dr. Walker (ECF No. 502).

## Legal Argument

**A.**   **Dr. Walker's opinions on the effects of state laws on producer behavior are relevant and probative to determining the validity of Dr. Baye's models.**

Back in late August, this Court denied in part a motion *in limine* filed by the Plaintiffs seeking "to exclude evidence about state statutes enacted after 2008 (Dckt. No. 174)."  ECF No. 286 at 1.  The Court held that "those laws might be relevant to whether Plaintiffs suffered an injury" and authorized the parties to "introduce evidence of state laws that affected the supply of eggs."  *Id.* at 9; *see also id.* at 15.  The Court explained:

> State laws adopted after 2008 could have caused supply restrictions and thus impacted prices.  It is fair game to cross-examine Plaintiffs' expert and probe whether he adequately took that possibility into account. Evidence about the legal landscape after 2008 has a bearing on whether Plaintiffs suffered an antitrust injury … .
>
> In a nutshell, state laws after 2008 might have reduced egg supply.  Any reduction in supply caused by the state laws should not be attributed to the alleged conspiracy.

*Id.* at 9.  The Court also rejected Plaintiffs' request that it "voir dire" Dr. Baye, outside the jury's presence, "to decide whether Dr. Baye controlled for the impact of the laws."  *Id.* at 10, quoting Pls.' Mtn. to Exclude State Laws at 9 (ECF No. 174).  The Court concluded that questions about the effects of state laws were not so "prejudicial or explosive" that they needed preclearance, *id.*, and that "'whether Dr. Baye controlled for the impact of the laws' is a question for the jury," not the bench, *id.* (quoting ECF No. 174 at 9-10).

That motion was not, of course, the first time that Plaintiffs have challenged the relevance of state laws in the testimony of the parties' expert witnesses in these cases. As discussed above, the Plaintiffs previously challenged the admissibility of Dr. Walker's opinions on the impacts of state laws in a *Daubert* motion back in 2015. Like this Court, Judge Pratter concluded that such testimony is relevant to determining the validity of Dr. Baye's models. (MDL ECF No. 1431 at 7 (Exhibit 2)).

Under the law of the case doctrine, the Court should follow its own, and Judge Pratter's, prior rulings on this exact issue. The Seventh Circuit Court of Appeals has explained:

> [T]he law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination. *See, e.g., Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006); *Starcon Int'l, Inc. v. N.L.R.B.*, 450 F.3d 276, 278 (7th Cir. 2006); *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). This presumption against re-opening matters already decided reflects interests in consistency, finality, and the conservation of judicial resources, among others. *Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 454 (7th Cir. 2005).

*Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007). Plaintiffs assert that "the developments over the last three weeks of trial" warrant a reversal of the Court's ruling. (Motion at 2.) But Plaintiffs have not offered any "compelling reason" for the Court to reconsider a decision it made just three months ago.

Plaintiffs newly suggest that the effects of state cage-space laws are irrelevant unless they affected the decisions of the Defendants themselves. (*Id.* at 4-5.) But Dr. Baye's analysis was focused at the national production level. His flock size and egg production models looked at "total US flock size" and "total egg production for human consumption" in the United States (Tr. 10-31-2023 at 2841:20-2842:5), and disregarded the size of the flocks owned by Cal-Maine, Rose Acre, Moark, Michael Foods, and Wabash Valley or the amount of eggs *they* produced.

5

(*Id.* at 2842:10-20.) Consequently, Defendants do not need to demonstrate that Rose Acre (for example) modified its expansion plans based on the adoption of cage space laws in New Jersey, Michigan, Maine, Ohio, Washington, or Oregon.[3] If any egg producers modified their production decisions based on the passage of those laws, and Dr. Baye failed to account for those production effects in his models, then the jury could conclude that Dr. Baye's regressions failed to demonstrate market impact or injury.

Plaintiffs also argue that, even if Defendants did not change their production decisions, Defendants were required to demonstrate that *other* "producers … changed their production plans in anticipation of specific state laws." (*Id.* at 4-5.) Plaintiffs suggest that Defendants were required to offer witness testimony regarding "the details of the egg production industries" in states that adopted cage-space requirements, and "potential growth in those areas," to "show[ ] that producers were likely to modify their behavior based on laws that may not go into effect until many years later (particularly laws that would only affect new facilities)." (*Id.* at 5.)

But some of the state laws did affect cage-space for existing facilities. In Ohio, for example, conventional battery cage systems already installed before September 29, 2011, were required to provide "a minimum average of sixty-seven square inches per layer" by September 2016. Ohio Admin. Code 901:12-9-03(F). And Dr. Baye conceded that uncertainty as to whether cages would be legislated out of a useful life in three to five years "could have an impact" on producers' incentives to expand. (Tr. 10-31-2023 at 2701:18-2702:2.) That, again, is why he ended his analysis in 2012: because he "figured … it was the best way to isolate the impact of the UEP's actions … on cage space … ." (*Id.* at 2701:5-17.) Given that Plaintiffs' own expert witness agrees that state cage laws can affect egg producers' expansion years before

---

[3] Indeed, the Court did not allow Mr. Hurd to testify that Rose Acre took into account the passage of state animal welfare laws in its building and expansion plans.

those laws go into effect, and that his model has to account for those effects, it makes no sense to hold the Defendants to a higher evidentiary standard to support the same point.

Additionally, Dr. Walker's opinion on this topic is based, in part, on economic principles. Dr. Walker opines, in his main report, that "abrupt changes in the regulatory climate … would not only have direct effects on producers' decisions about pullet and cage investment decisions as they sought to comply with actual laws …, but they would also foster uncertainty among producers about potential … future animal welfare laws." (Walker Main Report ¶ 200 (attached to Motion as Exhibit A).) He explains that:

> Rational producers would be expected to consider investments in new cages more carefully in the 2000s as states debated and adopted unique cage space requirements applicable not only to production facilities in their own states but also to eggs produced elsewhere but sold into their states. There was more reason for concern in the 2000s that newly purchased conventional changes would be rendered obsolete by unanticipated regulatory changes … .

(*Id.* ¶ 202 (footnote omitted).) Egg producer concerns over (i) the future viability of certain cage systems, (ii) where to locate additional production facilities, and (iii) whether to make certain investments at all until there was more certainty all would tend to affect egg production at the time of the concerns. These concerns would translate to less egg production than would otherwise have occurred. As noted above, Dr. Baye agreed with this basic principle. The problem is that because Dr. Baye's econometric models do not control for the effects of these state laws, the models wrongly attribute the reduced egg production caused by the passage of these state laws to the effects of the Certified Program.

Moreover, Dr. Walker's opinion was not based solely on economic principles. It was based on documentary evidence, too. Dr. Walker's main report pointed to a June 2007 *United Voices* that reported "hearing that producers are not building new cage layer houses or even remodeling those with depreciated equipment because of concerns that legislation may

ultimately ban egg production from cage facilities." (*Id.* ¶ 202.) It also cited documents in which Moark stated that it had decided not to construct a $35 million, 1.6 million bird facility in California after that state's passage of a ballot initiative (Proposition 2) prohibiting the confinement of egg-laying hens in a manner that does not allow them to turn around freely and fully extend their limbs,[4] and that Moark was also looking at "the political environment of the [other] states." (*Id.* ¶¶ 122 and 199, nn. 290 and 293). Dolph Baker similarly testified, at trial, that the adoption of Proposition 2 led to "a lot of uncertainty within the industry" (Tr. 10-24-2023 at 1610:16-17) regarding whether "other states would adopt similar laws, which has happened" (*id.* at 1613:11-14).

Plaintiffs' last argument on this point suggests that the passage of cage-space laws will be too time-consuming, and will require the jury to wade into minutiae, like when each law was passed and what they required. But the Defendants do not intend to belabor this point with Dr. Walker. The point is simple. Seven states – California, Michigan, Ohio, Oregon, Washington, New Jersey, and Maine – passed animal welfare standards during the period Dr. Baye analyzed. (*See* Walker Main Report ¶¶ 121-130.) "Those seven states collectively account for approximately 20% of egg production and 25% of the U.S. population." (*Id.* ¶ 131 (footnotes omitted).) "Each law would affect egg producers' investment choices regarding growth once its restrictions or requirements became effective or began to be phased in, [and] each law would also be expected to have immediate effects on affected producers that planned ahead." (*Id.* ¶ 121.) As Judge Pratter ruled in denying Plaintiffs' motion to exclude Dr. Walker back in 2016, Dr. Walker did not have to "conduct a statistical analysis of the impact such animal welfare

---

[4] New Jersey had a similar requirement for cage housing that went into effect on December 4, 2006 (*see* N.J. Admin. Code § 2:-8-4.4) – six years before Dr. Baye ended his econometric analyses.

standards actually had upon the industry … to opine that this variable is one which experts in the field would typically consider when attempting to account for changes in price and supply." (MDL ECF No. 1431 at 7.)  And Dr. Baye's analyses failed to account adequately for the effects of those state laws.  Plaintiffs' latest motion on this point offers no new and compelling reason why the Court should reverse its prior ruling on this issue, on the very morning Dr. Walker is set to take the stand.

**B.**     **The duration and magnitude of the USEM exports' effects on egg and egg product prices is relevant to Plaintiffs' ability to demonstrate anticompetitive effect.**

In order to prevail on their Sherman Act Section 1 claim, Plaintiffs must demonstrate that the alleged conspiracy imposed an "unreasonable restraint on trade."  15 U.S.C. § 1; *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021).  An unreasonable restraint of trade is one that adversely affects competition in a significant way.  *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Asso.*, 672 F.2d 1280, 1288 (7th Cir. 1982).  At trial, Dr. Baye testified that the USEM exports were "short-term measures" that would have had only small and short-term (at most, month-long) price effects.  (Tr. 10-31-2023 at 2694:3-5 and 2694:17-2696:6.)  But Plaintiffs seek to exclude similar testimony from Dr. Walker.

Plaintiffs contend that *Peto v. Howell*, 101 F.2d 353, 356 (7th Cir. 1938), "rejected [the notion] that anticompetitive effects must last a specified period of time before they are cognizable."  (Motion at 7.)  But *Peto*, and the cases that follow it, involved a claim of attempt to monopolize under Section 2 of the Sherman Act.  *See Peto* at 354.  Section 2 of the Sherman Act makes it a felony to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons[ ] to monopolize any part of the trade or commerce among the several States … ."  15 U.S.C. § 2.  Plaintiffs fail to explain why they believe *Peto* and its progeny are

relevant to a claim under Section 1 of the Sherman Act, and cite no case law extending its holding beyond monopoly cases. (*See* Motion at 7.)

Under Section 1 of the Sherman Act, sporadic and temporary market impacts are insufficient to demonstrate anticompetitive effect. *See Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288 (7th Cir. 1982) (holding that plaintiff's "fail[ure] to identify any clear or significant anticompetitive effects" from a "temporary denial" of membership in an industry association was insufficient to establish antitrust liability); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that a "four- to ten-month" effect on competition "is not significant enough to be classified as an injury to competition under the Sherman Act"); *JetAway Aviation, Ltd. Liab. Co. v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 841 (10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects."); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co.*, 885 F.2d 683, 697 (10th Cir. 1989) (reversing jury verdict for plaintiff where the alleged anticompetitive behavior "only threaten[ed] to have a transitory impact on the marketplace."); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015) (holding that a restraint on trade that lasted seven months was "far too short as a matter of law to create the required substantial marketwide harm of actual detrimental effects"), *aff'd*, 845 F.3d 1072 (11th Cir. 2016). Thus, Dr. Walker's testimony on the duration of the price effects of the USEM exports are relevant as a matter of law and should not be precluded.

**C.     Plaintiffs' ability to obtain non-Certified eggs, and their ability to finance new non-Certified entrants into the egg market, are probative of the likelihood that the alleged conspiracy would be successful.**

Plaintiffs' next argument repeats a point raised in their Motion to Preclude Defendants' Mitigation Evidence (ECF No. 393). Plaintiffs argue that "[Dr.] Walker should be precluded from offering any evidence that Plaintiffs could have avoided injury by obtaining non-certified

eggs." (Motion at 8.) In particular, Plaintiffs argue that Dr. Walker should be prohibited from arguing "that Plaintiffs could have purchased eggs from existing non-certified producers and that Plaintiffs could have financed the production of new non-certified eggs." (*Id.*, citing Walker Main Report ¶ 180).

But Dr. Walker has never argued, and will not assert at trial, that Plaintiffs "could have avoided injury by obtaining non-certified eggs." (*Id.*) And the portion of Dr. Walker's report that Plaintiffs cite, Paragraph 180, says nothing about the ability to avoid injury. Paragraph 180 addresses (and rebuts) the argument that the 100% rule (which was adopted in 2002) might somehow have caused the "but-for" reductions in flock size and egg production that Dr. Baye found beginning in August 2005. (*See* Walker Main Report ¶ 180, attached to Plaintiffs' Motion as Exhibit A.) It also rebuts the suggestion that the 100% Rule somehow shut down all non-Certified production in the United States. Dr. Walker's report notes that "Rembrandt and Daybreak are the third and fourth largest U.S. egg producers respectively, and neither of them participates in the UEP-Certification program." (*Id.*) And it notes that Plaintiffs did not submit expert testimony "identify[ing] any customer that wanted non-UEP-certified eggs but was unable to purchase them." (*Id.*)[5] Another portion of Dr. Walker's testimony notes that large buyers can sponsor new entrants into the market, which "undermine[s] the likelihood of effective collusion." (*Id.* at ¶ 63.)

Evidence that Plaintiffs were able to purchase non-Certified eggs is relevant in this proceeding for the reasons provided in Defendants' Memorandum in Opposition to Plaintiffs' Motion to Preclude Defendants' Mitigation Evidence (ECF No. 404). For example, the fact that

---

[5] Dr. Baye agreed that Plaintiffs could have bought non-Certified eggs from Sonstegard and acknowledged that "not every egg that comes out of the bottom of a hen is ultimately a UEP-certified egg," though he had no opinion about Plaintiffs' ability to buy non-Certified eggs from Rembrandt. (*See* Tr. 11-01-2023 at 3001:3-3001:21.))

non-Certified eggs were available for purchase bears directly on whether the Certified program is a restraint on trade. Defendants should not be precluded from demonstrating that options remained in the market. Evidence that the Plaintiffs were able to (and did) purchase egg products made from non-Certified eggs also would tend to undermine Dr. Baye's arguments regarding the plausibility of the alleged conspiracy and its supposed ability to raise prices. If the Plaintiffs are asking the Court to bar expert testimony on these points, the Court should deny that request.

**D.     Plaintiffs' remaining grounds for precluding certain testimony of Dr. Walker should be rejected.**

The remainder of Plaintiffs' objections to Dr. Walker's expected expert testimony should be rejected as well.

First, as indicated above, Dr. Baye was permitted to testify regarding the magnitude and duration of the price effects from USEM's experts. Dr. Walker should be permitted to testify to that point.

Second, the fact that restaurants like Burger King and McDonalds adopted cage-space requirements in the 2000s that were even more stringent than UEP's cage space requirements (*see* Walker Main Report ¶¶ 192-193) means that Dr. Baye's conspiracy period (2002-2012) differs from his benchmark period (1990-2002) in a way that Dr. Baye's econometric regression would need to account for. Dr. Baye testified that his economic regressions were trying to answer, "What would the number of hens [or the amount of eggs produced] look like if everything else stayed the same except the cage space restrictions and the efforts to … restrict the supply of layers?" (Tr. 10-30-2023 at 2546:10-13.) Yet Dr. Baye did not look at how many egg producers were supplying McDonalds or complying with Burger King's cage space requirements. (*Id.* at 284314-20.) He testified that his "time trend" would account for "trends in

12

animal welfare." (*Id.* at 2555:4-6.) Defendants disagree that the time trend will account for the production effects of cage-space requirements from large purchasers like McDonalds and Burger King. And Dr. Walker will testify that failing to account for things like non-UEP cage-space requirements is the same as assuming that "the 1990s status quo" (without non-UEP cage-space requirements) would have continued after 2002. (Walker Main Report ¶ 193.) Dr. Walker should be permitted to testify to this point as well.

Third, Plaintiffs argue that "Dr. Walker cannot be permitted to claim, without foundation[,] that '[e]ven poorly capitalized entities could obtain financing, acquire facilities and expand them.'" (Motion at 9-10, quoting Walker Supplemental Report ¶ 6.) In particular, Plaintiffs assert that Gregory Marshall contradicted that assertion when he testified that Rose Acre "maxed out all of [its] lines of credit" in December 2006 and could not get an extension of credit in December 2007 (*i.e.*, during a period of record low egg prices). (*Id.* at 10, quoting Tr. 11-09-2023 at 4924-4925.) But Mr. Marshall's testimony does not "rebut" Dr. Walker's expected testimony, as Plaintiffs assert (*see id.*). Dr. Walker's testimony is intended to rebut Dr. Baye's position that a conspiracy was likely to succeed because entry into the egg market was expensive. In particular, Dr. Walker's report notes that "Michael Foods sponsored independent companies seeking to acquire and expand preexisting egg production facilities … by guaranteeing a market for the eggs that these producers would sell." (Walker Supplemental Report ¶ 6.) Dr. Walker discusses the basis for this assertion at greater length in his main report. (Walker Report ¶¶ 72, 79.) Because Dr. Walker's testimony on the ability of poorly capitalized entities to obtain financing is supported by evidence of the kind typically relied upon by experts, it should be allowed at trial.

Plaintiffs' remaining quarrels with Dr. Walker's expected expert testimony – in particular, Plaintiffs' complaints that Dr. Walker will offer opinions that are speculative, or that he will use rhetoric they find uncomfortable – can be addressed during Dr. Walker's testimony. If Plaintiffs have a valid objection when Dr. Walker testifies, they are free to object. What they cannot do is seek to hamstring Dr. Walker before they have even heard his testimony.

### Conclusion

For the foregoing reasons, Defendants request that this Court deny Plaintiffs' Motion to Preclude Certain Testimony from Dr. Walker.

Dated: November 11, 2023                     Respectfully submitted,

*/s/ Jay L. Levine*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***

/s/ Robin P. Sumner
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square, 18th and Arch
Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

**Counsel for Defendants United Egg
Producers, Inc. & United States Egg
Marketers, Inc.**

/s/ Patrick M. Collins
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

**Counsel for Defendant Cal-Maine Foods,
Inc.**

23345848