# **EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | MULTIDISTRICT |
| ANTITRUST LITIGATION | : | LITIGATION |
| | : | |
| | : | |
| | : | |
| *THIS DOCUMENT APPLIES TO:* | : | No. 08-md-2002 |
| ALL ACTIONS | : | |

## M E M O R A N D U M

PRATTER, J.                                          SEPTEMBER $\underline{1}$, 2016

The nation's major egg producers are accused by those who purchase eggs directly and indirectly of conspiring to control and limit the supply of eggs and thereby increase egg prices. The plaintiffs have moved to exclude certain portions of the testimony of Dr. Jonathan Walker, an economist retained by defendants Michael Foods, Inc., Papetti's Hygrade Egg Products, Moark LLC, Norco Ranch, Inc., Daybreak Foods, Inc., Rose Acre Farms, Inc. and Cal-Maine Foods, Inc. Dr. Walker proposes to testify regarding the plaintiffs' various damage claims and offers his opinion as to whether the damages estimates presented by the plaintiffs' experts are based on sufficiently accurate facts and data and are the product of reliable methods. This involves certain regression analysis and analysis of the egg industry. The plaintiffs' motion seeks to exclude aspects of Dr. Walker's primary expert report, as well as his two supplemental reports. Doc. No. 1196.

The plaintiffs hope to exclude certain sections of Dr. Walker's opinion and testimony on the basis that he has improperly reached factual conclusions that are unrelated to his field of expertise. The Direct Purchaser Plaintiffs ("DPPs") and the Indirect Purchaser Plaintiffs ("IPPs") move to exclude Dr. Walker's opinions contained in his supplemental reports, to the

extent that they simply repeat the opinions of another defense expert, Dr. William Myslinski. The Direct Action Plaintiff's ("DAPs") move to exclude Dr. Walker's testimony to the extent that it "distorts" the DAPs' expert, Dr. Michael Baye.

The Court conducted a hearing during which Dr. Walker appeared and offered live testimony. Following this hearing, the Direct Purchaser Plaintiffs and the defendants filed additional post-hearing briefing. Having considered Dr. Walker's testimony and all the briefing, the Court denies the plaintiffs' motions for the reasons discussed in this Memorandum.

## I.    STANDARD OF REVIEW

The trial judge has a special obligation under Federal Rule of Evidence 702 to ensure that any and all expert testimony is not only relevant, but reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The purpose of the inquiry is to ensure that the expert, whether basing his testimony on professional studies or personal experience, is employing the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire,* 526 U.S. at 152. The Third Circuit Court of Appeals has characterized Rule 702 as embodying "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). While specialized knowledge is a requirement, the basis of such knowledge can be "practical experience as well as academic training and credentials." *Betterbox Commc'ns Ltd. v. BB*

2

*Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (Alito, J.) (noting that the specialized knowledge requirement has been construed "liberally") (citing *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). There is no prohibition against an expert relying upon the work of another expert so long as the expert is otherwise qualified. *See In re Zoloft (Sertraline Hydrocloride) Products Liab. Litig.*, 26 F. Supp. 3d 466, 470 (E.D. Pa. 2014) ("It is acceptable to rely on the hypothesis testing of others, so long as one addresses both supportive and contrary evidence in reaching one's opinion."); *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (citing *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. 03–4932, 2008 WL 2265269, at \*3 (E.D. Pa. June 3, 2008)).

## II.   ANALYSIS

In general, the plaintiffs' position in the motion challenging Dr. Walker is that certain of his opinions are not the product of "scientific, technical, or other specialized knowledge" but rather are simply lay opinions or recitations of the evidence in the record. The plaintiffs posit three arguments challenging certain segments of Dr. Walker's reports. First, and most generally, the plaintiffs argue that a number of Dr. Walker's purported expert opinions are recitations of the factual record and do not involve the application of any expertise, that is a predicate for admissibility. Similarly, the plaintiffs argue that the bulk of Dr. Walker's DPP and IPP supplemental reports "parrot" the regression analyses performed by Dr. Myslinski and do not constitute Dr. Walker's own opinions. Finally, the DAPs argue that Dr. Walker's opinions regarding Dr. Baye should be excluded because Dr. Walker admitted that aspects of his opinion are based on a misunderstanding of Dr. Baye's report and that in formulating his opinion, Dr. Walker created his own model rather than use Dr. Baye's.

### A.   Dr. Walker's Qualifications

3

The plaintiffs do not argue in their motion that Dr. Walker is not qualified to render an opinion generally in the area of industrial analysis and econometrics. As he testified at the hearing, Dr. Walker received a bachelor's degree in economics from the University of California, Berkeley, and a Ph.D. in economics from MIT. His doctoral dissertation addressed the subject of industrial organization. He has previously worked at the Federal Reserve Bank of Boston, conducting research on industrial organization research growing out of his dissertation. He is currently the President and Chief Executive Officer of Economists Incorporated. The Court finds that Dr. Walker is qualified to offer an expert opinion regarding industrial analysis on the egg and egg product industry, as well as respond to the expert opinions of the plaintiffs' industrial analysis expert.

## B. Dr. Walker's Opinions Regarding Record Evidence

First, the plaintiffs collectively argue that certain opinions contained in Dr. Walker's report must be excluded because they constitute nothing more than a recitation of factual material already in the record and fail to apply pertinent and reliable principles or methods. The plaintiffs specifically identify eight factual assertions in Dr. Walker's report which they contend should be stricken because they do not involve the application of any expertise by Dr. Walker. The challenged opinions consist of the following:

- Shifts in consumer demand related to animal welfare affected shell egg producers and their customers;
- Egg producers would have accounted for regulatory changes involving animal welfare that would take effect years in the future when making flock size decisions during the conspiracy period;
- Plaintiffs' experts did not properly account for trends in food consumption affecting demand in their models;
- Barriers to entry in the egg industry are small and that identified companies had the financial wherewithal to enter the industry during the conspiracy period;
- Plaintiffs' experts fail to adequately explain the effect of the 100% rule on output of shell eggs;

4

- Plaintiffs' experts have failed to adequately demonstrate that backfilling raised output;
- Egg producers were not operating with the "normal" secrecy associated with conspiracies and enforcement mechanism;
- Shell egg producers ignored calls to reduce output

In performing its gatekeeping duties regarding proposed expert testimony, the Court's objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. "*Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 598)); *accord Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000).

The Court finds generally that the plaintiffs' arguments regarding Dr. Walker's testimony fail to raise any questions regarding his qualifications or his methodology. Federal Rule of Evidence 703 expressly states that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.[1] The plaintiffs ignore the economic analysis conducted by Dr. Walker in his report and focus exclusively on the record evidence that Dr. Walker musters to provide support for his conclusions. During the hearing, Dr. Walker testified at length regarding the analysis he conducted and the basis for his various opinions. He testified that references in his report to evidence in the record corroborate his underlying conclusions which are based upon his

---

[1] The briefing has not identified any reason why the underlying facts the plaintiffs seek to prevent Dr. Walker from testifying to would be inadmissible if presented through some other means.

regression analysis as well as his understanding, as an econometric and industrial analysis expert, of what variables would typically be used when building a model. To the extent that plaintiffs assert that the conclusions he has drawn are incorrect, or based upon flawed data, they are certainly capable of subjecting Dr. Walker to cross examination at trial. On the basis of the arguments presented, however, the Court finds no basis to exclude the opinions specifically highlighted in the plaintiffs' motion.

### i. Opinions Regarding Animal Welfare

While the plaintiffs challenge a variety of specific opinions contained in Dr. Walker's report, these opinions can be grouped thematically into several categories. The first such category relates to Dr. Walker's opinions that changes in consumer demand were a result of changes in attitudes regarding animal welfare. Plaintiffs argue that Dr. Walker is not an animal welfare expert and that his opinion that significant changes in consumer attitudes during the alleged conspiracy period affected shell egg producers, is not the product of reliable principles or methods and is unrelated to his expertise as an economist. The specific paragraphs that the plaintiffs seek to exclude recount factual background information regarding examples of consumer behavior which lead Dr. Walker to conclude that consumer attitudes had changed during the relevant period. *See* Walker Report at ¶ 89-120. The plaintiffs want to exclude similar passages describing the impact of regulations on consumer demand. Dr. Walker concludes that in light of the evidence in the record showing that attitudes towards animal welfare were changing during the class period, any modeling, to be considered accurate, would need to account for such changes. *See* Walker Report at ¶ 191-193.

It is apparent that Dr. Walker is not proposing to offer testimony as to animal welfare standards in this country generally, or the specific impact that changes in public perception of

6

animal welfare had upon the model. Rather, his proposed testimony is limited to the fact that, during the time period in question, changes in public perception of such standards was a variable which an expert in the field would have tested when building an economic model. In reaching this conclusion, it is clear to the Court that he has applied his experience and knowledge regarding what variables from the market and industry would be relevant when building an economic model. When asked specifically regarding his opinions on this topic, Dr. Walker stated that his opinions were based on his "understanding of the theory of the firm." December 15, 2015 Hr. Tr. at 19.

> This is an industrial organization. This is how do firms behave. And so these statutes would have the impact on the useful life of cages and new facilities. And by limiting the useful life of these new facilities, they affect the incentives to invest in them, and that again affects the way that producers respond to price and to fuel costs and other input costs, and it would change the underlying structural model.

December 15, 2015 Hr. Tr. at 18-19. While Dr. Walker states that he did not conduct a statistical analysis of the impact such animal welfare standards actually had upon the industry, he was not required to do so under the circumstances in order to opine that this variable is one which experts in the field would typically consider when attempting to account for changes in price and supply. His opinion that such standards would likely have an impact on a statistical model goes to challenging the validity of the models offered by the plaintiffs' expert (who does not incorporate this variable).

To the extent that the plaintiffs contend that Dr. Walker has misrepresented aspects of the factual record, they will have opportunity to cross examine him on those points at trial.[2] Ultimately, the plaintiffs' criticisms of the relevance of this material go to the weight the

---

[2] Similarly, should Dr. Walker exceed the bounds of his expertise at trial and testify regarding animal welfare standards, the Court fully expects the plaintiffs to raise any relevant objections.

plaintiffs will argue the jury should give Dr. Walker's opinion and not the opinion's admissibility.

### ii. Egg Demand

The plaintiffs also argue that Dr. Walker's testimony regarding fluctuations in demand for eggs during the 1990's is inadmissible. They contend that Dr. Walker's opinion regarding the inappropriateness of picking the 1990's as a benchmark period for analysis is based upon the observation that literature that tended to vindicate eggs as a cause of cardiovascular disease, was gaining popularity among the general public at this time. This, Dr. Walker opines, would have had an impact on consumption patterns and should have been incorporated into the plaintiff's models. Again, the opinion being offered by Dr. Walker concerns the types of information that he, as an economist, would have attempted to account for when constructing a model. To the extent that the plaintiffs believe Dr. Walker is incorrect because such considerations actually were incorporated in their expert's model or were otherwise unnecessary to the analysis, their arguments go to weight of Dr. Walker's testimony, rather than its admissibility.

Plaintiffs also argue the inadmissibility of Dr. Walker's criticism of Dr. Rausser's conclusion that during the relevant time period, a potential entrant to the egg industry would have had to face high barriers to entry. The plaintiffs contend that Dr. Walker's criticism is based solely upon the fact that certain entities—namely Kroger grocery stores—had the financial resources to enter the egg market at the time. Dr. Walker's analysis of the egg market structure in his primary report, however, draws from traditional principles of economic theory. Dr. Walker noted in both his expert report and during his deposition that the prospect of entry into the egg market was governed by a potential entrant's financial wherewithal, the lure of monopoly profits and one's presence on the "periphery" of the industry. Based upon this, and

his review of the record, he concluded that instances of successful entry into the egg market were possible, and actually occurred during the conspiracy period. As to the plaintiffs' reference to Kroger in their briefing, the defendants contend that Dr. Walker does not opine that Kroger's financial resources were sufficient for market entry, but notes that Kroger's ability to enter the market was based on its history of operation within the industry, the fact that, as a retailer, the company could more easily vertically integrate and purchase farms, and the fact that, if the profits are attractive enough, any firm with sufficient cash could have been a potential entrant.

The plaintiffs' criticisms of these conclusions go to the weight Dr. Walker's opinions should be given by the fact finder. Should they wish to criticise Dr. Walker's conclusions on the basis they are contradicted by evidence in the record or opinions from their own experts, they will certainly be provided the opportunity to do so. But the arguments presented here fail to raise a basis for exclusion of Dr. Walker's opinions.

### iii. Effects of 100% Rule, Backfilling, and Supply Restrictions

Plaintiffs next argue that Dr. Walker's opinions regarding the effect of the "100% Rule", Backfilling and UEP's short-term supply recommendations on egg supply are speculative and based only on meager citations to the factual record. Defendants counter that Dr. Walker's critiques of the plaintiffs' expert reports are based upon accepted statistical principles and, having run the regressions that were included in the plaintiffs' experts own reports, Dr. Walker concluded that there was no demonstrated statistically significant decrease in egg supply or egg prices over the alleged conspiracy period. As noted above, criticisms as to the amount of work done by Dr. Walker, or disputes as to the value of the conclusions ultimately drawn, are fodder for cross examination.

9

Finally, the plaintiffs argue that sections of Dr. Walker's report that recount statements by UEP and its president, Gene Gregory, should be excluded. They contend that while this testimony may be admissible on its own, by having Dr. Walker present it along with his expert opinion, the jury would get the impression that the quotations are an expert's own statements. Reviewing the section of the report, it seems apparent that, as defendants argue, the statements from UEP and Gene Gregory included in the report are simply presented as corroboration of Dr. Walkers' opinion that the supply recommendations by UEP ultimately had no actual effect on supply. There is no apparent danger of confusion and even if there is, this is something that the plaintiffs can address on cross-examination.

### iv. Dr. Walker's use of Adjectives

The Court held a two-day oral argument which addressed the plaintiffs' motions to exclude defendants' various experts. During argument, counsel for the plaintiffs appeared to narrow the scope of the challenge to Dr. Walker testimony. Notably, counsel indicated that the concern was with Dr. Walker's use in his report of terms like "normal" secrecy, "revolutionary" change in demand, and the "speculative" effect. In light of the totality of Dr. Walker's report, which the plaintiffs have not challenged, the Court finds that the use of such adjectives has nothing to do with the methodology at issue, and to the extent that the plaintiffs wish to challenge them, they can do so adequately on cross-examination.

### C. Use of Dr. Myslinski's Tables

The plaintiffs' second general argument is that Dr. Walker's supplemental reports responding to the DPP's and IPP's do not contain any of Dr. Walker's own work and simply parrot the work done by the defendants' other expert, Dr. Myslinski. Plaintiffs do not appear to contend that the underlying regressions are based on unreliable methodology; rather, they argue

that the analysis should be excluded because an expert cannot simply be the "mouthpiece of another expert."

During his deposition, Dr. Walker acknowledged that tables in his supplemental report were based upon the same regressions included in Dr. Myslinski's report and admitted that there is substantial similarity to the analysis that Dr. Myslinski did in context of the DAP class certification hearing.

While an expert is not permitted to simply "parrot" the ideas of other experts or individuals, experts are permitted to rely on materials prepared by other experts in developing their own opinions. *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at \*3 (E.D. Pa. June 3, 2008) (citing *In re Wagner*, No. 06-01026, 2007 WL 966010, at \*4 (E.D. Pa. Mar. 29, 2007):

[E]xperts may use a "mix of objective data and subjective analysis from another expert to . . . create an admissible report," and an expert's knowledge of specific facts regarding the incident-or lack thereof-"go[es] to the weight accorded to [that expert's] report and testimony, rather than its admissibility."

*I.B.E.W. Local Union 380*, 2008 WL 2265269, at \*3 (citing *Wagner*, 2007 WL 966010, at \*4), accord *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014).

The plaintiffs acknowledge that an expert is permitted to rely on the work of others so long as he or she can explain and defend the veracity of the underlying work. They contend, however, that Dr. Walker did not independently investigate Dr. Myslinski's work. The deposition excerpts they use to support this argument, however, appear inapt. Dr. Walker states that he did not rely on anything conveyed to him by Dr. Myslinski and that while the regression methodology he used was the same as Dr. Myslinski's, Dr. Walker's work and conclusions drawn from the regressions were ultimately independent. As the defendants point out, the regressions in question relate to analysis performed by Drs. Rausser and Stiegert and the issues

11

relevant to Dr. Walker's critique were analogous to those presented on the motion for class certification. Consequently, Dr. Walker explained that he found no reason to reinvent the wheel, as it were.

During the hearing on the *Daubert* motions, Dr. Walker was asked on cross-examination to explain the differences and similarities between his work and Dr. Myslinski's report. He responded that:

> There was [sic] some differences between our ultimate opinions—well, our ultimate opinion is it's unreliable, but there's some differences in how we got there. But, yeah, I was aware that [Dr. Myslinski] had run – or actually he asked Dr. Su Sun or Dr. Clarissa Yeap to run some tabulations, and I knew that he reported some of the results in his report. I don't think that they're the same set of result that I report in Table 4A because my recollection is he was trying to make some different points. But, yes, I was aware and it prompted me to want to do this, because I saw it undermined the validity of what Dr. Rausser had done and it was very important to merits. So, yes, I asked Dr. Su Sun or Dr. Yeap, I don't remember who did the particular table, to perform the analysis on the data that applied to the merits case so that I could write about it in my merits report.

December 15, 2015 Hr. Tr. at 67-68.

Thus, Dr. Walker acknowledged that he relied upon the same general methodology as Dr. Myslinski—namely regression analysis—and called upon the assistance of the same individuals at Economists Incorporated. Dr. Walker explained however, that he reviewed the regressions by Drs. Yeap and Sun, determined that the analyses were run correctly and ultimately made the independent decision to include this information in his own report. Dr. Walker explained that the tables included in his report and Dr. Myslinski's report were similar, but that they included different data sets and that ultimately Dr. Walker was responsible for choosing to include the tables provided in his report

To the extent the plaintiffs criticise Dr. Walker's actual opinions regarding the plaintiffs' expert reports, once again, their concerns go to weight rather than admissibility. They criticize

12

the manner in which Dr. Walker (and Dr. Myslinski) conducted their regression analysis—specifically the decision to run regression analysis on subsets of data. This is not directed at methodology of regression analysis generally, but rather the manner in which these two experts employed it. Consequently, it is not a proper basis for a *Daubert* motion.

### D. Dr. Walker's Testimony Regarding Dr. Baye's Analysis

Finally, the DAPs argue that Dr. Walker's opinion responding to their egg supply expert, Dr. Baye, should be excluded. The DAPs advance two reasons. First, they allege that Dr. Walker wrongly assumed that Dr. Baye's findings regarding a percentage reduction in egg supply applied to both egg and egg products. Plaintiffs contend that in actuality Dr. Baye calculated the price effect on each specific egg and egg product category based on the changes in total production of eggs. Dr. Walker conceded that this assumption was in error. Consequently, the plaintiffs move to exclude four paragraphs of Dr. Walker's DAP Report which address Dr. Baye's demand elasticity assumptions. It appears that Dr. Walker has acknowledged that his criticisms regarding demand elasticity assumptions in Dr. Baye's analysis are moot, and, therefore, removed from consideration.

The plaintiffs also criticize Dr. Walker for his use of a "cruder model" than the one used by Dr. Baye. They question why Dr. Walker failed to explain his decision to construct his own model rather than rely on Dr. Baye's. The plaintiffs do not expressly argue, however, that Dr. Walker's model is based on an unreliable methodology. Rather, their argument appears to be that Dr. Walker's more simplistic approach is not as compelling as Dr. Baye's. Such an argument clearly addresses the weight the opinion should be given by the fact finder, and as such is not proper for a *Daubert* motion.

13

## III.   CONCLUSION

For the reasons discussed above, the Court will deny the plaintiffs' motion to exclude the

testimony of Dr. Jonathan Walker.  An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge