UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. <br><br> Defendants. | No. 1:11-cv-08808 <br><br> Judge Steven C. Seeger |

**PLAINTIFFS' REPLY REGARDING**
**THE COURT'S LIABILITY STANDARD QUESTIONS**

Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
Christopher M. Sheehan
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com
csheehan@jenner.com

Brandon D. Fox
Amy M. Gallegos (admitted *pro hac vice*)
Sati Harutyunyan (admitted *pro hac vice*)
JENNER & BLOCK LLP
515 S. Flower Street
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com

Dated: November 12, 2023

Plaintiffs submit this brief reply to show (1) Defendants ignore the ancillary restraint cases and thus misapprehend the liability standard; (2) the Court may apply different standards to different restraints; and (3) the evidence supports the application of the per se standard.

**1.** ***The Application of the Per Se Rule to Horizontal Agreements***. Plaintiffs have consistently argued that this case should be analyzed under the per se rule, and the ancillary restraint doctrine in particular. Dkt. 279-17 at 14-16; Dkt. 289-16 at 10-16. Cases in this Circuit, including the *McDonald's* case that is barely two months old, hold if defendants in a horizontal agreement "do not properly assert and establish a defense under the ancillary-restraints doctrine, the per se rule applies." *See* DOJ-FTC Amicus Brief at 14, *Deslandes v. McDonald's USA, Inc.*, 81 F.4th 699 (7th Cir. 2023). Defendants ignore this law and cite cases applying the rule of reason where horizontal collaboration was necessary for the market to exist at all, see Dkt. 503 n. 1, or cases involving vertical restraints, issues not present here and subject to different methods of analysis.

Defendants state there is a "vertical relationship between UEP and certain member egg producers" but the suggestion that this is a vertical restraint case is contrary to law. In *Denny's Marina, Inc. v. Renfro Prods., Inc.*, the Seventh Circuit stated an agreement between a trade association and its constituent members constitutes a horizontal agreement. 8 F.3d 1217, 1220 (7th Cir. 1993) ("The conspiracy in this case was horizontal because it was 'the product of a horizontal agreement.' . . . It consisted of Denny's competitors and their association.") (internal citation omitted).

**2.** ***The Court May Evaluate Each Restriction Separately***. Defendants fail to cite the DAP class case, a case in which they were parties. *In re Processed Egg Prod. Antitr. Litig.*, 962 F.3d 719 (3d Cir. 2020). That case explains that it was appropriate to apply different legal standards to the separate components of the conspiracy, a legal point that is not in dispute.

1

Defendants state the Court need not reach this issue because the only proof of injury, let alone a sustained injury, relates to the UEP Certified program. Dkt. 504 at 4-5. Defendants are incorrect. *First*, there is evidence in the record that the short-term measures caused injury. UEP's own admissions provided proof of injury from short-term measures and exports. *See, e.g.*, Ex. 555, 362. Defendants suggest that the coordinated slaughter of productive laying hens, molts, and hatch reductions could have resulted in an increase in egg supply, Dkt. 504 at 10-11. But, as detailed below, the evidence shows that Defendants *intended* the egg supply to decrease and reported that their efforts to decrease the egg supply had been successful. *See infra* Section 3. Moreover, the evidence shows that if slaughters, molts, and hatch reductions actually increased each producer's supply, then the producers would just take those measures unilaterally. It is because these measures *decreased* supply that the producers colluded—after all, it is only when enough producers participate for the supply reduction to lift the market price that flock reduction measures make sense. Tr. 1229:24-1130:8; 1236:10-24; 1228:10-22. Without coordination, any producer who decreases its own supply would just lose money by having fewer eggs to sell. *Id*.

*Second*, Defendants mischaracterize Dr. Baye's testimony. Dr. Baye did not testify that exports had no impact on prices. Dr. Baye testified he was not able to use an *econometric model* to estimate price effects from the exports, but he explained he used a *different technique* to quantify the effect of the exports on Urner Barry prices. Tr. 2591:3-9. Dr. Baye explained—using a demonstrative chart from his expert report—how he used record data about the volume of eggs shipped overseas to estimate the impact of the exports on price. Tr. 2591:13-2593:1. His analysis was conservative in that it used the Urner Barry price series with the lowest inverse elasticity to estimate the price effects. Tr. 2592:14-20. He concluded that although he could not say with a degree of scientific certainty how much the plaintiffs overpaid as a result of these price increases,

2

"as a matter of economics, these would have materially impacted domestic prices." *Id*. at 2593:4-7. Thus, Dr. Baye demonstrated injury, which is the issue to be decided in this phase of the trial.[1]

*Third*, antitrust injuries do not need to be prolonged to be actionable. The Seventh Circuit has long held that a restraint is actionable if it covers "a long period of time or [] a short period of time." *Peto v. Howell*, 101 F.2d 353, 356 (7th Cir. 1938). A monopoly of "one day" is sufficient. *Id. Peto* remains good law. The Seventh Circuit relied on *Peto* in *Kohen v. Pacific Investment Management Company*, 571 F.3d 672, 674 (7th Cir. 2009), a case involving a short-term effort to corner the market, and district courts have relied on it to recognize the injury must be considered in light of the restraint. In *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 867 n. 13, 14 (N.D. Ill. 2010), the court stated *Peto* is still good law and a defendant can be liable for cornering the market for three or four weeks. *See also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 904 (N.D. Ill. 2011) (applying principle in Section 1 case).

Finally, this case does not involve an injury that disappeared due to the market effects. Where a practice briefly raises prices, competitors promptly respond, and the market returns to equilibrium, there may be no antitrust issue. Here, Defendants' practices simply ran their course.

---

[1] Dr. Baye likewise did not testify that the coordinated slaughter and molt programs had no market impact. He explained that, as with the exports, it was not feasible to measure the impact with an econometric model. Tr. 2567:1-5. However, he emphasized that "[y]ou probably don't need an economist anyway. I mean, if they were slaughtering birds, it would reduce the number of birds." *Id*. at 1-5. He then explained early slaughter could lead to "short-term increases in price if you coordinate those slaughters across everyone in the industry." *Id*. at 13-15. Moreover, at no point did Dr. Baye opine that coordinated early slaughter had no effect on price—in fact, he said the opposite. *Id*. at 2567:20-22 (Q. Okay. And you're not saying that they didn't have an effect on price at all. A. I'm not saying they didn't have an effect."); *see also id*. at 2691:5-9 (Dr. Baye testifying on cross-examination that "I disagree with your characterization that they didn't—they didn't have an impact); *id*. at 2695:20-2696:1 (defense counsel reading into the record Dr. Baye's prior testimony that short-term measures "have an announcement effect so that pretty much as soon as they're announced, they have an effect based on the documentary record").

The practices increased price as long as they were in place. The market impact stopped because the practice stopped, not because of competitive reaction. Defendants would allow effective conspirators to reap monopoly profits forever, as long as they turned their restraint on and off. Dolph Baker has conceded that the impact of Defendants' measures was felt at various times during the conspiracy period. Tr. 1326:12-1327:6.

        3.       ***Trial Evidence Supports the Application of the Per Se Rule.*** Defendants suggest their conspiracy was only an information exchange. Dkt. 504 at 7-8. Yet evidence has shown actual agreements. Agreement among competitors to simultaneously slaughter young, productive hens ahead of schedule to reduce supply is not an information exchange. *E.g.*, Ex. 105, 215, 225, 262, 266, 275 p. 7, 304 p. 4, 434. Competitors committing to coordinated early slaughter, early molting, hatch reduction, and overall flock reduction via signed "Intention Forms" and "Commitment to Change" forms are agreeing to restrict output, not exchange information. Ex. 225, 333, 377. Obtaining written commitments to export eggs, sometimes at a loss and by buying eggs from other suppliers to meet the commitment, is an agreement to restrict output, not an information exchange. *E.g.* Ex. 24, 62, and 378 (export case volumes); Ex. 880 (export form showing loss); Ex. 59, 178, 191, 226 (export commitment forms). Formal votes to adopt output restricting measures, Def. Ex. 469; Ex. 220, and enforcing those measures through mandatory audits, is not an information exchange. Ex. 47 and 257 (audit forms); Ex. 68 (failed audit for backfilling resulting in loss of certified status). Agreeing not to backfill and requiring that backfilled birds be slaughtered to remain UEP-Certified is an output restriction, not an information exchange. Ex. 600 (UEP application prohibiting backfilling) and Ex. 109 (UEP email requiring destruction of birds that were backfilled). Agreeing to apply the UEP program to 100% of a producer's facilities and the facilities of its affiliates, Tr. 1272:10-14, is an output restriction, not an information exchange. Chief executives of Cal-Maine and Rose Acre have admitted they

4

agreed with competitors to reduce supply. Dkt. 503 at 7. This case is not about information exchanges.

**Short Term Measures.** Defendants assert that slaughtering unproductive hens and molting hens are "*bona fide* animal husbandry practices" in the egg industry. Dkt. 504 at 10. At the same time, Defendants assert that this Court lacks the ability to assess whether Defendants' short-term measures are anticompetitive. First, at issue here are the producers' coordinated, premature slaughter and molt of *productive* hens—measures that were intended to and did reduce supply. These short-term measures were not recommendations from the local agricultural extension office, or unilateral actions of each producer, they were collective actions agreed to and implemented by competitors. In fact, UEP asked members to sign intention forms and the UEP reported on who had signed up. Ex. 225, 591 p. 6. Second, in this case, it is plain to see the harm to competition. The evidence shows that a group of producers acted together to kill or temporarily render unproductive hens that lay eggs—i.e., the producers' *means of production*. There could be nothing more output restricting. Indeed, if early molt and early slaughter were somehow effective methods to increase supply, which they are not, there was no need to agree to do them on a coordinated schedule with competitors. That proves the purpose and effect was anticompetitive.

**Exports.** Defendants suggest the practice of exporting eggs at a loss was a benign effort to find a new market for eggs. Dkt. 504, 11-13. The evidence shows otherwise. USEM members were required to buy eggs they did not have and export them. That is not a legitimate search for a new market. And whether the producer had eggs available to export or not, Defendants sold eggs overseas at lower prices than they could have obtained in the U.S.— "incur[ring] a loss for the difference." Ex. 279, 555. They were not "surplus" eggs, and this is not a situation of "sell them or smell them," if the producer could sell the eggs in the United States at the time for more than they were selling overseas. Defendants exported eggs because they knew that by removing eggs

5

from the domestic market the increased domestic revenue would more than offset the loss from selling so-called "surplus" eggs overseas. Defendants stated at the time that "these exports have had a major positive impact upon shell egg prices and the financial conditions of shell egg producer/marketers. Likewise, the exports have improved, to a lesser degree, breaker stock prices and have benefited those producers selling eggs based upon the Urner Barry breaking stock quote." Ex. 279. On balance, exports performed as intended: "a producer with one (1) million hens realized an approximately increased revenue of the $1,740,000.00 over a 17-week period" at the cost of $47,000 lost in the overseas sales. Exports "provided a major return. Keep in mind this is increased revenue and not profits." *Id*.

*Back-filling*. Defendants do not address the back-filling ban, which was a horizontal restraint that is subject to the per se rule unless Defendants demonstrate it is ancillary. The backfill ban was not necessary to achieve any consumer benefit or meet demand. If banning backfilling improved production, each producer was always free to do so. Defendants cannot carry their burden to show it was an ancillary restraint.

*100% Rule*. This rule was the opposite of consumer choice. Defendants do not address it. If it was procompetitive in that customers demanded it, there was no need for collective action to meet that customer objective. The market would incent producers to behave in that manner. The evidence shows it was a means to extend the conspiracy's anticompetitive effects.

*Henhouse Density.* Defendants also fail to address the henhouse density requirements, yet these horizontal agreements, enforced through audits and compliance requirements, reduced supply. Dkt. 503 at 12-14. As such, it is Defendants' burden to demonstrate they are ancillary restraints. But Defendants have admitted an agreement around henhouse density was not ancillary to serving customer demands. Tr. 1402:8-14 (Baker admitting Cal-Maine could have increased cage space on its own). The details of the program – including its house average rule and the audit

6

procedure that provided no latitude for even a single excess hen – demonstrate even this part of the program was not ancillary. UEP's cage density requirements were not necessary to achieve other beneficial aspects of the UEP Certified Program. Nor were the UEP cage density requirements necessary to serve customer demand. For example, the demands of McDonald's, which UEP and Cal-Maine assert motivated the changes, were not met by the UEP Certified program. Oher producers met McDonald's' requirements without the anticompetitive aspects of the UEP Certified Program

Finally, the desire to meet customer demand does not justify the UEP's *collective* action. As is seen with the experience of other producers who satisfied McDonald's' request for humanely raised hens, customer demand could be met without the anticompetitive supply-reducing measures UEP implemented and enforced.

November 12, 2023

Respectfully submitted,

*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlé USA, Inc. and The Kellogg Company*

 /s/ *Brandon D. Fox*
Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
Christopher M. Sheehan
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com
csheehan@jenner.com

        Brandon D. Fox
        Amy M. Gallegos (admitted *pro hac vice)*
        Sati Harutyunyan (admitted *pro hac vice)*
        JENNER & BLOCK LLP
        515 S. Flower Street
        Suite 3300
        Los Angeles, CA 90071
        Tel: (213) 239-5100
        Fax: (213) 239-5199
        bfox@jenner.com
        agallegos@jenner.com
        sharutyunyan@jenner.com