UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., Plaintiffs, <br><br> v. <br><br> UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. Defendants. | No. 1:11-cv-08808 <br><br> Judge Steven C. Seeger |

**DEFENDANTS' SUBMISSION
AS TO WHY RULE OF REASON APPLIES TO EXPORTS**

Defendants submit this short submission to explain why the rule of reason analysis applies to USEM exports.[1]

**A. Per Se Standard is the Exception, Not the Rule**

The rule of reason is the presumptive method for determining whether a practice constitutes an unreasonable restraint of trade under Section 1. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Applying the *per se* rule of analysis is appropriate only where "courts have had considerable experience with that type of conduct and application of the

---

[1] For the reasons set forth in Defendants' Submission in Response to the Court's Three Questions (ECF No. 504), Plaintiffs failed to adduce evidence that the USEM Exports caused significant injury to the markets for eggs or egg products. As such, the exports inherently fail the "manifestly anticompetitive" test and lack the type of "pernicious effect" to warrant *per se* treatment. ECF No. 504 at 9; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d 1004, 1010-11 (7th Cir. 2012).

rule of reason has inevitably resulted in a finding of anticompetitive effects." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983). In other words, before this Court can apply the *per se* rule to exports, it must be convinced that exports "almost always tend to restrict competition" and are "manifestly anticompetitive." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988); *Leegin*, 551 U.S. at 886; *White Motor Co. v. United States*, 372 U.S. 253 (1963); *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982).

### B. The Exports are Not "Manifestly Anticompetitive"

There is no evidence from which one can say that the exports undertaken by USEM "almost always tend to restrict competition." *Sharp*, 485 U.S. at 723. To the contrary, the record shows that USEM exports were sporadic in nature and had, at best, a market impact lasting no longer than one month. Oct. 31, 2023 Tr. 2695:18-25. Such short lived and sporadic impacts are not the "substantial harm" to competition required by Section 1 of the Sherman Act. And they certainly do not allow anyone to conclude that all USEM exports are so "manifestly anticompetitive" that they should be condemned per se without an examination of their actual market impact and their potential procompetitive virtues. Notably, Plaintiffs have cited no case holding that joint exports should be subjected to *per se* treatment.

Exports can have procompetitive effects. Exports provide a market for eggs that otherwise would not be sold because there is no immediate market in the United States. Indeed, witnesses from Rose Acre and Cal-Maine testified that exports are a critical avenue for selling eggs before

2

they go bad. *See* Oct. 24, 2023 Tr. 1644:3-11[2]; Nov. 8, 2023 Tr. 4367:18-19.[3] "Surplus" eggs are eggs for which no domestic market exists. Nov. 8, 2023 Tr. 4370:17-19.[4] The term describes when producers have too many eggs, including eggs that would only be suitable for, if anything, to be used as breaker stock for egg products. Nov. 7, 2023 Tr. 4104:2-7.[5] Here, the evidence shows that from time to time producers had surplus fresh eggs, and that is what they exported in response to offers from brokers representing customers outside the United States. Oct. 23, 2023 Tr. 1183:10[6]; Nov. 8, 2023 Tr. 4370:14-25[7]; Nov. 7, 2023 Tr. 4107:1-14[8]; Exh. A, P-405 ("Exports

---

[2] Oct. 24, 2023 Tr. 1644:3-11 (Baker explaining that surplus eggs were exported because of their limited shelf life): Q. I think there was a term that you heard in opening argument "sell them or smell them." Is that a familiar term to an egg producer? A. Yes, it is. Q. Can you explain to the jury -- I think it's obvious. But can you explain in your words what that means. A. Yeah. You got to sell them or you have to export them. You have to do something with them because there is a limited shelf life.

[3] Nov. 8, 2023 Tr. 4367:18-19 (Mr. Rust testifying that for surplus eggs you either "'sell them or smell them' because if eggs get old, they rot"): Q. And why is it -- what was your understanding of why the egg market fell during that time frame? **A. We had too many eggs. You know, anytime you have too many eggs -- you know, we live by an old adage "sell them or smell them" because if eggs get old, they rot.**

[4] Nov. 8, 2023 Tr. 4370:17-19 (Mr. Rust testifying as to surplus eggs): Q. What are surplus eggs? A. That's eggs that you don't have a market for tomorrow or next week or the week after.

[5] Nov. 7, 2023 Tr. 4104:2-7: A. . . . [W]e're very tight in short eggs during the holiday periods and Easter time and -- **but the rest of the year, we have extra eggs, yes, surplus. Q. Surplus. Is that the term you use to describe when you have too many eggs? A. Yes. We call them surplus eggs.**

[6] Oct. 23, 2023 Tr. 1183:10 (Mr. Baker testifying as to exports of surplus eggs): Q. Now, you agree that **the primary reason for an egg producer to support the export efforts of UEP and USEM is to raise egg prices in the United States, correct? A. We'll find a home for our surplus eggs, yes, sir**.

[7] Nov. 8, 2023 Tr. 4370:14-25 (Mr. Rust testifying about what Rose Acre does with surplus eggs): Q. Now, that growth that Rose Acre experienced, would that produce surplus eggs? A. Yes. **Q. What are surplus eggs? A. That's eggs that you don't have a market for tomorrow or next week or the week after.** Q. And what does Rose Acre do with surplus eggs? A. Well, when -- we would break most of them. You know, we had three breaking plants, and we would break the eggs, and we had dryers and we dried some of the eggs. And, you know, we exported a few. But the main thing was, you know, for the processing.

[8] Nov. 7, 2023, Tr. 4107:1-14: Q. Are you familiar with the exports that -- that Rose Acre took through the USEM in 2007, 2008? A. Yes, sir. Q. All right. And how many exports were there? A. Six. Q. And if -- this is a demonstrative. And the yellow boxes, do those represent the dates when those exports took place? A. Yes, sir. Q. And so those are -- appear to be outside of the big demand times of Easter and the holidays? A. Yes, sir. Q. Would those be times when Rose Acre typically would have surplus eggs? A. Yes, sir.

being filled by members of USEM resulted in removing surplus eggs from the domestic supply."). When producers took an export, they were not committing to sell existing eggs, but were committing to fulfill that export order with future egg production, thereby encouraging future domestic output. Oct. 26, 2023 Tr. 2194:1-20.[9] The export's output maximizing effect allows the egg industry to ensure that it has the inventory of eggs needed to meet peak seasonal demand. Nov. 8, 2023 Tr. 4426:24-4427:13.[10]

Exports orders were typically for class 1 gradable nest run eggs which go to egg breaking facilities, known as "breakers." See Exh. B, P-59. Traditionally, shell egg producers sold their surplus, nest-run eggs to "breakers." Exh. C, Ex. P-599 ("Shell egg producers have in the past . . . looked upon the egg-breaking sector as a market for surplus eggs."). At the time of the exports at issue in this case, the breakers' demand for surplus eggs was dwindling. See Exh. D, P-105, Mar. 31 2006 Marketing Committee minutes "suggest[ing] breakers very likely will not be[] buying surplus shell eggs"); Exh. C, P-599 (Nov. 23, 2004 United Voices discussing how breakers were not buying surplus eggs); Exh. E, P-401 (Dec. 3, 2004 email from G Gregory to D Bell stating, "The days when shell egg producers could move surplus eggs to the breakers is diminishing very quickly and shell egg producers have to recognize that they are losing a market for some of their eggs."); Exh. F, D-1086 (Jun 23, 2006 United Voices stating, "Shell egg producers need to

---

[9] Oct. 26, 2023, Tr. 2194:1-20 (Reickard testifying that egg producers were committing future egg production).

[10] Nov. 8, 2023, Tr. 4426:24-4427:13: Q. So will you agree with us that supply -- the flock size is the most important factor in determining the price of eggs? A. I would have to say the flock size and the demand are. The exports was never that big of a thing. It was -- and the feed cost is always -- adjusted the flocks more than anything. Q. Well, you don't think Mr. Hinton was attempting to mislead his customers, do you? A. No, it's just one of the variable factors that went in. It's the timing of the year. You know, because the consumers buy eggs in the holiday season 30 -- 20, 30 percent more than they would than given weeks there than the rest of the year for baking and all that, and chickens don't lay them that way. So us producers have to figure out how many eggs we have to have in the so-called inventory to make sure we had enough eggs for the consumers during those supply periods.

recognize that with nearly 50% of all eggs being broken coming out of in-line production/breaking facilities, finding a home for surplus shell eggs is becoming more and more difficult."). With the breaker market demand drying up, exports were a viable option for the surplus eggs the breakers were not buying. Oct. 31, 2023 Tr. 2827:25-2828:3.[11]

### C. Generalized References to the Purported "Losses" Incurred by USEM Members Does Not Render USEM Exports Anticompetitive

Plaintiffs rely heavily on their contention that producers were exporting eggs at a loss. Yet, notably, of the five exports at issue in this case, four were sold at prices above the contemporaneous U.S. breaking stock prices. Report of Jonathan Walker ("Walker Report") at 104, Figure 28 (attached to Dckt. No. 502 as Exh. A). But price alone is not probative of whether the exports had any impact (much less a "sustained" impact) on domestic competition. The prevailing index price is not probative of whether the producers could have sold those eggs in the United States at that price, because (as described above) eggs are perishable, and there was a lack of domestic demand. Indeed, there is abundant evidence that actual domestic transaction prices for eggs were always at a discount off Urner Barry (*e.g.*, x cents back). *See* Nov. 6, 2023 Tr. 3817:20-3818:17 (Hardin testifying about Urner Barry pricing)[12]; Oct. 30, 2023 Tr. 2375:19-2376:9 (Manion testifying about

---

[11] Oct. 31, 2023 Tr. 2827:25-2828:3 (Dr. Baye testifying that exports were an option for class 1 nest run eggs that could not be sold to breakers): Q. And so since it's not your opinion, **one viable outlet for those nest-run class 1 eggs, if they can't be sold to breakers, is to export them, correct? A. That would be an option.**

[12] Nov. 6, 2023 Tr. 3817:20-3818:17 (Hardin testifying about Urner Barry pricing) Q. Do you see where it says, "Pricing based on Thursday's South Central Urner Barry market for eggs?" A. Yes, sir. Q. Now, just very briefly, explain what this pricing means as best you can in just layman's terms. A. Okay. It -- everything that we're doing back at this time is based on what's called the Urner Barry market. And it's published daily. Most of the customer base used a Thursday egg market. This was -- happened to be -- this was after the regional markets came out. So we've got a south central Urner Barry market that's published on a Thursday. And the piece that we negotiate between us and our customer is this 13 and a half back, which is a base of -- what we call a basis number. And all this is saying is that we're going to take the Thursday Urner Barry market and we're going to discount that by 13 and a half cents except for the large six count, which is the little six packs that you see in the store. Those are going to be 10 back, which is 3 and a half cents higher than a regular carton. And it's because the carton costs me

5

Urner Barry pricing).[13] To the extent documents refer to a "loss," those calculations were done by Gene Gregory who is not an economist. Nov. 8, 2023, 4365:6 (Mr. Rust testifying that Mr. Gregory was not an economist; "he was a promoter"); Exh. G, P-210 (Gene Gregory noting, "[w]hile I'm no economist and therefore look at things in a simple manner . . ."). Whether any producer actually suffered a "loss" necessarily would vary by egg producer and be dependent on a number of factors, including whether the eggs exported could actually be sold at a higher price at the time the export was agreed, not taken. Walker Report at 104 ("the relevant cost is . . . the price at which the seller could reasonably anticipate selling the eggs in the absence of the export program at the time the decision was made to export them"); Nov. 8, 2023 Tr. 4376:22-4377:9 (Rust testifying about the change in the number of surplus eggs between when an export was approved and actually taken). [14] There is no evidence in the record that there were willing buyers in the United States for the nest-run eggs comprising any given export. To the contrary, the evidence indicates these were surplus eggs with no domestic market. *See supra* notes 1-6. Indeed, the evidence shows when the export price was too low, USEM members rejected the export

---

more. So we're just negotiating the basis or we've negotiated a basis at this point, and we're just memorializing it in a contract.

[13] Oct. 30, 2023 Tr. 2375:19-2376:9 (Manion testifying about Urner Barry pricing): Q. Okay. So focusing your attention on the 1998 to 2008 time period, can you describe to the jury how egg products purchases at Kraft were priced as a general matter? A. Yes. The Urner Barry market was used as the base, and then it was applied to a formula for our specific items that we purchased. Q. Okay. Can you explain that a little bit more to the jury. How did Urner Barry provide a base? A. So if you're talking about whole eggs, liquid whole eggs, it would provide the benchmark price for that -- for the whole eggs. And then Kraft had a formula off of that based on the specification that we have. So the Urner Barry market for liquid whole eggs would be the base price, and then we would have a discount against that. And then we would have a calculation based on our particular formula.

[14] Nov. 8, 2023 Tr. 4376:22-4377:9: **Q. was it possible that there could be a change in the number of surplus eggs that Rose Acre had between the time an export was approved by the USEM board to the time that the export was actually executed? A. That would -- that could happen a lot**. Q. Does the number of surplus eggs for Rose Acre -- does it change on a daily basis? A weekly basis? A**. The egg market can turn in 24 hours.** You can go from being long to short in a 24-hour period. And it's always the perception of the market what the buyers are thinking. The minute they think the market is going up, all the brokers reach out and try to buy every egg they can buy and then there is a shortage and then the market goes up.

opportunity. *See* Exh. H, D-500 (Oct. 22, 2007 USEM minutes rescinding export where price was too low); Exh. I, P-635 at 4 (Oct. 24. 2003 USEM minutes weighing domestic demand in considering whether to entertain exports declining export where no surplus).

Moreover, there is evidence that USEM itself was necessary to take advantage of foreign export markets, which brings USEM squarely within the ambit of *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* (BMI)*, and National Collegiate Athletic Association v. Board of Regents* (NCAA). *See BMI*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all."); *NCAA*, 468 U.S. 85, 113 (1984) ("a joint selling arrangement may 'mak[e] possible a new product by reaping otherwise unattainable efficiencies.'"). The requests from foreign buyers were too sporadic, too large, and required too small of a delivery window for any individual producer to fill on its own. *See* Oct. 26, 2023 Tr. 1888:25-1889:12.[15] It also was necessary that all USEM members participate in an export when an export was taken; otherwise, USEM would not have had enough eggs to fulfill the order. That meant that, from time to time, a member would not have surplus eggs to fill a particular export. *See, e.g.*, Exh. J, P-178, Feb. 7, 2003 Letter to USEM members re: Export Order Accepted ("The purpose of an export is to market surplus eggs to foreign buyers and create buyers in the cash market. Every member has different circumstances. However, in order to get the most bang for our buck, we encourage those who can pack their export commitment to do so from their own

---

[15] Oct. 26, 2023 Tr. 1888:25-1889:12 Q. How often, to your best recollection -- during this period we're talking about, how often were exports presented that actually went through the whole process? A. Oh, it just depends. We would go -- some years we might have five or six exports, then it might be two or three years without any export. There were always just opportunistic. Q. And when you say "opportunistic," what does that mean? A. You never planned on them. They just -- they would – it's a world market. If a country or countries needed eggs, they would try to buy them from us if we were competitive. If we weren't competitive, they didn't buy them. They didn't buy them because they liked us; they bought them for economic purposes.

production and replace those eggs in the cash market for their normal business."). In joining USEM, members bet on exports being profitable for them more often than not, but in any event members testified that they valued the opportunity to access a world market. Specifically, USEM members utilized USEM to open up foreign markets and find new customers. Oct. 25, 2023 Trial Tr. 1999:17-2000:1. Finally, every single export had to be preapproved by the USDA's Agricultural Marketing Service.[16] The fresh egg exports coordinated by USEM on behalf of its members were consistent with the USDA's longstanding goal of expanding global markets and in promoting the marketing of agricultural products.[17]

Because there is evidence that the exports at issue here did not "almost always tend to restrict competition" and were not "manifestly anticompetitive," they are not subject to *per se* treatment. *Sharp*, 485 U.S. at 723.

### D. CONCLUSION

The question is not whether the jury might find USEM exports to be anticompetitive. The question is whether USEM exports are so manifestly anticompetitive that their unreasonableness must be presumed as a matter of law. For the reasons and based on the evidence cited above, they are not and, therefore, they do not fall within the small universe of conduct excepted from the standard rule of reason analysis.

Dated: November 13, 2023

Respectfully submitted:

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS

---

[16] (last visited Nov. 13, 2023).

[17] (last visited Nov. 13, 2023).

LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1926

*Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.*

/s/ Patrick M. Collins
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450

Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

<u>/s/ Donald M. Barnes</u>
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***