UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. <br><br> Defendants. | No. 1:11-cv-08808 <br><br> Judge Steven C. Seeger |

**DEFENDANTS' SUBMISSION AS TO WHY RULE OF REASON APPLIES TO SHORT-TERM RECOMMENDATIONS**

Defendants submit this filing at the Court's request regarding early molts and slaughters recommended by UEP to its members ("Short-Term Recommendations"). In this case, Plaintiffs failed to adduce evidence that the Short-Term Recommendations caused significant injury to the markets for eggs or egg products. As such, these activities inherently fail the "manifestly anticompetitive" test and lack the type of "pernicious effect" to warrant *per se* treatment.

A.  **Plaintiffs Have Not Shown "Economic Effect" of the Short-Term Recommendations.**

There is no demonstrated "economic effect" from the Short-Term Recommendations. *In re Processed Egg Prod. Antitrust Litig.,* 962 F.3d 719, 729 (3d

Cir. 2020) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007)). Plaintiffs' proffered expert consistently testified that he could not show, and did not measure, any economic effect from the sporadic and inconsistent early molts and slaughters. Oct. 30, 2023 Trial Tr. 2567:6–16 (Dr. Baye testifying that early recommendations were "unsuccessful" because "you can't sustain higher prices by killing birds"); 2688:23–2689:11 (Dr. Baye testifying that impact of any short-term recommendation is "not the way you're going to increase prices for a sustained period of time"); 2690:24–2691:2 (Dr. Baye testifying that "as an economist" he "can't measure the economic impact of the success of these short-term measures"); 2811:13–18 (Dr. Baye confirming that he was unable to confirm "with a degree of scientific certainty" whether a molt had any impact on egg-laying production); 2815:5–14 (Dr. Baye confirming that he did not know whether any producer followed through on a recommended slaughter, and could not measure any impact of any slaughter on the production of egg-laying hens); Nov. 1, 2023 Trial Tr. 2999:12–19 (Dr. Baye confirming that he did "no analysis to quantify the effect" of early molts and slaughters on the market); 3000:8–10 (Dr. Baye confirming he did "no analysis to determine how long any such effect [of early molts and slaughters], if it did occur, would last").[1] Without demonstrated economic effect, the Rule of Reason analysis is the only appropriate analysis for the Court to apply.

---

[1] Additionally, Plaintiffs entered into contracts for eggs during times that would bypass any changes to egg prices from the Short-Term Recommendations. *See* Nov. 3, 2023 Trial Tr. 3570:23–3571:1 (Tobey describing using price forecasts to determine whether to use fixed price contracts); Exhibit ("Ex.") A, DX13 at 4 (discussing strategy of seasonally buying "'cheap' eggs [during off-peak season] to dry and store for later

B.   **Courts Do Not Have Experience With These Types of Practices.**

Another reason that the Rule of Reason analysis applies to the Short-Term Recommendations is that courts do not have "considerable experience" with assessing how the practice of molts and slaughters affect the market (if at all). *Leegin,* 551 U.S. at 886-87; *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1271, 1284 (7th Cir. 1983); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d 1004, 1010-11 (7th Cir. 2012). Plaintiffs argue that the alleged conspiracy involves a horizontal agreement among competitors to restrict supply and raise prices through Short-Term Recommendations. *See* Pls. Response to the Court's Liability Standard Questions, Dkt. 503. Not so.

For starters, recommending egg producers engage in molts and slaughters is not an agreement to restrict supply. None of the cases on which Plaintiffs rely in arguing for the application of the *per se* rule to the Short-Term Recommendations involve early molts and slaughters. *See id*. Even *In re Broiler Chicken Antitr. Litig.*, 2022 WL 4303476 (N.D Ill. June 30, 2022) provides no support for applying the *per se* rule to the Short-Term Recommendations. There, the alleged conspiracy involved the slaughter of chickens without any replacement method. By contrast, here, the practice of molts and slaughters allowed for the making of or replacing with more productive hens—and more eggs. *See infra*, Sec. C.

---

use"); Ex. B, PX515 at 19–20 ("Egg Strategy Options" slide describing buying "in low demand periods of late spring to dry for Jul-Feb needs," and "Breaking Stocks Seasonal Index" showing seasonality of egg prices).

3

But in any case, courts do not have considerable experience with husbandry practices relating to egg farming, including complex methods for maximizing a hen's reproductive cycle, to apply a *per se* analysis.

### C. Early Molts and Slaughters Have Redeeming Benefits.

The Rule of Reason analysis applies because Plaintiffs fail to show early molts and slaughters are without "redeeming benefits." *In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d at 1010–11. In fact, the evidence shows the opposite—that molts and slaughters are bona fide animal husbandry practices that nearly all egg producers undertake to allow for *more* productive hens and *increased* egg production.

Molting is a common and necessary practice in the egg industry. *See* Nov. 1, 2023 Trial Tr. 3132:22–3133:3 (Dr. Armstrong discussing that "98 percent of the eggs in the country" were produced by producers who molted, which rendered impracticable a molting ban recommendation in the 2000 Scientific Advisory Committee recommendations); Ex. C, DX444 at 2 (Molting is a "natural process that allows a hen to rest and occurs naturally with decreasing daylight and reduced food intake in the fall and winter."); Oct. 24, 2023 Trial Tr. 1642:9–1643:5 (Mr. Baker confirming that molting is a natural process among egg-laying hens). As aptly explained by Dr. Armstrong, molting can lead to a more rejuvenated hen that helps increase egg production:

> If you think about a molt, you have a flock of hens that after a period of weeks, the eggs start to get brittle. The birds have been producing a lot. Their body stores have gone down, and you're at a point where the bird either needs to be terminated, euthanized, or harvested. Molting then allows the bird to be rejuvenated. So molting means you're stopping egg production. The bird can have a chance to rejuvenate, and then you have another whole round of egg production. Sometimes it can go to three

4

> cycles, two molts in the past. So you think about molting from a natural situation, a bird's molt, they lose feathers, etcetera, but in this case, it's a chance for the bird to be rejuvenated after several weeks of producing eggs every 28 hours.

Nov. 1, 2023 Trial Tr. 3129:5–3130:4; *see also* Oct. 24, 2023 Trial Tr. 1642:12–22 (Mr. Baker describing "rejuvenated" birds following a molt); Nov. 9, 2023 Trial Tr. 4737:15–4738:5 (Mr. Hurd explaining that "Short term, when you trigger the molt, it would drop production; but after the birds come back in to lay, it would be more production than if you had not done it at all.").

Similarly, the disposal of spent hens (*i.e.*, slaughters) is "always . . . part of commercial egg production." Nov. 1, 2023 Trial Tr. 3143:17–3144:1. At the end of their productive cycle, a hen is euthanized. *Id.* at 3145:21–3146:6; 3143:23–3144:1 (Dr. Armstrong explaining that after a "hen has basically produced all the eggs the hen can produce" it is "spent"). While grim to industry outsiders, this is not unusual and is even necessary to eliminate unproductive hens. *See* Nov. 9, 2023 Trial Tr. 4737:25–4738:5 (Mr. Hurd confirming that producers increase production by slaughtering hens by replacing older "less productive hen[s]" with "younger hens that are about to be more productive"). More to the point, none of these practices constitute agreements to "limit" supply.

### D. The Short-Term Recommendations are Not "Manifestly Anticompetitive."

The Rule of Reason analysis should apply because there is no evidence that early molts and slaughters "almost always tend to restrict competition" and are "manifestly anticompetitive." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Rather, these

5

practices "cannot be predicted with a high degree of certainty, which is a prerequisite for application of the per se standard." *In re Processed Egg Prod. Antitrust Litig.,* 962 F.3d at 729.

As an initial matter, Plaintiffs have not demonstrated the Short-Term Recommendations impacted competition at all. *See supra*, Sec. A; *see also* Oct. 31, 2023 Trial Tr. 2690:24–2691:2 (Dr. Baye testifying that "as an economist" he "can't measure the economic impact of the success of these short-term measures"); 2691:10–12 (Dr. Baye confirming short-term measures would not have had a sustained measurable impact); 2807:22–2808:11 (Dr. Baye confirming he "did not try to quantify" the productivity increase resulting from a molt); 2813:12–21 (Dr. Baye confirming he never analyzed slaughters, or the number of replacement hens following a slaughter during the conspiracy period).

Notwithstanding the lack of demonstrated impact, independent action cannot be manifestly anticompetitive. Defendants decided when and whether to molt and slaughter based on their own independent business reasons. Oct. 23, 2023 Trial Tr. 1230:13–15 (Mr. Baker stating that Cal-Maine was "going to do it whether anybody [else] did it or not"); Oct. 24, 2023 Trial Tr. 1654:2–6 (Mr. Baker describing that Cal-Maine used early molts and slaughters to "try[] to match our supply and demand with our customers"); 1653:24–1654:6 (Mr. Baker confirming that Cal-Maine would make decisions about whether to conduct early molts or slaughters based on what was in its own best interest); Nov. 9, 2023 Trial Tr. 4738:6–8 (Mr. Hurd confirming that Rose

6

Acre never conducted any early molts and slaughters at UEP's recommendation because it didn't make sense "at all" given Rose Acre's business model).

The ability to schedule molts and slaughters at a certain cadence allows egg producers to match their production more closely with customer demand. Oct. 24, 2023 Trial Tr. 1861:8–1864:11 (Mr. Baker describing how Cal-Maine operations team would have "weekly meetings" to compare projected sales against flock size and production to discuss whether to molt and slaughter in "trying to keep [their] supply/demand in balance."); Nov. 9, 2023 Trial Tr. 4737:9–14 (Mr. Hurd testifying that "if you're doing a molt earlier, you're taking a bird that's in lower egg production, and then after that molt time frame, it comes back in higher egg production. So you would have more eggs [later.]"). Molts and slaughters must occur at some point. Trial Tr. 3275:3–7 (Dr. Armstrong: "at the end of their lifetime, they're going to be euthanized or slaughtered."). It is completely reasonable for egg producers to leverage the timing of these practices to plan for and respond to different demand cycles based on their own business needs. *See* Oct. 25, 2023 Trial Tr. 1860:3–13 (Mr. Baker confirming that the differences in demand between peak-demand and low-demand created "enormous dilemma[s] and challenges" with regards to "the supply side"); Oct. 24, 2023 Trial Tr. 1641:13– 1642:8 (Mr. Baker describing how molting during low demand periods helped address "a timing issue" and allowed Cal-Maine to "decide when [it would] have [its] production").

Further, the evidence shows that UEP's recommendations were inconsistently followed or were not followed at all. Nov. 8, 2023 Trial Tr. 4384:6–10 (Rust confirming

7

that Rose Acre "never" did early molts and slaughters responsive to a Short-Term Recommendation); Nov. 9, 2023 Trial Tr. 4736:17–23 (Rose Acre's operations chief confirming that RAF never participated, and that he wasn't even aware of Short-Term Recommendations); Oct. 23, 2023 Trial Tr. 1145:15–22 (Mr. Baker confirming that "[e]ach company would decide whether they were going to participate or not participate" in recommendations); Nov. 8, 2023 Trial Tr. 4423:3–18 (Mr. Rust confirming that "some [producers] would listen to [the recommendations] and some would [not, and would instead] build more houses or add more production, have more"); *see also* Ex. D, DX1086 at 2 (Mr. Gregory asking in United Voices if "anyone follow[ed] the recommendation to dispose of flocks six weeks early" and asking if he was "wasting" his time urging producers to be more responsive); Ex. E, DX1041 at 2 (Mr. Gregory asking in United Voices about flock size growing despite his recommendations). Without an anticompetitive agreement among egg producers, there can simply be no anticompetitive effect.

### E. *Per Se* Standard is the Exception, Not the Rule.

The Rule of Reason is "the accepted standard" for Section 1 cases. *Leegin*, 551 U.S. at 885, 886-87 (noting that courts apply the *per se* rule "only after [they] have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason."); *In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d at 1010-11 ("The *per se* rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever"); *Bunker Ramo Corp.,* 713 F.2d at 1284 (applying the *per se* rule of analysis is appropriate only where

8

"courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects."). As such, *per se* treatment is appropriate only for conduct that has "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," *State Oil Co.*, 522 U.S. at 10 (citation omitted), that its "economic impact . . . is . . . immediately obvious," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986). In other words, before this Court can apply the *per se* rule to the Short-Term Recommendations, it must be convinced that early molts and slaughters "almost always tend to restrict competition" and are "manifestly anticompetitive." *Bus. Elecs. Corp.*, 485 U.S. at 723 (1988). Further, "when determining what standard to apply, courts are required to look at the 'economic effect rather than [rely] upon formalistic line drawing.'" *In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d at 727 (citing *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 887).

## Conclusion

For the reasons and evidence cited above, Defendants ask the Court to apply the standard Rule of Reason analysis to the Short-Term Recommendations.

Dated: November 14, 2023                    Respectfully submitted,

*/s/ Patrick M. Collins*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606

Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant Cal-Maine Foods, Inc.***

*/s/ Robin P. Sumner*
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

*/s/ Donald M. Barnes*
Donald M. Barnes
(dbarnes@porterwright.com)
Jay L. Levine
(jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King
(jking@porterwright.com)
Allen T. Carter
(acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

***Counsel for Defendant Rose Acre Farms, Inc.***

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***