UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) | |

**DEFENDANT CAL-MAINE FOODS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

**Introduction**

Cal-Maine Foods, Inc. ("Cal-Maine") is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 50(a). Cal-Maine incorporates by reference in their entirety the concurrently filed Rule 50 motions and memoranda submitted by Defendants Rose Acre Farms and United Egg Producers.

**Legal Standard**

"If a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim or defense that . . . under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).

**Argument**

**A.     There is No "Injury" as a Matter of Law for Cal-Maine's Conduct *At Least* until August 2005.**

As a matter of law, Plaintiffs cannot prove injury attributable to any purported conduct by Cal-Maine—to competition generally or to themselves specifically—until *at least* August 2005 (and they are time barred from recovering for any alleged conduct prior to September 24, 2004 based on the applicable statute of limitations). *In Re: Processed Egg Products Antitrust Litig.*, Case 2:08-md-02002-GP, ECF No. 776, (E. D. Pa. Dec. 12, 2012). To get to the jury, Plaintiffs must satisfy a threshold burden to demonstrate antitrust injury, which is "injury of the type the antitrust laws were

2

intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993). Moreover, to satisfy their burden, Plaintiffs cannot solely rely on alleged increased prices ...." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (quotation omitted). "[P]rices can be increased in the course of promoting procompetitive effects." *Id.* at 895–96.

Plaintiffs' proffered economics expert, Dr. Baye, found "no statistically significant" effect (or no effect at all) from *any* measure prior to August 2005. Oct. 31, 2023 Trial Tr. 2712:20–2713:12, 2724:7–25 (testifying that he found no "statistically significant effect" between the time the Certified Guidelines went into effect and July 2005); *see also infra*, Sec. B. Plaintiffs' failure to establish injury before August 2005 precludes any claim against Cal-Maine during that time period.

### B. No Short-Term Recommendation or USEM Export Adversely Affected Competition or Resulted in Antitrust Injury as a Matter of Law.

Regardless of whether short-term recommendations (*i.e.*, early molts and slaughters) and United States Egg Marketers ("USEM") exports are assessed under a rule of reason or *per se* standard, for these issues to go to the jury, Plaintiffs must show significant anticompetitive effect or sustained antitrust injury directly linked to these measures. *Greater Rockford Energy*, 998 F.2d at 395; *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc.*, 672 F.2d 1280, 1288–89 (7th Cir. 1982); *see also Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir.1998). Plaintiffs have failed to do so.

3

***Short-Term Recommendations***. Plaintiffs' proffered economic expert Dr. Baye admits that early molts and slaughters were sporadic, and their economic impact (if any) was not, in fact, sustained. Oct. 30, 2023 Trial Tr. 2567:6–16 (testifying that "killing birds" is not a "sustainable way to raises prices"); Oct. 31, 2023 Trial Tr. 2690:11–2691:12, 2819:2–12 (testifying that he could not quantify or measure the impact of molts and slaughters on price); 2805:19–2806:5; 2806:17–23; 2808:3–18; 2811:12–18, 2815:9–16 (testifying that he could not tell if a molt or slaughter had any economic impact "with a degree of scientific certainty"). Plaintiffs cannot demonstrate these activities caused significant anticompetitive effect as would be necessary to avoid a directed verdict on this issue. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288–89.

***USEM Exports.*** Dr. Baye also testified to the lack of sustained anticompetitive effect of the USEM exports. Oct. 30, 2023 Trial Tr. 2590:15–20; Oct. 31, 2023 Trial Tr. 2696:6–21 (testifying that he could not determine with a degree of scientific certainty if any of the exports caused Plaintiffs to pay higher prices). This is also not surprising as exports functioned as an outlet for surplus eggs during periods of low demand or when product was at risk of spoilage. *See, e.g.,* Oct. 24, 2023 Trial Tr. 1646:3–11 (Mr. Baker explaining that surplus eggs were exported because of their limited shelf life); 1885:12–19; PX599 (Nov. 23, 2004 United Voices discussing how breakers were no longer buying surplus eggs). Because Plaintiffs failed to show any sustained impact resulting from USEM exports, there is no anticompetitive effect necessary to impose Section 1 liability. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288.

4

### C. UEP Lacked Enforcement Mechanisms.

Plaintiffs allege a "hub and spoke" conspiracy where the "hub" is UEP and the "spokes" are (at least) five egg producers. As part of this theory, Plaintiffs allege that the vertical relationship between UEP and certain member egg producers facilitated a conspiracy that resulted in an unreasonable restraint on trade. This claim fails as a matter of law, however, because there can be no restraint of trade when UEP had no means by which to enforce its recommendations against any of its members, and, based on the complete trial record, took no enforcement action. The Seventh Circuit has been explicit that, in the context of alleged conspiracies between associations and members, "enforcement mechanisms *are* the 'restraints' of trade" and "[w]ithout them there is only uncoordinated individual action, the essence of competition." *Schachar v. Am. Acad. Of Opthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (emphasis added); *see also Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005) ("[A] trade association that . . . issues opinions, without constraining others to follow its recommendations, does not violate the Sherman act by unfavorably evaluating a manufacturer's product.") (internal quotation and citation omitted) (quoting and relying on *Consol. Metal Prods. Inc. v. Am. Petroleum Institute*, 846 F.2d 284, 292 (5th Cir. 1988)).

Here, Plaintiffs cannot prove that UEP could force its members to adopt its recommendations. Plaintiffs only available argument based on the evidence is that UEP could shame or praise egg producers in its newsletter but neither constitutes a "restraint" as a matter of law. *Id.* at 293–296; *compare* DX1086 at 2 (Gene Gregory asking in United Voices if "anyone follow[ed] the recommendation to dispose of flocks

5

six weeks early" and asking if he was "wasting" his time urging producers to be more responsive), *with* PX599 at 2 (United Voices publishing names of companies that had made "their intentions known" regarding UEP recommendations). Plaintiffs made no showing as to how many egg producers actually followed UEP recommendations and, on multiple occasions, UEP publicly expressed great frustration that members were not listening or following them. *See supra,* Sec. B*; see also* DX1041 (Gene Gregory asking in United Voices about flock size growing despite his recommendations); DX1086. Moreover, there was expert testimony that it would not be in the egg producers' interest to follow the UEP recommendations. Nov. 14, 2023 PM2 Rough Tr. at 6 (Dr. Walker explaining that individual producers would have a profit motive to ignore UEP's recommendations). At most, Plaintiffs have only established that UEP *hoped* that members would follow their recommendations but could do nothing about it if members declined to do so. *See* Oct. 23, 2023 Trial Tr. 1145:13–22. Sheer hope of participation is insufficient to establish a restraint of trade. *See Schachar*, 870 F.2d at 399; *Santana Prod., Inc.,* 401 F.3d at 133; *Consol. Metal Prods. Inc.*, 846 F.2d at 292. Accordingly, UEP's recommendations regarding short term measures are not "restraints" on trade as a matter of law. *Schachar*, 870 F.2d at 399.

**D. As a Matter of Law, the Alleged "Conspiracy" Cannot (1) Include Michael Foods, Inc. and/or (2) Be *All* Members of the Certified Program.**

Plaintiffs have failed to prove that Michael Foods Inc. ("MFI") was part of any alleged conspiracy. This underscores the larger point that Plaintiffs also cannot prove that *all* members of the Certified Program were co-conspirators.

6

### 1. Plaintiffs Have Failed to Prove as a Matter of Law that MFI Joined an Alleged Conspiracy.

Plaintiffs have not shown that MFI was a knowing member of an alleged conspiracy to restrict supply, let alone that it acted with the "intent to further the purpose of the conspiracy." *See* Oct. 16, 2023, Prelim. Jury Instr. at 10; Oct. 19, 2023 Trial Tr. 646:3–9. The record is uncontroverted that MFI did not agree to or otherwise participate in short-term supply recommendations, like "early" molts and slaughters or hatch reductions. There is no evidence, for instance, that anyone from MFI moved or seconded to support any such recommendation. Plaintiffs have not offered any such evidence during trial. Furthermore, there is no evidence that MFI was involved in participating with exports through USEM. MFI was never a member of USEM, and the company did not participate in any exports discussed by Plaintiffs.

The only evidence adduced at trial regarding MFI and the alleged conspiracy relates to the Certified Program. During Plaintiffs' case-in-chief, Plaintiffs pointed to the fact that employees of MFI were present at Producer Committee meeting regarding animal welfare. *See, e.g.*, Oct. 23, 2023 Trial Tr. 1233:15–20 (Mr. Baker testifying that MFI representative present at meeting). But mere presence cannot establish participation. To show MFI was part of a conspiracy, Plaintiffs must show evidence of MFI's *knowledge* and *intent* to further the purposes of the alleged conspiracy. Plaintiffs made no such showing. The law is clear that "attend[ing] industry meetings . . . is [in]sufficient evidence of agreement without evidence of communication." *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 7220170, at *23 (N.D. Ill. Nov. 2, 2023).

What the evidence does show is that MFI applied to join the Certified Program for the first time in mid-2006. PX600 (MFI's June 2006 UEP Certification application). And contrary to Plaintiffs' claims, the only evidence regarding the "why" of MFI's decision relates to customer demand. The jury heard from Gary Pickett that Walmart wouldn't purchase egg products from MFI unless it was certified. *See* Nov. 7, 2023 Trial Tr. 4226:19–4227:3 (stating that "preferential treatment" was given to UEP Certified suppliers and that non-certified egg suppliers would "have less items available to sell in [Walmart's] stores"); DX832 (Feb. 2006 Pickett email to MFI saying he "would expect [MFI's] sku count to go down" absent UEP Certification). That same year—2006—Plaintiff Nestlé began to include UEP Certification as a requirement for the sugared yolks that Dreyer's purchased from MFI, and thereafter purchased UEP Certified egg products from MFI. *See* DX175 (Nestlé's stipulation regarding same). Within months of the Pickett emails, MFI officially applied to the Certified Program. *See* PX600. Because there is no evidence from which a reasonable factfinder could find that MFI was a knowing member of the conspiracy, the evidence related to MFI, including all alleged coconspirator statements offered by MFI, should be stricken from the record. *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 7220170, at *23.

### 2. Plaintiffs Have Failed to Prove All Egg Producers Who Joined the Certified Program were "Co-Conspirators."

As an initial matter, the membership of USEM, UEP, and the Certified Program was not coextensive or even consistent throughout the entire alleged conspiracy period (*i.e.*, 1999–2008). *Compare* PX160 (2003 UEP Certified Companies

8

List) *with* DX483 (2006 UEP Certified Companies List); *compare* PX603 (Cal-Maine initial UEP Certification application in 2002) *with* PX600 (MFI's initial UEP Certification application in 2006) *and* PX601 (Rose Acre initial UEP Certification Application in 2002); *compare* PX636 (Oct. 2002 list of USEM members participating in export) *with* PX379 (Jan. 2007 list of USEM members participating in export) *and* PX378 (June 2008 list of USEM members participating in export). This creates insurmountable proof problems for Plaintiffs. To prove a conspiracy, Plaintiffs must show by a preponderance of the evidence that *each* of the alleged co-conspirators had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). That requires a showing that the conduct was related to an actual agreement between the co-conspirators—and not just independent action. *Id.* at 761. Simply put, just because an egg producer joined the Certified Program does not mean that egg producer thereby joined a "conspiracy." Membership alone in the program is not enough and there was a dearth of evidence as to the reasons behind the why dozens of members joined the Certified Program. *See* Order on Plaintiffs' *Santiago* Proffer, Dkt. #294 at 29, 32 ("Something more is required, above and beyond trade association membership. There must be 'some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member'"); *see also infra*, Sec. F.

The Certified Program is a science-based certification program setting minimum welfare standards for laying hens adopted by UEP and recommended to

the members of two other trade associations, Food Marketing Institute (FMI) and National Council of Chain Restaurants (NCCR), which was open to both UEP egg producers and non-UEP egg producers alike. Customers who "did not want to take the [reputational] risk" of garnering more activist attention, Nov. 7, 2023 Trial Tr. 4214:23–4215:2, wanted (and in many cases were willing to pay more for) these new eggs. *See, e.g.*, DX207 (Walmart agreeing to share $0.02 per dozen of costs related to producers implementing Certified Program); DX210 at 6 (contract between Kroger and Cal-Maine stating that "Kroger will not accept any eggs . . . that have not been 100% produced [under the Certified Program]."); DX211 at 2 (letter from Winn-Dixie asking Cal-Maine for permission to place Certified Program logo on eggs and notifying Cal-Maine that they will require a copy of annual audits to ensure compliance with Certified Program); DX261 (Winn-Dixie asking for Cal-Maine's animal welfare policy for the purpose of being "better informed when [they] receive inquiries from [their] customers and shareholders.").

Compelling evidence demonstrated that Cal-Maine joined the Certified Program in response to customer demand. *See e.g.*, Nov. 11, 2023 Trial Tr. 3743:5–3745:6 (Cal-Maine contacted by McDonald's in Aug. 2000 regarding requiring additional cage space for egg laying hens); Nov. 6, 2023 Trial Tr. 3766:15–24 (Cal-Maine customers required UEP/FMI Guidelines); DX194 (June 2002 FMI-NCCR Report recommending to its members use of UEP Certified Guidelines); *see also* Nov. 7, 2023 Trial Tr. 4226:19–4227:3 (Mr. Pickett stating that "preferential treatment" was given to UEP Certified suppliers and that non-certified egg suppliers would

10

"have less items available to sell in [Walmart's] stores").

Plaintiffs have not presented evidence that Cal-Maine joined the Certified Program with unlawful intent. Instead, Plaintiffs have only shown, at most, that many egg producers joined the Certified Program when it began in 2002 and thereafter. Some of these were not, and never did become, members of UEP, and thus under Plaintiffs' theory could not be "spokes." Oct. 31, 2023 Trial Tr. at 2753:15–24 (Dr. Baye confirming that approximately 30 of 177 Certified producers in 2004 were not UEP members). In fact, some once-certified producers (and purported conspirators under Plaintiffs' theory), like Sparboe Farms, were UEP Certified until, seeking a competitive advantage, left the program to start a different animal welfare certification program to compete with the Certified Program. *See* PX160 (2003 UEP Certified Companies list showing Sparboe as Certified in 2003); Nov. 2, 2023 Trial Tr. 3218:2–6 (describing Sparboe as "leading the charge" for the alternative Process Verified Program, or PVP); Nov. 7, 2023 Trial Tr. 4220:24–4221:7 (Mr. Pickett describing being pitched by Sparboe in 2005 regarding PVP). This is evidence not of a "conscious commitment to a common unlawful scheme", *Monsanto*, 465 U.S. at 764, but of competitors acting in their own self-interest as they battle each other for market share. The evidence has borne out that an alleged "conspiracy" of "all" UEP Certified Members from 2002–2008 has not been—and cannot be—proven. *Monsanto*, 465 U.S. at 764.

### E. Plaintiffs Failed to Prove the Certified Program Caused a Sustained Reduction of Egg Supply in a Relevant Market.

Plaintiffs failed to (and cannot) demonstrate through Dr. Baye that any alleged

11

"conspiracy" actually reduced the supply of egg products. Under the Rule of Reason analysis which should apply to the Certified Program, Plaintiffs have failed to show that the Certified Program unreasonably restrained trade, much less caused a reduction in the supply of fresh eggs or egg products. The Certified Program had no supply limitations. No producer had to join, and every Certified producer could produce as many eggs as they wanted to and expand capacity as much as they desired. Nov. 8, 2023 Trial Tr. 4502:20–4503:3 (Mr. Rust confirming that Rose Acre could produce "as many eggs" as it wanted to); Oct. 31, 2023 Trial Tr. 2752:1–2753:24 (Dr. Baye confirming there were at least 30 egg producers that were part of Certified Program but were not members of UEP). Rather, Dr. Baye focused on the so-called "effects" of the Certified Program (based on national flock sizes that included a host of independent egg producers and as well as specialty eggs like organic and free range) and, therefore, his analysis swept in the actions of hundreds of independent egg producers and different markets. In addition, testimonial evidence established that Plaintiffs had no difficulty procuring non-certified egg products during the alleged conspiracy period. *See*, *e.g.*, Nov. 3, 2023 Trial Tr. 3585:6–9 (Tobey confirming that Kellogg was always able to obtain the UEP Certified and non-certified egg products that it wanted).[1]

---

[1] All these eggs and egg products were lumped in together by Dr. Baye, even though Dr. Baye admitted that having the choice between a new and old product (like the choice that Plaintiffs had between UEP Certified eggs and commodity eggs), is an indicator of competition, and that "choices are procompetitive, absolutely." Nov. 1, 2023 Trial Tr. 2952:5–25.

12

## F. The Alleged "Conspiracy" Cannot Be "All" UEP Members by Virtue of Membership in UEP.

Nor can the alleged "conspiracy" be coextensive with UEP membership. Courts have declined to read the Sherman Act in a manner that would effectively turn associations into "walking conspirac[ies]." *Consol. Metal Prods.*, 846 F.2d at 293–94; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010). Under Section 1, "every action by a trade association is not concerted action by the association's members." *Id.*; *see also In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, at *23 (Neither "acting in parallel with other defendants to reduce supply" nor "attend[ing] industry meetings . . . is sufficient evidence of agreement without evidence of communication."); *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410–11 (5th Cir. 2007) (casino trade association's response on behalf of its members collectively to a group proposal to lease a web address did not constitute concerted action); *Jack Russell Terrier Network v. American Kennel Club*, 407 F.3d 1027, 1034–36 (9th Cir. 2005) (club and its regional affiliates were incapable of conspiring to exclude breeders from membership when national club and affiliates were pursuing common goal of maintaining value of dog breed and defendants were not alleged to be actual or potential competitors). This Court acknowledged these governing principles in its order on Plaintiffs' *Santiago* Proffer. Dkt. #294 at 29, 32.

Rather, courts have insisted upon showings of "some evidence of actual knowledge of, *and participation in*, the illegal scheme." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (per curiam) (rejecting "membership-ratification theory" basis for antitrust liability); *see also Moore v.*

13

*Boating Industry Associations*, 819 F.2d 693, 712 (7th Cir. 1987) ("[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws . . . There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member.") (citing T. Vakerics, *Antitrust Basics* § 6.13, at 6-37 to -38 (1985)). Indeed, "there is no such thing as an 'unwitting conspirator.'" *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 33889, at *15 (N.D. Ill. Jan. 19, 1999), *aff'd in relevant part*, 186 F.3d 781 (7th Cir. 1999) (citing *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir.1963)). "When a Section 1 plaintiff relies upon circumstantial evidence to prove the existence of an illegal conspiracy, he 'must show that the inference of conspiracy is reasonable in light of the competing inference [ ] of independent action.'" *Id*.

To the extent Plaintiffs now are claiming that the alleged "conspiracy" is every egg producer who was a member of UEP from 1999–2008, that claim fails as a matter of law because they have not put forward any evidence showing that every member of UEP had "actual knowledge" of, and intent to participate in, the alleged conspiracy. *See In re Brand Name Prescription Drugs*, 1999 WL 33889, at *15; *Moore*, 819 F.2d at 712; *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234. This evidentiary gap must be bridged and Plaintiffs proffered no evidence to bridge it. Accordingly, Cal-Maine is entitled to a judgment as a matter of law on the theory that every member of UEP was somehow a *de facto* member of an alleged conspiracy. *Id.*

14

### G. If Alleged Spokes of the "Conspiracy" Are the Five Identified Egg Producers or Fewer, Then Plaintiffs' Section 1 Claim Fails.

Plaintiffs are thus left with the five egg producers (or four without MFI) plus UEP and USEM. But Plaintiffs have not established that these alleged co-conspirators were capable of causing sustained anticompetitive effects. Indeed, Plaintiffs' failure to show that it would have been possible for these entities to inflict antitrust injury is fatal to Plaintiffs' Section 1 claim. *Schachar,* 870 F.2d at 398 ("the "first question in any rule of reason case is market power"); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 346 (1990) ("Respondent has failed to demonstrate it has suffered any antitrust injury. The allegation of a *per se* violation does not obviate the need to satisfy this test."); *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 395. Under a Rule of Reason analysis, which Cal-Maine submits is appropriate here, a showing of market power would be essential in order to go to the jury, but Cal-Maine, Rose Acre, Moark, MFI, and Wabash Valley together represented only 20.4% of the market. Oct. 31, 2023 Trial Tr. 2844:9–14. "The Seventh Circuit has held in cases alleging a violation of Section 1 of the Sherman Act, 'a 20%-25% market share or less does not constitute market power.'" *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 773 (N.D. Ill. 2015) (quoting *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987)). Plaintiffs' Section 1 claim fails as a matter of law.

### Conclusion

For the foregoing reasons, Defendant Cal-Maine respectfully asks that the Court enter judgment in Cal-Maine's favor as a matter of law.

Dated: November 14, 2023

Respectfully submitted,

*/s/ Patrick M. Collins*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

**Counsel for Defendant Cal-Maine Foods, Inc.**