UNITED STATES DISTRICT COURT
IN THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS UNITED EGG PRODUCERS, INC. AND UNITED STATES EGG MARKETERS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

**I.      INTRODUCTION**

Plaintiffs Kraft Food Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. ("Plaintiffs") have brought an antitrust claim under Section 1 of the Sherman Act alleging that Defendant United Egg Producers, Inc. ("UEP") conspired with Defendant United States Egg Marketers, Inc. ("USEM") and five egg producers to reduce the supply of eggs for the purpose of raising domestic egg prices through four mechanisms: (1) short-term measures recommended by UEP to reduce the nation's flock size, (2) coordinated exports through USEM, (3) cage density requirements adopted as part of the UEP Certified Program, and (4) a ban on backfilling, also required by the UEP Certified Program.

After 18 days of testimony, the evidence presented by Plaintiffs fails to establish that the alleged conspiracy produced any anticompetitive effect or caused any antitrust injury. For that

reason, and for the reasons set forth in (1) the Memorandum in Support of Defendant Rose Acre Farms' Motion for Judgment as a Matter of Law; and (2) Defendant Cal-Maine Foods, Inc.'s Memorandum in Support of Motion for Judgment as a Matter of Law, which are incorporated by reference as if fully set forth herein, UEP and USEM should be granted judgment as a matter of law.[1]

## II. LEGAL STANDARD

"If a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim or defense that . . . under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). The standard for granting judgment under Rule 50 mirrors the standard for summary judgment. *Robinson v. Perales*, 894 F.3d 818, 833 (7th Cir. 2018). That is, the court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party to whom the motion is directed." *Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir. 1989) (internal quotations omitted). A reasonable inference is one that may only be drawn from the evidence "without resort to speculation." 9 Moore's Federal Practice – Civil § 50.64[1] (2023) (internal citations omitted). The nonmoving party is "not entitled to the benefit of unreasonable inferences or to inferences conflicting with uncontested facts." *Id*. Rather, the court must "determine whether the party with the burden of

---

[1] Section III below restates and incorporates by reference arguments made by Defendants Rose Acre Farms and Cal-Maine, Inc. in their memoranda in support of their motions for judgment as a matter of law. For the avoidance of doubt, any argument not expressly restated here is nevertheless fully incorporated by reference.

proof has produced sufficient evidence upon which a jury could properly proceed to a verdict, and . . . a mere scintilla of evidence will not suffice." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (quoting *Richardson v. Indianapolis*, 658 F.2d 494, 498 (7th Cir. 1981)); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1133 (7th Cir. 2020).

District courts do not hesitate to grant, and the Seventh Circuit does not hesitate to affirm, judgments as a matter of law when the evidence is insufficient to support a claim, including in Sherman Act Section 1 conspiracy claims. *See e.g.*, *Gordon v. Illinois Bell Tel. Co.*, 330 F.2d 103, 106 (7th Cir. 1964) (affirming directed verdict for defendants on Sherman Act § 1 and § 2 claims where plaintiffs failed to establish evidence of conspiracy or intent to restrain interstate commerce); *Northwestern Oil Co. v. Socony-Vacuum Oil Co.*, 138 F.2d 967, 969, 971 (7th Cir. 1943) (affirming directed verdict for defendant where plaintiff failed to provide sufficient evidence of injury resulting from the allegedly anticompetitive conduct); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-C-897, 1999 U.S. Dist. LEXIS 550, at *43 (N.D. Ill. Jan. 19, 1999) (entering judgment in favor of all wholesaler defendants where plaintiffs failed to demonstrate the alleged conspiracy under Sherman Act § 1).

### III. UEP AND USEM ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

#### A. Plaintiffs Have Failed To Adduce Evidence from Which a Reasonable Jury Could Find That the Alleged Conspiracy Unreasonably Restrained Trade or Injured Plaintiffs

To prove that UEP and USEM violated Section 1 of the Sherman Act, Plaintiffs must establish that (1) UEP and USEM conspired to unreasonably restrain trade, (2) the conspiracy in which UEP and USEM participated unreasonably restrained trade, and (3) Plaintiffs suffered an injury resulting directly from the unreasonable trade restraint's adverse impact on competition. *See, e.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). An agreement unreasonably restrains trade when it has

a "substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. ---, 138 S.Ct. 2274, 2284, 201 L.Ed.2d 678 (2018); *Lee Klinger Volkswagen, Inc. v. Chrysler Corp.*, 583 F.2d 910, 915 n.6 (7th Cir. 1978) ("There must be evidence sufficient to show that 'the effect upon competition in the marketplace is substantially adverse.'" (citations omitted)). To prove an unreasonable trade restraint, Plaintiffs must show "actual, sustained adverse effects on competition." *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, '**proof of actual detrimental effects, such as a reduction of output**,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" (emphasis added)).

A plaintiff suffers antitrust injury when it sustains an injury that results directly from the anticompetitive nature of the challenged conduct. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Marion Healthcare, LLC v. S. Ill. Healthcare*, No. 12 -CV-871, 2020 U.S. Dist. LEXIS 55724, at *23 (S.D. Ill. Mar. 31, 2020) (citations omitted); *see also Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F. Supp. 2d 509, 515 (N.D. Ind. 2004) ("To show antitrust injury . . . [plaintiff] must prove that the [alleged antitrust violation] affected the price, quantity or quality of [] services, not just her own welfare.") , *aff'd*, 463 F.3d 710 (7th Cir. 2006). Plaintiffs bear the burden of establishing injury to a fair degree of certainty. *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-C-864, 2023 WL 4305901, at *62 (N.D. Ill. June 29, 2023) ("[P]laintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." (quoting *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993)).

Importantly, Plaintiffs must connect the alleged anticompetitive conduct to specific anticompetitive effect and injury. Here, Plaintiffs have alleged an overarching conspiracy among seven entities—the four Defendants and three other egg producers—to restrict egg supply in order to increase the price of eggs and egg products. Specifically, Plaintiffs claim Defendants agreed to reduce egg supply by implementing short-term measures recommended by UEP to reduce the nation's flock size (*e.g.*, early molts and slaughters), coordinating exports through USEM, and agreeing to adhere to the UEP Certified Program's cage density requirements and backfilling prohibition. Plaintiffs claim those measures restricted the supply of eggs and caused Plaintiffs to pay higher prices for egg products. Because Plaintiffs have failed to adduce evidence from which a reasonable juror could conclude that the alleged agreement among Defendants and the three alleged co-conspirators in fact restricted supply and/or caused Plaintiffs to pay more for egg products, this Court should grant judgment as a matter of law in favor of UEP and USEM.

    **1.**    **Plaintiffs Failed To Adduce Evidence that Any Short-Term Measure or Export Had Any Anticompetitive Effect or Caused Antitrust Injury**

        **(a)**    <u>Neither the short-term measures nor the USEM exports adversely affected competition or resulted in antitrust injury.</u>

As an initial matter, Plaintiffs have failed to put forth any evidence from which a reasonable juror could find that any short-term measure or export adversely affected competition or resulted in antitrust injury. Plaintiffs' sole evidence on these points is the testimony of their economic expert Dr. Michael Baye. While Dr. Baye opined that the overarching conspiracy restricted the nations' flock size and egg supply, inflated egg prices, and caused Plaintiffs to pay more for egg products, Baye, Oct. 30, 2023, 2532:10-17, he conceded that short-term measures and exports were sporadic and, as an economic matter, could not sustain high prices. Baye, Oct. 30, 2023, 2567:6-11 (testifying that "short-term flock reduction measures" were "unsuccessful" because "you can't

-5-

sustain higher prices by killing birds"); 2590:15-20 (testifying that he was unable to estimate effects from the exports because "[t]hey were short-lived"); 2593:3-4 ("it's hard to know exactly how long-lived these price increases are"); Baye, Oct. 30, 2023, 2593:4-7 ("I cannot say with a degree of scientific certainty how much the plaintiffs overpaid as a result of these price increases . . . ."); Baye, Oct. 31, 2023, 2689:3-7 (testifying that the short-term measures were temporary and imperfect and unlikely to be sustainable); 2691:10-12 (short-term measures wouldn't have sustained a measurable impact); Baye, Nov. 1, 2023, 2999:18-19 ("I don't think it's a sustainable way to raise prices"); 3000:8-10 (testifying that he conducted no analysis to determine how long any effect would last).

Moreover, when asked about his analysis of short-term measures, Dr. Baye conceded that he cannot tell with any degree of scientific certainty whether any short-term measure had any impact—positive or negative—on egg supply. Baye, Oct. 31, 2023, 2811:13-18 (explaining that he could not tell "either positive or negative" whether a molt had any impact "with a degree of scientific certainty"); 2815:9-14 (explaining that he could not tell "positive or negative" whether a recommended slaughter had any impact on the production of egg-laying hens).

Without actual, sustained adverse effects on competition, there is no substantial anticompetitive effect necessary to impose Section 1 liability. *See Indiana Fed'n of Dentists*, 476 U.S. at 460-61, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986); *Audio Car Stereo, Inc. v. Little Guys, Inc.*, No. 04-C-3562, 2004 WL 3019298, at *6 (N.D. Ill. Dec. 28, 2004) (requiring, in part, "'actual, sustained adverse effects on competition' in a geographic area where Defendants had market power" in order to survive motion to dismiss).

Additionally, short-lived and temporary impacts are insufficient to prove substantial anticompetitive effects. *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015)

(holding that a restraint on trade that lasted seven months was "far too short as a matter of law to create the required substantial marketwide harm of actual detrimental effects"), *aff'd*, 845 F.3d 1072 (11th Cir. 2016); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n, Inc.*, 672 F.2d 1280, 1289 (7th Cir. 1982) (holding that plaintiff's "fail[ure] to identify any clear or significant anticompetitive effects" from a "temporary denial" of membership in an industry association was insufficient to establish antitrust liability); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that a "four- to ten-month" effect on competition "is not significant enough to be classified as an injury to competition under the Sherman Act"); *W. Wholesale Supply v. Holladay*, No. 97-0297, 2000 U.S. Dist. LEXIS 22012, at *43 (D. Idaho Feb. 29, 2000) (following *Adaptive Power* and finding that an alleged group boycott would not support a claim under Sherman Act § 1 where it forced the plaintiff out of the relevant market "for just a few months"); *JetAway Aviation, Ltd. Liab. Co. v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 841 (10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects."); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co.*, 885 F.2d 683, 697 (10th Cir. 1989) (reversing jury verdict for plaintiff where the alleged anticompetitive behavior "only threaten[ed] to have a transitory impact on the marketplace."). This alone requires a finding in UEP's and USEM's favor that Plaintiffs failed to present evidence from which a reasonable juror could find that short-term measures or exports unreasonably restrained trade.

    **(b)**    Plaintiffs' expert's analysis on short-term measures and exports is unreliable.

  Dr. Baye explained that he could not form an opinion with any degree of scientific certainty regarding the impact of short-term measures and/or exports because the only evidence he considered was statements made by Gene Gregory in United Voices. Baye, Oct. 31, 2023,

2814:12-15; 2816:19-20 ("My opinions are based from the communications from United Voices to UEP members."); Baye, Nov. 1, 2023, 2948:1-5 (same). Dr. Baye admitted that he did not analyze and did not know whether any short-term measure was ever done, let alone effective. Baye, Nov. 1, 2023, 2918:18-24; 2919:22-2920:2. Dr. Baye also admitted that while he relied on Mr. Gregory's statements, he did not know the basis for Mr. Gregory's statements and did not know whether Mr. Gregory controlled for other variables before making statements about the impact of short-term measures. Baye, Nov. 1, 2023, 2948:1-2949:11. Further, Dr. Baye conceded that he did not conduct any analysis to test Mr. Gregory's statements. Baye, Nov. 1, 2023, 2949:1-5.

Thus, to the extent Dr. Baye offers any opinion about the impact of short-term measures or exports at all, that opinion is unreliable, unsupported, untested, and has no weight as a matter of law. Where an expert's "underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Fish v. Greatbanc Tr. Co.*, 2016 WL 5923448, at *66 (N.D. Ill. Sept. 1, 2016) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994)*; Porter v. Whitehall Labs., Inc.*, 791 F. Supp. 1335, 1346 (S.D. Ind. 1992) (excluding expert opinion that relied on "unsupported, hypothetical, inferential reasoning process to support an opinion on the fact of causation"), *aff'd*, 9 F.3d 607 (7th Cir. 1993) (affirming exclusion of expert opinion where the expert admitted that he could not show causation "to a reasonable degree of scientific certainty"); *Flis v. Kia Motors Corp.*, 2005 WL 8165913, at *2 (S.D. Ind. May 31, 2005) ("experts may base their opinions on data that would otherwise be inadmissible so long as the data is 'of a type reasonably relied upon by experts in the particular field'" and expressing doubt about the reasonableness of an expert's reliance on untested factual material produced in discovery). This

includes expert opinion that relies on anecdotes. *See Kochert*, 463 F.3d at 719 (expressing "serious doubts" as to expert opinion on anticompetitive effects that "rely almost exclusively on anecdotes").

The "data" underlying Dr. Baye's analysis as to short-term measures and exports—*i.e.,* the United Voices—is unreliable and inconsistent. United Voices are publications comprised of statements by Mr. Gregory "toot[ing] his own horn" and "tak[ing] credit" for favorable things that happened in the egg industry and "blam[ing] . . . producers" for unfavorable things. Hinton, Nov. 7, 2023, 4089:5-15. Producers did not consider Mr. Gregory's statements in United Voices to be consistent and did not rely on them. Hinton, Nov. 7, 2023, 4089:1-4 (Hinton testifying that he did not rely on Mr. Gregory's statements as to egg prices); 4089:16-20 (Hinton testifying that he did not consider Mr. Gregory's statements "to be a model of consistency"). As such, no reasonable expert could rely on Mr. Gregory's statements in United Voices, and Dr. Baye's opinions regarding the impact of short-term measures are insufficient to establish the short-term measures had any anticompetitive impact.

### 2. Plaintiffs Failed to Adduce Evidence Sufficient to Find that the Alleged Co-Conspirators' Participation in the UEP Certified Program Had Any Anticompetitive Effect or Injured Plaintiffs

Plaintiffs have failed to put forth any evidence from which a reasonable juror could find that an agreement among Defendants and the three identified co-conspirators to restrict egg supply through the UEP Certified Program unreasonably restrained trade or caused these Plaintiffs to sustain antitrust injury. Dr. Baye did not offer any opinion as to the anticompetitive impact of the five egg producers' participation in the UEP Certified Program. Baye, Oct. 31, 2023, 2747:11-14; 2748:2. In fact, Dr. Baye denied any understanding of the number or identities of the alleged conspirators. Baye, Oct. 30, 2023, 2618:14-18 (testifying that he did not know who the alleged

co-conspirators are). Instead, Dr. Baye's model tested and quantified the effects of the ***UEP Certified Program as a whole***, including the presumptively lawful conduct of 172 egg producers who are not alleged to be conspirators but nevertheless chose to become UEP Certified. Baye, Oct. 31, 2023, 2746:19-21; 2830:23-24. In other words, Dr. Baye's only opinion with respect to the UEP Certified Program is that the participation of ***all 177 egg producers*** reduced the nation's flock size and egg supply, which caused an increase in egg prices. Dr. Baye made no attempt to isolate or identify the impact of the alleged conspiracy, which Plaintiffs have defined as an agreement among five egg producers, UEP, and USEM. As such, Plaintiffs have failed to put forth any evidence from which a reasonable jury could find that the alleged conspiracy unreasonably restrained trade or injured Plaintiffs.

Moreover, in the Seventh Circuit, a finding of significant market power is a prerequisite to proving anticompetitive effect, and a 20.4 percent market share is insufficient as a matter of law. *See Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 736-37 (7th Cir. 2004) ("[I]f a plaintiff can show the rough contours of a relevant market, *and* show that the defendant commands a substantial share of the market, *then* direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share . . . ." (emphasis added)); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987) (establishing as a matter of law a 20%-25% market share as the benchmark for sufficient market power to restrain trade in violation of the Sherman Act); *Hannah's Boutique, Inc. v. Surdej*, No. 13-CV-2564, 2015 WL 3856551, at *5 (N.D. Ill. June 19, 2015) (citing 20%-25% threshold, finding 18% would be too small to possess market power). Here, Dr. Baye testified that the combined market share of the alleged conspirators

was 20.4 percent. Baye, Oct. 31, 2023, 2744:25-2745:3. As such, the alleged conspirators lack the market power necessary to produce any anticompetitive effect as a matter of law.

  **B. No Reasonable Jury Could Find That Every Participant in the UEP Certified Program Knowingly Joined a Conspiracy To Restrict Egg Supply in Order To Raise Egg Prices**

  Plaintiffs cannot salvage their failure to adduce evidence sufficient to find anticompetitive impact and antitrust injury from the 7-member conspiracy they set out to prove by expanding the conspiracy to include all 177 UEP Certified producers. Plaintiffs have adduced no evidence sufficient to support finding a 177-member conspiracy. "[A]t the heart of an antitrust conspiracy is an agreement and a conscious decision to join it." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (internal quotation marks omitted). To prove a Section 1 violation, Plaintiffs must establish that Defendants entered into an "agreement" that "unreasonably restrain[ed] trade." *See, e.g.*, *Am. Needle, Inc.*, 560 U.S. 183 at 186; *Agnew*, 683 F.3d at 328.. Plaintiffs must show "that each individual defendant joined the conspiracy and played some role in it." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 984 (N.D. Ill. 2022). Plaintiffs must prove that "the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Put differently, "the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id*. (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

  Because Dr. Baye's only opinion regarding anticompetitive effect or antitrust injury measures the effect of the entire UEP Certified Program, including the presumptively lawful conduct of 172 egg producers in addition to the 5 alleged egg producer co-conspirators, to establish

liability under Section 1, Plaintiffs would need to adduce evidence from which a reasonable juror could find a conspiracy that included those 172 egg producers. To do that, Plaintiffs would need to elicit evidence that all 177 egg producers shared a conscious commitment to a common scheme to restrict the supply of eggs. *Omnicare, Inc.*, 629 F.3d at 706.

In other words, Plaintiffs would have to show that all 177 egg producers joined the UEP Certified Program with the intent and for the purpose of restricting egg supply. The evidence comes nowhere close. For example, Dr. Baye testified that the UEP Certified Program includes at least 30 egg producers who are not even members of UEP, and Plaintiffs offered no evidence as to the circumstances under which or the reason why those producers joined the UEP Certified Program. Baye, Oct. 31, 2023, 2753:15-18; 2753:25-2754:2. Plaintiffs did not even identify them, and there is no evidence from which a reasonable juror could find any one of those 30 or more egg producers joined the UEP Certified Program with the intent and purpose of reducing egg supply to increase egg price. Contrary to any suggestion that all 177 UEP Certified producers joined the UEP Certified Program to restrict egg supply, the record is replete with evidence that customers and their trade associations required compliance with the UEP Certified Program as a condition of purchasing producers' eggs and egg products. *See, e.g.,* Manion, Oct. 30, 2023, 244:7-18 (agreeing that Kraft's policy required its "facilities and suppliers to meet the specific animal welfare guidelines developed by industry trade associations," including the UEP guidelines for egg laying hens); D-142 at No 4. (Kraft, Kellogg, and Nestlé admitting that they requested that their suppliers provide UEP Certified eggs or egg products); Baker, Oct. 25, 2023, 1854:19-21 (Walmart required suppliers to be certified in 2002); Baker, Oct. 24, 2023, 1719:1-25 (explaining that Walmart, Kroger, Safeway, Albertsons, HEB, Publix, Food Lion, and Winn-Dixie all required Certified eggs at some point between 1998 to 2008); Baker, Oct. 25, 2023, 1826:20-1828:11; D-211 (explaining

that if Cal-Maine did not join the Certified Program at some point in 2003, it would not have been able to sell to Winn Dixie). In this record there is no evidence that tends to exclude the possibility that the 172 egg producers about whom Plaintiffs offered no evidence acted independently in joining the UEP Certified Program.

To the extent Plaintiffs rely on *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85 (1984) for the proposition that they can prove an alleged conspiracy that includes all members of the UEP Certified Program without proving that each member of the Program had a conscious commitment to a common *unlawful* scheme, they are wrong. In *NCAA*, the Court found that the NCAA television plan expressly restrained price and reduced output, and that the plan was binding on and enforced against all member NCAA schools. *See NCAA*, 468 U.S. at 104-08. Unlike the NCAA television plan, "the UEP Certified Program does not involve an express agreement among competitors to restrain supply," and thus something more than the mere agreement to join the UEP Certified Program is required to prove an agreement to reduce supply. *In Re Processed Egg Prods Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016) (Pratter J.). As has been established repeatedly at trial and without contradiction, the UEP Certified Program does not limit the number of hens, cages, houses, or farms any producer can have or the number of eggs any producer can produce. Rust, Nov. 8, 2023, 4368:20-4370:13 (explaining that Rose Acre expanded every year after joining the Certified Program by building new houses and farms); Walker, Nov. 13, 2023, 5235:9-24 (testifying that nothing in the Certified Program limits the number of cages, houses, farms a producer can have or "the output of any particular producer").

Similarly, UEP membership is not enough to find that any producer in fact agreed to restrict supply through the UEP Certified Program because, unlike the NCAA television plan to which all NCAA members agreed, the UEP Certified Program is entirely voluntary. UEP members did not

have to join the UEP Certified Program, and many did not. At the same time, at least 30 non-UEP members did. Baye, Oct. 31, 2023, 2753:15-19; 2753:25-2754:2; D-1239, D-1250, D-1241, D-1240, D-1242, D-5015 (identifying non-member Certified companies from 2002 through 2008).

In short, Plaintiffs have failed to adduce evidence from which a reasonable juror could find (1) that any short-term measure or export had any anticompetitive effect or caused antitrust injury; (2) that the participation in the UEP Certified Program of the five egg producers who are alleged to have joined the conspiracy had any anticompetitive effect or caused antitrust injury; or (3) that the 172 other egg producers who joined the UEP Certified Program did so with the purpose and intent of reducing egg supply to increase price. As such, Plaintiffs lack any evidence from which a reasonable juror could conclude that the alleged anticompetitive effect and injury modeled by Dr. Baye resulted from an illegal agreement as opposed to presumptively legal independent decision making. Thus, judgment as a matter of law should be granted in UEP's and USEM's favor.

### C. Plaintiffs Have Not Established a Hub and Spoke Conspiracy

As set forth more fully in Defendant Cal-Maine Foods, Inc.'s Memorandum in Support of Motion for Judgment as a Matter of Law and incorporated by reference herein, Plaintiffs have failed to present evidence of a "hub and spoke" conspiracy.

### D. Plaintiffs Have Not Shown a Reduction in Eggs or an Increase in Egg Product Prices

As set forth more fully in the Memorandum in Support of Defendant Rose Acre Farms' Motion for Judgment as a Matter of Law and Defendant Cal-Maine Foods, Inc.'s Memorandum in Support of Motion for Judgment as a Matter of Law, and incorporated by reference herein, Plaintiffs have failed to present evidence establishing that there was a reduction in eggs during the relevant time period.

## IV.  CONCLUSION

For the reasons set forth above, Defendants UEP and USEM respectfully request that the Court enter judgment in UEP's and USEM's favor as a matter of law with respect to Plaintiffs' claim under Section 1 of the Sherman Act.

Dated: November 14, 2023

Respectfully submitted:

*/s/ Robin P. Sumner*
Robin P. Sumner (robin.sumner@troutman.com)
Kaitlin L. Meola (kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1926

***Counsel for Defendants United Egg Producers, Inc. & United States Egg Marketers, Inc.***