**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., Plaintiffs, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:11-cv-08808  Judge Steven C. Seeger  **ORAL ARGUMENT REQUESTED** |
| v. | | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. Defendants. | | |

**DEFENDANT ROSE ACRE FARMS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, Defendant Rose Acre Farms, Inc. ("Rose Acre") respectfully moves this Court to enter judgment as a matter of law in favor of Rose Acre. Rule 50(a) provides that if a party has been fully heard on an issue, and a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the Court may resolve the issue against the party and grant judgment as a matter of law.

As in their Second Amended Complaint, Plaintiffs Kraft Food Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. ("Plaintiffs") argued at trial that Defendants conspired to reduce the number of laying hens in the United States (also called "flock size") and, thus, the supply of shell eggs, in order to drive up the prices of shell eggs and the egg products that Plaintiffs purchased to manufacture their foodstuffs. But for multiple reasons, the evidence that Plaintiffs provided the jury was not legally sufficient to find in their favor. Specifically, Plaintiffs presented no evidence demonstrating that (a) the alleged conspiracy produced anticompetitive effects or (b) that those effects caused them injuries.

Plaintiffs' economic expert, Dr. Michael Baye, conceded that the UEP short-term supply recommendations and USEM exports had no sustained, measurable impacts on the egg market, and may have had no impact at all on the prices Plaintiffs paid for egg products. He also conceded that, under his econometric model, the Certified Program's cage space requirements and backfilling ban had no statistically significant impact on flock size or egg production (and, therefore, no statistically significant impact on the egg market or the prices Plaintiffs paid) until at least August 2005. And, he offered no theory to explain how a conspiracy that ended in August 2008 would have caused higher egg prices between September 2008 and the end of 2012.

For the remainder of the conspiracy period (August 2005 through August 2008), Plaintiffs' proof of an adverse effect on competition and injury consists entirely of Dr. Baye's econometric

1

model. That model found that the cage-space requirements and backfilling restrictions reduced egg production by statistically significant amounts, which (according to Dr. Baye) drove up the prices of all egg products by various amounts. But Dr. Baye's model measured the actions of *every* producer on the Certified Program from 2002-2012. Plaintiffs identified only five Certified egg producers who they say were part of their alleged conspiracy. There were hundreds of other Certified egg producers, dozens of which were not even members of the trade association that purportedly masterminded the alleged conspiracy, and none of which Plaintiffs even *tried* to tie to the conspiracy.

Plaintiffs also failed to present evidence demonstrating that any "but-for" reduction in *overall* egg supply would have reduced the supply of eggs specifically used to make egg products, which is the only logical way the Certified Program could have *caused* the price of egg products to rise. Accordingly, Plaintiffs failed to demonstrate that their alleged conspiracy would have driven up the prices of egg products.

For all of these reasons, the Court should enter a directed verdict in favor of Rose Acre and the other Defendants.[1]

I. **Applicable Legal Standard**

Judgment as a matter of law is appropriate when evidence is lacking on an issue or claim that is essential to the nonmoving party's cause of action. Fed. R. Civ. P. 50(a)(1).[2] Courts may grant judgment under Rule 50 when, viewing the evidence in the light most favorable to the non-

---

[1] Rose Acre also incorporates the arguments made by Cal-Maine and United Egg Producers in their respective Rule 50(a) motions.

[2] Trial courts may render judgment as a matter of law on issues that are wholly dispositive of a claim, or on discrete legal issues, even though granting the motion would not completely dispose of a claim. Moore's Federal Practice § 50.05[4]; *Fed. R. Civ. P. 50(a) Advisory Committee's Note to 1993 amendment* ("This amendment makes clear that judgments as a matter of law in jury trials may be entered…with respect to issues or defenses that may not be wholly dispositive of a claim or defense").

movants and giving them the advantage of every reasonable inference, there is insufficient evidence to support a jury verdict. *Susan Wakeen Doll Co. v. Ashton-Drake Galleries*, 272 F.3d 441, 449 (7th Cir. 2001); *Turubchuk v. S. Ill. Asphalt Co.*, 958 F.3d 541, 548 (7th Cir. 2020). Critically, the nonmoving party is "not entitled to the benefit of unreasonable inferences or to inferences conflicting with uncontested facts." *Id.* Rather, the court must "determine whether the party with the burden of proof has produced sufficient evidence upon which a jury could properly proceed to a verdict, and … a mere scintilla of evidence will not suffice." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (quoting *Richardson v. Indianapolis*, 658 F.2d 494, 498 (7th Cir. 1981)); *see also Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Physicians Assur. Corp.*, 922 F.3d 778, 784 (7th Cir. 2019).

The standard is no different in antitrust cases. *E.g.*, *Gordon v. Illinois Bell Tel. Co.*, 330 F.2d 103, 106 (7th Cir. 1964); *Northwestern Oil Co. v. Socony-Vacuum Oil Co.*, 138 F.2d 967, 969, 971 (7th Cir. 1943) (affirming a directed verdict for defendant when plaintiff failed to provide sufficient evidence of injury resulting from the allegedly anticompetitive conduct); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist. LEXIS 550, *43 (N.D. Ill. Jan. 19, 1999). As shown below, Rose Acre has met the Rule 50 standard.

II. **Plaintiffs Have Failed to Produce Sufficient Evidence to Demonstrate That the Alleged Conspirators Caused Any Anticompetitive Effect in Market, or Injured Plaintiffs Specifically.**

To prove a violation of Section 1 of the Sherman Act, Plaintiffs must first prove the existence of a "contract, combination…or conspiracy." 15 U.S.C. § 1. Plaintiffs must "produce evidence that would allow a jury to infer that [Rose Acre] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective," and the "circumstances of the case must reveal a 'unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Omnicare, Inc. v. UnitedHealth Group, Inc. et al*, 629 F.3d 697,

3

706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citations omitted)).

Second, Plaintiffs must provide that this "agreement" imposed an "unreasonable restraint on trade," *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021), which is conduct that adversely affects competition in a significant way. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Asso.*, 672 F.2d 1280, 1288 (7th Cir. 1982).

Third, Plaintiffs must prove that they suffered an antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiffs must show that their injury "is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

The bottom line is that Plaintiffs were required to show that the conspiracy's anticompetitive conduct significantly harmed the market, which then injured Plaintiffs. *E.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 506 (E.D. Pa. June 11, 2019); *Marion Healthcare, LLC v. S. Ill. Healthcare*, No. 3:12 -CV-871–MAB, 2020 U.S. Dist. LEXIS 55724, *23 (S.D. Ill. Mar. 31, 2020) (citing *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006)); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983). Plaintiffs failed to do so here.

**A.     Plaintiffs did not demonstrate that the alleged co-conspirators caused a significant and sustained reduction of eggs in the market.**

Plaintiffs presented no evidence that the alleged conspiracy, and those that participated in it, limited the supply of eggs at all, let alone caused a significant and sustained reduction of eggs in the market. And that is true for all aspects of the alleged conspiracy – UEP supply

4

recommendations (including early molts and early slaughters), USEM exports, and the cage-density requirements and backfilling limitation in the Certified Program.

### 1. There is no evidence the "short-term measures" or USEM exports reduced the supply or increased the price of eggs or egg products.

At trial, Plaintiffs did not demonstrate that the short-term measures or the exports caused significant or sustained injury to the market for eggs and egg products. Dr. Baye testified that the UEP supply recommendations were "sporadic" and "random"[3] and might theoretically have "led to some short-term increases in price,"[4] but would not have had "a sustained measurable impact" on output or price.[5] Similarly, he testified that the USEM exports were "short-term measures"[6] that would have had only small and short-term (at most, month-long) price effects.[7]

Sporadic and temporary market impacts are insufficient to demonstrate anticompetitive effect under the Sherman Act. *See Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Asso.*, 672 F.2d 1280, 1288 (7th Cir. 1982) (holding that plaintiff's "fail[ure] to identify any clear or significant anticompetitive effects" from a "temporary denial" of membership in an industry association was insufficient to establish antitrust liability); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that a "four- to ten-month" effect on competition "is not significant enough to be classified as an injury to competition under the Sherman Act"); *JetAway Aviation, Ltd. Liab. Co. v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 841

---

[3] Baye, Oct. 30, 2023 2566:22-24.

[4] *Id.* at 2567:6-16.

[5] Baye, Oct. 31, 2023 2691:5-2692:5.

[6] *Id.* at 2694:3-5.

[7] *Id.* at 2694:17-2696:6. For that matter, Dr. Baye did not even look to see whether any of the Plaintiffs purchased product from the Defendants during the months when price might have been affected by the USEM exports, or whether any changes in wholesale market prices from the USEM exports would have affected the prices Plaintiffs *paid* under their contracts with the Defendants. *Id.* at 2696:7.

(10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects."); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co.*, 885 F.2d 683, 697 (10th Cir. 1989) (reversing jury verdict for plaintiff where the alleged anticompetitive behavior "only threaten[ed] to have a transitory impact on the marketplace."); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015) (holding that a restraint on trade that lasted seven months was "far too short as a matter of law to create the required substantial marketwide harm of actual detrimental effects"), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

The short-term measures identified in the record (assuming UEP members actually implemented them) were fleeting and sporadic. The measures took place between (1) late April and mid-May 2004, (2) mid-May and August 1, 2004, (3) December 1, 2004 and Labor Day 2005, and (4) late March and early April 2006.[8] While the UEP Meeting Minutes, United Voices Newsletters, and other UEP correspondence made claims about egg market projections and historical benchmarks, all statements were general in nature and ambiguous with regard to both time frame and source of impact. Any record evidence claiming these measures affected domestic egg prices offers nothing but speculation as to the length and significance of that impact.

Accordingly, Plaintiffs failed to produce evidence sufficient to demonstrate that the short-term supply recommendations and/or USEM exports imposed an unreasonable restraint on trade or caused antitrust injury or injury in fact. For this reason, the Court should grant judgment as a matter of law to Rose Acre with respect to the UEP short-term measures and USEM exports.

---

[8] Plaintiffs' Exhibits 37, 102, 105, 137, 142, 150, 153, 377, 402, 410, 581, 592, 599, 704, 710, 827, 828.

### 2. Dr. Baye's econometric model failed to isolate the effects of the alleged conspiracy.

The foundation of Dr. Baye's conclusion that the alleged conspiracy reduced the supply of eggs during portions of the alleged conspiracy is an econometric model that attempted to determine whether egg production during the various phases of the Certified Program was lower than it would have been had production growth continued as it did during the benchmark period.[9] Dr. Baye acknowledged that his analysis was based on USDA production data from 1990 to 2012 that included every producer in the country and numerous varieties of eggs not at issue here.[10]

As an initial matter, Dr. Baye testified that his econometric model found that the Certified Program caused no statistically significant effects on egg production between August 2002 and January 2004[11] and between February 2004 and July 2005.[12] Given that the short-term supply recommendations and exports caused no significant or sustained market impacts at *any* time, the Plaintiffs have not demonstrated any adverse impact on competition (or injury to themselves) until at least August 2005. The Court should grant judgment as a matter of law to Rose Acre as to the period until August 2005.[13]

But even after August 2005, Dr. Baye did not demonstrate that any reduction in egg supply was caused by the *conspiracy*, rather than just the Certified Program, or that the conspiracy and the Certified Program are indistinguishable. Dr. Baye admitted that his econometric models tested

---

[9] *See*, *e.g.*, Baye, Oct. 30, 2023 2567:23-2568:16.

[10] Baye, Oct. 31, 2023 2699:24-2700:11.

[11] *Id.* at.

[12] *Id.* at 2712:20-2713:12 (Phase 1) and 2724:7-25 (Phase 2).

[13] Evidence of injury before September 24, 2004 would be irrelevant in any event, because the statute of limitations bars claims for any violation prior to that date. *See In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, 2012 U.S. Dist. LEXIS 180513 (Dec. 20, 2012).

the effect of every Certified producer's adherence to the Certified Program.[14] He admitted, in particular, that he is measuring the effects of the Certified Program, not the "conspiracy."[15] Thus, Dr. Baye's model (if it were valid and reliable) would at best show that the actions of every Certified egg producer – not the actions of the purportedly conspiring *producers* – caused anticompetitive effects. But unless every producer that ever followed the Certified Guidelines is part of the alleged conspiracy, Dr. Baye's analysis cannot support a finding that the conspiracy (*i.e.*, the aggregate effect of every co-conspirator) adversely impacted egg supply. And Plaintiffs never even attempted to make that showing.

Plaintiffs provided no evidence from which a jury could find that *every* Certified egg producer throughout 2002-2012 "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464 (1984) (citation omitted). And as the Court acknowledged in its draft jury instructions, a "person or business who has no knowledge of a conspiracy but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator."[16] Even Plaintiffs told this Court that "if an egg producer agreed to join the program *understanding that it was intended to restrict supply*, the mere joining of the program would be sufficient conduct for a jury to find the producer was a co-conspirator."[17] Yet Plaintiffs never established that every Certified producer believed or understood that the Certified Program was designed to drive up egg prices. Indeed, Plaintiffs

---

[14] Baye, Oct. 31, 2023 2746:19-21.

[15] *See id.* at 2793:1-13.

[16] Draft Jury Instructions, "Membership in a Conspiracy," at 34.

[17] Pls.' Resp. to Defs.' Motion to Exclude In-Trial Expansion of Defined Conspiracy at 3-4 (Oct. 30, 2023) (ECF No. 428) (emphasis added).

8

offered no evidence at all regarding the motivations of the overwhelming majority of egg producers who chose to be Certified between August 2005 and December 2012.

Although Plaintiffs will undoubtedly point to UEP statements like those summarized in this Court's ruling on Plaintiffs' *Santiago* proffer, Plaintiffs did not demonstrate that each Certified egg producer read those statements, agreed with them, and became Certified believing the Certified Program would reduce supply. Moreover, mere membership in UEP is insufficient to prove an egg producer is a conspirator. *See* Mem. Op. and Order at 32 (Sept. 18, 2023) (ECF No. 294). And dozens of egg producers – 30 out of 177, in 2004 – were not even in UEP.[18] Between 2002 and 2008, the number of Certified producers each year who were not in UEP ranged from 26 to 55 producers, with almost 90 non-UEP members in total choosing to be Certified over that time.[19] Plaintiffs gave the jury no basis to assume *those* producers knew or believed the Certified Program was intended to restrict supply.

Alternatively, Plaintiffs suggest that the jury can hold the identified conspirators responsible for "the industry-wide consequences" of the Certified Program because "the practices challenged in this suit were adopted by the UEP *and enforced upon its members* . . . ."[20] As support, Plaintiffs cite *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 104 S. Ct. 2948 (1984). But *NCAA* undermines Plaintiffs' argument, rather than supporting it. In *NCAA*, the trade association "limit[ed] the total amount of televised intercollegiate football and the number of games that any one team [could] televise," and prohibited any member from "mak[ing] any sale of television rights except in accordance with the basic plan." *Id.* at 94. The NCAA controlled the

---

[18] *Id.* at 2753:15-24.

[19] *See* Defendants' Exhibits D-1250, D-1241, D-1240, D-1242, D-502.

[20] Pls.' Resp. to Defs.' Motion to Exclude In-Trial Expansion of Defined Conspiracy at 5 (Oct. 30, 2023) (ECF No. 428) (emphasis added).

9

output of its members and was able to force the plan upon all of its members. *Id.* The Certified Program, in contrast, was a voluntary program, and some egg producers chose not to join.[21] Indeed, one of Plaintiffs' expert Dr. Baye's theories as to why the Certified Program had no statistically significant effects during its first two phases was that UEP couldn't "just snap [its] fingers, put this in place, and then . . . all of a sudden, everyone is going to be doing exactly what the UEP tells them to do."[22] The only companies against whom UEP enforced the Certified Program were those companies that voluntarily chose to join the Program. And, as stated above, dozens of those companies were not even in UEP. There is no evidence that UEP controlled the output of any of its members (and there is much evidence to the contrary), let alone non-UEP members.

It is important to note that the Certified Program is actually a vertical agreement between a producer and UEP, whereby the producer is able to license the Certified logo and trademark if it abides by the Certified Guidelines.[23] That agreement to join the Certified Program is not (and cannot be) the "agreement" that Plaintiffs need to prove in order to prevail on their Sherman Act Section 1 claim for two reasons. First, the agreement to become Certified is not an agreement to reduce supply. Judge Pratter noted that the Indirect Purchaser Plaintiffs (IPPs) and Direct Action Plaintiffs (DAPs) were "unable to point to any evidence that, on its face, the agreement to enter into the UEP Certified Program constituted an express agreement among competitors to restrict egg supply." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016). The same is true here. Defendants' expert, Dr. Jonathan Walker, testified at trial that "there is nothing in the certified program that actually limits [or] restricts… supply."[24] And

---

[21] *See* Hurd, Nov. 9, 2023 4748:10-15.

[22] *See*, e.g., Baye, Oct. 30, 2023 2559:9-12.

[23] *See*, *e.g.*, Plaintiffs' Exhibits P-601 (Rose Acre) and P-603 (Cal-Maine).

[24] Walker, Nov. 13, 2023 5235:11-13.

10

Plaintiffs' witness Dr. Baye acknowledged the same thing: nothing in the UEP Guidelines prohibits adding henhouses or cages or building greenfield farms.[25] Joining the Certified Program may be "direct evidence of concerted action," *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2016 U.S. Dist. LEXIS 133110, *19 (E.D. Pa. Sept. 28, 2016), But being Certified does not "constitute[ ] an agreement 'in and of itself[,]'" *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2017 U.S. Dist. LEXIS 160957, *7 (E.D. Pa. Sept. 29, 2017).

Second, Plaintiffs have alleged a horizontal agreement among producers. Hundreds of vertical agreements between UEP and independent producers does not equate to an agreement among producers. Plaintiffs still must prove the "rim" to their hub-and-spoke, which they have failed to do. Indeed, there is no proof that Rose Acre joined the Certified Program because it was agreeing with other egg producers to reduce the supply of eggs.[26] Instead, Rose Acre witnesses testified that they joined the Certified Program due to customer demand for an animal welfare program.[27] But putting that aside, there is zero evidence that every producer who ever became certified had a "meeting of the minds" with other producers to reduce the supply of eggs.

Because there is no proof that every Certified producer is a co-conspirator, Dr. Baye's analyses do not measure the effect of the alleged *conspiracy*, and do not demonstrate the injury to

---

[25] Baye, Oct. 31, 2023 2711:25-2712:8.

[26] *E.g.*, Hinton, Nov. 7, 2023 4047:2-5 ("Q: Based on your experience with this issue, did Rose Acre decide to join the UEP certified Program in order to restrict the supply of its shell eggs? A: No, sir."); Rust, Nov. 8, 2023 4385:7-14 (Q: Mr. Rust, did Rose Acre join the UEP Certified Program and agree to abide by the requirements of the UEP Certified Program in an effort to restrict your supply in order to raise egg prices? A: No. Q: Why did you join the UEP Certified Program? A: To have a good animal welfare program to satisfy our customers.") Because Plaintiffs failed to prove that Rose Acre (or any other producer) joined the Certified Program as a means of agreeing with other producers to reduce supply, judgment as a matter of law is warranted for this reason as well.

[27] Hinton, Nov. 7, 2023 4046:3-4047:13; Rust, Nov. 8, 2023 4385:7-14.

11

competition in the market that Plaintiffs were required to prove. Accordingly, the Court should enter judgment as a matter of law on behalf of the Defendants.

> B. Because the market Plaintiffs claim was manipulated involved the production of e*ggs*, not the processing of *egg products*, Plaintiffs have not shown the alleged anticompetitive conduct of Defendants caused the injury

Additionally, Plaintiffs failed to present evidence that the purported conspiracy caused an increase in the price of *egg product*s. Dr. Baye did not analyze the supply and price effects of the alleged conspirators' purportedly unlawful actions on egg products. Instead, Dr, Baye relied on the assumption that if there was conspiratorial conduct affecting the supply of shell eggs, it must have also affected the supply of eggs that are used to make egg products, which then purportedly caused egg product prices to increase:

> Q. Now I'd like to turn to the egg product market. Now, it's -- I believe it's your opinion that the reductions in total supply of eggs led to price increases for egg products, correct?
> A. That's correct.
> Q. Okay. And I believe you theorized that if there were fewer eggs overall, there must be fewer eggs to process into egg products, correct?
> A. It's what you might expect, yes.[28]

But most of the egg products sold to Plaintiffs were made with eggs produced by non-defendants and non-conspiring producers.[29] Additionally, Dr. Baye failed to support his assumption that a reduction in total egg supply would necessarily mean that the supply of eggs destined for egg products was likewise reduced such that the prices of egg products rose.[30]

---

[28] *Id.* at 2754:4-12.

[29] *See Baye,* Oct. 31, 2023 2756:17-25.

[30] *Id.* at 2755:5-2756:2.

At trial, Dr. Baye confirmed he relied on data regarding "production of *all* eggs for human consumption," including shell eggs produced from cage-free eggs and other specialty eggs.[31] He claims that a reduction in the total supply of eggs led to price increases in egg products as well.[32] But modeling data regarding production of *all* eggs for human consumption in the United States would not allow Dr. Baye to determine whether there was a shortfall in the production of eggs destined for *egg products*, and therefore whether egg product prices increased as a result of the Certified Program. Put differently, Dr. Baye could not say whether the shortfall in egg production he calculated was specifically attributable to egg products. He could only say that, according to his calculations, the entire *combined* category of eggs (commodity eggs, plus specialty eggs, plus eggs used to make egg products, plus exported eggs)[33] was smaller after August 2005 than it otherwise would have been. Without identifying the purported shortfall in the reduction of eggs to be used for egg products, Plaintiffs have no proof that the Certified Program (let alone the alleged conspiracy) had an effect on egg product prices. Plaintiffs' evidence therefore does not reliably demonstrate that the alleged anticompetitive conduct caused them injury.

Assuming for the sake of argument that Plaintiffs met their burden of presenting evidence that Defendants' anticompetitive conduct had an effect on *shell egg* prices, that alone is not sufficient to show the conduct had an effect on *egg product* prices. Showing that anticompetitive conduct caused an effect on a related product is not sufficient to show the same conduct had an effect on the product at issue. *E.g.*, *Lockformer Co. v. PPG Indus.*, No. 99C6799, 2000 U.S. Dist. LEXIS 22730, at *12-13 (N.D. Ill. Sept. 27, 2000) (dismissal of complaint was granted where the

---

[31] *Id.* at 2699:24-2700:4.

[32] *Id.* at 2754:4-12.

[33] *See* Baye, Oct. 31, 2023 2699:24-2700:4.

13

injury alleged was in a different, albeit related, market than the alleged antitrust violations); *see also Rozema v. Marshfield Clinic*, 1997 U.S. Dist. LEXIS 8261, *24-25 (W.D. Wis. Mar. 10, 1997) (citing *Stamatakis Indus. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)) ("plaintiffs must show that their injury results from defendants' acts that reduce output or raise prices in the relevant market.").

Based on the evidence presented, no reasonable jury could find the factual predicates to support causation and injury, and the Court should enter a directed verdict in Defendants' favor.

### III. Plaintiffs presented no evidence proving adverse effects after September 2008.

Finally, Plaintiffs presented no evidence that the alleged conspiracy, which supposedly ended in September 2008, continued to produce anticompetitive effects for another four years. The only time Plaintiffs have attempted to explain their "lasting effects" theory was in their opening statement. They told the jury that the conspiracy "c[a]me to light" in September 2008;[34] that the conspirators knew after that date that "people were looking over their shoulders;"[35] that "the number of hens *after* September of 2008 rose with the same trajectory . . . that it would have [had] in a free system";[36] but that the "20 million hen gap that existed because of their conspiracy *up until 2008* … still existed, remained relatively constant over the next four years."[37]

Plaintiffs presented only one witness who could have supported that economic theory: Dr. Baye. But he did not support it. Dr. Baye testified that his main model found reductions in egg production of 5.2% during the fifth phase of the Certified Program (August 2008 to December 2012).[38] He conceded that the Certified Program's cage-space requirements, 100% rule, audit

---

[34] Oct. 19, 2023 704:13-14.

[35] *Id.* 706:2-4.

[36] *Id.* 704:25-705:2 (emphasis added).

[37] *Id.* 705:2-5 (emphasis added).

[38] Baye, Oct. 30, 2023 2577:5-9.

14

requirements, and "backfilling ban" did not end in 2008, but remained in the UEP Guidelines for years thereafter.[39] In fact, Dr. Baye testified that "the cage space restrictions [were] still in place [in January 2015] and [were] *still having an effect*" at that time.[40] When asked for further explanation, he simply said that his "econometric analysis" showed that the number of "birds we would have had in the market but for the actions of the UEP certification program" during that period was higher than the actual flock size.[41] He never offered an opinion that the Certified Program's effects after September 2008 were the lingering result of the Certified Program's requirements before September 2008.

If the results of Dr. Baye's model were valid, the most reasonable explanation for the flock size and egg production effects it showed after September 2008 would not be the lingering effects of conduct undertaken ***before*** the end of the alleged conspiracy, but rather a couple hundred egg producers' adherence to the Certified Program ***after*** the alleged conspiracy was over. If Plaintiffs believe otherwise, they offered the jury no evidence to support that assumption. Accordingly, Plaintiffs have presented no proof of anticompetitive effect or injury during the "injury tail" period of September 2008 through December 2012. The Court should grant judgment as a matter of law to Rose Acre regarding Plaintiffs' claims for the period of September 2008 to December 2012.

### IV. Conclusion

For the reasons set forth above, Defendant Rose Acre Farms, Inc. respectfully asks that the Court enter judgment in Rose Acre's favor as a matter of law with respect to Plaintiffs' claims.

---

[39] Baye, Oct. 31, 2023 2743:19-25.

[40] Baye, Oct. 31, 2023 2741:7-2742:12.

[41] Baye, Nov. 1, 2023 2979:11-2980:4.

Dated: November 15, 2023          Respectfully submitted,

         */s/ Jay L. Levine*
         Donald M. Barnes (dbarnes@porterwright.com)
         Jay L. Levine (jlevine@porterwright.com)
         PORTER, WRIGHT, MORRIS & ARTHUR LLP
         2020 K. Street, N.W., Suite 600
         Washington, D.C. 20006-1110
         Tel: (202) 778-3000

         James A. King (jking@porterwright.com)
         Eric B. Gallon (egallon@porterwright.com)
         Allen T. Carter (acarter@porterwright.com)
         PORTER, WRIGHT, MORRIS & ARTHUR LLP
         41 South High Street, Suite 2900
         Columbus, OH 43215
         Tel: (614) 227-2000

         **Counsel for Defendant Rose Acre Farms, Inc.**

23169554v8