IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **KRAFT FOODS GLOBAL, INC.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-08808 |
| | ) | Judge Steven C. Seeger |
| **UNITED EGG PRODUCERS, INC.**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS ROSE ACRE FARMS, INC., CAL-MAINE FOODS, INC.,
UNITED EGG PRODUCERS, INC., AND UNITED STATES EGG MARKETERS, INC.'S
MOTION TO EXCLUDE OR LIMIT TESTIMONY OF
PLAINTIFFS' WITNESS DR. MICHAEL BAYE ON DAMAGES**

**I.    Introduction**

The jury has reached its verdict on liability.[1] According to that verdict, four egg producers (Defendants Cal-Maine Foods, Inc. and Rose Acre Farms, Inc., and non-parties Moark LLC and Wabash Valley Produce Inc.) and two industry associations (Defendants United Egg Producers, Inc. ("UEP") and United States Egg Marketers, Inc. ("USEM")) participated in a conspiracy to restrict the supply of eggs that included short-term measures (early slaughter, early molting, and flock reduction), exports of eggs through USEM, and the cage-space requirements and backfilling restrictions in the UEP Certified Program. The jury found that a fifth egg producer, Michael Foods, Inc., did not participate in the conspiracy, and neither did almost two hundred other egg producers who joined the UEP Certified Program. The jury also found that the conspiracy did not injure the Plaintiffs in the period ending December 2008.

---

[1] Verdict (Nov. 21, 2023).

In a few days, the jury will return to hear evidence regarding the damages Plaintiffs allegedly sustained between October 2004 and September 2008.[2] Plaintiffs plan to bring back Dr. Michael Baye to the stand. But Dr. Baye has no opinions that are relevant to the damages phase given the jury's verdict. Dr. Baye's reports include no damages estimates or calculations for either the short-term measures or the USEM exports. In fact, Dr. Baye admitted at trial that he cannot measure the economic impact of the short-term measures or the injury to the Plaintiffs from the exports. And for the UEP Certified Program, Dr. Baye has no damages calculations that are relevant to the conspiracy the jury found: one that includes Rose Acre, Cal-Maine, Moark, and Wabash Valley, but no other egg producer, and that only caused injury through the end of 2008. Dr. Baye's models generated damages estimates for a conspiracy that the jury rejected: one that included all Certified egg producers and caused injury through the end of 2012. Because Dr. Baye has no opinions that are relevant to the Plaintiffs' damages case, as further discussed below, his testimony should be excluded.

## II. Legal Standard

The Seventh Circuit has held that "[o]nce *causation* of damages has been established, the *amount* of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981), and *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123-24 (1969)). As discussed below, Dr. Baye testified that he could not measure Plaintiffs' injuries from the short-term measures or the USEM exports. If Plaintiffs should attempt to elicit

---

[2] Plaintiffs contend that the conspiracy ended in September 2008 with the publication of the *Wall Street Journal* article. Consistent with that position, the jury found the Plaintiffs suffered an injury during the period "Oct. 2004 to Dec. 2008."

new opinions on these topics from Dr. Baye in the damages phase, those opinions should be excluded as speculative.

A court must ensure, moreover, that expert testimony on damages is relevant to the questions before the jury. Under the Sherman Act and the Clayton Act, overcharges are recoverable only if they result from *unlawful* behavior. *MCI*, 708 F.2d at 1161 ("It is essential … that damages reflect only the losses directly attributable to *unlawful* competition"); *see also Comcast v. Behrend*, 569 U.S. 27, 35 (2013) ("any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation'"); *In re Pharm. Benefit Managers Antitrust Litig.*, No. 06-1782, 2017 U.S. Dist. LEXIS 6987, at *62-64 (E.D. Pa. Jan. 18, 2017) (rejecting expert damages model in antitrust MDL that did not attribute differences in reimbursement rates "solely to illegal conduct" and that "fail[ed] to account for legal behavior that could result" in those differences). Plaintiffs cannot recover for price increases that stem from lawful producer behavior unrelated to the alleged conspiracy. Thus, testimony from Dr. Baye that calculated damages based on market-wide changes in egg production – *i.e.*, changes in egg production by the co-conspirators *and* producers who were not part of the conspiracy – would be irrelevant.

Expert testimony that premises a damages theory in part on lawful action is irrelevant and unfairly prejudicial, and should be excluded under Rules 402 and 403. *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 U.S. Dist. LEXIS 183454, at *5 (N.D. Ohio Mar. 6, 2015) (granting Defendants' motion *in limine* in an antitrust action and striking expert testimony that was not "relevant to the issues at trial" and thus "fail[ed] to satisfy Federal Evidence Rule 402"). Rule 402 prohibits admission of irrelevant testimony. Rule 403 prohibits the introduction of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair

23391137v4

prejudice, confusing the issues, [and/or] misleading the jury," among other things. Given that "'[e]xpert evidence can be both powerful and quite misleading[,] because of the difficulty in evaluating it[,] . . ., the judge . . . under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786 (1993) (citation omitted).

### III. The Court Should Exclude Dr. Baye's Opinions on the Damages Purportedly Incurred by Plaintiffs for Each Phase of the Conspiracy

#### A. Early Slaughter, Early Molting, and Flock Reduction

There were two short-term measures identified in the record that took place during the damages period, September 24, 2004 to September 30, 2008 (assuming UEP members actually implemented them). The first was a four-week-early disposal and/or 5% flock reduction, which was supposed to have occurred between December 1, 2004 and Labor Day 2005.[3] The second was a six-week-early disposal and six-week-early molt, which was supposed to have begun on April 3, 2006.[4] Dr. Baye testified that the short-term measures generally "were unsuccessful."[5] He also opined that the short-term measures had no sustained, measurable impact on output or price.[6]

At trial, Dr. Baye testified that the short-term measures *could* have had an effect *if* enough egg producers participated in them. For example, Dr. Baye testified that "[y]ou might be able to have an early slaughter and lead to some short-term increases in price *if you coordinate those slaughters across everyone in the industry* … ."[7] Similarly, he testified that coordinated forced

---

[3] Plaintiffs' Exhibits P-137, P-142, P-377, P-410, P-592, P-599, P-710, P-827, and P-828.

[4] Plaintiffs' Exhibits P-102 and P-105.

[5] Baye, Oct. 30, 2023 Tr. 2567:6-8.

[6] Baye, Oct. 31, 2023 Tr. 2691:23-2692:4.

[7] Baye, Oct. 30, 2023 Tr. 2567:10-16 (emphasis added).

4

molts are "going to impact prices *if people follow through with [them]*."[8] But he explained that he "wasn't asserting that … they were necessarily successful in every instance."[9] And neither Dr. Baye nor Plaintiffs' other witnesses offered evidence regarding the percentage of the industry that participated in any short-term measure.

Not surprisingly, then, Dr. Baye's expert reports included no estimate of the short-term measures' effects on egg prices. At trial, Dr. Baye simply summarized what he saw in the evidentiary record.[10] And he admitted that "not everything in [*United Voices*] suggested that [the short-term measures] worked. And that's part of my reason for saying that I think the short-term measures likely didn't have lasting effects."[11]

In sum, Dr. Baye has not offered, and cannot offer for the first time in the damages phase, an opinion quantifying the supposed effect of the short-term measures on the egg or egg product market, much less their effect on the prices Plaintiffs paid. Dr. Baye acknowledged, on the stand, "that [he] can't measure the economic impact … of these short-term measures."[12] In fact, Dr. Baye admitted he did not know whether the short-term measures had any impact, positive or negative, on egg supply.[13] For these reasons, Dr. Baye should not be permitted to offer a new opinion, in the damages phase, on the damages Plaintiffs allegedly sustained from the short-term measures.

---

[8] Baye, Nov. 1, 2023 Tr. 2992:22-2993:5 (emphasis added). *See also id.* 2994:16-25 ("[T]he economic effect of that would be to elevate prices *if the UEP members followed through with the recommendation*.") (emphasis added); *id.* 2997:25-2998:4 ("If the members followed through with … what they pledged, [prices] would go up.").

[9] Baye, Nov. 1, 2023 Tr. 2919:14-21.

[10] Baye, Nov. 1, 2023 Tr. 2947:19-2948:5.

[11] Baye, Nov. 1, 2023 Tr. 2918:13-22.

[12] Baye, Oct. 31, 2023 Tr. 2690:25-2691:4. *See also id.* 2691:5-14.

[13] Baye, Oct. 31, 2023 Tr. 2811:13-18, 2815:11-14.

5

### B. Exports as Part of the USEM Export Program

Nor should Dr. Baye be permitted to offer new opinions regarding the damages that the Plaintiffs allegedly sustained from the USEM exports. According to the record evidence, there were seven USEM export events during the damages period:

- October-November 2006[14]
- January 2007[15]
- February-March 2007[16]
- April-May 2007[17]
- August-September 2007[18]
- May-June 2008[19]
- August 2008[20]

Dr. Baye testified regarding the price effects from a slightly different set of *six* USEM exports.[21] At trial, and in his reports, Dr. Baye offered no opinion about the price effects from the August-September 2007 export or the August 2008 exports.[22] At a minimum, Dr. Baye should not be permitted to offer new opinions on damages to Plaintiffs resulting from those two exports. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (expert reports are required to "contain[ ] … a complete statement of all opinions the witness will express").

More broadly, though, Dr. Baye should not be permitted to offer opinions on the damages Plaintiffs allegedly sustained as a result of *any* USEM export, because he has never offered any such opinion in the past. In his reports, and at trial, Dr. Baye testified regarding the price effects

---

[14] *See* Plaintiffs' exhibits P-66, P-80, P-279, P-555, and P-704, and Defendants' exhibit D-9.

[15] *See* Plaintiffs' exhibits P-37, P-279, P-379, and P-794, and Defendants' exhibit D-9.

[16] *See* Plaintiffs' exhibits P-37, P-59, P-62, and P-279, and Defendants' exhibit D-9.

[17] *See* Plaintiffs' exhibit P-362.

[18] *See* Plaintiffs' exhibit P-37, P-48, P-281, and P-297.

[19] *See* Plaintiffs' exhibits P-356 and P-378.

[20] *See* Plaintiffs' exhibit P-24.

[21] *See* Baye Slide 22 (ECF No. 439), which reproduces Baye Report Exhibit 26 (Jan. 22, 2015).

[22] *Id.*

of the USEM coordinated exports generally. Dr. Baye testified that he calculated "how much domestic [supply] fell because these eggs were being shipped overseas instead of being sold in the domestic market."[23] "[B]ased on those reductions," he then "c[a]me up with kind of a very crude estimate of how much that would have impacted domestic egg prices" assuming "the absolute lowest inverse elasticity" that he had calculated for any Urner Berry price series.[24] An image of Dr. Baye's demonstrative[25] is provided directly below:

### Price Effects of USEM Coordinated Exports: 2006-2008

| Month (a) | Quantity Exported | | | U.S. Egg Consumption -----(Dozens)----- (e) | Percent Decrease in Domestic Sales Due to Coordinated Export [-(d)/(d)+(e)] (f) | Percent Increase in Price Due to Coordinated Export [((1+(f)^(-6.11)-1)] (g) |
|---|---|---|---|---|---|---|
| | Containers (b) | Cases (c) | Dozens [30*(d)] (d) | | | |
| October-06 | 90 | 76,500 | 2,295,000 | 552,263,416 | -0.41 % | 2.57 % |
| January-07 | 300 | 246,600 | 7,398,000 | 538,780,322 | -1.35 | 8.69 |
| February-07 | 300 | 243,750 | 7,312,500 | 487,190,666 | -1.48 | 9.53 |
| April-07 | 200 | 160,000 | 4,800,000 | 524,758,489 | -0.91 | 5.72 |
| October-07 | 130 [1] | 106,003 | 3,180,085 | 546,598,949 | -0.58 | 3.61 |
| June-08 | 100 | 80,000 | 2,400,000 | 510,075,868 | -0.47 | 2.91 |

Note: Percent increase in price calculated using an inverse elasticity of -6.11076 for Northwest White Jumbo Shell, the most elastic demand estimated from the 2SLS model.

[1] Number of cases estimated using average number of cases per container for available data.

Source: NL001776; MOARK0009486-93 at MOARK0009486; NL001774-5 at NL001774; MOARK0008660-69 at MOARK0008660; UE0199809-10 at UE0199809, UE01998010; RA0000703-10 at RA0000703, RA0000704; RA0002299-306 at RA0002299; MOARK0007450-1 at MOARK0007450; MOARK0036622-3 at MOARK0036622; MOARK-IPP-0028504-5 at MOARK-IPP-0028504, MOARK-IPP-0028505; USDA.

Source: Baye Rep. Ex. 26

What Dr. Baye did *not* do is offer opinions on the damages Plaintiffs supposedly sustained as a result of those exports. To his credit, Dr. Baye conceded at trial that he "can't tell" how much more, if any, Plaintiffs paid as a result of these exports:

> … I think the point I was trying to make is … even for these [six exports], … *I can't tell you how much the plaintiffs in this case exactly were injured* … . I mean, it's clear that there's impact, but it's difficult for me as an

---

[23] Baye, Oct. 30, 2023 Tr. 2592:1-3.

[24] Baye, Oct. 30, 2023 Tr. 2592:3-20.

[25] *See* ECF No. 439, Slide 22 (Oct. 31, 2023).

23391137v4

economist to quantify that, and that's a decision that someone other than me has to make … about the impact of that … on the plaintiffs.[26]

He also said that he "[was] not willing" to venture an opinion on how the USEM exports affected the prices Plaintiffs paid for egg products:

> … I just want to be clear. I don't know … exactly … where the [exported] eggs were going. I don't know if they would have been used for egg products or something else.
>
> The only real information I have are the tidbits that were put together, and that's why *I'm not willing to stand behind exactly how much prices went up and how that might specifically have injured individual plaintiffs in this matter*.[27]

More specifically, Dr. Baye testified that he lacks an opinion on a necessary input to any damages calculation relating to the USEM exports: the *duration* of any price effects from those exports. In order to convert Dr. Baye's estimated price increases into damages, the Plaintiffs would need to answer at least three questions: (1) how long the price effects lasted; (2) whether the Plaintiffs purchased egg products while those price effects occurred; and (3) whether the prices Plaintiffs paid for those purchases could have been affected by those price effects (for example, whether the prices were linked to Urner Berry prices or, instead, were determined in fixed-price or grain-based contracts). At trial, Dr. Baye said that he does not know the answer to question (1) and is not taking a position on it:

> Q. … And I believe you – you testified that you couldn't know exactly how long lived these price increases are so that you couldn't testify with a degree of scientific certainty how much these plaintiffs would have overpaid as a result of these exports but that you felt, as a matter of economics, these would have materially impacted domestic prices. Do you remember that?
>
> A. Yes, I do, and that's – I mean, I think that's what I've said –
>
> Q. Okay.

---

[26] Baye, Oct. 31, 2023 Tr. 2693:19-2694:2 (emphasis added).

[27] Baye, Nov. 1, 2023 Tr. 2987:20-2988:3 (emphasis added).

23391137v4

> A. – this morning here, too.
>
> Q. And isn't it your opinion that each of these exports would have affected egg prices for no more than one month?
>
> A. Again, there's – there's a – the timing issue. I – *I don't know.* It's the question of it seems reasonable to imagine that the effects would be isolated around these events, but there's the timing of when they were taken off the market, and there's some uncertainty there, is all I'm saying.
>
> But the – the effect, if you thought about it as a monthly effect, this is what those effects would translate into.
>
> Q. But –
>
> A. It could be spread out over, you know, maybe a month and a half. *I'm not taking a position on that.*[28]

Even when Defendants' counsel asked Dr. Baye to confirm his previous deposition testimony that short-term measures "have an announcement effect … pretty much as soon as they're announced," with price effects not "last[ing] longer than a month[,]" Dr. Baye responded, with admirable candor, that his earlier opinion was "not true to a reasonable degree of scientific certainty."[29] He also agreed that he had not tried to answer question (2) (whether Plaintiffs purchased egg products in the months that would have been affected by the USEM exports), and that question (3) (whether the prices Plaintiffs paid would have been affected by changes in market prices) "would be relevant" to determining Plaintiffs' damages.[30]

In sum, Dr. Baye offered no opinion in his reports on the damages Plaintiffs allegedly sustained from the USEM exports.[31] And at trial, Dr. Baye made clear that he has developed no

---

[28] Baye, Oct. 31, 2023 Tr. 2694:6-2695:4 (emphasis added).

[29] Baye, Oct. 31, 2023 Tr. 2695:18-2696:4.

[30] *See* Baye, Oct. 31, 2023 Tr. 2696:7-21.

[31] Baye Reply Report ¶ 54 (Apr. 3, 2015) (Dr. Baye's "damages estimates … exclude the effects of Defendants' coordination on exports.") and ¶ 64 ("I am conservative in excluding any potential damages resulting from these [USEM] export events from my damages estimates."). *See also* Baye Report ¶ 234 (Jan. 22, 2015) ("The price effects of these coordinated exports are not included in my current calculation of damages.").

9

new opinion on these questions since he submitted his reports in 2015. For all of these reasons, Dr. Baye should not be permitted to offer new opinions in the damages phase of this trial regarding the damages Plaintiffs allegedly sustained due to the USEM exports.

      **C.    Cage-Space Requirements or Henhouse Density Restrictions and Restricting Backfilling of Egg-Producing Hens as Part of the UEP Certified Program**

Dr. Baye's econometric model is the foundation for his conclusion that the Certified Program's cage-space requirements and backfilling restriction reduced the supply of eggs during the latter phases of the alleged conspiracy. Dr. Baye testified that his Main Specification model found that the Certified Program had no statistically significant effect on egg production until August 2005.[32] From August 2005 to December 2012, Dr. Baye's "Main Specification" estimated shortfalls in actual egg production between 2.4% and 5.5% below what egg production would have been "but for" the alleged conspiracy, depending on which phase of the cage-space requirements were in effect.[33] Dr. Baye then ran a two-stage, least squares model to estimate how those calculated shortfalls in nationwide egg production affected the prices of various categories of shell eggs and egg products.[34] Finally, in his report, Dr. Baye applied those calculated price effects to the Plaintiffs' purchases of egg products from the Defendants between August 2005 and December 2012 to determine the Plaintiffs' alleged damages.[35] The jury's verdict is fundamentally inconsistent with Dr. Baye's market impact and damages analysis, in two important ways.

*First*, Dr. Baye's econometric models do not correspond with the conspiracy found by the jury. Dr. Baye admitted that his econometric models tested the supply effect of every Certified

---

[32] Baye, Oct. 31, 2023 Tr. 2712:20-2713:12 (Phase 1) and 2724:7-25 (Phase 2).

[33] Baye, Oct. 30, 2023 Tr. 2577:5-9. Dr. Baye's "Backfilling Ban" specification found a "but-for" reduction in egg production of 2.1%. *Id.* 2577:10-11.

[34] Baye Rep. ¶¶ 193-200.

[35] *See* Baye Rep. ¶¶ 227-232.

23391137v4

producer's adherence to the Certified Program.[36] But the jury expressly found that not every producer that followed the Certified Guidelines was part of the alleged conspiracy.[37] Thus, Dr. Baye's analysis cannot support a finding that the *conspiracy found by the jury – i.e.*, the aggregate effect of a few co-conspirators' actions – reduced the national overall egg supply, much less that the reduction in egg supply caused Plaintiffs to pay higher prices for the egg products they purchased from the few co-conspirators.

The MDL Court previously encountered this same issue. The Indirect Purchaser Plaintiffs' class certification expert, Dr. Kyle Stiegert, created a model that aimed to determine the size of the nation's flock "but-for" the alleged conspiracy. Dr. Stiegert, however, did not examine whether the alleged conspiracy reduced the number of hens laying commodity shell eggs in the alleged co-conspirators' flocks. Instead, Dr. Stiegert used USDA data on nationwide flock size to examine whether the *entire* American egg-laying flock was lower in the "conspiracy" period than his model indicated it should have been. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015).

Judge Pratter found that "the failure to account for non-conspiring producers … undermin[ed] the reliability of Dr. Stiegert's model." *Id.* In particular, Judge Pratter found that Dr. Stiegert's model failed to "isolate the effects of Defendants' conduct on the total egg supply" by not controlling for "any supply reduction by non-conspiring producers . . . ." *Id.*, 312 F.R.D. at 153; *see also id.* at 154. As a consequence, she held that Dr. Stiegert's model failed to show that "any drop in egg supply [was] sufficiently tied to Defendants' conduct to make the model reliable for showing antitrust impact." *Id.* at 153.

---

[36] Baye, Oct. 31, 2023 Tr. 2746:19-2748:2.

[37] *See* Verdict, Responses to Questions 4 and 8 (Nov. 21, 2023).

23391137v4

Dr. Baye's model has the same flaws as Dr. Stiegert's model. Like Dr. Stiegert, Dr. Baye did nothing to isolate the actions of the Defendants and co-conspirators from the actions of non-conspiring producers. Indeed, he asserted that looking only at the production of the identified co-conspirators would not "give[] an accurate picture of the harm caused":

> [I]t wouldn't answer the economic question of whether the … conspiracy reduced output and raised prices. Because … a handful … of market participants… may be able to increase output, but *if everyone else [contracts] output*, it would offset that. So the way you have to look at it is look at the market as a whole and find out whether, collectively, total output went down and prices went up … .[38]

Plaintiffs are required to proffer competent evidence to allow the factfinder to "make a *just* and *reasonable* estimate of the damage based on *relevant* data." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (emphasis added). But Dr. Baye did not even attempt to link the co-conspirators' actions to the production shortfall he estimated; he simply focused on the Certified Program's market-wide effects, and Plaintiffs attributed the entire shortfall in egg production that his model estimates to the conspiracy. Given the jury verdict, relying on that model in the damages phase would impermissibly assign to Defendants the legal and financial responsibility for the actions of more than 170 non-conspiring egg producers. *See MCI*, 708 F.2d at 1161 ("It is essential, however, that damages reflect only the losses directly attributable to *unlawful* competition"). In an antitrust case, the damages awarded must be proved to stem from the "'*defendant's* wrongful acts and their tending to injure plaintiffs' business, … not shown to be attributable to other causes.'" *Id.*, quoting *Bigelow*, 327 U.S. at 264 (emphasis added). Dr. Baye's failure to rely on a model that allows him to determine the effect of the conspiracy that the jury found, as opposed to

---

[38] Baye, Nov. 1, 2023 Tr. 2984:18-2985:6 (emphasis added).

23391137v4

the conspiracy the Plaintiffs originally alleged, compels the exclusion of Dr. Baye's egg production model and related testimony as irrelevant.

*Second*, Dr. Baye's model is inconsistent with both the Plaintiffs' theory of the case and the jury's conclusion. Dr. Baye assumed that the conspiracy continued from 2008 to 2012 (and beyond)[39] and continued to cause reductions in flock size and egg production (below the levels that would have occurred absent the conspiracy) during that period.[40] Dr. Baye testified: "I use data from 1990 to 2012 to identify the effects of the conspiracy, and I reject the hypothesis statistically that the conspiracy ended at the time of the last cage space restrictions."[41] At trial, Dr. Baye presented a demonstrative[42] that showed a 5.2% reduction in egg production "compared to [the] but-for world" between August 2008 and December 2012 under his Main Specification, and a 2.1% reduction in "but-for" egg production from February 2005 to December 2012 under his Backfilling Ban specification:

### Percent Fewer Eggs Compared to But-For World

| Restriction | Effective Date | Minimum Average Space Per Hen | | % Reduction of Egg Production | Statistically Significant at 99% Level |
| --- | --- | --- | --- | --- | --- |
| | | White | Brown | | |
| Restriction 1 | Aug. 2002 – Jan. 2004 | 56 inches | 63 inches | 0.2% | NO |
| Restriction 2 | Feb. 2004 – July 2005 | 59 inches | 66 inches | 0.6% | NO |
| Restriction 3 | Aug. 2005 – Jan. 2007 | 61 inches | 68 inches | 2.4% | YES |
| Restriction 4 | Feb. 2007 – July 2008 | 64 inches | 72 inches | 5.5% | YES |
| Restriction 5 | Aug. 2008 – Dec. 2012 | 67 inches | 76 inches | 5.2% | YES |
| Backfilling Ban | February 2005 | | | 2.1% | YES |

---

[39] Baye, Nov. 1, 2023 Tr. 3003:8-15 (agreeing that his opinion was based on an assumption that the conspiracy continued through the date of Dr. Baye's 2015 report and that he "tested it … [a]nd [he] found that it was.").

[40] Baye, Oct. 30, 2023 Tr. 2577:5-9 (finding a 5.2% reduction in "but-for" egg production in Phase 5); Baye, Nov. 1, 2023 Tr. 2979:11-2980:4.

[41] Baye, Nov. 1, 2023 Tr. 3003:24-3004:2.

[42] *See* ECF No. 439, Slide 12 (Oct. 31, 2023).

But the jury rejected Dr. Baye's conclusion that the conspiracy's effects lasted until 2012, finding that the Plaintiffs suffered *no* injury after 2008.[43]

As Defendants' expert Dr. Jonathan Walker testified at trial, the inclusion of data from 2008 to 2012 unavoidably affects the results of Dr. Baye's regressions from *before* 2008.[44] Dr. Walker explained the concept using the relationship between grain prices and production as an example:

> [I]f it's the case that in 2009, '10, '11, '12 the relationship between grain prices, for example, and output is different than it was prior to that period in time, well, you're going to get an averaging effect when you actually try to measure the impact of grain prices. You will not actually control for grain prices accurately. And so what that will do is you will not control for anything accurately. Some of the impact of grain prices is going to be picked up by all of those other variables. And if you misspecified the model in this way, none of the coefficient estimates are reliable.[45]

Plaintiffs presented no testimony to rebut this basic econometric principle.

The same principle applies to Dr. Baye's analysis of the conspiracy's effect on egg production. As shown in Dr. Baye's demonstrative above, Dr. Baye's Main Specification included "indicators associated with each of the … cage space restrictions that the UEP imposed" to identify the effects of the Certified Program, including August 2008 to December 2012.[46] Similarly, his Backfilling Ban specification included an indicator for the period when the backfilling restrictions were in place (February 2005 forward).[47] If the conspiracy did *not* injure Plaintiffs from 2008 to 2012, as the jury has now found, that does not just affect Dr. Baye's results for Phase 5 of the cage

---

[43] *See* Verdict, Responses to Question 7 (Nov. 21, 2023).

[44] Walker, Nov. 14, 2023 Tr. 5447:10-18.

[45] Walker, Nov. 14, 2023 Tr. 5447:13-23.

[46] Baye, Oct. 30, 2023 Tr. 2550:14-23.

[47] Baye, Oct. 30, 2023 Tr. 2552:5-11.

14

space requirements, or for the Backfilling Ban specification. As Dr. Walker explained, it means that *none* of Dr. Baye's results is reliable.

Dr. Baye does not have a fall-back position. Dr. Baye admitted at trial that his reports include no analysis using data from 1990 through 2008 only.[48] The jury rejected the conclusions of Dr. Baye's models for the period from 2009 to 2012. And that finding – that the model's conclusions for 2009 to 2012 are invalid – invalidates Dr. Baye's conclusions regarding the conspiracy's effects on egg production for the period of 2005 to 2008, too. In short, all of Dr. Baye's conclusions are based on a model that assumes the conspiracy had effects through 2012, and the jury's ruling on injury after 2008 renders the model's results invalid and irrelevant – even for the periods before 2008. For this reason as well, the Court should exclude testimony from Dr. Baye that relies on his models to calculate the effects of the Certified Program on production.

## IV. Conclusion

For the reasons provided above, Defendants respectfully request that the Court issue an order excluding or limiting Plaintiffs' expert Dr. Michael Baye from offering opinions on the damages Plaintiffs sustained as a result of the short-term measures, the USEM exports, and Defendants' participation in the Certified Program, including its cage-space requirements and backfilling limitations.

---

[48] Baye, Nov. 1, 2023 Tr. 3004:3-6.

23391137v4

Respectfully submitted,

*/s/ James A. King*
James A. King (jking@porterwright.com)
Allen T. Carter (acarter@porterwright.com)
Eric B. Gallon (egallon@porterwright.com)
   (pro hac vice)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215-6194
Tel: (614) 227-2000

Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

**Counsel for Defendant Rose Acre Farms, Inc.**

*/s/ Robin P. Sumner*
Robin P. Sumner
(robin.sumner@troutman.com)
Kaitlin L. Meola
(kaitlin.meola@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

Whitney R. Redding
(whitney.redding@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219-4429
Tel: (412) 454-5085

Molly DiRago
(Molly.DiRago@troutman.com)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe Street, Suite 3900
Chicago, IL 60606
Tel: (312) 759-1923

***Counsel for Defendants***
***United States Egg Producers, Inc. &***
***United States Egg Marketers, Inc.***

*/s/ Patrick M. Collins*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Lohr Beck (lohr.beck@kslaw.com)
(pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2812

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

***Counsel for Defendant***
***Cal-Maine Foods, Inc.***

17

23391137v4