UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE OR LIMIT TESTIMONY OF DR. MICHAEL BAYE ON DAMAGES**

Having lost at trial, Defendants now try to exclude Plaintiffs' expert, Dr. Michael Baye, from testifying at the damages phase. Their motion should be denied. Dr. Baye's model fits the facts of the case that was tried and resulted in a liability verdict against UEP, USEM, Cal-Maine, and Rose Acre. Defendants' arguments to the contrary misinterpret the jury's verdict; are unsupported by case law; or were already made and rejected in the MDL.

Finally, although Defendants spill a lot of ink about exports and short-term measures, Plaintiffs do not plan to introduce new expert opinions about these issues. Plaintiffs can and will establish damages for exports and short-term measures through evidence that is and will be in evidence.

I.  **Defendants' Attack on Dr. Baye's Model for Basing Overcharges on Nationwide Egg Production Should be Rejected.**

   **A.  Dr. Baye's Model Fits the Facts of the Case and the Jury's Findings.**

As the jury found, UEP, the egg industry's trade association, conspired with Cal-Maine and Rose Acre, two of the largest egg producers in the country, to limit the nation's egg supply by multiple means, including restricting henhouse density and backfilling, as part of the UEP Certified Program.[1] With UEP as the hub of the conspiracy, Defendants caused approximately 95% of the nation's egg producers to sign onto the Certified Program, which injured Plaintiffs by reducing the U.S. egg supply and inflating egg product prices.[2]

The evidence introduced at trial showed UEP created and implemented the program; the henhouse density requirements grew out of a plan by UEP's economic consultant to use density restrictions to restrict egg supply and raise prices industry-wide; and the backfilling ban was added in 2005 to further limit the nation's egg supply.[3] UEP used its *United Voices* newsletter as a "bullhorn" to urge producers to sign on to the program, while also working behind the scenes to force widespread adoption by convincing egg buyers to demand UEP Certified eggs.[4]

With respect to the producer defendants, the evidence showed (among other things) that Cal-Maine executives were on UEP's Board of Directors, held numerous key committee positions within the UEP, and advocated and voted for the Certified Program because it understood that imposing cage-density restrictions nationwide would reduce egg supply and inflate prices.[5] The evidence also showed that Rose Acre executives were involved in UEP and understood that the Certified Program was a supply management program. Rose Acre supported the Certified

---

[1] *See* Verdict (Nov. 23, 2023).
[2] Tr. 2984-2985.
[3] Tr. 1951-1959, 1976-1977.
[4] Plaintiffs' Ex. 637, 102; Tr. 2035, 1281-1282, 1288-1289, 1313.
[5] Tr. 1156-1157, 1202-1203.

2

Program, complied with it, and pushed for the 100% rule so that its competitors like Michael Foods would have to comply with the restrictions on all of their flocks.[6]

Consistent with Plaintiffs' theory and the evidence that the conspirators intended to and did restrict egg supply nationwide, Dr. Baye used a regression model to determine how the UEP Certified Program's henhouse density and backfilling restrictions impacted U.S. egg production, and then calculated the resulting overcharge for every different egg product Plaintiffs purchased.[7]

Defendants claim Dr. Baye's model does not fit the conspiracy because the jury purportedly only found that four egg producers were in the conspiracy, while finding in response to question #8 that not all participants in the UEP-certified program were not members of the conspiracy. Thus, Defendants argue, damages must be based only on supply reductions at their own facilities and not on the nationwide impact of the conspiracy. Defendants misread the verdict and misapprehend the theory on which they were found liable.

First, the jury did not find that *only* four egg producers were in the conspiracy; it simply answered no to the question of whether *every* UEP-Certified egg producer was in the conspiracy.[8] Indeed, the jury's finding that Michael Foods was not in the conspiracy meant the answer to Question 8 *had* to be no—regardless of whether any other producers were co-conspirators.

Second, whether other UEP certified program participants were knowing members of the conspiracy is legally irrelevant. The theory on which Plaintiffs tried and won the case was that Defendants devised a program intending to restrict egg supply industry-wide and persuaded 95% of the industry to sign on. The Defendants' purpose (including that of UEP, as manager and supervisor of the Certified Program) was to encourage and facilitate broad acceptance of the

---

[6] Tr. 4523-4524, 4477-4478.
[7] Tr. 2586-2587.
[8] Verdict (Nov. 23, 2023) (emphasis added).

3

program, including by other egg producers, as well as by customers, in order to drive up prices. The other egg producers did not need to be co-conspirators—that is, *knowing* participants in a conspiracy to restrict nationwide supply—in order for the program to be successful. It was irrelevant whether the absent egg producers knew that UEP's or Rose Acre's or Cal Maine's goal was to restrict nationwide supply. It is enough that UEP, Rose Acre, and Cal Maine conspired to restrict supply and used the UEP certified program to accomplish that goal.

Take a pyramid or Ponzi scheme as an example. In a pyramid scheme, the leaders of the scheme persuade others to join, and use them as instrumentalities to effectuate the scheme. It is irrelevant whether the other participants know the investment is part of a pyramid scheme—in fact, most participants may not knowingly join a conspiracy simply by playing a part in the scheme. Yet the leaders at the top, who are knowing members of the conspiracy, are liable for all resulting harm, including harm caused by the actions of all participants or instrumentalities. The Seventh Circuit regularly holds actors to account for conduct that was carried out by unknowing participants who they mobilized into action. *See, e.g.*, *United States v. Randy*, 81 F.3d 65, 68 (7th Cir. 1996).

Here, likewise, it is beside the point whether the other UEP-Certified producers knew or understood that the program's true purpose was to restrict egg production nationwide in order to drive up prices. The jury found that the henhouse density and backfilling restrictions in the UEP Certified Program were a product of Defendants' conspiracy, and Defendants are legally responsible for the harm the conspiracy caused regardless of what the other producers knew or why they joined the program.

**B. Defendants' Challenge to Dr. Baye is Untimely and Barred.**

At no point, including in his January 2015 expert report, has Dr. Baye ever stated that he assumes every UEP Certified participant fits the legal definition of a co-conspirator. To the extent

4

Defendants' theory is that Dr. Baye should have isolated and excluded non-conspirators when analyzing the impact of the certified program on egg supply, Defendants never filed a timely *Daubert* motion challenging Dr. Baye on this basis.

They did, however, file an *untimely* Daubert in the MDL proceedings, in which they made the same argument they are making now. The *Daubert* deadline in the MDL was May 25, 2015, but Defendants did not file their *Daubert* motion until August 2017, over two years after the deadline had passed. Judge Pratter denied the motion because it was untimely. *In re Processed Egg Products*, 2017 WL 517757 at *5 (E.D. Pa. 2017). Defendants' arguments are of course even more untimely now that *another six years* have passed. They should be rejected on that basis alone.

**C. In Addition to Being Barred, Defendants' Position is Legally Unsupported.**

Defendants briefed this issue three times already, but have never cited any case law supporting the position that they cannot be legally responsible for the nationwide supply restrictions they conspired to put in place unless every egg producer who complied with those restrictions was also a *knowing* member of their conspiracy.[9]

In the absence of supporting case law, Defendants rely on an out-of-context snippet from a ruling in which Judge Pratter declined to certify a class of indirect purchaser plaintiffs ("IPPs") because their expert's model failed to account for non-conspiring producers. Motion at 11. That ruling is not applicable because Judge Pratter was analyzing predominance under Rule 23, and was

---

[9] Indeed, the Third Circuit has already held that so long as Plaintiffs are only suing conspirators and seeking damages for purchases from conspirators, they can rely on a theory that the conspiracy raised the prices of all eggs and egg products. *In re Processed Egg Products Antitrust Litig.*, 881 F.3d 262, 274 (3d Cir. 2018). The position Defendants now advance—that Plaintiffs cannot recover overcharges based on a nationwide supply reduction but instead must sort the egg industry into conspirators and non-conspirators and exclude non-conspirator eggs from any damage analysis—is incompatible with that ruling.

focused on whether there was an effective way to determine which putative class members bought shell eggs from conspirators as opposed to non-conspirators. That is not an issue here.

Defendants know they are mis-citing Judge Pratter's ruling because they have done it before, and Judge Pratter told them so. In their untimely 2017 *Daubert* motion as to Dr. Baye, Defendants relied on that same quote about Dr. Steigert. Judge Pratter rejected their argument, explaining:

> The defendants first point to a September 2015 ruling by this Court that held 'the failure to account for non-conspiring producers and the failure to account for non-commodity eggs[] are both flaws undermining the reliability of Dr. Stiegert's models.' …. These supposed shortcomings in Dr. Baye's analysis were present in the initial report, and present before the Daubert deadline. *Moreover, the citation to the Court's reasoning is inapposite, given that the Court was answering a different question: whether common issues predominate under the IPP class, not whether damages could be calculated writ large.*

*In re Processed Egg Products Antitrust Litig.*, 2017 WL 517757 at *5 (E.D. Pa. 2017) (emphasis added; internal citations omitted). Judge Pratter's quote from the IPP class certification ruling provides no more support for Defendants' argument now than it did the first time they tried it.

## II. The Finding of No Post-2008 Injury Does Not Undermine Dr. Baye's Model.

The Court should likewise reject Defendants' contention that Dr. Baye's model has to be thrown out because the jury found no injury after 2008. Nothing about that finding undermines Dr. Baye's model. Even though Dr. Baye analyzed the impact of the UEP Certified Program through 2012, and showed a demonstrative illustrating the reduction in egg production relative to the but-for world that included dates through 2012, his report also breaks down overcharges by year and by plaintiff/vendor/product combination. Damage numbers for 2005-2008 have been available to Defendants since January 2015.[10]

---

[10] Defendants argue that Plaintiffs' damages must be cut off at September 2008, ECF 566 at 2, but that is not what the verdict states. They also say the jury found no injury for the period ending December 2008, *id*. at 1, but that is presumably a typo.

6

Defendants also contend that Dr. Baye's whole model is invalid because 2009-2012 data about the different variables that impact egg production was included in the regression. That does not logically follow. As Dr. Baye explained, his model measured the impact of the restrictions in the UEP Certified Program. His model did not assume that the UEP Certified Program was the product of a conspiracy, in the legal sense—let alone one that ended on any particular date.[11] The UEP Certified Program existed in 2009-2012, and the relationship between egg production and variables such as grain prices were what they were in the 2009-2012 time period. Dr. Baye was not required to pretend otherwise.

Moreover, contrary to Defendants' assertions, the jury did not find that the UEP Certified Program had no effect on egg production after 2008. The jury simply found that Plaintiffs were not injured after 2008, and that could have been for any number of reasons having nothing to do with whether the UEP Certified Program had an effect on egg production (*e.g.*, the jury could have credited Defendants' argument that the Plaintiffs wanted certified eggs in these later time periods and were not entitled to recover after Defendants' conspiracy became public in the *Wall Street Journal*).

Importantly, Defendants already made and lost this same argument in the MDL. One case in the MDL was a class action brought by direct purchasers (the "DPPs"). The DPPs' expert, Dr. Rausser, calculated overcharges using a regression model that included data through December 2013. After certifying the DPP class, Judge Pratter cut off the class period at December 31, 2008. *In re Processed Egg Products Antitrust Litig*., 2017 WL 2494221 at *2. Based on that ruling, Defendants moved to decertify the DPP class, arguing that cutting off the class period at 2008 invalidated Dr. Rausser's model because his regressions used post-2008 data. *Id*. at *4. Judge

---

[11] Tr. 2983-2984, 2741.

Pratter disagreed, explaining that "the UEP Certification Program continued through 2013 and included the same types of instrumentalities as are alleged to have characterized the conspiracy pre-2008." *Id*. at *5. Thus, "[c]utting off the class period in 2008 would not automatically invalidate the usefulness of the post-2008 data." *Id*. She also held that if there is a disagreement over the models, "that question is best answered by a jury." *Id*. The same holds true here.

### III. Dr. Baye will not Introduce Undisclosed Opinions.

Finally, Defendants argue extensively that Dr. Baye should not be allowed to testify as to new opinions about the price impact of exports or short-term slaughter, molt, and hatch reduction measures during the damage phase. To the extent Defendants are suggesting that Dr. Baye foreclosed the possibility of damages based on these measures, they are wrong. Although Dr. Baye did not use an econometric model to calculate the price impact of exports, he used a different technique to estimate their impact on price.[12] And he testified that although he could not say with a degree of scientific certainty how much the plaintiffs overpaid as a result of these price increases, "just as a matter of economics, these would have materially impacted domestic prices."[13]

Dr. Baye likewise did not testify that the short-term slaughter, molt, and hatch reduction programs had no price impact. Rather, he emphasized that an economist is not necessary to find that slaughtering birds results in fewer birds.[14] He then explained that although it was not a way to sustain price increases in the long run, "you might be able to have an early slaughter and lead to some short-term increases in price if you coordinate those slaughters across everyone in the industry." *Id*. at 12-22. Cal-Maine's Chairman Dolph Baker admitted at trial that there were coordinated industry-wide slaughters.[15]

---

[12] Tr. 2591 -2593.
[13] *Id*. at 2593.
[14] *Id*. at 2656-2567.
[15] Tr. 1222-1223.

8

In any event, Dr. Baye will not offer new opinions at trial. There is and will be ample evidence in the record from which damages from exports and short-term measures can be calculated —including UEP's own admissions about the price impact of exports, the length of time exports impacted prices, and the percentage of the industry that participated in short-term measures.

## CONCLUSION

For the foregoing reasons, Defendants' motion, which misapprehends the jury verdict, conflicts with the law, and rehashes untimely and already-rejected attacks on Dr. Baye's damage model, should be denied.

November 26, 2023

Respectfully submitted,
***Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlé USA, Inc. and The Kellogg Company***

/s/ *Brandon D. Fox*
Brandon D. Fox
Amy M. Gallegos (admitted *pro hac vice)*
Sati Harutyunyan (admitted *pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com

Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
Christopher M. Sheehan
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com

9

aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com
csheehan@jenner.com