UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO THE
COURT'S DAMAGES THEORY QUESTION**

The Court has inquired in light of Defendants' challenges to Dr. Baye's model about the law governing a damages theory that takes into account actions by non-members of the conspiracy. As the Court notes, the jury in Question 8 found that not every participant in the UEP Certified Program participated in the conspiracy to restrict nationwide supply of eggs. Defendants argue from this finding that Dr. Baye's model is fatally flawed, purportedly because he assumes such participation.

As this Court recognizes, Defendants' challenge to Dr. Baye is, at bottom, one about causation. Plaintiffs have proven a conspiracy; and Plaintiffs will present evidence of overcharges they paid. What remains is whether those overcharges were *proximately caused* by the conspiracy because non-conspiring egg producers who participated in the UEP Certified Program contributed to the higher prices paid by Plaintiffs. In other words, did Defendants cause the price to rise, as opposed to the price rising for reasons independent of Defendants' actions?

As discussed below, the answer is Yes. Consistent with case law both within the antitrust context and outside that context, the evidence shows that the conspirators induced well-meaning egg producers to join the UEP Certified Program, which in turn facilitated the conspirators' ability to charge high prices. Whether the evidence is sufficient to establish this causal link is a factual question for the jury to decide, not a legal matter for the Court.

I. **Defendants Proximately Caused Plaintiffs' Injuries**

Courts consider the six factors in assessing proximate cause in antitrust cases: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).

Plaintiffs' evidence in the liability phase established all six factors.[1] One of the Defendants found liable at trial was UEP. UEP was the sponsor of the UEP Certified Program. At its inception, consistent with the evidence presented to the jury, the Program was a supply management program. It was designed by UEP and the egg-producer Defendants to resolve the nation's over-supply of eggs on a long-term basis. To be successful, however, it required widespread participation by egg producers and broad support by customers. UEP and its agents facilitated that participation and support. By the mid-2000s, more than 95% of the industry's producers were UEP Certified. This is the definition of market power: Consumers had little choice but to buy UEP Certified; there

---

[1] For the purposes of this filing, Plaintiffs focus on the effect of the UEP Certified Program since that is the means that Dr. Baye's regression model analyzes.

were no other options in the market. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 452 (1992) (defining market power as the power to take away consumer choice).

It is wholly irrelevant—both factually and legally—that the jury found that not all UEP Certified producers knowingly conspired to restrict supply. First, as a factual matter, the jury's finding simply means that not all egg producers shared Defendants' conscious commitment to the common goal of restricting supply. There was no meeting of the minds as required for conspiracy liability. This does not mean, however, that the other producers did not participate in the program. It does not mean that the other producers' participation did not result in the nationwide restriction of egg production. And, most importantly, it does not mean that *Defendants* did not achieve their goal, which was to reduce nationwide supply of eggs by achieving widespread participation of competitors in the program.

Indeed, the jury must have agreed: The jury found injury. Injury, whether as a result of the UEP Certified Program, the short-term measures, or exports, could only have been inflicted through a collectively-caused market-wide price rise.

As it was in the liability phase, the question of causation in the damages phase should be a fact question for the jury. Defendants are entitled to attempt to poke holes by arguing to the jury that other factors besides the conspiracy caused the overcharges Plaintiffs will claim. But there is no question that, as a matter of law, Plaintiffs have given the jury a path to finding that Defendants' conspiracy, in a hub and spoke setting that involved a trade association, caused Plaintiffs' injuries.

Second, as a legal matter, antitrust law is replete with cases where the anticompetitive harm is the product of third parties' independent decisions. For instance, earlier this month Judge Durkin denied a motion to dismiss in *Dale v. Deutsche Telekom AG*, No. 1:22-cv-03189, 2023 WL 7220054 (N.D. Ill. Nov. 2, 2023) (Durkin, J.). The plaintiffs represented a putative class of customers of AT&T and Verizon who sought damages for overcharges indirectly caused by the T-

3

Mobile/Sprint merger. Judge Durkin held that the plaintiffs had adequately alleged injury, by asserting that "the merger reduced competition in the retail mobile wireless market and as a result, market participants AT&T and Verizon charged higher prices than they would have otherwise." *Id.* at *11. Plaintiffs did not allege that AT&T and Verizon did anything wrong, and thus were innocent players—even more so than many of the egg producers who joined the Certified Program. But plaintiffs' allegations that they were injured by the T-Mobile and Sprint merger based on the higher prices that AT&T and Verizon charged, were sufficient to show proximately cause.

The same principles apply beyond the antitrust context. Consider *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), an employment discrimination case that draws on general principles of proximate cause discussed in *Associated General Contractors of California, Inc.* The Supreme Court held that "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" 562 U.S. at 419 (citing *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). Accordingly, an innocent motive by the "ultimate decisionmaker" who took the adverse employment action "does not prevent the ***earlier agent's action*** (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.* This is precisely the current fact pattern: The joining of innocent decisionmakers (other egg producers) does not prevent earlier agents' actions (Defendants) from being the proximate cause of Plaintiffs' harm.

In other words, even if non-conspirators who joined the program did not knowingly enter into the conspiracy to restrict supply, Defendants' conspiracy could still be the proximate cause of the harm suffered by Plaintiffs. Perhaps non-conspirator egg producers are "also a proximate cause of the [] decision, but it is common for injuries to have multiple proximate causes." *Id*. (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)). Instead, there is only a superseding cause that

4

breaks the proximate cause chain "if it is a 'cause of independent origin that was not foreseeable.'"[2] *Id*. (quoting *Exxon Co., U.S.A. v. Sofec, Inc*., 517 U.S. 830, 837 (1996) (internal quotation marks omitted)).

This conclusion is reinforced by cases allowing for umbrella damages, that is, overcharges paid to non-conspirators where a cartel caused higher prices for both the cartel and the cartel's competitors. To be clear, Plaintiffs here do not seek umbrella damages. But the logic of the cases permitting umbrella damages is roughly analogous to the causal chain that connects Defendants to the harm caused by the UEP Certified Program writ large. In that context, a court within this district explained:

> Once it is established that nonconspirators have charged more than competitive prices, the inference that the cost increase was caused by the cartel is inescapable. Granted there will be some uncertainty regarding these calculations, but no more so than in any price fixing case where it is uncertain what price the defendants would have charged but for the antitrust violation.

*In re Uranium Antitrust Litigation*, 552 F. Supp. 518, 525 (N.D. Ill. 1982). In other words, courts allow plaintiffs to recover from conspirators for prices they paid to non-conspirators who took advantage of the uncompetitive market. Plaintiffs seek a lesser-included injury caused by the conspirators: the intended consequences of the conspiracy, which was to achieve market power.

## II. The Jury Has Already Rejected Defendants' Argument

Defendants cross-examined Dr. Baye on whether his model required all egg producers involved in the Certified program to be co-conspirators. Dr. Baye answered that his model was agnostic on the issue. But the jury found that Defendants engaged in a conspiracy to restrict the

---

[2] The Seventh Circuit has faithfully applied the Supreme Court's causation standard in a range of contexts. *See, e.g., Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) (citing *Staub*, 562 U.S. at 420). This is true even outside of the employment discrimination context. For example, in *Kemper v. Deutsche Bank AG*, the Seventh Circuit applied *Staub* in an international tort claim and looked at "foreseeability, directness, and the substantiality of the defendant's conduct." 911 F.3d 383, 392 (7th Cir. 2018).

supply of eggs, including through two means of the Certified Program, and concluded that each Plaintiff suffered an injury from the conspiracy. Dr. Baye's model relating to the effects of the Certified Program that Plaintiffs presented to the jury during the liability phase is the same as the model that will be presented during the damages phase. Dr. Baye's model has always focused on nationwide flock data and Plaintiffs never asserted that the co-conspirator producers, acting on their own, were able to cause the injury that the jury found.

### III. Dr. Baye's Model Studies the Effect of the Defendants' Conspiracy

Defendants misconstrue the chain of events that Dr. Baye studied. Defendants focus on Dr. Baye's use of nationwide flock data that includes data from all producers, not just those who have been found to be members of the conspiracy. They argue that he studied the effect of production decisions by conspirators and non-conspirators and then attributed all of the harm to the Defendants. This misunderstands Dr. Baye's model. Dr. Baye's specification was designed to assess the impact of the Certified Program, not the impact of production decisions by any producer or group of producers. Because the Defendants created, promoted, and orchestrated the Certified Program, particularly through the UEP as the hub, it is fair to allocate the harm caused by the program to the Defendants.

Dr. Baye assessed the effect of the UEP Certified program by setting different restriction periods and including a suite of control variables. These control variables allowed Dr. Baye to measure the impact of the UEP Certified program rather than other superseding causes. Whether he properly specified his model is a fact question that the jury will be able to evaluate during the damages phase.

### CONCLUSION

Plaintiffs are permitted to pursue damages that were proximately caused by Defendants, even if those actions included mobilizing non-conspirators. Here, Plaintiffs have given the jury

6

grounds to find that Defendants proximately caused the injuries at issue based on governing Supreme Court precedent within and beyond the antitrust context. Additionally, the jury has already effectively rejected Defendants' argument after Defendants repeatedly invoked it during the liability phase. And finally, Dr. Baye's model avoids Defendants' concerns by looking at the effects of the UEP Certified program, which was propagated by Defendants.

November 28, 2023

Respectfully submitted,

***Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlé USA, Inc. and The Kellogg Company***

 /s/ *Brandon D. Fox*
Brandon D. Fox
Amy M. Gallegos (admitted *pro hac vice)*
Sati Harutyunyan (admitted *pro hac vice*)
JENNER & BLOCK LLP
515 South Flower St, Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com

Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
Christopher M. Sheehan
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com
csheehan@jenner.com