# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., Plaintiffs, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:11-cv-08808<br><br>Judge Steven C. Seeger<br><br>**ORAL ARGUMENT REQUESTED** |
| v. | | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., MICHAEL FOODS INC., and ROSE ACRE FARMS, INC. Defendants. | | |

**DEFENDANT ROSE ACRE FARMS, INC.'S MEMORANDUM IN SUPPORT OF ITS RENEWED AND AMENDED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

Pursuant to Fed. R. Civ. P. 50(a), Defendant Rose Acre Farms, Inc. respectfully submits its renewed and amended motion to this Court to enter judgment as a matter of law in Rose Acre's favor. Rule 50(a) provides that if a party has been fully heard on an issue, and a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the Court may resolve the issue against the party and grant judgment as a matter of law.[1]

Plaintiffs Kraft Food Global, Inc., The Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. argued at trial that Defendants conspired to reduce the number of laying hens in the United States (also called "flock size") and, thus, the supply of shell eggs, in order to drive up the prices of shell eggs and the egg products that Plaintiffs purchased to manufacture their foodstuffs. But for multiple reasons, the evidence that Plaintiffs provided the jury was not legally sufficient to find in their favor. Specifically, Plaintiffs presented no evidence demonstrating (a) that the alleged conspiracy produced anticompetitive effects, (b) that there was sufficient market power to cause anticompetitive effects, or (c) that those effects caused injuries or damages to the Plaintiffs.

Plaintiffs' economic expert, Dr. Michael Baye, conceded that the UEP short-term supply recommendations and USEM exports had no sustained, measurable impacts on the egg market, and may have had no impact at all on the prices Plaintiffs paid for egg products. He also conceded that, under his econometric model, the Certified Program's cage space requirements and backfilling ban had no statistically significant impact on flock size or egg production (and, therefore, no statistically significant impact on the egg market or the prices Plaintiffs paid) until at least August 2005. And Dr. Baye offered no theory to explain how a conspiracy that ended in August 2008 would have caused higher egg prices between September 2008 and the end of 2012. Indeed, the jury found that Plaintiffs did not prove injury for 2009 to 2012.

---

[1] Rose Acre submits this amended Rule 50(a) motion to address the jury verdict in the liability phase and evidence from the damages phase.

For the remainder of the conspiracy period (August 2005 through December 2008), Plaintiffs' proof of an adverse effect on competition, injury, and damages consists entirely of Dr. Baye's econometric model. That model found that the cage-space requirements and backfilling restrictions reduced egg production by statistically significant amounts, which supposedly drove up the prices of all egg products by various amounts. But Dr. Baye's model measured the actions of *every* producer on the Certified Program. Plaintiffs identified only five Certified egg producers that were part of their alleged conspiracy, and of those, the jury specifically found that Michael Foods did not conspire. There were hundreds of other Certified egg producers, dozens of which were not even members of the trade association that purportedly masterminded the alleged conspiracy, and none of which Plaintiffs even *tried* to tie to the conspiracy. Despite Plaintiffs' efforts to align their conspiracy claims with Dr. Baye's model, the jury found that not every member of the Certified Program participated in the conspiracy to reduce the supply of eggs.

Plaintiffs also failed to present evidence demonstrating that any "but-for" reduction in *overall* egg supply would have reduced the supply of eggs specifically used to make egg products, which is the only logical way the Certified Program could have *caused* the price of egg products to rise. Accordingly, Plaintiffs failed to demonstrate that their alleged conspiracy would have driven up the prices of egg products.

For all of these reasons, the Court should direct an entry of judgment as a matter of law in favor of Rose Acre and the other Defendants. [2]

---

[2] Rose Acre also incorporates the arguments made by Cal-Maine and United Egg Producers in their respective Rule 50(a) motions.

I.   **Applicable Legal Standard**

Judgment as a matter of law is appropriate when evidence is lacking on an issue or claim that is essential to the nonmoving party's cause of action. Fed. R. Civ. P. 50(a)(1).[3] Courts may grant judgment under Rule 50 when, viewing the evidence in the light most favorable to the non-movants and giving them the advantage of every reasonable inference, there is insufficient evidence to support a jury verdict. *Susan Wakeen Doll Co. v. Ashton-Drake Galleries*, 272 F.3d 441, 449 (7th Cir. 2001); *Turubchuk v. S. Ill. Asphalt Co.*, 958 F.3d 541, 548 (7th Cir. 2020). Critically, the nonmoving party is "not entitled to the benefit of unreasonable inferences or to inferences conflicting with uncontested facts." *Id.* And "a mere scintilla of evidence will not suffice." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (quoting *Richardson v. Indianapolis*, 658 F.2d 494, 498 (7th Cir. 1981)); *see also Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Physicians Assur. Corp.*, 922 F.3d 778, 784 (7th Cir. 2019).

The standard is no different in antitrust cases. *E.g.*, *Gordon v. Illinois Bell Tel. Co.*, 330 F.2d 103, 106 (7th Cir. 1964); *Northwestern Oil Co. v. Socony-Vacuum Oil Co.*, 138 F.2d 967, 969, 971 (7th Cir. 1943) (affirming a directed verdict for defendant when plaintiff failed to provide sufficient evidence of injury resulting from the allegedly anticompetitive conduct); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist. LEXIS 550, *43 (N.D. Ill. Jan. 19, 1999). As shown below, Rose Acre has met the Rule 50 standard.

II.   **Plaintiffs Have Failed to Demonstrate That the Alleged Conspirators Caused Any Anticompetitive Effect in the Market, or Injured/Damaged Plaintiffs Specifically.**

To prove a violation of Sherman Act Section 1, Plaintiffs must first prove the existence of a "contract, combination…or conspiracy." 15 U.S.C. § 1. Plaintiffs must "produce evidence that

---

[3] Trial courts may render judgment as a matter of law on issues that are wholly dispositive of a claim, or on discrete legal issues, even though granting the motion would not completely dispose of a claim. Moore's Federal Practice § 50.05[4]; *Fed. R. Civ. P. 50(a) Advisory Committee's Note to 1993 amendment*.

3

would allow a jury to infer that [Rose Acre] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective,'" and the "circumstances of the case must reveal 'a unity of purpose or a common design and understanding . . . .'" *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citations omitted)). Second, Plaintiffs must prove this "agreement" imposed an "unreasonable restraint on trade," *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021), which is conduct that adversely affects competition in a significant way. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n.*, 672 F.2d 1280, 1288 (7th Cir. 1982). Third, Plaintiffs must prove they suffered an antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiffs must show their injury and associated damages are "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

The bottom line is that Plaintiffs were required to show that the conspiracy's anticompetitive conduct significantly harmed the market, which then injured and damaged them. *E.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 506 (E.D. Pa. June 11, 2019); *Marion Healthcare, LLC v. S. Ill. Healthcare*, No. 3:12 -CV-871–MAB, 2020 U.S. Dist. LEXIS 55724, *23 (S.D. Ill. Mar. 31, 2020) (citing *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006)); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983). Plaintiffs failed to do so here.

### A. Plaintiffs did not demonstrate that the alleged co-conspirators caused a significant and sustained reduction of eggs in the market.

Plaintiffs presented no evidence that the alleged conspiracy, and those who participated in it, limited the supply of eggs at all, let alone that the conspiracy caused a significant and sustained reduction of eggs in the market. And that is true for all aspects of the alleged conspiracy—UEP supply recommendations (including early molts and early slaughters), USEM exports, and the cage-density requirements and backfilling limitation in the Certified Program.

#### 1. There is no evidence the "short-term measures" or USEM exports reduced the supply or increased the price of eggs or egg products.

At trial, Plaintiffs did not demonstrate that the short-term measures or the exports caused significant or sustained injury to the market for eggs and egg products. Dr. Baye testified that the UEP supply recommendations were "sporadic" and "random"[4] and might theoretically have "led to some short-term increases in price,"[5] but would not have had "a sustained measurable impact" on output or price.[6] Similarly, he testified that the USEM exports were "short-term measures"[7] that would have had only small and short-term (at most, month-long) price effects.

Sporadic and temporary market impacts are insufficient to demonstrate anticompetitive effect under the Sherman Act. *See Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n.*, 672 F.2d 1280, 1288 (7th Cir. 1982) (holding that plaintiff's "fail[ure] to identify any clear or significant anticompetitive effects" from a "temporary denial" of membership in an industry association was insufficient to establish antitrust liability); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that a "four- to ten-month" effect on competition "is not significant enough to be classified as an injury to competition under

---

[4] Baye, Oct. 30, 2023 2566:22-24.
[5] *Id.* at 2567:6-16.
[6] Baye, Oct. 31, 2023 2691:5-2692:5.
[7] *Id.* at 2694:3-5.

5

the Sherman Act"); *JetAway Aviation, Ltd. Liab. Co. v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 841 (10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects."); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co.*, 885 F.2d 683, 697 (10th Cir. 1989) (reversing jury verdict for plaintiff where the alleged anticompetitive behavior "only threaten[ed] to have a transitory impact on the marketplace."); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015) (holding that a restraint on trade that lasted seven months was "far too short as a matter of law to create the required substantial marketwide harm of actual detrimental effects"), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

The short-term measures identified in the record (assuming UEP members actually implemented them) were fleeting and sporadic. The measures took place between (1) late April and mid-May 2004, (2) mid-May and August 1, 2004, (3) December 1, 2004 and Labor Day 2005, and (4) late March and early April 2006.[8] While the UEP Meeting Minutes, United Voices Newsletters, and other UEP correspondence made claims about egg market projections and historical benchmarks, all statements were general in nature and ambiguous with regard to both time frame and source of impact. Any record evidence claiming these measures affected domestic egg prices offers nothing but speculation as to the length and significance of that impact.

Accordingly, Plaintiffs failed to produce evidence sufficient to demonstrate that the short-term supply recommendations and/or USEM exports imposed an unreasonable restraint on trade or caused antitrust injury or injury in fact. Moreover, Plaintiffs did not even attempt to show damages for exports or short-term measures. For these reasons, the Court should grant judgment as a matter of law to Rose Acre with respect to the UEP short-term measures and USEM exports.

---

[8] Plaintiffs' Exhibits 37, 102, 105, 137, 142, 150, 153, 377, 402, 410, 581, 592, 599, 704, 710, 827, 828.

## 2. There is no evidence that the co-conspirators possessed sufficient market power to cause anticompetitive effects or injury.

A finding of significant market power is a prerequisite to proving anticompetitive effects and injury in the Seventh Circuit. *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012); *see also Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries . . . that matter under the federal antitrust laws."). At trial, Plaintiffs failed to show that the alleged co-conspirators (or those identified by the jury) had sufficient market power to cause anticompetitive effects or injury.

Dr. Baye testified that the combined market share of the alleged conspirators was 20.4 percent, based on Exhibit 7 of his expert report.[9] This 20.4 percent, as calculated, included Michael Foods, which the jury found not to be a member of the conspiracy.[10] Market share of 20.4 percent (not to mention 15.5 percent, once Michael Foods' share is deducted)[11] is insufficient to demonstrate market power as a matter of law. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987) (holding as a matter of law that a 20-25 percent market share or less does not constitute sufficient market power to restrain trade in violation of the Sherman Act); *Hannah's Boutique, Inc. v. Surdej*, No. 13-CV-2564, 2015 U.S. Dist. LEXIS79501, at *17 (N.D. Ill. June 19, 2015) (citing 18 percent as too small to possess market power); *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, Inc., 381 F.3d 717, 736-37 (7th Cir. 2004).

Plaintiffs may attempt to skirt this issue by arguing that Dr. Baye directly demonstrated anticompetitive effects, by showing lower production and higher prices, thus obviating the need to prove market power. This argument fails for two reasons. First, courts in the Seventh Circuit have

---

[9] Baye, Oct. 31, 2023 2744:25-2745:3.
[10] Verdict Form at 4 (ECF No. 582).
[11] See Exhibit 7 to Expert Report of Michael R. Baye (ECF No.593).

7

held such arguments to be unpersuasive. *See Hannah's Boutique, Inc. v. Surdej*, No. 13-cv-2564, 2015 U.S. Dist. LEXIS 86257, at *14 (N.D. Ill. July 2, 2015) ("Plaintiff's argument that it can use evidence of direct effects to prove market power while circumventing an initial showing of [defendant's] market share is not persuasive as a matter of law." (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004))). Second, as demonstrated below, Dr. Baye assessed the impact of *every* Certified producer's adherence to the Guidelines, not the impact of the co-conspirators' conduct. And the jury found that not every Certified producer was a co-conspirator. Because the alleged conspirators lack the market power necessary to produce any anticompetitive effect, they cannot prove injury as a matter of law.

### 3. Dr. Baye's analysis failed to isolate the effects of the alleged conspiracy.

The foundation for Dr. Baye's conclusion that the alleged conspiracy reduced the supply of eggs is an econometric model that attempted to determine whether egg production during the Certified Program was lower than it would have been had growth continued as it did during the benchmark period.[12] Dr. Baye acknowledged that his analysis was based on USDA production data that included every producer in the country and numerous varieties of eggs not at issue here.[13]

As an initial matter, Dr. Baye testified that the Main Specification of his econometric model found that the Certified Program caused no statistically significant effects on egg production between August 2002 and January 2004[14] and between February 2004 and July 2005.[15] Given Dr. Baye's testimony that the short-term supply recommendations and exports caused no significant or sustained market impacts at *any* time, the Plaintiffs have not demonstrated any adverse impact

---

[12] *See, e.g.*, Baye, Oct. 30, 2023 2567:23-2568:16.
[13] Baye, Oct. 31, 2023 2699:24-2700:11.
[14] *Id.* at.
[15] *Id.* at 2712:20-2713:12 (Phase 1) and 2724:7-25 (Phase 2).

8

on competition (or injury and damages to themselves) until at least August 2005. The Court should grant judgment as a matter of law to Rose Acre as to the period until August 2005.[16]

But even after August 2005, Dr. Baye did not demonstrate that any reduction in egg supply was caused by the *conspiracy*, rather than just the Certified Program, or that the conspiracy and the Certified Program were indistinguishable. Dr. Baye admitted that his models tested the effect of every Certified producer's adherence to the Certified Program.[17] He admitted, in particular, that he is measuring the effects of the Certified Program, not the "conspiracy."[18] Thus, Dr. Baye's models (if it were valid and reliable) would, at best, show that the actions of every Certified egg producer – not the actions of the purportedly *conspiring producers* – caused anticompetitive effects. But unless every producer that ever followed the Certified Guidelines is part of the alleged conspiracy – and the jury concluded that *not* every Certified producer was a conspirator – Dr. Baye's analysis cannot support a finding that the conspiracy (*i.e.*, the aggregate effect of every co-conspirator) adversely impacted egg supply.[19] Plaintiffs provided no evidence that *every* Certified egg producer "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464 (1984) (citation omitted). And as the Court acknowledged in its jury instructions, a "person or business who has no knowledge of a conspiracy but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator."[20] Despite Plaintiffs' argument that "if an egg

---

[16] Evidence of injury before September 24, 2004 would be irrelevant in any event, because the statute of limitations bars claims for any violation prior to that date. *See In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, 2012 U.S. Dist. LEXIS 180513 (Dec. 20, 2012).
[17] Baye, Oct. 31, 2023 2746:19-21.
[18] *See id.* at 2793:1-13.
[19] Verdict Form at 8 (ECF No. 582): Q: "Do you find that every egg producer who joined the UEP Certified Program through 2008 (whether or not a member of UEP) participated in the conspiracy to reduce the supply of eggs? A: No."
[20] Final Jury Instructions, "Membership in a Conspiracy," at Instruction No. 32 (Nov. 17, 2023) (ECF No. 545).

9

producer agreed to join the program *understanding that it was intended to restrict supply*, the mere joining of the program would be sufficient … to find the producer was a co-conspirator,"[21] Plaintiffs never established that every Certified producer believed or understood that the Certified Program was designed to drive up egg prices. Indeed, Plaintiffs offered no evidence at all regarding the motivations of the overwhelming majority of egg producers who chose to be Certified.

Although Plaintiffs will undoubtedly point to UEP statements like those summarized in this Court's ruling on Plaintiffs' *Santiago* proffer, Plaintiffs did not demonstrate that each Certified egg producer read those statements, agreed with them, and became Certified believing the Certified Program would reduce supply. Moreover, mere membership in UEP is insufficient to prove an egg producer is a conspirator. *See* Mem. Op. and Order at 32 (Sept. 18, 2023) (ECF No. 294); Final Jury Instructions, "Liability of Member for Acts of Association" at Instruction No. 48 (Nov. 17, 2023) (ECF No. 545). And dozens of egg producers were not even in UEP.[22] Between 2002 and 2008, the number of Certified producers each year who were not in UEP ranged from 26 to 55, with nearly 90 Certified producers choosing not to be UEP members at some point during that period.[23] Plaintiffs gave the jury no basis to assume *those* producers knew or believed the Certified Program was intended to restrict supply. And as the jury found in the liability phase, the evidence does not support that the conspiracy and Certified Program are one and the same. Even among the five producers specifically identified by Plaintiffs to be co-conspirators, the jury found that Michael Foods was not a member of the conspiracy.[24]

---

[21] Pls.' Resp. to Defs.' Motion to Exclude In-Trial Expansion of Defined Conspiracy at 3-4 (Oct. 30, 2023) (ECF No. 428) (emphasis added).
[22] *Id.* at 2753:15-24.
[23] *See* Defendants' Exhibits D-1250, D-1241, D-1240, D-1242, D-502.
[24] Verdict Form at 4 (ECF No. 582).

10

Alternatively, Plaintiffs have suggested that the jury can hold the identified conspirators responsible for "the industry-wide consequences" of the Certified Program because "the practices challenged in this suit were adopted by the UEP *and enforced upon its members* . . . ."[25] As support, Plaintiffs cite *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 104 S. Ct. 2948 (1984). But *NCAA* undermines Plaintiffs' argument, rather than supporting it. In *NCAA*, the trade association "limit[ed] the total amount of televised intercollegiate football and the number of games that any one team [could] televise," and prohibited any member from "mak[ing] any sale of television rights except in accordance with the basic plan." *Id.* at 94. The NCAA controlled the output of its members and was able to force the plan upon all of its members. *Id.* The Certified Program, in contrast, was a voluntary program, and some egg producers chose not to join.[26] Indeed, one of Plaintiffs' expert Dr. Baye's theories as to why the Certified Program had no statistically significant effects during its first two phases was that UEP couldn't "just snap [its] fingers, put this in place, and then . . . all of a sudden, everyone is going to be doing exactly what the UEP tells them to do."[27] The only companies against whom UEP enforced the Certified Program were those companies that voluntarily chose to join the Program. And, as stated above, dozens of those companies were not even UEP members. There is no evidence that UEP controlled the output of any of its members (and there is much evidence to the contrary), let alone non-UEP members.

It is important to note that the agreement to join the Certified Program cannot be the "agreement" that Plaintiffs need to prove in order to prevail for two reasons. First, the agreement to become Certified is not an agreement to reduce supply. Judge Pratter noted that the other plaintiff groups were "unable to point to any evidence that, on its face, the agreement to enter into

---

[25] Pls.' Resp. to Defs.' Motion to Exclude In-Trial Expansion of Defined Conspiracy at 5 (Oct. 30, 2023) (ECF No. 428) (emphasis added).
[26] *See* Hurd, Nov. 9, 2023 4748:10-15.
[27] *See*, e.g., Baye, Oct. 30, 2023 2559:9-12.

11

the UEP Certified Program constituted an express agreement among competitors to restrict egg supply." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016). The same is true here. Dr. Baye acknowledged that nothing in the UEP Guidelines prohibits adding henhouses or cages or building greenfield farms.[28] Joining the Certified Program may be "direct evidence of concerted action," *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2016 U.S. Dist. LEXIS 133110, *19 (E.D. Pa. Sept. 28, 2016), but becoming Certified does not "constitute[ ] an agreement 'in and of itself[,]'" *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2017 U.S. Dist. LEXIS 160957, *7 (E.D. Pa. Sept. 29, 2017).

Second, Plaintiffs have alleged a horizontal agreement among producers. The Certified Program is actually a vertical agreement between a producer and UEP, whereby the producer is able to license the Certified logo and trademark if it abides by the Guidelines.[29] Hundreds of vertical agreements between UEP and independent producers does not equate to an agreement among producers. Plaintiffs still must prove the "rim" to their hub-and-spoke, which they have failed to do. There is no proof Rose Acre joined the Certified Program because it was agreeing with other egg producers to reduce the supply of eggs.[30] Instead, Rose Acre witnesses testified that they joined the Certified Program due to customer demand for an animal welfare program.[31] But putting that aside, there is zero evidence that every Certified producer had a "meeting of the minds" with other producers to reduce the supply of eggs.

---

[28] Baye, Oct. 31, 2023 2711:25-2712:8.
[29] *See*, *e.g.*, Plaintiffs' Exhibits P-601 (Rose Acre) and P-603 (Cal-Maine).
[30] *E.g.*, Hinton, Nov. 7, 2023 4047:2-5 ("Q: Based on your experience with this issue, did Rose Acre decide to join the UEP certified Program in order to restrict the supply of its shell eggs? A: No, sir."); Rust, Nov. 8, 2023 4385:7-14 (Q: Mr. Rust, did Rose Acre join the UEP Certified Program and agree to abide by the requirements of the UEP Certified Program in an effort to restrict your supply in order to raise egg prices? A: No. Q: Why did you join the UEP Certified Program? A: To have a good animal welfare program to satisfy our customers.")
[31] Hinton, Nov. 7, 2023 4046:3-4047:13; Rust, Nov. 8, 2023 4385:7-14.

12

Because there is no proof that every Certified producer is a co-conspirator, Dr. Baye's analyses do not measure the effect of the alleged *conspiracy*, and do not demonstrate the injury to competition in the market that Plaintiffs were required to prove. Accordingly, the Court should enter judgment as a matter of law on behalf of the Defendants.

> 4. **Dr. Baye's analysis does not provide a reasonable basis from which the jury could conclude that Rose Acre's conduct (or other conspirators' conduct) caused anticompetitive effects, injury, or damages.**

As explained above and in Defendants' Memorandum in Support of Defendants' Motion to Exclude or Limit Testimony of Plaintiffs' Witness Dr. Michael Baye,[32] Dr. Baye's model of damages does not fit the conspiracy found by the jury: one that includes Rose Acre, Cal-Maine, Moark, and Wabash Valley, but no other egg producers. Instead, Dr. Baye's model creates damages estimates for a conspiracy that the jury rejected, by generating damages for a conspiracy that includes all Certified egg producers. Further, Dr. Baye's models prove no damages with respect to the short-term measures (early slaughter, early molting, and flock reduction) and exports of eggs through USEM. Dr. Baye has no analysis supporting the conspiracy and injury period found by the jury, and thus Dr. Baye's opinions are invalid, irrelevant, and cannot support Plaintiffs' theory of damages as a matter of law.

> B. **Plaintiffs have not shown the alleged anticompetitive conduct of Defendants caused injury and associated damages on egg products.**

Additionally, Plaintiffs failed to present evidence that the purported conspiracy caused an increase in the price of *egg products*. Dr. Baye did not analyze the supply effects of the alleged conspirators' purportedly unlawful actions on egg products. Instead, he assumed that if there was

---

[32] Rose Acre incorporates by reference as if restated herein the Motion to Exclude or Limit Testimony of Plaintiffs' Witness Dr. Michael Baye on Damages (ECF No. 565) and associated Memorandum in Support (ECF No. 566).

13

conspiratorial conduct affecting the supply of shell eggs, it must have also affected the supply of eggs used to make egg products, which then purportedly caused egg product prices to increase:

> Q. Now I'd like to turn to the egg product market. Now, it's -- I believe it's your opinion that the reductions in total supply of eggs led to price increases for egg products, correct?
>
> A. That's correct.
>
> Q. Okay. And I believe you theorized that if there were fewer eggs overall, there must be fewer eggs to process into egg products, correct?
>
> A. It's what you might expect, yes.[33]

But most of the egg products sold to Plaintiffs were made with eggs produced by non-defendants and non-conspiring producers.[34] Michael Foods, a non-conspiring producer, was one of the largest suppliers of egg products to the Plaintiffs.[35] Additionally, Dr. Baye failed to support his assumption that a reduction in total egg supply necessarily means that the supply of eggs destined for egg products decreased, causing the prices of egg products to rise.[36]

At trial, Dr. Baye confirmed he relied on data regarding "production of *all* eggs for human consumption," including shell eggs produced from cage-free eggs and other specialty eggs.[37] He claims that a reduction in the total supply of eggs led to price increases in egg products as well.[38] But modeling data regarding production of *all* eggs for human consumption in the United States would not allow Dr. Baye to determine whether there was a shortfall in the production of eggs destined for *egg products*, and therefore whether egg product prices increased as a result of the Certified Program. Put differently, Dr. Baye could not say whether the shortfall in egg production he calculated was specifically attributable to egg products. He could only say that, according to his calculations, the entire *combined* category of eggs (commodity eggs, plus specialty eggs, plus

---

[33] Baye, Oct. 31, 2023 2754:4-12.
[34] *See* Baye, Oct. 31, 2023 2756:17-25.
[35] *See* Plaintiffs' Exhibits 739, 740, 743, 745.
[36] Baye, Oct. 31, 2023 2755:5-2756:2.
[37] *Id.* at 2699:24-2700:4.
[38] *Id.* at 2754:4-12.

14

eggs used to make egg products, plus exported eggs)[39] was smaller after August 2005 than it otherwise would have been. Without identifying the purported shortfall in the reduction of eggs to be used for egg products, Plaintiffs have no proof that the Certified Program (let alone the alleged conspiracy) had an effect on egg product prices. Plaintiffs' evidence therefore does not reliably demonstrate that the alleged anticompetitive conduct caused them injury or associated damages.

Assuming for the sake of argument that Plaintiffs met their burden of presenting evidence that Defendants' anticompetitive conduct had an effect on *shell egg* prices, that alone is not sufficient to show the conduct had an effect on *egg product* prices. Showing that anticompetitive conduct caused an effect on a related product is not sufficient to show the same conduct had an effect on the product at issue. *E.g.*, *Lockformer Co. v. PPG Indus.*, No. 99C6799, 2000 U.S. Dist. LEXIS 22730, at *12-13 (N.D. Ill. Sept. 27, 2000) (dismissal of complaint was granted where the injury alleged was in a different, albeit related, market than the alleged antitrust violations); *see also Rozema v. Marshfield Clinic*, 1997 U.S. Dist. LEXIS 8261, *24-25 (W.D. Wis. Mar. 10, 1997) (citing *Stamatakis Indus. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)) ("plaintiffs must show that their injury results from defendants' acts that reduce output or raise prices in the relevant market.").

Based on the evidence presented, no reasonable jury could find the factual predicates to support causation, injury, and damages.

### III. Conclusion

For the reasons set forth above, Defendant Rose Acre Farms, Inc. respectfully asks that the Court enter judgment in Rose Acre's favor as a matter of law with respect to Plaintiffs' claims.

---

[39] *See* Baye, Oct. 31, 2023 2699:24-2700:4.

Dated: November 29, 2023	Respectfully submitted,

*/s/ Jay L. Levine*
Donald M. Barnes (dbarnes@porterwright.com)
Jay L. Levine (jlevine@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
2020 K. Street, N.W., Suite 600
Washington, D.C. 20006-1110
Tel: (202) 778-3000

James A. King (jking@porterwright.com)
Eric B. Gallon (egallon@porterwright.com)
  (pro hac vice)
Allen T. Carter (acarter@porterwright.com)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Tel: (614) 227-2000

**Counsel for Defendant Rose Acre Farms, Inc.**